**Hearing Date and Time:  March 18, 2010 at 10:00 a.m. (prevailing Eastern time)**
**Supplemental Response Date and Time:  March 16, 2010 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler


   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti

Attorneys for DPH Holdings Corp., et al.,
   Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -   -   x
                                                         :
        In re                                            :      Chapter 11
                                                         :
DPH HOLDINGS CORP., et al.,                              :      Case Number 05-44481 (RDD)
                                                         :
                                                         :      (Jointly Administered)
                                                         :
              Reorganized Debtors.                       :
                                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

REORGANIZED DEBTORS' SUPPLEMENTAL REPLY TO RESPONSES OF CERTAIN
CLAIMANTS TO DEBTORS' OBJECTIONS TO (A) PROOFS OF CLAIM
NOS. 10959 AND 10960  FILED BY HERAEUS AMERSIL, INC.
A/K/A HERAEUS TENEVO AND (B) PROOFS OF CLAIM NOS. 11643 AND 11644
<u>FILED BY MILLIKEN & COMPANY</u>

("SUPPLEMENTAL REPLY REGARDING MERCURY REFINING SITE CLAIMS")

DPH Holdings Corp. and certain of its affiliated reorganized debtors in the above-captioned cases (together with DPH Holdings Corp., the "Reorganized Debtors") hereby submit the Reorganized Debtors' Supplemental Reply To Responses Of Certain Claimants To Debtors' Objections To  (A) Proofs Of Claim Nos. 10959 And 10960  Filed By Heraeus Amersil, Inc. A/K/A Heraeus Tenevo And (B) Proofs Of Claim Nos. 11643 And 11644 Filed By Milliken & Company (the "Supplemental Reply"), and respectfully represent as follows:

A.    Preliminary Statement

1.    On October 8 and 14, 2005, Delphi Corporation and certain of its affiliates (the "Debtors"), predecessors of the Reorganized Debtors, filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").

2.    On October 6, 2009, the Debtors substantially consummated the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified (the "Modified Plan"), which had been approved by this Court pursuant to an order entered on July 30, 2009 (Docket No. 18707), and emerged from chapter 11 as the Reorganized Debtors.

3.    On February 18, 2010, the Reorganized Debtors filed the Notice Of Sufficiency Hearing With Respect To Debtors' Objection To Proofs Of Claim Nos. 6991, 7054, 9221, 10830, 10959, 10960, 11375, 11643, 11644, 11892, 11911, 11983, 11985, 11988, 11989, 12147, 12833, 13776, 13881, 14019, 14020, 14022, 14023, 14024, 14025, 14026, 14370, 14825, 14826, 16967, 18265, 18422, 18603, 18614, 19162, 19543, And 19545 (Docket No. 19504) (the "Sufficiency Hearing Notice").

4.    The Reorganized Debtors filed the Sufficiency Hearing Notice and are filing this Supplemental Reply to implement Article 9.6(a) of the Modified Plan, which provides

2

that "[t]he Reorganized Debtors shall retain responsibility for administering, disputing, objecting

to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors and

making distributions (if any) with respect to all Claims and Interests …."  Modified Plan, art.

9.6(a).

     5.    By the Sufficiency Hearing Notice and pursuant to the Order Pursuant To

11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014

Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices

And Procedures Governing Objections To Claims, entered December 7, 2006 (Docket No. 6089)

(the "Claims Objection Procedures Order") and the Ninth Supplemental Order Pursuant To 11

U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014

Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices

And Procedures Governing Objections To Claims, entered December 11, 2009 (Docket No.

19176), the Reorganized Debtors scheduled a hearing (the "Sufficiency Hearing") on March 18,

2010 at 10:00 a.m. (prevailing Eastern time) in this Court to address the legal sufficiency of each

proof of claim filed by the claimants listed on Exhibit A to the Sufficiency Hearing Notice and

whether each such proof of claim states a colorable claim against the asserted Debtor.

     6.    This Supplemental Reply is filed pursuant to paragraph 9(b)(i) of the

Claims Objection Procedures Order.  <u>Pursuant to paragraph 9(b)(ii) of the Claims Objection</u>

<u>Procedures Order, if a Claimant wishes to file a supplemental pleading in response to this</u>

<u>Supplemental Reply, the Claimant shall file and serve its response no later than two business</u>

<u>days before the scheduled Sufficiency Hearing – i.e., by</u> **March 16, 2010.**

B.    <u>Relief Requested</u>

     7.    By this Supplemental Reply, the Reorganized Debtors request entry of an

order disallowing and expunging proofs of claim filed by Heraeus Amersil, Inc. A/K/A Heraeus

Tenevo ("Heraeus") and Milliken & Company ("Milliken") for contribution to response costs that Heraeus and Milliken may incur in connection with the environmental investigation and remediation of the Mercury Refining Superfund Site, located at 26 Railroad Ave., Albany County, Colonie, New York (the "Site").

C.      Heraeus's and Milliken's Claims

8.      During their review of the proofs of claim filed in these cases, the Debtors determined that proofs of claim numbers 10959 and 10960 filed by Heraeus and proofs of claim numbers 11643 and 1164 filed by Milliken assert liabilities that are not owing pursuant to the Reorganized Debtors' books and records.  The Debtors believe that neither Heraeus nor Milliken is a creditor of the Debtors with respect to the Site.  Accordingly, this Court should enter an order disallowing and expunging each of the Mercury Refining Site Claims.

9.      The Mercury Refining Site Claims Filed Against The Debtors.  On July 26, 2006, Heraeus filed proof of claim number 10959 against Delphi Automotive Systems LLC ("DAS LLC"), a Debtor in these cases, and proof of claim number 10960 against Delphi Corporation, with each proof of claim asserting contingent, unliquidated and undetermined amounts for contribution under the federal Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, *et seq.* ("CERCLA") for response costs that Heraeus may incur at the Site.

10.      On July 26, 2006, Milliken filed proof of claim number 11644 against DAS LLC and proof of claim number 11643 against Delphi Corporation (together with proofs of claim numbers 10959 and 10960, the "Mercury Refining Site Claims"), with each proof of claim asserting contingent, unliquidated and undetermined amounts for contribution under CERCLA for response costs that Milliken may incur at the Site.

4

11.     <u>The Debtors' Objection To The Mercury Refining Site Claims</u>.  On

October 31, 2006, the Debtors filed the Debtors' (I) Third Omnibus Objection (Substantive)

Pursuant to 11 U.S.C. § 502(b) And Fed.R.Bankr.P. 3007 To Certain (A) Claims With

Insufficient Documentation, (B) Claims Unsubstantiated By Debtors' Books And Records, And

(C) Claims Subject To Modification And (II) Motion To Estimate Contingent And Unliquidated

Claims Pursuant To 11 U.S.C. § 502(c) (Docket No. 5452) (the "Third Omnibus Claims

Objection"), by which the Debtors objected to proofs of claim numbers 10959, 10960, 11643,

and 11644 as unsubstantiated claims for which the Debtors are not liable and sought an order

disallowing and expunging each of those proofs of claim.

12.     <u>Heraeus's and Milliken's Responses To The Debtors' Objections</u>.  On

November 21, 2006, Heraeus filed the Response To Debtors' Second Omnibus Objection to

Claims And Third Omnibus Claims Objection To Claims (Docket No. 5652) (the "Heraeus

Response"), in which Heraeus asserted that, to the extent that Heraeus was found liable at the

Site or claims were asserted against Heraeus in connection with, then it "may hold statutory and

common law rights to contribution against the Debtors."  <u>See</u> Heraeus Response at ¶ 5.

13.     On November 21, 2006, Milliken filed the Response In Opposition To

Debtors' Third Omnibus Claims Objection (Substantive) Pursuant to 11 U.S.C. § 502(b) and

Fed. R. Bankr. P. 3007 (Docket No. 5640) (the "Milliken Response"), in which Milliken asserted

that it had no knowledge or information regarding the Debtors' liability to Milliken but had

protectively filed a proof of claim because Milliken was listed on the Debtors' schedules of assets

and liabilities.  <u>See</u> Milliken Response at ¶ 7.

14.     <u>The Sufficiency Hearing Notice</u>.  Pursuant to the Claims Objection

Procedures Order, the hearing on the Mercury Refining Site Claims was adjourned to a future

date.  On February 18, 2010, the Reorganized Debtors filed the Sufficiency Hearing Notice with

respect to the Mercury Refining Site Claims, among other proofs of claim, scheduling the

Sufficiency Hearing.

D.    Claimants' Burden Of Proof And Standard For Sufficiency Of Claim

15.    The Reorganized Debtors respectfully submit that the Proofs of Claim fail

to state a claim against the Debtors under rule 7012 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules").  The claimants asserting the Mercury Refining Site Claims

have not proved any facts to support a right to payment by the Reorganized Debtors on behalf of

the Debtors.  Accordingly, the Debtors' objections to each Mercury Refining Site Claim should

be sustained with respect to such proofs of claim and each Mercury Refining Site Claim should

be disallowed and expunged in its entirety.

16.    The burden of proof to establish a claim against the Debtors rests on the

claimants and, if a proof of claim does not include sufficient factual support, such proof of claim

is not entitled to a presumption of prima facie validity pursuant to Bankruptcy Rule 3001(f).  In

re Spiegel, Inc., No. 03-11540, 2007 WL 2456626, at *15 (Bankr. S.D.N.Y. August 22, 2007)

(the claimant always bears the burden of persuasion and must initially allege facts sufficient to

support the claim); see also In re WorldCom, Inc., No. 02-13533, 2005 WL 3832065, at *4

(Bankr. S.D.N.Y. Dec. 29, 2005) (only a claim that alleges facts sufficient to support legal

liability to claimant satisfies claimant's initial obligation to file substantiated proof of claim); In

re Allegheny Intern., Inc., 954 F.2d 167, 173 (3d Cir. 1992) (in its initial proof of claim filing,

claimant must allege facts sufficient to support claim); In re Chiro Plus, Inc., 339 B.R. 111, 113

(Bankr. D.N.J. 2006) (claimant bears initial burden of sufficiently alleging claim and establishing

facts to support legal liability); In re Armstrong Finishing, L.L.C., No. 99-11576-C11, 2001 WL

1700029, at *2 (Bankr. M.D.N.C. May 2, 2001) (only when claimant alleges facts sufficient to

6

support its proof of claim is it entitled to have claim considered prima facie valid); In re United

Cos. Fin. Corp., 267 B.R. 524, 527 (Bankr. D. Del. 2000) (claimant must allege facts sufficient

to support legal basis to make prima facie case).

17.    For purposes of sufficiency, this Court has determined that the standard of

whether a claimant has met its initial burden of proof to establish a claim should be similar to the

standard employed by courts in deciding a motion to dismiss under Bankruptcy Rules 7012 and

9014.  See Transcript of January 12, 2007 Hearing (Docket No. 7118) (the "January 12, 2007

Transcript") at 52:24-53:1.  Pursuant to that standard, a motion to dismiss should be granted "if it

plainly appears that the nonmovant 'can prove no set of facts in support of his claim which would

entitle him to relief.'"  In re Lopes, 339 B.R. 82, 86 (Bankr. S.D.N.Y. 2006) (quoting Conley v.

Gibson, 355 U.S. 41, 45-46 (1957)).  Essentially, the claimant must provide facts that sufficiently

support a legal liability against the Debtors.

18.    This Court further established that the sufficiency hearing standard is

consistent with Bankruptcy Rule 3001(f), which states that "a proof of claim executed and filed

in accordance with these Rules shall constitute prima facie evidence of the validity and amount

of the claim." Fed. R. Bankr. P. 3001(f) (emphasis added).  Likewise, Bankruptcy Rule 3001(a)

requires that "the proof of claim must be consistent with the official form" and Bankruptcy Rule

3001(c) requires "evidence of a writing if the claim is based on a writing." Fed. R. Bankr. P.

3001(a), (c).  See January 12, 2007 Transcript at 52:17-22.

E.    Argument Regarding The Mercury Refining Site Claims

19.    The Reorganized Debtors Are Not Liable Under CERCLA.  The Mercury

Refining Site Claims assert that Delphi Corporation and DAS LLC are liable parties under

CERCLA for contamination at the Site.  However, nothing in the Mercury Refining Site Claims,

the Heraeus Response, or the Milliken Response proves such liability.  Indeed, both the Heraeus

Response and the Milliken Response concede that the claimants have no information regarding the Debtors' alleged liability at the Site.  See Heraeus Response at ¶ 5; Milliken Response at ¶ 7. On the basis of this concession alone, the Mercury Refining Site Claims should be disallowed.

20.    Moreover, the claims should be disallowed and expunged because, as described in more detail below, neither Delphi Corporation nor DAS LLC existed at the time the Site operated as a landfill, and therefore these entities have no statutory liability for contamination at the Site under CERCLA.  CERCLA imposes liability on four classes of potentially responsible parties ("PRPs"): (a) the current owner or operator of a contaminated site; (b) anyone who owned or operated the contaminated site at the time hazardous substances were disposed of; (c) any person who arranged for the disposal of any hazardous substances at the contaminated site; and (d) any person who transported any hazardous substances to a contaminated site.  See 42 U.S.C. § 9607(a).

21.    Neither Delphi Corporation nor DAS LLC has ever had any ownership interest in the Site, nor has either entity ever operated the Site.  Accordingly, any liability under CERCLA would have to arise because Delphi Corporation or DAS LLC arranged for the disposal of hazardous substances or transported hazardous substances for disposal at the Site. However, such liability is impossible because the landfill at the Site ceased accepting wastes for disposal and stopped operations in 1998, at which point neither Delphi Corporation nor DAS LLC held any assets or conducted any operations.  See In re Mercury Refining Superfund Site, Administrative Order on Consent, EPA Docket No. CERCLA-02-2006-2003 at ¶ 6, attached hereto as Exhibit A.[1]  Both Delphi Corporation and DAS LLC were formed as part of the

---

[1]    This Court may take judicial notice of the corporate documents included as exhibits to this brief.  Judicial notice is permitted for facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned."  Fed.R.Evid. 201.  Under this standard, courts may take judicial notice of the
*(cont'd)*

divestiture by General Motors Corporation ("General Motors") of its Delphi Automotive

Systems unit (the "Divestiture").  Specifically, General Motors formed DAS LLC and

incorporated Delphi Automotive Systems Corporation on September 16, 1998.  <u>See</u> Certificate of

Formation of Delphi Automotive Systems, attached hereto as <u>Exhibit B</u>; Certificate of

Incorporation of Delphi Automotive Systems Corporation, attached hereto as <u>Exhibit C</u>.  Delphi

Automotive Systems Corporation later changed its name to Delphi Corporation.  <u>See</u> Certificate

of Ownership and Merger, attached hereto as <u>Exhibit D</u>.  General Motors then transferred the

assets that had previously been a part of its Delphi Automotive Systems unit to these newly

formed entities to effectuate the Divestiture.  <u>See</u> Master Separation Agreement Among General

Motors Corporation, Delphi Automotive Systems Corporation, Delphi Automotive Systems,

LLC, Delphi Technologies, Inc. and Delphi Automotive Systems (Holding), Inc., at Recitals, §

2.01,  attached hereto as <u>Exhibit E</u> (the "Master Separation Agreement").

       22.    The Master Separation Agreement contemplated that General Motors and

Delphi Corporation would enter into certain ancillary agreements to further effect the Divestiture.

<u>Id</u>. at Art. 3.  One such agreement was the Environmental Matters Agreement by and between

General Motors Corporation and Delphi Automotive Systems Corporation (the "EMA"), which

addressed the assumption and retention of environmental liabilities between General Motors and

---

*(cont'd from previous page)*

    "records of various public or quasi-public bodies."  <u>In re Enron Corp.</u>, 323 B.R. 857, 869 (Bankr. S.D.N.Y. 2005).  First, the Administrative Order on Consent attached as <u>Exhibit  A</u> is from an administrative proceeding and therefore is appropriate for judicial notice.  Furthermore, the Certificate of Formation, Articles of Incorporation and Certificate of Ownership attached as <u>Exhibits B-D</u> are from the Secretary of the State of Delaware and therefore clearly meet this standard.  Furthermore, the Master Separation Agreement, attached hereto as <u>Exhibit E</u>, and the Environmental Matters Agreement, attached hereto as <u>Exhibit F</u>, are from filings with Securities and Exchange Commission, which have been recognized as matters of which a court may take judicial notice.  <u>Id</u>.; <u>see also</u> <u>Kramer v. Time Warner, Inc.</u>, 937 F.2d 767, 774 (2d Cir. 1991) ("[A] district court may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC as facts 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'")

Delphi.  See EMA attached hereto as Exhibit F.  The EMA was the sole agreement governing the

assumption of environmental liabilities under the Divestiture.  See Master Separation Agreement

at § 3(b) ("to the extent that any Ancillary Agreement expressly addresses any matters addressed

by this Agreement, including without limitation, matters covered by Article 2 and Article 5

hereof [assumption of liabilities], the terms and conditions of such Ancillary Agreement shall

govern the rights and obligations of the parties with respect to such matters."); see also Master

Separation Agreement at § 2.03(a) ("To the extent that the transfer of any Delphi Asset or the

assumption of any Delphi Liability is expressly provided for by the terms of an Ancillary

Agreement, the terms of such Ancillary Agreement shall determine the method of the transfer or

the assumption.").  As part of the Modified Plan, the EMA was terminated, and therefore the

EMA cannot be used to support an argument that DAS LLC or Delphi Corporation assumed any

environmental liabilities arising from General Motors' operation of the Delphi Automotive

Systems unit prior to the Divestiture, including any liabilities at the Site.  See Modified Plan at

Exhibit 7.7, § 9.19.1(C); see also Nat'l Labor Relations Bd. v. Cone Mills Corp., 373 F.2d 595,

598 (5th Cir. 1967) ("It is axiomatic in contract law that parties to an agreement are relieved of

their mutual obligations upon termination of the agreement. Restatement, Contracts § 386.").

Accordingly, any liability for wastes that were sent to the Site for disposal from any assets

related to General Motors' Delphi Automotive business unit would be General Motors' liabilities,

not the Reorganized Debtors.

       23.    Disallowance Pursuant To Section 502(e)(1)(B) Of The Bankruptcy Code.

In addition, the Reorganized Debtors request that this Court enter an order disallowing and

expunging the Mercury Refining Site Claims pursuant to section 502(e)(1)(B) of the Bankruptcy

Code.  Section 502(e)(1)(B) of the Bankruptcy Code provides that a bankruptcy court is to

disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on

or has secured the claim of a creditor to the extent that "such claim for reimbursement or

contribution is contingent as of the time of allowance or disallowance of such claim for

reimbursement or contribution." 11 U.S.C. § 502(e)(1)(B). See, e.g., Aetna Cas. & Sur. Co. v.

Georgia Tubing Corp., 93 F.3d 56 (2d Cir. 1996) (disallowing surety bond issuer's contingent

prospective subrogation claims as to bonds issued on behalf of debtor); In re Agway, Inc., No.

02-65872, 2008 WL 2827439, at *3  (Bankr. N.D.N.Y. July 18, 2008) (section 502(e)(1)(B)

directs that the court "shall disallow" any claim for reimbursement or contribution to the extent

that such claim is contingent at the time of disallowance).  Section 502(e)(1)(B) of the

Bankruptcy Code has been applied to claims for environmental cleanup costs brought by private

parties who are themselves liable under CERCLA.  See In re Charter Co., 862 F.2d 1500 (11th

Cir. 1989) (claims by PRPs to recover environmental cleanup costs arising under theories of

contribution, reimbursement and indemnification disallowed under section 502(e)(1)(B)); In re

Hexcel, 174 B.R. 807, 813 (Bankr. N.D. Cal. 1994) (disallowing claims for environmental

cleanup costs by co-liable parties).

       24.     As set forth in both the Heraeus Response and Milliken Response, the

liability of the Reorganized Debtors is contingent upon the claimants themselves being held

liable for contamination at the Site.  See Heraeus Response at ¶ 5; Milliken Response at ¶  3.

Accordingly, even if the Reorganized Debtors were liable at the Site under CERCLA, the

Mercury Refining Site Claims should be disallowed and expunged in their entirety pursuant to

under section 502(e)(1)(B) of the Bankruptcy Code.

       25.     Neither Heraeus nor Milliken has proved any set of facts that support a

right to payment from the Reorganized Debtors.  Accordingly, the Reorganized Debtors assert

that (a) those claimants have not met their burden of proof to establish a claim against the

Debtors, (b) the Mercury Refining Site Claims are not entitled to a presumption of prima facie

validity pursuant to Bankruptcy Rule 3001(f), and (c) the Mercury Refining Site Claims fail to

state a claim against the Reorganized Debtors under Bankruptcy Rule 7012.  Because the

claimants asserting the Mercury Refining Site Claims cannot provide facts or law supporting

their claims, the Third Omnibus Claims Objection should be sustained as to each Mercury

Refining Site Claim and each such claim should be disallowed and expunged in its entirety.

WHEREFORE the Reorganized Debtors respectfully request this Court enter an

order (a) sustaining the Reorganized Debtors' objections with respect to the Mercury Refining

Site Claims, (b) disallowing and expunging each Mercury Refining Site Claim in its entirety, and

(c) granting such further and other relief this Court deems just and proper.

Dated:    New York, New York
          March 8, 2010

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:   /s/ John Wm. Butler, Jr.
      John Wm. Butler, Jr.
      John K. Lyons
      Ron E. Meisler
155 North Wacker Drive
Chicago, Illinois 60606

- and -

By:   /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti
Four Times Square
New York, New York 10036

Attorneys for DPH Holdings Corp., et al.,
  Reorganized Debtors

**EXHIBIT A**

**<u>In re Mercury Refining Superfund Site</u>, Administrative Order on Consent,
EPA Docket No. CERCLA-02-2006-2003**

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION II

```
----------------------------------------------------------x
                                                          )
IN THE MATTER OF:                                         )        U.S. EPA Docket No.
                                                          )        CERCLA-02-2006-2003
MERCURY REFINING SUPERFUND SITE )
Towns of Guilderland and Colonie, New York                )        ADMINISTRATIVE ORDER
                                                          )        ON CONSENT
Proceeding under Section 122(g)(4)          )
of the Comprehensive Environmental                        )
Response, Compensation, and                               )
Liability Act of 1980, as amended,                        )
42 U.S.C. 9622(g)(4).                                     )
                                                          )
----------------------------------------------------------x
```

## I. **JURISDICTION**

1.  This Administrative Order on Consent ("Consent Order" or "Order") is issued pursuant to the authority vested in the President of the United States by Section 122(g)(4) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9622(g)(4), to reach settlements in actions under Section 106 or 107 of CERCLA, 42 U.S.C. §§ 9606 or 9607.  The authority vested in the President has been delegated to the Administrator of the United States Environmental Protection Agency ("EPA") by Executive Order 12580, 52 Fed. Reg. 2923 (Jan. 29, 1987).  This authority was further delegated to the EPA Regional Administrators by EPA Delegation Nos. 14-14-C and 14-14-D and redelegated within Region II to the Director of the Emergency and Remedial Response Division by Regional order No. R-1200, dated November 23, 2004.

2.  This Administrative Order on Consent is issued to the persons, corporations, or other entities identified in Appendix A ("Respondents").  Each Respondent agrees to undertake all actions required by this Consent Order.  Each Respondent further consents to and will not contest EPA's jurisdiction to issue this Consent Order or to implement or enforce its terms.

3.  EPA and Respondents agree that the actions undertaken by Respondents in accordance with this Consent Order do not constitute an admission of any liability by any Respondent.  Respondents do not admit, and retain the right to controvert in any subsequent proceedings other than proceedings to implement or enforce this Consent Order, the validity of the Statement of Facts or Determinations contained in Sections IV and V, respectively, of this Consent Order.

2

## II.  STATEMENT OF PURPOSE

4.  By entering into this Consent Order, the mutual objectives of the Parties are:

a.  to reach a final settlement among the Parties with respect to the Site pursuant to Section 122(g) of CERCLA, 42 U.S.C. § 9622(g), that allows Respondents to make a cash payment, including a premium, to resolve their alleged civil liability under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607, for injunctive relief with regard to the Site and for response costs incurred and to be incurred at or in connection with the Site, and the claims of the Respondents which have been or could have been asserted against the United States with respect to this Site, thereby reducing litigation relating to the Site;

b.  to simplify any remaining administrative and judicial enforcement activities concerning the Site by eliminating a substantial number of potentially responsible parties from further involvement at the Site; and

c.  to obtain settlement with Respondents for their fair share of response costs incurred and to be incurred at or in connection with the Site by the EPA Hazardous Substance Superfund, and by other persons, and to provide for full and complete contribution protection for Respondents with regard to the Site pursuant to Sections 113(f)(2) and 122(g)(5) of CERCLA, 42 U.S.C. §§ 9613(f)(2) and 9622(g)(5).

## III.  DEFINITIONS

5.  Unless otherwise expressly provided herein, terms used in this Consent Order that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in the statute or regulations.  Whenever the terms listed below are used in this Consent Order, the following definitions shall apply:

a.  "CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601, *et seq*.

b.  "Consent Order" or "Order" shall mean this Administrative Order on Consent and all appendices attached hereto.  In the event of conflict between this Order and any appendix, the Order shall control.

c.  "Day" shall mean a calendar day.  In computing any period of time under this Consent Order, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next working day.

d.  "EPA" shall mean the United States Environmental Protection Agency and any successor departments, agencies or instrumentalities.

e.  "EPA Hazardous Substance Superfund" shall mean the Hazardous Substance

3

Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

f. "Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year.

g. "Paragraph" shall mean a portion of this Consent Order identified by an Arabic numeral.

h. "Parties" shall mean EPA and the Respondents.

i. "Respondents" shall mean those individuals, corporations, or other entities listed in Appendix A.

j. "Response costs" shall mean all costs of "response" as that term is defined by Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).

k. "Section" shall mean a portion of this Consent Order identified by a Roman numeral.

l. "Site" shall mean the Mercury Refining Superfund Site, which includes the property known as 26 Railroad Avenue located on the border of the Towns of Guilderland and Colonie, Albany County, New York and is generally shown on the map attached as Appendix B.

m. "Tracked Waste" shall mean all hazardous substance-containing materials sent or brought to the Site for treatment or disposal, other than batteries.

n. "United States" shall mean the United States of America, including its departments, agencies and instrumentalities.

## IV. **STATEMENT OF FACTS**

6. The Mercury Refining Site was operated by Mercury Refining Company, Inc. ("Mereco") from the late-1950's until 1998 as a mercury reclamation facility. During this time, special "retort" ovens were used to heat mercury-bearing materials to recover mercury, which was then further processed and refined on the Site before being sold. EPA has catalogued over 7,200,000 pounds of material which was sent to the Site for mercury reclamation.

7. Mercury, which is a hazardous substance as that term is defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), has been released at or from the Site, and there is a threat of further such releases into the environment. In the course of Site processing operations, air emissions, discharges of mercury-containing wastes into a storm sewer, dumping of mercury-containing residues from the retort process, other sloppy materials handling, and a fire, caused

4

mercury to be released onto the soils and into groundwater and surface water at the Site.

8.    From 1983, when the Site was placed on the National Priorites List, through November 1999, the lead agency with respect to the planning and implementation of response actions at the Site under the National Contingency Plan, 40 CFR Part 300, was the New York State Department of Environmental Conservation ("NYSDEC").  In November 1999 NYSDEC requested that EPA take over the lead in the remediation of the Site under the Superfund program.

9.    As a result of the release or threatened release of hazardous substances, EPA has undertaken response actions at or in connection with the Site under Section 104 of CERCLA, 42 U.S.C. § 9604, and will undertake response actions in the future.  Such response actions have included the performance of a Remedial Investigation/Feasibility Study and a responsible party search.

10.  In performing these response actions, EPA has incurred  and will continue to incur response costs at or in connection with the Site.  As of February 28, 2005, EPA has incurred and paid approximately $4,050,663.37 in response costs.

11.  In accordance with a 2003 settlement, EPA collected $497,389.80 from Mereco and is currently collecting, pursuant to a payment plan, $30,000 plus Interest, from Leo Cohen, the owner and founder of Mereco.  This settlement was based on Mereco's and Leo Cohen's ability to pay.

12.  Each Respondent arranged for disposal or treatment at the Site, or arranged with a transporter for transport for disposal or treatment at the Site, of a hazardous substance owned or possessed by such Respondent.

13.  The amount of Tracked Waste contributed to the Site by each Respondent is less than 1.0% of the total amount of Tracked Waste contributed to the Site by persons or entities whom EPA has been  able to locate.  In addition, the amount of hazardous substances contributed to the Site by each Respondent is less than 1% of the total amount of hazardous substances at the Site. The hazardous substances contributed by each Respondent to the Site are not significantly more toxic or of significantly greater hazardous effect than other hazardous substances at the Site.  The amount of  Tracked Waste contributed to the Site by each Respondent is listed on Appendix C.

14.  EPA estimates that the total response costs incurred and to be incurred at or in connection with the Site by the EPA Hazardous Substance Superfund and by other persons is between approximately $7,600,000 and $12,600,000.  The payment required to be made by each Respondent pursuant to this Consent Order is a minor portion of this total amount.

## V.  DETERMINATIONS

15.  Based upon the Statement of Facts set forth above and on the administrative record for this Site, EPA has determined that:

a.  The Mercury Refining Superfund Site is a "facility" as that term is defined in

5

Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

b. Each Respondent is a "person" as that term is defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

c. Each Respondent is a "potentially responsible party" within the meaning of Section 122(g)(1) of CERCLA, 42 U.S.C. § 9622(g)(1).

d. There has been an actual or threatened "release" of a "hazardous substance" from the Site as those terms are defined in Section 101(22) and (14) of CERCLA, 42 U.S.C. § 9601(22) and (14).

e. The actual or threatened "release" caused the incurrence of response costs.

f. Prompt settlement with each Respondent is practicable and in the public interest within the meaning of Section 122(g)(1) of CERCLA, 42 U.S.C. § 9622(g)(1).

g. As to each Respondent, this Consent Order involves only a minor portion of the response costs at the Site within the meaning of Section 122(g)(1) of CERCLA, 42 U.S.C. § 9622(g)(1).

h. The amount of hazardous substances contributed to the Site by each Respondent and the toxic or other hazardous effects of the hazardous substances contributed to the Site by each Respondent are minimal in comparison to other hazardous substances at the Site within the meaning of Section 122(g)(1)(A) of CERCLA, 42 U.S.C. § 9622(g)(1)(A).

## VI. **ORDER**

16. Based upon the administrative record for the Site and the Statement of Facts and Determinations set forth above, and in consideration of the promises and covenants set forth herein, the following is hereby AGREED TO AND ORDERED:

## VII. **PAYMENT**

17. Within 30 days after the effective date of this Consent Order, each Respondent shall pay to the EPA Hazardous Substance Superfund the amount set forth for such Respondent in Appendix C to this Consent Order.

18. Each Respondent's payment includes an amount for: a) past response costs incurred at or in connection with the Site; b) projected future response costs to be incurred at or in connection with the Site; and c) a premium to cover the risks and uncertainties associated with this settlement, including but not limited to, the risk that total response costs incurred or to be incurred at or in connection with the Site by the EPA Hazardous Substance Superfund, or by any other person, will exceed the estimated total response costs upon which Respondents' payments are based.

6

19.  Each payment shall be made by certified or cashier's check made payable to "EPA Hazardous Substance Superfund."  Each check, or a letter accompanying each check, shall identify the name and address of the party making payment, the Mercury Refining Superfund Site, EPA Region 2 and Site Spill ID Number 0276, and the EPA docket number for this action, and shall be sent to:

>  USEPA - Region II
>  Hazardous Substance Superfund
>  P.O. Box 360188M
>  Pittsburgh, PA 15251

The total amount to be paid by Respondents pursuant to Paragraph 17 shall be deposited by EPA in the Mercury Refining Site Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

20.  At the time of payment, each Respondent shall send notice that such payment has been made to:

>  Sharon E. Kivowitz
>  Mercury Refining Site Attorney
>  Office of Regional Counsel
>  U.S. Environmental Protection Agency
>  290 Broadway, 17th Floor
>  New York, NY 10007

>  and

>  Financial Management Officer
>  U.S. EPA, Region II
>  290 Broadway, 29th Floor
>  New York, NY 10007-1866

## VIII.  FAILURE TO MAKE PAYMENT

21.  If any Respondent fails to make full payment within the time required by Paragraph 17, that Respondent shall pay Interest on the unpaid balance.  In addition, if any Respondent fails to make full payment as required by Paragraph 17, the United States may, in addition to any other available remedies or sanctions, bring an action against that Respondent seeking injunctive relief to compel payment and/or seeking civil penalties under Section 122(i) of CERCLA, 42 U.S.C. § 9622(i), for failure to make timely payment.

7

## IX.  CERTIFICATION OF RESPONDENT

22.  By signing this Consent Order, each Respondent certifies, individually, that, to the best of its knowledge and belief, it:

a.  has conducted a thorough, comprehensive, good faith search for documents, and has fully and accurately disclosed to EPA, all information currently in its possession, or in the possession of its officers, directors, employees, contractors or agents, which relates in any way to the ownership, operation, or control of the Site, or to the ownership, possession, generation, treatment, transportation, storage or disposal of a hazardous substance, pollutant, or contaminant at or in connection with the Site;

b.  has not altered, mutilated, discarded, destroyed or otherwise disposed of any records, documents, or other information relating to its potential liability regarding the Site after notification of potential liability or the filing of a suit against it regarding the Site; and

c.  has and will comply fully with any and all EPA requests for information regarding the Site pursuant to Sections 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e).

## X.  COVENANT NOT TO SUE BY UNITED STATES

23.  In consideration of the payments that will be made by Respondents under the terms of this Consent Order, and except as specifically provided in Section XI (Reservations of Rights by United States), the United States covenants not to sue or take administrative action against any of the Respondents pursuant to Sections 106 or 107 of CERCLA, 42 U.S.C. §§ 9606 or 9607, relating to the Site.  With respect to present and future liability, this covenant not to sue shall take effect for each Respondent upon receipt of that Respondent's payment as required by Section VII.  With respect to each Respondent, individually, this covenant not to sue is conditioned upon:  a) the satisfactory performance by Respondent of all obligations under this Consent Order; and b) the veracity of the information provided to EPA by Respondent relating to Respondent's involvement with the Site.  This covenant not to sue extends only to Respondents and does not extend to any other person.

## XI.  RESERVATIONS OF RIGHTS BY UNITED STATES

24.  The United States reserves, and this Consent Order is without prejudice to, all rights against Respondents with respect to all matters not expressly included within the Covenant Not to Sue by United States in Paragraph 23.  Notwithstanding any other provision of this Consent Order, the United States reserves all rights against Respondents with respect to:

a.  liability for failure to meet a requirement of this Consent Order;

8

    b.  criminal liability;

    c.  liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments; or

    d.  liability based upon the ownership or operation of the Site, or upon the transportation, treatment, storage, or disposal, or the arrangement for the transportation, treatment, storage, or disposal of a hazardous substance or a solid waste at or in connection with the Site, after signature of this Consent Order by Respondent.

    25.  Notwithstanding any other provision in this Consent Order, the United States reserves, and this Consent Order is without prejudice to, the right to institute judicial or administrative proceedings against any individual Respondent seeking to compel that Respondent to perform response actions relating to the Site, and/or to reimburse the United States for additional costs of response, if information is discovered which indicates that such Respondent contributed hazardous substances to the Site in such greater amount or of such greater toxic or other hazardous effects that such Respondent no longer qualifies as a *de minimis* party at the Site because such Respondent contributed 1.0% or more  of the total amount of Tracked Waste contributed to the Site by individuals, corporations or other entities whom EPA has been able to locate, or because such Respondent contributed hazardous substances which are significantly more toxic or are of significantly greater hazardous effect than other hazardous substances at the Site.

## XII.  COVENANT NOT TO SUE BY RESPONDENTS

    26.  Respondents covenant not to sue and agree not to assert any claims or causes of action against the United States or its contractors or employees with respect to the Site or this Consent Order including, but not limited to:

    a.  any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund based on Sections 106(b)(2), 107, 111, 112, or 113 of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other provision of law;

    b.  any claim arising out of response actions at or in connection with the Site, including any claim under the United States Constitution, the Constitution of the State of New York, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, as amended, or at common law; and

    c.  any claim against the United States pursuant to Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and 9613, relating to the Site.

    Except as provided in Paragraph 28 (Waiver of Claims) and Paragraph 30 (Waiver of Claim-Splitting Defenses), these covenants not to sue shall not apply in the event the United States brings a cause of action or issues an order pursuant to the reservations set forth in  Paragraph 24 (c) or (d) or Paragraph 25, but only to the extent that Respondents' claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the

9

applicable reservation.

27.  Nothing in this Consent Order shall be deemed to constitute preauthorization or approval of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. 300.700(d).

28.  Respondents agree not to assert any claims or causes of action (including claims for contribution under CERCLA) that they may have for all matters relating to the Site against each other or any other person who is a potentially responsible party under CERCLA at the Site.  This waiver shall not apply with respect to any defense, claim, or cause of action that a Respondent may have against any person if such person asserts or has asserted a claim or cause of action relating to the Site against such Respondent.

## XIII.  EFFECT OF SETTLEMENT/CONTRIBUTION PROTECTION

29.  Except as provided in Paragraph 28 (Waiver of Claims), nothing in this Consent Order shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Consent Order.  Except as provided in Paragraph 28 (Waiver of Claims), the United States and Respondents each reserve any and all rights (including, but not limited to, any right to contribution), defenses, claims, demands, and causes of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto.

30.  In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, recovery of response costs, or other relief  relating to the Site, Respondents shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised in the subsequent proceeding were or should have been brought in the instant action; provided, however, that nothing in this Paragraph affects the enforceability of the covenant not to sue included in Paragraph 23.

31.  The Parties agree that each Respondent is entitled, as of the effective date of this Consent Order, to protection from contribution actions or claims as provided by Sections 113(f)(2) and 122(g)(5) of CERCLA, 42 U.S.C. §§ 9613(f)(2) and 9622(g)(5), for "matters addressed" in this Consent Order.  The "matters addressed" in this Consent Order are all response actions taken or to be taken and all response costs incurred or to be incurred, at or in connection with the Site, by the United States or any other person.  As to each Respondent, the "matters addressed" in this Consent Order do not include those response costs or response actions as to which the United States has reserved its rights under this Consent Order (except for claims for failure to comply with this Consent Order), in the event that the United States asserts rights against such Respondent coming within the scope of such reservations.

## XIV.  PARTIES BOUND

10

32.  This Consent Order shall apply to and be binding upon EPA and upon Respondents and their heirs, successors and assigns.  Any change in ownership or corporate or other legal status of a Respondent, including but not limited to, any transfer of assets or real or personal property, shall in no way alter such Respondent's responsibilities under this Consent Order.  Each signatory to this Consent Order certifies that he or she is authorized to enter into the terms and conditions of this Consent Order and to execute and bind legally the party represented by him or her.

## XV.  INTEGRATION/APPENDICES

33.  This Consent Order and its appendices constitute the final, complete and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Order.  The Parties acknowledge that there are no representations, agreements or understandings relating to the settlement other than those expressly contained in this Consent Order.  The following appendices are attached to and incorporated into this Consent Order:

"Appendix A" is the list of Respondents and addresses.

"Appendix B" is the map of the Site.

"Appendix C" is the list of Respondents and payment amounts.

## XVI.  PUBLIC COMMENT

34.  This Consent Order shall be subject to a public comment period of not less than 30 days pursuant to Section 122(i) of CERCLA, 42 U.S.C. § 9622(i).  In accordance with Section 122(i)(3) of CERCLA, 42 U.S.C. § 9622(i)(3), EPA may withdraw or withhold its consent to this Consent Order if comments received disclose facts or considerations which indicate that this Consent Order is inappropriate, improper, or inadequate.

## XVII.  ATTORNEY GENERAL APPROVAL

35.  This Order is subject to the approval of  the Attorney General or his designee in accordance with Section 122(g)(4) of CERCLA, 42 U.S.C. § 9622(g)(4).

## XVIII.  EFFECTIVE DATE

36.  The effective date of this Consent Order shall be the date upon which EPA issues written notice to Respondents that the public comment period pursuant to Paragraph 34 has closed and that comments received, if any, do not require modification of or EPA withdrawal from this Consent Order.

IT IS SO AGREED AND ORDERED:

11

U.S. Environmental Protection Agency


By: _____          _____

     George Pavlou, Director                                    Date
     Emergency and Remedial Response Division
     Region II

12

THE UNDERSIGNED RESPONDENT enters into this Consent Order in the matter of EPA Docket # CERCLA-02-2006-2003, relating to the Mercury Refining Superfund Site, Towns of Guilderland and Colonie, Albany County, New York:

FOR RESPONDENT: _____
                              Company Name

                  _____
                          Company Address

By: _____
           Printed Name

_____
          Title

_____          _____
          Signature                                    Date

**APPENDIX A**

**APPENDIX  B**

**APPENDIX C**

**EXHIBIT B**

**Certificate of Formation of Delphi Automotive Systems**

# Delaware

*PAGE 1*

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "DPH-DAS LLC" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF FORMATION, FILED THE SIXTEENTH DAY OF SEPTEMBER, A.D. 1998, AT 10:01 O'CLOCK A.M.

CERTIFICATE OF MERGER, FILED THE THIRTIETH DAY OF SEPTEMBER, A.D. 2005, AT 1:16 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF MERGER IS THE THIRTIETH DAY OF SEPTEMBER, A.D. 2005, AT 11:59 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, CHANGING ITS NAME FROM "DELPHI AUTOMOTIVE SYSTEMS LLC" TO "DPH-DAS LLC", FILED THE SIXTH DAY OF OCTOBER, A.D. 2009, AT 12:38 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF AMENDMENT IS THE SIXTH DAY OF OCTOBER, A.D. 2009, AT 11:59 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE

Jeffrey W. Bullock, Secretary of State

2944910   8100H

100002839

*You may verify this certificate online
at corp.delaware.gov/authver.shtml*

AUTHENTICATION: 7734966

DATE: 01-04-10



*PAGE   2*

## The First State

*AFORESAID LIMITED LIABILITY COMPANY, "DPH-DAS LLC".*

*2944910   8100H*

*100002839*

Jeffrey W. Bullock, Secretary of State

*AUTHENTICATION: 7734966*

*DATE: 01-04-10*

# CERTIFICATE OF FORMATION

## OF

## DELPHI AUTOMOTIVE SYSTEMS LLC

This Certificate of Formation of Delphi Automotive Systems LLC has been duly executed and is being filed by the undersigned, as an authorized person, to form a limited liability company under the Delaware Limited Liability Act (6 Del. C. § 18-101. et. seq.).

1.  The name of the limited liability company is Delphi Automotive Systems LLC (the "LLC")

2.  The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

3.  The name and address of the registered agent for service of process on the LLC in the State of Delaware is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation of Delphi Automotive Systems LLC this 16th day of September, 1998

By: _____

Name:      Martin I. Darvick

Its:          Authorized Person

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 10:01 AM 09/16/1998
981358883 – 2944910

**EXHIBIT C**

**Certificate of Incorporation of Delphi Automotive Systems Corporation**

# Delaware

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "DELPHI CORPORATION" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF INCORPORATION, FILED THE SIXTEENTH DAY OF SEPTEMBER, A.D. 1998, AT 10 O'CLOCK A.M.

RESTATED CERTIFICATE, FILED THE TWENTY-SIXTH DAY OF JANUARY, A.D. 1999, AT 4:30 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE SECOND DAY OF FEBRUARY, A.D. 1999, AT 7:30 O'CLOCK A.M.

CERTIFICATE OF OWNERSHIP, CHANGING ITS NAME FROM "DELPHI AUTOMOTIVE SYSTEMS CORPORATION" TO "DELPHI CORPORATION", FILED THE THIRTEENTH DAY OF MARCH, A.D. 2002, AT 3 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID CORPORATION, "DELPHI CORPORATION".

2944832   8100H

090138516

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 7135321

DATE: 02-13-09

# CERTIFICATE OF INCORPORATION
## OF
### DELPHI AUTOMOTIVE SYSTEMS CORPORATION

1.  The name of the corporation is Delphi Automotive Systems Corporation

2.  The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. the name of its registered agent at such address is The Corporation Trust Company.

3.  The nature of the business or purposes to be conducted or promoted to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

4.  The total number of shares of stock which the corporation shall have authority to issue is one hundred (100) and the par value of each of such shares is ten cents ($0.10) amounting in the aggregate to ten dollars ($10.00).

5.  The board of directors is authorized to make, alter or repeal the bylaws of the corporation. Election of directors need not be by written ballot.

6.  The name and mailing address of the sole incorporation is:

Barbara A. Lister
General Motors Corporation
3031 West Grand Boulevard
Mail Code 482-208-840
Detroit, Michigan 48232

I, THE UNDERSIGNED, being the incorporator hereinbefore named, for the purpose of forming a corporation pursuant to the General Corporation Law of the State of Delaware, do make this certificate, hereby declaring and certifying that this is my act and deed and the facts herein stated are true, and accordingly have hereunto set my hand this 16th day of September, 1998.

Sole Incorporator

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 10:00 AM 09/16/1998
981358881 - 2944832

**EXHIBIT D**

**Certificate of Ownership and Merger**

# Delaware

PAGE 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT
COPIES OF ALL DOCUMENTS ON FILE OF "DELPHI CORPORATION" AS
RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF INCORPORATION, FILED THE SIXTEENTH DAY OF
SEPTEMBER, A.D. 1998, AT 10 O'CLOCK A.M.

RESTATED CERTIFICATE, FILED THE TWENTY-SIXTH DAY OF JANUARY,
A.D. 1999, AT 4:30 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE SECOND DAY OF
FEBRUARY, A.D. 1999, AT 7:30 O'CLOCK A.M.

CERTIFICATE OF OWNERSHIP, CHANGING ITS NAME FROM "DELPHI
AUTOMOTIVE SYSTEMS CORPORATION" TO "DELPHI CORPORATION", FILED
THE THIRTEENTH DAY OF MARCH, A.D. 2002, AT 3 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID
CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE
AFORESAID CORPORATION, "DELPHI CORPORATION".

2944832    8100H

090138516

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION:  7135321

DATE:  02-13-09

You may verify this certificate online
at corp.delaware.gov/authver.shtml

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 03:00 PM 03/13/2002
020167948 – 2944832

# CERTIFICATE OF OWNERSHIP AND MERGER

## MERGING

## DELPHI CORPORATION

## INTO

## DELPHI AUTOMOTIVE SYSTEMS CORPORATION

* * * * * * *

Delphi Automotive Systems Corporation (the "Company"), a corporation organized and existing under the laws of Delaware,

DOES HEREBY CERTIFY:

FIRST: That the Company was incorporated on the 16th day of September, 1998, pursuant to Section 102 of the General Corporation Law of the State of Delaware.

SECOND: That the Company owns all of the outstanding shares of the stock of Delphi Corporation, a corporation incorporated on the 10th day of January, 2002, pursuant to Section 102 of the General Corporation Law of the State of Delaware.

THIRD: That the Company, by the following resolutions of its Board of Directors, duly adopted at a meeting held on the 13th day of March, 2002, determined to and did merge into itself said Delphi Corporation:

WHEREAS, the Board of Directors of Delphi Automotive Systems Corporation, a Delaware corporation (the "Company"), deems it to be advisable and in the best interests of the Company for the Company's name to be changed to "Delphi Corporation" through the merger of Delphi Corporation, a Delaware corporation and wholly-owned subsidiary of the Company ("Merger Sub"), with and into the Company pursuant to Section 253 of the Delaware General Corporation Law, as amended (the "DGCL");

NOW, THEREFORE, be it

RESOLVED, that effective upon the filing of a Certificate of Ownership and Merger with the Secretary of State of Delaware, Merger Sub shall be merged with and into the Company in accordance with Section 253 of the DGCL, with the Company being the surviving corporation (the "Merger");

FURTHER RESOLVED, that by virtue of the Merger and without any action on the part of the holders thereof, each outstanding share of capital stock of the Company (of any class or series) shall remain outstanding, in all respects remaining unaffected, and each outstanding share of capital stock of Merger Sub shall be canceled. Holders of outstanding shares of capital stock of the Company or Merger Sub shall not receive any form of consideration as a result of the Merger;

FURTHER RESOLVED, that pursuant to, and at the effective time of, the Merger, Article I of the Amended and Restated Certificate of Incorporation of the Company shall be amended to read in its entirety as follows:

"The name of the corporation (hereinafter referred to as the 'Corporation') is Delphi Corporation."

FURTHER RESOLVED, that the officers of the Company be, and each of them hereby is, authorized to execute a Certificate of Ownership and Merger setting forth a copy of these resolutions, to cause it to be filed with the Secretary of State of Delaware and to do all acts and things, whether within or without the state of Delaware, which may be necessary or advisable to effect the Merger and the name change.

FOURTH: Anything herein or elsewhere to the contrary notwithstanding, this merger may be amended or terminated and abandoned by the Board of Directors of Delphi Automotive Systems Corporation at any time prior to the time that this merger filed with the Secretary of State becomes effective.

IN WITNESS WHEREOF, said Delphi Automotive Systems Corporation has caused this Certificate to be signed by Diane L. Kaye, its Secretary, this 13th day of March, 2002.

DELPHI AUTOMOTIVE SYSTEMS CORPORATION

By: _____
Diane L. Kaye, Secretary

**EXHIBIT E**

**Master Separation Agreement**

1

EXHIBIT 10.1

EXECUTION COPY

MASTER SEPARATION AGREEMENT

dated as of

December 22, 1998

among

GENERAL MOTORS CORPORATION,

DELPHI AUTOMOTIVE SYSTEMS CORPORATION,

DELPHI AUTOMOTIVE SYSTEMS LLC,

DELPHI TECHNOLOGIES, INC.

and

DELPHI AUTOMOTIVE SYSTEMS (HOLDING), INC.

2

# TABLE OF CONTENTS

-----------------------------

## ARTICLE 1
Definitions

Section 1.01    Defined Terms................................................2

## ARTICLE 2
Contribution and Assumption

Section 2.01    Contribution of Assets......................................6
Section 2.02    Assumption of Liabilities...................................7
Section 2.03    Methods of  Transfer and Assumption.........................7
Section 2.04    Nonassignable Contracts.....................................8
Section 2.05    Transition Services.........................................8

## ARTICLE 3
Ancillary Agreements

Section 3.01    General....................................................10
Section 3.02    Priority..................................................10
Section 3.03    Extensions of Transition Services.........................10

## ARTICLE 4
Covenants

Section 4.01    IPO and Distribution Agreement............................10
Section 4.02    Registration Rights Agreement.............................10
Section 4.03    Delayed Asset Transfers...................................10

## ARTICLE 5
Indemnification

Section 5.01    Indemnification by Delphi.................................11
Section 5.02    Indemnification Procedures................................11
Section 5.03    Certain Limitations.......................................12

## ARTICLE 6
Access to Information

Section 6.01    Restrictions on Disclosure of Information.................13
Section 6.02    Legally Required Disclosure of Confidential Information....13
Section 6.03    Access to Information.....................................13
Section 6.04    Record Retention.........................................14
Section 6.05    Production of Witnesses..................................16
Section 6.06    Reimbursement...........................................16

i

3

ARTICLE 7
Certain Claims and Litigation

Section 7.01    Product Liability Claims...................................16
Section 7.02    General Litigation.........................................17
Section 7.03    Employment Related Claims.................................18
Section 7.04    Cooperation...............................................18

ARTICLE 8
Insurance Matters

Section 8.01    Delphi Insurance Coverage During the Transition Period.....19
Section 8.02    Delphi Insurance Coverage After the Transition Period......20

ARTICLE 9
Miscellaneous

Section 9.01    Entire Agreement..........................................20
Section 9.02    Governing Law.............................................20
Section 9.03    Descriptive Headings......................................20
Section 9.04    Notices...................................................20
Section 9.05    Parties In Interest.......................................21
Section 9.06    Counterparts..............................................21
Section 9.07    Binding Effect; Assignment................................21
Section 9.08    Dispute Resolution........................................21
Section 9.09    Severability..............................................22
Section 9.10    Failure or Indulgence Not Waiver; Remedies Cumulative......22
Section 9.11    Amendment.................................................22
Section 9.12    Authority.................................................22
Section 9.13    Interpretation............................................22


Schedule A      Ancillary Agreements
Schedule B      Delphi Financial Statements
Schedule C      Facilities to be Transferred
Schedule D      Covenants Not to Compete
Schedule E      Domestic Ownership Interest Transfers
Schedule F      International Ownership Interest Transfers
Schedule G      Extension of Eligibility in the GM Vehicle Purchase Program -
                Used Vehicle Program
Schedule H      Extension of Eligibility in the GM New Vehicle Purchase
                Program
Schedule I      Certain Agreements with Respect to Divested Businesses
Schedule J      Entities in Liquidation by 12/31/98 to be Retained by GM
Schedule K      General Litigation Claims to be Transferred to Delphi
Schedule L      General Litigation Claims to be Defended by GM at Delphi's
                Expense
Schedule M      Delphi Related General Litigation Claims for which GM will
                Retain Liability
Schedule N      Employment Related Claims to be Transferred to Delphi
Schedule O      Employment Related Claims to be Jointly Defended by GM and
                Delphi
Schedule P      Entities Included in Delphi Financial Statements which are to
                be retained by GM after 1/1/99

ii

4

# MASTER SEPARATION AGREEMENT

This Master Separation Agreement ("Agreement") is entered into on December 22, 1998 among General Motors Corporation, a Delaware corporation ("GM"), Delphi Automotive Systems Corporation, a Delaware corporation ("Delphi"), Delphi Automotive Systems LLC, a Delaware limited liability company and, on the date hereof, a wholly owned subsidiary of GM ("DAS LLC"), Delphi Technologies, Inc., a Delaware corporation and, on the date hereof, a wholly owned subsidiary of GM ("DTI", and together with DAS LLC, the "Delphi U.S. Subsidiaries") and Delphi Automotive Systems (Holding), Inc., a Delaware corporation and, on the date hereof, a wholly owned subsidiary of GM ("Delphi International Subsidiary"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article 1 hereof.

## RECITALS

WHEREAS, the Board of Directors of GM has determined that it would be appropriate and desirable to completely separate the Delphi Automotive Systems Business from GM;

WHEREAS, GM has caused Delphi to be incorporated in order to effect such separation, GM currently owns all of the issued and outstanding common stock of Delphi, and Delphi currently conducts no business operations and has no significant assets or liabilities;

WHEREAS, the Boards of Directors of GM and Delphi have each determined that it would be appropriate and desirable for GM to contribute and transfer to Delphi, and for Delphi to receive and assume, directly or indirectly, substantially all of the assets and liabilities currently associated with the Delphi Automotive Systems Business, including those assets and liabilities currently held directly by GM in divisional form and the stock or similar interests currently held by GM in subsidiaries and other entities that conduct such business;

WHEREAS, GM and Delphi intend that the contribution and assumption of assets and liabilities will qualify as a tax-free reorganization under Section 368(a)(1)(D) of the Code;

WHEREAS, GM and Delphi currently contemplate that, following the contribution and assumption of assets and liabilities, Delphi will make an initial public offering of an amount of its common stock that will reduce GM's ownership of Delphi to not less than 80%;

WHEREAS, GM currently contemplates that, several months following such initial public offering, GM will distribute to the holders of its common stock, $1-2/3 par value, by means of an exchange offer and/or a pro rata distribution, all of the shares of Delphi common stock owned by GM (the "Distribution");

WHEREAS, GM and Delphi intend that the Distribution will be tax-free to GM and its stockholders under the Code; and

WHEREAS, the parties intend in this Agreement, including the Exhibits and Schedules hereto, to set forth the principal arrangements between them regarding the separation of the Delphi Automotive Systems Business from GM.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth below, the parties hereto agree as follows:

5

ARTICLE 1

DEFINITIONS

SECTION 1.01. Defined Terms. The following terms, as used herein, shall have the following meanings:

"AFFILIATE" of any specified Person means any other Person directly or indirectly Controlling, Controlled by, or under common Control with, such specified Person; provided, however, that for purposes of this Agreement, (i) GM and its subsidiaries (other than Delphi and its subsidiaries) shall not be considered Affiliates of Delphi and (ii) Delphi and its subsidiaries shall not be considered Affiliates of GM.

"AMENDED AND RESTATED TAX ALLOCATION AGREEMENT" means the Amended and Restated Agreement for the Allocation of Federal, United States, State and Local Income Tax, between GM and Delphi, a copy of which is attached hereto as Exhibit L-3.

"ANCILLARY AGREEMENTS" means each of the agreements which are listed on Schedule A hereto and which are attached as Exhibits A-1 through M-5 to this Agreement, including any exhibits, schedules, attachments, tables or other appendices thereto, and each agreement and other instrument contemplated therein.

"ASSETS" means, except for cash and cash equivalents, any and all assets, properties and rights, whether tangible or intangible, whether real, personal or mixed, whether fixed, contingent or otherwise, and wherever located, including, without limitation, the following:

      (i)    real property interests (including leases), land, plants, buildings and improvements;

      (ii)    machinery, equipment, vehicles (other than GM Product Evaluation Program vehicles), furniture and fixtures, leasehold improvements, supplies, repair parts, tools, plant, laboratory and office equipment and other tangible personal property, including any and all leases with respect thereto, together with any rights or claims arising out of the breach of any express or implied warranty by the manufacturers or sellers of any of such assets or any component part thereof;

      (iii)    inventories, including raw materials, work-in-process, finished goods, parts and accessories;

      (iv)    notes, loans and accounts receivable (whether current or not current), interests as beneficiary under letters of credit, advances and performance and surety bonds;

      (v)    banker's acceptances, shares of stock, bonds, debentures, evidences of indebtedness, certificates of interest or participation in profit-sharing agreements, collateral-trust certificates, investment contracts, voting trust certificates, puts, calls, straddles, options, swaps, collars, caps and other securities or hedging arrangements of any kind;

      (vi)    financial, accounting and operating data and records including, without limitation, books, records, electronic data, notes, sales and sales promotional data, purchasing materials and data, advertising materials, credit information, cost and pricing information, customer and supplier lists, reference catalogs, payroll and personnel records, facility blueprints and plant layouts, minute books, stock ledgers, stock transfer records and other similar property, rights and information;

      (vii)    Intellectual Property;

      (viii)    Contracts and all rights therein;

6

                  (ix)     prepaid expenses, deposits and retentions held by third parties;

                  (x)     claims, causes of action, choses in action, rights under insurance policies, rights under express or implied warranties, rights of recovery, rights of set-off, and rights of subrogation;

                  (xi)     licenses, franchises, permits, authorizations and approvals; and

                  (xii)    goodwill and going concern value.

"BUSINESS DAY" means a day other than a Saturday, a Sunday or a day on which banking institutions located in the State of New York or Michigan are authorized or obligated by law or executive order to close.

"CODE" means the Internal Revenue Code of 1986, as amended from time to time, together with the rules and regulations promulgated thereunder.

"COMMERCIAL TRAVEL SERVICES SUPPLY AGREEMENT" means the Commercial Travel Services Supply Agreement, effective as of the date Contribution Date, between GM and Delphi (or their respective Affiliates), a copy of which is attached hereto as Exhibit J-2.

"COMMISSION" means the Securities and Exchange Commission.

"CONFIDENTIAL INFORMATION" means with respect to any party hereto, (i) any Information concerning such party, its business or any of its Affiliates that was obtained by another party hereto prior to the Contribution Date, (ii) any Information concerning such party that is obtained by another party under Section 6.03, or (iii) any other Information obtained by, or furnished to, another party hereto prior to the Contribution Date, in each case that (a) was marked "Proprietary" or "Company Private" or words of similar import by the party owning such Information, or any Affiliate of such party, or (b) the party owning such Information notified such other party in writing was confidential or secret by the Contribution Date.

"CONSOLIDATED TAX PERIOD" has the meaning set forth in the Amended and Restated Tax Allocation Agreement.

"CONTRACTS" means any contract, agreement, lease, license, sales order, purchase order, instrument or other commitment that is binding on any Person or any part of its property under applicable law.

"CONTRIBUTION DATE" means January 1, 1999.

"CONTROL" means the possession, direct or indirect, of the power to direct or cause the direction of the management of the policies of a Person, whether through the ownership of voting securities, by contract or otherwise. "CONTROLLING" and "CONTROLLED" have the corollary meanings ascribed thereto.

"DELPHI ASSETS" means all of GM's right, title and interest in and to all Assets that (i) (x) are, except as set forth on Schedule P or as otherwise provided herein or in an Ancillary Agreement, reflected in the Delphi Financial Statements and not disposed of by GM after the date thereof and before the Contribution Date (including assets written off or expensed but still used by Delphi which Delphi can demonstrate to GM's reasonable satisfaction were paid for by the Delphi Automotive Systems Sector of GM) or (y) are to be transferred pursuant to Section 2.01(c) of this Agreement (as and when transferred thereunder) or (ii) are acquired by the Delphi Automotive Systems Business after the date of the Delphi Financial Statements and would be reflected in the financial statements of Delphi as of the Contribution Date if such financial statements were prepared using the same accounting principles under which the Delphi Financial Statements were prepared, or (iii) are expressly provided by this Agreement or any Ancillary Agreement to be transferred to Delphi, or (iv) are listed on Schedule C hereto (which sets forth the facilities to be transferred to Delphi) or (v) except as otherwise provided in an Ancillary Agreement or other express agreement of the parties, are used exclusively by the Delphi Automotive Systems Business as of the Contribution

7

Date; provided, unless the parties otherwise expressly agree, that if the
accounting principles under which the Delphi Financial Statements were prepared
would have required any Asset described in the preceding clause (v) to be
reflected in the Delphi Financial Statements as of the date thereof, then such
Asset shall be included in the "Delphi Assets" only if so reflected.

"DELPHI AUTOMOTIVE SYSTEMS BUSINESS" means the business conducted by
the Delphi Automotive Systems Sector of GM at any time on or before the
Contribution Date, including (i) all business operations whose financial
performance is reflected in the Delphi Financial Statements, (ii) all business
operations initiated or acquired by the Delphi Automotive Systems Sector of GM
after the date of the Delphi Financial Statements and (iii) all business
operations that were conducted at any time in the past by the Delphi Automotive
Systems Sector of GM or by any predecessor of such Sector (including, without
limitation, the GM Automotive Components Group) but were discontinued or
disposed of prior to the date of the Delphi Financial Statements other than by
transfer or disposition to any other Sector of GM.

"DELPHI COMMON STOCK" means the Common Stock, $0.01 par value per
share, of Delphi.

"DELPHI FINANCIAL STATEMENTS" means the financial statements
(including the notes thereto) of Delphi for the period ended September 30, 1998
as set forth in the IPO Registration Statement as amended at the date of this
Agreement, a copy of which is set forth on Schedule B attached hereto.

"DELPHI LIABILITIES" means all of the Liabilities of GM that (i) (x)
are, except as otherwise set forth on Schedule P or as otherwise provided herein
or in an Ancillary Agreement, reflected in the Delphi Financial Statements and
remain outstanding at the Contribution Date or (y) are to be transferred
pursuant to Section 2.01(c) of this Agreement (as and when transferred
thereunder), or (ii) arise in connection with the Delphi Automotive Systems
Business after the date of the Delphi Financial Statements and would be
reflected in financial statements of Delphi as of the Contribution Date if such
financial statements were prepared using the same accounting principles under
which the Delphi Financial Statements were prepared, or (iii) are expressly
provided by this Agreement or any Ancillary Agreement to be transferred to and
assumed by Delphi, or (iv) except as otherwise provided in an Ancillary
Agreement or other express agreement of the parties, are related to or arise out
of or in connection with the Delphi Assets, or (v) except as otherwise provided
in an Ancillary Agreement or other express agreement of the parties, are related
to or arise out of or in connection with the Delphi Automotive Systems Business
(including but not limited to the covenants not to compete entered into by GM
prior to the Contribution Date set forth on Schedule D hereto) whether before or
after the date of the Delphi Financial Statements; provided, unless the parties
otherwise expressly agree, that if the accounting principles under which the
Delphi Financial Statements were prepared would have required any liabilities
described in the preceding clause (v) to be reflected in the Delphi Financial
Statements as of the date thereof, then such liabilities shall be considered to
be "Delphi Liabilities" only if so reflected.

"DETERMINATION" has the meaning set forth in the NITA.

"DISTRIBUTION" has the meaning set forth in the preamble to this
Agreement.

"DISTRIBUTION DATE" means the date to be determined by GM in its sole
and absolute discretion when the Distribution is completed.

"EMPLOYEE MATTERS AGREEMENT" means the Employee Matters Agreement,
effective as of the Contribution Date, between GM and Delphi (or their
respective Affiliates), a copy of which is attached hereto as Exhibit B-1.

"FINANCIAL SERVICES SUPPLY AGREEMENT" means the Financial Services
Supply Agreement, effective as of the Contribution Date, between GM and Delphi
(or their respective Affiliates), a copy of which is attached hereto as Exhibit
J-4.

4

8

"FINAL DETERMINATION" has the meaning set forth in the Amended and Restated Tax Allocation Agreement.

"INCOME TAX RETURNS" has the meaning set forth in the Amended and Restated Tax Allocation Agreement.

"INFORMATION" means all records, books, contracts, instruments, computer data and other data.

"INTELLECTUAL PROPERTY" means any and all domestic and foreign patents and patent applications, together with any continuations, continuations-in-part or divisional applications thereof, and all patents issuing thereon (including reissues, renewals and re-examinations of the foregoing); invention disclosures; mask works; copyrights, and copyright applications and registrations; trademarks, servicemarks, trade names, and trade dress, in each case together with any applications and registrations therefor and all appurtenant goodwill relating thereto; trade secrets, commercial and technical information, know-how, proprietary or confidential information, including engineering, production and other designs, notebooks, processes, drawings, specifications, formulae, and technology; computer and electronic data processing programs and software (object and source code), data bases and documentation thereof; inventions (whether patented or not); and all other intellectual property under the laws of any country throughout the world.

"IPO AND DISTRIBUTION AGREEMENT" means the agreement to be entered into between GM and Delphi on or before the IPO Effective Date, the form of which is attached hereto as Exhibit E-1.

"IPO EFFECTIVE DATE" means the date on which the IPO Registration Statement is declared effective by the Commission.

"IPO REGISTRATION STATEMENT" means the registration statement on Form S-1, Registration No. 333-67333 filed by Delphi with the Securities and Exchange Commission in connection with the initial public offering of the Delphi Common Stock, together with all amendments and supplements thereto.

"LIABILITIES" means any and all debts, liabilities, guarantees, assurances, commitments and obligations, whether fixed, contingent or absolute, asserted or unasserted, matured or unmatured, liquidated or unliquidated, accrued or not accrued, known or unknown, due or to become due, whenever or however arising (including, without limitation, whether arising out of any Contract or tort based on negligence or strict liability) and whether or not the same would be required by generally accepted accounting principles to be reflected in financial statements or disclosed in the notes thereto.

"NITA" means the Agreement for the Indemnification of United States Federal, State and Local Non-Income Taxes, between GM and Delphi, a copy of which is attached hereto as Exhibit L-2.

"NON-INCOME TAXES" has the meaning set forth in the NITA.

"PERSON" means an individual, partnership, limited liability company, joint venture, corporation, trust, unincorporated association, any other entity, or a government or any department or agency or other unit thereof.

"PRIOR RELATIONSHIP" means the ownership relationship between GM and Delphi at any time prior to the Contribution Date.

"REGISTRATION RIGHTS AGREEMENT" means the agreement to be entered into between GM and Delphi on or before the IPO Effective Date, the form of which is attached hereto as Exhibit E-2.

"REPRESENTATIVES" means directors, officers, employees, agents, consultants, advisors, accountants, attorneys and representatives.

9

"SUBSIDIARY" means with respect to any specified Person, any corporation, any limited liability company, any partnership or other legal entity of which such Person or any of its Subsidiaries Controls or owns, directly or indirectly, more than 50% of the stock of other equity interest entitled to vote on the election of the members to the board of directors or similar governing body.

"SUPPLY AGREEMENT" means the Component Supply Agreement, effective as of the Contribution Date, between GM and Delphi, a copy of which is attached hereto as Exhibit K-1.

"THIRD-PARTY CLAIM" means any claim, suit, arbitration, inquiry, proceeding or investigation by or before any court, governmental or other regulatory or administrative agency or commission or any arbitration tribunal asserted by a Person other than any party hereto or their respective Affiliates which gives rise to a right of indemnification hereunder.


ARTICLE 2

CONTRIBUTION AND ASSUMPTION

SECTION 2.01. Contribution of Assets.

(a) Except as provided for in Section 2.01(c), on the Contribution Date, GM (i) hereby transfers (or causes its appropriate Subsidiaries and Representatives to transfer) the Delphi Assets in the following order: (A) all intellectual property to be transferred pursuant to the intellectual property agreements attached hereto as Exhibits G-1 through G-5, to DTI (except that all Delco Electronics Corporation intellectual property shall be transferred to DTI after GM has transferred its stock ownership interest in DTI to Delco Electronics Corporation), (B) its stock ownership interest in DTI to Delco Electronics Corporation, (C) its stock ownership interest in Delco Electronics Corporation to DAS LLC and (D) all other Delphi Assets located in the United States, including the ownership interests listed on Schedule E but excluding those listed on Schedule F, to either Delphi or DAS LLC, and (ii) will have transferred or shall transfer as promptly as reasonably practicable (or cause its appropriate Subsidiaries and Representatives to transfer) the Delphi Assets located outside of the United States and the ownership interests of the United States and foreign entities listed on Schedule F owning such Delphi Assets, to either Delphi, the Delphi International Subsidiary, or such other Subsidiary as Delphi may direct. Each of Delphi, the Delphi U.S. Subsidiaries and Delphi International Subsidiary shall receive and accept such Delphi Assets, subject to the terms and conditions of this Agreement. GM further transfers to Delphi on the Contribution Date but after the transfers described in clause (i) above, its membership interest in DAS LLC and its stock ownership interest in the Delphi International Subsidiary, effective as of the Contribution Date. Each of Delphi, the Delphi U.S. Subsidiaries and Delphi International Subsidiary acknowledges and agrees that the foregoing transfers will be made "AS IS WHERE IS" and that neither GM nor any Subsidiary of GM has made or will make any warranty, express or implied, including without limitation any warranty of merchantability or fitness for a particular purpose, with respect to any Delphi Asset.

(b) On the Contribution Date, GM shall contribute to Delphi cash and/or cash equivalents in the aggregate amount of $1 billion. Additionally, GM shall contribute to Delphi such additional amounts as GM and Delphi agree, corresponding to the amounts Delphi will pay to GM (or an Affiliate of GM) in connection with the Canada and Brazil transactions described in Exhibits H-1 and H-2, respectively.

(c) Notwithstanding any other provision of this Agreement, this Agreement shall not transfer or effect the assignment or assumption of any Assets or Liabilities of the Delphi Automotive Systems Business provided for in the agreements constituting Exhibits H-1 through H-110 referred to in Schedule A to this Agreement, except as such Assets and Liabilities shall be transferred and assumed on the dates and in accordance with the terms set forth herein and in such agreements.

6

10

(d) GM and Delphi additionally shall comply with the terms of the letters from GM to Delphi, copies of which are attached hereto as Schedules G and H, which relate to the extension of eligibility for Delphi employees to participate in the GM Vehicle Purchase Programs.

SECTION 2.02.    Assumption of Liabilities.

(a) General. Effective as of the Contribution Date, each of Delphi and/or the Delphi U.S. Subsidiaries, as directed by Delphi, hereby assumes and on a timely basis shall pay, perform, satisfy and discharge in accordance with their terms the Delphi Liabilities relating to the operations of the Delphi Automotive Systems Business in the United States. Delphi International Subsidiary shall, and shall utilize its best efforts to recommend and encourage its respective Subsidiaries and Affiliates to, assume and on a timely basis pay, perform, satisfy and discharge in accordance with their terms, the Delphi Liabilities relating to the operations of the Delphi Automotive Systems Business outside of the United States.

(b) Divested Business. Delphi shall, with respect to the businesses and operations divested by the Delphi Automotive Systems Business, assume all Liabilities of GM related thereto; provided, however, that Delphi shall not assume those Liabilities relating to operations divested by the Delphi Automotive Systems Business to the extent such Liabilities are expressly retained by GM pursuant to the terms of this Agreement or the Ancillary Agreements (including without limitation, the Employee Matters Agreement, the Environmental Matters Agreement and the Real Estate Matters Agreement) and the Liabilities assumed by Delphi shall include, without limitation, the obligation to satisfy all of the obligations of GM under the various agreements pursuant to which the Delphi Automotive Systems Business effected such divestitures (the "Divestiture Agreements"); provided, further, however, that notwithstanding the foregoing or any other provision of this Agreement or any Ancillary Agreement, responsibility for certain obligations relating to certain divestitures shall be allocated between the parties as set forth on Schedule I hereto.

(c) Machinery and Equipment Leases Related to the Delphi Automotive Systems Business. The parties hereto hereby agree that to the extent that GM entered into a lease with a third party dated prior to the Contribution Date pursuant to which GM agreed to lease (i) machinery and/or equipment for use by the Delphi Automotive Systems Business and (ii) machinery and/or equipment for use by GM businesses other than the Delphi Automotive Systems Business, upon identification of any such lease, GM and Delphi will enter into a sublease with terms identical or as similar as possible to such original lease pursuant to which Delphi will sublease from GM that portion of the machinery and/or equipment used by the Delphi Automotive Systems Business covered under such original lease.

(d) Nonrecurring Costs and Expenses. Notwithstanding anything herein to the contrary, any nonrecurring costs and expenses incurred by the parties hereto to effect the transactions contemplated hereby which are not allocated pursuant to the terms of this Agreement or any Ancillary Agreement shall be the responsibility of the party which incurs such costs and expenses.

SECTION 2.03.    Methods of Transfer and Assumption.

(a) The parties shall enter into the Ancillary Agreements, other than the IPO and Distribution Agreement and the Registration Rights Agreement, on or about the date of this Agreement. To the extent that the transfer of any Delphi Asset or the assumption of any Delphi Liability is expressly provided for by the terms of any Ancillary Agreement, the terms of such Ancillary Agreement shall determine the manner of the transfer or assumption. It is the intent of the parties that pursuant to Section 2.01, the transfer and assumption of all other Delphi Assets and Delphi Liabilities shall be made effective as of the Contribution Date, provided, however, that circumstances in various jurisdictions outside the United States may require the transfer of certain Assets and the assumption of certain Liabilities to occur in such other manner and at such other time as the parties shall agree.

(b) The parties intend to complete the transfer of all Delphi Assets and the assumption of all Delphi Liabilities effective on or prior to the Contribution Date but shall, subject to Section 4.03 hereof, and to the extent

11

that any such transfers and assumptions are not completed prior to the Contribution Date, take all actions reasonably necessary or appropriate to complete such transactions as promptly thereafter as possible. In addition to those transfers and assumptions accurately identified and designated by the parties to take place but which the parties are not able to effect prior to the Contribution Date, there may exist (i) Assets that the parties discover were, contrary to the agreements between the parties, by mistake or omission, transferred to Delphi or retained by GM or (ii) Liabilities that the parties discover were, contrary to the agreements between the parties, by mistake or omission, assumed by Delphi or not assumed by Delphi. The parties shall, between the Contribution Date and the earlier of the Distribution Date or six months from the Contribution Date, cooperate in good faith to effect the transfer or re-transfer of such Assets, and/or the assumption or re-assumption of such Liabilities, to or by the appropriate party and shall not use the determination of remedial actions contemplated herein to alter the original intent of the parties hereto with respect to the Assets to be transferred to or Liabilities to be assumed by Delphi. Each party shall reimburse the other or make other financial adjustments (e.g., without limitation, cash reserves) or other adjustments to remedy any mistakes or omissions relating to any of the Assets transferred hereby or any of the Liabilities assumed hereby.

(c)    Each party shall execute and deliver to each other party all such documents, instruments, certificates and agreements in appropriate form, and to make all filings and recordings and to take all such other actions, as shall be necessary or reasonably requested by such other party, whether before or after the Contribution Date, in order to give full effect to and evidence and perfect the transfer and contribution of the Delphi Assets and the Delphi Liabilities as contemplated hereby. However, Delphi acknowledges and agrees that neither GM nor any Subsidiary of GM will comply with the provisions of any bulk transfer law of any jurisdiction in connection with the transfer of any Delphi Asset.

(d)    Any Subsidiary of Delphi that will receive any Delphi Asset or assume any Delphi Liability shall for all purposes be deemed to be a party to this Agreement.

SECTION 2.04. Nonassignable Contracts. Anything contained herein to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Asset or Liability if an assignment or attempted assignment of the same without the consent of another Person would constitute a breach thereof or in any way impair the rights of a party thereunder or give to any third party any rights with respect thereto. If any such consent is not obtained or if an attempted assignment would be ineffective or would impair such party's rights under any such Asset or Liability so that the party entitled to the benefits and responsibilities of such purported transfer (the "Intended Transferee") would not receive all such rights and responsibilities, then (x) the party purporting to make such transfer (the "Intended Transferor") shall use commercially reasonable efforts to provide or cause to be provided to the Intended Transferee, to the extent permitted by law, the benefits of any such Asset or Liability and the Intended Transferor shall promptly pay or cause to be paid to the Intended Transferee when received all moneys received by the Intended Transferor with respect to any such Asset and (y) in consideration thereof the Intended Transferee shall pay, perform and discharge on behalf of the Intended Transferor all of the Intended Transferor's Liabilities thereunder in a timely manner and in accordance with the terms thereof which it may do without breach. In addition, the Intended Transferor shall take such other actions as may reasonably be requested by the Intended Transferee in order to place the Intended Transferee, insofar as reasonably possible, in the same position as if such Asset had been transferred as contemplated hereby and so all the benefits and burdens relating thereto, including possession, use, risk of loss, potential for gain and dominion, control and command, shall inure to the Intended Transferee. If and when such consents and approvals are obtained, the transfer of the applicable Asset shall be effected in accordance with the terms of this Agreement. To the extent that the Delphi Liabilities include liabilities, obligations or commitments pursuant to any contract, permit, license, franchise or other Asset to which Delphi also has any rights, GM shall, to the extent such asset is not a Delphi Asset, upon request by Delphi either assign such rights to Delphi or assert and seek to enforce such rights for the benefit of Delphi.

SECTION 2.05.  Transition Services.

(a)    For a period of twelve months following the Contribution Date (the "Transition Period"), GM shall use its reasonable best efforts to provide, or cause its Affiliates to use their reasonable best efforts to provide,

12

to Delphi or its Affiliates all Transition Services in the manner and at a
relative level of service consistent in all material respects with that provided
by GM or its Affiliates to the Delphi Automotive Systems Business immediately
prior to the Contribution Date. Delphi shall use all commercially reasonable
efforts to obtain all such Transition Services from a source other than GM and
its Affiliates commencing upon the conclusion of the Transition Period; provided
that, if (x) Delphi cannot obtain any Transition Service from a source other
than GM and its Affiliates and (y) such Transition Service is necessary in order
to operate the Delphi Automotive Systems Business in substantially the same
manner as it was conducted immediately prior to the Contribution Date, then GM
(or its Affiliates) shall provide such Transition Service to Delphi (or its
Affiliates) for an additional period not to exceed six months. For the purpose
of this Section 2.05, "Transition Services" means any services provided by GM,
its Affiliates or their suppliers to the Delphi Automotive Systems Business
immediately prior to the Contribution Date which Delphi reasonably identifies
and requests in writing that GM provide to it during the Transition Period;
provided that Transition Services expressly excludes any such services which
shall be provided to Delphi or its Affiliates pursuant to the terms of other
sections of this Agreement or any of the Ancillary Agreements; provided,
further, that Transition Services expressly excludes any such services which GM
would not be legally permitted to provide to a third party.

(b)   Notwithstanding anything contained in this Agreement or in any
Ancillary Agreement to the contrary, except with respect to all services to be
provided by GM to Delphi pursuant to the Financial Services Supply Agreement,
the Commercial Travel Services Supply Agreement, any real estate leases and any
health care services to be provided by GM to Delphi pursuant to the Employee
Matters Agreement, for all Transition Services provided by GM (or its
Affiliates) to Delphi (or its Affiliates) pursuant to section 2.05(a) above and
for all other services to be provided by GM (or its Affiliates) to Delphi (or
its Affiliates) pursuant to any of the Ancillary Agreements, Delphi shall pay to
GM on or prior to the fifteenth day following the date of Delphi's receipt of an
invoice related to the provision of such services (x) in the case of any
Transition Service or any service to be provided pursuant to an Ancillary
Agreement in which a payment amount or formula has not been set forth, an amount
equal to the cost historically allocated to the Delphi Automotive Systems
Business as of the Contribution Date for such service, adjusted to reflect any
changes in the nature, cost or level of the services provided; provided that, if
no cost has historically been allocated to the Delphi Automotive Systems
Business for any Transition Service or for such other service, then Delphi shall
pay to GM (i) that portion of the total cost borne by GM which GM would have
allocated to Delphi under its internal allocation formula, plus (ii) any direct
user charges or similar type charges resulting from Delphi's use or services
which are not recouped by GM under the charges provided for in (i), plus (iii)
any other reasonable charges necessary to make GM whole for the provision of
such services or (y) in the case of any service to be provided pursuant to an
Ancillary Agreement in which a payment amount or formula has been set forth, the
amount owed pursuant to the terms of such Ancillary Agreement. Payments under
this Section made on or after the first business day following the forty-fifth
day after the date of Delphi's receipt of the invoice related to the provision
of the relevant service shall be accompanied by a payment of interest to be
calculated as follows:

Transitional Service (or other service) Payment x Prime Rate x Number of days late, to
                                                 ----------   the date of actual
                                                  365 days    payment.

As used in this Section 2.05(b), the "Prime Rate" shall mean to the prime rate
as published in the Wall Street Journal on the first business day following the
forty-fifth day after the date of Delphi's receipt of the invoice related to the
provision of the relevant service.

(c)   Notwithstanding anything contained in this Agreement or in any
Ancillary Agreement to the contrary, any charges to GM from outside suppliers
for the provision of Transition Services or any other services provided pursuant
to any Ancillary Agreement and any other costs which are attributable to the
operation of Delphi other than incidental costs provided in connection with
Transition Services or such other services which GM (or an Affiliate of GM)
incurs shall be submitted by GM to Delphi for payment and, except as GM may
otherwise agree in connection with any individual statement of charges which has
been submitted to GM, Delphi hereby agrees to make payment therefor either (i)
to such outside supplier in accordance with the payment terms of such outside
supplier or (ii) where GM is required to pay such outside supplier, on or before
the date on which GM notifies

9

13

Delphi it intends to make payment, or if GM does not provide such notice, immediately after GM provides notice to Delphi that GM has made such payment.

(d)    Notwithstanding anything to the contrary herein, Delphi shall be responsible for providing the transitional services agreed to by the parties (or, where no specific terms have been agreed to, then in accordance with the terms of Section 2.05(b) hereof) with respect to the businesses set forth on Schedule J hereto.

## ARTICLE 3

### ANCILLARY AGREEMENTS

(a)    General. GM and Delphi acknowledge that the Ancillary Agreements, other than the IPO and Distribution Agreement and the Registration Rights Agreement, have been or will be entered into prior to the Contribution Date by the parties hereto and/or by their respective Subsidiaries. GM and Delphi shall take all steps reasonably necessary to cause their respective Subsidiaries and Affiliates to enter into and perform such Ancillary Agreements in accordance with their terms.

(b)    Priority. Except with respect to Sections 2.05 (b) and (c) above, to the extent that any Ancillary Agreement expressly addresses any matters addressed by this Agreement, including, without limitation, matters covered by Article 2 and Article 5 hereof, the terms and conditions of such Ancillary Agreement shall govern the rights and obligations of the parties with respect to such matters.

(c)    Extensions of Transition Services. Delphi shall use all commercially reasonable efforts to obtain services provided to it by GM under the terms of the Ancillary Agreements relating to transitional services from a source other than GM. Certain Ancillary Agreements relating to transitional services provide that the parties may extend the transition service beyond the termination of the transition periods provided for therein. The parties expect that any such extension would be negotiated by GM and Delphi after the Distribution. In the event of an extension of any transitional service, GM and Delphi shall negotiate at arm's length the terms of any such extension, including fair market value pricing for all such services.

## ARTICLE 4

### COVENANTS

SECTION 4.01. IPO and Distribution Agreement. GM and Delphi hereby agree to execute and deliver, on or before the IPO Effective Date, the IPO and Distribution Agreement, in form and substance substantially as set forth on Exhibit E-1 hereto, with such modifications to such form as the parties shall mutually deem reasonably necessary and desirable; provided, that GM shall be entitled in its sole and absolute discretion at any time and from time to time to make any modifications to the provisions thereof relating to the preservation of the tax-free nature of the Distribution or the tax-free nature of the transactions contemplated hereby as it shall reasonably deem necessary or desirable.

SECTION 4.02. Registration Rights Agreement. GM and Delphi hereby agree to execute and deliver, on or before the IPO Effective Date, the Registration Rights Agreement, in form and substance substantially as set forth on Exhibit E-2 hereto, with such modifications to such form as the parties shall mutually deem reasonably necessary and desirable.

SECTION 4.03. Delayed Asset Transfers. GM and Delphi hereby agree to use their best efforts and, where applicable, to cause their subsidiaries to use their best efforts to consummate the transactions contemplated by

10

14

Section 2.01(c) hereof and the other provisions hereof as and when contemplated
in the relevant Ancillary Agreements.

ARTICLE 5

INDEMNIFICATION

SECTION 5.01. Indemnification by Delphi. Delphi and each Subsidiary of
Delphi which shall receive any Delphi Asset or Delphi Liability transferred
pursuant to the terms of this Agreement and their respective
successors-in-interest and assigns (the "Indemnifying Parties") shall jointly
and severally indemnify, defend and hold harmless GM and each of its
Subsidiaries and their respective successors-in-interest, and each of their
respective past and present Representatives (the "Indemnitees") against any
losses, claims, damages, liabilities or actions, resulting from, relating to or
arising, whether prior to or following the Contribution Date, out of or in
connection with (a) the Delphi Liabilities and/or (b) Delphi's conduct of its
business and affairs after the Contribution Date and the Indemnifying Parties
shall reimburse such entity, each such Subsidiary, each such
successor-in-interest and each such Representative for any reasonable attorneys'
fees or any other expenses reasonably incurred by any of them in connection with
investigating and/or defending any such loss, claim, damage, liability or
action.

SECTION 5.02.  Indemnification Procedures.

(a)    If any Indemnitee receives notice of the assertion of any
Third-Party Claim with respect to which an Indemnifying Party is obligated under
this Agreement to provide indemnification, such Indemnitee shall promptly give
such Indemnifying Party notice thereof (together with a copy of such Third-Party
Claim, process or other legal pleading) promptly after becoming aware of such
Third-Party Claim; provided, however, that the failure of any Indemnitee to give
notice as provided in this Section 5.02 shall not relieve any Indemnifying Party
of its obligations under this Section 5.02, except to the extent that such
Indemnifying Party is actually prejudiced by such failure to give notice. Such
notice shall describe such Third-Party Claim in reasonable detail.

(b)    An Indemnifying Party, at such Indemnifying Party's own expense
and through counsel chosen by such Indemnifying Party (which counsel shall be
reasonably acceptable to the Indemnitee), may elect to defend any Third-Party
Claim. If an Indemnifying Party elects to defend a Third-Party Claim, then,
within ten Business Days after receiving notice of such Third-Party Claim (or
sooner, if the nature of such Third Party claim so requires), such Indemnifying
Party shall notify the Indemnitee of its intent to do so, and such Indemnitee
shall cooperate in the defense of such Third-Party Claim. Such Indemnifying
Party shall pay such Indemnitee's reasonable out-of-pocket expenses incurred in
connection with such cooperation. Such Indemnifying Party shall keep the
Indemnitee reasonably informed as to the status of the defense of such
Third-Party Claim. After notice from an Indemnifying Party to an Indemnitee of
its election to assume the defense of a Third-Party Claim, such Indemnifying
Party shall not be liable to such Indemnitee under this Section 5.02 for any
attorneys' fees or other expenses subsequently incurred by such Indemnitee in
connection with the defense thereof other than those expenses referred to in the
preceding sentence; provided, however, that such Indemnitee shall have the right
to employ one law firm as counsel, together with a separate local law firm in
each applicable jurisdiction ("Separate Counsel"), to represent such Indemnitee
in any action or group of related actions (which firm or firms shall be
reasonably acceptable to the Indemnifying Party) if, in such Indemnitee's
reasonable judgment at any time, either a conflict of interest between such
Indemnitee and such Indemnifying Party exists in respect of such claim, or there
may be defenses available to such Indemnitee which are significantly different
from or in addition to those available to such Indemnifying Party and the
representation of both parties by the same counsel would, in the reasonable
judgment of the Indemnitee, be inappropriate, and in that event (i) the
reasonable fees and expenses of such Separate Counsel shall be paid by such
Indemnifying Party (it being understood, however, that the Indemnifying Party
shall not be liable for the expenses of more than one Separate Counsel
(excluding local counsel) with respect to any Third-Party Claim (even if against
multiple Indemnitees)) and (ii) each of such Indemnifying Party and such
Indemnitee shall have the right to conduct its own defense in respect of such
claim. If an Indemnifying Party elects not to defend against a Third-Party
Claim, or fails to notify an Indemnitee of its election as provided in this
Section 5.02 within the period of ten Business

11

15

Days described above, the Indemnitee may defend, compromise, and settle such
Third-Party Claim and shall be entitled to indemnification hereunder (to the
extent permitted hereunder); provided, however, that no such Indemnitee may
compromise or settle any such Third-Party claim without the prior written
consent of the Indemnifying Party, which consent shall not be unreasonably
withheld or delayed. Notwithstanding the foregoing, the Indemnifying Party shall
not, without the prior written consent of the Indemnitee, (i) settle or
compromise any Third-Party Claim or consent to the entry of any judgment which
does not include as an unconditional term thereof the delivery by the claimant
or plaintiff to the Indemnitee of a written release from all liability in
respect of such Third-Party Claim or (ii) settle or compromise any Third-Party
Claim in any manner that would be reasonably likely to have a material adverse
effect on the Indemnitee.

        SECTION 5.03.  Certain Limitations.

        (a)    The amount of any indemnifiable losses or other liability for
which indemnification is provided under this Agreement shall be net of any
amounts actually recovered by the Indemnitee from third parties (including,
without limitation, amounts actually recovered under insurance policies) with
respect to such indemnifiable losses or other liability. Any Indemnifying Party
hereunder shall be subrogated to the rights of the Indemnitee upon payment in
full of the amount of the relevant indemnifiable loss. An insurer who would
otherwise be obligated to pay any claim shall not be relieved of the
responsibility with respect thereto or, solely by virtue of the indemnification
provision hereof, have any subrogation rights with respect thereto. If any
Indemnitee recovers an amount from a third party in respect of an indemnifiable
loss for which indemnification is provided in this Agreement after the full
amount of such indemnifiable loss has been paid by an Indemnifying Party or
after an Indemnifying Party has made a partial payment of such indemnifiable
loss and the amount received from the third party exceeds the remaining unpaid
balance of such indemnifiable loss, then the Indemnitee shall promptly remit to
the Indemnifying Party the excess (if any) of (A) the sum of the amount
theretofore paid by such Indemnifying Party in respect of such indemnifiable
loss plus the amount received from the third party in respect thereof, less (B)
the full amount of such indemnifiable loss or other liability.

        (b)    The amount of any loss or other liability for which
indemnification is provided under this Agreement shall be (i) increased to take
account of any net tax cost incurred by the Indemnitee arising from the receipt
or accrual of an indemnification payment hereunder (grossed up for such
increase) and (ii) reduced to take account of any net tax benefit realized by
the Indemnitee arising from incurring or paying such loss or other liability. In
computing the amount of any such tax cost or tax benefit, the Indemnitee shall
be deemed to recognize all other items of income, gain, loss, deduction or
credit before recognizing any item arising from the receipt or accrual of any
indemnification payment hereunder or incurring or paying any indemnified loss.
Any indemnification payment hereunder shall initially be made without regard to
this Section 5.03(b) and shall be increased or reduced to reflect any such net
tax cost (including gross-up) or net tax benefit only after the Indemnitee has
actually realized such cost or benefit. For purposes of this Agreement, an
Indemnitee shall be deemed to have "actually realized" a net tax cost or a net
tax benefit to the extent that, and at such time as, the amount of taxes payable
by such Indemnitee is increased above or reduced below, as the case may be, the
amount of taxes that such Indemnitee would be required to pay but for the
receipt or accrual of the indemnification payment or the incurrence or payment
of such loss, as the case may be. The amount of any increase or reduction
hereunder shall be adjusted to reflect any Final Determination with respect to
the Indemnitee's liability for taxes, and payments between such indemnified
parties to reflect such adjustment shall be made if necessary.

        (c)    Any indemnification payment made under this Agreement shall be
characterized for tax purposes as if such payment were made immediately prior to
the Contribution Date.

12

16

ARTICLE 6

ACCESS TO INFORMATION

SECTION 6.01  Restrictions on Disclosure of Information.

(a)    Without limiting any rights or obligations under any other
agreement between or among the parties hereto and/or any of their respective
Affiliates relating to confidentiality, for a period of three years following
the Contribution Date, each of the parties hereto agrees that it shall not, and
shall not permit any of its Affiliates or Representatives to, disclose any
Confidential Information to any Person, other than to such Affiliates or
Representatives on a need-to-know basis in connection with the purpose for which
the Confidential Information was originally disclosed. Notwithstanding the
foregoing, each of the parties hereto and its respective Affiliates and
Representatives may disclose such Confidential Information, and such Information
shall no longer be deemed Confidential Information, to the extent that such
party can demonstrate that such Confidential Information is or was (i) available
to such party outside the context of the Prior Relationship on a nonconfidential
basis prior to its disclosure by the other party, (ii) in the public domain
other than by the breach of this Agreement or by breach of any other agreement
between or among the parties hereto and/or any of their respective Affiliates
relating to confidentiality, or (iii) lawfully acquired outside the context of
the Prior Relationship on a nonconfidential basis or independently developed by,
or on behalf of, such party by Persons who do not have access to, or
descriptions of, any such Confidential Information. Additionally,
notwithstanding anything to the contrary herein, any Information provided by GM
to Delphi or by Delphi to GM shall, except as hereafter agreed to in writing by
the parties, not be deemed Confidential Information with respect to the use of
such Information by Delphi in the ordinary course of Delphi's business or by GM
in the ordinary course of GM's business, respectively.

(b)    Each of the parties hereto shall maintain, and shall cause their
respective Affiliates to maintain, policies and procedures, and develop such
further policies and procedures as shall from time to time become necessary or
appropriate, to ensure compliance with this Section 6.01.

SECTION 6.02. Legally Required Disclosure of Confidential Information.
If any of the parties to this Agreement or any of their respective Affiliates or
Representatives becomes legally required to disclose any Confidential
Information, such disclosing party shall promptly notify the party owning the
Confidential Information (the "Owning Party") and shall use all commercially
reasonable efforts to cooperate with the Owning Party so that the Owning Party
may seek a protective order or other appropriate remedy and/or waive compliance
with this Section 6.02. All expenses reasonably incurred by the disclosing party
in seeking a protective order or other remedy shall be borne by the Owning
Party. If such protective order or other remedy is not obtained, or if the
Owning Party waives compliance with this Section 6.02, the disclosing party or
its Affiliate or Representative, as applicable, shall (a) disclose only that
portion of the Confidential Information which its legal counsel advises it is
compelled to disclose or else stand liable for contempt or suffer other similar
significant corporate censure or penalty, (b) use all commercially reasonable
efforts to obtain reliable assurance requested by the Owning Party that
confidential treatment will be accorded such Confidential Information, and (c)
promptly provide the Owning Party with a copy of the Confidential Information so
disclosed, in the same form and format so disclosed, together with a description
of all Persons to whom such Confidential Information was disclosed.

SECTION 6.03. Access to Information. During the Retention Period (as
defined in Section 6.04 below), each of the parties hereto shall cooperate with
and afford, and shall cause their respective Affiliates, Representatives,
Subsidiaries, successors and/or assignees, and shall use reasonable efforts to
cause joint ventures that are not Affiliates (collectively, "Related Parties")
to cooperate with and afford, to the other party reasonable access upon
reasonable advance written request to all information (other than information
which is (i) protected from disclosure by the attorney client privilege or work
product doctrine, (ii) proprietary in nature or (iii) the subject of a
confidentiality agreement between such party and a third party which prohibits
disclosure to the other party) within such party's or any Related Party's
possession which was created prior to the Contribution Date or, with

13

17

respect to any information which would be relevant to the provision of a transitional service pursuant to this Agreement or any Ancillary Agreement, information created during the period in which one party is providing the other party with such transition service. Access to the requested information shall be provided so long as it relates to the requesting party's (the "Requestor") business, assets or liabilities, and access is reasonably required by the Requestor as a result of the parties' Prior Relationship for purposes of auditing, accounting, claims or litigation (except for claims or litigation between the parties hereto), employee benefits, regulatory or tax purposes or fulfilling disclosure or reporting obligations including, without limitation, Information reasonably necessary for the preparation of reports required by or filed under the Securities Exchange Act of 1934, as amended, with respect to any period entirely or partially prior to the Contribution Date.

Access as used in this paragraph shall mean the obligation of a party in possession of Information (the "Possessor") requested by the Requestor to exert its reasonable best efforts to locate all requested Information that is owned and possessed by Possessor or any Related Party. The Possessor, at its own expense, shall conduct a diligent search designed to identify all requested Information and shall collect all such Information for inspection by the Requestor during normal business hours at the Possessor's place of business. Subject to confidentiality and/or security provisions as the Possessor may reasonably deem necessary, the Requestor may have all requested Information duplicated at Requestor's expense. Alternatively, the Possessor may choose to deliver, at its own expense, all requested Information to the Requestor in the form it was requested by the Requestor. If so, the Possessor shall notify the Requestor in writing at the time of delivery if such Information is to be returned to the Possessor. In such case, the Requestor shall return such Information when no longer needed to the Possessor at the Possessor's expense.

In connection with providing Information pursuant to this Section 6.03, each of the parties hereto shall upon the request of the other party make available its respective employees (and those of their respective Related Parties, as applicable) to the extent that they are reasonably necessary to discuss and explain all requested Information with and to the requesting party.

SECTION 6.04.  Record Retention.

(a)    Books and Records. Delphi shall preserve and keep all books and records included in the Delphi Assets or otherwise in the possession of Delphi or its Related Parties, whether in electronic form or otherwise, for no less than ten years from the Contribution Date, or for any longer period as may be required by any government agency, GM's record retention schedule effective as of the Contribution Date or as GM may subsequently notify Delphi that such schedule has been modified, litigation (including applicable "Litigation Holds"), law, regulation, audit or appeal of taxes, tax examination or the expiration of the periods described in Section 6.04 (c), where applicable (the "Retention Period") at Delphi's sole cost and expense. If Delphi wishes to dispose of any books and records or other documents which it is obligated to retain under this Section 6.04 after the Retention Period, then Delphi shall first provide 90 days' written notice to GM and GM shall have the right, at its option and expense, upon prior written notice within such 90-day period, to take possession of such books or records or other documents within 180 days after the date of Delphi's notice to GM hereunder. Written notice of intent to dispose of such books and records shall include a description of the books and records in detail sufficient to allow GM to reasonably assess its potential need to retain such materials. In the event Delphi enters into an agreement with a third party to sell a portion of its business, together with the books and records related thereto, GM shall have the right to duplicate such books and records prior to any such disposition and, should the purchaser of the Delphi business be a competitor of GM, GM shall have the right to prohibit the transfer or disclosure to such party of that portion of the former books and records of GM which GM notifies Delphi contain confidential and proprietary information. To the extent that books and records of GM or any of its Affiliates which contain information relating to the Delphi Automotive Systems Business are not included in the Delphi Assets, GM agrees to cooperate with Delphi in providing Delphi with any such information upon Delphi's reasonable request to the extent that any such information exists and is reasonably separable from GM information unrelated to the Delphi Automotive Systems Business. Delphi shall reimburse GM for all of its reasonable out-of-pocket costs incurred in connection with any such request.

18

(b)    Technical Documentation and Personnel. In addition to the
retention requirements of Section 6.04(a), for a period no less than the
Retention Period, Delphi, at its sole cost and expense, shall use its reasonable
best efforts to maintain all technical documentation in its possession or in the
possession of any of its Related Parties applicable to product design, test,
release, and validation at locations at which such technical documents shall be
reasonably accessible to GM upon request (at GM's sole cost and expense) and, to
the extent reasonably possible, through employees of Delphi who formerly
performed that task for GM. In addition to the obligations set forth in Section
6.05 hereof, Delphi shall, from time to time, at the reasonable request of GM,
cooperate fully with GM in providing GM, to the extent reasonably possible
through Delphi employees formerly employed by GM who previously performed the
same functions on behalf of GM, with technical assistance and information in
respect to any claims brought against GM involving the conduct of the Delphi
Automotive Systems Business prior to the Contribution Date, including
consultation and/or the appearance(s) of such persons on a reasonable basis as
expert or fact witnesses in trials or administrative proceedings. GM shall
reimburse Delphi for its reasonable out-of-pocket costs (travel, hotels, etc.)
of providing such services, consistent with GM's policies and practices
regarding such expenditures. Additionally, GM shall, from time to time, at the
reasonable request of Delphi, cooperate fully with Delphi in providing Delphi,
to the extent reasonably possible through applicable GM employees, with
technical assistance and information in respect to any claims brought against
Delphi involving the conduct of the Delphi Automotive Systems Business prior to
the Contribution Date, including consultation and/or the appearance(s) of such
persons on a reasonable basis as expert or fact witnesses in trials or
administrative proceedings. Delphi shall reimburse GM for its reasonable
out-of-pocket costs (travel, hotels, etc.) of providing such services,
consistent with Delphi's policies and practices regarding such expenditures.

In particular, Delphi shall: (i) retain all documents required to be
maintained by international, national, state, provincial, regional or local
regulations and all documents that may be reasonably required to establish due
care or to otherwise assist GM in pursuing, contesting or defending such claims;
(ii) make available its documents and records in connection with any pursuit,
contest or defense, including, subject to an appropriate confidentiality
agreement or protective order, documents that may be considered to be
"confidential" or subject to trade secret protection ; (iii) promptly respond to
discovery requests in connection with such claim, understanding and
acknowledging that the requirements of discovery in connection with litigation
require timely responses to interrogatories, requests to produce, requests for
admission and depositions and also understanding and acknowledging that any
delays in connection with responses to discovery may result in sanctions; (iv)
make available, as may be reasonably necessary and upon reasonable advance
notice and for reasonable periods so as not to interfere materially with
Delphi's business, mutually acceptable engineers, technicians or other
knowledgeable individuals to assist GM in connection with such claim, including
investigation into claims and occurrences described in this section and
preparing for and giving factual and expert testimony at depositions, court
proceedings, inquiries, hearings and trial; (v) make available facilities and
exemplar parts for the sole and limited use of assisting GM in the contest or
defense; and (vi) acknowledge that GM is responsible for and will control, as
between GM and Delphi, the conduct of the pursuit, contest or defense.

(c)    Tax Related Records. GM and Delphi agree to retain all Income Tax
Returns, related schedules and workpapers, and all material records and other
documents as required under Section 6001 of the Code, as well as by any similar
provision of state or local income tax law, until the later of (i) the
expiration of the applicable statute of limitations for the tax period to which
the records relate, or (ii) the Final Determination has been made with respect
to all issues related to the final Consolidated Tax Period.

With respect to Non-Income Taxes, GM and Delphi agree to retain all
Non-Income Tax Returns, related schedules and workpapers, and all material
records and other documents as required under Federal, state or local law, until
the later of (i) the expiration of the applicable statute of limitations for the
tax period to which the records relate, or (ii) a Determination has been made
with respect to all issues for the tax periods to which NITA applies.

If either party wishes to dispose of any such records or documents
after such retention period, then the procedure described in (a) above shall
apply.

15

19

SECTION 6.05. Production of Witnesses. Until the six-year anniversary of the Contribution Date, each of the parties hereto shall use all commercially reasonable efforts, and shall cause each of their respective Affiliates to use all commercially reasonable efforts, to make available to each other, upon written request, its directors, officers, employees and other Representatives as witnesses to the extent that any such Person may reasonably be required (giving consideration to the business demands upon such Persons) in connection with any legal, administrative or other proceedings in which the requesting party may from time to time be involved; provided, however, that with respect to any legal or administrative proceedings relating to the tax liability of any of the parties hereto or any of their respective Affiliates, each of the parties hereto shall, and shall cause each of their respective Affiliates to, make their directors, officers, employees and other Representatives available as witnesses until such time as the statute of limitations have expired with respect to all tax years prior to and including the year in which the asset transfers contemplated by this Agreement are consummated.

SECTION 6.06. Reimbursement. Unless otherwise provided in this Article 6, each party to this Agreement providing access, information or witnesses to another party pursuant to Sections 6.03, 6.04 or 6.05 shall be entitled to receive from the recipient, upon the presentation of invoices therefor, payment for all reasonable out-of-pocket costs and expenses (excluding allocated compensation, salary and overhead expense) as may be reasonably incurred in providing such information or witnesses.


ARTICLE 7

CERTAIN CLAIMS AND LITIGATION


Section 7.01.  Product Liability Claims.

(a)   Applicability. GM and Delphi agree to the allocation of liability for all claims and causes of action, however presented, alleging that parts, components or systems that have been (i) manufactured by the Delphi Automotive Systems Business or Delphi or its Affiliates, or (ii) manufactured by a third party, whether sold or otherwise supplied separately, or incorporated into components or systems of Delphi or its Affiliates, in each case, which have been sold or otherwise supplied by the Delphi Automotive Systems Business, Delphi or its Affiliates to GM, its Affiliates or customers of Delphi other than GM or its Affiliates (the foregoing collectively constituting "Delphi Products") have caused or been alleged to cause personal inuries, injuries to property or other damages as set forth in this Section 7.01. The provisions in this Section 7.01 cover claims which include but are not limited to the following types of claims: claims premised on theories of negligence, strict liability, express or implied warranties of merchantability, fitness for ordinary use and/or compliance with reasonable consumer expectations, failure to issue adequate warnings, negligent and/or intentional misrepresentation, negligent and/or intentional infliction of emotional distress, failure to provide replacement and/or retrofit parts, and failure to conduct a recall or adequately conduct a recall that has been issued. The provisions set forth in this Section 7.01 apply to claims for compensatory damages as well as all claims for punitive or exemplary damages and all claims for defective design as well as all claims for defective manufacture.

(b)      Parts Components or Systems Manufactured by the Delphi Automotive Systems Business Prior to January 1, 1999.

(i)  As between GM and Delphi, Delphi shall assume the defense of all such claims involving Delphi Products sold or otherwise supplied prior to January 1, 1999 to customers other than GM or an Affiliate or Subsidiary of GM. Delphi shall indemnify, defend and hold harmless GM and its Affiliates against any and all such claims. Delphi shall reimburse GM and its Affiliates for any reasonable attorneys' fees or other expenses reasonably incurred by GM subsequent to December 31, 1998 in connection with investigating and/or defending against any such claim.


16

20

       (ii) GM shall retain and/or assume the defense of all such claims involving parts, components or systems manufactured by the Delphi Automotive Systems Business prior to January 1, 1999 and sold or otherwise supplied to GM or its Affiliates before, on, or after January 1, 1999. GM shall indemnify, defend and hold harmless Delphi and its Affiliates against any and all such claims. GM shall reimburse Delphi and its Affiliates for any reasonable attorneys' fees or other expenses reasonably incurred by Delphi or its Affiliates subsequent to December 31, 1998 in connection with investigating and/or defending any such claim or securing the indemnification and/or defense that GM is required to provide pursuant to this paragraph.

      (c)   Parts, Components or Systems Manufactured, Sold or otherwise Supplied by Delphi on or Subsequent to January 1, 1999.

       (i)   Delphi shall defend GM and its Affiliates against all claims involving (A) parts, components or systems manufactured by Delphi or its Affiliates which on or subsequent to January 1, 1999 are sold or otherwise supplied to customers other than GM or its Affiliates; and (B) parts, components or systems acquired by the Delphi Automotive Systems Business or Delphi or its Affiliates from suppliers thereto other than GM or its Affiliates and sold or otherwise supplied by Delphi or its Affiliates on or subsequent to January 1, 1999 to customers other than GM or its Affiliates. Delphi or its Affiliates shall indemnify, defend and hold harmless GM and its Affiliates against any and all such claims. Delphi or its Affiliates shall reimburse GM and its Affiliates for any reasonable attorneys' fees or other expenses reasonably incurred by GM and its Affiliates in connection with investigating and/or defending any such claim or securing the indemnification and/or defense that Delphi and its Affiliates are required to provide pursuant to this paragraph.

       (ii) The rights, obligations and liabilities of GM and Delphi with respect to claims involving parts, components or systems manufactured by Delphi or its affiliates subsequent to December 31, 1998 which are sold by Delphi or its Affiliates to GM or its Affiliates shall be determined according to the terms of the agreements relating to such sale.

      (d)   Recall and Warranty Campaigns. Claims of GM or its Affiliates against the Delphi Automotive Systems Business in the nature of warranty and recall campaigns relating to parts, components or systems sold by the Delphi Automotive Systems Business to GM or its Affiliates (regardless of when or by whom manufactured (but excluding parts or systems manufactured by GM or its Affiliates)) which arise prior to or after the Contribution Date shall be determined according to the terms of the agreements relating to the sale of such parts, components or systems, all of which agreements are assumed by Delphi and its Affiliates pursuant to the terms of the Supply Agreement.

      (e)   Notice. GM and Delphi agree that in the case of claims covered by either paragraphs (b) or (c) above, the party receiving such a claim will notify the other party within 30 days of receipt of written notice of the claim. Thereafter, the party being notified of the claim shall have 30 days to respond. The party first receiving such a claim shall take all reasonable action necessary to defend against the claim including, but not limited to, responding to court ordered deadlines before the expiration of the time for response.

      Section 7.02.  General Litigation.

      (a)   Claims to Be Transferred to Delphi. On the Contribution Date, the legal responsibilities for the claims identified on Schedule K shall be transferred in their entirety from GM to Delphi. As of the Contribution Date and thereafter, Delphi shall assume the defense of these claims. Delphi shall indemnify, defend and hold harmless GM against these claims. Delphi shall reimburse GM for any reasonable attorneys fees and all other expenses reasonably incurred by GM subsequent to the Contribution Date in connection with investigating and/or defending against any such claim, including reimbursement for any services provided by members of the GM Legal Staff.

17

21

(b)    Claims to be Defended by GM at Delphi's Expense. GM shall defend
the claims identified in Schedule L; provided, however, that (i) Delphi shall
indemnify and hold harmless GM against any judgments entered against GM on the
claims identified on Schedule L or settlements of the claims identified on
Schedule L, provided that GM may not compromise or settle any such claim without
the prior written consent of Delphi, which shall not be unreasonably withheld or
delayed, (ii) GM shall promptly compromise or settle claim(s) identified on
Schedule L if Delphi so directs, (iii) GM shall promptly permit Delphi to assume
responsibility for the defense of the claims identified on Schedule L if Delphi
so requests and (iv) Delphi shall reimburse GM for any reasonable attorneys'
fees and all other expenses reasonably incurred by GM subsequent to the
Contribution Date in connection with defending against the claims identified on
Schedule L, including reimbursement for any services provided by members of the
GM Legal Staff.

(c)    Claims for which GM will Retain Liability. GM shall defend the
claims identified on Schedule M and shall indemnify and hold harmless Delphi
against any judgments entered against Delphi on the claims identified in
Schedule M or settlements of the claims identified on Schedule M. GM shall
reimburse Delphi for any reasonable attorneys' fees and all other expenses
reasonably incurred by Delphi subsequent to the Contribution Date in connection
with defending against the claims identified on Schedule M, including
reimbursement for any services provided by members of the Delphi Legal Staff.

Section 7.03.  Employment Related Claims.

(a)    Claims to Be Transferred to Delphi. On the Contribution Date, the
legal responsibilities for the claims identified on Schedule N shall be
transferred in their entirety from GM to Delphi. Thereafter, Delphi shall assume
the defense of these claims. Delphi shall indemnify, defend and hold harmless GM
against these claims. Delphi shall reimburse GM for any reasonable attorneys'
fees and all other expenses reasonably incurred by GM subsequent to the
Contribution Date in connection with investigating and/or defending against any
such claim, including reimbursement for any services provided by members of the
GM Legal Staff.

(b)    Claims to be Jointly Defended by GM and Delphi. GM and Delphi
shall jointly defend the claims identified in Schedule O; provided, however,
that (i) Delphi shall indemnify and hold harmless GM against any judgments
entered against GM on the claims identified in Schedule O or settlements of the
claims identified in Schedule O, provided that GM may not compromise or settle
any such claim regarding employees of Delphi without the prior consent of
Delphi, which consent shall not be unreasonably withheld or delayed and (ii)
Delphi and GM shall split the attorneys' fees and all other expenses reasonably
incurred subsequent to the Contribution Date in connection with defending
against the unemployment claims identified in Schedule O based on the number of
hourly employees of each organization that are claimants in the litigation.

(c)    Unscheduled Claims. Delphi will have financial responsibility
for employment related claims regarding all Delphi Employees and Delphi
Terminated Employees (as those terms are defined in the Employee Matters
Agreement, a copy of which is attached hereto as Exhibit B-1) whether incurred
before or after the Contribution Date. If a claim is not scheduled, Delphi and
GM shall mutually determine whether the claim is treated under Paragraph (a) or
(b) above. Responsibility for new U.S. claims will be treated in the same
manner. Notwithstanding the above, U.S. claims for pension and welfare benefits
from salaried employees who retire on or before the Contribution Date, and
hourly employees who retire on or before October 1, 1999 shall remain the
responsibility of GM.

Section 7.04. Cooperation. GM and Delphi and their respective
Affiliates shall cooperate with each other in the defense of any and all claims
covered under this Article 7 and afford to each other reasonable access upon
reasonable advance notice to witnesses and information (other than information
protected from disclosure by applicable privileges) that is reasonably required
to defend these claims as set forth in Article 6 of this Agreement. The
foregoing agreement to cooperate includes, but is not limited to, an obligation
to provide access to qualified assistance to provide information, witnesses and
documents to respond to discovery requests in specific lawsuits. In such cases,
cooperation shall be timely so that the party responding to discovery may meet
all court-imposed

18

22

deadlines. The party requesting information shall reimburse the party providing
information consistent with the terms of Section 6.06 of this Agreement. The
obligations set forth in this paragraph are more clearly defined in Section 6.01
through and including 6.06 of this Agreement, to which reference is hereby made.


ARTICLE 8

INSURANCE MATTERS

SECTION 8.01  Delphi Insurance Coverage During  the Transition Period.

(a)   Throughout the period beginning on the Contribution Date and
ending on the earlier of the Distribution Date or the first anniversary of the
Contribution Date (i.e., the "Insurance Transition Period"), GM shall, subject
to insurance market conditions and other factors beyond its control, maintain
policies of insurance, including for the benefit of Delphi or any of its
Affiliates, directors, officers, employees or other covered parties
(collectively, the "Delphi Covered Parties") which are comparable to those
maintained generally by GM; provided, however, that this provision shall not
apply to insurance applicable to employees and/or beneficiaries relating to
benefits provided under ERISA governed benefit plans or to Personal Umbrella
Liability Insurance; provided, further, however, that if GM determines that (i)
the amount or scope of such coverage will be reduced to a level materially
inferior to the level of coverage in existence immediately prior to the
Insurance Transition Period or (ii) the retention or deductible level applicable
to such coverage, if any, will be increased to a level materially greater than
the levels in existence immediately prior to the Insurance Transition Period, GM
shall give Delphi notice of such determination as promptly as practicable. Upon
notice of such determination, Delphi shall be entitled to no less than 60 days
to evaluate its options regarding continuance of coverage hereunder and may
cancel all or any portion of such coverage as of any day within such 60 day
period. Except as provided below, during the Insurance Transition Period, such
policies of insurance shall cover Delphi Covered Parties for liabilities and
losses insured prior to the Contribution Date. To the extent of any self insured
or other loss retentions with respect to insurance policies in force, Delphi
shall, during the Insurance Transition Period, be solely responsible for any
losses, damages and related expenses, not included in GM insurance program
expense allocations to Delphi, incurred by itself or Delphi Covered Parties
within such loss or retentions and shall not seek reimbursement or
indemnification thereof from GM.

(b)   GM will use all commercially reasonable efforts to assist Delphi
Covered Parties in asserting claims under applicable insurance policies, and
shall adjust such policies, as necessary and practicable, to provide for Delphi
and GM recoveries consistent with their respective interests and shall not
unduly favor one insured party over another.

(c)   Delphi shall promptly pay or reimburse GM, as the case may be,
for premium expenses, and Delphi Covered Parties shall promptly pay or reimburse
GM for any costs and expenses which GM may incur in connection with the
insurance coverages maintained pursuant to this Section 8.01, including but not
limited to any subsequent premium adjustments. All payments and reimbursements
by Delphi and Delphi Covered Parties to GM shall be made within fifteen (15)
days after Delphi's receipt of an invoice from GM. Late payments shall bear
interest at the Prime Rate (as defined in Section 2.05(b) hereof) and shall be
paid in accordance with the terms relating to payments of interest set forth in
Section 2.05(b) of this Agreement.

(d)   To the full extent permitted by contract and law, the control and
administration of such insurance policies, including claims against insurance
policies and any modifications to terms or conditions of insurance policies,
shall remain with GM (except that any such action taken by GM shall treat fairly
all insured parties and their respective claims and shall not unduly favor one
insured party over another). Delphi and Delphi Covered Parties shall make all
reasonable efforts to facilitate GM's control and administration of such
policies.

(e)   GM's insurance policies shall be applicable to Delphi losses, as
follows: (i) with respect to any insurance policies where coverage is provided
on a "claims-made" or "occurrences reported" basis, any events,

23

acts or omissions which may give rise to insured losses, or damages which give rise to claims thereunder, must have occurred and notice given to GM prior to expiration of the Insurance Transition Period; (ii) with respect to other types of insurance policies, including those provided on an "occurrence" basis, any events, acts or omissions giving rise to any insured losses or damages must have occurred prior to expiration of the Insurance Transition Period; and (iii) with respect to all claims under all insurance policies, coverage for events, acts or omissions shall be interpreted consistent with the terms of such policies and the intent of subparagraphs (i) and (ii) above.

(f)    With respect to claims comprehended by the insurance policies, GM and Delphi shall control the investigation, defense and settlement of all claims as provided for in Article 7 of this Agreement; provided, however, that Delphi may not effect any settlement with respect to any such claim without GM's prior written consent (which consent shall not be unreasonably withheld or delayed) unless such settlement (i) will have no direct impact on GM's future insurance recoveries under relevant insurance policies, and (ii) will require that only Delphi or Delphi Covered Parties, and not GM or its insurers, assume financial responsibility for the settlement (under applicable deductibles or self-insured retentions), any related expenses and/or any subsequent premium adjustments.


SECTION 8.02. Delphi Insurance Coverage After The Insurance Transition Period. From and after expiration of the Insurance Transition Period, except as provided herein, Delphi, and Delphi alone, shall be responsible for obtaining and maintaining insurance programs for its risk of loss and such insurance arrangements shall be separate and apart from GM's insurance programs. Notwithstanding the foregoing, (a) GM, upon the request of Delphi, shall use all commercially reasonable efforts to assist Delphi in the transition to its own separate insurance programs from and after the Insurance Transition Period, and shall provide Delphi with any information that is in the possession of GM and is reasonably available and necessary to either obtain insurance coverages for Delphi or to assist Delphi in preventing unintended self-insurance, in whatever form, (b) each of GM and Delphi, at the request of the other, shall cooperate with and use commercially reasonable efforts to assist the other in recoveries from claims made under any insurance policy for the benefit of any insured party; and (c) neither GM nor Delphi, nor any of their Affiliates, shall take any action which would intentionally jeopardize or otherwise interfere with either party's ability to collect any proceeds payable pursuant to any insurance policy.


ARTICLE 9

MISCELLANEOUS

SECTION 9.01. Entire Agreement. This Agreement, including all the Ancillary Agreements and all other Exhibits and Schedules attached hereto, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior written and oral and all contemporaneous oral agreements and understandings with respect to the subject matter hereof, other than with respect to the Cash and Debt Management Agreement, dated as of December 22, 1998, among the Corporate Sector of GM, the Global Automotive Sector of GM and the Delphi Automotive Systems Sector of GM.

SECTION 9.02. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware regardless of the laws that might otherwise govern under principles of conflicts of laws applicable thereto.

SECTION 9.03. Descriptive Headings. The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

SECTION 9.04. Notices. All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered in person, by telecopy with answer back, by express or overnight mail delivered by a nationally recognized air courier (delivery charges prepaid), or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties as follows:

24

if to GM:

    c/o General Motors Corporation
    3031 West Grand Blvd.
    Detroit, MI  48202
    Attention:  Warren G. Andersen
    Telecopy:  (313) 974-0685

if to Delphi, the Delphi U.S. Subsidiaries or Delphi International Subsidiary:

    c/o Delphi Automotive Systems Corporation
    5725 Delphi Drive
    Troy, MI  48098
    Attention:  General Counsel
    Telecopy: 248-813-2523

or to such other address as the party to whom notice is given may have previously furnished to the others in writing in the manner set forth above. Any notice or communication delivered in person shall be deemed effective on delivery. Any notice or communication sent by telecopy or by air courier shall be deemed effective on the first Business Day at the place at which such notice or communication is received following the day on which such notice or communication was sent. Any notice or communication sent by registered or certified mail shall be deemed effective on the fifth Business Day at the place from which such notice or communication was mailed following the day on which such notice or communication was mailed.

SECTION 9.05. Parties in Interest. This Agreement shall be binding upon and inure solely to the benefit of each party hereto and their legal representatives and successors, and each Subsidiary and each Affiliate of the parties hereto, and nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Agreement, except for Article 5 (which is intended to be for the benefit of the Persons provided for therein and may be enforced by such Persons).

SECTION 9.06. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.

SECTION 9.07. Binding Effect; Assignment. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives and successors. This Agreement may not be assigned by any party hereto. The Schedules and Exhibits attached hereto or referred to herein are an integral part of this Agreement and are hereby incorporated into this Agreement and made a part hereof as if set forth in full herein.

SECTION 9.08. Dispute Resolution. Except as otherwise set forth in the Ancillary Agreements, resolution of any and all disputes arising from or in connection with this Agreement (excluding matters related to the Supply Agreement), whether based on contract, tort, or otherwise (collectively, "Disputes"), shall be exclusively governed by and settled in accordance with the provisions of this Section 9.08. The parties hereto shall use all commercially reasonable efforts to settle all Disputes without resorting to mediation, arbitration, litigation or other third party dispute resolution mechanisms. If any Dispute remains unsettled, a party hereto may commence proceedings hereunder by first delivering a written notice from a Senior Vice President or comparable executive officer of such party (the "Demand") to the other parties providing reasonable description of the Dispute to the others and expressly requesting mediation hereunder. The parties hereby agree to submit all Disputes to non-binding mediation before a mediator reasonably acceptable to all parties involved in such Dispute. If, after such mediation, the parties subject to such mediation disagree regarding the mediator's recommendation, such Dispute shall be submitted to arbitration under the terms hereof, which arbitration shall be final, conclusive and binding upon the parties, their successors and assigns. The arbitration shall be conducted in Detroit, Michigan by three arbitrators acting by majority vote (the

21

25

"Panel") selected by agreement of the parties not later than ten (10) days after the delivery of the recommendation provided by the mediator as described above or, failing such agreement, appointed pursuant to the commercial arbitration rules of the American Arbitration Association, as amended from time to time (the "AAA Rules"). If an arbitrator so selected or appointed becomes unable to serve, his or her successors shall be similarly selected or appointed. The arbitration shall be conducted pursuant to the Federal Arbitration Act and such procedures as the parties subject to such arbitration (each, a "Party") may agree, or, in the absence of or failing such agreement, pursuant to the AAA Rules. Notwithstanding the foregoing: (i) each Party shall have the right to audit the books and records of the other Party that are reasonably related to the Dispute; (ii) each Party shall provide to the other, reasonably in advance of any hearing, copies of all documents which a Party intends to present in such hearing; and (iii) each Party shall be allowed to conduct reasonable discovery through written requests for information, document requests, requests for stipulation of fact and depositions, the nature and extent of which discovery shall be determined by the Parties; provided that if the Parties cannot agree on the terms of such discovery, the nature and extent thereof shall be determined by the Panel which shall take into account the needs of the Parties and the desirability of making discovery expeditious and cost effective. The award shall be in writing and shall specify the factual and legal basis for the award. The Panel shall apportion all costs and expenses of arbitration, including the Panel's fees and expenses and fees and expenses of experts, between the prevailing and non-prevailing Party as the Panel deems fair and reasonable. The parties hereto agree that monetary damages may be inadequate and that any party by whom this Agreement is enforceable shall be entitled to seek specific performance of the arbitrators' decision from a court of competent jurisdiction, in addition to any other appropriate relief or remedy. Notwithstanding the foregoing, in no event may the Panel award consequential, special, exemplary or punitive damages. Any arbitration award shall be binding and enforceable against the parties hereto and judgment may be entered thereon in any court of competent jurisdiction.

SECTION 9.09. Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify such provision so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the fullest extent possible.

SECTION 9.10. Failure or Indulgence Not Waiver; Remedies Cumulative. No failure or delay on the part of any party hereto in the exercise of any right hereunder shall impair such right or be construed to be a waiver of, or acquiescence in, any breach of any representation, warranty or agreement herein, nor shall any single or partial exercise of any such right preclude other or further exercise thereof or of any other right. All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

SECTION 9.11. Amendment. No change or amendment will be made to this Agreement or the Ancillary Agreements except by an instrument in writing signed on behalf of each of the parties to such agreement.

SECTION 9.12. Authority. Each of the parties hereto represents to the other that (a) it has the corporate or other requisite power and authority to execute, deliver and perform this Agreement and the Ancillary Agreements, (b) the execution, delivery and performance of this Agreement and the Ancillary Agreements by it have been duly authorized by all necessary corporate or other action, (c) it has duly and validly executed and delivered this Agreement and the Ancillary Agreements, and (d) this Agreement and each Ancillary Agreement is a legal, valid and binding obligation, enforceable against it in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equity principles.

SECTION 9.13. Interpretation. The headings contained in this Agreement, in any Exhibit or Schedule hereto and in the table or contents to this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Any capitalized term used in any Schedule or Exhibit but not

22

26

otherwise defined therein, shall have the meaning assigned to such term in this
Agreement. When a reference is made in this Agreement to an Article or a
Section, Exhibit or Schedule, such reference shall be to an Article or Section
of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated.
After the Contribution Date, the Delphi Automotive Systems Business shall be
deemed to no longer exist and all references made herein to Delphi as a party
which operate as of a time following the Contribution Date, shall be deemed to
refer to Delphi, the Delphi U.S. Subsidiaries and Delphi International
Subsidiary as a single party.

******

[SIGNATURES ON FOLLOWING PAGE]

23

27

          IN WITNESS WHEREOF, each of the parties has caused this Agreement to be
executed on its behalf by its officers thereunto duly authorized on the day and
year first above written.

                    GENERAL MOTORS CORPORATION



          By:  /s/ G. Richard Wagoner
               ----------------------------------
               Name:  G. Richard Wagoner
               Title: President and Chief Operating Officer


          DELPHI AUTOMOTIVE SYSTEMS CORPORATION



          By: /s/ J.T. Battenberg, III
              ----------------------------------
              Name:  J.T. Battenberg, III
              Title: Chairman, Chief Executive Officer and
                     President


          DELPHI AUTOMOTIVE SYSTEMS LLC



          By: /s/ J.T. Battenberg, III
              ----------------------------------
              Name:  J.T. Battenberg, III
              Title: Chief Executive Officer and
                     President


          DELPHI TECHNOLOGIES, INC.



          By: /s/ Andrew Brown, Jr
              ----------------------------------
              Name:  Andrew Brown, Jr.
              Title: President


          DELPHI AUTOMOTIVE SYSTEMS (HOLDING), INC.



          By: /s/ John P. Arle
              ----------------------------------
              Name:  John P. Arle
              Title: President

**EXHIBIT F**

**Environmental Matters Agreement**

**Environmental Matters Agreement between Delphi Automotive Systems Corporation
(n/k/a Delphi) and GM, dated as of "October 1998"**

**Exhibit C-1**

## ENVIRONMENTAL MATTERS AGREEMENT

This Environmental Matters Agreement ("Agreement"), dated as of October, 1998, is made among General Motors Corporation, a Delaware corporation ("GM"), with its principal place of business in Detroit, Michigan, and Delphi Automotive Systems Corporation, a Delaware corporation ("Delphi"), with its principal place of business in Troy, Michigan. GM and Delphi are sometimes referred to herein as a "Party" and collectively as the "Parties."

### RECITALS

WHEREAS, GM and Delphi are Parties to a Master Separation Agreement entered into in connection with the separation of the business heretofore carried on by the Delphi Automotive Systems Division as a part of GM into a business owned and operated by Delphi and completely separate and independent from GM; and

WHEREAS, the Parties desire to enter into this Agreement regarding environmental matters.

NOW, THEREFORE, in consideration of the mutual covenants and provisions hereunder contained, the Parties agree as follows:

### ARTICLE 1

### Definitions

**1.1. <u>Defined Terms.</u>** As used in this Agreement, the following terms (in singular and plural forms) shall have the meanings below. Capitalized terms used, but not defined, herein shall have the meaning set forth in the Master Separation Agreement or elsewhere in this Agreement.

"Contribution Date" has the same meaning assigned to this term in the Master Separation Agreement.

"Corporate Successor" means any successor in interest of a Party by reason of a merger, reorganization or sale of all or substantially all of the assets of such Party.

"Delphi Assets" means the equipment, machinery and other personal property acquired by purchase, lease or otherwise by Delphi from GM as of the Contribution Date in accordance with the terms of the Master Separation Agreement whether or not associated with a Delphi Facility.

"Delphi Facility" means each parcel of real property, including all facilities and improvements thereon, acquired by purchase, lease or otherwise by Delphi as of the Contribution Date in accordance with the terms of the Master Separation Agreement as the same may

1

hereafter be revised as a result of the "true-up" process provided for in the Real Estate Matters Agreement between the Parties.

"Environmental Claim" shall mean any third-party (i.e., non-Party) accusation, allegation, notice of violation, action, claim, lien, demand, abatement or other order or directive (conditional or otherwise) for personal injury (including sickness, disease or death), tangible or intangible property damage, damage to the environment, nuisance, pollution, contamination of or other adverse effect on the environment or human health, or for fines, penalties, or restrictions, resulting from or based upon: (i) the existence, or the continuation of the existence of, a Release (including without limitation a sudden or non-sudden accidental or non-accidental Release), or, exposure to, any Hazardous Material, in, into or onto the indoor or outdoor environment, including, but not limited to, the air, soil, surface water or groundwater, at, on, by, from or related to any Facility; (ii) the use, management, handling, transportation, storage, treatment or disposal of Hazardous Material in connection with any Facility; or (iii) the violation or alleged violation of any Environmental Law relating to the ownership, use, operation, or remediation of any Facility or to the use, management, handling, transportation. Release, storage, treatment or disposal of Hazardous Materials thereon or therefrom.

"Environmental Costs and Liabilities" shall mean any and all losses, liabilities, obligations, damages, fines, penalties, judgments, actions, claims, reasonable costs and reasonable expenses (including without limitation attorneys' fees, disbursements and expenses of legal counsel, experts, engineers, and consultants and the costs of Remedial Action) arising from or under or related to any Environmental Law.

"Environmental Damages" shall refer to any and all Environmental Costs and Liabilities and Environmental Claims, including, but not limited to, costs, expenses and attorneys' or other experts' or consultants' fees in connection with any Remedial Action or enforcing any right of indemnification hereunder against any Indemnitor; provided, however, that Environmental Damages do not include consequential, special or incidental damages, including, but not limited to, loss of profits, loss of business opportunity, loss of use, diminution in value, stigma damages, or any attorneys' or consultant's fees or other expenses as to any matter as to which an Indemnitor has accepted its defense and indemnity obligations.

"Environmental Law" means, collectively, all applicable foreign, domestic, federal, state or local laws, statutes, ordinances, rules, regulations, codes, common law doctrines, or other legally binding requirements, including, but not limited to, orders, judgments, settlement agreements, consent orders, consent decrees, consent judgments or Environmental Permits, relating to regulation and protection of human health, the environment, or natural resources, including, but not limited to, all laws regulating Releases or threatened Releases of Hazardous Materials, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.,* the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq.,* the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *el seq.,* the Clean Air Act, 42 U.S.C. § 7401 *el seq.,* the Clean Water Act, 33 U.S.C. § 1251 *et seq.,* and the Toxic Substances Control Act, 15 U.S.C § 52601 *et seq., as* any of the foregoing may have been, or may in the future be, amended.

2

3

"Environmental Permits" means permits, licenses, registrations, and other authorizations issued under any Environmental Law.

"Environmental Records" means any and all books, records, notes, reports, letters, memoranda, assessments, testing data, maps, Environmental Permits, certificates, applications, approvals, surveys or other written, printed, or electronically or magnetically recorded materials, communications or data relating to; (i) the use, management, handling, transportation. Release, storage, treatment or disposal of any Hazardous Material in, about or under any Delphi Facility; (ii) the environmental condition of the Delphi Facilities; and (iii) compliance with Environmental Laws at the Delphi Facilities. By way of example, Environmental Records includes the following as they directly or indirectly relate to Delphi Facilities: environmental bulletins, environmental performance criteria, NAO reference letters, EPCRA and TSCA manuals, environmental performance audit reports (IPSR & EPR), Phase I property transfer evaluations, release reports, GM SARA database, ISO 14001 certification guidance, Title V materials, (e.g., compliance assessments, compliance reports, outside counsel memoranda re issues, GM emission factors, and rule interpretations).

"Facility" means, as the context may require, either a GM Retained Facility or a Delphi Facility, or both.

"GM Retained Facility" means any and all real property and facilities which are not Delphi Facilities and which were owned, operated, occupied or possessed by GM or its direct or indirect wholly-owned subsidiaries prior to the Contribution Date.

"Hazardous Material" shall mean, collectively, any: (i) chemical, material or substance: (a) which is now or hereafter becomes defined as or included in the definition of "hazardous substance," "extremely hazardous substance," "hazardous waste," "hazardous material," "restricted hazardous waste," "contaminant," "pollutant," "toxic substance," or words of similar import under any Environmental Law; or (b) the emission, discharge, release, storage, transport, disposal, management, handling or use of which is regulated under or subject to any Environmental Law; and (ii) petroleum or petroleum products, or derivatives or fractions thereof, flammable materials, explosives, radioactive materials (including radon gas other than that which is naturally occurring), urea formaldehyde foam insulation ("UFI"), asbestos-containing materials ("ACM") and polychlorinated biphenyls ("PCBs").

"Identified Waste Disposal Sites" means those Off-Site Waste Disposal Sites known to the Parties as of the Contribution Date, where liability is known or alleged, which are identified on Exhibit A to this Agreement.

"Indemnifying Party" or "Indemnitor" means a person that is obligated to provide indemnification under Article 3 of this Agreement.

"Indemnitee" means a person that is entitled to seek indemnification under Article 3 of this Agreement.

3

"Newly Identified Waste Disposal Site" means an Off-Site Waste Disposal Site other than an Identified Waste Disposal Site where liability becomes known or is alleged after the Contribution Date.

"Off-Site Waste Disposal Site" means any site, other than a Facility, which is or becomes subject to an obligation for Remedial Action under an Environmental Law.

"Release" means any release, spill, emission, escape, abandonment of any container or receptacle containing any Hazardous Material, leaking, pumping, pouring, emptying, injection, deposit, disposal, discharge, dispersal, leaching, movement or migration of any Hazardous Material on or into the indoor or outdoor environment or into or out of any property.

"Remedial Action" means all investigations and/or actions to: (i) clean up, remove, remediate, treat, or in any other way address any Hazardous Material under or pursuant to any Environmental Law; (ii) prevent the Release or threatened Release, or minimize the further Release of, any Hazardous Material so that it does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; (iv) perform corrective actions or obtain timely closure or closure certification related to any underground or aboveground tank, container storage area, treatment, storage or disposal facility or operation, solid waste management unit or other location of Hazardous Material use, management, handling, transportation, treatment, storage, or disposal; or (v) bring any matter, activity, practice or conduct into compliance with any Environmental Law.

## ARTICLE 2

### Allocation of Environmental Liabilities

### 2.1. <u>Responsibility for GM Retained Facilities.</u>

As of and after the Contribution Date, GM shall be solely responsible for all Environmental Damages arising from, relating to or in connection with all GM Retained facilities, whether or not the circumstances or claims giving rise to such Environmental Damages occurred or were asserted before or after the Contribution Date; provided, however, that Delphi shall be responsible for all Environmental Damages at the GM Retained Facilities to the extent caused by Delphi's acts or omissions first occurring or continuing after the Contribution Date. Where necessary for GM to fulfill its obligations under this Agreement, Delphi will use its best efforts to assign its rights with respect to GM Retained Facilities.

### 2.2. <u>Responsibility for Delphi Facilities.</u>

(a) Subject to Section 2.2(b), as of and after the Contribution Date, Delphi shall be solely responsible for all Environmental Damages arising from, relating to or in connection with all Delphi Facilities and Delphi Assets, whether or not the circumstances or claims giving rise to such Environmental Damages occurred or were asserted before or after the Contribution Date; provided, however, that GM shall be responsible for all Environmental Damages at the Delphi

4

Facilities to the extent caused by GM's acts or omissions first occurring or continuing after the Contribution Date.

(b) Notwithstanding Section 2.2(a), GM shall be solely responsible for all payments relating to any contract for Remedial Action and other environmental-related service or goods procurement contracts, or any stipulated penalties, fines or other sanctions under orders, decrees, judgments or settlements with respect to any environmental matter at a Delphi Facility, actually incurred but not paid by GM prior to the Contribution Date for services performed or acts or omissions occurring before the Contribution Date. Before the Contribution Date, Delphi shall procure environmental-related goods and services only on commercially reasonable terms and conditions, and in no event shall GM be responsible for any materials purchased by Delphi before the Contribution Date and not utilized by Delphi within ninety (90) days after the Contribution Date. Except as otherwise specifically provided in this Section 2.2(b), Delphi shall be solely responsible for all payments under any contracts for Remedial Action, other environmental-related service or goods procurement contracts, and any stipulated penalties, fines or other sanctions under orders, decrees, judgments, or settlements with respect to any environmental matter at a Delphi Facility.

(c) Between the date of the execution of this Agreement and the Contribution Date, the Parties shall pursue, with reasonable diligence and in good faith, with respect to the Delphi Facilities: (i) compliance with Environmental Laws; (ii) the avoidance of any liability under any Environmental Law; and (iii) the resolution or continued performance of any activities necessary to resolve any Environmental Claim or satisfy or discharge any Environmental Damages before the Contribution Date.

**2.3.  Responsibility for Waste Disposal Sites.**

(a) Identified Waste Disposal Sites.

As of and after the Contribution Date, GM shall be solely responsible for Environmental Damages and any other liabilities, to the extent due to contributions by GM before or after the Contribution Date, arising from, relating to or in connection with all Identified Waste Disposal Sites.

(b) Newly Identified Waste Disposal Sites.

Within twenty (20) days after receiving notice or other information as to the existence of a Newly Identified Waste Disposal Site as to which the other Party may have liability under an Environmental Law, the Party receiving such notice or information shall notify the other Party and provide copies of all relevant correspondence and other documents relating thereto.

(c) Allocation.

(i) The Parties' respective liability with respect to: (1) Newly Identified Waste Disposal Sites; and (2) contributions to Identified Waste Disposal Sites after the

5

Contribution Date, shall be allocated based on each Party's respective contributions thereto, as follows:

(a) GM's liability shall be based on contributions attributable to the GM Retained Facilities and any other facility owned or operated by GM before, on or after the Contribution Date except the Delphi Facilities.

(b) Delphi's liability shall be based on contributions attributable to the Delphi Facilities and any other facility owned or operated by Delphi on or after the Contribution Date, whether or not such contributions were made before or after the Contribution Date. Delphi shall not be responsible for contributions to Identified Waste Disposal Sites occurring before the Contribution Date.

(ii) The Parties shall use their reasonable best efforts to amicably resolve all liability and allocation issues using traditional factors, such as the volume, type and toxicity of the contributions to such Newly Identified Waste Disposal Site or Identified Waste Disposal Site by each Party.

**2.4. <u>Duty to Comply With Environmental Laws</u>.**

(a) <u>GM</u>. As of and after the Contribution Date, GM shall comply with Environmental Laws at the GM Retained Facilities and the sole legal and financial responsibility for compliance with Environmental Laws applicable to GM's use of, operations at or occupancy
of the GM Retained Facilities shall be that of GM.

(b) <u>Delphi</u>. As of and after the Contribution Date, Delphi shall comply with Environmental Laws at the Delphi Facilities and the sole legal and financial responsibility for compliance with Environmental Laws applicable to Delphi's use of, operations at or occupancy
of the Delphi Facilities shall be that of Delphi.

(c) The sole remedy of the Parties for breach of this Section 2.4 shall be under the indemnification provisions of Article 3 of this Agreement.

**2.5. <u>No Representations or Warranties</u>.** Except as otherwise expressly set forth in this Agreement, the Delphi Facilities and Delphi Assets are being conveyed in their "as is, where is" condition and with all faults and without any representation or warranty of any nature whatsoever, express or implied, oral or written, and in particular without any implied warranty of merchantability or fitness for a particular purpose.

6

7

## ARTICLE 3

### Indemnification

**3.1. <u>Indemnification by GM.</u>** GM shall indemnify, defend and hold harmless Delphi from and against all Environmental Damages which are caused by, relate to or arise in connection with:

(a) The GM Retained Facilities, including, but not limited to, Environmental Damages caused by, relating to or arising in connection with circumstances occurring or claims asserted either on, before or after the Contribution Date; provided, however, that GM shall have no indemnity or defense obligations hereunder with respect to Environmental Damages to the extent caused by, relating to, or arising in connection with Delphi's acts or omissions first occurring or continuing after the Contribution Date.

(b) Any act or omission by GM after the Contribution Date.

(c) Contributions before the Contribution Date to all Identified Waste Disposal Sites attributable to a Delphi Facility as well as contributions attributable to a GM Retained Facility.

(d) GM contributions to Newly Identified Waste Disposal Sites attributable to a GM Retained Facility.

(e) Any breach of this Agreement.

(f) Any imposition or acceleration of Environmental Costs and Liabilities or Environmental Claims regarding GM Retained Facilities under Section 9.2(b) under any applicable Environmental Transfer Law, as defined hereafter, as a result of the transactions contemplated by the Master Separation Agreement.

**3.2. <u>Indemnification by Delphi.</u>** Delphi shall indemnify, defend and hold harmless GM from and against all Environmental Damages which are caused by, relate to or arise in connection with:

(a) The Delphi Facilities and all Delphi Assets, including, but not limited to, Environmental Damages caused by, relating to or arising in connection with circumstances occurring or claims asserted either on, before or after the Contribution Date; provided, however, that Delphi shall have no indemnity or defense obligations hereunder with respect to Environmental Damages to the extent caused by. relating to or arising in connection with GM's acts or omissions first occurring or continuing after the Contribution Date.

(b) Any act or omission by Delphi after the Contribution Date.

(c) Any breach of this Agreement.

7

8

(d) Delphi contributions on or after the Contribution Date to Identified Waste Disposal Sites.

(e) Delphi contributions to Newly Identified Waste Disposal Sites attributable to a Delphi Facility.

(f) Any imposition or acceleration of Environmental Costs and Liabilities or Environmental Claims regarding Delphi Facilities under Section 9.2(b) under any applicable Environmental Transfer Law, as defined hereafter, as a result of the transactions contemplated by the Master Separation Agreement.

### 3.3. **Indemnification Procedures.**

(a) If any Indemnitee receives notice of any Environmental Claim or becomes aware of any Environmental Costs and Liabilities or other matter with respect to which an Indemnifying Party is or may be obligated under this Agreement to provide indemnification to such Indemnitee, the Indemnitee shall give the Indemnifying Party prompt written notice thereof (together with any information concerning the matter). Whenever practicable, such notice shall be provided at least ten (10) business days before the Indemnitee incurs any Environmental Damages in respect of such matter. If such advance notice is not practicable, then notice shall be provided as soon as practicable. Failure or delay of any Indemnitee to give notice as provided in this Section 3.3 shall not relieve any Indemnifying Party of its obligations except to the extent that such Indemnifying Party is actually prejudiced.

(b) An Indemnifying Party may elect to defend any Environmental Claim at its own expense and through its counsel (which counsel shall be reasonably acceptable to the Indemnitee). If an Indemnifying Party elects to defend an Environmental Claim, it shall notify the Indemnitee of its intent to do so within ten (10) business days after receiving notice of such Environmental Claim (or sooner, if the nature of such Environmental Claim so requires). The Indemnitee shall cooperate in the defense of such Environmental Claim. The Indemnifying Party shall keep the Indemnitee reasonably informed as to the status of the defense of such Environmental Claim. The Indemnifying Party shall also pay such Indemnitee's reasonable out-of-pocket expenses incurred in connection with such cooperation, but shall not be responsible for any legal or other expenses subsequently incurred by such Indemnitee in connection with the defense of such Environmental Claim. The Indemnifying Party shall not, without the prior written consent of the Indemnitee: (i) settle or compromise any Environmental Claim or consent to the entry of any judgment which does not include a written release from all liability to the Indemnitee; or (ii) settle or compromise any Environmental Claim in any manner that would be reasonably likely to have a material adverse effect on the Indemnitee. If an Indemnifying Party elects not to defend against a Environmental Claim, or fails to properly notify an Indemnitee of its election, the Indemnitee may defend, compromise, and settle such Environmental Claim and shall be entitled to indemnification to the extent permitted hereunder; provided, however, that the Indemnitee may not compromise or settle any such Environmental Claim without the prior written consent of the Indemnifying Party, which shall not be unreasonably withheld or delayed.

8

**3.4. <u>Mitigation.</u>** No Party shall have any obligation to indemnify the other Party with respect to any Environmental Damages to the extent such Environmental Damages could have reasonably been avoided or mitigated.

**3.5. <u>Exclusive Remedy.</u>** The Parties acknowledge that, except with respect to matters covered under Sections 9.3 and 9.4 of this Agreement: (a) the rights and obligations provided in this Agreement shall be the exclusive rights and obligations of the Parties with respect to environmental matters; and (b) the remedies in Articles 3 and 6 of this Agreement shall be the exclusive remedies of the Parties with respect to environmental matters and shall be in lieu of, and not in addition to, all other remedies which may exist in law, equity or under any other contract.

**3.6. <u>No Initiation of Third Party Claims.</u>** The Parties shall not initiate any action with any third party, including any governmental agency, which could reasonably be expected to lead to an Environmental Claim; provided, however, that nothing herein shall prevent either Party from performing its obligations or exercising its rights under this Agreement.

**3.7. <u>Cooperation On Third Party Claims.</u>** If either Party, in addressing a matter or in defending or resolving any Environmental Claim as to which it has defense or indemnification responsibility under this Agreement (for purposes of this Section 3.7, the "Indemnifying Party"), remediates or incurs costs or damages with respect to a matter for which a third party may be responsible or liable, the other party agrees to cooperate with the Indemnifying Party in pursuing any claim against such third party and the Parties shall assist each other so as to enable the Indemnifying Party to legally assert such claim against such third party and to recover its costs and damages from such third party, including acting as the real party in interest and assigning any rights or causes of action against any such third party relating to such claim or the proceeds thereof to the Indemnifying Party.

### ARTICLE 4

### Environmental Reserves

**4.1.** As of the Contribution Date, each Party shall be responsible for establishing its own reserves for environmental liabilities in accordance with generally accepted accounting principles. At the time of Contribution, the environmental reserves established for the Delphi Facilities are shown on Exhibit B. These reserves were established in accordance with the same principles used to establish reserves for GM Retained Facilities.

### ARTICLE 5

### Environmental Permits

**5.1.** Set forth on Exhibit C are all of the Environmental Permits identified and not yet expired with respect to the Delphi Facilities and the Delphi Assets. Exhibit C also identifies, with respect to each such Environmental Permit, whether each such Environmental Permit: (i)

9

10

relates to the Delphi Facilities and operations by GM on GM Retained Facilities, but shall not be transferred to Delphi by GM and shall remain with GM as permittee; (ii) may be transferred to Delphi under applicable Environmental Law; or (iii) may not be transferred to Delphi under applicable Environmental Law. The Parties shall use best efforts to: (i) effectuate the transfer of those Environmental Permits under clause (ii), above, that may be transferred to Delphi under applicable Environmental Law; (ii) obtain issuance to Delphi of new or replacement Environmental Permits for Delphi's operations now covered by the Environmental Permits described in clauses (i) or (iii), above; and (iii) mitigate problems that may arise during the transfer process. As of and after the Contribution Date, Delphi shall be solely responsible to obtain and comply with all Environmental Permits with respect to the Delphi Facilities and the Delphi Assets, whether or not GM was required under any Environmental Law to, but did not, obtain any such Environmental Permits. Prior to the Contribution Date, Delphi shall have obtained and GM shall also assist Delphi in obtaining new RCRA generator identification numbers which are or may be required under current or future Environmental Laws for hazardous waste, as defined under current or future Environmental Laws. If same cannot be obtained prior to the Contribution Date, Delphi will expeditiously obtain such identification number after the Contribution Date and, to the extent legally required, will use such number or obtain a substitute number for Delphi's use after the Contribution Date. Without the prior written consent of GM, Delphi will not use for any purpose any such numbers issued before the Contribution Date to GM with respect to the Delphi Facilities.

## ARTICLE 6

### Dispute Resolution

**6.1.** The Parties shall use good faith, best efforts and sound and accepted engineering judgment in making all determinations under this Agreement. In the event of a dispute or disagreement under this Agreement, the Parties shall consult in good faith with each other and shall use best efforts to resolve the matter. It is the express intent of the Parties that any such disputes or disagreements shall be resolved through negotiation between the Parties or, if mutually agreeable as to a specific matter in each Party's discretion, a form of alternative dispute resolution, including binding or non-binding arbitration. It is further understood and agreed, however, that alternative dispute resolution and litigation under this Agreement shall be viewed as a last resort and that the results of any non-litigation dispute resolution procedure under this Article 6 shall not be admissible for any purposes in any litigation in which the Parties are involved and relating to this Agreement unless the Parties otherwise agree as part of such resolution or are utilized to enforce the terms thereof. Either Party shall have the right, after making a reasonable and good faith effort to resolve such dispute through other means, to seek judicial relief in connection with any dispute arising under this Agreement, and in the event that either Party resorts to litigation in order to resolve a dispute (including any breach of this Agreement) under this Agreement, the Party prevailing in connection with such dispute shall be entitled to recover its reasonable and actual attorneys' fees and costs incurred in connection with such litigation. In the event that the matter in litigation relates to a dispute involving a Party's failure to comply with its defense and indemnification obligations under this Agreement and the Party in favor of whom such obligations run has, as a result of the successful assertion of an Environmental Claim, spent money to resolve or otherwise dispose of any resulting

10

11

Environmental Damages, the Indemnifying Party shall pay the Indemnitee's interest at the "prime rate" then in effect from the date due until fully paid, on and to the extent of any expenditures by the other Party in respect of such Environmental Damages. Except with respect to matters covered by Section 2.4 (Duty to Comply with Environmental Laws), the procedures under this Article 6 shall apply to all disputes arising under this Agreement.

## ARTICLE 7

### Transfer Obligations and Non-Assignability

**7.1. Duties Upon Transfer**. Each Party, in connection with the execution and delivery of any lease, sublease, assignment, agreement of sale or other transfer, assignment or conveyance agreement relating to the Delphi Facilities, Delphi Assets or GM Retained Facilities ("Conveyance Document") in which any interest in or portion of any Delphi Facility, Delphi Asset or GM Retained Facility, respectively, is conveyed, sold, contributed, assigned, transferred, leased or subleased, shall use its reasonable best efforts to provide in such Conveyance Document that the non-transferring Party shall have no liability or responsibility for, and shall be fully released and exculpated from, all Environmental Costs and Liabilities and Environmental Claims with respect to the specific Delphi Facility, Delphi Asset or GM Retained Facility subject to such Conveyance Document, and to impose the obligations under this Section 7.1 on any subsequent user, occupant or transferee.

**7.2. Non-Assignability**. The Parties' respective rights, obligations, duties and liabilities under this Agreement, including, but not limited to, the indemnification provisions of Article 3, are personal to each of them and may not be assigned to, or assumed by, any successor, assignee, or any other person without the prior written consent of the other Party, which consent may be granted or withheld in the sole discretion of such other Party; provided, however, that either Party may assign their respective rights under this Agreement to a Corporate Successor without the consent of the other Party, but only if such Corporate Successor also agrees to assume such Party's duties, obligations and liabilities under this Agreement. No such assignment or assumption shall relieve either Party of its obligations under this Agreement unless so agreed in writing by the other Party.

## ARTICLE 8

### Mutual Releases and Covenants Not to Sue

**8.1. Release**. Except as otherwise expressly set forth in Articles 3 and 6 of this Agreement, each Party hereby fully and forever releases and discharges the other Party and its officers, directors, employees, shareholders, direct and indirect wholly-owned subsidiaries, representatives and agents from all manner of action and causes of action, suits, proceedings, arbitrations, choses in action, contracts, covenants, claims, bonds, bills, debts, dues, sums of money, damages, demands and rights whatsoever, in law or in equity, now existing or which may hereafter accrue by reason of any known or unknown facts existing either before or after the Contribution Date and which relate to matters under Environmental Laws, whether or not specifically addressed in this Agreement, including, but not limited to, the environmental

11

12

condition and compliance status of the Delphi Facilities, the Delphi Assets, the GM Retained Facilities, the Identified Waste Disposal Sites, and the Newly Identified Waste Disposal Sites, and all Environmental Damages, Environmental Costs and Liabilities, and Environmental Claims relating thereto.

**8.2. Covenant Not to Sue**. Except as otherwise expressly set forth in Articles 3 and 6 of this Agreement, each Party hereby covenants that it shall not commence any action, arbitration, proceeding or suit, or participate or assist in any manner in the commencement or prosecution of any action, arbitration, proceeding or suit, in law or in equity, in any judicial, administrative, or other forum, based upon or arising out of any matter subject to a release by such Party under Section 8.1 of this Agreement.

## ARTICLE 9

### Miscellaneous

**9.1. Environmental Records**.

(a) As of the Contribution Date, GM shall transfer to Delphi either the originals or true and complete copies of all Environmental Records.

(b) Subject to Section 9.1(c), for a period of seven (7) years from and after the date hereof, each Party covenants and agrees to keep and maintain at reasonably accessible locations all of the Environmental Records in its possession or control as of the date hereof or otherwise coming into the possession or control of such Party after the date hereof. Following reasonable advance written notice, each Party shall make available for review and photocopying by the other Party each and all of its Environmental Records.

(c) With respect to matters in dispute between the Parties or subject to an Environmental Claim at the end of the seven (7) year record retention period, such retention period shall be extended and shall continue with respect to all Environmental Records that may be relevant to the matter until the matter is finally and fully resolved.

**9.2. Environmental/Real Property Transfer Laws**.

(a) The Parties shall reasonably cooperate in good faith with respect to compliance with any applicable Environmental Laws or other laws that require disclosures or other notifications regarding environmental matters to be made by or to either Party or any unit of government in connection with the transactions contemplated by the Master Separation Agreement (collectively, "Environmental Transfer Laws"). To the extent that any obligation exists under any Environmental Transfer Laws to report any information or make any report or notice, such obligation shall be jointly undertaken by the Parties. Each Party hereby waives any requirements under any such Environmental Transfer Law that disclosures or other reports or notifications be made before the Contribution Date and agree that such disclosures and other notifications may be made on the Contribution Date.

12

13

(b) The Parties shall each use their reasonable best efforts to avoid the imposition of or accelerating any Environmental Costs and Liabilities or Environmental Claims under any applicable Environmental Transfer Law as a result of the transactions contemplated by the Master Separation Agreement. Such avoidance strategies could include GM leasing assets to Delphi. Subject to the preceding sentence, neither Party shall be liable or responsible for any Environmental Costs and Liabilities or Environmental Claims regarding the other Party's facilities under any Environmental Transfer Law resulting from the transactions contemplated by the Master Separation Agreement, and each Party shall indemnify and defend the other with respect thereto in accordance with the terms of Article 3.

**9.3. Wastewaters, Stormwater and other Services Agreements**. The Parties may enter into a Wastewaters and Stormwater Services Agreement, or other agreements, under which one Party shall provide certain services for the other Party.

**9.4. Leases and Sub-leases Regarding Certain Facilities**. The Parties have entered or will enter into leases and sub-leases with respect to certain facilities. The terms and conditions with respect to environmental matters at such facilities shall be governed by the respective leases and sub-leases for those facilities.

**9.5. Entire Agreement**. Except for the Master Separation Agreement, the service agreements and the leases and sub-leases referenced in this Agreement, this Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings with respect to the subject matter hereof. In the event of a conflict between this Agreement and the Master Separation Agreement, the terms of this Agreement shall supersede those of the Master Separation Agreement. This Agreement is not intended to confer upon any other person any benefit, right or remedy.

**9.6. No Arrangement for Disposal.** The Parties each acknowledge that the transactions contemplated by this Agreement constitute a transfer of assets in the ordinary course of business and are not intended in any way, nor will they be deemed to be, an arrangement for treatment, storage or disposal of any of the Delphi Facilities or Delphi Assets or any substances or materials contained therein. Delphi agrees that GM will not have any liability under any Environmental Law by virtue of such transfer alone and Delphi will not assert any claim or cause of action against GM based solely thereon.

**9.7. Further Assurances.** The Parties hereto, at any time before or after the Contribution Date, shall, at their own expense, execute, acknowledge and deliver any further assurances, documents and instruments reasonably requested by one another and shall take any other action consistent with the terms of this Agreement that may reasonably be requested by one another for the purpose of consummating the transactions contemplated by or fulfilling the intent of this Agreement.

**9.8. Governing Law.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware regardless of the laws that otherwise govern under applicable principles of conflicts of laws.

13

14

**9.9. <u>Descriptive Headings</u>.** The descriptive headings herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

**9.10. <u>Notices</u>.** All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered in person, by express or overnight mail or messenger delivered by a nationally recognized air courier (delivery charges prepaid), or by registered or certified mail (postage prepaid, return receipt requested), to a Party as follows:

If to GM: Michelle T. Fisher, Esq.

If to Delphi: Mark A. Hester, Esq.

**9.11. <u>Amendment</u>.** No change or amendment shall be made to this Agreement except by an instrument in writing signed on behalf of each Party hereto.

**9.12. <u>Counterparts</u>.** This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

**9.13. <u>Severability</u>.** If any provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the subject matter hereof is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner so the intent hereof is fulfilled to the fullest extent possible.

**9.14. <u>Failure or Induilgence Not Waived</u>.** Subject to the express provisions of this Agreement, no failure or delay on the part of any Party hereto in the exercise of any right hereunder shall impair such right or be construed to be a waiver of, or acquiescence in, any breach of this Agreement, nor shall any single or partial exercise of any such right preclude other or further exercise thereof or of any other right.

**9.15. <u>Confidentiality</u>.** The terms of this Agreement shall remain confidential and each Party shall not disclose the same without the prior written consent of the other Party except: (a) to such Party's directors, officers, partners, employees, legal counsel, accountants, engineers,

14

15

contractors, financial advisors and similar professionals and consultants to the extent such Party deems it necessary or appropriate and such Party shall inform each of the foregoing persons of such Party's obligations under this paragraph and shall secure the agreement of such persons to be bound by the terms hereof; (b) pursuant to contractual obligations existing as of the date hereof; or (c) as otherwise required by law or regulation.

**9.16.** No rights are created in any third party by this Agreement.

**9.17.** Each Party will cause its direct and indirect wholly-owned subsidiaries to take such actions as may be reasonably necessary to assist such Party to perform its obligations under this Agreement.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by its authorized officers.

GENERAL MOTORS CORPORATION

By:/s/ [ILLEGIBLE]
    Name:    [ILLEGIBLE]
    Title:    [ILLEGIBLE]

DELPHI AUTOMOTIVE SYSTEMS
CORPORATION

By:/s/ James A. Bertrand
    Name:    James A. Bertrand
    Title:    Vice President-Operations


EXECUTION RECOMMENDED
WORLDWIDE REAL ESTATE

BY  /s/ C. P. Schwartz

15

16