IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :

In re                     :      Chapter 11
                        :

DPH HOLDINGS CORP., et al.,    :      Case No. 05-44481 (RDD)
                        :

        Reorganized Debtors.    :      (Jointly Administered)
                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AFFIDAVIT OF SERVICE

      I, Darlene Calderon, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants LLC, the Court appointed claims and noticing agent for the Reorganized Debtors in the above-captioned cases.

      On March 8, 2010, I caused to be served the documents listed below (i) upon the parties listed on Exhibit A hereto via overnight mail, (ii) upon the parties listed on Exhibit B hereto via electronic notification, and (iii) upon the parties listed on Exhibit C hereto via postage pre-paid U.S. mail:

1) Reorganized Debtors' Supplemental Reply to Responses of Certain Claimants to Debtors' Objections to Proofs of Claim Nos. 13776 and 13881 Filed by the New York State Department of Environmental Conservation ("Supplemental Reply Regarding the New York Claims") (Docket No. 19600) [a copy of which is attached hereto as Exhibit D]

2) Reorganized Debtors' Supplemental Reply to Responses of Certain Claimants to Debtors' Objections to Proof of Claim No. 12833 Filed by PLA Holdings VI LLC ("Supplemental Reply Regarding PLA Holdings' Claim") (Docket No. 19601) [a copy of which is attached hereto as Exhibit E]

3) Reorganized Debtors' Supplemental Reply to Responses of the City of Olathe to Debtors' Objections to Proofs of Claim Nos. 14825 and 14826 Filed by the City of Olathe ("Supplemental Reply Regarding the City of Olathe's Claims") (Docket No. 19602) [a copy of which is attached hereto as Exhibit F]

4) Reorganized Debtors' Supplemental Reply to Responses of Certain Claimants to Debtors' Objections to Proofs of Claim Nos. 11983, 11985, 11988, and 11989 Filed by Illinois Tool Works Inc. and ITW Food Equipment Group LLC ("Supplemental Reply Regarding Illinois Tool Claims") (Docket No. 19603) [a copy of which is attached hereto as Exhibit G]

5) Reorganized Debtors' Supplemental Reply to Response of Certain Claimants to Debtors' Objections to (A) Proofs of Claim Nos. 10959 and 10960 Filed by Heraeus Amersil, Inc. a/k/a Heraeus Tenevo and (B) Proofs of Claim Nos. 11643 and 11644 Filed by Milliken & Company ("Supplemental Reply Regarding Mercury Refining Site Claims") (Docket No. 19604) [a copy of which is attached hereto as Exhibit H]

6) Reorganized Debtors' Supplemental Reply to Responses of Certain Claimants to Debtors' Objections to Proof of Claim No. 7054 Filed by Joyce L. Skillman, Proof of Claim No. 9221 Filed by Audrey Amort Cabrera, Proof of Claim No. 10830 Filed by Saundra L. Hamlin, Proof of Claim No. 11375 Filed by Jeffrey A. Miller, Administrative Expense Claim No. 16967 Filed by Dwight L. Goodin, Administrative Expense Claim No. 18614 Filed by William E. Cross, and Administrative Expense Claim No. 19162 Filed by Scott A. McBain ("Supplemental Reply Regarding Certain Pension and Benefit Claims") (Docket No. 19605) [a copy of which is attached hereto as Exhibit I]

7) Reorganized Debtors' Supplemental Reply to Response of Claimant to Debtors' Objection to Proof of Claim No. 6991 Filed by FHBC America, Inc. and Subsequently Transferred to Contrarian Funds LLC ("Supplemental Reply Regarding Duplicate Claim") (Docket No. 19606) [a copy of which is attached hereto as Exhibit J]

8) Reorganized Debtors' Supplemental Reply to Responses of Certain Claimants to Debtors' Objections to Proof of Claim No. 11911 Filed by Michael Potter and Administrative Expense Claim No. 18603 Filed by Lance W. Weber ("Supplemental Reply Regarding Certain Equity Claims") (Docket No. 19607) [a copy of which is attached hereto as Exhibit K]

9) Notice of Adjournment of Claims Objection Hearing with Respect to Debtors' Objection to (A) Proof of Claim No. 11892 Filed by Ronald E. Jorgensen, (B) Proof of Claim No. 12147 Filed by Pamela Gellar, (C) Proofs of Claim Nos. 14019, 14020, 14022, 14023, 14024, 14025, and 14026 Filed by Atul Pasricha, (D) Proof of Claim No. 14370 Filed by William P. Downey, (E) Administrative Expense Claim No. 18265 Filed by Polymer Concentrates, Inc., (F) Administrative Expense Claim No. 18422 Filed by Marybeth Cunningham, (G) Administrative Expense Claim No. 19543 Filed by Jose C. Alfaro and Martha Alfaro, and (H) Administrative Expense Claim No. 19545 Filed by Harris County et al. ("Notice of Adjournment of Sufficiency Hearing as to Certain Proofs of Claim and Administrative Expense Claims") (Docket No. 19608) [a copy of which is attached hereto as Exhibit L]

On March 8, 2010, I caused to be served the document listed below upon the party listed on <u>Exhibit M</u> hereto via overnight mail:

10) Reorganized Debtors' Supplemental Reply to Responses of Certain Claimants to Debtors' Objections to Proofs of Claim Nos. 13776 and 13881 Filed by the New York State Department of Environmental Conservation ("Supplemental Reply Regarding the New York Claims") (Docket No. 19600) [a copy of which is attached hereto as Exhibit D]

On March 8, 2010, I caused to be served the document listed below upon the parties listed on <u>Exhibit N</u> hereto via overnight mail:

11) Reorganized Debtors' Supplemental Reply to Responses of Certain Claimants to Debtors' Objections to Proof of Claim No. 12833 Filed by PLA Holdings VI LLC ("Supplemental Reply Regarding PLA Holdings' Claim") (Docket No. 19601) [a copy of which is attached hereto as Exhibit E]

On March 8, 2010, I caused to be served the document listed below upon the party listed on <u>Exhibit O</u> hereto via overnight mail:

12) Reorganized Debtors' Supplemental Reply to Responses of the City of Olathe to Debtors' Objections to Proofs of Claim Nos. 14825 and 14826 Filed by the City of Olathe ("Supplemental Reply Regarding the City of Olathe's Claims") (Docket No. 19602) [a copy of which is attached hereto as Exhibit F]

On March 8, 2010, I caused to be served the document listed below upon the party listed on <u>Exhibit P</u> hereto via overnight mail:

13) Reorganized Debtors' Supplemental Reply to Responses of Certain Claimants to Debtors' Objections to Proofs of Claim Nos. 11983, 11985, 11988, and 11989 Filed by Illinois Tool Works Inc. and ITW Food Equipment Group LLC ("Supplemental Reply Regarding Illinois Tool Claims") (Docket No. 19603) [a copy of which is attached hereto as Exhibit G]

On March 8, 2010, I caused to be served the document listed below upon the parties listed on <u>Exhibit Q</u> hereto via overnight mail:

14) Reorganized Debtors' Supplemental Reply to Response of Certain Claimants to Debtors' Objections to (A) Proofs of Claim Nos. 10959 and 10960 Filed by Heraeus Amersil, Inc. a/k/a Heraeus Tenevo and (B) Proofs of Claim Nos. 11643 and 11644 Filed by Milliken & Company ("Supplemental Reply Regarding

Mercury Refining Site Claims") (Docket No. 19604) [a copy of which is attached hereto as Exhibit H]

On March 8, 2010, I caused to be served the document listed below upon the parties listed on Exhibit R hereto via overnight mail:

15) Reorganized Debtors' Supplemental Reply to Responses of Certain Claimants to Debtors' Objections to Proof of Claim No. 7054 Filed by Joyce L. Skillman, Proof of Claim No. 9221 Filed by Audrey Amort Cabrera, Proof of Claim No. 10830 Filed by Saundra L. Hamlin, Proof of Claim No. 11375 Filed by Jeffrey A. Miller, Administrative Expense Claim No. 16967 Filed by Dwight L. Goodin, Administrative Expense Claim No. 18614 Filed by William E. Cross, and Administrative Expense Claim No. 19162 Filed by Scott A. McBain ("Supplemental Reply Regarding Certain Pension and Benefit Claims") (Docket No. 19605) [a copy of which is attached hereto as Exhibit I]

On March 8, 2010, I caused to be served the document listed below upon the parties listed on Exhibit S hereto via overnight mail:

16) Reorganized Debtors' Supplemental Reply to Response of Claimant to Debtors' Objection to Proof of Claim No. 6991 Filed by FHBC America, Inc. and Subsequently Transferred to Contrarian Funds LLC ("Supplemental Reply Regarding Duplicate Claim") (Docket No. 19606) [a copy of which is attached hereto as Exhibit J]

On March 8, 2010, I caused to be served the document listed below upon the parties listed on Exhibit T hereto via overnight mail:

17) Reorganized Debtors' Supplemental Reply to Responses of Certain Claimants to Debtors' Objections to Proof of Claim No. 11911 Filed by Michael Potter and Administrative Expense Claim No. 18603 Filed by Lance W. Weber ("Supplemental Reply Regarding Certain Equity Claims") (Docket No. 19607) [a copy of which is attached hereto as Exhibit K]

On March 8, 2010, I caused to be served the document listed below upon the parties listed on Exhibit U hereto via overnight mail:

18) Notice of Adjournment of Claims Objection Hearing with Respect to Debtors' Objection to (A) Proof of Claim No. 11892 Filed by Ronald E. Jorgensen, (B) Proof of Claim No. 12147 Filed by Pamela Gellar, (C) Proofs of Claim Nos. 14019, 14020, 14022, 14023, 14024, 14025, and 14026 Filed by Atul Pasricha, (D) Proof of Claim No. 14370 Filed by William P. Downey, (E) Administrative Expense

Claim No. 18265 Filed by Polymer Concentrates, Inc., (F) Administrative Expense Claim No. 18422 Filed by Marybeth Cunningham, (G) Administrative Expense Claim No. 19543 Filed by Jose C. Alfaro and Martha Alfaro, and (H) Administrative Expense Claim No. 19545 Filed by Harris County et al. ("Notice of Adjournment of Sufficiency Hearing as to Certain Proofs of Claim and Administrative Expense Claims") (Docket No. 19608) [a copy of which is attached hereto as Exhibit L]

Dated: March 11, 2010

_____ */s/ Darlene Calderon* _____
Darlene Calderon

State of California
County of Los Angeles

Subscribed and sworn to (or affirmed) before me on this 11th day of March, 2010, by Darlene Calderon, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: _ */s/ Nancy Santos* _____

Commission Expires: _*2/2/14* _____

# EXHIBIT A

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|
| Barnes & Thornburg LLP | Peter A. Clark | One North Wacker Drive | Suite 4400 | Chicago | IL | 60606-2833 | 312-214-5668 | 312-759-5646 | Counsel to Recticel Interiors; Motorola; Temic Automotive |
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell LLP | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | 212-450-3092 212-450-3213 | Counsel to Debtor's Postpetition Administrative Agent; Counsel to JPMorgan Chase Bank, N.A. |
| Delphi Automotive LLP | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2491 | |
| DPH Holdings Corp. | John Brooks | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2143 | | Reorganized Debtors |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | 303-652-4716 | Counsel to Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | | Counsel to Flextronics International USA, Inc. |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Jennifer L Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | Financial Advisors to Debtors |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | Counsel to Employee Benefits |
| Hodgson Russ LLP | Garry M. Graber | 60 East 42nd St | 37th Floor | New York | NY | 10165-0150 | 212-661-3535 | 212-972-1677 | Counsel to Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | Counsel to General Motors Corporation |
| Internal Revenue Service | Attn: Insolvency Department | 477 Michigan Ave | Mail Stop 15 | Detroit | MI | 48226 | 313-628-3648 | 313-628-3602 | Michigan IRS |
| Internal Revenue Service | Attn: Insolvency Department, Maria Valerio | 290 Broadway | 5th Floor | New York | NY | 10007 | 212-436-1038 | 212-436-1931 | IRS |
| Jefferies & Company, Inc, | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | UCC Professional |
| JPMorgan Chase Bank, N.A. | Richard Duker | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | Prepetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Susan Atkins, Gianni Russello | 277 Park Ave 8th Fl | | New York | NY | 10172 | 212-270-0426 | 212-270-0430 | Postpetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | Counsel Data Systems Corporation; EDS Information Services, LLC |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 1 of 3

3/9/2010 5:02 PM
Master Service List 100301.xlsx Overnight

Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|
| Kurtzman Carson Consultants | Sheryl Betance | 2335 Alaska Ave | | El Segundo | CA | 90245 | 310-823-9000 | 310-823-9133 | Noticing and Claims Agent |
| Law Debenture Trust of New York | Daniel R. Fisher | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | Indenture Trustee |
| Law Debenture Trust of New York | Patrick J. Healy | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | Indenture Trustee |
| McDermott Will & Emery LLP | David D. Cleary | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Jason J. DeJonker | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Mohsin N. Khambati | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | Counsel to Recticel North America, Inc. |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | 212-682-5015 | UCC Professional |
| Milbank Tweed Hadley & McCloy LLP | Gregory A Bray Esq Thomas R Kreller Esq James E Till Esq | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017 | 213-892-4000 | 213-629-5063 | Counsel to Cerberus Capital Management LP and Dolce Investments LLC |
| New York State Office of Attorney General | Eugene J. Leff | Assistant Attorney General & Deputy Bureau Chief | 120 Broadway, 26th Floor | New York | NY | 10271 | 212-416-8465 | 212-416-6007 | State of New York; New York State Department of Environmental Consevation |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | New York Attorney General's Office |
| O'Melveny & Myers LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | Special Labor Counsel |
| O'Melveny & Myers LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | Special Labor Counsel |
| Paul, Weiss, Rifkind, Wharton & Garrison LLP | Stephen J. Shimshak Philip A Weintraub | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | 212-373-3000 | 212-757-3990 | Counsel to Ryder Integrated Logistics, Inc. |
| Pension Benefit Guaranty Corporation | Israel Goldowitz | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | Chief Counsel to the Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Karen L. Morris, John Menke, Ralph L. Landy, Beth A. Bangert | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | Counsel to Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | Counsel to Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 620 Eighth Ave | | New York | NY | 10018-1405 | 212-218-5500 | 212-218-5526 | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | Local Counsel to the Reorganized Debtors |

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 155 N Wacker Drive | Suite 2700 | Chicago | IL | 60606-1720 | 312-407-0700 | 312-407-0411 | Counsel to the Reorganized Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | Counsel to the Reorganized Debtor |
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Stahl Cowen Crowley Addis LLC | Jon D. Cohen, Trent P. Cornell | 55 West Monroe Street | Suite 1200 | Chicago | IL | 60603 | 312-641-0060 | 312-641-6959 | Counsel to the Delphi Retiree Committee |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | Counsel to Wamco, Inc. |
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | Conflicts Counsel to the Reorganized Debtors |
| United States Trustee | Brian Masumoto | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | 212-510-0500 | 212-668-2255 does not take service via fax | Counsel to United States Trustee |
| Weil, Gotshal & Manges LLP | Harvey R. Miller | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8500 | 212-310-8077 | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | Creditor Committee Member/Indenture Trustee |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 3 of 3

3/9/2010 5:02 PM
Master Service List 100301.xlsx Overnight

# EXHIBIT B

DPH Holdings Corp.
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|
| Barnes & Thornburg LLP | Peter A. Clark | One North Wacker Drive | Suite 4400 | Chicago | IL | 60606-2833 | 312-214-5668 | pclark@btlaw.com | Counsel to Recticel Interiors; Motorola; Temic Automotive |
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | rstark@brownrudnick.com | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | bsimon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | sreisman@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell LLP | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent; Counsel to JPMorgan Chase Bank, N.A. |
| Delphi Automotive LLP | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | |
| DPH Holdings Corp. | John Brooks | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2143 | john.brooks@delphi.com | Reorganized Debtors |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | cschiff@flextronics.com | Counsel to Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | paul.anderson@flextronics.com | Counsel to Flextronics International USA, Inc. |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Jennifer L Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | rodbuje@ffhsj.com sliviri@ffhsj.com | Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | lhassel@groom.com | Counsel to Employee Benefits |
| Hodgson Russ LLP | Garry M. Graber | 60 East 42nd St | 37th Floor | New York | NY | 10165-0150 | 212-661-3535 | ggraber@hodgsonruss.com | Counsel to Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| Jefferies & Company, Inc, | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Richard Duker | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | richard.duker@jpmorgan.com | Prepetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Susan Atkins, Gianni Russello | 277 Park Ave 8th Fl | | New York | NY | 10172 | 212-270-0426 | susan.atkins@jpmorgan.com | Postpetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | Sheryl Betance | 2335 Alaska Ave | | El Segundo | CA | 90245 | 310-823-9000 | sbetance@kccllc.com | Noticing and Claims Agent |
| Law Debenture Trust of New York | Daniel R. Fisher | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | daniel.fisher@lawdeb.com | Indenture Trustee |
| Law Debenture Trust of New York | Patrick J. Healy | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | patrick.healy@lawdeb.com | Indenture Trustee |

DPH Holdings Corp.
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|
| McDermott Will & Emery LLP | Jason J. DeJonker | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | jdejonker@mwe.com | Counsel to Recticel North America, Inc. |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | conh@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | bmctigue@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | lszlezinger@mesirowfinanci al.com | UCC Professional |
| Milbank Tweed Hadley & McCloy LLP | Gregory A Bray Esq Thomas R Kreller Esq James E Till Esq | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017 | 213-892-4000 | gbray@milbank.com tkreller@milbank.com jtill@milbank.com | Counsel to Cerberus Capital Management LP and Dolce Investments LLC |
| New York State Office of Attorney General | Eugene J. Leff | Assistant Attorney General & Deputy Bureau Chief | 120 Broadway, 26th Floor | New York | NY | 10271 | 212-416-8465 | eugene.leff@oag.state.ny.u s | State of New York; New York State Department of Environmental Consevation |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | william.dornbos@oag.state. ny.us | New York Attorney General's Office |
| O'Melveny & Myers LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Myers LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | tjerman@omm.com | Special Labor Counsel |
| Paul, Weiss, Rifkind, Wharton & Garrison LLP | Stephen J. Shimshak Philip A Weintraub | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | 212-373-3000 | sshimshak@paulweiss.com pweintraub@paulweiss.com | Counsel to Ryder Integrated Logistics, Inc. |
| Pension Benefit Guaranty Corporation | Karen L. Morris, John Menke, Ralph L. Landy, Beth A. Bangert | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | landy.ralph@pbgc.gov morris.karen@pbgc.gov menke.john@pbfgc.gov bangert.beth@pbgc.gov efile@pbgc.gov | Counsel to Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | sriemer@phillipsnizer.com | Counsel to Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | david.resnick@us.rothschild .com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 620 Eighth Ave | | New York | NY | 10018-1405 | 212-218-5500 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Reorganized Debtors |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 155 N Wacker Drive | Suite 2700 | Chicago | IL | 60606-1720 | 312-407-0700 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Reorganized Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | kmarafio@skadden.com | Counsel to the Reorganized Debtor |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 2 of 3

3/9/2010 5:03 PM
Master Service List 100301.xlsx Email

DPH Holdings Corp.
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | ddoyle@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | nfranke@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Stahl Cowen Crowley Addis LLC | Jon D. Cohen, Trent P. Cornell | 55 West Monroe Street | Suite 1200 | Chicago | IL | 60603 | 312-641-0060 | jcohen@stahlcowen.com tcornell@stahlcowen.com | Counsel to the Delphi Retiree Committee |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | cp@stevenslee.com cs@stevenslee.com | Counsel to Wamco, Inc. |
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | altogut@teamtogut.com | Conflicts Counsel to the Reorganized Debtors |
| Weil, Gotshal & Manges LLP | Harvey R. Miller | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8500 | harvey.miller@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | jeff.tanenbaum@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 3 of 3

3/9/2010 5:03 PM
Master Service List 100301.xlsx Email

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Adalberto Cañadas Castillo | | Avda Ramon de Carranza | 10-1º | Cadiz | | 11006 | Spain | 34 956 226 311 | adalberto@canadas.com | Representative to DASE |
| Adler Pollock & Sheehan PC | Joseph Avanzato | One Citizens Plz 8th Fl | | Providence | RI | 02903 | | 401-274-7200 | javanzato@apslaw.com | Attorneys for Fry's Metals Inc. and Specialty Coatings Systems Eft |
| Airgas, Inc. | David Boyle | 259 Radnor-Chester Road, Suite 100 | P.O. Box 6675 | Radnor | PA | 19087-8675 | | 610-902-6028 | david.boyle@airgas.com | Counsel to Airgas, Inc. |
| Akebono Brake Corporaton | Brandon J. Kessinger | 310 Ring Road | | Elizabethtown | KY | 42701 | | 270-234-5580 | bkessinger@akebono-usa.com | Representative for Akebono Corporation |
| Akin Gump Strauss Hauer & Feld, LLP | David M Dunn | 1333 New Hampshire Ave NW | | Washington | DC | 20036 | | 202-887-4000 | ddunn@akingump.com | Counsel to TAI Unsecured Creditors Liquidating Trust |
| Akin Gump Strauss Hauer & Feld, LLP | Ira S Dizengoff | One Bryant Park | | New York | NY | 10036 | | 212-872-1000 | idizengoff@akingump.com | Counsel to TAI Unsecured Creditors Liquidating Trust |
| Akin Gump Strauss Hauer & Feld, LLP | Peter J. Gurfein | 2029 Centure Park East | Suite 2400 | Los Angeles | CA | 90067 | | 310-552-6696 | pgurfein@akingump.com | Counsel to Wamco, Inc. |
| Allen Matkins Leck Gamble & Mallory LLP | Michael S. Greger | 1900 Main Street | Fifth Floor | Irvine | CA | 92614-7321 | | 949-553-1313 | mgreger@allenmatkins.com | Counsel to Kilroy Realty, L.P. |
| Alston & Bird, LLP | Craig E. Freeman | 90 Park Avenue | | New York | NY | 10016 | | 212-210-9400 | craig.freeman@alston.com | Counsel to Cadence Innovation, LLC |
| Alston & Bird, LLP | Dennis J. Connolly; David A. Wender | 1201 West Peachtree Street | | Atlanta | GA | 30309 | | 404-881-7269 | dconnolly@alston.com dwender@alston.com | Counsel to Cadence Innovation, LLC, PD George Co, Furukawa Electric Company, Ltd., and Furukawa Electric North America APD, Inc. |
| American Axle & Manufacturing, Inc. | Steven R. Keyes | One Dauch Drive, Mail Code 6E-2-42 | | Detroit | MI | 48243 | | 313-758-4868 | steven.keyes@aam.com | Representative for American Axle & Manufacturing, Inc. |
| Andrews Kurth LLP | Gogi Malik | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | gogimalik@andrewskurth.com | Counsel to ITW Mortgage Investments IV, Inc. |
| Anglin, Flewelling, Rasmussen, Campbell & Trytten, LLP | Mark T. Flewelling | 199 South Los Robles Avenue | Suite 600 | Pasadena | CA | 91101-2459 | | 626-535-1900 | mtf@afrct.com | Counsel to Stanley Electric Sales of America, Inc. |
| Arent Fox PLLC | Robert M. Hirsh | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | Hirsh.Robert@arentfox.com | Counsel to Pullman Bank and Trust Company |
| Arnall Golden Gregory LLP | Darryl S. Laddin | 171 17th Street NW | Suite 2100 | Atlanta | GA | 30363-1031 | | 404-873-8120 | dladdin@agg.com | Counsel to Daishinku (America) Corp. d/b/a KDS America ("Daishinku"), SBC Telecommunications, Inc. (SBC) |
| Arnold & Porter LLP | Joel M. Gross | 555 Twelfth Street, N.W. | | Washington | D.C. | 20004-1206 | | 202-942-5000 | joel_gross@aporter.com | Counsel to CSX Transportation, Inc. |
| ATS Automation Tooling Systems Inc. | Carl Galloway | 250 Royal Oak Road | | Cambridge | Ontario | N3H 4R6 | Canada | 519-653-4483 | cgalloway@atsautomation.com | Company |
| Balch & Bingham LLP | Eric T. Ray | PO Box 306 | | Birmingham | AL | 35201 | | 205-251-8100 | eray@balch.com | Attorney for Alabama Power Company |
| Barack, Ferrazzano, Kirschbaum & Nagelberg LLP | Kimberly J. Robinson | 200 W Madison St Ste 3900 | | Chicago | IL | 60606 | | 312-984-3100 | kim.robinson@bfkn.com | Counsel to Motion Industries, Inc., EIS, Inc. and Johnson Industries, Inc. |
| Barack, Ferrazzano, Kirschbaum & Nagelberg LLP | William J. Barrett | 200 W Madison St Ste 3900 | | Chicago | IL | 60606 | | 312-984-3100 | william.barrett@bfkn.com | Counsel to Motion Industries, Inc., EIS, Inc. and Johnson Industries, Inc. |
| Barnes & Thornburg LLP | Alan K. Mills | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | alan.mills@btlaw.com | Counsel to Mays Chemical Company |
| Barnes & Thornburg LLP | David M. Powlen | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | david.powlen@btlaw.com | Counsel to Howard county, Indiana |

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-------|------------------|
| Barnes & Thornburg LLP | John T. Gregg | 171 Monroe Avenue NW | Suite 1000 | Grand Rapids | MI | 49503 | | 616-742-3930 | jgregg@btlaw.com | Counsel to Priority Health; Clarion Corporation of America; Continental AG and Affiliates |
| Barnes & Thornburg LLP | Mark R. Owens | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | mark.owens@btlaw.com | Counsel to Clarion Corporation of America |
| Barnes & Thornburg LLP | Michael K. McCrory | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | michael.mccrory@btlaw.com | Counsel to Gibbs Die Casting Corporation; Clarion Corporation of America |
| Barnes & Thornburg LLP | Patrick E. Mears | 171 Monroe Avenue NW | Suite 1000 | Grand Rapids | MI | 49503 | | 616-742-3936 | pmears@btlaw.com | Counsel to Armada Rubber Manufacturing Company, Bank of America Leasing & Leasing & Capital, LLC, & AutoCam Corporation |
| Barnes & Thornburg LLP | Wendy D. Brewer | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | wendy.brewer@btlaw.com | Counsel to Gibbs Die Casting Corporation |
| Bartlett Hackett Feinberg P.C. | Frank F. McGinn | 155 Federal Street | 9th Floor | Boston | MA | 02110 | | 617-422-0200 | ffm@bostonbusinesslaw.com | Counsel to Iron Mountain Information Management, Inc. |
| Beeman Law Office | Thomas M Beeman | 33 West 10th Street | Suite 200 | Anderson | IN | 46016 | | 765-640-1330 | tom@beemanlawoffice.com | Counsel to Madison County (Indiana) Treasurer |
| Bendinelli Law Office PC | Jerry Sumner | 11184 Huron Street | Suite 10 | Denver | CO | 80234 | | 303-940-9900 | js@colawfirm.com michelle@colawfirm.com | Counsel to Jose C Alfaro |
| Bernstein Litowitz Berger & Grossman | Hannah E. Greenwald | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1411 | hannah@blbglaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Berry Moorman P.C. | James P. Murphy | 535 Griswold | Suite 1900 | Detroit | MI | 48226 | | 313-496-1200 | murph@berrymoorman.com | Counsel to Kamax L.P.; Optrex America, Inc.; GKN Sinter Metals, Inc. |
| Bialson, Bergen & Schwab | Kenneth T. Law, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | klaw@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc.. |
| Bialson, Bergen & Schwab | Lawrence M. Schwab, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | lschwab@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc.; Solectron Corporation; Solectron De Mexico SA de CV; Solectron Invotronics; Coherent, Inc.; Veritas Software Corporation |
| Bialson, Bergen & Schwab | Patrick M. Costello, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | pcostello@bbslaw.com | Solectron Corporation; Solectron de Mexico SA de CV; Solectron Invotronics and Coherent, Inc. |
| Bialson, Bergen & Schwab | Thomas M. Gaa | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | tgaa@bbslaw.com | Counsel to  Veritas Software Corporation |
| Bingham McHale LLP | Whitney L Mosby | 10 West Market Street | Suite 2700 | Indianapolis | IN | 46204 | | 317-635-8900 | wmosby@binghammchale.com | Counsel to Universal Tool & Engineering co., Inc. and M.G. Corporation |
| Blank Rome LLP | Marc E. Richards | The Chrylser Building | 405 Lexington Avenue | New York | NY | 10174 | | 212-885-5000 | mrichards@blankrome.com | Counsel to DENSO International America, Inc. |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 2 of 22

3/9/2010 3:29 PM
Email (388)

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Bodman LLP | Ralph E. McDowell | 100 Renaissance Center | 34th Floor | Detroit | MI | 48243 | | 313-393-7592 | rmcdowell@bodmanllp.com | Counsel to Freudenberg-NOK; General Partnership; Freudenberg-NOK, Inc.; Flextech, Inc.; Vibracoustic de Mexico, S.A. de C.V.; Lear Corporation; American Axle & Manufacturing, Inc. |
| Bond, Schoeneck & King, PLLC | Camille W. Hill | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | chill@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp. |
| Bond, Schoeneck & King, PLLC | Charles J. Sullivan | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | csullivan@bsk.com | Counsel to Diemolding Corporation |
| Bond, Schoeneck & King, PLLC | Stephen A. Donato | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | sdonato@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp; Diemolding Corporation |
| Boult, Cummings, Conners & Berry, PLC | Austin L. McMullen | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | amcmullen@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Boult, Cummings, Conners & Berry, PLC | Roger G. Jones | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | rjones@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Brembo S.p.A. | Massimiliano Cini | Administration Department via Brembo 25 | 24035 Curno BG | Bergamo | | | Italy | 00039-035-605-529 | massimiliano_cini@brembo.it | Creditor |
| Brown & Connery, LLP | Donald K. Ludman | 6 North Broad Street | | Woodbury | NJ | 08096 | | 856-812-8900 | dludman@brownconnery.com | Counsel to SAP America, Inc. |
| Buchalter Nemer, A Profesional Corporation | Shawn M. Christianson | 333 Market Street | 25th Floor | San Francisco | CA | 94105-2126 | | 415-227-0900 | schristianson@buchalter.com | Counsel to Oracle USA, Inc.; Oracle Credit Corporation |
| Buchanan Ingersoll & Rooney PC | Mary Caloway | The Brandywine Building | 1000 West Street, Suite 1410 | Wilmington | DE | 19801 | | 302-552-4200 | mary.caloway@bipc.com | Counsel to Fiduciary Counselors |
| Buchanan Ingersoll & Rooney PC | William H. Schorling, Esq. | Two Liberty Place | 50 S. 16th St., Ste 3200 | Philadelphia | PA | 19102 | | 215-665-5326 | william.schorling@bipc.com | Counsel to Fiduciary Counselors |
| Burr & Forman LLP | Michael Leo Hall | 420 North Twentieth Street | Suite 3100 | Birmingham | AL | 35203 | | (205) 458-5367 | mhall@burr.com | Counsel to Mercedes-Benz U.S. International, Inc |
| Cadwalader Wickersham & Taft LLP | Jeannine D'Amico | 1201 F St NW Ste 1100 | | Washington | DC | 20004 | | 202-862-2452 | jeannine.damico@cwt.com | Attorneys for the Audit Committee of Delphi Corporation |
| Cadwalader Wickersham & Taft LLP | John J. Rapisardi Esq Joseph Zujkowski Esq | One World Financial Center | | New York | NY | 10281 | | 212-504-6000 | john.rapisardi@cwt.com joseph.zujkowski@cwt.com | Counsel to the Auto Task Force of the U.S. Department of the Treasury |
| Cahill Gordon & Reindel LLP | Jonathan Greenberg | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | jonathan.greenberg@BASF.COM | Counsel to Engelhard Corporation |
| Cahill Gordon & Reindel LLP | Kevin Burke | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | kburke@cahill.com | Counsel to Engelhard Corporation |
| Calfee, Halter & Griswold LLC | Jean R. Robertson, Esq. | 1400 McDonald Investment Ctr | 800 Superior Ave | Cleveland | OH | 44114 | | 216-622-8404 | jrobertson@calfee.com | Counsel to Brush Engineered materials |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 3 of 22

3/9/2010 3:29 PM
Email (388)

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Calinoff & Katz, LLP | Dorothy H. Marinis-Riggio Robert Calinoff | 140 East 45th Street | 17th Floor | New York | NY | 10017 | | 212-826-8800 | dhriggio@gmail.com rcalinoff@candklaw.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, I |
| Carson Fischer, P.L.C. | Joseph M Fischer Patrick J Kukla | 4111 Andover Road | West 2nd Floor | Bloomfield Hills | MI | 48302 | | 248-644-4840 | brcy@carsonfischer.com | Counsel to Bing Metals Group, LLC; Behr America, Inc.; Findlay Industries; Vitec, LLC |
| Carson Fischer, P.L.C. | Robert A. Weisberg | 4111 Andover Road | West 2nd Floor | Birmingham | MI | 48302 | | 248-644-4840 | rweisberg@carsonfischer.com brcy@carsonfischer.com | Counsel to Cascade Die Casting Group, Inc.; Behr America, Inc. |
| Carter Ledyard & Milburn LLP | Aaron R. Cahn | 2 Wall Street | | New York | NY | 10005 | | 212-732-3200 | cahn@clm.com | Counsel to STMicroelectronics, Inc. |
| Chadbourne & Parke LLP | Douglas Deutsch, Esq. | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-408-5100 | ddeutsch@chadbourne.com | Counsel to EagleRock Capital Management, LLC |
| Clark Hill PLC | Joel D. Applebaum | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | japplebaum@clarkhill.com | Counsel to 1st Choice Heating & Cooling, Inc.; BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLC | Shannon Deeby | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | sdeeby@clarkhill.com | Counsel to BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLLC | Robert D. Gordon | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8572 | rgordon@clarkhill.com | Counsel to ATS Automation Tooling Systems Inc. |
| Cleary Gottlieb Steen & Hamilton LLP | Deborah M. Buell | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | maofiling@cgsh.com | Counsel to Arneses Electricos Automotrices, S.A.de C.V.; Cordaflex, S.A. de C.V. |
| Cleary, Gottlieb, Steen & Hamilton LLP | James L. Bromley | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | maofiling@cgsh.com | Counsel to Bear, Stearns, Co. Inc.; Citigroup, Inc.; Credit Suisse First Boston; Deutsche Bank Securities, Inc.; Goldman Sachs Group, Inc.; JP Morgan Chase & Co.; Lehman Brothers, Inc.; Merrill Lynch & Co.; Morgan Stanley & Co., Inc.; UBS Securities, LLC |
| Cohen & Grigsby, P.C. | Thomas D. Maxson | 11 Stanwix Street | 15th Floor | Pittsburgh | PA | 15222-1319 | | 412-297-4706 | tmaxson@cohenlaw.com | Counsel to Nova Chemicals, Inc. |
| Cohen, Weiss & Simon LLP | Joseph J. Vitale Babette Ceccotti | 330 West 42nd Street | | New York | NY | 10036 | | 212-356-0238 | jvitale@cwsny.com bceccotti@cwsny.com | Counsel to International Union, United Automobile, Areospace and Agriculture Implement Works of America (UAW) |
| Cohn Birnbaum & Shea P.C. | Scott D. Rosen, Esq. | 100 Pearl Street, 12th Floor | | Hartford | CT | 06103 | | 860-493-2200 | srosen@cb-shea.com | Counsel to Floyd Manufacturing Co., Inc. |
| Conlin, McKenney & Philbrick, P.C. | Bruce N. Elliott | 350 South Main Street | Suite 400 | Ann Arbor | MI | 48104 | | 734-971-9000 | Elliott@cmplaw.com | Counsel to Brazeway, Inc. |
| Connolly Bove Lodge & Hutz LLP | Jeffrey C. Wisler, Esq. | 1007 N. Orange Street | P.O. Box 2207 | Wilmington | DE | 19899 | | 302-658-9141 | jwisler@cblh.com | Counsel to ORIX Warren, LLC |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 4 of 22

3/9/2010 3:29 PM
Email (388)

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Contrarian Capital Management, L.L.C. | Mark Lee, Janice Stanton, Bill Raine, Seth Lax | 411 West Putnam Avenue | Suite 225 | Greenwich | CT | 06830 | | 203-862-8200 (230) 862-8231 | mlee@contrariancapital.com jstanton@contrariancapital.com wraine@contrariancapital.com solax@contrariancapital.com | Counsel to Contrarian Capital Management, L.L.C. |
| Coolidge Wall Co. LPA | Ronald S. Pretekin | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | Pretekin@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany; Attorneys for Columbia Industrial |
| Covington & Burling | Susan Power Johnston Aaron R. Marcu | 620 Eighth Ave | | New York | NY | 10018 | | 212-841-1005 | sjohnston@cov.com | Special Counsel to the Debtor |
| Cox, Hodgman & Giarmarco, P.C. | Sean M. Walsh, Esq. | Tenth Floor Columbia Center | 101 W. Big Beaver Road | Troy | MI | 48084-5280 | | 248-457-7000 | swalsh@chglaw.com | Counsel to Nisshinbo Automotive Corporation |
| Curtin & Heefner, LLP | Daniel P. Mazo | 250 N. Pennslyvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | dpm@curtinheefner.com | Counsel to SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |
| Curtin & Heefner, LLP | Robert  Szwajkos | 250 N. Pennslyvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | rsz@curtinheefner.com | Counsel to SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | Cindi Eilbott | 101 Park Avenue | | New York | NY | 10178-0061 | | 212-696-6936 | ceilbott@curtis.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Damon & Morey LLP | William F. Savino | 1000 Cathedral Place | 298 Main Street | Buffalo | NY | 14202-4096 | | 716-856-5500 | wsavino@damonmorey.com | Counsel to Relco, Inc.; The Durham Companies, Inc. |
| David P. Martin | | 519 Energy Center Blvd | Ste 1104 | Northport | AL | 35401 | | 205-343-1771 | davidpmartin@erisacase.com davidpmartin@bellsouth.net | Co-Counsel for David Gargis, Jimmy Mueller, and D. Keith Livingston |
| Day Pitney LLP | Richard M. Meth | P.O. Box 1945 | | Morristown | NJ | 07962-1945 | | 973-966-6300 | rmeth@daypitney.com | Counsel to Marshall E. Campbell Company |
| Day Pitney LLP | Ronald S. Beacher Conrad K. Chiu | 7 Times Square | | New York | NY | 10036 | | 212-297-5800 | rbeacher@daypitney.com cchiu@daypitney.com | Counsel to IBJTC Business Credit Corporation, as successor to IBJ Whitehall Business Credit Corporation |
| Dechert LLP | Glenn E. Siegel James O. Moore | 1095 Avenue of the Americas | | New York | NY | 10036-6797 | | 212-698-3500 | glenn.siegel@dechert.com james.moore@dechert.com | Counsel for Kensington International Limited, Manchester Securities Corp. and Springfield Associates, LLC |
| Denso International America, Inc. | Carol Sowa | 24777 Denso Drive | | Southfield | MI | 48086 | | 248-372-8531 | carol_sowa@denso-diam.com | Counsel to Denso International America, Inc. |
| DiConza Law, P.C. | Gerard DiConza, Esq. | 630 Third Avenue, 7th Floor | | New York | NY | 10017 | | 212-682-4940 | gdiconza@dlawpc.com | Counsel to Tyz-All Plastics, Inc.; Co-Counsel to Tower Automotive, Inc. |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 5 of 22

3/9/2010 3:29 PM
Email (388)

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Dinsmore & Shohl LLP | John Persiani | 1900 Chemed Center | 255 East Fifth Street | Cincinnati | OH | 45202 | | 513-977-8200 | john.persiani@dinslaw.com | Counsel to The Procter & Gamble Company |
| DLA Piper Rudnick Gray Cary US LLP | Richard M. Kremen Maria Ellena Chavez-Ruark | The Marbury Building | 6225 Smith Avenue | Baltimore | Maryland | 21209-3600 | | 410-580-3000 | richard.kremen@dlapiper.com | Counsel to Constellation NewEnergy, Inc. & Constellation NewEnergy - Gas Division, LLC |
| Drinker Biddle & Reath LLP | Andrew C. Kassner | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | andrew.kassner@dbr.com | Counsel to Penske Truck Leasing Co., L.P. |
| Drinker Biddle & Reath LLP | David B. Aaronson | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | david.aaronson@dbr.com | Counsel to Penske Truck Leasing Co., L.P. and Quaker Chemical Corporation |
| Duane Morris LLP | Joseph H. Lemkin | 744 Broad Street | Suite 1200 | Newark | NJ | 07102 | | 973-424-2000 | jhlemkin@duanemorris.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC; and Hosiden America Corporation |
| Duane Morris LLP | Lewis R Olshin Esq | 30 South 17th Street | | Philadelphia | PA | 19103 | | 215-979-1129 | Olshin@duanemorris.com | Counsel to ACE American Insurance Company and Pacific Employers Insurance Company |
| Duane Morris LLP | Margery N. Reed, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | dmdelphi@duanemorris.com | Counsel to ACE American Insurance Company |
| Duane Morris LLP | Wendy M. Simkulak, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | wmsimkulak@duanemorris.com | Counsel to ACE American Insurance Company |
| Dykema Gossett PLLC | Douglas S Parker | 39577 Woodward Ave | Suite 300 | Bloomfield Hills | MI | 48304 | | 248-203-0703 | dparker@dykema.com | Counsel for Federal Screw |
| Dykema Gossett PLLC | Morgan Smith | 10 South Wacker Dr | Suite 2300 | Chicago | IL | 60606 | | 312-627-5679 | mmsmith@dykema.com | Attorneys for Tremond City Barrel Fill PRP Group |
| Dykema Gossett PLLC | Sharon A. Salinas | 10 South Wacker Dr | Suite 2300 | Chicago | IL | 60606 | | 312-627-2199 | ssalinas@dykema.com | Counsel to Tremont City Barrel Fill PRP Group |
| Electronic Data Systems Corporation | Ayala Hassell | 5400 Legacy Dr. | Mail Stop H3-3A-05 | Plano | TX | 75024 | | 212-715-9100 | ayala.hassell@eds.com | Representattive for Electronic Data Systems Corporation |
| Ellenberg, Ogier, Rothschild & Rosenfeld, P.C. | Barbara Ellis-Monro | 170 Mitchell Street, SW | | Atlanta | GA | 30303 | | 404-581-3818 | bem@eorrlaw.com | Counsel to Southwire Company |
| Entergy Services, Inc. | Alan H. Katz | 639 Loyola Ave 26th Fl | | New Orleans | LA | 70113 | | | akatz@entergy.com | Assistant General Counsel to Entergy Services, Inc |
| Epstein Becker & Green PC | Maura I. Russell Anthony B. Stumbo | 250 Park Ave | 11th Floor | New York | NY | 10177-1211 | | 212-351-4500 | MRussell@ebglaw.com | Counsel to SPCP Group LLC as agent for Silver Point Capital Fund LP and Silver Point Capital Offshore Fund Ltd |
| Ettelman & Hochheiser, P.C. | Gary Ettelman | c/o Premium Cadillac | 77 Main Street | New Rochelle | NY | 10801 | | 516-227-6300 | gettelman@e-hlaw.com | Counsel to Jon Ballin |
| Faegre & Benson LLP | Elizabeth K. Flaagan | 3200 Wells Fargo Center | 1700 Lincoln St | Denver | CO | 80203-4532 | | 303-607-3694 | eflaagan@faegre.com | Counsel to CoorsTek, Inc.; Corus, L.P. |
| Farrell Fritz PC | Louis A. Scarcella Patrick T. Collins | 1320 RexCorp Plaza | | Uniondale | NY | 11556-1320 | | 516-227-0700 | lscarcella@farrellfritz.com pcollins@farrellfritz.com | Counsel to Official Committee of Equity Holders |
| Filardi Law Offices LLC | Charles J. Filardi, Jr., Esq. | 65 Trumbull Street | Second Floor | New Haven | CT | 06510 | | 203-562-8588 | charles@filardi-law.com | Counsel to Federal Express Corporation |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 6 of 22

3/9/2010 3:29 PM
Email (388)

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Finkel Goldstein Rosenbloom & Nash LLP | Ted J. Donovan | 26 Broadway | Suite 711 | New York | NY | 10004 | | 212-344-2929 | tdonovan@finkgold.com | Counsel to Pillarhouse (U.S.A.) Inc. |
| Foley & Lardner LLP | Ann Marie Uetz | 500 Woodward Avenue | Suite 2700 | Detroit | MI | 48226-3489 | | 313-234-7100 | auetz@foley.com | Counsel to PBR Tennessee |
| Foley & Lardner LLP | Jill L. Murch | 321 North Clark Street | Suite 2800 | Chicago | IL | 60610-4764 | | 312-832-4500 | jmurch@foley.com | Counsel to Kuss Corporation |
| Foley & Lardner LLP | John A. Simon | One Detroit Center | 500 Woodward Ave Suite 2700 | Detroit | MI | 48226-3489 | | 313-234-7100 | jsimon@foley.com | Counsel to Ernst & Young LLP |
| Foley & Lardner LLP | John R. Trentacosta Katherine R. Catanese | 500 Woodward Avenue | Suite 2700 | Detroit | MI | 48226-3489 | | 313-234-7100 | jtrentacosta@foley.com kcatanese@foley.com | Counsel to Kautex Inc. |
| Fox Rothschild LLP | Fred Stevens | 13 East 37th Street | Suite 800 | New York | NY | 10016 | | 212-682-7575 | fstevens@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Fox Rothschild LLP | Michael J. Viscount, Jr. | 1301 Atlantic Avenue | Suite 400 | Atlantic City | NJ | 08401-7212 | | 609-348-4515 | mviscount@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Frederick T. Rikkers | | 419 Venture Court | P.O. Box 930555 | Verona | WI | 53593 | | 608-848-6350 | ftrikkers@rikkerslaw.com | Counsel to Southwest Metal Finishing, Inc. |
| Fulbright & Jaworski LLP | David A Rosenzweig | 666 Fifth Avenue | | New York | NY | 10103-3198 | | 212-318-3000 | drosenzweig@fulbright.com | Counsel to Southwest Research Institute Attorney for Solvay Fluorides, LLC |
| Fulbright & Jaworski LLP | Michael M Parker | 300 Convent St Ste 2200 | | San Antonio | TX | 78205 | | 210-224-5575 | mparker@fulbright.com | Counsel to Southwest Research Institute |
| Genovese Joblove & Battista, P.A. | David C. Cimo | 100 S.E. 2nd Street | Suite 4400 | Miami | FL | 33131 | | 305-349-2300 | dcimo@gjb-law.com | Counsel to Ryder Integrated Logistics, Inc. |
| Gibbons P.C. | David N. Crapo | One Gateway Center | | Newark | NJ | 07102-5310 | | 973-596-4523 | dcrapo@gibbonslaw.com | Counsel to Epcos, Inc. |
| Goldberg Segalla LLP | Attn Bruce W Hoover | 665 Main St Ste 400 | | Buffalo | NY | 14203 | | 716-566-5400 | bhoover@goldbergsegalla.com | Attorneys for MasTec Inc. |
| Gorlick, Kravitz & Listhaus, P.C. | Barbara S. Mehlsack | 17 State Street | 4th Floor | New York | NY | 10004 | | 212-269-2500 | bmehlsack@gkllaw.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Goulston & Storrs, P.C. | Peter D. Bilowz | 400 Atlantic Avenue | | Boston | MA | 02110-333 | | 617-482-1776 | pbilowz@goulstonstorrs.com | Counsel to Thermotech Company |
| Grant & Eisenhofer P.A. | James J Sabella | 485 Lexington Ave | | New York | NY | 10017 | | 646-722-8520 | jsabella@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employes's Retirement System of Mississipp; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Grant & Eisenhofer P.A. | Jay W. Eisenhofer | 45 Rockefeller Center | 650 Fifth Avenue | New York | NY | 10111 | | 212-755-6501 | jeisenhofer@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employes's Retirement System of Mississipp; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 7 of 22

3/9/2010 3:29 PM
Email (388)

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Gratz, Miller & Brueggeman, S.C. | Matthew R. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | mrr@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Graydon Head & Ritchey LLP | J. Michael Debbler, Susan M. Argo | 1900 Fifth Third Center | 511 Walnut Street | Cincinnati | OH | 45202 | | 513-621-6464 | mdebbler@graydon.com | Counsel to Grote Industries; Batesville Tool & Die; PIA Group; Reliable Castings |
| Greenberg Traurig, LLP | Maria J. DiConza | MetLife Bldg | 200 Park Avenue | New York | NY | 10166 | | 212-801-9200 | diconzam@gtlaw.com | Counsel to Samtech Corporation |
| Greenberg Traurig, LLP | Shari L. Heyen | 1000 Louisiana | Suite 1800 | Houston | TX | 77002 | | 713-374-3500 | heyens@gtlaw.com | Counsel to Samtech Corporation |
| Greensfelder, Hemker & Gale, P.C. | Cherie Macdonald J. Patrick Bradley | 10 S. Broadway | Suite 200 | St. Louis | MO | 63102 | | 314-241-9090 | ckm@greensfelder.com jpb@greensfelder.com | Counsel to ARC Automotive, Inc. |
| Hahn Loeser & Parks LLP | Lawrence E Oscar Christopher W Peer | 200 Public Square | Suite 2800 | Cleveland | OH | 44114 | | 216-621-0150 | leoscar@hahnlaw.com cpeer@hahnlaw.com | Counsel to Casco Products, a Unit of Sequa Corporation and ARC Automotive, Inc. |
| Halperin Battaglia Raicht, LLP | Alan D. Halperin Christopher J.Battaglia Julie D. Dyas | 555 Madison Avenue | 9th Floor | New York | NY | 10022 | | 212-765-9100 | cbattaglia@halperinlaw.net ahalperin@halperinlaw.net jdyas@halperinlaw.net | Counsel to Pacific Gas Turbine Center, LLC and Chromalloy Gas Turbine Corporation; ARC Automotive, Inc |
| Hancock & Estabrook LLP | R John Clark Esq | 1500 Tower I | PO Box 4976 | Syracuse | NY | 13221-4976 | | 315-471-3151 | rjclark@hancocklaw.com | Counsel to Alliance Precision Plastics Corporation |
| Harrington, Dragich & O'Neill PLLC | David G Dragich | 21043 Mack Avenue | | Grosse Pointe Woods | MI | 48236 | | 313-886-4550 | ddragich@hdolaw.com | Counsel to Intermet Corporation |
| Harris D. Leinwand | Harris D. Leinwand | 315 Madison Avenue | Suite 901 | New York | NY | 10017 | | 212-725-7338 | hleinwand@aol.com | Counsel to Baker Hughes Incorporated; Baker Petrolite Corporation |
| Haskell Slaughter Young & Rediker LLC | Robert H. Adams | 2001 Park Place North | Suite 1400 | Birmingham | AL | 35203 | | 205-251-1000 | rha@hsy.com | Counsel to Simco Construction, Inc. |
| Haynes and Boone, LLP | Judith Elkin | 153 East 53rd Street | Suite 4900 | New York | NY | 10022 | | 212-659-7300 | judith.elkin@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Haynes and Boone, LLP | Lenard M. Parkins Kenric D. Kattner | 1 Houston Center | 1221 McKinney, Suite 2100 | Houston | TX | 77010 | | 713-547-2000 | lenard.parkins@haynesboone.com kenric.kattner@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Herrick, Feinstein LLP | Paul Rubin | 2 Park Avenue | | New York | NY | 10016 | | 212-592-1448 | prubin@herrick.com | Counsel to Canon U.S.A., Inc. and Schmidt Technology GmbH |
| Hewlett-Packard Company | Kenneth F. Higman | 2125 E. Katella Avenue | Suite 400 | Anaheim | CA | 92806 | | 714-940-7120 | ken.higman@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Ramona S. Neal | 11311 Chinden Blvd., M/S 314 | | Boise | ID | 83714-0021 | | 208-396-6484 | Ramona.neal@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Sharon Petrosino | 420 Mountain Avenue | | Murray Hill | NJ | 07974 | | 908-898-4760 | sharon.petrosino@hp.com | Counsel to Hewlett-Packard Financial Services Company |
| Hinckley Allen & Snyder LLP | Michael J Pendell | 185 Asylum St CityPlace I | 35th Floor | Hartford | CT | 06103-3488 | | 860-725-6200 | mpendell@haslaw.com | Counsel to Barnes Group, Inc. |
| Hiscock & Barclay, LLP | J. Eric Charlton | 300 South Salina Street | PO Box 4878 | Syracuse | NY | 13221-4878 | | 315-425-2716 | echarlton@hiscockbarclay.com | Counsel to GW Plastics, Inc. |
| Hodgson Russ LLP | Garry M. Graber | 60 E 42nd St 37th Fl | | New York | NY | 10165-0150 | | 212-661-3535 | ggraber@hodgsonruss.com | Counsel to Hexcel Corporation |
| Hodgson Russ LLP | Julia S. Kreher | One M&T Plaza | Suite 2000 | Buffalo | NY | 14203 | | 716-848-1330 | jkreher@hodgsonruss.com | Counsel to Hexcel Corporation |

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-------|------------------|
| Hogan & Hartson L.L.P. | Audrey Moog | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | amoog@hhlaw.com | Counsel to Umicore Autocat Canada Corp. |
| Hogan & Hartson L.L.P. | Edward C. Dolan | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | ecdolan@hhlaw.com | Counsel to Umicore Autocat Canada Corp. |
| Hogan & Hartson L.L.P. | Scott A. Golden | 875 Third Avenue | | New York | NY | 10022 | | 212-918-3000 | sagolden@hhlaw.com | Counsel to XM Satellite Radio Inc. |
| Honigman, Miller, Schwartz and Cohn, LLP | Donald T. Baty, Jr. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7314 | dbaty@honigman.com | Counsel to Fujitsu Ten Corporation of America |
| Honigman, Miller, Schwartz and Cohn, LLP | E. Todd Sable | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7548 | tsable@honigman.com | Counsel to Valeo Climate Control Corp.; Valeo Electrical Systems, Inc. - Motors and Actuators Division;Valeo Electrical Systems, Inc. - Wipers Division; Valeo Switches & Detection System, Inc. |
| Honigman, Miller, Schwartz and Cohn, LLP | Lawrence J. Murphy | 2290 First National Building | 660 Woodward Ave | Detroit | MI | 48226 | | 313-465-7488 | lmurphy@honigman.Com | Attorneys for Guide Corporation and Lightsource Parent Corporation |
| Honigman, Miller, Schwartz and Cohn, LLP | Seth A Drucker | 2290 First National Building | 660 Woodward Avenue Ste 2290 | Detroit | MI | 48226 | | 313-465-7626 | sdrucker@honigman.com | Counsel for Valeo Climate Control, Corp. |
| Howard & Howard Attorneys PC | Lisa S Gretchko | 39400 Woodward Ave | Ste 101 | Bloomfield Hills | MI | 48304-5151 | | 248-723-0396 | lgretchko@howardandhoward.com | Intellectual Property Counsel for Delphi Corporation, et al. |
| Howick, Westfall, McBryan & Kaplan, LLP | Louis G. McBryan | 3101 Tower Creek Parkway | Ste 600 One Tower Creek | Atlanta | GA | 30339 | | 678-384-7000 | lmcbryan@hwmklaw.com | Counsel to Vanguard Distributors, Inc. |
| Hunter & Schank Co. LPA | John J. Hunter | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | | 419-255-4300 | jrhunter@hunterschank.com | Counsel to ZF Group North America Operations, Inc. |
| Hunter & Schank Co. LPA | Thomas J. Schank | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | | 419-255-4300 | tomschank@hunterschank.com | Counsel to ZF Group North America Operations, Inc. |
| Hunton & Williams LLP | Steven T. Holmes | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | sholmes@hunton.com | Counsel to RF Monolithics, Inc. |
| Hurwitz & Fine P.C. | Ann E. Evanko | 1300 Liberty Building | | Buffalo | NY | 14202 | | 716-849-8900 | aee@hurwitzfine.com | Counsel to Jiffy-Tite Co., Inc. |
| Ice Miller | Ben T. Caughey | One American Square | Box 82001 | Indianapolis | IN | 46282-0200 | | 317-236-2100 | Ben.Caughey@icemiller.com | Counsel to Sumco, Inc. |
| Infineon Technologies North America Corporation | Greg Bibbes | 1730 North First Street | M/S 11305 | San Jose | CA | 95112 | | 408-501-6442 | greg.bibbes@infineon.com | General Counsel & Vice President for Infineon Technologies North America Corporation |
| Infineon Technologies North America Corporation | Jeff Gillespie | 2529 Commerce Drive | Suite H | Kokomo | IN | 46902 | | 765-454-2146 | jeffery.gillispie@infineon.com | Global Account Manager for Infineon Technologies North America |
| International Union of Operating Engineers | Richard Griffin | 1125-17th Avenue, N.W. | | Washington | DC | 20036 | | 202-429-9100 | rgriffin@iuoe.org | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Jackson Walker LLP | Bruce J. Ruzinsky | 1401 McKinney St Ste 1900 | | Houston | TX | 77010 | | 713-751-4200 | bruzinsky@jw.com | Counsel to Constellation NewEnergy, Inc. |
| Jackson Walker LLP | Heather M. Forrest | 901 Main St Ste 600 | | Dallas | TX | 75202 | | 214-953-6000 | hforrest@jw.com | Counsel to Constellation NewEnergy, Inc. |
| James R Scheuerle | Parmenter O'Toole | 601 Terrace Street | PO Box 786 | Muskegon | MI | 49443-0786 | | 231-722-1621 | JRS@Parmenterlaw.com | Counsel to Port City Die Cast and Port City Group Inc |
| Jason, Inc. | Will Schultz, General Counsel | 411 E. Wisconsin Ave | Suite 2120 | Milwaukee | WI | 53202 | | 414-277-2110 | wschultz@jasoninc.com | General Counsel to Jason Incorporated |
| Jenner & Block LLP | Ronald R. Peterson | One IBM Plaza | | Chicago | IL | 60611 | | 312-222-9350 | rpeterson@jenner.com | Counsel to SPX Corporation (Contech Division), Alcan Rolled Products-Ravenswood, LLC, Tenneco Inc. and Contech LLC |
| Johnston, Harris Gerde & Komarek, P.A. | Jerry W. Gerde, Esq. | 239 E. 4th St. | | Panama City | FL | 32401 | | 850-763-8421 | gerdekomarek@bellsouth.net | Counsel to Peggy C. Brannon, Bay County Tax Collector |
| Jones Day | Corinne Ball | 222 East 41st Street | | New York | NY | 10017 | | 212-326-7844 | cball@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Jones Day | Peter J. Benvenutti Michaeline H. Correa | 555 California St 26th Floor | | San Francisco | CA | 94104 | | 415-626-3939 | pjbenvenutti@jonesday.com mcorrea@jonesday.com | Attorneys for Symantec Corporation, Successor-in-Interest to Veritas Corporation |
| Jones Day | Scott J. Friedman | 222 East 41st Street | | New York | NY | 10017 | | 212-326-3939 | sjfriedman@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Katten Muchin Rosenman LLP | John P. Sieger, Esq. | 525 West Monroe Street | | Chicago | IL | 60661 | | 312-902-5200 | john.sieger@kattenlaw.com | Counsel to TDK Corporation America and MEMC Electronic Materials, Inc. |
| Kaye Scholer LLP | Richard G Smolev | 425 Park Avenue | | New York | NY | 10022-3598 | | 212-236-8000 | rsmolev@kayescholer.com | Counsel to InPlay Technologies Inc |
| Kegler, Brown, Hill & Ritter Co., LPA | Kenneth R. Cookson | 65 East State Street | Suite 1800 | Columbus | OH | 43215 | | 614-426-5400 | kcookson@keglerbrown.com | Counsel to Solution Recovery Services |
| Keller Rohrback L.L.P. | Lynn Lincoln Sarko Cari Campen Laufenberg Erin M. Rily | 1201 Third Avenue | Suite 3200 | Seattle | WA | 98101 | | 206-623-1900 | lsarko@kellerrohrback.com claufenberg@kellerrohrback.com eriley@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Keller Rohrback P.L.C. | Gary A. Gotto | National Bank Plaza | 3101 North Central Avenue, Suite 900 | Phoenix | AZ | 85012 | | 602-248-0088 | ggotto@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |

In re: DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 10 of 22

3/9/2010 3:29 PM
Email (388)

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Kelley Drye & Warren, LLP | Craig A. Wolfe | 101 Park Avenue | | New York | NY | 10178 | | 212-808-7800 | cwolfe@kelleydrye.com | Counsel to the Pension Benefit Guaranty Corporation |
| Kelley Drye & Warren, LLP | Merrill B. Stone | 101 Park Avenue | | New York | NY | 10178 | | 212-808-7800 | mstone@kelleydrye.com | Counsel to the Pension Benefit Guaranty Corporation |
| Kennedy, Jennick & Murray | Larry Magarik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | lmagarik@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kennedy, Jennick & Murray | Susan M. Jennik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | sjennik@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kennedy, Jennick & Murray | Thomas Kennedy | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | tkennedy@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| King & Spalding, LLP | Daniel Egan | 1185 Avenue of the Americas | | New York | NY | 10036 | | 212-556-2100 | degan@kslaw.com | Counsel to KPMG LLP |
| King & Spalding, LLP | H. Slayton Dabney, Jr. | 1185 Avenue of the Americas | | New York | NY | 10036 | | 212-556-2100 | sdabney@kslaw.com | Counsel to KPMG LLP |
| Kirkland & Ellis LLP | Jim Stempel | 200 East Randolph Drive | | Chicago | IL | 60601 | | 312-861-2000 | jstempel@kirkland.com | Counsel to Lunt Manufacturing Company |
| Kirkpatrick & Lockhart Nicholson Graham LLP | Edward M. Fox | 599 Lexington Avenue | | New York | NY | 10022 | | 212-536-4812 | efox@klng.com | Counsel to Wilmington Trust Company, as Indenture trustee |
| Kokomo Gas & Fuel Company | Patti E Pope Revenue Recovery Manager | Northern Indiana Public Service Company | 801 East 86th Avenue | Merrillville | IN | 46410 | | | pepope@nisource.com | Kokomo Gas & Fuel Company |
| Kramer Levin Naftalis & Frankel LLP | Jordan D Kaye | 1177 Avenue of the Americas | | New York | NY | 10036 | | 212-715-9489 | jkaye@kramerlevin.com | Counsel to HP Enterprise Services, LLC |
| Krugliak, Wilkins, Griffiths & Dougherty CO., L.P.A. | Sam O. Simmerman | 4775 Munson Street N.W. | P.O. Box 36963 | Canton | OH | 44735-6963 | | 330-497-0700 | sosimmerman@kwgd.com | Counsel to for Millwood, Inc. |
| Kutak Rock LLP | Jay Selanders | 1010 Grand Blvd Ste 500 | | Kansas City | MO | 64106 | | 816-502-4617 | jay.selanders@kutakrock.com | Counsel to DaimlerChrysler Corporation; DaimlerChrysler Motors Company, LLC; DaimlerChrylser Canada, Inc. |
| Kutchin & Rufo, P.C. | Edward D. Kutchin | Two Center Plaza | Suite 620 | Boston | MA | 02108-1906 | | 617-542-3000 | ekutchin@kutchinrufo.com | Counsel to Parlex Corporation |
| Kutchin & Rufo, P.C. | Kerry R. Northrup | Two Center Plaza | Suite 620 | Boston | MA | 02108-1906 | | 617-542-3000 | knorthup@kutchinrufo.com | Counsel to Parlex Corporation |
| Lambert, Leser, Isackson, Cook & Guinta, P.C. | Adam D. Bruski | 309 Davidson Building | PO Box 835 | Bay City | MI | 48707-0835 | | 989-893-3518 | adbruski@lambertleser.com | Counsel to Creditor Linamar Corp. |
| Lambert, Leser, Isackson, Cook & Guinta, P.C. | Susan M. Cook | 309 Davidson Building | PO Box 835 | Bay City | MI | 48707-0835 | | 989-893-3518 | smcook@lambertleser.com | Counsel to Linamar Corporation |
| Latham & Watkins | Mark A. Broude | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1384 | mark.broude@lw.com | UCC Professional |
| Latham & Watkins | Michael J. Riela | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | michael.riela@lw.com | UCC Professional |
| Latham & Watkins | Mitchell A. Seider | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | mitchell.seider@lw.com | UCC Professional |
| Latham & Watkins | Robert Rosenberg | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1370 | robert.rosenberg@lw.com | UCC Professional |
| Law Offices of Michael O'Hayer | Michael O'Hayer Esq | 22 N Walnut Street | | West Chester | PA | 19380 | | 610-738-1230 | mkohayer@aol.com | Counsel to A-1 Specialized Services and Supplies Inc |

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Lewis and Roca LLP | Rob Charles, Esq. | One South Church Street | Suite 700 | Tucson | AZ | 85701 | | 520-629-4427 | rcharles@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Lewis and Roca LLP | Susan M. Freeman, Esq. | 40 North Central Avenue | Suite 1900 | Phoenix | AZ | 85004-4429 | | 602-262-5756 | sfreeman@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Linear Technology Corporation | John England, Esq. | General Counsel for Linear Technology Corporation | 1630 McCarthy Blvd. | Milpitas | CA | 95035-7417 | | 408-432-1900 | jengland@linear.com | Counsel to Linear Technology Corporation |
| Linebarger Goggan Blair & Sampson, LLP | Diane W. Sanders | 1949 South IH 35 (78741) | P.O. Box 17428 | Austin | TX | 78760-7428 | | 512-447-6675 | austin.bankruptcy@publicans.com | Counsel to Cameron County, Brownsville ISD |
| Linebarger Goggan Blair & Sampson, LLP | Elizabeth Weller | 2323 Bryan Street | Suite 1600 | Dallas | TX | 75201 | | 214-880-0089 | dallas.bankruptcy@publicans.com | Counsel to Dallas County and Tarrant County |
| Linebarger Goggan Blair & Sampson, LLP | John P. Dillman | P.O. Box 3064 | | Houston | TX | 77253-3064 | | 713-844-3478 | houston_bankruptcy@publicans.com | Counsel in Charge for Taxing Authorities: Cypress-Fairbanks Independent School District, City of Houston, Harris County |
| Locke Lord Bissell & Liddell | Kevin J. Walsh | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | | 212-812-8304 | kwalsh@lockelord.com | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| Locke Lord Bissell & Liddell | Timothy S. McFadden | 111 South Wacker Drive | | Chicago | IL | 60606 | | 312-443-0370 | tmcfadden@lockelord.com | Counsel to Methode Electronics, Inc. |
| Loeb & Loeb LLP | P. Gregory Schwed | 345 Park Avenue | | New York | NY | 10154-0037 | | 212-407-4000 | gschwed@loeb.com | Counsel to Creditor The Interpublic Group of Companies, Inc. and Proposed Auditor Deloitte & Touche, LLP |
| Loeb & Loeb LLP | William M. Hawkins | 345 Park Avenue | | New York | NY | 10154 | | 212-407-4000 | whawkins@loeb.com | Counsel to Industrial Ceramics Corporation |
| Lowenstein Sandler PC | Bruce S. Nathan | 1251 Avenue of the Americas | | New York | NY | 10020 | | 212-262-6700 | bnathan@lowenstein.com | Counsel to Daewoo International (America) Corp. |
| Lowenstein Sandler PC | Ira M. Levee | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | ilevee@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employes's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Lowenstein Sandler PC | Kenneth A. Rosen | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | krosen@lowenstein.com | Counsel to Cerberus Capital Management, L.P. |
| Lowenstein Sandler PC | Michael S. Etikin | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | metkin@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employes's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Lowenstein Sandler PC | Scott Cargill | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | scargill@lowenstein.com | Counsel to Cerberus Capital Management, L.P.; AT&T Corporation |
| Lowenstein Sandler PC | Vincent A. D'Agostino | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | vdagostino@lowenstein.com | Counsel to AT&T Corporation |

In re: DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 12 of 22

3/9/2010 3:29 PM
Email (388)

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Lyden, Liebenthal & Chappell, Ltd. | Erik G. Chappell | 5565 Airport Highway | Suite 101 | Toledo | OH | 43615 | | 419-867-8900 | egc@lydenlaw.com | Counsel to Metro Fibres, Inc. |
| Maddin, Hauser, Wartell, Roth & Heller PC | Alexander Stotland Esq | 28400 Northwestern Hwy | Third Floor | Southfield | MI | 48034 | | 248-354-4030 | axs@maddinhauser.com | Attorney for Danice Manufacturing Co. |
| Madison Capital Management | Joe Landen | 6143 South Willow Drive | Suite 200 | Greenwood Village | CO | 80111 | | 303-957-4254 | jlanden@madisoncap.com | Representative for Madison Capital Management |
| Margulies & Levinson, LLP | Leah M. Caplan, Esq. | 30100 Chagrin Boulevard | Suite 250 | Pepper Pike | OH | 44124 | | 216-514-4935 | lmc@ml-legal.com | Counsel to Venture Plastics |
| Mastromarco & Jahn, P.C. | Victor J. Mastromarco, Jr. | 1024 North Michigan Avenue | P.O. Box 3197 | Saginaw | MI | 48605-3197 | | 989-752-1414 | vmastromar@aol.com | Counsel to H.E. Services Company and Robert Backie and Counsel to Cindy Palmer, Personal Representative to the Estate of Michael Palmer |
| Masuda Funai Eifert & Mitchell, Ltd. | Gary D. Santella | 203 North LaSalle Street | Suite 2500 | Chicago | IL | 60601-1262 | | 312-245-7500 | gsantella@masudafunai.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC and Hosiden America Corporation |
| McCarter & English, LLP | David J. Adler, Jr. Esq. | 245 Park Avenue, 27th Floor | | New York | NY | 10167 | | 212-609-6800 | dadler@mccarter.com | Counsel to Ward Products, LLC |
| McCarter & English, LLP | Eduardo J. Glas, Esq. | Four Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4096 | | 913-622-4444 | eglas@mccarter.com | Counsel to General Products Delaware Corporation |
| McCarthy Tetrault LLP | Lorne P. Salzman | 66 Wellington Street West | Suite 4700 | Toronto | Ontario | M5K 1E6 | | 416-362-1812 | lsalzman@mccarthy.ca | Counsel to Themselves (McCarthy Tetrault LLP) |
| McDermott Will & Emery LLP | Gary O. Ravert | 340 Madison Avenue | | New York | NY | 10017-1922 | | 212-547-5477 | gravert@mwe.com | Counsel for Temic Automotive of North America, Inc. |
| McDermott Will & Emery LLP | James M. Sullivan | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5477 | jmsullivan@mwe.com | Counsel to Linear Technology Corporation, National Semiconductor Corporation; Timken Corporation |
| McDermott Will & Emery LLP | Stephen B. Selbst | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5400 | sselbst@mwe.com | Counsel to National Semiconductor Corporation |
| McDermott Will & Emery LLP | Steven P. Handler Monica M. Quinn | 227 W Monroe St | | Chicago | IL | 60606 | | 312-372-2000 | shandler@mwe.com mquinn@mwe.com | Counsel for Temic Automotive of North America, Inc. |
| McDonald Hopkins Co., LPA | Scott N. Opincar, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | sopincar@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McDonald Hopkins Co., LPA | Shawn M. Riley, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | sriley@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McElroy, Deutsch, Mulvaney & Carpenter, LLP | Jeffrey Bernstein, Esq. | Three Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4079 | | 973-622-7711 | jbernstein@mdmc-law.com | Counsel to New Jersey Self-Insurers Guaranty Association |
| McGuireWoods LLP | Aaron G McCollough Esq | One James Center | 901 East Cary Street | Richmond | VA | 23219-4030 | | 804-775-1000 | amccollough@mcguirewoods.com | Counsel to Siemens Energy & Automation, Inc. |
| McGuireWoods LLP | Daniel F Blanks | One James Center | 901 East Cary Street | Richmond | VA | 23219 | | 804-775-1000 | dblanks@mcguirewoods.com | Counsel for CSX Transportation, Inc. |
| McGuireWoods LLP | John H Maddock III | One James Center | 901 East Cary Street | Richmond | VA | 23219-4030 | | 804-775-1178 | jmaddock@mcguirewoods.com | Counsel to Siemens Logistics Assembly Systems, Inc.; Counsel for CSX Transportation, Inc. |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 13 of 22

3/9/2010 3:29 PM
Email (388)

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Meyer, Suozzi, English & Klein, P.C. | Attn Thomas R Slome Esq | 990 Stewart Ave Ste 300 | PO Box 9194 | Garden City | NY | 11530-9194 | | 516-741-6565 | tslome@msek.com | Counsel for Pamela Geller; JAE Electronics, Inc. |
| Meyer, Suozzi, English & Klein, P.C. | Hanan Kolko | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | hkolko@msek.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Meyers Law Group, P.C. | Merle C. Meyers | 44 Montgomery Street | Suite 1010 | San Francisco | CA | 94104 | | 415-362-7500 | mmeyers@mlg-pc.com | Counsel to Alps Automotive, Inc. |
| Meyers, Rodbell & Rosenbaum, P.A. | M. Evan Meyers | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | emeyers@mrrlaw.net | Counsel to Prince George County, Maryland |
| Meyers, Rodbell & Rosenbaum, P.A. | Robert H. Rosenbaum | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | rrosenbaum@mrrlaw.net | Counsel to Prince George County, Maryland |
| Miami-Dade County Tax Collector | April Burch | Paralegal Unit | 140 West Flagler St Ste 1403 | Miami | FL | 33130 | | 305-375-5314 | mdtcbkc@miamidade.gov | Paralegal Collection Specialist for Miami-Dade County |
| Michael Cox | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | miag@michigan.gov | Attorney General for State of Michigan, Department of Treasury |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Dennis J. Raterink | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1176 | raterinkd@michigan.gov | Assistant Attorney General for Worker's Compensation Agency; Attorney for the Funds Administration for the State of Michigan |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Michael Cox | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | miag@michigan.gov | Attorney General for Worker's Compensation Agency; Attorney for the Funds Administration for the State of Michigan |
| Miles & Stockbridge, P.C. | Thomas D. Renda | 10 Light Street | | Baltimore | MD | 21202 | | 410-385-3418 | trenda@milesstockbridge.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Miller & Martin PLLC | Dale Allen | 150 Fourth Ave North | Ste 1200 | Nashville | TN | 37219 | | | vjones@millermartin.com | Counsel to Averitt Express |
| Miller Johnson | Thomas P. Sarb Robert D. Wolford | 250 Monroe Avenue, N.W. | Suite 800, PO Box 306 | Grand Rapids | MI | 49501-0306 | | 616-831-1748 616-831-1726 | sarbt@millerjohnson.com wolfordr@millerjohnson.com | Counsel to Pridgeon & Clay, Inc. |
| Miller, Canfield, Paddock and Stone, P.L.C. | Jonathan S. Green | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8452 | greenj@millercanfield.com | Counsel to Wells Operating Partnership, LP |
| Miller, Canfield, Paddock and Stone, P.L.C. | Marc N. Swanson | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-963-6420 | swansonm@millercanfield.com | Counsel to Brose North America Holding LP and its affiliates |
| Miller, Canfield, Paddock and Stone, P.L.C. | Timothy A. Fusco | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8435 | fusco@millercanfield.com | Counsel to Niles USA Inc.; Techcentral, LLC; The Bartech Group, Inc.; Fischer Automotive Systems |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 14 of 22

3/9/2010 3:29 PM
Email (388)

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Mintz, Levin, Cohn, Ferris Glovsky and Pepco, P.C. | Paul J. Ricotta | One Financial Center | | Boston | MA | 02111 | | 617-542-6000 | pjricotta@mintz.com pricotta@mintz.com | Counsel to Hitachi Automotive Products (USA), Inc. and Conceria Pasubio |
| Molex Connector Corp | Jeff Ott | 2222 Wellington Ct. | | Lisle | IL | 60532 | | 630-527-4254 | Jeff.Ott@molex.com | Counsel to Molex Connector Corp |
| Morgan, Lewis & Bockius LLP | Andrew D. Gottfried | 101 Park Avenue | | New York | NY | 10178-0060 | | 212-309-6000 | agottfried@morganlewis.com | Counsel to ITT Industries, Inc.; Hitachi Chemical (Singapore), Ltd. |
| Morgan, Lewis & Bockius LLP | Menachem O. Zelmanovitz | 101 Park Avenue | | New York | NY | 10178 | | 212-309-6000 | mzelmanovitz@morganlewis.com | Counsel to Hitachi Chemical (Singapore) Pte, Ltd. |
| Morgan, Lewis & Bockius LLP | Richard W. Esterkin, Esq. | 300 South Grand Avenue | | Los Angeles | CA | 90017 | | 213-612-1163 | resterkin@morganlewis.com | Counsel to Sumitomo Corporation |
| Moritt Hock Hamroff & Horowitz LLP | Leslie Ann Berkoff | 400 Garden City Plaza | | Garden City | NY | 11530 | | 516-873-2000 | lberkoff@moritthock.com | Counsel to Standard Microsystems Corporation and its direct and indirect subsidiares Oasis SiliconSystems AG and SMSC NA Automotive, LLC (successor-in-interst to Oasis Silicon Systems, Inc.) |
| Munsch Hardt Kopf & Harr, P.C. | Raymond J. Urbanik, Esq., Joseph J. Wielebinski, Esq. and Davor Rukavina, Esq. | 3800 Lincoln Plaza | 500 North Akard Street | Dallas | RX | 75201-6659 | | 214-855-7590 214-855-7561 214-855-7587 | rurbanik@munsch.com jwielebinski@munsch.com drukavina@munsch.com | Counsel to Texas Instruments Incorporated |
| Nantz, Litowich, Smith, Girard & Hamilton, P.C. | Sandra S. Hamilton | 2025 East Beltline, S.E. | Suite 600 | Grand Rapids | MI | 49546 | | 616-977-0077 | sandy@nlsg.com | Counsel to Lankfer Diversified Industries, Inc. |
| Nathan, Neuman & Nathan, P.C. | Kenneth A. Nathan | 29100 Northwestern Highway | Suite 260 | Southfield | MI | 48034 | | 248-351-0099 | Knathan@nathanneuman.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| National City Commercial Capital | Lisa M. Moore | 995 Dalton Avenue | | Cincinnati | OH | 45203 | | 513-455-2390 | l.moore@pnc.com | Vice President and Senior Counsel to National City Commercial Capital |
| National Renewable Energy Laboratory | Marty Noland Principal Attorney | 1617 Golden Blvd | Legal Office, Mail Stop 1734 | Golden | CO | 80401 | | 303-384-7550 | marty_noland@nrel.gov | Counsel for National Renewable Energy Laboratory |
| Nelson Mullins Riley & Scarborough | George B. Cauthen | 1320 Main Street, 17th Floor | PO Box 11070 | Columbia | SC | 29201 | | 803-7255-9425 | george.cauthen@nelsonmullins.com | Counsel to Datwyler Rubber & Plastics, Inc.; Datwyler, Inc.; Datwyler i/o devices (Americas), Inc.; Rothrist Tube (USA), Inc. |
| New Jersey Attorney General's Office Division of Law | Tracy E Richardson Deputy Attorney General | R.J. Hughes Justice Complex | 25 Market St P.O. Box 106 | Trenton | NJ | 08628-0106 | | 609-292-1537 | tracy.richardson@dol.lps.state.nj.us | Deputy Attorney General - State of New Jersey Division of Taxation |
| North Point | David G. Heiman | 901 Lakeside Avenue | | Cleveland | OH | 44114 | | 216-586-3939 | dgheiman@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Office of the Chapter 13 Trustee | Camille Hope | P.O. Box 954 | | Macon | GA | 31202 | | 478-742-8706 | cahope@chapter13macon.com | Office of the Chapter 13 Trustee |
| Office of the Texas Attorney General | Jay W. Hurst | P.O. Box 12548 | | Austin | TX | 78711-2548 | | 512-475-4861 | jay.hurst@oag.state.tx.us | Counsel to The Texas Comptroller of Public Accounts |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 15 of 22

3/9/2010 3:29 PM
Email (388)

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-------|------------------|
| Ohio Environmental Protection Agency | c/o Michelle T. Sutter | Principal Assistant Attorney General Environmental Enforcement Section | 30 E Broad St 25th Fl | Columbus | OH | 43215 | | 614-466-2766 | msutter@ag.state.oh.us | Attorney for State of Ohio, Environmental Protection Agency |
| Orbotech, Inc. | Michael M. Zizza, Legal Manager | 44 Manning Road | | Billerica | MA | 01821 | | 978-901-5025 | michaelz@orbotech.com | Company |
| O'Rourke Katten & Moody | Michael Moody | 55 W Wacker Dr | Ste 1400 | Chicago | IL | 60615 | | 312-849-2020 | mmoody@rourkeandmoody.com | Counsel to Ameritech Credit Corporation d/b/a SBC Capital Services |
| Orrick, Herrington & Sutcliffe LLP | Alyssa Englund, Esq. | 666 Fifth Avenue | | New York | NY | 10103 | | 212-506-5187 | aenglund@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Frederick D. Holden, Jr., Esq. | 405 Howard Street | | San Francisco | CA | 94105 | | 415-773-5700 | fholden@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Jonathan P. Guy | Columbia Center | 1152 15th St NW | Washington | DC | 20005-1706 | | 202-339-8400 | jguy@orrick.com | Counsel to Westwood Associates, Inc. |
| Orrick, Herrington & Sutcliffe LLP | Raniero D'Aversa, Jr. | 666 Fifth Avenue | | New York | NY | 10103-0001 | | 212-506-3715 | Rdaversa@orrick.com | Counsel to Bank of America, N.A. |
| Orrick, Herrington & Sutcliffe LLP | Richard H. Wyron | Columbia Center | 1152 15th St NW | Washington | DC | 20005-1706 | | 202-339-8400 | rwyron@orrick.com | Counsel to Westwood Associates, Inc. |
| Pachulski Stang Ziehl & Jones LLP | Michael R. Seidl | 919 N. Market Street, 17th Floor | P.O. Box 8705 | Wilmington | DE | 19899-8705 | | 302-652-4100 | mseidl@pszjlaw.com | Counsel for Essex Group, Inc. |
| Pachulski Stang Ziehl & Jones LLP | Robert J. Feinstein Ilan D. Scharf | 780 Third Avenue, 36th Floor | | New York | NY | 10017-2024 | | 212-561-7700 | Rfeinstein@pszjlaw.com Ischarf@pszjlaw.com | Counsel for Essex Group, Inc. |
| Patterson Belknap Webb & Tyler LLP | Daniel A. Lowenthal | 1133 Avenue of the Americas | | New York | NY | 10036 | | 212-336-2720 | dalowenthal@pbwt.com | Counsel to American Finance Group, Inc. d/b/a Guaranty Capital Corporation |
| Patterson Belknap Webb & Tyler LLP | David W. Dykhouse Phyllis S. Wallitt | 1133 Avenue of the Americas | | New York | NY | 10036-6710 | | 212-336-2000 | dwdykhouse@pbwt.com | Attorneys for Fry's Metals Inc. and Specialty Coatings Systems Eft |
| Paul H. Spaeth Co. LPA | Paul H. Spaeth | 130 W Second St Ste 450 | | Dayton | OH | 45402 | | 937-223-1655 | spaethlaw@phslaw.com | Attorneys for F&G Multi-Slide Inc and F&G Tool & Die Co. Inc. |
| Paul, Weiss, Rifkind, Wharton & Garrison | Andrew N. Rosenberg | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | arosenberg@paulweiss.com | Counsel to Merrill Lynch, Pierce, Fenner & Smith, Incorporated |
| Paul, Weiss, Rifkind, Wharton & Garrison | Douglas R. Davis | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | ddavis@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Elizabeth R. McColm | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | emccolm@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Stephen J. Shimshak | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3133 | sshimshak@paulweiss.com | Counsel to Ambrake Corporation |
| Peggy Housner | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | housnerp@michigan.gov | Assistant Attorney General for State of Michigan, Department of Treasury |
| Pepe & Hazard LLP | Kristin B. Mayhew | 30 Jelliff Lane | | Southport | CT | 06890-1436 | | 203-319-4022 | kmayhew@pepehazard.com | Counsel for Illinois Tool Works Inc., Illinois Tool Works for Hobart Brothers Co., Hobart Brothers Company, ITW Food Equipment Group LLC and Tri-Mark, Inc. |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 16 of 22

3/9/2010 3:29 PM
Email (388)

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-------|------------------|
| Pepper, Hamilton LLP | Francis J. Lawall | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | lawallf@pepperlaw.com | Counsel to Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Pepper, Hamilton LLP | Henry Jaffe | 1313 Market Street | PO Box 1709 | Wilmington | DE | 19899-1709 | | 302-777-6500 | jaffeh@pepperlaw.com | Counsel to SKF USA, Inc. |
| Pepper, Hamilton LLP | Nina M. Varughese | 3000 Two Logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | varughesen@pepperlaw.com | Counsel to Capro, Ltd; Teleflex Automotive Manufacturing Corporation; Teleflex Incorporated; Ametek; Cleo, Inc.; Sierra International, Inc. |
| Pickrel Shaeffer & Ebeling | Sarah B. Carter Esq | 2700 Kettering Tower | | Dayton | OH | 45423-2700 | | 937-223-1130 | scarter@pselaw.com | |
| Pierce Atwood LLP | Jacob A. Manheimer | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | jmanheimer@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p.A. |
| Pierce Atwood LLP | Keith J. Cunningham | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | kcunningham@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p.A. |
| Pietragallo Bosick & Gordon LLP | Richard J. Parks | 54 Buhl Blvd | | Sharon | PA | 16146 | | 724-981-1397 | rjp@pbandg.com | Counsel to Ideal Tool Company, Inc. |
| Pillsbury Winthrop Shaw Pittman LLP | Karen B. Dine | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | karen.dine@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |
| Pillsbury Winthrop Shaw Pittman LLP | Margot P. Erlich | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | margot.erlich@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Mark D. Houle | 650 Town Center Drive | Ste 550 | Costa Mesa | CA | 92626-7122 | | 714-436-6800 | mark.houle@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |
| Pillsbury Winthrop Shaw Pittman LLP | Richard L. Epling | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | richard.epling@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Robin L. Spear | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | robin.spear@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Porzio, Bromberg & Newman, P.C. | Brett S. Moore, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | bsmoore@pbnlaw.com | |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 17 of 22

3/9/2010 3:29 PM
Email (388)

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Porzio, Bromberg & Newman, P.C. | John S. Mairo, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | jsmairo@pbnlaw.com | Counsel to Neuman Aluminum Automotive, Inc. and Neuman Aluminum Impact Extrusion, Inc. |
| Previant, Goldberg, Uelman, Gratz, Miller & Brueggeman, S.C. | Jill M. Hartley and Marianne G. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | jh@previant.com mgr@previant.com | Counsel to International Brotherhod of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| PriceWaterHouseCoopers | Enrique Bujidos | Almagro | 40 | Madrid | | 28010 | Spain | 34 915 684 356 | enrique.bujidos@es.pwc.com | Representative to DASE |
| QAD, Inc. | Stephen Tyler Esq | 10,000 Midlantic Drive | Suite 100 West | Mt. Laurel | NJ | 08054 | | 856-840-2870 | xst@qad.com | Counsel to QAD, Inc. |
| Quarles & Brady LLP | John A. Harris | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | jharris@quarles.com | Counsel to Semiconductor Components Industries, Inc. |
| Quarles & Brady LLP | John J. Dawson | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | jdawson@quarles.com | Counsel to Semiconductor Components Industries, Inc. |
| Quarles & Brady LLP | Kasey C. Nye | One South Church Street | | Tucson | AZ | 85701 | | 520-770-8717 | knye@quarles.com | Counsel to Offshore International, Inc.; Maquilas Teta Kawi, S.A. de C.V.; On Semiconductor Corporation; Flambeau Inc. |
| Quarles & Brady LLP | Roy Prange | 33 E Main St Ste 900 | | Madison | WI | 53703-3095 | | 608-283-2485 | rlp@quarles.com | Counsel for Flambeau Inc. |
| Reed Smith | Ann Pille | 10 South Wacker Drive | | Chicago | IL | 60606 | | 312-207-1000 | apille@reedsmith.com | Counsel to Infineon; Infineon Technologies |
| Republic Engineered Products, Inc. | Joseph A Kaczka | 3770 Embassy Parkway | | Akron | OH | 44333 | | 330-670-3215 | jkaczka@republicengineered.com | Counsel to Republic Engineered Products, Inc. |
| Riddell Williams P.S. | Joseph E. Shickich, Jr. | 1001 4th Ave. | Suite 4500 | Seattle | WA | 98154-1195 | | 206-624-3600 | jshickich@riddellwilliams.com | Counsel to Microsoft Corporation; Microsoft Licensing, GP |
| Rieck and Crotty PC | Jerome F Crotty | 55 West Monroe Street | Suite 3390 | Chicago | IL | 60603 | | 312-726-4646 | jcrotty@rieckcrotty.com | Counsel to Mary P. O'Neill and Liam P. O'Neill |
| Russell Reynolds Associates, Inc. | Charles E. Boulbol, P.C. | 26 Broadway, 17th Floor | | New York | NY | 10004 | | 212-825-9457 | rtrack@msn.com | Counsel to Russell Reynolds Associates, Inc. |
| Satterlee Stephens Burke & Burke LLP | Christopher R. Belmonte | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | cbelmonte@ssbb.com | Counsel to Moody's Investors Service |
| Satterlee Stephens Burke & Burke LLP | Pamela A. Bosswick | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | pbosswick@ssbb.com | Counsel to Moody's Investors Service |
| Satterlee Stephens Burke & Burke LLP | Roberto Carrillo | 230 Park Avenue | Suite 1130 | New York | NY | 10169 | | 212-818-9200 | rcarrillo@ssbb.com | Attorney's for Tecnomec S.r.l. |
| Schafer and Weiner PLLC | Daniel Weiner | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | dweiner@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Howard Borin | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | hborin@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Michael R Wernette | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | mwernette@schaferandweiner.com shelile@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Ryan Heilman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | rheilman@schaferandweiner.com | Counsel to Dott Industries, Inc. |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 18 of 22

3/9/2010 3:29 PM
Email (388)

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-------|-----------------|
| Schiff Hardin LLP | Eugene J. Geekie, Jr. | 7500 Sears Tower | | Chicago | IL | 60606 | | 312-258-5635 | egeekie@schiffhardin.com | Counsel to Means Industries |
| Schulte Roth & Zabel LLP | David J. Karp | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | david.karp@srz.com | Counsel to Parnassus Holdings II, LLC and Platinum Equity Capital Partners II, LP |
| Schulte Roth & Zabel LLP | James T. Bentley | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2273 | james.bentley@srz.com | Counsel to Panasonic Automotive Systems Company of America |
| Schulte Roth & Zabel LLP | Michael L. Cook | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | michael.cook@srz.com | Counsel to Panasonic Automotive Systems Company of America; D.C. Capital Partners, L.P. |
| Schwartz Lichtenberg LLP | Barry E Lichtenberg Esq | 420 Lexington Ave Ste 2400 | | New York | NY | 10170 | | 212-389-7818 | barryster@att.net | Counsel to Marybeth Cunningham |
| Seyfarth Shaw LLP | Paul M. Baisier, Esq. | 1545 Peachtree Street, N.E. | Suite 700 | Atlanta | GA | 30309-2401 | | 404-885-1500 | pbaisier@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | Robert W. Dremluk | 620 Eighth Ave | | New York | NY | 10018-1405 | | 212-218-5500 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | William J. Hanlon | World Trade Center East | Two Seaport Lane, Suite 300 | Boston | MA | 02210 | | 617-946-4800 | whanlon@seyfarth.com | Counsel to le Belier/LBQ Foundry S.A. de C.V. |
| Shaw Gussis Fishman Glantz Wolfson & Towbin LLC | Brian L Shaw | 321 N. Clark St. | Suite 800 | Chicago | IL | 60654 | | 312-541-0151 | bshaw100@shawgussis.com | Counsel to ATC Logistics & Electronics, Inc. |
| Sheehan Phinney Bass + Green Professional Association | Bruce A. Harwood | 1000 Elm Street | P.O. Box 3701 | Manchester | NH | 03105-3701 | | 603-627-8139 | bharwood@sheehan.com | Counsel to Source Electronics, Inc. |
| Sheldon S. Toll PLLC | Sheldon S. Toll | 2000 Town Center | Suite 2550 | Southfield | MI | 48075 | | 248-358-2460 | lawtoll@comcast.net | Counsel to Milwaukee Investment Company |
| Sheppard Mullin Richter & Hampton LLP | Eric Waters | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | ewaters@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Malani J. Sternstein | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | msternstein@sheppardmullin.com | Counsel to International Rectifier Corp. and Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theodore A. Cohen | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | tcohen@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theresa Wardle | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | twardle@sheppardmullin.com | Counsel to International Rectifier Corp. |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 5353 Essen Lane | Suite 650 | Baton Rouge | LA | 70809 | | 225-757-2185 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 909 Poydras Street | 28th Floor | New Orleans | LA | 70112-1033 | | 504-299-2100 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |
| Shipman & Goodwin LLP | Kathleen M. LaManna | One Constitution Plaza | | Hartford | CT | 06103-1919 | | 860-251-5603 | bankruptcy@goodwin.com | |
| Sills, Cummis Epstein & Gross, P.C. | Andrew H. Sherman | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | asherman@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |
| Sills, Cummis Epstein & Gross, P.C. | Jack M. Zackin | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | jzackin@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |
| Sills, Cummis Epstein & Gross, P.C. | Valerie A Hamilton Simon Kimmelman | 650 College Rd E | | Princeton | NJ | 08540 | | 609-227-4600 | vhamilton@sillscummis.com skimmelman@sillscummis.com | Counsel to Doosan Infracore America Corp. |
| Silver Point Capital, L.P. | Chaim J. Fortgang | Two Greenwich Plaza | 1st Floor | Greenwich | CT | 06830 | | 203-542-4216 | cfortgang@silverpointcapital.com | Counsel to Silver Point Capital, L.P. |
| Smith, Katzenstein & Furlow LLP | Kathleen M. Miller | 800 Delaware Avenue, 7th Floor | P.O. Box 410 | Wilmington | DE | 19899 | | 302-652-8400 | kmiller@skfdelaware.com | Counsel to Airgas, Inc. |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 19 of 22

3/9/2010 3:29 PM
Email (388)

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-------|------------------|
| Sonnenschein Nath & Rosenthal LLP | D. Farrington Yates | 1221 Avenue of the Americas | 24th Floor | New York | NY | 10020 | | 212-768-6700 | fyates@sonnenschein.com | Counsel to Molex, Inc. and INA USA, Inc. and United Plastics Group |
| Sonnenschein Nath & Rosenthal LLP | Monika J. Machen | 8000 Sears Tower | 233 South Wacker Drive | Chicago | IL | 60606 | | 312-876-8000 | mmachen@sonnenschein.com | Counsel to United Plastics Group |
| Sonnenschein Nath & Rosenthal LLP | Oscar N. Pinkas | 1221 Avenue of the Americas | 24th Floor | New York | NY | 10020 | | 212-768-6700 | opinkas@sonnenschein.com | Counsel to Schaeffler Canada, Inc. and Schaeffler KG |
| Sonnenschein Nath & Rosenthal LLP | Robert E. Richards | 7800 Sears Tower | 233 South Wacker Drive | Chicago | IL | 60606 | | 312-876-8000 | rrichards@sonnenschein.com | Counsel to Molex, Inc. and INA USA, Inc.; Counsel to Schaeffler Canada, Inc. and Schaeffler KG |
| Squire, Sanders & Dempsey L.L.P. | G. Christopher Meyer | 4900 Key Tower | 127 Public Sq | Cleveland | OH | 44114 | | 216-479-8692 | cmeyer@ssd.com | Counsel to Furukawa Electric Co., Ltd.; Counsel for the City of Dayton, Ohio |
| State of California Office of the Attorney General | Sarah E. Morrison | Deputy Attorney General | 300 South Spring Street Ste 1702 | Los Angeles | CA | 90013 | | 213-897-2640 | sarah.morrison@doj.ca.gov | Attorneys for the State of California Department of Toxic Substances Control |
| State of Michigan Department of Labor & Economic Growth, Unemployment Insurance Agency | Roland Hwang Assistant Attorney General | 3030 W. Grand Boulevard | Suite 9-600 | Detroit | MI | 48202 | | 313-456-2210 | hwangr@michigan.gov | Assistant Attorney General for State of Michigan, Unemployment Tax Office of the Department of Labor & Economic Growth, Unemployment Insurance Agency |
| State of Michigan Labor Division | Susan Przekop-Shaw | PO Box 30736 | | Lansing | MI | 48909 | | 517-373-2560 | przekopshaws@michigan.gov | Assistant Attorney General as Attorney for the Michigan Workers' Compensation Agency |
| Steel Technologies, Inc. | John M. Baumann | 15415 Shelbyville Road | | Louisville | KY | 40245 | | 502-245-0322 | jmbaumann@steeltechnologies.com | Counsel to Steel Technologies, Inc. |
| Sterns & Weinroth, P.C. | Michael A Spero Simon Kimmelman Valerie A Hamilton | 50 West State Street, Suite 1400 | PO Box 1298 | Trenton | NJ | 08607-1298 | | 609-392-2100 | jspecf@sternslaw.com | Counsel to Doosan Infracore America Corp. |
| Stevens & Lee, P.C. | Chester B. Salomon, Esq. Constantine D. Pourakis, Esq. | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | | 212-319-8500 | cs@stevenslee.com cp@stevenslee.com | Counsel to Tonolli Canada Ltd.; VJ Technologies, Inc. and V.J. ElectroniX, Inc. |
| Stinson Morrison Hecker LLP | Mark A. Shaiken | 1201 Walnut Street | | Kansas City | MO | 64106 | | 816-842-8600 | mshaiken@stinsonmoheck.com | Counsel to Thyssenkrupp Waupaca, Inc. and Thyssenkrupp Stahl Company |
| Stites & Harbison PLLC | Madison L.Cashman | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | robert.goodrich@stites.com | Counsel to Setech, Inc. |
| Stites & Harbison PLLC | Robert C. Goodrich, Jr. | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | madison.cashman@stites.com | Counsel to Setech, Inc. |
| Stites & Harbison, PLLC | W. Robinson Beard, Esq. | 400 West Market Street | | Louisville | KY | 40202 | | 502-681-0448 502-587-3400 | wbeard@stites.com loucourtsum@stites.com | Counsel to WAKO Electronics (USA), Inc.,Ambrake Corporation, and Akebona Corporation (North America) |
| Stutman Treister & Glatt Professional Corporation | Christine M. Pajak Eric D. Goldberg Isaac M. Pachulski Esq Jeffrey H Davidson Esq | 1901 Avenue of the Stars | 12th Floor | Los Angeles | CA | 90067 | | 310-228-5600 | cpajak@stutman.com egoldberg@stutman.com ipachulski@stutman.com jdavidson@stutman.com | Counsel to CR Intrinsic Investors, LLC, Elliot Associates, L.P., Highland Capital Management, L.P. |
| Taft, Stettinius & Hollister LLP | Richard L .Ferrell | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202-3957 | | 513-381-2838 | ferrell@taftlaw.com | Counsel to Wren Industries, Inc. |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 20 of 22

3/9/2010 3:29 PM
Email (388)

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Taft, Stettinius & Hollister LLP | W Timothy Miller Esq | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202 | | 513-381-2838 | miller@taftlaw.com | Counsel to Select Industries Corporation and Gobar Systems, Inc. |
| Teitelbaum & Baskin LLP | Jay Teitelbaum Ron Baskin | 3 Barker Avenue | 3rd Floor | White Plains | NY | 10601 | | 914-437-7670 | jteitelbaum@tblawllp.com rbaskin@tblawllp.com | Counsel to Mary H. Schaefer |
| Tennessee Department of Revenue | Marvin E. Clements, Jr. | c/o TN Attorney General's Office, Bankruptcy Division | PO Box 20207 | Nashville | TN | 37202-0207 | | 615-532-2504 | agbanknewyork@ag.tn.gov | Tennesse Department of Revenue |
| Thacher Proffitt & Wood LLP | Jonathan D. Forstot | Two World Financial Center | | New York | NY | 10281 | | 212-912-7679 | jforstot@tpw.com | Counsel to TT Electronics, Plc |
| Thacher Proffitt & Wood LLP | Louis A. Curcio | Two World Financial Center | | New York | NY | 10281 | | 212-912-7607 | lcurcio@tpw.com | Counsel to TT Electronics, Plc |
| The Furukawa Electric Co., Ltd. | Mr. Tetsuhiro Niizeki | 6-1 Marunouchi | 2-Chrome, Chiyoda-ku | Tokyo | Japan | 100-8322 | | | niizeki.tetsuhiro@furukawa.co.jp | Counsel to The Furukawa Electric Co., Ltd. |
| The Timken Corporation BIC - 08 | Robert Morris | 1835 Dueber Ave. SW | PO Box 6927 | Canton | OH | 44706-0927 | | 330-438-3000 | robert.morris@timken.com | Legal Department of The Representative for Timken Corporation |
| Thompson & Knight | Rhett G. Cambell | 333 Clay Street | Suite 3300 | Houston | TX | 77002 | | 713-654-1871 | rhett.campbell@tklaw.com | Counsel to STMicroelectronics, Inc. |
| Thompson & Knight LLP | Ira L. Herman | 919 Third Avenue | 39th Floor | New York | NY | 10022-3915 | | 212-751-3045 | ira.herman@tklaw.com | Counsel to Victory Packaging |
| Thompson & Knight LLP | John S. Brannon | 1700 Pacific Avenue | Suite 3300 | Dallas | TX | 75201-4693 | | 214-969-1505 | john.brannon@tklaw.com | Counsel to Victory Packaging |
| Thompson Coburn Fagel Haber | Lauren Newman | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | | 312-346-7500 | lnewman@tcfhlaw.com | Counsel to Aluminum International, Inc. |
| Thompson Coburn LLP d/b/a Thompson Coburn Fagel Haber | Dennis E. Quaid Esq | 55 E Monroe 40th Fl | | Chicago | IL | 60603 | | 312-580-2215 | dquaid@tcfhlaw.com efiledocketgroup@fagelhaber.com | Counsel for Penn Aluminum International Inc |
| TI Group Automotive Systms LLC | Timothy M. Guerriero | 12345 E Nine Mile Rd | | Warren | MI | 48089 | | 586-755-8066 | tguerriero@us.tiauto.com | General Counsel and Company Secretary to TI Group Automotive Systems LLC |
| Todd & Levi, LLP | Jill Levi, Esq. | 444 Madison Avenue | Suite 1202 | New York | NY | 10022 | | 212-308-7400 | jlevi@toddlevi.com | Counsel to Bank of Lincolnwood |
| Todtman Nachamie Spizz & Johns PC | Janice B. Grubin | 425 Park Avenue | 5th Floor | New York | NY | 10022 | | 212-754-9400 | jgrubin@tnsj-law.com | Counsel to Vanguard Distributors, Inc. |
| U.S. Department of Justice | Matthew L Schwartz Joseph N Cordaro | Assistant United States Attorneys | 86 Chambers Street 3rd Fl | New York | NY | 10007 | | 212-637-1945 | matthew.schwartz@usdoj.gov | Counsel to Enviromental Protection Agency; Internal Revenue Service; Department of Health and Human Services; and Customs and Border Protection |
| Underberg & Kessler, LLP | Helen Zamboni | 300 Bausch & Lomb Place | | Rochester | NY | 14604 | | 585-258-2800 | hzamboni@underbergkessler.com | Counsel to McAlpin Industries, Inc. |
| Union Pacific Railroad Company | Mary Ann Kilgore | 1400 Douglas Street | MC 1580 | Omaha | NE | 68179 | | 402-544-4195 | mkilgore@UP.com | Counsel to Union Pacific Railroad Company |
| United Steel, Paper and Forestry, Rubber, Manufacturing, Energy | Allied Industrial and Service Workers, Intl Union (USW), AFL-CIO David Jury, Esq. | | Five Gateway Center Suite 807 | Pittsburgh | PA | 15222 | | 412-562-2546 | djury@usw.org | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Vorys, Sater, Seymour and Pease LLP | Tiffany Strelow Cobb | 52 East Gay Street | | Columbus | OH | 43215 | | 614-464-8322 | tscobb@vorys.com | Counsel to America Online, Inc. and its Subsidiaries and Affiliates |
| Wachtell, Lipton, Rosen & Katz | Richard G. Mason | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | RGMason@wlrk.com | Counsel to Capital Research and Management Company |
| Warner Norcross & Judd LLP | Gordon J. Toering | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2185 | gtoering@wnj.com | Counsel to Robert Bosch Corporation; Counsel to Daewoo International Corp and Daewoo International (America) Corp |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 21 of 22

3/9/2010 3:29 PM
Email (388)

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Warner Norcross & Judd LLP | Michael G. Cruse | 2000 Town Center | Suite 2700 | Southfield | MI | 48075 | | 248-784-5131 | mcruse@wnj.com | Counsel to Compuware Corporation |
| Warner Norcross & Judd LLP | Stephen B. Grow | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2158 | growsb@wnj.com | Counsel to Behr Industries Corp. |
| Weltman, Weinberg & Reis Co., L.P.A. | Geoffrey J. Peters | 175 South Third Street | Suite 900 | Columbus | OH | 43215 | | 614-857-4326 | gpeters@weltman.com | Counsel to Seven Seventeen Credit Union |
| White & Case LLP | Glenn Kurtz Gerard Uzzi Douglas Baumstein | 1155 Avenue of the Americas | | New York | NY | 10036-2787 | | 212-819-8200 | gkurtz@ny.whitecase.com guzzi@whitecase.com dbaumstein@ny.whitecase.com | Counsel to Appaloosa Management, LP |
| White & Case LLP | Thomas Lauria Frank Eaton | Wachovia Financial Center | 200 South Biscayne Blvd., Suite 4900 | Miami | FL | 33131 | | 305-371-2700 | tlauria@whitecase.com featon@miami.whitecase.com | Counsel to Appaloosa Management, LP |
| Whyte, Hirschboeck Dudek S.C. | Bruce G. Arnold | 555 East Wells Street | Suite 1900 | Milwaukee | WI | 53202-4894 | | 414-273-2100 | barnold@whdlaw.com | Counsel to Schunk Graphite Technology |
| Wickens Herzer Panza Cook & Batista Co | James W Moennich Esq | 35765 Chester Rd | | Avon | OH | 44011-1262 | | 440-930-8000 | jmoennich@wickenslaw.com | Counsel for Delphi Sandusky ESOP |
| Winston & Strawn LLP | David Neier Carey D. Schreiber | 200 Park Avenue | | New York | NY | 10166-4193 | | 212-294-6700 | dneier@winston.com cschreiber@winston.com | Counsel to Ad Hoc Group of Tranche A & B DIP Lenders |
| Winthrop Couchot Professional Corporation | Marc. J. Winthrop | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | mwinthrop@winthropcouchot.com | Counsel to Metal Surfaces, Inc. |
| Winthrop Couchot Professional Corporation | Sean A. O'Keefe | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | sokeefe@winthropcouchot.com | Counsel to Metal Surfaces, Inc. |
| Womble Carlyle Sandridge & Rice, PLLC | Allen Grumbine | 550 South Main St | | Greenville | SC | 29601 | | 864-255-5402 | agrumbine@wcsr.com | Counsel to Armacell |
| Womble Carlyle Sandridge & Rice, PLLC | Michael G. Busenkell | 222 Delaware Avenue | Suite 1501 | Wilmington | DE | 19801 | | | mbusenkell@wcsr.com | Counsel to Chicago Miniature Optoelectronic Technologies, Inc. |
| Woods Oviatt Gilman LLP | Ronald J. Kisinski | 700 Crossroads Bldg | 2 State St | Rochester | NY | 14614 | | 585-362-4514 | rkisicki@woodsoviatt.com | |
| Zeichner Ellman & Krause LLP | Stuart Krause | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | skrause@zeklaw.com | Counsel to Toyota Tsusho America, Inc. |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 22 of 22

3/9/2010 3:29 PM
Email (388)

# EXHIBIT C

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Angelo, Gordon & Co. | Leigh Walzer | 245 Park Avenue | 26th Floor | New York | NY | 10167 | | 212-692-8251 | 212-867-6395 | |
| APS Clearing, Inc. | Andy Leinhoff Matthew Hamilton | 1301 S. Capital of Texas Highway | Suite B-220 | Austin | TX | 78746 | | 512-314-4416 | 512-314-4462 | Counsel to APS Clearing, Inc. |
| Arent Fox PLLC | Mitchell D. Cohen | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | Counsel to Pullman Bank and Trust Company |
| Bingham McHale LLP | John E Taylor Michael J Alerding | 10 West Market Street | Suite 2700 | Indianapolis | IN | 46204 | | 317-635-8900 | 317-236-9907 | Counsel to Universal Tool & Engineering co., Inc. and M.G. Corporation |
| DaimlerChrysler Corporation | Kim Kolb | CIMS 485-13-32 | 1000 Chrysler Drive | Auburn Hills | MI | 48326-2766 | | 248-576-5741 | | Counsel to DaimlerChrysler Corporation; DaimlerChrylser Motors Company, LLC; DaimlerChrylser Canada, Inc. |
| Goodwin Proctor LLP | Allan S. Brilliant Craig P. Druehl | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | 212-355-3333 | Counsel to UGS Corp. |
| Harris D. Leinwand | Harris D. Leinwand | 235 Weaver Street | Unit 6H | Greenwich | CT | 06831 | | | | Counsel to Ahaus Tool & Engineering |
| Harris D. Leinwand | Harris D. Leinwand | 315 Madison Avenue | Suite 901 | New York | NY | 10017 | | 212-725-7338 | | Counsel to Ahaus Tool & Engineering |
| Hodgson Russ LLP | Stephen H. Gross, Esq. | 60 E 42nd St 37th Fl | | New York | NY | 10165-0150 | | 212-661-3535 | 212-972-1677 | Co-Counsel for Yazaki North America, Inc. |
| InPlay Technologies Inc | Heather Beshears | 234 South Extension Road | | Mesa | AZ | 85201 | | | | Creditor |
| Jaffe, Raitt, Heuer & Weiss, P.C. | Paige E. Barr | 27777 Franklin Road | Suite 2500 | Southfield | MI | 48034 | | 248-351-3000 | 248-351-3082 | Counsel to Trutron Corporation |
| Jason, Inc. | Beth Klimczak, General Counsel | 411 E. Wisconsin Ave | Suite 2120 | Milwaukee | WI | 53202 | | | | General Counsel to Jason Incorporated |
| McCarthy Tetrault LLP | John J. Salmas | 66 Wellington Street West | Suite 4700 | Toronto | Ontario | M5K 1E6 | Canada | 416-362-1812 | 416-868-0673 | Counsel to Themselves (McCarthy Tetrault LLP) |
| Meyer, Suozzi, English & Klein, P.C. | Lowell Peterson, Esq. | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | 212-239-1311 | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Michigan Heritage Bank | Janice M. Donahue | 28300 Orchard Lake Rd | Ste 200 | Farmington Hills | MI | 48334 | | 248-538-2529 | 248-786-3596 | Counsel to Michigan Heritage Bank; MHB Leasing, Inc. |
| Miller & Chevalier Chartered | Anthony F Shelley Timothy P O'Toole | 655 Fifteenth Street NW Suite 900 | | Washington | DC | 20005 | | 202-626-5800 | | Counsel to Dennis Black, Charles Cunningham, and the Delphi Salaried Retiree Association |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 1 of 4

3/9/2010 3:30 PM
US Mail (47)

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Morrison Cohen LLP | Joseph T. Moldovan Michael R Dal Lago | 909 Third Ave | | New York | NY | 10022 | | 212-735-8600 | | Counsel to Dennis Black, Charles Cunningham, and the Delphi Salaried Retiree Association |
| Norris, McLaughlin & Marcus | Elizabeth L. Abdelmasieh, Esq | 721 Route 202-206 | P.O. Box 1018 | Somerville | NJ | 08876 | | 908-722-0700 | 908-722-0755 | Counsel to Rotor Clip Company, Inc. |
| Paul, Weiss, Rifkind, Wharton & Garrison | Curtis J. Weidler | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3157 | 212-373-2053 | Counsel to Ambrake Corporation; Akebono Corporation |
| Paul, Weiss, Rifkind, Wharton & Garrison | Justin G. Brass | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | Counsel to Merrill Lynch, Pierce, Fenner & Smith, Incorporated |
| Pepper, Hamilton LLP | Linda J. Casey | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | Counsel to SKF USA, Inc. |
| Plunkett Cooney | Charles W Browning Robert G Kamenec Elaine M Pohl | 38505 Woodward Avenue | Suite 2000 | Bloomfield Hills | MI | 48304 | | 248-901-4000 | 248-901-4040 | Counsel to ACE American Insurance Company and Pacific Employers Insurance Company |
| Professional Technologies Services | John V. Gorman | P.O. Box #304 | | Frankenmuth | MI | 48734 | | 989-385-3230 | 989-754-7690 | Corporate Secretary for Professional Technologies Services |
| Quinn Emanuel Urquhart Oliver & Hedges LLP | Susheel Kirpalani James C Tecce Scott C Shelley | 51 Madison Ave 22nd Fl | | New York | NY | 10010 | | 212-849-7199 | 212-849-7100 | Counsel For Collective Of Tranche C DIP Lenders |
| Reed Smith | Elena Lazarou | 599 Lexington Avenue | 29th Floor | New York | NY | 10022 | | 212-521-5400 | 212-521-5450 | Counsel to General Electric Capital Corporation, Stategic Asset Finance. |
| Republic Engineered Products, Inc. | Joseph Lapinsky | 3770 Embassy Parkway | | Akron | OH | 44333 | | 330-670-3004 | 330-670-3020 | Counsel to Republic Engineered Products, Inc. |
| Riverside Claims LLC | Holly Rogers | 2109 Broadway | Suite 206 | New York | NY | 10023 | | 212-501-0990 | 212-501-7088 | Riverside Claims LLC |
| Robinson, McFadden & Moore, P.C. | Annemarie B. Mathews | P.O. Box 944 | | Columbia | SC | 29202 | | 803-779-8900 | 803-771-9411 | Counsel to Blue Cross Blue Shield of South Carolina |
| Ropers, Majeski, Kohn & Bentley | Christopher Norgaard | 515 South Flower Street | Suite 1100 | Los Angeles | CA | 90071 | | 213-312-2000 | 213-312-2001 | Counsel to Brembo S.p.A; Bibielle S.p.A.; AP Racing |
| Ropes & Gray LLP | Gregory O. Kaden | One International Place | | Boston | MA | 02110-2624 | | 617-951-7000 | 617-951-7050 | Attorneys for D-J, Inc. |
| Sachnoff & Weaver, Ltd | Arlene Gelman Charles S. Schulman | 10 South Wacker Drive | 40th Floor | Chicago | IL | 60606 | | 312-207-1000 | 312-207-6400 | Counsel to Infineon Technologies North America Corporation |
| Schafer and Weiner PLLC | Max Newman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | Counsel to Dott Industries, Inc. |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 2 of 4

3/9/2010 3:30 PM
US Mail (47)

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Schiffrin & Barroway, LLP | Michael Yarnoff | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7706 | 610-667-7056 | Counsel to Teachers Retirement System of Oklahoma; Public Employes's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Schiffrin & Barroway, LLP | Sean M. Handler | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7706 | 610-667-7056 | Counsel to Teachers Retirement System of Oklahoma; Public Employes's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Shipman & Goodwin LLP | Jennifer L. Adamy | One Constitution Plaza | | Hartford | CT | 06103-1919 | | 860-251-5811 | 860-251-5218 | Counsel to Fortune Plastics Company of Illinois, Inc.; Universal Metal Hose Co., |
| Sony Electronics Inc. | Lloyd B. Sarakin - Chief Counsel, Finance and Credit | 1 Sony Drive | MD #1 E-4 | Park Ridge | NJ | 07656 | | 201-930-7483 | | Counsel to Sony Electronics, Inc. |
| Squire, Sanders & Dempsey L.L.P. | Eric Marcks | One Maritime Plaza | Suite 300 | San Francisco | CA | 94111-3492 | | | 415-393-9887 | Counsel to Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| Stein, Rudser, Cohen & Magid LLP | Robert F. Kidd | 825 Washington Street | Suite 200 | Oakland | CA | 94607 | | 510-287-2365 | 510-987-8333 | Counsel to Excel Global Logistics, Inc. |
| Steinberg Shapiro & Clark | Mark H. Shapiro | 24901 Northwestern Highway | Suite 611 | Southfield | MI | 48075 | | 248-352-4700 | 248-352-4488 | Counsel to Bing Metals Group, Inc.; Gentral Transport International, Inc.; Crown Enerprises, Inc.; Economy Transport, Inc.; Logistics Insight Corp (LINC); Universal Am-Can, Ltd.; Universal Truckload Services, Inc. |
| Sterns & Weinroth, P.C. | Jeffrey S. Posta | 50 West State Street, Suite 1400 | PO Box 1298 | Trenton | NJ | 08607-1298 | | 609-392-2100 | 609-392-7956 | Counsel to Doosan Infracore America Corp. |
| Thelen Reid Brown Raysman & Steiner LLP | Marcus O. Colabianchi | 101 Second St Ste 1800 | | San Francisco | CA | 94105-3606 | | 415-369-7301 | 415-369-8764 | Counsel to Oki Semiconductor Company |
| Togut, Segal & Segal LLP | Albert Togut, Esq. | One Penn Plaza | Suite 3335 | New York | NY | 10119 | | 212-594-5000 | 212-967-4258 | Conflicts counsel to Debtors |
| Tyler, Cooper & Alcorn, LLP | W. Joe Wilson | 185 Asylum Street | CityPlace I 35th Floor | Hartford | CT | 06103-3488 | | 860-725-6200 | 860-278-3802 | Counsel to Barnes Group, Inc. |
| Waller Lansden Dortch & Davis, PLLC | Robert J. Welhoelter, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | 615-244-6804 | Counsel to Nissan North America, Inc. |
| Warner Stevens, L.L.P. | Michael D. Warner | 301 Commerce Street | Suite 1700 | Fort Worth | TX | 76102 | | 817-810-5250 | 817-810-5255 | Counsel to Electronic Data Systems Corp. and EDS Information Services, L.L.C. |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 3 of 4

3/9/2010 3:30 PM
US Mail (47)

DPH Holdings Corp.
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|------------------|
| Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP | Lei Lei Wang Ekvall | 650 Town Center Drive | Suite 950 | Costa Mesa | CA | 92626 | | 714-966-1000 | 714-966-1002 | Counsel to Toshiba America Electronic Components, Inc. |
| WL Ross & Co., LLC | Stephen Toy | 1166 Avenue of the Americas | | New York | NY | 10036-2708 | | 212-826-1100 | 212-317-4893 | Counsel to WL. Ross & Co., LLC |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 4 of 4

3/9/2010 3:30 PM
US Mail (47)

# EXHIBIT D

**Hearing Date and Time:  March 18, 2010 at 10:00 a.m. (prevailing Eastern time)**
**Supplemental Response Date and Time:  March 16, 2010 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti

Attorneys for DPH Holdings Corp., et al.,
    Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -   -   x
                                                            :
        In re                                               :    Chapter 11
                                                            :
DPH HOLDINGS CORP., et al.,                                 :    Case Number 05-44481 (RDD)
                                                            :
                                                            :    (Jointly Administered)
                Reorganized Debtors.                        :
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

REORGANIZED DEBTORS' SUPPLEMENTAL REPLY TO RESPONSES OF CERTAIN
CLAIMANTS TO DEBTORS' OBJECTIONS TO PROOFS OF CLAIM NOS. 13776 AND 13881
FILED BY THE NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION

("SUPPLEMENTAL REPLY REGARDING THE NEW YORK CLAIMS")

DPH Holdings Corp. and certain of its affiliated reorganized debtors in the above-captioned cases (together with DPH Holdings Corp., the "Reorganized Debtors") hereby submit the Reorganized Debtors' Supplemental Reply To Responses Of Certain Claimants To Debtors' Objections To Proofs Of Claim Nos. 13776 And 13887 Filed By The New York State Department of Environmental Conservation (the "Supplemental Reply"), and respectfully represent as follows:

A.    Preliminary Statement

1.    On October 8 and 14, 2005, Delphi Corporation and certain of its affiliates (the "Debtors"), predecessors of the Reorganized Debtors, filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").

2.    On October 6, 2009, the Debtors substantially consummated the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified (the "Modified Plan"), which had been approved by this Court pursuant to an order entered on July 30, 2009 (Docket No. 18707) (the "Confirmation Order"), and emerged from chapter 11 as the Reorganized Debtors.

3.    On February 18, 2010, the Reorganized Debtors filed the Notice Of Sufficiency Hearing With Respect To Debtors' Objections To Proofs Of Claim Nos. 6991, 7054, 9221, 10830, 10959, 10960, 11375, 11643, 11644, 11892, 11911, 11983, 11985, 11988, 11989, 12147, 12833, 13776, 13881, 14019, 14020, 14022, 14023, 14024, 14025, 14026, 14370, 14825, 14826, 16967, 18265, 18422, 18603, 18614, 19162, 19543, And 19545 (Docket No. 19504) (the "Sufficiency Hearing Notice").

4.      The Reorganized Debtors filed the Sufficiency Hearing Notice and are filing this Supplemental Reply to implement Article 9.6(a) of the Modified Plan, which provides that "[t]he Reorganized Debtors shall retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors and making distributions (if any) with respect to all Claims and Interests …."  Modified Plan, art. 9.6(a).

5.      By the Sufficiency Hearing Notice and pursuant to the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims, entered December 7, 2006 (Docket No. 6089) (the "Claims Objection Procedures Order") and the Ninth Supplemental Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims, entered December 11, 2009 (Docket No. 19176), the Reorganized Debtors scheduled a hearing (the "Sufficiency Hearing") on March 18, 2010 at 10:00 (prevailing Eastern time) in this Court to address the legal sufficiency of each proof of claim filed by the claimants listed on Exhibit A to the Sufficiency Hearing Notice and whether each such proof of claim states a colorable claim against the asserted Debtor.

6.      This Supplemental Reply is filed pursuant to paragraph 9(b)(i) of the Claims Objection Procedures Order.  Pursuant to paragraph 9(b)(ii) of the Claims Objection Procedures Order, if a Claimant wishes to file a supplemental pleading in response to this Supplemental Reply, the Claimant shall file and serve its response no later than two business days before the scheduled Sufficiency Hearing – i.e., by **March 16, 2010.**

3

B.    Relief Requested

7.    By this Supplemental Reply, the Reorganized Debtors request entry of an

order disallowing and expunging proofs of claim filed by the New York Department of

Environmental Conservation ("NYDEC") to the extent they seek payment of future costs that are

contingent and have not been incurred by NYDEC in response to alleged environmental

contamination at properties formerly owned by the Reorganized Debtors.

C.    NYDEC's Claims

8.    During their review of the proofs of claim filed in these cases, the Debtors

determined that certain proofs of claim filed by NYDEC asserted contingent liabilities for future

cleanup costs that have not yet been incurred by NYDEC or dollar amounts that are not owing

pursuant to the Reorganized Debtors' books and records.  Accordingly, this Court should enter an

order disallowing and expunging each such proof of claim to the extent that it seeks recovery of

contingent costs that have not been incurred by NYDEC.

9.    The New York Claims Filed Against The Debtors.  On July 31, 2006,

NYDEC filed proof of claim number 13776 against Delphi Automotive Systems LLC ("DAS

LLC") asserting liability for environmental contamination at the property located at 1000

Lexington Ave., Rochester, New York (the "Rochester Site").  The claim asserts an

administrative expense claim in the amount of $9,955,768 for future remediation costs at the

Rochester Site.  It also asserts an administrative expense claim in the amount of $4,447.27 for

administrative costs incurred by NYDEC post-petition and a general unsecured claim in the

amount of $2,459.20 in administrative costs incurred by NYDEC prior to the commencement of

the Reorganized Debtors' bankruptcy proceedings.

10.    On July 31, 2006, NYDEC filed proof of claim number 13881  against

DAS LLC (collectively with proof of claim number 13776, the "New York Claims") asserting

liability for environmental contamination at the property located at 200 Upper Mountain,

Lockport, New York (the "Lockport Site" and, together with the Rochester Site, the "New York

Sites").  The claim asserts an administrative expense claim in the amount of $405,000 for future

remediation costs at the Lockport Site.  It also asserts an administrative expense claim in the

amount of $446 for administrative costs incurred by NYDEC post-petition and a general

unsecured claim in the amount of $1,585.39 in administrative costs incurred by NYDEC prior to

the commencement of the Reorganized Debtors' bankruptcy proceedings.

      11.    <u>The Debtors' Objection To The New York Claims</u>.  On October 31, 2006,

the Debtors filed the Debtors' (I) Third Omnibus Objection (Substantive) Pursuant To 11 U.S.C.

§ 502(b) And Fed. R. Bankr. P. 3007 To Certain (A) Claims With Insufficient Documentation,

(B) Claims Unsubstantiated By Debtors' Books And Records, And (C) Claims Subject To

Modification And (II) Motion To Estimate Contingent And Unliquidated Claims Pursuant To 11

U.S.C. § 502(c) (Docket No. 5452) (the "Third Omnibus Claims Objection"), by which the

Debtors objected to proofs of claim numbers 13776 and 13881 as unsubstantiated claims for

which the Debtors are not liable and sought an order disallowing and expunging each of those

proofs of claim.

      12.    <u>NYDEC'S Responses To The Debtors' Objections</u>.  On November 22,

2006, NYDEC filed the Response To Debtors' Third Omnibus Objection To Proofs of Claim Nos.

13776 And 13881 (Docket No. 5734) (the "Response"), in which NYDEC asserted that DAS

LLC was required to implement certain cleanup activities at the New York Sites under separate

Orders on Consent.

      13.    <u>The Sufficiency Hearing Notice</u>.  Pursuant to the Claims Objection

Procedures Order, the hearing on the New York Claims was adjourned to a future date.  On

February 18, 2010, the Reorganized Debtors filed the Sufficiency Hearing Notice with respect to the New York Claims, among other proofs of claim, scheduling the Sufficiency Hearing.

D.    Claimant's Burden Of Proof And Standard For Sufficiency Of Claim

14.    The Reorganized Debtors respectfully submit that the Proofs of Claim fail to state a claim against the Debtors under rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  NYDEC has not proved any facts to support a right to payment by the Reorganized Debtors on behalf of the Debtors.  Accordingly, the Debtors' objections to the New York Claims should be sustained with respect to such proofs of claim and both New York Claims should be disallowed and expunged to the extent they seek recovery of future remediation costs that have not yet been incurred by NYDEC.

15.    The burden of proof to establish a claim against the Debtors rests on the claimants and, if a proof of claim does not include sufficient factual support, such proof of claim is not entitled to a presumption of prima facie validity pursuant to Bankruptcy Rule 3001(f).  In re Spiegel, Inc., No. 03-11540, 2007 WL 2456626, at *15 (Bankr. S.D.N.Y. August 22, 2007) (the claimant always bears the burden of persuasion and must initially allege facts sufficient to support the claim); see also In re WorldCom, Inc., No. 02-13533, 2005 WL 3832065, at *4 (Bankr. S.D.N.Y. Dec. 29, 2005) (only a claim that alleges facts sufficient to support legal liability to claimant satisfies claimant's initial obligation to file substantiated proof of claim); In re Allegheny Intern., Inc., 954 F.2d 167, 173 (3d Cir. 1992) (in its initial proof of claim filing, claimant must allege facts sufficient to support claim); In re Chiro Plus, Inc., 339 B.R. 111, 113 (Bankr. D.N.J. 2006) (claimant bears initial burden of sufficiently alleging claim and establishing facts to support legal liability); In re Armstrong Finishing, L.L.C., No. 99-11576-C11, 2001 WL 1700029, at *2 (Bankr. M.D.N.C. May 2, 2001) (only when claimant alleges facts sufficient to support its proof of claim is it entitled to have claim considered prima facie valid); In re United

6

Cos. Fin. Corp., 267 B.R. 524, 527 (Bankr. D. Del. 2000) (claimant must allege facts sufficient to support legal basis to make prima facie case).

16.    For purposes of sufficiency, this Court has determined that the standard of whether a Claimant has met its initial burden of proof to establish a claim should be similar to the standard employed by courts in deciding a motion to dismiss under Bankruptcy Rules 7012 and 9014.    See Transcript of January 12, 2007 Hearing (Docket No. 7118) (the "January 12, 2007 Transcript") at 52:24-53:1.    Pursuant to that standard, a motion to dismiss should be granted "if it plainly appears that the nonmovant 'can prove no set of facts in support of his claim which would entitle him to relief.'"    In re Lopes, 339 B.R. 82, 86 (Bankr. S.D.N.Y. 2006) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).    Essentially, the claimant must provide facts that sufficiently support a legal liability against the Debtors.

17.    This Court further established that the sufficiency hearing standard is consistent with Bankruptcy Rule 3001(f), which states that "a proof of claim executed and filed in accordance with these Rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f) (emphasis added).    Likewise, Bankruptcy Rule 3001(a) requires that "the proof of claim must be consistent with the official form" and Bankruptcy Rule 3001(c) requires "evidence of a writing if the claim is based on a writing."    Fed. R. Bankr. P. 3001(a), (c).    See January 12, 2007 Transcript at 52:17-22.

E.    Argument Regarding The New York Claims.

18.    Under the Modified Plan, the Reorganized Debtors transferred the New York Sites to GM Components Holdings, LLC ("GM").    See Supplement To First Amended Disclosure Statement With Respect To First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession at S-xviii (Docket No. 17031).

7

19.    In connection with this transfer, GM assumed responsibility for addressing

the contamination at the New York Sites that is the subject of the New York Claims.

Specifically, the Confirmation Order provided that:

> GM Components, as Buyer of the Delphi Automotive Systems Site located at
> 1000 Lexington Avenue, Rochester, New York, identified in the New York State
> Department of Environmental Conservation ("NYSDEC") Environmental Site
> Remediation Database as Site Code 828064 (the "Rochester Facility"), and the
> Delphi Thermal Systems Facility located at 200 Upper Mountain, Lockport, New
> York, identified in the NYSDEC Environmental Site Remediation Database as
> Site Codes C932138, C932139, C932140, and 932113 and in the NYSDEC Spill
> Incidents Database as Site Code 0651261 (collectively, the "Lockport Facility"),
> acknowledges that it shall be responsible for conducting investigation and
> remediation of the Rochester Facility and the Lockport Facility in accordance
> with applicable Environmental Laws.

Confirmation Order ¶ 63(ii)(1).

20.    Because GM has assumed, pursuant to an order from this Court, the

obligation to implement and pay for the cleanup of the New York Sites, the New York Claims, to

the extent they seek recovery from the Reorganized Debtors of the costs of such cleanup, are

contingent.  NYDEC would only have a valid claim against the Reorganized Debtors for future

costs cleanup costs at the New York Sites if GM were to default on the obligations it expressly

assumed in the Confirmation Order.   To the Reorganized Debtors' knowledge, there has been no

such default on GM's part, and nothing in NYDEC's Proofs of Claim or the Response indicates

that such a contingency is likely to happen.

21.    NYDEC has not proved any set of facts that supports a right to payment

from the Reorganized Debtors.  Accordingly, the Reorganized Debtors assert that (a) NYDEC

has not met its burden of proof to establish a claim against the Debtors, (b) the New York Claims

are not entitled to a presumption of prima facie validity pursuant to Bankruptcy Rule 3001(f),

and (c) the New York Claims fail to state a claim against the Reorganized Debtors under

Bankruptcy Rule 7012 for future remediation costs. Because NYDEC cannot provide facts or law supporting their claims, the Reorganized Debtors' Third Omnibus Claims Objection should be sustained as to the New York Claims' assertion of future remediation costs and the New York Claims should be disallowed and expunged to the extent they seek such costs.

WHEREFORE the Reorganized Debtors respectfully request this Court enter an order (a) sustaining the Reorganized Debtors' objections with respect to the New York Claims, (b) disallowing and expunging each of the New York Claims to the extent they seek recovery of future remediation costs, and (c) granting such further and other relief this Court deems just and proper.


Dated:     New York, New York
           March 8, 2010
                                        SKADDEN, ARPS, SLATE, MEAGHER
                                          & FLOM LLP

                                        By:  /s/ John Wm. Butler, Jr.
                                             John Wm. Butler, Jr.
                                             John K. Lyons
                                             Ron E. Meisler
                                        155 North Wacker Drive
                                        Chicago, Illinois 60606

                                             - and -

                                        By:  /s/ Kayalyn A. Marafioti
                                             Kayalyn A. Marafioti
                                        Four Times Square
                                        New York, New York 10036

                                        Attorneys for DPH Holdings Corp., et al.,
                                          Reorganized Debtors

# EXHIBIT E

**Hearing Date and Time:  March 18, 2010 at 10:00 a.m. (prevailing Eastern time)**
**Supplemental Response Date and Time:  March 16, 2010 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler


      - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti

Attorneys for DPH Holdings Corp., et al.,
    Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                                          :
            In re                                         :       Chapter 11
                                                          :
DPH HOLDINGS CORP., et al.,                               :       Case Number 05-44481 (RDD)
                                                          :
                                                          :       (Jointly Administered)
                                                          :
            Reorganized Debtors.                          :
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

REORGANIZED DEBTORS' SUPPLEMENTAL REPLY TO RESPONSES OF CERTAIN
CLAIMANTS TO DEBTORS' OBJECTIONS TO PROOF OF CLAIM
NO. 12833 FILED BY PLA HOLDINGS VI LLC

("SUPPLEMENTAL REPLY REGARDING PLA HOLDINGS' CLAIM")

DPH Holdings Corp. and certain of its affiliated reorganized debtors in the above-captioned cases (together with DPH Holdings Corp., the "Reorganized Debtors") hereby submit the Reorganized Debtors' Supplemental Reply To Responses Of Certain Claimants To Debtors' Objections To Proof Of Claim Number 12833 Filed By PLA Holdings VI LLC (the "Supplemental Reply"), and respectfully represent as follows:

A.     Preliminary Statement

1.     On October 8 and 14, 2005, Delphi Corporation and certain of its affiliates (the "Debtors"), predecessors of the Reorganized Debtors, filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").

2.     On October 6, 2009, the Debtors substantially consummated the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified (the "Modified Plan"), which had been approved by this Court pursuant to an order entered on July 30, 2009 (Docket No. 18707), and emerged from chapter 11 as the Reorganized Debtors.

3.     On February 18, 2010, the Reorganized Debtors filed the Notice Of Sufficiency Hearing With Respect To Debtors' Objection To Proofs Of Claim Nos. 6991, 7054, 9221, 10830, 10959, 10960, 11375, 11643, 11644, 11892, 11911, 11983, 11985, 11988, 11989, 12147, 12833, 13776, 13881, 14019, 14020, 14022, 14023, 14024, 14025, 14026, 14370, 14825, 14826, 16967, 18265, 18422, 18603, 18614, 19162, 19543, And 19545 (Docket No. 19504) (the "Sufficiency Hearing Notice").

4.     The Reorganized Debtors filed the Sufficiency Hearing Notice and are filing this Supplemental Reply to implement Article 9.6(a) of the Modified Plan, which provides

2

that "[t]he Reorganized Debtors shall retain responsibility for administering, disputing, objecting

to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors and

making distributions (if any) with respect to all Claims and Interests …."  Modified Plan, art.

9.6(a).

        5.      By the Sufficiency Hearing Notice and pursuant to the Order Pursuant To

11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014

Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices

And Procedures Governing Objections To Claims, entered December 7, 2006 (Docket No. 6089)

(the "Claims Objection Procedures Order") and the Ninth Supplemental Order Pursuant To 11

U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014

Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices

And Procedures Governing Objections To Claims, entered December 11, 2009 (Docket No.

19176), the Reorganized Debtors scheduled a hearing (the "Sufficiency Hearing") on March 18,

2010 at 10:00 (prevailing Eastern time) in this Court to address the legal sufficiency of each

proof of claim filed by the claimants listed on Exhibit A to the Sufficiency Hearing Notice and

whether each such proof of claim states a colorable claim against the asserted Debtor.

        6.      This Supplemental Reply is filed pursuant to paragraph 9(b)(i) of the

Claims Objection Procedures Order.  <u>Pursuant to paragraph 9(b)(ii) of the Claims Objection</u>

<u>Procedures Order, if a Claimant wishes to file a supplemental pleading in response to this</u>

<u>Supplemental Reply, the Claimant shall file and serve its response no later than two business</u>

<u>days before the scheduled Sufficiency Hearing – i.e., by</u> **<u>March 16, 2010.</u>**

B.      Relief Requested

            7.      By this Supplemental Reply, the Reorganized Debtors request entry of an

order disallowing and expunging the proof of claim number 12833 filed by PLA Holdings VI

LLC.

C.      PLA Holdings' Claims

            8.      During their review of the proofs of claim filed in these cases, the Debtors

determined that proof of claim number 12833 by PLA Holdings VI LLC ("PLA Holdings")

asserts liabilities or dollar amounts that are not owing pursuant to the Reorganized Debtors books

and records.  The Reorganized Debtors believe that PLA Holdings is not a creditor of the

Debtors.  Accordingly, this Court should enter an order disallowing and expunging proof of

claim number 12833 in its entirety.

            9.      PLA Holdings' Claim Filed Against The Debtors.  On July 28, 2006, PLA

Holdings filed proof of claim number 12833 (the "PLA Claim") against Delphi Corporation

("Delphi") asserting contingent, unliquidated, and undetermined amounts for indemnification

under an environmental agreement between Delphi, Delphi Delco Electronics de Mexico, S.V.

de C.V. and PLA Holdings dated April 11, 2005 (the "Environmental Agreement").  The

Environmental Agreement was entered into as part of a real estate transaction in which Delphi

sold to PLA Holdings (and several of its affiliates) certain property in Reynosa, Mexico.

            10.     The Debtors' Objection To The PLA Claim.  On October 31, 2006, the

Debtors filed the Debtors' (I) Third Omnibus Objection (Substantive) Pursuant to 11 U.S.C. §

502(b) And Fed. R. Bankr. P. 3007 To Certain (A) Claims With Insufficient Documentation, (B)

Claims Unsubstantiated By Debtors' Books And Records, And (C) Claims Subject To

Modification And (II) Motion To Estimate Contingent And Unliquidated Claims Pursuant To 11

U.S.C. § 502(c) (Docket No. 5452) (the "Third Omnibus Claims Objection"), by which the

4

Debtors objected to proof of claim number 12833 as an unsubstantiated claim for which the

Debtors are not liable and sought an order disallowing and expunging each of those proofs of

claim.

11.    <u>PLA Holdings' Responses To The Debtors' Objection</u>.  On November 22,

2006, PLA Holdings filed the Response Of (A) Banco J.P. Morgan, S.A., Institucion De Banca

Multiple, J.P. Grupo Financiero, Division Fiduciaria, Not Individually, But In Its Capacity As

Trustee of Trust F/00121, (B) Prudential Financial, Inc., (C) Prudential Investment Management,

Inc., (D) Prudential Real Estate Investors, A Division of Prudential Investment Management,

Inc., (E) PLA Holding IV, LLC, (F) PLA Mexico Industrial Manager I LLC AND (G) PLA

Industrial Fund I, LLC To Debtors' Third Omnibus Claim Objection (Docket No. 5736) (the

"Response"), in which PLA Holdings asserted that although the amount of the claim was

unknown, it still had a valid claim for indemnification under the Environmental Agreement.

PLA Holdings asserted, without any explanation or documentation, that the value of the claim

was at least $2,000,000.

12.    <u>The Sufficiency Hearing Notice</u>.  Pursuant to the Claims Objection

Procedures Order, the hearing on the PLA Claim was adjourned to a future date.  On February 18,

2010, the Reorganized Debtors filed the Sufficiency Hearing Notice with respect to the PLA

Claim, among other proofs of claim, scheduling the Sufficiency Hearing.

D.    <u>Claimant's Burden Of Proof And Standard For Sufficiency Of Claim</u>

13.    The Reorganized Debtors respectfully submit that the PLA Claim fails to

state a claim against the Debtors under rule 7012 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules").  PLA Holdings has not proved any facts to support a right to payment

by the Reorganized Debtors on behalf of the Debtors.  Accordingly, the Debtors' objections to

the PLA Claim should be sustained and the PLA Claim should be disallowed and expunged in its entirety.

14.    The burden of proof to establish a claim against the Debtors rests on the claimants and, if a proof of claim does not include sufficient factual support, such proof of claim is not entitled to a presumption of prima facie validity pursuant to Bankruptcy Rule 3001(f).  In re Spiegel, Inc., No. 03-11540, 2007 WL 2456626, at *15 (Bankr. S.D.N.Y. August 22, 2007) (the claimant always bears the burden of persuasion and must initially allege facts sufficient to support the claim); see also In re WorldCom, Inc., No. 02-13533, 2005 WL 3832065, at *4 (Bankr. S.D.N.Y. Dec. 29, 2005) (only a claim that alleges facts sufficient to support legal liability to claimant satisfies claimant's initial obligation to file substantiated proof of claim); In re Allegheny Intern., Inc., 954 F.2d 167, 173 (3d Cir. 1992) (in its initial proof of claim filing, claimant must allege facts sufficient to support claim); In re Chiro Plus, Inc., 339 B.R. 111, 113 (Bankr. D.N.J. 2006) (claimant bears initial burden of sufficiently alleging claim and establishing facts to support legal liability); In re Armstrong Finishing, L.L.C., No. 99-11576-C11, 2001 WL 1700029, at *2 (Bankr. M.D.N.C. May 2, 2001) (only when claimant alleges facts sufficient to support its proof of claim is it entitled to have claim considered prima facie valid); In re United Cos. Fin. Corp., 267 B.R. 524, 527 (Bankr. D. Del. 2000) (claimant must allege facts sufficient to support legal basis to make prima facie case).

15.    For purposes of sufficiency, this Court has determined that the standard of whether a Claimant has met its initial burden of proof to establish a claim should be similar to the standard employed by courts in deciding a motion to dismiss under Bankruptcy Rules 7012 and 9014.  See Transcript of January 12, 2007 Hearing (Docket No. 7118) (the "January 12, 2007 Transcript") at 52:24-53:1.  Pursuant to that standard, a motion to dismiss should be

granted "if it plainly appears that the nonmovant 'can prove no set of facts in support of his claim which would entitle him to relief.'"  In re Lopes, 339 B.R. 82, 86 (Bankr. S.D.N.Y. 2006) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  Essentially, the claimant must provide facts that sufficiently support a legal liability against the Debtors.

16.    This Court further established that the sufficiency hearing standard is consistent with Bankruptcy Rule 3001(f), which states that "a proof of claim executed and filed in accordance with these Rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f) (emphasis added).  Likewise, Bankruptcy Rule 3001(a) requires that "the proof of claim must be consistent with the official form" and Bankruptcy Rule 3001(c) requires "evidence of a writing if the claim is based on a writing."  Fed. R. Bankr. P. 3001(a), (c).  See January 12, 2007 Transcript at 52:17-22.

E.    Argument Regarding The PLA Claim.

17.    The PLA Claim is entirely contingent upon PLA Holdings suffering an indemnifiable loss under the Environmental Agreement.  To the Reorganized Debtors' knowledge, no such loss has occurred and no other contingent event has occurred that would give rise to a claim against the Reorganized Debtors under the Environmental Agreement.  Although the Response asserted that the value of the PLA Claim was a least $2,000,000, the Response included absolutely no evidence to support this number or to demonstrate that PLA Holdings has suffered any loss that would require indemnification from the Reorganized Debtors under the Environmental Agreement.

18.    PLA Holdings has not, in either its Proof of Claim or Response to the Debtors' objection to its Proof of Claim, proved any set of facts that support a right to payment from the Reorganized Debtors.  Accordingly, the Reorganized Debtors assert that (a) PLA Holdings has not met its burden of proof to establish a claim against the Debtors, (b) the PLA

7

Claim is not entitled to a presumption of prima facie validity pursuant to Bankruptcy Rule

3001(f), and (c) the PLA Claim fails to state a claim against the Reorganized Debtors under

Bankruptcy Rule 7012.  Because PLA Holdings cannot provide facts or law supporting its claim,

the Third Omnibus Claims Objection should be sustained as to PLA Claim and the claim should

be disallowed and expunged in its entirety.

    WHEREFORE the Reorganized Debtors respectfully request this Court enter an

order (a) sustaining the Reorganized Debtors' objection with respect to the PLA Claim, (b)

disallowing and expunging the PLA Claim in its entirety, and (c) granting such further and other

relief this Court deems just and proper.


Dated:  New York, New York
    March 8, 2010

          SKADDEN, ARPS, SLATE, MEAGHER
           & FLOM LLP

         By: /s/ John Wm. Butler, Jr.
           John Wm. Butler, Jr.
           John K. Lyons
           Ron E. Meisler
         155 North Wacker Drive
         Chicago, Illinois 60606

          - and -

         By: /s/ Kayalyn A. Marafioti
           Kayalyn A. Marafioti
         Four Times Square
         New York, New York 10036

         Attorneys for DPH Holdings Corp., et al.,
          Reorganized Debtors

# EXHIBIT F

**Hearing Date and Time:  March 18, 2010 at 10:00 a.m. (prevailing Eastern time)**
**Supplemental Response Date and Time:  March 16, 2010 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler


    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti

Attorneys for DPH Holdings Corp., et al.,
    Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                                              :
          In re                                               :     Chapter 11
                                                              :
DPH HOLDINGS CORP., et al.,                                   :     Case Number 05-44481 (RDD)
                                                              :
                                                              :     (Jointly Administered)
                                                              :
          Reorganized Debtors.                                :
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

REORGANIZED DEBTORS' SUPPLEMENTAL REPLY TO RESPONSES OF THE CITY OF
OLATHE TO DEBTORS' OBJECTIONS TO PROOFS OF CLAIM NOS. 14825 AND 14826
FILED BY THE CITY OF OLATHE

("SUPPLEMENTAL REPLY REGARDING THE CITY OF OLATHE'S CLAIMS")

1

DPH Holdings Corp. and certain of its affiliated reorganized debtors in the above-captioned cases (together with DPH Holdings Corp., the "Reorganized Debtors") hereby submit the Reorganized Debtors' Supplemental Reply To Responses Of The City Of Olathe To Debtors' Objections To Proofs Of Claim Nos. 14825 And 14826 Filed By The City of Olathe (the "Supplemental Reply"), and respectfully represent as follows:

A.    Preliminary Statement

1.    On October 8 and 14, 2005, Delphi Corporation and certain of its affiliates (the "Debtors"), predecessors of the Reorganized Debtors, filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").

2.    On October 6, 2009, the Debtors substantially consummated the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified (the "Modified Plan"), which had been approved by this Court pursuant to an order entered on July 30, 2009 (Docket No. 18707) (the "Confirmation Order"), and emerged from chapter 11 as the Reorganized Debtors.

3.    On February 18, 2010, the Reorganized Debtors filed the Notice Of Sufficiency Hearing With Respect To Debtors' Objection To Proofs Of Claim Nos. 6991, 7054, 9221, 10830, 10959, 10960, 11375, 11643, 11644, 11892, 11911, 11983, 11985, 11988, 11989, 12147, 12833, 13776, 13881, 14019, 14020, 14022, 14023, 14024, 14025, 14026, 14370, 14825, 14826, 16967, 18265, 18422, 18603, 18614, 19162, 19543, And 19545 (Docket No. 19504) (the "Sufficiency Hearing Notice").

4.    The Reorganized Debtors filed the Sufficiency Hearing Notice and are filing this Supplemental Reply to implement Article 9.6(a) of the Modified Plan, which provides

2

that "[t]he Reorganized Debtors shall retain responsibility for administering, disputing, objecting

to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors and

making distributions (if any) with respect to all Claims and Interests …."  Modified Plan, art.

9.6(a).

5.      By the Sufficiency Hearing Notice and pursuant to the Order Pursuant To

11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014

Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices

And Procedures Governing Objections To Claims, entered December 7, 2006 (Docket No. 6089)

(the "Claims Objection Procedures Order") and the Ninth Supplemental Order Pursuant To 11

U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014

Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices

And Procedures Governing Objections To Claims, entered December 11, 2009 (Docket No.

19176), the Reorganized Debtors scheduled a hearing (the "Sufficiency Hearing") on March 18,

2010 at 10:00 (prevailing Eastern time) in this Court to address the legal sufficiency of each

proof of claim filed by the claimants listed on Exhibit A to the Sufficiency Hearing Notice and

whether each such proof of claim states a colorable claim against the asserted Debtor.

6.      This Supplemental Reply is filed pursuant to paragraph 9(b)(i) of the

Claims Objection Procedures Order.  Pursuant to paragraph 9(b)(ii) of the Claims Objection

Procedures Order, if a Claimant wishes to file a supplemental pleading in response to this

Supplemental Reply, the Claimant shall file and serve its response no later than two business

days before the scheduled Sufficiency Hearing – i.e., by **March 16, 2010.**

B.      Relief Requested

7.      By this Supplemental Reply, the Reorganized Debtors request entry of an

order disallowing and expunging proofs of claim filed by the City of Olathe seeking payment of

3

the costs to perform environmental cleanup activities required under a Consent Order entered

into by the City of Olathe, Delphi Automotive Systems LLC ("DAS LLC") and the Kansas

Department of Health & Environment dated July 13, 2000 (the "2000 Consent Order").

C.      The City of Olathe's Claims

        8.      During their review of the proofs of claim filed in these cases, the Debtors

determined that certain proofs of claim filed by the City of Olathe (the "City") asserted liabilities

which the Reorganized Debtors have already resolved with the City and therefore the claims are

not owing pursuant to the Reorganized Debtors' books and records.  Accordingly, this Court

should enter an order disallowing and expunging the City's proofs of claims in their entirety.

        9.      The City's Claims Filed Against The Debtors.  On July 31, 2006, the City

filed proof of claim number 14825 against DAS LLC and proof of claim number 14826 against

Delphi Corporation, with each claim seeking the full recovery of all costs necessary to comply

with the 2000 Consent Order (the "City's Claims").

        10.     The Debtors' Objection To The City's Claims.  On November 6, 2009, the

Reorganized Debtors filed the Reorganized Debtors' Thirty-Eighth Omnibus Objection Pursuant

To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To (I) Expunge Certain (A) Equity Interests,

(B) Books And Records Claims, (C) Untimely Claims, (D) Pension, Benefit, And OPEB Claims,

And (E) Workers' Compensation Claims And (II) Modify And Allow Certain Claims (Docket No.

19044) (the "Thirty-Eighth Omnibus Claims Objection"), by which the Debtors objected to

proofs of claim numbers 14825 and 14826 as unsubstantiated claims for which the Debtors are

not liable and sought an order disallowing and expunging each of those proofs of claim.

        11.     The City's Responses To The Debtors' Objections.  On December 7, 2009

the City filed the City of Olathe, Kansas's Response And Objection To Reorganized Debtors'

Thirty-Eight Omnibus Claims Objection (Docket No. 19152) (the "Response") in which the City

4

acknowledged that the City and DAS LLC had entered into a Corrective Action Plan/Corrective

Action Funding Agreement: Mill Creek Site, Olathe, Kansas, dated May 6, 2008 (the "Funding

Agreement"), whereby the City and DAS LLC agreed to certain procedures and cost sharing

arrangements for the implementation of the work required under the 2000 Consent Decree.

Response at ¶ 7.

   12. The Sufficiency Hearing Notice.  Pursuant to the Claims Objection

Procedures Order, the hearing on the City's Claims was adjourned to a future date.  On February

18, 2010, the Reorganized Debtors filed the Sufficiency Hearing Notice with respect to the City's

Claims, among other proofs of claim, scheduling the Sufficiency Hearing.

D. Claimant's Burden Of Proof And Standard For Sufficiency Of Claim

   13. The Reorganized Debtors respectfully submit that the Proofs of Claim fail

to state a claim against the Debtors under rule 7012 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules").  The City has not proved any facts to support a right to

payment by the Reorganized Debtors on behalf of the Debtors.  Accordingly, the Debtors'

objections to the City's Claims should be sustained with respect to such proofs of claim and the

City's Claims should be disallowed and expunged in their entirety.

   14. The burden of proof to establish a claim against the Debtors rests on the

claimants and, if a proof of claim does not include sufficient factual support, such proof of claim

is not entitled to a presumption of prima facie validity pursuant to Bankruptcy Rule 3001(f).  In

re Spiegel, Inc., No. 03-11540, 2007 WL 2456626, at *15 (Bankr. S.D.N.Y. August 22, 2007)

(the claimant always bears the burden of persuasion and must initially allege facts sufficient to

support the claim); see also In re WorldCom, Inc., No. 02-13533, 2005 WL 3832065, at *4

(Bankr. S.D.N.Y. Dec. 29, 2005) (only a claim that alleges facts sufficient to support legal

liability to claimant satisfies claimant's initial obligation to file substantiated proof of claim); In

re Allegheny Intern., Inc., 954 F.2d 167, 173 (3d Cir. 1992) (in its initial proof of claim filing,

claimant must allege facts sufficient to support claim); In re Chiro Plus, Inc., 339 B.R. 111, 113

(Bankr. D.N.J. 2006) (claimant bears initial burden of sufficiently alleging claim and establishing

facts to support legal liability); In re Armstrong Finishing, L.L.C., No. 99-11576-C11, 2001 WL

1700029, at *2 (Bankr. M.D.N.C. May 2, 2001) (only when claimant alleges facts sufficient to

support its proof of claim is it entitled to have claim considered prima facie valid); In re United

Cos. Fin. Corp., 267 B.R. 524, 527 (Bankr. D. Del. 2000) (claimant must allege facts sufficient

to support legal basis for to make prima facie case).

        15.     For purposes of sufficiency, this Court has determined that the standard of

whether a Claimant has met its initial burden of proof to establish a claim should be similar to

the standard employed by courts in deciding a motion to dismiss under Bankruptcy Rules 7012

and 9014.  See Transcript of January 12, 2007 Hearing (Docket No. 7118) (the "January 12,

2007 Transcript") at 52:24-53:1.  Pursuant to that standard, a motion to dismiss should be

granted "if it plainly appears that the nonmovant 'can prove no set of facts in support of his claim

which would entitle him to relief.'"  In re Lopes, 339 B.R. 82, 86 (Bankr. S.D.N.Y. 2006)

(quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  Essentially, the claimant must provide

facts that sufficiently support a legal liability against the Debtors.

        16.     This Court further established that the sufficiency hearing standard is

consistent with Bankruptcy Rule 3001(f), which states that "a proof of claim executed and filed

in accordance with these Rules shall constitute prima facie evidence of the validity and amount

of the claim."  Fed. R. Bankr. P. 3001(f) (emphasis added).  Likewise, Bankruptcy Rule 3001(a)

requires that "the proof of claim must be consistent with the official form" and Bankruptcy Rule

3001(c) requires "evidence of a writing if the claim is based on a writing."  Fed. R. Bankr. P.

3001(a), (c).  <u>See</u> January 12, 2007 Transcript at 52:17-22.

E.    <u>Argument Regarding The City's Claims.</u>

17.    As the City acknowledged in the Response, the City and DAS LLC

entered into the Funding Agreement on May 6, 2008.  The Funding Agreement provided for

DAS LLC and the City to continue to perform and share the costs of the remediation required

under the 2000 Consent Order.  Additionally, the Funding Agreement states that it constitutes a

"complete satisfaction" of proofs of claim numbers 14825 and 14826 (i.e., the City's Claims).  A

copy of the Funding Agreement is attached hereto as <u>Exhibit A</u> and was also attached to the

Response.

18.    Accordingly, the City and DAS LLC have already resolved any liability

that DAS LLC may owe to the City under the City's Claims and therefore the City's Claims

should be disallowed and expunged in their entirety.

19.    The City has not proved any set of facts that support a right to payment

from the Reorganized Debtors.  Accordingly, the Reorganized Debtors assert that (a) the City has

not met its burden of proof to establish a claim against the Debtors, (b) the City's Claims are not

entitled to a presumption of <u>prima facie</u> validity pursuant to Bankruptcy Rule 3001(f), and (c) the

City's Claims fail to state a claim against the Reorganized Debtors under Bankruptcy Rule 7012

for future remediation costs.  Because the City cannot provide facts or law supporting their

claims, the Reorganized Debtors' Thirty-Eighth Omnibus Claims Objection should be sustained

as to the City's Claims and such claims should be disallowed and expunged in their entirety.

WHEREFORE the Reorganized Debtors respectfully request this Court enter an

order (a) sustaining the Reorganized Debtors' objection with respect to the City's Claims, (b)

disallowing and expunging each the City's Claims to the extent they seek recovery of future

remediation costs, and (c) granting such further and other relief this Court deems just and proper.


Dated:      New York, New York
            March 8, 2010

                                    SKADDEN, ARPS, SLATE, MEAGHER
                                        & FLOM LLP


                                    By:   /s/ John Wm. Butler, Jr.
                                          John Wm. Butler, Jr.
                                          John K. Lyons
                                          Ron E. Meisler
                                    155 North Wacker Drive
                                    Chicago, Illinois 60606

                                        - and -


                                    By:   /s/ Kayalyn A. Marafioti
                                          Kayalyn A. Marafioti
                                    Four Times Square
                                    New York, New York 10036

                                    Attorneys for DPH Holdings Corp., et al.,
                                        Reorganized Debtors

**EXHIBIT A**

**Corrective Action Plan/Corrective Action Funding Agreement:**
**Mill Creek Site, Olathe, Kansas, dated May 6, 2008**



EXHIBIT
A

## CORRECTIVE ACTION PLAN/CORRECTIVE ACTION FUNDING AGREEMENT:
## MILL CREEK SITE, OLATHE, KANSAS

THIS AGREEMENT is entered into this 6th day of May _____, 2008, by and between the City of Olathe, Kansas ("City") and Delphi Automotive Systems LLC ("Delphi"). In this Agreement, City and Delphi may be individually referred to as "Party" and collectively as "Parties."

WHEREAS, the Kansas Department of Health and Environment ("KDHE") has requested that the City and Delphi implement a Corrective Action Plan/Corrective Action ("CAP/CA") as defined by the Amendment to Consent Order and its attachments to be executed by the KDHE and the Parties concerning the presence of waste at the Mill Creek Site in Olathe, Kansas (the "Site"); and

WHEREAS, the City currently owns and operates its City Service Center on at least a portion of the Site; and

WHEREAS, the City formerly operated a municipal landfill on at least a portion of the Site; and

WHEREAS, Delphi or its predecessors in interest may be the source of some contamination at the Site; and

WHEREAS, Delphi and City have agreed to work together to address KDHE's request and have selected Delphi to lead the project; and

WHEREAS, the Amendment to Consent Order is expected to bind City and Delphi to the terms and conditions of the Amendment to Consent Order; and

WHEREAS, on October 8, 2005, Delphi and Delphi Corporation filed voluntary petitions 05-44640 under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended, in the Unites States Bankruptcy Court for the Southern District of New York (the "Delphi Bankruptcy Court"), and

WHEREAS, City has filed Proofs of Claim Nos. 14825 and 14826 against Delphi and Delphi Corporation asserting liability for costs of responding to environmental conditions at the Site addressed by the CAP/CA; and

WHEREAS, Delphi warrants and responds that it is authorized to enter into this Settlement Agreement without further Court approval or further notice, including that of the Delphi Bankruptcy Court, pursuant to that certain Amended and Restated Order Under 11 U.S.C. §§ 363, 502 And 503 And Fed. R. Bankr. P. 9019(b) Authorizing Debtors To Compromise Or Settle Certain Classes Of Controversy And Allow Claims Without Further Court Approval (Docket No. 8401) entered by the Delphi Bankruptcy Court on June 26, 2007.

NOW, THEREFORE, in consideration of the foregoing recitals which should be deemed to be a part of this agreement and the following promises and mutual covenants and agreements, the Parties hereby agree as follows:

1.　Pursuant to City's and Delphi's responsibilities under the anticipated Amendment to Consent Order, Delphi has engaged and is working with Burns & McDonnell Waste Consultants, Inc., to perform the CAP/CA. Delphi will share with City all relevant information regarding Burns & McDonnell's work.  In addition, prior to the submission of Site-related documents to the KDHE, Delphi will give City a reasonable opportunity to review and comment upon such documents.

2.　Delphi will act as its own project manager for the CAP/CA at this Site. City will be consulted concerning all such work and must approve all contractors used by the Delphi to accomplish such CAP/CA, it being agreed that such approval will not be unreasonably withheld.

3.　City may, at its sole discretion, obtain split samples of any and all samples taken by Delphi and/or its contractors during the course of implementing the CAP/CA.

4.　In exchange for the above consideration, City will pay 50% of the cost of (1) the CAP/CA, and (2) KDHE's oversight costs paid pursuant to the Consent Order; Delphi will pay

50% of such costs. City's payments to Delphi for such costs shall be due 45 days after city receives an invoice from Delphi.

5.　　　City's obligations set forth in paragraph 4 shall be subject to the following conditions:

a.　　　City's share of KDHE's oversight costs shall not exceed $25,000.00 ("City Oversight Costs Cap") without City's written approval; and

b.　　　City's share of the cost of the CAP/CA activities, including preparation of the work plans and reports, shall not exceed $375,000.00 ("City CAP/CA Costs Cap") without City's written approval.

6.　　　The Parties acknowledge that KDHE reserves the right to request of City and Delphi that additional tasks be added to the Scope of Work required for the CAP/CA. The costs of such additional tasks shall be allocated between the Parties as set forth in paragraph 4 of this Agreement. No such additional work will be performed without written consensus and approval of City and Delphi.

7.　　　If Delphi or City anticipate that without City's written approval (1) City's share of KDHE's oversight costs will exceed the City Oversight Costs Cap; or (2) City's share of the cost of the work comprising the CAP/CA will exceed the City CAP/CA Costs Cap, Delphi and City shall jointly evaluate the situation, and shall use their best efforts to reach written consensus before performing any such work causing the City Oversight Costs Cap or the City CAP/CA Costs Cap to be exceeded.

8.　　　If one or both Parties are successful in establishing liability on, and collecting funds based on such liability with respect to this Site from a person not a party to this Agreement, any such recovery of funds shall be allocated between the Parties as is set forth in paragraph 4 of this Agreement, unless the Parties agree otherwise in writing, in which case the allocation of such recovery of funds shall be allocated according to such other written agreement.

9.      Notwithstanding any provision herein, the Parties recognize and agree that City's obligations shall be subject to the Kansas cash basis law (K.S.A. 10-1101 *et. seq.*) and budget law (K.S.A. 79-2925 *et. seq.*).

10.      The Parties agree that this Agreement is made in the spirit of compromise. Nothing in this Agreement shall be considered an admission of any fact or acknowledgment of any liability by any Party; and, nothing herein shall be binding or have any effect on the position of the Parties on any matter other than the Amendment to Consent Order that may be included in any other consent order.  This Agreement relates solely to the matters covered under the Amendment to Consent Order, and does not obligate either Party to participate in any other activity relating to the Site.

11.      If a court of competent jurisdiction adjudges any portion of this Agreement invalid, the remaining portions of this Agreement will remain valid.

12.      This Agreement constitutes the entire agreement between the Parties, and supersedes any previous agreements.  Any modification of this Agreement is not valid unless it is in writing and signed by both Parties.

13.      Each Party certifies that its signatory to this Agreement can validly bind that signatory's respective Party to all the terms and conditions of this Agreement.

14.      City acknowledges that Delphi's obligations under this Settlement Agreement, which shall survive the bankruptcy proceedings and bind the reorganized Delphi, constitute complete satisfaction of Proofs of Claims Nos. 14825 and 14826, which shall be disallowed and expunged pursuant to a joint stipulation and agreed order providing notice of this Settlement Agreement to be filed by the Parties with the Delphi Bankruptcy Court, which satisfaction, disallowance, and expungement shall be effective when said agreed order is final and non-appealable.

WHEREFORE, the Parties enter into this Agreement effective the date set forth in the initial paragraph of this Agreement.

Agreed to for and on behalf of
The City of Olathe, Kansas

By: _____

Title: _____Mayor_____

Date: _____5/16/08_____

Agreed to for an on behalf of
Delphi Automotive Systems LLC

By: _____

Title: DIRECTOR, ENVIRONMENTAL SERVICES

Date: 9 APRIL 2008

# EXHIBIT G

**Hearing Date and Time:  March 18, 2010 at 10:00 a.m. (prevailing Eastern time)**
**Supplemental Response Date and Time:  March 16, 2010 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti

Attorneys for DPH Holdings Corp., et al.,
    Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                                              :
      In re                                               :     Chapter 11
                                                              :
DPH HOLDINGS CORP., et al.,                                   :     Case Number 05-44481 (RDD)
                                                              :
                                                              :     (Jointly Administered)
                                                              :
              Reorganized Debtors.                    :
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

REORGANIZED DEBTORS' SUPPLEMENTAL REPLY TO RESPONSES OF
CERTAIN CLAIMANTS TO DEBTORS' OBJECTIONS TO PROOFS OF CLAIM
NOS. 11983, 11985, 11988, AND 11989 FILED BY ILLINOIS TOOL WORKS INC.
AND ITW FOOD EQUIPMENT GROUP LLC

("SUPPLEMENTAL REPLY REGARDING ILLINOIS TOOL CLAIMS")

1

DPH Holdings Corp. and certain of its affiliated reorganized debtors in the above-captioned cases (together with DPH Holdings Corp., the "Reorganized Debtors") hereby submit the Reorganized Debtors' Supplemental Reply To Responses Of Certain Claimants To Debtors' Objections To Proofs Of Claim Nos. 11983, 11985, 11988, And 11989 Filed By Illinois Tool Works Inc. And ITW Food Equipment Group LLC (the "Supplemental Reply"), and respectfully represent as follows:

A.    Preliminary Statement

1.    On October 8 and 14, 2005, Delphi Corporation and certain of its affiliates (the "Debtors"), predecessors of the Reorganized Debtors, filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").

2.    On October 6, 2009, the Debtors substantially consummated the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified (the "Modified Plan"), which had been approved by this Court pursuant to an order entered on July 30, 2009 (Docket No. 18707), and emerged from chapter 11 as the Reorganized Debtors.

3.    On February 18, 2010, the Reorganized Debtors filed the Notice Of Sufficiency Hearing With Respect To Debtors' Objections To Proofs Of Claim Nos. 6991, 7054, 9221, 10830, 10959, 10960, 11375, 11643, 11644, 11892, 11911, 11983, 11985, 11988, 11989, 12147, 12833, 13776, 13881, 14019, 14020, 14022, 14023, 14024, 14025, 14026, 14370, 14825, 14826, 16967, 18265, 18422, 18603, 18614, 19162, 19543, And 19545 (Docket No. 19504) (the "Sufficiency Hearing Notice").

4.    The Reorganized Debtors filed the Sufficiency Hearing Notice and are filing this Supplemental Reply to implement Article 9.6(a) of the Modified Plan, which provides

2

that "[t]he Reorganized Debtors shall retain responsibility for administering, disputing, objecting

to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors and

making distributions (if any) with respect to all Claims and Interests …."  Modified Plan, art.

9.6(a).

        5.    By the Sufficiency Hearing Notice and pursuant to the Order Pursuant To

11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014

Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices

And Procedures Governing Objections To Claims, entered December 7, 2006 (Docket No. 6089)

(the "Claims Objection Procedures Order") and the Ninth Supplemental Order Pursuant To 11

U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014

Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices

And Procedures Governing Objections To Claims, entered December 11, 2009 (Docket No.

19176), the Reorganized Debtors scheduled a hearing (the "Sufficiency Hearing") on March 18,

2010 at 10:00 (prevailing Eastern time) in this Court to address the legal sufficiency of each

proof of claim filed by the claimants listed on Exhibit A to the Sufficiency Hearing Notice and

whether each such proof of claim states a colorable claim against the asserted Debtor.

        6.    This Supplemental Reply is filed pursuant to paragraph 9(b)(i) of the

Claims Objection Procedures Order.  <u>Pursuant to paragraph 9(b)(ii) of the Claims Objection</u>

<u>Procedures Order, if a Claimant wishes to file a supplemental pleading in response to this</u>

<u>Supplemental Reply, the Claimant shall file and serve its response no later than two business</u>

<u>days before the scheduled Sufficiency Hearing – i.e., by</u> **March 16, 2010.**

B.    <u>Relief Requested</u>

        7.    By this Supplemental Reply, the Reorganized Debtors request entry of an

order disallowing and expunging proofs of claim filed by Illinois Tool Works Inc. and ITW Food

3

Equipment Group LLC (collectively, "Illinois Tool") for recovery of response costs that Illinois

Tool has or will incur in connection with the environmental investigation and remediation of the

South Dayton Dump and Landfill, located at 1975 Dryden Road (a/k/a Springboro Pike),

Moraine, Montgomery County, Ohio (the "Site").

C.    Illinois Tool's Claims

        8.     During their review of the proofs of claim filed in these cases, the Debtors

determined that proofs of claim numbers 11983, 11985, 11988, and 11989 assert liabilities that

are not owing pursuant to the Reorganized Debtors' books and records.  The Debtors believe that

Illinois Tool is not a creditor of the Debtors.  Accordingly, this Court should enter an order

disallowing and expunging proofs of claim numbers 11983, 11985, 11988, and 11989 in their

entirety.

        9.     Illinois Tool's Claims Filed Against The Debtors.  On July 26, 2006,

Illinois Tool filed proofs of claim number 11983 and 11989 against Delphi Automotive Systems

LLC ("DAS LLC"), a Debtor in these cases, and proofs of claim number 11985 and 11988

against Delphi Corporation (collectively, the "Illinois Tool Claims").  Each of the Illinois Tool

Claims asserts unliquidated and undetermined amounts under the federal Comprehensive

Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, *et seq*.

("CERCLA") for response costs that Illinois Tool has or will incur at the Site.

        10.    The Debtors' Objection To The Illinois Tool Claims.  On October 31,

2006, the Debtors filed the Debtors' (I) Third Omnibus Objection (Substantive) Pursuant To 11

U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (A) Claims With Insufficient

Documentation, (B) Claims Unsubstantiated By Debtors' Books And Records, And (C) Claims

Subject To Modification And (II) Motion To Estimate Contingent And Unliquidated Claims

Pursuant To 11 U.S.C. § 502(c) (Docket No. 5452) (the "Third Omnibus Claims Objection"), by

which the Debtors objected to the Illinois Tool Claims as unsubstantiated claims for which the

Debtors are not liable and sought an order disallowing and expunging each of those proofs of

claim.

11.    <u>Illinois Tool's Responses To The Debtors' Objections</u>.  On November 21,

2006, Illinois Tool filed the Response of Creditors: (i) Illinois Tool Works Inc.; (ii) Illinois Tool

Works for Hobart Brothers Co.; (iii) Hobart Brothers Company, (iv) ITW Food Equipment

Group LLC; And (v) Tri-Mark, Inc. In Opposition To Debtors' Third Omnibus Objection To

Certain Claims (Docket No. 5617) (the "Response"), in which Illinois Tool asserted that the

Debtors were liable under CERCLA for the contamination at the Site and that Illinois Tool had,

"*inter alia,* a direct action for recovery of response costs incurred by them against the Debtors

pursuant to 43 U.S.C. § 9607(a)(4)(B)."  Response at ¶ 35.

12.    <u>The Sufficiency Hearing Notice</u>.  Pursuant to the Claims Objection

Procedures Order, the hearing on the Illinois Tool Claims was adjourned to a future date.  On

February 18, 2010, the Reorganized Debtors filed the Sufficiency Hearing Notice with respect to

the Illinois Tool Claims, among other proofs of claim, scheduling the Sufficiency Hearing.

D.    <u>Claimant's Burden Of Proof And Standard For Sufficiency Of Claim</u>

13.    The Reorganized Debtors respectfully submit that the Illinois Tool Claims

fail to state a claim against the Debtors under rule 7012 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules").  Illinois Tool has not proved any facts to support a right to

payment by the Reorganized Debtors on behalf of the Debtors.  Accordingly, the Debtors'

objections to each of the Illinois Tool Claims should be sustained with respect to such proofs of

claim and each Illinois Tool Claim should be disallowed and expunged in its entirety.

14.    The burden of proof to establish a claim against the Debtors rests on the

claimants and, if a proof of claim does not include sufficient factual support, such proof of claim

5

is not entitled to a presumption of prima facie validity pursuant to Bankruptcy Rule 3001(f).  In

re Spiegel, Inc., No. 03-11540, 2007 WL 2456626, at *15 (Bankr. S.D.N.Y. August 22, 2007)

(the claimant always bears the burden of persuasion and must initially allege facts sufficient to

support the claim); see also In re WorldCom, Inc., No. 02-13533, 2005 WL 3832065, at *4

(Bankr. S.D.N.Y. Dec. 29, 2005) (only a claim that alleges facts sufficient to support legal

liability to claimant satisfies claimant's initial obligation to file substantiated proof of claim); In

re Allegheny Intern., Inc., 954 F.2d 167, 173 (3d Cir. 1992) (in its initial proof of claim filing,

claimant must allege facts sufficient to support claim); In re Chiro Plus, Inc., 339 B.R. 111, 113

(Bankr. D.N.J. 2006) (claimant bears initial burden of sufficiently alleging claim and establishing

facts to support legal liability); In re Armstrong Finishing, L.L.C., No. 99-11576-C11, 2001 WL

1700029, at *2 (Bankr. M.D.N.C. May 2, 2001) (only when claimant alleges facts sufficient to

support its proof of claim is it entitled to have claim considered prima facie valid); In re United

Cos. Fin. Corp., 267 B.R. 524, 527 (Bankr. D. Del. 2000) (claimant must allege facts sufficient

to support legal basis to make prima facie case).

　　　　　　　　　15.　　　For purposes of sufficiency, this Court has determined that the standard of

whether a claimant has met its initial burden of proof to establish a claim should be similar to the

standard employed by courts in deciding a motion to dismiss under Bankruptcy Rules 7012 and

9014.  See Transcript of January 12, 2007 Hearing (Docket No. 7118) (the "January 12, 2007

Transcript") at 52:24-53:1.  Pursuant to that standard, a motion to dismiss should be granted "if it

plainly appears that the nonmovant 'can prove no set of facts in support of his claim which would

entitle him to relief.'"  In re Lopes, 339 B.R. 82, 86 (Bankr. S.D.N.Y. 2006) (quoting Conley v.

Gibson, 355 U.S. 41, 45-46 (1957)).  Essentially, the claimant must provide facts that sufficiently

support a legal liability against the Debtors.

16.    This Court further established that the sufficiency hearing standard is consistent with Bankruptcy Rule 3001(f), which states that "a proof of claim executed and filed in accordance with these Rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f) (emphasis added).  Likewise, Bankruptcy Rule 3001(a) requires that "the proof of claim must be consistent with the official form" and Bankruptcy Rule 3001(c) requires "evidence of a writing if the claim is based on a writing." Fed. R. Bankr. P. 3001(a), (c).  See January 12, 2007 Transcript at 52:17-22.

E.    Argument Regarding The Illinois Tool Claims

17.    The Reorganized Debtors Are Not Liable Under CERCLA.  The Illinois Tool Claims assert that Delphi Corporation and DAS LLC are liable parties under CERCLA for contamination at the Site.  However, nothing in the Illinois Tool Claims or the Response proves such liability.  Indeed, Illinois Tool's only basis for asserting such liability is the fact that the United States Environmental Protection Agency (the "EPA") "has alleged that the Debtor is responsible for the disposal of an unknown quantity of waste" at the Site.  See Proof of claim number 11989.  However, allegations by the EPA do not amount to proof of any such liability.  Accordingly, Illinois Tool has failed to meet its burden of proof, and its claims should be disallowed and expunged their entirety.

18.    Furthermore, as described in more detail below, because neither Delphi Corporation nor DAS LLC existed at the time the Site operated as a landfill, these entities have no statutory liability for contamination at the Site under CERCLA.  CERCLA imposes liability on four classes of potentially responsible parties ("PRPs"):  (a) the current owner or operator of a contaminated site; (b) anyone who owned or operated the contaminated site at the time hazardous substances were disposed of; (c) any person who arranged for the disposal of any

7

hazardous substances at the contaminated site; and (d) any person who transported any

hazardous substances to a contaminated site.  See 42 U.S.C. § 9607(a).

19.     Neither Delphi Corporation nor DAS LLC has ever had any ownership

interest in the Site, nor has either entity ever operated the Site.  Accordingly, any liabilitiy under

CERCLA would have to arise because Delphi Corporation or DAS LLC arranged for the

disposal of hazardous substances or transported hazardous substances for disposal at the Site.

However, Illinois Tool's Response demonstrates that this is impossible because the landfill at the

Site ceased accepting wastes for disposal and stopped operations in September 1995, at which

point neither Delphi Corporation nor DAS LLC existed.  See Response at Exhibit E ¶9 (a).

20.     Both Delphi Corporation and DAS LLC were formed as part of the

divestiture by General Motors Corporation ("General Motors") of its Delphi Automotive

Systems unit (the "Divestiture").  Specifically, General Motors formed DAS LLC and

incorporated Delphi Automotive Systems Corporation on September 16, 1998.  See Certificate of

Formation of Delphi Automotive Systems, attached hereto as Exhibit A[1]; Certificate of

Incorporation of Delphi Automotive Systems Corporation, attached hereto as Exhibit B.  Delphi

Automotive Systems Corporation later changed its name to Delphi Corporation.  See Certificate

of Ownership and Merger, attached hereto as Exhibit C.  General Motors then transferred the

---

[1]    This Court may take judicial notice of the corporate documents included as exhibits to this brief.  Judicial notice
is permitted for facts that are "capable of accurate and ready determination by resort to sources whose accuracy
cannot be reasonably questioned."  Fed.R.Evid. 201.  Under this standard, courts may take judicial notice of the
"records of various public or quasi-public bodies."  In re Enron Corp., 323 B.R. 857, 869 (Bankr. S.D.N.Y.
2005).  The Certificate of Formation, Articles of Incorporation and Certificate of Ownership attached as
Exhibits A-C are from the Secretary of the State of Delaware and therefore clearly meet this standard.
Furthermore, the Master Separation Agreement attached hereto as Exhibit D and the Environmental Matters
Agreement attached hereto as Exhibit E are from filings with the Securities and Exchange Commission, which
have been recognized as matters of which a court may take judicial notice.  Id.; see also Kramer v. Time
Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991) ("[A] district court may take judicial notice of the contents of
relevant public disclosure documents required to be filed with the SEC as facts 'capable of accurate and ready
determination by resort to sources whose accuracy cannot reasonably be questioned.'").

assets that had previously been part of its Delphi Automotive Systems unit to these new entities

to effectuate the Divestiture.  See Master Separation Agreement Among General Motors

Corporation, Delphi Automotive Systems Corporation, Delphi Automotive Systems, LLC,

Delphi Technologies, Inc. and Delphi Automotive Systems (Holding), Inc. at Recitals, § 2.01,

attached hereto as Exhibit D (the "Master Separation Agreement").

           21.     The Master Separation Agreement contemplated that General Motors and

Delphi Corporation would enter into certain ancillary agreements to further effect the Divestiture.

Id. at Art. 3.  One such agreement was the Environmental Matters Agreement by and between

General Motors Corporation and Delphi Automotive Systems Corporation (the "EMA"), which

addressed the assumption and retention of environmental liabilities between General Motors and

Delphi.  See EMA attached hereto as Exhibit E.  The EMA was the sole agreement governing the

assumption of environmental liabilities under the Divestiture.  See Master Separation Agreement

at § 3(b) ("to the extent that any Ancillary Agreement expressly addresses any matters addressed

by this Agreement, including without limitation, matters covered by Article 2 and Article 5

hereof [assumption of liabilities], the terms and conditions of such Ancillary Agreement shall

govern the rights and obligations of the parties with respect to such matters."); see also Master

Separation Agreement at § 2.03(a) ("To the extent that the transfer of any Delphi Asset or the

assumption of any Delphi Liability is expressly provided for by the terms of an Ancillary

Agreement, the terms of such Ancillary Agreement shall determine the method of the transfer or

the assumption.").  As part of the Modified Plan, the EMA was terminated, and therefore the

EMA cannot be used to support an argument that DAS LLC or Delphi Corporation assumed any

environmental liabilities arising from General Motors' operation of the Delphi Automotive

Systems unit prior to the Divestiture, including any liabilities at the Site.  See Modified Plan at

Exhibit 7.7, § 9.19.1(C); see also Nat'l Labor Relations Bd. v. Cone Mills Corp., 373 F.2d 595,

598 (5th Cir. 1967) ("It is axiomatic in contract law that parties to an agreement are relieved of

their mutual obligations upon termination of the agreement. Restatement, Contracts § 386.").

Accordingly, any liability for wastes that were sent to the Site for disposal from any assets

related to General Motors' Delphi Automotive business unit would be General Motors' liabilities,

not the Reorganized Debtors.

      22.    Disallowance Pursuant To Section 502(e)(1)(B) Of The Bankruptcy Code.

In addition, the Reorganized Debtors request that this Court enter an order disallowing and

expunging the Illinois Tool Claims pursuant to section 502(e)(1)(B) of the Bankruptcy Code.

Section 502(e)(1)(B) of the Bankruptcy Code provides that a bankruptcy court is to disallow any

claim for reimbursement or contribution of an entity that is liable with the debtor on or has

secured the claim of a creditor to the extent that "such claim for reimbursement or contribution is

contingent as of the time of allowance or disallowance of such claim for reimbursement or

contribution."  11 U.S.C. § 502(e)(1)(B).  See, e.g., Aetna Cas. & Sur. Co. v. Georgia Tubing

Corp., 93 F.3d 56 (2d Cir. 1996) (disallowing surety bond issuer's contingent prospective

subrogation claims as to bonds issued on behalf of debtor); In re Agway, Inc., No. 02-65872,

2008 WL 2827439, at *3 (Bankr. N.D.N.Y. July 18, 2008) (section 502(e)(1)(B) directs that the

court "shall disallow" any claim for reimbursement or contribution to the extent that such claim

is contingent at the time of disallowance).  Section 502(e)(1)(B) of the Bankruptcy Code has

been applied to claims for environmental cleanup costs brought by private parties who are

themselves liable under CERCLA.  See In re: Charter Co., 862 F.2d 1500 (11th Cir. 1989)

(claims by PRPs to recover environmental cleanup costs arising under theories of contribution,

reimbursement and indemnification disallowed under section 502(e)(1)(B)); In re Hexcel, 174

B.R. 807, 813 (Bankr. N.D. Cal. 1994) (disallowing claims for environmental cleanup costs by

co-liable parties).  As set forth in its proofs of claims and the Response, Illinois Tool is a PRP at

the Site.  See, e.g., Response at ¶ 11.  Accordingly, even if the Debtors or Reorganized Debtors

were liable under CERCLA, the Illinois Tool Claims should be disallowed and expunged

pursuant to section 502(e)(1)(B) of the Bankruptcy Code.

23.    Disallowance under section 502(e)(1)(B) is especially important in this

case because the EPA filed a proof of claim against the Debtors seeking to recover the costs to

cleanup the Site.  See Proof of claim number 14309.  Thus, if the Illinois Tool Claims are

allowed to stand, the Reorganized Debtors would face double liability for the same alleged

contribution of wastes to the Site.  See In re Hexcel, 174 B.R. at 812 (noting that if a PRP's claim

against the debtor were allowed, "it would compete with and duplicate the claim of [New Jersey].

Both claims are directed to the same need to remediate" the contaminated site.)

24.    In sum, Illinois Tool has failed, both in its proofs of claim and its

Response, to prove any set of facts that support a right to payment from the Reorganized Debtors.

Accordingly, the Reorganized Debtors assert that (a) Illinois Tool has not met its burden of proof

to establish a claim against the Debtors, (b) the Illinois Tool Claims are not entitled to a

presumption of prima facie validity pursuant to Bankruptcy Rule 3001(f), and (c) the Illinois

Tool Claims fail to state a claim against the Reorganized Debtors under Bankruptcy Rule 7012.

Because Illinois Tool cannot provide facts or law supporting their claims, the Third Omnibus

Claims Objection should be sustained as to each the Illinois Tool Claim and each such claim

should be disallowed and expunged in its entirety.

WHEREFORE the Reorganized Debtors respectfully request this Court enter an

order (a) sustaining the Reorganized Debtors' objection with respect to the Illinois Tool Claims,

(b) disallowing and expunging each Illinois Tool Claim in its entirety, and (c) granting such

further and other relief this Court deems just and proper.


Dated:      New York, New York
            March 8, 2010

                                        SKADDEN, ARPS, SLATE, MEAGHER
                                            & FLOM LLP


                                        By:   /s/ John Wm. Butler, Jr.
                                              John Wm. Butler, Jr.
                                              John K. Lyons
                                              Ron E. Meisler
                                        155 North Wacker Drive
                                        Chicago, Illinois 60606

                                               - and -


                                        By:   /s/ Kayalyn A. Marafioti
                                              Kayalyn A. Marafioti
                                        Four Times Square
                                        New York, New York 10036

                                        Attorneys for DPH Holdings Corp., et al.,
                                            Reorganized Debtors


12

**EXHIBIT A**

**Certificate of Formation of Delphi Automotive Systems**

# Delaware

PAGE 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT
COPIES OF ALL DOCUMENTS ON FILE OF "DPH-DAS LLC" AS RECEIVED AND
FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF FORMATION, FILED THE SIXTEENTH DAY OF
SEPTEMBER, A.D. 1998, AT 10:01 O'CLOCK A.M.

CERTIFICATE OF MERGER, FILED THE THIRTIETH DAY OF SEPTEMBER,
A.D. 2005, AT 1:16 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF
THE AFORESAID CERTIFICATE OF MERGER IS THE THIRTIETH DAY OF
SEPTEMBER, A.D. 2005, AT 11:59 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, CHANGING ITS NAME FROM "DELPHI
AUTOMOTIVE SYSTEMS LLC" TO "DPH-DAS LLC", FILED THE SIXTH DAY OF
OCTOBER, A.D. 2009, AT 12:38 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF
THE AFORESAID CERTIFICATE OF AMENDMENT IS THE SIXTH DAY OF
OCTOBER, A.D. 2009, AT 11:59 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID
CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE

2944910   8100H

100002839

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 7734966

DATE: 01-04-10



*PAGE 2*

*The First State*

*AFORESAID LIMITED LIABILITY COMPANY, "DPH-DAS LLC".*

*2944910   8100H*

*100002839*

Jeffrey W. Bullock, Secretary of State

*AUTHENTICATION: 7734966*

*DATE: 01-04-10*

## CERTIFICATE OF FORMATION

### OF

### DELPHI AUTOMOTIVE SYSTEMS LLC

This Certificate of Formation of Delphi Automotive Systems LLC has been duly executed and is being filed by the undersigned, as an authorized person, to form a limited liability company under the Delaware Limited Liability Act (6 Del. C. § 18-101. et. seq.).

1.  The name of the limited liability company is Delphi Automotive Systems LLC (the "LLC")

2.  The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

3.  The name and address of the registered agent for service of process on the LLC in the State of Delaware is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation of Delphi Automotive Systems LLC this 16th day of September, 1998

By: _____

Name:    Martin I. Darvick

Its:    Authorized Person

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 10:01 AM 09/16/1998
981358883 - 2944910

**EXHIBIT B**

**Certificate of Incorporation of Delphi Automotive Systems Corporation**

# Delaware

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "DELPHI CORPORATION" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF INCORPORATION, FILED THE SIXTEENTH DAY OF SEPTEMBER, A.D. 1998, AT 10 O'CLOCK A.M.

RESTATED CERTIFICATE, FILED THE TWENTY-SIXTH DAY OF JANUARY, A.D. 1999, AT 4:30 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE SECOND DAY OF FEBRUARY, A.D. 1999, AT 7:30 O'CLOCK A.M.

CERTIFICATE OF OWNERSHIP, CHANGING ITS NAME FROM "DELPHI AUTOMOTIVE SYSTEMS CORPORATION" TO "DELPHI CORPORATION", FILED THE THIRTEENTH DAY OF MARCH, A.D. 2002, AT 3 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID CORPORATION, "DELPHI CORPORATION".

2944832   8100H

090138516

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 7135321

DATE: 02-13-09

CERTIFICATE OF INCORPORATION
OF
DELPHI AUTOMOTIVE SYSTEMS CORPORATION

1. The name of the corporation is Delphi Automotive Systems Corporation

2. The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. the name of its registered agent at such address is The Corporation Trust Company.

3. The nature of the business or purposes to be conducted or promoted to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

4. The total number of shares of stock which the corporation shall have authority to issue is one hundred (100) and the par value of each of such shares is ten cents ($0.10) amounting in the aggregate to ten dollars ($10.00).

5. The board of directors is authorized to make, alter or repeal the bylaws of the corporation. Election of directors need not be by written ballot.

6. The name and mailing address of the sole incorporation is:

Barbara A. Lister
General Motors Corporation
3031 West Grand Boulevard
Mail Code 482-208-840
Detroit, Michigan 48232

I, THE UNDERSIGNED, being the incorporator hereinbefore named, for the purpose of forming a corporation pursuant to the General Corporation Law of the State of Delaware, do make this certificate, hereby declaring and certifying that this is my act and deed and the facts herein stated are true, and accordingly have hereunto set my hand this 16th day of September, 1998.

_____
Sole Incorporator

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 10:00 AM 09/16/1998
981358881 - 2944832

**EXHIBIT C**

**Certificate of Ownership and Merger**

# Delaware

*PAGE 1*

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT
COPIES OF ALL DOCUMENTS ON FILE OF "DELPHI CORPORATION" AS
RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF INCORPORATION, FILED THE SIXTEENTH DAY OF
SEPTEMBER, A.D. 1998, AT 10 O'CLOCK A.M.

RESTATED CERTIFICATE, FILED THE TWENTY-SIXTH DAY OF JANUARY,
A.D. 1999, AT 4:30 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE SECOND DAY OF
FEBRUARY, A.D. 1999, AT 7:30 O'CLOCK A.M.

CERTIFICATE OF OWNERSHIP, CHANGING ITS NAME FROM "DELPHI
AUTOMOTIVE SYSTEMS CORPORATION" TO "DELPHI CORPORATION", FILED
THE THIRTEENTH DAY OF MARCH, A.D. 2002, AT 3 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID
CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE
AFORESAID CORPORATION, "DELPHI CORPORATION".

*2944832   8100H*

*090138516*

Jeffrey W. Bullock, Secretary of State

*AUTHENTICATION: 7135321*

*DATE: 02-13-09*

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 03:00 PM 03/13/2002
020167948 - 2944832

# CERTIFICATE OF OWNERSHIP AND MERGER

## MERGING

## DELPHI CORPORATION

### INTO

## DELPHI AUTOMOTIVE SYSTEMS CORPORATION

\* \* \* \* \* \* \*

Delphi Automotive Systems Corporation (the "Company"), a corporation organized and existing under the laws of Delaware,

DOES HEREBY CERTIFY:

FIRST: That the Company was incorporated on the 16th day of September, 1998, pursuant to Section 102 of the General Corporation Law of the State of Delaware.

SECOND: That the Company owns all of the outstanding shares of the stock of Delphi Corporation, a corporation incorporated on the 10th day of January, 2002, pursuant to Section 102 of the General Corporation Law of the State of Delaware.

THIRD: That the Company, by the following resolutions of its Board of Directors, duly adopted at a meeting held on the 13th day of March, 2002, determined to and did merge into itself said Delphi Corporation:

WHEREAS, the Board of Directors of Delphi Automotive Systems Corporation, a Delaware corporation (the "Company"), deems it to be advisable and in the best interests of the Company for the Company's name to be changed to "Delphi Corporation" through the merger of Delphi Corporation, a Delaware corporation and wholly-owned subsidiary of the Company ("Merger Sub"), with and into the Company pursuant to Section 253 of the Delaware General Corporation Law, as amended (the "DGCL");

NOW, THEREFORE, be it

RESOLVED, that effective upon the filing of a Certificate of Ownership and Merger with the Secretary of State of Delaware, Merger Sub shall be merged with and into the Company in accordance with Section 253 of the DGCL, with the Company being the surviving corporation (the "Merger");

FURTHER RESOLVED, that by virtue of the Merger and without any action on the part of the holders thereof, each outstanding share of capital stock of the Company (of any class or series) shall remain outstanding, in all respects remaining unaffected, and each outstanding share of capital stock of Merger Sub shall be canceled. Holders of outstanding shares of capital stock of the Company or Merger Sub shall not receive any form of consideration as a result of the Merger;

FURTHER RESOLVED, that pursuant to, and at the effective time of, the Merger, Article I of the Amended and Restated Certificate of Incorporation of the Company shall be amended to read in its entirety as follows:

"The name of the corporation (hereinafter referred to as the 'Corporation') is Delphi Corporation."

FURTHER RESOLVED, that the officers of the Company be, and each of them hereby is, authorized to execute a Certificate of Ownership and Merger setting forth a copy of these resolutions, to cause it to be filed with the Secretary of State of Delaware and to do all acts and things, whether within or without the state of Delaware, which may be necessary or advisable to effect the Merger and the name change.

FOURTH: Anything herein or elsewhere to the contrary notwithstanding, this merger may be amended or terminated and abandoned by the Board of Directors of Delphi Automotive Systems Corporation at any time prior to the time that this merger filed with the Secretary of State becomes effective.

IN WITNESS WHEREOF, said Delphi Automotive Systems Corporation has caused this Certificate to be signed by Diane L. Kaye, its Secretary, this 13th day of March, 2002.

DELPHI AUTOMOTIVE SYSTEMS CORPORATION

By: _____
       Diane L. Kaye, Secretary

**EXHIBIT D**

**Master Separation Agreement**

1

EXHIBIT 10.1

EXECUTION COPY

MASTER SEPARATION AGREEMENT

dated as of

December 22, 1998

among

GENERAL MOTORS CORPORATION,

DELPHI AUTOMOTIVE SYSTEMS CORPORATION,

DELPHI AUTOMOTIVE SYSTEMS LLC,

DELPHI TECHNOLOGIES, INC.

and

DELPHI AUTOMOTIVE SYSTEMS (HOLDING), INC.

2

# TABLE OF CONTENTS

----------------------------

ARTICLE 1
Definitions

Section 1.01    Defined Terms................................................2

ARTICLE 2
Contribution and Assumption

Section 2.01    Contribution of Assets......................................6
Section 2.02    Assumption of Liabilities...................................7
Section 2.03    Methods of  Transfer and Assumption.........................7
Section 2.04    Nonassignable Contracts.....................................8
Section 2.05    Transition Services.........................................8

ARTICLE 3
Ancillary Agreements

Section 3.01    General....................................................10
Section 3.02    Priority...................................................10
Section 3.03    Extensions of Transition Services..........................10

ARTICLE 4
Covenants

Section 4.01    IPO and Distribution Agreement.............................10
Section 4.02    Registration Rights Agreement..............................10
Section 4.03    Delayed Asset Transfers....................................10

ARTICLE 5
Indemnification

Section 5.01    Indemnification by Delphi..................................11
Section 5.02    Indemnification Procedures.................................11
Section 5.03    Certain Limitations........................................12

ARTICLE 6
Access to Information

Section 6.01    Restrictions on Disclosure of Information..................13
Section 6.02    Legally Required Disclosure of Confidential Information....13
Section 6.03    Access to Information......................................13
Section 6.04    Record Retention...........................................14
Section 6.05    Production of Witnesses....................................16
Section 6.06    Reimbursement..............................................16

i

3

ARTICLE 7
Certain Claims and Litigation

Section 7.01    Product Liability Claims...................................16
Section 7.02    General Litigation........................................17
Section 7.03    Employment Related Claims.................................18
Section 7.04    Cooperation...............................................18

ARTICLE 8
Insurance Matters

Section 8.01    Delphi Insurance Coverage During the Transition Period.....19
Section 8.02    Delphi Insurance Coverage After the Transition Period......20

ARTICLE 9
Miscellaneous

Section 9.01    Entire Agreement..........................................20
Section 9.02    Governing Law.............................................20
Section 9.03    Descriptive Headings......................................20
Section 9.04    Notices...................................................20
Section 9.05    Parties In Interest.......................................21
Section 9.06    Counterparts..............................................21
Section 9.07    Binding Effect; Assignment................................21
Section 9.08    Dispute Resolution........................................21
Section 9.09    Severability..............................................22
Section 9.10    Failure or Indulgence Not Waiver; Remedies Cumulative......22
Section 9.11    Amendment.................................................22
Section 9.12    Authority.................................................22
Section 9.13    Interpretation............................................22


Schedule A      Ancillary Agreements
Schedule B      Delphi Financial Statements
Schedule C      Facilities to be Transferred
Schedule D      Covenants Not to Compete
Schedule E      Domestic Ownership Interest Transfers
Schedule F      International Ownership Interest Transfers
Schedule G      Extension of Eligibility in the GM Vehicle Purchase Program -
                Used Vehicle Program
Schedule H      Extension of Eligibility in the GM New Vehicle Purchase
                Program
Schedule I      Certain Agreements with Respect to Divested Businesses
Schedule J      Entities in Liquidation by 12/31/98 to be Retained by GM
Schedule K      General Litigation Claims to be Transferred to Delphi
Schedule L      General Litigation Claims to be Defended by GM at Delphi's
                Expense
Schedule M      Delphi Related General Litigation Claims for which GM will
                Retain Liability
Schedule N      Employment Related Claims to be Transferred to Delphi
Schedule O      Employment Related Claims to be Jointly Defended by GM and
                Delphi
Schedule P      Entities Included in Delphi Financial Statements which are to
                be retained by GM after 1/1/99

ii

4

# MASTER SEPARATION AGREEMENT

This Master Separation Agreement ("Agreement") is entered into on December 22, 1998 among General Motors Corporation, a Delaware corporation ("GM"), Delphi Automotive Systems Corporation, a Delaware corporation ("Delphi"), Delphi Automotive Systems LLC, a Delaware limited liability company and, on the date hereof, a wholly owned subsidiary of GM ("DAS LLC"), Delphi Technologies, Inc., a Delaware corporation and, on the date hereof, a wholly owned subsidiary of GM ("DTI", and together with DAS LLC, the "Delphi U.S. Subsidiaries") and Delphi Automotive Systems (Holding), Inc., a Delaware corporation and, on the date hereof, a wholly owned subsidiary of GM ("Delphi International Subsidiary"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article 1 hereof.

## RECITALS

WHEREAS, the Board of Directors of GM has determined that it would be appropriate and desirable to completely separate the Delphi Automotive Systems Business from GM;

WHEREAS, GM has caused Delphi to be incorporated in order to effect such separation, GM currently owns all of the issued and outstanding common stock of Delphi, and Delphi currently conducts no business operations and has no significant assets or liabilities;

WHEREAS, the Boards of Directors of GM and Delphi have each determined that it would be appropriate and desirable for GM to contribute and transfer to Delphi, and for Delphi to receive and assume, directly or indirectly, substantially all of the assets and liabilities currently associated with the Delphi Automotive Systems Business, including those assets and liabilities currently held directly by GM in divisional form and the stock or similar interests currently held by GM in subsidiaries and other entities that conduct such business;

WHEREAS, GM and Delphi intend that the contribution and assumption of assets and liabilities will qualify as a tax-free reorganization under Section 368(a)(1)(D) of the Code;

WHEREAS, GM and Delphi currently contemplate that, following the contribution and assumption of assets and liabilities, Delphi will make an initial public offering of an amount of its common stock that will reduce GM's ownership of Delphi to not less than 80%;

WHEREAS, GM currently contemplates that, several months following such initial public offering, GM will distribute to the holders of its common stock, $1-2/3 par value, by means of an exchange offer and/or a pro rata distribution, all of the shares of Delphi common stock owned by GM (the "Distribution");

WHEREAS, GM and Delphi intend that the Distribution will be tax-free to GM and its stockholders under the Code; and

WHEREAS, the parties intend in this Agreement, including the Exhibits and Schedules hereto, to set forth the principal arrangements between them regarding the separation of the Delphi Automotive Systems Business from GM.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth below, the parties hereto agree as follows:

5

ARTICLE 1

DEFINITIONS

SECTION 1.01. Defined Terms. The following terms, as used herein, shall have the following meanings:

"AFFILIATE" of any specified Person means any other Person directly or indirectly Controlling, Controlled by, or under common Control with, such specified Person; provided, however, that for purposes of this Agreement, (i) GM and its subsidiaries (other than Delphi and its subsidiaries) shall not be considered Affiliates of Delphi and (ii) Delphi and its subsidiaries shall not be considered Affiliates of GM.

"AMENDED AND RESTATED TAX ALLOCATION AGREEMENT" means the Amended and Restated Agreement for the Allocation of Federal, United States, State and Local Income Tax, between GM and Delphi, a copy of which is attached hereto as Exhibit L-3.

"ANCILLARY AGREEMENTS" means each of the agreements which are listed on Schedule A hereto and which are attached as Exhibits A-1 through M-5 to this Agreement, including any exhibits, schedules, attachments, tables or other appendices thereto, and each agreement and other instrument contemplated therein.

"ASSETS" means, except for cash and cash equivalents, any and all assets, properties and rights, whether tangible or intangible, whether real, personal or mixed, whether fixed, contingent or otherwise, and wherever located, including, without limitation, the following:

(i)     real property interests (including leases), land, plants, buildings and improvements;

(ii)    machinery, equipment, vehicles (other than GM Product Evaluation Program vehicles), furniture and fixtures, leasehold improvements, supplies, repair parts, tools, plant, laboratory and office equipment and other tangible personal property, including any and all leases with respect thereto, together with any rights or claims arising out of the breach of any express or implied warranty by the manufacturers or sellers of any of such assets or any component part thereof;

(iii)   inventories, including raw materials, work-in-process, finished goods, parts and accessories;

(iv)    notes, loans and accounts receivable (whether current or not current), interests as beneficiary under letters of credit, advances and performance and surety bonds;

(v)     banker's acceptances, shares of stock, bonds, debentures, evidences of indebtedness, certificates of interest or participation in profit-sharing agreements, collateral-trust certificates, investment contracts, voting trust certificates, puts, calls, straddles, options, swaps, collars, caps and other securities or hedging arrangements of any kind;

(vi)    financial, accounting and operating data and records including, without limitation, books, records, electronic data, notes, sales and sales promotional data, purchasing materials and data, advertising materials, credit information, cost and pricing information, customer and supplier lists, reference catalogs, payroll and personnel records, facility blueprints and plant layouts, minute books, stock ledgers, stock transfer records and other similar property, rights and information;

(vii)   Intellectual Property;

(viii)  Contracts and all rights therein;

2

6

          (ix)    prepaid expenses, deposits and retentions held by third parties;

          (x)    claims, causes of action, choses in action, rights under insurance policies, rights under express or implied warranties, rights of recovery, rights of set-off, and rights of subrogation;

          (xi)    licenses, franchises, permits, authorizations and approvals; and

          (xii)   goodwill and going concern value.

    "BUSINESS DAY" means a day other than a Saturday, a Sunday or a day on which banking institutions located in the State of New York or Michigan are authorized or obligated by law or executive order to close.

    "CODE" means the Internal Revenue Code of 1986, as amended from time to time, together with the rules and regulations promulgated thereunder.

    "COMMERCIAL TRAVEL SERVICES SUPPLY AGREEMENT" means the Commercial Travel Services Supply Agreement, effective as of the date Contribution Date, between GM and Delphi (or their respective Affiliates), a copy of which is attached hereto as Exhibit J-2.

    "COMMISSION" means the Securities and Exchange Commission.

    "CONFIDENTIAL INFORMATION" means with respect to any party hereto, (i) any Information concerning such party, its business or any of its Affiliates that was obtained by another party hereto prior to the Contribution Date, (ii) any Information concerning such party that is obtained by another party under Section 6.03, or (iii) any other Information obtained by, or furnished to, another party hereto prior to the Contribution Date, in each case that (a) was marked "Proprietary" or "Company Private" or words of similar import by the party owning such Information, or any Affiliate of such party, or (b) the party owning such Information notified such other party in writing was confidential or secret by the Contribution Date.

    "CONSOLIDATED TAX PERIOD" has the meaning set forth in the Amended and Restated Tax Allocation Agreement.

    "CONTRACTS" means any contract, agreement, lease, license, sales order, purchase order, instrument or other commitment that is binding on any Person or any part of its property under applicable law.

    "CONTRIBUTION DATE" means January 1, 1999.

    "CONTROL" means the possession, direct or indirect, of the power to direct or cause the direction of the management of the policies of a Person, whether through the ownership of voting securities, by contract or otherwise. "CONTROLLING" and "CONTROLLED" have the corollary meanings ascribed thereto.

    "DELPHI ASSETS" means all of GM's right, title and interest in and to all Assets that (i) (x) are, except as set forth on Schedule P or as otherwise provided herein or in an Ancillary Agreement, reflected in the Delphi Financial Statements and not disposed of by GM after the date thereof and before the Contribution Date (including assets written off or expensed but still used by Delphi which Delphi can demonstrate to GM's reasonable satisfaction were paid for by the Delphi Automotive Systems Sector of GM) or (y) are to be transferred pursuant to Section 2.01(c) of this Agreement (as and when transferred thereunder) or (ii) are acquired by the Delphi Automotive Systems Business after the date of the Delphi Financial Statements and would be reflected in the financial statements of Delphi as of the Contribution Date if such financial statements were prepared using the same accounting principles under which the Delphi Financial Statements were prepared, or (iii) are expressly provided by this Agreement or any Ancillary Agreement to be transferred to Delphi, or (iv) are listed on Schedule C hereto (which sets forth the facilities to be transferred to Delphi) or (v) except as otherwise provided in an Ancillary Agreement or other express agreement of the parties, are used exclusively by the Delphi Automotive Systems Business as of the Contribution

3

7

Date; provided, unless the parties otherwise expressly agree, that if the accounting principles under which the Delphi Financial Statements were prepared would have required any Asset described in the preceding clause (v) to be reflected in the Delphi Financial Statements as of the date thereof, then such Asset shall be included in the "Delphi Assets" only if so reflected.

"DELPHI AUTOMOTIVE SYSTEMS BUSINESS" means the business conducted by the Delphi Automotive Systems Sector of GM at any time on or before the Contribution Date, including (i) all business operations whose financial performance is reflected in the Delphi Financial Statements, (ii) all business operations initiated or acquired by the Delphi Automotive Systems Sector of GM after the date of the Delphi Financial Statements and (iii) all business operations that were conducted at any time in the past by the Delphi Automotive Systems Sector of GM or by any predecessor of such Sector (including, without limitation, the GM Automotive Components Group) but were discontinued or disposed of prior to the date of the Delphi Financial Statements other than by transfer or disposition to any other Sector of GM.

"DELPHI COMMON STOCK" means the Common Stock, $0.01 par value per share, of Delphi.

"DELPHI FINANCIAL STATEMENTS" means the financial statements (including the notes thereto) of Delphi for the period ended September 30, 1998 as set forth in the IPO Registration Statement as amended at the date of this Agreement, a copy of which is set forth on Schedule B attached hereto.

"DELPHI LIABILITIES" means all of the Liabilities of GM that (i) (x) are, except as otherwise set forth on Schedule P or as otherwise provided herein or in an Ancillary Agreement, reflected in the Delphi Financial Statements and remain outstanding at the Contribution Date or (y) are to be transferred pursuant to Section 2.01(c) of this Agreement (as and when transferred thereunder), or (ii) arise in connection with the Delphi Automotive Systems Business after the date of the Delphi Financial Statements and would be reflected in financial statements of Delphi as of the Contribution Date if such financial statements were prepared using the same accounting principles under which the Delphi Financial Statements were prepared, or (iii) are expressly provided by this Agreement or any Ancillary Agreement to be transferred to and assumed by Delphi, or (iv) except as otherwise provided in an Ancillary Agreement or other express agreement of the parties, are related to or arise out of or in connection with the Delphi Assets, or (v) except as otherwise provided in an Ancillary Agreement or other express agreement of the parties, are related to or arise out of or in connection with the Delphi Automotive Systems Business (including but not limited to the covenants not to compete entered into by GM prior to the Contribution Date set forth on Schedule D hereto) whether before or after the date of the Delphi Financial Statements; provided, unless the parties otherwise expressly agree, that if the accounting principles under which the Delphi Financial Statements were prepared would have required any liabilities described in the preceding clause (v) to be reflected in the Delphi Financial Statements as of the date thereof, then such liabilities shall be considered to be "Delphi Liabilities" only if so reflected.

"DETERMINATION" has the meaning set forth in the NITA.

"DISTRIBUTION" has the meaning set forth in the preamble to this Agreement.

"DISTRIBUTION DATE" means the date to be determined by GM in its sole and absolute discretion when the Distribution is completed.

"EMPLOYEE MATTERS AGREEMENT" means the Employee Matters Agreement, effective as of the Contribution Date, between GM and Delphi (or their respective Affiliates), a copy of which is attached hereto as Exhibit B-1.

"FINANCIAL SERVICES SUPPLY AGREEMENT" means the Financial Services Supply Agreement, effective as of the Contribution Date, between GM and Delphi (or their respective Affiliates), a copy of which is attached hereto as Exhibit J-4.

4

8

"FINAL DETERMINATION" has the meaning set forth in the Amended and Restated Tax Allocation Agreement.

"INCOME TAX RETURNS" has the meaning set forth in the Amended and Restated Tax Allocation Agreement.

"INFORMATION" means all records, books, contracts, instruments, computer data and other data.

"INTELLECTUAL PROPERTY" means any and all domestic and foreign patents and patent applications, together with any continuations, continuations-in-part or divisional applications thereof, and all patents issuing thereon (including reissues, renewals and re-examinations of the foregoing); invention disclosures; mask works; copyrights, and copyright applications and registrations; trademarks, servicemarks, trade names, and trade dress, in each case together with any applications and registrations therefor and all appurtenant goodwill relating thereto; trade secrets, commercial and technical information, know-how, proprietary or confidential information, including engineering, production and other designs, notebooks, processes, drawings, specifications, formulae, and technology; computer and electronic data processing programs and software (object and source code), data bases and documentation thereof; inventions (whether patented or not); and all other intellectual property under the laws of any country throughout the world.

"IPO AND DISTRIBUTION AGREEMENT" means the agreement to be entered into between GM and Delphi on or before the IPO Effective Date, the form of which is attached hereto as Exhibit E-1.

"IPO EFFECTIVE DATE" means the date on which the IPO Registration Statement is declared effective by the Commission.

"IPO REGISTRATION STATEMENT" means the registration statement on Form S-1, Registration No. 333-67333 filed by Delphi with the Securities and Exchange Commission in connection with the initial public offering of the Delphi Common Stock, together with all amendments and supplements thereto.

"LIABILITIES" means any and all debts, liabilities, guarantees, assurances, commitments and obligations, whether fixed, contingent or absolute, asserted or unasserted, matured or unmatured, liquidated or unliquidated, accrued or not accrued, known or unknown, due or to become due, whenever or however arising (including, without limitation, whether arising out of any Contract or tort based on negligence or strict liability) and whether or not the same would be required by generally accepted accounting principles to be reflected in financial statements or disclosed in the notes thereto.

"NITA" means the Agreement for the Indemnification of United States Federal, State and Local Non-Income Taxes, between GM and Delphi, a copy of which is attached hereto as Exhibit L-2.

"NON-INCOME TAXES" has the meaning set forth in the NITA.

"PERSON" means an individual, partnership, limited liability company, joint venture, corporation, trust, unincorporated association, any other entity, or a government or any department or agency or other unit thereof.

"PRIOR RELATIONSHIP" means the ownership relationship between GM and Delphi at any time prior to the Contribution Date.

"REGISTRATION RIGHTS AGREEMENT" means the agreement to be entered into between GM and Delphi on or before the IPO Effective Date, the form of which is attached hereto as Exhibit E-2.

"REPRESENTATIVES" means directors, officers, employees, agents, consultants, advisors, accountants, attorneys and representatives.

9

"SUBSIDIARY" means with respect to any specified Person, any corporation, any limited liability company, any partnership or other legal entity of which such Person or any of its Subsidiaries Controls or owns, directly or indirectly, more than 50% of the stock of other equity interest entitled to vote on the election of the members to the board of directors or similar governing body.

"SUPPLY AGREEMENT" means the Component Supply Agreement, effective as of the Contribution Date, between GM and Delphi, a copy of which is attached hereto as Exhibit K-1.

"THIRD-PARTY CLAIM" means any claim, suit, arbitration, inquiry, proceeding or investigation by or before any court, governmental or other regulatory or administrative agency or commission or any arbitration tribunal asserted by a Person other than any party hereto or their respective Affiliates which gives rise to a right of indemnification hereunder.


ARTICLE 2

CONTRIBUTION AND ASSUMPTION

SECTION 2.01. Contribution of Assets.

(a) Except as provided for in Section 2.01(c), on the Contribution Date, GM (i) hereby transfers (or causes its appropriate Subsidiaries and Representatives to transfer) the Delphi Assets in the following order: (A) all intellectual property to be transferred pursuant to the intellectual property agreements attached hereto as Exhibits G-1 through G-5, to DTI (except that all Delco Electronics Corporation intellectual property shall be transferred to DTI after GM has transferred its stock ownership interest in DTI to Delco Electronics Corporation), (B) its stock ownership interest in DTI to Delco Electronics Corporation, (C) its stock ownership interest in Delco Electronics Corporation to DAS LLC and (D) all other Delphi Assets located in the United States, including the ownership interests listed on Schedule E but excluding those listed on Schedule F, to either Delphi or DAS LLC, and (ii) will have transferred or shall transfer as promptly as reasonably practicable (or cause its appropriate Subsidiaries and Representatives to transfer) the Delphi Assets located outside of the United States and the ownership interests of the United States and foreign entities listed on Schedule F owning such Delphi Assets, to either Delphi, the Delphi International Subsidiary, or such other Subsidiary as Delphi may direct. Each of Delphi, the Delphi U.S. Subsidiaries and Delphi International Subsidiary shall receive and accept such Delphi Assets, subject to the terms and conditions of this Agreement. GM further transfers to Delphi on the Contribution Date but after the transfers described in clause (i) above, its membership interest in DAS LLC and its stock ownership interest in the Delphi International Subsidiary, effective as of the Contribution Date. Each of Delphi, the Delphi U.S. Subsidiaries and Delphi International Subsidiary acknowledges and agrees that the foregoing transfers will be made "AS IS WHERE IS" and that neither GM nor any Subsidiary of GM has made or will make any warranty, express or implied, including without limitation any warranty of merchantability or fitness for a particular purpose, with respect to any Delphi Asset.

(b) On the Contribution Date, GM shall contribute to Delphi cash and/or cash equivalents in the aggregate amount of $1 billion. Additionally, GM shall contribute to Delphi such additional amounts as GM and Delphi agree, corresponding to the amounts Delphi will pay to GM (or an Affiliate of GM) in connection with the Canada and Brazil transactions described in Exhibits H-1 and H-2, respectively.

(c) Notwithstanding any other provision of this Agreement, this Agreement shall not transfer or effect the assignment or assumption of any Assets or Liabilities of the Delphi Automotive Systems Business provided for in the agreements constituting Exhibits H-1 through H-110 referred to in Schedule A to this Agreement, except as such Assets and Liabilities shall be transferred and assumed on the dates and in accordance with the terms set forth herein and in such agreements.

6

10

(d) GM and Delphi additionally shall comply with the terms of the letters from GM to Delphi, copies of which are attached hereto as Schedules G and H, which relate to the extension of eligibility for Delphi employees to participate in the GM Vehicle Purchase Programs.

SECTION 2.02.     Assumption of Liabilities.

(a) General. Effective as of the Contribution Date, each of Delphi and/or the Delphi U.S. Subsidiaries, as directed by Delphi, hereby assumes and on a timely basis shall pay, perform, satisfy and discharge in accordance with their terms the Delphi Liabilities relating to the operations of the Delphi Automotive Systems Business in the United States. Delphi International Subsidiary shall, and shall utilize its best efforts to recommend and encourage its respective Subsidiaries and Affiliates to, assume and on a timely basis pay, perform, satisfy and discharge in accordance with their terms, the Delphi Liabilities relating to the operations of the Delphi Automotive Systems Business outside of the United States.

(b) Divested Business. Delphi shall, with respect to the businesses and operations divested by the Delphi Automotive Systems Business, assume all Liabilities of GM related thereto; provided, however, that Delphi shall not assume those Liabilities relating to operations divested by the Delphi Automotive Systems Business to the extent such Liabilities are expressly retained by GM pursuant to the terms of this Agreement or the Ancillary Agreements (including without limitation, the Employee Matters Agreement, the Environmental Matters Agreement and the Real Estate Matters Agreement) and the Liabilities assumed by Delphi shall include, without limitation, the obligation to satisfy all of the obligations of GM under the various agreements pursuant to which the Delphi Automotive Systems Business effected such divestitures (the "Divestiture Agreements"); provided, further, however, that notwithstanding the foregoing or any other provision of this Agreement or any Ancillary Agreement, responsibility for certain obligations relating to certain divestitures shall be allocated between the parties as set forth on Schedule I hereto.

(c) Machinery and Equipment Leases Related to the Delphi Automotive Systems Business. The parties hereto hereby agree that to the extent that GM entered into a lease with a third party dated prior to the Contribution Date pursuant to which GM agreed to lease (i) machinery and/or equipment for use by the Delphi Automotive Systems Business and (ii) machinery and/or equipment for use by GM businesses other than the Delphi Automotive Systems Business, upon identification of any such lease, GM and Delphi will enter into a sublease with terms identical or as similar as possible to such original lease pursuant to which Delphi will sublease from GM that portion of the machinery and/or equipment used by the Delphi Automotive Systems Business covered under such original lease.

(d) Nonrecurring Costs and Expenses. Notwithstanding anything herein to the contrary, any nonrecurring costs and expenses incurred by the parties hereto to effect the transactions contemplated hereby which are not allocated pursuant to the terms of this Agreement or any Ancillary Agreement shall be the responsibility of the party which incurs such costs and expenses.

SECTION 2.03.     Methods of Transfer and Assumption.

(a) The parties shall enter into the Ancillary Agreements, other than the IPO and Distribution Agreement and the Registration Rights Agreement, on or about the date of this Agreement. To the extent that the transfer of any Delphi Asset or the assumption of any Delphi Liability is expressly provided for by the terms of any Ancillary Agreement, the terms of such Ancillary Agreement shall determine the manner of the transfer or assumption. It is the intent of the parties that pursuant to Section 2.01, the transfer and assumption of all other Delphi Assets and Delphi Liabilities shall be made effective as of the Contribution Date, provided, however, that circumstances in various jurisdictions outside the United States may require the transfer of certain Assets and the assumption of certain Liabilities to occur in such other manner and at such other time as the parties shall agree.

(b) The parties intend to complete the transfer of all Delphi Assets and the assumption of all Delphi Liabilities effective on or prior to the Contribution Date but shall, subject to Section 4.03 hereof, and to the extent

7

11

that any such transfers and assumptions are not completed prior to the
Contribution Date, take all actions reasonably necessary or appropriate to
complete such transactions as promptly thereafter as possible. In addition to
those transfers and assumptions accurately identified and designated by the
parties to take place but which the parties are not able to effect prior to the
Contribution Date, there may exist (i) Assets that the parties discover were,
contrary to the agreements between the parties, by mistake or omission,
transferred to Delphi or retained by GM or (ii) Liabilities that the parties
discover were, contrary to the agreements between the parties, by mistake or
omission, assumed by Delphi or not assumed by Delphi. The parties shall, between
the Contribution Date and the earlier of the Distribution Date or six months
from the Contribution Date, cooperate in good faith to effect the transfer or
re-transfer of such Assets, and/or the assumption or re-assumption of such
Liabilities, to or by the appropriate party and shall not use the determination
of remedial actions contemplated herein to alter the original intent of the
parties hereto with respect to the Assets to be transferred to or Liabilities to
be assumed by Delphi. Each party shall reimburse the other or make other
financial adjustments (e.g., without limitation, cash reserves) or other
adjustments to remedy any mistakes or omissions relating to any of the Assets
transferred hereby or any of the Liabilities assumed hereby.

(c)   Each party shall execute and deliver to each other party all such
documents, instruments, certificates and agreements in appropriate form, and to
make all filings and recordings and to take all such other actions, as shall be
necessary or reasonably requested by such other party, whether before or after
the Contribution Date, in order to give full effect to and evidence and perfect
the transfer and contribution of the Delphi Assets and the Delphi Liabilities as
contemplated hereby. However, Delphi acknowledges and agrees that neither GM nor
any Subsidiary of GM will comply with the provisions of any bulk transfer law of
any jurisdiction in connection with the transfer of any Delphi Asset.

(d)   Any Subsidiary of Delphi that will receive any Delphi Asset or
assume any Delphi Liability shall for all purposes be deemed to be a party to
this Agreement.

SECTION 2.04. Nonassignable Contracts. Anything contained herein to the
contrary notwithstanding, this Agreement shall not constitute an agreement to
assign any Asset or Liability if an assignment or attempted assignment of the
same without the consent of another Person would constitute a breach thereof or
in any way impair the rights of a party thereunder or give to any third party
any rights with respect thereto. If any such consent is not obtained or if an
attempted assignment would be ineffective or would impair such party's rights
under any such Asset or Liability so that the party entitled to the benefits and
responsibilities of such purported transfer (the "Intended Transferee") would
not receive all such rights and responsibilities, then (x) the party purporting
to make such transfer (the "Intended Transferor") shall use commercially
reasonable efforts to provide or cause to be provided to the Intended
Transferee, to the extent permitted by law, the benefits of any such Asset or
Liability and the Intended Transferor shall promptly pay or cause to be paid to
the Intended Transferee when received all moneys received by the Intended
Transferor with respect to any such Asset and (y) in consideration thereof the
Intended Transferee shall pay, perform and discharge on behalf of the Intended
Transferor all of the Intended Transferor's Liabilities thereunder in a timely
manner and in accordance with the terms thereof which it may do without breach.
In addition, the Intended Transferor shall take such other actions as may
reasonably be requested by the Intended Transferee in order to place the
Intended Transferee, insofar as reasonably possible, in the same position as if
such Asset had been transferred as contemplated hereby and so all the benefits
and burdens relating thereto, including possession, use, risk of loss, potential
for gain and dominion, control and command, shall inure to the Intended
Transferee. If and when such consents and approvals are obtained, the transfer
of the applicable Asset shall be effected in accordance with the terms of this
Agreement. To the extent that the Delphi Liabilities include liabilities,
obligations or commitments pursuant to any contract, permit, license, franchise
or other Asset to which Delphi also has any rights, GM shall, to the extent such
asset is not a Delphi Asset, upon request by Delphi either assign such rights to
Delphi or assert and seek to enforce such rights for the benefit of Delphi.

SECTION 2.05.  Transition Services.

(a)   For a period of twelve months following the Contribution Date
(the "Transition Period"), GM shall use its reasonable best efforts to provide,
or cause its Affiliates to use their reasonable best efforts to provide,

12

to Delphi or its Affiliates all Transition Services in the manner and at a relative level of service consistent in all material respects with that provided by GM or its Affiliates to the Delphi Automotive Systems Business immediately prior to the Contribution Date. Delphi shall use all commercially reasonable efforts to obtain all such Transition Services from a source other than GM and its Affiliates commencing upon the conclusion of the Transition Period; provided that, if (x) Delphi cannot obtain any Transition Service from a source other than GM and its Affiliates and (y) such Transition Service is necessary in order to operate the Delphi Automotive Systems Business in substantially the same manner as it was conducted immediately prior to the Contribution Date, then GM (or its Affiliates) shall provide such Transition Service to Delphi (or its Affiliates) for an additional period not to exceed six months. For the purpose of this Section 2.05, "Transition Services" means any services provided by GM, its Affiliates or their suppliers to the Delphi Automotive Systems Business immediately prior to the Contribution Date which Delphi reasonably identifies and requests in writing that GM provide to it during the Transition Period; provided that Transition Services expressly excludes any such services which shall be provided to Delphi or its Affiliates pursuant to the terms of other sections of this Agreement or any of the Ancillary Agreements; provided, further, that Transition Services expressly excludes any such services which GM would not be legally permitted to provide to a third party.

(b)   Notwithstanding anything contained in this Agreement or in any Ancillary Agreement to the contrary, except with respect to all services to be provided by GM to Delphi pursuant to the Financial Services Supply Agreement, the Commercial Travel Services Supply Agreement, any real estate leases and any health care services to be provided by GM to Delphi pursuant to the Employee Matters Agreement, for all Transition Services provided by GM (or its Affiliates) to Delphi (or its Affiliates) pursuant to section 2.05(a) above and for all other services to be provided by GM (or its Affiliates) to Delphi (or its Affiliates) pursuant to any of the Ancillary Agreements, Delphi shall pay to GM on or prior to the fifteenth day following the date of Delphi's receipt of an invoice related to the provision of such services (x) in the case of any Transition Service or any service to be provided pursuant to an Ancillary Agreement in which a payment amount or formula has not been set forth, an amount equal to the cost historically allocated to the Delphi Automotive Systems Business as of the Contribution Date for such service, adjusted to reflect any changes in the nature, cost or level of the services provided; provided that, if no cost has historically been allocated to the Delphi Automotive Systems Business for any Transition Service or for such other service, then Delphi shall pay to GM (i) that portion of the total cost borne by GM which GM would have allocated to Delphi under its internal allocation formula, plus (ii) any direct user charges or similar type charges resulting from Delphi's use or services which are not recouped by GM under the charges provided for in (i), plus (iii) any other reasonable charges necessary to make GM whole for the provision of such services or (y) in the case of any service to be provided pursuant to an Ancillary Agreement in which a payment amount or formula has been set forth, the amount owed pursuant to the terms of such Ancillary Agreement. Payments under this Section made on or after the first business day following the forty-fifth day after the date of Delphi's receipt of the invoice related to the provision of the relevant service shall be accompanied by a payment of interest to be calculated as follows:

Transitional Service (or other service) Payment x Prime Rate x Number of days late, to
                                                  ----------     the date of actual
                                                  365 days       payment.

As used in this Section 2.05(b), the "Prime Rate" shall mean to the prime rate as published in the Wall Street Journal on the first business day following the forty-fifth day after the date of Delphi's receipt of the invoice related to the provision of the relevant service.

(c)   Notwithstanding anything contained in this Agreement or in any Ancillary Agreement to the contrary, any charges to GM from outside suppliers for the provision of Transition Services or any other services provided pursuant to any Ancillary Agreement and any other costs which are attributable to the operation of Delphi other than incidental costs provided in connection with Transition Services or such other services which GM (or an Affiliate of GM) incurs shall be submitted by GM to Delphi for payment and, except as GM may otherwise agree in connection with any individual statement of charges which has been submitted to GM, Delphi hereby agrees to make payment therefor either (i) to such outside supplier in accordance with the payment terms of such outside supplier or (ii) where GM is required to pay such outside supplier, on or before the date on which GM notifies

9

13

Delphi it intends to make payment, or if GM does not provide such notice, immediately after GM provides notice to Delphi that GM has made such payment.

(d)    Notwithstanding anything to the contrary herein, Delphi shall be responsible for providing the transitional services agreed to by the parties (or, where no specific terms have been agreed to, then in accordance with the terms of Section 2.05(b) hereof) with respect to the businesses set forth on Schedule J hereto.


ARTICLE 3

ANCILLARY AGREEMENTS

(a)    General. GM and Delphi acknowledge that the Ancillary Agreements, other than the IPO and Distribution Agreement and the Registration Rights Agreement, have been or will be entered into prior to the Contribution Date by the parties hereto and/or by their respective Subsidiaries. GM and Delphi shall take all steps reasonably necessary to cause their respective Subsidiaries and Affiliates to enter into and perform such Ancillary Agreements in accordance with their terms.

(b)    Priority. Except with respect to Sections 2.05 (b) and (c) above, to the extent that any Ancillary Agreement expressly addresses any matters addressed by this Agreement, including, without limitation, matters covered by Article 2 and Article 5 hereof, the terms and conditions of such Ancillary Agreement shall govern the rights and obligations of the parties with respect to such matters.

(c)    Extensions of Transition Services. Delphi shall use all commercially reasonable efforts to obtain services provided to it by GM under the terms of the Ancillary Agreements relating to transitional services from a source other than GM. Certain Ancillary Agreements relating to transitional services provide that the parties may extend the transition service beyond the termination of the transition periods provided for therein. The parties expect that any such extension would be negotiated by GM and Delphi after the Distribution. In the event of an extension of any transitional service, GM and Delphi shall negotiate at arm's length the terms of any such extension, including fair market value pricing for all such services.


ARTICLE 4

COVENANTS


SECTION 4.01. IPO and Distribution Agreement. GM and Delphi hereby agree to execute and deliver, on or before the IPO Effective Date, the IPO and Distribution Agreement, in form and substance substantially as set forth on Exhibit E-1 hereto, with such modifications to such form as the parties shall mutually deem reasonably necessary and desirable; provided, that GM shall be entitled in its sole and absolute discretion at any time and from time to time to make any modifications to the provisions thereof relating to the preservation of the tax-free nature of the Distribution or the tax-free nature of the transactions contemplated hereby as it shall reasonably deem necessary or desirable.

SECTION 4.02. Registration Rights Agreement. GM and Delphi hereby agree to execute and deliver, on or before the IPO Effective Date, the Registration Rights Agreement, in form and substance substantially as set forth on Exhibit E-2 hereto, with such modifications to such form as the parties shall mutually deem reasonably necessary and desirable.

SECTION 4.03. Delayed Asset Transfers. GM and Delphi hereby agree to use their best efforts and, where applicable, to cause their subsidiaries to use their best efforts to consummate the transactions contemplated by

10

14

Section 2.01(c) hereof and the other provisions hereof as and when contemplated in the relevant Ancillary Agreements.

ARTICLE 5

INDEMNIFICATION

SECTION 5.01. Indemnification by Delphi. Delphi and each Subsidiary of Delphi which shall receive any Delphi Asset or Delphi Liability transferred pursuant to the terms of this Agreement and their respective successors-in-interest and assigns (the "Indemnifying Parties") shall jointly and severally indemnify, defend and hold harmless GM and each of its Subsidiaries and their respective successors-in-interest, and each of their respective past and present Representatives (the "Indemnitees") against any losses, claims, damages, liabilities or actions, resulting from, relating to or arising, whether prior to or following the Contribution Date, out of or in connection with (a) the Delphi Liabilities and/or (b) Delphi's conduct of its business and affairs after the Contribution Date and the Indemnifying Parties shall reimburse such entity, each such Subsidiary, each such successor-in-interest and each such Representative for any reasonable attorneys' fees or any other expenses reasonably incurred by any of them in connection with investigating and/or defending any such loss, claim, damage, liability or action.

SECTION 5.02.   Indemnification Procedures.

(a)   If any Indemnitee receives notice of the assertion of any Third-Party Claim with respect to which an Indemnifying Party is obligated under this Agreement to provide indemnification, such Indemnitee shall promptly give such Indemnifying Party notice thereof (together with a copy of such Third-Party Claim, process or other legal pleading) promptly after becoming aware of such Third-Party Claim; provided, however, that the failure of any Indemnitee to give notice as provided in this Section 5.02 shall not relieve any Indemnifying Party of its obligations under this Section 5.02, except to the extent that such Indemnifying Party is actually prejudiced by such failure to give notice. Such notice shall describe such Third-Party Claim in reasonable detail.

(b)   An Indemnifying Party, at such Indemnifying Party's own expense and through counsel chosen by such Indemnifying Party (which counsel shall be reasonably acceptable to the Indemnitee), may elect to defend any Third-Party Claim. If an Indemnifying Party elects to defend a Third-Party Claim, then, within ten Business Days after receiving notice of such Third-Party Claim (or sooner, if the nature of such Third Party claim so requires), such Indemnifying Party shall notify the Indemnitee of its intent to do so, and such Indemnitee shall cooperate in the defense of such Third-Party Claim. Such Indemnifying Party shall pay such Indemnitee's reasonable out-of-pocket expenses incurred in connection with such cooperation. Such Indemnifying Party shall keep the Indemnitee reasonably informed as to the status of the defense of such Third-Party Claim. After notice from an Indemnifying Party to an Indemnitee of its election to assume the defense of a Third-Party Claim, such Indemnifying Party shall not be liable to such Indemnitee under this Section 5.02 for any attorneys' fees or other expenses subsequently incurred by such Indemnitee in connection with the defense thereof other than those expenses referred to in the preceding sentence; provided, however, that such Indemnitee shall have the right to employ one law firm as counsel, together with a separate local law firm in each applicable jurisdiction ("Separate Counsel"), to represent such Indemnitee in any action or group of related actions (which firm or firms shall be reasonably acceptable to the Indemnifying Party) if, in such Indemnitee's reasonable judgment at any time, either a conflict of interest between such Indemnitee and such Indemnifying Party exists in respect of such claim, or there may be defenses available to such Indemnitee which are significantly different from or in addition to those available to such Indemnifying Party and the representation of both parties by the same counsel would, in the reasonable judgment of the Indemnitee, be inappropriate, and in that event (i) the reasonable fees and expenses of such Separate Counsel shall be paid by such Indemnifying Party (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one Separate Counsel (excluding local counsel) with respect to any Third-Party Claim (even if against multiple Indemnitees)) and (ii) each of such Indemnifying Party and such Indemnitee shall have the right to conduct its own defense in respect of such claim. If an Indemnifying Party elects not to defend against a Third-Party Claim, or fails to notify an Indemnitee of its election as provided in this Section 5.02 within the period of ten Business

11

15

Days described above, the Indemnitee may defend, compromise, and settle such Third-Party Claim and shall be entitled to indemnification hereunder (to the extent permitted hereunder); provided, however, that no such Indemnitee may compromise or settle any such Third-Party claim without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, the Indemnifying Party shall not, without the prior written consent of the Indemnitee, (i) settle or compromise any Third-Party Claim or consent to the entry of any judgment which does not include as an unconditional term thereof the delivery by the claimant or plaintiff to the Indemnitee of a written release from all liability in respect of such Third-Party Claim or (ii) settle or compromise any Third-Party Claim in any manner that would be reasonably likely to have a material adverse effect on the Indemnitee.

SECTION 5.03.   Certain Limitations.

(a)   The amount of any indemnifiable losses or other liability for which indemnification is provided under this Agreement shall be net of any amounts actually recovered by the Indemnitee from third parties (including, without limitation, amounts actually recovered under insurance policies) with respect to such indemnifiable losses or other liability. Any Indemnifying Party hereunder shall be subrogated to the rights of the Indemnitee upon payment in full of the amount of the relevant indemnifiable loss. An insurer who would otherwise be obligated to pay any claim shall not be relieved of the responsibility with respect thereto or, solely by virtue of the indemnification provision hereof, have any subrogation rights with respect thereto. If any Indemnitee recovers an amount from a third party in respect of an indemnifiable loss for which indemnification is provided in this Agreement after the full amount of such indemnifiable loss has been paid by an Indemnifying Party or after an Indemnifying Party has made a partial payment of such indemnifiable loss and the amount received from the third party exceeds the remaining unpaid balance of such indemnifiable loss, then the Indemnitee shall promptly remit to the Indemnifying Party the excess (if any) of (A) the sum of the amount theretofore paid by such Indemnifying Party in respect of such indemnifiable loss plus the amount received from the third party in respect thereof, less (B) the full amount of such indemnifiable loss or other liability.

(b)   The amount of any loss or other liability for which indemnification is provided under this Agreement shall be (i) increased to take account of any net tax cost incurred by the Indemnitee arising from the receipt or accrual of an indemnification payment hereunder (grossed up for such increase) and (ii) reduced to take account of any net tax benefit realized by the Indemnitee arising from incurring or paying such loss or other liability. In computing the amount of any such tax cost or tax benefit, the Indemnitee shall be deemed to recognize all other items of income, gain, loss, deduction or credit before recognizing any item arising from the receipt or accrual of any indemnification payment hereunder or incurring or paying any indemnified loss. Any indemnification payment hereunder shall initially be made without regard to this Section 5.03(b) and shall be increased or reduced to reflect any such net tax cost (including gross-up) or net tax benefit only after the Indemnitee has actually realized such cost or benefit. For purposes of this Agreement, an Indemnitee shall be deemed to have "actually realized" a net tax cost or a net tax benefit to the extent that, and at such time as, the amount of taxes payable by such Indemnitee is increased above or reduced below, as the case may be, the amount of taxes that such Indemnitee would be required to pay but for the receipt or accrual of the indemnification payment or the incurrence or payment of such loss, as the case may be. The amount of any increase or reduction hereunder shall be adjusted to reflect any Final Determination with respect to the Indemnitee's liability for taxes, and payments between such indemnified parties to reflect such adjustment shall be made if necessary.

(c)   Any indemnification payment made under this Agreement shall be characterized for tax purposes as if such payment were made immediately prior to the Contribution Date.

12

16

ARTICLE 6

ACCESS TO INFORMATION

SECTION 6.01  Restrictions on Disclosure of Information.

(a)   Without limiting any rights or obligations under any other agreement between or among the parties hereto and/or any of their respective Affiliates relating to confidentiality, for a period of three years following the Contribution Date, each of the parties hereto agrees that it shall not, and shall not permit any of its Affiliates or Representatives to, disclose any Confidential Information to any Person, other than to such Affiliates or Representatives on a need-to-know basis in connection with the purpose for which the Confidential Information was originally disclosed. Notwithstanding the foregoing, each of the parties hereto and its respective Affiliates and Representatives may disclose such Confidential Information, and such Information shall no longer be deemed Confidential Information, to the extent that such party can demonstrate that such Confidential Information is or was (i) available to such party outside the context of the Prior Relationship on a nonconfidential basis prior to its disclosure by the other party, (ii) in the public domain other than by the breach of this Agreement or by breach of any other agreement between or among the parties hereto and/or any of their respective Affiliates relating to confidentiality, or (iii) lawfully acquired outside the context of the Prior Relationship on a nonconfidential basis or independently developed by, or on behalf of, such party by Persons who do not have access to, or descriptions of, any such Confidential Information. Additionally, notwithstanding anything to the contrary herein, any Information provided by GM to Delphi or by Delphi to GM shall, except as hereafter agreed to in writing by the parties, not be deemed Confidential Information with respect to the use of such Information by Delphi in the ordinary course of Delphi's business or by GM in the ordinary course of GM's business, respectively.

(b)   Each of the parties hereto shall maintain, and shall cause their respective Affiliates to maintain, policies and procedures, and develop such further policies and procedures as shall from time to time become necessary or appropriate, to ensure compliance with this Section 6.01.

SECTION 6.02. Legally Required Disclosure of Confidential Information. If any of the parties to this Agreement or any of their respective Affiliates or Representatives becomes legally required to disclose any Confidential Information, such disclosing party shall promptly notify the party owning the Confidential Information (the "Owning Party") and shall use all commercially reasonable efforts to cooperate with the Owning Party so that the Owning Party may seek a protective order or other appropriate remedy and/or waive compliance with this Section 6.02. All expenses reasonably incurred by the disclosing party in seeking a protective order or other remedy shall be borne by the Owning Party. If such protective order or other remedy is not obtained, or if the Owning Party waives compliance with this Section 6.02, the disclosing party or its Affiliate or Representative, as applicable, shall (a) disclose only that portion of the Confidential Information which its legal counsel advises it is compelled to disclose or else stand liable for contempt or suffer other similar significant corporate censure or penalty, (b) use all commercially reasonable efforts to obtain reliable assurance requested by the Owning Party that confidential treatment will be accorded such Confidential Information, and (c) promptly provide the Owning Party with a copy of the Confidential Information so disclosed, in the same form and format so disclosed, together with a description of all Persons to whom such Confidential Information was disclosed.

SECTION 6.03. Access to Information. During the Retention Period (as defined in Section 6.04 below), each of the parties hereto shall cooperate with and afford, and shall cause their respective Affiliates, Representatives, Subsidiaries, successors and/or assignees, and shall use reasonable efforts to cause joint ventures that are not Affiliates (collectively, "Related Parties") to cooperate with and afford, to the other party reasonable access upon reasonable advance written request to all information (other than information which is (i) protected from disclosure by the attorney client privilege or work product doctrine, (ii) proprietary in nature or (iii) the subject of a confidentiality agreement between such party and a third party which prohibits disclosure to the other party) within such party's or any Related Party's possession which was created prior to the Contribution Date or, with

13

17

respect to any information which would be relevant to the provision of a
transitional service pursuant to this Agreement or any Ancillary Agreement,
information created during the period in which one party is providing the other
party with such transition service. Access to the requested information shall be
provided so long as it relates to the requesting party's (the "Requestor")
business, assets or liabilities, and access is reasonably required by the
Requestor as a result of the parties' Prior Relationship for purposes of
auditing, accounting, claims or litigation (except for claims or litigation
between the parties hereto), employee benefits, regulatory or tax purposes or
fulfilling disclosure or reporting obligations including, without limitation,
Information reasonably necessary for the preparation of reports required by or
filed under the Securities Exchange Act of 1934, as amended, with respect to any
period entirely or partially prior to the Contribution Date.

    Access as used in this paragraph shall mean the obligation of a party
in possession of Information (the "Possessor") requested by the Requestor to
exert its reasonable best efforts to locate all requested Information that is
owned and possessed by Possessor or any Related Party. The Possessor, at its own
expense, shall conduct a diligent search designed to identify all requested
Information and shall collect all such Information for inspection by the
Requestor during normal business hours at the Possessor's place of business.
Subject to confidentiality and/or security provisions as the Possessor may
reasonably deem necessary, the Requestor may have all requested Information
duplicated at Requestor's expense. Alternatively, the Possessor may choose to
deliver, at its own expense, all requested Information to the Requestor in the
form it was requested by the Requestor. If so, the Possessor shall notify the
Requestor in writing at the time of delivery if such Information is to be
returned to the Possessor. In such case, the Requestor shall return such
Information when no longer needed to the Possessor at the Possessor's expense.

    In connection with providing Information pursuant to this Section 6.03,
each of the parties hereto shall upon the request of the other party make
available its respective employees (and those of their respective Related
Parties, as applicable) to the extent that they are reasonably necessary to
discuss and explain all requested Information with and to the requesting party.

    SECTION 6.04.  Record Retention.

    (a)    Books and Records. Delphi shall preserve and keep all books and
records included in the Delphi Assets or otherwise in the possession of Delphi
or its Related Parties, whether in electronic form or otherwise, for no less
than ten years from the Contribution Date, or for any longer period as may be
required by any government agency, GM's record retention schedule effective as
of the Contribution Date or as GM may subsequently notify Delphi that such
schedule has been modified, litigation (including applicable "Litigation
Holds"), law, regulation, audit or appeal of taxes, tax examination or the
expiration of the periods described in Section 6.04 (c), where applicable (the
"Retention Period") at Delphi's sole cost and expense. If Delphi wishes to
dispose of any books and records or other documents which it is obligated to
retain under this Section 6.04 after the Retention Period, then Delphi shall
first provide 90 days' written notice to GM and GM shall have the right, at its
option and expense, upon prior written notice within such 90-day period, to take
possession of such books or records or other documents within 180 days after the
date of Delphi's notice to GM hereunder. Written notice of intent to dispose of
such books and records shall include a description of the books and records in
detail sufficient to allow GM to reasonably assess its potential need to retain
such materials. In the event Delphi enters into an agreement with a third party
to sell a portion of its business, together with the books and records related
thereto, GM shall have the right to duplicate such books and records prior to
any such disposition and, should the purchaser of the Delphi business be a
competitor of GM, GM shall have the right to prohibit the transfer or disclosure
to such party of that portion of the former books and records of GM which GM
notifies Delphi contain confidential and proprietary information. To the extent
that books and records of GM or any of its Affiliates which contain information
relating to the Delphi Automotive Systems Business are not included in the
Delphi Assets, GM agrees to cooperate with Delphi in providing Delphi with any
such information upon Delphi's reasonable request to the extent that any such
information exists and is reasonably separable from GM information unrelated to
the Delphi Automotive Systems Business. Delphi shall reimburse GM for all of its
reasonable out-of-pocket costs incurred in connection with any such request.

18

(b)    Technical Documentation and Personnel. In addition to the retention requirements of Section 6.04(a), for a period no less than the Retention Period, Delphi, at its sole cost and expense, shall use its reasonable best efforts to maintain all technical documentation in its possession or in the possession of any of its Related Parties applicable to product design, test, release, and validation at locations at which such technical documents shall be reasonably accessible to GM upon request (at GM's sole cost and expense) and, to the extent reasonably possible, through employees of Delphi who formerly performed that task for GM. In addition to the obligations set forth in Section 6.05 hereof, Delphi shall, from time to time, at the reasonable request of GM, cooperate fully with GM in providing GM, to the extent reasonably possible through Delphi employees formerly employed by GM who previously performed the same functions on behalf of GM, with technical assistance and information in respect to any claims brought against GM involving the conduct of the Delphi Automotive Systems Business prior to the Contribution Date, including consultation and/or the appearance(s) of such persons on a reasonable basis as expert or fact witnesses in trials or administrative proceedings. GM shall reimburse Delphi for its reasonable out-of-pocket costs (travel, hotels, etc.) of providing such services, consistent with GM's policies and practices regarding such expenditures. Additionally, GM shall, from time to time, at the reasonable request of Delphi, cooperate fully with Delphi in providing Delphi, to the extent reasonably possible through applicable GM employees, with technical assistance and information in respect to any claims brought against Delphi involving the conduct of the Delphi Automotive Systems Business prior to the Contribution Date, including consultation and/or the appearance(s) of such persons on a reasonable basis as expert or fact witnesses in trials or administrative proceedings. Delphi shall reimburse GM for its reasonable out-of-pocket costs (travel, hotels, etc.) of providing such services, consistent with Delphi's policies and practices regarding such expenditures.

In particular, Delphi shall: (i) retain all documents required to be maintained by international, national, state, provincial, regional or local regulations and all documents that may be reasonably required to establish due care or to otherwise assist GM in pursuing, contesting or defending such claims; (ii) make available its documents and records in connection with any pursuit, contest or defense, including, subject to an appropriate confidentiality agreement or protective order, documents that may be considered to be "confidential" or subject to trade secret protection ; (iii) promptly respond to discovery requests in connection with such claim, understanding and acknowledging that the requirements of discovery in connection with litigation require timely responses to interrogatories, requests to produce, requests for admission and depositions and also understanding and acknowledging that any delays in connection with responses to discovery may result in sanctions; (iv) make available, as may be reasonably necessary and upon reasonable advance notice and for reasonable periods so as not to interfere materially with Delphi's business, mutually acceptable engineers, technicians or other knowledgeable individuals to assist GM in connection with such claim, including investigation into claims and occurrences described in this section and preparing for and giving factual and expert testimony at depositions, court proceedings, inquiries, hearings and trial; (v) make available facilities and exemplar parts for the sole and limited use of assisting GM in the contest or defense; and (vi) acknowledge that GM is responsible for and will control, as between GM and Delphi, the conduct of the pursuit, contest or defense.

(c)    Tax Related Records. GM and Delphi agree to retain all Income Tax Returns, related schedules and workpapers, and all material records and other documents as required under Section 6001 of the Code, as well as by any similar provision of state or local income tax law, until the later of (i) the expiration of the applicable statute of limitations for the tax period to which the records relate, or (ii) the Final Determination has been made with respect to all issues related to the final Consolidated Tax Period.

With respect to Non-Income Taxes, GM and Delphi agree to retain all Non-Income Tax Returns, related schedules and workpapers, and all material records and other documents as required under Federal, state or local law, until the later of (i) the expiration of the applicable statute of limitations for the tax period to which the records relate, or (ii) a Determination has been made with respect to all issues for the tax periods to which NITA applies.

If either party wishes to dispose of any such records or documents after such retention period, then the procedure described in (a) above shall apply.

15

19

          SECTION 6.05. Production of Witnesses. Until the six-year anniversary
of the Contribution Date, each of the parties hereto shall use all commercially
reasonable efforts, and shall cause each of their respective Affiliates to use
all commercially reasonable efforts, to make available to each other, upon
written request, its directors, officers, employees and other Representatives as
witnesses to the extent that any such Person may reasonably be required (giving
consideration to the business demands upon such Persons) in connection with any
legal, administrative or other proceedings in which the requesting party may
from time to time be involved; provided, however, that with respect to any legal
or administrative proceedings relating to the tax liability of any of the
parties hereto or any of their respective Affiliates, each of the parties hereto
shall, and shall cause each of their respective Affiliates to, make their
directors, officers, employees and other Representatives available as witnesses
until such time as the statute of limitations have expired with respect to all
tax years prior to and including the year in which the asset transfers
contemplated by this Agreement are consummated.

          SECTION 6.06. Reimbursement. Unless otherwise provided in this Article
6, each party to this Agreement providing access, information or witnesses to
another party pursuant to Sections 6.03, 6.04 or 6.05 shall be entitled to
receive from the recipient, upon the presentation of invoices therefor, payment
for all reasonable out-of-pocket costs and expenses (excluding allocated
compensation, salary and overhead expense) as may be reasonably incurred in
providing such information or witnesses.


                              ARTICLE 7

                     CERTAIN CLAIMS AND LITIGATION


          Section 7.01.  Product Liability Claims.

          (a)   Applicability. GM and Delphi agree to the allocation of liability
for all claims and causes of action, however presented, alleging that parts,
components or systems that have been (i) manufactured by the Delphi Automotive
Systems Business or Delphi or its Affiliates, or (ii) manufactured by a third
party, whether sold or otherwise supplied separately, or incorporated into
components or systems of Delphi or its Affiliates, in each case, which have been
sold or otherwise supplied by the Delphi Automotive Systems Business, Delphi or
its Affiliates to GM, its Affiliates or customers of Delphi other than GM or its
Affiliates (the foregoing collectively constituting "Delphi Products") have
caused or been alleged to cause personal inuries, injuries to property or other
damages as set forth in this Section 7.01. The provisions in this Section 7.01
cover claims which include but are not limited to the following types of claims:
claims premised on theories of negligence, strict liability, express or implied
warranties of merchantability, fitness for ordinary use and/or compliance with
reasonable consumer expectations, failure to issue adequate warnings, negligent
and/or intentional misrepresentation, negligent and/or intentional infliction of
emotional distress, failure to provide replacement and/or retrofit parts, and
failure to conduct a recall or adequately conduct a recall that has been issued.
The provisions set forth in this Section 7.01 apply to claims for compensatory
damages as well as all claims for punitive or exemplary damages and all claims
for defective design as well as all claims for defective manufacture.

          (b)        Parts Components or Systems Manufactured by the Delphi
                     Automotive Systems Business Prior to January 1, 1999.

               (i)  As between GM and Delphi, Delphi shall assume the defense
of all such claims involving Delphi Products sold or otherwise supplied
prior to January 1, 1999 to customers other than GM or an Affiliate or
Subsidiary of GM. Delphi shall indemnify, defend and hold harmless GM
and its Affiliates against any and all such claims. Delphi shall
reimburse GM and its Affiliates for any reasonable attorneys' fees or
other expenses reasonably incurred by GM subsequent to December 31,
1998 in connection with investigating and/or defending against any such
claim.


                                16

20

       (ii) GM shall retain and/or assume the defense of all such claims involving parts, components or systems manufactured by the Delphi Automotive Systems Business prior to January 1, 1999 and sold or otherwise supplied to GM or its Affiliates before, on, or after January 1, 1999. GM shall indemnify, defend and hold harmless Delphi and its Affiliates against any and all such claims. GM shall reimburse Delphi and its Affiliates for any reasonable attorneys' fees or other expenses reasonably incurred by Delphi or its Affiliates subsequent to December 31, 1998 in connection with investigating and/or defending any such claim or securing the indemnification and/or defense that GM is required to provide pursuant to this paragraph.

     (c)   Parts, Components or Systems Manufactured, Sold or otherwise Supplied by Delphi on or Subsequent to January 1, 1999.

       (i)   Delphi shall defend GM and its Affiliates against all claims involving (A) parts, components or systems manufactured by Delphi or its Affiliates which on or subsequent to January 1, 1999 are sold or otherwise supplied to customers other than GM or its Affiliates; and (B) parts, components or systems acquired by the Delphi Automotive Systems Business or Delphi or its Affiliates from suppliers thereto other than GM or its Affiliates and sold or otherwise supplied by Delphi or its Affiliates on or subsequent to January 1, 1999 to customers other than GM or its Affiliates. Delphi or its Affiliates shall indemnify, defend and hold harmless GM and its Affiliates against any and all such claims. Delphi or its Affiliates shall reimburse GM and its Affiliates for any reasonable attorneys' fees or other expenses reasonably incurred by GM and its Affiliates in connection with investigating and/or defending any such claim or securing the indemnification and/or defense that Delphi and its Affiliates are required to provide pursuant to this paragraph.

       (ii) The rights, obligations and liabilities of GM and Delphi with respect to claims involving parts, components or systems manufactured by Delphi or its affiliates subsequent to December 31, 1998 which are sold by Delphi or its Affiliates to GM or its Affiliates shall be determined according to the terms of the agreements relating to such sale.

     (d)   Recall and Warranty Campaigns. Claims of GM or its Affiliates against the Delphi Automotive Systems Business in the nature of warranty and recall campaigns relating to parts, components or systems sold by the Delphi Automotive Systems Business to GM or its Affiliates (regardless of when or by whom manufactured (but excluding parts or systems manufactured by GM or its Affiliates)) which arise prior to or after the Contribution Date shall be determined according to the terms of the agreements relating to the sale of such parts, components or systems, all of which agreements are assumed by Delphi and its Affiliates pursuant to the terms of the Supply Agreement.

     (e)   Notice. GM and Delphi agree that in the case of claims covered by either paragraphs (b) or (c) above, the party receiving such a claim will notify the other party within 30 days of receipt of written notice of the claim. Thereafter, the party being notified of the claim shall have 30 days to respond. The party first receiving such a claim shall take all reasonable action necessary to defend against the claim including, but not limited to, responding to court ordered deadlines before the expiration of the time for response.

     Section 7.02.  General Litigation.

     (a)   Claims to Be Transferred to Delphi. On the Contribution Date, the legal responsibilities for the claims identified on Schedule K shall be transferred in their entirety from GM to Delphi. As of the Contribution Date and thereafter, Delphi shall assume the defense of these claims. Delphi shall indemnify, defend and hold harmless GM against these claims. Delphi shall reimburse GM for any reasonable attorneys fees and all other expenses reasonably incurred by GM subsequent to the Contribution Date in connection with investigating and/or defending against any such claim, including reimbursement for any services provided by members of the GM Legal Staff.

17

21

(b)    Claims to be Defended by GM at Delphi's Expense. GM shall defend the claims identified in Schedule L; provided, however, that (i) Delphi shall indemnify and hold harmless GM against any judgments entered against GM on the claims identified on Schedule L or settlements of the claims identified on Schedule L, provided that GM may not compromise or settle any such claim without the prior written consent of Delphi, which shall not be unreasonably withheld or delayed, (ii) GM shall promptly compromise or settle claim(s) identified on Schedule L if Delphi so directs, (iii) GM shall promptly permit Delphi to assume responsibility for the defense of the claims identified on Schedule L if Delphi so requests and (iv) Delphi shall reimburse GM for any reasonable attorneys' fees and all other expenses reasonably incurred by GM subsequent to the Contribution Date in connection with defending against the claims identified on Schedule L, including reimbursement for any services provided by members of the GM Legal Staff.

(c)    Claims for which GM will Retain Liability. GM shall defend the claims identified on Schedule M and shall indemnify and hold harmless Delphi against any judgments entered against Delphi on the claims identified in Schedule M or settlements of the claims identified on Schedule M. GM shall reimburse Delphi for any reasonable attorneys' fees and all other expenses reasonably incurred by Delphi subsequent to the Contribution Date in connection with defending against the claims identified on Schedule M, including reimbursement for any services provided by members of the Delphi Legal Staff.

Section 7.03.   Employment Related Claims.

(a)    Claims to Be Transferred to Delphi. On the Contribution Date, the legal responsibilities for the claims identified on Schedule N shall be transferred in their entirety from GM to Delphi. Thereafter, Delphi shall assume the defense of these claims. Delphi shall indemnify, defend and hold harmless GM against these claims. Delphi shall reimburse GM for any reasonable attorneys' fees and all other expenses reasonably incurred by GM subsequent to the Contribution Date in connection with investigating and/or defending against any such claim, including reimbursement for any services provided by members of the GM Legal Staff.

(b)    Claims to be Jointly Defended by GM and Delphi. GM and Delphi shall jointly defend the claims identified in Schedule O; provided, however, that (i) Delphi shall indemnify and hold harmless GM against any judgments entered against GM on the claims identified in Schedule O or settlements of the claims identified in Schedule O, provided that GM may not compromise or settle any such claim regarding employees of Delphi without the prior consent of Delphi, which consent shall not be unreasonably withheld or delayed and (ii) Delphi and GM shall split the attorneys' fees and all other expenses reasonably incurred subsequent to the Contribution Date in connection with defending against the unemployment claims identified in Schedule O based on the number of hourly employees of each organization that are claimants in the litigation.

(c)    Unscheduled Claims. Delphi will have financial responsibility for employment related claims regarding all Delphi Employees and Delphi Terminated Employees (as those terms are defined in the Employee Matters Agreement, a copy of which is attached hereto as Exhibit B-1) whether incurred before or after the Contribution Date. If a claim is not scheduled, Delphi and GM shall mutually determine whether the claim is treated under Paragraph (a) or (b) above. Responsibility for new U.S. claims will be treated in the same manner. Notwithstanding the above, U.S. claims for pension and welfare benefits from salaried employees who retire on or before the Contribution Date, and hourly employees who retire on or before October 1, 1999 shall remain the responsibility of GM.

Section 7.04. Cooperation. GM and Delphi and their respective Affiliates shall cooperate with each other in the defense of any and all claims covered under this Article 7 and afford to each other reasonable access upon reasonable advance notice to witnesses and information (other than information protected from disclosure by applicable privileges) that is reasonably required to defend these claims as set forth in Article 6 of this Agreement. The foregoing agreement to cooperate includes, but is not limited to, an obligation to provide access to qualified assistance to provide information, witnesses and documents to respond to discovery requests in specific lawsuits. In such cases, cooperation shall be timely so that the party responding to discovery may meet all court-imposed

18

22

deadlines. The party requesting information shall reimburse the party providing
information consistent with the terms of Section 6.06 of this Agreement. The
obligations set forth in this paragraph are more clearly defined in Section 6.01
through and including 6.06 of this Agreement, to which reference is hereby made.


ARTICLE 8

INSURANCE MATTERS

SECTION 8.01  Delphi Insurance Coverage During  the Transition Period.

(a)    Throughout the period beginning on the Contribution Date and
ending on the earlier of the Distribution Date or the first anniversary of the
Contribution Date (i.e., the "Insurance Transition Period"), GM shall, subject
to insurance market conditions and other factors beyond its control, maintain
policies of insurance, including for the benefit of Delphi or any of its
Affiliates, directors, officers, employees or other covered parties
(collectively, the "Delphi Covered Parties") which are comparable to those
maintained generally by GM; provided, however, that this provision shall not
apply to insurance applicable to employees and/or beneficiaries relating to
benefits provided under ERISA governed benefit plans or to Personal Umbrella
Liability Insurance; provided, further, however, that if GM determines that (i)
the amount or scope of such coverage will be reduced to a level materially
inferior to the level of coverage in existence immediately prior to the
Insurance Transition Period or (ii) the retention or deductible level applicable
to such coverage, if any, will be increased to a level materially greater than
the levels in existence immediately prior to the Insurance Transition Period, GM
shall give Delphi notice of such determination as promptly as practicable. Upon
notice of such determination, Delphi shall be entitled to no less than 60 days
to evaluate its options regarding continuance of coverage hereunder and may
cancel all or any portion of such coverage as of any day within such 60 day
period. Except as provided below, during the Insurance Transition Period, such
policies of insurance shall cover Delphi Covered Parties for liabilities and
losses insured prior to the Contribution Date. To the extent of any self insured
or other loss retentions with respect to insurance policies in force, Delphi
shall, during the Insurance Transition Period, be solely responsible for any
losses, damages and related expenses, not included in GM insurance program
expense allocations to Delphi, incurred by itself or Delphi Covered Parties
within such loss or retentions and shall not seek reimbursement or
indemnification thereof from GM.

(b)    GM will use all commercially reasonable efforts to assist Delphi
Covered Parties in asserting claims under applicable insurance policies, and
shall adjust such policies, as necessary and practicable, to provide for Delphi
and GM recoveries consistent with their respective interests and shall not
unduly favor one insured party over another.

(c)    Delphi shall promptly pay or reimburse GM, as the case may be,
for premium expenses, and Delphi Covered Parties shall promptly pay or reimburse
GM for any costs and expenses which GM may incur in connection with the
insurance coverages maintained pursuant to this Section 8.01, including but not
limited to any subsequent premium adjustments. All payments and reimbursements
by Delphi and Delphi Covered Parties to GM shall be made within fifteen (15)
days after Delphi's receipt of an invoice from GM. Late payments shall bear
interest at the Prime Rate (as defined in Section 2.05(b) hereof) and shall be
paid in accordance with the terms relating to payments of interest set forth in
Section 2.05(b) of this Agreement.

(d)    To the full extent permitted by contract and law, the control and
administration of such insurance policies, including claims against insurance
policies and any modifications to terms or conditions of insurance policies,
shall remain with GM (except that any such action taken by GM shall treat fairly
all insured parties and their respective claims and shall not unduly favor one
insured party over another). Delphi and Delphi Covered Parties shall make all
reasonable efforts to facilitate GM's control and administration of such
policies.

(e)    GM's insurance policies shall be applicable to Delphi losses, as
follows: (i) with respect to any insurance policies where coverage is provided
on a "claims-made" or "occurrences reported" basis, any events,

19

23

acts or omissions which may give rise to insured losses, or damages which give rise to claims thereunder, must have occurred and notice given to GM prior to expiration of the Insurance Transition Period; (ii) with respect to other types of insurance policies, including those provided on an "occurrence" basis, any events, acts or omissions giving rise to any insured losses or damages must have occurred prior to expiration of the Insurance Transition Period; and (iii) with respect to all claims under all insurance policies, coverage for events, acts or omissions shall be interpreted consistent with the terms of such policies and the intent of subparagraphs (i) and (ii) above.

(f)    With respect to claims comprehended by the insurance policies, GM and Delphi shall control the investigation, defense and settlement of all claims as provided for in Article 7 of this Agreement; provided, however, that Delphi may not effect any settlement with respect to any such claim without GM's prior written consent (which consent shall not be unreasonably withheld or delayed) unless such settlement (i) will have no direct impact on GM's future insurance recoveries under relevant insurance policies, and (ii) will require that only Delphi or Delphi Covered Parties, and not GM or its insurers, assume financial responsibility for the settlement (under applicable deductibles or self-insured retentions), any related expenses and/or any subsequent premium adjustments.


SECTION 8.02. Delphi Insurance Coverage After The Insurance Transition Period. From and after expiration of the Insurance Transition Period, except as provided herein, Delphi, and Delphi alone, shall be responsible for obtaining and maintaining insurance programs for its risk of loss and such insurance arrangements shall be separate and apart from GM's insurance programs. Notwithstanding the foregoing, (a) GM, upon the request of Delphi, shall use all commercially reasonable efforts to assist Delphi in the transition to its own separate insurance programs from and after the Insurance Transition Period, and shall provide Delphi with any information that is in the possession of GM and is reasonably available and necessary to either obtain insurance coverages for Delphi or to assist Delphi in preventing unintended self-insurance, in whatever form, (b) each of GM and Delphi, at the request of the other, shall cooperate with and use commercially reasonable efforts to assist the other in recoveries from claims made under any insurance policy for the benefit of any insured party; and (c) neither GM nor Delphi, nor any of their Affiliates, shall take any action which would intentionally jeopardize or otherwise interfere with either party's ability to collect any proceeds payable pursuant to any insurance policy.


ARTICLE 9

MISCELLANEOUS

SECTION 9.01. Entire Agreement. This Agreement, including all the Ancillary Agreements and all other Exhibits and Schedules attached hereto, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior written and oral and all contemporaneous oral agreements and understandings with respect to the subject matter hereof, other than with respect to the Cash and Debt Management Agreement, dated as of December 22, 1998, among the Corporate Sector of GM, the Global Automotive Sector of GM and the Delphi Automotive Systems Sector of GM.

SECTION 9.02. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware regardless of the laws that might otherwise govern under principles of conflicts of laws applicable thereto.

SECTION 9.03. Descriptive Headings. The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

SECTION 9.04. Notices. All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered in person, by telecopy with answer back, by express or overnight mail delivered by a nationally recognized air courier (delivery charges prepaid), or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties as follows:

20

24

if to GM:

        c/o General Motors Corporation
        3031 West Grand Blvd.
        Detroit, MI  48202
        Attention:  Warren G. Andersen
        Telecopy:  (313) 974-0685

if to Delphi, the Delphi U.S. Subsidiaries or Delphi International Subsidiary:

        c/o Delphi Automotive Systems Corporation
        5725 Delphi Drive
        Troy, MI  48098
        Attention:  General Counsel
        Telecopy: 248-813-2523

or to such other address as the party to whom notice is given may have previously furnished to the others in writing in the manner set forth above. Any notice or communication delivered in person shall be deemed effective on delivery. Any notice or communication sent by telecopy or by air courier shall be deemed effective on the first Business Day at the place at which such notice or communication is received following the day on which such notice or communication was sent. Any notice or communication sent by registered or certified mail shall be deemed effective on the fifth Business Day at the place from which such notice or communication was mailed following the day on which such notice or communication was mailed.

SECTION 9.05. Parties in Interest. This Agreement shall be binding upon and inure solely to the benefit of each party hereto and their legal representatives and successors, and each Subsidiary and each Affiliate of the parties hereto, and nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Agreement, except for Article 5 (which is intended to be for the benefit of the Persons provided for therein and may be enforced by such Persons).

SECTION 9.06. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.

SECTION 9.07. Binding Effect; Assignment. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives and successors. This Agreement may not be assigned by any party hereto. The Schedules and Exhibits attached hereto or referred to herein are an integral part of this Agreement and are hereby incorporated into this Agreement and made a part hereof as if set forth in full herein.

SECTION 9.08. Dispute Resolution. Except as otherwise set forth in the Ancillary Agreements, resolution of any and all disputes arising from or in connection with this Agreement (excluding matters related to the Supply Agreement), whether based on contract, tort, or otherwise (collectively, "Disputes"), shall be exclusively governed by and settled in accordance with the provisions of this Section 9.08. The parties hereto shall use all commercially reasonable efforts to settle all Disputes without resorting to mediation, arbitration, litigation or other third party dispute resolution mechanisms. If any Dispute remains unsettled, a party hereto may commence proceedings hereunder by first delivering a written notice from a Senior Vice President or comparable executive officer of such party (the "Demand") to the other parties providing reasonable description of the Dispute to the others and expressly requesting mediation hereunder. The parties hereby agree to submit all Disputes to non-binding mediation before a mediator reasonably acceptable to all parties involved in such Dispute. If, after such mediation, the parties subject to such mediation disagree regarding the mediator's recommendation, such Dispute shall be submitted to arbitration under the terms hereof, which arbitration shall be final, conclusive and binding upon the parties, their successors and assigns. The arbitration shall be conducted in Detroit, Michigan by three arbitrators acting by majority vote (the

21

25

"Panel") selected by agreement of the parties not later than ten (10) days after
the delivery of the recommendation provided by the mediator as described above
or, failing such agreement, appointed pursuant to the commercial arbitration
rules of the American Arbitration Association, as amended from time to time (the
"AAA Rules"). If an arbitrator so selected or appointed. The arbitration shall be
successors shall be similarly selected or appointed. The arbitration shall be
conducted pursuant to the Federal Arbitration Act and such procedures as the
parties subject to such arbitration (each, a "Party") may agree, or, in the
absence of or failing such agreement, pursuant to the AAA Rules. Notwithstanding
the foregoing: (i) each Party shall have the right to audit the books and
records of the other Party that are reasonably related to the Dispute; (ii) each
Party shall provide to the other, reasonably in advance of any hearing, copies
of all documents which a Party intends to present in such hearing; and (iii)
each Party shall be allowed to conduct reasonable discovery through written
requests for information, document requests, requests for stipulation of fact
and depositions, the nature and extent of which discovery shall be determined by
the Parties; provided that if the Parties cannot agree on the terms of such
discovery, the nature and extent thereof shall be determined by the Panel which
shall take into account the needs of the Parties and the desirability of making
discovery expeditious and cost effective. The award shall be in writing and
shall specify the factual and legal basis for the award. The Panel shall
apportion all costs and expenses of arbitration, including the Panel's fees and
expenses and fees and expenses of experts, between the prevailing and
non-prevailing Party as the Panel deems fair and reasonable. The parties hereto
agree that monetary damages may be inadequate and that any party by whom this
Agreement is enforceable shall be entitled to seek specific performance of the
arbitrators' decision from a court of competent jurisdiction, in addition to any
other appropriate relief or remedy. Notwithstanding the foregoing, in no event
may the Panel award consequential, special, exemplary or punitive damages. Any
arbitration award shall be binding and enforceable against the parties hereto
and judgment may be entered thereon in any court of competent jurisdiction.

SECTION 9.09. Severability. If any term or other provision of this
Agreement is invalid, illegal or incapable of being enforced by any rule of law
or public policy, all other conditions and provisions of this Agreement shall
nevertheless remain in full force and effect so long as the economic or legal
substance of the transactions contemplated hereby is not affected in any manner
materially adverse to any party. Upon such determination that any term or other
provision is invalid, illegal or incapable of being enforced, the parties hereto
shall negotiate in good faith to modify this Agreement so as to effect the
original intent of the parties as closely as possible in an acceptable manner to
the end that transactions contemplated hereby are fulfilled to the fullest
extent possible.

SECTION 9.10. Failure or Indulgence Not Waiver; Remedies Cumulative. No
failure or delay on the part of any party hereto in the exercise of any right
hereunder shall impair such right or be construed to be a waiver of, or
acquiescence in, any breach of any representation, warranty or agreement herein,
nor shall any single or partial exercise of any such right preclude other or
further exercise thereof or of any other right. All rights and remedies existing
under this Agreement are cumulative to, and not exclusive of, any rights or
remedies otherwise available.

SECTION 9.11. Amendment. No change or amendment will be made to this
Agreement or the Ancillary Agreements except by an instrument in writing signed
on behalf of each of the parties to such agreement.

SECTION 9.12. Authority. Each of the parties hereto represents to the
other that (a) it has the corporate or other requisite power and authority to
execute, deliver and perform this Agreement and the Ancillary Agreements, (b)
the execution, delivery and performance of this Agreement and the Ancillary
Agreements by it have been duly authorized by all necessary corporate or other
action, (c) it has duly and validly executed and delivered this Agreement and
the Ancillary Agreements, and (d) this Agreement and each Ancillary Agreement is
a legal, valid and binding obligation, enforceable against it in accordance with
its terms subject to applicable bankruptcy, insolvency, reorganization,
moratorium or other similar laws affecting creditors' rights generally and
general equity principles.

SECTION 9.13. Interpretation. The headings contained in this Agreement,
in any Exhibit or Schedule hereto and in the table or contents to this Agreement
are for reference purposes only and shall not affect in any way the meaning or
interpretation of this Agreement. Any capitalized term used in any Schedule or
Exhibit but not

22

26

otherwise defined therein, shall have the meaning assigned to such term in this Agreement. When a reference is made in this Agreement to an Article or a Section, Exhibit or Schedule, such reference shall be to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated. After the Contribution Date, the Delphi Automotive Systems Business shall be deemed to no longer exist and all references made herein to Delphi as a party which operate as of a time following the Contribution Date, shall be deemed to refer to Delphi, the Delphi U.S. Subsidiaries and Delphi International Subsidiary as a single party.

******

[SIGNATURES ON FOLLOWING PAGE]

23

        IN WITNESS WHEREOF, each of the parties has caused this Agreement to be
executed on its behalf by its officers thereunto duly authorized on the day and
year first above written.

                    GENERAL MOTORS CORPORATION



                    By:  /s/ G. Richard Wagoner
                        -----------------------------------
                        Name:  G. Richard Wagoner
                        Title: President and Chief Operating Officer


            DELPHI AUTOMOTIVE SYSTEMS CORPORATION



                    By: /s/ J.T. Battenberg, III
                        -----------------------------------
                        Name:  J.T. Battenberg, III
                        Title: Chairman, Chief Executive Officer and
                               President


            DELPHI AUTOMOTIVE SYSTEMS LLC



                    By: /s/ J.T. Battenberg, III
                        -----------------------------------
                        Name:  J.T. Battenberg, III
                        Title: Chief Executive Officer and
                               President


            DELPHI TECHNOLOGIES, INC.



                    By: /s/ Andrew Brown, Jr
                        -----------------------------------
                        Name:  Andrew Brown, Jr.
                        Title: President


            DELPHI AUTOMOTIVE SYSTEMS (HOLDING), INC.



                    By: /s/ John P. Arle
                        -----------------------------------
                        Name:  John P. Arle
                        Title: President

**EXHIBIT E**

**Environmental Matters Agreement**

**Environmental Matters Agreement between Delphi Automotive Systems Corporation
(n/k/a Delphi) and GM, dated as of "October 1998"**

Exhibit C-1

## ENVIRONMENTAL MATTERS AGREEMENT

This Environmental Matters Agreement ("Agreement"), dated as of October, 1998, is made among General Motors Corporation, a Delaware corporation ("GM"), with its principal place of business in Detroit, Michigan, and Delphi Automotive Systems Corporation, a Delaware corporation ("Delphi"), with its principal place of business in Troy, Michigan. GM and Delphi are sometimes referred to herein as a "Party" and collectively as the "Parties."

### RECITALS

WHEREAS, GM and Delphi are Parties to a Master Separation Agreement entered into in connection with the separation of the business heretofore carried on by the Delphi Automotive Systems Division as a part of GM into a business owned and operated by Delphi and completely separate and independent from GM; and

WHEREAS, the Parties desire to enter into this Agreement regarding environmental matters.

NOW, THEREFORE, in consideration of the mutual covenants and provisions hereunder contained, the Parties agree as follows:

### ARTICLE 1

#### Definitions

**1.1. <u>Defined Terms.</u>** As used in this Agreement, the following terms (in singular and plural forms) shall have the meanings below. Capitalized terms used, but not defined, herein shall have the meaning set forth in the Master Separation Agreement or elsewhere in this Agreement.

"Contribution Date" has the same meaning assigned to this term in the Master Separation Agreement.

"Corporate Successor" means any successor in interest of a Party by reason of a merger, reorganization or sale of all or substantially all of the assets of such Party.

"Delphi Assets" means the equipment, machinery and other personal property acquired by purchase, lease or otherwise by Delphi from GM as of the Contribution Date in accordance with the terms of the Master Separation Agreement whether or not associated with a Delphi Facility.

"Delphi Facility" means each parcel of real property, including all facilities and improvements thereon, acquired by purchase, lease or otherwise by Delphi as of the Contribution Date in accordance with the terms of the Master Separation Agreement as the same may

1

hereafter be revised as a result of the "true-up" process provided for in the Real Estate Matters Agreement between the Parties.

"Environmental Claim" shall mean any third-party (i.e., non-Party) accusation, allegation, notice of violation, action, claim, lien, demand, abatement or other order or directive (conditional or otherwise) for personal injury (including sickness, disease or death), tangible or intangible property damage, damage to the environment, nuisance, pollution, contamination of or other adverse effect on the environment or human health, or for fines, penalties, or restrictions, resulting from or based upon: (i) the existence, or the continuation of the existence of, a Release (including without limitation a sudden or non-sudden accidental or non-accidental Release), or, exposure to, any Hazardous Material, in, into or onto the indoor or outdoor environment, including, but not limited to, the air, soil, surface water or groundwater, at, on, by, from or related to any Facility; (ii) the use, management, handling, transportation, storage, treatment or disposal of Hazardous Material in connection with any Facility; or (iii) the violation or alleged violation of any Environmental Law relating to the ownership, use, operation, or remediation of any Facility or to the use, management, handling, transportation. Release, storage, treatment or disposal of Hazardous Materials thereon or therefrom.

"Environmental Costs and Liabilities" shall mean any and all losses, liabilities, obligations, damages, fines, penalties, judgments, actions, claims, reasonable costs and reasonable expenses (including without limitation attorneys' fees, disbursements and expenses of legal counsel, experts, engineers, and consultants and the costs of Remedial Action) arising from or under or related to any Environmental Law.

"Environmental Damages" shall refer to any and all Environmental Costs and Liabilities and Environmental Claims, including, but not limited to, costs, expenses and attorneys' or other experts' or consultants' fees in connection with any Remedial Action or enforcing any right of indemnification hereunder against any Indemnitor; provided, however, that Environmental Damages do not include consequential, special or incidental damages, including, but not limited to, loss of profits, loss of business opportunity, loss of use, diminution in value, stigma damages, or any attorneys' or consultant's fees or other expenses as to any matter as to which an Indemnitor has accepted its defense and indemnity obligations.

"Environmental Law" means, collectively, all applicable foreign, domestic, federal, state or local laws, statutes, ordinances, rules, regulations, codes, common law doctrines, or other legally binding requirements, including, but not limited to, orders, judgments, settlement agreements, consent orders, consent decrees, consent judgments or Environmental Permits, relating to regulation and protection of human health, the environment, or natural resources, including, but not limited to, all laws regulating Releases or threatened Releases of Hazardous Materials, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.,* the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq.,* the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *el seq.,* the Clean Air Act, 42 U.S.C. § 7401 *el seq.,* the Clean Water Act, 33 U.S.C. § 1251 *et seq.,* and the Toxic Substances Control Act, 15 U.S.C § 52601 *et seq., as* any of the foregoing may have been, or may in the future be, amended.

2

3

"Environmental Permits" means permits, licenses, registrations, and other authorizations issued under any Environmental Law.

"Environmental Records" means any and all books, records, notes, reports, letters, memoranda, assessments, testing data, maps, Environmental Permits, certificates, applications, approvals, surveys or other written, printed, or electronically or magnetically recorded materials, communications or data relating to; (i) the use, management, handling, transportation. Release, storage, treatment or disposal of any Hazardous Material in, about or under any Delphi Facility; (ii) the environmental condition of the Delphi Facilities; and (iii) compliance with Environmental Laws at the Delphi Facilities. By way of example, Environmental Records includes the following as they directly or indirectly relate to Delphi Facilities: environmental bulletins, environmental performance criteria, NAO reference letters, EPCRA and TSCA manuals, environmental performance audit reports (IPSR & EPR), Phase I property transfer evaluations, release reports, GM SARA database, ISO 14001 certification guidance, Title V materials, (e.g., compliance assessments, compliance reports, outside counsel memoranda re issues, GM emission factors, and rule interpretations).

"Facility" means, as the context may require, either a GM Retained Facility or a Delphi Facility, or both.

"GM Retained Facility" means any and all real property and facilities which are not Delphi Facilities and which were owned, operated, occupied or possessed by GM or its direct or indirect wholly-owned subsidiaries prior to the Contribution Date.

"Hazardous Material" shall mean, collectively, any: (i) chemical, material or substance: (a) which is now or hereafter becomes defined as or included in the definition of "hazardous substance," "extremely hazardous substance," "hazardous waste," "hazardous material," "restricted hazardous waste," "contaminant," "pollutant," "toxic substance," or words of similar import under any Environmental Law; or (b) the emission, discharge, release, storage, transport, disposal, management, handling or use of which is regulated under or subject to any Environmental Law; and (ii) petroleum or petroleum products, or derivatives or fractions thereof, flammable materials, explosives, radioactive materials (including radon gas other than that which is naturally occurring), urea formaldehyde foam insulation ("UFI"), asbestos-containing materials ("ACM") and polychlorinated biphenyls ("PCBs").

"Identified Waste Disposal Sites" means those Off-Site Waste Disposal Sites known to the Parties as of the Contribution Date, where liability is known or alleged, which are identified on Exhibit A to this Agreement.

"Indemnifying Party" or "Indemnitor" means a person that is obligated to provide indemnification under Article 3 of this Agreement.

"Indemnitee" means a person that is entitled to seek indemnification under Article 3 of this Agreement.

3

4

"Newly Identified Waste Disposal Site" means an Off-Site Waste Disposal Site other than an Identified Waste Disposal Site where liability becomes known or is alleged after the Contribution Date.

"Off-Site Waste Disposal Site" means any site, other than a Facility, which is or becomes subject to an obligation for Remedial Action under an Environmental Law.

"Release" means any release, spill, emission, escape, abandonment of any container or receptacle containing any Hazardous Material, leaking, pumping, pouring, emptying, injection, deposit, disposal, discharge, dispersal, leaching, movement or migration of any Hazardous Material on or into the indoor or outdoor environment or into or out of any property.

"Remedial Action" means all investigations and/or actions to: (i) clean up, remove, remediate, treat, or in any other way address any Hazardous Material under or pursuant to any Environmental Law; (ii) prevent the Release or threatened Release, or minimize the further Release of, any Hazardous Material so that it does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; (iv) perform corrective actions or obtain timely closure or closure certification related to any underground or aboveground tank, container storage area, treatment, storage or disposal facility or operation, solid waste management unit or other location of Hazardous Material use, management, handling, transportation, treatment, storage, or disposal; or (v) bring any matter, activity, practice or conduct into compliance with any Environmental Law.

## ARTICLE 2

### Allocation of Environmental Liabilities

**2.1. Responsibility for GM Retained Facilities.**

As of and after the Contribution Date, GM shall be solely responsible for all Environmental Damages arising from, relating to or in connection with all GM Retained facilities, whether or not the circumstances or claims giving rise to such Environmental Damages occurred or were asserted before or after the Contribution Date; provided, however, that Delphi shall be responsible for all Environmental Damages at the GM Retained Facilities to the extent caused by Delphi's acts or omissions first occurring or continuing after the Contribution Date. Where necessary for GM to fulfill its obligations under this Agreement, Delphi will use its best efforts to assign its rights with respect to GM Retained Facilities.

**2.2. Responsibility for Delphi Facilities.**

(a) Subject to Section 2.2(b), as of and after the Contribution Date, Delphi shall be solely responsible for all Environmental Damages arising from, relating to or in connection with all Delphi Facilities and Delphi Assets, whether or not the circumstances or claims giving rise to such Environmental Damages occurred or were asserted before or after the Contribution Date; provided, however, that GM shall be responsible for all Environmental Damages at the Delphi

4

5

Facilities to the extent caused by GM's acts or omissions first occurring or continuing after the Contribution Date.

(b) Notwithstanding Section 2.2(a), GM shall be solely responsible for all payments relating to any contract for Remedial Action and other environmental-related service or goods procurement contracts, or any stipulated penalties, fines or other sanctions under orders, decrees, judgments or settlements with respect to any environmental matter at a Delphi Facility, actually incurred but not paid by GM prior to the Contribution Date for services performed or acts or omissions occurring before the Contribution Date. Before the Contribution Date, Delphi shall procure environmental-related goods and services only on commercially reasonable terms and conditions, and in no event shall GM be responsible for any materials purchased by Delphi before the Contribution Date and not utilized by Delphi within ninety (90) days after the Contribution Date. Except as otherwise specifically provided in this Section 2.2(b), Delphi shall be solely responsible for all payments under any contracts for Remedial Action, other environmental-related service or goods procurement contracts, and any stipulated penalties, fines or other sanctions under orders, decrees, judgments, or settlements with respect to any environmental matter at a Delphi Facility.

(c) Between the date of the execution of this Agreement and the Contribution Date, the Parties shall pursue, with reasonable diligence and in good faith, with respect to the Delphi Facilities: (i) compliance with Environmental Laws; (ii) the avoidance of any liability under any Environmental Law; and (iii) the resolution or continued performance of any activities necessary to resolve any Environmental Claim or satisfy or discharge any Environmental Damages before the Contribution Date.

**2.3.  Responsibility for Waste Disposal Sites.**

(a) Identified Waste Disposal Sites.

As of and after the Contribution Date, GM shall be solely responsible for Environmental Damages and any other liabilities, to the extent due to contributions by GM before or after the Contribution Date, arising from, relating to or in connection with all Identified Waste Disposal Sites.

(b) Newly Identified Waste Disposal Sites.

Within twenty (20) days after receiving notice or other information as to the existence of a Newly Identified Waste Disposal Site as to which the other Party may have liability under an Environmental Law, the Party receiving such notice or information shall notify the other Party and provide copies of all relevant correspondence and other documents relating thereto.

(c) Allocation.

(i) The Parties' respective liability with respect to: (1) Newly Identified Waste Disposal Sites; and (2) contributions to Identified Waste Disposal Sites after the

5

Contribution Date, shall be allocated based on each Party's respective contributions thereto, as follows:

(a) GM's liability shall be based on contributions attributable to the GM Retained Facilities and any other facility owned or operated by GM before, on or after the Contribution Date except the Delphi Facilities.

(b) Delphi's liability shall be based on contributions attributable to the Delphi Facilities and any other facility owned or operated by Delphi on or after the Contribution Date, whether or not such contributions were made before or after the Contribution Date. Delphi shall not be responsible for contributions to Identified Waste Disposal Sites occurring before the Contribution Date.

(ii) The Parties shall use their reasonable best efforts to amicably resolve all liability and allocation issues using traditional factors, such as the volume, type and toxicity of the contributions to such Newly Identified Waste Disposal Site or Identified Waste Disposal Site by each Party.

**2.4. <u>Duty to Comply With Environmental Laws</u>.**

(a) <u>GM</u>. As of and after the Contribution Date, GM shall comply with Environmental Laws at the GM Retained Facilities and the sole legal and financial responsibility for compliance with Environmental Laws applicable to GM's use of, operations at or occupancy
of the GM Retained Facilities shall be that of GM.

(b) <u>Delphi</u>. As of and after the Contribution Date, Delphi shall comply with Environmental Laws at the Delphi Facilities and the sole legal and financial responsibility for compliance with Environmental Laws applicable to Delphi's use of, operations at or occupancy
of the Delphi Facilities shall be that of Delphi.

(c) The sole remedy of the Parties for breach of this Section 2.4 shall be under the indemnification provisions of Article 3 of this Agreement.

**2.5. <u>No Representations or Warranties</u>.** Except as otherwise expressly set forth in this Agreement, the Delphi Facilities and Delphi Assets are being conveyed in their "as is, where is" condition and with all faults and without any representation or warranty of any nature whatsoever, express or implied, oral or written, and in particular without any implied warranty of merchantability or fitness for a particular purpose.

6

7

# ARTICLE 3

## Indemnification

**3.1. <u>Indemnification by GM.</u>** GM shall indemnify, defend and hold harmless Delphi from and against all Environmental Damages which are caused by, relate to or arise in connection with:

(a) The GM Retained Facilities, including, but not limited to, Environmental Damages caused by, relating to or arising in connection with circumstances occurring or claims asserted either on, before or after the Contribution Date; provided, however, that GM shall have no indemnity or defense obligations hereunder with respect to Environmental Damages to the extent caused by, relating to, or arising in connection with Delphi's acts or omissions first occurring or continuing after the Contribution Date.

(b) Any act or omission by GM after the Contribution Date.

(c) Contributions before the Contribution Date to all Identified Waste Disposal Sites attributable to a Delphi Facility as well as contributions attributable to a GM Retained Facility.

(d) GM contributions to Newly Identified Waste Disposal Sites attributable to a GM Retained Facility.

(e) Any breach of this Agreement.

(f) Any imposition or acceleration of Environmental Costs and Liabilities or Environmental Claims regarding GM Retained Facilities under Section 9.2(b) under any applicable Environmental Transfer Law, as defined hereafter, as a result of the transactions contemplated by the Master Separation Agreement.

**3.2. <u>Indemnification by Delphi.</u>** Delphi shall indemnify, defend and hold harmless GM from and against all Environmental Damages which are caused by, relate to or arise in connection with:

(a) The Delphi Facilities and all Delphi Assets, including, but not limited to, Environmental Damages caused by, relating to or arising in connection with circumstances occurring or claims asserted either on, before or after the Contribution Date; provided, however, that Delphi shall have no indemnity or defense obligations hereunder with respect to Environmental Damages to the extent caused by. relating to or arising in connection with GM's acts or omissions first occurring or continuing after the Contribution Date.

(b) Any act or omission by Delphi after the Contribution Date.

(c) Any breach of this Agreement.

7

8

(d) Delphi contributions on or after the Contribution Date to Identified Waste Disposal Sites.

(e) Delphi contributions to Newly Identified Waste Disposal Sites attributable to a Delphi Facility.

(f) Any imposition or acceleration of Environmental Costs and Liabilities or Environmental Claims regarding Delphi Facilities under Section 9.2(b) under any applicable Environmental Transfer Law, as defined hereafter, as a result of the transactions contemplated by the Master Separation Agreement.

### 3.3. <u>Indemnification Procedures.</u>

(a) If any Indemnitee receives notice of any Environmental Claim or becomes aware of any Environmental Costs and Liabilities or other matter with respect to which an Indemnifying Party is or may be obligated under this Agreement to provide indemnification to such Indemnitee, the Indemnitee shall give the Indemnifying Party prompt written notice thereof (together with any information concerning the matter). Whenever practicable, such notice shall be provided at least ten (10) business days before the Indemnitee incurs any Environmental Damages in respect of such matter. If such advance notice is not practicable, then notice shall be provided as soon as practicable. Failure or delay of any Indemnitee to give notice as provided in this Section 3.3 shall not relieve any Indemnifying Party of its obligations except to the extent that such Indemnifying Party is actually prejudiced.

(b) An Indemnifying Party may elect to defend any Environmental Claim at its own expense and through its counsel (which counsel shall be reasonably acceptable to the Indemnitee). If an Indemnifying Party elects to defend an Environmental Claim, it shall notify the Indemnitee of its intent to do so within ten (10) business days after receiving notice of such Environmental Claim (or sooner, if the nature of such Environmental Claim so requires). The Indemnitee shall cooperate in the defense of such Environmental Claim. The Indemnifying Party shall keep the Indemnitee reasonably informed as to the status of the defense of such Environmental Claim. The Indemnifying Party shall also pay such Indemnitee's reasonable out-of-pocket expenses incurred in connection with such cooperation, but shall not be responsible for any legal or other expenses subsequently incurred by such Indemnitee in connection with the defense of such Environmental Claim. The Indemnifying Party shall not, without the prior written consent of the Indemnitee: (i) settle or compromise any Environmental Claim or consent to the entry of any judgment which does not include a written release from all liability to the Indemnitee; or (ii) settle or compromise any Environmental Claim in any manner that would be reasonably likely to have a material adverse effect on the Indemnitee. If an Indemnifying Party elects not to defend against a Environmental Claim, or fails to properly notify an Indemnitee of its election, the Indemnitee may defend, compromise, and settle such Environmental Claim and shall be entitled to indemnification to the extent permitted hereunder; provided, however, that the Indemnitee may not compromise or settle any such Environmental Claim without the prior written consent of the Indemnifying Party, which shall not be unreasonably withheld or delayed.

8

**3.4. <u>Mitigation.</u>** No Party shall have any obligation to indemnify the other Party with respect to any Environmental Damages to the extent such Environmental Damages could have reasonably been avoided or mitigated.

**3.5. <u>Exclusive Remedy.</u>** The Parties acknowledge that, except with respect to matters covered under Sections 9.3 and 9.4 of this Agreement: (a) the rights and obligations provided in this Agreement shall be the exclusive rights and obligations of the Parties with respect to environmental matters; and (b) the remedies in Articles 3 and 6 of this Agreement shall be the exclusive remedies of the Parties with respect to environmental matters and shall be in lieu of, and not in addition to, all other remedies which may exist in law, equity or under any other contract.

**3.6. <u>No Initiation of Third Party Claims.</u>** The Parties shall not initiate any action with any third party, including any governmental agency, which could reasonably be expected to lead to an Environmental Claim; provided, however, that nothing herein shall prevent either Party from performing its obligations or exercising its rights under this Agreement.

**3.7. <u>Cooperation On Third Party Claims.</u>** If either Party, in addressing a matter or in defending or resolving any Environmental Claim as to which it has defense or indemnification responsibility under this Agreement (for purposes of this Section 3.7, the "Indemnifying Party"), remediates or incurs costs or damages with respect to a matter for which a third party may be responsible or liable, the other party agrees to cooperate with the Indemnifying Party in pursuing any claim against such third party and the Parties shall assist each other so as to enable the Indemnifying Party to legally assert such claim against such third party and to recover its costs and damages from such third party, including acting as the real party in interest and assigning any rights or causes of action against any such third party relating to such claim or the proceeds thereof to the Indemnifying Party.

**ARTICLE 4**

**Environmental Reserves**

**4.1.** As of the Contribution Date, each Party shall be responsible for establishing its own reserves for environmental liabilities in accordance with generally accepted accounting principles. At the time of Contribution, the environmental reserves established for the Delphi Facilities are shown on Exhibit B. These reserves were established in accordance with the same principles used to establish reserves for GM Retained Facilities.

**ARTICLE 5**

**Environmental Permits**

**5.1.** Set forth on Exhibit C are all of the Environmental Permits identified and not yet expired with respect to the Delphi Facilities and the Delphi Assets. Exhibit C also identifies, with respect to each such Environmental Permit, whether each such Environmental Permit: (i)

9

relates to the Delphi Facilities and operations by GM on GM Retained Facilities, but shall not be transferred to Delphi by GM and shall remain with GM as permittee; (ii) may be transferred to Delphi under applicable Environmental Law; or (iii) may not be transferred to Delphi under applicable Environmental Law. The Parties shall use best efforts to: (i) effectuate the transfer of those Environmental Permits under clause (ii), above, that may be transferred to Delphi under applicable Environmental Law; (ii) obtain issuance to Delphi of new or replacement Environmental Permits for Delphi's operations now covered by the Environmental Permits described in clauses (i) or (iii), above; and (iii) mitigate problems that may arise during the transfer process. As of and after the Contribution Date, Delphi shall be solely responsible to obtain and comply with all Environmental Permits with respect to the Delphi Facilities and the Delphi Assets, whether or not GM was required under any Environmental Law to, but did not, obtain any such Environmental Permits. Prior to the Contribution Date, Delphi shall have obtained and GM shall also assist Delphi in obtaining new RCRA generator identification numbers which are or may be required under current or future Environmental Laws for hazardous waste, as defined under current or future Environmental Laws. If same cannot be obtained prior to the Contribution Date, Delphi will expeditiously obtain such identification number after the Contribution Date and, to the extent legally required, will use such number or obtain a substitute number for Delphi's use after the Contribution Date. Without the prior written consent of GM, Delphi will not use for any purpose any such numbers issued before the Contribution Date to GM with respect to the Delphi Facilities.

## ARTICLE 6

### Dispute Resolution

**6.1.** The Parties shall use good faith, best efforts and sound and accepted engineering judgment in making all determinations under this Agreement. In the event of a dispute or disagreement under this Agreement, the Parties shall consult in good faith with each other and shall use best efforts to resolve the matter. It is the express intent of the Parties that any such disputes or disagreements shall be resolved through negotiation between the Parties or, if mutually agreeable as to a specific matter in each Party's discretion, a form of alternative dispute resolution, including binding or non-binding arbitration. It is further understood and agreed, however, that alternative dispute resolution and litigation under this Agreement shall be viewed as a last resort and that the results of any non-litigation dispute resolution procedure under this Article 6 shall not be admissible for any purposes in any litigation in which the Parties are involved and relating to this Agreement unless the Parties otherwise agree as part of such resolution or are utilized to enforce the terms thereof. Either Party shall have the right, after making a reasonable and good faith effort to resolve such dispute through other means, to seek judicial relief in connection with any dispute arising under this Agreement, and in the event that either Party resorts to litigation in order to resolve a dispute (including any breach of this Agreement) under this Agreement, the Party prevailing in connection with such dispute shall be entitled to recover its reasonable and actual attorneys' fees and costs incurred in connection with such litigation. In the event that the matter in litigation relates to a dispute involving a Party's failure to comply with its defense and indemnification obligations under this Agreement and the Party in favor of whom such obligations run has, as a result of the successful assertion of an Environmental Claim, spent money to resolve or otherwise dispose of any resulting

10

Environmental Damages, the Indemnifying Party shall pay the Indemnitee's interest at the "prime rate" then in effect from the date due until fully paid, on and to the extent of any expenditures by the other Party in respect of such Environmental Damages. Except with respect to matters covered by Section 2.4 (Duty to Comply with Environmental Laws), the procedures under this Article 6 shall apply to all disputes arising under this Agreement.

## ARTICLE 7

### Transfer Obligations and Non-Assignability

**7.1. Duties Upon Transfer**. Each Party, in connection with the execution and delivery of any lease, sublease, assignment, agreement of sale or other transfer, assignment or conveyance agreement relating to the Delphi Facilities, Delphi Assets or GM Retained Facilities ("Conveyance Document") in which any interest in or portion of any Delphi Facility, Delphi Asset or GM Retained Facility, respectively, is conveyed, sold, contributed, assigned, transferred, leased or subleased, shall use its reasonable best efforts to provide in such Conveyance Document that the non-transferring Party shall have no liability or responsibility for, and shall be fully released and exculpated from, all Environmental Costs and Liabilities and Environmental Claims with respect to the specific Delphi Facility, Delphi Asset or GM Retained Facility subject to such Conveyance Document, and to impose the obligations under this Section 7.1 on any subsequent user, occupant or transferee.

**7.2. Non-Assignability**. The Parties' respective rights, obligations, duties and liabilities under this Agreement, including, but not limited to, the indemnification provisions of Article 3, are personal to each of them and may not be assigned to, or assumed by, any successor, assignee, or any other person without the prior written consent of the other Party, which consent may be granted or withheld in the sole discretion of such other Party; provided, however, that either Party may assign their respective rights under this Agreement to a Corporate Successor without the consent of the other Party, but only if such Corporate Successor also agrees to assume such Party's duties, obligations and liabilities under this Agreement. No such assignment or assumption shall relieve either Party of its obligations under this Agreement unless so agreed in writing by the other Party.

## ARTICLE 8

### Mutual Releases and Covenants Not to Sue

**8.1. Release**. Except as otherwise expressly set forth in Articles 3 and 6 of this Agreement, each Party hereby fully and forever releases and discharges the other Party and its officers, directors, employees, shareholders, direct and indirect wholly-owned subsidiaries, representatives and agents from all manner of action and causes of action, suits, proceedings, arbitrations, choses in action, contracts, covenants, claims, bonds, bills, debts, dues, sums of money, damages, demands and rights whatsoever, in law or in equity, now existing or which may hereafter accrue by reason of any known or unknown facts existing either before or after the Contribution Date and which relate to matters under Environmental Laws, whether or not specifically addressed in this Agreement, including, but not limited to, the environmental

11

12

condition and compliance status of the Delphi Facilities, the Delphi Assets, the GM Retained Facilities, the Identified Waste Disposal Sites, and the Newly Identified Waste Disposal Sites, and all Environmental Damages, Environmental Costs and Liabilities, and Environmental Claims relating thereto.

**8.2. Covenant Not to Sue**. Except as otherwise expressly set forth in Articles 3 and 6 of this Agreement, each Party hereby covenants that it shall not commence any action, arbitration, proceeding or suit, or participate or assist in any manner in the commencement or prosecution of any action, arbitration, proceeding or suit, in law or in equity, in any judicial, administrative, or other forum, based upon or arising out of any matter subject to a release by such Party under Section 8.1 of this Agreement.

### ARTICLE 9

### Miscellaneous

**9.1. Environmental Records.**

(a) As of the Contribution Date, GM shall transfer to Delphi either the originals or true and complete copies of all Environmental Records.

(b) Subject to Section 9.1(c), for a period of seven (7) years from and after the date hereof, each Party covenants and agrees to keep and maintain at reasonably accessible locations all of the Environmental Records in its possession or control as of the date hereof or otherwise coming into the possession or control of such Party after the date hereof. Following reasonable advance written notice, each Party shall make available for review and photocopying by the other Party each and all of its Environmental Records.

(c) With respect to matters in dispute between the Parties or subject to an Environmental Claim at the end of the seven (7) year record retention period, such retention period shall be extended and shall continue with respect to all Environmental Records that may be relevant to the matter until the matter is finally and fully resolved.

**9.2. Environmental/Real Property Transfer Laws.**

(a) The Parties shall reasonably cooperate in good faith with respect to compliance with any applicable Environmental Laws or other laws that require disclosures or other notifications regarding environmental matters to be made by or to either Party or any unit of government in connection with the transactions contemplated by the Master Separation Agreement (collectively, "Environmental Transfer Laws"). To the extent that any obligation exists under any Environmental Transfer Laws to report any information or make any report or notice, such obligation shall be jointly undertaken by the Parties. Each Party hereby waives any requirements under any such Environmental Transfer Law that disclosures or other reports or notifications be made before the Contribution Date and agree that such disclosures and other notifications may be made on the Contribution Date.

12

13

(b) The Parties shall each use their reasonable best efforts to avoid the imposition of or accelerating any Environmental Costs and Liabilities or Environmental Claims under any applicable Environmental Transfer Law as a result of the transactions contemplated by the Master Separation Agreement. Such avoidance strategies could include GM leasing assets to Delphi. Subject to the preceding sentence, neither Party shall be liable or responsible for any Environmental Costs and Liabilities or Environmental Claims regarding the other Party's facilities under any Environmental Transfer Law resulting from the transactions contemplated by the Master Separation Agreement, and each Party shall indemnify and defend the other with respect thereto in accordance with the terms of Article 3.

**9.3. <u>Wastewaters, Stormwater and other Services Agreements</u>**. The Parties may enter into a Wastewaters and Stormwater Services Agreement, or other agreements, under which one Party shall provide certain services for the other Party.

**9.4. <u>Leases and Sub-leases Regarding Certain Facilities</u>**. The Parties have entered or will enter into leases and sub-leases with respect to certain facilities. The terms and conditions with respect to environmental matters at such facilities shall be governed by the respective leases and sub-leases for those facilities.

**9.5. <u>Entire Agreement</u>**. Except for the Master Separation Agreement, the service agreements and the leases and sub-leases referenced in this Agreement, this Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings with respect to the subject matter hereof. In the event of a conflict between this Agreement and the Master Separation Agreement, the terms of this Agreement shall supersede those of the Master Separation Agreement. This Agreement is not intended to confer upon any other person any benefit, right or remedy.

**9.6. <u>No Arrangement for Disposal.</u>** The Parties each acknowledge that the transactions contemplated by this Agreement constitute a transfer of assets in the ordinary course of business and are not intended in any way, nor will they be deemed to be, an arrangement for treatment, storage or disposal of any of the Delphi Facilities or Delphi Assets or any substances or materials contained therein. Delphi agrees that GM will not have any liability under any Environmental Law by virtue of such transfer alone and Delphi will not assert any claim or cause of action against GM based solely thereon.

**9.7. <u>Further Assurances.</u>** The Parties hereto, at any time before or after the Contribution Date, shall, at their own expense, execute, acknowledge and deliver any further assurances, documents and instruments reasonably requested by one another and shall take any other action consistent with the terms of this Agreement that may reasonably be requested by one another for the purpose of consummating the transactions contemplated by or fulfilling the intent of this Agreement.

**9.8. <u>Governing Law.</u>** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware regardless of the laws that otherwise govern under applicable principles of conflicts of laws.

13

14

**9.9. <u>Descriptive Headings.</u>** The descriptive headings herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

**9.10. <u>Notices.</u>** All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered in person, by express or overnight mail or messenger delivered by a nationally recognized air courier (delivery charges prepaid), or by registered or certified mail (postage prepaid, return receipt requested), to a Party as follows:

If to GM: Michelle T. Fisher, Esq.

If to Delphi: Mark A. Hester, Esq.

**9.11. <u>Amendment.</u>** No change or amendment shall be made to this Agreement except by an instrument in writing signed on behalf of each Party hereto.

**9.12. <u>Counterparts.</u>** This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

**9.13. <u>Severability.</u>** If any provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the subject matter hereof is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner so the intent hereof is fulfilled to the fullest extent possible.

**9.14. <u>Failure or Indulgence Not Waived.</u>** Subject to the express provisions of this Agreement, no failure or delay on the part of any Party hereto in the exercise of any right hereunder shall impair such right or be construed to be a waiver of, or acquiescence in, any breach of this Agreement, nor shall any single or partial exercise of any such right preclude other or further exercise thereof or of any other right.

**9.15. <u>Confidentiality.</u>** The terms of this Agreement shall remain confidential and each Party shall not disclose the same without the prior written consent of the other Party except: (a) to such Party's directors, officers, partners, employees, legal counsel, accountants, engineers,

14

15

contractors, financial advisors and similar professionals and consultants to the extent such Party deems it necessary or appropriate and such Party shall inform each of the foregoing persons of such Party's obligations under this paragraph and shall secure the agreement of such persons to be bound by the terms hereof; (b) pursuant to contractual obligations existing as of the date hereof; or (c) as otherwise required by law or regulation.

**9.16.** No rights are created in any third party by this Agreement.

**9.17.** Each Party will cause its direct and indirect wholly-owned subsidiaries to take such actions as may be reasonably necessary to assist such Party to perform its obligations under this Agreement.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by its authorized officers.

GENERAL MOTORS CORPORATION

By:/s/ [ILLEGIBLE]
    Name:    [ILLEGIBLE]
    Title:    [ILLEGIBLE]

DELPHI AUTOMOTIVE SYSTEMS CORPORATION

By:/s/ James A. Bertrand
    Name:    James A. Bertrand
    Title:    Vice President-Operations

EXECUTION RECOMMENDED
WORLDWIDE REAL ESTATE

BY  /s/ C. P. Schwartz

15

16

# EXHIBIT H

**Hearing Date and Time:  March 18, 2010 at 10:00 a.m. (prevailing Eastern time)**
**Supplemental Response Date and Time:  March 16, 2010 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler


     - and -


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti

Attorneys for DPH Holdings Corp., et al.,
    Reorganized Debtors


DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698


DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                                         :
         In re                                           :    Chapter 11
                                                         :
DPH HOLDINGS CORP., et al.,                              :    Case Number 05-44481 (RDD)
                                                         :
                                                         :    (Jointly Administered)
                                                         :
          Reorganized Debtors.                           :
                                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

REORGANIZED DEBTORS' SUPPLEMENTAL REPLY TO RESPONSES OF CERTAIN
CLAIMANTS TO DEBTORS' OBJECTIONS TO (A) PROOFS OF CLAIM
NOS. 10959 AND 10960  FILED BY HERAEUS AMERSIL, INC.
A/K/A HERAEUS TENEVO AND (B) PROOFS OF CLAIM NOS. 11643 AND 11644
FILED BY MILLIKEN & COMPANY

("SUPPLEMENTAL REPLY REGARDING MERCURY REFINING SITE CLAIMS")

1

DPH Holdings Corp. and certain of its affiliated reorganized debtors in the above-caption cases (together with DPH Holdings Corp., the "Reorganized Debtors") hereby submit the Reorganized Debtors' Supplemental Reply To Responses Of Certain Claimants To Debtors' Objections To  (A) Proofs Of Claim Nos. 10959 And 10960  Filed By Heraeus Amersil, Inc. A/K/A Heraeus Tenevo And (B) Proofs Of Claim Nos. 11643 And 11644 Filed By Milliken & Company (the "Supplemental Reply"), and respectfully represent as follows:

A.    <u>Preliminary Statement</u>

1.    On October 8 and 14, 2005, Delphi Corporation and certain of its affiliates (the "Debtors"), predecessors of the Reorganized Debtors, filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").

2.    On October 6, 2009, the Debtors substantially consummated the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified (the "Modified Plan"), which had been approved by this Court pursuant to an order entered on July 30, 2009 (Docket No. 18707), and emerged from chapter 11 as the Reorganized Debtors.

3.    On February 18, 2010, the Reorganized Debtors filed the Notice Of Sufficiency Hearing With Respect To Debtors' Objection To Proofs Of Claim Nos. 6991, 7054, 9221, 10830, 10959, 10960, 11375, 11643, 11644, 11892, 11911, 11983, 11985, 11988, 11989, 12147, 12833, 13776, 13881, 14019, 14020, 14022, 14023, 14024, 14025, 14026, 14370, 14825, 14826, 16967, 18265, 18422, 18603, 18614, 19162, 19543, And 19545 (Docket No. 19504) (the "Sufficiency Hearing Notice").

4.    The Reorganized Debtors filed the Sufficiency Hearing Notice and are filing this Supplemental Reply to implement Article 9.6(a) of the Modified Plan, which provides

2

that "[t]he Reorganized Debtors shall retain responsibility for administering, disputing, objecting

to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors and

making distributions (if any) with respect to all Claims and Interests …."  Modified Plan, art.

9.6(a).

          5.      By the Sufficiency Hearing Notice and pursuant to the Order Pursuant To

11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014

Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices

And Procedures Governing Objections To Claims, entered December 7, 2006 (Docket No. 6089)

(the "Claims Objection Procedures Order") and the Ninth Supplemental Order Pursuant To 11

U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014

Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices

And Procedures Governing Objections To Claims, entered December 11, 2009 (Docket No.

19176), the Reorganized Debtors scheduled a hearing (the "Sufficiency Hearing") on March 18,

2010 at 10:00 a.m. (prevailing Eastern time) in this Court to address the legal sufficiency of each

proof of claim filed by the claimants listed on Exhibit A to the Sufficiency Hearing Notice and

whether each such proof of claim states a colorable claim against the asserted Debtor.

          6.      This Supplemental Reply is filed pursuant to paragraph 9(b)(i) of the

Claims Objection Procedures Order.  <u>Pursuant to paragraph 9(b)(ii) of the Claims Objection</u>

<u>Procedures Order, if a Claimant wishes to file a supplemental pleading in response to this</u>

<u>Supplemental Reply, the Claimant shall file and serve its response no later than two business</u>

<u>days before the scheduled Sufficiency Hearing – i.e., by **March 16, 2010.**</u>

B.    <u>Relief Requested</u>

          7.      By this Supplemental Reply, the Reorganized Debtors request entry of an

order disallowing and expunging proofs of claim filed by Heraeus Amersil, Inc. A/K/A Heraeus

Tenevo ("Heraeus") and Milliken & Company ("Milliken") for contribution to response costs

that Heraeus and Milliken may incur in connection with the environmental investigation and

remediation of the Mercury Refining Superfund Site, located at 26 Railroad Ave., Albany

County, Colonie, New York (the "Site").

C.    Heraeus's and Milliken's Claims

         8.    During their review of the proofs of claim filed in these cases, the Debtors

determined that proofs of claim numbers 10959 and 10960 filed by Heraeus and proofs of claim

numbers 11643 and 1164 filed by Milliken assert liabilities that are not owing pursuant to the

Reorganized Debtors' books and records.  The Debtors believe that neither Heraeus nor Milliken

is a creditor of the Debtors with respect to the Site.  Accordingly, this Court should enter an

order disallowing and expunging each of the Mercury Refining Site Claims.

         9.    The Mercury Refining Site Claims Filed Against The Debtors.  On July 26,

2006, Heraeus filed proof of claim number 10959 against Delphi Automotive Systems LLC

("DAS LLC"), a Debtor in these cases, and proof of claim number 10960 against Delphi

Corporation, with each proof of claim asserting contingent, unliquidated and undetermined

amounts for contribution under the federal Comprehensive Environmental Response,

Compensation and Liability Act, 42 U.S.C. § 9601, *et seq*. ("CERCLA") for response costs that

Heraeus may incur at the Site.

         10.    On July 26, 2006, Milliken filed proof of claim number 11644 against

DAS LLC and proof of claim number 11643 against Delphi Corporation (together with proofs of

claim numbers 10959 and 10960, the "Mercury Refining Site Claims"), with each proof of claim

asserting contingent, unliquidated and undetermined amounts for contribution under CERCLA

for response costs that Milliken may incur at the Site.

4

11.    <u>The Debtors' Objection To The Mercury Refining Site Claims</u>.  On

October 31, 2006, the Debtors filed the Debtors' (I) Third Omnibus Objection (Substantive)

Pursuant to 11 U.S.C. § 502(b) And Fed.R.Bankr.P. 3007 To Certain (A) Claims With

Insufficient Documentation, (B) Claims Unsubstantiated By Debtors' Books And Records, And

(C) Claims Subject To Modification And (II) Motion To Estimate Contingent And Unliquidated

Claims Pursuant To 11 U.S.C. § 502(c) (Docket No. 5452) (the "Third Omnibus Claims

Objection"), by which the Debtors objected to proofs of claim numbers 10959, 10960, 11643,

and 11644 as unsubstantiated claims for which the Debtors are not liable and sought an order

disallowing and expunging each of those proofs of claim.

12.    <u>Heraeus's and Milliken's Responses To The Debtors' Objections</u>.  On

November 21, 2006, Heraeus filed the Response To Debtors' Second Omnibus Objection to

Claims And Third Omnibus Claims Objection To Claims (Docket No. 5652) (the "Heraeus

Response"), in which Heraeus asserted that, to the extent that Heraeus was found liable at the

Site or claims were asserted against Heraeus in connection with, then it "may hold statutory and

common law rights to contribution against the Debtors."  <u>See</u> Heraeus Response at ¶ 5.

13.    On November 21, 2006, Milliken filed the Response In Opposition To

Debtors' Third Omnibus Claims Objection (Substantive) Pursuant to 11 U.S.C. § 502(b) and

Fed. R. Bankr. P. 3007 (Docket No. 5640) (the "Milliken Response"), in which Milliken asserted

that it had no knowledge or information regarding the Debtors' liability to Milliken but had

protectively filed a proof of claim because Milliken was listed on the Debtors' schedules of assets

and liabilities.  <u>See</u> Milliken Response at ¶ 7.

14.    <u>The Sufficiency Hearing Notice</u>.  Pursuant to the Claims Objection

Procedures Order, the hearing on the Mercury Refining Site Claims was adjourned to a future

date.  On February 18, 2010, the Reorganized Debtors filed the Sufficiency Hearing Notice with

respect to the Mercury Refining Site Claims, among other proofs of claim, scheduling the

Sufficiency Hearing.

D.        Claimants' Burden Of Proof And Standard For Sufficiency Of Claim

15.        The Reorganized Debtors respectfully submit that the Proofs of Claim fail

to state a claim against the Debtors under rule 7012 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules").  The claimants asserting the Mercury Refining Site Claims

have not proved any facts to support a right to payment by the Reorganized Debtors on behalf of

the Debtors.  Accordingly, the Debtors' objections to each Mercury Refining Site Claim should

be sustained with respect to such proofs of claim and each Mercury Refining Site Claim should

be disallowed and expunged in its entirety.

16.        The burden of proof to establish a claim against the Debtors rests on the

claimants and, if a proof of claim does not include sufficient factual support, such proof of claim

is not entitled to a presumption of prima facie validity pursuant to Bankruptcy Rule 3001(f).  In

re Spiegel, Inc., No. 03-11540, 2007 WL 2456626, at *15 (Bankr. S.D.N.Y. August 22, 2007)

(the claimant always bears the burden of persuasion and must initially allege facts sufficient to

support the claim); see also In re WorldCom, Inc., No. 02-13533, 2005 WL 3832065, at *4

(Bankr. S.D.N.Y. Dec. 29, 2005) (only a claim that alleges facts sufficient to support legal

liability to claimant satisfies claimant's initial obligation to file substantiated proof of claim); In

re Allegheny Intern., Inc., 954 F.2d 167, 173 (3d Cir. 1992) (in its initial proof of claim filing,

claimant must allege facts sufficient to support claim); In re Chiro Plus, Inc., 339 B.R. 111, 113

(Bankr. D.N.J. 2006) (claimant bears initial burden of sufficiently alleging claim and establishing

facts to support legal liability); In re Armstrong Finishing, L.L.C., No. 99-11576-C11, 2001 WL

1700029, at *2 (Bankr. M.D.N.C. May 2, 2001) (only when claimant alleges facts sufficient to

6

support its proof of claim is it entitled to have claim considered <u>prima</u> <u>facie</u> valid); <u>In re United</u>

<u>Cos. Fin. Corp.</u>, 267 B.R. 524, 527 (Bankr. D. Del. 2000) (claimant must allege facts sufficient

to support legal basis to make <u>prima</u> <u>facie</u> case).

17.     For purposes of sufficiency, this Court has determined that the standard of

whether a claimant has met its initial burden of proof to establish a claim should be similar to the

standard employed by courts in deciding a motion to dismiss under Bankruptcy Rules 7012 and

9014.  <u>See</u> Transcript of January 12, 2007 Hearing (Docket No. 7118) (the "January 12, 2007

Transcript") at 52:24-53:1.  Pursuant to that standard, a motion to dismiss should be granted "if it

plainly appears that the nonmovant 'can prove no set of facts in support of his claim which would

entitle him to relief.'"  <u>In re Lopes</u>, 339 B.R. 82, 86 (Bankr. S.D.N.Y. 2006) (<u>quoting</u> <u>Conley v.</u>

<u>Gibson</u>, 355 U.S. 41, 45-46 (1957)).  Essentially, the claimant must provide facts that sufficiently

support a legal liability against the Debtors.

18.     This Court further established that the sufficiency hearing standard is

consistent with Bankruptcy Rule 3001(f), which states that "a proof of claim executed and filed

in accordance with <u>these Rules</u> shall constitute <u>prima</u> <u>facie</u> evidence of the validity and amount

of the claim."  Fed. R. Bankr. P. 3001(f) (emphasis added).  Likewise, Bankruptcy Rule 3001(a)

requires that "the proof of claim must be consistent with the official form" and Bankruptcy Rule

3001(c) requires "evidence of a writing if the claim is based on a writing."  Fed. R. Bankr. P.

3001(a), (c).  <u>See</u> January 12, 2007 Transcript at 52:17-22.

E.      <u>Argument Regarding The Mercury Refining Site Claims</u>

19.     <u>The Reorganized Debtors Are Not Liable Under CERCLA</u>.  The Mercury

Refining Site Claims assert that Delphi Corporation and DAS LLC are liable parties under

CERCLA for contamination at the Site.  However, nothing in the Mercury Refining Site Claims,

the Heraeus Response, or the Milliken Response proves such liability.  Indeed, both the Heraeus

7

Response and the Milliken Response concede that the claimants have no information regarding the Debtors' alleged liability at the Site.  <u>See</u> Heraeus Response at ¶ 5; Milliken Response at ¶ 7.  On the basis of this concession alone, the Mercury Refining Site Claims should be disallowed.

20.    Moreover, the claims should be disallowed and expunged because, as described in more detail below, neither Delphi Corporation nor DAS LLC existed at the time the Site operated as a landfill, and therefore these entities have no statutory liability for contamination at the Site under CERCLA.  CERCLA imposes liability on four classes of potentially responsible parties ("PRPs"): (a) the current owner or operator of a contaminated site; (b) anyone who owned or operated the contaminated site at the time hazardous substances were disposed of; (c) any person who arranged for the disposal of any hazardous substances at the contaminated site; and (d) any person who transported any hazardous substances to a contaminated site.  <u>See</u> 42 U.S.C. § 9607(a).

21.    Neither Delphi Corporation nor DAS LLC has ever had any ownership interest in the Site, nor has either entity ever operated the Site.  Accordingly, any liability under CERCLA would have to arise because Delphi Corporation or DAS LLC arranged for the disposal of hazardous substances or transported hazardous substances for disposal at the Site.  However, such liability is impossible because the landfill at the Site ceased accepting wastes for disposal and stopped operations in 1998, at which point neither Delphi Corporation nor DAS LLC held any assets or conducted any operations.  <u>See</u> <u>In re Mercury Refining Superfund Site</u>, Administrative Order on Consent, EPA Docket No. CERCLA-02-2006-2003 at ¶ 6, attached hereto as <u>Exhibit A</u>.[1]  Both Delphi Corporation and DAS LLC were formed as part of the

---

[1]    This Court may take judicial notice of the corporate documents included as exhibits to this brief.  Judicial notice is permitted for facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned."  Fed.R.Evid. 201.  Under this standard, courts may take judicial notice of the
*(cont'd)*

divestiture by General Motors Corporation ("General Motors") of its Delphi Automotive

Systems unit (the "Divestiture").  Specifically, General Motors formed DAS LLC and

incorporated Delphi Automotive Systems Corporation on September 16, 1998.  <u>See</u> Certificate of

Formation of Delphi Automotive Systems, attached hereto as <u>Exhibit B</u>; Certificate of

Incorporation of Delphi Automotive Systems Corporation, attached hereto as <u>Exhibit C</u>.  Delphi

Automotive Systems Corporation later changed its name to Delphi Corporation.  <u>See</u> Certificate

of Ownership and Merger, attached hereto as <u>Exhibit D</u>.  General Motors then transferred the

assets that had previously been a part of its Delphi Automotive Systems unit to these newly

formed entities to effectuate the Divestiture.  <u>See</u> Master Separation Agreement Among General

Motors Corporation, Delphi Automotive Systems Corporation, Delphi Automotive Systems,

LLC, Delphi Technologies, Inc. and Delphi Automotive Systems (Holding), Inc., at Recitals, §

2.01,  attached hereto as <u>Exhibit E</u> (the "Master Separation Agreement").

       22.    The Master Separation Agreement contemplated that General Motors and

Delphi Corporation would enter into certain ancillary agreements to further effect the Divestiture.

<u>Id</u>. at Art. 3.  One such agreement was the Environmental Matters Agreement by and between

General Motors Corporation and Delphi Automotive Systems Corporation (the "EMA"), which

addressed the assumption and retention of environmental liabilities between General Motors and

---

*(cont'd from previous page)*

    "records of various public or quasi-public bodies."  <u>In re Enron Corp.</u>, 323 B.R. 857, 869 (Bankr. S.D.N.Y.
2005).  First, the Administrative Order on Consent attached as <u>Exhibit A</u> is from an administrative proceeding
and therefore is appropriate for judicial notice.  Furthermore, the Certificate of Formation, Articles of
Incorporation and Certificate of Ownership attached as <u>Exhibits B-D</u> are from the Secretary of the State of
Delaware and therefore clearly meet this standard.  Furthermore, the Master Separation Agreement, attached
hereto as <u>Exhibit E</u>, and the Environmental Matters Agreement, attached hereto as <u>Exhibit F</u>, are from filings
with Securities and Exchange Commission, which have been recognized as matters of which a court may take
judicial notice.  <u>Id</u>.; <u>see also</u> <u>Kramer v. Time Warner, Inc.</u>, 937 F.2d 767, 774 (2d Cir. 1991) ("[A] district court
may take judicial notice of the contents of relevant public disclosure documents required to be filed with the
SEC as facts 'capable of accurate and ready determination by resort to sources whose accuracy cannot
reasonably be questioned.'")

Delphi.  See EMA attached hereto as Exhibit F.  The EMA was the sole agreement governing the

assumption of environmental liabilities under the Divestiture.  See Master Separation Agreement

at § 3(b) ("to the extent that any Ancillary Agreement expressly addresses any matters addressed

by this Agreement, including without limitation, matters covered by Article 2 and Article 5

hereof [assumption of liabilities], the terms and conditions of such Ancillary Agreement shall

govern the rights and obligations of the parties with respect to such matters."); see also Master

Separation Agreement at § 2.03(a) ("To the extent that the transfer of any Delphi Asset or the

assumption of any Delphi Liability is expressly provided for by the terms of an Ancillary

Agreement, the terms of such Ancillary Agreement shall determine the method of the transfer or

the assumption.").  As part of the Modified Plan, the EMA was terminated, and therefore the

EMA cannot be used to support an argument that DAS LLC or Delphi Corporation assumed any

environmental liabilities arising from General Motors' operation of the Delphi Automotive

Systems unit prior to the Divestiture, including any liabilities at the Site.  See Modified Plan at

Exhibit 7.7, § 9.19.1(C); see also Nat'l Labor Relations Bd. v. Cone Mills Corp., 373 F.2d 595,

598 (5th Cir. 1967) ("It is axiomatic in contract law that parties to an agreement are relieved of

their mutual obligations upon termination of the agreement. Restatement, Contracts § 386.").

Accordingly, any liability for wastes that were sent to the Site for disposal from any assets

related to General Motors' Delphi Automotive business unit would be General Motors' liabilities,

not the Reorganized Debtors.

         23.    Disallowance Pursuant To Section 502(e)(1)(B) Of The Bankruptcy Code.

In addition, the Reorganized Debtors request that this Court enter an order disallowing and

expunging the Mercury Refining Site Claims pursuant to section 502(e)(1)(B) of the Bankruptcy

Code.  Section 502(e)(1)(B) of the Bankruptcy Code provides that a bankruptcy court is to

disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on

or has secured the claim of a creditor to the extent that "such claim for reimbursement or

contribution is contingent as of the time of allowance or disallowance of such claim for

reimbursement or contribution."  11 U.S.C. § 502(e)(1)(B).  See, e.g., Aetna Cas. & Sur. Co. v.

Georgia Tubing Corp., 93 F.3d 56 (2d Cir. 1996) (disallowing surety bond issuer's contingent

prospective subrogation claims as to bonds issued on behalf of debtor); In re Agway, Inc., No.

02-65872, 2008 WL 2827439, at *3  (Bankr. N.D.N.Y. July 18, 2008) (section 502(e)(1)(B)

directs that the court "shall disallow" any claim for reimbursement or contribution to the extent

that such claim is contingent at the time of disallowance).  Section 502(e)(1)(B) of the

Bankruptcy Code has been applied to claims for environmental cleanup costs brought by private

parties who are themselves liable under CERCLA.  See In re Charter Co., 862 F.2d 1500 (11th

Cir. 1989) (claims by PRPs to recover environmental cleanup costs arising under theories of

contribution, reimbursement and indemnification disallowed under section 502(e)(1)(B)); In re

Hexcel, 174 B.R. 807, 813 (Bankr. N.D. Cal. 1994) (disallowing claims for environmental

cleanup costs by co-liable parties).

       24.    As set forth in both the Heraeus Response and Milliken Response, the

liability of the Reorganized Debtors is contingent upon the claimants themselves being held

liable for contamination at the Site.  See Heraeus Response at ¶ 5; Milliken Response at ¶  3.

Accordingly, even if the Reorganized Debtors were liable at the Site under CERCLA, the

Mercury Refining Site Claims should be disallowed and expunged in their entirety pursuant to

under section 502(e)(1)(B) of the Bankruptcy Code.

       25.    Neither Heraeus nor Milliken has proved any set of facts that support a

right to payment from the Reorganized Debtors.  Accordingly, the Reorganized Debtors assert

that (a) those claimants have not met their burden of proof to establish a claim against the

Debtors, (b) the Mercury Refining Site Claims are not entitled to a presumption of prima facie

validity pursuant to Bankruptcy Rule 3001(f), and (c) the Mercury Refining Site Claims fail to

state a claim against the Reorganized Debtors under Bankruptcy Rule 7012.  Because the

claimants asserting the Mercury Refining Site Claims cannot provide facts or law supporting

their claims, the Third Omnibus Claims Objection should be sustained as to each Mercury

Refining Site Claim and each such claim should be disallowed and expunged in its entirety.

WHEREFORE the Reorganized Debtors respectfully request this Court enter an

order (a) sustaining the Reorganized Debtors' objections with respect to the Mercury Refining

Site Claims, (b) disallowing and expunging each Mercury Refining Site Claim in its entirety, and

(c) granting such further and other relief this Court deems just and proper.


Dated:    New York, New York
          March 8, 2010
                                    SKADDEN, ARPS, SLATE, MEAGHER
                                       & FLOM LLP


                                    By:   /s/ John Wm. Butler, Jr.
                                          John Wm. Butler, Jr.
                                          John K. Lyons
                                          Ron E. Meisler
                                    155 North Wacker Drive
                                    Chicago, Illinois 60606

                                          - and -


                                    By:   /s/ Kayalyn A. Marafioti
                                          Kayalyn A. Marafioti
                                    Four Times Square
                                    New York, New York 10036

                                    Attorneys for DPH Holdings Corp., et al.,
                                       Reorganized Debtors


12

**EXHIBIT A**

**In re Mercury Refining Superfund Site, Administrative Order on Consent,**
**EPA Docket No. CERCLA-02-2006-2003**

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION II

```
-------------------------------------------------------------x
                                          )
IN THE MATTER OF:                         )      U.S. EPA Docket No.
                                          )      CERCLA-02-2006-2003
MERCURY REFINING SUPERFUND SITE )
Towns of Guilderland and Colonie, New York  )    ADMINISTRATIVE ORDER
                                          )      ON CONSENT
Proceeding under Section 122(g)(4)          )
of the Comprehensive Environmental        )
Response, Compensation, and               )
Liability Act of 1980, as amended,        )
42 U.S.C. 9622(g)(4).                      )
                                          )
-------------------------------------------------------------x
```

## I. **JURISDICTION**

1.  This Administrative Order on Consent ("Consent Order" or "Order") is issued pursuant to the authority vested in the President of the United States by Section 122(g)(4) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9622(g)(4), to reach settlements in actions under Section 106 or 107 of CERCLA, 42 U.S.C. §§ 9606 or 9607.  The authority vested in the President has been delegated to the Administrator of the United States Environmental Protection Agency ("EPA") by Executive Order 12580, 52 Fed. Reg. 2923 (Jan. 29, 1987).  This authority was further delegated to the EPA Regional Administrators by EPA Delegation Nos. 14-14-C and 14-14-D and redelegated within Region II to the Director of the Emergency and Remedial Response Division by Regional order No. R-1200, dated November 23, 2004.

2.  This Administrative Order on Consent is issued to the persons, corporations, or other entities identified in Appendix A ("Respondents").  Each Respondent agrees to undertake all actions required by this Consent Order.  Each Respondent further consents to and will not contest EPA's jurisdiction to issue this Consent Order or to implement or enforce its terms.

3.  EPA and Respondents agree that the actions undertaken by Respondents in accordance with this Consent Order do not constitute an admission of any liability by any Respondent.  Respondents do not admit, and retain the right to controvert in any subsequent proceedings other than proceedings to implement or enforce this Consent Order, the validity of the Statement of Facts or Determinations contained in Sections IV and V, respectively, of this Consent Order.

2

## II. **STATEMENT OF PURPOSE**

4.  By entering into this Consent Order, the mutual objectives of the Parties are:

a.  to reach a final settlement among the Parties with respect to the Site pursuant to Section 122(g) of CERCLA, 42 U.S.C. § 9622(g), that allows Respondents to make a cash payment, including a premium, to resolve their alleged civil liability under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607, for injunctive relief with regard to the Site and for response costs incurred and to be incurred at or in connection with the Site, and the claims of the Respondents which have been or could have been asserted against the United States with respect to this Site, thereby reducing litigation relating to the Site;

b.  to simplify any remaining administrative and judicial enforcement activities concerning the Site by eliminating a substantial number of potentially responsible parties from further involvement at the Site; and

c.  to obtain settlement with Respondents for their fair share of response costs incurred and to be incurred at or in connection with the Site by the EPA Hazardous Substance Superfund, and by other persons, and to provide for full and complete contribution protection for Respondents with regard to the Site pursuant to Sections 113(f)(2) and 122(g)(5) of CERCLA, 42 U.S.C. §§ 9613(f)(2) and 9622(g)(5).

## III. **DEFINITIONS**

5.  Unless otherwise expressly provided herein, terms used in this Consent Order that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in the statute or regulations.  Whenever the terms listed below are used in this Consent Order, the following definitions shall apply:

a.  "CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601, *et seq*.

b.  "Consent Order" or "Order" shall mean this Administrative Order on Consent and all appendices attached hereto.  In the event of conflict between this Order and any appendix, the Order shall control.

c.  "Day" shall mean a calendar day.  In computing any period of time under this Consent Order, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next working day.

d.  "EPA" shall mean the United States Environmental Protection Agency and any successor departments, agencies or instrumentalities.

e.  "EPA Hazardous Substance Superfund" shall mean the Hazardous Substance

3

Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

  f.  "Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a).  The applicable rate of interest shall be the rate in effect at the time the interest accrues.  The rate of interest is subject to change on October 1 of each year.

  g.  "Paragraph" shall mean a portion of this Consent Order identified by an Arabic numeral.

  h.  "Parties" shall mean EPA and the Respondents.

  i.  "Respondents" shall mean those individuals, corporations, or other entities listed in Appendix A.

  j.  "Response costs" shall mean all costs of "response" as that term is defined by Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).

  k.  "Section"  shall mean a portion of this Consent Order identified by a Roman numeral.

  l.  "Site" shall mean the Mercury Refining Superfund Site, which includes the property known as 26 Railroad Avenue located on the border of the Towns of Guilderland and Colonie, Albany County, New York and is generally shown on the map attached as Appendix B.

  m.  "Tracked Waste" shall mean all hazardous substance-containing materials sent or brought to the Site for treatment or disposal, other than batteries.

  n.  "United States" shall mean the United States of America, including its departments, agencies and instrumentalities.

## IV. __STATEMENT OF FACTS__

  6.  The Mercury Refining Site was operated by Mercury Refining Company, Inc. ("Mereco") from the late-1950's until 1998 as a mercury reclamation facility.  During this time, special "retort" ovens were used to heat mercury-bearing materials to recover mercury, which was then further processed and refined on the Site before being sold.  EPA has catalogued over 7,200,000 pounds of material which was sent to the Site for mercury reclamation.

  7.  Mercury, which is a hazardous substance as that term is defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), has been released at or from the Site, and there is a threat of further such releases into the environment.  In the course of Site processing operations, air emissions, discharges of mercury-containing wastes into a storm sewer, dumping of mercury-containing residues from the retort process, other sloppy materials handling, and a fire, caused

4

mercury to be released onto the soils and into groundwater and surface water at the Site.

8.    From 1983, when the Site was placed on the National Priorites List, through November 1999, the lead agency with respect to the planning and implementation of response actions at the Site under the National Contingency Plan, 40 CFR Part 300, was the New York State Department of Environmental Conservation ("NYSDEC").  In November 1999 NYSDEC requested that EPA take over the lead in the remediation of the Site under the Superfund program.

9.    As a result of the release or threatened release of hazardous substances, EPA has undertaken response actions at or in connection with the Site under Section 104 of CERCLA, 42 U.S.C. § 9604, and will undertake response actions in the future.  Such response actions have included the performance of a Remedial Investigation/Feasibility Study and a responsible party search.

10.  In performing these response actions, EPA has incurred  and will continue to incur response costs at or in connection with the Site.  As of February 28, 2005, EPA has incurred and paid approximately $4,050,663.37 in response costs.

11.  In accordance with a 2003 settlement, EPA collected $497,389.80 from Mereco and is currently collecting, pursuant to a payment plan, $30,000 plus Interest, from Leo Cohen, the owner and founder of Mereco.  This settlement was based on Mereco's and Leo Cohen's ability to pay.

12.  Each Respondent arranged for disposal or treatment at the Site, or arranged with a transporter for transport for disposal or treatment at the Site, of a hazardous substance owned or possessed by such Respondent.

13.  The amount of Tracked Waste contributed to the Site by each Respondent is less than 1.0% of the total amount of Tracked Waste contributed to the Site by persons or entities whom EPA has been  able to locate.  In addition, the amount of hazardous substances contributed to the Site by each Respondent is less than 1% of the total amount of hazardous substances at the Site. The hazardous substances contributed by each Respondent to the Site are not significantly more toxic or of significantly greater hazardous effect than other hazardous substances at the Site.  The amount of  Tracked Waste contributed to the Site by each Respondent is listed on Appendix C.

14.  EPA estimates that the total response costs incurred and to be incurred at or in connection with the Site by the EPA Hazardous Substance Superfund and by other persons is between approximately $7,600,000 and $12,600,000.  The payment required to be made by each Respondent pursuant to this Consent Order is a minor portion of this total amount.

## V.  DETERMINATIONS

15.  Based upon the Statement of Facts set forth above and on the administrative record for this Site, EPA has determined that:

a.  The Mercury Refining Superfund Site is a "facility" as that term is defined in

5

Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

      b.  Each Respondent is a "person" as that term is defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

      c.  Each Respondent is a "potentially responsible party" within the meaning of Section 122(g)(1) of CERCLA, 42 U.S.C. § 9622(g)(1).

      d.  There has been an actual or threatened "release" of a "hazardous substance" from the Site as those terms are defined in Section 101(22) and (14) of CERCLA, 42 U.S.C. § 9601(22) and (14).

      e.  The actual or threatened "release" caused the incurrence of response costs.

      f.  Prompt settlement with each Respondent is practicable and in the public interest within the meaning of Section 122(g)(1) of CERCLA, 42 U.S.C. § 9622(g)(1).

      g.  As to each Respondent, this Consent Order involves only a minor portion of the response costs at the Site within the meaning of Section 122(g)(1) of CERCLA, 42 U.S.C. § 9622(g)(1).

      h.  The amount of hazardous substances contributed to the Site by each Respondent and the toxic or other hazardous effects of the hazardous substances contributed to the Site by each Respondent are minimal in comparison to other hazardous substances at the Site within the meaning of Section 122(g)(1)(A) of CERCLA, 42 U.S.C. § 9622(g)(1)(A).

## VI.  ORDER

    16.  Based upon the administrative record for the Site and the Statement of Facts and Determinations set forth above, and in consideration of the promises and covenants set forth herein, the following is hereby AGREED TO AND ORDERED:

## VII.  PAYMENT

    17.  Within 30 days after the effective date of this Consent Order, each Respondent shall pay to the EPA Hazardous Substance Superfund the amount set forth for such Respondent in Appendix C to this Consent Order.

    18.  Each Respondent's payment includes an amount for:  a) past response costs incurred at or in connection with the Site;  b) projected future response costs to be incurred at or in connection with the Site; and c) a premium to cover the risks and uncertainties associated with this settlement, including but not limited to, the risk that total response costs incurred or to be incurred at or in connection with the Site by the EPA Hazardous Substance Superfund, or by any other person, will exceed the estimated total response costs upon which Respondents' payments are based.

6

19.  Each payment shall be made by certified or cashier's check made payable to "EPA Hazardous Substance Superfund."  Each check, or a letter accompanying each check, shall identify the name and address of the party making payment, the Mercury Refining Superfund Site, EPA Region 2 and Site Spill ID Number 0276, and the EPA docket number for this action, and shall be sent to:

> USEPA - Region II
> Hazardous Substance Superfund
> P.O. Box 360188M
> Pittsburgh, PA 15251

The total amount to be paid by Respondents pursuant to Paragraph 17 shall be deposited by EPA in the Mercury Refining Site Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

20.  At the time of payment, each Respondent shall send notice that such payment has been made to:

> Sharon E. Kivowitz
> Mercury Refining Site Attorney
> Office of Regional Counsel
> U.S. Environmental Protection Agency
> 290 Broadway, 17th Floor
> New York, NY 10007

> and

> Financial Management Officer
> U.S. EPA, Region II
> 290 Broadway, 29th Floor
> New York, NY 10007-1866

## VIII.  FAILURE TO MAKE PAYMENT

21.  If any Respondent fails to make full payment within the time required by Paragraph 17, that Respondent shall pay Interest on the unpaid balance.  In addition, if any Respondent fails to make full payment as required by Paragraph 17, the United States may, in addition to any other available remedies or sanctions, bring an action against that Respondent seeking injunctive relief to compel payment and/or seeking civil penalties under Section 122(i) of CERCLA, 42 U.S.C. § 9622(i), for failure to make timely payment.

7

## IX.  CERTIFICATION OF RESPONDENT

22.  By signing this Consent Order, each Respondent certifies, individually, that, to the best of its knowledge and belief, it:

a.  has conducted a thorough, comprehensive, good faith search for documents, and has fully and accurately disclosed to EPA, all information currently in its possession, or in the possession of its officers, directors, employees, contractors or agents, which relates in any way to the ownership, operation, or control of the Site, or to the ownership, possession, generation, treatment, transportation, storage or disposal of a hazardous substance, pollutant, or contaminant at or in connection with the Site;

b.  has not altered, mutilated, discarded, destroyed or otherwise disposed of any records, documents, or other information relating to its potential liability regarding the Site after notification of potential liability or the filing of a suit against it regarding the Site; and

c.  has and will comply fully with any and all EPA requests for information regarding the Site pursuant to Sections 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e).

## X.  COVENANT NOT TO SUE BY UNITED STATES

23.  In consideration of the payments that will be made by Respondents under the terms of this Consent Order, and except as specifically provided in Section XI (Reservations of Rights by United States), the United States covenants not to sue or take administrative action against any of the Respondents pursuant to Sections 106 or 107 of CERCLA, 42 U.S.C. §§ 9606 or 9607, relating to the Site.  With respect to present and future liability, this covenant not to sue shall take effect for each Respondent upon receipt of that Respondent's payment as required by Section VII.  With respect to each Respondent, individually, this covenant not to sue is conditioned upon:  a) the satisfactory performance by Respondent of all obligations under this Consent Order; and b) the veracity of the information provided to EPA by Respondent relating to Respondent's involvement with the Site.  This covenant not to sue extends only to Respondents and does not extend to any other person.

## XI.  RESERVATIONS OF RIGHTS BY UNITED STATES

24.  The United States reserves, and this Consent Order is without prejudice to, all rights against Respondents with respect to all matters not expressly included within the Covenant Not to Sue by United States in Paragraph 23.  Notwithstanding any other provision of this Consent Order, the United States reserves all rights against Respondents with respect to:

a.  liability for failure to meet a requirement of this Consent Order;

8

b.  criminal liability;

c.  liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments; or

d.  liability based upon the ownership or operation of the Site, or upon the transportation, treatment, storage, or disposal, or the arrangement for the transportation, treatment, storage, or disposal of a hazardous substance or a solid waste at or in connection with the Site, after signature of this Consent Order by Respondent.

25.  Notwithstanding any other provision in this Consent Order, the United States reserves, and this Consent Order is without prejudice to, the right to institute judicial or administrative proceedings against any individual Respondent seeking to compel that Respondent to perform response actions relating to the Site, and/or to reimburse the United States for additional costs of response, if information is discovered which indicates that such Respondent contributed hazardous substances to the Site in such greater amount or of such greater toxic or other hazardous effects that such Respondent no longer qualifies as a *de minimis* party at the Site because such Respondent contributed 1.0% or more  of the total amount of Tracked Waste contributed to the Site by individuals, corporations or other entities whom EPA has been able to locate, or because such Respondent contributed hazardous substances which are significantly more toxic or are of significantly greater hazardous effect than other hazardous substances at the Site.

## XII.  COVENANT NOT TO SUE BY RESPONDENTS

26.  Respondents covenant not to sue and agree not to assert any claims or causes of action against the United States or its contractors or employees with respect to the Site or this Consent Order including, but not limited to:

a.  any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund based on Sections 106(b)(2), 107, 111, 112, or 113 of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other provision of law;

b.  any claim arising out of response actions at or in connection with the Site, including any claim under the United States Constitution, the Constitution of the State of New York, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, as amended, or at common law; and

c.  any claim against the United States pursuant to Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and 9613, relating to the Site.

Except as provided in Paragraph 28 (Waiver of Claims) and Paragraph 30 (Waiver of Claim-Splitting Defenses), these covenants not to sue shall not apply in the event the United States brings a cause of action or issues an order pursuant to the reservations set forth in  Paragraph 24 (c) or (d) or Paragraph 25, but only to the extent that Respondents' claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the

9

applicable reservation.

27.  Nothing in this Consent Order shall be deemed to constitute preauthorization or approval of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. 300.700(d).

28.  Respondents agree not to assert any claims or causes of action (including claims for contribution under CERCLA) that they may have for all matters relating to the Site against each other or any other person who is a potentially responsible party under CERCLA at the Site.  This waiver shall not apply with respect to any defense, claim, or cause of action that a Respondent may have against any person if such person asserts or has asserted a claim or cause of action relating to the Site against such Respondent.

## XIII.  EFFECT OF SETTLEMENT/CONTRIBUTION PROTECTION

29.  Except as provided in Paragraph 28 (Waiver of Claims), nothing in this Consent Order shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Consent Order.  Except as provided in Paragraph 28 (Waiver of Claims), the United States and Respondents each reserve any and all rights (including, but not limited to, any right to contribution), defenses, claims, demands, and causes of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto.

30.  In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, recovery of response costs, or other relief  relating to the Site, Respondents shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised in the subsequent proceeding were or should have been brought in the instant action; provided, however, that nothing in this Paragraph affects the enforceability of the covenant not to sue included in Paragraph 23.

31.  The Parties agree that each Respondent is entitled, as of the effective date of this Consent Order, to protection from contribution actions or claims as provided by Sections 113(f)(2) and 122(g)(5) of CERCLA, 42 U.S.C. §§ 9613(f)(2) and 9622(g)(5), for "matters addressed" in this Consent Order.  The "matters addressed" in this Consent Order are all response actions taken or to be taken and all response costs incurred or to be incurred, at or in connection with the Site, by the United States or any other person.  As to each Respondent, the "matters addressed" in this Consent Order do not include those response costs or response actions as to which the United States has reserved its rights under this Consent Order (except for claims for failure to comply with this Consent Order), in the event that the United States asserts rights against such Respondent coming within the scope of such reservations.

## XIV.  PARTIES BOUND

10

32.  This Consent Order shall apply to and be binding upon EPA and upon Respondents and their heirs, successors and assigns.  Any change in ownership or corporate or other legal status of a Respondent, including but not limited to, any transfer of assets or real or personal property, shall in no way alter such Respondent's responsibilities under this Consent Order.  Each signatory to this Consent Order certifies that he or she is authorized to enter into the terms and conditions of this Consent Order and to execute and bind legally the party represented by him or her.

## XV.  INTEGRATION/APPENDICES

33.  This Consent Order and its appendices constitute the final, complete and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Order.  The Parties acknowledge that there are no representations, agreements or understandings relating to the settlement other than those expressly contained in this Consent Order. The following appendices are attached to and incorporated into this Consent Order:

"Appendix A" is the list of Respondents and addresses.

"Appendix B" is the map of the Site.

"Appendix C" is the list of Respondents and payment amounts.

## XVI.  PUBLIC COMMENT

34.  This Consent Order shall be subject to a public comment period of not less than 30 days pursuant to Section 122(i) of CERCLA, 42 U.S.C. § 9622(i).  In accordance with Section 122(i)(3) of CERCLA, 42 U.S.C. § 9622(i)(3), EPA may withdraw or withhold its consent to this Consent Order if comments received disclose facts or considerations which indicate that this Consent Order is inappropriate, improper, or inadequate.

## XVII.  ATTORNEY GENERAL APPROVAL

35.  This Order is subject to the approval of  the Attorney General or his designee in accordance with Section 122(g)(4) of CERCLA, 42 U.S.C. § 9622(g)(4).

## XVIII.  EFFECTIVE DATE

36.  The effective date of this Consent Order shall be the date upon which EPA issues written notice to Respondents that the public comment period pursuant to Paragraph 34 has closed and that comments received, if any, do not require modification of or EPA withdrawal from this Consent Order.

IT IS SO AGREED AND ORDERED:

11

U.S. Environmental Protection Agency


By: _____          _____
    George Pavlou, Director                                   Date
    Emergency and Remedial Response Division
    Region II

12

THE UNDERSIGNED RESPONDENT enters into this Consent Order in the matter of EPA Docket # CERCLA-02-2006-2003, relating to the Mercury Refining Superfund Site, Towns of Guilderland and Colonie, Albany County, New York:

FOR RESPONDENT: _____
                              Company Name

                 _____
                              Company Address

By: _____
              Printed Name

_____
              Title

_____          _____
              Signature                                    Date

**APPENDIX A**

**APPENDIX  B**

**APPENDIX C**

**EXHIBIT B**

**Certificate of Formation of Delphi Automotive Systems**

# Delaware

PAGE 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "DPH-DAS LLC" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF FORMATION, FILED THE SIXTEENTH DAY OF SEPTEMBER, A.D. 1998, AT 10:01 O'CLOCK A.M.

CERTIFICATE OF MERGER, FILED THE THIRTIETH DAY OF SEPTEMBER, A.D. 2005, AT 1:16 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF MERGER IS THE THIRTIETH DAY OF SEPTEMBER, A.D. 2005, AT 11:59 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, CHANGING ITS NAME FROM "DELPHI AUTOMOTIVE SYSTEMS LLC" TO "DPH-DAS LLC", FILED THE SIXTH DAY OF OCTOBER, A.D. 2009, AT 12:38 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF AMENDMENT IS THE SIXTH DAY OF OCTOBER, A.D. 2009, AT 11:59 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE

Jeffrey W. Bullock, Secretary of State

2944910   8100H

100002839

AUTHENTICATION: 7734966

DATE: 01-04-10



*PAGE  2*

*The First State*

*AFORESAID LIMITED LIABILITY COMPANY, "DPH-DAS LLC".*

*2944910   8100H*

*100002839*

Jeffrey W. Bullock, Secretary of State

*AUTHENTICATION:  7734966*

*DATE:  01-04-10*

# CERTIFICATE OF FORMATION

## OF

## DELPHI AUTOMOTIVE SYSTEMS LLC

This Certificate of Formation of Delphi Automotive Systems LLC has been duly executed and is being filed by the undersigned, as an authorized person, to form a limited liability company under the Delaware Limited Liability Act (6 Del. C. § 18-101. et. seq.).

1.    The name of the limited liability company is Delphi Automotive Systems LLC (the "LLC")

2.    The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

3.    The name and address of the registered agent for service of process on the LLC in the State of Delaware is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation of Delphi Automotive Systems LLC this 16th day of September, 1998

By: _____
Name:    Martin I. Darvick
Its:    Authorized Person

*STATE OF DELAWARE*
*SECRETARY OF STATE*
*DIVISION OF CORPORATIONS*
*FILED 10:01 AM 09/16/1998*
*981358883 – 2944910*

**EXHIBIT C**

**Certificate of Incorporation of Delphi Automotive Systems Corporation**

# Delaware

*PAGE 1*

### *The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "DELPHI CORPORATION" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF INCORPORATION, FILED THE SIXTEENTH DAY OF SEPTEMBER, A.D. 1998, AT 10 O'CLOCK A.M.

RESTATED CERTIFICATE, FILED THE TWENTY-SIXTH DAY OF JANUARY, A.D. 1999, AT 4:30 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE SECOND DAY OF FEBRUARY, A.D. 1999, AT 7:30 O'CLOCK A.M.

CERTIFICATE OF OWNERSHIP, CHANGING ITS NAME FROM "DELPHI AUTOMOTIVE SYSTEMS CORPORATION" TO "DELPHI CORPORATION", FILED THE THIRTEENTH DAY OF MARCH, A.D. 2002, AT 3 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID CORPORATION, "DELPHI CORPORATION".

*2944832   8100H*

*090138516*

Jeffrey W. Bullock, Secretary of State

*AUTHENTICATION: 7135321*

*DATE: 02-13-09*

CERTIFICATE OF INCORPORATION
OF
DELPHI AUTOMOTIVE SYSTEMS CORPORATION

1.  The name of the corporation is Delphi Automotive Systems Corporation

2.  The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. the name of its registered agent at such address is The Corporation Trust Company.

3.  The nature of the business or purposes to be conducted or promoted to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

4.  The total number of shares of stock which the corporation shall have authority to issue is one hundred (100) and the par value of each of such shares is ten cents ($0.10) amounting in the aggregate to ten dollars ($10.00).

5.  The board of directors is authorized to make, alter or repeal the bylaws of the corporation. Election of directors need not be by written ballot.

6.  The name and mailing address of the sole incorporation is:

Barbara A. Lister
General Motors Corporation
3031 West Grand Boulevard
Mail Code 482-208-840
Detroit, Michigan 48232

I, THE UNDERSIGNED, being the incorporator hereinbefore named, for the purpose of forming a corporation pursuant to the General Corporation Law of the State of Delaware, do make this certificate, hereby declaring and certifying that this is my act and deed and the facts herein stated are true, and accordingly have hereunto set my hand this 16th day of September, 1998.

Sole Incorporator

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 10:00 AM 09/16/1998
981358881 - 2944832

**EXHIBIT D**

**Certificate of Ownership and Merger**

# Delaware

*PAGE 1*

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "DELPHI CORPORATION" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF INCORPORATION, FILED THE SIXTEENTH DAY OF SEPTEMBER, A.D. 1998, AT 10 O'CLOCK A.M.

RESTATED CERTIFICATE, FILED THE TWENTY-SIXTH DAY OF JANUARY, A.D. 1999, AT 4:30 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE SECOND DAY OF FEBRUARY, A.D. 1999, AT 7:30 O'CLOCK A.M.

CERTIFICATE OF OWNERSHIP, CHANGING ITS NAME FROM "DELPHI AUTOMOTIVE SYSTEMS CORPORATION" TO "DELPHI CORPORATION", FILED THE THIRTEENTH DAY OF MARCH, A.D. 2002, AT 3 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID CORPORATION, "DELPHI CORPORATION".

2944832    8100H

090138516

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 7135321

DATE: 02-13-09

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 03:00 PM 03/13/2002
020167948 – 2944832

# CERTIFICATE OF OWNERSHIP AND MERGER

## MERGING

## DELPHI CORPORATION

## INTO

## DELPHI AUTOMOTIVE SYSTEMS CORPORATION

\* \* \* \* \* \* \*

Delphi Automotive Systems Corporation (the "Company"), a corporation organized and existing under the laws of Delaware,

DOES HEREBY CERTIFY:

FIRST: That the Company was incorporated on the 16th day of September, 1998, pursuant to Section 102 of the General Corporation Law of the State of Delaware.

SECOND: That the Company owns all of the outstanding shares of the stock of Delphi Corporation, a corporation incorporated on the 10th day of January, 2002, pursuant to Section 102 of the General Corporation Law of the State of Delaware.

THIRD: That the Company, by the following resolutions of its Board of Directors, duly adopted at a meeting held on the 13th day of March, 2002, determined to and did merge into itself said Delphi Corporation:

WHEREAS, the Board of Directors of Delphi Automotive Systems Corporation, a Delaware corporation (the "Company"), deems it to be advisable and in the best interests of the Company for the Company's name to be changed to "Delphi Corporation" through the merger of Delphi Corporation, a Delaware corporation and wholly-owned subsidiary of the Company ("Merger Sub"), with and into the Company pursuant to Section 253 of the Delaware General Corporation Law, as amended (the "DGCL");

NOW, THEREFORE, be it

RESOLVED, that effective upon the filing of a Certificate of Ownership and Merger with the Secretary of State of Delaware, Merger Sub shall be merged with and into the Company in accordance with Section 253 of the DGCL, with the Company being the surviving corporation (the "Merger");

FURTHER RESOLVED, that by virtue of the Merger and without any action on the part of the holders thereof, each outstanding share of capital stock of the Company (of any class or series) shall remain outstanding, in all respects remaining unaffected, and each outstanding share of capital stock of Merger Sub shall be canceled. Holders of outstanding shares of capital stock of the Company or Merger Sub shall not receive any form of consideration as a result of the Merger;

FURTHER RESOLVED, that pursuant to, and at the effective time of, the Merger, Article I of the Amended and Restated Certificate of Incorporation of the Company shall be amended to read in its entirety as follows:

"The name of the corporation (hereinafter referred to as the 'Corporation') is Delphi Corporation."

FURTHER RESOLVED, that the officers of the Company be, and each of them hereby is, authorized to execute a Certificate of Ownership and Merger setting forth a copy of these resolutions, to cause it to be filed with the Secretary of State of Delaware and to do all acts and things, whether within or without the state of Delaware, which may be necessary or advisable to effect the Merger and the name change.

FOURTH: Anything herein or elsewhere to the contrary notwithstanding, this merger may be amended or terminated and abandoned by the Board of Directors of Delphi Automotive Systems Corporation at any time prior to the time that this merger filed with the Secretary of State becomes effective.

IN WITNESS WHEREOF, said Delphi Automotive Systems Corporation has caused this Certificate to be signed by Diane L. Kaye, its Secretary, this 13th day of March, 2002.

DELPHI AUTOMOTIVE SYSTEMS CORPORATION

By: _____
Diane L. Kaye, Secretary

**EXHIBIT E**

**Master Separation Agreement**

1

EXHIBIT 10.1

EXECUTION COPY

MASTER SEPARATION AGREEMENT

dated as of

December 22, 1998

among

GENERAL MOTORS CORPORATION,

DELPHI AUTOMOTIVE SYSTEMS CORPORATION,

DELPHI AUTOMOTIVE SYSTEMS LLC,

DELPHI TECHNOLOGIES, INC.

and

DELPHI AUTOMOTIVE SYSTEMS (HOLDING), INC.

2

TABLE OF CONTENTS

-----------------------------

ARTICLE 1
Definitions

Section 1.01    Defined Terms...............................................2

ARTICLE 2
Contribution and Assumption

Section 2.01    Contribution of Assets......................................6
Section 2.02    Assumption of Liabilities...................................7
Section 2.03    Methods of  Transfer and Assumption.........................7
Section 2.04    Nonassignable Contracts.....................................8
Section 2.05    Transition Services.........................................8

ARTICLE 3
Ancillary Agreements

Section 3.01    General....................................................10
Section 3.02    Priority...................................................10
Section 3.03    Extensions of Transition Services..........................10

ARTICLE 4
Covenants

Section 4.01    IPO and Distribution Agreement.............................10
Section 4.02    Registration Rights Agreement..............................10
Section 4.03    Delayed Asset Transfers....................................10

ARTICLE 5
Indemnification

Section 5.01    Indemnification by Delphi..................................11
Section 5.02    Indemnification Procedures.................................11
Section 5.03    Certain Limitations........................................12

ARTICLE 6
Access to Information

Section 6.01    Restrictions on Disclosure of Information..................13
Section 6.02    Legally Required Disclosure of Confidential Information....13
Section 6.03    Access to Information......................................13
Section 6.04    Record Retention...........................................14
Section 6.05    Production of Witnesses....................................16
Section 6.06    Reimbursement..............................................16

i

3

ARTICLE 7
Certain Claims and Litigation

Section 7.01    Product Liability Claims....................................16
Section 7.02    General Litigation.........................................17
Section 7.03    Employment Related Claims..................................18
Section 7.04    Cooperation................................................18

ARTICLE 8
Insurance Matters

Section 8.01    Delphi Insurance Coverage During the Transition Period.....19
Section 8.02    Delphi Insurance Coverage After the Transition Period......20

ARTICLE 9
Miscellaneous

Section 9.01    Entire Agreement..........................................20
Section 9.02    Governing Law.............................................20
Section 9.03    Descriptive Headings......................................20
Section 9.04    Notices...................................................20
Section 9.05    Parties In Interest.......................................21
Section 9.06    Counterparts..............................................21
Section 9.07    Binding Effect; Assignment................................21
Section 9.08    Dispute Resolution........................................21
Section 9.09    Severability..............................................22
Section 9.10    Failure or Indulgence Not Waiver; Remedies Cumulative......22
Section 9.11    Amendment.................................................22
Section 9.12    Authority.................................................22
Section 9.13    Interpretation............................................22

Schedule A    Ancillary Agreements
Schedule B    Delphi Financial Statements
Schedule C    Facilities to be Transferred
Schedule D    Covenants Not to Compete
Schedule E    Domestic Ownership Interest Transfers
Schedule F    International Ownership Interest Transfers
Schedule G    Extension of Eligibility in the GM Vehicle Purchase Program -
              Used Vehicle Program
Schedule H    Extension of Eligibility in the GM New Vehicle Purchase
              Program
Schedule I    Certain Agreements with Respect to Divested Businesses
Schedule J    Entities in Liquidation by 12/31/98 to be Retained by GM
Schedule K    General Litigation Claims to be Transferred to Delphi
Schedule L    General Litigation Claims to be Defended by GM at Delphi's
              Expense
Schedule M    Delphi Related General Litigation Claims for which GM will
              Retain Liability
Schedule N    Employment Related Claims to be Transferred to Delphi
Schedule O    Employment Related Claims to be Jointly Defended by GM and
              Delphi
Schedule P    Entities Included in Delphi Financial Statements which are to
              be retained by GM after 1/1/99

ii

4

# MASTER SEPARATION AGREEMENT

This Master Separation Agreement ("Agreement") is entered into on December 22, 1998 among General Motors Corporation, a Delaware corporation ("GM"), Delphi Automotive Systems Corporation, a Delaware corporation ("Delphi"), Delphi Automotive Systems LLC, a Delaware limited liability company and, on the date hereof, a wholly owned subsidiary of GM ("DAS LLC"), Delphi Technologies, Inc., a Delaware corporation and, on the date hereof, a wholly owned subsidiary of GM ("DTI", and together with DAS LLC, the "Delphi U.S. Subsidiaries") and Delphi Automotive Systems (Holding), Inc., a Delaware corporation and, on the date hereof, a wholly owned subsidiary of GM ("Delphi International Subsidiary"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article 1 hereof.

## RECITALS

WHEREAS, the Board of Directors of GM has determined that it would be appropriate and desirable to completely separate the Delphi Automotive Systems Business from GM;

WHEREAS, GM has caused Delphi to be incorporated in order to effect such separation, GM currently owns all of the issued and outstanding common stock of Delphi, and Delphi currently conducts no business operations and has no significant assets or liabilities;

WHEREAS, the Boards of Directors of GM and Delphi have each determined that it would be appropriate and desirable for GM to contribute and transfer to Delphi, and for Delphi to receive and assume, directly or indirectly, substantially all of the assets and liabilities currently associated with the Delphi Automotive Systems Business, including those assets and liabilities currently held directly by GM in divisional form and the stock or similar interests currently held by GM in subsidiaries and other entities that conduct such business;

WHEREAS, GM and Delphi intend that the contribution and assumption of assets and liabilities will qualify as a tax-free reorganization under Section 368(a)(1)(D) of the Code;

WHEREAS, GM and Delphi currently contemplate that, following the contribution and assumption of assets and liabilities, Delphi will make an initial public offering of an amount of its common stock that will reduce GM's ownership of Delphi to not less than 80%;

WHEREAS, GM currently contemplates that, several months following such initial public offering, GM will distribute to the holders of its common stock, $1-2/3 par value, by means of an exchange offer and/or a pro rata distribution, all of the shares of Delphi common stock owned by GM (the "Distribution");

WHEREAS, GM and Delphi intend that the Distribution will be tax-free to GM and its stockholders under the Code; and

WHEREAS, the parties intend in this Agreement, including the Exhibits and Schedules hereto, to set forth the principal arrangements between them regarding the separation of the Delphi Automotive Systems Business from GM.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth below, the parties hereto agree as follows:

5

ARTICLE 1

DEFINITIONS

SECTION 1.01. Defined Terms. The following terms, as used herein, shall have the following meanings:

"AFFILIATE" of any specified Person means any other Person directly or indirectly Controlling, Controlled by, or under common Control with, such specified Person; provided, however, that for purposes of this Agreement, (i) GM and its subsidiaries (other than Delphi and its subsidiaries) shall not be considered Affiliates of Delphi and (ii) Delphi and its subsidiaries shall not be considered Affiliates of GM.

"AMENDED AND RESTATED TAX ALLOCATION AGREEMENT" means the Amended and Restated Agreement for the Allocation of Federal, United States, State and Local Income Tax, between GM and Delphi, a copy of which is attached hereto as Exhibit L-3.

"ANCILLARY AGREEMENTS" means each of the agreements which are listed on Schedule A hereto and which are attached as Exhibits A-1 through M-5 to this Agreement, including any exhibits, schedules, attachments, tables or other appendices thereto, and each agreement and other instrument contemplated therein.

"ASSETS" means, except for cash and cash equivalents, any and all assets, properties and rights, whether tangible or intangible, whether real, personal or mixed, whether fixed, contingent or otherwise, and wherever located, including, without limitation, the following:

(i)     real property interests (including leases), land, plants, buildings and improvements;

(ii)    machinery, equipment, vehicles (other than GM Product Evaluation Program vehicles), furniture and fixtures, leasehold improvements, supplies, repair parts, tools, plant, laboratory and office equipment and other tangible personal property, including any and all leases with respect thereto, together with any rights or claims arising out of the breach of any express or implied warranty by the manufacturers or sellers of any of such assets or any component part thereof;

(iii)   inventories, including raw materials, work-in-process, finished goods, parts and accessories;

(iv)    notes, loans and accounts receivable (whether current or not current), interests as beneficiary under letters of credit, advances and performance and surety bonds;

(v)     banker's acceptances, shares of stock, bonds, debentures, evidences of indebtedness, certificates of interest or participation in profit-sharing agreements, collateral-trust certificates, investment contracts, voting trust certificates, puts, calls, straddles, options, swaps, collars, caps and other securities or hedging arrangements of any kind;

(vi)    financial, accounting and operating data and records including, without limitation, books, records, electronic data, notes, sales and sales promotional data, purchasing materials and data, advertising materials, credit information, cost and pricing information, customer and supplier lists, reference catalogs, payroll and personnel records, facility blueprints and plant layouts, minute books, stock ledgers, stock transfer records and other similar property, rights and information;

(vii)   Intellectual Property;

(viii)  Contracts and all rights therein;

2

6

                (ix)    prepaid expenses, deposits and retentions held by third parties;

                (x)    claims, causes of action, choses in action, rights under insurance policies, rights under express or implied warranties, rights of recovery, rights of set-off, and rights of subrogation;

                (xi)    licenses, franchises, permits, authorizations and approvals; and

                (xii)   goodwill and going concern value.

"BUSINESS DAY" means a day other than a Saturday, a Sunday or a day on which banking institutions located in the State of New York or Michigan are authorized or obligated by law or executive order to close.

"CODE" means the Internal Revenue Code of 1986, as amended from time to time, together with the rules and regulations promulgated thereunder.

"COMMERCIAL TRAVEL SERVICES SUPPLY AGREEMENT" means the Commercial Travel Services Supply Agreement, effective as of the date Contribution Date, between GM and Delphi (or their respective Affiliates), a copy of which is attached hereto as Exhibit J-2.

"COMMISSION" means the Securities and Exchange Commission.

"CONFIDENTIAL INFORMATION" means with respect to any party hereto, (i) any Information concerning such party, its business or any of its Affiliates that was obtained by another party hereto prior to the Contribution Date, (ii) any Information concerning such party that is obtained by another party under Section 6.03, or (iii) any other Information obtained by, or furnished to, another party hereto prior to the Contribution Date, in each case that (a) was marked "Proprietary" or "Company Private" or words of similar import by the party owning such Information, or any Affiliate of such party, or (b) the party owning such Information notified such other party in writing was confidential or secret by the Contribution Date.

"CONSOLIDATED TAX PERIOD" has the meaning set forth in the Amended and Restated Tax Allocation Agreement.

"CONTRACTS" means any contract, agreement, lease, license, sales order, purchase order, instrument or other commitment that is binding on any Person or any part of its property under applicable law.

"CONTRIBUTION DATE" means January 1, 1999.

"CONTROL" means the possession, direct or indirect, of the power to direct or cause the direction of the management of the policies of a Person, whether through the ownership of voting securities, by contract or otherwise. "CONTROLLING" and "CONTROLLED" have the corollary meanings ascribed thereto.

"DELPHI ASSETS" means all of GM's right, title and interest in and to all Assets that (i) (x) are, except as set forth on Schedule P or as otherwise provided herein or in an Ancillary Agreement, reflected in the Delphi Financial Statements and not disposed of by GM after the date thereof and before the Contribution Date (including assets written off or expensed but still used by Delphi which Delphi can demonstrate to GM's reasonable satisfaction were paid for by the Delphi Automotive Systems Sector of GM) or (y) are to be transferred pursuant to Section 2.01(c) of this Agreement (as and when transferred thereunder) or (ii) are acquired by the Delphi Automotive Systems Business after the date of the Delphi Financial Statements and would be reflected in the financial statements of Delphi as of the Contribution Date if such financial statements were prepared using the same accounting principles under which the Delphi Financial Statements were prepared, or (iii) are expressly provided by this Agreement or any Ancillary Agreement to be transferred to Delphi, or (iv) are listed on Schedule C hereto (which sets forth the facilities to be transferred to Delphi) or (v) except as otherwise provided in an Ancillary Agreement or other express agreement of the parties, are used exclusively by the Delphi Automotive Systems Business as of the Contribution

3

7

Date; provided, unless the parties otherwise expressly agree, that if the accounting principles under which the Delphi Financial Statements were prepared would have required any Asset described in the preceding clause (v) to be reflected in the Delphi Financial Statements as of the date thereof, then such Asset shall be included in the "Delphi Assets" only if so reflected.

"DELPHI AUTOMOTIVE SYSTEMS BUSINESS" means the business conducted by the Delphi Automotive Systems Sector of GM at any time on or before the Contribution Date, including (i) all business operations whose financial performance is reflected in the Delphi Financial Statements, (ii) all business operations initiated or acquired by the Delphi Automotive Systems Sector of GM after the date of the Delphi Financial Statements and (iii) all business operations that were conducted at any time in the past by the Delphi Automotive Systems Sector of GM or by any predecessor of such Sector (including, without limitation, the GM Automotive Components Group) but were discontinued or disposed of prior to the date of the Delphi Financial Statements other than by transfer or disposition to any other Sector of GM.

"DELPHI COMMON STOCK" means the Common Stock, $0.01 par value per share, of Delphi.

"DELPHI FINANCIAL STATEMENTS" means the financial statements (including the notes thereto) of Delphi for the period ended September 30, 1998 as set forth in the IPO Registration Statement as amended at the date of this Agreement, a copy of which is set forth on Schedule B attached hereto.

"DELPHI LIABILITIES" means all of the Liabilities of GM that (i) (x) are, except as otherwise set forth on Schedule P or as otherwise provided herein or in an Ancillary Agreement, reflected in the Delphi Financial Statements and remain outstanding at the Contribution Date or (y) are to be transferred pursuant to Section 2.01(c) of this Agreement (as and when transferred thereunder), or (ii) arise in connection with the Delphi Automotive Systems Business after the date of the Delphi Financial Statements and would be reflected in financial statements of Delphi as of the Contribution Date if such financial statements were prepared using the same accounting principles under which the Delphi Financial Statements were prepared, or (iii) are expressly provided by this Agreement or any Ancillary Agreement to be transferred to and assumed by Delphi, or (iv) except as otherwise provided in an Ancillary Agreement or other express agreement of the parties, are related to or arise out of or in connection with the Delphi Assets, or (v) except as otherwise provided in an Ancillary Agreement or other express agreement of the parties, are related to or arise out of or in connection with the Delphi Automotive Systems Business (including but not limited to the covenants not to compete entered into by GM prior to the Contribution Date set forth on Schedule D hereto) whether before or after the date of the Delphi Financial Statements; provided, unless the parties otherwise expressly agree, that if the accounting principles under which the Delphi Financial Statements were prepared would have required any liabilities described in the preceding clause (v) to be reflected in the Delphi Financial Statements as of the date thereof, then such liabilities shall be considered to be "Delphi Liabilities" only if so reflected.

"DETERMINATION" has the meaning set forth in the NITA.

"DISTRIBUTION" has the meaning set forth in the preamble to this Agreement.

"DISTRIBUTION DATE" means the date to be determined by GM in its sole and absolute discretion when the Distribution is completed.

"EMPLOYEE MATTERS AGREEMENT" means the Employee Matters Agreement, effective as of the Contribution Date, between GM and Delphi (or their respective Affiliates), a copy of which is attached hereto as Exhibit B-1.

"FINANCIAL SERVICES SUPPLY AGREEMENT" means the Financial Services Supply Agreement, effective as of the Contribution Date, between GM and Delphi (or their respective Affiliates), a copy of which is attached hereto as Exhibit J-4.

4

8

"FINAL DETERMINATION" has the meaning set forth in the Amended and Restated Tax Allocation Agreement.

"INCOME TAX RETURNS" has the meaning set forth in the Amended and Restated Tax Allocation Agreement.

"INFORMATION" means all records, books, contracts, instruments, computer data and other data.

"INTELLECTUAL PROPERTY" means any and all domestic and foreign patents and patent applications, together with any continuations, continuations-in-part or divisional applications thereof, and all patents issuing thereon (including reissues, renewals and re-examinations of the foregoing); invention disclosures; mask works; copyrights, and copyright applications and registrations; trademarks, servicemarks, trade names, and trade dress, in each case together with any applications and registrations therefor and all appurtenant goodwill relating thereto; trade secrets, commercial and technical information, know-how, proprietary or confidential information, including engineering, production and other designs, notebooks, processes, drawings, specifications, formulae, and technology; computer and electronic data processing programs and software (object and source code), data bases and documentation thereof; inventions (whether patented or not); and all other intellectual property under the laws of any country throughout the world.

"IPO AND DISTRIBUTION AGREEMENT" means the agreement to be entered into between GM and Delphi on or before the IPO Effective Date, the form of which is attached hereto as Exhibit E-1.

"IPO EFFECTIVE DATE" means the date on which the IPO Registration Statement is declared effective by the Commission.

"IPO REGISTRATION STATEMENT" means the registration statement on Form S-1, Registration No. 333-67333 filed by Delphi with the Securities and Exchange Commission in connection with the initial public offering of the Delphi Common Stock, together with all amendments and supplements thereto.

"LIABILITIES" means any and all debts, liabilities, guarantees, assurances, commitments and obligations, whether fixed, contingent or absolute, asserted or unasserted, matured or unmatured, liquidated or unliquidated, accrued or not accrued, known or unknown, due or to become due, whenever or however arising (including, without limitation, whether arising out of any Contract or tort based on negligence or strict liability) and whether or not the same would be required by generally accepted accounting principles to be reflected in financial statements or disclosed in the notes thereto.

"NITA" means the Agreement for the Indemnification of United States Federal, State and Local Non-Income Taxes, between GM and Delphi, a copy of which is attached hereto as Exhibit L-2.

"NON-INCOME TAXES" has the meaning set forth in the NITA.

"PERSON" means an individual, partnership, limited liability company, joint venture, corporation, trust, unincorporated association, any other entity, or a government or any department or agency or other unit thereof.

"PRIOR RELATIONSHIP" means the ownership relationship between GM and Delphi at any time prior to the Contribution Date.

"REGISTRATION RIGHTS AGREEMENT" means the agreement to be entered into between GM and Delphi on or before the IPO Effective Date, the form of which is attached hereto as Exhibit E-2.

"REPRESENTATIVES" means directors, officers, employees, agents, consultants, advisors, accountants, attorneys and representatives.

9

"SUBSIDIARY" means with respect to any specified Person, any corporation, any limited liability company, any partnership or other legal entity of which such Person or any of its Subsidiaries Controls or owns, directly or indirectly, more than 50% of the stock of other equity interest entitled to vote on the election of the members to the board of directors or similar governing body.

"SUPPLY AGREEMENT" means the Component Supply Agreement, effective as of the Contribution Date, between GM and Delphi, a copy of which is attached hereto as Exhibit K-1.

"THIRD-PARTY CLAIM" means any claim, suit, arbitration, inquiry, proceeding or investigation by or before any court, governmental or other regulatory or administrative agency or commission or any arbitration tribunal asserted by a Person other than any party hereto or their respective Affiliates which gives rise to a right of indemnification hereunder.


ARTICLE 2

CONTRIBUTION AND ASSUMPTION

SECTION 2.01. Contribution of Assets.

(a) Except as provided for in Section 2.01(c), on the Contribution Date, GM (i) hereby transfers (or causes its appropriate Subsidiaries and Representatives to transfer) the Delphi Assets in the following order: (A) all intellectual property to be transferred pursuant to the intellectual property agreements attached hereto as Exhibits G-1 through G-5, to DTI (except that all Delco Electronics Corporation intellectual property shall be transferred to DTI after GM has transferred its stock ownership interest in DTI to Delco Electronics Corporation), (B) its stock ownership interest in DTI to Delco Electronics Corporation, (C) its stock ownership interest in Delco Electronics Corporation to DAS LLC and (D) all other Delphi Assets located in the United States, including the ownership interests listed on Schedule E but excluding those listed on Schedule F, to either Delphi or DAS LLC, and (ii) will have transferred or shall transfer as promptly as reasonably practicable (or cause its appropriate Subsidiaries and Representatives to transfer) the Delphi Assets located outside of the United States and the ownership interests of the United States and foreign entities listed on Schedule F owning such Delphi Assets, to either Delphi, the Delphi International Subsidiary, or such other Subsidiary as Delphi may direct. Each of Delphi, the Delphi U.S. Subsidiaries and Delphi International Subsidiary shall receive and accept such Delphi Assets, subject to the terms and conditions of this Agreement. GM further transfers to Delphi on the Contribution Date but after the transfers described in clause (i) above, its membership interest in DAS LLC and its stock ownership interest in the Delphi International Subsidiary, effective as of the Contribution Date. Each of Delphi, the Delphi U.S. Subsidiaries and Delphi International Subsidiary acknowledges and agrees that the foregoing transfers will be made "AS IS WHERE IS" and that neither GM nor any Subsidiary of GM has made or will make any warranty, express or implied, including without limitation any warranty of merchantability or fitness for a particular purpose, with respect to any Delphi Asset.

(b) On the Contribution Date, GM shall contribute to Delphi cash and/or cash equivalents in the aggregate amount of $1 billion. Additionally, GM shall contribute to Delphi such additional amounts as GM and Delphi agree, corresponding to the amounts Delphi will pay to GM (or an Affiliate of GM) in connection with the Canada and Brazil transactions described in Exhibits H-1 and H-2, respectively.

(c) Notwithstanding any other provision of this Agreement, this Agreement shall not transfer or effect the assignment or assumption of any Assets or Liabilities of the Delphi Automotive Systems Business provided for in the agreements constituting Exhibits H-1 through H-110 referred to in Schedule A to this Agreement, except as such Assets and Liabilities shall be transferred and assumed on the dates and in accordance with the terms set forth herein and in such agreements.

6

10

(d) GM and Delphi additionally shall comply with the terms of the letters from GM to Delphi, copies of which are attached hereto as Schedules G and H, which relate to the extension of eligibility for Delphi employees to participate in the GM Vehicle Purchase Programs.

SECTION 2.02.    Assumption of Liabilities.

(a) General. Effective as of the Contribution Date, each of Delphi and/or the Delphi U.S. Subsidiaries, as directed by Delphi, hereby assumes and on a timely basis shall pay, perform, satisfy and discharge in accordance with their terms the Delphi Liabilities relating to the operations of the Delphi Automotive Systems Business in the United States. Delphi International Subsidiary shall, and shall utilize its best efforts to recommend and encourage its respective Subsidiaries and Affiliates to, assume and on a timely basis pay, perform, satisfy and discharge in accordance with their terms, the Delphi Liabilities relating to the operations of the Delphi Automotive Systems Business outside of the United States.

(b) Divested Business. Delphi shall, with respect to the businesses and operations divested by the Delphi Automotive Systems Business, assume all Liabilities of GM related thereto; provided, however, that Delphi shall not assume those Liabilities relating to operations divested by the Delphi Automotive Systems Business to the extent such Liabilities are expressly retained by GM pursuant to the terms of this Agreement or the Ancillary Agreements (including without limitation, the Employee Matters Agreement, the Environmental Matters Agreement and the Real Estate Matters Agreement) and the Liabilities assumed by Delphi shall include, without limitation, the obligation to satisfy all of the obligations of GM under the various agreements pursuant to which the Delphi Automotive Systems Business effected such divestitures (the "Divestiture Agreements"); provided, further, however, that notwithstanding the foregoing or any other provision of this Agreement or any Ancillary Agreement, responsibility for certain obligations relating to certain divestitures shall be allocated between the parties as set forth on Schedule I hereto.

(c) Machinery and Equipment Leases Related to the Delphi Automotive Systems Business. The parties hereto hereby agree that to the extent that GM entered into a lease with a third party dated prior to the Contribution Date pursuant to which GM agreed to lease (i) machinery and/or equipment for use by the Delphi Automotive Systems Business and (ii) machinery and/or equipment for use by GM businesses other than the Delphi Automotive Systems Business, upon identification of any such lease, GM and Delphi will enter into a sublease with terms identical or as similar as possible to such original lease pursuant to which Delphi will sublease from GM that portion of the machinery and/or equipment used by the Delphi Automotive Systems Business covered under such original lease.

(d) Nonrecurring Costs and Expenses. Notwithstanding anything herein to the contrary, any nonrecurring costs and expenses incurred by the parties hereto to effect the transactions contemplated hereby which are not allocated pursuant to the terms of this Agreement or any Ancillary Agreement shall be the responsibility of the party which incurs such costs and expenses.

SECTION 2.03.    Methods of Transfer and Assumption.

(a) The parties shall enter into the Ancillary Agreements, other than the IPO and Distribution Agreement and the Registration Rights Agreement, on or about the date of this Agreement. To the extent that the transfer of any Delphi Asset or the assumption of any Delphi Liability is expressly provided for by the terms of any Ancillary Agreement, the terms of such Ancillary Agreement shall determine the manner of the transfer or assumption. It is the intent of the parties that pursuant to Section 2.01, the transfer and assumption of all other Delphi Assets and Delphi Liabilities shall be made effective as of the Contribution Date, provided, however, that circumstances in various jurisdictions outside the United States may require the transfer of certain Assets and the assumption of certain Liabilities to occur in such other manner and at such other time as the parties shall agree.

(b) The parties intend to complete the transfer of all Delphi Assets and the assumption of all Delphi Liabilities effective on or prior to the Contribution Date but shall, subject to Section 4.03 hereof, and to the extent

7

11

that any such transfers and assumptions are not completed prior to the
Contribution Date, take all actions reasonably necessary or appropriate to
complete such transactions as promptly thereafter as possible. In addition to
those transfers and assumptions accurately identified and designated by the
parties to take place but which the parties are not able to effect prior to the
Contribution Date, there may exist (i) Assets that the parties discover were,
contrary to the agreements between the parties, by mistake or omission,
transferred to Delphi or retained by GM or (ii) Liabilities that the parties
discover were, contrary to the agreements between the parties, by mistake or
omission, assumed by Delphi or not assumed by Delphi. The parties shall, between
the Contribution Date and the earlier of the Distribution Date or six months
from the Contribution Date, cooperate in good faith to effect the transfer or
re-transfer of such Assets, and/or the assumption or re-assumption of such
Liabilities, to or by the appropriate party and shall not use the determination
of remedial actions contemplated herein to alter the original intent of the
parties hereto with respect to the Assets to be transferred to or Liabilities to
be assumed by Delphi. Each party shall reimburse the other or make other
financial adjustments (e.g., without limitation, cash reserves) or other
adjustments to remedy any mistakes or omissions relating to any of the Assets
transferred hereby or any of the Liabilities assumed hereby.

       (c)    Each party shall execute and deliver to each other party all such
documents, instruments, certificates and agreements in appropriate form, and to
make all filings and recordings and to take all such other actions, as shall be
necessary or reasonably requested by such other party, whether before or after
the Contribution Date, in order to give full effect to and evidence and perfect
the transfer and contribution of the Delphi Assets and the Delphi Liabilities as
contemplated hereby. However, Delphi acknowledges and agrees that neither GM nor
any Subsidiary of GM will comply with the provisions of any bulk transfer law of
any jurisdiction in connection with the transfer of any Delphi Asset.

       (d)    Any Subsidiary of Delphi that will receive any Delphi Asset or
assume any Delphi Liability shall for all purposes be deemed to be a party to
this Agreement.

       SECTION 2.04. Nonassignable Contracts. Anything contained herein to the
contrary notwithstanding, this Agreement shall not constitute an agreement to
assign any Asset or Liability if an assignment or attempted assignment of the
same without the consent of another Person would constitute a breach thereof or
in any way impair the rights of a party thereunder or give to any third party
any rights with respect thereto. If any such consent is not obtained or if an
attempted assignment would be ineffective or would impair such party's rights
under any such Asset or Liability so that the party entitled to the benefits and
responsibilities of such purported transfer (the "Intended Transferee") would
not receive all such rights and responsibilities, then (x) the party purporting
to make such transfer (the "Intended Transferor") shall use commercially
reasonable efforts to provide or cause to be provided to the Intended
Transferee, to the extent permitted by law, the benefits of any such Asset or
Liability and the Intended Transferor shall promptly pay or cause to be paid to
the Intended Transferee when received all moneys received by the Intended
Transferor with respect to any such Asset and (y) in consideration thereof the
Intended Transferee shall pay, perform and discharge on behalf of the Intended
Transferor all of the Intended Transferor's Liabilities thereunder in a timely
manner and in accordance with the terms thereof which it may do without breach.
In addition, the Intended Transferor shall take such other actions as may
reasonably be requested by the Intended Transferee in order to place the
Intended Transferee, insofar as reasonably possible, in the same position as if
such Asset had been transferred as contemplated hereby and so all the benefits
and burdens relating thereto, including possession, use, risk of loss, potential
for gain and dominion, control and command, shall inure to the Intended
Transferee. If and when such consents and approvals are obtained, the transfer
of the applicable Asset shall be effected in accordance with the terms of this
Agreement. To the extent that the Delphi Liabilities include liabilities,
obligations or commitments pursuant to any contract, permit, license, franchise
or other Asset to which Delphi also has any rights, GM shall, to the extent such
asset is not a Delphi Asset, upon request by Delphi either assign such rights to
Delphi or assert and seek to enforce such rights for the benefit of Delphi.

       SECTION 2.05.  Transition Services.

       (a)    For a period of twelve months following the Contribution Date
(the "Transition Period"), GM shall use its reasonable best efforts to provide,
or cause its Affiliates to use their reasonable best efforts to provide,

8

12

to Delphi or its Affiliates all Transition Services in the manner and at a relative level of service consistent in all material respects with that provided by GM or its Affiliates to the Delphi Automotive Systems Business immediately prior to the Contribution Date. Delphi shall use all commercially reasonable efforts to obtain all such Transition Services from a source other than GM and its Affiliates commencing upon the conclusion of the Transition Period; provided that, if (x) Delphi cannot obtain any Transition Service from a source other than GM and its Affiliates and (y) such Transition Service is necessary in order to operate the Delphi Automotive Systems Business in substantially the same manner as it was conducted immediately prior to the Contribution Date, then GM (or its Affiliates) shall provide such Transition Service to Delphi (or its Affiliates) for an additional period not to exceed six months. For the purpose of this Section 2.05, "Transition Services" means any services provided by GM, its Affiliates or their suppliers to the Delphi Automotive Systems Business immediately prior to the Contribution Date which Delphi reasonably identifies and requests in writing that GM provide to it during the Transition Period; provided that Transition Services expressly excludes any such services which shall be provided to Delphi or its Affiliates pursuant to the terms of other sections of this Agreement or any of the Ancillary Agreements; provided, further, that Transition Services expressly excludes any such services which GM would not be legally permitted to provide to a third party.

(b)    Notwithstanding anything contained in this Agreement or in any Ancillary Agreement to the contrary, except with respect to all services to be provided by GM to Delphi pursuant to the Financial Services Supply Agreement, the Commercial Travel Services Supply Agreement, any real estate leases and any health care services to be provided by GM to Delphi pursuant to the Employee Matters Agreement, for all Transition Services provided by GM (or its Affiliates) to Delphi (or its Affiliates) pursuant to section 2.05(a) above and for all other services to be provided by GM (or its Affiliates) to Delphi (or its Affiliates) pursuant to any of the Ancillary Agreements, Delphi shall pay to GM on or prior to the fifteenth day following the date of Delphi's receipt of an invoice related to the provision of such services (x) in the case of any Transition Service or any service to be provided pursuant to an Ancillary Agreement in which a payment amount or formula has not been set forth, an amount equal to the cost historically allocated to the Delphi Automotive Systems Business as of the Contribution Date for such service, adjusted to reflect any changes in the nature, cost or level of the services provided; provided that, if no cost has historically been allocated to the Delphi Automotive Systems Business for any Transition Service or for such other service, then Delphi shall pay to GM (i) that portion of the total cost borne by GM which GM would have allocated to Delphi under its internal allocation formula, plus (ii) any direct user charges or similar type charges resulting from Delphi's use or services which are not recouped by GM under the charges provided for in (i), plus (iii) any other reasonable charges necessary to make GM whole for the provision of such services or (y) in the case of any service to be provided pursuant to an Ancillary Agreement in which a payment amount or formula has been set forth, the amount owed pursuant to the terms of such Ancillary Agreement. Payments under this Section made on or after the first business day following the forty-fifth day after the date of Delphi's receipt of the invoice related to the provision of the relevant service shall be accompanied by a payment of interest to be calculated as follows:

Transitional Service (or other service) Payment x Prime Rate x Number of days late, to
                                                  ----------    the date of actual
                                                   365 days     payment.

As used in this Section 2.05(b), the "Prime Rate" shall mean to the prime rate as published in the Wall Street Journal on the first business day following the forty-fifth day after the date of Delphi's receipt of the invoice related to the provision of the relevant service.

(c)    Notwithstanding anything contained in this Agreement or in any Ancillary Agreement to the contrary, any charges to GM from outside suppliers for the provision of Transition Services or any other services provided pursuant to any Ancillary Agreement and any other costs which are attributable to the operation of Delphi other than incidental costs provided in connection with Transition Services or such other services which GM (or an Affiliate of GM) incurs shall be submitted by GM to Delphi for payment and, except as GM may otherwise agree in connection with any individual statement of charges which has been submitted to GM, Delphi hereby agrees to make payment therefor either (i) to such outside supplier in accordance with the payment terms of such outside supplier or (ii) where GM is required to pay such outside supplier, on or before the date on which GM notifies

9

13

Delphi it intends to make payment, or if GM does not provide such notice, immediately after GM provides notice to Delphi that GM has made such payment.

(d)   Notwithstanding anything to the contrary herein, Delphi shall be responsible for providing the transitional services agreed to by the parties (or, where no specific terms have been agreed to, then in accordance with the terms of Section 2.05(b) hereof) with respect to the businesses set forth on Schedule J hereto.


ARTICLE 3

ANCILLARY AGREEMENTS

(a)   General. GM and Delphi acknowledge that the Ancillary Agreements, other than the IPO and Distribution Agreement and the Registration Rights Agreement, have been or will be entered into prior to the Contribution Date by the parties hereto and/or by their respective Subsidiaries. GM and Delphi shall take all steps reasonably necessary to cause their respective Subsidiaries and Affiliates to enter into and perform such Ancillary Agreements in accordance with their terms.

(b)   Priority. Except with respect to Sections 2.05 (b) and (c) above, to the extent that any Ancillary Agreement expressly addresses any matters addressed by this Agreement, including, without limitation, matters covered by Article 2 and Article 5 hereof, the terms and conditions of such Ancillary Agreement shall govern the rights and obligations of the parties with respect to such matters.

(c)   Extensions of Transition Services. Delphi shall use all commercially reasonable efforts to obtain services provided to it by GM under the terms of the Ancillary Agreements relating to transitional services from a source other than GM. Certain Ancillary Agreements relating to transitional services provide that the parties may extend the transition service beyond the termination of the transition periods provided for therein. The parties expect that any such extension would be negotiated by GM and Delphi after the Distribution. In the event of an extension of any transitional service, GM and Delphi shall negotiate at arm's length the terms of any such extension, including fair market value pricing for all such services.


ARTICLE 4

COVENANTS


SECTION 4.01. IPO and Distribution Agreement. GM and Delphi hereby agree to execute and deliver, on or before the IPO Effective Date, the IPO and Distribution Agreement, in form and substance substantially as set forth on Exhibit E-1 hereto, with such modifications to such form as the parties shall mutually deem reasonably necessary and desirable; provided, that GM shall be entitled in its sole and absolute discretion at any time and from time to time to make any modifications to the provisions thereof relating to the preservation of the tax-free nature of the Distribution or the tax-free nature of the transactions contemplated hereby as it shall reasonably deem necessary or desirable.

SECTION 4.02. Registration Rights Agreement. GM and Delphi hereby agree to execute and deliver, on or before the IPO Effective Date, the Registration Rights Agreement, in form and substance substantially as set forth on Exhibit E-2 hereto, with such modifications to such form as the parties shall mutually deem reasonably necessary and desirable.

SECTION 4.03. Delayed Asset Transfers. GM and Delphi hereby agree to use their best efforts and, where applicable, to cause their subsidiaries to use their best efforts to consummate the transactions contemplated by

10

14

Section 2.01(c) hereof and the other provisions hereof as and when contemplated
in the relevant Ancillary Agreements.

ARTICLE 5

INDEMNIFICATION

SECTION 5.01. Indemnification by Delphi. Delphi and each Subsidiary of
Delphi which shall receive any Delphi Asset or Delphi Liability transferred
pursuant to the terms of this Agreement and their respective
successors-in-interest and assigns (the "Indemnifying Parties") shall jointly
and severally indemnify, defend and hold harmless GM and each of its
Subsidiaries and their respective successors-in-interest, and each of their
respective past and present Representatives (the "Indemnitees") against any
losses, claims, damages, liabilities or actions, resulting from, relating to or
arising, whether prior to or following the Contribution Date, out of or in
connection with (a) the Delphi Liabilities and/or (b) Delphi's conduct of its
business and affairs after the Contribution Date and the Indemnifying Parties
shall reimburse such entity, each such Subsidiary, each such
successor-in-interest and each such Representative for any reasonable attorneys'
fees or any other expenses reasonably incurred by any of them in connection with
investigating and/or defending any such loss, claim, damage, liability or
action.

SECTION 5.02.  Indemnification Procedures.

(a)   If any Indemnitee receives notice of the assertion of any
Third-Party Claim with respect to which an Indemnifying Party is obligated under
this Agreement to provide indemnification, such Indemnitee shall promptly give
such Indemnifying Party notice thereof (together with a copy of such Third-Party
Claim, process or other legal pleading) promptly after becoming aware of such
Third-Party Claim; provided, however, that the failure of any Indemnitee to give
notice as provided in this Section 5.02 shall not relieve any Indemnifying Party
of its obligations under this Section 5.02, except to the extent that such
Indemnifying Party is actually prejudiced by such failure to give notice. Such
notice shall describe such Third-Party Claim in reasonable detail.

(b)   An Indemnifying Party, at such Indemnifying Party's own expense
and through counsel chosen by such Indemnifying Party (which counsel shall be
reasonably acceptable to the Indemnitee), may elect to defend any Third-Party
Claim. If an Indemnifying Party elects to defend a Third-Party Claim, then,
within ten Business Days after receiving notice of such Third-Party Claim (or
sooner, if the nature of such Third Party claim so requires), such Indemnifying
Party shall notify the Indemnitee of its intent to do so, and such Indemnitee
shall cooperate in the defense of such Third-Party Claim. Such Indemnifying
Party shall pay such Indemnitee's reasonable out-of-pocket expenses incurred in
connection with such cooperation. Such Indemnifying Party shall keep the
Indemnitee reasonably informed as to the status of the defense of such
Third-Party Claim. After notice from an Indemnifying Party to an Indemnitee of
its election to assume the defense of a Third-Party Claim, such Indemnifying
Party shall not be liable to such Indemnitee under this Section 5.02 for any
attorneys' fees or other expenses subsequently incurred by such Indemnitee in
connection with the defense thereof other than those expenses referred to in the
preceding sentence; provided, however, that such Indemnitee shall have the right
to employ one law firm as counsel, together with a separate local law firm in
each applicable jurisdiction ("Separate Counsel"), to represent such Indemnitee
in any action or group of related actions (which firm or firms shall be
reasonably acceptable to the Indemnifying Party) if, in such Indemnitee's
reasonable judgment at any time, either a conflict of interest between such
Indemnitee and such Indemnifying Party exists in respect of such claim, or there
may be defenses available to such Indemnitee which are significantly different
from or in addition to those available to such Indemnifying Party and the
representation of both parties by the same counsel would, in the reasonable
judgment of the Indemnitee, be inappropriate, and in that event (i) the
reasonable fees and expenses of such Separate Counsel shall be paid by such
Indemnifying Party (it being understood, however, that the Indemnifying Party
shall not be liable for the expenses of more than one Separate Counsel
(excluding local counsel) with respect to any Third-Party Claim (even if against
multiple Indemnitees)) and (ii) each of such Indemnifying Party and such
Indemnitee shall have the right to conduct its own defense in respect of such
claim. If an Indemnifying Party elects not to defend against a Third-Party
Claim, or fails to notify an Indemnitee of its election as provided in this
Section 5.02 within the period of ten Business

11

15

Days described above, the Indemnitee may defend, compromise, and settle such
Third-Party Claim and shall be entitled to indemnification hereunder (to the
extent permitted hereunder); provided, however, that no such Indemnitee may
compromise or settle any such Third-Party claim without the prior written
consent of the Indemnifying Party, which consent shall not be unreasonably
withheld or delayed. Notwithstanding the foregoing, the Indemnifying Party shall
not, without the prior written consent of the Indemnitee, (i) settle or
compromise any Third-Party Claim or consent to the entry of any judgment which
does not include as an unconditional term thereof the delivery by the claimant
or plaintiff to the Indemnitee of a written release from all liability in
respect of such Third-Party Claim or (ii) settle or compromise any Third-Party
Claim in any manner that would be reasonably likely to have a material adverse
effect on the Indemnitee.

        SECTION 5.03.  Certain Limitations.

        (a)    The amount of any indemnifiable losses or other liability for
which indemnification is provided under this Agreement shall be net of any
amounts actually recovered by the Indemnitee from third parties (including,
without limitation, amounts actually recovered under insurance policies) with
respect to such indemnifiable losses or other liability. Any Indemnifying Party
hereunder shall be subrogated to the rights of the Indemnitee upon payment in
full of the amount of the relevant indemnifiable loss. An insurer who would
otherwise be obligated to pay any claim shall not be relieved of the
responsibility with respect thereto or, solely by virtue of the indemnification
provision hereof, have any subrogation rights with respect thereto. If any
Indemnitee recovers an amount from a third party in respect of an indemnifiable
loss for which indemnification is provided in this Agreement after the full
amount of such indemnifiable loss has been paid by an Indemnifying Party or
after an Indemnifying Party has made a partial payment of such indemnifiable
loss and the amount received from the third party exceeds the remaining unpaid
balance of such indemnifiable loss, then the Indemnitee shall promptly remit to
the Indemnifying Party the excess (if any) of (A) the sum of the amount
theretofore paid by such Indemnifying Party in respect of such indemnifiable
loss plus the amount received from the third party in respect thereof, less (B)
the full amount of such indemnifiable loss or other liability.

        (b)    The amount of any loss or other liability for which
indemnification is provided under this Agreement shall be (i) increased to take
account of any net tax cost incurred by the Indemnitee arising from the receipt
or accrual of an indemnification payment hereunder (grossed up for such
increase) and (ii) reduced to take account of any net tax benefit realized by
the Indemnitee arising from incurring or paying such loss or other liability. In
computing the amount of any such tax cost or tax benefit, the Indemnitee shall
be deemed to recognize all other items of income, gain, loss, deduction or
credit before recognizing any item arising from the receipt or accrual of any
indemnification payment hereunder or incurring or paying any indemnified loss.
Any indemnification payment hereunder shall initially be made without regard to
this Section 5.03(b) and shall be increased or reduced to reflect any such net
tax cost (including gross-up) or net tax benefit only after the Indemnitee has
actually realized such cost or benefit. For purposes of this Agreement, an
Indemnitee shall be deemed to have "actually realized" a net tax cost or a net
tax benefit to the extent that, and at such time as, the amount of taxes payable
by such Indemnitee is increased above or reduced below, as the case may be, the
amount of taxes that such Indemnitee would be required to pay but for the
receipt or accrual of the indemnification payment or the incurrence or payment
of such loss, as the case may be. The amount of any increase or reduction
hereunder shall be adjusted to reflect any Final Determination with respect to
the Indemnitee's liability for taxes, and payments between such indemnified
parties to reflect such adjustment shall be made if necessary.

        (c)    Any indemnification payment made under this Agreement shall be
characterized for tax purposes as if such payment were made immediately prior to
the Contribution Date.

ARTICLE 6

ACCESS TO INFORMATION

SECTION 6.01  Restrictions on Disclosure of Information.

(a)    Without limiting any rights or obligations under any other
agreement between or among the parties hereto and/or any of their respective
Affiliates relating to confidentiality, for a period of three years following
the Contribution Date, each of the parties hereto agrees that it shall not, and
shall not permit any of its Affiliates or Representatives to, disclose any
Confidential Information to any Person, other than to such Affiliates or
Representatives on a need-to-know basis in connection with the purpose for which
the Confidential Information was originally disclosed. Notwithstanding the
foregoing, each of the parties hereto and its respective Affiliates and
Representatives may disclose such Confidential Information, and such Information
shall no longer be deemed Confidential Information, to the extent that such
party can demonstrate that such Confidential Information is or was (i) available
to such party outside the context of the Prior Relationship on a nonconfidential
basis prior to its disclosure by the other party, (ii) in the public domain
other than by the breach of this Agreement or by breach of any other agreement
between or among the parties hereto and/or any of their respective Affiliates
relating to confidentiality, or (iii) lawfully acquired outside the context of
the Prior Relationship on a nonconfidential basis or independently developed by,
or on behalf of, such party by Persons who do not have access to, or
descriptions of, any such Confidential Information. Additionally,
notwithstanding anything to the contrary herein, any Information provided by GM
to Delphi or by Delphi to GM shall, except as hereafter agreed to in writing by
the parties, not be deemed Confidential Information with respect to the use of
such Information by Delphi in the ordinary course of Delphi's business or by GM
in the ordinary course of GM's business, respectively.

(b)    Each of the parties hereto shall maintain, and shall cause their
respective Affiliates to maintain, policies and procedures, and develop such
further policies and procedures as shall from time to time become necessary or
appropriate, to ensure compliance with this Section 6.01.

SECTION 6.02. Legally Required Disclosure of Confidential Information.
If any of the parties to this Agreement or any of their respective Affiliates or
Representatives becomes legally required to disclose any Confidential
Information, such disclosing party shall promptly notify the party owning the
Confidential Information (the "Owning Party") and shall use all commercially
reasonable efforts to cooperate with the Owning Party so that the Owning Party
may seek a protective order or other appropriate remedy and/or waive compliance
with this Section 6.02. All expenses reasonably incurred by the disclosing party
in seeking a protective order or other remedy shall be borne by the Owning
Party. If such protective order or other remedy is not obtained, or if the
Owning Party waives compliance with this Section 6.02, the disclosing party or
its Affiliate or Representative, as applicable, shall (a) disclose only that
portion of the Confidential Information which its legal counsel advises it is
compelled to disclose or else stand liable for contempt or suffer other similar
significant corporate censure or penalty, (b) use all commercially reasonable
efforts to obtain reliable assurance requested by the Owning Party that
confidential treatment will be accorded such Confidential Information, and (c)
promptly provide the Owning Party with a copy of the Confidential Information so
disclosed, in the same form and format so disclosed, together with a description
of all Persons to whom such Confidential Information was disclosed.

SECTION 6.03. Access to Information. During the Retention Period (as
defined in Section 6.04 below), each of the parties hereto shall cooperate with
and afford, and shall cause their respective Affiliates, Representatives,
Subsidiaries, successors and/or assignees, and shall use reasonable efforts to
cause joint ventures that are not Affiliates (collectively, "Related Parties")
to cooperate with and afford, to the other party reasonable access upon
reasonable advance written request to all information (other than information
which is (i) protected from disclosure by the attorney client privilege or work
product doctrine, (ii) proprietary in nature or (iii) the subject of a
confidentiality agreement between such party and a third party which prohibits
disclosure to the other party) within such party's or any Related Party's
possession which was created prior to the Contribution Date or, with

13

17

respect to any information which would be relevant to the provision of a transitional service pursuant to this Agreement or any Ancillary Agreement, information created during the period in which one party is providing the other party with such transition service. Access to the requested information shall be provided so long as it relates to the requesting party's (the "Requestor") business, assets or liabilities, and access is reasonably required by the Requestor as a result of the parties' Prior Relationship for purposes of auditing, accounting, claims or litigation (except for claims or litigation between the parties hereto), employee benefits, regulatory or tax purposes or fulfilling disclosure or reporting obligations including, without limitation, Information reasonably necessary for the preparation of reports required by or filed under the Securities Exchange Act of 1934, as amended, with respect to any period entirely or partially prior to the Contribution Date.

Access as used in this paragraph shall mean the obligation of a party in possession of Information (the "Possessor") requested by the Requestor to exert its reasonable best efforts to locate all requested Information that is owned and possessed by Possessor or any Related Party. The Possessor, at its own expense, shall conduct a diligent search designed to identify all requested Information and shall collect all such Information for inspection by the Requestor during normal business hours at the Possessor's place of business. Subject to confidentiality and/or security provisions as the Possessor may reasonably deem necessary, the Requestor may have all requested Information duplicated at Requestor's expense. Alternatively, the Possessor may choose to deliver, at its own expense, all requested Information to the Requestor in the form it was requested by the Requestor. If so, the Possessor shall notify the Requestor in writing at the time of delivery if such Information is to be returned to the Possessor. In such case, the Requestor shall return such Information when no longer needed to the Possessor at the Possessor's expense.

In connection with providing Information pursuant to this Section 6.03, each of the parties hereto shall upon the request of the other party make available its respective employees (and those of their respective Related Parties, as applicable) to the extent that they are reasonably necessary to discuss and explain all requested Information with and to the requesting party.

SECTION 6.04.   Record Retention.

(a)    Books and Records. Delphi shall preserve and keep all books and records included in the Delphi Assets or otherwise in the possession of Delphi or its Related Parties, whether in electronic form or otherwise, for no less than ten years from the Contribution Date, or for any longer period as may be required by any government agency, GM's record retention schedule effective as of the Contribution Date or as GM may subsequently notify Delphi that such schedule has been modified, litigation (including applicable "Litigation Holds"), law, regulation, audit or appeal of taxes, tax examination or the expiration of the periods described in Section 6.04 (c), where applicable (the "Retention Period") at Delphi's sole cost and expense. If Delphi wishes to dispose of any books and records or other documents which it is obligated to retain under this Section 6.04 after the Retention Period, then Delphi shall first provide 90 days' written notice to GM and GM shall have the right, at its option and expense, upon prior written notice within such 90-day period, to take possession of such books or records or other documents within 180 days after the date of Delphi's notice to GM hereunder. Written notice of intent to dispose of such books and records shall include a description of the books and records in detail sufficient to allow GM to reasonably assess its potential need to retain such materials. In the event Delphi enters into an agreement with a third party to sell a portion of its business, together with the books and records related thereto, GM shall have the right to duplicate such books and records prior to any such disposition and, should the purchaser of the Delphi business be a competitor of GM, GM shall have the right to prohibit the transfer or disclosure to such party of that portion of the former books and records of GM which GM notifies Delphi contain confidential and proprietary information. To the extent that books and records of GM or any of its Affiliates which contain information relating to the Delphi Automotive Systems Business are not included in the Delphi Assets, GM agrees to cooperate with Delphi in providing Delphi with any such information upon Delphi's reasonable request to the extent that any such information exists and is reasonably separable from GM information unrelated to the Delphi Automotive Systems Business. Delphi shall reimburse GM for all of its reasonable out-of-pocket costs incurred in connection with any such request.

18

(b)    Technical Documentation and Personnel. In addition to the retention requirements of Section 6.04(a), for a period no less than the Retention Period, Delphi, at its sole cost and expense, shall use its reasonable best efforts to maintain all technical documentation in its possession or in the possession of any of its Related Parties applicable to product design, test, release, and validation at locations at which such technical documents shall be reasonably accessible to GM upon request (at GM's sole cost and expense) and, to the extent reasonably possible, through employees of Delphi who formerly performed that task for GM. In addition to the obligations set forth in Section 6.05 hereof, Delphi shall, from time to time, at the reasonable request of GM, cooperate fully with GM in providing GM, to the extent reasonably possible through Delphi employees formerly employed by GM who previously performed the same functions on behalf of GM, with technical assistance and information in respect to any claims brought against GM involving the conduct of the Delphi Automotive Systems Business prior to the Contribution Date, including consultation and/or the appearance(s) of such persons on a reasonable basis as expert or fact witnesses in trials or administrative proceedings. GM shall reimburse Delphi for its reasonable out-of-pocket costs (travel, hotels, etc.) of providing such services, consistent with GM's policies and practices regarding such expenditures. Additionally, GM shall, from time to time, at the reasonable request of Delphi, cooperate fully with Delphi in providing Delphi, to the extent reasonably possible through applicable GM employees, with technical assistance and information in respect to any claims brought against Delphi involving the conduct of the Delphi Automotive Systems Business prior to the Contribution Date, including consultation and/or the appearance(s) of such persons on a reasonable basis as expert or fact witnesses in trials or administrative proceedings. Delphi shall reimburse GM for its reasonable out-of-pocket costs (travel, hotels, etc.) of providing such services, consistent with Delphi's policies and practices regarding such expenditures.

In particular, Delphi shall: (i) retain all documents required to be maintained by international, national, state, provincial, regional or local regulations and all documents that may be reasonably required to establish due care or to otherwise assist GM in pursuing, contesting or defending such claims; (ii) make available its documents and records in connection with any pursuit, contest or defense, including, subject to an appropriate confidentiality agreement or protective order, documents that may be considered to be "confidential" or subject to trade secret protection ; (iii) promptly respond to discovery requests in connection with such claim, understanding and acknowledging that the requirements of discovery in connection with litigation require timely responses to interrogatories, requests to produce, requests for admission and depositions and also understanding and acknowledging that any delays in connection with responses to discovery may result in sanctions; (iv) make available, as may be reasonably necessary and upon reasonable advance notice and for reasonable periods so as not to interfere materially with Delphi's business, mutually acceptable engineers, technicians or other knowledgeable individuals to assist GM in connection with such claim, including investigation into claims and occurrences described in this section and preparing for and giving factual and expert testimony at depositions, court proceedings, inquiries, hearings and trial; (v) make available facilities and exemplar parts for the sole and limited use of assisting GM in the contest or defense; and (vi) acknowledge that GM is responsible for and will control, as between GM and Delphi, the conduct of the pursuit, contest or defense.

(c)    Tax Related Records. GM and Delphi agree to retain all Income Tax Returns, related schedules and workpapers, and all material records and other documents as required under Section 6001 of the Code, as well as by any similar provision of state or local income tax law, until the later of (i) the expiration of the applicable statute of limitations for the tax period to which the records relate, or (ii) the Final Determination has been made with respect to all issues related to the final Consolidated Tax Period.

With respect to Non-Income Taxes, GM and Delphi agree to retain all Non-Income Tax Returns, related schedules and workpapers, and all material records and other documents as required under Federal, state or local law, until the later of (i) the expiration of the applicable statute of limitations for the tax period to which the records relate, or (ii) a Determination has been made with respect to all issues for the tax periods to which NITA applies.

If either party wishes to dispose of any such records or documents after such retention period, then the procedure described in (a) above shall apply.

15

19

SECTION 6.05. Production of Witnesses. Until the six-year anniversary of the Contribution Date, each of the parties hereto shall use all commercially reasonable efforts, and shall cause each of their respective Affiliates to use all commercially reasonable efforts, to make available to each other, upon written request, its directors, officers, employees and other Representatives as witnesses to the extent that any such Person may reasonably be required (giving consideration to the business demands upon such Persons) in connection with any legal, administrative or other proceedings in which the requesting party may from time to time be involved; provided, however, that with respect to any legal or administrative proceedings relating to the tax liability of any of the parties hereto or any of their respective Affiliates, each of the parties hereto shall, and shall cause each of their respective Affiliates to, make their directors, officers, employees and other Representatives available as witnesses until such time as the statute of limitations have expired with respect to all tax years prior to and including the year in which the asset transfers contemplated by this Agreement are consummated.

SECTION 6.06. Reimbursement. Unless otherwise provided in this Article 6, each party to this Agreement providing access, information or witnesses to another party pursuant to Sections 6.03, 6.04 or 6.05 shall be entitled to receive from the recipient, upon the presentation of invoices therefor, payment for all reasonable out-of-pocket costs and expenses (excluding allocated compensation, salary and overhead expense) as may be reasonably incurred in providing such information or witnesses.

ARTICLE 7

CERTAIN CLAIMS AND LITIGATION

Section 7.01.  Product Liability Claims.

(a)    Applicability. GM and Delphi agree to the allocation of liability for all claims and causes of action, however presented, alleging that parts, components or systems that have been (i) manufactured by the Delphi Automotive Systems Business or Delphi or its Affiliates, or (ii) manufactured by a third party, whether sold or otherwise supplied separately, or incorporated into components or systems of Delphi or its Affiliates, in each case, which have been sold or otherwise supplied by the Delphi Automotive Systems Business, Delphi or its Affiliates to GM, its Affiliates or customers of Delphi other than GM or its Affiliates (the foregoing collectively constituting "Delphi Products") have caused or been alleged to cause personal inuries, injuries to property or other damages as set forth in this Section 7.01. The provisions in this Section 7.01 cover claims which include but are not limited to the following types of claims: claims premised on theories of negligence, strict liability, express or implied warranties of merchantability, fitness for ordinary use and/or compliance with reasonable consumer expectations, failure to issue adequate warnings, negligent and/or intentional misrepresentation, negligent and/or intentional infliction of emotional distress, failure to provide replacement and/or retrofit parts, and failure to conduct a recall or adequately conduct a recall that has been issued. The provisions set forth in this Section 7.01 apply to claims for compensatory damages as well as all claims for punitive or exemplary damages and all claims for defective design as well as all claims for defective manufacture.

(b)        Parts Components or Systems Manufactured by the Delphi Automotive Systems Business Prior to January 1, 1999.

(i)  As between GM and Delphi, Delphi shall assume the defense of all such claims involving Delphi Products sold or otherwise supplied prior to January 1, 1999 to customers other than GM or an Affiliate or Subsidiary of GM. Delphi shall indemnify, defend and hold harmless GM and its Affiliates against any and all such claims. Delphi shall reimburse GM and its Affiliates for any reasonable attorneys' fees or other expenses reasonably incurred by GM subsequent to December 31, 1998 in connection with investigating and/or defending against any such claim.

16

20

      (ii) GM shall retain and/or assume the defense of all such claims involving parts, components or systems manufactured by the Delphi Automotive Systems Business prior to January 1, 1999 and sold or otherwise supplied to GM or its Affiliates before, on, or after January 1, 1999. GM shall indemnify, defend and hold harmless Delphi and its Affiliates against any and all such claims. GM shall reimburse Delphi and its Affiliates for any reasonable attorneys' fees or other expenses reasonably incurred by Delphi or its Affiliates subsequent to December 31, 1998 in connection with investigating and/or defending any such claim or securing the indemnification and/or defense that GM is required to provide pursuant to this paragraph.

      (c)   Parts, Components or Systems Manufactured, Sold or otherwise Supplied by Delphi on or Subsequent to January 1, 1999.

      (i)   Delphi shall defend GM and its Affiliates against all claims involving (A) parts, components or systems manufactured by Delphi or its Affiliates which on or subsequent to January 1, 1999 are sold or otherwise supplied to customers other than GM or its Affiliates; and (B) parts, components or systems acquired by the Delphi Automotive Systems Business or Delphi or its Affiliates from suppliers thereto other than GM or its Affiliates and sold or otherwise supplied by Delphi or its Affiliates on or subsequent to January 1, 1999 to customers other than GM or its Affiliates. Delphi or its Affiliates shall indemnify, defend and hold harmless GM and its Affiliates against any and all such claims. Delphi or its Affiliates shall reimburse GM and its Affiliates for any reasonable attorneys' fees or other expenses reasonably incurred by GM and its Affiliates in connection with investigating and/or defending any such claim or securing the indemnification and/or defense that Delphi and its Affiliates are required to provide pursuant to this paragraph.

      (ii) The rights, obligations and liabilities of GM and Delphi with respect to claims involving parts, components or systems manufactured by Delphi or its affiliates subsequent to December 31, 1998 which are sold by Delphi or its Affiliates to GM or its Affiliates shall be determined according to the terms of the agreements relating to such sale.

      (d)   Recall and Warranty Campaigns. Claims of GM or its Affiliates against the Delphi Automotive Systems Business in the nature of warranty and recall campaigns relating to parts, components or systems sold by the Delphi Automotive Systems Business to GM or its Affiliates (regardless of when or by whom manufactured (but excluding parts or systems manufactured by GM or its Affiliates)) which arise prior to or after the Contribution Date shall be determined according to the terms of the agreements relating to the sale of such parts, components or systems, all of which agreements are assumed by Delphi and its Affiliates pursuant to the terms of the Supply Agreement.

      (e)   Notice. GM and Delphi agree that in the case of claims covered by either paragraphs (b) or (c) above, the party receiving such a claim will notify the other party within 30 days of receipt of written notice of the claim. Thereafter, the party being notified of the claim shall have 30 days to respond. The party first receiving such a claim shall take all reasonable action necessary to defend against the claim including, but not limited to, responding to court ordered deadlines before the expiration of the time for response.

      Section 7.02.   General Litigation.

      (a)   Claims to Be Transferred to Delphi. On the Contribution Date, the legal responsibilities for the claims identified on Schedule K shall be transferred in their entirety from GM to Delphi. As of the Contribution Date and thereafter, Delphi shall assume the defense of these claims. Delphi shall indemnify, defend and hold harmless GM against these claims. Delphi shall reimburse GM for any reasonable attorneys fees and all other expenses reasonably incurred by GM subsequent to the Contribution Date in connection with investigating and/or defending against any such claim, including reimbursement for any services provided by members of the GM Legal Staff.

17

21

(b)    Claims to be Defended by GM at Delphi's Expense. GM shall defend
the claims identified in Schedule L; provided, however, that (i) Delphi shall
indemnify and hold harmless GM against any judgments entered against GM on the
claims identified on Schedule L or settlements of the claims identified on
Schedule L, provided that GM may not compromise or settle any such claim without
the prior written consent of Delphi, which shall not be unreasonably withheld or
delayed, (ii) GM shall promptly compromise or settle claim(s) identified on
Schedule L if Delphi so directs, (iii) GM shall promptly permit Delphi to assume
responsibility for the defense of the claims identified on Schedule L if Delphi
so requests and (iv) Delphi shall reimburse GM for any reasonable attorneys'
fees and all other expenses reasonably incurred by GM subsequent to the
Contribution Date in connection with defending against the claims identified on
Schedule L, including reimbursement for any services provided by members of the
GM Legal Staff.

(c)    Claims for which GM will Retain Liability. GM shall defend the
claims identified on Schedule M and shall indemnify and hold harmless Delphi
against any judgments entered against Delphi on the claims identified in
Schedule M or settlements of the claims identified on Schedule M. GM shall
reimburse Delphi for any reasonable attorneys' fees and all other expenses
reasonably incurred by Delphi subsequent to the Contribution Date in connection
with defending against the claims identified on Schedule M, including
reimbursement for any services provided by members of the Delphi Legal Staff.

Section 7.03.  Employment Related Claims.

(a)    Claims to Be Transferred to Delphi. On the Contribution Date, the
legal responsibilities for the claims identified on Schedule N shall be
transferred in their entirety from GM to Delphi. Thereafter, Delphi shall assume
the defense of these claims. Delphi shall indemnify, defend and hold harmless GM
against these claims. Delphi shall reimburse GM for any reasonable attorneys'
fees and all other expenses reasonably incurred by GM subsequent to the
Contribution Date in connection with investigating and/or defending against any
such claim, including reimbursement for any services provided by members of the
GM Legal Staff.

(b)    Claims to be Jointly Defended by GM and Delphi. GM and Delphi
shall jointly defend the claims identified in Schedule O; provided, however,
that (i) Delphi shall indemnify and hold harmless GM against any judgments
entered against GM on the claims identified in Schedule O or settlements of the
claims identified in Schedule O, provided that GM may not compromise or settle
any such claim regarding employees of Delphi without the prior consent of
Delphi, which consent shall not be unreasonably withheld or delayed and (ii)
Delphi and GM shall split the attorneys' fees and all other expenses reasonably
incurred subsequent to the Contribution Date in connection with defending
against the unemployment claims identified in Schedule O based on the number of
hourly employees of each organization that are claimants in the litigation.

(c)    Unscheduled Claims. Delphi will have financial responsibility
for employment related claims regarding all Delphi Employees and Delphi
Terminated Employees (as those terms are defined in the Employee Matters
Agreement, a copy of which is attached hereto as Exhibit B-1) whether incurred
before or after the Contribution Date. If a claim is not scheduled, Delphi and
GM shall mutually determine whether the claim is treated under Paragraph (a) or
(b) above. Responsibility for new U.S. claims will be treated in the same
manner. Notwithstanding the above, U.S. claims for pension and welfare benefits
from salaried employees who retire on or before the Contribution Date, and
hourly employees who retire on or before October 1, 1999 shall remain the
responsibility of GM.

Section 7.04. Cooperation. GM and Delphi and their respective
Affiliates shall cooperate with each other in the defense of any and all claims
covered under this Article 7 and afford to each other reasonable access upon
reasonable advance notice to witnesses and information (other than information
protected from disclosure by applicable privileges) that is reasonably required
to defend these claims as set forth in Article 6 of this Agreement. The
foregoing agreement to cooperate includes, but is not limited to, an obligation
to provide access to qualified assistance to provide information, witnesses and
documents to respond to discovery requests in specific lawsuits. In such cases,
cooperation shall be timely so that the party responding to discovery may meet
all court-imposed

18

22

deadlines. The party requesting information shall reimburse the party providing
information consistent with the terms of Section 6.06 of this Agreement. The
obligations set forth in this paragraph are more clearly defined in Section 6.01
through and including 6.06 of this Agreement, to which reference is hereby made.


ARTICLE 8

INSURANCE MATTERS

SECTION 8.01  Delphi Insurance Coverage During  the Transition Period.

(a)    Throughout the period beginning on the Contribution Date and
ending on the earlier of the Distribution Date or the first anniversary of the
Contribution Date (i.e., the "Insurance Transition Period"), GM shall, subject
to insurance market conditions and other factors beyond its control, maintain
policies of insurance, including for the benefit of Delphi or any of its
Affiliates, directors, officers, employees or other covered parties
(collectively, the "Delphi Covered Parties") which are comparable to those
maintained generally by GM; provided, however, that this provision shall not
apply to insurance applicable to employees and/or beneficiaries relating to
benefits provided under ERISA governed benefit plans or to Personal Umbrella
Liability Insurance; provided, further, however, that if GM determines that (i)
the amount or scope of such coverage will be reduced to a level materially
inferior to the level of coverage in existence immediately prior to the
Insurance Transition Period or (ii) the retention or deductible level applicable
to such coverage, if any, will be increased to a level materially greater than
the levels in existence immediately prior to the Insurance Transition Period, GM
shall give Delphi notice of such determination as promptly as practicable. Upon
notice of such determination, Delphi shall be entitled to no less than 60 days
to evaluate its options regarding continuance of coverage hereunder and may
cancel all or any portion of such coverage as of any day within such 60 day
period. Except as provided below, during the Insurance Transition Period, such
policies of insurance shall cover Delphi Covered Parties for liabilities and
losses insured prior to the Contribution Date. To the extent of any self insured
or other loss retentions with respect to insurance policies in force, Delphi
shall, during the Insurance Transition Period, be solely responsible for any
losses, damages and related expenses, not included in GM insurance program
expense allocations to Delphi, incurred by itself or Delphi Covered Parties
within such loss or retentions and shall not seek reimbursement or
indemnification thereof from GM.

(b)    GM will use all commercially reasonable efforts to assist Delphi
Covered Parties in asserting claims under applicable insurance policies, and
shall adjust such policies, as necessary and practicable, to provide for Delphi
and GM recoveries consistent with their respective interests and shall not
unduly favor one insured party over another.

(c)    Delphi shall promptly pay or reimburse GM, as the case may be,
for premium expenses, and Delphi Covered Parties shall promptly pay or reimburse
GM for any costs and expenses which GM may incur in connection with the
insurance coverages maintained pursuant to this Section 8.01, including but not
limited to any subsequent premium adjustments. All payments and reimbursements
by Delphi and Delphi Covered Parties to GM shall be made within fifteen (15)
days after Delphi's receipt of an invoice from GM. Late payments shall bear
interest at the Prime Rate (as defined in Section 2.05(b) hereof) and shall be
paid in accordance with the terms relating to payments of interest set forth in
Section 2.05(b) of this Agreement.

(d)    To the full extent permitted by contract and law, the control and
administration of such insurance policies, including claims against insurance
policies and any modifications to terms or conditions of insurance policies,
shall remain with GM (except that any such action taken by GM shall treat fairly
all insured parties and their respective claims and shall not unduly favor one
insured party over another). Delphi and Delphi Covered Parties shall make all
reasonable efforts to facilitate GM's control and administration of such
policies.

(e)    GM's insurance policies shall be applicable to Delphi losses, as
follows: (i) with respect to any insurance policies where coverage is provided
on a "claims-made" or "occurrences reported" basis, any events,

19

23

acts or omissions which may give rise to insured losses, or damages which give rise to claims thereunder, must have occurred and notice given to GM prior to expiration of the Insurance Transition Period; (ii) with respect to other types of insurance policies, including those provided on an "occurrence" basis, any events, acts or omissions giving rise to any insured losses or damages must have occurred prior to expiration of the Insurance Transition Period; and (iii) with respect to all claims under all insurance policies, coverage for events, acts or omissions shall be interpreted consistent with the terms of such policies and the intent of subparagraphs (i) and (ii) above.

(f) With respect to claims comprehended by the insurance policies, GM and Delphi shall control the investigation, defense and settlement of all claims as provided for in Article 7 of this Agreement; provided, however, that Delphi may not effect any settlement with respect to any such claim without GM's prior written consent (which consent shall not be unreasonably withheld or delayed) unless such settlement (i) will have no direct impact on GM's future insurance recoveries under relevant insurance policies, and (ii) will require that only Delphi or Delphi Covered Parties, and not GM or its insurers, assume financial responsibility for the settlement (under applicable deductibles or self-insured retentions), any related expenses and/or any subsequent premium adjustments.


SECTION 8.02. Delphi Insurance Coverage After The Insurance Transition Period. From and after expiration of the Insurance Transition Period, except as provided herein, Delphi, and Delphi alone, shall be responsible for obtaining and maintaining insurance programs for its risk of loss and such insurance arrangements shall be separate and apart from GM's insurance programs. Notwithstanding the foregoing, (a) GM, upon the request of Delphi, shall use all commercially reasonable efforts to assist Delphi in the transition to its own separate insurance programs from and after the Insurance Transition Period, and shall provide Delphi with any information that is in the possession of GM and is reasonably available and necessary to either obtain insurance coverages for Delphi or to assist Delphi in preventing unintended self-insurance, in whatever form, (b) each of GM and Delphi, at the request of the other, shall cooperate with and use commercially reasonable efforts to assist the other in recoveries from claims made under any insurance policy for the benefit of any insured party; and (c) neither GM nor Delphi, nor any of their Affiliates, shall take any action which would intentionally jeopardize or otherwise interfere with either party's ability to collect any proceeds payable pursuant to any insurance policy.


ARTICLE 9

MISCELLANEOUS

SECTION 9.01. Entire Agreement. This Agreement, including all the Ancillary Agreements and all other Exhibits and Schedules attached hereto, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior written and oral and all contemporaneous oral agreements and understandings with respect to the subject matter hereof, other than with respect to the Cash and Debt Management Agreement, dated as of December 22, 1998, among the Corporate Sector of GM, the Global Automotive Sector of GM and the Delphi Automotive Systems Sector of GM.

SECTION 9.02. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware regardless of the laws that might otherwise govern under principles of conflicts of laws applicable thereto.

SECTION 9.03. Descriptive Headings. The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

SECTION 9.04. Notices. All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered in person, by telecopy with answer back, by express or overnight mail delivered by a nationally recognized air courier (delivery charges prepaid), or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties as follows:

24

if to GM:

>           c/o General Motors Corporation
>           3031 West Grand Blvd.
>           Detroit, MI  48202
>           Attention:  Warren G. Andersen
>           Telecopy:  (313) 974-0685

if to Delphi, the Delphi U.S. Subsidiaries or Delphi International Subsidiary:

>           c/o Delphi Automotive Systems Corporation
>           5725 Delphi Drive
>           Troy, MI  48098
>           Attention:  General Counsel
>           Telecopy: 248-813-2523

or to such other address as the party to whom notice is given may have previously furnished to the others in writing in the manner set forth above. Any notice or communication delivered in person shall be deemed effective on delivery. Any notice or communication sent by telecopy or by air courier shall be deemed effective on the first Business Day at the place at which such notice or communication is received following the day on which such notice or communication was sent. Any notice or communication sent by registered or certified mail shall be deemed effective on the fifth Business Day at the place from which such notice or communication was mailed following the day on which such notice or communication was mailed.

SECTION 9.05. Parties in Interest. This Agreement shall be binding upon and inure solely to the benefit of each party hereto and their legal representatives and successors, and each Subsidiary and each Affiliate of the parties hereto, and nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Agreement, except for Article 5 (which is intended to be for the benefit of the Persons provided for therein and may be enforced by such Persons).

SECTION 9.06. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.

SECTION 9.07. Binding Effect; Assignment. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives and successors. This Agreement may not be assigned by any party hereto. The Schedules and Exhibits attached hereto or referred to herein are an integral part of this Agreement and are hereby incorporated into this Agreement and made a part hereof as if set forth in full herein.

SECTION 9.08. Dispute Resolution. Except as otherwise set forth in the Ancillary Agreements, resolution of any and all disputes arising from or in connection with this Agreement (excluding matters related to the Supply Agreement), whether based on contract, tort, or otherwise (collectively, "Disputes"), shall be exclusively governed by and settled in accordance with the provisions of this Section 9.08. The parties hereto shall use all commercially reasonable efforts to settle all Disputes without resorting to mediation, arbitration, litigation or other third party dispute resolution mechanisms. If any Dispute remains unsettled, a party hereto may commence proceedings hereunder by first delivering a written notice from a Senior Vice President or comparable executive officer of such party (the "Demand") to the other parties providing reasonable description of the Dispute to the others and expressly requesting mediation hereunder. The parties hereby agree to submit all Disputes to non-binding mediation before a mediator reasonably acceptable to all parties involved in such Dispute. If, after such mediation, the parties subject to such mediation disagree regarding the mediator's recommendation, such Dispute shall be submitted to arbitration under the terms hereof, which arbitration shall be final, conclusive and binding upon the parties, their successors and assigns. The arbitration shall be conducted in Detroit, Michigan by three arbitrators acting by majority vote (the

21

25

"Panel") selected by agreement of the parties not later than ten (10) days after the delivery of the recommendation provided by the mediator as described above or, failing such agreement, appointed pursuant to the commercial arbitration rules of the American Arbitration Association, as amended from time to time (the "AAA Rules"). If an arbitrator so selected or appointed becomes unable to serve, his or her successors shall be similarly selected or appointed. The arbitration shall be conducted pursuant to the Federal Arbitration Act and such procedures as the parties subject to such arbitration (each, a "Party") may agree, or, in the absence of or failing such agreement, pursuant to the AAA Rules. Notwithstanding the foregoing: (i) each Party shall have the right to audit the books and records of the other Party that are reasonably related to the Dispute; (ii) each Party shall provide to the other, reasonably in advance of any hearing, copies of all documents which a Party intends to present in such hearing; and (iii) each Party shall be allowed to conduct reasonable discovery through written requests for information, document requests, requests for stipulation of fact and depositions, the nature and extent of which discovery shall be determined by the Parties; provided that if the Parties cannot agree on the terms of such discovery, the nature and extent thereof shall be determined by the Panel which shall take into account the needs of the Parties and the desirability of making discovery expeditious and cost effective. The award shall be in writing and shall specify the factual and legal basis for the award. The Panel shall apportion all costs and expenses of arbitration, including the Panel's fees and expenses and fees and expenses of experts, between the prevailing and non-prevailing Party as the Panel deems fair and reasonable. The parties hereto agree that monetary damages may be inadequate and that any party by whom this Agreement is enforceable shall be entitled to seek specific performance of the arbitrators' decision from a court of competent jurisdiction, in addition to any other appropriate relief or remedy. Notwithstanding the foregoing, in no event may the Panel award consequential, special, exemplary or punitive damages. Any arbitration award shall be binding and enforceable against the parties hereto and judgment may be entered thereon in any court of competent jurisdiction.

SECTION 9.09. Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the fullest extent possible.

SECTION 9.10. Failure or Indulgence Not Waiver; Remedies Cumulative. No failure or delay on the part of any party hereto in the exercise of any right hereunder shall impair such right or be construed to be a waiver of, or acquiescence in, any breach of any representation, warranty or agreement herein, nor shall any single or partial exercise of any such right preclude other or further exercise thereof or of any other right. All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

SECTION 9.11. Amendment. No change or amendment will be made to this Agreement or the Ancillary Agreements except by an instrument in writing signed on behalf of each of the parties to such agreement.

SECTION 9.12. Authority. Each of the parties hereto represents to the other that (a) it has the corporate or other requisite power and authority to execute, deliver and perform this Agreement and the Ancillary Agreements, (b) the execution, delivery and performance of this Agreement and the Ancillary Agreements by it have been duly authorized by all necessary corporate or other action, (c) it has duly and validly executed and delivered this Agreement and the Ancillary Agreements, and (d) this Agreement and each Ancillary Agreement is a legal, valid and binding obligation, enforceable against it in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equity principles.

SECTION 9.13. Interpretation. The headings contained in this Agreement, in any Exhibit or Schedule hereto and in the table or contents to this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Any capitalized term used in any Schedule or Exhibit but not

22

26

otherwise defined therein, shall have the meaning assigned to such term in this Agreement. When a reference is made in this Agreement to an Article or a Section, Exhibit or Schedule, such reference shall be to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated. After the Contribution Date, the Delphi Automotive Systems Business shall be deemed to no longer exist and all references made herein to Delphi as a party which operate as of a time following the Contribution Date, shall be deemed to refer to Delphi, the Delphi U.S. Subsidiaries and Delphi International Subsidiary as a single party.

******

[SIGNATURES ON FOLLOWING PAGE]

23

27

        IN WITNESS WHEREOF, each of the parties has caused this Agreement to be
executed on its behalf by its officers thereunto duly authorized on the day and
year first above written.

                        GENERAL MOTORS CORPORATION



            By:  /s/ G. Richard Wagoner
                 ----------------------------------
                 Name:  G. Richard Wagoner
                 Title: President and Chief Operating Officer


            DELPHI AUTOMOTIVE SYSTEMS CORPORATION



            By: /s/ J.T. Battenberg, III
                ----------------------------------
                Name:  J.T. Battenberg, III
                Title: Chairman, Chief Executive Officer and
                       President


            DELPHI AUTOMOTIVE SYSTEMS LLC



            By: /s/ J.T. Battenberg, III
                ----------------------------------
                Name:  J.T. Battenberg, III
                Title: Chief Executive Officer and
                       President


            DELPHI TECHNOLOGIES, INC.



            By: /s/ Andrew Brown, Jr
                ----------------------------------
                Name:  Andrew Brown, Jr.
                Title: President


            DELPHI AUTOMOTIVE SYSTEMS (HOLDING), INC.



            By: /s/ John P. Arle
                ----------------------------------
                Name:  John P. Arle
                Title: President

**EXHIBIT F**

**Environmental Matters Agreement**

**Environmental Matters Agreement between Delphi Automotive Systems Corporation
(n/k/a Delphi) and GM, dated as of "October 1998"**

**Exhibit C-1**

## ENVIRONMENTAL MATTERS AGREEMENT

This Environmental Matters Agreement ("Agreement"), dated as of October, 1998, is made among General Motors Corporation, a Delaware corporation ("GM"), with its principal place of business in Detroit, Michigan, and Delphi Automotive Systems Corporation, a Delaware corporation ("Delphi"), with its principal place of business in Troy, Michigan. GM and Delphi are sometimes referred to herein as a "Party" and collectively as the "Parties."

### RECITALS

WHEREAS, GM and Delphi are Parties to a Master Separation Agreement entered into in connection with the separation of the business heretofore carried on by the Delphi Automotive Systems Division as a part of GM into a business owned and operated by Delphi and completely separate and independent from GM; and

WHEREAS, the Parties desire to enter into this Agreement regarding environmental matters.

NOW, THEREFORE, in consideration of the mutual covenants and provisions hereunder contained, the Parties agree as follows:

### ARTICLE 1

#### Definitions

**1.1. <u>Defined Terms.</u>** As used in this Agreement, the following terms (in singular and plural forms) shall have the meanings below. Capitalized terms used, but not defined, herein shall have the meaning set forth in the Master Separation Agreement or elsewhere in this Agreement.

"Contribution Date" has the same meaning assigned to this term in the Master Separation Agreement.

"Corporate Successor" means any successor in interest of a Party by reason of a merger, reorganization or sale of all or substantially all of the assets of such Party.

"Delphi Assets" means the equipment, machinery and other personal property acquired by purchase, lease or otherwise by Delphi from GM as of the Contribution Date in accordance with the terms of the Master Separation Agreement whether or not associated with a Delphi Facility.

"Delphi Facility" means each parcel of real property, including all facilities and improvements thereon, acquired by purchase, lease or otherwise by Delphi as of the Contribution Date in accordance with the terms of the Master Separation Agreement as the same may

1

hereafter be revised as a result of the "true-up" process provided for in the Real Estate Matters Agreement between the Parties.

"Environmental Claim" shall mean any third-party (i.e., non-Party) accusation, allegation, notice of violation, action, claim, lien, demand, abatement or other order or directive (conditional or otherwise) for personal injury (including sickness, disease or death), tangible or intangible property damage, damage to the environment, nuisance, pollution, contamination of or other adverse effect on the environment or human health, or for fines, penalties, or restrictions, resulting from or based upon: (i) the existence, or the continuation of the existence of, a Release (including without limitation a sudden or non-sudden accidental or non-accidental Release), or, exposure to, any Hazardous Material, in, into or onto the indoor or outdoor environment, including, but not limited to, the air, soil, surface water or groundwater, at, on, by, from or related to any Facility; (ii) the use, management, handling, transportation, storage, treatment or disposal of Hazardous Material in connection with any Facility; or (iii) the violation or alleged violation of any Environmental Law relating to the ownership, use, operation, or remediation of any Facility or to the use, management, handling, transportation. Release, storage, treatment or disposal of Hazardous Materials thereon or therefrom.

"Environmental Costs and Liabilities" shall mean any and all losses, liabilities, obligations, damages, fines, penalties, judgments, actions, claims, reasonable costs and reasonable expenses (including without limitation attorneys' fees, disbursements and expenses of legal counsel, experts, engineers, and consultants and the costs of Remedial Action) arising from or under or related to any Environmental Law.

"Environmental Damages" shall refer to any and all Environmental Costs and Liabilities and Environmental Claims, including, but not limited to, costs, expenses and attorneys' or other experts' or consultants' fees in connection with any Remedial Action or enforcing any right of indemnification hereunder against any Indemnitor; provided, however, that Environmental Damages do not include consequential, special or incidental damages, including, but not limited to, loss of profits, loss of business opportunity, loss of use, diminution in value, stigma damages, or any attorneys' or consultant's fees or other expenses as to any matter as to which an Indemnitor has accepted its defense and indemnity obligations.

"Environmental Law" means, collectively, all applicable foreign, domestic, federal, state or local laws, statutes, ordinances, rules, regulations, codes, common law doctrines, or other legally binding requirements, including, but not limited to, orders, judgments, settlement agreements, consent orders, consent decrees, consent judgments or Environmental Permits, relating to regulation and protection of human health, the environment, or natural resources, including, but not limited to, all laws regulating Releases or threatened Releases of Hazardous Materials, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq.*, the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *el seq.*, the Clean Air Act, 42 U.S.C. § 7401 *el seq.*, the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and the Toxic Substances Control Act, 15 U.S.C § 52601 *et seq.*, *as* any of the foregoing may have been, or may in the future be, amended.

2

"Environmental Permits" means permits, licenses, registrations, and other authorizations issued under any Environmental Law.

"Environmental Records" means any and all books, records, notes, reports, letters, memoranda, assessments, testing data, maps, Environmental Permits, certificates, applications, approvals, surveys or other written, printed, or electronically or magnetically recorded materials, communications or data relating to; (i) the use, management, handling, transportation. Release, storage, treatment or disposal of any Hazardous Material in, about or under any Delphi Facility; (ii) the environmental condition of the Delphi Facilities; and (iii) compliance with Environmental Laws at the Delphi Facilities. By way of example, Environmental Records includes the following as they directly or indirectly relate to Delphi Facilities: environmental bulletins, environmental performance criteria, NAO reference letters, EPCRA and TSCA manuals, environmental performance audit reports (IPSR & EPR), Phase I property transfer evaluations, release reports, GM SARA database, ISO 14001 certification guidance, Title V materials, (e.g., compliance assessments, compliance reports, outside counsel memoranda re issues, GM emission factors, and rule interpretations).

"Facility" means, as the context may require, either a GM Retained Facility or a Delphi Facility, or both.

"GM Retained Facility" means any and all real property and facilities which are not Delphi Facilities and which were owned, operated, occupied or possessed by GM or its direct or indirect wholly-owned subsidiaries prior to the Contribution Date.

"Hazardous Material" shall mean, collectively, any: (i) chemical, material or substance: (a) which is now or hereafter becomes defined as or included in the definition of "hazardous substance," "extremely hazardous substance," "hazardous waste," "hazardous material," "restricted hazardous waste," "contaminant," "pollutant," "toxic substance," or words of similar import under any Environmental Law; or (b) the emission, discharge, release, storage, transport, disposal, management, handling or use of which is regulated under or subject to any Environmental Law; and (ii) petroleum or petroleum products, or derivatives or fractions thereof, flammable materials, explosives, radioactive materials (including radon gas other than that which is naturally occurring), urea formaldehyde foam insulation ("UFI"), asbestos-containing materials ("ACM") and polychlorinated biphenyls ("PCBs").

"Identified Waste Disposal Sites" means those Off-Site Waste Disposal Sites known to the Parties as of the Contribution Date, where liability is known or alleged, which are identified on Exhibit A to this Agreement.

"Indemnifying Party" or "Indemnitor" means a person that is obligated to provide indemnification under Article 3 of this Agreement.

"Indemnitee" means a person that is entitled to seek indemnification under Article 3 of this Agreement.

3

4

"Newly Identified Waste Disposal Site" means an Off-Site Waste Disposal Site other than an Identified Waste Disposal Site where liability becomes known or is alleged after the Contribution Date.

"Off-Site Waste Disposal Site" means any site, other than a Facility, which is or becomes subject to an obligation for Remedial Action under an Environmental Law.

"Release" means any release, spill, emission, escape, abandonment of any container or receptacle containing any Hazardous Material, leaking, pumping, pouring, emptying, injection, deposit, disposal, discharge, dispersal, leaching, movement or migration of any Hazardous Material on or into the indoor or outdoor environment or into or out of any property.

"Remedial Action" means all investigations and/or actions to: (i) clean up, remove, remediate, treat, or in any other way address any Hazardous Material under or pursuant to any Environmental Law; (ii) prevent the Release or threatened Release, or minimize the further Release of, any Hazardous Material so that it does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; (iv) perform corrective actions or obtain timely closure or closure certification related to any underground or aboveground tank, container storage area, treatment, storage or disposal facility or operation, solid waste management unit or other location of Hazardous Material use, management, handling, transportation, treatment, storage, or disposal; or (v) bring any matter, activity, practice or conduct into compliance with any Environmental Law.

## ARTICLE 2

### Allocation of Environmental Liabilities

**2.1. <u>Responsibility for GM Retained Facilities</u>.**

As of and after the Contribution Date, GM shall be solely responsible for all Environmental Damages arising from, relating to or in connection with all GM Retained facilities, whether or not the circumstances or claims giving rise to such Environmental Damages occurred or were asserted before or after the Contribution Date; provided, however, that Delphi shall be responsible for all Environmental Damages at the GM Retained Facilities to the extent caused by Delphi's acts or omissions first occurring or continuing after the Contribution Date. Where necessary for GM to fulfill its obligations under this Agreement, Delphi will use its best efforts to assign its rights with respect to GM Retained Facilities.

**2.2. <u>Responsibility for Delphi Facilities</u>.**

(a) Subject to Section 2.2(b), as of and after the Contribution Date, Delphi shall be solely responsible for all Environmental Damages arising from, relating to or in connection with all Delphi Facilities and Delphi Assets, whether or not the circumstances or claims giving rise to such Environmental Damages occurred or were asserted before or after the Contribution Date; provided, however, that GM shall be responsible for all Environmental Damages at the Delphi

4

Facilities to the extent caused by GM's acts or omissions first occurring or continuing after the Contribution Date.

(b) Notwithstanding Section 2.2(a), GM shall be solely responsible for all payments relating to any contract for Remedial Action and other environmental-related service or goods procurement contracts, or any stipulated penalties, fines or other sanctions under orders, decrees, judgments or settlements with respect to any environmental matter at a Delphi Facility, actually incurred but not paid by GM prior to the Contribution Date for services performed or acts or omissions occurring before the Contribution Date. Before the Contribution Date, Delphi shall procure environmental-related goods and services only on commercially reasonable terms and conditions, and in no event shall GM be responsible for any materials purchased by Delphi before the Contribution Date and not utilized by Delphi within ninety (90) days after the Contribution Date. Except as otherwise specifically provided in this Section 2.2(b), Delphi shall be solely responsible for all payments under any contracts for Remedial Action, other environmental-related service or goods procurement contracts, and any stipulated penalties, fines or other sanctions under orders, decrees, judgments, or settlements with respect to any environmental matter at a Delphi Facility.

(c) Between the date of the execution of this Agreement and the Contribution Date, the Parties shall pursue, with reasonable diligence and in good faith, with respect to the Delphi Facilities: (i) compliance with Environmental Laws; (ii) the avoidance of any liability under any Environmental Law; and (iii) the resolution or continued performance of any activities necessary to resolve any Environmental Claim or satisfy or discharge any Environmental Damages before the Contribution Date.

**2.3. <u>Responsibility for Waste Disposal Sites</u>.**

(a) <u>Identified Waste Disposal Sites</u>.

As of and after the Contribution Date, GM shall be solely responsible for Environmental Damages and any other liabilities, to the extent due to contributions by GM before or after the Contribution Date, arising from, relating to or in connection with all Identified Waste Disposal Sites.

(b) <u>Newly Identified Waste Disposal Sites</u>.

Within twenty (20) days after receiving notice or other information as to the existence of a Newly Identified Waste Disposal Site as to which the other Party may have liability under an Environmental Law, the Party receiving such notice or information shall notify the other Party and provide copies of all relevant correspondence and other documents relating thereto.

(c) <u>Allocation</u>.

(i) The Parties' respective liability with respect to: (1) Newly Identified Waste Disposal Sites; and (2) contributions to Identified Waste Disposal Sites after the

5

Contribution Date, shall be allocated based on each Party's respective contributions thereto, as follows:

(a) GM's liability shall be based on contributions attributable to the GM Retained Facilities and any other facility owned or operated by GM before, on or after the Contribution Date except the Delphi Facilities.

(b) Delphi's liability shall be based on contributions attributable to the Delphi Facilities and any other facility owned or operated by Delphi on or after the Contribution Date, whether or not such contributions were made before or after the Contribution Date. Delphi shall not be responsible for contributions to Identified Waste Disposal Sites occurring before the Contribution Date.

(ii) The Parties shall use their reasonable best efforts to amicably resolve all liability and allocation issues using traditional factors, such as the volume, type and toxicity of the contributions to such Newly Identified Waste Disposal Site or Identified Waste Disposal Site by each Party.

**2.4. <u>Duty to Comply With Environmental Laws.</u>**

(a) <u>GM</u>. As of and after the Contribution Date, GM shall comply with Environmental Laws at the GM Retained Facilities and the sole legal and financial responsibility for compliance with Environmental Laws applicable to GM's use of, operations at or occupancy of the GM Retained Facilities shall be that of GM.

(b) <u>Delphi</u>. As of and after the Contribution Date, Delphi shall comply with Environmental Laws at the Delphi Facilities and the sole legal and financial responsibility for compliance with Environmental Laws applicable to Delphi's use of, operations at or occupancy of the Delphi Facilities shall be that of Delphi.

(c) The sole remedy of the Parties for breach of this Section 2.4 shall be under the indemnification provisions of Article 3 of this Agreement.

**2.5. <u>No Representations or Warranties.</u>** Except as otherwise expressly set forth in this Agreement, the Delphi Facilities and Delphi Assets are being conveyed in their "as is, where is" condition and with all faults and without any representation or warranty of any nature whatsoever, express or implied, oral or written, and in particular without any implied warranty of merchantability or fitness for a particular purpose.

6

## ARTICLE 3

### Indemnification

**3.1. <u>Indemnification by GM.</u>** GM shall indemnify, defend and hold harmless Delphi from and against all Environmental Damages which are caused by, relate to or arise in connection with:

(a) The GM Retained Facilities, including, but not limited to, Environmental Damages caused by, relating to or arising in connection with circumstances occurring or claims asserted either on, before or after the Contribution Date; provided, however, that GM shall have no indemnity or defense obligations hereunder with respect to Environmental Damages to the extent caused by, relating to, or arising in connection with Delphi's acts or omissions first occurring or continuing after the Contribution Date.

(b) Any act or omission by GM after the Contribution Date.

(c) Contributions before the Contribution Date to all Identified Waste Disposal Sites attributable to a Delphi Facility as well as contributions attributable to a GM Retained Facility.

(d) GM contributions to Newly Identified Waste Disposal Sites attributable to a GM Retained Facility.

(e) Any breach of this Agreement.

(f) Any imposition or acceleration of Environmental Costs and Liabilities or Environmental Claims regarding GM Retained Facilities under Section 9.2(b) under any applicable Environmental Transfer Law, as defined hereafter, as a result of the transactions contemplated by the Master Separation Agreement.

**3.2. <u>Indemnification by Delphi.</u>** Delphi shall indemnify, defend and hold harmless GM from and against all Environmental Damages which are caused by, relate to or arise in connection with:

(a) The Delphi Facilities and all Delphi Assets, including, but not limited to, Environmental Damages caused by, relating to or arising in connection with circumstances occurring or claims asserted either on, before or after the Contribution Date; provided, however, that Delphi shall have no indemnity or defense obligations hereunder with respect to Environmental Damages to the extent caused by. relating to or arising in connection with GM's acts or omissions first occurring or continuing after the Contribution Date.

(b) Any act or omission by Delphi after the Contribution Date.

(c) Any breach of this Agreement.

7

8

(d) Delphi contributions on or after the Contribution Date to Identified Waste Disposal Sites.

(e) Delphi contributions to Newly Identified Waste Disposal Sites attributable to a Delphi Facility.

(f) Any imposition or acceleration of Environmental Costs and Liabilities or Environmental Claims regarding Delphi Facilities under Section 9.2(b) under any applicable Environmental Transfer Law, as defined hereafter, as a result of the transactions contemplated by the Master Separation Agreement.

**3.3. <u>Indemnification Procedures.</u>**

(a) If any Indemnitee receives notice of any Environmental Claim or becomes aware of any Environmental Costs and Liabilities or other matter with respect to which an Indemnifying Party is or may be obligated under this Agreement to provide indemnification to such Indemnitee, the Indemnitee shall give the Indemnifying Party prompt written notice thereof (together with any information concerning the matter). Whenever practicable, such notice shall be provided at least ten (10) business days before the Indemnitee incurs any Environmental Damages in respect of such matter. If such advance notice is not practicable, then notice shall be provided as soon as practicable. Failure or delay of any Indemnitee to give notice as provided in this Section 3.3 shall not relieve any Indemnifying Party of its obligations except to the extent that such Indemnifying Party is actually prejudiced.

(b) An Indemnifying Party may elect to defend any Environmental Claim at its own expense and through its counsel (which counsel shall be reasonably acceptable to the Indemnitee). If an Indemnifying Party elects to defend an Environmental Claim, it shall notify the Indemnitee of its intent to do so within ten (10) business days after receiving notice of such Environmental Claim (or sooner, if the nature of such Environmental Claim so requires). The Indemnitee shall cooperate in the defense of such Environmental Claim. The Indemnifying Party shall keep the Indemnitee reasonably informed as to the status of the defense of such Environmental Claim. The Indemnifying Party shall also pay such Indemnitee's reasonable out-of-pocket expenses incurred in connection with such cooperation, but shall not be responsible for any legal or other expenses subsequently incurred by such Indemnitee in connection with the defense of such Environmental Claim. The Indemnifying Party shall not, without the prior written consent of the Indemnitee: (i) settle or compromise any Environmental Claim or consent to the entry of any judgment which does not include a written release from all liability to the Indemnitee; or (ii) settle or compromise any Environmental Claim in any manner that would be reasonably likely to have a material adverse effect on the Indemnitee. If an Indemnifying Party elects not to defend against a Environmental Claim, or fails to properly notify an Indemnitee of its election, the Indemnitee may defend, compromise, and settle such Environmental Claim and shall be entitled to indemnification to the extent permitted hereunder; provided, however, that the Indemnitee may not compromise or settle any such Environmental Claim without the prior written consent of the Indemnifying Party, which shall not be unreasonably withheld or delayed.

8

3.4. **Mitigation.** No Party shall have any obligation to indemnify the other Party with respect to any Environmental Damages to the extent such Environmental Damages could have reasonably been avoided or mitigated.

3.5. **Exclusive Remedy.** The Parties acknowledge that, except with respect to matters covered under Sections 9.3 and 9.4 of this Agreement: (a) the rights and obligations provided in this Agreement shall be the exclusive rights and obligations of the Parties with respect to environmental matters; and (b) the remedies in Articles 3 and 6 of this Agreement shall be the exclusive remedies of the Parties with respect to environmental matters and shall be in lieu of, and not in addition to, all other remedies which may exist in law, equity or under any other contract.

3.6. **No Initiation of Third Party Claims.** The Parties shall not initiate any action with any third party, including any governmental agency, which could reasonably be expected to lead to an Environmental Claim; provided, however, that nothing herein shall prevent either Party from performing its obligations or exercising its rights under this Agreement.

3.7. **Cooperation On Third Party Claims.** If either Party, in addressing a matter or in defending or resolving any Environmental Claim as to which it has defense or indemnification responsibility under this Agreement (for purposes of this Section 3.7, the "Indemnifying Party"), remediates or incurs costs or damages with respect to a matter for which a third party may be responsible or liable, the other party agrees to cooperate with the Indemnifying Party in pursuing any claim against such third party and the Parties shall assist each other so as to enable the Indemnifying Party to legally assert such claim against such third party and to recover its costs and damages from such third party, including acting as the real party in interest and assigning any rights or causes of action against any such third party relating to such claim or the proceeds thereof to the Indemnifying Party.

## ARTICLE 4

### Environmental Reserves

4.1. As of the Contribution Date, each Party shall be responsible for establishing its own reserves for environmental liabilities in accordance with generally accepted accounting principles. At the time of Contribution, the environmental reserves established for the Delphi Facilities are shown on Exhibit B. These reserves were established in accordance with the same principles used to establish reserves for GM Retained Facilities.

## ARTICLE 5

### Environmental Permits

5.1. Set forth on Exhibit C are all of the Environmental Permits identified and not yet expired with respect to the Delphi Facilities and the Delphi Assets. Exhibit C also identifies, with respect to each such Environmental Permit, whether each such Environmental Permit: (i)

9

relates to the Delphi Facilities and operations by GM on GM Retained Facilities, but shall not be transferred to Delphi by GM and shall remain with GM as permittee; (ii) may be transferred to Delphi under applicable Environmental Law; or (iii) may not be transferred to Delphi under applicable Environmental Law. The Parties shall use best efforts to: (i) effectuate the transfer of those Environmental Permits under clause (ii), above, that may be transferred to Delphi under applicable Environmental Law; (ii) obtain issuance to Delphi of new or replacement Environmental Permits for Delphi's operations now covered by the Environmental Permits described in clauses (i) or (iii), above; and (iii) mitigate problems that may arise during the transfer process. As of and after the Contribution Date, Delphi shall be solely responsible to obtain and comply with all Environmental Permits with respect to the Delphi Facilities and the Delphi Assets, whether or not GM was required under any Environmental Law to, but did not, obtain any such Environmental Permits. Prior to the Contribution Date, Delphi shall have obtained and GM shall also assist Delphi in obtaining new RCRA generator identification numbers which are or may be required under current or future Environmental Laws for hazardous waste, as defined under current or future Environmental Laws. If same cannot be obtained prior to the Contribution Date, Delphi will expeditiously obtain such identification number after the Contribution Date and, to the extent legally required, will use such number or obtain a substitute number for Delphi's use after the Contribution Date. Without the prior written consent of GM, Delphi will not use for any purpose any such numbers issued before the Contribution Date to GM with respect to the Delphi Facilities.

## ARTICLE 6

### Dispute Resolution

**6.1.** The Parties shall use good faith, best efforts and sound and accepted engineering judgment in making all determinations under this Agreement. In the event of a dispute or disagreement under this Agreement, the Parties shall consult in good faith with each other and shall use best efforts to resolve the matter. It is the express intent of the Parties that any such disputes or disagreements shall be resolved through negotiation between the Parties or, if mutually agreeable as to a specific matter in each Party's discretion, a form of alternative dispute resolution, including binding or non-binding arbitration. It is further understood and agreed, however, that alternative dispute resolution and litigation under this Agreement shall be viewed as a last resort and that the results of any non-litigation dispute resolution procedure under this Article 6 shall not be admissible for any purposes in any litigation in which the Parties are involved and relating to this Agreement unless the Parties otherwise agree as part of such resolution or are utilized to enforce the terms thereof. Either Party shall have the right, after making a reasonable and good faith effort to resolve such dispute through other means, to seek judicial relief in connection with any dispute arising under this Agreement, and in the event that either Party resorts to litigation in order to resolve a dispute (including any breach of this Agreement) under this Agreement, the Party prevailing in connection with such dispute shall be entitled to recover its reasonable and actual attorneys' fees and costs incurred in connection with such litigation. In the event that the matter in litigation relates to a dispute involving a Party's failure to comply with its defense and indemnification obligations under this Agreement and the Party in favor of whom such obligations run has, as a result of the successful assertion of an Environmental Claim, spent money to resolve or otherwise dispose of any resulting

10

11

Environmental Damages, the Indemnifying Party shall pay the Indemnitee's interest at the "prime rate" then in effect from the date due until fully paid, on and to the extent of any expenditures by the other Party in respect of such Environmental Damages. Except with respect to matters covered by Section 2.4 (Duty to Comply with Environmental Laws), the procedures under this Article 6 shall apply to all disputes arising under this Agreement.

## ARTICLE 7

### Transfer Obligations and Non-Assignability

**7.1. Duties Upon Transfer**. Each Party, in connection with the execution and delivery of any lease, sublease, assignment, agreement of sale or other transfer, assignment or conveyance agreement relating to the Delphi Facilities, Delphi Assets or GM Retained Facilities ("Conveyance Document") in which any interest in or portion of any Delphi Facility, Delphi Asset or GM Retained Facility, respectively, is conveyed, sold, contributed, assigned, transferred, leased or subleased, shall use its reasonable best efforts to provide in such Conveyance Document that the non-transferring Party shall have no liability or responsibility for, and shall be fully released and exculpated from, all Environmental Costs and Liabilities and Environmental Claims with respect to the specific Delphi Facility, Delphi Asset or GM Retained Facility subject to such Conveyance Document, and to impose the obligations under this Section 7.1 on any subsequent user, occupant or transferee.

**7.2. Non-Assignability**. The Parties' respective rights, obligations, duties and liabilities under this Agreement, including, but not limited to, the indemnification provisions of Article 3, are personal to each of them and may not be assigned to, or assumed by, any successor, assignee, or any other person without the prior written consent of the other Party, which consent may be granted or withheld in the sole discretion of such other Party; provided, however, that either Party may assign their respective rights under this Agreement to a Corporate Successor without the consent of the other Party, but only if such Corporate Successor also agrees to assume such Party's duties, obligations and liabilities under this Agreement. No such assignment or assumption shall relieve either Party of its obligations under this Agreement unless so agreed in writing by the other Party.

## ARTICLE 8

### Mutual Releases and Covenants Not to Sue

**8.1. Release**. Except as otherwise expressly set forth in Articles 3 and 6 of this Agreement, each Party hereby fully and forever releases and discharges the other Party and its officers, directors, employees, shareholders, direct and indirect wholly-owned subsidiaries, representatives and agents from all manner of action and causes of action, suits, proceedings, arbitrations, choses in action, contracts, covenants, claims, bonds, bills, debts, dues, sums of money, damages, demands and rights whatsoever, in law or in equity, now existing or which may hereafter accrue by reason of any known or unknown facts existing either before or after the Contribution Date and which relate to matters under Environmental Laws, whether or not specifically addressed in this Agreement, including, but not limited to, the environmental

11

12

condition and compliance status of the Delphi Facilities, the Delphi Assets, the GM Retained Facilities, the Identified Waste Disposal Sites, and the Newly Identified Waste Disposal Sites, and all Environmental Damages, Environmental Costs and Liabilities, and Environmental Claims relating thereto.

**8.2. Covenant Not to Sue**. Except as otherwise expressly set forth in Articles 3 and 6 of this Agreement, each Party hereby covenants that it shall not commence any action, arbitration, proceeding or suit, or participate or assist in any manner in the commencement or prosecution of any action, arbitration, proceeding or suit, in law or in equity, in any judicial, administrative, or other forum, based upon or arising out of any matter subject to a release by such Party under Section 8.1 of this Agreement.

# ARTICLE 9

## Miscellaneous

**9.1. Environmental Records**.

(a) As of the Contribution Date, GM shall transfer to Delphi either the originals or true and complete copies of all Environmental Records.

(b) Subject to Section 9.1(c), for a period of seven (7) years from and after the date hereof, each Party covenants and agrees to keep and maintain at reasonably accessible locations all of the Environmental Records in its possession or control as of the date hereof or otherwise coming into the possession or control of such Party after the date hereof. Following reasonable advance written notice, each Party shall make available for review and photocopying by the other Party each and all of its Environmental Records.

(c) With respect to matters in dispute between the Parties or subject to an Environmental Claim at the end of the seven (7) year record retention period, such retention period shall be extended and shall continue with respect to all Environmental Records that may be relevant to the matter until the matter is finally and fully resolved.

**9.2. Environmental/Real Property Transfer Laws**.

(a) The Parties shall reasonably cooperate in good faith with respect to compliance with any applicable Environmental Laws or other laws that require disclosures or other notifications regarding environmental matters to be made by or to either Party or any unit of government in connection with the transactions contemplated by the Master Separation Agreement (collectively, "Environmental Transfer Laws"). To the extent that any obligation exists under any Environmental Transfer Laws to report any information or make any report or notice, such obligation shall be jointly undertaken by the Parties. Each Party hereby waives any requirements under any such Environmental Transfer Law that disclosures or other reports or notifications be made before the Contribution Date and agree that such disclosures and other notifications may be made on the Contribution Date.

12

13

(b) The Parties shall each use their reasonable best efforts to avoid the imposition of or accelerating any Environmental Costs and Liabilities or Environmental Claims under any applicable Environmental Transfer Law as a result of the transactions contemplated by the Master Separation Agreement. Such avoidance strategies could include GM leasing assets to Delphi. Subject to the preceding sentence, neither Party shall be liable or responsible for any Environmental Costs and Liabilities or Environmental Claims regarding the other Party's facilities under any Environmental Transfer Law resulting from the transactions contemplated by the Master Separation Agreement, and each Party shall indemnify and defend the other with respect thereto in accordance with the terms of Article 3.

**9.3. Wastewaters, Stormwater and other Services Agreements**. The Parties may enter into a Wastewaters and Stormwater Services Agreement, or other agreements, under which one Party shall provide certain services for the other Party.

**9.4. Leases and Sub-leases Regarding Certain Facilities**. The Parties have entered or will enter into leases and sub-leases with respect to certain facilities. The terms and conditions with respect to environmental matters at such facilities shall be governed by the respective leases and sub-leases for those facilities.

**9.5. Entire Agreement**. Except for the Master Separation Agreement, the service agreements and the leases and sub-leases referenced in this Agreement, this Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings with respect to the subject matter hereof. In the event of a conflict between this Agreement and the Master Separation Agreement, the terms of this Agreement shall supersede those of the Master Separation Agreement. This Agreement is not intended to confer upon any other person any benefit, right or remedy.

**9.6. No Arrangement for Disposal.** The Parties each acknowledge that the transactions contemplated by this Agreement constitute a transfer of assets in the ordinary course of business and are not intended in any way, nor will they be deemed to be, an arrangement for treatment, storage or disposal of any of the Delphi Facilities or Delphi Assets or any substances or materials contained therein. Delphi agrees that GM will not have any liability under any Environmental Law by virtue of such transfer alone and Delphi will not assert any claim or cause of action against GM based solely thereon.

**9.7. Further Assurances.** The Parties hereto, at any time before or after the Contribution Date, shall, at their own expense, execute, acknowledge and deliver any further assurances, documents and instruments reasonably requested by one another and shall take any other action consistent with the terms of this Agreement that may reasonably be requested by one another for the purpose of consummating the transactions contemplated by or fulfilling the intent of this Agreement.

**9.8. Governing Law.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware regardless of the laws that otherwise govern under applicable principles of conflicts of laws.

13

**9.9. <u>Descriptive Headings.</u>** The descriptive headings herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

**9.10. <u>Notices.</u>** All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered in person, by express or overnight mail or messenger delivered by a nationally recognized air courier (delivery charges prepaid), or by registered or certified mail (postage prepaid, return receipt requested), to a Party as follows:

If to GM: Michelle T. Fisher, Esq.

If to Delphi: Mark A. Hester, Esq.

**9.11. <u>Amendment.</u>** No change or amendment shall be made to this Agreement except by an instrument in writing signed on behalf of each Party hereto.

**9.12. <u>Counterparts.</u>** This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

**9.13. <u>Severability.</u>** If any provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the subject matter hereof is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner so the intent hereof is fulfilled to the fullest extent possible.

**9.14. <u>Failure or Indulgence Not Waived.</u>** Subject to the express provisions of this Agreement, no failure or delay on the part of any Party hereto in the exercise of any right hereunder shall impair such right or be construed to be a waiver of, or acquiescence in, any breach of this Agreement, nor shall any single or partial exercise of any such right preclude other or further exercise thereof or of any other right.

**9.15. <u>Confidentiality.</u>** The terms of this Agreement shall remain confidential and each Party shall not disclose the same without the prior written consent of the other Party except: (a) to such Party's directors, officers, partners, employees, legal counsel, accountants, engineers,

14

15

contractors, financial advisors and similar professionals and consultants to the extent such Party deems it necessary or appropriate and such Party shall inform each of the foregoing persons of such Party's obligations under this paragraph and shall secure the agreement of such persons to be bound by the terms hereof; (b) pursuant to contractual obligations existing as of the date hereof; or (c) as otherwise required by law or regulation.

**9.16.** No rights are created in any third party by this Agreement.

**9.17.** Each Party will cause its direct and indirect wholly-owned subsidiaries to take such actions as may be reasonably necessary to assist such Party to perform its obligations under this Agreement.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by its authorized officers.

GENERAL MOTORS CORPORATION

By:/s/ [ILLEGIBLE]
    Name:    [ILLEGIBLE]
    Title:    [ILLEGIBLE]

DELPHI AUTOMOTIVE SYSTEMS CORPORATION

By:/s/ James A. Bertrand
    Name:    James A. Bertrand
    Title:    Vice President-Operations

EXECUTION RECOMMENDED
WORLDWIDE REAL ESTATE

BY  /s/ C. P. Schwartz

15

16

# EXHIBIT I

**Hearing Date and Time:  March 18, 2010 at 10:00 a.m. (prevailing Eastern time)**
**Supplemental Response Date and Time:  March 16, 2010 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti

Attorneys for DPH Holdings Corp., et al.,
   Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                             :
          In re                                :     Chapter 11
                                             :
DPH HOLDINGS CORP., et al.,        :     Case Number 05-44481 (RDD)
                                           :
                                         :     (Jointly Administered)
                  Reorganized Debtors.     :
                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

REORGANIZED DEBTORS' SUPPLEMENTAL REPLY TO RESPONSES OF CERTAIN
CLAIMANTS TO DEBTORS' OBJECTIONS TO PROOF OF CLAIM NO. 7054 FILED BY
JOYCE L. SKILLMAN, PROOF OF CLAIM NO. 9221 FILED BY AUDREY AMORT
CARBRERA, PROOF OF CLAIM NO. 10830 FILED BY SAUNDRA L. HAMLIN,
PROOF OF CLAIM NO. 11375 FILED BY JEFFREY A. MILLER, ADMINISTRATIVE
EXPENSE CLAIM NO. 16967 FILED BY DWIGHT L. GOODIN, ADMINISTRATIVE
EXPENSE CLAIM NO. 18614 FILED BY WILLIAM E. CROSS, AND ADMINISTRATIVE
EXPENSE CLAIM NO. 19162 FILED BY SCOTT A. MCBAIN

("SUPPLEMENTAL REPLY REGARDING CERTAIN PENSION AND BENEFIT CLAIMS")

DPH Holdings Corp. and certain of its affiliated reorganized debtors in the above-captioned cases (together with DPH Holdings Corp., the "Reorganized Debtors") hereby submit the Reorganized Debtors' Supplemental Reply To Responses Of Certain Claimants To Debtors' Objections To Proof Of Claim No. 7054 Filed By Joyce L. Skillman, Proof Of Claim No. 9221 Filed By Audrey Amort Carbrera, Proof Of Claim No. 10830 Filed By Saundra L. Hamlin, Proof Of Claim No. 11375 Filed By Jeffrey A. Miller, Administrative Expense Claim No. 16967 Filed By Dwight L. Goodin, Administrative Expense Claim No. 18614 Filed By William E. Cross, And Administrative Expense Claim No. 19162 Filed By Scott A. McBain (the "Supplemental Reply"), and respectfully represent as follows:

A.    Preliminary Statement

1.    On October 8 and 14, 2005, Delphi Corporation and certain of its affiliates (the "Debtors"), predecessors of the Reorganized Debtors, filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").

2.    On October 6, 2009, the Debtors substantially consummated the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified (the "Modified Plan"), which had been approved by this Court pursuant to an order entered on July 30, 2009 (Docket No. 18707), and emerged from chapter 11 as the Reorganized Debtors.

3.    On February 18, 2010, the Reorganized Debtors filed the Notice Of Sufficiency Hearing With Respect To Debtors' Objections To Proofs Of Claim Nos. 6991, 7054, 9221, 10830, 10959, 10960, 11375, 11643, 11644, 11892, 11911, 11983, 11985, 11988, 11989, 12147, 12833, 13776, 13881, 14019, 14020, 14022, 14023, 14024, 14025, 14026, 14370, 14825,

2

14826, 16967, 18265, 18422, 18603, 18614, 19162, 19543, And 19545 (Docket No. 19504) (the "Sufficiency Hearing Notice").

      4.    The Reorganized Debtors filed the Sufficiency Hearing Notice and are filing this Supplemental Reply to implement Article 9.6(a) of the Modified Plan, which provides that "[t]he Reorganized Debtors shall retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors and making distributions (if any) with respect to all Claims and Interests."  Modified Plan, art. 9.6(a).

      5.    By the Sufficiency Hearing Notice and pursuant to the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims, entered December 7, 2006 (Docket No. 6089) (the "Claims Objection Procedures Order") and the Ninth Supplemental Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims, entered December 11, 2009 (Docket No. 19176), the Reorganized Debtors scheduled a hearing (the "Sufficiency Hearing") on March 18, 2010 at 10:00 a.m. (prevailing Eastern time) in this Court to address the legal sufficiency of each proof of claim filed by the claimants listed on Exhibit A to the Sufficiency Hearing Notice and whether each such proof of claim states a colorable claim against the asserted Debtor.

      6.    This Supplemental Reply is filed pursuant to paragraph 9(b)(i) of the Claims Objection Procedures Order.  Pursuant to paragraph 9(b)(ii) of the Claims Objection Procedures Order, if a Claimant wishes to file a supplemental pleading in response to this

Supplemental Reply, the Claimant shall file and serve its response no later than two business

days before the scheduled Sufficiency Hearing – i.e., by **March 16, 2010.**

B.    Relief Requested

7.    By this Supplemental Reply, the Reorganized Debtors request entry of an

order disallowing and expunging certain proofs of claim and administrative expense claims filed

by employees of the Debtors or a spouse of an employee of the Debtors asserting pension,

employment benefit, and other post-employment benefit ("OPEB") claims.

C.    Pension And Benefit Claims

8.    During their review of the proofs of claim and administrative expense

claims filed in these cases, the Reorganized Debtors also determined that certain Proofs of Claim

assert liabilities or dollar amounts in connection with pension plans, employee benefit programs,

and/or OPEB that are not owing pursuant to the Reorganized Debtors' books and records.

Because the amounts asserted by these claimants are not owing by the Debtors, the Reorganized

Debtors believe that the parties asserting these proofs of claim are not creditors of the Debtors.

Accordingly, this Court should enter an order disallowing and expunging each of these proofs of

claim in their entirety.

D.    Pension And Benefit Claims Filed Against The Debtors

9.    On May 30, 2006, Joyce L. Skillman, the former spouse of a former

salaried employee of the Debtors, filed proof of claim number 7054 against Delphi Corporation,

asserting $274,230.36 pursuant to a qualified domestic relations order (a "QDRO") entered in a

state court that provided that certain retirement benefits would be paid to Ms. Skillman.

10.    On July 10, 2006, Audrey Amort Carbrera, the former spouse of a former

employee of the Debtors, filed proof of claim number 9221 against Delphi Corporation, asserting

a priority claim for child support and spousal support to be taken from her former spouse's retirement benefits.

11.     On July 25, 2006, Saundra L. Hamlin, the former spouse of a former salaried employee of the Debtors, filed proof of claim number 10830 against Delphi Corporation, asserting an unliquidated claim pursuant to a qualified domestic relations order entered in a state court that provided that certain retirement benefits would be paid to Ms. Hamlin.

12.     On July 27, 2006, Jeffrey A. Miller, a former salaried employee of the Debtors, filed proof of claim number 11375 against Delphi Corporation, asserting a priority claim in the amount of $37,000.00 plus stock pursuant to an incentive program.

13.     On June 29, 2009, Dwight L. Goodin, a former salaried employee of the Debtors, filed administrative expense claim number 16967 against Delphi Corporation, asserting retirement benefits and amounts allegedly owing in connection with the Debtors' Supplemental Executive Retirement Program (the "SERP").

14.     On July 14, 2009, William E. Cross, a former salaried employee of the Debtors, filed administrative expense claim number 18614 against Delphi Corporation, asserting retirement, pension, and other post-employment benefit ("OPEB") claims allegedly owing pursuant to a settlement agreement resolving Mr. Cross's wrongful discharge and age discrimination lawsuit against Delphi Corporation and General Motors Corporation.

15.     On July 15, 2009, Scott A. McBain (together with Ms. Skillman, Ms. Carbrera, Ms. Hamlin, Mr. Miller, Mr. Goodin, and Mr. Cross, the "Claimants"), a former salaried employee of the Debtors, filed administrative expense claim number 19162 (together with proofs of claim numbers 7054, 9221, 10830, and 11375 and administrative expense claim numbers 16967 and 18614, the "Pension and Benefit Claims") against Delphi Corporation,

asserting $10,000.00 under a U.S. Executive Recognition and Retention Grant Agreement (the

"Executive Retention Agreement") between Mr. McBain and the Debtors, dated February 23,

2005.

      16.    <u>The Debtors' Objections To The Pension And Benefit Claims</u>.  <u>The</u>

<u>Debtors' Objections To The Pension And Benefit Claims</u>.  On February 15, 2008, the Debtors

filed the Debtors' Twenty-Sixth Omnibus Objection Pursuant To 11 U.S.C. § 502(b) And Fed. R.

Bankr. P. 3007 To Certain (A) Duplicate Or Amended Claims, (B) Untimely Claims Not

Reflected on Debtors' Books And Records, (C) Untimely Claims, And (D) Claims Subject To

Modification And Modified Claim Asserting Reclamation (Docket No. 12686) (the "Twenty-

Sixth Omnibus Claims Objection"), by which the Debtors objected to proof of claim number

9221 filed by Ms. Cabrera, on the grounds that this claim is a duplicate of another claim filed

against the Debtors, proof of claim number 16768.

      17.    On October 15, 2009, the Debtors filed the Reorganized Debtors' Thirty-

Sixth Omnibus Objection Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To (I)

Modify And Allow Claim And (II) Expunge Certain (A) Duplicate SERP Claims, (B) Books

And Records Claims, (C) Untimely Claims, And (D) Pension, Benefit, And OPEB Claims

(Docket No. 18983) (the "Thirty-Sixth Omnibus Claims Objection"), by which the Debtors

objected to proofs of claim numbers 7054, 10830, and 11375 filed by Ms. Skillman, Ms. Hamlin,

and Mr. Miller, respectively, on the grounds that such claims assert pension and/or benefit

obligations not reflected on the Debtors' books and records and for which the Debtors are not

liable and, accordingly, sought an order disallowing and expunging those proofs of claim.

      18.    On October 15, 2009, the Debtors filed the Reorganized Debtors' Thirty-

Seventh Omnibus Objection Pursuant To 11 U.S.C. § 503(b) And Fed. R. Bankr. P. 3007 To

Expunge Certain (I) Prepetition Claims, (II) Equity Interests, (III) Books And Records Claims,

(IV) Untimely Claims, (V) Paid Severance Claims, (VI) Pension, Benefit, And OPEB Claims,

And (VII) Duplicate Claims (Docket No. 18984) (the "Thirty-Seventh Omnibus Claims

Objection"), by which the Debtors objected to administrative expense claim numbers 16967,

18614, and 19162 filed by Mr. Goodin, Mr. Cross, and Mr. McBain, respectively, on the grounds

that such claims assert pension and/or benefit obligations not reflected on the Debtors' books and

records and for which the Debtors are not liable and, accordingly, sought an order disallowing

and expunging those proofs of claim.

19.     <u>Responses To The Debtors' Objections</u>.  On November 10, 2009, Ms.

Skillman filed a response to the Thirty-Sixth Omnibus Claims Objection (Docket No. 7054), in

which she asserts that her claim is not a pension claim, but a claim for benefits allegedly owing

to her pursuant to the QDRO she obtained.

20.     On March 17, 2008, Ms. Carbrera filed a response to the Twenty-Sixth

Omnibus Claims Objection (Docket no. 13131), asserting that she was not aware of proof of

claim number 16768, the duplicate claim referenced in the Debtors' objection.

21.     Ms. Hamlin served an undocketed response to the Thirty-Sixth Omnibus

Claims Objection, in which she asserts that the Debtors should be responsible for the pension

benefits she asserts in her claim by virtue of the QDRO she obtained.  A copy of Ms. Hamlin's

response is attached hereto as <u>Exhibit A</u>.

22.     On November 8, 2009, Mr. Miller served an undocketed response to the

Thirty-Sixth Omnibus Claims Objection, in which he asserts that he was told that he would

obtain bonuses during these chapter 11 cases and that he would have a job with "the new

Delphi."  Mr. Miller asserts that he is entitled to stock in the new company equal to the value of

what was not paid to him and states that he would accept a cash settlement of $81,575.00.  A copy of Mr. Miller's response is attached hereto as <u>Exhibit B</u>.

       23.     On November 3, 2009, Mr. Goodin filed a response to the Thirty-Seventh Omnibus Claims Objection (Docket No. 19033), in which he asserts that if his claim is a duplicate of scheduled liability number 10416687 that has already been allowed, it should be disallowed but that the allowance of his scheduled liability should not be affected.

       24.     On November 9, 2009, Mr. Cross filed a response to the Thirty-Seventh Omnibus Claims Objection (Docket No. 19070), in which he reiterates the argument made in his claim that he is entitled to receive retirement, pension, and OPEB payments pursuant to a settlement agreement resolving Mr. Cross's wrongful discharge and age discrimination lawsuit against Delphi Corporation and General Motors Corporation.

       25.     On November 10, 2009, Mr. McBain filed a response to the Thirty-Seventh Omnibus Claims Objection (Docket No. 19069), in which he asserts that he is owed amounts pursuant to the Executive Retention Agreement.

       26.     <u>The Sufficiency Hearing Notice</u>.  Pursuant to the Claims Objection Procedures Order, the hearing on the Debtors' objection to the Pension and Benefit Claims was adjourned to a future date.  On February 18, 2010, the Reorganized Debtors filed the Sufficiency Hearing Notice with respect to the Pension and Benefit Claims, among other proofs of claim and administrative claims, scheduling the Sufficiency Hearing.

E.     <u>Claimants' Burden Of Proof And Standard For Sufficiency Of Claim</u>

       27.     The Reorganized Debtors respectfully submit that the Pension and Benefit Claims fail to state a claim against the Debtors under rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Claimants have not proved any facts to support a right to payment by the Reorganized Debtors on behalf of the Debtors.  Accordingly,

8

the Debtors' objections to each Pension and Benefit Claim should be sustained and each such

claim should be disallowed and expunged in its entirety.

28.    The burden of proof to establish a claim against the Debtors rests on the

claimants and, if a proof of claim does not include sufficient factual support, such proof of claim

is not entitled to a presumption of <u>prima facie</u> validity pursuant to Bankruptcy Rule 3001(f).  <u>In</u>

<u>re Spiegel, Inc.</u>, No. 03-11540, 2007 WL 2456626, at *15 (Bankr. S.D.N.Y. August 22, 2007)

(the claimant always bears the burden of persuasion and must initially allege facts sufficient to

support the claim); <u>see also</u> <u>In re WorldCom, Inc.</u>, No. 02-13533, 2005 WL 3832065, at *4

(Bankr. S.D.N.Y. Dec. 29, 2005) (only a claim that alleges facts sufficient to support legal

liability to claimant satisfies claimant's initial obligation to file substantiated proof of claim); <u>In</u>

<u>re Allegheny Intern., Inc.</u>, 954 F.2d 167, 173 (3d Cir. 1992) (in its initial proof of claim filing,

claimant must allege facts sufficient to support claim); <u>In re Chiro Plus, Inc.</u>, 339 B.R. 111, 113

(Bankr. D.N.J. 2006) (claimant bears initial burden of sufficiently alleging claim and establishing

facts to support legal liability); <u>In re Armstrong Finishing, L.L.C.</u>, No. 99-11576-C11, 2001 WL

1700029, at *2 (Bankr. M.D.N.C. May 2, 2001) (only when claimant alleges facts sufficient to

support its proof of claim is it entitled to have claim considered <u>prima facie</u> valid); <u>In re United</u>

<u>Cos. Fin. Corp.</u>, 267 B.R. 524, 527 (Bankr. D. Del. 2000) (claimant must allege facts sufficient

to support legal basis for its claim to have claim make <u>prima facie</u> case).

29.    For purposes of sufficiency, this Court has determined that the standard of

whether a claimant has met its initial burden of proof to establish a claim should be similar to the

standard employed by courts in deciding a motion to dismiss under Bankruptcy Rules 7012 and

9014.  <u>See</u> Transcript of January 12, 2007 Hearing (Docket No. 7118) (the "January 12, 2007

Transcript") at 52:24-53:1.  Pursuant to that standard, a motion to dismiss should be granted "if it

9

plainly appears that the nonmovant 'can prove no set of facts in support of his claim which would entitle him to relief.'"  In re Lopes, 339 B.R. 82, 86 (Bankr. S.D.N.Y. 2006) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  Essentially, the claimant must provide facts that sufficiently support a legal liability against the Debtors.

30.    This Court further established that the sufficiency hearing standard is consistent with Bankruptcy Rule 3001(f), which states that "a proof of claim executed and filed in accordance with these Rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f) (emphasis added).  Likewise, Bankruptcy Rule 3001(a) requires that "the proof of claim must be consistent with the official form" and Bankruptcy Rule 3001(c) requires "evidence of a writing if the claim is based on a writing."  Fed. R. Bankr. P. 3001(a), (c).  See January 12, 2007 Transcript at 52:17-22.

F.    Argument Regarding The Pension and Benefit Claims

31.    In their Proofs of Claim and responses to the Debtors' objection to those claims, the Claimants have not proved any set of facts that support a right to payment from the Reorganized Debtors or address the Debtors' arguments as set forth in the Twenty-Sixth Omnibus Claims Objection, the Thirty-Sixth Omnibus Claims Objection, and the Thirty-Seventh Omnibus Claims Objection supporting the Debtors' request for this Court to enter an order disallowing and expunging the Pension and Benefit Claims.

32.    As set forth in the Twenty-Sixth Omnibus Claims Objection, the Thirty-Sixth Omnibus Claims Objection, and the Thirty-Seventh Omnibus Claims Objection, proofs of claim asserting liabilities or dollar amounts in connection with the Delphi Hourly-Rate Employees Pension Plan, the Delphi Retirement Program for Salaried Employees, the Delphi Mechatronic Systems Retirement Program, the ASEC Manufacturing Retirement Program, the Packard-Hughes Interconnect Bargaining Retirement Plan, and the Packard-Hughes Interconnect

10

Non-Bargaining Retirement Plan (together, the "Pension Plans") are not enforceable against the

Debtors or property of the Debtors for the purposes of section 502(b)(1) of the Bankruptcy Code

because the Pension Plans are separate legal entities distinct from the Debtors' estates.  See In re

Springfield Furniture, Inc., 145 B.R. 520, 528 (Bankr. E.D. Va. 1992) (holding that defined

benefit pension plan and trust holding assets of plan are separate and distinct legal entities and

thus "the assets of the Trust (and Plan) are not assets of the [d]ebtors' bankruptcy estate").  The

Pension Plans – not the Debtors – are obligated to pay benefits to Pension Plan participants, so

any Claims arising from the Pension Plans must be asserted against the Pension Plans rather than

the Debtors.

            33.       In addition, the Pension Plans were terminated by the Pension Benefit

Guaranty Corporation (the "PBGC") as of July 31, 2009.  Under the Employee Retirement

Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1301 et seq., the PBGC has

the sole and total right to recover against employers for pension plan underfunding and

participants have no right to make claims against their employers for benefits under terminated

plans.  See 29 U.S.C. § 1362; see also United Steelworkers of Amer. v. United Eng'g, Inc., 52

F.3d 1386, 1390 (6th Cir. 1995); Int'l Ass'n of Machinists & Aerospace Workers v. Rome Cable

Corp., 810 F. Supp. 402 (N.D.N.Y. 1993); In re Adams Hard Facing Co., 129 B.R. 662 (W.D.

Okla. 1991); In re Lineal Group, Inc., 226 B.R. 608 (Bankr. M.D. Tenn. 1998).

            34.       Argument Regarding Pension And Benefit Claims Asserting Claims For

Salaried OPEB.  The Proofs of Claim should be disallowed and expunged to the extent they

assert liabilities or dollar amounts on account of salaried OPEB, as this Court has previously

determined that the Debtors' Salaried OPEB was not vested and was provided on an at will basis.

See Final Order Under 11 U.S.C. §§ 105, 363 (b)(1), 1108, And 1114 (d) (I) Confirming

Debtors' Authority to Terminate Employer-Paid Post-Retirement Health Care Benefits And Employer-Paid Post-Retirement Life Insurance Benefits For Certain (a) Salaried Employees And (b) Retirees And Their Surviving Spouses And (II) Amending Scope And Establishing Deadline For Completion Of Retirees' Committee's Responsibilities, dated March 11, 2009 (Docket No. 16448).

35.     The cancellation of a benefit provided on an at will basis does not give rise to a "claim" as defined in section 101(5) of the Bankruptcy Code because the retiree has no "right to payment."  See, e.g., In re Wellman, Inc., No. 08-10595, slip op. at 6 (Bankr. S.D.N.Y. Jan. 23, 2009) (sustaining debtors' objection to disallow portion of claims for modified severance benefits that exceeded amounts owed under amended severance plan, reasoning that because old severance plan was terminable at will, claims under old severance plan were not enforceable); In re Ionosphere Clubs, Inc., 134 B.R. 515, 519 n. 4 (Bankr. S.D.N.Y. 1991) (noting that terminating plans which are terminable at will gave rise to no claims whatsoever).

G.     Arguments Regarding Specific Claims

36.     Joyce L. Skillman (Proof of Claim No. 7054) And Saundra L. Hamlin (Proof of Claim No. 10830).  The assertions of Ms. Skillman and Ms. Hamlin that their claims are valid because they arise pursuant to a QDRO rather than the Pension Plans are in error.  A QDRO is a domestic relations order that creates or recognizes the existence of an alternate payee's right to receive, or assigns to an alternate payee the right to receive, all or a portion of the benefits payable with respect to a participant under a retirement plan.  See 29 U.S.C. § 1056(d)(3)(B)(i); 26 U.S.C. § 414(p)(1)(A).  As described above, participants in the Pension Plans have no right to make claims against their employers for benefits under terminated plans. Accordingly, individuals who are alternate payees pursuant to a QDRO do not have such rights either.

12

37.     <u>Audrey Amort Carbrera (Proof of Claim No. 9221)</u>.  Similarly, Ms. Carbrera is not entitled to make a claim against the Debtors because of her former spouse's retirement benefits, as her spouse no longer has a claim against the Debtors for those benefits.[1]

38.     <u>Jeffrey A. Miller (Proof of Claim No. 11375)</u>.  Mr. Miller's assertion that he is entitled to a grant of stock should be denied because his claim is not sufficiently documented.  Mr. Miller merely stated that he has a claim but did not include any explanation or provide any proof with respect to his claim.  Because of Mr. Miller's failure to provide sufficient documentation to permit an understanding of the basis for his claims, such claims do not make out a <u>prima</u> <u>facie</u> case against the Debtors.

39.     <u>Dwight L. Goodin (Administrative Expense Claim No. 16967)</u>.  Mr. Goodin's administrative expense claim number 16967 is a duplicate of his scheduled liability number 10416687, which was allowed as a general unsecured claim in the amount of $409,200.79 pursuant to Joint Stipulation And Agreed Order (I) Compromising And Allowing Proofs Of Claim Filed By Certain Retirees And Related Claimants And (II) Disallowing and Expunging Other Proof Of Claim Filed By Certain Retirees And Related Claimants (Dwight L. Goodin And Spouse) entered February 4, 2008 (Docket No. 12488).  Accordingly, administrative expense claim number 16967 should be disallowed and expunged as a duplicate claim.[2]

40.     <u>William E. Cross (Administrative Claim No. 18614)</u>.  Mr. Cross's assertion that he is entitled to continue receiving pension, benefit, and OPEB payments pursuant to his settlement agreement is without merit.  As stated above, those pension and benefit plans

---

[1]     Although the Debtors objected to Ms. Carbrera's claim because it is a duplicate claim, the Reorganized Debtors request that her claim be disallowed and expunged on the grounds set forth herein.

[2]     Although the Reorganized Debtors objected to Mr. Goodin's claim because it is a claim asserting pension and other benefits for which they are not liable, the Reorganized Debtors request that his claim be disallowed and expunged on the grounds set forth herein.

were terminated with respect to all employees.  Mr. Cross is not exempted from the orders of this

Court authorizing those terminations by virtue of his settlement agreement.

        41.    <u>Scott A. McBain (Administrative Claim No. 19162)</u>.  Mr. McBain's

assertion that he is entitled to payment under his Executive Retention Agreement is in error

because by participating in the Key Executive Compensation Program authorized by this Court

pursuant to Order Under 11 U.S.C. §§ 105 And 363 Authorizing The Debtors To Implement A

Short-Term Annual Incentive Program (Docket No. 2441)., Mr. McBain signed a waiver on

February 28, 2006 waiving all claims arising from the Executive Retention Agreement.  A copy

of this waiver is attached hereto as <u>Exhibit C</u>.

WHEREFORE the Reorganized Debtors respectfully request this Court enter an order (a) sustaining the objections with respect to the Pension and Benefit Claims, (b) disallowing and expunging each Pension and Benefit Claim in its entirety, and (c) granting such further and other relief this Court deems just and proper.

Dated:     New York, New York
           March 8, 2010

                          SKADDEN, ARPS, SLATE, MEAGHER
                             & FLOM LLP

                          By:   John Wm. Butler, Jr.
                               John Wm. Butler, Jr.
                               John K. Lyons
                               Ron E. Meisler
                          155 North Wacker Drive
                          Chicago, Illinois 60606

                               - and -

                          By:   Kayalyn A. Marafioti
                               Kayalyn A. Marafioti
                          Four Times Square
                          New York, New York 10036

                          Attorneys for DPH Holdings Corp., et al.,
                             Reorganized Debtors

15

**EXHIBIT A**

Regarding #36 and #37

RECEIVED
BY MAIL ☐
BY HAND ☐

NOV 18 2009

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM

I object – The company should be responsible for holding up their part of agreement with their employees, ex-employees, ex spouses, and spouses, for the pension and benefits.

Date filed – 7/25/06
# 10830
Basis for Objection
Pension, Benefits
and OPEB Claims

SAUNDRA HAMLIN
505 UNGER AVE
ENGLEWOOD, OHIO
45322

9372381838

The Claim identified as having a Basis for Objection of "Modified And Allowed Claim" is a claim that overstates the dollar amount owed.

Claims identified as having a Basis for Objection of "Duplicate SERP Claims" are duplicates of other claims.

Claims identified as having a Basis for Objection of "Books And Records Claims" assert liabilities and dollar amounts that are not owing pursuant the Reorganized Debtors' books and records.

Claims identified as having a Basis for Objection of "Untimely Claims" are Claims that were not timely filed pursuant to the Order Under 11 U.S.C. §§ 107(b), 501, 502, And 1111(a) And Fed R. Bankr. P. 1009, 2002(a)(7), 3003(c)(3), And 5005(a) Establishing Bar Dates For Filing Proofs Of Claim And Approving Form And Manner Of Notice Thereof (Docket No. 3206).

Claims identified as having a Basis for Objection of "Pension, Benefit, And OPEB Claims" are those Claims for which the Reorganized Debtors are not liable.

| Date Filed | Claim Number | Asserted Claim Amount[1] | Basis For Objection | Treatment Of Claim | Surviving Claim Number (if any) |
|---|---|---|---|---|---|
| 07/25/06 | 10830 | $0.00 | Pension, Benefit, And OPEB Claims | Disallow And Expunge | |

If you wish to view the complete exhibits to the Thirty-Sixth Omnibus Claims Objection, you can do so at www.dphholdingsdocket.com. If you have any questions about this notice or the Thirty-Sixth Omnibus Claims Objection to your Claim, please contact the Reorganized Debtors' counsel by e-mail at dphholdings@skadden.com, by telephone at 1-800-718-5305, or in writing at Skadden, Arps, Slate, Meagher & Flom LLP, 155 North Wacker Drive, Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr., John K. Lyons, and Joseph N. Wharton). Questions regarding the amount of a Claim or the filing of a Claim should be directed to Claims Agent at 1-888-249-2691 or www.dphholdingsdocket.com. CLAIMANTS SHOULD NOT CONTACT THE CLERK OF THE BANKRUPTCY COURT TO DISCUSS THE MERITS OF THEIR CLAIMS.

THE PROCEDURES SET FORTH IN THE ORDER PURSUANT TO 11 U.S.C. § 502(b) AND FED. R. BANKR. P. 2002(m), 3007, 7016, 7026, 9006, 9007, AND 9014 ESTABLISHING (I) DATES FOR HEARINGS REGARDING OBJECTIONS TO CLAIMS AND (II) CERTAIN NOTICES AND PROCEDURES GOVERNING OBJECTIONS TO CLAIMS, ENTERED DECEMBER 7, 2006 (THE "CLAIMS OBJECTION PROCEDURES ORDER"), APPLY TO YOUR PROOFS OF CLAIM THAT ARE SUBJECT TO THE REORGANIZED DEBTORS' OBJECTION AS SET FORTH ABOVE. A

---

1    Asserted Claim Amounts listed as $0.00 generally reflect that the claim amount asserted is unliquidated.

**EXHIBIT B**

The Claim identified as having a Basis for Objection of "Modified And Allowed Claim"
is a claim that overstates the dollar amount owed.

Claims identified as having a Basis for Objection of "Duplicate SERP Claims" are
duplicates of other claims.

Claims identified as having a Basis for Objection of "Books And Records Claims" assert
liabilities and dollar amounts that are not owing pursuant the Reorganized Debtors' books
and records.

Claims identified as having a Basis for Objection of "Untimely Claims" are Claims that
were not timely filed pursuant to the Order Under 11 U.S.C. §§ 107(b), 501, 502, And
1111(a) And Fed R. Bankr. P. 1009, 2002(a)(7), 3003(c)(3), And 5005(a) Establishing
Bar Dates For Filing Proofs Of Claim And Approving Form And Manner Of Notice
Thereof (Docket No. 3206).

Claims identified as having a Basis for Objection of "Pension, Benefit, And OPEB
Claims" are those Claims for which the Reorganized Debtors are not liable.

| Date Filed | Claim Number | Asserted Claim Amount[1] | Basis For Objection | Treatment Of Claim | Surviving Claim Number (if any) |
|---|---|---|---|---|---|
| 07/27/06 | 11375 | $74,000.00 | Pension, Benefit, And OPEB Claims | Disallow And Expunge | |

If you wish to view the complete exhibits to the Thirty-Sixth Omnibus Claims Objection, you can
do so at www.dphholdingsdocket.com.  If you have any questions about this notice or the Thirty-Sixth
Omnibus Claims Objection to your Claim, please contact the Reorganized Debtors' counsel by e-mail at
dphholdings@skadden.com, by telephone at 1-800-718-5305, or in writing at Skadden, Arps, Slate,
Meagher & Flom LLP, 155 North Wacker Drive, Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr.,
John K. Lyons, and Joseph N. Wharton).  Questions regarding the amount of a Claim or the filing of a
Claim should be directed to Claims Agent at 1-888-249-2691 or www.dphholdingsdocket.com.
CLAIMANTS SHOULD NOT CONTACT THE CLERK OF THE BANKRUPTCY COURT TO
DISCUSS THE MERITS OF THEIR CLAIMS.

THE PROCEDURES SET FORTH IN THE ORDER PURSUANT TO 11 U.S.C. § 502(b) AND
FED. R. BANKR. P. 2002(m), 3007, 7016, 7026, 9006, 9007, AND 9014 ESTABLISHING (I) DATES
FOR HEARINGS REGARDING OBJECTIONS TO CLAIMS AND (II) CERTAIN NOTICES AND
PROCEDURES GOVERNING OBJECTIONS TO CLAIMS, ENTERED DECEMBER 7, 2006 (THE
"CLAIMS OBJECTION PROCEDURES ORDER"), APPLY TO YOUR PROOFS OF CLAIM THAT
ARE SUBJECT TO THE REORGANIZED DEBTORS' OBJECTION AS SET FORTH ABOVE.  A

---

1    Asserted Claim Amounts listed as $0.00 generally reflect that the claim amount asserted is unliquidated.

R E C E I V E D
☑ BY MAIL    ☐ BY HAND

NOV 1 2 2009

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM

To: Honorable Robert Drain, United States Bankruptcy Judge

Claimant: Jeffrey Allen Miller

Claim Description:
1. Loss of stock grants 8,915 with a stock price of $5 at time of filing
2. Jan-June 2006 KECP bonus of $37,000 not paid
3. Stock options 17,546 never exercised

Reason claim should not be disallowed:

I was asked to go to Delphi's worst performing plant (Dayton, Ohio Moraine) in 2004 that was losing ($180M) a year. In one year that I provided operational leadership the losses in the plant were cut in half. The incentive and long term compensation that were promised were never paid.
However, believing that my employer would make good on its financial promises to me, I was severely disadvantaged during divorce proceedings in the same time period.
As part of the divorce the stock grants and stock options were used in the settlement, causing me to have full obligation for college tuition for the three children.

Additionally, I was an executive with the AHG (Automotive Holdings Group) which was tasked to sell or close all North American operations. As an executive member I was told:
• Bonuses would be paid during chapter 11 process for retention
• A letter signed by Sr. VP Mark Webber stating that I had a job in the new Delphi

Therefore, I believe verbal and written commitments were made and used in other legal proceedings. Thus, I am entitled to stock in the new company equal to the value of what was not paid to me. A cash settlement is equally acceptable in the amount of $81,575.00.

I ask that you please give this serious consideration.

Jeffrey A. Miller

11/08/09

**Name of Creditor** (The person or other entity to whom the debtor owes money or property): *Jeffrey A. Miller*

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

**Name and address where notices should be sent:**
*Jeffrey A. Miller*
*19145 Mill Grove Dr*
*Noblesville, IN 46062*

**Telephone number:**

THIS SPACE IS FOR COURT USE ONLY

Account or other number by which creditor identifies debtor:

Check here ☐ replaces    a previously filed claim, dated:_____
if this claim  ☐ amends

**1. Basis for Claim**
- ☐ Goods Sold / Services Performed
- ☐ Customer Claim
- ☐ Taxes
- ☐ Money Loaned
- ☐ Personal Injury
- ☐ Other _____

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☑ Wages, salaries, and compensation (fill out below)
  Last four digits of SS #: *0241*
  Unpaid compensation for services performed
  from *1/12/1998* to *7/21/2006*
      (date)            (date)

**2. Date debt was incurred:** *January 12, 1998 Through July 21, 2006*

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:** $ *STOCK* (unsecured)   $ (secured)   $ *37,000* (priority)   $ *37,000 + Stock* (Total)

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate   ☐ Motor Vehicle
☐ Other_____

Value of Collateral:   $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

**6. Unsecured Nonpriority Claim** $ *New Stock 28,061 shares* Issuance of

☑ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $ *37,000*
Specify the priority of the claim:
- ☑ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
- ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).
- ☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).
- ☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
- ☐ Taxes or penalties owed to governmental units-11 U.S.C. § 507(a)(8).
- ☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. $10,000 and 180-day limits apply to cases filed on or after 4/20/05. Pub. L. 109-8.

**8. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim

THIS SPACE IS FOR COURT USE ONLY

**Date** *7-21-06*

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): *Jeffry A. Miller*

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Jeff:

Per our conversation, here are your current RSU balances - please note that dividedns will continue to accrue on the balance

The 2003 grant:
Current balance is 1,561
Will vest equally in 2006 and 2008

The 2004 grant:
Current balance is 3,722
Will vest equally in 2007, 2008, 2009

The 2005 grant:
Current balance is 3,632
Will vest equally in 2008, 2009, 2010

If you need anything else, please feel free to call

Regards,
Michelle

Michelle Swastek
Manager, Executive Compensation
Ph: 248-813-6065
Fax: 248-813-2523
e-mail: michelle.swastek@delphi.com

TOTAL 8,915 RSU's

STOCK PRICE @ Time of filing #5

$44,575

Delphi Document MAY 02, 2003 RSU stock price assumed at $10.00/share

$89,150.

8,182   8,915

1

| CASH COMPENSATION | |
|---|---|
| Base Compensation | |
| Current Salary: | $143,808 |
| January - June 2006 Incentive Plan Award | |
| Corporate Target: | $9,250 |
| Division Target: | $9,250 |
| Total 6-month AIP Target: | $18,500 |

*Targets are shown at current band level; year-end targets are adjusted for promotions and transfers*

Incentive award targets represent the average award (consistent with competitive market practice by pay band) that an executive who substantially achieves individual performance objectives could expect to earn if the performance measurements were at 100% of targeted levels. Actual payouts vary based on actual results.

By participating in the Key Executive Compensation Program (KECP), the executive waives any and all of the executive claims arising from the 2005 Recognition and Retention Grant program.

This award is subject to the KECP Safe Harbor provision approved by the Court on February 10, 2006. The full provision is attached.

Acknowledged and agreed:

_signature_

Date: 3-9-06

AHG-Division 200% 18,500
corp 200% 18,500
_____
37,000

Corporate EBITDAR Matrix

Target EBITDAR: ($81 M)    Maximum EBITDAR: $340 M

AHG OIBITDAR Matrix

Target OIBITDAR: ($583.9 M)    Maximum OIBITDAR: ($555.6 M)

# Stock Option

## View Your Options Account                         JEFFREY MILLER

| Grant Listing | Transaction History | Order Summary | Tax Summary | Account Information | Your Portfolio |

View Options: [ Option Summary ▾ ] [ Go! ]       Sort By: [ Grant Date ▾ ] [ Go! ]

| Grant Date (mm/dd/yyyy) | Grant Type | Shares Granted | Grant Price | Shares Outstanding | Shares Exercisable | Expiration Date (mm/dd/yyyy) | |
|---|---|---|---|---|---|---|---|
| 01/12/1998 | NQ | 416 | $13.4500 | 416 | 416 | 01/14/2008 | Details |
| 01/11/1999 | NQ | 416 | $20.6400 | 416 | 416 | 01/13/2009 | Details |
| 02/05/1999 | NQ | 100 | $18.6600 | 100 | 100 | 02/06/2009 | Details |
| 01/07/2000 | NQ | 1,030 | $17.1300 | 1,030 | 1,030 | 01/08/2010 | Details |
| 01/02/2001 | NQ | 1,031 | $11.8800 | 1,031 | 1,031 | 01/03/2011 | Details |
| 01/02/2001 | ISO | 3,294 | $11.8800 | 3,294 | 3,294 | 01/01/2011 | Details |
| 01/02/2002 | ISO | 8,059 | $13.6000 | 8,059 | 8,059 | 01/01/2012 | Details |
| 04/24/2003 | ISO | 4,800 | $8.4300 | 4,800 | 3,200 | 04/23/2013 | Details |
| **Total** | | **19,146** | | **19,146** | **17,546** | | |

┌─────────────────────────────────────────────────────────────────────────────┐
View Your Account Documents

Click here to view your account documents online. Please note that documents are only available online if your company
has elected to use this feature. Therefore, if you participate in multiple companies' plans, you will only have access to the
documents of the companies that have elected this feature.
└─────────────────────────────────────────────────────────────────────────────┘

The expiration date noted above is the date your Company has provided SB as the last day in which you may exercise your
stock options. In order to exercise your stock options prior to expiration, SB must enter your order prior to the close of the
U.S. market ("Market") on which your Company's stock trades (The NASDAQ, NYSE and AMEX hours are currently 9:30 am
to 4:00 pm ET). Therefore, please leave enough time for (i) you to contact SB, (ii) you to provide SB with appropriate
instructions and (iii) SB to process the trade. If your expiration date falls on a day the Market is closed, you must exercise
before the expiration day and on a day in which the Market is open.

Please note: Your order (whether a market order or limit order) will be filled in accordance with the priority rules of the
appropriate market. Therefore, there is no guarantee that your order will be filled. Please reference the specifics of market
and limit orders to determine which is appropriate for you.

**Option Summary View**

The grant listing option summary is a concise report that displays the date, type, grant price and number of stock options that
have been granted to you as well as the portion of your stock options that are exercisable and outstanding. This quantity of
shares outstanding may include unvested shares plus vested shares that have not been exercised as well as the date these
shares expire if they are not exercised. The quantity of shares exercisable displays the number of vested stock options
currently available to be exercised. These values will increase every time a grant becomes vested or an open order is
cancelled. The values are decreased when an order is placed and option is exercised. You have the ability to customize the

**EXHIBIT C**

# DELPHI

PERSONAL & CONFIDENTIAL

Compensation Summary Statement for:

### Scott McBain
### ATTORNEY

| Band: | B |
|-------|---|
| Currency: | US$ |

| CASH COMPENSATION | |
|---|---|
| **Base Compensation** | |
| Current Salary: | █████████ |
| **January - June 2006 Incentive Plan Award** | |
| 6-month AIP Target: | █████ |
| *Targets are shown at current band level; year-end targets are adjusted for promotions and transfers* | |

Incentive award targets represent the average award (consistent with competitive market practice by pay band) that an executive who substantially achieves individual performance objectives could expect to earn if the performance measurements were at 100% of targeted levels. Actual payouts vary based on actual results.

By participating in the Key Executive Compensation Program (KECP), the executive waives any and all of the executive claims arising from the 2005 Recognition and Retention Grant program.

This award is subject to the KECP Safe Harbor provision approved by the Court on February 10, 2006.  The full provision is attached.

Acknowledged and agreed:

_____

Date:___02/22/2006____

## Corporate EBITDAR Matrix



| Target EBITDAR: | Maximum EBITDAR: |
|---|---|
| ($81 M) | $340 M |

# EXHIBIT J

**Hearing Date and Time:  March 18, 2010 at 10:00 a.m. (prevailing Eastern time)**
**Supplemental Response Date and Time:  March 16, 2010 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti

Attorneys for DPH Holdings Corp., et al.,
  Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                      :

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| DPH HOLDINGS CORP., et al., | : | Case Number 05-44481 (RDD) |
|  | : |  |
|  | : | (Jointly Administered) |
| Reorganized Debtors. | : |  |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**REORGANIZED DEBTORS' SUPPLEMENTAL REPLY TO RESPONSE OF
CLAIMANT TO DEBTORS' OBJECTION TO PROOF OF CLAIM NO. 6991
FILED BY FHBC AMERICA, INC. AND SUBSEQUENTLY TRANSFERRED
TO CONTRARIAN FUNDS LLC**

**("SUPPLEMENTAL REPLY REGARDING DUPLICATE CLAIM")**

DPH Holdings Corp. and certain of its affiliated reorganized debtors in the above-captioned cases (together with DPH Holdings Corp., the "Reorganized Debtors") hereby submit the Reorganized Debtors' Supplemental Reply To Responses Of Claimant To Debtors' Objection To Proof Of Claim No. 6991 Filed By FHBC America, Inc. And Subsequently Transferred To Contrarian Funds LLC (the "Supplemental Reply"), and respectfully represent as follows:

A.    Preliminary Statement

1.    On October 8 and 14, 2005, Delphi Corporation and certain of its affiliates (the "Debtors"), predecessors of the Reorganized Debtors, filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").

2.    On October 6, 2009, the Debtors substantially consummated the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified (the "Modified Plan"), which had been approved by this Court pursuant to an order entered on July 30, 2009 (Docket No. 18707), and emerged from chapter 11 as the Reorganized Debtors.

3.    On February 18, 2010, the Reorganized Debtors filed the Notice Of Sufficiency Hearing With Respect To Debtors' Objections To Proofs Of Claim Nos. 6991, 7054, 9221, 10830, 10959, 10960, 11375, 11643, 11644, 11892, 11911, 11983, 11985, 11988, 11989, 12147, 12833, 13776, 13881, 14019, 14020, 14022, 14023, 14024, 14025, 14026, 14370, 14825, 14826, 16967, 18265, 18422, 18603, 18614, 19162, 19543, And 19545 (Docket No. 19504) (the "Sufficiency Hearing Notice").

4.    The Reorganized Debtors filed the Sufficiency Hearing Notice and are filing this Supplemental Reply to implement Article 9.6(a) of the Modified Plan, which provides that "[t]he Reorganized Debtors shall retain responsibility for administering, disputing, objecting

2

to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors and making distributions (if any) with respect to all Claims and Interests ...."  Modified Plan, art. 9.6(a).

        5.       By the Sufficiency Hearing Notice and pursuant to the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims, entered December 7, 2006 (Docket No. 6089) (the "Claims Objection Procedures Order") and the Ninth Supplemental Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims, entered December 11, 2009 (Docket No. 19176), the Reorganized Debtors scheduled a hearing (the "Sufficiency Hearing") on March 18, 2010 at 10:00 a.m. (prevailing Eastern time) in this Court to address the legal sufficiency of each proof of claim filed by the claimants listed on Exhibit A to the Sufficiency Hearing Notice and whether each such proof of claim states a colorable claim against the asserted Debtor.

        6.       This Supplemental Reply is filed pursuant to paragraph 9(b)(i) of the Claims Objection Procedures Order.  <u>Pursuant to paragraph 9(b)(ii) of the Claims Objection Procedures Order, if a Claimant wishes to file a supplemental pleading in response to this Supplemental Reply, the Claimant shall file and serve its response no later than two business days before the scheduled Sufficiency Hearing – i.e., by **March 16, 2010.**</u>

B.     <u>Relief Requested</u>

        7.       By this Supplemental Reply, the Reorganized Debtors request entry of an order disallowing and expunging a proof of claim as a duplicate of another claim filed against the Debtors in these cases.

C.    <u>Duplicate Claim Filed Against The Debtors</u>

8.    During their review of the proofs of claim filed in these cases, the

Reorganized Debtors also determined that a certain proof of claim is a duplicate of another claim

filed in these cases, asserting the same liability.  It is axiomatic that creditors are not entitled to

multiple recoveries for a single liability against a debtor.  Accordingly, this Court should enter an

order disallowing and expunging the duplicate proof of claim in its entirety.

9.    On May 30, 2006, FHBC America, Inc. filed proof of claim number 6991

against Delphi Corporation, asserting $168,862.08 for goods sold.  On November 9, 2006, this

claim was transferred to Contrarian Funds, LLC ("Contrarian") pursuant to the Amended Notice

Of Transfer For Contrarian Funds, LLC Re: FHBC America Inc. (Docket No. 5516).

10.    <u>The Debtors' Objection To Proof of Claim Number 6991</u>.  On February 15,

2007, the Debtors objected to proof of claim number 6991 on the Debtors' Eighth Omnibus

Objection (Procedural) Pursuant To 11 U.S.C. Section 502(b) And Fed. R. Bankr. P. 3007 To

Certain (A) Duplicate And Amended Claims, (B) Claims Duplicative Of Consolidated Trustee

Claim, (C) Equity Claims, And (D) Protective Claims (Docket No. 6962) (the "Eighth Omnibus

Claims Objection"), by which the Debtors objected to that proof of claim on the grounds that

such claim is duplicative of another claim.

11.    <u>Response To The Debtors' Objection</u>.  On March 15, 2007, Contrarian

filed a response to the Eighth Omnibus Claims Objection (Docket No. 7276), in which it asserted

that it would consent to the disallowance of proof of claim number 6991 as a duplicate claim if

the Debtors recognized that Contrarian was the legal and beneficial owner of proof of claim

number 16386.

12.    <u>The Sufficiency Hearing Notice</u>.  Pursuant to the Claims Objection

Procedures Order, the hearing on the Debtors' objection to proof of claim number 6991 was

4

adjourned to a future date.  On February 18, 2010, the Reorganized Debtors filed the Sufficiency

Hearing Notice with respect to proof of claim number 6991, among other proofs of claim and

administrative expense claims, scheduling the Sufficiency Hearing.

D.    Claimants' Burden Of Proof And Standard For Sufficiency Of Claim

13.    The Reorganized Debtors respectfully submit that proof of claim number

6991 fails to state a claim against the Debtors under rule 7012 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").  Contrarian has not proved any facts to support

a right to payment by the Reorganized Debtors on behalf of the Debtors.  Accordingly, the

Debtors' objections to proof of claim number 6991 should be sustained and such claim should be

disallowed and expunged in its entirety.

14.    The burden of proof to establish a claim against the Debtors rests on the

claimants and, if a proof of claim does not include sufficient factual support, such proof of claim

is not entitled to a presumption of prima facie validity pursuant to Bankruptcy Rule 3001(f).  In

re Spiegel, Inc., No. 03-11540, 2007 WL 2456626, at *15 (Bankr. S.D.N.Y. August 22, 2007)

(the claimant always bears the burden of persuasion and must initially allege facts sufficient to

support the claim); see also In re WorldCom, Inc., No. 02-13533, 2005 WL 3832065, at *4

(Bankr. S.D.N.Y. Dec. 29, 2005) (only a claim that alleges facts sufficient to support legal

liability to claimant satisfies claimant's initial obligation to file substantiated proof of claim); In

re Allegheny Intern., Inc., 954 F.2d 167, 173 (3d Cir. 1992) (in its initial proof of claim filing,

claimant must allege facts sufficient to support claim); In re Chiro Plus, Inc., 339 B.R. 111, 113

(Bankr. D.N.J. 2006) (claimant bears initial burden of sufficiently alleging claim and establishing

facts to support legal liability); In re Armstrong Finishing, L.L.C., No. 99-11576-C11, 2001 WL

1700029, at *2 (Bankr. M.D.N.C. May 2, 2001) (only when claimant alleges facts sufficient to

support its proof of claim is it entitled to have claim considered prima facie valid); In re United

5

Cos. Fin. Corp., 267 B.R. 524, 527 (Bankr. D. Del. 2000) (claimant must allege facts sufficient

to support legal basis for its claim to have claim make prima facie case).

        15.     For purposes of sufficiency, this Court has determined that the standard of

whether a claimant has met its initial burden of proof to establish a claim should be similar to the

standard employed by courts in deciding a motion to dismiss under Bankruptcy Rules 7012 and

9014.  See Transcript of January 12, 2007 Hearing (Docket No. 7118) (the "January 12, 2007

Transcript") at 52:24-53:1.  Pursuant to that standard, a motion to dismiss should be granted "if it

plainly appears that the nonmovant "can prove no set of facts in support of his claim which

would entitle him to relief.'" In re Lopes, 339 B.R. 82, 86 (Bankr. S.D.N.Y. 2006) (quoting

Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  Essentially, the claimant must provide facts that

sufficiently support a legal liability against the Debtors.

        16.     This Court further established that the sufficiency hearing standard is

consistent with Bankruptcy Rule 3001(f), which states that "a proof of claim executed and filed

in accordance with these Rules shall constitute prima facie evidence of the validity and amount

of the claim." Fed. R. Bankr. P. 3001(f) (emphasis added).  Likewise, Bankruptcy Rule 3001(a)

requires that "the proof of claim must be consistent with the official form" and Bankruptcy Rule

3001(c) requires "evidence of a writing if the claim is based on a writing."  Fed. R. Bankr. P.

3001(a), (c).  See January 12, 2007 Transcript at 52:17-22.

        17.     Disallowance Of Duplicate Claim.  On October 17, 2008 the Debtors

objected to the duplicate claim, proof of claim number 16386, on the Debtors' Thirty-First

Omnibus Objection Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To (A)

Untimely Equity Claim, (B) Books And Records Claim That Is Subject To Prior Order, (C)

Untimely Books And Records Claims, (D) Books And Records Tax Claim That Is Subject To

Prior Order, (E) Untimely Claims, And (F) Modified Claims Asserting Reclamation That Are

Subject To Prior Orders (Docket No. 14349) (the "Thirty-First Omnibus Claims Objection"),

seeking entry of an order disallowing that claim on the grounds that it had been fully satisfied by

cure payments made following an asset divestiture by the Debtors.  No response was filed, so

pursuant to the order on the Thirty-First Omnibus Claims Objection, entered November 24, 2008

(Docket No. 14489), proof of claim number 16386 was disallowed and expunged.  Because

proofs of claim number 6991 and 16386 assert the same liabilities and proof of claim number

16386 has been disallowed and expunged, proof of claim number 6991 should also be disallowed

and expunged as well.

        18.     Accordingly, the Reorganized Debtors assert that (a) Contrarian has not

met its burden of proof to establish a claim against or interest in the Debtors, (b) proof of claim

number 6991 is not entitled to a presumption of <u>prima</u> <u>facie</u> validity pursuant to Bankruptcy Rule

3001(f), and (c) proof of claim number 6991 fails to state a claim against the Reorganized

Debtors under Bankruptcy Rule 7012.  Because Contrarian cannot provide facts or law

supporting their claims, the Eighth Omnibus Claims Objection should be sustained as to proof of

claim numbers 6991 and such claim should be disallowed and expunged in its entirety.

        WHEREFORE the Reorganized Debtors respectfully request this Court enter an

order (a) sustaining the objection with respect to proof of claim number 6991, (b) disallowing

and expunging proof of claim number 6991 in its entirety, and (c) granting such further and other

relief this Court deems just and proper.

Dated:    New York, New York
          March 8, 2010

                                         SKADDEN, ARPS, SLATE, MEAGHER
                                           & FLOM LLP

                                         By:   John Wm. Butler, Jr.
                                               John Wm. Butler, Jr.
                                             John K. Lyons
                                             Ron E. Meisler
                                        155 North Wacker Drive
                                        Chicago, Illinois 60606

                                           - and -

                                        By:   Kayalyn A. Marafioti
                                               Kayalyn A. Marafioti
                                        Four Times Square
                                        New York, New York 10036

                                        Attorneys for DPH Holdings Corp., et al.,
                                           Reorganized Debtors

# EXHIBIT K

**Hearing Date and Time:  March 18, 2010 at 10:00 a.m. (prevailing Eastern time)**
**Supplemental Response Date and Time:  March 16, 2010 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti

Attorneys for DPH Holdings Corp., et al.,
   Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                      :
        In re                        :    Chapter 11
                                        :
DPH HOLDINGS CORP., et al.,     :    Case Number 05-44481 (RDD)
                                        :
                                        :    (Jointly Administered)
               Reorganized Debtors.   :
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**REORGANIZED DEBTORS' SUPPLEMENTAL REPLY TO RESPONSES OF
CERTAIN CLAIMANTS TO DEBTORS' OBJECTIONS TO PROOF OF CLAIM
NO. 11911 FILED BY MICHAEL POTTER AND ADMINISTRATIVE
EXPENSE CLAIM NO. 18603 FILED BY LANCE W. WEBER**

**("SUPPLEMENTAL REPLY REGARDING CERTAIN EQUITY CLAIMS")**

DPH Holdings Corp. and certain of its affiliated reorganized debtors in the above-captioned cases (together with DPH Holdings Corp., the "Reorganized Debtors") hereby submit the Reorganized Debtors' Supplemental Reply To Responses Of Certain Claimants To Debtors' Objections To Proof Of Claim No. 11911 Filed By Michael Potter And Administrative Expense Claim No. 18603 Filed By Lance W. Weber (the "Supplemental Reply"), and respectfully represent as follows:

A.    <u>Preliminary Statement</u>

1.    On October 8 and 14, 2005, Delphi Corporation and certain of its affiliates (the "Debtors"), predecessors of the Reorganized Debtors, filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").

2.    On October 6, 2009, the Debtors substantially consummated the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified (the "Modified Plan"), which had been approved by this Court pursuant to an order entered on July 30, 2009 (Docket No. 18707) (the "Modification Approval Order"), and emerged from chapter 11 as the Reorganized Debtors.

3.    On February 18, 2010, the Reorganized Debtors filed the Notice Of Sufficiency Hearing With Respect To Debtors' Objections To Proofs Of Claim Nos. 6991, 7054, 9221, 10830, 10959, 10960, 11375, 11643, 11644, 11892, 11911, 11983, 11985, 11988, 11989, 12147, 12833, 13776, 13881, 14019, 14020, 14022, 14023, 14024, 14025, 14026, 14370, 14825, 14826, 16967, 18265, 18422, 18603, 18614, 19162, 19543, And 19545 (Docket No. 19504) (the "Sufficiency Hearing Notice").

4.    The Reorganized Debtors filed the Sufficiency Hearing Notice and are filing this Supplemental Reply to implement Article 9.6(a) of the Modified Plan, which provides

2

that "[t]he Reorganized Debtors shall retain responsibility for administering, disputing, objecting

to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors and

making distributions (if any) with respect to all Claims and Interests."  Modified Plan, art. 9.6(a).

5.      By the Sufficiency Hearing Notice and pursuant to the Order Pursuant To

11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014

Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices

And Procedures Governing Objections To Claims, entered December 7, 2006 (Docket No. 6089)

(the "Claims Objection Procedures Order") and the Ninth Supplemental Order Pursuant To 11

U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014

Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices

And Procedures Governing Objections To Claims, entered December 11, 2009 (Docket No.

19176), the Reorganized Debtors scheduled a hearing (the "Sufficiency Hearing") on March 18,

2010 at 10:00 a.m. (prevailing Eastern time) in this Court to address the legal sufficiency of each

proof of claim filed by the claimants listed on Exhibit A to the Sufficiency Hearing Notice and

whether each such proof of claim states a colorable claim against the asserted Debtor.

6.      This Supplemental Reply is filed pursuant to paragraph 9(b)(i) of the

Claims Objection Procedures Order.  Pursuant to paragraph 9(b)(ii) of the Claims Objection

Procedures Order, if a Claimant wishes to file a supplemental pleading in response to this

Supplemental Reply, the Claimant shall file and serve its response no later than two business

days before the scheduled Sufficiency Hearing – i.e., by **March 16, 2010.**

B.      Relief Requested

7.      By this Supplemental Reply, the Reorganized Debtors request entry of an

order disallowing and expunging a certain proof of claim and a certain administrative expense

claim asserting equity interests in the Debtors and claims for losses in value of securities in the

Debtors.

C.      Equity Claims Filed Against The Debtors

8.      During their review of the proofs of claim and administrative expense

claims filed in these cases, the Reorganized Debtors also determined that a certain proof of claim

and a certain administrative expense claim assert liabilities or dollar amounts in connection with

the claimant's alleged ownership of equity in the Debtors and the purported loss of value of that

equity.  Because the amounts asserted by these claimants are not owing by the Debtors, the

Reorganized Debtors believe that the parties asserting these claims are not creditors of the

Debtors.  Accordingly, this Court should enter an order disallowing and expunging each of these

claims in their entirety.

9.      On July 28, 2006, Michael Potter filed proof of claim number 11911

against Delphi Corporation, asserting $8,408.00 based on the alleged loss in value of stock in

Delphi Corporation owned by Mr. Potter.

10.      On July 14, 2009, Lance W. Weber (together with Mr. Potter, the

"Claimants") filed administrative expense claim number 18603 (together with proof of claim

number 11911, the "Equity Claims"), asserting an administrative expense claim in the amount of

$14,030.00 on account of equity interests in the Debtors.

11.      The Debtors' Objections To The Equity Claims.  On November 2, 2006,

the Debtors objected to Mr. Potter's proof of claim number 11911 on the Debtors' (I) Third

Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(B) And Fed. R. Bankr. P. 3007

To Certain (A) Claims With Insufficient Documentation, (B) Claims Unsubstantiated By

Debtors' Books And Records, And (C) Claims Subject To Modification And (II) Motion To

Estimate Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) (Docket No.

4

5452) (the "Third Omnibus Claims Objection") as an unsubstantiated claim and sought entry of an order disallowing and expunging such claim.

12.    On November 6, 2009, the Debtors filed the Reorganized Debtors' Thirty-Eighth Omnibus Objection Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To (I) Expunge Certain (A) Equity Interests, (B) Books And Records Claims, (C) Untimely Claims, (D) Pension, Benefit, And OPEB Claims, And (E) Workers' Compensation Claims And (II) Modify And Allow Certain Claims  (Docket No. 19044) (the "Thirty-Eighth Omnibus Claims Objection"), by which the Debtors objected to administrative expense claim number 18603 filed by Mr. Weber as an equity interests not asserting claims against the Debtors and sought entry of an order disallowing and expunging such administrative expense claim.

13.    Responses To The Debtors' Objections.  On November 27, 2006, Mr. Potter filed a response to the Third Omnibus Claims Objection (Docket No. 5927), in which he asserted that all of the Debtors' "holdings worldwide" be included in their net worth.

14.    On November 30, 2009, Mr. Weber filed a response to the Thirty-Eighth Omnibus Claims Objection (Docket No. 19149), in which he asserts that he should be reimbursed for the amounts that he invested in the Debtors.

15.    The Sufficiency Hearing Notice.  Pursuant to the Claims Objection Procedures Order, the hearing on the Debtors' objection to the Equity Claims was adjourned to a future date.  On February 18, 2010, the Reorganized Debtors filed the Sufficiency Hearing Notice with respect to the Equity Claims, among other proofs of claim and administrative expense claims, scheduling the Sufficiency Hearing.

D.    Claimants' Burden Of Proof And Standard For Sufficiency Of Claim

16.    The Reorganized Debtors respectfully submit that the Equity Claims fail to state a claim against the Debtors under rule 7012 of the Federal Rules of Bankruptcy

5

Procedure (the "Bankruptcy Rules").  The Claimants have not proved any facts to support a right

to payment by the Reorganized Debtors on behalf of the Debtors.  Accordingly, the Debtors'

objections to each Equity Claim should be sustained and each such claim should be disallowed

and expunged in its entirety.

17.      The burden of proof to establish a claim against the Debtors rests on the

claimants and, if a proof of claim does not include sufficient factual support, such proof of claim

is not entitled to a presumption of <u>prima facie</u> validity pursuant to Bankruptcy Rule 3001(f).  <u>In</u>

<u>re Spiegel, Inc.</u>, No. 03-11540, 2007 WL 2456626, at *15 (Bankr. S.D.N.Y. August 22, 2007)

(the claimant always bears the burden of persuasion and must initially allege facts sufficient to

support the claim); <u>see also</u> <u>In re WorldCom, Inc.</u>, No. 02-13533, 2005 WL 3832065, at *4

(Bankr. S.D.N.Y. Dec. 29, 2005) (only a claim that alleges facts sufficient to support legal

liability to claimant satisfies claimant's initial obligation to file substantiated proof of claim); <u>In</u>

<u>re Allegheny Intern., Inc.</u>, 954 F.2d 167, 173 (3d Cir. 1992) (in its initial proof of claim filing,

claimant must allege facts sufficient to support claim); <u>In re Chiro Plus, Inc.</u>, 339 B.R. 111, 113

(Bankr. D.N.J. 2006) (claimant bears initial burden of sufficiently alleging claim and establishing

facts to support legal liability); <u>In re Armstrong Finishing, L.L.C.</u>, No. 99-11576-C11, 2001 WL

1700029, at *2 (Bankr. M.D.N.C. May 2, 2001) (only when claimant alleges facts sufficient to

support its proof of claim is it entitled to have claim considered <u>prima facie</u> valid); <u>In re United</u>

<u>Cos. Fin. Corp.</u>, 267 B.R. 524, 527 (Bankr. D. Del. 2000) (claimant must allege facts sufficient

to support legal basis for its claim to have claim make <u>prima facie</u> case).

18.      For purposes of sufficiency, this Court has determined that the standard of

whether a claimant has met its initial burden of proof to establish a claim should be similar to the

standard employed by courts in deciding a motion to dismiss under Bankruptcy Rules 7012 and

9014.  See Transcript of January 12, 2007 Hearing (Docket No. 7118) (the "January 12, 2007

Transcript") at 52:24-53:1.  Pursuant to that standard, a motion to dismiss should be granted "if it

plainly appears that the nonmovant 'can prove no set of facts in support of his claim which would

entitle him to relief.'"  In re Lopes, 339 B.R. 82, 86 (Bankr. S.D.N.Y. 2006) (quoting Conley v.

Gibson, 355 U.S. 41, 45-46 (1957)).  Essentially, the claimant must provide facts that sufficiently

support a legal liability against the Debtors.

19.    This Court further established that the sufficiency hearing standard is

consistent with Bankruptcy Rule 3001(f), which states that "a proof of claim executed and filed

in accordance with these Rules shall constitute prima facie evidence of the validity and amount

of the claim."  Fed. R. Bankr. P. 3001(f) (emphasis added).  Likewise, Bankruptcy Rule 3001(a)

requires that "the proof of claim must be consistent with the official form" and Bankruptcy Rule

3001(c) requires "evidence of a writing if the claim is based on a writing."  Fed. R. Bankr. P.

3001(a), (c).  See January 12, 2007 Transcript at 52:17-22.

E.    Argument Regarding The Equity Claims

20.    In their proof of claim and administrative expense claim, as the case may

be, and responses to the Debtors' objections to those claims, the Claimants have not proved any

set of facts that support a right to payment from the Reorganized Debtors or address the Debtors'

arguments as set forth in the Third Omnibus Claims Objection and the Thirty-Eighth Omnibus

Claims Objection supporting the Debtors' request for this Court to enter an order disallowing and

expunging the Equity Claims.

21.    On or prior to April 20, 2006, the Debtors caused Kurtzman Carson

Consultants, the claims and noticing agent in these cases, to serve notice of the Bar Date (the

"Bar Date Notice"), together with a proof of claim form, on, among others, holders of Delphi

Corporation common stock to ensure that holders of stock who wished to assert claims against

7

any of the Debtors that were not based solely upon their ownership of Delphi Corporation common stock would be afforded the opportunity to file such claims in these cases.  The ownership of Delphi Corporation common stock constitutes an equity interest in Delphi Corporation, but does not constitute a "claim" against the Debtors as such term is defined in section 101(5) of the Bankruptcy Code.  Furthermore, as set forth in the Bar Date Notice that was approved by this Court, creditors and equity holders were notified that they were not required to file proofs of claim based exclusively on ownership interests in Delphi Corporation common stock.[1]

22.    In addition, pursuant to section 1141(d) of the Bankruptcy Code, the distributions and rights that are provided in the Modified Plan are in complete satisfaction, discharge, and release of, among other things, interests in Delphi Corporation whether or not a proof of claim based upon such interest is filed.  Finally, the Modification Approval Order is a judicial determination of the discharge of all interests in the Debtors.

F.    Argument Regarding The Purported Loss Of Value

23.    The Claimants' claims arising from the purported loss of value of their equity interests are also without merit.  The Claimants must allege some legal theory to support

---

[1]    The Bar Date Order provides, in relevant part:

Proofs of Claim are not required, at this time, to be filed by any Person or Entity asserting a Claim of any of the types set forth below:

* * *

(h) Any holder of equity securities of, or other interests in, the Debtors solely with respect to such holder's ownership interest in or possession of such equity securities, or other interest; provided, however, that any such holder which wishes to assert a Claim against any of the Debtors that is not based solely upon its ownership of the Debtors' securities, including, but not limited to, Claims for damages or rescission based on the purchase or sale of such securities, must file a proof of claim on or prior to the General Bar Date in respect of such Claim.

Bar Date Order ¶ 5 (emphasis added).

their claims for the loss of value of stock that they owned. Those claims, however, are

unsubstantiated and therefore should be disallowed.

        24.      The Claimants appear to attempt to assert claims based on alleged

securities fraud or some other cognizable common law fraud. However, the Claimants failed to

identify any particular claim or establish a sufficient legal or factual basis to support such a

claim.[2] The Claimants have not invoked Section 10(b) of the Exchange Act, Rule 10b-5, or any

other legal basis for their purported claims. To establish such a claim, the Claimants would need

to show, inter alia, that they were involved in the purchase or sale of a security and that the

Debtors made an untrue statement of material fact. See 17 C.F.R. § 240.10b-5. The Claimants

have not, however, alleged facts in their claims that, even when viewed in the light most

favorable to the Claimants, would support a claim for securities fraud or any other cognizable

common law fraud claim. Indeed, some of the Claimants failed to allege, even generally, any

purchase or sale of securities or any wrongdoing at all on the part of the Debtors.

        25.      These Claimants hold nothing more than equity interests. Accordingly,

the Reorganized Debtors assert that the Claimants have not met their burden of proof to establish

a claim against or interest in the Debtors, (b) the Equity Claims are not entitled to a presumption

---

[2]    Section 10(b) of the Exchange Act makes it unlawful for a person "[t]o use or employ in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 implements Section 10(b) by making it unlawful for any person, in connection with the purchase or sale of a security, "to make any untrue statement of material fact or omit to state a material fact necessary in order to make the statements . . . not misleading." 17 C.F.R. § 240.10b-5. The Supreme Court has identified the basic elements of a securities fraud case:

      (1) a material misrepresentation or omission,
      (2) scienter, or a wrongful state of mind,
      (3) a connection with the purchase or sale of a security,
      (4) reliance,
      (5) economic loss, and
      (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss.

 Dura Pharm. v. Broudo, 544 U.S. 336, 341 (2005).

of prima facie validity pursuant to Bankruptcy Rule 3001(f), and (c) each Equity Claim fails to

state a claim against the Reorganized Debtors under Bankruptcy Rule 7012.  Because the

Claimants cannot provide facts or law supporting their claims, the Third Omnibus Claims

Objection should be sustained as to proof of claim number 11911 and the Thirty-Eighth Omnibus

Claims Objection should be sustained as to administrative expense claim number 18603 and each

such claim should be disallowed and expunged in its entirety.

        WHEREFORE the Reorganized Debtors respectfully request this Court enter an

order (a) sustaining the objections with respect to the Equity Claims, (b) disallowing and

expunging each Equity Claim in its entirety, and (c) granting such further and other relief this

Court deems just and proper.


Dated:    New York, New York
        March 8, 2010

                SKADDEN, ARPS, SLATE, MEAGHER
                  & FLOM LLP

                By:   John Wm. Butler, Jr.           
                    John Wm. Butler, Jr.
                    John K. Lyons
                    Ron E. Meisler
                155 North Wacker Drive
                Chicago, Illinois 60606

                    - and -

                By:   Kayalyn A. Marafioti           
                    Kayalyn A. Marafioti
                Four Times Square
                New York, New York 10036

                Attorneys for DPH Holdings Corp., et al.,
                  Reorganized Debtors

# EXHIBIT L

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti

Attorneys for DPH Holdings Corp., et al.,
   Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -  -     x
                                :
     In re                          :     Chapter 11
                                  :
DPH HOLDINGS CORP., et al.,         :     Case No. 05-44481 (RDD)
                                  :
                                  :     (Jointly Administered)
         Reorganized Debtors.        :
                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -     x

NOTICE OF ADJOURNMENT OF CLAIMS OBJECTION HEARING WITH RESPECT TO DEBTORS'
OBJECTION TO (A) PROOF OF CLAIM NO. 11892 FILED BY RONALD E. JORGENSEN, (B) PROOF
OF CLAIM NO. 12147 FILED BY PAMELA GELLAR, (C) PROOFS OF CLAIM NOS. 14019, 14020,
14022, 14023, 14024, 14025, AND 14026 FILED BY ATUL PASRICHA, (D) PROOF OF CLAIM NO.
14370 FILED BY WILLIAM P. DOWNEY, (E) ADMINISTRATIVE EXPENSE CLAIM NO. 18265
FILED BY POLYMER CONCENTRATES, INC., (F) ADMINISTRATIVE EXPENSE CLAIM NO.
18422 FILED BY MARYBETH CUNNINGHAM, (G) ADMINISTRATIVE EXPENSE CLAIM NO.
19543 FILED BY JOSE C. ALFARO AND MARTHA ALFARO, AND (H) ADMINISTRATIVE
EXPENSE CLAIM NO. 19545 FILED BY HARRIS COUNTY ET AL.

("NOTICE OF ADJOURNMENT OF SUFFICIENCY HEARING AS TO CERTAIN
PROOFS OF CLAIM AND ADMINISTRATIVE EXPENSE CLAIMS")

PLEASE TAKE NOTICE that as set forth on Exhibit A attached hereto, Delphi

Corporation and certain of its subsidiaries and affiliates, debtor and debtors-in-possession in the

above-captioned cases (f/k/a In re Delphi Corporation, et al.) (collectively, the "Debtors")

objected to various proofs of claim and administrative expense claims (the " Claims") filed by

certain parties.

PLEASE TAKE FURTHER NOTICE that on October 6, 2009, the Debtors

substantially consummated the First Amended Joint Plan Of Reorganization Of Delphi

Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified (the

"Modified Plan"), which had been approved by the United States Bankruptcy Court for the

Southern District of New York pursuant to an order entered on July 30, 2009 (Docket No.

18707), and emerged from chapter 11 as DPH Holdings Corp. and its affiliated reorganized

debtors (the "Reorganized Debtors").

PLEASE TAKE FURTHER NOTICE that Article 9.6(a) of the Modified Plan

provides that "[t]he Reorganized Debtors shall retain responsibility for administering, disputing,

objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the

Debtors and making distributions (if any) with respect to all Claims and Interests."  Modified

Plan, art. 9.6(a).

PLEASE TAKE FURTHER NOTICE that on February 18, 2010, the Reorganized

Debtors filed the Notice Of Sufficiency Hearing With Respect To Debtors' Objection To Proofs

Of Claim Nos. 6991, 7054, 9221, 10830, 10959, 10960, 11375, 11643, 11644, 11892, 11911,

11983, 11985, 11988, 11989, 12147, 12833, 13776, 13881, 14019, 14020, 14022, 14023, 14024,

14025, 14026, 14370, 14825, 14826, 16967, 18265, 18422, 18603, 18614, 19162, 19543, and

2

19545 (Docket No. 19504) (the "Sufficiency Hearing Notice") scheduling a sufficiency hearing

(the "Sufficiency Hearing") scheduled for March 18, 2010, at 10:00 a.m. (prevailing Eastern

time) in the United States Bankruptcy Court for the Southern District of New York, 300

Quarropas Street, Room 118, White Plains, New York 10601-4140 to address the legal

sufficiency of each of the Claims and whether each Claim states a colorable claim against the

asserted Debtor.

PLEASE TAKE FURTHER NOTICE that pursuant to paragraph 9(a)(ii) of the

Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006,

9007, And 9014 Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii)

Certain Notices And Procedures Governing Objections To Claims, entered December 7, 2006

(Docket No. 6089) (the "Claims Objection Procedures Order") and the Order Pursuant To 11

U.S.C. §§ 105(a) And 503(b) Authorizing Debtors To Apply Claims Objection Procedures To

Address Contested Administrative Expense Claims entered October 22, 2009 (Docket No.

18998) (the "Administrative Claims Objection Procedures Order"), the Sufficiency Hearing is

hereby adjourned without date, subject to the Reorganized Debtors' right to re-notice the

claimant and/or assignee, as applicable, in accordance with the procedures set forth in the Claims

Objection Procedures Order and the Administrative Claims Objection Procedures Order.

Dated:    New York, New York
          March 8, 2010

                     SKADDEN, ARPS, SLATE, MEAGHER
                        & FLOM LLP

                     By:   /s/ John Wm. Butler, Jr.
                        John Wm. Butler, Jr.
                        John K. Lyons
                        Ron E. Meisler
                     155 North Wacker Drive
                     Chicago, Illinois 60606

                        - and -

                     By:   /s/ Kayalyn A. Marafioti
                        Kayalyn A. Marafioti
                     Four Times Square
                     New York, New York 10036

                     Attorneys for DPH Holdings Corp., et al.,
                        Reorganized Debtors

**EXHIBIT A**

| Proof Of Claim Number | Date Filed | Party Filing Proof Of Claim | Owner Of Claim | Asserted Amount | Omnibus Claims Objection | Date Of Omnibus Claims Objection | Debtor Named On Proof Of Claim |
|---|---|---|---|---|---|---|---|
| 9221 | 7/10/2006 | CARRERERA AUDREY AMORT | CARRERERA AUDREY AMORT | $79,362.00 | Twenty-Sixth Omnibus Claims Objection | 2/15/2008 | DELPHI CORPORATION |
| 11882 | 7/28/2006 | JORGENSEN RONALD E | JORGENSEN RONALD E | $82,299.00 | Third Omnibus Claims Objection | 10/31/2006 | DELPHI CORPORATION |
| 12147 | 7/28/2006 | GELLER PAMELA | GELLER PAMELA | $50,000.00 | Twenty-First Omnibus Claims Objection | 9/21/2007 | DELPHI CORPORATION |
| 14019 | 7/31/2006 | PASRICHA ATUL | PASRICHA ATUL | $0.00 | Twenty-First Omnibus Claims Objection | 9/21/2007 | DELPHI CORPORATION |
| 14020 | 7/31/2006 | PASRICHA ATUL | PASRICHA ATUL | $0.00 | Twenty-First Omnibus Claims Objection | 9/21/2007 | DELPHI MEDICAL SYSTEMS LLC |
| 14022 | 7/31/2006 | PASRICHA ATUL | PASRICHA ATUL | $0.00 | Twenty-First Omnibus Claims Objection | 9/21/2007 | DELPHI MEDICAL SYSTEMS CORPORATION |
| 14023 | 7/31/2006 | PASRICHA ATUL | PASRICHA ATUL | $0.00 | Twenty-First Omnibus Claims Objection | 9/21/2007 | DELPHI MEDICAL SYSTEMS TEXAS CORPORATION |
| 14024 | 7/31/2006 | PASRICHA ATUL | PASRICHA ATUL | $0.00 | Twenty-First Omnibus Claims Objection | 9/21/2007 | DELPHI MEDICAL SYSTEMS COLORADO CORPORATION |
| 14025 | 7/31/2006 | PASRICHA ATUL | PASRICHA ATUL | $0.00 | Twenty-First Omnibus Claims Objection | 9/21/2007 | DELPHI TECHNOLOGIES, INC |
| 14026 | 7/31/2006 | PASRICHA ATUL | PASRICHA ATUL | $0.00 | Twenty-First Omnibus Claims Objection | 9/21/2007 | DELPHI AUTOMOTIVE SYSTEMS OVERSEAS CORPORATION |
| 14370 | 7/31/2006 | WILLIAM P DOWNEY | WILLIAM P DOWNEY | $20,641.44 | Third Omnibus Claims Objection | 10/31/2006 | DELPHI CORPORATION |
| 18265 | 7/19/2009 | POLYMER CONCENTRATES INC | POLYMER CONCENTRATES INC | $64,856.00 | Thirty-Seventh Omnibus Claims Objection | 6/22/2009 | DELPHI CORPORATION |
| 18422 | 7/3/2009 | MARYBETH CUNNINGHAM | MARYBETH CUNNINGHAM | $730,843.00 | Thirty-Seventh Omnibus Claims Objection | 8/21/2009 | DELPHI CORPORATION |
| 19543 | 8/10/2009 | JOSE C ALFARO AND MARTHA ALFARO | JOSE C ALFARO AND MARTHA ALFARO | $1,500,000.00 | Thirty-Seventh Omnibus Claims Objection | 10/15/2009 | DELPHI CORPORATION |
| 19545 | 7/20/2009 | HARRIS COUNTY ET AL | HARRIS COUNTY ET AL | $3,199.00 | Thirty-Seventh Omnibus Claims Objection | 10/15/2009 | DELPHI CORPORATION |

# EXHIBIT M

DPH Holdings Corp.
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip |
|---|---|---|---|---|---|---|
| New York State Dept of Environmental Conservation | Eugene Leff | New York Attorney Generals Office | 120 Broadway 26th Floor | New York | NY | 10271 |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 1 of 1

3/9/2010 3:40 PM
Briefs & NOA Special Parties.xlsx
New York Special Parties

# EXHIBIT N

DPH Holdings Corp.
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip |
|---|---|---|---|---|---|---|
| Greenberg Traurig LLP | Maria J DiConza | Counsel to Pla Holding Vi LLC | 200 Park Ave | New York | NY | 10166 |
| Pla Holding Vi LLC | c o Greenberg Traurig LLP | Nancy A Peterman | 77 West Wacker Dr Ste 2500 | Chicago | IL | 60601 |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 1 of 1

3/9/2010 3:43 PM
Briefs & NOA Special Parties.xlsx
PLA Holdings Special Parties

# EXHIBIT O

DPH Holdings Corp.
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip |
|---------|---------|----------|----------|------|-------|-----|
| City of Olathe Kansas | Paul D Sinclair | Shughart Thomson & Kilroy PC | 120 W 12th St Ste 1800 | Kansas City | MO | 64105 |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 1 of 1

3/9/2010 3:45 PM
Briefs & NOA Special Parties.xlsx
Olathe Special Parties

# EXHIBIT P

DPH Holdings Corp.
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip |
|---------|---------|----------|----------|------|-------|-----|
| Pepe & Hazard LLP | Kristin B Mayhew Esq | Illinois Tool Works ITW Food Equipment Group | 30 Jelliff Ln | Southport | CT | 06890 |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 1 of 1

3/9/2010 3:49 PM
Briefs & NOA Special Parties.xlsx
Illinois Tool Special Party

# EXHIBIT Q

DPH Holdings Corp.
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip |
|---------|---------|----------|----------|------|-------|-----|
| Heraeus Amersil Inc aka Heraeus Tenevo | c o Jason J DeJonker Esq | McDermott Will & Emery LLP | 227 W Monroe St | Chicago | IL | 60606-5096 |
| Milliken & Company | | 1045 Sixth Ave | | New York | NY | 10018 |
| Otterbourg Steindler Houston & Rosen PC | Scott L Hazan Stanley L Lane | Counsel to Milliken & Company | 230 Park Ave | New York | NY | 10169 |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 1 of 1

3/9/2010 3:53 PM
Briefs & NOA Special Parties.xlsx
Mercury Special Parties

# EXHIBIT R

DPH Holdings Corp.
Special Parties

| Company | Address1 | City | State | Zip |
| --- | --- | --- | --- | --- |
| Carbrera Audrey Amort | 1525 Oxford St | Redwood City | CA | 94061 |
| Dwight L Goodin | 4518 Golf View Dr | Brighton | MI | 48116-9797 |
| Hamlin Saundra L | 505 Unger Ave | Englewood | OH | 45322 |
| Miller Jeffrey A | 4040 Solitude Ct | Noblesville | IN | 46062 |
| Scott A McBain | 1613 Black Maple Dr | Rochester Hills | MI | 48309 |
| Skillman Joyce L | 922 Cherry St | Saginaw | MI | 48607 |
| William E Cross | 104 SW 28th St | Oak Island | NC | 28465 |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 1 of 1

3/9/2010 3:55 PM
Briefs & NOA Special Parties.xlsx
Pension & Benefit Special Parties

# EXHIBIT S

DPH Holdings Corp.
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip |
|---|---|---|---|---|---|---|
| Contrarian Funds LLC | Attn Alpa Jimenez | 411 W Putnam Ave Ste 225 | | Greenwich | CT | 06830 |
| Kasowitz Benson Torres & Friedman LLP | David S Rosner Adam L Shiff Daniel N Zinman Daniel A Fliman | Contrarian Funds LLC | 1633 Broadway 22nd Fl | New York | NY | 10019 |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 1 of 1

3/9/2010 3:57 PM
Briefs & NOA Special Parties.xlsx
Duplicate Special Parties

# EXHIBIT T

DPH Holdings Corp.
Special Parties

| Company | Address1 | City | State | Zip |
|---|---|---|---|---|
| Lance W Weber | 41 Passaic Ave | North Haledon | NJ | 07508-0000 |
| Potter Michael | N 38w 26876 Glacier Rd | Pewaukee | WI | 53072 |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 1 of 1

3/9/2010 3:59 PM
Briefs & NOA Special Parties.xlsx
Equity Special Parties

# EXHIBIT U

DPH Holdings Corp.
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip |
|---|---|---|---|---|---|---|
| Foley & Lardner LLP | Attn David G Dragich | Counsel to Pasricha Atul | 500 Woodward Ave Ste 2700 | Detroit | MI | 48226 |
| Geller Pamela | | 1715 Carrington Way | | Bloomfield | MI | 48302 |
| Harrington Dragich | David G Dragich | Counsel to Pasricha Atul | 21043 Mack Avenue | Grosse Pointe Woods | MI | 48236 |
| Harris County et al | John P Dillman | Linebarger Goggan Blair & Sampson LLP | PO Box 3064 | Houston | TX | 77253-3064 |
| Harris County et al | | PO Box 4924 | | Houston | TX | 77210-4924 |
| Jacob & Weingarten PC | Alan J Schwartz | Counsel to Marybeth Cunningham | 777 Somerset Pl 2301 W Big Beaver Rd | Troy | MI | 48084 |
| Jorgensen Ronald E | | 1130 Deer Path Trail | | Oxford | MI | 48371-6604 |
| Jose C Alfaro and Martha Alfaro | c o Don C Staab Attorney at Law | 899 Logan St Ste 200 | | Denver | CO | 80209 |
| Jose C and Martha Alfaro | | 304 W 5th St | | Goodland | KS | 67735 |
| Marybeth Cunningham | | 1110 Carolina Cir SW | | Vero Beach | FL | 32962 |
| Meyer Suozzi English & Klein PC | Attn Thomas R Slome Esq | Counsel to Geller Pamela | 990 Stewart Ave Ste 300 PO Box 9194 | Garden City | NY | 11530-9194 |
| Pasricha Atul | | 2394 Heronwood Dr | | Bloomfield Hills | MI | 48302 |
| Polymer Concentrates Inc | | PO Box 42 | | Clinton | MA | 01510-0042 |
| William P Downey | | 3456 Fishinger Rd | | Columbus | OH | 43221-4722 |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 1 of 1

3/9/2010 5:42 PM
Briefs & NOA Special Parties.xlsx
NOA Special Parties