# EXHIBIT A

US1DOCS 7474392v3

**Presentment Date and Time: June 15 , 2006 at 4:00 p.m.**
**Objection Deadline: June 15, 2006 at 2:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
     Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                      :
          In re                                       :     Chapter 11
                                                      :
DELPHI CORPORATION, et al.,                           :     Case No. 05- 44481 (RDD)
                                                      :
                              Debtors.                :     (Jointly Administered)
                                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF PRESENTMENT OF ORDER UNDER
11 U.S.C. §§ 327(a) AND 328 AND FED. R. BANKR. P. 2014 AUTHORIZING
EMPLOYMENT AND RETENTION OF PRICEWATERHOUSECOOPERS LLP
TO PROVIDE CERTAIN SARBANES-OXLEY COMPLIANCE,
TAX AND FINANCIAL PLANNING, AND OTHER GENERAL TAX CONSULTING
SERVICES TO THE DEBTORS, NUNC PRO TUNC TO JANUARY 1, 2006

PLEASE TAKE NOTICE that on June 5, 2006, Delphi Corporation

("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in

the above-captioned cases, filed the Application For An Order Under 11 U.S.C. §§ 327(a)

And 328 And Fed. R. Bankr. P. 2014 Authorizing Employment And Retention Of

PricewaterhouseCoopers LLP To Provide Certain Sarbanes-Oxley Compliance, Tax And

Financial Planning, And Other General Tax Consulting Services To The Debtors, Nunc Pro

Tunc To January 1, 2006 (the "Application," attached to this notice as Exhibit A).

PLEASE TAKE FURTHER NOTICE that if timely written objections are

filed, served, and received in accordance with this notice, a hearing to consider approval of

the Application will be held on June 16, 2006, at 10:00 a.m. (Prevailing Eastern Time) (the

"Hearing") before the Honorable Robert D. Drain, United States Bankruptcy Court for the

Southern District of New York, One Bowling Green, Room 610, New York, New York,

10004.

PLEASE TAKE FURTHER NOTICE that if no written objections to the

Application are timely filed, served, and received, the order filed with the Application and

attached to this notice as Exhibit B will be submitted for signature to the Honorable Robert

D. Drain, United States Bankruptcy Court for the Southern District of New York, One

Bowling Green, Room 610, New York, New York 10004 on June 15, 2006 at 4:00 p.m.

(Prevailing Eastern Time).

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Applica-

tion must (a) be in writing, (b) conform to the Federal Rules of Bankruptcy Procedure, the

Local Bankruptcy Rules for the Southern District of New York, and the Seventh Supple-

mental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Manage-

ment, And Administrative Procedures, entered by this Court on May 19, 2006, as amended

(the "Seventh Supplemental Case Management Order") (Docket No. 3824), (c) be filed

with the Bankruptcy Court in accordance with General Order M-242 (as amended)

registered users of the Bankruptcy Court's case filing system must file electronically, and all

other parties-in-interest must file on a 3.5 inch disk (preferably in Portable Document

Format (PDF), WordPerfect, or any other Windows-based word processing format), (d) be

submitted in hard-copy form directly to the chambers of the Honorable Robert D. Drain,

United States Bankruptcy Judge, and (e) be served upon (i) Delphi Corporation, 5725

Delphi Drive, Troy, Michigan 48098 (Att'n: General Counsel), (ii) counsel to the Debtors,

Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100,

Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr.), (iii) counsel for the agent under the

Debtors' prepetition credit facility, Simpson Thacher & Bartlett LLP, 425 Lexington

Avenue, New York, New York 10017 (Att'n: Kenneth S. Ziman), (iv) counsel for the agent

under the postpetition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue, New

York, New York 10017 (Att'n: Brian Resnick), (v) counsel for the Official Committee Of

Unsecured Creditors, Latham & Watkins LLP, 885 Third Avenue, New York, New York

10022 (Att'n: Robert J. Rosenberg and Mark A. Broude), (vi) PricewaterhouseCoopers

LLP, 225 South Sixth Street, Suite 1400, Minneapolis, Minnesota 55402 (Att'n: Andrea

Clark Smith), (vii) counsel for the Official Committee Of Equity Security Holders, Fried

Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York

10004 (Att'n: Vivek Melwani), and (viii) the Office of the United States Trustee for the

Southern District of New York, 33 Whitehall Street, Suite 2100, New York, New York

10004 (Att'n: Alicia M. Leonhard), in each case so as to be **received** no later than **2:00**

**p.m. (Prevailing Eastern Time) on June 15, 2006** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that only those objections made as

set forth herein and in accordance with the Seventh Supplemental Case Management

Order will be considered by the Bankruptcy Court at the Hearing.  If no objections to the

Application are timely filed and served in accordance with the procedures set forth herein

and in the Seventh Supplemental Case Management Order, the Bankruptcy Court may

enter an order granting the Application **without further notice**.

Dated: New York, New York
     June 5, 2006

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: /s/ John Wm. Butler
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -

By: /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York  10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - x
                                  :

In re                             :      Chapter 11
                                    :

DELPHI CORPORATION, et al.,     :      Case No. 05-44481 (RDD)
                                    :

              Debtors.    :      (Jointly Administered)
                                    :

- - - - - - - - - - - - - - - - - - - - - - - - - x

APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a) AND 328 AND FED. R.
BANKR. P. 2014 AUTHORIZING EMPLOYMENT AND RETENTION OF
PRICEWATERHOUSECOOPERS LLP TO PROVIDE CERTAIN SARBANES-OXLEY
COMPLIANCE, TAX AND FINANCIAL PLANNING, AND OTHER GENERAL TAX
CONSULTING SERVICES TO THE DEBTORS NUNC PRO TUNC TO JANUARY 1, 2006

("PRICEWATERHOUSECOOPERS RETENTION APPLICATION")

           Delphi Corporation ("Delphi") and certain of its subsidiaries and

affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the

"Debtors"), hereby submit this application (the "Application") for an order under 11 U.S.C. §

327(a) and 328 And Fed. R. Bankr. P. 2014 authorizing the employment and retention of

PricewaterhouseCoopers LLP ("PwC") to provide certain Sarbanes-Oxley compliance, tax and

financial planning, and other general tax consulting services to the Debtors, nunc pro tunc to

January 1, 2006.  In support of this Application, the Debtors submit the Declaration of Brian D.

Decker, sworn to June 5, 2006, (the "Decker Declaration").  In further support of this

Application, the Debtors respectfully represent as follows:

Background

A.       The Chapter 11 Filings

        1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and

affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of

title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy

Code").  The Debtors continue to operate their businesses and manage their properties as

debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This

Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

        2.    On October 17, 2005, the Office of the Unites States Trustee (the "U.S.

Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").

On April 28, 2006, the U.S. Trustee appointed an official committee of equity security holders.

No trustee or examiner has been appointed in the Debtors' cases.

        3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

        4.    The statutory predicates for the relief requested herein are section 362 of

the Bankruptcy Code and Rules 7016 and 9019 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules").

B.       Current Business Operations Of The Debtors

        5.    Delphi and its subsidiaries and affiliates (collectively, the "Company") had

global 2005 net sales of approximately $26.9 billion, and global assets as of August 31, 2005

of approximately $17.1 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth

---

[1]    The aggregated financial data used in this Application generally consists of consolidated information from
Delphi and its worldwide subsidiaries and affiliates.

2

largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6.   The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.   Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.   Events Leading To The Chapter 11 Filing

8.   In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company

3

reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2]  Reflective of a

continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately

$2.8 billion on net sales of $26.9 billion.

        9.    The Debtors believe that the Company's financial performance has

deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational

restrictions driven by collectively bargained agreements, including restrictions preventing the

Debtors from exiting non-profitable, non-core operations, all of which have the effect of

creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for

domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually

in the United States and related pricing pressures, and (c) increasing commodity prices.

        10.    In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities,

product portfolio, operational issues, and forward-looking revenue requirements.  Because

discussions with its major unions and GM had not progressed sufficiently by the end of the

third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses

to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.      The Debtors' Transformation Plan

        11.    On March 31, 2006, the Company outlined the key tenets of its

transformation plan.  The Company believes that this plan will enable it to return to stable,

profitable business operations and allow the Debtors to emerge from these chapter 11 cases in

the first half of 2007.  To complete their restructuring process, the Debtors must focus on five

key areas.  First, Delphi must modify its labor agreements to create a competitive arena in

---

[2]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

which to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.  Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise a workable solution to their current pension situation.

      12.    In connection with the first two elements of the Company's transformation plan, Delphi continues to participate in discussions with its unions and GM.  Throughout those discussions, Delphi has consistently communicated a clear message to both its hourly workforce and GM: Delphi is committed to finding a consensual resolution to its issues and intends to continue to discuss with its unions and GM ways to become competitive in the Debtors' U.S. operations.  To that end, Delphi, GM and the UAW recently received this Court's approval of a tripartite agreement providing for a special hourly attrition program for Delphi's UAW-represented employees (the "Hourly Attrition Program").  This special hourly attrition program could provide as many as 18,000 of Delphi's 23,000 existing UAW-represented long-term hourly employees with "soft landings" through retirement attrition programs and GM flowbacks.  Delphi also hopes to reach agreement on similar hourly attrition programs with its other unions, which could provide as many as 4,500 additional hourly employees with retirement programs or incentives.

      13.    These hourly attrition programs constitute an important first step in implementing the Debtors' transformation plan, but will not resolve all of the issues related to Delphi's uncompetitive labor agreements.  Moreover, Delphi has not yet reached

5

comprehensive agreements with its unions and GM. Therefore, on March 31, 2006, Delphi

moved under sections 1113 and 1114 of the Bankruptcy Code for authority to reject its U.S.

labor agreements and to modify retiree benefits.[3]  Contemporaneously therewith, the Debtors

also moved to reject unprofitable supply contracts with GM.[4]  Among the reasons for the GM

contract rejection motion was the Debtors' belief that GM must cover a greater portion of the

costs of manufacturing products for GM at plants that bear the burden of the Debtors' legacy

costs.  This initial motion covers approximately half of the Debtors' North American annual

purchase volume revenue from GM but only 10% of the Debtors' total contracts with GM.

Although the filing of these motions was a necessary procedural step, the Debtors remain

focused on reaching a consensual resolution with all of Delphi's unions and GM.

        14.    To implement the third element of the Debtors' transformation plan, the

Company announced plans to focus its product portfolio on those core technologies for which

the Company has significant competitive and technological advantages and expects the greatest

opportunities for increased growth.  To that end, the Company will concentrate the

organization around the following core strategic product lines: (a) Controls & Security (Body

Security, Mechatronics, Power Products, and Displays), (b) Electrical/Electronic Architecture

(Electrical/Electronic Distribution Systems, Connection Systems, and Electrical Centers), (c)

Entertainment & Communications (Audio, Navigation, and Telematics), (d) Powertrain (Diesel

---

[3]    Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements
And Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035).

[4]    Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain
Executory Contracts With General Motors Corporation (Docket No. 3033).

and Gas Engine Management Systems), (e) Safety (Occupant Protection and Safety Electronics), and (f) Thermal (Climate Control & Powertrain Cooling).[5]

15.    In contrast, the Company similarly identified certain non-core product lines that do not fit into its future strategic framework, including Brake & Chassis Systems, Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics, Steering, and Wheel Bearings. The Company will seek to sell or wind down these non-core product lines (which will include approximately one-third of its global manufacturing sites) and will consult with its customers, unions, and other stakeholders to carefully manage the transition of such affected product lines. The Company intends to sell or wind down the non-core product lines and manufacturing sites by January 1, 2008.

16.    As part of its organizational restructuring, the fourth element of the Debtors' transformation plan, the Company expects to reduce its global salaried workforce by as many as 8,500 employees as a result of portfolio and product rationalizations and initiatives adopted following an analysis of the Company's selling, general, and administration ("SG&A") cost saving opportunities. The Company believes that once its SG&A plan is fully implemented, the Company should realize savings of approximately $450 million per year in addition to savings realized from competitive measures planned for its core businesses and the disposition of non-core assets.

17.    As noted above, the final key tenet of the transformation plan is to devise a workable solution to the Debtors' current pension situation. The Debtors' goal is to retain the benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors' hourly and salaried workforce. To do so, however, it will be necessary to freeze the current

---

[5]    The Company does not expect the portfolio changes to have a significant impact on its independent aftermarket or consumer electronics businesses. Similarly, the Company does not expect an impact on medical, commercial vehicles, or other adjacent-market businesses and product lines.

hourly U.S. pension plan as of October 1, 2006 and to freeze the current salaried U.S. pension

plan as of January 1, 2007.  Despite the freeze, because of the size of the funding deficit, it will

also be necessary for the Debtors to obtain relief from the Pension Benefit Guaranty

Corporation, the Internal Revenue Service, the Department of Labor, and potentially Congress,

to amortize funding contributions over a long-term period.  The Company intends to replace

the hourly plan (for certain employees) and the salaried plan with defined contribution plans.

18.    Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are

well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal

all of its resources to continue to deliver high-quality products to its customers globally.

Additionally, the Company will preserve and continue the strategic growth of its non-U.S.

operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

19.    By this Application, the Debtors seek to employ and retain PwC to

provide certain compliance, tax and financial planning, and other general tax consulting

services <u>nunc</u> <u>pro</u> <u>tunc</u> to January 1, 2006, as further described below.  Accordingly, the

Debtors respectfully request the entry of an order under sections 327(a) and 328 of the

Bankruptcy Code authorizing the employment and retention of PwC to provide assistance to

the Company in complying with the provisions of the Sarbanes-Oxley Act of 2002 including,

but not limited to Section 404 of the Sarbanes-Oxley Act, as well as to provide certain

compliance, tax and financial planning, and other general tax consulting services on the terms

and conditions of that certain Master Professional Services Agreement dated as of March 17,

2006 (the "Master Agreement"), and applicable statements of work (individually each as

defined below, and collectively, the "Statements Of Work"), between PwC and the Debtors.  A

8

copy of the Master Agreement is attached as <u>Exhibit 1</u> to the Decker Declaration.  A copy of

the Statement Of Work For Sarbanes-Oxley 404 Services (the "Sarbanes-Oxley Statement Of

Work") is attached as <u>Exhibit 2</u> to the Decker Declaration.  A copy of the Statement Of Work

For Executive Personal Financial Planning Services (the "Financial Planning Statement Of

Work") is attached as <u>Exhibit 3</u> to the Decker Declaration.  A copy of the Statement Of Work

For Tax Compliance - Foreign Affiliate Reporting (the "Tax Compliance Statement Of Work")

is attached as <u>Exhibit 4</u> to the Decker Declaration.  A copy of the Statement Of Work For PwC

WNTS Advocacy Services (the "WNTS Advocacy Statement Of Work") is attached as <u>Exhibit</u>

<u>5</u> to the Decker Declaration.  A copy of the Statement Of Work For Miscellaneous General

Consulting Not Exceeding $20,000 (the "Consulting Statement Of Work") is attached as

<u>Exhibit 6</u> to the Decker Declaration.

<u>Basis For Relief</u>

20.    The Debtors wish to employ PwC to provide assistance and support in

connection with the Debtors' compliance with Section 404 of the Sarbanes-Oxley Act, certain

financial planning services as well as consulting and advocacy services with respect to tax

policy, legislative and IRS administrative matters, foreign affiliates tax reporting, and other

general tax consulting services.

21.    To help ensure compliance with Section 404 of the Sarbanes-Oxley Act,

the Debtors require the services of various professionals.  In this vein, the Debtors engaged

PwC to provide management certification testing and remediation plans necessary for the

Debtors to meet the requirements of Section 404 of the Sarbanes-Oxley Act.  The Debtors

selected PwC to provide such services because of PwC's national reputation and expertise in

these areas.

22.    The Debtors' retention of PwC is evidenced by the Master Agreement as supplemented by the Statements of Work.  In accordance with the terms of the Master Agreement, the respective scopes of the services that PwC conducts are defined in statements of work which are periodic attachments to the Master Agreement.  As more fully described in the applicable Statements of Work, PwC will provide service such as Sarbanes-Oxley compliance assistance, personal financial planning services, tax compliance assistance in connection with the foreign affiliate tax reporting requirements, analysis and computations of U.S. earnings and profits and related creditable income tax pools, consulting and advocacy services with respect to tax policy, legislative, and IRS administrative matters, and other miscellaneous general tax consulting services.

23.    The Debtors had retained PwC as an ordinary course professional under the Order Under 11 U.S.C §§ 327, 330, And 331 Authorizing Retention Of Professionals Utilized By Debtors In Ordinary Course Of Business ("Ordinary Course Professionals Order") (Docket No. 883).  As a professional retained under the Ordinary Course Professionals Order, PwC has provided tax planning and personal financial planning services such as assistance with income tax projections, modeling the tax impact of company benefits, and cash flow and debt management analysis.  During 2006, the Debtors and PwC discussed expanding the scope of the professional services to include Sarbanes-Oxley compliance and tax advisory consulting services.  The Debtors are concerned that PwC will exceed the fee cap established in the Ordinary Course Professionals Order.  Therefore, the Debtors request that PwC be formally retained to provide Sarbanes-Oxley compliance, tax and financial planning, and other general tax consulting services in these chapter 11 cases.

24.    The Debtors believe that they will continue to require the services provided by PwC.  Accordingly, the Debtors are hereby seeking authority to retain PwC to

10

complete the projects described in the Statements Of Work and to execute additional

Statements Of Work as necessary without seeking further Court approval.

Qualifications Of PwC

25.    PwC is a firm of independent public accountants as defined under the code

of professional conduct of the American Institute of Certified Public Accountants. PwC is a

global market leader for accounting, tax and advisory services that has operated for more than

150 years.  PwC assists businesses, individuals, and organizations with accounting, tax,

strategy, planning, and compliance, while also delivering a wide range of business advisory

services. PwC is one of the four largest accounting and auditing, tax, and consulting firms in

the United States, with 23,000 dedicated professionals in the United States, and with an

international practice with 130,000 professionals in more than 148 countries.  PwC has

significant experience proving a wide range of accounting and tax services for troubled and

restructuring companies.

26.    The Debtors submit that PwC is well-positioned to provide such services.

As a result of its previous engagement by the Debtors, PwC has worked closely with the

Debtors and has become familiar with the Debtors' businesses.  Accordingly, PwC has the

necessary background and capability to deal effectively with potential issues that may arise in

the future course of its work with the Debtors in these chapter 11 cases.  Moreover, given its

expertise and the institutional knowledge it has acquired regarding the Debtors' businesses,

PwC is uniquely qualified to provide the services needed by the Debtors.  Accordingly, the

Debtors' retention of PwC on the terms set forth herein and in the Master Agreement as

supplemented by the Statements of Work is in the best interests of the Debtors, their estates,

creditors, and other parties-in-interest.

11

27.    The Debtors believe that the employment of PwC to provide services pertaining to consulting, management certification testing, and remediation planning under section 404 of the Sarbanes-Oxley Act, personal financial planning, tax compliance, advocacy, and other miscellaneous general tax consulting services will enhance and will not duplicate the employment of KPMG LLP, the Debtors' tax and transaction services advisors, Ernst & Young, the Debtors' independent auditors, accountants, and tax advisors or any of the other professionals retained by the Debtors to perform specific tasks that are unrelated to the work to be performed by PwC. The Debtors and PwC understand that PwC will work closely with other professionals retained by the Debtors to avoid any such duplication.

<u>Services To Be Rendered</u>

28.    As set forth in the Mater Agreement and the Statements of Work, the Debtors have engaged PwC to provide the following professional services to the Debtors:

(a)    Pursuant to the Sarbanes-Oxley Statement Of Work, PwC will provide project assistance under the direction of company accounting executives, related to the Debtors' overall management certification testing and remediation plans under section 404 of the Sarbanes-Oxley Act of 2002;

(b)    Pursuant to the Financial Planning Statement Of Work, PwC will provide (i) tax planning services to Debtors' senior executives, such as assistance with income tax projections, modeling tax impact of provided benefits, modeling tax impact of life events, withholding tax analysis, and estimated tax payment sufficiency analysis and (ii) personal financial planning services to Debtors' senior executives, such as cash flow and debt management, stock option analysis, education funding planning, retirement funding planning, retirement distributions, investment strategies, estate tax minimization, and wealth distribution;

(c)    Pursuant to the Tax Compliance Statement Of Work, PwC will provide tax compliance assistance in connection with the foreign affiliate tax reporting requirements included in the 2005 Delphi consolidated U.S. tax return, including, but not limited to, analysis and computations of U.S. earnings and profits and related creditable income tax pools, analysis of potential subpart F inclusions, analysis of the U.S. tax implications of dividend distributions and related section 902 credits,

12

and computation of intercompany transaction flow information for use
in transfer pricing analysis;

(d)    Pursuant to the WNTS Advocacy Statement Of Work, PwC will provide
consulting and advocacy services with respect to tax policy, legislative,
and Internal Revenue Service administrative matters, including, but not
limited to, analysis of emerging tax issues and discussions and analysis
of forums of tax executives focused on international tax policy issues;
and

(e)    Pursuant to the Consulting Statement Of Work, PwC will provide
miscellaneous general tax consulting services for projects not exceeding
$20,000 per project, including consulting with PwC's U.S. and foreign
offices and providing subscription and data services for accounting and
other miscellaneous needs.

29.    In addition, the Debtors and PwC are in the process of negotiating a
statement of work for the provision of bankruptcy tax advisory services.  Under this statement
of work, PwC will assist the Debtors with tax advisory and consulting services relating to the
impact of the bankruptcy filing, including calculating net operating loss carry forwards, the tax
consequences of any proposed plans of reorganization, and assistance in the preparation of any
federal, state, local, and foreign ruling requests regarding the future tax consequences of
alternative reorganization structures.

30.    Subject to this Court's approval of the Application, PwC is willing to
perform the services described in the Master Service Agreement and the Statements of Work
on the terms set forth therein.

Disinterestedness Of Professionals

31.    To the best of the Debtors' knowledge, except as set forth in the Decker
Declaration, (a) PwC neither holds nor represents any interest adverse to the Debtors' estates,
(b) PwC has had no affiliation with the Debtors, their creditors, any party-in-interest, or their
respective attorneys and accountants, the United States Trustee, any person employed in the
office of the United States Trustee, or the Bankruptcy Judge presiding over these cases, and (c)

13

PwC is a "disinterested person" within the meaning of Sections 101(14) and 327(a) of the

Bankruptcy Code.   The Decker Declaration, executed on behalf of PwC in accordance with

section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014, is filed contemporaneously

herewith and incorporated herein by reference.  The Debtors' knowledge, information, and

belief regarding the matters set forth in this Application are based on, and made in reliance

upon, the Decker Declaration.

    32. In addition to services provided to the Debtors, PwC provides continued

assistance to the law firm of Wilmer Cutler Pickering Hale and Dorr LLP ("Wilmer Hale"), the

special regulatory counsel to the Audit Committee of the Debtors' Board of Directors (the

"Audit Committee"), in its representation of the Audit Committee in an SEC investigation into

certain accounting transactions and contracts entered into by the Debtors.  PwC will continue

to be compensated for its assistance to Wilmer Hale in accordance with the fee statements and

fee applications submitted by Wilmer Hale in these chapter 11 cases.

    33. The Debtors submit that the appointment of PwC on the terms and

conditions set forth herein is in the best interest of the Debtors, their creditors, and all parties-

in-interest.

Professional Compensation

    34. Consistent with the Master Agreement, the applicable Statements of

Work, and as described in the Decker Declaration, the Debtors have agreed to pay PwC

reasonable sums in accordance with the normal rates charged by PwC for the services provided

and to compensate PwC for reasonable and necessary out of pocket expenses incurred, which

expenses may include travel, report preparation, delivery services, and other necessary costs in

providing services to the Debtors in accordance with PwC's customary reimbursement policies.

14

PwC's hourly rates for professional services are based upon the individual resources provided from PwC's various lines of business and are currently as follows:[6]

| | |
|---|---|
| Partners | $390 to $975 |
| Directors/Senior Managers | $250 to $690 |
| Managers | $165 to $460 |
| Senior Associates/Associates | $120 to $320 |
| Paraprofessionals/Office Staff | $ 75 to $180 |

These rates are PwC's normal and customary rates for the type of services to be provided. The Debtors are advised that these rates are subject to change but that any changes will remain in line with market rates for comparable services.

35.    During the one-year period preceding the Petition Date, the Debtors paid PwC approximately $431,467 in respect of the types of services to be rendered pursuant to the Master Agreement and the expenses incurred in relation thereto.

36.    In summary, if this Application is approved, as compensation for the services rendered under the existing Statements Of Work, PwC will be entitled to receive the following fees:

(a)    For work performed under the Sarbanes-Oxley Statement Of Work, PwC will receive compensation based on the number of hours of professional time provided at an hourly rate as follows: Partner $250 to $400 per hour, Senior Manager $180 to 300 per hour, Manager $120 to $200 per hour, Senior Associate $60 - $160 per hour, and Associate $50 to $130 per hour;

(b)    For work performed under the Financial Planning Statement Of Work, PwC will receive compensation in accordance with the terms of the Master Agreement, total charges of $6,000 per participant per annum except that the fee for the initial year of services will be approximately $11,000 per participant. The fee for certain specified individuals on the Debtor's strategy board will be $2,000 higher;

---

[6]    These rates are the current U.S. hourly rates by personnel level. The hourly rates for the various PwC's foreign offices are not included in the ranges above, which may be significantly lower or higher for any personnel level. For the Sarbanes-Oxley Statement of Work, the foreign office billing rates, specific for the project, have been disclosed to the Debtors.

(c)     For work performed under the Tax Compliance Statement Of Work,
PwC will receive compensation based on the number of hours of
professional time provided at a discounted hourly rate as follows:
Senior Associate - $155.00 per hour, Associate, Transfer Pricing -
$125.00 per hour, Associate - $110.00 per hour;

(d)     For work performed under the WNTS Advocacy Statement Of Work,
PwC will receive $60,000 per year, invoiced at $5,000 per month; and

(e)     For work performed under the Consulting Statement Of Work, the
Debtors will pay PwC their regular hourly rates.

37.    The Debtors and PwC acknowledge and agree that (a) the hours worked,

(b) the results achieved, and (c) the ultimate benefit to the Debtors of the work performed, in

each case, in connection with this engagement, may be variable, and the Debtors and PwC

have taken such factors into account in setting the fees under the Master Agreement and the

Statements of Work; provided, however, that with respect to the hours worked, PwC will

devote whatever resources are required to fulfill the purposes of this engagement on a timely

basis.

38.    In the event that this Court approves the retention of PwC by the Debtors,

(a) PwC's fees and expenses will be subject to (i) the jurisdiction and approval of this Court

under section 328(a) of the Bankruptcy Code and any order entered by this Court with regard

to PwC's retention, (ii) any applicable fee and expense guideline orders, and (iii) any

requirements governing interim and final fee applications, and (b) the Debtors will pay all fees

and expenses of PwC under the Master Agreement and the Statements Of Work as promptly as

practicable in accordance with the terms thereof and the orders of this Court governing interim

and final fee applications, and after obtaining all necessary further approvals from this Court, if

any.

39.    PwC will also seek reimbursement for necessary expenses incurred, in

accordance with Appendix A of the Master Agreement and guidelines established by the

16

Unites States Trustee, which will include travel, photocopying, delivery service, postage,

vendor charges, and other out-of-pocket expenses incurred in providing professional services.

<u>Dispute Resolution Procedures</u>

40.    As set forth in <u>Exhibit 7</u> to the Decker Declaration, the Debtors and PwC

have agreed, subject to this Court's approval of the Application, that (a) any controversy or

claim with respect to, in connection with, arising out of, or in any way related to this

Application or the services provided by PwC to the Debtors as outlined in the Application,

including any matter involving a successor in interest or agent of any of the Debtors or of PwC,

shall be brought in this Court or the District Court for the Southern District of New York if

such District Court withdraws the reference, (b) PwC and the Debtors and any and all

successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole

and exclusive forum (unless such court does not have or retain jurisdiction over such claims or

controversies) for the resolution of such claims, causes of actions or lawsuits, (c) PwC and the

Debtors, and any and all successors and assigns thereof, waive trial by jury, such waiver being

informed and freely made, (d) if this Court, or the District Court for the Southern District of

New York if such District Court withdraws the reference, does not have or retain jurisdiction

over the foregoing claims and controversies, PwC and the Debtors, and any and all successors

and assigns thereof, will submit first to non-binding mediation and, if mediation is not

successful, then to binding arbitration, in accordance with the dispute resolution procedures set

forth in <u>Exhibit 7</u> to the Decker Declaration, and (e) judgment on any arbitration award may be

entered in any court having proper jurisdiction.

41.    PwC has agreed, as set forth in the Decker Declaration, not to raise or

assert any defense based upon jurisdiction, venue, abstention, or otherwise to the jurisdiction

and venue of this Court or the District Court for the Southern District of New York if such

17

District Court withdraws the reference to hear or determine any controversy or claims with

respect to, in connection with, arising out of, or in any way related to, this Application or the

services provided hereunder.

      42.   For the foregoing reasons, the Debtors submit that the relief requested

herein is in the best interests of the Debtors and their estates and creditors and should be

approved.

<u>Notice</u>

      43.   Notice of this Motion has been provided in accordance with the Seventh

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m),

9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case

Management, And Administrative Procedures, entered by this Court on April 20, 2006 (Docket

No. 3293).  In light of the nature of the relief requested, the Debtors submit that no other or

further notice is necessary.

<u>Memorandum Of Law</u>

      44.   Because the legal points and authorities upon which this Application

relies are incorporated herein, the Debtors respectfully request that the requirement of the

service and filing of a separate memorandum of law under Rule 9013-1(b) of the Local

18

Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) authorizing the Debtors to employ and retain PwC to provide certain Sarbanes-Oxley compliance, tax and financial planning, and other general tax consulting services to the Debtors, nunc pro tunc to January 1, 2006 and (b) granting the Debtors such other and further relief as is just.

Dated: New York, New York
     June 5, 2006

DELPHI CORPORATION, on behalf of itself and certain of its subsidiaries and affiliates, as Debtors and Debtors-in-possession

By:  /s/ John D. Sheehan
      Name: John D. Sheehan
      Title:  Vice President, Chief Restructuring Officer, and Controller

19

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                         :

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. §§ 327(a) AND 328 FED.
R. BANKR. P. 2014 AUTHORIZING EMPLOYMENT AND RETENTION OF
PRICEWATERHOUSECOOPERS LLP TO PROVIDE CERTAIN SARBANES-OXLEY
COMPLIANCE, TAX AND FINANCIAL PLANNING, AND OTHER GENERAL TAX
CONSULTING SERVICES TO DEBTORS NUNC PRO TUNC TO JANUARY 1, 2006

("PRICEWATERHOUSECOOPERS RETENTION ORDER")

Upon the application, dated June 5, 2006 (the "Application"), of Delphi Corporation

and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-

captioned cases (collectively, the "Debtors"), for an order (the "Order"), under 11 U.S.C. §§ 327(a)

and 328 authorizing the employment and retention of PricewaterhouseCoopers LLP ("PwC") to

provide cerain compliance, tax and financial planning, and other general tax consulting services to

the Debtors as of January 1, 2006; and upon the Declaration of Brian D. Decker, executed on June 5,

2006, in support of the Application; and this Court having determined that the relief requested in the

Application is in the best interests of the Debtors, their estates, their creditors, and other parties-in-

interest; and this Court being satisfied that PwC is disinterested and represents no interest adverse to

the Debtors or their estates as to the matters upon which PwC is to be engaged; and it appearing that

proper and adequate notice of the Application has been given and that no other or further notice is

necessary; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is

hereby

ORDERED, ADJUDGED, AND DECREED THAT:

1. The Application is GRANTED.

2. The Debtors' employment of PwC to provide certain Sarbanes-Oxley compliance, tax and financial planning, and other general tax consulting services, pursuant to the Application and that certain Master Professional Service Agreement, dated as of March 17, 2006 and the applicable Statements of Work, is approved under 11 U.S.C. §§ 327(a) and 328 and Fed. R. Bankr. P. 2014, with approval of such employment being effective on January 1, 2006.

3. PwC shall be compensated in accordance with the standards and procedures set forth in sections 330 and 331 of the United States Bankruptcy Code and all applicable Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York, the guidelines established by the Office of the United States Trustee, and further orders of this Court. Without limiting the foregoing, PwC shall make reasonable efforts to ensure that the Debtors' estates are not charged for any duplication of work with the other professionals retained in these cases.

4. This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

5. The requirement under Local Rule 9013-1(b) for the service and filing of a separate memorandum of law is deemed satisfied by the Application.


Dated: New York, New York
     June _____, 2006

                                            _____

                                            UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                    :
     In re                  :    Chapter 11
DELPHI CORPORATION, et al.,                          :    Case No. 05-44481 (RDD)
                  Debtors.    :    (Jointly Administered)
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF BRIAN D. DECKER IN
SUPPORT OF APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a),
328(a), AND 1107(b) AUTHORIZING EMPLOYMENT AND RETENTION OF
PRICEWATERHOUSECOOPERS LLP TO PROVIDE CERTAIN SARBANES-OXLEY
COMPLIANCE, TAX AND FINANCIAL PLANNING, AND OTHER GENERAL TAX
CONSULTING SERVICES TO DEBTORS NUNC PRO TUNC TO JANUARY 1, 2006

Brian D. Decker, states the follows:

      1.     I am a Certified Public Accountant and a partner of PricewaterhouseCoopers

LLP ("PricewaterhouseCoopers"), a professional services firm.  I submit this declaration on

behalf of PricewaterhouseCoopers in support of the application (the "Application") of Delphi

Corporation, and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in

the above-captioned cases (collectively, the "Debtors"), for entry of an order, pursuant to

sections 327(a), 328(a) and 1107(b) of the United States Bankruptcy Code, 11 U.S.C. 101-

1330, as amended (the "Bankruptcy Code"), authorizing the retention and employment of

PricewaterhouseCoopers LLP to provide Sarbanes-Oxley compliance, tax and financial

planning, and other general tax consulting services to the Debtors, nunc pro tunc to January 1,

2006 [1], pursuant to the terms and conditions set forth in the Master Professional Services

Master Agreement, dated March 17, 2006, attached as Exhibit 1 hereto and the applicable

_____

[1]     PricewaterhouseCoopers was employed and paid as an Ordinary Course Professional during calendar
year 2005. Beginning in February, 2006, it became clear to PricewaterhouseCoopers and the Debtors that our
cumulative fees would exceed the applicable limits set forth as an Ordinary Course Professional.

Statement of Works, attached as <u>Exhibits</u> 2, 3, 4, 5 and 6 hereto, for Sarbanes-Oxley 404

services executed May 11, 2006 (the "Sarbanes-Oxley Statement of Work"), tax planning and

personal financial planning services executed April 25, 2006 (the "Financial Planning

Statement of Work", for tax compliance assistance associated with foreign affiliate

requirements executed April 25, 2006 (the "Tax Compliance Statement of Work"), consulting

and advocacy relative to tax and IRS matters executed April 25, 2006 (the "WNTS Advocacy

Statement of Work"), and for miscellaneous general tax consulting executed April 25, 2006

(the "Consulting Statement of Work", and, together with the Master Professional Services

Master Agreement (the "Master Agreement").  Except as otherwise noted [2], I have personal

knowledge of the matters set forth herein, and, if called as a witness, would testify

competently thereto.

QUALIFICATIONS OF PROFESSIONALS

2.    PricewaterhouseCoopers is a firm of independent public accountants as

defined under the code of professional conduct of the American Institute of Certified Public

Accountants. PricewaterhouseCoopers is a global market leader for accounting, tax and

advisory services that has operated for over 150 years.  PricewaterhouseCoopers assists

businesses, individuals and organizations with accounting, tax strategy, planning, and

compliance, while also delivering a wide range of business advisory services.

PricewaterhouseCoopers is one of the four largest accounting and auditing, tax and

consulting firms in the United States, with 23,000 dedicated professionals in the United

States, and with an international practice with 130,000 professionals in over 148 countries,

and has significant experience proving a wide range of accounting and tax services for

troubled and restructuring companies.

_____

[2]    Certain of the disclosures herein relate to matters within the personal knowledge of other professionals
at PricewaterhouseCoopers and are based on information provided by them.

3.     The Debtors have selected PricewaterhouseCoopers as one of their Sarbanes-Oxley compliance, tax and financial advisors because of the wealth of experience in providing accounting, tax and advisory services in restructurings and reorganizations and enjoys an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

4.     On the Petition Date, PricewaterhouseCoopers was requested by the Debtors to continue providing tax planning and personal financial planning services such as assistance with income tax projections, modeling the tax impact of company benefits, and cash flow and debt management analysis.  On November 4, 2006, this Court approved PricewaterhouseCoopers' retention as an ordinary course professional.  On December 7, 2005, PricewaterhouseCoopers filed its Declaration of Ordinary Course Professional.

5.     During 2006, PricewaterhouseCoopers and the Debtors continued to discuss the expansion of various requested services, including Sarbanes-Oxley compliance and tax advisory services, as described within this Declaration and the associated Application. By virtue of these additional engagements, PricewaterhouseCoopers anticipates exceeding the aggregate limits established for an Ordinary Course Professional.

6.     PricewaterhouseCoopers is familiar with the books, records, financial information and other data maintained by the Debtors as relevant to the services hereunder and is qualified to continue to provide litigation, tax and financial advisory services to the Debtors.  As such, expanding the services provided by PricewaterhouseCoopers is an efficient and cost effective manner in which the Debtors may obtain the requisite services. PricewaterhouseCoopers and the Debtors continue to believe that PricewaterhouseCoopers is an appropriate professional to advise the Debtors during the course of these chapter 11 cases.

## SERVICES TO BE RENDERED

7.     PricewaterhouseCoopers has been providing tax advising services to the

Debtors as an Ordinary Course Professional since the Petition Date.  The Debtors and

PricewaterhouseCoopers respectfully request an expansion of services to include certain

Sarbanes-Oxley compliance, tax and financial planning and other general tax consulting

services pursuant to the Master Agreement and its applicable statement of works.

(a)     Pursuant to the Sarbanes-Oxley Statement Of Work, PwC will provide project
assistance under the direction of company accounting executives, related to
the Debtors' overall management certification testing and remediation plans
under section 404 of the Sarbanes-Oxley Act of 2002;

(b)     Pursuant to the Financial Planning Statement Of Work, PwC will provide (i)
tax planning services to Debtors' senior executives, such as assistance with
income tax projections, modeling tax impact of provided benefits, modeling
tax impact of life events, withholding tax analysis, and estimated tax payment
sufficiency analysis and (ii) personal financial planning services to Debtors'
senior executives, such as cash flow and debt management, stock option
analysis, education funding planning, retirement funding planning, retirement
distributions, investment strategies, estate tax minimization, and wealth
distribution;

(c)     Pursuant to the Tax Compliance Statement Of Work, PwC will provide tax
compliance assistance in connection with the foreign affiliate tax reporting
requirements included in the 2005 Delphi consolidated U.S. tax return,
including, but not limited to, analysis and computations of U.S. earnings and
profits and related creditable income tax pools, analysis of potential subpart F
inclusions, analysis of the U.S. tax implications of dividend distributions and
related section 902 credits, and computation of intercompany transaction flow
information for use in transfer pricing analysis;

(d)     Pursuant to the WNTS Advocacy Statement Of Work, PwC will provide
consulting and advocacy services with respect to tax policy, legislative, and
Internal Revenue Service administrative matters, including, but not limited to,
analysis of emerging tax issues and discussions and analysis of forums of tax
executives focused on international tax policy issues; and

(e)     Pursuant to the Consulting Statement Of Work, PwC will provide
miscellaneous general tax consulting services for projects not exceeding
$20,000 per project, including consulting with PwC's U.S. and foreign offices
and providing subscription and data services for accounting and other
miscellaneous needs.

8.     In addition, the Debtors and PwC are in the process of negotiating a statement

of work for the provision of bankruptcy tax advisory services.  Under this statement of work,

PwC will assist the Debtors with tax advisory and consulting services relating to the impact of the bankruptcy filing, including calculating net operating loss carry forwards, the tax consequences of any proposed plans of reorganization, and assistance in the preparation of any federal, state, local, and foreign ruling requests regarding the future tax consequences of alternative reorganization structures.

9.      PricewaterhouseCoopers, at the request of the Debtors, also may render additional related professional support deemed appropriate and necessary to the benefits of the Debtors' estates.  The services to be provided by PricewaterhouseCoopers to the Debtors will not be unnecessarily duplicative of those provided by any of the Debtors' other professionals, and PricewaterhouseCoopers will coordinate any services performed at the Debtors' request with such professionals, including financial advisors, accountants and counsel, as appropriate, to avoid duplication of effort.

10.      The PricewaterhouseCoopers professionals providing the Sarbanes-Oxley compliance, tax and financial planning, and other general tax consulting services and will consult with internal PricewaterhouseCoopers bankruptcy advisors to ensure compliance with the requirements of the Bankruptcy Code, as well as to decrease the overall fees associated with the administrative aspects of PricewaterhouseCoopers postpetition engagements. The services provided by these PricewaterhouseCoopers bankruptcy advisors include: assistance with the bankruptcy retention Master Agreements; required disinterestedness disclosures; and compensation requirements including compliance with the Bankruptcy Rules, the Local Rules, orders of this Court and guidelines established by the Untied States Trustee.  Due to the specialized nature of the services, and consistency between bankruptcy venues, specific billing rates have been established for these bankruptcy advisors.[3]

---

[3]      The rate per hour for the PricewaterhouseCoopers bankruptcy advisors by level of experience will be as follows: Partner: $570; Director/Senior Manager: $500; Manager: $360; Senior Associate: $260; Associate: $205 and Paraprofessional: $135. These rates are subject to periodic adjustments.

11.    Subject to this Court's approval of the Application, PricewaterhouseCoopers is
willing to perform the services described in the Master Agreement and the Statement of
Works on the terms set forth therein.

OTHER TERMS AND CONDITIONS ASSOCIATED WITH THE MASTER
AGREEMENT

Dispute Resolution Procedures

12.    The Debtors and PricewaterhouseCoopers have agreed, subject to the Court's
approval of this Application, that  (a) any controversy or claim with respect to, in connection
with, arising out of, or in any way related to this Application or the services provided by
PricewaterhouseCoopers to the Debtors as outlined in this Application, including any matter
involving a successor in interest or agent of any of the Debtors or of PricewaterhouseCoopers,
shall be brought in the Bankruptcy Court or the District Court for the Southern District of
New York if such District Court withdraws the reference, (b) PricewaterhouseCoopers and
the Debtors and any and all successors and assigns thereof, consent to the jurisdiction and
venue of such court as the sole and exclusive forum (unless such court does not have or retain
jurisdiction over such claims or controversies) for the resolution of such claims, causes of
actions or lawsuits, (c) PricewaterhouseCoopers and the Debtors, and any and all successors
and assigns thereof, waive trial by jury, such waiver being informed and freely made, (d) if
the Bankruptcy Court, or the District Court for the Southern District Of New York withdraws
the reference, does not have or retain jurisdiction over the foregoing claims and controversies,
PricewaterhouseCoopers and the Debtors, and any and all successors and assigns thereof, will
submit first to non-binding mediation and, if mediation is not successful, then to binding
arbitration, in accordance with the dispute resolution procedures set forth in Exhibit 7 to this
Declaration, and (e) judgment on any arbitration award may be entered in any court having

proper jurisdiction. By this Application, the Debtors seek approval of this Master Agreement by the Court.

13.     Further, PricewaterhouseCoopers has agreed not to raise or assert any defense based upon jurisdiction, venue, abstention, or otherwise to the jurisdiction and venue of the Bankruptcy Court or the District Court for the Southern District of New York, if such District Court withdraws the reference) to hear or determine any controversy or claims with respect to, in connection with, arising out of, or in any way related to, this Application or the services provided hereunder.

### DISINTERESTEDNESS OF PROFESSIONALS

14.     Skadden, Arps has provided a list (the "List") of the Debtors' (A) Affiliates and Non-Debtor Subsidiaries; (B) Former Officers and Directors (for the past three years); (C) All Lenders (including current and former agents under credit facilities and their counsel and financial advisors); (D) Insurers; (E) Professionals (attorneys, accountants, investment bankers, consultants for the past three years, excluding those professionals that charge less than $100,000 in Annual Fees); (F) Parties to Litigation and their Counsel (for claims of at least $500,000); (G) Top 50 Creditors; (H) Holders of 5% or More of any Outstanding Equity Security of the Company; (I) Record Noteholders holding 5% or More of Any Outstanding Issuance of Notes of the Company; (J) Indenture Trustees; (K) Underwriters of Securities Issued by the Company During the Past Three Years; (L) Counterparties to Major Leases; (M) Counterparties to Major Contracts (over $100,000); (N) Secured Financial Creditors; (O) Lienholders and Other Significant Lenders; (P) Major Customers; (Q) Major Suppliers; (R) Letter of Credit Issuers and Beneficiaries; (S) State and Other Governmental Authorities with an Interest in the Company; (T) Unions Representing Company Employees; (U) Other Miscellaneous Interested Parties; (V) Objecting/Adverse Parties/Postpetition Parties; and (W) Master Service List and 2002 Entities List.

15.    Our review, completed under my supervision, consisted of queries of an internal computer database containing names of individuals and entities that are present or recent former clients of PricewaterhouseCoopers in order to identify potential relationships. PricewaterhouseCoopers' review of its relationships with these parties in interest is continuing and PricewaterhouseCoopers will file a supplemental declaration disclosing the results of the remaining entities in an expedient manner.  A summary of potential relationships that PricewaterhouseCoopers has already been able to locate using its reasonable efforts is reflected in Exhibit 8 to this Declaration.

16.    In addition to the services provided by the Debtors, PricewaterhouseCoopers provides continued assistance to the law firm of Wilmer Cutler Pickering Hale and Dorr LLP ("Wilmer Hale"), the special regulatory counsel to the Audit Committee of the Debtors' Board of Directors (the "Audit Committee"), in its representation of the Audit Committee in an SEC investigation into certain accounting transactions and contracted entered into by the Debtors.  PricewaterhouseCoopers will continue to be compensated for its assistance to Wilmer Hale in accordance with the fee statements and fee applications submitted by Wilmer Hale in these chapter 11 cases.[4]

17.    PricewaterhouseCoopers confirms it is not providing and will not provide services to any of the clients that are listed on Exhibit 8 that are adverse to the Debtors or related to issues connected to the Debtors' bankruptcy.  Further, we are not providing and will not provide services to the Debtors that would be adverse to any of the entities listed on Exhibit 8.  Despite the size or significance of the relationships with the entities listed on Exhibit 8, none of those relationships will compromise in any way PricewaterhouseCoopers'

---

[4]    Subsequent to the Petition Date, PricewaterhouseCoopers have invoiced the Debtors, $442,914 for services rendered through March 31, 2006 and the Debtors have paid PricewaterhouseCoopers, $294,341, associated with the services through January 31, 2006. PricewaterhouseCoopers provides a narrative summary of the services provided to Wilmer Hale and the Debtors.

ability to provide Sarbanes-Oxley compliance, tax and financial planning and other general tax consulting services to the Debtors.

18.   PricewaterhouseCoopers has provided and likely will continue to provide services unrelated to the Debtors' case for the various entities shown on Exhibit 8.  Our assistance to these parties has been primarily related to auditing, tax, and/or other consulting services.  To the best of my knowledge, no services have been provided to these creditors or other parties in interest which could impact their rights in the Debtors' case, nor does PricewaterhouseCoopers' involvement in this case compromise its ability to continue such auditing, tax and/or consulting services.  With respect to those potential parties in interest listed on Exhibit 8 who are PricewaterhouseCoopers clients, only two of those clients accounted for more than 1% of PricewaterhouseCoopers revenues for the fiscal year ended June 30, 2005, and that client did not account for more than 1.5% of PricewaterhouseCoopers' revenues for the fiscal year ended June 30, 2005.

19.   Further, as part of its diverse practice, PricewaterhouseCoopers appears in numerous cases, proceedings and transactions that involve many different professionals, including attorneys, accountants and financial consultants, who may represent claimants and parties-in-interest in the Debtors' chapter 11 cases.  Also, PricewaterhouseCoopers has performed in the past, and may perform in the future, audit, tax and consulting services for various attorneys and law firms in the legal community, and has been represented by several attorneys and law firms in the legal community, some of whom may be involved in these proceedings. In addition, PricewaterhouseCoopers has in the past, may currently and will likely in the future be working with or against other professionals involved in these cases in matters unrelated to the Debtors and these cases.  Based on our current knowledge of the professionals involved, and to the best of my knowledge, none of these business relationships

create interests materially adverse to the Debtors herein in matters upon which PricewaterhouseCoopers is to be employed, and none are in connection with this case.

20.    PricewaterhouseCoopers is not a "Creditor" of any of the Debtors within the meaning of Section 101(10) of the Bankruptcy Code.   Further, PricewaterhouseCoopers is not a holder of any shares of the Debtors' stock.    Further, neither I nor any other PricewaterhouseCoopers partner or principal, to the best of my knowledge, is a holder of any shares of the Debtors' stock.

21.    Based on the results of the relationship search conducted to date as described above, PricewaterhouseCoopers insofar as I have been able to ascertain has no connection with the above-captioned Debtors, their creditors, equity security holders, other parties-in-interest (as reasonably known to us) or their respective attorneys, except as disclosed or otherwise described herein.  Further, to the best of my knowledge, no one involved in this case has any connection to the U.S. Trustee or any person employed in the Office of the U.S. Trustee in the New York Southern District, or the Bankruptcy Judge presiding over these cases.

22.    As such, to the best of my knowledge, PricewaterhouseCoopers is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, in that PricewaterhouseCoopers:

(a)    is not a creditor, equity security holder or insider of the Debtors;

(b)    is not and was not an investment banker for any outstanding security of the Debtors;

(c)    has not been, within three years before the date of the filing of the Debtors' chapter 11 petition, (i) an investment banker for a security of the Debtors or (ii) an attorney for such an investment banker in connection with the offer, sale, or issuance of a security of the Debtors; and

(d)    was not, within two years before the date of filing of the Debtors' chapter 11 petitions, a director, officer, or employee of the Debtors or of any investment banker as specified in subparagraph (b) or (c) of this paragraph.

In addition, to the best of my knowledge and based upon the results of the relationship search described above, PricewaterhouseCoopers neither holds nor represents an interest adverse to the Debtors within the meaning of Section 327(a) of the Bankruptcy Code.

23.    It is PricewaterhouseCoopers' policy and intent to update and expand its ongoing relationship search for additional parties in interest in an expedient manner. If any new relevant facts or relationships are discovered or arise, PricewaterhouseCoopers will promptly file a Bankruptcy Rule 2014(a) Supplemental Declaration.

## PROFESSIONAL COMPENSATION

Subject to this Court's approval and pursuant to the terms and conditions of the Master Agreement, except as otherwise set forth below, PricewaterhouseCoopers' requested compensation for professional services rendered to the Debtors will be based upon the hours actually expended by each assigned staff member at each staff member's hourly billing rate. PricewaterhouseCoopers' hourly rates for professional services are based upon the individual resources provided from PwC's various lines of business and are currently as follows:[5]

| | |
|---|---|
| Partners | $390 to $975 |
| Directors/Senior Managers | $250 to $690 |
| Managers | $165 to $460 |
| Senior Associates/Associates | $120 to $320 |
| Paraprofessionals/Office Staff | $75 to $180 |

24.    These rates are PricewaterhouseCoopers' normal and customary rates for the type of services to be provided. The Debtors are advised that these rates are subject to change but that any changes will remain in line with market rates for comparable services. Except as otherwise set forth below, the Debtors have agreed to compensate PricewaterhouseCoopers for professional services rendered at its normal and customary hourly rates.

---

[5]    These rates are the current U.S. hourly rates by personnel level. The hourly rates for the various PricewaterhouseCoopers' foreign offices are not included in the ranges above, which may be significantly lower or higher for any personnel level. For the Sarbanes-Oxley Statement of Work, the foreign office billing rates, specific for the project, have been disclosed to the Debtors.

<u>Statement of Work with Fixed Fee Arrangements</u>

25.    The Debtors and PricewaterhouseCoopers have agreed to a fixed fee for various projects. For these Fixed Fee Services, PricewaterhouseCoopers intends to include as an exhibit to each fee application a summary in reasonable detail of the approximate time spent by professionals on various tasks in lieu of contemporaneous time records in partial hour increments or a qualitative report of the types of services rendered to the Debtors for each monthly services, rather than a specific detailed time descriptions.

26.    <u>Financial Planning Statement of Work</u>: The Debtors and PricewaterhouseCoopers have agreed to a fixed fee of $6,000 per participant per year, except that the initial year of services will be approximately $11,000 per participant. The fee for certain specified individuals on the Strategy Board will be $2,000 higher. To date, $43,000.00 has been paid related to these services during the post-petition period. PricewaterhouseCoopers intends to include as an exhibit to the fee applications a narrative summary of the services provided to the Debtors for these fixed fee services.

27.    <u>WNTS Advocacy Statement of Work</u>: The Debtors and PricewaterhouseCoopers have agreed to a fixed fee of $60,000 per year, invoiced at $5,000 per month, plus reimbursement of out of pocket as invoiced. To date, $0.00 has been paid related to these services. Accordingly, PricewaterhouseCoopers will begin invoicing the Debtors for the post-petition services, along with the out-of-pocket expenses.

<u>Statement of Work with Hourly Rate Arrangements</u>

28.    PricewaterhouseCoopers intends to apply to this Court for the allowance of compensation for professional services rendered and reimbursement of expenses incurred in accordance with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), guidelines established by the U.S. Trustee, and the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern

District of New York.[6] PricewaterhouseCoopers will submit time records in a summary

format which shall set forth a description of the services rendered by each professional and

the amount of time spend on each date, in half-hour (x.5) or whole-hour (x.0) increments, by

each such individual in rendering services on behalf of the Debtors. PricewaterhouseCoopers

understands that interim and final fee awards are subject to approval by this Court. The

approved compensation billing rates for the services rendered under the existing Statement of

Works are described below:

29.    <u>Sarbanes-Oxley Statement of Work</u>: The Debtors and

PricewaterhouseCoopers have agreed to the following ranges of hourly rates by personnel

level. The specifics for each respective country are detailed within the Exhibit 2, Appendix

A.

| Personnel Level | Range of Hourly Rates |
| --- | --- |
| Partner | $250 - $400 |
| Senior Manager | $180 - $300 |
| Manager | $120 - $200 |
| Senior Associate | $ 60 - $160 |
| Associate | $ 50 - $130 |

30.    <u>Tax Compliance Statement of Work</u>:  The Debtors and

PricewaterhouseCoopers have agreed to discounted hourly rates to be rendered by its

professionals plus reimbursement of out of pocket expenses:

| Foreign Affiliate Reporting: | Discounted Rates: |
| --- | --- |
| Senior Associate | $155/hour |
| Associate - Transfer Pricing | $125/hour |
| Associate - Other | $110/hour |

---

[6]    As mentioned previously, PricewaterhouseCoopers professionals will consult with internal
PricewaterhouseCoopers bankruptcy specialists regarding the administrative processes of the bankruptcy court.
The rate per hour for these professionals, by level of experience, will be as follows: Partner: $570;
Director/Senior Manager: $500; Manager: $360; Senior Associate: $260; Associate: $205 and Paraprofessional:
$135. These rates are subject to periodic adjustments.

PricewaterhouseCoopers prepared an invoice for services rendered February 20, 2006 through March 15, 2006, totaling $53,380.00. This invoice has not been paid and accordingly, PricewaterhouseCoopers will include these fees in the initial invoice to the Debtors for the post-petition services and intends to include as an exhibit a narrative summary of the services provided to the Debtors through this outsourcing of professionals.

31.    <u>Consulting Statement of Work</u>:  The Debtors and PricewaterhouseCoopers have not agreed to hourly rates to be rendered in this category.  As soon as the parties determine the hourly billing rates for this category, PricewaterhouseCoopers will file a supplemental Declaration disclosing the hourly rates.

32.    <u>Bankruptcy Tax Advisory Services</u>: The Debtors and PricewaterhouseCoopers have not finalized their hourly rates, but our standard hourly rates for this type of services are provided below:

| Personnel Level | Range of Hourly Rates |
|---|---|
| Partner | $530 - $795 |
| Director | $435 - $670 |
| Manager | $370 - $610 |
| Senior Associate | $240 - $435 |
| Associate | $190 - $305 |
| Administrative | $ 85 - $105 |

33.    PricewaterhouseCoopers will also seek reimbursement for necessary expenses incurred, in accordance with the Appendix A of the Master Agreement and guidelines established by the U.S. Trustee, which shall include travel, photocopying, delivery service, postage, vendor charges and other out-of-pocket expenses incurred in providing professional services.

34.    During the one-year period preceding the Petition Date, the Debtors paid PwC approximately $431,467 in respect of types of services to be rendered pursuant to the Master Agreement and expenses incurred in relation thereto.

35.    In accordance with section 504 of the Bankruptcy Code, I hereby state that there is no Master Agreement or understanding between PricewaterhouseCoopers and any other entity, other than a member, partner or regular associate of PricewaterhouseCoopers, for the sharing of compensation received or to be received for services rendered in connection with these proceedings.

36.    This declaration is provided in accordance with section 327 of the Bankruptcy Code and Bankruptcy Rule 2014.

37.    I declare under the penalty of perjury, that the foregoing is true and correct.

[THE REMAINDER OF THIS PAGE WAS INTENTIONALLY LEFT BLANK]

Dated:          Detroit, Michigan
                June 5, 2006

                                   PRICEWATERHOUSECOOPERS LLP

                          By:      /s/ Brian D. Decker__
                                   Name: Brian D. Decker
                                   Title:   Partner

                                   PricewaterhouseCoopers LLP
                                   1900 St Antoine Street
                                   Detroit, Michigan 48226-2263
                                   Telephone: (313) 394-6000
                                   Facsimile: (313) 394-6555

Exhibit 1

Master Professional Services Agreement

# MASTER PROFESSIONAL SERVICES AGREEMENT

This is a MASTER PROFESSIONAL SERVICES AGREEMENT, dated as of March 17, 2006 (this "Agreement"), between PricewaterhouseCoopers LLP, a Delaware limited liability partnership ("PwC"), and Delphi Corporation, a Delaware corporation ("Client"), each a Party, and together Parties, to this Agreement.

### Background

PwC and Client desire to establish a contract pursuant to which Client may, from time to time, obtain from PwC, and PwC may provide to Client, certain professional Services (as defined in Section 1(a)), all on the terms and subject to the conditions set forth in this Agreement and in the applicable statement of work ("SOW").

### Terms and Conditions

In consideration of the premises and of the mutual covenants and agreements contained herein, and intending to be legally bound, the Parties hereby agree as follows:

1.    Services.

(a)    This Agreement establishes the standard terms and conditions pursuant to which PwC may provide to Client certain professional services (the "Services"), as may be performed or agreed upon from time to time in writing in an SOW. Notwithstanding any provision to the contrary contained herein, audit, attest and other assurance services are not within the definition of "Services" and such engagements are not covered by this Agreement. An executed SOW, attached and incorporated into a Client purchase order, may expressly identify and amend terms and conditions in this Agreement, or list special terms and conditions, effective for that SOW only. Unless modified by provisions contained in an SOW, the terms and conditions in this Agreement are incorporated into and made part of each SOW. To the extent of any express conflict or inconsistency between the terms and conditions of an SOW and the terms and conditions of this Agreement, the terms and conditions of the SOW will control.

(b)    An SOW shall contain the following, as applicable: (i) the term or period of time during which PwC will perform the Services, provide resources or otherwise perform its obligations as specified in the SOW; (ii) a description of the obligations of, and Services to be performed by, PwC; (iii) a description of Client's responsibilities related to the SOW, including any facilities, equipment, personnel and tasks or other support to be provided or performed by Client; (iv) PwC's fees and expenses under the SOW, or, if applicable, the basis on which such fees and expenses will be computed; (v) any provision limiting the liability of either Party other than, or in addition to, those provision set forth herein, and (vi) any other terms and conditions

appropriate to the Services to be performed and the obligations of the Parties under that SOW. Forms of Statements of Work are attached hereto as Attachment A.

2.    Term.

The term of this Agreement shall commence as of October 8, 2005, and shall continue until March 31, 2007, whereupon Client and PwC may agree to extend the Agreement for successive one (1) year periods. Each SOW shall become effective as of the date of the commencement of the Services or, if earlier, the date of execution of such SOW. Each SOW executed by the Parties prior to the effective date of a termination (as provided for in Section 7) shall remain in full force and effect in accordance with its terms, including the terms and conditions of this Agreement. If PwC commenced the performance of the Services prior to the execution of this Agreement, this Agreement shall be effective as of the commencement of such Services and shall cover such Services, unless the performance of such Services are governed by an existing executed agreement. The Parties agree that any such existing executed agreements shall be converted to SOWs within ninety (90) days of the execution of this Agreement, unless the services under such existing executed agreements have been completed by such date.

3.    Fees, Expenses and Taxes.

        (a)    In addition to professional fees outlined in the applicable SOW, PwC will also bill Client for pre-approved, reasonable out-of-pocket and travel expenses according to the guidelines set forth in Exhibit A: Delphi Travel and Expense Reimbursement Policy for Contractors; provided, however, that instead of submitting all expenses on Delphi expense vouchers, PwC shall account for such expenses within PwC's normal expense reimbursement system. Included in travel expenses shall be PwC internal per ticket charges for booking travel (as agreed from time to time between PwC and Delphi). The internal per ticket charge is an allocation of estimated costs of running PwC's travel department in a manner to maximize cost savings. PwC shall provide Client with a summary of such expenses and Client shall have the right to audit such expenses.

        (b)    Client shall pay for all taxes, other than withholding taxes and taxes based on or measured by PwC's or PwC's personnel's net income, including any interest and penalties from any related deficiency if due to an act by Client and not that of PwC, in connection with this Agreement, including any sales, use, excise, value-added, services, consumption, and other taxes and duties assessed on the provision of Services by PwC to Client or on PwC's charges to Client under this Agreement including the reimbursement of expenses, so long as such taxes are listed in the applicable SOW. The parties shall cooperate in good faith to minimize such tax liabilities to the extent legally permissible.

2

4.    Invoices.

Unless otherwise provided in an SOW, PwC will submit an invoice to Client at the end of every month for all hours of service provided to Client by PwC, together with all expenses incurred by PwC, during the preceding month period. The invoices shall be in the form and contain all information required by the rules and procedures of the United States Bankruptcy Court for the Southern District of New York. Each such invoice shall be due and payable pursuant to Client's Multilateral Netting System ("MNS-2"), which provides, on average, that payment shall be on the second day of the second month following the date of the invoice, recognizing that the rules and procedures of the United States Bankruptcy Court for the Southern District of New York will apply. In no event shall Client pay Supplier interest or other late charges on any fees due under this Agreement.

5.    Client Responsibilities.

    (a)    Client shall provide PwC with all information relevant to the Services and any reasonable assistance as may be required to properly perform the Services. Unless otherwise indicated, Client represents and warrants to PwC that all such information will be accurate and complete in all material respects, to the best of Client's knowledge. The overall definition and scope of the work to be performed, and the adequacy of such definition and scope in addressing Client's needs, is Client's responsibility. Client shall perform all management functions and make all management decisions in connection with the Services, and shall assign competent individuals to oversee the Services. Client is also responsible for the implementation of actions identified in the course of this engagement and results achieved from using any Services or Deliverables as defined in Section 6(a) below.

    (b)    Each Party shall use commercially reasonable procedures to check for the then most commonly known viruses and to check the integrity of data before sending information to the other electronically, but each Party recognizes that such procedures cannot be a guarantee that transmissions will be virus free. It remains the responsibility of the Party receiving an electronic communication from the other to carry out a virus check on any attachments before launching any documents whether received on disk or otherwise.

    (c)    Neither Party shall be responsible for any delay, cost increase or other consequences due to the other Party's failure to perform any of its obligations under this Agreement or an SOW or otherwise due to factors beyond its reasonable control. Each Party will use commercially reasonable efforts to mitigate such costs or expenses. Any PwC deadline that is affected by any Client default shall be extended by a reasonable amount of time provided that PwC has provided timely communication to Client.

6.    Deliverables.

    (a)    Ownership. PwC shall own any general skills, know-how, expertise, ideas, concepts, methods, techniques, processes, software, materials or other intellectual property or information which may have been discovered, created, developed or derived by PwC either prior to or as a result of its provision of Services under this Agreement ("PwC Materials"). Subject to the restrictions in this Agreement, Client will own all tangible written material

3

originally prepared expressly for Client and delivered to Client under this Agreement (the "Deliverables"), excluding any PwC Materials contained or embodied therein. PwC's working papers and PwC's Confidential Information (as defined in Section 9(a)) belong exclusively to PwC; provided, however, PwC shall provide a copy of such working papers to Client after consultation and agreement with Client. Client will have a non-exclusive, non-transferable license to use PwC Materials for Client's own internal use and only for the purposes for which they are delivered to the extent that they form part of the Deliverables.

(b)        Use of Deliverables.   Except as otherwise expressly stated in the applicable SOW, all Deliverables are solely for Client's internal use and benefit. Client shall not authorize any third party ("Third Party") to rely upon any of the Deliverables except as set forth in an SOW or, if not set forth in an SOW, without PwC's prior written consent. Except that Deliverables may be disclosed to (i) taxing authorities, (ii) an accounting firm providing attest services to Client (solely to the extent necessary for the performance of such attest services), and (iii) as set forth in this Section 9(b) or (iv) as set forth in an SOW; Client shall not distribute to, discuss with, or otherwise disclose the Deliverables to any Third Party without PwC's prior written consent. Oral or preliminary information, drafts or advice given by PwC may not be relied upon or attributed to PwC unless PwC specifically confirms such information or advice or otherwise reduces such draft to a final writing.

7.     Termination.

(a)     Either Party may terminate this Agreement or any SOW under this Agreement in the event of a material breach of this Agreement that is not cured within thirty (30) days after receipt of written notice of such breach. Unless otherwise provided in the applicable SOW, Client may terminate this Agreement or any SOW for convenience at any time upon thirty (30) days prior written notice. In the event of Client termination for breach by PwC, Client shall be responsible for fees earned and expenses incurred only up to the date of written notice to PwC of the breach. In the event of other termination by Client or termination by PwC for breach by Client, Client will be responsible for fees earned and expenses incurred through the actual date of termination. In the event of termination by mutual agreement, the Parties shall jointly determine the fees due or to be refunded.

(b)     PwC may also resign from performing all or any portion of the Services and terminating this Agreement and/or any Schedule immediately upon written notice in the event that circumstances arise that would make continuation of all or any portion of the Services by PwC in conflict with any independence or other professional regulations, standards or guidelines to which PwC conforms. If Client is or becomes an SEC registrant audit client of PwC and the Services performed and/or Deliverables provided under a particular SOW will be relied upon by the PwC audit team, the limitation of liability and Client's obligation to indemnify under this Agreement will not apply to such Services and/or Deliverables.

8.     Warranty.

PwC warrants that it has the requisite power and authority to enter into and perform its obligations under this Agreement and each SOW. PwC further warrants that the Services will be

4

performed by qualified personnel. PwC warrants that it will provide its non-tax related Services in a manner consistent with the terms and conditions of this Agreement and in accordance with the applicable Standards for Consulting Services established by the American Institute of Certified Public Accountants ("AICPA") as well as any applicable standards (as agreed to between the Parties) of the Public Company Accounting Oversight Board ("PCAOB"). PwC warrants that it will provide its tax services in a manner consistent with the terms and conditions of this Agreement and in accordance with the AICPA Statements on Standards for Tax Services and any applicable standards (as agreed to between the Parties) of the PCAOB.   THE WARRANTIES IN THIS SECTION 8 AS WELL AS ANY EXPRESS WARRANTY IN ANY APPLICABLE SOW (BUT ONLY IF EXPRESSLY IDENTIFIED AS A "WARRANTY" IN SUCH SOW) ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, OR WHETHER ARISING BY COURSE OF DEALING OR PERFORMANCE, CUSTOM, USAGE IN THE TRADE OR PROFESSION OR OTHERWISE, INCLUDING BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

9.     Confidentiality.

(a)     All data relating specifically to a Party's business and any other information which reasonably should be understood to be confidential in nature are confidential information of such Party. PwC's proprietary software, tools, methodologies, techniques, ideas, discoveries, inventions, know-how and any other information which reasonably should be understood to be confidential to PwC are confidential information of PwC.  Client confidential information and PwC confidential information are collectively referred to as "Confidential Information." Each Party shall use Confidential Information of the other Party only in furtherance of the purposes of this Agreement and shall not disclose such Confidential Information to any third party without the other Party's prior written consent.  Each Party agrees to take reasonable measures to protect the confidentiality of the other Party's Confidential Information and to advise its employees of the confidential nature of the Confidential Information and of the confidentiality provisions and use prohibitions herein.

(b)     Notwithstanding any terms or conditions in this Agreement to the contrary, no conditions of confidentiality within the meaning of Internal Revenue Code §6111(d) or U.S. Treasury regulations §1.6011-4 are intended, and Client (and each employee, representative, or other agent of Client) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of any transaction and all materials of any kind (including opinions or other tax analysis) that are provided to the Client relating to such tax treatment and tax structure, subject to the limitations set forth in the following sentence.  In the event that a Deliverable includes discussion of such tax treatment or tax structure, disclosure of the Deliverable will be limited solely to the section or sections discussing the tax treatment or tax structure; all other information in the Deliverable unrelated to the tax treatment or tax structure remains subject to the restrictions set forth in Section 9(a) and all references to "PwC" or "PricewaterhouseCoopers" and all branding and other identifiers of PwC shall be redacted from the tax treatment and tax structure portions of such Deliverable, and/or shall otherwise not be distributed to any other third party, except as may be expressly provided for in this Agreement.

This Section 9(b)) is effective as of the commencement of any discussions the Parties may have had regarding any transaction related to any Services.

(c)    Notwithstanding anything to the contrary contained in this Agreement, neither Party shall be obligated to treat as confidential any information disclosed by the other Party (the "Disclosing Party") which: (i) is rightfully known to the recipient prior to its disclosure by the Disclosing Party except that which was disclosed under a prior confidentiality agreement between the Parties; (ii) is released by the Disclosing Party to any other person or entity (including governmental agencies) without restriction; (iii) is independently developed by the recipient without any use of or reliance on Confidential Information; or (iv) is or later becomes publicly available without violation of this Agreement or may be lawfully obtained by a Party from any nonparty. Notwithstanding the foregoing, either Party may disclose Confidential Information of the other to a third party as may be required by law, statute, rule or regulation, including any subpoena or other similar form of process, or by the standards of the AICPA or other professional self-regulatory authority, provided that (and without breaching any legal or regulatory requirement) the Party to which the request is made provides the other Party with prompt written notice thereof and, if practicable under the circumstances, allows the other Party to seek a restraining order or other appropriate relief.    Subject to PwC's confidentiality obligations in this Agreement, nothing herein shall preclude or limit PwC from providing services similar to the Services to other PwC clients.

10.    Indemnification.

(a)    Subject to the provisions hereof, each Party shall indemnify, defend and hold harmless the other from and against any and all amounts payable under any judgment, verdict, court order or settlement for death or bodily injury or the damage to or loss or destruction of any real or tangible personal property, but only to the extent the foregoing arise out of the indemnitor's gross negligence or intentional misconduct in the performance of this Agreement.

(b)    PwC agrees to indemnify, defend and hold harmless Client from and against any and all amounts payable under any judgment, verdict, court order or settlement for Third Party claims of infringement or misappropriation of any trade secrets, copyrights, trademarks, trade names or other intellectual property rights alleged to have occurred and arising from the Deliverables. Should Client's use of such Deliverables be determined to have infringed, or if, in PwC's judgment, such use is likely to be infringing, PwC may, at its option: (i) procure for Client the right to continue using such Deliverables provided, or (ii) replace or modify them to make their use non-infringing while yielding substantially equivalent results. If neither of the above options are or would be available on a basis that PwC finds commercially reasonable, then, PwC may terminate this Agreement, Client shall return such Deliverables provided to PwC and PwC will refund to Client the fees paid for the Deliverables provided. This infringement indemnity does not cover claims to the extent arising from: (1) the combination of such Deliverables with products or services not provided by PwC; (2) the modification of such Deliverables by any person, other than PwC; (3) Deliverables complying with or based upon: (A) designs provided by or at the direction of Client or (B) specifications or other information provided by or at the direction of the Client; or (4) use of systems, materials or work performed in a manner not permitted or contemplated hereunder or by another obligation of Client to PwC.

6

11.    <u>Limitation of Liability</u>.

(a)    PwC is the US member firm of the global network of PricewaterhouseCoopers firms (exclusive of PwC, the "PricewaterhouseCoopers Firms"). In the course of providing the Services and/or Deliverables hereunder, PwC, may, in its discretion, draw on the resources of and subcontract to other PricewaterhouseCoopers Firms. Client agrees that PwC may provide any information PwC receives in connection with this engagement to other PricewaterhouseCoopers Firms for the purpose of providing the Services and/or for internal administrative and regulatory compliance purposes. The provision of Services and/or Deliverables will remain the responsibility of PwC. Client agrees that in relation to the Services and this Agreement, its relationship is solely with PwC. Client further agrees that no PricewaterhouseCoopers Firms, nor the partners, principals or employees of PwC or the PricewaterhouseCoopers Firms (together the "Beneficiaries"), who perform work in connection with the Services and/or Deliverables will have any liability to Client in connection with the Services or this Agreement. Client therefore agrees to bring any claim under this Agreement against PwC and not to bring a claim of any nature against any such PricewaterhouseCoopers Firm relating to the Services, Deliverables or this Agreement except where such a claim cannot be excluded by law.

(b)    The provisions of this Agreement and any SOWs relating to the Beneficiaries, have been stipulated by PwC expressly for their benefit. Client agrees that each of the Beneficiaries shall have the right to rely on said provisions as if they were Parties to this Agreement. Client likewise agrees on behalf of all of its business operations in which Client has a direct or indirect controlling interest and that are receiving Services or Benefits of Services under this Agreement ("Service Recipients"), that they are bound by these provisions as if they were Parties to this Agreement. Without limiting any other indemnification provision set forth in this Agreement, Client agrees to indemnify and hold harmless PwC and the Beneficiaries from and against any claim that is asserted by any Service Recipient other than Client arising out of or relating to the Services and/or Deliverables provided under this Agreement, and all liabilities, costs, damages and expenses imposed or incurred in connection therewith, including reasonable attorneys' fees.

(c)    Each SOW shall include a provision setting forth any applicable limitation of liability. The parties acknowledge and agree that no SOW shall be valid unless it contains such a provision.

In addition, neither party will be liable in any event for lost profits or any consequential, indirect, punitive, exemplary or special damages. Further, PwC shall have no liability to Client arising from or relating to any third party hardware, software, information or materials supplied by Client.

(d)    PwC accepts no liability to third parties with respect to the Services and Deliverables. Client agrees (without limiting any other indemnification provision set forth in this Agreement) to indemnify and hold PwC and the Beneficiaries (as defined in Section 11(a)) harmless from and against any and all Third Party claims, suits and actions, and all associated damages, settlements, losses, liabilities, costs, and expenses, including without limitation reasonable attorneys fees, arising from or relating to the Services and/or Deliverables under this