**Hearing Date And Time: March 18, 2010 at 10:00 a.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| DPH HOLDINGS CORP., et al., | : | Case No. 05-44481 (RDD) |
| | : | (Jointly Administered) |
| Reorganized Debtors. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

REPLY OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP TO THE
OBJECTION OF THE UNITED STATES TRUSTEE TO ITS FINAL FEE APPLICATION

("SKADDEN FINAL FEE APPLICATION REPLY")

Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), counsel for DPH Holdings Corp. ("DPH Holdings")[1] and certain of its affiliates in the above-captioned cases, submits this reply in support of the Seventh And Final Skadden Fee Application (the "Reply"), and respectfully represents as follows:

Preliminary Statement

1.  On July 30, 2009, this Court entered an order (Docket No. 18707) (the "Modification Approval Order") approving modifications to the confirmed plan of reorganization in these cases (the "Modified Plan").  On October 6, 2009 (the "Effective Date"), Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, former debtors and debtors-in-possession in the above-captioned cases (the "Debtors"), substantially consummated the Modified Plan and closed the transactions under the Master Disposition Agreement and related agreements.  On December 30, 2009, Skadden filed its Seventh And Final Skadden Fee Application (Docket No. 19256) ("Final Fee Application").  The Final Fee Application was filed in accordance with article 10.3(a) of the Modified Plan.

2.  In her objection, the U.S. Trustee seeks disallowance of $436,530.19 of the amount requested in the Final Fee Application based on two technical objections that relate to issues that were previously raised and resolved by the Fee Review Committee (defined below), a committee on which the U.S. Trustee's office participated, without adjustment to Skadden's interim fee applications.  Moreover, Skadden reduced the fees, charges, and disbursements owed by the Reorganized Debtors through voluntary accommodations totaling more than $10 million and does not believe any further reduction is warranted.  This voluntary reduction includes an accommodation of $350,789 on the Final Fee Application for, among other

---

[1]  Upon emergence from chapter 11, Delphi Corporation formally changed its name to DPH Holdings Corp.  DPH Holdings and its affiliated reorganized debtors are collectively referred to herein as the "Reorganized Debtors."

2

things, the elimination of fees relating to any timekeeper (many of whom were paraprofessionals) who billed less than $10,000 for the period from October 8, 2005 through January 25, 2008 (the "Final Application Period"). Although the U.S. Trustee estimates that voluntary fee accommodations by professionals were 4% in the aggregate, Skadden's fee accommodations total approximately 9.5% – almost two and half times the aggregate calculated by the U.S. Trustee.

3. The U.S. Trustee's technical and limited objections also bear no relationship to the unsupported statement in the introduction to her objection that "the cases . . . were not a success," and the Court should therefore disregard that statement. Although the economic storm in the credit markets and the collapse of the auto industry required many shared sacrifices and dramatically reduced anticipated distributions to prepetition unsecured creditors and other stakeholders, the Reorganized Debtors successfully emerged from chapter 11 while satisfying all secured and administrative claims and preserving a recovery for prepetition unsecured creditors. They also preserved as going concerns the core businesses identified in their 2006 transformation plan, with 100,000 employees in 270 locations across 32 countries.

Reply

A.  Skadden's Requested Fees Are Reasonable And The United States Trustee's Objection Is Unwarranted

4. Skadden seeks final approval of $90,556,038 in professional fees and $5,756,849 in charges and disbursements for a total final allowance of $96,312,887 for the Final Application Period. Of these amounts, $19,430,197 in professional fees and $1,235,653 in charges and disbursements relate to the period from October 1, 2007 through January 25, 2008 (the "Seventh Application Period"). Skadden voluntarily reduced its monthly statements during the Final Application Period by $9,170,700, provided additional accommodations in its prior

3

interim fee applications and final fee application in the amount of $907,159, and previously agreed with the Fee Review Committee to a voluntary reduction of $40,000 in connection with Skadden's first, second, and third interim fee applications. This resulted in a total voluntary reduction with respect to fees, charges, and disbursements of $10,117,859,[2] or approximately 9.5%, from those amounts that Skadden would customarily charge. These voluntary accommodations of approximately 9.5% are well in excess of the 4% aggregate voluntary accommodation calculated by the U.S. Trustee.

        5.        Moreover, to monitor costs to the Debtors' estates and avoid duplication of efforts in the review of fee applications filed in these cases, the Debtors, the official committee of unsecured creditors, and the U.S. Trustee negotiated the formation of a committee (the "Fee Review Committee") to review, comment on, and, if necessary, object to the various fee applications filed in these cases. On May 5, 2006, this Court authorized the establishment of the Fee Review Committee and approved a fee review protocol. In addition, on August 17, 2006, this Court entered an order authorizing the Fee Review Committee to retain Legal Cost Control, Inc. ("LCC") as a fee analyst to assist the Fee Review Committee (Docket No. 4959).[3] In connection with the Fee Review Committee's review of the first six interim fee applications, LCC issued reports to each professional with certain recommended reductions. These reports previously identified the technical objections raised by the U.S. Trustee regarding the fees requested for paraprofessionals and unadmitted attorneys. Other than an aggregate accommodation of $40,000 for Skadden's first, second, and third interim fee applications, the Fee

---

[2]     In addition, $3,197,520 of the total voluntary accommodation relates to a reduced billing rate for non-working travel time. As Skadden explained in footnote 38 of its final fee application, Skadden provided a 55% accommodation from Skadden's guideline hourly rates for nonworking travel time. This reduction is comprised of the elimination of approximately 1,084.7 hours of billed time during the Final Application Period, and thereafter, a 50% reduction to the guideline hourly rates.

[3]     The Fee Review Committee no longer retains LCC.

Review Committee (including the U.S. Trustee as a member of that committee) recommended that this Court approve Skadden's interim fee applications as submitted, including the amounts requested for paraprofessional time and unadmitted attorney time.  Skadden's billing practices for the Seventh Application Period are consistent with its prior practices that were previously recommended by the Fee Review Committee and approved on an interim basis, and accordingly no further reduction is appropriate.

        (i)        A Reduction For Paraprofessional Time Is Not Warranted

        6.        In addition to the more than $10 million accommodation already provided by Skadden, the U.S. Trustee requests that Skadden further reduce its fees by $400,000 for paraprofessional time billed during the Seventh Application Period.  The U.S. Trustee asserts that "at least one half of paraprofessional time billed was for clerical tasks" for which Skadden should not be compensated.  Skadden's policy is not to charge clients for firm administration matters (i.e., clerical tasks) and the Final Fee Application does not include fees for secretarial, library, word processing and other staff services.  However, as contemplated under the United States Trustees Guidelines For Reviewing Applications For Compensation & Reimbursement Of Expenses Filed Under 11 U.S.C. § 330 and customary practice in the Southern District of New York, Skadden is permitted to recover reasonable paraprofessional fees.  Given the size and complexity of these chapter 11 cases, paraprofessionals were required during the Seventh Application Period to, among other things, review the case docket (with more than 12,350 docket entries as of the end of Seventh Application Period); review various correspondences from parties-in-interest; track motions and other pleadings to assure that all deadlines were timely met; prepare binders of pleadings, witness related materials, and other materials for court hearings; and create, monitor, and generate service lists.

7.   These tasks do not constitute firm overhead.  To the contrary, these are specific tasks required for the smooth and continuous representation of debtors in very large and complex chapter 11 cases.  Skadden does not assign secretaries and other clerical personnel to have principal responsibility for these important tasks.  These tasks are often required to be completed under tight time constraints and require specialized skills to be completed in a timely, efficient, accurate, and professional manner.  Skadden provides training to its paraprofessionals to handle these specific tasks, whereas secretarial and clerical staff do not receive such training.  Moreover, these tasks require professional judgment and are accordingly appropriately delegated to paraprofessionals rather than clerical employees.

8.   Furthermore, because this case was large and complex, the court has conducted monthly omnibus hearings to streamline the process by which matters are brought before the court.  These hearings have taken place in addition to the monthly claims hearings and certain off-omnibus hearing dates.  Because multiple matters were heard at each hearing, Skadden professionals (primarily legal assistants) were required to collect and organize pleadings so that the attorneys had the appropriate documents to review and prepare for the hearing.  In addition, Skadden professionals were required to prepare exhibit lists and declarations in connection with these hearings, where appropriate, and compile documentary exhibits in support of certain motions.  Accordingly, the time billed by Skadden paraprofessionals was justified due to the nature and complexity of these chapter 11 cases.

9.   Finally, the U.S. Trustee's objection with respect to time billed by paraprofessionals is almost identical to the comments made by LCC in connection with its review of Skadden's first six interim fee applications.  Nevertheless, the Fee Review Committee (which included the U.S. Trustee's office) recommended to the Court that Skadden's interim fee

applications be approved as filed (except for an aggregate voluntary reduction of $40,000 agreed to in connection with Skadden's first three interim fee applications). Based on the explanation provided above and following the prior recommendations of the Fee Review Committee, the amount requested for paraprofessional time is reasonable and justified and no further reduction is warranted.

        (ii)    <u>The Amounts Billed For Unadmitted Attorneys Is Appropriate</u>

        10.    The U.S. Trustee asserts that Skadden should reduce the rate charged for unadmitted attorneys to the average rate billed for paraprofessionals. This request in unreasonable and inconsistent with Skadden's engagement agreement with Delphi dated as of July 12, 2005 (the "Engagement Agreement"), which was approved by this Court,[4] in which Skadden and Delphi agreed to a reduced first-year associate rate prior to bar admission. Specifically, the Engagement Agreement provides that as of September 1, 2005, the hourly billing rates for legal assistants was $90-$230. First-year associates were billed at $295 per hour, but that rate increased to $335 after such associates were admitted to the bar. Moreover, the Engagement Agreement provides: "As part of the Firm's ordinary business practices, hourly time charges are periodically reviewed and revised." Because the Court-approved Engagement Agreement specifically contemplates that unadmitted attorneys are billed out at hourly rates greater than the highest paraprofessional rate, and that such rate can be periodically reviewed and revised, the rates charged by Skadden for unadmitted attorneys is reasonable.

---

[4]   <u>See</u> Application For Order Under 11 U.S.C. §§ 327(a) And 329 And Fed. R. Bankr. P. 2014 And 2016 (I) Authorizing Employment And Retention Of Skadden, Arps, Slate, Meagher & Flom LLP And Affiliates As Attorneys For Debtors-in-Possession And (II) Scheduling A Final Hearing Thereon (Docket No. 47) (the "Skadden Retention Application"). Skadden's Retention Application included a declaration in support of the application and the Engagement Agreement was attached to that declaration.

11. Furthermore, unadmitted attorneys are law school graduates who are awaiting formal admission to the bar. The tasks performed by unadmitted attorneys are more comparable to those performed by admitted attorneys than to the ones typically performed by paraprofessionals. Indeed, paraprofessionals do not have the same training as law school graduates and thus only more senior, more expensive, admitted attorneys would be capable of completing the tasks that otherwise could be performed by unadmitted attorneys. If the U.S. Trustee's objection were granted, firms would have an incentive to only staff admitted attorneys on bankruptcy matters when unadmitted attorneys could have performed some of the tasks at a reduced rate. This would ultimately lead to higher fees in bankruptcy matters, not lower.

12. In addition, at least one of LCC's reports in connection with an interim fee application of Skadden took issue with the rate charged by Skadden for unadmitted attorneys. Nevertheless, the Fee Review Committee (which included the U.S. Trustee's office) recommended to this Court that Skadden's fee application be approved as submitted (except for an aggregate voluntary reduction of $40,000 agreed to in connection with Skadden's first three interim fee applications). Thus, in accordance with the Court-approved Engagement Agreement and the prior practices throughout these chapter 11 cases, Skadden should not be required to further lower the billing rate for unadmitted attorneys to the average paraprofessional rate as suggested by the U.S. Trustee.

B.  The Delphi Reorganization Cases Were Successful

13. The U.S. Trustee casually asserts in the introductory paragraph of her objection that "the cases . . . were not a success." The objection contains no analysis to support that opinion. Furthermore, it is not relevant to any of the U.S. Trustee's narrow and technical

8

objections to the fee requests at issue. She does not assert supposed lack of success as a basis for disallowing fees in these cases.[5]

14.    Although the U.S. Trustee is entitled to her opinion, her conclusion is belied by even a cursory review of the facts and circumstances. Delphi's core businesses, with more than 100,000 employees in 270 locations in 32 countries, remain in operation under private ownership as part of Delphi Automotive LLP, and Delphi's non-core businesses, which employ tens of thousands of additional employees, were divested successfully as going concerns. Preserving jobs and viable businesses as going concerns is a central policy goal of chapter 11.

15.    The objection compares the original plan to the Modified Plan while omitting any acknowledgement of the economic storm that threatened the failure of the global financial system, the collapse of the entire automotive industry, and a global depression. The Court adverted to these circumstances when it observed that:

> The debtors were obviously presented with a colossal problem when the effective date of the plan didn't occur upon the refusal of most of the plan investors to close in April of 2008. That problem was very clearly exacerbated by a series of remarkable events over the following months, that involved both frightening turmoil in the capital markets as well as unprecedented difficulty in the debtors' industry, the auto industry, and in particular, the travails of its largest customer and likely source of substantial funding for the plan, GM Corporation. . . . [In addition,] their debtor-in-possession loan facility matured seven months ago without a replacement . . . .

(See July 30, 2009 Tr. at 50-51.) In short, the Debtors and their legal and strategic advisors were operating in anything but a neutral environment, and these cases could easily have spiraled into liquidation at any of a number of critical junctures. This in turn would certainly have resulted in

---

[5]    The U.S. Trustee objects to Rothschild's $15 million Completion Fee apparently on the grounds that the original transactions in the confirmed plan of reorganization were not consummated even though the Reorganized Debtors had acknowledged in writing that the Completion Fee had been earned. The balance of the U.S Trustee's objections cover approximately $1.1 million in professional fees spread among seven firms.

the non-payment of billions of dollars in secured and administrative claims as well as the likely failure of the global automotive supply chain.

16.  Although the U.S. Trustee did not appreciate the against-all-odds success story inherent in the company's ability to overcome these obstacles, the Court observed that "the debtors, led by an extremely active board, but also through the work of all of their employees, consistently addressed these problems in a responsible and good-faith manner . . . ." (Id. at 51.) Skadden and the Company's other legal and strategic advisors were integral to the Company's formulation and execution of the strategy that maintained a plan of reorganization and kept Delphi's core businesses intact.[6]

17.  Despite the sacrifices required of many stakeholders under the Modified Plan, there can be no doubt that the result was vastly superior to the alternatives. As a result of the Modified Plan, for example, the tranche A and tranche B DIP lenders and the secured hedging parties were paid in full. The claims of the tranche C DIP lenders – the successors to the prepetition secured lenders in the January 2007 "roll-up" of the prepetition secured loans to DIP secured loans – were deemed satisfied in full as a result of the transactions consummated in the Modified Plan. Importantly, all administrative claims were satisfied and a contingent recovery was agreed to with prepetition unsecured creditors.[7] At the time, several potential acquirers of

---

[6]  The U.S. Trustee incorrectly asserts that "the Debtors did not obtain exit financing." (Objection at 10.) The plan investors refused to participate in the April 4, 2008 closing at which the Debtors' exit lenders appeared and announced their intention to close on $6.1 billion in exit financing.

[7]  As reported in the Closing Report In Chapter 11 Cases dated October 21, 2009 (Docket No. 18994), under the Modified Plan, prepetition general unsecured creditors have a maximum contingent recovery of just over 4%, compared to a recovery that had been deemed to be at par plus accrued value under the original plan, and equity holders did not obtain the modest recovery called for under the original plan. But the changes in these stakeholders' distributions were not because of any failure of the chapter 11 cases but because global financial markets and the global auto industry imploded. Under the circumstances – and in light of the fact that unsecured creditors were not interested in investing in new Delphi when given an opportunity to do so– it was a victory that the company was able to satisfy administrative claims and preserve any recovery for prepetition general unsecured creditors.

10

Delphi's businesses and other key stakeholders including, at times, General Motors Corporation ("GM"), DIP lenders, and other major creditors, were advocating a sale of assets outside a plan of reorganization pursuant to section 363 of the Bankruptcy Code. These unsecured creditors' retain the potential to share in the upside of Delphi Automotive LLP's future success only because Delphi and its advisors insisted that these cases be resolved through a modified plan.

18.  Many prepetition general unsecured creditors indirectly benefited from the success of the restructuring in other ways. For example, many of them were also ordinary course suppliers to Delphi during the reorganization, and thus benefited from Delphi's success in maintaining ordinary course relationships without interruption through nearly four years in chapter 11. In addition, many of the company's original prepetition unsecured creditors sold their claims at times during the cases when such claims were valued at or near par.

19.  As with the company's ordinary course suppliers, many of the Debtors' other stakeholders received benefits during the chapter 11 cases that made them better off than they otherwise might have been. Although the company's hourly workers shared in enormous sacrifices during the restructuring, these sacrifices were accomplished through consensual negotiations, as the U.S. Trustee acknowledges, that involved substantial payments to many affected workers. For example, in 2006, Delphi entered into special attrition programs to reduce the size of its hourly workforce through negotiated retirement and buyout programs. These voluntary programs provided a "soft landing" to more than 20,000 of Delphi's hourly employees who chose to participate in them through (a) early retirement eligibility and a $35,000 lump sum retirement incentive payment for employees with more than 26 years of service and (b) buy out payments ranging from $40,000 to $140,000 depending on seniority for employees not eligible for the retirement program. Delphi's salaried severance program provided certain salaried

employees with similar benefits. Although Delphi ultimately was unable to continue to subsidize salaried retirees' healthcare, salaried retirees benefited from Delphi's commitment to maintain these benefits, at a cost of approximately $70 million per year through more than three years in chapter 11, and also from Delphi's effort to assist in establishing a Voluntary Employees' Beneficiary Association that the Court found would qualify for a health care tax credit.

20.     Although the Debtors achieved nearly all of the goals of their March 2006 transformation plan, they were ultimately unable to achieve their objective of maintaining their hourly and salaried pension plans. As the Court recently observed, however, "[i]t was always Delphi's goal to assume those plans if possible, and this case was prolonged two or three – well, at least two years, because of Delphi's desire to do that, I think, among other things."  (See February 25, 2010 Tr. at 99.)  Indeed, until the very last days of the post-confirmation period during which plan modifications were being considered by the company and its stakeholders, Delphi sought to compel GM through moral and economic persuasion to assume both the salaried and hourly pension plans. But when GM became embroiled in its own separate reorganization cases and would not assume the plans, Delphi determined that it would be unable to maintain these pension plans. Even so, the Debtors successfully negotiated a consensual resolution with the PBGC whereby the PBGC received additional value for the pension plans.

21.     Finally, because Delphi's restructuring was the fulcrum restructuring in the North American automotive industry, the indirect benefits of Delphi's successful emergence from chapter 11 are broadly distributed throughout the economy. Of course, Delphi's maintaining continuity of supply was essential to the restructurings of General Motors, Chrysler, and Ford and to the survival of these and most other global automakers. But nowhere is the indirect benefit of Delphi's restructuring more apparent than in its ability to maintain the supply

chain without interruption.  Just during 2008, for example, Delphi purchased more than $4.5 billion from U.S. suppliers in the ordinary course.  Had Delphi's restructuring not been successful, the effect on the automotive industry would have been catastrophic.

        22.    Accordingly, notwithstanding the shared sacrifices that occurred in the cases and the reduced dividends to prepetition stakeholders, the actual results of the Debtors' reorganization belie the unsupported suggestion that the cases were not a success, and the U.S. Trustee's statement in that regard is not relevant to the technical objections pending before the Court.

WHEREFORE Skadden respectfully request that the Court enter an order (a) approving the Final Fee Application as submitted, (b) overruling the U.S. Trustee's objection as it relates to Skadden, and (c) granting Skadden such other and further relief as is just.

Dated:  New York, New York
        March 12, 2010

                                        SKADDEN, ARPS, SLATE, MEAGHER
                                         & FLOM LLP

                                        By: /s/ John Wm. Butler, Jr.
                                            John Wm. Butler, Jr.
                                            John K. Lyons
                                            Ron E. Meisler
                                        155 North Wacker Drive
                                        Chicago, Illinois 60606

                                            - and -

                                        By: /s/ Kayalyn A. Marafioti
                                            Kayalyn A. Marafioti
                                        Four Times Square
                                        New York, New York 10036