Hearing Date And Time: **March 18, 2010 at 10:00 a.m. (prevailing Eastern time)**

DPH Holdings Corp.
John Brooks, President
David M. Sherbin, Esq.
5725 Delphi Drive
Troy, Michigan 48098

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re | Chapter 11 |
| DPH HOLDINGS CORP., et al., | Case No. 05-44481 (RDD) |
| | (Jointly Administered) |
| Reorganized Debtors. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STATEMENT OF DPH HOLDINGS CORP. WITH
RESPECT TO PROFESSIONALS' FINAL FEE APPLICATIONS

("DPH HOLDINGS' STATEMENT REGARDING FINAL FEE APPLICATIONS")

DPH Holdings Corp. ("DPH Holdings") makes the following representations for its Statement Regarding Final Fee Applications on behalf of itself and its affiliated reorganized debtors (the "Reorganized Debtors"):

Preliminary Statement

1. The transactions consummated pursuant to Delphi's plan of reorganization preserved under private ownership Delphi's core businesses, which employ approximately 100,000 employees in 270 locations in 32 countries. Delphi's non-core businesses, which

employ tens of thousands of additional employees, were divested successfully as going concerns. Although it may have been possible to achieve a similar result through a section 363 sale, even in the absence of a plan of reorganization, that course of action would not have included the plan's provisions for paying in full or otherwise satisfying the estates' administrative claims or providing a contingent recovery for prepetition general unsecured creditors.  The Reorganized Debtors' legal and strategic advisors were integral to the formulation and execution of the strategy that not only kept Delphi's core businesses intact as going concerns but also preserved the plan of reorganization.  Compared to any reasonably available alternatives these cases were unquestionably a success for the Reorganized Debtors.

        2.      The U.S. Trustee's objection to Rothschild's Completion Fee constitutes more than 93% of the value of the professional fees at issue in the objection.  As set forth below, Rothschild's Completion Fee has already been reviewed by DPH Holdings and paid, and DPH Holdings believes the factual record is clear that Rothschild earned it in accordance with the engagement letter approved by the Court.  DPH Holdings is further prepared to pay the additional balance due and owing to Rothschild of $2,190,322.58, consisting of the $2 million M&A fee (after credits) that Rothschild earned in connection with the sale of the steering business, and the approximately 20% holdback amounts from professional fees submitted for the seventh interim fee period.  As to the other professional fees at issue, DPH Holdings is also prepared to pay outstanding amounts due and owing as reconciled in the Statement Of The Delphi Joint Fee Review Committee being filed contemporaneously.

    A.    <u>DPH Holdings Paid Rothschild's Completion Fee As Approved By The Court</u>

        3.      The U.S. Trustee incorrectly asserts that "Rothschild did not meet its burden of proving that it is entitled to a Completion Fee of $15 million" and asks the Court to

2

disallow this amount in its entirety. It appears from the objection that the U.S. Trustee does not appreciate the basis for the payment.

4. Rothschild attached its engagement letter, with amendments, as Exhibit B to its final fee application. As explained in the last amendment to the engagement letter, executed by John Sheehan on behalf of Delphi Corporation:

> . . . [T]he effectiveness of the Amended and Restated Global Settlement Agreement and Amended Master Restructuring Agreement (the "[GSA/MRA]") by and among the Company, General Motors Corporation ("GM") and the Company's U.S. unions involving the assumption by GM of the Company's U.S. hourly post-retirement benefit obligations, transfer to GM of the Company's hourly pension plan, support by GM of certain of the Company's labor costs, and payments by GM to the Company under the amendment to the existing Advance Agreement constitutes a Transaction as defined in the Engagement Letter which entitles Rothschild to payment of the Completion Fee.
>
> Since the Company has not emerged from bankruptcy and the original intent of the Company, GM and the Company's stakeholders was that the execution of the GSA/MRA and Advance Agreement would occur contemporaneously with the confirmation of a Plan of Reorganization (a "Plan"), the Company has asked and Rothschild has agreed to defer payment of a portion of the Completion Fee.
>
> Accordingly, Rothschild has agreed to waive its ability to request immediate full payment of the Completion Fee in consideration for the Company's agreement to pay Rothschild, promptly upon presentation of its invoice, as follows: (i) $7.5 million not later than January 15, 2009; and (ii) the balance of the Completion Fee upon the closing or consummation of another Transaction.

(See October 27, 2008 letter agreement, Docket No. 19255, Ex. B.) In accordance with the letter agreement, Delphi paid Rothschild $7.5 million in January 2009 and $7.5 million in connection with the closing of the transactions on the Effective Date in October 2009.

5. The U.S. Trustee does not attack the reasonableness of Rothschild's Completion Fee or otherwise challenge it on any ground except for an alleged failure to meet its burden of proof. In light of the apparently overlooked explanation set forth in the amendment to

3

the engagement letter, the Court should overrule the U.S. Trustee's objection to Rothschild's Completion Fee.

6. DPH Holdings is also aware that Rothschild has agreed to the following voluntary accommodations with respect to its overall fee. First, Rothschild agreed to reduce its M&A fee with respect to the sale of the steering business (the "Steering M&A fee") by $500,000. Rothschild earned a $5 million Steering M&A Fee which, after applying the 50% credit against the Completion Fee as required under section 5 of the engagement letter, entitled Rothschild to receive payment of $2.5 million. As an accommodation, however, Rothschild agreed to further reduce this amount to $2 million and to defer payment until after the Effective Date. Second, Rothschild waived its right to receive a $2 million New Capital Fee in connection with in the DIP Accommodation Agreement among Delphi Corporation and certain of its DIP lenders. As set forth in the April 14, 2008 amendment to Rothschild's engagement letter, Rothschild was entitled to a New Capital Fee capped at $2 million in connection with any extension, modification, or refinancing of debtor-in-possession financing. Although DPH Holdings believes that Rothschild earned this $2 million New Capital Fee in connection with the DIP Accommodation Agreement, Rothschild waived the New Capital Fee as an additional accommodation.

7. Finally, the factual record also demonstrates no basis for the U.S. Trustee's alternative objection that Rothschild allegedly failed to offset the Completion Fee by 50% of (a) the $2 million Steering M&A Fee and (b) the $4 million M&A fee in connection with the sale of the Interior Division (the "Interior Division M&A Fee"), respectively, as required by section 5 of the engagement letter. (See Obj. at 22.) As discussed above, and as explained in Rothschild's final fee application, the unpaid $2 million Steering M&A fee is net of the 50% offset and a

4

further $500,000 accommodation. (See Docket No. 19255, at 7 n.4.) As further explained in Rothschild's final fee application, the $4 million Interior Division M&A Fee was not subject to offset under the April 14, 2008 amendment to the engagement letter. (See id. at 7 n. 5.)

8.   DPH Holdings is prepared to pay the balance due and owing to Rothschild of $2,190,322.58. This amount consists of (a) the approximately 20% holdback of $190,322.58 in respect of the seventh interim fee period that is covered by the professional fee escrow, and (b) the $2 million Steering M&A fee which was separately provided for at closing and is subject to reimbursement under section 3 of the Master Disposition Agreement.

B.   The Court Should Authorize Payments Reconciled By The Fee Committee

9.   As discussed in its statement, the Fee Committee reviewed and recommended approval of the first six interim fee applications. In addition, the Reorganized Debtors reviewed and reconciled the amounts covered in the seventh interim fee period in connection with their emergence from chapter 11, and the Fee Committee reviewed and reconciled the final fee applications. DPH Holdings is prepared to pay the unpaid fee amounts as reconciled by the Fee Committee. Other than as discussed above with respect to the Steering M&A fee, these amounts have been fully provided for in the professional fee escrow established in connection with the closing of the transactions on the Effective Date.

5

WHEREFORE, for the foregoing reasons the DPH Holdings respectfully requests that the Court (i) approve the final fee applications as reconciled by the Delphi Fee Committee and (ii) grant DPH Holdings such other and further relief as is just.

Dated:  New York, New York
March 12, 2010

DPH Holdings Corp.

By: /s/ John Brooks
Johns Brooks, President

By: /s/ David M. Sherbin
David M. Sherbin,
Counsel to DPH Holdings Corp.