1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481-rdd

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DPH HOLDINGS CORP., ET AL.,


      Debtors.


- - - - - - - - - - - - - - - - - - - -x


          U.S. Bankruptcy Court

          300 Quarropas Street

          White Plains, New York


          March 18, 2010

          10:12 AM


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1    Status Conference on Various Adversary Proceedings.

2

3    Final Fee Applications of Professionals for the Period from

4    October 8th, 2005 through January 25, 2008.

5

6    Notice of Hearing on Forty-Fourth Omnibus Objection.

7

8    Notice of Hearing on Forty-Fifth Omnibus Objection related to

9    Administrative Claims.

10

11    Notice of Hearing Proposed Thirty-First Claims Hearing Agenda

12    filed by John William Butler, Jr. on behalf of DPH Holdings

13    Corp., et al.

14

15    Notice of Hearing Proposed Fifty-Third Omnibus Hearing Agenda

16    filed by John William Butler, Jr. on behalf of DPH Holdings

17    Corp., et al.

18

19

20

21

22

23

24

25    Transcribed by:  Dena Page

3

1

2    A P P E A R A N C E S :

3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

4         Attorneys for Reorganized Debtors

5         155 North Wacker Drive

6         Chicago, IL 60606

7

8    BY:   JOHN WM. BUTLER, JR., ESQ.

9          JOHN K. LYONS, ESQ.

10         JOSEPH N. WHARTON, ESQ. (TELEPHONICALLY)

11

12

13   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

14        Attorneys for Reorganized Debtors

15        Four Times Square

16        New York, NY 10036

17

18   BY:   KAYALYN A. MARAFIOTI, ESQ.

19

20

21

22

23

24

25

4

1

2      BUTZEL LONG, P.C.

3           Attorneys for Preference Actions

4           380 Madison Avenue

5           22nd Floor

6           New York, NY 10017

7

8      BY:   ERIC B. FISHER, ESQ.

9

10

11     BUTZEL LONG, P.C.

12          Attorneys for Preference Actions

13          150 West Jefferson

14          Suite 100

15          Detroit, MI 48226

16

17     BY:   CYNTHIA J. HAFFEY, ESQ.

18

19

20     BUTZEL LONG, P.C.

21          Attorneys for Preference Actions

22          41000 Woodward Avenue

23          Bloomfield Hills, MI 48304

24

25     BY:   THOMAS B. RADOM, ESQ. (TELEPHONICALLY)

5

1

2    CADWALADER, WICKERSHAM & TAFT, LLP

3         One World Financial Center

4         New York, NY 10281

5

6    BY:   SAMUEL S. CAVIOR, ESQ.

7

8

9    COVINGTON & BURLING LLP

10        Attorneys for Covington & Burling

11        620 Eighth Avenue

12        New York, NY 10018

13

14   BY:   SUSAN POWER JOHNSTON

15

16

17   FOLEY & LARDNER LLP

18        Attorneys for Ernst & Young

19        321 North Clark Street

20        Suite 2800

21        Chicago, IL 60610

22

23   BY:   MARK L. PRAGER, ESQ.

24

25

6

```
1    FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

2         Attorneys for Equity Committee

3         One New York Plaza

4         New York, NY 10004

5

6    BY:   BONNIE STEINGART, ESQ.

7

8

9    LATHAM & WATKINS LLP

10        Attorneys for Unsecured Creditors' Committee

11        53rd at Third

12        885 Third Avenue

13        New York, NY 10022

14

15   BY:   MARK A. BROUDE, ESQ.

16

17

18   LOEB & LOEB LLP

19        Attorneys for Deloitte & Touche, LLP

20        345 Park Avenue

21        New York, NY 10154

22

23   BY:   DANIEL B. BESIKOF, ESQ.

24

25
```

7

1

2    REICH REICH & REICH, P.C.

3         Attorneys for Critech Research, Inc.

4         235 Main Street, Suite 450

5         White Plains, NY 10601

6

7    BY:   LAWRENCE R. REICH, ESQ.

8

9

10   SHEARMAN & STERLING LLP

11        599 Lexington Avenue

12        New York, NY 10022

13

14   BY:   DOUGLAS P. BARTNER, ESQ.

15

16

17   THOMPSON HINE LLP

18        Attorneys for Rieck Group

19        35 Madison Avenue

20        12th Floor

21        New York, NY 10017

22

23   BY:   BARRY M. KAZAN, ESQ.

24

25

8

```
 1

 2    THOMPSON HINE LLP

 3         Attorneys for Rieck Group

 4         2000 Courthouse Plaza, N.E.

 5         10 W. Second Street

 6         Dayton, OH 45402

 7

 8    BY:   LAWRENCE T. BURICK (TELEPHONICALLY)

 9

10

11    TOGUT, SEGAL & SEGAL LLP

12         Conflict Counsel for Reorganized Debtors

13         One Penn Plaza

14         New York, NY 10010

15

16    BY:   NEIL BERGER, ESQ.

17

18

19    UNITED STATES DEPARTMENT OF JUSTICE

20         Office of the United States Trustee

21         271 Cadman Plaza East

22         Suite 4529

23         Brooklyn, NY 11201

24

25    BY:   ALICIA M. LEONHARD, AUST
```

9

1    BAKER & MCKENZIE, LLP

2         Attorneys for Donobat Machine Tool Co., Inc.

3         130 East Randolph Drive

4         Suite 3900

5         Chicago, IL 60601

6

7    BY:   LAWRENCE T. VONCKX, ESQ. (TELEPHONICALLY)

8

9

10   BANNER & WITCOFF, LTD.

11        Attorneys for DPH Holdings Corp.

12        Ten South Wacker Drive

13        Suite 3000

14        Chicago, IL 60606

15

16   BY:   CHARLES W. SHIFLEY, ESQ. (TELEPHONICALLY)

17

18

19   CALFEE, HALTER & GRISWOLD, LLP

20        Attorneys for Williams Advanced Materials

21        1400 KeyBank Center

22        800 Superior Avenue

23        Cleveland, Ohio 44114

24

25   BY:   NATHAN A. WHEATLEY, ESQ. (TELEPHONICALLY)

10

1

2   DICKINSON WRIGHT, PLLC

3        Attorneys for Dickinson Wright

4        500 Woodward Avenue

5        Suite 4000

6        Detroit, MI 48226

7

8   BY:   KRISTI A. KATSMA, ESQ. (TELEPHONICALLY)

9

10

11   DLA PIPER, LLP (U.S.)

12        Attorneys for Mobile Area, Inc., et al.

13        550 South Hope Street

14        Suite 2300

15        Los Angeles, CA 90071

16

17   BY:   BRENDAN P. COLLINS, ESQ. (TELEPHONICALLY)

18        NATASHA L. JOHNSON, ESQ. (TELEPHONICALLY)

19

20

21

22

23

24

25

11

1

2      DYKEMA GOSSETT PLLC

3            Special Counsel for DPH Holdings, Corp.

4            39577 Woodward Avenue

5            Suite 300

6            Bloomfield Hills, MI 48304

7

8      BY:   RONALD L. ROSE, ESQ. (TELEPHONICALLY)

9

10

11     FOLEY & LARDNER, LLP

12           Attorneys for Ernst & Young

13           321 North Clark Street

14           Suite 2800

15           Chicago, IL 60654

16

17     BY:   JOANNE LEE, ESQ. (TELEPHONICALLY)

18

19

20

21

22

23

24

25

12

```
 1
 2    GORLICK, KRAVITZ & LISTHAUS, P.C.
 3         Attorneys for International Union of Operating
 4             Engineers Locals
 5         17 State Street
 6         4th Floor
 7         New York, NY 10004
 8
 9    BY:   BARBARA S. MEHLSACK, ESQ. (TELEPHONICALLY)
10
11
12    GREGORY P. JOSEPH LAW OFFICES LLC
13         Attorneys for Official Committee of Equity Security
14             Holders of Delphi Corporation
15         485 Lexington Avenue
16         30th Floor
17         New York, NY 10017
18
19    BY:   MICHAEL B. SLOAN, ESQ. (TELEPHONICALLY)
20
21
22
23
24
25
```

13

1

2    GROOM LAW GROUP

3         Groom Law Group

4         1701 Pennsylvania Avenue, N.W.

5         Washington, DC 20006

6

7    BY:   JASON H. LEE, ESQ. (TELEPHONICALLY)

8

9

10   HASKELL SLAUGHTER YOUNG & REDIKER, LLC

11        Attorneys for Simco Construction, Inc.

12        1400 Park Place Tower

13        2001 Park Place North

14        Birmingham, AL 35203

15

16   BY:   ROBERT ADAMS, ESQ. (TELEPHONICALLY)

17

18

19   HOWARD & HOWARD

20        Attorneys for Howard & Howard

21        450 West Fourth Street

22        Royal Oak, MI 48067

23

24   BY:   LISA S. GRETCHKO, ESQ. (TELEPHONICALLY)

25

14

IVINS PHILLIPS & BARKER, CHARTERED

    1700 Pennsylvania Avenue, N.W.

    Suite 600

    Washington, DC 20006


BY:   WILLIAM L. SOLLEE, JR., ESQ. (TELEPHONICALLY)



JAECKLE FLEISCHMANN & MUGEL, LLP

    Attorneys for Jaeckle Fleischmann & Mugel

    12 Fountain Plaza

    Buffalo, NY 14202


BY:   MARJORIE BIALY, ESQ. (TELEPHONICALLY)



KING & SPALDING LLP

    Attorney for KPMG

    1185 Avenue of the Americas

    New York, NY 10036


BY:   DANIEL G. EGAN, ESQ. (TELEPHONICALLY)

15

1

2      LAMBERT, LESER, ISACKSON, COOK & GIUNTA, P.C.

3            Attorneys for ProTech Machine

4            309 Davidson Building

5            916 Washington Avenue

6            Bay City, MI 48708

7

8      BY:   SUSAN M. COOK, ESQ. (TELEPHONICALLY)

9

10

11     LAW OFFICE OF JOHN MARQUESS

12           Attorney for Legal Cost Control, Inc.

13           255 Kings Hwy E #A3,

14           Haddonfield, NJ 08033

15

16     BY:   JOHN MARQUESS, ESQ. (TELEPHONICALLY)

17

18

19     MACDONALD ILLIG JONES & BRITTON LLP

20           Attorneys for Blair Strip Steel

21           100 State Street

22           Suite 700

23           Erie, PA 16507

24

25     BY:   SUSAN FUHRER REITER, ESQ. (TELEPHONICALLY)

16

1

2    MAYER BROWN, LLP

3         Attorneys for Delphi Corporation

4         71 South Wacker Drive

5         Chicago, IL 60606

6    BY:   CRAIG E. REIMER, ESQ. (TELEPHONICALLY)

7

8

9    O'MELVENY & MYERS LLP

10        Attorneys for Delphi Corp.

11        1625 Eye Street, NW

12        Washington, DC 20006

13

14   BY:   TOM JERMAN, ESQ. (TELEPHONICALLY)

15

16

17   PREVIANT, GOLDBERG, UELMEN, GRATZ, MILLER, & BRUEGGEMAN, S.C.

18        Attorneys for IBEW & IAM

19        1555 N. RiverCenter Drive

20        Suite 202

21        Milwaukee, WI 53212

22

23   BY:   MARIANNE GOLDSTEIN ROBBINS, ESQ. (TELEPHONICALLY)

24

25

17

1    QUINN EMANUEL URQUHART & SULLIVAN, LLP

2         Attorneys for Quinn Emanuel Urquhart & Sullivan, LLP

3         865 S. Figueroa Street

4         10th Floor

5         Los Angeles, CA 90017

6

7    BY:   TIGRAN GULEDJIAN, ESQ. (TELEPHONICALLY)

8

9

10   QUINN EMANUEL URQUHART & SULLIVAN, LLP

11        Attorneys for Quinn Emanuel Urquhart & Sullivan, LLP

12        51 Madison Avenue

13        22nd Floor

14        New York, NY 10010

15

16   BY:   JOSEPH G. MINIAS, ESQ. (TELEPHONICALLY)

17

18

19   WILMER CUTLER PICKERING HALE AND DORR, LLP

20        Attorneys for DPH Holdings Corp., et al.

21        399 Park Avenue

22        New York, NY 10022

23

24   BY:   PHILIP D. ANKER, ESQ. (TELEPHONICALLY)

25        MICHELLE A. GOLDIS, ESQ. (TELEPHONICALLY)

18

1

2    ALSO PRESENT (TELEPHONICALLY):

3         JOHN BROOKS, DPH Holdings

4         STEVE CARLIN, KPMG

5         SEAN CORCORAN, ESQ., DPH Holdings

6         DANIEL CROWLEY, Houlihan Lokey

7         BRIAN D. DECKER, PricewaterhouseCoopers

8         ROBERT E. DETTINGER, In Propria Persona

9         PETER MCCORMICK, Buck Consultants

10        PATRICK MORROW, Jefferies & Co., Inc.

11        BROCK PLUMB, Deloitte & Touche, LLP

12        JOHN SHEEHAN, Delphi Fee Committee

13        GARY SILBERG, In Propria Persona

14

15

16

17

18

19

20

21

22

23

24

25

19

1              P R O C E E D I N G S

2         THE CLERK:  All rise.

3         THE COURT:  Please be seated.  Okay, good morning.

4    This is In re:  DPH Holdings Corp, et al.

5         MR. LYONS:  Good morning, Your Honor.  John Lyons on

6    behalf of the reorganized debtors.  This is the fifty-third

7    omnibus hearing, Your Honor, and with me in court, I have my

8    partner, Jack Butler and Kayalyn Marafioti, who you're well-

9    familiar with.  Also, Your Honor, we have in court John Brooks,

10   who is the president of DPH Holdings who has not yet been

11   introduced to Your Honor.  Mr. Brooks is in charge of the wind-

12   down.  And then we also have Dean Unrue who is the claims

13   administrator, who's here, among others here in court, as well.

14        THE COURT:  Okay.

15        MR. LYONS:  Your Honor, with your permission, we would

16   like to proceed through the omnibus agenda.  There are three

17   groups of matters.  First, there is a status conference on

18   various adversary proceedings.  And then we also have the

19   forty-fourth and forty-fifth omnibus claims objection, and then

20   finally, the fee app matters which will probably cover the bulk

21   of the omnibus hearing.

22        THE COURT:  Okay, my thought was maybe it would make

23   sense to flip the last two matters and do the fee applications

24   since I think we have a lot of people here on those matters

25   and --

20

1          MR. LYONS:  Okay, so should we proceed first --

2          THE COURT:  -- and as I understand from communications

3    with chambers, most of those matters, if not all of them ,have

4    now been resolved, as far as the U.S. trustee's objections.  So

5    let's do it in that order, instead.

6          MR. LYONS:  Okay, very good, Your Honor.  I'll turn

7    the podium over to --

8          THE COURT:  Well, I'd like the report first, though,

9    in dealing with the adversary proceedings, and then we'll deal

10   with the fees.

11         MR. LYONS:  Very good.

12         THE COURT:  Just the claim objections will be last.

13         MR. LYONS:  Very good.  I'd like to introduce, then,

14   Eric Fisher, counsel for DPH Holdings, with respect to the

15   adversary complaints.

16         THE COURT:  Okay.

17         MR. FISHER:  Good morning, Your Honor.

18         THE COURT:  Good morning.

19         MR. FISHER:  Eric Fisher with Butzel Long.  I'm here

20   today with my partner, Cynthia Haffey.  As Your Honor is aware,

21   there are 177 adversary proceedings that were retained pursuant

22   to a preservation order entered by the Court.  For today,

23   thirty-seven of those retained actions were originally

24   scheduled for an initial status conference, and thirty of those

25   thirty-seven adjournments were granted, mostly due to ongoing

21

1    settlement discussions in those actions.  We believe, Your

2    Honor, that it makes sense to address the procedural and

3    scheduling issues concerning those actions that were scheduled

4    for a status conference today in the broader context of all of

5    the retained adversary proceedings, and to that end, yesterday,

6    Your Honor, we filed a motion for a case management order that

7    would govern all of the preference actions that are now in the

8    process of being unsealed and served.  That motion is set for

9    hearing on April 22nd.  If Your Honor wishes for me to address

10   some of the elements of the case management order, I'm happy

11   to, although I believe that it's not necessary at this moment.

12           THE COURT:  No, I don't think you should do that.  Did

13   you serve the parties to the preference actions?

14           MR. FISHER:  Yes, we've served the motions --

15           THE COURT:  I'm sorry, someone who's sort of Darth

16   Vader breathing on the phone should put their phone on mute.

17           Okay, sorry, you can go ahead.

18           MR. FISHER:  I also wanted to clarify, Your Honor,

19   that our firm, Butzel Long, will be representing DPH Holdings

20   with regard to 165 of the preference actions.  Eleven of them,

21   DPH Holdings will be represented by the firm of Togut, Segal.

22   But again, in an effort to ensure that common procedures apply

23   to all of these actions, Togut, Segal joins in the case

24   management order on behalf of DPH Holdings.

25           THE COURT:  Okay.

22

1          MR. FISHER:  So we're talking about procedures that

2    would be common to all of the actions.

3          THE COURT:  All right.  Unless there's something I

4    really need to focus on before the April hearing, then, I'll

5    just -- I'll just deal with it then.

6          MR. FISHER:  Okay, Your Honor, there's only, then, one

7    issue as to which I would respectfully request the Court's

8    guidance.  And that is, there are a number of defendants who

9    are foreign defendants who do not have a location for service

10   in the United States.  Our current deadline for service under

11   the last extension order that Your Honor entered provides for

12   service by April 5 of this year.  Before that date, we expect

13   to have all of the summonses and complaints issued, translated,

14   and transmitted to the foreign serving authorities with regard

15   to those defendants, but as I'm sure Your Honor's aware, under

16   the Hague Convention, it can take quite a number of months to

17   complete service.  And my question, Your Honor, is simply

18   whether we ought to move for a further extension as to those

19   foreign defendants before April 5th or whether the Court will

20   entertain those motions after that date?

21         THE COURT:  I think to be safe, you should move before

22   April 5th.

23         MR. FISHER:  Will do, Your Honor.

24         THE COURT:  The ultimate resolution, if you didn't,

25   may depend on the individual countries where service is made,

23

1      and it's probably safer to do it beforehand.

2              MR. FISHER:  Understood.

3              THE COURT:  Okay.  Okay.

4              MR. FISHER:  Thank you, Your Honor.

5              MR. BUTLER:  Your Honor, good morning.  Jack Butler,

6      counsel for DPH Holdings here in connection with the final fee

7      applications of professionals for the period from October 8th,

8      2005 through January 25, 2008.  These are matters 4 through 44

9      on the omnibus agenda.  Present in the courtroom, Your Honor,

10     in addition to Mr. Brooks, who was introduced to you as

11     president of DPH Holdings, is Sean Corcoran, counsel to DPH

12     Holdings, who has been assisting in the fee review process, and

13     John Sheehan, who is the representative of the Delphi fee

14     committee, who's also present in the courtroom, if the Court

15     has any questions.  And as the Court's aware, Alicia Leonhard,

16     from the Office of the United States Trustee who's also a

17     member of the fee committee and who also had independently

18     reviewed this as is the responsibility of the U.S. trustee and

19     filed a separate objection which has been resolved -- and I'll

20     report on that in a few minutes -- Ms. Leonard is also here and

21     will address the Court at the appropriate time.  So those are

22     the -- in addition, there are representatives of most of the

23     applicants and applicants who had principal roles in the case,

24     most of them are present in court today, individually, in case

25     Your Honor has any questions, and many of the others are

24

1      represented, as chambers permitted, on the telephone --

2      telephonically.

3              THE COURT:  Okay.

4              MR. BUTLER:  Your Honor, in accordance with Article

5      10.3, the modified plan, the deadline to file final fee

6      applications was December 31st, 2009.  On January 26th, 2010,

7      Your Honor, entered an order at docket number 19370 that

8      enlarged the time for professionals to file applications until

9      February 1, 2010.  In connection with that order, Your Honor

10     included a paragraph 4 of that January 26 order that indicated

11     that any professional who used the enlargement period would be

12     limited in respect to their fees and expenses for the seventh

13     interim fee period to no more than the lesser of what Your

14     Honor awarded, ultimately, but not more than the amount the

15     fees and expenses estimated and reported to the debtors in

16     advance of the October 6th consummation of the plan.  There

17     were, Your Honor, ten professionals who filed after December

18     31st.  I simply wanted the record to indicate that none of them

19     have sought amounts that have exceeded the amounts that were

20     estimated prior to the modified plan, so subject to Your

21     Honor's determining what the Court will reward, all of them are

22     in compliance with Your Honor's January 26th order.

23             THE COURT:  Okay.

24             MR. BUTLER:  Your Honor, there are forty-one

25     professionals that have final fee applications pending before

25

1    the Court.  In the aggregate, it's approximately 374 million

2    dollars in professional fees and approximately 24.9 million

3    dollars in charges and disbursements for the period involved.

4    There were, Your Honor, five professionals among the forty-one

5    applicants that sought approval of fees after January 25th,

6    2008.  Those are not part of the final fee application process,

7    pursuant to Article 10.3 of the modified plan and paragraph 33

8    of the confirmation order.  And those amounts have been

9    excluded from the proposed order that's been presented to Your

10   Honor, and those applicants have been advised of that.  And

11   those are being dealt with in the ordinary course by DPH

12   Holdings.

13           Your Honor, on January 28th of this year, Your Honor

14   entered an order at docket number 19383 that scheduled the

15   hearing on the final fee applications for March 18th, 2010.  On

16   February 3rd, 2010, a notice of hearing on the final fee

17   applications filed at docket number 19394 was filed listing the

18   retained professionals and the amounts for which they sought

19   approval.  There were two professionals, Pagemill Partners, LLC

20   and Crowell & Moring LLP, that had been retained earlier in

21   these cases.  They never filed either interim or final fee

22   applications, and there's no provision for them receiving any

23   kind of final approval today.  I think my understanding, Your

24   Honor, is that they never incurred fees that would be subject

25   to review of the Court.  One had a contingent arrangement that

1    was never consummated; the other one had no fees that were

2    subject to the Court's review.

3            THE COURT:  Okay.

4            MR. BUTLER:  But in any event, if they are, they're at

5    their risk, not the estate's as part of the reorganized

6    companies.

7            In addition, Your Honor, there were two professionals,

8    Buck Consultants, LLC, and Dickinson Wright, PLLC that were

9    incorrectly listed in the final fee application notice.  With

10    respect to Buck Consultants, the final fee application notice

11    listed final approval of 248,074 dollars in fees and no charges

12    in disbursements.  After review, the fee review committee

13    determined that that amount actually included approximately

14    95,000 dollars of fees that was incurred after January 25th,

15    2008 and in connection with the fee committee's review, the

16    amounts before the Court were reduced to 153,506 in fees and no

17    charges in disbursements.

18            Similarly, with respect to the Dickinson Wright law

19    firm, the final fee application notice should have listed

20    455,642.49 for fees and 21,976.71 for charges and

21    disbursements.  In addition, there was some issues with respect

22    to the Dickinson Wright application in that they withdrew their

23    final fee application.  They converted to an ordinary course

24    professional at some point and filed the final fee application

25    well in advance of any of the other firms, and had been advised

27

1    that that wasn't going to be considered at that time.  They

2    withdrew it.  There was -- the fee committee consulted with

3    them, reviewed the amounts of their fees, and determined that

4    the application they did file in their prior interim

5    applications should be deemed their final application.  I think

6    Ms. Leonhard, on behalf of the U.S. trustee, similarly

7    concurred.

8            THE COURT:  And it was still noticed?

9            MR. BUTLER:  It was still noticed, yes, Your Honor.

10           THE COURT:  Okay.

11           MR. BUTLER:  But it was --

12           THE COURT:  As far as the public -- the creditor body

13   thought, it was subject to review?

14           MR. BUTLER:  I think that's correct, Your Honor.

15           THE COURT:  Okay.

16           MR. BUTLER:  Your Honor, there was a reconciliation

17   process that went on in these cases which I want to report on

18   briefly, and that has to do with Articles 10.3(b) and 10.3(c)

19   of the modified plan.  And in connection with the debtors'

20   emergence from Chapter 11, professionals were required to

21   submit estimates for unbilled amounts and statements for unpaid

22   amounts, including outstanding holdback amounts.  And that led

23   DPH Holdings, prior to emergence, to conduct a thorough review

24   of all the professional fees in the case, in addition to what

25   had been done with the fee review committee over the first six

28

1    interim periods.  And those amounts were all reconciled at that

2    time when the professional fee escrows were set up in

3    connection with emergence from Chapter 11.  Although those

4    professional fees were reviewed and reconciled by the debtors

5    in advance of the effective date, the fee review committee,

6    acting through the debtors' representatives on the fee review

7    committee, also undertook a review of the final fee

8    applications.  And during this review, which was a second

9    review, if you will, the fee review committee identified

10   discrepancies in six of the professionals' fee applications,

11   and determined that the amounts of those fees and expenses

12   exceeded, on an aggregate basis, the amount anticipated by the

13   committee based on the court awards for the six interim periods

14   and the monthly invoices that had previously been reviewed and

15   reconciled by the debtors.  And in each of those cases, the fee

16   review committee contacted those professionals to reconcile the

17   discrepancies.  The reconciliation resulted in the six

18   professionals agreeing to reduce the fees or charges in an

19   aggregate amount of approximately 215,000 dollars.

20        THE COURT:  And they're all within the estimate?

21        MR. BUTLER:  Yes.  They are, now.  They're all within

22   the estimate, now, and they're all within the expectations of

23   DPH Holdings and the fee committee based on the work that had

24   been previously done.

25        THE COURT:  Okay.

29

1        MR. BUTLER:  Additionally, Your Honor, as Ms. Leonhard

2    had and the U.S. trustee had always indicated when they

3    participated in the fee review committee, the U.S. trustee

4    retained their individual prerogative and authority to review

5    final fee applications and make their own determinations as to

6    their positions on those applications.  That resulted in a

7    filing of an objection as to certain amounts involving certain

8    firms, all of which have now been resolved.  And I'll report on

9    those briefly.

10        Ms. Leonhard, unless you'd like to.  Do you want me to

11    report?  Let me just stop right now and ask Ms. Leonhard --

12        THE COURT:  Okay, all right.

13        MS. LEONHARD:  Thank you.  Good morning, Your Honor.

14    Alicia Leonhard for the U.S. trustee.  Your Honor, the U.S.

15    trustee reviewed the fees for the entire case, as is our

16    statutory duty.  However, all but one objection involved the

17    fees requested for the seventh interim fee period.  The U.S.

18    trustee participated in the fee committee for the first through

19    sixth interim fee periods, and as a result -- and concurred in

20    the resolutions on those applications, so therefore, the U.S.

21    trustee did not second-guess any resolutions with respect to

22    those fees for those periods, except the one issue with respect

23    to WilmerHale and Pricewaterhouse.  The U.S. trustee had no

24    involvement in the fee committee after confirmation of the plan

25    and was not involved in the review of the seventh interim fee

30

1    applications with the fee committee.

2        I'm very happy to report that the U.S. trustee's

3    resolved all of the issues.  As Mr. Butler reported, Dickinson

4    Wright -- we agreed with Dickinson Wright that their sixth

5    interim fee application would be deemed the final application,

6    and the U.S. trustee reviewed it and has no objections to the

7    award of final fees or to the payment of the holdback.

8        With respect to Rothschild, the issue was whether

9    Rothschild had met is burden of proof that it was entitled to

10   the completion fee and an M&A fee and -- M&A fees, I should

11   say -- and whether they had properly credited the M&A fee

12   against the completion fee.  After discussions with Rothschild,

13   they filed a response to the U.S. trustee's objection, and as

14   it turned out, the transactions that triggered the entitlement

15   to those fees took place after confirmation of the first plan,

16   and technically, aren't within the purview of Section 330.  And

17   in their response, Rothschild met their burden of proof.  And

18   to the extent that those fees are reviewable under 330, the

19   U.S. trustee has no objection.

20       WarnerStevens requested future fees, but the debtors

21   and the U.S. trustee agreed that the debtor could pay them in

22   the ordinary course of business because they were incurred

23   postconfirmation of the original plan.

24       Fried Frank has agreed to a reduction of 26,500 --

25   excuse me, 30,000 dollars to resolve the U.S. trustee's

31

1    objection.  Skadden has agreed to a reduction of 100,000

2    dollars to resolve the U.S. trustee's objection.  And Latham &

3    Watkins agreed to a reduction of 26,500 dollars.  These amounts

4    are twenty percent of the U.S. trustee's -- the fees that the

5    U.S. trustee questioned, and so it's uniform.

6            THE COURT:  And it generally relates to use of law

7    school graduates who haven't yet been admitted to the bar and

8    some are associates with a couple of firms, I guess.

9            MS. LEONHARD:  That's correct.  And the other issue,

10   too, Your Honor, was billing for clerical time incurred by

11   paraprofessionals.  But I think this resolution is satisfactory

12   to the U.S. trustee.

13           THE COURT:  Okay.

14           MS. LEONHARD:  With respect to Pricewaterhouse and

15   WilmerHale, the issue was disclosure of their relationship, and

16   in -- when this issue, when the U.S. trustee identified this

17   issue, I, on behalf of the U.S. trustee went back and looked at

18   every retention application Rule 2014 disclosure fee

19   application, everything related to those two professionals.

20   And while it is the U.S. trustee's view that the disclosure of

21   the relationship between the debtors, Pricewaterhouse and

22   WilmerHale could have been clearer, after discussions with Mr.

23   Sherbin at the reorganized debtors and WilmerHale and review of

24   documents, the U.S. trustee's satisfied that there's no

25   violation of Rule 2014 of this disclosure, and so therefore,

32

1    has no further objection to the award of fees to WilmerHale and

2    withdraws the request for disgorgement.

3        The second issue with respect to WilmerHale and

4    Pricewaterhouse was that Pricewaterhouse received the payment

5    of fees which were billed as expenses to the debtors, and

6    generally, this is not acceptable because it circumvents the

7    Section 327 retention requirements.  However, based on my

8    discussions with WilmerHale and the reorganized debtors, it

9    appears that there was a valid reason to have this arrangement

10   and that everybody knew about it, and it had been fully

11   disclosed to all of the parties of interest in the case.  So

12   therefore, the U.S. trustee has no further objection to

13   Pricewaterhouse's fees.

14       THE COURT:  Well, Pricewaterhouse, I think, did submit

15   time records, right?

16       MS. LEONHARD:  It did.

17       THE COURT:  Although they weren't in tenths of an

18   hour.

19       MS. LEONHARD:  And they were also filed under seal

20   because of the sensitive nature.

21       THE COURT:  Oh, but that's because it was an

22   investigation.

23       MS. LEONHARD:  Correct.  And so they did file time

24   records and the arrangement was made because of the sensitive

25   nature of that investigation, and there was a valid reason.

33

1    And so the U.S. trustee is satisfied with the explanation.

2          THE COURT:  Okay.

3          MS. LEONHARD:  So Howard & Howard is the final

4    objection, and that, again, was the request for future fees.

5    But the U.S. trustee agrees with the debtor that these -- any

6    fees can be paid in the ordinary course of business.

7          THE COURT:  Because they're postconfirmation --

8          MS. LEONHARD:  Correct.

9          THE COURT:  -- fees?

10         MS. LEONHARD:  Correct.

11         THE COURT:  Okay.

12         MS. LEONHARD:  So in closing, Your Honor, unless the

13   Court has any other questions, I'd just like to thank the

14   professionals for their cooperation in resolving these

15   objections, and I have nothing further.  Thank you.

16         THE COURT:  Okay.  Can I ask you -- and maybe Mr.

17   Butler, although I don't think you sat on this fee committee --

18   obviously, there's a cost involved in a committee like this,

19   but it was my view that given the size of this case and the

20   projected size of the fees that it would be worthwhile.  Did

21   you feel it was worthwhile to have the review occur the way it

22   did in this case?

23         MS. LEONHARD:  I think I do, Your Honor.  I think that

24   the fee committee operated very well, and in fact, you know,

25   reviewing LC -- Legal Cost Control's application, also, the

34

1    amount of money paid to them, a couple million dollars,

2    actually resulted in quite a lar -- a much larger return, in

3    terms of disallowed or resolved fees.  I think it was very

4    helpful in this case.

5            THE COURT:  Okay, thank you.

6            MS. LEONHARD:  Thank you.

7            MR. BUTLER:  Your Honor, turning to the professional

8    fee escrow under Article 10.3(c) of the modified plan, DPH

9    Holdings was required to transmit to the holdback escrow

10   account the aggregate amount of about 6.1 million dollars,

11   which represented the holdback on payment for professional fees

12   and expenses for allowed professional claims, the extent not

13   previously paid or disallowed.  As I indicated, the fee review

14   committee reconciled the expected amounts in connection with

15   their final review, and after certain reconciliations that were

16   made, the fee review committee believes that no professionals

17   seeking payment from the professional fee escrow for an amount

18   greater than what was escrowed for that individual professional

19   at the time of the reconciliation back in October of 2009.

20   There are several professionals, KPMG, LLP, Mesirow Financial

21   Consulting, and Skadden Arps, that are seeking payment for

22   their professional fee escrow for amounts less than was

23   escrowed for such professionals, as a result of having

24   voluntarily extended fee accommodations to the reorganized

25   debtors apart from and incremental to any settlements with the

35

1    U.S. trustee in connection with her objection.

2         THE COURT:  Will you remind me, where does the surplus

3    in the escrow go?

4         MR. BUTLER:  The surplus will go back to DPH Holdings.

5         THE COURT:  Okay.

6         MR. BUTLER:  I think, Your Honor, the only other

7    comment that I think I would make, here, in connection with

8    this process -- and I should say, by the way, that in response

9    to your questions about the fee committee, Mr. Sheehan is here

10   as the debtors' representative, the reorganized company's

11   representative on the fee committee, and is available to answer

12   any questions Your Honor may have about that, as well.

13        Let me just also just indicate, Your Honor, there was

14   a fair amount of exchange in the written pleadings in

15   preparation for this hearing, you know, about the success of

16   the cases and about what went on here.  I know from -- I'll

17   just speak briefly, now, not as representing DPH Holdings, but

18   as an applicant and as the lead counsel to the debtors

19   throughout their Chapter 11 cases.  This was, obviously, a

20   complex, long and difficult case.  I think it is -- it turned

21   out to be the fulcrum restructuring in the automotive industry,

22   and I think that the professionals assembled here, regardless

23   of the constituencies they represented, are proud of the fact

24   that this case was resolved through a modified plan, which

25   provided for the payment or satisfaction of all administrative

36

1   claims and for a contingent recovery to the unsecured

2   creditors, which I think some of us believe, in fact, will be

3   paid, ultimately, in connection with the recovery of the

4   automotive industry.  And certainly, there were, at many

5   moments in this case, opportunities for this case to have gone

6   sideways and to have ended up in a liquidation, which would

7   have, among other things, threatened the global automotive

8   supply chain, if not have broken it.

9          And so from the company's perspective -- or, excuse

10   me, from my perspective, personally -- the company spoke

11   through their own statements and we addressed it in our

12   statement back to the Court -- this was, I think, on many

13   levels, and I'll just speak from Skadden's perspective, this is

14   a case, if you actually looked at our engagement letter which

15   was Exhibit B to our retention application and to our final fee

16   application, on many levels, and if you looked at the actual

17   contract between Skadden and Delphi Corporation, this was a

18   transaction in which the fee enhancements and other provisions

19   of that agreement that had been previously negotiated, actually

20   were triggered and came into play.  Instead, we stand before

21   you with having agreed to something close to a ten percent

22   discount off of our standard rates.  I think the reason for

23   that, at the end of the day, is that everyone in this case,

24   including the professionals, recognized the shared sacrifices

25   that occurred in this case, and whatever the contracts may have

1    otherwise said, the right outcome, we believe, are the

2    applications that are before the Court.

3            THE COURT:   Okay.

4            MR. BUTLER:   Thank you, Your Honor.

5            THE COURT:   Okay.   Does anyone else have anything to

6    say on the fee applications?   All right.   Well, I have reviewed

7    the final applications, as well as the U.S. trustee's objection

8    and the responses to it.   And I will note that I think that the

9    agreements reached with the U.S. trustee are fair and

10    reasonable and properly reflect the issues raised by the U.S.

11    trustee.   Where the U.S. trustee has agreed to withdraw her

12    objection, I believe that she's done so for a good reason.   The

13    largest objection was to an element of -- or, a couple of

14    elements of Rothschild's transactional fees, but Rothschild has

15    adequately answered the questions raised in the objection with

16    regard to these fees and their calculation.

17            The one issue that still gave me some pause was the

18    Wilmer Cutler/Pricewaterhouse issue, given the fact that

19    retention under 327(a) and disclosure under 2014 are absolute

20    requirements under the statute of the case law for the ability

21    to be compensated.   However, I believe, as the U.S. trustee has

22    concluded, that the authorized retention of Pricewaterhouse

23    which was approved retroactive to January 2006 contemplated the

24    work that it did in connection with the audit committee work

25    and for or with WilmerHale at that time and that the work was

38

1    sufficiently disclosed to justify the compensation in this

2    instance.

3         As far as whether I had any other issues with the fee

4    applications, I don't.  I believe they should be awarded in the

5    amounts agreed to or otherwise, where there was no objection,

6    as sought.  The -- well, the fact is, in the past, when I was a

7    practicing lawyer, I often found amusing when a bankruptcy

8    Court cited to itself, but I dealt with the standard for

9    approving fee applications in In re:  Cenargo International,

10   PLC 294 B.R. 571, Bankr.S.D.N.Y. 2003, and I think that there's

11   been no change in the case law since then that would alter my

12   approach to reviewing professionals' fee applications in

13   Chapter 11 cases.  As I said in that case, the standard is what

14   would a reasonable professional have done at the time.

15   Clearly, this case, at various points, contemplated a much

16   larger distribution, not only to unsecured creditors, but also

17   a distribution to shareholders.  I, in fact, appointed an

18   equity committee to protect the interests of shareholders.  I

19   do not believe that the ultimate distributions in this case,

20   and the fact that they're obviously much lower than had been

21   contemplated during the course of the case, are in any way

22   attributable to the work of the professionals or the exercise

23   of their judgment, and consequently, I believe that their fees

24   should not be reduced in light of the fact that creditors and

25   shareholders are justifiably disappointed with the

39

1   distributions in the case.  The outcome of the case, I believe,

2   is instead attributable to the nature of the debtors' business

3   and the environment in which it operated, and in fact, it seems

4   to me the professionals throughout the case not only did their

5   work properly, but in fact, contributed to the fact that there

6   are distributions at all in the case.

7           So in light of that, I'll approve the applications.

8           I know you circulated an order yesterday.  I think

9   there have been some changes since then.

10          MR. BUTLER:  I think we've circulated an order that's

11  been adjusted.  We have -- and we'll make sure, Your Honor,

12  with chamber, that we present the final reconciled order that

13  we've reviewed with parties.

14          THE COURT:  Okay, thank you.

15          MR. BUTLER:  Thank you.  Your Honor, at this time, can

16  the parties that were --

17          THE COURT:  Yes, all of the professionals and their

18  representatives can be excused, who were here on that aspect.

19          IN UNISON:  Thank you, Your Honor.

20      (Pause)

21          THE COURT:  But I would ask you all to leave so that

22  we could pursue the remaining matters.

23          Okay.

24          MR. LYONS:  So much for my audience, I guess, Your

25  Honor.

40

1      THE COURT:  Yeah.  Well --

2      MR. LYONS:  Your Honor, if we could, we could turn --

3  why don't we wait a few seconds, here.

4      MR. WHEATLEY:  Your Honor, Nathan Wheatley, appearing

5  on behalf of Williams Advanced Materials as part of the

6  adversary proceedings.  Am I to understand that the Court would

7  like to proceed without anyone on the telephonic line?

8      THE COURT:  I'm sorry, I didn't hear the last thing

9  you said.

10      MR. WHEATLEY:  I'm sorry, Your Honor.  Nathan

11  Wheatley.  I was appearing on behalf of my client, Williams

12  Advanced Materials, a defendant in one of the adversary

13  proceedings as part of the scheduled pretrial conferences.  I

14  wasn't sure if the Court wanted everyone off the telephonic

15  lines.  I've just been waiting for the pretrial conference on

16  my adversary proceeding.

17      THE COURT:  All right, well, I was under the

18  impression that the pretrial conferences had all been

19  adjourned.  Is that correct?  I think the gentleman was here

20  and spoke on that at the start of the hearing.

21      MR. WHEATLEY:  Your Honor, I talked with Ms. Nagefi

22  (ph.) on, I believe it was Tuesday -- I was out of the office

23  on a hearing yesterday -- and informed her that -- she informed

24  me that there was an offer to adjourn the pretrial hearing, but

25  I informed her that I wanted to go forward with the pretrial

41

1   hearing because the proposed scheduling order offered by the

2   debtors that I understand was filed yesterday is objectionable

3   to my client.

4           THE COURT:  Oh, well, I -- we have a hearing scheduled

5   in April on the pretrial order, which I understand the debtors

6   are proposing to have be applicable to all of the adversary

7   proceedings.  And given that I expect there will be responses

8   to that proposed order by more than you, and that I have the

9   hearing scheduled on that in April, that I'll deal with those

10  issues then.  I don't consider the parties bound by that order,

11  obviously, before then.  And it seems to me that to the extent

12  there is to be any discovery or other activity in the adversary

13  before that date, it should only be done on a voluntary basis

14  by the parties.

15          MR. WHEATLEY:  Very good, Your Honor.  Just as a point

16  of clarification, would you like the objection to the proposed

17  order all filed in the bankruptcy proceeding itself, or with

18  each individual --

19          THE COURT:  Yes, I think that would be best.

20          MS. COOK:  Your Honor?

21          THE COURT:  Yes.

22          MS. COOK:  Susan Cook.  I'm an attorney representing

23  another defendant, ProTech Machine.  I'm from Lambert, Leser.

24  I don't know what is happening with the communication.  I don't

25  know if Mr. Fisher is still in the court, but we didn't receive

42

1    notice that this was going to be adjourned.  We didn't receive

2    notice the last time it was going to be adjourned until

3    probably the day.  And quite frankly, they mistakenly entered a

4    default in this matter against my client.  So I don't know what

5    can be done to improve the communication, but it is definitely

6    lacking, here.

7         THE COURT:  Okay, did you file an answer?

8         MS. COOK:  Yes, yeah.

9         THE COURT:  All right.

10        MS. COOK:  We filed an answer well within the time,

11   and the response, when we finally got a hold of Mr. Fisher, was

12   he didn't really know what had happened.

13        THE COURT:  All right.

14        MS. COOK:  He didn't withdraw the request.  But

15   that -- it seems like we don't -- we're never told.  I mean,

16   I've been sitting on the line, now, and I had no idea that the

17   pretrial had been adjourned.

18        THE COURT:  Well, Mr. Fisher spoke at the beginning of

19   the hearing on the adversaries, so I'm sympathetic to your not

20   being told of the adjournment.  I don't understand why you

21   didn't speak up when he was speaking.  He's not here now.

22        MS. COOK:  I guess I didn't know that --

23        THE COURT:  I'm going to instruct --

24        MS. COOK:  I thought that the matters were being put

25   to the last part of the call, so I mistaken --

43

1          THE COURT:  No, I --

2          MS. COOK:  I guess I misunderstood what was being

3     said.

4          THE COURT:  Okay, no, I only put the claim objections

5     to the last part.  I dealt with the adversary proceedings at

6     the beginning of the hearing.

7          He's not here now.  I'll ask Mr. Lyons to speak with

8     him and also to the lawyers at Togut, Segal & Segal, the

9     conflict firm, because I'm not sure which one of them is

10    representing the debtor in your adversary, to make sure that

11    they have up-to-date lists of all of their adversary counsel

12    and that they have very clear procedures in place for notifying

13    people of any requested adjournments.

14          MS. COOK:  Thank you, Your Honor, and I do appreciate

15    your allowing me to participate by phone.

16          THE COURT:  That's no problem.  And that's generally

17    my rule for out-of-town counsel, except when they're presenting

18    evidence.  So --

19          MS. COOK:  Thank you.

20          THE COURT:  -- you just need to make the e-mail so

21    that you can get added to the call, but other than that, you

22    should assume that the request is granted.

23          MS. COOK:  Thank you, Your Honor.

24          THE COURT:  Okay.

25          MR. LYONS:  If I may ask Ms. Cook, who was her client?

1       I didn't catch the name.

2               MS. COOK:  My client is ProTech; the adversary

3       proceeding number is 07-02690.  ProTech Machine.

4               THE COURT:  Okay.  Is there anyone else on the line

5       who is on the line because of a scheduled pretrial conference

6       in an adversary proceeding, as opposed to a claim objection?

7               MR. ADAMS:  Yes, Your Honor, I'm Robert Adams in

8       Birmingham for Simco Construction, and I misunderstood, as

9       well.

10              THE COURT:  Okay.

11              MR. ADAMS:  And I apologize.  But if I'm understanding

12      now, this matter will come back before the Court on April 22nd?

13              THE COURT:  When I hear the debtors' --

14              MR. ADAMS:  Court management procedures order?

15              THE COURT:  -- case management procedures for all of

16      the adversaries.

17              MR. ADAMS:  Yes, Your Honor.

18              THE COURT:  I would urge you and the other counsel who

19      are on the phone, you have quite a while to object.  I would

20      urge you in advance of that time to reach out to the debtors'

21      counsel if you have problems with the procedures or

22      suggestions.  Based on my experience in the case with regard to

23      the claims management procedures, the debtors have been

24      prepared to make changes to omnibus procedural orders in

25      response to the other sides' comments, and obviously, if

45

1    they're not willing to, I'll hear them.  But that may well

2    narrow down some of the issues.

3            MR. ADAMS:  Thank you, Your Honor.

4            THE COURT:  Okay.

5            MS. COOK:  Thank you, Your Honor.

6            MS. REITER:  Your Honor, my name is Susan Reiter.  I'm

7    counsel for one of the adversary defendants, Blair Strip Steel

8    Company, and I was equally misunderstanding the procedure

9    today.  I did not know of the adjournment, and I have been

10   waiting on the phone, also.

11           THE COURT:  Okay, well, I will say there was a slip-

12   up, here, I think, as far as notifying you all of the

13   adjournments.  Really, when I say that there should be lists, I

14   mean, I think that, frankly, that the parties should exchange

15   their e-mail addresses and the debtors counsel should have an

16   e-mail list so they can send out notices on a ready basis to

17   everyone to make sure that there's no confusion.

18           MS. REITER:  Thank you, Your Honor.

19           THE COURT:  Okay.

20           MR. WHEATLEY:  And, Your Honor, Nathan Wheatley again.

21   Just to clarify going forward some more, am I to understand,

22   then, that any further attempts to address omnibus issues or

23   protocols for all of the adversary proceedings will be heard as

24   part of the omnibus hearing from the main bankruptcy, as

25   opposed to separate hearings for each of the adversary

46

1   proceedings?

2        THE COURT:  Yes, I mean, technically, the agenda for

3   the April -- what is it, 22nd? -- 22nd hearing will be both on

4   the main case and on the adversaries.  But I contemplate

5   entering an order that will be applicable to each of the

6   adversaries.

7        MR. WHEATLEY:  Very good, Your Honor.

8        THE COURT:  Okay.

9        All right, so why don't we proceed, then, to the claim

10  objection portion of the hearing.

11       MR. LYONS:  Yes, Your Honor.  Your Honor, the first

12  omnibus objection is the forty-fourth omnibus objection which

13  was filed and served in accordance with the claims procedure

14  order including the individual particularized notice that went

15  to all claimants.  Your Honor, this is going to be the last

16  omnibus objection that deals with prepetition claims because

17  the claims objection deadline for prepetition claims expired on

18  February 3rd.  So this is the last objection that deals with

19  prepetition claims in an omnibus matter.

20       There were a total of 136 proofs of claim, originally,

21  on the objection, plus another 207 scheduled liabilities that

22  we objected to pursuant to the plan to, in essence, object to

23  our schedules, for a total of 343 total claims and scheduled

24  liabilities.  Five claims were withdrawn from the objection,

25  and those related to, primarily, the fiduciary counselors'

47

1    claims who consensually agreed to withdraw their claims from

2    the dockets.  So those are actually now no longer -- or will no

3    longer be on the claims register.  Thirty-seven claims covered

4    by responses were filed, and then five scheduled liabilities

5    covered by responses were filed.  So there will be a total of

6    296 claims on the order which we submitted yesterday to Your

7    Honor; 94 relate to claims that have been filed totaling 78

8    million, and then 202 scheduled liabilities that were subject

9    to objection, totaling 21.7 million.

10          The bulk of the objections were just to account for

11   cure payments made during the Chapter 11 cases, and also to

12   preserve rights under 502(d) of the Bankruptcy Code relating to

13   the avoidance actions.  So that was the main purpose of the

14   omnibus objection.  I can go into some more details, Your

15   Honor, but I know at our last omnibus hearing, this was the

16   level of detail that I explained, Your Honor.

17          THE COURT:  No, I don't -- the only -- I have not had

18   a chance to look at the order.  The only issue I had was the

19   502(d) objections are obviously subject to 502(j) if, in fact,

20   either the defendant prevails or the defendant pays.  And I

21   just want to make sure the order reflects that.

22          MR. LYONS:  We will --

23          THE COURT:  That it's not a permanent disallowance.

24   It's a fairly arcane section of the Code, and I have to assume

25   that that right wouldn't be self-evident to the claimants, if

48

1   they get to the order.  So I'd like that to be clear in the

2   order.

3         MR. LYONS:  Okay, we will do so, Your Honor.  And

4   again, the purpose was to just preserve rights under 502(d).

5         THE COURT:  No, I understand, but I don't want them to

6   be confused to think that they're barred forever and that they

7   can't cure it either by paying or winning.

8         MR. LYONS:  Okay, we will recheck the order and make

9   sure that's clear, Your Honor.

10        THE COURT:  Okay.

11        MR. LYONS:  So Your Honor --

12        THE COURT:  But other than that, I will grant the

13  relief requested because, as you have now requested it, it's

14  unopposed.  There's been due and adequate individualized notice

15  on the claims procedures and the omnibus objection itself sets

16  forth a valid basis for shifting the burden back to the

17  claimant in each case, which the claimant has not taken up.  So

18  I'll grant the relief with that one change on the 502(d)

19  claims.

20        MR. LYONS:  Thank you, Your Honor.

21        Next is the forty-fifth omnibus objection, and this

22  objection covers administrative claims.  We've made a lot of

23  progress, so far, on the administrative claims, and this is the

24  next step in progressing and administering those claims.  There

25  were a total of fifty-four claims that were on this objection,

1  and actually, I misspoke before:  the five that were withdrawn

2  were actually the fiduciary counselors.  So those are now

3  withdrawn from the docket itself.  Seven claims covered by

4  responses were filed, so there are a total of forty-two

5  administrative expense claims on the order that we submitted

6  yesterday and also described in our apply.  Mostly, these

7  claims relate to duplicate claims.  There are some OPEB claims,

8  severance, transferred workers compensation claims that went

9  over to either GM or New Delphi, and then some modified and

10  allowed claims for severance and other valid administrative

11  claims.  So Your Honor, we again serve this in accordance with

12  the claims procedure order with the particularized notice, and

13  we'd ask Your Honor respectfully to enter the order.

14         THE COURT:  Okay, and these are separate than the two

15  or three admin claims that are in the contested portion that

16  are on for today?

17         MR. LYONS:  Yes.

18         THE COURT:  Okay.

19         MR. LYONS:  This only deals with --

20         THE COURT:  We never dealt with these claims before?

21         MR. LYONS:  Correct, Your Honor.

22         THE COURT:  All right.

23         MR. LYONS:  Because the second step --

24         THE COURT:  All right.

25         MR. LYONS:  -- is to notice them under the

1    procedures --

2              THE COURT:  Right.

3              MR. LYONS:   -- once they get adjourned.

4              THE COURT:  Does anyone want to address this relief?

5              Okay, I will grant the omnibus objection as modified

6    on the record to reflect that the relief that's being sought

7    and that I'm granting is uncontested.  And again, it's based

8    upon the averments in the omnibus objection which set forth a

9    valid basis to shift the burden onto the administrative

10   claimant to the extent it needs to be shift in connection with

11   an administrative claim, and the claimants have not met that

12   burden and have not opposed the relief.

13             MR. LYONS:  Thank you, Your Honor.

14             That's the last item on the omnibus hearing agenda,

15   Your Honor, so with that, the omnibus hearing is concluded,

16   unless Your Honor has anything to discuss.

17             THE COURT:  No, I don't.  So why don't we proceed,

18   then, to the sufficiency hearings and then the two evidentiary

19   hearings.

20             MR. LYONS:  Very good, Your Honor.  We are now looking

21   at the thirty-first claims hearing agenda, and a number of

22   matters have been adjourned in the agenda.  Another matter,

23   although it didn't make it onto the agenda because we filed it

24   earlier, but I understand Your Honor also adjourned the New

25   York State environmental objection.

51

1          THE COURT:  I did.  I saw your -- maybe it was you,

2     maybe it was one of your colleagues -- letter in response.

3     I -- rather than -- since the whole matter seemed to rest on

4     whether GM has assumed this obligation or not, it seemed to me

5     that it's something that's probably better dealt with a month

6     or so from now, including maybe clearing up and getting GM

7     admit that it assumed the obligation, in which case, I think it

8     would significantly reduce the amount of dispute.

9          MR. LYONS:  I'm hopeful the parties will be discussing

10    that between now and the next hearing, Your Honor.

11         THE COURT:  Okay.

12         MR. LYONS:  And hopefully that can be consensually

13    resolved.

14         THE COURT:  Okay.  But I just want to make sure,

15    there's no one on the phone on the New York State Departmental

16    of Environmental Conservation claim?  Okay.  So that's

17    adjourned to the next omnibus date.

18         MR. LYONS:  Okay, Your Honor.  With your permission,

19    I'll skip over the matters that are noted as continued or

20    adjourned in the agenda.  We would expect that all of these, or

21    at least a substantial number of these, would be reset for the

22    April 22nd hearing --

23         THE COURT:  Okay.

24         MR. LYONS:  -- to be heard.

25         THE COURT:  All right, I'm just going to ask you again

52

1    to keep in mind that -- and only you really know this best, is

2    that it's hard for me to do more than three or four that are

3    truly contested or that raise serious issues that involve

4    substantial briefing and/or development of facts.  So try to

5    keep those to about that limit.

6              MR. LYONS:  Understood, Your Honor, and if we do have

7    a need to address more of those, as in the past, we'll reach

8    out to chambers and see if there's a possible --

9              THE COURT:  You can get other dates.

10             MR. LYONS:  -- spillover date that we can get, Your

11   Honor.

12             THE COURT:  Definitely you can get other dates for

13   those.

14             MR. LYONS:  Okay, Your Honor, so I will turn, then, to

15   item 6 on the agenda, contested matters, and that's the New

16   York State matter that has been adjourned, so we'll skip over

17   that.

18             Item number 7 is the sufficiency hearing regarding

19   claims of PLA Holdings, LLC.  Your Honor, this involved pre-

20   spinoff, that is, pre-spinoff from GM, originally, back in

21   1999.  PLA has confirmed to us that it's not going to file a

22   response, and they're not going to oppose the relief that

23   we've --

24             THE COURT:  Okay.

25             MR. LYONS:  -- that we're seeking here.

53

1        THE COURT:  All right.  I -- that was a good idea of

2    theirs, because I believe that the claim objection should be

3    granted for two reasons.  First, this is -- to the extent it is

4    a claim at all, and PLA has couched it as -- clearly as a

5    contingent claim, it's a contingent and unliquidated claim for

6    reimbursement or contribution, and therefore, would be

7    disallowed under Section 502(e)(1)(B).  There's no evidence of

8    any actual loss, leaving aside the issue of whether any such

9    loss would be covered by the agreement.  But it's disallowable

10   under 502(e)(1)(B).

11       MR. LYONS:  Thank you, Your Honor.

12       The next item, item number 8, is the sufficiency

13   hearing regarding the claims of Heraeus Amersil, a.k.a. Heraeus

14   Tenevo, and Milliken & Company.  Your Honor, we did file an

15   omnibus reply in support of our sufficiency notice to expunge

16   the claim.  No response has been filed.  We have not received

17   the same kind of affirmative "we're not going to pursue this"

18   as we did from PLA.

19       THE COURT:  Okay.

20       MR. LYONS:  But nonetheless, we believe the relief is

21   warranted as this liability all occurred before the spinoff.

22   It is contingent in nature, and in any event, there is no

23   liability under CERCLA for exposure before this company ever

24   existed.

25       THE COURT:  Okay.  I will grant the objection.  The

54

1    claims and the response to the omnibus objection both make it

2    clear that these are true contingent, unliquidated claims for

3    contribution or reimbursement.  In fact they're couched as

4    claims to the extent, if any, that either Heraeus Amersil or

5    Milliken & Company may be responsible themselves and have

6    contribution claims.  So they're disallowable under Section

7    502(e)(1)(B) and the case law authority that the debtors cite

8    including In re:  Charter Company, 862 F.2d 1500 Eleventh

9    Circuit, 1989 and In re:  Hexcel, 174 B.R. 807, 813 (Bankr.

10   N.D.Cal 1994).  It seemed to me that there would only be one

11   potentially narrow circumstance where the debtors might be

12   liable under CERCLA, ever, rather than address that issue at

13   this point, and it would be under the agreement, which has not

14   been particularly briefed, with GM.  I won't address that

15   alternative basis since there's no evidence in the claim or in

16   the record -- or, in the claims or the record that any

17   liability was incurred at any time.

18          MR. LYONS:  Okay, thank you, Your Honor.

19          Next -- that is it for the environmental objections,

20   as I'll characterize them.  Item number 9 is the sufficiency

21   hearing regarding the claims of Joyce Skillman, Audrey Amort

22   Carbrera, Saundra Hamlin, Jeffrey A. Miller, Dwight L. Goodin,

23   William E. Cross, and Scott A. McBain.  Your Honor, we did file

24   the notices and served them on the parties just listed and also

25   filed a reply in support of our notice of sufficiency hearing.

55

1       It's probably easiest, Your Honor, to group these

2   claimants depending upon the nature of the claims that have

3   been filed in order to look at the individual merits of the

4   objection.  First, Your Honor, two claimants, Ms. Skillman and

5   Ms. Hamlin, these relate to qualified domestic relations

6   orders, also known as quadros, where basically, pursuant to a

7   domestic relations settlement, they were entitled to receive

8   what their other spouse received, or some portion of that.  It

9   was, in essence, an alternate payee.  That does not, of course,

10  give them any greater rights than the original payee had, and

11  since the original payee had certain OPEB claims, salaried

12  OPEB, based upon Your Honor's prior ruling, the salaried OPEB

13  claims were not vested and were terminable at will.  So when

14  the salaried OPEB was terminated, the right to receive any

15  payment under the quadros likewise ceased.  So those are the

16  two claims regarding Ms. Skillman and Ms. Hamlin.

17       THE COURT:  Okay, is there anyone present or on the

18  phone on behalf of, or is Ms. Skillman, Ms. Hamlin, or Ms.

19  Amort Carbrera on the phone?

20       Okay, I have reviewed each of their responses.  As you

21  said, they're premised upon divorce decrees -- or, child

22  support and/or divorce decrees where they have been assigned

23  the rights of their spouse under or in connection with OPEB.

24  As I previously ruled in this case, based on my review of the

25  underlying right to OPEB, the debtors had the ability to

56

1    terminate OPEB at will; that's the law of the case.  I'm not

2    going to change my view now.  And consequently, each of those

3    three claims, the Skillman, the Amort Carbrera claim, and the

4    Hamlin claim are disallowed.

5         As with the last matter, Heraeus Amersil and Milliken

6    claims, I think you should submit separate orders on these, now

7    that we've gotten to this stage of the proceeding.

8         MR. LYONS:  Okay, then we will do the same for Ms.

9    Skillman, Carbrera, and Hamlin, as well.

10        THE COURT:  Right.

11        MR. LYONS:  Okay, very good.  All right, Your Honor,

12   next is the claim of Jeffrey Miller.  Mr. Miller seeks a claim

13   relating to various restricted stock unit grants that were made

14   prepetition, as well as other stock that he had held.  In

15   addition, he had a claim for 37,000 dollars under the KECP

16   (ph.) plan.  I think, Your Honor, after further reviewing his

17   claim, we would adjourn the 37,000 dollar portion of the KECP

18   so we can investigate it and see whether he's been paid.  With

19   his remaining claims for equity, though, Your Honor, we think

20   that's rather straightforward that that is not a claim, should

21   be disallowed, and at a minimum, possible, a 510(b)

22   subordinated claim that's -- won't get distribution.

23        THE COURT:  But the plan classifies those types of

24   claims, 510(b) claims, and provides for their treatment, right?

25        MR. LYONS:  Correct.  I don't think Mr. Miller's has

1    asserted any kind of fraud in the purchaser sale, though.   I

2    think his claims really are just equity interest that would

3    be --

4              THE COURT:   That's true.

5              MR. LYONS:   -- technically not a proof of claim and

6    should be expunged.

7              THE COURT:   Okay.  All right.  Mr. Miller, or you on

8    the phone, or is anyone here on his behalf?

9              All right, the debtors have done what I was going to

10   recommend.  It seemed to me the KECP claim, to the extent it's

11   not satisfied, is a claim.  And I'm happy to adjourn that

12   matter so you can see whether it's been dealt with.  The

13   remaining portion of the claim which is premised upon an

14   alleged oral agreement to continue to work with "New Delphi"

15   and a right to stock grants and options, I will disallow.  If,

16   to the extent that the oral agreement is solely to have stock

17   grants and options, that's an equity right, not a claim.  And I

18   also believe that the existence of such an agreement, as

19   alleged, is too amorphous or vague, given the circumstances

20   during which it was made, to be enforceable.  So that would be

21   an alternative basis for disallowing the claim.

22             MR. LYONS:   Thank you, Your Honor.

23             The claim of Dwight L. Goodin, Your Honor, this is

24   what we would believe to be a duplicate administrative claim.

25             THE COURT:   And I think he's agreed with you.  As I

58

1    read -- Mr. Goodin, are you on the phone?  As I read his

2    response, he acknowledges that he entered into a settlement

3    with the debtors for 400 -- same amount -- 409,000, and that he

4    filed the admin claim before then.  He wasn't sure whether he

5    had a deal.  But I think he acknowledges that this is a

6    duplicate of the unsecured claim under the settlement, and

7    moreover, he waived his other rights as part of the settlement.

8    So the admin claim should be disallowed as, A, not entitled to

9    admin treatment, but B, because as an unsecured claim, it's

10   duplicative of the other claim.

11        MR. LYONS:  Very good.  So the order will expunge the

12   admin claim, which he agrees.

13        THE COURT:  Yes.  Yeah, because he has the other

14   claim.

15        MR. LYONS:  Correct.  The next is William E. Cross.

16   This is an individual who, again, believes he's entitled to

17   OPEB, certain OPEB pursuant to a settlement agreement.  We have

18   not been able to locate any settlement agreement.  He did not

19   attach it to his proof of claim.  But, certainly, there's no

20   proof here that somehow Delphi modified its rights to terminate

21   the salaried OPEB for any reason.  So on that basis, Your

22   Honor, we believe that claim should be expunged.

23        THE COURT:  Okay.  Is there anyone here on behalf of

24   Mr. Cross, or is Mr. Cross on the phone?

25        Let me just -- I don't believe he -- what number is

1    this under?  This is under 6?

2             MR. LYONS:  On the agenda, Your Honor?

3             THE COURT:  No -- yes, I'm sorry.

4             MR. LYONS:  It's item number 9.

5             THE COURT:  Excuse me.

6             Yes, he attaches the settlement agreement, but that

7    merely entitles him to participation in the OPEB.  It doesn't

8    change the terms of the OPEB.  So consistent with my ruling

9    earlier in the case, what he received was a right to OPEB so

10   long as the debtors kept it in place.  And the debtors had the

11   right to terminate it without creating a claim for future

12   benefits, so -- and I took his claim to be one for future

13   benefits, not for amounts that were accrued before the

14   termination.  So the claim should be disallowed on the basis of

15   the lack of a right to OPEB after the debtors terminated the

16   plan.

17            MR. LYONS:  Okay, Your Honor.  And then the last one

18   is Mr. Scott McBain.  And he put a claim in for the U.S.

19   Executive Recognition Grant.  That was waived under the express

20   terms of the KECP when he participated in that, so that claim

21   has been waived.

22            THE COURT:  Right.  Is Mr. McBain on the phone, or

23   anyone on his behalf, or present?

24            All right, the debtors attach the waiver, which is

25   attached as Exhibit C, where he clearly did waive this right in

60

1    return for the KECP.  So in light of that, I'll grant the

2    objection.

3            MR. LYONS:  Item number 10, Your Honor, is the

4    sufficiency hearing regarding claims filed by FHBC America

5    which were subsequently transferred to Contrarian Funds.  The

6    FHBC proof of claim number is 6991, and another proof of claim

7    which we believe to be the -- will be the surviving claim is

8    16386.  These are duplicate claims, and in fact, the claim

9    16386 was fully satisfied by cure and has already been expunged

10   on the basis of that; 6991 is a mere duplicate of that.  And on

11   that basis, Your Honor, we would request Your Honor to expunge

12   6991, as well.

13           THE COURT:  Okay.  I guess that leaves open who was

14   entitled to the payment -- the cure payment.  But because

15   Contrarian says it was assigned -- 16386 was assigned to it.

16   But given the cure payment, the debtor shouldn't be responsible

17   for it.  So the order should reflect that the claims -- I'm

18   sorry, that 16 -- I'm sorry, that 6991 is expunged as

19   duplicative of 16386, and that any rights as between Contrarian

20   and its assignor in respect of that claim are preserved as

21   between those parties.

22           MR. LYONS:  Okay.

23           THE COURT:  And I'm sorry, 16386, are you seeking that

24   that be disallowed now, or --

25           MR. LYONS:  No, that's already been disallowed.

61

1          THE COURT:  It's already been disallowed.

2          MR. LYONS:  Right.

3          THE COURT:  Because -- right, okay.

4          MR. LYONS:  6991 was just a duplicate claim --

5          THE COURT:  Right.

6          MR. LYONS:  -- that was still on the register.

7          THE COURT:  Okay, fine.

8          MR. LYONS:  We will add that language.

9          THE COURT:  And then there was this other one, which I

10   think -- 14878 -- it doesn't -- there's no -- Contrarian

11   doesn't oppose of the disallowance of 14878, so I guess that

12   should be in the order, too, right, since it was duplicative of

13   16447?

14         MR. LYONS:  Your Honor, I need to check that.

15         THE COURT:  Maybe that's already been dealt with in an

16   omnibus?  I'm not sure.

17         MR. LYONS:  I believe it has, Your Honor.

18         THE COURT:  Because in the reply, Contrarian says we

19   don't dispute that that should be disallowed.  You should just

20   go back and check to see if it's already been dealt with in the

21   omnibus order.

22         MR. LYONS:  I'll check.  I suspect it is because the

23   time Contrarian filed its --

24         THE COURT:  Right.

25         MR. LYONS:  -- reply --

62

1           THE COURT:  Would be --

2           MR. LYONS:  -- it was before we paid the cur.

3           THE COURT:  The order would have come out after that.

4           MR. LYONS:  Okay, Your Honor, item number 11, moving

5    on, we have the sufficiency claims of Michael Potter and Lance

6    Weber.  Your Honor, they have asserted claims for the loss --

7    primarily for the loss and value of their shares of stock.

8    They also allude to certain wrongdoing in connection with the

9    purchase and sale.  Your Honor, I guess this might fall into

10   the category that we were discussing earlier, whether, you

11   know, is it truly a claim on behalf of equity, or is it a claim

12   based upon -- in connection with the purchase of the equity and

13   alleging wrongdoing, which, of course, is subordinated under

14   510(b).

15          THE COURT:  And also separately treated under the

16   plan.

17          MR. LYONS:  And separately treated under the plan.  I

18   guess -- pardon me, Your Honor -- if we could -- perhaps in the

19   order, just to give us comfort, to say that either they are

20   claims on behalf of equity, which are disallowed, or would be

21   subordinated under 510(b) so at least we have the

22   classification clear for purposes of the plan.

23          THE COURT:  Right.  I mean, frankly, I don't think

24   they set forth a claim anyway, but conceivably, they might have

25   a right to amend the claim to state the fraud with sufficient

63

1    particularity.  But I will -- to the extent the claim is based

2    on an equity interest, it's disallowed as an equity interest.

3    To the extent it's premised upon a claim based upon the

4    purchase or sale of stock, which would be the only alternative

5    basis for the claim, it's subordinated under Section 510(b),

6    and the claim, it is relegated to the treatment of such claims

7    under the plan, pursuant to 1141(d).

8           MR. LYONS:  Very good.

9           THE COURT:  And those -- there would be no other

10   aspect to this claim.  Those are the only two conceivable bases

11   for the claim.

12          MR. LYONS:  Right, and we'll make note in the claims

13   register because this may -- to just clearly that it'll be in a

14   510(b) provisional category for now, which, of course, would

15   not get a distribution.

16          THE COURT:  Okay.

17          MR. LYONS:  Your Honor, we have three remaining

18   matters, and I'm not sure which order you'd like to take them.

19   We have the splinter unions matter.  I know we had briefed that

20   per Your Honor's --

21          THE COURT:  I would like to take Mr. Dettinger, and

22   then Mr. Gardner, and then the unions.

23          MR. LYONS:  Very good.  Your Honor, Mr. Dettinger

24   filed his response.  This is an evidentiary matter since it

25   deals with -- well, you know, honestly, Your Honor, it could

1    very well be a sufficiency matter, as I think through it,

2    because there is no dispute as to the SERP amount.  Mr.

3    Dettinger agreed to the SERP amount of 289,538.  He filed an

4    administrative claim because he believes that that amount

5    reached in settlement of the SERP claim, which, of course, is a

6    prepetition program, should be entitled to administrative

7    priority.  Although that certainly was our hope when we had the

8    first original plan, circumstances changes and no longer

9    allowed the estate to pay SERP claims.

10           THE COURT:  But doesn't the settlement agreement

11   provide there would be a general unsecured claim?

12           MR. LYONS:  It does, Your Honor, and he even states as

13   much in his response.

14           THE COURT:  Okay.

15           MR. LYONS:  So Your Honor, we would request that his

16   administrative claim for 289,538 be expunged.  And of course,

17   he would still keep his prepetition unsecured claim in that

18   amount.

19           THE COURT:  Mr. Dettinger, are you on the phone?

20           MR. DETTINGER:  Yes, I am, Your Honor.

21           THE COURT:  Okay.

22           MR. DETTINGER:  Robert Dettinger.

23           THE COURT:  Okay.  I do note that the -- it's

24   undisputed that the settlement agreement dealing with the SERP

25   states that the $289,538.39 amount is a general unsecured

65

1    claim.

2            MR. DETTINGER:  That's correct, Your Honor.

3            THE COURT:  Since your claim is premised upon that

4    agreement, it seems to me that that would be the treatment of

5    the claim, as a general unsecured claim.

6            MR. DETTINGER:  Well, one additional, if I could

7    speak, Your Honor?

8            THE COURT:  Sure.

9            MR. DETTINGER:  I'm basing my entire claim, here --

10   and it is a repeat of -- my number of 17863 is a repeat of

11   16722, which was adjudicated to the 289,000 aforementioned.

12   But I'm basing my entire evidentiary hearing on the letter of

13   February the 5th, 2009, which states emphatically that Delphi

14   has a right to terminate SERP, which they do, and they did

15   terminate, as you know, last April.  But they said they

16   would -- this termination of SERP would not affect the

17   settlement which would, apparently, as I investigated it

18   further by talking to Debra Alexander of Delphi, at the time,

19   said that the amount would be paid at the exit of bankruptcy.

20   And so what I'm saying is that, in effect, was -- whether it

21   was a contract of adhesion or a promise or whatever it was,

22   obviously, they did the first part in the letter.  They stopped

23   SERP.  But they never paid the settlement.

24           THE COURT:  But this --

25           MR. DETTINGER:  And so that's what I'm basing my claim

1    on.

2         THE COURT:  But the settlement doesn't say that it

3    will be paid in cash, right?  It just says it will be treated

4    as an unsecured --

5         MR. DETTINGER:  It -- it was -- yeah, that's what it

6    says in, I think, in the court documents.  When I did talk to

7    Delphi at the time, it was said that it would be paid in cash

8    and stock at the time.  They did not know what the formula

9    would be; that would be in the final plan.

10        THE COURT:  Okay, see, Mr. Dettinger, it's -- the

11   premise for the settlement is a prepetition right under the

12   SERP.  And I, frankly, wouldn't have approved the settlements

13   if it elevated those rights into administrative claims.  the

14   difference between a general unsecured and administrative

15   claim, among other things, is that an administrative claim, as

16   long as the case stays in Chapter 11, has to get paid -- it

17   must get paid in cash in full on the effective date of a plan,

18   where as a general unsecured claim gets paid only what general

19   unsecured creditors get paid, and as you've said, that may be

20   cash, it may be stock.  It depends on what the plan provides.

21   And as I said, I would not have elevated a general unsecured

22   claim based on a prepetition agreement to admin claim status

23   and I don't think the agreement does that.

24        So consistent with the terms of the agreement, and

25   frankly, consistent with what you just told me, the bargain was

1    that the 289,000 would be treated as a general unsecured claim;

2    the amount would be fixed and it would get what general

3    unsecured creditors get in the case.  It was hoped, of course,

4    that they would get payment in full in cash or cash plus stock

5    that would be equivalent to payment in full.  But there was

6    never an agreement to pay unsecured claims in full in that way.

7         So I believe the debtors' objection is appropriate and

8    that you claim to $289,538.39 should be allowed, but allowed as

9    a general unsecured claim.

10        MR. DETTINGER:  Just one question, Your Honor, and

11   that's all I have.  Both you have just stated, and also the

12   lawyer stated previously that this was a prepetition claim, but

13   prepetition, I was paid a monthly SERP allotment, which was

14   like thirty-three percent and was a wage -- it was a pension,

15   according to the IRS.  But the 289,000 was done postpetition.

16   It was basically a buy-out, if you want to call it that.

17        THE COURT:  Right.  But it's premised upon a

18   prepetition agreement, and the case law is clear that even

19   though performance may become due on a contract after the

20   filing of the bankruptcy case, the claim based upon the breach

21   of that contract is viewed as a prepetition claim if the

22   contract itself was prepetition.  The fact of the breach

23   doesn't change the nature of the claim.

24        MR. DETTINGER:  I understand, Your Honor.

25        THE COURT:  Okay.

68

1        MR. DETTINGER:  So it'll still stand as an unsecured

2    claim, then?

3        THE COURT:  Yes.

4        MR. DETTINGER:  Okay.

5        THE COURT:  Yeah, and the order will reflect it's --

6        MR. DETTINGER:  Then I'll withdraw my administrative

7    claim.

8        THE COURT:  Okay, very well.  The order will reflect

9    that it's -- that the claims docket will reflect that the

10   claims' allowed as a general unsecured claim and the other

11   claim is withdrawn.  Okay, thank you.

12       MR. DETTINGER:  Okay, thank you, Your Honor.  I can

13   sign off, now?

14       THE COURT:  Yes.

15       MR. DETTINGER:  Okay, thank you.

16       THE COURT:  Thanks.

17       MR. LYONS:  Okay, the next matter is the sufficiency

18   objection regarding Mr. Gardner.  And that's item number 16 on

19   the agenda.  Mr. Gardner asserts that the debtors' offer --

20   that the debtors made an offer -- a binding offer of 800,000

21   dollars as reflected in an e-mail.  Your Honor, I think it's

22   pretty clear from the e-mail, it was a cap, not an allowed

23   amount, as we were working toward the target, as Your Honor

24   recalls, back in January of 2008.  We actually capped a lot of

25   claims because we were going to deal with those later; get a

1    cap and then move on.  So Your Honor, I think that assertion

2    can be quickly disposed of.

3          As to the calculation of the claim, we have Mr.

4    Unrue's declaration which explains how we calculated the claim.

5    I do have an additional supplemental proffer from Mr. Unrue to

6    give you precise details on exactly --

7          THE COURT:  Okay, I think I'll need that because the

8    declaration just says we did a good job.

9          MR. LYONS:  -- use the methodology.

10         THE COURT:  Right.

11         MR. LYONS:  So Your Honor, let me address that first,

12   and I'll give you a supplemental proffer.  Mr. Unrue's here --

13         THE COURT:  Okay.

14         MR. LYONS:  -- subject to cross-examination.  I

15   guess --

16         THE COURT:  Let me just make sure -- Mr. Gardner, are

17   you on the phone?  No, okay.

18         MR. LYONS:  Your Honor, if called as a witness, Mr.

19   Unrue would testify as follows.  As noted in our pleadings and

20   in my declaration, the amount of SERP benefits for each SERP

21   eligible retiree was calculated at the direction of the debtors

22   by Watson Wyatt, a firm that provides, among other things,

23   professional actuarial services, in accordance with provisions

24   in the SERP and in accordance with GAAP.

25         In my capacity as claims administrator with past

70

1    experience in financial accounting, I'm familiar with the

2    methodology used by Watson Wyatt and believe it to be accurate.

3    Specifically, the calculations were made by determining the

4    present value amount of each retiree's -- eligible retiree's

5    remaining SERP benefits as of November 1st, 2005.  That's the

6    first day of the first full month after the petition date.  The

7    present value of November 1st, 2005 was calculated based upon

8    two factors commonly used in actuarial calculations:  number

9    one, the expected mortality of the SERP claimant whose lump sum

10   benefits are being calculated, and two, the interest rate to be

11   used for discounting future payments.

12         Mortality was calculated using the 1994 uninsured

13   pensioner mortality table, UP-94, which was developed by the

14   Society of Actuaries.  I understand this mortality table is --

15   or, Mr. Unrue would testify that his understanding is that this

16   mortality table is commonly used to perform actuarial

17   calculations.

18         The discount rate was calculated using a common

19   actuarial method for determining the discount rate for lump sum

20   pension payments.  In particular, the interest rate on thirty

21   year Treasury bills, specifically the average daily rate for

22   each day in the month of July, proceeding the day on which the

23   lump sum was calculated.

24         So again, they use the T bill, thirty-year T bill for

25   the interest rate and the mortality table developed by the

1    Society of Actuaries to determine mortality.

2         The present value was then reduced by the amounts of

3    any monthly SERP payments made after the petition date through

4    March 1st, 2008 when SERP payments were stopped.  The amount in

5    Mr. Unrue's declaration, 580,203 dollars is the calculated

6    value of Mr. Gardner's SERP claim using the above methodology.

7         And this is the same methodology that was used for all

8    of the other SERP claims, as well, all of whom, except for Mr.

9    Gardner and I believe one other didn't accept the number.

10        THE COURT:  Okay.

11        MR. LYONS:  So Mr. Unrue believes, based upon his

12   financial experience and also his -- in his role as claims

13   administrator that these calculations are reasonable.

14        THE COURT:  Well, this is a question for either you or

15   Mr. Unrue.  I looked at the basis for Mr. Gardner's

16   calculation, and it was pretty clear to me that it was premised

17   upon the cost to him of obtaining an annuity that would provide

18   the same income stream.  Am I right about that?  I mean,

19   they're basically two fundamentally different methods of

20   calculating the amount, here.  One is the present value of the

21   claim, and the other is the cost to the debtor of replacing the

22   present -- the value of the claim.

23        MR. LYONS:  Well, again, Your Honor, I've seen in

24   other -- when you look at trying to calculate a rejection

25   claim, for example, or in this case, a SERP claim.  I mean, the

72

1    cost of annuity embeds a lot of other factors and data

2    including the profit margin --

3        THE COURT:  Well, there's a profit involved.

4        MR. LYONS:  Yeah, which is not insubstantial, one

5    could imagine, as well as some of the risk, you know, who

6    should bear the risk of any kind of investment loss.

7        THE COURT:  Right.

8        MR. LYONS:  Under a pension plan, that's really borne

9    by the administrator, whereas in an annuity, that's shifted to

10   the people who are buying the annuity.  Then they pay a higher

11   price for a guaranteed stream of payments.  But again, you

12   know, there is no real -- the methodology in which the annuity

13   price is calculated is not really evident at all, and I think

14   it is a very fair assumption, again, the cost of overhead, cost

15   of administration, and probably a healthy profit margin are

16   built into that calculation which skews the amount of the

17   claim.

18       THE COURT:  Okay.  I actually think that Mr. Gardner

19   gave the right information to the two firms that calculated the

20   cost of the annuity, but I also believe that that's not the

21   proper way to measure the damages, here.  I think the damages

22   are the amount that he would otherwise have received from the

23   debtors on a present value basis.  And based on the proffer,

24   including the rate used, which I believe is a reasonably low

25   rate, that the debtors calculation of damages is not only the

73

1   proper approach to calculating damage but it's also a

2   reasonable and appropriate methodology for doing so.  So I'll

3   disallow the claim to the extent it asserts a claim above

4   $580,203.73.  I agree with you that based on the e-mail that

5   was attached to the objection -- or, the response by Mr.

6   Gardner, there was no agreement by the debtor to cap -- I'm

7   sorry, to allow the claim at 800,000 dollars.  But at most,

8   even though the e-mail doesn't suggest this, it was an

9   agreement to cap the claim subject to further litigation at

10   800,000 dollars, i.e., it was Mr. Gardner's agreement to cap

11   the claim at 800,000 dollars, but, again, subject to the

12   debtors' rights to assert the claim was less than 800,000

13   dollars.

14        MR. LYONS:  Thank you, Your Honor.

15        The sole remaining matter on the agenda is the

16   splinter unions matter, and I believe the way we left it is we

17   did our supplemental briefing, and if Your Honor had any need

18   for further argument or had any questions, we would make

19   ourselves available.

20        THE COURT:  Okay, and do I have counsel for the unions

21   on the phone?

22        MS. ROBBINS:  Yes, Your Honor.  Marianne Robbins

23   appearing for the IAM and the IBW.

24        MS. MEHLSACK:  And Barbara Mehlsack, Your Honor, for

25   the operating engineers.

74

1          THE COURT:  Okay, I appreciate the extra briefing.

2     Among other things, I think it clarified that the only

3     remaining claim is premised upon the fact pattern of a claim

4     that's for the nonguaranteed pension benefits, that the pension

5     benefits are not being picked up by PBGC?

6          MS. ROBBINS:  That's correct, Your Honor.

7          THE COURT:  Okay.

8          MS. ROBBINS:  It's premised on the nonguaranteed

9     benefits --

10          THE COURT:  Okay.

11          MS. ROBBINS:  -- reduced benefits.

12          THE COURT:  Right, the reduced amount of benefits.

13     Now, on that score, as I see it, there are two grounds for the

14     reduced benefit claim.  The first is that the collective

15     bargaining agreement as modified by the MOU gives rise to such

16     a claim itself.  It's a claim for breach of the collective

17     bargaining agreement.  And the second is that even if it

18     doesn't, there is a breach of fiduciary duty claim.  Is that a

19     fair summary?

20          MS. ROBBINS:  That is, Your Honor.

21          MS. MEHLSACK:  Yes, Your Honor.

22          THE COURT:  Okay, on the first point, on the breach of

23     collective bargaining agreement, the debtors contend that the

24     agreement contemplates the termination of the plan, and that

25     the claim for the reduced pension benefits or the nonguaranteed

75

1    benefits is caused by the termination of the plan.  I think

2    that was most clearly raised in the debtors' reply brief, so I

3    just wanted to give both of you a chance to respond to that

4    argument.

5              MS. ROBBINS:  Your Honor, I would be glad to respond

6    to that.  It seems to me that there are very clear provisions

7    here as to what pension benefits would be provided.  Now, in

8    agreeing that the employer could terminate, we do not think

9    that was meaning that the employer did not have -- that the

10   unions did not have a claim for the reduction in benefits that

11   would result.  I think the clearest way that I can say that is

12   that everybody understands when they sign an agreement --

13   execute an agreement that there may be circumstances in which

14   the performance that's promised does not occur as planned.  But

15   everybody also understands that in that situation, if there are

16   damages incurred because there has been a promise to provide

17   those benefits, there is a claim for those damages, and I think

18   that that is all that was being said.  Yes, there could be a

19   termination, but there was no provision that if there was a

20   termination, since these benefits had been promised both

21   postpetition as well as prepetition that there would not be a

22   claim for the reduction in benefits.  We think it's very

23   significant that the release was very clear that the release

24   did not apply to pension benefits and that excluded from the

25   release was any benefit that was provided by the agreement.

76

1     And so we think it's very clear that the intent was that these

2     were the benefits to be provided.  And if, by chance, something

3     happened and they were not provided, that the claims that would

4     result were not released.

5          THE COURT:  Okay.  Let me -- and Ms. Mehlsack, you can

6     chime in, too, but -- and also Mr. Lyons on this point in a

7     second.  Let me turn to the sentence that precedes the sentence

8     that says that the union agrees that Delphi reserves its right

9     to seek termination of the pension plan, which says that the

10    Delphi HRP -- I'm sorry, "Delphi will cause the frozen Delphi

11    HRP to pay benefits in accordance with the terms of the Delphi

12    HRP and applicable law".  And here's the sentence I want to

13    focus on:  "These benefits will not be reduced from the levels

14    in effect as of the date immediately preceding the effective

15    date unless they are similarly reduced for other retired Delphi

16    HRP participants."  So my question is, assuming I agree with

17    you for the moment that the union's giving Delphi a reservation

18    of the right to seek to terminate the plan doesn't alter a

19    contractual obligation to provide HRP benefits, it just creates

20    a claim that's created by the termination.  How -- what is the

21    response to the notion that the obligation to provide the

22    benefits is contingent upon -- or is one unless they're

23    similarly reduced for other retired Delphi HRP participants.

24    Where did Delphi reduce the benefits disproportionately?

25         MS. ROBBINS:  Well, Your Honor, looking at that

1    provision, first we would note that that provision does not

2    address, specifically, a termination.  It talks about a benefit

3    reduction, not a termination.

4            THE COURT:  No, I understand, but --

5            MS. ROBBINS:  I'm sorry.

6            THE COURT:  But I think your earlier --- the argument

7    you just made is that notwithstanding a termination, we still

8    have a claim under this section.

9            MS. ROBBINS:  Yes, and I would like to address that

10   now.

11           THE COURT:  Okay.

12           MS. ROBBINS:  I think from the unions' perspective,

13   what that language meant was really that there could be -- and

14   I can think of at least two ways that this could happen outside

15   of a termination.  Let's say Delphi, instead of terminating the

16   plan, realized that the benefits would not be as great or could

17   not be as great as they currently were, but that by not

18   terminating the plan, there would be another arrangement which

19   would be equitable to all concerned that would not be at the

20   current level but would be at a level that was equitable for

21   everyone, and that that was a circumstance where a reduction in

22   benefits could occur.  Now, one of the ways that that could

23   have occurred would be by transferring some of pension benefits

24   to General Motors, and having a reduction that would apply to

25   General Motors and the Delphi people equitably so that -- I'm

78

1    just throwing out numbers -- instead of a hundred cents on the

2    dollar, everybody would experience the reduced eighty cents on

3    the dollar.  But the idea was that everyone who was a

4    participant in the Delphi program would be getting exactly the

5    same benefit -- I mean, years of service, but it would be

6    calculated on the same formulas.  Everybody would be similarly

7    disadvantaged.  Regardless of what we all knew was going on,

8    which was that there were other parties in play.  It certainly

9    did not mean that there could be a termination and people would

10   be treated differently because some people would be transferred

11   or some people would get guarantees and others wouldn't.  It

12   was saying, listen, if we find a way out of this that's going

13   mean some reduction and it's equitably shared by everybody in

14   the world that's covered by this plan, that could happen.

15           MS. MEHLSACK:  Your Honor, also, the language of the

16   agreement speaks to benefits being similarly reduced for other

17   retirees.  It really doesn't say who and how those benefits may

18   be reduced.  It contemplates a consequence, regardless of who

19   the actors are and how the reduction comes into play.  There's

20   also two things that are being promised in the MOUs.  One is a

21   certain level of benefits, including supplemental benefits that

22   are effectively, in the context of a termination would be

23   nonguaranteed benefits, and the second is an equitable level of

24   potential reductions, however those reductions may come about.

25   And it's both those promises that come into play and that we

1    assert are being breached and leave us with a claim.  That is,

2    it's not inconsistent with the notion that the plan is going to

3    be terminated to say that if it is terminated and there is a

4    loss of benefits expressly promised in the MOU or a failure to

5    result in an equitable reduction, that there remains in place a

6    claim for those breaches.

7        THE COURT:  Well, let -- I understand what both of you

8    have been saying.  I want to explore one point, though, in a

9    little more detail, which is is there anything that Delphi did

10   to disproportionately reduce the benefits for your union

11   members in contrast to other participants in the HRP?

12       MS. ROBBINS:  They terminated the plan with specific

13   provision for every other group of individuals other than our

14   group such that the benefits levels were not reduced, in

15   effect -- were not reduced equitably, similarly reduced for

16   others as they were for our individuals -- our participants.

17   And that is documented in the PBGC settlement.

18       THE COURT:  But let me ask --

19       MS. ROBBINS:  The settlement may be appropriate, or

20   maybe has already been approved, but it certainly placed our

21   participants in a different circumstance than the other

22   participants.

23       THE COURT:  But let me ask you, what is it that Delphi

24   did to do that as opposed to GM or the PBGC?

25       MS. ROBBINS:  It entered that agreement, among other

80

1    things.

2         MS. MEHLSACK:  And I think, Your Honor, this

3    effectively shades off into the fiduciary duty claim, as well.

4    So I don't think it's possible to separate out all of the

5    aspects of the transactions involved.  And even though those

6    transactions may have been, from a settler perspective,

7    appropriate business decisions, they nonetheless, from the

8    fiduciary perspective, we believe, breaches.  And that goes

9    to --

10        THE COURT:  Okay, no, I want to -- I'll get to that,

11   and I agree with you, I think it does transition into that

12   second level of claim, but I want to make sure I've covered the

13   contract issues, first.

14        MS. ROBBINS:  The conduct is a combination of agreeing

15   to -- a claim for -- the PBGC's claim for money from Delphi

16   through the plan is the claim for money that could go to pay

17   both guaranteed benefits and nonguaranteed benefits.

18        THE COURT:  Right.

19        MS. ROBBINS:  The agreement was to give -- the

20   agreement was that that claim would be reduced by fifty percent

21   at the same time as there is an agreement that there will be

22   nonguaranteed be -- there will be transfers made of certain

23   participants' assets and liabilities.  There will be

24   nonguaranteed benefits that will be paid to similarly-situated

25   participants, while leaving the participants that the splinter

1    unions represent without those guaranteed benefits.  So it's

2    the combination of those acts that go to the breach of the

3    MOUs.  I don't think you can view it as any single act.  There

4    is not a, in fact, the MOU contemplates plan termination.  Now,

5    there are two kinds of plan terminations.  If Delphi had

6    actually voluntarily terminated the plan, it could not do that

7    without contemplation -- without dealing with the collective

8    bargaining agreement obligation.  But in fact, what happened

9    here was -- admittedly, the PBGC went into the district court

10   and fought an order of termination.  And that is contemplated

11   by the MOU.

12        So it's the combination of acts that led to the two

13   consequences:  the supplemental benefits, the nonguaranteed

14   benefits not being paid to a group of similarly-situated

15   participants while they are being paid to another group of

16   similarly-situated participants, an agreement to give up on

17   behalf of the plan claims that could have resulted in the group

18   of participants who are not getting their nonguaranteed

19   benefits paid through GM, there being enough money in the plan

20   to pay those nonguaranteed benefits, and now there is not

21   enough money in the plan.  So that's the combination of conduct

22   that --

23        THE COURT:  Well, I was sort of following you until

24   the last point.  I didn't really under -- can I walk through it

25   and let me see if I summarize what you're saying correctly.

82

1    You're saying that the breach of this second sentence of

2    paragraph 2(b) of the MOU, which is, "These benefits will not

3    be reduced from the levels in effect as of the date immediately

4    preceding the effective date unless they're similarly reduced

5    for other retired HRP participants," you're saying that Delphi

6    breached that provision by entering into the PBGC settlement

7    agreement which provided for or contemplated the transfer of

8    some HRP participants but not your clients, or not your union

9    members, to the GM plans, and as a result of that transfer,

10   those people got more in respect of the nonguaranteed portion.

11   Is that right?

12            And then secondly -- and this is where I didn't follow

13   your argument -- that Delphi's having not funded the plan more

14   breached the agreement.

15            MS. ROBBINS:  Your Honor, if I could elaborate on both

16   of those points.

17            THE COURT:  Okay.

18            MS. ROBBINS:  First of all, on the last point, the

19   PBGC settlement provides in the preamble that it's acknowledged

20   that the PBGC is entitled to a seven billion dollar unsecured

21   claim.  But that same provision says that the only general

22   unsecured claim that the PBGC will get from Delphi is a three

23   billion dollar claim, an allowed three billion dollar claim,

24   even though it was entitled to a seven billion dollar claim.

25            THE COURT:  Right.

83

1      MS. ROBBINS:  So that is one part of the agreement

2  that Delphi made that basically put it in a position where it

3  knew that individuals were going to have benefits that were

4  reduced dissimilarly.

5      THE COURT:  But why would it -- I'm sorry, why would

6  it be dissimilarly.  I guess that's --

7      MS. ROBBINS:  I think that that goes to two items.

8  One is the provisions for transferring liability from Delphi to

9  General Motors, which occurred in a number of circumstances

10 post the agreement, and basically, created a circumstance where

11 some people would get full benefits.  Delphi participants would

12 get full benefits, and others would not.  In addition to that,

13 there is the acknowledgement in the PBGC settlement of benefit

14 guarantees, which again provide some Delphi participants will

15 get full benefits, and others will not.

16     THE COURT:  Explain the latter point to me.  I'm not

17 sure I follow that.

18     MS. ROBBINS:  The PBGC settlement provides references

19 to the pension benefit guarantee.  At the same time, as Ms.

20 Mehlsack indicated, at the same time that the contribution --

21 or, the general unsecured claim for Delphi participants is

22 being reduced, there is an acknowledgement and a maintenance of

23 the cross-claims of the PBGC and Delphi and GM to support the

24 pension benefit guarantee.  So what you have is a circumstance

25 where you're reducing the funds that are available to people

84

1    who are not transferred to General Motors, and also do not have

2    the pension guarantee.  And you're at the same time reducing

3    the funds that are available for the people left behind because

4    you're not getting the seven billion; you're getting the three

5    billion.  That's a general unsecured claim.  You know, it's not

6    necessarily a hundred cents on the dollar, but you basically,

7    instead of providing as much as a participation as there should

8    have been, you've reduced that.

9         THE COURT:  But let me -- but if you're moving most of

10   the people to GM, doesn't that reduce PBGC's claim because GM's

11   picking up that -- that plan's picking up the responsibility?

12        MS. ROBBINS:  Your Honor, I have not seen a full

13   accounting of everything that went on, but what everybody had

14   to understand from that entire transaction is that the people

15   left behind in the Delphi hourly plan were not going to be

16   treated similarly to the people who were transferring and the

17   people who were getting the benefit guarantee.  So this

18   agreement was reached in the context of basically breaching our

19   provision that the reduction would only happen if everybody's

20   benefit was similarly reduced.

21        THE COURT:  But I guess the question I have, here, and

22   it's just a matter of interpreting this provision, it's the

23   reduction of benefits under the Delphi HRP plan, right?  It's

24   not a reduction of benefits, generally.  So, I mean --

25        MS. ROBBINS:  No, it doesn't say that.  It says

85

1    similarly reduced for other retired Delphi HRP participants.

2    It doesn't say, as Ms. Mehlsack indicated, it does not say that

3    the benefits are the benefits coming from the Delphi HRP.  It's

4    talking about the --

5         THE COURT:  Well, it says -- I'm sorry, it say "these

6    benefits".

7         MS. MEHLSACK:  Your Honor, it's correct.  It's the

8    benefits -- the level of benefits we're talking about are those

9    that are provided under the plan.  But also, the MOU is very

10   specific that Delphi is promising the splinter unions that

11   those benefits that we know the PBGC characterizes under the

12   statute as nonguaranteed benefits will be paid.  So that the

13   provision that says benefits shall not be reduced for one group

14   unless they're being reduced for another contemplates the level

15   that's being promised, originally defined by the HRP, but then

16   by the MOU explicitly promised by Delphi that we're going to

17   keep these benefits -- your -- the people that you represent

18   are going to be able to maintain their benefits at

19   nonguaranteed benefit levels.  It talks about -- there are

20   several provisions and not just the supplemental benefit that

21   lasts until age sixty-two, but the promise that there will be

22   certain accruals that will continue so that all of those -- it

23   is not -- it is the benefits at the level in the HRP as of a

24   certain date, but the sentence that says, "Benefit shall not be

25   reduced for one group unless reduced for another" is -- however

86

1    that -- the concept is not necessarily that Delphi is going to

2    say, all right, we're reducing benefits in the HRP, but that

3    whatever conduct occurs, if it results in a reduction for one

4    group and not another, constitutes a breach of that provision.

5    I don't know if that helps, Your Honor.  That is our

6    understanding of what that agreement means.  In other words, if

7    Delphi doesn't have to say I'm reducing the benefit -- we're

8    reducing the benefits, the result is there is a reduction.

9         MS. ROBBINS:  And it does not say the benefits

10   provided by the Delphi HRP, it says the benefits which are

11   listed, as Ms. Mehlsack indicated, by exactly what they were in

12   the Delphi plan will be reduced parallel for other Delphi HRP

13   participants.  And this is before the transfers and before the

14   guarantees but it contemplates that everyone's going to be

15   treated the same.  We may have to move some to GM, we may have

16   to keep some here, we may have to do this or that, but

17   everyone's going to be similarly reduced if there is a

18   reduction.

19        THE COURT:  Okay.

20        MS. MEHLSACK:  And, Your Honor, if I may address the

21   question that you asked before about whether or not a transfer

22   of certain participant's assets and liabilities wouldn't reduce

23   the PBGC claim.  That is certainly true, but the reductions

24   that the -- the magnitude of the reduction is of the PBGC claim

25   is greater, we believe, than -- we're not in a position to

87

1    calculate exactly, but just based on the --

2         THE COURT:  Well, I don't think that would be for this

3    hearing since it's just a sufficiency hearing.

4         MS. MEHLSACK:  Right.

5         THE COURT:  But it does strike me that you're -- the

6    people you're -- in your unions are about twenty-five people,

7    right?  Did it --

8         MS. ROBBINS:  It's a hundred between all three unions.

9         THE COURT:  Oh, I'm sorry.  All three would be

10   about --

11        MS. ROBBINS:  Right.

12        THE COURT:  -- but the ones that went to the GM are

13   far beyond that number, right?

14        MS. MEHLSACK:  No, Your Honor, to -- you mean the ones

15   that the assets transfers?  That went --

16        THE COURT:  The people that were picked up by GM?

17        MS. ROBBINS:  I don't know that we've ever seen that

18   number, Your Honor.

19        THE COURT:  Okay.

20        MS. MEHLSACK:  Your Honor, we -- you mean over all the

21   unions?

22        THE COURT:  Yes.

23        MS. MEHLSACK:  Oh.  I don't know what the -- the asset

24   transfers of what is called the 414(l) transfers, I'm sure that

25   the UAW IUE steelworker numbers were greater than -- we had --

88

1    the operating engineers had five people transferred under those

2    414(l) transfer agreements.

3              But it's not simply the 414(l) transfers.  It's the

4    payment of nonguaranteed benefits and that's where -- in other

5    words, GM -- as we understand GM -- what's happening, to the

6    extent that those people who are protected by the payment of

7    their nonguaranteed benefits are -- don't get them from the

8    HRP.  GM will pay -- will be providing those benefits whether

9    by -- and I don't believe it, but my understanding is it is not

10   by a transfer to the GM plan, but whether or not that is -- in

11   other words, GM -- there's going to have to be some kind of --

12             THE COURT:  GM reaffirmed the backstop.

13             MS. MEHLSACK:  That's right.  And did it for all

14   the -- all the other unions involved.

15             THE COURT:  Okay.  Was that it -- that wasn't in the

16   settlement agreement was it?

17             MS. MEHLSACK:  It is in -- it is in Section B of the

18   settlement agreement.

19             THE COURT:   I thought it didn't cover all of the -- I

20   thought it just covered a couple.

21             MS. MEHLSACK:  Well, it contemplates -- as I read part

22   B, the UAW had already received its promise that the

23   nonguaranteed benefits would be picked up and the agreement

24   contemplates the possibility that there will be additional

25   unions who --

1          THE COURT:  Which they fought over in the GM case and

2     eventually agreed to.

3          MS. MEHLSACK:  That's right, Your Honor.

4          THE COURT:  Okay.

5          MS. MEHLSACK:  That's right.

6          THE COURT:  All right.  So, can we turn, then, to the

7     fiduciary duty point?

8          MS. MEHLSACK:  That similarly derives from -- it's the

9     same conduct --

10          THE COURT:  Well, let me focus, then, on a -- a little

11     more narrowly then.  It would seem to me that -- I want to

12     focus on the specific conduct that is alleged to have

13     breached -- in which the plan wearing its fiduciary hat, the

14     debtor breached its fiduciary duties.

15          MS. MEHLSACK:  And very -- it's not simple, Your

16     Honor, to pull apart, because I think it is a -- it's the

17     global transaction.  It's one giving -- agreeing that there

18     will not be a claim that the PBGC will make against Delphi.  In

19     other words, the plan is entitled to certain contributions.

20          The PBGC has the right to demand those contributions

21     and the agreement was the PBGC would give up the plan's claim

22     for three billion dollars worth of contributions.  And those

23     are assets, plan assets, that now to the extent that Delphi

24     retains those assets, Delphi is effectively unjustly enriched

25     at the expense of our participants because at the same time,

1    Delphi has entered into an agreement with GM, and as well as

2    its agreement with the PBGC, and that agreement contemplates

3    that even though there will not be enough money to pay

4    nonguaranteed benefits, GM, and there are several complicated

5    intercompany transactions, exchanges of claims, between GM and

6    Delphi and amongst those exchanges are an agreement that GM is

7    going to pick up the cost of the nonguaranteed benefits,

8    however much GM is entitled to claim from Delphi for picking up

9    that portion of the nonguaranteed benefits, there's an agr --

10   there's that aspect of the agreement.  So, effectively, Delphi

11   is saying, well, we're going to get to keep a certain

12   proportion of assets that would otherwise be available through

13   the PBGC to pay nonguaranteed benefits even though we know that

14   similarly situated participants are going to get their

15   nonguaranteed benefits while this one very small group of

16   people are not going to receive their nonguaranteed benefits.

17          THE COURT:  I guess that --

18          MS. MEHLSACK:  And --

19          THE COURT:  -- I'm sorry; I didn't mean to interrupt

20   you.  Go ahead.

21          MS. MEHLSACK:  -- it's the differential treatment

22   combined with the effectively saying we're going to enter into

23   this contract in which we agree that we all agree there will be

24   less money available through this plan to pay nonguaranteed

25   benefits to similarly situated participants even though we know

91

1    that one group of those similarly -- the lion's share, ninety,

2    whatever the percentage, got to be more than ninety-nine

3    percent of those similarly situated participants are going to

4    get their nonguaranteed benefits.

5         So, we, Delphi, are getting to keep some money that

6    would otherwise be available to pay that very small group of

7    nonguaranteed benefits -- of participants whose nonguaranteed

8    benefits are not being guaranteed as part of this -- these

9    other arrangements.

10        THE COURT:  But I -- I guess it's the latter part that

11   I don't understand as a breach of fiduciary duty which is how

12   is it a breach of fiduciary duty to have -- to, in essence,

13   transfer liability out of the plan and onto GM?

14        MS. ROBBINS:  Your Honor, I don't think that it's the

15   transfer of liability from the plan to GM.  It's that when you

16   transfer the liability, you have not made sure that the

17   participants on both sides of the transaction are going to be

18   treated equitably.  And, you know, our brief references several

19   cases where the way in which an employer terminated the plan in

20   a way that not all participants were treated equitably

21   constituted a breach of fiduciary duty.

22        If you're involved in transferring liabilities and

23   you're starting out with all of the participants, you're

24   responsible for making sure that they're all going to be

25   treated equitably at the other end of the transaction.  And

92

1  here instead, there is very obvious evidence that that's not

2  the case.  Some participants are being transferred with full

3  benefits.  Some people are going to be guaranteed a comp to get

4  those additional benefits.  And at the same time, you're

5  reaching an agreement that you're going to keep four billion

6  out of seven billion.  You're only -- even though you know that

7  the PBGC is entitled to seven billion, you've been managed to

8  reduce that amount to four billion -- or to three billion

9  reducing it by four billion.  So, you've created the situation

10  where this -- this group that is not transferred and you --

11  will not have the guarantee it's going to be in a very

12  different circumstance from everybody else and you did the

13  transfer knowing that.

14       THE COURT:  But I don't see where that group is any

15  worse off than if there had not been the transfer.  I mean

16  it -- they may be envious that GM has picked up the liability

17  to the group that was transferred, but I don't see how the

18  debtor has deprived them of something.

19       MS. ROBBINS:  Well, Your Honor, I -- if you are

20  terminating a plan and you are making decisions not to take

21  resources that would be avail -- or you're transferring

22  resources that should have been available to the HRP, the seven

23  billion in general unsecured claims and you're reducing it to

24  three.

25       THE COURT:  No, that's -- that part I understand the

93

1    argument.  I think the debtor probably has responses to it.

2    It's the second part about the so-called disparate treatment

3    that I don't -- I don't see how that fits into any sort of

4    fiduciary duty argument.

5            MS. ROBBINS:  Well, Your Honor, I think it's part and

6    parcel of the same thing.  If you're protecting some people by

7    transfer, don't you protect other people in whatever way

8    possible?  Don't you make equitable protections?  One of the

9    cases that we cited, I think it's a Seventh Circuit case, Solis

10   (ph.), in that last paragraph, you know, talks about

11   participants having alternative elections as to whether they

12   would take real property or cash for their pension.

13           THE COURT:  But that was -- but that was a guy who

14   stole the money.  I mean he took the money.

15           MS. ROBBINS:  And here four billion went into the

16   general coffers instead of into the pension plan.

17           THE COURT:  But he was a -- he was a participant in

18   the plan.  I mean I just -- it seems to me that by moving -- by

19   permitting the move of the UAW and potentially others, which

20   eventually happened, the steelworkers and the IUE, I guess, you

21   actually reduce the claims against the debtors' plan because

22   they're being satisfied out of the GM plan --

23           MS. MEHLSACK:  Your Honor, if I may.  It's my

24   understanding that it's not -- what would happen -- is going to

25   happen first is the PBGC and -- makes a determination as to

94

1    what people's benefit levels are going to be.  And to the

2    extent that you are a participant who is protected by the GM

3    agreement, if your nonguaranteed benefits are not being paid by

4    the PBGC then you go to GM.  Because it's my understanding that

5    what's been left open between GM and the PBGC is, in fact, any

6    claims that GM may have that the PBGC has incorrectly

7    calculated what's available for non -- or not available for

8    nonguaranteed benefits.  So, that my understanding is that what

9    GM is doing, except the 414(l) transfers are different; those

10    were transfers of both assets and liabilities.  So, those

11    should have been, I believe, a wash.  But when it comes to the

12    guarantee of nonguaranteed benefits, my understanding is GM

13    only steps in to the extent that the plan assets that are

14    available for the PBGC to allocate, are not -- will not cover

15    nonguaranteed benefits.

16          THE COURT:  Okay.

17          MS. MEHLSACK:  So that there is no benefit to the

18    plan.

19          MS. ROBBINS:  The pension benefit guarantee those

20    individuals are actually being subsidized by General Motors

21    while they stay in the Delphi plan.

22          THE COURT:  All right.  But I guess -- I still don't

23    see how -- I don't see how the plan is harmed by it.  I mean

24    it's basically --

25          MS. MEHLSACK:  What would be -- and, Your Honor --

95

1          THE COURT:  -- these people are getting something else

2     from another source.  I mean if, in fact, the fiduciaries of

3     the plan reduce the amount that they were entitled to it would

4     seem to be that they would be the ones that have the beef.

5          MS. MEHLSACK:  -- Your Honor, can --

6          THE COURT:  We're trying because everyone's getting

7     their pro rata share of the deficiency and then GM is picking

8     up the difference.

9          MS. MEHLSACK:  But the agree --

10          MS. ROBBINS:  But you're --

11          MS. MEHLSACK:  Go on.

12          MS. ROBBINS:  But, Your Honor, in this situation,

13     there is an agreement that trades off and reduces what's

14     provided to the Delphi HRP and at the same time recognizes

15     these other benefits and the claims that arise from them.  And

16     so what you have is you have a transaction that is

17     disadvantaging one and advantaging others who are all Delphi

18     participants.

19          THE COURT:  Okay.

20          MS. ROBBINS:  And if I may, we're all similarly

21     situated Delphi participants because there are other groups of

22     Delphi participants who are not similarly situated.

23          MS. MEHLSACK:  Your Honor, is --

24          THE COURT:  But how is -- aren't I right that the UAW

25     had a benefit guarantee that your union's collective bargaining

96

1    agreements don't provide for?  So, I mean that -- isn't that

2    ultimately the basis for GM's willingness to pick this up?

3           MS. MEHLSACK:  Well, Your Honor, that is -- there's

4    no -- we can't say the fact that there is no benefit guarantee.

5    But it's more -- I really think that --

6           MS. ROBBINS:  No, wait --

7           MS. MEHLSACK:  Marianne, if I may.  It's more

8    complicated, Your Honor, because the entity that's picking up

9    these obligations is New General Motors not Old General Motors.

10   So, the question of whether or not it is --

11          THE COURT:  But that wasn't the case -- when the

12   debtor entered into this agreement, that wasn't the case,

13   right?  'Cause I don't think at that point GM had gone into

14   bankruptcy.

15          MS. MEHLSACK:  Oh, yeah, no, this agreement, Your

16   Honor, the overall PBGC settlement agreement, though, is an

17   agreement that encompasses both New GM and Old GM.  So, it

18   contemplates that there may be obligations for nonguaranteed

19   benefits.  It's not simply the UAW obligation or the

20   obligation -- an obligation to the UAW.

21          THE COURT:  But that's just something in the future.

22   I mean I -- I guess --

23          MS. ROBBINS:  Your Honor.

24          THE COURT:  -- that always struck me as nice language

25   but it didn't really bind them to anything.

1          MS. ROBBINS:  Your Honor, I think that that same

2     sentence that talks about reduction certainly from our point of

3     view meant that all Delphi participants were going to be

4     treated the same regardless of whether there was a benefit

5     guarantee or not.

6          THE COURT:  Okay.  Now, we've --

7          MS. ROBBINS:  Everyone is going to get the same

8     benefit --

9          THE COURT:  All right.

10         MS. ROBBINS:  -- wherever they came from.

11         THE COURT:  We covered that.  We've covered that one,

12    though, right?

13         MS. ROBBINS:  Yeah.

14         THE COURT:  Okay.  I guess the -- and I -- Mr. Lyons

15    has been waiting here and probably wanting to talk, but the

16    last question I had on this point is if you can find, for the

17    moment, the fiduciary duty issue to simply the fact the debtor

18    agreed to a compromise of the PBGC's claim, and now we're just

19    talking about fiduciary duty, we're not talking about the

20    contract issues, the debtor agreed to a compromise of the PBGC

21    claim, what is your response to the argument that the PBGC in

22    looking out for pension beneficiaries and being given the right

23    to make the claim, has every incentive to make the claim be

24    allowed as high as it should be, and that the decision to

25    compromise the claim shouldn't be second-guessed.  That they're

1    the ones with the standing to do this.

2          MS. MEHLSACK:  Your Honor, we think that there are a

3    number of issues that mean that they are not -- they are not

4    the exclusive -- they may be the exclusive holder of a claim

5    for contribution on behalf of a plan, but that's not the claims

6    that we're making.  And so, there are two things.  One is that

7    the preemption argument expressly recognizes, and we believe

8    that even that the Sixth Circuit would recognize, a breach of

9    fiduciary duty claims are not preempted under Title IV.  And,

10   in fact, the settlement agreement expressly says that so that

11   to the extent that our claims are for breach of fiduciary duty,

12   the PBGC's role as the trustee of the plan does not subsume

13   those claims.

14         THE COURT:  You know, I guess I asked my question a

15   little -- I didn't ask it right.  I understand that the

16   preemption argument applies to the contract claims.  But it

17   seems to me an odd fiduciary duty claim to assert that the

18   claim -- the breach of fiduciary duty claim is based upon the

19   debtors' settlement, not the -- the debtors' settlement of the

20   PBGC's claim when the PBGC -- I mean you're basically saying

21   that it's a totally one-side -- you're basically assuming it

22   has to be a one-sided negotiation.  The debtor should agree to

23   whatever PBGC says.  If it doesn't, it's breaching its

24   fiduciary duties.

25         MS. MEHLSACK:  Your Honor, that's where I think you

99

1   can't -- I'm afraid we can't separate the claim basis -- the

2   claim issue from the inequitable treatment issue.

3       THE COURT:  Well, no, I'm going to ask you to do that

4   though, because I'm really just focusing on the claim at this

5   point.  And I just -- it just seems odd to me.  I mean this

6   argument would suggest that the PBGC could assert, you know --

7   and the PBGC has been known to do this.  To take the wildest

8   discount rate they could think of and assert a ten billion

9   dollar claim.  And a debtor that's a sponsor of a plan has no

10  ability to object to such a claim without making itself

11  susceptible to breach of fiduciary duty?  It just doesn't -- it

12  seems odd to me.

13      MS. ROBBINS:  Your Honor, in this case though, both

14  parties stipulated that the PBGC was entitled to the seven

15  billion dollar figure.  So, it's not like the debtor was taking

16  the position that the seven billion dollar figure was

17  unjustified and the four billion dollar figure was all that was

18  justified and they compromised because there was a difference

19  of opinion.  They both agreed that seven billion dollars was

20  owed but only three billion would be paid.  Not paid in full

21  but paid as an allowed general unsecured claim.  And there are

22  so many things going on including claims relating to the cross-

23  claims going to the benefit guarantee that there may be

24  tradeoffs involved.  But the fact is that what we know is that

25  our people were disadvantaged to the amount of our share of the

100

1    four billion dollars.  And the same agreement where everybody

2    was reserving their rights to cross-claim about the pension

3    benefit guarantees.

4         THE COURT:  Okay.  So, let me ask you, Mr. Lyons, what

5    is the response to the argument that the unions are making

6    that -- and I'm not -- you don't need to jump in, Ms. Robbins

7    or Ms. Mehlsack because I know you're making other arguments

8    too, but I'm just limiting it to this argument, that the unions

9    should be able to pursue a breach of fiduciary duty claim based

10   on the agreement to compromise an allowable seven billion

11   dollar claim for three billion dollars?

12        MR. LYONS:  Your Honor, the PBGC, when they terminated

13   the plan they were the holder of the claim.  They exercised all

14   judgments on how to collect it from whatever asset pools and

15   how to compromise it.

16        You know, basically, they're trying to hold us to a

17   breach of fiduciary duty over the claimants' decision how to

18   settle a claim.  There's no possible way that we could have a

19   fiduciary duty to make sure some other claimant settled at a

20   high number.  That makes absolutely no sense.  We didn't

21   control the claim at that point.  That was a claim held by an

22   independent government agency that negotiate at arm's length

23   and which was approved by Your Honor at a fairness hearing.  It

24   just makes no sense at all that somehow we could be responsible

25   for some kind of breach of fiduciary duty for how PBGC decided

1    to settle the claim.

2         THE COURT:  And this isn't the preemption argument

3    because it is breach of fiduciary duty.  You're just saying

4    that the claimant is charged with pursuing its rights and if

5    they don't pursue it the plan trustees don't have an obligation

6    to -- on behalf of the participants to get them to pursue it?

7         MR. LYONS:  No.  Because I mean at that point, the

8    PBGC is the holder of the claim.  They are the fiduciary.  They

9    are the ones who are going out to try to maximize returns.

10        THE COURT:  Because they terminated the plan?

11        MR. LYONS:  Right.  Nobody -- there was no trust

12   fiduciary relationship vis-a-vis that claim.  That was taking

13   over by the PBGC when they terminated the plan.  It's -- you

14   know, when they terminated the plan, the PBGC took over the

15   plan and took over all claims.

16        THE COURT:  So, you're basically saying vis-a-vis the

17   claim at that point there was no fiduciary on the plan side?

18   That PBGC was the fiduciary?

19        MR. LYONS:  Once the plan was -- once the plan was

20   terminated by the PBGC, the PBGC, by operation of the ERISA

21   statutes, was and charged with pursuing claims and then making

22   distributions in accordance with PBGC distribution scheme.

23        THE COURT:  Ms. Robbins or Ms. Mehlsack, what's the

24   response to that?

25        MS. MEHLSACK:  Your Honor, when the agreement was made

1    the plan was not yet terminated.

2         MS. ROBBINS:  And I guess I would add, Your Honor, we

3    are pursuing our claim for loss of pension benefits and the

4    PBGC is not opposing our claim.  And, you know, we're not

5    asserting the PBGC's claim, we're supporting our own claim

6    which is not being opposed --

7         MR. LYONS:  Your Honor --

8         MS. ROBBINS:  -- by the PBGC.

9         MR. LYONS:  -- if I may interject there

10        THE COURT:  Well, that's a whole separate -- that's

11   the standing issue and that's a separate issue I think.

12        MR. LYONS:  Yeah.  To say that PBGC isn't in

13   opposition to what the splinter unions are trying to do is flat

14   wrong, Your Honor.  I think the PBGC, they're not here before

15   Your Honor, but clearly the PBGC has taken the position in

16   other cases that they are the owner of these claims.

17        MS. ROBBINS:  Well, in this case there are --

18        THE COURT:  Mr. Lyon's, what's your response to the

19   point that at the time the PBGC settlement was entered into,

20   the plan hasn't been terminated yet and so, therefore, at that

21   point debtors were still --

22        MR. LYONS:  Well, if you remember the settlement

23   agreement, Your Honor --

24        THE COURT:  -- a sponsor.

25        MR. LYONS:  -- it didn't lock the PBGC into doing

1    anything.  If they chose to terminate it then that would be --

2    that's an independent credit action on the part of the PBGC as

3    to whether or not they wanted to terminate the plan.  If they

4    wanted to assess that in advance, I mean again that ultimately

5    I don't think that in any way would result in a breach of

6    fiduciary duty on our part.

7         And another point, Your Honor, the disposition of

8    spinoff or what have you is not a fiduciary act and we've laid

9    this out in our papers; it's a settler action.  It's not a

10   fiduciary action.

11        THE COURT:  No, I'm just talking about the claim now.

12   I'm just talking about that point; settling the claim.

13        MR. LYONS:  Well, you know, again, Your Honor, I don't

14   think it is a -- in essence a contingent settlement that will

15   happen once the termination occurs.  I don't think it involves

16   or could be alleged to be some type of breach of fiduciary duty

17   on the part of Delphi, Your Honor.

18        THE COURT:  Okay.  Am I right, and this is for all

19   three of you, that the only asset -- besides the argument about

20   the claim being fixed at three billion instead of seven, am I

21   right that the only transfer of assets is through the 414

22   transfers?  That the other people that get the benefit of the

23   GM backstop that's all they get?  The asset doesn't go over.

24   They're not other assets from the plan going over in respect of

25   them?

1          MR. LYONS:  Yeah.  I don't think, Your Honor, there's

2    any issue and they can confirm whether the asset transfers were

3    somehow inappropriate.  That I don't think is before -- I don't

4    think that's ever been really called into question.

5          MS. ROBBINS:  Your Honor, the only thing that I would

6    note is that there is reference to reserving cross-claims for

7    the pension benefit guarantee and there's no specificity as to

8    what those are or would be.

9          THE COURT:  Cross-claims --

10         MS. ROBBINS:  But other than that, I think Your Honor

11   is accurate.

12         THE COURT:  You mean claims by GM against the --

13         MS. ROBBINS:  It doesn't -- all it says is the PBGC,

14   GM, Old GM, Delphi, I believe -- I believe they're all in

15   there; I'd have to go back and look.  But that there are a lot

16   of cross-claims that are not being resolved.

17         MS. MEHLSACK:  And, Your Honor, I think that goes to

18   and it does involve plan assets whether or not the PBGC is

19   correctly calculating from GM's point of view how much is

20   available to pay nonguaranteed benefits.

21         It's my understanding and I'm not really clear on it

22   but I believe that GM preserves the right to go to the PBGC and

23   say your -- whatever interest factor you're using is incorrect.

24   You should be paying more money out of the plan so that we, GM,

25   have to pay less money.

1          THE COURT:  All right.  But as far as the plan itself,

2     the debtors -- that the debtor wearing a plan fiduciary hat, it

3     seems to me the only asset transfer that's being alleged to

4     give rise to a breach of fiduciary duty claim here, that they

5     have caused is this claim allowance.  Fixing the claim at three

6     billion, right?  I don't see -- I mean the 414 seemed to be

7     neutral and fine and I don't see any allegations that somehow

8     other assets have been transferred out of the plan to GM or to

9     PBGC separately.

10          MS. MEHLSACK:  To the --

11          MS. ROBBINS:  Other than what was left open on that

12     issue.

13          THE COURT:  I'm sorry?

14          MS. ROBBINS:  Just the thing I said before, Your

15     Honor, that it's not clear what claims and counterclaims there

16     might be concerning the pension benefit guaranty as

17     Ms. Mehlsack described.

18          MS. MEHLSACK:  Also, Your Honor, and I think it's --

19     there is -- part of the agreement is that New GM -- PBGC has a

20     claim against New GM and that in effect, I believe, is all part

21     and parcel of the overall agreement in which the PBGC and

22     Delphi have agreed to reduce the assets available to the plan

23     from Delphi in exchange for the PBGC's recognition that there's

24     going to be, in effect, the equivalent of a follow-up plan

25     through nonguaranteed benefits.  The PBGC is getting a claim

106

1    against New GM so that what you again have is an exchange of

2    assets -- claims for assets that disadvantage a small group of

3    participants.

4           It would have been just as easy --

5           THE COURT:  Okay.

6           MS. MEHLSACK:  I'm sorry, Your Honor.  I won't -- and

7    I don't see -- there are other assets involved.

8           THE COURT:  All right.  I just don't see it I'm

9    afraid.  All right.  I'm done with my questions but I'll give

10   you all a chance if you want to supplement what you've already

11   put in the papers which are quite helpful to -- which have been

12   quite helpful to me.

13          MS. MEHLSACK:  Your Honor, there is actually one other

14   argument that we -- we did not address in our papers because

15   they had, in fact, not been addressed by the debtor and that is

16   this question of what's equitable relief versus what's legal

17   relief for 502(a)(3) claim.  I don't know if Your Honor

18   wants --

19          THE COURT:  No, no, you should have a chance to

20   respond to that.  If you -- what do you have to say on that

21   point?

22          MS. MEHLSACK:  That, Your Honor, what the Second

23   circuit and, I believe, the Supreme Court has recognized that

24   has said is just because something is monetary relief, doesn't

25   mean that it's not equitable.  And there are forms of monetary

107

1    restitution.  The question is is the restitution equitable or

2    is it legal in nature?  And we believe that in this case,

3    because what we're talking about is going back to the reduction

4    of the seven billion to the three billion, that Delphi is, in

5    effect, getting to keep unjustly assets when at the same time

6    those asset -- knowing that a group of similarly situated

7    participants are not getting their nonguaranteed benefits, that

8    that is a form of unjust enrichments that would permit us to

9    seek restitution in the form of equitable relief and not come

10   afoul of the Supreme Court's holding that only equitable relief

11   is available under 502(a)(3).

12        THE COURT:  Okay.  Mr. Lyons, do you have anything to

13   add?

14        MR. LYONS:  Your Honor, I think you've looked at this

15   and you've ruled on pretty squarely the issue of whether it

16   violates the MOU.  You know, Your Honor, I think if you look at

17   what the splinter unions are arguing, they are trying to assert

18   a claim against the debtor for the acts of independent parties.

19   The PBGC terminated the plan.  The debtors didn't reduce the

20   benefits.  They were reduced by operation of law by reason of

21   the termination and the fact that other participants may have

22   been topped off by GM that was a consideration that GM put in.

23        I am sure the debtors would have loved have had GM be

24   able to top off on the splinter unions as well.  But, Your

25   Honor, we do not control the actions of GM nor can we control

108

1        the actions of the PBGC.

2            You know, quickly on this restitution point, I'm not

3        sure exactly what relief they are seeking here, Your Honor.  I

4        mean are they seeking to go out to all the other UAW employees

5        and all the other union members and are they the ones being

6        unjustly enriched?  Because I don't see how the debtors are in

7        any way unjustly enriched.  The fact of the matter that GM may

8        have topped off the others, doesn't translate into unjust

9        enrichment on DPH's perspective.

10            And, Your Honor, unless you have any further

11       questions, I think your ruling was pretty clear.  And, you

12       know, again, all the transactions now that are being challenged

13       as breaches of fiduciary duty were approved by Your Honor on

14       notice and hearing and the fairness was determined.

15            THE COURT:  You mean as part of the approval of the

16       settlement?

17            MR. LYONS:  Part of the approval of settlement, Your

18       Honor, the modification -- the plan modification order.  All

19       those were reviewed by Your Honor and the record was very

20       carefully made on those.

21            MS. ROBBINS:  And in reply to that point, we think

22       that the Court was very clear that the issue of claim would be

23       addressed separately.

24            THE COURT:  I'm sorry, the issue of -

25            MS. ROBBINS:  Claim would be addressed separately.

109

1   That it was not adjudicated at that hearing on the plan.

2          MR. LYONS:  You know, one other point, Your Honor,

3   that hasn't really been discussed, is just the United

4   Engineering decision in the Sixth Circuit.  I think that

5   decision is clear.  I won't go into it.  I think Your Honor is

6   very familiar with it.  And there is no contrary authority.  I

7   know it's in the Sixth Circuit, but there's no contrary

8   authority anyway.

9          THE COURT:  But you don't -- you don't disagree with

10  the unions that the unique -- well the preemption of the claim

11  issue doesn't apply to breach of fiduciary duty claims?

12         MR. LYONS:  Your Honor, I recognize that.

13         THE COURT:  Although you do take the view that the

14  union does not have standing to assert the claim on behalf of

15  its members?

16         MR. LYONS:  Yes.

17         THE COURT:  The breach of fiduciary duty claim?

18         MR. LYONS:  And also the other reasons in our papers

19  why there is no fiduciary duty claim here as well.

20         THE COURT:  Right.  Okay.

21         MR. LYONS:  Thank you.

22         THE COURT:  All right.  Anything else?

23         MS. ROBBINS:  Your Honor, I think it's in our papers

24  that we do not think that United Engineering applies to a

25  circumstance such as this where it's clear that the termination

110

1    did not contemplate a provision of nonguaranteed benefits and

2    instead was looking to private causes of action or private

3    agreements for those whether they be guarantees or in our case

4    the MOUs.  We don't think that -- we think that the prior case

5    law is far more in point in terms of the structure of this

6    termination was at the PBGC's role.

7              THE COURT:  Okay.  All right.  I have before me the

8    objection by DPH Holdings Corporation which is the successor

9    through the Chapter 11 plan for Delphi Corporation and its

10   affiliated debtors and debtors in possession with regard to

11   claims asserted against those entities.  It is objected to

12   proofs of claim filed by the IAM, IBEW and IUOE, all unions

13   representing former workers for the debtors who were covered by

14   the Delphi HRP or pension plan.  I'll sometimes refer to these

15   unions as the splinter unions.  That's just a colloquial term

16   to distinguish them from the UAW, the United Steelworkers, and

17   the IUE who in the aggregate represent far more of the debtors'

18   employees.

19             The objection originally addressed several aspects of

20   the splinter unions' claims based on the initial hearing on the

21   claim objection and the unions' response.  I asked the parties

22   for further briefing.  The first issue that I asked to be

23   covered has now been completely clarified.  It is now clear and

24   the unions acknowledge that the only claims that they are

25   proceeding on at this point and that they have otherwise agreed

111

1    to the objection over are claims that they have asserted for

2    the reduction in their members recovery of pension benefits

3    under the HRP or the so-called nonguaranteed claim portion of

4    their pension benefits.  By the latter phrase, I mean the

5    following.

6         The Delphi HRP was terminated and taken over by the

7    PBGC.  Under ERISA, the PBGC is responsible for paying amounts

8    to the pension beneficiaries.  The three unions seek to have

9    allowed their claim against Delphi for the amounts owed in

10   respect to the terminated plan to their members that exceed the

11   amounts that will be paid by the PBGC.  The unions assert two

12   separate grounds, or alternative grounds, for their claims.

13        First, they contend that the debtors' termination of

14   the pension plans and the subsequent creation of the reduction

15   claims or the nonguaranteed claims violates their respective

16   collective bargaining agreements and therefore gives rise to a

17   breach claim.

18        Secondly, they assert, or alternatively they assert

19   that the agreement by the debtor with the PBGC and GM in

20   respect of the treatment of the Delphi HRP, the PBGC's claim

21   under ERISA against the debtor in respect of the plan for

22   termination liability and the debtors' facilitation of the

23   agreement by GM to backstop any unpaid plan benefits for

24   certain beneficiaries of the plan, namely the UAW, and the

25   recognition of the possibility of GM doing it for other

112

1    beneficiaries, namely the beneficiaries represented by the

2    United Steelworkers and the IUE, constitute a breach of

3    fiduciary duty by the debtor wearing its hat as a fiduciary

4    under ERISA in respect of being a -- a plan fiduciary.

5         The debtor has raised numerous grounds for objecting

6    to these two claims.  The first ground, and I will focus now on

7    the contract claim, is that under ERISA as amended in post-

8    1986, the PBGC has been given sole control over the liability

9    of an employer, such as the debtor, in respect of a pension

10   plan, such as the Delphi HRP, and that such liability is owed

11   uniquely to the PBGC.  And, in particular, it is not owed under

12   the Section 301 of the LMRA or assertable by a union

13   notwithstanding the existence of collective bargaining

14   agreement that requires the payment of such benefits.

15        The case law on this issue, I believe, is clear and

16   convincing that the debtors' position is correct.  The leading

17   case is United Steelworkers of America v. United Engineering,

18   Inc., 52 F.3d 1386 (6th Cir. 1995) which discusses the stated

19   law prior to the amendments to ERISA in which the courts,

20   including the Sixth Circuit as well as the Second Circuit, had

21   filled in what they perceive to be a gap in ERISA that would

22   enable other parties, including unions, on behalf of their --

23   well, including unions, to assert the underfunding claim

24   against the employer or plan sponsor.  As discussed in the

25   United Engineering case, it appears clear that congress aware

113

1    of such case law amended ERISA in '86, in 1986, to make it

2    clear that employers are liable to the PBGC for the total

3    amount of unfunded benefit liabilities.

4          So, based on the United Steelworkers case and cases it

5    cited, including In re Adams Hard Facing Company, 129 B.R. 662

6    (Bankr. W.D.) -- I'm sorry -- (W.D. Okla.), not bankruptcy,

7    (W.D. Okla. 1991), and International Association of Machinists

8    and Aerospace Workers v. Rome Cable Corporation, 810 F. Supp.

9    402 (N.D.N.Y 1993) as well as the subsequent case of In re

10   Lineal Group, L-I-N-E-A-L, 226 B.R. 608, (Bankr. M.D. Tenn.

11   1998), I believe that under ERISA the claim that is the basis

12   for the unions' contract claim is preempted by ERISA.

13         On the preemption argument, or in response to the

14   preemption argument, the unions point to one case and to a

15   theory, and I've considered both, as far as the case is

16   concerned the unions point to an unreported decision of the

17   Sixth Circuit, Local No. 1654 International Brotherhood of

18   Electrical Workers v. LG Phillips Display Components Company,

19   137 Fed. Appendix 776 (6th Cir. June 7, 2005) in which the

20   Sixth Circuit recognized that while state law claims for the

21   recovery of employee benefits are always preempted by ERISA,

22   claims involving rights created by collective bargaining

23   agreement are governed by the LMRA and at least in respect of

24   the facts at hand who are not superseded by ERISA.  The facts

25   at hand in that case were based upon not a termination of the

114

1    pension plan and its takeover claim by -- and the claim

2    asserted after its takeover by the PBGC for the underfunding or

3    deficiency, but rather for a fraud claim in connection with the

4    negotiations involving the termination of the plant and the

5    agreement of the union to receive their retirement benefits in

6    a lump sum.  There was no indication that the retirement

7    benefits would not be paid in full, only with regard to the

8    factors used in computing the lump sum.  The Sixth Circuit in

9    that unpublished decision stated and recognized the United

10   Steelworkers case as stated.  However, United Steelworkers was

11   decided on the narrow ground that ERISA preempted claims for

12   nonguaranteed pension benefits against plan sponsors because

13   ERISA had been amended to provide that plan sponsors were not

14   liable for nonguaranteed benefits.

15        The unions would interpret that sentence to state

16   effectively that as long as there is a separate basis for a

17   claim for nonguaranteed basis in this case under the collective

18   bargaining agreement, they would not be preempted by ERISA.  I

19   do not view that to be the case.  I believe that the United

20   Steelworkers case, in fact, involve such a situation and

21   nevertheless the Sixth Circuit, I think, correctly said that

22   the claim under Section 301 of the LMRA was preempted as is, I

23   believe, also the case with respect of the logic of that

24   decision applying to provide that the debtor literally is not

25   liable for such amount.  And so, therefore, when one looks at

1    the terms of the collective bargaining agreements here, which

2    are set forth in the three MOUs entered into by the respective

3    unions, splinter unions, and Delphi Corporation, paragraph 2(b)

4    of the MOUs states that "Delphi will cause the frozen Delphi

5    HRP to pay benefits in accordance with the terms of the Delphi

6    HRP and applicable law."

7        Applicable law here as interpreted by the Sixth

8    Circuit based on an accurate description of ERISA would fix the

9    liability as fixed with the PBGC and that that would be the

10   claim.

11       The provision goes onto say "These benefits will not

12   be reduced from the levels in effect as of the date immediately

13   preceding the effective date of the MOU unless they are

14   similarly reduced for other retired Delphi HRP participants.

15   The IUOE" and this is also as agreed by the other two unions,

16   "agrees that Delphi reserves its right to seek termination of

17   the Delphi HRP consistent with applicable law."

18       Delphi contends that the reservation of rights

19   recognizes Delphi's right to terminate and to have the claim be

20   limited to the claim determined vis-a-vis it and the PBGC with

21   no additional claim to be asserted.

22       The unions contend that last sentence recognizes a

23   right to terminate but not a right to eliminate the claim.  I

24   have already dealt with this issue in connection with the

25   unions' objections to the PBGC settlement and the confirmation

1    of the modified plan which contemplated the foregoing.  But in

2    this case, did not address, I believe, sufficiently for res

3    judicata or collateral estoppel purposes any resulting claim

4    that would occur.  However, I believe that the reduction of the

5    claim as a result of the termination here is consistent with

6    Delphi's obligations under the MOU which provides that -- which

7    first recognizes the right to terminate and the -- therefore,

8    the implicit role to be played by the PBGC in fixing the claim.

9        And secondly, provides that the benefits prior to

10   termination can be reduced if they are similarly reduced for

11   other retired Delphi HRP participants.  I believe the record is

12   clear here that with regard to the benefits under the Delphi

13   HRP those benefits were reduced equally across the board with

14   regard to the participants and therefore the savings provision

15   in the second sentence of paragraph 2(b) applies here.

16       Again, that sentence reads, "These benefits," the

17   these referring to the benefits under the terms of the Delphi

18   HRP, "will not be reduced from the levels of effect as of the

19   date immediately preceding the effective date unless they" the

20   they clearly refers to these benefits "are similarly reduced

21   for other retired Delphi HRP participants."

22       The record is clear here that as far as the benefits

23   paid out under the Delphi HRP, upon termination the benefits

24   paid by the Delphi HRP were paid pro rata across the board to

25   the participants and the HRP.

117

1          The unions argue that as a result of the PBGC

2     settlement, GM agreed to backstop those amounts that would not

3     be paid out across the board by the Delphi HRP but those are GM

4     benefits and not Delphi HRP benefits.  So it appears clear to

5     me to be the case that under the terms of the applicable MOUs

6     there has not been a breach of this agreement.

7          The second basis for the claims, as I said, is that

8     not as the employer or plan sponsor but as a plan fiduciary the

9     debtor is liable for breach of fiduciary duty to each of the

10    three unions.  Before discussing the nature of the fiduciary

11    duty that the debtor would have to the beneficiaries of the

12    plan and the alleged breach of that duty, I should first deal

13    with the issue of the union's standing to pursue such a claim.

14         The law in this district and in the Second Circuit is

15    clear that claims for breach of fiduciary duty, under ERISA,

16    are limited to the specific types of persons or entities listed

17    in Section 502 of ERISA.  It is clear here that the union is

18    not pursuing the breach of fiduciary duty claims as a

19    beneficiary of the Delphi HRP or in any other capacity

20    recognized specifically by section 502 of ERISA.  Consequently

21    the debtors -- the debtor has argued that the unions do not

22    have standing to bring this claim, which is one effectively for

23    money damages given that it is a proof of claim and therefore

24    seeks relief for money either -- well, on the basis of Section

25    1015 of the Bankruptcy Code.

1      I agree with the debtor's argument that the unions do

2  not have standing in this situation.  Again, this is not

3  premised upon pre-emption because the debtors and I agree with

4  the unions that the fiduciary duty claim is not the same thing

5  as the underfunding or deficiency claim that only the PBGC has

6  against a sponsor but is rather based on a separate provision

7  of ERISA.

8      However, as laid out in the case law, that claim is

9  limited in ERISA to parties that would not include here the

10  union, see Local 100 Transport Workers Union v. Rosen, 2007, WL

11  2042511 (S.D.N.Y. July 13, 2007), Toussaint v. J.J. Wiser &

12  Company, 2005 WL 356834 (S.D.N.Y. February 13, 2005); District

13  65 UAW v Harper & Row Publishers Inc., 576 F Supp 1468

14  (S.D.N.Y. 1983).  See also McCabe v. Trombley, 867 F Supp 120

15  (N.D.N.Y. 1994).

16      In response, the union sites, or the unions site, the

17  American Medical Association v. United Healthcare Corporation,

18  2002 U.S.D. LEXIS 20309 (S.D.N.Y. October 23, 2002) as well as

19  the American Medical Association v. United Healthcare

20  Corporation, 2003 U.S.D. LEXIS 1398 (January 30, 2003) in which

21  Judge McKenna gave standing to, in the first case, the Medical

22  Association plaintiff and in the latter case to, among others,

23  unions in a fiduciary duty breach litigation under ERISA.

24  However, he did so after having carefully analyzed the factors

25  for associational standing in International Union United Auto

119

1      Workers v. Brock 477 U.S. 274281 (1988).  In doing so, he made

2      it clear in both opinions that he granted standing only insofar

3      as the relief sought by the associations or the unions related

4      to claims for injunctive declaratory relief as opposed to a

5      damages claim.  I also note that the second order, which

6      applied to the unions, was, in addition to being limited to

7      that basis, was without opposition by any party.

8           The unions also rely on Southern Illinois Carpenters'

9      Welfare Fund v. Carpenters' Welfare Fund of Illinois, 326 F. 3d

10     919, (Seventh Circuit, 2003).  However, in addition to this

11     case I believe not being on point with the present facts, it's

12     also contrary to the case law from the second circuit that I've

13     previously sited to the extent it is on point, which I, again,

14     don't believe to be the case.

15          So before turning to the merits of the fiduciary duty

16     claim, I conclude that the claim should be disallowed based on

17     the union's lack of standing to pursue this claim for money,

18     whether based on an equitable remedy or based on a claim for

19     damages for breach of fiduciary duty under the foregoing case

20     law and section 502 of ERISA.

21          This is not an evidentiary hearing; this is a

22     sufficiency hearing and therefore is generally governed by a

23     standard akin to on all -- or in fact on all fours with, for

24     purposes of the claims resolution process and these cases, of

25     the standard under Federal Rules of Civil Procedure 12(b)(6)

1    Twombley and Iqbal.  So therefore I am focusing only on the

2    assertions in the claim and whether they set forth a legally

3    feasible claim.  I'm not weighing the evidence that might be

4    offered in their support except to the extent that the

5    assertions simply are not plausible or the facts are

6    uncontroverted.  If the assertions are simply not plausible,

7    given the context, I would require the unions to set forth more

8    in their claim.

9         That wrinkle really doesn't come into play here

10   because of the clarification of the nature of the union's

11   breach of fiduciary duty claim.  The unions contend that the

12   debtor as a plan fiduciary breached its fiduciary duty

13   essentially in two ways, and again this is with the debtor

14   wearing its hat as plan administrator and not as employer or in

15   any other capacity.

16        First, the unions contend that although the debtor

17   agreed in the PBGC settlement that the PBGC was entitled to an

18   allowed claim of seven billion dollars in respect of the

19   employer's termination of the pension plan, it -- the PBGC

20   would have an allowed claim of only three billion dollars.  The

21   unions contend, therefore, that as plan administrator the

22   debtor left money on the table for itself as debtor rather than

23   having it be allocated to pay a larger claim and that

24   therefore, in essence, it was self-dealing.

25        Secondly, the union contends that in the same -- the

1    unions, excuse me -- the unions contend that in the same PBGC

2    settlement agreement the debtor agreed, along with the PBGC and

3    GM, that to the extent that the pension claims would not be

4    paid in full to the PBGC and/or to the beneficiaries, that GM

5    would pay the difference.

6          As far as the United Auto Worker beneficiaries were

7    concerned, the settlement agreement also contemplated the

8    possibility that the same treatment would apply to other union

9    beneficiaries such as the United Steel Workers and the IUE,

10   which treatment eventually was agreed to by GM.

11         The debtor also facilitated the so-called 414

12   transfers of both beneficiaries' liabilities and the associated

13   assets of the plan to other plans by GM.  I do not believe,

14   however, that the latter agreement is being attacked as a

15   breach of fiduciary duty, nor do I believe that there would be

16   a basis for it to be attacked.

17         The contention is, however, with regard to the former

18   agreement that the debtor was unfavorably or unfairly

19   permitting certain beneficiaries of the pension plan to receive

20   additional value in the form of the GM agreed backstop.

21         The fiduciary duty of a plan administrator is clearly

22   different than and separate from any obligations that a plan

23   sponsor or the employer that established a plan has.  It's a

24   fiduciary duty that arises under ERISA and the parties are

25   generally in agreement that under ERISA a fiduciary is one who

122

1    exercises any authority or control respecting management of

2    disposition of the plan's assets and that has control over the

3    operation of the plan as opposed to the terms of the plan.

4           The decision to agree with the PBGC to the plan's

5    termination itself is clearly not a basis for a claim against

6    the debtor for breach of fiduciary duty.  The focus would need

7    to be upon whether in administering the plan itself the debtor,

8    as plan administrator, breached a fiduciary duty.  The two

9    cases cited in support of the claim by the unions fall into

10   that context Solas v. Current Development Corporation, 557 F.3d

11   772 (7th Cir. 2009) involves an administrator's clear self

12   dealing where the trustee "finagled" the termination so that

13   they would receive, he and his wife, more than their fair share

14   as participants in the plan.  In District 65 UAW v. Harper &

15   Row Publishers Inc. 670 F. Supp 550 (S.D.N.Y. 1987) the court

16   found potential breach of fiduciary duty liability with regard

17   to the administrator's, the fiduciary's, use and actual control

18   of the pension plan's assets.

19          I simply do not see how the provisions of the PBGC

20   settlement that contemplated the backstop by GM of unpaid

21   nonguaranteed liabilities of the beneficiaries who were members

22   of the UAW and the potential for doing the same for other union

23   beneficiaries could fall into the category of breach of

24   fiduciary duty under those circumstances.  As I noted in

25   connection with the contract portion of my ruling, the amount

123

1    of payments under the settlement agreement coming from Delphi

2    are not affected by the GM backstop.  The GM backstop involves

3    assets of a third party, GM, and GM's agreement, for its

4    reasons, to supplement what would be available from the PBGC

5    and the PBGC's recovery from the debtor and therefore would, to

6    my mind, under no circumstances result in any misuse of the

7    plan's assets or unfair or discriminatory treatment of the

8    plan's beneficiaries in respect of those assets by the plan

9    administrator.

10            The issue of the allowance of the PBGC's claim does

11   involve, indirectly, the, at least superficially, treatment of

12   an asset of the plan but I believe only superficially.  The

13   settlement agreement was in contemplation of the PBGC's

14   termination of the pension plan and the allowance of the claim

15   was effectively contingent upon such termination.  It was under

16   those circumstances that the PBGC would have sole control of

17   the claim.  The agreement was with the debtor since the claim

18   was against the debtor as plan sponsor, not an agreement with

19   the debtor as plan administrator.

20            I do not believe that the debtor had an obligation to

21   bargain against itself for a higher claim.  Moreover, given

22   that the claim was, and the agreement, in contemplation of the

23   termination of the plan when, as I have noted the PBGC has sole

24   ownership of the deficiency claim, the plan administrators

25   would have a role in trying to get the deficiency claim against

124

1   the plan sponsor higher.  At that point the claim would be

2   controlled by the PBGC.  Thus, I do not believe that the plan

3   administrators had an obligation to jump in and intervene to

4   fight themselves as the debtor in insisting that the claim

5   should be higher or to replace themselves -- itself in a

6   conflict with its role as the plan sponsor.  Instead, I believe

7   that given the context of the agreement it was proper to look

8   to PBGC as the owner of the claim and that the potential

9   conflict of interest was therefore booted by the role that the

10  PBGC played.  Consequently, I do not believe that this aspect

11  of the union's claim sets forth a claim for breach of fiduciary

12  duty either.

13          Again, my ruling is based upon the ground rules for a

14  sufficiency hearing under these claims procedures.  As I noted

15  during oral argument, I had some suspicions that ultimately the

16  treatment of the claim did not leave the three union groups

17  members, who were beneficiaries of the plan, any worse off in

18  light of the spinoffs.  But I'm not basing my ruling on any of

19  that at all.  In fact, I'm assuming that the claim would always

20  have been at seven billion dollars and was not reduced in light

21  of any other value that would be going to participants in the

22  plan, from the plan.  However, I still do not see how the

23  debtor, as plan administrator, under the circumstances where

24  the PBGC was going to terminate the plan and that the amount of

25  the claim was fixed in contemplation of that termination had an

125

1   ability, as a fiduciary, to oppose the PBGC's settlement of the

2   claim at three billion dollars.

3       So for each of those reasons I will grant the debtor's

4   objection to the claims to the extent they're based upon an

5   alleged breach of fiduciary duty.  So the debtor's counsel

6   should submit an order consistent with that ruling disallowing

7   the claims.

8       MR. LYONS:  We will do so, Your Honor.

9       THE COURT:  Okay.

10      MR. LYONS:  And Your Honor, that's the last item on

11  the agenda so we will see you April 22nd.

12      THE COURT:  Okay.  Thank you.

13      MR. LYONS:  Thank you.

14      (Proceedings concluded at 1:31 PM)

15

16

17

18

19

20

21

22

23

24

25

126

I N D E X

RULINGS

|  | Page | Line |
|---|---|---|
| Fee Applications Approved | 39 | 7 |
| Forty-Forth Omnibus Objection Relief Granted | 48 | 12 |
| Forty-Fifth Omnibus Objection Relief Granted | 50 | 7 |
| PLA Holdings Claim Rejected; Objection Granted | 53 | 3 |
| Heraeus Tenevo Claim Rejected; Objection Granted | 53 | 25 |
| Milliken & Company Claim Rejected; Objection Granted | 53 | 25 |
| Claim of Ms. Skillman Rejected; Objection Granted | 56 | 4 |
| Claim of Ms. Amort Carbrera Rejected; Objection Granted | 56 | 4 |
| Claim of Ms. Hamlin Rejected; Objection Granted | 56 | 4 |
| Claim of Mr. Miller Rejected; Objection Granted | 57 | 21 |
| Claim of Mr. Goodin Rejected; Objection Granted | 58 | 13 |
| Claim of Mr. Cross Rejected; Objection Granted | 59 | 14 |
| Claim of Mr. McBain Rejected; Objection Granted | 60 | 1 |

127

| | | | |
|---|---|---|---|
| 1 | Claim of Contrarian Rejected; | 60 | 17 |
| | Objection Granted | | |
| 2 | | | |
| | Claim of Mr. Potter Rejected; | 63 | 3 |
| 3 | Objection Granted | | |
| 4 | Claim of Mr. Weber Rejected; | 63 | 3 |
| | Objection Granted | | |
| 5 | | | |
| | Claim of Mr. Dettinger Rejected; | 68 | 8 |
| 6 | Claim to be Withdrawn by Claimant | | |
| 7 | Claim of Mr. Gardner Rejected; | 73 | 3 |
| | Objection Granted | | |
| 8 | | | |
| | Claim Disallowed Based on Union's | 119 | 16 |
| 9 | Lack of Standing to Pursue | | |
| | Claim for Money | | |
| 10 | | | |
| | Debtor's Objection to Claims, | 125 | 3 |
| 11 | Granted | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

128

1

2                    C E R T I F I C A T I O N

3

4      I, Dena Page, certify that the foregoing transcript is a true

5      and accurate record of the proceedings.

6

7      _____

8      Dena Page

9

10     Also transcribed by:

11     Pnina Eilberg, AAERT Certified Electronic Transcriber

12     (CET**D-488)

13

14     Veritext

15     200 Old Country Road

16     Suite 580

17     Mineola, NY 11501

18

19     Date:  March 24, 2010

20

21

22

23

24

25