# Exhibit G

## LEASE AGREEMENT

THIS LEASE AGREEMENT (this "**Lease**") is entered into effective as of the _____ day of October, 2009, by and between **DELPHI PROPERTIES MANAGEMENT LLC**, a Delaware limited liability company ("**Tenant**"), and **GM COMPONENTS HOLDINGS LLC**, a Delaware limited liability company ("**Landlord**").

## RECITALS

A.    Landlord is the owner of certain real property located in the Town of Lockport, Niagara County, New York, which is more particularly described and/or depicted on **Exhibit A** attached hereto (the "**Real Property**"), including the certain technical center located within the Real Property (the "**Technical Center**"), which is more particularly described and/or depicted on **Exhibit B** attached hereto (the "**Site Plan**").

B.    Landlord, Tenant and certain other entities are parties to a certain Master Disposition Agreement dated as of July 30, 2009 (the "**MDA**"), and in connection with the MDA, Landlord is to lease to Tenant the Technical Center, which includes (i) office area on two floors for Tenant's exclusive use; (ii) back-end area used for wind-tunnels, model shop, test labs, and maintenance for Tenant's non-exclusive use (the "**Back-End Area**"); (iii) mezzanine area for Tenant's non-exclusive use (the "**Mezz Area**"), and (iv) the items set forth in **Section 1.01** below, all in accordance with the terms and conditions set forth in this Lease, and subject to Landlord's right to use and occupy the certain areas located within the Technical Center as described in **Section 1.03** below (collectively, the "**Leased Premises**"), which Leased Premises are more particularly described and/or depicted on the Building Plan on **Exhibit C** attached hereto.

C.    Landlord has agreed to lease the Leased Premises to Tenant for the Permitted Use (as defined below), in accordance with the terms and conditions set forth in this Lease.

NOW, THEREFORE, in consideration of One Dollar ($1.00) and the covenants and agreements set forth in the MDA, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## SECTION 1:  LEASED PREMISES

**1.01**    Landlord hereby leases and demises to Tenant, and Tenant hereby takes and hires from Landlord, on the terms, covenants, provisions and conditions set forth in this Lease, the Leased Premises, which includes the following: (a) any and all improvements (including, but not limited to, above ground and/or underground storage tanks located at the Technical Center), appurtenances, rights, interest, easements, utilities and privileges relating to the Technical Center, (b) any easements or other rights in the Real Property inuring to Landlord by reason of ownership of the Technical Center and required for the use thereof (including rights of access

over any land owned by Landlord which are reasonably necessary for the use and enjoyment of the Leased Premises), (c) all fixtures and any replacements thereof, attached to or used in connection with the use, occupation and operation of the Technical Center, (d) all alterations, additions and improvements hereafter made to the Technical Center, title to which alterations, additions and improvements shall, to the extent not removable from the Technical Center without causing material damage or waste to the Technical Center, vest in Landlord upon the termination of this Lease, subject to all zoning ordinances, use restrictions, applicable permits, easements, covenants, and all matters of record, (e) the certain parking area, which is more particularly described and/or depicted on **Exhibit D** attached hereto (the "**Parking Area**"), of which Tenant shall have the exclusive use of the fenced area of the Parking Area and of which Tenant shall have the non-exclusive use in common with Landlord of the non-fenced area of the Parking Area, and the non-fenced area shall be used only for vehicular parking for Tenant's and Landlord's employees, guests and invitees, and (f) the common areas (as defined in **Section 5.04** below), in common with the others to whom Landlord has granted or may hereafter grant rights to use such common areas, subject to rules and regulations for the use thereof as prescribed by Landlord.

**1.02** During the Term, Tenant shall have the right to use the certain items of personal property, furniture and equipment, which is more particularly described and/or depicted on **Exhibit E** attached hereto (the "**Personal Property**"), in accordance with the terms and conditions set forth in this Lease, including, but not limited to, **Section 11** below.

**1.03** Notwithstanding anything to the contrary contained in this Lease, Landlord shall have exclusive use of 6,000 square feet of office space within of the first floor ("**GMCH First Floor Area**"), which such GMCH First Floor Area shall not be included as part of the Leased Premises; and Landlord shall have the right to use, in common with Tenant, the Back-End Area, the Mezz Area, and conference room(s), restrooms and cafeteria areas, all as more particularly shown on **Exhibit C** attached hereto (collectively, the "**CRC Area**"), the common areas, and the Parking Area, provided Landlord shall not unreasonably interfere with Tenant's use and enjoyment of the Leased Premises. Tenant's rights in and to the Technical Center shall be subject to (a) Landlord's exclusive right to use and occupy the GMCH First Floor Area as referenced above, (b) Landlord's non-exclusive right to use, in common with Tenant, the Back-End Area, Mezz Area, CRC Area, the common areas, and Parking Area as referenced above, and (c) the other terms, covenants, provisions and conditions set forth in this Lease. Landlord's use and access to the Back-End Area shall be limited to: (i) those employees, agents and representatives of Landlord that require access as needed to support engineering operations, and (ii) such use and access as otherwise provided in this Lease.

## SECTION 2: TERM; DURATION AND RECORDING

**2.01** The term of this Lease shall commence on October 7, 2009 (the "**Commencement Date**") and shall continue for a period of (2) years, unless terminated sooner as provided in this Lease (the "**Term**").

1053517-2

**2.02**    Upon the Commencement Date, Landlord shall deliver possession of the Leased Premises to Tenant in its "as is," and "where is," "with all faults" condition.    TENANT ACKNOWLEDGES THAT LANDLORD HAS NOT MADE ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, WITH RESPECT TO ANY OF THE LEASED PREMISES, INCLUDING ANY WARRANTY OR REPRESENTATION AS TO (a) ITS FITNESS, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE, (b) THE QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, (c) THE EXISTENCE OF ANY DEFECT, LATENT OR PATENT, (d) COMPLIANCE WITH LAWS, (e) LOCATION, (f) USE, (g) OPERATION, OR (h) THE EXISTENCE OF ANY HAZARDOUS SUBSTANCE; AND LANDLORD SHALL HAVE NO LIABILITY TO TENANT IN RELATION THERETO; TENANT ACKNOWLEDGES THAT THE LEASED PREMISES HAVE BEEN INVESTIGATED AND INSPECTED BY TENANT AND ARE SATISFACTORY TO TENANT. IN THE EVENT OF ANY DEFECT OR DEFICIENCY IN ANY OF THE LEASED PREMISES OF ANY NATURE, WHETHER LATENT OR PATENT, LANDLORD SHALL NOT HAVE ANY RESPONSIBILITY OR LIABILITY FOR ANY DAMAGES, INCLUDING INCIDENTAL OR CONSEQUENTIAL DAMAGES. TENANT EXPRESSLY WAIVES ANY RIGHT OF RESCISSION HEREUNDER AND RELEASES AND DISCHARGES LANDLORD FROM ANY AND ALL CLAIMS OR CAUSES OF ACTION THAT TENANT MAY HAVE AS OF THE DATE OF THIS LEASE AGAINST LANDLORD SPECIFICALLY RELATING TO THIS LEASE AND THE LEASED PREMISES.

## SECTION 3:  RENT

**3.01**    During the Term of this Lease, Tenant agrees to pay to Landlord, as base rent, the total amount of One and No/100 Dollar ($1.00) per year during the Term (the "**Rent**").

**3.02**    Tenant shall, except as otherwise set forth herein, be responsible for any and all costs, expenses and obligations of every kind and nature whatsoever relating in any way to the Leased Premises and the Personal Property, including, but not limited to, taxes, insurance and utilities, and any and all costs, expenses and obligations relating to maintaining, repairing, and cleaning the Leased Premises, but only to the extent that Landlord is not otherwise responsible for such costs, expenses and obligations pursuant to the certain Transition Services Agreement dated October 6, 2009 (the "TSA"), the Facility Services Cost Allocation Table (as defined herein) or otherwise as specifically set forth herein.  Tenant agrees to pay to Landlord, as Additional Rent ("**Additional Rent**"), Tenant's pro rata share of Technical Center expenses relating to the services contained in the facility services cost allocation table set forth on **Exhibit F** attached hereto (the "**Facility Services Cost Allocation Table**") (excluding those costs, expenses and obligations relating to the Leased Premises, which are paid directly by Tenant).  Additional Rent shall be paid on a monthly basis, with payments in the amount of one twelfth (1/12) of the total amounts set forth on the Facility Services Cost Allocation Table being due and payable on the Commencement Date and continuing on the first day of each subsequent month thereafter.  As of the Commencement Date, the monthly payment will be Ninety Two Thousand Seven Hundred Fifty Eight and 00/10 Dollars ($92,758.00); provided, however, in the event of any conflict between amount of the monthly payment recited in this sentence and the monthly payment set forth on the Facility Services Cost Allocation Table, then the amount set forth on the Facility Services Cost Allocation Table shall prevail.  Within sixty (60) days after the end of (i) the first

six (6) months of the Term, (ii) the first twelve (12) months of the Term, (iii) the first eighteen (18) months of the Term, and (iv) the twenty-fourth (24th) month of the Term, Landlord shall furnish Tenant with a statement of the actual amount of Tenant's pro rata share of Additional Rent for said period, which, if the total amount paid by Tenant under this **Section 3** for any such period is less than the actual amount due for Tenant, Tenant shall pay the difference between the amount paid and the actual amount due within thirty (30) days after the furnishing of each such statement.  If the total amount paid by Tenant hereunder for any such period shall exceed such actual amount due from Tenant for said period, such excess shall be refunded to Tenant within thirty (30) days after the furnishing of such statement.

**3.03**   With respect to costs, expenses and obligations set forth in **Section 3.02** above, the Facilities Services Cost Allocation Table and **Section 5.06**, Tenant's "pro rata share" shall be sixty-eight percent (68%) and Landlord's "pro rata share" shall be thirty-two percent (32%).

**3.04**   In the event Tenant shall fail to pay any Rent, Additional Rent or any other amounts due hereunder within seven (7) days following written notice from Landlord of such failure, Tenant shall pay to Landlord on demand an amount equal to two percent (2%) of the amount of such unpaid installment unless Tenant is disputing, in good faith, any such Additional Rent invoice.

**3.05**   In the event Tenant shall fail to pay any Rent, Additional Rent or any other amounts due hereunder within seven (7) days following written notice from Landlord of such failure, Tenant shall pay to Landlord interest at the rate of seven percent (7%) per annum (**"Default Rate"**) on all overdue amounts of Rent, Additional Rent and any other amounts due hereunder from the date when due until the date when paid.

**3.06**   Tenant shall pay all Rent and Additional Rent to Landlord in lawful money of the United States of America at the following address:

> By Mail:        Worldwide Real Estate
>                 P.O. Box 77000
>                 Department 771280
>                 Detroit, MI 48277-1280
>
> By Wire Transfer:
>
>                 Bank         JPMorgan Chase
>                 Account      9102631075
>                 Routing      021000021
>                 Swift Code   chasus33

or to such other person or at such other place as Landlord may from time to time designate by written notice to Tenant.

**3.07**   In the event any of the expenses set forth in **Section 3.02** above and the Facilities Services Cost Allocation Table are billed directly to and paid by Tenant, then Landlord shall pay to Tenant its pro rata share of such expenses within five (5) days after receipt of Tenant's invoices for same, but only to the extent such expenses relate to the entire Technical Center,

including, but not limited to, the areas used and occupied by Landlord pursuant to **Section 1.03**, which payment will be made in lawful money of the United States of America at the following address:

> By Mail:          Delphi Automotive Systems
> 5725 Delphi Drive
> Troy, Michigan 48098
> Attn:  Executive Director Operations Support Group

or to such other person or at such other place as Tenant may from time to time designate by written notice to Landlord.

## SECTION 4:  TAXES AND ASSESSMENTS

**4.01**    Tenant agrees to pay, as Additional Rent, its pro rata share of any and all ad valorem taxes and assessments, whether general and special, levies, charges, fees and other governmental impositions, and any replacements thereof (collectively, the **"Taxes"**), relating to or levied upon the Technical Center.  To the extent not otherwise paid directly by Tenant, Tenant shall pay to Landlord its pro rata share of Taxes at the same time and in the same manner as Additional Rent set forth above (i.e. $1/12^{th}$ of the total amount of annual Taxes (as set forth in the Facility Services Cost Allocation Table) shall be paid on the Commencement Date and continuing on the first day of each subsequent month thereafter).

## SECTION 5:  USE AND MAINTENANCE OF LEASED PREMISES

**5.01**    Tenant shall only use and occupy the Leased Premises or any portion or portions thereof for office, design, engineering, and testing of automotive and general commercial applications (which shall include the manufacture of prototype components within the model shop, and component and system level validation testing within the Test Lab and vehicle level testing in climatic wind tunnels), and other uses reasonably incidental to each of the foregoing (the **"Permitted Use"**).  In carrying out the Permitted Use, and in the use and operation of the Leased Premises and the common areas generally, Tenant shall use only the substances, materials, compounds and chemicals (collectively, **"Commercial Products"**) approved through a commercial product review process to be implemented by Landlord and Tenant through mutual cooperation and good faith as described in **Exhibit G** attached hereto. Any change in use of a Commercial Product will be governed by Exhibit G. Furthermore, in carrying out the Permitted Use, and in the use and operation of the Leased Premises generally, Tenant and Landlord have agreed to a process for removal and disposal of non-hazardous trash generated by Tenant associated with Tenant's administrative/office and other activities at the Leased Premises under which Landlord will bear certain responsibility for the management of such non-hazardous trash and Tenant shall bear certain obligations to pay Landlord for such non-hazardous trash removal and disposal as more specifically described in the Facility Services Cost Allocation Table attached hereto. Tenant shall describe in **Exhibit H** attached hereto the Hazardous Waste Products (as such term is defined below in Section 17.03(b)) generated by Tenant at the Leased Premises.  Such description shall include a list of the Hazardous Waste Products, including the EPA waste codes and the estimated quantities generated of each.  Tenant shall promptly notify

Landlord in writing if Tenant makes a change in Hazardous Waste Products that would require a submittal to NYSDEC or other applicable governmental agency of the Notification of Regulated Waste Activity form. Tenant shall be responsible for the management of such Hazardous Waste Products as set forth in Section 17.03 herein. The Personal Property shall only be used within the Premises for its designed purpose and consistent with Procedures for such Personal Property, and for no other purpose whatsoever. Tenant shall not commit, or suffer to be committed, any nuisance upon the Leased Premises or the Real Property.

**5.02**    At any time during the Term of this Lease, Landlord shall have the right, at its sole option, to encumber the Real Property or any part thereof, including, but not limited to, the Leased Premises with the Environmental Easement Agreement (as defined below), the Site Management Plan (as defined below) or any documents in connection therewith, and/or deed restrictions or use restrictions typically contained in conveyance documents and/or lease agreements in which Landlord or its affiliates are the seller and/or lessor, as applicable, to the extent same do not unreasonably interfere with Tenant's Permitted Use and business operations at the Leased Premises, the form of which are attached hereto as **Exhibit L** (the "**Deed Restrictions**").

**5.03**    Landlord shall have access and shall be permitted to allow others access to the Leased Premises, including but not limited to reserving and granting unto itself (for the benefit of itself and/or others) nonexclusive perpetual easements for ingress, egress, connections to any utilities now or hereafter existing or other purposes related to Landlord's or Landlord's affiliates' property adjoining, abutting or adjacent to the Leased Premises; provided that any future easements do not have a material adverse impact upon Tenant's Permitted Use, and provided further that no such access unreasonably interferes with Tenant's operations at the Leased Premises.

**5.04**    The term "common areas", as used in this Lease, shall mean the parking areas, roadways, pedestrian sidewalks, truck ways, loading docks, landscaped areas, public bathrooms, delivery areas, cafeteria and other areas or improvements which may be provided by Landlord for the convenience and use of any employees, customers, invitees, agents and other licensees of the Technical Center.

**5.05**    Intentionally Omitted.

**5.06**    Tenant, at its sole cost and expense (to the extent Landlord is not otherwise responsible for such costs and expenses pursuant to the TSA or the Facility Services Cost Allocation Table), shall perform all necessary maintenance and repairs to the Leased Premises (including, but not limited to the routine repair and/or maintenance on the HVAC system that services the Leased Premises and replacement and disposal of any and all light bulbs), and otherwise keep the Leased Premises clean, orderly and in compliance with all applicable laws, rules and/or regulations with respect to Tenant's operations thereon, including, but not limited to, the Americans With Disabilities Act (42 USC §§ 12101 *et seq.*) and Environmental Laws (subject to Section 17 hereof), and shall maintain same in good condition and working order; provided, however, except as otherwise provided herein, Tenant shall not be required to make any alterations to the exterior of the building in which the Leased Premises is located or make any alterations of a

structural nature or incur any capital expenditures related thereto unless such alterations or expenditures are required due to the intentional acts or negligence of Tenant or are necessary to operate Tenant's or Landlord's business at the Technical Center in accordance with applicable law. Landlord shall not be required to furnish any services or facilities or to make any repairs or alterations in or to the Leased Premises throughout the existence of this Lease. Notwithstanding the foregoing, Landlord shall be responsible for the repair and maintenance relating to those specific services which are included within the Facility Services Cost Allocation Table, subject to Landlord's rights to collect Additional Rent from Tenant, and only relating to those portions of the Technical Center which do not include the Leased Premises.

Tenant shall be responsible for the repair, maintenance and replacement of the structural portions of the Technical Center, including, without limitation, the roof, walls, floors, interior supports, foundations, the HVAC system, plumbing, utility systems, and Parking Area of the Technical Center (collectively, the "**Capital Improvements**"); provided, however, Tenant's requirement to make Capital Improvements shall only be to the extent such Capital Improvements are required due to the intentional acts or negligence of Tenant or are necessary to operate Tenant's or Landlord's business at the Technical Center in accordance with applicable law. In no event whatsoever, shall Landlord be required to perform or make any Capital Improvements during the Term.

Prior to making any Capital Improvements to the Technical Center, Tenant shall prepare or cause to be prepared all plans and specifications for the Capital Improvements, including, without limitation, working drawings, construction drawings, electrical, plumbing and mechanical drawings necessary to construct the Capital Improvements (the "**Drawings**") and a budget for the Capital Improvement Expenses (as defined below) (the "**Budget**"), all of which shall be subject to Landlord's approval, such approval not to be unreasonably conditioned, delayed or withheld. The Drawings and the Budget shall be delivered to Landlord as soon as is reasonably practicable, and Landlord shall return its corrections, objections and requested changes, if any, to the submitted Drawings and Budget within fifteen (15) business days after Tenant's submission thereof. Landlord and Tenant shall cooperate and work in good faith to address Landlord's corrections, objections and requested changes to the Drawings and Budget, and Tenant shall not commence construction of the Capital Improvements until Landlord has approved the Drawings and Budget, such approval not to be unreasonably conditioned, delayed or withheld. Notwithstanding the foregoing, in the event Tenant is required to perform Capital Improvements hereunder within a time frame that is less than the notice and comment time periods provided herein due to the exigency of the condition or due to a requirement under applicable law, then Tenant shall provide Landlord prior notice and comment time as is reasonably practicable under the circumstances.

Tenant shall construct or cause the construction of the Capital Improvements in accordance with the Budget, subject to reasonable cost adjustments and overruns not to exceed fifteen percent (15%) of the initial Budget, and the Drawings in a good and workmanlike manner using materials specified in the Drawings and in compliance with all applicable codes, ordinances, rules and regulations applicable to the Capital Improvements and all permits, licenses, and all other governmental approvals requisite for the construction thereof (the "**Permits**"). Landlord

assumes no liability for special, consequential, or incidental damages of any kind whatsoever in connection with the design or construction of the Capital Improvements.

Tenant shall initially pay one hundred percent (100%) of any and all costs, expenses and charges incurred in connection with the Capital Improvements, Drawings and Permits (collectively, the "**Capital Improvement Expenses**"), subject to Landlord's obligation to reimburse Tenant for fifty percent (50%) of the Capital Improvement Expenses as set forth herein. Tenant shall submit to Landlord, on a periodic basis, an invoice for fifty percent (50%) of the Capital Improvement Expenses that have been paid by Tenant ("**Landlord's Share of the Capital Improvement Expenses**"), which such invoice shall itemize the Capital Improvement Expenses for the work performed for the period covered by such invoice. Landlord shall pay to Tenant Landlord's Share of the Capital Improvement Expenses on a periodic basis in accordance with a mutually acceptable forecasting and payment process to be developed by Landlord and Tenant using good faith and reasonable best efforts, but in no event later than sixty (60) days after receipt of such invoice from Tenant. In the event Landlord shall fail to reimburse Tenant for Landlord's Share of the Capital Improvement Expenses within sixty (60) days after receipt of such invoice from Tenant, then Tenant shall have the right to withhold and offset against Additional Rent the amount of Landlord's Share of Capital Improvement Expenses not paid by Landlord for such invoice, in addition to any other rights and remedies Tenant may have under this Lease.

Notwithstanding anything to the contrary contained herein, in the event Tenant shall not exercise the Option to purchase the Technical Center, then upon expiration of the Term of this Lease, Landlord shall reimburse Tenant for those Capital Improvement Expenses which have not been previously paid by Landlord to Tenant. In the event Tenant shall exercise the Option, then upon closing of the conveyance of the Technical Center pursuant to the Option, Tenant shall pay to Landlord the full amount of Landlord's Share of Capital Improvement Expenses to the extent previously paid by Landlord to Tenant. Landlord's and Tenant's obligations to reimburse the other party with respect to Capital Improvement Expenses as expressly set forth in this **Section 5.06** shall survive the assignment, expiration, or earlier termination of this Lease, but only to the extent such Capital Improvement Expenses have been incurred during the Term of this Lease and actually paid by the party entitled to such reimbursement.

**5.07**    Landlord shall provide Tenant with all facility services identified in the Facility Services Cost Allocation Table.

**5.08**    Except for the obligations of maintenance set forth in this Lease, Tenant shall make no changes, additions, alterations or improvements of any nature whatsoever in or to any of the Technical Center (collectively, the "**Alterations**"), without Landlord's prior written consent (which consent will not be unreasonably withheld, conditioned or delayed), and shall not demolish or destroy any of the Technical Center or the Real Property.

## SECTION 6: LIABILITY AND PROPERTY INSURANCE

**6.01**    Tenant covenants and agrees from and after the date hereof, at its sole cost and expense, to obtain, keep and maintain in full force and effect for the mutual benefit of Landlord, Tenant,

and Landlord's lenders, the names and addresses of which lenders shall be provided to Tenant, commercial general liability, including bodily injury, property damage and personal injury and advertising injury, insurance against claims for damage to persons or property arising out of or incidental to the use of the Technical Center, or any part or parts thereof, in limits of not less than $5,000,000.00 per occurrence and in limits of not less than $10,000,000.00 aggregate.

**6.02**   All insurance provided for in this **Section 6** may be in the form of a combination of primary and excess policies which may be furnished by Tenant.

**6.03**   Tenant covenants that it will from and after the Commencement Date, during the Term of this Lease, keep or cause to be kept the Leased Premises, including the improvements thereon, and the Personal Property insured against loss or damage by fire and such other hazards as are currently embraced in the standard extended coverage endorsement in the State of New York, and in an amount not less than the full replacement value of the Leased Premises and the Personal Property.

**6.04**   All insurance policies required hereunder shall be in such form and with insurance companies as shall be reasonably satisfactory to Landlord with a provision for at least thirty (30) days' advance written notice to Landlord in the event of cancellation. At least twenty (20) days prior to the expiration of any such policy, Tenant shall deliver a substitute therefore with evidence of payment of the premiums therefore. Upon Tenant's failure to do so, Landlord may at his option obtain such insurance and charge the cost thereof to Tenant as Additional Rent. All policies maintained by Tenant pursuant to this **Section 6** and/or as otherwise provided in this Lease shall name Landlord as an additional insured. All insurance policies which Tenant shall be required to maintain pursuant to this **Section 6** shall, in addition to the foregoing, be written by insurers which have an A.M. Best & Company rating of [**A-**] or better and are authorized to write such business in the State of New York.

**6.05**   Landlord and Tenant hereby release each other and their respective agents and employees from any and all liability to each other or anyone claiming through or under them by way of subrogation or otherwise for any loss or damage to property caused by or resulting from risks insured against under fire or extended coverage casualty insurance carried by the parties hereto and in force at the time of any such loss or damage; provided, however, that this release shall be applicable only with respect to loss or damage occurring during such time as the releasor's policies contain a clause or endorsement to the effect that any such release shall not adversely affect or impair such policies or prejudice the right of the releasor to recover thereunder. Landlord and Tenant each agrees that it will request its insurance carriers to include in its policies such a clause or endorsement, and will include such a clause if available.

**6.06**   Landlord shall obtain and maintain during the Term a policy of all risk property insurance, including fire, for the Building upon a full replacement cost basis with no coinsurance requirement. Tenant shall be responsible for its own personal property.

## SECTION 7:  SPECIAL COVENANTS

**7.01**   Intentionally Omitted.

**7.02**   Tenant shall indemnify, protect, defend  and hold harmless Landlord, Landlord's affiliates, and their partners, officers, directors, employees, agents and other representatives, and their successors and assigns, from and against any and all damages for any personal injury or injuries, death(s), damages, claims or losses to any person(s) or property that may be suffered or sustained by any person or persons in, on or about the Leased Premises or any part thereof, or arising from or in connection with the Personal Property and/or any default, breach or violation by Tenant and/or its respective partners, officers, directors, employees, agents and other representatives, and their successors and assigns of any provision of this Lease (collectively, "**Losses**"), except to the extent that such Losses result from the willful misconduct or gross negligence of Landlord, its employees, agents or contractors.

**7.03**   Landlord and Tenant each represent and warrant that there are no real estate agent or brokerage commissions or fees due in connection with this Lease, and each party does hereby indemnify the other against and hold it harmless from any liability arising from any such claim.

**7.04**   Landlord and Tenant agree that the provisions of this **Section 7** shall survive the termination of this Lease with respect to any Losses arising, occurring or relating to the period of time prior to such termination.

## SECTION 8:  IMPROVEMENTS

**8.01**   Tenant shall not locate or erect on the Leased Premises, or on any portion thereof, any improvements, structures and appurtenances without the prior written approval of Landlord and in any event, in full compliance with all laws, rules and regulations affecting the Leased Premises.

**8.02**   In the event any mechanics or similar liens may be recorded against the Leased Premises as a result of any act or omission of Tenant, or its employees, agents, officers, contractors or subcontractors or in connection with the Capital Improvements, then Tenant shall cause such mechanics or similar liens to be discharged or bonded over within sixty (60) days of receipt of notice of any such liens, unless Tenant is then disputing, in good faith, the validity of such lien. In the event that Tenant fails to so do within the time period set forth above, then Landlord may, in its sole and absolute discretion and upon ten (10) days prior written notice to Tenant, pay any such lien so as to cause same to be discharged.  Tenant shall be fully liable to Landlord for the payment of such lien and any and all costs and expenses incurred by Landlord in connection therewith, including but not limited to reasonable attorneys' fees and costs of collection of such amounts from Tenant.  Landlord may collect any of the foregoing amounts owed by Tenant as Additional Rent hereunder.

## SECTION 9:  COMPLIANCE WITH LAWS

**9.01**   Subject to the provisions of **Section 5.06** above, Tenant shall promptly comply with all applicable present and future laws, ordinances, orders, rules, regulations and requirements of the federal, state, county, city and municipal governments or any of their departments, bureaus, boards, commissions and officials thereof with respect to Tenant's use or operations on the

Leased Premises, the improvements thereon or hereafter erected thereon by Tenant, and the Personal Property or the use thereof, whether said compliance shall be ordered or directed to or against Landlord or Tenant.

**9.02** Landlord shall have the right to access, at its sole cost, expense and risk, the Leased Premises for the purposes of (i) evaluating Tenant's compliance with all applicable laws, ordinances, orders, rules, regulations and other requirements, which are applicable to the Leased Premises, including, but not limited to, Environmental Laws, and/or (ii) evaluating Tenant's compliance with the terms and conditions of this Lease. Tenant shall reasonably cooperate with Landlord in connection with such evaluations, and Tenant shall provide such non-privileged documentation and information, as reasonably requested by Landlord upon Landlord's request. In connection with the evaluations set forth in this Section 9.02, Landlord shall (i) provide prior written notice to Tenant at least three (3) business days before entering the Leased Premises, (ii) enter the Leased Premises only during normal business hours and with a representative of Tenant present, and (iii) not unreasonably interfere with Tenant's business operations at the Leased Premises.

## SECTION 10: MORTGAGES OF THE FEE INTEREST

**10.01** Tenant agrees, whenever and as often as Landlord may request, to cooperate with Landlord, at no additional cost or expense to Tenant, if Landlord desires to mortgage its fee simple interest in the Real Property (including the Leased Premises).

**10.02** Intentionally Omitted.

**10.03** Landlord shall have the right at any time and from time to time, during the existence of this Lease, to replace and/or refinance any mortgages affecting the Real Property and to obtain any loans or financing as Landlord may desire. Tenant agrees, at no additional cost or expense to Tenant, to cooperate with Landlord to mortgage the Real Property and to execute such instruments as may be reasonably necessary in connection therewith, including, but not limited to, commercially reasonable estoppel certificates and subordination, non-disturbance and attornment agreements, provided in no event shall Tenant's Option (as set forth in **Section 20** hereof) be subject or subordinate to any such mortgage.

**10.04** In conjunction with the replacement and/or refinancing set forth in this **Section 10** Landlord and Tenant shall comply with all other terms and provisions of this **Section 10** as if such replacement and/or refinancing were the first mortgage financing hereunder, provided in no event shall Tenant's Option (as set forth in **Section 20** hereof) be subject or subordinate to any such mortgage.

## SECTION 11: PERSONAL PROPERTY AND LEASEHOLD MORTGAGES

**11.01** Intentionally Omitted

**11.02** Upon the Commencement Date, Landlord shall deliver the Personal Property to Tenant in its "as is," "where is," and "with all faults" condition. Tenant acknowledges that Landlord is

not a seller under the Uniform Commercial Code and that Landlord makes no representations or warranties of any nature, including, but not limited to, warranties as to the merchantability of the Personal Property, its fitness for any particular purpose, its installation, its size, design, capacity or condition, its quality, or its compliance with any laws, rules, specifications or contracts.

**11.03**    All of the Personal Property shall remain at the Leased Premises and shall not be removed from the Leased Premises for any reason whatsoever without Landlord's prior written consent, which may be withheld in Landlord's sole and absolute discretion.  Subject to the provisions of Section 9.02 hereof, Landlord shall have the right to enter the Leased Premises and inspect the Personal Property at any time during normal business hours and upon reasonable advance notice to Tenant.  If Landlord supplies Tenant with labels stating that the Personal Property or any item thereof is owned by Landlord, Tenant shall affix and keep the same on each item of Personal Property, Tenant shall not alter, deface or remove any of the same and Tenant shall promptly replace any such labels that may be removed, defaced or destroyed.  Tenant shall not permit the name of any person other than Landlord to be placed on any item of Personal Property in a manner that might be interpreted as a claim of any right, title or interest in or to such item.

**11.04**    Title to each item of Personal Property shall be and remain with Landlord at all times, and Tenant shall not make any assertion to the contrary.  Tenant shall have no right, title or interest in or to any of the Personal Property except its leasehold interest solely as tenant as provided herein.  Each item of Personal Property is and shall at all times remain personal property, notwithstanding the manner in which it may now or hereafter be affixed or attached to the Leased Premises.

**11.05**    Tenant shall keep the Personal Property in good working order, condition and repair throughout the term of this Lease, ordinary wear and tear excepted.  Tenant represents, warrants and agrees that all Personal Property will be used solely for business purposes and not for personal, family or household purposes.  Tenant shall use the Personal Property in a careful, proper manner only for the purposes for which it is intended to be used.  To the extent Tenant does not exercise the Option to purchase the Personal Property as set forth in **Section 20.2** below, Tenant shall return the Personal Property to Landlord at the expiration of the Term, ordinary wear and tear excepted.

**11.06**    Tenant acknowledges and agrees that each item of the Personal Property will have significant value to Landlord at the expiration or earlier termination of the term of this Lease, and that Landlord intends to retake possession of the Personal Property at that time.  Landlord shall notify Tenant of Landlord's schedule for removal of the Personal Property, and Tenant shall cooperate with Landlord in effecting the removal of the Personal Property from the Leased Premises in accordance with Landlord's schedule.

**11.07**    Tenant shall at all times bear the entire risk of loss, theft, destruction or damage, whether partial or complete and whether or not insured, of each item of the Personal Property, and of any condemnation, confiscation, requisition, seizure, forfeiture or other taking of title to or use of each item of Personal Property, whether partial or complete, from any cause whatsoever (herein **"Loss or Damage"**), except to the extent that any such Loss or Damage may

result from the sole negligence or willful misconduct of Landlord, or its agents, contractors or employees. No Loss or Damage shall release, impair or otherwise affect Tenant's obligation to pay rent or any other obligation of Tenant under this Lease.

**11.08**   Tenant shall, at its own expense, at all times during the term of this Lease, insure the Personal Property against risks customarily insured against (as reasonably approved by Landlord) on similar items of personal property in an amount not less than the full cost of replacement of the Personal Property, as more particularly set forth in **Section 6** above.

**11.09**   Tenant shall keep the Personal Property free and clear of all claims, liens, charges, security interests and other encumbrances. Tenant shall be responsible for any and all ad valorem and other taxes relating to the Personal Property. If tax returns are required to be filed by Landlord, Tenant shall provide Landlord promptly upon request such information as Landlord shall require to complete such returns. Landlord shall pay the Personal Property taxes when due, upon which Tenant shall pay to Landlord within thirty (30) days after written notice and receipt of all paid invoices and/or receipts, as Additional Rent, the amount equal to all amounts paid by Landlord.

**11.10**   During the Term, Landlord shall not sell, convey or otherwise dispose of the Personal Property, without Tenant's prior written consent.

## SECTION 12:  BREACH; CURE; TERMINATION

**12.01**   The occurrence of any one or more of the following events shall be default under and breach of this Lease by Tenant:

>   (a)   <u>Failure to Pay Rent</u>.   Tenant fails to pay, within seven (7) days after written notice that same is past due, any Rent, Additional Rent or other monetary obligation payable by Tenant under the provisions of this Lease.

>   (b)   <u>Failure to Perform Other Obligations</u>.   Tenant breaches or violates any provision of this Lease applicable to Tenant, and such breach or violation continues for a period of thirty (30) days after notice thereof from Landlord to Tenant; or, if such breach or violation cannot be reasonably cured within such thirty-day period, Tenant does not commence to cure such breach or violation within such thirty-day period or does not thereafter diligently pursue such cure in good faith to completion.

**12.02**   Landlord's Remedies.   If any default occurs beyond applicable notice and cure periods, Landlord shall have the right, at its election, at any time, to exercise any one or more of the remedies described below.

>   (a)   <u>Cure by Landlord</u>.   Landlord may, at Landlord's option but without obligation to do so, and without releasing Tenant from any obligations under this Lease, make any payment or take any action as Landlord deems necessary or desirable to cure any default in such manner and to such extent as Landlord deems necessary or desirable, provided that, prior to making any such payment or taking

any such action, Landlord notifies Tenant of Landlord's intention to do so and affords Tenant at least fifteen (15) days in which to make such payment or take such action; except in the event of an emergency or other obligation which requires immediate attention in order to prevent bodily injury to any person or material damage to the Technical Center, in which event Landlord shall be permitted to take immediate action upon reasonable notice to Tenant under the circumstances and shall be permitted immediate access to the Leased Premises for the purposes of curing such default hereunder. Tenant shall pay Landlord, within thirty (30) days after written demand and receipt of all paid invoices and/or receipts, all advances and costs of Landlord in connection with making any such payment or taking any such action, including reasonable attorneys' fees.

(b)    Termination of Lease and Damages.  Landlord may terminate this Lease, effective at such time as may be specified by notice to Tenant, and demand (and, if such demand is refused, recover) possession of the Leased Premises from Tenant.  In such event, Landlord shall be entitled to recover from Tenant, as damages for loss of bargain and not as a penalty, an aggregate sum equal to all unpaid Rent and Additional Rent for any period prior to the termination date of this Lease, plus any damages, losses, costs or expenses incurred by Landlord resulting from Tenant's breach or default of this Lease.

(c)    Repossession and Reletting.  Landlord may reenter and take possession of all or any part of the Leased Premises, without additional demand but upon prior written notice and in accordance with applicable law, and repossess the same and expel Tenant and any party claiming by, through or under Tenant, and remove the effects of both using such force for such purposes as may be necessary and lawfully permitted, without being liable for prosecution for such action or being deemed guilty of any manner of trespass, and without prejudice to any remedies for arrears of Rent and Additional Rent or right to bring any proceeding for breach of covenants or conditions.  No such reentry or taking possession of the Leased Premises by Landlord, or notice thereof, shall be construed as an election by Landlord to terminate this Lease unless a notice of such intention is given to Tenant. Landlord reserves the right, following any reentry or reletting, to exercise its right to terminate this Lease by giving Tenant notice of such termination, in which event this Lease shall terminate as specified in such notice.  After recovering possession of the Leased Premises, Landlord shall have no obligation whatsoever to use reasonable efforts to relet the Leased Premises, but may, at Landlord's option, relet the Leased Premises.  Landlord may make such repairs, alterations or improvements as Landlord considers appropriate to accomplish such reletting, and Tenant shall reimburse Landlord within thirty (30) days after written demand for all reasonable costs, including reasonable attorneys' fees, which Landlord may incur in connection with such reletting, which demand shall be accompanied by paid invoices and/or receipts for such costs.  Landlord may collect and receive the rents for such reletting but Landlord shall in no way be responsible or liable for any inability, to relet the Leased Premises or to collect any rent due upon such reletting.  Regardless of Landlord's recovery of possession of the Leased Premises, so long as this Lease is not terminated, Tenant

shall continue to pay, on the dates specified in this Lease, the Rent and Additional Rent that would be payable if such repossession had not occurred, less a credit for the net amounts, if any, actually received by Landlord through any reletting of the Leased Premises.

(d)     _Remedies Not Exclusive_.  In lieu of or in addition to any of the foregoing remedies and damages, Landlord may exercise any remedies and collect any damages available to it at law or in equity.  All remedies are cumulative and concurrent and no remedy is exclusive of any other remedy.  Each remedy may be exercised at any time a default has occurred and is continuing and may be exercised from time to time.  No remedy shall be exhausted by any exercise thereof.

(e)     _No Mitigation_.  Landlord shall not be required to mitigate any of its damages hereunder unless required to by applicable Law.

(f)     _No Waiver_.  No failure of Landlord (i) to insist at any time upon the strict performance of any provision of this Lease or (ii) to exercise any option, right, power or remedy contained in this Lease shall be construed as a waiver, modification or relinquishment thereof.  A receipt by Landlord of any sum in satisfaction of any obligation with knowledge of the breach of any provision hereof shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision hereof shall be deemed to have been made unless expressed in a writing signed by Landlord.

(g)     _Recovery of Enforcement Costs_.    All costs, including reasonable attorneys' fees and disbursements, incurred by Landlord in connection with the exercise of any permitted remedy for any default, or the enforcement of the provisions of this Lease, shall be paid by Tenant to Landlord within thirty (30) days after written demand and receipt of paid invoices and/or receipts.

**12.03**  Tenant's Remedies upon Landlord Default.  If Landlord shall fail to comply with any provision or condition of this Lease on its part to be kept and performed, and if such default continues for a period of thirty (30) days after receipt of written notice from Tenant, then Tenant shall have the right, at its option, but shall not be obligated, to (i) subject to the limitations set forth below, remedy such default after providing Landlord with notice of Tenant's intention to do so and providing Landlord at least fifteen (15) days in which to take such action, except in the event of an emergency or other obligation which requires immediate attention in order to prevent bodily injury to any person or material damage to the Technical Center, in which event Tenant shall be permitted to take immediate action upon reasonable notice to Landlord under the circumstances, or (ii) terminate this Lease by giving Landlord notice in writing and, in the event of such termination, Tenant shall be relieved of any further obligation hereunder except with respect to the obligations set forth in **Section 5.01**, **Section 7**, and **Section 17** of this Lease.  All sums expended or obligations incurred by Tenant, in connection with curing Landlord's default shall be paid by Landlord to Tenant within thirty (30) days after written demand and receipt of paid invoices and/or receipts and, if Landlord fails to reimburse Tenant within such thirty-day

period, Tenant may, in addition to any other right or remedy Tenant may have, deduct such amount from subsequent installments of Additional Rent and/or other sums required to be paid by Tenant under this Lease until such amount is fully recovered by Tenant, unless such amounts are being contested by Landlord in good faith, in which event Tenant shall not be permitted to offset such amounts hereunder.   Notwithstanding anything to the contrary contained herein, Tenant shall have no right to exercise any remedies or actions as set forth in this **Section 12.03(i)** above with respect to any breach, default or non-compliance of Landlord, which is in any way related to or arising out of the covenants, conditions or obligations, if any, contained in **Section 5.01** and **Section 17** of this Lease.   Notwithstanding anything to the contrary contained herein, in no event whatsoever shall Landlord be responsible or liable to Tenant or any other third party for any consequential, special or incidental damages, including, but not limited to, claims for losses due to business interruption, as the result of any breach, default or non-compliance of Landlord of this Lease.

## SECTION 13: CONDEMNATION AND CASUALTY

**13.01**   If the entire Leased Premises shall be taken by the exercise of the right of eminent domain for any public or quasi-public improvement or use, this Lease shall then expire on the date when title to the Leased Premises so taken shall vest in the appropriate authority or on the date when any possession is required to be surrendered, whichever is later.   If the entire Leased Premises shall be damaged or destroyed by fire or other casualty so that the Leased Premises is unusable, in either party's sole discretion, this Lease shall then expire upon the date of such fire or casualty.

**13.02**   If a portion of the Leased Premises or any building or improvements shall be so taken or damaged as to make the Leased Premises unusable, in Tenant's sole judgment, then Tenant shall have the right to terminate this Lease on ten (10) days' prior written notice to Landlord from (i) the point at which possession is taken by such condemning authority or Landlord conveys same by deed in lieu of condemnation, as the case may be, or (ii) the date of such damage, as applicable.

**13.03**   Except as set forth herein, Tenant shall have no right to pursue any eminent domain related claims and/or insurance proceeds, as applicable, all of which are deemed assigned to Landlord.   Damages awarded for such taking under the power of eminent domain (a "**Takings Award**") and/or insurance proceeds, as applicable, whether for the whole or a part of the Leased Premises, shall be distributed solely to Landlord without distribution or allocation to Tenant. Notwithstanding the foregoing, Tenant shall be entitled to receive, and Landlord assigns to Tenant, all of Landlord's right, title and interest in any portion of any such Takings Award that is attributable to the value of the Option (as set forth in Section 20 hereof), or to moving expenses, business relocation expenses or damages to Tenant's business incurred as a result of any such condemnation.

**13.04**   If neither party cancels the Lease as provided in this **Section 13**, this Lease shall not terminate but the Leased Premises shall be reduced and a replacement **Exhibit C** shall be executed by Landlord and Tenant indicating the reduced size of the Leased Premises.

## SECTION 14:  ESTOPPEL CERTIFICATES

**14.01**  Landlord and/or Tenant shall, without charge at any time and from time to time, within thirty (30) days after receipt of request by the other party, certify by written instrument, which Landlord and/or Tenant, as the case may be, shall duly execute and acknowledge, and deliver to the other party or any mortgagees selected by Landlord, or any other person, firm or corporation specified by Landlord:

> (a)      that this Lease is unmodified and in full force and effect, (or, if there has been a modification, that the same is in full force and effect as modified and stating the modification);

> (b)      the dates and amounts, if any, to which the charges hereunder have been paid in advance; and

> (c)      whether, to each parties actual knowledge without due diligence inquiry, as applicable, Tenant or Landlord is or is not in default in the performance of any covenant, condition or agreement on such party's part to be performed and the nature of such party's default, if any, and such other customary, pertinent information as the other party or the holder of a mortgage described in **Section 10** hereof may reasonably request.

## SECTION 15:  EASEMENTS AND RELATED MATTERS

**15.01**  While no such consent is required, Tenant shall nonetheless grant consent to the execution of such instruments, in recordable form, as Landlord may reasonably request for using and granting easements and rights-of-way in, on, under and over the Leased Premises for ingress/egress, public and other utilities and any rights-of-way to applicable governmental agencies, including, without limitation thereof, gas, telephone, water, sewage, power, drainage and electricity, and for the maintenance, replacement and repair thereof; provide Tenant shall not be required to incur any unreasonable expense or pay any unreasonable cost in connection with such consent, and provided further that Tenant's failure to grant such consent shall not be a default hereunder.

## SECTION 16:  SIGNS

**16.01**  Tenant shall not be allowed to place or permit to be placed signs and advertising matter in, on or about the Leased Premises, the Technical Center or land located on the Real Property, without the prior written consent of Landlord, which such consent shall not be unreasonably withheld, conditioned or delayed.  Any such signage shall, at all times, comply with applicable ordinances and/or municipal requirements.

## SECTION 17:  ENVIRONMENTAL MATTERS

**17.01**  For purposes of this Lease:

(a)    **"Environmental Laws"** means all federal, state or local laws, statutes, rules, regulations, ordinances, permits (whether issued to Landlord or Tenant), orders, court or administrative decisions, or other governmental directives, requirements or standards whether now existing or hereafter enacted, amended, promulgated, or issued, related to Hazardous Substances, pollution, or protection of the indoor or outdoor environment, public safety, or human health.

(b)    **"Hazardous Substances"** means any element, mixture, chemical, hazardous substance, constituent, waste, pollutant, contaminant or material including petroleum or petroleum-based or petroleum-derived substances, polychlorinated biphenyls, asbestos-containing materials (**"ACM"**), noxious, radioactive, flammable, corrosive or caustic compound (whether solid, liquid or gaseous), which are regulated or can give rise to liability under an Environmental Law.

**17.02**    Except as otherwise described in this Section 17, Tenant shall comply with all Environmental Laws applicable to Tenant's activities and uses of, on or about the Leased Premises, the improvements thereon or hereafter erected thereon by Tenant, and Tenant's use of the Personal Property, except to the extent any such non-compliance is caused by Landlord's activities at the Leased Premises during the Term of this Lease.  Tenant shall not perform any activities or discharge or emit any Hazardous Substances, which would cause or contribute to any violation of any environmental permits of Landlord.  Tenant acknowledges receipt of copies of the environmental permits of Landlord.

**17.03**        (a)        Tenant shall not introduce, permit, treat, store, or dispose of any Hazardous Substances, including Hazardous Waste Products as defined below in Section 17.03(b), at, on, or within the Real Property and will maintain RCRA small quantity generator status or generator-only status, separate from the adjacent GM Components Holdings facility, pursuant to Environmental Laws; provided, however, Tenant may, subject to the provisions of **Section 5.01** above, use and accumulate Commercial Products that may contain such Hazardous Substances so long as: (A) such use and accumulation of such Commercial Products are (i) generated within the Leased Premises, (ii) required for the Permitted Use, (iii) in conformance with all applicable Environmental Laws, and (B) Tenant fully complies with all applicable legal requirements pertaining to the accumulation, storage, handling, management, use or disposal of any Hazardous Substances, including any Hazardous Waste Products.  Tenant shall not cause or permit the release, threatened release, abandonment, treatment, dumping, discharging, or disposal of any Hazardous Substances, including Hazardous Waste Products, at, on, under, about or from the Leased Premises or the adjoining property, and Tenant shall dispose of Hazardous Waste Products at a location outside of the Real Property in accordance with **Section 17.03(b)** below.

(b)        Tenant, at Tenant's sole cost and expense, shall be fully and solely liable and responsible for the proper management and disposal of any wastes it generates that are defined as hazardous under Environmental Laws (herein, "Hazardous Waste Products"), and shall do so in accordance with all applicable laws, rules and/or regulations, including, but not limited to, Environmental Laws and any environmental permits of Landlord to the extent

applicable. Tenant shall not be permitted to dispose of Hazardous Waste Products at any location within the Real Property, but shall transport Hazardous Waste Products to an offsite location for offsite storage or disposal in accordance with applicable Environmental Laws.

**17.04**      (a)      Tenant shall promptly (and concurrently with any notice to any governmental regulatory agency) notify Landlord in writing upon obtaining knowledge of: (i) any spill, release, discharge or disposal of any Hazardous Substance at, on, under, about or from the Leased Premises or adjoining property; (ii) any enforcement, cleanup, removal or other governmental or regulatory action instituted, contemplated, or threatened against Tenant with respect to the Leased Premises or adjoining property pursuant to any Environmental Law; (iii) any claim made or threatened by any person against Tenant relating to damage, contribution, cost recovery, compensation, loss or injury resulting from or claimed to result from any Hazardous Substances at, on, under, about or from the Leased Premises or adjoining property; (iv) any reports made to any governmental agency or to Tenant arising out of or in connection with any Hazardous Substances at, on, under, about, from or removed from the Leased Premises or adjoining property, including any complaints, notices, warnings, reports or asserted violations in connection therewith; and (v) any actual or alleged violation of any Environmental Law in connection with Tenant's or any other person's activities (other than Landlord's activities during the Term of this Lease) on or about, or use of, the Leased Premises, the improvements thereon or hereafter erected thereon by Tenant, or use of the Personal Property. Notwithstanding the foregoing, Tenant shall not be obligated to notify Landlord of de minimus spills or releases that do not constitute reportable quantities under applicable Environmental Laws and do not have a likely potential to impact soils, subsurface soils, surface waters, sewer systems or groundwater.

(b)      If the presence of any Hazardous Substances on or about the Leased Premises or the Real Property caused or permitted by Tenant, during the Term, results in any contamination of any portion thereof, then Tenant shall act as follows: (1) with respect to any such Hazardous Substances that are within the facility or improvements but have not impacted the soils, subsurface soils, surface waters, or groundwater, Tenant shall promptly take all actions at its sole cost as are necessary to return the Leased Premises or the Real Property to substantially the same condition as existing prior to the introduction of any such Hazardous Substances, and (2) with respect to any such Hazardous Substances which have impacted the soils, subsurface soils, surface waters, or groundwater, Tenant will be responsible and liable for performing all remediation required under applicable Environmental Laws, including without limitation obtaining agency approval, if required; provided, however, that Landlord acknowledges that Tenant would intend to propose the least stringent cleanup levels allowed under applicable Environmental Laws, including the use of risk-based cleanup levels where allowed under applicable Environmental Laws all subject to obtaining Landlord's prior written consent of the actions to be taken by Tenant, which consent may be granted or withheld in Landlord's reasonable discretion, provided all such actions of Tenant shall at all times comply with the applicable Environmental Laws, the Site Management Plan, to the extent applicable, the Environmental Easement Agreement, to the extent applicable , and/or any applicable  Deed Restrictions.

(c)      If in its reasonable discretion Landlord believes that Tenant is not taking all actions as are necessary to return the Leased Premises or the Real Property to substantially the same condition in which it existed prior to the introduction of any such Hazardous Substances

pursuant to **Section 17.04(b)**, Landlord shall notify Tenant of the actions it believes to be necessary to return the Leased Premises or the Real Property to substantially the same condition in which it existed prior to the introduction of any such Hazardous Substances. Upon receipt of such notice, Tenant shall have thirty (30) days to commence such Landlord stipulated actions and continue same to completion. If Tenant fails to commence such action within said thirty (30) day period, Landlord may commence such actions at Tenant's expense unless Tenant agrees to so commence such actions within a reasonable time frame so long as such actions are in accordance with Section 17.04(b) above. Tenant shall reimburse Landlord for the reasonable cost of any such action taken by Landlord to cure Tenant's breach hereunder within sixty (60) days after receipt of an invoice therefore, together with reasonable supporting documentation.

17.05   Tenant shall not install any additional underground storage tanks at the Leased Premises without the prior written consent of Landlord, which may be withheld in the sole discretion of Landlord. Tenant shall not install any additional above ground storage tanks at the Leased Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. In the event the NYSDEC or other governing environmental agency requires, during the Term of this Lease, that Landlord or Tenant undertake remediation or other actions at or about the Leased Premises under applicable Environmental Laws to address the above ground or underground storage tanks and/or other conditions or matters of noncompliance directly relating to the Leased Premises or caused by Tenant's use and occupancy of the Leased Premises during the Term and not directly related to or originating from the adjacent facility owned by Landlord (including, without limitation, the chlorinated solvents associated with the Building 8 former above-ground TCE storage tank) or actions of the Landlord on the Leased Premises during the Term, Tenant agrees that, as between Tenant and Landlord, Tenant shall be responsible and liable for performing any such agency-required remediation. Tenant shall promptly inform the NYSDEC or the other governmental agency(ies) requiring the remediation that Tenant is performing such remediation or taking such actions. Tenant shall resolve any NYSDEC or other governmental agency notices or allegations of noncompliance by Tenant caused by Tenant's use or operations at the Leased Premises during the Term of this Lease. In connection with any such remediation activities, Tenant shall not disturb or interfere with any subsurface utilities located on, under or about the Real Property. Landlord agrees that in the event the NYSDEC or other governing environmental agency so requires such remediation at or about the Technical Center, Tenant intends to propose the least stringent cleanup levels and remedial actions allowed under applicable Environmental Laws, including the use of risk-based cleanup levels where allowed under applicable Environmental Laws; provided, however, that in any event Tenant's actions shall be in conformance with applicable Environmental Laws, including, but not limited to, obtaining agency approval, if required.

Regarding Tenant's remediation or other actions, if any, under this Section 17.05 during the Term of this Lease, the cost of such remediation or other actions (the "**Reimbursable Remediation Costs**") shall be allocated as follows: Tenant shall initially pay one hundred percent (100%) of any such Reimbursable Remediation Costs incurred during the Term of this Lease; and, Landlord shall reimburse Tenant for fifty percent (50%) of such Reimbursable Remediation Costs to the extent same have been actually paid by Tenant (**"Landlord's Share of the Reimbursable Remediation Costs"**) on a periodic basis in accordance with a mutually acceptable forecasting and payment process to be developed by Landlord and Tenant using good

faith and reasonable best efforts, but in no event later than sixty (60) days after receipt of an invoice from Tenant, together with reasonable supporting documentation, including contractor and/or consultant invoices. Notwithstanding the foregoing, with respect to remediation or other actions that are required to address contamination to the extent caused by Tenant's use or operations at the Leased Premises during the Term of this Lease or required to resolve any NYSDEC or other governmental agency notices or allegations of noncompliance by Tenant caused by Tenant's use or operations at the Leased Premises during the Term of this Lease, Tenant shall be solely liable and responsible for addressing such matters including the cost thereof and such costs shall not be reimbursable by Landlord hereunder and such matters shall not be included as part of the Reimbursable Remediation Costs.

Tenant shall promptly provide Landlord with any written correspondence from or to NYSDEC or other governmental agency relating to matters for which Tenant may properly seek reimbursement from Landlord under this **Section 17.05**. Tenant shall provide Landlord with copies of any draft work plans, including any proposals for work, including without limitation, any investigation, assessment, or remediation related to matters for which Tenant may properly seek reimbursement from Landlord under this **Section 17.05** at least two (2) weeks prior to implementing any such work or submitting such documents to any governing agency. Landlord shall have the right to review such plans and proposals and shall provide Tenant with its reasonable comments on such plans and proposals which will be limited to commenting on whether such plans and proposals meet the standard for cleanup and remediation set forth in this **Section 17.05**. Tenant shall reasonably consider Landlord's reasonable comments. Notwithstanding the foregoing, in the event remediation or other action of a condition for which Tenant could seek reimbursement hereunder from Landlord: (1) requires action by Tenant within a time frame that is less than the notice and comment time periods provided herein due to the exigency of the condition, or (2) is required to be undertaken by Tenant under applicable Environmental Laws within a time frame that is less than the notice and comment time periods provided herein, then Tenant shall provide Landlord with as much prior notice and comment time as is reasonably practicable under the circumstances.

In the event Landlord shall fail to reimburse Tenant for Landlord's Share of the Reimbursable Remediation Costs within sixty (60) days after receipt of an invoice (as described above) from Tenant, then Tenant shall have the right to withhold and offset against Additional Rent the amount of Landlord's Share of the Reimbursable Remediation Costs not paid by Landlord for such invoice, in addition to any other rights and remedies Tenant may have under this Lease.

Notwithstanding anything to the contrary contained herein, in the event Tenant shall not exercise the Option to purchase the Technical Center, then upon expiration of the Term of this Lease, Landlord shall reimburse Tenant those Reimbursable Remediation Costs, which have not been previously paid by Landlord to Tenant. In the event Tenant shall exercise the Option, then upon closing of the conveyance of the Technical Center pursuant to the Option, Tenant shall pay to Landlord the full amount of Landlord's Share of Reimbursable Remediation Costs to the extent previously paid by Landlord to Tenant.

**17.06** Except for a duly authorized agent of any governmental or regulatory agency, in no event shall Tenant permit or engage any third party to conduct any physical examination or analysis of the land comprising the Leased Premises without the prior written consent of Landlord, which consent may be withheld in Landlord's sole discretion. Notwithstanding the foregoing, in the event Tenant receives a court order or directive from a governmental agency mandating such an

investigation of the Leased Premises, or requiring disclosure of any information within Tenant's possession or knowledge, Tenant shall, prior to complying with such court order or directive, provide Landlord with written notice of such order or directive within five (5) business days after receipt of said order or directive. Landlord shall have the right to challenge such order or directive, or seek an injunction or similar protective order. In the event Landlord provides Tenant written notice within five (5) business days after receipt of Tenant's notice of the pending order or directive of its intent to initiate and does in fact initiate such legal action challenging the order or directive, Tenant shall, so long as Tenant is not subjected to any cost or liability as a consequence, defer compliance with such order or directive pending the outcome of Landlord's challenge.

**17.07**    Tenant reasonably agrees to cooperate with Landlord to produce any required reporting under Environmental Laws, such as by way of and not limitation calculating threshold determinations for reporting under the Emergency Planning and Community Right-to Know Act of 1986.

**17.08**        (a)    (i)    Landlord and its representatives may undertake certain Response Activities (as defined herein) at the Leased Premises in accordance with a consent order to be entered into by Landlord and the NYSDEC regarding Inactive Hazardous Waste Registry Site 932113 and any subsequent, applicable consent orders or work plans which may be entered into with the NYSDEC or any other authorized governmental agency to complete Response Activities at the Leased Premises (herein collectively referred to as the "Consent Order"). Copies of any Consent Order or other plans with the NYSDEC or any other authorized governmental agency will be made available for Tenant's review.

(ii)    "Response Activities" by Landlord may include, without limitation, investigation, assessment, reporting, monitoring, inspection, evaluation, remediation, equipment installation, construction, recording of environmental easements or deed restrictions, including without limitation the Deed Restrictions, and/or other actions, which Landlord determines are necessary, or are required to comply with Landlord's obligations under any Consent Order, work plan, or any Environmental Laws. Such Response Activities will include monitoring and site activities consistent with the form of Site Management Plan attached hereto as **Exhibit I** and/or recording the Environmental Easement Agreement the form of which is attached hereto as **Exhibit K**. Tenant shall, at all times, to the extent applicable to the Leased Premises, comply with the Site Management Plan, the Environmental Easement and/or the Consent Order, and, upon Landlord's request, Tenant shall reasonably cooperate with Landlord with respect to any reporting requirements under such documents and shall certify to Landlord, the NYSDEC and/or any other authorized governmental agency, as applicable, that Tenant is in compliance with such documents. Tenant shall provide to Landlord such certification or any other documentation described above within thirty (30) days of receipt of written request from Landlord.

(b)    (i)    In the event Landlord determines, in its sole judgment that Response Activity(ies) must be conducted at or in the Leased Premises or the portion of the Real Property adjacent to the Leased Premises, Tenant acknowledges and agrees that Landlord and/or its representatives may have access to the Leased Premises at reasonable times when possible under the circumstances throughout the Term of the Lease to conduct such Response

Activity(ies); and in the event Tenant shall exercise the Option as set forth in **Section 20.2** below, then any deed from Landlord to Tenant will contain an access easement which will provide Landlord with access to the Leased Premises for the purposes set forth in this **Section 17**. Any such employee or representative shall, to the maximum extent possible, comply with any applicable health and safety requirements applicable to the Leased Premises.

(ii)   Tenant agrees that employees and representatives of the NYSDEC, USEPA or any New York State Agency may have access to the Leased Premises at reasonable times when possible under the circumstances for the purpose of inspection, sampling, and testing to ensure Landlord's compliance with the any Consent Order.   Any such employee or representative shall, to the maximum extent possible, comply with any applicable health and safety requirements applicable to the Leased Premises.

(iii)   Tenant acknowledges and agrees that Tenant's use of and operations at the Leased Premises may not interfere with the performance of any Response Activity(ies) by Landlord and/or its representatives in the Leased Premises or at or in the Real Property.   If Landlord determines that proposed activities by Tenant will or may interfere with Response Activity(ies) at the Leased Premises or the Real Property, Landlord shall notify Tenant in writing.   Tenant shall modify, to Landlord's reasonable satisfaction, any such proposed activities so as to not interfere with Landlord's Response Activity(ies).   Tenant must obtain prior written approval from Landlord for any use modification that would constitute a "substantial change of use" under 6 NYCRR §375-1.3(v).

(iv)   In exercising its rights under this Section 17, Landlord shall use reasonable best efforts to minimize unreasonably interfering with Tenant's use of or occupancy of the Leased Premises; however, due to the nature of its Response Activity(ies), some interference may occur.   Landlord shall notify Tenant in writing at least two weeks prior to commencing a significant Response Activity(ies).   Such notice shall include a work plan that describes such Response Activity(ies) to be undertaken within the Leased Premises at that time and any restrictions on Tenant's activities at the Leased Premises which may be necessary to perform the Response Activity(ies). In the event Tenant reasonably determines that Landlord's proposed action would unreasonably interfere with or impair Tenant's ability to conduct its operations at the Leased Premises in the ordinary course (the "Potential Interference"), Tenant shall notify Landlord in writing.   Such notice shall specify in detail the nature and scope of the Potential Interference; provided, however, that it will not be reasonable for Tenant to object to Landlord's action: (1) because a different action might take a shorter period of time or require less of a presence of Landlord or its representatives at the Lease Premises, or (2) to require action more stringent or materially different from that required under applicable Environmental Laws. Tenant and Landlord shall work together cooperatively and in good faith to mutually agree upon a modified work plan that would resolve such Potential Interference.

(v)   So long as the provisions set forth in **Section 17.08(b)(iv)** have been met, and so long as Landlord has implemented or is implementing Response Activity(ies) substantially in accordance with the written work plan (or modified work plan) referenced in **Section 17.08(b)(iv)** above, then Tenant hereby waives any claim for damages for any injury or inconvenience to or interference with Tenant's business, any loss of occupancy, or quiet enjoyment of the Leased Premises or any other loss occasioned by such access and Response

Activities, except for personal injury or property damage caused by Landlord or its representatives within the Leased Premises.

**17.09**         Landlord hereby notifies Tenant that indoor air sampling has been performed in various areas within the Real Property. A set of fact sheets has been developed by New York State Department of Health ("NYSDOH") regarding the chemicals of concern and are attached hereto as Exhibit J. Details of the sampling efforts, including sampling plans and test results are available for review upon request. Landlord will notify Tenant should additional samples be collected and test results received. Future test results will be made available upon request. The Parties acknowledge that the indoor air sampling data made available to the Parties as of the Commencement Date does not disclose any actionable levels. In addition, Landlord shall notify Tenant in advance of the date, time and location of any public meeting to be held to discuss test results, if any. In the event any results from future sampling, if any, require mitigation controls to address vapor intrusion into the Technical Center caused by contamination directly relating to or originating from the adjacent facility owned by Landlord (including, without limitation, the chlorinated solvents associated with the Building 8 former above-ground TCE storage tank) and the NYSDEC or NYSDOH requires such mitigation controls during the Term of the Lease or, in the event Tenant has exercised the Option as set forth in Section 20 herein, while Tenant, its permitted assigns or permitted successors, is still the owner of the Leased Premises, then the following terms shall apply:

Vapor Intrusion Mitigation Costs means: (1) the costs to implement or install the most cost-effective vapor intrusion mitigation system allowed under applicable Environmental Laws and acceptable to the NYSDEC or NYSDOH, if such acceptance is required (the "Installation Cost") and (2) the cost of the annual operation and maintenance of the system for a period of twenty (20) years, and may include verification that the current HVAC system within the facility, either to partially or entirely, satisfy the mitigation requirements, which would involve minimal costs but would require Tenant to maintain such HVAC system (the "Maintenance Cost"). The Vapor Intrusion Mitigation Costs proposal for the Installation Cost and the Maintenance Cost shall be prepared by utilizing a firm mutually agreeable to both Landlord and Tenant (such as Haley and Aldrich). Such cost proposal shall satisfy the notice requirements of Section 17.08(b)(iv) above.

Landlord shall, at its option, either (i) install or implement the most cost-effective vapor intrusion mitigation system allowed under applicable Environmental Laws and acceptable to the NYSDEC or NYSDOH, if such acceptance is required, (in which case Landlord shall solely bear the actual Installation Cost) and pay Tenant the Maintenance Cost, or (ii) pay Tenant the total Vapor Intrusion Mitigation Costs (the Installation Cost plus the Maintenance Cost) which shall fully satisfy such mitigation obligation in which case Tenant, and not Landlord, shall be fully responsible for the Installation Cost and the Maintenance Cost. Should Landlord elect to install the mitigation control system, Tenant agrees to reasonably cooperate with Landlord. If the actual Installation Cost exceeds the Installation Cost estimated by the consultant in the Vapor Intrusion Mitigation Costs proposal, then Landlord shall promptly reimburse Tenant for such Installation Cost overrun upon Landlord's receipts of documentation reasonably acceptable to Landlord that verifies the project cost overruns.

**17.10** Except as otherwise provided herein, all representations, warranties, covenants and other obligations provided for in this **Section 17** shall not survive the assignment, expiration, or earlier

termination of this Lease; provided, however, (i) the obligations set forth in Section 17.09 shall survive the assignment, expiration, or earlier termination of this Lease until the earlier of (A) conveyance of possession or title of the Leased Premises to a third party, or (B) NYSDEC and NYSDOH, as applicable, concur that vapor intrusion mitigation systems at the Leased Premises are no longer required as a result of or in connection with Landlord's activities, and (ii) Landlord's and Tenant's obligation to reimburse the other party with respect to Reimbursable Remediation Costs as expressly set forth in **Section 17.05** shall survive the assignment, expiration, or earlier termination of this Lease, but only as it relates to such Reimbursable Remediation Costs which have been incurred during the Term of this Lease and actually paid by the party entitled so such reimbursement. Nothing contained in this **Section 17** is intended to nor shall it confer rights upon any third parties.

**17.11**  Tenant shall be solely liable for all costs, expenses, including reasonable attorneys' fees, losses, damages, actions, claims, liabilities, judgments, cleanup, remediation, disposal costs, penalties, assessments, or fines, but only to the extent such environmental costs and expenses arise from or are related to or due to Tenant's uses of or operations at the Leased Premises, or Tenant's failure to comply with the covenants contained in this **Section 17** and/or **Section 5.01** (hereinafter collectively referred to as "**Environmental Losses**").

**17.12**  Intentionally Omitted.

## SECTION 18:   WRITTEN NOTICES

**18.01**  Whenever under the terms of this Lease a written notice is required, or whenever a written notice or communication is sent, the same shall be accomplished by either facsimile with electronic confirmation of transmission and with a copy sent by U.S. Mail, or by overnight delivery service which guarantees next day delivery (such as FedEx), addressed as follows:

To Tenant:

DELPHI PROPERTIES MANAGEMENT LLC
5725 Delphi Drive
Troy, Michigan 48098


To Landlord:

GM Components Holdings LLC
c/o General Motors Company
Worldwide Real Estate
Attn.: Director of NA Real Estate
200 Renaissance Center, 38th Floor
MC 482-B38-C96
Detroit, MI  48265

with a copy to:

Lawrence D. McLaughlin, Esq.
Honigman Miller Schwartz and Cohn LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506

or to such other address(es) as any of the parties above mentioned shall designate by written notice. Delivery of notices sent pursuant to this **Section 18** shall be deemed delivered and received One (1) business day after deposit of such notice with the overnight delivery service or if sent by facsimile, the day of transmission, unless transmitted after 5:00 P.M., Detroit time, in which case delivery shall be deemed to have occurred the next business day.

## SECTION 19: MISCELLANEOUS

**19.01**  Except as otherwise provided in this Lease, all covenants, agreements, provisions and conditions of this Lease shall be binding on and inure to the benefit of the parties hereto, their respective personal representatives, successors and assigns.

**19.02**  The captions of the sections of this instrument are solely for convenience and shall not be deemed a part of this instrument for the purposes of construing the meaning thereof or for any other purpose.

**19.03**  Except as otherwise set forth in this Section 19.03, without the prior written consent of Landlord, which may be withheld in Landlord's sole and absolute discretion, Tenant covenants not to (i) sell, assign or transfer this Lease or any interest in this Lease or the Personal Property or any interest in the Personal Property, (ii) hypothecate, mortgage, pledge, encumber or convey the Leased Premises, this Lease, the Personal Property or any portion thereof, or (iii) sublease or permit any other party to use the Leased Premises, the Personal Property or any portion thereof (collectively, "**Transfer**").  Notwithstanding the forgoing, Tenant shall be permitted to Transfer this Lease, without the prior written consent of Landlord, to Delphi Automotive Systems LLC, to an affiliate of Tenant, or to an entity which has acquired substantially all of the assets of or a controlling interest in Tenant, provided such entity is not an original equipment manufacturer, in which event Landlord's prior written consent shall be required prior to such Transfer.  No Transfer of any interest in this Lease by Tenant shall relieve Tenant from any of its obligations and liabilities hereunder, and Landlord shall have the right to proceed, jointly and/or severally, against Tenant and any assignee, transferee, mortgagee or other person holding any interests under the Lease for any obligation or liability of Tenant hereunder.

**19.04**  This Lease shall be construed in accordance with the laws of the State in which the Leased Premises is situated.  Whenever the contents of any provision shall require it, the singular number shall be held to include the plural number and vice versa.  The neuter gender includes the masculine and the feminine.

1053517-2

**19.05**   This Lease contains the entire agreement of the parties hereto with respect to the Leased Premises described above.  This Lease may not be amended, modified, released or discharged in whole or in part except by an instrument in writing signed by the parties hereto, their respective successors or assigns.

**19.06**   The failure of any party to insist upon strict performance of any of the terms, covenants or conditions hereof shall not be deemed a waiver of any rights or remedies which that party may have hereunder, at law or in equity, and shall not be deemed a waiver of any subsequent breach or default in any of such terms, covenants or conditions.  No waiver by any party of any default under this Lease shall be effective or binding on such party unless made in writing by such party and no such waiver shall be implied from any omission by a party to take action in respect to such default.  No express written waiver of any default shall affect any other default or cover any other period of time other than any default and/or period of time specified in such express waiver.  One (1) or more written waivers of any default under any provision of this Lease shall not be deemed to be a waiver of any subsequent default in the performance of the same provision or any other term or provision contained in this Lease.

**19.07**   Landlord and Tenant agree that the exercise by such party of its rights hereunder shall not violate any agreement, contract, or similar arrangement to which such party is bound and no third party shall have any interest in the Leased Premises or the Real Property.

**19.08**   If Tenant shall hold over as a Tenant after the expiration of the then existing Lease Term without renewal thereof, then such tenancy shall be deemed to be on a month-to-month basis with rent payable at fair market value per day for each day or part thereof that Tenant holds over, plus any and all Additional Rent due to Landlord hereunder as well as any damages incurred by Landlord.

**19.09**   Except as otherwise provided in this Lease, all covenants, agreements, provisions and conditions of this Lease shall be binding on and inure to the benefit of the parties hereto, their respective personal representatives, successors and permitted assigns.  The word "**Tenant**," as used in this Lease, means only the owner for the time being of Tenant's interest in this Lease.  The word "**Landlord**", as used in this Lease, means only the owner for the time being of Landlord's interest in this Lease and the Leased Premises.  In the event of any conveyance of the Leased Premises, Landlord shall be and hereby is entirely freed and relieved of all obligations of Landlord hereunder thereafter accruing, provided any such transferee assumes, in writing, Landlord's obligations hereunder from and after the date of such transfer.

**19.10**   Upon the termination or expiration of the Lease Term Tenant shall quit and surrender the Leased Premises in substantially the same condition that existed as of the Commencement Date of this Lease, reasonably wear and tear excepted, but free from any Hazardous Substances introduced by Tenant or its agents, affiliates, customers, employees, invitees, business associates or assigns during the Term.

**19.11**   Landlord agrees, covenants and warrants that so long as Tenant faithfully performs the agreements, terms, covenants and conditions of this Lease, Tenant shall peaceably and quietly have, hold and enjoy the Leased Premises for the Term hereby granted.

**19.12**  If any term, covenant, condition or provision of this Lease or the application thereof to any person or circumstances shall at any time or to any extent be invalid or unenforceable, the remainder of this Lease or the application of such term or provision to persons or circumstances, other than those as to which this Lease is held invalid or unenforceable, shall not be affected thereby and each term, covenant, condition and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

**19.13**  Landlord and Tenant waive trial by jury in any action, or proceeding or counterclaim brought by Landlord or Tenant against the other with respect to any matter arising out of or in connection with this Lease, Tenant's use and occupancy of the Premises, or the relationship of Landlord and Tenant.

**19.14**  This Lease may be executed in counterparts and, when all counterpart documents are executed, the counterparts shall be deemed a single binding instrument.

**19.15**  The parties hereto agree that neither this Lease nor any memorandum or other evidence shall be recorded against the Real Property or any portion thereof.

## SECTION 20:  SEPARATION PLAN AND OPTION TO PURCHASE

**20.1**  <u>Separation Plan</u>.  During the Term, Landlord shall not sell or otherwise dispose of any of the Personal Property.  Landlord and Tenant, at Tenant's expense, shall use commercially reasonable efforts to develop and implement a reasonable, mutually agreed-upon, cost effective separation plan for their respective businesses conducted at the Real Property and, following such separation, during the remainder of the Term, Tenant shall have the Option (as set forth in Section 20.2 hereof).  Tenant will pay all costs associated with the separation of the Technical Center and all capital investment needed in connection with separation of the Technical Center and other capital expenditures; provided that any shared capital expenditures required with respect to any shared Personal Property or Real Property shall be equitably allocated between the parties as mutually agreed to by Landlord and Tenant.

**20.2**  <u>Option to Purchase and Leaseback</u>.  Pursuant to the terms and conditions of Section 11.2.1.D. of the MDA, Tenant shall have the right to purchase the Technical Center and the Personal Property (the **"Option"**) at any time during the Term by providing written notice to Landlord (the **"Exercise Notice"**).  The Exercise Notice shall be delivered within ninety (90) days' prior to expiration of the Term and shall specify the date on which Tenant desires to purchase the Technical Center and the Personal Property.  Tenant shall have the right to purchase the Technical Center and the Personal Property pursuant to the Option for the price of $1.00 and the assumption by Tenant of all Liabilities (as such term is defined in the MDA) directly related to the Technical Center and not the remainder of the Real Property retained by Landlord.  Tenant's exercise of the Option shall be subject to a lease back to Landlord for the portion of the Technical Center that will continue to be occupied by Landlord after the date upon which Tenant takes title to the Technical Center and the provision for the use by Landlord of the relevant related Personal Property.  The lease back to the Landlord shall provide for the Landlord to pay its pro rata share of costs on a triple net basis, plus $1.00 per year and having such other terms and conditions as agreed to by Landlord and Tenant.  Tenant must exercise its Option to acquire

the Technical Center in order to purchase the Personal Property. In the event Tenant exercises its Option, the following shall apply:

A. Purchase Price. The purchase price for the Technical Center and Personal Property shall be One and 00/100 ($1.00) Dollar.

B. Survey. Tenant, at Tenant's sole expense, shall furnish to Landlord an ALTA survey of the Technical Center showing the recordable legal description of the Leased Premises in a form reasonably satisfactory to Landlord.

C. Title. Landlord shall furnish to Tenant a commitment (the "**Commitment**") for an ALTA owner's policy of title insurance covering the Technical Center in a form reasonably satisfactory to Tenant.

D. Closing. The closing of the sale of the Technical Center shall be held at a location mutually agreeable to Landlord and Tenant. Conveyance of the Technical Center from Landlord to Tenant shall be via customary quit claim deed, which shall be subject to the Environmental Easement Agreement, any restrictions contained in the Site Management Plan and/or the Deed Restrictions.

E. Parcel Split. Tenant shall be fully responsible for, including payment of any and all costs, expenses or fees, in any way related to splitting or separating the Technical Center from the Real Property in compliance with all applicable building and use restrictions, planning and zoning ordinances, governmental codes, regulations and subdivisions rules, easements, covenants, and all matters of record, such that the Technical Center (i) is a separate and distinct parcel, (ii) is separately metered for all utilities, unless submetering of utilities by Landlord is permissible, in which case, at Tenant's option, Landlord and Tenant shall collaborate to obtain necessary authorizations for such submetering, as well as the continued supply of power from the New York Power Authority, and (iii) has its own separate access to a public road or is able to obtain access to a public road by operation of an easement granting such access (collectively, the "**Parcel Split**"). In the event certain utilities will be submetered pursuant to this **Section 20.2(E)**, then the cost of such utilities shall be based upon the submetering cost.

F. Landlord and Tenant, at Tenant's sole cost and expense, shall collaborate and use commercially reasonable efforts to develop and implement a mutually acceptable Parcel Split of the Technical Center from the Real Property.

G. Closing Costs. Tenant shall be responsible for any and all closing costs and the conveyance of the Technical Center and Personal Property, including, without limitation, transfer taxes or documentary stamps, recording fees, title insurance premiums, title company closing fees, escrow fees and any other closing costs. Utilities shall be prorated as of the closing date, and taxes shall be prorated on the customary basis for property transactions in Niagara County, New York. Tenant's share of all Additional Rent and expenses due and payable under the Lease shall be pro-rated as of the closing date.

1053517-2

Notwithstanding anything to the contrary contained in this Lease or the MDA, in the event that the closing of conveyance of the Technical Center pursuant to this Section 20.2 shall not have occurred on or before the earlier of (i) the date which is nine (9) months from and after Landlord's receipt of the Exercise Notice, and (ii) the date which is six (6) months from and after expiration of the Term of this Lease (as may be extended), then either Landlord or Tenant shall have the right, at either party's option, by sending written notice to the other party, to terminate the Option hereunder, upon which this Lease shall automatically terminate and any and all of Tenant's rights to purchase the Technical Center pursuant to this Lease shall automatically terminate.

## SECTION 21:  GUARANTY

**21.1**    Delphi Technologies, Inc., a Delaware corporation ("DTI"), does hereby guarantee the full, faithful and timely payment and performance by Tenant of all of the payments, covenants and other obligations of Tenant under or pursuant to this Lease.  If Tenant shall default at any time in the payment of any Rent, Additional Rent or any other sums, costs or charges whatsoever, or in the performance of any of the other covenants and obligations of Tenant, under or pursuant to this Lease, then DTI, at its expense, shall on demand of Landlord, fully and promptly pay all such amounts to be paid by Tenant, and perform all the other covenants and obligations to be performed by Tenant under or pursuant to this Lease.

**21.2**    The obligations of DTI hereunder are independent of the obligations of Tenant.  A separate action or actions may, at Landlord's option, be brought and prosecuted against DTI, whether or not any action is first or subsequently brought against Tenant, or whether or not Tenant is joined in any such action, and DTI may be joined in any action or proceeding commenced by Landlord against Tenant arising out of, in connection with or based upon this Lease.  DTI waives any right to require Landlord to proceed against Tenant or pursue any other remedy in Landlord's power whatsoever, any right to complain of delay in the enforcement of Landlord's rights under this Lease, and any demand by Landlord and/or prior action by Landlord of any nature whatsoever against Tenant, or otherwise.

**21.3**    DTI's obligations hereunder remain and continue in full force and effect and shall not be discharged in whole or in part notwithstanding (whether prior or subsequent to the execution hereof) any alteration,modification, amendment, assignment, or subletting of this Lease.  DTI's obligations hereunder shall remain fully binding although Landlord may have waived one or more defaults by Tenant or extended the time of performance by Tenant.

*[Signatures continued on following pages]*

## TENANT SIGNATURE PAGE TO LEASE AGREEMENT

IN WITNESS WHEREOF, this Lease was executed as of the day and year first written above.

**DELPHI PROPERTIES MANAGEMENT LLC,**
a Delaware limited liability company

By:_____

Name:_____

Its:_____

"Tenant"

STATE OF _____ )

                         ) ss.

COUNTY OF _____ )

The foregoing instrument was acknowledged before me this ____ day of _____, 2009, by _____, the _____ of **DELPHI PROPERTIES MANAGEMENT LLC**, on behalf of such limited liability company.

_____

*_____ Notary, Public

_____ County, _____

My commission expires: _____

Acting in _____ County

Signatures

## LANDLORD SIGNATURE PAGE TO LEASE AGREEMENT

IN WITNESS WHEREOF, this Lease was executed as of the day and year first written above.

**GM COMPONENTS HOLDINGS LLC**, a Delaware limited liability company

By:_____

Name:_____

Its:_____

"Landlord"

STATE OF _____)

           ) ss.

COUNTY OF _____)

The foregoing instrument was acknowledged before me this ____ day of _____, 2009, by _____, the _____ of **GM COMPONENTS HOLDINGS LLC**, a Delaware limited liability company, on behalf of such company.

\*_____ Notary, Public

_____ County, _____

My commission expires: _____

Acting in _____ County