**Hearing Date and Time: April 23, 2010 at 10:00 a.m. (prevailing Eastern time)**
**Supplemental Response Date and Time: April 21, 2010 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti

Attorneys for DPH Holdings Corp., et al.,
   Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | : | |
| In re | : | Chapter 11 |
| | : | |
| DPH HOLDINGS CORP., et al., | : | Case Number 05-44481 (RDD) |
| | : | |
| | : | (Jointly Administered) |
| Reorganized Debtors. | : | |
| | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |

REORGANIZED DEBTORS' SUPPLEMENTAL REPLY TO RESPONSES OF CERTAIN
CLAIMANTS TO DEBTORS' OBJECTIONS TO PROOFS OF CLAIM NUMBERS 14019,
14020, 14022, 14023, 14024, 14025, AND 14026 FILED BY ATUL PASRICHA
AND PROOF OF CLAIM NUMBER 12147 FILED BY PAMELA GELLER

("SUPPLEMENTAL REPLY REGARDING CERTAIN
CONTINGENT PERSONAL INDEMNIFICATION CLAIMS")

DPH Holdings Corp. and certain of its affiliated reorganized debtors in the above-captioned cases (together with DPH Holdings Corp., the "Reorganized Debtors") hereby submit the Reorganized Debtors' Supplemental Reply To Responses Of Certain Claimants To Debtors' Objections To Proofs Of Claim Numbers 14019, 14020, 14022, 14023, 14024, 14025, And 14026 Filed By Atul Pasricha And Proof Of Claim Number 12147 Filed By Pamela Geller (the "Supplemental Reply"), and respectfully represent as follows:

A.    Preliminary Statement

1.    On October 8 and 14, 2005, Delphi Corporation and certain of its affiliates (the "Debtors"), predecessors of the Reorganized Debtors, filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").

2.    On October 6, 2009, the Debtors substantially consummated the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified (the "Modified Plan"), which had been approved by this Court pursuant to an order entered on July 30, 2009 (Docket No. 18707), and emerged from chapter 11 as the Reorganized Debtors.

3.    On March 25, 2010, the Reorganized Debtors filed the Notice Of Sufficiency Hearing With Respect To Debtors' Objections To Proofs Of Claim Nos. 11892, 12147, 14019, 14020, 14022, 14023, 14024, 14025, 14026, 14370, And 19543 (Docket No. 19725) (the "Sufficiency Hearing Notice").

4.    The Reorganized Debtors filed the Sufficiency Hearing Notice and are filing this Supplemental Reply to implement Article 9.6(a) of the Modified Plan, which provides that "[t]he Reorganized Debtors shall retain responsibility for administering, disputing, objecting

2

to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors and making distributions (if any) with respect to all Claims and Interests …." Modified Plan, art. 9.6(a).

5.      By the Sufficiency Hearing Notice and pursuant to the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims, entered December 7, 2006 (Docket No. 6089) (the "Claims Objection Procedures Order") and the Eleventh Supplemental Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims, entered April 5, 2010 (Docket No. 19776), the Reorganized Debtors scheduled a hearing (the "Sufficiency Hearing") on April 23, 2010[1] at 10:00 a.m. (prevailing Eastern time) in this Court to address the legal sufficiency of each proof of claim filed by the claimants listed on Exhibit A to the Sufficiency Hearing Notice and whether each such proof of claim states a colorable claim against the asserted Debtor.

6.      This Supplemental Reply is filed pursuant to paragraph 9(b)(i) of the Claims Objection Procedures Order.  Pursuant to paragraph 9(b)(ii) of the Claims Objection Procedures Order, if a Claimant wishes to file a supplemental pleading in response to this Supplemental Reply, the Claimant shall file and serve its response no later than two business days before the scheduled Sufficiency Hearing – i.e., by **April 21, 2010.**

---

[1]     Pursuant to the Sufficiency Hearing Notice, filed March 25, 2010, the Sufficiency Hearing was scheduled for April 22, 2010.  Pursuant to direction of this Court, the Sufficiency Hearing was rescheduled for April 23, 2010 at 10:00 a.m. (prevailing Eastern time).

3

B.    <u>Relief Requested</u>

7.    By this Supplemental Reply, the Reorganized Debtors request entry of an order disallowing and expunging certain proofs of claim filed by Mr. Pasricha and Ms. Geller for potential personal indemnification obligations.

C.    <u>Contingent Personal Indemnification Claims</u>

8.    During their review of the proofs of claim filed in these cases, the Debtors determined that certain proofs of claim that were filed by Atul Pasricha and Pamela Geller, former employees of the Debtors, assert personal indemnification obligations that are not owing pursuant to the Reorganized Debtors' books and records.  The Reorganized Debtors believe that Mr. Pasricha and Ms. Geller are not creditors of the Debtors.  Accordingly, this Court should enter an order disallowing and expunging each such proof of claim filed by Mr. Pasricha and Ms. Geller in its entirety.

9.    <u>The Contingent Personal Indemnification Claims Asserted Against The Debtors By Atul Pasricha</u>.  On July 31, 2006, Atul Pasricha filed the following proofs of claim (the "Pasricha Claims") in the corresponding amounts against the corresponding Debtors in these cases:

| Proof of Claim Number | Debtor Against Which Claim Was Filed | Asserted Amount |
|---|---|---|
| 14019 | Delphi Corporation | $10,000.00 priority, plus unliquidated unsecured amount |
| 14020 | DAS LLC | $10,000.00 priority, plus unliquidated unsecured amount |
| 14022 | Delphi Medical Systems Corporation | Unliquidated unsecured amount |
| 14023 | Delphi Medical Systems Texas Corporation | Unliquidated unsecured amount |
| 14024 | Delphi Medical Systems Colorado Corporation | Unliquidated unsecured amount |
| 14025 | Delphi Technologies, Inc. | Unliquidated unsecured amount |
| 14026 | Delphi Automotive Systems Overseas Corporation | Unliquidated unsecured amount |

10.    Each claim of Mr. Pasricha asserts unliquidated amounts for indemnity under the Debtors' bylaws with respect to any action, suit or proceedings related to Mr. Pasricha being a director, officer or employee of the Debtors.  Each of proofs of claim numbers 14019 and 14020 also assert (a) unliquidated amounts for (i) amounts to be funded, paid, or equity to be vested pursuant to a change in control agreement, (ii) awards under various bonus programs (the "2004-2006 Performance Achievement Plan," the "2005-2007 Performance Achievement Plan," the "Annual Incentive Plan for 2005," and the "2005 Recognition and Retention Grant,"), (iii) cancellation of supplemental group life insurance benefit (the "Supplemental Group Life Insurance Benefit"), (iv) benefits under a benefit equalization plan (the "Benefit Equalization Plan"), (v) benefits arising under the Debtors' Supplemental Executive Retirement Program (the "SERP"), and (vi) and restricted stock units and (b) a $10,000.00 priority claim for wages, salaries, or commissions earned within 180 days before the Petition Date and contributions to employee benefit plans.

5

11.     <u>The Contingent Personal Indemnification Claims Asserted Against The
Debtors By Pamela Geller.</u> On July 28, 2006, Pamela Geller filed proof of claim number 12147
against Delphi Corporation, asserting contingent and unliquidated amounts for legal fees
incurred by Ms. Geller for which she asserts Delphi Corporation is liable pursuant to its bylaws
(the "Geller Claim" and together with the Pasricha Claims, the "Contingent Personal
Indemnification Claims").

12.     <u>The Debtors' Objections To the Contingent Personal Indemnification
Claims.</u>  On September 21, 2007, the Debtors filed the Debtors' Twenty-First Omnibus Objection
Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (A) Duplicate Or
Amended Claims, (B) Untimely Equity Claim, (C) Insufficiently Documented Claims, (D)
Claims Not Reflected On Debtors' Books and Records, (E) Untimely Claims, And (F) Claims
Subject To Modification, Tax Claim Subject To Modification, And Modified Claims Asserting
Reclamation (Docket No. 9535) (the "Twenty-First Omnibus Claims Objection"), by which the
Debtors objected to the Contingent Personal Indemnification Claims on the grounds that such
claims assert contingent personal indemnification obligations not reflected on the Debtors' books
and records and for which the Debtors are not liable and sought an order disallowing and
expunging those proofs of claim.

13.     <u>Responses To The Debtors' Objections.</u>  On October 23, 2007, Mr.
Pasricha filed a response to the Twenty-First Omnibus Claims Objection (Docket No. 10699), in
which he asserts that the Debtors, by their objection, failed to introduce evidence sufficient to
rebut the presumption of the validity of the Pasricha Claims.

14.     On October 24, 2007, Ms. Geller filed a response to the Twenty-First
Omnibus Claims Objection (Docket No. 10712), in which she asserts that although her claim

should be disallowed and expunged, nothing in the order disallowing and expunging her claim should impact her rights under the Order Under 11 U.S.C. § 105(a) And Fed. R. Bankr. P. 2016(a) Authorizing Advancement Of Defense Costs Under Debtors' Insurance Policies, entered on December 22, 2006 (Docket No. 6264) (the "Insurance Proceeds Defense Costs Order").

15.    <u>The Sufficiency Hearing Notice</u>.  Pursuant to the Claims Objection Procedures Order, the hearing on the Debtors' objection to the Contingent Personal Indemnification Claims was adjourned to a future date.  On March 25, 2010, the Reorganized Debtors filed the Sufficiency Hearing Notice with respect to the Contingent Personal Indemnification Claims, among other proofs of claim, scheduling the Sufficiency Hearing.

D.    <u>Claimants' Burden Of Proof And Standard For Sufficiency Of Claim</u>

16.    The Reorganized Debtors respectfully submit that the Contingent Personal Indemnification Claims fail to state a claim against the Debtors under rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  Neither Mr. Pasricha nor Ms. Geller has proved any facts to support a right to payment by the Reorganized Debtors on behalf of the Debtors.  Accordingly, the Debtors' objections to each Personal Indemnification Claim should be sustained and each such Claim should be disallowed and expunged in its entirety.

17.    The burden of proof to establish a claim against the Debtors rests on the claimants and, if a proof of claim does not include sufficient factual support, such proof of claim is not entitled to a presumption of <u>prima facie</u> validity pursuant to Bankruptcy Rule 3001(f).  <u>In re Spiegel, Inc.</u>, No. 03-11540, 2007 WL 2456626, at *15 (Bankr. S.D.N.Y. August 22, 2007) (the claimant always bears the burden of persuasion and must initially allege facts sufficient to support the claim); <u>see also</u> <u>In re WorldCom, Inc.</u>, No. 02-13533, 2005 WL 3832065, at *4 (Bankr. S.D.N.Y. Dec. 29, 2005) (only a claim that alleges facts sufficient to support legal liability to claimant satisfies claimant's initial obligation to file substantiated proof of claim); <u>In</u>

7

re Allegheny Int'l., Inc., 954 F.2d 167, 173 (3d Cir. 1992) (in its initial proof of claim filing,

claimant must allege facts sufficient to support claim); In re Chiro Plus, Inc. 339 B.R. 111, 113

(Bankr. D.N.J. 2006) (claimant bears initial burden of sufficiently alleging claim and establishing

facts to support legal liability); In re Armstrong Finishing, L.L.C., No. 99-11576-C11, 2001 WL

1700029, at *2 (Bankr. M.D.N.C. May 2, 2001) (only when claimant alleges facts sufficient to

support its proof of claim is it entitled to have claim considered prima facie valid); In re United

Cos. Fin. Corp., 267 B.R. 524, 527 (Bankr. D. Del. 2000) (claimant must allege facts sufficient

to support legal basis for its claim to have claim make prima facie case).

18.    For purposes of sufficiency, this Court has determined that the standard of

whether a claimant has met its initial burden of proof to establish a claim should be similar to the

standard employed by courts in deciding a motion to dismiss under Bankruptcy Rules 7012 and

9014.  See Transcript of January 12, 2007 Hearing (Docket No. 7118) (the "January 12, 2007

Transcript") at 52:24-53:1.  Pursuant to that standard, a motion to dismiss should be granted "if it

plainly appears that the nonmovant 'can prove no set of facts in support of his claim which would

entitle him to relief.'"  In re Lopes, 339 B.R. 82, 86 (Bankr. S.D.N.Y. 2006) (quoting Conley v.

Gibson, 355 U.S. 41, 45-46 (1957)).  Essentially, the claimant must provide facts that sufficiently

support a legal liability against the Debtors.

19.    This Court further established that the sufficiency hearing standard is

consistent with Bankruptcy Rule 3001(f), which states that "a proof of claim executed and filed

in accordance with these Rules shall constitute prima facie evidence of the validity and amount

of the claim." Fed. R. Bankr. P. 3001(f) (emphasis added).  Likewise, Bankruptcy Rule 3001(a)

requires that "the proof of claim must be consistent with the official form" and Bankruptcy Rule

3001(c) requires "evidence of a writing if the claim is based on a writing."  Fed. R. Bankr. P.

3001(a), (c).  See January 12, 2007 Transcript at 52:17-22.

E.      The Pasricha Claims Should Be Disallowed

        20.     Indemnification and Change-In-Control Agreement.  To the Reorganized

Debtors' knowledge, no event has occurred that would trigger a personal indemnification claim

asserted in the Pasricha Claims.  Mr. Pasricha, in his proofs of claim and response to the Debtors'

objection, has not proved any set of facts that support a right to payment from the Reorganized

Debtors.  ████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████  Accordingly, the Reorganized Debtors assert

that (a) Mr. Pasricha has not met his burden of proof to establish a claim against the Debtors with

respect to indemnification or the change-in-control agreement, (b) the Pasricha Claims, to the

extent that they relate to indemnification or the change-in-control agreement, are not entitled to a

presumption of prima facie validity pursuant to Bankruptcy Rule 3001(f), and (c) the Pasricha

Claims, to the extent that they relate to indemnification or the change-in-control agreement, fail

to state a claim against the Reorganized Debtors under Bankruptcy Rule 7012.  Because Mr.

Pasricha cannot provide facts or law supporting his claims, the Twenty-First Omnibus Claims

Objection should be sustained as to the Pasricha Claims, to the extent that they relate to

indemnification or the change-in-control agreement, and each such claim should be disallowed and expunged in its entirety.

21.     Other Benefit Claims.  Mr. Pasricha's assertion of liabilities arising from various employee benefits, SERP benefits, and a priority claim for wages and salaries are not valid. The benefits and wages that Mr. Pasricha asserts have either been paid in the ordinary course of business or are owing pursuant to benefit plans that have been terminated.  For instance, the 2004-2006 Performance Achievement Plan,  the 2005-2007 Performance Achievement Plan,[2] and the 2005 Recognition and Retention Grant were terminated as of the Petition Date. Moreover, by participating in the Key Executive Compensation Program (the "KECP"), Mr. Pasricha waived any and all of the executive claims arising from the 2005 Recognition and Retention Grant program.[3]

22.     In addition, Mr. Pasricha has provided no documentation to show that he is entitled to any amounts owing from vested restricted stock units.  Moreover, any claim on account of restricted stock units should be disallowed because all equity interests were cancelled pursuant to the Modified Plan.  Furthermore, Mr. Pasricha has not provided any documentation that the Debtors met the benchmark to trigger any compensation under the Annual Incentive Plan award for 2005.[4]   Finally, Mr. Pasricha's claim for SERP benefits is not valid because he was not eligible to participate in SERP. To be eligible to participate in SERP, an employee must,

---

[2]   The 2004-2006 Performance Achievement Plan and the 2005-2007 Performance Achievement Plan were cancelled pursuant to the Motion For Order Under §§ 105 And 363 Authorizing The Debtors To Implement A Key Employee Compensation Program (Docket No. 213) (the "KECP Motion").  The relevant portions of the KECP Motion are attached hereto as Exhibit B.

[3]   See Compensation Summary Statement for Atul Pasricha, signed February 27, 2006, attached hereto as Exhibit C.

[4]   The Debtors did not meet the benchmark to trigger any compensation under the Annual Incentive Plan award for 2005, which was the year the Debtors filed for bankruptcy

among other things, have been (i) at least 62 years old at retirement; (ii) at least 55 years old at time of total and permanent disability retirement under the Delphi Retirement Program for Salaried Employees; or (iii) at least 55 years old at time of death.[5]  Because Mr. Pasricha was 49 years old at the time of his separation, he was not eligible for SERP.

> 23.    In addition, the Reorganized Debtors request that this Court enter an order disallowing and expunging the Contingent Personal Indemnification Claims pursuant to section 502(e)(1)(B) of the Bankruptcy Code to the extent that such claims assert contingent liabilities for indemnification from the Debtors for amounts owed to third parties.  Section 502(e)(1)(B) of the Bankruptcy Code provides that a bankruptcy court is to disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor to the extent that "such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution." 11 U.S.C. § 502(e)(1)(B); see also Aetna Cas. & Sur. Co. v. Georgia Tubing Corp., 93 F.3d 56 (2d Cir. 1996) (disallowing surety bond issuer's contingent prospective subrogation claims as to bonds issued on behalf of debtor); In re Agway, Inc., 2008 WL 2827439, at *3 (Bankr. N.D.N.Y. July 18, 2008) (section 502(e)(1)(B) directs that the court "shall disallow" any claim for reimbursement or contribution to the extent that such claim is contingent at the time of disallowance).

> 24.    Accordingly, the Reorganized Debtors assert that Mr. Pasricha has not met his burden of proof to establish a claim against the Debtors, (b) the Pasricha Claims are not entitled to a presumption of prima facie validity pursuant to Bankruptcy Rule 3001(f), and (c) the Pasricha Claims fail to state a claim against the Reorganized Debtors under Bankruptcy Rule

---

[5]    See SERP, as amended September 1, 2005, Section IV (b)(i)-(iii), attached hereto as Exhibit D.

7012. Because Mr. Pasricha cannot provide facts or law supporting his claims, the Twenty-First

Omnibus Claims Objection should be sustained as to the Pasricha Claims and each claim should

be disallowed and expunged in its entirety.

F.    The Geller Claim Should Be Disallowed

25.    To the Reorganized Debtors' knowledge, no event has occurred that would

trigger a personal indemnification claim asserted in the Geller Claim.  Ms. Geller, in her proof of

claim and response to the Debtors' objections to her claims, has not proved any set of facts that

support a right to payment from the Reorganized Debtors.  Furthermore, Ms. Geller

acknowledged that her claim should be disallowed in her response so long as her rights under the

Insurance Proceeds Defense Costs Order are not affected.  The Reorganized Debtors have

reviewed Ms. Geller's response and agree that the expungement of her claim does not affect

whatever rights that she may have with respect to the Insurance Proceeds Defense Costs Order.

Furthermore, the Reorganized Debtors will include language to that effect in the proposed order.

26.    Accordingly, the Reorganized Debtors assert that Ms. Geller has not met

her burden of proof to establish a claim against the Debtors, (b) the Geller Claim is not entitled

to a presumption of prima facie validity pursuant to Bankruptcy Rule 3001(f), and (c) the Geller

Claim fails to state a claim against the Reorganized Debtors under Bankruptcy Rule 7012.

Because Ms. Geller cannot provide facts or law supporting her claim, the Twenty-First Omnibus

Claims Objection should be sustained as to the Geller Claim and the claim should be disallowed

and expunged in its entirety.

WHEREFORE the Reorganized Debtors respectfully request this Court enter an

order (a) sustaining the objections with respect to the Contingent Personal Indemnification

Claims, (b) disallowing and expunging each of the Pasricha Claims in its entirety, (c) disallowing

and expunging the Geller Claim in its entirety, provided that the expungement of her claim does

not affect whatever rights that she may have with respect to the Insurance Proceeds Defense

Costs Order, and (d) granting such further and other relief this Court deems just and proper.


Dated:     New York, New York
           April 13, 2010

                                        SKADDEN, ARPS, SLATE, MEAGHER
                                           & FLOM LLP

                                        By:   /s/ John Wm. Butler, Jr.
                                              John Wm. Butler, Jr.
                                              John K. Lyons
                                              Ron E. Meisler
                                        155 North Wacker Drive
                                        Chicago, Illinois 60606

                                              - and -


                                        By:   /s/ Kayalyn A. Marafioti
                                              Kayalyn A. Marafioti
                                        Four Times Square
                                        New York, New York 10036

                                        Attorneys for DPH Holdings Corp., et al.,
                                           Reorganized Debtors

**EXHIBIT A**

To Be Filed Under Seal

**EXHIBIT B**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler


    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)


Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession


Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                    :
        In re                       :    Chapter 11
                                    :
DELPHI CORPORATION et al.,          :    Case No. 05-44481 (RDD)
                                    :
                                    :    (Jointly Administered)
                Debtors.            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


## MOTION FOR ORDER UNDER §§ 105 AND 363 AUTHORIZING THE DEBTORS TO IMPLEMENT A KEY EMPLOYEE COMPENSATION PROGRAM

("KECP MOTION")



Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the

"Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases (collectively,

the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. §§ 105(a)

and 363(b)(1) authorizing the Debtors to implement a key employee compensation program.  In

support of this Motion, the Debtors submit the Affidavit Of Robert S. Miller, Jr. In Support Of

Chapter 11 Petitions And First Day Orders, sworn to October 8, 2005.  In further support of this

Motion, the Debtors respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8, 2005 (the "Petition Date"), each of the Debtors filed a

voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United

States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  The Debtors continue

to operate their businesses and manage their properties as debtors-in-possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have moved this Court for an

order authorizing joint administration of these chapter 11 cases.

2.    No trustee, examiner, or creditors' committee has been appointed in the

Debtors' cases.

---

[1]    In addition to Delphi, the following entities are debtors in these related cases:  ASEC Manufacturing General
Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi
Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive
Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems
Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi
Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive
Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection
Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation,
Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc.,
Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems
Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi
NY Holdings Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc.,
Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty
Electronics, Inc., and Specialty Electronics International Ltd.

2

3.        This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.        The statutory predicate for the relief requested herein is sections 105(a) and 363(b)(1) of the Bankruptcy Code.

B.        Current Business Operations Of The Debtors

5.        With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1 billion,[2] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6.        Over the past century, the operations which are now owned by Delphi have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines.  Today, the Company is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide.  The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of

---

[2]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and

Volkswagen Group exceeding $850 million.

7.        As part of its growth strategy, Delphi has established an expansive global

presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures

located in every major region of the world.  In the U.S., the Debtors employ approximately 50,600

people.  Those employees work in approximately 44 manufacturing sites and 13 technical centers

across the country, and in Delphi's worldwide headquarters and customer center located in Troy,

Michigan.  Approximately 34,750 of these individuals are hourly employees, 96% of whom are

represented by approximately 49 different international and local unions.  Outside the United

States, the Company's foreign entities employ more than 134,000 people, supporting 120

manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8.        Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary

of GM.  Prior to January 1, 1999, GM conducted the Company's business through various

divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions

and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with

the terms of a Master Separation Agreement between Delphi and GM.  In connection with these

transactions, Delphi accelerated its evolution from a North American-based, captive automotive

supplier to a global supplier of components, integrated systems, and modules for a wide range of

customers and applications.  Although GM is still the Company's single largest customer, today

more than half of Delphi's revenue is generated from non-GM sources.

9.        Due to the significant planning that goes into each vehicle model, Delphi's

efforts to generate new business do not immediately affect its financial results, because supplier

selection in the auto industry is generally finalized several years prior to the start of production of

4

the vehicle.  When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base.  The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base.  The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.    Events Leading To The Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005.  The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[3]

11.    The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S.

---

[3]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

vehicle production environment for domestic OEMs resulting in the reduced number of motor

vehicles that GM produces annually in the United States and related pricing pressures, and (c)

increasing commodity prices.

        12.     In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues and forward looking revenue requirements.  Having concluded that

pre-filing discussions with its Unions and GM were not leading to the implementation of a plan

sufficient to address the Debtors' issues on a timely basis, the Company determined to commence

these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and

preserve value.

        13.     Through the reorganization process, the Debtors intend to achieve

competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive

legacy liabilities and burdensome restrictions under current labor agreements and realigning

Delphi's global product portfolio and manufacturing footprint to preserve the Company's core

businesses.  This will require negotiation with key stakeholders over their respective contributions

to the restructuring plan or, absent consensual participation, the utilization of the chapter 11

process to achieve the necessary cost savings and operational effectiveness envisioned in the

Company's transformation plan.  The Debtors believe that a substantial segment of Delphi's U.S.

business operations must be divested, consolidated, or wound-down through the chapter 11

process.

        14.     Upon the conclusion of this process, the Debtors expect to emerge from

chapter 11 as a stronger, more financially sound business with viable U.S. operations that are

well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all

6

of its resources to continue to deliver value and high-quality products to its customers globally.

Additionally, the Company will preserve and continue the strategic growth of its non-U.S.

operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

15.    By this Motion, the Debtors seek authority, under sections 105(a) and

363(b)(1) of the Bankruptcy Code, to implement a key employee compensation program (the "Key

Employee Compensation Program"), as described herein, and as more fully set forth in <u>Exhibit 1</u> to

the Order.  The purpose of the Key Employee Compensation Program is to retain and incentivize

Covered Employees (as defined below) during the Debtors' restructuring period.

<u>Basis For Relief</u>

A.    <u>Importance Of Covered Employees</u>

16.    As a result of the Debtors' historical financial performance, many of the

company's incentive based compensation programs failed to provide salaried and executive

workforce with total compensation that is competitive with the industry norm.  As the Debtors

implement their transformation plan, it is imperative that the Debtors' key personnel are

appropriately incentivized to maximize the financial performance of the Debtors' operations.  The

alignment of an incentive program that tracks the Debtors' goals is crucial to the Debtors' ability to

navigate through this process and to emerge successfully from chapter 11.

17.    Moreover, because the Debtors' current salaried and executive total

compensation programs are not competitive in the automotive industry, over the last several

months following the arrival of Robert S. "Steve" Miller, Jr. as Chairman and Chief Executive

Officer, senior management, in consultation with the board of directors of Delphi, decided to

realign its executive compensation program to properly incentivize the Company's personnel who

7

are needed to implement the Company's transformation plan and maximize value for all stakeholders.[4] This point has been particularly lucid as more that 25 executives have left the Company's employ since January 1, 2005.

18.    Further exacerbating the Company's risk of attrition, the commencement of a bankruptcy case heightens employee concerns regarding possible job loss, and often increases employee responsibilities, creates longer hours, and imposes other burdens as a result of an employer's status as a debtor-in-possession.   Thus, at a time when the Debtors most need the continued efforts and loyalty of Covered Employees, the Debtors must take proactive steps to ensure that mechanics are in place to allow their employees to remain loyal, despite potential opportunities with competitors or other employers who may be perceived as providing more stable employment opportunities.   In order to address these concerns, the Debtors designed a special incentive compensation program that aligns the interests of both program participants and the Debtors' stakeholders (the "Key Employee Compensation Program"), which program has been benchmarked against competitive practices in the industry.

B.    Development Of The Key Employee Compensation Program

19.    The Debtors, with input from certain financial advisors, compensation experts and legal advisors, including Watson Wyatt Worldwide ("Watson") and the Debtors' counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), have evaluated their existing compensation structure and incentive plans and obtained input from their board and senior executives to identify Covered Employees and consider the appropriate incentive levels.

---

[4]    It should be noted that Mr. Miller has "opted out" of the KECP, continues as an employee "at will" without an employment agreement or severance plan, and is not entitled to any material compensation beyond base salary except as determined by the Board of Directors in connection with Mr. Miller's completion of his period of service as Chief Executive Officer.

8

20.    The Key Employee Compensation Program does not include a retention or stay component which differentiates it from other incentive programs and the issues raised in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCA").  The primary reason for the elimination of a retention component and the inclusion of a fully developed exit plan is to focus the Debtors' approximately 486 executives (the "Covered Employees") on achieving certain benchmarks and encourage them to complete an efficient and successful reorganization.

21.    In developing the Key Employee Compensation Program, the Debtors considered specific incentive programs implemented by other companies in chapter 11, including, but not limited to, Federal Mogul and Hayes-Lemmerz, other automotive industry suppliers. Reviewing these and similar programs was helpful in developing a basis from which the Debtors could develop a plan suitable to their needs.  Based on their analysis of the various programs, the Debtors, with the assistance of Watson and Skadden, undertook the development of the Key Employee Compensation Program.

22.    The Debtors determined that they required a program that would not only incentivize Covered Employees to remain in the Debtors' employ during the chapter 11 cases, but which would also align their interests with the Debtors' stakeholders to encourage maximum effort and performance during the cases.  To achieve these goals, the Debtors created an overall incentive program that the Debtors believe incorporate the most effective components of the employee plans the Debtors reviewed.  Thereafter, the Debtors calculated the appropriate levels of compensation that would achieve the Debtors' goal of motivating Covered Employees at competitive rates while also being mindful of the duty to manage these estates in a fiscally responsible manner and maximize stakeholder recoveries.

9

23.     The Debtors began to develop the Key Employee Compensation Program over the past several months, and the Debtors worked directly with the Compensation Committee of the board of directors (the "Compensation Committee") and the Company's advisors to refine and finalize the Key Employee Compensation Program.  Specifically, the Debtors have crafted the Key Employee Compensation Program to ensure that the appropriate employees were included and were assigned levels of compensation designed to achieve the Debtors' desired goals.  Based on this analysis, the Debtors believe that (a) the Key Employee Compensation Program is reasonable and competitive against other plans approved in similar chapter 11 cases, (b) the value of the Key Employee Compensation Program to the eligible employees and the cost to the Debtors is consistent with other plans implemented by other chapter 11 companies of comparable size, and (c) the Key Employee Compensation Program strikes an appropriate balance between the employees' and the Debtors' concerns.

C.      Summary Of The Key Employee Compensation Program[5]

Covered Employees

24.     The proposed Key Employee Compensation Program covers the Debtors' executives.  In contrast to the plans of many other chapter 11 debtors, the Debtors' Key Employee Compensation Program does not cover the Debtors' chief executive officer, as Mr. Miller opted not to participate in this program and to be compensated at the discretion of the Compensation Committee, subject to approval of the full Board of Directors, as they deem appropriate at the end of his period of service as Chief Executive Officer based upon the merit of his performance.

25.     The proposed Key Employee Compensation Program is described in Exhibit 1 attached to the Order.  As can be seen in Exhibit 1, the Key Employee Compensation

---

[5]     The description of the Key Employee Compensation Program is intended as a summary only.  The actual terms of the Key Employee Compensation Program set forth in Exhibit 1 to the order shall control.

10

Program has two principal components and calls out a third program that the Company

implemented prepetition: (a) an annual incentive plan, (b) an emergence bonus plan, and (c) a

prepetition severance plan that was modified during the third quarter of 2005.  Noticeably absent

from Exhibit 1 is any form of retention plan.  The debtors are not going to make periodic payments

to employees to reward them merely for staying with the company.  In addition, the company has

determined to eliminate an unrelated retention plan, already approved by the Compensation

Committee of the Board of Directors in early 2005 and, the unvested, unfunded portion of the

Debtors' long-term incentive programs.  The Debtors believe that the program described herein

will serve in part to replace the former retention plan with a thoughtful program which will likely

create better opportunities for the Company and its Covered Employees.  Indeed, payments to

Covered Employees are tied to specific performance and emergence targets, and therefore are

geared so as to incentivize employees to work towards an early and successful emergence from

chapter 11.

> Annual Incentive Plan

> 26.    The annual incentive plan is designed to promote the Company's business

turnaround by conditioning payments on the Debtors' achievement of certain financial objectives.

Specifically, the plan was developed in order to encourage participants to increase the Debtors'

enterprise value, and thus increase value and returns for all stakeholders during the Debtors'

chapter 11 cases.  This particular component of the Key Employee Compensation Program is

designed to replace the Debtors' prepetition annual incentive program.  In doing so, the Debtors

have adopted a plan that is a fairly similar in concept to the prepetition plan, but with modifications

to certain of the components.  In particular, the performance targets track EBITDAR goals rather

11

than net earnings targets and the performance periods have been shortened to increase the

incentive to meet the targeted goals. [6]

27.     Under the annual incentive plan, employees' eligibility to receive annual

bonuses is dependent on whether the Debtors reach their projected business plan EBITDAR levels

over performance periods, generally covering six months as well as an acceptable level of personal

performance.  The EBITDAR levels for the first performance period, covering October 1, 2005 to

June 30, 2006,[7] will be set before December 31, 2005, by the Compensation Committee, an

independent committee of the Debtors' Board of Directors.  The second performance period will

run from July 1, 2006 to December 31, 2006.  Six month performance periods will continue

thereafter until the Debtors exit chapter 11.  Each participant's bonus opportunity for a

performance period will equal one-half of his or her current annual plan opportunity (except for the

first performance period where the opportunity will be 75% of the prepetition annual plan

opportunity) to reflect the shortened performance periods.

Emergence Bonus Plan

28.     As outlined in Exhibit 1, the Key Employee Compensation Program will

afford eligible employees cash payments and, in some cases, available equity in the new company

upon emergence from chapter 11 (the "Emergence Bonus Plan").  The cash component of the plan

is payable to U.S. executives upon either the effective date of the confirmation of the plan of

reorganization or a sale of all or substantially all of the company's assets (collectively, the

"Effective Date").  In addition, if the Debtors achieve a successful reorganization, the equity

component of the plan will allocate 10% of the equity in the reorganized company to Delphi's

---

[6]     As of the Petition Date, the non-executive Salaried Incentive Plan will also change to target EBITDAR goals.

[7]     The first period is the only nine-month period under the plan.  It was designated as such to capture the stub period
        of October 1 through December 31, 2005.

approximately 600 domestic and foreign executives.  The Emergence Bonus Plan is entirely new

and is designed to incentivize employees to achieve a successful restructuring and to remain loyal

to the Company even after emergence.  The Emergence Bonus Plan replaces the Debtors'

prepetition long-term incentive plan and compares favorably to the costs under the long-term

incentive plan.

29.    The cash component of the Emergence Bonus Plan is available only to U.S.

executives of the Company.  As mentioned, the Debtors' chief executive officer has opted out of

the plan.  Cash payments vary from 30% to 250% of a participant's salary, based on level of

responsibility in the Debtors' organization.  Payments under the cash component of the Emergence

Bonus Plan will be paid in one lump sum payment shortly after the Effective Date.

30.    Similar to other incentive programs, a participant who voluntarily

terminates employment (except in the case of a constructive termination) will not be eligible for

any payment under the program.  On the other hand, if a participant's employment is terminated

involuntarily, other than for cause, the participant will receive a pro rata payment[8] contingent upon

the occurrence of the Effective Date.  If a participant's opportunity to receive a payment is

prevented because his or her business unit is sold prior to the Effective Date, then that participant

would be entitled to a pro rata payment, also contingent upon the occurrence of the Effective Date.

Finally, any participant whose employment terminates because of death or disability would also be

entitled to a pro rata payment, contingent upon the occurrence of the Effective Date.

31.    In addition to a cash component, the Debtors have adopted an equity

component as part of its Emergence Bonus Plan which is designed to cover Delphi's non-U.S.

---

[8]    The pro rata payment would be equal to the former participant's opportunity multiplied by a fraction where the
numerator is the number of days from (a) the filing date or (b) such participant's hire date, whichever is later, until
the date his or her employment is terminated and the denominator is the number of days from the later of the (x)
filing date or (y) such party's hire date to the effective date.

13

executives as well, for a total of approximately 600 executives.  This component is designed to

maintain the Debtors' long-term compensation, enable recruitment of a "Best in Class"

management team, motivate and reward high performance, and incentivize executives to remain

working for the Debtors during this chapter 11 period.

32.    Under the equity component of the Emergence Bonus Plan, each

executive's equity award is valued one-third in restricted stock and two-thirds in stock options.

The Debtors propose that each option's strike price be set based on the mid-point of the valuation

range in the disclosure statement accompanying the plan of reorganization approved by this Court.

The particular amount of equity is based on the executive's level of responsibility with the Debtors.

Equity awards will vest one-quarter (25%) at the Effective Date, with the balance vesting in equal

increments on each of the first, second, and third anniversaries of the Effective Date.  To the extent

any eligible executive has left the Debtors prior to the Effective Date, the executive's allocation

will be added to the reserve of awards available to employees who are promoted or newly hired.

33.    The Debtors intend to seek creditor agreement or court approval, pursuant

to a plan of reorganization to set aside 10% of the equity in the reorganized entity for

approximately 600 U.S. and foreign executives.[9]  The Debtors believe that this amount of equity is

reasonable and necessary to ensure that management continues working with and for the Debtors

through and following the duration of the chapter 11.  Moreover, the Debtors believe that setting

aside this amount of equity for its executives falls squarely within the range of competitive

practices and will further increase the Debtors' ability to attract and retain executives while also

motivating executives to create value for all stakeholders during the chapter 11 process.

---

[9]    Equity awards will not be granted in the case of a sale of all or substantially all of the Debtors' assets.

Severance

34.    During any reorganization process, when employees may be laid off or terminated, it is often difficult to recruit new employees and retain current employees.  Severance plans can mitigate the anxiety felt by employees and provide employees with desired protection and security, typically in the form of salary continuation in the event employment is terminated by the company without cause.

35.    During the prepetition period, the Debtors maintained a severance program for its executives and officers as disclosed in further detail in Exhibit 1 and the "Human Capital Compensation Motion" filed contemporaneously herewith.[10]  In order to recruit and maintain employees, the Key Employee Compensation Program continues the Debtors' prepetition severance program.

36.    Pursuant to the Debtors' prepetition severance program, U.S. executives without employment agreements are entitled to severance benefits only upon termination if (a) the executive's employment was terminated involuntarily for any reason other than for "cause," or (b) the executive's employment is terminated after a change in control for "good reason" as defined in the Delphi's formal severance plan.  The severance payment under this program is made in a lump sum and consists of (x) all unused and accrued vacation time, (y) all accrued but unpaid compensation earned, and (z) a severance benefit.  As described in Exhibit 1, the severance benefits under the Debtor's prepetition severance program provide that upon separation, senior executives are eligible for payments of 12 months base pay plus an additional 12 month bonus target and non-senior executives receive 12 months base pay.  All such severance benefits are

---

[10]    Motion for Order Under 11 U.S.C. §§ 105(a), 363, 507, 1107, and 1108 (I) Authorizing Debtors To Pay Prepetition Wages And Salaries To Employees And Independent Contractors, (II) Authorizing Debtors To Pay Prepetition Benefits And Continue Maintenance Of Human Capital Benefit Programs In The Ordinary Course, And (III) Directing Banks to Honor Prepetition Checks For Payment of Prepetition Human Capital Obligations.

15

contingent upon the participant signing an agreement(s) that provides for the release of claims,

non-solicitation, non-compete, non-disclosure and non-disparagement.

37.    Finally, the Debtors' twenty-one U.S. officers, other than the chief

executive officer, each has an employment agreement that provides for such officer to receive,

upon a qualifying termination of employment, an amount equal to 1/12 of his or her annualized

compensation (salary plus annual target bonus) for 18 months.  In exchange for providing the

twenty-one officers with formal severance benefits in the event of termination, Delphi has

agreements in place that prevent the participant from (a) competing against the Company, (b)

disclosing Delphi's manufacturing methods, (c) soliciting Delphi employees to work at a new

organization, and (e) disparaging the organization and its employees.

<u>Applicable Authority</u>

38.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.  11

U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be

authorized if the debtor demonstrates a sound business justification for it.  <u>See</u> <u>In re Lionel Corp.</u>,

722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires a finding that a good business

reason exists to grant a debtor's application under section 363(b)); <u>In re Delaware Hudson Ry. Co.</u>,

124 B.R. 169, 179 (Bankr. D. Del. 1991).  Once the debtor articulates a valid business justification,

"[t]he business judgment rule 'is a presumption that in making a business decision the directors of

a corporation acted on an informed basis, in good faith and in the honest belief that the action was

in the best interests of the company.'"  <u>In re Integrated Resources, Inc.</u>, 147 B.R. 650, 656

(S.D.N.Y. 1992).

16

39.      Given the importance of the Debtors' employees to the Debtors' continued

operations and the ultimate success of these chapter 11 cases, this Court should approve the relief

requested herein.  The Debtors have determined that the costs associated with the adoption of the

Key Employee Compensation Program are more than justified by the benefits that are expected to

be realized by encouraging the Covered Employees to continue working for the Debtors and

vigorously assisting in the Debtors' restructuring efforts.  This is especially true in this case given

the fact that a substantial amount of the payments under the Key Employee Compensation

Program are conditioned on achievement of certain predetermined financial goals.[11]

40.      Moreover, approval of the Key Employee Compensation Program will

boost employee morale and forestall the loss of value that would be attendant to resignations

among the Covered Employees.  The proposed relief therefore will enable the Debtors to retain the

knowledge, experience and loyalty of the employees who are crucial to the Debtors' reorganization

efforts.  If these employees were to leave their current jobs at this stage in the Debtors' chapter 11

cases, it is virtually assured that the Debtors would not be able to attract replacement employees of

comparable quality, experience, knowledge and character.  Indeed, suitable new employees, even

if available, would not have in-depth and historical knowledge of the Debtors' business.  The time

and costs incurred, and the learning curve necessarily involved in hiring replacements for

employees, clearly outweighs the potential costs of payments made under the Key Employee

Compensation Program.

41.      In sum, the Debtors have determined in the exercise of their business

judgment that it is essential that the Covered Employees continue to focus their efforts on

---

[11]    Since the proposed Key Employee Compensation Program is needed to retain employees -- who are in turn
necessary for the preservation of the Debtors' estates -- the payment rights of the employees under the Program are
"actual, necessary costs and expenses of preserving the [Debtors'] estate[s]," and should be accorded 11 U.S.C. §
503(b)(1)(A) administrative expense status to the extent they become due.

17

supporting and maintaining the Debtors' reorganization efforts in the coming months.

Accordingly, the Debtors believe that granting the relief requested in this Motion is in the best

interests of the Debtors' estates, their creditors, and other interested parties and should be

approved.  See, e.g., In re America West Airlines, Inc., 171 B.R. 674, 678 (Bankr. D. Ariz. 1994)

(holding that proposal to pay bonuses on confirmation of reorganization plan was exercise of

debtor's sound business judgment); In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)

(concluding that implementation of a critical employee retention plan was a proper exercise of

debtor's business judgment).

### Notice

42.    Notice of this Motion has been provided by facsimile, electronic

transmission, overnight delivery, or hand delivery to (i) the Office of the United States Trustee, (ii)

the Debtors' 50 largest unsecured creditors, (iii) counsel for the agent under the Debtors'

prepetition credit facility, and (iv) counsel for the agent under the Debtors' proposed postpetition

credit facility.  In light of the nature of the relief requested, the Debtors submit that no other or

further notice is necessary.

### Memorandum Of Law

43.    Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and filing

of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that the Court enter an order, (i) authorizing the implementation of the Key Employee Compensation Program as described herein, and (ii) granting such other and further relief as is just and proper.

Dated:  New York, New York
       October 13, 2005

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP

By: s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (pro hac vice motion pending)
    John K. Lyons
    Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

    - and -

By: s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

19

**<u>EXHIBIT 1</u>**

WWW.WATSONWYATT.COM

Watson Wyatt
_Worldwide_

**Delphi Corporation**

**Key Employee
Compensation Programs**

October 8, 2005



# Business Case

After lengthy discussions involving the Compensation Committee, management, and Company advisors, the following decisions were made regarding compensation programs going forward.

– The existing retention program (adopted in February 2005) has been terminated.

– Awards made under the current Performance Achievement Plan (PAP) have been cancelled except the award for the 2003-2005 performance cycle . (The first day motion provides that the earned award for the 2003-2005 cycle will be paid in early 2006.) Thus, awards made under the 2004-2006 and 2005-2007 cycles will be cancelled.

– The annual incentive plan (which will not pay any bonuses for the January 1-December 31, 2005 plan year) has been modified as follows:

  • EBITDAR will become the performance measure

  • Each performance period will be six months rather than 12 months

7

# EXHIBIT C

PERSONAL & CONFIDENTIAL

# DELPHI

Compensation Summary Statement for:

## Atul Pasricha
### DIRECTOR MERGERS, ACQUISITIONS & PLNG

| Band: | F |
|---|---|
| Currency: | US$ |

**Base Compensation**

| Current Salary: | $410,000 |
|---|---|

**January - June 2006 Incentive Plan Award**

| 6-month AIP Target | $110,000 |
|---|---|

*Targets are shown at current band level; year-end targets are adjusted for promotions and transfers*

**Performance Achievement Plan Award**

| | Pro-Rata Target | Payout % | Final Award |
|---|---|---|---|
| 2003 – 2005 PAP: | $196,056 | 21.3% | $41,759.93 |

Incentive award targets represent the average award (consistent with competitive market practice by pay band) that an executive who substantially achieves individual performance objectives could expect to earn if the performance measurements were at 100% of targeted levels. Actual payouts vary based on actual results.

By participating in the Key Executive Compensation Program (KECP), the executive waives any and all of the executive claims arising from the 2005 Recognition and Retention Grant program.

This award is subject to the KECP Safe Harbor provision approved by the Court on February 10, 2006. The full provision is attached.

Acknowledged and agreed:

Date: 2/28/06



Corporate EBITDAR Matrix

| Target EBITDAR: | Maximum EBITDAR: |
|---|---|
| ($81 M) | $340 M |

**EXHIBIT D**

# DELPHI

# DELPHI CORPORATION

# Supplemental Executive Retirement Program

# Effective January 1, 1999 and

# Amended as of September 1, 2005

# DELPHI
# SUPPLEMENTAL EXECUTIVE RETIREMENT PROGRAM

The Supplemental Executive Retirement Program ("SERP" or the "Program") is an unfunded, non-tax-qualified benefit program. The Program is structured to qualify for certain exemptions from the eligibility, funding and other requirements of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and, further, SERP benefits are computed without regard to compensation limits imposed under the Internal Revenue Code of 1986, as amended ("IRC").

**Section I.    Purpose of the Program**

The purpose of SERP is to assure that eligible retiring salaried executive employees of Delphi Corporation ("the Corporation") may receive an overall level of monthly retirement benefits which are competitive with the benefits provided executives retiring from other major U.S. industrial companies. To achieve this goal, the monthly retirement benefits determined under the tax-qualified Delphi Retirement Program for Salaried Employees ("SRP"), plus any benefits payable under certain other Delphi-provided benefit programs, will be supplemented by benefits, if any, provided under the formulas of this Program.

**Section II.    Administration of the Program**

(a)    SERP will at all times be maintained, considered, and administered as a non-qualified plan that is wholly separate and distinct from the SRP. Moreover, it will be maintained as an unfunded plan providing deferred compensation for a select group of management or highly-compensated employees under Section 201(2) of ERISA.

(b)    Benefits under this Program are not guaranteed.

**DELPHI**
## SUPPLEMENTAL EXECUTIVE RETIREMENT PROGRAM

(c)    The Corporation is the Plan Administrator.  The Plan Administrator may delegate various aspects of Program administration as it deems appropriate and to the extent permitted by applicable law.  Additionally, any committee or person delegated various aspects of Program administration may sub-delegate that authority as appropriate and as permitted by applicable law.  Committees or persons delegated various aspects of Program administration have discretionary authority to construe, interpret, apply, make factual determinations regarding, and administer the Program in accordance with its terms.  Any interpretation or determination regarding the Program made by the Plan Administrator, or any committee or person(s) delegated the authority to make such an interpretation or determination, will be given full force and effect, unless it is proven that the interpretation or determination was contrary to the Program or arbitrary and capricious.

(d)    The Compensation and Executive Development Committee ("Committee") of the Corporation's Board of Directors is the Named Fiduciary with respect to the Program.  As such, the Committee enjoys all responsibility and authority of a Named Fiduciary under applicable law.

(e)    The Compensation and Executive Development Committee has been delegated, among other powers, the discretionary authority to interpret, construe and make final determinations, including factual findings, of any and all claims under the Program.  Any and all decisions of the Committee as to interpretation or application of the Program will be final, conclusive, and binding upon all parties, including the Corporation, the stockholders, and the participants and beneficiaries of the Program.  Any interpretation or determination regarding the Program made by the Committee will be

# DELPHI
# SUPPLEMENTAL EXECUTIVE RETIREMENT PROGRAM

given full force and effect, unless it is proven that the interpretation or determination was contrary to the Program or arbitrary and capricious.

(f)    The Plan Administrator, and any committee or person delegated authority regarding the Program, has the full power to engage and employ such recordkeeping, legal, actuarial, auditing, tax, and other such agents, as it will determine, in its sole discretion, to be in the best interest of the Corporation, the Program, and its participants and beneficiaries.

(g)    The expenses of administering this Program will be borne by the Corporation and may not be charged against its participants and beneficiaries.

(h)    For purposes of the Program, a "Plan Year" means the 12-month period beginning January 1 and ending December 31.

## Section III.   Effective Date

The Corporation established this Program effective January 1, 1999.  The Program was most recently amended effective September 1, 2005.

## Section IV.   Eligibility to Participate in the Program

(a)    To be eligible for a Regular SERP Benefit under the Regular SERP Formula, an executive employee must:

(1)    be a regular U.S. or U.S. Expatriate executive employee at the date of retirement or death;

# DELPHI
## SUPPLEMENTAL EXECUTIVE RETIREMENT PROGRAM

    (2)      have at least 10 years of SRP Part B credited service and be contributing to Part B at the time of retirement, death or onset of disability or have at least 10 years of service under the account balance plan feature of the SRP; and

    (3)      be:

        (i)      at least 62 years old at retirement;

        (ii)      at least 55 years old at time of total and permanent disability retirement under the SRP; or

        (iii)      at least 55 years old at time of death.

(b)      To be eligible for an Alternative SERP Benefit under the Alternative SERP Formula, an executive employee must:

    (1)      be a regular U.S. or U.S. Expatriate executive employee at the date of retirement or death;

    (2)      have at least 10 years of SRP Part B credited service and be contributing to Part B at the time of retirement, death or onset of disability or have at least 10 years of service under the account balance plan feature of the SRP; and

    (3)      be actively at work and at least age 62 at time of retirement, death, or onset of disability.

(c)      Executives will not be eligible to grow into benefits under the Alternative SERP Formula from any long-term leave of absence.

**DELPHI**

**SUPPLEMENTAL EXECUTIVE RETIREMENT PROGRAM**

(d)     Until age 70, any retired executive employee receiving an Alternative
SERP benefit under the Alternative SERP Formula is prohibited from all
activity which is competitive with the Corporation or otherwise acting in
any manner inimical or contrary to the best interests of the Corporation.
Alternative SERP benefits may be suspended if a retired executive does
not respond to the Corporation's request for information under this
paragraph.  If any such executive violates these conditions precedent, the
executive and his beneficiaries thereafter would lose any benefits based
upon the Alternative SERP Formula, commencing with the date of initial
violation.  While the conditions precedent identified above (i.e., prohibit
working for a competitor or otherwise acting in any manner inimical or
contrary to the best interests of the Corporation) are not now conditions to
the receipt of Regular SERP benefits, the Corporation reserves the right
to impose prohibitions and conditions precedent to the receipt of Regular
SERP benefits at any time and without prior notice.

(e)     An executive who is subject to automatic retirement at age 65 under the
terms of the SRP must be approved by the Committee to be eligible for
SERP benefits under this Program for retirement at ages 62-64.

**Section V.    Amount of Benefits Under the Regular Formula of the Program**

(a)     An employee who is eligible to participate in the Program is eligible to
receive as a monthly benefit under the Regular formula of this Program an
amount equal to two percent (2%) of average monthly base salary for the
highest 60 of the 120 months immediately preceding retirement or death,
multiplied by (1) the years of credited service used to determine the Part
B Supplementary benefit under the SRP, or (2) years of service in the
account balance plan feature of the SRP, less the sum of (i) all monthly

**DELPHI**

**SUPPLEMENTAL EXECUTIVE RETIREMENT PROGRAM**

benefits payable under the SRP prior to reduction for the cost of any survivor coverage or the monthly single lifetime annuity equivalent attributable to the SRP account balance plan feature lump sum, plus (ii) two percent (2%) of the maximum Primary Social Security benefit payable (regardless of actual receipt) in the year of retirement or death multiplied by the employee's years of Part A credited service under the SRP or years of service in the account balance plan feature of the SRP, plus (iii) any benefits payable under certain other Delphi-provided benefit programs (e.g. Extended Disability Benefits).

(b)     The "Special Benefit" provided under the Delphi Salaried Health Care Program, will not be taken into account in determining any monthly benefit amount payable hereunder.

(c)     Any post-retirement increase under the SRP will not reduce any monthly benefit payable under this Program.  For purposes of this subsection, adjustments to the IRC Section 415 limits will not be considered post-retirement increases.

(d)     The monthly Social Security offset amount will be based upon the maximum Primary Social Security benefit amount payable in the year the executive retires or dies, regardless of the executive's age or availability to him/her of a Social Security benefit.  The Social Security offset amount determined at retirement will not be redetermined for any subsequent Social Security increase.

(e)     Benefits payable under the Regular Formula to a surviving spouse are detailed in Section VIII.

## DELPHI
## SUPPLEMENTAL EXECUTIVE RETIREMENT PROGRAM

**Section VI.    Amount of Benefits Under the Alternative Formula of the Program**

(a)    Under the Program, of which this Alternative Formula is a part, an eligible retiring executive is entitled to the greater of the monthly benefit, if any, generated through either (1) the Alternative Formula, as described hereinafter, or (2) the Regular SERP formula described in Section V.

(b)    The effective date of this formula is for retirements with benefits payable commencing on or after January 1, 1999.

(c)    The monthly benefit level provided hereunder will equal 1.5% of average total direct compensation (monthly base salary plus average monthly annual incentive compensation, as defined in Section VI(e) below), multiplied by (1) years of participation (35-year maximum) used to determine the part B supplementary benefit under the SRP or (2) years of service (35-year maximum) in the account balance plan feature of the SRP, less the sum of (i) all monthly benefits payable under the SRP prior to reduction for the cost of any survivor coverage or the monthly single lifetime annuity equivalent attributable to the SRP account balance plan lump sum, plus (ii) 100% of the maximum Primary Social Security benefit payable (regardless of actual receipt) in the year of retirement or death, plus (iii) any benefits payable under certain Delphi-provided programs (e.g. Extended Disability Benefits).

(d)    The "Special Benefit" payable under the Delphi Salaried Health Care Program will not be taken into account in determining any monthly benefit amount payable hereunder.

**DELPHI**

## SUPPLEMENTAL EXECUTIVE RETIREMENT PROGRAM

(e)     For purposes of this Section VI, average monthly base salary means the monthly average of base salary for the highest 60 of the 120 months immediately preceding retirement or death.  Average monthly incentive compensation means an amount determined by dividing the total of the highest five of the last ten years (preceding the date of retirement or death) of annual incentive awards, by 60.  Each annual incentive award amount is based on the total value related to the year for which it was awarded, not the amount that is subsequently paid.  Any award related to the year of retirement is not used in the calculation.  Moreover, neither Performance Achievement Plan awards, Stock Incentive Plan grants, Long Term Incentive Plan awards, nor any other form of payment, are eligible for inclusion in determining an Alternative Formula monthly benefit amount.  Non-consecutive years within the last ten years of employment may be used for determining the blended amount of average monthly (1) base salary, and (2) incentive compensation.

(f)     The monthly Social Security offset amount will be the age 65 (or age at which full Social Security benefits are payable, if later) Primary Social Security benefit amount payable in the year the executive retires, regardless of the executive's age at retirement or availability to him/her of a Social Security benefit.  The Social Security offset amount determined at retirement will not be redetermined for any subsequent Social Security increase.

(g)     Any post-retirement increase under the SRP will not reduce any monthly benefit payable under this Program.  For purposes of this subsection, adjustments to the IRC Section 415 limits will not be considered post-retirement increases.

# DELPHI
## SUPPLEMENTAL EXECUTIVE RETIREMENT PROGRAM

(h)     Benefits payable under the Alternative Formula to a surviving spouse are detailed in Section VIII.

## Section VII.   Payment of Benefits

(a)     Payment of benefits, in the monthly amount determined pursuant to Section V or VI of this Program, will be made in accordance with the terms and conditions established by the Plan Administrator.

(b)     The payment of benefits under (a) above will be reduced by the amount that a participant owes the Corporation or any subsidiary, for any reason, including benefit overpayments, wage overpayments, and amounts due under all incentive compensation plans.  The participant will be relieved of liability in the amount of the reduction following the payment to the Corporation.

## Section VIII.   Surviving Spouse Benefits

(a)     SERP provides for an election of a lifetime monthly benefit to be paid to a surviving spouse otherwise eligible for surviving spouse benefits under the SRP.  The spouse's consent is not required if the employee rejects the SERP surviving spouse coverage.

(b)     If an executive employee who is eligible for benefits under this Program dies in service on or after having attained age 55, but prior to having attained age 62, and such executive would have been eligible to retire voluntarily under the terms of the SRP on the date of his or her death, then the eligible surviving spouse of such employee will be eligible to receive a 65% surviving spouse benefit based upon the amount of SERP

# DELPHI
## SUPPLEMENTAL EXECUTIVE RETIREMENT PROGRAM

that would be payable to the participant at age 62 and one month. In order for a surviving spouse to be eligible to receive surviving spouse benefits under this Program, the surviving spouse must have been married to the executive employee on the date of his or her death for a period of not less than one year.

(c)    No surviving spouse SERP Benefit is available for marriage or re-marriage that occurs after the effective date of retirement.

(d)    Any such survivor benefit will be equal to 65% of the reduced monthly SERP amount otherwise payable to the deceased retiree or employee. Any such reduction applicable to the retiree's benefit is 5% if the age of the employee and the age of the spouse are within five full years of each other.  The 5% is increased by 1/2 percent (1/2%) for each full year over five years the spouse is younger than the employee.  The 5% is reduced by 1/2 percent (1/2%) for each full year over five years the spouse is older than the employee.

(e)    Any surviving spouse of an executive who dies prior to age 55 while eligible to retire voluntarily with 30 or more years of credited service shall be entitled to a benefit from this Program equal to the amount of the reduction under the SRP attributable to the compensation limits applicable to the SRP.

(f)    If a Program eligible retiree is not receiving a SERP benefit due to eligibility to receive benefits under the SRP and other Delphi-provided plans which exceed the SERP benefit payable under this Program, the accrued cost of the surviving spouse benefit described in Section VIII will

# DELPHI
## SUPPLEMENTAL EXECUTIVE RETIREMENT PROGRAM

be recovered in full before the retiree is first entitled to receive benefits under this Program.

### Section IX.   Amendment, Modification, Suspension, or Termination

(a)   The Corporation reserves the right to amend, modify, suspend, or terminate this Program in whole or in part, at any time, by action of the Compensation and Executive Development Committee of the Board of Directors, the Committee, or other committee(s) or person(s) expressly authorized by the Corporation to take such action.  No oral statements can change the terms of this Program.  This Program can only be amended in writing.  Absent an express delegation of authority, no one has the authority to commit the Corporation to any benefit or benefits provision not provided for under this Program or to change the eligibility criteria or other provisions of this Program.

(b)   The Corporation may, from time-to-time and in its sole discretion, adopt limited early retirement provisions to provide retirements (i) during a specified period of time, (ii) at a specified level of benefits, and (iii) for identified executive employees.  Any such early retirement provisions that may be adopted by the Corporation are made a part of this Program as though set out fully herein.

(c)   The Corporation may, from time-to-time and in its sole discretion, adjust the amount of an executive's credited service used to determine the benefits under this Program, or the amount of benefits payable to an executive employee under this Program.

### Section X.   Claim Denial Procedures; Appeal Rights; Limitations Period

# DELPHI
# SUPPLEMENTAL EXECUTIVE RETIREMENT PROGRAM

(a)    A claim for benefits under the Program must be made within 180 days of the date purportedly giving rise to the entitlement to benefits.  A written determination granting or denying the claim will be furnished to the person making the claim ("Claimant") within 90 days of the date on which the claim is filed.  If special circumstances require a longer period, the Claimant will be notified in writing, prior to the expiration of the 90-day period, of the reasons for an extension of time; provided, however, that no extensions will be permitted beyond 90 days after expiration of the initial 90-day period.  Any denial or partial denial of a claim will be dated and signed by a person designated to speak on behalf of the Plan Administrator and will clearly set forth:

(i)    the specific reason(s) for the denial;

(ii)   specific reference to pertinent Program provision(s) on which the denial is based;

(iii)  a description of any additional material or information necessary for the Claimant to perfect the claim and an explanation of why such material or information is necessary; and

(iv)   an explanation of the review procedures set forth below.

If no written determination is furnished to the Claimant, then the claim will be deemed denied and the review procedure described below will become available to the Claimant.

(b)    A Claimant may obtain review of an adverse benefit determination by filing a written notice of appeal with the Committee within sixty (60) days after the determination date or, if later, within sixty (60) days after the

# DELPHI
## SUPPLEMENTAL EXECUTIVE RETIREMENT PROGRAM

receipt of a written notice denying the claim.  Such an appeal may be initiated by forwarding the request to Delphi Corporation Compensation and Executive Development Committee, Mail Code 483-400-606, Delphi World Headquarters, Troy, Michigan 48098.  As a part of this review, the participant or beneficiary must submit any written comments that may support their position.  The Committee will conduct a full and fair review, which will provide for the Claimant's right to:

(i)     be represented by an individual whom the Corporation determines has been properly authorized to act on Claimant's behalf;

(ii)    present written comments, documents, records, and any other information relating to the Claimant's claim for benefits under the Program;

(iii)   receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Claimant's claim for benefits; and

(iv)    have all comments, documents, records, and other information submitted by the Claimant relating to the claim reviewed.

(c)     The Committee's decision will be rendered no more than sixty (60) days after the request for review, except that such period may be extended for an additional sixty (60) days if the Committee determines that special circumstances require such extension.

**DELPHI**
**SUPPLEMENTAL EXECUTIVE RETIREMENT PROGRAM**

(d)     The Committee, or its delegate, will promptly provide a Claimant with a
written decision in a manner calculated to be understood by the Claimant
setting forth:

(i)     the findings of fact;

(ii)     the specific reason(s) for the denial;

(iii)     specific reference to pertinent Program provision(s) on
which the denial is based;

(iv)     a statement that the Claimant is entitled to receive, upon
request and free of charge, reasonable access to, and
copies of, all documents, records, and other information
relevant to the Claimant's claim for benefits; and

(v)     a statement of the Claimant's right to bring an action under
ERISA.

(e)     A Claimant must follow the claims and appeal procedures described in
this section before taking action in any other forum regarding a claim for
benefits under the Program.  Any suit or legal action initiated by a
Claimant under the Plan must be brought no later than one year following
a final decision on the claim by the Committee.  This one-year limitation
period on suits for benefits applies in any forum where a Claimant initiates
such suit or legal action.

**Section XI.    Service of Legal Process**

Service of legal process on the Corporation may be made at any office of C T
Corporation.  C T Corporation, which maintains offices in 50 states, is the
statutory agent for services of legal process on the Corporation.  The procedure
for making such service generally is known to practicing attorneys.  Services of

# DELPHI
# SUPPLEMENTAL EXECUTIVE RETIREMENT PROGRAM

legal process also may be made upon Delphi Corporation at the Service of Process Office, Delphi World Headquarters, Mail Code 483-400-126, 5725 Delphi Drive, Troy, Michigan 48098.

**Section XII.  Non-Assignability**

No right or interest of any participant in the Program is assignable or transferable, in whole or in part, either directly or by operation of law or otherwise, including, but not by way of limitation, execution, levy, garnishment, attachment, pledge, bankruptcy, or in any other manner, and further excluding devolution by death or mental incompetency.  No right or interest of any participant in the Program will be liable for, or subject to, any obligation or liability of such participant except as provided in Section VII(b).