1                           **EXHIBIT A**

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 05-44481-rdd

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    DPH HOLDINGS CORP., ET AL.,

9

10           Debtors.

11

12   - - - - - - - - - - - - - - - - - - - -x

13                     **MODIFIED BENCH RULING**

14           U.S. Bankruptcy Court

15           300 Quarropas Street

16           White Plains, New York

17

18           March 18, 2010

19           10:12 AM

20

21   B E F O R E:

22   HON. ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   Transcribed by:  Dena Page

```
 1    A P P E A R A N C E S :

 2    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

 3          Attorneys for Reorganized Debtors

 4          155 North Wacker Drive

 5          Chicago, IL 60606

 6

 7    BY:   JOHN WM. BUTLER, JR., ESQ.

 8          JOHN K. LYONS, ESQ.

 9          JOSEPH N. WHARTON, ESQ. (TELEPHONICALLY)

10

11

12    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

13          Attorneys for Reorganized Debtors

14          Four Times Square

15          New York, NY 10036

16

17    BY:   KAYALYN A. MARAFIOTI, ESQ.

18

19

20

21

22

23

24

25
```

```
 1    GORLICK, KRAVITZ & LISTHAUS, P.C.

 2          Attorneys for International Union of Operating

 3              Engineers Locals

 4          17 State Street

 5          4th Floor

 6          New York, NY 10004

 7

 8    BY:   BARBARA S. MEHLSACK, ESQ. (TELEPHONICALLY)

 9

10    PREVIANT, GOLDBERG, UELMEN, GRATZ, MILLER, & BRUEGGEMAN, S.C.

11          Attorneys for IBEW & IAM

12          1555 N. RiverCenter Drive

13          Suite 202

14          Milwaukee, WI 53212

15

16    BY:   MARIANNE GOLDSTEIN ROBBINS, ESQ. (TELEPHONICALLY)

17

18

19

20

21

22

23

24

25
```

DPH HOLDINGS CORP., ET AL.

1                       P R O C E E D I N G S

2              THE COURT:   I have before me a claim objection by DPH

3    Holdings Corporation, which is the successor through the

4    confirmed and effective Chapter 11 plan for Delphi Corporation

5    and its affiliated debtors and debtors in possession with

6    regard to claims asserted against those entities.   It has

7    objected to proofs of claim filed by the IAM, IBEW and IUOE,

8    all unions or union locals representing former workers for the

9    debtors who were covered by the Delphi HRP, or Delphi pension

10   plan.   I'll sometimes refer to these unions as the splinter

11   unions.   That's just a colloquial term to distinguish them from

12   the UAW, the United Steelworkers, and the IUE, who in the

13   aggregate represent far more of the debtors' former employees.

14             The objection originally addressed several claims by

15   the splinter unions.   Based on the initial hearing on the claim

16   objection and the unions' response, I asked the parties for

17   further briefing.   The first issue that I asked to be briefed

18   has now been completely clarified.   It is now clear, and the

19   unions so acknowledge, that the only claims that they are

20   proceeding on at this point (having acknowledged that they have

21   no other disputed claims) are claims that they have asserted

22   for the reduction in their members' recovery of pension

23   benefits under the HRP -- or the so-called nonguarantied claim

24   portion of their pension benefits.

25             By the "nonguarantied claim portion," I mean the

DPH HOLDINGS CORP., ET AL.

1   following.  The Delphi HRP was terminated and taken over by the

2   PBGC.  Under ERISA, the PBGC is responsible for paying amounts

3   to the pension beneficiaries.  The three unions seek to have

4   allowed their claims against Delphi for the amounts owed to

5   their members as beneficiaries of the terminated pension plan

6   that exceed the amounts that will be paid by the PBGC.

7           The unions assert two separate grounds, or alternative

8   grounds, for these claims.

9           First, they contend that the debtors' termination of

10  the pension plan and the subsequent creation of the benefit

11  reduction claims, or the nonguaranteed claims, violates their

12  respective collective bargaining agreements and, therefore,

13  gives rise to a breach claim.

14          Secondly, they assert, or alternatively they assert,

15  that the agreement by Delphi with the PBGC and GM in respect of

16  the treatment of the Delphi HRP, which fixed the PBGC's claim

17  under ERISA against the debtors in respect of the pension plan

18  for termination liability and facilitated the agreement by GM

19  to backstop any unpaid, nonguarantied plan benefits for certain

20  beneficiaries of the plan -- namely the beneficiaries who were

21  members of the UAW (and the recognition of the possibility of

22  GM doing the same for other beneficiaries -- namely the

23  beneficiaries represented by the United Steelworkers and the

24  IUE), constituted a breach of fiduciary duty by Delphi in its

25  capacity as a pension plan fiduciary.

DPH HOLDINGS CORP., ET AL.

1        The debtors have raised numerous grounds for objecting

2    to these claims.  The first ground, and I will focus now on the

3    unions' contract claim, is that under ERISA as amended post-

4    1986, the PBGC has been given sole control over the liability

5    of an employer/sponsor, such as the debtors, in respect of a

6    pension plan, such as the Delphi HRP, and that such liability

7    is owed uniquely to the PBGC.  And, in particular, it is not

8    owed under Section 301 of the LMRA or assertable by a union,

9    notwithstanding the existence of a collective bargaining

10   agreement that requires the payment of such benefits.

11       The case law on this issue, I believe, is clear and

12   convincing that the debtors' position is correct.  The leading

13   case is United Steelworkers of America v. United Engineering,

14   Inc., 52 F.3d 1386 (6th Cir. 1995), which discusses the state

15   of the law prior to the amendments to ERISA, in which the

16   courts, including the Sixth Circuit as well as the Second

17   Circuit, had filled in what they perceived to be a gap in ERISA

18   that enabled other parties, including unions, to assert a

19   pension underfunding claim against the employer/plan sponsor.

20   As discussed in the United Engineering case, it appears clear

21   that Congress, aware of such case law, amended ERISA in 1986 so

22   that employers would be liable only to the PBGC for the total

23   amount of unfunded pension benefit liabilities of a terminated

24   plan.

25       So, based on the United Steelworkers case and cases it

DPH HOLDINGS CORP., ET AL.

1    cites, including In re Adams Hard Facing Company, 129 B.R. 662

2    (W.D. Okla. 1991), and International Association of Machinists

3    and Aerospace Workers v. Rome Cable Corporation, 810 F. Supp.

4    402 (N.D.N.Y 1993), as well as the subsequent case of In re

5    Lineal Group, 226 B.R. 608 (Bankr. M.D. Tenn. 1998), I believe

6    that the unions' breach of contract claim is preempted by

7    ERISA, or, stated differently, under ERISA only the PBGC has a

8    claim for termination liability.

9           On the preemption argument, or in response to the

10   preemption argument, the unions point to one case and to a

11   theory; however, having considered both, I am not persuaded. As

12   far as the case is concerned, the unions point to an unreported

13   decision of the Sixth Circuit, Local No. 1654 International

14   Brotherhood of Electrical Workers v. LG Phillips Display

15   Components Company, 137 Fed. Appendix 776 (6th Cir. June 7,

16   2005), in which the Sixth Circuit recognized that while state

17   law claims for the recovery of employee benefits are always

18   preempted by ERISA, claims involving rights created by

19   collective bargaining agreement are governed by the LMRA and,

20   at least in respect of the facts there at hand, are not

21   superseded by ERISA.  The facts at hand in that case, however,

22   involved not a termination of a pension plan and the resulting

23   claim assertable after its takeover by the PBGC for the plan's

24   underfunding, or deficiency, but, rather, a fraud claim in

25   connection with the sponsor's negotiations involving the

DPH HOLDINGS CORP., ET AL.

1   termination of the plan leading to the agreement of the union

2   to receive their retirement benefits in a lump sum.  There was

3   no indication in that case that the retirement benefits would

4   not be paid in full, only a dispute with regard to the factors

5   used in computing the lump sum cash payment.  The Sixth Circuit

6   in that unpublished decision recognized the United Steelworkers

7   case and stated, however, that the United Steelworkers case was

8   decided on the narrow ground that ERISA preempted claims for

9   nonguaranteed pension benefits against plan sponsors because

10   ERISA had been amended to provide that plan sponsors were not

11   otherwise liable for nonguaranteed benefits.

12           The unions would interpret that sentence to state,

13   effectively, that as long as there is a separate basis for a

14   claim for nonguaranteed benefits (in the present case, under

15   the splinter unions' collective bargaining agreements), the

16   claim would not be preempted by ERISA.  I do not view that to

17   be correct.  I believe that the United Steelworkers case, in

18   fact, involved just such a situation as the present dispute

19   before me and, nevertheless, the Sixth Circuit, I think

20   correctly, held that the claim under Section 301 of the LMRA

21   was preempted -- as is, I believe, also required by the logic

22   of that decision as applied to the present claims of the

23   splinter unions: literally, under ERISA, the debtors are not

24   liable for such claims, except to the PBGC.  And so, therefore,

25   when one looks at the terms of the collective bargaining

DPH HOLDINGS CORP., ET AL.

1   agreements here, which are set forth in the three MOUs entered

2   into by the respective splinter unions, and Delphi Corporation,

3   paragraph 2(b) of the MOUs states that "Delphi will cause the

4   frozen Delphi HRP to pay benefits in accordance with the terms

5   of the Delphi HRP and applicable law."

6         "Applicable law" here, as interpreted by the Sixth

7   Circuit based on an apt reading of ERISA, would fix the

8   sponsor's pension liability as it was fixed with the PBGC --

9   and that would be the claim, a claim, further, assertable only

10  by PBGC.

11        There is another, separate basis, as well, for

12  disallowing the splinter unions' breach of contract claims.

13  The provision of the MOUs that I just quoted, paragraph 2(b),

14  goes onto say "These benefits will not be reduced from the

15  levels in effect as of the date immediately preceding the

16  effective date of the MOU unless they are similarly reduced for

17  other retired Delphi HRP participants.  The IUOE [and this is

18  also as agreed by the other two unions] agrees that Delphi

19  reserves its right to seek termination of the Delphi HRP

20  consistent with applicable law."

21        Delphi contends that the reservation of rights in the

22  last sentence of paragraph 2(b) recognizes Delphi's right to

23  terminate the HRP and to have the unions' claims be limited to

24  the claim determined by the PBGC, with no additional claim to

25  be assertable by the unions.

DPH HOLDINGS CORP., ET AL.

1      The unions contend, to the contrary, that the last

2  sentence of paragraph 2(b) recognizes only a right to terminate

3  the HRP, not a right to be relieved of a claim for breach of

4  the MOUs.  As the debtors have pointed out, I have already

5  dealt with this issue to some extent in the context of the

6  splinter unions' objections to the PBGC settlement and the

7  confirmation of the debtors' modified chapter 11 plan, which

8  contemplated the implementation of the PBGC settlement.  At

9  that time, in approving the PBGC settlement I found that the

10  debtors were not precluded from entering into the settlement by

11  the splinter unions' collective bargaining agreements.  But in

12  that context I did not address, I believe, sufficiently for res

13  judicata or collateral estoppel purposes whether a resulting

14  breach claim had been precluded by the MOUs' own language.  At

15  that time, in approving the settlement, I was requested only to

16  find that the settlement was fair and equitable and in the best

17  interests of the debtors and their estates (although I believed

18  that the reduction of the PBGC's termination or deficiency

19  claim under the settlement was consistent with Delphi's

20  obligations under the MOUs, which first recognized the debtors'

21  right to terminate the pension plan and, therefore, the

22  implicit role to be played by the PBGC in fixing the

23  termination claim).  Therefore, I do not accept the debtors'

24  reading of the last sentence of paragraph 2(b) or the debtors'

25  argument that the unions are precluded by my earlier rulings

DPH HOLDINGS CORP., ET AL.

1    approving the PBGC settlement and confirming the chapter 11

2    plan from asserting their claims.

3          As quoted earlier, paragraph 2(b) of the MOUs has a

4    second, critical provision, however, which states that the

5    benefits provided under the Delphi HRP to the unions' members

6    can be reduced if they are similarly reduced for the other

7    Delphi HRP participants.  I believe the record is clear that

8    with the termination of the pension plan the benefits under the

9    Delphi HRP were reduced equally, across the board, with regard

10   to all participants and, therefore, the savings provision in

11   the second sentence of paragraph 2(b) applies as an alternative

12   basis to defeat the splinter unions' breach of contract claim.

13         Again, that sentence reads, "These benefits" ["these"

14   referring to the "benefits under the terms of the Delphi

15   HRP,"]"will not be reduced from the levels in effect as of the

16   date immediately preceding the effective date unless they [the

17   "they" clearly refers to "these benefits"] are similarly

18   reduced for other retired Delphi HRP participants."

19         The record is clear that upon termination of the

20   Delphi HRP, the benefits paid by the Delphi HRP were paid pro

21   rata, across the board to the beneficiaries of the HRP by means

22   of the PBGC's claim.

23         The splinter unions argue that, as a result of the

24   PBGC settlement, GM agreed to backstop those amounts that would

25   not be paid out across the board by the Delphi HRP to the PBGC

DPH HOLDINGS CORP., ET AL.

1    and from the PBGC to the beneficiaries, but those are <u>GM</u>

2    benefits and not Delphi HRP benefits.  So it appears clear to

3    me that under the terms of the applicable MOUs there has not

4    been a breach of the splinter unions' collective bargaining

5    agreements, even if the splinter unions had standing to assert

6    their claims notwithstanding ERISA's preemption of the right to

7    assert the deficiency claim arising upon plan termination.

8            The second basis for the splinter unions' claims, as I

9    said, is that, not as the employer or plan sponsor but as a

10   plan fiduciary, Delphi is liable for a breach of fiduciary duty

11   to each of the three unions' member beneficiaries.  Before

12   discussing the nature of the fiduciary duty that Delphi would

13   have to the beneficiaries of the HRP and the alleged breach of

14   that duty, however, I should first deal with the issue of the

15   unions' standing to pursue such a claim.

16           The law in the Second Circuit and this district is

17   clear that the right to assert claims for breach of fiduciary

18   duty under ERISA is limited to the specific types of persons or

19   entities listed in Section 502 of ERISA.  It is also clear that

20   the unions are not pursuing the breach of fiduciary duty claims

21   as a beneficiary of the Delphi HRP or in any other capacity

22   recognized specifically by section 502 of ERISA.  Consequently,

23   the debtor has argued that the unions do not have standing to

24   bring this breach of fiduciary claim under Section 101(5) of

25   the Bankruptcy Code (defining a "claim").

DPH HOLDINGS CORP., ET AL.

1          I agree with the debtor's argument that the unions do

2     not have standing to assert their members' alleged breach of

3     fiduciary duty claims under ERISA.  It is worth emphasizing

4     that this argument regarding the unions' standing is not

5     premised upon pre-emption, because the unions are correct that

6     a fiduciary duty claim against an ERISA fiduciary is not the

7     same thing as the underfunding or deficiency claim that only

8     the PBGC has standing to pursue against a plan sponsor.  It is,

9     rather, based on a separate provision of ERISA, section 502.

10    However, as is clear from the case law, a claim for breach of

11    such a fiduciary duty is limited by section 502 to parties that

12    do not include the unions.  See Local 100 Transport Workers

13    Union v. Rosen, 2007 WL 2042511 (S.D.N.Y. July 13, 2007);

14    Toussaint v. J.J. Wiser & Company, 2005 WL 356834 (S.D.N.Y.

15    February 13, 2005); District 65 UAW v Harper & Row Publishers

16    Inc., 576 F Supp 1468 (S.D.N.Y. 1983).  See also McCabe v.

17    Trombley, 867 F. Supp. 120 (N.D.N.Y. 1994).

18          In response, the unions cite The American Medical

19    Association v. United Healthcare Corporation, 2002 U.S. Dist.

20    LEXIS 20309 (S.D.N.Y. October 23, 2002), as well as The

21    American Medical Association v. United Healthcare Corporation,

22    2003 U.S.Dist. LEXIS 1398 (January 30, 2003), in which Judge

23    McKenna gave standing to, in the first case, the American

24    Medical Association plaintiff and, in the latter case, to,

25    among others, unions, in fiduciary duty breach litigation under

DPH HOLDINGS CORP., ET AL.

1   ERISA.  However, he did so after having carefully analyzed the

2   factors for associational standing set forth in International

3   Union United Auto Workers v. Brock 477 U.S. 274, 281 (1988).

4   In so doing, he made it clear in both opinions that he granted

5   standing only insofar as the relief sought by the Association

6   or the unions related to claims for injunctive or declaratory

7   relief, as opposed to a damages claim.  (I also note that the

8   second order issued by Judge McKenna, which applied to the

9   unions, was, in addition to being limited to that basis,

10  entered expressly without opposition by any party.)  Here, as I

11  noted, however, the splinter unions are asserting a claim

12  against Delphi's estate, payable under section 101(5) of the

13  Bankruptcy Code, even if based in equity, in money, which

14  clearly takes the unions out of the ambit of the The American

15  Medical Association decisions.

16       The unions also rely on Southern Illinois Carpenters'

17  Welfare Fund v. Carpenters' Welfare Fund of Illinois, 326 F.3d

18  919, (7th Cir. 2003).  However, in addition to the fact that

19  the Carpenters' Welfare Fund case, I believe, is not on point

20  with the present facts, it is also contrary to the case law

21  from the Second Circuit that I've previously cited (to the

22  extent it is on point, which, again, I don't believe to be the

23  case).

24       So, before turning to the merits of the breach of

25  fiduciary duty claim, I conclude that the unions' claims should

DPH HOLDINGS CORP., ET AL.

1    be disallowed based on the unions' lack of standing to pursue a

2    right to payment for breach of a fiduciary duty under the

3    foregoing case law and section 502 of ERISA.

4           This is not an evidentiary hearing; it is a

5    sufficiency hearing and, therefore, is generally governed by a

6    standard akin to -- in fact, on all fours with -- for purposes

7    of the claims resolution process in these cases, the standard

8    under Federal Rule of Civil Procedure 12(b)(6), Twombley and

9    Iqbal.  Therefore, I am focusing only on the assertions in the

10   unions' claims and whether they would set forth, if proven,

11   legally feasible claims.  I'm not weighing the evidence that

12   might be offered in their support (although, if the claims'

13   assertions simply are not plausible, given the context, in

14   which case I would require the unions to set forth more in

15   their claims or disallow them).

16          That last wrinkle really doesn't come into play here,

17   however, because of the clarification of the nature of the

18   union's breach of fiduciary duty claim as set forth in the

19   additional briefing and at oral argument.  It is now clear

20   that, as far as the breach of fiduciary duty theory goes, the

21   unions contend that Delphi, as a plan fiduciary under the HRP,

22   breached its fiduciary duty essentially in two ways (and again

23   this is with the debtor wearing its hat as plan administrator

24   and not as employer/sponsor or in any other capacity).

25          First, the unions contend that although Delphi as plan

DPH HOLDINGS CORP., ET AL.

1    sponsor agreed, in the PBGC settlement, that the PBGC was

2    entitled to an allowed claim of <u>seven</u> billion dollars in

3    respect of the employer's termination of the pension plan,

4    settlement provided that the PBGC would have an allowed claim

5    against Delphi as plan sponsor of only <u>three</u> billion dollars.

6    The unions contend, therefore, that as plan administrator the

7    debtor left money on the table for itself as plan sponsor

8    rather than having it be allocated to pay a larger claim, and,

9    therefore, in essence, that it was self-dealing.

10           Secondly, the unions contend that, in the same PBGC

11   settlement agreement, Delphi agreed, along with the PBGC and

12   GM, that to the extent that the pension benefit claims of the

13   Delphi HRPs' beneficiaries would not be paid in full post-

14   termination, GM would pay the difference as far as the United

15   Auto Worker beneficiaries were concerned.  The PBGC settlement

16   agreement also contemplated the possibility that the same GM

17   "top up" treatment would apply to other union member

18   beneficiaries of the Delphi HRP, such as the United Steel

19   Workers and the IUE, which treatment eventually was agreed to

20   by GM.

21           (The debtor also facilitated the so-called 414(i)

22   transfers of Delphi HRP beneficiaries' liabilities and the

23   associated plan assets to other pension plans sponsored by GM.

24   I do not believe, however, that these latter agreements are

25   being attacked by the splinter unions as a breach of fiduciary

DPH HOLDINGS CORP., ET AL.

1    duty, nor do I believe that there would be a basis for such

2    transfers to be attacked.)

3              The splinter unions' contention is, with regard to the

4    GM "top up" agreement, that Delphi was unfavorably or unfairly

5    permitting certain beneficiaries of its terminated pension plan

6    to receive additional value in the form of the GM backstop and

7    that this constituted a breach of fiduciary duty to the

8    splinter unions' member beneficiaries, who GM did not offer to

9    "top up."

10             The fiduciary duty of a plan administrator is clearly

11   different than and separate from the obligations of a plan

12   sponsor or the employer that established the plan.  It's a

13   fiduciary duty that arises under ERISA, and the parties are

14   generally in agreement that under ERISA a fiduciary is one who

15   exercises authority or control respecting management or

16   disposition of the plan's assets, therefore having control over

17   the operation of the plan, as opposed to the plan's terms.

18             Delphi's decision to agree with the PBGC to the plan's

19   termination itself is clearly not a basis for a claim against

20   Delphi, as plan administrator, for breach of fiduciary duty

21   under ERISA.  That was a plan sponsor function, not a plan

22   fiduciary function; it also was a step the PBGC took on its

23   own.  When considering the fiduciary duty claim, the focus

24   would instead need to be upon whether, in administering the

25   plan, Delphi, as plan administrator, breached a fiduciary duty

DPH HOLDINGS CORP., ET AL.

1   under ERISA.  The two cases cited by the unions in support of

2   their breach of fiduciary duty claim fall into that context.

3   Solas v. Current Development Corporation, 557 F.3d 772 (7th

4   Cir. 2009), involves an administrator's clear self dealing

5   where the trustee "finagled" a plan's termination so that he

6   and his wife would receive more than their fair share as plan

7   participants.  In District 65 UAW v. Harper & Row Publishers

8   Inc., 670 F. Supp 550 (S.D.N.Y. 1987), the court found

9   potential breach of fiduciary duty liability with regard to the

10  administrator's use and actual control of the pension plan's

11  assets.

12          I simply do not see, moreover, how the provisions of

13  the PBGC settlement that contemplated the backstop by GM of

14  unpaid, nonguaranteed liabilities of the beneficiaries who were

15  members of the UAW (and the potential for doing the same for

16  other union beneficiaries) could fall into the category of a

17  breach of fiduciary duty by Delphi as plan administrator.  As I

18  noted in connection with the contract portion of my ruling, the

19  amount of payments under the settlement agreement coming from

20  Delphi are not affected by the GM backstop.  The GM backstop

21  involves assets of a third party, GM, and GM's agreement, for

22  its own reasons, to supplement what would be available from the

23  PBGC and, therefore, would, to my mind, under no circumstances

24  result in any misuse of the plan's assets or unfair or

25  discriminatory treatment of the HRP's beneficiaries in respect

DPH HOLDINGS CORP., ET AL.

1    of those assets by the plan administrator, Delphi.

2          The allowance of the PBGC's claim in a reduced amount

3    under the PBCG settlement agreement at least does involve,

4    indirectly, the treatment of an asset of the plan (unlike the

5    recognition of the GM backstop in the PBGC settlement), but I

6    believe it does so only superficially and not as a basis for

7    giving rise to a breach of fiduciary duty.  By its terms the

8    PGGC settlement agreement was made in contemplation of the

9    PBGC's termination of the Delphi HRP, and the allowance of the

10   PBGC's claim under the settlement agreement was effectively

11   contingent upon such termination.  Upon termination, the PBGC

12   would have sole control of that claim.  It was the PBGC's claim

13   to assert, defend and maximize.  In that context, the PBGC's

14   agreement on the claim's allowance was with Delphi as plan

15   sponsor, not as plan administrator.

16         I do not believe that Delphi had an obligation to

17   bargain against itself in that context for a higher PBGC claim.

18   Because the claim was controlled by the PBGC under the premises

19   of the settlement agreement, I do not believe, either, that

20   Delphi, as plan administrator, had an obligation to jump up and

21   intervene to insist that the PGBC's claim should be higher.

22   Instead, I believe that, given the context of the settlement

23   agreement, it was proper to look to PBGC, as the owner of the

24   claim, to protect the claim, and that Delphi's potential

25   conflict of interest was therefore mooted by the role that the

DPH HOLDINGS CORP., ET AL.

1    PBGC played.  Moreover, the PBGC settlement was subject to

2    notice and Court approval, which occurred.  It was not a hidden

3    transaction, like the dealings in the cases cited by the

4    unions.  Consequently, I do not believe that this aspect of the

5    union's claim sets forth a claim for breach of fiduciary duty,

6    either.

7           Again, my ruling is based upon the ground rules for a

8    sufficiency hearing under the claims procedures previously

9    adopted in these cases.  As I noted during oral argument, I had

10   some suspicions that ultimately the treatment of the PBGC's

11   claim did not leave the three unions' members who were

12   beneficiaries of the Delphi HRP any worse off.  But I'm not

13   basing my ruling on that suspiion.  In fact, I'm assuming that

14   the claim would always have been at seven billion dollars and

15   was not reduced in light of any other value that would be going

16   to beneficiaries of the plan, from the plan.  However, I still

17   do not see how the debtor, as plan administrator, under the

18   circumstances where the PBGC was going to terminate the plan

19   and the amount of the claim was fixed in contemplation of that

20   termination, had an ability, as an ERISA fiduciary, to oppose

21   the PBGC's settlement of the claim at three billion dollars.

22          So, for each of those alternative reasons I will grant

23   the debtors' objection to the splinter unions' claims to the

24   extent they're based upon an alleged breach of fiduciary duty.

25          The debtors' counsel should submit an order,

DPH HOLDINGS CORP., ET AL.

1    consistent with my ruling, disallowing the claims.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25