Hearing Date and Time: April 22, 2010 at 10:00 a.m. (prevailing Eastern time)
Response Date and Time: April 15, 2010 at 4:00 p.m. (prevailing Eastern time)

BARNES & THORNBURG LLP
One North Wacker Drive, Suite 4400
Chicago, Illinois 60606
Telephone: (312) 357-1313
Facsimile: (312) 759-5646

Deborah L. Thorne
Kathleen L. Matsoukas (KL-1821)
Telephone: (312) 214-8307
Email: deborah.thorne@btlaw.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| DPH HOLDINGS CORP., *et al.*, | ) ) ) | No. 05-44481 (RDD) |
| Reorganized Debtors. | ) ) ) ) ) | Jointly Administered |

**RESPONSE OF JOHNSON CONTROLS INC. POWER SOLUTIONS (CLAIM NO. 18719) AND JOHNSON CONTROLS BATTERY GROUP, INC. (CLAIM NO. 18720) TO REORGANIZED DEBTORS' FORTY-SIXTH OMNIBUS OBJECTION PURSUANT TO 11 U.S.C. § 503(b) AND FED. R. BANKR. P. 3007 TO (I) DISALLOW AND EXPUNGE CERTAIN ADMINISTRATIVE EXPENSE (A) BOOKS AND RECORDS CLAIMS, (B) METHODE ELECTRONICS CLAIMS, (C) STATE WORKERS' COMPENSATION CLAIMS, (F) TRANSFERRED WORKERS' COMPENSATION CLAIMS, (G) TAX CLAIMS, (H) DUPLICATE INSURANCE CLAIMS, AND (I) SEVERANCE CLAIMS, (II) DISALLOW AND EXPUNGE (A) A CERTAIN DUPLICATE WORKERS' COMPENSATION CLAIM, (B) A CERTAIN DUPLICATE TAX CLAIM, AND (C) A CERTAIN DUPLICATE SEVERANCE CLAIM, (III) MODIFY CERTAIN ADMINISTRATIVE EXPENSE (A) STATE WORKERS' COMPENSATION CLAIMS AND (B) WORKERS' COMPENSATION CLAIMS, AND <u>(IV) ALLOW CERTAIN ADMINISTRATIVE EXPENSE SEVERANCE CLAIMS</u>**

Johnson Controls Inc. Power Solutions ("JCI") and Johnson Controls Battery Group, Inc. ("JCBGI") jointly respond to the Forty-Sixth Omnibus Objection Pursuant to 11 U.S.C. § 503(b) and Fed. R. Bankr. P. 3007 to (I) Disallow and Expunge Certain Administrative Expense (A) Books and Records Claims, (B) Methode Electronics Claims, (C) State Workers' Compensation Claims, (F) Transferred Workers' Compensation Claims, (G) Tax Claims, (H) Duplicate Insurance Claims, and (I) Severance Claims, (II) Disallow And Expunge (A) A Certain Duplicate Workers' Compensation Claim, (B) A Certain Duplicate Tax Claim, And (C) A Certain Duplicate Severance Claim, (III) Modify Certain Administrative Expense (A) State Workers' Compensation Claims and (B) Workers' Compensation Claims, and (IV) Allow Certain Administrative Expense Severance Claims (the "Objection") of Debtor DPH Holdings Corp. and its debtor affiliates (collectively, the "Reorganized Debtors") concerning administrative expense claims numbered 18719 and 18720 (the "JC Claims"), respectively, as follows:

## BACKGROUND

1.    The JC Claims arise out of a post-petition sale of certain real property commonly known as 760 New Jersey Avenue, New Brunswick, New Jersey (the "Property") by Debtor Delphi Automotive Systems LLC ("Delphi") to JCI in 2006 (the "Sale"). The facts underlying the sale of the Property are set forth in more detail in the Memorandum in Support of Administrative Expense Claims of JCI and JCBGI, filed on July 13, 2009 along with the JC Claims (the "JC Claims Memo"). The JC Claims, including the Exhibits and the JC Claims Memo, are attached hereto as Exhibit 1 and Exhibit 2. Certain pertinent facts are repeated herein.

2

**A.      The Bankruptcy Case**

2.      On October 8 and 14, 2005 (the "Petition Date"), Delphi Corporation and certain of its subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").

3.      On December 10, 2007, the Debtors filed their first amended joint plan of reorganization (the "Plan") and related disclosure statement.  The Court entered an order confirming the Plan on January 25, 2008 (the "Confirmation Order") and the Confirmation Order became final on February 4, 2008.

4.      On October 3, 2008, the Debtors filed a motion under 11 U.S.C. § 1127 for an order approving (i) certain modifications to the Plan and related disclosure statement and (ii) related procedures for re-soliciting votes on the Confirmed Plan, as modified (the "Plan Modification Motion").  On June 1, 2009, the Debtors filed a supplement to the Plan Modification Motion which sought approval of (i) certain modifications to the Confirmed Plan (creating the "Modified Plan"), (ii) supplemental disclosure, and (iii) procedures for re-soliciting votes on the Modified Plan.  This Court entered an order approving the Modified Plan on July 30, 2009 (the "Modification Order").

5.      Pursuant to Article 10.2 of the Modified Plan and paragraph 38 of the Modification Order, this Court established July 15, 2009 as the bar date for asserting a claim for an administrative expense under section 503(b)(1) of the Bankruptcy Code.  In addition, Articles 1.5 and 10.5 of the Modified Plan established 30 days after the Effective Date (the "Post-Emergence Bar Date") as the bar date for asserting an administrative claim for the period

3

between June 1, 2009 and the Effective Date, unless otherwise ordered by this Court. Because the Effective Date was October 6, 2009, the Post-Emergence Bar Date was November 5, 2009. (*See* Objection ¶¶ 7-8.) January 11, 2010 was established as the objection date by which time the Reorganized Debtor was to object to Administrative Claims. (*See* Modified Plan at Art. 10.2.)

**B.     The Transfer Agreement and the Indemnification Provisions**

6.     On May 26, 2006, Delphi agreed to sell the Property to JCI pursuant to an agreement entitled "Transfer Agreement Relating to Transfer of Delphi's New Brunswick Battery Facility to JCI" (the "Transfer Agreement"). A true and correct copy of the Transfer Agreement is attached to each of the JC Claims as Exhibit A. (*See* Exs. 1, 2 at Ex. A.) The Transfer Agreement was approved by an order dated June 26, 2006 entered by this Court (the "Sale Approval Order"). (*See* Docket No. 4363.) Delphi transferred title to the Property to JCBGI on July 31, 2006, and JCBGI remains the owner of the Property.

7.     In Section 3.6.H of the Transfer Agreement, entitled "Environmental Matters," Delphi agreed to indemnify JCI as set forth in Exhibit 3.6.H of the Transfer Agreement. (*See* Ex. A at § 3.6.H.)

8.     In Section 2 of Exhibit 3.6.H, Delphi specifically agreed to indemnify JCI for "Environmental Damages arising from Pre-Closing Environmental Contamination, Pre-Closing Compliance Matters or Pre-Closing Off-Site Liability." (*See* Ex. A at Ex. 3.6.H, § 2.1.) "Environmental Damages" is defined in Section 1.9 to include

> losses, liabilities, costs, damages, fines, penalties and expenses (including reasonable expenses of investigation and attorneys' fees) arising out of an Environmental Law, but in all cases excluding losses, liabilities, costs, damages and expenses deemed consequential or loss of profit, and also excluding expenses of investigating information for the purposes of making a claim for indemnification under this Exhibit.

(*Id.* § 1.9.)

4

9. Additionally, in Section 7.1.A of the Transfer Agreement, Delphi agreed to indemnify JCI and JCBGI against damages, losses and expenses resulting from Delphi's breach of "any of its warranties or covenants" under the Transfer Agreement. (*See* Ex. A at § 7.1.A.)

**C.    Delphi's Breach of the Transfer Agreement**

10. In Section 4.1 of Exhibit 3.6.H to the Transfer Agreement, encompassed under the heading "Remediation of Environmental Damage," Delphi agreed that it would investigate and clean up the Property as required by the New Jersey Department of Environmental Protection ("NJDEP"), in satisfaction of the State of New Jersey's Industrial Site Recovery Act ("ISRA"). (*See* Ex. A at Ex. 3.6.H, § 4.1.)

11. In order to begin to comply with its contractual obligations under the Transfer Agreement and statutory obligations under ISRA, Delphi entered into a Remediation Agreement with NJDEP on July 26, 2006 (the "Remediation Agreement"). Pursuant to the Remediation Agreement, Delphi agreed to investigate and clean up the Property after selling it and agreed to establish financial assurance that it could complete the cleanup in the amount of $353,000. Thereafter, Delphi investigated the Property, made several submissions required by ISRA to NJDEP to document this investigation, and sought from NJDEP a statement that no further action was needed for certain portions of the Property. NJDEP responded in a lengthy letter to Delphi dated May 8, 2009, in which it rejected most of Delphi's assertions that it had sufficiently investigated the Property and required further investigation by Delphi before submission of a plan for clean-up. Delphi responded to NJDEP on November 5, 2009 and then agreed to undertake certain work NJDEP required for further investigation of the Property. On information and belief, despite having agreed on November 5, 2009 to undertake most of what NJDEP required to be done on May 8, 2009, Delphi has not increased beyond $353,000 the

5

remediation funding source which Delphi is required to establish with the NJDEP under ISRA in order to provide NJDEP with financial assurance of Delphi's ability to complete the investigation and cleanup of the Property under ISRA.

12.    As the owner of the Property, JCBGI is responsible for its environmental condition under both federal and New Jersey statutes. JCBGI therefore could be held liable by NJDEP for any investigation or cleanup of the Property for which Delphi is statutorily liable under ISRA and contractually liable under the Transfer Agreement.

13.    JCBGI has incurred and continues to incur additional costs as owner of the Property in order to comply with federal and state environmental law. JCBGI has incurred costs of approximately $380,400 annually to remove lead from stormwater as it is discharged from the Property, which it is required to do under a New Jersey Pollutant Discharge Elimination System permit issued by NJDEP (the "Stormwater Permit"). (*See* Exs. 1, 2 at Ex. C.) None of the lead removed by JCBGI from stormwater under the Stormwater Permit was released into the environment at the Property by any act or omission of either JCBGI or JCI. All such lead existed at the Property before the Transfer Agreement was entered into and is the result of operations conducted at the Property before its sale.

14.    JCBGI has also incurred costs in response to the release or threat of release to the environment of lead on floors in buildings at the Property in the amount of $3,315.

**D.    The JC Claims**

15.    Based on the foregoing, in the JC Claims, JCI and JCBGI have each asserted claims for indemnification arising under Section 3.6.H and Exhibit 3.6.H to the Transfer Agreement, and Section 7.1.A. of the Transfer Agreement. The JC Claims were filed on July 13, 2009 with Kurtzman Carson Consultants LLC as directed by this Court's orders. (*See* Exs. 1, 2.)

6

16. As set forth in the JC Claims, JCI and JCBGI are entitled to contractual and statutory indemnification from Delphi due to Delphi's anticipatory breach of the Transfer Agreement.

17. JCI and JCBGI are entitled to contractual indemnification pursuant to Sections 3.6.H and 7.1.A. of the Transfer Agreement and Exhibit 3.6.H thereto. Delphi covenanted in Section 4.1 of Exhibit 3.6.H to investigate and clean up the Property as required by NJDEP to satisfy ISRA. In Section 7.1.A of the Transfer Agreement, Delphi also agreed to indemnify JCI against damages, losses and expenses resulting from Delphi's breach of "any of its warranties or covenants" under the Transfer Agreement. (*See* Ex. A, § 7.1.A.) Delphi has already breached the Transfer Agreement by failing to provide adequate financial assurance for that cleanup's completion beyond the initial $535,000, by failing to address every area of concern as required by ISRA and by failing to establish within this bankruptcy a fund to pay for all ISRA compliance required at the Property. These failures violate Delphi's covenants in Section 4.1 of Exhibit 3.6.H, and JCI and JCBGI are entitled to indemnification pursuant to Section 3.6.H and Section 7.1.A of the Transfer Agreement.

18. JCBGI is also entitled to indemnification based on liabilities that will accrue when Delphi ceases to perform investigation and cleanup of the Property as required by both ISRA and the Transfer Agreement. NJDEP has incurred oversight costs in response to the release or threatened release of hazardous substances at the Property and will continue to incur such oversight costs. NJDEP could seek to recover them from JCBGI, as the current owner of the Property, under either the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.*, as amended ("CERCLA"), or the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 *et seq.* (the "Spill Act").

7

19.     JCI and JCBGI are thus entitled to cost recovery from Delphi pursuant to Section 7.1.A of the Transfer Agreement and Section 4 of Exhibit 3.6.H thereto (1) for the costs of cleanup JCI and JCBGI will incur due to Delphi's failure to fulfill its contractual obligations, and (2) under CERCLA and the Spill Act in the event JCI and/or JCBGI are liable to NJDEP thereunder.

20.     JCI is also entitled to contractual indemnification pursuant to Section 2 of Exhibit 3.6.H of the Transfer Agreement for Environmental Damages that arose prior to closing. As set forth above, Delphi has breached the terms of the Transfer Agreement that require Delphi to clean-up the Property, and the Property remains in a contaminated state as a result of Delphi's prior use of the Property. Given that JCI and JCBGI will incur cleanup costs in connection with the pre-closing Environmental Damage to the Property, JCI is entitled to indemnification for the clean-up costs JCI and JCBGI will incur in cleaning up the Property, as well as investigatory expenses and attorneys' fees.

21.     JCI and JCBGI are further entitled to administrative expense reimbursement for their statutory claims against Delphi under Section 107(a) of CERCLA and the Spill Act. JCBGI has incurred and continues to incur costs in connection with lead removal under the Stormwater Permit. JCI has incurred costs in response to the release or threat of release to the environment of lead on floors in buildings on the Property. These costs, as well as costs to be incurred by JCBGI and/or JCI in the future are recoverable from Delphi under CERCLA and the Spill Act.

**E.     Calculation of JC Claims**

22.     The estimated costs for the future cleanup of the Property total $8,973,550, as set forth in Exhibit B to the JC Claims. (*See* Exs. 1, 2 at Ex. B.)

8

23.     This amount does not include the accrued and accruing oversight costs of NJDEP, nor JCI's and JCBGI's expenses for attorneys' fees and investigation.  JCI had already incurred fees of approximately $178,916 at the time the JC Claims were filed, and JCI expects to incur fees and expenses in the amount of approximately $996,475, which is equal to the amount spent by JCI and JCBGI in defending a similar case.

24.     Additionally, JCBGI has incurred and continues to incur additional costs as owner of the Property in order to comply with federal and state environmental law.  JCBGI has incurred costs of approximately $380,400 annually, in accordance with the Stormwater Permit, to remove lead from stormwater discharged from the Property.  JCBGI has incurred costs in the amount of $760,800 so far, and expects to incur costs of $3,324,355 in the future for ongoing treatment of this issue.  These costs relate to pre-closing Environmental Damages, as that term is defined in Exhibit 3.6.H of the Transfer Agreement, and are set forth in Exhibit C to the JC Claims.

25.     JCI has also incurred costs in response to the release or threat of release to the environment of lead on floors in buildings at the Property in the amount of $3,315.  These costs related to pre-closing Environmental Damages, as that term is defined in Exhibit 3.6.H of the Transfer Agreement.

26.     As set forth below, under the Transfer Agreement and as set forth in the JC Claims, JCI is entitled to payment or escrow of its costs and expenses, which total $10,148,941 plus the oversight costs of NJDEP, which are as yet undetermined.  JCBGI is entitled to payment or escrow of its costs and expenses, which total $13,058,705 plus the oversight costs of NJDEP.

**RESPONSE**

27.     Reorganized Debtors' objection to the JC Claims should be rejected as untimely and meritless.  The objection was filed well after the due date for objections to Administrative

9

Claims, as set forth in Article 10.2 of the First Amended Joint Plan of Reorganization. Even if timely, the Reorganized Debtors' conclusory, generalized objection to payment of the JC Claims should be rejected as baseless, given that JCI and JCBGI have set forth a clear right to payment under the Transfer Agreement, supported by evidence and Delphi's own agreements and actions, and, in any event, are entitled to a hearing on the merits of the JC Claims.

**A.     The Reorganized Debtors' objection to the JCI Claims is untimely.**

28.     The Reorganized Debtors have objected to claim numbers 18719 and 18720, asserting that the amounts due under those claims are not reflected on the Reorganized Debtors' books and records. This obligation is untimely and should be disregarded.

29.     Pursuant to Article 10.2 of the Modified Plan, the Reorganized Debtors were required to file any objections to an Administrative Expense claim within 180 days of the July 15, 2009 bar date. Unless the Administrative Expense is subject to a timely objection, Article 10.2 provides that it "shall be deemed allowed in the amount requested."

30.     The Reorganized Debtors' Forty-Sixth Omnibus Objection was not filed until March 19, 2010, well after the 180-day window in which the Reorganized Debtors were permitted to file objections to administrative expenses.

31.     Because the Reorganized Debtors' Objection was not filed within 180 days of the July 15, 2009 bar date, the Objection should be disregarded as untimely, and the JC Claims should be deemed allowed in the amounts requested.

**B.     The Reorganized Debtors' objection to the JCI Claims is meritless.**

32.     Despite the lack of a timely objection, should the Court be willing to consider the objection of the Reorganized Debtors to the JC Claims, the objection should be disregarded as baseless and the claims should be allowed.

33.     The Reorganized Debtors' objection to the JCI Claims is based solely on the conclusory assertion that JCI and JCBGI (along with a multitude of other administrative claimants) have failed to meet their burden of proving that the allowance of the claims is justified by a preponderance of the evidence because their claims "are not owing pursuant to the Reorganized Debtors' books and records."  (*See* Objection ¶¶15-18.)

34.     "According to 11 U.S.C. § 503(b)(1)(A), 'the actual, necessary costs and expenses of preserving the estate' constitute administrative expenses entitled to priority status upon distribution of the estate." *In re Klein Sleep Prods., Inc.*, 78 F.3d 18, 22 (2d Cir. 1996). "Generally, a claim for an administrative expense status will qualify under 11 U.S.C. § 503 if the right to payment arose from a post-petition transaction with the debtor estate rather than from a prepetition transaction with the debtor, and the conduct giving rise to the payment was beneficial to the estate of the debtor." *In re New York Trap Rock Corp.*, 137 B.R. 568, 572 (Bankr. S.D.N.Y. 1992) (citations omitted); *see also In re Klein Sleep Prods., Inc.*, 78 F.3d at 20 ("Special priority is therefore accorded to expenses incurred under new contracts with the debtor, as 'administrative expenses' of the estate."); *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986) ("Accordingly, an expense is administrative only if it arises out of a transaction between the creditor and the bankrupt's trustee or debtor in possession, and only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business.") (citations and internal quotation marks omitted).  The burden of proving entitlement to an administrative expense priority rests with the party requesting it. *In re New York Trap Rock Corp.*, 137 B.R. at 572 (citations omitted).

11

35. The fact that an administrative claim is contingent does not make its holder any less entitled to payment. Under Section 101(5)(A) of the Bankruptcy Code, a "claim" includes a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, *contingent*, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . ." 11 U.S.C. § 101(5)(A) (emphasis added); *see also In re Caldor, Inc.*, 240 B.R. 180, 191-92 (Bankr. S.D.N.Y. 1999) ("[N]either the Bankruptcy Code nor caselaw construing it prohibits contingent administrative claims. To the contrary, whenever an entity provides goods or services to a trustee or debtor-in-possession, it has a contingent administrative claim.").

36. The JC Claims are properly classified as administrative claims because they arise out of the Reorganized Debtors' obligations under the Transfer Agreement, a post-petition contract for which the Reorganized Debtors received consideration. Specifically, as set forth above, the JC Claims arise out of Delphi's obligations under the Transfer Agreement to conduct a cleanup of the Property and to indemnify JCI and JCBGI for damages, costs, expenses, and fees arising out of environmental damages to the Property and Delphi's failure to clean-up those damages. The Transfer Agreement was signed by Delphi, and expressly approved by this Court in its Order dated June 26, 2006. Accordingly, the JC Claims are properly categorized as Administrative Claims under the Bankruptcy Code. *See, e.g.*, *In re Klein Sleep Prods.*, 78 F.3d at 20; *Trustees of Amalgamated Ins. Fund*, 789 F.2d at 101.

37. JCI and JCBGI have demonstrated their entitlement to payment of the JC Claims. JCI and JCBGI have complied with all administrative procedures for filing the JC Claims, which were timely filed in accordance with the procedures approved by this Court within the allowed time frame. JCI and JCBGI have also submitted documents in connection with the JC Claims that demonstrate their entitlement to payment of the JC Claims. In connection with the

12

submission of the JC Claims, JCI and JCBGI produced (1) the Transfer Agreement (Exhibit A to the JC Claims); (2) an estimate of the costs to be incurred by JCI and/or JCBGI in undertaking the cleanup of the Property (Exhibit B to the JC Claims); (3) an estimate of the costs to be incurred in connection with the obligations of JCI and/or JCBGI pursuant to the Stormwater Permit (Exhibit C to the JC Claims); and (4) a memorandum setting forth the basis for the JC Claims in detail.  More importantly, under Section 503(b) of the Bankruptcy Code, JCI and JCBGI are entitled to notice and a hearing on the JC Claims and are not required to prove their entitlement to the relief sought in the JC Claims at this time.  *See* 11 U.S.C. § 503(b); *In re Ames Dept. Stores, Inc.*, 582 F.3d 422, 430 (2d Cir. 2009) ("[S]ection 503(b) requires notice and a hearing on all requests for administrative expenses, regardless of whether any objection has been made.").  At that hearing, JCI and JCBGI will submit additional evidence in support of the JC Claims in order to meet its burden to prove its entitlement to the JC Claims.

38. Given the nature and substance of the JC Claims, the Reorganized Debtors' contention that the JC Claims should be rejected because they are not on the books and records of the Reorganized Debtors is meritless.  There is no requirement that an administrative claim or the amount thereof be found in a debtor's books and records in order to qualify as an administrative expense.  Indeed, because the JC Claims are contingent claims, it would be unlikely that they would be found in the debtor's books and records.

39. Accordingly, the Reorganized Debtors' Objection as it relates to the JC Claims should be rejected.  If the Court declines to find that the Objection was untimely and considers the merits of the Objection, the Court should reject the Objection on the grounds that JCI and JCBGI are entitled to a hearing on the JC Claims and, in any event, have shown entitlement to payment of the JC Claims as administrative expense claims.

40. The person authorized to reconcile and resolve this objection is Deborah L. Thorne, Barnes & Thornburg LLP, One North Wacker Drive, Suite 4400, Chicago, Illinois 60606-2833.

Dated: April 15, 2010

          BARNES & THORNBURG LLP
          Counsel to Johnson Controls Battery Group, Inc.
          and Johnson Controls, Inc. (Power Solutions)

          By:   /s/Kathleen L. Matsoukas
                Deborah L. Thorne
                Kathleen L. Matsoukas (KL-1821)
                Business Address:
                One North Wacker Drive, Suite 4400
                Chicago, Illinois 60606
                Telephone: (312) 357-1313