| **United States Bankruptcy Court**<br>Southern District of New York<br>Delphi Corporation et al. Claims Processing<br>c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue<br>El Segundo, California 90245 | **Administrative Expense Claim Form** | |
|---|---|---|
| **Debtor against which claim is asserted :**<br>Delphi Corporation, *et al.* 05-444481 | **Case Name and Number**<br>In re Delphi Corporation., *et al.* 05-4448<br>Chapter 11, Jointly Administered | COPY |

**NOTE:** This form should not be used to make a claim in connection with a request for payment for goods or services provided to the Debtors prior to the commencement of the case. This Administrative Expense Claim Request form is to be used solely in connection with a request for payment of an administrative expense arising after commencement of the case but prior to June 1, 2009, pursuant to 11 U.S.C. § 503.

| Name of Creditor<br>*(The person or other entity to whom the debtor owes money or property)*<br><br>Johnson Controls Battery Group, Inc.<br><br>Name and Address Where Notices Should be Sent<br>c/o Stephen T. Bobo<br>Reed Smith, LLP<br>10 S. Wacker Dr., 40th Flr., Chicago, IL 60606<br>Telephone No.<br>(312) 207-1000 | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br>☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☐ Check box if the address differs from the address on the envelope sent to you by the court.<br><br>**THIS SPACE IS FOR COURT USE ONLY** |
|---|---|

| ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR: | Check here if this claim ☐ replaces<br>☐ amends    a previously filed claim, dated: _____ | |
|---|---|---|

| 1. BASIS FOR CLAIM<br>☐ Goods sold<br>☐ Services performed<br>☐ Money loaned<br>☐ Personal injury/wrongful death<br>☐ Taxes<br>☒ Other (Describe briefly)    Environmental Claims | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)<br>☐ Wages, salaries, and compensation (Fill out below)<br>Your social security number _____<br>Unpaid compensation for services performed<br>from _____    to _____<br>    (date)        (date) |
|---|---|

| 2. DATE DEBT WAS INCURRED<br>Various | 3. IF COURT JUDGMENT, DATE OBTAINED: |
|---|---|

4. TOTAL AMOUNT OF ADMINISTRATIVE CLAIM: $ 13,058,705 + oversight costs of NJDEP

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all additional charges.

5. Brief Description of Claim (attach any additional information):

Indemnification and statutory claims for environmental contamination of New Brunswick, New Jersey facility.

| 6. **CREDITS AND SETOFFS:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to debtor.<br><br>7. **SUPPORTING DOCUMENTS:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. Any attachment must be 8-1/2" by 11".<br><br>8. **DATE-STAMPED COPY:** To receive an acknowledgement of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim. | THIS SPACE IS FOR COURT USE ONLY<br><br>**RECEIVED**<br>JUL 1 4 2009<br>KURTZMANCARSONCONSULTANTS |
|---|---|

| Date<br><br>July 13, 2009 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any) |
|---|---|

Stephen T. Bobo, Attorney for Johnson Controls, Inc.

## MEMORANDUM IN SUPPORT OF ADMINISTRATIVE EXPENSE CLAIMS OF JOHNSON CONTROLS, INC. AND JOHNSON CONTROLS BATTERY GROUP, INC.

Johnson Controls, Inc. ("JCI") and Johnson Controls Battery Group, Inc. ("JCBGI") assert administrative expense claims against Delphi Automotive Systems LLC ("Delphi") arising from Delphi's sale of certain real property commonly known as 760 New Jersey Avenue, New Brunswick, New Jersey (the "Property") to JCI in 2006. JCI subsequently transferred the Property to JCBGI, which remains the owner of the Property.

### A. Factual Background

1.      Delphi sold the Property to JCI pursuant to a certain Transfer Agreement Relating To Transfer of Delphi's New Brunswick Battery Facility To JCI entered into between those parties and dated May 26, 2006 (the "Transfer Agreement"). The Transfer Agreement was approved by an order dated June 26, 2006 entered by the United States Bankruptcy Court for the Southern District of New York in Bankruptcy Case No. 05-44481 (RDD) (the "Sale Approval Order"), and the transaction closed shortly thereafter. A copy of the Transfer Agreement is attached hereto as Exhibit A.

2.      Before it could sell the Property, Delphi was required to comply with applicable New Jersey law, including the New Jersey Industrial Site Recovery Act, as amended, N.J.S.A. 13:1K-6 et seq. ("ISRA"). In order to begin to comply with ISRA, Delphi entered into a Remediation Agreement with the New Jersey Department of Environmental Protection ("NJDEP") dated July 26, 2006 (the "Remediation Agreement"). Pursuant to the Remediation Agreement, Delphi agreed to investigate and clean up the Property after selling it and agreed to establish financial assurance that it could complete the cleanup. NJDEP required Delphi to establish financial assurance in the initial amount of $535,000.

3.      After entering into the Remediation Agreement with NJDEP, Delphi investigated the Property and made several submissions to NJDEP regarding the results of its investigation and sought from NJDEP a statement that no further action was needed for certain portions of the Property. NJDEP responded in a lengthy letter to Delphi dated May 8, 2009 which rejected most of Delphi's assertions that it had sufficiently investigated the Property. NJDEP required Delphi to investigate the Property further before submitting a plan for its cleanup. Delphi has not responded to NJDEP's May 8, 2009 letter and has indicated that it intends to seek additional time until August 13, 2009 to respond to NJDEP.

4.      NJDEP has incurred oversight costs in response to the release or threatened release of hazardous substances at the Property and will continue to incur such oversight costs. If Delphi does not pay for these oversight costs, NJDEP could seek to recover them from JCBGI, as the current owner of the Property, under either the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9601

et seq., or the New Jersey Spill Compensation and Control Act, as amended (the "Spill Act"),
N.J.S.A. 58:10-23.11 et seq. Delphi's liability under ISRA for NJDEP's oversight costs does not
prevent NJDEP from using its CERCLA or Spill Act authority to seek to recover these costs
from JCBGI.

     5.     JCI and JCBGI each assert contractual claims for indemnification arising under §
7.1.A of the Transfer Agreement. JCI also asserts contractual indemnification claims under
Exhibit 3.6.H to the Transfer Agreement (the "Environmental Matters Exhibit"). Both JCI and
JCBGI assert statutory claims against Delphi arising under CERCLA and the Spill Act.

## B.  Claims for Indemnification under Transfer Agreement § 7.1.A

     6.     Both JCI and JCBGI are entitled to indemnification from Delphi under Transfer
Agreement § 7.1.A against damages, losses and expenses resulting from Delphi's breach of "any
of its warranties or covenants" under the Transfer Agreement. Delphi covenanted in § 4.1 of the
Environmental Matters Exhibit to investigate and clean up the Property as required by NJDEP to
satisfy ISRA.

     7.     Delphi has already breached or will breach this covenant by failing to complete
the ISRA cleanup and failing to provide adequate financial assurance for that cleanup's
completion. It is now clear that Delphi intends to liquidate pursuant to its Amended Plan of
Reorganization without either performing the ISRA cleanup itself or setting aside an adequate
reserve to fund the cleanup work by a third party. Delphi does not intend even to respond to the
NJDEP regarding its further investigation of the Property until well after: (i) the Administrative
Expense claims bar date, (ii) the date set for filing objections to the Modified Plan of
Reorganization, and (iii) the hearing on confirmation of the Modified Plan of Reorganization.
Despite receiving the May 8, 2009 letter from NJDEP requiring substantial additional
investigation of the Property, Delphi also has not increased the amount of financial assurance
provided to NJDEP to provide for funding to complete the cleanup beyond the initial $535,000
posted in 2006. Consequently, Delphi is attempting to put its liquidating plan into effect without
ensuring completion or adequate funding of the ISRA cleanup. These omissions violate its
covenant in § 4.1 of the Environmental Matters Exhibit.

     8.     Under § 7.2 of the Transfer Agreement, it is sufficient for purposes of
indemnification that JCI and JCBGI know of facts which may become the basis of a third-party
claim against them. In particular, Delphi's failure to complete its ISRA cleanup obligations will
likely make JCI and JCBGI subject to one or more claims by NJDEP under either the Spill Act
or CERCLA to compel either or both of them to clean up the Property themselves. Accordingly,
JCI and JCBGI are entitled to indemnification for the costs of performing the ISRA cleanup (the
"Cleanup Costs"), as well as related costs and expenses.

     9.     As set forth on the remediation summary attached as Exhibit B, the cleanup work
that ISRA requires to be done includes the following actions: Cleaning of the Building Interior,
Facility Decontamination, and Soil Remediation and Disposal. The estimated Cleanup Costs for
this work total $8,973,550, plus the accrued and accruing oversight costs of NJDEP. In addition,

US_ACTIVE-101907451.4-STBOBO-319417-00077 7/13/09 5:42 PM

JCI and JCBGI are entitled under § 7.1.A to be reimbursed for the expenses of investigation and attorneys fees they have accrued and will continue to accrue. To date, JCI and JCBGI have incurred attorneys' fees totaling $178,916 in connection with environmental issues relating to the Property, and they expect to incur extensive additional attorneys' fees both in connection with this claim and in dealing with the NJDEP. In similar environmental litigation that was recently resolved through mediation, JCI and JCBGI incurred attorneys' fees totaling $996,475. Therefore the total expected legal expense that will be incurred is $1,175,391.

10.    The total amount that JCI and JCBGI are entitled to be indemnified for under §7.1.A of the Transfer Agreement is $10,148,941 plus the NJDEP oversight costs. Delphi must either pay this total amount directly to JCI and JCBGI or else place that amount in trust for the sole purposes of funding the ISRA Cleanup Costs and oversight costs relating to the Property and reimbursing JCI and JCBGI for their attorneys fees.

### C.  Contractual indemnification claims under Environmental Matters Agreement § 2

11.    Section 2 of the Environmental Matters Exhibit requires Delphi to indemnify JCI for Environmental Damages arising from Pre-Closing Environmental Contamination. The New Jersey Attorney General's office has informed counsel for JCI that it believes that neither the Sale Approval Order nor the provisions of the Bankruptcy Code prevent NJDEP from asserting claims against JCI and JCBGI with respect to pre-closing environmental conditions at the Property.

12.    Under the definition of "Environmental Damages" in §1.9 of the Environmental Matters Exhibit, JCI is entitled to indemnification for any cost "arising out of an Environmental Law" and incurred under such law in response to contamination that Delphi caused.

13.    The clean up of the areas that Delphi has already disclosed to NJDEP under ISRA and whatever additional cleanup work is required as a result of Delphi's subsequent disclosures to NJDEP are required by ISRA. Therefore the cost of such work is also subject to indemnification under § 2.1 of the Environmental Matters Exhibit. The estimated Cleanup Costs are detailed on the attached schedule.

14.    JCI is entitled to indemnification under §2.1 of the Environmental Matters Exhibit in the amount of $8,973,550 for the Cleanup Costs to comply with ISRA, as set forth on the attached Exhibit B, plus NJDEP's oversight costs. In addition, JCI is entitled to indemnification for the attorneys fees it has already incurred in the amount of $178,916 and the attorneys fees it expects to the incur in the amount of $996,475. Therefore, JCI is entitled to indemnification in the total amount of $10,148,941 plus NJDEP's oversight costs pursuant to § 2.1 of the Environmental Matters Exhibit.

### D.  Statutory Claims

15.    JCI and JCBGI are also entitled to administrative expense status for their statutory claims against Delphi, which are: (1) a claim for cost recovery against Delphi under Section

US_ACTIVE-101907451.4-STBOBO-319417-00077 7/13/09 5:42 PM

107(a) of CERCLA, 42 U.S.C. § 9607(a); and (2) a claim for contribution under the Spill Act.
See N.J.S.A. 58:10-23.11f.a(2)(a).

16.     JCBGI has incurred and continues to incur costs to remove lead from stormwater
which enters the Property and is required to do so under a New Jersey Pollutant Discharge
Elimination System permit issued by NJDEP (the "Stormwater Permit") pursuant to the New
Jersey Water Pollution Control Act, as amended, N.J.S.A. 58:10A-1 et seq. Under the
Stormwater Permit, JCI has been incurring an annual cost of approximately $380,400 since 2006
to remove lead present in such stormwater as a result of Delphi's operations.

17.     JCI has incurred costs in response to the release or threat of release to the
environment of lead on floors in buildings at the Property. The amount of such costs is $3,315.

18.     Neither JCI nor JCBGI operated a battery manufacturing operation on the
Property. JCBGI operated a battery fill and form operation at the Property for a seven month
period. These operations did not involve the receipt, processing, recycling or reclamation of
lead.

19.     Portions of the Property were operated by either Delphi or its predecessor,
General Motors Corporation, for more than sixty years, from 1945 until 2006, to manufacture
lead/acid storage batteries for, primarily, the automotive industry. As described by Delphi in
submittals made on its behalf to NJDEP pursuant to ISRA, Delphi is a former owner and a
former operator of the Property that has discharged lead and a variety of other hazardous
substances at the Property.

20.     JCI and JCBGI are entitled under CERCLA § 107(a) and under the Spill Act to
recover from Delphi all costs JCBGI has incurred to remove lead from Property stormwater and
all costs JCI has incurred in response to the release or threat of release of lead from buildings at
the Property, since all such lead results from the acts and omissions of Delphi or its predecessors.
The amounts that JCBGI can recover from Delphi for stormwater treatment are costs already
incurred, which total $760,800, and the costs that will continue to be incurred for ongoing
treatment in the future, the present value of which is $3,324,355, as set forth in the spreadsheet
attached as Exhibit C.

21.     In addition, provision should be made for the Cleanup Costs under the Spill Act
and CERCLA §107(a). JCI and JCBGI are entitled to declaratory relief that Delphi is liable for
all contamination existing at the Property at the time it was sold to JCI, and either Delphi should
be required to escrow funds for the Cleanup Costs, or else JCI and JCBGI should be permitted to
recover that amount from Delphi. The necessary cleanup work includes the following remedial
activities: Cleaning of the Building Interior, Facility Decontamination, and Soil Remediation
and Disposal. These Cleanup Costs are estimated to total $8,973,550, as set forth on the attached
Exhibit B. In addition, JCI and JCBGI can recover NJDEP's oversight costs.

22.     JCI is entitled to recover the $3,315 it has already incurred in response to the
release or threat of a release to the environment under Section 107(a) of CERCLA and the Spill
Act, and is also entitled to have the Cleanup Costs amount of $8,973,550 plus NJDEP's

- 4 -

oversight costs either escrowed or paid over to JCI to use in connection with completing the cleanup of the Property.

23.    JCBGI is entitled to recover from Delphi under Section 107(a) of CERCLA and the Spill Act for the $760,800 it has incurred in connection with the stormwater cleanup, and JCBGI is also entitled to have Delphi either escrow $3,324,355 for the costs of future stormwater treatment and escrow $8,973,550 for the Cleanup Costs plus NJDEP's oversight costs, or pay those amounts over to JCBGI.

US_ACTIVE-101907451.4-STBOBO-319417-00077 7/13/09 5:42 PM

# EXHIBIT A

EXECUTION COPY

### TRANSFER AGREEMENT RELATING TO
### TRANSFER OF DELPHI'S NEW BRUNSWICK
### BATTERY FACILITY TO JCI

**THIS AGREEMENT,** made and entered into this **26th** day of **May, 2006** by and between **JOHNSON CONTROLS, INC.,** a Wisconsin corporation ("**Buyer**") and **DELPHI AUTOMOTIVE SYSTEMS LLC,** a Delaware limited liability company ("**Seller**").

### R E C I T A L S:

WHEREAS, Seller is engaged in the Business (as hereinafter defined).

WHEREAS, on October 8, 2005 (the "**Petition Date**"), Seller and certain of its Affiliates filed voluntary petitions for relief (the "**Bankruptcy Cases**") under Chapter 11 of Title 11, U.S.C. §§101 et seq. (as amended) (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

WHEREAS, upon the terms and subject to the conditions set forth in this Agreement, and as authorized under Sections 363 and 365 of the Bankruptcy Code, Seller wishes to sell to Buyer, all right, title and interest of Seller in and to the Acquired Assets (as hereinafter defined), and Buyer wishes to make such purchase; subject to the conditions set forth in this Agreement.

WHEREAS, Buyer and Seller are parties to a Tier 2 Component Supply Agreement ("CSA") under which Seller manufactures SLI batteries, at the Seller's facility in New Brunswick, New Jersey (the "**Facility**").

NOW, THEREFORE, in consideration of the mutual promises and covenants contained in this Agreement, Buyer and Seller agree as follows:

1.    **DEFINITIONS.**    As used in this Agreement, the following words, when capitalized, shall have the respective meanings set forth below:

1.1    "**Acquired Assets**" means the Real Property and all of the following assets to the extent owned by Seller and used or held for use primarily or exclusively in the Business at the Facility: (i) Administrative Assets; (ii) Permits; (iii) Personal Property owned by Seller, located at the Facility and used for manufacturing Products for Buyer under the CSA, including any addition thereto or any replacement, adjustment or modification thereof; and (iv) certain Inventory of the Business.    Exhibit 1.1 to this Agreement contains a list of the Acquired Assets consisting of Personal Property and Real Property as of the date hereof to the best of Seller's Knowledge. For the avoidance of doubt, it is specified that the term **"Acquired Assets"** does not include: (i) any machinery, equipment and other assets owned by Buyer; (ii) any of Seller's assets within its Laurel, Mississippi or Flint, Michigan operations (which make plastic battery trays, covers and other plastic components of Products) or Fitzgerald, Georgia operations (without affecting JCI's rights to its bailed assets within those facilities); (iii) assets owned by third parties; (iv) except as set forth in Section 7.3 (Indemnity), the benefits of any of Seller's or Seller's Affiliates' insurance policies relating to the operation of the

Business (including any right to proceeds thereunder); (v) all finished goods Inventory and all inventories, products, rights, properties, assets and businesses of the Business which shall have been transferred or disposed of by Seller prior to Completion in the Ordinary Course of Business or not otherwise in breach of this Agreement; (vi) Any Inventory consisting of work in process (other than green group batteries), or raw materials not listed on Exhibit 1.11 of this Agreement, including the excluded raw materials Inventory set forth on Exhibit 1.1(vi); (vii) any Contracts; and (viii) any document or information the transfer of which is prohibited by law or regulation.

1.2    "**Administrative Assets**" means books, records and other administrative assets including advertising and promotional materials, catalogues, price lists, correspondence, mailing lists, customer lists, vendor lists, photographs, production data, sales materials and records, purchasing materials and records, personnel records of employees, billing records, accounting records, other financial records, sale order files, tool routings, labor routings, facility blueprints, service blueprints and plant layouts; provided, however that Administrative Assets does not include Technical Documentation or information and materials protected by attorney-client privilege (the lack of which materials are not material to the operation of the Business under the CSA).

1.3    "**Affiliate**" means with respect to any Party any business or other entity directly or indirectly controlling, controlled by or under common control with such specified entity.  For purposes of this definition, control means ownership of more than fifty percent (50%) of the shares or other equity interest having power to elect directors or persons performing a similar functions.

1.4    "**Agreement**" means this Transfer Agreement, including Exhibit 4.1 and all other exhibits to this Agreement.

1.5    Intentionally omitted.

1.6    "**Business**" means the manufacture of starting SLI batteries by Seller at the Facility.

1.7    "**Completion**" means completion of the purchase of the Acquired Assets by Buyer resulting from and in accordance with this Agreement.

1.8    "**Completion Date**" means the date of Completion of the transfer of the Facility to Purchaser under this Agreement.

1.9    "**Contracts**" means purchase orders, service contracts, leases, product warranty or service agreements and other commitments, agreements and undertakings relating to the Business.

1.10    "**Improvements**" means buildings, fixtures and other improvements to Real Property, including the Facility.

1.11    "**Inventory**" included within the Acquired Assets means finished Products, raw materials set forth on Exhibit 1.11, work-in-process consisting of green group batteries, packaging, stores, stock, supplies, spare parts and other inventory used in making Products located at the Facility.

2

**1.12** "**Lien**" means any lien, mortgage, charge, pledge, security interest, restriction on transferability, easement, defect of title or other claim, easement, encroachment or other encumbrance of any nature whatsoever on any Acquired Asset.

**1.13** "**IUE Consent**" means the IUE waiver of "no sale" provisions contained in the Delphi-IUE-CWA National Agreement (as defined in <u>Exhibit 4.1</u>) and IUE waiver of the Buyer's assumption of the Unpublished Delphi IUE-CWA Neutrality Letter or any other neutrality agreement, included as part of <u>Exhibit 1.13</u> of this Agreement.

**1.14** "**Purchase Price**" means the purchase price to be paid for the Acquired Assets, exclusive of any Transaction Taxes, equal to One Dollar ($1.00) plus (i) $20.00 for every green group battery, and (ii) the CSA price for all finished goods Inventory, in each case located at the Facility as of close of business on July 31, 2006, based on a physical inventory to be conducted by the parties.

**1.15** "**Ordinary Course of Business**" means the ordinary course of business of the Business, consistent with past practice and custom, including the CSA.

**1.16** "**Party**" or "**Parties**" means Buyer and/or Seller.

**1.17** "**Permits**" means permits, concessions, grants, franchises, licenses and other governmental authorizations and approvals issued to Seller and that relate exclusively to the Facility or the Acquired Assets, to the extent that Seller or any of its Affiliates has the power, authority or right to transfer or assign such Permits.

**1.18** "**Permitted Lien**" means: (i) any Lien for taxes not yet delinquent; (ii) any statutory Lien arising in the ordinary course of business by operation of law with respect to a liability that is not yet delinquent; (iii) purchase money security interests arising in the Ordinary Course of Business; (iv) security interests relating to vendor tooling arising in the Ordinary Course of Business; (v) Liens and encumbrances of record; and (vi) Liens consented to by Buyer (such consent not to be unreasonably withheld).

**1.19** "**Personal Property**" means tangible personal property other than Administrative Assets, Inventory, including production machinery, equipment, tools, dies, jigs, molds, patterns, gauges, production fixtures, material handling equipment, business machines, office furniture and fixtures, in-factory vehicles, trucks, model shop equipment, laboratory test fixtures and other tangible personal property used by the Business, whether located at the Facility, at the place of business of a vendor or elsewhere.

**1.20** "**Products**" means SLI batteries.

**1.21** "**Real Property**" means the real property used by the Business and owned by Seller, as described in <u>Exhibit 1.21</u>, and all Improvements located thereon.

**1.22** "**Sale Approval Order**" means an order or orders of the Bankruptcy Court issued pursuant to Sections 363 and 365 of the Bankruptcy Code substantially in the form set forth on <u>Exhibit 1.22</u> to this Agreement, authorizing and approving, among other things, the sale, transfer and assignment of the Acquired Assets to Buyer in accordance with the terms and conditions of this Agreement, free and clear of all Liens other than Permitted Liens.

**1.23** "**Seller's Knowledge**" or "**Knowledge of Seller**" means the knowledge of any of the individuals listed on <u>Exhibit 1.23</u> with respect to their respective functional areas of expertise. For this purpose, an individual will be deemed to have Knowledge of a particular fact or other matter if: (i) such individual is actually aware of such fact or other matter; or (ii) a prudent individual would be expected to discover or otherwise become aware of such fact or other matter in the course of conducting a reasonable inquiry of Delphi's files and its employees who, in the ordinary course of their job responsibilities, would reasonably be expected to have actual possession or actual personal Knowledge of such information.

**1.24** "**SLI Batteries**" means starting, lighting and ignition lead-acid batteries.

**1.25** "**Technical Documentation**" means: (i) assembly and parts drawings, material specifications and drawings for Products; (ii) information to assemble Products; (iii) labor and tool routing sheets; drawings of special tools, fixtures, dies, jigs, gauges and patterns, and service information; and (iv) operating manuals, instructions and other available, relevant documents relating to the operation of the machinery and equipment located at the Facility.

**1.26** "**Transaction Taxes**" mean any sales taxes, documentary and stamp taxes, transfer taxes, use taxes, excise taxes, value-added taxes, registration duties, gross receipts or similar charges, all charges for filing and recording documents in connection with the transfer of the Acquired Assets.

## 2.    <u>COMPLETION OF THE SALE OF THE ACQUIRED ASSETS:</u>

**2.1** <u>Completion</u>. Subject to the conditions set forth in this Section 2.1, Completion shall take place on the Completion Date at the offices of Seller in Troy, Michigan or at such other place as Buyer and Seller may jointly determine. The Completion date will be the later of August 1 (12:01AM EST), 2006 and the date that is ten (10) days after the date of the Sale Approval Order, unless otherwise agreed by the Parties. Each Party's obligation to perform at the Completion Date is subject to:

A.    Bankruptcy Court approval of the Sale Approval Order, including without limitation, approval of <u>Exhibit 1.13.</u>

B.    Completion of the implementation of the attrition plan set forth in Exhibit 1.13 (the "**Attrition Plan**") to reduce the number of U.S. Hourly Employees to approximately one hundred (100) U.S. Hourly Employees, in accordance with the terms of the IUE Consent;

C.    Seller must not have negotiated any other Collective Bargaining Agreement which purports to be applicable to the New Brunswick Facility.

D.    The other Party's being in compliance, in all material respects, with its agreements with respect to Employee Matters that are such other Party's responsibility, and to be performed before Completion as described in <u>Exhibit 4.1</u> hereto, and with such Party's representations and warranties set forth in Section 3 of this Agreement being true and correct in all material respects as of

4

the Completion Date, except where a failure is due to the acts or omissions of the other Party;

E.    The other Party must not be in default in any material respect under, and must not have rejected, the CSA dated June 30, 2005;

F.    The Facility must be an operational plant producing Products in accordance with the CSA, with such changes as contemplated in Exhibit 1.13; and

G.    The other party shall be in compliance in all material respects with the Environmental Matters Agreement dated June 30, 2005 with respect to the Facility.

H.    Each Party undertakes to pay to the other or to the relevant tax authorities the Transaction Taxes as required by applicable law and in accordance with Section 1.26.

**2.2**    **Seller Deliveries at Completion.**    At Completion Seller shall deliver to Buyer:

A.    A Bill of Sale for the Personal Property and Inventory, substantially in the form of Exhibit 2.2A hereto, duly executed together with an invoice relating to the Acquired Assets transferred;

B.    A covenant deed for the Real Property;

C.    A certificate that all the representations and warranties made in Article 3 by Seller are true and correct in all material respects, and that it has complied with its obligations under this Section 2.2, with the same force and effect, and subject to the same qualifications, as though made at Completion;

D.    Officer's certificate stating that at least $12.5 million USD has been incurred by Delphi in furtherance of the Attrition Plan, as referred to in Section 3.A(xi) of Exhibit 4.1; and

E.    Such other documents as may be necessary to give Buyer good and valid title to and ownership of the Acquired Assets.

**2.3**    **Buyer Deliveries at Completion.**    At Completion Buyer shall:

A.    A certificate that all the representations and warranties made in Section 3 by Buyer are true and correct in all material respects, and that it has complied with its obligations under this Section 2.3, with the same force and effect, and subject to the same qualifications, as though made at Completion; and

B.    Pay to Seller the Purchase Price by wire transfer in accordance with wiring instructions to be provided by Seller before Completion.

**2.4    Transfer of Acquired Assets.**  Seller and Buyer hereby agree that, as of the Completion Date, title and risk of loss to all Acquired Assets shall pass from Seller to Buyer.

**2.5    Post Closing Deliveries.**  Buyer will pay for assets, goods or services ordered by Seller on or before Completion for the Business in the Ordinary Course of Business to the extent such assets, goods or services are received by the Business after the Completion Date; other than Inventory items that have been excluded from the Acquired Assets under Section 1.1(vi) of this Agreement.  If any such excluded items are delivered to the facility after Completion, Buyer will promptly contact Seller and segregate such items in a reasonable manner, and Seller and Buyer will cooperate in Seller's removal of such items within 30 days after such notice as set forth in Section 8.15 below.

**2.6    Prorations, Adjustments of Expenses Following Completion:**

A.    **Prorations:**

(i)    To the extent that Seller makes any payment relating to the Business prior to, on or following the Completion Date with respect to any item listed in clause (ii) below relating to periods following the Completion Date for which Buyer will receive a benefit, Buyer shall reimburse Seller on a per diem basis, unless otherwise provided for; and

(ii)    To the extent Buyer makes any payment relating to the Business following the Completion Date with respect to any item listed below relating to periods on or prior to the Completion Date for which Seller received a benefit, Seller shall reimburse Buyer on a per diem basis, unless otherwise provided for, in each case for the following:

(a)    Personal, real property and other ad valorem Taxes, with real property Taxes allocated pursuant to Section 5.5.

(b)    Water, wastewater treatment, sewer charges and other similar types of charges and/or Taxes thereon and any other assessments payable with respect to the Business.

(c)    Electric, fuel, gas, telephone and other utility charges.

(d)    Reimbursable employee business expenses will be paid by Seller if incurred prior to or on the Completion Date or Buyer if incurred after the Completion Date.

(e)    Rentals and other charges under leases to be transferred to or assumed by the Buyer pursuant to this Agreement.

(f)    Payments and charges due pursuant to any Contract (other than pursuant to collective bargaining agreements,

6

Benefit Plans (as defined in Section 3(3) of ERISA)), employee payroll-related items except as set forth in clause (d), Permit, commitment or other binding arrangement to which Seller is a party or is obligated and which are being assumed by the Buyer pursuant to this Agreement or offered to Buyer by Seller on a transition services basis, as may be agreed by the Parties prior to Completion.

B.    **Further Assurance.** To the extent that, after the Completion Date, Delphi, on the one hand, or Buyer, on the other hand, receives any bills or invoices for any of the items listed in this Section 2.6 or similar items, relating to both pre-Completion and post-Completion periods, such Party shall, within ten (10) business days, send any such bills or invoices to the other Party. If necessary to avoid incurring interest, penalties and/or late charges, the Party receiving any such bill or invoice shall pay all amounts shown to be due thereon, and shall invoice the other Party for all amounts owed by such other Party thereunder, and such other Party shall reimburse such amounts in accordance with Section 2.6C.

C.    **Payments.** Any payments due under this Section 2.6 shall be made within fifteen (15) days after the end of the month in which a bill or invoice is sent to a Party pursuant to Section 2.6C; provided, however, that the disputed portion of any such item shall be paid within fifteen (15) days after the final determination thereof on an item-by-item basis. When any Party makes a payment to a third party which is required to be reimbursed to it by another Party, the reimbursement payment shall be considered the repayment of an advance. Such payments shall be made by wire transfer in immediately available funds.

2.7    **Approvals and Consents; Cooperation; Notification.** Seller shall notify, as required by the Bankruptcy Court, all parties entitled to notice of the proposed sale of the Acquired Assets to Buyer, and Buyer will cooperate with Seller in attempting to obtain the Sale Approval Order.

2.8    **Fitzgerald.** Regarding Delphi's supply of Products to JCI from Delphi's Fitzgerald, Georgia battery manufacturing facility, Delphi will continue to supply such batteries to JCI in accordance with the terms of the Component Supply Agreement between the parties dated July 1, 2005 ("CSA"), as amended. In no event shall the pricing of Products manufactured at Fitzgerald be modified other than the GM discounts and other changes and adjustments contemplated by the existing CSA terms.

3.    **REPRESENTATIONS, WARRANTIES AND INDEMNITIES:**

3.1    **Representations and Warranties made by each Party.** Each of Seller and Buyer makes the representations and warranties contained in this Article 3 to the other Party except for those in Section 3.6, which are made solely by Seller to Buyer. The representations and warranties contained in this Article 3 are made on the date of this Agreement and are deemed to be repeated on the Completion Date.

3.2    **Power and Authority.** Subject to Bankruptcy Court approval of the Sale Approval Order, it has the power to execute, deliver and perform this Agreement, and

7

has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby.

**3.3    Authorizations.**    Subject to Bankruptcy Court approval of the Sale Approval Order, all authorizations required in connection with the execution, delivery, performance, validity and enforceability of, and the transactions contemplated by, this Agreement have been obtained or effected and are in full force and effect, provided, however, that performance of this Agreement is subject to Buyer and Seller taking necessary action as required to meet their respective obligations regarding employee matters, as set forth on Exhibit 4.1 hereto.

**3.4    Enforceability.**    Subject to Bankruptcy Court approval of the Sale Approval Order, this Agreement constitutes its legal, valid and binding obligation enforceable against it in accordance with its terms.

**3.5    No Breach.**    Subject to Bankruptcy Court approval of the Sale Approval Order, entering into this Agreement and performing its undertakings hereunder shall not result in the breach of any provision of, or constitute a default under, any judgment, decree, indenture, mortgage or other agreement or instrument to which it is a party or by which it is bound.

**3.6    Miscellaneous Matters Relating to Business:**

A.    **Ownership of the Acquired Assets.**    Seller has good, valid and marketable title to the Acquired Assets, and upon entry by the Bankruptcy Court of the Sale Approval Order, Seller shall transfer and convey the Acquired Assets free and clear of any Lien other than Permitted Liens. Except for this Agreement and the Bankruptcy Court approvals reflected in the Sale Approval Order, the Real Property will be transferred free and clear of any restrictions with respect to the transferability or divisibility thereof. At the Closing, Buyer will receive good and marketable fee title or leasehold title (as applicable) to all of the Real Property owned by Seller, free and clear of all Liens other than the Permitted Liens.

B.    **Condition.**    The Real Property and Personal Property (other than Inventory) have been maintained as required by the CSA and are in such condition (considering age and purpose for which used) as to enable the Business to be conducted as currently conducted without material disruption.

C.    **Inventory.**    SELLER MAKES NO WARRANTY OF WHATSOEVER KIND OR NATURE REGARDING INVENTORY, ALL OF WHICH IS BEING SOLD "AS IS" AND "WHERE IS", AND SELLER HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES, INCLUDING THE CONDITION OF THE INVENTORY AND EACH PART THEREOF, AND THE ADEQUACY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE INVENTORY OR ANY PART THEREOF.

D.    **Real Property.**    To Seller's Knowledge, the use of the Real Property as currently used is a permitted use by right in the applicable zoning classification and is not a nonconforming use or a conditioned use, and no variances are needed and none have been granted with respect to the Real

8

Property.   There are currently in full force and effect duly issued certificates of occupancy permitting the Real Property and the Facility to be legally used and occupied for the purpose of conducting the Business.  The Real Property has rights of access to dedicated public highways.  To Seller's Knowledge, no fact or condition exists that would prohibit or adversely affect the ordinary rights of access to and from the Real Property from and to the existing highways and roads, and there is no pending or, to Seller's Knowledge, threatened restriction or denial, governmental or otherwise, upon such ingress and egress.  Seller has not received notice of: (i) any claim of adverse possession or prescriptive rights involving or affecting any of the Real Property; (ii) any structure located on any Real Property that encroaches on or over the boundaries of neighboring or adjacent properties; or (iii) any structure of any other person or entity that encroaches on or over the boundaries of any Real Property.  None of the Real Property is located in a flood plain, flood hazard area, wetland or lakeshore erosion area within the meaning of any Law or Order.

E.    **No Condemnation, Expropriation or Similar Action.**    To Seller's Knowledge, neither the whole nor any portion of the Real Property is subject to any order to be sold (other than the Sale Approval Order) or is being condemned, expropriated or otherwise taken by any governmental entity with or without payment of compensation therefore, and no such condemnation, expropriation or taking has been planned, scheduled or proposed.

F.    **Compliance.**  The Real Property is, or at the time of Completion will be, in compliance in all material respects with any applicable law, regulation or ordinance, and Seller has not received any notice, written or to the best of Seller's knowledge oral, of any such violation.

G.    **Litigation.**  Except for matters disclosed prior to Completion and for which Seller will retain responsibility if so required under the terms of the CSA, there is no litigation or administrative proceeding and to Seller's Knowledge, threatened litigation or administrative proceeding which affects or could affect the Real Property or Buyer's ability to conduct the Business at the Facility.

H.    **Environmental Matters.**   Seller makes no representations or warranties regarding environmental matters in this Agreement (notwithstanding anything to the contrary herein).  Notwithstanding the aforementioned, to the extent that the Sale Approval Order or other applicable provisions of the Bankruptcy Code fails to discharge liability with respect to any claims brought by a third party against Buyer relating to pre-Completion environmental matters at the Facility, Seller will indemnify Buyer as set forth in <u>Exhibit 3.6.H</u> to this Agreement.

I.    Seller represents and warrants that, except for the unpublished Neutrality Letter and Exhibit 1.13 referenced herein, Seller has no current agreements or understandings with the IUE-CWA which create obligations or liabilities for Buyer at its other plants if Buyer purchases the New Brunswick facility or assumes the terms of the Delphi IUE-CWA National Agreement or the Delphi IUE-CWA Local Agreement.

9

J.    EXCEPT FOR SPECIFIC REPRESENTATIONS AND WARRAN-
TIES CONTAINED IN THIS AGREEMENT, THE ACQUIRED ASSETS ARE
BEING SOLD ON AN "AS IS," "WHERE IS" BASIS AND SELLER DOES NOT
MAKE ANY WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY,
FITNESS OR OTHERWISE WITH RESPECT TO THE ACQUIRED ASSETS
WHICH EXTEND BEYOND THE AFORESAID SPECIFIC REPRESENTATIONS
AND WARRANTIES.

### 3.7    Product Warranty/Liability:

A.    **Buyer Indemnity.**    Buyer will defend, indemnify and hold
harmless Seller and its directors, officers, agents and employees, from and
against any and all claims, suits, causes of action, liabilities, losses, damages,
costs of settlement, and expenses (including reasonable attorney fees) which
may be imposed upon or incurred by Seller from claims, suits or causes of action
(including without limitation those for death, personal injury, or property damage)
by any Person whatsoever at any time against Seller and/or its directors, officers,
agents and employees to the extent arising from, caused or alleged to be caused
by: (a) defective or improper design or manufacture of any Products
manufactured by Seller under the CSA; (b) infringement of any intellectual
property right (including patent, trademark, copyright, moral, industrial design or
other proprietary rights, or misuse or misappropriation of trade secret) in
connection with the design or manufacture of any Products other than
infringement of U.S. Patent No. 4,906,540 or U.S. Patent No. 5,401,278; and/or
(c) the failure of the design of Products to comply with any applicable Laws.

B.    **Seller Indemnity.**    To the extent that the Sale Approval Order or
other applicable provisions of the Bankruptcy Code fails to discharge liability with
respect to any claims for Products manufactured at the Facility brought by a third
party against Buyer relating to pre-Completion Product warranty/liability matters,
Seller will defend, indemnify and hold harmless Buyer and its directors, officers,
agents and employees, from and against any and all claims, suits, causes of
action, liabilities, losses, damages, costs of settlement, and expenses (including
reasonable attorney fees) which may be imposed upon or incurred by Buyer from
claims, suits or causes of action (including without limitation those for death,
personal injury, or property damage) by any Person whatsoever at any time
against Buyer and/or its directors, officers, agents and employees to the extent
arising from or caused by: (a) infringement of U.S. Patent No. 4,906,540 or U.S.
Patent No. 5,401,278;    (b) infringement of any intellectual property right
(including patent, trademark, copyright, moral, industrial design or other
proprietary rights, or misuse or misappropriation of trade secret) other than in
connection with the design or manufacture of any Products; (c) the failure of the
Products manufactured by Seller at the Facility under the CSA to comply in any
material respect with the applicable specifications as a result of Seller's failure to
comply with the Manufacturing and Quality Procedures set forth in the CSA or
negligent workmanship; and/or (d) any and all claims related to the Facility, its
employees, Products to the extent arising in any manner out of facts or
circumstances in existence prior to July 1, 2005.

4.    **EMPLOYEE MATTERS.** The treatment of U.S. Hourly Employees and U.S. Salaried Employees, and the obligations of Seller and Buyer with respect thereto, will be as set forth in Exhibit 4.1.

5.    **TAX MATTERS:**

5.1    **Seller Responsibilities.** Seller shall file any Tax Returns and pay any Taxes which may be required by any federal, state, local or foreign tax authorities or governmental agencies by reason of business conducted by Seller on or prior to the Completion Date.

5.2    **Buyer Responsibilities.** Buyer shall file any Tax Returns and pay any Taxes which may be required by any federal, state, local or foreign tax authorities or governmental agencies by reason of business conducted by Buyer after the Completion Date. All United States or foreign, national, state or local sales taxes, documentary and stamp taxes, transfer taxes, registration taxes, use taxes, gross receipts taxes, registration duties and all charges for filing and recording documents in connection with the transfer of the Acquired Assets (including intellectual property filing and recording fees), as well any permit, transfer and filing fees required in order to obtain governmental approvals and consents relating to the transactions contemplated by this Agreement ("**Transfer Taxes**"), shall be borne by Buyer.

5.3    **Mutual Assistance.**    Without affecting the foregoing responsibilities, Seller and Buyer shall provide reasonable assistance during normal business hours to one another to resolve any Tax issues which may relate to their respective business activities utilizing the Acquired Assets and personnel. Such assistance may include, without limitation, access to relevant business records and personnel in connection with: (i) the preparation and filing of Tax Returns, elections, consents, certifications and claims for refunds; (ii) the determination of liability for Taxes; and (iii) the response to tax audits, examinations and other proceedings. To the extent permitted by applicable law, Buyer and Seller agree to reasonably cooperate with each other to complete any and all exemption certificates or other documents that exempt any portion of the Purchase Price from any of the Transaction Taxes prior to either the Completion Date or the due date for such Transaction Tax.

5.4    **Definitions.**    For purposes of this Agreement, the words "**Taxes**" and "**Tax Return**" are defined as follows:

A.    "**Taxes**" mean any tax or similar governmental charge, impost or levy whatsoever (including, without limitation, income, franchise, transfer, taxes, use, gross receipts, value added, employment, excise, ad valorem, property, withholding, payroll, minimum, windfall profit taxes, transfer fees, customs duties or registration duties), together with any related penalties, fines, additions to tax or interest, imposed by the United States or any state, county, local or foreign governmental or subdivision or agency thereof;

B.    "**Tax Return**" means any return, declaration, report, claim for refund or information return or statement, or any other similar filings related to Taxes, including any schedule or attachment thereto.

**5.5    Real Estate Taxes.** All real estate taxes and assessments assessed on the Real Property for the calendar year in which the Completion occurs shall be prorated between Buyer and Seller. The Seller shall be allocated tax liability for the portion of the year beginning on January 1 and ending on the Completion Date; the Buyer shall be allocated tax liability for the portion of the year beginning on the day following the Completion Date and ending on December 31. The percentage for each party will be the number of days in its portion of the year divided by the total number of days in the year. Since the actual determination of tax liability for a given calendar year occurs in June, if the Completion Date occurs before the tax has been determined for the year, the calculation of the prorated taxes will be made as soon as practical after the tax bill has been rendered for the calendar year. If the Completion Date occurs after the tax liability has been determined for the year, the calculation of the prorated taxes will take place at Completion. Each party will be responsible for paying or otherwise discharging any installments due in the year in which the Completion Date occurs based on ownership of the property at the time the installment is due. If the tax allocated to a party exceeds the installments paid or to be paid by that party, that party will make a payment to the other party equal to the excess of the prorated liability over the sum of the installment payments paid or to be paid. The parties agree to cooperate as necessary to accurately and promptly determine the prorated tax liability.

## 6.    GOVERNING LAW; DISPUTE RESOLUTION:

**6.1    Governing Law.** This Agreement shall be construed and enforced in accordance with the laws of the State of New York, without giving effect to rules governing the conflict of laws. Buyer and Seller irrevocably and unconditionally consent to submit to the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agree not to commence any litigation relating thereto except in the Bankruptcy Court).

**6.2    Dispute Resolution:**

A.    Buyer and Seller will, in the first instance, attempt to settle any and all claims or disputes arising in connection with this Agreement by good faith negotiations by senior management of each Party. If the dispute is not resolved by senior management within thirty (30) days after delivery of a written request for such negotiation by either Party to the other, either Party may make a written demand (the "**Demanding Party**") for formal dispute resolution (the "**Notice of Dispute**") and specify therein in reasonable detail the nature of the dispute. Within ten (10) days after receipt of the Notice of Dispute, the receiving Party (the "**Defending Party**") shall submit to the other a written response. The Notice of Dispute and the response shall include: (i) a statement of the respective Party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that Party and of any other person who will accompany the executive to meetings of the parties. Within fifteen (15) days after such written notification, the executives (and other named in the Notice of Dispute or response) will meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute (the "**Dispute Resolution Meeting**"). All reasonable requests for information made by one Party to the other will be honored promptly. All negotiations pursuant to this Section 6.2A are confidential and shall be treated as

compromise and settlement negotiations for purposes of applicable rules of evidence.

**B.**    The parties agree that neither of them will initiate legal action in respect of a dispute within the period of fifteen (15) days following the Dispute Resolution Meeting.  In the absence of agreement at the Dispute Resolution Meeting and following that fifteen (15) day period, any party shall be free to pursue its rights and remedies as it may see fit in accordance with this Agreement.

7.    **INDEMNIFICATION:**

7.1    **Indemnification:**

      A.    **Indemnification Provisions for Benefit of Buyer.**    If Seller breaches any of its warranties or covenants contained in this Agreement, and Buyer makes a written claim for indemnification against Seller in accordance with the procedures set forth in Section 7.2 below within the applicable survival period, to the extent that the Sale Approval Order or other applicable provisions of the Bankruptcy Code fails to discharge the underlying third party claim,  Seller agrees to indemnify Buyer and its Affiliates and their officers, directors, employees and agents (individually a **"Buyer Indemnitee"** and collectively the **"Buyer Indemnitees"**) and to hold each Buyer Indemnitee harmless from and against all damages, losses and expenses (including reasonable expenses of investigation and attorneys' fees) (**"Losses"**) to the extent caused by or arising out of: (i) any breach of warranty or inaccurate or erroneous representation of Seller contained in this Agreement or in any certificate delivered pursuant to this Agreement; or (ii) any breach of this Agreement.  Buyer shall be named as an additional insured on Seller's General Liability and Excess Liability policies as related to the Business, but only to the extent of Seller's Indemnification Obligations under this Agreement.    Buyer agrees that all claims for indemnification shall be presented to Seller in advance of its insurers to the extent that Buyer does not invalidate its obligations to ensure coverage of such claims is not jeopardized.

      B.    **Indemnification Provisions for Benefit of Seller.**    If Buyer breaches any of its Warranties or covenants contained in this Agreement, and Seller makes a written claim for indemnification against Buyer in accordance with the procedures set forth in Section 7.2 below within the applicable survival period, Buyer agrees to indemnify Seller and its Affiliates and their officers, directors, employees and agents (individually a **"Seller Indemnitee"** and collectively the **"Seller Indemnitees"**) and to hold each Seller Indemnitee harmless from and against all Losses to the extent caused by or arising out of: (i) any breach of warranty or inaccurate or erroneous representation of Buyer contained in this Agreement or in any certificate delivered pursuant to this Agreement; (ii) any breach of this Agreement.

      C.    **Mitigation.**    Notwithstanding anything to the contrary in this Section B, no Party shall have an obligation to indemnify the other Party with respect to any Losses to the extent such Losses could have reasonably been

13

avoided by such other Party, or the damage to such other Party from such Losses reasonably could have been mitigated.

D. **Deductible and Cap.** No Indemnitor shall be liable to an Indemnitee until the amount of all indemnifiable Losses of such Indemnitee in the aggregate exceeds USD One Hundred Thousand ($100,000.00) ("**Deductible Amount**") threshold, after which point the Indemnitor will be obligated to the Indemnitee from and against indemnifiable Losses in excess of the Deductible Amount until the amount of indemnifiable Losses paid by such indemnifying Party in the aggregate reaches a cap equal to USD Twenty Million ($20 million) (the "**Cap Amount**") after which point the indemnifying Party will have no further obligation with respect to Losses under this Agreement.

**7.2    Indemnification Procedure.** When a Party obtains knowledge of the commencement of any third-party claim, action, suit or proceeding or of the occurrence of any event or the existence of any state of facts which may become the basis of a third-party claim (any such claim, action, suit or proceeding or event or state of facts being hereinafter referred to in this Section as a "**Claim**"), in respect of which such Party (an "**Indemnitee**") is entitled to indemnification under this Agreement, such Indemnitee shall promptly notify the indemnitor under this Agreement (the "**Indemnitor**") of such Claim in writing; provided, however, that any failure to give such notice will not waive any rights of the Indemnitee except to the extent that the rights of the Indemnitor are prejudiced thereby. With respect to any Claim as to which such notice is given by the Indemnitee to the Indemnitor, the Indemnitor may, subject to the provisions below, assume the defense and settlement of such Claim; provided, however, that: (i) the Indemnitee shall cooperate with the Indemnitor in the defense and settlement of such Claim in any manner reasonably requested by the Indemnitor; the Indemnitee will not, and it will use all reasonable efforts to ensure that its employees will not, make an admission of liability in respect of any Third Party Claim and as soon as it becomes aware of a Third Party Claim it shall issue an instruction to relevant employees requiring them not to make any disclosure or statement to any third party in relation to any Third Party Claim or any product or service to which such Third Party Claim relates (except for notices to governmental authorities as required by applicable Laws) without the prior written consent of the Indemnitor (such consent not to be unreasonably withheld or delayed); (ii) the Indemnitee shall have the right to pay or settle such Claim at any time, in which event the Indemnitee shall be deemed to have waived any right to indemnification therefor by the Indemnitor; (iii) the Indemnitee shall be permitted to join in the defense and settlement of such Claim and to employ counsel at its own expense; and (iv) the Indemnitor shall not consent to the entry of any judgment or enter into any settlement with respect to such Claim without the written consent of the Indemnitee, provided further, however, that if Indemnitee fails to consent to a written settlement offer and judgment is subsequently entered in an amount exceeding the amount of such offer, then Indemnitor shall have no responsibility for the amount of such excess.

If: (i) the Indemnitor fails to assume the defense of such Claim or, having assumed the defense and settlement of such Claim, fails reasonably to contest such Claim in good faith; and (ii) the remedy sought by the claimant with respect to such Claim is not solely for money damages, the Indemnitee, without waiving its right to indemnification, may assume the defense and settlement of such Claim; provided, however, that: (a) the Indemnitor shall be permitted to join in the defense and settlement of such Claim and to employ counsel at its own expense; (b) the Indemnitor shall

14

cooperate with the Indemnitee in the defense and settlement of such Claim in any reasonable manner requested by the Indemnitee; and (c) the Indemnitee shall not consent to the entry of any judgment or enter into any settlement with respect to such Claim without the written consent of the Indemnitor.

As used in this section, the term Indemnitee shall be deemed to include the plural thereof where the rights or obligations of more than one Indemnitee may be involved.

**7.3    Sole and Exclusive Remedy.**  Each of Buyer and Seller acknowledge and agree that the indemnification provided in this Article 7 shall be the sole and exclusive remedy of the parties and their Affiliates and their respective successors and assigns in respect of any claim for monetary damages arising out of or under this Agreement.

**8.    GENERAL PROVISIONS:**

**8.1    No Inducement.**  The Parties represent to each other and each agrees that, neither it nor any person acting on its behalf has, in contravention of any applicable law, given or offered to give or will give or offer to give any sum of money or other material consideration to any person, directly or indirectly, as an inducement to obtain business hereunder or to influence the granting of licenses or other governmental permissions to enter into this Agreement or perform obligations hereunder.

**8.2    Governing Approvals.**    Seller and Buyer, respectively, shall be responsible for compliance with and for the obtaining of such approvals and/or permits as may be required under national, state and local laws, ordinances, regulations and rules as may be applicable to the performance of their respective responsibilities and obligations under this Agreement.

**8.3    No Agency.**  This Agreement does not constitute either Party the agent or legal representative of the other Party.   Neither Party is authorized to create any obligation on behalf of the other Party.

**8.4    Successors and Assigns.**  This Agreement shall be binding upon and inure to the benefit of Seller and Buyer and their respective successors and assigns. No Party may assign this Agreement or any of its rights, interests or obligations hereunder without the prior written consent of the other Party; provided, however, that Seller has the right to assign any of its rights or obligations hereunder to any division, subsidiary or affiliate of Seller or to any successor to any or all of Seller's business; provided that, notwithstanding such assignment Seller shall remain liable for all of its obligations hereunder.

**8.5    No Implied Waiver.**  The failure of either Party at any time to require performance by the other Party of any provision hereof shall in no way affect the full right to require such performance at any time thereafter. The waiver by either Party of a breach of any provision hereof shall not constitute a waiver of the provision itself.   The failure of either Party to exercise its rights provided under this Agreement shall not constitute a waiver of such right.

8.6   **Notices**.   Any notice under this Agreement shall be in writing (letter, facsimile or telegram) and shall be effective when received by the addressee at its address indicated below:

Notice sent to Seller shall be addressed as follows:

**DELPHI AUTOMOTIVE SYSTEMS LLC**
5725 Delphi Drive
Troy, Michigan 48098
Attn: President-Delphi Energy & Chassis Systems
Fax No.: 248-813-4301

with a copy to:

**DELPHI AUTOMOTIVE SYSTEMS LLC**
5725 Delphi Drive
Troy, MI 48098-2815
Attention: Assistant General Counsel
Commercial & Transactional
Fax: 248-813-2491

Notice sent to Buyer shall be addressed as follows:

**JOHNSON CONTROLS, INC.**
5757 N. Green Bay Avenue
PO Box 591
Milwaukee, Wisconsin 53201-0591
Attn: President - Battery
Fax No.: 414-524-2828

with a copy to:

**JOHNSON CONTROLS, INC.**
5757 N. Green Bay Avenue
PO Box 591
Milwaukee, Wisconsin 53201-0591
Attn: General Counsel
Fax No.: 414-524-2077

The parties by notice hereunder may designate other addresses to which notices shall be sent.

8.7   **Amendments**.   This Agreement and the Mutual Nondisclosure Agreement dated April 24, 2006 between the Parties, constitutes the entire agreement of the Parties, and supersedes all previous agreements, oral or written, between Buyer and Seller with respect to the subject matter hereof. No amendment or modification to this Agreement shall be binding upon either Party unless it is in writing and is signed by both parties.

8.8   **Expenses**.   Whether or not the transactions contemplated by this Agreement are consummated, Buyer and Seller shall each bear its respective

16

accounting, legal, financial, advisory and other expenses incurred in connection with the transactions contemplated by this Agreement.

8.9     **Headings.**   The Article and/or Section headings herein are used for convenience of reference only and shall not be deemed a part of this Agreement for any purpose.

8.10     **Severability.**   If any provision of this Agreement shall be held to be invalid, illegal or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, that provision shall be deemed severed to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the parties shall negotiate in good faith to arrive at an alternative replacement provision approximating the parties' original business objective. The remaining provisions hereof shall remain in effect.

8.11     **Counterparts.**   This Agreement may be executed in more than one counterpart, each of which shall for all purposes be deemed to be an original and all of which shall constitute one and the same agreement.

8.12     **Third Parties.**   Nothing contained in this Agreement is intended to or shall be construed to confer upon or give to any person, firm, corporation, association, labor union or trust (other than the Parties, their Affiliates and their respective permitted successors and assigns), any claims, rights or remedies under or by reason of this Agreement.

8.13     **Bulk Sales.**   Buyer hereby waives the requirements, if any, of all applicable bulk sales laws.

8.14     **Force Majeure.**   Each Party shall be temporarily excused from performing its obligations under this Agreement for so long as such performance is prevented or delayed by any event of Force Majeure. The term "**Force Majeure**" shall, for purposes of this Agreement, include: (i) any strike or lockout at the plant of a Party or any of its suppliers; (ii) any act or omission of any government authority; or (iii) any other cause beyond the reasonable control of a Party. A Party affected by an event of Force Majeure shall promptly notify the other Party and shall use its best efforts to overcome and mitigate such event of Force Majeure.

8.15 **Excluded Inventory**. Within 30 days after Completion, Seller will remove at its sole cost and expense all Inventory not included in the Acquired Assets. Buyer will cooperate with Seller and provide reasonable access to the Facility to facilitate such removal.

**THIS AGREEMENT** was executed as of the day and year first set forth above.

DELPHI AUTOMOTIVE SYSTEMS LLC

By: _____

Name: **Keith Stipp**

Title: **Finance Director,
Automotive Holdings Group**

JOHNSON CONTROLS, INC.

By: _____

Name: **Gregg M. Sherrill**

Title: **Vice President, and General
Manager
Automotive Systems Group
Battery Division**

18

## EXHIBIT 1.1

| Inventory number | Asset | Cap.date | Asset description |
|---|---|---|---|
| DGT004763N01 | 1000654 | 12/1/1946 | GRADING & LANDSCAPING |
| DGT004765N01 | 1000655 | 12/1/1946 | ROADWAY |
| DGT004766N01 | 1000656 | 12/1/1946 | SIDEWALKS |
| DGT004768N01 | 1000657 | 12/1/1946 | SEWERS-STORM |
| DGT004770N01 | 1000658 | 12/1/1946 | SEWERS-SANITARY |
| DGT004771N01 | 1000659 | 4/1/1947 | GRADING & LANDSCAPING |
| DGT004772N02 | 1000660 | 12/1/1946 | RAILROAD TRACKS & SIDINGS |
| DGT004774N | 1000661 | 12/1/1946 | WATER LINES |
| DGT004776N | 1000662 | 12/1/1946 | TUNNELS |
| DGT004888N | 1000663 | 6/1/1946 | LAND-NEW BRUNSWICK |
| DGT004911N | 1000664 | 12/1/1953 | MAIN BUILDING-WEST ADDITION-SEWERS |
| DGT004925N | 1000665 | 8/1/1954 | MAIN BUILDING-WEST ADDITION-PAVEMENT |
| DGT004926N | 1000666 | 8/1/1954 | RETAINING WALL |
| DGT008569N | 1000667 | 12/1/1956 | ROADWAY |
| DGT008607N | 1000668 | 3/1/1958 | FENCE |
| DGT008675N | 1000669 | 12/1/1965 | LAND-NEW BRUNSWICK |
| DGT008680N | 1000670 | 4/1/1968 | LAND IMPROVEMENTS |
| DGT008711N | 1000671 | 10/1/1966 | PARKING AREA |
| DGT008712N | 1000672 | 12/1/1966 | LIGHTING-OUTSIDE |
| DGT008725N | 1000673 | 12/1/1968 | RAILROAD SIDING |
| DGT012029N | 1000674 | 10/1/1974 | LAND-NEW BRUNSWICK |
| DGT012052N | 1000675 | 9/1/1976 | CONCRETE PAD-PVC |
| DGT012053N | 1000676 | 9/1/1976 | CONCRETE PAD-MATERIAL STORAGE |
| DGT012054N | 1000677 | 9/1/1976 | LEAD RECLAIM BUILDING-CONCRETE PAD F/LEAD STORAGE |
| DGT012085N | 1000678 | 10/1/1977 | ACID MIX BUILDING-CONCRETE PAD |
| DGT012086N | 1000679 | 10/1/1977 | ACID MIX BUILDING-CONCRETE PAD |
| DGT012087N | 1000680 | 10/1/1977 | CONCRETE PAD-REAR OF POWER HOUSE |
| DGT012087N01 | 1000681 | 2/1/1978 | CONCRETE PAD-REAR OF POWER HOUSE |
| DGT012088N | 1000682 | 10/1/1977 | RETAINING WALL-WATER TOWER |
| DGT012110N | 1000683 | 7/1/1978 | GRADING & LANDSCAPING |
| DGT012221N | 1000685 | 2/1/1989 | WELLS-MONITORING |
| DGT012232N | 1000686 | 6/1/1995 | STORM WATER COLLECTION/TREATMENT SYSTEM |
| DGT690066 | 1000687 | 11/1/2001 | ELIMINATION OF UNDERGROUND PROCESS SEWER |
| DGT004779N01 | 2001722 | 12/1/1946 | MAIN BUILDING |
| DGT004779N02 | 2001723 | 11/1/2001 | PHASE III VENTILATION REPAIRS |
| DGT004779N01 | 2001724 | 11/1/2001 | LIGHTING FIXTURES,PLANT WALL,GAS MAIN |
| DGT004781N01 | 2001726 | 12/1/1946 | GATE HOUSE |
| DGT004910N01 | 2001727 | 12/1/1953 | MAIN BUILDING-WEST ADDITION |
| DGT004912N | 2001728 | 12/1/1953 | MAIN BUILDING-FIRE PROOF ROOF |
| DGT004915N | 2001729 | 6/1/1954 | HOSE HOUSE |
| DGT004923N01 | 2001730 | 12/1/1954 | MAIN BUILDING-WEST ADDITION-ACCESS |
| DGT004928N02 | 2001731 | 12/1/1954 | MAIN BUILDING-EAST ADDITION |
| DGT004928N03 | 2001732 | 8/1/1954 | MAIN BUILDING-EAST ADDITION |
| DGT008542N | 2001733 | 5/1/1956 | WATER LINES |
| DGT008570N | 2001734 | 12/1/1956 | MAIN BUILDING-EAST ADDITION |
| DGT008594N | 2001735 | 5/1/1957 | MAIN BUILDING-LOCKER ROOM |
| DGT008649N | 2001736 | 7/1/1962 | OIL BUILDING |
| DGT008650N | 2001737 | 2/1/1963 | MAIN BUILDING-MEZZANINE-CASE |
| DGT008658N | 2001738 | 6/1/1963 | WAREHOUSE |
| DGT008664N | 2001739 | 8/1/1965 | MAIN BUILDING-ADDITION-MEZZANINE |
| DGT008674N | 2001740 | 12/1/1965 | MAIN BUILDING-ADDITION |
| DGT008720N | 2001741 | 12/1/1968 | SEWERS-SANITARY |
| DGT008721N | 2001742 | 12/1/1968 | SEWERS-STORM |
| DGT008738N | 2001743 | 9/1/1970 | MAIN BUILDING-MEZZANINE |
| DGT008744N | 2001744 | 7/1/1971 | ROOF-RAISE |
| DGT012049N | 2001745 | 9/1/1976 | LEAD RECLAIM BUILDING |
| DGT012049N01 | 2001746 | 6/1/1977 | LEAD RECLAIM BUILDING |
| DGT012049N02 | 2001747 | 8/1/1977 | LEAD RECLAIM BUILDING |
| DGT012050N | 2001748 | 9/1/1976 | ACID MIX BUILDING |
| DGT012050N01 | 2001749 | 10/1/1977 | ACID MIX BUILDING |
| DGT012079N | 2001750 | 2/1/1977 | CURE ROOM MODIFICATIONS |
| DGT012092N | 2001751 | 12/1/1977 | WASTE TREATMENT BUILDING |

| | | | |
|---|---|---|---|
| DGT012092N01 | 2001752 | 5/1/1978 | WASTE TREATMENT BUILDING |
| DGT012113N | 2001753 | 7/1/1978 | STORAGE SHED-3 SIDED |
| DGT012143N | 2001754 | 3/1/1980 | TRUCK DOCK ANNEX |
| DGT012145N | 2001755 | 6/1/1980 | BATTERY STORAGE BUILDING |
| DGT012165N | 2001756 | 7/1/1971 | MAIN BUILDING-MEZZANINE |
| DGT012175N | 2001757 | 6/1/1983 | FIRE LOOP |
| DGT012175N01 | 2001758 | 9/1/1984 | FIRE LOOP |
| DGT012175N02 | 2001759 | 10/1/1984 | FIRE LOOP |
| DGT012175N03 | 2001760 | 11/1/1984 | FIRE LOOP |
| DGT012183N | 2001761 | 12/1/1984 | MAIN BUILDING-MEZZANINE |
| DGT012191N | 2001762 | 8/1/1986 | MAIN BUILDING-MEZZANINE-PAINT MIXING |
| DGT012231N | 2001765 | 6/1/1995 | OVERHEAD PROCESS SEWER |
| DGT105875 | 2001766 | 1/1/1998 | FRONT ENTRANCE STEPS, RAMPS, RAILS |
| DGT105877 | 2001767 | 11/1/2001 | NON-SLIP GRATING, ISLES BTWN CHARGE TABLES & FILL |
| DGT105909 | 2001768 | 1/1/2002 | SAFETY STEPS AND HANDRAILS |
| DGT105922B | 2001769 | 11/1/2001 | NON-SLIP GRATING FOR FORMATION FLOOR |
| DGT105923B | 2001770 | 11/1/2001 | FOAM ROOF '98 |
| DGT105928 | 2001771 | 1/2/1998 | UPGRADE HEATING SYSTEM |
| DGT690029 | 2001772 | 1/2/1998 | 1996 ROOF REPAIR |
| DGT690037 | 2001773 | 11/1/1998 | AUTO SIZE CONTAINMENT DOOR |
| DGT690038 | 2001774 | 11/1/1998 | AUTO SIZE CONTAINMENT DOOR |
| DGT690039 | 2001775 | 11/1/1998 | AUTO SIZE CONTAINMENT DOOR |
| DGT690061 | 2001776 | 11/1/2001 | TRENCH & FOUNDATION FOR THE X-MET LINE |
| DGT690062 | 2001777 | 11/1/2001 | MEZZANINE FOR THE X-MET LINE |
| DGT690063 | 2001778 | 11/1/2001 | ROOF ENCLOSURE FOR THE X-MET LINE |
| DGT690100 | 2001779 | 11/1/2001 | REPLACE LIGHTING ON CHG FLOOR, REPLACE LIGHTING SE |
| DGT690170 | 2001780 | 11/1/2001 | OUTDOOR SMOKING SHELTER – NEW BRUNSWICK BATTERY P |
| DGT690171 | 2001781 | 11/1/2001 | OUTDOOR SMOKING SHELTER – NEW BRUNSWICK BATTERY P |
| DGT690197 | 2001782 | 11/1/2001 | SECURITY/FIRE ALARM UPGRADE |
| DGT72424 | 2001783 | 11/1/2001 | INSTALL SPRINKLER SYSTEM |
| DGTB690064 | 2001784 | 11/1/2001 | INSTALLATION OF MEZZANINE FOR X-MET FROM MUNCIE TO |
| DGT690110 | 2004713 | 9/11/2002 | REPAIR BATTERY FORMATION VENTILATION SYSTEM |
| DGTB690114 | 2004714 | 9/11/2002 | REPLACE FLOOR IN WET HEAT SEALER AREA |
| DGTB690090 | 2004715 | 9/11/2002 | REPAIR WALL OF BUILDING TO NEW CONDITION |
| DGT690175 | 2004716 | 9/11/2002 | GREEN GROUP VENTILATION -- NB |
| DGT690221 | 2004717 | 9/11/2002 | INSTALL NEW DUCTWORK ON CHARGE FLOOR |
| DGT690198 | 2004718 | 9/11/2002 | GUARDING/FIRE PROTECTION TANK FARM |
| DGT690189 | 2004719 | 9/11/2002 | VENTILATION COLLECTOR FOR GREEN GROUP LEAN CELL - |
| DGT690179 | 2004720 | 9/11/2002 | NEW BRUNSWICK STEAM HOOD UPGRADE |
| DGT690223 | 2008539 | 9/23/2003 | DESIGN FOR A NATURAL GAS LINE FOR PLANT |
| DGT690268 | 2008540 | 9/23/2003 | HOT WATER HEATER SYS FOR MENS AND WOMENS SHOWER AR |
| DGT695041 | 2008556 | 10/17/2003 | FORMATION VENTILATION STACK TOP ACID MIST FILTERS |
| DGT004779N03 | 2009360 | 1/31/2004 | PHASE III VENTILATION REPAIRS |
| DGT012142N01 | 2009466 | 1/31/2004 | FORMATION VENT REPAIRS/CHARGE TABLE 2 OF 2 |
| DGT012141N01 | 2009467 | 3/31/2004 | FORMATION VENT REPAIRS/CHARGE TABLE 1 OF 2 |
| DGT004779N04 | 2009513 | 6/29/2004 | ENGINEERING SERVICES TO LICENSE NEW STACK FOR VENT |
| DGT690275 | 2009514 | 1/1/2004 | HEATING UPGRADES FOR PLANT CONVERSION TO NATURAL G |
| DGT690291 | 2010088 | 6/14/2005 | FIRE SPRINKLER PROTECTION ON CHARGE FLOOR |
| DGT004898N | 3025115 | 2/1/1953 | PROPANE TANK |
| DGT008560N | 3025119 | 9/1/1956 | POWER EQUIPMENT-EAST |
| DGT008589N | 3025120 | 3/1/1957 | SCREW CONVEYOR |
| DGT008595N | 3025121 | 5/1/1957 | LINES)ELECTR |
| DGT008599N | 3025123 | 10/1/1957 | DUST CNTR EQ |
| DGT008681N | 3025125 | 9/1/1964 | SUBSTATION |
| DGT008682N | 3025126 | 10/1/1960 | SUBSTATIONEQ |
| DGT008732N | 3025127 | 5/1/1969 | COOLING TOWER |
| DGT008743N | 3025128 | 7/1/1971 | SCREW CONVEYOR |
| DGT008750N | 3025129 | 6/1/1972 | BOILER |
| DGT012003N | 3025130 | 1/1/1973 | SWITCHGEAR |
| DGT012004N | 3025131 | 1/1/1973 | RECTIFIER |
| DGT012004N01 | 3025132 | 2/1/1973 | TRAILING CHARGES TO TAG #012004N |
| DGT012005N | 3025133 | 1/1/1973 | SWITCHGEAR |
| DGT012006N | 3025134 | 1/1/1973 | RECTIFIER |
| DGT012007N | 3025135 | 2/1/1973 | ACID TANK |
| DGT012008N | 3025136 | 2/1/1973 | ACID TANK |
| DGT012010N | 3025137 | 2/1/1973 | ACID TANK |
| DGT012011N | 3025138 | 2/1/1973 | ACID TANK |

| | | | |
|---|---|---|---|
| DGT012016N | 3025139 | 9/1/1973 | CONVEYOR |
| DGT012017N | 3025140 | 9/1/1973 | CONVEYOR |
| DGT012018N | 3025141 | 9/1/1973 | CONVEYOR |
| DGT012020N | 3025143 | 9/1/1973 | CONVEYOR |
| DGT012021N | 3025144 | 12/1/1973 | SUB STATION |
| DGT012022N | 3025145 | 12/1/1973 | CABLE |
| DGT012023N | 3025146 | 12/1/1973 | PLATFORM |
| DGT012024N | 3025147 | 3/1/1974 | VENTILATION |
| DGT012025N | 3025148 | 3/1/1974 | CONVEYOR |
| DGT012026N | 3025149 | 3/1/1974 | VENTILATION |
| DGT012027N | 3025150 | 3/1/1974 | VACUUM SYSTEM |
| DGT012034N | 3025151 | 8/1/1975 | VACUUM TO MOLDING |
| DGT012036N | 3025152 | 3/1/1976 | TRENCHES |
| DGT012038N | 3025153 | 5/1/1976 | VENTILATION |
| DGT012043N | 3025154 | 8/1/1976 | ACID TANK |
| DGT012044N | 3025155 | 8/1/1976 | ACID PUMPING SYSTEM FOR MEZZANINE |
| DGT012046N | 3025156 | 9/1/1976 | VENTILATION FOR LEAD POTS |
| DGT012047N | 3025157 | 9/1/1976 | FINAL ACID FILL |
| DGT012051N | 3025158 | 9/1/1976 | ACID TOP-OFF |
| DGT012055N | 3025159 | 9/1/1976 | SUB-STATION-LEAD STRIP |
| DGT012055N01 | 3025160 | 10/1/1977 | ADDITIONAL CHARGES TO TAG #012055N |
| DGT012057N | 3025161 | 10/1/1976 | LEAD MELT FURNACE |
| DGT012058N | 3025162 | 10/1/1976 | FOUNDATION & SUMPS FOR LEAD CASTER |
| DGT012060N | 3025163 | 12/1/1976 | VENTILATION FOR CHARGING UNITS |
| DGT012060N01 | 3025164 | 6/1/1980 | ADDITIONAL CHARGES TO TAG #012060N |
| DGT012062N | 3025165 | 1/1/1977 | ACID MIXING SYSTEM |
| DGT012064N | 3025167 | 1/1/1977 | ACID PUMPS RECLAIM |
| DGT012065N | 3025168 | 1/1/1977 | VENTILATION PLATE OVENS |
| DGT012066N | 3025169 | 1/1/1977 | ACID STORAGE TANK |
| DGT012067N | 3025170 | 1/1/1977 | ACID STORAGE TANK |
| DGT012068N | 3025171 | 1/1/1977 | ACID STORAGE TANK |
| DGT012069N | 3025172 | 1/1/1977 | ACID STORAGE TANK |
| DGT012070N | 3025173 | 1/1/1977 | ACID STORAGE TANK |
| DGT012071N | 3025174 | 1/1/1977 | ACID STORAGE TANK |
| DGT012072N | 3025175 | 1/1/1977 | ACID STORAGE TANK |
| DGT012073N | 3025176 | 1/1/1977 | ACID STORAGE TANK |
| DGT012074N | 3025177 | 1/1/1977 | ACID STORAGE TANK |
| DGT012075N | 3025178 | 1/1/1977 | ACID STORAGE TANK |
| DGT012076N | 3025179 | 1/1/1977 | ACID STORAGE TANK |
| DGT012077N | 3025180 | 1/1/1977 | ACID STORAGE TANK |
| DGT012080N | 3025181 | 2/1/1977 | COOLING FACILITIES FOR CASTER |
| DGT012083N | 3025182 | 7/1/1977 | SUB STATION LEAD RECLAIM |
| DGT012095N | 3025183 | 2/1/1978 | LINDBURG FURNACE |
| DGT012096N | 3025184 | 2/1/1978 | TRANSFER SYSTEM |
| DGT012097N | 3025185 | 9/1/1978 | STEAMER HOOD |
| DGT012098N | 3025186 | 9/1/1978 | STEAMER HOOD |
| DGT012099N | 3025187 | 1/1/1977 | STEAMER HOOD |
| DGT012100N | 3025188 | 1/1/1977 | STEAMER HOOD |
| DGT012102N | 3025189 | 4/1/1978 | WATER CONTAINMENT |
| DGT012109N | 3025190 | 12/1/1976 | PRIMARY SWITCH GEAR |
| DGT012109N01 | 3025191 | 12/1/1977 | TRAILING CHARGE TO TAG #012109N |
| DGT012109N02 | 3025192 | 3/1/1978 | TRAILING CHARGE TO TAG #012109N |
| DGT012117N | 3025193 | 10/1/1978 | CONVEYOR SYSTEM |
| DGT012118N | 3025194 | 10/1/1978 | ACID FILL STATION |
| DGT012119N | 3025195 | 10/1/1978 | REPAIR STATIONS (2) |
| DGT012120N | 3025196 | 11/1/1978 | EXTEND TRENCH/X-MET LINE |
| DGT012121N | 3025197 | 11/1/1978 | AIR MAKEUP UNIT |
| DGT012122N | 3025198 | 12/1/1978 | AIR MAKE UP SYSTEM |
| DGT012122N01 | 3025199 | 10/1/1979 | ADDITIONAL CHARGES TO TAG #012122N |
| DGT012123N | 3025200 | 12/1/1978 | BATROLIFE MEZZANINE |
| DGT012124N | 3025201 | 1/1/1979 | CONVEYOR FROM SETTLING CHAMBER |
| DGT012126N | 3025202 | 2/1/1979 | VENTILATION TUNNEL-EXTENSION |
| DGT012128N | 3025205 | 3/1/1979 | ROLLER TYPE CONVEYOR |
| DGT012129N | 3025206 | 3/1/1979 | INCLINE BELT CONVEYOR |
| DGT012130N | 3025207 | 4/1/1979 | POWER DROPS/C O S & PREHEAT |
| DGT012131N | 3025208 | 5/1/1979 | CONVEYOR FROM COLLECTOR |
| DGT012132N | 3025209 | 8/1/1979 | VENT FOR ELEMENT ASSEMBLY |

| | | | |
|---|---|---|---|
| DGT012132N01 | 3025210 | 9/1/1979 | TRAILING CHARGE TO TAG #012132N |
| DGT012137N | 3025212 | 9/1/1979 | OVERHEAD CONVEYOR |
| DGT012138N | 3025213 | 9/1/1979 | ELECTRIC CABLE & DROPS |
| DGT012139N | 3025214 | 9/1/1979 | SETTLING CHAMBER |
| DGT012140N | 3025215 | 11/1/1979 | LEAD DROP & CONTROLS FOR BARTON POT |
| DGT012141N | 3025216 | 12/1/1979 | CHARGE TABLES |
| DGT012142N | 3025217 | 12/1/1979 | CHARGE TABLES |
| DGT012146N | 3025218 | 6/1/1980 | LEAD MELT POT |
| DGT012147N | 3025219 | 6/1/1980 | VENTILATION F/POT |
| DGT012148N | 3025220 | 6/1/1980 | ELECTRIC CABLE & BUSWAY |
| DGT012150N | 3025222 | 6/1/1980 | COOLING TOWER |
| DGT012151N | 3025223 | 12/1/1980 | EXTEND TRENCHES FOR CONVEYOR |
| DGT012152N | 3025224 | 12/1/1980 | STORAGE RACKS & SPRINKLER |
| DGT012152N01 | 3025225 | 12/1/1981 | TRAILING CHARGE TO TAG #012152N |
| DGT012154N01 | 3025226 | 1/1/1998 | UPGRADE STORM WATER TREATMENT PLANT |
| DGT012156N | 3025227 | 12/1/1980 | RECEIVING OFFICE |
| DGT012159N | 3025229 | 12/1/1981 | CHARGE TABLES |
| DGT012160N | 3025230 | 12/1/1981 | (14) CHARGE TABLES |
| DGT012161N | 3025231 | 2/1/1982 | VENTILATION SYSTEM |
| DGT012162N | 3025232 | 2/1/1982 | LOAD/UNLOAD CONVEYOR |
| DGT012163N | 3025233 | 6/1/1982 | COLLECTOR |
| DGT012164N | 3025234 | 6/1/1980 | VESTIBULE |
| DGT012166N | 3025235 | 9/1/1982 | OWENS CORNING ACID TANK |
| DGT012167N | 3025236 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR 95995 |
| DGT012168N | 3025237 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR95996 |
| DGT012169N | 3025238 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR95997 |
| DGT012170N | 3025239 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR95998 |
| DGT012171N | 3025240 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR95999 |
| DGT012172N | 3025241 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR96000 |
| DGT012173N | 3025242 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR105751 |
| DGT012174N | 3025243 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR105752 |
| DGT012176N | 3025244 | 12/1/1983 | OXIDE ELEVATORS & CONVEYORS |
| DGT012176N01 | 3025245 | 10/1/1983 | MATERIAL HANDLING SYSTEM AT PASTE MIX |
| DGT012181N | 3025246 | 9/1/1984 | POWER ROLLER CONVEYOR |
| DGT012182N | 3025247 | 12/1/1984 | ACID & WATER SYSTEM |
| DGT012184N | 3025248 | 12/1/1984 | VENTILATION F/3 PAINT MIXERS |
| DGT012185N | 3025249 | 4/1/1985 | WOMEN'S REST ROOM-WEST |
| DGT012186N | 3025250 | 5/1/1985 | WOMEN'S LOCKER/SHOWER-EAST |
| DGT012187N | 3025251 | 12/1/1985 | CONVEYOR & VENTILATION FOR 6 TABLES |
| DGT012188N | 3025252 | 1/1/1986 | ROOF EXHAUSTERS |
| DGT012194N | 3025253 | 2/1/1987 | ACID PIT |
| DGT012200N | 3025256 | 5/1/1987 | TRANSFER CONVEYORS(ALL) |
| DGT012202N | 3025257 | 10/1/1987 | #26(82'CHG TABLE CONV) |
| DGT012203N | 3025258 | 10/1/1987 | #27(82'CHG TABLE CONV) |
| DGT012204N | 3025259 | 10/1/1987 | #28(82'CHG TABLE CONV) |
| DGT012205N | 3025280 | 10/1/1987 | #29(82'CHG TABLE CONV) |
| DGT012206N | 3025261 | 10/1/1987 | #30(82'CHG TABLE CONV) |
| DGT012207N | 3025262 | 10/1/1987 | 82 FT. CONVEYOR (#31) |
| DGT012208N | 3025263 | 10/1/1987 | #32(82'CHG TABLE CONV) |
| DGT012209N | 3025264 | 10/1/1987 | #33(82'CHG TABLE CONV) |
| DGT012210N | 3025265 | 12/1/1987 | #1 X-MET LINE(OFFBEAR CONV) |
| DGT012211N | 3025266 | 5/1/1988 | POWERED ROLLER CONV(4) |
| DGT012212N | 3025267 | 5/1/1988 | VENT FOR CAST ON STRAP MACH |
| DGT012215N | 3025268 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012216N | 3025269 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012217N | 3025270 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012218N | 3025271 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012219N | 3025272 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012220N | 3025273 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012222N | 3025274 | 6/30/1989 | CAPITALIZABLE MAINT. |
| DGT012223N | 3025275 | 3/1/1990 | VENTILATION FOR (8) BATTERY CHARGE TABLES |
| DGT012224N | 3025276 | 9/1/1990 | TEMPERATURE CONTROL |
| DGT012225N | 3025277 | 1/1/1991 | COS CONTROL |
| DGT012228N | 3025278 | 7/1/1994 | WASTE WATER TREATMENT SYSTEM |
| DGT012230N | 3025280 | 8/1/1995 | ACID LEVELER |
| DGT012233N | 3025281 | 3/1/1995 | AUTOMATIC LABELING MACHINE |
| DGT012234N | 3025282 | 1/1/1996 | RESERVE CAPACITY TESTERS (12) |

22

| | | | |
|---|---|---|---|
| DGT012236N | 3025284 | 1/1/1996 | 110 OZ CONVERSION |
| DGT014722N | 3025285 | 6/1/1977 | BAYSTONE PLATE STEAMER |
| DGT014729N | 3025286 | 6/1/1977 | OXIDE SCREW CONVEYOR SYSTEM |
| DGT014737N | 3025287 | 7/1/1977 | SCREW CONVEYOR |
| DGT014738N | 3025288 | 7/1/1977 | SCREW CONVEYOR |
| DGT015201N | 3025289 | 12/1/1979 | INSULATE STEAMER HOODS (6) |
| DGT020031D01 | 3025298 | 2/1/1947 | LATHES-ENGIN |
| DGT020059D01 | 3025300 | 12/1/1946 | DRILL-STANDA |
| DGT020726D01 | 3025301 | 7/1/1947 | MIX CONVEYOR |
| DGT021837D | 3025305 | 2/1/1956 | SETTLING CHR |
| DGT021838D | 3025306 | 2/1/1956 | BARTON POT |
| DGT021840D | 3025307 | 2/1/1956 | 12R)DUSTCOLL |
| DGT022488D | 3025308 | 3/1/1957 | COMPRESSORS} |
| DGT022506D | 3025309 | 4/1/1957 | RECTIFIERS)E |
| DGT022510D | 3025310 | 5/1/1957 | BARTON POT |
| DGT022511D | 3025311 | 5/1/1957 | SETTLING CHR |
| DGT022530D | 3025312 | 10/1/1957 | RECTIFIERS)E |
| DGT028031N | 3025315 | 6/1/1996 | ALLEN BRADLEY CONTROL |
| DGT028785N | 3025316 | 10/31/1989 | ACID DUMP SYSTEM |
| DGT028855N | 3025317 | 11/1/1991 | CENTRIFUGAL BLOWER |
| DGT056948D | 3025318 | 6/1/1956 | GRINDER |
| DGT058830D | 3025319 | 6/1/1957 | BARTON POT |
| DGT060227D | 3025320 | 6/1/1954 | BARTON POT |
| DGT060228D | 3025321 | 6/1/1954 | BARTON POT |
| DGT060229D | 3025322 | 6/1/1954 | BARTON POT |
| DGT060230D | 3025323 | 6/1/1954 | SET}CHAMBER |
| DGT060231D | 3025324 | 6/1/1954 | SET}CHAMBER |
| DGT060232D | 3025325 | 6/1/1954 | SET}CHAMBER |
| DGT060233E | 3025327 | 11/1/2001 | MODIF OF MISC LINE STROKER, PLATFORM, LEFT AND TAB |
| DGT060279D | 3025329 | 11/1/1960 | POWER ROLLER |
| DGT060295D | 3025330 | 7/1/1961 | IMPACT TESTI |
| DGT066940D | 3025331 | 6/1/1946 | LATHE |
| DGT069865D | 3025333 | 2/1/1963 | LATHE |
| DGT070211D | 3025335 | 6/1/1963 | TOLEDO SCALE |
| DGT070253D | 3025336 | 8/1/1963 | MILLING MACHINE |
| DGT070255D | 3025337 | 8/1/1983 | SURFACEGRIND |
| DGT071020D | 3025338 | 5/1/1984 | LATHE |
| DGT071037D | 3025339 | 7/1/1984 | MILLING MCH |
| DGT071058D | 3025340 | 12/1/1964 | BOILER |
| DGT071087D | 3025343 | 12/1/1965 | BOILER |
| DGT072221D | 3025346 | 8/1/1966 | EL AS SECT |
| DGT072222D | 3025347 | 9/1/1969 | DUST COLLECTOR |
| DGT072223D | 3025348 | 9/1/1969 | MATL COLL SYS |
| DGT072239D | 3025352 | 4/1/1967 | LATHE |
| DGT072280D | 3025360 | 10/1/1968 | CONVEYORS |
| DGT072284D01 | 3025361 | 3/1/1970 | STARTER |
| DGT072292D | 3025366 | 6/1/1970 | MOLD TEMP CONTR |
| DGT083874D | 3025367 | 5/1/1966 | RECTIFIER |
| DGT087857D | 3025381 | 7/1/1970 | PLATE SAW |
| DGT087872D | 3025385 | 2/1/1971 | CONVEYOR |
| DGT093030D | 3025386 | 12/1/1973 | PASTE MIXER |
| DGT095313D | 3025390 | 7/1/1971 | PASTE MIXER |
| DGT095328D | 3025392 | 4/1/1972 | HACKSAW |
| DGT095330D | 3025394 | 5/1/1973 | DUST COLLECTOR |
| DGT095351D | 3025416 | 9/1/1973 | CONVEYOR |
| DGT095352D | 3025417 | 9/1/1973 | CONVEYOR |
| DGT095353D | 3025418 | 9/1/1973 | GRANULATOR |
| DGT095354E | 3025420 | 11/1/2001 | M & L FOR MODIF OF MAIN LINE STACKER PLATFORM, L/R |
| DGT095355D | 3025421 | 9/1/1973 | CAST ON STRAP |
| DGT095356D | 3025422 | 9/1/1973 | CAST ON STRAP |
| DGT095357D | 3025423 | 9/1/1973 | CAST ON STRAP |
| DGT095358D | 3025424 | 9/1/1973 | CAST ON STRAP |
| DGT095359D | 3025425 | 9/1/1973 | SPOT FACE CONVEYOR |
| DGT095363D | 3025427 | 9/1/1973 | EXT FUSION CONV |
| DGT095364D | 3025428 | 9/1/1973 | AIR TEST CONVEYOR |
| DGT095365D | 3025429 | 9/1/1973 | LABLER CONV |
| DGT095369D | 3025432 | 9/1/1973 | LEAK TEST |

| | | | |
|---|---|---|---|
| DGT095370D | 3025433 | 9/1/1973 | DATE CODE |
| DGT095372D | 3025434 | 9/1/1973 | LEAD POT |
| DGT095373D | 3025435 | 9/1/1973 | LEAD POT |
| DGT095374D | 3025436 | 9/1/1973 | LEAD POT |
| DGT095375D | 3025437 | 9/1/1973 | LEAD POT |
| DGT095376D | 3025438 | 9/1/1973 | VACUUM SYSTEM STACKER |
| DGT095382D | 3025439 | 9/1/1973 | TEMPERATURE CONTROL |
| DGT095383D | 3025440 | 9/1/1973 | HEAT SEAL MACHINE |
| DGT095384D | 3025441 | 9/1/1973 | HEAT SEAL MACHINE |
| DGT095385D | 3025442 | 9/1/1973 | HEAT SEAL MACHINE |
| DGT095387D | 3025443 | 12/1/1973 | AIR COMPRESSOR |
| DGT095398D | 3025446 | 3/1/1974 | LIFT TRUCK |
| DGT095399D | 3025447 | 3/1/1974 | SLITTER |
| DGT095400D | 3025448 | 3/1/1974 | SLITTER |
| DGT095603D | 3025450 | 10/1/1974 | DUST COLLECTOR |
| DGT095604D | 3025451 | 10/1/1974 | DUST COLLECTOR |
| DGT095610D | 3025452 | 1/1/1975 | HEAT SEAL MACHINE |
| DGT095612D | 3025453 | 4/1/1975 | CONVEYOR SYSTEM |
| DGT095614D | 3025454 | 9/1/1975 | SOFTENING TANK |
| DGT095615D | 3025455 | 9/1/1975 | SOFTENING TANK |
| DGT095620D | 3025456 | 1/1/1976 | EXT-FUSION MACHINE |
| DGT095620D01 | 3025457 | 3/1/1976 | ADDITIONAL CHARGES TO TAG #095620D |
| DGT095621D | 3025458 | 2/1/1976 | HOIST |
| DGT095622D | 3025459 | 5/1/1976 | DIELECTRIC LINE |
| DGT095628D | 3025462 | 5/1/1976 | BRIDGE HOIST |
| DGT095638D | 3025472 | 6/1/1976 | SKID RACK |
| DGT095639D | 3025473 | 6/1/1976 | SKID RACK |
| DGT095640D | 3025474 | 6/1/1976 | SKID RACK |
| DGT095641D | 3025475 | 6/1/1976 | SKID RACK |
| DGT095646D | 3025476 | 9/1/1976 | BUTT WELDER |
| DGT095647D | 3025477 | 9/1/1976 | BUTT WELDER |
| DGT095654D | 3025479 | 7/1/1976 | HI-RATE TEST |
| DGT095657D | 3025480 | 7/1/1976 | SCRAP CONVEYOR SYSTEM |
| DGT095658D | 3025481 | 7/1/1976 | CONVEYOR |
| DGT095661D | 3025484 | 9/1/1976 | DE-REELER |
| DGT095662D | 3025485 | 9/1/1976 | DE-REELER |
| DGT095663D | 3025486 | 9/1/1976 | DE-REELER |
| DGT095664D | 3025487 | 9/1/1976 | DE-REELER |
| DGT095666D | 3025489 | 9/1/1976 | EXPANDING PRESS |
| DGT095670D | 3025491 | 9/1/1976 | LUG FORM PRESS |
| DGT095671D | 3025492 | 9/1/1976 | LUG FORM PRESS |
| DGT095674D | 3025495 | 9/1/1976 | MODICON-PASTE LINE |
| DGT095675D | 3025496 | 9/1/1976 | MODICON-PASTE LINE |
| DGT095676D | 3025497 | 8/1/1979 | OVEN CONVERSION |
| DGT095677D | 3025498 | 8/1/1979 | OVEN CONVERSION |
| DGT095681D | 3025501 | 9/1/1976 | PARTS CONVEYOR F/250 TON MOLD MACHINE |
| DGT095682D | 3025502 | 9/1/1976 | PARTS CONVEYOR F/250 TON MOLD MACHINE |
| DGT095685D | 3025503 | 9/1/1976 | CONVEYOR FOR PASTE MACHINE |
| DGT095688D | 3025504 | 9/1/1976 | PILOT HOLE PIERCE |
| DGT095689D | 3025505 | 9/1/1976 | PILOT HOLE PIERCE |
| DGT095698D | 3025510 | 10/1/1976 | BATTERY CHARGER LAB. FACILITIES |
| DGT095801D | 3025511 | 10/1/1976 | COLLECTION SYSTEM FOR OFFBEAR |
| DGT095801D01 | 3025512 | 10/1/1978 | COLLECTION SYSTEM FOR OFFBEAR |
| DGT095801D02 | 3025513 | 8/1/1979 | VENT & CURE OVEN |
| DGT095803D | 3025515 | 10/1/1976 | FOUR-ARM STORAGE TURNSTILE |
| DGT095804D | 3025516 | 10/1/1976 | SPECTROGRAPH |
| DGT095807D | 3025518 | 12/1/1976 | ROLLING MILL 7 STAND |
| DGT095809D | 3025519 | 12/1/1976 | CHARGING UNITS BATTERIES |
| DGT095809D01 | 3025520 | 12/1/1978 | TRAILING CHARGE TO TAG #095809D |
| DGT095809D02 | 3025521 | 6/1/1980 | ADDITIONAL CHARGES TO TAG #095809D |
| DGT095810D | 3025522 | 12/1/1976 | CHARGING UNITS BATTERIES |
| DGT095810D01 | 3025523 | 12/1/1978 | TRAILING CHARGE TO TAG #095810D |
| DGT095810D02 | 3025524 | 6/1/1980 | TRAILING CHARGE TO TAG #095810D |
| DGT095811D | 3025525 | 12/1/1976 | CHARGING UNITS BATTERIES |
| DGT095811D01 | 3025526 | 12/1/1978 | TRAILING CHARGE TO TAG #095811D |
| DGT095811D02 | 3025527 | 6/1/1980 | TRAILING CHARGE TO TAG #095811D |
| DGT095812D | 3025528 | 12/1/1976 | CHARGING UNITS BATTERIES |

| | | | |
|---|---|---|---|
| DGT095812D01 | 3025529 | 12/1/1978 | TRAILING CHARGE TO TAG #095812D |
| DGT095812D02 | 3025530 | 6/1/1980 | TRAILING CHARGE TO TAG #095812D |
| DGT095818D | 3025531 | 1/1/1977 | HEAT SEAL FINAL COVER |
| DGT095821D | 3025532 | 1/1/1977 | TURNSTILE |
| DGT095822D | 3025533 | 1/1/1977 | S O C INSERTER |
| DGT095823D | 3025534 | 1/1/1977 | COIL UP UNIT |
| DGT095826D | 3025535 | 2/1/1977 | WATER CHILLER PASTE MIXING |
| DGT095829D | 3025538 | 4/1/1977 | COIL UP UNIT |
| DGT095830D | 3025539 | 4/1/1977 | COIL UP UNIT |
| DGT095831D | 3025540 | 6/1/1977 | PULL BOX CASTER |
| DGT095832D | 3025541 | 6/1/1977 | PULL BOX CASTER |
| DGT095836D | 3025542 | 10/1/1977 | FRONT END LOADER |
| DGT095837D | 3025543 | 10/1/1977 | CHILLER FOR PULL BOX-20 TON |
| DGT095839D | 3025545 | 10/1/1977 | COIN ROLL |
| DGT095840D | 3025546 | 10/1/1977 | COIN ROLL |
| DGT095842D | 3025547 | 10/1/1977 | ROLLING MILL-7 STAND |
| DGT095843D | 3025548 | 6/1/1976 | SKID RACK |
| DGT095845D | 3025549 | 12/1/1957 | CHARGING UNIT |
| DGT095845D01 | 3025550 | 12/1/1978 | TRAILING CHARGE TO TAG #095845D |
| DGT095846D | 3025551 | 12/1/1977 | CHARGING UNIT |
| DGT095846D01 | 3025552 | 12/1/1978 | TRAILING CHARGE TO TAG #095846D |
| DGT095848D | 3025553 | 12/1/1977 | CHARGING UNIT |
| DGT095848D01 | 3025554 | 12/1/1978 | TRAILING CHARGE TO TAG #095848D |
| DGT095849D | 3025555 | 12/1/1977 | CHARGING UNIT |
| DGT095849D01 | 3025556 | 12/1/1978 | TRAILING CHARGE TO TAG #095849O |
| DGT095850D | 3025557 | 12/1/1977 | CHARGING UNIT |
| DGT095850D01 | 3025558 | 12/1/1978 | TRAILING CHARGE TO TAG #095850D |
| DGT095854D | 3025559 | 12/1/1977 | CHARGING UNIT |
| DGT095854D01 | 3025560 | 12/1/1978 | TRAILING CHARGE TO TAG #095854D |
| DGT095858D | 3025561 | 12/1/1977 | CHARGING UNIT |
| DGT095858D01 | 3025562 | 12/1/1978 | TRAILING CHARGE TO TAG #095858D |
| DGT095859D | 3025563 | 12/1/1977 | CHARGING UNIT |
| DGT095859D01 | 3025564 | 12/1/1978 | TRAILING CHARGE TO TAG #095859D |
| DGT095860D | 3025565 | 12/1/1977 | CHARGING UNIT |
| DGT095860D01 | 3025566 | 12/1/1978 | TRAILING CHARGE TO TAG #095860D |
| DGT095861D | 3025567 | 12/1/1977 | CHARGING UNIT |
| DGT095861D01 | 3025568 | 12/1/1978 | TRAILING CHARGE TO TAG #095861D |
| DGT095862D | 3025569 | 12/1/1977 | CHARGING UNIT |
| DGT095862D01 | 3025570 | 12/1/1978 | TRAILING CHARGE TO TAG #095862D |
| DGT095868D | 3025571 | 3/1/1978 | TEST UNIT AND MODULES |
| DGT095870D | 3025572 | 4/1/1978 | COVER HEAT SEAL |
| DGT095872D | 3025573 | 9/1/1978 | BUTT WELDER |
| DGT095873D | 3025574 | 9/1/1978 | DEREELER |
| DGT095874D | 3025575 | 9/1/1978 | DEREELER |
| DGT095877D | 3025576 | 9/1/1978 | LUG FORM PRESS |
| DGT095878D | 3025577 | 9/1/1978 | ROTARY CUT OFF MACHINE |
| DGT095879D | 3025578 | 9/1/1978 | PILOT HOLE PIERCE PRESS |
| DGT095880D | 3025579 | 9/1/1978 | PLATE DRYING OVEN |
| DGT095882D | 3025581 | 6/1/1976 | SKID RACK |
| DGT095883D | 3025582 | 6/1/1976 | SKID RACK |
| DGT095884D | 3025583 | 7/1/1978 | THERMO CARE WATER CHILLER |
| DGT095885D | 3025584 | 8/1/1978 | FULLER BAG COLLECTOR |
| DGT095885D01 | 3025585 | 9/1/1978 | TRAILING CHARGE TO TAG #095885D |
| DGT095887D | 3025586 | 9/1/1978 | CAMBER SENSOR |
| DGT095888D | 3025587 | 11/1/1978 | LABEL MACHINE |
| DGT095889D | 3025588 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095890D | 3025589 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095891D | 3025590 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095892D | 3025591 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095893D | 3025592 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095894D | 3025593 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095895D | 3025594 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095896D | 3025595 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095897D | 3025596 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095898D | 3025597 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095899D | 3025598 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095900D | 3025599 | 12/1/1978 | BATTERY CHARGING UNIT |

| | | |
|---|---|---|
| DGT095901A | 3025600 | 11/1/2001 REBUILD #4 AIR COMPRESSOR - ORIGINAL TAG REFERENCE |
| DGT095901D | 3025601 | 12/1/1978 AIR COMPRESSOR |
| DGT095901D01 | 3025602 | 7/1/1991 ADDL CHG(STRUCTURE OF COMPRESSOR) |
| DGT095902D | 3025603 | 2/1/1979 BASE FOR STACKER |
| DGT095903D | 3025604 | 2/1/1979 FREEZER |
| DGT095906D | 3025606 | 2/1/1979 FILL IN CONVEYOR |
| DGT095907D | 3025607 | 2/1/1979 FILL IN CONVEYOR |
| DGT095908D | 3025608 | 2/1/1979 FILL IN CONVEYOR |
| DGT095909D | 3025609 | 2/1/1979 CONVEYOR TO STORAGE |
| DGT095910D | 3025610 | 2/1/1979 CONVEYOR TO STORAGE |
| DGT095911D | 3025611 | 2/1/1979 CONVEYOR TO STORAGE |
| DGT095912D | 3025612 | 2/1/1979 CONVEYOR TO STORAGE |
| DGT095915D | 3025614 | 4/1/1979 RIB TRIM MACHINE |
| DGT095916D | 3025615 | 4/1/1979 TOP TERM ALIGNMENT MACHINE |
| DGT095919D | 3025618 | 4/1/1979 CHILLER-15 TON |
| DGT095920D | 3025619 | 5/1/1979 TEMPERATURE CONTROLLER |
| DGT095923D | 3025620 | 7/1/1979 HEAT SEAL MACHINE |
| DGT095925D | 3025622 | 7/1/1979 CASE GATHERING CONVEYOR FROM COS |
| DGT095927D | 3025624 | 7/1/1979 CAMBER SENSOR |
| DGT095928D | 3025625 | 7/1/1979 CAMBER SENSOR |
| DGT095932D | 3025628 | 8/1/1979 OSI PLATE DRY OVEN |
| DGT095933D | 3025629 | 8/1/1979 OSI PLATE DRY OVEN |
| DGT095934D | 3025630 | 8/1/1979 5 STATION EXT FUSION MACHINE |
| DGT095935D | 3025631 | 8/1/1979 SLITTER & CHOPPER |
| DGT095936D | 3025632 | 8/1/1979 SLITTER & CHOPPER |
| DGT095937D | 3025633 | 8/1/1979 COOLING CHAMBER |
| DGT095938D | 3025634 | 8/1/1979 GROUP PALLET CONVEYOR |
| DGT095940D | 3025635 | 8/1/1979 WORK PLATFORM FOR (2) CAST ON STRAP |
| DGT095942D | 3025636 | 9/1/1979 SCREW CONVEYOR SYSTEM |
| DGT095943D | 3025637 | 9/1/1979 PASTE RECLAIM SYSTEM |
| DGT095944D | 3025638 | 9/1/1979 TENNENT FLOOR SWEEPER |
| DGT095944D01 | 3025639 | 9/1/1979 ADDITIONAL CHARGES TO TAG #095944D |
| DGT095946D | 3025641 | 10/1/1979 CAST ON STRAP |
| DGT095947D | 3025642 | 10/1/1979 GREEN GROUP SHORT TEST CONVEYOR |
| DGT095948D | 3025643 | 10/1/1979 LEAK TEST CONVEYOR |
| DGT095949D | 3025644 | 10/1/1979 GREEN GROUP SHORT TEST CONVEYOR |
| DGT095950D | 3025645 | 10/1/1979 GREEN SHORT TEST CONVEYOR |
| DGT095953D | 3025646 | 12/1/1979 CONVEYOR TO CHARGING TABLES |
| DGT095955D | 3025649 | 12/1/1979 HOPPER AND CONVEYOR |
| DGT095957D | 3025650 | 12/1/1979 VENTILATION SYSTEM |
| DGT095958D | 3025651 | 12/1/1979 LEAK TEST |
| DGT095961D | 3025652 | 12/1/1979 DROTT DECK CRANE |
| DGT095965D | 3025655 | 2/1/1980 ROCKWELL BAND SAW |
| DGT095971D | 3025657 | 6/1/1980 TIG WELDER |
| DGT095972D | 3025658 | 6/1/1980 TIG WELDER |
| DGT095973D | 3025659 | 6/1/1980 TIG WELDER |
| DGT095975D | 3025660 | 6/1/1980 TIG WELD CONVEYOR SYSTEM |
| DGT095985D | 3025666 | 12/1/1981 PASTE MIXER |
| DGT095985D01 | 3025667 | 12/1/1983 INSTRUMENTS FOR/PASTE MIXER |
| DGT095986D | 3025668 | 12/1/1981 PASTE MIXER |
| DGT095986D01 | 3025669 | 12/1/1983 INSTRUMENTS FOR/PASTE MIXER |
| DGT095987D01 | 3025670 | 7/1/1984 INSTRUMENTS FOR/PASTE MIXER |
| DGT095989D | 3025671 | 12/1/1981 STOCK DEREELER |
| DGT095990D | 3025672 | 12/1/1981 STOCK DEREELER |
| DGT095991D | 3025673 | 12/1/1981 STRETCH WRAP MACHINE |
| DGT095992D | 3025674 | 12/1/1982 SINGLE STAND MILL |
| DGT095993D | 3025675 | 12/1/1982 WATER CHILLER |
| DGT095993D01 | 3025676 | 1/1/1983 WATER CHILLER |
| DGT095994D | 3025677 | 12/1/1982 WATER CHILLER |
| DGT095994D01 | 3025678 | 1/1/1983 WATER CHILLER |
| DGT095995D | 3025679 | 12/1/1980 VENTILATION F/COLLECTION SYSTEM |
| DGT095996D | 3025680 | 12/1/1980 VENTILATION F/COLLECTION SYSTEM |
| DGT095997D | 3025681 | 12/1/1982 VENILATION F/COLLECTION SYSTEM |
| DGT095998D | 3025682 | 12/1/1982 VENTILATION F/COLLECTION SYSTEM |
| DGT095999D | 3025683 | 12/1/1982 VENTILATION F/COLLECTION SYSTEM |
| DGT096000D | 3025684 | 12/1/1982 VENTILATION F/COLLECTION SYSTEM |
| DGT098187D | 3025690 | 12/1/1972 DUST COLLECTOR |

| | | |
|---|---|---|
| DGT098361D01 | 3025691 | 10/31/1989 REBUILD MOLDING MACHINE |
| DGT098361D02 | 3025692 | 3/1/1992 ADDL CHG(700 T MOLDING MACH) |
| DGT100287D | 3025696 | 6/1/1977 EXPAND PRESS |
| DGT100297D | 3025698 | 6/1/1977 PASTE MIXER |
| DGT100306D | 3025699 | 6/1/1977 BUTT WELDER |
| DGT100312D | 3025700 | 6/1/1977 DEREELER |
| DGT100315D | 3025701 | 6/1/1977 DEREELER |
| DGT100470D | 3025702 | 9/1/1977 TIG TOP TERM BURN MACHINE |
| DGT102070D | 3025703 | 7/1/1978 LUG TRIM PRESS |
| DGT102099D | 3025704 | 8/1/1978 OSI PLATE DRY OVEN |
| DGT102511D | 3025708 | 7/1/1979 SLITTER & CHOPPER |
| DGT102513D | 3025709 | 7/1/1979 CAMBER SENSORS |
| DGT104491 | 3025710 | 2/1/1998 LEVELATOR |
| DGT104492 | 3025711 | 2/1/1998 LEVELATOR |
| DGT104493 | 3025712 | 2/1/1998 LEVELATOR |
| DGT104494 | 3025713 | 2/1/1998 LEVELATOR |
| DGT104495 | 3025714 | 2/1/1998 LEVELATOR |
| DGT104496 | 3025715 | 2/1/1998 LEVELATOR |
| DGT104497 | 3025716 | 2/1/1998 LEVELATOR |
| DGT104498 | 3025717 | 2/1/1998 LEVELATOR |
| DGT104499 | 3025718 | 2/1/1998 LEVELATOR |
| DGT104500 | 3025719 | 2/1/1998 LEVELATOR |
| DGT104501 | 3025720 | 2/1/1998 LEVELATOR |
| DGT104502 | 3025721 | 2/1/1998 LEVELATOR |
| DGT105567D | 3025724 | 6/1/1983 STRETCH WRAP MACHINE |
| DGT105650D | 3025725 | 8/1/1983 SINGLE STAND MILL |
| DGT105751D | 3025726 | 12/1/1982 VENTILATION F/COLLECTION SYSTEM |
| DGT105752D | 3025727 | 12/1/1982 VENTILATION F/COLLECTION SYSTEM |
| DGT105753D | 3025728 | 2/1/1983 TRABON LUBE SYSTEM |
| DGT105754D | 3025729 | 2/1/1983 TRABON LUBE SYSTEM |
| DGT105755D | 3025730 | 2/1/1983 SINGLE STAND MILL |
| DGT105756D | 3025731 | 3/1/1983 DIESEL FIRE PUMP |
| DGT105757D | 3025732 | 3/1/1983 ELECTRIC FIRE PUMP |
| DGT105758D | 3025733 | 3/1/1983 JOCKEY PUMP |
| DGT105761D | 3025734 | 12/1/1983 HYDRAULIC PASTE BOX |
| DGT105762D | 3025735 | 12/1/1983 HYDRAULIC PASTE BOX |
| DGT105763D | 3025736 | 12/1/1983 ROTARY PILOT HOLE MACHINE |
| DGT105764D | 3025737 | 12/1/1983 ROTARY PILOT HOLE MACHINE |
| DGT105765D | 3025738 | 12/1/1983 TANK FOR MIXER |
| DGT105766D | 3025739 | 12/1/1983 TANK FOR MIXER |
| DGT105769D | 3025741 | 6/1/1984 LABEL MACHINE |
| DGT105770D | 3025742 | 8/1/1984 TIG WELDER |
| DGT105770D01 | 3025743 | 1/1/1995 ADDITIONAL CHARGES TO TAG #105770 |
| DGT105771D | 3025744 | 8/1/1984 TIG WELDER |
| DGT105771D01 | 3025745 | 1/1/1995 ADDITIONAL CHARGES TO TAG #105771 |
| DGT105772D | 3025746 | 8/1/1984 TIG WELDER |
| DGT105772D01 | 3025747 | 1/1/1995 ADDITIONAL CHARGES TO TAG #105772 |
| DGT105773D | 3025748 | 8/1/1984 TIG WELDER |
| DGT105773D01 | 3025749 | 1/1/1995 ADDITIONAL CHARGES TO TAG #105773 |
| DGT105774D | 3025750 | 10/1/1984 PILOT HOLE MACHINE |
| DGT105775D | 3025751 | 12/1/1984 HEVI DUTY TRANSFORMER-300KVA LIGHTING |
| DGT105776D | 3025752 | 12/1/1984 TANK FOR MIXER |
| DGT105777D | 3025753 | 1/1/1985 HYDRAULIC PASTE BOX |
| DGT105781D | 3025754 | 1/1/1985 BATTERY WASHER |
| DGT105787D | 3025756 | 12/1/1985 EXPANDER PRESS #2 |
| DGT105789D | 3025757 | 8/1/1986 HI STACKER TIERING TRUCK |
| DGT105790D | 3025758 | 8/1/1986 HI STACKER TIERING TRUCK |
| DGT105795D | 3025759 | 9/1/1986 EPANDER PRESS #1LINE |
| DGT105796D | 3025760 | 10/1/1986 PASTE MACH LINE#1 |
| DGT105797D | 3025761 | 10/1/1986 BUTT WELDER LINE#1 |
| DGT105798D | 3025762 | 10/1/1986 PASTE MIXER LINE #1 |
| DGT105800D | 3025763 | 10/1/1986 HOT RUNNER CONTROLLER(500T CINN MOLD) |
| DGT105801D | 3025764 | 10/1/1986 MOLD MONITOR MACH #12(500T MOLD MACH) |
| DGT105802D | 3025765 | 10/1/1986 PARTS CONV(25T MOLD MACH)15'&7' |
| DGT105805D | 3025766 | 2/1/1987 EXPANDER PRESS LN#1 |
| DGT105806D | 3025767 | 2/1/1987 COVER HEAT SEAL |
| DGT105807D | 3025768 | 4/1/1987 FINAL COVER FILT PLACER |

| DGT105810D | 3025770 | 9/1/1987 CONV-HANDLE PLACEMENT |
| DGT105811D | 3025771 | 5/1/1988 CHARGE PANEL |
| DGT105812D | 3025772 | 5/1/1988 CHARGE PANEL |
| DGT105817D | 3025773 | 2/1/1988 S.O.C. PROGRAMMABLE CONTROLLER |
| DGT105818D | 3025774 | 2/1/1988 S.O.C. PROGRAMMABLE CONTROLLER |
| DGT105820D | 3025775 | 2/1/1988 15T WATER CHILLER |
| DGT105822D | 3025776 | 5/1/1988 CAST ON STRAP MACH |
| DGT105823D | 3025777 | 5/1/1988 HI-RATE TESTER(5575L&R) |
| DGT105824D | 3025778 | 5/1/1988 AIR BLAST SYS BLOWER |
| DGT105825D | 3025779 | 5/1/1988 TOP TERM TIG BURN MACH |
| DGT105826D | 3025780 | 5/1/1988 HI-RATE CONVEYOR |
| DGT105828D | 3025782 | 11/1/1988 CHARGE FLOOR PROCESS FAN |
| DGT105830D | 3025784 | 12/1/1988 LABEL MACHINE |
| DGT105831D | 3025785 | 1/1/1989 SPOT FACE MACHINE |
| DGT105832D | 3025786 | 1/1/1989 SPOT FACE MACHINE |
| DGT105834D | 3025787 | 8/31/1989 AUTO STRETCH WRAP UNIT |
| DGT105837D | 3025788 | 10/31/1989 LEAD SULFATE RECOVERY SYSTEM |
| DGT105839D | 3025790 | 2/1/1990 CONVEYOR |
| DGT105840D | 3025791 | 2/1/1990 90 DEGREE EXIT CONV(RIGHT SIDE INFEED OHB) |
| DGT105842D | 3025793 | 8/1/1973 TRUCK POWERED SHOP |
| DGT105843D | 3025794 | 3/1/1980 TRUCK-POWERED-SHOP |
| DGT105845D | 3025795 | 8/1/1976 TRUCK-POWERED-SHOP |
| DGT105846D | 3025796 | 5/1/1991 ROTARY DRUM PASTE MACH |
| DGT105847D | 3025797 | 5/1/1991 ROTARY DRUM PASTE MACH |
| DGT105848D | 3025798 | 5/1/1991 ROTARY DRUM PASTE MACH |
| DGT105849D | 3025799 | 5/1/1991 ROTARY DRUM PASTE MACH |
| DGT105854D | 3025802 | 12/1/1991 PRESTRETCH UNIT |
| DGT105856D | 3025803 | 1/1/1993 ENCLOSURE F/3 DOORS |
| DGT105865D | 3025804 | 3/1/1994 SPIROMETER |
| DGT105869D | 3025806 | 2/28/1995 (9)TOLEDO SCALE WEIGHT CONTROLLERS |
| DGT105870D | 3025807 | 1/1/1996 AUTOMATIC PALLETIZER |
| DGT105870E | 3025808 | 11/1/2001 AUTOMATIC PALLETIZER |
| DGT105871 | 3025809 | 2/28/1997 (B) ULTRASONIC WELDER |
| DGT105871A | 3025810 | 12/1/1998 TRAILING CHARGE TO DGT105871 |
| DGT105871D | 3025811 | 1/1/1987 GENIE BOOM ELECTRIC MAN LIFT |
| DGT105872D | 3025813 | 3/1/1983 CLARK WALKING STYLE ELECTRIC SWEEPER/SCRUBBER |
| DGT105873 | 3025814 | 7/31/1997 AUTO OFF-BEAR SYS |
| DGT105874 | 3025816 | 7/31/1997 HEATING SYSTEM (UPGRADE) |
| DGT105876 | 3025817 | 11/1/2001 LEAD OXIDE VENTALATION ON XMET |
| DGT105878 | 3025818 | 11/1/2001 SYNTRON BOWL CONVERSION |
| DGT105880 | 3025819 | 11/1/2001 REBUILD CHANGE TABLE |
| DGT105881 | 3025820 | 11/1/2001 REBUILD CHARGE TABLES |
| DGT105883 | 3025821 | 11/1/2001 MANCOOLERS FOR C.O.S. |
| DGT105884 | 3025822 | 11/1/2001 REPAIR PERSON COOLERS - X-MET |
| DGT105886 | 3025824 | 11/1/2001 ROLLING MILL DRIVE UNIT |
| DGT105887 | 3025825 | 11/1/2001 REPLACE MODICON CONTROLLERS |
| DGT105888 | 3025826 | 11/1/1997 SAND FILTER |
| DGT105890 | 3025828 | 11/1/1997 POWERED SWEEPER |
| DGT105892 | 3025829 | 11/1/1997 HOT MELT EQUIPMENT |
| DGT105894 | 3025832 | 11/1/1997 RETENTION AREA |
| DGT105895 | 3025833 | 11/1/2001 LASER DATE CODE-CELL #1 |
| DGT105897 | 3025834 | 11/1/2001 HI RATE MACHINE FOR LEAN CELL #1 |
| DGT105898 | 3025835 | 11/1/2001 AIRCHECK FOR LEAN CELL #1 |
| DGT105899 | 3025836 | 11/1/2001 AIRCHECK PANEL FOR LEAN CELL #1 |
| DGT105902 | 3025837 | 11/1/2001 CARTON PRINTER MACHINE CELL #1 |
| DGT105903 | 3025838 | 11/1/2001 HANDLE PLACER MACHINE |
| DGT105906 | 3025839 | 11/1/2001 LOW VOLUME SHRING WRAP MACHINE |
| DGT105907 | 3025840 | 11/1/2001 HIGH SPEED SHRINK WRAP MACHINE |
| DGT105908 | 3025841 | 11/1/2001 INKJET PRINTER CELL #1 |
| DGT105911 | 3025842 | 11/1/2001 DESIGN OF ACID HANDLING SYSTEM |
| DGT105912 | 3025843 | 11/1/2001 PLANT UPGRADES FOR LEAN CELLS |
| DGT105913 | 3025844 | 11/1/2001 LABEL JET LABELLER |
| DGT105914 | 3025845 | 11/1/2001 LABEL JET LABELLER |
| DGT105915 | 3025846 | 11/1/2001 LABEL JET LABELLER |
| DGT105916 | 3025847 | 11/1/2001 LABEL JET LABELLER |
| DGT105917 | 3025848 | 11/1/2001 LABEL JET LABELLER |
| DGT105918 | 3025849 | 11/1/2001 LABEL JET LABELLER |

| | | |
|---|---|---|
| DGT105920 | 3025850 | 11/1/2001 HEAT SEAL FOR MISC. LINE |
| DGT105921 | 3025851 | 11/1/2001 POLY STORAGE ELIMINATTION EQUIPMENT TO MOVE PLASTI |
| DGT105924 | 3025852 | 11/1/2001 QC LAB BITRODE CYCLER FOR NEW BRUNSWICK |
| DGT106102D | 3025853 | 6/1/1984 PILOT HOLE MACHINE |
| DGT106164D | 3025854 | 9/1/1984 BRIDGEPORT TAPE MILL |
| DGT106164D01 | 3025855 | 10/1/1984 TRAILING CHARGE TO TAG #106164D |
| DGT109106D | 3025858 | 12/1/1988 PASTE MACH(ROTARY DRUM) |
| DGT111097D | 3025859 | 4/1/1993 BOILER CONTROL FOR #1 |
| DGT111098D | 3025860 | 4/1/1993 BOILER CONTROL FOR #2 |
| DGT111099D | 3025861 | 4/1/1993 BOILER CONTROL FOR #3 |
| DGT111100D | 3025862 | 4/1/1993 BOILER CONTROL FOR #4 |
| DGT111673D | 3025864 | 7/1/1994 RED LEAD STORAGE SYSTEM |
| DGT111673D01 | 3025865 | 7/1/1994 ADDITIONAL CHARGES TO TAG #111673D |
| DGT111673D02 | 3025866 | 1/1/1995 TRAILING CHARGES TO TAG #111673D |
| DGT111674D | 3025867 | 7/1/1994 RED LEAD DELIVERY SYSTEM |
| DGT111674D01 | 3025868 | 7/1/1994 TRAILING CHARGE TO TAG #111674D |
| DGT112844 | 3025870 | 4/28/1999 INFORMATION BOARD |
| DGT113107 | 3025871 | 7/31/1997 ROBOT |
| DGT690000 | 3025872 | 1/2/1998 LEVELATOR |
| DGT690001 | 3025873 | 1/2/1998 LEVELATOR |
| DGT690002 | 3025874 | 1/2/1998 LEVELATOR |
| DGT690003 | 3025875 | 1/2/1998 LEVELATOR |
| DGT690004 | 3025876 | 1/2/1998 LEVELATOR |
| DGT690005 | 3025877 | 1/2/1998 LEVELATOR |
| DGT690006 | 3025878 | 1/2/1998 LEVELATOR |
| DGT690007 | 3025879 | 1/2/1998 LEVELATOR |
| DGT690008 | 3025880 | 1/2/1998 LEVELATOR |
| DGT690009 | 3025881 | 1/2/1998 LEVELATOR |
| DGT690010 | 3025882 | 1/2/1998 LEVELATOR |
| DGT690011 | 3025883 | 1/2/1998 LEVELATOR |
| DGT690012 | 3025884 | 1/2/1998 LEVELATOR |
| DGT690013 | 3025885 | 1/2/1998 LEVELATOR |
| DGT690014 | 3025886 | 1/2/1998 LEVELATOR |
| DGT690015 | 3025887 | 1/2/1998 LEVELATOR |
| DGT690016 | 3025888 | 8/1/1998 TIG WELDER |
| DGT690017 | 3025889 | 1/2/1998 DOCK LOCK |
| DGT690018 | 3025890 | 1/2/1998 DOCK LOCK |
| DGT690019 | 3025891 | 1/2/1998 DOCK LOCK |
| DGT690021 | 3025893 | 1/2/1998 DOCK LOCK |
| DGT690022 | 3025894 | 1/2/1998 DOCK LOCK |
| DGT690023 | 3025895 | 1/2/1998 DOCK LOCK |
| DGT690024 | 3025896 | 1/2/1998 DOCK LOCK |
| DGT690025 | 3025897 | 1/2/1998 DOCK LOCK |
| DGT690027 | 3025899 | 1/2/1998 SITE SIGN (DELPHI) |
| DGT690028 | 3025900 | 4/1/1998 PERFORATOR LINE UPC |
| DGT690030 | 3025901 | 11/1/1998 LIFT TABLE |
| DGT690031 | 3025902 | 11/1/1998 LIFT TABLE |
| DGT690032 | 3025903 | 11/1/1998 LIFT TABLE |
| DGT690033 | 3025904 | 11/1/1998 NON SLIP FLOOR COATING-EXPANDER&PASTE MACH. AREAS |
| DGT690034 | 3025905 | 11/1/1998 TRANSFORMER |
| DGT690035 | 3025906 | 11/1/1998 LABEL MACHINE |
| DGT690036 | 3025907 | 11/1/1998 ALARMED FEEDER TO FIRE PUMP HOSE |
| DGT690040 | 3025908 | 11/1/1998 AUXILLARY REMOTE FIRE DEPT CONNECTION |
| DGT690041 | 3025909 | 11/1/1998 AUTOMATIC PLATE STACKER SYS W/CONTROLS F/X-MET1 |
| DGT690042 | 3025910 | 11/1/1998 AUTOMATIC PLATE STACKER SYS W/CONTROLS F/X-MET2 |
| DGT690043 | 3025911 | 11/1/1998 AUTOMATIC PLATE STACKER SYS W/CONTROLS F/X-MET3 |
| DGT690044 | 3025912 | 1/2/1998 ROBOT |
| DGT690045 | 3025913 | 1/2/1998 ROBOT |
| DGT690046 | 3025914 | 1/2/1998 ROBOT |
| DGT690047 | 3025915 | 1/2/1998 ROBOT |
| DGT690048 | 3025916 | 11/1/1998 ABB-IRB 6400 ROBOT FOR AUTOMATIC PLATE HANDLING |
| DGT690049 | 3025917 | 11/1/1998 ABB-IRB 6400 ROBOT FOR AUTOMATIC PLATE HANDLING |
| DGT690050 | 3025918 | 11/1/1998 ABB-IRB 6400 ROBOT FOR AUTOMATIC PLATE HANDLING |
| DGT690051 | 3025919 | 11/1/1998 ABB-IRB 6400 ROBOT FOR AUTOMATIC PLATE HANDLING |
| DGT690052 | 3025920 | 1/2/1998 AUTOMATED ORIENTATION ROBOT |
| DGT690053 | 3025921 | 1/2/1998 TITAN CENTRAL CHILL |
| DGT690054 | 3025922 | 1/2/1998 AIR DRYER |

| | | |
|---|---|---|
| DGT690055 | 3025923 | 1/2/1998 AIR DRYER |
| DGT690056 | 3025924 | 11/1/2001 BRIDGE CRANE |
| DGT690057 | 3025925 | 1/1/1999 NEW BRUNSWICK STORM WATER TREATMENT |
| DGT690058 | 3025926 | 11/1/2001 DUST COLLECTION SYSTEM FOR THE X-MET LINE |
| DGT690060 | 3025927 | 11/1/2001 ELECTRICAL DISTRIBUTION SYSTEM FOR THE X-MET LINE |
| DGT690065 | 3025928 | 11/1/2001 COULTER COUNTER PER DAVE MCCORD - MEASURES OXIDE P |
| DGT690068 | 3025929 | 11/1/2001 HEAT SEAL MACHINE #1 |
| DGT690069 | 3025930 | 11/1/2001 HEAT SEAL MACHINE #2 |
| DGT690070 | 3025931 | 11/1/2001 HEAT SEAL MACHINE #3 |
| DGT690071 | 3025932 | 11/1/2001 HEAT SEAL MACHINE #4 |
| DGT690072 | 3025933 | 11/1/2001 CONVERT BOILERS TO-ONLY MARK GOODWIN AUTHORIZATION |
| DGT690073 | 3025934 | 11/1/2001 ACID TANK |
| DGT690074 | 3025935 | 11/1/2001 ACID TANK |
| DGT690075 | 3025936 | 11/1/2001 ACID TANK |
| DGT690076 | 3025937 | 11/1/2001 ACID TANK |
| DGT690077 | 3025938 | 11/1/2001 NEW AIR WASHER FAN - INSTALLED |
| DGT690078 | 3025939 | 11/1/2001 NEW AIR WASHER FAN - INSTALLED |
| DGT690081 | 3025940 | 11/1/2001 BLOWER UNIT FOR AIR WASHER |
| DGT690082 | 3025941 | 1/1/2002 BLOWER UNIT FOR AIR WASHER |
| DGT690111 | 3025942 | 11/1/2001 FEED WATER PUMP #1 IN POWER PLANT |
| DGT690112 | 3025943 | 11/1/2001 FEED WATER PUMP #2 IN POWER PLANT |
| DGT690113 | 3025944 | 11/1/2001 BUSS DUCT UPGRADE |
| DGT690115 | 3025945 | 11/1/2001 FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690116 | 3025946 | 11/1/2001 FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690117 | 3025947 | 11/1/2001 FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690118 | 3025948 | 11/1/2001 FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690119 | 3025949 | 11/1/2001 FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690120 | 3025950 | 11/1/2001 FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690122 | 3025951 | 11/1/2001 SHEET METAL SHEAR |
| DGT690123 | 3025952 | 11/1/2001 SONIC WELDER SYSTEM |
| DGT690124 | 3025953 | 11/1/2001 HIGH VOLTAGE GREEN GRP TEST MACHINE |
| DGT690125 | 3025954 | 11/1/2001 HIGH VOLTAGE GREEN GRP TEST MACHINE |
| DGT690126 | 3025955 | 11/1/2001 AERIAL PLATFORM TRUCK - NEW |
| DGT690129 | 3025957 | 1/1/2002 PHASE II REPAIRS TO FORMATION VENTILATION - PROCES |
| DGT690132 | 3025958 | 11/1/2001 BATTERY LAB AIR CONDITIONER, UPGRADE |
| DGT690134 | 3025959 | 1/1/2002 SEPARATE PROPANE SYSTEMS FOR PROD PROC, PLANT BOIL |
| DGT690135 | 3025960 | 11/1/2001 WALMART J240H T BATTERY, APPLICATOR AND TUBING |
| DGT690136 | 3025961 | 11/1/2001 WALMART J240H T BATTERY, ELECTRICAL CONTROLS |
| DGT690137 | 3025962 | 11/1/2001 WALMART J240H T BATTERY, ELECTRICAL CONTROLS |
| DGT690138 | 3025963 | 11/1/2001 WALMART J240H T BATTERY, ENGINEERING DESIGN |
| DGT690139 | 3025964 | 11/1/2001 WALMART J240H T BATTERY, HOIST |
| DGT690140 | 3025965 | 11/1/2001 LEAD STRIP MILL (FROM MUNCIE) |
| DGT690141 | 3025966 | 11/1/2001 WALMART J240 HT BATTERY, MQ 2 MTL |
| DGT690147 | 3025967 | 11/1/2001 LIFT & ROTATE TABLE # 1 FOR BATTERY PLATE SKIDS |
| DGT690148 | 3025968 | 11/1/2001 LIFT & ROTATE TABLE # 2 FOR BATTERY PLATE SKIDS |
| DGT690149 | 3025969 | 11/1/2001 LIFT & ROTATE TABLE # 3 FOR BATTERY PLATE SKIDS |
| DGT690150 | 3025970 | 11/1/2001 LIFT & ROTATE TABLE # 4 FOR BATTERY PLATE SKIDS |
| DGT690151 | 3025971 | 11/1/2001 LIFT & ROTATE TABLE # 5 FOR BATTERY PLATE SKIDS |
| DGT690152 | 3025972 | 11/1/2001 LIFT & ROTATE TABLE # 6 FOR BATTERY PLATE SKIDS |
| DGT690153 | 3025973 | 11/1/2001 LIFT & ROTATE TABLE # 7 FOR BATTERY PLATE SKIDS |
| DGT690156 | 3025974 | 11/1/2001 LIFT & ROTATE TABLE # 8 FOR BATTERY PLATE SKIDS |
| DGT690157 | 3025975 | 11/1/2001 LIFT & ROTATE TABLE # 9 FOR BATTERY PLATE SKIDS |
| DGT690158 | 3025976 | 11/1/2001 LIFT & ROTATE TABLE # 10 FOR BATTERY PLATE SKIDS |
| DGT690159 | 3025977 | 11/1/2001 LIFT & ROTATE TABLE # 11 FOR BATTERY PLATE SKIDS |
| DGT690160 | 3025978 | 11/1/2001 LIFT & ROTATE TABLE # 12 FOR BATTERY PLATE SKIDS |
| DGT690161 | 3025979 | 11/1/2001 LIFT & ROTATE TABLE # 13 FOR BATTERY PLATE SKIDS |
| DGT690162 | 3025980 | 11/1/2001 LIFT & ROTATE TABLE # 14 FOR BATTERY PLATE SKIDS |
| DGT690163 | 3025981 | 11/1/2001 ACID RECLAIM PUMP # 1 |
| DGT690164 | 3025982 | 11/1/2001 ACID RECLAIM PUMP # 2 |
| DGT690165 | 3025983 | 11/1/2001 WALMART J240HT BATTERY, SCRAP COLLECTION SYSTEM |
| DGT690166 | 3025984 | 11/1/2001 INSTALL EQUIP TRANS FROM TRENTON |
| DGT690168 | 3025985 | 11/1/2001 HOOD FOR OPERATOR QUALITY TESTING EQUIPMENT |
| DGT690169 | 3025986 | 11/1/2001 ACID ABSORPTION TESTER |
| DGT690176 | 3025987 | 11/1/2001 HEAT EXCHANGER FOR WASH TUNNEL - NB |
| DGT690177 | 3025988 | 1/1/2002 PERSONNEL VACUUM SYS. ON CLEAN AREA DOORWAY (1 OF |
| DGT690178 | 3025989 | 11/1/2001 INSTALL HIGH SPEED ROLLUP DOOR TO SHIPPING DEPT |
| DGT690181 | 3025990 | 11/1/2001 REPLACE CHARGE TABLE BLOWER |

30

| | | | |
|---|---|---|---|
| DGT690194 | 3025991 | 11/1/2001 | BOILER CONTROLLER (1 OF 3) |
| DGT690195 | 3025992 | 11/1/2001 | BOILER CONTROLLER (2 OF 3) |
| DGT690196 | 3025993 | 11/1/2001 | BOILER CONTROLLER (3 OF 3) |
| DGT690218 | 3025994 | 1/1/2002 | PERSONNEL VACUUM SYS. IN CLEAN AREA DOORWAY (2 OF |
| DGT690219 | 3025995 | 1/1/2002 | PERSONNEL VACUUM SYS. IN CLEAN AREA DOORWAY (3 OF |
| DGT690220 | 3025996 | 1/1/2002 | PERSONNEL VACUUM SYS. IN CLEAN AREA DOORWAY (4 OF |
| DGT720001 | 3025997 | 4/28/1999 | ACID FILL MACHINE |
| DGT720002 | 3025998 | 4/28/1999 | MOD. TO VR |
| DGT720007 | 3025999 | 4/28/1999 | 50 AMP RECTIFIER |
| DGT720010 | 3026000 | 4/28/1999 | UPDATE STACKER SYSTEM |
| DGT72383 | 3026001 | 11/1/2001 | REBUILD 700 MOLDING MACHINE |
| DGT72395 | 3026002 | 1/1/2002 | CAST ON STRAP CONTROLS |
| DGT72396 | 3026003 | 1/1/2002 | PROPANE BACK UP SYSTEM FOR BOILERS |
| DGT72413 | 3026004 | 1/1/2002 | AUTO PLATE STIELER SYSTEM CONTROLS #4 |
| DGT74405 | 3026005 | 11/1/2001 | ACID FILL/PREWASH MACHINE CELL #1 |
| DGT74406 | 3026006 | 11/1/2001 | ACID MIX SYSTEM CELL #1 |
| DGT74407 | 3026007 | 11/1/2001 | WASHER/DRYER FOR FINISHED BATTERIES CELL #1 |
| DGT74408 | 3026008 | 11/1/2001 | BITROBE HIRATE CELL #1 |
| DGTEX095387D | 3026009 | 11/1/2001 | CAPITALIZABLE MAINTENANCE - RECONDITION I.R. AIR C |
| DGT018263N | 3026024 | 1/1/1979 | CASE GATHERING CONVEYOR |
| DGT018358N | 3026079 | 10/1/1986 | HOT RUNNER CONTROLLER SYSTEM |
| DGT018359N | 3026080 | 10/1/1986 | HOT RUNNER CONTROLLER SYSTEM |
| DGT018360N | 3026081 | 10/1/1986 | HOT RUNNER CONTROLLER SYSTEM |
| DGT018361N | 3026082 | 10/1/1986 | HOT RUNNER CONTROLLER SYSTEM |
| DGT018362N | 3026083 | 10/1/1986 | HOT RUNNER CONTROLLER SYSTEM |
| DGT081436D | 3026331 | 11/1/1974 | STRAP CAST MACHINE |
| DGT081437D | 3026332 | 11/1/1974 | STRAP CAST MACHINE |
| DGT081438D | 3026333 | 11/1/1974 | STRAP CAST MACHINE |
| DGT091798D | 3026399 | 12/1/1977 | CAST ON STRAP MACHINE |
| DGT101707D | 3026558 | 7/1/1985 | STRETCH WRAP MACHINE |
| DGT101750D | 3026598 | 1/1/1988 | OSI OVEN-ENERGY RECOVERY SYSTEM |
| DGT081611D | 3027025 | 4/1/1977 | VACUUM SYSTEM FOR INCAPTULATORS |
| DGT081622D | 3027033 | 7/1/1977 | PLATE ENCAPSULATOR |
| DGT081623D | 3027035 | 7/1/1977 | PLATE ENCAPSULATOR |
| DGT081648D | 3027064 | 8/1/1977 | SPECTROGRAPH |
| DGT081649D | 3027066 | 8/1/1977 | HEAT SEAL MACHINE FINAL |
| DGT081650D | 3027067 | 8/1/1977 | HEAT SEAL MACHINE FINAL |
| DGT081651D | 3027068 | 8/1/1977 | HEAT SEAL MACHINE FINAL |
| DGT081693D | 3027101 | 10/1/1977 | TEMPERATURE CONTROL FOR TERMINAL |
| DGT081705D | 3027112 | 11/1/1977 | FINAL COVER LEAK TEST |
| DGT081743D | 3027130 | 9/1/1978 | BUTT WELDER |
| DGT095750D | 3027192 | 12/1/1976 | X MAT EXPANDING PRESS |
| DGT095758D | 3027208 | 12/1/1976 | PASTE MIXER |
| DGT096940D | 3027221 | 5/1/1972 | WATER CHILLER |
| DGT100166D | 3027229 | 4/1/1977 | TIG BURN MACHINE |
| DGT100357D | 3027246 | 7/1/1977 | EDGE TRIM & CHOPPER UNIT |
| DGT100485D | 3027251 | 9/1/1977 | ENCAPSULATOR |
| DGT100486D | 3027252 | 9/1/1977 | ENCAPSULATOR |
| DGT103764D | 3027269 | 9/1/1978 | GROUP ALIGN CONVEYOR MACHINE |
| DGT103775D | 3027277 | 12/1/1978 | ENCAPSULATION & COLLATION MACHINE |
| DGT103776D | 3027279 | 12/1/1978 | ENCAPSULATION & COLLATION MACHINE |
| DGT103780D | 3027283 | 1/1/1979 | COVER HEAT SEAL |
| DGT103780D01 | 3027284 | 3/1/1979 | TRAILING CHARGE TO TAG #103780D |
| DGT103794D | 3027288 | 4/1/1979 | GREEN GROUP SHORT TEST CONVEYOR #1 |
| DGT103815D | 3027299 | 7/1/1979 | STRAP CAST STATION |
| DGT103833D | 3027307 | 10/1/1979 | WATER CHILLER-15 TON |
| DGT103848D | 3027313 | 12/1/1979 | DC DC MODULE |
| DGT103849D | 3027314 | 12/1/1979 | DC DC MODULE |
| DGT103850D | 3027315 | 12/1/1979 | DC DC MODULE |
| DGT103851D | 3027316 | 12/1/1979 | DC DC MODULE |
| DGT103852D | 3027317 | 12/1/1979 | DC DC MODULE |
| DGT103853D | 3027318 | 12/1/1979 | DC DC MODULE |
| DGT103854D | 3027319 | 12/1/1979 | DC DC MODULE |
| DGT103856D | 3027321 | 12/1/1979 | DC DC MODULE |
| DGT103857D | 3027322 | 12/1/1979 | DC DC MODULE |
| DGT103907D | 3027345 | 11/1/1982 | WATER CHILLER |
| DGT103933D | 3027353 | 9/1/1983 | HEAT TREAT FURNACE |

| | | | |
|---|---|---|---|
| DGT104743D | 3027392 | 6/1/1980 | BRANSON WELD UNIT |
| DGT107507D | 3027402 | 1/1/1986 | DUST COLLECTOR |
| DGT107566D | 3027438 | 3/1/1990 | EKG MACHINE |
| DGT107586D | 3027452 | 1/1/1991 | GMF ROBOT FOR C.O.S. LINE |
| DGT107588D | 3027454 | 6/1/1991 | JWI LEAD FILTER PRESS |
| DGT107609D | 3027463 | 1/1/1992 | LEBLOND MAKINO LATHE |
| DGT107619D | 3027469 | 2/1/1992 | DIGITAL READOUT FOR LEBLOND LATHE |
| DGT107621D | 3027470 | 4/1/1992 | TEMP CONTROLLER FOR MOLD MACH |
| DGT107636D | 3027479 | 4/1/1994 | SATELLITE SPIROMETER |
| DGT107647D | 3027487 | 1/1/1994 | CHILLER SYSTEM FOR #2 LEAD STRIP |
| DGT107678D | 3027499 | 7/1/1995 | SPRAYMATION HOT MELT EQUIPMENT |
| DGT107698 | 3027515 | 6/30/1997 | DIELECTRIC TEST CONTROL |
| DGT107700 | 3027517 | 7/31/1997 | AUTO OFF |
| DGT107723B | 3027544 | 6/1/1999 | FORMATION TABLE SYSTEM |
| DGT107731 | 3027549 | 11/1/2001 | LIFT TABLE FOR PLATES |
| DGT107732 | 3027550 | 11/1/2001 | LIFT TABLE FOR PLATES |
| DGT107733 | 3027551 | 11/1/2001 | LIFT TABLE FOR PLATES |
| DGT107734 | 3027552 | 11/1/2001 | LIFT TABLE FOR PLATES |
| DGT107735 | 3027553 | 11/1/2001 | LIFT TABLE FOR PLATES |
| DGT107736 | 3027554 | 11/1/2001 | LIFT TABLE FOR PLATES |
| DGT107744 | 3027559 | 4/1/2000 | TOP TERMINAL TIG WELDER |
| DGT600015 | 3027596 | 11/1/2001 | 44 X 52 4000LB CAPACITY SCISSOR LIFT |
| DGT600016 | 3027597 | 11/1/2001 | 44 X 55 4000LB CAPACITY SCISSOR LIFT |
| DGT600017 | 3027598 | 11/1/2001 | 44 X 52 4000LB CAPACITY SCISSOR LIFT |
| DGT600018 | 3027599 | 11/1/2001 | 44 X 52 4000LB CAPACITY SCISSOR LIFT |
| DGT600019 | 3027600 | 11/1/2001 | 44 X 52 4000LB CAPACITY SCISSOR LIFT |
| DGT600020 | 3027601 | 11/1/2001 | 44 X 52 4000LB CAPACITY SCISSOR LIFT |
| DGT600043 | 3027617 | 11/1/2001 | SEPERATOR ROLL LIFT, JIB CRANE, AND HOIST |
| DGT600044 | 3027618 | 11/1/2001 | SEPERATOR ROLL LIFT, JIB CRANE AND HOIST |
| DGT600045 | 3027619 | 11/1/2001 | PROTOTYPE WATER BATH FORMATION SYSTEM |
| DGT600049 | 3027622 | 11/1/2001 | FORMATION CHARGING TABLE #3 |
| DGT600056 | 3027625 | 11/1/2001 | ROBOT TO LOAD BATTERY GROUPS INTO CAST-ON-STRAP MA |
| DGT600106 | 3027656 | 11/1/2001 | WALMART J240HT BATT, SCRAP COLLECTION SYSTEM |
| DGT690101 | 3051124 | 9/11/2002 | SEPARATOR LIFTING JIB CRANE AND HOIST |
| DGT690099 | 3051125 | 9/11/2002 | DELPHI MACHINE TO TEST BATTERY CELLS FOR SHORTS |
| DGT690097 | 3051126 | 9/11/2002 | DELPHI WATER COOLING STATION |
| DGT690095 | 3051127 | 9/11/2002 | DELPHI STRETCH/PERFORATE MACHINE |
| DGT690094 | 3051128 | 9/11/2002 | DELPHI GROUP LOADING MACHINE STATION |
| DGT690093 | 3051129 | 9/11/2002 | DELPHI TOP TERMINAL COVER SPIN MACHINE |
| DGT690092 | 3051130 | 9/11/2002 | DELPHI GROUP LOADING MACHINE STATION |
| DGT690102 | 3051131 | 9/11/2002 | SEPARATOR LIFTING JIB CRANE AND HOIST |
| DGT690187 | 3051132 | 9/11/2002 | (#6) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690186 | 3051133 | 9/11/2002 | (#5) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690185 | 3051134 | 9/11/2002 | (#4) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690184 | 3051135 | 9/11/2002 | (#3) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690183 | 3051136 | 9/11/2002 | (2) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690182 | 3051137 | 9/11/2002 | (#1) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690103 | 3051138 | 9/11/2002 | FILTRATION SYSTEM FOR CHILLED WATER SUPPLY |
| DGT690212 | 3051139 | 9/11/2002 | WELDER #8 |
| DGT690211 | 3051140 | 9/11/2002 | WELDER #7 |
| DGT690210 | 3051141 | 9/11/2002 | WELDER #6 |
| DGT690209 | 3051142 | 9/11/2002 | WELDER #5 |
| DGT690208 | 3051143 | 9/11/2002 | WELDER #4 |
| DGT690207 | 3051144 | 9/11/2002 | WELDER #3 |
| DGT690206 | 3051145 | 9/11/2002 | WELDER #2 |
| DGT690213 | 3051146 | 9/11/2002 | WELDER #9 |
| DGT690083 | 3051147 | 9/11/2002 | BIG JOE LIFT TRUCK (REV. 1) |
| DGT105901 | 3051148 | 9/11/2002 | REPLACE HEAT SEALER |
| DGT105900 | 3051149 | 9/11/2002 | FIRE PTOTECTION FOR GREEN GROU/ VACUUM EXHAUSTER |
| DGT105896 | 3051150 | 9/11/2002 | REPLACE HEAT SEALERS |
| DGT690216 | 3051151 | 9/11/2002 | WELDER #12 |
| DGT690215 | 3051152 | 9/11/2002 | WELDER #11 |
| DGT690214 | 3051153 | 9/11/2002 | WELDER #10 |
| DGT690188 | 3051154 | 9/11/2002 | DELPHI MACHINE TO ALIGN TOP TERMINAL POSTS |
| DGT105910 | 3051170 | 9/11/2002 | RE ROUTE STORM OUTFALL |
| 72414 | 3051171 | 9/11/2002 | VACUUM EXHAUSTER |
| 72393 | 3051172 | 9/11/2002 | REBUILD TWO CHANGE TABLE |

| | | | |
|---|---|---|---|
| DGT690202 | 3051173 | 9/11/2002 | WATER CONSERVATION SYSTEM FOR BATTERY WASHER |
| DGT690191 | 3051174 | 9/11/2002 | MISC CONVEYORS FOR LAYOUT CHANGES TO GRN GRP LEAN |
| DGT690190 | 3051175 | 9/11/2002 | VENTILATION COLLECTOR FAN FOR GREEN GROUP LEAN CEL |
| 72370 | 3051176 | 9/11/2002 | FIRE PROTECTION UPGRADE |
| DGT690109 | 3051182 | 9/11/2002 | ROBOT TO LOAD BATTERY GROUPS INTO CAST-ON-STRAP MA |
| DGT690205 | 3051183 | 9/11/2002 | WELDER #1 |
| DGT690130 | 3051209 | 9/11/2002 | LINE INSTALL COSTS FOR MQ 1 VALIDATION |
| DGT690121 | 3051210 | 9/11/2002 | DELPHI LEAN COVER TO CASE HEAT SEAL MACHINE |
| DGT690108 | 3051211 | 9/11/2002 | INTER. COVER AIR CHECK MACHINE |
| DGT690107 | 3051212 | 9/11/2002 | GROUP HOTMELT MACHINE |
| DGT690106 | 3051213 | 9/11/2002 | TOP TERMINAL HOTMELT MACHINE |
| DGT690104 | 3051214 | 9/11/2002 | DELPHI CAST-ON-STRAP MACHINE REBUILD OF DGS0099445 |
| DGT890096 | 3051215 | 9/11/2002 | DELPHI SINGLE HEAD EF WELDER MACHINE |
| DGT690131 | 3051216 | 9/11/2002 | PRODUCTIVE MTL FOR MQ 1 VALIDATION |
| DGT690203 | 3051217 | 9/11/2002 | XMET PASTE MIXER #1 UPGRADE (REPLACES DGT100297D) |
| DGT690174 | 3051218 | 9/11/2002 | #2 DR2-NB ENCAPSULATION/COLLATION MACHINE |
| DGT690173 | 3051219 | 9/11/2002 | #1 DR2-NB ENCAPSULATION/COLLATION MACHINE |
| DGT690144 | 3051220 | 9/11/2002 | UPGRADE BATTERY ACID RETENTION & DIST-TANK & COOLI |
| DGT690143 | 3051221 | 9/11/2002 | UPGRADE BATTERY ACID RETENTION & DIST-CONSTR & INS |
| DGT690142 | 3051222 | 9/11/2002 | UPGRADE BATTERY ACID RETENTION & DIST & ACID HOUSE |
| DGT690133 | 3051223 | 9/11/2002 | NFPA VENTING ON PROPANE REGULATORS |
| DGT690087 | 3051228 | 9/11/2002 | DELPHI LEAN TOP TERMINAL TIG WELDER |
| DGT690086 | 3051229 | 9/11/2002 | DELPHI LEAN SIDE TERMINAL TIG WELDER |
| DGT056948 | 3051230 | 9/11/2002 | OXIDE GRINDER CONTROL PANEL REBUILT |
| DGT72373 | 3051408 | 9/25/2002 | replace sulfuric acid tank |
| DGT72387 | 3051409 | 9/25/2002 | new brunswick security upgrade |
| DGT600175 | 3115835 | 2/10/2003 | #5 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600174 | 3115836 | 2/10/2003 | #4 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600173 | 3115837 | 2/10/2003 | #3 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600172 | 3115838 | 2/10/2003 | #2 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600171 | 3115839 | 2/10/2003 | #1 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600176 | 3115841 | 2/10/2003 | #6 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600178 | 3115842 | 2/10/2003 | LOAD STATION & MAGAZINE FOR ROBOT LOAD |
| DGT600170 | 3115843 | 2/10/2003 | ABB ROBOTS (4 OF 4) |
| DGT600169 | 3115844 | 2/10/2003 | ABB ROBOTS (3 OF 4) |
| DGT600168 | 3115845 | 2/10/2003 | ABB ROBOTS (2 OF 4) |
| DGT600167 | 3115846 | 2/10/2003 | ABB ROBOTS (1 OF 4) |
| DGT600177 | 3115848 | 2/10/2003 | CONVEYORS FOR DR3 |
| DGT600126 | 3115866 | 2/11/2003 | #2 DR2-AN ENCAPSULATION/COLLATION MACHINE |
| DGT600125 | 3115867 | 2/11/2003 | #1 DR2-AN ENCAPSULATION/COLLATION MACHINE |
| DGT600060 | 3115887 | 2/12/2003 | INTERMEDIATE COVER. ASSY. MACHINE FOR MARINE |
| DGT600203 | 3115900 | 2/12/2003 | FORMATION TABLE #2 |
| DGT600193 | 3115907 | 2/12/2003 | OPERATOR ASSIST FOR DR-3 (1 OF 2)GREEN GROUP LEAN |
| DGT600194 | 3115908 | 2/12/2003 | OPERATOR ASSIST FOR DR-3 (2 OF 2)GREEN GROUP LEAN |
| DGT600075 | 3115918 | 2/12/2003 | HI VOLTAGE GREEN GROUP SHORT CHECK- MISC GREEN GRP |
| DGT600229 | 3117571 | 5/22/2003 | LIFT ASSIST FOR DR-3 |
| DGT600230 | 3117572 | 5/22/2003 | LIFT ASSIST FOR DR-3 |
| DGT600231 | 3117573 | 5/22/2003 | LIFT ASSIST FOR DR-3 |
| DGT600204 | 3117578 | 5/22/2003 | CONVEYOR SYSTEM FOR MISC LINE DR-3 |
| DGT600213 | 3117580 | 5/22/2003 | CONVEYER FOR DR-3 #3&4 ON MISC. LINE |
| DGT690276 | 3151172 | 9/23/2003 | BUSS DUCT FOR 1203 |
| DGT690180 | 3151173 | 9/23/2003 | BACKFLOW PREVENTORS ON WATER MAINS |
| DGT690267 | 3151174 | 9/23/2003 | NEW PROCESS BOILER FOR PLATE STEAM HOODS |
| DGT690262 | 3151175 | 9/23/2003 | INSTALL NATURAL GAS LINE IN PLANT |
| DGT690260 | 3151183 | 9/23/2003 | GRAPHITE HEAT EXCHANGER FOR ACID HOUSE |
| DGT690263 | 3151189 | 9/23/2003 | LIFT PUMP #1 |
| DGT690259 | 3151190 | 9/23/2003 | CHARGE TABLE 25 |
| DGT690258 | 3151191 | 9/23/2003 | CHARGE TABLE 24 |
| DGT690236 | 3151192 | 9/23/2003 | NEW CHARGE TABLE |
| DGT690235 | 3151193 | 9/23/2003 | NEW CHARGE TABLE |
| DGT690224 | 3151194 | 9/23/2003 | INSTALLATION OF MAJOR MECHANICAL,VENTILATION,ELECT |
| DGT690222 | 3151195 | 9/23/2003 | DESIGN OF NEW CHARGE TABLE VENTILATION |
| DGT690265 | 3151196 | 9/23/2003 | LIFT PUMP #2 |
| DGT695033 | 3152528 | 10/17/2003 | PASTE MIXER BOWL |
| DGT690230 | 3153273 | 11/22/2003 | LUG FORM PILOTED DIE (XMET LINE 3) |
| DGT690229 | 3153274 | 11/22/2003 | LUG FORM CUT-OFF MACHINE (XMET LINE 2) |
| DGT690204 | 3153275 | 11/22/2003 | BAR CODE ERROR PROOFING PROJECT |

33

| | | | |
|---|---|---|---|
| DGT690193 | 3153276 | 11/22/2003 | STATION TO REMOVE FORMATION CHARGE SPOOLS |
| DGT690283 | 3153277 | 11/22/2003 | HEAT SEAL MACHINE |
| DGT690234 | 3153278 | 11/22/2003 | REFURBISH SIDE TERMINAL PLACEMENT MACHINE |
| DGT690233 | 3153279 | 11/22/2003 | REFURBISH TOP TERMINAL PLACEMENT MACHINE |
| DGT690231 | 3153280 | 11/22/2003 | NEW SCRAP CONVEYOR (XMET LINE 4) |
| DGT690228 | 3153281 | 11/22/2003 | PASTE BOX & RAILS (XMET LINE 1) |
| DGT690232 | 3153282 | 11/22/2003 | NEW STRIP WIDTH GAGE (XMET LINE 5) |
| DGT695034 | 3153284 | 11/22/2003 | OIL PURIFICATION SYSTEM |
| DGT690261 | 3153285 | 11/22/2003 | BUFFER CONVEYOR FOR MISC LINE |
| DGT690257 | 3153286 | 11/22/2003 | CONTROLS SYS FOR CUTTING ON THE GRID FUNCTIONS |
| DGT890256 | 3153287 | 11/22/2003 | VISION SYS FOR NO SPIN CONDITION AND SPOT FACE QUA |
| DGT690255 | 3153288 | 11/22/2003 | SPARE EQUIPMENT TO CUT ON GRID JUNCTIONS (XMET) |
| DGT690254 | 3153289 | 11/22/2003 | SCRAP SYSTEM FOR PHASE 1 TO CUT ON GRID JUNCTIONS |
| DGT690253 | 3153290 | 11/22/2003 | NEW ACID FILL FOR MAIN LINE (WATERFALL) |
| DGT690226 | 3153291 | 11/22/2003 | NEW WASHER AND DRYER FOR MAIN LINE |
| DGT690155 | 3153301 | 11/22/2003 | POWER TRANSFORMER # 4 FOR LIFT AND ROTATE TABLES |
| DGT690154 | 3153302 | 11/22/2003 | POWER TRANSFORMER # 3 FOR LIFT AND ROTATE TABLES |
| DGT690146 | 3153303 | 11/22/2003 | POWER TRANSFORMER # 2 FOR LIFT AND ROTATE TABLES |
| DGT690145 | 3153304 | 11/22/2003 | POWER TRANSFORMER # 1 FOR LIFT AND ROTATE TABLES |
| DGT690067 | 3153306 | 11/22/2003 | OXIDE EQUIPMENT UPG (REACTOR CONTROLS) |
| DGT105892A | 3153307 | 11/22/2003 | HOT MELT EQUIPMENT (REBUILD) |
| DGT095660E | 3153308 | 11/22/2003 | REFURBISH #2 HEAT SEAL MACHINE |
| DGT095659E | 3153309 | 11/22/2003 | REFURBISH #2 HEAT SEAL MACHINE |
| DGT600124 | 3153354 | 11/25/2003 | CONTROLLER FOR TIG WELDER |
| DGT600123 | 3153355 | 11/25/2003 | CONTROLLER FOR TIG WELDER |
| DGT600046 | 3153358 | 11/25/2003 | GROUP CONVEYOR SYSTEM |
| DGT012095O | 3190741 | 1/31/2004 | CAPITALIZE REBUILT COST (SUBMERSIBLE HEATERS LINDB |
| DGT690227 | 3190742 | 1/31/2004 | SLURRY ROOM EQUIPMENT TO RECLAIM PASTE |
| DGT690278 | 3190743 | 1/31/2004 | HOT MELT MACHINE OVERHAUL |
| DGT690192 | 3190744 | 1/1/2004 | AUTOMATED ASSEMBLY CELL FOR CASES & TERMINAL ASSY' |
| DGT690250 | 3190745 | 1/31/2004 | AIR LEAK TEST MACHINE |
| DGT690273 | 3190750 | 1/31/2004 | OXIDE DELIVERY SYSTEM |
| DGT690277 | 3190751 | 1/31/2004 | INSULATOR DETECTION SYSTEM - MAINLINE |
| DGT690279 | 3190752 | 1/31/2004 | INSULATOR DETECTION SYSTEM - MISC LINE |
| DGT690222 | 3190754 | 2/24/2004 | #9 DR-3 ENCAPSULATION COLOLATION MACHINE |
| DGT690264 | 3190755 | 1/31/2004 | AUTOMATIC INSULATOR INSERTER FOR SATURN BATTERY |
| DGT690266 | 3190756 | 1/31/2004 | MACHINE TO INSTALL INSULATOR UNDER SIDE TERMINAL S |
| DGT690269 | 3190757 | 1/1/2004 | HIGH RATE MACHINE BASE |
| DGT690270 | 3190758 | 1/31/2004 | BITRODE VRL HIGH RATE |
| DGT690271 | 3190759 | 1/31/2004 | BITRODE VRL HIGH RATE LOAD |
| DGT600217 | 3190800 | 2/24/2004 | LOAD STATION & MAGAZINE FOR ROBOT LOAD |
| DGT600239 | 3190808 | 2/24/2004 | CONVEYOR FOR DR-3 |
| DGT600223 | 3191600 | 3/30/2004 | #10 DR-3 ENCAPSULATION COLLATION MACHINE |
| DGT600237 | 3191601 | 3/30/2004 | BATTERY CHARGE TABLE #4 |
| DGT600236 | 3191602 | 3/30/2004 | BATTERY CHARGE TABLE #3 |
| DGT600235 | 3191610 | 3/30/2004 | BATTERY CHARGE TABLE #2 |
| DGT600234 | 3191618 | 3/30/2004 | BATTERY CHARGE TABLE #1 |
| DGT690258A | 3192185 | 4/30/2004 | CHARGE TABLE 24 |
| DGT690259A | 3192186 | 4/30/2004 | CHARGE TABLE 25 |
| DGT004779N05 | 3193545 | 1/1/2004 | GENERAL SPENDING FOR MISC. PURCHASES - DESIGN, OUT |
| DGT012175N04 | 3193546 | 6/29/2004 | UPGRADE FIRE LOOP AT PLANT |
| DGT690272 | 3193547 | 1/1/2004 | HEATING SYSTEM FOR PLANT FOR 350000 CFM |
| DGT000254 | 3195184 | 9/16/2004 | RECTIFIER CABINET |
| DGT000255 | 3195185 | 9/16/2004 | RECTIFIER CABINET |
| DGT000256 | 3195186 | 9/16/2004 | RECTIFIER CABINET |
| DGT000257 | 3195187 | 9/16/2004 | RECTIFIER CABINET |
| DGT098361D03 | 3215010 | 11/30/2004 | ADDL CHG(700 T MOLDING MACH) |
| DGT690104A | 3215013 | 11/30/2004 | 007797 - DELPHI CAST-ON-STRAP M |
| DGT690295 | 3215132 | 12/1/2004 | LASER DATE CODE |
| DGT690296 | 3215133 | 12/1/2004 | TOP TERMINAL VISION SYSTEM 66 CELL |
| DGT690288 | 3220272 | 2/17/2005 | 48 HOUR STAND PROCESS LIFT TABLE EQUIPMENT |
| DGT690289 | 3220273 | 2/17/2005 | 48 HOUR STAND PROCESS SPOTFACE MACHINE |
| DGT690290 | 3220274 | 2/17/2005 | 48 HOUR STAND PROCESS TOPTIER MACHINE |
| DGT690297 | 3220275 | 2/17/2005 | AFTERMARKET LINE AHERN-SOPER LABEL ERROR PROOF |
| DGT690298 | 3220276 | 2/17/2005 | MAIN LINE AHERN-SOPER LABEL ERROR PROOF |
| DGT116709 | 3220311 | 1/1/2005 | VRL #2 |
| DGT1116710 | 3220312 | 1/1/2005 | LASER DATE CODE #2 |

| | | | |
|---|---|---|---|
| DGT690096A | 3220661 | 3/14/2005 | UPGRADE DELPHI SINGLE HEAD EF WELDER MACHINE |
| DGT690108A | 3220663 | 3/2/2005 | INTERMEDIATE COVER AIR CHECK MACHINE |
| DGT690121A | 3220664 | 3/2/2005 | LEAN COVER TO CASE HEAT SEAL MACHINE |
| DGT690301 | 3220665 | 3/2/2005 | DR3 PLATE LIFTS |
| DGT690287 | 3220669 | 2/17/2005 | 48 HR STAND PROCESS STORAGE EQUIP |
| DGT690307 | 3222009 | 1/1/2005 | INSTALL DATRONICS INKJET SYSTEM |
| DGT690043A | 3222460 | 5/9/2005 | PLATE STACKER EQUIPMENT UPGRADE |
| DGT690188A | 3222463 | 5/9/2005 | TOP POST ALIGNMENT EQUIPMENT UPGRADE |
| DGT690173A | 3222466 | 5/9/2005 | #1 DR2 ENCAPSULATOR/COALATOR |
| DGT690299 | 3223037 | 6/14/2005 | New Xmet Underground Scrap Conveyor |
| DGT690285 | 3223038 | 6/14/2005 | SODIUM SULFATE DISPENSING SYSTEM EQUIPMENT |
| DGW690314 | 3223256 | 7/19/2005 | MAIN LINE INCLINED CONVEYOR |
| DGT690293 | 3223278 | 7/20/2005 | AUTO INSULATOR INSERTION MACH - MAIN LINE |
| DGT690294 | 3223279 | 7/20/2005 | AUTO INSULATOR INSERTION MACH-MISC LINE |
| DGT012161N01 | 3223280 | 7/20/2005 | INSTALL BAFFLES IN FORMATION TABLES |
| DGT690310 | 3223281 | 7/20/2005 | WIRE BRUSH STATION-HONDA/TOYOTA LINE |
| DGT690317 | 3223282 | 7/20/2005 | VRL REJECT PRINTER FOR HONDA/TOYOTA LINE |
| DGT690309 | 3223283 | 7/20/2005 | VCI APPLICATOR FOR HONDA/TOYOTA LINE |
| DGT105866D | 3223831 | 1/30/1995 | ICE MAKER |
| DGT690302 | 3223862 | 8/24/2005 | ROBOTIC LOAD EQUIP FOR COS MACHINE |
| DGT690311 | 3223863 | 8/24/2005 | CONTROLS FOR COS - DR3 PROJECT |
| DGT690286 | 3223958 | 8/26/2005 | OXIDE REACTOR #5 |
| DGT690324 | 3223959 | 8/26/2005 | OXIDE REACTOR #6 |
| DGT690282 | 3224765 | 9/29/2005 | 007651 - FORMATION TEMPERATURE MONITORING SYSTEM |
| DGT690305 | 3224771 | 9/29/2005 | ROBOT GUARDING SYSTEM #1 |
| DGT690325 | 3224775 | 9/29/2005 | ROBOT GUARDING SYSTEM #2 |
| DGT690326 | 3224776 | 9/29/2005 | ROBOT GUARDING SYSTEM #3 |
| DGT690327 | 3224777 | 9/29/2005 | ROBOT GUARDING SYSTEM #4 |
| DGT690328 | 3224778 | 9/29/2005 | ROBOT GUARDING SYSTEM#5 |
| DGT690329 | 3224779 | 9/29/2005 | ROBOT GUARDING SYSTEM#6 |
| DGT690318 | 3225240 | 10/17/2005 | PACKOUT LEVELATOR FOR HONDA/TOYOTA LINE |
| DGT690323 | 3225241 | 10/17/2005 | HONDA/TOYOTA FINISHING LINE MATL |
| DGT690303 | 3225242 | 10/17/2005 | INSTALL FINAL COVER PLACER SYSTEM |
| DGT690315 | 3226228 | 11/29/2005 | MISC LINE TUNNEL STRUCTURE |
| DGT690312 | 3226231 | 11/29/2005 | CONTROLS FOR DR3 CONVEYORS |
| DGT690316 | 3226243 | 11/29/2005 | MISC LINE DR3 CONVEYOR |
| DGT690304 | 3226254 | 11/29/2005 | GROUP CONVEYOR SYSTEM DR3'S TO ROBOTS - MAIN LINE |
| DGT690330 | 3226402 | 11/29/2005 | OSHAWA VRL SCRAP SAW |
| DGT690331 | 3226403 | 11/29/2005 | OSHAWA BITRODE UNIT |
| DGT690332 | 3226404 | 11/29/2005 | OSHAWA HONDA BANDER SYSTEM-SURPLUS |
| DGT690308 | 3226436 | 12/19/2005 | DR#3 CAMCO UNIT 1 OF 3 |
| DGT690334 | 3226437 | 12/19/2005 | DR#3 CAMCO UNIT 2 OF 3 |
| DGT690335 | 3226438 | 12/19/2005 | DR#3 CAMCO UNIT 3 OF 3 |
| DGT690333 | 3227473 | 1/1/2006 | OSHAWA INSPECTION VISION SYSTEM |
| DGT690322 | 3227475 | 1/1/2006 | A BRADLEY CONTROLS FOR XMET LINE #4-MTL |
| DGT105866D | 5000713 | 10/1/1994 | GM TKS INFORMATION CENTER |
| DGT105866D01 | 5000714 | 1/1/1995 | TRAILING CHARGES TO TAG #105866D |

See Exhibit 1.21 for Real Property address

**EXHIBIT 1.1(vi)**
**EXCLUDED RAW MATERIALS**

Excluded raw materials Inventory includes the following parts numbers:

| Raw Materials | Part Number |
| --- | --- |
| PURE LEAD (red +) | 9599001 |
| ALUMINUM (white +) | 9692001 |
| CALCIUM | 9680001 |
| 3% ANT LEAD | 9595001 |
| 100 % TIN | 9681001 |
| Polypropylene | 9528001 |
| HOT MELT-1213 | 9521001 |
| DR4 EXPANDER | 9672025 |
| DR25 EXPANDER | 19060890 |
| POS GMX T/T BUSHING | 19062042 |
| NEG GMX T/T BUSHING | 19062043 |
| POS T/T BUSHING | 10457694 |
| NEG T/T BUSHING | 10457695 |
| HI-TEMP SIDE TERM | 19057272 |
| LEAD RING | 19057273 |
| CHROMA COLOR | 9515001 |
| RUBBER O-RING SEAL | 19057274 |
| 4.6 CRYSTEX PAPER | 9661046 |
| 3.5 CRYSTEX PAPER | 9661035 |
| 4.1 CRYSTEX PAPER | 9661041 |
| 3.75 CRYSTEX PAPER | 19060891 |
| LEXAN STRIP | 9574002 |
| 660 SEPARATOR | 10457660 |
| 658 SEPARATOR | 10457658 |
| 196 SEPARATOR | 19065196 |
| 889 SEPARATOR | 19060889 |
| DYNEL FIBER | 9502001 |
| SODIUM | 9448001 |
| TERMINAL SHEILDS | 10496263 |
| WAFER INSULATOR | 10454924 |
| INSULATOR ROLL | 19065509 |
| FLAME ARRESTORS | 1892323 |
| 10" Interm Cover - | 10472239 |
| 9" Interm Cvr | 10472230 |
| 9" Interm Cvr | 10472231 |
| 9" Interm Cvr | 10472233 |
| 9" Interm Cvr | 10472235 |

36

| | |
|---|---|
| 9" Interm Cvr | 10472236 |
| 9" Interm Cvr | 10472229 |
| 10" Interm Cover - | 10472241 |
| 10" Interm Cover - | 10472240 |
| 10" Interm Cover - | 10472243 |
| 10" Interm Cover - | 10472245 |
| 10" Interm Cover - | 10472238 |

## EXHIBIT 1.11

Raw Materials (direct materials) included in the Acquired Assets

| Raw Materials | Part Number | STP Qty | UM | Unit | Minimum Inventory |
|---|---|---|---|---|---|
| ACID | 9402001 | 45,000 | LB | 1 Tank | 860,000 |
| HYDROMETERS 1124 | 10491124 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 5478 | 10495478 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 2595 | 10492595 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 8954 | 10498954 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 8957 | 10498957 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 7495 | 19057495 | 1,400 | Pcs | Box | 5 |
| SLIPSHEETS- | 39"X45" | 300 | Pcs | 1 Pallet | 8 |
| SLIPSHEETS- | 42"X48" | 300 | Pcs | 1 Pallet | 5 |
| HONEYCOMB- | 37"x44"x1.5 | 29 | Pcs | 1 Pallet | 16 |
| HONEYCOMB- | 42"x44"x1 | 45 | Pcs | 1 Pallet | 6 |
| 13" SHRINKWRAP | 10457753 | 1,368 | LB | 1 Pallet | 3 |
| 12" SHRINKWRAP | 10453144 | 1,404 | LB | 1 Pallet | 3 |
| 11" SHRINKWRAP | 10457752 | 1,053 | LB | 1 Pallet | 1 |
| 10" HANDLE | 10457298 | 5,640 | Pcs | 1 Pallet | 3 |
| 9" HANDLE | 10457299 | 5,640 | Pcs | 1 Pallet | 3 |
| 8" HANDLE | 10457297 | 5,640 | Pcs | 1 Pallet | 1 |
| NEG SIDE TERMINAL CAP | 10467094 | 4,280 | Pcs | Crate | 10 |
| POS SIDE TERMINAL CAP | 10489952 | 4,280 | Pcs | Crate | 10 |
| TOP TERMINAL CAP | 10471203 | 2,000 | Pcs | Crate | 12 |
| TOP TERMINAL CAP | 10471204 | 2,000 | Pcs | Crate | 12 |
| TERMINAL ADAPTORS | 10469296 | 1,080 | Pcs | Box | 3 |
| HOT MELT-1246 | 9462001 | 31 | LB | Box | 2 |
| 083 FOAM BLOCK | 275083 | 2,310 | Pcs | 1 Pallet | 2 |
| 313 CARTON | 10468313 | 1,000 | Pcs | 1 Pallet | 1 |
| 325 CARTON | 10468325 | 1,200 | Pcs | 1 Pallet | 1 |
| 327 CARTON | 10468327 | 1,000 | Pcs | 1 Pallet | 1 |
| 073 CARTON | 10474073 | 1,000 | Pcs | 1 Pallet | 1 |
| 072 CARTON | 10474072 | 1,000 | Pcs | 1 Pallet | 1 |
| 561 CARTON | 10489561 | 1,000 | Pcs | 1 Pallet | 1 |
| AC DELCO PLACARD | 10457751 | 4,000 | Pcs | Box | 8 |
| BU DELPHI PLACARD | 10450883 | 4,000 | Pcs | Box | 2 |
| GMX Interm Cvr | 19063666 | 1320 | Pcs | Pallet | 6 |
| GMX Final Cvr | 19063668 | 4224 | Pcs | Pallet | 2 |

**EXHIBIT 1.13**

**IUE CONSENT**

**IUE-CWA - DELPHI**
**MEMORANDUM OF AGREEMENT**
**REGARDING THE SALE OF**
**DELPHI NEW BRUNSWICK OPERATIONS AND**
**SPECIAL ATTRITION PROGRAM**

MEMORANDUM OF AGREEMENT entered into this 25ᵗʰ day of May, 2006 between Delphi Corporation ("Delphi") and the International Union, IUE-CWA and IUE-CWA Local 416 (collectively the "IUE-CWA" or the "Union").

WHEREAS, effective August 1, 2006, Delphi seeks to sell its New Brunswick, New Jersey Operations to Johnson Controls, Inc. ("JCI") as an ongoing business consistent with the terms of this Memorandum of Agreement; and

WHEREAS, pursuant to the "Sale of Business" letter attached to the 2003 IUE-CWA-Delphi National Agreement as Document 7, JCI is required to assume the applicable terms of the 2003 IUE-CWA-Delphi National Agreement and to otherwise assume the Local Agreements with respect to New Brunswick; and

WHEREAS, it is the intent of the parties and the purpose of this Memorandum to establish a Special Attrition Program for all but 100 employees of the New Brunswick bargaining unit identified in accordance with seniority and plant staffing requirements and to transfer to JCI approximately 100 of the current Delphi bargaining unit members at the established New Brunswick Tier III rate and JCI benefit level.    Therefore, the parties agree as follows:

      1.    The IUE-CWA agrees that:

          A.    Document 63 of the 2003 IUE-CWA-Delphi National Agreement is waived as to the sale of the New Brunswick Operations to JCI pursuant to the "New Brunswick Put and Call Agreement" between Delphi and JCI dated June 30, 2005;

          B.    JCI is not required to assume any contractual neutrality obligations collectively bargained by Delphi and the IUE-CWA; and

          C.    The International Union, IUE-CWA and Local 416 will continue to discuss Local Agreement modifications aimed at obtaining agreement on wage, benefits and work practices comparable to JCI's existing IUE-CWA bargaining agreements at JCI's St. Joseph, Missouri and Geneva, Illinois sites.

      2.    Delphi and the IUE-CWA agree on the following Special Attrition Program for all New Brunswick employees on active or on leave status with more than one year of seniority as of 8/1/06 and those employees in protected status assigned to the New Brunswick Operations who, except as to option 2.E. below, are participants in the Delphi Hourly-Rate Employees Pension Plan ("Delphi HRP"). Such employee may select one of the options set forth in clauses A through E below, as applicable to such employee:

          A.    If eligible to retire as of 8/1/06, retire as follows:

               (i)    $35,000, less applicable withholdings, for normal or early voluntary retirement (85 points 30 and out, 60 years old with 10 years or more years of credited service) retroactive to October 1, 2005; or

               (ii)    50 & 10 Mutually Satisfactory Retirement (MSR).

B.     Any employee with at least 27 and less than 30 years of credited service regardless of age will be eligible for special voluntary placement in a pre-retirement program under the following terms:

(i)     Employees electing this pre-retirement program must be eligible no later than August 1, 2006.

(ii)     Employees will retire without additional incentives when they first accrue 30 years of credited service under the provisions of the Delphi HRP.

(iii)     The gross monthly wages while in the program will be:

(a)     29 years credited service     $2,900

(b)     28 years credited service     $2,850

(c)     27 years credited service     $2,800

Wages, without COLA and vacation entitlement, will be paid weekly on an hourly basis (2,080 hours per year) and will remain at that rate until 30 years of credited service is accrued.

(iv)     Within ten (10) business days after the first date on which any employees are eligible to receive wage payments in accordance with Paragraph 2.B(iii) above, Delphi will establish a segregated payment account (the "Account") in an amount sufficient to fund the wage payments (the "Ceiling Amount"). The funds in the Account will be available to reimburse Delphi for the payment of weekly wage payments (which will be paid through Delphi's normal payroll process) under Paragraph 2.B(iii) above or for direct wage payments to employees entitled to receive such payments, as described in this Paragraph.

(a)     Delphi shall not draw funds from the Account for purposes of this Paragraph until a date (the "Permitted Draw Down Date"), which shall be the later of the Final Election Date or the Adequate Funding Date (see definitions below). Prior to the Permitted Draw Down Date, payments to satisfy the obligations to employee participants pursuant to this Paragraph will be drawn from Delphi's available cash.

(b)     If, on the Permitted Draw Down Date, the Anticipated Liability is less than the Ceiling Amount, Delphi shall be permitted to draw such funds out of the Account so that the balance remaining in the Account is equal to the Anticipated Liability.

The Final Election Date shall be the first of the month following the last day on which employees at New Brunswick can make an election to participate in the pre-retirement program described in Paragraph 2.B., or sooner if determined by the IUE-CWA-Delphi National Parties.

2

The Adequate Funding Date shall be the date on which the Ceiling Amount is greater than or equal to the Anticipated Liability.

The Anticipated Liability shall be an amount, calculated after the Final Election Date, sufficient to pay all of the remaining liabilities under Paragraph 2.B(iii) for all employees who have elected to participate in such program for the full remaining duration of such program. The Anticipated Liability shall be calculated based on the number of eligible employees, the remaining duration of the wage payments, and the applicable pay rates.

(c)     The funds in the Account shall be available to satisfy the obligations of this Paragraph and for no other purpose. The Bankruptcy Court order approving this Agreement shall specifically provide that under no circumstances (including but not limited to conversion of Delphi's Chapter 11 cases to Chapter 7 proceedings) shall the assets in the Account be available to satisfy the claims of any party other than the employees.     This Agreement is, in its entirety, contingent on entry of an order, which, to the satisfaction of the IUE-CWA and Delphi National Parties provides the protections described in this Paragraph.

C.     For current employees who are participants in the Delphi HRP, a buyout of $140,000 (with ten or more years of seniority) or a buy out of $70,000 (with less than ten years of seniority), less applicable withholdings, to sever all ties with Delphi, except vested pension benefits.  Also, the employees electing this option are eligible for up to $2,100 per year pursuant to the terms of the Individual Upward Educational Plan for an additional two years beginning 8/1/06 and ending 7/31/08.

D.     For current employees who are participants in the Delphi HRP, elect to remain on the active roll for one year and receive one year of health care (at a total cost to Delphi of up to $15,000 depending on type of enrollee contract), and a weekly payment of $2,403.84 (assuming $15,000 enrollee contract), less withholdings, for one year (with ten or more years of seniority) or a weekly payment of $1,057.69, less withholdings, for one year (with less than ten years of seniority) and sever all ties with Delphi, except vested pension benefits, if any, at the conclusion of the year. Also, the employees electing this option are eligible for up to $2,100 per year pursuant to the terms of the Individual Upward Educational Plan for an additional two years beginning 8/1/06 and ending 7/31/08.

E.     For competitive rate employees, who are not participants in the Delphi HRP, percentage buyout prorated against $140,000(with ten or more years of seniority), or against $70,000 (with less than ten years of seniority but more than one year of seniority) less applicable withholdings, to sever all ties with Delphi. In each case, the buyout is calculated based upon the participant's competitive wage rate as a percentage of the maximum traditional wage rate for the participant's classification.

F.     All participants in options A through F will be required to sign a release of all claims, except Workers Compensation claims.

3.     New Brunswick employees, except those on a leave of absence, who have not selected, or who are not eligible to participate in one of the options identified above, are eligible for transfer, with seniority, to JCI effective 8/1/2006, at the

3

established New Brunswick Tier III rate and with JCI Benefit Plans coverages. The offer of employment with JCI will sever all ties to Delphi, except for current vested benefits, if any. Traditional wage rate employees accepting such transfer will receive a $50,000 buy down (intended to represent an offset to a timed wage and benefit reduction) to the Tier III wage and the existing JCI benefit levels. Such employees transferred to JCI will be required to sign a release of all claims, except Workers Compensation, as a condition for receiving the $50,000 buy down amount. Employees on a leave of absence, who do not participate in the Special Attrition Program, will be eligible for transfer to JCI upon the conclusion of their leave.

4.      It is understood by all parties that JCI will employ approximately one hundred employees at the Tier III wage and JCI benefit levels. In the instance of excess employee participation in the Special Attrition Program, the lowest seniority employees will be retained for transfer to JCI and will not be permitted to participate in this Special Attrition Program, even if previously eligible, thereby providing JCI with a workforce of 100 employees. In the instance of insufficient participation in the Special Attrition Program, the 100 highest remaining seniority employees will transfer to JCI with eligibility for the $50,000 buy down, if applicable, with the remaining lower seniority employees being separated from Delphi, thereby providing JCI with a workforce of 100 employees. The terms of the Delphi-IUE-CWA Agreements and the ESCOP 2000 Agreement in effect at the time of this Memorandum will apply to all such Tier III employees, unless specifically modified by this Memorandum, and until an Agreement is reached between the IUE -CWA and JCI. JCI is not assuming Delphi's benefit plans and will provide its own retirement benefits to employees who accept employment at New Brunswick, in accordance with the terms of the ESCOP 2000 Agreement.

5.      Delphi and the IUE-CWA agree to the following:

A.      Delphi will use temporary employees as needed to bridge any difficulties arising from the implementation of the Special Attrition Program;

B.      Delphi and the IUE-CWA may agree to use separated employees as contract personnel on a case by case basis as needed to bridge any difficulties arising from the implementation of the Special Attrition Program; and

C.      If during the remaining course of Delphi's bankruptcy, materially different Special Attrition Program financial incentives are negotiated between Delphi and the IUE -CWA for the option selected by the employee, it is understood that the employee will not be advantaged or disadvantaged.

6.      The parties acknowledge that Delphi's participation in this Agreement is subject to (i) the approval of the U.S. Bankruptcy Court, which approval Delphi will seek at the next scheduled omnibus hearing; and (ii) the Closing of the sale of the New Brunswick Operations to JCI. In the event the Bankruptcy Court does not allow such participation, or the Closing does not occur, Delphi and the IUE-CWA will have no obligations hereunder.

7.      A.      The parties further agree that this Agreement is without prejudice to any party-in-interest in all other aspects of Delphi's Chapter 11 cases, including by illustration, all collective bargaining matters involving the parties, in any proceedings under Sections 1113 and/or 1114 of the Bankruptcy Code with respect to the IUE-CWA, in any pension termination proceeding under ERISA and/or the Bankruptcy Code, and all claims administration and allowance matters.

4

B.      Nothing in this Agreement, the Bankruptcy Court's approval of this Agreement, or the performance of any obligations hereunder  shall limit or otherwise modify: (i) Delphi's rights under Section 4041 of ERISA; or (ii) Delphi's rights under Section 1113 and/or 1114 of the Bankruptcy Code with regard to any obligations which pre-existed this Agreement (including pre-existing obligations referenced within this Agreement), such as (by way of illustration only) the obligation to maintain the hourly pension plan or provide retirees or active employees (including employees/retirees participating in the attrition programs contained in this Agreement) with levels of healthcare or other benefits as specified in pre-existing labor agreements.

C.      Nothing contained herein, the Bankruptcy Court's approval of this Agreement, or the performance of any obligations hereunder shall constitute an assumption of any agreement described herein, including, without limitation any collective bargaining agreement between the IUE-CWA and Delphi, nor shall anything herein, the Bankruptcy Court's approval of this Agreement, or the performance of any obligations hereunder, be deemed to create or give rise to an administrative or priority claim or convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party.

_____
Delphi Corporation

_____
Delphi Corporation

Date: 5/26/06

_____
International Union, IUE-CWA

_____
International Union, IUE-CWA

Date: 5-26-06

5

**EXHIBIT 1.21**

**REAL PROPERTY**

U.S:   760 Jersey Avenue
     New Brunswick, New Jersey  08903
       United States