UNITED STATES BANKRUPTCY COURT     Hearing Date:  April 22, 2010
SOUTHERN DISTRICT OF NEW YORK     Hearing Time:  10:00 a.m.

-------------------------------------------------------- x
: 
In re                                             :    Case No. 05-44481 (RDD)
: 
DPH HOLDINGS CORP., *et al.*,              :    Chapter 11
: 
             Reorganized Debtors.     :    (Jointly Administered)
: 
-------------------------------------------------------- x

### OBJECTION OF THE UNITED STATES TRUSTEE TO CREDITORS' APPLICATIONS FOR REIMBURSEMENT OF PROFESSIONAL FEES AND EXPENSES

**TO THE HONORABLE ROBERT D. DRAIN,**
**UNITED STATES BANKRUPTCY JUDGE**:

      The United States Trustee for Region 2 (the "United States Trustee"), respectfully submits her objection (the "Objection") to four applications seeking the reimbursement of professional fees and expenses incurred in making a substantial contribution in the case, under 11 U.S.C. §§ 503(b)(3) and (4), and one application seeking reimbursement of professional fees and costs pursuant to a settlement agreement incorporated into the Debtors' plan of reorganization, confirmed on January 25, 2008 (collectively, the "Applications").  In support of her Objection, the United States Trustee represents and alleges as follows:

## I.     INTRODUCTION

      Five applicants (the "Applicants") seek the reimbursement of professional fees and expenses, in the aggregate amount of $9,807,814.17, as follows:

| Applicant | Professional | Fees | Expenses | Total |
|---|---|---|---|---|
| CR Intrinsic Investors and Elliott Associates, under Sections 503(b)(3) and (4) | Stutman, Treister & Glatt | $268,501.98 | $15,823.42 | $284,325.40 |
| Delphi Trade Committee, under Sections 503(b)(3) and (4) | Kasowitz, Benson, Torres & Friedman | $1,444,978.00 | $78,397.63 | $1,523,375.63 |
| | Ropes & Gray | $34,012.50 | $89.50 | $34,102.00 |
| | Capstone Advisory Group | $226,029.00 | $1,150.72 | $227,179.72 |

| Applicant | Professional | Fees | Expenses | Total |
|---|---|---|---|---|
| Davis Kempner Capital Management, Elliot Associates, Nomura Corporate Research and Asset Management, Northeast Investors Trust, SPCP Group, and Whitebox Advisors, under a settlement agreement incorporated into the Debtors' plan of reorganization, confirmed on January 25, 2008 | Goodwin Proctor | $3,412,444.50 | $224,661.30 | $3,637,105.80 |
| | Klestadt & Winters | $3,205.00 | $66.56 | $3,721.56 |
| | Maryann Keller & Assoc. | $329,906.25 | $0.00 | $329,906.25 |
| Highland Capital Management, under Sections 503(b)(3) and (4) | Haynes & Boone | $2,020,498.35 | $61,295.57 | $2,081,793.20 |
| | Loughlin, Meghji & Co. | $400,000.00 | $47,999.67 | $447,999.67 |
| IUE-CWA, under Sections 503(b)(3) and (4) | Kennedy, Jennik & Murray | $1,185,701.25 | $52,603.60 | $1,238,304.85 |
| Total | | $9,325,276.92 | $482,087.99 | $9,807,814.17 |

CR Intrinsic Investors and Elliott Associates ("CR and Elliott"), the *Ad Hoc* Trade Committee (the "Trade Committee"), Highland Capital Management ("Highland"), and the IUE-CWA seek approval of the fees and expenses incurred by its professionals in making a substantial contribution under 11 U.S.C. § 503(b)(3) and (4). Davis Kempner Capital Management, Elliot Associates, Nomura Corporate Research and Asset Management, Northeast Investors Trust, SPCP Group, and Whitebox Advisors (the "Senior Noteholders' Committee") seek approval of the fees and expenses of their professionals under a settlement agreement incorporated into the Debtors' plan of reorganization, confirmed on January 25, 2008, which provides for the review of the Senior Noteholders' professional fees under a "reasonableness under the totality of the circumstances" standard.

The United States Trustee has reviewed the Applications under the appropriate standard. As discussed in detail in Section II of this Objection, the United States Trustee makes the following recommendations:

A.    **CP and Elliott**.  The Court should deny the Application.  CP and Elliot did not meet their burden of proving that they made a substantial contribution under Sections 503(b)(3) and (4).

B.    **The Trade Committee**.  The Court should deny the Application.  The Trade Committee did not demonstrate that its actions resulted in a substantial benefit to the Debtors' estate under Sections 503(b)(3) and (4).

C.    **The Senior Noteholders.**  The Court should grant the Application.  The fees and expenses requested appear to be reasonable under the standard of 11 U.S.C. § 330.

D.    **Highland.**  The Court should deny the Application.  Highland did not demonstrate that it conferred substantial benefit to the estate under Section 503(b)(3) and (4).

E.    **The IUE-CWA.**  The Court should grant the Application.  The IUE-CWA met its burden of proving that its actions conferred a substantial benefit to the estate under Sections 503(b)(3) and (4).

## II.    FACTS

### A.    The Debtors

Delphi Corporation and thirty-eight subsidiaries filed their chapter 11 cases on October 8, 2005 (the "Petition Date").  On the Petition Date, the court entered an order approving the joint administration of the cases.  *See* ECF Doc. No. 28.  On October 14, 2005, three additional affiliates filed chapter 11 cases, and, on October 19, 2005, the court entered a second order authorizing the joint administration of all forty-two cases.  *See* ECF Doc. No. 404.  The Debtors

3

continued to operate their businesses and manage their properties as debtors-in-possession

pursuant to sections 1107(a) and 1108 of Bankruptcy Code.

B.    **Statutory Committees**

On October 20, 2005, the United States Trustee appointed an official committee of

unsecured creditors (the "Creditors' Committee").  *See* ECF Doc. No. 469.  The United States

Trustee amended the appointment of the Creditors' Committee on March 6, 2006 due to the

resignation of a member.  *See* ECF Doc. No. 2685.

On December 22, 2005, Appaloosa Management, L.P. ("Appaloosa") and an *ad hoc*

committee of equity security holders filed a motion for an order directing the United States

Trustee to appoint an official committee of equity security holders (the "Equity Committee

Motion").  *See* ECF Doc. No. 1604.  After a trial, the court entered an order granting the Equity

Committee Motion on March 30, 2006.  *See* ECF Doc. No. 3024.  The United States Trustee

appointed an Official Committee of Equity Security Holders (the "Equity Committee") on April

28, 2006 and filed an amended appointment on May 11, 2006.  *See* ECF Doc. Nos. 3503 and

3726.  On April 24, 2008, United States Trustee filed a notice of disbandment of the Equity

Committee, effective April 23, 2009.  *See* ECF Doc. No. 16578.

D.    **The Debtors' Transformation Plan and Labor and Pension Issues**

The Debtors' stated goal in chapter 11 was to implement their "Transformation Plan."

*See, e.g.*, Affidavit of Robert S. Miller, at 71, ¶ 142, ECF Doc. No. 7.  Elements of the

Transformation Plan included, among other things, obtaining "significant labor and retiree cost

savings and other modifications from the unions representing the employees of the Debtors," by

seeking to reject collective bargaining agreements and eliminating retiree benefits for existing

retirees who were members of the union.  *Id.*

On March 31, 2006, the Debtors filed a motion, under 11 U.S.C. §§ 1113 and 1114, for

an order rejecting collective bargaining agreements and modifying retiree benefits (the

"1113/1114 Motion").  *See* ECF Doc. No. 3035.  Trial was held for four days in May 2006

4

during which the Debtors and the unions held negotiations regarding a resolution.  *See* Transcript of Hearing Held on May 26 2006, at 133, Lines 1-23, ECF Doc. No. 4346.

On March 31, 2006, the Debtors also filed a motion seeking approval of an agreement between the UAW, GM and the Debtors (the "UAW Attrition Program"), under which UAW members were offered early retirement or buyouts.  *See* ECF Doc. No. 2933.  On May 8, 2006, the court approved UAW Attrition Program and, on May 12, 2006 entered an amended order approving the UAW Attrition Program.  *See* ECF Doc. Nos. 3648 and 3754.  On July 7, 2006, the court approved a supplement to the UAW Attrition Program and a similar program for IUE-CWA union employees (the "IUE-CWA Attrition Agreement").  *See* ECF Doc. No. 4461.  On January 31, 2007, the court entered an order staying further proceedings on the 1113/1114 Motion in light of the Debtors' pending disclosure statement and plan and related agreements. *See* ECF Doc. No.  6779.

On August 6, 2007, the Debtors filed motions to approve memoranda of understanding (the "MOUs") between the Debtors, GM, the AUW, the IUE-CWA and other unions regarding modification of collective bargaining agreements and retiree benefit plans.  *See* ECF Doc. Nos. 8906 and 8907.  Terms of the MOUs included attrition options, buy downs and severance options for laid off employees, the transfer of retiree benefit obligations to GM, and the reduction of health and disability benefits.  *See* ECF Doc. No. 8907, Exhibit 4.

The unions also made significant wage concessions under the MOUs.  Production workers' hourly rates were cut to between $10.50 for entry level positions to $16.50 for legacy workers.  *Id*. at 24-25.  New hourly rates for skilled workers ranged from $20.00 to $26.00.  *Id.* at 25.  The court entered orders approving the MOUs on August 16, 2007.  *See* ECF Doc. Nos. 9106 and 9107.

### E.    The EPCA and the PSA

On December 18, 2006, the Debtors filed a motion (the "EPCA Motion") for an order approving an equity purchase and commitment agreement ( the "EPCA") and a plan framework

support agreement (the "PSA"). *See* ECF Doc. No. 6179. The EPCA and the PSA were the product of negotiations between the Debtors, GM, the unions representing the Debtors' workers, the statutory committees and other stakeholders. *See* EPCA Motion, at 15-18. The PSA and the EPCA were meant to implement the Debtors' Transformation Plan and to fund a plan of reorganization. *Id*. at 6.

The PSA set forth terms of a plan of reorganization. *Id*. at 24. Negotiated terms included the treatment of GM's claim, the resolution of pension funding issues, and the terms of the preferred stock to be issued though the Debtors' plan of reorganization. *Id*. The PSA was subject to the Debtors and GM reaching a resolution of issues prior to January 31, 2007. *Id*. at 25.

Under the EPCA, the Debtors proposed to make a rights offering to their equity security holders to purchase *pro rata* shares of common stock in the reorganized debtors. *Id*. at 19. The EPCA also set forth the terms and conditions under which Appaloosa, through its affiliate A-D Acquisition Holdings, LLC, Harbinger Del-Auto Investment Company, Ltd., Merrill Lynch, Pierce, Fenner & Smith Incorporated, UBS Securities LLC ("UBS"), and others (the "Plan Investors") would commit to invest up to $3.4 billion through the purchase of common and preferred stock in the reorganized debtors and any unsubscribed shares from the rights offering. *Id*. Under the EPCA, the Debtors agreed to pay the Plan Investors commitment fees of over $68 million and to reimburse their expenses. *Id.* at 20.

Numerous stakeholders, including the Creditors' Committee, the Equity Committee, and the unions objected to the EPCA Motion. *See, e.g.*, ECF Doc. Nos. 6242, and 6247. After discovery and a trial, the court approved the EPCA and PSA on January 12, 2007. *See* ECF Doc. No. 6589.

In July 2007, the Debtors terminated the EPCA because they could not come to a final agreement with the Plan Investors and other parties. Termination of the EPCA also terminated the PSA. Therefore, on July 18, 2007, the Debtors filed a motion (the "Amended EPCA

Motion") to approve an amended EPCA (the "Amended EPCA") and an amended PSA (the

"Amended PSA").  *See* ECF Doc. No.  8673.  The court granted the Amended EPCA Motion on

August 2, 2007.  *See* ECF Doc. No. 8856.

On October 30, 2007, the Debtors filed a motion for approval of a second amended

EPCA (the "Second Amended EPCA").  *See* ECF Doc. No. 10760.  The Court granted the

Motion on December 10, 2007.  *See* ECF Doc. No. 11382.

### F.    The Debtors' Disclosure Statement and Original Plan of Reorganization

The Debtors filed a disclosure statement and plan of reorganization on September 6,

2007.  *See* ECF Doc Nos. 9263 and 9264.  On December 10, 2007, the Debtors filed an amended

disclosure statement (the "Disclosure Statement") and plan (the "Original Plan") after receiving

objections from numerous parties.  *See* ECF Doc Nos. 11386 and 11388.

The Debtors intended to implement the Original Plan through funding received from the

Second Amended EPCA.  *See* Original Plan, Article VII, § 7.11, at 38, and Exhibit 7.11 to the

Original Plan.  The Debtors also proposed to fund the Original Plan through exit financing,

which would repay debtor in possession facilities, make payments due on the effective date, and

satisfy other claims under the Original Plan.  *Id.,* Article VII, § 7.14, at 39, and Exhibit 7.14.

Under the Original Plan, the Debtors proposed to seek exit financing after confirmation, and the

closing of an exit financing agreement was a condition precedent to the Original Plan becoming

effective.  *Id.*, Article XII, § 12.2(a).

Included in the Original Plan were the Delphi-GM Global Settlement Agreement (the

"GSA") and the Delphi-GM Master Restructuring Agreement (the "MRA"), which were meant

to facilitate the restructuring of Delphi's manufacturing base and resolve employee-related

issues.  *Id.*, Article VII, § 7.2 and ECF Doc. No. 14162, at 3, ¶ 4.  Among other things, under the

GSA, GM agreed to assume liability for Delphi's pension and benefit obligations to Delphi's

hourly workers and to reimburse Delphi for benefits paid prior to the assumption of liability.  *See*

GSA, Article II, ECF Doc. No. 11388.  Under the MRA, GM agreed, among other things, to

7

reimburse Delphi for some labor costs and to provide Delphi with recovery of working capital

with respect to businesses sold or closed.  *See* MRA, Articles II and IV.   The GSA and MRA

were conditioned on the Original Plan becoming effective.  *See* ECF Doc. No. 14162, at 17, ¶ 39.

The Original Plan provided, among other things, that general unsecured creditors

(Classes 1C through 12C) would receive common stock in the reorganized debtors, with a value

of 78.4% of the face amount of their claims.  *See* Original Plan, Article V, § 5.3(a), at 30.  With

respect to the balance of their claims, general unsecured creditors in Classes 1C through 12C

would receive the right to participate in a discount rights offering up to their *pro rata* share, or if

they chose not to participate, a *pro rata* share of any cash from oversubscription to the rights

offering.  *Id.*, § 5.3(b), at 30-31.  Equity security holders were to receive discount rights to

purchase pro *rata* shares in the stock of the reorganized debtors.  *Id.*, § 5.8, at 32.

On December 10, 2007, the Court approved the Disclosure Statement.  *See* ECF Doc. No.

11389.  On January 25, 2008, after a two day trial, the Court entered findings of fact and

conclusions of law and an order confirming the Original Plan and approving the GSA and the

MRA.  *See* ECF Doc. No. 12359.

### G.        Implementation of the Original Plan

After confirmation of the Original Plan, the Plan Investors took issue with the terms of

the Debtors' proposed exit financing and refused to perform under the Second Amended EPCA

until their objections were resolved.  Therefore, on March 5, 2008, the Debtors filed an

expedited motion for Implementation of the Original Plan under 11 U.S.C. § 1142 (the

"Implementation Motion").  *See* ECF Doc. No. 12978.  In the Implementation Motion, the

Debtors alleged that, during the syndication of the exit financing, they and the arrangers

determined that it would be beneficial to increase GM's participation.  *Id*. at 11.  After the

Debtors re-launched the syndication efforts with GM's increased participation, the Plan

Investors alleged that seeking exit financing with GM's participation was inconsistent with the

terms of the Amended EPCA and refused to perform under the Second Amended EPCA.  *Id.* at

8

13, and Exhibit B to the Implementation Motion.  The Debtors sought an order implementing the Original Plan, finding that the exit financing terms were consistent with the Second Amended EPCA and the Original Plan and that the Debtors had met their obligations under the Second Amended EPCA and the Original Plan, and directing the Plan Investors to perform under the Second Amended EPCA.  *Id.* at 23-24.  At a hearing on the Implementation Motion on March 7, 2008, the court ruled that it was appropriate for the Debtors to seek relief by motion under Section 1142.  *See* Transcript of Hearing Held on March 7, 2008, at 124, Lines 3-11.  The court also ruled, among other things, that certain issues of interpretation of the Second Amended EPCA, including whether GM's participation would have a material impact on the Plan Investors' investment, required an evidentiary hearing.  *Id.* at 127, Lines 1-14.

H.    **The GM Arrangement and the Amended GM Arrangement**

On May 8, 2008, the Court entered an order approving the Debtor's second amended and restated DIP credit agreement which included financial arrangements with GM (the "GM Arrangement").  *See* ECF Doc. No. 13699.  Under the GM Arrangement, GM agreed to advance Delphi $650 million so that Delphi could maintain liquidity.  *See* ECF Doc. No. 14031, at 10, ¶ 20.  The advance would mature on the effective date of the Original Plan and the amounts that Delphi owed to.  Gm would be offset against funds due to GM under the GSA and MRA.  *Id.*

On August 8, 2008, the Debtor filed a motion to amend the GM Arrangement (the "Amended GM Arrangement").  *See* ECF Doc. No. 14031.  Under the Amended GM Arrangement, GM agreed to advance up to $950 million.  *Id.* at 12, ¶ 25.  Highland and CR and Elliott filed an objection to the motion on August 20, 2008.  *See* ECF Doc. No. 14082.  The Creditors' Committee filed objections on September 12, 2008 and September 29, 2008.  *See* ECF Doc. Nos. 14168 and 14205.  The Court entered an order approving the Amended GM Arrangement on September 26, 2008.  *See* ECF Doc. No. 14289.

I.        **The Modified Plan**

The Plan Investors did not perform under the Second Amended EPCA and the Debtors

did not obtain exit financing, and, as a result the Original Plan never became effective.

Therefore, on September 12, 2008, the Debtor filed a motion for authority to implement an

amended MRA (the "Amended MRA") and an amended GSA (the "Amended GSA").  *See* ECF

Doc. No. 14164.  Under the Amended GSA, Delphi agreed to dismiss a pending complaint

against GM and provide third party releases in any modified plan.  *Id*. at 38, ¶ 82.  Under the

Amended MRA, GM's obligations were "enhanced."  *Id*. at 41, ¶ 87.  Among other things, GM

agreed to provide Delphi with $110 million in addition to assuming labor liabilities and

providing recovery of working capital.  *Id.*

Several parties, including CR and Elliott and the Creditors' Committee, objected to the

motions.  At an adjourned hearing on the motions, on September 25, 2008, the Debtors informed

the Court that it had settled the Creditors' Committee's objection and described the economic

terms of the settlement under which GM agreed to share part of its recovery under a plan with

unsecured creditors under amendments to Section 4.04 of the Amended GSA.  *See* September

25, 2008 Transcript. ("September 25, 2008 Tr."), at 10-13, ECF Doc. No. 14293, and First

Amendment to the Amended and Restated Global Settlement Agreement, ECF Doc. No. 14288.

In sum, under the settlement, if GM was obligated to accept preferred stock under a plan,

unsecured creditors would receive an additional distribution equal to 20% of their claims.  *See*

September 25, 2008 Tr., at 11, lines 9-25, and 12, lines 1-14, and ECF Doc No. 14293.  If GM

was not obligated to accept stock, then unsecured creditors would receive 50% of any

distributions that would be made to GM on account of its administrative claim.  *Id*. at 9, lines 19-

25, and 10, lines 1-8.  The Court approved the Amended GSA, including the amendments to

Section 4.04, and the Amended MRA on September 26, 2008.  *See* ECF Doc. 14288.

On October 3, 2008, the Debtors filed a motion to modify the Original Plan (the "Plan

Modification Motion").  *See* ECF Doc. No. 14311.  After several adjournments of the hearing on

the Plan Modification Motion, the Debtors filed a supplemental motion to modify the Original

Plan on June 1, 2009.  *See* ECF Doc. No. 16646.

The Debtors' proposed modified plan (the "Modified Plan") was to be funded by an

agreement between GM, Parnassus Holding II, LLC ("Parnassus"), and others (the "Master

Disposition Agreement").  *Id.*, Exhibits 1-A and 1-A-1.  The Debtors were able to propose the

Master Distribution Agreement after the United States Treasury agreed to allow GM to provide

$250 million of government funds to implement the Modified Plan.  *See* Motion to Modify Plan,

at 7, ¶ 6.

Under the Master Disposition Agreement, GM purchased certain of the Debtors' business

operations that provide parts for GM products.  *Id.* at 8, ¶ 7.  Parnassus purchased other

businesses and assets.  *See* Master Distribution Agreement, Article II, §2.1.4, at 2.  GM agreed to

satisfy the Debtors' obligations to the Debtors' DIP lenders, waive its prepetition claims, pay

$291,020,079 in cash and satisfy fifty percent of administrative claims, including $15 million in

professional fees, up to $148 million.  *Id.*, Article 3, § 3.1.1, at 26.  Among other things,

Parnassus agreed to assume the liabilities and cure amounts of the businesses it purchased, pay

$1.00, transfer Parnassus Class C membership interests to Delphi or a trust for the benefit of the

DIP lenders, and pay fifty percent of administrative claims, including $15 million in professional

fees.  *Id.*, §§ 3.2.1 - 3.2.4, at 37, and Article 7, § 7,8(e), at 40.

Under the Modified Plan, general unsecured creditors are entitled to distributions from

the "General Unsecured MDA Distribution," under which

> if and to the extent Parnassus makes distributions to its members (which for the
> avoidance of doubt do not include the 8% preferred return payable to holders of
> Parnassus Class C Interests) in excess of $7.2 billion, an amount equal to $3
> dollars for every $97 dollars so distributed in excess of $7.2 billion; provided,
> however, that in no event shall the General Unsecured MDA Distribution exceed
> $180,000,000 in the aggregate.

*See* Modified Plan, Article 1, § 1.95, at 14, and Article V, § 5.3, at 33.  In addition, under Article

I, § 1.226 and Article V, § 5.3, unsecured creditors will have a right to share property remaining

in the "Supplemental Distribution Account," to the extent that disputed claims are disallowed.

11

*Id*. at 26 and 33.  The distributions to unsecured creditors, set forth in § 5.3 "shall be in complete

satisfaction of all obligations of GM under Section 4.04 of the [Amended GSA]." *Id*. at 34.  GM

will receive no distribution on account of its administrative claim and will accept releases on

account of its unsecured claim.  *Id*., Article II, § 2.3, at 30, and Article V, § 5.5, at 34.  Equity

security holders will receive no distribution under the Modified Plan.  *Id*., Article V, § 5.8, at 7.

On July 30, 2009, the Court approved the Master Distribution Agreement and confirmed

the Modified Plan.  *See* ECF Doc. No. 18707.  On October 6, 2009, the Master Distribution

Agreement transactions closed and the Modified Plan became effective.  *See* ECF Doc. No.

18958.

## III.    LEGAL STANDARDS

### A.    The Substantial Contribution Standard

Sections 503(b)(3)(D) and (4) provide, in part:

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including –
>> …
>> (3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by –
>>> …
>>> (D) a creditor . . . or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title;
>> …
>> (4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the extent and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant . . . .

11 U.S.C. §§ 503(b)(3)(D) and (4).

Compensation based upon a "substantial contribution" is designed to meet policy

objectives of encouraging meaningful participation in the reorganization process while keeping

fees and administrative expenses at a minimum to preserve as much of the estate as possible for

creditors.  *In re U.S. Lines, Inc*., 103 B.R. 427, 430 (Bankr. S.D.N.Y. 1989).  As a result, Section

503(b) is narrowly construed. *Id.* "Compensation is limited to those extraordinary actions that lead to an 'actual and demonstrable benefit to the debtor's estate, the creditors, and to the extent relevant, the stockholders.'" *In re Randall's Island Family Golf Ctrs., Inc*., 300 B.R. 590, 598 (Bankr. S.D.N.Y. 2003) (quoting *In re Jensen-Farley Pictures, Inc.*, 47 B.R. 557, 569 (Bankr. D. Utah 1985)). *Accord In re Best Prods. Co.*, 173 B.R. 862, 866 (Bankr. S.D.N.Y. 1994), and *In re Alert Holdings, Inc.*, 157 B.R. 753, 757 (Bankr. S.D.N.Y. 1993). The provision does not change the general rule that an attorney must look to his client for payment of his fees. *In re Granite Partners, L.P.*, 213 B.R. 440, 445 (Bankr. S.D.N.Y. 1997).

Whether a creditor has made a substantial contribution in a reorganization case is a question of fact. *In re Hooker Invs., Inc.*, 188 B.R. 117, 120 (S.D.N.Y. 1995). The burden of proof is on the applicant to show by a preponderance of the evidence that the services it rendered provided a substantial benefit to the estate. *Best Prods.*, 173 B.R. at 865. *See also In re Villa Luisa, L.L.C.*, 354 B.R. 345, 348 (Bankr. S.D.N.Y. 2006) (the burden of proof is on the applicant and it is exceedingly difficult because a litigant is presumed to act in its own interest).

In determining whether a creditor has made a substantial contribution, courts generally consider the following factors:

(1) whether the services benefitted the creditor or all creditors;

(2) whether the services provided a direct, significant and demonstrable benefit to the estate; and

(3) whether the services rendered were duplicative of services rendered by attorneys for the committee, the committees themselves, or the debtor and its attorneys.

*Best Prods.*, 173 B.R. at 865.

Active participation alone is insufficient to give rise to a substantial contribution claim. *Granite Partners*, 213 B.R. at 446. This includes involvement in negotiation, drafting and confirming a plan of reorganization. *In re Baldwin-United Corp.*, 79 B.R.321, 340-41 (Bankr. S. D. Ohio 1987). Services that delay rather than enhance the reorganization are likewise not

13

compensable under Section 503(b). *Granite Partners,* 213 B.R. at 447. In addition, requests for compensation for insubstantial or duplicative services or services that deplete rather than increase the size of estate assets should be denied. *U.S. Lines*, 103 B.R. at 429-430. An applicant cannot recover fees related to case administration, monitoring and education, including attending hearings, reviewing documents and consulting with clients because these services are performed for the client, not the estate. *Granite Partners*, 213 B.R. at 453-454.

Settlement negotiations require the participation of many parties-in-interest and do not give rise to substantial contribution claims. *See Matter of Columbia Gas Syst., Inc.*, 224 B.R. 540, 549 (Bankr. D. Del. 1998) (creditor's Section 503(b) claims were rejected where the evidence showed that the participation of many parties was needed to effectuate a settlement); and *In re Alumni Hotel Corp.*, 203 B.R. 624, 632 (Bankr. E. D. Mich. 1996) (successful reorganizations require consensual activity and if one applicant's fees are approved, others might argue they also made a substantial contribution). Encouraging compromise, participating in settlement negotiations and proposing settlement terms are the professional obligation of a creditor's counsel. *Alumni Hotel*, 224 B.R. at 630. Creditors have strong economic self interest in settlements that may or may not coincide with the interests of creditors as a whole. *Columbia Gas*, 224 B.R. at 549.

Under Section 503(b), a creditor who makes a substantial contribution is entitled to reasonable fees and necessary expenses of its attorneys and accountants. *Alert Holdings*, 157 B.R. at 757. Under Section 503(b)(4), the Court retains the right to review professional fees for reasonableness but the applicant must first establish that it made a substantial contribution. *In re Mariner Post-Acute Network, Inc.*, 267 B.R. 46, 61 (Bankr. D. Del. 2001).

### B.    The Reasonableness Standard

The reasonableness standard is set forth in 11 U.S.C. § 330[1], which provides, in part:

(a)(1) After notice . . . and a hearing . . . the court may award to a . . . professional person employed under section 327 or 1103 –

(A) reasonable compensation for actual, necessary services rendered by the . . . professional person or attorney and by any paraprofessional employed by any such person; and

(B) reimbursement for actual and necessary expenses.

11 U.S.C. § 330(a)(1).

Factors that the Court considers in determining reasonableness are set forth in Sections 330(a)(3), (4) and (6).  Under Section 330(a)(3),

(3) In determining the amount of reasonable compensation, to be awarded to  . . . a professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3)(A) through (F).

---

[1]    11 U.S.C. § 330, by its terms, applies only to retained professionals.  *Lamie v. United States Trustee*, 540 U.S. 526, 536 (2004).

Under Section 330(a)(4),

the court shall not allow compensation for --

    (i)  unnecessary duplication of services; or

    (ii) services that were not

        (I) reasonably likely to benefit the debtor's estate; or

        (II) necessary to the administration of the case.

11 U.S.C. § 330(a)(4).

Finally, under Section 330(a)(6)

    (6) Any compensation awarded for the preparation of a fee application shall be based on the level and skill reasonably required to prepare the application.

11 U.S.C. §330(a)(6).

The applicant has the burden of proving that the services rendered were actual and necessary, and that the compensation sought  was reasonable.  *In re Bennett Funding Group, Inc.*, 213 B.R. 234, 244 (Bankr. N.D.N.Y. 1997).  The services must be both necessary and reasonable. *Keene Corp.*, 205 B.R. 690, 696 (Bankr. S.D.N.Y. 1997).  Services are necessary if they benefit the estate.  *Id.*  The determination of reasonableness is an objective test that considers what services a reasonable lawyer or legal firm would have performed in the same circumstances." *In re Ames Dep't. Stores, Inc.*, 76 F.3d 66, 72 (2d Cir.1996) (citing *In re Taxman Clothing Co.*, 49 F.3d 310, 315 (7th Cir.1995)); *accord In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. 13, 23 (Bankr. S.D.N.Y. 1991).

Applicants must support their requests for fees and expenses with specific, detailed and itemized documentation to meet their burden of proof.  *Bennett Funding*, 213 B.R. at 244-245.  Under Section 330(a)(1)(B), a professional seeking an expense reimbursement from the estate "must furnish enough specificity for the Court to establish whether a given expense was both actual and necessary."  *In re Fibermark, Inc.*, 349 B.R. 385, 399 (Bankr. D. Vt. 2006).  Expenses

16

are actual if they are actually incurred and necessary if "reasonably needed to accomplish proper representation of the client." *In re Korea Chosun Daily Times, Inc.*, 337 B.R. 758, 769 (Bankr. E.D.N.Y. 2005).

In the Southern District of New York, applicants must also comply with *United States Trustee Fee Guidelines* (the "*United States Trustee Guidelines*"), the Court's *Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases* (General Order M-389) (Effective December 4, 2009) (the *"Amended Court Guidelines"*) (collectively, the "*Fee Guidelines*"). The *Fee Guidelines* require, among other things, that applicants arrange detailed time entries in project categories, *see United States Trustee Guidelines*, Section 4(i), and file a certification with their applications. *See Court Guidelines*, at 1,

## III.    THE APPLICATIONS

### A.    CR and Elliott

#### 1.    The Application

CR and Elliott were holders of senior notes issued by Delphi. *See* Application, at 2. They seek the reimbursement of fees, totaling $284,325.40, and expenses, in the amount of $15,823.42, incurred by its counsel Strutman Treister & Glatt ("STG"), between June 4, 2008 and September 25, 2008. *Id*. at 5, ¶ 5. The amounts requested represent CR and Elliott's share of fees and expenses incurred in objecting to the Debtors' motion for approval of the Amended GM Arrangement and the Debtor's motion to approve the Amended GSA. *Id*. at 3, ¶ 1. In their objection to the Amended GSA, CR and Elliott argued that the Amended GSA was a *sub rosa* plan of reorganization and that the Debtors had not met the requirements of Fed. R. Bankr. P. 9019 for approval of a settlement. *See* ECF Doc. No. 14211, at 12-25. With respect to the Amended GM Arrangement, CR and Elliott argued that it impermissibly effected the substantive consolidation of the Debtors' estates outside of a plan. *See* ECF Doc. No. 14082, at 10-14.

CR and Elliott claim that their objections led to improved treatment of unsecured

creditors under the Modified Plan.  *Id.* at 3, ¶ 2.  They also note that the Debtors and the

Creditors' Committee agreed not to object to the Application "in recognition of the benefit that

the [CR and Elliott] provided to the Debtors' estates."  *Id.* at 11, ¶ 26.

### 2.      Substantial Contribution

CR and Elliott have not met their burden of proof under Sections 503(b)(3) and (4).  They

have not demonstrated how their participation resulted in a substantial benefit to the estate.  *See*

*Best Prods.*, 173 B.R. at 865 (applicant must show that its services "provided a direct, significant

and demonstrable benefit to the estate").  CR and Elliott's sole statements regarding their

contribution are that "[a]s a direct result of the filing and prosecutions of the Objections by the

Senior Noteholders, the Debtors agreed to improve the plan treatment for all general unsecured

creditors[,]" *id.* at 3, ¶ 2, and that the Debtor and the Creditors Committee had agreed not to

object to the Application except as to reasonableness.  *Id.* at 11, ¶ 26.  "While both parties thus

effectively stipulated that the legal standard for substantial contribution had been satisfied . . .,

each party reserved its rights to review the amount of the claims [for] reasonableness."  *Id.* at 9, ¶

19.

It appears that any benefit to creditors arising from objections to the Amended GSA were

the result of settlement negotiations between many parties.  At the hearing on the motion to

approve the Amended GSA on September 25, 2008, the Debtors informed the Court that they

had settled the objections of the Creditors' Committee.  Under the settlement, the Debtors and

GM agreed to amend Section 4.04 of the Amended GSA to require GM to share its distributions

under any plan with unsecured creditors.  *See* September 25, 2008 Tr. at 10-13, and ECF Doc.

No. 14293.  The Court then adjourned the hearing to allow the parties to finalize the language of

the amendment and the Debtor to consult with other objectors.  *Id.* at 13, lines 18-25, and 14, 1-

7.  After the hearing reconvened later that day, the Debtors informed the Court that CR and

Elliott's objection, among others, had been resolved.  *Id.* at 15, lines 1-8.  However, it does not

appear that resolving CR and Elliott's objection resulted in any revisions to the economic terms

of amended Section 4.04 that the Debtors had put on the record earlier in the hearing.  *Id*. at 21,

lines 1-9.  Based on the record, it appears that CR and Elliott was one of many participants in

settlement negotiations and not solely and directly responsible for enhancing the treatment of

creditors.  Participating in settlement negotiations does not give rise to a claim for substantial

contribution.  *See Columbia Gas*, 224 B.R. at 549 (creditor's Section 503(b) claims were rejected

where the evidence showed that the participation of many parties was needed to effectuate a

settlement).

Moreover, the objection did not result in a demonstrable benefit to the estate.  *See Best

Prods.*, 173 B.R. at 865 (substantial contribution requires a showing of substantial benefit to the

estate).  Even if CR and Elliott had been instrumental in negotiating GM's agreement to share its

distributions under a plan, under the Modified Plan, GM waived its administrative claim and

accepted releases in full satisfaction of its unsecured claim and no longer had proceeds to share.

*See* Modified Plan, Article II, § 2.3, at 30, and Article V, § 5.5, at 34 B.

### 3.        Reasonableness

If the Court determines that CR and Elliott made a substantial contribution, the fees

requested are not reasonable.  The time records filed with the Application contain entries for

numerous matters outside the scope of the objections to the Amended GSA and the Amended

GM Arrangement.  For example, counsel incurred significant time reviewing issues related to the

PBGC, analyzing the order confirming the original plan, preparing research and documents

regarding technology, researching exclusivity, and analyzing the Disclosure Statement.  *See*

Exhibit D to the Application.  There are also many vague entries, such as "telephone conference

re background," "analyze bankruptcy case pleadings," and "prepare correspondence," and

redacted entries that obscure the nature of the time spent.  *Id*.  If necessary, CR and Elliott

should provide unredacted time records related solely to the substantial contribution request to

the Court and the United States Trustee so that they can conduct a proper reasonableness review.

19

B.    **The Trade Committee**

1.    **The Application**

The Trade Committee is made up of creditors holding trade claims against Delphi Automotive Systems LLC and other subsidiaries.  *See* Application, at 1.  It seeks reimbursement of $1.5 million on account of the following fees and expenses incurred between June 13, 2006 and November 28, 2008:

| | | | |
|---|---|---|---|
| Kasowitz, Benson, Torres & Friedman | $1,444,978.00 | $78,397.63 | $1,523,375.63 |
| Ropes & Gray, Co-Counsel | $34,012.50 | $89.50 | $34,102.00 |
| Capstone Advisory Group | $226,029.00 | $1,150.72 | $227,179.72 |

*Id.* at 2.

The Trade Committee claims that it made a substantial contribution by providing a voice to creditors of the Debtors' subsidiaries and obtaining "critical plan terms regarding the classification and treatment of domestic trade creditors."  *Id*. at 3.  It specifically notes that it objected to the disparate treatment of trade claims under the EPCA and PSA, negotiated revisions to the PSA with respect to the classification of trade claims, and objected to the Amended EPCA which it claimed vitiated the original PSA and rendered any plan unconfirmable.  *Id*. at 4-7, ¶¶ 3, 4, 10, and 11.  The Trade Committee also claims that it was instrumental in modifications to the PSA that benefitted all creditors, including placing trade creditors in the same class as noteholders and resolving absolute priority rule issues by negotiating an agreement to pay unsecured creditors post petition interest under a plan.  *Id*. at 12-13, ¶¶ 24-25.  It states that the parties to the case recognize its contribution because they agreed not to oppose a request for reimbursement of professional fees and expenses under Section 503(b)(3) and (4) in both the Interim EPCA Order and with respect to the Amended EPCA Motion.  *Id*. at 5, ¶ 4, and 6-7, ¶ 11..

20

## 2.    Substantial Contribution

The Trade Committee has not shown that its efforts resulted in a substantial contribution. On the contrary, its own evidence shows that its actions benefitted the members of the Trade Committee rather than all unsecured creditors. At the hearing on the Amended EPCA and the Disclosure Statement, held on December 6, 2007, the Debtors placed a settlement of the Trade Committee's objection to the Amended EPCA and the Disclosure Statement on the record. The Debtors characterized the settlement as follows:

> The next objection I'd like to address is the objection of the [Trade Committee]. We have reached a settlement with the [Trade Committee] that I believe has the concurrence of the [Creditors' Committee] participated in negotiating that resolution . . . .  I'll just read into the record our understanding with them.
>
>> This is in full and final settlement of any and all objections of the [Trade Committee] to the disclosure and plan confirmation process, including without limitation, the disclosure statement, the [Second Amended EPCA] and the plan of reorganization, including plan confirmation matters. . . .  The two things we have agreed to do with respect to the [Trade Committee], is first we've agreed to use commercially reasonable efforts to **reconcile, and if agreed, allow on or before the confirmation date, trade claims held by the members of the Trade Committee.** . . .

See December 6, 2007 Transcript, attached to the Application (the "December 6, 2007 Tr."), at 10, lines 9-25, and 11, lines 1-4 (emphasis added). The Debtors also agreed to reimburse the Trade Committee's fees and expenses up to $1.5 million. *Id.* at 11, lines 11-16. Based on the nature of the settlement, only the members of the Trade Committee, not all unsecured creditors, benefitted from the settlement. The Trade Committee's efforts, therefore, did not result in a substantial contribution. *See Villa Luisa*, 354 B.R. at 348 (creditors acting in their own interests do not provide a substantial contribution).

The Trade Committee's objections were also duplicative of the Creditors' Committee's and the Equity Committee's objections to the EPCA, the Amended EPCA, the Second Amended EPCA, and the Disclosure Statement, contrary to the Trade Committee's assertion in the Application. *See* Application, at 13, ¶ 29. The Trade Committee argued in its objection to the Second Amended EPCA that the Amended EPCA was not terminated. *See* ECF Doc. No.

11042, at 7-8, ¶ 14-18. It argued that the Second Amended EPCA diluted the return to unsecured creditors. *Id*., at 10-12, ¶¶ 24-26. The Trade Committee also alleged violations of the priority rule. *Id*. at 12-13, ¶¶ 28. In its objection to the Disclosure Statement, the Trade Committee objected to the inclusion of subordinated notes in the unsecured creditor class, the failure of the plan to pay unsecured creditors in full, the dilution of the return to unsecured creditors, and the payment of interest to unsecured creditors only through December 31, 2007 and called into question the basis for the Debtor's enterprise value. *See* ECF Doc. No. 11049.

The Creditors' Committee raised many of the same issues in its objection to the Second Amended EPCA, including the accrual of interest with respect to general unsecured claims only until December 31, 2007, not through plan confirmation. *See* ECF Doc. No.11037, at 4, ¶ 7. The Creditors' Committee also objected a provision in the Second Amended EPCA that would dilute the return to unsecured creditors. *Id*. at 4-5, ¶¶ 8-9. The Creditors' Committee raised these same objections with respect to the Disclosure Statement. *See* ECF Doc. No. 10804 and 11804.

Likewise, the Equity Committee argued in its objection to the Amended EPCA that the EPCA was not terminated. *See* ECF Doc. No. 11032, at 7-8, ¶¶ 14-18. The Equity Committee also argued that the Amended EPCA diluted the return to other stakeholders. *Id*. at 11-12, ¶¶ 23-24. The Equity Committee, like the Trade Committee, also questioned the disclosure of the changes in the enterprise valuation of the Debtors and the structure of creditor recoveries. *Id*. at 15-18, ¶¶ 30-35.

### 3.    Reasonableness

If the Court determines that the Trade Committee made a substantial contribution, Kasowitz's and Ropes & Grays' fee requests are not reasonable. Kasowitz's and Ropes & Gray's time records are not arranged in project categories as required by the United States Trustee Guidelines, which makes a reasonableness review difficult. *See* Exhibits 3A and 3B to the Application. Moreover, many of Kasowitz's time records relate to matters other than the

22

EPCA, the Amended EPCA, the Second Amended EPCA and the Disclosure Statement.  For

example, between June 13, 2006 and December 15, 2006, most of the professional time incurred

was for analysis of the members' claims, preparation of Kasowitz's Rule 2019 statement,

preparation and revision of a joint interest and fee sharing agreement, and review of pleadings

filed in the case.  *See* Exhibit 3A, at 1-26.  During the entire fee period, paralegals billed for

significant time incurred in reviewing the docket, downloading documents and organizing

exhibits, which is in the nature of clerical work and not compensable.  *Id*. at 1-96.  *See In re*

*Fibermark*, 349 B.R. at 396 (professionals may not bill the estate for time spent by

paraprofessionals on administrative activities).  Ropes & Gray likewise incurred significant time

related to the joint interest and fee sharing agreement, the 9019 statement and claims objections.

*See* Exhibit 3-B to the Application.

        C.        **The Senior Noteholders' Committee**

                1.        **The Application**

        The Senior Noteholders' Committee is made up of senior noteholders of the Debtors.  *See*

Application, at 3.  In the Application, it seeks the reimbursement of its professionals' fees and

expenses pursuant to a settlement with the Debtors, under Fed. R. Bankr. P. 9019, that the Court

approved at the hearing on confirmation of the Original Plan on January 17, 2008.  *See*

Transcript of Hearing Held on January 17, 2008 (the "January 17, 2008 Tr."), at 31, lines 8-11,

ECF Doc. No. 12476.  The settlement is also incorporated into the order confirming the Original

Plan.  *See* Confirmation Order, ¶ 62(c).

        The settlement provides for the reimbursement of "reasonable fees and expenses up to $5

million incurred [on behalf of current and former clients] under the totality of circumstances."

*See* January 17, 2008 Tr., at 20, lines 22-25.  At the January 17, 2008 hearing, the United States

Trustee objected to the settlement arguing that the proper standard of review of fees and

expenses of a creditor is substantial contribution under Sections 503(b)(3) and (4).  *Id*. at 15-16.

The Court overruled the United States Trustee's objection and approved the "reasonable under

23

the totality of the circumstances" standard of review.  *Id*. at 29, lines 4-25, and 30, lines 1-10.

The Court, however, ruled that the Senior Noteholders Committee could not seek reimbursement

of fees and expenses for former members of the group of Senior Note Holders, but that

"reasonableness under the totality of the circumstances . . . conceivably may include fees that

were incurred before the members . . . who later joined the group and are still extent [sic] did

so."  *Id*. at 31, lines 2-7.  The Confirmation Order provides that the Senior Noteholders'

Committee "may seek reimbursement on behalf of the Formerly Represented Parties to the

extent the Applicants benefitted from the work product performed on behalf of the Formerly

Represented Parties."  *See* Confirmation Order, ¶ 62(c) and Application, at 5.  The Formerly

Represented Parties include Caspian Capital Advisors, Castlerigg Master Investments, Ltd., CR

Intrinsic Investors, LLC, Everest Capital Limited, Gradient Partners, L.P.  and Sailfish Capital

Partners, LLC.  *See* Application, at 2, n1.

### 2.    Reasonableness

The Senior Noteholders Committee seeks the reimbursement of the following fees and

expenses for the period from September 1, 2007 through January 17, 2008:

| | | | |
|---|---|---|---|
| Goodwin Proctor | $3,412,444.50 | $224,661.30 | $3,637,105.80 |
| Klestadt & Winters | $3,205.00 | $66.56 | $3,721.56 |
| Maryann Keller & Assoc. | $329,906.25 | $0.00 | $329,906.25 |

*See* Application, at 3.

Services provided by Goodwin Proctor included participating in litigation and

negotiations regarding the Disclosure Statement and Original Plan.         *Id*. at 14-21.  The

Senior Noteholders Committee also interposed objections to the Multi-District Litigation

Settlement.  *Id*. at 21-24.  Maryann Keller and Associates provided research and review of

documents related to valuation of the Debtors.  *Id*. at 24-25.  Klestadt and Winters acted as

conflict counsel in the claims estimation process.  *Id*. at 25-26.

24

The United States Trustee reviewed the time and expense records submitted with the Application under the reasonableness standard of 11 U.S.C. § 330 and the United States Trustee Guidelines. Although it is unclear from the Application which, if any, services were provided to Formerly Represented Parties, it appears that the fees sought are reasonable and the services were beneficial to the estate and the expenses sought were actual and necessary. Therefore, the United States Trustee has no objection to the Application.

###### D.    Highland

###### 1.    The Application

Highland, which submitted a competing bid to fund the Original Plan, seeks the reimbursement of fees, in the amount of $2,020,498.35, and expenses of $61,295.57, incurred by its counsel, Haynes & Boone, and $400,000 in fees and $47,999.67 incurred by Loughlin Meghji, its financial advisor, between March 26, 2006 and October 29, 2009. *See* Application, at 8-9, ¶ 5. Highland is a substantial noteholder of the Debtors. *See* ECF Doc. No. 14007, ¶ 3.

Highland alleges that it made a substantial contribution by objecting to the EPCA, including the break up fee and terms that made the EPCA a risk free investment for Appaloosa, and then submitting a competing investment proposal. *See* Application, at 11-12, ¶¶ 13-14.

> Rather than sit on the sidelines, Highland assembled a competing bid to give force to the Highland Objection. While others objected to the Appaloosa deal – the only game in town – the Highland Objection was supported by a formal proposal which it believed was a higher and better proposal for the Debtors.

*Id.*, at 12, ¶ 15. Highland alleges that it was its competing bid that resulted in revisions to the EPCA that benefitted the Debtors because the Debtors used Highland's bid as leverage in their negotiations with Appaloosa. *Id.* at 13, ¶ 19. Highland states that after the Court approved the EPCA and rejected its bid, it "did not press its legal options any further. Highland's actions were calculated to provide a significantly better deal for the Debtor . . . and to provide a foil for Appaloosa . . . so that the Debtor could negotiate from a position of strength." *Id.* at 13-14, ¶ 20.

25

## 2.    Substantial Contribution

Highland has not shown that it made a substantial contribution.  Ironically, Appaloosa made the same arguments when it sought reimbursement of fees and expenses, under Sections 503(b)(3) and (4), in *In re Dana*, 390 B.R. 100 (Bankr. S.D.N.Y. 2008),  In *Dana*, Appaloosa argued that its objections to an agreement with another investor, Centerbridge, and a series of counter proposals to Centerbridge's bids provided the estate with a final agreement with Centerbridge with substantially superior terms, and that absent Appaloosa's participation, Centerbridge would have had no incentive to negotiate a deal more advantageous to the Debtor. *Id*. at 109.

The Court rejected Appaloosa's arguments and denied the Section 503(b)(3) and (4) request.  *Id*. at 109-110.  The Court held that Appaloosa did not rebut the presumption that it was acting in its self interest.  *Id.* at 109.  Parties objecting to Appaloosa's application showed that the improved terms were due to negotiation between the parties, not Appaloosa's competing bid. *Id*.  Appaloosa's role in the case was solely as a prospective investor and it was not intimately involved in the plan process the way that Centerbridge was.  *Id*.  "When a creditor is pursuing its own economic self-interest, as by definition it does as a bidder at a bankruptcy auction, then that creditor cannot establish the requisite 'direct benefit' required to establish a substantial contribution."  *Id.* at 110 (*quoting in re Public Service Co. of New Hampshire*, 160 B.R. 404, 502 (Bankr. D.N.H. 1993) (internal quotation marks omitted).

Here, the record shows that Highland was acting in its own self interest as a competing bidder.  In its objection to the EPCA, filed on December 28, 2006, Highland set forth the terms of its investment proposal and described it as a "viable alternative" and "clearly superior" to the EPCA.  *See* ECF Doc. No. 6330, at 12-18.  *See also* Declaration of Patrick H. Daugherty, filed on January 10, 2007, ECF Doc. No. 6541.

On January 4, 2007, Highland filed an objection to the Debtors' motion to extend exclusivity, stating that the Debtors were not cooperating in Highland's attempt to enter into a

26

confidentiality agreement so that it could conduct due diligence with respect to its investment proposal. *See* ECF Doc. No. 6442, at 4-5 ¶¶ 10-11. Highland requested that, as a condition to extending exclusivity, the Court require the Debtors to cooperate with Highland and to negotiate with parties other than Appaloosa. *Id.* at 6.

On July 27, 2007, Highland filed an objection to the Amended EPCA. *See* ECF Doc. Nos. 8752 and 8754. In the objection, Highland stated that, on July 17, 2007, it had submitted another investment proposal to the Debtors, which exceeded the value of Appaloosa's proposal. *Id.*, ¶ 2. It also stated that it "is disappointed that the Debtors chose to accept the Appaloosa Proposal as the basis for their plan of reorganization." *Id.*, ¶ 3.

On December 7, 2007, Highland filed an objection to the Disclosure Statement. *See* ECF Doc. No. 11292. Highland alleged that after each revision to the EPCA, the return to creditors under a plan "deteriorated more and more, while concomitantly, more and more concessions were made to Appaloosa. *Id.*, ¶ 3. Highland reminded the Court that the Debtors had rejected two prior investment proposals that Highland submitted. *Id.*, ¶ 2. Highland also disclosed that a group of unidentified bondholders had put together an alternative investment proposal which they had presented to the Creditors' Committee. *Id.*, ¶¶ 4-5. The Creditors' Committee, however, had informed the bondholders that it would not endorse the proposal but would invite further discussion. *Id.*, ¶ 5. Highland requested that the Court require the Debtors to advise creditors of the existence of the alternative proposal in the Disclosure Statement.[2] *Id.*, ¶ 6.

In every objection it filed, Highland promoted its alternative investment proposals, including the two that it submitted to the Debtors and the proposal of the unnamed bondholders. See ECF Doc. Nos. 6330, 6442, 8752 and 11292. In two cases, it asked the Court to grant relief to facilitate consideration of the proposals. *See* ECF Doc Nos. 6442 amd 11292. Highland has presented no evidence to support its contention that its participation as a bidder provided a

---

[2]    In June 2008, Highland, CP and Elliott retained ST&G as counsel and thereafter filed objections as a group. *See, e.g.*, ECF Doc. Nos. 14007 and 14082.

27

substantial benefit to the estate by facilitating a more favorable agreement with Appaloosa and enhancing creditor recoveries. *See* Application, at 23, ¶¶ 46-48. In its own pleadings, Highland bemoans the negative effects and diminished returns to creditors as of the ever changing deals with Appaloosa. The Debtors' success in obtaining investors and confirming a plan is attributable, not to Highland, but to the Debtors, the statutory committees and other parties' who conducted in depth and ongoing negotiations. Highland did not meet its burden of showing that it made a substantial contribution and the Court should, therefore, deny the Application.

### 3. Reasonableness

The United States Trustee also objects to the Application based on reasonableness. Haynes & Boone's time records contain so many redacted entries that it is impossible to determine whether the services rendered benefitted the estate. *See* Exhibit A to the Certification and Notice of Filing Exhibits to the Application. Haynes & Boone also seeks reimbursement for secretarial overtime in the amount of $1,908.40. Secretarial overtime is in the nature of overhead and overhead expense reimbursement will be "categorically denied." *Fibermark*, 349 B.R. at 400. Loughlin Meghji provided no time records at all. *Id.*, Exhibit C. The only documentation of its scope of work is a letter agreement that is almost entirely redacted. *Id.*, Exhibit B.

### F. IUE-CWA

#### 1. The Application

The IUE-CWA, the union representing 8,500 employees and 3,000 retirees of Delphi, seeks reimbursement of fees incurred by its counsel, Kennedy, Jennik & Murray, P.C. ("KJM"), between January 3, 2006 and May 6, 2009, in the amount of $1,185,701.23, and expenses of $52,603.60, for a total request of $1,238,304.85. *See* Application, at 2 and 12.

The IUE-CWA seeks reimbursement, under Section 503(b)(3) and (4), of fees and expenses incurred by KJM with respect to the objection and settlement of the 1113 and 1114 motion to modify collective bargaining agreements, objections to proposed management

28

compensations plans, and objections to proposed plans and sale agreements that would not benefit the estate.  *Id*. at 5.

Among other things, the IUE-CWA objected to the Debtors' proposed Key Employment Compensation Plan (the "KECP") and the management compensation plan set forth in the Original Plan.  *Id*. at 8.  As a result of the IUE-CWA's objection to the Original Plan, the Court reduced the bonus component of the compensation plan in the Original Plan from $87 million to $16.5 million, which represents a reduction of $70.50 million.  *See* January 22, 2008 Transcript, at 180, lines 9-15.

### 2.    Substantial Contribution

With respect to the 1113 and 1114 issues, the IUE-CWA played a lead role in litigating the 1113 and 1114 motions and in negotiating the MOU between the IUE-CWA, GM and the Debtors regarding modification of collective bargaining agreements and retiree benefits approved by the Court on August 16, 2007.  *See* ECF Doc. No. 9106.  The IUE-CWA supported the special attrition program proposed by the Debtors which reduced IUE-CWA represented employees from 8,500 to 2,000.  *See* Application, at 2 and 9, and ECF Doc. No. 3038, ¶ 11. Through the IUE-CWA's efforts, the Debtors were able to meet the goal of their Transformation Plan to obtain "significant labor and retiree cost savings and other modifications from the unions representing the employees of the Debtors."  *See* Affidavit of Robert S. Miller, at 71, ¶ 142, ECF Doc. No. 7.  The IUE-CWA also objected to the commitment fees set forth in the EPCA and the lock up agreement in the Amended EPCA.  *See* Application, at 10-11.  Both provisions were modified and the IUE-CWA withdrew its objections.  *Id*.

The IUE-CWA has met its burden of proof under Sections 5103(b)(3) and (4).  Its efforts resulted in a substantial benefit to the estate in the form of reduced emergence bonuses for executives, and most importantly to the Debtors, significant reductions in labor costs.

29

### 3.    Reasonableness

The United States Trustee reviewed KJM's time and expense records under the reasonableness standard of 11 U.S.C. § 330 and the United States Trustee Guidelines.  Based on this review, it appears that the fees sought are reasonable and the services were beneficial to the estate and the expenses sought were actual and necessary.  Therefore, the United States Trustee has no objection to the Application.

## IV.    CONCLUSION

Based on the foregoing, the United States Trustee requests that the Court sustain her objections and grant other relief as is just.

Dated: New York, NY
March 15, 2010

Respectfully submitted,

DIANA G. ADAMS
UNITED STATES TRUSTEE

By:    */s/ Alicia M. Leonhard*
Alicia M. Leonhard
Assistant United States Trustee
271 Cadman Plaza East, Suite 4529
Brooklyn, New York 11201
Phone: 718.422.4970
Facsimile: 718.422.4990
Alicia.M.Leonhard@usdoj.gov