**PEPE & HAZARD LLP**
Kristin B. Mayhew (9794)
30 Jelliff Lane
Southport, CT  06890-1436
Tel    (203) 319-4022
Fax    (203) 259-0251
*Admission Pro Hac Vice*
*Attorneys for Illinois Tool Works Inc., Illinois Tool Works for Hobart Brothers Co., Hobart Brothers Company, ITW Food Equipment Group LLC and Tri-Mark, Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br>DELPHI CORPORATION, *et al.*<br><br>Debtors. | Chapter 11<br><br>Case No.05-44481 (RDD)<br>(Jointly Administered)<br><br>April 20, 2010 |

### SUPPLEMENTAL BRIEF OF ILLINOIS TOOL WORKS INC. AND ITW FOOD EQUIPMENT GROUP LLC IN SUPPORT OF CLAIM NOS. 11983, 11985, 11988 AND 11989

Illinois Tool Works Inc. and ITW Food Equipment Group (collectively, "ITW"), by and through their undersigned counsel, hereby file the within supplement to their Response dated November 21, 2006 In Opposition to Debtors' Third Omnibus Objection to Certain Claims (Docket No. 5617) and in support of Claim Nos. 11983, 11985, 11988 and 11989. ITW has been named by the Environmental Protection Agency (the "EPA") as a potentially responsible party ("PRP") for environmental contamination at the South Dayton Dump and Landfill ("Site") in Ohio. Pursuant to their claims in this case, ITW seeks to recover sums that they have directly expended and will expend to investigate and remediate the hazardous waste at this site attributable to other PRPs, including Delphi Automotive Systems LLC

KBM/32073/63/972111v2
04/20/10-SPT/

("DAS") and Delphi Corporation ("Delphi") (collectively, the "Debtors"). The Debtors seek to avoid liability for their fair share of the environmental clean-up costs at this Site and have objected to ITW's claims. Despite the fact that the EPA issued a Special Notice Letter identifying Delphi Automotive Systems f/k/a Delco-Moraine as a PRP at this Site, and has filed claims against these Debtors for liabilities related to the Site, the Debtors assert that ITW's claims must be disallowed because the EPA's allegations of liability do not amount to proof of such liability. While EPA's allegations may not rise to the level of proof at this juncture, they certainly provide ITW with prima facie validity of their claims against the Debtors. Because ITW has been named as a PRP and has incurred direct costs in response to Site conditions, ITW has an independent and direct cause of action against the Debtors under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, *et seq.* ("CERCLA") for the recovery of response costs it has and will incur in the clean-up of the Site.

Additionally, as evidenced by the arguments set forth below, there is no basis in law to dismiss ITW's claims for failure to state a claim upon which relief can be granted. The Debtors' underlying CERCLA liability stems from: (i) their status as a successor to General Motors Corporation ("General Motors") – who owned and operated the Delco-Moraine facility prior to its spin-off to the Debtors and contributed hazardous waste to the landfill; and (ii) their contractual agreement to assume the environmental liabilities associated with this facility. Moreover, because ITW has a direct claim against the Debtors under Section 107(a) of CERCLA, its claims are not subject to disallowance under § 502(e)(1)(B) of Title 11 of the

United States Code (the "Bankruptcy Code"). For these reasons, and those set forth below, the Debtors' objection to ITW's claims must be overruled and ITW's claims allowed.

## PROCEDURAL HISTORY

1.  As detailed in their Response, on July 26, 2006, ITW filed Claim Nos. 11985 and 11988 against Delphi and Claim Nos. 11983 and 11989 against DAS (collectively, the "Claims"). The Claims arise from certain environmental liabilities associated with the South Dayton Dump and Landfill in the City of Moraine located in Montgomery County, Ohio.

2.  On or about October 31, 2006, the Debtors filed their (I) Third Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed.R.Bankr.P. 3007 To Certain (A) Claims With Insufficient Documentation; (B) Claims Unsubstantiated By Debtors' Books and Records, and (C) Claims Subject To Modification And (II) Motion To Estimate Contingent and Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) (the "Third Omnibus Claims Objection").

3.  Pursuant to the Third Omnibus Claims Objection, the Debtors sought to disallow, *inter alia*, ITW's Claims on the basis that the claims are "unsubstantiated" and are allegedly not due and owing pursuant to the Debtors' books and records.

4.  On November 21, 2006, ITW filed the Response of Creditors: (i) Illinois Tool Works Inc.; (ii) Illinois Tool Works For Hobart Brothers Co., (iii) Hobart Brothers Company, (iv) ITW Food Equipment Group LLC and (v) Tri-Mark, Inc. In Opposition To Debtors' Third Omnibus Objection To Certain Claims (the "Response").

3

5.  As more particularly set forth in the Response, ITW seeks to recover from the Debtors sums that they have directly expended and will directly expend in the future to remediate the hazardous waste at the Site.

6.  On March 8, 2010, the Debtors filed the Reorganized Debtors' Supplemental Reply To Responses Of Certain Claimants To Debtors' Objections To Proofs Of Claim Nos. 11983, 11985, 11988, and 11989 Filed By Illinois Tool Works Inc. and ITW Food Equipment Group LLC (the "Reply").

7.  In addition to the Debtors' generic allegation that ITW's Claims were "unsubstantiated" as set forth in their Third Omnibus Claims' Objection, the Debtors now attempt to disallow the Claims on the basis that: (i) CERCLA does not impose any liability on the Debtors for contamination at the South Dayton Dump and Landfill; (ii) any contractual assumption of liability by the Debtors relating to the Site has been negated by the Debtors' termination of certain agreements with General Motors as part of the Reorganized Debtors' Plan of Reorganization; and (iii) Section 502(e)(1)(B) of the Bankruptcy Code prohibits recovery by ITW. As will be demonstrated below, each of these arguments fails as a matter of law.

## ARGUMENT

I.  ITW Has Established The *Prima Facie* Validity Of Its Claims

8.  The ITW Claims are statutorily entitled to prima facie validity, and the objecting party bears the initial burden of producing sufficient evidence to rebut ITW's prima facie claim. *See* Fed.R.Bankr.P. 3001(f); *In re Kahn*, 114 B.R. 40, 44 (Bankr. S.D.N.Y. 1990). The Debtors "may not rebut the prima facie case merely by stating that the amount . . .

4

KBM/32073/63/97211v2
04/20/10-SPT/

claimed . . . is not correct; the [Debtors] must produce some evidence to support that statement." *In re Forte*, 234 B.R. 607, 618 (Bankr E.D.N.Y. 1999) (citations omitted); *see also*, *In re Worldcom, Inc.*, No. 02-13533(AJG), 2005 WL 3832065, at *4 (Bankr. S.D.N.Y. Dec. 29, 2005) ("[T]he objector [must] produce evidence sufficient to negate the prima facie validity of the filed claim. It is often said that the objector must produce evidence equal in force to the prima facie case." (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992))).

9. If the Debtors are able to rebut the prima facie validity of the Claims, a point ITW in no way concedes, then the burden would shift to ITW to prove its Claims. *See Worldcom*, 2005 WL 3832065, at *4.

10. ITW has clearly established the prima facie validity of the Claims. EPA named both ITW and DAS (and others) as PRPs under CERCLA with respect to the Site.

11. As detailed in ITW's Response, hazardous substances, including drummed wastes, were disposed of at the Site as early as 1941 and continued through the 1970's and 80's.

12. On September 23, 2004, the Site was proposed for inclusion on the National Priorities List ("NPL"), pursuant to Section 105 of CERCLA.

13. On September 25, 2005, the EPA issued Special Notice Letters pursuant to CERCLA §122(e) identifying, among others, ITW and DAS f/k/a Delco Moraine as potentially responsible parties with respect to the Site.

14. On or about July 31, 2006, the EPA filed a proof of claim later designated as claim # 14309 (the "EPA Claim") against the Debtors.

5

15. Pursuant to its claim, the EPA alleges that Delphi is liable to the United States under CERCLA with respect to the Site. (EPA Claim at ¶5). Specifically, EPA alleges that "Delphi is liable to the United States because by contract, agreement or otherwise, it arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by Delphi at the South Dayton Site owned by another party or entity, and containing hazardous substances, [pursuant to Section 107(a)(3) of CERCLA, 42 U.S.C. 9607(a)(3)]. (EPA Claim at ¶5).

16. In or about August, 2006, ITW and other PRPs, entered into an Administrative Settlement Agreement and Order on Consent ("ASAOC") for the Remedial Investigation/Feasibility Study ("RI/FS") at the South Dayton Dump and Landfill. The EPA signed the ASAOC on August 10, 2006.

17. The costs for the RI/FS are estimated to range from approximately $550,000.00 to over $3,300,000.00.

18. ITW has satisfied its burden of proof with respect to the initial prima facie validity of its claims. In compliance with Rule 3001(f) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), ITW attached to its proofs of claim copies of the following: (i) the Special Notice Letter; (ii) the ASAOC; and (iii) the RI/FS, all of which demonstrate Delphi's potential liability under CERCLA to the EPA and other PRPs, including ITW. The Debtors now attempt, through their Reply, to rebut the prima facie validity of ITW's Claims. The Debtors, however, cannot satisfy the stringent requirements of Rule 7012(b)(6).

6

II.   There Is No Basis In Law To Dismiss ITW's Claims For Failure To State A Claim Upon Which Relief Can Be Granted Pursuant to Bankruptcy Rule 7012(b)(6).

19.   The Debtors allege that ITW has failed to state a claim against the Debtors under Bankruptcy Rule 7012. The Debtors are mistaken. It is well-established that a moving party has the burden under a Rule 7012(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). To prevail on its motion, the movant must show "beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief." *Conley*, 355 U.S. at 45-46; *In re Spiegel, Inc.*, 354 B.R. 51 (S.D.N.Y. 2006). It is fundamental that the court must accept as true all factual allegations in the complaint and draw inferences from these allegations in the light most favorable to the plaintiff. *Id.* at 56.

20.   Additionally, a motion to dismiss for failure to state a claim "is viewed with disfavor and is rarely granted." *Walsh v. McGee*, 918 F.Supp. 107, 112 (S.D.N.Y. 1996). In fact, the Second Circuit has noted that "the practice of dismissing claims 'on the basis of the barebone pleadings is a precarious one with a high mortality rate.'" *Powers v. Coe*, 728 F.2d 97, 99 (2d Cir. 1984). When viewed in light of the foregoing principles, it is clear that the Debtors' attempted dismissal of ITW's Claims must be denied.

III.  DAS And Delphi Are Successors To General Motors Corporation And Are Liable For The Environmental Damages Caused By General Motors At The South Dayton Dump And Landfill.

21.   The Debtors take the position that despite EPA's allegations, no actual finding of liability under CERCLA exists and therefore, they are not liable to ITW. Moreover, according to the Debtors, neither the EPA nor ITW will be able to establish liability under CERCLA because the Debtors did not dispose hazardous wastes at the Site. Specifically,

7

Debtors allege that "because neither Delphi Corporation nor DAS LLC existed at the time the [. . .] Site operated as a landfill, these entities have no statutory liability for contamination at the Site under CERCLA." (Debtors' Reply at ¶18).

22. Even assuming for purposes of argument that Delphi and DAS were not formed until after the landfill closed does not, by any means, insulate them from liability under CERCLA for Site contamination. To make such a logical leap ignores an entire body of case law which holds a corporate successor liable for the debts of its predecessor under certain circumstances such as those existing here.

23. In an attempt to demonstrate that DAS and Delphi did not exist at the time of the alleged contamination at the Site, the Debtors point to certain corporate documents indicating that these entities were previously owned by General Motors and spun- off into separate stand-alone entities on or about September 16, 1998. According to the Debtors, after DAS and Delphi Automotive Systems Corporation (which later became Delphi Corporation) were formed, "General Motors then transferred the assets that had previously been part of its Delphi Automotive Systems unit to these new entities to effectuate the Divestiture." (Debtor's Reply at ¶20).

24. As will be demonstrated through discovery, the newly formed Delphi and DAS continued to operate out of the same location as when they had been a unit of General Motors, retained the same employees and management, maintained the same business operations and produced the same products which were provided to the same customers, including GM.

25. The traditional common law rule on successor liability holds that a purchaser of assets does not succeed to the seller's liabilities. *New York v. Nat'l. Sers. Indus.*, 352 F. 3d

8

682, 685 (2d Cir. 2003). However, there are four widely-recognized exceptions to this general rule of non-liability. A purchaser of assets only succeeds to the seller's liabilities where (1) the purchaser of assets expressly or impliedly agrees to assume the obligations of the transferor; (2) the transaction amounts to a consolidation or de facto merger; (3) the purchasing corporation is a mere continuation of the transferor corporation; or (4) the transaction is fraudulently entered into to escape liability.[1] *Mickowski v. Visi-Trak Worldwide, LLC*, 415 F. 3d 501, 509-510 (6th Cir. 2005); *New York v. Nat'l. Serv. Indus.*, 352 F. 3d 682 (2d Cir. 2003).

26. Three of the four exceptions to the general rule of non-liability of a successor corporation are applicable in the case at bar.

   A.  General Motors Corporation's Divestiture Of The Delphi Facilities To The Debtors Was A De Facto Merger

27. First, Delphi is liable as a successor to General Motors under the "de facto merger" theory of successor liability. Under this theory, courts have found successor liability in the context of an asset purchase when the asset purchase was a de facto merger. "A de facto merger is a merger in fact without an official declaration of such." *Welco Indus. Inc. v. Applied Cos.*, 617 N.E.2d 1129, 1134 (Ohio 1993).

28. "The hallmarks of a de facto merger include (1) the continuation of the previous business activity and corporate personnel, (2) a continuity of shareholders resulting from a sale

---

[1] It is assumed that Ohio state law governs ITW's successor liability claims. A federal court exercising its bankruptcy court jurisdiction under 28 U.S.C. Section 1334(b) over state law claims such as successor liability will typically apply the choice of law rules of the state in which it sits. *See Adelphia Communications Corp. v. Bank of America*, 365 B.R. 24, 82 (Bankr. S.D.N.Y. 2007). Under New York's choice-of-law rules, New York state courts decide choice of law questions for tort claims according to the *lex loci* test. *Hadar v. Concordia Yacht Builders, Inc.*, 886 F.Supp. 1082 (S.D.N.Y. April 13, 1985). The *lex loci* test requires the court to apply the law of the state where the tort occurred. Given that the Site is located in South Dayton, Ohio, it is likely that this Court will apply Ohio state law in analyzing ITW's successor liability claims. *Id.* and *see generally*, *E.B. & A.C. Whiting Co. v. Hartford Fire Ins. Co.*, 838 F. Supp. 863, 865-66 (D. Vt. 1993).

9

of assets in exchange for stock, (3) the immediate or rapid dissolution of the predecessor corporation, and (4) the assumption by the purchasing corporation of all liabilities and obligations ordinarily necessary to continue the predecessor's business operations." *Id.* At 349; *See also Mickowski,* 415 F. 3d at 510 and *Kasarda v. Nelson Tree Service,* No.: 2001CA00009, 2001 Ohio App. LEXIS 4578 at *13-14 (September 25, 2001).

29. As will be demonstrated through discovery, General Motors' divestiture of its Delphi subsidiaries in 1998 to a newly incorporated Delphi was effectively a de facto merger.

30. Subsequent to the divestiture, the new, independent Delphi operated the former General Motors' Delphi facilities at the same physical location, with the same assets and general business operations and with a continuity of management and personnel and product lines. Moreover, as indicated in the Master Separation Agreement (the "MSA") between General Motors and Delphi, General Motors continued to own at least 80% of the stock of Delphi subsequent to the divestiture. (Debtors' Reply, Exh. D at p.4). While obviously General Motors did not cease its operations as a result of the divestiture, it did cease those operations previously conducted by its Delphi subsidiary, leavings those operations to the new Delphi. For these reasons, GM's divestiture of the Delphi facilities to the Debtors was effectively a de facto merger and therefore, the Debtors are liable for the environmental contamination caused by General Motors at the Site.

    B.    Delphi And DAS Assumed General Motors' Environmental Liabilities Associated With The South Dayton Dump And Landfill

31. Not only is Delphi liable for the environmental contamination at the Site under the de facto merger theory, but it is also liable as a successor because Delphi agreed to assume

certain environmental liabilities of General Motors pursuant to the Environmental Matters Agreement ("EMA") dated October, 1998.

32.  Pursuant to the EMA, Delphi agreed to assume certain environmental liabilities that related to the facilities previously operated by GM and divested to an independent Delphi. Paragraph 2.2 of the EMA states in relevant part, " . . . Delphi shall be solely responsible for all Environmental Damages arising from, relating to or in connection with all Delphi Facilities and Delphi Assets, *whether or not the circumstances or claims giving rise to such Environmental Damages occurred or were asserted before or after the Contribution Date. . . .*" (Debtors' Reply, Exh. E at p.4)(emphasis added). Delphi Facility is defined by the EMA as "each parcel of real property, including all facilities and improvements thereon, acquired by purchase, lease or otherwise by Delphi as of the Contribution Date in accordance with the terms of the Master Separation Agreement. . . ." (Debtors' Reply, Exh. D at p. 1). "Delphi Assets" are similarly defined as "the equipment, machinery and other personal property acquired by purchase, lease or otherwise by Delphi from GM as of the Contribution Date in accordance with the terms of the Master Separation Agreement whether or not associated with a Delphi Facility." (Debtors' Reply, Exh. D at p.1).

33.  Despite Delphi's clear and unequivocal assumption of environmental liabilities arising from prior General Motors' facilities under the EMA, the Debtors now take the position that these assumed liabilities have been negated because the Debtors terminated the EMA as part of its Modified Plan. (Debtors' Reply at ¶21).

34.  The EMA is an executory contract under Section 365 of the Bankruptcy Code. 11 U.S.C. § 365. Under Section 365(a), a trustee or debtor-in-possession, subject to the

11

court's approval, may assume or reject any executory contract. Rejection constitutes a breach of the contract, 11 U.S.C. § 365(g), and gives rise to a claim for rejection damages by the injured party. Therefore, Delphi's so-called termination, *i.e.,* rejection, of the EMA as part of the Modified Plan, gives rise to a claim for rejection damages by General Motors. It similarly gives rise to a rejection damages claim by ITW. For, ITW is a third-party beneficiary of that agreement. The obvious purpose of the EMA was to assign liability, by agreement, for environmental damages caused by former GM facilities. In recognition of the many environmental claims that would be asserted by the state and federal government and other injured parties, Delphi and General Motors sought, by agreement, to clarify the scope of each one's responsibility for such damages. As an EPA noticed PRP for the Site, ITW is an injured party with a direct action against Delphi for its assumed liabilities. The concept of the third-party beneficiary arises from the notion that "it is just and practical to permit the person for whose benefit the contract is made to enforce it against one whose duty it is to pay" or perform. *Seaver v. Ransom,* 224 N.Y. 233, 237 (1918); *DFP Manufacturing Corporation v. Northrop Grumman Corp.,* No.: 97-CV-4494 (JS), 1999 U.S. Dist. LEXIS 22998 (E.D.N.Y. Mar. 23, 1999). Thus, as a third-party beneficiary of an executory contract that has been rejected by the Debtors, ITW is entitled to a claim for rejection damages.

C. Delphi Is Liable As A Successor Under The Mere Continuation Theory Of Successor Liability

35. Because there is a commonality of shareholders before and after General Motors' divestiture of its Delphi subsidiaries, the Debtors are also liable under the "mere continuation" theory of successor liability.

12

36. Under the "mere continuation" theory, it is not enough to show that the "purported successor has the same physical plant, officers, employees and product line as the purported predecessor. Rather, 'the basis of this [mere continuation] theory is the continuation of the corporate entity, not the business operation, after the transaction,' such as when one corporation sells its assets to another corporation with the same people owning both corporations. '[T]he key element in establishing continuation is a common identity of stockholders, directors and stock." *Per-Co, Ltd. v. Great Lakes Factors*, 299 Fed. Appx. 559, 563 (6th Cir. 2008).

37. As evidenced by the MSA, General Motors continued to own at least 80% of the stock of Delphi after the Delphi subsidiaries were spun-off to stand-alone entities. Therefore, the Debtors are liable under the "mere continuation" theory of successor liability.

IV. Section 502(e)(1)(B) Of The Bankruptcy Code Does Not Bar ITW's Claims Because ITW Has A Direct Claim Under §107(a) Of CERCLA

38. Finally, the Debtors take the position that ITW's claims must be disallowed under Section 502(e)(1)(B) of the Bankruptcy Code.

39. That section provides in relevant part:

> (e)(1) The Court shall disallow any claim for reimbursement and contribution of an entity that is liable with the debtor on . . . the claim of a creditors, to the extent that –
> (B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution . . . .

11 U.S.C. § 502(e)(1)(B).

40. "A claim will be disallowed under § 502(e)(1)(B) only if (1) the claim is for reimbursement or contribution; (2) the party asserting the claim is liable with the debtor on the

13

claim of a creditor; and (3) the claim is contingent at the time of allowance or disallowance." *In re Dant & Russell, Inc.*, 951 F.2d 246, 248 (9th Cir. 1991).

41.    As discussed above, ITW seeks to recover response costs it incurred in conducting investigation at the South Site. Sections 107(a) and 113(f) of CERCLA permit a private party to recover from a responsible party response costs it incurs in conducting investigation pursuant to CERCLA. *BF Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir. 1992); *In re Dant & Russell, Inc.*, 951 F.2d at 248; *In re Charter Co.*, 862 F.2d 1500, 1503 (11th Cir. 1989).

42.    Claims made under Section 107(a)(4)(B) of CERCLA cannot be disallowed by § 502(e)(1)(B). *See In re Harvard Industries, Inc.*, 138 B.R. 10 (Bankr. D. Del. 1992); *In re Dant & Russell, Inc.*, 951 F.2d at 248; *In re New York Trap Rock Corp.*, 153 B.R. 648 (S.D.N.Y. 1993); and *In re Allegheny Int'l, Inc.*, 126 B.R. 919 (W.D.Pa. 1991), aff'd, 950 F.2d 721 (3d Cir. 1991).

43.    In short, CERCLA §107(a) allows direct claims by PRP against another. ITW's claim is for past and future response costs it has incurred or will incur itself, based upon the same section of CERCLA. The EPA is involved in the Site solely in an oversight role. ITW's claim is a direct claim which is not subject to disallowance under Section 502(e)(1)(B). Therefore, the Debtors' objection to ITW's Claims based on Section 502(e)(1)(B) must be overruled as a matter of law.

44.    The Debtors allege that because the EPA filed a proof of claim with respect to the Site that ITW is seeking a double recovery which should be disallowed by Section 502(e)(1)(B). This is a red herring. As pointed out above, ITW is not seeking reimbursement

14

for monies it has or will pay to the EPA, rather it is seeking recovery for sums it has spent as a PRP at the Site to complete Site investigation. *See generally In re Allegheny Int'l, Inc.* 126 B.R. 919 at 923 ("[t]he distinction between a cleanup performed by Al Tech [the claimant] and a cleanup performed by the EPA is crucial . . . Section 502(e)(1)(B) is not a means of immunizing debtors from contingent liability, but instead protects debtors from multiple liability on contingent debts).

## CONCLUSION

45. In sum, ITW has satisfied its burden of proof and has demonstrated that its Claims should be allowed. ITW has a direct claim against the Debtors under Section 107(a) of CERCLA. Moreover, the Debtors are liable for the environmental contamination at the Site under alternative theories of successor liability. Nor should ITW's Claims be disallowed under Section 502(e)(1)(B) of the Bankruptcy Code because ITW is not seeking reimbursement for monies paid to the EPA, but rather the recovery of sums that have been and will be incurred by ITW directly for investigation costs at the Site.

WHEREFORE, ITW respectfully request entry of an Order: (a) overruling the Debtors' Third Omnibus Objection as to the ITW Claims, with prejudice; (b) allowing the ITW Claims in their entirety; and (c) directing the payment thereof in accordance with the terms of the Debtors' Modified Plan of Reorganization.

ILLINOIS TOOL WORKS INC. and
ITW FOOD EQUIPMENT GROUP LLC

By: \_\_\_\_\_/s/_____
    Kristin B. Mayhew
    Pepe & Hazard LLP
    30 Jelliff Lane
    Southport, CT  06890-1436
    Tel.   (203) 319-4022
    Fax    (203) 259-0251
    Email  kmayhew@pepehazard.com
    Their Attorneys

KBM/32073/63/97211v2
04/20/10-SPT/

## CERTIFICATE OF SERVICE

I, Kristin B. Mayhew, hereby certify that on this 20th day of April, 2010, the foregoing Supplemental Brief Of Illinois Tool Works Inc. And ITW Food Equipment Group LLC In Support Of Claim Nos. 11983, 11985, 11988 And 11989 was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic notification system (CM/ECF). Additionally, other parties may access this filing through the Court's electronic system.

In addition to service via ECF, I caused a true copy of the foregoing Supplemental Response To Reorganized Debtors' Supplemental Reply to be served upon the persons set forth below:

By Federal Express:
DPH Holdings Corp.
Attn: President
5725 Delphi Drive
Troy, Michigan 48098

By Federal Express:
John Wm. Butler, Jr., Esq.
John K. Lyons, Esq.
Michael W. Perl, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
155 North Wacker Drive
Chicago, Illinois 60606

By Federal Express:
Brian S. Masumoto, Esq.
Office of the United States Trustee
33 Whitehall Street, 21st Floor
New York, New York 10004

/s/ Kristin B. Mayhew
Kristin B. Mayhew

KBM/32073/63/97211v2
04/20/10-SPT/