# Exhibit A

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

DELPHI AUTOMOTIVE SYSTEMS, LLC,
a Delaware limited liability company,

        Plaintiff,

vs.

METHODE ELECTRONICS, INC.,

        Defendant.

Civil Action No.: 08-095518-CK

Hon. Nanci J. Grant

OAKLAND COUNTY  **08-095518-CK**

JUDGE NANCI J. GRANT
DELPHI AUTOMO  v  METHODE ELECT

| | |
|---|---|
| Thomas S. Bishoff (P53753) | John R. Trentacosta (P31856) |
| Stephen W. King (P56456) | Gary E. Steinbauer (P69789) |
| Attorneys for Plaintiff Delphi | Attorneys for Defendant Methode |
| Dykema Gossett PLLC | Foley & Lardner LLP |
| 400 Renaissance Center, 35th Floor | 500 Woodward Avenue, Suite 2700 |
| Detroit, Michigan 48243 | Detroit, Michigan 48226-3489 |
| (313) 568-5341 | (313) 234-7100 |
| | |
| Charles E. Brown (P46400) | Ann Marie Walsh |
| Co-Counsel for Plaintiff Delphi | Admitted *pro hac vice* |
| Delphi Automotive Systems, LLC | Co-Counsel for Defendant Methode |
| MC 480-410-254 | Locke Lord Bissell & Liddell LLP |
| 5825 Delphi Dr. | 111 South Wacker Drive |
| Troy, Michigan 48098 | Chicago, Illinois |
| (248) 813-3368 | (312) 443-0654 |

*A civil action between these parties arising out of the transaction or occurrence alleged in the Second Amended and Supplemented Verified Complaint for Breach of Contract and Injunctive and Other Relief was filed in the U.S.D.C. for the Northern District of Illinois, Eastern Division where it was given docket number 09CV2191 and was assigned to Judge Coar. The action has been transferred to the U.S.D.C. for the Eastern District of Michigan by Judge Coar's order dated July 13, 2009 and remains pending.*

## SECOND AMENDED AND SUPPLEMENTED VERIFIED COMPLAINT FOR BREACH OF CONTRACT AND INJUNCTIVE AND OTHER RELIEF

Plaintiff Delphi Automotive Systems, LLC ("Delphi") alleges as follows for its Second Amended and Supplemented Verified Complaint for Breach of Contract and Injunctive and Other Relief:

## NATURE OF THE ACTION

1.      In this civil action Delphi seeks to recover money damages from Defendant Methode Electronics, Inc. ("Methode") based on Methode's refusal to return or turn over tooling drawings or copies of tooling drawings in its possession to Delphi prior to the filing of this lawsuit.  Delphi also seeks to recover a copy of the tooling drawings from Methode.

2.      In this civil action Delphi also seeks to recover money damages for Methode's continuing refusal to supply Delphi with certain prototype and production parts.

3.      With respect to the tooling drawings, Delphi has paid for and owns the tooling drawings, as well as the underlying tooling.  The tooling drawings are in electronic format and copies can be transferred easily to Delphi with the click of a computer mouse.  Methode has no right to refuse to provide the tooling drawings or copies of the tooling drawings and a clear contractual obligation to turn them over to Delphi upon demand.  Despite repeated demands by Delphi to turn over copies of the tooling drawings, Methode refused to do so prior to this lawsuit being filed.  Since this lawsuit was filed, Methode has offered to provide copies of the tooling drawings to Delphi but only upon certain preconditions, including the precondition that Delphi give up its bargained for termination rights under the parties' contracts, as detailed below.

4.      In breach of its contracts with Delphi, Methode threatened to stop delivery of unique and safety critical Bladders ("Parts") – essential to the manufacture of Passive Occupant Detection Sensors ("PODS"), sometimes referred to as Passenger Occupant Detection Sensors, used in Delphi's PODS Programs – unless Delphi acceded to Methode's wrongful price increase

demands. At the time Methode refused to provide the Tooling Drawings to Delphi, Delphi had little to no excess or "bank" of the Parts, and if Methode had halted shipments, then Delphi would have run out of the Parts within 24-48 hours.

5.    The Parts are used by Delphi in the production and supply of PODS which are then sold to its customers – approximately 15 Original Equipment Manufacturers ("OEM") for use as part of the OEM vehicles' occupant protection systems. Almost every major OEM in the world uses Delphi's PODS in one or more of its vehicle models.

6.    If Methode had ceased shipments of the Parts then it would have been responsible for the almost immediate shutdown of Delphi's related PODS production, which would have lead to a disruption and shut downs in the OEMs' production, thus resulting in irreparable harm to Delphi, the OEMs, automobile dealers, automobile workers, and the public for which money damages alone could never adequately compensate.

7.    In order to avoid the aforementioned irreparable harm, Delphi was forced to issue new purchase orders to Methode for the Parts at substantially higher prices. Methode even refused to accept purchase orders "under protest" if Delphi wished to assure continued supply past Methode's unilaterally imposed deadline. In some instances, Delphi paid 40-50% price increases. In aggregate, Delphi estimates that it will pay $16 million dollars annually in prices increases.

8.    Having issued new purchase orders with substantial price increases, and seeking to avoid the possibility of doing so again in the future should Methode decide to extract even higher prices or new commercial terms by stopping or threatening to stop shipping the Parts, and in order to ensure that it could meet its contractual obligations to its OEM customers, Delphi demanded copies of the tooling drawings used to make the tooling for the Parts.

3

9.      Although Methode acknowledged that Delphi had paid for and owned the underlying tooling, prior to this lawsuit Methode had refused to turn over the tooling drawings in breach of its contractual obligations to Delphi and in violation of Michigan law, thereby entitling Delphi to money damages and injunctive and other relief.

10.     In addition, Methode is concealing the tooling drawings from Delphi by wrongfully withholding them and otherwise preventing their disclosure to Delphi. Methode's continued wrongful possession of the tooling drawings and withholding of the tooling drawings from Delphi constitutes a concealment of the tooling drawings that substantially impairs their value and Delphi's ability to use them. Therefore, pursuant to MCR 3.105 and MCL §600.2920, Delphi is also entitled to an order for immediate possession pending final judgment.

11.     With respect to the prototype and production parts, on January 9, 2009, after Delphi had filed its original complaint in this matter, Methode refused to supply Delphi with certain prototype and production parts even though the parties' contracts or agreements, coupled with Methode's course of conduct and past performance, make it clear that Methode is to supply such parts to Delphi on an on-going basis. In addition, since January 9, 2009, Methode has refused to supply Delphi with other prototype and productions parts. These refusals to supply prototype and production parts are clear breaches by Methode of its contractual obligations and duties to Delphi and continue to date.

## PARTIES, JURISDICTION, AND VENUE

12.     Delphi is a Delaware limited liability company with its principal place of business located in Troy, Michigan.

13.     Methode is a Delaware corporation that conducts business in connection with the issues set forth herein in Oakland County, Michigan.

14.    This case is within the subject matter jurisdiction of this Court because the amount in controversy exceeds $25,000, exclusive of interest, fees and costs, and because equitable relief is sought.

15.    Venue in this Court is proper pursuant to MCL §600.1621 because Methode conducts business in connection with the issues set forth herein in Oakland County, Michigan, the parties have consented to venue in this Court, and Delphi seeks replevin of its property located in Oakland County, Michigan.

16.    This Court has personal jurisdiction over Methode because it conducts continuous and systematic business in the State of Michigan, including the business transactions set forth in this complaint.  In addition, Methode has agreed that the forum and venue for any legal or equitable action or proceeding arising out of or in connection with the contracts (as defined below) for the Parts is the appropriate federal or state courts in the State of Michigan and it specifically waived any and all objections to such jurisdiction and venue:

> [E]ach party hereby agrees that the forum and venue for any legal or equitable action or proceeding arising out of, or in connection with, this Contract will lie in the appropriate federal or state courts in the State of Michigan and specifically waives any and all objections to such jurisdiction and venue. (Ex. D, Delphi General Terms and Conditions, ¶ 26.)

Therefore, Methode has consented to personal jurisdiction.

## GENERAL ALLEGATIONS

### The Parties' Supply Relationship

17.    Delphi is a world-wide supplier of automotive parts to the automotive industry, and is engaged in the business of, among other things, manufacturing and supplying parts that are designed and manufactured to meet the stringent quality and safety standards of its customers, as well as applicable governmental safety standards.

18.    Methode is a global manufacturer of component and subsystem devices with manufacturing, design, and testing facilities in the United States, Mexico, Malta, United Kingdom, Germany, Czech Republic, Singapore, and China. Methode designs, manufactures, and markets devices employing electrical, electronic, wireless, sensing, and optical technologies.

19.    As a direct supplier to its OEM customers, Delphi is known as a Tier One supplier. Delphi contracts with Tier Two suppliers, such as Methode, to provide component parts that are incorporated into systems or assemblies supplied by Delphi to its customers.

20.    Methode supplies Delphi with the Parts, which are unique to Delphi specifications and critical for PODS. The Parts are incorporated into Delphi's PODS systems and sold to Delphi's OEM customers. The PODS supplied by Delphi are utilized by numerous OEMs on their various models, including GM, Ford, Chrysler, Hyundai, Subaru, Nissan, and Toyota.

## Just-in-Time Inventory and Sole Source Suppliers

21.    Delphi, consistent with industry standards, operates on a "single-source, just-in-time" inventory supply system basis and lean manufacturing (the "Auto Supply System").

22.    Delphi is the single source to its OEM customers for certain PODS, which are ordered on an as needed basis by its OEM customers pursuant to their contracts with Delphi. In this case, Delphi turns the Parts around in approximately 24-48 hours, and thus, typically maintains little to no inventory of the Parts.

23.    The PODS (including the Parts) are uniquely manufactured for approximately 90 different vehicle models in which they are installed. They are manufactured to specific and exacting OEM specifications and requirements, as well as governmental safety standards. The Parts are safety critical. Simply stated, without the Parts for the PODS, the aforementioned vehicles cannot be manufactured, assembled, shipped to automobile dealerships and sold to the public.

24.    The Auto Supply System is standard in the automotive industry and is used by Delphi, its OEM customers, and automotive equipment suppliers throughout the supply chain. Under the Auto Supply System, the customer maintains a very limited inventory (*i.e.,* typically inventory sufficient for not more than one or two days) of product in order to manufacture and assemble automobiles.

25.    As a result, each entity throughout the supply chain relies on frequent, generally daily, shipments of parts or products in order to meet its production needs. There are usually no inventories maintained for these parts or products, and the failure to supply as ordered could quickly shut down assembly plants (sometimes within hours, other times within days).

26.    Methode is currently the single source, sole supplier of the Parts that are incorporated by Delphi into the PODS sold to its OEM customers, although Delphi is developing in-house manufacturing capability and has obtained prototype parts from a third-party for those prototypes and part numbers that Methode refused to provide or supply to Delphi, including prototypes and part numbers set forth in Methode's January 9, 2009 refusal letter, as described below, and other prototypes and part numbers.

27.    The Parts provided by Methode to Delphi are manufactured to particular OEM and governmental safety and other standards and are not readily available to Delphi by alternative suppliers. Hence, in all circumstances the Parts provided by Methode to Delphi are designed to meet the needs of the specific vehicle into which they are ultimately incorporated and undergo the rigorous production part approval process ("PPAP") to be validated before they are utilized on production vehicles.

## The Parties' Contracts and the Tooling Drawings

28.     Pursuant to the supply relationship between the parties and as part of the process of manufacturing and supplying the Parts to Delphi, Delphi issued certain production purchase orders ("Production Purchase Orders") and tooling purchase orders ("Tooling Purchase Orders") to Methode.  As described below, Delphi also issued certain purchase orders to Methode for prototype tooling and prototype parts.

29.     Specifically, Delphi issued 140 Production Purchase Orders and 108 Tooling Purchase Orders to Methode, which Methode accepted through its regular performance.

30.     Pursuant to the Production Purchase Orders, Tooling Purchase Orders, and other purchase orders issued by Delphi to Methode, as described below, Methode purchased certain tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment, supplies, materials and other items, including the tooling drawings at issue in this case.

31.     The tooling drawings consist of electronic files and/or hard copy drawings of welding tools and cutting tools ("Tooling Drawings") used to make the Parts.  A list identifying the Tooling Drawings with specificity is attached to pleadings previously filed by Delphi in this matter, including Delphi's First Amended Verified Complaint, and therefore it is in the possession of Methode and is not attached here pursuant to MCR 2.113(F).

32.     Delphi issued the Tooling Purchase Orders and the other purchase orders described below to Methode to purchase the tooling used to make the Parts.  As a necessary and inherent part of the process of acquiring and manufacturing the tooling and supplying the Parts, Methode created, or had created on its behalf, the Tooling Drawings.

8

33.    Pursuant to the Production Purchase Orders, Tooling Purchase Orders, and other purchase orders issued by Delphi to Methode, as described below, Delphi paid for the various tooling utilized to make the Parts, including the Tooling Drawings.

34.    The Production Purchase Orders, Tooling Purchase Orders, and other purchase orders issued by Delphi to Methode, as described below, incorporate Delphi's General Terms and Conditions.

35.    The contracts between Delphi and Methode consist of the Production Purchase Orders, Tooling Purchase Orders, other purchase orders issued by Delphi to Methode, as described below, and Delphi's General Terms and Conditions ("T&Cs"), and those rights, duties and obligations that vested, survived or are continuing from prior agreements between the parties, including the August 1, 2001 Long Term Contract and the extension thereof in the email exchange of December 17 and 20, 2004 between Delphi's Nang Ku and Methode's Tim Glandon.  The Production Purchase Orders, Tooling Purchase Orders, other purchase orders issued by Delphi to Methode, as described below, and T&Cs, and those rights, duties and obligations that vested, survived or are continuing from prior agreements between the parties, including the August 1, 2001 Long Term Contract and the extension thereof in the email exchange of December 17 and 20, 2004 between Delphi's Nang Ku and Methode's Tim Glandon are collectively referred to as the "Contracts."  These documents are in the  possession of Methode and therefore are not attached here pursuant to MCR 2.113(F).

36.    The T&Cs address a multitude of issues regulating the parties' business relationship.  For example, the T&Cs specifically define Methode's means of acceptance of the Contracts:

**1. ACCEPTANCE**

Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document, whether expressed in written form, by electronic data interchange or other tangible format, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). Seller acknowledges and agrees that it has read and understands these General Terms and Conditions. **If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification.** Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that an authorized employee of Buyer expressly agrees to accept any such proposals in writing. (Emphasis added.)

37.     The T&Cs also address in detail and make clear that Delphi owns the Tooling

Drawings, Methode holds the Tooling Drawings on a bailment basis, Delphi has the right to re-

take possession of the Tooling Drawings, and, in the event Methode refuses to release the

Tooling Drawings, Delphi may obtain an immediate writ of possession and take possession of

them:

**17.  BUYER'S PROPERTY AND INFORMATION**

17.1  <u>Acquisition of Tooling and Materials</u>. **To the extent that this Contract covers Buyer's purchase of, or reimbursement to Seller for, any tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment, supplies, materials and other items (collectively, "Tooling and Materials") to be used in connection with Seller's actual or anticipated supply of goods to Buyer, Seller will acquire such Tooling and Materials as agent of Buyer** and Buyer shall pay to or reimburse Seller the lower of (i) the amount specified in this Contract for such Tooling and Materials or (ii) Seller's actual out-of-pocket cost to acquire the Tooling or Materials from an unrelated  third party or, if the Tooling and Materials are constructed or fabricated by Seller or any affiliate of Seller, the actual direct costs for materials, labor and overhead associated with such construction and fabrication. **Seller shall assign to Buyer any contract rights or claims in**

**which Seller has an interest with respect to such Tooling and Materials.** Seller shall establish a reasonable accounting system that readily enables the identification of Seller's costs as described above. Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any such Tooling and Materials. **Upon Seller's acquisition of such Tooling and Materials, title thereto shall vest immediately in Buyer and such Tooling and Materials shall be held as "Buyer's Property" by Seller in accordance with this Article 17.**

17.2 <u>Bailment of Buyer's Property</u>. **All Tooling and Materials which Buyer furnishes, either directly or indirectly, to Seller or which Buyer buys from, or gives reimbursement to, Seller in whole or in part (collectively, "Buyer's Property") will be and remain the property of Buyer and be held by Seller on a bailment basis. Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer immediately upon attachment to or incorporation into Buyer's Property. When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property for work performed on, or utilizing, such property or otherwise.**

17.3 <u>Seller's Duties with Respect to Buyer's Property</u>. While Buyer's Property is in Seller's possession and until Seller delivers Buyer's Property back to Buyer, Seller bears the risk of loss, theft and damage to Buyer's Property. Seller will be responsible for the cost of repairing or replacing Buyer's Property if it is stolen, damaged or destroyed regardless of cause or fault. Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's own expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be personal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not commingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from Seller's applicable shipping location (as shown by the shipping address of Seller) without prior written approval from an authorized employee of Buyer, and (g) use Buyer's Property in compliance with Buyer's or the manufacturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations. Buyer will have the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with respect thereto. Seller will not sell, lend, rent, encumber, pledge, lease, transfer or otherwise dispose of Buyer's Property. **Furthermore, Seller will not assert, or permit any**

11

person claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property.

17.4 <u>Return of Buyer's Property</u>. **Seller agrees that Buyer has the right, at any time and from time to time, with or without reason and without payment of any kind, to retake possession of or request the return of Buyer's Property. Without further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the right to enter Seller's premises and take possession of any and all of Buyer's Property.** Upon Buyer's request and in accordance with Buyer's instructions, Buyer's Property will be immediately released to Buyer or delivered to Buyer by Seller, either (i) Ex Works (IncoTerms 2000) at Seller's plant properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates, in which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates. **If Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an immediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or without legal process, and take immediate possession of Buyer's Property.** (Emphasis added.)

38.    Additionally, under Paragraph 12.4 of the T&Cs, entitled "Software and Written Works," the Tooling Drawings at issue here are works of authorship and the property of Delphi:

Seller grants to Buyer a permanent, paid-up license to use, repair, modify and sell any operating software incorporated in the goods in conjunction with the use or sale of the goods. **In addition, all works of authorship, including without limitation, software, computer programs and databases (including object code, micro code, source code and data structures), and all enhancements, modifications and updates thereof and all other written work products or materials, which are created in the course of performing this Contract, separately or as part of any goods and components, are "works made for hire" and the sole property of Buyer. To the extent that such works of authorship do not qualify under applicable law as works made for hire, Seller hereby assigns to Buyer all right, title and interest in any intellectual property rights in such works of authorship. If such assignment is not possible under any applicable law, Seller hereby grants an exclusive, royalty-free license to Buyer with respect to such works of authorship.** (Emphasis added.)

39.     Under Paragraph 12.5 of the T&Cs, entitled "Development, Engineering and

Consulting Services," any intellectual property derived from engineering, consulting or

development services under the Contracts shall be the sole property of Delphi:

> **Engineering, consulting or development services ("Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of authorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole property of Buyer.** Seller agrees to assign all right, title and interest in and to IP that results from Development Services ("Developed IP") to Buyer. Seller shall notify Buyer of the existence of Developed IP and assist Buyer in every reasonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional documents reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse Seller for reasonable costs incurred by Seller in providing such assistance. (Emphasis added.)

40.     Finally, the T&Cs also detail the consequences should a "Seller," such as

Methode, breach or threaten to breach the Contracts, including an acknowledgment by Methode

that Delphi would not have an adequate remedy at law and would be entitled to injunctive relief:

> **19. REMEDIES AND INJUNCTIVE RELIEF**
>
> The rights and remedies reserved to Buyer in this Contract are cumulative with, and in addition to, all other or further remedies provided in law or equity. To the extent that this Contract is for the supply of goods for use as, or fabrication into, parts, components or systems, Seller acknowledges and agrees that money damages would not be a sufficient remedy for any actual, anticipatory or threatened breach of this Contract by Seller with respect to its delivery of goods to Buyer and that, in addition to all other rights and remedies which Buyer may have, Buyer shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach.

13

**Methode's Supply of the Parts to Delphi and the Typical Back-
and-Forth Exchanges Between Delphi and Methode that Result
in the Creation of Tooling Drawings**

41.    The Tooling Drawings are an inherent part of the tooling utilized by Methode to

make the Parts.

42.    The Tooling Drawings are used in connection with Methode's supply of the Parts

to Delphi.

43.    Methode has been compensated by Delphi for the Tooling Drawings.

44.    Generally speaking, there are three stages in the process that results in the creation

of Tooling Drawings, tooling and ultimately production Parts that are installed in vehicles

purchased by the public:  (1) prototype tooling; (2) production tooling; and (3) production parts.

As the name implies, prototype tooling is used to make prototype parts that are tested and

approved by Delphi.  Once the prototype parts are approved by Delphi, production tooling is

manufactured and approved.  Sample production parts are then created from the production

tooling and tested by Delphi as part of a process known as PPAP.  If the sample production parts

pass scrutiny, then the supplier is authorized to begin shipping production parts to Delphi.

Production parts (here the bladders that Methode supplies to Delphi) are incorporated into

assemblies (the PODS) and then ultimately installed into production vehicles.

**Prototype Tooling**

45.    **Step 1:  Delphi engineers create a concept part drawing.**  The first step in the

process of making the subject parts begins with Delphi engineers creating a concept drawing of

the part.  One aspect of the part is the bladder that Methode supplies to Delphi.  The drawing

usually is transmitted electronically from Delphi to Methode.

46.    **Step 2:  Methode's engineer-in-residence at Delphi create hand-made sample**

**parts.**  The next step in the process involves Methode engineers who prior to the filing of this

14

lawsuit were in-residence at Delphi facilities in Kokomo, Indiana, Wuppertal, Germany and (before it closed approximately five months before this lawsuit was filed) Delphi's design center in Brighton, Michigan. These Methode engineers were employed on a full time basis at Delphi and prior to the filing of this lawsuit worked out of the Delphi facilities noted above as if full time Delphi employees.

47.    The Methode engineers-in-residence at Delphi create hand-made parts. The Methode engineers work from the concept part drawings.

48.    **Step 3: Hand-made parts are tested by Delphi.** The hand-made parts are then tested by Delphi engineers in standard performance testing protocols. Depending on the test results, it may be necessary to make multiple design changes and create new sample parts before an acceptable sample is produced.

49.    **Step 4: Prototype tooling drawings are created and prototype sample parts are manufactured.** If the hand-made sample parts are acceptable to Delphi, then Delphi finalizes its concept part drawing into a component level drawing for the part. As part of the process of finalizing the component part drawing, a Methode engineer reviews the drawing and offers comments regarding the manufacturability of the design; that is, whether the design can be manufactured without issues. It is common for the Delphi and Methode engineers to have multiple email exchanges about the electronic part drawings, with the drawings attached to the emails. A sample of this email exchange between Delphi and Methode engineers is attached as Exhibit 1-E to Delphi's Reply Brief on file with the Court and therefore it is in the possession of Methode and not attached here pursuant to MCR 2.113(F).

50.    The component part drawing, which is in electronic format, is also transferred electronically to Methode.

51.    From the component level drawing of the part, Methode creates a prototype tooling drawing. The prototype tooling drawing is used to manufacture prototype tooling, also known as "soft tooling." Prototype tooling got this name because historically it was made out of soft, less-expensive metal designed to produce only a limited run of sample parts.

52.    The prototype tooling is used to manufacture prototype parts. Typically, Methode manufactures a limited quantity of prototype parts and ships them to Delphi for testing. Delphi subjects the prototype parts to standard performance testing protocols. If the prototype parts do not pass Delphi's tests, then the entire process starts over.

53.    As part of the process of acquiring prototype tooling, Delphi engineers issue a purchase requisition, which is an internal document used to generate a prototype tooling purchase order. Next, Delphi issues a prototype tooling purchase order to Methode. Methode then acquires the necessary tooling and issues an invoice to Delphi, which Delphi typically pays via electronic funds transfer, or EFT. Sample prototype tooling documentation, including a prototype tooling purchase order and Methode invoice, is attached as Exhibit 1-F to Delphi's Reply Brief on file with the Court and therefore it is in the possession of Methode and not attached here pursuant to MCR 2.113(F).

54.    Delphi's prototype tooling purchase orders incorporate Delphi's T&Cs:

> **Seller acknowledges and agrees that Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are incorporated in, and a part of, this contract** and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract."). (Ex. 1-F to Delphi's Reply Brief on file with the Court, emphasis added, which is in the possession of Methode and not attached here pursuant to MCR 2.113(F) .)

16

**Production Tooling**

55.     **Step 5:  Delphi signs-off on the production component part design.**  If the
prototype parts are acceptable to Delphi line engineers, then the production component part
design is submitted to the responsible Chief Engineer and others as part of a process known as
"critical design review."  The purpose of the process is to obtain formal "sign-off" or approval of
a production component part design.  If the production component part design is approved by
Delphi, then Delphi issues a purchase requisition form which is used internally to generate a
production tooling purchase order for the supplier, here Methode.

56.     **Step 6:  Delphi issues a request for quotation and Methode submits a
quotation to Delphi.**  Once a production component part is approved, Delphi issues an
Integrated Quote Request Form to Methode.   A sample quote request form for part number
28091941, a PODS B bladder assembly for a Toyota Corolla, as completed and submitted by
Methode, is attached as Exhibit 1-G to Delphi's Reply Brief on file with the Court and therefore
it is in the possession of Methode and not attached here pursuant to MCR 2.113(F).

57.     The quote request form makes it clear that Delphi's T&Cs are incorporated into
and become a part of the supplier's quote.  On the first page of the Request for Quotation, it
provides:

> **Supplier acknowledges and agrees that Delphi's General
> Terms and Conditions and Customer Specific Requirements
> are incorporated in, and a part of, this Request for Quotation.**
> By responding to this Request for Quotation or commencing any
> work, services or other activities related to this Request of
> Quotation, Supplier acknowledges and agrees that Delphi's Terms
> and Conditions will apply to any resulting contract between Delphi
> and Supplier (including any purchase order, release, requisition,
> work order, shipping instruction, specification and other document
> issued by Delphi or accepted in writing by Delphi) in their entirety
> without modification.  (Ex. 1-G to Delphi's Reply Brief on file
> with the Court, emphasis added, which is in the possession of
> Methode and not attached here pursuant to MCR 2.113(F).)

17

58.    The supplier is required to provide extensive information in its quote, including a detailed part price breakdown for the production part it is to supply, as well as production tooling costs associated with supplying the production part.

59.    For example, in Ex. 1-G to Delphi's Reply Brief on file with the Court, which is in the possession of Methode and not attached here pursuant to MCR 2.113(F), Methode identified the "PRODUCTION TOOLING COSTS" for part number 28091941 as follows:

| | |
|---|---|
| Bladder tooling | [$]15,400 |
| Assembly plates | [$]8660 |
| EOL test tooling | [$]9300 |
| TOTAL PRODUCTION TOOL | [$]33,360 |

60.    Methode also included in its quote package a Supplier Team Feasibility Letter and Supplier Packaging Information.

61.    **Step 7: Delphi reviews Methode's quote and, if acceptable, issues a production tooling purchase order.**    After Methode submits its quote to Delphi, it is reviewed by Delphi purchasing and engineering.  If acceptable, then Delphi engineering issues an internal purchase requisition form which triggers the generation of a production tooling purchase order.

62.    Delphi issues the production tooling purchase order to Methode.  A sample production tooling purchase order for part number 28091941 is attached as Exhibit 1-H to Delphi's Reply Brief on file with the Court and therefore it is in the possession of Methode and not attached here pursuant to MCR 2.113(F).

63.    The production tooling purchase order incorporates Delphi's T&Cs:

> **Supplier acknowledges and agrees that Delphi's General Terms and Conditions and Customer Specific Requirements are incorporated in, and a part of, this contract** and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents

are collectively referred to as this "Contract."). (Ex. 1-H to Delphi's Reply Brief on file with the Court, emphasis added, which is in the possession of Methode and not attached here pursuant to MCR 2.113(F).)

64.    **Step 8: Using the production tooling purchase order, Methode produces and submits sample production parts to Delphi.** Upon receipt of the production tooling purchase order, Methode is authorized to acquire the production tooling, including the Tooling Drawings. Simply stated, the tooling cannot be manufactured without the Tooling Drawings.

65.    Once the production tooling is manufactured using the Tooling Drawings, sample parts are made from the tooling and submitted to Delphi for testing. Similar to sample parts generated from prototype tooling, Methode produces a limited run of sample parts from production tooling. Delphi subjects the sample production parts to standard performance testing protocols as part of PPAP.

66.    **Step 9: Methode issues an invoice for tooling, including Tooling Drawings, to Delphi, which is paid via EFT or Electronic Funds Transfer.** If the sample production parts produced from the production tooling pass PPAP, then Delphi advises Methode, and Methode submits a tooling invoice to Delphi. A sample Methode invoice for part number 280911941, which matches the production tooling purchase order above, is attached as Exhibit 1-I to Delphi's Reply Brief on file with the Court and therefore it is in the possession of Methode and not attached here pursuant to MCR 2.113(F).

67.    Typically, Methode's invoices are paid via electronic funds transfer, or EFT.

## Production Parts

68.    **Step 10: Full production parts are authorized and manufactured by Methode.** Once sample production parts are deemed acceptable by Delphi, Delphi issues releases to Methode to ship production parts. Delphi also issues production purchase orders. A

sample production purchase order for part number 28091941 is attached as Exhibit 1-J to

Delphi's Reply Brief on file with the Court and therefore it is in the possession of Methode and

not attached here pursuant to MCR 2.113(F). Sample production purchase orders for the same

part number that were re-issued by Delphi in July 2008 and September 2008 are attached as

Exhibits 1-K and 1-L, respectively, to Delphi's Reply Brief on file with the Court and therefore

they are in the possession of Methode and not attached here pursuant to MCR 2.113(F).

69.     The ten-step process above is typical of the exchanges between Delphi and

Methode and demonstrates how the Tooling Drawings are used in connection with Methode's

supply of Parts to Delphi. At times the process may vary depending on the circumstances of

each Part or assembly. For example, there may be design revisions to an existing Part that

require only minor changes.

70.     At each stage of the process, Delphi makes clear that its T&Cs control. In

addition, Delphi pays Methode for prototype tooling, prototype sample parts, production tooling,

production sample parts, and ultimately production parts.

71.     Prior to filing this lawsuit, Delphi repeatedly demanded copies of the Tooling

Drawings from Methode, but Methode concealed them from Delphi by withholding them,

thereby denying their use to Delphi, and refused to provide them to Delphi.

**The Supply Relationship Between the
Parties Dates Back Many Years**

72.     Methode has been a supplier of the Parts to Delphi for many years.

73.     On or about August 1, 2001, the parties entered into a Long Term Contract. A

copy of Long Term Contract is in Methode's possession and therefore it is not attached here

pursuant to MCR 2.113(F).

74.    The August 1, 2001 Long Term Contract provides for the purchase by Delphi of bladder assemblies from Methode for model years 2002 through 2004. It also provides a product price exemption period to Methode for model years 2002 through 2004 during which Methode's price was not required to be competitive with prices available to Delphi from alternative sources until commencement of the 2005 model year, and that Delphi would forebear from exercising its right to terminate for convenience during the price-exemption period of 2002-2004 model years. Commencing with model year 2005, Methode was required to remain price competitive with prices from alternative sources and Delphi's right to terminate for convenience applied. The August 2001 Long Term Contract also provides that in the event the Buyer [Delphi] exercises its right to terminate or cancel and then makes the products or purchases them from another supplier that Methode agrees not to bring any action or claim against Buyer [Delphi], its suppliers, dealers, or customers for any reason, including any claim for infringement of patents it may have obtained or other proprietary rights, arising from the manufacture, use and sale of the products or use of the information furnished to Delphi by Methode so long as Methode remains the single source through 2004 model year and Delphi fulfills the terms of that agreement. Methode in fact remained the single source through 2004 model year and Delphi did fulfill the terms of that agreement.

75.    In late 2004, the Long Term Contract was extended pursuant to an email exchange between Delphi's Nang Ku and Methode's Tim Glandon dated December 17 and 20, 2004. A copy of this email exchange is in Methode's possession and therefore it is not attached here pursuant to MCR 2.113(F). The parties agreed in that extension that Delphi's General Terms and Conditions apply.

76.    Under the August 1, 2001 Long Term Contract and the Nang Ku/Tim Glandon

extension, although certain aspects of the pricing set forth in the Long Term Contract expired or

were modified, certain rights, duties and obligations under those agreements vested, survived,

and/or are continuing.

77.    The parties continued to perform under the Long Term Contract as extended in

2004 for many years. Pursuant to that agreement and in furtherance of it, Delphi issued new and

amended purchase orders to Methode, which Methode accepted without objection, for prototype

and production tooling, as well as prototype and production parts.

### In 2008 Methode Threatens to Stop Shipping in Order to Extract Substantially Higher Prices for the Parts

78.    On May 1, 2008, Methode sent a letter to Delphi demanding "revised pricing" on

the Parts. In subsequent exchanges between the parties, this pricing became known as the "May

1, 2008 pricing." A copy of the letter is attached to pleadings filed in this matter, including

Delphi's First Amended Verified Complaint, and therefore it is in the possession of Methode and

not attached here pursuant to MCR 2.113(F).

79.    This letter was preceded by discussions among representatives of the parties

during which Methode repeatedly demanded price increases for the Parts from Delphi. In these

discussions, Methode also took the position that the Contracts expired as of June 30, 2008,

despite the fact that nearly every Production Purchase Order had an expiration date beyond that

date, in many cases several years beyond.

80.    Methode's May 1st letter resulted in a meeting between the parties at Delphi's

facility in Kokomo, Indiana. Unfortunately, the parties were not able to resolve their differences

at that meeting.

81.     On June 27, 2008, Methode issued another letter to Delphi, again taking the position that the Contracts were set to expire on June 30, 2008.  Methode concluded its letter with an ominous threat to stop shipping:

> **To ensure an uninterrupted supply of parts**, please forward your agreement to the new pricing no later than June 30, 2008 as any parts shipped after that date will be pursuant to the attached new pricing.  (Emphasis added.)

A copy of the letter is attached to pleadings filed in this matter, including Delphi's First Amended Verified Complaint, and therefore it is in the possession of Methode and not attached here pursuant to MCR 2.113(F).

82.     On June 27, 2008, Delphi responded to Methode's letter of the same date.  In response, Delphi took "strong exception to Methode's assertion that the existing contracts expire as of July 1st, and to its demands to unilaterally impose dramatic price increases, ranging from 30 to 50% or more…."  Delphi also took this opportunity to remind Methode of the catastrophic and irreparable consequences to Delphi, and its OEM customers, should Methode stop shipping the Parts.  A copy of the letter is attached to pleadings filed in this matter, including Delphi's First Amended Verified Complaint, and therefore it is in the possession of Methode and not attached here pursuant to MCR 2.113(F).

83.     On June 30, 2008, Methode issued yet another letter to Delphi, reiterating its demand for substantially higher prices for the Parts.  Methode advised Delphi that it would continue to ship parts until September 30, 2008 at the "May 1, 2008 pricing", but after that date Methode would cut-off supply of the Parts unless the parties reached "an agreement on a new contract for future supply of parts."  Methode demanded that Delphi confirm within 24 hours that it would issue revised purchase orders:

> Please be advised that we need new purchase orders with the May 1, 2008 pricing retroactive to July 1, 2008 with the ZCRI payment

terms. **To insure an uninterrupted supply of parts**, please confirm tomorrow, July 1, 2008, that purchase orders will be updated accordingly. We require new PO's by Friday, July 11. (Emphasis added.)

A copy of the letter is attached to pleadings filed in this matter, including Delphi's First Amended Verified Complaint, and therefore it is in the possession of Methode and not attached here pursuant to MCR 2.113(F).

84.     On July 1, 2008, Delphi issued a letter to Methode requesting good faith negotiations to resolve the parties' pricing dispute. In order to ensure the uninterrupted supply of the Parts and mitigate its damages, Delphi agreed to issue purchases orders with the "May 1, 2008 pricing." In doing so, Delphi "fully reserve[d] its rights and remedies." A copy of the letter is attached to pleadings filed in this matter, including Delphi's First Amended Verified Complaint, and therefore it is in the possession of Methode and not attached here pursuant to MCR 2.113(F).

85.     Shortly after its July 1, 2008 letter, Delphi issued revised purchase orders at the substantially higher "May 1, 2008 pricing." Each revised purchase order contained a statement that the above-contract prices were being paid under protest:

> THIS PURCHASE ORDER IS ISSUED BY DELPHI UNDER PROTEST AND THE INCREASED PRICE SET FORTH HEREIN IS BEING PAID BY DELPHI UNDER PROTEST. DELPHI FULLY RESERVES ITS RIGHTS AND REMEDIES.

An exemplar purchase order is attached to pleadings filed in this matter, including Delphi's First Amended Verified Complaint, and therefore it is in the possession of Methode and not attached here pursuant to MCR 2.113(F).

86.     On July 11, 2008, Methode wrote to Delphi to advising that it would "agree to maintain the May 1, 2008 pricing for a period of three years" provided certain other terms were satisfied. A copy of the letter is attached to pleadings filed in this matter, including Delphi's

24

First Amended Verified Complaint, and therefore it is in the possession of Methode and not attached here pursuant to MCR 2.113(F).

87.    On July 28, 2008, Methode wrote to Delphi to confirm that it had started to receive the revised purchase orders. Methode also advised that it could not accept several terms set forth in Delphi's General Terms and Conditions, including T&C paragraph 12 (pertaining to Methode owned equipment used to make the Parts), paragraph 16 (pertaining to the right to take possession of Methode owned equipment), paragraph 18 (pertaining to service or replacement parts), and paragraph 28 (pertaining to Delphi's rights to audit Methode's records). A copy of the letter is attached to pleadings filed in this matter, including Delphi's First Amended Verified Complaint, and therefore it is in the possession of Methode and not attached here pursuant to MCR 2.113(F).

88.    Methode also took exception to Delphi paying the increased prices "under protest" and demanded the removal of such language from Delphi's purchase orders as a precondition to shipping the Parts after September 30, 2008:

> Through September 30, 2008, Methode will accept purchase orders with May 1, 2008 pricing subject to the above exceptions [to Delphi's T&Cs]. In order for Methode to accept purchase orders for product shipped after September 30, 2008, the purchase orders must have these exceptions noted as well as the removal of any reference to pricing being "under protest." (Emphasis in original.)

### Methode Drops a Bomb Shell by Demanding Yet Higher Prices from Delphi, Thereby Raising the Aggregate Annual Price Increase to $16-22 Million Dollars

89.    On August 19, 2008, Methode advised Delphi that, due to what it described as "volume reductions," Methode would withdraw its May 1, 2008 pricing and submit two new pricing proposals, one proposal for pricing based on a one-year agreement and another proposal for pricing based on a three-year agreement. A copy of the letter is attached to pleadings filed in

this matter, including Delphi's First Amended Verified Complaint, and therefore it is in the possession of Methode and not attached here pursuant to MCR 2.113(F).

90.     On August 25, 2008, Methode dropped a bomb shell on Delphi when it issued its proposal for a three-year agreement. A copy of the letter is attached to pleadings filed in this matter, including Delphi's First Amended Verified Complaint, and therefore it is in the possession of Methode and not attached here pursuant to MCR 2.113(F).

91.     To Delphi's great surprise, the pricing set forth in the three-year proposal was significantly higher than the May 1, 2008 pricing. Methode demand approximately 40-50% prices increases with an annual aggregate price increase of approximately $16 million dollars.

92.     Methode's three-year proposal also demanded certain "conditions" and revisions to Delphi's General Terms and Conditions. Specifically:

(a)     Methode demanded that it be placed on a "material/component cost adder program" so that it could pass along any increases or surcharges from its supply base to Delphi.

(b)     Methode demanded new payment terms.

(c)     Methode objected to paragraph 12 of Delphi's T&Cs to the extent it gives ownership rights to Delphi in tooling and equipment owned by Methode for which Delphi did not pay.

(d)     Methode objected to paragraph 16 of Delphi's T&Cs to the extent it gives Delphi the right to take possession of Methode-owned equipment.

(e)     Methode objected to paragraph 18 of Delphi's T&Cs to the extent it obligates Methode to produce certain service or replacement parts.

(f)     Methode objected to paragraph 28 of Delphi's T&Cs, pertaining to Delphi's audit rights, and insisted that the paragraph be replaced with audit.

93.     Methode did not object to or take issue with any other Delphi T&Cs, including Delphi's ability to terminate for convenience or for breach as set forth in Delphi's T&Cs.

94.     Continuing to leverage the threat of a stop ship, Methode concluded its three-year proposal, stating:

Methode will accept purchase orders with the attached pricing subject to the above conditions and exceptions through September 30, 2011. In order for Methode to accept purchase orders for product shipped after September 30, 2008, the purchase orders must have these exceptions noted as well as Delphi must remove any reference to pricing being "under protest." Delphi must also waive all rights or claims to having paid Methode "under protest" as to any past purchase orders.

95.    On August 26, 2008, Methode issued it one-year proposal to Delphi. A copy of the letter is attached to pleadings filed in this matter, including Delphi's First Amended Verified Complaint, and therefore it is in the possession of Methode and not attached here pursuant to MCR 2.113(F).

96.    Methode's one-year proposal sought even higher price increases for the Parts than the May 1, 2008 pricing or the pricing set forth in the three-year proposal. Methode demanded price increases of approximately 65% with an annual aggregate price increase of approximately $22 million dollars.

97.    Methode's one-year proposal also required Delphi to "provide written assurance that Delphi will not manufacture, use or sell products or induce any third party to manufacture, use or sell products that infringe Methode's patents," which Methode identified as patent nos. D409,935 and 5,975,568 and 7,237,443. This term was completely unacceptable to Delphi for many reasons, including that Methode's demand for assurances was unlawful. Delphi could not give the demanded assurances because Methode's patents are not valid, do not cover the subject parts, and are unenforceable. Delphi invented the PODS products in the 1990's, and Delphi, not Methode, owns numerous patents that cover the design and operation of Delphi's PODS products. Moreover, Methode's demand for such assurances was made in restraint of trade and intended to interfere unlawfully with Delphi's ability to develop the capability to and right to purchase from others and in-source supply to itself of the subject parts if necessary.

Additionally, no requirement existed that Delphi provide such assurances demanded when it buys parts from a supplier.

98.     Similar to the three-year proposal, Methode's one-year proposal included certain "conditions" and revisions to paragraphs 12, 16, 18, and 28 of Delphi's General Terms and Conditions. Methode did not object to or take issue with any other Delphi T&Cs, including Delphi's ability to terminate for convenience or for breach as set forth in Delphi's T&Cs.

99.     Under both proposals, Methode gave Delphi until the close of business September 5, 2008 to accept, otherwise Methode would stop shipping the Parts.

100.     Left with no alternative in order to ensure uninterrupted supply of the Parts, on September 4, 2008, Delphi accepted Methode's three-year proposal set forth in its August 25, 2008 letter, including the modifications to Delphi's T&Cs demanded by Methode. A copy of letter is attached to pleadings filed in this matter, including Delphi's First Amended Verified Complaint, and therefore it is in the possession of Methode and not attached here pursuant to MCR 2.113(F).

101.     Shortly thereafter, Delphi issued new purchase orders to Methode consistent with the terms of the three-year proposal. An exemplar purchase order is attached to pleadings filed in this matter, including Delphi's First Amended Verified Complaint, and therefore it is in the possession of Methode and not attached here pursuant to MCR 2.113(F).

102.     The new agreement between the parties, referred to herein as the "Agreement," includes:  (1) Methode's August 25, 2008 letter; (2) Delphi's September 4, 2008 letter; (3) Delphi's modified General Terms and Conditions, including the right to terminate for convenience and/or breach; (4) Delphi's modified Purchase Orders, which have been accepted by Methode; (5) additional purchase orders issued by Delphi to Methode, including purchase

orders for prototype parts; (6) the September 16, 2008 email from Methode's Tim Glandon to

Delphi's Mark Shively (described below); and (7) those rights, duties and obligations that vested,

survived or are continuing from prior agreements between the parties, including, as described

above, the Long Term Contract as executed in August 2001 and extended in 2004. All of these

documents are in the possession of Methode and therefore are not attached here pursuant to

MCR 2.113(F).

### Methode Refused to Turn Over Copies of the Tooling
### Drawings Prior to the Filing of this Lawsuit

103.    On several occasions in July 2008, while the parties were discussing pricing

issues, Delphi repeatedly requested the return of the Tooling Drawings both orally and in

writing. A copy of the written requests are attached to pleadings filed in this matter, including

Delphi's First Amended Verified Complaint, and therefore they are in the possession of Methode

and not attached here pursuant to MCR 2.113(F).

104.    On July 29, 2008, Methode responded in writing to Delphi's requests. A copy of

the letter is attached to pleadings filed in this matter, including Delphi's First Amended Verified

Complaint, and therefore it is in the possession of Methode and not attached here pursuant to

MCR 2.113(F).

105.    In its July 29th letter, Methode acknowledged that Delphi had paid for and owned

the underlying tooling, but Methode refused to turn over the Tooling Drawings to Delphi as

required by the Contracts. Methode requested that Delphi identify the purchase order terms and

conditions that it was relying upon to establish ownership.

106.    On August 5, 2008, Delphi responded to Methode's July 29th letter, detailing the

contractual basis for Delphi's claim that it owned and was entitled to immediate possession of

the Tooling Drawings. A copy of the letter is attached to pleadings filed in this matter, including

29

Delphi's First Amended Verified Complaint, and therefore it is in the possession of Methode and not attached here pursuant to MCR 2.113(F).

107.    Specifically, Delphi advised Methode that it owned and was entitled to immediate possession of the Tooling Drawings pursuant to Paragraph 17.1 and 17.2 of Delphi's T&Cs, quoted above.

108.    In addition, Delphi cited Paragraphs 12.4 and 12.5 of Delphi's T&Cs, also quoted above, which make clear that Delphi's right to inspect and be provided copies of the Tooling Drawings is absolute and unconditional under the Contracts.

109.    Prior to Delphi filing this lawsuit, Methode refused to turn over copies of the Tooling Drawings to Delphi despite its clear contractual obligation to do so.

**On January 9, 2009 Methode Refuses to Supply Prototype and Production Parts**

110.    On January 9, 2009, after this lawsuit was filed by Delphi, Methode informed Delphi that it would no longer supply Delphi with certain prototype parts, which are part of the parties' Agreement. A copy of Methode's January 9, 2009 letter, referred to herein as "Methode's Refusal Letter," is in the possession of Methode and not attached here pursuant to MCR 2.113(F).

111.    Methode's Refusal Letter states in pertinent part:

> Thank you for your purchase order # 450824472 and # 450829849 for prototype parts. We would be happy to supply the prototype parts to Delphi at the price stated once the current business issues relating to production parts are resolved. As you know, immediately after entering a three-year supply agreement, Delphi sued Methode in Michigan court. Given Delphi's litigation posture and Delphi's statements made in the context of that litigation, Methode is not interested in entering into any new contracts with Delphi at this time.
>
> Please be advised that should these issues be resolved, Methode will require the inclusion of the terms of our current three-year supply agreement including that Delphi will award Methode 100%

of Delphi's requirements. In other words, Delphi must agree that it will neither in-source nor re-source the parts to a third party. As you know, Methode is not a prototype shop but has manufactured prototype parts for Delphi in the past based on the understanding and prior practice that it would be awarded the production program. **Methode will also require Delphi to remove the termination for convenience clause from the Delphi Terms & Conditions for all purchase orders including those included in the three-year supply agreement**. (Emphasis added.)

112.     As is clear from its letter, Methode is attempting, among other things, to use the threat of not shipping to force Delphi to drop the bargained for termination for convenience provision without consideration. Delphi will not agree to such tactics as the termination for convenience provision is valid and enforceable and part of the Agreement. Methode's request for its removal is an express admission of the same.

113.     On January 16, 2009, Delphi responded to Methode's Refusal Letter by noting, among other things, that Methode had already taken the position in its pleadings and before the Court that it had honored and intended to continue to honor the parties' new agreement. A copy of Delphi's letter is in the possession of Methode and not attached here pursuant to MCR 2.113(F).

114.     Additionally, Methode's Counterclaim filed in this matter states that it has "fully performed and will continue to perform its obligations under the three-year supply agreement." *See* ¶ 47 of Methode's Counterclaim.

115.     It is clear that the Agreement includes the purchase orders for prototype parts that Methode rejected in its refusal letter, *i.e.*, #450824472 and #450829849.

116.     Purchase order #45082849, which relates to prototype parts bearing part number 28160147 for the Hyundai LM program, is a PODS D program included within the scope of the Agreement. A copy of that purchase order is attached to Delphi's January 16, 2009 letter as Ex.

31

B, and therefore it is in the possession of Methode and not attached here pursuant to MCR 2.113(F).

117.    Methode's August 25, 2008 letter specifically references PODS D and makes clear that PODS D programs are included within the Agreement's scope.

118.    Methode also committed to supplying prototype parts long before Methode's Refusal Letter.  Specifically, beginning in April 2008, Delphi issued numerous purchase orders to Methode for prototype parts for testing related to the Hyundai LM program (part number 28160147), as set forth in the following chart:

| Purchase Order # | Date PO Issued | Amount | Date Paid |
|---|---|---|---|
| 450702166 | 4/18/08 | $3,812.50 | 6/16/08 |
| 450821362 | 12/4/08 | $625 | 12/11/08 |
| 450823400 | 12/10/08 | $1,500 | 12/15/08 |

Copies of these purchase orders are attached to Delphi's January 16, 2009 letter as Ex. C, and therefore they are in the possession of Methode and not attached here pursuant to MCR 2.113(F).

119.    Methode's commitment to supply prototype parts to Delphi for the Hyundai LM program going forward was reaffirmed when it quoted the Hyundai LM program back on September 15, 2008.  A copy of Methode's quote response is attached to Delphi's January 16, 2009 letter as Ex. D, and therefore it is in the possession of Methode and not attached here pursuant to MCR 2.113(F).

120.    Methode's quote response includes a production part price of $12.43, which evidences an intent to supply production parts.  Indeed, Methode estimated 2009 calendar year production volume for this part at 36,000.  Methode's quote response also makes clear that Methode understood it was committed to producing prototype parts going forward for validation

pursuant to the PPAP.  It identifies the PPAP date as "February 6, 2009" and an ultimate "PPAP

Quantity" of 10.

121.    With respect to the second purchase order – purchase order #450824472, which

relates to prototype parts bearing part number 28172262 for the Ford B299N PODS program –

Methode also committed to supplying prototype parts for that program long before Methode's

Refusal Letter.  A copy of that purchase order is attached to Delphi's January 16, 2009 letter as

Ex. E, and therefore it is in the possession of Methode and not attached here pursuant to MCR

2.113(F)

122.    Delphi issued purchase order #450758315 on August 7, 2008, for tooling and 125

prototype parts (part number 28172262) related to the Ford B299N program.  Delphi paid for the

tooling and the prototype parts on September 17, 2008.  Copies of these purchase orders are

attached to Delphi's January 16, 2009 letter as Ex. F, and therefore they are in the possession of

Methode and not attached here pursuant to MCR 2.113(F).

123.    In addition, Methode's quote response for the Ford B299N program, which was

submitted to Delphi on July 31, 2008, includes a production part price of $11.14 and estimates

2010, 2011 and 2012 calendar year production volumes at 60,000 per year.  A copy of

Methode's quote response is attached to Delphi's January 16, 2009 letter as Ex. G, and therefore

it is in the possession of Methode and not attached here pursuant to MCR 2.113(F).

124.    These documents show a clear intent on Methode's part to supply prototype and

production parts.  Methode's quote response also makes clear that Methode understood it was

committing to producing prototype parts for PPAP validation going forward.  The quote response

identifies the PPAP date as "November 2, 2009."

125.    Given the parties' course of dealing and performance, there is no question that Methode agreed to produce prototype parts for projects going forward under the terms of the Agreement.

126.    In fact, Methode made this point in its September 16, 2008 email to Delphi. A copy of this email is attached to Delphi's January 16, 2009 letter as Ex. H, and therefore it is in the possession of Methode and not attached here pursuant to MCR 2.113(F)

127.    The email, which was authored by Methode's Tim Glandon, follows closely on the heels of Methode's August 25, 2008 letter and Delphi's September 4, 2008 letter and confirms and implements numerous issues under the Agreement. Specifically, Methode states:

> Prototype pricing will be held at current levels through the first year of our agreement. Based on estimated future prototype needs and material price increases, year 2 and year 3 prices may require an adjustment.

128.    All of the items detailed in Methode's September 16, 2009 email make clear that the parties intended by their Agreement to carry forward past practices, a phrase repeatedly used by Methode, including the practice of manufacturing prototype parts.

129.    Methode has manufactured tens of thousands of prototype parts for Delphi during the course of the parties' business relationship. Until Methode's Refusal Letter, Methode had never rejected any purchase order or request to supply prototype parts.

130.    Since its January 9, 2009 refusal letter, Methode has refused to supply other prototype and production parts to Delphi.

131.    As a result of Methode's breaches of contract, including its refusal to supply prototype and production parts, Delphi has been forced to make alternative arrangements in order to ensure that it can meet its contractual obligations to its OEM customers.

## COUNT I – BREACH OF CONTRACT
## (REGARDING TOOLING DRAWINGS)

132.    Delphi re-alleges each of the preceding paragraphs as if set forth fully herein.

133.    Delphi and Methode have entered into valid, enforceable Contracts, as defined above, supported by consideration.

134.    The Contracts are binding on Methode, and Delphi has performed fully its obligations under them.

135.    Methode has breached the Contracts with Delphi by refusing to return or turn over the Tooling Drawings or copies of the Tooling Drawings as demanded by Delphi prior to the filing of this lawsuit.

136.    By refusing to return or turn over the Tooling Drawings or copies of the Tooling Drawings unconditionally when demanded, prior to the filing of this lawsuit, Methode deprived Delphi of the ability to evaluate promptly and then act if necessary to re-source or in-source the subject parts; Methode deprived Delphi of the ability to assure and protect supply of the products to Delphi's customers from stop-shipments, threats of stop-shipment, or Methode's failure to supply the subject parts for whatever reason; and Delphi's ability to re-source or in-source the Parts was significantly hampered and delayed, at great expense, cost and damage to Delphi.

137.    By refusing to return or turn over the Tooling Drawings or copies of the Tooling Drawings unconditionally when demanded, prior to the filing of this lawsuit, Methode has wrongfully obstructed, hindered, and delayed Delphi's ability to evaluate and make necessary contingency plans and strategic decisions, including terminating its supply relationship with Methode, which Delphi is entitled to do pursuant to its T&Cs.

138.    Delphi has suffered compensable damages as a result of Methode's breaches of contract, which damages are or should have been foreseeable to Methode.

35

139.   Methode is liable to Delphi for its damages.

## COUNT II – BREACH OF CONTRACT
## (REGARDING REFUSAL TO SUPPLY PROTOTYPE AND PRODUCTION PARTS)

140.   Delphi re-alleges each of the preceding paragraphs as if set forth fully herein.

141.   Delphi and Methode have entered into a valid, enforceable Agreement, as defined above, supported by consideration.

142.   The Agreement is binding on Methode, and Delphi has performed fully its obligations under it.

143.   Methode has breached the Agreement with Delphi by, among other things, refusing to provide or supply prototype and production parts to Delphi as required under the Agreement.

144.   Delphi has suffered compensable damages as a result of Methode's breaches of contract, which damages are or should have been foreseeable to Methode.

145.   Methode is liable to Delphi for its damages.

## COUNT III – INJUNCTIVE RELIEF/SPECIFIC PERFORMANCE

146.   Delphi re-alleges each of the preceding paragraphs as if set forth fully herein.

147.   The Contracts are binding on Methode, and Delphi has performed fully its obligations under them.

148.   Delphi has paid for and owns the Tooling Drawings pursuant to the Contracts.

149.   Delphi has the right to retake possession of the Tooling Drawings pursuant to the Contracts and under Michigan law.

150.   Methode has a legal duty to turn over the Tooling Drawings (or copies thereof) to Delphi pursuant to the Contracts and under Michigan law.

151.    Methode has breached the Contracts and violated Michigan law by refusing to turn over copies of the Tooling Drawings to Delphi prior to this lawsuit being filed, despite repeated requests from Delphi that it do so.

152.    Delphi has been and will continue to be irreparably harmed without possession of the Tooling Drawings because it has been and will continue to be hindered, hampered and obstructed in its ability to re-source or in-source the Parts.  In addition, Delphi has been and will continue to be hindered and hampered in implementing or making strategic business decisions with respect to future supply of the Parts, including the potential for terminating Methode as a supplier should it become necessary to do so in order for Delphi to meet its contractual obligations to its OEM customers.  Moreover, by not providing possession of the Tooling Drawings to Delphi, Methode deprived Delphi of the ability to evaluate promptly and then act if necessary to re-source or in-source the Parts and deprived Delphi of the ability to assure and protect supply of the products to Delphi's customers from stop-shipments, threats of stop-shipment, or Methode's failure to supply the Parts for whatever reason.

153.    Delphi has a substantial likelihood of prevailing on the merits.  The contracts in question make clear that Delphi owns the Tooling Drawings, Methode holds the Tooling Drawings on a bailment basis, Delphi has the right to re-take possession of the Tooling Drawings, and, in the event Methode refuses to release the Tooling Drawings unconditionally, Delphi may obtain a writ of possession and take possession of them.

154.    The balance of potential harms tips decidedly in Delphi's favor because if Methode had stopped supplying the Parts, plants and/or assembly lines would have been forced to shut down in whole or in part within a matter of days.  On the other hand, there is no potential harm to Methode if it turns over copies of the Tooling Drawings to Delphi without precondition,

as it is contractually obligated to do, because Delphi owns the drawings and Methode has no right to retain them. Further, Delphi does not seek to deprive Methode from using the Tooling Drawings (to the extent it is necessary to meet its contractual obligations to supply the Parts), rather Delphi simply seeks copies of the Tooling Drawings which are in electronic format, easily reproduced and even more easily transferred to Delphi.

155.    The public interest weighs heavily in favor of Delphi because courts have recognized that the public has an interest in preserving the enforceability of contracts, and the public interest is served when commercial contracting parties are made to follow through on their promises and not be allowed to use strong-arm tactics to avoid their contractual commitments or coerce unreasonable price increases or force surrender of bargained for contractual rights and provisions.

156.    Accordingly, Delphi is entitled to injunctive relief directing that Methode turn over copies of the Tooling Drawings to Delphi without precondition.

## COUNT IV – CLAIM AND DELIVERY

157.    Delphi re-alleges each of the preceding paragraphs as if set forth fully herein.

158.    The Tooling Drawings are described specifically in pleadings previously filed in this matter, including Delphi's First Amended Verified Complaint.

159.    The Tooling Drawings are comprised of independent pieces of property.

160.    Delphi holds title to and/or rights of ownership in the Tooling Drawings.

161.    Upon information and belief, the Tooling Drawings have not been taken for any tax, assessment or fine. Nor have they been taken under an execution or attachment.

162.    The original purchase prices for the tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment, supplies and other items, including the Tooling Drawings, exceed $3.0 million dollars and are set forth in detail in the Tooling Purchase Orders.

163.    Despite repeated demands by Delphi, prior to Delphi filing this lawsuit Methode refused to comply with its obligation to provide Delphi with unconditional possession of the Tooling Drawings.

164.    Methode is concealing the Tooling Drawings by wrongfully withholding them from Delphi and preventing disclosure of them to Delphi.  Withholding the drawings and denying Delphi its contractual right to possession of them upon demand is in fact a concealment.

165.    Methode's continued possession, custody, and/or control over the Tooling Drawings is unlawful and in clear violation of the Contracts.

166.    Methode's continued wrongful and unlawful detention and exercise of dominion over the Tooling Drawings is to Delphi's detriment, including monetary damages.

167.    Methode's continued wrongful and unlawful detention and possession of the Tooling Drawings substantially impairs their value and Delphi's ability to use them.  Therefore, pursuant to MCR 3.105 and MCL §600.2920, Delphi is entitled to an order of unconditional possession pending final judgment.

168.    Delphi is entitled to costs pursuant to MCR 3.105(I).

## **RELIEF REQUESTED**

**THEREFORE**, Delphi respectfully requests that this Court enter an order:

(a)    Awarding Delphi damages sustained as a result of the Methode's breaches of contract, including its unlawful detention and concealment of the Tooling Drawings and wrongful refusal to supply prototype and production parts;

(b)    Granting injunctive relief directing Methode to turn over copies of the Tooling Drawings without precondition to Delphi consistent with its obligations under the Contracts and Michigan law;

(c)    Granting Delphi unconditional possession of copies of the Tooling Drawings and requiring Defendants to account for and return possession of copies of the Tooling Drawings to Delphi;

(d)    Allowing Delphi and/or its authorized representatives unconditional access to Methode's facilities to inspect, inventory, account for, load, remove and transfer copies of the Tooling Drawings;

(e)    Requiring Methode to take all necessary and reasonable steps to preserve and protect the Tooling Drawings until such time as copies of the Tooling Drawings are inspected, accounted for, and transferred from their current location;

(f)    Requiring Methode to provide all reasonable and necessary assistance and cooperation to Delphi  in its efforts to take unconditional possession of copies of the Tooling Drawings;

(g)    Granting an order of unconditional possession of copies of the Tooling Drawings pending final judgment pursuant to MCR 3.105(E);

(h)    Awarding Delphi costs, as defined in MCR 3.105 and otherwise, and reasonable attorneys' fees incurred in bringing this action;

(i)    Awarding Delphi money damages for Methode's breaches of contract; and

(j)    Granting Delphi such other and further relief as this Court deems just and proper.


Dated:  July 21, 2009                                    Respectfully submitted,

                                                         DYKEMA GOSSETT PLLC


                                                         By: _____
                                                         Thomas S. Bishoff (P53753)
                                                         Stephen W King (P56456)
                                                         Attorneys for Plaintiff Delphi
                                                         400 Renaissance Center
                                                         Detroit, Michigan 48243
                                                         (313) 568-5341


40

## VERIFICATION OF LISA A. HANSON

I, Lisa A. Hanson, Chief Engineer, Occupant Sensing Systems for Delphi Electronics &

Safety Division, Delphi Automotive Systems, LLC ("Delphi"), am the authorized representative

of Delphi and its affiliates for the purpose of verifying paragraphs 41-71 of the Second Amended

and Supplemented Verified Complaint for Breach of Contract and Injunctive and Other Relief; I

have personal knowledge of the matters set forth in paragraphs 41-71 of the Second Amended

and Supplemented Verified Complaint for Breach of Contract and Injunctive and Other Relief or

the information contained therein has been collected and made available to me by counsel and

employees of Delphi; and I state, under a penalty of perjury, that the factual information and

statements made therein are true and correct.

_Lisa A. Hanson_
Lisa A. Hanson

STATE OF INDIANA          )
                          )  SS:
COUNTY OF HOWARD_____ )

Subscribed and sworn to before me a Notary Public in and for said County and State this

21st day of July 2009.

LORI S. SAILER
NOTARY PUBLIC - INDIANA
TIPTON COUNTY
My Commission Expires
April 23, 2015

_Lori S. Sailer_
Signature
_Lori S. Sailer_
Printed

My County of Residence
_Tipton_

My Commission Expires:
_4-23-2015_

41

## VERIFICATION OF KENNETH H. BETEET

I, Kenneth H. Beteet, Manager, Global Supply Management for Delphi Electronics &

Safety Division, Delphi Automotive Systems, LLC ("Delphi"), am the authorized representative

of Delphi and its affiliates for the purpose of verifying the Second Amended and Supplemented

Verified Complaint for Breach of Contract and Injunctive and Other Relief save paragraphs 41-

71; I have personal knowledge of the matters set forth in the Second Amended and

Supplemented Verified Complaint for Breach of Contract and Injunctive and Other Relief save

paragraphs 41-71 or the information contained therein has been collected and made available to

me by counsel and employees of Delphi; and I state, under a penalty of perjury, that the factual

information and statements made therein are true and correct.

_____
Kenneth H. Beteet

STATE OF INDIANA            )
                            )    SS:
COUNTY OF HOWARD_____  )


Subscribed and sworn to before me a Notary Public in and for said County and State this

21 day of July 2009.

_____
Signature

Kristopher Wright
Printed

My County of Residence

Marion

My Commission Expires:
April 3, 2015

DET01\706539.5
ID\TSB

KRISTOPHER WRIGHT
NOTARY PUBLIC
SEAL
STATE OF INDIANA
MY COMMISSION EXPIRES APRIL 3, 2015

42

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

DELPHI AUTOMOTIVE SYSTEMS, LLC,
a Delaware limited liability company,

               Plaintiff/Counter-Defendant,           Civil Action No.: 08-095518-CK

vs.                                  Hon. Nanci J. Grant

METHODE ELECTRONICS, INC.,      OAKLAND COUNTY **08-095518-CK**

               Defendant/Counter-Plaintiff.

JUDGE NANCI J. GRANT
DELPHI AUTOMO  v  METHODE ELEC

| | |
|---|---|
| Thomas S. Bishoff (P53753) | John R. Trentacosta (P31856) |
| Stephen W. King (P56456) | Gary E. Steinbauer (P69789) |
| Attorneys for Delphi | Attorneys for Methode |
| DYKEMA GOSSETT PLLC | FOLEY & LARDNER LLP |
| 400 Renaissance Center | One Detroit Center |
| Detroit, MI  4843 | 500 Woodward Ave., Suite 2700 |
| (313) 568-5341 | Detroit, MI  48226 |
| | (313) 234-7124 |
| Charles E. Brown (P46400) | |
| Co-Counsel for Delphi | and |
| Delphi Automotive Systems, LLC | |
| MC 480-410-254 | Ann Marie Walsh |
| 5825 Delphi Dr. | Admitted *pro hac vice* |
| Troy, Michigan  48098 | Co-Counsel for Methode |
| (248) 813-3368 | LOCKE LORD BISSELL & LIDDELL |
| | 111 South Wacker Drive |
| | Chicago, IL  60606 |
| | (312) 443-0654 |

## PROOF OF SERVICE

The undersigned states that on July 21, 2009, a copy of:

- **SECOND AMENDED AND SUPPLEMENTED VERIFIED COMPLAINT FOR BREACH OF CONTRACT AND INJUNCTIVE AND OTHER RELIEF**; and

- this **PROOF OF SERVICE** were served upon:

John R. Trentacosta, Esq.  
FOLEY & LARDNER LLP  
One Detroit Center  
500 Woodward Ave., Suite 2700  
Detroit, MI 48226

Ann Marie Walsh, Esq.  
LOCKE LORD BISSELL & LIDDELL  
111 South Wacker Drive  
Chicago, IL 60606

via email and 1st class mail.

I declare that the statements above are true to
the best of my information, knowledge and belief.

_Karenen Cooper_

Dated:  July 21, 2009

DET01\621391.1  
ID\TSB - 101289/0005