# Exhibit E

## STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

DELPHI AUTOMOTIVE SYSTEMS, LLC,
a Delaware limited liability company,

      Plaintiff,

vs.

METHODE ELECTRONICS, INC.,

      Defendant.

Civil Action No. 08-095518-CK

Hon. Nanci J. Grant

OAKLAND COUNTY **08-095518-CK**

JUDGE NANCI J. GRANT
DELPHI AUTOMO  v  METHODE ELEC

| | |
|---|---|
| Thomas S. Bishoff (P53753) | John R. Trentacosta (P31856) |
| Stephen W. King (P56456) | Jeffrey S. Kopp (P59485) |
| Attorneys for Plaintiff Delphi | Gary E. Steinbauer (P69789) |
| Dykema Gossett PLLC | Attorneys for Defendant Methode |
| 400 Renaissance Center, 35th Floor | Foley & Lardner LLP |
| Detroit, Michigan 48243 | 500 Woodward Avenue, Suite 2700 |
| (313) 568-5341 | Detroit, Michigan 48226-3489 |
| | (313) 234-7100 |
| Charles E. Brown (P46400) | |
| Co-Counsel for Plaintiff Delphi | Ann Marie Walsh |
| Delphi Automotive Systems, LLC | Admitted *pro hac vice* |
| MC 480-410-254 | Co-Counsel for Defendant Methode |
| 5825 Delphi Dr. | Locke Lord Bissell & Liddell LLP |
| Troy, Michigan 48098 | 111 South Wacker Drive |
| (248) 813-3368 | Chicago, Illinois |
| | (312) 443-0654 |

## PLAINTIFF/COUNTER-DEFENDANT'S ANSWER TO DEFENDANT/ COUNTER-PLAINTIFF'S COUNTERCLAIM AND AFFIRMATIVE DEFENSES

Plaintiff/Counter-Defendant Delphi Automotive Systems, LLC ("Delphi") states as follows for its Answer and Affirmative Defenses to the Counterclaim of Defendant/Counter-Plaintiff Methode Electronics, Inc. ("Methode"):

## ANSWER TO COUNTERCLAIM

## GENERAL DENIAL

In this civil action Delphi seeks to recover a copy of tooling drawings in the possession of Methode, as well as money damages for Methode's refusal to return or turn over the tooling

drawings or copies of the tooling drawings to Delphi. Delphi has paid for and owns the tooling drawings, as well as the underlying tooling and equipment. Methode has no right to refuse to provide copies of the tooling drawings and a clear contractual obligation to turn them over to Delphi upon demand. Despite repeated demands by Delphi to turn over copies of the tooling drawings, Methode has refused to do so. Methode refuses to turn over the tooling drawings even though it acknowledges that Delphi owns the underlying tooling and equipment. Thus, Delphi is forced to file this action seeking the return of its property that Methode has wrongfully and unlawfully detained and money damages.

Methode's Counterclaim for anticipatory breach is premised on the unfounded assertion that the parties have an exclusive, three-year agreement that cannot be terminated. Methode's Counterclaim is frivolous, and Delphi denies that Methode is entitled to any recovery or relief.

The agreement that the parties reached in August/September 2008, as set forth in Methode's letter of August 25, 2008, Delphi's letter of September 4, 2008, and the revised Delphi General Terms and Conditions (the "Agreement"), was made by Delphi under duress after Methode repeatedly threatened to stop shipping parts which jeopardized Delphi's production and the production of Delphi's customers, approximately fifteen Original Equipment Manufacturers ("OEM"). (A copy of the Agreement is the possession of Methode, and therefore, a copy is not attached here.) It is undisputed that the Agreement includes Delphi's General Terms and Conditions ("T&Cs") as specifically modified by Methode during the parties' negotiations. As set forth in its August 25, 2008 letter, Methode objected to numerous provisions in Delphi's T&Cs, including paragraph 16 (to the extent it gave Delphi the right to take possession of Methode-owned equipment for which Delphi had not paid or reimbursed Methode), paragraph 18 (to the extent it obligated Methode to produce certain service or

2

replacement parts), and paragraph 28 (pertaining to Delphi's audit rights). With the exception of these modifications, Delphi's T&Cs became part of the Agreement.

Among the provisions within Delphi's T&Cs that remained part of the Agreement, which Methode chose not to modify, was Delphi's right to terminate the Agreement for breach, pursuant to paragraph 10, or for convenience, pursuant to paragraph 11. Methode's knowledge of and familiarity with the termination provisions in Delphi's T&Cs dates back to the beginning of its business relationship with Delphi. In fact, in connection with a Long Term Contract that the parties executed on or about August 1, 2001, which ran until model year 2005 and has since expired, Methode insisted that Delphi "forbear from exercising its rights to 'terminate for convenience' as provided in [Delphi's] General Terms and Conditions."

Further, every Delphi purchase order that Methode has accepted since the beginning of the parties' business relationship has incorporated Delphi's T&Cs. Methode has accepted hundreds of such purchase orders from Delphi. Every purchase order states that the supplier is deemed to have read and understands Delphi's T&Cs.

Consequently, any suggestion by Methode that Delphi was obligated to "purchase the subject parts from Methode for at least a substantial portion of the three-year contract" is contradicted by the plain and unambiguous language of the Agreement that permits Delphi to terminate for breach or terminate for convenience.

Equally frivolous is the assertion in Methode's Counterclaim that Delphi has acted in bad faith. As set forth herein and in the pleadings Delphi has filed in this action, Methode has engaged in what amounts to economic extortion by repeatedly threatening to stop shipping parts unless Delphi pays ransom price increases.

3

Methode's bad faith is also demonstrated by its repeated, unlawful attempts to force Delphi to give assurances that Methode's patents are valid and apply to the subject parts – assurances that Delphi believes are untrue and contrary to law. On several occasions Methode has conditioned the return of the tooling drawings on such assurances. Delphi's T&Cs, which govern the parties' supply arrangement, do not permit Methode to withhold the tooling drawings in exchange for such assurances. Patents do not cover drawings; no patent rights are involved in the delivery of drawings as requested by Delphi.

Similarly, Methode's August 26, 2008 letter, which contained Methode's proposal for a one-year agreement that Delphi rejected, included a demand that Delphi provide written assurances that it would not infringe Methode's patents:

> Finally, Methode requires that Delphi provide written assurance that Delphi will not manufacture, use or sell products or induce any third party to manufacture, use or sell products that infringe Methode's patents. As you know, the applicable patents in the United States are D409,935 and 5,975,568 and 7,237,443.

Delphi rejected Methode's one-year proposal for good business reasons and because Methode's demand for assurances was unlawful. Further, Delphi does not provide such assurances, nor is it required to do so when it buys parts from a supplier. Delphi could not give those assurances because Methode's patents are not valid, do not cover the subject parts, and are unenforceable. Moreover, patents do not cover Delphi tooling drawings, and no patent rights are involved in the delivery of drawings as requested by Delphi. Additionally, no requirement existed that Delphi provide the assurances demanded in order to purchase parts. Contrary to Methode's allegations in its Counterclaim, Delphi invented the PODS products in the 1990's, and Delphi, not Methode, owns numerous patents that cover the design and operation of Dephi's PODS products. By its conduct, Methode, in restraint of trade, has also unlawfully interfered

4

with Delphi's ability to develop the capability to and right to purchase from others and in-source supply to itself.

The most recent example of Methode's bad faith is its refusal to supply pre-production and prototype parts in breach of the parties' Agreement, which threatens new vehicle launches for numerous automobile manufacturers. Methode's motivation for its bad faith conduct is clear from the letter that it sent to Delphi on January 9, 2009, advising Delphi that it would not supply the requested parts: Methode wants to re-write the parties' Agreement by deleting the termination for convenience provision. Methode's January 9th letter provides:

> Methode will require the inclusion of the terms of our current three-year supply agreement including that Delphi will award Methode 100% of Delphi's requirements. In other words, Delphi must agree that it will neither in-source nor re-source the part to a third party. ... **Methode will also require Delphi to remove the termination for convenience clause from the Delphi Terms & Conditions for all purchase orders including those included in the three-year supply agreement.** (*See* January 9, 2009, Methode letter, attached as Exhibit A, emphasis added.)

For the reasons set forth in this general denial and the answers to the specific allegations below, Delphi denies that Methode is entitled to any recovery or relief on its Counterclaim, and Methode's Counterclaim should be dismissed with prejudice.

## ANSWER TO SPECIFIC ALLEGATIONS

### Nature of the Action

1.      Methode alleges an anticipatory breach of the three-year supply agreement between Methode and Delphi by Delphi. Delphi obtained three-year pricing from Methode based on the pretense that Delphi intended to purchase the subject parts from Methode for at least a substantial portion of the three-year contract. By this time, Delphi was already contacting or planning to contact Methode's suppliers to attempt to re-source the parts. Immediately after obtaining Methode's commitment to three-year pricing, Delphi intensified its efforts to re-source and sued Methode to obtain copies of tooling drawings.

**ANSWER:**    Delphi denies the allegations in Paragraph 1.

2.    Delphi's conduct demonstrates that it intended not to perform its obligations under the supply agreement when it obtained Methode's commitment to three-year pricing, and instead intended only to use the commitment to buy time to prepare its lawsuit against Methode and re-source the subject parts.

**ANSWER:**    Delphi denies the allegations in Paragraph 2.

### Jurisdiction and Venue

3.    Jurisdiction and venue are proper in this Court because the original claims to which this Counterclaim applies are pending in this Court and the Counter-Defendant has submitted to the jurisdiction and venue of this Court.

**ANSWER:**    Delphi admits that this Court has subject matter jurisdiction over this action.  Delphi further admits that this Court is the proper venue for the adjudication of this controversy.    Further answering, Delphi states that this Court is without subject matter jurisdiction to decide or consider disputes, to the extent any disputes exist at all, regarding any patent claims, patent coverage, or other issues falling under the United States Patent Act, all of which are within the exclusive jurisdiction of the United States Federal Courts.

### Parties

4.    Counter-Plaintiff Methode designs, manufactures, and markets component devices and parts to the consumer and industrial markets, including supplying components to original equipment manufacturers and suppliers in the automotive industry.

**ANSWER:**    Delphi admits that Methode is a global manufacturer of component and subsystem devices with manufacturing, design, and testing facilities in the United States, Mexico, Malta, United Kingdom, Germany, Czech Republic, Singapore, and China.  Methode designs, manufactures, and markets devices employing electrical, electronic, wireless, sensing, and optical technologies.

5.    Counter-Defendant Delphi is a supplier of various parts, including the Passive Occupant Detection System (PODS), to the automotive industry.  The PODS, which is installed

6

in the front passenger seat, provides a signal that controls and modifies airbag deployment characteristics depending on the presence or weight (such as a child) of an occupant in the passenger seat.

**ANSWER:**    Delphi admits that it is a world-wide supplier of automotive parts to the automotive industry, and is engaged in the business of, among other things, manufacturing and supplying parts that are designed and manufactured to meet the stringent quality and safety standards of its customers, as well as applicable governmental safety standards. Methode supplies Delphi with safety critical Bladders ("Parts") used in the manufacture of Passive Occupant Detection Systems ("PODS"), sometimes referred to as a passenger occupant detection sensor. The Parts are incorporated into Delphi's PODS B and D Programs systems and sold to Delphi's OEM customers. The PODS supplied by Delphi are utilized by numerous OEMs on their various models, including GM, Ford, Chrysler, Hyundai, Subaru, Nissan, and Toyota. Delphi denies Methode's characterization of the PODS and states that PODS sense pressure imposed upon a vehicle's passenger seat and provide a signal based thereon to an airbag control module, which controls airbag deployment. To the extent not already answered, Delphi denies the allegations in Paragraph 5.

## General Allegations

### Methode supplies patent-protected parts to Delphi.

6.    Methode manufactures for Delphi certain bladder assemblies (hereinafter referred to as "the subject parts") that are components of Delphi's PODS. The bladder is a key component of the PODS.

**ANSWER:**    Methode supplies Delphi with safety critical Bladders, ("Parts") used in the manufacture of PODS. The Parts are incorporated into Delphi's PODS B and D Programs systems and sold to Delphi's OEM customers. To the extent not already answered, Delphi denies the allegations in Paragraph 6.

7

7.    The subject parts were invented by American Components, Inc. (ACI), a company which was located in Dandridge, Tennessee. In the 1990s, ACI designed, manufactured and assembled products including the subject parts.

**ANSWER:**    Delphi denies the allegations in Paragraph 7 and further states that Delphi

invented its PODS product in the 1990's. Moreover, Delphi states that it, not Methode, owns

numerous patents that cover the design and operation of Delphi's PODS products.

8.    The subject parts are protected by certain patents (including U.S. Patents 5,975,568, 7,237,443, and/or Des 409,935).

**ANSWER:**    Delphi denies the allegations in Paragraph 8. Further, Delphi admits that

Methode claims to own certain patents but denies that Delphi's PODS products are covered by

any valid and enforceable claim of any Methode patent and that these Methode patents are

lawfully valid and enforceable. Moreover, Delphi states that it, not Methode, owns numerous

patents that cover the design and operation of Delphi's PODS products. Further, for purposes of

this action, patents do not cover the Delphi owned tooling drawings and no patent rights are

involved in the delivery of Delphi's drawings as requested by Delphi.

9.    In 2001, Methode purchased from American Components, Inc. (ACI) certain assets, including the intellectual property rights relating to PODS, and thus acquired the rights to patents that applied to the parts.

**ANSWER:**    Delphi denies the allegations in Paragraph 9. Further, Delphi denies that

its PODS products are covered by any valid and enforceable claim of any patent owned by ACI

or Methode. Delphi also denies that Methode owns any intellectual property rights relating to

the PODS products.

## The parties' long-term supply agreement expired in 2008.

10.    Beginning in 2001, through a series of long-term supply agreements, Methode has been the exclusive supplier of the patented subject parts to Delphi. Each long-term supply agreement spanned several years.

**ANSWER:**    Delphi admits that the parties entered into a Long Term Contract that the parties executed on or about August 1, 2001, with the term covering model years 2002 through 2004, which contract has expired.    Delphi further admits that in the Long Term Contract Methode insisted that Delphi "forbear from exercising its rights to 'terminate for convenience' as provided in [Delphi's] General Terms and Conditions" until commencement of 2005 Model Year.    Further, the Delphi Purchase Order contracts that govern supply of Delphi's requirements from Methode for 2005 Model Year and later incorporated Delphi's T&Cs, including the right to terminate for convenience provision.    Further answering, the Long Term Contract speaks for itself and is the best evidence of its contents.    To the extent not already answered, Delphi denies the allegations in Paragraph 10 and specifically denies that Delphi's PODS products, as well as any parts supplied by Methode, are covered by any valid and enforceable claim of any Methode patent, and moreover, Delphi states that it, not Methode, owns numerous patents that cover the design and operation of its PODS products.

11.    Before the current long-term agreement, the parties performed under a December 2004 agreement that was set to expire on June 30, 2008.    *See* Letter from Timothy Glandon to Kenneth Beteet dated June 30, 2008 Ex. A.

**ANSWER:**    Delphi denies the allegations in Paragraph 11.

12.    In the 2004 agreement, as in the prior contract, Methode provided annual price discounts.    *See* Glandon Letter Ex. A.    Delphi benefited from price decreases during the contract term, but as a consequence Methode had to absorb the price increases for the materials required to produce the parts, with no relief from Delphi.    The increases in costs of materials were not passed on to Delphi.

**ANSWER:**    Delphi admits that Methode was obligated to provide firm fixed pricing in exchange for receiving an award of Delphi's requirements of Parts with certain price discounts for the Parts.    Any outstanding Delphi Purchase Orders issued to Methode before October 8, 2005, for these Parts requirements became property of the Delphi debtor's estate in U.S.

9

Bankruptcy Court as of October 8, 2005 with the filing of Delphi's Chapter 11 reorganization petition and thereafter subject to the Bankruptcy Court's automatic stay order under 11 U.S.C. § 362(a) "which operates as a stay, applicable to all entities, of … any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" without first receiving permission of the Bankruptcy Court as an exception to the stay order. Further answering, Delphi is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 12.

### Methode advised Delphi of price increases beginning in December 2007.

13.     Seven months before the 2004 agreement expired, in December of 2007, Methode advised Delphi that it would need a price increase when the then-current agreement expired on June 30, 2008. On May 1, 2008, Methode sent Delphi new pricing, which would take effect immediately after the 2004 agreement expired on June 30, 2008. *See* E-mail from Timothy Glandon to Mark Shively dated May 1, 2008 Ex. B. On May 15, during a conference call, Delphi rejected the May 1 pricing.

**ANSWER:**    Delphi admits that on May 1, 2008, Methode sent a letter to Delphi demanding "revised pricing" on the Parts. This letter was preceded by discussions among representatives of the parties during which Methode repeatedly demanded price increases for the Parts from Delphi. To the extent not already answered, Delphi denies the allegations in Paragraph 13.

14.     In mid-2008, at a meeting in Kokomo, Indiana, the parties continued to discuss a new supply agreement that would continue supply after the existing agreement expired. Methode informed Delphi that the prices for the new agreement would have to reflect:  (1) increases in the prices of materials used to manufacture the parts, and (2) significant decreases in Delphi's projected volume requirements. Delphi, on the other hand, sought further price reductions from Methode in a new agreement.

**ANSWER:**    Delphi admits that Methode's May 1st letter resulted in a meeting between the parties at Delphi's facility in Kokomo, Indiana. Unfortunately, the parties were not able to

resolve their differences at that meeting.  To the extent not already answered, Delphi denies the

allegations in Paragraph 14.

### The parties continued discussions and Delphi asked for a three-year agreement.

15.    Over the next four months, the parties continued discussions concerning a possible new contract and Delphi asked for a three-year agreement.  Delphi asked on several occasions that Methode extend the then-expiring contract.  *See* E-mail from Joyce Hoffman to Timothy Glandon dated June 13, 2008 Ex C; *see also* E-mail from Kenneth Beteet to Timothy Glandon dated June 18, 2008 Ex. D.

**ANSWER:**    Delphi admits that during the period May 2008 through September 2008,

Methode repeatedly threatened to stop shipping the Parts in order to extract substantially higher

prices for the Parts.  Further answering, Delphi states that the referenced documents speak for

themselves and are the best evidence of their contents.  To the extent not already answered,

Delphi denies the allegations in Paragraph 15.

16.    During a conference call on June 6, Delphi asked Methode to provide the framework for a three-year agreement.

**ANSWER:**    Delphi denies the allegations in Paragraph 16.

17.    On June 18, 2008, Methode provided a proposal for three-year pricing to Delphi, which was the same as the May 1, 2008 pricing with certain protections for Methode against further material price increases and drastic volume reductions.  *See* E-mail from Timothy Glandon to Mark Shively et al. dated June 18, 2008 Ex. E.

**ANSWER:**    Delphi admits that during the period May 2008 through September 2008,

Methode repeatedly threatened to stop shipping the Parts in order to extract substantially higher

prices for the Parts.  Further answering, Delphi states that the referenced document speaks for

itself and is the best evidence of its contents.  To the extent not already answered, Delphi denies

the allegations in Paragraph 17.

18.    Delphi responded the next day, June 19, thanking Methode for the three-year pricing but again seeking an extension of purchase orders without any commitment to a three-year agreement.  *See* E-mail from Kenneth Beteet to Timothy Glandon dated June 19, 2008 Ex.

F. Methode responded the same day and provided Delphi additional time to issue new purchase orders. *See* E-mail from Timothy Glandon to Kenneth Beteet dated June 19, 2008 Ex. G.

**ANSWER:**   Delphi admits that during the period May 2008 through September 2008, Methode repeatedly threatened to stop shipping the Parts in order to extract substantially higher prices for the Parts. Further answering, Delphi states that the referenced documents speak for themselves and are the best evidence of their contents. To the extent not already answered, Delphi denies the allegations in Paragraph 18.

### Delphi rejects Methode's proposals and threatens to re-source the subject parts.

19.    On June 24, Methode and Delphi met in Kokomo to further discuss a possible new long-term agreement. During the discussions, much to Methode's surprise, a Delphi vice-president threatened to re-source Methode as a supplier "soon." *See* Letter from Timothy Glandon to Kenneth Beteet dated June 27, 2008 Ex. H. Despite numerous discussions, emails, and letters on the topic from both parties, Delphi also took the position, for the very first time, that the parties did not have a long-term supply agreement and that the supply agreement did not expire on June 30, 2008. *See* Letter from Kenneth Beteet to Timothy Glandon dated June 27, 2008 Ex. I and Methode's response, Glandon Letter Ex. H.

**ANSWER:**   Delphi admits that during the period May 2008 through September 2008, Methode repeatedly threatened to stop shipping the Parts in order to extract substantially higher prices for the Parts. Further answering, Delphi states that the referenced documents speak for themselves and are the best evidence of their contents. To the extent not already answered, Delphi denies the allegations in Paragraph 19.

20.    On June 26, Delphi rejected the May 1 pricing proposal. *See* E-mail from Kenneth Beteet to Timothy Glandon dated June 26, 2008 Ex. J. The next day, in response to Delphi's stated intention of re-sourcing Methode "soon," Methode also provided pricing that would be good for only 90 days since it did not know what Delphi meant by "soon." *See* Glandon Letter Ex. H.

**ANSWER:**   Delphi admits that during the period May 2008 through September 2008, Methode repeatedly threatened to stop shipping the Parts in order to extract substantially higher prices for the Parts. Delphi further admits that it rejected Methode's unilateral demands for

substantial price increases. Further answering, Delphi states that the referenced documents speak for themselves and are the best evidence of their contents. To the extent not already answered, Delphi denies the allegations in Paragraph 20.

21.    On June 30, with the long-term agreement expiring that day, Methode made an accommodation to Delphi – it offered to ship parts at the May 1 pricing for 90 days so long as the parties reached a new supply agreement for future parts by August 31, 2008. *See* Glandon Letter Ex. A.

**ANSWER:**    Delphi admits that during the period May 2008 through September 2008, Methode repeatedly threatened to stop shipping the Parts in order to extract substantially higher prices for the Parts. Delphi further admits that on June 30, 2007, Methode issued yet another letter to Delphi, reiterating its demand for substantially higher prices for the Parts. Methode advised Delphi that it would continue to ship parts until September 30, 2008 at the "May 1, 2008 pricing," but after that date Methode would cut-off supply of the Parts unless the parties reached "an agreement on a new contract for future supply of parts." Methode demanded that Delphi confirm within 24 hours that it would issue revised purchase orders:

> Please be advised that we need new purchase orders with the May 1, 2008 pricing retroactive to July 1, 2008 with the ZCRI payment terms. To insure an uninterrupted supply of parts, please confirm tomorrow, July 1, 2008, that purchase orders will be updated accordingly. We require new PO's by Friday, July 11.

In order to ensure the uninterrupted supply of the Parts, Delphi was forced to pay substantially higher prices for the Parts under duress and contrary to the parties' contracts. Further answering, Delphi states that the referenced document speaks for itself and is the best evidence of its contents. To the extent not already answered, Delphi denies the allegations in Paragraph 21.

**In July 2008, Delphi requests the subject drawings for the first time.**

13

22.    During the seven years in which Methode has been supplying parts to Delphi, it has never requested copies of tooling drawings for the subject parts; nor is Delphi entitled to the drawings under the parties' supply agreement. Delphi has alleged that the tooling drawings are necessary to re-source parts to another supplier.

**ANSWER:**    Delphi denies the allegations in Paragraph 22.

23.    On July 8, 2008, during pricing discussions, Delphi for the first time requested copies of the tooling drawings for the subject parts. *See* E-mail from Joyce Hoffman to Dan Andrus dated July 8, 2008 Ex. K.

**ANSWER:**    Delphi admits that on several occasions in July 2008, while the parties were discussing pricing issues, Delphi repeatedly requested the return of tooling drawings for the Parts both orally and in writing. Further answering, Delphi states that the referenced document speaks for itself and is the best evidence of its contents. To the extent not already answered, Delphi denies the allegations in Paragraph 23.

24.    On July 21, after the normal summer shutdown, Methode responded and agreed to provide the drawings if Delphi would agree to provide adequate assurances that the drawings would not be used to infringe Methode's patents. *See* Letter from Timothy Glandon to Joyce Hoffman dated July 21, 2008 Ex. L. Delphi did not respond in any way, and Methode did not provide the drawings.

**ANSWER:**    Delphi admits that Methode responded to Delphi's repeated requests for return of the tooling drawings for the Parts. Further answering, Delphi states that the referenced document speaks for itself and is the best evidence of its contents. Further, Delphi believes that Methode's demand for such assurances is unlawful. Further, while Methode claims to own certain patents, Delphi denies that its PODS products are covered by any valid and enforceable claim of any Methode patent. Further answering, patents do not cover drawings; no patent rights are involved in the delivery of Delphi owned tooling drawings as requested by Delphi. Further, Delphi states it invented its PODS products in the 1990's and denies that Delphi's PODS products are covered by any valid and enforceable claim of any ACI or Methode patent. Further, Delphi states that it, not Methode, owns numerous patents that cover the design and operation of

its PODS products. To the extent not already answered, Delphi denies the allegations in Paragraph 24.

25.    On July 24, Delphi again requested the tooling drawings. *See* Letter from Joyce Hoffman to Timothy Glandon dated July 24, 2008 Ex. M. On July 29, Methode again asked Delphi to provide assurances that Delphi will not use the drawings to infringe Methode's patents. *See* Letter from Timothy Glandon to Joyce Hoffman dated July 29, 2008 Ex. N.

**ANSWER:** Delphi admits that on several occasions in July 2008, while the parties were discussing pricing issues, Delphi repeatedly requested the return of tooling drawings for the Parts both orally and in writing. Delphi admits that on July 29, 2008, Methode responded in writing to Delphi's requests. In its July 29th letter, Methode acknowledged that Delphi had paid for and owned the underlying tooling and equipment, but Methode refused to turn over the tooling drawings to Delphi as required by the parties' contracts. Further answering, Delphi states that the referenced documents speak for themselves and are the best evidence of their contents. Moreover, Delphi states that it, not Methode, owns numerous patents that cover the design and operations of its PODS products. Further answering, through its demands for patent assurances from Delphi, Methode has unlawfully, and in restraint of trade, interfered with Delphi's right to purchase from others or in-source to supply itself. To the extent not already answered, Delphi denies the allegations in Paragraph 25.

26.    Over the next five weeks, Methode continued to discuss a possible new long-term supply agreement with Delphi.

**ANSWER:** Delphi admits that during the period May 2008 through September 2008, Methode repeatedly threatened to stop shipping the Parts in order to extract substantially higher prices for the Parts. To the extent not already answered, Delphi denies the allegations in Paragraph 26.

15

27.    As of the date of this filing, Delphi has still not provided any assurances that it does not intend to infringe Methode's patents. Instead, Delphi advised Methode's counsel that the patents do not apply to the parts. *See* Letter from Ann Walsh to Charles Brown dated October 15, 2008 Ex. O. This was the first time Delphi ever took such a position, contrary to Delphi's previous conduct. Several years ago, Delphi sought a license from Methode to manufacture the patented parts, thereby acknowledging Methode's patent rights. *Id.*

**ANSWER:**    Delphi admits that Methode's patents do not apply to the Parts. Further, Delphi believes that Methode's demand for assurances is unlawful. Further, Delphi invented its PODS products in the 1990's and while Methode claims to own certain patents, Delphi denies that its PODS products are covered by any valid and enforceable claim of any Methode patent. Further answering, Delphi states that it, not Methode, owns numerous patents that cover the design and operations of its PODS products. Further, no contractual requirement existed that obligated Delphi to give the assurances demanded by Methode or to condition delivery of the tooling drawings upon receipt of those assurances. Further, patents do not cover drawings; no patent rights are involved in the delivery of copies of Delphi's tooling drawings as requested by Delphi. To the extent not already answered, Delphi denies the allegations in Paragraph 27.

### Methode and Delphi finalize a three-year agreement.

28.    Pursuant to Delphi's request, on August 25 and 26, 2008, Methode provided revised one- and three-year pricing. *See* Letter from Timothy Glandon to Mark Shively dated Aug. 25, 2008 Ex. P; Letter from Timothy Glandon to Mark Shively dated Aug. 26, 2008 Ex. Q.

**ANSWER:**    Delphi admits that on August 25, 2008, Methode dropped a bombshell on Delphi when it issued its proposal for a three-year agreement. The pricing set forth in the three-year proposal was significantly higher than the May 1, 2008 pricing. Methode demanded approximately 40-50% price increases with an annual aggregate price increase of approximately $16 million dollars. Methode's three-year proposal also demanded certain "conditions" and revisions to Delphi's General Terms and Conditions. Specifically:

(a)    Methode demanded that it be placed on a "material/component cost adder program" so that it could pass along any increases or surcharges from its supply base to Delphi.

(b)    Methode demanded new payment terms.

(c)    Methode objected to paragraph 12 of Delphi's T&Cs to the extent it gives ownership rights to Delphi in tooling and equipment owned by Methode for which Delphi did not pay.

(d)    Methode objected to paragraph 16 of Delphi's T&Cs to the extent it gives Delphi the right to take possession of Methode-owned equipment.

(e)    Methode objected to paragraph 18 of Delphi's T&Cs to the extent it obligates Methode to produce certain service or replacement parts.

(f)    Methode objected to paragraph 28 of Delphi's T&Cs, pertaining to Delphi's audit rights, and insisted that the paragraph be replaced.

Methode did not object to or take issue with any other Delphi T&Cs, including Delphi's ability to terminate for convenience or for breach as set forth in Delphi's T&Cs.

Continuing to leverage the threat of a stop ship, Methode concluded its three-year proposal, stating:

> Methode will accept purchase orders with the attached pricing subject to the above conditions and exceptions through September 30, 2011.  In order for Methode to accept purchase orders for product shipped after September 30, 2008, the purchase orders must have these exceptions noted as well as Delphi must remove any reference to pricing being "under protest."  Delphi must also waive all rights or claims to having paid Methode "under protest" as to any past purchase orders.

On August 26, 2008, Methode issued its one-year proposal to Delphi.  Methode's one-year proposal sought even higher price increases for the Parts than the May 1, 2008 pricing or the pricing set forth in the three-year proposal.  Methode demanded price increases of approximately 65% with an annual aggregate price increase of approximately $22 million dollars.  Similar to the three-year proposal, Methode's one-year proposal included certain "conditions" and revisions to paragraphs 12, 16, 18, and 28 of Delphi's General Terms and Conditions.  Methode did not

17

object to or take issue with any other Delphi T&Cs, including Delphi's ability to terminate for convenience or for breach as set forth in Delphi's T&Cs.

Methode's one-year proposal contained a provision that unlawfully required Delphi to provide written assurances that Delphi would not manufacture, use or sell products or induce any third party to manufacture, use or sell products that infringe Methode's patents stating: "As you know the applicable patents in the United States are D409,935 and 5,975,568 and 7, 237,443." Methode made this unlawful demand even though Delphi invented its PODS products in the 1990's and despite the fact that Delphi's PODS products are not covered by any valid and enforceable claim of any Methode patent.   In effect, Methode sought to unlawfully, and in restraint of trade, interfere with Delphi's ability to develop the capability to and right to purchase from others or in-source to supply itself.

Under both proposals, Methode gave Delphi until the close of business September 5, 2008 to accept; otherwise Methode would stop shipping the Parts.   Left with no alternative in order to ensure uninterrupted supply of the Parts, on September 4, 2008, Delphi accepted Methode's three-year proposal set forth in its August 25, 2008 letter, including the modifications to Delphi's T&Cs demanded by Methode.   Shortly thereafter, Delphi issued new purchase orders to Methode consistent with the terms of the three-year proposal.

Further answering, Delphi states that the referenced documents speak for themselves and are the best evidence of their contents.   To the extent not already answered, Delphi denies the allegations in Paragraph 28.

29.     As the parties finalized the discussions regarding a new long-term supply agreement, Delphi did not raise any concerns as to tooling drawings.

**ANSWER:**     Delphi denies the allegations in Paragraph 29.

30.    On September 4, 2008, discussions concerning a new long-term agreement concluded and the parties consummated a new three-year supply agreement. *See* Ltr from Mark Shively to Timothy Glandon dated Sept. 4, 2008 Ex. R.

**ANSWER:**    Delphi admits that on August 25, 2008, Methode dropped a bombshell on Delphi when it issued its proposal for a three-year agreement. The pricing set forth in the three-year proposal was significantly higher than the May 1, 2008 pricing. Methode demanded approximately 40-50% price increases with an annual aggregate price increase of approximately $16 million dollars. Methode's three-year proposal also demanded certain "conditions" and revisions to Delphi's General Terms and Conditions. Specifically:

(a)    Methode demanded that it be placed on a "material/component cost adder program" so that it could pass along any increases or surcharges from its supply base to Delphi.

(b)    Methode demanded new payment terms.

(c)    Methode objected to paragraph 12 of Delphi's T&Cs to the extent it gives ownership rights to Delphi in tooling and equipment owned by Methode for which Delphi did not pay.

(d)    Methode objected to paragraph 16 of Delphi's T&Cs to the extent it gives Delphi the right to take possession of Methode-owned equipment.

(e)    Methode objected to paragraph 18 of Delphi's T&Cs to the extent it obligates Methode to produce certain service or replacement parts.

(f)    Methode objected to paragraph 28 of Delphi's T&Cs, pertaining to Delphi's audit rights, and insisted that the paragraph be replaced.

Methode did not object to or take issue with any other Delphi T&Cs, including Delphi's ability to terminate for convenience or for breach as set forth in Delphi's T&Cs.

Continuing to leverage the threat of a stop ship, Methode concluded its three-year proposal, stating:

> Methode will accept purchase orders with the attached pricing subject to the above conditions and exceptions through September 30, 2011. In order for Methode to accept purchase orders for product shipped after September 30, 2008, the purchase orders

19

must have these exceptions noted as well as Delphi must remove
any reference to pricing being "under protest." Delphi must also
waive all rights or claims to having paid Methode "under protest"
as to any past purchase orders.

On August 26, 2008, Methode issued its one-year proposal to Delphi. Methode's one-
year proposal sought even higher price increases for the Parts than the May 1, 2008 pricing or the
pricing set forth in the three-year proposal. Methode demanded price increases of approximately
65% with an annual aggregate price increase of approximately $22 million dollars. Similar to
the three-year proposal, Methode's one-year proposal included certain "conditions" and revisions
to paragraphs 12, 16, 18, and 28 of Delphi's General Terms and Conditions. Methode did not
object to or take issue with any other Delphi T&Cs, including Delphi's ability to terminate for
convenience or for breach as set forth in Delphi's T&Cs.

Methode's one year proposal contained a provision that unlawfully required Delphi to
provide written assurances that Delphi would not manufacture, use or sell products or induce any
third party to manufacture, use or sell products that infringe Methode's patents stating: "As you
know the applicable patents in the United States are D409,935 and 5,975,568 and 7, 237,443."
Methode made this unlawful demand even though Delphi invented its PODS products in the
1990's and despite the fact that Delphi's PODS products are not covered by any valid and
enforceable claim of any Methode patent. In effect, Methode sought to unlawfully, and in
restraint of trade, interfere with Delphi's ability to develop the capability to and right to purchase
from others or in-source to supply itself.

Under both proposals, Methode gave Delphi until the close of business September 5,
2008 to accept; otherwise Methode would stop shipping the Parts. Left with no alternative in
order to ensure uninterrupted supply of the Parts, on September 4, 2008, Delphi accepted
Methode's three-year proposal set forth in its August 25, 2008 letter, including the modifications

20

to Delphi's T&Cs demanded by Methode. Shortly thereafter, Delphi issued new purchase orders

to Methode consistent with the terms of the three-year proposal.

Further answering, Delphi states that the referenced documents speak for themselves and

are the best evidence of their contents. To the extent not already answered, Delphi denies the

allegations in Paragraph 30.

31.    Under the new supply arrangement, Methode will supply 100% of Delphi's
requirements for the subject parts between October 1, 2008 and June 30, 2011. A 100%
requirements contract means that neither Delphi nor any other company can supply any of the
subject parts to Delphi and that Methode is the exclusive source of the parts.

**ANSWER:**    Delphi denies the allegations in Paragraph 31.

32.    With the expiration of the prior agreement and the resolution of the new supply
agreement, Methode believed that the issue of Delphi's demand for copies of the tooling
drawings had been resolved.

**ANSWER:**    Delphi is without knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 32.

33.    As part of the new three-year agreement, Delphi benefits from Methode's lower
pricing based on a three-year supply relationship, as opposed to the higher proposed pricing
based on a one-year supply.

**ANSWER:**    Delphi denies the allegations in Paragraph 33.

### Delphi sues Methode shortly after the parties execute the new three-year agreement.

34.    Only weeks after the parties agreed to the new exclusive supply agreement,
Delphi filed suit in this Court seeking to obtain tooling drawings that would enable Delphi to in-
source or re-source the parts.

**ANSWER:**    Delphi admits that it filed this civil action to recover a copy of tooling

drawings in the possession of Methode, as well as money damages for Methode's refusal to

return or turn over the tooling drawings or copies of the tooling drawings to Delphi. Delphi has

paid for and owns the tooling drawings, as well as the underlying tooling. Methode has no right

to refuse to provide copies of the tooling drawings and has a clear contractual obligation to turn

21

them over to Delphi upon demand. Despite repeated demands by Delphi to turn over copies of the tooling drawings, Methode has refused to do so. Methode refuses to turn over the tooling drawings even though it acknowledges that Delphi owns the underlying tooling and equipment. Thus, Delphi was forced to file this action seeking the return of its property, which Methode has wrongfully and unlawfully detained, and money damages. To the extent not already answered, Delphi denies the allegations in Paragraph 34.

35.    Delphi has expressed its unequivocal intention to in-source or re-source Methode and has said it needs the drawings to do so.

**ANSWER:**    Delphi denies the allegations in Paragraph 35.

### Delphi repeatedly contacts Methode's suppliers and provides the parts drawings.

36.    Delphi contacted Methode's material and equipment suppliers as part of its efforts to in-source or re-source Methode as a supplier for the subject parts.

**ANSWER:**    Delphi denies that material, tooling and equipment suppliers are "Methode's" as such, but rather said suppliers are independent companies with whom Delphi is free to initiate contact and contract with for their services or products. Further answering, Delphi states that under the parties' Agreement Delphi remains free to seek to develop the capability for more competitive supplier alternatives, whether they be alternative suppliers or in-sourcing capability. Further answering, Delphi admits that it has had contact with some suppliers but denies the remaining allegations in Paragraph 36.

37.    Delphi asked Methode's suppliers to quote to Delphi directly the components and equipment required to manufacture the subject parts.

**ANSWER:**    Delphi denies that material, tooling and equipment suppliers are "Methode's" as such, but rather said suppliers are independent companies with whom Delphi is free to initiate contact and contract with for their services or products. Further answering, Delphi states that under the parties' Agreement Delphi remains free to seek to develop the capability for

more competitive supplier alternatives, whether they be alternative suppliers or in-sourcing capability. Further answering, Delphi admits it has requested quotes from some suppliers to determine competitive pricing and costs and in preparation for trying to develop potentially competitive alternatives and remains free to do so under the parties' Agreement. To the extent not already answered, Delphi denies the allegations in Paragraph 37.

38.    For at least one of Methode's suppliers, Delphi requested price quotes by sending copies of drawings with Methode part numbers erased. That particular supplier had previously refused to provide price quotes to Delphi when Delphi sent drawings that contained the Methode part numbers.

**ANSWER:**    Delphi is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38.

39.    Through its suit for preliminary injunction and possession pending final judgment, Delphi seeks to gain access to tooling drawings for the explicit purpose of in-sourcing or re-sourcing Methode as a supplier.

**ANSWER:**    Delphi denies the allegations in Paragraph 39.

### Claim for Anticipation Repudiation of Supply Agreement

40.    Methode re-alleges each of the preceding paragraphs as if fully set forth herein.

**ANSWER:**    Delphi incorporates its answers to the preceding paragraphs.

41.    Methode and Delphi engaged in substantive discussions over many months that resulted in the execution of a three-year supply agreement.

**ANSWER:**    Delphi admits that during the period May 2008 through September 2008, Methode repeatedly threatened to stop shipping the Parts in order to extract substantially higher prices for the Parts. Delphi further admits that on August 25, 2008, Methode dropped a bombshell on Delphi when it issued its proposal for a three-year agreement. The pricing set forth in the three-year proposal was significantly higher than the May 1, 2008 pricing. Methode demanded approximately 40-50% price increases with an annual aggregate price increase of

23

approximately $16 million dollars.    Methode's three-year proposal also demanded certain

"conditions" and revisions to Delphi's General Terms and Conditions.  Specifically:

(a)    Methode demanded that it be placed on a "material/component cost adder program" so that it could pass along any increases or surcharges from its supply base to Delphi.

(b)    Methode demanded new payment terms.

(c)    Methode objected to paragraph 12 of Delphi's T&Cs to the extent it gives ownership rights to Delphi in tooling and equipment owned by Methode for which Delphi did not pay.

(d)    Methode objected to paragraph 16 of Delphi's T&Cs to the extent it gives Delphi the right to take possession of Methode-owned equipment.

(e)    Methode objected to paragraph 18 of Delphi's T&Cs to the extent it obligates Methode to produce certain service or replacement parts.

(f)    Methode objected to paragraph 28 of Delphi's T&Cs, pertaining to Delphi's audit rights, and insisted that the paragraph be replaced.

Methode did not object to or take issue with any other Delphi T&Cs, including Delphi's

ability to terminate for convenience or for breach as set forth in Delphi's T&Cs.

Continuing to leverage the threat of a stop ship, Methode concluded its three-year

proposal, stating:

> Methode will accept purchase orders with the attached pricing subject to the above conditions and exceptions through September 30, 2011.  In order for Methode to accept purchase orders for product shipped after September 30, 2008, the purchase orders must have these exceptions noted as well as Delphi must remove any reference to pricing being "under protest."  Delphi must also waive all rights or claims to having paid Methode "under protest" as to any past purchase orders.

On August 26, 2008, Methode issued its one-year proposal to Delphi.  Methode's one-

year proposal sought even higher price increases for the Parts than the May 1, 2008 pricing or the

pricing set forth in the three-year proposal.  Methode demanded price increases of approximately

65% with an annual aggregate price increase of approximately $22 million dollars.  Similar to

24

the three-year proposal, Methode's one-year proposal included certain "conditions" and revisions to paragraphs 12, 16, 18, and 28 of Delphi's General Terms and Conditions. Methode did not object to or take issue with any other Delphi T&Cs, including Delphi's ability to terminate for convenience or for breach as set forth in Delphi's T&Cs.

Methode's one-year proposal contained a provision that unlawfully required Delphi to provide written assurances that Delphi would not manufacture, use or sell products or induce any third party to manufacture, use or sell products that infringe Methode's patents, stating: "As you know the applicable patents in the United States are D409,935 and 5,975,568 and 7, 237,443." Methode made this unlawful demand even though Delphi invented its PODS products in the 1990's and despite the fact that Delphi's PODS products are not covered by any valid and enforceable claim of any Methode patent. In effect, Methode sought to unlawfully, and in restraint of trade, interfere with Delphi's ability to develop the capability to and right to purchase from others or in-source to supply itself.

Under both proposals, Methode gave Delphi until the close of business on September 5, 2008 to accept; otherwise Methode would stop shipping the Parts. Left with no alternative in order to ensure uninterrupted supply of the Parts, on September 4, 2008, Delphi accepted Methode's three-year proposal set forth in its August 25, 2008 letter, including the modifications to Delphi's T&Cs demanded by Methode. Shortly thereafter, Delphi issued new purchase orders to Methode consistent with the terms of the three-year proposal.

To the extent not already answered, Delphi denies the allegations in Paragraph 41.

42.    Delphi induced Methode to enter and continue discussions for a three-year agreement based on the false pretense that Delphi intended to perform its obligations under the agreement in good faith.

**ANSWER:**    Delphi denies the allegations in Paragraph 42.

43.   Prior to obtaining Methode's agreement to a three-year supply contract and not disclosed to Methode, Delphi intended to sue Methode to obtain tooling drawings and in-source or re-source the subject parts.

**ANSWER:**   Delphi denies the allegations in Paragraph 43.

44.   Delphi concealed its intent to in-source or re-source Methode shortly after executing the agreement in order to induce Methode to enter the agreement, and Delphi concealed its intent to sue Methode to obtain the Methode tooling drawings in order to effect the re-sourcing.

**ANSWER:**   Delphi denies the allegations in Paragraph 44.

45.   Methode would not have offered the three-year pricing and would not have entered into the current supply agreement if Methode had expected or contemplated that Delphi would sue Methode shortly after entering the agreement or that Delphi would otherwise attempt to in-source or re-source Methode within the duration of the exclusive supply agreement.

**ANSWER:**   Delphi is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45.

46.   The parties' three-year supply agreement is a valid executory contract.

**ANSWER:**   Delphi admits that the parties' Agreement is a valid, executory contract which includes Delphi's T&Cs, as modified by Methode pursuant to its August 25, 2008 letter. Among the provisions within Delphi's T&Cs that remained part of the Agreement, which Methode chose not to modify, was Delphi's right to terminate the Agreement for breach, pursuant to paragraph 10, or for convenience, pursuant to paragraph 11.

47.   Methode has fully performed and will continue to perform its obligations under the three-year supply agreement.

**ANSWER:**   Delphi denies the allegations in Paragraph 47. Further answering, Delphi states that Methode has breached the parties' Agreement by failing to provide toolings drawings and failing to supply parts, including pre-production and prototype parts.

48.   Delphi has demonstrated its unequivocal intent not to perform under the parties' three-year supply agreement.

**ANSWER:**     Delphi denies the allegations in Paragraph 48.

49.     Delphi's conduct constitutes an anticipatory repudiation or anticipatory breach of the agreement.

**ANSWER:**     Delphi denies the allegations in Paragraph 49.

50.     Delphi's anticipatory repudiation of the parties' exclusive supply agreement entitles Methode to rescission of the agreement.

**ANSWER:**     Delphi denies the allegations in Paragraph 50.

51.     As a consequence of Delphi's conduct, Methode has incurred or will incur damages in an amount to be determined at trial.

**ANSWER:**     Delphi denies the allegations in Paragraph 51.

**AFFIRMATIVE DEFENSES**

Delphi asserts the following affirmative defenses to Methode's Counterclaim without assuming the burden of proof where it otherwise would be on Methode:

1.     Methode's Counterclaim fails to state a claim upon which relief can be granted.

2.     Methode's Counterclaim is barred, in whole or in part, by the express written contracts between Delphi and Methode.

3.     The parties' rights and obligations are governed exclusively by the express contracts between the parties, which bar Methode's Counterclaim in whole or in part.

4.     Methode's Counterclaim is barred, in whole or in part, because Delphi has performed in good faith its obligations under the parties' express contracts.

5.     Methode is barred from recovering damages because of and to the extent of its failure to mitigate damages.

6.      Methode's claims are barred, in whole or in part, by the doctrines of release, waiver, estoppel, setoff, discharge, payment, accord and satisfaction, laches, and/or unclean hands.

7.      To the extent the Counterclaim and any claims alleged therein are premised upon allegations of oral promises, representations, agreements, or contracts, those claims are barred under the applicable statute of frauds.

8.      No subject matter jurisdiction exists for the Court to address any patent issues, if any exist at all, arising under the United State Patent Act.

9.      Methode's Counterclaim is barred, in whole or in part, by the termination for convenience provision in the parties' express contracts.

10.     Methode's Counterclaim is barred, in whole or in part, by its prior material breach of the parties' express contracts. Methode has breached the parties' express contracts by, among other things, failing to provide tooling drawings to Delphi and failing to supply parts, including pre-production and prototype parts.

Delphi reserves the right to assert other affirmative defenses as this action proceeds and as it determines the particulars of Methode's Counterclaim.

## PRAYER FOR RELIEF

WHEREFORE, Delphi respectfully requests that:   (1) Methode's Counterclaim be dismissed with prejudice; (2) the Court find that Methode is not entitled to any judgment or relief; (3) the Court enter judgment in favor of Delphi on Methode's Counterclaim; (4) the Court enter judgment in favor of Delphi and award Delphi all of the relief sought in its First Amended Complaint; and (5) the Court award Delphi its costs, expenses, interest, and such other and further relief as the Court deems just and proper.

Dated: January 30, 2009                        Respectfully submitted,

                                   DYKEMA GOSSETT PLLC


                        By:_____
                                   Thomas S. Bishoff (P53753)
                                   Stephen W. King (P56456)
                                   Attorneys for Plaintiff Delphi
                                   400 Renaissance Center
                                   Detroit, Michigan 48243
                                   (313) 568-5341

## VERIFICATION OF KENNETH H. BETEET

I, Kenneth J. Beteet, Manager, Global Supply Management for Delphi Electronics &

Safety Division, Delphi Automotive Systems, LLC ("Delphi"), am the authorized representative

of Delphi and its affiliates for the purpose of verifying the Answer to Counterclaim; I have

personal knowledge of the matters set forth in the foregoing Answer to Counterclaim or the

information contained therein has been collected and made available to me by counsel and

employees of Delphi; and I state, under a penalty of perjury, that the factual information and

statements made therein are true and correct.

_____
Kenneth H. Beteet

STATE OF INDIANA          )
                          )  SS:
COUNTY OF  HOWARD         )

Subscribed and sworn to before me a Notary Public this 30th day of January 2009.

_____
Signature

LoRi  A.  Weaver
Printed

My County of Residence

Cass

My Commission Expires:

2 3 2009

LORI A. WEAVER
CASS COUNTY
My Commission Expires
February 3, 2009





**METHODE ELECTRONICS, INC.**

**Corporate Headquarters**
7401 West Wilson Avenue
Chicago, IL 60706-4548
708.867.6777 • Fax: 708.867-6999 • 877.316.7700

January 9, 2009

Ms. Joyce A. Hoffman
Delphi E & S
2151 E. Lincoln Road
Kokomo, IN 46901

**Re: Delphi/Methode - Prototype Parts**

Dear Joyce:

Thank you for your purchase order # 450824472 and # 450829849 for prototype parts. We would be happy to supply the prototype parts to Delphi at the price stated once the current business issues relating to production parts are resolved. As you know, immediately after entering a three-year supply agreement, Delphi sued Methode in Michigan court. Given Delphi's litigation posture and Delphi's statements made in the context of that litigation, Methode is not interested in entering into any new contracts with Delphi at this time.

Please be advised that should these issues be resolved, Methode will require the inclusion of the terms of our current three-year supply agreement including that Delphi will award Methode 100% of Delphi's requirements. In other words, Delphi must agree that it will neither in-source nor re-source the part to a third party. As you know, Methode is not a prototype shop but has manufactured prototype parts for Delphi in the past based on the understanding and prior practice that it would be awarded the production program. Methode will also require Delphi to remove the termination for convenience clause from the Delphi Terms & Conditions for all purchase orders including those included in the three-year supply agreement.

Please call me if you wish to discuss.

Sincerely,

Timothy R. Glandon
Vice President & General Manager
North American Automotive Operations