# EXHIBIT I

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

DELPHI AUTOMOTIVE SYSTEMS, LLC,
a Delaware limited liability company,

           Plaintiff/Counter-Defendant,

vs.

METHODE ELECTRONICS, INC.,

           Defendant/Counter-Plaintiff.

Civil Action No. 08-095518-CK

Hon. Nanci J. Grant

"OAKLAND" "COUNTY" 08-095518-CK

JUDGE NANCI J. GRANT
DELPHI AUTOMO  v  METHODE ELEC

| | |
|---|---|
| Thomas S. Bishoff (P53753) | John R. Trentacosta (P31856) |
| Stephen W. King (P56456) | Jeffrey S. Kopp (P59485) |
| Attorneys for Plaintiff Delphi | Gary E. Steinbauer (P69789) |
| Dykema Gossett PLLC | Attorneys for Defendant Methode |
| 400 Renaissance Center, 35th Floor | Foley & Lardner LLP |
| Detroit, Michigan 48243 | 500 Woodward Avenue, Suite 2700 |
| (313) 568-5341 | Detroit, Michigan 48226-3489 |
| | (313) 234-7100 |
| Charles E. Brown (P46400) | |
| Co-Counsel for Plaintiff Delphi | Ann Marie Walsh |
| Delphi Automotive Systems, LLC | Admitted *pro hac vice* |
| MC 480-410-254 | Co-Counsel for Defendant Methode |
| 5825 Delphi Dr. | Locke Lord Bissell & Liddell LLP |
| Troy, Michigan 48098 | 111 South Wacker Drive |
| (248) 813-3368 | Chicago, Illinois |
| | (312) 443-0654 |

## DELPHI'S RESPONSE BRIEF IN OPPOSITION TO METHODE'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## I.   SUMMARY OF ARGUMENT

Methode's motion should be denied because Methode cannot demonstrate that it will suffer irreparable harm. Methode's sole claim against Delphi, for anticipatory breach of the parties' supply agreement consummated in August/September 2008, is a garden variety contract claim that involves alleged economic injuries that can be remedied by money damages. Michigan law is well-settled that the "classic remedy" for a breach of contract action is money damages. Where there is an adequate remedy at law, "no irreparable harm may be found as a matter of law."

It is clear that Methode, a half billion dollar company listed on the NYSE, will not be forced out of business if injunctive relief is denied. Methode is careful not to allege that it will go out of business. Instead, it argues that its "AST division," with the vast majority of its employees located in Mexico, will be forced to close. To the extent Methode's AST division faces financial challenges, those are the result of strategic business decisions on Methode's part, including its decision to exit its "legacy North American automotive business" and "restructure" its automotive business (which represents only a portion of Methode's overall global business) by closing U.S. plants. Moreover, to the extent that Methode is concerned about losing key R&D personnel, which at best comprise only a fraction of the 200 employees at issue (the vast majority being low-wage manufacturing jobs in Mexico), it is undisputed that Methode has the resources to retain key employees for future projects. As Methode recently reported to investors in its quarterly earnings conference call on September 3, 2009, it has a strong balance sheet, no debt, and $57 million dollars in cash on hand. There is also no possibility that Methode will lose "goodwill" with its customers because Delphi is the only customer of Methode's AST division and no "expectancy of continued patronage" exists with Delphi.

1

Methode's motion should also be denied because Methode cannot demonstrate that it has a substantial likelihood of success on the merits of its anticipatory repudiation claim. By its clear and unambiguous terms, Delphi has the contractual right to terminate its contract with Methode for convenience and breach. Delphi's termination rights were bargained for and specifically included by Methode as part of the parties' current supply agreement. During the negotiations of that agreement in 2008, Methode surgically modified Delphi's General Terms and Conditions ("T&Cs"), deleting some paragraphs of the T&Cs entirely, substituting others with alternative clauses, and leaving intact and unaltered Delphi's termination rights as set forth in Paragraph 10, entitled "Termination for Breach," and Paragraph 11 entitled "Termination for Convenience." There can be no doubt that Methode intended this because the same individual who negotiated the agreement for Methode in 2008 and surgically modified Delphi's T&Cs, Mr. Timothy Glandon (Methode's Vice President and General Manager), is the same person who surgically modified Delphi's T&Cs in 1999 and 2001 as part of a series of long-term contracts between the parties, including specifically modifying and limiting Delphi's "termination for convenience" clause in those earlier agreements. Under well-settled Michigan law, "courts are bound to enforce contracts as written."

In an effort to circumvent the plain and unambiguous language of the contract and preclude Delphi from exercising its bargained-for terminating rights, Methode argues that Delphi engaged in bad faith by "secretly" engaging in a plan to in-source bladder production. By its own admissions – repeated over and over in correspondence and pleadings filed by Methode in this case – Methode was well aware of Delphi's intention to in-source bladder production dating back to June 2008, well before the parties consummated the August/September 2008 supply agreement. Indeed, Methode filed its anticipatory breach counterclaim against Delphi over eight

2

months ago on January 9, 2009, alleging that "Delphi has expressed its unequivocal intention to in-source" and that Delphi was activity engaged in the process of in-sourcing by, among other things, contacting "Methode's material and equipment suppliers" and requesting "price quotes" from sub-suppliers.    Moreover, recognizing that Delphi was in the process of in-sourcing, Methode dramatically increased its prices in response.    In short, Methode's grand conspiracy theory falls flat and its claims that Delphi has acted in bad faith ring hallow.

Finally, the balancing of harms and public interest strongly favor Delphi.    Delphi will suffer significant and irreparable harm if this Court forces it to continue purchasing the bladders from Methode.    Delphi has entered contracts and placed orders with sub-suppliers who are depending on supplying Delphi's needs with their goods.    Delphi has purchased millions of dollars in raw materials to make the bladders, for which there is no alternative use by Delphi. Delphi has incurred over $7 million dollars in tooling and capital expenditures which will go to waste.    More importantly from a long-term business perspective, Delphi and its OEM customers have spent significant time and money validating these safety-critical parts.    Delphi will lose significant goodwill with its OEM customers if it is forced to flip-flop and revert to using Methode's bladders.    In contrast, Methode has been aware of Delphi's intention to in-source since June 2008 and has had plenty of time to make the necessary adjustments to its supply base. Indeed, as Methode recently acknowledged to its stock investors in its earnings conference call, the contract termination by Delphi was "not a surprise."

## II.    <u>COUNTER-STATEMENT OF FACTS</u>

For the sake of brevity, Delphi incorporates the verified factual allegations set forth in its Second Amended and Supplement Verified Complaint (Ex. A).    The following counter-statement of facts focuses on those issues most relevant to Methode's motion.

3

A.    **Methode Is A Half Billion Dollar Company That Decided Long Ago To Exit Its "Legacy North American Automotive Business" To Focus On Other Aspects Of Its Global Business Operations And Pair Down Its AST Division To Essentially The Bladders Supplied To Delphi.**

Methode is not a Mom-and-Pop small business concentrating in and desperate for the business of automotive bladders. Methode stock is traded on the New York Stock Exchange, it calls itself "global," and it is. *See* Methode corporate information, Ex. B, at 11. Methode has divisions and branches for fiber optics, automotive electronics, electrical products, connector products, and several other product lines. *Id.* at 1-2. It has personnel and facilities in at least China, the Czech Republic, England, Germany, Ireland, Malta, Mexico, Poland, Romania, Singapore, Slovenia, and the Ukraine. *See id.* at 1-4, 7-8. It has thirty (30) subsidiary companies around the world. *See id.* at 4. It does half a billion dollars in annual sales. *See id.* at 11. More than half of its business is not automotive and more than half of its automotive business is European, not U.S. *See* transcript of Methode's fiscal 2010 first quarter earnings conference call, Ex. C. As well, Methode's asserted "entire division" of its alleged concern in this case, the AST division, manufactures its products in Mexico, not the U.S. *See* Ex. B at 17 heading "Methode Mexico, Apodaca, Mexico"("This facility manufactures the weight sensor bladder product, which is a component of a Passenger Occupant Detection System.").

And Methode's claim that Delphi is putting U.S. automotive business and jobs at risk is belied by **Methode having established and executed on a corporate strategy of exiting its "legacy North American automotive business" and "restructuring,"** *i.e.,* **sending its automotive business and jobs to Mexico and China and shuttering U.S. facilities.** *See* earnings conf. call transcript, Ex. C at 2; Ex. B at 9-11 and 18-19 (on 1/24/08 Methode closed its manufacturing facility in Carthage, Illinois which, according to Illinois State Senator John Sullivan, resulted in "a blow [from Methode] to the gut [of the Midwest].") Clearly Methode has

chosen based on corporate profit motives to terminate voluntarily the jobs of nearly all the workers in the plant it now allegedly wants to protect. *Id.* at 18. It has been Methode, not anyone else, which has already cost Methode relevant business and jobs.

Meanwhile, **as Methode executives reported to the investing public on September 3, 2009, just days after Methode filed its motion, Methode has increased gross margins, decreased expenses, a strong balance sheet, no debt, and $57 million in cash.** *See* 9/3/09 earning call transcript, Ex. C at 3 and 4. During that same earnings conference call, Methode executives stated candidly to investors that the contract termination by Delphi was "not a surprise." *Id.* at 5.

**B.     In An Effort To Have The Court Re-Write The Parties' Contract, Methode Only Tells Half Of The Story About Delphi's Termination Rights.**

The real purpose of Methode's motion is to have the Court re-write the parties' agreement negotiated in August/September 2008, thereby deleting Delphi's termination rights that Methode specifically included as part of the deal. Since this lawsuit was filed, Methode has repeatedly demanded that Delphi drop its bargained-for termination rights. Methode has even gone so far as to refuse to supply prototype and production parts to Delphi unless Delphi "remove[s] the termination for convenience clause from the Delphi Terms & Conditions for all purchase orders including those included in the three-year supply agreement." *See* January 9, 2009 Methode letter, Ex. D and Amended Complaint, Ex. A, ¶¶ 110-131. Having failed to coerce Delphi into dropping its termination rights bargained for in the parties' August/September 2008 agreement, Methode now asks this Court to force Delphi to do so under the guise of injunctive relief in violation of well-settled Michigan law.

**1.     Methode Was Well Aware Of Delphi's Termination Rights In Its T&Cs Dating Back To The Inception Of The Parties' Business Relationship, Having Specifically Modified Them In Prior Agreements In 1999 And 2001.**

Although Methode generally describes in its motion the "series of long-term agreements" between the parties, it fails to advise the Court that in some of those earlier agreements Methode specifically carved out and modified Delphi's right to terminate for convenience as set forth in Delphi's T&Cs. For example, in the 1999 Long Term Contract ("1999 LTC," Ex. E) between Delphi and Methode's predecessor, ACI, Mr. Timothy Glandon, who was working for ACI at that time, demanded that Delphi waive its termination rights as part of the contract. To accomplish this ACI/Glandon surgically altered Delphi's T&Cs to preclude Delphi from terminating the contract for convenience. Paragraph 5.1 of the 1999 LTC provides:

> [I]n recognition of Seller's commitments under this Purchase Order, and so long as Seller performs its obligations hereunder (including those set forth in Section 3), Seller's price for Product shall not be required to be competitive with prices available to Buyer from others until commencement of the 2005 Model year. **In addition, during the period of this Product price exemption, Buyer shall forbear from exercising its rights under Paragraph 13 ("Termination") on the reverse side of this Purchase Order.** (Emphasis added.)

Similarly, in the 2001 Long Term Contract between Methode and Delphi ("2001 LTC," Ex. F), Methode again surgically altered Delphi's T&Cs to remove Delphi's "termination for convenience" clause by demanding the following language in the 2001 LTC: "In addition, during the period of this Product price exemption, Buyer shall forbear from exercising its rights to "terminate for convenience" as provided in [Delphi's] General Terms and Conditions attached to this Contract." *Id.*

This demonstrates unequivocally that Methode was acutely aware of Delphi's termination rights set forth in its T&Cs dating back to the inception of the parties' business relationship. It

also demonstrates unequivocally that Methode knew how to bargain away or limit Delphi's termination for convenience rights if it chose to do so.[1]

2.    **Methode Specifically Included Delphi's Termination Rights In The Parties' Current Supply Agreement.**

Methode also fails to advise the Court that, with respect to what Methode describes as the "current supply agreement" (*i.e.,*, the agreement that was formed in August/September 2008), Methode carefully reviewed Delphi's T&Cs, surgically removed several clauses, inserted other clauses, and specifically left intact and unaltered Delphi's termination rights as set forth in its T&Cs, including the right to terminate for convenience pursuant to Paragraph 11 and for breach pursuant to Paragraph 10. *See* Delphi's modified T&Cs, Paragraph 10 and 11, Ex. G. The language of these paragraphs is clear and unambiguous.

The following timeline sets forth the key exchanges between the parties in 2008 leading up to the August/September 2008 supply agreement. It demonstrates how Methode methodically and surgically modified Delphi's T&Cs – terms and conditions that Methode now dismissively describes in its motion as "boilerplate" – leaving intact and unaltered Delphi's termination rights. Methode's actions demonstrate that it did not treat Delphi's T&Cs as mere boilerplate:

- **June 24, 2008** – Based on Methode's price increase demands and threats to stop shipping the subject parts, during a June 24, 2008 meeting between Delphi and Methode personnel (including Mr. Glandon) at Delphi's facility in Kokomo, Indiana, Delphi's Vice President

---

[1] Indeed, the same person who negotiated and executed the 1999 agreement on behalf of Methode (or Methode's predecessor), Mr. Glandon, is the same person who negotiated and executed the parties' most recent supply agreement in 2008. Mr. Glandon was also involved in the negotiations of the August 2001 LTC, as well as the extension of that agreement in December 2004, which extension included Delphi's T&Cs and its termination rights as set forth in Paragraph 10, Termination for Breach, and Paragraph 11, Termination for Convenience. According to Mr. Glandon's affidavit, submitted in support of Methode's motion, back in 1999 he was employed by Methode's predecessor, ACI, as its Vice President and General Manager, and he currently serves as Methode's Vice President and General Manager of North American Automotive Operations. *See* Glandon Affidavit, attached as Ex. B to Methode's Brief in Support.

**Beth Schwarting advises Methode that Delphi would be re-sourcing or in-sourcing the subject parts soon.**

- **June 27 & June 30, 2008** - Methode confirmed its understanding that Delphi would be re-sourcing or in-sourcing the subject parts in a letter dated June 27, 2008 (Ex. H) and again in a letter dated June 30, 2008 (Ex. I). Even more, **Methode informed Delphi that its future pricing demand for the supply of bladders after September 30, 2008 would be higher because the prices would take into account Delphi's in-sourcing plans.** *Id.*

- **July 28, 2008** – Following additional negotiations between the parties, on July 28, 2008 Methode's Mr. Glandon issues a letter to Delphi advising that Methode could not agree to several terms in Delphi's purchase orders and several terms in Delphi's T&Cs. *See* 7/28/08 letter, Ex. J. **Methode then set forth in detail the specific paragraphs within the T&Cs that it sought to delete or modify, including Paragraph 12 (which addressed tools and equipment), Paragraph 16 (which addressed equipment); Paragraph 18 (which addressed service parts) and Paragraph 28 (which addressed Delphi's audit rights of Methode's books and records).** *Id.*

- **August 25, 2008** – Methode's Mr. Glandon issues a letter to Delphi containing a three-year proposal to supply the subject parts **conditioned upon a number of demands, including surgical modifications (both additions and deletions) to Delphi's T&Cs.** *See* 8/25/08 letter, Ex. K. Methode was precise in identifying its concerns with Delphi's T&Cs:

    > **Third, as previously discussed Methode cannot agree to several terms of the purchase orders and the Delphi General Terms and Conditions ("Delphi T's & C's). One such term is paragraph 12** of PO# 550063028, which provides that "tools and equipment provided for performance of an operation by consignee remain the property of Delphi unless otherwise noted." As Delphi knows, not all tools and equipment used by Methode in the production of Delphi parts are the property of Delphi. As such, Methode objects to that term to the extent it was intended to include tools or equipment not paid for by Delphi.

    > **Similarly, Methode cannot agree to paragraph 16 of the Delphi T's & C's** to the extent that it grants Seller the right to take possession of and title to any part of any equipment owned by Methode if it was used in the production of Delphi parts.

    > **Given the fact that the agreement would expire after three years, Methode can not [sic] agree to paragraph 18 of the Delphi T's and C's.** Specifically, Methode does not agree to produce any service or replacement parts other than those that will be produced prior to September 30, 2011. Given the limited amount of service parts ordered and the resulting set-up costs

8

incurred by Methode, the pricing for service parts will be determined by the order quantity.

**Finally, Methode does not agree to paragraph 28 of the Delphi T's and C's regarding Delphi audits. In lieu of that paragraph, Methode will agree to the following term adapted from the OESA (Original Equipment Suppliers Association) Draft Model Terms and Conditions ....** (Emphasis added.)

• **August 26, 2008** – Methode's Mr. Glandon issues a letter to Delphi containing a one-year proposal to supply the subject parts, **again conditioned upon a number of demands, including similar surgical modifications (both additions and deletions) to Delphi's T&Cs as set forth in its August 25th letter.** *See* 8/26/2008 letter, Ex. L. Unlike the three-year proposal, however, Methode's one-year proposal also required Delphi to "provide written assurance that Delphi will not manufacture, use or sell products or induce any third party to manufacture, use or sell products that infringe Methode's patents," which Methode identified as patent nos. D409,935 and 5,975,568 and 7,237,443. *Id.* As explained in detail below, this term was completely unacceptable to Delphi for many reasons, not the least of which that such assurances are unlawful and detrimental to Delphi's own and superior patent rights. **This unreasonable demand left Delphi with no choice but to accept Methode's three-year proposal.** *See* Affidavit of Schwarting, Ex. M.

• **September 4, 2008** – Under both of Methode's proposals Delphi was given until the close of business September 5, 2008 to accept, otherwise Methode would stop shipping the parts. Left with no alternative in order to ensure uninterrupted supply of the parts, on September 4, 2008, Delphi issued a letter to Methode accepting Methode's three-year proposal, including the modifications to Delphi's T&Cs. *See* 9/4/08 letter, Ex. N. **Consistent with the agreement reached by the parties, Delphi advised Methode that it would issue purchase orders containing the precise language demanded by Methode. Delphi also advised Methode that it would modify its T&Cs in precisely the manner dictated by Methode.**

• **September 12, 2008** – On September 12, 2008, Delphi issued and emailed revised purchase orders to "subject to the conditions and exceptions" noted in Methode's August 25, 2008 letter. An exemplar purchase order is attached as Ex. O. Delphi issued dozens of purchase orders to Methode which Methode accepted and performed against. **Delphi's email to Mr. Glandon also contained the modified T&Cs, which Methode accepted.** The email from Delphi to Mr. Glandon reads: "Hi Tim, Attached are the modified PO's and Terms and Conditions as per the agreement. Have a good weekend." A copy of the email and modified T&Cs is attached as Ex. G.

**Importantly, in the course of discovery in this matter, Methode admitted that Delphi**

**issued the modified T&Cs to Methode on September 12, 2008 and that Methode accepted**

**them:**

**REQUEST NO. 4:** Admit that Exhibit C attached hereto is a true and accurate copy of Delphi's modified General Terms and Conditions that was issued by Delphi and accepted by Methode pursuant to the agreement reached between Delphi and Methode arising out of Timothy R. Glandon's August 25, 2008 letter to Delphi's Mark A. Shively and Mark A. Shively's September 4, 2008 letter to Methode's Timothy R. Glandon.

**[Methode's] RESPONSE: Admitted.** Delphi did not incorporate its General Terms and Conditions as part of Mark A. Shively's September 4, 2008 letter to Methode's Timothy R. Glandon, **but Delphi provided modified General Terms and Conditions on September 12, 2008. Methode admits that Exhibit C is a true and accurate copy of Delphi's General Terms and Conditions with an effective date of February 1, 2008.** (*See* excerpts from Methode's responses to Delphi's requests to admit, dated August 6, 2009, Ex. P, emphasis added.)

In light of this undisputed evidence, any suggestion by Methode that Delphi was obligated to "purchase the subject parts from Methode for at least a **substantial portion** of the three-year contract" (as Methode alleges in its Counterclaim, ¶ 1) or for three years (as it now maintains in its motion) is contradicted by the plain and unambiguous language of the parties' agreement which permits Delphi to terminate for breach or convenience. *See* modified T&Cs, Ex. G, ¶¶ 10, 11.

3.    **Methode's Post-Agreement Conduct Demonstrates That The Termination For Convenience Provision Was Part Of The Parties' Agreement.**

Although Methode now maintains that Delphi does not have the right to terminate the agreement for convenience, Methode's actions since the filing of the complaint in this matter demonstrate otherwise. Methode has repeatedly demanded in writing that Delphi drop its bargained-for termination rights. Obviously if those rights were not part of the parties' agreement, there would be no basis or need to demand their removal.

For example, on January 9, 2009, Methode refused to supply pre-production and prototype parts in breach of the parties' agreement, which threatened new vehicle launches for

numerous automobile manufacturers. Methode's motivation for its bad faith conduct was clear

from the letter that it sent to Delphi advising that it would not supply the requested parts.

Methode wanted to re-write the parties' agreement by deleting the termination for convenience

provision. *See* 1/9/09 letter, Ex. D. This letter also demonstrates that Methode was well aware

of Delphi's efforts to in-source bladder production because Methode demands, as a precondition

to it supplying the prototype parts to Delphi, that Delphi agree not to in-source. Believing that

Delphi could not secure in a timely fashion prototype bladders from another source, Methode

attempted to extort another concession by demanding that Delphi drop the termination for

convenience provision in the parties' supply agreement:

> Methode will require the inclusion of the terms of our current
> three-year supply agreement including that Delphi will award
> Methode 100% of Delphi's requirements. **In other words, Delphi
> must agree that it will neither in-source nor re-source the part
> to a third party.... Methode will also require Delphi to remove
> the termination for convenience clause from the Delphi Terms
> & Conditions for all purchase orders including those included
> in the three-year supply agreement.** (*Id.,* emphasis added.)

In defense of its actions, Methode takes the position that the bladders at issue in its

January 9th letter for the Hyundai LM and Ford B229N programs were "outside the scope" of the

parties' agreement. Since its January 9th letter, Methode has also taken the same position, and

has refused to ship prototype or production parts, with respect to four (4) additional vehicle

programs for Toyota (639Z), Mercedes (R172 and W166), and Bentley (B831). (This is the trick

Methode plays in order to assert to this Court with a straight face that it never refused to supply

parts to Delphi, at least parts which Methode deemed to be "covered under the parties' current

supply agreement.") Even if Methode is right (which it is not), its actions in refusing to supply

bladders to Delphi for these six (6) OEM vehicle programs demonstrates what Delphi knew back

in 2008: namely, that Methode has no concerns about shutting down OEM vehicle production facilities in order to extract concessions from Delphi.[2]

**C.    Methode Concedes That It Was Advised Of Delphi's Efforts To Re-Source Or In-Source The Subject Parts As Early As June 2008 And Its Claims Of A Grand Conspiracy By Delphi And Bad Faith Fall Flat.**

In asking this Court to re-write the parties' contract and exercise a line-item veto striking Delphi's termination for convenience clause, Methode purports to describe Delphi's lack of good faith in negotiating the current supply agreement and "Delphi's hidden agenda to subvert the contract" by in-sourcing. Brief in Support, p. 6. Methode alleges that "unbeknownst" to it, while the parties were discussing the terms of the current supply agreement, Delphi was carrying out a secret plan to in-source the subject parts. *Id.* at 7. **Methode's contention is unfounded and belied by its own letters and pleadings filed in this action which show that Methode was very much aware of Delphi's intention to in-source the subject parts as early as June 2008, several months before the parties consummated the supply agreement in August/September 2008 and actually increased prices for the parts in response to Delphi's stated intent to in-source.** The following are just a few examples:

- **June 24, 2008** – On June 24, 2008, during a meeting between Methode and Delphi in Kokomo, Indiana, a Delphi vice-president (Beth Schwarting) threatened **to re-source Methode as a supplier "soon."** As noted below, this statement was made in numerous pleadings filed by Methode in this action, all of which are binding admissions by Methode. *See* Methode Counterclaim and Amended Counterclaim, and Methode Response brief, cited below.

---

[2] In reality, as set forth in Delphi's January 16, 2009 response letter and the Verified Complaint (which now includes a claim for breach of contract arising out of Methode's refusal to supply prototype and production parts), the prototype parts for those programs fall squarely within the parties' agreement. *See* 1/16/09 Delphi letter, Ex. Q; Verified Complaint, Ex. A, ¶¶ 110-139. Methode's failure to supply them was a breach of contract entitling Delphi to terminate. On August 26, 2009, pursuant to the parties' agreement, Delphi exercised its contractual rights to terminate effective September 10, 2009 (Ex. R.) Among the reasons cited in Delphi's termination notice was Methode's failure to supply prototype and production parts.

- **June 27, 2008** – In a June 27, 2008 letter, Methode's Mr. Glandon wrote: "Beth Schwarting's statements certainly also surprised us at our meeting this week [referring to the June 24, 2008 meeting in Kokomo] **that Delphi is soon resourcing this business to another supplier." In response to this, Methode adjusted the part prices dramatically upward in order to capture costs associated with early termination.** *See* 6/27/08 letter, Ex. H, a copy of which was also attached to Delphi's First Amended Complaint, filed on December 5, 2008.

- **June 30, 2008** – In a June 30, 2008 letter, Mr. Glandon again stated that Methode was well aware of Delphi's efforts to re-source or in-source the subject parts: "As you know, in our meeting on June 24, 2008, a **Delphi vice-president indicated that Delphi intends to resource the Methode business.** In response to that statement and higher expected costs as a result of this resourcing intent, Methode provided new pricing on June 27." **Not only was Methode well aware of Delphi's intention to re-source, Methode factored that eventuality into yet higher prices for the subject parts.** *See* 6/30/08 letter, Ex. I, a copy of which was attached to Delphi's First Amended Complaint, filed on December 5, 2008.

- **November 7, 2008 Methode's response brief in opposition to Delphi's motion for preliminary injunction** – In opposing Delphi's motion for preliminary injunction back in November 2008, Methode advised the Court that: "On June 24, 2008, Methode and Delphi met in Kokomo to resolve the issues of a new long-term agreement. During the negotiations, much to Methode's surprise, a **Delphi vice-president threatened to re-source Methode as a supplier 'soon'."** This statement was copied from the Affidavit of Mr. Glandon, which was attached to Methode's response brief as Ex. B.

- **January 9, 2009 Methode's Counterclaim** – Methode alleges in its Counterclaim, Ex. S at ¶ 19, that **Methode was advised as early as June 24, 2008 that Delphi intended to re-source or in-source the subject parts.** Indeed, this allegation is central to Methode's Counterclaim for anticipatory repudiation of the parties' supply agreement.

- **August 6, 2009 Methode interrogatory answer** – On August 6, 2009, Methode answered Delphi's first set of interrogatories. Interrogatory No. 20 asked Methode to identify by name the Delphi vice president who threatened to re-source Methode as a supplier "soon" at the June 24, 2008 meeting in Kokomo. Methode's answered: **"Beth Schwarting, Vice President of Delphi Electronics and Safety threatened to re-source Methode as a supplier 'soon' during a meeting on June 24, 2008.** This meeting was attended by Timothy Glandon, Thomas Reynolds, Benjamin Boyer of Methode Electronics, Inc, and Beth Schwarting, Kenneth Beteet, John Glass, Timothy Hamashuk, and Jerry Griffin of Delphi." A copy of Methode's interrogatory answer is attached as Ex. T, emphasis added.

- **August 13, 2009 amended Methode Counterclaim** – Just weeks ago, Methode filed an amended Counterclaim for anticipatory repudiation of the parties' supply agreement. **Again, a central allegation in the amended Counterclaim is that Methode was well aware of Delphi's intention to in-source or re-source dating back to June 2008.** *See* amended Counterclaim, Ex. U at ¶ 19.

In addition to the above binding admissions, which completely eviscerate Methode's grand conspiracy theory, Delphi also advised Methode in the federal court patent action months ago that Delphi was evaluating in-sourcing capabilities to produce the PODS bladder. Specifically, in a May 29, 2009 letter from Delphi's patent counsel to Methode's patent counsel, Delphi advised:

> We reiterate that Delphi is in the process of evaluating in-house capabilities to produce the PODS bladder. **Confirming information you state you understand, yes, Delphi ordered tooling consistent with it process of evaluating in-house capabilities to commercially produce the PODS bladder.** *See* May 29, 2009 letter, Ex. V (emphasis added).

Further, on June 26, 2009, Methode deposed Delphi's Chief Engineer responsible for the PODS, Lisa Hanson, was cross-examined for hours during a deposition in the federal court action about Delphi's efforts to in-source the subject parts. Chief Engineer Hanson testified at length about Delphi's need to develop in-house manufacturing capabilities in order to produce the prototype and production parts that Methode refused to make. She also testified at length about Delphi's efforts to develop the capability in-house to manufacture the bladders. *See* Hanson deposition transcript, attached to Methode's Brief in Support at Ex. CC. She further testified that Delphi had not made a decision at that time to actually start making production parts, although it anticipated being in a position to make parts in "mid-August of 2009." Chief Engineer Hanson was deposed as a corporate representative of Delphi. Her statements on Delphi's behalf are hardly evidence of a conspiracy by Delphi to "secretly" in-source.

Based on the binding admissions made by Methode in this case, and the undisputed facts set forth above, it strains credibility for Methode to allege now that Delphi somehow acted in bad faith during the parties' contract negotiations by concealing its "true intent" to in-source.

**D.    Delphi Was Forced To Reject Methode's One-Year Proposal Because It
Included A Requirement That Delphi Provide Assurances Regarding
Methode's Patents.**

Methode misleads the Court by suggesting that Delphi rejected Methode's one-year

proposal in favor of its three-year proposal in order to save $6 million dollars annually, which

amount, according to Methode, represents the difference between the two proposals.  *See* Brief in

Support, pp. 6 and 13.  Again, Methode fails to advise the Court of critical facts.  Specifically,

**Methode ignores the fact that its one-year proposal contained a very unique demand**

**pertaining to Methode's patents that was not contained in the three-year proposal**:

> Finally, Methode requires that Delphi provide written assurance
> that Delphi will not manufacture, use or sell products or induce any
> third party to manufacture, use or sell products that infringe
> Methode's patents.  As you know, the applicable patents in the
> United States are D409,935 and 5,975,568 and 7,237,443.  (*See*
> 8/26/08 letter, Ex. L.)

Previously, Methode had requested such patent assurances from Delphi as a pre-condition to

turning over copies of the tooling drawings.  *See* 7/21/08 letter, Ex. W; 7/29/08 letter, Ex. X.

Now Methode tied its patent assurance demands to the one-year pricing proposal, but only the

one-year pricing proposal.

Methode's demand that Delphi provide written assurances regarding Methode's patents

was completely unacceptable to Delphi for numerous reasons, including the following:  **First**,

Methode's demand for assurances was unlawful because Methode's patents are not valid, do not

cover the subject parts, are unenforceable and would detrimentally damage the superior patent

rights of Delphi's patent and Delphi's claim of ownership to the Methode patents.[3]  **Second**,

---

[3]  Contrary to Methode's allegations in its Counterclaim, Delphi invented the PODS
products in the 1990's, and Delphi, not Methode, owns numerous patents that cover the design
and operation of Delphi's PODS products.  Methode made its demands for assurances regarding
its patents knowing full well that the U.S. Patent Office granted Delphi an earlier filed patent
covering the subject parts and that the assurances Methode demanded would have been to the
detriment of Delphi's patent and Delphi's ownership claim to Methode's patents, and could be

Delphi already possesses rights to Methode's intellectual property and patents via a license and covenant not to sue that vested under the parties' August 1, 2001 LTC once Delphi permitted Methode to be the single-source of bladders for the PODS program through the 2004 Model Year. Paragraph 6.2 of the 2001 LTC (Ex. F) provides that should Delphi exercise its right to terminate or cancel the contract, Methode would not bring any action or claim against Delphi, its suppliers, dealers or customers for any reason, including any claim for infringement of whatever patents or proprietary rights Methode may have obtained, arising from the use, manufacture or sale of the bladders nor for use of information furnished by Methode to Delphi.[4] **Third**, patents do not cover Delphi tooling drawings, and no patent rights are involved in the delivery of drawings as requested by Delphi. **Fourth**, Delphi does not provide such assurances, nor is it required to do so when it buys parts from a supplier.

By including a demand for assurances regarding its patents in its one-year proposal, Methode forced Delphi's hand and left it with no alternative but to accept Methode's three-year proposal by the September 5, 2008 deadline. *See* Affidavit of Schwarting, Ex. M.

## III.    <u>ARGUMENT</u>

As this Court ruled in denying Delphi's request for injunctive relief back in November 2008, injunctive relief should issue only in extraordinary circumstances where an adequate remedy at law does not exist. *Michigan Coalition of State Employee Unions v. Civil Ser.*

---

construed to give affect and credence to patents that Methode unlawfully and fraudulently obtained in the first place. Methode demanded those assurances despite the fact that, previously on several occasions, it had filed subsequent patent applications with the U.S. Patent Office seeking to expand its alleged rights that were denied due to Delphi's earlier filed patent for the subject bladder parts. Needless to say, these issues will be adjudicated in the federal court patent action.

[4] *See also* identical provision of paragraph 6.2 of the June 1999 LTC with ACI, Ex. E, which Methode's Mr. Glandon signed for ACI while employed there, and whose assets Methode acquired in July 2001, after ACI became financially distressed.

16

*Comm'n*, 236 Mich. App. 96, 106 (1999), *rev'd on other grounds*, 465 Mich. 212 (2001).

Methode bears the burden of proving all of the following: (1) Methode will suffer irreparable

harm – not compensable by money – if the requested injunction is not granted; (2) Methode has a

substantial likelihood of success on the merits; (3) the harm to Methode absent injunctive relief

outweighs the harm to Delphi if the injunctive relief is granted; and (4) harm to the public

interest will arise if the injunction is not issued. *Id.* As an initial matter, Methode does not

address why it is entitled to a TRO. Accordingly, this Court should not issue one.

## A.    Methode Cannot Establish That It Will Suffer Irreparable Harm If An Injunction Does Not Issue.

### 1.    Methode Has An Adequate Remedy At Law.

An injury is irreparable only if "there is no legal measurement of damages or … damages

cannot be determined with a sufficient degree of certainty." *Thermatool Corp v Borzym*, 227

Mich App 366, 377 (1998); *Basicomputer Corp v Scott*, 973 F2d 507, 511 (6th Cir 1992).

Economic injuries that can be remedied by money damages are not irreparable. *Id.* (citing *Acorn*

*Building Components, Inc v Local Union No 2194, UAW*, 164 Mich App 358, 366 (1987));

*Alliance for the Mentally Ill v Michigan*, 231 Mich App 647, 664 (1998). Where there is an

adequate remedy at law, "no irreparable harm may be found as a matter of law." *Cellnet*

*Communications, Inc v New Par*, 291 F Supp 2d 565, 570 (ED Mich 2003) (quoting *Jerome*

*Duncan, Inc v Auto-By-Tel, LLC*, 966 F Supp 540, 541 (ED Mich 1997)). In breach of contract

actions, the "classic remedy … is an action at law for damages." *Id.*

Methode cannot show irreparable harm in this case for the simple fact that this is a breach

of contract action. The "classic remedy" for breach of contract actions is money damages. *Id.*

In cases where monetary damages will fully compensate the injured party, the court is precluded

from finding the existence of an irreparable injury. *Thermatool*, 227 Mich App at 377. In the

unlikely event Methode prevails on its contract claim for anticipatory repudiation then it will be entitled to seek money damages. Simply stated, Methode has an adequate remedy at law.

Methode asserts that its "AST division" will shut down and it will be forced to lay off 200 workers if Delphi is permitted to terminate the agreement. These claims ring hallow when one considers the fact that Methode is a half billion dollar company that made the strategic business decision long ago to "exit its legacy North American automotive business," "restructure" its automotive business by shuttering U.S. plants and moving jobs to Mexico and China, and strip its AST division, leaving essentially its bladder business with Delphi, in order to focus on other global sectors. *See* transcript, Ex. C.

Moreover, Methode is being disingenuous at best when it claims that it will not be able to engage in necessary R&D (for unspecified projects at some unspecified time in the future) because it will have to eliminate 200 jobs. The vast majority of these jobs are low-wage manufacturing positions based in Mexico, where its bladder manufacturing operations are located, not high-end R&D. In addition, with $57 million in cash and no debt, clearly Methode has sufficient means to retain those employees it deems necessary for future projects or business.

    **2.**    **Methode Will Suffer No Loss of Goodwill Because Its Only Customer For The Bladders Is Delphi, and Methode Destroyed Any Goodwill It Had With Delphi Long Ago By Extorting Price Increases And Refusing To Ship Goods.**

Methode attempts to trump up its irreparable injury claim by arguing that it will lose its goodwill with its customers if the injunction is not granted. However, Methode only has one customer for the bladders – Delphi. Termination of the parties' supply agreement will have no effect on Methode's goodwill because Methode has no expectation of continued patronage with Delphi. *See, e.g.*, *Newark Morning Ledger Co v United States*, 507 US 546, 555 (1993) (describing goodwill in general and defining it as "the expectancy of continued patronage."). As the breach of this contract would be fully compensable by money damages, *see Cellnet*, 291 F

Supp 2d at 570, availing itself of the "loss of goodwill" argument does not advance Methode's position.[5]

Methode's "goodwill" argument is also flatly contradicted by statements by its executives during the September 3, 2009 earnings conference call (which took place just days *after* Methode filed its motion) where they describe in detail Methode's efforts to exit its legacy North American automotive business and wind down contracts with Chrysler and Ford. Despite these statements, Methode's executives also reported to the investing public that there was "no change in goodwill." *See* transcript of earnings conference call, Ex. C, p. 4.

### 3.    Apprehensions Regarding Delphi's Future Collectability Cannot Form The Basis For Injunctive Relief.

Methode argues that money damages are inadequate because Delphi's financial position is "precarious." Methode offers no support for its contention. In fact, Delphi has paid Methode timely for the bladders it has received. More importantly, it is well settled that a preliminary injunction may not be issued to preserve the ability to collect potential money damages. *DeBeers Consolidated Mines v. United States*, 325 U.S. 212 (1945); *USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94 (6th Cir. 1982). Moreover, on July 30, 2009, the U.S. Bankruptcy Court approved Delphi's emergence plans.

### B.    Methode Has Failed To Show A Substantial Likelihood Of Success On The Merits.

### 1.    In Order For Methode To Prevail On The Merits It Must Convince This Court To Do Something That It Is Prohibited From Doing Under Michigan

---

[5] Methode's reference to a "recent unusual inquiry" from Hyundai only reinforces this point. Brief in Support, p. 23. It is very unusual indeed for an OEM to contact Tier 2 suppliers directly. Hyundai's contact is equally likely due to Methode's refusal to supply prototype bladders for Hyundai's LM program, as detailed in II.B.3, *supra*, and concerns by Hyundai that its vehicle production would be impacted as a result. Methode's actions in refusing to supply bladders to Delphi for the Hyundai LM program demonstrates that Methode cannot be trusted and further justifies Delphi's in-sourcing efforts.

### Law – Namely, Re-Write An Unambiguous Contract And Strike Delphi's Bargained-For Termination Rights.

Under well-settled Michigan law, courts are bound to enforce contracts as written. *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 51-52 (2003) (recognizing the "bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public policy.") Where the terms of a written contract are unambiguous, "the parties' intent is gleaned from the actual language used." *Id.* Unambiguous contract terms are reflective of the parties' intent as a matter of law. *Quality Products & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 375 (2003).

Like any other unambiguous term, a right to terminate for convenience may be freely exercised and must be fully enforced if it was properly bargained-for. *Cloverdale Equip Co v Simon Aerials, Inc*, 869 F2d 934, 938 (6th Cir 1989) ("If properly bargained for, the right [to terminate a contract] is given full effect and may be exercised for any reason.") (citing *JR Watkins Co v Rich*, 254 Mich 82 (1931)). "Bargained-for" rights are those duties and obligations contracting parties voluntarily establish between themselves to define the boundaries of their relationship. *Vulcan Materials Co v Atofina Chemicals Inc*, 355 F Supp 2d 1214, 1237 (D Kan Feb 14, 2005).

Methode does not contend, nor could it, that Paragraph 11 of Delphi's modified T&Cs, entitled "Termination for Convenience," is ambiguous. Paragraph 11 is unambiguous and provides that "[i]n addition to any other rights of [Delphi] to terminate this Contract, [Delphi] may immediately terminate all or any part of this Contract, at **any time and for any reason**, by notifying [Methode] in writing." Ex. G, ¶ 11, emphasis added. As an unambiguous term, Paragraph 11 reflects the parties' intent as a matter of law and must be enforced as written.

*Quality Products*, 469 Mich at 375.   To hold otherwise would be to rewrite the parties' agreement, which this court may not do.  *Prentis Family Foundation v Barbara Ann Karmanos Cancer Institute*, 266 Mich App 39, 59 (2005) ("[C]ourts are not permitted to discern the parties' reasonable expectations and rewrite contract accordingly."); *Rory v. Continental Ins. Co.*, 473 Mich. 457, 461 (2005) ("[T]he judiciary is without authority to modify unambiguous contracts … because fundamental principles of contract law preclude such subjective post hoc judicial determinations of 'reasonableness' as a basis upon which courts may refuse to enforce unambiguous contractual provisions.").

There can be no doubt that the termination for convenience and breach clauses were properly bargained-for.   As detailed in II.B, *supra*, Methode has a history of surgically modifying Delphi's T&Cs, especially Delphi's termination for convenience clause.  Methode's Mr. Glandon, the same person who carefully reviewed and negotiated the 2008 supply agreement at issue in Methode's motion, is the same person who in 2001 severely limited Delphi's right to terminate for convenience by demanding that Delphi forebear from terminating until years later, commencing with Model Year 2005 vehicle production.  *See* Ex. F, p. 3.  Mr. Glandon also negotiated similar modifications to Delphi's termination for convenience rights in connection with the parties' 1999 LTC.  *See* Ex. E, p. 2.

Nor can there be any doubt that Methode and Mr. Glandon carried over their well-established practice of surgically modifying Delphi's T&Cs to the negotiations of the parties' current supply agreement in 2008.  Methode's own letters make clear that Methode/Glandon carefully reviewed Delphi's T&Cs, surgically removed several clauses, inserted a model clause regarding audit rights from the Original Equipment Suppliers Association (OESA) in lieu of Delphi's standard audit clause, and specifically left intact and unaltered Delphi's termination

21

rights as set forth in its T&Cs. *See* Methode/Glandon letters dated 7/28/08, Ex. J, 8/25/08, Ex. K, and 8/26/08, Ex. L. As further evidence that the modifications to Delphi's T&Cs were freely bargained-for, Methode's Mr. Glandon accepted the modified T&Cs on September 12, 2008. Ex. G. **In addition, Methode has admitted in its answers to requests for admissions that it accepted Delphi's modified T&Cs.** *See* excerpts of Methode's responses to Delphi's requests to admit, Ex. P.

The parties current supply agreement was the result of arm's length negotiations between sophisticated parties, and the termination for convenience clause was a right they freely negotiated. It must, therefore, be enforced. *Cloverdale*, 869 F2d at 938.

The fact that the agreement is a three-year requirements contract does not render the termination for convenience clause any less valid or enforceable. In a case factually analogous to the instant case, *QC Onics v Johnson Controls, Inc*, No 1-04-CV-138-TS, 2006 WL 1722365, at *10 (ND Ind June 21, 2006), (Ex. AA), the court, applying Michigan law, held that the exercise of a properly bargained-for termination clause in a requirements contract was enforceable. The purchase orders at issue contained clauses granting the defendant the right to terminate the contracts at its convenience. *Id.* at *3. After the defendant notified the plaintiff of its intention to exercise the termination clause, the plaintiff sued arguing that the contract was terminated in bad faith. *Id.* at *1. The court rejected this argument:

> The termination of the contracts is justified by the fact that the termination clause was **expressly included in the purchase orders** and allowed for termination of the contracts, provided the Defendant gave notice and paid the Plaintiff for the costs stated in the purchase orders. **The fact that this is a requirements contract is not relevant**, as the Defendant does not rely on the requirements clause to justify its termination and does not argue that its requirements were zero. (*Id.* at *10.)

2. **Methode's Grand Conspiracy Theory And Claims Of Bad Faith Argument Are Untruthful And Absurd.**

22

In an effort to circumvent the plain and unambiguous language of the contract and preclude Delphi from exercising its bargained-for termination rights, Methode argues that Delphi engaged in bad-faith by "secretly" engaging in a plan to in-source bladder production. **By its own admissions – repeated over and over in correspondence and pleadings filed by Methode is this case – Methode was well aware that Delphi would in-source bladder production dating back to June 2008**. *See* II.C, *supra*. These are binding admissions by Methode, and it cannot run away from them simply because it is no longer convenient or doesn't support its latest motion.[6]

In addition, based on many of these same Methode letters, it is clear that Methode already adjusted the prices higher to take into account Delphi's intention to in-source. For example, in Methode's June 27, 2008 letter to Delphi, Timothy Glandon states:

> Beth Schwarting's statements certainly also surprised us at our meeting this week that Delphi is soon resourcing this business to another supplier. **Based on the shortened duration of future production, Methode is hereby providing revised pricing that will be valid for three (3) months from July 1, 2008 to September 30, 2008. This revised pricing reflects accelerated depreciation and amortization, costs associated with early lease termination, material price adders and other costs associated with the shortened duration of manufacturing by Methode.** (6/27/08 letter, Ex. H, emphasis added.)

Presumably Methode is factoring "early lease termination" for its manufacturing facilities in Mexico. Similarly, in its June 30, 2008 letter to Delphi, Mr. Glandon states: "As you know, in our meeting on June 24, 2008, a Delphi vice-president indicated that Delphi intends to resource the Methode business. **In response to that statement and higher expected costs as a**

---

[6] Incredibly, Methode in its Brief in Support, pp. 6-11, cries that it only recently learned through discovery of third-parties Dow, Gasket and Nike of Delphi's intention to in-source the bladder supply. Obviously, as demonstrated above, Methode already knew and expected Delphi would in-source so this third-party information offers nothing that Methode did not already know.

**result of this resourcing intent, Methode provided new pricing on June 27.**" *See* 6/30/08 letter, Ex. I, emphasis added. Thus, not only was Methode aware of Delphi's intention to in-source, Methode insisted upon substantially higher prices as a result of Delphi's resourcing intent, which Delphi was forced to pay. Now, Methode seeks a windfall by forcing Delphi, through the Court's injunctive powers, to pay these artificially inflated prices for the indefinite future. An injunction should not issue where granting relief gives a party complete relief. *Bratton v Detroit Automobile*, 120 Mich App 73, 79 (1982). Here, forcing Delphi to continue to purchase bladders at artificially inflated prices affords complete relief to Methode.[7]

A party is not acting in bad faith when it is forced to accept grossly unfavorable terms in the short term, then reassesses its options, and ultimately seeks to invalidate those terms at a later date. In *General Motors Corp v Paramount Metal Products Co*, 90 F Supp 2d 861, 866-67 (ED Mich 2000), Paramount threatened to stop shipping parts to GM unless GM made certain price concessions. *Id.* at 864. To ensure its supply of parts, GM entered into an accommodation with Paramount that required GM to pay significantly higher prices for the same parts. *Id.* Months later, after locating another supplier, GM sued Paramount to invalidate the accommodation. *Id.* Paramount filed a counterclaim alleging GM never intended to perform its obligations under the

---

[7] If any party has acted in bad faith, it has been Methode. It was Methode, not Delphi, that repeatedly threatened to stop shipping the bladders unless Delphi conceded to its price-increase demands. It was Methode that refused to supply bladders to Delphi for the Hyundai, Ford, and four other OEM programs even though Methode's refusal to provide the prototypes would jeopardize the launch of these important OEM vehicles needed to help boast sales in the struggling automotive market. It was Methode that presented Delphi with a take-it or leave-it "choice" between its one-year proposal (which included 65% price increases and a demand that Delphi give assurances on Methode's patents, a demand that Methode knew was completely unacceptable to Delphi) and its three-year proposal (which included 40-50% price increases). It is well-settled law that a party seeking equity must come to the courthouse with clean hands. *Stachnik v Winkel*, 394 Mich 375, 382 (1975). It is clear that Methode does not have clean hands.

contract, and, therefore, fraudulently induced Paramount to enter the accommodation. *Id.* The court rejected Paramount's argument: "GM[ ]'s apparent decision to file a lawsuit against Paramount after finding another ... supplier and becoming 'free and clear' of Paramount's supply line does not evidence that the plaintiffs intended not to fully perform the Accommodation Agreement" from its inception. *Id.* at 867.  Like GM, Delphi was forced to enter into the supply agreement with Methode in August/September 2008 to ensure its supply of bladders because it had no other choice at the time but to acquiesce to Methode's demands.  Delphi's decision to terminate the parties' agreement after it had a chance to explore and act on its options does not evince any bad faith at the time the agreement was entered, especially where Methode was aware of Delphi's intention to in-source by its own admissions months before consummating the agreement. *Id.*

### 3.    Given Methode's Surgical Modifications To Delphi's T&Cs Methode's "Boilerplate" Argument Strains Credibility And Should Be Rejected.

Under the guise of the general rule that specific terms trump general terms, Methode makes a half-hearted argument that the termination for convenience clause should take a back seat to the durational term of the agreement because the termination for convenience clause is "boilerplate."  A similar argument was made and rejected in *Viron International Corp v David Boland, Inc*, 237 F Supp 2d 812, 815-16 (WD Mich 2002).  In *Viron*, the plaintiff sought to avoid a forum selection clause contained in the terms and conditions printed on the back of the defendants' purchase orders. *Id.* at 815.  Noting that the plaintiff had negotiated the terms of other conditions on the back of those same purchase orders, the court held that the plaintiff could not pick and choose which conditions would be binding: "[P]laintiff obviously read and negotiated over the terms of some of the boilerplate on the back of the purchase orders.  Simply because plaintiff either chose not to negotiate over other provisions in the boilerplate or failed to

read all of the terms contained in the boilerplate does not mean that the forum selection clause is not binding on the plaintiff." *Id.* at 816; *Dematic Corp v International Union*, ___ F Supp 2d ___, No 1:08-cv-730, 2009 WL 2143648, at *16, n.7 (WD Mich July 16, 2009) (Ex. BB) ("This attempt to denigrate clear terms in a valid contract is unavailing. At least in the context of substantial commercial entities bargaining at arms length with the assistance of counsel, parties to a contract are entitled to enforce 'boilerplate' under the same conditions as terms which are less common or actively contested in negotiations.").

As set forth in II.B.2, *supra*, Methode did not treat Delphi's T&Cs as mere boilerplate. By surgically modifying Delphi's T&Cs, and choosing to leave unaltered Delphi's termination rights, Methode has no basis to now "pick and choose" which remaining terms and conditions it deems binding. *Viron*, 237 F Supp 2d at 816.

In addition, Methode confuses the concept of a durational term – which speaks to the potential length of a contract – with a party's ability to terminate the contract based on bargained-for termination rights. Indeed, Methode's argument cannot be right because taken to its logical conclusion it would mean that any durational term (of any length) would always trump a termination for convenience clause. Michigan law is well settled that bargained-for termination clauses are valid and binding. *QC Onics v Johnson Controls, Inc*, No 1-04-CV-138-TS, 2006 WL 1722365, at *10 (ND Ind June 21, 2006); *Cloverdale Equip Co v Simon Aerials, Inc*, 869 F2d 934, 938 (6th Cir 1989).

### 4. Methode Breached The Supply Agreement By Refusing To Ship Parts And Provide Copies Of The Tooling Drawings.

Methode maintains that it did not breach the parties' supply agreement because the parts that it refused to ship were not covered by that agreement. As set forth above, and in Delphi's January 16, 2009 response letter, Ex. Q, and Amended Complaint, Ex. A at ¶¶ 110-131, Methode

is playing it cute. Clearly these OEM programs were covered under the parties' agreement. Methode's contemporaneous documents demonstrate its intent to supply prototype and production parts into the future, including a 9/16/08 email sent from Mr. Glandon to Delphi just days after the parties consummated the supply agreement in which he discusses in the context of that agreement Methode supplying Delphi's "future prototype needs" two and three years down the road. *See* Ex. Q, January 16, 2009 Delphi letter and 9/16/08 email attached thereto as Ex. H.

In an effort to deflect the import of its breach of contract, Methode characterizes its breach as "immaterial." Methode's argument simply makes no sense given the tremendous, negative economic consequences associated with endangering a timely launch of an OEM vehicle program and from shutting down an OEM assembly line. In this case, Methode was willing to scuttle the launch of new vehicle programs for a variety of OEM programs. Clearly this is material.

Delphi was also entitled to terminate the agreement based on Methode's failure to provide the requested tooling drawings. For the sake of brevity, Delphi refers the Court to its Amended Complaint, Ex. A, and Verified Emergency Motion for TRO and Preliminary Injunction, filed on October 23, 2008, which set forth the factual and legal support for Delphi's contention.

### 5. Delphi Was Also Entitled To Terminate The Parties' Agreement For Methode's Lack of Price Competitiveness.

Methode was obligated to remain price competitive by virtue of the vested rights set forth that carried forward from the parties' 2001 LTC, Section 5. On July 20, 2009, Delphi issued a letter to Methode advising that its bladders were not price competitive. *See* 7/20/09 letter, Ex. Y. Delphi further advised Methode that if it committed to matching competitive prices for the bladders that Delphi would provide a complete competitive price listing. *Id.* Methode

completely ignored Delphi's letter. Consequently, among the reasons given for Methode's termination in Delphi's August 26, 2009 notice was Methode's lack of price competitiveness. *See* 8/26/09 letter, Ex. R. Methode's response that this is nothing more than "legal-sounding gobbledygook" is no response at all and certainly doesn't demonstrate a substantial likelihood to prevail on the merits.

**C.    The Balancing Of Harms Favors Delphi, And The Public Interest Would Be Harmed If An Injunction Is Granted.**

Contrary to the suggestion in Methode's motion, there is a significant and irreparable harm to Delphi if this Court enters an injunction. Putting aside the millions of dollars that Delphi has sunk into its efforts to develop the capability to in-source bladders – consider, for example, the testimony of PODS Chief Engineer Lisa Hanson at her June 26, 2009 that Delphi had incurred approximately $7 million dollars to date in tooling and capital expenditures – Delphi has also entered contracts and placed orders with sub-suppliers who are depending on supplying Delphi's needs with their goods. Ordering injunctive relief and forcing Delphi to hang these sub-suppliers out to dry is particularly problematic in these difficult financial times, especially in the hard-hit automotive industry. Moreover, Delphi has already purchased millions of dollars of raw materials to make the bladders for the PODS products. These raw materials do not have an alternative use to Delphi. *See* Affidavit of Hamashuk , Ex. Z. Delphi has also spent significant time validating these safety critical parts with its numerous OEM customers. As Methode acknowledges, the bladders and PODS are "safety-critical" components that are subjected to rigorous evaluation and must pass stringent testing protocols. *Id.* It is not a simple matter of turning off the spigot as Methode suggests.

In contrast, Methode has been well aware of Delphi's intention to in-source the bladders since June 2008, and it has had plenty of time to make the necessary adjustments to its supply

base.   Indeed, as Methode recently acknowledged to its stock investors in its 1Q earnings conference call, the contract termination by Delphi was "not a surprise."   In addition, as noted above, Methode has an adequate remedy in money damages.

In addition, the public interest weighs heavily in favor of Delphi because courts have recognized that the public has an interest in preserving the enforceability of contracts, and the public interest is served when commercial contracting parties are made to follow through on their promises and not use strong-arm tactics to avoid their contractual commitments or re-write the parties' agreement.  *Neveuex v. Webcraft Technologies, Inc.*, 921 F. Supp. 1568 (E.D. Mich. 1996).   The public and Michigan courts also have in interest in having unambiguous contracts enforced as written.  *See Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 51-52 (2003).

## IV.    CONCLUSION

Because Methode cannot establish any of the essential elements for a preliminary injunction, Delphi respectfully requests that the Court deny Methode's motion.

Dated:  September 8, 2009

Respectfully submitted,

DYKEMA GOSSETT PLLC

By: _____

Thomas S. Bishoff (P53753)
Attorneys for Delphi

DET01\715324.6
ID\TSB – 101289/0005