# EXHIBIT Q

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| DELPHI AUTOMOTIVE SYSTEMS, LLC ) | |
| ) | |
| Plaintiff, ) | Civil Action No. _____ |
| ) | |
| v. ) | DEMAND FOR JURY TRIAL |
| ) | |
| METHODE ELECTRONICS, INC. ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

## COMPLAINT

Delphi Automotive Systems, LLC ("Delphi"), by and through its counsel, hereby states its Complaint against Defendant, Methode Electronics, Inc. ("Methode"), and its demand for trial by jury, alleging as follows:

## PARTIES

1.     Delphi is a limited liability company formed under the laws of the State of Delaware and has a principal place of business at 5725 Delphi Drive, Troy, Michigan 48098-2815.  Delphi was incorporated on August 21, 2009.

2.     Upon information and belief, Methode is a Delaware corporation with its principal place of business at 7401 West Wilson Avenue, Chicago, Illinois.

**JURISDICTION AND VENUE**

3.        This action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and

2202, and the patent laws of the United States, Title 35 United States Code, as well as under the

common law of the State of Indiana.

4.        This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331, 1338, and 1367.

5.        Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(b).

**ACTUAL CONTROVERSY**

6.        In 2001, DPH-DAS LLC ("DPH"), formerly known as Delphi Automotive

Systems LLC, and the Defendant here, Methode, entered into a Long Term Contract such that

Methode became the sole supplier of bladders used in DPH's airbag actuation system called the

Passive Occupant Detection System ("PODS").   PODS is a seat-occupant sensing technology

that detects a child and/or small adult in vehicle front passenger seats and supplies information to

a computer to permit the inflation of the airbag to be suppressed when suppression is needed for

safety.   For many years, Methode enjoyed this sole-supplier arrangement, selling over 30 million

PODS bladders to DPH.   In early to mid-2008, however, Methode began taking advantage of its

sole-supplier arrangement, by demanding, *inter alia*, that DPH pay drastically higher prices for

the PODS bladders and in January 2009 by refusing, *inter alia*, to provide prototype bladders for

new vehicle launches.   Many of these prototypes were for launches for which DPH had already

been awarded PODS contracts.

7.        Unreasonable positions by Methode left DPH and its customers at risk.   The

customers depended exclusively on DPH for the PODS product and DPH bought the PODS

bladder solely from Methode.  By refusing to make prototype bladders for new vehicle launches, Methode put at risk the manufacture and sale of new vehicle models slated to lift vehicle sales in the depressed global automotive market.  Because Methode's practices carried significant negative consequences for DPH, DPH's customers, and the vehicle buying public, DPH was left with no option but to seek out other sources of the prototype bladders that Methode had wrongfully refused to manufacture.  DPH consulted with and provided information to an Indiana company, Marian, Inc., so that Marian, Inc. could provide limited prototypes of DPH's PODS bladders.

8.      Based on Methode's bad faith actions, in October 2008, DPH was forced to bring suit against Methode in Michigan State Court in the 6th Judicial Circuit of Michigan, Oakland County Circuit Court (captioned *Delphi Automotive Systems LLC v. Methode Electronics*, Inc., Case No. 08-095518-CK) (Ex. 1, Michigan State Court Action Complaint (without exhibits)), seeking, *inter alia*, return of drawings for the DPH owned tooling related to the PODS.  This Michigan State Court Action is currently pending.

9.      Thereafter, on April 9, 2009, Methode filed suit against DPH and Marian, Inc. in the United States District Court for the Northern District of Illinois ("Methode Patent Infringement Action"), alleging two counts of patent infringement based on U.S. Patent No. 5,975,568 ("'568 Patent") (Ex. 2).  Count I of Methode's Complaint in the Methode Patent Infringement Action alleges:

> 24.      The claims of the ['568 Patent] are directed, *inter alia*, to a [weight sensing bladder] for an automobile.
> 25.      Methode is the owner by assignment of the ['568 Patent], its subject matter, and the rights of recovery flowing therefrom.

3

26.     On information and belief, [DPH] has manufactured and used, and continues to have manufactured and continues to use, [PODS bladder]s in the United States without authorization from Methode.

27.     On information and belief, [DPH] has offered for sale, or intends to offer for sale and sell, [PODS bladder]s throughout the United States without authorization from Methode.

28.     On information and belief, [DPH]'s [PODS bladder]s infringe, literally or by equivalents, one or more valid and enforceable claims of the ['568 Patent].

29.     [DPH] has infringed, and continues to infringe, directly or indirectly, the ['568 Patent] by, *inter alia*, practicing or inducing or contributing to others practicing one or more valid and enforceable claims of the ['568 Patent].

30.     As a direct and proximate result of [DPH]'s acts of infringement of the ['568 Patent], Methode has suffered injury and damages for which it is entitled to relief, including, but not limited to, monetary damages.

31.     On information and belief, [DPH] has knowingly, willfully, and deliberately infringed the ['568 Patent] in conscious disregard of Methode's rights, making this case exceptional within the meaning of 35 U.S.C. § 285 and justifying treble damages pursuant to 35 U.S.C. § 284.

32.     On information and belief, [DPH] will continue to infringe the ['568 Patent], causing immediate and irreparable harm unless this Court enjoins and restrains its activities.

33.     On information and belief, the infringement by [DPH] has deprived, and will further deprive, Methode of revenue which Methode would have made or would enjoy in the future; has injured Methode in other respects; and will cause Methode added injury and damage in the future unless [DPH] is enjoined from infringing the ['568 Patent].

(*See* Ex. 3, Methode's Complaint from the Methode Patent Infringement Action (without exhibits), ¶¶ 24-33).

10.     In its Complaint in the Methode Patent Infringement Action, Methode seeks "a permanent injunction restraining [DPH], its directors, officers, agents, employees, successors, subsidiaries, assigns, and affiliates, and all persons acting in privy or in concert or participation with any of them from" infringing the '568 Patent.  (*See id.* ¶ G).

11.     On July 13, 2009, Judge Coar of the United States District Court for Northern District of Illinois Ordered the Methode Patent Infringement Action transferred to the United States District Court for the Eastern District of Michigan.

12.     The Methode Patent Infringement Action is currently pending in the United States District Court for the Eastern District of Michigan as Case No. 2:09-cv-13078-PDB-VMM.

13.     On August 26, 2009, DPH provided Methode notice that effective September 10, 2009, DPH was terminating the parties' supply agreement for PODS bladders based on at least the breach of contract and termination for convenience provisions of the Terms and Conditions included in the parties' Supply Agreement.

14.     On September 2, 2009, Methode filed a motion for preliminary injunction in the Michigan State Court Action seeking to effectively enjoin DPH from producing PODS bladders in-house.   On September 10, 2009, citing Methode's failure to adequately show either a likelihood of success on the merits or irreparable harm, the Michigan State Court denied Methode's motion for a preliminary injunction.

15.     On October 6, 2009, DPH emerged from bankruptcy.

16.     In connection with DPH's bankruptcy, Delphi purchased assets of DPH.   The DPH assets purchased by Delphi include, *inter alia*, DPH's production capabilities, parts, and products for manufacturing PODS and PODS bladders—the device Methode, in the ongoing Methode Patent Infringement Action, alleges infringes the '568 Patent.

17.     As a result of its purchase of DPH assets, Delphi now owns all or substantially all of the PODS bladders that were previously in DPH's possession, as well as all or substantially all of DPH's production capabilities, parts, and products for manufacturing PODS bladders.

18.     Delphi is currently manufacturing PODS bladders using the production capabilities, parts, and products Delphi acquired from its purchase of assets from DPH.

19.     Upon information and belief, Methode no longer supplies PODS bladders to any entity, including DPH.

20.     Based on Methode's ongoing litigation in the Methode Patent Infringement Action against DPH; Methode's request in that Action for a permanent injunction "restraining [DPH], its directors, officers, agents, employees, successors, subsidiaries, assigns, and affiliates, and all persons acting in privy or in concert or participation with any of them from" infringing the '568 Patent; Methode's efforts to obtain a preliminary injunction in the Michigan State Court Action to enjoin DPH from producing PODS bladders in-house; the fact that Delphi now owns DPH's assets related to the PODS bladders; and the fact that Delphi is currently producing PODS bladders in-house—the same PODS bladders that are a subject of the Methode Patent Infringement Action and a subject of the Michigan State Court Action—an actual case or controversy exists between Delphi and Methode as to whether the manufacture, use, sale, or offer for sale of the PODS bladders by Delphi by use of its acquired assets infringes any valid and enforceable claim of the '568 Patent.

## COUNT I - BREACH OF CONTRACT

21.     Paragraphs 1-20 of Delphi's Complaint are re-alleged and reincorporated by reference as if fully set forth herein.

22.     DPH's predecessor, Delco Electronics Corporation ("DPH/Delco"), a pioneer in automotive safety technologies, developed the PODS bladders used in PODS now manufactured by Delphi.  In late 1996 and through 1997, employees at DPH/Delco, including Duane Fortune,

Robert Myers, Morgan Murphy and Pamela Roe, began working on a PODS bladder for use in

PODS.

23.     After months of testing, researching, and designing bladders, DPH/Delco

approached Methode's predecessor, Automotive Components, Incorporated ("Methode/ACI"), to

determine whether Methode/ACI could serve as a potential manufacturer for the PODS bladder.

To that end, on or about May 23, 1997, Methode/ACI signed a General Nondisclosure

Agreement with DPH/Delco, which became effective on or about May 28, 1997.  Through the

General Nondisclosure Agreement, Methode/ACI agreed to take certain measures to avoid

dissemination of DPH/Delco's proprietary information relating to PODS bladder technology

("Proprietary Information") to any third party, and to use such Proprietary Information only for

the benefit of DPH/Delco and only for the purpose of Developing and/or Quoting.

24.     Thereafter, and pursuant to this General Nondisclosure Agreement, DPH/Delco

began providing to Methode/ACI significant details of DPH/Delco's inventions and development

work, including the Proprietary Information, so that Methode/ACI could evaluate and provide

appropriate manufacturing prototypes and tooling to produce the bladders to be used in PODS

products.

25.     During the course of this development, Mr. Duane Fortune, Mr. Morgan Murphy,

among others at DPH/Delco—but not Dr. Speckhart, Mr. Baker or anyone else at

Methode/ACI—developed a PODS bladder with an array of circular cells.   DPH/Delco

subsequently shared these concepts and designs with Methode/ACI.

26.     Around January 1998, DPH/Delco spun-off from General Motors Corporation and

later became a wholly-owned subsidiary of DPH.  On December 31, 2003, DPH/Delco converted

and changed its name to Delco Electronics LLC.  On September 30, 2005, Delco Electronics LLC merged by operation of law into DPH-DAS LLC.  Accordingly, DPH/Delco's rights under the General Nondisclosure Agreement were assigned to DPH.

27.     On February 18, 1998, DPH/Delco filed a patent application directed to a weight-sensing bladder that encompasses the bladder used in DPH's PODS.  This patent application ultimately issued as U.S. Patent No. 6,101,436 ("'436 Patent") on August 8, 2000.

28.     Unbeknownst to DPH/Delco and months after DPH/Delco filed its patent application, Methode/ACI disclosed and utilized—and Methode continues to utilize—the Proprietary Information in violation of Methode/ACI's contractual obligations, including the obligations set forth in the General Nondisclosure Agreement.

29.     Methode/ACI disclosed DPH/Delco's Proprietary Information at least in United States Patent Application Serial No. 29/085,897 ("the '897 application"), United States Patent Application Serial No. 09/072,833 ("the '833 application"), and United States Application Serial No. 09/146,677 ("the '677 application")—the application that eventually became the '568 Patent—in violation of Methode/ACI's contractual obligations, including the obligations set forth in the General Nondisclosure Agreement.

30.     Upon information and belief, Methode/ACI used the Proprietary Information to prepare the '897 application, the '833 application, and the '677 application.  Upon information and belief, these activities commenced before September 3, 1998, and continued thereafter.

31.     By using the Proprietary Information to prepare the '897 application, the '833 application, and the '677 application, Methode/ACI used the Proprietary Information for

purposes other than Developing and/or Quoting and for purposes other than the benefit of DPH/Delco in violation of Methode/ACI's contractual obligations.

32.      Upon information and belief, on or about 2001, Methode/ACI sold substantially all of its assets to Methode including, but not limited to, equipment, technology/know-how, and intellectual property.

33.      Upon information and belief, Methode/ACI no longer exists.

34.      Upon information and belief, after having acquired Methode/ACI, Methode filed patent applications including, but not limited to, United States Application Serial No. 09/998,206 ("the '206 application") that contained the Proprietary Information.  Methode used the Proprietary Information for purposes other than Developing and/or Quoting and for purposes other than the benefit of DPH/Delco.

35.      Methode is liable as a successor to Methode/ACI for Methode/ACI's contractual obligations and any breach thereof, including Methode/ACI's contractual obligations set forth in the General Nondisclosure Agreement.  Methode purchased substantially all of Methode/ACI's assets which resulted in a *de facto* merger and/or Methode becoming a mere continuation of Methode/ACI because, on information and belief, Methode has, among other things, maintained continuity of Methode/ACI's corporate entity based on, among other things and on information and belief, Methode's hiring of Methode/ACI management and personnel, and Methode's use of Methode/ACI's physical operations.

36.      In connection with the consummation of DPH's Modified Plan of Reorganization and under a Master Disposition Agreement, Delphi purchased the vast majority of DPH's assets

which included an assignment of the General Nondisclosure Agreement.  This transaction was effective October 6, 2009.

37.     By reason of the foregoing acts and conduct of Methode/ACI and Methode, Delphi has suffered and will continue to suffer great harm and damage.

38.     Delphi is entitled to recover from Methode the gains, profits, advantages, and unjust enrichment Methode and Methode/ACI obtained as a result of Methode/ACI's and Methode's wrongful acts as hereinabove alleged.  Delphi is further entitled to recover from Methode the damages sustained by it as a result of Methode/ACI's and Methode's wrongful acts as hereinabove alleged.

39.     Delphi is entitled to an injunction restraining Methode from reaping any additional commercial advantage from Methode/ACI's and Methode's violation of their contractual obligations set forth herein.

## COUNT II - DECLARATION OF INVALIDITY OF THE '568 PATENT

40.     Paragraphs 1-39 of Delphi's Complaint are re-alleged and reincorporated by reference as if fully set forth herein.

41.     The '568 Patent was issued by the U.S. Patent and Trademark Office ("USPTO") on November 2, 1999.  Methode, in paragraphs 11 and 25 of its Complaint in the Methode Patent Infringement Action, claims to own all rights in and to the '568 Patent.

42.     In the Methode Patent Infringement Action, Methode claims that certain acts of DPH infringed the '568 Patent.

43.     Delphi has purchased assets of DPH including DPH's production capabilities, parts, and products for manufacturing PODS and PODS bladders.

44.     Delphi is currently manufacturing PODS bladders using the production capabilities, parts, and products Delphi acquired from DPH.

45.     The '568 Patent is invalid for failure to satisfy one or more of the conditions for patentability specified in Title 35 of the United States Code, including but not limited to 35 U.S.C. §§ 102, 103 and 112, and/or for being in violation of one or more of the sections of Parts I, II, and III of Title 35 of the United States Code, and/or for being anticipated by prior art patent '436 Patent, and/or prior invention by DPH/Delco personnel.

46.     By reason of the foregoing, there is an actual and justiciable controversy between Delphi on the one hand, and Methode on the other, and Delphi is entitled to a decree that the '568 Patent is invalid.

### COUNT III - DECLARATION OF
### UNENFORCEABILITY OF THE '568 PATENT

47.     Paragraphs 1-46 of Delphi's Complaint are re-alleged and reincorporated by reference as if fully set forth herein.

48.     For the reasons set forth below, the '568 Patent is unenforceable.

49.     Upon information and belief, during prosecution of the '568 Patent, Methode/ACI and others substantively involved in the prosecution of the '568 Patent deliberately engaged in a pattern of inequitable conduct that was misleading and calculated to mislead the USPTO into granting the '568 Patent coverage to which Methode/ACI was not and is not entitled.

50.     Upon information and belief, those involved in this scheme included at least the following individuals at Methode/ACI, all of whom were believed to be substantively involved in the prosecution of the '568 Patent:  Frank Speckhart and Scott Baker.

51.     Upon information and belief, Methode/ACI and others substantively involved in the prosecution of the '568 Patent filed the underlying application for the '568 Patent directed to subject matter that the named inventors either did not invent or which was not patentable over the prior art known to those substantively involved in the prosecution of the '568 Patent.

52.     In addition, upon information and belief, Methode/ACI and those substantively involved in the prosecution of the '568 Patent deliberately concealed from the USPTO material prior art and other material information, including the inventions, designs, offers for sales, and other information regarding the design and development of Delphi's PODS products, including the bladder with circular cells invention as well as other occupant sensing designs and technologies, disclosed by DPH/Delco to Frank Speckhart, Scott Baker and others at Methode/ACI in an effort by Methode/ACI to mislead the USPTO.

53.     In addition, upon information and belief, Methode/ACI and those substantively involved in the prosecution of the '568 Patent, deliberately and with deceptive intent concealed from the USPTO the true inventors of the subject matter claimed in the '568 Patent, namely Messrs. Duane Fortune and/or Morgan Murphy, concealed the inventive contribution attributable to Messrs. Fortune and/or Murphy to the subject matter claimed in the '568 Patent, and/or incorrectly named inventors, in an unlawful effort to disenfranchise Messrs. Fortune and/or Murphy from their rights to the subject matter claimed in the '568 Patent and to mislead the USPTO.

54.     The foregoing activities were material and intended by Methode/ACI and others substantively involved in the prosecution of the '568 Patent to mislead the USPTO.  As a result, the '568 Patent is unenforceable by reason of inequitable conduct.

55.     By reason of the foregoing, there is an actual and justiciable controversy between Delphi on the one hand, and Methode on the other, and Delphi is entitled to a decree that the '568 Patent is unenforceable.

**COUNT IV - DECLARATION OF
<u>NON-INFRINGEMENT OF THE '568 PATENT</u>**

56.     Paragraphs 1-55 of Delphi's Complaint are re-alleged and reincorporated by reference as if fully set forth herein.

57.     Delphi has not infringed, and does not infringe any valid, enforceable claim of the '568 Patent, either directly, indirectly, contributorily, through the doctrine of equivalents, or otherwise, and has not induced others to infringe the '568 Patent.

58.     By reason of the foregoing, there is an actual and justiciable controversy between Delphi on the one hand, and Methode on the other, and Delphi is entitled to a decree that Delphi does not infringe the '568 Patent.

**<u>JURY DEMAND</u>**

Delphi demands a trial by jury on all issues so triable.

**<u>RELIEF REQUESTED</u>**

**WHEREFORE**, Delphi respectfully requests the following relief:

A.  A judgment that the '568 Patent is invalid and unenforceable;

B.  A judgment that Delphi has not infringed and is not infringing, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '568 Patent, and that Delphi has not contributed to or induced and is not contributing to or inducing infringement of any valid and enforceable claim of the '568 Patent;

C.  A judgment that Delphi has authority by license, assignment, waiver, covenant not to sue and/or otherwise to practice the claimed subject matter of the '568 Patent;

D.  A judgment that Methode and Methode/ACI breached and/or violated their contractual obligations set forth in the General Nondisclosure Agreement;

E.  A judgment that Methode is a successor to Methode/ACI and is liable for Methode/ACI's obligations under the General Nondisclosure Agreement and any breach thereof;

F.  A judgment awarding Delphi the gains, profits, advantages, and unjust enrichment Methode and Methode/ACI obtained as a result of Methode/ACI's and Methode's actions;

G.  A judgment awarding Delphi damages determined to be sustained by Delphi as a result of Methode's actions;

H.  A judgment finding that Methode's actions were willful and/or in bad faith entitling Delphi to enhanced damages including punitive damages;

I.  A judgment awarding pre-litigation and pre-award interest on all damages at the maximum legally allowable rate of interest;

J.  A judgment that this case is an exceptional case and awarding Delphi its costs, expenses and reasonable attorneys' fees pursuant to 35 U.S.C. § 285 and as otherwise permitted by law; and

K.  Any and all other relief to which Delphi may be entitled or which this Court deems just and proper.

Respectfully submitted,

Dated:  _____ October 30, 2009 _____     By:  _____ /s/ Timothy J. Rechtien _____

Charles W. Shifley
IL Bar No. 2587564
  *cshifley@bannerwitcoff.com*
Binal J. Patel
IL Bar No. 6237843
  *bpatel@bannerwitcoff.com*
Matthew P. Becker
IL Bar No. 6255614
  *mbecker@bannerwitcoff.com*
Timothy J. Rechtien
IL Bar No. 6293623
  *trechtien@bannerwitcoff.com*
BANNER & WITCOFF, LTD.
10 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
Tel.:   (312) 463-5000
Fax:   (312) 463-5001

Joseph E. Papelian
  *joseph.e.papelian@delphi.com*
William Cosnowski, Jr.
  *william.cosnowski.jr@delphi.com*
Delphi Automotive Systems, LLC
5725 Delphi Drive, M/C 483-400-554
Troy, Michigan 48098-2815

**Attorneys for Plaintiff Delphi Automotive
Systems, LLC.**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | | |
|---|---|---|
| DELPHI AUTOMOTIVE SYSTEMS, LLC | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. _____ |
| | ) | |
| v. | ) | DEMAND FOR JURY TRIAL |
| | ) | |
| METHODE ELECTRONICS, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## INDEX OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1 | Michigan State Court Action Complaint (without exhibits) |
| 2 | U.S. Patent No. 5,975,568 |
| 3 | Methode's Complaint from the Methode Patent Infringement Action (without exhibits) |

# EXHIBIT 1

# STATE OF MICHIGAN

# IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

DELPHI AUTOMOTIVE SYSTEMS, LLC,
a Delaware limited liability company,

        Plaintiff,

vs.

METHODE ELECTRONICS, INC.,

        Defendant.

Civil Action No.: ___

Hon. _____

OAKLAND COUNTY **08-095518-CK**

JUDGE NANCI J. GRANT
DELPHI AUTOMO  v  METHODE ELECT

Thomas S. Bishoff (P53753)
Stephen W. King (P56456)
Attorneys for Delphi
Dykema Gossett PLLC
400 Renaissance Center, 35th Floor
Detroit, Michigan 48243
(313) 568-5341

Charles E. Brown (P46400)
Co-Counsel for Delphi
Delphi Automotive Systems, LLC
MC 480-410-254
5825 Delphi Dr.
Troy, MI 48098
(248) 813-3368

*There is no other pending or resolved civil action arising out of the transactions or occurrences alleged in this Verified Complaint for Injunctive and Other Relief.*

## VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Delphi Automotive Systems, LLC ("Delphi") alleges as follows for its Verified Complaint for Injunctive and Other Relief:

## NATURE OF THE ACTION

1.      In this civil action Delphi seeks to recover a copy of tooling drawings in the possession of Defendant Methode Electronics, Inc. ("Methode"). Delphi has paid for and owns the tooling drawings, as well as the underlying tooling and equipment. Delphi does not seek to

1

recover the underlying tooling and equipment. The tooling drawings are in electronic format and copies can be transferred easily to Delphi with the click of a computer mouse. Methode has no right to refuse to provide copies of the tooling drawings and a clear contractual obligation to turn them over to Delphi upon demand. Despite repeated demands by Delphi to turn over copies of the tooling drawings, Methode has refused to do so. Incredibly, Methode refuses to turn over the tooling drawings even though it acknowledges that Delphi owns the underlying tooling and equipment. Thus, Delphi is forced to file this action for injunctive relief and claim and delivery seeking the return of its property which Methode has wrongfully and unlawfully detained.

2.     In breach of its contracts with Delphi, Methode threatened to stop delivery of unique and safety critical Bladders ("Parts") – essential to the manufacture of Passenger Occupant Detection Sensors ("PODS") used in Delphi's PODS B and D Programs – unless Delphi acceded to Methode's wrongful price increase demands. Delphi has little to no excess or "bank" of the Parts, and if Methode halted shipments, then Delphi would have run out of the Parts within 24-48 hours.

3.     The Parts are used by Delphi in the production and supply of PODS which are then sold to its customers – approximately 15 Original Equipment Manufacturers ("OEM") for use as part of the OEM vehicles' occupant protection systems. Almost every major OEM in the world uses Delphi's PODS in one or more of its vehicle models.

4.     If Methode had ceased shipments of the Parts then it would have been responsible for the almost immediate shutdown of Delphi's related PODS production, which would have lead to a disruption and shut downs in the OEMs' production, thus resulting in irreparable harm to Delphi, the OEMs, automobile dealers, automobile workers, and the public for which money damages alone could never adequately compensate.

2

5.      In order to avoid the aforementioned irreparable harm, Delphi was forced to issue
new purchase orders to Methode for the Parts at substantially higher prices.  Methode refused to
even accept purchase orders "under protest" if Delphi wished to assure continued supply past
Methode's unilaterally imposed deadline.  In some instances, Delphi paid 40-50% price
increases.  In aggregate, Delphi estimates that it will pay $16 million dollars annually in prices
increases.

6.      Having issued new purchase orders with substantial price increases, and seeking
to avoid the possibility of doing so again in the future should Methode decide to extract even
higher prices or new commercial terms by stopping or threatening to stop shipping the Parts,
Delphi demanded copies of the tooling drawings used to make the tooling for the Parts.

7.      Although Methode acknowledges that Delphi has paid for and owns the
underlying tools and equipment, Methode refuses to turn over the tooling drawings in breach of
its contractual obligations to Delphi and in violation of Michigan law, thereby justifying
injunctive relief.

8.      **Delphi will be irreparably harmed** without immediate possession of the tooling
drawings because it will be deprived of the ability to re-source the Parts in the event Methode
seeks to extract even higher prices or more favorable commercial terms and conditions by
stopping shipments or threatening to stop shipments of the Parts.  Delphi will also be deprived of
the ability to make strategic business decisions with respect to future supply of the Parts should it
become necessary for Delphi's financial survival.

9.      **Delphi has a substantial likelihood of prevailing on the merits**.  The contracts
in question make clear that Delphi owns the tooling drawings, Methode holds the tooling
drawings on a bailment basis, Delphi has the right to re-take possession of the tooling drawings,

3

and, in the event Methode refuses to release the tooling drawings, Delphi may obtain an

immediate writ of possession and take possession of them.

10. **The balance of potential harms tips decidedly in Delphi's favor** because if

Methode stops supplying the Parts, plants and/or assembly lines will be forced to shut down in

whole or in part within a matter of days. On the other hand, there is no potential harm to

Methode if it turns over copies of the tooling drawings to Delphi, as it is contractually obligated

to do, because Delphi owns the drawings and Methode has no right to retain them. Further,

Delphi does not seek to deprive Methode from using the tooling drawings (to the extent it is

necessary to meet its contractual obligations to supply the Parts), rather Delphi simply seeks

copies of the tooling drawings which are in electronic format, easily reproduced and even more

easily transferred to Delphi.

11. **The public interest weighs heavily in favor of Delphi because** courts have

recognized that the public has an interest in preserving the enforceability of contracts, and the

public interest is served when commercial contracting parties are made to follow through on their

promises and not use strong-arm tactics to avoid their contractual commitments or coerce

unreasonable price increases.

12. In addition, Methode's continued wrongful possession of the tooling drawings

substantially impairs their value and Delphi's ability to use them. Therefore, pursuant to MCR

3.105 and MCL §600.2920, Delphi is also entitled to an order for immediate possession pending

final judgment.

## PARTIES, JURISDICTION, AND VENUE

13. Delphi is a Delaware limited liability company with its principal place of business

located in Troy, Michigan.

4

14.     Methode is a Delaware corporation that conducts business in connection with the issues set forth herein in Oakland County, Michigan.

15.     This case is within the subject matter jurisdiction of this Court because the amount in controversy exceeds $25,000, exclusive of interest, fees and costs, and because equitable relief is sought.

16.     Venue in this Court is proper pursuant to MCL §600.1621 because Methode conducts business in connection with the issues set forth herein in Oakland County, Michigan, the parties have consented to venue in this Court, and Delphi seeks replevin of its property located in Oakland County, Michigan.

17.     This Court has personal jurisdiction over Methode because it conducts continuous and systematic business in the State of Michigan, including the business transactions set forth in this Verified Complaint.  In addition, Methode has agreed that the forum and venue for any legal or equitable action or proceeding arising out of or in connection with the contracts (as defined below) for the Parts is the appropriate federal or state courts in the State of Michigan and it specifically waived any and all objections to such jurisdiction and venue:

> [E]ach party hereby agrees that the forum and venue for any legal or equitable action or proceeding arising out of, or in connection with, this Contract will lie in the appropriate federal or state courts in the State of Michigan and specifically waives any and all objections to such jurisdiction and venue.

(Ex. D, Delphi General Terms and Conditions, ¶ 26.)  Therefore, Methode has consented to personal jurisdiction.

## GENERAL ALLEGATIONS

### The Parties' Supply Relationship

18.     Delphi is a world-wide supplier of automotive parts to the automotive industry, and is engaged in the business of, among other things, manufacturing and supplying parts that

are designed, and manufactured to meet the stringent quality and safety standards of its customers, as well as applicable governmental safety standards.

19.    Methode is a global manufacturer of component and subsystem devices with manufacturing, design, and testing facilities in the United States, Mexico, Malta, United Kingdom, Germany, Czech Republic, Singapore, and China. Methode designs, manufactures, and markets devices employing electrical, electronic, wireless, sensing, and optical technologies.

20.    As a direct supplier to its OEM customers, Delphi is known as a Tier One supplier. Delphi contracts with Tier Two suppliers, such as Methode, to provide component parts that are incorporated into systems or assemblies supplied by Delphi to its customers.

21.    Methode supplies Delphi with the Parts, which are unique to Delphi specifications and critical for Passenger Occupant Detection Sensors. The Parts are incorporated into Delphi's PODS B and D Programs systems and sold to Delphi's OEM customers. The PODS supplied by Delphi are utilized by numerous OEMs on their various models, including GM, Ford, Chrysler, Hyundai, Subaru, Nissan, and Toyota.

### Just-in-Time Inventory and Sole Source Suppliers

22.    Delphi, consistent with industry standards, operates on a "single-source, just-in-time" inventory supply system basis and lean manufacturing (hereinafter the "Auto Supply System").

23.    Delphi is the single source to its OEM customers for certain PODS, which are ordered on an as needed basis by its OEM customers pursuant to their contracts with Delphi. In this case, Delphi turns the Parts around in approximately 24 hours, and thus, maintains little to no inventory of the Parts.

24.    The PODS (including the Parts) are uniquely manufactured for approximately 90 different vehicle models in which they are installed. They are manufactured to specific and

6

exacting OEM specifications and requirements, as well as governmental safety standards. The Parts are safety critical. Simply stated, without the Parts for the PODS, the aforementioned vehicles cannot be manufactured, assembled, shipped to automobile dealerships and sold to the public.

25.   The Auto Supply System is standard in the automotive industry and is used by Delphi, its OEM customers, and automotive equipment suppliers throughout the supply chain. Under the Auto Supply System, the customer maintains a very limited inventory (*i.e.,* typically inventory sufficient for not more than one or two days) of product in order to manufacture and assemble automobiles.

26.   As a result, each entity throughout the supply chain relies on frequent, generally daily, shipments of parts or product in order to meet its production needs. There are usually no inventories maintained for these parts or products, and the failure to supply as ordered could quickly shut down assembly plants (sometimes within hours, other times within days).

27.   Methode is currently the single source, sole supplier of the Parts that are incorporated by Delphi into the PODS sold to its OEM customers.

28.   The Parts provided by Methode to Delphi are manufactured to particular OEM and governmental safety and other standards and are not readily available to Delphi by alternative suppliers. Hence, in all circumstances the Parts provided by Methode to Delphi are designed to meet the needs of the specific vehicle into which they are ultimately incorporated and undergo the rigorous production part approval process (hereinafter "PPAP") to be validated before they are utilized on production vehicles.

## The Parties' Contracts and the Tooling Drawings

29.     Pursuant to the supply relationship between the parties and as part of the process of manufacturing and supplying the Parts to Delphi, Delphi issued certain production purchase orders ("Production Purchase Orders") and tooling purchase orders ("Tooling Purchase Orders") to Methode.

30.     Specifically, Delphi issued 140 Production Purchase Orders and 108 Tooling Purchase Orders to Methode, which Methode accepted through its regular performance.

31.     Pursuant to the Production Purchase Orders and the Tooling Purchase Orders, Methode purchased certain tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment, supplies, materials and other items, including the tooling drawings at issue in this case.

32.     The tooling drawings consist of electronic files and/or hard copy drawings of welding tools and cutting tools ("Tooling Drawings") used to make the Parts.  A list identifying the Tooling Drawings with specificity is attached as Ex. A.

33.     Delphi issued the Tooling Purchase Orders to Methode to purchase the tooling and equipment used to make the Parts.  As a necessary and inherent part of the process of acquiring and manufacturing the tooling and equipment and supplying the Parts, Methode created, or had created on its behalf, the Tooling Drawings.

34.     Pursuant to the Production Purchase Orders and the Tooling Purchase Orders, Delphi paid for the various tooling and equipment utilized to make the Parts, including the Tooling Drawings.

35.     The Production Purchase Orders and the Tooling Purchase Orders incorporate Delphi's General Terms and Conditions.

8

36.     The contracts between Delphi and Methode consist of the Production Purchase

Orders and Tooling Purchase Orders issued by Delphi to Methode[1] and Delphi's General Terms

and Conditions ("T&Cs").[2]  The Production Purchase Orders, Tooling Purchase Orders and

T&Cs are collectively referred to as the "Contracts."

37.     The T&Cs address a multitude of issues regulating the parties' business

relationship.  For example, the T&Cs specifically define Methode's means of acceptance of the

Contracts:

### 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and
Conditions are incorporated in, and a part of, this contract and each
purchase order, release, requisition, work order, shipping
instruction, specification and other document, whether expressed
in written form, by electronic data interchange or other tangible
format, relating to the goods and/or services to be provided by
Seller pursuant to this contract (such documents are collectively
referred to as this "Contract").  Seller acknowledges and agrees
that it has read and understands these General Terms and
Conditions.  **If Seller accepts this Contract in writing or
commences any of the work or services which are the subject
of this Contract, Seller will be deemed to have accepted this
Contract and these General Terms and Conditions in their
entirety without modification.**  Any additions to, changes in,
modifications of, or revisions of this Contract (including these
General Terms and Conditions) which Seller proposes will be
deemed to be rejected by Buyer except to the extent that an
authorized employee of Buyer expressly agrees to accept any such
proposals in writing. (Ex. D, emphasis added.)

38.     The T&Cs also address in detail and make clear that Delphi owns the Tooling

Drawings, Methode holds the Tooling Drawings on a bailment basis, Delphi has the right to re-

---

[1] As there are numerous Production Purchase Orders and Tooling Purchase Orders, all of which
are in possession of Methode, Delphi has attached exemplar purchase orders here.  An exemplar
Production Purchase Order is attached as Ex. B and an exemplar Tooling Purchase Order is attached as
Ex. C.

[2] *See* Ex. D.

take possession of the Tooling Drawings, and, in the event Methode refuses to release the Tooling Drawings, Delphi may obtain an immediate writ of possession and take possession of them:

### 17. BUYER'S PROPERTY AND INFORMATION

17.1 <u>Acquisition of Tooling and Materials</u>. **To the extent that this Contract covers Buyer's purchase of, or reimbursement to Seller for, any tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment, supplies, materials and other items (collectively, "Tooling and Materials") to be used in connection with Seller's actual or anticipated supply of goods to Buyer, Seller will acquire such Tooling and Materials as agent of Buyer** and Buyer shall pay to or reimburse Seller the lower of (i) the amount specified in this Contract for such Tooling and Materials or (ii) Seller's actual out-of-pocket cost to acquire the Tooling or Materials from an unrelated third party or, if the Tooling and Materials are constructed or fabricated by Seller or any affiliate of Seller, the actual direct costs for materials, labor and overhead associated with such construction and fabrication. **Seller shall assign to Buyer any contract rights or claims in which Seller has an interest with respect to such Tooling and Materials.** Seller shall establish a reasonable accounting system that readily enables the identification of Seller's costs as described above. Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any such Tooling and Materials. **Upon Seller's acquisition of such Tooling and Materials, title thereto shall vest immediately in Buyer and such Tooling and Materials shall be held as "Buyer's Property" by Seller in accordance with this Article 17.**

17.2 <u>Bailment of Buyer's Property</u>. **All Tooling and Materials which Buyer furnishes, either directly or indirectly, to Seller or which Buyer buys from, or gives reimbursement to, Seller in whole or in part (collectively, "Buyer's Property") will be and remain the property of Buyer and be held by Seller on a bailment basis. Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer immediately upon attachment to or incorporation into Buyer's Property. When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property for work performed on, or utilizing, such property or otherwise.**

10

17.3   <u>Seller's Duties with Respect to Buyer's Property</u>.   While Buyer's Property is in Seller's possession and until Seller delivers Buyer's Property back to Buyer, Seller bears the risk of loss, theft and damage to Buyer's Property.   Seller will be responsible for the cost of repairing or replacing Buyer's Property if it is stolen, damaged or destroyed regardless of cause or fault.   Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's own expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be personal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not commingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from Seller's applicable shipping location (as shown by the shipping address of Seller) without prior written approval from an authorized employee of Buyer, and (g) use Buyer's Property in compliance with Buyer's or the manufacturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations.   Buyer will have the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with respect thereto. Seller will not sell, lend, rent, encumber, pledge, lease, transfer or otherwise dispose of Buyer's Property.   **Furthermore, Seller will not assert, or permit any person claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property.**

17.4   <u>Return of Buyer's Property</u>.   **Seller agrees that Buyer has the right, at any time and from time to time, with or without reason and without payment of any kind, to retake possession of or request the return of Buyer's Property.   Without further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the right to enter Seller's premises and take possession of any and all of Buyer's Property.**   Upon Buyer's request and in accordance with Buyer's instructions, Buyer's Property will be immediately released to Buyer or delivered to Buyer by Seller, either (i) Ex Works (IncoTerms 2000) at Seller's plant properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates, in which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates.   **If Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an immediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or without legal process, and take immediate possession of Buyer's Property.**   (Ex. D, emphasis added.)

11

39.     Additionally, under Paragraph 12.4 of the T&Cs, entitled "Software and Written Works," the Tooling Drawings at issue here are works of authorship and the property of Delphi:

> Seller grants to Buyer a permanent, paid-up license to use, repair, modify and sell any operating software incorporated in the goods in conjunction with the use or sale of the goods. **In addition, all works of authorship, including without limitation, software, computer programs and databases (including object code, micro code, source code and data structures), and all enhancements, modifications and updates thereof and all other written work products or materials, which are created in the course of performing this Contract, separately or as part of any goods and components, are "works made for hire" and the sole property of Buyer. To the extent that such works of authorship do not qualify under applicable law as works made for hire, Seller hereby assigns to Buyer all right, title and interest in any intellectual property rights in such works of authorship. If such assignment is not possible under any applicable law, Seller hereby grants an exclusive, royalty-free license to Buyer with respect to such works of authorship.** (Ex. D, emphasis added.)

40.     Under Paragraph 12.5 of the T&Cs, entitled "Development, Engineering and Consulting Services," any intellectual property derived from engineering, consulting or development services under the Contracts shall be the sole property of Delphi:

> **Engineering, consulting or development services ("Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of authorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole property of Buyer.** Seller agrees to assign all right, title and interest in and to IP that results from Development Services ("Developed IP") to Buyer. Seller shall notify Buyer of the existence of Developed IP and assist Buyer in every reasonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional documents reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse Seller for reasonable costs incurred by Seller in providing such assistance. (Ex. D, emphasis added.)

12

41.     Finally, the T&Cs also detail the consequences should a "Seller," such as

Methode, breach or threaten to breach the Contracts, including an acknowledgment by Methode

that Delphi would not have an adequate remedy at law and would be entitled to injunctive relief:

### 19. REMEDIES AND INJUNCTIVE RELIEF

The rights and remedies reserved to Buyer in this Contract are cumulative with, and in addition to, all other or further remedies provided in law or equity.  To the extent that this Contract is for the supply of goods for use as, or fabrication into, parts, components or systems, Seller acknowledges and agrees that money damages would not be a sufficient remedy for any actual, anticipatory or threatened breach of this Contract by Seller with respect to its delivery of goods to Buyer and that, in addition to all other rights and remedies which Buyer may have, Buyer shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach. (Ex. D.)

### Methode Threatens to Stop Shipping in Order to Extract Substantially Higher Prices for the Parts

42.     On May 1, 2008, Methode sent a letter to Delphi demanding "revised pricing" on

the Parts.  In subsequent exchanges between the parties, this pricing became known as the "May

1, 2008 pricing."  A copy of the letter is attached as Ex. E.

43.     This letter was preceded by discussions among representatives of the parties

during which Methode repeatedly demanded price increases for the Parts from Delphi.  In these

discussions, Methode also took the position that the Contracts expired as of June 30, 2008,

despite the fact that nearly every Production Purchase Order had an expiration date beyond that

date, in many cases several years beyond.

44.     Methode's May 1 letter resulted in a meeting between the parties at Delphi's

facility in Kokomo, Indiana.  Unfortunately, the parties were not able to resolve their differences

at that meeting.

13

45.     On June 27, 2008, Methode issued another letter to Delphi, again taking the

position that the Contracts were set to expire on June 30, 2008.  Methode concluded its letter

with an ominous threat to stop shipping:

> **To ensure an uninterrupted supply of parts,** please forward your
> agreement to the new pricing no later than June 30, 2008 as any
> parts shipped after that date will be pursuant to the attached new
> pricing.

A copy of the letter is attached as Ex. F (emphasis added).

46.     On June 27, 2008, Delphi responded to Methode's letter of the same date.  In

response, Delphi took "strong exception to Methode's assertion that the existing contracts expire

as of July 1st, and to its demands to unilaterally impose dramatic price increases, ranging from 30

to 50% or more…."  Delphi also took this opportunity to remind Methode of the catastrophic and

irreparable consequences to Delphi, and its OEM customers, should Methode stop shipping the

Parts.  A copy of the letter is attached as Ex. G.

47.     On June 30, 2007, Methode issued yet another letter to Delphi, reiterating its

demand for substantially higher prices for the Parts.  Methode advised Delphi that it would

continue to ship parts until September 30, 2008 at the "May 1, 2008 pricing", but after that date

Methode would cut-off supply of the Parts unless the parties reached "an agreement on a new

contract for future supply of parts."  Methode demanded that Delphi confirm within 24 hours that

it would issue revised purchase orders:

> Please be advised that we need new purchase orders with the May
> 1, 2008 pricing retroactive to July 1, 2008 with the ZCRI payment
> terms.  **To insure an uninterrupted supply of parts,** please
> confirm tomorrow, July 1, 2008, that purchase orders will be
> updated accordingly.  We require new PO's by Friday, July 11.

A copy of the letter is attached as Ex. H.

14

48. On July 1, 2008, Delphi issued a letter to Methode requesting good faith negotiations to resolve the parties' pricing dispute. In order to ensure the uninterrupted supply of the Parts and mitigate its damages, Delphi agreed to issue purchases orders with the "May 1, 2008 pricing." In doing so, Delphi "fully reserve[d] its rights and remedies." A copy of the letter is attached as Ex. I.

49. Shortly after its July 1, 2008 letter, Delphi issued revised purchase orders at the substantially higher "May 1, 2008 pricing." Each revised purchase order contained a statement that the above-contract prices were being paid under protest:

> THIS PURCHASE ORDER IS ISSUED BY DELPHI UNDER PROTEST AND THE INCREASED PRICE SET FORTH HEREIN IS BEING PAID BY DELPHI UNDER PROTEST. DELPHI FULLY RESERVES ITS RIGHTS AND REMEDIES.

An exemplar purchase order is attached as Ex. J.

50. On July 11, 2008, Methode wrote to Delphi to advising that it would "agree to maintain the May 1, 2008 pricing for a period of three years" provided certain other terms were satisfied. A copy of the letter is attached as Ex. K.

51. On July 28, 2008, Methode wrote to Delphi to confirm that it had started to receive the revised purchase orders. Methode also advised that it could not accept several terms set forth in Delphi's General Terms and Conditions, including T&C paragraph 12 (pertaining to Methode owned equipment used to make the Parts), paragraph 16 (pertaining to the right to take possession of Methode owned equipment), paragraph 18 (pertaining to service or replacement parts), and paragraph 28 (pertaining to Delphi's rights to audit Methode's records). A copy of the letter is attached as Ex. L.

52.     Methode also took exception to Delphi paying the increased prices "under

protest" and demanded the removal of such language from Delphi's purchase orders as a

precondition to shipping the Parts after September 30, 2008:

> Through September 30, 2008, Methode will accept purchase orders
> with May 1, 2008 pricing subject to the above exceptions [to
> Delphi's T&Cs].  In order for Methode to accept purchase orders
> for product shipped after September 30, 2008, the purchase orders
> must have these exceptions noted as well as the removal of any
> reference to pricing being "under protest."

Ex. L (emphasis in original).

### Methode Drops a Bomb Shell by Demanding Yet Higher Prices from Delphi, Thereby Raising the Aggregate Annual Price Increase to $16-22 Million Dollars

53.     On August 19, 2008, Methode advised Delphi that, due to what it described as

"volume reductions," Methode would withdraw its May 1, 2008 pricing and submit two new

pricing proposals, one proposal for pricing based on a one-year agreement and another proposal

for pricing based on a three-year agreement.  A copy of the letter is attached as Ex. M.

54.     On August 25, 2008, Methode dropped a bomb shell on Delphi when it issued its

proposal for a three-year agreement.  A copy of the letter is attached as Ex. N.

55.     To Delphi's amazement, the pricing set forth in the three-year proposal was

significantly higher than the May 1, 2008 pricing.  Methode demand approximately 40-50%

prices increases with an annual aggregate price increase of approximately $16 million dollars.

56.     Methode's three-year proposal also demanded certain "conditions" and revisions

to Delphi's General Terms and Conditions.  Specifically:

(a)     Methode demanded that it be placed on a "material/component cost adder
program" so that it could pass along any increases or surcharges from its supply base to Delphi.

(b)     Methode demanded new payment terms.

16

(c)     Methode objected to paragraph 12 of Delphi's T&Cs to the extent it gives ownership rights to Delphi in tooling and equipment owned by Methode for which Delphi did not pay.

(d)     Methode objected to paragraph 16 of Delphi's T&Cs to the extent it gives Delphi the right to take possession of Methode-owned equipment.

(e)     Methode objected to paragraph 18 of Delphi's T&Cs to the extent it obligates Methode to produce certain service or replacement parts.

(f)     Methode objected to paragraph 28 of Delphi's T&Cs, pertaining to Delphi's audit rights, and insisted that the paragraph be replaced with audit

57.     Methode did not object to or take issue with any other Delphi T&Cs.

58.     Continuing to leverage the threat of a stop ship, Methode concluded its three-year proposal, stating:

> Methode will accept purchase orders with the attached pricing subject to the above conditions and exceptions through September 30, 2011.  In order for Methode to accept purchase orders for product shipped after September 30, 2008, the purchase orders must have these exceptions noted as well as Delphi must remove any reference to pricing being "under protest."  Delphi must also waive all rights or claims to having paid Methode "under protest" as to any past purchase orders.

Ex. N.

59.     On August 26, 2008, Methode issued it one-year proposal to Delphi.  A copy of the letter is attached as Ex. O.

60.     Methode's one-year proposal sought even higher price increases for the Parts than the May 1, 2008 pricing or the pricing set forth in the three-year proposal.  Methode demanded price increases of approximately 65% with an annual aggregate price increase of approximately $22 million dollars.

61.     Similar to the three-year proposal, Methode's one-year proposal included certain "conditions" and revisions to paragraphs 12, 16, 18 and 28 of Delphi's General Terms and Conditions.

17

62.     Under both proposals, Methode gave Delphi until the close of business September

5, 2008 to accept, otherwise Methode would stop shipping the Parts.

63.     Left with no alternative in order to ensure uninterrupted supply of the Parts, on

September 4, 2008, Delphi accepted Methode's three-year proposal set forth in its August 25,

2008 letter, including the modifications to Delphi's T&Cs demanded by Methode.  A copy of

letter is attached as Ex. P.

64.     Shortly thereafter, Delphi issued new purchase orders to Methode consistent with

the terms of the three-year proposal.  An exemplar purchase order is attached as Ex. Q.

**Methode Refuses to Turn Over Copies of the Tooling Drawings**

65.     On several occasions in July 2008, while the parties were discussing pricing

issues, Delphi repeatedly requested the return of the Tooling Drawings both orally and in

writing.  A copy of the written requests are attached as Ex. R.

66.     On July 29, 2008, Methode responded in writing to Delphi's requests.  A copy of

the letter is attached as Ex. S.

67.     In its July 29 letter, Methode acknowledged that Delphi had paid for and owned

the underlying tooling and equipment, but Methode refused to turn over the Tooling Drawings to

Delphi as required by the Contracts.  Methode requested that Delphi identify the purchase order

terms and conditions that it was relying upon to establish ownership.  *See* Ex. S.

68.     On August 5, 2008, Delphi responded to Methode's July 29, 2008 letter, detailing

the contractual basis for Delphi's claim that it owned and was entitled to immediate possession

of the Tooling Drawings.  A copy of the letter is attached as Ex. T.

69.     Specifically, Delphi advised Methode that it owned and was entitled to immediate

possession of the Tooling Drawings pursuant to Paragraph 17.1 and 17.2 of Delphi's T&Cs,

quoted above.  *See* Ex. T.

18

70.     In addition, Delphi cited Paragraphs 12.4 and 12.5 of Delphi's T&Cs, also quoted above, which make clear that Delphi's right to inspect and be provided copies of the Tooling Drawings is absolute and unconditional under the Contracts. *See* Ex. T.

71.     To date, Methode has refused to turn over copies of the Tooling Drawings to Delphi despite its clear contractual obligation to do so.

## COUNT I – INJUNCTIVE RELIEF/SPECIFIC PERFORMANCE

72.     Delphi re-alleges each of the preceding paragraphs as if set forth fully herein.

73.     The Contracts are binding on Methode, and Delphi has performed fully its obligations under them.

74.     Delphi has paid for and owns the Tooling Drawings pursuant to the Contracts.

75.     Delphi has the right to retake possession of the Tooling Drawings pursuant to the Contracts and under Michigan law.

76.     Methode has a legal duty to turn over the Tooling Drawings (or copies thereof) to Delphi pursuant to the Contracts and under Michigan law.

77.     Methode has breached the Contracts and violated Michigan law by refusing to turn over copies of the Tooling Drawings to Delphi, despite repeated requests from Delphi that it do so.

78.     Delphi will be irreparably harmed without immediate possession of the Tooling Drawings because it will be deprived of the ability to re-source the Parts in the event Methode seeks to extract even higher prices or more favorable commercial terms and conditions by stopping shipments or threatening to stop shipments of the Parts. Delphi will also be deprived of the ability to make strategic business decisions with respect to future supply of the Parts should it become necessary for Delphi's financial survival.

19

79.     Delphi has a substantial likelihood of prevailing on the merits.  The contracts in question make clear that Delphi owns the Tooling Drawings, Methode holds the Tooling Drawings on a bailment basis, Delphi has the right to re-take possession of the Tooling Drawings, and, in the event Methode refuses to release the Tooling Drawings, Delphi may obtain an immediate writ of possession and take possession of them.

80.     The balance of potential harms tips decidedly in Delphi's favor because if Methode stops supplying the Parts, plants and/or assembly lines will be forced to shut down in whole or in part within a matter of days.  On the other hand, there is no potential harm to Methode if it turns over copies of the Tooling Drawings to Delphi, as it is contractually obligated to do, because Delphi owns the drawings and Methode has no right to retain them.  Further, Delphi does not seek to deprive Methode from using the Tooling Drawings (to the extent it is necessary to meet its contractual obligations to supply the Parts), rather Delphi simply seeks copies of the Tooling Drawings which are in electronic format, easily reproduced and even more easily transferred to Delphi.

81.     The public interest weighs heavily in favor of Delphi because courts have recognized that the public has an interest in preserving the enforceability of contracts, and the public interest is served when commercial contracting parties are made to follow through on their promises and not use strong-arm tactics to avoid their contractual  commitments.

82.     Accordingly, Delphi is entitled to injunctive relief directing that Methode immediately turn over copies of the Tooling Drawings to Delphi.

## COUNT II – CLAIM AND DELIVERY

83.     Delphi re-alleges each of the preceding paragraphs as if set forth fully herein.

84.     The Tool Drawings are described specifically above and in Ex. A.

85.     The Tooling Drawings are comprised of independent pieces of property.

20

86.    Delphi holds title to and/or rights of ownership in the Tooling Drawings.

87.    Upon information and belief, the Tooling Drawings have not been taken for any tax, assessment or fine.  Nor have they been taken under an execution or attachment.

88.    The original purchase prices for the tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment, suppliers and other items, including the Tooling Drawings, exceed $1.8 million dollars and are set forth in detail in the Tooling Purchase Orders.  The Tooling Drawings have *de minimis* resale value as they are owned by Delphi, were specifically designed for production of the Parts and can only be used with Delphi's consent.  Due to the lack of an open market for the Tooling Drawings and for purposes of MCR 3.105, Delphi alleges that the Tooling Drawings should be determined to have a *de minimis* value, or $100, whichever is less.

89.    Despite repeated demands by Delphi, Methode has refused to comply with its obligation to provide Delphi with immediate possession of the Tooling Drawings.

90.    Methode's continued possession, custody, and/or control over the Tooling Drawings is unlawful and in clear violation of the Contracts.

91.    Methode's continued wrongful and unlawful detention and exercise of dominion over the Tooling Drawings is to Delphi's detriment, including monetary damages.

92.    Methode's continued wrongful and unlawful detention and possession of the Tooling Drawings substantially impairs their value and Delphi's ability to use them.  Therefore, pursuant to MCR 3.105 and MCL §600.2920, Delphi is entitled to an order of immediate possession pending final judgment.

## COUNT III – BREACH OF CONTRACT

93.    Delphi re-alleges each of the preceding paragraphs as if set forth fully herein.

94.    Delphi and Methode have entered into valid, enforceable Contracts supported by consideration.

95.     The Contracts are binding on Methode, and Delphi has performed fully its obligations under them.

96.     Methode has breached the Contracts with Delphi by refusing to return or turn over the Tooling Drawings as demanded by Delphi.

97.     Delphi has suffered compensable damages as a result of Methode's breaches, which damages are or should have been foreseeable to Methode.

98.     Methode is liable to Delphi for its damages.

## **RELIEF REQUESTED**

**THEREFORE**, Delphi respectfully requests that this Court enter an order:

(a)     Granting preliminary and permanent injunctive relief directing Methode to turn over copies of the Tooling Drawings to Delphi consistent with its obligations under the Contracts and Michigan law;

(b)     Granting Delphi immediate possession of copies of the Tooling Drawings and requiring Defendants to immediately and without delay account for and return possession of copies of the Tooling Drawings to Delphi;

(c)     Allowing Delphi and/or its authorized representatives immediate access to Methode's facilities to inspect, inventory, account for, load, remove and transfer copies of the Tooling Drawings;

(d)     Requiring Methode to take all necessary and reasonable steps to preserve and protect the Tooling Drawings until such time as copies of the Tooling Drawings are inspected, accounted for, and transferred from their current location;

(e)     Requiring Methode to provide all reasonable and necessary assistance and cooperation to Delphi  in its efforts to take possession of copies of the Tooling Drawings;

(f)     Granting an order of immediate possession of copies of the Tooling Drawings pending final judgment pursuant to MCR 3.105(E);

(g)     Awarding Delphi damages sustained as a result of the Methode's unlawful detention of the Tooling Drawings;

(h)     Awarding Delphi costs, as defined in MCR 3.105 and otherwise, and reasonable attorneys' fees incurred in bringing this action;

(i)     Awarding Delphi money damages for Methode's breach of contract; and

22

(j)     Granting Delphi such other and further relief as this Court deems just and proper.

                              Respectfully submitted,

                              DYKEMA GOSSETT PLLC

                              By:_____
                              Thomas S. Bishoff (P53753)
                              Stephen W. King (P56456)
                              Attorneys for Delphi
                              400 Renaissance Center
                              Detroit, Michigan 48243
Dated:  October 23, 2008       (313) 568-5341

DET01\618849.5
ID\TSB

## VERIFICATION OF KENNETH H. BETEET

I, Kenneth H. Beteet, Manager, Global Supply Management for Delphi Electronics & Safety Division, Delphi Automotive Systems, LLC, am the authorized representative of Delphi Automotive Systems, LLC and its affiliates for the purpose of verifying the Verified Complaint and Verified Motion; I have personal knowledge of the matters set forth in the Verified Complaint and Verified Motion or the information contained therein has been collected and made available to me by counsel and employees of Delphi Automotive Systems, LLC; and I state, under a penalty of perjury, that the factual information and statements made therein are true and correct.

Kenneth H. Beteet

STATE OF INDIANA            )
                            )   SS:
COUNTY OF  HOWARD_____ )

Subscribed and sworn to before me a Notary Public in and for said County and State this 6th day of October 2008.

S. KIM BREWSTER
NOTARY PUBLIC
SEAL
STATE OF INDIANA
MY COMMISSION EXPIRES August 30, 2015

S. Kim Brewster
Signature

_____
Printed

My County of Residence

Howard_____

My Commission Expires:

_____



BH01\885668.2
ID\SWK

# EXHIBIT 2

Case 2:09-cv-14303-VMM    Document 17    Filed 04/20/10    Entered 04/20/10 20:26:54    Exhibit Q
Pg 44 of 64

US005975568A

# United States Patent [19]

## Speckhart et al.

[11] **Patent Number:** 5,975,568

[45] **Date of Patent:** Nov. 2, 1999

[54] **SENSOR PAD FOR CONTROLLING AIRBAG DEPLOYMENT AND ASSOCIATED SUPPORT**

[75] Inventors: **Frank H. Speckhart**, Knoxville; **Robert Scott Baker**, Dandridge, both of Tenn.

[73] Assignee: **American Components, Inc.,** Dandridge, Tenn.

[21] Appl. No.: **09/146,677**

[22] Filed: **Sep. 3, 1998**

### Related U.S. Application Data

[63] Continuation-in-part of application No. 29/085,897, Apr. 1, 1998, and application No. 09/072,833, May 5, 1998.

[51] **Int. Cl.**[6] ............................ **B60R 21/32; B60K 28/00**
[52] **U.S. Cl.** ............................................ **280/735;** 180/273
[58] **Field of Search** ...................................... 180/273, 271; 280/735, 734; 297/DIG. 3, 199, 217.2; 340/667; 73/37, 700; 5/706, 707

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,842,951 | 7/1958 | Bacon, Jr. | 73/37 |
| 4,644,597 | 2/1987 | Walker | 5/449 |
| 4,957,286 | 9/1990 | Persons, II et al. | 272/73 |
| 5,117,373 | 5/1992 | Huff | 364/550 |
| 5,427,331 | 6/1995 | Stroud | 244/122 AG |

*Primary Examiner*—Lanna Mai
*Assistant Examiner*—Faye M. Fleming

*Attorney, Agent, or Firm*—Pitts & Brittian, P.C.

[57] **ABSTRACT**

A sensor pad for controlling the deployment of an automobile airbag. Weight sensing pad **10** is used in the seat **54** of an automobile, (not illustrated), to detect the presence of an occupant on the seat. Weight sensing pad **10** is used in conjunction with the vehicle's airbag control module in order to allow deployment of the airbag, in the event of a collision, only if the seat is occupied by a person of a preselected weight. Weight sensing pad **10** is defined by a bladder member **15** having an interior volume subdivided into a plurality of individual cells **42** in fluid communication with each other and that is filled with a non-compressible fluid **18**, such as silicon or a silica gel of medium viscosity. A pressure tube **22** is in fluid communication with bladder **15** and is in further fluid communication with a pressure activated electronic transducer **26** which in turn is in electronic communication with the airbag controller **30**. When a person sits upon weight sensing pad **10**, there is a volumetric displacement of fluid **18** that provides a pressure change in the bladder member. If there is a sufficient pressure change due to the volumetric displacement of fluid to activate transducer **26**, transducer **26** sends a signal to air bag controller **30**. Electronic transducer **26** is selected to generate a signal upon detection of pressure resultant from the volumetric displacement of fluid **18** from bladder **15** expected from the average size adult of approximately one hundred pounds or heavier.

**20 Claims, 6 Drawing Sheets**



05-44481-rdd   Doc 19897-17   Filed 04/20/10   Entered 04/20/10 20:26:54   Exhibit Q
Case 2:05-cv-14903-PBS-VMM   Document 1-4   Filed 10/30/2005   Page 3 of 12
Pg 45 of 64



**Fig. 1**



Fig.2

Fig.3

05-44481-rdd    Doc 19897-17    Filed 04/20/10    Entered 04/20/10 20:26:54    Exhibit Q
Case 2:05-cv-14903-RJB-VMM    Document 1-4    Filed 10/30/2005    Page 3 of 12
Pg 47 of 64



# Fig.4

Case 2:05-cv-14903-FJB-VMM Document 1-4 Filed 10/30/2005 Page 6 of 12



# Fig.5

05-44481-rdd   Doc 19897-17   Filed 04/20/10   Entered 04/20/10 20:26:54   Exhibit Q
Case 2:05-cv-14903-RGB-VMM   Document 1-4   Filed 10/30/2005   Page   Exhibit Q
Pg 49 of 64



Fig.6

05-44481-rdd   Doc 19897-17   Filed 04/20/10   Entered 04/20/10 20:26:54   Exhibit Q
Pg 50 of 64
Case 2:05-cv-14903-RB-VMM   Document 1-4   Filed 10/30/2005   Page 8 of 12



# Fig.7

5,975,568

# 1

## SENSOR PAD FOR CONTROLLING AIRBAG DEPLOYMENT AND ASSOCIATED SUPPORT

This application Ser. No. 09/146,677, a continuation in part discloses and claims subject matter disclosed in my earlier filed pending applications, Ser. No. 29/085,897, which was filed on Apr. 1, 1998; and Ser. No. 09/072,833, which was filed on May 5, 1998.

### TECHNICAL FIELD

This invention relates to the field of weight sensing pads. More particularly, it relates to a sensor pad, and associated sensor pad support, for detecting both the presence and weight of a passenger for controlling deployment of an automobile airbag.

### BACKGROUND ART

In recent years, airbags or self-inflating restraints, have proven to be effective in preventing injury resulting from head-on and near head-on collisions, when used correctly in conjunction with the shoulder-lap restraints. However, a small number of highly publicized incidents have highlighted a serious risk of potentially catastrophic injury to small adults, children or infants in rear-facing child-safety seats. While it is certainly advisable to place small children or infants in rear-facing child-safety seats in a rear seat, in certain types of vehicles, namely pick-up trucks, this is simply not an option. As a result, a demand has arisen for selective deployment of the automobile's self-inflating restraint. In response, certain automobile manufacturers now provide a key-switch to allow the owner/operator to choose whether or not the self-inflating restraint should be "armed" that is to say, whether the self-inflating restraint should be active and deployable in the event of a collision. However, these types of manual controls, or overrides, also carry an inherent risk. Namely the inadvertent failure to re-arm the restraint for an adult passenger, or the failure to deactivate the restraint in the event that the passenger seat is occupied by a child or safety seat. Further, the state of the art airbag deployment system does not detect whether the passenger seat is unoccupied and in the event of a collision fires the airbag, needlessly resulting in the unnecessary expense of replacing the dash and airbag mechanism.

What is missing in the art is a sensor pad that would detect the presence or absence of a person sitting in the seat and that could distinguish between an average size adult and a diminutive adult or child safety seat so as to control the deployment of an automobile self-inflating restraint, such as an airbag.

Accordingly, it is an object of the present invention to provide a sensor pad for controlling the deployment of a self-inflating restraint.

Another object of the present invention is to provide a sensor pad that is weight sensitive and that detects the presence of a person sitting in seat associated with the sensor pad and that upon detection of a person occupying the seat directs the airbag to deploy in the event of a collision.

Yet another object of the present invention is to provide a sensor pad for controlling the deployment of an automobile airbag without significantly increasing the vehicle weight or cost of manufacture.

Other objects and advantages over the prior art will become apparent to those skilled in the art upon reading the detailed description together with the drawings as described as follows.

# 2

## DISCLOSURE OF THE INVENTION

In accordance with the various features of this invention, a sensor pad for controlling the deployment of an automobile airbag is provided. In the preferred embodiment, the weight sensing pad is used in the seat of an automobile to sense the detect the presence of the seat's occupant. The volumetric displacement of the fluid within the weight sensing pad produces a pressure change and is measured with an electronic pressure transducer and is used to determine if an airbag should be deployed upon impact in a collision. In this regard, the transducer is in electronic communication with the vehicle's airbag control module. The weight sensing pad is defined by a thin, fluid-filled bladder. The bladder is preferably constructed of two identical sheets of urethane. The urethane sheets are spot welded together at a plurality of points or areas in order to form cells, in a selected geometric configuration, in fluid communication with one another. The size, geometric configuration and cross-sectional area of the spots are selected so as to maximize performance while minimizing weight. In this regard, in order to minimize the weight of the bladder, internal volume must be small in relation to the external surface area of the weight sensing pad. The bladder in the preferred embodiment is filled with a non-compressible fluid having a very low freezing point, such that there are a minimum of air, or gas, pockets within the bladder. A silicone, such as silica gel, of medium viscosity is a suitable fluid.

Volumetric displacement, under pressure, of the fluid within the bladder is dependent on a number of factors such as bladder stiffness, i.e. the ability of the urethane material to resist stretching, the zero pressure volume of the bladder, the seated area of the passenger or child safety seat, and the weight of the seated passenger or car safety seat. Bladder stiffness can be measured in units of $lb/in^5$ and can be defined to be the slope of the curve of volume change vs. pressure increase. In other words bladder stiffness=pressure change/volume change=$lb/in^2/in^3$. Bladder stiffness is a function of the physical size and shape of the individual cells as well as the thickness of the bladder material. The preferred bladder will have a high bladder stiffness. The slope of the curve is not expected to be constant. As the bladder volume increases, the slope of the curve is expected to increase.

Zero pressure volume is defined as the volume of fluid that will first cause the pressure in the bladder to increase. In order to have minimum bladder weight, the zero pressure volume should be as small as possible. Thus, the preferred bladder has a relatively small zero pressure volume and a high degree of bladder stiffness. A bladder having a large number of relatively small internal cells in fluid communication with one another and a thin-wall bladder material meets these two criteria.

In one embodiment, the bladder is configured to be placed within the seat portion of a state of the art automobile seat. While, the bladder can be supported by a seat cushion, the bladder is preferably secured to a support member that is suspended on the seat frame. The bladder includes a pressure tube connected to a pressure activated electronic transducer that is in electronic communication with the air bag control module. As will be described in more detail below, the preferred transducer is digital and sends an arming signal to the airbag control module upon detection of a preselected pressure. The bladder further includes a plurality of securement regions for securing the bladder to the seat cushion or the support member. The bladder is formed by two urethane

5,975,568

<table>
<tr><td>3</td><td>4</td></tr>
</table>

panels that are perimetrically sealed to each other. In the preferred embodiment, the two panels are additionally secured to one another by a plurality of relatively small, preferably circular spot welds configured to form hexagonal-like cells that are in fluid communication with each other. In an alternate embodiment, relatively large approximately octagonal spot welds are used to form small fluid cell areas, (about thirty-three percent cell area to about sixty-seven percent weld area), thus reducing the overall weight of the liquid in the bladder.

In use, an electronic transducer is selected to generate a signal upon detection of pressure resultant from the volumetric displacement of fluid inside the bladder expected from the average size adult of approximately one hundred pounds or heavier. In an alternate embodiment, an analog transducer could be utilized to generate a signal as a function of the passenger's weight. With this information the control module would fire the airbag in accordance with a preselected set of conditions. Further information regarding passenger weight could be used to determine the force at which a variable force airbag would deploy as airbag technology advances,

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates a plan view of the weight sensing pad and support member of the present invention.

FIG. 2 illustrates a cross sectional view of the weight sensing pad and support member of the present invention taken along line 2—2 in FIG. 1.

FIG. 3 illustrates and end view of the embodiment illustrated in FIG. 1.

FIG. 4 illustrates a perspective view showing the weight sensing pad positioned above the cushioning in an exemplary automotive seat.

FIG. 5 illustrates a perspective view showing the weight sensing pad positioned below the cushioning in an exemplary automotive seat.

FIG. 6 illustrates a schematic view of the control of air bag deployment by the present weight sensing pad.

FIG. 7 illustrates an alternate embodiment weight sensing pad.

BEST MODE FOR CARRYING OUT THE INVENTION

A sensor pad for controlling the deployment of an automobile airbag, constructed in accordance with the present invention, is illustrated generally as 10 in the figures. As seen in FIGS. 4 and 5, in the preferred embodiment, weight sensing pad 10 is used in the seat 54 of an automobile, (not illustrated), to detect the presence of an occupant on the seat. Weight sensing pad 10 is used in conjunction with the vehicle's airbag control module in order to allow deployment of the airbag, in the event of a collision, only if the seat is occupied by a person of above a preselected weight. Weight sensing pad 10 is defined by a bladder member 15 having an interior volume subdivided into a plurality of individual cells 42 in fluid communication with each other and that is filled with a non-compressible fluid 18, such as silicone or a silica gel of medium viscosity. In the preferred embodiment, fluid 18 should have a very low freezing point, preferably below the temperature of reasonably anticipated atmospheric conditions to which the typical automobile is exposed. A pressure tube 22 is in fluid communication with bladder 15 and is in further fluid communication with a pressure activated electronic transducer 26 which in turn is

in electronic communication with the airbag controller 30. When a person sits upon a seat 54 in which a weight sensing pad 10 is mounted, there is a volumetric displacement of fluid 18 inside the bladder 15 causing the bladder 15 to change shape and consequently causes the pressure to increase which is measured by transducer 26. If there is a sufficient volumetric displacement of fluid to cause sufficient pressure change to activate transducer 26, transducer 26 sends a signal to air bag controller 30. In other words, if a passenger that weighs in excess of a preselected weight is seated on a seat 54 in which a weight sensing pad 10 is mounted, a sufficient volumetric displacement will occur to activate transducer 26.

In the preferred embodiment, bladder 15 is constructed of two preferably substantially identical sheets of urethane 34 and 38. Volumetric displacement, under pressure, of fluid 18 within bladder 15 is dependent on a number of factors such as bladder stiffness, i.e. the ability of the urethane material to resist stretching, the zero pressure volume of bladder 15, the seated area of the passenger and the weight of the seated passenger. Bladder stiffness can be measured in units of $lb/in^3$ and can be defined to be the slope of the curve of volume change vs. pressure increase. In other words, bladder stiffness=pressure change/volume change=$lb/in^2/in^3$. Bladder stiffness is a function of the physical size and shape of the individual cells 42 as well as the thickness of urethane sheets 34 and 38. In general, the bladder stiffness increases when the bladder pressure increases. The preferred bladder 15 will have a high bladder stiffness. The slope of the curve is not expected to be constant. As the bladder volume increases, the slope of the curve is expected to increase.

Zero pressure volume is defined as the volume of fluid 18 that will first cause the pressure in bladder 15 to increase. In order to have minimum bladder weight, the zero pressure volume should be as small as possible. Thus, the preferred bladder 15 has a relatively small zero pressure volume and a high degree of bladder stiffness. A bladder 15 having a large number of relatively small internal cells 42 in fluid communication with one another and a thin-wall urethane sheets 34 and 38 meets these two criteria. The urethane sheets 34 and 38 are spot welded together by a plurality of spot welds 46 in order to form cells 42, which are defined by the regions between spot welds 46, in a selected geometric configuration, in fluid communication with one another. In the preferred embodiment, a bore hole 48 is provided through each spot weld 46 in order to provide ventilation between the passenger and the seat. The size, geometric configuration and cross-sectional area of cells 42 are selected so as to maximize performance while minimizing weight. In this regard, in order to minimize the weight of the bladder 15, internal volume must be small in relation to the external surface area of the weight sensing pad 10.

The bladder further includes a plurality of securement regions 58 for securing bladder 15 in the seat area 50 either to the seat cushion directly or preferably to support member 70. In this regard, in the preferred embodiment, securement regions 58 are defined by fluid-void regions not in fluid communication with the fluid filled interior volume of bladder 15. Support member 70 is defined by a planar piece of fabric 72 and includes at least one hook member 74 which engages the seat frame (not shown). In this regard, in the preferred embodiment, at least one rigid rod member 76 is disposed in each of two loops 78 and 80 which are in spaced relation from each other. Hooks 74 are carried by rigid rod member 76. A seat cushion overlies sensor pad 10 and is also supported by support member 70.

In the preferred embodiment, spot welds 46 are relatively small, circular and are selectively positioned so as to form

5,975,568

| 5 | 6 |

substantially hexagonal cells 42 that are in fluid communication with each other. While hexagonal cells are preferred, other geometrically shaped cells could be utilized. In an alternate embodiment, illustrated in FIG. 7, relatively large octagonal spot welds 46' are used to form small fluid cell areas 42', (about thirty-three percent cell area to about sixty-seven percent weld area), thus reducing the overall weight of the bladder 15'. As above, a bore hole 48 is provided through each spot weld 46' in order to provide ventilation between the passenger and the seat.

In use, electronic transducer 26 is selected to generate a signal upon detection of pressure resultant from the volumetric displacement of fluid 18 from bladder 15 expected from the average size adult of approximately one hundred pounds or heavier. Thus, for a small adult or child less than one hundred pounds, or if a child seat is positioned on the seat, there will be insufficient volumetric displacement to cause a pressure change to activate transducer 26 and the airbag controller will not arm the airbag to deploy in the event of a collision. In an alternate embodiment, an analog transducer could be utilized to generate a signal proportional to the passenger's weight. With this information the control module would fire the airbag in accordance with a preselected set of conditions. Further information regarding passenger weight could be used to determine the force at which a variable force airbag would deploy as airbag technology advances.

From the foregoing description, it will be recognized by those skilled in the art that a weight sensing pad for controlling deployment of an automobile airbag offering advantages over the prior art has been provided. Specifically, the sensor pad for controlling the deployment of a self-inflating restraint provides a sensor pad that is weight sensitive and that detects the presence of a person of a selected weight sitting in seat associated with the sensor pad and that upon detection of a person of a selected weight occupying the seat directs the airbag to deploy in the event of a collision without significantly increasing the vehicle weight or cost of manufacture.

While a preferred embodiment has been shown and described, it will be understood that it is not intended to limit the disclosure, but rather it is intended to cover all modifications and alternate methods falling within the spirit and the scope of the invention as defined in the appended claims.

Having thus described the aforementioned invention, I claim:

1. A weight sensing pad for an automobile seat, said weight sensing pad comprising:

a bladder member having a compressible interior volume defined by first and second sheets perimetrically bonded together, wherein said bladder member is subdivided into a plurality of substantially hexagonally shaped cells by a plurality of small, substantially circular regions of bonding between said first and second sheets whereby said substantially hexagonally shaped cells are in fluid communication with each other; and

a non-compressible fluid contained within said compressible interior volume of said bladder member.

2. The weight sensing pad of claim 1 wherein said regions of bonding are defined by spot welds.

3. The weight sensing pad of claim 1 wherein said fluid has a low freezing point.

4. The weight sensing pad of claim 1 wherein said fluid is silicon.

5. The weight sensing pad of claim 1 wherein said weight sensing pad further comprises a pressure activated electronic transducer in fluid communication with said bladder member and in electronic communication with an airbag control module, wherein said transducer is activated by a selected volumetric displacement of said fluid that provides a pressure change in said bladder member.

6. The weight sensing pad of claim 5 wherein said electronic transducer is a digital transducer.

7. The weight sensing pad of claim 1 wherein a bore is provided in substantially each of said plurality of small, substantially circular regions of bonding.

8. A weight sensing pad for controlling activation of an automobile airbag, said weight sensing pad comprising:

a bladder member having an interior volume defined by first and second sheets perimetrically bonded together, wherein said bladder member is subdivided into a plurality of substantially hexagonally shaped cells in fluid communication with each other by a plurality of small, substantially circular regions of bonding between said first and second sheets;

a fluid contained within said interior volume of said bladder member;

a pressure activated electronic transducer in fluid communication with said bladder member and in electronic communication with an airbag control module, wherein said transducer is activated by a selected volumetric displacement of said fluid that provides a pressure change in said bladder member; and

a pressure tube interconnected between and in fluid communication with said bladder member and said transducer.

9. The weight sensing pad of claim 8 wherein said fluid is non-compressible and has a low freezing point.

10. The weight sensing pad of claim 8 wherein said fluid is silicon.

11. The weight sensing pad of claim 8 wherein said weight sensing pad further comprises at least one securement region for facilitating securement of said weight sensing pad to an automobile seat.

12. The weight sensing pad of claim 8 wherein said weight sensing pad further comprises at least one support member for engaging a seat frame, said support member being defined by a planar support panel and having members for engaging a seat frame wherein said bladder member is secured to said support member.

13. The weight sensing pad of claim 8 wherein a bore is provided in substantially each of said plurality of small, substantially circular regions of bonding for providing ventilation through said weight sensing pad.

14. A weight sensing pad for controlling activation of an automobile airbag, said weight sensing pad comprising:

a bladder member having an interior volume defined by first and second sheets perimetrically bonded together, wherein said bladder member is subdivided into a plurality of substantially hexagonally shaped cells in fluid communication with each other by a plurality of small, substantially circular regions of bonding between said first and second sheets, said bladder member including at least one securement region;

at least one support member for engaging a seat frame, said support member being defined by a planar support panel secured to said at least one securement region and having members for engaging a seat frame wherein said bladder member is secured to said support member; and

a fluid contained within said interior volume of said bladder member.

15. The weight sensing pad of claim 14 wherein said regions of bonding are defined by spot welds.

Case 2:09-cv-12035-PDB-VMM  Document 1-4  Filed 04/20/10  Entered 04/20/10 20:26:54  Exhibit Q
Pg 54 of 64

5,975,568

**7**

**16**. The weight sensing pad of claim **14** wherein said fluid is non-compressible and has a low freezing point.

**17**. The weight sensing pad of claim **14** wherein said fluid is silica gel.

**18**. The weight sensing pad of claim **1** wherein a bore is provided in substantially each of said plurality of small, substantially circular regions of bonding.

**19**. A weight sensing pad for an automobile seat, said weight sensing pad comprising:

a bladder member having an interior volume defined by first and second sheets perimetrically bonded together, wherein said bladder member is subdivided into a plurality of substantially hexagonally shaped cells in fluid communication with each other by a plurality of small, substantially circular regions of bonding between said first and second sheets;

a fluid contained within said interior volume of said bladder member; and

at least one securement region for facilitating securement of said weight sensing pad to an automobile seat.

**8**

**20**. A weight sensing pad for an automobile seat, said weight sensing pad comprising:

a bladder member having an interior volume defined by first and second sheets perimetrically bonded together, wherein said bladder member is subdivided into a plurality of substantially hexagonally shaped cells in fluid communication with each other by a plurality of small, substantially circular regions of bonding between said first and second sheets;

a fluid contained within said interior volume of said bladder member; and

at least one support member for engaging a seat frame, said support member being defined by a planar support panel and having members for engaging a seat frame wherein said bladder member is secured to said support member.

\*  \*  \*  \*  \*

# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Methode Electronics, Inc.<br>7401 West Wilson Avenue<br>Chicago, IL 60706,<br><br>PLAINTIFF<br><br>v.<br><br>Delphi Automotive Systems LLC<br>5725 Delphi Drive<br>Troy, Michigan 48098<br><br>and<br><br>Marian, Incorporated<br>1011 E. St. Clair Street<br>Indianapolis, Indiana 46202,<br><br>DEFENDANTS. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Civil Action No.<br>Jury Trial Demanded |

## **COMPLAINT**

Plaintiff, Methode Electronics, Inc. ("Methode"), by and through its undersigned counsel, brings this complaint for patent infringement against defendants Delphi Automotive Systems LLC ("Delphi") and Marian, Inc. ("Marian"), and alleges as follows:

## **PARTIES, JURISDICTION, AND VENUE**

1.     Methode is a Delaware corporation with its principal place of business at 7401 West Wilson Avenue, Chicago, Illinois. Methode is the assignee and owner of U.S. Patent No. 5,975,568, entitled "Sensor Pad for Controlling Airbag Deployment and Associated Support" ("the Speckhart Patent").

115716.00100/35932397v.1

Case 2:08-cv-4301-JFB-MM   Document 1-8   Filed 08/06/2009   Page 3 of 10

2.      Defendant Delphi is a Delaware corporation with its principal place of business at 5725 Delphi Drive, Troy, Michigan.  Delphi does business in this judicial district and throughout the state of Illinois.

3.      Defendant Marian is an Indiana corporation with a principal place of business at 1011 E. St. Clair Street, Indianapolis, Indiana.  Marian has a place of business in this judicial district and does business throughout the state of Illinois.

4.      Jurisdiction is proper in this Court under 28 U.S.C. §§ 1331 and 1338(a), as this case arises under the patent laws of the United States, 35 U.S.C. §§ 271 and 281.

5.      Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400.

<u>FACTS</u>

6.      Methode incorporates by reference the allegations of paragraphs 1 through 5 as though fully set forth herein.

7.      In 1997, Delphi's predecessor, Delco Electronics Corporation ("Delco"), approached Methode's predecessor, American Components, Inc. ("ACI"), and requested that ACI develop a weight sensing pad suitable for use in a vehicle restraint system.  Despite its attempts, Delco had been unable to develop a suitable weight sensing pad.

8.      In response to Delco's request, ACI engaged Dr. Frank Speckhart, a professor at the University of Tennessee, to work with Mr. Scott Baker, Vice President of ACI, on the weight sensing pad.

9.      To meet Delco's requirements, Dr. Speckhart and Mr. Baker, working together, invented a weight sensing pad with hexagonal cells formed by spot welding.  Their invention is described and claimed in the Speckhart Patent.

2

10.     The success of the Speckhart-Baker invention led Delco to enter into a multi-year agreement with ACI whereby ACI was the exclusive supplier of the weight sensing pads to Delco.

11.     Subsequently, Plaintiff Methode acquired assets of ACI, including the Speckhart Patent and assets related to the weight sensing pads.

12.     After Methode acquired the Speckhart Patent and assets related to the weight sensing pads in 2001, Delphi continued to purchase weight sensing pads from Methode on an exclusive basis through a second successive multi-year agreement with Methode.   In this agreement, Methode provided Delphi with year over year price decreases, which applied over the term of the agreement even though material costs increased dramatically.

13.     Methode's weight sensing pad is a critical component to Delphi's PODS system for complying with federal safety mandates.  Since contract inception, Methode has produced and shipped in excess of 25 million weight sensing pads to Delphi.

14.     In 2008, the term of the second agreement ended.  Rather than negotiating in good faith with Methode, Delphi instead threatened to find a new source for the weight sensing pads.  After many years of price decreases, economic factors, including material price increases and unanticipated and dramatic volume reductions, caused Methode to increase the price of the weight sensing pads.

15.     During the negotiations for the 2008 agreement with its associated price increase, Defendant Delphi requested, for the first time in its seven year course of dealing with Plaintiff Methode, the tooling drawings for the weight sensing pads.  When Methode requested assurances that Delphi would respect the Speckhart Patent, Delphi subsequently sued Methode in Michigan state court to obtain the tooling drawings for the weight sensing pads.

3

16.     Defendant Delphi expressly acknowledged in its state court complaint that it demanded the tooling drawings so that Delphi could make arrangements for an alternative source for the weight sensing pads.

17.     On information and belief, Delphi provided specimens and samples of the weight sensing pads and other technical information about the weight sensing pads to Marian.

18.     On information and belief, Marian has used this information to manufacture infringing weight sensing pads for Delphi for the commercial purpose of entering a contract with Delphi to provide Delphi with infringing weight sensing pads.

19.     Since Delphi succeeded Delco and Methode acquired ACI, Delphi has been aware of the Speckhart Patent and, on information and belief, has never sought an alternative supplier for the weight sensing pads until its relationship with Marian, as such an alternative supply agreement would result in an infringement of the Speckhart Patent.

20.     On information and belief, Delphi is currently testing infringing weight sensing pads manufactured by Marian for the commercial purpose of qualifying the infringing Marian weight sensing pads in vehicle restraint systems offered for sale by Delphi.

21.     On information and belief, Marian will continue to manufacture infringing weight sensing pads and will sell those infringing weight sensing pads to Delphi, and Delphi will use and sell the infringing weight sensing pads to its own customers.

## COUNT I
## PATENT INFRINGEMENT BY DELPHI

22.     Methode incorporates by reference the allegations of paragraphs 1 through 21 as though fully set forth herein.

23.     On November 29, 1999, the Speckhart Patent was duly and legally issued. A true and correct copy of the Speckhart Patent is appended hereto as Exhibit A.

4

24.     The claims of the Speckhart Patent are directed, *inter alia,* to a weight sensing pad for an automobile.

25.     Methode is the owner by assignment of the Speckhart Patent, its subject matter, and the rights of recovery flowing therefrom.

26.     On information and belief, Delphi has manufactured and used, and continues to have manufactured and continues to use, weight sensing pads in the United States without authorization from Methode.

27.     On information and belief, Delphi has offered for sale, or intends to offer for sale and sell, weight sensing pads throughout the United States without authorization from Methode.

28.     On information and belief, Delphi's weight sensing pads infringe, literally or by equivalents, one or more valid and enforceable claims of the Speckhart Patent.

29.     Delphi has infringed, and continues to infringe, directly or indirectly, the Speckhart Patent by, *inter alia,* practicing or inducing or contributing to others practicing one or more valid and enforceable claims of the Speckhart Patent.

30.     As a direct and proximate result of Delphi's acts of infringement of the Speckhart Patent, Methode has suffered injury and damages for which it is entitled to relief, including, but not limited to, monetary damages.

31.     On information and belief, Delphi has knowingly, willfully, and deliberately infringed the Speckhart Patent in conscious disregard of Methode's rights, making this case exceptional within the meaning of 35 U.S.C. § 285 and justifying treble damages pursuant to 35 U.S.C. § 284.

32.     On information and belief, Delphi will continue to infringe the Speckhart Patent, causing immediate and irreparable harm unless this Court enjoins and restrains its activities.

33.     On information and belief, the infringement by Delphi has deprived, and will further deprive, Methode of revenue which Methode would have made or would enjoy in the future; has injured Methode in other respects; and will cause Methode added injury and damage in the future unless Delphi is enjoined from infringing the Speckhart Patent.

COUNT II
PATENT INFRINGEMENT BY MARIAN

34.     Methode incorporates by reference the allegations of paragraphs 1 through 33 as though fully set forth herein.

35.     On information and belief, Marian has manufactured and continues to manufacture weight sensing pads in the United States without authorization from Methode.

36.     On information and belief, Marian has offered for sale, and/or intends to offer for sale and sell, weight sensing pads throughout the United States without authorization from Methode.

37.     On information and belief, Marian's weight sensing pads infringe, literally or by equivalents, one or more valid and enforceable claims of the Speckhart Patent.

38.     Marian has infringed, and continues to infringe, directly or indirectly, the Speckhart Patent by, *inter alia*, practicing or inducing or contributing to others practicing one or more valid and enforceable claims of the Speckhart Patent.

39.     As a direct and proximate result of Marian's acts of infringement of the Speckhart Patent, Methode has suffered injury and damages for which it is entitled to relief, including, but not limited to, monetary damages.

40.     On information and belief, Marian has knowingly, willfully, and deliberately infringed the Speckhart Patent in conscious disregard of Methode's rights, making this case

6

exceptional within the meaning of 35 U.S.C. § 285 and justifying treble damages pursuant to 35 U.S.C. § 284.

41.     On information and belief, Marian will continue to infringe the Speckhart Patent, causing immediate and irreparable harm unless this Court enjoins and restrains its activities.

42.     On information and belief, the infringement by Marian has deprived, and will further deprive, Methode of revenue which Methode would have made or would enjoy in the future; has injured Methode in other respects; and will cause Methode added injury and damage in the future unless Marian is enjoined from infringing the Speckhart Patent.

**WHEREFORE**, Methode prays that judgment be entered in its favor and against Defendants Delphi Corporation and Marian, Inc. as follows:

A.     Enter judgment for Methode that the Speckhart Patent was duly and legally issued, is valid and enforceable, and has been infringed by Delphi;

B.     Enter judgment for Methode that the Speckhart Patent was duly and legally issued, is valid and enforceable, and has been infringed by Marian;

C.     Enter judgment for Methode that Delphi has willfully infringed, and is willfully infringing, one or more claims of the Speckhart Patent;

D.     Enter judgment for Methode that Marian has willfully infringed, and is willfully infringing, one or more claims of the Speckhart Patent;

E.     Issue a preliminary injunction restraining Delphi, its directors, officers, agents, employees, successors, subsidiaries, assigns, and affiliates, and all persons acting in privy or in concert or participation with any of them from the continued infringement, direct or contributory, or active inducement of infringement by others of the Speckhart Patent;

F.     Issue a preliminary injunction restraining Marian, its directors, officers, agents, employees, successors, subsidiaries, assigns, and affiliates, and all persons acting in privy or in

concert or participation with any of them from the continued infringement, direct or contributory, or active inducement of infringement by others of the Speckhart Patent;

G.     Issue a permanent injunction restraining Delphi, its directors, officers, agents, employees, successors, subsidiaries, assigns, and affiliates, and all persons acting in privy or in concert or participation with any of them from the continued infringement, direct or contributory, or active inducement of infringement by others of the Speckhart Patent;

H.     Issue a permanent injunction restraining Marian, its directors, officers, agents, employees, successors, subsidiaries, assigns, and affiliates, and all persons acting in privy or in concert or participation with any of them from the continued infringement, direct or contributory, or active inducement of infringement by others of the Speckhart Patent;

I.     Direct Delphi to file with this Court and to serve on Methode a written report under oath setting forth in detail the manner and form in which Delphi has complied with the injunction;

J.     Direct Marian to file with this Court and to serve on Methode a written report under oath setting forth in detail the manner and form in which Delphi has complied with the injunction;

K.     Order Delphi to account for in written form and to pay to Methode actual damages suffered by reason of Delphi's infringement of the Speckhart Patent, including, but not limited to, monetary damages, and further order that such damages be trebled due to Delphi's deliberate, willful, and knowing conduct;

L.     Order Marian to account for in written form and to pay to Methode actual damages suffered by reason of Marian's infringement of the Speckhart Patent, including, but not limited to, monetary damages, and further order that such damages be trebled due to Marian's deliberate, willful, and knowing conduct;

M.    Order Delphi to pay Methode its costs, expenses, and fees, including reasonable attorneys' fees pursuant to 35 U.S.C. § 285, and pre-judgment and post-judgment interest at the maximum rate allowed by law;

N.    Order Marian to pay Methode its costs, expenses, and fees, including reasonable attorneys' fees pursuant to 35 U.S.C. § 285, and pre-judgment and post-judgment interest at the maximum rate allowed by law; and

O.    Grant Methode such other and further relief as the Court may deem just and proper.

<u>DEMAND FOR JURY TRIAL</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff Methode Electronics, Inc. demands a jury trial on all issues so triable.

Dated:  April 9, 2009                          Respectfully submitted,

                                                      ___/s/ David J. Stetler___
                                                      David J. Stetler
                                                      Jonathan M. Cyrluk
                                                      Henry M. Baskerville
                                                      Stetler & Duffy
                                                      11 S. LaSalle Street, Suite 1200
                                                      Chicago, IL 60603
                                                      Telephone:  312.338.0202
                                                      Facsimile:  312.338.0070
                                                      Email:  dstetler@stetleranddduffy.com

                                                      *Attorney for Plaintiff Methode Electronics, Inc.*

<u>Of counsel:</u>
Charles R. Wolfe, Jr.
Katherine P. Barecchia
Blank Rome LLP
600 New Hampshire Ave. NW
Washington, DC 20037
Telephone:  202.772.5841
Facsimile:  202.772.1669
Email:  wolfe@blankrome.com

9