Hearing Date and Time: May 20, 2010 at 10:00 a.m., E.T.
Objection Deadline: May 13, 2010 at 4:00 p.m., E.T.

JACOB & WEINGARTEN, P.C.
2301 W. Big Beaver, Ste 777
Troy, Michigan 48084
Telephone: (248) 649-1900
Facsimile: (248) 649-2920
Howard S. Sher (*admitted pro hac vice*)
Alan J. Schwartz (*admitted pro hac vice*)

MILLER & CHEVALIER CHARTERED
655 15th Street, NW, Ste. 900
Washington, DC 20005
Telephone: (202) 626-5800
Facsimile: (202) 626-5801
Anthony F. Shelley(*admitted pro hac vice*)
Timothy P. O'Toole(*admitted pro hac vice*)
Michael N. Khalil

Attorneys for Dennis Black, Charles
Cunningham, Kenneth Hollis and
The Delphi Salaried Retiree Association

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------x
                                    :
In re                               :   Chapter 11
                                    :
DPH HOLDINGS CORP., et al.,         :   Case No. 05-44481(RDD)
                                    :
          Reorganized Debtors.      :   (Jointly Administered)
                                    :
------------------------------------x
```

**AMENDED MOTION OF THE SALARIED RETIREES FOR ORDER CONFIRMING**
**THAT SECOND AMENDED COMPLAINT DOES NOT VIOLATE**
**THE MODIFIED PLAN OR THE PLAN MODIFICATION ORDER**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Dennis Black, Charles Cunningham, Kenneth Hollis and The

Delphi Salaried Retiree Association (collectively, the "Salaried

Retirees")[1] respectfully submit this Amended Motion For Order Confirming That Second Amended Complaint Does Not Violate The Modified Plan Or The Plan Modification Order ("Amended Motion").[2]

1.    These Chapter 11 bankruptcy cases began in October, 2005 when Delphi Corporation ("Delphi") and certain of its affiliates (collectively, "Debtors") filed voluntary petitions for relief in this Court.

2.    On June 1, 2009, Debtors filed a motion that, among other things, sought approval of modifications to the plan of reorganization that was previously confirmed by the Court (the "Modified Plan").

3.    On July 22, 2009, the Pension Benefit Guaranty Corporation (the "PBGC") filed a number of complaints against Delphi in the Eastern District of Michigan, initiating termination proceedings concerning Delphi's pension plans (including the Salaried Plan).

4.    On July 30, 2009, the Court entered an order (the "Plan Modification Order") approving the Modified Plan.

---

[1]  The Salaried Retirees are former salaried employees of Delphi Corporation ("Delphi") and are participants in the Delphi Retirement Program for Salaried Employees (the "Salaried Plan").
[2]  This Amended Motion amends and replaces Motion For Order Confirming That Second Amended Complaint Does Not Violate The Modified Plan Or The Plan Modification Order (the "Original Motion") filed by the Salaried Retirees on April 1, 2010 (Docket No. 19750). This Amended Motion is being filed to reflect that the proposed second amended complaint and proposed order attached to the Original Motion have been revised at the request of New GM (defined below).  The second amended complaint attached hereto as Exhibit 2 and the proposed order attached hereto as Exhibit 1 incorporate the changes requested by New GM and agreed to by the Salaried Retirees.

5.    On August 7, 2009, the PBGC dismissed its complaints against Delphi, and on August 10, 2009, the PBGC terminated Delphi's pension plans by agreement with Delphi.

6.    On September 11, 2009, the Court approved the Stipulation Concerning The Automatic Stay In Connection With The Commencement Of An Action Against The Pension Benefit Guaranty Corporation (the "Stipulation") (Docket No. 18896).

7.    Pursuant to the Stipulation, the Debtors agreed to the commencement and prosecution by the Salaried Retirees of an action against the PBGC under § 4003(f) of the Employee Retirement Income Security Act, subject to the limitations set forth in the Stipulation.

8.    On September 14, 2009, the Salaried Retirees commenced an action (the "Michigan Litigation") in the United States District Court for the Eastern District of Michigan (the "Michigan Court") by filing a complaint asserting claims against the PBGC.

9.    On November 5, 2009, the Salaried Retirees filed a first amended complaint (the "First Amended Complaint") in the Michigan Litigation, adding additional claims and additional parties, including the United States Treasury Department, the Presidential Task Force on the Auto Industry, Timothy F. Geithner (individually and in his official capacity), Steven Rattner (individually and in his official capacity), Ron Bloom

(individually  and  in  his  official  capacity),  DOES  1-50
(individually  and  in  their  official  capacities)  and  General
Motors LLC ("New GM").

10.  On  January  25,  2010,  New  GM  filed  Motion  Of  General
Motors  LLC  (F/K/A  General  Motors  Company)  To  Enforce  Modified
Plan  And  Plan  Modification  Order  (the  "New  GM  Motion")  (Docket
No.  19361),  seeking  the  dismissal  of  New  GM  from  the  Michigan
Litigation.

11.  The  Salaried  Retirees  objected  to  the  New  GM  Motion.
On  February  25,  2010,  a  hearing  was  held  on  the  New  GM  Motion.

12.  On  March  1,  2010,  the  Court  entered  Order  Enforcing
Plan  And  Plan  Modification  Order  (the  "Enforcement  Order")
(Docket  No.  19578),  ordering  the  Salaried  Retirees  to
immediately  dismiss  New  GM  from  the  Michigan  Litigation.

13.  On  March  12,  2010,  the  Michigan  Court  entered  Order
Dismissing  General  Motors  LLC,  dismissing  New  GM  from  the
Michigan  Litigation.

14.  As  a  result  of  the  dismissal  of  New  GM,  the  Salaried
Retirees  intend  to  seek  leave  from  the  Michigan  Court  to  file  a
second  amended  complaint  (the  "Second  Amended  Complaint"),
substantially  in  the  form  attached  hereto  as  Exhibit  2,  in  order
to  reflect  the  dismissal  of  New  GM  and  to  seek  certain
alternative  relief  in  the  Michigan  Litigation  from  the  following
defendants:  United  States  Treasury  Department,  Presidential  Task

- 4 -

Force on the Auto Industry, Timothy F. Geithner (in his official capacity), Steven Rattner (in his official capacity) and Ron Bloom (in his official capacity).[3]

15. Pursuant to the Second Amended Complaint, the Salaried Retirees will not be seeking any relief from the Michigan Court against New GM.

16. The Salaried Retirees do not believe that the filing of the Second Amended Complaint and the pursuit of the relief requested therein violates any provision of the Modified Plan, the Plan Modification Order or any other order of this Court.

17. Notwithstanding the foregoing, prior to seeking leave from the Michigan Court to file the Second Amended Complaint, out of an abundance of caution, and in light of the Enforcement Order and the Stipulation, the Salaried Retirees seek an order from this Court confirming that the filing of the Second Amended Complaint and the pursuit of the relief requested therein will not violate the Modified Plan, the Plan Modification Order or any other order of this Court.

18. A copy of a proposed order (the "Proposed Order") granting the relief requested by this Amended Motion is attached hereto as Exhibit 1.

---

[3] The Salaried Retirees will not seek to in any way amend Counts I through IV of the First Amended Complaint, which counts are solely against the PBGC and are the only counts against the PBGC.

**WHEREFORE**, the Salaried Retirees respectfully request the Court to enter the Proposed Order, and to grant such other and further relief which the Court deems appropriate in the circumstances.

Respectfully submitted,

Dated: April 21, 2010

/s/ Howard S. Sher
Howard S. Sher (*admitted pro hac vice*)
Alan J. Schwartz (*admitted pro hac vice*)
JACOB & WEINGARTEN, P.C.
2301 W. Big Beaver, Ste. 777
Troy, Michigan 48084
Telephone: (248) 649-1900
Facsimile: (248) 649-2920

Anthony F. Shelley
Timothy P. O'Toole
Michael N. Khalil
MILLER & CHEVALIER CHARTERED
655 15th Street, NW, Ste. 900
Washington, DC 20005
Telephone: (202) 626-5800
Facsimile: (202) 626-5801

Attorneys for Dennis Black, Charles Cunningham, Kenneth Hollis and The Delphi Salaried Retiree Association

# Exhibit 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------x
                                    :
In re                               :    Chapter 11
                                    :
DPH HOLDINGS CORP., et al.,         :    Case No. 05-44481(RDD)
                                    :
            Reorganized Debtors.    :    (Jointly Administered)
                                    :
------------------------------------x
```

## ORDER GRANTING AMENDED MOTION OF THE SALARIED RETIREES FOR ORDER CONFIRMING THAT SECOND AMENDED COMPLAINT DOES NOT VIOLATE THE MODIFIED PLAN OR THE PLAN MODIFICATION ORDER

This matter having come before the Court upon Motion Of The Salaried Retirees For Order Confirming That Second Amended Complaint Does Not Violate The Modified Plan Or The Plan Modification Order (the "Motion")[1] filed by Dennis Black, Charles Cunningham, Kenneth Hollis and The Delphi Salaried Retiree Association; no response to the Motion having been filed; the Court finding that there was due and sufficient notice of the Motion and the opportunity for a hearing on the Motion; the Court having reviewed the Motion, being otherwise duly advised of the pertinent facts and finding good cause to grant the relief requested in the Motion;

**IT IS HEREBY ORDERED THAT:**

1.    The Motion is GRANTED as set forth herein.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

2.   The   filing   of   the   Second   Amended   Complaint,   as
attached to the Motion, and the pursuit of the relief requested
therein   will   not   violate   the   Modified   Plan,   the   Plan
Modification Order, the Enforcement Order or any other order of
this Court; provided, however, that the Salaried Retirees shall
not in any way seek any of the relief requested in the Second
Amended Complaint, either directly or indirectly, from New GM.

3.   This   Court   shall   retain   jurisdiction   to   hear   and
determine   all   matters   arising   from   or   related   to   the
implementation of this Order.

# Exhibit 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| DENNIS BLACK, CHARLES CUNNINGHAM, KENNETH HOLLIS, and THE DELPHI SALARIED RETIREE ASSOCIATION, <br><br> Plaintiffs, <br><br> v. <br><br> THE PENSION BENEFIT GUARANTY CORPORATION; THE U.S. TREASURY DEPARTMENT; THE PRESIDENTIAL TASK FORCE ON THE AUTO INDUSTRY; and TIMOTHY GEITHNER, STEVEN RATTNER, RON BLOOM, and DOES 1-50, individually and in their official capacities, <br><br> Defendants. | Case No. 2:09-cv-13616 <br> Hon. Arthur J. Tarnow <br> Magistrate Judge Donald A. Scheer <br><br> **JURY DEMANDED** |

## SECOND AMENDED COMPLAINT

Dennis Black, Charles Cunningham, Kenneth Hollis, and the Delphi Salaried Retiree Association (collectively referred to as "the Salaried Workers"), through their undersigned attorneys, hereby submit this second amended complaint against the Pension Benefit Guaranty Corporation ("PBGC"), the United States Treasury Department, the Presidential Task Force on the Auto Industry, Timothy F. Geithner, Steven Rattner, Ron Bloom, and DOES 1-50 .

## I.  Jurisdiction and Venue

1.      This case arises under the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, the First and Fifth Amendments to the U.S. Constitution,

and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

2.      This Court has jurisdiction to hear this action pursuant to 29 U.S.C.

§ 1303(f)(2)(B), 28 U.S.C. § 1331, and 5 U.S.C. § 702.

3.      Venue properly lies in this judicial district under 29 U.S.C. § 1303(f)(2)(B) and

28 U.S.C. § 1391(b), (c) & (e).

## II.  Parties

4.      The PBGC is a United States government corporation established under 29 U.S.C.

§ 1302(a) to administer the pension plan termination insurance program established by Title IV

of ERISA.  The PBGC guarantees the payment of certain, but not all, pension benefits provided

by defined benefit pension plans that are covered by Title IV of ERISA.  Its board of directors

includes, among its three members, the Secretary of the Treasury.  ERISA § 4002(d), 29 U.S.C.

§ 1302(d).

5.      Dennis Black, Charles Cunningham, and Kenneth Hollis are retired salaried

employees of Delphi Corporation ("Delphi").  They receive benefits from the Delphi Retirement

Program for Salaried Employees (the "Salaried Plan" or the "Plan"), which on information and

belief has now been terminated and transferred to the PBGC.  As a result of termination, Messrs.

Black, Cunningham, and Hollis have lost a substantial portion of their pension income.

6.      The Delphi Salaried Retiree Association is a nonprofit organization, comprised of participants in the Salaried Plan and dependents of participants who are beneficiaries in the Salaried Plan.

7.      Defendant U.S. Department of the Treasury is the executive agency responsible for promoting economic prosperity and ensuring the financial security of the United States.

8.      Defendant Presidential Task Force on the Auto Industry (the "Auto Task Force") is a cabinet level group appointed by the President to oversee the administration's efforts to support and stabilize the domestic automotive industry.  It is co-chaired by Secretary of the Treasury Timothy Geithner and National Economic Council Director Larry Summers.

9.      Defendant Timothy F. Geithner ("Geithner") is the Secretary of the Treasury, a co-chair of the Auto Task Force, and one of three directors of the PBGC.  At all relevant times, Defendant Geithner was acting under color of law.  He is sued in his individual and official capacities.

10.     Defendant Steven Rattner ("Rattner") was, at times relevant to this case, the lead advisor to the Secretary of the Treasury on the automotive industry and a member of the Auto Task Force.  At all relevant times, Defendant Rattner was acting under color of law.  He is sued in his individual and official capacities.

11.     Defendant Ron Bloom ("Bloom") is a senior advisor on the auto industry at the Treasury Department and replaced Defendant Rattner as the lead advisor of the Auto Task Force. At all relevant times, Defendant Bloom was acting under color of law.  He is sued in his individual and official capacities.

3

12.    At all relevant times, Defendants DOES 1-50 (also "DOE Defendants") were agents, employees, or otherwise representatives of the Treasury Department and/or the Auto Task Force.  At all relevant times, DOES 1 through 50 were acting under color of law.  Upon information and belief, Plaintiffs allege that DOES 1 through 50, among others, are legally responsible for the wrongs committed against Plaintiffs described in this Second Amended Complaint.  When Plaintiffs become aware of the true identities of one or more DOE Defendants, Plaintiffs will amend this Second Amended Complaint to add or substitute them as named Defendants.

### III.  Factual Allegations

13.    General Motors LLC (f/k/a General Motors Company and hereafter "New GM") became the successor entity to General Motors Corporation (who was the original sponsor of the Plan and is now known as "Motors Liquidation Company" and hereinafter referred to as "Old GM") when it purchased substantially all of the assets of Old GM.  New GM is one of the world's largest automakers and maintains its global headquarters in Detroit.  New GM's majority owner is the Defendant U.S. Department of the Treasury, who owns 60.8% of the common stock. Plaintiffs allege that the actions undertaken by New GM complained of herein were the result of overt government coercion in connection with governmental policies, such that it was a governmental actor whose actions are subject to the guarantees of the United States Constitution.

14.  Delphi is a global producer of automobile electronics and parts and does business in this judicial district.  Until the termination of the Plan, Delphi was the contributing sponsor of the Plan, a defined benefit pension plan designed to provide for the payment of tax-qualified and non tax-qualified pension benefits to eligible Plan participants and beneficiaries.

15.     Under the terms of the Plan, Delphi was designated as the Plan Administrator.
Delphi, in turn, delegated the functional responsibilities as Plan Administrator to its Executive
Committee, stating that "the Executive Committee of the Corporation's Board of Directors is the
Named Fiduciary with respect to this Program.  The Executive Committee may delegate
authority to carry out such of its responsibilities as it deems appropriate in order to carry out the
proper and effective administration of this Program to the extent permitted by ERISA." *See*
Delphi Retirement Program for Salaried Employees § 14.  The individual members of the
Executive Committee are, accordingly, the "persons" identified as Plan Administrator under 29
U.S.C. § 1002(16)(a)(1), and serve as individual fiduciaries under 29 U.S.C. § 1002(21)(A).[1]

16.     Delphi was originally an operating unit of Old GM, the original sponsor of the
Salaried Plan.  Delphi was incorporated separately in 1998 and was spun-off from Old GM in
1999.  When Delphi was spun off in 1999, it assumed responsibility for maintaining the pension
plans for all Delphi employees.  Those plans included the Salaried Plan, as well as plans for
unionized workers, which had been negotiated by their unions.  The Salaried Workers were not
unionized during their tenures at Old GM and Delphi or currently.  There are currently over
15,000 participants in the Plan.  Most spent the bulk of their careers working for Old GM, but
became subject to Delphi's oversight of the Plan at the time of the spin-off in 1999.

---

[1] In prior proceedings between Delphi's Executive Committee and some of the Plaintiffs, *see* ¶ 26
(describing prior action in this District), there has been dispute as to whether the Plan Administrator of the
Plan is Delphi or its Executive Committee.  Plaintiffs steadfastly adhere to their position (as stated in the
prior proceedings) that the Executive Committee, through delegation from Delphi, is the Plan
Administrator.  Delphi has asserted that it, not the Executive Committee, is the Plan Administrator.  For
present purposes, it does not make any difference whether the Plan Administrator is actually Delphi or the
Executive Committee.  We therefore generally sometimes here use "Delphi" as a shorthand for the Plan
Administrator, whether the Plan Administrator is the company itself or the company's Executive
Committee.

17.     In October 2005, Delphi filed for Chapter 11 bankruptcy in the United States

District Court for the Southern District of New York. *See In re Delphi Corp.*, No. 05-44481

(RDD) (S.D.N.Y. Bankr., filed Oct. 8, 2005). Because the Plan was a potential creditor with

claims against Delphi, and because Delphi (*i.e.*, its Executive Committee) was also a fiduciary of

the Plan, Delphi's financial distress placed Delphi in a conflicted situation -- namely, it obligated

Delphi to file creditor claims against itself in the bankruptcy. In January 2006, in recognition of

the obvious conflict of interest inherent in retaining fiduciary powers along with its corporate

offices, Delphi delegated the fiduciary responsibility to file claims (though no other

responsibilities) to Fiduciary Counselors, Inc.

18.     In September 2008, Delphi announced that it had concluded a deal with Old GM

and the PBGC in which Delphi could potentially transfer billions of dollars in pension liabilities

from the plans for unionized workers (but not the Salaried Plan) to existing plans of Old GM.

When the PBGC learns that an employer has not made required minimum funding contributions,

and unpaid amounts total more than $1 million, the PBGC can perfect and enforce a statutory

lien on behalf of the pension plan against property of the plan sponsor. The use of these

statutory liens is the PBGC's primary tool to prevent a plan's termination or to mitigate potential

losses. In return for Old GM's assumption of the hourly pension liabilities, the PBGC released

more than $1.2 billion in liens that it had filed against Delphi's non-debtor foreign affiliates on

behalf of the pension plan for unionized hourly workers.

19.     Although it did not appear at the time of the September 2008 deal that Delphi had

attempted to secure a similar arrangement to protect the Salaried Workers, such an arrangement

was, according to Delphi, unnecessary. In this regard, in a September 8, 2008 press release,

Delphi reiterated a commitment it had made since the start of the bankruptcy proceedings that it would itself continue the Salaried Plan, stating that Delphi "remained committed to fully funding our pension plans."

20.     One month later, in November 2008, Old GM sought and received billions of dollars in emergency secured financing from the U.S. Government, through the Department of Treasury.  In order to secure this financing, the Treasury Department required Old GM to submit a proposed viability plan to Congress.  The Treasury Department continued to offer massive financial assistance to Old GM, but required it to submit a proposed business plan that required, among other things, the restructuring of employee benefits and work rules.  *See In re General Motors Corp.*, 407 B.R. 463, 478 (S.D.N.Y. Bankr. 2009).

21.     On February 15, 2009, the President appointed the Auto Task Force to oversee the administration's efforts to support and stabilize the domestic automotive industry.  The President appointed Treasury Secretary Geithner and National Economic Council Director Larry Summers as co-chairs of the Auto Task Force.

22.     On March 30, 2009, the government announced that the viability plan proposed by Old GM was not satisfactory, however the United States would provide substantial assistance to Old GM if it took certain steps to justify such assistance, including restructuring its relationship with the United Auto Workers union ("UAW").  *Id.* at 479.

23.     At this point the Treasury Department was Old GM's largest secured creditor and was poised to become its majority owner after an expedited bankruptcy sale.  The U.S. government had invested enormous amounts of capital (both financial and political) in the effort

to reorganize the auto industry and would face severe political consequences if its efforts with respect to Old (and New) GM were not successful.

24.     On information and belief, beginning in the spring of 2009, the United States, acting through the Treasury Department and the Auto Task Force, began to enter into discussions with officials from Delphi, the PBGC, and Old GM regarding the future of Delphi's pension plans. During these negotiations, a number of factors become clear to the Treasury Department: (1) an interruption in the supply of parts from Delphi to Old GM would be devastating to the latter; (2) Delphi's lenders could seek to foreclose on all or some portion of Delphi's assets as early as July 10, 2009, resulting in a significant interruption of supplies; (3) the best way to avoid the possibility of an interruption of Delphi supplies to Old (or New) GM required that Delphi's assets be sold to a stable entity; (4) Delphi's assets were currently subject to significant PBGC liens asserted on behalf of the Salaried Plan, and as of April 25, 2009, could be subject to still more PBGC liens; and (5) there were no potential purchasers willing to purchase Delphi's assets while they were subject to the threat of the PBGC liens.

25.     The facts began to emerge to the public beginning June 1, 2009, with Old GM filing for bankruptcy, the sale of Old GM's assets to New GM (*i.e.*, General Motors Company), and the federal government becoming the majority shareholder of New GM. At that time, Delphi announced, in conjunction with a filing in its own bankruptcy proceeding, that it had developed "a workable pension solution for its defined benefit plans." The bankruptcy filing stated that Delphi expected to enter into an agreement with the PBGC, whereby the PBGC would initiate involuntary termination proceedings concerning the Salaried Plan. Upon the Salaried Plan's termination, responsibility for paying out benefits owed under the Salaried Plan would

transfer from Delphi to the PBGC, and the benefits would be subject to the statutory maximums
provided for under ERISA.

26.    On July 16, 2009, the Salaried Workers filed a complaint for equitable relief
against the named fiduciaries of the Salaried Plan, seeking, *inter alia*, the appointment of an
independent fiduciary for the Salaried Plan for purposes of negotiating any Plan termination and
protecting participants' and beneficiaries' rights in any termination proceedings. *See Black v.
Naylor*, Case No. 2:09-cv-12810 (E.D. Mich.).  The complaint alleged that the named fiduciaries
were in a position where their responsibilities as officers of Delphi prevented their functioning
with the complete loyalty to the Salaried Plan's participants and beneficiaries that is demanded
as ERISA fiduciaries in matters of Plan administration.   On July 21, 2009 the Salaried Workers
filed a motion for a temporary restraining order and a preliminary injunction against the named
fiduciaries of the Salaried Plan, which sought to prohibit the Plan Administrator from
negotiating, signing, or effectuating an agreement with the PBGC summarily to terminate the
Salaried Plan, pending determination of the underlying complaint.

27.    In later proceedings on the Salaried Workers' complaint, Delphi's executives
plainly admitted that they did not treat the decision to enter any agreement to terminate the Plan
as a fiduciary function but as a "settlor" function and that they therefore could or would make
any decision in the best interests of the company, not the Plan's participants and beneficiaries.
On information and belief, Delphi (including its Executive Committee) was under strong
pressure by the federal government to agree to the termination of the Plan, which at the time was
underfunded, because termination of the Plan would further the government's interest in
restructuring the auto industry at the lowest cost to the government and expediently,

9

notwithstanding that termination would not be in the best interests of the Plan's participants and beneficiaries. Delphi executives communicated to the Salaried Workers that the federal government was pressuring or did pressure Delphi to consent to termination of the Plan.

28.    Also on July 21, 2009, and unbeknownst at the time to the Salaried Workers, the PBGC signed a settlement agreement with Delphi. Under the settlement agreement, it was anticipated that the PBGC would initiate involuntary termination procedures to terminate Delphi's pension plans, and Delphi was obligated to direct the Plan Administrator to agree to summary termination of all of those plans, including the Salaried Plan. Under the agreement, the PBGC agreed to release all of its statutory liens against Delphi. On information and belief, the vast bulk of these liens were held on behalf of the Salaried Plan, and in fact the PBGC no longer held any statutory liens on behalf of the plan for unionized hourly workers, despite the fact that hourly workers' plan's under-funding was significantly greater than that of the Salaried Plan. Despite the obvious benefit the release of these liens provided to New GM, and the fact that the liens were the most significant tool available to ensure additional funding for the Salaried Plan, New GM did not top-up any benefits for participants and beneficiaries of the Salaried Plan in exchange for the release of the liens. Additionally, the PBGC unconditionally released Delphi, Old GM, and the successor entities, as well as all of their current and former officers, directors, and employees from any and all suits and causes of action "upon any legal or equitable theory, (whether contractual, common law, statutory, federal, state, local or otherwise)."

29.    Consistent with the settlement agreement, on July 22, 2009, the PBGC filed a complaint against Delphi, seeking, *inter alia*, the termination of the Salaried Plan and the appointment of the PBGC as statutory trustee of the Plan. *See PBGC v. Delphi Corp.*, Case No.

2:09-cv-12876 (E.D. Mich.). Under ERISA, in order for a plan to be involuntarily terminated,

the PBGC must initiate an action in a district court and must prove that certain statutory

conditions for termination exist. *See* 29 U.S.C. § 1342. The only exception to the requirement

of district court adjudication is for "small plans," which potentially can be terminated in a

streamlined manner, but only if the PBGC makes special provision for safeguarding the interests

of beneficiaries. *Id.*

30.     In response to the PBGC's lawsuit, the Salaried Workers voluntarily dismissed

their complaint on July 23, 2009, noting that they intended to intervene in the PBGC's lawsuit to

protect their interests. ERISA provides that the PBGC's filing of an action to initiate termination

of a plan automatically stays all other pending cases against that plan. *See* 29 U.S.C. § 1342(f).

31.     On July 30, 2009, the bankruptcy court overseeing Delphi's bankruptcy approved

a modified reorganization plan that included the PBGC-Delphi settlement agreement calling for

involuntary termination of the Plan. *See In re Delphi Corp.*, No. 05-44481 (RDD), Dkt. No.

18707 (S.D.N.Y. Bankr. July 30, 2009). In addition, the bankruptcy court approved the sale of

Delphi's assets, a sale in which New GM is a principal participant and through which the

purchaser of Delphi's assets will be a chief parts supplier to New GM.

32.     On August 6, 2009, the Salaried Workers contacted the PBGC and Delphi to seek

their consent to the Salaried Workers' proposed intervention in the termination action.

33.     One day later, on August 7, 2009, the PBGC filed a notice of voluntary dismissal

of its termination action.

34.     The PBGC has since posted an announcement on its website stating that, "[o]n

August 10, 2009, the Pension Benefit Guaranty Corporation assumed responsibility for the

11

pension plans of Delphi Corp. The plans ended as of July 31, 2009." As such, it appears that the

PBGC and the Plan Administrator of the Salaried Plan have entered into an agreement

summarily to terminate the Plan and that the PBGC is attempting to terminate the Plan without

adjudication by or even the consent of a United States District Court. Nor has the PBGC in any

manner attempted to safeguard the interests of Plan beneficiaries through notice or opportunity

for comment or participation with respect to termination.

35.     The financial consequences to the Salaried Workers of the Plan's termination will

likely be severe. The Salaried Workers had undertaken an analysis of the impact to them should

the PBGC assume responsibility for the Plan, and that analysis concludes that they stand to lose

between 30% and 70% of their current pension benefits. The PBGC concedes as well that the

Salaried Workers will suffer losses in pension benefits. *See* PBGC Press Release (July 22,

2009). The losses in benefits stem, in part, from various statutory limits placed on distribution of

a terminated plan's remaining assets and the manner in which the PBGC interprets its obligation

to guarantee benefits for a terminated plan. *See, e.g.*, 29 U.S.C. § 1344(a) (containing various

limitations on distribution of remaining Plan assets); *id.* § 1322(b) (PBGC maximum guarantee);

*see also* PBGC Press Release (July 22, 2009) ("The PBGC will pay pension benefits up to the

limits set by law. In 2009, the maximum benefit for a 65-year-old is $54,000 per year. The

maximum is lower for those who retire earlier or elect survivor benefits. In addition, certain

early retirement subsidies and supplements are generally not insured, and benefit increases made

within the past five years may not be fully insured").

36.     As a result of unlawful government discrimination, only the salaried retirees of

Delphi will suffer these pension losses. On information and belief, after becoming the majority

owner of New GM, the United States government, acting through Defendants Treasury Department, Auto Task Force, Geithner, Rattner, Bloom, and DOES 1-50, exercised considerable control over the actions of New GM, using New GM to carry out governmental policies.  In response to the Delphi-PBGC settlement agreement, New GM announced that it would "top-up" the pension benefits for "certain limited groups" of Delphi retirees, specifically the hourly workers represented by the United Auto Workers union.  As a result of the "top-up," benefits that would otherwise be lost because of the PBGC's limits and exclusions would be made up by New GM.

37.    On September 1, 2009, at the direction of the United States government, acting through the Treasury Department and the Auto Task Force, New GM agreed to "top-up" the pension benefits and provide health benefits to additional union-affiliated Delphi retirees, but not to the salaried retirees of Delphi.  On information and belief, this discriminatory decision was the result of significant pressure by the United States, carried out in connection with governmental policies that were politically motivated, and the result of the Treasury Department's management and control of New GM.  As a result of these actions, Plaintiffs have been denied the benefit of a top-up solely on the basis of their choice not to associate with a union, in violation of the First and Fifth Amendments to the United States Constitution.

## IV. Claims for Relief

### COUNT 1
**Failure to Comply with ERISA's Requirements Regarding
the Adjudication of Plan Terminations
(Against Defendant PBGC)**

38.    Plaintiffs incorporate by reference the allegations in the paragraphs above as though fully set forth here.

39.    In order for the PBGC to terminate a pension plan, it must obtain a court decree to that effect.  29 U.S.C. § 1342(a), (c).  Any allowance in ERISA for termination via a summary agreement between the PBGC and a Plan Administrator applies, if at all, only to small plans and, even then, only when the PBGC has made special provision for adequate procedural safeguards for the interests of participants and beneficiaries.  29 U.S.C. § 1342(a) ("The corporation may prescribe a simplified procedure to follow in terminating small plans as long as that procedure includes substantial safeguards for the rights of the participants and beneficiaries under the plans, and for the employers who maintain such plans (including the requirement for a court decree under subsection (c)).")

40.    The Salaried Plan is not a small plan and therefore cannot be terminated through summary agreement between the PBGC and Plan Administrator, and the termination of the Salaried Plan through agreement between the PBGC and the Plan Administrator therefore violates ERISA.  Moreover, in summarily terminating the Plan through agreement with the Plan's Plan Administrator, the PBGC made no provision for substantial safeguards of the interests of Plan participants and beneficiaries; therefore, for this reason as well, the termination of the Salaried Plan through agreement between the PBGC and the Plan Administrator violates ERISA.

14

41.    For these reasons, the PBGC's termination of the Plan through summary agreement is null and void and illegal.

## COUNT 2
### Failure to Comply with ERISA's Requirement that Any Summary Termination Agreement Be with a Plan Administrator Properly Acting in that Capacity
### (Against Defendant PBGC)

42.    Plaintiffs incorporate by reference the allegations in the paragraphs above as though fully set forth here.

43.    Under ERISA, a Plan Administrator is an ERISA fiduciary with respect to any discretionary functions, and an ERISA fiduciary must discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries of the plan. 29 U.S.C. §§ 1002(21)(A), 1104(a). As a result, the Plan Administrator of the Salaried Plan, at least prior to and at the time of the signing of any agreement with the PBGC terminating the Plan, owed a fiduciary duty to the Plan's participants and beneficiaries in deciding whether to enter into and execute a termination agreement.

44.    In entering an agreement summarily to terminate the Plan, the PBGC unlawfully entered into an agreement with a Plan Administrator who -- in violation of ERISA -- did not act as a fiduciary of the Plan. Instead, Delphi and its executives have stated that the decision, through the Plan Administrator, to enter into an agreement with the PBGC summarily to terminate the Plan involves a "settlor" function to be done in the corporate interest, rather than in the Plan participants' and beneficiaries' interests.

45.    The PBGC's summary termination of the Plan based on an agreement with the Plan's Plan Administrator, when the Plan Administrator acted in the corporate interest as a settlor rather than as a fiduciary in the participants' and beneficiaries' best interests, violates

ERISA, which requires that any such agreement (if at all allowable) be entered with a Plan Administrator properly acting in its fiduciary capacity.

46.     In addition, even in the absence of any showing that the Plan Administrator entered a summary termination agreement based on the corporate interest rather than Plan participants' and beneficiaries' interests, the PBGC's termination of the Plan based on such an agreement violates ERISA because the agency entered the agreement with a Plan Administrator laboring under a conflict of interest. ERISA fiduciaries have an obligation under ERISA to avoid placing themselves in a position where their acts as directors or officers of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as fiduciaries. This duty requires that fiduciaries avoid conflicts of interest and that they resolve them promptly whenever they occur. This duty of loyalty requires the fiduciary to step aside in favor of a neutral fiduciary whenever it labors under a conflict of interest.

47.     The Plan's Plan Administrator, whether that is Delphi or its Executive Committee, faced an irreconcilable conflict of interest that required it to step aside in favor of a neutral fiduciary with respect to any termination issues. Delphi and its executives' corporate interest necessarily favored a rapid termination of the Plan under the terms pressed by the federal government, including the PBGC. For one thing, those terms included the release of liens against Delphi assets; in addition, the terms included a release of any and all causes of action the PBGC might have against Delphi and its executives associated with the Plan, including mismanagement. Furthermore, Delphi and its executives were being pressured by the federal government to terminate the Plan as part of an orchestrated effort on the federal government's part to restructure the auto industry as expediently and cheaply as possible; compliance with the

16

government's will was in the furtherance of the corporate interest to emerge from bankruptcy immediately. To that end, Delphi has stated that its settlement with the PBGC is vital to its reorganization and that the summary termination agreement is a necessary element of that settlement.

48.    In contrast, the interests of the Salaried Plan's participants and beneficiaries, who have vested and accrued benefits due to them under the Plan was, and is, in seeing the Plan maintained and fully funded or at least not terminated under the conditions the PBGC pursued. As fiduciaries of the Plan, the Plan's Plan Administrator should have favored careful consideration of any issues of Plan termination, a judicial adjudication of termination (as is the norm), and even rejection altogether of termination.

49.    Delphi's and its executives' interests in selling Delphi's assets as quickly as possible and in terminating the Salaried Plan consistent with the government's will directly conflict with the interests of the Plan's participants and beneficiaries against termination. As such, the Plan's Plan Administrator labored under a conflict of interest with respect to termination and lacked capacity to sign a summary termination agreement with the PBGC (if any such agreement is otherwise allowable). By terminating the Plan based on a summary agreement with a Plan Administrator who labored under a conflict of interest, and therefore was incompetent to make fiduciary determinations, the PBGC has violated ERISA.

50.    For these reasons, the PBGC's termination of the Plan through summary agreement is null and void and illegal.

## COUNT 3
### Violation of the Due Process Clause of the Fifth Amendment
### (Against Defendant PBGC)

51.     Plaintiffs incorporate by reference the allegations in the paragraphs above as though fully set forth here.

52.     If an agreement summarily to terminate the Plan between the PBGC and the Plan Administrator is otherwise allowable and authorized under ERISA, ERISA's authorization for summary plan termination is unconstitutional in violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution.  In all instances, the Salaried Workers, because they have a cognizable property interest in their vested pension benefits, are entitled to meaningful notice of any Plan termination and the opportunity for a hearing prior to the Plan's termination.  Because any ERISA provisions allowing for summary plan termination deprive the Salaried Workers of protected interests without adequate procedural safeguards, the provisions violate the Due Process Clause.

53.     For these reasons, The PBGC's termination of the Plan through summary agreement is null and void and illegal.

## COUNT 4
### Plan Termination in Violation of ERISA
### (Against Defendant PBGC)

54.     Plaintiffs incorporate by reference the allegations in the paragraphs above as though fully set forth here.

55.     If the Plan is to be terminated, it may only be terminated consistent with ERISA and Due Process after the full adjudication set forth in 29 U.S.C. § 1342(a) and (c) and compliance with the substantive standards for termination there set forth.

56.     The PBGC cannot satisfy the standards for termination of the Salaried Plan under

29 U.S.C. § 1342(a) and (c) with the current termination terms it has negotiated and put in place.

The termination of the Plan pursuant to the current termination terms is (i) unsupported by fact;

(ii) not in accordance with 29 U.S.C. § 1342(a) and (c); (iii) unsupported by the law; (iv) the

result of the PBGC's clear error in judgment and consideration of irrelevant factors; and (iv)

otherwise arbitrary and capricious.  Contrary to the statutory requirements, the PBGC's

termination of the Plan was politically motivated; the fact that the PBGC's decision was the

result of political expediency rather than relevant statutory criteria is evidenced by the

allegations described in this Second Amended Complaint, including among other things:  the

PBGC's release of its liens against Delphi's foreign assets, its failure to place additional liens

against Delphi's foreign assets despite the under-funding of the Salaried Plan; its waiver of

actions against Delphi and GM entities, and its failure to obtain additional funding from Old and

New GM for the Salaried Plan in exchange for the release of the liens.

## COUNT 5
### Violation of the Equal Protection Component of the Fifth Amendment
### (First and Fifth Amendments, APA, and *Bivens*)
### (Against Defendants Treasury Department, Auto Task Force, and Bloom,
### Geithner, Rattner and DOES 1-50)

57.     Plaintiffs incorporate by reference the allegations in the paragraphs above as

though fully set forth here.

58.     The decision to top-up the pension benefits of only certain union-affiliated Delphi

retirees was made at the direction of Defendants Treasury Department, Auto Task Force, Bloom,

Geithner, Rattner and DOES 1-50.

59.     The decision to provide to Delphi retirees pension top-ups has benefited only
certain union-affiliated retirees.  Plaintiffs allege that the decision was made for political reasons
-- on the basis of affiliation with a particular union or unions -- and not on the basis of any
relevant extenuating circumstances.  As described in this Second Amended Complaint, the
government's decision to terminate Plaintiffs' pension benefits but to maintain intact those of
union-affiliated retirees or retirees affiliated with certain unions was not rationally related to any
legitimate public purpose.

60.     The decision to discriminate against similarly situated retirees based directly on
associational status violates the Equal Protection component of the Fifth Amendment to the U.S.
Constitution and the First Amendment's associational and speech guarantees, particularly in light
of the lack of relevant extenuating circumstances to support the decision.  The termination of
these vested benefits is a permanent and severe economic penalty based entirely on the Plaintiffs'
decision not to affiliate with a union.  This decision has directly and substantially interfered with
Plaintiffs' associational rights, in that, as a direct consequence of their decision not to associate
with particular unions, Plaintiffs have been forced to forfeit a significant portion of their pension
benefits.  Through these top-ups, the government has injected undue favoritism into private labor
relationships, and in doing so it has unconstitutionally burdened Plaintiffs' right to choose freely
how and with whom to associate.

61.     Plaintiffs seek specific relief against Defendants Treasury Department and Auto
Task Force, as well as against Defendants Bloom, Geithner, Rattner and DOES 1-50 in their
*official* capacities (all such Defendants are hereinafter collectively referred to as the "Treasury
Defendants"), such that the Court should:

a.  (i) declare that the Treasury Defendant's selective provision of top-up benefits to certain Delphi retirees on the basis of associational status violates the Constitution, and (ii) require the Treasury Defendants only (and not New GM) to extend the top-up benefits to all Salaried Plan participants; or

b.  grant such other relief against the Treasury Defendants as this Court deems appropriate.

62.   Plaintiffs also allege that the Treasury Defendants are responsible for the decision to provide pension top-ups to only those Delphi retirees associated with particular unions, and not to Plaintiffs.  As described in this Second Amended Complaint, at all relevant times, the federal government was the majority shareholder and a significant creditor of New GM, and was extensively involved in questions related to the outcome of pension benefits to Delphi's retirees. As such it exercised significant coercive power and provided significant encouragement to New GM in connection with the benefits decision such that New GM's ultimate decision in this regard must be deemed to be that of the government, or at least that the government was a joint participant in the decision.  *See San Francisco Arts & Athletics, Inc. v. United States Olympic Committee*, 483 U.S. 522 (1987).  Moreover, because the Treasury Defendants were extensively entwined with New GM's management and control in making the decision, New GM must be deemed a governmental actor.  *See Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001).

63.   Plaintiffs seek compensatory and punitive damages against Defendants Bloom, Geithner Rattner and DOES 1-50 in their *personal* capacities, for denying Plaintiffs the same benefits provided to the similarly situated union-affiliated retirees on the basis of their non-union

21

affiliation, in violation of their rights to equal protection under the Fifth Amendment of the

Untied States Constitution. In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 389 (1971), the Supreme Court authorized a federal cause of action for

monetary damages against individual federal officers alleged to have violated constitutional

rights. In *Davis v. Passman*, 442 U.S. 228 (1979), the Court recognized the availability of a

*Bivens* action for an alleged violation of the equal protection component of the Fifth

Amendment.

64.     Plaintiffs do not seek damages from the Treasury Defendants. Rather, Plaintiffs

seek these damages from Defendants Geithner, Bloom and Rattner, in their individual capacities,

as authorized by *Bivens* and its progeny.

## V. Prayer for Relief

WHEREFORE, the Salaried Workers request a judgment in their favor:

A.     Declaring that, under ERISA, the Salaried Plan cannot be terminated summarily

by agreement between the PBGC and the Plan Administrator and therefore that the PBGC has

unlawfully terminated the Salaried Plan;

B.     Declaring that, under the Due Process Clause, the Salaried Plan cannot be

terminated summarily by agreement between the PBGC and the Plan Administrator and therefore

that the PBGC has unlawfully terminated the Salaried Plan;

C.     Declaring that the PBGC's termination of the Salaried Plan, on the terms put in

place by the PBGC, violates ERISA;

D.      Permanently enjoining the PBGC from terminating the Salaried Plan on the termination conditions and terms currently in place and otherwise setting aside the PBGC's termination of the Plan;

E.      Awarding appropriate equitable relief against the Defendants to undo the Plan's termination and to place the parties in the position they were prior to termination of the Plan;

F.      Declaring that the Treasury Defendants' selective provision of top-up benefits to certain Delphi retirees on the basis of associational status violates the Constitution;

G.      Ordering the Treasury Defendants only (and not New GM) to extend the top-up benefits to all Salaried Plan participants;

H.      Awarding compensatory and punitive damages against Defendants Geithner, Bloom and Rattner, in their individual capacities, for violation of Plaintiffs' First and Fifth Amendment rights.

K.      Awarding costs and attorney fees and other expenses pursuant to 29 U.S.C. § 1303(f)(3), or under the Equal Access to Justice Act, 5 U.S.C. § 2412.

L.      Awarding such other relief against the Defendants as the Court deems appropriate.

## **JURY DEMAND**

A jury is demanded on all issues triable by a jury.

Respectfully submitted,

JACOB & WEINGARTEN, P.C.

_____

Alan J. Schwartz (P38144)
777 Somerset Place
2301 Big Beaver Road
Troy, Michigan  48084
Telephone:  248-649-1900
Facsimile:  248-649-2920
E-mail:  alan@jacobweingarten.com

-and-

Anthony F. Shelley
Timothy P. O'Toole
Michael N. Khalil
MILLER & CHEVALIER CHARTERED
655 15th Street, NW, Suite 900
Washington, DC  20005
Telephone:  202-626-5800
Facsimile:  202-626-5801
E-mail:  ashelley@milchev.com
         totoole@milchev.com
         mkhalil@milchev.com

*Attorneys for Plaintiffs*

# Notice Of Hearing

JACOB & WEINGARTEN, P.C.
2301 W. Big Beaver, Ste 777
Troy, Michigan 48084
Telephone: (248) 649-1900
Facsimile: (248) 649-2920
Howard S. Sher (*admitted pro hac vice*)
Alan J. Schwartz (*admitted pro hac vice*)

MILLER & CHEVALIER CHARTERED
655 15th Street, NW, Ste. 900
Washington, DC 20005
Telephone: (202) 626-5800
Facsimile: (202) 626-5801
Anthony F. Shelley(*admitted pro hac vice*)
Timothy P. O'Toole(*admitted pro hac vice*)
Michael N. Khalil

Attorneys for Dennis Black, Charles
Cunningham, Kenneth Hollis and
The Delphi Salaried Retiree Association

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------x
                                    :
In re                               :    Chapter 11
                                    :
DPH HOLDINGS CORP., et al.,         :    Case No. 05-44481(RDD)
                                    :
          Reorganized Debtors.      :    (Jointly Administered)
                                    :
------------------------------------x
```

**NOTICE OF HEARING ON AMENDED MOTION OF THE SALARIED RETIREES FOR
ORDER CONFIRMING THAT SECOND AMENDED COMPLAINT DOES NOT VIOLATE
THE MODIFIED PLAN OR THE PLAN MODIFICATION ORDER**

**PLEASE TAKE NOTICE THAT:**

1.   A hearing on Amended Motion Of The Salaried Retirees

For Order Confirming That Second Amended Complaint Does Not

Violate The Modified Plan Or The Plan Modification Order (the

"Motion")[1] filed by Dennis Black, Charles Cunningham, Kenneth Hollis and The Delphi Salaried Retiree Association (collectively, the "Salaried Retirees") shall be held before the Honorable Robert D. Drain, United States Bankruptcy Judge, in Room 118 of the United States Bankruptcy Court, Hon. Charles L. Brieant Jr. Federal Building and Courthouse, 300 Quarropas Street, White Plains, New York 10601, on May 20, 2010 at 10:00 am (New York time).[2]

2.    Objections, if any, to the relief sought in the Motion must be made in writing, with a hard copy to Chambers, conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the Southern District of New York and be filed with the Bankruptcy Court and must be served in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates and Certain Notice, Case Management, and Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Sixteenth Supplemental Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m),

---

[1] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

[2] The Motion amends and replaces Motion For Order Confirming That Second Amended Complaint Does Not Violate The Modified Plan Or The Plan Modification Order (the "Original Motion") filed by the Salaried Retirees on April 1, 2010 (Docket No. 19750). Thus, this Notice replaces the Amended Notice Of Hearing On Motion For Order Confirming That Second Amended Complaint Does Not Violate The Modified Plan Or The Plan Modification Order filed by the Salaried Retirees on April 14, 2010 (Docket No. 19822) with respect to the Original Motion.

9006, 9007, and 9014 Establishing Omnibus Hearing Dates and Revising Certain Notice Procedures, entered December 11, 2009 (Docket No. 191780), so as to be actually received by not later than 4:00 p.m. (New York time) on May 13, 2010 (the "Objection Deadline").

3.   If no objections are timely filed and served with respect to the Motion, the Salaried Retirees may, on or after the Objection Deadline, submit to the Court a final order substantially in the form attached to the Motion, which final order may be entered with no further notice or opportunity to be heard offered to any party.

4.   Copies of the Motion may be obtained from the Court's website at http://ecf.nysb.uscourts.gov or free of charge at http://dphholingsdocket.com/dph.

                              Respectfully submitted,

Dated: April 21, 2010    /s/ Howard S. Sher
                         Howard S. Sher (admitted pro hac vice)
                         Alan J. Schwartz (admitted pro hac vice)
                         JACOB & WEINGARTEN, P.C.
                         2301 W. Big Beaver, Ste. 777
                         Troy, Michigan 48084
                         Telephone: (248) 649-1900
                         Facsimile: (248) 649-2920

                         Anthony F. Shelley
                         Timothy P. O'Toole
                         Michael N. Khalil
                         MILLER & CHEVALIER CHARTERED
                         655 15th Street, NW, Ste. 900
                         Washington, DC 20005
                         Telephone: (202) 626-5800
                         Facsimile: (202) 626-5801

Attorneys for Dennis Black, Charles
Cunningham, Kenneth Hollis and
The Delphi Salaried Retiree Association

# Proof Of Service

Hearing Date and Time: May 20, 2010 at 10:00 a.m., E.T.
Objection Deadline: May 13, 2010 at 4:00 p.m., E.T.

JACOB & WEINGARTEN, P.C.
2301 W. Big Beaver, Ste 777
Troy, Michigan 48084
Telephone: (248) 649-1900
Facsimile: (248) 649-2920
Howard S. Sher (*admitted pro hac vice*)
Alan J. Schwartz (*admitted pro hac vice*)

MILLER & CHEVALIER CHARTERED
655 15th Street, NW, Ste. 900
Washington, DC 20005
Telephone: (202) 626-5800
Facsimile: (202) 626-5801
Anthony F. Shelley(*admitted pro hac vice*)
Timothy P. O'Toole(*admitted pro hac vice*)
Michael N. Khalil

Attorneys for Dennis Black, Charles
Cunningham, Kenneth Hollis and
The Delphi Salaried Retiree Association

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------x
                                   :
In re                              :      Chapter 11
                                   :
DPH HOLDINGS CORP., et al.,        :      Case No. 05-44481(RDD)
                                   :
          Reorganized Debtors.     :      (Jointly Administered)
                                   :
-----------------------------------x
```

## PROOF OF SERVICE

I, Teri Breaugh, state that on April 21, 2010, I did send a
copy of Amended Motion Of The Salaried Retirees For Order
Confirming That Second Amended Complaint Does Not Violate The
Modified Plan Or The Plan Modification Order, Notice Of Hearing
On Amended Motion Of The Salaried Retirees For Order Confirming
That Second Amended Complaint Does Not Violate The Modified Plan
Or The Plan Modification Order and this Proof Of Service by
first class mail to:

John A. Menke
Pension Benefit Guaranty Corporation
Office of Chief Counsel
1200 K Street, N.W.
Washington, D.C. 20005-4026

Ralph L. Landy
Pension Benefit Guaranty Corporation
Office of Chief Counsel
1200 K Street, N.W.
Washington, D.C. 20005-4026

Heather Lennox
Jones Day
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114

Robert S. Walker
Jones Day
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114

David M. Glass
Sr. Trial Counsel, Dep't of Justice,
 Civil Division
20 Mass. Ave., N.W., Room 7200
Washington, D.C. 20530

DPH Holdings Corp.
Attn: David Sherbin
5725 Delphi Drive
Troy, MI 48098

Judge Robert D. Drain
300 Quarropas Street
Room 118
White Plains, NY 10601

US Bankruptcy Court
Attn: Clerk of the Court
300 Quarropas Street
White Plains, NY 10601

Alicia M. Leonhard
Office of the US Trustee
33 Whitehall Street, Ste. 2100
New York, NY 10004

Tracy Hope Davis
US Trustee Office
33 Whitehall St.
21st Floor
New York, NY 10004

John Wm. Bulter, Jr.
Skadden Arps Slate Meagher & Flom LLP
155 North Wacker Drive, Suite 2700
Chicago, IL 60606-1720

Andrew M. Kramer
Jones Day
51 Louisiana Ave NW
Washington, D.C. 20001

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: April 21, 2010

            /s/ Teri Breaugh
            Teri Breaugh
            Jacob & Weingarten, P.C.
            2301 West Big Beaver Road
            Suite 777
            Troy, Michigan 48084
            howard@jacobweingarten.com