# **EXHIBIT B**

ALSTON & BIRD LLP
Dennis J. Connolly (DC-9932)
David A. Wender (admitted *pro hac vice*)
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Telephone (404) 881-7000
Facsimile (404) 881-7777

*Counsel for Furukawa Electric Company, Ltd.*
*and Furukawa Electric North America APD, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
                                            :
**In re: DPH HOLDINGS CORP.,** *et. al.,*    :    **Chapter 11**
                                            :
                    **Reorganized Debtors.**    :    **Case No. 05-44481 (RDD)**
                                            :
                                            :    **(Jointly Administered)**
-----------------------------------------------------------x

**SUPPLEMENT TO MOTION OF FURUKAWA ELECTRIC COMPANY, LTD.**
**FOR ALLOWANCE OF AN ADMINISTRATIVE EXPENSE CLAIM,**
**PURSUANT TO 11 U.S.C. § 503(b)(1)(A) AND, IN THE ALTERNATIVE,**
**FOR LEAVE TO FILE A LATE ADMINISTRATIVE EXPENSE CLAIM**
**PURSUANT TO BANKRUPTCY RULE 9006(B)**

COMES NOW Furukawa Electric Company, Ltd. ("Furukawa"), by and through

their undersigned counsel, and hereby files this motion (the "Motion Supplement") to

supplement the asserted amount of administrative expenses incurred by certain of the

above-captioned debtors in the *Motion of Furukawa Electric Company, Ltd. for*

*Allowance of an Administrative Expense Claim, Pursuant to 11 U.S.C. 503(b)(1)(A) and,*

*in the Alternative, for Leave to File a Late Administrative Expense Claim Pursuant to*

*Bankruptcy Rule 9006(B)* (the "Administrative Expense Motion") [Docket No. 18706],

incorporated herein by reference.  In support of the Motion Supplement, Furukawa

respectfully shows as follows.

## **PRELIMINARY STATEMENT**

Furukawa hereby seeks allowance of all administrative expense amounts owing by certain Delphi debtors (the "Debtors"), totaling $1,548,770.97 (the "Total Administrative Claim"), including amounts set forth in the Administrative Expense Motion and additional amounts (the "Supplemental Amounts"), further detailed below, that have accrued since the date of the Administrative Expense Motion. The Total Administrative Claim relates to royalty payments owing by the Debtors to Furukawa that accrued during the pendency of their bankruptcy cases. Since the filing of the Administrative Expense Motion, while the parties engaged in good faith discussions concerning the Total Administrative Claim, the Debtors continued to accrue payment obligations under contracts with Furukawa, which such amounts, until recently, were unavailable to Furukawa. As reflected in the Administrative Expense Motion and this motion, a portion of the Supplemental Amounts and a portion of the amounts set forth in the Administrative Expense Motion are estimated because the Debtors have not provided the information necessary to calculate the full amounts due and owing by the Debtors. Moreover, because the Debtors have failed to provide the necessary information, Furukawa files this Motion Supplement to determine the full amounts owed to Furukawa and obtain an order requiring immediate payment of the Supplemental Amounts and the amounts set forth in the Administrative Expense Motion. Notwithstanding that certain amounts have been estimated, Furukawa has determined that $1,548,770.97 reflects the total administrative amount owing by the Debtors to Furukawa that relate to the royalty payments addressed in the Administrative Expense Motion and below.

## FACTUAL BACKGROUND

1.      On November 19, 2004, Delphi Automotive Systems LLC ("DAS") and Furukawa Electric North America APD, Inc. ("American Furukawa") formed a joint venture, Delphi Furukawa Wiring Systems, LLC ("DFWS"), pursuant to a "Limited Liability Company Agreement" (the "JV Agreement"). Under the JV Agreement, American Furukawa and DAS agreed to "pool their resources" primarily for the "design of wiring harnesses for the Toyota F and MC programs to be built in North America….and sale of such harnesses…." *See* JV Agreement at Page 1, attached hereto as Exhibit 1.

2.      In furtherance of this joint venture and, in particular, the desire to have certain debtor affiliates to manufacture the wiring harnesses and certain electronic distribution systems, Furukawa and the Debtors entered into the following contracts:

a.   Tacoma License and Technical Support Agreement, dated March 5, 2005, between DAS and Furukawa (the "Technical Consulting Agreement");

b.   Tacoma-Corolla Consulting and Technical Support Agreement, dated June 28, 2005, between DAS and Furukawa (the "Personnel Consulting Agreement"); and

c.   Intellectual Property License, Restricted Use, and Technical Assistance Agreement, dated December 8, 2004, between and among Delphi Technologies, Inc., DAS, Furukawa and DFWS (the "Joint Venture License Agreement") (together with the Technical Consulting Agreement and Personnel Consulting Agreement, the "Agreements").

3.    At bottom, through the Agreements, the Debtors obtained access to and the right to use (subject to certain royalty obligations and use restrictions) intellectual property owned by Furukawa that enabled the Debtors to manufacture products for and fulfill contracts with several entities. *See, e.g.*, Technical Consulting Agreement §§ 1.3; 2.1, attached as Exhibit 1 to the Administrative Expense Motion (wherein Furukawa provides technical assistance to the Debtors through access to licensed technical information that includes proprietary information relating to the design and manufacture of electrical and electronic distribution systems for the Toyota Corolla and Tacoma); Personnel Consulting Agreement at Page 1, attached as Exhibit 3 to the Administrative Expense Motion (provides access to Furukawa's intellectual property relating to the design and manufacture of the distribution systems for the Toyota Corolla and Tacoma); Joint Venture License Agreement at Page 1, attached as Exhibit 5 to the Administrative Expense Motion (wherein Furukawa licensed certain intellectual property to DFWS for the design and sale of product to Toyota).

4.    In exchange for the use of Furukawa's intellectual property and personnel, Furukawa is entitled to royalty payments from the Debtors under each of the Agreements. *See* Technical Consulting Agreement § 3.1 (quarterly royalty payment of one-half of one percent of sale proceeds of distribution systems); Personnel Consulting Agreement § 11.1 (quarterly royalty payment of one-half of one percent of sale proceeds of distribution systems); Joint Venture License Agreement § 6.1 (quarterly royalty payment equal to one percent of sale proceeds of wiring harness assemblies). The royalty payments are calculated based on sale proceeds and these quarterly figures are provided to Furukawa by DAS and DFWS.

5.     On October 8 and 14, 2005, the Debtors commenced their cases in this Court under Chapter 11 of the Bankruptcy Code.

6.     Under the Debtors' modified plan of reorganization (the "Modified Plan"), the Debtors have sought to assume and assign and/or reject several executory contracts. On July 2, 2009, certain of the Debtors gave notice of their intent to reject the Joint Venture License Agreement and Personnel Consulting Agreement in a notice of contracts to be assumed or rejected under the modified plan (the "July 2 Notice") [Docket No. 17557]. On July 15, 2009, Furukawa filed an objection to the July 2 Notice (the "July 2 Objection") [Docket No. 18256] because the July 2 Notice was unclear (it did not clearly address DFWS' intent under the Joint Venture License Agreement). The failure to identify DFWS' intent left Furukawa unable to assess the status of the Joint Venture License Agreement and its potential cure rights.[1]

7.     As noted in the July 2 Objection, the July 2 Notice was even more ambiguous in light of a corrected notice filed by the Debtors on July 13, 2009 (the "July 13 Notice") [Docket No. 18169] that noticed the Debtors' intent to assume all contracts with Furukawa that "relate to" intellectual property. *See* July 2 Objection ¶ 11. The July 13 Notice appeared to conflict with the prior rejection of the Joint Venture License Agreement and Personnel Consulting Agreement as both of these agreements "relate to" intellectual property.[2]

8.     On July 20, 2009, Furukawa filed an objection [Docket No. 18472] (the "July 13 Objection," together with the July 2 Objection, the "Objections") to the July 13

---

[1] Furukawa is informed that DFWS did not intend to reject the JV Agreement.

[2] Furukawa has requested, but not received, the list of the "intellectual property" contracts that the Debtors are seeking to assume and assign.

Notice that again requested sufficient information to assess the required cure amounts for assumed contracts.

9.    On July 30, 2009, Furukawa filed the Administrative Expense Motion seeking payment for accrued postpetition royalty payments under the Agreements. The Administrative Expense Motion included all invoiced amounts and estimates for all other royalties accrued as of the date of the motion. In the Administrative Expense Motion, Furukawa stated that it would amend the motion to include any additional amounts due under the Agreements. *See* Administrative Expense Motion at footnotes 1-3 and 6.

10.    On July 30, 2009, this Court confirmed the Modified Plan. *See* Docket No. 18707.

11.    The Administrative Expense Motion was scheduled for hearing on August 20, 2009. This hearing was postponed at the Debtors' request and the parties have since engaged in discussions regarding amounts owing to Furukawa, the Agreements, the parties' joint venture, and the Debtors' continued use of Furukawa's intellectual property.

12.    Furukawa originally sought to consensually resolve all payment obligations under the Agreements in its discussions with the Debtors, but as the discussions have not progressed, Furukawa files this Motion Supplement.

13.    In January 2010, during discussions with the Debtors concerning the consensual resolution of the Debtors' payment obligations to Furukawa under the Agreements, the Debtors provided to Furukawa, for the first time, information that enabled Furukawa to calculate certain additional royalties owing by the Debtors.[3]

---

[3] Importantly, in an e-mail communication to Furukawa, attached hereto in Exhibit 2, representatives of the Debtors stated that DFWS owes Furukawa in excess of $1.46 million on account of Furukawa Outside Payable.

14.    Since the filing of the Administrative Expense Motion, $20,000 in royalty payments accrued under the Technical Consulting Agreement, $31,500 under the Personnel Consulting Agreement and $325,151.00[4] under the Joint Venture License Agreement, bringing the total figure for Supplemental Amounts to $380,860.[5]    *See* Exhibit 2 attached hereto.  The Total Administrative Claim that the Debtors currently owe Furukawa is $1,548,770.97, which includes the amounts asserted in the Administrative Expense Motion.[6]

## BASIS FOR RELIEF

15.    The Total Administrative Claim falls clearly within the category of "freely allowable" claim amendments. *See Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.)*, 419 F.3d 115, 133 (2d Cir. 2005).  The Second Circuit has held that amendments to proofs of claims are "'freely allowed where the purpose is to cure a defect in the claim as originally filed, ***to describe the claim with greater particularity***, or to plead a new theory of recovery on the facts set forth in the original claim.'"  *Id.* (emphasis added) quoting *In re Integrated Res., Inc. v. Ameritrust Co. Nat'l Ass'n (In re Integrated Res., Inc.)*, 157 B.R. 66, 70 (S.D.N.Y. 1993).  This holding equally applies to amendments to administrative expense claims. *In re PT-1 Commc'ns Inc.*, 386 B.R. 402, 409 (Bankr. E.D.N.Y. 2007).

---

[4] The amount owing under the Joint Venture License Agreement takes into account a reduction of $4,209.00 originally sought in the Administrative Expense Motion.  This adjustment is based upon Furukawa's review of information belatedly provided by the Debtors to Furukawa.

[5] Furukawa was able to calculate the additional royalties owing under the Joint Venture License Agreement based on certain documentation provided to it by Delphi in January 2010.  The amended amounts for the Technical Consulting Agreement and Personnel Consulting Agreement include estimated amounts. Furukawa reserves its right to supplement and/or amend this Motion Supplement to describe the amended amounts with more particularity and/or assert any additional amounts owed by the Debtors under any of the Agreements.  Additionally, the actual and estimated amounts asserted herein represent the royalties accrued under the Agreements as of October 6, 2009, the effective date for assumption or rejection of the Agreements.

[6] See the corresponding invoices attached as Exhibits 2, 4 and 6 to the Administrative Expense Motion.

16.      Claim amendments made after the applicable bar date are subject to "careful scrutiny to assure that there was no attempt to file a new claim under the guise of amendment." *In re Enron Corp.*, 419 F.3d at 133. Whether a claim amendment is allowed after passage of the bar date is within the court's discretion and is guided by a two-prong test: (1) whether a timely claim was made that evidenced the claimant's intent to hold the estate liable and (2) whether it is equitable to allow amendment. *Id.*

17.      As more fully stated in the Administrative Expense Motion, Furukawa's original administrative expense claim was timely and clearly evidenced Furukawa's intent to hold the Debtors liable for the royalties due under the Agreements. *See* Administrative Expense Motion ¶¶ 22-25. The Total Administrative Claim now includes those additional royalty amounts unavailable at the time of the Administrative Expense Motion. A summary of the relevant facts has been restated herein solely for the Court's convenience.

18.      Additionally, the equitable factors considered by courts favor allowance of the Total Administrative Claim. Courts balance the equities of a claim amendment based on consideration of the following factors:

> (1) undue prejudice to opposing party; (2) bad faith or dilatory behavior on part of the claimant; (3) whether other creditors would receive a windfall were the amendment not allowed; (4) whether other claimants might be harmed or prejudiced; and (5) the justification for the inability to file the amended claim at the time the original claim was filed.

*In re Integrated Res.*, 157 B.R. at 70.

19.      <u>Prejudice to the Opposing Party</u>. The potential prejudice to the opposing party is the most important equitable factor and, here, the most compelling reason to allow the Total Administrative Claim. *In re Enron Corp.*, 419 F.3d at 133 ("'the critical

consideration is whether the opposing party will be unduly prejudiced.'") (citations omitted). The Debtors are not at all prejudiced by allowance of the Total Administrative Claim. First, royalties only accrue under the Agreements if the Debtors choose to use Furukawa's intellectual property and personnel and actually benefit from this use through sale proceeds. If the Debtors found that the benefit of the Agreements was not worth the cost of the royalty payments, they should have ceased using Furukawa's intellectual property and personnel. Because the Debtors already benefited from the use of Furukawa's intellectual property, there can be no prejudice. Additionally, as detailed more in the Administrative Expense Motion, if the Debtors' request suspension of royalty payments, they cannot also seek to subject Furukawa to procedures based on unsuspended payment dates. *See* Administrative Expense Motion ¶¶ 22-25.

20.    Second, the Debtors had notice of the Supplemental Amounts even before Furukawa and are not prejudiced by any lack of notice. As explained above, calculation of the Supplemental Amounts is based on information held by DAS and DFWS and later provided to Furukawa. Similarly, DFWS has recognized the amounts owing to Furukawa. *See* Exhibit 2 attached hereto.

21.    Throughout the parties' negotiation process, the Debtors have been fully aware that amounts continued to accrue under the Agreements and were given notice of this Motion Supplement prior to filing. They are not now prejudiced by Furukawa's formal assertion of amounts informally known by the Debtors. The Debtors should not be allowed to use Furukawa's willingness to consensually resolve issues as reason to limit Furukawa's rights. *See In re Integrated Res.*, 157 B.R. at 70 (the principles of

equity that guide a court's decision on claim amendments insure that "'technical considerations will not prevent substantial justice from being done.'").

22.    _Justification for Amendment._    The Supplemental Amounts were not included in the Administrative Expense Motion as they had not yet accrued and remained unknown.    However, during the interim period, Furukawa discussed the accruing obligations under the Agreements with the Debtors.

23.    The present facts are substantially similar to that in _United States v. Berger (In re Tanaka Brothers Farms, Inc.)_, where the Tenth Circuit allowed an amended claim of the IRS that included additional amounts unknown at the time of the original claim. 36 F.3d 996 (10th Cir. 1994). In _Tanaka_, the IRS amended its tax claim after the bar date to include an additional $300,000 based on a tax return filed by the debtor after the IRS' original proof of claim. _Id._ at 1000. The Tenth Circuit's holding was based on several relevant factors. First, while the IRS could have amended its claim before the bar date, amending the claim at that time still would have required estimation. _Id._ at 999. Thus, the decision to wait until the actual amounts were known was justified, especially considering the IRS communicated the anticipated amounts to the trustee during the interim period. Second, the IRS' original claim stated that it was an estimate, which in addition to the trustee's knowledge that its tax return was needed to include the actual amounts, served as clear notice of the forthcoming amendment. _Id._ Third, the low amount of the estimate did not preclude amendment of the claim to a much higher amount given the trustee was in a better position to estimate the claim. _Id._

24.    The situation here is similar and even more compelling than the facts presented in _Tanaka_: (1) the Supplemental Amounts were not available at the time of the

Administrative Expense Motion and, indeed, a portion of the Supplemental Amounts is comprised of estimates; (2) the Administrative Expense Motion explicitly stated that some amounts were estimates and royalties continued to accrue; and (3) the Supplemental Amounts are either lower or in the same range as royalties for prior quarters and, nevertheless, since the royalties are based on their use, the Debtors are in a better position to estimate the accrued royalties.

25.     <u>Bad faith</u>.  There is no bad faith here.  Furukawa has cooperated with the Debtors in postponing hearing on its demand for payment of administrative expenses to reduce the unnecessary expenses and litigation costs of both parties.  Furukawa agreed to this postponement for efficiency purposes since, once the Objections are resolved, the administrative expenses incurred under the Agreements may be paid as a cure amount.  It is also important to Furukawa, that if any of the Agreements are assumed, it is able to maintain a productive working relationship with the Debtors.

26.     <u>Windfall to Other Creditors</u>.  Other creditors would receive a windfall if the Total Administrative Claim is not allowed as money has flowed into the estate on account of the Debtors' use of Furukawa's intellectual property and personnel.  Royalties only accrue under the Agreements if the Debtors receive proceeds pursuant to the Agreements.

27.     <u>Harm or Prejudice to Other Creditors</u>.  Other creditors were on notice of the Total Administrative Claim upon the filing of the Administrative Expense Motion and are thus not harmed or prejudiced by allowance of the Total Administrative Claim.  The Administrative Expense Motion explicitly stated that the claim amount included estimates and would be amended to include any additional amounts.  *See* Administrative

Expense Motion at footnotes 1-3 and 6; *Tanaka*, 36 F.3d at 1000 (creditor was not prejudiced by higher amount in amended claim; if estimated claim was important to creditor's settlement with debtor, creditor should have contacted the claimant for further information instead of "blindly relying" on the estimated claim). This notice was particularly effective considering the Supplemental Amounts are within range of the royalties for prior quarters and are thus within reasonable creditor expectations. Other creditors have not been subjected to any unfair surprise.

28.    As discussed in the Administrative Expense Motion, Furukawa disputes that any portion of the original administrative expense claim was untimely. *See* Administrative Expense Motion ¶¶ 22-25. However, out of an abundance of caution, Furukawa also submits that the equitable factors addressed herein would also compel allowance of the Total Administrative Claim as a late-filed claim. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993) (claim can be allowed if the movant's untimely filing was due to "excusable neglect," which depends on the prejudice to the debtor, length of delay, reason for the delay, the potential impact on the proceedings and the movant's good faith); *In re Enron Corp.*, 419 F.3d at 133 (equitable analysis of a claim amendment "closely resembles *Pioneer's* 'excusable neglect' analysis of belated *new* claims").

WHEREFORE, Furukawa requests that the Court enter an order granting immediate payment of the Total Administrative Claim and any other relief the Court deems appropriate.

Respectfully submitted, this 6th day of April, 2010.

ALSTON & BIRD LLP

/s/   David A. Wender
Dennis J. Connolly (DC-9932)
David A. Wender (admitted *pro hac vice*)

One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Telephone (404) 881-7000
Facsimile (404) 881-7777

*Counsel for Furukawa Electric Company,
Ltd. and Furukawa Electric North America
APD, Inc.*

# EXHIBIT 1

Execution Copy

# DELPHI FURUKAWA WIRING SYSTEMS LLC

# LIMITED LIABILITY COMPANY AGREEMENT

# LIMITED LIABILITY COMPANY AGREEMENT

THIS LIMITED LIABILITY COMPANY AGREEMENT ("Agreement") of Delphi Furukawa Wiring Systems LLC (the "Company"), dated as of November 19, 2004, is made and entered into by and between Delphi Automotive Systems LLC ("Delphi"), a Delaware limited liability company with its principal place of business at 5725 Delphi Drive, Troy, Michigan, and Furukawa Electric North America APD, Inc. ("Furukawa"), a Delaware corporation with its principal place of business at 47677 Galleon Drive, Plymouth, Michigan. Furukawa is a wholly owned subsidiary of Furukawa Electric North America, Inc., a Delaware corporation, which is in turn a wholly owned subsidiary of The Furukawa Electric Co., Ltd. ("Furukawa-Japan"), a Japanese corporation. Delphi and Furukawa are collectively referred to herein as "Members" and individually as a "Member."

RECITALS:

WHEREAS, Furukawa and Furukawa-Japan design and manufacture wire harness systems for automotive applications;

WHEREAS, Delphi designs and manufactures electrical / electronic distribution systems for the automotive industry;

WHEREAS, Delphi and Furukawa (which is duly authorized and empowered by Furukawa-Japan to be Furukawa-Japan's representative agent) desire to pool their resources and form a new entity for the purpose of conducting (directly and/or through one or more wholly owned subsidiaries) the business described more fully in Section 1.4 and **Exhibit A** below – namely, (1) design of wiring harnesses for the Toyota F and MC programs to be built in North America (presently scheduled to launch in late 2006 and 2007, respectively) and sale of such harnesses directly or indirectly to Toyota Motor North America, Inc. and its North American affiliates, including Toyota Motor Manufacturing Canada, Inc., and New United Motor Manufacturing, Inc. (NUMMI), and (2) such other business as the Members may mutually agree in writing;

WHEREAS, the Members desire, by execution of this Agreement, to form the Company as a limited liability company pursuant to the Delaware Limited Liability Company Act ("Act"); and

WHEREAS, Delphi and Furukawa desire to enter into this Agreement to set forth their entire agreement concerning the formation and the operation of the Company and the relationships as now intended among Delphi and Furukawa, including without limitation, the funding of the capital contributions required under this Agreement.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants and conditions herein, the Members agree as follows:

## SECTION 1
Organization

SECTION 1.1 Formation.

The Members, by execution of this Agreement and the Certificate of Formation ("Certificate of Formation") in the form attached hereto as **Exhibit B**, hereby enter into and join together in, and subject to the filing of the Certificate of Formation do hereby form, the Company as a limited liability company under and subject to the Act. Except as is expressly herein stipulated to the contrary, the rights and obligations of the Members and the administration and termination of the Company shall be governed by the Act. Upon request of the Board of Managers of the Company, any Member, or as required by law, the Members shall promptly execute all amendments of the Certificate of Formation and all other documents and take all such other actions as may be necessary or advisable to enable the Company to accomplish all filing, recording, publishing and other ministerial acts necessary or appropriate to comply with all requirements for the formation and operation of the Company under the Act in accordance with this Agreement.

SECTION 1.2 Name.

The name of the Company shall be: Delphi Furukawa Wiring Systems LLC, or such other name as the Members may unanimously agree.

SECTION 1.3 Consents.

The Members each hereby authorize, approve, ratify and/or confirm the filing of the Certificate of Formation with the Delaware Secretary of State and the filing of such other instruments as may be necessary or appropriate to effectuate this Agreement.

SECTION 1.4 Scope of Business; Purpose; Noncompetition.

    (a)    The business of the Company ("Company's Business") shall consist solely of the business(es) identified in **Exhibit A** to this Agreement (as such Exhibit may be amended from time to time) -- which business may be conducted directly and/or through one or more wholly owned subsidiaries as determined by the Members. As of the date of this Agreement, the activities identified in **Exhibit A** consist of (and are limited to), the design of wiring harnesses (electrical / electronic distribution systems) designed and engineered by Furukawa and Delphi in cooperation with Toyota, and procurement of assembled wiring harnesses supplied to the Company by Delphi, for the Toyota F and MC programs to be built in North America (presently scheduled to launch in late 2006 and 2007, respectively) and sale of such harnesses directly or indirectly to Toyota Motor North America, Inc. and its North American Affiliates, including Toyota Motor Manufacturing Canada, Inc., and New United Motor Manufacturing, Inc. **Exhibit A** may also hereafter be amended to add such other business or businesses as Delphi and Furukawa may, each in their sole discretion, from time to time unanimously agree in writing, in accordance with Section 5 and Section 14.10. As for the next generation(s) of Toyota F and MC

platforms, the Members shall respectfully emphasize Toyota's direction and/or preference as a strong guideline.

(b)    The Company may do any and all things permitted under the Act to carry on and conduct the Company's Business.

(c)    The Members hereby covenant and agree that during the term of this Agreement, the Company shall constitute the sole vehicle through which they (and all of their Affiliates, as hereinafter defined in this Agreement) will engage in the Company's Business. Accordingly, during the term of this Agreement, each Member (including any of their Affiliates) shall neither engage nor knowingly cause a third party to engage (other than through the Company) in the Company's Business. As set forth in Section 14.16 below, nothing in this Agreement shall restrict the right and ability of either Member to engage independently (or with one or more third parties) in any business activity outside of the Company's Business as defined herein.

(d)    For purposes of this Agreement, an "Affiliate" of any Person shall mean another Person that directly, or indirectly through one or more intermediaries, owns or controls, is owned or controlled by, or is under common ownership or control with that Person, and in the case of an individual, also includes any other Persons related by blood or marriage.  (For purposes of this Agreement, (1) "ownership" means the ownership, directly or indirectly together with such Person's Affiliates, of at least fifty percent (50%) of the outstanding equity interests in an entity; (2) "control" means the ownership, directly or indirectly, together with such Person's Affiliates, of fifty percent (50%) or more of the voting securities of a Person; and (3) "Person" means any natural person, corporation, partnership, limited liability company or other legal entity.)

SECTION 1.5 Registered Agent, Registered Office, and Principal Business Office.

The initial registered agent for the Company shall be CT Corporation System and the initial registered office of the Company shall be located at 1209 Orange Street, Wilmington, Delaware 19801 or any other location(s) as the Members may duly designate pursuant to the Act.  The principal business office of the Company shall be such location, initially within the State of Ohio, as the Board of Managers shall decide.  The principal business office, registered office and registered agent of the Company may be changed by the Board of Managers from time to time in accordance with this Agreement and the then-applicable provisions of the Act and any other applicable laws.

SECTION 1.6 Effective Dates and Duration.

After execution, this Agreement shall be effective as of the date of filing of the Company's Certificate of Formation.  The Company shall continue in existence so long as the Company's Business (as defined in Section 1.4 and **Exhibit A**) is continuing or until terminated or dissolved pursuant to any applicable provision of the Act or this Agreement.

SECTION 1.7 Certain Obligations.

The Members recognize and specifically ratify as valid obligations of the Company, and approve pursuant to Sections 18-107 of the Act, certain Related Agreements identified in Section 10 hereto, which may be entered into either contemporaneously with the execution of this Agreement or at a later date, in furtherance of the Company's Business.

### SECTION 2
### Capital Contributions and Other Funding

SECTION 2.1 Capital Contributions.

   (a)    Delphi and Furukawa hereby subscribe for and agree to make the cash capital contributions set forth in Sections 2.1(b) and (c) below, in the combined aggregate amount of Six Million Six Hundred Thirty Thousand Five Hundred Thirty United States Dollars (US$6,630,530) subject to:

       (1)    satisfaction of the following conditions precedent on or before December 31, 2004:

          (a)    in the case of Delphi, Delphi Strategy Board approval in the event that the revised Business Plan to be prepared by October 31, 2004, for review and approval by the Board of Managers or Members in accordance with Section 4.7 below, contains any material adverse differences in respect of the business case (including any Related Agreements) from the point of view of Delphi from that reflected in the Initial Business Plan attached hereto as **Exhibit E**;

          (b)    in the case of Furukawa, approval by the Furukawa Board of Directors in the event that the revised Business Plan to be prepared by October 31, 2004, for review and approval by the Board of Managers or Members in accordance with Section 4.7 below, contains any material adverse differences in respect of the business case (including any Related Agreements) from the point of view of Furukawa from that reflected in the Initial Business Plan attached hereto as **Exhibit E**; and

          (c)    formal award by Toyota to the Company of business consisting of the design of wiring harnesses for the Toyota MC and F programs to be built in North America and sale of such harnesses directly or indirectly to Toyota.

   (b)    Furukawa shall make cash capital contributions to the Company in the aggregate amount of One Million Three Hundred Twenty-six Thousand One Hundred Six United States Dollars (US$1,326,106) (representing 20% of total Member capital

4

contributions called for under Section 2.1(a) of US$6,630,530), to be paid to the Company in accordance with the schedule set forth in **Exhibit C** to this Agreement, subject to the satisfaction of the conditions precedent set forth in Section 2.1(a).

(c)     Delphi shall make the cash capital contributions to the Company in the aggregate amount of Five Million Three Hundred and Four Thousand Four Hundred Twenty-Four United States Dollars (US$5,304,424) (representing 80% of total Member capital contributions called for under Section 2.1(a) of US$6,630,530), to be paid to the Company in accordance with the schedule set forth in **Exhibit C** to this Agreement, subject to the satisfaction of the conditions precedent set forth in Section 2.1(a).

(d)     In exchange for the foregoing contribution, each Member is granted an initial interest in the Company (a "Membership Interest") which is equal to its percentage of the aggregate Capital Contributions of the Member (its "Percentage Interest") (see Section 3.4(a) below).

(e)     The Members may, by unanimous vote of the Members as set forth in Section 5, agree to make additional cash contributions to the capital of the Company, which additional cash contributions shall be made pro rata in accordance with each Member's Percentage Interest.

(f)     In the event that the Members, at any time prior to making the capital contributions set forth in Sections 2.1(b) and 2.1(c) above, agree that the Company's Business does not require the full, aggregate amount of the agreed-upon capital contributions set forth in Sections 2.1(b) and 2.1(c), then the Members may, but only by mutual agreement in writing, amend Sections 2.1(a), (b) and (c) above to provide for a reduction in the capital contributions required under this Agreement, provided that any such reduction shall be allocated between the Members on a pro rata basis in accordance with the Members' respective Percentage Interests as set forth in Section 2.1(d) above and Section 3.4(a) below.

(g)     Except as provided in this Section 2.1, in no event shall any Member be required to contribute additional capital for the benefit of the Company.

(h)     Unless otherwise unanimously agreed by the Members in writing, no Member shall be required to make any loan to, or guaranty any indebtedness of, the Company.

(i)     The Company shall bear the cost of and reimburse the Members for pre-formation start-up expenditures listed on **Exhibit D** hereto up to the amount listed on **Exhibit D**, and for such other bona fide pre-formation, formation and start-up expenditures and/or disbursements incurred by the Members for or on behalf of the Company as may be mutually agreed upon in writing by all of the Members. The Members shall keep a detailed account of all such authorized, pre-formation, formation, and start-up expenditures and shall also keep receipts and notes supporting such expenditures for tax purposes. Each Member shall periodically

provide to the others a statement showing disbursements for authorized expenses incurred by such Member. Upon the Company becoming operational and having received the capital contributions set forth in **Exhibit C** for the first quarter 2005, the Company shall provide the reimbursement called for under this Section.

SECTION 2.2 Other Financing.

Subject to any agreement in writing between the Members upon a plan for funding any expansion of the Company's Business, any other financing required for the operation or growth of the Company shall be sought from the following sources (listed in descending order of preference):

    (a)    internally-generated funds of the Company;

    (b)    borrowings from non-affiliated entities which do not require guaranties of the Members; or

    (c)    either (1) inter-company loans from the Members, made pro rata in accordance with each Member's Percentage Interest, (2) increases in the Members' capital in accordance with Section 2.1., or (3) some combination of 2.2(c)(1) and (2).

In no event, however, shall the Company, without the prior unanimous written approval of the Members: (a) borrow money or incur indebtedness, excepting trade accounts payable incurred in the ordinary course of business, or (b) receive additional capital contributions.

SECTION 2.3 Failure to Contribute.

In the event that any Member (the "Defaulting Member") fails to make any cash capital contributions called for pursuant to Sections 2.1(a), (b), or (c), or otherwise fails to provide any other capital contribution or other financing which has been approved by all of the Members in accordance with the provisions of Section 2.1(e) and Section 5 ("Agreed Contribution"), then, in addition to and without prejudice to a non-Defaulting Member's ("Non-Defaulting Member") rights under this Agreement, including Section 11.1(c) below (permitting the Non-Defaulting Member, among other matters, to exercise its right to purchase the Membership Interest of the Defaulting Member or to initiate the dissolution of the Company), the Non-Defaulting Member may elect, after five (5) business days of such failure, but within thirty (30) business days following such failure, to advance the Defaulting Member's Agreed Contribution (such electing Member or Members being referred to as "Contributing Member"). Such advances of the Defaulting Member's Agreed Contribution shall be deemed a loan (a "Capital Advance") by the Contributing Member to the Defaulting Member in the amount of the Agreed Contribution which Capital Advance shall bear interest at the annual rate of prime (as published in the Midwest edition of the Wall Street Journal) plus five percent (5%) (not to exceed the maximum rate permitted under applicable law) until repaid by the Defaulting Member, and until such Capital Advance is repaid by the Defaulting Member, the Contributing Member shall be entitled to receive directly from the Company any payments of Distributable Cash Flow made by the Company on account of the Defaulting Member's Membership Interest, with such payments to be applied toward repayment of the Capital Advance. (If there is more than one Contributing Member, the total Agreed Contribution of the Defaulting

Member shall be divided by the Contributing Members pro rata in the proportion that each Contributing Member's Percentage Interest bears to the aggregate of all Contributing Members' Percentage Interest.) If any Capital Advance is not repaid, with interest, by the Defaulting Member within one (1) year following the date it is made by the Contributing Member, the Defaulting Member, at the election of the Contributing Member and upon notice thereof to the Defaulting Member, shall be deemed to have transferred to the Contributing Member such percentage of its Membership Interest that is equal to the percentage that the value of the Defaulting Member's Agreed Contribution (plus interest) bears to the value of Defaulting Member's Capital Account as of the date of the Agreed Contribution. The Members hereby agree to amend this Agreement to reflect any such change in the Percentage Interests of the Members. (If there is more than one Contributing Member, the portion of the Defaulting Member's Membership Interest to be transferred will be divided among the Contributing Members pro rata in the proportion that each Contributing Member's Percentage Interest bears to the aggregate of all Contributing Members' Percentage Interests.)

SECTION 2.4 Withdrawals.

The capital of the Company shall not be withdrawn by any Member except as provided in this Agreement.

SECTION 2.5 Capital Accounts; Adjustments; Substantial Economic Effect.

    (a)    The Company shall establish and maintain a capital account ("Capital Account") for each Member. The Members intend that the Capital Accounts of the Members shall be determined and maintained throughout the full term of the Company in accordance with the partnership accounting rules of Section 704 of the Internal Revenue Code of 1986, as amended (the "Code"), and Treasury Regulations §§1.704-1(b)(2)(ii) and (iv) or any subsequent similar provisions. Accordingly, the Members understand and agree that the amounts of profits and losses allocated to each Member as provided in Section 3 hereof will be credited or debited to the Members' Capital Accounts and will affect the amounts received by the Members' upon liquidation.

    (b)    Liquidating distributions shall be made in accordance with final positive Capital Account balances after all payments of expenses incurred in dissolution and termination have been made and payment of all creditors, except secured creditors whose obligations will be assumed or otherwise transferred on a liquidation of the Company property or assets, until the amount distributed to each Member is equal to such positive Capital Account balance; if any amounts remain, such amounts shall be distributed thereafter to all Members in proportion to their respective Percentage Interests.

SECTION 2.6 Interest.

No interest shall be paid on the Capital Account of any Member.

after providing for the Company's future cash needs for investment and cash reserves as agreed to in the Business Plan.

(c)     Any distributions of Distributable Cash Flow to the Members from the Company will be made to the Members in accordance with their respective Percentage Interests and will be made at least annually and not later than ninety (90) days after the end of the fiscal year covered by the financial statements upon which the determination of Distributable Cash Flow pursuant to Section 3.3(a) is based.

SECTION 3.4 Allocations.

(a)     Allocation Rules. All items of Company income, gain, loss, deduction, allowance, or credit shall be allocated between or among the Members in accordance with each Member's Percentage Interest in the Company, as set forth below:

| Member | Percentage Interest |
|--------|---------------------|
| Delphi | 80% |
| Furukawa | 20% |

(b)     Tax and Book Effects. The Members intend that the allocations of profits and losses provided by this Section are for Federal income tax purposes as well as financial accounting purposes. All profits and losses of the Company, including all items of income, gain, deduction, loss, allowance, or credit shall be allocated as provided by this Section.

(c)     Changes in Members' Percentage Interests. Notwithstanding the foregoing, in the event any Member's Percentage Interest changes during the fiscal year for any reason, including the transfer of any interest in the Company or an adjustment of the Member's Percentage Interest hereunder (see, e.g., Section 2.3), the allocations of taxable income or loss or any other item shall be adjusted as necessary to reflect the varying interests of the Members during such year using an interim closing of the books method as of the date of such change or such other method as is unanimously approved by the Members.

(d)     Tax Required Allocations. The following allocations of Company items shall be made to the extent required for Federal income tax purposes.

   (1)     *Qualified Income Offset.* If for any fiscal year of the Company, any Member unexpectedly receives any adjustment, allocation or distribution described in Treasury Regulations §1.704-1(b)(2)(ii)(d) or any successor provision thereto, which creates or increases a deficit in such Member's Capital Account as of the end of the year after taking into account with respect to such Member's Capital Account all adjustments, allocations and distributions which are required to be taken into account with respect to such Capital Account by such Treasury Regulations, items of income and gain (consisting of a pro rata portion of each item of partnership income, including gross income, and gain for such year)

9

SECTION 2.7 No Third Party Rights.

Provisions of this Agreement relating to capital contributions or other financing shall not be construed as conferring any rights or benefits to or upon any person not a party to this Agreement, including, but not limited to, any bank or the holder of any obligations secured by a mortgage, deed of trust, security interest or other lien or encumbrance upon or affecting the Company or any of its assets or any interest of a Member therein.

SECTION 2.8 No Certificates.

Neither the capital of the Company nor the ownership of any Membership Interest shall be represented by any certificate of interest or other written instrument representing in any manner such ownership, and such ownership shall be reflected solely in this Agreement and on the books and records of the Company.

## SECTION 3
### Cash Flow, Distributions, and Allocations

SECTION 3.1 Cash Flow.

The term "Cash Flow" shall mean the total of all cash generated from all sources, including operating revenues, other income or gains, and returns of capital in each case received in cash for the account of the Company less the total of all cash expenditures by or on behalf of the Company in managing the Company and the Company's Business. Cash Flow shall be determined on a cash basis in a consistent manner, without distortions.

SECTION 3.2 Distribution Restrictions.

The Company shall not make any distribution of Cash Flow or any other available funds if, and to the extent, that after giving effect to such distribution, (i) the Company would not be able to pay its debts as they become due in the usual course of business; (ii) the Company's total assets would be less than the sum of its total liabilities; or (iii) any such distribution would otherwise be in contravention of Section 18-607 of the Act.

SECTION 3.3 Distribution of Cash Flow.

(a)     The Members shall determine annually, based on audited financial statements prepared consistently with Section 7.1, the amount of Cash Flow which is distributable consistent with the limitation of Section 3.2 ("Distributable Cash Flow").

(b)     Subject to Sections 3.2 and the decision of the Members in accordance with Section 5, it is the intention of the Members that all excess Distributable Cash Flow shall be paid to the Members in proportion to their respective Percentage Interests,

8

shall be allocated to such Member in an amount and manner sufficient to eliminate such deficit balance as quickly as possible.

(2) *Minimum Gain Chargeback.* If for any fiscal year of the Company, there is a net decrease in Company minimum gain as that term is defined in Treasury Regulations §1.704-2(b)(2) and §1.704-2(d)(1), each Member which has previously been allocated any nonrecourse deductions or received distributions of proceeds attributable to any nonrecourse borrowing of the Company in any fiscal year of the Company shall be allocated items of Company income and gain for the year in which there is a net decrease in Company minimum gain in proportion to such prior allocations equal to that Member's share of the net decrease in Company minimum gain consistently with the requirements of Treasury Regulation §1.704-2.

(3) *Nonrecourse Deductions.* If for any fiscal year of the Company, the Company shall have any losses, deductions or Code §705(a)(2)(B) expenditures attributable to Company recourse or nonrecourse liabilities (including nonrecourse liabilities for which a Member bears the economic risk of loss) such item shall be allocated in accordance with Treasury Regulations §1.704-2 and Code §752.

(c) Curative Allocations. If, and to the extent, allocations required to be made for Federal income tax purposes have been made pursuant to Section 3.4(d), thereafter and to the extent permitted by and consistent with Section 3.4(d), such allocations shall be equitably offset as quickly as possible and prior to any allocations pursuant to Sections 3.4(a) or (c) by subsequent offsetting "curative" allocations of income, gain or loss so that the net cumulative effect (except for timing differences) of the tax allocations made to Members and their respective Capital Accounts pursuant to Section 3.4(d) and the curative allocations made to Members and their respective Capital Accounts pursuant to this subsection shall be the same as if no required tax allocations or curative allocations had been made.

SECTION 3.5 Taxes on the Company.

To the extent any taxes are imposed on the Company, rather than the Members, such amounts shall be treated in all respects as expenses of the Company.

## SECTION 4
### Management of the Company

SECTION 4.1 Number, Identification and Qualifications of Managers.

Subject to any limitations imposed by the Act, the Certificate of Formation, and this Agreement (including without limitation Section 1.4 above and Section 5.7 below), as well as any approved Business Plan, the business and affairs of the Company shall be managed under the direction and

control of a Board of Managers (the "Managers" or collectively, the "Board of Managers"),
consisting of four (4) members. Three (3) of the four (4) Managers shall be nominated and
appointed by Delphi, and one (1) of the four (4) Managers shall be nominated and appointed by
Furukawa. The nominees and appointees of each Member shall be officers or employees of Delphi
or Furukawa, respectively. The four (4) Managers of the Company initially shall be the following
persons:

| Furukawa Nominee | Delphi Nominees |
|---|---|
| Shuji Hayashida | Douglas Gruber |
| | Max Rogers |
| | Michael Balsei |

A Delphi Nominee will preside as Chairman at meetings of the Board of Managers.

(a)   Changes Regarding Composition / Number of Board of Managers. The number and
composition of the Board of Managers may only be changed by the unanimous
written approval of all the Members.

(b)   Election. Managers shall be appointed at the annual meeting of the Members, and
each Manager shall be appointed to hold office for a term of one (1) year or until his
successor shall be elected and qualified.

(c)   Vacancies. Vacancies in the Board of Managers arising from any cause shall be
filled by the Member who nominated and appointed the Manager whose position has
become vacant.

(d)   Resignation and Removal. A Manager may resign by written notice to the Company.
The resignation shall be effective upon its receipt by the Company or at a subsequent
time as set forth in the notice of resignation. A Manager may be removed, with or
without cause, at any time, by the Member which nominated and appointed him.
Such Member shall notify the other Member in writing, within a reasonable amount
of time, of a Manager's removal.

(e)   Committees. The Board of Managers with unanimous consent may establish
advisory and such other committees as they may determine (collectively,
"Committees") and may authorize such Committees to exercise any of the powers of
the Board, to the extent permitted by law. All actions of any Committee shall be by
unanimous consent. The Board of Managers with unanimous consent may
discontinue the operation at any time of any committee established under this
Section.

(f)   Meetings. An organizational meeting of the Board of Managers shall be held
immediately following the annual meeting of Members. Unless otherwise
unanimously agreed by the Members, the annual Members' Meeting shall be held
within three (3) months after the end of each fiscal year, as determined by the
Chairman of the Board in each fiscal year. The Chairman of the Board shall also

11

convene additional meetings of the Board of Managers upon the request of any
Managers or any Member. In addition to the meeting of the Board of Managers
following the annual meeting of Members (generally to be held annually in the first
fiscal quarter per the second sentence of this sub-section), the Board of Managers
shall meet at least once in each of the following three fiscal quarters of a given year
at a date and time to be determined by the Chairman of the Board. Due notice of all
meetings of the Board of Managers, as provided in this Agreement and as required
by applicable law, shall be given. Meetings may be held within or outside the State
of Michigan. If any member of the Board of Managers cannot attend a meeting of
the Board of Managers, the Manager (or the Member which appointed such
Manager) may appoint a proxy to represent and vote for the absent Manager. A
power of attorney or an appointment letter by which the proxy is appointed shall be
presented at or before the commencement of the meeting.

(g)   Notice. Written notice of meetings of the Board of Managers shall be provided to
      each Manager sent to the Manager's last known residence or place of business (in the
      manner reasonably requested by such Manager or Member in writing – for example,
      by facsimile (receipt confirmed) or email or regular mail), not less than ten (10)
      business days prior to the date of the meeting. Notice of the meeting shall specify
      the time and place of holding of the meeting and any and all business to be
      transacted at such meeting. Notice may be waived, in writing, either before or after
      such meeting. Attendance of a Manager member at a meeting constitutes a waiver of
      notice of the meeting except where a Manager attends a meeting for the express
      purpose of objecting to the transaction of any business because the meeting is not
      lawfully called or convened.

(h)   Quorum and Voting. A quorum for the transaction of business by the Board of
      Managers shall consist of two (2) Managers being present in person or by proxy,
      provided that one (1) of the Managers present has been appointed by Furukawa and
      one (1) of the Managers present has been appointed by Delphi. The vote of the
      majority of the Managers present at a meeting at which a quorum is present
      constitutes the action of the Board of Managers unless the vote of a larger number is
      required by law or this Agreement. In the event a quorum is not present, the
      Chairman of the Board (or the Chairman of the Committee, if applicable) shall
      reschedule the meeting and provide due notice as provided herein.

(i)   Adjournment. If at any meeting of the Board of Managers, the Managers are unable
      to reach unanimous agreement on an issue, any Manager present may require that the
      matter be adjourned for consideration and a decision (without further adjournment)
      at the next meeting of the Board of Managers in order: (i) to provide an opportunity
      for consultation with one or both Members, or (ii) to provide an opportunity for a
      more complete attendance when the matter is considered.

(j)   Action by Unanimous Written Consent. Action required or permitted to be taken
      pursuant to authorization voted at a meeting of the Board of Managers or a
      Committee may be taken without a meeting, without prior notice and without a vote

if before or after the action all members of the Board of Managers or the Committee consent thereto in writing. Every written consent shall bear the date and signature of each Manager who signs the consent. Such consent shall be filed with the minutes of the proceedings of the Board of Managers or the Committee and shall have the same effect as a vote of the Board of Managers or the Committee for all purposes.

(k)    Participation by Communication Equipment. A member of the Board of Managers or a Committee may participate in a meeting of the Board of Managers or Committee by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other. Such participation constitutes presence in person at the meeting.

SECTION 4.2 Powers and Duties of the Board of Managers.

The Board of Managers shall have full, exclusive and complete power to manage and control the business and affairs of the Company, in accordance with the Business Plan, subject to the requirements of the Act, the Certificate of Formation, and this Agreement (including without limitation Section 1.4(a) above regarding the scope of the Company's Business and Section 5 below). Pursuant to and subject to the foregoing, it is understood and agreed that (1) the Managers shall have all the rights and powers of a "manager" as provided in the Act, as amended from time to time, (2) the appointment of an individual as a Manager pursuant to Section 4.1 shall constitute the due designation of the individual so elected or appointed as a "manager" for purposes of the Act, and (3) except as provided by law, any action taken by the Managers shall constitute the act of and shall bind the Company. Notwithstanding anything to the contrary set forth herein, the Board of Managers shall have the right to delegate authority, rights and/or obligations, whether arising hereunder, under the Act or otherwise, to officers in accordance with Sections 5 and 6 below, provided that the President, and other officer(s) through the President, shall report to, be responsible to, and be subject to the direction and control of the Board of Managers in the exercise of their responsibilities hereunder with respect to the management of the business and affairs of the Company, as set forth in Sections 5 and 6 below.

SECTION 4.3 Transactions with Members and Affiliates of Members.

Any Member and any Affiliate of a Member may deal with the Company, directly or indirectly, as vendor, purchaser, employee, agent, or otherwise. No contract or other act of the Company shall be voidable or affected in any manner solely by the fact that a Member or Affiliate of a Member is directly or indirectly interested in such contract or other act apart from its interest as a Member, nor shall any Member or any Affiliate of a Member be accountable to the Company or the other Members with respect to any profits directly or indirectly realized by it by reason of such contract or other act, and such interested Member shall be eligible to vote or take any other action as a Member with respect to such contract or other act as it would be entitled were such Member or its Affiliate not interested in such contract or other act. Notwithstanding the foregoing provisions of this Section 4.3, (a) any direct or indirect interest of a Member or Affiliate of a Member in any proposed contract or other act, other than an interest as a Member, shall be disclosed to all other Members and Managers before the Company enters into the proposed contract or other act; (b) such contract or other act shall be unanimously approved by the Board of Managers or by a vote of the

13

Members pursuant to Section 5.7 below, before the Company enters into the proposed contract or other act unless such contract or other act is specifically authorized in this Agreement, in accordance with Section 1.7 and Section 10, or in a Business Plan approved by the Board of Managers under Section 4.7 or the Members; and (c) the Members shall not receive or hold any property of the Company as collateral security for any claim against the Company unless otherwise unanimously agreed by the Members in writing. The Members agree that the Company shall be operated as an independent profitable business and that any transactions between the Company and any Member or any Affiliate of any Member shall be on an arm's length basis.

SECTION 4.4 Standard of Care; Liability.

(a)     Subject to Section 5.4 below, each Manager shall discharge his or her management duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances and in a manner he or she reasonably believes to be in the best interests of the Company as required by the Act. Notwithstanding the foregoing, no Manager shall be liable for monetary damages or otherwise to the Company or any Member in relation to this Agreement (including without limitation for any action taken or failure to act on behalf of the Company within the scope of the authority conferred on the Managers by this Agreement or by law) except for (i) actions or inactions constituting fraud or willful misconduct or gross negligence, (ii) actions or inactions taken by a Manager in violation of other Sections of this Agreement, (iii) the receipt of a financial benefit to which the Manager is not entitled, or (iv) a knowing violation of law.

(b)     The provisions of this Agreement, to the extent that they modify the duties and liabilities of Managers otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Persons.

SECTION 4.5 Compensation.

No Manager shall receive any compensation from the Company for his or her services to the Company in the capacity of Manager, unless approved unanimously by the Members.

SECTION 4.6 Devotion of Time to Company.

No Manager shall be required to serve as a Manager of the Company as his or her sole and exclusive function, and he or she may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any rights, by virtue of this Agreement, to share or participate in such other investments or activities of any Manager or to the income or proceeds derived therefrom. No Manager shall incur any liability to the Company or to any of the Members solely as a result of engaging in any other business or venture.

14

SECTION 4.7 Business Plan.

(a)    General.

(1)    A business plan for the Company ("Business Plan") shall be prepared and submitted to the Board of Managers on an annual basis. The purpose of the Business Plan shall be to govern the operation of the Company's Business for the succeeding one, three and five year periods. The Business Plan shall include, without limitation, financial and market projections, anticipated capital requirements, including both borrowing needs and required capital contributions, a capital spending plan, marketing strategy, any new business targets, and staffing and personnel needs. The initial Business Plan for the Company is attached hereto as **Exhibit E**. Not later than every October 1 preceding the next fiscal year (commencing with October 1, 2005), a revised Business Plan for the Company for the next fiscal year (and the succeeding three and five year periods), shall be prepared under the direction of the President, the Vice President, and the Finance Manager and submitted to the Board of Managers. The revised Business Plan for any fiscal year, to become effective, must first be approved by the Board of Managers, with such approval (if not unanimously approved by the entire Board of Managers) requiring the affirmative vote of at least one Manager appointed by each Member. The President and Finance Manager shall implement the Company's approved Business Plan, beginning with the initial Business Plan attached as **Exhibit E**. The Company shall not be governed by any overall business plan other than the then-current, approved Business Plan.

(2)    No approved Business Plan shall be deemed an amendment of this Agreement. Among other matters, no approval of a Business Plan by the Board of Managers shall constitute an amendment to the capital contribution, other financing or related provisions of this Agreement, and any reduction or amendment of the schedule for capital contributions called for under Sections 2.1(a), (b) and (c), the timing and amounts of any further capital contributions under Section 2.1(e), and the timing and amount of any other financing under Section 2.2 requires the unanimous consent of the Members in accordance with Sections 2.1(e), 2.2 and 5.7 below.

(b)    Approval. The Members shall cause their Managers on the Board to cooperate in good faith to finalize any Business Plan proposed pursuant to Section 4.7(a) by the 30th day before the beginning of the relevant fiscal year. Pending approval of or resolution of a dispute or deadlock over any proposed new Business Plan, the most recent approved Business Plan shall continue in effect, *mutatis mutandis*, except that the Company (and any Member or officer of the Company) shall not, without the approval of the Board in accordance with Section 4.7(a), (i) undertake any significant departure from any then current operating or other material practice or (ii) enter into any agreement or commitment to make any capital expenditures or leases in excess individually of $150,000 beyond the capital expenditures and leases called

15

for in the most recent approved Business Plan, other than for safety, health, or other
similar necessary reasons.

(c)     <u>Form and Scope</u>. Each proposed Business Plan after the initial Business Plan shall
(i) propose activities to be undertaken during the relevant period(s) including
financial projections and funding plans, (ii) include an operating budget, headcount
forecasts, and a capital expenditures plan, (iii) contain a sales projection, (iv) unless
the Board of Managers approves otherwise, be at least as detailed as the initial
Business Plan, and (v) reasonably enable each Member to comply with its internal
corporate procedures. Amendments to the Business Plan may be made by the Board
of Managers, subject to the same vote requirements as Business Plans under
Section 4.7(a) above. Once a new or amended Business Plan has been approved by
the Board of Managers in accordance with Section 4.7(a), and subject to
Section 4.7(a)(2) above, it becomes the budget and plan of action for the Company,
and the proper officers of the Company may conduct the Company's Business in
accordance with the Business Plan without the Board of Manager's further approval,
unless otherwise directed by the Board of Managers.

(d)     <u>Additional Matters</u>. It is understood and agreed that the forecasts / estimates
reflected in an approved Business Plan are not representations, warranties or
guaranties by either Member to the other (or to the Company) with respect to actual
performance / results that will be achieved by the Company, and that the business of
the Company is subject to business risks associated with business of the nature being
undertaken by the Company including, without limitation, in the case of MC and F
platforms for Toyota, matters such as changes in volume and/or timing of production
required by Toyota and exchange rate / currency matters.

SECTION 4.8 <u>Indemnification (Including Managers, Members, Officers and Seconded Employees)</u>.

To the fullest extent permitted by law, the Company shall indemnify any Manager or Member or
officer or Seconded Employee (and may indemnify, defend and hold harmless any other employee,
or agent of the Company), who was or is a party, or is threatened to be made a party, to a
threatened, pending, or completed action, suit, or proceeding, whether civil, criminal,
administrative, or investigative, and whether formal or informal (other than an action by or in the
right of the Company) by reason of the fact that such person is or was a Manager, Member, officer,
employee, or agent of the Company, against liability damages, costs, expenses (including attorneys'
fees), judgments, penalties, fines, and amounts paid in settlement actually and reasonably incurred
by such person in connection with the action, suit, or proceeding -- except that no indemnification
shall be provided to any Manager, Member, officer, Seconded Employee or other employee or agent
of the Company for or in connection with matters for which such person may be liable under or
consistent with the second sentences of Section 4.4(a) above or Sections 5.4 or 6.6 below. To the
extent permitted by law, the Company shall pay any such indemnifiable expenses as they are
incurred. The indemnification authorized by this Section is not exclusive of and shall be in addition
to any other rights granted to those seeking indemnification under this Agreement, under any other
agreement, under a vote of Members, or otherwise. This indemnification provision shall continue to
apply to a person who has ceased to be a Manager, Member, officer, Seconded Employee, or other

employee or agent of the Company and shall inure to the benefit of his or her heirs, executors and administrators. Any such indemnification under this provision shall be only from the assets of the Company. Indemnification obligations under this provision shall survive any termination of this Agreement.

## SECTION 5
### Rights of Members; Voting; Meetings

SECTION 5.1 Limitation of Liability.

The Members shall have no liability to third parties for the debts of the Company in accordance with the Act. A Member shall not be personally liable for any losses of the Company beyond the Member's capital contributions under Section 2.1 above, except as provided in the Act.

SECTION 5.2 Actions of Members.

Except as otherwise expressly authorized by all of the Members in writing, no Member, acting alone, shall exercise the authority to act for, undertake or assume any obligations or responsibility on behalf of the Company or the other Member(s) of the Company.

SECTION 5.3 Member Authorized Representative.

Furukawa shall appoint one (1) individual and Delphi shall appoint one (1) individual (such individuals are collectively referred to as "Member Authorized Representatives") to represent such Member's Membership Interest at Member meetings, through execution of unanimous consent resolutions, and otherwise in respect of actions taken or to be taken by such Member in respect of its Membership Interest in the Company. Member Authorized Representatives shall serve until such time as the Member appointing them selects a successor Member Authorized Representative. Any Member Authorized Representative may resign at any time by giving adequate prior written notice to the Members including the Member which appointed such Member Authorized Representative and copied to the other Member so that a successor Member Authorized Representative may be appointed by such Member. Neither Member shall designate a person to be a Member Authorized Representative who is not a manager, director, officer or employee of such Member, or of an Affiliate of such Member, without the consent of the other Member. The Board of Managers and the Members shall be entitled to rely on the actions of any Member's Member Authorized Representative as the actions of such Member and shall be fully protected in such reliance. A Member or its Member Authorized Representative may designate by proxy (in writing) one or more other persons who are authorized to act on behalf of the Member with respect to such matter(s) identified in the proxy.

SECTION 5.4 Conflict of Interest; Limitation of Liability; Indemnification.

Each Member (including any Manager nominated or appointed by a Member) shall be entitled to vote consistent with the Member's own interests when the Member's own interest is not, or may not be, consistent with the interest of the Company or the Members as a whole. Subject to the

foregoing, each Member shall take into account the best interests of the Company when exercising its membership rights under this Agreement. Nothing in this Agreement shall prevent the Members or any of their Affiliates from competing with the other Member or any of their Affiliates on business which is not Company Business. Notwithstanding the foregoing, so long as a Member remains a Member in the Company, such Member shall not enter into or engage in a business directly or indirectly competitive with the Company's Business, and provided, however, no Member (including any Manager nominated or appointed by a Member) shall be liable for monetary damages or otherwise to the Company or any Member in relation to any action or failure to act in its capacity as a Member of the Company except for (i) actions constituting fraud or willful misconduct, or gross negligence, (ii) actions taken by a Member in violation of this Section or other Sections of this Agreement, (iii) the receipt of a financial benefit to which the Member / Manager is not entitled, or (iv) a knowing violation of law. The provisions of this Agreement, to the extent that they modify the duties and liabilities of Members, or any Affiliates thereof, otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Persons. Members shall be entitled to indemnification in accordance with Section 4.8 above.

SECTION 5.5 Voting.

All Members shall be entitled to vote on any matter submitted to a vote of the Members. Unless a greater vote is required by the Act, the Certificate of Formation, or this Agreement (including for example, Section 2.1(e), Section 2.2, Section 4.1(a), and/or Section 5.7), the affirmative vote or consent of a majority of the Percentage Interests of all the Members entitled to vote or consent on such matter shall be required.

SECTION 5.6 Meetings; Actions by Written Consent.

(a)    The Members shall meet in Warren, Ohio or such other place as the Members shall determine, at least annually; *provided, however,* that a special meeting may be called by a Member upon thirty (30) days written notice which notice may be waived by the other Member. Special meeting notices shall state the purposes of the proposed meeting. If a Member Authorized Representative is unable to attend a Member meeting, the Member appointing such Member Authorized Representative shall have the right, at its option, to appoint an alternate Member Authorized Representative under Section 5.3 who will replace, for all purposes, the absent Member Authorized Representative at such meeting. A quorum for the transaction of business at any properly called Member meeting shall be Authorized Representatives representing Members owning at least 81% of the outstanding Membership Interests.

(b)    Notice of Meetings. Written notice of the time, place, and purposes of each regular and special meeting of the Members shall be given by the President or any other officer to each Member and to the designated Member Authorized Representative (in accordance with this Agreement) not less than thirty (30) days before the meeting, which notice may be waived by the Members.

(c)    Written Consent in Lieu of Meeting. Any action which may be taken at any meeting of Members may be taken without a meeting, without prior notice, and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by all of the Members.

(d)    Participation in a Meeting by Conference Telephone. A Member Authorized Representative may participate in a meeting by means of conference telephone or similar communications equipment by means of which all person participating in the meeting can hear and address each other. Participation in a meeting pursuant to this Section shall constitute presence in person at such meeting.

(e)    Compensation of Member Authorized Representatives. Member Authorized Representatives shall receive no compensation from the Company for their services as Authorized Representatives but may receive reimbursement of expenses according to policies established by the Members. Nothing in this provision shall preclude a Member Authorized Representative from serving the Company in some other capacity and receiving compensation for such other service.

SECTION 5.7 Approval of Certain Matters.

Notwithstanding anything to the contrary in this Agreement, neither the Board of Managers nor the Company shall have the authority, right, power or privilege to do or undertake any of the following matters without the prior unanimous written approval of the Members:

(a)    Any additional capital contributions, loans or guaranties by a Member or other financing (see, e.g., Sections 1.4(a), 2.1(e), (f) and (g) and 2.2);

(b)    Withdrawal of a Member;

(c)    Admission of any Member;

(d)    Amending or waiving the terms of the Certificate of Formation or this Agreement;

(e)    Amendment or termination of any Related Party Agreement (see Section 10 below) other than for fraud, criminal prosecution or gross misconduct;

(f)    Merger, consolidation, or other similar transaction;

(g)    Sale or disposition of all or any substantial part of the assets of Company, including without limitation any mortgage, encumbrance, lease or other transfer of any kind;

(h)    Termination, voluntary dissolution or filing for bankruptcy petition of the Company or entering an arrangement with creditors;

(i)    Continuation of the existence of the Company upon involuntary dissolution;

(j)    Approval and adoption of any Business Plan or amendment thereto after the initial Business Plan (other than any Business Plan approved by the Board of Managers in accordance with Section 4.7 above);

(k)    Any expansion or change in the Company's Business, as defined in Section 1.4 above, and/or any related operations of the Company;

(l)    Any transaction (including amendments) between the Company, on the one hand, and any Member (Furukawa or Delphi), on the other hand, or their respective Affiliates – unless otherwise approved by the Board of Managers in accordance with Section 4.3;

(m)    The creation of debt or debt obligation of Company or the creation of any mortgage, lien, pledge or other encumbrance on Company's assets, other than trade accounts payable – including without limitation any indebtedness that could be converted into equity interests (Membership Interests) in the Company;

(n)    Other than as specified in an approved Business Plan, any capital expenditures or leases which individually exceed $150,000;

(o)    Any change of any significance in the Company's accounting practices and procedures (including internal accounting standards);

(p)    Entering into any contract other than contracts in the ordinary course of the Company's Business, and/or contracts reflected in a Business Plan approved by the Members, and/or contracts reflected in a Business Plan approved under Section 4.7, and not otherwise requiring the approval of the Members under this Section 5.7;

(q)    Any distributions by the Company to Members or any Member other than distributions under Section 3.3(c) or upon dissolution of the Company;

(r)    Any change to the number and composition of the Board of Managers;

(s)    Any change in the Company's name, location or the adoption of an assumed name under which to conduct the Company's Business;

(t)    Agreements for the sale of assembled wire harnesses for the MC & F programs (presently scheduled to launch in late 2006 - 2007) directly to Toyota, and similar customer agreements for the Company's Business under and subject to Section 1.4(a) above;

(u)    Settlement of any litigation with third parties where the settlement amount exceeds $100,000 US Dollars; and

(v)    Any investment or loan to a third party outside of the approved Business Plan.

SECTION 5.8 Action by Members in Place of Board of Managers.

Any action required or permitted to be taken by the Board of Managers under this Agreement may instead be taken by the unanimous consent, approval, or action of the Members, and, if such action is taken by the Members, no further action or approval shall be required by the Board of Managers.

## SECTION 6
## Officers

SECTION 6.1 General.

    (a)    Officers. The officers of the Company shall include a president ("President") and a vice president (the "Vice President") each of whom shall have such authority to act on behalf of the Company as contemplated by this Agreement or designated from time to time by the Board of Managers. The President and Vice President shall be employees of Delphi or Furukawa, and non-compensated positions in the Company. Delphi shall be responsible for nominating the Company's President. Furukawa shall be responsible for nominating the Company's Vice President. The Members shall cause the Board of Managers to elect the foregoing officers of the Company based upon the Members' nomination of the officers in accordance with this Section 6.1(a) and (b).

    (b)    Other Officers and Agents. The Board of Managers with unanimous consent may appoint such other officers and agents as it shall deem necessary or appropriate. Such officers shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board of Managers, consistent with this Agreement.

        (1)    Delphi shall be responsible for nominating the Company's Operations Consultant and Finance Consultant, neither of whom will be an officer of the Company, and shall be compensated in accordance with the terms of the Delphi Service Agreement between the Company and Delphi (see Section 10 below).

        (2)    Furukawa shall be responsible for nominating the Company's Manufacturing and Engineering Consultant and the Quality Control Consultant, neither of whom will be an officer of the Company, and shall be compensated in accordance with the terms of the Furukawa Service Agreement between the Company and Furukawa (see Section 10 below).

    (c)    Appointment and Term of Office, Resignation, Removal and Vacancies. Each officer shall serve until his or her successor has been duly appointed and qualified or until his or her earlier death, resignation or removal. Any officer may resign at any time – in the case of the President and Vice President, by giving adequate prior

21

written notice to the Members including the Member which nominated such officer so that a successor may be nominated by such Member. With written notice to the other Member, any officer may be removed at any time with or without cause, with vacancies being filled for the unexpired portion of the term, as follows: Delphi shall be entitled to remove any person holding the office of President and to fill any vacancy in that position, and Furukawa shall be entitled to remove any person holding the office of Vice President and to fill any vacancy in that position.

SECTION 6.2 Powers and Duties of the President.

The President shall have responsibility, consistent in all respects with the terms of this Agreement, the Certificate of Formation, the Act and the Business Plan, and subject to the direction and control of the Board of Managers, for executing and overseeing the Company's long term strategic focus in regard to the Company's Business and the Company's Business Plan. The President shall have supervisory authority over the Operations Consultant and the President's authority shall supersede the authority of the Vice President on all Company matters. The Members agree that the President shall be an employee of Delphi.

SECTION 6.3 Powers and Duties of the Vice President.

The Vice President of the Company shall have responsibility for supporting the Manufacturing and Engineering Consultant and the Quality Control Consultant (each as defined in the Furukawa Assistance Agreement) consistent in all respects with the terms of this Agreement, the Certificate of Formation, the Act, and the Business Plan, and subject to the direction and control of the Board of Managers and the President. The Members agree that the Vice President shall be an employee of Furukawa.

SECTION 6.4 Limitations on Powers.

Notwithstanding any other provision contained in this Agreement to the contrary, no act shall be taken, sum expended, decision made, obligation incurred, or power exercised by the President, the Vice President, or any other officer on behalf of the Company except by the consent of the Board of Managers with respect to: (a) any of the matters reserved for the approval of the Members by this Agreement, including without limitation Section 5.7; (b) any expansion or change in the Company's Business; (c) the commission of any act which would impede the Company's ability to carry on the Company's Business; or (d) any act that would contravene any provision of the Certificate of Formation, this Agreement, any Related Agreement, the then-current Business Plan, or the Act.

SECTION 6.5 Standard of Care; Liability.

Each officer, in his or her capacity as an officer, shall discharge his or her management duties in good faith, with the care an ordinary prudent person in a like position would exercise under similar circumstances, and in a manner he or she reasonably believes to be in the best interests of the Company as required by the Act. Notwithstanding the foregoing, no officer shall be liable for monetary damages to the Company for any breach of any such management duties except for (i) actions constituting fraud, willful misconduct, or gross negligence, (ii) actions taken by an officer in

22

violation of other Sections of this Agreement, (iii) the receipt of a financial benefit to which the officer is not entitled, or (iv) a knowing violation of the law. Officers shall be entitled to indemnification under Section 4.8 above.

SECTION 6.6 Devotion of Time.

Each officer of the Company shall not be required to devote substantially all his or her working time to the Company.

SECTION 6.7 Execution of Instruments by Officers.

All agreements, deeds, contracts, proxies, covenants, bonds, checks, drafts, bills of exchange, notes, acceptances and endorsements, and all evidences of indebtedness and other documents, instruments or writings of any nature whatsoever, shall be signed by either the President or his designee. All transactions outside the approved Business Plan shall be approved by the Members.

## SECTION 7
### Books of Account; Records; and Reports

SECTION 7.1 Accounting.

Proper and complete records and books of account shall be kept by the Finance Consultant, in which shall be entered fully and accurately all transactions and other matters relative to the Company's Business as are usually entered into records and books of account maintained by persons engaged in businesses of like character. The Company books and records shall be maintained on the basis reasonably recommended by the Company's independent accountants and shall be prepared in accordance with generally accepted accounting principles consistently applied. The Company's books and records (including, but not limited to, books and records of accounts, checks, bills, invoices, vouchers, statements, cash receipts, correspondence and other records in connection with the management of the Company) shall at all times be maintained at the principal office of the Company and shall be open to the inspection and examination of the Members, their Member Authorized Representatives, or their proxies, upon reasonable notice during regular business hours.

SECTION 7.2 Reports.

    (a)    As soon as practicable, but not later than sixty (60) days after the end of the fiscal year, the Company shall send to any Member, a balance sheet for the Company as of the end of such fiscal year then ended, together with a statement of income and other reports pertaining to the Company that any Member may reasonably request.

    (b)    All such annual statements shall be audited by the Deloitte & Touche LLP accounting firm. The accounting firm will also prepare the Company's tax returns.

(c)     As soon as practical, but not later than thirty (30) days after the end of each fiscal quarter, the Company shall send to each Member a balance sheet for the Company as of the end of such fiscal quarter then ended, together with statements of earnings and cash flows for the Company, in each case for the period from the end of the last fiscal year to the end of such fiscal quarter.

(d)     As soon as practicable, but not later than thirty (30) days after the end of each month, the Company shall send to each Member a report of the results from operations for the Company.

## SECTION 7.3 Additional Reports.

The Company shall provide to each Member such additional reports as the Members may reasonably request.

## SECTION 7.4 Fiscal Year.

The fiscal year of the Company shall end on the last day of December in each year, unless the Company shall be required to operate on a different fiscal year to conform with the requirements of Code Section 706 and the Regulations thereunder.

## SECTION 7.5 Banking Arrangements.

The banking business of the Company shall be transacted with such banks, trust companies, or other organizations or bodies corporate as may from time to time be designated by or under the authority of the Board of Managers. The Finance Consultant shall have the authority to authorize facsimile signatures on checks, and authorize signing officers to sign, endorse, or deposit checks, bills of exchange, loans and similar documents and to attend to other matters related to the Company's dealings with the bankers. Company funds shall not be commingled with those of any other person.


## SECTION 8
### Assignability of Interests

## SECTION 8.1 Restrictions on Transfers.

(a)     Except in accordance with the other provisions of this Section 8, no Member shall, directly or indirectly, sell, assign, transfer, exchange, mortgage, pledge, grant, hypothecate, bequeath, or otherwise dispose of ("Transfer") any Membership Interest in the Company.

(b)     In addition to any other restrictions hereinafter contained in this Section 8, no Member shall Transfer its Membership Interest in the Company (1) without the prior written consent of all the Members if the effect of the Transfer would be to terminate the Company within the meaning of Code Section 708(b), and (2) without an opinion of counsel in form and substance satisfactory to counsel for the Company that

registration of the Membership Interest in the Company being Transferred is not required under the Federal Securities Act of 1933 (the "33 Act") and applicable state law and that such Transfer will not result in a termination of the Company within the meaning of Code Section 708(b). In no event shall any Member Transfer its interest in the Company if such Transfer would violate any applicable state or Federal securities law.

(c)     Any attempted Transfer of a Membership Interest in the Company in violation of this Section 8 shall be null and void and shall not be effective to Transfer any interest in or title to any such Membership Interest. Neither the Company nor any party to this Agreement shall recognize the Person to whom any such Transfer in violation of this Agreement was attempted or purported to be made as a Member or owner of any such Membership Interest or of any rights or interests therein.

SECTION 8.2 Permitted Assignment or Other Transfer.

(a)     In the event the Members consent to an assignment or other Transfer of a Member's Membership Interest, and unless otherwise agreed by the other Members in writing or otherwise provided under the terms of this Section 8, (1) such Transfer alone shall not of itself substitute the assignee as a Member or entitle the assignee to appoint Managers to the Board of Managers or to otherwise participate with respect to the management of the Company and voting of Membership Interests; (2) such Transfer shall only entitle the assignee to receive, to the extent assigned, the distributions to which the assigning Member would otherwise be entitled; and (3) the Transferring Member shall remain a Member and be liable for payment of any remaining installments of Capital Contributions due with respect to the interest assigned.

(b)     No Transfer of a Membership Interest shall be effective with respect to the Company until written notice is given to the Company and the other Members.

(c)     Notwithstanding any provision of this Section 8 to the contrary, the Members may assign its Membership Interest to an Affiliate, and any other Members shall consent to the admission of such Affiliate as a Member, subject to the requirements set forth in Sections 8.1(b) and 8.3 and such reassignment has no detrimental effect to the conduct of the Company.

SECTION 8.3 Admission of Assignees of Membership Interests as Members.

(a)     An assignee of a Membership Interest shall not be admitted as a substitute or additional Member unless the Members unanimously consent in writing, or unless otherwise provided under this Section 8.

(b)     In connection with and as a condition to admission of an assignee of a Membership Interest as a substitute or additional Member, the remaining Members may require such assignee to comply with the following requirements, in addition to the requirements of Section 8.1(b): (i) the assignment instrument being in form and

substance satisfactory to the Members and the Company's counsel; (ii) the assignor and assignee named in the assignment instrument having executed and acknowledged such other instrument or instruments as the Members may deem necessary or desirable to effectuate such admission; (iii) the assignee having accepted and adopted all of the terms and provisions of this Agreement, as this Agreement may have been amended, as if the assignee were a party who joined in the execution of this Agreement; and (iv) such assignee having paid or acknowledged an obligation to pay all reasonable expenses (including attorneys' fees) connected with such admission.

(c)     If admitted, the substitute or additional Member has, to the extent assigned, all of the rights and powers, and is subject to all the restrictions and liabilities, of a Member.

## SECTION 8.4  Right of First Refusal.

(a)     In the event that a Member receives a bona fide offer, which it wishes to accept, from an arm's length third party (the "Third Party Offer") to purchase (directly or indirectly) all or any part of its Membership Interest in the Company, then such Member shall give a notice in writing ("Notice of Proposed Sale") to the other Member , indicating that it is willing to sell its Membership Interest subject to the Third Party Offer and shall specify the price ("Sale Price") and terms under which it is prepared to sell such Membership Interest in the Company (which price and terms shall be the same as those contained in the Third Party Offer). The other Member shall have ninety (90) days from receipt of the Notice of Proposed Sale to consider the offer. Such Member may then exercise, but is not required to exercise, its right of first refusal to purchase the Membership Interest in the Company on the terms and conditions set forth in the Notice of Proposed Sale. If the Member elects not to exercise its right of first refusal, the sale by the offering Member pursuant to the Third Party Offer may proceed, provided that the conditions set forth in Sections 8.1(b) and 8.3(b) and (c) are also satisfied.

(b)     Dissolution. The other Member, within ninety (90) days from receipt from the offering Member of a Notice of Proposed Sale, shall have and may exercise the right to trigger the dissolution and sale of the Company under Section 11 below.

## SECTION 8.5  Determination of Purchase Price; Related Matters; Closing.

(a)     Except as otherwise provided in Section 8.4(a) and 8.5(b), the purchase price ("Purchase Price") of a Membership Interest shall be the Book Value of the Membership Interest in the Company being purchased and sold.

(b)     Book Value of a Membership Interest may be fixed at any time by agreement of the Members involved in the transaction (as reflected in Section 8.5(b)(1) below) or in a written certificate of agreed Book Value of a Membership Interest signed by each of them and filed with the Company. The Members may, at any time, execute a new certificate of Book Value; in no event shall any but the last certificate of agreed Book Value be effective for any purposes herein.

(1)    The Members hereby fix by agreement the Book Value of their respective
Membership Interests during the period through the production life of wire
harnesses for the Toyota MC and F platforms (presently scheduled for late
2006-2007) (see, Section 1.4(a) above), as follows: Book Value of a Member's
Membership Interest shall be equal to the product of (x) the net book value of
the Company as reflected in the then-current financial statements of the
Company prepared in accordance with Section 7.1 above, times (y) the
Member's Percentage Interest in the Company (expressed as a decimal).

(c)    The purchase price under this Section 8.5 shall be paid in cash or immediately available
funds at closing.

(d)    The closing of the purchase of a Membership Interests under Sections 8.4 and 8.5 shall
be held on a business day, and at a place and time, reasonably determined by the
Members, but in no event shall it be later than the later of forty-five (45) days after the
determination of the Purchase Price (if the sale is to occur under Section 8.5) or written
notice by a Member choosing to exercise its right of first refusal (if the sale is to occur
under Section 8.4), or five (5) days after securing any necessary government approvals
or other consents under subparagraph (e) below, subject to obtaining any necessary
government approvals. At the closing, the purchaser (which may be a Member) shall
pay the Purchase Price (if the sale is to occur under Section 8.5) or the Sale Price (if the
sale is to occur under Section 8.4), and the seller shall deliver to the purchaser an
assignment / bill of sale for the Membership Interest being transferred, together with
any related documents, in form and content satisfactory to counsel for the purchaser, to
accomplish the immediate transfer of ownership of the Membership Interest in question
to the purchaser, free and clear of all liens and encumbrances whatsoever other than the
restrictions under this Agreement and the Articles of Organization, as applicable. The
purchaser shall acknowledge and confirm that the Membership Interest in the Company
is being acquired for investment and not with a view to any resale or distribution
thereof, and the purchaser (if not already a Member) shall confirm in writing the
purchaser's agreement to be subject to and bound by all the provisions of this
Agreement as if such the purchaser were originally a party to this Agreement.

(e)    After the Purchase Price has been determined in accordance with this Section 8.5, or
after the Sale Price has been determined in accordance with Section 8.4, the parties
shall use their best efforts to secure all necessary governmental approvals or any
other consents, and to satisfy any remaining conditions required in connection with
the purchase.

(f)    Upon transfer of a Member's Membership Interest as set forth in this Agreement:
(1) the selling Member and its Affiliates shall repay all loans, loan capital,
borrowings, and indebtedness in the nature of borrowings outstanding to the
Company from the selling Member or its Affiliates (together with any accrued
interest); (2) the Company shall repay all loans, loan capital, borrowings and
indebtedness in the nature of borrowings outstanding from the Company to the

selling Member or its Affiliates (together with any accrued interest); (3) the purchasing Member shall use all reasonable efforts to secure the release of any guaranties or indemnities given by the selling Member or its Affiliates to or with respect to the Company; and (4) the selling Member shall, at the request of the Company, cause any Manager appointed by the selling Member and any officer or employee associated with the selling Member or its Affiliates to submit his or her resignation as a Manager, officer, or employee of the Company.

SECTION 8.6 Related Matters.

In the event of the transfer of a Membership Interest in the Company by sale or exchange, the Company, if the person acquiring such interest so requests, shall elect pursuant to Code Section 754, to adjust the basis of the Company property. Each Member hereby agrees to provide the Company with all information necessary to give effect to such election. The transferee shall reimburse the Company for any reasonable costs incurred as a result of such election, as determined by the Board of Managers.

## SECTION 9
### Deadlock

SECTION 9.1 Avoidance and Resolution of Deadlock.

(a)    The Members shall use their good faith efforts to avoid deadlock with respect to matters which would materially adversely affect the ability of the Company to carry on the Company's Business (as defined and limited under Section 1.4 of this Agreement) pursuant to the initial Business Plan or any subsequent approved Business Plan for the Company, and where any such matters require decisions which (pursuant to this Agreement) require the unanimous vote of the Members or, in the case of decisions to be made by the Board of Managers, require the consent of at least one Manager appointed by Furukawa and at least one Manager appointed by Delphi.

(b)    Upon the occurrence of a situation where the Members and/or Board of Managers (as applicable) are unable to agree regarding a matter described in Section 9.1(a) above, the matter shall be referred to the Furukawa Board of Directors (or their designees, such as Furukawa-Japan Board of Directors or its designees) and to the Delphi Strategy Board (or their designees), who shall negotiate in good faith to resolve such matter for thirty (30) days, or such longer period of time to which such persons may mutually agree.

(c)    A "Deadlock" shall be deemed to have occurred in any case where a deadlock has occurred with respect to a matter described in Section 9.1(a) and the Members have been unable under Section 9.1(b) to resolve the deadlock. A "Deadlock" shall not be deemed to have occurred in the event that the parties fail to agree on matters outside the scope of Section 9.1(a) – such as (i) on a proposal by one Member or the other to

expand the Company's Business under Section 1.4 above, or (ii) on a proposal by one Member or the other with respect to financing for the business described in Section 1.4(a) relating and with respect to which agreement is needed within 120 days from the date of this Agreement for the business described in Section 1.4(a) to be included in the Company's Business.

SECTION 9.2 Additional Rights and Obligations in the Event of Deadlock.

(a)     In the event of a Deadlock under Section 9.1(c) above, either Member shall have the right, exercisable by written notice to the other Member, to cause the Company to be dissolved in accordance with Section 11.1 below – subject to such Member having first complied with Section 9.2(b) if applicable.

(b)     In the event of a Deadlock as defined under Section 9.1(c) above occurring after satisfaction of the conditions precedent under Section 2.1(a)(1) above, and prior to a Member exercising its right under Section 9.2(a) to cause the Company to be dissolved by reason of such Deadlock, such Member must first offer to sell its Membership Interest in the Company to the other Member, at the Purchase Price determined in accordance with Section 8.5 above and otherwise in accordance with the timing, procedures and payment schedule set forth in Section 8.5. Such offer shall be made by written notice to the other Member, and the time period / schedule specified in Section 8.5 will begin to run from the date of such notice. If the Member receiving such notice does not accept in writing the offer to sell within thirty (30) days of receipt of such notice, either Member may thereafter cause the Company to be dissolved in accordance with Section 11.1 below. A Member electing to purchase the Membership Interest of the other Member pursuant to this Section 9.2(b) shall have the right to have the Membership Interest purchased (on the terms and conditions set forth herein) by a third party designated by such Member in writing at or before the Closing under Section 8.5.

## SECTION 10
### Support by the Members

SECTION 10.1 Related Agreements Among Delphi, Furukawa and the Company, and Related Matters Including Intellectual Property.

(a)     Delphi (or its Affiliates), Furukawa (or its Affiliates), and/or the Company, in connection with the implementation of the Initial Business Plan of the Company under Section 4.7 above, and any subsequent Business Plan / amendments approved under Section 4.7 relating to wire harnesses for the Toyota MC and F platforms, shall enter into agreements for the assembly of wiring harnesses and other assistance and support to the Company as set forth in this Section 10 (collectively referred to as the "Related Agreements").

The nature and scope of matters covered by the Related Agreements, and the terms and conditions thereof, will be consistent with the Initial Business Plan and any subsequent and/or amended Business Plan approved under Section 4.7 (or, if applicable, Section 5.7) and will be reviewed annually in connection with the business planning process under Section 4.7. Additional Related Agreements (or amendments to then-existing Related Agreements) may be entered into by mutual written Agreement of the Members in connection with any agreement for financing contemplated by the Members to otherwise amend **Exhibit A** and expand the Company's Business under Sections 1.4 and 5.7 above.

(b)     The following Related Agreements shall be entered into initially, consistent with the Initial Business Plan, Section 10.1(d) below:

(1)     Furukawa Electric North America Assistance Agreement. The Company and Furukawa Electric North America, Inc. ("**Furukawa CA**") shall enter into an agreement ("Furukawa Service Agreement"), in substantially the form attached hereto as **Exhibit F-1**, pursuant to which Furukawa CA will provide to the Company one full-time employee to serve as Manufacturing & Engineering Consultant to the Company, subject at all times to the direction and control of the Operations Consultant. Furukawa CA will provide one full-time employee to serve as Quality Control Consultant, subject at all times to the direction and control of the Manufacturing and Engineering Consultant to the Company. Furukawa CA will provide such other assistance (including for example, commercial support and information technology) as the Members and the Company may agree, consistent with the charges reflected in the Initial Business Plan for such assistance and in any subsequent approved Business Plan / amendment.

(2)     Delphi Assistance Agreement. The Company and Delphi International Services Inc. shall enter into an agreement ("Delphi Service Agreement"), in substantially the form attached hereto as **Exhibit F-2**, pursuant to which Delphi will provide to the Company, consistent with the charges set forth in the Initial Business Plan and any further approved Business Plan / amendment, one full-time employee to serve as Operations Consultant to the Company and one full-time employee to serve as Finance Consultant of the Company. The Finance Consultant shall report to the Operations Consultant.

(3)     Delphi Administrative and Support Services Agreement. The Company and Delphi shall enter into an agreement in substantially the form attached hereto as **Exhibit F-3**, pursuant to which Delphi Packard will provide such other assistance, as the Members and the Company may mutually agree.

(4)     Dedicated Manufacturing Agreement. The Company and Delphi shall enter into an agreement, in substantially the form attached hereto as **Exhibit F-4**, pursuant to which Delphi will be the sole supplier of assembled wiring harnesses, to the extent that the performances defined in Dedicated Manufacturing Agreement are fully met to the requirements of the

30

Company's customer, to the Company for the Company Business, at prices consistent with the pricing set forth in the Initial Business Plan and any subsequent approved Business Plans / amendments.

(5)     Intellectual Property License, Restricted Use, and Technical Assistance Agreement. The Company, The Furukawa Electric Co., Ltd., Delphi Technologies, Inc., and Delphi shall enter into an agreement, in substantially the form attached hereto as **Exhibit F-5**, pursuant to which The Furukawa Electric Co., Ltd. and Delphi will provide technical assistance to the Company for the Company Business and the associated compensation. The Furukawa Electric Co., Ltd. and Delphi will each license certain intellectual property (as defined in such agreement) to the Company.

(c)     Other Related Agreements. The Company, Delphi and Furukawa may enter into other agreements pursuant to which Furukawa and/or Delphi, as applicable, may be the supplier for certain agreed upon raw materials, components, services and/or assistance required for any additional Company's Business agreed upon pursuant to Section 1.4(a) above, at prices and on related terms and conditions to be set forth in such agreements and consistent with the then-current Business Plan approved by the Members in relation to such area(s) of the Company's Business.

SECTION 10.2      Additional Services.

Furukawa and Delphi shall each provide certain initial administrative and management support to the Company during its initial existence up through the capital contribution scheduled to be made in the first quarter of 2005, at no charge to the Company. To the extent the Company requests assistance from either Member, the Member shall agree to provide such services to the Company, pursuant to terms to be mutually agreed upon between Furukawa, Delphi, and the Company. This Section shall not apply to: (1) the leasing of employees by Furukawa and/or its Affiliate to Delphi and/or the Company; rather, the terms and conditions of any such employee leasing shall be separately and mutually agreed upon by Furukawa, its Affiliate, Delphi and/or the Company, as applicable; and (2) the services to be provided under any of the Related Agreements identified in Section 10.1 above.

SECTION 10.3      Other Services.

The Members and their Affiliates may provide, depending on the needs of the Company, such additional administrative, engineering, technical, or other services to the Company as the Company and the Members may from time to time agree upon, on terms to be mutually agreed upon by the Members.

SECTION 10.4      Ownership of Intellectual Property.

The Members agree that all Intellectual Property (as defined in the Intellectual Property License, Restricted Use, and Technical Assistance Agreement) (i) jointly acquired, developed or conceived by the Members (including their Affiliates) in furtherance of the Company's Business after

January 1, 2004, and prior to the formation of the Company, including, but not limited to, all of the intellectual property jointly acquired, developed, or conceived in connection with the so-called "engineering alliance" (Obeya room) activities in Japan and elsewhere; and (ii) the Intellectual Property that both Delphi and Furukawa-Japan jointly acquire, develop or conceive after formation of the Company in furtherance of the Company's Business shall be owned jointly by Delphi and Furukawa-Japan.

### SECTION 11
### Termination of the Company

SECTION 11.1        Termination.

(a)     The Company shall be dissolved upon the earliest to occur of:

　　(1)     the expiration of the term specified in Section 1.6;

　　(2)     the occurrence of an event which causes the termination of the Company pursuant to the Limited Liability Company Act ("Statutory Termination Event");

　　(3)     the giving of written consent of all Members;

　　(4)     the entering of any decree by a court which results in the inability of Company to meet its obligations (unless such decree is being duly appealed);

　　(5)     unless the Members unanimously agree to the contrary, the failure by the Company and/or the Members to satisfy any of the conditions precedent required under Section 2.1(a) to the making of the capital contributions called for under Section 2.1(b) and/or 2.1(c);

　　(6)     in connection with Third Party Offers, exercise by a Member of its rights under Section 8.4(b); or

　　(7)     under Section 9.2(b) above, in the event of a Deadlock.

　　(8)     Any three consecutive years of negative net income, commencing after the fiscal year ending December 31, 2006, unless the Members mutually agree in writing to continue the Company.

Upon the occurrence of any of the foregoing items, (a) the Members shall proceed with the winding up of the Company, (b) its assets shall be applied and distributed as herein provided, and (c) except only as necessary to carry out such winding up of the Company and the application and distribution of its assets, and subject to Section 11.1(e) below, this Operating Agreement shall be terminated.

(b)     A Member who attempts to cause, or in fact so causes, the dissolution of the Company in contravention of this Agreement shall be liable to the Company and to the other Member(s) for any and all damages, losses, and expenses (including, without limitation, any adverse tax consequences resulting from such attempt or dissolution) suffered or incurred by the Company and the other Member(s) as a result of such attempt or dissolution. Neither Member shall have any liability to the other in the event of termination / dissolution by reason of a failure of the Company or either Member to satisfy a condition precedent to the making of the capital contributions called for under Sections 2.1(b) and/or 2.1(c).

(c)     In the event of a failure by a Member to make a capital contribution required under Section 2.1 of this Agreement, the Non-Defaulting Member shall have the right, in addition to those set forth in Section 2.3 above or any other rights under applicable law, to cause the Company to be dissolved in accordance with this Section 11.1, or to purchase (or have a third party designated by the Non-Defaulting Member purchase) the Membership Interest of the Defaulting Member at the price and in accordance with the related terms and conditions set forth in Section 8.5 above. This right may be exercised at the time of the failure, or thereafter upon at least ten days notice to the Company and the other Members so long as there is any loan representing a Capital Advance outstanding from Non-Defaulting Member under Section 2.3 of this Agreement.

(d)     In the event of a material breach of this Agreement by a Member, the non-breaching Member (in addition to any other rights which such Member may have under this Agreement or applicable law) shall have the right to initiate the dissolution of the Company upon at least ninety (90) days prior written notice to the breaching Member, unless the breaching Member promptly cures such material breach following receipt of such notice.

'(e)     The following Sections shall survive the termination of this Agreement and/or the dissolution of the Company: 3.4, 3.5, 4.4, 4.8, 5.1, 5.2, 5.4, 6.5, 10.1(b), all of Section 11, all of Section 12, all of Section 13, and all of Section 14.

SECTION 11.2     Payment of Debts; Distributions.

Upon the winding up of the Company, the Members shall proceed to the orderly liquidation of the assets and termination of the Company, and the proceeds of such sale or disposition, together with other available proceeds, shall be applied and distributed in the following order of priority: (i) to the expenses of liquidation; (ii) to the payment or provision for payments of all debts and liabilities of the Company; (iii) to the establishment of any reserves which the Members deem reasonable or necessary to provide for any contingent or unforeseen liabilities or obligations of the Company; and (iv) to the Members in accordance with Section 2.5(b) above.

SECTION 11.3     Reserve.

After the expiration of such period of time as the Members may deem advisable, the balance of any reserve, established pursuant to the authority in Section 11.2, remaining after payment of such contingencies shall be distributed in the manner set forth in Section 11.2. Any such reserve may, in the discretion of the Members, be paid over to a U. S. national banking or other financial institution with trust authority as escrow agent, to be held by it for the discharge of the liabilities of the Company. Any such amounts, when and if subsequently distributable to the Members, shall be distributed in accordance with Section 11.2.

SECTION 11.4     Final Accounting.

Each of the Members shall be furnished with a statement, which shall set forth the assets and liabilities of the Company as of the date of the complete liquidation. Upon the compliance by the Members with the distribution plan set forth in Sections 11.2 and 11.3, the Company shall cease to exist, and the Members shall cause to be executed and filed a Certificate of Dissolution.

## SECTION 12
### Tax Matters

SECTION 12.1     Tax Matters Member.

Pursuant to Code Section 6231 (a)(7) or any subsequent similar provision, Delphi is hereby designated as the Tax Matters Member for the Company ("Tax Matters Member") and shall assume and be responsible for duties provided in the Code and this Agreement, in close consultation with the Company's independent accounting firm (see Section 7.2(b)). In the event that Delphi ceases to own, directly or indirectly, 50% or more of the outstanding Membership Interests in the Company the Tax Matter Member shall be Furukawa, unless otherwise unanimously agreed by the Members. In the event a third party Member is admitted, the Member with the largest Membership Interest in the Company will become the Tax Matter Member, unless the Members unanimously agree otherwise.

SECTION 12.2     Tax Information.

As soon as practicable, but not later than ninety (90) days after the end of each fiscal year, the Tax Matters Member, shall send to each Member a copy of the Company's annual Federal income tax return, a Form K-1 and such other tax information as shall be appropriate for the preparation by such Member of the Member's Federal and other state or local income or other tax returns. Both Members shall have an opportunity to review the Federal Income Tax Return at least 30 days prior to filing.

SECTION 12.3     Returns.

The Tax Matters Member shall cause to be prepared and filed, on or before the due date (or any extension thereof), Federal and applicable state or local tax or information returns required to be

34

filed by the Company. The Tax Matters Member, to the extent that Company funds are available, shall cause the Company to pay any taxes payable by the Company, provided that the Tax Matters Member shall not be required to cause the Company to pay any tax for so long as the Tax Matters Member of the Company is in good faith, and by appropriate administrative or legal proceedings contesting the validity, applicability or amount thereof, provided such contest does not materially endanger any right or interest of the Company.

SECTION 12.4      Elections.

To the extent that the Company may be or is required to make elections for Federal or applicable state or local income or other tax purposes, and to the extent that Members may be or are required to make such elections concerning the business of the Company, such elections shall be made by the Members in the manner best calculated to minimize the cash requirements of the Company and the Members.

SECTION 12.5      Consistency of Tax Treatment.

No Member shall treat a Company tax item on its Federal or applicable state or local income or other tax returns or permit an Affiliate to treat a Company tax item on such Affiliate's tax returns in a manner inconsistent with the treatment of such item on the Company's Federal, applicable state or local tax returns, unless required to do so by statute, regulation or other relevant authority.

SECTION 12.6      Tax Coordination.

(a)      The Tax Matters Member shall keep the other Members informed of all administrative and judicial proceedings for the adjustment at the Company level of all administrative and Company items.

(b)      The other Members shall promptly provide to the Tax Matters Member copies of all correspondence to or from, or summaries of any other communications with, the Internal Revenue Service or the United States Departments of Treasury or Justice, or any other state or local tax authorities relating to any Company tax matter or issue or any Company tax items.

(c)      No member other than the Tax Matters Member, in consultation with the Company's independent accounting firm, shall enter into settlement negotiations with the Internal Revenue Service or Justice or with any state or local authorities with respect to the Federal income tax treatment of Company items. No Member other than the Tax Matters Member shall file: (1) a request for an administrative adjustment of Company items under code Section 6227(a); (2) a petition for readjustment of Company items under Code Section 6226(b) or (3) a civil action for refund under Code Section 6228(b)(2) without first giving reasonable advance written notice of such intended action (including proposed treatment of the Company items and the proposed court, if applicable, to the Tax Matters Member.

SECTION 12.7       Tax Classification.

(a)       The Members intend the Company be treated as a Partnership for tax purposes.

(b)       The Company has not made and covenants that it will not at any time during its
existence make the election provided by Treasury Regulations § 301.7701-3(c) or
made any other election or taken any other action the effect of which would be to
cause the Company to be taxed as an association taxable as a corporation rather than
as a "partnership" for federal income tax purposes.

SECTION 12.8       Survival of Tax Obligations.

The provisions of this Section regarding tax matters shall survive the termination of this Agreement
and/or the termination or transfer of any Member's interest in the Company and shall remain
binding upon any terminating or transferring Member for a period of time necessary to resolve with
the Internal Revenue Service, the United States Department of Justice and/or any state or local tax
authority any and all matters regarding the Federal, state or local income or other matters relative to
the taxation of the Company and present or previous Members.

## SECTION 13
### Representations and Warranties

SECTION 13.1       Representations and Warranties.

(a)       By execution and delivery of this Agreement, each of Furukawa and Delphi
represents and warrants to the Company and each of the other parties that:

(1)       the party is a corporation (in the case of Furukawa) or limited liability
company (in the case of Delphi), duly organized, validly existing and in good
standing under the laws of its jurisdiction of incorporation or organization (as
applicable) and is qualified to do business in every jurisdiction in which it is
required to be so qualified;

(2)       the execution, delivery and performance of this Agreement and any Related
Agreement by such party and any Affiliates thereof does not: (i) violate or
conflict with its charter, by-laws or other organizational documents; (ii)
violate or conflict with, or constitute a breach of, or require consent or
approval under, any written or oral agreement as now exists between such
party and any other person, except as otherwise set forth in **Exhibit G** hereto;
or (iii) violate, conflict with or require consent or approval (other than any
consent or approval obtained by the date hereof) under any order, injunction,
decree or any Federal, state or local law, statute, ordinance, rule or regulation
applicable to such party, and this Agreement and any Related Agreements to
which such party is a party are the valid and binding obligations of such
party, fully enforceable against such party in accordance with their respective

36

terms and conditions, subject to applicable state or federal laws relating to bankruptcy or insolvency;

(3)     such party is capable of evaluating the merits and risks of an investment in the Company, has had access to and an opportunity to review all relevant materials relating to the Company and/or its (direct or indirect) investment in the Company, including without limitation the Company's Business, the qualifications of each Member, and the tax and financial implications of an investment in the Company, has made such investigation as it has deemed appropriate for such purpose, and is acquiring a Membership Interest (directly or indirectly) for investment and not with a view to the direct or indirect resale or distribution of all or any part thereof;

(4)     such party is able to bear the economic risk of an investment in the Company for the duration of this Agreement;

(5)     such party has no liability or obligations to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement; and

(6)     each party acknowledges that the acquired Membership Interests in the Company have not been registered under the '33 Act, as amended, or under the securities laws of any state in reliance upon applicable exemptions under said laws and may not be assigned or otherwise transferred without registration or an exemption therefrom.

## SECTION 14
### Miscellaneous

SECTION 14.1     Governing Law; Official Language.

This Agreement shall be governed by, and construed and enforced in accordance with, the laws of Delaware without regard to the conflicts of laws provisions thereof. The English language shall be the official language of this Agreement and such language shall prevail in the event of a conflict or uncertainty of meaning with the Japanese language.

SECTION 14.2     Notices.

(a)     Any notice, report, or other communication required or permitted to be given under this Agreement shall be made in writing and shall be delivered in person or mailed by registered or certified first class mail, postage prepaid, or sent by facsimile overnight delivery service or email (receipt confirmed), addressed to the party intended as the recipient to the address of such party set forth below:

If to Delphi:          Delphi Packard Electric Systems
408 Dana Street
Warren, Ohio 44486
Attention: Business Line Manager E/EDS North
America
Fax No.: 330-373-3524

with a copy to:     Delphi Automotive Systems LLC
5725 Delphi Drive
Troy, Michigan 48098
Attention: General Counsel
Fax No.: 248-813-2491

If to Furukawa:    Furukawa Electric North America APD, Inc.
47677 Galleon Drive
Plymouth, Michigan 48170
Attention: President
Fax No.: 734-446-2260

with a copy to:     The Furukawa Electric Co., Ltd.
6-1, Marunouchi 2-chome, Chiyoda-ku, Tokyo 100-
8322 Japan
Attention: General Manager / Administrative and
Planning Dept. / Automotive Product
Division
Fax No.: +81-3-3286-3984

If to the Company: Delphi Furukawa Wiring Systems LLC
408 Dana Street
Warren, Ohio 44486
Attention: President
Fax No.: 330-373-3524

and            the Members (in the manner noted above) other
than the Member giving notice hereunder.

(b)    Any such notice, report or other communication shall be deemed received, given, or
served, if mailed by first class mail, on the fifth (5th) day after the day of mailing,
and, if sent by facsimile, overnight delivery service or email, twenty-four (24) hours
after the time of dispatch, provided customary confirmation of delivery or receipt has
been received.

38

SECTION 14.3        Counterparts.

This Agreement may be executed in multiple counterparts, each of which shall be deemed an original instrument, and all of which shall constitute one Agreement. The Agreement may be executed and delivered by facsimile transmission.

SECTION 14.4        Agreement for Further Execution.

At any time or times, the Members agree to sign, swear to, or acknowledge any certificate required by the Act, to sign, swear to, or acknowledge any amendment or cancellation as required by law, to sign, swear to, or acknowledge similar certificates or affidavits or certificates of fictitious firm names, trade name, or the like (and to any amendments or cancellations thereof) required by the laws of Delaware or any other jurisdiction in which the Company does, or proposes to do, business, and cause the filing of any of the same for recording wherever such filing shall be required by law.

SECTION 14.5        Entire Agreement; Waiver.

This Agreement (together with any Exhibits attached or hereafter attached hereto in accordance with the terms and conditions of this Agreement) constitutes the entire agreement between the parties and contains all of the agreements between the parties with respect to the subject matter hereof and supersedes all prior agreements and negotiations between the parties, concerning the subject matter herein, including but not limited to the Memorandum of Understanding between the parties dated as of October 22, 2003, and the Confidentiality Agreement dated October 3, 2003. Failure by a Member to enforce any term or condition of this Agreement (or any Related Agreement attached or hereafter attached as an Exhibit hereto), or to exercise any right hereunder, shall not be construed as thereafter waiving such term, condition or right; and in no event shall any course of dealing, custom or usage of trade modify, alter or supplement any term of this Agreement.

SECTION 14.6        Severability.

If any provision of this Agreement shall be conclusively determined by a court of competent jurisdiction to be invalid or unenforceable, to any extent, the remainder of the Agreement shall not be affected thereby.

SECTION 14.7        Captions.

Any Section titles or captions contained in this Agreement are for convenience only and shall not be deemed part of the context of this Agreement.

SECTION 14.8        Number and Gender.

All of the terms and words used in this Agreement, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter, as the context or sense of this Agreement or any paragraph or clause herein may require, the same as if such term or word had been fully and properly written in such number and gender.

SECTION 14.9       Holidays.

If the date on which any act or performance required or permitted hereunder shall be a Saturday, Sunday, or other day on which banking institutions in the State of Michigan are authorized to remain closed, such act or performance may be taken or made on the next succeeding business day.

SECTION 14.10      Amendments.

This Agreement may not be amended except by unanimous written agreement of each Member, executed by duly authorized officers.

SECTION 14.11      Press Releases and Other Publicity Announcements.

Any public announcement or similar publicity with respect to the Company or its business shall be subject to the consent of the Members (which consent shall not be unreasonably withheld) unless such communication is required to be made by law or is pursuant to rules and regulations of the Securities and Exchange Commission, the New York Stock Exchange Listing Requirements or Tokyo Stock Exchange, if applicable, after coordination and consultation between the Members.

SECTION 14.12      Exhibits; Incorporation by Reference.

Each of the Exhibits referred to in this Agreement is hereby incorporated by reference in this Agreement as if such Exhibits were set out in full in the text of this Agreement.

SECTION 14.13      Assignment.

This Agreement and each and every covenant, term and condition hereof shall be binding upon and inure to the benefit of the Members hereto and their respective successors and permitted assigns. Except as otherwise specifically provided in this Agreement, neither this Agreement nor any rights or obligations hereunder shall be assignable or be delegated directly or indirectly by any Member hereto to a third party without the prior written consent of all the Members to this Agreement.

SECTION 14.14      No Agency Created.

This Agreement does not create any agency relationship between the Members. No Member hereto shall have any authority to enter into, assume or create any obligations or agreements on behalf of or in the name of any other of the Members.

SECTION 14.15      Indemnification.

(a)     Subject to any limitations expressly set forth in this Agreement, any Related Agreement, or the Certificate of Formation, each Member (the "Indemnifying Party") agrees to indemnify, defend and hold harmless the other Members from and against any loss, damage, liability or expense, including but not limited to interest, penalties and the

40

reasonable fees of attorneys and disbursements, arising out of or resulting from breach of the Indemnifying Party's representations, warranties and obligations or any noncompliance with any covenants, agreements, or undertakings of the Indemnifying Party contained in or made pursuant to this Agreement.

(b)     The provisions of this paragraph are in addition to, and not in limitation of, indemnification provisions contained elsewhere in this Agreement (see, for example, Sections 4.8, 5.4 and 6.6).

SECTION 14.16     Conflict of Interest; Corporate Opportunity; Related Matters.

(a)     No Member, Manager, officer, Seconded Employee, or employee of the Company shall be obligated to reveal confidential or proprietary information belonging to any Member or any Member's Affiliate (other than information pertaining to and originating from the Company) without the consent of such Member or Affiliate. Except as specifically provided in Section 5.4, no Member, or Manager, officer, or Seconded Employee appointed or furnished by such Member, shall be obligated to recommend or take any action or inaction in such capacity that prefers the interests of the Company over the interests of a Member or Member's Affiliate, and the Company and the Members hereby waive the fiduciary duty, if any, to the Company of such Member, Manager, officer or Seconded Employee in the event of any such conflict of interest.

(b)     Except as specifically provided in Section 1.4(c), such legal doctrines as corporate opportunity, business opportunity or partnership duties sometimes applied to persons having fiduciary obligations shall not apply with respect to any participation by a Member, Affiliate of a Member, and/or any Manager or officer or Seconded Employee appointed to the Company while remaining employed by such Member, in any other business activity or endeavor.

(c)     Neither Member shall be liable to the Company or the other Member for the misfeasance or malfeasance of any Manager, officer or Seconded Employee, acting in his or her capacity as Manager, officer or Seconded Employee, solely because such Manager, officer or Seconded Employee is an employee of such Member.

SECTION 14.17     Arbitration.

Any dispute, controversy or claim (hereinafter "Dispute") between the parties of any kind or nature whatsoever based on or arising from a claimed breach of this Agreement by either Member, or by any Manager or Officer nominated by either Member (and excluding "Deadlocks" on matters subject to Section 9 above), and whether arising in contract, tort or otherwise, shall be resolved according to the following procedure. If such a Dispute is not resolved by good faith negotiations between the parties, then such Dispute, upon 30 days' prior notice from one Member to the other of its intent to arbitrate (an "Arbitration Notice"), shall be submitted to and settled by arbitration; *provided, however,* that nothing contained herein shall preclude any party hereto from seeking or obtaining (a) injunctive relief, or (b) equitable or other judicial relief to enforce the provisions

hereof or to preserve the status quo pending resolution of disputes hereunder. Such arbitration shall be conducted in accordance with the commercial arbitration rules of the American Arbitration Association existing at the time of submission by one arbitrator. The Members shall attempt to agree upon an arbitrator. If one cannot be agreed upon, the Member which did not give the Arbitration Notice may request the Chief Judge of the United States District Court for the Eastern District of Michigan to appoint an arbitrator. If he or she will not, the arbitrator shall be appointed by the American Arbitration Association. If an arbitrator so selected becomes unable to serve, his or her successor shall be similarly selected or appointed. All arbitration hearings shall be conducted on an expedited schedule, in the English language, and all proceedings shall be confidential. Either Member may at its expense make a stenographic record thereof. The arbitrator shall apportion all costs and expenses of arbitration (including the arbitrator's fees and expenses, the fees and expenses of experts, and the fees and expenses of counsel of the parties), between the prevailing and nonprevailing Member as the arbitrator deems fair and reasonable. Any arbitration award shall be binding and enforceable against the parties hereto and judgment may be entered thereon in any court of competent jurisdiction. The arbitration will take place at New York City, New York.

SECTION 14.18      Confidentiality.

(a)      The Members and Company acknowledge that, in the course of performing their respective obligations under this Agreement, they will be receiving information which is confidential and proprietary to the disclosing Member or Affiliate thereof and which the disclosing Member or Affiliate wishes to protect from public disclosure. For purposes of this Section 14.18, the term "Proprietary Information" shall mean any confidential / proprietary information which has been or will be disclosed by a Member to the Company or other Member relating to the disclosing Member's business, financial condition, customers, products, plans, intellectual property, know how, trade secrets and the like, and which is stamped "proprietary" when disclosed in writing or designated as proprietary at the time of disclosure when disclosed orally and confirmed as such in writing within 45 days following such disclosure. For purposes of this Section 14.18, the term Member shall include any Affiliate of such Member. The Members and the Company agree that regardless of the date of termination of this Agreement or the dissolution of Company, a Member will keep confidential any Proprietary Information of any other Member, and the Company will keep confidential the Proprietary Information of a Member, for a period commencing upon receipt thereof until five (5) years following the date of disclosure or two (2) years after termination or dissolution, whichever is the longer period. In furtherance of the above, each of the Members and the Company: (i) agrees to not disclose Proprietary Information given to it by a Member to any third party; (ii) shall require any third party to whom disclosure of Proprietary Information is authorized to execute a confidentiality / non-disclosure agreement in substantially the same form as this Section 14.18, and (iii) shall exercise the same degree of care to safeguard the confidentiality of such Proprietary Information as it would exercise in protecting the confidentiality of similar property and information of its own, but in no event less than a reasonable degree of care. Notwithstanding the foregoing, the obligations to avoid publication or dissemination of Proprietary Information will not apply to any information which a Member can show: (a) is already in the possession

of such Member; (b) is or becomes independently developed by such Member prior to receipt of the Proprietary Information; (c) is or becomes publicly available other than pursuant to a breach of this Section 14.18; (d) is rightfully received by such Member from a third party not under an obligation of non-disclosure or confidence to such Member with respect thereto; (e) is released for disclosure by the other Member with its written consent; or (f) is disclosed pursuant to the requirements of a court of competent jurisdiction, governmental agency or by operation of law, *provided* that such Member is obligated to give the disclosing Member reasonable advance notice thereof so as to enable such Member to seek a protective order, and the Members shall cooperate in good faith as requested by a Member to prevent disclosure or seek confidential treatment under the circumstances.

(b)     In addition to the foregoing, each Member agrees not to disclose to any third party the terms of this Agreement or any commercial information relating to the other Member (including without limitation any product or pricing information), without the express written consent of the other Member.

(c)     Unless otherwise agreed by the parties in writing, the Members shall use information received from the Company in the course of providing assistance to the Company under this Agreement, any Assistance Agreement, or any other Related Agreement in a manner consistent with the Members' agreement under Section 1.4(c) of the Company Limited Liability Company Agreement that the Company, during the term of the Company Limited Liability Company Agreement, shall constitute the sole vehicle through which the Members will engage in the Company's Business.

(d)     Unless otherwise agreed by the parties in writing, there is no restriction on Delphi's or Furukawa's use (i) outside the Company's Business or (ii) after the expiration or termination of the Company Limited Liability Company Agreement, of information received from the Company in the course of providing assistance to the Company in connection with this Agreement, any Assistance Agreement or any other Related Agreement, other than (1) restrictions under this Sections 10.1 and/or 14.18, with respect to Proprietary Information owned by the other Member, and (2) any restrictions arising by reason of copyright or patents not owned by or licensed to such Member.

*Remainder of Page Intentionally Left Blank*

**Execution Copy**

IN WITNESS WHEREOF, the undersigned have each caused this Agreement to be executed in ink all as of the date first set forth above.

DELPHI AUTOMOTIVE SYSTEMS LLC

By: _____

Name: _Douglas R Grimmer_

Its: _Business Line Executive & EPS_

FURUKAWA ELECTRIC NORTH AMERICA APD, INC.

By: _S Hayashida_

Name: _Shuji Hayashida_

Its: _President & CEO_

## Exhibit A

The Company's Business
(see, Section 1.4, "Scope of Company's Business")

1.     Scope of Delphi-FEC joint venture is wiring harnesses (electrical / electronic distribution
systems) designed and engineered by Furukawa and Delphi in cooperation with Toyota, with
procurement of assembled wiring harnesses supplied to the Company by Delphi, for the F &
MC programs to be built in North America (presently scheduled to launch in late 2006-2007,
respectively) and  sale of such harnesses directly and indirectly to Toyota Motor North
America, Inc. and its North American affiliates, including Toyota Motor Manufacturing
Canada, Inc., and New United Motor Manufacturing, Inc. (NUMMI)

**Exhibit B**

CERTIFICATE OF FORMATION
OF
DELPHI FURUKAWA WIRING SYSTEMS LLC

This Certificate of Formation of Delphi Furukawa Wiring Systems LLC has been duly executed and is being filed by the undersigned, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act.

1.   The name of the limited liability company is Delphi Furukawa Wiring Systems LLC.

2.   The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. The name of its registered agent as such address is The Corporation Trust Company.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation of Delphi Furukawa Wiring Systems LLC this _____ day of _____, 2004.

By: _____
Name:  Diane L. Kaye
Its:     Authorized Person for Member, Delphi
         Automotive Systems LLC

## Exhibit C

Schedule of Capital Contributions
of
Delphi Furukawa Wiring Systems LLC

| COMPANY | 2005 | 2006 | 2007 | TOTAL |
|---------|------|------|------|-------|
| Delphi | $2.78 | $1.36 | $1.16 | $5.30 |
| FEC | $0.69 | $0.35 | $0.29 | $1.33 |
| Totals | $3.47 | $1.71 | $1.45 | $6.63 |

Note:  Amounts are in U.S. Million Dollars.


The Members agree all scheduled capital contributions must be made to, and received by, the Company no later than the last business day of the first calendar quarter of the year in which the capital contribution is scheduled, unless otherwise agreed by the Members.

Exhibit C                                                                47

## Exhibit D

Pre-formation Start-up
Expenditures to be Reimbursed to Members
And Related Matters (see Section 2.1(i))

1.  Costs associated with establishing the Company (not including legal and related fees of the Members in negotiating the Operating Agreement and Related Agreements).

2.  Other costs associated with pre-formation activities, as mutually and unanimously agreed upon by the Board of Managers.

Overall, the expenditures to be reimbursed under Section 2.1(i) are not to exceed $100,000.

## Exhibit E
### Initial Business Plan
**Project Income Statement**

*(In U.S. $ Millions)*

| Income Statement | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|
| SALES | $0.0 | $7.5 | $33.3 | $83.7 | $81.0 | $80.6 | $80.2 | $81.3 | $82.4 | $83.5 |
| COGS | | | | | | | | | | |
|   Material Cost | . | 3.5 | 16.5 | 44.4 | 43.9 | 44.6 | 45.3 | 46.0 | 46.7 | 47.3 |
|   Manufacturing Cost | . | 2.2 | 9.1 | 22.3 | 21.9 | 22.3 | 22.7 | 23.2 | 23.8 | 24.3 |
|   Manufacturing Start-up / JIT Centers | 0.9 | 1.1 | 1.0 | 1.9 | 2.0 | 2.0 | 2.1 | 2.2 | 2.2 | 2.3 |
|   Engineering Reimbursement | 1.9 | 0.6 | 0.4 | . | . | . | . | . | . | . |
|   Reach        totals ($12.6M) | . | . | . | (0.4) | (0.9) | (1.3) | (1.8) | (2.3) | (2.7) | (3.3) |
|   Total COGS | 2.8 | 7.3 | 27.1 | 68.2 | 66.9 | 67.6 | 68.4 | 69.1 | 69.9 | 70.7 |
|     Gross Margin % | . | 2.1% | 18.8% | 18.5% | 17.5% | 16.2% | 14.7% | 14.9% | 15.1% | 15.3% |
| D&A | . | . | . | . | . | . | . | . | . | . |
| Equipment Lease | . | 0.3 | 1.4 | 2.6 | 2.6 | 2.6 | 2.6 | 3.0 | 2.8 | 1.6 |
| SG&A | 0.7 | 1.1 | 2.8 | 5.8 | 5.7 | 5.8 | 5.9 | 6.0 | 6.1 | 6.2 |
| Royalties | . | 0.2 | 0.9 | 2.3 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 2.3 |
|   Total Cost | $3.5 | $8.9 | $32.1 | $78.8 | $77.4 | $78.2 | $79.0 | $80.3 | $81.0 | $80.8 |
| Operating Income - $ | ($3.5) | ($1.4) | $1.2 | $4.9 | $3.7 | $2.5 | $1.2 | $1.0 | $1.4 | $2.7 |
| TAXES | . | . | . | . | . | . | . | . | . | . |
| Net Income - $ | ($3.5) | ($1.4) | $1.2 | $4.9 | $3.7 | $2.5 | $1.2 | $1.0 | $1.4 | $2.7 |
|   - % | . | (18.3%) | 3.6% | 5.8% | 4.5% | 3.0% | 1.5% | 1.2% | 1.7% | 3.3% |

*(In U.S $ Millions)*

**Project Balance Sheet**

| Balance Sheet | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|
| Cash | . | 0.2 | 0.8 | 2.1 | 2.0 | 2.0 | 2.0 | 2.0 | 2.1 | 2.1 |
| Accounts Receivable | . | 2.1 | 9.2 | 9.4 | 9.1 | 9.1 | 9.0 | 9.1 | 9.3 | 9.4 |
| Inventory | . | 0.4 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.4 |
| Net Plant & Equipment | . | . | . | . | . | . | . | . | . | . |
| Other Assets | . | 0.0 | 0.2 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 |
|   Total Assets | . | 2.6 | 11.5 | 13.2 | 12.8 | 12.8 | 12.7 | 12.9 | 13.1 | 13.2 |
| Accounts Payable | . | 2.3 | 8.4 | 8.4 | 8.2 | 8.3 | 8.4 | 8.5 | 8.6 | 8.7 |
| Other Current Liabilities | . | 0.0 | 0.2 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 |
|   Sub-total Current Liabilities | . | 2.3 | 8.5 | 8.8 | 8.6 | 8.7 | 8.8 | 8.9 | 9.0 | 9.1 |
| Debt | . | . | . | . | . | . | . | . | . | . |
| Equity | . | 0.3 | 3.0 | 4.4 | 4.2 | 4.0 | 3.9 | 4.0 | 4.0 | 4.1 |
|   Total Debt And Equity | . | 0.3 | 3.0 | 4.4 | 4.2 | 4.0 | 3.9 | 4.0 | 4.0 | 4.1 |
|   Total Liabilities + Equity | . | 2.6 | 11.5 | 13.2 | 12.8 | 12.8 | 12.7 | 12.9 | 13.1 | 13.2 |

*(In U.S. $ Millions)*

**Project Cash Flow**

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Cash Flows** | | | | | | | | | | |
| Net Income/(Loss) | (3.5) | (1.4) | 1.2 | 4.9 | 3.7 | 2.5 | 1.2 | 1.0 | 1.4 | 2.7 |
| Depreciation | . | . | . | . | . | . | . | . | . | . |
| Working Capital Changes | . | (0.3) | (2.7) | (1.4) | 0.2 | 0.1 | 0.1 | (0.1) | (0.1) | (0.1) |
| Capital Expenditures | . | . | . | . | . | . | . | . | . | . |
|   TOTAL Venture Flows | (3.5) | (1.7) | (1.5) | 3.4 | 3.9 | 2.6 | 1.3 | 0.9 | 1.3 | 2.7 |
| **Financing Flows** | | | | | | | | | | |
| Equity Injections | 3.5 | 1.7 | 1.5 | . | . | . | . | . | . | . |
| (Distributions of JV Earnings) | . | . | . | (3.4) | (3.9) | (2.6) | (1.3) | (0.9) | (1.3) | (2.7) |
|   TOTAL Financing Flows | 3.5 | 1.7 | 1.5 | (3.4) | (3.9) | (2.6) | (1.3) | (0.9) | (1.3) | (2.7) |
| Memo  FEC Injections = $1.3M | 0.7 | 0.3 | 0.3 | | | | | | | |
| Delphi Injections = $5.3M | 2.8 | 1.4 | 1.2 | | | | | | | |
| | 3.5 | 1.7 | 1.5 | | | | | | | |

### Exhibit E

49

## Exhibit E  (Continued)

|  | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|
| **JV Revenue** | . | **$7.5** | **$33.3** | **$83.7** | **$81.0** | **$80.6** | **$80.2** | **$81.3** | **$82.4** | **$83.5** |

**Delphi Dedicated Manufacturing**

MC Program

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Transfer Price per Vehicle* | - | - | $129.88 | $126.08 | $126.04 | $126.26 | $126.56 | $127.57 | $127.96 | $127.00 |
| Vehicles per Year | - | - | 95,201 | 430,091 | 422,956 | 428,841 | 434,726 | 440,611 | 446,496 | 452,380 |
| Annual Harness Cost ($US millions) | - | - | $12.4 | $54.2 | $53.3 | $54.1 | $55.0 | $56.2 | $57.1 | $57.5 |

F-Platform

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Transfer Price per Vehicle** | - | $61.08 | $59.78 | $59.42 | $59.37 | $59.47 | $59.62 | $60.32 | $59.56 | $57.87 |
| Vehicles per Year | - | 97,808 | 244,781 | 253,374 | 253,465 | 257,588 | 261,711 | 265,834 | 269,957 | 274,079 |
| Annual Harness Cost ($US millions) | - | $6.0 | $14.6 | $15.1 | $15.0 | $15.3 | $15.6 | $16.0 | $16.1 | $15.9 |

| Commitment after SOP | - | - | - | ($0.4) | ($0.9) | ($1.3) | ($1.8) | ($2.3) | ($2.7) | ($3.3) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Total Dedicated Mfg Expense** | - | **$6.0** | **$27.0** | **$68.3** | **$67.5** | **$68.2** | **$68.9** | **$70.0** | **$70.5** | **$70.0** |

Delphi Administrative/Support Service Agreements

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| SG&A | 0.0 | 0.5 | 1.8 | 4.7 | 4.7 | 4.7 | 4.8 | 4.9 | 5.0 | 5.1 |
| Other JV Admin/Registration Costs | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Manufacturing Start-up | 0.5 | 0.7 | 0.4 | - | - | - | - | - | - | - |
| Project Expense | 0.0 | 0.2 | | | | | | | | |
| Engineering IT / Training | 0.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.1 |
| Excess & Obsolete - MC | - | 0.0 | 0.1 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| Excess & Obsolete - F Platform | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Warehouse / SILS | - | 0.1 | 0.6 | 1.9 | 1.9 | 2.0 | 2.0 | 2.1 | 2.2 | 2.2 |
| **Total Admin/Support Service** | **$1.2** | **$1.7** | **$3.1** | **$7.2** | **$7.1** | **$7.3** | **$7.4** | **$7.6** | **$7.7** | **$7.9** |

Seconded Employees Agreement

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Employees seconded from Delphi | 0.5 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| Employees seconded from FEC | - | 0.1 | 0.4 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| **Total Seconded Employees** | **$0.5** | **$0.4** | **$0.7** | **$0.6** | **$0.6** | **$0.6** | **$0.6** | **$0.6** | **$0.6** | **$0.6** |

Engineering Agreements

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Royalties to FEC | - | 0.1 | 0.3 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 |
| Royalties to Delphi | - | 0.1 | 0.3 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 |
| Engineering Fee to FEC | 1.9 | 0.6 | 0.4 | - | - | - | - | - | - | - |
| Engineering Fee to Delphi | - | 0.1 | 0.2 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 |
| **Total Engineering Agreements** | **$1.9** | **$0.8** | **$1.3** | **$2.3** | **$2.2** | **$2.2** | **$2.2** | **$2.2** | **$2.2** | **$2.3** |

| **TOTAL JV EXPENSES** | **$3.5** | **$8.9** | **$32.1** | **$78.8** | **$77.4** | **$78.2** | **$79.0** | **$80.3** | **$81.0** | **$80.8** |
|---|---|---|---|---|---|---|---|---|---|---|
| **JV OPERATING INCOME** | **($3.5)** | **($1.4)** | **$1.2** | **$4.9** | **$3.7** | **$2.5** | **$1.2** | **$1.0** | **$1.4** | **$2.7** |
| | 0.0% | -18.3% | 3.6% | 5.8% | 4.5% | 3.0% | 1.5% | 1.2% | 1.7% | 3.3% |

## **Exhibit F**

Related Agreements

Exhibit F-1:   Furukawa Assistance Agreement

Exhibit F-2:   Delphi International Services, Inc. Assistance Agreement

Exhibit F-3:   Delphi Administrative and Support Services Agreement

Exhibit F-4:   Dedicated Manufacturing Agreement

Exhibit F-5:   Intellectual Property License, Restricted Use, and Technical Assistance Agreement

# EXHIBIT 2

| | |
|---|---|
| **From:** | Schuppe, Mike L [Michael.l.Schuppe@delphi.com] |
| **Sent:** | Thursday, January 21, 2010 5:36 PM |
| **To:** | Naoki Matsuura; Cassudakis, Nick G; sakata@americanfurukawa.com; dthomas@americanfurukawa.com; Greenbury, Donna |
| **Subject:** | DFWS 2009 Financials as of October 5th with Balance Sheet & Cash Flow |
| **Attachments:** | 2009 DFWS Financials pre emergence w Balance Sheet.pdf |

To All,
Attached is a file containing the Income Statement, Balance Sheet & Cash Flow as of October 5th; for clarification here is a breakdown of the Furukawa/Outside Payable:

| | |
|---|---|
| Furukawa Royalty | (1,407,885) |
| Toyota Overpayments (Canada GST) | (56,511) |
| Total Furukawa/Outside Payable | (1,464,396) |

*Regards,*
Mike

---

**From:** Schuppe, Mike L
**Sent:** Thursday, January 07, 2010 9:28 AM
**To:** 'Naoki Matsuura'; Cassudakis, Nick G; 'sakata@americanfurukawa.com'; 'dthomas@americanfurukawa.com'; Greenbury, Donna
**Subject:** DFWS 2009 Financials as of October 5th

To All,
Attached are 2 files documenting the DFWS financials for 2009 as of October 5th; I've included 2 files, the 1st file "2009 DFWS Financials pre emergence.pdf" documents the 2009 financials for the period of 1/1/09 to 10/5/09. In October I recorded service amounts necessary to get the year total services to the percentages listed in the JV Agreement. Please see the file named "2009 DFWS Financials pre emergence SG&A Support.pdf" for this calculation.

*Thanks,*
Mike Schuppe
Delphi Furukawa Wiring Systems LLC
****************************************************************************************
Note:  If the reader of this message is not the intended recipient, or an employee o
****************************************************************************************