**Hearing Date And Time: May 20, 2010 at 10:00 a.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti

Attorneys for DPH Holdings Corp., et al.,
   Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | : | |
| In re | : | Chapter 11 |
| | : | |
| DPH HOLDINGS CORP., et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| | : | (Jointly Administered) |
| Reorganized Debtors. | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |

REORGANIZED DEBTORS' LIMITED OBJECTION TO MOTION OF SALARIED
RETIREES FOR ORDER CONFIRMING THAT SECOND AMENDED COMPLAINT
<u>DOES NOT VIOLATE MODIFIED PLAN OR PLAN MODIFICATION ORDER</u>

DPH Holdings Corp. ("DPH Holdings") and certain of its affiliated reorganized debtors in the above-captioned cases (together with DPH Holdings, the "Reorganized Debtors") hereby submit this Limited Objection To Motion Of Salaried Retirees For Order Confirming That Second Amended Complaint Does Not Violate Modified Plan Or Plan Modification Order (the "Objection") filed by Dennis Black, Charles Cunningham, Kenneth Hollis, and the Delphi Salaried Retirees Association (together, the "Salaried Retirees"), and respectfully represent as follows:

## Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, Delphi Corporation ("Delphi") and certain of its affiliates (together with Delphi, the "Debtors"), predecessors of the Reorganized Debtors, filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").

2.    On December 10, 2007, the Debtors filed their first amended joint plan of reorganization (Docket No. 11386) (the "Plan") and related disclosure statement (Docket No. 11388).  On January 25, 2008, the Court entered an order (Docket No. 12359) (the "Confirmation Order") confirming the Plan (as modified) (the "Confirmed Plan"), and the Confirmation Order became final on February 4, 2008.

3.    On October 3, 2008, the Debtors filed a motion under 11 U.S.C. § 1127 for an order approving (i) certain modifications to the Confirmed Plan and related disclosure statement and (ii) related procedures for re-soliciting votes on the Confirmed Plan, as modified (Docket No. 14310) (the "Plan Modification Motion").  On June 1, 2009, the Debtors filed a supplement to the Plan Modification Motion (the "Motion Supplement"), which sought approval of (i) certain modifications to the Confirmed Plan (the "Modified Plan"), (ii) supplemental disclosure, and (iii)

2

procedures for re-soliciting votes on the Modified Plan.  Leading up to the hearing on the modifications to the Confirmed Plan, the Debtors were seeking to reach a settlement with the Pension Benefit Guaranty Corporation (the "PBGC") to solve for their underfunded qualified pension plans.  In fact, increasing the urgency of reaching settlement was the fact that resolution of the Debtors' pension issues was a condition precedent to the effectiveness of the Modified Plan.  See Section 12.2(c) of the Modified Plan.  On July 21, 2009, the Debtors reached an accord with the PBGC and entered into a settlement (the "PBGC Settlement Agreement"), which was incorporated as Exhibit 7.17 to the Modified Plan and filed with this Court on that same day, as reflected in the Notice Of Filing Of Settlement Agreement Between Delphi Corporation And The Pension Benefit Guaranty Corporation (Docket No. 18559).  Pursuant to the PBGC Settlement Agreement, the Debtors qualified pensions plans were likely to be terminated and the PBGC was granted an allowed claim in the Debtors' chapter 11 cases and, pursuant to a settlement with GM, the PBGC was granted additional consideration.  The next day, on July 22, 2009, the PBGC filed a "Complaint For Pension Plan Termination" against Delphi Corporation as plan administrator for the Delphi Retirement Program for Salaried Employees Debtors' (the "Pension Plan") in the United States District Court for the Eastern District of Michigan, Case No: 2:09-cv-12874-AJT-MKM (the "PBGC Complaint") to effect the termination of the Debtors' qualified pension plans.

    4.  As part of the hearing to approve the Debtors' Modified Plan, on July 29, 2009, this Court presided over the Debtors' request for authority to enter into the PBGC Settlement Agreement.  After overruling several objections, including objections raised by the Salaried Retirees, the Court authorized the Debtors to enter into the PBGC Settlement Agreement.  In particular, the Court found, among other things, that: (i) reorganization under the Modified Plan

3

would not have been possible so long as the Debtors' pension obligations existed; (ii) there were clear grounds under the Employee Retirement Income Security Act ("ERISA") for the PBGC's termination of the Debtors pension plans and for the Debtors to have entered into termination and trusteeship agreements with the PBGC; and (iii) the PBGC Settlement Agreement did not violate various agreements and prior orders of the court relating to the Debtors' labor unions. (Modification Approval Order ¶ KK).  As noted by the Court on the record at the hearing, the PBGC Settlement Agreement specifically reserved the rights of parties to pursue certain remedies under ERISA.  (Hearing Tr. 217, July 29, 2009 ("But I do note further that for purposes of clarity the order that the debtors have asked me to enter specifically reserves parties rights under 29 U.S.C. 14 Section 1303.").)  On the following day, the Court entered an order approving the Modified Plan (Docket No. 18707) (the "Modification Approval Order").  On August 7, 2009, the PBGC dismissed the PBGC Complaint because the complaint was no longer required to effectuate the termination of the Debtors' pension plans.  Three days later, on August 10, 2009, the Pension Plan was terminated as of July 31, 2009.

       5.     While the Debtors worked toward confirmation of the Modified Plan, the Salaried Retirees' litigation efforts began with the Complaint For Equitable Relief, filed on July 16, 2009, in the United States District Court for the Eastern District Of Michigan, Southern Division (the "Michigan District Court") against Craig G. Naylor, David N. Farr, Martin E. Welch, and James P. Whitson.  The Salaried Retirees then sought a temporary restraining order in the Michigan District Court preventing the Debtors from cooperating with the PBGC's efforts to terminate the Pension Plan. Consequently, the Debtors filed the Emergency Automatic Stay Enforcement Motion (Docket No. 18579) on July 23, 2009.  Because it was clear that the Salaried Retirees had violated the automatic stay, the parties were able to reach a consensual resolution quickly and

4

both actions were dismissed. Moreover, pursuant to the Stipulation Concerning The Automatic Stay In Connection With The Commencement Of An Action Against The Pension Benefit Guaranty Corporation (Docket No. 18896) (the "Stipulation"), dated September 11, 2009, the Debtors and the Salaried Retirees reached a further agreement, consistent with this Court's ruling, which permitted the Salaried Retirees to commence an action against the PBGC subject to the Debtors' right to contest such action as a collateral challenge to a prior order of the Bankruptcy Court. The Stipulation acknowledged the Salaried Retirees' intention to file a Complaint For Equitable Relief, the form of which was attached to the Stipulation.

6. On September 14, 2009, the Salaried Retirees filed a complaint in the Michigan District Court asserting claims against the PBGC. In the Salaried Retirees' complaint, they asked the applicable District Court to undo the Pension Plan's termination and to place the parties in the position they were prior to termination of the Pension Plan. While this prayer for relief might imply putting the Pension Plan back to the Debtors, at the time it was filed, the Modified Plan was not yet consummated. Despite this fact, the Salaried Retirees did not make any effort to stay the consummation of the Debtors' Modified Plan. And, in fact, on October 6, 2009 (the "Effective Date"), the Debtors substantially consummated the Modified Plan and closed the transactions under the Master Disposition Agreement, dated as of July 30, 2009, by and among Delphi, GM Components Holdings, LLC, General Motors Company, Motors Liquidation Company (f/k/a General Motors Corporation), DIP Holdco 3 LLC (which assigned its rights to DIP Holdco LLP, subsequently renamed Delphi Automotive LLP, a United Kingdom limited liability partnership), and the other sellers and buyers party thereto. In connection therewith, DIP Holdco LLP, through various subsidiaries and affiliates, acquired substantially all of the Debtors' global core businesses, and GM Components Holdings, LLC and Steering Solutions

Services Corporation acquired certain U.S. manufacturing plants and the Debtors' non-core steering business, respectively. The Reorganized Debtors have emerged from chapter 11 as DPH Holdings and affiliates and remain responsible for the post-Effective Date administration of these chapter 11 cases, including the disposition of certain retained assets, the payment of certain retained liabilities as provided for under the Modified Plan, and the eventual closing of the cases.

B.      The Salaried Retirees' Motion

7.      By this limited Objection, the Reorganized Debtors object to one aspect of the relief sought by the Salaried Retirees pursuant to their Motion For Order Confirming That Second Amended Complaint Does Not Violate The Modified Plan Or the Plan Modification Order (Docket No. 19750), which was filed on April 1, 1010 and subsequently amended on April 21, 2010 (Docket No. 19904) (the "Motion"). Specifically, the Salaried Retirees in their Second Amended Complaint seek to undo the termination and restore the Pension Plan. To the extent the prayer for relief would result in the Pension Plan being put to the Reorganized Debtors, then this prayer for relief represents a collateral attack on the Modified Plan and the Modification Approval Order. As will be explained below, should the district court grant this relief, the result would be untenable and would confound one of the fundamental underpinnings of the Modified Plan. It would revive the Reorganized Debtors' pension issues and immediately render the Reorganized Debtors insolvent, forcing a chapter 7 filing before administrative creditors are paid in full under the Modified Plan. In addition, certain of the other transactions consummated under the Modified Plan would simply unravel.

8.      As described in the Motion, the Salaried Retirees seek to amend their complaint relating to the termination of the Pension Plan by the PBGC. As this Court recalls, the Salaried Retirees amended their complaint once already by adding additional claims and additional parties, including General Motors LLC ("GM"). GM moved for enforcement of the Modified

6

Plan and the Modification Approval Order and sought immediate dismissal of the Salaried Retirees' complaint against GM in the Michigan District Court (Docket No. 19361).  Following a hearing on the merits, this Court entered its Order Enforcing Plan And Plan Modification Order (Docket No. 19578) on March 1, 2010, requiring the Salaried Retirees' to dismiss the complaint against GM because the complaint violated the injunction imposed by the Modified Plan and the Modification Approval Order.

        9.       In what appears to be a precautionary measure, the Salaried Retirees filed a motion seeking an order from this Court confirming that their proposed Second Amended Complaint, the form of which is attached as Exhibit 2 to the Motion, does not violate the Modified Plan, the Modification Approval Order, or any other order of the Court.

Relief Requested

        10.      By this Limited Objection, the Reorganized Debtors object to the Motion because, through their Second Amended Complaint, the Salaried Retirees seek relief that would undo termination of, and reinstate, the Pension Plan.  This prayer for relief implies a potential collateral attack on the Modified Plan and the Modification Approval Order, and, if the Pension Plan were put to the Reorganized Debtors, it would severely prejudice certain of the Debtors' many stakeholders.  Specifically, reinstating the Pension Plan such that it would put the plan to the Reorganized Debtors would undermine the Modified Plan and Modification Approval Order, and place holders of Allowed Administrative Claims at risk.  Accordingly, the Reorganized Debtors request an order denying the Motion to the extent that the Second Amended Complaint seeks relief that would directly or indirectly create liabilities or obligations on the part of the Reorganized Debtors relating to the Pension Plan.

7

Objection To The Salaried Retirees' Motion

11.    The Salaried Retirees seek an order from the Court confirming that the Second Amended Complaint does not violate the Modified Plan or the Modification Approval Order. Included in the Second Amended Complaint is a request that the court award "appropriate equitable relief against the Defendants to undo the Plan's termination and to place the parties in the position they were prior to termination of the Plan." (Second Amended Complaint ¶ E.) Neither the Motion nor the Second Amended Complaint, however, describes how exactly this relief would be implemented.

12.    The Reorganized Debtors do not oppose the Salaried Retirees' Motion except insofar as it collaterally attacks the Modified Plan and the Modification Approval Order. If they are seeking to put the Pension Plan to the Reorganized Debtors, then the relief sought would undo a critical element of the Modified Plan – resolving the Debtors' pension issues – and would render the Reorganized Debtors immediately insolvent and therefore unable to pay allowed administrative claims in full as set forth in the Modified Plan. The Reorganized Debtors would, therefore, be forced to liquidate. As a result, the PBGC likely would be compelled to file another complaint to terminate the Pension Plan – essentially leaving the Salaried Retirees' situation unchanged while severely prejudicing the Debtors' stakeholders, including holders of allowed administrative claims. In addition, as described in greater detail below, any attempt to reinstate the Debtors' pension obligations against the Reorganized Debtors would be equitably moot in light of substantial consummation of the Modified Plan and the Debtors' emergence from chapter 11 on the Effective Date.[1]

---

[1]    The equitable-mootness doctrine typically arises in the context of an appeal relating to confirmation of a plan of reorganization. Rather than pursue an appeal, however, the Salaried Retirees have endeavored to seek what amounts to a declaratory judgment sanctioning their efforts to undo termination of the Pension Plan, which was

*(cont'd)*

8

13.     The Reorganized Debtors, therefore, object to the Motion to the extent that the contemplated reinstatement of the Pension Plan would create liabilities against the Reorganized Debtors. If, on the other hand, the relief sought in the Second Amended Complaint made clear that obligations relating to the Pension Plan could never be imposed on the Reorganized Debtors or any other party protected by the Modified Plan, then the Reorganized Debtors would have no objection to the Motion.[2]

        **(a)** **Efforts To Reinstate Pension Obligations Against The Reorganized Debtors Subject To Doctrine Of Equitable Mootness**

14.     In the Second Circuit, "an appeal should . . . be dismissed as moot when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." <u>Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co.</u> (In re Chateaugay Corp.) (<u>Chateaugay I</u>), 988 F.2d 322, 325 (2d Cir. 1995). The purpose of the equitable-mootness doctrine is "to avoid disturbing a reorganization plan once implemented." <u>Deutche Bank AG v. Metromedia Fiber Network, Inc.</u> (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 144 (2d Cir. 2005). Thus, upon substantial consummation of a plan of reorganization,[3] actions that would undo aspects of

---

*(cont'd from previous page)*
    a critical element of the Modified Plan. Thus, the Motion is functionally similar to an appeal insofar as it seeks to reverse certain actions that were approved under the Modification Approval Order.

[2]  It is not clear to the Reorganized Debtors, however, that reinstatement of the Pension Plan could be accomplished in a way that would not impact the Reorganized Debtors. Even if the Salaried Retirees will not seek or accept any direct payment from the Reorganized Debtors, the Reorganized Debtors could still be liable to third parties – including the Internal Revenue Service – on account of the pension obligations. As described in this Objection, reinstatement of pension obligations against the Reorganized Debtors would be devastating if it imposed any such liabilities on the Reorganized Debtors.

[3]  Substantial consummation occurs when (a) all or substantially all of the property proposed to be transferred under a plan of reorganization has been transferred; (b) the debtor or its successor in interest under a plan of reorganization has assumed the business or management of all or substantially all of the property dealt with by the plan of reorganization; and (c) distributions under the plan of reorganization have commenced. 11 U.S.C. § 1101(2).

the plan are presumed to be equitably moot.  See AETNA Cas. & Sur. Co. v. LTV Steel Co. Inc. (In re Chateaugay Corp.) (Chateaugay III), 94 F.3d 772 (2d. Cir. 1996) ("Reviewing courts presume that it will be inequitable or impractical to grant relief after substantial consummation of a plan of reorganization."); In re Calpine Corp., 390 B.R. 508, 516 (S.D.N.Y. 2008) ("When a plan of reorganization has been substantially consummated, an appeal is presumed moot.").  The presumption of equitable mootness can be rebutted if the party seeking relief can establish all five of the following factors:

> (a) the court can still order some effective relief; (b) such relief will not affect "the re-emergence of the debtor as a revitalized corporate entity"; (c) such relief will not unravel intricate transactions so as to "knock the props out from under the authorization for every transaction that has taken place" and "create an unmanageable, uncontrollable situation for the Bankruptcy Court"; (d) the "parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings"; and (e) the appellant "pursue[d] with diligence all available remedies to obtain a stay of execution of the objectionable order . . . if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from."

Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.) (Chateaugay II), 10 F.3d 944, 952-53 (2d Cir. 1993) (citations omitted).

### (b) The Salaried Retirees Did Not Attempt To Appeal Or Stay The Modified Plan Or The Modification Approval Order

15. A chief consideration in this circuit is whether the party subject to equitable mootness sought a stay of confirmation or otherwise tried to stay consummation of the plan of reorganization.  See In re Metromedia, 416 F.3d 144 ("A chief consideration under Chateaugay II is whether the appellant sought a stay of confirmation.").  Compare Chateaugay II, 10 F.3d at 954 ("Also significant is that [challenger] sought to stay confirmation of the Plan in urgent applications before the bankruptcy court, the district court and [the Second Circuit Court of

10

Appeals]."). This factor weighs heavily against the relief sought by the Salaried Retirees in their Second Amended Complaint because they failed to seek any type of stay of the Modified Plan or consummation of same. See, e.g., In re Calpine, 390 B.R. 517 ("The failure to seek a stay of the confirmation order pending appeal, with the result that the reorganization is substantially consummated, in particular lends itself to a finding that an appeal is moot."); Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.), 326 B.R. 497, 501-04 (S.D.N.Y. 2005) (holding that claims were equitably moot when claimant failed to satisfy all necessary factors for rebutting presumption of equitable mootness after substantial consummation of plan of reorganization including, in particular, claimants' failure to appeal confirmation or seek stay of consummation of plan of reorganization).  The Salaried Retirees had plenty of time to stay the hearings or the consummation of the Modified Plan, but chose not to do so.  As a result of the Salaried Retirees' election not to try to stay the hearings on July 29 and 30, 2009 nor the consummation of the Modified Plan, the Salaried Retirees fail perhaps the most important of the five factors required in this Circuit to rebut the assumption of equitable mootness.

16.     Of particular note because of the similarity in fact pattern is the U.S. Airways decision that was issued by the U.S. Court of Appeals for the Fourth Circuit's decision in Retired Pilots Assoc. of U.S. Airways, Inc. v. US Airways Group, Inc. (In re US Airways Group, Inc.), 369 F.3d 806 (4th Cir. 2004).  In US Airways, the debtor was unable to resolve its pension-funding obligations and therefore sought and received bankruptcy court approval to effect a distress termination of its pension plans.  The debtor later received the approval of its unions and the PBGC.  The pension terminations were incorporated into the debtor's plan of reorganization, which was subsequently confirmed by the bankruptcy court.  After effectuating the pension terminations, the debtor's plan of reorganization became effective and the debtor emerged from

11

chapter 11.  An association of retirees, however, had appealed the bankruptcy court's order approving termination of the pension plans and continued to pursue its appeal after the debtor's emergence from chapter 11.  Nevertheless, the retirees did not seek to stay consummation of the plan of reorganization.

17. On appeal, the Fourth Circuit rejected the retirees' attempt to undo the termination and restore the pension plans, holding that such relief was equitably moot.  Id. at 811.  In so holding, the Fourth Circuit highlighted several important factors weighing against the retirees.  First, the retirees never sought to stay either the termination of the pension plans or the confirmation order.  Id. at 809-10.  Second, both the termination of the pension plans and the plan of reorganization had been fully consummated.  Id. at 810.  Third, "the requested relief – reversal of the termination order – could [not] be granted without undoing U.S. Airways' reorganization plan and without adversely impacting the interests of third parties who have relied upon the consummated confirmation order."  Id.  In particular, the court noted that "the company would have been unable to emerge from bankruptcy and continue its operations" without first terminating its pension plans.  Id.

18. The Reorganized Debtors now find themselves in a similar situation to U.S. Airways.  Termination of the Pension Plan was consummated on August 10, 2009, and the Modified Plan was consummated on October 6, 2009, more than eight months ago, and the Salaried Retirees never sought to stay consummation of the Modified Plan.[4]  The Salaried Retirees now face a presumption that the "equitable" relief sought in the Second Amended

---

[4] In addition, were the Salaried Retirees able to achieve the reinstatement of the Pension Plan to the Reorganized Debtors, it would amount to substantive modifications to the Modified Plan post-consummation, which is prohibited by section 1127 of the Bankruptcy Code.

Complaint is in fact equitably moot to the extent it seeks to undo the PBGC's termination of the Pension Plan and restore the Pension Plan to the Reorganized Debtors.

### (c) The Reorganization Accomplished Under The Modified Plan Is Not Viable If Reorganized Debtors Are Liable For Pension Obligations

19. Neither the Motion nor the Second Amended Complaint describes how reinstatement of the Pension Plan would be accomplished, and in particular, who would be financially responsible for the renewed pension obligations. To the extent that the Salaried Retirees contemplate that the Reorganized Debtors would be liable in the event that the Debtors' pension plans are restored, then the relief sought in the Second Amended Complaint amounts to a collateral attack on the Modified Plan and order and is not feasible.

20. Specifically, the Reorganized Debtors do not have the financial wherewithal to support the Pension Plan. To the contrary, if shouldered with these pension obligations, the Reorganized Debtors would no longer be able to pay administrative claims and otherwise perform under the Modified Plan. As a result, the Reorganized Debtors – with near certainty – would be compelled to liquidate under chapter 7 of the Bankruptcy Code.[5] At a minimum, this would prejudice the recovery expected by holders of allowed administrative claims. A the Third Circuit has observed, where "investors and other third parties consummated a massive reorganization in reliance on an unstayed confirmation order that, explicitly and as a condition of feasibility, denied the claim for which appellate review is sought, the allowance of such appellate

---

[5] Under ordinary circumstances, the PBGC would have the right to immediately file another complaint to terminate the pension plans after their reinstatement due to the Reorganized Debtors' inability to fund pension benefits. However, the Second Amended Complaint also contains a prayer for relief seeking to "[p]ermanently enjoin[] the PBGC from terminating the Salaried Plan on the termination conditions and terms currently in place and otherwise set[] aside the PBGC's termination of the Plan." (Second Amended Complaint ¶ D.) Thus, the Reorganized Debtors would seem to be stuck with pension liabilities that they would be incapable of satisfying. Not only would such a result be completely impracticable, not only for the Reorganized Debtors, but for pension beneficiaries who would be left empty-handed.

review would likely undermine public confidence in the finality of bankruptcy confirmation orders and make successful completion of large reorganizations like this more difficult." In re Continental Airlines, 91 F.3d 553, 565 (3d Cir. 1996) (en banc).Thus, the relief sought by the Salaried Retirees in the Second Amended Complaint, to the extent that they are trying to put the Pension Plan to the Reorganized Debtors, should be prevented.

### (d)    Reinstating The Pension Plan Would Undo The Framework Of The Modified Plan

21.    Resolution of the Debtors' pension funding situation, as embodied in the PBGC Settlement Agreement, was integral to the consummation and implementation of the Modified Plan.  Indeed, the need to devise a workable solution of the Debtors' pension issues was recognized early in the chapter 11 cases and was one of five key tenets to the Debtors' transformation plan.  To this end, the Debtors made every effort to preserve the Pension Plan and sought to assume their pension obligations under the Confirmed Plan.  But as the global capital markets deteriorated through 2008 and 2009, the Debtors' pension obligations became insurmountable.[6]

22.    By the time that the Debtors had proposed the Modified Plan, reorganization of the Debtors' estates was not feasible unless all of the Debtors' pension obligations were either terminated or assigned.  Consequently, the Debtors and the PBGC entered into a comprehensive agreement providing for the termination of the Pension Plan and compromising the PBGC's substantial claims against the Debtors.  The Modified Plan was expressly conditioned on the

---

[6]    As of July 21, 2009, the PBGC's claims against the Debtors' for unfunded benefit liabilities totaled approximately $4.35 billion for the "Delphi Hourly-Rate Employees Pension Plan" and $2.72 billion for the "Delphi Retirement Program for Salaried Employees" and other subsidiary pension plans.

14

effectiveness of the PBGC Settlement Agreement.[7] In turn, termination of the Debtors' pension plans was a condition precedent to the PBGC Settlement Agreement.[8] (PBGC Settlement Agreement ¶ 6.) Thus, reinstating the Pension Plan to the Reorganized Debtors could have a domino effect, as some may argue that the conditions precedent to the effectiveness of both the PBGC Settlement Agreement and the Modified Plan are no longer satisfied.

23. As described above, the Reorganized Debtors would become unviable if forced to take on pension obligations. Moreover, additional transaction consummated under the Modified Plan could be at risk, including, without limitation, the distributions to the PBGC itself. Pursuant to the PBGC Settlement Agreement and the Modified Plan, the PBGC was granted a $3 billion allowed claim against the Debtors and additional cash payments from GM. The consideration received by the PBGC, however, was not specifically apportioned on account of the Debtors' various pension plans. Consequently, it is not clear how to reconcile the consideration already provided to the PBGC in the event that the Pension Plan were to be put to the Reorganized Debtors.

24. In addition, the transactions consummated under the Master Disposition Agreement were expressly conditioned on the effectiveness of the PBGC Settlement Agreement, primarily because the buyers did not want the risks associated with the PBGC's asserted liens against certain non-Debtor foreign affiliates. The transactions contemplated by the Master Disposition Agreement – including the waterfall distributions to the Debtors' general unsecured

---

[7] Section 12.2(c) of the Modified Plan provided, as a condition precedent to effectiveness of the Modified Plan, that the Debtors "shall have entered into the Delphi-PBGC Settlement Agreement and all conditions precedent to the consummation thereof shall have been waived or satisfied."

[8] Paragraph 6 of the PBGC Settlement Agreement includes as a condition precedent "solely as to Delphi, execution of the termination and trusteeship agreements" with the PBGC. In addition, paragraph 14 provides that: "Each of the terms of this Agreement is a material and integral part hereof. Should any provision of this Agreement be held unenforceable or contrary to law, the entire Agreement shall be deemed null and void."

creditors – may therefore need to be unwound if the Salaried Retirees are allowed to seek reinstatement of the Pension Plan against the Reorganized Debtors.[9]  Moreover, if the Pension Plan is restored, the conditions precedent to the Modified Plan could unravel and thereby "knock the props out from under the authorization for every transaction that has taken place."  In re Roberts Farms, Inc., 652 F.2d 793, 797 (9th Cir. 1981), quoted in Chateaugay II, 10 F.3d at 953.

### Notice

25.     Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Seventeenth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered January 25, 2010 (Docket No. 19360).  In light of the nature of the relief requested, the Reorganized Debtors submit that no other or further notice is necessary.

---

[9]  Again, it is not clear to the Reorganized Debtors how any relief could be granted to the Salaried Retirees that would reinstate the Pension Plan without exposing the Reorganized Debtors to additional obligations or liabilities.  See supra note 2.

16

WHEREFORE the Reorganized Debtors respectfully request that this Court enter an order (a) granting the relief requested herein and (b) granting the Reorganized Debtors such other and further relief as is just.

Dated: New York, New York
May 13, 2010

        SKADDEN, ARPS, SLATE, MEAGHER
          & FLOM LLP

By: /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr.
    John K. Lyons
    Ron E. Meisler
155 North Wacker Drive
Chicago, Illinois 60606

- and -

By: Kayalyn A. Marafioti
    Kayalyn A. Marafioti
Four Times Square
New York, New York 10036

Attorneys for DPH Holdings Corp., et al.,
   Reorganized Debtors