**Hearing Date And Time:  May 20, 2010 at 10:00 a.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti

Attorneys for DPH Holdings Corp., et al.,
   Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|  |  |
|---|---|
| In re | :   Chapter 11 |
| DPH HOLDINGS CORP., et al., | :   Case No. 05-44481 (RDD) |
|  | :   (Jointly Administered) |
| Reorganized Debtors. | : |
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

REORGANIZED DEBTORS' OBJECTION TO MOTION OF METHODE
ELECTRONICS, INC. FOR AN ORDER (I) PERMITTING METHODE TO
CONTINUE POST-PETITION LITIGATION WITH REORGANIZED DEBTORS
IN MICHIGAN AND (II) OVERRULING THE REORGANIZED DEBTORS'
TIMELINESS OBJECTION TO METHODE'S ADMINISTRATIVE EXPENSE CLAIMS

DPH Holdings Corp. ("DPH Holdings") and certain of its affiliated reorganized debtors in the above-captioned cases (together with DPH Holdings, the "Reorganized Debtors") hereby submit this objection to Motion Of Methode Electronics, Inc. For An Order (I) Permitting Methode To Continue Post-Petition Litigation With The Reorganized Debtors In Michigan And (II) Overruling The Reorganized Debtors' Timeliness Objection To Methode's Administrative Expense Claims (Docket Nos. 19895, 19896, and 19897) (the "Motion" or "Mem."), and respectfully represent as follows:

## Preliminary Statement

In the Forty-Sixth Omnibus Claims Objection, the Reorganized Debtors objected to two administrative expense claims that were tardily filed by Methode (the "Administrative Claims"). The Administrative Claims concern allegations asserted by Methode in two lawsuits – a claim for anticipatory breach of contract (the "Contract Claim") pending in Michigan state court (the "Contract Action") and a claim for patent infringement (the "Patent Claim") pending in the federal district court for the Eastern District of Michigan (the "Patent Action"). Although Methode asserted the allegations related to its Administrative Claims in these lawsuits prior to June 1, 2009, it did not file its Administrative Claims until November 5, 2009 – almost four months after the July 15, 2009 bar date applicable to administrative expense claims that arose prior to June 1, 2009 (the "July 15 Bar Date"). For this reason and others, the Reorganized Debtors contend in the Forty-Sixth Omnibus Claims Objection that Methode's Contract Claim should be expunged, and that its Patent Claim should be expunged to the extent it seeks damages for alleged claims that arose prior to June 1, 2009.[1]

---

[1]    The Reorganized Debtors first objected that Methode filed two claims that were duplicative of each other. (Docket No. 19711 ¶ 20.) Methode states in the Motion that it is willing for claim number 19951 to be expunged as duplicative. (Mem. p.1, n.1.) The Reorganized Debtors also objected on the merits to the contract claims pending in Michigan state court and the patent claims pending in federal court. (Docket No.

Methode styled its response as a motion requesting permission to continue litigating the parties' disputes in the state and federal courts in Michigan.[2] Methode's Motion misses the mark in trying to fashion the issue here as primarily one of venue. This Court has exclusive jurisdiction over whether to allow or disallow Methode's Administrative Claims under Article 13(b) of the Plan. If the Court disallows Methode's Contract Claim as time-barred, there would be nothing left of that claim to litigate in any forum. As for the Patent Claim – New Delphi is the real party in interest going forward. If the Court finds that Methode's Patent Claim is barred to the extent it asserts claims that arose prior to June 1, 2009, then DPH Holdings would only be potentially responsible for alleged claims that arose during the four month period between June 1, 2009, and October 6, 2009, the Effective Date. And the Reorganized Debtors recognize and agree that it would be appropriate to resolve the merits of the underlying patent dispute in the federal district court in Michigan. Thus Methode's Motion regarding venue is essentially moot.

Even if the Court does consider Methode's Motion with respect to the Contract Action – which the state court recently stayed based on the Court's plan injunction – other factors besides timeliness compel denial of the Motion. Most importantly, forum selection clauses are not binding in core bankruptcy proceedings, and the determination of whether to allow an administrative claim is a core proceeding. Similarly, there is no strong policy reason for this Court to abstain in favor of the state court because, among other things, the validity of Methode's Contract Claim turns on the Court's interpretation of its own orders.

---

19711 ¶¶ 22-25.) Methode concedes that arguments as to the merits of the parties' disputes are reserved. (Mem. p.1, n.1.) The Reorganized Debtors also reserve all arguments regarding the merits of the parties' disputes.

[2]      The Motion also asks the Court to overrule the Reorganized Debtors' timeliness objection and states that it "also constitutes Methode's response to the . . . Forty-Sixth Omnibus Claims Objection."

**Background**

Methode and the Reorganized Debtors have different views about the background to the parties' disputes. Methode was a supplier to former Delphi Automotive Systems, LLC ("Delphi") of parts used in Delphi's Passive Occupant Detection System (PODS). Almost every major automobile original equipment manufacturer in the world uses Delphi's PODS in one or more of its vehicle models. The Reorganized Debtors' view of the breakdown in the parties' supply relationship is contained in the Second Amended And Supplemented Verified Complaint For Breach Of Contract And Injunctive And Other Relief filed in the Contract Action. (See Walsh Decl., Ex. A.) The Second Amended Complaint alleges that, beginning in May 2008, Methode began coercing significant price increases from Delphi – up to 50% or more – to which Methode was not entitled, and threatening to cease supplying parts to Delphi if it did not comply. (Id. ¶¶ 78-102.) To further box Delphi in, Methode began breaching its contractual obligation to provide Delphi access to tooling drawings (Id. 103-109.)

Although Delphi informed Methode that its hostile actions would cause Delphi to seek to resource away from Methode, ultimately Delphi was forced to accept the significant price increases to ensure continuity of supply and entered into the three-year agreement proffered by Methode in September 2008. (Id. ¶¶90-100). This agreement expressly incorporated Delphi's Terms & Conditions as modified through specific negotiations with Methode. Section 11 of the Terms & Conditions – left unmodified by Methode – provided Delphi the right to terminate "for convenience" at any time, and also provided that Methode's "sole and exclusive recovery" for such termination would be a cancellation payment for "raw materials, work-in-process and finished goods inventory" calculated pursuant to the terms of the agreement. (Id.; see also Walsh Decl., Ex. B, ¶ 11.)

4

The litigation ensued thereafter.  Delphi initiated the Contract Action in Michigan state court in October 2008 seeking to enforce its right to obtain tooling drawings.  Methode filed its counterclaim in the Contract Action in January 2009 alleging anticipatory breach of contract based on Delphi's purportedly concealed efforts to resource supply.  In April 2009, Methode commenced the Patent Action by suing Delphi and Marian, Inc. for patent infringement in the district court for the Northern District of Illinois.  Thereafter, Delphi succeeded in having the Patent Action transferred to the Eastern District of Michigan.  Although Methode's allegations in the Contract Action and the Patent Action arose, and were filed, prior to June 1, 2009, Methode did not file its Administrative Claims by the July 15 Bar Date.

Ultimately, Delphi did terminate the parties' supply agreement for convenience and on account of Methode's breaches of the agreement.  Methode sought to enjoin the termination in the Contract Action, but the state court denied the motion.  (See Walsh Decl., Ex. J.)  Thereafter, Methode submitted a claim for the cancellation payment under Section 11 of the Terms & Conditions in the amount of approximately $761,000, which the parties continue to reconcile.

On or about November 5, 2009, Methode submitted its Administrative Claims seeking $40.5 million for breach of contract and additional damages for patent infringement.  (Claim Nos. 19950 and 19951; see also Walsh Decl, Ex. Z.)  On December 4, 2009, the Reorganized Debtors moved in the Contract Action for a stay based on the plan injunctions contained in paragraph 22 of the Plan Modification Order and Article 11.4 of the Modified Plan.  The state court granted the motion on February 24, 2009.  (See Walsh Ex. X.)  Methode filed the instant Motion in response to the Reorganized Debtors' Forty-Sixth Omnibus Claims Objection, in which the Reorganized Debtors' seek to disallow and expunge Methode's Administrative

5

Claims because, among other things, "the Contract Claim and the Patent Claim – to the extent

that the Patent Claim asserts claims arising prior to June 1, 2009 – are untimely."  (Docket No.

19711 ¶ 21.)[3]

**Argument**

**I.     ADMINISTRATIVE EXPENSE CLAIMS THAT METHODE FILED
         AFTER THE APPLICABLE BAR DATE SHOULD BE EXPUNGED**

Methode's Administrative Claims are time-barred and should be expunged with

respect to claims arising prior to June 1, 2009 because Methode did not file its Administrative

Claims until almost four months after the applicable July 15 Bar Date.  Methode does not dispute

that its Contract Claim, filed in Michigan state court in January 2009, arose prior to June 1, 2009.

Nor does Methode dispute that its patent claim, filed in federal court in April 2009, arose (in part)

prior to June 1, 2009.  Rather, Methode argues that the Court should excuse its late filing because

(i) the Modified Plan does not require filing of an administrative claim where litigation is

pending in another court; (ii) Methode's pleadings in other courts satisfy the "informal proof of

claim" doctrine; or (iii) Methode's tardiness should be excused "for cause."

Each of Methode's contentions is incorrect as a matter of law.  There is no carve-

out for litigation pending in other forums in the administrative expense procedures; the Court has

consistently rejected the "informal proof of claim" doctrine where the document at issue was not

filed in the bankruptcy court; and Methode cannot meet the applicable "excusable neglect"

standard because the deadline was clear and its failure to timely file was entirely within its

---

[3]     Both parties agree that the underlying merits of the dispute are not relevant in addressing the issues
currently before the Court with respect to the Motion.  The Reorganized Debtors dispute Methode's
characterization of its allegations to the extent they purport to be offered for the truth of the matter asserted
(rather than for what Methode alleged).  For example, paragraph 8 of the Walsh Declaration merely reports
what was alleged in Methode's counterclaim but does not purport to offer evidence in support of those
allegations.  When the allegations are repeated in the Motion, however, they are not expressly couched as
allegations.  (See Mem. ¶¶ 6-10.)  As discussed above, the Reorganized Debtors dispute Methode's
characterization of the facts underlying facts merits of the dispute.

control.  This Court has consistently applied the "excusable neglect" standard to deny leave to file late claims.

Under the claim procedures applicable to administrative expense claims, Methode's filing of a response to the Reorganized Debtors' objection automatically adjourns the hearing on the Reorganized Debtors' objection to a later date.  Here, however, Methode seeks to have the Court determine the Reorganized Debtors' timeliness objection now by styling its response as a motion to overrule that objection.  Because the timeliness issue is straightforward and likely will moot the forum issues in the remainder of the Motion, the Reorganized Debtors are willing to litigate their timeliness objection now while reserving the right to bring remaining objections to hearing at a later date.

### A.    The Plan Required Filing Of An Administrative Expense Claim

Article 10.2 of the Modified Plan and paragraph 38 of the Modification Procedures Order (Docket No. 17032) unequivocally required Methode to file an administrative expense claim before the July 15, 2009 bar date for any claims it wished to assert against the Reorganized Debtors and clearly spelled out the consequences for its failure to do so.  For example, the Modification Procedures Order provides the following:

> Establishment Of Bar Date For Administrative Expense Claims. Any party that wishes to assert an administrative claim under 11 U.S.C. § 503(b) for the period from the commencement of these cases through June 1, 2009 shall file a proof of administrative expense (each, an "Administrative Expense Claim Form") for the purpose of asserting an administrative expense request, including any substantial contribution claims (each, an "Administrative Expense Claim" or "Claim") against any of the Debtors. July 15, 2009 at 5:00 p.m. prevailing Eastern time shall be the deadline for submitting all Administrative Expense Claims (the "Administrative Expense Bar Date") for the period from the commencement of these cases through June 1, 2009.

* * *

7

> Any party that is required but fails to file a timely Administrative Expense
> Claim Form shall be forever barred, estopped and enjoined from asserting
> such claim against the Debtors, and the Debtors and their property shall be
> forever discharged from any and all indebtedness, liability, or obligation
> with respect to such claim.

(See Docket No. 17032 ¶¶ 38, 40.)[4]  The Modification Procedures Order contains certain

exceptions to the filing requirement, such as for claims for payment for postpetition goods and

services delivered prior to June 1, 2009 but not yet due and payable, that are inapplicable here.

(Id. ¶ 39.)  Moreover, the Modified Plan contains the following similar provisions that are based

on the Modification Procedures Order:

> **Pre-Confirmation Administrative Claim Procedures**.  Pursuant to the
> Modification Procedures Order, all requests for payment of an
> Administrative Claim through June 1, 2009 (other than claims under the
> DIP Facility or as set forth in the Modification Procedures Order, Article
> 10.1 [DIP Facility Claims], or Article 10.3 [Professional Claims] of this
> Plan) must be filed with the Claims Agent and served on counsel for the
> Debtors and the Statutory Committees no later than . . . July 15, 2009.
> Any request for payment of an Administrative Claim pursuant to this
> Article 10.2 that is not timely filed and served shall be disallowed
> automatically without the need for any objection from the Debtors or the
> Reorganized Debtors. . . .  In the event that the Debtors or the Reorganized
> Debtors object to an Administrative Claim, the Bankruptcy Court shall
> determine the allowed amount of such Administrative Claim.

(See Modified Plan Article 10.2.)  Again, there is no contention that Methode's claim falls under

any of the exceptions enumerated in the applicable Modified Plan provision.

Although Methode can point to no language exempting its Administrative Claims

from these filing requirements, Methode nevertheless makes a perfunctory argument that the

pending litigation in the state and federal courts in Michigan relieved Methode of any obligation

to "file a piece of paper in this Court."  (Mem. ¶¶ 57-58.)  First, Methode points out that the

---

[4]     On July 15, 2009, this Court entered the Stipulation And Agreed Order Modifying Paragraph 38 Of
Modification Procedures Order Establishing Administrative Expense Bar Date (Docket No. 18259) to
require parties to submit an Administrative Expense Claim Form for Claims for the period from the
commencement of these cases through May 31, 2009 rather than through June 1, 2009.

prefecatory definition of "Allowed Claim" in the Modified Plan includes, among other things, a

Claim "that has been allowed by a Final Order of the Bankruptcy Court (or such other court or

forum as the Reorganized Debtors and the holder or such Claim agree may adjudicate such

Claim . . .)." Putting aside that no such "Final Order" exists (and avoiding any discussion of the

specific language from the Modification Procedures Order and the Modified Plan governing

administrative claims), Methode stitches this definition together with the Michigan forum

selection clause in the parties' contract to argue that "Delphi unequivocally agreed to the

allowance of Methode's claims in Michigan." (Id. at ¶ 57.) This makes no sense.

At most, Methode's argument supports the idea that the Modified Plan would

allow the parties to agree to determine the amount of presently unliquidated claims in another

forum. Moreover, this would require the Reorganized Debtors' consent and relief from the

injunction, and even then this Court would ultimately determine whether the administrative

claim is "allowed" or, for example, barred due to late filing. Thus, Methode's argument does not

support its contention that it was not required to file an administrative expense claim. Based on

the unequivocal terms of the Modification Procedures Order and the Modified Plan, Methode's

pre-June 1, 2009 administrative expense claims are barred.

### B.    Methode Admits That It Cannot Meet The Standard To Invoke The "Informal Proof Of Claim" Doctrine

Methode argues in the alternative that its filings in Michigan are adequate to meet

the "informal proof of claim" doctrine. (Mem. ¶ 59.) Methode itself describes this standard as

follows:

> Under that doctrine, a pleading or document that does not meet the formal
> requirements of a proof of claim nevertheless will be deemed adequate if it
> (1) was timely filed with the bankruptcy court, (2) states the existence and
> nature of the debt, (3) states the amount of the claim against the estate, and
> (4) evidences the creditor's intent to hold the debtor liable for the debt.

(Mem. ¶ 59 (citing In re Enron Creditors Recovery Corp., 370 B.R. 90, 99 (Bankr. S.D.N.Y.

2007)).)  See also Houbigant, Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.), 190 B.R. 185,

187-88 (Bankr. S.D.N.Y. 1995).  Methode concedes that it does not meet the test it set forth

because it made no timely filing with the bankruptcy court as required by the first prong of the

test.  (Mem. ¶ 59 ("With the exception of a filing in the Bankruptcy Court, Methode's pleadings

in Michigan satisfy each of those requirements.") (emphasis added).)  Accordingly, by its own

telling Methode's argument fails as a matter of law.

        Although Methode cites cases from outside this Circuit to argue that "pleadings in

lawsuits outside the bankruptcy court can qualify as informal proofs of claim" (Mem. ¶ 59), this

Court has already rejected that argument during the course of these chapter 11 cases.  See

Transcript of August 20, 2009 Hearing at 44, attached as Exhibit C hereto ("The [informal proof

of claim] argument, however, again runs afoul of case law in this district and the majority of the

cases, including at the circuit court level elsewhere: that is, that the document giving rise to the

informal proof of claim was not filed in this Court, but rather, instead, only in the courts in

Michigan and in Massachusetts."); see also In re Houbigant, Inc., 190 B.R. at 187-88 (citing

Berger v. Trans World Airlines (In re Trans World Airlines, Inc.), 182 B.R. 102, 108 (D. Del.

1995) (counterclaims filed by creditor in litigation pending in federal district court in Missouri

do not qualify as informal claims in bankruptcy case pending in Delaware because they were not

filed of record in the bankruptcy court)).

        In addition, Methode's pleadings also do not meet the requirement to "state[] the

amount of the claim against the estate."  (Mem. ¶ 59 (citing In re Enron Creditors Recovery

Corp., 370 B.R. at 99).)  In particular, Methode's state court counterclaim provided no notice that

Methode would be seeking "an amount not less than $40,500,000," as set forth in Methode's late-

filed administrative expense claims.  (Walsh Decl., Ex. Z.)  For these reasons, the informal proof

of claim doctrine cannot save Methode's untimely claims.

### C.    There Is No Basis To Accept Methode's Tardy Claims Under The Applicable "Excusable Neglect" Standard

Methode also bases its third and final argument against the Reorganized Debtors'

timeliness objection on faulty premises.  First, ignoring this Court's prior rulings in these chapter

11 cases applying the "excusable neglect" standard to administrative claims, Methode relies

exclusively on out-of-Circuit cases to argue for a looser "standard of 'cause' [that] is more

flexible than a standard of 'excusable neglect.'"  (Mem. at 23-24.)  Second, Methode also ignores

Second Circuit case law establishing that "excusable neglect" is rarely if ever satisfied where, as

here, the deadline was clear and the failure to file was within the control of the movant.

### 1.    The Excusable Neglect Standard Applies

The Modification Procedures Order established the July 15 Bar Date.  Bankruptcy

Rule 9006(b)(1) provides that:

> when an act is required or allowed to be done at or within a specified
> period . . . by order of court, the court for cause shown may at any time in
> its discretion . . . (2) on motion made after the expiration of the specified
> period permit the act to be done where the failure to act was the result of
> excusable neglect.

Although Bankruptcy Rule 9006(b)(1) unambiguously applies by its terms and equates "cause"

with "excusable neglect" after the expiration of the relevant deadline, Methode argues that the

Rule is inapplicable.  Methode cites a single unreported case from the Southern District of

Indiana for the proposition that Bankruptcy Code section 503(a) sets up a more lenient and

flexible "cause" standard just for administrative claims because it separately provides that "[a]n

entity may timely file a request for payment of an administrative expense, or may tardily file

such request if permitted by the Court for cause."  (Mem. ¶ 61 (citing Good v. Blankenship (In re

11

Heartland Steel, Inc.), No. 03-CV-802, 2003 WL 23100035 (S.D. Ind. Dec. 16, 2003).)   Unlike

the district court in In re Heartland Steel, bankruptcy courts in this district have harmonized the

"cause" standards under Bankruptcy Rule 9006(b), section 503(a) of the Bankruptcy Code, as

well as Bankruptcy Rule 3003(c)(3) applicable late-filed pre-petition claims.  In re Dana Corp.,

No. 06-10354, 2007 WL 1577763, at *3 (Bankr. S.D.N.Y May 30, 2007); see also In re

Northwest Airlines Corp., No. 05-17930, 2010 WL 502837, at *1-2 (Bankr. S.D.N.Y. Feb. 9,

2010); In re PT-1 Communications, Inc., 386 B.R. 402 (Bankr. E.D.N.Y. 2007).

Indeed, during the pendency of these chapter 11 cases this Court has found that

late administrative claims are subject to the excusable neglect standard.  See Transcript of

August 20, 2009 Hearing at 47, attached as Exhibit C hereto ("The issue then comes down to

whether the late filing of the proof of administrative claim should be permitted under Bankruptcy

Rule 9006 for excusable neglect.");  see also generally Transcript of December 18, 2009 Hearing

(Docket No. 19295) at 75 ("I conclude that the Fund has not carried its burden to establish

excusable neglect here in respect of its proof of claim").  Methode's Motion provides no reason

for the Court to depart from the standard of "excusable neglect" that it has consistently applied.

### 2.        Methode Cannot Demonstrate Excusable Neglect

Methode has not met its burden for establishing "excusable neglect" under the test

outlined by the United States Supreme Court in Pioneer Investment Services Co. v. Brunswick

Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993). In Pioneer, the Supreme Court held that excusable

neglect is the failure to comply with a filing deadline because of negligence. Id. at 394. In

examining whether a creditor's failure to file a claim by the bar date constituted excusable

neglect, the Supreme Court found that the factors include "[i] the danger of prejudice to the

debtor, [ii] the length of the delay and its potential impact on judicial proceedings, [iii] the reason

for the delay, including whether it was within the reasonable control of the movant, and [iv]

whether the movant acted in good faith." Id. at 395. The Second Circuit has held the most

important factor is the reason for the delay, including whether it was within the reasonable

control of the movant. Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron

Corp.), 419 F.3d 115, 122-24 (2d Cir. 2005).

As this Court has consistently ruled on motions under Bankruptcy Rule 9006(b)(1)

seeking leave to file an untimely proof of claim, a movant must first show that its failure to file a

timely claim constituted "neglect," as opposed to willfulness or a knowing omission.  Then, a

movant must show by a preponderance of the evidence that the neglect was "excusable." See,

e.g., Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 (I) Denying United

States Of America's Motion For Leave To File Late Claim And (II) Disallowing And Expunging

Proof Of Claim Number 16727, entered March 25, 2009 (Docket No. 16515) at Ex. A p. 2 (citing

Pioneer and Midland Cogeneration cases).

The Second Circuit has observed that "'the equities will rarely if ever favor a party

who fail[s] to follow the clear dictates of a court rule,' and 'that where the rule is entirely clear,

we continue to expect that a party claiming excusable neglect will, in the ordinary course, lose

under the Pioneer test.'"  In re Enron Corp., 419 F.3d at 123 (quoting Silivanch v. Celebrity

Cruises, Inc., 333 F.3d 355, 366-67 (2d Cir. 2003)).

### a.  Reason For The Delay

The reason for the delay is the most important factor and is often dispositive. See

In re Musicland Holding Corp., 356 B.R. 603, 607-08 (Bankr. S.D.N.Y. 2006) (emphasizing and

noting that the Second Circuit emphasizes the reason for the delay in determining excusable

neglect and stating that, "The other factors are relevant only in close cases.").  Methode does not

dispute that it received adequate notice of the July 15 Bar Date.  In fact, Methode received notice

directly at its various addresses, as well as through notice served on counsel representing

Methode in the state court action.  (See Affidavit of E. Gershbein dated June 23, 2009, Docket

No. 17267.)  Furthermore, Methode was unquestionably well aware of its claims prior to the bar

date as it had commenced litigation six months earlier on the same claims.  Therefore, Methode's

failure to file a timely administrative expense claim was entirely within Methode's control.  This

factor weighs heavily in favor of the Reorganized Debtors.  Indeed, this Court has held that

where a notice is clear, and is received by counsel, the failure to comply is willful conduct that

cannot be excused under the "excusable neglect" standard.  See Transcript of February 14, 2007

Hearing (Docket No. 7446) at 29.

Although Methode offers no specific excuse for its delay, Methode does contend

that it has acted reasonably.  In doing so, it draws a comparison between itself and the claimants

in Greyhound Lines, Inc. v. Rogers (In re Eagles Bus Mfg., Inc.) 62 F.3d 730 (5th Cir. 1995).  In

Greyhound, certain claimants did not submit proofs of claim prior to the claims bar date just as

Methode has failed to do in these cases.  However, unlike Methode, these claimants were in the

midst of alternative dispute resolution that was ordered by the bankruptcy court prior to the bar

date.  The Fifth Circuit affirmed the bankruptcy court's finding of excusable neglect not because

the claimants were participating in litigation with the Debtor in another forum but because

> "the ADR order required claimants to participate in ADR prior to any
> hearing on a motion to lift stay. Had this order not been issued the
> majority of the claimants would no doubt have filed a motion to lift the
> automatic stay."  But for the requirement to go to ADR, the Claimants
> would have most probably filed motions to stay the execution months
> before the bar date.  These motions usually constitute informal proofs of
> claim . . . Furthermore, the warning provided to creditors about the need
> for filing their proofs of claim, regardless of the ADR, was not very
> conspicuous.

Greyhound, 62 F.3d at 739-40 (quoting the bankruptcy court's opinion).

14

This reasoning is entirely inapplicable to the facts of the instant case. Unlike the claimants in <u>Greyhound</u>, Methode was not forced to pursue litigation in other forums prior to seeking relief from this Court nor does Methode contend that notice regarding the bar date was ineffective.

### b.  Prejudice To The Debtor

Secondly, allowing Methode to pursue its late-filed claim will prejudice the Reorganized Debtors because they remain responsible for the wind-up of administrative claims. Methode's late contract claim alone asserts $40.5 million in damages.  Allowance of Methode's claims at anything close to the asserted amount would obviously prejudice the Reorganized Debtors.

In addition, Methode's claims would prejudice the Reorganized Debtors as well as other creditors in these cases who filed timely administrative expense claims by opening the floodgates to any potential claimant who failed to file an administrative expense claim on or before July 15, 2009.  The July 15 Bar Date was established to identify administrative expense claims accruing before June 1, 2009 that would either be paid pursuant to the terms of the Modified Plan or the Master Disposition Agreement.  Allowing Methode to file an untimely claim may inspire many other similarly situated potential claimants to file similar motions.  Any potential claimant who, by its own error, failed to file a timely administrative expense claim may seek to follow Methode's lead.  Courts have often recognized the danger of opening the floodgates to potential claimants. <u>In re Enron Corp.</u>, 419 F.3d at 132 (2d Cir. 2005); <u>see also</u> <u>In re Kmart Corp.</u>, 381 F.3d 709, 714 (7th Cir. 2004) (noting that if court allowed all similar late filed claims, "Kmart could easily find itself faced with a mountain of such claims"); <u>In re Enron Creditors Recovery Corp.</u>, 370 B.R. at 103 ("'It can be presumed in a case of this size with tens

of thousands of filed claims, there are other similarly-situated potential claimants. . . . Any

deluge of motions seeking similar relief would prejudice the Debtors' reorganization process.'"

(citation omitted)); In re Dana Corp., No. 06-10354, 2007 WL 1577763, at *6 (Bankr. S.D.N.Y.

2007) ("the floodgates argument is a viable one").

Indeed, the Court has denied late administrative claims and other late claims in

these cases, and fairness counsels that the Court should remain consistent in its application of bar

dates.  Accordingly, establishing a precedent for allowing untimely claims without a compelling

justification would greatly prejudice the Debtors, their estates, and their creditors and undermine

the Debtors' restructuring efforts.

### c.  Length Of The Delay And Impact On Judicial Proceedings

Finally, the length of the delay also favors disallowing Methode's claim.  The

Second Circuit has adopted a "strict" standard in the area of excusable neglect, Asbestos Personal

Injury Plaintiffs v. Travelers Indem. Co.  (In re Johns-Manville Corp.), 476 F.3d 118, 120 (2d

Cir. 2007), and Methode was nearly four months late in filing its claim.  Furthermore, Methode's

claims could not be taken into account during the plan modification process as it was filed over

two months after the Modified Plan was confirmed.

For all of these reasons, Methode's pre-June 1, 2009 administrative expense

claims should be expunged.

## II.    REORGANIZED DEBTORS' OBJECTIONS TO THE TIMELINESS OF METHODE'S ADMINISTRATIVE EXPENSE CLAIMS RENDER METHODE'S MOTION TO LIFT THE PLAN INJUNCTION MOOT

The balance of Methode's Motion seeks an order permitting Methode to continue

to prosecute the two cases it has pending against the Reorganized Debtors in the Michigan state

and federal courts.  In the event the Court grants the Reorganized Debtors' objection to the

timeliness of Methode's claims, however, there will be no dispute between the parties regarding

this issue.  As explained more fully below, expungement of the Contract Claim will resolve

Methode's claims in the Contract Action, which is currently stayed.  As for the Patent Action,

New Delphi has effectively intervened in the suit by filing its own consolidated action.  Although

this Court must determine the validity and scope of Methode's administrative expense claim for

patent infringement – including the degree to which it is barred – the Reorganized Debtors agree

that it is appropriate for the federal district court to determine the merits of the underlying patent

dispute.

### A.    Anticipatory Breach Of Contact

Methode filed its anticipatory breach of contract counterclaim on January 9, 2009.

The counterclaim was based on the central allegation that "Delphi entered into the [parties'

supply] agreement in bad faith and, in particular, that 'Delphi concealed its intent to in-source or

re-source Methode shortly after executing the agreement, and Delphi concealed its intent to sue

Methode to obtain the Methode tool drawings in order to effect the re-sourcing.'"  (Mem. ¶ 12

(quoting Walsh Decl. Ex. D ¶ 44).)  This counterclaim clearly arose prior to June 1, 2009, since

it was filed six months earlier and has never been amended.

Moreover, when Delphi terminated the supply agreement in August 2009 for

convenience and breach under the terms of the parties' agreement, the termination did not give

rise to any new claims in the Contract Action.  Although Methode moved for a preliminary

injunction to stop the termination, Methode's motion was based on the assertion that Delphi was

barred from relying on the termination-for-convenience clause because of its earlier alleged

17

anticipatory breach of the supply agreement.[5]  (Mem. ¶ 15.)  Again, Methode relied on the same

allegations from its January 9, 2009 counterclaim, which it never amended.

In a single paragraph in the Motion, Methode tentatively suggests – contrary to its

own allegations in the lawsuit – that its claim might have arisen in August 2009 rather than

January 2009, stating only that "to the extent Methode's contract claim and damages arose when

Delphi's threat of termination was carried out in August 2009, Delphi's timeliness argument is

inapplicable . . . ."  (Mem. ¶ 55.)  Even if construed as an argument upon which Methode asks

the Court to rely, the argument fails.

Delphi's termination for convenience was pursuant to a right expressly bargained

for in the agreement, and it provided Methode an exclusive contractual recovery for raw

materials, work-in-process and finished goods inventory possessed by Methode at the time that

Delphi elected to exercise the termination for convenience provision.  As set forth in the

agreement:

> TERMINATION FOR CONVENIENCE.  In addition to any other rights
> of Buyer to terminate this Contract, Buyer may immediately terminate all
> or any part of this Contract, at any time and for any reason, by notifying
> Seller in writing.  Upon such termination, Buyer may, at its option,
> purchase from Seller any or all raw materials, work-in-process and
> finished goods inventory related to the goods under this Contract which
> are usable and in a merchantable condition.  The purchase price for such
> finished goods, raw materials and work-in-process, and Seller's sole and
> exclusive recovery from Buyer (without regard to the legal theory with is
> the basis for any claim by Seller) on account of such termination, will be
> (a) the contract price for all goods or services that have been completed in
> accordance with this Contract as of termination date and delivered and
> accepted by Buyer and not previously paid for, plus (b) the actual costs of
> work-in-process and raw materials incurred by Seller in furnishing the
> goods or services under this Contract to the extent such costs are
> reasonable in amount and are properly allocable or apportionable under
> generally accepted accounting principles to the terminated portion of this

---

[5]      Methode's motion was denied by the state court because, among other reasons, the Court found that
Methode was unlikely to succeed on the merits of its argument that Delphi's termination for convenience
was in bad faith.  (Walsh Decl., Ex. J at 2-3.)

> Contract <u>less</u> (c) the reasonable value or cost (whichever is higher) of any
> goods or materials used or sold by Seller with Buyer's written consent. . . .
> Within sixty (60) days after the effective date of termination, Seller will
> submit a comprehensive termination claim to Buyer . . . .

(<u>See</u> General Terms & Conditions, Walsh Decl., Ex. B ¶11.)  Delphi's August 26, 2009

Termination Letter requested an inventory and cost breakdown of all raw materials, work-in-

progress, and finished goods inventory as contemplated by this contractual provision.  On

November 1, 2009, Methode submitted its cancellation claim pursuant to this contractual

provision in the amount of $761,755.94 (as amended by Methode on November 18, 2009).  (A

true and correct copy is attached hereto as Ex. A.)  The parties continue to work toward

reconciling the amount of the payment under the cancellation claim, as reflected most recently in

Methode's letter of April 30, 2010.  (A true and correct copy is attached hereto as Ex. B.)

Although this cancellation payment is part of Methode's administrative claim for

contract damages, it does not stem from a breach of contract and is not part of the litigation in the

Michigan state court or in any other court.  Indeed, Methode's request for the cancellation

payment under paragraph 11 of the General Terms & Conditions is inconsistent with the relief it

is seeking in the contract action – and the $40.5 million in damages attributed to the contract

action in the administrative claim – because the cancellation payment is expressly stated to be

"Seller's sole and exclusive recovery from Buyer" under the terms of the agreement.  (<u>See</u> Walsh

Decl., Ex. B ¶11.)  In short the termination-for-convenience payment is separate from the breach

of contract claim and is not pending in any other forum.

Because all of the claims at issue in Contract Action are barred by Methode's

failure to timely file its administrative claim, its Motion to continue litigating in Michigan state

court is moot and the Court need not consider other factors that Methode urges in support of its

Motion.

### B.    Patent Infringement

On April 9, 2009, Methode filed the Patent Action against Delphi and Marian, Inc. in the district court for the Northern District of Illinois.  The patent action alleged that "as part of the same effort to re-source the pads underlying the dispute over the tooling drawings, Delphi was making, using, and/or selling infringing weight sensing pads . . . ."  (Mem. ¶16.)  Delphi succeeded in having venue transferred to the district court for the Eastern District of Michigan.  Because the Patent Action was filed in April 2009, it necessarily arose, at least in part, prior to June 1, 2009.

The Reorganized Debtors do not believe that they are liable for patent infringement either before or after June 1, 2009.  In fact, Delphi countersued in the Patent Action disputing the validity, ownership, and enforceability of Methode's patent.  Moreover, New Delphi is the real party in interest going forward.  If the Court finds that Methode's patent infringement claims are barred with respect to infringement that occurred prior to June 1, 2009, then DPH Holdings would only be potentially responsible for claims of infringement for the four month period between June 1, 2009, and October 6, 2009.  As to the venue for the underlying patent litigation, however, there is no dispute.  The Reorganized Debtors recognize and agree that it is appropriate for the Michigan federal court to resolve the patent issues in light of the specialized subject matter and the involvement of other parties.

## III.    THERE IS NO BASIS TO CONTINUE LITIGATION OF THE CONTRACT DISPUTE IN MICHIGAN STATE COURT

### A.    The Plan Injunction Unquestionably Applies

Despite Methode's contention that it did not violate this Court's injunction by continuing to litigate in state court, the injunction is not susceptible to any other interpretation.  Paragraph 22 of the Plan Modification Order provides that:

> Injunction. Except as otherwise specifically provided in the
> Modified Plan, the MDA Documents, or this order and except as
> may be necessary to enforce or remedy a breach of the Modified
> Plan, the Debtors and all Persons shall be precluded and
> permanently enjoined on and after the Effective Date from (a)
> commencing or continuing in any manner any Claim, action,
> employment of process, or other proceeding of any kind with
> respect to any Claim, Interest, Cause of Action, or any other right
> or Claim against the Reorganized Debtors, which they possessed or
> may possess prior to the Effective Date . . . .

(Docket No. 18707 ¶ 22.)  As the Michigan state court noted in granting the Reorganized

Debtors' motion for a stay, "this Court does not see how the Bankruptcy Court's injunction could

be construed as anything but an order enjoining proceedings in other courts.   (See Walsh Decl.,

Ex. X, at 3.)[6]

Methode's arguments to the contrary are based on the definition of Allowed Claim,

as debunked above in Section I.A., and on Methode's contention that the Reorganized Debtors

waived any reliance on the injunction by continuing to litigate in Michigan after the Effective

Date.  It should be noted that Methode greatly exaggerates the significance of litigation in

Michigan state court between the Effective Date (October 6, 2009) and the Reorganized Debtors'

filing of the motion for a stay on December 4, 2009.  (See Mem. ¶ 23.)  The Reorganized

Debtors' inadvertent continuation of limited discovery activities after the Effective Date does not

vitiate Methode's obligation to abide by the injunction.

## B.      There Is No Basis To Modify The Injunction

This Court has maintained jurisdiction to adjudicate Methode's Administrative

Claims pursuant to Article XIII of the Modified Plan which states that:

> Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the
> Bankruptcy Court shall have exclusive jurisdiction of all matters
> arising out of, and related to, the Chapter 11 Cases and this Plan,
> including . . . to adjudicate any and all adversary proceedings,

---

[6]      The Contract Action is also barred by the injunction in Article 11.14 of the Modified Plan.

applications, and contested matters that may be commenced or
maintained pursuant to the Chapter 11 Cases, this Plan, or that
were the subject of proceedings before the Bankruptcy Court prior
to the Effective Date, proceedings to adjudicate the allowance of
Disputed Claims and Disputed Interests, and all controversies and
issues arising from or relating to any of the foregoing[.]

Methode argues that the parties are contractually required to resolve both the

Contract Action and the Patent Action in Michigan pursuant to the terms of the forum selection

clause, however, "[a] debtor-in-possession or trustee . . . is not bound by a forum selection clause

in an agreement provided the litigation at issue amounts to a core proceeding and is not

inextricably intertwined with non-core matters." Official Comm. of Unsecured Creditors v.

Transpacific Corporation Ltd. (In re Commodore International), 242 B.R. 243 at 261 (Bankr.

S.D.N.Y. 1999); see also Statutory Comm. of Unsecured Creditors v. Motorola, Inc., (In re

Iridium Operating LLC) 285 B.R. 822, 837 (S.D.N.Y. 2002) (applying the rule set forth in

Commodore); Breeden v. The Ageis Consumer Funding Group Inc. (In re Bennett Funding

Group, Inc.), 259 B.R. 243, 252 (N.D.N.Y. 2001) ("Transferring a core matter that is not

'inextricably intertwined' with non-core matters adversely impacts the strong public policy

interest in centralizing all core matters in the bankruptcy court.").

Section 157(b)(2) of Title 28 provides a non-exclusive list of proceedings deemed

to be core, including "matters concerning the administration of the estate;" "allowance or

disallowance of claims against the estate;" "counterclaims by the estate against persons filing

claims against the estate;" and "orders to turn over property of the estate."  The Second Circuit

has found that "[i]n crafting § 157, 'Congress realized that the bankruptcy court's jurisdictional

reach was essential to the efficient administration of bankruptcy proceedings and intended that

'core' jurisdiction would be construed as broadly as possible to the constitutional limits

established'" by the Supreme Court. Bankruptcy Serv. Inc. v. Ernst & Young (In re CBI Holding

Co., Inc.), 529 F.3d 432 at 460 (2d Cir. 2008) (citing S.G. Phillips Constructors, Inc. v. City of

Burlington, Vermont (In re S.G. Phillips Constructors, Inc.), 45 F.3d 702 (2d Cir. 1995)).

   Furthermore, the Second Circuit has explicitly found that any cause of action

stemming from a contract entered into and breached post-petition is a core proceeding because

the adjudication of post-petition contract claims is an integral part of administering the estate.

Ben Cooper, Inc. v. Ins. Co. of Pa. (In re Ben Cooper, Inc.), 896 F.2d 1394, 1399-1400 (2d Cir.

1990) ("We hold, therefore, that the bankruptcy court has core jurisdiction, pursuant to §

157(b)(2)(A), over contract claims under state law when the contract was entered into post-

petition.")

   The Debtors filed their bankruptcy petitions on October 8 and 15, 2005 and the

Post-Confirmation Supply Agreement was entered into on or about September 4, 2008. Walsh

Decl. ¶ 8(d).  Because the Contract Action arises from a dispute regarding a contract entered into

and breached post-petition, it falls within the category of a core proceeding under 28 U.S.C.

§157.  See In re Ben Cooper, Inc., 896 F.2d  at 1399-1400.  Additionally, these core proceedings

are not inextricably tied to non-core proceedings, and hence, the Reorganized Debtors should not

be bound by the forum selection clause.  See In re Commodore International, 242 B.R. at 261.

   Furthermore, in a proceeding in which a nondischargeable postpetition, pre-

effective date claim was at issue, another court in this district noted that "[t]he Court was unable

to find any reported decision where a court, other than the court in which the debtor filed,

substantively adjudicated the determination of whether an administrative claim against the

debtor's estate should be allowed as an actual, necessary cost and expense of preserving the

estate." In re WorldCom, Inc., No. 02-13533,  2009 WL 2959457 at *5 (Bankr. S.D.N.Y. May

19, 2009) (emphasis added).

In support of its argument that the forum selection clause should control venue,

Methode cites to M/S Bremen v. Zapata Off-Shore Co., for the rule that forum selection clauses

"are prima facie valid and should be enforced unless enforcement is shown by the resisting party

to be unreasonable under the circumstances." 407 U.S. 1, 10 (1972).  Methode fails to mention,

however, that the Supreme Court expanded upon this statement by finding that the resisting party

could overcome the presumption by showing that enforcement of the clause would contravene a

strong public policy of the forum in which the suit is brought.  Moreover, Methode does not

address numerous cases in this circuit and others that have found that transferring a core matter

that is not inextricably intertwined with non-core matters adversely impacts the strong public

policy interest in centralizing all core matters in the bankruptcy court.  See In re Bennett Funding

Group, Inc. 259 B.R. at 252 ("Transferring a core matter that is not 'inextricably intertwined'

with non-core matters adversely impacts the strong public policy interest in centralizing all core

matters in the bankruptcy court."); see also In re Stephanie Brown, 354 B.R. 591 (Bankr. D.R.I.

2006) ("courts have uniformly found that forum selection clauses in core contract proceedings

are not automatically enforceable because such enforcement would undermine the goal of

centralizing bankruptcy proceedings"); In re Iridium Operating LLC, 285 B.R. at 837 (Bankr.

S.D.N.Y. 2002) (holding that "although there is a strong policy favoring the enforcement of

forum selection clauses ... this policy is not so strong as to mandate that forum selection clauses

be adhered to where the dispute is core"); N. Parent, Inc., v. Cotter & Co. (In re N. Parent, Inc.),

221 B.R. 609, 622 (Bankr. D. Mass. 1998) (collecting cases and holding that "[r]etaining core

proceedings in this Court, in spite of a valid forum selection clause, promotes the well-defined

policy goals of centralizing all bankruptcy matters in a specialized forum to ensure the

expeditious reorganization of debtors"). Because the Contract Action stands on its own, there is

no reasonable basis for believing that it is inextricably intertwined with non-core matters.

Furthermore, Methode states that forum selection clauses have even more force

after a plan is confirmed and courts enforce such provisions, notwithstanding language in chapter

11 plan reserving bankruptcy court jurisdiction over disputes involving the debtor, especially

where virtually all distributions have been made and the outcome of the proceeding will have no

impact upon the plan and cites Unified Data Sys. v. Almarc Corp. (In re Almarc Corp.), 94 B.R.

361, 366 (Bankr. E.D. Pa. 1988) in support.  Although, Methode correctly summarizes the rule

set forth in Almarc, the Almarc court in making its ruling explicitly disagreed with the holding of

a similar case decided in the Eastern District of New York, Matter of Hudson Feather & Down

Products, Inc., 36 B.R. 466 (E.D.N.Y. 1984), which found that no effect upon the plan was

required.  In re Almarc Corp., 94 B.R. at 364 ("At least one court has held that a retention of

jurisdiction clause found in a confirmed plan would justify bankruptcy court resolution of an

adversary proceeding, pending at the time of confirmation, even though the outcome of the

proceeding would have no effect upon the plan. Respectfully, I disagree with this holding.")

What is more, even under the rule set forth in Almarc, jurisdiction of this Court

over the Contract Claim would be proper because of the more than $40 million in damages

sought by Methode.  Methode's sizeable claim was not contemplated at the time the plan was

confirmed and would certainly have a detrimental effect on the Reorganized Debtors' ability to

carry out the terms of the plan.

## C.    **Permissive Abstention Is Not Warranted**

The Court should also decline Methode's request to abstain from hearing

Methode's Contract Claim under discretionary abstention pursuant to 28 U.S.C. Section

1334(c)(1).  Although this Court granted discretionary abstention in <u>In re Portrait Corporation of America, Inc.</u>, the Court noted that "'[f]ederal courts should be sparing in the exercise of discretionary abstention,'" and "the balance should be 'heavily weighted in favor of the exercise of jurisdiction.'"  406 B.R. 637, 641-42 (Bankr. S.D.N.Y. 2009) (internal citations omitted).

In denying a request for discretionary abstention in these cases in connection with recent litigation between the Delphi Salaried Retiree's Association and General Motors LLC, the Court reiterated that a decision to abstain is "extraordinary" and noted the Supreme Court's statement that a court's duty to exercise its jurisdiction when properly invoked is a "virtually unflagging obligation."  (Docket No. 19587, Feb. 25, 2010 Tr., pp. 86-87.)  As in that case, numerous factors weigh against abstention here and also distinguish Methode's state court contract claim from the claims at issue in <u>Portrait Corp.</u>  Among other things:

- The state court case has been enjoined by the Modified Plan and this Court's Plan Modification Order.  Therefore, there is no risk of the state court and this court making overlapping or inconsistent factual findings because the state court action is not proceeding.  <u>See id.</u> at 643.

- Methode's claims are subject to dismissal on bankruptcy grounds having nothing to do with the underlying dispute which – unlike in <u>Portrait Corp.</u> – arise from interpretation of this Court's own orders rather an order entered by another bankruptcy judge.  <u>Id.</u>

- As discussed above, the Reorganized Debtors have a large financial interest in the outcome of the dispute, whereas in <u>Portrait Corp.</u> the debtors were only a nominal party with no financial interest.  Id.; <u>see also id.</u> at 639 n.1.

- To the extent the merits are relevant they revolve around commonplace breach of contract issues rather than specialized issues such as the trademark claims at issue in <u>Portrait Corp</u>.  <u>Id.</u> at 642.

- There are no third parties involved in the state court action.

- There is no basis for Methode's suggestion of forum shopping where the Reorganized Debtors have merely objected to administrative claims over which this Court has retained jurisdiction, and obtained a stay in the state

court action based on the plan injunction within a reasonable time after the Effective Date.

For these reasons as well as the other reasons set forth herein, the Court should decline to exercise discretionary abstention of Methode's breach of contract claim.

WHEREFORE the Reorganized Debtors respectfully request that this Court enter an order (a) overruling Methode's Motion For An Order Permitting Methode To Continue Post-Petition Litigation With Reorganized Debtors In Michigan; (b) expunging Methode's administrative expense claims arising prior to June 1, 2009; and (c) granting the Reorganized Debtors such other and further relief as is just.

Dated:   New York, New York
         May 13, 2010

                                    SKADDEN, ARPS, SLATE, MEAGHER
                                       & FLOM LLP

                                 By:   /s/ John Wm. Butler, Jr.
                                     John Wm. Butler, Jr.
                                     John K. Lyons
                                     Ron E. Meisler
                               155 North Wacker Drive
                               Chicago, Illinois 60606

                                        - and -

                                 By:   /s/ Kayalyn A. Marafioti
                                     Kayalyn A. Marafioti
                               Four Times Square
                               New York, New York 10036

                               Attorneys for DPH Holdings Corp., et al.,
                                 Reorganized Debtors

# EXHIBIT A

**From:** Glandon, Tim [mailto:Tim.Glandon@methode.com]
**Sent:** Sunday, November 01, 2009 11:07 AM
**To:** Beteet, Kenneth H
**Cc:** Boyer, Ben; Buenzow, Julie
**Subject:** RE: Part Numbers 28016811 and 12233189

Ken:

Attached is Methode's claim for obsolescence. This claim is based on the cancellation notification received by Methode on 8-27-09 and the weekly release received on 8-24-09.

Methode would be happy to release components and finished goods for shipment once we have received payment in full for our obsolescence claim.  Please contact Ben Boyer or Julie Buenzow with any questions.

Regards,
Tim


**From:** Beteet, Kenneth H [mailto:kenneth.h.beteet@delphi.com]
**Sent:** Thursday, October 29, 2009 10:27 AM
**To:** Boyer, Ben
**Cc:** Glandon, Tim
**Subject:** Part Numbers 28016811 and 12233189
**Importance:** High

Ben,

We understand that you may have some inventory of the subject part number bladder assemblies available for immediate possession by Delphi.  If so, please confirm quantity and the contact person at Methode you would like us to coordinate collecting this material.  The pricing for these part numbers are already established as follows:

- 28016811 = $11.63
- 12233189 = $11.74

Feel free to contact me at 765-451-2520 if you have questions and your prompt reply would be appreciated.

Ken Beteet
Manager, GSM
Delphi Corporation

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Note:   If the reader of this message is not the intended recipient, or an employee

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**DELPHI DELCO ELECTRONICS SYSTEMS**                    **DE WI FOR 406.05.01A**

# Direct Supplier Cancellation Claim Request

| Effective Date:    May 2, 1999 | Page 1 of 5 |

---

**NOTE:**  Pages 1 and 2 of this form are to be filled out by Supplier and sent
to DE Buyer for processing.  Shaded areas are for DE use only.

Log # (MPS)_____

---

Buyer Information:

Buyer Name _____      Phone _____      FAX _____      M.S. _____

---

Supplier Name     Methode Electronics

Date  10/30/09

Supplier Address  111 W Buchanan

                              Carthage, Il 62321

Purchase Order Number(s)  Various

Supplier Duns Numbers:   Scheduling  13-735-5322 and 81-260-3215   Shipping  07-348-5943

Plant Code(s) of DE using factory(s)  _____

Pull Signal Coordinator(s)  _____

Part Number  Various              Part description  POD's Bladders

Part standard pack quantity  Various

Quantity requesting cancellation settlement  See Attached

Reason for cancellation      (include ECO # or Customer Cancellation Request if applicable) :

Delphi terminated contract
_____

Type of material (steel, plastic, precious metals, etc.)  Plastic, Urethane, HDPE, etc.

Are there any hazardous concerns?              Yes _____              No     X

---

If Yes, describe the appropriate disposition process  _____
_____

**Quantity that is**              _____     X     Part $ _____    =   $ _____
completely fabricated                          Price   (DE purchase price)
Indicate how the above quantity is calculated:
SPD or SDS Date and quantity            _____
                                                        (3 weeks minimum; current week, week before, week after)

  -  Pulls shipped                        _____
                                                        (3 weeks minimum; current week, week before, week after)

  -  Other/Explain                      See attached  pages for cost of each program

  -  Location of Material            McAllen, Texas, USA
                                                  (City, State, Country)

---

When printed, this document is uncontrolled unless identified as controlled by a Document Control Center.

**DELPHI DELCO ELECTRONICS SYSTEMS**                    **DE WI FOR 406.05.01A**

# Direct Supplier Cancellation Claim Request

**Effective Date:**    May 2, 1999                                                        Page 2 of 5

**Quantity that is partially fabricated**    _____    Log # (MPS)_____

    Percent complete to finished state    _____

    $ Value declared    _____

    Describe how quantity and cost are calculated    _____

    _____

    _____

    _____

    Location of Material    _____
                              (City, State, Country)

**Quantity of raw material and/or purchased parts**    _____

$ Value declared    _____

Describe how the value is calculated    See attached sheets_____

_____

_____

Location of Material                    McAllen, Texas, USA
                                  (City, State, Country)

**Total Quantity**    _____
                    (should equal "Quantity requesting cancellation settlement" above)

**Total $ Value Declared**    $737,026.95_____

Preparer's Name  Julie Buenzow    Preparer's Signature  Julie Buenzow

Preparer's Phone Number  217-357-3941 ext 22315   FAX    217-357-6275

Return completed form to the DE buyer of this material:
    -  Include a copy of Material Commitment Authorization (for MPS)
    -  Include copies of SPD or SDS used in calculations
    -  Do not destroy and/or sell claimable material until written approval is given by DE
    -  DE has the right to audit quantities declared

Pg 32 of 92 **DE WI FOR 406.05.01A**

# Direct Supplier Cancellation Claim Request

**Effective Date:**    **May 2, 1999**                                                                                             **Page** 3 **of** 5

Log # (MPS)_____

**Service Needs** (Excluding life time buys)    _____

_____

_____

Service Signature _____        Date _____

---

**Salvage Recommendation:**            Scrap at Supplier _____

Send to DE _____
Comments: _____

_____

Salvage Signature_____        Date _____

---

**Cancellation Claim Analysis:**                    Date _____

End Model Numbers _____

Average daily consumption _____        Focused Factory(s) Inventory _____

Date of SPD or SDS used by supplier _____        MCA (commitment time) _____

Date of SPD or SDS used by DE _____        SPD or SDS total commitment _____
                                                                                per MCA

Total number of parts received _____

DE's liability to supplier _____

_____

_____

Prior Communication (describe/attach) _____

_____

_____

Analysis done by _____
                            Buyer (MIS material) or CMC MPS Contact (MPS material)

---

**Physical material audit by Finance recommended?**   Yes _____        Recommended by _____

---

**Account Classification & Finance Approval:**

General Ledger Account No. _____

Finance Approval Signature _____        Date _____

When printed, this document is uncontrolled unless identified as controlled by a Document Control Center.

**DELPHI DELCO ELECTRONICS SYSTEMS**                    **DE WI FOR 406.05.01A**

# Direct Supplier Cancellation Claim Request

**Effective Date:      May 2, 1999**                                        **Page** 4 **of  5**

Log # (MPS)  _____

**Buyer Checklist & Approval:**

| | | | |
|---|---|---|---|
| Vendor will not accept for credit | \_\_\_\_\_ | No use as alternate or optional part | \_\_\_\_\_ |
| Cannot be modified for other use | \_\_\_\_\_ | Cannot be sold | \_\_\_\_\_ |
| Service requirement addressed | \_\_\_\_\_ | Salvage recommendation addressed | \_\_\_\_\_ |
| MPS Contact involved if MPS | \_\_\_\_\_ | Release statement put on cancellation P.O. | \_\_\_\_\_ |
| Original PO # and Part # included | \_\_\_\_\_ | | |
| in Description on PO | | | |

Final negotiated cancellation charge      $_____

Original P.O. No.  _____      Cancellation P.O. No.  _____ECO or Customer  _____
                                                                                            Cancellation #

Comments:  _____

_____

_____

Buyer Approval Signature                    _____      Date  _____

Purchasing Mgr/Commodity Mgr Approval Signature  _____      Date  _____

**Supplier Accounting:**      Invoice No.      _____      Invoice Date _____

Invoice Amount  _____

Date invoice paid  _____      By  _____

When printed, this document is uncontrolled unless identified as controlled by a Document Control Center.

**DELPHI DELCO ELECTRONICS SYSTEMS**                    **DE WI FOR 406.05.01A**

# Direct Supplier Cancellation Claim Request

**Effective Date:**      **May 2, 1999**                                                    **Page** 5 **of  5**

When printed, this document is uncontrolled unless identified as controlled by a Document Control Center.

| | | |
|---|---|---|
| **Total Obsolete Claim** | **$** | **737,026.95** |
| Finished Goods | $ | 37,705.51 |
| Program Specific Raw Material | $ | 502,101.79 |
| Common Components Raw Material | $ | 197,219.64 |

| | | | | | Program specific Raw material Delphi responsible | FG Delphi Responsible |
| | | | | | $ 502,101.79 | $ 37,705.51 |
| FG Delphi Responsible | Raw Material Delphi Responsibe | Total Delphi Responsible | PLATFORM | DELPHI PART NUMBER | Cost per program for raw material | FG |
|---|---|---|---|---|---|---|
| | 0 | 0 | P221 | 12219220 | $       - | |
| 1800 | 17640 | 19440 | NISSAN UL | 12227259 | $ 24,687.98 | $       - |
| | 3600 | 3600 | Landrover L319 | 12228239 | $  5,454.80 | |
| 1440 | 13680 | 15120 | EN | 12231710 | $ 15,848.15 | $       - |
| | 0 | 0 | Jag X204 | 12228039 | $       - | |
| 360 | 2520 | 2880 | Volvo P2 C3 | 21000351 | $  5,021.16 | $       - |
| 360 | 1080 | 1440 | Jag X404 | 21000280 | $  2,234.76 | $       - |
| | 0 | 0 | Subaru 00X | 12245219 | $       - | |
| | 0 | 0 | GMT201 | 28005599 | $       - | |
| | 0 | 0 | GMT001 | 28003555 | $       - | |
| | 1080 | 1080 | GMT345 | 28009245 | $  2,599.20 | |
| | 0 | 0 | SAAB 606 | 28011221 | $       - | |
| | 0 | 0 | SAAB 442 | 28005945 | $       - | |
| | 0 | 0 | SAAB 440 | 28012474 | $       - | |
| 1440 | 8640 | 10080 | S197 | 28011252 | $ 17,332.88 | $       - |
| 7180 | 46080 | 53260 | U204 (2005) | 28014609 | $ 29,933.52 | $   246.96 |
| | 0 | 0 | Hyundai JM | 28022794 | $       - | |
| | 0 | 0 | GMT360 | 28016013 | $       - | |
| 240 | | 240 | GMX001 | 28026953 | $   447.97 | |
| | 0 | 0 | Hyundai TG | 12241679 | $       - | |
| | 360 | 360 | BENTLEY 614/615 | 28016811 | $   805.77 | |
| | 0 | 0 | MERCEDES R230 | 28017111 | $       - | |
| 360 | 2520 | 2880 | TACOMA/TUNDRA | 28037858 | $  3,016.18 | $       - |
| | 0 | 0 | Mercedes R171 | 28017110 | $       - | |
| 340 | 5040 | 5380 | GMX222/272 | 28041706 | $  9,987.50 | $   250.54 |
| 0 | 4680 | 4680 | VOLVO Y286 | 28019044 | $  4,641.91 | $ 9,494.50 |
| | 0 | 0 | D219 | 28039566 | $       - | |
| 1420 | 10080 | 11500 | GMT355 | 28042022 | $  5,964.53 | $   262.13 |
| 340 | 2880 | 3220 | Lexus 250L | 28017741 | $  6,744.63 | $   255.42 |
| 2520 | 21960 | 24480 | Nissan X11C | 28041709 | $ 14,231.38 | $       - |
| | 3240 | 3240 | Audi B6/B7 Basic | 28043051 | $  3,349.38 | |
| | 0 | 0 | GMX211/231 | 28044079 | $       - | |
| | 0 | 0 | PQ35 D1 PHAETON | 28041348 | $       - | |
| | 720 | 720 | PQ35 Touareg (2004) | 28041349 | $  1,126.85 | |
| 3180 | 17640 | 20820 | VW Jetta | 28041350 | $ 22,934.62 | $  5,465.04 |
| 240 | 1440 | 1680 | VW BEETLE | 28041351 | $  5,527.98 | $       - |
| | 0 | 0 | Lexus 424L | 28017740 | $       - | |
| 1800 | 11880 | 13680 | Hyundai CM | 12241699 | $ 16,034.14 | $       - |
| 2520 | 17280 | 19800 | NISSAN HS (L32H) | 28002804 | $ 13,701.55 | $       - |
| | 0 | 0 | AUDI A8 (D3) | 28048022 | $       - | |
| 1440 | 9360 | 10800 | Toyota 041L | 28046641 | $ 22,781.72 | $       - |
| 1420 | 7560 | 8980 | Toyota 221L | 28017742 | $  5,463.74 | $   259.33 |
| | 1440 | 1440 | L322 | 28042012 | $  2,433.86 | |
| 1800 | 12600 | 14400 | WS204 | 28017108 | $ 12,183.84 | $       - |
| | 0 | 0 | MCLAREN | 28042014 | $       - | |
| 1080 | 18900 | 19980 | P150 | 28057939 | $ 21,595.45 | $       - |
| | 0 | 0 | Bentley BY821 | 28029716 | $       - | |
| | 60 | 60 | Bentley BY825 | 28031746 | $   106.76 | |
| | 0 | 0 | Nissan AL07 | 28056495 | $       - | |

| FG Delphi Responsible | Raw Material Delphi Responsibe | Total Delphi Responsible | PLATFORM | DELPHI PART NUMBER | Cost per program for raw material | FG |
|---|---|---|---|---|---|---|
| 340 | 2520 | 2860 | GMX215/245 | 28056999 | $ 3,539.84 | $ 255.29 |
| | 0 | 0 | Kia KM | 28055834 | $ - | |
| | 0 | 0 | GMT900 | 28070165 | $ - | |
| | 0 | 0 | R171 | 28079716 | $ - | |
| 3280 | 8640 | 11920 | Subaru ZR1 | 28071459 | $ 16,683.60 | $ 4,436.54 |
| | 0 | 0 | AC209 (Gen 1.5) | 28086716 | $ - | |
| | 0 | 0 | CL203 (Gen 1.5) | 28086785 | $ - | |
| 5740 | 44280 | 50020 | C170 | 28042522 | $ 44,285.94 | $ 246.00 |
| 360 | 3240 | 3600 | Jaguar X358 | 28080781 | $ 5,320.20 | $ - |
| | 0 | 0 | GMT921 | 28058693 | $ - | |
| | 0 | 0 | C216 w/ fass | 28076914 | $ - | |
| | 0 | 0 | C216 w/ fass & foam | 28076915 | $ - | |
| 360 | 6120 | 6480 | VOLVO P2 | 28080155 | $ 12,196.72 | $ - |
| 7180 | 37800 | 44980 | Toyota Corolla Domestic (150L) | 28091941 | $ 36,345.06 | $ 257.62 |
| | 0 | 0 | Toyota Corolla Export (253L) | 28091942 | $ - | |
| 360 | 3960 | 4320 | Toyota Scion 145L | 28101880 | $ 692.67 | $ 4,649.72 |
| 360 | 1440 | 1800 | SMART451 | 28108237 | $ 4,600.44 | $ - |
| | 0 | 0 | Toyota 215L/220L | 28109991 | $ - | |
| | 0 | 0 | Audi B8 | 28111267 | $ - | |
| 1080 | 1800 | 2880 | Hyundai BH | 28031178 | $ 2,692.03 | $ - |
| | 0 | 0 | Kia HM | 28068994 | $ - | |
| 1380 | 10080 | 11460 | Mercedes WS212 | 28092602 | $ 15,739.75 | $ 789.04 |
| 360 | 1440 | 1800 | Mercedes W221 | 28108070 | $ 4,039.02 | $ - |
| 360 | 1440 | 1800 | Porsche Panamera | 28087586 | $ 2,759.26 | $ - |
| | 0 | 0 | GMT900 PODS D | 28151126 | $ - | |
| 3220 | 17280 | 20500 | Audi B8 | 28128390 | $ 14,313.41 | $ 213.84 |
| 360 | 360 | 720 | Hyundai BK | 28088155 | $ 1,550.49 | $ - |
| 360 | 1080 | 1440 | Mercedes AC207 | 28163734 | $ 3,228.87 | $ - |
| | 112 | 112 | Viper | 28160604 | $ 294.56 | |
| 13048 | 110880 | 123928 | GMT900 PODS D | 28179576 | $ 33,334.02 | $ 487.93 |
| 900 | 9720 | 10620 | D258 | 28169615 | $ 9,609.39 | $ 2,324.81 |
| 500 | 6120 | 6620 | V227 | 28146298 | $ 14,684.29 | $ 7,810.80 |

**Common Components Raw Material $ 197,219.64**

Yellow - Less material than Delphi is responsible for
Red - More material then Delphi is responsible for

| Common Components | Cost for common Components | Inventory on Hand | Delphi Responsible Per releases | Delphi Responsible per inventory | Total Cost |
|---|---|---|---|---|---|
| 83010 | $ 1.72 | 24897 | 203718 | 24897 | $ 42,822.60 |
| 83110 | $ 0.07 | 70229 | 436528 | 70229 | $ 4,916.03 |
| 83111 | $ 0.08 | 15370 | 56040 | 15370 | $ 1,237.29 |
| 83112 | $ 0.08 | 4145 | 27300 | 4145 | $ 331.60 |
| 83174 | $ 0.11 | 41039 | 63120 | 41039 | $ 4,698.97 |
| 83499 | $ 0.06 | 5920 | 0 | 0 | $ - |
| 83591 | $ 0.06 | 4100 | 10800 | 4100 | $ 227.14 |
| 83009 | $ 0.06 | 113637.3667 | 366232 | 113637 | $ 6,295.51 |
| 83006-2 | $ 0.16 | 15112 | 17280 | 15112 | $ 2,373.89 |
| 83006-3 | $ 0.10 | 18564 | 21420 | 18564 | $ 1,808.89 |
| 83006-4 | $ 0.11 | 16910 | 10080 | 10080 | $ 1,065.54 |
| 83006-5 | $ 0.12 | 35706 | 35060 | 35060 | $ 4,120.24 |
| 83006-6 | $ 0.14 | 22622 | 26260 | 22622 | $ 3,259.71 |
| 83006-7 | $ 0.08 | 0 | 0 | 0 | $ - |
| 83006-8 | $ 0.23 | 16002 | 11540 | 11540 | $ 2,651.02 |
| 83006-10 | $ 0.22 | 5135 | 1860 | 1860 | $ 405.32 |
| 83006-11 | $ 0.09 | 7234 | 112 | 112 | $ 10.19 |
| 83006-12 | $ 0.13 | 31286 | 174160 | 31286 | $ 4,138.62 |
| 83006-13 | $ 0.17 | 58712 | 72220 | 58712 | $ 10,020.34 |
| 83006-14 | $ 0.17 | 10726 | 3240 | 3240 | $ 537.66 |
| 83006-15 | $ 0.19 | 23116 | 19440 | 19440 | $ 3,777.02 |
| 83006-16 | $ 0.15 | 0 | 0 | 0 | $ - |
| 83006-17 | $ 0.18 | 53284 | 150968 | 53284 | $ 9,723.28 |
| 83006-18 | $ 0.22 | 2507 | 0 | 0 | $ - |
| 83006-19 | $ 0.15 | 1002 | 720 | 720 | $ 105.87 |
| 83006-20 | $ 0.09 | 8562 | 0 | 0 | $ - |
| 83006-21 | $ 0.21 | 23389 | 24420 | 23389 | $ 4,917.21 |
| 83006-22 | $ 0.25 | 3817 | 2860 | 2860 | $ 724.57 |
| 83006-23 | $ 0.19 | 0 | 0 | 0 | $ - |
| 83006-24 | $ 0.20 | 15797 | 11460 | 11460 | $ 2,314.56 |
| 83013 | $ 0.01 | 319144 | 821456 | 319144 | $ 3,191.44 |
| 83024 | $ 0.02 | 29412 | 75960 | 29412 | $ 588.24 |
| 83651-1 | $ 0.05 | 19855 | 41000 | 19855 | $ 945.10 |
| 83194 | $ 0.05 | 42988 | 32700 | 32700 | $ 1,635.00 |
| 83258 | $ 0.06 | 64538 | 156944 | 64538 | $ 3,998.13 |
| 83136-3 | $ 0.05 | 55464 | 88460 | 55464 | $ 2,911.86 |
| 83114-3 | $ 0.03 | 59390 | 43160 | 43160 | $ 1,294.80 |
| 83020 | $ 0.07 | 11536 | 2880 | 2880 | $ 187.20 |
| 83464 | $ 0.03 | 5486 | 6480 | 5486 | $ 180.49 |
| 83129 | $ 0.05 | 5107 | 67380 | 5107 | $ 254.84 |
| 83582 | $ 0.35 | 10207 | 11660 | 10207 | $ 3,536.73 |
| 83623 | $ 0.09 | 10381 | 20500 | 10381 | $ 891.73 |
| 83424 | $ 0.32 | 2140 | 240 | 240 | $ 77.81 |
| 83182 | $ 0.02 | 26652 | 0 | 0 | $ - |
| 83248 | $ 0.12 | 20415 | 24060 | 20415 | $ 2,421.22 |
| 83369 | $ 0.04 | 10 | 0 | 0 | $ - |
| 83306 | $ 0.17 | 27381 | 23740 | 23740 | $ 4,035.80 |
| 83018 | $ 0.00 | 181037.75 | 184501 | 181038 | $ 687.94 |
| 83476 | $ 0.01 | 67289.25 | 21420 | 21420 | $ 107.10 |

| Common Components | Cost for common Components | Inventory on Hand | Delphi Responsible Per releases | Delphi Responsible per inventory | | Total Cost |
|---|---|---|---|---|---|---|
| 83012 | $ 0.03 | 177735 | 499800 | 177735 | $ | 5,332.05 |
| 83012-1 | $ 0.03 | 7073 | 0 | 0 | $ | - |
| 83103 | $ 0.08 | 26563 | 47380 | 26563 | $ | 2,125.04 |
| 83103-2 | $ 0.08 | 14189 | 35920 | 14189 | $ | 1,135.12 |
| 83015 | $ 0.01 | 123563 | 209480 | 123563 | $ | 1,235.63 |
| 83317 | $ 0.01 | 63819 | 118200 | 63819 | $ | 638.19 |
| 508 | $ 2.32 | 8301 | 24642 | 8301 | $ | 19,258.32 |
| 509 | $ 3.58 | 259 | 180 | 180 | $ | 644.40 |
| 510 | $ 3.50 | 345 | 84 | 84 | $ | 294.00 |
| 511 | $ 3.96 | 1118 | 1366 | 1118 | $ | 4,427.28 |
| 507 | $ 4.73 | 150 | 0 | 0 | $ | - |
| 83011 | 0.06 | 10075 | 1440 | 1440 | $ | 86.40 |
| 83331 | 0.005 | 21829.85 | 990 | 990 | $ | 4.95 |
| 83642 | 0.054 | 1092 | 22300 | 1092 | $ | 58.97 |
| 83151 | 1.38 | 6974 | 2880 | 2880 | $ | 3,974.40 |
| Evco Raw Material | | | | | $ | 5,020.14 |
| Chem-Tech Raw Material | | | | | $ | 815.51 |
| Silicone Costs to return material | | | | | $ | 11,227.00 |
| Supplier Box raw material | | | | | $ | 1,513.75 |

# EXHIBIT B



**111 W. Buchanan Street**
**PO Box 130**
**Carthage, IL 62321**
**Ph: 217-357-3941**
**Fax: 217-357-6265**

April 30, 2010

Mr. John Brooks
President, DPH-DAS LLC
5725 Delphi Drive
Troy, MI  48098

Re:      Methode Obsolescence Claim

Dear Mr. Brooks:

We are in receipt of your letter of April 15, 2010 regarding Methode's obsolescence claim which
was submitted to Delphi almost six months ago on November 1, 2009.  We have followed up on
that claim and provided additional requested information on November 24, 2009, December 14,
2009 and February 18, 2010.

At the outset, we note that you write on behalf of DPH-DAS.  Please note that Methode is not
waiving its rights as to who is the obligor for Methode's claims since Methode has no definitive
independent insight at this time into what entity is responsible for Methode's claims after
consummation of the Delphi plan.

We note that you dispute the amount of the claim owed by Delphi under the terms of the contract
and assert that the amount due and owing is $626,482.20 as opposed to the $761,755.94 claim
submitted by Methode.  Please note that the total amount of the claim is correctly stated in the
cancellation claim form as $761,755.94.  The spreadsheet earlier provided to Delphi had a
discrepancy in the formula at Column CD, cell 55 and 56 at the BOM tab.  A revised spreadsheet
is attached.

As to its obsolescence claim, Methode has submitted complete information to Delphi and as you
have noted in your letter, our spreadsheets are supported by related detail.  Although we disagree
with your calculation and are not waiving any portion of our claim, we would like to address
specifically your exclusion of $100,206.45 for the cost of 16,785 pressure sensors that Methode
has purportedly not returned to Delphi.  As set forth in great detail in our letter of February 18,
2010, those sensors are not in Methode's possession and Delphi has made a miscalculation.
Delphi double-counted sensors and then did not subtract from Methode's inventory the sensors
that Methode had returned to Delphi.  In fact, the number of pressure sensors reported in
Delphi's letter of December 9, 2009 was much closer to the actual number than the revised count

Mr. John Brooks
April 30, 2010
Page 2


in Delphi's February 5, 2010 letter.  We enclose another copy of our February 18th letter for
your information and consideration.

Furthermore, although Methode disputes that it provided "insufficient data" on any item in its
cancellation claim and specifically Delphi's exclusion of $18,576.40 on that basis, the attached
spreadsheet provides some additional data on this point at the Summary Tab, column N, cells 63-
66.  The costs Methode incurred for each of the items identified by Delphi, silicone disposal
costs, Evco raw material, supplier box raw material, and Chem-Tech raw material, were well
within the Delphi releases and are, therefore, appropriately part of Methode's cancellation claim.

In the interest of resolving this matter, however, Methode will agree to settle its obsolescence
claim for $745,242.88  **By this offer of settlement, Methode does not in any way waive or
consent to settle any other part of its pending administrative claims (Methode Proofs of
Claim numbers 19950 and 19951) other than the obsolescence/cancellation claim nor can
this offer be construed as such.**  Those matters are separate and distinct from Methode's
obsolescence claim submitted on November 1, 2009.  If Delphi wishes to accept this offer of
settlement of Methode's obsolescence claim, Delphi must remit payment on or before May 17,
2010.

We look forward to hearing from you promptly.

Sincerely,



Ben Boyer
Product Line Manager
Methode Electronics, Inc.



**111 W. Buchanan Street**
**PO Box 130**
**Carthage, IL 62321**
**Ph: 217-357-3941**
**Fax: 217-357-6265**


February 18, 2010


Mr. Kenneth H. Beteet
Senior Product Line Purchasing Manager
Delphi Electronics & Safety
P.O. Box 9005
Kokomo, IN  46904-9005

   **Re: Pressure Sensor Inventory**

Dear Ken:

  We have received your letter of February 5, 2010 and Methode cannot agree with Delphi's analysis of the pressure sensor inventory.  We provide below information we believe will help resolve this issue.

  One of the key points of discrepancies between Methode and Delphi's analyses is the quantity of sensor shipments to Methode.  In your letter of December 9, 2009, Delphi advised Methode of quantities for both starting inventory and the shipments of sensors to Methode.  Delphi advised that between January 24, 2009 and the termination of the business in September of 2009, Delphi had shipped 1,305,698 sensors to Methode and Methode had 146,689 sensors in inventory.  Since Delphi does not advise Methode in advance as to the number of sensors it is shipping and since Methode does not receive an inventory for sensors en route, Methode could not verify the accuracy of either quantity but assumed the numbers Delphi provided were, in fact, correct.  In your letter dated February 5, 2010, however, Delphi revised these quantities as well as some other quantities.  Once again, Methode can not confirm these quantities nor understand why the quantities previously supplied by Delphi were changed.

  In your February 5 letter, the sensor shipments increased leading us to believe that Delphi double-counted sensors in shipments that were already included in Delphi's "sensor starting inventory" category.  In fact, our conclusion here is consistent with the total inventory numbers provided by both Delphi in its December 9 letter and by Methode in the chart below.  Delphi had concluded that the total inventory was 1,452,387 and Methode concludes below that the total inventory was 1,451,338 – a discrepancy of only 1049 sensors.

  As you can see from the chart below which is based on Methode's internal inventory system, between January 24, 2009 and the end of the business, there is a discrepancy of 1003 sensors.

Mr. Kenneth H. Beteet
February 18, 2010
Page 2

| Item | Methode's Internal Inventory | Methode |
|------|------------------------------|---------|
| 1 | Methode inventory as of 1/24/09 | 121,498 |
| 2 | Methode's Receipt of Sensors after 1/24/09 | 1,329,840 |
| 3 | **Total Inventory** | **1,451,338** |
| | | |
| 4 | Finished Goods Shipped to Delphi | 1,421,073 |
| 5 | Scrap Monterrey (Scrap reported) | 1,225 |
| 6 | Scrap Reynosa (Scrap reported) | 1,072 |
| 7 | Returns to Los Indios (per BOL) | 15,147 |
| 8 | Material in Process (MTY) Delphi Resp. | 477 |
| 9 | Material in Process (Rey) Delphi Resp. | 3,084 |
| 10 | Sensors Located in McAllen | 121 |
| 11 | Finished Goods at McAllen | 9,480 |
| 12 | Adjustments and Scrap reported | 662 |
| | | -1,003 |

Please note that the total inventory above (Item 3) is only 1049 sensors less than the total inventory provided in Delphi's December 9th letter.  This supports the 46 piece discrepancy reflected in our letter of December 14, 2009.  (1049 - 1003 = 46.)

In an effort to better understand the situation, Methode has created the following chart .  Each column is identified by the date of the letter.  Again, please note our analysis provided on December 14, 2009 utilized the inventory numbers provided by Delphi.

| Item | Transaction Description | Delphi 12/9/09 | Methode 12/14/09 | Delphi 2/5/010 | | Methode 2/18/10 |
|------|------------------------|----------------|------------------|----------------|---|-----------------|
| 1 | Sensor starting inventory (1/24/09) | 146,689 | 146,689 | 146,689 | Increase | 121,498 |
| 2 | Sensor Shipments to Methode/receipts | 1,305,698 | 1,305,698 | 1,324,560 | 18,862 | 1,329,840 |
| | **Total Inventory** | **1,452,387** | **1,452,387** | **1,471,249** | | **1,451,338** |
| 3 | Sensors returned to Delphi | | 15,147 | 15,147 | sum | 15,147 |
| 4 | Sensor scrap reported by Methode | | 2,297 | 3,715 | 18,862 | 2,297 |
| 5 | Methode bladder shipments to Delphi (1/24/09-Sept 09) | 1,420,105 | 1,421,073 | 1,420,105 | | 1,421,073 |
| 7 | Internal Adjustment (not scrap | | 304 | | 304 | |
| 8 | **Inventory Difference** | **31,978** | **13,870** | **31,978** | | **12,821** |
| 11 | Material in process Monterrey Delphi Responsible | | 477 | | | 477 |
| 12 | Material in process Reynosa Delphi Responsible | | 3,084 | | | 3,084 |
| 13 | Sensors in McAllen | | 121 | | | 121 |
| 14 | Finished Goods at McAllen | | 9,480 | | | 9,480 |
| 15 | Adjustments reported on sensor scrap sheet | | 662 | | | 662 |
| | | | | 15,193 | | |
| | | | | | | |
| 19 | **Total Discrepancy in dispute** | **31,978** | **46** | **16,785** | - | **1,003** |

Mr. Kenneth H. Beteet
February 18, 2010
Page 3

Consistent with the double-counting error discussed above, you noted in your February 5 letter that the 15,147 sensors that were returned to Delphi's Los Indios facility were accounted for in line item 2 (1,305,698). Methode agrees that those 15,147 sensors are part of the pressure sensor inventory. Therefore, when the sensors were returned to Delphi, that quantity must be **subtracted** from the total inventory at Methode. Delphi, however, is using these returned 15,147 sensors to incorrectly reconcile the double-counted sensors discussed above. Similarly, Delphi incorrectly increased the sensor scrap numbers. Methode reported scrap of only 2297 whereas in its February 5 letter, Delphi inexplicably claimed that Methode reported scrap of 3,715. The total increase in your February 5 numbers equals the sum of these two numbers shown in red above and, therefore, this error accounts for the primary discrepancy.

As for the Delphi Pressure Sensor Shipments chart provided in your February 5 letter, the Delphi BOL Delivery Numbers do not correlate to the BOL numbers on shipments received by Methode for this time period. As you will note from our attached chart entitled "Sensor Receipt 1/24/09 to End of Business", only 47 of the BOL numbers provided by Delphi match the BOL numbers on shipments received by Methode in this time frame. In other words, the Delphi BOL numbers only account for 343,920 sensors received and leaves 985,920 sensors not accounted for in our BOL receipts.

We have spent a considerable amount of time and energy trying to resolve the discrepancies between Methode and Delphi's pressure sensor inventory. We trust this pressure sensor inventory issue is not part of the Methode obsolescence claim and therefore, Methode requests immediate payment of our obsolescence claim which was submitted to Delphi on November 1, 2009 .

Sincerely,


Ben Boyer

Methode Product #319120 (Y)
Y=on Delphi sheet    Y = 985,920    Delphi BOL # not received = 980,640
N=not on Delphi sheet    Methode Total 1,329,840    Delphi Total 1,324,560

| Qty | Date Received | Bol Number | |
|---|---|---|---|
| 6,240.00 | 9/8/2009 | 56157083 | N |
| 9,600.00 | 9/1/2009 | 56144746 | N |
| 5,520.00 | 9/1/2009 | 56158571 | Y |
| 17,520.00 | 8/31/2009 | 56135882 | N |
| 4,800.00 | 8/26/2009 | 56105321 | N |
| 19,920.00 | 8/25/2009 | 56084684 | N |
| 6,240.00 | 8/25/2009 | 56094541 | N |
| 12,240.00 | 8/25/2009 | 56108826 | Y |
| 11,280.00 | 8/20/2009 | 56077811 | Y |
| 9,600.00 | 8/19/2009 | 56057090 | N |
| 8,160.00 | 8/18/2009 | 56047189 | N |
| 6,480.00 | 8/18/2009 | 56060095 | Y |
| 11,280.00 | 8/17/2009 | 56038099 | N |
| 14,400.00 | 8/12/2009 | 56009655 | N |
| 3,840.00 | 8/11/2009 | 56010031 | N |
| 15,120.00 | 8/10/2009 | 55958428 | N |
| 4,080.00 | 8/10/2009 | 55958428 | N |
| 480.00 | 8/10/2009 | 55986884 | N |
| 4,320.00 | 8/7/2009 | 55986623 | Y |
| 6,000.00 | 8/5/2009 | 55958425 | N |
| 8,640.00 | 8/4/2009 | 55958411 | N |
| 15,600.00 | 8/4/2009 | 55970588 | Y |
| 12,480.00 | 8/3/2009 | 55950583 | N |
| 720.00 | 8/3/2009 | 55941038 | N |
| 6,240.00 | 8/3/2009 | 55959034 | Y |
| 5,520.00 | 7/31/2009 | 55941777 | Y |
| 720.00 | 7/30/2009 | 55924592 | N |
| 15,600.00 | 7/28/2009 | 55924540 | Y |
| 8,880.00 | 7/24/2009 | 55908600 | Y |
| 1,920.00 | 7/23/2009 | 55887094 | Y |
| 5,760.00 | 7/22/2009 | 55895560 | N |
| 6,480.00 | 7/21/2009 | 55897315 | Y |
| 3,120.00 | 7/20/2009 | 55887074 | Y |
| 2,640.00 | 7/20/2009 | 55873797 | N |
| 2,640.00 | 7/15/2009 | 55862459 | N |
| 17,280.00 | 7/14/2009 | 55870255 | Y |
| 960.00 | 7/9/2009 | 55845263 | Y |
| 4,320.00 | 7/8/2009 | 55828177 | N |
| 8,640.00 | 7/2/2009 | 55814967 | Y |
| 3,120.00 | 7/2/2009 | 55782188 | Y |
| 8,640.00 | 7/2/2009 | 55782188 | Y |
| 13,440.00 | 6/29/2009 | 55782163 | Y |
| 21,600.00 | 6/23/2009 | 55743664 | Y |
| 20,640.00 | 6/16/2009 | 55698268 | Y |
| 12,750.00 | 6/15/2009 | 55687202 | Y |
| (30.00) | 6/15/2009 | 55687202 | Y |
| 8,640.00 | 6/15/2009 | 55672614 | N |
| 6,240.00 | 6/10/2009 | 55649091 | N |
| 1,920.00 | 6/10/2009 | 55653613 | N |
| 5,040.00 | 6/8/2009 | 55623958 | N |
| 9,840.00 | 6/4/2009 | 55605103 | N |
| 9,840.00 | 6/4/2009 | 55614392 | N |
| 5,040.00 | 6/2/2009 | 55597357 | N |
| 4,080.00 | 5/29/2009 | 55578030 | N |
| 4,080.00 | 5/29/2009 | 55578030 | N |
| 3,360.00 | 5/28/2009 | 55568183 | N |
| 6,720.00 | 5/27/2009 | 55561207 | N |
| 5,040.00 | 5/27/2009 | 55548729 | N |
| 2,160.00 | 5/22/2009 | 55525762 | N |
| 3,360.00 | 5/22/2009 | 55525762 | N |
| 5,280.00 | 5/22/2009 | 55533466 | N |
| 8,640.00 | 5/20/2009 | 55510140 | N |
| 10,800.00 | 5/20/2009 | 55517243 | N |
| 5,280.00 | 5/19/2009 | 55492288 | N |
| 5,520.00 | 5/14/2009 | 55485021 | N |
| 480.00 | 5/14/2009 | 55485021 | N |
| 7,920.00 | 5/13/2009 | 55476548 | N |
| 10,320.00 | 5/12/2009 | 55469721 | N |
| 6,240.00 | 5/8/2009 | 55454329 | N |

Received BOL that matched Delphi = 343,920 (Y)
Methode BOL # not received = 985,920
Delphi BOL # not received = 980,640
Methode Total 1,329,840          Delphi Total 1,324,560

| Qty | Date Received | Bol Number | Y=on Delphi sheet N=not on Delphi sheet |
|---|---|---|---|
| 4,800.00 | 5/7/2009 | 55446293 | N |
| 5,760.00 | 5/6/2009 | 55437857 | N |
| 7,200.00 | 5/5/2009 | 55431120 | N |
| 4,320.00 | 5/4/2009 | 55417876 | N |
| 4,320.00 | 4/30/2009 | 55408270 | N |
| 8,880.00 | 4/30/2009 | 55387782 | N |
| 7,200.00 | 4/29/2009 | 55398239 | N |
| 3,360.00 | 4/23/2009 | 55362374 | N |
| 3,360.00 | 4/22/2009 | 55353519 | N |
| 14,400.00 | 4/21/2009 | 55338264 | N |
| 6,000.00 | 4/17/2009 | 55326714 | N |
| 6,000.00 | 4/16/2009 | 55318509 | N |
| 4,320.00 | 4/15/2009 | 55312324 | N |
| 6,240.00 | 4/15/2009 | 55293986 | N |
| 6,000.00 | 4/13/2009 | 552818829 | N |
| 6,000.00 | 4/13/2009 | 55291499 | N |
| 720.00 | 4/8/2009 | 55270973 | N |
| 6,480.00 | 4/7/2009 | 55250437 | N |
| 11,520.00 | 4/6/2009 | 55240586 | N |
| 2,160.00 | 4/2/2009 | 55230794 | N |
| 6,720.00 | 4/1/2009 | 55221877 | N |
| 2,880.00 | 3/31/2009 | 55211443 | N |
| 8,880.00 | 3/31/2009 | 55223271 | Y |
| 9,120.00 | 3/26/2009 | 55181866 | N |
| 6,480.00 | 3/20/2009 | 55143746 | N |
| 7,200.00 | 3/19/2009 | 55125148 | N |
| 18,720.00 | 3/17/2009 | 55097522 | N |
| 5,520.00 | 3/12/2009 | 55089606 | N |
| 5,760.00 | 3/10/2009 | 55053411 | N |
| 2,400.00 | 3/10/2009 | 55053411 | N |
| 19,200.00 | 3/3/2009 | 55022458 | N |
| 720.00 | 3/3/2009 | 55022458 | N |
| 1,920.00 | 2/25/2009 | 54982756 | N |
| 8,880.00 | 2/25/2009 | 54982756 | N |
| 17,280.00 | 2/24/2009 | 54974955 | N |
| 7,680.00 | 2/19/2009 | 54942749 | N |
| 1,680.00 | 2/19/2009 | 54942749 | N |
| 11,760.00 | 2/19/2009 | 54949636 | N |
| 6,960.00 | 2/19/2009 | 54949636 | N |
| 6,480.00 | 2/13/2009 | 54917906 | N |
| 7,200.00 | 2/12/2009 | 54907155 | N |
| 1,200.00 | 2/12/2009 | 54897457 | N |
| 6,000.00 | 2/12/2009 | 54897457 | N |
| 1,440.00 | 2/10/2009 | 54888220 | N |
| 16,560.00 | 2/10/2009 | 54888220 | N |
| 3,360.00 | 2/3/2009 | 54846828 | N |
| 14,160.00 | 1/27/2009 | 54799396 | N |
| 13,920.00 | 1/27/2009 | 54799396 | N |
| 5,280.00 | 2/5/2009 | 54861119 | N |
| 3,360.00 | 9/8/2009 | 56157083 | N |
| 8,640.00 | 8/31/2009 | 56135882 | N |
| 4,800.00 | 8/28/2009 | 56136515 | Y |
| 4,800.00 | 8/26/2009 | 56105321 | N |
| 6,240.00 | 8/25/2009 | 56084684 | N |
| 6,000.00 | 8/25/2009 | 56094541 | N |
| 12,240.00 | 8/25/2009 | 56108826 | Y |
| 5,520.00 | 8/20/2009 | 56077811 | Y |
| 480.00 | 8/20/2009 | 56077811 | Y |
| 240.00 | 8/18/2009 | 56047189 | N |
| 7,680.00 | 8/18/2009 | 56047189 | N |
| 6,480.00 | 8/18/2009 | 56060095 | Y |
| 11,280.00 | 8/17/2009 | 56038099 | N |
| 1,680.00 | 8/12/2009 | 55009655 | N |
| 12,720.00 | 8/12/2009 | 56009659 | N |
| 13,440.00 | 8/11/2009 | 56010031 | N |
| 6,240.00 | 8/10/2009 | 56009694 | Y |
| 4,320.00 | 8/7/2009 | 55986623 | Y |
| 2,160.00 | 8/5/2009 | 55958425 | N |
| 3,840.00 | 8/5/2009 | 55958425 | N |

Y=on Delphi sheet  N=not on Delphi sheet  N = 985,920  Methode Total 1,329,840  Delphi BOL # not received = 980,640  Delphi Total 1,324,560

| Qty | Date Received | Bol Number | N=not on Delphi sheet |
|---|---|---|---|
| 2,880.00 | 8/4/2009 | 55958411 | N |
| 6,000.00 | 8/4/2009 | 55970588 | Y |
| 12,240.00 | 8/3/2009 | 55932837 | N |
| 960.00 | 8/3/2009 | 55941038 | N |
| 3,600.00 | 8/3/2009 | 55959720 | Y |
| 960.00 | 8/3/2009 | 55959034 | Y |
| 4,560.00 | 7/31/2009 | 55941777 | Y |
| 3,600.00 | 7/30/2009 | 55924592 | N |
| 6,000.00 | 7/28/2009 | 55924540 | Y |
| 1,920.00 | 7/27/2009 | 55913845 | N |
| 4,080.00 | 7/24/2009 | 55908600 | Y |
| 1,200.00 | 7/23/2009 | 55887094 | Y |
| 720.00 | 7/23/2009 | 55887094 | Y |
| 5,280.00 | 7/23/2009 | 55880025 | N |
| 5,520.00 | 7/22/2009 | 5589560 | N |
| 720.00 | 7/21/2009 | 55897315 | Y |
| 1,680.00 | 7/21/2009 | 55897521 | N |
| 5,040.00 | 7/20/2009 | 55887074 | Y |
| 5,280.00 | 7/20/2009 | 55880100 | N |
| 2,640.00 | 7/16/2009 | 55870056 | N |
| 12,960.00 | 7/7/2009 | 55828812 | Y |
| 7,200.00 | 7/2/2009 | 55814967 | Y |
| 9,360.00 | 6/16/2009 | 55698268 | Y |
| 720.00 | 6/16/2009 | 55698268 | Y |
| 12,480.00 | 6/15/2009 | 55687202 | Y |
| 8,640.00 | 6/15/2009 | 55660510 | N |
| 9,120.00 | 6/10/2009 | 55653613 | N |
| 4,800.00 | 6/8/2009 | 55623958 | N |
| 4,800.00 | 6/2/2009 | 55597357 | N |
| 3,360.00 | 5/28/2009 | 55568183 | N |
| 5,040.00 | 5/27/2009 | 55548729 | N |
| 5,280.00 | 5/22/2009 | 55525762 | N |
| 4,800.00 | 5/22/2009 | 55533466 | N |
| 720.00 | 5/22/2009 | 55533466 | N |
| 2,160.00 | 5/20/2009 | 55510140 | N |
| 5,040.00 | 5/19/2009 | 55492288 | N |
| 4,560.00 | 5/14/2009 | 55485021 | N |
| 1,440.00 | 5/14/2009 | 55485021 | N |
| 4,080.00 | 5/13/2009 | 55476548 | N |
| 4,800.00 | 5/12/2009 | 55469721 | N |
| 240.00 | 5/8/2009 | 55454329 | N |
| 3,120.00 | 5/8/2009 | 55454329 | N |
| 4,800.00 | 5/7/2009 | 55446293 | N |
| 5,760.00 | 5/6/2009 | 55437857 | N |
| 6,960.00 | 5/5/2009 | 55431120 | N |
| 4,320.00 | 5/4/2009 | 55417876 | N |
| 4,320.00 | 4/30/2009 | 55408270 | N |
| 7,200.00 | 4/30/2009 | 55387782 | N |
| 5,280.00 | 4/29/2009 | 55398239 | N |
| 4,080.00 | 4/24/2009 | 55371486 | N |
| 6,960.00 | 4/23/2009 | 55362374 | N |
| 11,040.00 | 4/22/2009 | 55353519 | N |
| 6,000.00 | 4/17/2009 | 55326714 | N |
| 6,000.00 | 4/16/2009 | 55318509 | N |
| 2,400.00 | 4/15/2009 | 55293986 | N |
| 5,760.00 | 4/15/2009 | 55293986 | N |
| 2,880.00 | 4/13/2009 | 55281829 | N |
| 3,120.00 | 4/13/2009 | 55281829 | N |
| 6,000.00 | 4/13/2009 | 55291499 | N |
| 5,040.00 | 4/8/2009 | 55270973 | N |
| 3,120.00 | 4/7/2009 | 55250437 | N |
| 1,200.00 | 4/2/2009 | 55230794 | N |
| 2,400.00 | 4/2/2009 | 55230794 | N |
| 2,880.00 | 3/31/2009 | 55211443 | N |
| 9,120.00 | 3/31/2009 | 55223271 | Y |
| 4,800.00 | 3/26/2009 | 55181866 | N |
| 4,080.00 | 3/26/2009 | 55181866 | N |
| 7,200.00 | 3/19/2009 | 55132483 | N |
| 11,040.00 | 3/11/2009 | 55079020 | N |

| Qty | Date Received | Bol Number | N=not on Delphi sheet |
|---|---|---|---|
| | | | Y=on Delphi sheet |
| 5,520.00 | 2/5/2009 | 54861119 | N |
| 3,120.00 | 2/3/2009 | 54846828 | N |

Received BOL in Delphi 343,920 (Y)
N = 985,920
Methode Total 1,329,840

Delphi BOL # not received = 980,640
Delphi Total 1,324,560

# EXHIBIT C

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481-rdd

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION, et al.,


        Debtors.



- - - - - - - - - - - - - - - - - - - -x


                U.S. Bankruptcy Court

                One Bowling Green

                New York, New York


                August 20, 2009

                10:20 AM



B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

13

1   additional fact that would, I think, be implicated in the

2   litigation in that one of the principal OEMs that received the

3   CD players was General Motors, and General Motors waived a

4   substantial portion of their warranty claims in connection with

5   all the settlements that we had --

6          THE COURT:  So that would --

7          MR. BUTLER:  -- or dealt with.

8          THE COURT:  -- that would greatly reduce the fifteen

9   million in claims damages.

10         MR. BUTLER:  Arguably, Your Honor, it would.  I mean,

11  you know, you'd get in -- I think you'd get into an argument

12  about fungibility at the time, but that's what 9019 is designed

13  for us to assess.

14         THE COURT:  Right.

15         MR. BUTLER:  And, ultimately, the judgment reached was

16  this -- the settlements before Your Honor seem to be an

17  appropriate disposition of this litigation under these

18  circumstances.

19         THE COURT:  Okay.

20         Does anyone have anything to say on this motion?

21         All right, for the reasons stated in the motion, I'll

22  approve it as clearly a fair and reasonable settlement.

23         MR. BUTLER:  Your Honor, matter number 7 on the agenda

24  is the motion of Plymouth Rubber Company, LLC seeking to have

25  an administrative claim that was filed fifteen days after the

14

1    bar date to be deemed timely filed, at docket number 18714.

2    And counsel's here to present the motion.

3           THE COURT:  Okay.

4           MR. VINCEQUERRA:  Good morning, Your Honor.  James

5    Vincequerra, Duane Morris, for Plymouth Rubber Company, LLC.

6    I'll explain in a minute why I'm emphasizing the LLC.  With me

7    today is Kara Zaleskas from my -- Duane Morris' Boston office.

8           As a matter of housekeeping, Your Honor, Ms. Zaleskas

9    filed a pro hac vice motion approximately two weeks ago.  I

10   don't believe I saw the order on the docket yet.  I would just

11   ask, to the extent she is required to appear here --

12          THE COURT:  That's fine.  That's granted.

13          MR. VINCEQUERRA:  Thank you very much, Your Honor.  A

14   number of -- a lot of trees were killed in the filings in

15   connection with this matter.  We raise no less than five issues

16   as to why -- or reasons why our claim should be deemed timely

17   or should otherwise be -- or the new admin claims bar date

18   should not be deemed to apply to our claim.

19          I'm really going to focus here on two of the issues:

20   the improper notice issue first and then, to the extent that

21   Your Honor finds that the new bar date does apply to the claims

22   of Plymouth Rubber Company, LLC, the excusable -- the

23   components of excusable neglect.

24          I'll leave the balance of the arguments in our papers

25   with regard to the technicalities of the amended admin bar

15

1   date, or the new admin bar date, the efficacy of that

2   admitted -- or modification order and the informal notice to

3   our papers.  I think they're argued fairly clearly there.

4           THE COURT:  The informal proof-of-claim argument?

5           MR. VINCEQUERRA:  Yes, that's right.

6           THE COURT:  Okay.

7           MR. VINCEQUERRA:  I apologize.  I'll leave those to my

8   papers and reserve any statements on those for rebuttal to the

9   extent we deem it's necessary.

10          As an initial matter, do you have any questions about

11  the papers, Your Honor?  I'd be happy to answer them.

12          THE COURT:  Well, I've reviewed them, so -- I guess

13  the issue on whether it's Inc. or LLC, to my mind, is -- it

14  seems to me it's a non-issue because it was actually received

15  by the claimant, right?  It was received?

16          MR. VINCEQUERRA:  It was received the day after the

17  bar date.

18          THE COURT:  Well, no, I mean it was received by the

19  individual who forwarded it on.

20          MR. VINCEQUERRA:  Well, really, the -- I mean, the

21  point we're getting to is proper notice, I would imagine.  And

22  a couple of points.  The debtor to points to 2002(g) and

23  service on LLC first through the law firm Burns and Levinson

24  and then at the former address of the Plymouth Rubber, Inc.

25  entity.  A couple of points here, Your Honor.  Service was made

16

1    pursuant to outdated -- you know, an outdated claims --

2    outdated exhibit-and-schedules lists and based on a claim that

3    was filed by a different entity.  Service was effected on

4    counsel for a different entity.  Burns and Levinson LLC, which

5    makes up a bulk of the notice argument, never represented the

6    LLC entity.  I mean, and it's important to understand --

7            THE COURT:  Was there any -- is there anything in the

8    record about notice of Plymouth Rubber Company Inc.'s Chapter

9    11 case and reorganization by --

10           MR. VINCEQUERRA:  Delphi actively participated in that

11   case, Your Honor.

12           THE COURT:  How do I know that?

13           MR. VINCEQUERRA:  Excuse me?

14           THE COURT:  How do I know that?  Or will they

15   acknowledge that?

16           MR. VINCEQUERRA:  Well, I can't imagine they won't

17   acknowledge it, Your Honor, as they filed stipulations in that

18   case as well as, I believe, a claim.

19           THE COURT:  When did the plan confirm?

20           MR. VINCEQUERRA:  Plymouth Rubber Inc. confirmed its

21   plan and emerged from bankruptcy on August 31st, 2006.  And

22   maybe I should back up a little bit, Your Honor, and give you a

23   little bit of a time line here because that may be helpful.

24           THE COURT:  I mean, I know they sued LLC.

25           MR. VINCEQUERRA:  That -- you know, that's the rub

17

1    here, Your Honor.  They served the objection -- the notice of

2    the new bar date on Inc. at seven different locations, or five

3    different locations, wherever it -- however many it was, served

4    counsel for Inc.  Burns and Levinson has never represented the

5    reorganized debtor, and -- but they got it right when they

6    wanted to sue the new entity under the new purchase order.

7         THE COURT:  But, again, Mr. Collins forwarded this

8    notice on to LLC, right?

9         MR. VINCEQUERRA:  Well, you're right, Your Honor,

10   they --

11        THE COURT:  And he was acting as LLC's agent, wasn't

12   he?

13        MR. VINCEQUERRA:  Right, as part of the wind-down

14   staff.  And if --

15        THE COURT:  Okay.

16        MR. VINCEQUERRA:  -- if Your Honor is -- you know,

17   wants it moved forward to the excusable neglect argument, which

18   I think is also a very good argument, I don't think the notice

19   was proper there.  I think, you know -- at footnote 3 of their

20   objection is very telling.  They note that for the purposes of

21   their objection they presume that LLC is the successor-in-

22   interest to Inc.  I'm not aware of any case law that says you

23   can get the benefit of that assumption for notice requirements

24   under an --

25        THE COURT:  But, again --

1          MR. VINCEQUERRA:  -- under an admin --

2          THE COURT:  -- Mr. Collins made the same presumption,

3     right?  He sent the notice on to LLC?

4          MR. VINCEQUERRA:  He did send it on, there's -- we do

5     not contest that fact.

6          THE COURT:  Okay.

7          MR. VINCEQUERRA:  So if you have no other questions

8     for me on the proper notice -- we don't contest the fact that

9     Mr. Collins did receive actual notice -- I can move on to

10    excusable neglect.

11         THE COURT:  Okay.

12         MR. VINCEQUERRA:  Debtors don't contest two components

13    of excusable neglect:  They don't contest that the -- regarding

14    the length of delay or Plymouth Rubber's good faith.  So,

15    really all that we're left with, Your Honor, is the prejudice

16    requirement and the reason for delay.

17         Mr. Butler indicated that a proof of claim was filed

18    fifteen or sixteen days after the bar date.  That's technically

19    true.  We alerted -- well, we alerted counsel for the debtor

20    the day after the bar date, asking them to deem the claim

21    timely filed; that's reflected in Ms. Zaleskas' affidavit.

22         But to get to the point of excusable neglect, Your

23    Honor, what happened here is really a perfect storm for my

24    client.  The prior entity, the Inc. entity, will have business

25    relationships with Delphi as a result of the Delphi bankruptcy

19

1    and things that happened which, to be quite honest with you, my

2    firm was not involved with.  They went into bankruptcy and

3    reorganized.  When they emerged from bankruptcy, they had new

4    equity, substantially new officers and directors, effectively a

5    new entity; entered into a new purchase order agreement with

6    Delphi on January 30th, 2008.  About nine months after that,

7    that's approximately a year and a half after, they emerged from

8    bankrupt -- the reorganized debtor emerged from bankruptcy.

9         Approximately nine months after entry into that

10   purchase order, Delphi sued Plymouth Rubber Company, LLC in

11   Michigan for breach of the contract, for breach of the purchase

12   order agreement.  Plymouth Rubber Company, LLC counterclaimed,

13   and that's the basis of our -- those are the bases of our --

14   that's the basis of our admin claims.

15        Six days after Delphi sued Yongel (ph.) -- the Yongel

16   Company, another -- a supplier of Plymouth Rubber Company also

17   sued Plymouth Rubber Company, LLC.  And in that case as well,

18   Plymouth Rubber Company filed counterclaims both against Yongel

19   and Delphi.

20        Both those cases were consolidated for mediation

21   purposes and they're in global mediation.  The -- as a result

22   of the lawsuits from their principal buyer and their principal

23   supplier, Plymouth Rubber Company, LLC started its own line

24   down in October of 2008 and approximately three months after

25   that laid of all of its employees.  And that's where we have,

20

1    you know, the sole employee of the debtor, Mr. Collins.

2         So, you know, it's important to remember -- oh, let me

3    jump -- I'm sorry, excuse me, Your Honor, let me jump to the

4    portions of excusable neglect that are in dispute:  reason for

5    delay.  We laid out some of these facts because, I mean,

6    clearly there is a legitimate reason for Plymouth Rubber

7    Company, LLC's one-day delay in providing notice to the debtors

8    with regard to their admin claim.

9         THE COURT:  I guess my one issue with that is why

10   didn't Mr. Collins open the envelopes?

11        MR. VINCEQUERRA:  Why did he open the envelopes?

12        THE COURT:  Why didn't he?

13        MR. VINCEQUERRA:  Why didn't he?

14        THE COURT:  Right.  I mean, he got them on the 9th.

15   He put them -- it doesn't say this, but I guess one can infer

16   that he didn't open them, he put them in another envelope and

17   mailed them to Mr. -- it begins with an S, let me get the right

18   name -- Mr. Schultz.

19        MR. VINCEQUERRA:  Yes, that's right.  His name is --

20        THE COURT:  I don't understand why he didn't open the

21   envelopes, because they weren't received by Mr. Schultz until

22   six days later.  I mean, particularly if he'd been waiting --

23   if they'd been -- you know, if he only checks the P.O. box

24   every two weeks, I don't understand why he wouldn't have opened

25   the envelopes.

21

1          MR. VINCEQUERRA:  Well, I mean, it's not in his

2     papers, Your Honor, and anything I say would be pure, you know,

3     suspicion and guesswork.  But the fact of the matter is that

4     the notices were not addressed to the entity that employed him.

5     They were addressed to an Inc. -- the Inc. entity.  So, LLC

6     never filed a notice of appearance in this case, has never

7     appeared in this case until this dispute, and they never felt

8     that they had a need to appear in this case because they were

9     party to a post-petition contract that, under the prior plan,

10    gave them an allowed amended claim.

11         So, I mean, while it's pure, you know, circumspection

12    as to why he did not open the letter for a day and put it in

13    regular mail, the letter wasn't addressed to the entity that

14    employed him and the entity that's in wind-down.

15         THE COURT:  Well, it didn't employ Mr. Schultz either,

16    did it?

17         MR. VINCEQUERRA:  No, it did not.  So, Your Honor, to

18    continue on with reason for the delays, you know, there was an

19    aggressive timetable here for the bar date, from the height of

20    the holiday season.  We're in -- Plymouth Rubber Company, LLC

21    is in its own wind-down, is on a short staff, and I think that

22    there's ample justification here for the reason of delay -- for

23    the reason for delay.

24         To move to the other component that's in contest, as

25    to prejudice, I don't see, you know, any realistic manner of

22

1   prejudice here for the debtors.  They learned of the claim one

2   day after the bar date.  There's no contest that Ms. -- there's

3   no question that Ms. Zaleskas -- I mean, it's not contested

4   Ms. Zaleskas alerted the debtors to the claim the day after the

5   bar date.  The claim was filed a week and a half to two weeks

6   later, followed shortly by this motion.  The claim is an

7   unliquidated amount, is in the nature of a counterclaim, you

8   know, brought as a response to suits against Plymouth Rubber

9   Company, LLC.

10      My understanding from my reading of the plan and

11  disclosure statement in this case and some things in the news

12  is admin claims are anticipated to be paid in full, and there

13  are literally hundreds of millions of dollars of admin claims.

14      So I see very little chance for prejudice there.  The

15  debtors make the argument that -- you know, the classic

16  floodgates argument that you commonly see in pioneer type of

17  cases.  The facts of this case are so unique I really don't see

18  that as a reasonable prospect.  Two creditors of the debtors

19  with substantially similar names but different entities, you

20  know, the claimant being in wind-down, I just don't see the

21  floodgates opening here.

22      So with that, Your Honor, if you have no questions,

23  I'll turn it over to, I guess -- is it Mr. Powlen?

24      MR. POWLEN:  Yeah.

25      THE COURT:  Is it -- was it a compulsory counterclaim?

23

1      Does it arise under the same transaction or occurrence?

2              MR. VINCEQUERRA:  Rises under the same purchase order

3      agreement.

4              THE COURT:  Okay.

5              MR. VINCEQUERRA:  Thank you very much, Your Honor.

6              MR. BUTLER:  Judge, just one moment, if you don't

7      mind.

8          (Pause)

9              MR. BUTLER:  Your Honor, I just want to make sure the

10     record is clear here.  I have, and I think counsel will

11     acknowledge that we obtained, and I have for the Court, a

12     certification of conversion from a corporation to a limited

13     liability company of Plymouth Rubber Company, Inc., a

14     Massachusetts corporation.  It's -- it is the same company.  I

15     mean, we hear that it's different companies and not successors.

16     I actually have the documentation from the State of Delaware

17     Secretary of State's Office that we obtained that shows that on

18     September 1st, 2006 the same legal entity was converted from

19     one kind of corporation in Delaware to another kind of

20     corporation in Delaware.

21             So, I mean, I think the suggestion that these are

22     fundamentally different entities just is not accurate.  And

23     I've got the evidence here.  I don't think that counsel,

24     Mr. Vincequerra, would dispute the Secretary of State of

25     Delaware as to what the entity is, and I have that.

24

1          So this is the same legal entity that was converted on

2    the -- on September 1st.

3          Second, Your Honor, Mr. Vincequerra, in his argument,

4    made a major point about the fact that there was a new purchase

5    order in January of 2008.  And, in fact, there was a purchase

6    order that was reissued on -- in January of 2008 after the 2006

7    reorganization to Plymouth Rubber, and it was purchase order

8    number P6850008, and it was issued to the address 500 Turnpike

9    Street in Canton, Massachusetts.  That was the business address

10   that the parties New Plymouth, Plymouth LLC, whatever one wants

11   to call it, that is the address that Plymouth used with Delphi

12   in connection with the new purchase order that Mr. Vincequerra

13   referred to, and the PO was issued to that address.  And the

14   notice of administrative claims bar date was -- one of the

15   places that it went to was to that address in Canton.

16          And so I think that the -- you know, the argument that

17   the notice, in addition to being actually received, it also was

18   the business address that Delphi and Plymouth Rubber Company,

19   LLC used between themselves in the January 2008 purchase order

20   and was the appropriate business address.

21          I don't think, Your Honor, that this matter should

22   turn in any respect on the issue of notice.  Appropriate notice

23   was given; it was given in connection with -- to the

24   appropriate -- you know, the legal entity, which really was the

25   same entity converted, to the business address that was used in

25

1    the 2008 contract between the companies.  And the notice was

2    actually, in fact, received.

3         I think the question is more the excusable neglect

4    question here, and I only have a few comments on that.  First,

5    we acknowledged in our papers that we did receive a call from

6    counsel the day after the bar date.  That isn't unusual.  We

7    receive those kinds of calls fairly regularly when there are

8    bar date issues, and our response is always the same, which is

9    it's not our bar date to change, it's the Court's bar date, and

10   that we don't have any ability to change the date and people

11   need to take whatever steps they need to take to protect their

12   clients.  And the same kind of -- the same discussion was had

13   with counsel for Plymouth Rubber.

14        The fact that they waited a couple of weeks -- and it

15   wasn't just a week, it was the fact they waited until after the

16   plan modification hearing to submit the proof of claim two

17   weeks later, is -- you know, kind of mystifies me as to why

18   they chose to do that.  But that's not excusable neglect.  They

19   could have filed something the next day.  According to

20   Mr. Vincequerra's argument, it would have been -- you know, all

21   they needed to do was to file an administrative claim that

22   attached the lawsuit and that that would have done that.

23        I think when you look at the -- from the company's

24   perspective, the issue here is -- Your Honor, I think, knows

25   from the plan modification hearing and all of the pleadings

26

1    filed in connection with that, Delphi was on a mission over the

2    last fifteen, sixteen months since the prior plan, before it

3    was modified, hadn't gone effective, to try and develop a

4    solution for these cases that would be successful, that would

5    involve modifying the plan, emerging pursuant to a plan and

6    providing for the payment of administrative expenses that are

7    allowed.  And that took an enormous amount of effort and

8    negotiation to do that.  And one of the things, the processes

9    we went through in the latter part of July, was to assess all

10   of the claims that were made in connection with the bar date

11   and to evaluate those with our chief restructuring officer and

12   with the representatives of our other major stakeholders,

13   particularly with the -- some of the advisors of the DIP

14   lenders in connection with their credit bid so that we were all

15   comfortable in proceeding on the 29th here.  And that was based

16   on having an assessment of what the world of administrative

17   claims was through July -- or through May 31st, understanding,

18   as Your Honor knows, under the modified plan that's now been

19   approved, the -- there's another window bar date that's going

20   to go out covering June 1st through the anticipated effective

21   date of September 30th.

22          But making the assessment of what the unpaid

23   administrative claims were from the -- from October 5, 2005

24   through May 31, 2008 was a real exercise in connection with

25   preparing for the plan modification hearing.  And the fact that

27

1    counsel or their client chose not to file the claim for a

2    couple of weeks after they had actual notice and they had had

3    actual conversations with us I don't think fits within the

4    factors of excusable neglect.

5         That's all, Your Honor, the debtors would have to say

6    on this.

7         THE COURT:  Well, let me explore that a little bit

8    more.  Is there or was there an estimate of allowed

9    administrative claims that was a factor in the DIP lenders and

10   GM going forward on the 29th to propose the winning plan

11   support agreement and lead to the modified confirmation --

12        MR. BUTLER:  Yes, Your Honor.  You --

13        THE COURT:  -- of the plan?  Because, I mean, I don't

14   remember any testimony --

15        MR. BUTLER:  No.

16        THE COURT:  -- on, you know, some floor that -- or

17   some ceiling for administrative claims or anything.

18        MR. BUTLER:  No, there's not, Your Honor.  There was

19   not.  What Your Honor may recall was that one of the charts

20   that we put up and went through explained how the

21   administrative liabilities were going to be allocated among the

22   parties.

23        THE COURT:  Right.

24        MR. BUTLER:  It was intentional that -- and one of the

25   things we fought for in the MDA was not to have dollar cap

28

1    limitations.  There were, in fact -- that was a subject of

2    protracted negotiation, actually, as to whether or not there

3    would be limitations and what those liabilities would be and,

4    instead, the agreement was to do it by category.  And Your

5    Honor saw those categories allocated between the GM entity, the

6    DIPCo entity and DPH Holdings, the reorganized entity.

7            THE COURT:  Right.

8            MR. BUTLER:  And there was also a focus, and Your

9    Honor may recall that Mr. Stipp, in his sworn testimony,

10   provided in his declaration a fair amount of discussion about

11   the assessment of administrative claims as it related to DPH

12   Holdings' ability to be able to deal with its -- or what it

13   needed to satisfy as it moved forward.  And so there was an

14   assessment that went on, there was -- Mr. Stipp did make those

15   evaluations and make those assessment, and there was that, if

16   you will, sort of informal feasibility discussion among the

17   parties.  Ultimately, that didn't arise to the level, Your

18   Honor, of having -- beyond the sworn testimony, there wasn't

19   any controversy at the plan modification hearing about it

20   because ultimately it had been negotiated out.

21           THE COURT:  So which of the three entities would be

22   responsible for any affirmative recovery here?

23           MR. BUTLER:  Without prejudicing the estate, because I

24   may get this wrong, but my sense is that this is a retained

25   liability of DPH Holdings.  I don't know that this -- and the

29

1    reason I say that is because this supplier no longer does

2    business with the company.  This is a -- but I'd have to check

3    that in terms of -- go back and check that under the plan in

4    the negotiations.  But this is a supplier -- this is a former

5    supplier who, from the company's perspective, failed to live up

6    to its obligations under the purchase order, and it required

7    Delphi to incur a very substantial expense in re-sourcing from

8    the supplier who failed to live up to the terms of their

9    contract in the company.  And that's only why we sued them, and

10   we re-sourced the product.

11         So I think the re-sourced product and the

12   administrative liabilities associated with them go to, in fact,

13   DIPCo, but I think that the exposure under this litigation is

14   likely a DPH Holding obligation.  But I'd have to confirm that,

15   Judge.  That's my best recollection.

16         THE COURT:  Okay.  Well --

17         MR. BUTLER:  And as you know, DPH Holdings --

18         THE COURT:  It wouldn't be -- I guess it wouldn't be a

19   GM one because this isn't a GM plant --

20         MR. BUTLER:  No, it's not -- no, no, it's -- and

21   that's what I'm saying to you.  My -- and I think Ms. Kraft

22   (ph.) is here from the company and we just told her about

23   this -- my believe is the retained liability for the litigation

24   exposure would be DPH Holdings.  And the supplier contract for

25   what was the re-sourced contract, which is with another entity,

30

1   that obligation and the administrative claims associated with

2   it, that went to DIP Holdco, or will go to DIP Holdco.

3        THE COURT:  Okay.

4        MR. BUTLER:  I think that's the proper -- at least

5   that was the philosophy behind the negotiation at the time.

6        THE COURT:  All right.  And it looks like to me the

7   counterclaim -- you can correct if I'm wrong -- the

8   counterclaim just seeks monetary damages, right?  It doesn't

9   seek specific performance or anything like that?

10       MR. BUTLER:  That's correct.

11       THE COURT:  It's an unliquidated claim.  Have there

12  been any discussion as to what the damages are asserted to be

13  as far as the counterclaim?  Either one of you --

14       MR. BUTLER:  There was, Your Honor -- I'm advised, and

15  Mr. Vincequerra may know, I was advised it was a mediation.  I

16  don't know what was --

17       THE COURT:  Right.

18       MR. BUTLER:  -- put on the table at the mediation.

19       THE COURT:  I mean, I don't want you to reveal

20  settlement proposals, but, just, has there been a settlement of

21  what the damages could be?

22       MR. VINCEQUERRA:  Yes, Your Honor, that's the irony of

23  this whole thing for my client is that while this bar date

24  procedure has been going on, my client has been across the

25  table --

31

1        THE COURT:  No, I know there's been a mediation.  I'm

2    just trying to figure out what --

3        MR. VINCEQUERRA:  No, there have been -- you know, a

4    mediation is fairly far along.  There have been numbers

5    exchanged.

6        THE COURT:  I don't want to hear settlement proposals.

7    What I'm focusing on here is, on the issue of prejudice, you

8    had made a good point that these claims are going to be paid in

9    full under the modified plan.  The point I've just been

10   exploring with Mr. Butler is who's going to be paying them.  If

11   it is, as it would appear to me to be the case just from the

12   nature of the claim and the MDA, the remaining holding company,

13   the debtor wind-down company, then I did make a conclusion as

14   part of my ruling approving the modification of the plan that

15   that modification was feasible, and that was premised upon the

16   testimony about the likely amount of administrative claims and

17   the funding of the successor entity and the like.

18       So the reason I'm asking this question is to find out

19   how large your claim is.  It wasn't taken into account in that

20   testimony, and it was a large claim that may affect the

21   prejudice calculation.  I just don't know.  I mean, it's an

22   unliquidated claim.  I don't know whether it's large or not but

23   whether it's, you know, something that, for example, pales in

24   comparison to the debtors' claim.

25       So I'm not asking you about settlement discussions;

32

1    I'm asking what's been asserted, unless you want to tell me

2    what you think the realistic number is.  But that's up to you.

3         MR. VINCEQUERRA:  It's difficult to say , Your Honor,

4    because, to be quite honest with you, I haven't been involved

5    in the mediation.  I understand from our mediation statement

6    that that counterclaim number that we've been stuck at is

7    roughly twenty million dollars.  Again, that's as a

8    counterclaim that would be, obviously, offset against any

9    successful recovery that they have against us.

10        THE COURT:  Although it would seem to be it's

11   either/or, right?  Unless you settle it, either they breached

12   or you breached.  So I'm not sure there'd be much of an offset.

13        Okay.  All right.

14        MR. BUTLER:  Your Honor, that's all the debtors

15   have --

16        THE COURT:  Well --

17        MR. BUTLER:  -- unless you had a question.

18        THE COURT:  -- let me ask you, though, based upon a

19   twenty million dollar claim, how does that affect the -- was

20   any liability for this taken into account in the declarations

21   in support of the modification of the plan?

22        MR. BUTLER:  My understanding is the answer to that

23   question is no, there was no money allocated to this amount

24   through the -- whether the claims process was evaluated.

25        The -- and, you know, Your Honor, there has been a

33

1    wide variety of lawsuits started, stopped in hiatus, since

2    October of 2005.  And the debtors relied on the administrative

3    claims process here that went out to everybody as -- to catch

4    the claims that people were going to assert as part of the --

5    to understand as part of the plan modification process.

6            THE COURT:  And, again, this claim came in after the

7    plan modification hearing.

8            MR. BUTLER:  Correct.  It came in on the June 30 -- on

9    July 30th --

10           THE COURT:  The hearing was on the 29th.

11           MR. BUTLER:  -- and where the hearing was July 29th.

12   And the assessment was actually made in the days -- we spent

13   three or four days leading up to the July 29th hearing going

14   over this evaluation and assessment.

15           THE COURT:  Okay.

16           MR. BUTLER:  And I think -- you know, I don't have

17   Mr. Stipp here, Your Honor, but Ms. Kraft is here and she works

18   closely with Mr. Stipp.  I think that Mr. Stipp would tell you

19   that if he had an extra twenty million dollar -- if in fact,

20   taking their -- I think we disagree vigorously with the claim,

21   but if you add another twenty million dollars of litigation

22   exposure to the pot, would that be material, I think Mr. Stipp

23   would say yes, it's material.

24           THE COURT:  Well, what was funding again for --

25           MR. BUTLER:  Remember, the funding from -- I think it

34

1    was -- the entire funding from General Motors was fifty

2    million; plus, we had the plants that were retained which we

3    could sell off; plus, we had --

4            THE COURT:  But those are more dogs and cats than --

5            MR. BUTLER:  They were.

6            THE COURT:  Right.

7            MR. BUTLER:  Plus, we had the avoidance actions, to

8    the extent that there's collectability on some of the avoidance

9    actions.  And there were some other -- there were some -- I

10   think some other MRA payments, I think, from General Motors or

11   a few other sources of revenue.  But it was calibrated.  It

12   was -- you know, it was designed, as you know, to provide for

13   an efficient disposition of all of those assets and remediation

14   of the -- of some of the other issues and payment of the

15   liabilities.  So I think Mr. Stipp would argue that twenty

16   million was material in that calculation.

17           THE COURT:  Okay.

18           MR. BUTLER:  Thanks, Judge.

19           THE COURT:  Okay.

20           MR. POWLEN:  Just one minor point, Your Honor.

21   Mr. Butler -- I don't know if he passed it up, because I didn't

22   see him pass it up, but makes much of the fact that the

23   entities -- the LLC entity and the Inc. entity are the same.  I

24   know Your Honor said actual -- there was -- you know, the

25   notice was received, but they're the same entities.  And I know

35

1    Mr. Butler's familiar with the concept of a fresh start and a

2    reorganized debtor, but they're the same entities as they would

3    be in any post-effective date debtor that has entirely new

4    equity and has a fresh start in a bankruptcy.  That this was

5    not accomplished through a 363 sale and a transfer of assets

6    but rather an infusion of equity and a stock deal doesn't

7    change the fact that at the end of the day they were dealing

8    with a newly born entity.

9            Other than that, Your Honor, I have nothing further.

10   Thank you very much for your time.

11           THE COURT:  Okay.

12           Is -- neither Mr. Collins nor Mr. Schultz is here,

13   right?

14           MR. POWLEN:  No, Your Honor.

15           THE COURT:  They're not present?

16           MR. POWLEN:  No, Your Honor.  We had discussions with

17   Skadden, and prior to the hearing we agreed that we would just

18   rely on the affidavits.

19           THE COURT:  Okay.

20           Okay, anyone else?

21           Okay, I have before me a motion by Plymouth Rubber

22   Company, LLC for an order deeming its administrative expense

23   claim timely filed or for related relief.  The origin of this

24   dispute is that, in connection with proceeding to obtain the

25   modification and ultimate consummation of its confirmed but

36

1       unconsummated Chapter 11 plan, Delphi Corporation and its

2       affiliated debtors sought approval of an administrative claims

3       bar date for the Chapter 11 period through May of 2009.  The

4       debtors' confirmed Chapter 11 plan was not consummated because,

5       asserting breaches, the plan investors under that plan refused

6       to close in April of 2008.  That left Delphi with a significant

7       hole in the required funding for the confirmed plan.  Delphi

8       then spent close to a year dealing with ways to plug that hole

9       as well as to address the further deterioration in the

10      financial markets and in their perception of Delphi's value,

11      which led to a substantially different approach, ultimately, to

12      their exit from Chapter 11 under a Chapter 11 plan.

13              The debtors, in assessing their ability to emerge from

14      Chapter 11, and having entered into an agreement with an entity

15      called Platinum, as well as General Motors, that would have

16      provided for that combined entity's acquisition of most of the

17      debtors' business operations in return for sufficient cash to

18      deal with a portion of the administrative claims against the

19      debtors, plus stock -- I'm sorry, plus forms of contingent

20      consideration -- having entered into that transaction, the

21      debtors determined that they needed prompt means to calculate

22      the outstanding administrative claims other than the debtor-in-

23      possession financing claims against them, and, therefore,

24      obtained from the Court, in connection with establishing

25      procedures for consideration of the proposed modification to

37

1    the Chapter 11 plan involving GM and Platinum, the

2    administrative claims bar date.

3         The bar date notice provided for, for purposes of a

4    bar date, fairly short notice, but given the timing constraints

5    that the debtors faced, including, in essence, a week-to-week

6    extension of enforcement of remedies under the DIP facility and

7    a clear and short deadline from GM and Platinum, such notice

8    was appropriate under the circumstances.

9         The debtors sent out the notice and received timely

10   administrative claims from approximately 2,400 claimants.  The

11   claims procedures motion that is on the calendar for later

12   today states that approximately one billion dollars of

13   administrative claims were asserted in those proofs of claim,

14   plus unliquidated amounts.

15        Ultimately, the proposed modified plan was itself

16   modified, although not materially so for purposes of the issues

17   before me today -- and instead of Platinum acquiring

18   significant assets under the plan, along with GM, Platinum was

19   replaced by the debtors after an auction process by a

20   consortium of the debtor-in-possession lenders.  And that

21   group, plus GM, entered into an MDA with the debtors, which

22   formed the basis for the modified plan.  The Court held a

23   hearing on that modification and approved it on July 29th, two

24   weeks after the administrative claims bar date.

25        The rough structure of the plan provides for the

38

1    continuation of most of the debtors' businesses, either in the

2    hands of a GM acquisition company with respect to certain

3    facilities that primarily manufacture parts for GM vehicles, as

4    well as other assets that would go to the DIP lender

5    acquisition group.

6        The third split of the debtors' assets would be

7    retained by the debtors, since neither GM nor the DIP

8    acquisition group wanted to acquire them.  In addition, that

9    entity that would continue to hold those assets would receive a

10   cash payment by GM to enable that entity to pay administrative

11   claims against it that were not being assumed in connection

12   with the purchase of ongoing operations by the DIP acquisition

13   vehicle and GM acquisition vehicle.  And that amount of cash

14   was determined by the debtors in consultation with various

15   constituents, including GM, to be sufficient to have the

16   surviving debtor entity meet its obligations under the plan,

17   including the payment of allowed administrative claims.

18       The Court took testimony on that aspect of the

19   proposed plan modification in the form of an affidavit by

20   Mr. Stipp, in which he went through his analysis of likely

21   sources and uses of cash to pay that entity's administrative

22   claims.  No one cross-examined Mr. Stipp.  And based upon my

23   review of the MDA, the modified plan and the affidavits

24   submitted in support thereof, I concluded that the plan, as

25   modified, was feasible: that is, that it was not likely to be

39

1    succeeded by a liquidation under Chapter 7 and that it could be

2    performed, including the payment of administrative claims, as

3    contemplated by the plan.

4         The debtors sent out notice of the administrative

5    claims bar date as required by my order establishing the bar

6    date, and notice was actually received by Plymouth Rubber

7    Company, Inc. on -- it is acknowledged to have been received by

8    Plymouth Rubber Company, Inc. on July 9, 2009.  That's set

9    forth in the affidavit in support of Plymouth's motion of

10   Mr. Collins.

11        The debtors sent that notice to the address in their

12   post-petition purchase order between them and Plymouth Rubber

13   Company, LLC -- the same location.  The address on the envelope

14   was to Plymouth Rubber Company, Inc., which had been the entity

15   with which the debtors had done business prior to Plymouth's

16   Chapter 11 reorganization.

17        Mr. Collins, as I said, received the notice, which was

18   also sent to numerous other locations to Plymouth Rubber

19   Company, Inc., including to the counsel that filed the proof of

20   claim on behalf of Inc. in the Chapter 11 case.  Mr. Collins

21   did not open the notice but, instead, on July 10th, put it, and

22   apparently some other correspondence, in an envelope and

23   forwarded it to Mr. Schultz, who is described in the Collins

24   affidavit as a representative of Plymouth Rubber, LLC's parent,

25   or at least an affiliate, retained to manage Plymouth's

40

1    affairs, Versa Capital Management, Inc., which also manages the

2    funds which directly own the equity interest in Plymouth

3    Rubber.

4        Although mailed on July 10th, according to

5    Mr. Collins, the notice was not received by Mr. Schultz until

6    July 16th, at which point Mr. Schultz, unlike Mr. Collins,

7    opened the package, read the notice and immediately contacted

8    the debtors, seeking an extension of the bar date, which was

9    not agreed to.

10       It's undisputed that Plymouth did not file the proof

11   of claim and/or seek approval of an extension until July 30th,

12   after the plan modification hearing.

13       Plymouth requests that the Court consider its

14   administrative claim timely on a number of different grounds,

15   although most of the focus, properly so, of this hearing, has

16   been on the ground of excusable neglect.  Before I deal with

17   that issue and those factors, let me briefly deal with the

18   other bases for Plymouth's requested relief.

19       First, Plymouth contends that the Court did not have

20   power to establish the administrative claims bar date, given

21   the treatment of the administrative claims bar date in the

22   original plan and the confirmation order.  The plan itself

23   contemplated, in the definition of "administrative claim," the

24   potential for establishing a different administrative claims

25   bar date than was set forth in the plan, which was a date

1    forty-five days after the confirmation of the plan.  The plan

2    also reserved fully the debtors' rights in the event that the

3    plan did not go effective, which clearly was the case.

4         That plan, as I noted, contemplated a very different

5    outcome for creditors than the current modified plan.  Not only

6    was there no issue of the payment of all administrative claims,

7    requiring no determination, as a practical matter, by the Court

8    as to feasibility for potential failure to cover administrative

9    claims, but also the plan provided for full payment of

10   unsecured creditors at a deemed plan value, and a substantial

11   return to shareholders.  Consequently, the plan's

12   administrative claims bar date provision was appropriate for

13   that structure -- again, one where there was really no issue as

14   to whether the debtors would be able to pay all asserted

15   administrative claims.

16        The confirmation order similarly provided for a forty-

17   five day post-confirmation administrative claims bar date and

18   stated that it would govern in light of -- in the event of a

19   conflict between the plan and the confirmation order.  And

20   clearly it was an extant order.  However, the debtors' need to

21   set an earlier bar date, given the changes to their plan, was

22   clear and required the establishment of a different bar date,

23   clearly, in the context of the deadlines they were facing.  The

24   Court considered such a request to be appropriate, both in

25   light of the rights that the debtors reserved for themselves

42

1    under the confirmed but not consummated plan, as well as under

2    the Court's ability to amend the confirmation order, which on

3    this point, was quite clearly outdated.

4        Therefore, I believe that Plymouth's argument that the

5    Court exceeded its authority in setting a new administrative

6    claims bar date order, and that Delphi and the other parties

7    should be governed in this respect by the terms of the

8    confirmed plan and the confirmation order entered in 2008, is

9    not well taken and is denied.

10       Next, Plymouth argues, as a matter of due process,

11   that the notice to it of the administrative claims bar date was

12   deficient.  It does so on two grounds.  The first is that it

13   asserts the debtors were involved in post-petition litigation

14   commenced by the debtors in state court in Michigan against

15   Plymouth as well as subsequent litigation commenced by a third

16   party in Massachusetts.  The second is that the debtors knew

17   that Plymouth was represented by counsel in that litigation,

18   and, therefore, that in addition to the other places that the

19   debtors provided Plymouth with notice, they should have

20   provided notice to litigation counsel in the Michigan and

21   Massachusetts litigation. It should be noted that those counsel

22   did not file a notice of appearance in the Chapter 11 case and

23   that, in fact, they have not appeared in the Chapter 11 case

24   until this current motion.

25       The motion relies upon, primarily, on this point, In

43

1    re Grand Union Company, 204 B.R. 864 (Bankr. D. Del. 1997), in

2    which the bankruptcy court concluded in that case that the

3    debtors' direct mailing of notice to personal injury tort

4    claimants represented by counsel was inadequate notice of the

5    bar date, and that the notice should have been provided to the

6    personal injury counsel that Grand Union was dealing with.

7    That case flies in the face of a number of cases in the Second

8    Circuit, including in the Southern District of New York, which

9    state that notice requirements under the Bankruptcy Code,

10   including in respect of bar dates (and notices of similar

11   consequence), do not have to be sent to counsel representing

12   the claimant, but may instead only be sent -- or need only,

13   instead, be sent to the claimant itself.  See, for example, In

14   re Brunswick Baptist Church v. Brunswick Baptist Church, 2007

15   U.S. Dist. LEXIS 3319 (N.D.N.Y. Jan. 16, 2007); In re

16   Alexander's Inc. 176 B.R. 715 (Bankr. S.D.N.Y. 1995); In re

17   R.H. Macy & Company Inc. 161 B.R. 355 (Bankr. S.D.N.Y. 1993);

18   and Dependable Insurance Company v. Horton, 149 B.R. 49 (Bankr.

19   S.D.N.Y. 1992).

20        I should note further that Judge Walsh, in the Grand

21   Union case, made it clear that he was focusing on the unique

22   facts before him, where he found that the claimants who

23   received the notice were unsophisticated and that all dealings

24   in respect of their claims had previously been through their

25   respective counsel.  Clearly, Plymouth is not an

44

1    unsophisticated tort claimant here.

2        Consequently, based on the rationale of the Brunswick

3    Church case and the other cases I've cited, I do not believe

4    that the debtors were required to give notice to counsel of

5    record in the pending litigation, particularly as, as I noted,

6    that counsel had not appeared in the Chapter 11 case.

7        In addition, Plymouth contends that it filed through

8    its counterclaim in the pending non-bankruptcy litigation an

9    informal proof of claim that should be recognized by the Court,

10   and clearly that that proof of claim was timely in that it was

11   well before -- the counterclaim was filed well before the

12   expiry of the administrative claims bar date.  The argument,

13   however, again runs afoul of case law in this district and the

14   majority of the cases, including at the circuit court level

15   elsewhere: that is, that the document giving rise to the

16   informal proof of claim was not filed in this Court, but

17   rather, instead, only in the courts in Michigan and in

18   Massachusetts.

19       I should note that the cases that deal with this issue

20   are generally dealing with pre-petition claims.  But given the

21   practice of treating claims and disputes related to missed bar

22   dates for administrative claims the same way as the courts

23   treat missed bar dates for pre-petition claims, I find those

24   claims to be analogous -- those cases, I'm sorry, to be

25   appropriate here, and for all intents and purposes on all

45

1    fours.  For the close analogy see -- between disputes in

2    respect of late administrative claims and disputes in respect

3    of late pre-petition claims, see In re PT-1 Communications Inc.

4    386 B.R. 402 (Bankr. E.D.N.Y. 2007).

5         The informal proof of claim rule, as far as I can see,

6    has always, in the Second Circuit and in the Southern District,

7    been applied to claims that were not filed in the form of a

8    proof of claim, but that were filed in the bankruptcy court,

9    that show an intention to make a demand for money from the

10   debtors' estate.  See In re G.L. Miller & Company Inc. 45 F.2d.

11   115 (2d Cir. 1930), as well as the statement of the four-factor

12   test -- factor one of which is that the claim, the documents

13   have been timely filed with the bankruptcy court and had become

14   part of the judicial record -- in In re Enron Corporation 370

15   B.R. 90 (Bankr. S.D.N.Y. 2007).

16        The rationale for this, again, is the collective

17   nature of a bankruptcy case and the need to put more than just

18   the debtor on notice of the existence of the claim.  See also

19   In re M.J. Waterman & Associates Inc. 227 F.3d. 604 (6th Cir.

20   2000), and In re Trans World Airlines Inc. 182 B.R. 102 (D.

21   Del. 1995), which was reversed in part and affirmed in part,

22   reversed on other grounds, at 96 F.3d. 687 (3d Cir. 1996).

23   Consequently, I don't believe that the complaint or the

24   counterclaim asserted in the Massachusetts District Court

25   action and the Michigan State Court action would constitute an

1   informal proof of claim.

2          Lastly, the movant contends that notice was improper

3   because it was delivered, albeit at the same address, to

4   Plymouth Rubber Company, Inc. as opposed to Plymouth Rubber

5   Company, LLC.  The change in name resulted from the Chapter 11

6   reorganization of Plymouth Rubber Company, Inc., which is the

7   entity that had filed the proof of claim against the debtor's

8   estate.  The emerged, reorganized debtor changed its name to

9   Plymouth Rubber Company, LLC as the successor to Plymouth

10  Rubber Company, Inc., and that was the entity, again at the

11  same address, with which the debtor contracted post-petition

12  under the contract that is now the subject of the dispute in

13  Michigan and Massachusetts.

14         Plymouth contends that because the notice was sent to

15  "Inc." as opposed to "LLC," albeit at the same address, that

16  notice was constitutionally deficient.  Under the facts before

17  me, however, I do not accept that argument.  As set forth in

18  Mr. Collins' affidavit and in the motion itself, Mr. Collins

19  was the sole employee of Plymouth Rubber after it had

20  determined to wind down its affairs.  He was retained by the

21  managing - or manager for Plymouth Rubber, LLC as well as the

22  manager for other investments owned by the fund that owned the

23  debtor, Versa Capital Management.  And I believe that, as

24  evidenced by the fact that Versa opened the notice and that

25  Versa had hired Mr. Collins to look after LLC's affairs, and

47

1    that, therefore, he was acting as Versa's agent in this matter,

2    there was sufficient actual notice as of July 9th for due

3    process purposes.

4         The issue then comes down to whether the late filing

5    of the proof of administrative claim should be permitted under

6    Bankruptcy Rule 9006 for excusable neglect.  A claims bar date

7    is an important milestone in most Chapter 11 cases, and clearly

8    here the administrative claims bar date was an important

9    milestone in this case for the reasons that I've already

10   stated.  See First Fidelity Bank N.A. v. Hooker Investments

11   Inc.(In re Hooker Investments Inc.), 937 F.2d. 833, 840 (2d

12   Cir. 1991), in which the Court said, "A bar order does not

13   function merely as a procedural gauntlet, but as an integral

14   part of the reorganization process."  See also In re Musicland

15   Holding Corporation, 356 B.R. 603, 607 (Bankr. S.D.N.Y. 2006).

16        In most cases, the filing of a bar date order and the

17   existence of a bar date enables the debtor and other

18   constituents to determine whether the projected payments under

19   a plan will actually satisfy the parties' expectations; and, in

20   particular, an administrative claims bar date enables the

21   parties to determine whether the plan they're proposing is

22   feasible, in that administrative claims need to be paid in full

23   for a plan to be confirmed and consummated.

24        Nevertheless, the bankruptcy court may enlarge the

25   time for filing proofs of claim where the failure to act was

48

1      the result of excusable neglect, under Bankruptcy Rule

2      9006(b)(1).  The U.S. Supreme Court has adopted a two-part

3      framework for the movant to establish its excusable neglect

4      under Rule 9006(b)(1).  The movant has the burden in this

5      regard.  See Midland Cogeneration Venture Limited Partnership

6      v. Enron Corporation 419 F.3d. 115, 121 (2d Cir. 2005).

7           That framework was set forth in Pioneer Investment

8      Services Company v. Brunswick Associates Limited Partnership,

9      507 U.S. 380 (1993).  First a failure to file the proof of

10     claim must have been caused by neglect, which the Court defined

11     as inadvertence, mistake or carelessness, including intervening

12     circumstances beyond the party's control.  Id. at 388.  A

13     tactical, or simply a knowing, decision not to file a timely

14     claim will not suffice.

15          Second, the movant's neglect must have been excusable,

16     which is to be determined in the exercise of the Court's

17     equitable discretion taking into account all relevant

18     circumstances surrounding the failure to file a timely claim,

19     id. at 395, guided, however, by the following four factors:

20     "the danger of prejudice to the debtor; the length of the delay

21     and its potential impact on judicial proceedings; the reason

22     for the delay, including whether it was within the reasonable

23     control of the movant; and whether the movant acted in good

24     faith." Id.

25          The Second Circuit has taken a "hard line" when

49

1    applying the Pioneer factors to motions under Rule 9006(b)(1)

2    and other federal rules premised on excusable neglect.  Again,

3    see In re Enron Corporation 419 F.3d at 122.  Although all four

4    Pioneer factors should be considered, the Second Circuit places

5    the greatest weight on the reason for the delay and whether it

6    was in the movant's reasonable control.  In re Musicland

7    Holdings Corp. 356 B.R. at 607.

8              In the normal case, the movant has acted in good

9    faith, for example, and that's the case here.  Thus, the Second

10   Circuit said, "In the typical case, three of the Pioneer

11   factors, the length of the delay, the danger of prejudice and

12   the movant's good faith, usually weigh in favor of the party

13   seeking the extension.  We and other circuits have focused on

14   the third factor, the reason for the delay, including whether

15   it was within the reasonable control of the movant.  The

16   equities will rarely, if ever, favor a party who fails to

17   follow the clear dictates of a Court rule.  Where the rule is

18   entirely clear, we continue to expect that a party claiming

19   excusable neglect will, in the ordinary course, lose under the

20   Pioneer test."  In re Enron Corporation 419 F.3d at 122-23; see

21   also Canfield v. Van Atta Buick/GMC Truck Inc. 127 F.3d 248,

22   250-51(2d Cir. 1997).

23             Factors other than the reason for the delay usually

24   are relevant, therefore, only in close cases. In re Musicland

25   Holdings Corporation 356 B.R. at 608.  This is a somewhat close

50

1    case, in that I accept that Plymouth Rubber was clearly in

2    wind-down mode, where it only had one employee, who, consistent

3    with the very limited nature of its operations (which from

4    Mr. Collins' affidavit, which is uncontroverted, pertained

5    almost entirely to the two pending litigations) meant that

6    Mr. Collins checked the post office box only roughly once every

7    two weeks.  In addition, the time for the bar date notice was

8    shortened here from the normal time that would usually be

9    provided.  And, finally, there was potentially some room for

10   confusion, given that the notice was addressed to "Inc." as

11   opposed to "LLC."

12          On the other hand, I find it very hard to understand

13   why, given Mr. Collins' sole function, which appears to be to

14   monitor the mail, and the fact that he did so only roughly once

15   every two weeks, he did not open the mail, but instead simply

16   forwarded it to Mr. Schultz of Versa.  It would not seem to me

17   that he should have done that, given that Plymouth had

18   established the P.O. box that he checked as opposed to setting

19   up an automatic forwarding from Plymouth's address to Versa's.

20   It would appear, instead, to me appropriate for Mr. Collins to

21   have acted as someone who actually read the mail as opposed to

22   as a second mailman for delivery purposes.

23          So, clearly, it was within Plymouth's control to have

24   had notice of the bar date, at least by July 9th.  Moreover,

25   Plymouth did not file its claim until after the hearing on plan

51

1   modification, which it needn't have waited for.  It had the

2   claim or was aware of the late claim issue on July 16th, but,

3   nevertheless, waited two weeks thereafter to do so.  So, all

4   things being considered, it appears to me that while this is a

5   somewhat close case, the neglect here was largely within the

6   control of Plymouth.

7          Secondly, while the time between the bar date and the

8   filing of the claim was relatively short, I conclude that there

9   was prejudice to the debtor and other parties that resulted

10  from the delay.  If, in fact, the responsibility for paying

11  this administrative claim, to the extent it is allowed, rested

12  with either GM or the DIP lender acquisition vehicle, it would

13  appear to me, particularly given the balance of factors on

14  whether the delay was within Plymouth's control, that the lack

15  of prejudice to the estate would have argued for letting the

16  claim be filed late.  (The fact that some party receives a

17  smaller distribution or another third party pays more money as

18  a result of a claim being allowed to be filed late is not

19  sufficient prejudice, it is not the type of prejudice that the

20  courts have in mind when they evaluate the prejudice factor

21  under Pioneer.)

22         However, here, I believe there is prejudice to the

23  estate.  And also, again, some blame should be laid on Plymouth

24  for causing this prejudice by not filing the claim until after

25  the plan modification hearing.  As represented by Mr. Butler,

52

1    who clearly was involved in the preparation for the plan

2    modification hearing and the debtors' efforts to determine

3    whether, in fact, the MDA would result in a feasible plan, the

4    calculation of likely administrative claims against a surviving

5    debtor entity was a key factor in moving forward with the

6    hearing on July 29th.

7         It's been stated that a demand number under the

8    counterclaim by Plymouth is approximately twenty million

9    dollars.  That number would have had a significant impact on

10   the debtors' presentation of the modification of the plan on

11   July 29th and the Court's consideration of whether the plan is

12   feasible or was feasible, and would have, if asserted as a

13   recovery against the debtors -- the surviving debtors, as an

14   administrative claim it could have had a very significant

15   impact on feasibility.  Consequently, it would appear to me

16   that although the delay was short, it was very significant, and

17   that both the debtors as well as the other parties to the MDA,

18   and ultimately the Court, moved ahead in reliance on that claim

19   not being asserted.

20        So, that prejudice, as well as my conclusion that the

21   lateness of the claim, first in terms of its being verbally

22   asserted only on July 16th and then actually formally asserted

23   after the plan modification hearing, was largely, if not

24   entirely, within the control of Plymouth, leads me to deny

25   Plymouth's motion.

53

1          Obviously, to the extent that it is asserting a right

2     to setoff or recoupment, the lateness of the claim should not

3     matter, so that what this ruling effectively does is preclude

4     Plymouth from an affirmative recovery against the debtor's

5     estate as opposed to, again, a recoupment or setoff right in

6     the Michigan and Massachusetts litigation.

7          So Mr. Butler, you can submit an order to that effect.

8          MR. BUTLER:  Yes, Your Honor.

9          THE COURT:  Okay.

10         MR. BUTLER:  Your Honor, the last matter on the agenda

11    for today, matter number 8, is a motion for authority to apply

12    the claims objection procedures to administrative expense

13    claims, filed at docket number 18715.  Your Honor, by this

14    motion, what we're seeking to do is to use the claims

15    procedures that Your Honor is familiar with, that have been

16    running on a separate claims track for the last two and a half

17    years, to apply those to administrative claims.  And I think it

18    goes without saying that the -- and I think Your Honor has

19    observed in the past, that the procedures that have been

20    adopted by the Court here back on December 7th of 2006 at

21    docket number 6089, have served the debtors well and have dealt

22    with an expeditious treatment of almost 17,000 proofs of claim,

23    and through some 34 omnibus claims objections that addressed

24    over 14,000 of those claims, and have resulted in the

25    disallowance or withdrawal of over 10,000 of those claims.  So