# EXHIBIT F

**Hearing Date and Time:  May 20, 2010 at 10:00 a.m. (prevailing Eastern time)**
**Supplemental Response Date and Time:  May 18, 2010 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti

Attorneys for DPH Holdings Corp., et al.,
     Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        :
          In re                                         :     Chapter 11
                                                        :
DPH HOLDINGS CORP., et al.,                             :     Case Number 05-44481 (RDD)
                                                        :
                                                        :     (Jointly Administered)
          Reorganized Debtors.                          :
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

REORGANIZED DEBTORS' SUPPLEMENTAL REPLY TO RESPONSE OF
CLAIMANT TO DEBTORS' OBJECTION TO PROOF OF CLAIM NUMBER
19543 FILED BY JOSE C. ALFARO AND MARTHA ALFARO

("SUPPLEMENTAL REPLY REGARDING CERTAIN CLAIMS
FILED BY JOSE C. ALFARO AND MARTHA ALFARO")

DPH Holdings Corp. and certain of its affiliated reorganized debtors in the above-captioned cases (together with DPH Holdings Corp., the "Reorganized Debtors") hereby submit the Reorganized Debtors' Supplemental Reply To Response Of Claimant To Debtors' Objection To Proof of Claim Number 19543 Filed By Jose C. Alfaro And Martha Alfaro (the "Supplemental Reply"), and respectfully represent as follows:

A.      Preliminary Statement

1.      On October 8 and 14, 2005, Delphi Corporation and certain of its affiliates (the "Debtors"), predecessors of the Reorganized Debtors, filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").

2.      On October 6, 2009, the Debtors substantially consummated the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified (the "Modified Plan"), which had been approved by this Court pursuant to an order entered on July 30, 2009 (Docket No. 18707), and emerged from chapter 11 as the Reorganized Debtors.

3.      On April 22, 2010, the Reorganized Debtors filed the Notice Of Sufficiency Hearing With Respect To Reorganized Debtors' Objection To Proofs Of Claim Nos. 16898, 17094, 18027, And 19543 (Docket No. 19928) (the "Sufficiency Hearing Notice").

4.      The Reorganized Debtors filed the Sufficiency Hearing Notice and are filing this Supplemental Reply to implement Article 9.6(a) of the Modified Plan, which provides that "[t]he Reorganized Debtors shall retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors and

2

making distributions (if any) with respect to all Claims and Interests …."  Modified Plan, art. 9.6(a).

5.        By the Sufficiency Hearing Notice and pursuant to the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims, entered December 7, 2006 (Docket No. 6089) (the "Claims Objection Procedures Order"), the Order Pursuant To 11 U.S.C. §§ 105(a) And 503(b) Authorizing Debtors To Apply Claims Objection Procedures To Address Contested Administrative Expense Claims, entered October 22, 2009 (Docket No. 18998), and the Eleventh Supplemental Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims, entered April 5, 2010 (Docket No. 19776), the Reorganized Debtors scheduled a hearing (the "Sufficiency Hearing") on May 20, 2010 at 10:00 a.m. (prevailing Eastern time) in this Court to address the legal sufficiency of each proof of claim filed by the claimants listed on Exhibit A to the Sufficiency Hearing Notice and whether each such proof of claim states a colorable claim against the asserted Debtor.

6.        This Supplemental Reply is filed pursuant to paragraph 9(b)(i) of the Claims Objection Procedures Order.  Pursuant to paragraph 9(b)(ii) of the Claims Objection Procedures Order, if a Claimant wishes to file a supplemental pleading in response to this Supplemental Reply, the Claimant shall file and serve its response no later than two business days before the scheduled Sufficiency Hearing – i.e., by **May 18, 2010.**

3

B.      Relief Requested

7.      By this Supplemental Reply, the Reorganized Debtors request entry of an

order disallowing and expunging a proof of claim because (i) the actions underlying the proof of

claim have been denied by summary judgment, (ii) the proof of claim has already been asserted

by the Claimants, and (iii) the proof of claim was untimely filed.

C.      The Claims Filed Against The Debtors

8.      On August 10, 2009, Jose C. Alfaro and Martha Alfaro (the "Alfaros" or

the "Claimants") filed proof of claim number 19543 (the "Claim") asserting an unsecured non-

priority claim in the amount of $1,500,000.00 against Delphi Corporation ("Delphi").

9.      The Reorganized Debtors' Objection To The Claim. On October 15, 2009,

the Reorganized Debtors objected to the Claim on the Reorganized Debtors' Thirty-Sixth

Omnibus Objection Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To (I) Modify

And Allow Claim And (II) Expunge Certain (A) Duplicate SERP Claims, (B) Books And

Records Claims, (C) Untimely Claims, And (D) Pension, Benefit, And OPEB Claims (Docket

No. 18983) (the "Thirty-Sixth Omnibus Claims Objection") on the grounds that such claim was

untimely filed.

10.      Response To The Reorganized Debtors' Objection.  On November 12,

2009, Mr. and Mrs. Alfaro filed a response to the Thirty-Sixth Omnibus Claims Objection

(Docket No. 19076), in which they assert that their previous attorney fraudulently replaced their

timely filed proof of claim with an untimely second proof of claim, both of which have since

been disallowed by this Court.

11.      The Sufficiency Hearing Notice.  Pursuant to the Claims Objection

Procedures Order, the hearing on the Debtors' objection to the Claim was adjourned to a future

date.  On April 22, 2010, the Reorganized Debtors filed the Sufficiency Hearing Notice with

4

respect to the Claim, among other proofs of claim and administrative expense claims, scheduling
the Sufficiency Hearing.

D.    <u>Claimants' Burden Of Proof And Standard For Sufficiency Of Claim</u>

12.    The Reorganized Debtors respectfully submit that the Claim fails to state a
claim against the Debtors under rule 7012 of the Federal Rules of Bankruptcy Procedure (the
"Bankruptcy Rules").  The Claimants have not proved any facts to support a right to payment by
the Reorganized Debtors on behalf of the Debtors.  Accordingly, the Reorganized Debtors'
objection to the Claim should be sustained and the Claim should be disallowed and expunged in
its entirety.

13.    The burden of proof to establish a claim against the Debtors rests on the
claimants and, if a proof of claim does not include sufficient factual support, such proof of claim
is not entitled to a presumption of <u>prima facie</u> validity pursuant to Bankruptcy Rule 3001(f).  <u>In
re Spiegel, Inc.</u>, No. 03-11540, 2007 WL 2456626, at *15 (Bankr. S.D.N.Y. August 22, 2007)
(the claimant always bears the burden of persuasion and must initially allege facts sufficient to
support the claim); <u>see also</u> <u>In re WorldCom, Inc.</u>, No. 02-13533, 2005 WL 3832065, at *4
(Bankr. S.D.N.Y. Dec. 29, 2005) (only a claim that alleges facts sufficient to support legal
liability to claimant satisfies claimant's initial obligation to file substantiated proof of claim); <u>In
re Allegheny Int'l., Inc.</u>, 954 F.2d 167, 173 (3d Cir. 1992) (in its initial proof of claim filing,
claimant must allege facts sufficient to support claim); <u>In re Chiro Plus, Inc.</u>, 339 B.R. 111, 113
(Bankr. D.N.J. 2006) (claimant bears initial burden of sufficiently alleging claim and establishing
facts to support legal liability); <u>In re Armstrong Finishing, L.L.C.</u>, No. 99-11576-C11, 2001 WL
1700029, at *2 (Bankr. M.D.N.C. May 2, 2001) (only when claimant alleges facts sufficient to
support its proof of claim is it entitled to have claim considered <u>prima facie</u> valid); <u>In re United</u>

Cos. Fin. Corp., 267 B.R. 524, 527 (Bankr. D. Del. 2000) (claimant must allege facts sufficient
to support legal basis for its claim to have claim make prima facie case).

14.    For purposes of sufficiency, this Court has determined that the standard of
whether a claimant has met its initial burden of proof to establish a claim should be similar to the
standard employed by courts in deciding a motion to dismiss under Bankruptcy Rules 7012 and
9014.  See Transcript of January 12, 2007 Hearing (Docket No. 7118) (the "January 12, 2007
Transcript") at 52:24-53:1.  Pursuant to that standard, a motion to dismiss should be granted "if it
plainly appears that the nonmovant 'can prove no set of facts in support of his claim which would
entitle him to relief.'" In re Lopes, 339 B.R. 82, 86 (Bankr. S.D.N.Y. 2006) (quoting Conley v.
Gibson, 355 U.S. 41, 45-46 (1957)).  Essentially, the claimant must provide facts that sufficiently
support a legal liability against the Debtors.

15.    This Court further established that the sufficiency hearing standard is
consistent with Bankruptcy Rule 3001(f), which states that "a proof of claim executed and filed
in accordance with these Rules shall constitute prima facie evidence of the validity and amount
of the claim." Fed. R. Bankr. P. 3001(f) (emphasis added).  Likewise, Bankruptcy Rule 3001(a)
requires that "the proof of claim must be consistent with the official form" and Bankruptcy Rule
3001(c) requires "evidence of a writing if the claim is based on a writing."  Fed. R. Bankr. P.
3001(a), (c).  See January 12, 2007 Transcript at 52:17-22.

E.    Argument Regarding The Claim

16.    The Alfaros assert that Delphi owes them $1.5 million based on a personal
injury claim. Delphi does not owe any amounts to the Alfaros because (i) a federal district court
has already resolved an issue against the Alfaros that is essential to the Claim, and the Alfaros
are precluded from relitigating the issue under the doctrine of issue preclusion , (ii) the

underlying claim has already been expunged by this Court, and (iii) the proof of claim was untimely filed.

17.    <u>Summary Judgment Order Terminating Action Underlying Proof Of Claim Shows That The Alfaros Fail To State A Claim.</u> On April 7, 2005, the Alfaros filed a complaint against General Motors Corporation ("GM"), Delco Electronics Corporation, Delco Electronics Corporation, Delphi Automotive Systems (f/k/a Inland Fisher Guide), John Doe, and John Doe, Inc. (collectively, the "Defendants") in the United States District Court for the District of Colorado (the "District Court"), alleging that Defendants were liable for the personal injury claim asserted by the Alfaros. <u>Jose C. Alfaro and Martha Alfaro v. General Motors Corporation, Delco Electronics Corporation, Delphi Automotive Systems (f/k/a Inland Fisher Guide), John Doe, and John Doe, Inc.</u>, Civil Action No. 05-cv-00645 (D. Col.) (the "District Court Action").[1] The District Court Action against the Debtors was stayed pursuant to the automatic stay.

18.    In the Alfaros' complaint (District Court Action, Docket No. 1) (the "Complaint"), which is attached hereto as <u>Exhibit A</u>, the Alfaros list three claims for relief against the Defendants: (i) strict liability in tort under C.R.S. §13-21-401; (ii) negligent design, manufacture, installation, testing, and inspection; and (iii) breach of implied warranty of merchantability.  Complaint ¶¶ 30 -45.  As the Alfaros describe in their Complaint, the 2000 Chevrolet Silverado 1500, 4X4, Ltd., VIN 1GCEK19T1YE143024 (the "Silverado"), was the subject of the Complaint ¶ 9.

19.    <u>Strict Liability In Tort Under C.R.S. §13-21-401.</u>  To prove strict liability in tort under C.R.S. §13-21-401 the Alfaros must establish by a preponderance of the evidence:

---

[1]    Proof of claim number 19543 is based on this litigation.  For example, the Alfaros attached the complaint filed in the District Court Action to the Response as well as to the previously disallowed duplicative proofs of claim numbers 15613 and 16471.

(1) the Defendants were the manufacturer of the Silverado; (2) the Defendants were engaged in the business of selling such products; (3) the Defendants sold the Silverado; (4) the Silverado was defective and, because of the defect, the Silverado was unreasonably dangerous to a person who might reasonably be expected to use, consume, or be affected by the Silverado; (5) the Silverado was defective at the time it was sold by the Defendants or left their control; (6) the Silverado was expected to reach the user or consumer without substantial change or condition in which it was sold; (7) the Silverado did reach the user or consumer without substantial change in the condition in which it was sold; (8) the Claimants were persons who would reasonably be expected to use, consume or be affected by the Silverado; (9) the Claimants had injuries; and (10) the defect in the Silverado was a cause of the Claimants' injuries. Simon v. Cappola, 876 P.2d 10, 15 (Colo Ct. App. 1993).

20. Negligent Design, Manufacture, Installation, Testing, And Inspection. To prove the claim for relief based on manufacturer's negligence, the Alfaros must establish by a preponderance of the evidence that: (1) the Defendants manufactured the Silverado; (2) the Defendants were negligent by failing to exercise reasonable care to prevent the Silverado from creating an unreasonable risk of harm to the person or property of one who might reasonably be expected to use, consume or be affected by the Silverado while it was being used in the manner the Defendants might have reasonably expected; (3) the Claimants were persons the Defendants should reasonably have expected to use, consume or be affected by the Silverado; and (4) the Claimants had injuries that were caused by the Defendants' negligence, while the Silverado was being used in a manner the Defendants should reasonably have expected. Lyons v. Nesby, 770 P.2d 1250, 1254 (Colo. 1989).

21.     <u>Breach Of Implied Warranty Of Merchantability.</u>  To prove the claim for

relief based on breach of implied warranty of merchantability, the Alfaros must establish by a

preponderance of the evidence that: (1) the Defendants sold the Silverado; (2)  the Claimants are

persons who were reasonably expected to use, consume or be affected by the product; (3)  the

Defendants were merchants with respect to the type of product involved herein; (4) the Silverado

was not of merchantable quality at the time of sale; (5) this breach of warranty caused the

Plaintiffs' injuries; and (6) within a reasonable time after the Claimants discovered or should

have discovered the alleged breach of warranty, the Claimants notified the Defendants of such

breach. <u>Prutch v. Ford Motor Co.</u>, 618 P.2d 657, 660 (Colo. 1980).

22.     All three of the causes of action against Delphi, strict liability, negligence,

and implied breach of warranty, require that the Alfaros demonstrate that same issues be proved

– that the Silverado was defective.

23.     On July 21, 2006, after full discovery, GM moved for summary judgment

(District Court Action, Docket No. 59) (the "Summary Judgment Motion") and concurrently

filed its brief in support of the Summary Judgment Motion (District Court Action, Docket No. 60)

(the "Summary Judgment Motion Brief").  For this Court's reference, a copy of the Summary

Judgment Motion is attached hereto as <u>Exhibit B</u> and a copy of the Summary Judgment Motion

Brief is attached hereto as <u>Exhibit C</u>.  The evidence presented to the District Court in connection

with the Summary Judgment Motion included, among other things an expert report prepared by

the Alfaros' expert that addressed whether the Silverado was defective. Summary Judgment

Motion Exhibit A-3.

24.    On August 21, 2006, GM filed a motion to expedite consideration for summary judgment (District Court Action, Docket No. 63) (the "Motion to Expedite"), a copy of which is attached hereto as Exhibit D.

25.    On August 23, 2006, the Alfaros filed their opposition to Motion to Expedite (District Court Action, Docket No. 65) (the "Alfaro Opposition") and on September 11, 2006, GM filed its reply to the Alfaro Opposition (District Court Action, Docket No. 66).  A copy of the Alfaro Opposition is attached hereto as Exhibit E and GM's reply is attached hereto as Exhibit F.

26.    On October 17, 2006, the District Court issued an opinion and judgment granting the Summary Judgment Motion in its entirety and terminating the District Court Action (District Court Action, Docket No. 67) (the "Summary Judgment Order"), a copy of the Summary Judgment Order is attached hereto as Exhibit G.  In the Summary Judgment Order, the District Court held that Alfaro Opposition would be treated as a response to the Summary Judgment Motion.

27.    In the Summary Judgment Order , the District Court granted summary judgment in favor of GM and against the Alfaros on the grounds that the Alfaros failed to come forward with sufficient evidence that the Silverado was defective, as required under each of the three claims for relief asserted.

28.    On October 30, 2006, the Alfaros filed a motion to reconsider the Summary Judgment Order (District Court Action, Docket No. 68) (the "Motion to Reconsider"), GM filed its response to the Motion to Reconsider (District Court Action, Docket No. 81), and the District Court denied the motion on December 11, 2006 (District Court Action, Docket No.

86).  For this Court's reference, a copies of the Motion to Reconsider, GM's response, the order
denying the Motion to Reconsider are attached hereto as Exhibits H, I, and J respectively.

29.     On January 2, 2007, the District Court entered a final judgment against the
Alfaros (District Court Action, Docket No. 88), a copy of which is attached hereto as Exhibit K.

30.     As with their claims against GM, to sustain their proof of claim against
Delphi the Alfaros would need to prove that the Silverado was defective.  Indeed the claims
against Delphi are based on the same theories and facts and circumstances as the claims against
GM in the District Court Action. The Alfaros cannot relitigate the question whether the
Silverado was defective, however, because the District Court's judgment prohibits them from
doing so under the doctrine of issue preclusion.

31.     When, as here, a federal court in a diversity action issues a judgment with
respect to state law,  the preclusive effect of the judgment is governed by the applicable state law
– in this case, Colorado.  Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 508-10 (U.S.
2001) (holding that when determining which law to apply with respect to issue preclusion, it is "a
classic case for adopting, as the federally prescribed rule of decision, the law that would be
applied by state courts in the State in which the federal diversity court sits"); see also Duane
Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 600 F.3d 190, 195 (2d Cir. 2010) (citing Semtek
and affirming that the law governing the doctrine of res judicata in a diversity action is the law
that would be applied by state courts in the State in which the federal diversity court sits).  Under
Colorado law, issue preclusion bars re-litigation of an issue if: (1) the issue is identical to an
issue actually litigated and necessarily adjudicated in the prior proceeding; (2) the party against
whom estoppel was sought was a party to or was in privity with a party to the prior proceeding;
(3) there was a final judgment on the merits in the prior proceeding; and (4) the party against

11

whom the doctrine is asserted had a full and fair opportunity to litigate the issues in the prior

proceeding.  Huffman v. Westmoreland Coal Co., 205 P.3d 501, 506 (Colo. Ct. App. 2009); see

also In re Tonko, 154 P.3d 397, 405 (Colo. 2007).

       32.    As discussed above, all three causes of action against Delphi rest on the

same issue: whether the Silverado was defective.  The Alfaros are the party against whom

estoppel is sought and were not able to prove this issue.  The Alfaros had a final judgment

rendered against them on the merits (District Court Action Docket No. 88).  Finally, the Alfaros

had a full and fair opportunity to litigate the issue in the District Court Action in connection with

the Summary Judgment Motion. (District Court Action, Docket Nos. 1, 65, and 68).  In addition

there was a second round of litigation triggered by the Afaros' Motion to Reconsider the

Summary Judgment Order (District Court Action Docket No. 68), which was later denied after

full briefing (District Court Action Docket No. 86).  All four elements for issue preclusion under

Colorado law are easily satisfied.  Having failed to establish that the Silverado was defective, the

Alfaros should not be given a second bite at the apple in the form of an opportunity to litigate

that same issue here.  The District Court summary judgment bars the Alfaros from doing so and

for that reason they cannot succeed on the Claim against Delphi  Accordingly, proof of claim

number 19543 should be disallowed and expunged in its entirety.

       33.    The Underlying Claim Has Already Been Expunged By This Court.  On

August 10, 2009, the Claimants filed proof of claim number 19543 asserting an unsecured non-

priority claim in the amount of  $1,500,000.00 against Delphi.  The Claim is an attempt to

resurrect proofs of claim numbers 15613[2] and 16471, which were expunged on April 23, 2007

---

[2]    On July 31, 2006, the Claimants filed proof of claim number 15613 in the amount of $1,500,00.00 on account
    of a prepetition lawsuit, which was disallowed and expunged pursuant to this Court's Order Pursuant To 11

*(cont'd)*

and  September 28, 2007[3] respectively.  Moreover, proof of claim number 19543 is an exact photocopy of the previously disallowed proof of claim number 15613.  In fact, proof of claim number 19543 is even dated July 25, 2006 despite being filed on August 10, 2009. By filing the Claim, the Claimants seek to unilaterally circumvent Fed. R. Bankr. P. 3008.

34.    Proof Of Claim Number 19543 Is Untimely.  Moreover, proof of claim number 19543 should be disallowed and expunged because it was not timely filed.  On April 12, 2006, this Court entered its Bar Date Order[4] setting a bar date of July 31, 2006 (the "Bar Date"), for creditors to file proofs of claim in the Debtors' chapter 11 cases and approved the Notice Of Bar Date For Filing Proofs Of Claim (the "Bar Date Notice") to be used to notify parties of the Bar Date, and included a form to be used to submit a proof of claim (the "Proof of Claim Form"). On or before April 20, 2006, in accordance with the Bar Date Order, the Debtors caused Kurtzman Carson Consultants LLC ("KCC"), the claims and noticing agent in these chapter 11 cases, to transmit to the Alfaros the Bar Date Notice, which set forth certain procedures for asserting a proof of claim, and a copy of the Proof of Claim Form.  KCC served the Bar Date Notice by first class mail on the Alfaros.  See Affidavit Of Service Of Evan Gershbein, dated April 28, 2006 (Docket No. 3501), the relevant portions of which, including the Bar Date Notice, are attached hereto as Exhibit L.

---

*(cont'd from previous page)*

U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 Disallowing And Expunging (A) Duplicate And Amended Claims And (B) Equity Claims Identified In Tenth Omnibus Claims Objection (Docket No. 7772) and proof of claim number 16471 in the amount of  $500,000.00 was deemed to be the Claimants' surviving claim.

[3]    Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 Disallowing And Expunging Certain (A) Duplicate And Amended Claims, (B) Insufficiently Documented Claims, (C) Claims Not Reflected On Debtors' Books And Records, (D) Untimely Claim, And (E) Claims Subject To Modification, Tax Claims Subject To Modification, Modified Claims Asserting Reclamation, Consensually Modified And Reduced Tort Claims, And Lift Stay Procedures Claims Subject To Modification Identified In Twentieth Omnibus Claims Objection (Docket No. 9692).

[4]    Order Under 11 U.S.C. §§ 107(b), 501, 502, And 1111(a) And Fed R. Bankr. P. 1009, 2002(a)(7), 3003(c)(3), And 5005(a) Establishing Bar Dates For Filing Proofs Of Claim And Approving Form And Manner Of Notice Thereof (Docket No. 3206) (the "Bar Date Order").

35.     Even though proof of claim number 19543 was filed on August 10, 2009 –
more than three years after the Bar Date –the Alfaros have not yet filed a motion or made any
attempt in their proof of claim or responses to the Debtors' objection to their proof of claim to
establish excusable neglect under the test outlined by the U.S. Supreme Court in Pioneer
Investment Services Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993).  In Pioneer,
the Supreme Court held that excusable neglect is the failure to comply with a filing deadline
because of negligence.  Id. at 394.  In examining whether a creditor's failure to file a claim by the
bar date constituted excusable neglect, the Supreme Court found that the factors include "[a] the
danger of prejudice to the debtor, [b] the length of the delay and its potential impact on judicial
proceedings, [c] the reason for the delay, including whether it was within the reasonable control
of the movant, and [d] whether the movant acted in good faith."  Id. at 395.  The Second Circuit
has held the most important factor is the reason for the delay, including whether it was within the
reasonable control of the movant.  Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In
re Enron Corp.), 419 F.3d 115, 122-24 (2d Cir. 2005).

36.     As this Court has consistently ruled on motions under Fed. R. Bankr. P.
9006(b)(1) seeking leave to file an untimely proof of claim, a movant must first show that its
failure to file a timely claim constituted "neglect," as opposed to willfulness or a knowing
omission.  Then, a movant must show by a preponderance of the evidence that the neglect was
"excusable."  See, e.g., Order Pursuant to 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 (I)
Denying United States Of America's Motion For Leave To File Late Claim And (II) Disallowing
And Expunging Proof Of Claim Number 16727, entered March 25, 2009 (Docket No. 16515) at
Exh. A p. 2 (citing Pioneer and Midland Cogeneration cases).

37.     The Alfaros have made no attempt to prove any set of facts showing that their neglect in timely filing the Claim was "excusable."  In their Response, the Alfaros assert that their previous attorney fraudulently replaced their timely filed proof of claim with an untimely second proof of claim, both of which have since been disallowed by this Court.  Any claim that the Alfaros may have against their former attorney is outside the scope of the claims procedures and is not the responsibility of the Reorganized Debtors.  Proof of claim number 19543 should, therefore, be disallowed and expunged with prejudice as untimely.

WHEREFORE the Reorganized Debtors respectfully request this Court enter an order (a) sustaining the objection with respect to proof of claim number 19543, (b) disallowing and expunging proof of claim number 19543 in its entirety, and (c) granting such further and other relief this Court deems just and proper.

Dated:     New York, New York
           May 10, 2010

    SKADDEN, ARPS, SLATE, MEAGHER
     & FLOM LLP

    By:   /s/ John Wm. Butler, Jr.
       John Wm. Butler, Jr.
       John K. Lyons
       Ron E. Meisler
    155 North Wacker Drive
    Chicago, Illinois 60606

      - and -

    By:   /s/ Kayalyn A. Marafioti
       Kayalyn A. Marafioti
    Four Times Square
    New York, New York 10036

    Attorneys for DPH Holdings Corp., et al.,
      Reorganized Debtors

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 05-MK-645 (BNB)

JOSÉ C. ALFARO, and
MARTHA ALFARO,
Plaintiffs,

v.

GENERAL MOTORS CORPORATION,
HONEYWELL, INC. f/k/a ALLIEDSIGNAL, INC.
DELCO ELECTRONICS CORPORATION,
DELPHI AUTO SYSTEMS, f/k/a/ INLAND FISHER GUIDE
JOHN DOE, and JOHN DOE, INC.
Defendants.

---

## COMPLAINT

---

Come now Plaintiffs, José C. Alfaro and Martha Alfaro, by their lawyer, Stanley J.

Walter, for their Complaint against General Motors Corporation, Honeywell, Inc. f/k/a

AlliedSignal, Inc., Delco Electronics Corporation and Delphi Auto Systems f/k/a Inland

Fisher Guide, John Doe, and John Doe Inc. allege as follows:

### JURISDICTION AND VENUE

1.      This court has jurisdiction relative to Plaintiffs' claims against Defendants

by virtue of 28 U.S.C. § 1332, in that, there exists complete diversity of citizenship

between all parties plaintiff and defendant, and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

2.    Venue is proper in this district under 28 U.S.C § 1391 (a) because jurisdiction is founded only on diversity of citizenship and a substantial part of events or omissions giving rise to this claim occurred in this district and all Defendants were subject to personal jurisdiction in this district at the time this action was commenced.

## PARTIES

3.    Plaintiffs, José Alfaro and Martha Alfaro, are now, and at all times mentioned were, citizens of the United States of America, and are citizens of the State of Kansas and reside at 304 West 5th St. in Goodland, Kansas.

4.    Defendant General Motors Corporation (hereinafter "GMC") is a foreign corporation organized and existing pursuant to the laws of the State of Delaware with its principal place of business in the State of Michigan.

5.    Defendant Delco Electronics Corporation (hereinafter Delco) is a foreign corporation organized and existing pursuant to the laws of the State of Delaware with its principal place of business in the State of Indiana.

6.    Defendant Delphi Automotive Systems, LLC (hereinafter Delphi) is a foreign corporation organized and existing pursuant to the laws of the State of Delaware

with its principal of business in the state of Michigan, and was formerly known as Inland
Fisher Guide.

7.    Defendant Honeywell, Inc. (hereinafter Honeywell) is a foreign corporation
organized and existing pursuant to the laws of the State of Delaware, with its principal
place of business in the state of New Jersey, and was formerly known as AlliedSignals, Inc.

## GENERAL ALLEGATIONS

8.    At all times material hereto, Defendant GMC was registered to do business
in this state, and was doing business in this state, and at all times material hereto, on
information and belief, Defendants Delco and Delphi were and are subsidiaries of
Defendant GMC, and upon information and belief, GMC is the sole distributor of GMC
Silverado trucks in America, selling this product to General Motors dealers who, in turn,
sell them to the American public.

9.    Defendant GMC designed, manufactured, marketed, warranted and sold
in interstate commerce a  2000 Chevrolet Silverado 1500, 4X4, LTD, the vehicle which
is the subject of this complaint,  VIN 1GCEK19T1YE143024.

10.    On information and belief, the automobile in question, and /or its relevant
component parts, were designed, manufactured, assembled, constructed, fabricated,
inspected, distributed, sold, and/or otherwise produced or prepared, and introduced into
the stream of commerce by each of the defendants named in this lawsuit.

3

11.    Defendants John Doe and John Doe, Inc., on information and belief, are other individuals or entities involved in the manufacture of this unreasonably dangerous automobile and/or its component parts including, but not limited to, seats, seatbelts, restraint systems, airbags, airbag sensors and related parts   Their identities, on information and belief, are known by defendants in this suit; however, they are unknown at the present time to plaintiffs.   Plaintiffs will supplement and amend pleadings as necessary when the identity of these defendants becomes known.

12.    The condition of the Silverado at the time of the crash complained of herein, was substantively the same as when it entered the stream of commerce, and the defects in the vehicle existed when it left the control of the Defendant GMC.

13.    Defendants reasonably expected, or had reason to expect, that the plaintiff or others could have been injured in this state by reason of its' unreasonably dangerous and defective product, and they derive substantial revenue from interstate and international commerce.

14.    The Silverado in question was manufactured by Defendant GMC and the other Defendants with a safety system that included seat belts and airbags.

15.    At approximately 11:00 p.m. on the 21st day of May, 2003,  the Silverado was traveling, in the right (slow) lane, eastbound on 1-70 at approximately mile post 435 at Burlington, Colorado.

4

16.    Gorgonio Diaz was driving and the Plaintiff, José Alfaro, was riding in the front passenger seat. ( An infant passenger was riding in the back seat in a properly secured infant chair. After the crash she was examined and released.)

17.    The airbag system has a switch on the dash for the passenger-side airbag, and this switch was in the on position.

18.    Both Mr. Diaz and the Plaintiff, José Alfaro were properly wearing their respective seatbelts.

19.    The interstate at this point is a 4-lane divided highway with a posted speed limit of 75 miles per hour.

20.    For unknown reasons, the Silverado veered sharply to the left, crossed over the center line of the eastbound lane, left the paved portion of the highway, traveled in the median, struck a crossover with great force, became airborne, landed in the median, crossed over the west bound lane and came to rest on the north side of the west bound lanes.

21.    At the time the Silverado left the highway it was traveling at approximately 70 miles per hour.

22.    At the time of impact, the seat belts failed to restrain both front seat passengers, and the both front seat airbags failed to deploy.

23.    As a direct and proximate result of the product failure, and failure of the safety systems, the Plaintiff, José Alfaro, was violently thrown about inside the cab of the pickup and severely injured.

24.    The Silverado struck with such force that it became a total loss and not economically feasible to repair.

25.    As a direct and proximate result of the unreasonably dangerous and defective condition of the Silverado, the Plaintiff, José Alfaro, has incurred medical expense in an amount exceeding $400,000.00, and medical expense is ongoing, sustained severe and permanent injuries, including, but not limited to, remaining comatose for a period of 63 days, loss of sight in one eye, lost of the use of an arm, suffered several painful surgeries, injury to both shoulders, other disabilities, disfigurements and scarring, and has endured substantial and unbearable pain, discomfort, mental anguish, mental suffering, extreme emotional distress and loss of enjoyment of life.

26.    As a direct and proximate result of the unreasonably dangerous and defective condition of the Silverado in question Plaintiff, José Alfaro, has and will continue to incur substantial medical expense, has lost income in an amount exceeding $150,000.00, and has suffered impairment of earning ability.

27.    Martha Alfaro is the wife of Plaintiff José Alfaro.

28.    As a direct and proximate result of the unreasonably dangerous and defective condition of the Silverado, Plaintiff, Martha Alfaro, has had to care for her husband, and act as nurse, and to assist him in dressing, and almost all ordinary household tasks, and has suffered the loss of his services, friendship and society, and has endured extreme mental suffering in helping her husband deal with his pain, and mental and physical suffering, all to her damage in an amount exceeding $75,000.00.

29.    The doctrine of *res ipsa loquitor* applies to this case.

### FIRST CLAIM FOR RELIEF
### Strict Liability In Tort C.R.S. §13-21-401

30.    Plaintiffs incorporate by reference as if fully set forth herein all statements and allegations contained in the proceeding paragraphs.

31.    Defendants are the "manufacturers" of the Silverado within the meaning of the Colorado Products Liability Statute, C.R.S. § 13-31-401.

32.    At the time of the crash, the Silverado was defective and unreasonably dangerous to persons who might reasonably expect to use, consume or be affected by it, in at least the following respects, among others;

A.    The safety system airbag did not deploy.

B.    The safety system seatbelt did not restrain the passengers.

7

C.   The vehicle was not accompanied with adequate warnings of its

defective nature.

33.    Had either system worked properly, Plaintiff José Alfaro's injuries, if any,

would have been minimal.

34.    Plaintiffs are persons who would reasonably be expected to use, consume,

or be affected by the Silverado.

35.    As a direct and proximate result of the defective and unreasonably

dangerous condition of the Silverado at the time of the crash, the Plaintiffs suffered

damages as set out in paragraphs 25, 26 and 28 above.

### SECOND CLAIM FOR RELIEF
### Negligent Design, Manufacture, Installation, Testing and Inspection

36.    Plaintiffs incorporate by reference as if fully set forth herein all statements

and allegations contained in the preceding paragraphs.

37.    Defendants each owed a duty to Plaintiffs to design, test, manufacture and

install and inspect the Silverado and component parts in a reasonably safe manner.

38.    Defendants breached this duty by designing, testing, manufacturing,

installing and/or inspecting the Silverado and /or its component parts in a negligent and

unreasonable manner.

39.   All defendants acting jointly were negligent, grossly negligent and/or reckless in preparing, designing, manufacturing, fabricating, inspecting, producing the component parts, and selling and distributing the final product of the G.M.C. Silverado such that joint liability may be imposed within the meaning of C.R.S. §13-21-111.

40.   Plaintiffs injuries, losses and damages, as set out in paragraphs 25, 26 and 28, were a direct and proximate result of Defendants' negligence.

### THIRD CLAIM FOR RELIEF
### Breach of Implied Warranty of Merchantability

41.   Plaintiff incorporates by reference as if fully set forth herein all statements and allegations contained in the preceding paragraphs.

42.   Defendants were merchants with respect to the Silverado and component parts at issue.

43.   The Silverado was not of merchantable quality at the time of sale, use or consumption by reason of the defectiveness discussed *infra,* which made this product unreasonably dangerous.

44   This breach of warranty was the proximate cause of Plaintiffs injuries, damages and losses as set out in paragraphs 25, 26 and 28.

45.   Within a reasonable time after Plaintiffs discovered the breach of implied warranty they notified Defendants.

## PRAYER FOR RELIEF

WHEREFORE,  for all the foregoing reasons, Plaintiffs pray that this Court enter

judgment in their favor against the Defendants, and each of them, jointly and severally,

for special and compensatory damages in an amount to be proven at trial which fully and

fairly compensate them for their injuries, damages and losses, for pre- and post-judgment

interest from May 21, 2003 until satisfaction of judgment and for their costs, expert

witness fees, attorney fees, and for such other and further relief  as this Court deems just

and proper.

Dated this 7th day of April, 2005.

Stanley J. Walter
Lawyer
1017 S. Gaylord Street
Denver, CO  80209
(303) 698-1957


**Address of Plaintiffs**:
304 West 5th Street,
Goodland, Kansas




UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Instructions Regarding
Notice of Availability of a United States Magistrate Judge
to Exercise Jurisdiction Pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73,
and D.C.COLO.LCivR 72.2

Attached please find a copy of the United States District Court for the District of
Colorado Local Rules of Practice 72.2 (D.C.COLO.LCivR 72.2), a Notice of Availability
of a Magistrate Judge to Exercise Jurisdiction and Consent to the Exercise of Jurisdiction
by a United States Magistrate Judge, and a proposed Order of Reference.

Pursuant to D.C.COLO.LCivR 72.2, it is the responsibility of the filing party to
serve a copy of these instructions, D.C.COLO.LCivR 72.2, and the attached forms on the
opposing party or parties and to file proof of such service with the court.  The filing party
is the plaintiff when an action is commenced by the filing of a complaint, the defendant
when an action is commenced by the filing of a notice of removal, the third-party plaintiff
when a third-party complaint is filed, or any party that adds an additional party to the civil
action.

If ALL parties have consented to this exercise of jurisdiction please file an original
and two copies of the Notice and Consent and proposed Order of Reference.  In
accordance with D.C.COLO.LCivR 72.2D, the Notice and Consent must be filed no later
than ten days after the discovery cut-off.  In cases not requiring discovery, the parties
shall have 40 days from the filing of the last responsive pleading to file their unanimous
consent.

If any additional parties are added after the entry of an Order of Reference to the
magistrate judge under 28 U.S.C. § 636(c), the party adding an additional party or parties
MUST file with the clerk a document titled "Notice," which informs the clerk that an
additional party has or parties have been added.  The notice MUST provide the added
party's address, or parties' addresses, so that the clerk can serve a copy of these
instructions, D.C.COLO.LCivR 72.2, and attached forms upon the newly added party or
parties in accordance with D.C.COLO.LCivR 72.2F.  This mailing will be completed
promptly.

You are encouraged to serve the summons and complaint promptly so that the
added party or parties will understand the reason for being sent the attached forms from
the Clerk's Office.

(06/21/02)

**D.C.COLO.LCivR 72.2**
**CONSENT JURISDICTION OF MAGISTRATE JUDGES**

A.    Designation. Pursuant to 28 U.S.C. § 636(c)(1) and subject to the provisions of this rule, all full-time magistrate judges in the District of Colorado are specially designated to conduct any or all proceedings in any jury or nonjury civil matter and order the entry of judgment in the case. This rule, implementing 28 U.S.C. § 636(c) consent jurisdiction in the District of Colorado, does not affect assignments to magistrate judges under other court rules and orders of reference.

B.    Prohibition. No judicial officer, court official, or court employee may attempt to influence the granting or withholding of consent to the reference of any civil matter to a magistrate judge under this rule. The form of notice of right to consent to disposition by a magistrate judge shall make reference to the prohibition and shall identify the rights being waived.

C.    Notice. Upon the filing of any civil case, the clerk shall deliver to the plaintiff(s) written notice of the right of the parties to consent to disposition of the case by a magistrate judge pursuant to 28 U.S.C. § 636(c) and the provisions of this rule. The written notice shall be in such form as the district judges shall direct. The clerk shall also provide copies of such notice to be attached to the summons and thereafter served upon the defendant(s) in the manner provided by Fed. R. Civ. P. 4. A failure to serve a copy of such notice upon any defendant shall not affect the validity of the service of process or personal jurisdiction over the defendant(s).

D.    Unanimous Consent; Determination. Written consent to proceed before a magistrate judge must be filed no later than ten days after the discovery cut-off date. In cases not requiring discovery, the parties shall have 40 days from the filing of the last responsive pleading to file their unanimous consent. When there is such consent, the magistrate judge shall forthwith notify the assigned district judge, who will then determine whether to enter an order of reference pursuant to 28 U.S.C. § 636(c).

E.    Reassignment. Upon entry of an order of reference pursuant to 28 U.S.C. § 636(c), the civil action will be reassigned to a magistrate judge by random draw, excluding the magistrate judge previously assigned.

F.   Additional Parties.  Any party added to the action or served after reference to a magistrate judge under this rule shall be notified by the clerk of the right to consent to the exercise of jurisdiction by the magistrate judge pursuant to 28 U.S.C. § 636(c).  If any added party does not file a consent to proceed before a magistrate judge within 20 days from the date of mailing of the notice, the action shall be returned to the assigned district judge for further proceedings.

G.   Vacating Reference.  The district judge, for good cause shown on the district judge's own initiative or under extraordinary circumstances shown by a party, may vacate a reference of a civil matter to a magistrate judge under this rule.

H.   Appeal.  Upon entry of a judgment in any civil action on consent of the parties under 28 U.S.C. § 636(c) authority, an appeal shall be directly to the United States Court of Appeals for the Tenth Circuit in the same manner as an appeal from any other judgment of this court.

(06/21/02)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

              Plaintiff(s),

    v.

              Defendant(s).

---

NOTICE OF AVAILABILITY OF A UNITED STATES MAGISTRATE JUDGE TO EXERCISE JURISDICTION

---

In accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D.C.COLO.LCivR 72.2, you are hereby notified that a United States magistrate judge of this district court is available to handle all dispositive matters in this civil action, including a jury or nonjury trial, and to order the entry of a final judgment. Exercise of this jurisdiction by a magistrate judge, however, is permitted only if all parties voluntarily consent and the district judge orders the reference to a magistrate judge under 28 U.S.C. § 636(c).

You may, without adverse substantive consequences, withhold your consent, but this will prevent the court's jurisdiction from being exercised by a magistrate judge. If any party withholds consent, the identity of the parties consenting or withholding consent will not be communicated to any magistrate judge or to the district judge to whom the case has been assigned.

Pursuant to D.C.COLO.LCivR 72.2, no district judge or magistrate judge, court official, or court employee may attempt to influence the granting or withholding of consent to the reference of any civil matter to a magistrate judge under this rule.

An appeal from a judgment entered by a magistrate judge shall be taken directly to the appropriate United States Court of Appeals in the same manner as an appeal from any other judgment of a district court.

If this civil action has been referred to a magistrate judge to handle certain nondispositive matters, that reference shall remain in effect. Upon entry of an order of reference pursuant to 28 U.S.C. § 636(c), the civil action will be drawn randomly to a magistrate judge, excluding the magistrate judge previously assigned.

## CONSENT TO THE EXERCISE OF JURISDICTION BY A UNITED STATES MAGISTRATE JUDGE

In accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D.C.COLO.LCivR 72.2, the parties in this civil action hereby voluntarily consent to have a United States magistrate judge conduct any and all further proceedings in the case, including the trial, and order the entry of a final judgment.

|          Signatures          |     Party Represented     |        Date        |
| ---------------------------- | ------------------------- | ------------------ |
| Print _____  | _____   | _____  |
| Print _____  | _____   | _____  |
| Print _____  | _____   | _____  |
| Print _____  | _____   | _____  |

NOTE: Return the original and a copy of this form to the clerk of the court ONLY IF all parties have consented ON THIS FORM to the exercise of jurisdiction by a United States magistrate judge. Also attach a captioned proposed order. (See attached).

06/21/02)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____


              Plaintiff(s),

v.

              Defendant(s).

_____

ORDER OF REFERENCE PURSUANT TO 28 U.S.C. § 636 (c)

_____

Pursuant to D.C.COLO.LCivR 72.2 on the _____ day of _____, _____, Magistrate Judge _____ notified the court of the parties' unanimous consent to disposition of the above action by a United States Magistrate Judge. Now, therefore, being sufficiently advised,

IT IS ORDERED as follows:

1.      The above action is referred for disposition to a magistrate judge pursuant to 28 U.S.C. § 636 (c);

2.      The above action will be randomly assigned to a magistrate judge selected by random draw, excluding Magistrate Judge _____; and

3.      Upon such reassignment, the above case number will be amended to reflect the magistrate judge to whom the case is reassigned.


BY THE COURT:

DATED: _____

_____
Judge, United States District Court

NOTICE OF REASSIGNMENT

Pursuant to the above order, this civil action is reassigned to United States Magistrate Judge
_____.


Gregory C. Langham, Clerk


By _____,Deputy Clerk

# EXHIBIT B

Case 1:05-cv-00645-MSK-BNB   Document 59   Filed 07/21/06   USDC Colorado   Page 1 of 13
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 34 of 113

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-645-MSK-BNB

JOSE C. ALFARO, and
MARTHA ALFARO,

     Plaintiffs,

v.

GENERAL MOTORS CORPORATION,
HONEYWELL, INC., f/k/a ALLIEDSIGNAL, INC.
DELCO ELECTRONICS CORPORATION,
DELPHI AUTO SYSTEMS, f/k/a INLAND FISHER GUIDE,
JOHN DOE, and
JOHN DOE, INC.,

     Defendants.

---

## DEFENDANT GENERAL MOTORS CORPORATION'S
## MOTION FOR SUMMARY JUDGMENT

---

**COMES NOW** Defendant General Motors Corporation (GM) and moves this Court for summary judgment on all claims in the Complaint (DKT No. 1) pursuant to FED. R. CIV. P. 56. Because resolution of the issues raised in GM's motion for summary judgment requires a more detailed legal analysis, a separate brief addressing those legal issues is filed contemporaneously herewith.

Counsel for GM has discussed this motion with counsel for Plaintiffs. GM understands that Plaintiffs oppose this motion.

Case 1:05-cv-00645-MSK-BNB   Document 59   Filed 07/21/06   USDC Colorado   Page 2 of 13
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 35 of 113

## CLAIMS AND DEFENSES UPON WHICH JUDGMENT IS SOUGHT

**A.   GM is entitled to summary judgment on Plaintiffs' first claim for relief: Strict Liability in Tort.**

    1.   <u>Burden of proof and elements</u>

Plaintiffs' claim for relief based on strict liability in tort under C.R.S. § 13-21-401[1]

requires that Plaintiffs establish by a preponderance of the evidence:

    (1)   GM was a manufacturer of the 2000 Chevrolet Silverado 1500 extended cab pickup truck (the Silverado);

    (2)   GM was engaged in the business of selling such products;

    (3)   GM sold the Silverado;

    (4)   the Silverado was defective and, because of the defect, the Silverado was unreasonably dangerous to a person who might reasonably be expected to use, consume, or be affected by the Silverado;

    (5)   the Silverado was defective at the time it was sold by GM or left its control;

    (6)   the Silverado was expected to reach the user or consumer without substantial change in the condition in which it was sold;

    (7)   the Silverado did reach the user or consumer without substantial change in the condition in which it was sold;

    (8)   the Plaintiffs were persons who would reasonably be expected to use, consume or be affected by the Silverado;

    (9)   the Plaintiffs had injuries; and

    (10)   the defect in the Silverado was a cause of the Plaintiffs' injuries.

---

[1] Plaintiffs' Complaint references Colorado law. It is unclear, however, whether Colorado or Kansas law applies to Plaintiffs' claims because, although the accident occurred in Colorado, Plaintiffs are residents of Kansas. Regardless, however, of whether Colorado or Kansas law applies, GM is still entitled to summary judgment based on Plaintiffs' lack of proof regarding a specific defect.

Case 1:05-cv-00645-MSK-BNB   Document 59   Filed 07/21/06   USDC Colorado   Page 3 of 13
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 36 of 113

C.J.I.-Civ.·14:1; *accord Simon v. Coppola*, 876 P.2d 10, 15 (Colo. Ct. App. 1993).[2] GM challenges Plaintiffs' ability to prove the fourth, fifth and tenth elements of this claim. GM does not, at this time, challenge Plaintiffs' ability to prove the other elements of their strict liability claim under the summary judgment standard.

### 2.   Elements that cannot be proven by the Plaintiffs

Elements 4, 5 and 10:  GM contends that Plaintiffs cannot demonstrate a triable issue of fact as to whether there was a defect in the subject Silverado and, because of that defect, the Silverado was unreasonably dangerous. Likewise, Plaintiffs cannot prove that a defect in the Silverado was the cause of Plaintiffs' injuries.

A.   This lawsuit arises out of May 21, 2003, single-vehicle accident that occurred in the median of Interstate 70 in Kit Carson County, Colorado. *See* State of Colorado Traffic Accident Report, attached hereto as Exhibit A-1. At the time of the accident, which occurred at approximately 11:05 p.m., Plaintiff Jose C. Alfaro was the right front seat passenger in a 2000 Chevrolet Silverado 1500 extended cab pickup driven by Gorgonia Diaz. *Id.* While traveling eastbound on Interstate 70, Mr. Diaz drove the pickup off the left side of the roadway, traveling for approximately 269 feet in a depressed median between the eastbound and westbound lanes of traffic. *Id.* While traveling in the median, the Silverado then contacted a raised median crossover (a turnaround running perpendicular to the eastbound and westbound traffic lanes), traveled over the crossover, and went airborne for some distance before landing in the median. *See id.* Mr. Diaz then drove the Silverado to a rest area, and the accident was reported. *See id.*

---

[2] Similarly, under Kansas law, to establish a prima facie case of strict liability the plaintiff must produce proof of three elements: "(1) the injury resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; and (3) the condition existed at the time it left the defendant's control." *Jenkins v. Amchem Prods.*, 886 P.2d 869, 886 (Kan. 1994) (citing *Mays v. Ciba-Geigy Corp.*, 661 P.2d 348 (1983)).

Case 1:05-cv-00645-MSK-BNB   Document 59   Filed 07/21/06   USDC Colorado   Page 4 of 13
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 37 of 113

B.     Plaintiffs filed this lawsuit on April 7, 2005, alleging that the air bag system and the right front passenger seat belt system in the Silverado were defective.  *See* Compl., DKT. No. 1, at 7, ¶ 32.

C.     In an apparent effort to support their allegations as to the air bag system and the right front passenger seat belt system, Plaintiffs identified William G. Broadhead (Broadhead), of Automotive Safety Research, Inc., as an expert witness.  *See* Plaintiffs' Disclosure of Expert Witnesses at 1, attached hereto as Exhibit A-2; *see also* Automotive Safety Research, ·Inc., Preliminary Report (April 21, 2006) Prepared by William G. Broadhead (Broadhead Report), attached hereto as Exhibit A-3.

D.     Plaintiffs and their expert Broadhead have failed to come forward with evidence of a specific defect in either the Silverado's air bag system or the right front passenger seat belt system.  Broadhead's Report fails to identify a specific defect in either the seat belt system or the air bag system at the time the Silverado left GM's control.  Instead, Plaintiffs and their expert Broadhead circularly reason that, because Mr. Alfaro was injured, something in these two components *must* have malfunctioned or was defective in some fashion. ·Plaintiffs' expert Broadhead simply speculates about "possibilities" in the performance of the "restraint system" at the time of the accident:

> The restraint system as a whole failed to provide protection from interior impact as would be expected in a situation as this.  At least two possibilities or a combination thereof exists.  Either a malfunction, such as the aforementioned SDM problem, occurred resulting in a non-deployment, or by design the deployment threshold and characteristics of the crash sensor system are such that certain non-deployment collisions will be beyond the capabilities of the seatbelt to protect the front seat occupants.  Both of these scenarios involve defect and unacceptably poor performance of the vehicle's restraint systems.

*See* Broadhead Report at 10, Exhibit A-3.

Case 1:05-cv-00645-MSK-BNB   Document 59   Filed 07/21/06   USDC Colorado   Page 5 of 13
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 38 of 113

E.      There is no evidence, however, of any design or manufacturing defect in the seat belt system for the right front passenger in the Silverado. The retractor for the seat belt system contains two different types of locking mechanisms, each of which may perform the lock-up function during the crash. Expert Report of Kathryn F. Anderson at 9 (May 22, 2006), attached hereto as Exhibit A-4. The first mechanism within the seat belt retractor senses vehicle decelerations and locks the seat belt. *Id.* The second mechanism within the seat belt retractor senses how quickly the seat belt webbing is being pulled out, and locks the seat belt. *Id.* An evaluation of the right front passenger seat belt system on April 27, 2006, demonstrated that both the vehicle sensitivity feature and the webbing sensitivity feature remain functional for the right front seat occupant. *Id.* at 5-6, 10; *see also* Report of Daniel Davee at 5, ¶ 1 (May 22, 2006), attached hereto as Exhibit A-5 ("The seat belt assemblies in the 2000 Chevrolet Silverado were not defectively designed, manufactured or assembled.").

F.      There is no evidence of a defect in the Silverado's air bag system that caused Mr. Alfaro's injuries. The fact that the air bags did not deploy in the May 21, 2003, accident was not due to any defect in the air bag system. Expert Report of John Sprague at 10 (May 22, 2006), attached hereto as Exhibit A-6. Whether there is air bag deployment is dependent upon the response of the sensing system to longitudinal (i.e. front to back) deceleration input, influenced by the angle of impact, severity of impact, structural deformation, nature of the object struck and other factors. *Id.* at 5. The characteristics of the May 21, 2003, accident – i.e., the longitudinal deceleration from impacts with the median crossover and the landing in the median of I-70 – were below the air bag deployment threshold for the Silverado, and deployment of the air bags was not commanded in the May 21, 2003, accident. *Id.* at 9.

Case 1:05-cv-00645-MSK-BNB   Document 59   Filed 07/21/06   USDC Colorado   Page 6 of 13
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 39 of 113

Further, the design of the air bag system in the Silverado was reasonable and appropriate. *Id.*; *see also* Expert Report of Kathryn F. Anderson, attached hereto as Exhibit A-4, at 11.

G.   Expert proof of a defect in the Silverado's seat belt system or air bag system is required for there to be strict liability. *Union Supply Co. v. Pust*, 583 P.2d 276, 286 (Colo. 1978) ("By reason of the nature of the case, the trier of fact is greatly dependent on expert evidence and industry standards in deciding whether a defect is present."); *Wilcheck v. Doonan Truck & Equip., Inc.*, 552 P.2d 938, 942 (Kan. 1976) (Regardless of the theory upon which recovery is sought for injury in a products liability case under Kansas law, "proof that a defect in the product caused the injury is a prerequisite to recovery.").

H.   Yet Plaintiffs have not identified any other witnesses who would be qualified to offer opinion testimony identifying a specific defect in the Silverado's seat belt system or air bag system.

I.   The fact that Plaintiffs sustained injuries in the accident, "without more, does not establish that the product was defective or unreasonably dangerous." C.J.I.-Civ. 14:7; *see also Kysor Indus. Corp. v. Frazier*, 642 P.2d 908 (Colo. 1982); *Wilcheck v. Doonan Truck & Equip. Co:*, 552 P.2d 938, 943 (Kan. 1976) ("The mere fact that a person suffered injury while using a product is insufficient in itself to satisfy the requirement of proof that a defect in the product was a proximate cause of the injury.").

J.   As such, Plaintiffs cannot state a *prima facie* claim for strict liability. Plaintiffs' expert does not identify a specific defect which made the Silverado unreasonably dangerous. Moreover, an inference of a defect from Plaintiffs' injury and air bag non-deployment is impermissible. Accordingly, GM is entitled to judgment as a matter of law on Plaintiffs' claim strict liability claim.

Case 1:05-cv-00645-MSK-BNB   Document 59   Filed 07/21/06   USDC Colorado   Page 7 of 13
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 40 of 113

**B.** **GM is entitled to summary judgment on Plaintiffs' second claim for relief: Manufacturer's Liability Based on Negligence.**

1.  <u>Burden of proof and elements</u>

Plaintiffs' claim for relief based on manufacturer's negligence requires Plaintiffs to establish by a preponderance of the evidence that:

(1)  GM manufactured the Silverado;

(2)  GM was negligent by failing to exercise reasonable care to prevent the Silverado from creating an unreasonable risk of harm to the person or property of one who might reasonably be expected to use, consume or be affected by the Silverado while it was being used in the manner GM might have reasonably expected;

(3)  Plaintiffs were persons GM should reasonably have expected to use, consume or be affected by the Silverado; and

(4)  Plaintiffs had injuries that were caused by GM's negligence, while the Silverado was being used in a manner GM should reasonably have expected.

C.J.I.-Civ. 14:17; *accord Lyons v. Nesby*, 770 P.2d 1250, 1254 (Colo. 1989).[3] GM challenges Plaintiffs' ability to prove the second and fourth elements of this claim. GM does not, at this time, challenge Plaintiffs' ability to prove the other elements of their claim of manufacturer's liability based on negligence under the summary judgment standard.

2.  <u>Elements that cannot be proven by the Plaintiffs</u>

<u>Elements 2 and 4:</u> GM contends that Plaintiffs cannot demonstrate a triable issue of fact as to whether GM was negligent by failing to exercise reasonable care to prevent the Silverado

---

[3] Similarly, under Kansas law, to recover for negligence, the plaintiff must prove that GM has a legal duty to produce vehicles without defects that present a foreseeable and unreasonable risk of harm, that there was a breach of that duty, that an injury resulted, and that there is a causal connection between the duty breached and the injury suffered. *South v. McCarter*, 119 P.3d 1, 20 (Kan. 2005) (citing *Schmidt v. HTG, Inc.*, 961 P.2d 677, 692 (Kan. 1998)); *Barnett-Holdgraf v. Mut. Life Ins. Co.*, 3 P.3d 89, 93 (Kan. Ct. App. 2000).

Case 1:05-cv-00645-MSK-BNB   Document 59   Filed 07/21/06   USDC Colorado   Page 8 of 13
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 41 of 113

from creating an unreasonable risk of harm to Plaintiffs. Further, Plaintiffs cannot prove that any negligence caused Plaintiffs' injuries.

   A. The report of Plaintiffs' expert Broadhead fails to identify a specific defect in either the seat belt system or the air bag system that caused Mr. Alfaro's injuries. *See* Broadhead Report, Exhibit A-3.

   B. In contrast, GM has shown that the design, development and testing of the air bag system in the Silverado were reasonable and appropriate. *See* Expert Report of Kathryn F. Anderson, attached hereto as Exhibit A-4, at 11. The air bag system was developed through computer modeling, sled testing, and full-scale barrier testing with instrumented dummies. Expert Report of John Sprague, attached hereto as Exhibit A-6, at 6. Moreover, the components of the air bag system for the Silverado were specified, tested and validated as part of the vehicle design to ensure that proper materials and components have been chosen for the system. *Id.* The air bag system also was tested in full-scale barrier, rough road, and severe abuse tests to address not only government requirements, but also GM's internal system performance goals. *Id.*

   C. This design, development, and testing of the front seat belt system in the Silverado was reasonable and appropriate. *See* Expert Report of Kathryn F. Anderson, attached hereto as Exhibit A-4, at 11; *see also* Report of Daniel Davee, attached hereto as Exhibit A-5, at 5.

   D. Expert proof of a specific defect in the Silverado's seat belt system or air bag system is required for there to be manufacturer's liability based on negligence. *Union Supply Co.*, 583 P.2d at 286; *Wilcheck*, 552 P.2d at 942.

Case 1:05-cv-00645-MSK-BNB   Document 59   Filed 07/21/06   USDC Colorado   Page 9 of 13
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 42 of 113

E.       Plaintiffs have not identified any other witnesses who would be qualified to offer opinion testimony identifying a specific defect in the Silverado's seat belt system or air bag system.

F.       The fact that Plaintiffs sustained injuries, without more, does not establish that the product was defective or unreasonably dangerous.   C.J.I.-Civ. 14:7; *see also Kysor Indus. Corp.*, 642 P.2d 908; *Wilcheck*, 552 P.2d at 943.

G.       As such, Plaintiffs cannot state a *prima facie* claim for manufacturer's liability based on negligence because Plaintiffs' expert does not identify a specific defect which made the Silverado unreasonably dangerous.   Accordingly, GM is entitled to summary judgment on this claim.

**C.       GM is entitled to summary judgment on Plaintiffs' third claim for relief: Breach of Implied Warranty of Merchantability.**

1.       <u>Burden of proof and elements</u>

Plaintiffs' claim for relief based on breach of implied warranty of merchantability requires Plaintiffs to establish by a preponderance of the evidence that:

(1)       GM sold the Silverado;

(2)       the Plaintiffs are persons who were reasonably expected to use, consume or be affected by the product;

(3)       GM was a merchant with respect to the type of product involved herein;

(4)       The Silverado was not of merchantable quality at the time of sale;

(5)       This breach of warranty caused the Plaintiffs' injuries; and

(6)       Within a reasonable time after the Plaintiffs discovered or should have discovered the alleged breach of warranty, the Plaintiffs notified GM of such breach.

Case 1:05-cv-00645-MSK-BNB   Document 59   Filed 07/21/06   USDC Colorado   Page 10 of 13
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 43 of 113

C.J.I.-Civ. 14:10; *accord Prutch v. Ford Motor Co.*, 618 P.2d 657, 660 (Colo. 1980)).[4]  GM

challenges Plaintiffs' ability to prove the fourth and fifth elements of this claim.  GM does not, at

this time, challenge Plaintiffs' ability to prove the other elements of their claim for breach of

implied warranty of merchantability under the summary judgment standard.

2.    Elements that cannot be proven by the Plaintiffs

**Elements 4 and 5:**  GM contends that Plaintiffs cannot demonstrate a triable issue of fact

as to whether the Silverado was not of merchantable quality at the time of the sale.  Additionally,

Plaintiffs cannot prove that any breach of any warranty caused Plaintiffs' injuries.

A.    The report of Plaintiffs' expert Broadhead fails to identify a specific defect

in either the seat belt system or the air bag system of the Silverado the caused Mr. Alfaro's

injuries.  *See* Broadhead Report, Exhibit A-3.

B.    Expert proof of a specific defect in the Silverado's seat belt system or air

bag system is required for there to be liability for breach of implied warranty of merchantability.

*Union Supply Co.*, 583 P.2d at 286; *Wilcheck*, 552 P.2d at 942.

C.    Plaintiffs have not identified any other witnesses who would be qualified

to offer opinion testimony identifying a specific defect in the Silverado's seat belt system or air

bag system.

D.    The fact that Plaintiffs sustained injuries, without more, does not establish

that the Silverado was defective or unreasonably dangerous.  C.J.I.-Civ. 14:7; *see also Kysor*

*Indus. Corp.*, 642 P.2d 908; *Wilcheck*, 522 P.2d at 943.

---

[4] Similarly, under Kansas law, to establish a breach of warranty claim, a buyer must prove (1) the ordinary purpose of the goods involved, and (2) the particular goods sold were not fit for that purpose.  "Kansas case law has interpreted this to mean that the buyer must show that the goods were defective and that the defect existed at the time of sale." *Black v. Don Schmid Motor, Inc.*, 657 P.2d 517, 525 (Kan. 1983).  "[C]auses of action for breach of the implied warranty of merchantability and strict tort liability are very similar in practice, if not in concept." KAN. STAT. ANN. § 84-2-314, Kan. cmt. 5 (1996).

Case 1:05-cv-00645-MSK-BNB   Document 59   Filed 07/21/06   USDC Colorado   Page 11 of 13
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 44 of 113

E.     As such, Plaintiffs cannot state a *prima facie* claim for breach of implied warranty of merchantability because Plaintiffs' expert does not identify a defect which made the vehicle unmerchantable.   Accordingly, GM is entitled to judgment as a matter of law on that claim.

**D.     GM is entitled to summary judgment on its affirmative defense of statute of limitations regarding Claim 3, breach of warranty.**

1.     Burden of proof and elements

GM bears the burden of establishing the affirmative defense of statute of limitations.  This defense has one element: that the plaintiff's action was not commenced within the three years of delivery of the vehicle.   COLO. REV. STAT. § 4-2-725; *Boyd v. A.O. Smith Harvestore Prods., Inc.*, 776 P.2d 1125, 1128-29 (Colo. Ct. App. 1989).

2.     The undisputed facts show that the Alfaro's breach of warranty claim is time barred.

A.     The Silverado was delivered on August 21, 1999.  *See* Vehicle Invoice, attached hereto as Exhibit A-7.

B.     Plaintiffs filed this lawsuit on April 7, 2005, more than three years later. *See* Complaint (DKT No. 1).

C.     Therefore, the undisputed facts establish that the breach of warranty claim is untimely.

## CONCLUSION

The Plaintiffs' expert fails to identify a specific defect in the Silverado's seat belt or air bag system, a critical element of all three of Plaintiffs' claims.   GM is therefore entitled to summary judgment on all of Plaintiffs' claims.  GM is also entitled to summary judgment on its affirmative defense of statute of limitations on Plaintiffs' breach of warranty claim as it is

Case 1:05-cv-00645-MSK-BNB   Document 59   Filed 07/21/06   USDC Colorado   Page 12 of 13
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 45 of 113

undisputed that Plaintiffs filed this action beyond the three year limitation period for such actions.

For the foregoing reasons, GM respectfully requests that the Court grant its Motion for Summary Judgment.

Dated this 21st day of July, 2006.

Respectfully submitted,

/s/ Michael F. Smith
ELDRIDGE COOPER STEICHEN
& LEACH, PLLC
MARY QUINN-COOPER (#11966)
mcooper@ecslok.com
MICHAEL F. SMITH (#14815)
msmith@ecslok.com
HAROLD C. ZUCKERMAN (#11189)
hzuckerman@ecslok.com
P. O. BOX 3566
110 W. 7th Street, Ste 200
TULSA, OKLAHOMA 74101-3566

CHARLES L. CASTEEL
Charles.Casteel@dgslaw.com
DAVIS GRAHAM & STUBBS LLP
SUITE 500, 1550 SEVENTEENTH STREET
DENVER, CO  80202
(303) 892-9400 telephone
(303) 893-1379 facsimile
*Attorneys for General Motors Corporation*

Case 1:05-cv-00645-MSK-BNB   Document 59   Filed 07/21/06   USDC Colorado   Page 13 of 13
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 46 of 113

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of July, 2006, I electronically filed the foregoing **DEFENDANT GENERAL MOTORS CORPORATION'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using Lexis Nexis for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic filing to the following ECF registrants:

Stanley Walter
stan@stanwalterlaw.com

Mary A. Wells
mwells@warllc.com

Peter F. Jones
JonesP@HallEvans.com

and I certify that I have mailed the documents to the following non CM/ECF participants:

Mr. Don C. Staab
1301 Oak Street
Hays, Kansas  67601

Attorney for Plaintiff Martha Alfaro

J. Kenneth Wainwright, Jr.
Barry B. Sutton
Harvey Kruse PC
1050 Wilshire Drive
Troy, Michigan  48084-1526

Attorneys for Delco Electronic, LLC and
Delphi Automotive Systems, LLC

/s/ Michael F. Smith

Case 1:05-cv-00645-MSK-BNB   Document 59-1   Filed 07/21/06   USDC Colorado   Page 1 of 3
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 47 of 113

# STATE OF COLORADO TRAFFIC ACCIDENT REPORT

MAIL TO: State of Colorado
Motor Vehicle Division   ID# 327EXDRMQR
Traffic Records
Denver, CO 80261-0016   SHEET 1 OF 2

☐ AMENDED/SUPPLEMENTAL REPORT   ☐ UNDER $1,000 ACCIDENT

DR 447 (REV 1/97)

| CDOT CODE | AGENCY CODE CSP S8070 M.P. 436 M12 | | DOR CODE |
|---|---|---|---|
| | 1A03-591 | | |

| DATE OF ACCIDENT 05/21/2003 | CITY | AGENCY Colorado State Patrol | COUNTY 26 Kit Carson |
| TIME 2305 | OFFICER NUMBER 7180 | OFFICER NAME Preston, Kirk | SIGNATURE | DETAIL 1A |
| NUMBER KILLED 0 | NUMBER INJURED 2 | LOCATION ROUTE, STREET, ROAD Colo 70 | 0.2 MILES ☐ FEET ☐ N ☐ E ☐ S ☒ W OF: |
| DATE OF REPORT 05/23/2003 | | LATITUDE | ☐ AT: Milepost 436 LONGITUDE |

| INVESTIGATED @ SCENE X | TOTAL VEHICLES 1 | DISTRICT NUMBER 1A | PUBLIC PROPERTY EMPLOYEE | PHOTOS TAKEN | RAILROAD CROSSING | CONST. ZONE | ON BRIDGE | INCOMPLETE REPORT |

| VEH # 1 | BICYCLE | PEDESTRIAN # | PARKED | VEH # | BICYCLE | PEDESTRIAN # | PARKED |
|---|---|---|---|---|---|---|---|
| LAST NAME Diaz | FIRST Gorgonia | MI S | | LAST NAME | FIRST | MI |
| STREET ADDRESS 814 Washington | | RES. PHONE None | | STREET ADDRESS | | RES. PHONE |
| CITY Goodland | STATE KS | ZIP 67735 | BUS. PHONE None | CITY | STATE | ZIP | BUS. PHONE |
| DRIVERS LIC. NUMBER GD382510946 | STATE | SEX M | DOB 11/07/1983 | DRIVERS LIC. NUMBER | STATE | SEX | DOB |
| PRIMARY VIOLATION Careless Driving Caused Injury | | | | PRIMARY VIOLATION | | | |
| VIOLATION CODE 42-4-1402 | CITATION NUMBER 1924120 | COMMON CODE 139 | | VIOLATION CODE | CITATION NUMBER | COMMON CODE |
| YEAR 2000 | MAKE Chevrolet | MODEL Z71 | BODY TYPE Pickup | YEAR | MAKE | MODEL | BODY TYPE |
| LIC PLATE NO. UFO344 | STATE KS | COLOR Gray | | LIC PLATE NO. | STATE | COLOR |
| VEHICLE ID NO. 1GCEK19T1YE143024 | | | | VEHICLE ID NO. | | |
| VEHICLE OWNER LAST NAME Diaz | FIRST Jose | MI | | VEHICLE OWNER LAST NAME | FIRST | MI |
| ADDRESS 814 Washington Goodland, KS 67735 | CITY | STATE | ZIP | ADDRESS | CITY | STATE | ZIP |
| TOWED DUE TO DAMAGE ☒ TO: Burlington C0. BY: Joes Garage | | | | TOWED DUE TO DAMAGE ☐ TO: | | | |

1 = SLIGHT; 2 = MODERATE; 3 = EXTREME

1 = SLIGHT; 2 = MODERATE; 3 = EXTREME

| INSURANCE CO. Shelter | EXP. DATE 06/27/2003 | INSURANCE CO. | EXP. DATE |
| POLICY NO. 15-1-4807942-4 | | POLICY NO. | |
| OWNER DAMAGED PROP. LAST NAME | FIRST | MI | OWNER DAMAGED PROP. LAST NAME | FIRST | MI |
| ADDRESS | CITY | STATE | ZIP | ADDRESS | CITY | STATE | ZIP |

| VEH # | POS. | RESTR. | EJECT. | M/C PROT. | INJ. SEV. | AGE | SEX | NAME | ADDRESS |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 1 | 2 | | 3 | 19 | M | Gorgonia S Diaz/814 Washington Goodland, KS 677 |
| 1 | 3 | 2 | 2 | | 4 | 70 | M | Jose Alfaro/304 West 5th Goodland   Ks |
| 1 | 5 | 3 | 2 | | 1 | 23mo | F | Jaquelin Diaz-coronell/814 Washington Goodland Ks |

EXHIBIT

A-1

Case 1:05-cv-00645-MSK-BNB   Document 59-1   Filed 07/21/06   USDC Colorado   Page 2 of 3
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 48 of 113

DR 447-NARRATIVE / DRAWING                          327EXDRMQR          SHEET 2 OF 2

**DESCRIBE ACCIDENT**

Vehicle#1 was eastbound on Colo 70. Vehicle#1 drove off the left side of the roadway into a depressed median for 269'. Vehicle#1 then struck a raised median crossover with its front undercarriage.  Vehicle#1 then went airborne for 50' coming down and impacting the ground with its front. Vehicle#1 then drove to town and reported the accident.

Vehicle#1 was airbag equipped but not deployed.

ACCIDENT DRAWING



Case 1:05-cv-00645-MSK-BNB   Document 59-1   Filed 07/21/06   USDC Colorado   Page 3 of 3
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 49 of 113

**COLORADO STATE PATROL**
**CASE REPORT**

CONNECTING CASE NO.

CASE REPORT NO. 1A03-0591

UCR ENTRY REQUIRED:   Yes ☐ No ☐

REASON HELD (additional info in narrative)
SD 70   1-A-2
MPH36
1 VEH CRASH

**HOLD ORDER: YES ☐ NO ☐**

42-13-106.  Release of impounded vehicles - penalty. Any owner, operator, or employee of any garage or service station of any appointed custodian who releases any vehicle impounded or ordered held by an officer of the Colorado state patrol without a release from an officer of the Colorado state patrol or a bona fide court order commits a class 3 misdemeanor and shall be punished as provided in section 18-1-106, C.R.S.

☐ INCIDENT REPORT
☐ CUSTODY REPORT
☐ LIVESTOCK THEFT/RECOVERY
☐ OFFICER ASSAULTED
☑ TOW REPORT
☐ AUTO THEFT/RECOVERY
☐ OFFENSE REPORT
☐ THEFT REPORT

DATE 5-21-03   TIME 2350   ☐ AM ☑ PM   LOCATION  Colo 70  1 W Burlington

CODES   DR=DRIVER;   RO=REGISTERED OWNER;   V=VICTIM;   W=WITNESS;   LP=LAST PERSON IN POSSESSION;   RP=REPORTING PARTY   S=SUSPECT

**SUBJECT 1**

| CODE | LAST NAME | FIRST | MI | DOB | SOCIAL SECURITY NO. |
|---|---|---|---|---|---|
| DR | DIAZ | GORGONIO | J | 110783 | |

ADDRESS  KM UNISSUCTON   CITY  GOODLAND   STATE  KS   ZIP CODE  6773   PLACE OF BIRTH (CITY, STATE)  MEXICO

DRIVERS LICENSE NUMBER AND TYPE  GD8231049G   STATE  MEX   RACE  W   SEX  M   WGT.  508   HGT.  160   HAIR  BLK   EYES  BRN   HOME TELEPHONE  NONE

EMPLOYER NAME   EMPLOYER ADDRESS   OCCUPATION   BUSINESS TELEPHONE  NONE

**SUBJECT 2**

| CODE | LAST NAME | FIRST | MI | DOB | SOCIAL SECURITY NO. |
|---|---|---|---|---|---|
| | | | | | |

ADDRESS   CITY   STATE   ZIP CODE

DRIVERS LICENSE NUMBER AND TYPE   STATE   RACE   SEX   WGT.   HGT.   HAIR   EYES   HOME TELEPHONE

EMPLOYER NAME   EMPLOYER ADDRESS   OCCUPATION   BUSINESS TELEPHONE

**VEHICLE INFORMATION**

LICENSE PLATE/TYPE  DEAZ UD344   STATE  KS   VEHICLE YEAR  2000   MAKE  CHEV   TYPE OR BODY STYLE  271 3DR

COLOR (TOP/BOTTOM)  BEIGE   VIN  1GCEK19TXYE142024

REASON TOWED:
☑ CRASH   ☐ OTHER:
☐ ARREST
☐ ABANDONED HAZARD

INVENTORY OF VEHICLE   TRUNK EXAMINED ☐ YES ☑ NO

LIST OF PROPERTY  SVCS

CONDITION OF VEHICLE:
1-MINOR   2-MODERATE   3-EXTREME

$900

3

20 Undercarriage  3

VALUE OF RECOVERED STEAL  $

VALUE OF PROPERTY.  $

OWNER NOTIFIED  ☐ MAIL ☐ PERSON ☐ OTHER:   DATE/TIME

TOW COMPANY NAME  JOE'S GARAGE   ADDRESS  Colo Ave Burlington, Co.   PHONE

SIGNATURE OF TOW OPERATOR  X   VEHICLE RELEASED TO:   DATE/TIME   RELEASED BY

**CHARGES**

| STATUTE NUMBER | CHARGE | WARRANT YES | WARRANT NO | SUMMONS/WARRANT NUMBER |
|---|---|---|---|---|
| 42-4-1402 | CARELESS CAUSED INJURY | | V | 1924120 |

**NARRATIVE**

VEH #1 IMPACT MEDIAN CROSSOVER MIDPOINT IMPACT GROUND
HEAVY DAMAGE
MODERATE INJURY TO ONE
MINOR INJURY TO DRIVER
CHILD Y/CARSEAT NO INJURY

I AFFIRM THAT THIS INFORMATION IS CORRECT AND TRUE:

SIGNATURE OF REPORTING PARTY

DATE OF REPORT  5-21-03   SIGNATURE OF OFFICER   NUMBER  5162   REVIEWED BY (INITIALS)

ROADSIDE AUTHORIZATION

I authorize and accept responsibility for the above-captioned vehicle to remain where now parked, and understand that this vehicle MUST be moved within 24 hours, or it may be towed at the owner's expense.

OPERATOR

WHITE-CASE FILE   GREEN-DATA ENTRY FILE   YELLOW-JAIL   PINK-TOW OPERATOR   GOLDENROD-VEHICLE OWNER/OPERATOR

CSP30 (REV 3/95)   **VEHICLE OWNER/OPERATOR: READ REVERSE SIDE CAREFULLY**

Case 1:05-cv-00645-MSK-BNB   Document 59-2   Filed 07/21/06   USDC Colorado   Page 1 of 3
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 50 of 113

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: <u>05-CV-645-MSK-BNB</u>

JOSE ALFARO, and
MARTHA ALFARO,

      Plaintiff,

v.

GENERAL MOTORS CORPORATION,
HONEYWELL, INC. f/k/a ALLIEDSIGNAL, INC.
DELCO ELECTRONICS CORPORATION,
DELPHI AUTO SYSTEMS, f/k/a/ INLAND FISHER GUIDE
JOHN DOE, and JOHN DOE, INC.

      Defendants.

---

## PLAINTIFFS' DISCLOSURE OF EXPERT WITNESSES

COME NOW the Plaintiffs, José and Martha Alfaro, by and through their lawyers,

Stanley J. Walter and Don Staab, and disclose the following expert witnesses:

| Name | Address & Phone No. | Description of Testimony |
|---|---|---|
| Automotive Safety Research, Inc.<br>William G. Broadhead | 5350 Hollister Avenue, Suite D<br>Santa Barbara, CA 93111-2326<br>805-964-1110 | Mr. Broadhead has 29 years experience in the field of occupant restraint systems, centered around design, analysis and investigation of vehicle restraint systems. |
| Injury Analysis<br>Dennis F. Shanahan, M.D., M.P.H. | 2839 Via Conquistador<br>Carlsbad, CA 92009-3020<br>760-931-5430 | Dr. Shanahan has extensive experience in the fields of injury mechanisms, crash investigation, injury reconstruction, restraint performance, crash dynamics and occupant kinematics. |
| Ponderosa Associates Limited | 130 Miners Drive | Mr. Feiereisen's experience and |

EXHIBIT

A-2

Case 1:05-cv-00645-MSK-BNB   Document 59-2   Filed 07/21/06   USDC Colorado   Page 2 of 3
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 51 of 113

| Thomas Feiereisen, M.S., P.E. | Lafayette, CO 80026-2951<br>303-666-8112 | expertise are in the areas of motor vehicle accident investigation/reconstruction, automobile airbag anomalies. |
| Rehabilitation Consulting Services, Inc.<br>Patrick Renfro, | 1777 S. Bellaire St., Suite 321<br>Denver, CO 80222<br>720-524-0256 | Mr. Renfro is an expert in vocational rehabilitation counseling and medical rehabilitation consulting. |

Enclosed are reports submitted by each of the above referenced experts.

Done this 24th day of April, 2006.

*s/ Stanley J. Walter*
Stanley J. Walter
518 17th Street, Suite 1044
Denver, CO 80202-4119
303-698-1957 phone
303-698-1938 fax

Don C. Staab
1301 Oak
Hays, KS 67601-3659
785-628-8517 phone
785-628-2243 fax

Case 1:05-cv-00645-MSK-BNB   Document 59-2   Filed 07/21/06   USDC Colorado   Page 3 of 3
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 52 of 113

## CERTIFICATE OF SERVICE

I certify that on this 24th day of April, 2006, a true and correct copy of the above and foregoing Plaintiffs' Disclosure of Expert Witnesses was sent, via email and U.S. Mail, postage prepaid, to:

Charles Casteel
Davis, Graham & Stubbs
1550 17th Street, Suite 500
Denver, CO  80202

Peter Jones
Hall & Evans
1125 17th Street, Suite 600
Denver, CO  80202

Mary Wells
David Mayhan
Wells, Anderson & Race
1700 Broadway, Suite 1020
Denver, CO  80290-1705

Michael Smith
Eldridge, Cooper, Steichen & Leach
P.O. Box 3566
Tulsa, OK  74101-3566
110 W. 7th Street, Suite 200
Tulsa, OK  74119

Case 1:05-cv-00645-MSK-BNB   Document 59-3   Filed 07/21/06   USDC Colorado   Page 1 of
05-44481-rdd    Doc 20074-2    Filed 05/14/10    Entered 05/14/10 00:24:53    Exhibit F
part 1    Pg 53 of 113

**A**UTOMOTIVE
**S**AFETY
**R**ESEARCH, INC.

5350 HOLLISTER AVENUE, SUITE D
SANTA BARBARA, CA 93111-2326
TELEPHONE (805) 964-1110
FAX (805) 964-5442
www.asr-engineering.com

## REPORT

### Alfaro v. General Motors. et al.

Prepared by:

William G. Broadhead
Automotive Safety Research, Inc.
5350 Hollister Avenue, Suite D
Santa Barbara, CA 93111-2326

April 21, 2006

Prepared for:

Stanley J. Walter, Esq.
Law Office of Stanley J. Walter
518 17th Street, Suite 1044
Denver, CO 80202



EXHIBIT

tabbies®

A-3

Case 1:05-cv-00645-MSK-BNB    Document 59-3    Filed 07/21/06    USDC Colorado    Page 2 of
    05-44481-rdd    Doc 20074-2    Filed 05/14/10    Entered 05/14/10 00:24:53    Exhibit F
                        part 1    Pg 54 of 113

**A**UTOMOTIVE
**S**AFETY
**R**ESEARCH, INC.

5350 HOLLISTER AVENUE, SUITE D
SANTA BARBARA, CA 93111-2326
TELEPHONE (805) 964-1110
FAX (805) 964-5442
www.asr-engineering.com

## PRELIMINARY REPORT

### Alfaro v. General Motors. et al.

Prepared by:

William G. Broadhead
Automotive Safety Research, Inc.
5350 Hollister Avenue, Suite D
Santa Barbara, CA 93111-2326

April 21, 2006

Prepared for:

Stanley J. Walter, Esq.
Law Office of Stanley J. Walter
518 17th Street, Suite 1044
Denver, CO 80202

Case 1:05-cv-00645-MSK-BNB   Document 59-3   Filed 07/21/06   USDC Colorado   Page 3 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 55 of 113

## I. Qualifications

I am a mechanical engineer with 29 years of occupant restraint system experience. I have personally conducted more than 100 full scale vehicle crash tests and sled tests, and I have participated in more than 700 traffic accident reconstructions. My career has centered around the design, analysis and investigation of vehicle restraint systems. More specifically, I was a Program Manager for National Highway Traffic Safety Administration (NHTSA) contracts to design, build, install, and test restraint systems. Please refer to my attached curriculum vitae for additional information regarding my experience and qualifications (Attachment "A"). A list of my trial and deposition testimony over the last four years is also included (Attachment "B"). I have published papers in the field of vehicle occupant restraint systems. These papers are listed in my curriculum vitae attached hereto. I have followed scientifically accepted methodology in the investigation and analysis of this unfortunate incident. I have read technical papers relevant to issues in this case. My hourly rate for case work and testimony is $350 per hour.

This report is based on material reviewed to date. In the event further material becomes available an updated report may be warranted. Additionally, I may rely on documents and exhibits produced by the Plaintiff and Defense. I expect to review and consider depositions, reports and testimony of other experts as they become available.

## II. Materials reviewed and investigations conducted to date:

1.      State of Colorado Traffic Accident Report, 05/21/03;

2.      Subject 2000 Chevrolet 1500 Silverado inspection by William Broadhead, with video and photographs;

3.      Medical Records of Jose Alfaro, from St. Anthony Hospital, 05/22/03;

4.      Photographs of Jose Alfaro;

5.      Transcription of interview of Jose Alfaro by GM representative, 03/07/04;

Case 1:05-cv-00645-MSK-BNB   Document 59-3   Filed 07/21/06   USDC Colorado   Page 4 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 56 of 113

6.      Depositions:

    a.      Jose Alfaro, Volume 1 and 2

    b.      Manuel Salas

    c.      Gorgonia Diaz

    d.      Kirk L. Preston

    e.      Robert Madyag, M.D.

    f.      Martha Alfaro


7.      NHTSA Recall #02V178000 -  Component: Airbags frontal sensor/control module.
Vehicles affected: 2000 Chevrolet Silverado, Chevrolet Suburban, Chevrolet Tahoe,
GMC Sierra, GMC Yukon, and GMC Yukon XL;

8.      Photographs of subject vehicle and Accident Site from Ponderosa & Associates;

9.      Vetronix Crash Data Retrieval Report from subject vehicle, completed by General
Motors on 02/05/04.


## III.  Introduction

The subject accident took place May 21, 2003 on I-70 near Burlington, Colorado.  It was
a single vehicle collision involving a 2000 Chevrolet 1500 Silverado driven by Gorgonia
Diaz.  Other occupants included Jose Alfaro sitting in the right front passenger position and
Jacqueline Diaz, 23 months, in a child restraint system in the rear center position of the
extended cab.  According to the Colorado Traffic Accident Report, the vehicle deviated to
the left from its eastbound lane of I-70 and onto the center median.  It then struck a raised
median crossover, became airborne and impacted the ground with the front and
undercarriage of the vehicle.

Case 1:05-cv-00645-MSK-BNB   Document 59-3   Filed 07/21/06   USDC Colorado   Page 5 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 57 of 113



Photograph #1

Physical evidence indicates that Mr. Diaz and Mr. Alfaro were both using the available seatbelts at the time of the incident.  A download of the vehicle's Sensing Diagnostic Module (SDM) also confirms that Mr. Diaz was wearing his seatbelt.  Model year 2000 Chevrolet pickups were not equipped with the ability to record seat belt usage for right front occupants.  Jose Alfaro's seat belt did show evidence of loading during the subject event and the hospital report related that "He had an abrasion on the shoulder on the right side consistent with a seat belt injury." Despite the use of their seat belts, both Mr. Diaz and Mr. Alfaro sustained significant injuries due to impact with portions of the vehicle's interior. Unfortunately, neither of the front seat airbags deployed in this accident.

Case 1:05-cv-00645-MSK-BNB    Document 59-3    Filed 07/21/06    USDC Colorado    Page 6 of
05-44481-rdd    Doc 20074-2    Filed 05/14/10    Entered 05/14/10 00:24:53    Exhibit F
part 1    Pg 58 of 113

## IV.  Injuries

Mr. Diaz is reported to have been approximately 5'2" to 5'3" in height and about 110 to 115 pounds.  He apparently suffered a broken nose, injury to his teeth and other unspecified injuries due to the impact.

Mr. Alfaro was 70-years-old and 6'1", 160 pounds at the time of the accident.  His injuries included blunt force trauma to the mid-facial area, mostly on the left side, including fractures, lacerations and abrasions and loss of vision in his left eye.  He also sustained injuries to each of his shoulders.  This included dislocation of his left shoulder with associated neuropathy.  The contusions/abrasions and/or laceration to his right anterior shoulder was described by medical personnel as being consistent with injury caused by the seatbelt.  Other injuries to Mr. Alfaro included left rib fractures and injury to his right knee.

Jacqueline Diaz, the child, was reported not injured.

## V. Vehicle Inspection

The subject vehicle was inspected on November 16, 2004 in Littleton, CO.  The vehicle sustained damage consistent with a ground impact in which significant  longitudinal as well as vertical forces were imparted.

The interior of the vehicle revealed evidence of severe occupant impacts.  The steering wheel was deformed forward at the upper part of the wheel rim consistent with driver impact.  See photograph #2.  The windshield on the driver side sustained three fracture patterns consistent with direct impact to the windshield.  See photograph #3.

Case 1:05-cv-00645-MSK-BNB   Document 59-3   Filed 07/21/06   USDC Colorado   Page 7 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 59 of 113



Photograph #2



Photograph #3

Case 1:05-cv-00645-MSK-BNB   Document 59-3   Filed 07/21/06   USDC Colorado   Page 8 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 60 of 113

On the right side of the vehicle, the passenger grab bar located just above the passenger airbag module cover  was severely bent forward and down.  See photograph #4.  The dashboard exhibited marks consistent with impact by Mr. Alfaro's teeth.



Photograph #4

The vehicle's front seat restraints utilize a belt system that is commonly known as  "all belts to seat." This means that the anchor points of the seatbelt system are incorporated into the seat and thus, this type of belt system relies on the structural integrity of the seatback to limit forward excursion of the occupant.  The driver seatbelt latch plate exhibited grooves in the plastic consistent with loading of the belt webbing.  The driver seatbelt also had blood staining in areas that would not be exposed had the belt been in the stowed position.  This physical evidence along with the information downloaded from the vehicle's SDM establish that the belt was being worn at the time of the collision.

Case 1:05-cv-00645-MSK-BNB    Document 59-3    Filed 07/21/06    USDC Colorado    Page 9 of
05-44481-rdd    Doc 20074-2    Filed 05/14/10    Entered 05/14/10 00:24:53    Exhibit F
part 1    Pg 61 of 113

The right front passenger seatbelt webbing exhibited wavy, parallel passthrough lines in the area where it contacts the latchplate. See photograph #5. This evidence is consistent with occupant loading of the seatbelt. As mentioned earlier, Mr. Alfaro had a residual injury pattern on his right shoulder consistent with shoulder belt loading.



Photograph #5

## VI. Collision Severity

The accident sequence involved two frontal impacts, the first being the striking of the upside of the median crossover and the second being the subsequent impact with the ground after the vehicle became airborne. An engineering accident reconstruction performed by Thomas Feiereisen, of Ponderosa & Associates, indicates the first of these impacts was the more severe. Mr. Feirereisen has estimated that the change in velocity from the first impact was as high as 24 mph with a principle direction at approximately 12 o'clock and an impact angle relative to the horizontal of about 20 to 30 degrees. The second collision involved a yet to be determined change in velocity, but one that is estimated to be considerably less than the

Case 1:05-cv-00645-MSK-BNB   Document 59-3   Filed 07/21/06   USDC Colorado   Page 10 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 62 of 113

first.   Accurate quantification of impact related velocity change is extremely difficult to
ascertain in ground impacts where the vehicle's underside plows through dirt.  The trajectory
and impact severity of the restrained occupants however, clearly put this accident in a
category where frontal airbags are imperative.


## VII.  Discussion

The initial impact is likely the one in which Mr. Diaz and Mr. Alfaro sustained their injuries.
Each of these individuals has testified that they were restrained and the physical evidence
supports this claim.  Despite being belted, both of these gentlemen articulated forward and
forcefully contacted the interior components and surfaces of the vehicle, causing significant
injury.   Given the collision severity, one would not expect a normally seated, belted
occupant to impact the interior of the vehicle with such intensity.  Thus, the circumstances
and physical evidence of this collision  indicate that either the seatbelt system failed to
properly restrain these gentlemen, or the magnitude of the impact was well beyond the
range of their design parameters.   In either case this was clearly a situation for which
airbags were needed.


The subject vehicle is involved in a recall campaign pertaining to airbag non-deployment
problems involving the crash sensing system.[1]  This recall apparently involves a SDM
anomaly that results in a failure to deploy during certain frontal crashes.  Under crash
conditions in which the forward discriminating sensor closes prior to safing sensor closure,
a subsequent short duration closure and opening cycle (referred to as sensor "bounce") of
the safing sensor can lead to inductance and microprocessor reset problems within the
SDM.  This can cause a failure of sufficient firing current impulse to the airbag module
squibs.

The subject vehicle's front crash sensor is located in the area below the radiator.  It is this
part of the structure that was impacted and damaged as a result of ground contact during
the accident.  The nature of the collision was one in which the front sensor would have been

---

[1] NHTSA Campaign ID Number 02V178000; GM Recall 02029.

Case 1:05-cv-00645-MSK-BNB   Document 59-3   Filed 07/21/06   USDC Colorado   Page 11 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 63 of 113

subjected to a significant acceleration impulse early in the event, one that would quite likely cause the front sensor to close prior to the safing sensor. Thus, the subject collision was one conducive to the malfunction described in the recall.

The deployment threshold of the airbag system is determined by the manufacturer and may be based on a number of factors. One factor considered is the risk of facial fracture due to impact with interior components. The goal is to ensure proper airbag deployment at collision severities where the risk of facial injury is deemed significant. The airbag is thus intended to provide protection against injury for such impacts.

In higher severity frontal collisions, the seatbelts and airbags are intended to work together to mitigate injury from impact with the interior of the vehicle. For any given seat belt restraint, there will be some level of frontal collision severity beyond which some occupants will sustain impact with interior components. One design goal of airbag restraint systems is that they will be deployed at impact severities beyond the seatbelt's capability of preventing interior impact. The deployment threshold and design of the airbag system must work in conjunction with the seatbelts.

Such was not the case in the subject accident. The restraint system as a whole failed to provide protection from interior impact as would be expected in a situation as this. At least two possibilities or a combination thereof exists. Either a malfunction, such as the aforementioned SDM problem, occurred resulting in a non-deployment, or by design the deployment threshold and characteristics of the crash sensor system are such that certain non-deployment collisions will be beyond the capabilities of the seatbelt to protect the front seat occupants. Both of these scenarios involve defect and unacceptably poor performance of the vehicle's restraint systems.

## Conclusion

The occurrence and extent of Mr. Diaz' and Mr. Alfaro's injuries would not have resulted if either 1) the airbag system had deployed and operated as expected or 2) absent the airbag

Case 1:05-cv-00645-MSK-BNB   Document 59-3   Filed 07/21/06   USDC Colorado   Page 12 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 64 of 113

deployment, the seatbelts would not have allowed such excessive forward excursion of the occupants.   Clearly, both front seat occupants would have benefitted from properly deployed airbags.  It is expected that the airbags would have: 1) Prevented impact between the occupants and the vehicle interior; 2) Provided energy absorption capability to reduce the forces imparted to Mr. Diaz and Mr. Alfaro; 3) Provided force distribution that would serve to mitigate injury.  Wholly considered, the subject vehicle's restraint systems simply did not perform as would be reasonably expected for an impact of this nature.

The opinions expressed herein are based on the information available to date.  As additional information becomes available, supplemental opinions or revisions may be warranted.

Sincerely,

Automotive Safety Research

William Broadhead

William Broadhead
President

WGB/kmc

Attachment:
      A.    Curriculum Vitae
      B.    4-Year Testimony List

Case 1:05-cv-00645-MSK-BNB   Document 59-4   Filed 07/21/06   USDC Colorado   Page 1 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 65 of 113



**GENERAL MOTORS NORTH AMERICA**
Safety Integration

May 22, 2006

Mary Quinn Cooper, Esq.
ELDRIDGE, COOPER, STEICHEN & LEACH
110 West Seventh Street
Suite 200
Tulsa, OK  74119

### Expert Report of Kathryn F. Anderson
### Jose C. Alfaro and Martha Alfaro v. General Motors Corporation

Dear Ms. Cooper:

This report contains my assessment of the development, function and performance of the restraint system in the subject vehicle, the occupant kinematics, and the biomechanics of injury associated with Mr. Jose C. Alfaro who was the right front passenger in a 2000 Chevrolet Silverado, 1500 series, four-wheel drive, extended cab pick-up truck (subject vehicle) that was involved in an accident on May 21, 2003.

## QUALIFICATIONS

I have a Bachelor of Science degree in Engineering from Purdue University.  The focus of my undergraduate studies was in biomedical engineering through the Interdisciplinary Engineering school at Purdue University.  I also have a Masters of Science degree in Biomedical Engineering (Biomechanics) from the University of Michigan.

I have been employed by General Motors Corporation since 1991, and am currently a Field Performance Assessment Engineer for the Field Performance Assessment group.  My current job responsibilities include evaluating the field performance of current and past product restraint systems, and providing technical expertise in the area of occupant protection, restraint systems, and biomechanics to various entities within General Motors.  In the past, I have been responsible for the development of front and rear seat occupant protection systems and have conducted crash and sled tests to assess the performance of these systems.  I have also been responsible for the design release of driver air bags, passenger air bags, and steering wheels.  I have knowledge and experience in the development, testing, and design of the components that comprise frontal impact restraint systems.   I am also familiar with the design, development, and testing of the General Motors C/K truck product line.

> **EXHIBIT**
>
> tabbies®  A-4

General Motors Corporation ● GM Technical Center ● Mail Code 480-111-E20 ● 30200 Mound Rd. ● Warren, MI 48090

Case 1:05-cv-00645-MSK-BNB   Document 59-4   Filed 07/21/06   USDC Colorado   Page 2 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 66 of 113



**GENERAL MOTORS NORTH AMERICA**
Safety Integration

I have also researched motorsports safety technology, various applications of specific occupant protection features, and the use of anthropomorphic test device measurement equipment. I actively participate in the Crash Injury Research and Engineering Network project through the University of Michigan Program for Injury Research and Education and have been an engineering fellow with the University of Michigan Program for Injury Research and Education. In addition, I participate in the USCAR Occupant Safety Research Partnership which includes joint research activities with Ford Motor Company and DaimlerChrysler Corporation.

I have more than fourteen years experience in the design and development of automotive crash protection systems and occupant injury evaluation. My CV provides a more detailed description of my various current and past job responsibilities, and my publications.

## INFORMATION CONSIDERED

I have considered the information contained in the following documents in formulating my opinions about the restraint system and the mechanisms of the injuries sustained by Mr. Jose Alfaro in the accident of May 21, 2003:

Plaintiffs' Complaint;

Answer and Jury Demand of Defendant General Motors Corporation;

Plaintiffs' Responses to General Motors Corporation's First Request for Production;

Plaintiffs' Responses to General Motors Corporation's First Request for Admissions;

Plaintiffs' Responses to General Motors Corporation's First Interrogatories;

State of Colorado Traffic Accident Report of subject incident;

Shelter Insurance file and subject vehicle photographs taken 7/16/03;

Wrecker records from Joe's Garage, Inc.;

Record of climatological observations for the month of May, 2003;

Photographs of Mr. Jose Alfaro provided by Plaintiffs;

Inspection Photographs Taken by Investigation Specialists, Ltd., 2/5/04 and 2/27/04;

Accident Scene Photographs and Video Taken by Investigation Specialists, Ltd., 3/18/04;

Inspection Photographs Taken by William Broadhead, 11/16/04;



Case 1:05-cv-00645-MSK-BNB   Document 59-4   Filed 07/21/06   USDC Colorado   Page 3 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 67 of 113



**GENERAL MOTORS NORTH AMERICA**
Safety Integration

Inspection Photographs Taken by Dennis Shanahan, 12/20/05;

Inspection Photographs taken by Doug Allsop, 3/9/06;

Accident Scene Photographs taken by Doug Allsop, 3/10/06;

Inspection Photographs taken by John Sprague, 3/22/06;

Report of Dennis F. Shanahan, dated April 21, 2006;

Report of Patrick M. Renfro and Kristine K. Harris, dated April 24, 2006;

Report of Thomas Feiereisen, dated April 21, 2006;

Report of William Broadhead, dated April 21, 2006;

Deposition of Jose C. Alfaro, Volume I, taken February 9, 2006;

Deposition of Jose C. Alfaro, Volume II, taken March 24, 2006;

Deposition of Gorgonia Diaz, taken February 8, 2006;

Deposition of Martha A. Alfaro, taken March 24, 2006;

Deposition of Dr. Robert Madayag, taken March 15, 2006;

Deposition of Manuel Salas, taken February 8, 2006;

Deposition of Corporal Kirk Preston, taken February 7, 2006;

Deposition of Dr. Bradley Simon, taken April 28, 2006;

Deposition of Dr. David K. Patterson, taken May 4, 2006;

SDM Data and Translation;

Subject Vehicle Invoice;

GM VIS Information;

Performance Assessment Committee Final Reports;

Restraint Systems Evaluations Considerations Book;

General Motors barrier crash and sled test documentation, photos, and videos;

FMVSS 208, 209 and 210 Compliance Documents;

Engineering Drawings;



Case 1:05-cv-00645-MSK-BNB    Document 59-4    Filed 07/21/06    USDC Colorado    Page 4 of
05-44481-rdd    Doc 20074-2    Filed 05/14/10    Entered 05/14/10 00:24:53    Exhibit F
part 1    Pg 68 of 113

 **GENERAL MOTORS NORTH AMERICA**
Safety Integration

2000 Chevrolet C/K Truck Service Manual;

2000 Chevrolet C/K Truck Owner's Manual;

Jose C. Alfaro's Medical Records obtained to date.

## THE INCIDENT

On May 21, 2003, Mr. Gorgonia Diaz was driving a 2000 Chevrolet Silverado extended cab pick-up truck and was traveling eastbound on interstate I-70, near milepost 436 in Kit Carson County, Colorado.  Mr. Jose C. Alfaro was riding in the right front passenger seat, and 23-month-old Jacquelin Diaz-Coronell was riding in a child seat in the rear seat.  As reported in the Colorado Traffic Accident Report, Mr. Gorgonia Diaz drove off the left side of the highway, into a grassy median.  He made contact with the west side of a raised median crossover, causing the subject vehicle to become airborne, and eventually impact the ground with the front underside of the vehicle upon landing.  Mr. Gorgonia Diaz proceeded to drive the subject vehicle to a rest area located on the north side of I-70.

## REPORTED INJURIES

Mr. Alfaro, the right front passenger, was reportedly injured as a result of this accident event.  Mr. Alfaro was 70 years old and reportedly 6'1" tall and 160 lbs at the time of the accident (from 5/22/03 St. Anthony Hospital Central medical records).  His most clinically significant injuries reported immediately after the accident event, based on review of the documents above, are:

1)   Right LeFort II and left LeFort II facial fractures

2)   Minimally displaced C6 spinous process fracture

3)   Minimally displaced C7 left transverse process fracture

4)   Left glenohumeral anterior joint dislocation

5)   Three or four middle left rib fractures (non-displaced)

6)   Mild bibasilar atelectasis with possible left lower lobe pulmonary contusion

7)   Small spleen laceration

8)   Right knee medial collateral ligament tear

9)   Right wrist scapholunate dissociation

10)  6 cm chin laceration below right lower lip

11)  1 cm avulsion/laceration above left upper eyebrow

12)  Multiple abrasions and contusions

General Motors Corporation  •  GM Technical Center  •  Mail Code 480-111-E20  •  30200 Mound Rd.  •  Warren, MI 48090



Case 1:05-cv-00645-MSK-BNB   Document 59-4   Filed 07/21/06   USDC Colorado   Page 5 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 69 of 113



**GENERAL MOTORS NORTH AMERICA**
Safety Integration

These reported injuries will be addressed in this report in order to more completely discuss the occupant kinematics during the accident event.

## BASIS OF OPINIONS

I have reviewed the information listed above relative to the subject 2000 Chevrolet Silverado extended cab pick-up truck that was involved in an accident on May 21, 2003, in Kit Carson County, Colorado. I have also inspected the subject vehicle. My opinions are based on the information contained in the documents previously mentioned, my inspection, my education, background and experience in automotive occupant protection research and development, and field performance assessment. I reserve the right to amend my opinions expressed herein in the event that new information becomes available to me.

## ANALYSIS AND OPINIONS

I have reviewed all available scene and subject vehicle photographs. I also performed a visual inspection of the subject vehicle on April 27, 2006. The subject vehicle's rear window glass was broken out, and the forward portion of the bed of the pick-up truck was deformed forward in the center and was in contact with the back of the cab. At the time of my inspection, I also noted damage to the body and frame that caused the subject vehicle to "bow" in the middle. The front windshield was cracked in several places with one distinct impact point visible at the centerline of the windshield and two others to the left of the centerline. The rearview mirror was no longer attached to the windshield. The mirror glass was separated from the retainer, but not broken. The left rear side glass was not in place, and was found intact in the bed of the subject vehicle.

There was some contact damage to the front of the subject vehicle that was primarily concentrated at the bottom of the left front corner of the vehicle. The damage was indicative of an impact that induced a vertical input to the front structure, which would be consistent with the description of the subject incident. Dirt was found embedded in the front bumper, frame, front tow hooks, and underbody that would have been the result of the subject vehicle's initial contact with the sloped, grassy embankment leading up to the highway median crossover, and the subsequent impact into the grassy median when the subject vehicle landed on the other side of the crossover. The exterior damage to the front of the subject vehicle suggests the principal direction of force (PDOF) applied to the vehicle contained both vertical and longitudinal components.

General Motors Corporation • GM Technical Center • Mail Code 480-111-E20 • 30200 Mound Rd. • Warren, MI 48090



Case 1:05-cv-00645-MSK-BNB    Document 59-4    Filed 07/21/06    USDC Colorado    Page 6 of
05-44481-rdd    Doc 20074-2    Filed 05/14/10    Entered 05/14/10 00:24:53    Exhibit F
part 1    Pg 70 of 113



**GENERAL MOTORS NORTH AMERICA**
Safety Integration

I also performed a visual inspection of the interior occupant compartment. Mr. Diaz testified that he was transporting approximately 300 pounds of raw meat in the bed of the pick-up at the time of the accident event. Upon impact, this meat was reportedly projected through the back window glass, and into the occupant compartment, impacting the occupants. The right front passenger's head restraint was bent forward in vehicle. There was extensive evidence of meat having been splattered throughout the vehicle's interior at the time of my inspection. In addition, I noted evidence of occupant contact with the interior on the driver's side of the occupant compartment. The upper rim of the steering wheel was deformed toward the instrument panel. There was physical evidence of occupant loading of the driver's seat belt latch plate, and the shoulder belt guide loop trim on the seat was dislodged. There was slight gathering in the webbing at the position where the webbing rests at the shoulder belt guide loop trim on the seat when in the stowed position. The webbing sensitivity and vehicle sensitivity features of the driver seat belt system operated as expected at the time of my inspection. The sensing and diagnostic module (SDM) non-deployment event file data that was downloaded from the subject vehicle after the accident indicates that the driver was belted at the time of the subject crash event. Based on the physical evidence of seat belt loading, and the SDM data, it is my opinion that the driver, Mr. Diaz, was belted during the accident event.

There was also evidence of occupant contact with the interior on the right front passenger's side of the occupant compartment. The assist grip located on the instrument panel directly in front of the right front passenger's seating location was deformed downward and toward the instrument panel. It was compressed against the instrument panel (at the time of my inspection, a cigarette was lodged between the assist grip and the instrument panel, but this cigarette was not located here in the earliest photos of the subject vehicle taken by Shelter Insurance and Investigation Specialists, Ltd). Gouges were found in the assist grip and in the top of the instrument panel just in front of the location of the assist grip gouge. The passenger air bag switch on the instrument panel was in the ON position. The front of the center floor console had been loaded from the right side, causing some distortion in the trim which caused debris to become trapped between the trim pieces. The HVAC outlet located under the left side of the assist grip was broken. The inboard retainer rod on the sun visor was broken, in addition to the sun visor vanity mirror. There was no physical evidence of occupant loading on the right front passenger's seat belt latch plate, or shoulder belt guide loop trim on the seat. The guide loop trim was not dislodged. There was slight gathering in the webbing at the position where the webbing rests at the shoulder belt guide loop trim on the seat when in the stowed position. The webbing sensitivity and vehicle sensitivity features of the right front passenger's seat belt system operated as expected at the time of my inspection. Based on the

General Motors Corporation • GM Technical Center • Mail Code 480-111-E20 • 30200 Mound Rd. • Warren, MI 48090



Case 1:05-cv-00645-MSK-BNB   Document 59-4   Filed 07/21/06   USDC Colorado   Page 7 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 71 of 113



**GENERAL MOTORS NORTH AMERICA**
Safety Integration

lack of physical evidence of seat belt loading, and the nature of Mr. Alfaro's injuries, it is my opinion that the right front passenger, Mr. Alfaro, was not belted during the accident event.

In addition to my inspection of the interior and exterior damage to the subject 2000 Chevrolet Silverado extended cab pick-up truck, I have reviewed all other available photographs of the subject vehicle and accident scene. Although I will be relying on Dr. Doug Allsop's reconstruction of the accident, it is my opinion that the accident of May 21, 2003, contained both vertical and longitudinal inputs to the front underbody structures of the subject vehicle. The initial frontal impact into the upward sloping, grassy embankment at the west side of the median crossover would have caused the right front passenger, Mr. Alfaro, to initially move forward in the longitudinal direction, and downward in the vertical direction, relative to the vehicle's interior as the truck became airborne. It is my understanding that Dr. Allsop estimated the longitudinal change in velocity experienced by the subject vehicle during this initial impact (at launch) was less than 10 mph. The subject vehicle traveled airborne for a period of time before landing, left front corner first, into the grassy median on the east side of the median crossover. It is my understanding that Dr. Allsop estimated the longitudinal change in velocity experienced by the subject vehicle during this secondary impact (at landing) was less than 10 mph, but this secondary impact would also have contained a vertical input that would have been significant enough to pitch Mr. Alfaro into the instrument panel directly in front of and slightly to the left of his seating position. This secondary impact (the landing) would have been the most significant impact to the occupants. These occupant kinematics are consistent with the sources and mechanisms of injuries sustained by Mr. Alfaro during this type of accident sequence.

Mr. Alfaro was 70 years old and reportedly 6'1" tall and 160 lbs at the time of the accident (from 5/22/03 St. Anthony Hospital Central medical records). He was found by emergency personnel to be alert and oriented times three, with major facial contusions, left shoulder pain with deformity, and right hip pain with deformity. As reported in the medical records provided, Mr. Alfaro's right hip was later found at the hospital to be uninjured and showed no sign of fracture or instability. His left shoulder was anteriorly dislocated, where the humeral head was displaced forward relative to the shoulder socket. It was also reported that he had a scapholunate dissociation in his right wrist, which is a separation or widening between the scaphoid bone and lunate bone in the right wrist. These injuries are consistent with loads that are applied through the hands as the torso moves forward, as would be the case if Mr. Alfaro were bracing himself during the accident. I suspect that Mr. Alfaro may have attempted to initially brace himself, but he would not have been able to brace himself throughout the entire accident sequence.

General Motors Corporation • GM Technical Center • Mail Code 480-111-E20 • 30200 Mound Rd. • Warren, MI 48090



Case 1:05-cv-00645-MSK-BNB   Document 59-4   Filed 07/21/06   USDC Colorado   Page 8 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 72 of 113



**GENERAL MOTORS NORTH AMERICA**
Safety Integration

Mr. Alfaro was also diagnosed with LeFort II facial fractures on the right and left sides of his face.  The left LeFort II fracture included fractures of the left zygomaxillary complex, zygomatic arch, nasal bone, orbital floor, supraorbital rim, maxillary sinus and pterygoid plate.  The right LeFort II fracture included fractures of the right zygomatic arch, nasal bone, infraorbital rim, maxillary sinus, and pterygoid plate.  Mr. Alfaro was also noted to have a 6 cm facial laceration below the right lower lip.  These injuries are consistent with a blunt impact across the front of the mid-face, slightly more concentrated to the left side than the right.  Mr. Alfaro was also found to have a minimally displaced fracture of the spinous process of the 6th cervical vertebra and the left transverse process of the 7th cervical vertebra.  A 1 cm avulsion/laceration was noted above his left eyebrow.  When the secondary impact occurred (the landing), the front end of the subject vehicle made contact with the ground first, "diving" into the grassy median.  Upon impact, Mr. Alfaro's head most likely contacted the vehicle's header at the right front sun visor, inducing his left-sided forehead laceration above the eyebrow and his neck fractures.  Mr. Alfaro's upper torso would have continued pitching forward and downward relative to the vehicle's interior, allowing his face to impact the instrument panel directly in front of his seating position, inducing his facial fractures and chin laceration.

In addition to the above-mentioned injuries, Mr. Alfaro reportedly sustained three or four non-displaced fractures of middle left ribs with no evidence of a hemothorax or pnemothorax (these fractures were reported as anterior fractures on his 5/22/03 chest CT, and as lateral fractures on his 5/22/03 chest single view x-ray).  It is suspected that Mr. Alfaro's rib fractures and left pulmonary contusion also resulted from direct impact with the instrument panel.  In addition to the vertical deformation in the assist grip, the assist grip was also deformed forward in vehicle, compressed against the instrument panel.  This deformation most likely occurred when Mr. Alfaro's torso moved forward and slightly to the left, during the final impact with the grassy median upon landing.  He was also reported to have had a small spleen laceration that may have been a result of impact during rebound with the inboard armrest on his seat which was apparently in the down position at the time of the crash.  Mr. Alfaro also sustained a tear in the medial collateral ligament in his right knee, which was most likely due to contact with the glove box door.

The sensing and diagnostic module (SDM) senses vehicle decelerations in the longitudinal direction, such as those experienced when the vehicle is in a frontal or near frontal collision.  In these types of impacts, the occupant's motion will be primarily forward into the seat belt and/or frontal air bag.  In order for the air bag to deploy, the vehicle must exceed a pre-determined deployment threshold.  This threshold will be exceeded when the SDM experiences a sufficient level of longitudinal deceleration to warrant the need to deploy the frontal air bags.  My review and analysis of the information pertaining to the May 21, 2003,

Case 1:05-cv-00645-MSK-BNB  Document 59-4  Filed 07/21/06  USDC Colorado  Page 9 of
05-44481-rdd  Doc 20074-2  Filed 05/14/10  Entered 05/14/10 00:24:53  Exhibit F
part 1  Pg 73 of 113



**GENERAL MOTORS NORTH AMERICA**
Safety Integration

incident indicates the subject vehicle did not experience a frontal or near frontal impact that produced a longitudinal deceleration that was sufficient enough to warrant the deployment of the frontal air bags. The sensing system is a predictive system that must anticipate the occurrence of deployment level crash events, based on inputs sensed in the longitudinal direction. Neither the impact of the 2000 Chevrolet Silverado with the sloped, grassy embankment nor the impact upon landing in the grassy median, generated a level of longitudinal deceleration significant enough to be detected as the beginning of a deployment level crash event. Based on a review of the information contained in the documents listed above, and my inspection of the vehicle, it is evident that the subject vehicle did not experience a large enough change in longitudinal velocity in a short enough period of time to warrant deployment of the frontal air bags.

The driver and right front passenger seat belt systems in the 2000 Chevrolet Silverado extended cab pick-up truck are all-belts-to-seat systems. The lap and shoulder belt system is entirely mounted to the seat, which includes the retractor, webbing, latch plate, and buckle assembly. The seat belt retractor contains two different types of locking mechanisms that are designed to activate in response to a crash event in order to restrain the occupant. Either one of these mechanisms may perform the safety belt lock-up function during the crash. The first mechanism within the seat belt retractor senses vehicle decelerations and locks the seat belt. The second mechanism within the seat belt retractor senses how quickly the seat belt webbing is being pulled out, and locks the seat belt. The seat belt functions to provide the primary restraint in frontal impacts of all severities. The seat belt is also designed to work in conjunction with the supplemental air bag. In addition to providing the primary restraint, the seat belt functions to help keep the occupant in position during an impact. The air bag is designed to distribute the crash forces experienced by the occupant over a larger area of the upper body, in order to stop the occupant more gradually. Seat belts and air bags are intended to help mitigate injury, but cannot prevent all injuries to all occupants in all types of crashes.

Although Mr. Alfaro's injuries were a result of impact with the vehicle's interior, and a frontal air bag may be designed to reduce the risk of injury to the occupant due to contact with the vehicle's interior, a frontal air bag is designed to deploy in response to longitudinal vehicle inputs. Frontal air bag deployment decisions are based on how quickly the vehicle slows down during the crash event, in other words the change in longitudinal velocity over time. The air bag is designed to provide supplemental protection in certain frontal or near frontal collisions. Air bags are not designed to deploy in some accidents of long duration, where occupants may be at risk of being out-of-position by the time the sensing system detects a crash and

General Motors Corporation • GM Technical Center • Mail Code 480-111-E20 • 30200 Mound Rd. • Warren, MI 48090



Case 1:05-cv-00645-MSK-BNB   Document 59-4   Filed 07/21/06   USDC Colorado   Page 10 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 74 of 113

 **GENERAL MOTORS NORTH AMERICA**
Safety Integration

deploys the air bags, exposing that occupant to an increased risk of inflation induced injury. The frontal impact threshold for air bag deployment is specifically set at a level where the risk of exposing a potentially out-of-position occupant to an inflation induced injury is balanced against the benefits of providing supplemental protection against significant and life-threatening injuries. The subject 2000 Chevrolet Silverado air bag and seat belt systems were designed to meet the Federal Motor Vehicle Safety Standard (FMVSS) 208, 209 and 210 requirements. In addition, General Motors conducted due care testing to develop the performance of the air bag and seat belt systems for other simulated real world conditions, including the assessment of inflation induced injuries to out-of-position occupants. Various types of component tests, sled tests and full scale crash tests were conducted by General Motors during the development process of the restraint system in this generation of Chevrolet Silverado. The Performance Assessment Committee (PAC) Report and GM's Restraint Systems Evaluations Considerations Book document the considerations addressed in balancing the performance of the restraint system in the 2000 Chevrolet Silverado pick-up truck.

## SUMMARY

It is my opinion, based on a reasonable degree of scientific certainty, that:

- Mr. Alfaro was unbelted during the accident event that occurred on May 21, 2003, and was most likely bracing himself with both hands at the start of the accident sequence, contributing to his left anterior shoulder dislocation and right wrist scapholunate dissociation injuries.

- Mr. Alfaro's forehead laceration and neck fractures were a result of contact with the subject vehicle's header in the region of the sun visor.

- Mr. Alfaro's face and upper torso impacted the instrument panel during the crash event, resulting in his previously mentioned facial and chest injuries.

- The severity of Mr. Alfaro's injuries was a direct result of the circumstances of the May 21, 2003, accident event, where the subject vehicle experienced vertical and longitudinal decelerations.

- The left and right front seat belt retractors were operational and functioning as designed at the time of my inspection.

General Motors Corporation • GM Technical Center • Mail Code 480-111-E20 • 30200 Mound Rd. • Warren, MI 48090



Case 1:05-cv-00645-MSK-BNB   Document 59-4   Filed 07/21/06   USDC Colorado   Page 11 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 75 of 113



**GENERAL MOTORS NORTH AMERICA**
Safety Integration

- Had Mr. Alfaro been wearing his seat belt, it would have restrained him, and the severity of his injuries would have been reduced.

- The subject vehicle, 2000 Chevrolet Silverado, 1500 series, extended cab pick-up truck, did not experience a sufficient level of longitudinal deceleration to result in an above threshold, deployment level impact.

- The design, development, and testing of the air bag system in the 2000 Chevrolet Silverado, 1500 series, extended cab pick-up truck was reasonable and appropriate.

- The design, development, and testing of the front seat belt system in the 2000 Chevrolet Silverado, 1500 series, extended cab pick-up truck was reasonable and appropriate.

- The frontal air bag and seat belt systems in the 2000 Chevrolet Silverado, 1500 series, extended cab pick-up truck are reasonably safe, and meet or exceed the applicable Federal Motor Vehicle Safety Standards.

In addition, I may offer historical information about the design and development of General Motors vehicles in general, and of the 2000 Chevrolet Silverado, 1500 series, extended cab pick-up truck in particular. This type of information is described in the final report to the Performance Assessment Committee and the Restraint Systems Evaluation Considerations Book.

My opinions are based on my education, my automotive industry experience as an occupant protection system development/design engineer and researcher for over 14 years, and my review of the general information outlined above. The investigation into the circumstances surrounding the crash event that occurred May 21, 2003, is ongoing, and my opinions outlined above are based on the information available to me at this time. I reserve the right to amend my opinions should additional information become available to me.

General Motors Corporation  •  GM Technical Center  •  Mail Code 480-111-E20  •  30200 Mound Rd.  •  Warren, MI 48090



Case 1:05-cv-00645-MSK-BNB   Document 59-4   Filed 07/21/06   USDC Colorado   Page 12 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 76 of 113



**GENERAL MOTORS NORTH AMERICA**
Safety Integration

I am a salaried General Motors employee and received no additional compensation for my work on this case. Any publications that I have authored during the last ten years are listed on my CV.

*Kathryn F. Anderson*

Kathryn F. Anderson
Field Performance Assessment
Vehicle Structure and Safety Integration
General Motors Corporation



Case 1:05-cv-00645-MSK-BNB   Document 59-5   Filed 07/21/06   USDC Colorado   Page 1 of 5
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 77 of 113

# E$^x$ponent¨

Exponent
23445 North 19th Avenue
Phoenix, AZ 85027

telephone 623-582-6949
facsimile 623-581-8814
www.exponent.com

May 22, 2006

Mr. Peter F. Jones, Esq.
Hall & Evans, L.L.C.
1125 Seventeenth Street, Suite 600
Denver, Colorado 80202

      Re:    Jose C. Alfaro and Martha Alfaro v General Motors Corporation, Honeywell,
               Inc. f/k/a AlliedSignal, Inc., Delco Electronics Corporation, Delphi Auto
               Systems, f/k/a Inland Fisher Guide, John Doe, and John Doe, Inc.
               In the United States District for the District of Colorado
               Civil Action No.: 05-MK-645 (BNB)

Dear Mr. Jones:

Following your request, Exponent® Failure Analysis Associates (Exponent) has performed certain investigation regarding an accident that occurred on May 21, 2003, involving a 2000 Chevrolet Silverado pickup operated by Mr. Gorgonio Diaz, with Mr. Jose Alfaro as his passenger.

The purpose of this letter is to report the results of our investigation. The following sections list the material reviewed by Exponent, describe our understanding of the circumstances of the incident, discuss our inspection of the vehicle, and present our preliminary observations and conclusions.

With respect to automotive restraints, we will discuss their design, manufacture, assembly, testing, operation, usage, performance and applicable Federal Motor Vehicle Safety Standards (FMVSS).

**Materials Reviewed**
- Complaint;
- Plaintiff's Disclosure of Expert Witnesses;
- Honeywell's 1st set of Interrogatories to Plaintiff;
- Honeywell's 1st Request for Production of Documents and Tangible Things;
- Revised Scheduling Order;
- Motion for Protective Order;
- Injury Analysis, Dennis Shanahan, 4/21/06;
- Rehab Consulting Services, Inc., Patrick M. Renfro, RN, MS, CDMS, CRC Kristine K. Harris, MS, CRC dated 4/24/06;
- Automotive Safety Research Inc., William G. Broadhead dated 4/21/06;

PH09502.000/C0T0/0506/R295

**EXHIBIT**

A-5

tabbies®

Case 1:05-cv-00645-MSK-BNB   Document 59-5   Filed 07/21/06   USDC Colorado   Page 2 of 5
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 78 of 113

Mr. Peter F. Jones, Esq.                                                                    Page 2
May 22, 2006

- Ponderosa, Thomas Feiereisen, dated 4/21/06;
- Shanahan Photos dated 12/20/05;
- Plaintiff's Inspection photos of subject vehicle, dated November 16, 2004
- Photographs of Jose Alfaro's body;
- WGB Photos and Video dated 11/06/04;
- Vehicle Inspection by Daniel Davee and Dr. Christine Raasch on November 22, 2005
- Vehicle and Scene Inspection photos of Jon Bready, November 21-22, 2005
- Surrogate Study by Daniel Davee on January 27, 2005
- Bradley Simon with Exhibit #1
- Gorgonio Diaz;
- Jose Alfaro Volume I dated 2/9/06;
- Kirk Preston
- Manuel Salas
- Robert Madayag
- David Patterson
- SDM Download information
- FMVSS 208, 209, 210

**Accident Information**

According to the State of Colorado Traffic Accident Report, at approximately 11:05 pm on May 21, 2003, Mr. Gorgonio Diaz, age 19, was driving a 2000 Chevrolet Silverado Z71 1500 extended cab pickup eastbound on I-70. Mr. Jose Alfaro, age 70, was seated in the right front passenger seat, and 23-month-old Jaquelin Diaz was in the center rear position. Approximately 0.2 miles west of milepost 436, Mr. Diaz drove off the left side of the highway into the depressed median for 269 feet. He then struck a raised median crossover with the front undercarriage of the pickup and went airborne for 50 feet before the front of the vehicle impacted with the ground. After the vehicle came to rest, Diaz drove to a rest stop and reported the accident. The pickup was equipped with airbags, but they did not deploy. Mr. Diaz was cited for careless driving causing injury.

The accident report indicates that Mr. Diaz was a restrained occupant, Mr. Alfaro was unrestrained, and Ms. Diaz was restrained in a child safety restraint. Mr. Diaz was listed as suffering a non-incapacitating injury, Mr. Alfaro was listed as suffering an incapacitating injury, and Ms. Diaz was noted to have no injury.

Plaintiff's complaint alleges that Jose Alfaro's seat belt failed to restrain him and claims that the seatbelt is defective. The remainder of the report will address this issue.

$Ex$

Case 1:05-cv-00645-MSK-BNB   Document 59-5   Filed 07/21/06   USDC Colorado   Page 3 of 5
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 79 of 113

Mr. Peter F. Jones, Esq.                                                                                          Page 3
May 22, 2006

**Background**

The 2000 Chevrolet Silverado has five designated seating positions; two fronts and three rear.
The outboard seating positions are equipped with Type 2 seat belt assemblies and the center rear
seating position is equipped with a body-mounted static Type 1 seat belt assembly.

Seat belt assemblies

The front outboard seating positions of the subject vehicle are equipped with what is commonly
referred to as a three-point, all-belts-to seat (ABTS) design. It consists of a retractor and an end
release buckle assembly both mounted to the seat structure. The indirect emergency locking,
dual sensitive (vehicle and web sensitive) retractor is attached to the lower seatback frame and is
fully enclosed within the seat's trim. The retractor assembly incorporates adjustment hardware
for the stowage of webbing and an inertia mechanism, which is capable, when locked, of
withstanding restraint forces. Webbing from the retractor spool is routed upward inside the
upholstered seat by means of a plastic guide tube to a roller assembly located high on the
outboard side of the seat back and exits via an escutcheon (which is similar to a D-ring in body
mounted seat belt assemblies). The webbing is anchored to the seat frame via a metal anchor.
The retractor assembly also incorporates a single slot tongue. When the seat belt assembly is
donned, the tongue fastens to an end-release buckle attached to the inboard side of the seat. The
right front retractor is also equipped with a Child Hold Out Mechanism (CHOM), which
converts the emergency locking retractor to an automatic locking retractor when activated.

Assuming that an occupant has donned the seat belt, the retractor typically remains in the
unlocked mode except during a rapid deceleration (such as during a crash) or change in
orientation of the vehicle or when the webbing is rapidly extracted. The vehicle sensing
mechanism locks once a sensor detects the necessary condition(s) to arm the locking mechanism
and a small amount of webbing is extracted. The rotational inertia sensor can independently
cause the retractor to lock due to webbing extraction. Either mechanism (vehicle or web sensor)
can cause the retractor to lock. The retractor will then remain locked unless and until web
tension is removed and a small amount of webbing is allowed to retract.

**Vehicle and Seat Belt Inspection**

My inspection of the subject vehicle was conducted at Ponderosa Engineering in Lafayette,
Colorado on November 22, 2005. The subject vehicle was at this facility under the control of
the Plaintiff's attorney. My primary focus was the inspection of the front seating positions and
seat belt assemblies.

Inspection of the driver's seat belt assembly revealed witness marks consistent with usage of
that seatbelt during a wreck and that the driver's seatbelt provided occupant restraint during the
collision. These included deformation of the seat belt escutcheon and displacement of that
escutcheon from the seatback, and characteristic abrasions on the loading surface of the tongue
web slot. Inspection of the right front seat belt assembly revealed no witness marks consistent

$E\mathcal{X}$

Case 1:05-cv-00645-MSK-BNB   Document 59-5   Filed 07/21/06   USDC Colorado   Page 4 of 5
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 80 of 113

Mr. Peter F. Jones, Esq.                                                                     Page 4
May 22, 2006

with usage of that seatbelt during a wreck. The right front seat belt assembly also contained no marks consistent with a "release" of the seatbelt buckle during a collision. Several stains and abrasions were observed on the right front seat belt webbing and related components, but these marks are consistent with normal usage and stowage of the seat belt in the vehicle, not with its use by an occupant during a collision. I observed no accident load marks on the right front passenger's seatbelt and no evidence that would be consistent either with a "spool out" or release of that seatbelt under accident conditions. My findings are consistent with the Colorado Traffic Accident Report.

In addition, other evidence, consistent with the movement of an unrestrained occupant during a collision was found in the vehicle, including: cracked mirror glass in the sun visor mirror, broken visor mounting bar, deformation of the grab bar over the glove compartment, apparent teeth marks on the grab bar, and apparent teeth marks on the dashboard forward of the grab bar.

I have also observed certain photographs of Mr. Alfaro's right shoulder, which the Plaintiff claims are consistent with his alleged use of a seatbelt. I will defer to Dr. Banks for comments about the medical cause of the marks observed on Mr. Alfaro's body. However, if the seatbelt had interacted with Mr. Alfaro to an extent necessary to cause the marks shown in the photographs, then Newton's Laws Of Motion indicate that some reciprocal evidence should be present on the seatbelt webbing if it was the object that caused marks on Mr. Alfaro's body. There are no such marks present on the webbing, leading to the conclusion that the marks photographed on Mr. Alfaro's body were caused by some mechanism other than his interaction with a seatbelt during the accident.

The plaintiff's witnesses suggest that a three-point restraint system failed to restraint Jose Alfaro. However, the effectiveness of any seat belt assembly is completely compromised by an occupant's failure to use the seat belt.

It has been alleged that Mr. Alfaro was a restrained passenger immediately prior to the subject accident of September 29, 2001. However, that claim is inconsistent with both the police report and the physical evidence. Inspection of the driver's seat belt assembly revealed no witness marks consistent with usage or accident loading of the restraint assembly during the subject accident.

**Surrogate and Exemplar Vehicle Inspection**

A surrogate study was conducted using an exemplar vehicle and a surrogate of similar size and weight to Jose Alfaro. This study indicated that Jose Alfaro would have had to extract nearly all the seat belt webbing from the retractor to reach a position where he could have struck and deformed the handle over the glove compartment, leaving the apparent teeth marks in the handle and dashboard that I observed during my inspection of the subject vehicle.

Prior to the study, the exemplar seat belt webbing was inspected and found to have wrinkles and striations at the locations where the webbing passed through the escutcheon. These marks were

$E^{x^-}$

Case 1:05-cv-00645-MSK-BNB   Document 59-5   Filed 07/21/06   USDC Colorado   Page 5 of 5
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 81 of 113

Mr. Peter F. Jones, Esq.                                                                  Page 5
May 22, 2006

substantially similar to those visible in the photographs of the subject webbing taken by Ponderosa Associates. Clearly, these markings are due to stowage and not evidence of occupant loading. In addition, the subject seat belt assembly was observed to have an aftermarket sleeve attached to the webbing that would also exaggerate the wrinkles in this area.

## Conclusions

Based upon my background, training and experience in the areas of mechanical engineering, analysis of occupant restraint systems, and materials reviewed to date, I have reached the following conclusions and hold each of the following opinions to a reasonable degree of scientific and engineering certainty:

1. The seat belt assemblies in the 2000 Chevrolet Silverado were not defectively designed, manufactured, or assembled.

2. The seat belt assemblies in the subject vehicle meet all applicable Federal Motor Vehicle Safety Standards.

3. The absence of characteristic accident load marks on Mr. Alfaro's seatbelt webbing and associated hardware, and a comparison with the marks that are present on the driver's seatbelt, confirm that Jose Alfaro was not using his functional and available seatbelt at the time of the subject accident.

4. Had Mr. Alfaro chosen to use his functional and available seatbelt, it would have provided substantial restraint during the subject accident.

The foregoing opinions and conclusions are based on the information available to me at this time. I would appreciate an opportunity to consider any additional or different information that may become available at a later date. If necessary, I will author a supplemental report.

Exponent currently charges $330 per hour for all my consulting services. Attached is a list of my previous four years testimony. In preparation for trial, I plan on making exhibits to illustrate many of the opinions expressed in this matter.

If you have further questions, please do not hesitate to call.

Sincerely,

Daniel Davee
Principal Engineer

PH09502.000/C0T0/0506/R295

Ex

Case 1:05-cv-00645-MSK-BNB   Document 59-6   Filed 07/21/06   USDC Colorado   Page 1 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 82 of 113



**GENERAL MOTORS NORTH AMERICA**
Safety Integration

May 22, 2006

Mary Quinn-Cooper, Esquire
ELDRIDGE COOPER STEICHEN & LEACH
110 West Seventh Street
Suite 200
Tulsa, Oklahoma 74119

Re: Jose C. Alfaro, et al vs. General Motors (PL469246)

Dear Ms. Cooper:

This report expresses my analysis and opinions of the supplemental inflatable restraint system
and its performance during the collision involving Jose C. Alfaro on May 21, 2003.

## ENGINEERING REPORT OF JOHN SPRAGUE

### I. BACKGROUND

**A. Engineering Education**

I earned a Bachelor of Engineering degree from Vanderbilt University. I have completed Traffic
Accident Reconstruction I from the Northwestern University Traffic Institute of Evanston, Illinois. A
copy of my *curriculum vitae* and testimony list is attached to this report. Any publications that I have
authored during the last 10 years are listed on my CV.

**B. GM Employment**

I became an employee of the Delco Electronics Division of General Motors in 1981. In 1993 I
became a Systems Applications Engineer with the Supplemental Inflatable Restraints group at Delco
Electronics. In 1997 I began a position as a Resident/ Design Release Engineer for Delco Electronics
working with air bag sensing systems at General Motors. (I was an employee of GM from 1981 until
1999. Between 1999 and 2001 I was an employee of Delphi Automotive Systems.) My responsibilities



EXHIBIT

A-6



1

Case 1:05-cv-00645-MSK-BNB    Document 59-6    Filed 07/21/06    USDC Colorado    Page 2 of
05-44481-rdd    Doc 20074-2    Filed 05/14/10    Entered 05/14/10 00:24:53    Exhibit F
part 1    Pg 83 of 113

 **GENERAL MOTORS NORTH AMERICA**
Safety Integration

have included the development and implementation of air bag sensing systems and performance for many

General Motors vehicles, including frontal and side impact air bag systems. I am knowledgeable about

vehicle and component level testing conducted to evaluate the performance of frontal and side impact air

bag sensing systems. In developing air bag sensing systems, I also have been a member of safety

performance teams that were responsible for balancing the decisions of when an air bag should be

immune to deployment and when an air bag deployment is intended. I have also been responsible for the

vehicle level integration of the air bag sensing components as a design release engineer. I have provided

support to vehicle assembly plants regarding air bag sensing systems. I have specialized knowledge and

expertise concerning air bag sensing system design, performance, analysis, integration, and

manufacturing.

Since 2001 I have been employed by GM as a Field Performance Assessment Engineer in the

Field Performance Assessment Department. My current job responsibilities involve evaluating the field

performance of General Motors vehicles, including the areas of air bag systems and their components;

providing technical and engineering analysis of product liability allegations; maintaining knowledge of

current General Motors products; and consulting with various entities within General Motors regarding

the field performance of GM vehicles. I am personally familiar with the design, development, testing, and

manufacturing processes of GM's products. I am familiar with the design of the air bag system and the

testing conducted during the development of the occupant protection system in the subject 2000

Chevrolet Silverado vehicle.

## II. MATERIAL REVIEWED

I have reviewed the following material:

1. Plaintiffs' Complaint,
2. Answer and Jury Demand of Defendant General Motors Corporation to the Complaint,
3. Answer of Delco Electronics Corporation to Complaint,
4. General Motors Corporation's First Request for Production to Plaintiffs,
5. General Motors Corporation's First Request for Admissions to Plaintiffs,

 2

Case 1:05-cv-00645-MSK-BNB   Document 59-6   Filed 07/21/06   USDC Colorado   Page 3 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 84 of 113

 **GENERAL MOTORS NORTH AMERICA**
Safety Integration

6. General Motors Corporation's First Interrogatories to Plaintiffs,
7. Plaintiffs' Responses to General Motors Corporation's First Request for Production,
8. Plaintiff's Responses to General Motors Corporation's First Request for Admissions,
9. Plaintiff's Responses to General Motors Corporation's First Interrogatories to Plaintiffs,
10. Shelter Insurance Company's file for Claim Number 15-1-4807942-4,
11. State of Colorado Traffic Accident Report for the subject collision,
12. The deposition transcript of Kirk Preston from February 7, 2006,
13. The deposition transcript of Gorgonia Diaz from February 8, 2006,
14. The deposition transcript of Jose Cano Alfaro from February 9, 2006,
15. The deposition transcript of Jose Cano Alfaro from March 24, 2006,
16. The deposition transcript of Martha Avelar Alfaro from March 24, 2006,
17. The deposition transcript of Robert Madayag, M.D., from March 15, 2006,
18. The deposition transcript of Manuel Salas from February 8, 2006,
19. The deposition transcript of Bradley Simon, M.D. from April 28, 2006,
20. The deposition transcript of David K. Patterson, M.D. from May 4, 2006,
21. Photographs of the subject vehicle taken by Investigation Specialists Ltd,
22. Photographs of the subject vehicle taken during my inspection on March 22, 2006,
23. Photographs of the subject vehicle taken by Kathryn Anderson,
24. Photographs of the subject vehicle taken by Doug Allsop,
25. Photographs of the collision scene taken by Doug Allsop,
26. Various photographs of Jose Alfaro taken after the subject collision,
27. Video from the site of the subject collision taken on March 18, 2004,
28. The Vetronix Crash Data Retrieval (CDR) System Report for the data downloaded from the subject vehicle's SDM,
29. The Hexadecimal Translation Tool (HTT) Report for the data that was downloaded from the subject vehicle's SDM,
30. Plaintiffs' Disclosure of Expert Witnesses for the subject case,
31. The April 21, 2006, report of Dennis F. Shanahan, M.D., M.P.H., for the subject case,
32. The April 24, 2006, report from Rehab Consulting Services, Inc. for the subject case,
33. The April 21, 2006, report of Thomas Feiereisen for the subject case,
34. The Preliminary Report of William G. Broadhead for the subject case,
35. Final Reports to the Performance Assessment Committee applicable to the 2000 Chevrolet Silverado,
36. Air Bag Sensing System Summary applicable to the 2000 Chevrolet Silverado,
37. Crash Tests with substantially similar vehicles,
38. Component location drawings for the air bag system,
39. Documents describing the hardware and operation of the air bag sensing components,
40. Product Definition Document applicable to the subject vehicle's SDM,
41. Vehicle Invoice and GM Vehicle Inquiry System Information from the subject vehicle,
42. Campaign Bulletin for General Motors Voluntary Product Recall Campaign No. 02029,
43. General Motors FPE file on the investigation that led to GM's Voluntary Product Recall Campaign No. 02029,
44. The Owner's Manual for the 2000 Chevrolet Silverado,
45. The Service Manual for the 2000 Chevrolet Silverado.



Case 1:05-cv-00645-MSK-BNB   Document 59-6   Filed 07/21/06   USDC Colorado   Page 4 of
~~05-44481-rdd    Doc 20074-2    Filed 05/14/10~~   Entered 05/14/10 00:24:53    Exhibit F
part 1    Pg 85 of 113

**GM** GENERAL MOTORS NORTH AMERICA
Safety Integration

### III. FACTS

This case involves a 2000 Chevrolet Silverado with vehicle identification number (VIN) 1GCEK19T1YE143024 with a driver and passenger supplemental restraint system (SRS). Gorgonia Diaz was driving the subject vehicle in Kit Carson County, Colorado, on May 21, 2003. While traveling eastbound on Interstate 70 near Milepost 436, the subject truck went off the left side of the roadway and into a depressed median. According to the State of Colorado Traffic Accident Report, the truck traveled approximately 269 feet through the median before striking a raised median crossover with the front undercarriage. Reportedly, the Silverado then went airborne for approximately 50 feet before impacting the ground with the front of the vehicle. The vehicle continued forward and was then driven from the scene to report the collision. The air bags in the subject vehicle did not deploy as a result of the collision.

This vehicle was subject to the General Motors Voluntary Product Recall Campaign 02029, Air Bag Sensing Diagnostic Module. The Vehicle Inquiry System report shows that the Campaign Status for Campaign Number 02029 was "Open."

I inspected the post- collision damaged vehicle on March 22, 2006.

### IV. THE AIR BAG SYSTEM

The frontal air bag system in the 2000 Chevrolet Silverado is a supplemental restraint system designed to augment the primary restraint, the lap/shoulder belt. The supplemental inflatable restraint system in the 2000 Chevrolet Silverado primarily consists of a driver's air bag module on the hub of the steering wheel, a passenger air bag module located on the right side of the dash, and the air bag sensing system.

The air bag sensing system consists of a Sensing and Diagnostics Module (SDM) located under the driver's seat and a front sensor on the lower radiator support of the vehicle. The SDM contains an accelerometer, a microprocessor, an electro-mechanical arming sensor, supporting circuitry for

Case 1:05-cv-00645-MSK-BNB   Document 59-6   Filed 07/21/06   USDC Colorado   Page 5 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 86 of 113

 **GENERAL MOTORS NORTH AMERICA**
Safety Integration

communications, filtering, energy reserve, diagnostics, and the air bag deployment drivers. The microprocessor contains a deployment control algorithm to predict if an event is severe enough to warrant an air bag deployment to restrain the vehicle's front occupants. The SDM performs diagnostics on the air bag system and warns the driver if a diagnostic condition exists. The SDM also provides an energy reserve to deploy the air bags. It can also store some crash-related information.

The SDM in the 2000 Chevrolet Silverado uses information from the accelerometer, the front sensor, and the arming sensor to determine if deployment of the air bags is required. The deployment control algorithm in the SDM is enabled by the accelerometer output. After algorithm enable, the microprocessor compares measured acceleration, calculated values, and front sensor status to calibration parameters stored in the SDM. If the algorithm commands an air bag deployment and the arming sensor closes, electrical power is provided to both sides of the air bag deployment circuits. When the algorithm commands an air bag deployment, it permanently sets a Diagnostic Trouble Code 51 (Deployment Commanded) in the SDM and records certain information in a deployment event file.

The sensing system design was based on the vehicle safety system performance goals. Vehicle level testing data for both deploy and non-deploy events, as well as required air bag deployment criteria for occupant protection were used to develop the sensing system. The events used to develop the sensing system included full frontal crashes into a rigid barrier, angle crashes, pole impacts, rough road, and service abuse tests. Computer simulation, component level testing, and vehicle testing were used to develop the sensing system. This sensing system development was performed during the design and development of the vehicle.

Whether there is an air bag deployment is dependent upon the response of the sensing system to longitudinal (i.e., front to back) deceleration input, influenced by the angle of impact, severity of impact, structural deformation, nature of object struck and other factors. If a 2000 Chevrolet Silverado goes straight into a wall that does not move or deform the threshold level for deployment is about 9 to 16 mph.

Case 1:05-cv-00645-MSK-BNB   Document 59-6   Filed 07/21/06   USDC Colorado   Page 6 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 87 of 113

**GENERAL MOTORS NORTH AMERICA**
Safety Integration

The pre-impact travel speed necessary to generate an air bag deployment may be different if the object struck is some combination of narrow, angled, movable, or deformable. If the angle of impact is not a full frontal, it will take a larger total force to generate the same longitudinal inputs as a full frontal impact. The air bag deployment thresholds for each GM vehicle line are developed for that line to balance the injury potential from a deploying air bag with the mitigating effects an air bag has for serious injuries in deployment level collisions.

The air bag system for the 2000 Chevrolet Silverado was developed through computer modeling, sled testing, and full-scale barrier testing with instrumented dummies. Development activity is described in more detail in the Final Report to the Performance Assessment Committee.

The components of the air bag system for the 2000 Chevrolet Silverado were specified, tested, and validated as part of the vehicle design to ensure that the proper materials and components have been chosen for the system. The air bag system was also tested in full-scale barrier, rough road, and service abuse tests to address not only government requirements but also, GM's internal system performance goals.

## V. GENERAL MOTORS PRODUCT RECALL CAMPAIGN NUMBER 02029

In August 2002, General Motors voluntarily issued Product Recall Campaign Number 02029. General Motors determined there was a defect that relates to motor vehicle safety in certain 2000 Model Year Chevrolet Silverado, Tahoe, and Suburbans; and GMC Sierra, Yukon, and Yukon XLs (The GMT800 family). Some of the vehicles had an air bag sensing and diagnostics module (SDM) that contained an anomaly that could result in the driver and passenger's air bag failing to deploy during certain frontal collisions, although deployment was commanded. The vehicles involved in GM's Voluntary Product Recall Campaign No. 02029 had been built within specific VIN ranges. The issues that led to GM's Voluntary Product Recall Campaign 02029 did not involve a condition of the air bag

Case 1:05-cv-00645-MSK-BNB   Document 59-6   Filed 07/21/06   USDC Colorado   Page 7 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 88 of 113

**GM** GENERAL MOTORS NORTH AMERICA
Safety Integration

sensing system's ability to detect a crash and determine if the air bags should deploy. Instead it involved a condition of the system that executes the air bag deployment command. It affects only those vehicles involved in collisions with sufficient force and direction where a command to deploy the air bags was given and the frontal air bags did not deploy. When this condition occurred, the SDM sensed a deployment-level crash event; commanded an air bag deployment in response to that event; permanently recorded a DTC 51 and Deployment Event; but then did not deploy the air bags.

For the SDDs (the deployment drivers) within the SDM to send current to deploy the air bags, they must receive information from the microprocessor within the SDM that the deployment threshold boundary conditions have been met, and they must also detect closure of the arming sensor within the SDM. The SDDs must receive both messages, simultaneously, before current will be sent. In those events where the recall campaign condition manifested itself, the deployment threshold boundary conditions had been met before there was a solid closure of the arming sensor. Under that circumstance, current flow to the air bags might be interrupted before the air bags could deploy, if the arming sensor bounced before solidly closing. Arming sensor bounce (a close/open/close within a very short time) would cause the SDDs to reset and shut off current flow to the air bags. The recall campaign involved recalibrating SDMs in the field, to change the auxiliary boundary curves, so that the deployment threshold boundary conditions would not be met before there was a solid arming sensor closure.

The SDM supplier added components to the circuit boards of the SDMs supplied for GMT 800s that went into production starting in February of 2000 that eliminated the ability of the SDDs to reset and shut off current flow to the air bags after the deployment threshold boundary conditions have been met. Those 2000 model year GMT 800s produced in February 2000 and later, with SDMs that incorporated these hardware changes, were not subject to GM's Voluntary Product Recall Campaign 02029.

Case 1:05-cv-00645-MSK-BNB   Document 59-6   Filed 07/21/06   USDC Colorado   Page 8 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 89 of 113

**GENERAL MOTORS NORTH AMERICA**
Safety Integration

## VI. OBSERVATIONS

I have reviewed the available material and have made the following observations:

The subject collision was not a full frontal rigid barrier impact. The collision involved an impact of the vehicle's undercarriage with a raised median crossover. The vehicle went airborne after striking the crossover and impacted the ground with the front of the vehicle. The vehicle then continued on before coming to rest in the median.

My review of the available photographs and inspection of the vehicle indicate that there was damage to the front of the vehicle. Dirt was also evident in the front of the vehicle. This is consistent with the reported impact to the raised median crossover and subsequent impact with the ground. Unlike a rigid barrier, the median crossover and the ground in the median that were struck in this collision would have been able to deform upon impact. In addition, the post-collision vehicle shows signs of substantial vertical loading to the front of the vehicle. This is also consistent with the description of the crash. This type of vehicle damage is also consistent with an event where a significant amount of the forces acting on the vehicle were not in the longitudinal direction.

The SDM in the subject vehicle can record data specific to one deployment level event and one non-deployment event, or two deployment level events. If the SDM detects a deployment level crash it sets a code for deployment commanded and creates a permanent "deployment event" record. This record is written to non-volatile memory, and therefore the deployment event is not erased from the SDM's memory, and the SDM will not overwrite the data. A non-deployment event is severe enough to "wake up" the sensing algorithm in the SDM but not severe enough to deploy the air bags. A non-deployment event can be overwritten by another non-deployment event. For the SDM used in the subject vehicle, a non-deployment event record may be overwritten by the next non-deployment event regardless of severity. In addition, a non-deployment event file is cleared from the SDM memory after sufficient ignition cycles.

FIELD PERFORMANCE ASSESSMENT
Mail Code: 480-111-E20 • 30200 Mound Road • Warren, MI 48090



8

Case 1:05-cv-00645-MSK-BNB   Document 59-6   Filed 07/21/06   USDC Colorado   Page 9 of
05-44181-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 90 of 113

**GENERAL MOTORS NORTH AMERICA**
Safety Integration

The SDM data was downloaded by Gary Burr during his inspection on February 5, 2004. The SDM that was downloaded was the original SDM that was installed in the subject 2000 Chevrolet Silverado. The SDM data did not contain a deployment event file. This indicates that the impacts experienced by the subject vehicle were below the threshold for an air bag deployment in a 2000 Chevrolet Silverado.

The SDM data did contain a non-deployment event record from ignition cycle 11153. The non-deployment event record shows that there were no air bag system fault codes present and that the air bag system warning lamp was off at the time of the non-deployment event. This indicates that the air bag system was functioning properly at the time of the non-deployment event. The SDM recorded a driver's seat belt switch status of "buckled" at the time of the non-deployment event. The maximum SDM recorded velocity change in the recorded non-deployment event was 0.75 mph. Another non-deployment event had occurred 200 milliseconds prior to the recorded non-deployment event.

The SDM continually performs diagnostic evaluations on the air bag system. The SDM warns the driver if there is a diagnostic condition that could affect the functionality of the air bag system. There is no evidence of an air bag warning light prior to the subject collision. This would indicate that the air bag system was functional at the time of the crash event. In addition, photographs from Gary Burr's vehicle inspection document that the air bag system warning lamp would illuminate at the time of the inspection.

## VII. CONCLUSIONS

I have reviewed the available material and, along with my education and experience, state with a reasonable degree of engineering certainty:

1. The air bag system design in the 2000 Chevrolet Silverado was reasonable and appropriate;

2. The longitudinal inputs in the impacts from the median crossover and subsequent landing were below the air bag deployment threshold for the 2000 Chevrolet Silverado and the air bag system functioned properly during this collision;



9

Case 1:05-cv-00645-MSK-BNB   Document 59-6   Filed 07/21/06   USDC Colorado   Page 10 of
05-11181-rdd   Doc 20074-2   Filed 05/14/19   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 91 of 113

 **GENERAL MOTORS NORTH AMERICA**
Safety Integration

3.  The issues that led to GM's Voluntary Product Recall Campaign No. 02029 were not a factor in the performance of the air bag system in the subject collision; and

4.  The fact that the air bags did not deploy was not due to any defect in the air bag system.

The paragraphs that follow provide explanation and discussion to support these opinions.

*The air bag system functioned properly during this collision.*

The SDM in the subject vehicle can record data specific to one deployment level event and one non-deployment event, or two deployment level events. If the SDM detects a deployment level crash it sets a code for deployment commanded and creates a permanent "deployment event" record. This record is written to non-volatile memory, and therefore the deployment event is not erased from the SDM's memory, and the SDM will not overwrite the data. A non-deployment event is severe enough to "wake up" the sensing algorithm in the SDM but not severe enough to deploy the air bags. A non-deployment event is cleared from the SDM memory after sufficient ignition cycles. The SDM data is but one of the factors considered in assessing vehicle performance. Investigators for NHTSA, Transport Canada, law enforcement agencies, auto manufacturers, and other investigators have utilized data from SDM event data recorders in their field investigations and studies.

The SDM data was downloaded by Gary Burr during his inspection on February 5, 2004. The SDM that was downloaded was the original SDM that was installed in the subject 2000 Chevrolet Silverado. The SDM data did not contain a deployment event file. This indicates that any impacts experienced by the subject vehicle were below the threshold for an air bag deployment in a 2000 Chevrolet Silverado. Thus, the longitudinal inputs in the impacts with the median crossover and subsequent landing were below the air bag deployment threshold for the 2000 Chevrolet Silverado and the air bag system functioned properly during this collision.

Case 1:05-cv-00645-MSK-BNB   Document 59-6   Filed 07/21/06   USDC Colorado   Page 11 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 92 of 113

**GM** GENERAL MOTORS NORTH AMERICA
Safety Integration

Dr. Doug Allsop of AREA Inc. has done a reconstruction of the subject collision sequence. Dr. Allsop indicated that the longitudinal delta-v for the Silverado's impacts with the median crossover and the subsequent landing in the median resulted in longitudinal velocity changes that were below 10 mph for each impact. This appears to be consistent with the physical damage to the vehicle which I inspected on March 22, 2006. Thus, the calculated longitudinal delta-v places the severity of the collisions below the impact speed of the full frontal rigid barrier "all-deploy" threshold for the 2000 Chevrolet Silverado.

In addition the median crossover and the median itself that were struck in the collisions were able to deform. This would help lengthen the crash pulse in each of the subject collisions when compared to a full frontal rigid barrier impact. The longer crash pulses would have affected the longitudinal forces experienced by the air bag sensing system and any occupants of the vehicle. In addition, based on the description of the impacts and the physical damage to the vehicle, a substantial amount of the collision forces were in the vertical direction. The air bag system is designed to respond to the longitudinal inputs during an event. Accordingly, the air bag system functioned properly during the subject collision sequence. The fact that the air bags did not deploy was not due to any defect in the air bag system.

*The issues that led to GM Product Recall Campaign No. 02029 were not a factor in the performance of the air bag system in the subject accident.*

General Motors Product Recall Campaign No. 02029 addressed a condition where deployment of the air bags was commanded by the SDM, but the airbag deployment command may not be fully executed. The data downloaded from the subject vehicle's SDM did not contain a deployment file or a code for commanded air bag deployment (DTC 51). A DTC 51 may not be cleared and a deployment event file can not be cleared or overwritten therefore, one was never recorded by the SDM. Since no air bag deployment was commanded by the air bag sensing system in the subject vehicle, the conditions

Case 1:05-cv-00645-MSK-BNB   Document 59-6   Filed 07/21/06   USDC Colorado   Page 12 of
05-44191-rdd   Doc 20074-2   Filed 05/14/19   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 93 of 113

 **GENERAL MOTORS NORTH AMERICA**
Safety Integration

under which the voluntarily recalled vehicles might not deploy the air bags did not occur in the subject

collision.

*The fact that the air bags did not deploy was not due to any defect in the air bag system.*

The information available indicates that the supplemental restraint system was functioning

properly before, during, and after the collision; notwithstanding the potential recall condition.  This

information indicates that the system was capable of diagnosing potential malfunctions.  It also indicates

that there was no degradation in the ability of the system to warn the driver if such a condition existed.

Should more information become available I will supplement my report if necessary.

## VIII. TRIAL EXHIBITS

If I testify at trial, I may use the following material:

1.  All of the listed materials reviewed for this report,

2.  Occupant Restraints Considerations Evaluation Book (Blue Book),

3.  Representative visor warning labels concerning airbags,

4.  Technical articles concerning crashworthiness and air bags,

5.  Engineering drawings for the components in the air bag sensing system,

6.  Documents and material produced by GM and other parties during discovery,

7.  Exemplar components,

8.  Exhibits generated from the information in any of these documents.

I may have additional exhibits to list, as more information becomes available.

12

Case 1:05-cv-00645-MSK-BNB   Document 59-6   Filed 07/21/06   USDC Colorado   Page 13 of
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1    Pg 94 of 113

**GM** GENERAL MOTORS NORTH AMERICA
Safety Integration

## IX. COMPENSATION

I am currently a salaried employee of GM.  As a GM employee I do not receive additional

compensation for analyzing materials and information in this case or providing testimony.

John Sprague

Case 1:05-cv-00645-MSK-BNB   Document 59-7   Filed 07/21/06   USDC Colorado   Page 1 of 2
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 95 of 113

```
2000 SILVERADO LT 1500 PICKUP        CHEVROLET MO   R DIVISION
14U  MED CHARCOAL GRAY METAL    :   /V8G  GENERAL MOTO    CORPORATION
922  MEDIUM GRAY INTERIOR TRIM       100 RENAISSANCE CENTER
ORDER NO. BSDR78/TRE      STOCK NO.  DETROIT       MI   48243-1001
VIN 1GC EK19 T1 YE143024             VEHICLE INVOICE 10D44910049
*************************************************************13*10177S
MODEL & FACTORY OPTIONS       MSRP    INV AMT  RETAIL - STOCK
CK15753 SILVERADO LT 1500 PICKUP 31320.00  27405.00  INVOICE 08/23/99
C7H 6,400 LB GVW RATING       N/C      N/C   SHIPPED 08/21/99
FE9 FEDERAL/NORTHEAST EMISSIONS 0.00    0.00  EXP I/T 08/29/99
GT4 REAR AXLE - 3.73 RATIO    N/C      N/C   INT COM 08/30/99
G80 LOCKING DIFFERENTIAL-REAR AXLE 285.00  245.10  PRC EFF 08/21/99
LM7 VORTEC 5300 V8 SFI GAS ENGINE N/C   N/C   KEYS  NW97  NW97
M30 4-SPD AUTOMATIC TRANSMISSION N/C    N/C   WFP-S QTR  OPT-1
    WITH TOW HAUL MODE                       BANK: DEBIS FINAN
NP8 AUTOTRAC ACTIVE TRANSFER CASE N/C   N/C   CHG-TO    10-177
QGD P265/75R16-114S ALT WOL TIRES 365.00 313.90
Z71 OFF-ROAD SUSPENSION PKG INCLS: 395.00 339.70  SHIP WT:  4719
    * SKID PLATES                            HP:       44.8
    * HIGH CAPACITY AIR CLEANER              GVW:      6400
Z82 TRAILERING SPECIAL EQUIPMENT 285.00  245.10  GVWF:     3925
    INCLUDES:                                GVWR:     3750
    * TRAILER HITCH PLATFORM                 GMS:      28209.30
    * 8-WIRE TRAILER HARNESS                 NTR: 1/2
    * TRANSMISSION OIL COOLER                DAN:      CLR
1SC LT DECOR INCLUDES:        N/C      N/C   MEMO      1632.50
    * AIR CONDITIONING WITH AIR
      FILTRATION SYSTEM
    * ISRV MIRROR W/COMPASS & TEMP
    * DUAL PWR HEATED OSRV MIRRORS
    * REAR WINDOW DEFOGGER
    * DEEP TINT GLASS
    * FRONT FOG LAMPS
    * AM/FM STEREO W/CASSETTE & CD
    * CHROME GRILLE
    * ELECTRONIC SPEED CONTROL
    * POWER LOCKS & WINDOWS
    * REMOTE KEYLESS ENTRY WITH
      CONTENT THEFT ALARM
    * LEATHER WRAPPED STEERING WHL
    * CAST ALUMINUM WHEELS
    * BODYSIDE MOLDINGS
    * 6-WAY POWER HEATED BUCKET
      SEATS W/FRNT LEATHER SEATING
      SURFACES & DRIVER MEMORY

** CONTINUED ON PAGE  2 **



MEDVED CHEVROLET, INC.
```

**EXHIBIT**

tabbies®

A-7

Case 1:05-cv-00645-MSK-BNB   Document 59-7   Filed 07/21/06   USDC Colorado   Page 2 of 2
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 96 of 113

```
2000 SILVERADO LT 1500 PICKUP          CHEVROLET MOTOR DIVISION
14U  MED CHARCOAL GRAY METAL   C   /V8G GENERAL MOTORS CORPORATION
922  MEDIUM GRAY INTERIOR TRIM         100 RENAISSANCE CENTER
ORDER NO. BSDR78/TRE       STOCK NO.   DETROIT        MI  48243-1001
VIN 1GC EK19 T1 YE143024               VEHICLE INVOICE 1OD44910049
**************************************************13*10177S
MODEL & FACTORY OPTIONS              MSRP   INV AMT  RETAIL - STOCK
** CONTINUED FROM PAGE  1 **
```

```
TOTAL MODEL & OPTIONS          32650.00   28548.80  ACT 237  28209.30
DESTINATION CHARGE               640.00     640.00  H/B 261    979.50
DEALER CO-OP ADVERTISING                    326.50  ADV 261    326.50
TOTAL                          33290.00   29515.30  PAY 310  29515.30
MEMO: TOTAL LESS HOLDBACK AND
     APPROX WHOLESALE FINANCE CREDIT        28066.00
*****************************************************************
INVOICE DOES NOT REFLECT DEALER'S ULTIMATE COST BECAUSE OF MANUFACTURER
REBATES, ALLOWANCES, INCENTIVES, HOLDBACK, FINANCE CREDIT AND RETURN TO
DEALER OF ADVERTISING MONIES, ALL OF WHICH MAY APPLY TO VEHICLE.
*****************************************************************

MEDVED CHEVROLET, INC.
```

# EXHIBIT C

Case 1:05-cv-00645-MSK-BNB   Document 60   Filed 07/21/06   USDC Colorado   Page 1 of 17
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 98 of 113

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-645-MSK-BNB

JOSE C. ALFARO, and
MARTHA ALFARO,

      Plaintiffs,

v.

GENERAL MOTORS CORPORATION,
HONEYWELL, INC., f/k/a ALLIEDSIGNAL, INC.
DELCO ELECTRONICS CORPORATION,
DELPHI AUTO SYSTEMS, f/k/a INLAND FISHER GUIDE,
JOHN DOE, and
JOHN DOE, INC.,

      Defendants.

---

## DEFENDANT GENERAL MOTORS CORPORATION'S
## OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

---

**COMES NOW** Defendant General Motors Corporation (GM), pursuant to D.C. Colo.

LCivR 56.1(A), and submits this opening brief in support of its Motion for Summary Judgment

(GM's Motion).

### STATEMENT OF FACTS

This lawsuit arises out of a May 21, 2003, single-vehicle accident that occurred in the

median of Interstate 70 in Kit Carson County, Colorado. On the evening of the accident, which

occurred at approximately 11:05 p.m., Plaintiff Jose C. Alfaro, a Kansas resident,[1] was the right

front seat passenger in a 2000 Chevrolet Silverado 1500 extended cab pickup (the Silverado)

---

[1] Plaintiffs' Complaint cites Colorado substantive law. *See* Complaint (DKT No. 1). However, since Alfaro is a
resident of Kansas and the accident occurred in Colorado the question arises as to which law applies to Plaintiffs'
claims, Kansas or Colorado. In this brief, however, GM cites authority from both Colorado and Kansas to
demonstrate that GM is entitled to summary judgment regardless of which state's law applies. The result would be
the same and the choice of law decision need not be made to grant GM's motion for summary judgment.

Case 1:05-cv-00645-MSK-BNB   Document 60   Filed 07/21/06   USDC Colorado   Page 2 of 17
05-44481-rdd    Doc 20074-2    Filed 05/14/10    Entered 05/14/10 00:24:53    Exhibit F
part 1    Pg 99 of 113

driven by Gorgonia Diaz. *See* State of Colorado Traffic Accident Report, Exhibit A-1 to GM's

Motion. While traveling eastbound on Interstate 70, Mr. Diaz drove the Silverado off the left

side of the roadway, traveling for approximately 269 feet in a depressed median between the

eastbound and westbound lanes of traffic. *Id.* While traveling in the median, the Silverado

contacted a raised median crossover (a turnaround running perpendicular to the highway lanes),

traveled over the crossover, and went airborne for some distance before landing in the median.

*Id.* Following this incident, Mr. Diaz drove the Silverado to a rest area and reported the accident.

*Id.*

Alfaro and his wife, Plaintiff Martha Alfaro,[2] sued GM and others, asserting claims for

strict liability, negligence, and breach of implied warranties. Plaintiffs alleged in the Complaint

that the air bag system and the right front passenger seat belt system in the Silverado were

defective.[3] In an apparent effort to support their allegations of defect, Plaintiffs identified

William G. Broadhead (Broadhead), of Automotive Safety Research, Inc., as an expert witness.

*See* Plaintiffs' Disclosure of Expert Witnesses at 1, Exhibit A-2 to GM's Motion.

As demonstrated below, however, Plaintiffs' expert does not identify a specific defect

that caused the alleged failure of the seat belt and air bag systems to restrain Alfaro. As such,

Plaintiffs' proof fails and GM is entitled to judgment as a matter of law on all of Plaintiffs'

claims. Further, Plaintiffs' breach of implied warranty claim is barred by the statute of

limitations.

---

[2] Mrs. Alfaro was not involved in the accident. Mrs. Alfaro claims loss of consortium which is derivative of Alfaro's claim. Because Alfaro's claims fail as a matter of law, so does Mrs. Alfaro's derivative claim. *See Welch v. George*, 19 P.3d 675, 677 (Colo. 2000). *See also Farmers Ins. Co. v. Jokan*, 57 P.3d 24, 27 (Kan. Ct. App. 2002) ("Derivative claims are the consequence of injury suffered by another; they depend upon rights of the injured party to recover and are subject to the same defenses available to the underlying personal injury claim.").

[3] Plaintiffs do not allege that any condition of the vehicle caused the accident. *See* Compl., DKT. No. 1

Case 1:05-cv-00645-MSK-BNB   Document 60   Filed 07/21/06   USDC Colorado   Page 3 of 17
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 100 of 113

## The Air Bag System

The frontal air bag system in the 2000 Chevrolet Silverado is a supplemental restraint system designed to augment the primary restraint, the lap/shoulder belt.  *See* Expert Report of John Sprague (Sprague Report) at 4 (May 22, 2006), Exhibit A-6 to GM's Motion.   The supplemental inflatable restraint system in the 2000 Chevrolet Silverado primarily consists of a driver's air bag module on the hub of the steering wheel, a passenger air bag module located on the right side of the dash, and the air bag sensing system.  *Id.*

The air bag sensing system consists of a Sensing and Diagnostics Module (SDM) located under the driver's seat and a front sensor on the lower radiator support of the vehicle.  Sprague Report at 4.   The SDM contains an accelerometer, a microprocessor, an electro-mechanical arming sensor, supporting circuitry for communications, filtering, energy reserve, diagnostics, and the air bag deployment drivers.  *Id.* at 4-5.   The microprocessor contains a deployment control algorithm to predict if an event is severe enough to warrant an air bag deployment to restrain the vehicle's front occupants.  *Id.* at 5.   The SDM performs diagnostics on the air bag system and warns the driver if a diagnostic condition exists.  *Id.*   The SDM also provides an energy reserve to deploy the air bags.  *Id.*  It can also store some crash-related information.  *Id.*

The SDM in the 2000 Chevrolet Silverado uses information from the accelerometer, the front sensor, and the arming sensor to determine if deployment of the air bags is required. Sprague Report at 5.   The deployment control algorithm in the SDM is enabled by the accelerometer output.  *Id.*   After algorithm enable, the microprocessor compares measured acceleration, calculated values, and front sensor status to calibration parameters stored in the SDM.  *Id.*  If the algorithm commands an air bag deployment and the arming sensor closes, electrical power is provided to both sides of the air bag deployment circuits.  *Id.*  When the

Case 1:05-cv-00645-MSK-BNB   Document 60   Filed 07/21/06   USDC Colorado   Page 4 of 17
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 101 of 113

algorithm commands an air bag deployment, it permanently sets a Diagnostic Trouble Code 51 (meaning Deployment Commanded), in the SDM and records certain information in a deployment event file. *Id.*

The sensing system design was based on the vehicle safety system performance goals. Sprague Report at 5. Vehicle level testing data for both deploy and non-deploy events, as well as required air bag deployment criteria for occupant protection were used to develop the sensing system. *Id.* The events used to develop the sensing system included full frontal crashes into a rigid barrier, angle crashes, pole impacts, rough road, and service abuse tests. *Id.* Computer simulation, component level testing, and vehicle testing were used to develop the sensing system. *Id.* This sensing system development was performed during the design and development of the vehicle. *Id.*

Whether there is an air bag deployment is dependent upon the response of the sensing system to longitudinal (i.e., front to back) deceleration input, influenced by the angle of impact, severity of impact, structural deformation, nature of object struck and other factors. Sprague Report at 5. The pre-impact travel speed necessary to generate an air bag deployment may be different if the object struck is some combination of narrow, angled, movable, or deformable. *Id.* at 6. If the angle of impact is not a full frontal, it will take a larger total force to generate the same longitudinal inputs as a full frontal impact. *Id.* The air bag deployment thresholds for each GM vehicle line are developed for that line to balance the injury potential from a deploying air bag with the mitigating effects an air bag has for serious injuries in deployment level collisions. *Id.*

The air bag system for the 2000 Chevrolet Silverado was developed through computer modeling, sled testing, and full-scale barrier testing with instrumented dummies. Sprague Report

Case 1:05-cv-00645-MSK-BNB   Document 60   Filed 07/21/06   USDC Colorado   Page 5 of 17
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 102 of 113

at 6. Components of the air bag system for the 2000 Chevrolet Silverado were specified, tested, and validated as part of the vehicle design to ensure that the proper materials and components have been chosen for the system. *Id.* The air bag system was also tested in full-scale barrier, rough road, and service abuse tests to address not only government requirements but also, GM's internal system performance goals. *Id.*

**The Seat Belt Restraint System**

The driver and right front passenger seat belt systems in the 2000 Chevrolet Silverado extended cab pick-up truck are all-belts-to-seat systems. *See* Expert Report of Kathryn F. Anderson at 9, Exhibit A-4 to GM's Motion. The lap and shoulder belt system is entirely mounted to the seat, which includes the retractor, webbing, latch plate, and buckle assembly. *Id.* The seat belt retractor contains two different types of locking mechanisms that are designed to activate in response to a crash event in order to restrain the occupant. *Id.* Either one of these mechanisms may perform the safety belt lock-up function during the crash. *Id.* The first mechanism within the seat belt retractor senses vehicle decelerations and locks the seat belt. *Id.* The second mechanism within the seat belt retractor senses how quickly the seat belt webbing is being pulled out, and locks the seat belt. *Id.* The seat belt functions to provide the primary restraint in frontal impacts of all severities. *Id.* The seat belt is also designed to work in conjunction with the supplemental air bag. *Id.* In addition to providing the primary restraint, the seat belt functions to help keep the occupant in position during an impact. *Id.* The air bag is designed to distribute the crash forces experienced by the occupant over a larger area of the upper body, in order to stop the occupant more gradually. *Id.* Seat belts and air bags are intended to help mitigate injury, but cannot prevent all injuries to all occupants in all types of crashes. *Id.*

Case 1:05-cv-00645-MSK-BNB   Document 60   Filed 07/21/06   USDC Colorado   Page 6 of 17
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 103 of 113

## ARGUMENT AND AUTHORITIES

## PROPOSITION I

### GM IS ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFFS HAVE NO EXPERT EVIDENCE THAT THE SILVERADO'S SEAT BELT SYSTEM OR AIR BAG SYSTEM HAD A SPECIFIC DESIGN OR MANUFACTURING DEFECT

Plaintiffs assert three causes of action against GM: (1) strict liability; (2) negligence; and (3) breach of implied warranty of merchantability. Each claim is premised on Plaintiffs' assertion that the Silverado's seat belt system and air bag system failed to restrain Alfaro because of a design or manufacturing defect.

### A. All of Plaintiffs' claims require proof of a defect.

To establish a *prima facie* case as to each of their three claims, Plaintiffs must prove the existence of a specific design or manufacturing defect. To establish a *prima facie* case of strict liability under Colorado law, Plaintiffs must prove that the Silverado's seat belt system or air bag system: (1) was defective and because of the defect was unreasonably dangerous; (2) the defect existed at the time the Silverado was sold or left GM's control; (3) the Silverado was expected to and did reach an expected user without substantial change in its condition; (4) Plaintiffs were injured; and (5) the defect was the cause of the injury. *Simon v. Coppola*, 876 P.2d 10, 15 (Colo. Ct. App. 1993); *see also Bartholic v. Scripto-Tokai Corp.*, 140 F. Supp. 2d 1098, 1106 (D. Colo. 2000); *Jenkins v. Amchem Prods.*, 886 P.2d 869, 886 (Kan. 1994) (Under Kansas law, to establish a *prima facie* case of strict liability the plaintiff must prove three elements: "(1) the injury resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; and (3) the condition existed at the time it left the defendant's control.") (citing *Mays v. Ciba-Geigy Corp.*, 661 P.2d 348, 361 (Kan. 1983)).

Case 1:05-cv-00645-MSK-BNB   Document 60   Filed 07/21/06   USDC Colorado   Page 7 of 17
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 104 of 113

To establish a negligence claim under Colorado law, Plaintiffs must prove that GM had a legal duty of care with respect to the design and manufacture of the Silverado, *i.e.*, to design and manufacture the Silverado without defects posing a foreseeable and unreasonable risk of harm to others, and that the duty was breached, proximately causing Plaintiffs' injuries. *Lyons v. Nasby*, 770 P.2d 1250, 1254 (Colo. 1989). Kansas' negligence law also requires proof of a defect. *South v. McCarter*, 119 P.3d 1, 20 (Kan. 2005) (Under Kansas law, to recover for negligence, the plaintiff must prove that GM had a legal duty to produce vehicles without defects that present a foreseeable and unreasonable risk of harm, that there was a breach of that duty, that an injury resulted, and that there is a causal connection between the duty breached and the injury suffered.) (citing *Schmidt v. HTG, Inc.*, 961 P.2d 677, 692 (Kan. 1998)); *see also Barnett-Holdgraf v. Mut. Life Ins. Co.*, 3 P.3d 89, 93 (Kan. Ct. App. 2000).

Finally, to establish a breach of warranty claim under Colorado law, Plaintiffs have the burden to prove that, at the time of purchase, the Silverado was flawed or defective in a manner constituting a breach of warranty. *Prutch v. Ford Motor Co.*, 618 P.2d 657, 660 (Colo. 1980). Kansas law also requires a defect in breach of warranty claims. *Black v. Don Schmid Motor, Inc.*, 657 P.2d 517, 525 (Kan. 1983) (under Kansas law, buyer must prove (1) the ordinary purpose of the goods involved, and (2) the particular goods sold were not fit for that purpose, noting that "the buyer must show that the goods were defective and that the defect existed at the time of sale.").

**B.    Proof of an alleged defect in a seat belt system and/or an air bag system requires expert opinion testimony identifying a defect.**

Absent expert proof of a specific defect, Plaintiffs cannot state a *prima facie* claim for any of their three claims under either Colorado or Kansas law. Here, Plaintiffs must introduce direct evidence that a specific design or manufacturing defect caused the alleged failure of the

Case 1:05-cv-00645-MSK-BNB   Document 60   Filed 07/21/06   USDC Colorado   Page 8 of 17
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 105 of 113

seat belt system or air bag system to restrain Alfaro in the accident. *Union Supply Co. v. Pust*, 583 P.2d 276, 286 (Colo. 1978) ("By reason of the nature of the case, the trier of fact is greatly dependent on expert evidence and industry standards in deciding whether a defect is present."); *Randolph v. Collectramatic, Inc.*, 590 F.2d 844, 848 (10th Cir. 1979) ("[Fed. R. Evid. 701] does dictate that where the *topic* requires special experience, only the testimony of a person of that special experience will be received;" thus, a lay witness who has no knowledge or special experience in design or manufacture or pressure cookers was not competent to offer defect opinions) (emphasis in original). Regardless of the theory upon which recovery is sought for injury in a products liability case under Kansas law, "proof that a defect in the product caused the injury is a prerequisite to recovery." *Wilcheck v. Doonan Truck & Equip., Inc.*, 552 P.2d 938, 942 (Kan. 1976).

The mere fact that a plaintiff sustained an injury in connection with the use of a product is insufficient to prove a defect in that product under either Colorado or Kansas law. The accident by itself is not sufficient to present a *prima facie* case. *Shultz v. Linden-Alimak, Inc.*, 734 P.2d 146, 148-49 (Colo. Ct. App. 1986) ("[the] occurrence of an accident in connection with the use of a product does not necessarily make the product defective and unreasonably dangerous."). There must be admissible proof of a defect attributable to the manufacturer. *Id.* at 149. "The mere fact that a person suffered injury while using a product is insufficient in itself to satisfy the requirement of proof that a defect in the product was a proximate cause of the injury." *Wilcheck*, 552 P.2d at 943.

Plaintiffs cannot establish a *prima facie* case on any of their three counts under either Colorado or Kansas law. Plaintiffs' expert fails to identify the specific defect that allegedly caused the seat belt system or the air bag system to restrain Alfaro in the accident. Plaintiffs

Case 1:05-cv-00645-MSK-BNB   Document 60   Filed 07/21/06   USDC Colorado   Page 9 of 17
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 106 of 113

must demonstrate that the product failed due to a specific defect. *Schultz v. Linden-Alimak, Inc.*, 734 P.2d 146, 149 (a plaintiff cannot recover "without proof of a defect attributable to the manufacturer or seller which was the cause of the plaintiff's injuries"); *see also Wilcheck*, 552 P.2d at 942 ("proof that a defect in the product caused the injury is a prerequisite to recovery."). The failure of the seat belt system or the air bag system to restrain Alfaro in the accident, without more, is not adequate proof of a defect. *Bartholic*, 140 F. Supp. 2d at 1106 (the fact of an injury in connection with the use of a product is not enough to make the manufacturer liable under strict liability); *Lui v. Barnhart*, 987 P.2d 942, 947 (Colo. Ct. App. 1999) (mere fact of any accident, standing alone, is insufficient to demonstrate negligence); *Oja v. Howmedica, Inc.*, 111 F.3d 782, 792 (for the jury to properly find for a party, the party must present more than a "mere scintilla" of evidence supporting its claim); *Wilcheck*, 552 P.2d at 943 ("The mere fact that a person suffered injury while using a product is insufficient in itself to satisfy the requirement of proof that a defect in the product was a proximate cause of the injury.").

Plaintiffs' proof fails to identify a specific defect in the Silverado's seat belts and air bags. Plaintiffs' expert Broadhead simply speculates about "possibilities" in the performance of the "restraint system" at the time of the accident:

> The restraint system as a whole failed to provide protection from interior impact as would be expected in a situation as this. At least two possibilities or a combination thereof exists. Either a malfunction, such as the aforementioned SDM problem, occurred resulting in a non-deployment, or by design the deployment threshold and characteristics of the crash sensor system are such that certain non-deployment collisions will be beyond the capabilities of the seatbelt to protect the front seat occupants. Both of these scenarios involve defect and unacceptably poor performance of the vehicle's restraint systems.

*See* Automotive Safety Research, Inc., Preliminary Report (April 21, 2006) Prepared by William G. Broadhead at 10 (Broadhead Report), Exhibit A-3 to GM's Motion. Furthermore, in addition

Case 1:05-cv-00645-MSK-BNB   Document 60   Filed 07/21/06   USDC Colorado   Page 10 of 17
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 107 of 113

to the fact that Plaintiffs' expert does not identify a specific defect, the undisputed expert opinion testimony presented to this Court establishes that neither the seat belts nor the air bags in the Silverado are defective.

GM's expert Kathryn F. Anderson evaluated the right front passenger seat belt system on April 27, 2006. *See* Expert Report of Kathryn F. Anderson (Anderson Report) at 5-6, 10 (May 22, 2006), Exhibit A-4 to GM's Motion. Her evaluation demonstrated that both the vehicle sensitivity feature and the webbing sensitivity feature remain functional for the right front seat occupant. *Id.* Daniel Davee, another identified expert in this action, also opines, "The seat belt assemblies in the 2000 Chevrolet Silverado were not defectively designed, manufactured or assembled." *See* Report of Daniel Davee at 5, ¶ 1 (May 22, 2006), Exhibit A-5 to GM's Motion.

As to the Silverado's air bag system, GM's expert John Sprague opines that the fact that the air bags did not deploy in the accident was not due to any defect in the air bag system. Sprague Report at 10, Exhibit A-6 to GM's Motion. Whether there is air bag deployment is dependent upon the response of the sensing system to longitudinal (i.e. front to back) deceleration input, influenced by the angle of impact, severity of impact, structural deformation, nature of the object struck and other factors. *Id.* at 5. The characteristics of the accident at issue – i.e., the longitudinal deceleration from impacts with the median crossover and the landing in the median of I-70 – were below the air bag deployment threshold for the Silverado. *Id.* at 9. Furthermore, both Sprague and Anderson opine that the design of the air bag system in the Silverado was reasonable and appropriate. *Id.*; *see also* Anderson Report at 11.

Case 1:05-cv-00645-MSK-BNB   Document 60   Filed 07/21/06   USDC Colorado   Page 11 of 17
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 108 of 113

Plaintiffs have no expert proof that there was a specific defect in the Silverado's seat belts or air bags. The only expert proof presented to this Court establishes that the Silverado's seat belts and air bags are not defective. On this record, GM is entitled to summary judgment.

**C.      Circumstantial proof of defect is only appropriate in limited situations.**

Under Colorado law, in the absence of direct evidence of a specific defect, circumstantial evidence may be admitted in limited situations, to prove a defect only if all other causes of the product failure have been excluded. *See Weir v. Federal Ins. Co.*, 811 F.2d 1387, 1392 (10th Cir. 1987); *Union Ins. Co. v. RCA Corp.*, 724 P.2d 80, 83 (Colo. Ct. App. 1986). Kansas law also provides that if the plaintiff proceeds based on circumstantial evidence alone, then the plaintiff must present evidence that negates causes other than the alleged defect, otherwise "there must be an expert opinion that the product was defective." *Mays*, 661 P.2d at 360. The circumstances demonstrated must justify an inference of probability rather than a mere possibility. *Id.* This action, however, is not appropriate for circumstantial proof.

Product liability actions asserting a defect based on the alleged failure of the seat belt system or the air bag system to restrain a plaintiff in an accident are not the type of cases that are appropriate for circumstantial evidence. Expert proof of the defect is required in such cases. *See, e.g., Montag v. Honda Motor Co., Ltd.*, 75 F.3d 1414, 1420-21 (10th Cir.), *cert. denied*, 519 U.S. 814 (1996) (only an expert could provide evidence that a seat belt was "defective" or poorly conceived" in a product liability case). For example, a plaintiff's testimony about an alleged seat belt malfunction is not sufficient to take a defect seat belt allegation to the jury when presented with expert opinion testimony that the seat belt is not defective. *See, e.g., Tiner v. General Motors Corp.*, 909 F. Supp 112, 117-18 (N.D. N.Y. 1995). In time, the court ruled that the plaintiff's testimony was not sufficient to survive summary judgment where the plaintiff testified

Case 1:05-cv-00645-MSK-BNB   Document 60   Filed 07/21/06   USDC Colorado   Page 12 of 17
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 109 of 113

that "the belt allowed her to move forward after the collision, so that her chest hit the steering wheel and her knees hit the underside of the dashboard. The belt also allowed her to move backward, so that her head hit the police cage behind her." *Id.* at 117. Rejecting the plaintiff's proof, the district court ruled:

> Matters such as the tolerance a seat belt should allow for movement after a collision are not within the ken of the average juror. Moreover, it is likely that many factors besides the seat belt design and manufacture—issues such as maintenance, the proximity of the driver's seat to the steering wheel, and adjustments the driver made to seat belt settings—could explain the degree or direction of movement allowed to the driver. A jury may infer that a product has a defect without actual proof of the particular defect only if the plaintiff (1) establishes that the product did not perform as intended, and (2) excludes all other causes for the accident. [The plaintiff] has not offered any proof that the seat belt did not perform as intended. Nor has she offered proof excluding all other potential causes for any malfunction. Therefore, it would be improper to allow the jury to infer that the seat belt was defective. Because [the plaintiff] has offered no competent proof of a defect in the seat belt, her claim on this issue must be dismissed.

*Id.* at 117-18. *See also Ruminer v. General Motors Corp.*, No. 4:03-CV-00349 GTE, 2006 U.S. Dist. LEXIS 37861, *6 (E.D. Ark. Feb. 6, 2006) (granting summary judgment in favor of the defendant manufacturer ruling plaintiff failed to come forward with sufficient evidence to take his case to the jury because plaintiff "ma[de] no effort to prove any particular defect in the seat belt restraint system.") (attached hereto as Exhibit A-8).

Similarly, other courts have ruled that a plaintiff must present expert opinion testimony to support a claim that an air bag was defective. *See, e.g., Klootwyk v. Daimler Chrysler Corp.*, No. 01-C-6127, 2003 U.S. Dist. LEXIS 7768, at *10 (N.D. Ill. May 7, 2003) ("In a case such as this one, Plaintiff needed to offer expert testimony to attest to the fact that the driver-side air bag was unreasonably dangerous, as this claim involves technical matters beyond the common knowledge

Case 1:05-cv-00645-MSK-BNB   Document 60   Filed 07/21/06   USDC Colorado   Page 13 of 17
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 110 of 113

and experience of jurors.") (attached hereto as Exhibit A-9); *Turner v. Daimler Chrysler Corp.*, No. 99-0696-RV-L, 2000 U.S. Dist. LEXIS 18244, at *6 (S.D. Ala. Oct. 31, 2000) ("plaintiff must affirmatively establish the defective condition of the [air bag] by means of expert testimony") (citing *Brooks v. Colonial Chevrolet-Buick*, 579 So.2d 1328, 1332-33 (Ala. 1991)) (attached hereto as Exhibit A-10); *Wood v. Toyota Motor Corp.*, 760 A.2d 315, 318 (Md. Ct. Spec. App. 2000) (air bag is precisely the type of complex and technical product that requires expert testimony to prove an alleged defect); *St. Clair v. General Motors Corp.*, 10 F. Supp. 2d 523, 527 (M.D. N.C. 1998) (Plaintiff could not establish that his air bag was defective in absence of expert testimony).

Whether air bag and seat belt systems are defective are technical issues beyond the ken of lay jurors. As outlined above, there are various engineering considerations that determine whether or not air bags deploy in any given accident scenario. Similarly, whether a seat belt restraint system was defective in light of any given accident scenario requires consideration of technical and engineering principles. These considerations are beyond the understanding of average lay jurors. Expert opinion testimony is necessary to evaluate the air bags and a seat belt restraint system in this accident to determine whether some alleged defect affected their performance. The issues presented by Plaintiffs' defect allegations involve complex engineering issues that require expert witness testimony. And yet Plaintiffs have no expert testimony to support their defect allegations.

**D.    Plaintiffs have failed to identify a defect and cannot demonstrate a defect through circumstantial evidence.**

Plaintiffs cannot establish a *prima facie* case on any of their three counts under either Colorado or Kansas law. Despite their burden, Plaintiffs' expert Broadhead failed to identify any specific defect in the Silverado's seat belt system or air bag system. This is not a case where the

Case 1:05-cv-00645-MSK-BNB   Document 60   Filed 07/21/06   USDC Colorado   Page 14 of 17
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 111 of 113

allegedly defective product has been destroyed thereby making the identification of the specific

defect impossible.  Broadhead has inspected the Silverado, its seat belt system, and its air bag

system.  He has reviewed the data downloaded from the Silverado's Sensing and Diagnostic

Module (SDM).  Following his examination, Broadhead opines:

> The restraint system as a whole failed to provide protection from
> interior impact as would be expected in a situation as this.  At least
> two possibilities or a combination thereof exists.  Either a
> malfunction, such as the aforementioned SDM problem, occurred
> resulting in a non-deployment, or by design the deployment
> threshold and characteristics of the crash sensor system are such
> that certain non-deployment collisions will be beyond the
> capabilities of the seatbelt to protect the front seat occupants.  Both
> of these scenarios involve defect and unacceptably poor
> performance of the vehicle's restraint systems.

Broadhead Report at 10.  Unable to identify a specific defect in the air bag or seat belt systems,

Broadhead's conclusion and reasoning is circular—the Silverado's seat belt system or the air bag

system failed to restrain Alfaro and therefore either the seat belt or the air bag system has a

defect or malfunctioned.  This logic is nothing more than concluding that there was some defect

because Alfaro sustained injuries in an accident.  As set forth above, such reasoning is

inappropriate and insufficient under either Colorado or Kansas law.  Broadhead's logic does not

identify the defect.  Indeed, his analysis does not even identify which component was allegedly

defective.

Even assuming this case was appropriate for circumstantial proof, which it is not,

Plaintiffs' circumstantial evidence fails to negate other causes of Alfaro's injury for which GM

would not be liable.  Plaintiffs' expert does not rule out the possibility that injuries are

unavoidable in an accident such as that at issue here. Plaintiffs' expert does not negate other

post-manufacture conditions which might have caused Alfaro's injuries which would not be

attributable to GM.  Plaintiffs' expert does not negate the possibility that Alfaro was improperly

Case 1:05-cv-00645-MSK-BNB   Document 60   Filed 07/21/06   USDC Colorado   Page 15 of 17
05-44481-rdd   Doc 20074-2   Filed 05/14/10   Entered 05/14/10 00:24:53   Exhibit F
part 1   Pg 112 of 113

wearing the seat belt at the time of the accident. Plaintiffs' proof does not negate possible causes of Alfaro's injury for which GM would not be liable. Consequently, Plaintiffs cannot proceed to trial based on circumstantial evidence.

Plaintiffs' proof is insufficient to state a *prima facie* claim for recovery in a products action under either Colorado or Kansas law. Accordingly, GM is entitled to judgment as a matter of law.

## PROPOSITION II

### GM IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' WARRANTY CLAIM BECAUSE PLAINTIFF FILED THIS ACTION MORE THAN THREE YEARS AFTER THE SILVERADO WAS FIRST SOLD AND THE WARRANTY ACTION IS THEREFORE TIME-BARRED

Further, Plaintiffs' claim for breach of warranty is time-barred by the statute of limitations. Under Colorado law, a breach of warranty occurs "when tender of delivery is made," and must be brought within three years or is forever time barred. COLO. REV. STAT. § 4-2-725 (2005); *Boyd v. A.O. Smith Harvestore Prods., Inc.*, 776 P.2d 1125, 1128-29 (Colo. Ct. App. 1989) (warranty claim breach occurred at time of delivery, not when plaintiff discovered damage); *see also Leprino Foods Co. v. Feldmeier Equip., Inc.*, No. 03-cv-02461-MSK-OES, 2006 U.S. Dist. LEXIS 17227, at 8-14 (D. Colo. 2006) (breach of warranty claims occur on date of delivery). The Silverado was delivered on August 21, 1999. Plaintiffs filed this lawsuit on April 7, 2005, more than three years later. Accordingly, Plaintiffs' claim for breach of warranty is time barred.

## CONCLUSION

Plaintiffs' expert fails to identify a specific defect in the Silverado's seat belts or air bags. The undisputed expert proof before this Court establishes that the Silverado's seat belts functioned properly after the accident and were not defectively designed, manufactured or

Case 1:05-cv-00645-MSK-BNB  Document 60  Filed 07/21/06  USDC Colorado  Page 16 of 17
05-44481-rdd  Doc 20074-2  Filed 05/14/10  Entered 05/14/10 00:24:53  Exhibit F
part 1  Pg 113 of 113

assembled.  The undisputed proof also establishes that the fact that the Silverado's air bags did not deploy in the accident was not due to any defect.  Instead, the characteristics of the accident – i.e., the longitudinal deceleration from impacts with the median crossover and the landing in the median of I-70 – were below the air bag deployment threshold for the Silverado.  It is also undisputed that the design of the Silverado's air bag system was reasonable and appropriate.

Because Plaintiffs' evidence is insufficient to establish the existence of a specific defect, a critical element of all three of Plaintiffs' claims under either Colorado or Kansas law, GM is entitled to summary judgment on all of Plaintiffs' claims.  GM is also entitled to summary judgment on Plaintiffs' breach of warranty claim because Plaintiffs filed this action more than three years after the Silverado was first tendered for delivery.

Respectfully submitted,

/s/ Michael F. Smith
ELDRIDGE COOPER STEICHEN
    & LEACH, PLLC
MARY QUINN-COOPER (#11966)
mcooper@ecslok.com
MICHAEL F. SMITH (#14815)
msmith@ecslok.com
HAROLD C. ZUCKERMAN (#11189)
hzuckerman@ecslok.com
P. O. BOX 3566
110 W. 7th Street, Ste 200
TULSA, OKLAHOMA 74101-3566
(918) 388-5555  FAX (918) 388-5654

CHARLES L. CASTEEL
DAVIS GRAHAM & STUBBS LLP
SUITE 500, 1550 SEVENTEENTH STREET
DENVER, CO  80202
Charles.Casteel@dgslaw.com
(303) 892-9400 telephone
(303) 893-1379 facsimile

*Attorneys for General Motors Corporation*