# Exhibit 2

**Hearing Date And Time: August 16, 2007, At 10:00 A.M.**
**Objection Deadline: August 13, 2007, At 4:00 P.M.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:  http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -x
                      :

      In re                :    Chapter 11

                      :

DELPHI CORPORATION, et al.,    :    Case No. 05-44481 (RDD)

                      :

                      :    (Jointly Administered)

          Debtors.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - -x

EXPEDITED MOTION FOR ORDER UNDER 11 U.S.C. §§ 102(1)(A), 105(a), 107, 108(a)(2),
AND 546(a) AND FED. R. BANKR. P. 7004, 9006(c), AND 9018 (i) AUTHORIZING
DEBTORS TO ENTER INTO STIPULATIONS TOLLING STATUTE OF LIMITATIONS
WITH RESPECT TO CERTAIN CLAIMS, (ii) AUTHORIZING PROCEDURES TO IDENTIFY
CAUSES OF ACTION THAT SHOULD BE PRESERVED, AND (iii) ESTABLISHING
PROCEDURES FOR CERTAIN ADVERSARY PROCEEDINGS INCLUDING
THOSE COMMENCED BY DEBTORS UNDER 11 U.S.C. § 541, 544, 545, 547, 548, OR 553

("PRESERVATION OF ESTATE CLAIMS PROCEDURES MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), submit this expedited motion (the "Motion") for an order (the "Order") under 11 U.S.C. §§ 102(1)(A), 105(a), 107, 108(a)(2), and 546(a) and Federal Rules of Bankruptcy Procedure 7004, 9006(c), and 9018 (i) authorizing the Debtors to enter into stipulations tolling the statute of limitations with respect to certain claims, (ii) authorizing procedures for the Debtors to identify causes of action that should be preserved and granting authority to abandon certain causes of action, and (iii) establishing procedures for certain adversary proceedings, including those commenced by the Debtors under 11 U.S.C. § 541, 544, 545, 547, 548, or 553, and respectfully represent as follows:

Background

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. The Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the official committee of unsecured creditors, the "Statutory Committees").

2

3.      This Court has jurisdiction over this motion pursuant to 28 U.S.C.

§§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is

a core proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief requested herein are

sections 102(1)(a), 105(a), 107, 108(a)(2), 502(d), 541, 544, 545, 546(a), 547, 548, and

553 of the Bankruptcy Code and Rules 7004, 9006(c), and 9018 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

5.      Delphi and its subsidiaries and affiliates (collectively, the

"Company") as of December 31, 2006 had global net sales of $26.4 billion and global

assets of approximately $15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked

as the fifth largest public company business reorganization in terms of revenues and the

thirteenth largest public company business reorganization in terms of assets.  Delphi's non-

U.S. subsidiaries are not chapter 11 debtors and continue their business operations without

supervision from the Bankruptcy Court.[2]

6.      The Company is a leading global technology innovator with

significant engineering resources and technical competencies in a variety of disciplines,

---

[1]   The aggregated financial data used in this Motion generally consists of consolidated information from
Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on
February 27, 2007.

[2]   On March 20 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-
core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish
insolvency proceeding.  The application was approved by the Spanish court on April 13, 2007.  On
July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a
settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The
Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with
Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost
structure.

and is one of the largest global suppliers of vehicle electronics, transportation components,

integrated systems and modules, and other electronic technology. The Company supplies

products to nearly every major global automotive original equipment manufacturer

("OEM").

   7. Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM

conducted the Company's business through various divisions and subsidiaries. Effective

January 1, 1999, the assets and liabilities of these divisions and subsidiaries were

transferred to the Company in accordance with the terms of a Master Separation

Agreement between Delphi and GM. In connection with these transactions, Delphi

accelerated its evolution from a North American-based, captive automotive supplier to a

global supplier of components, integrated systems, and modules for a wide range of

customers and applications. Although GM is still the Company's single largest customer,

today more than half of Delphi's revenue is generated from non-GM sources.

C. Events Leading To The Chapter 11 Filing

   8. In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income. Every year thereafter,

however, with the exception of 2002, the Company has suffered losses. In calendar year

2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net

sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net

---

[3] Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the
recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The
Company's net operating loss in calendar year 2004 was $482 million.

losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006, the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

9.    The Debtors believe that the Company's financial performance has deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

10.    In light of these factors. the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues. and forward-looking revenue requirements. Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

11.    On March 31. 2006. the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable. profitable business operations. The Debtors stated that they needed to focus on five key areas:[4] first.

---

[4]    In furtherance of the Debtors' transformation plan. on December 18. 2006. the Debtors announced their execution of an equity purchase and commitment agreement with certain investors. and a plan framework support agreement with those investors and GM. On July 9. 2007. Delphi confirmed that it had formally terminated the equity purchase and commitment agreement and related plan framework

modifying the Company's labor agreements to create a competitive arena in which to
conduct business;[5] second, concluding their negotiations with GM to finalize GM's
financial support for the Debtors' legacy and labor costs and to ascertain GM's business
commitment to the Company;[6] third, streamlining their product portfolio to capitalize on
their world-class technology and market strengths and make the necessary manufacturing
alignment with their new focus;[7] fourth, transforming their salaried workforce to ensure

---

support agreement but that it expected to enter into new framework agreements with plan investors
presently. Subsequently, on July 18, 2007, Delphi announced that it had accepted a new proposal for an
equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group
comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger
Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities
LLC) as well as, Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P.
(collectively, the "New Plan Investors"). Under the Delphi-Appaloosa EPCA, the New Plan Investors
would invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the
Company's transformation plan and plan of reorganization. This Court approved the Delphi-Appaloosa
EPCA on August 2, 2007.

[5]    Among the progress made to date, on June 22, 2007, Delphi reached an agreement with the International
Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW")
and GM that (a) modifies, extends, or terminates provisions of the existing collective bargaining
agreements among Delphi, the UAW, and its various locals, (b) provides that Delphi and GM will
undertake certain financial obligations to Delphi's UAW-represented employees and retirees to facilitate
these modifications, and (c) modifies retiree welfare benefits for certain UAW-represented retirees of the
Debtors. This agreement, which was approved by this Court on July 19, 2007, should facilitate the
Debtors' reaching consensual resolutions of their labor issues with the remaining unions and GM and
permit the Debtors to continue to implement their transformation plan and to develop, prosecute,
confirm, and consummate a plan of reorganization. As of August 6, 2007, similar agreements have been
reached with the International Association of Machinists and Aerospace Workers and its District 10 and
Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663,
International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication
Workers of America and its local unions, and Locals 832S, 18S, and 101S of the International Union of
Operating Engineers. Delphi is currently engaged in settlement discussions with its remaining U.S.
labor union and is working to conclude discussions with that union as soon as practicable.

[6]    On July 9, 2007, Delphi confirmed that its discussions with GM on a comprehensive settlement
agreement had entered the documentation phase and that it expected that a settlement with GM would be
incorporated into the Debtors' plan of reorganization rather than filed with this Court for separate
approval.

[7]    In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core"
and "non-core" product lines and plants. The Debtors have been working to divest non-core assets so as
to maximize the value of the estate for stakeholders. During the 2006 and 2007 calendar years, for
example, the Debtors sold substantially all of the assets related to MobileAria, Inc., its chapter 11
affiliate, obtained court approval for the sale of substantially all of the assets of their brake hose and

6

that the Company's organizational and cost structure is competitive and aligned with its

product portfolio and manufacturing footprint[8] and devising a workable solution to their

current pension situation.[9]

       12.     Upon the conclusion of the reorganization process, the Debtors

expect to emerge as a stronger, more financially sound business with viable U.S.

operations that are well-positioned to advance global enterprise objectives. In the

meantime, Delphi will marshal all of its resources to continue to deliver high-quality

products to its customers globally. Additionally, the Company will preserve and continue

the strategic growth of its non-U.S. operations and maintain its prominence as the world's

premier auto supplier.

---

Saltillo, Mexico brake plant businesses, and obtained court approval of bid procedures related to the upcoming sale of substantially all assets used in their catalyst business. In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering, interior, and closures businesses.

[8]   As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages. The Company's revised operating structure consists of its four core business segments: Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture. The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan. The Debtors also made significant progress in ensuring that their organizational and cost structure is competitive in obtaining the entry of this Court's Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order"). The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[9]   To that end, on May 31, 2007, the Bankruptcy Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 plan year funding waivers, which were approved by the IRS, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Plans"). On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 28, 2008, respectively.

E.    Revised Plan Framework Agreements And Preserving Estate Causes Of Action

13.    The Debtors have made significant progress toward confirming a plan of reorganization: they have obtained the support of their Statutory Committees for and Court approval of the Delphi-Appaloosa EPCA, they have negotiated agreements with five of their six U.S. labor unions, they are engaged in the documentation phase for a comprehensive settlement agreement with GM, and they have scheduled a hearing in October 2007 to seek approval of their proposed disclosure statement and of solicitation procedures for a reorganization plan. The Delphi-Appaloosa EPCA approved by this Court on August 2, 2007 details the New Plan Investors' commitment to invest in the reorganized Delphi and attaches a proposed framework for a reorganization plan pursuant to which the Debtors expect to emerge from chapter 11 by the end of the year. The proposed treatment of claims under this reorganization plan would generally provide that all claims be paid or satisfied in full through distributions of cash. common stock, or both. Accordingly, avoiding preferential transfers would provide no benefit to the Debtors' estates because any party returning such a transfer would be entitled to a claim for the same amount. to be paid in full under such a plan. For the same reasons. avoiding statutory liens or prepetition setoffs would provide little to no benefit to the estates. As a result. the Debtors contemplate that their reorganization plan will waive or release most if not all avoidance causes of action.

14.    At present, the Debtors estimate that they may have more than 11.000 potential preference claims arising from transfers totaling approximately $5.8 billion (before taking into account potential defenses such as transfers made in the ordinary course of business). The constructively fraudulent transfer reach-back period. made

8

applicable by Bankruptcy Code section 544(b) and state law, is generally six years under

the law of Michigan and New York.[10]  Thus, with a company of Delphi's size, there are

literally hundreds of thousands of transactions that occurred during these constructively

fraudulent transfer reach-back periods.   Under the Bankruptcy Code, each Debtor has until

two years after the entry of the order for relief to commence adversary proceedings

asserting avoidance causes of action, as well as certain causes of action where the

applicable statute of limitations has been tolled by the Bankruptcy Code during the initial

two years of these chapter 11 cases.

> 15.    Although the Debtors do not intend to pursue avoidance actions in

light of their anticipated reorganization, as a precautionary measure they must preserve

these actions in some manner.  The Debtors have explored various alternatives to filing

avoidance actions before the two-year deadline, such as executing tolling agreements with

potential defendants.  The logistical challenges of circulating and executing agreements

with such a large number of potential defendants, however, make that solution impractical.

The Debtors, therefore, must timely commence these actions or take other action in the

coming months or risk losing forever potential causes of action that should be preserved.[11]

---

[10]    By examining transactions during this reach-back period to identify potential fraudulent transfer claims
that should be preserved, the Debtors do not concede that they were insolvent, undercapitalized, or
unable to pay their debts as they became due at any time during the reach-back period.

[11]    As noted above, Delphi has been in discussions with GM on a comprehensive settlement agreement that
they anticipate incorporating into the Debtors' reorganization plan.  Because of GM's unique role in these
cases, in addition to filing a sealed complaint governed by the procedures sought in this Motion, the
Debtors request leave for the Debtors and GM to file, under seal, a stipulation that contains tolling
provisions, consistent with this Motion, and other agreements of the parties with respect to the sealed
complaint involving GM, which stipulation shall be deemed "so ordered" and shall be sealed in
accordance with the terms of the order sought herein.

16.     Once these actions have been commenced, the Debtors will proceed no further and will not use them for any purpose while they focus on confirming a reorganization plan. The procedures proposed in this Motion are designed to permit the Debtors to preserve these claims while otherwise maintaining the status quo among all parties in interest. The causes of action would remain dormant and become relevant again only in the unlikely event that the Debtors do not timely emerge from chapter 11.

### Relief Requested

17.     As set forth in the proposed order attached hereto as <u>Exhibit A</u>, the Debtors seek to implement procedures applicable to Adversary Proceedings that will permit all parties to preserve the status quo as the Debtors are finalizing preparations for confirming a reorganization plan by year's end. By this Motion, the Debtors seek the following relief:

#### Tolling Agreement

- *Approval Of Form.* The Debtors seek court approval of a form of stipulation (attached as <u>Exhibit B</u>) which would, without further order of this Court, toll the applicable statute of limitations on claims against parties with whom the Debtors seek to enter into such stipulations.

- *Intercompany Tolling.* The Debtors also seek to have this Court "deem" all Debtors to have entered into a stipulation with each of the other Debtors and affiliated non-Debtor entities.

#### Approval Of Avoidance Evaluation Procedures And Authority To Abandon Claims

- *Preference Claims Below $250,000 In Value.* The Debtors request authority to abandon these preference actions. To the extent that these actions are against insiders or involve persons or transactions associated with the SEC investigation of the Debtors, the Debtors also will be authorized to abandon those actions after notice to the Statutory Committees. If a Statutory Committee objects within 10 days after service of the notice, the Debtors may bring the matter before this Court for a ruling on whether the proposed abandonment satisfies section 554(a) of the Bankruptcy Code.

- *Select Categories Of Preference Claims.* The Debtors seek authority to abandon the following categories of preference actions: (i) payments to parties with a secured or priority interest in such payment, (ii) union dues, (iii) pension plan contributions, (iv) payments required under the terms of collective bargaining agreements, (v) payments to reimburse employee business expenses, (vi) ordinary course wages, salaries, and benefits to employees, (vii) payments required by a garnishment to satisfy third-party judgments and obligations, (viii) contributions to charitable organizations, (ix) payments to foreign suppliers, (x) payments to the Debtors' shippers, (xi) payments to the Debtors' insurance providers, and (xii) payments to the Debtors' utilities.

- *Scope Of Fraudulent Transfer Review.* The Debtors seek entry of an order directing that, for purposes of identifying and preserving potential fraudulent transfer claims, the Debtors need only review the following categories of transactions: merger and acquisition deals at or exceeding $20 million, transfers to Delphi's board of directors or strategy board members other than for compensation or ordinary-course expense reimbursement (if any), unusual securities transactions, dividend distributions to 5% shareholders, and Delphi's financially troubled supplier program.

- *Additional Authority For Abandonment After Notice To Statutory Committees.* The Debtors seek authority to abandon, after notice to the Statutory Committees, and without further order of this Court or further notice under Bankruptcy Rule 6007, claims (i) with insignificant value, (ii) where litigation costs would likely exceed expected recovery, (ii) where the potential harm to businesses outweighs expected recovery, or (iv) where valid defenses exist. If a Statutory Committee objects within 10 days after service of the notice, the Debtors may bring the matter before this Court for a ruling on whether the proposed abandonment satisfies section 554(a) of the Bankruptcy Code.

Commencement Of The Adversary Proceedings And Service Of Process

- *Deferral Of Issuance Of Summons.* The Clerk of Court would be directed by this Court to defer issuing a summons after the filing of a complaint, unless and until the Debtors intend to pursue the claims in the complaint.

- *Extension Of Fed. R. Civ. P. 4(m) Time Period.* The Debtors would have until March 31, 2008 to serve each defendant with a summons and a copy of the complaint, without prejudice to the Debtors' right to seek further extensions of the deadline.

- *Service Of Order With Summons And Complaint.* The Debtors would be required to serve a copy of any order approving this Motion upon each defendant in any adversary proceeding either if and when the Debtors serve process on the defendant or as soon thereafter as practicable.

Stay Of Adversary Proceedings Until Service Of Process And Interim Sealing

- *Activity During The Stay.* During the stay, the Debtors may (i) amend their complaint, and (ii) after notice to the Statutory Committees, dismiss it.

- *Expiration Of The Stay.* The stay would continue until the earlier of (i) service of process and (ii) further order of this Court.

- *Filing Of The Complaints Under Interim Seal.* The Debtors seek authority to file under seal paper copies (with PDF copies on appropriate electronic media) of the complaints in the adversary proceedings and to have the docket for such proceedings likewise sealed.

Basis For Relief

18.    The Debtors believe that implementing the proposed procedures would help enable the Debtors fulfill their fiduciary responsibility to preserve valuable estate assets in a manner that would not unnecessarily disrupt the plan process or the Debtors' existing business relationships with potential defendants that are necessary to the Debtors' ongoing operations.  These procedures would also reduce the administrative and economic burdens of the Adversary Proceedings on the Debtors, this Court, and potential defendants.  Most if not all of the avoidance actions will likely remain unnecessary in light of the terms of the Debtors' prospective reorganization plan.

F.    Approval Of Form Of Tolling Agreements

19.    The Debtors desire to preserve their respective rights and to continue negotiation and settlement discussions with certain parties without incurring the expense of filing complaints before the expiration of the applicable statute of limitations

period. The Debtors anticipate entering into stipulations with, among others, (i) GM,
(ii) professional firms retained by the Debtors, and (iii) insiders who received transfers
from the Debtors.

20.    Assuming that a potential defendant is willing to enter into a
stipulation extending the statute of limitations, the Debtors request authorization to enter
into such a stipulation, substantially in the form attached as <u>Exhibit B</u>. The principal terms
of the stipulation would be as follows:

- *Statute Of Limitations*: Execution of the stipulation would toll the statute of limitations provided for under sections 108 and 546(a) of the Bankruptcy Code and other applicable law.

- *Term*: The applicable statute of limitations would be extended up to and including the first business day that is nine months following the entry of an order confirming a plan, as the same may have been amended or modified before its entry (the "Tolling Period").

- *Binding Effect*: The stipulation would bind and inure to the benefit of the successors, representatives, assigns, and heirs of the parties.

- *Termination*: The Debtors or their respective successors and assigns would be permitted during the Tolling Period to commence litigation against (a) other Debtors, (b) affiliated non-Debtor entities, and (c) third parties.

- *Effective Date*: The stipulation would become effective immediately upon execution thereof.

- *Prior Court Approval*: The stipulation would be deemed "so ordered" upon execution.

21.    Allowing the Debtors to enter into the stipulations tolling the
applicable statute of limitations with respect to the claims would be the most efficient and
cost-effective means of preventing unnecessary motion practice and litigation and
preserving the Debtors' and potential defendants' respective legal rights without allowing

13

the applicable statute of limitations period to expire and without acknowledging in any way that valid claims, causes of action, or defenses thereto do or do not exist.

22.     In view of the number of potential claims and causes of action that the Debtors must preserve, obtaining Court approval for each tolling stipulation would result in burdensome administrative expenses such as the time and cost of drafting, serving, and filing separate approval pleadings and the time incurred by attorneys in preparing for, and appearing at, related hearings before this Court. Accordingly, the Debtors request authority to enter into stipulations tolling the statute of limitations with respect to the claims without seeking further Court approval.

23.     Likewise, requiring each of the 42 Debtors in these chapter 11 cases to enter into individual stipulations with each of the other Debtors would require the Debtors to execute more than 1,500 stipulations. Execution of stipulations between the Debtors and affiliated non-Debtor entities would add hundreds more. Obviously, such actions and the costs and expenses associated therewith are unnecessarily burdensome and time-consuming in light of the related nature of the claims. Accordingly, the Debtors also seek an order that "deems" them to have entered into a stipulation with each of the other Debtors and affiliated non-Debtor entities.

G.     Approval Of Avoidance Evaluation Procedures And Authority To Abandon Certain Causes Of Action

24.     The Debtors request approval of their proposed criteria for reviewing, evaluating, and selecting those potential causes of action that should be preserved in accordance with the procedures discussed herein. These criteria strike a sensible balance between the Debtors' duty to preserve valuable estate assets and the

14

extraordinary costs to preserve then when, as here, there is little chance that the Debtors

will prosecute any of the thousands of actions it will be commencing.

### Preference Claims Below $250,000 In Value

25.    In particular, the Debtors seek authority not to pursue any preference

action against an entity if the aggregate value of transfers to or for the benefit of that entity

is less than $250,000 in value.  Although this threshold would eliminate 9,894 of 11,544

potential preference recoveries, the aggregate amount eliminated would be merely 4.5% of

the billions in total potential preferential transfers (before taking into account potential

preference defenses).  By focusing on the 1,650 entities which benefited from transfers of

$250,000 or more, the Debtors would preserve billions in potential claims (before defenses

are considered) while saving the estates from incurring significant legal and other costs and

avoiding any disruption to commercial relationships and the Debtors' efforts to emerge

from chapter 11.  If the preference action is against an insider or involves a person or

transaction associated with the SEC investigation of the Debtors, then the Debtors would

be authorized to abandon such actions after notice to the Statutory Committees.  If a

Statutory Committee objects within 10 days after service of the notice, the Debtors propose

that they would bring the matter before this Court for a ruling on whether the proposed

abandonment satisfies section 554(a) of the Bankruptcy Code.

### Select Categories Of Preference Claims

26.    In addition, the Debtors seek authority to abandon the following

categories of potential preference actions which the Debtors, in their business judgment,

have decided should not be pursued:  (i) payments to parties with a secured or priority

interest in such payment, (ii) union dues, (iii) pension plan contributions, (iv) payments required under the terms of collective bargaining agreements, (v) payments to reimburse employee business expenses, (vi) ordinary course wages, salaries, and benefits to employees, (vii) payments required by a garnishment to satisfy third-party judgments and obligations, (viii) contributions to charitable organizations, (ix) payments to foreign suppliers, (x) payments to the Debtors' shippers, (xi) payments to the Debtors' insurance providers, and (xii) payments to the Debtors' utilities.

<u>Scope Of Fraudulent Transfer Review</u>

27.    As noted above, potential fraudulent transfer claims are likely subject to a six-year reach-back period during which the Debtors engaged in hundreds of thousands of transactions, the vast majority of which indisputably involved the Debtors' receipt of reasonably equivalent value or involved amounts that do not warrant the mammoth undertaking of examining each and every transaction. To balance the need for a review of transactions effected during the reach-back period and avoiding unnecessary costs, the Debtors propose to identify and review all business or asset acquisition or divestiture transactions that equal or exceed $20 million in value. This would include a review of whether the Debtors followed their own internal procedures for the transaction and, as necessary, interviews with managers to follow up on any issues identified during the review process.

28.    The Debtors also would review (i) certain transfers to insiders, including payments or indemnifications to current and former members of the Delphi Board of Directors and of the Delphi Strategy Board other than for compensation or

ordinary-course expense reimbursement (if any), (ii) large or unusual securities

transactions (if any) such as large capitalizations or recapitalizations, derivatives, foreign

currency, hedging transactions, or commercial paper transactions, (iii) all dividend

distributions to 5% shareholders, and (iv) the financially troubled supplier program.  As

discussed below, the Debtors would enter into tolling agreements for all intercompany

transactions that involve a Debtor or insiders of a Debtor.

29.    The Debtors request authority to abandon the causes of action

described above in accordance with the proposed procedures, without the need for any

further order or any further notice under Bankruptcy Rule 6007(a).

<u>Additional Authority To Abandon</u>

30.    With respect to other categories of causes of action, the Debtors

anticipate that during their review they may identify additional causes of action which, in

the exercise of their reasonable business judgment, should not be pursued.  The Debtors

seek approval for the abandonment of those causes of action which the Debtors determine,

upon completion of their review and after notice to counsel to the Statutory Committees,

(i) are of insignificant value to the estates, (ii) would impose costs in excess of the value of

any reasonably expected recovery, (iii) could pose other potential harm to the Debtors'

businesses that would outweigh the expected recovery value, or (iv) with respect to which

the Debtors believe the defendants would have valid defenses.

31.    If a Statutory Committee objects within 10 days after service of the

notice, the Debtors may bring the matter before this Court for a ruling on whether the

proposed abandonment satisfies section 554(a) of the Bankruptcy Code.

17

<u>Preservation Of The Debtors' Rights Under 11 U.S.C. § 502(d)</u>

32.    Although the Debtors are proposing to abandon certain avoidance

causes of action, the Debtors have decided to abandon them based, in part, on their

determination that they will have a right to use the avoidance claim liability to seek the

disallowance of claims asserted against the estates, as permitted by section 502(d) of the

Bankruptcy Code. Under that section, the Debtors may seek to preclude a creditor subject

to an avoidance cause of action from asserting a claim against the estate as long as the

creditor remains in possession of, or otherwise obtains the benefit of, the avoidable claim

or transfer.[12]

H.    <u>Extending Time For Service Of Process</u>

33.    Fed. R. Civ. P. 4(m), made applicable here by Bankruptcy

Rule 7004(a)(1), requires this Court either to dismiss without prejudice any adversary

proceeding for which the summons and complaint are not served on the defendant within

120 days of the filing of the complaint or direct that service be effected within a specified

time, unless the plaintiff in the adversary proceeding can show good cause for extending

the 120-day period.  The Debtors request an extension of the time within which the

Debtors must serve the summonses and complaints to March 31, 2008[13]—less than 60 days

beyond the initial 120-day deadline.  The Debtors seek the extension to preserve the status

---

[12]    In light of an appellate ruling from this district, <u>United States Lines, Inc. v. U.S.</u> (In re McLean Indus.),
196 B.R. 670, 675-77 (S.D.N.Y. 1996) (Cote, J.), <u>aff'g</u> 184 B.R. 10 (Bankr. S.D.N.Y. 1995) (Blackshear,
J.), and this Court's prior ruling, <u>In re Metiom, Inc.</u>, 301 B.R. 634, 641 (Bankr. S.D.N.Y. 2003), that
section 502(d) may continue to be used defensively after an action on the underlying avoidance action
has become time-barred, the Debtors have concluded that no affirmative relief with respect to this
Motion is required to preserve the Debtors' ability to use 502(d) defensively.  The Debtors
expressly reserve all rights with respect to section 502(d).

[13]    March 31, 2008 is the current deadline for closing under the Delphi-Appaloosa EPCA.  <u>See</u>
Section 12(d)(iii).

quo and to avoid having to force all potential defendants to retain counsel to defend against
adversary proceedings when, in fact, most of them likely will be resolved by a
reorganization plan and never pursued. The Debtors propose the following procedures
concerning the commencement of the Adversary Proceedings and service of process:

- *Deferral Of Issuance Of Summons.* The Clerk of Court would be directed by this Court to defer issuing a summons after the filing of a complaint filed in accordance with these procedures, unless and until the Debtors notify the Clerk of Court that they intend to litigate the claims alleged in the complaint.

- *Extension Of Fed. R. Civ. P. 4(m) Time Period.* The Debtors would have until March 31, 2008 to serve each defendant with a summons and a copy of the complaint, without prejudice to the Debtors' right to seek further extensions of the deadline.

- *Service Of Order With Summons And Complaint.* The Debtors would be required to serve a copy of any order approving this Motion upon each defendant in any Adversary Proceeding either when the Debtors serve the summons and complaint on the defendant or as soon thereafter as practicable.

34. These procedures would permit the Debtors to preserve potentially valuable assets without disrupting the plan process or existing business relationships prematurely or prejudicing the rights of any defendants.

I.   Stay Of Adversary Proceedings Until Service Of Process

35. For the same reasons that the Debtors seek an extension of their time to serve potential defendants with process, the Debtors also request that the Adversary Proceedings filed pursuant to the proposed procedures be temporarily stayed, without prejudice to the Debtors' right to amend their complaints during the stay. Under the proposed procedures, the Debtors also would be authorized to file, without further order of this Court, a notice of dismissal of the Adversary Action in accordance with Bankruptcy

19

Rule 7041 and Fed. R. Civ. P. 41(a) if it is decided that the Adversary Action should not be

pursued after notice to the Statutory Committees or as otherwise provided in a plan of

reorganization or confirmation order. If a Statutory Committee objects within 10 days

after service of the notice, the Debtors request that they be permitted to bring the matter

before this Court for a ruling on whether the proposed dismissal satisfies section 554(a) of

the Bankruptcy Code. The stay would be lifted upon the Debtors' service of the summons

and complaint, without further order of this Court.

J.    Filing Of The Complaints Under Seal

36.    Maintaining the status quo would also be promoted by permitting

the filing of the complaints under seal. Once filed, the actions would remain dormant. The

Debtors do not intend to prosecute the actions while pursuing plan confirmation. Sealing

the complaints will keep the actions inactive and would be consistent with the Debtors'

intention to de-link the sealed adversary proceedings from all other activity in these

chapter 11 cases and to prevent their use for any purpose by any party. Thus, sealing

should promote the plan process and avoid needless costs relating to actions that remain

unnecessary under the Debtors' prospective plan.

37.    Moreover, sealing the actions would avoid unnecessarily alarming

potential defendants. The Debtors have worked to preserve and repair their business

relationship with many of the potential defendants during these cases and have negotiated

or regained favorable credit terms with many suppliers and are continuing to do so. The

Debtors are also engaged in negotiations with some of the potential defendants on issues

unrelated to avoidance actions.

38.    To enable the Debtors to preserve these potential causes of action, yet allow the Debtors to continue to implement their transformation plan and to promptly develop, negotiate, prosecute, confirm, and consummate a plan of reorganization, the Debtors seek authorization to file under seal paper copies (along with discs containing complaints in PDF format) of the complaints filed in each Adversary Proceeding against the potential defendants under seal. The Debtors also request that the case docket for any adversary proceedings initiated by the complaints likewise be sealed and not available for public access. The Debtors will coordinate with the Clerk to ensure an efficient, cost-effective approach to filing under seal the numerous actions contemplated by this Motion.

<u>Applicable Authority</u>

39.    This Court has broad statutory authority to approve the relief requested in this Motion. The Court may "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code, this Court has expansive equitable powers to fashion any order or decree that is in the interest of preserving or protecting the value of the debtor's assets. <u>See</u> <u>Schwartz v. Aquatic Dev. Group, Inc.</u> (In re Aquatic Dev. Group, Inc.). 352 F.3d 671, 673 (2d Cir. 2003) (Straub, J., concurring) (quoting <u>In re Momentum Mfg. Corp.</u>, 25 F.3d 1132, 1136 (2d Cir. 1994) ("[I]t is axiomatic that bankruptcy courts are 'courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.'"); <u>Bird v. Crown Convenience</u> (In re NWFX, Inc.). 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy . . . is that equitable principles govern.") (citations omitted); <u>In</u>

re Cooper Properties Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986)

("[T]he Bankruptcy Court is one of equity and as such it has a duty to protect whatever

equities a debtor may have in property for the benefit of its creditors as long as that

protection is implemented in a manner consistent with the bankruptcy laws.").  Likewise,

this Court has "exclusive jurisdiction of all the property, wherever located, of the debtor as

of the commencement of [its] case, and of property of the estate,"  28 U.S.C. § 1334(e),

and causes of action generally constitute property of a debtor's estate.  See, e.g., Citicorp

Acceptance Co. v. Robison (In re Sweetwater), 884 F.2d 1323, 1326 (10th Cir. 1989).

K.    Approval Of Form Of Tolling Agreements

        40.    The two-year deadline imposed by section 546(a) can be waived or

extended by agreement of the non-debtor party to the action.  See In re Rodriguez, 283

B.R. 112, 114 (Bankr. E.D.N.Y. 2001); Pugh v. Brook (In re Pugh), 158 F.3d 530, 532-38

(11th Cir. 1998); McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.), 52 F.3d 1330,

1337-38 (5th Cir. 1995); Brandt v. Gelardi (In re Shape, Inc.), 138 B.R. 334, 337 (Bankr.

D. Me. 1992) (plain reading of statute and legislative history support determination that

section 546(a) is statute of limitations, waivable either by stipulation or failure to assert it

as defense in answer, rather than jurisdictional provision, which is not subject to expansion

by court order or otherwise); In re Iron-Oak Supply Corp., 162 B.R. 301, 307 (Bankr. E.D.

Cal. 1993) (rejecting argument that section 546(a)(1) is statute of repose); In re M & L

Bus. Machs. Inc., 153 B.R. 308, 311 (D. Colo. 1993) aff'd, 160 B.R. 850 (D. Colo. 1993)

(section 546 limitations period is not jurisdictional but is waivable and subject to equitable

tolling); see also Cepa Consulting Ltd. v. New York Nat'l Bank (In re Wedtech), 187 B.R.

105, 110-11 (S.D.N.Y. 1995) (treating section 546(a) as a non-jurisdictional statute of

22

limitation that must be raised by opposing party in a timely fashion). But see Martin v.

First Nat'l Bank of Louisville (In re Butcher), 829 F.2d 596, 599-600 (6th Cir. 1987)

(characterizing section 546(a) as "jurisdictional" or "substantive" statute of limitations, not

subject to expansion by Bankruptcy Rule 9006(a) requiring that Saturday and Sunday be

excluded in computing two-year limitations period). The Debtors should therefore be

authorized to enter into stipulations tolling all applicable statutes of limitations.

L.    Approval Of Avoidance Evaluation Procedures And Authority To Abandon Certain
      Causes Of Action

41.    The Bankruptcy Code expressly authorizes a debtor to abandon

property of the estate that it determines is burdensome or of inconsequential value.

11 U.S.C. § 554. Specifically, section 554 of the Bankruptcy Code provides: "After notice

and a hearing, the trustee may abandon any property of the estate that is burdensome to the

estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a). In

determining the value and benefits of particular property for purposes of the decision to

abandon the property, the debtor is afforded significant discretion. See, e.g., In re

Interpictures, Inc., 168 B.R. 526, 535 (Bankr. E.D.N.Y. 1994) ("courts have placed the

burden of proving an abuse of discretion of the trustee's action or inaction on abandonment

on the party seeking to make the trustee act"); In re Slack, 290 B.R. 282, 284 (Bankr.

D.N.J. 2003) ("Courts defer to the trustee's judgment and place the burden on the party

opposing the abandonment to prove a benefit to the estate and an abuse of the trustee's

discretion."); In re Cult Awareness Network, Inc., 205 B.R. 575, 579 (Bankr. N.D. Ill.

1997) (decision to abandon property "must rest on a reasonable basis"). This Court need

only ensure that the decision to abandon "reflects a business judgment made in good faith."

Cult Awareness Network, 205 B.R. at 579.[14]

42.      Notwithstanding abandonment, the failure to file a complaint by the

two-year deadline set forth in section 546(a) of the Bankruptcy Code does not prevent the

Debtors from later using section 502(d) defensively.  Section 502(d) provides, in pertinent

part, as follows:

> the court shall disallow any claim of any entity from which property
> is recoverable under section 542, 543, 550, or 553 of this title or that
> is a transferee of a transfer avoidable under section 522(f), 522(h),
> 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or
> transferee has paid the amount, or turned over any such property, for
> which such entity or transferee is liable under section 522(i), 542,
> 543, 550, or 553 of this title.

11 U.S.C. § 502(d).

43.      Courts applying section 502(d) of the Bankruptcy Code have barred

any and all claims asserted by creditors who are in receipt of avoidable transfers, unless the

creditor first repays the amount of the avoidable transfer to the debtor's estate.  See, e.g.,

Glinka v. Murad (In re Housecraft Indus. USA, Inc.), 310 F.3d 64, 72 n.8 (2d Cir. 2002);

Germain v. Conn. Nat'l Bank, 988 F.2d 1323, 1327 (2d Cir. 1993); In re Centennial

Textiles, Inc., 209 B.R. 31, 33 (Bankr. S.D.N.Y. 1997).  Further, this Court, as well as

other courts in the Southern District of New York and elsewhere, has specifically held that

the section 502(d) defense may be asserted after the expiration of the two-year statute of

limitations set forth in section 546(a)(1) of the Bankruptcy Code.  See In re Metiom, Inc.,

---

[14]    Similar relief was granted in In re Safety-Kleen Corp., No. 00-2303 (PJW) (Bankr. D. Del. May 17,
2002.  See Order (I) Establishing Omnibus Filing And Pretrial Procedures For Certain Adversary
Proceedings, Including Adversary Proceedings Under 11 U.S.C. § 544, 545, 547, 548 Or 550. And
(II) Granting Authority To Abandon Certain Causes Of Action.) (Docket No. 4108).

301 B.R. 634, 641 (Bankr. S.D.N.Y. 2003) (Drain, J.); see also United States Lines, Inc. v.

U.S. (In re McLean Indus.), 196 B.R. 670, 675-77 (S.D.N.Y. 1996) (Cote, J.); In re Asia

Global Crossing, Ltd., 344 B.R. 247, 251 (Bankr. S.D.N.Y. 2006) (Bernstein, J.); In re Mid

Atl. Fund, Inc., 60 B.R. 604, 609-11 (Bankr. S.D.N.Y. 1986) (Abram, J.); El Paso City v.

Am. W. Airlines, Inc. (In re Am. West Airlines, Inc.), 217 F.3d 1161, 1167 (9th Cir. 2000);

cf. Comm. of Unsecured Creditors v. Commodity Credit Corp. (In re KF Dairies, Inc.), 143

B.R. 734, 736-38 (B.A.P. 9th Cir. 1992) (permitting section 502(d) defense after expiration

of section 549 statute of limitations). But see In re Marketing Assocs. of Am., 122 B.R.

367, 369 (Bankr. E.D. Mo. 1991) (holding that "the Trustee may not use section 502(d)

defensively").

     44.     Here, the Debtors have proposed reasonable criteria and procedures

for determining which avoidance claims should be preserved and which causes of action

the Debtors should be authorized to abandon. Accordingly, the Debtors seek approval of

these procedures.[15]

M.     Extending Time For Service Of Process

     45.     The Bankruptcy Rules and Federal Rules of Civil Procedure grant

this Court discretion to adopt and implement guidelines, such as those proposed herein,

that will aid in the administration of adversary proceedings. Bankruptcy Rule 9006(b)(1)

---

[15]  Similar relief was granted in In re Service Merchandise, et al., Case No. 399-02649 (Bankr. M.D. Tenn.
Mar. 21, 2001) (Paine, J.), where the bankruptcy court authorized the debtors to abandon claims against
critical vendors. See Order Authorizing Abandonment And/Or Stay Of Certain Estate Causes Of Action
And For Related Relief. The bankruptcy court also authorized the debtors to abandon four categories of
claims: (i) claims less than $5,000, (ii) payments of rent to landlords, (iii) customer refunds, and
(iv) ordinary course reimbursements to employees. See Order (i) Establishing Omnibus Initial Filing
And Pretrial Procedures For Adversary Proceedings Under 11 U.S.C § 544, 545, 547, 548, Or 553 And
Certain Adversary Proceedings, (ii) Granting Authority, Pursuant to Fed. Bankr. R. P. 9019, To
Compromise And Settle Such Actions, And (iii) Granting Authority To Abandon Certain De Minimis
Claims And Causes Of Action dated February 27, 2001.

provides for the enlargement of time to perform acts required under the Bankruptcy Rules.[16] As previously discussed, Fed. R. Civ. P. 4(m) requires the court to extend the period for service of process after the filing of a complaint upon a showing of good cause. Even absent good cause, this Court has discretion to extend the 120-day service period. Mejia v. Castle Hotel, Inc., 164 F.R.D. 343, 345 (S.D.N.Y. 1996).

      46.     Here, the Debtors request an extension to March 31, 2008, an extension of less than 60 days. By permitting the Debtors to timely file the Adversary Proceedings but to defer serving process on defendants, the procedures would enable the Debtors to preserve valuable business relationships and to continue developing a plan of reorganization. The Debtors submit that permitting the Debtors to preserve potentially valuable assets without prejudicing the rights of any defendant constitutes good cause for the requested extension.[17]

N.    Stay Of Adversary Proceedings Until Service Of Process

      47.     "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." Landis v. North American Co., 299 U.S. 248, 254 (1936); see also Air Line Pilots Ass'n v. Miller, 523 U.S. 866, 879 n.6 (1998). This inherent power is vested in bankruptcy courts as well. See Uni-Rty Corp. v.

---

[16]    Bankruptcy Rule 9006(b)(1) provides in relevant part as follows: "[W]hen an act is required or allowed to be done at or within a specified period by these rules or by a notice given thereunder or by order of court, the court for cause shown may at any time in its discretion . . . order the period enlarged if the request therefor is made before the expiration of the period originally prescribed or as extended by a previous order . . . ." Fed. R. Bankr. P. 9006(b)(1).

[17]    Similar relief was granted in In re Ames Dep't Stores, Inc., No. 01-42217 (REG) (Bankr. S.D.N.Y. Feb. 3, 2004). See Order Extending Time For Service Of Process With Respect To Certain Preference Actions (Docket No. 2524).

Guangdong Building, Inc. (In re Uni-Rty Corp.), No. 96 Civ. 4573 (DAB), 1998 WL

299941, at *7 (S.D.N.Y. 1998) (recognizing that bankruptcy courts possess inherent

authority to stay proceedings); In re Hagerstown Fiber Ltd. P'ship, 277 B.R. 181, 199

(Bankr. S.D.N.Y. 2002) (court has inherent power to stay proceedings before it,

particularly where stay will promote judicial economy); In re Cleveland, 353 B.R. 254, 260

(Bankr. E.D. Cal. 2006) (staying adversary proceeding pursuant to court's inherent power

to stay proceedings before it); Swift v. Bellucci (In re Bellucci), 119 B.R. 763, 770 (Bankr.

E.D. Cal. 1990) ("a bankruptcy court has the inherent power to control its docket,

including controlling the timing of proceedings on that docket"). The determination

whether a stay of proceedings is appropriate "calls for the exercise of judgment, which

must weigh competing interests and maintain an even balance." Landis. 299 U.S. at 248,

254-55. The party seeking the stay "bears the burden of demonstrating the wisdom and

justice of a stay." John's Insulation, Inc. v. Siska Const. Co., Inc., 671 F. Supp. 289. 297

(S.D.N.Y. 1987). "[T]he basic goal [is] to avoid prejudice." Volmar Distributors v. New

York Post Co., 152 F.R.D. 36, 39 (S.D.N.Y. 1993).[18]

48.    Here, for essentially the same reasons that the Debtors have

articulated for deferring issuance of summonses and service of legal process, this Court

should likewise stay the proceedings while the Debtors pursue plan confirmation. The stay

will not prejudice the potential defendants. In fact, the potential defendants will benefit

from the stay inasmuch as they will not need to expend time or resources investigating the

---

[18]    The Volmar court articulated the following factors that may guide a court's exercise of its inherent
power: "(1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as
balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the
defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation;
and (5) the public interest." Id. at 39.

facts relating to, or defending, a lawsuit that the Debtors likely will never need to pursue.

Under these circumstances, this Court should stay each proceeding unless and until the

Debtors request the Clerk of Court to issue summons in that particular proceeding.[19]

O.      Filing Of The Complaints Under Seal

        49.     Section 107 of the Bankruptcy Code provides bankruptcy courts

with the power to issue orders that will protect entities from potential harm that may result

from the disclosure of certain confidential information.  Section 107(b)(1) of the

Bankruptcy Code specifically provides in part as follows: "On request of a party in interest,

the bankruptcy court shall . . . protect an entity with respect to a trade secret or confidential

research, development, or commercial information . . . ."  11 U.S.C. § 107(b)(1).

        50.     The Second Circuit has held that section 107(b) of the Bankruptcy

Code and Rule 9018 of the Bankruptcy Rules do "not require that commercial information

be the equivalent of a trade secret before protecting such information." Video Software

Dealers Ass'n v. Orion Pictures Corp.  (In re Orion Pictures Corp.), 21 F.3d 24, 28 (2d Cir.

1994).  Indeed, other courts in this district have stated that it "is required to grant that relief

upon the motion of a party in interest, assuming the information is of the type listed in

section 107(b)." In re Global Crossing Ltd., 295 B.R. 720, 723 n.7 (Bankr. S.D.N.Y. 2003)

(citing Video Software, 21 F.3d at 27).  In addition, the Second Circuit has held that a

party seeking the sealing of information is required only to show that the information is

confidential and commercial, and no showing of "good cause" is necessary.  See Video

---

[19]     Similar relief was granted in In re Service Merchandise, Case No. 399-02649 (Bankr. M.D. Tenn.
         Mar. 21, 2001), where the bankruptcy court granted the debtors authority to stay certain adversary
         proceedings while the debtors were continuing to investigate whether they would ultimately pursue
         them.  See Order Authorizing Abandonment And/Or Stay Of Certain Estate Causes Of Action And For
         Related Relief.

Software, 21 F.3d at 28. Thus, a bankruptcy court may enter a sealing order under the broad confidentiality protections in bankruptcy proceedings where necessary to protect confidential information. Id.; see also Global Crossing, 295 B.R. at 725 (The "whole point of [Bankruptcy Rule 9018] is to protect business entities from disclosure of information that could reasonably be expected to cause the entity commercial injury.").

51.    Upon the request of a party in interest, a court has no discretion and must deny public access to information that falls within one of the categories under Bankruptcy Code section 107(b). Orion Pictures Corp., 21 F.3d at 27. If, however, the information to be protected does not fit into any of the specified categories, then the court has discretion to decide if the requesting party has shown cause to permit filing under seal. See In re Bennett Funding Group. Inc., 226 B.R. 331, 336 (Bankr. N.D.N.Y. 1998) (citing Nixon v. Warner Communications. Inc., 435 U.S. 589, 599 (1978)); Orion Pictures Corp., 21 F.3d at 27 ("In limited circumstances, courts must deny access to judicial documents").

52.    The power to seal also arises from the inherent power of the court to control dissemination of its records. See In re Robert Landau Assocs., Inc. 50 B.R. 670, 676, 677 (Bankr. S.D.N.Y. 1985) (court's inherent power to seal, despite section 107(b)'s inapplicability, is implicit in section 704(7)'s exception to disclosure—"unless the court orders otherwise"); In re I.G. Servs. Ltd., 244 B.R. 377, 388 n.14 (Bankr. W.D. Tex. 2000) (concluding that if section 107 applied to records not filed with court, court still had power to control dissemination of information beyond scope of section 107), rev'd on other grounds sub nom. San Antonio Express-News v. Blackwell (In re Blackwell). 263 B.R. 505 (W.D. Tex. 2000): In re Apex Oil Co.. 101 B.R. 92, 101-02 (Bankr. E.D. Mo. 1989)

29

(citing Robert Landau Assocs.); In re EPIC Assocs. V, 54 B.R. 445, 450 (Bankr. E.D. Va.
1985) (exercising inherent supervisory power over its own records and files). When
deciding to allow a debtor to file documents under seal, courts should look at all relevant
facts and circumstances and weigh the competing interests of the debtor seeking protection
with the general right of the public to access documents filed in a bankruptcy case.
Bennett Funding, 226 B.R. at 336. Relevant factors include (1) whether the debtor will
suffer irreparable harm if the information is disclosed, (2) whether the debtor can
demonstrate that disclosure will have a negative impact on its estate such that the debtor
would be at a disadvantage in comparison with competitors, and (3) whether the debtor is
seeking to protect the information on a temporary basis or on a permanent basis. See
generally In re Hemple, 295 B.R. 200, 202 (Bankr. D. Vt. 2003).

     53.     The circumstances of this case demonstrate the need for
confidentiality to preserve the status quo and to avoid unnecessary harm to the Debtors and
others that would be caused by filing these complaints publicly.[20]

*     *     *

     54.     In light of the benefits that the relief requested would provide to the
Debtors, defendants in Adversary Proceedings, and other stakeholders, and given the

---

[20]    Similar relief was granted in In re Service Merchandise, et al., Case No. 399-02649 (Bankr. M.D. Tenn.
Feb. 27, 2001), the bankruptcy court granted the debtors authority to file under seal certain adversary
proceedings so that the debtors could continue negotiations with defendants, who were also the debtors'
business partners. and to ensure that such defendants continued doing business with the debtors. See
Order (i) Establishing Omnibus Initial Filing And Pretrial Procedures For Adversary Proceedings Under
11 U.S.C § 544. 545. 547. 548. Or 553 And Certain Adversary Proceedings. (ii) Granting Authority,
Pursuant to Fed. Bankr. R. P. 9019. To Compromise And Settle Such Actions. And (iii) Granting
Authority To Abandon Certain De Minimis Claims And Causes Of Action (permitting debtor to file
documents under seal in any adversary proceeding in which debtors also sought to stay the proceeding).

30

authority in support of such relief, the Debtors believe that entry of the proposed order is justified and appropriate.

### Notice Of Motion

55.    Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883) (the "Supplemental Case Management Order"), and the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered October 26, 2006 (Docket No. 5418) (together with the Supplemental Case Management Order, the "Case Management Orders").[21] In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

### Memorandum Of Law

56.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

---

[21]    In addition to giving notice in accordance with the Case Management Orders, the Debtors will describe the relief obtained through this Motion in their disclosure statement for the Debtors' plan of reorganization.

WHEREFORE the Debtors respectfully request that this Court enter an

order (i) granting the Motion and (ii) granting them such other and further relief as is just.

Dated:   New York, New York
         August 6, 2007

                              SKADDEN, ARPS, SLATE, MEAGHER
                              & FLOM LLP

                    By:   /s/ John Wm. Butler, Jr.
                          John Wm. Butler, Jr. (JB 4711)
                          George N. Panagakis (GP 0770)
                          Ron E. Meisler (RM 3026)
                    333 West Wacker Drive, Suite 2100
                    Chicago, Illinois 60606
                    (312) 407-0700

                              - and -

                    By:   /s/ Kayalyn A. Marafioti
                          Kayalyn A. Marafioti (KM 9632)
                          Thomas J. Matz (TM 5986)
                    Four Times Square
                    New York, New York 10036
                    (212) 735-3000

                    Attorneys for Delphi Corporation, et al.,
                    Debtors and Debtors-in-Possession