**FOX ROTHSCHILD LLP**

Midtown Building, Suite 400
1301 Atlantic Avenue
Atlantic City, NJ  08401
Michael J. Viscount, Jr. (Admitted *pro hac vice*)
Brian R. Isen (*Pro hac vice* pending)
Tel: (609) 348-4515

      -and-

100 Park Avenue, 15th Floor
New York, NY 10017
Fred Stevens
Tel: (212) 878-7905

*Attorneys for M&Q Plastic Products, LP*

**Hearing Date:  July 22, 2010 at 10:00 a.m.**
**Objection Deadline:  June 7, 2010 at 4:00 p.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DPH HOLDINGS CORP., et  al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |

----------------------------------------------------------x

| | | |
|---|---|---|
| DELPHI CORPORATION, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Adv. Pro. No. 07-02743 (RDD) |
| vs. | : | |
| | : | |
| M&Q PLASTIC PRODUCTS AND | : | |
| M AND Q PLASTIC PRODUCTS., | : | |
| | : | |
| Defendants. | : | |

----------------------------------------------------------x

**MOTION OF M&Q PLASTIC PRODUCTS L.P. SEEKING AN ORDER (I)
DISMISSING THE COMPLAINT WITH PREJUDICE; (II) VACATING CERTAIN
PRIOR ORDERS PURSUANT TO FED. R. CIV. P. 60 AND FED R. BANKR. P. 9024;
AND (III) IN THE ALTERATIVE, REQUIRING A MORE DEFINITE STATEMENT**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

M&Q Plastic Products L.P., purported defendant in the above-captioned adversary proceeding ("Defendant" or "M&Q")[1], by and through its counsel, Fox Rothschild LLP, as and for its motion (the "Motion"), for an order (i) dismissing with prejudice the plaintiff's (the "Plaintiff") complaint commencing this action (the "Complaint"), (ii) vacating certain prior orders pursuant to Fed. R. Civ. P. 60, made applicable by Fed. R. Bankr. P. 9024, and (iii) in the alternative, requiring a more definitive statement of the claims asserted in the Complaint, respectfully states as follows:

## PRELIMINARY STATEMENT

1.      This is a very big bankruptcy case.  At the time it was filed in 2005, it was one of the largest bankruptcy cases ever filed.  It involved a large company that was critical to the efficient functioning of the worldwide automobile industry.  A disruption at Delphi (defined below) would disrupt automobile assembly in the US and elsewhere, which as we have seen since 2008 would have had a negative systemic impact on developed and developing economies worldwide.  It was also a very complicated bankruptcy case.  Because of the size of Delphi, there were hundreds of thousands of creditors and other parties in interest effected by the filing.  On a daily basis, starting only hours after the filing on a Saturday night, there have been numerous pleadings filed seeking some form or another of relief.  There were 8 bridge orders signed over the weekend of the filing and at least 55 filings before the court opened on Monday morning, October 10, 2005, of which 44 were first day motions seeking some form of immediate relief effecting the rights of thousand of interested parties.  To date, there are over 20,000 filings

---

[1] As will be discussed, *infra,* Defendant M&Q Plastic Products L.P. sold its operating assets to a third party and ceased doing business in early 2008.  The remaining assets of the Defendant were placed into a liquidating trust effective September 2009, and the company and its sole partners have each filed certificates of termination in the jurisdictions of their respective formations.

2

shown on the docket of the Bankruptcy Case.  Surely, this has not been an easy case to manage

by the Court, the Debtors or the multitudes of creditors and others who have dealt with Delphi or

been effected by its operations and other activities before and since the filings.  It is in this

context that M&Q asks the Court for relief in connection with a $6.6 million lawsuit brought

against it based upon a preference theory involving purchase and sale transactions that took place

almost 5 years ago.

2.      In or about September 2007, Delphi Corporation, *et al.*, debtors in the above

captioned chapter 11 bankruptcy cases (hereinafter interchangeably referred to as the "Debtors"

or "Delphi") devised a plan to file over 700 adversary proceedings under seal and unilaterally

extend a statute of limitations.  The sealed Complaint (Adv. Docket No. 7)[2] sought to avoid and

recover over $6.6 million in alleged preferential transfers purportedly made by one or more of

the Debtors to M&Q.  The Debtors provided ***no notice*** to M&Q that it had filed the Complaint

nor that it had done so only after seeking leave to initiate the matter secretly, under seal.  On

March 12, 2010, ***4 ½ years*** after the alleged preferential transfers were purportedly made (more

than twice the time afforded under the applicable statute of limitations for commencing such

actions), Delphi (then operating as the "Reorganized Debtors" and after a name change to "DPH

Holding Corp.")[3], finally unsealed and served M&Q with the secret Complaint.

3.      During this lengthy time period, while Delphi intentionally hid its intent to pursue

avoidance actions from M&Q (and other defendants), M&Q and its owners ceased doing

business, and formed a liquidating trust, which has been administering M&Q's few remaining

assets after a sale of M&Q's business in March of 2008.  Because Delphi failed to give proper

---

[2] References to "Adv. Docket" are to the Docket of this Adversary Proceeding and reference to the "Docket" are to the Docket of the Bankruptcy Case.
[3] As used herein, the term "Delphi" shall include the Debtors and the Reorganized Debtors (now called DPH Holding Corp.)

AC1 912053v8 05/14/10

notice of this Adversary Proceeding, M&Q was not aware of the need to (i) take special steps to organize and preserve its accounting and the records of transactions with Delphi, all of which must now be reconstructed from otherwise available information, including that in the possession and control of the third party purchaser of M&Q's assets and the third party purchaser of the assets of Delphi[4], (ii) hold exit interviews with employees who were knowledgeable about the Delphi business relationships prior to M&Q's liquidation, or (iii) make arrangements to keep in touch with those former employees to provide litigation information or serve as third party witnesses.

4.      Despite this clear prejudice, Delphi contends that it may, nonetheless, proceed against M&Q – 2 ½ years after the statute of limitations has expired and 4 ½ years after the alleged preference payments were made – because it obtained, *again without any notice to M&Q*, four unilateral extensions of its statutory time to serve its secretly-filed Complaint (collectively, the "Extension Orders").  It is clear that the only reason Delphi wished to maintain these avoidance actions was to create a fund to pay the professional fees and other administrative expenses in the Chapter 11 case in the event that the entire restructuring effort failed, which unfortunately, is exactly what happened.

5.      Delphi is mistaken.  The vacation of the Extension Orders is mandated by the fact that, if Delphi's improper actions are allowed to stand, Delphi will have orchestrated a process that will, for all practical purposes, eviscerate the purpose and intent of the two-year statute of limitations imposed by 11 U.S.C § 546(a), effectively extending the Congressionally-mandated statute of limitations by over two years.

---

[4] It is the understanding and belief of M&Q that the Reorganized Debtors have no assets other than litigation claims, no operations other than administration of the wind down of the bankruptcy estate, and no personnel involved in the wind down other than possibly one former employee of Delphi and the lawyers representing the Reorganized Debtors.

AC1 912053v8 05/14/10

6.      The Extension Orders were also obtained by Delphi without regard to the most fundamental notions of procedural due process – the right of notice and an opportunity to be heard.  Because the Supreme Court and the Second Circuit have both held that orders issued in violation of due process are void (*i.e.,* a legal nullity), the Extension Orders must be vacated with respect to M&Q.

7.      In addition, M&Q adopts and joins the motions made by a number of other preference defendants, including, but not limited to, Wagner-Smith Company, dated February 5, 2010 (Bankruptcy Docket No. 19401), Danobat Machine Tool Co. Inc., dated March 11, 2010 (Adv. Pro. No. 07-02250, Bankruptcy Docket No. 12), Microchip Technology Incorporated, dated March 15, 2010 (Adv. Pro. No. 07-02436, Bankruptcy Docket No. 10), Hewlett Packard, *et. al.,* dated April 9, 2010 (Adv. Pro. No. 07-02499, Bankruptcy Docket Nos. 16 & 17), EDS, *et. al.,* dated April 9, 2010 (Adv. Pro. No. 07-02262, Bankruptcy Docket Nos. 16 & 17), Unifrax Corp., dated April 12, 2010 (Adv. Pro No. 07-02270, Bankruptcy Docket No. 17), Vishay Americas, Inc., dated April 24, 2010 (Adv. Pro No. 07-02556, Bankruptcy Docket No. 23), and Affinia Group Holdings Inc., *et. al.,* dated April 29, 2010 (Adv. Pro. No. 07-02198, Bankruptcy Docket No. 41 & 42), seeking the same or similar relief as is sought by this Motion.

## BACKGROUND[5]

A.  <u>Delphi and its Bankruptcy</u>

8.      On October 8, 2005 and October 14, 2005 (as applicable, the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code to

---

[5] The bulk of the information contained in this Background section of this pleading has been taken from pleadings filed by or on behalf of the Debtors in the bankruptcy case.  On a motion to dismiss, courts may take judicial notice of documents which are matters of public record such as court-filed documents.  <u>McGehean v. AF&L Ins. Co.</u>, 2009 U.S. Dist. LEXIS 92194, at *6 (E.D. Pa. Oct. 2, 2009) (<u>citing</u> <u>Rouse v. II-VI Inc.</u>, No. 02:06cv0566, 2008 U.S. Dist. LEXIS 10076, 2008 WL 398788, at *1 (W.D. Pa. Feb. 11, 2008) (citations omitted).

commence individual bankruptcy cases which have been jointly administered under the above referenced docket number (the "Bankruptcy Case").

9.     Prior to the bankruptcy filings, Delphi and its subsidiaries and affiliates (sometimes herein collectively referred to as the "Company") were a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplied products to nearly every major global automotive original equipment manufacturer ("OEM"). As of December 31, 2007, the Company reported global net sales of $22.3 billion and global assets of approximately $13.7 billion.

10.     At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.

11.     Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM remained the Company's single largest customer, at the time of the bankruptcy filing more than half of Delphi's revenue was generated from non-GM sources.

AC1 912053v8 05/14/10

12.     In the first two years following Delphi's separation from GM, the Company reported approximately $2 billion in net income.    Every year thereafter, however, with the exception of 2002, the Company has suffered losses.    In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.    Reflective of a continued downturn in the marketplace, in 2005 Delphi reported net losses of approximately $2.4 billion on net sales of $26.9 billion.    Moreover, in 2006 the Debtors reported a net loss of $5.5 billion, $3.0 billion of which was comprised of charges related to the U.S. employee special attrition programs, and in 2007, the Debtors reported a net loss of $3.1 billion.

13.     In the Bankruptcy Case, the Debtors maintained that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

14.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.    Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced the chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

    B.    The Defendant M&Q Plastic Products, L.P.

15.     Prior to the bankruptcy filings of Delphi in 2005, the Defendant M&Q supplied

various of the Debtors with convoluted and other tubing used primarily by Delphi in the

production of wire harnesses and fuel tube assemblies.  After the Petition Date, M&Q continued

to supply to Delphi under substantially the same terms as were in effect pre-petition.  The supply

relationship continued during the bankruptcy until M&Q sold is assets and businesses and ceased

doing business on March 14, 2008.

16.    Counsel for M&Q filed a Notice of Appearance in the Bankruptcy Case on

October 12, 2005 (Docket No. 149).   The Notice of Appearance contains the following

reservation:

> [N]either this Notice of Appearance and Demand for Service of
> Papers (the Notice) nor any later appearance, pleading, proof of
> claim, claim, or suit, shall constitute a waiver of M&Q's:
>
> a) rights to have any and all final orders in any and all non-core
> matters entered only after *de novo* review by a United States
> District Judge;
> b) rights to trial by jury in any proceedings as to any and all
> matters so triable, whether or not the same be designated legal or
> private rights, or in any case, controversy or pursuant to 28 U.S.C.
> § 157(b)(2), and whether such jury trial right is pursuant to statute
> or the United States Constitution;
> c) rights to seek abstention or remand of any matter or proceeding
> subject to mandatory discretionary abstention or remand, and to
> have the District Court withdraw the reference in any matter or
> proceeding subject to mandatory or discretionary withdrawal;
> d) rights to receipt of service of process in all actions, causes,
> claims, or proceedings arising in, arising under or related to these
> proceedings to be served directly on M&Q;
> e) rights to contest service of process; or
> f) rights, remedies and claims against other entities or any
> objection that may be made to the jurisdiction and venue of the
> Court or venue of this case.
>
> All of the above rights are expressly reserved and preserved by
> M&Q without exception.

17.    On or about June 6, 2006, Defendant filed a proof of claim for unsecured sums

due in the amount of $653,828.81 as of the Petition Date, which was assigned Claim No. 7579

by the Debtors (the "Claim").  Defendant sold the Claim to Goldman Sachs Credit Partners, L.P. in July 2006.  A Notice of the Transfer of Claim was filed in the Bankruptcy Case on or about August 8, 2006.

18.     M&Q made a reclamation demand directed to Delphi in accordance with procedures approved by the Court as part of the "First Day Orders" (Docket No. 230), and on October 15, 2005, counsel for M&Q filed a Notice of Reclamation Demand in the Bankruptcy Case (Docket No. 298).   By conscious inaction, M&Q elected to have its reclamation claim treated as a general unsecured claim, in response to the Debtors' December 10, 2007 Notice of Treatment of Reclamation Claim Under Plan of Reorganization.

19.     By December, 2007, M&Q had no further interest in the Delphi Bankruptcy Case other than that of a post-petition supplier and, as long as it was getting paid for the shipments of product to the Debtors, knew of no reason to be following the proceedings that continued.

20.     Subsequently, Defendant M&Q sold its business and operating assets to a third party through a transaction that closed on March 14, 2008.  M&Q ceased doing business with the Debtors at that time, and has since terminated its existence, as has the two entities that were its partners.  The remaining assets of the Defendant are now held in a liquidation trust that became effective on September 30, 2009.

C.  Case Management Order

21.     In response to a first day motion filed by the Debtors on October 8, 2005 (Docket No. 10), on October 14, 2005, this Court entered an order establishing omnibus hearing dates, certain notice, case management, and administrative procedures, and scheduling an initial case conference (the "Case Management Order") (Docket No. 245).  The Case Management Order provided uniform procedures to alert all parties in interest of all "Filings" in the case.  The Case

9

Management Order specifically provided that "[a]ll Filings shall be served via overnight mail **upon all parties with a particularized interest in the subject of the Filing**, with a hard copy to chambers, as well as the following list (the "<u>Master Service List</u>") of parties or entities . . ." Case Management Order, ¶ 15 (emphasis added) (herein after called the "<u>Notice Requirement</u>"). The Master Service List was comprised of Debtors' counsel, and other limited parties. Neither M&Q, nor its counsel were included on the Master Service List.

      D.  <u>Avoidance Actions Commenced in Secret</u>

      22.    On March 31, 2006, Delphi outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations. The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their current pension situation.

      23.    Before it was able to file and confirm a plan, Delphi needed to address the fast approaching two (2) year statute of limitations for avoidance actions under Bankruptcy Code § 546. Delphi wanted to maintain good relations with its suppliers and may have even expected that its vendors would be made whole under a confirmed plan that continued its business after the reorganization as contemplated. In any event, Delphi did not want to have to file avoidance

10

actions that were sure to upset the supply relationships needed for successful post-effective date operations. Thus, on or about August 6, 2007, Delphi sought the Court's assistance through a motion for an order establishing procedures to preserve estate claims beyond the statute of limitations imposed by section 546 of the Bankruptcy Code (Docket No. 8905) (the "Preservation of Estate Claims Motion") which was filed on August 6, 2007.

24.    The Affidavit of Service filed on behalf of the Debtors in connection with the filing of the Preservation of Estate Claims Motion (Docket No. 9039) reveals that Delphi did not comply with the Notice Requirement as to M&Q, and M&Q has no record of being served or otherwise having been given notice by the Debtors concerning the filing and/or content of the Preservation of Estate Claims Motion.[6]

25.    On August 16, 2007, the Court entered an order (Docket No. 9105) (the "Preservation of Estate Claims Procedures Order") that: (i) permitted Delphi to file adversary proceeding complaints under seal; (ii) directed the Clerk of Court to delay issuing summonses for complaints unless and until Delphi notified the Clerk of Court of their intent to prosecute such actions; (iii) stayed each adversary proceeding unless and until Delphi made service of process on the respective defendants; and (iv) extended until May 31, 2008, the deadline under Fed. R. Civ. P. 4(m) by which Delphi would have to serve process on M&Q and the other parties named as defendants in the adversary proceedings that had been filed under seal.

26.    The Affidavit of Service filed on behalf of the Debtors in connection with the Court's issuance of the Preservation of Estate Claims Order (Docket No. 9141) reveals that Delphi did not comply with the Notice Requirement as to M&Q, and M&Q has no record of

---

[6] Counsel of record for M&Q had filed a request for notice under R. 2002, was listed on the 2002 Service List utilized by the Debtors, and received electronic notice, but after the sale of M&Q's claim a year before in July 2006, had no interest in the Bankruptcy Case concerning matters other than reclamation, and no known reason to be concerned about Estate claims in August of 2007.

11

being served or otherwise having been given notice by the Debtors concerning the filing and/or content of the Preservation of Estate Claims Order.

27.    On September 30, 2007, Delphi initiated the instant adversary proceeding against the Defendant by filing under seal a complaint seeking to recover 21 alleged preferential transfers made in the aggregate amount of $6,621,649.14, and at the same time a number of similar complaints reported to exceed 700 were filed under seal against other parties with whom Delphi had transacted business prior to its bankruptcy filings in 2005.

E.    Plan Confirmation

28.    On December 10, 2007, the Debtors filed their first amended joint plan of reorganization (Docket No. 11386) (the "Plan") and related disclosure statement (Docket No. 11388).  The Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order") on January 25, 2008, and the Confirmation Order became final on February 4, 2008.

29.    The Plan, as confirmed on January 25, 2008 (the "Confirmed Plan"), was based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases.  The Global Settlement Agreement and the Master Restructuring Agreement provide for a comprehensive settlement with GM, and both agreements were approved by the Court in the Confirmation Order.  The Confirmed Plan provided for a 100% distribution on account of pre-petition unsecured claims.  Confirmed Plan § 5.3 (Docket No. 11386).  This was significant to M&Q because it meant the Debtors would not be able to assert preference claims.

30.    Section 7.24 of the Confirmed Plan provides that "Causes of Action against Persons arising under section 544, 545, 547, 548 or 553 of the Bankruptcy Code or similar state

laws **shall not be retained** by the Reorganized Debtors **unless specifically listed** on Exhibit 7.24 hereto." The cause of action against the Defendant is under section 547 of the Bankruptcy Code and **was not** listed on Exhibit 7.24 to the Confirmed Plan.

31.     After the Plan was confirmed, the Debtors focused their efforts on satisfying the conditions for the Plan to become effective. The Debtors maintain that they satisfied those conditions and on April 4, 2008 began a formal closing process attended by representatives of GM, the exit lenders, and the statutory committees. Also according to the Debtors, the Plan Investors refused to participate in the closing or fund their obligations under the Investment Agreement, and instead delivered written notices purporting to terminate the Investment Agreement based on both alleged breaches by the Debtors and the failure of the Plan's effective date to occur by April 4, 2008.

32.     A full six (6) months after the original reorganization deal fell through on October 3, 2008, the Debtors filed a motion under 11 U.S.C. § 1127 for an order approving (i) certain modifications to the confirmed Plan and related disclosure statement and (ii) related procedures for re-soliciting votes on the confirmed Plan, as modified (Docket No. 14310) (the "Plan Modification Motion"). After eight (8) more months passed, on June 1, 2009, the Debtors filed a supplement to the Plan Modification Motion (the "Motion Supplement"), which sought approval of (i) certain modifications to the confirmed Plan (the "Modified Plan"), (ii) supplemental disclosure, and (iii) procedures for re-soliciting votes on the Modified Plan. The Court entered an order approving the Modified Plan (Docket No. 18707) (the "Plan Modification Order") on July 30, 2009 – 16 months after the original reorganization deal fell through. All of this happened well after M&Q sold its claim, sold its business, was no longer a part of the Delphi supply chain, and had no known reason to be at all concerned about Delphi on its reorganization.

13

33.    Section 7.19 of the Modified Plan has an identical provision to section 7.24 of the original Confirmed Plan and provides that "Causes of Action against Persons arising under section 544, 545, 547, 548 or 553 of the Bankruptcy Code or similar state laws shall not be retained by the Reorganized Debtors unless specifically listed on Exhibit 7.19 hereto." This time, however, the listing on Exhibit 7.19 to the Modified Plan included all of the "Causes of Action" that were filed under seal in accordance with the Preservation of Estate Claims Procedures Order, and Exhibit 7.19 listed the various Avoidance Actions by reference to the adversary case number that had been assigned to each, but it did not refer to M&Q or any of the other defendants in those Causes of Action by name.

34.    The Affidavits of Service filed on behalf of the Debtors in connection with the filing of the Plan Modification Motion (Docket No. 14319), the Motion Supplement (Docket No. 16657), and the Plan Modification Order (Docket No. 18806) reveal that Delphi did not comply with the Notice Requirement as to M&Q, and M&Q has no record of being served or otherwise having been given notice by the Debtors concerning the filing and/or content of, or the proceedings concerning, the Plan Modification Motion, the Motion Supplement, or the Modified Plan.

35.    Another two (2) months passed after the Modified Plan was approved, and on October 6, 2009 (the "Effective Date"), the Debtors substantially consummated the Modified Plan, and closed on the transactions under the Master Disposition Agreement dated as of July 30, 2009, by and among Delphi, the reorganized General Motors Corporation ("New GM")[7], and the purchaser entity called DIP Holdco LLP, subsequently renamed Delphi Automotive LLP, a United Kingdom limited liability partnership (the "UK Buyer"), and the other sellers and buyers party thereto. In connection therewith, the UK Buyer acquired substantially all of the Debtors'

---

[7] New GM emerged from bankruptcy on July 10, 2009.

14

global core businesses, and subsidiaries of New GM acquired certain U.S. manufacturing plants and the Debtors' non-core steering business, respectively, leaving the Reorganized Debtors "emerged from chapter 11."

36.    The Reorganized Debtors have been renamed as DPH Holdings and affiliates, and they remain responsible for the post-Effective Date administration of these chapter 11 cases, including the disposition of certain retained assets and payment of certain retained liabilities as provided for under the Modified Plan, and the eventual closing of the cases. Included among the "retained assets" was this adversary proceeding and the others like it which remained filed under seal and secret to the Defendant and others who are similarly situated.

37.    The Reorganized Debtors have not identified the person who is serving in the capacity of Plan Administrator under the Modified Plan.  M&Q understands and therefore believes that, aside from the lawyers and other personnel at the law firms and other entities retained to provide professional services to the Debtors in the bankruptcy cases, the only person retained by the Reorganized Debtors to wind down the estates and prosecute Avoidance Actions is a single former employee of Delphi whose name is John C. Brooks.   July 30, 2009 Hearing Transcript, p. 24 (Docket No. 18830).

F.    Prosecution of Avoidance Actions

38.    While the plan confirmation process played out, the Debtors filed motions on February 8, 2008 (the "February 2008 Extension Motion"), April 10, 2008 (the "April 2008 Extension Motion"), and October 2, 2009 (the "October 2009 Extension Motion" and together with the February 2008 Extension Motion and the April 2008 Extension Motion herein called the "Extension Motions") for successive extensions of the deadline to serve process in this and another 176 similar adversary proceedings.

15

05-44481-rdd    Doc 20098    Filed 05/14/10    Entered 05/14/10 15:28:52    Main Document
Pg 16 of 46

39.     In the Preservation of Estate Claims Motion, the Debtors represented to the Court that "most of [the avoidance actions] likely will be resolved by a reorganization plan and never pursued."  Preservation of Estate Claims Motion, ¶ 33.  Consistent with this statement, in the February 2008 Extension Motion, the Debtors took the position that under their Plan they would "not retain any of the causes of action asserted in the Adversary Proceedings except those specifically listed on Exhibit 7.24 to the Plan."  February 2008 Extension Motion, ¶ 17.  Exhibit 7.24 to the Plan did not list the action against M&Q.  The Debtors further stated that of the claims listed on Exhibit 7.24 "only the claims relating to Laneko Engineering Co., Wachovia Bank, National Association, Laneko Engineering Co. Inc., and their affiliates and subsidiaries were subject to the Preservation of Estate Claims Procedures Order."  February 2008 Extension Motion, ¶ 17, n.4.  At the hearing on March 19, 2008 in connection with the February 2008 Extension Motion, counsel for Delphi said, "Upon the confirmation of a plan, I believe all but one, possibly two of those matters, would end up not being pursued.  They would end up being dismissed as of the effective date and would not be pursued."  See March 19, 2008 Hearing Transcript, p. 22, line 7, attached as Exhibit "A".  The Debtors reiterated these positions in the April 2008 Extension Motion and the Court adopted the positions advanced by the Debtors when it entered orders granting the relief sought in these motions.  April 2008 Extension Motion, ¶ 18, n.4.

40.     The Court acted by the Extension Orders entered on March 28, 2008, April 30, 2008 and October 22, 2009, to grant Delphi's Extension Motions, with the final extension under the October 22 Order running until 180 days after substantial consummation of the Modified Plan.

AC1 912053v8 05/14/10

41.    The Affidavits of Service filed on behalf of the Debtors in connection with the filing of the Extension Motions (Docket Nos. 12970, 13415, and 18967, respectively) and in connection with entry of the respective Extension Orders of March 28, 2008 and April 30, 2008 (Docket Nos. 13315 and 13560, respectively) reveal that Delphi did not comply with the Notice Requirement as to M&Q, and M&Q has no record of being served or otherwise having been given notice by the Debtors concerning the filing of, or the proceedings concerning, the various motions that lead to the Court's issuance of the Extension Orders.   There is no record of a Affidavit of Service filed for the October, 22 2009 extension order.

42.    M&Q was served with the Complaint on or about March 22, 2010, over four years after the commencement of the underlying bankruptcy cases and over two and a half years after the Complaint was filed under seal.

43.    Delphi's Complaint is "bare-bones," providing no information other than a list of all payments made by the Debtors to M&Q in the 90 day period prior to the filing of bankruptcy by the Debtors all of which are alleged to be avoidable.  The Complaint does not even identify which of the Debtors made the transfers at issue, but instead seeks relief on behalf of "Delphi Corporation ('Delphi') and other [unnamed] above-captioned debtors and debtors in possession."

G.  Joinder to Motion to Vacate

44.    On April 14, 2010, M&Q joined two motions to vacate and dismiss adversary proceedings filed in the Bankruptcy Case by Wagner-Smith Company and Microchip Technologies Incorporated.  (Adv. Docket No. 15 and Docket No. 19818).  For purposes of clarification, and in light of numerous additional arguments that this court must consider in deciding whether to dismiss this Adversary Proceeding, M&Q has filed this pleading as its own motion to dismiss.

17

## ARGUMENTS

I.   **DUE TO THE EFFECT OF THE LONG DELAY IN SERVING PROCESS THE
     COMPLAINT SHOULD BE DISMISSED AS BARRED BY THE STATUTE OF
     LIMITATIONS**

45.    Even though the Complaint was technically filed within two (2) years of the

Petition Date, Delphi's avoidance claims must be dismissed because it would be inappropriate to

permit the Debtors to bypass the statute of limitations through their efforts to delay service of

process or the giving of any other notice that an avoidance action had been filed against M&Q.

This is particularly so where, as here, the delay brought about by the Debtors inaction would

effectively serve to extend the Congressionally-mandated statute of limitations by more than 2 ½

years, **_all for the convenience of the Debtors and at the expense of M&Q and the other_**

**_defendants_**.

46.    Section 546(a) of the Bankruptcy Code sets forth a clear statute of limitations for

bringing avoidance actions:

> An action or proceeding under section 544, 545, 547, 548, or 553
> of this title may not be commenced after the earlier of – (1) the
> later of – (A) 2 years after the entry of the order for relief; or (B) 1
> year after the appointment or election of the first trustee under
> section 702, 1104, 1163, 1202, or 1302 of this title if such
> appointment or such election occurs before the expiration of the
> period specified in subparagraph (A); or (2) the time the case is
> closed or dismissed.

11 U.S.C. § 546(a).

47.    Under Bankruptcy Code section 546(a), the deadline for commencing an

adversary proceeding against M&Q on account of an allegedly avoidable preference expired on

or before October 14, 2007.[8]   The Plaintiffs filed the Complaint under seal on September 30,

2007, but M&Q was not served with process, and did not otherwise receive notice of the

---

[8] Since Delphi has not revealed which of the Debtors made the transfers alleged to be preferential, we cannot know
the relevant Petition Date when the two year statute of limitations began to run.

AC1 912053v8 05/14/10

Complaint until well over two years after the statute of limitations contained in section 546(a) expired. The practical effect of this 2 ½ year delay was to allow Delphi to prosecute its claims, well after the statute of limitations expired, without providing any notice or an opportunity for M&Q to be heard on the matter.

48.      Fed. R. Civ. P 4(m), made applicable to here by R. 7004 of the Bankruptcy Rules, requires that a defendant be serve with a summons and complaint within 120 days of the time when the complaint is filed. In this case, M&Q was not actually served with the Complaint until 902 days after it was filed under seal. To accomplish this feat, Debtors sought and obtained multiple extensions of their time to serve process – extensions for an indefinite period of time tied to an event (substantial consummation of a plan) largely in their own control. Most significantly, while their early requests for extensions were of limited duration (approximately two months each) and based on a defined rationale (i.e., the intention not to prosecute avoidance actions in the face of a 100 cent plan expected to become effective shortly), the subsequent extensions lacked either this moderation or purpose. During this extended period of delay, the Debtors were not hindered by any inability to complete service of the Complaint or otherwise give notice. Under these circumstances, it would eviscerate the purpose of a statute of limitations to allow this action to proceed at this late date given these facts.

49.      A statute of limitations, such as the two-year limitations period found in Section 546(a), is a statute of repose "'enacted upon the presumption, that one having a well-founded claim will not delay enforcing it beyond a reasonable time, if he has the power to sue.'" In re Cornwall, 9 Blatchf. 114, 6 F. Cas. 586, 591 (C.C.D. Conn. Sept. Term 1871) (citation omitted). Statutes of repose are intended to give plaintiffs notice of the time within which they may prosecute legal claims and to alert potential defendants of the time beyond which their exposure

to liability ceases. <u>Diversified Hospitality Group, Inc. v. Carson Pirie Scott & Co.</u>, 1991 WL 35953, at *5 (S.D.N.Y. Mar. 8, 1991). Statutes of repose are only to be outweighed where "the interests of justice require vindication of the plaintiff's rights." <u>Family Golf Ctrs., Inc. v. Acushnet Co. (In re: Randall's Island Family Golf Ctrs., Inc.)</u>, 288 B.R. 701, 705 (Bankr. S.D.N.Y. 2003). Such circumstances occur where the plaintiff has not slept on his rights, has commenced a timely action in a court of competent jurisdiction, the particular defect in the complaint is waivable and frequently waived, and the defendant "***could not have relied upon the policy of repose embodied in the limitation statute, for it was aware that [the plaintiff] was actively pursuing . . . his remedy.***" <u>Id.</u> (quoting <u>Burnett v. N.Y. Cent. R.R. Co.</u>, 380 U.S. 424, 428-29 (1965)) (emphasis added).

50.    Here, M&Q was entitled to rely upon the policy of repose embedded in section 546(a) of the Bankruptcy Code. For a full two years after the statute of limitations had actually expired, M&Q was not made aware of the fact that it had been sued by Debtors. In addition, had M&Q been paying attention to the Delphi case (which it had no reason to do and was not) every indication provided by Delphi in the Extension Motions supported the assumption that M&Q would not be subject to a preference action, because the Debtors had confirmed a 100% plan that abandoned all but four specific Avoidance Actions.

51.    By keeping this action a secret for well over two years ***after*** the statute of limitations expired, the Debtors deliberately prejudiced defendants' right and ability to put on its case. Indeed, evidence has been lost or become stale, memories have faded and witnesses have disappeared. <u>See</u> <u>Order of R. Telegraphers v. Railway Express Agency, Inc.</u>, 321 U.S. 342, 348-49 (1944); <u>United States v. Kubrick</u>, 444 U.S. 111, 117 (1979) (statutes of limitation "protect defendants and the courts from having to deal with cases in which the search for truth may be

seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise").  As a result, M&Q's ability to defend itself has been substantially impaired.  Sealing the complaint and waiting 2 ½ years to serve it on M&Q is, in fact, no different than if the Debtors filed the Complaint long past the expiration of the statute of limitations.

52.    Accordingly, even though the Debtor actually filed the complaint before the expiration of its statutory imposed limit, the practical effect of the Debtors' actions was to extend the 2 year statute of repose set up by Congress under Bankruptcy Code section 546(a), thus depriving M&Q of its due process rights and causing such prejudice that Delphi's claims are barred by the statute of limitations and should be dismissed.

## II.    DELPHI'S CLAIMS WERE WAIVED IN THE PLAN PURSUANT TO THE DOCTRINE OF *RES JUDICATA*

53.    The claim against M&Q is precluded under the doctrine of *res judicata* because the Debtors failed to expressly reserve the right to litigate the cause of action in the Confirmed Plan.

54.    "Disclosure is the 'pivotal' concept in Chapter 11 reorganization," Kunica v. St. Jean Fin., Inc., 233 B.R. 46, 54 (S.D.N.Y. 1999), and the Bankruptcy Code requires that a plan and disclosure statement provide "adequate information," to enable creditors to "make an informed judgment about the plan." 11 U.S.C. § 1125.  See Kunica, 233 B.R. at 54 ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court.  Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'") (citing Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 417 (3d Cir. 1988)).

55.    It is well settled law that confirmation of a debtor's plan is *res judicata* as to all

AC1 912053v8 05/14/10

issues that were or could have been decided in the confirmation process. See Tracar v. Silverman (In re American Preferred Prescription, Inc.), 266 B.R. 273, 277 (E.D.N.Y. 2000) ("confirming a reorganization plan constitutes a final judgment on the merits and is to be given preclusive effect under *res judicata*"); Sure-Snap Corp. v. State St. Bank & Trust Co., 948 F.2d 869, 872-73 (2d Cir. 1991) (order confirming plan of reorganization has preclusive effect under *res judicata*); In re Justice Oaks II, Ltd., (898 F.2d 1544, 1550 (11th Cir. 1990) ("[t]his issue has been settled for some time: a bankruptcy court's order confirming a plan of reorganization is given the same effect to any district court's final judgment on the merits"); See also In re Layo, 460 F. 3d 289, 294 (2d Cir. 2006) (same result under Chapter 13 plan).

56.     A confirmed plan has *res judicata* effect only to the extent its provisions give clear notice to creditors and any other interested parties that the plan will have the claimed effect. In re Porter, 382 B.R. 29, 41 (Bankr. D. Vt. 2008).  A vague blanket reservation of rights clause is insufficient notice to creditors to satisfy due process. Id.

57.     Accordingly, a debtor is precluded from asserting any claims post-confirmation that are not expressly preserved in its plan. See D & K Props. Crystal Lake v. Mut. Life Ins. Co. of New York, 112 F.3d 257, 259 (7th Cir. 1997).   Only where the right to pursue litigation is specifically identified and expressly reserved in writing in a plan, does the doctrine of *res judicata* not serve to prevent the Debtor from subsequently pursuing those claims. Id. at 261.

58.     The majority of courts that have considered this issue have held that, for the exception to apply, the reservation must identify with some specificity what claims it intends to preserve and against whom those claims are asserted. See Browning v. Levy, 283 F.3d 761, 774 (6th Cir. 2002) ("[a] general reservation of rights [in a plan] does not suffice to avoid *res judicata*."); D & K, 112 F.3d at 261 ("A blanket reservation that seeks to reserve all causes of

action reserves nothing."); In re Kelley, 199 B.R. 698, 704 (9th Cir. BAP 1996) ("even a blanket reservation by the debtor reserving 'all causes of action which the debtor may choose to institute' has been held insufficient to prevent the application of *res judicata* to a specific action.") (internal quotations omitted); Slone v. M2M Int'l, Inc. (In re G-P Plastics, Inc.), 320 B.R. 861, 869 (E.D. Mich. 2005) ("general reservation of rights in the Plan is insufficient to bar the application of *res judicata*"); Official Comm. of Unsecured Creditors of Crowley, Milner & Co. v. Callahan (In re Crowley, Milner & Co.), 299 B.R. 830, 851 (Bankr. E.D. Mich. 2003) ("reservation of rights in this instance is not sufficient to avoid the *res judicata* effect of the Order Confirming Plan"); Westland Oil Development Corp. v. MCORP Management Solutions, Inc., 157 B.R. 100, 103 (S.D. Tex. 1993) (finding a debtor intentionally "hid [a claim against a creditor] within the murky language of the general retention clause").

59.    In the instant case, the Debtors did not preserve any claim against M&Q in the Confirmed Plan.  The Confirmed Plan provided that only claims specifically listed on Exhibit 7.24 of the plan would be retained by the Reorganized Debtors. Delphi knew at the time of possible claims against M&Q having already filed the Complaint under seal.  Nonetheless, the cause of action against M&Q was not listed on Exhibit 7.24 and was not specifically mentioned in the Confirmed Plan.

60.    The Modified Plan filed on October 3, 2008 provided that the Debtors did not intend to preserve avoidance actions except those listed on Exhibit 7.19.  Yet the Debtors did not file the final plan supplement containing Exhibit 7.19 until July 2, 2009, after they had begun solicitation of the Modified Plan and a mere 28 days before that plan was confirmed.  The information ultimately provided in connection with Section 7.19 of the Modified Plan was a mere list of adversary proceeding case numbers that referred to sealed dockets, contained in an

exhibit filed after the Debtors commenced solicitation of votes only 28 days before the plan was confirmed. Such vague references to the Claims are insufficient, and do not comport with the disclosure requirements as set forth in 11 U.S.C. § 1125. See Kunica, 233 B.R. at 56 (to "merely indicated that [Debtors] would retain certain . . . unvalued causes of action against various unnamed third parties" is insufficient notice).

61.    To make matters worse, however inadequate, the Debtors notice concerning plan modifications and the decision to pursue avoidance actions was not even provided to M&Q as dictated by the notice requirement of the Case Management Order entered at the beginning of the Bankruptcy Case. The Debtors' Affidavits of Service reveal that no notice was sent to M&Q by mail or otherwise. The only conceivable argument to be made by the Debtors that notice was given is that the law firm which had entered an appearance for M&Q in the Bankruptcy Case in 2005 was still at the time on the 2002 Service List which was receiving notice of most filings by e-mail sent by the Debtor's noticing agent. However, these "notices" given by e-mail contained nothing to alert counsel to the fact M&Q had a particularized interest in any of the Plan Modifications, and the modification of the Plan, like all of the other actions taken with respect to the assertion of the Avoidance Actions filed under seal, occurred well after M&Q had sold its unsecured claim, abandoned its reclamation rights, and had no further interest in the outcome of the Bankruptcy Case. Such "notice," as it was, is patently inadequate to give M&Q notice of the preference claims against it or to allow any it or any creditor to make an informed judgment with respect to the value of those claims and action it might choose to take to defend or otherwise protect its interest.

62.    Unlike in many other cases, the Debtors' failure to disclose the identity of the defendants was not due to any burden involved in identifying or investigating potential claims.

These claims had already been identified years earlier, and the Debtors had in fact already filed adversary proceedings.  It would have been more than "reasonably practicable" to include the defendants' identities, rather than a meaningless list of case numbers in the disclosure statement or plan schedule.

63.    The Confirmed Plan, Plan Exhibits, Disclosure Statement, Confirmation Order, and Modified Plan never referenced any potential future actions against M&Q.  M&Q was never on notice of the Complaint under seal.  After reasonable due diligence, M&Q could not have determined there was a pending action against it.  The Debtors had many opportunities to specifically mention the cause of action against M&Q, but waited until the 44th Omnibus Objection, on February 3, 2010 to even mention the possibility of a cause of action against M&Q.

64.    The Modified Plan and related disclosure statement provided **no** specific information about the claims against M&Q, despite the minimal burden involved, and the importance of providing proper disclosure.  These claims should therefore be dismissed as barred by *res judicata* and as a matter of due process.

### III.    THE COMPLAINT IS BARRED BY LACHES AND SHOULD BE DISMISSED

65.    Delphi's Complaint should also be barred by laches.  A defendant may prevail on a laches defense if it establishes: (i) that it lacked knowledge that the claim might be asserted against it; (ii) that the plaintiff delayed asserting the claim despite an opportunity to do so; and (iii) that it would be prejudiced if the claim were now allowed to go forward.  In re Gucci, 197 Fed. Appx. 58, 60 (2d Cir. 2006);  Rapf v. Suffolk Cty, 755 F.2d 282, 292 (2d Cir. 1985).

66.    Starting with item (ii) of the three part test set out by the Second Circuit in Rapf, there can be no doubt that the Debtors had numerous opportunities to assert their claim against

25

M&Q long before they did so.  The question to ask here is when did the Debtors know they were going to want to assert the Avoidance Actions they had abandoned under the Confirmed Plan? Was it in early April, 2008 when the exit financing sources refused to close?  Or how about September, 2008 when Lehman Brothers collapsed and filed bankruptcy setting off a worldwide financial crisis of the likes not seen since the 1930's?  Was it not evident then to Delphi and its advisors that the previously confirmed "100% plan" was not going to go effective, would have to be abandoned, and that the only hope for Delphi was a sale of the "good assets" and a liquidating plan with avoidance action recoveries needed to fund not only deficiency claims but also large amounts of Chapter 11 administrative claims?  Indeed, once the Debtors knew that their creditors would no longer be paid 100 percent and that certain avoidance actions would be prosecuted, there was no justification for keeping the complaints a secret after that date, whatever it was, and it certainly was long before March 22, 2010, which is the date when Delphi finally made M&Q aware of the preference action.  Instead of doing the right thing, Delphi chose to do the thing that was most expedient for the Reorganized Debtors in continuing to conceal the claim for 2 ½ years.

67.    No doubt, Delphi will argue that the decision to prosecute abandoned avoidance actions should not come as a surprise, and was not prejudicial, because of the reservation of rights to change its mind which was included within <u>Exhibit 7.24</u> of the Confirmed Plan.  This argument does not work in this case.  While some courts have held that a general reservation of claims is sufficient, they have done so in the context of reorganizations where the debtors have not had time to identify and evaluate potential claims.  For example, in <u>In re I. Appel Corp</u>, 300 B.R. 564 (S.D.N.Y. 2003), the court found that "mandating a specific description of every claim the debtor intends to pursue could entail months or years of investigation and a corresponding

delay in the confirmation of the plan of reorganization." Id. at 569. Well, that is simply not the case in this instance where Delphi knew of the claims and had a detailed list of the claim amounts and the names of each defendant against whom suits had been filed under seal. The identity of the defendants, including M&Q, could have been easily identified at any time after September 2007. The disclosure could have been made in conjunction with the filing of any of the Extension Motions. It was not. It could have been made at the time of the filing of the Plan Modifications. It was not. Delphi chose not to make that disclosure for a long period of time – over two (2) years after the date when there could be no further justification for continued concealment.

68.    As to the third prong of the test under Rapf, M&Q would be severely prejudiced if the preference action to recover $6.6 million is allowed to go forward. The passage of time has improved the litigation position of the Plaintiff at the expense of the unknowing defendants. In fact, by both sealing the Complaint and not disclosing their intention to bring these claims, the Plaintiffs are forcing M&Q to defend a stale claim with one hand tied behind its back, relying on witnesses who, if still available, have memories which likely have faded. Compound this with the fact that both M&Q and, for all practical purposes, Delphi no longer exist, both have restricted access to the books and records that have been transferred to a third party purchasers and neither is in a position to be able to compel the cooperation of former employees with the best knowledge of the relationship from over 4 ½ years ago, it is nearly impossible for M&Q to prepare an adequate defense of the Adversary Proceeding.

69.    The first prong of the test under Rapf is likely to be the one most susceptible to attack by Delphi, which will no doubt argue that any supplier of goods who does business right up to and after the filing of bankruptcy by its financially troubled customer has to be aware that a

preference claim might be asserted against it for payments made in the immediate 90 days prior to the petition date.  While this may be true in a general sense, the facts of this case are much different than the typical Chapter 11 case.  Here, there was an active market trading in unsecured pre-petition claims as evidenced by the number of claims transferred to investors in this case.  In addition, and most significantly, the Debtors filed and confirmed a plan in early 2008 that proposed to pay unsecured creditors 100% on the dollar in stock and warrants, with an abandonment of all avoidance actions except for a few that were scheduled, not including a claim against M&Q.  At the same time, it was M&Q's subjective belief that its dealings with Delphi, at all times before bankruptcy were in accordance with its course of dealing and contracts with Delphi and that the course of dealing and contract terms, having been dictated by Delphi, were consistent with customary and ordinary trade terms then applicable in the automotive industry.  When considering all of this in context, it is easy to find that M&Q did lack knowledge that the claim might be asserted against it at all time relevant.

70.    Accordingly, the Complaint should be dismissed for laches.

### IV.    THE COMPLAINT IS BARRED BY JUDICIAL ESTOPPEL

71.    The doctrine of judicial estoppel "prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by [that party] in a prior legal proceeding."  In re Venture Mortgage Fund, L.P., 245 B.R. 460, 471 (Bankr. S.D.N.Y. 2000), aff'd, 282 F.3d 185 (2d Cir. 2002).  Judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  New Hampshire v. Maine, 532 U.S. 742, 749 (2001).  Courts have uniformly recognized that the purpose of judicial estoppel is to "protect the integrity of the judicial process . . . by prohibiting parties form deliberately changing positions according

AC1 912053v8 05/14/10

to the exigencies of the moment." Id. at 749-750; see also Rosenshein v. Kleban, 918 F. Supp. 98, 104 (S.D.N.Y. 1996) ("Judicial estoppel is invoked . . . to prevent the party from playing fast and loose with the courts, and to protect the essential integrity of the judicial process").  "The doctrine does not depend upon prejudice to the party invoking it." Galerie Des Monnaies of Geneva, Ltd. v. Deutsche Bank, A.G., New York Branch (In re Galerie Des Monnaies of Geneva, Ltd), 55 B.R. 253, 260 (Bankr. S.D.N.Y. 1986).

72.    The New Hampshire court observed that "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle." New Hampshire, 532 U.S. at 750 (internal citations omitted).  The Second Circuit has identified two factors that must be satisfied to invoke the doctrine of judicial estoppel: (i) the party against whom estoppel is asserted took an inconsistent position in a prior proceeding, and (ii) the first tribunal adopted the inconsistent position in some manner, such as by rendering a favorable judgment. In re Venture Mortgage Fund, L.P., 245 B.R. at 472.

73.    The Debtors repeatedly represented to the Court (both orally and in writing) that, with respect to avoidance actions that they intended to preserve and pursue, they only intended to pursue certain claims, NOT the claim against M&Q.  In the Preservation of Estate Claims Motion, the Debtors represented to the Court that "most of [the avoidance actions] likely will be resolved by a reorganization plan and never pursued."  Preservation of Estate Claims Motion, ¶ 33.  Consistent with this statement, in the February 2008 Extension Motion, the Debtors took the position that under their Plan they would "not retain any of the causes of action asserted in the Adversary Proceedings except those specifically listed on Exhibit 7.24 to the Plan."  February 2008 Extension Motion, ¶ 17 (Docket No. 8905).  Exhibit 7.24 to the Plan did not list the instant action.  The Debtors further stated that of the claims listed on Exhibit 7.24 "only the claims

29

05-44481-rdd    Doc 20098    Filed 05/14/10    Entered 05/14/10 15:28:52    Main Document
Pg 30 of 46

relating to Laneko Engineering Co., Wachovia Bank, National Association, Laneko Engineering Co. Inc., and their affiliates and subsidiaries were subject to the Preservation of Estate Claims Procedures Order." February 2008 Extension Motion, ¶ 17, n.4. At the hearing on March 19, 2008 in connection with the February 2008 Extension Motion, counsel for Delphi said, "Upon the confirmation of a plan, I believe all but one, possibly two of those matters, would end up not being pursued. They would end up being dismissed as of the effective date and would not be pursued." See March 19, 2008 Hearing Transcript, p. 22, line 7, attached as Exhibit "A". The Debtors reiterated these positions in the April 2008 Extension Motion and the Court adopted the positions advanced by the Debtors when it entered orders granting the relief sought in these motions. April 2008 Extension Motion, ¶ 18, n.4. Thus, the Debtors took this position in Exhibit 7.24 to the Confirmed Plan when they confirmed the abandonment of all but a few of the avoidance actions involving parties they included, not M&Q. The Court, in turn, accepted Debtors' position that it intended to pursue only four avoidance claims when it entered orders granting the relief sought by the Debtors in their motions.

74.    By bringing the Complaint against M&Q (and the other avoidance defendants), Delphi now takes the exact opposite position than that: (i) advanced in the prior motions; and (ii) adopted by the Court. M&Q respectfully submits, pursuant to doctrine of judicial estoppel, that the Court should not sanction the Debtors' attempt to "play fast and loose with the court" and allow Delphi to pursue 177 avoidance claims after the Debtors previously, and consistently, stated they intended to pursue no more than four claims. Had the Court known, when ruling on the motions, that the Debtors would actually pursue 177 (rather than 4) avoidance actions, M&Q does not know that the Court would not have permitted the Debtors to file their actions under seal and repeatedly extend the deadline for service of process by over two years, all without

AC1 912053v8 05/14/10

providing any notice to M&Q (and the other defendants). Indeed, when ruling on the motions, the Court ensured that the Laneko Defendants – the 4 preserved defendants – received notice of the Debtors' motions.

75.    Accordingly, M&Q requests that the Court exercise its discretion and apply the doctrine of judicial estoppel to prevent the Debtors from pursing their claims against M&Q, which the Debtors had repeatedly indicated they would not pursue.

## V.    THIS COURT'S PRIOR ORDERS SHOULD BE VACATED BECAUSE THEY WERE ENTERED WITHOUT M&Q HAVING NOTICE AND AN OPPORTUNITY TO RESPOND IN VIOLATION OF M&Q'S FUNDAMENTAL DUE PROCESS RIGHTS

76.    The Extension Orders must be vacated because they were improvidently entered due to Plaintiff's failure to provide M&Q with notice of the Extension Motions and Plaintiff's denial of M&Q's opportunity to be heard. While M&Q asserts that the Complaint is barred on several grounds, it alternatively seeks relief under Rule 60(b) to the extent necessary to support dismissal of this action.

77.    Rule 60(b)(4), made applicable by Fed. R. Bankr. P. 9024, authorizes a court to relieve a party from a final order if the order is void:

> On motion and just terms, the Court may relieve a party or its legal representative from a final judgment, order or proceeding for the following reasons . . . (5) applying it [the order] prospectively is no longer equitable; or (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(6)(4).

78.    A court must grant relief under this Rule if the order "is void because entry of order violates due process rights." Fustok v. Conticommodity Services, Inc., 122 F.R.D. 151, 154-55 (S.D.N.Y. 1988) (citing Textile Banking Co. v. Rentschler, 657 F.2d 844, 850 (7th Cir. 1981)); see also United States v. Castro, 243 B.R. 380 (D. Ariz. 1999) (explaining that vacation of the order is mandatory, not discretionary).

31

A. <u>The Complaint Was Improperly Filed Under Seal Pursuant to Section 107 of the Bankruptcy Code</u>

79.    Parties seeking to deny public access to court documents must overcome a strong presumption and the denial of public access is an extraordinary remedy that is appropriate only under very limited circumstances.    This "presumption" is "rooted in the public's First Amendment right to know about the administration of justice."    <u>In re Food Mgm't Group, LLC</u>, 359 B.R. 543, 553 (Bankr. S.D.N.Y. 2007) (internal citations and quotations omitted).    In fact, the "public interest in openness of court proceedings is at its zenith when issues concerning the integrity and transparency of bankruptcy court proceedings are involved."    <u>Id.</u>; <u>see also</u> <u>Gitto v. Worcester Telegram & Gazette Corp. (In re Gitto Global Corp.)</u>, 422 F.3d 1, 7 (lst Cir. 2005) (citing <u>In re Crawford</u>, 194 F.3d 954, 960 (9th Cir. 1999)) ("This governmental interest is of special importance in the bankruptcy arena, as unrestricted access to judicial records fosters confidence among creditors regarding the fairness of the bankruptcy system").

80.    Section 107(a) of the Bankruptcy Code codified the common law right of public access in the bankruptcy setting and provides, in relevant part, that "a paper filed in a case under this title and the dockets of a bankruptcy court are public records and open to examination by an entity at reasonable times without charge."    11 U.S.C. § 107(a).    The "plain meaning of § 107(a) mandates that *all* papers filed with the bankruptcy court are 'public records' unless the bankruptcy court 'decides to protect the information pursuant to the standards set forth in Section 107(b).'"    <u>Food Mgm't</u>, 359 B.R. at 553 (quoting <u>Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank and Trust Co. of Chicago (In re Ionosphere Clubs, Inc.)</u>, 156 B.R. 414, 433 n.7 (S.D.N.Y. 1993)); <u>See also</u> <u>In re Barney's, Inc.</u>, 201 B.R. 703, 707 (Bankr. S.D.N.Y. 1996) ("Congress did not intend that sealed pleadings be the rule in bankruptcy cases"); <u>In re Alterra Healthcare Corp.</u>, 353 B.R. 66, 74 (Bankr. D. Del. 2006) ("Congress has codified the historical practice of

open access in bankruptcy").

81.     Section 107(b) of the Bankruptcy Code establishes two sharply delineated exceptions to the general right of access.  Sealing court papers is appropriate to: "(1) protect an entity with respect to a trade secret or confidential research, development, or commercial information; or (2) protect a person with respect to scandalous or defamatory matter."  11 U.S.C. §107(b).  "[A] judge must carefully and skeptically review sealing requests to insure that there really is an extraordinary circumstance or compelling need" to keep the material private.  Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.), 21 F.3d 24, 27 (2d Cir. 1994).

82.     In light of the general rule that "the public has a right to know," the sealing of records "is a highly unusual and extraordinary remedy."  In re Eric Assocs., 54 B.R. 445, 448 (Bankr. E.D. Va. 1985).  While "not absolute," "the right of public access to court records is firmly entrenched and well supported by policy and practical considerations . . ." Orion, 21 F.3d at 27.  Therefore, "[i]n the Second Circuit, documents which are part of the court record should not remain under seal absent the most compelling reasons." In re Fibermark, Inc., 330 B.R. 480, 503-4 (Bankr. D. Vt. 2005).  This strong presumption of openness does not permit the routine closing of judicial records to the public and the party seeking to seal any part of a judicial record bears the heavy burden of showing (i) that the material is the kind of information that courts will protect and (ii) that disclosure will work a clearly defined and serious injury to the party seeking closure.  Publicker Indus., Inc. v. Cohen, 733 F.2d 1059 (3d Cir. 1984).  Before sealing the record, the court must be able to articulate the compelling countervailing interests to be protected, make specific findings on the record concerning the effects of disclosure, and provide an opportunity for interested third parties to be heard.  Id. at 1072.

83.     Moreover, to make the difficult case that the facts at hand should lead to the extraordinary remedy of hiding documents from public view, the moving party must "clearly define[]" the "serious injury" that would ensue from public disclosure of the documents. Goldstein v. Forbes (In re Cendant Corp.), 260 F.3d 183, 194 (3d Cir. 2001). Vague allegations that public access to documents would cause hardship are not sufficient to defeat the clear public policy embodied in § 107(a). See id. ("specificity is essential" for party seeking to deny public access).

84.     The Complaint falls woefully short of these standards. The Debtors invoked section 107(b)(1) of the Bankruptcy Code when requesting that the Court permit the filing of the Complaint under seal, attempting to characterize preservation of the status quo and existing business relationships as "commercial information" in need of protection. To support this argument the Debtors alleged that they "have worked to preserve and repair their business relationship with many of the potential defendants during these cases and have negotiated or regained favorable credit terms with many suppliers and are continuing to do so." Preservation of Estate Claims Procedures Motion, ¶ 37. Far from justifying the extraordinary relief the Debtors were seeking, this allegation serves, in fact, as a fairly alarming admission of bad faith negotiations: the Debtors sought to conceal material facts from the Preference Defendants, including M&Q, to obtain favorable business terms from them.

85.     In any event, the Debtors' reliance on the "commercial information" exception to the general requirement of public filings is misplaced, as that phrase has never been defined in this or any other district so broadly as to protect information that would be prejudicial to the Debtors vis-à-vis their own creditors. Rather, "commercial information has been defined as information which would cause an **unfair advantage to competitors** by providing them

AC1 912053v8 05/14/10

information as to the commercial operations of the debtor." Orion, 21 F.3d at 27 (emphasis added; internal citation omitted). This exception is narrowly construed, as it should be.

86.    In In re Northwest Airlines Corp., 363 B.R. 704 (Bankr. S.D.N.Y. 2007), the court denied an unsecured committee's request that the court seal certain Rule 2019 disclosures relating to committee members' trading in the debtors' securities. The court flatly rejected the argument that the committee members' interest in keeping their investment strategies secret constituted the kind of "commercial information" protected from disclosure under section 107(b)(1). Plainly, the actions filed against the Preference Defendants do not constitute "commercial information" warranting protection either. M&Q is not and never has been a competitor of the Debtors. Nor could it be seriously contended that the knowledge of the Debtors' preference claims would in any way advantage their competitors.

87.    Desperate to assure the Court that there was any precedent whatsoever for the extraordinary relief that they sought, the Debtors pointed to In re Service Merchandise, et al., Case No. 399-02649 (Bankr. M.D. Tenn. Feb. 27, 2001), (Docket No. 3565) for the untenable position that their preference claims represented "commercial information" appropriate for sealing. Service Merchandise is clearly at odds with prevailing Sixth Circuit law - not to mention Second Circuit law, as discussed above. See In re Frontier Group, LLC, 256 B.R. 771, 772 (Bankr. E.D. Tenn. 2000) (adopting the definition of "commercial information" established in Orion). In any event, that counsel for the Debtors, who also served as counsel for the debtors in Service Merchandise, was able to procure the same extraordinary and unjustified relief in one prior case hardly demonstrates that sealing complaints and then unilaterally extending the period for serving them is accepted as consistent with the spirit or letter of the law.

88.    In conclusion, Bankruptcy Code section 107 provides absolutely no basis for the

35

Debtors to have lawfully sealed the Complaint or any of the other complaints served against

Preference Defendants. The statute exists for the very opposite purpose: to codify "the general

right under common law to inspect and copy public documents, including judicial records . . .

[T]he basis for this right to access is not a proprietary interest in the information but, rather, the

public's interest in monitoring the workings of the judicial system." 2 Collier on Bankruptcy ¶

107.2 (15th ed. rev.). Indeed, the "existence of such rights has been called 'fundamental to a

democratic state." Id.

B. There was No Good Cause to Extend the Time for Service

89.    The Plaintiffs rely on the Extension Orders to justify the lengthy gap between the

time that M&Q should have been served with the Complaint and the date on which it was

actually served with the Complaint. Fed. R. Civ. P. 4(m), made applicable by Fed. R. Bankr. P.

7004(m), provides, in relevant part:

> *Time Limit for Service.* If a defendant is not served within 120 days
> after the complaint is filed, the court - on motion or on its own
> after notice to plaintiff- must dismiss the action without prejudice
> against that defendant or order that service be made within a
> specified time. But if the plaintiff shows good cause for the failure,
> the court must extend the time for service for an appropriate
> period.

Fed. R. Bankr. P. 7004(m).

90.    Good cause is "evidenced only in exceptional circumstances where the

insufficiency of service results from circumstances beyond the plaintiff's control." In re

WorldCom, Inc. Securities Litig., 2006 WL 83371, at *1 (S.D.N.Y. 2006) (quoting Feingold v.

Hankin, 269 F. Supp. 2d 268, 276 (S.D.N.Y. 2003). Good cause is measured against the

plaintiffs reasonable efforts to effect service and the prejudice to the defendant from the delay.

AIG Managed Mkt. Neutral Fund v. Askin Capital Mgmt., L.P., 197 F.R.D. 104, 108 (S.D.N.Y.

AC1 912053v8 05/14/10

2000).  A bankruptcy court also has discretion to extend the service of process period absent a

showing of good cause.  See Advisory Committee Notes to Fed. R. Cir. P. 4(m).  Relevant

factors are: "(1) whether the applicable statute of limitations would bar the refiled action; (2)

whether the defendant had actual notice of the claims asserted in the complaint; (3) whether the

defendant had attempted to conceal the defect in service; and (4) whether the defendant would be

prejudiced by the granting of plaintiff's request for relief from the provision."

91.    The Extension Orders should not have been entered, as good cause did not exist to

extend the time to serve process as a matter of law.  Good cause generally exists under Fed. R.

Civ. P. 4(m) when service is attempted, but not completed, within the 120-day period.  See e.g.,

Cohen v. Stokes Elec. Supply (In re Submicron Sys. Corp.), No. 03-230-SLR, 2004 U.S. Dist.

LEXIS 19170, at *7 (D, Del. Sept. 21, 2004);  Moll v. Parker (In re Parker), No. 07-30697, Adv.

Proc. No. 07-3037, 2007 Bankr. LEXIS 3297, at *5 (Bankr. E.D. Tenn. Sept. 25, 2007).  It does

not exist, however, in situations where, as is the case here, the Plaintiffs know and can serve the

named defendants, but simply choose not to do so to obtain benefits from the defendants before

they know they have been sued.  The use of procedural rules to obtain a result not contemplated

by the accompanying substantive law is impermissible.  See 28 U.S.C. § 2075 (rules prescribed

by the United States Supreme Court "shall not abridge, enlarge, or modify any substantive

right");  see also Morse v. Perrotta (In re Perrotta), 406 B.R. 1, 8 (Bankr. D.N.H. 2009)

("Therefore, to the extent that the Bankruptcy Rules and Bankruptcy Code are inconsistent, the

statute controls.").

92.    In the March 18, 2008 hearing before this Court, the Debtors addressed the 120-

day service period under Fed R. Civ. P. 4(m) in support of the February 2008 Extension Motion.

The Debtors argued that "[s]imilar relief of this nature has been granted in other cases – Chapter

AC1 912053v8 05/14/10

11 case in this district, including in the Ames Department Store case in 2004 where a further
extension was granted at docket number 2524 in that case." March 19, 2008 Hearing Transcript,
p. 22, line 7, attached as Exhibit "A". In the Ames case, the Debtors filed a motion to extend
time for service of process with respect to certain adversary proceedings; however, the ***names of
all defendants were listed on the exhibit to the extension motion***. (Case No. 01-42217, Docket
No. 2524). It is not surprising that the Debtors attempted to compare Ames to the situation here,
where M&Q was ***never*** listed as a defendant in the Extension Motions, and ***never*** received
proper notice of the Extension Motions.

93.     Moreover, while it is true that courts have discretion to extend the time for service
of process without good cause, such extensions were not warranted here. Although the
expiration of the statute of limitations would bar the Complaint from being refiled, the Debtors
actively chose to conceal the Complaint from M&Q. M&Q had no actual notice of the claims
raised in the Complaint and the two and half year delay in service is prejudicial to M&Q.
Furthermore, as M&Q was unaware of the Complaint's existence, it could not have possibly
concealed the procedural defects in the service of the Complaint from the Debtors.

94.     For all of the foregoing reasons, the Preservation of Estate Claims Procedures
Order, each of the Extension Orders, and the Modified Plan Confirmation Order (to the extent it
allows for the retention of these causes of action) should be vacated on the ground that the
application of each is inequitable and unjust with respect to M&Q.

C.  M&Q's Due Process Rights Have Been Violated

95.     M&Q respectfully submits that the combination of permitting the Debtors to file
the Complaint under seal – thereby concealing from M&Q that it had been sued – while
repeatedly extending the Debtors' time to serve process for nearly 2 ½ years after the expiration

of the statute of limitations – all without notice or an opportunity for M&Q to object - has resulted in a proceeding completely devoid of procedural due process.

96.    The following is undisputed: (i) the Debtors failed to notify M&Q that they filed the Preservation of Estate Claims Motion and failed to notify M&Q that they filed three Extension Motions; (ii) the Debtors failed to notify M&Q that they had filed a sealed Complaint; and (iii) as a result, M&Q had absolutely no opportunity to be heard (and to object) with respect to these motions, which ultimately resulted in a series of orders which, in part, extended the time to serve the sealed Complaint until 2 ½ years after expiration of the statute of limitations.

97.    It has been long recognized that: "The core of due process is the right to notice and a meaningful opportunity to be heard." Lachance v. Erickson, 522 U.S. 262, 266 (1998). For example, in Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313-14 (1950) (citations omitted), the Supreme Court established what Due Process requires:

> [T]here can be no doubt that at a minimum [the Due Process Clause] require[s] that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case . . . An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the action and afford them an opportunity to present objections.

Indeed, the right to be heard "has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." Mullane, 339 U.S. at 314.

98.    Accordingly, the Supreme Court and the Second Circuit both recognize that, if a party like M&Q is not afforded due process during the proceeding that led up to entry of an order, the party is not bound and the order is unenforceable against that party.  For example, in City of New York v. New York, N.H. & H. R.R. Co., 344 U.S. 293 (1953), the City, a creditor of

the bankruptcy debtor, did not receive notice of the claims bar date order issued by the court despite the fact that the debtor was required to mail notice of the order to the City.  The Supreme Court held that the City, whose identity and address were known, was not bound by the claims bar date because it was not given notice by the debtor.

99.     The Second Circuit recently made it clear that where a party is not given notice of a proceeding, it was not bound by any orders in the bankruptcy case.  In re Johns Manville Corp., -- F.3d --, 2010 WL 1007832, at *20 (2d Cir. 2010).  The Second Circuit held that because Chubb Indemnity Insurance Company did not receive notice of the proceedings that led to approval of: (i) the 1984 Insurance Settlement Agreement and the Manville Plan; and (ii) the 1986 Orders at issue, it was not bound by the orders (because to bind Chubb would violate its due process rights).  The court noted that "'one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which *he has not been made a party by service of process*.'"  Id. at 48 (quoting Ortiz v. Fibreboard Corp., 527 U.S. 815, 846 (1999)).

100.     Likewise, in United States v. Castro, 243 B.R. 380 (D. Ariz. 1999), the government did not receive notice of a motion filed by the debtor seeking a determination of tax liability or the court's related order.  Because the government received no notice, the court held the order was void as a matter of law (in violation of due process) and was vacated as to the government.  See also In re Krueger, 88 B.R. 238 (BAP 9th Cir. 1988) (vacating order of dismissal on due process grounds, explaining that the debtor did not receive notice of the hearing; as a result, the court retroactively reinstated the automatic stay and held that a foreclosure sale was void in violation of the automatic stay).

101.     Moreover, M&Q's due process rights are not affected by the fact that M&Q knew of the Debtors' bankruptcy proceeding.  In City of New York, the Supreme Court expressly

declared that the Due Process Clause entitles creditors to reasonable notice from a bankruptcy court before they will be bound – even where the creditor knew of the bankruptcy proceedings but did not monitor them.  The court stated:

> Nor can the bar order against New York be sustained because of the city's knowledge that reorganization of the railroad was taking place in the court. The argument is that such knowledge puts a duty on creditors to inquire for themselves about possible court orders limiting the time for filing claims. But even creditors who have knowledge of a reorganization have a right to assume that the statutory 'reasonable notice' will be given them before their claims are forever barred.

344 U.S. at 297.  The Supreme Court has never wavered from this reasoning.  See, e.g., Riehards v. Jefferson County, Richards v. Jefferson County, 517 U.S. 793, 800 n.5 (1996) (no duty to intervene in suit in which the party is a stranger);  Martin v. Wilks, 490 U.S. 755, 763 (1989) (no duty to intervene where a party is entitled to notice and a hearing before its rights are affected);  Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 799 (1983) ("a party's ability to take steps to safeguard its interests does not relieve the State of its constitutional obligation" to serve notice).  Accordingly, the Preservation of Estate Claims Procedures Order and the Extension Orders must be vacated.  See United Student Aid Funds, Inc. v. Espinosa, -- S.Ct. --, 2010 WL 1027825, at *6 (2010) (where notice and an opportunity to be heard are not provided, the order is a "legal nullity").

102.     The passage of time has improved the Debtors' litigation position at the expense of unknowing defendants, among them, M&Q.  For the past 4 ½ years, Plaintiffs have been able to gather evidence in support of the allegations in support of the allegations in the Complaint. Amazingly, the Debtors asserted that the procedures extending the relevant service deadlines would "not prejudice the potential defendants."  By forcing M&Q to defend a stale claim with one hand behind its back, M&Q is now forced to rely on witnesses, whose memories have faded

41

to the extent they can even be found.  It is impossible that all of the documents related to the Adversary Proceeding will be found by M&Q.  M&Q ceases to exist, no longer has unrestricted access to books and records or former employees with knowledge, has sold substantially all of its assets, and has transferred all its remaining assets and rights to a liquidating trust.

103.    All statutory defenses that M&Q will be forced to raise if the Adversary Proceeding is not dismissed will require time, money, and support from former M&Q employees.  M&Q bears the burden of proof for all statutory defenses, and it is impossible that M&Q can raise the same defenses it could have raised if the Complaint was served two years ago.

104.    M&Q failed to put financial reserves in place to make allowance for this Adversary Proceeding after M&Q sold its claim to Goldman Sachs, because it genuinely believed that it had no exposure after the passage of the limitations period.  M&Q sold the Claim to Goldman Sachs.  Therefore, M&Q faces the possibility of not only having an outstanding judgment, but liability from Goldman Sachs if this court agrees to a set-off or disallowance of M&Q's (now Goldman Sachs') claim against the Debtors.[9]

## V.    THE COMPLAINT FAILS TO PLEAD SUFFICIENT FACTS TO STATE A CAUSE FOR RELIEF AND SHOULD BE DISMISSED

105.    Delphi's Complaint does not state a claim for relief under 11 U.S.C. § 547, and, therefore, must be dismissed pursuant to Rule 7012(b)(6).  In Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the Supreme Court established the standard by which federal courts are to determine motions to dismiss.  Under Twombly, to survive a motion to dismiss, the complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face."  Id.

---

[9] M&Q has opposed the attempt by the Reorganized Debtor to reserve set-off rights pursuant to the Reorganized Debtors Forty Fourth Omnibus Claims Objection (Docket No. 19395) by Response filed on March 10, (Docket No. 19613) and reserves all rights in respect thereof.

AC1 912053v8 05/14/10

at 570. A pleading that only offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not suffice. Id. at 555. The Supreme Court recently elaborated on its holding in Twombly

> Two working principles underlie our decision in Twombly. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action supported by mere conclusory statements, do not suffice. Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not "show[n]"–"that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).
>
> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-1950 (2009) (emphasis added; internal citations to Twombly and corresponding quotation marks omitted).

106.    In Angell v. Haven (In re Careamerica), 409 B.R. 346 (Bankr. E.D.N.C. 2009), the bankruptcy court applied the Supreme Court's holding in Twombly to a preference action. The defendant filed a motion to dismiss the trustee's claims to avoid alleged preferential and fraudulent transfers. The bankruptcy court concluded that, based on the Supreme Court's holdings in Twombly, the trustee's complaint must plead sufficient factual allegations to

43

establish that a preference cause of action is plausible.  Id. at 350.  The bankruptcy court then analyzed each element of the preference statute to determine if sufficient factual allegations were pleaded.

107.    The bankruptcy court held that the trustee's complaint did not contain sufficient factual allegations to show it was plausible that a transfer of an interest of the debtor in property had occurred because the complaint failed to identify which of the debtors made the alleged transfers.  Id.  Moreover, the bankruptcy court held that the trustee's complaint did not contain sufficient factual allegations to show it was plausible that the alleged transfers were made on account of an antecedent debt.  The bankruptcy court explained that "the trustee must assert the nature and amount of the antecedent debt in order to allege a plausible claim for relief."  Id. at 351.  The trustee's complaint merely recited the statutory element that the transfer was made "for, or on account of, an antecedent debt owed by the Debtors to the Defendant before the transfers were made."  Id.  The complaint lacked any facts showing the existence of an antecedent debt.  The bankruptcy court explained that in order to satisfy the pleading requirements under Twombly "the trustee must allege facts regarding the nature and amount of the antecedent debt which, if true, would render plausible the assertion that a transfer was made for or on account of such antecedent debt."  Id.

108.    Like the complaint at issue in Careamerica, the Complaint in the instant case (Adv. Docket No. 7) does not contain sufficient factual matter to state a claim for relief under section 547 that is plausible on its face.  The Complaint contains nothing more than a formulaic recitation of the elements of a claim for relief under 11 U.S.C. § 547.  The Complaint contains no factual allegations other than a list of alleged transfers contained in Exhibit 1 to the Complaint.

109.    First, the Debtors do not allege that they actually made the alleged transfers listed

on Exhibit 1.  Instead, the Debtors allege that they "made, or caused to be made," the alleged transfers.  Complaint,  ¶¶ 10, 12 and 13.

110.    Second, like the complaint dismissed by the court in <u>Careamerica</u>, the Complaint here does not identify the specific debtor that is alleged to have made the transfers listed on Exhibit 1 of the Complaint.  Instead, the Complaint alleges that the alleged transfers were made by "Plaintiffs" which are defined to include "all of the Debtors in the above-captioned chapter 11 cases."  <u>Id.</u>, p. 2, n.1.

111.    Third, the Complaint does not identify the recipient of any alleged transfer.  The Complaint names two (2) different entities that allegedly received transfers but fails to identify the transfers allegedly received by each such entity.  <u>Id.</u>, ¶¶ 3, 10, 12 and 13.

112.    Finally, the list of transfers challenged by Delphi includes every payment received by M&Q in the 90 days prior to the Petition Date without accounting for the course of dealing among the parties or the fact that new shipments continued throughout the period.

113.    This Court must also note that many of the complaints filed in the Adversary Proceedings are identical, with the exception the exhibit attached to the complaint.  This is clear evidence that the Complaints were generic, and the Plaintiffs made no attempt whatsoever to follow the guidelines set forth under <u>Iqbal</u> and <u>Twombly</u>.

114.    Accordingly, the Court should dismiss the Complaint under <u>Iqbal</u> and <u>Twombly</u>.

## VI.    IN THE ALTERNATIVE, DEBTORS SHOULD BE REQUIRED TO FILE A MORE DEFINITE STATEMENT

115.    In any event, to the extent the Court concludes that the Complaint should not be dismissed, M&Q respectfully requests that the Court order Delphi, pursuant to Fed. R. Civ. P. 12(e), to file a more definite statement, addressing the deficiencies outlined above.

AC1 912053v8 05/14/10

## **CONCLUSION**

116.    For the reasons set forth at length above, M&Q respectfully submits that the

Complaint should be dismissed with prejudice.


WHEREFORE, Defendant requests that the Complaint be dismissed with prejudice, that

the Extension Orders be vacated, and that the Court grant to Defendant such further relief as is

proper and just.


Dated:   New York, New York
         May 14, 2010

                              FOX ROTHSCHILD LLP


                    By:    */s/ Michael Viscount*
                           Michael J. Viscount (Admitted *pro hac vice*)
                           Brian R. Isen (*Pro hac vice* pending)
                           Midtown Building, Suite 400
                           1301 Atlantic Avenue
                           Atlantic City, NJ  08401
                           (609) 348-4515

                                   -and-

                           Fred Stevens
                           100 Park Avenue, 15th Floor
                           New York, New York 10017
                           (212) 878-7900

                           *Attorneys for Defendant M&Q Plastic Products, LP*

AC1 912053v8 05/14/10