STITES & HARBISON PLLC
Robert C. Goodrich Jr. (TN 10454)
Madison L. Martin (TN 24027)
401 Commerce Street, Suite 800
Nashville, TN 37219
Tel: (615) 244-5200
Fax: (615) 782-2371
Email:  robert.goodrich@stites.com
        madison.martin@stites.com

        -and-

John A. Bicks (JB 3496)
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, New York 10020-1089
Tel:  (212) 768-6700
Fax: (212) 768-6800

*Attorneys for Setech, Inc.*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| DPH HOLDINGS CORP., *et al.*, | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------- x

| | | |
|---|---|---|
| DPH HOLDINGS CORP., *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Adv. Pro. No. 07-02619 (RDD) |
| | : | |
| Against | : | |
| | : | |
| SETECH INC. and SETECH, | : | |
| | : | |
| Defendants. | : | |

-------------------------------------------------- x

## DECLARATION OF RICHARD M. EDDINGER

RICHARD M. EDDINGER declares as follows:

1.    I am the Vice President and Chief Financial Officer of defendant Setech, Inc.

("**Setech**").

2.      My statements in this Declaration are based on the knowledge I have gained to the present, since becoming involved with the Delphi integrated manufacturing facilities service contracts, during which time I have, among other things, reviewed Setech's files and had access to its computer database that contains the receivables and payment history, I have been closely involved in all contract negotiations with Delphi Corporation (the "**Debtor,**" and with its affiliates, the "**Debtors**") throughout its relationship with Setech, and I have now reviewed the Complaint allegedly filed in this proceeding over two and a half years ago ("**Complaint**").

## BACKGROUND OF RELATIONSHIP

3.      Under that certain Delphi/Setech Master Agreement dated July 1, 2005, and predecessor master agreements (collectively the "**Master Agreement**"), Setech operated and functioned for the Debtors as: (i) an integrated on-site supply manager for the purpose of providing the on-site information, data base, and property systems and personnel essential to conduct and oversee Delphi's inventory management and (ii) a purchasing agent for the Debtors for the purpose of procuring certain products, services and materials from vendors (collectively, the "**Agency Vendors**," and each an "**Agency Vendor**") critical to the continued operation of certain manufacturing facilities owned by the Debtors. A true and correct copy of the Master Agreement is attached as *Exhibit 1* hereto. Pursuant to the Master Agreement "Setech will purchase indirect/MRO materials as directed by and as agent for Delphi." Master Agreement at p. 5 at ¶ 4.

4.      The manufacturing facilities operated by the Debtors and managed by Setech on their behalf included the following facilities (each a "**Facility**" and collectively the "**Facilities**") commonly referred to as:

> (i)      Kettering - Delphi Energy & Chassis, 2555 Woodman Dr., Gate # 4, Dock 14, Kettering, OH, 45420,
>
> (ii)     Sandusky - Delphi Energy & Chassis, 2509 Hayes Avenue, Sandusky, OH, 44870,
>
> (iii)    Home Ave.- Delphi Energy & Chassis, Home Ave. 2701 Home Ave. Bldg. 5, Dayton, OH, 45417,

(iv)    Vandalia - Delphi Energy & Chassis, 480 N. Dixie, Vandalia, OH, 45377,

(v)    Needmore - Delphi Energy & Chassis, 3100 Needmore Dr., Dayton, OH, 45414,

(vi)    Wisconsin - Delphi Energy & Chassis, 1515 Cincinnati Rd., Dayton, OH, 45408,

(vii)    Harrison Moraine - Delphi Harrison Thermal, 3600 Dryden Rd., Moraine, OH 45439,

(viii)    Kokomo - Delphi Delco Electronics, 2033 East Blvd., Plant 9 Dock 9-S, Kokomo, IN, 46902,

(ix)    E & S Milwaukee – Delphi Delco Electronics, 7929 S. Howell, Oak Creek, WI, 53154,

(x)    E &C Milwaukee – Delphi Energy & Chassis, 7929 S. Howell, Oak Creek, WI, 53154,

(xi)    Saginaw – Delphi Saginaw Steering Systems, 3900 East Holland Rd, Saginaw, MI, 48601, and

(xii)    Athens - Delphi Saginaw Steering Systems, 6275 Highway 31 South, Athens, AL, 35611.

5.    The Debtors generally did not enter into long-term contracts with the Agency Vendors. As an agent for the Debtors, Setech generally placed orders with Agency Vendors for spot purchases on an open account basis in accordance with individual purchase orders.

6.    Certain of the Debtors filed bankruptcy on October 8, 2005 and certain additional Debtors filed bankruptcy on October 14, 2005. On or about October 18, 2005, Setech served a precautionary reclamation demand upon the Debtors in accordance with Uniform Commercial Code § 2-702-(2) and 11 U.S.C.§ 546(c), but only to the extent that it could have been classified as a seller of the identified reclaimed goods and not otherwise (the "**Setech Reclamation Demand**").

7.    The Court  entered an Essential Supplier Order on October 13, 2005 (Docket No. 197)(the "**Essential Supplier Order**"). Pursuant to the Essential Supplier Order, the Debtors and Setech entered into the Setech Essential Supplier Agreement dated October 27, 2005 ("**Setech Essential Supplier Agreement**"). A true and correct copy of the Essential Supplier Order is attached as *Exhibit 2* hereto. A true and correct copy of the Setech Essential Supplier Agreement is attached as *Exhibit 3* hereto.

8.      Based on the Setech Essential Supplier Agreement, as required by the terms of the Essential Supplier Order (*see* Ex. 2 at ¶ 3(f)), Setech withdrew the Setech Reclamation Demand. A true and correct copy of the Withdrawal Notice is attached as ***Exhibit 4*** hereto.

9.      Debtors and Setech entered into a Memorandum of Understanding on May 16, 2007 (the "**MOU**"), in which Setech agreed to certain price concessions benefiting Debtors. A true and correct copy of the MOU is attached as ***Exhibit 5*** hereto.

10.     Debtors and Setech entered into a Transaction Agreement on September 1, 2007 (the "**Transaction Agreement**"), in which Setech agreed to additional price concessions benefiting Debtors. The Transaction Agreement was amended twice, once on November 29, 2007, and again October 6, 2009, and in both amendments, at the Debtors' request, Setech granted them price concessions.

11.     On or about July 15, 2008, Debtors and Setech, through their respective Mexican affiliates, entered to another Management Services Agreement for Setech to provide similar agency and management services with respect to the Debtors' facility in Mexico (as amended from time to time, the "**Los Pinos Agreement**").

## PRE-FUND TRANSFER EXPRESS WAIVER AND RELEASE

12.     On October 6, 2005, the Debtors wire-transferred $1,335,013.94 to Setech. So far as I have been able to determine, this payment did not match any particular invoices or invoices or combination of invoices. In the Essential Supplier Agreement, the Debtors and Setech defined this payment as the "**Setech Prefund Transfer**." Setech Essential Supplier Agreement at ¶ I on page 2. The Essential Supplier Order at p. 5, ¶ 7, provides as follows:

> The Debtors are hereby authorized but not directed to waive and release their rights, and the rights of their respective estates, under section 547 of the Bankruptcy Code to avoid a prepetition transfers (each a "Prefunded Transfer") on account of the prefunding of obligations to a supplier (each a "Prefunded Suppliers") if, on or before November 7, 2005, such Prefunded Supplier enters in a Trade Agreement.

13.     The Debtors exercised the authority to waive avoidance rights as to the Setech Prefund Transfer to the full extent granted by the Essential Supplier Order in the Setech Essential Supplier Agreement, p. 3 at ¶ 2:

> 2.     The Debtors hereby release and waive any claim to avoid and recover, seek disgorgement of, or to assert as a defense or counterclaim the Setech Prefund Transfer to the fullest extent permitted under the Essential Supplier Order.

14.     Setech relied upon the authority granted in the Essential Supplier Order and Debtors' express waiver and release as to all claims to the Setech Prefund Transfer when it withdrew the Setech Reclamation Demand.

## SETECH WAS NEVER A TRANSFEREE OF PRODUCT PAYMENTS

15.     I have reviewed Setech's accounting records and the transfers alleged in Exhibit "1" to the Complaint (excluding the Setech Prefund Transfer, the "**Alleged Transfers**"). The Alleged Transfers total $21,332,109.40.

16.     Historically, payments to Setech by Debtors were made on account of four categories of obligations:

> (i)      Product delivered by Agency Vendors to the Facilities (collectively, the "**Product**");
>
> (ii)     Freight cost of common carriers who delivered the Products to the Facilities (collectively, the "**Freight**");
>
> (iii)    Various site expenses for the operation of the Facilities, including employee wages and benefits (collectively, the "**Site Expenses**"); and
>
> (iv)     The Setech monthly management fee for performing the integrated services required to operate the Facilities (collectively, the "**Management Fees**").

17.     The general practice for payment of Product was as follows: as agent for the Debtors, Setech ordered Product for the Debtors, and the Debtors, not Setech, became liable to the Vendors to pay for that Product. Setech received Product at the Facilities, and based on the date of receipt of the Product, it requested payment from the Debtors to be made on the second

business day of the second month after the Product had been received. Then, anticipating receipt of an electronic funds transfer or transfers from the Debtors, Setech cut checks to Agency Vendors invoiced on payment terms of second day, second month billing cycles, but did not mail them. The electronic funds transfer or transfers were subject to the Debtors' approval on a Facility by Facility basis, and typically approvals were made and funds released to Setech during a 3-5 day period around the second business day of each month. After the funds were electronically transferred, Setech mailed the checks to the Agency Vendors. Because of this practice and because of Setech's status as a paying agent for the Debtors, the parties stipulated in the Setech Essential Supplier Agreement that:

> No payment to Setech by the Debtors that Setech used to pay Agency Vendors under the Master Agreement constitutes a transfer to Setech under the Bankruptcy Code or under any similar law providing for avoidance, disgorgement, or other remedies in insolvency-related situations.

Setech Essential Supplier Agreement, ¶ F at p. 2.

18.      Of the Alleged Transfers totaling $21,332,109.40, $18,937,299.65 (or 88%) constituted funds used by Setech to pay for Product ("**Product Payments**"), with the remaining $2,394,809.75 for Freight, Site Expenses, and Management Fees. A spreadsheet summarizing the breakdown of the Alleged Transfers is attached as *Exhibit 6* hereto. Based on the stipulation contained in paragraph F of the Setech Essential Supplier Agreement, $18,937,299.65 of the $21,332,109.40 in Alleged Transfers were not transfers to Setech subjecting it to any avoidance liability, and Setech had no basis to believe that it was subject to any liability as a result of them.

### ORDINARY COURSE OF BUSINESS

19.      The payment terms granted to Debtors by the Agency Vendors were standard in the automotive parts industry: "Second Day, Second Month" Terms. This means that obligations invoiced on any day during month one would be due and payable on the second business day of the second month following invoice, or month three. Therefore, any obligation invoiced on January 1 or January 31 would be due on the second business day of March, which may or may not fall on the second calendar day of March.

20.     When Setech requested payment from the Debtors for Product, it also billed them for Freight, Site Expenses, and Management Fees, and the wire transfers received around the second day, second month included payment for Product, Freight, Site Expenses, and Management Fees. The allocation of the Alleged Transfers to those four categories is shown on Exhibit 6.

21.     Except for the August 11, 2005 Alleged Transfer, all of the Alleged Transfers listed on Exhibit A to the Complaint were paid within 3 days of the "Second Day Second Month" Terms, and this pattern is consistent with payment practices prior to July 2005 as well. The Alleged Transfers timing is summarized as follows:

| Alleged Transfer Amount | Alleged Transfer Date | Business Days Late or (Early) |
|---|---|---|
| $598.64 | 7/29/2005 | (2) |
| $790.50 | 8/1/2005 | (1) |
| $7,170,977.31 | 8/2/2005 | 0 |
| $522,897.38 | 8/3/2005 | 1 |
| $388,503.32 | 8/4/2005 | 2 |
| $590,135.53 | 8/5/2005 | 3 |
| $659,392.78 | 8/11/2005 | 7 |
| $996,551.38 | 8/30/2005 | (3) |
| $246,740.86 | 8/31/2005 | (2) |
| $6,780,536.54 | 9/2/2005 | 0 |
| $1,249,563.52 | 10/4/2005 | 0 |
| $2,187,311.34 | 10/5/2005 | 1 |
| $23,139.33 | 10/6/2005 | 2 |
| $514,970.97 | 10/7/2005 | 3 |

22.     As a component of the contract renewal negotiations effective June 1, 2005, Setech and the Debtors agreed to change the billing cycle for all remaining Facilities from the 20th day of the month to the 30th day of the month. Therefore, the June 2005 invoice report to the Debtors for Kokomo was broken down into two bills, one invoice report for the first 20 days of the month and a later-generated "short bill" for the last 10 days of the month, both of which would have been due on the second business day of August 2005. It is my belief that due to the Independence Day holiday and the attendant usual shutdown of the Facilities for the first week of July, the 10-day "short bill" in the amount of $659,392.78 was both generated and paid several

days later than it otherwise would have been generated and paid had the parties not changed the billing cycle.

23.    All of the Alleged Transfers were completed in the ordinary course of Setech's and the Debtors' businesses and on terms and conditions that are standard in our industry.

## NO NOTICE WAS GIVEN TO SETECH

24.    Setech had no knowledge that Debtors would sue, or in fact did sue, Setech until it received the Complaint on or around April 1, 2010.

25.    Prior to receiving the Complaint on April 1, 2010, Setech was not served with any notice of any motions to extend service of the Complaint.

23.    Setech was aware that there was a two-year statute of limitations for avoidance actions.

## PREJUDICE TO SETECH

26.    While the Complaint was sealed, during which time Setech had no knowledge of it, the Debtors and Setech negotiated two amendments to the Transaction Agreement and Mexican affiliates of Setech and the Debtors entered into the Los Pinos Agreement. Setech would not have given the Debtors the terms set forth in those agreements had it known that the Complaint had been filed and was pending. It was deceitful for the Debtors to hide the Complaint from Setech while seeking and receiving favorable terms from Setech.

27.    Setech is neither Laneko Engineering Co., Wachovia Bank, National Association nor Laneko Engineering Co. Inc. nor a parent, affiliate or subsidiary thereof.

28.    Setech is not a competitor of the Debtors.

29.    The filing of this action under seal and then the subsequent secreting of the action, with service of process for two and one-half years, is repugnant. Actual prejudice to Setech was the foreseeable and actual result. The prejudice stems from the following:

    a.    All of the Facilities except Kokomo are now closed or sold off.

b.    So far as I know, no Facility-level employees, either on the Setech side or the Debtors' side, remain employed by either party and may now be beyond the subpoena power of the Court. Therefore, there may be no site-level witnesses on either side available to testify as to the business practices between the parties.

c.    As to all of the Facilities, documentary evidence which for the most part would have been readily available on-site had this action been timely prosecuted has since been bulk shipped, culled and stored offsite, and documents of original entry may have since been purged or lost. Similarly, the historical payment data that was once stored in the DACOR computer system used by the Debtors may no longer exist in any decipherable form.

d.    Setech, in the mistaken belief that there was no litigation, has not retained all records of the agency vendor transactions, resulting in a loss of evidence, such as e-mail and handwritten, contemporaneous notes, which could be essential in defending the action. Likewise, Setech has not retained all of its employees or contact information for all witnesses whose personal knowledge is relevant to this action, each of whom is essential in defending the action.

e.    The Debtors extracted new contracts and more favorable payment terms from Setech, than it otherwise would have gotten had Setech been informed that it had been sued for a multiple of its total net worth.

f.    If this action continues, Setech has lost all benefit from the statute of repose.

g.    During the period of September 2007 through April 2010 Setech undertook a number of key strategic and operational investments that consumed a significant portion of its equity. These investment included expenditures into joint ventures in support of operations and significant expenditures for internal update information systems software and hardware. During this time frame Setech's investments totaled between $2 million and $3 million, over fifty percent of its equity. Setech and its investors would have never undertaken these directions had they known of the existence of a suit totaling over four times its equity.

h.    During the period of September 2007 through April 2010, Setech bought back stock from investors and investors purchased stock in Setech, without knowledge of the Complaint. The existence of the Complaint is unquestionably material information to anyone considering buying or selling equity in Setech.

i.    Setech is routinely asked to give customers and potential customers and potential business partners financial information. Even assuming that the Complaint is meritless, the existence of a $22,667,123.34 claim, which is many times in excess of Setech's net worth, impairs its ability to maintain and create new business relationships.

Executed:      Murfreesboro, Tennessee
               May 12, 2010

I declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true

and correct.

_____

Richard M. Eddinger

2.      My statements in this Declaration are based on the knowledge I have gained to the present, since becoming involved with the Delphi integrated manufacturing facilities service contracts, during which time I have, among other things, reviewed Setech's files and had access to its computer database that contains the receivables and payment history, I have been closely involved in all contract negotiations with Delphi Corporation (the "**Debtor,**" and with its affiliates, the "**Debtors**") throughout its relationship with Setech, and I have now reviewed the Complaint allegedly filed in this proceeding over two and a half years ago ("**Complaint**").

## BACKGROUND OF RELATIONSHIP

3.      Under that certain Delphi/Setech Master Agreement dated July 1, 2005, and predecessor master agreements (collectively the "**Master Agreement**"), Setech operated and functioned for the Debtors as: (i) an integrated on-site supply manager for the purpose of providing the on-site information, data base, and property systems and personnel essential to conduct and oversee Delphi's inventory management and (ii) a purchasing agent for the Debtors for the purpose of procuring certain products, services and materials from vendors (collectively, the "**Agency Vendors,**" and each an "**Agency Vendor**") critical to the continued operation of certain manufacturing facilities owned by the Debtors. A true and correct copy of the Master Agreement is attached as *Exhibit 1* hereto. Pursuant to the Master Agreement "Setech will purchase indirect/MRO materials as directed by and as agent for Delphi." Master Agreement at p. 5 at ¶ 4.

4.      The manufacturing facilities operated by the Debtors and managed by Setech on their behalf included the following facilities (each a "**Facility**" and collectively the "**Facilities**") commonly referred to as:

     (i)    Kettering - Delphi Energy & Chassis, 2555 Woodman Dr., Gate # 4, Dock 14, Kettering, OH, 45420,

     (ii)   Sandusky - Delphi Energy & Chassis, 2509 Hayes Avenue, Sandusky, OH, 44870,

(iii)   Home Ave.- Delphi Energy & Chassis, Home Ave. 2701 Home
Ave. Bldg. 5, Dayton, OH, 45417,

(iv)    Vandalia - Delphi Energy & Chassis, 480 N. Dixie, Vandalia, OH,
45377,

(v)     Needmore - Delphi Energy & Chassis, 3100 Needmore Dr.,
Dayton, OH, 45414,

(vi)    Wisconsin - Delphi Energy & Chassis, 1515 Cincinnati Rd.,
Dayton, OH, 45408,

(vii)   Harrison Moraine - Delphi Harrison Thermal, 3600 Dryden Rd.,
Moraine, OH 45439,

(viii)  Kokomo - Delphi Delco Electronics, 2033 East Blvd., Plant 9
Dock 9-S, Kokomo, IN, 46902,

(ix)    E & S Milwaukee – Delphi Delco Electronics, 7929 S. Howell,
Oak Creek, WI, 53154,

(x)     E &C Milwaukee – Delphi Energy & Chassis, 7929 S. Howell,
Oak Creek, WI, 53154,

(xi)    Saginaw – Delphi Saginaw Steering Systems, 3900 East Holland
Rd, Saginaw, MI, 48601, and

(xii)   Athens - Delphi Saginaw Steering Systems, 6275 Highway 31
South, Athens, AL, 35611.

5.      The Debtors generally did not enter into long-term contracts with the Agency
Vendors. As an agent for the Debtors, Setech generally placed orders with Agency Vendors for
spot purchases on an open account basis in accordance with individual purchase orders.

6.      Certain of the Debtors filed bankruptcy on October 8, 2005 and certain additional
Debtors filed bankruptcy on October 14, 2005. On or about October 18, 2005, Setech served a
precautionary reclamation demand upon the Debtors in accordance with Uniform Commercial
Code § 2-702-(2) and 11 U.S.C.§ 546(c), but only to the extent that it could have been classified
as a seller of the identified reclaimed goods and not otherwise (the "**Setech Reclamation
Demand**").

7.      The Court  entered an Essential Supplier Order on October 13, 2005 (Docket No.
197)(the "**Essential Supplier Order**"). Pursuant to the Essential Supplier Order, the Debtors and
Setech entered into the Setech Essential Supplier Agreement dated October 27, 2005 ("**Setech**

**Essential Supplier Agreement**"). A true and correct copy of the Essential Supplier Order is attached as *Exhibit 2* hereto. A true and correct copy of the Setech Essential Supplier Agreement is attached as *Exhibit 3* hereto.

8.      Based on the Setech Essential Supplier Agreement, as required by the terms of the Essential Supplier Order (*see* Ex. 2 at ¶ 3(f)), Setech withdrew the Setech Reclamation Demand. A true and correct copy of the Withdrawal Notice is attached as *Exhibit 4* hereto.

9.      Debtors and Setech entered into a Memorandum of Understanding on May 16, 2007 (the "**MOU**"), in which Setech agreed to certain price concessions benefiting Debtors. A true and correct copy of the MOU is attached as *Exhibit 5* hereto.

10.     Debtors and Setech entered into a Transaction Agreement on September 1, 2007 (the "**Transaction Agreement**"), in which Setech agreed to additional price concessions benefiting Debtors. The Transaction Agreement was amended twice, once on November 29, 2007, and again October 6, 2009, and in both amendments, at the Debtors' request, Setech granted them price concessions.

11.     On or about July 15, 2008, Debtors and Setech, through their respective Mexican affiliates, entered to another Management Services Agreement for Setech to provide similar agency and management services with respect to the Debtors' facility in Mexico (as amended from time to time, the "**Los Pinos Agreement**").

## PRE-FUND TRANSFER EXPRESS WAIVER AND RELEASE

12.     On October 6, 2005, the Debtors wire-transferred $1,335,013.94 to Setech. So far as I have been able to determine, this payment did not match any particular invoices or invoices or combination of invoices. In the Essential Supplier Agreement, the Debtors and Setech defined this payment as the "**Setech Prefund Transfer**." Setech Essential Supplier Agreement at ¶ I on page 2. The Essential Supplier Order at p. 5, ¶ 7, provides as follows:

The Debtors are hereby authorized but not directed to waive and release their
rights, and the rights of their respective estates, under section 547 of the
Bankruptcy Code to avoid a prepetition transfers (each a "Prefunded Transfer")
on account of the prefunding of obligations to a supplier (each a "Prefunded
Suppliers") if, on or before November 7, 2005, such Prefunded Supplier enters in
a Trade Agreement.

13.    The Debtors exercised the authority to waive avoidance rights as to the Setech

Prefund Transfer to the full extent granted by the Essential Supplier Order in the Setech Essential

Supplier Agreement, p. 3 at ¶ 2:

2.    The Debtors hereby release and waive any claim to avoid and recover,
seek disgorgement of, or to assert as a defense or counterclaim the Setech
Prefund Transfer to the fullest extent permitted under the Essential Supplier
Order.

14.    Setech relied upon the authority granted in the Essential Supplier Order and

Debtors' express waiver and release as to all claims to the Setech Prefund Transfer when it

withdrew the Setech Reclamation Demand.

## SETECH WAS NEVER A TRANSFEREE OF PRODUCT PAYMENTS

15.    I have reviewed Setech's accounting records and the transfers alleged in

Exhibit "1" to the Complaint (excluding the Setech Prefund Transfer, the "**Alleged Transfers**").

The Alleged Transfers total $21,332,109.40.

16.    Historically, payments to Setech by Debtors were made on account of four

categories of obligations:

    (i)    Product delivered by Agency Vendors to the Facilities
           (collectively, the "**Product**");

    (ii)   Freight cost of common carriers who delivered the Products to the
           Facilities (collectively, the "**Freight**");

    (iii)  Various site expenses for the operation of the Facilities, including
           employee wages and benefits (collectively, the "**Site Expenses**");
           and

       (iv)    The Setech monthly management fee for performing the integrated services required to operate the Facilities (collectively, the "**Management Fees**").

17.    The general practice for payment of Product was as follows: as agent for the Debtors, Setech ordered Product for the Debtors, and the Debtors, not Setech, became liable to the Vendors to pay for that Product. Setech received Product at the Facilities, and based on the date of receipt of the Product, it requested payment from the Debtors to be made on the second business day of the second month after the Product had been received. Then, anticipating receipt of an electronic funds transfer or transfers from the Debtors, Setech cut checks to Agency Vendors invoiced on payment terms of second day, second month billing cycles, but did not mail them. The electronic funds transfer or transfers were subject to the Debtors' approval on a Facility by Facility basis, and typically approvals were made and funds released to Setech during a 3-5 day period around the second business day of each month. After the funds were electronically transferred, Setech mailed the checks to the Agency Vendors. Because of this practice and because of Setech's status as a paying agent for the Debtors, the parties stipulated in the Setech Essential Supplier Agreement that:

> No payment to Setech by the Debtors that Setech used to pay Agency Vendors under the Master Agreement constitutes a transfer to Setech under the Bankruptcy Code or under any similar law providing for avoidance, disgorgement, or other remedies in insolvency-related situations.

Setech Essential Supplier Agreement, ¶ F at p. 2.

18.    Of the Alleged Transfers totaling $21,332,109.40, $18,937,299.65 (or 88%) constituted funds used by Setech to pay for Product ("**Product Payments**"), with the remaining $2,394,809.75 for Freight, Site Expenses, and Management Fees. A spreadsheet summarizing the breakdown of the Alleged Transfers is attached as *Exhibit 6* hereto. Based on the stipulation contained in paragraph F of the Setech Essential Supplier Agreement, $18,937,299.65 of the $21,332,109.40 in Alleged Transfers were not transfers to Setech subjecting it to any avoidance liability, and Setech had no basis to believe that it was subject to any liability as a result of them.

## ORDINARY COURSE OF BUSINESS

19.     The payment terms granted to Debtors by the Agency Vendors were standard in the automotive parts industry: "Second Day, Second Month" Terms. This means that obligations invoiced on any day during month one would be due and payable on the second business day of the second month following invoice, or month three. Therefore, any obligation invoiced on January 1 or January 31 would be due on the second business day of March, which may or may not fall on the second calendar day of March.

20.     When Setech requested payment from the Debtors for Product, it also billed them for Freight, Site Expenses, and Management Fees, and the wire transfers received around the second day, second month included payment for Product, Freight, Site Expenses, and Management Fees. The allocation of the Alleged Transfers to those four categories is shown on Exhibit 6.

21.     Except for the August 11, 2005 Alleged Transfer, all of the Alleged Transfers listed on Exhibit A to the Complaint were paid within 3 days of the "Second Day Second Month" Terms, and this pattern is consistent with payment practices prior to July 2005 as well. The Alleged Transfers timing is summarized as follows:

| Alleged Transfer Amount | Alleged Transfer Date | Business Days Late or (Early) |
|---|---|---|
| $598.64 | 7/29/2005 | (2) |
| $790.50 | 8/1/2005 | (1) |
| $7,170,977.31 | 8/2/2005 | 0 |
| $522,897.38 | 8/3/2005 | 1 |
| $388,503.32 | 8/4/2005 | 2 |
| $590,135.53 | 8/5/2005 | 3 |
| $659,392.78 | 8/11/2005 | 7 |
| $996,551.38 | 8/30/2005 | (3) |
| $246,740.86 | 8/31/2005 | (2) |
| $6,780,536.54 | 9/2/2005 | 0 |
| $1,249,563.52 | 10/4/2005 | 0 |
| $2,187,311.34 | 10/5/2005 | 1 |
| $23,139.33 | 10/6/2005 | 2 |
| $514,970.97 | 10/7/2005 | 3 |

22.     As a component of the contract renewal negotiations effective June 1, 2005, Setech and the Debtors agreed to change the billing cycle for all remaining Facilities from the 20th day of the month to the 30th day of the month. Therefore, the June 2005 invoice report to the Debtors for Kokomo was broken down into two bills, one invoice report for the first 20 days of the month and a later-generated "short bill" for the last 10 days of the month, both of which would have been due on the second business day of August 2005. It is my belief that due to the Independence Day holiday and the attendant usual shutdown of the Facilities for the first week of July, the 10-day "short bill" in the amount of $659,392.78 was both generated and paid several days later than it otherwise would have been generated and paid had the parties not changed the billing cycle.

23.     All of the Alleged Transfers were completed in the ordinary course of Setech's and the Debtors' businesses and on terms and conditions that are standard in our industry.

## NO NOTICE WAS GIVEN TO SETECH

24.     Setech had no knowledge that Debtors would sue, or in fact did sue, Setech until it received the Complaint on or around April 1, 2010.

25.     Prior to receiving the Complaint on April 1, 2010, Setech was not served with any notice of any motions to extend service of the Complaint.

23.     Setech was aware that there was a two-year statute of limitations for avoidance actions.

## PREJUDICE TO SETECH

26.     While the Complaint was sealed, during which time Setech had no knowledge of it, the Debtors and Setech negotiated two amendments to the Transaction Agreement and Mexican affiliates of Setech and the Debtors entered into the Los Pinos Agreement. Setech would not have given the Debtors the terms set forth in those agreements had it known that the

Complaint had been filed and was pending. It was deceitful for the Debtors to hide the Complaint from Setech while seeking and receiving favorable terms from Setech.

27.     Setech is neither Laneko Engineering Co., Wachovia Bank, National Association nor Laneko Engineering Co. Inc. nor a parent, affiliate or subsidiary thereof.

28.     Setech is not a competitor of the Debtors.

29.     The filing of this action under seal and then the subsequent secreting of the action, with service of process for two and one-half years, is repugnant. Actual prejudice to Setech was the foreseeable and actual result. The prejudice stems from the following:

  a.     All of the Facilities except Kokomo are now closed or sold off.

  b.     So far as I know, no Facility-level employees, either on the Setech side or the Debtors' side, remain employed by either party and may now be beyond the subpoena power of the Court. Therefore, there may be no site-level witnesses on either side available to testify as to the business practices between the parties.

  c.     As to all of the Facilities, documentary evidence which for the most part would have been readily available on-site had this action been timely prosecuted has since been bulk shipped, culled and stored offsite, and documents of original entry may have since been purged or lost. Similarly, the historical payment data that was once stored in the DACOR computer system used by the Debtors may no longer exist in any decipherable form.

  d.     Setech, in the mistaken belief that there was no litigation, has not retained all records of the agency vendor transactions, resulting in a loss of evidence, such as e-mail and handwritten, contemporaneous notes, which could be essential in defending the action. Likewise, Setech has not retained all of its employees or contact information for all witnesses whose personal knowledge is relevant to this action, each of whom is essential in defending the action.

  e.     The Debtors extracted new contracts and more favorable payment terms from Setech, than it otherwise would have gotten had Setech been informed that it had been sued for a multiple of its total net worth.

  f.     If this action continues, Setech has lost all benefit from the statute of repose.

  g.     During the period of September 2007 through April 2010 Setech undertook a number of key strategic and operational investments that

consumed a significant portion of its equity. These investment included expenditures into joint ventures in support of operations and significant expenditures for internal update information systems software and hardware. During this time frame Setech's investments totaled between $2 million and $3 million, over fifty percent of its equity. Setech and its investors would have never undertaken these directions had they known of the existence of a suit totaling over four times its equity.

h.    During the period of September 2007 through April 2010, Setech bought back stock from investors and investors purchased stock in Setech, without knowledge of the Complaint. The existence of the Complaint is unquestionably material information to anyone considering buying or selling equity in Setech.

i.    Setech is routinely asked to give customers and potential customers and potential business partners financial information. Even assuming that the Complaint is meritless, the existence of a $22,667,123.34 claim, which is many times in excess of Setech's net worth, impairs its ability to maintain and create new business relationships.

Executed:    Murfreesboro, Tennessee
             May 12, 2010

I declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true

and correct.

_____

Richard M. Eddinger

# EXHIBIT 1

# Delphi / Setech Master Agreement

The following represents a Master Agreement between
Delphi Corporation, (Buyer) and Setech, Inc., (Seller) for services provided in the United
States.

## A) Locations:

Services at the following Delphi plants are included:

Delphi Automotive Holdings Group (AHG) Division - Athens, AL
Delphi Electronics & Safety Division - Kokomo, IN
Delphi Electronics & Safety Division - Milwaukee, WI
Delphi Energy & Chassis Division - Milwaukee, WI
Delphi AHG Division Kettering Plant - Dayton, OH
Delphi AHG Division Wisconsin/Needmore Plant - Dayton, OH
Delphi AHG Group Division Home Ave/Vandalia Plant - Dayton, OH
Delphi Energy & Chassis Division - Sandusky, OH
Delphi AHG Division Moraine (KBP) — Moraine, OH

## B) Scope:

Provide labor, equipment, materials, supervision and services to support an Indirect
Material Management (IMM) and/or Commodity Management (CM) program.  The Site
Management & Operating fees represented in this Agreement cover all costs associated
with base service activities of an IMM/CM program such as, but not limited to,
procurement, inventory management, billing, handling, warranty, repair, and other
associated services as determined by the local Delphi sites referenced above.  Each
site may request reduced or additional services from their local labor costs but the base
services are covered in this Agreement fees. This Agreement covers management fees,
labor rates, expense fees, service goals and metrics.

Delphi General Terms and Conditions apply. Any specific divisional/site services and
requirements not covered herein will be set forth in separate purchase orders issued by
each division/site.  However, in the event of any conflicting requirement expressed in
any division/site contract, the terms of this Master Agreement will take precedence.

## C) Period of Performance:

Subject to Delphi's right to terminate early in accordance with this Master Agreement,
this Agreement's duration is July 1, 2005 to June 30, 2006.

**Right to Purchase from Others**

During the entire term of this Contract, Seller will assure that Service remains competitive in terms of technology, design and quality with any similar Service available to Buyer. Following **January 1, 2006,** Seller will also assure that Service remains competitive in terms of price with any similar Service available to Buyer. If, in the reasonable opinion of Buyer, a Service does not remain competitive, Buyer, to the extent it is free to do so, will advise Seller in writing of the area(s) in which a similar Service is more competitive. If, within sixty (60) days, Seller does not agree to immediately sell any Service with comparable technology, design, quality, or, if applicable, price, Buyer may elect to purchase any similar Service available to Buyer without any liability to Seller under this Contract.

## D) Fees:

Setech will generate monthly site invoices on the end of each month. The monthly site invoices will include separate line items for each of the following:

1. Material expenses in the format defined by each site
2. Monthly Site Management **
3. Operating Fees
4. Monthly Site Labor Fee (IMM support) *
5. Project Labor Fees will listed separate with associated project name *

* A breakdown of monthly labor fees will be provided to the Buyer each month. The breakdown will include position, title, or employee name with hourly and associated benefits paid for the billing month.
** Setech will provide a breakdown of system fees (Symix) by site.

The monthly site invoices will be delivered to each Delphi site and in a summary to the Delphi designated site personnel within the first five (5) business days of the month following services rendered. Items 1, 2, 3, 4 and 5 will be invoiced monthly.

### 1) Site Management Fees (monthly):

| | | |
|---|---|---|
| Electronics & Safety | Kokomo | $ 142,207 |
| | Milwaukee | $ 19,392 |
| Automotive Holdings Group | Kettering | $ 65,806 |
| | Wisconsin/Needmore | $ 106,020 |
| | Vandalia/Home | $ 38,000 |
| | Athens | $ 42,652 |
| | Moraine | $ 64,980 |
| Energy & Chassis | Sandusky | $ 60,321 |
| | Milwaukee | $ 14,580 |

In the event of a significant change in scope of work at any site, the affected site's fees will be adjusted accordingly.

### 2) Site Operating Fees (monthly): Will be actual site costs.

| | |
|---|---|
| Electronics & Safety | Kokomo |
| | Milwaukee |
| Automotive Holdings Group | Kettering |
| | Wisconsin/Needmore |
| | Vandalia/Home |
| | Athens |
| | Moraine |
| Energy & Chassis | Sandusky |
| | Milwaukee |

### 3) Labor Fee

Current annual labor rate ranges for each employee are shown In Table A. The buyer is to be provided all site personnel position titles, names, and actual base rate for the start of this Agreement July 1, 2005. Billings for each site will be the actual rate plus monthly benefit total and will include a detailed headcount. Any new positions required by Delphi will be defined and the rate established as needed in advance. All charges will be auditable via Setech payroll records. All additional employees added by the site will be listed on the invoice as a separate line item by project name and wage detail will be provided to the buyer.

Immediate action will be taken to identify those positions that can be eliminated and restructured. This will include, but not be limited to, the execution of a Lean review of all Setech operations and implementation of a Commodity Management program as quickly as possible. Setech will provide specific job descriptions and responsibilities for all site personnel by July 31, 2005. Delphi will have final approval on authorized headcount levels. Upon reduction of the staffing levels, the Site Labor Fees will be reduced based on the actual costs.

All employees of SETECH working at the sites or the Dayton Central Processing Center (CPC) will be billed to Delphi based on the actual labor expenses paid by SETECH for each employee assigned to that site or the CPC. CPC actual labor expenses will be billed as a separate line item of the monthly invoice and allocated to each of the participating sites as determined by Delphi World Wide Purchasing. This charge will cover all labor related payments made by SETECH. This would include severance costs for any employee terminated without cause at the request of Delphi. The labor cost will include the base salary or hourly cost, plus all employee benefit costs to SETECH. The current average costs of these benefits are approximately 23% of the base wages paid. Base labor costs will be billed as a single line on the monthly invoice. Any and all overtime charges must be provided by associated plant and invoiced as a separate line

Page 3 of 11

on the invoice. SETECH is required to obtain signatures from plant management, 8th level or higher. The current base rates for each of the current employees are contained in Table A, unless modified by express written consent of the Delphi SETECH Program Coordinator for the site in question. Any contract labor, non-SETECH employees, procured by SETECH to work at Delphi sites will be billed to Delphi at a pass through cost invoiced to SETECH and have actual invoices available for review.

| CPC Costs | |
|---|---|
| Site | Allocation |
| KETTERING | 36% |
| NEEDMORE | 26% |
| HOME/Vandalia | 22% |
| KBP | 15% |

This allocation is based on monthly average transaction processed through the CPC from each of the above mentioned sites. As processes improve, allocation can be readjusted.

Table A -- SETECH Current Base Labor Rates
Hourly and Annual -- Not Including Benefits
Table 1 of 2

| Site | Positions | Name | Type | Rate |
|---|---|---|---|---|
| Athens | Administrative Assistant | Watrous, Cherry E | Hourly | $7.50 |
| Athens | Buyer | Prosser, Belinda H | Hourly | $13.73 |
| Athens | Inventory Control | Bailey, Traci L | Hourly | $14.28 |
| Athens | Inventory Control | Louden, Jerry L | Hourly | $14.28 |
| Athens | Lead Purchaser | Fielding, Brandi M | Salaried | $29,120.26 |
| Athens | Site Manager | Cron, Gene M | Salaried | $81,120.00 |
| Athens | Technical Support | Huffstutler, Harold D | Salaried | $55,325.14 |
| Athens | Technical Support | Long, Henry B | Salaried | $59,667.92 |
| Kokomo | Accounts Payable | Davis, Lori Jean | Hourly | $10.97 |
| Kokomo | Buyer | Chaplin, Lucinda S | Hourly | $13.30 |
| Kokomo | Buyer | McKay, Kimberly M | Hourly | $13.12 |
| Kokomo | Buyer | Perez, Cynthia A | Hourly | $16.76 |
| Kokomo | Buyer | Rankert, Jennifer L | Hourly | $13.74 |
| Kokomo | Buyer | Rush, Teresa L | Hourly | $15.77 |
| Kokomo | Inventory Control | Meyers, John F | Hourly | $14.12 |
| Kokomo | Site Supervisor | Dobbins, Shelly A | Salaried | $30,328.48 |
| Kokomo | Site Manager | Meyers, Phillip R | Salaried | $78,547.82 |
| Kokomo | Technical Support | Salyers, Michael J | Salaried | $54,326.22 |
| Kokomo | Warehouse | Droke, Mickey Q | Hourly | $12.60 |
| Milwaukee | Buyer | Maslowski, Lynn S | Hourly | $13.50 |
| Milwaukee | Buyer | McCabe, Ryan J | Hourly | $13.64 |
| Milwaukee | Site Supervisor | Islami, Luizime | Salaried | $32,762.08 |
| Milwaukee | Site Manager | Wellerriter, William J | Salaried | $74,562.80 |
| Milwaukee | Technical Support | Devillers, Terry W | Salaried | $51,739.22 |

Page 4 of 11

Table A – SETECH Current Base Labor Rates
Hourly and Annual – Not Including Benefits
Table 2 of 2

| Site | Positions | Name | Type | Rate |
|------|-----------|------|------|------|
| Dayton CPC Office | Accounts Payable | Austin, Lisa M | Hourly | $12.50 |
| Dayton CPC Office | Accounts Payable | Sigler, Lori | Hourly | $13.51 |
| Dayton CPC Office | Buyer | Aldous, Heather N | Hourly | $14.42 |
| Dayton CPC Office | Buyer | Frazier, Maria A | Hourly | $14.42 |
| Dayton CPC Office | Buyer | Johnson, Linda J | Hourly | $17.57 |
| Dayton CPC Office | Purchaser | Adkins, Lu Ann | Salaried | $36,673.00 |
| Dayton CPC Office | Purchaser | Fultz, Dana | Salaried | $44,137.60 |
| Dayton CPC Office | Purchaser | Pruitt, Larry J | Salaried | $50,141.52 |
| Dayton CPC Office | Purchaser | Sekardi, Faye M | Salaried | $48,381.06 |
| Dayton CPC Office | Site Supervisor | Dillon, Paula A | Salaried | $54,672.02 |
| Home Avenue | Buyer | Miller, Joseph E | Hourly | $16.04 |
| Home Avenue | Customer Service | Knoblock, Kenneth D | Hourly | $17.26 |
| Home Avenue | Site Supervisor | Strumberger, James A | Salaried | $67,807.22 |
| Home Avenue | Technical Support | Hughes, Keith F | Salaried | $45,760.00 |
| Kettering | Customer Service | Thomas III, Richard L | Hourly | $14.42 |
| Kettering | Site Manager | Henry, James P | Salaried | $83,640.18 |
| Kettering | Technical Support | Chrisler, Wayne O | Salaried | $66,851.20 |
| Kettering | Warehouse | Coleman, Patricia M | Hourly | $10.00 |
| Kettering | Warehouse | Drake, Jill E | Hourly | $20.85 |
| Moraine | Customer Service | Calvlert, Nicholas A | Hourly | $16.35 |
| Moraine | Site Supervisor | Frieszell, Debbie | Salaried | $45,000.02 |
| Moraine | Technical Support | Buhrlage, Donald J | Salaried | $61,405.24 |
| Needmore | Site Supervisor | Graham, Lisa S | Salaried | $49,199.02 |
| Needmore | Site Manager | Gray, William V | Salaried | $79,686.62 |
| Needmore | Technical Support | Suggs, Steven R | Salaried | $71,809.40 |
| Sandusky | Accounts Payable | Hill, Laura J | Hourly | $13.59 |
| Sandusky | Buyer | Nieling, Russell W | Hourly | $20.00 |
| Sandusky | Inventory Control | Strohm, Sheila M | Hourly | $14.03 |
| Sandusky | Purchaser | Behrens, Connie J | Salaried | $39,550.42 |
| Sandusky | Purchaser | Freeh, Douglas M | Salaried | $53,000.22 |
| Sandusky | Site Supervisor | Wilburn, James D | Salaried | $45,919.64 |
| Sandusky | Site Manager | Moll, Jon K | Salaried | $75,000.12 |
| Sandusky | Technical Support | Jenney, Hilas Lee | Salaried | $50,000.08 |

## 4) Material

Setech will purchase indirect/MRO materials as directed by and as agent for Delphi. A plan-for-every part process, approved by Delphi, will be utilized to determine inventory-stocking requirements. Setech will purchase materials from third party manufacturers or distributors at pricing approved by Delphi. All materials will be transferred to Delphi upon receipt at the actual cost to Setech, without mark-up. Delphi payments for materials will be provided through the monthly material expense charges, to be invoiced

in a format defined by each site. Freight will be paid by Delphi using the Delphi procedure wherever possible. In instances where Setech does incur freight expenses, Delphi will reimburse Setech whatever their actual costs incurred. Setech will bill these costs as a separate line item on the monthly invoice. Setech will ensure that Delphi sourcing procedures are utilized to obtain the best value to Delphi.

Setech will not bill sales or use tax on items delivered to all shipped to locations within the states listed below. Delphi holds direct payment authority with these states. Delphi will remit directly to taxing authorities all sales or use tax liability related to its purchase and use of tangible personal property and services. Listed below are direct pay permit or sales tax license numbers for the five (5) states where Delphi holds direct pay authority:

| State | ID |
|-------|-----|
| Alabama | 805 |
| Indiana | 1018702130011 |
| Michigan | 38-3431131 |
| Ohio | 98-002667 |
| Wisconsin | WDP-99-01-010037 |

### 5) Delayed Payments

The parties will seek to resolve any disputed invoice or other payment amounts through mutual negotiation. If the parties are unable to resolve any such dispute through mutual negotiation, then the matter will be referred to their respective senior management who will, during the 30-day period following such referral, review the matter and attempt to negotiate a mutually acceptable resolution. If the parties are unable to agree upon a resolution within such 30-day period, then the matter will be submitted to arbitration. The arbitration will be administered according to the Center for Public Resources Rules for Non-Administered Arbitration of Business Disputes ("CPR"). In the event of any conflict between the CPR and this Agreement, the provisions of this Agreement will govern. The parties share all costs of the arbitration proceeding equally. The arbitration proceedings will take place in a location mutually agreed upon by the parties and will be conducted in English. In the event that the parties cannot agree upon a location within thirty (30) days of the initiation of the arbitration process, the arbitration will take place in Chicago, Illinois. The parties will appoint a single arbitrator, provided, however, that if, within thirty (30) days of the initiation of the arbitration process, the parties are unable to agree on the appointment of an arbitrator, the parties will seek assistance in such regard from the CPR. The arbitration will be subject to the Federal Arbitration Act, 9 U.S.C.A. Section 1 ET. Seq. and judgment upon the award of the arbitrator may be entered by any U.S. Court having jurisdiction thereof. The arbitrator(s) shall not award any exemplary or punitive damages. At all times during and after the arbitration, each party will continue to fulfill all of its obligations under this Agreement. The arbitrator, in addition to determining the amount in dispute, shall have the discretion, if the arbitrator determines that the party determined to be at fault acted

in bad faith in light of all of the facts and circumstances concerning the dispute, to require the party at fault to pay (i) interest on the amount determined to be due and payable, (ii) the entire costs of the arbitration and/or, (iii) the reasonable legal fees incurred by the prevailing party.

### 6) Facilities and Access

Delphi shall provide appropriate space to Setech at no cost at all sites. Delphi shall furnish heat, electric current, and access to telephone service as necessary for the efficient operation of the facility. Delphi shall provide Setech and its employees' reasonable ingress and egress to those areas, corridors, elevators, passageways, driveways, restrooms, and first aid facilities necessary to the reasonable performance of Setech's obligation under this Agreement.

Setech agrees that all of its employees, agents, and visitors while on Delphi premises will obey and comply with all rules and regulations (including security regulations) established by Delphi.

Setech shall make no alterations to the premises that it uses without the prior written consent of Delphi.

## E) Metrics/Requirements:

### 1) Inventory:

Inventory to be managed by Setech includes all the site's inventories where Setech is the Indirect Material Manager (IMM). Ownership of this inventory can be with Delphi, Setech or various Commodity Managers (CM's). Setech as our IMM is to oversee the management of all inventories. Specific divisional inventory reduction goals will be established in conjunction with Setech and are to be met by Setech as the IMM or CM.

### 2) Cost per Unit:

Cost per Unit Produced: Delphi will provide to Setech for a minimum of the last twenty-four (24) months and on a monthly basis through the life of the contract, production statistics for each site under this agreement. Such data will be delivered to Setech by the fifth business day following the end of a month. Setech will prepare within five business days following receipt of the data Metrics Reports showing total MRO procurement cost per unit produced as well as key sub components of such cost per unit.

### 3) Cost Savings:

Key operating requirements will be defined and reported as needed to each site/division. Setech's total savings goal is 7-10% of total spend. Cost book figures will be adjusted at July 1, 2005 and January 1, 2006 to last price paid prior to change date.

### 4) Third Party Information:

Setech shall work with Delphi or our designated 3rd party provider to develop information technology for manufacturing operations, inventory control and plant support. Delphi expects Setech to work in a cooperative manner with existing Delphi Indirect Material suppliers to provide a single inventory control method.

### 5) Setech Search:

An "Excess" database is to be established by August 1st, 2005 and will contain only items deemed excess based on rules provided by the sites/division. (i.e. Plan for Every Part.)  All current Setech Search users will have access to this Excess database in addition to their home site.  Setech personnel will manage the requests between sites to determine availability and shipment to the requesting site.  New Setech Search users will not be added until Setech and Delphi review current Setech Search users and agree on the need for the add and any subsequent cost. If any additional telecom infrastructure is required to handle additional Search users this will be identified and evaluated by Delphi prior to the new users being added.

### 6) Creative Improvement Plan:

A) ISO Certification is not required for this Agreement.

B) Setech is to work with Delphi's EDS representative Jeff Simons on coordination of data networks by October 30, 2005. The goal of this effort is to possibly use existing Delphi data networks to replace dedicated Setech lines for possible cost savings to Delphi.

C) Setech is to work with Delphi on the possible moving of certain material to a warehouse in Murfreesboro, TN.  Evaluation of property tax issues, floor space freeing, and identification of items to manufacturer's part number/machine are to be compared to moving and ongoing warehousing costs.  Delphi and Setech are to agree on any implementation plan.

D) Delphi requires item identification to machine/brass tag. Setech will coordinate this effort with Delphi.

E) Setech and Delphi will work to combine dual expenses such as phone lines, computers, postage, office supplies, cell phones, pagers, data line, waste disposal, etc.

### 7)  Commodity Management:

Setech is to restructure a Commodity Management (CM) approach at current Setech sites for all Delphi divisions. Setech is to maximize the support from the Commodity Managers to reduce inventory, reduce pricing, and provide appropriate technical support. All available suppliers will be reviewed as potential Commodity Managers and

managed as to provide the services at the least total cost to Delphi. Delphi sites will be involved in CM review and selection as defined by site/division contracts. Delphi will have final approval on CM selection. Potential Commodity Managers maybe asked to quote consignment of all items that were used during the past 12 months. CM's may own the entire inventory in their commodity group and work to increase the Tier I content in that commodity. Setech site head count for buyers, buyer support, technical support and others will be reduced as each CM is added in proportion to the percentage of the CM items to the total items purchased at that site. As each site is analyzed, the specific staffing reductions will be defined and the time line for the impact on that sites expense fees and labor will be agreed upon.

### 8) Prior SETECH Claims:

In consideration for the execution of this contract, Setech agrees to drop all prior claims related to the earned but unpaid risk and reward fees at the Delphi Reynosa, Mexico facility. All fees related to this facility are considered paid in full.

## F) Insurance

### I. Indemnification

Setech shall indemnify, defend and hold harmless Delphi, and its directors, officers, employees, agents and representatives from any and all claims, demands, actions, damages, liabilities, costs and expenses, including reasonable attorney fees and expenses, for the death or personal injury of individuals, and/or the damage, loss or destruction of real or personal property of individuals resulting from Setech's performance of this Agreement or activities; except, those claims, demands, actions, damages, liabilities, costs and expenses arising out of the sole negligence or intentional acts of Delphi, and/or its directors, officers, employees, agents and representatives. Setech's indemnification of Delphi includes any and all costs and expenses incurred in connection with the enforcement of this section.

### II. Force Majeure

Delphi shall not be liable and shall be relieved from the terms of this Agreement if Delphi's failure to perform or delay in performance hereunder is caused by or arises out of acts of God, action of governmental authority, fire, flood, windstorm, explosion, riot, war, sabotage, insurrection, labor problems (including lockouts, strikes and slowdowns), court injunction or order or other causes that are beyond the reasonable control of Delphi.

### III. Contractual Insurance Terms

Setech shall obtain and maintain consistent with the provisions of this Agreement, at its sole expense, the following types of insurance coverages, to remain in force during the term of this Agreement, with minimum limits as set forth below:

1. Commercial General Liability covering liability arising from premises, operations, independent contractors, products-completed operations, personal and advertising injury, and blanket contractual liability - US$ 10,000,000 each occurrence.
2. Business Automobile Liability covering all owned, hired, and non-owned vehicles - US$1,000,000 each occurrence, including all applicable statutory coverages.
3. Workers Compensation - statutory limits for all states of operation (U.S. only).
4. Employers Liability – US$1,000,000 each employee for bodily injury by accident and - US$1,000,000 each employee for bodily injury by disease.
5. Pollution Legal Liability, including coverage for both sudden/accidental and non-sudden (gradual) occurrences for pollution releases emanating on or from the site - the greater of - US$ 1,000,000 per occurrence, or such coverage limits as may be required according to applicable governing regulations. Coverage must apply to bodily injury, property damage, clean up costs and defense.
6. Blanket Crime coverage including employee dishonesty for acts against or involving Delphi property - US$ 1,000,000 per occurrence.

7. Property/Business Interruption/Extra Expense insurance on an "all-risk" basis (including boiler, machinery, flood and earthquake) to cover loss of profits and continuing expenses in the event of an interruption - US$ 40,000,000 per occurrence. Coverage shall extend to Setech's obligation to pay reimbursement to Delphi for additional expenses incurred to secure and maintain an alternate source of service during the interruption. The coverage period will be for a minimum of 12 months.

All insurance deductibles and waiting periods are at Setech's expense.

All policies of insurance procured by Setech herein shall be written as primary policies. Setech shall agree to waive their insurer's right of subrogation under its policies. Delphi shall be an additional insured under Setech's insurance policy (except Worker's Compensation and Employer's Liability), and at Delphi's request, Setech shall provide Delphi with a certificate of insurance evidencing compliance with the limits, insurance requirements and waiver of subrogation set forth above. Such certificate shall be in a form acceptable to, and underwritten by an insurance company reasonably satisfactory to Delphi and with an A.M. Best Company rating of A- or above. By requiring insurance herein, Delphi does not represent that coverage and limits will necessarily be adequate to protect Setech. The purchase of appropriate insurance coverage by Setech or the furnishing of a certificate of insurance shall not release Setech from its respective obligations or liabilities under this Agreement.

## G) Right to Audit

Setech grants to Delphi access to all pertinent ledgers, books, records, correspondence, written instructions, drawings, receipts, vouchers, data systems, and other documents for the purpose of auditing the charges and/or allocations under this agreement. Setech further agrees, for this purpose, to preserve all of the above-enumerated documents for a period of one year after final payment hereunder.

## H) Proprietary Information

All proprietary information furnished or made available by Delphi to Setech, or to Setech's employees or subcontractors, in connection with the work or services to be performed for Delphi hereunder, and all proprietary information generated or developed by Setech, its employees and subcontractors, for Delphi shall be treated as confidential by Setech, its employees and subcontractors, and shall not be disclosed by Setech, its employees and subcontractors, to anyone, either in whole or in part, without written authorization by Delphi. Further, data accumulated in Symix (Setech's IT system) to support Delphi locations is also considered Delphi proprietary information. As necessary if Delphi needs to transition this business information to another system, Setech will facilitate the orderly transfer of Delphi's data in the format defined by Delphi or its designee.

## I) Delphi Standard Terms and Conditions

Delphi Corporation General Terms and Conditions, apply, of which Setech has received a copy.

_____    Date_____
Delphi Plant representatives

_____    Date 21 JUL05
Delphi Purchasing Corporate

_____    Date 7/21/05
Delphi Negotiation Team

_____    Date 6-30-05
Setech Geoffrey Peters, COO

_____    Date 6-30-05
Setech Christopher Moore, Director, Delphi Operations

## Amendment to Delphi Master Agreement

This Amendment to the Delphi Master Agreement is entered into as of June 15, 2005 by and between Delphi Corporation ("Delphi") and Setech Inc. ("Setech") in order to amend the Delphi Master Agreement dated July 3, 2002 (the "Master Agreement") and the 2 subsequent amendments to the Master Agreement dated December 19, 2003 and February 20, 2004.

Delphi and Setech agree as follows:

**1. Period of performance:**  The Master Agreement is amended to allow for chemical management services to be provided by Setech to Delphi E&S at their Milwaukee, WI facility on a continuing month to month basis until such time as the Master Agreement is amended for some longer time period.

**2. Cancellation:**  Either party can cancel or void this amendment for convenience by providing the other party with 30 days of written notice as to such intent.

**3. Services:**  Setech will provide procurement and inventory management of chemicals for the Milwaukee E&S site.  Further detail and description of the services to be provided is detailed in Attachment 1, Statement of Work.

**4. Scope:**  The known estimated annual spend of the 42 items to be managed is $83,500.  Any additional items added above a total number of 50 chemicals managed will represent a change in scope and thus a change in fee.

**5. Cost Savings:**  There is no contractual commitment to achieve any specific amount of cost savings for the purpose of this amendment.  Setech personnel will make every effort to achieve savings wherever possible though.

**6. Staffing:**  Setech will provide the agreed to services with no increase in the local Milwaukee-Setech headcount.  However, any reduction in Milwaukee-Setech's current total headcount of five (5) will be a change in scope and thus a change in fee.

**7. Fees:**  Delphi will pay Setech the sum of $6,000 annually to provide the herein described services.  This fee is payable in 12 monthly installments of $500 per month for each month that Setech provides services.

**8. Master Agreement.**  Except as amended by the express terms of this Amendment and other Amendments, the Master Agreement remains in full force and effect.

## Attachment 1
## STATEMENT OF WORK

Setech will perform all aspects of Integrated Material Management (IMM) for the Delphi E&S Milwaukee Operations as specified in their current agreement with Delphi. The expected IMM role for this additional business must be consistent with the present management and procurement activities of existing Milwaukee indirect materials.

Delphi Milwaukee Operations will continue to handle the indirect materials as specified in the above agreement as they are currently today. This includes activities such as handling, stocking, government reporting, container recycling, hazardous waste disposal, and health & safety administration.

**EXECUTED** as of the above date.

Kenneth H. Betest

~~Delphi Purchasing~~ (R.C.)

6/14/05
Date

Richard Eddinger, CFO
Setech, Inc.

6/6/05
Date

# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                              :
        In re                                 :
                                              :    Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :
                                              :    Case No.  05–44481 (RDD)
                          Debtors.            :
                                              :    (Jointly Administered)
                                              :
------------------------------------------------------------x

ORDER UNDER 11 U.S.C. §§ 105(a), 363, 364, 1107, AND 1108 AND
FED. R. BANKR. P. 6004 AND 9019 AUTHORIZING CONTINUATION OF VENDOR
RESCUE PROGRAM AND PAYMENT OF PREPETITION CLAIMS OF FINANCIALLY-
DISTRESSED SOLE SOURCE SUPPLIERS AND VENDORS WITHOUT CONTRACTS

("ESSENTIAL SUPPLIER ORDER")

Upon the motion, dated October 8, 2005 (the "Motion"),[1] of Delphi Corporation

and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the

above-captioned cases (collectively, the "Debtors"), for an order (the "Order") under

sections 105, 363, 1107, and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330,

as amended (the "Bankruptcy Code"), and Fed. R. Bankr. P. 6004 and 9019, authorizing the

continuation of the Debtors' prepetition vendor rescue program and the payment of prepetition

claims of financially-distressed sole source suppliers and vendors without enforceable contracts;

and upon the Affidavit Of Robert S. Miller, Jr. In Support Of Chapter 11 Petitions And First Day

Orders, sworn to October 8, 2005; and upon the record of the hearing held on the Motion; and

this Court having determined that the relief requested in the Motion is in the best interests of the

---

[1]      Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in
the Motion.

D.I. 197
10-13-2005

Debtors, their estates, their creditors, and other parties-in-interest; and it appearing that proper

and adequate notice of the Motion has been given and that no other or further notice is necessary;

and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

ORDERED, ADJUDGED, AND DECREED THAT:

1.    The Motion is GRANTED.

2.    The Debtors be, and they hereby are, authorized but not directed in the

reasonable exercise of their business judgment, to pay all, a portion, or none of the prepetition

claims (the "Essential Supplier Claims") owing to certain of the Debtors' suppliers that are

essential to the uninterrupted functioning of the Debtors' business operations (the "Essential

Suppliers") up to an aggregate amount of $90 million (the "Essential Supplier Claims Cap,"

which amount includes any amounts paid by the Debtors under the Bridge Order Under 11

U.S.C. §§ 105(a), 363, 364, 1107, And 1108 And Fed. R. Bankr. P. 6004 And 9019 Authorizing

Continuation Of Vendor Rescue Program And Payment Of Prepetition Claims Of Financially-

Distressed Sole Source Suppliers And Vendors Without Contracts entered on October 8, 2005)

upon such terms and in the manner provided in this Order and subject to the provisions of the

Debtors' postpetition financing agreement.

3.    The Debtors shall undertake appropriate efforts to cause Essential Suppliers

to enter into an agreement with the Debtors substantially similar to Exhibit A hereto as a

condition of payment of their Essential Supplier Claims, which agreement shall include, but not

be limited to, the following terms:

(a)    The amount of such Essential Supplier's estimated Essential Supplier
Claims, accounting for any setoffs, other credits, and discounts thereto, shall be as mutually
determined in good faith by the Essential Supplier and the Debtors (but such amount shall be
used only for the purposes of determining such Essential Supplier's claim under the Order and
shall not be deemed a claim allowed by the Court and the rights of all interested persons to object

2

to such claim shall be fully preserved until further order of the Court, unless such claim is waived by the Essential Supplier pursuant to the terms of the letter);

(b)   MNS-2 payment terms and those other terms and conditions as are embodied in the Delphi's General Terms and Conditions or such other more favorable trade terms, practices, and programs in effect between such supplier and the Debtors in the twelve months prior to the Petition Date (the "Customary Trade Terms") between such Essential Supplier and the Debtors, or such other favorable terms as the Essential Suppliers and the Debtors may agree, and the Essential Supplier's agreement to provide goods and services in accordance with such terms;

(c)   The Essential Supplier's agreement to provide goods and services to the Debtors based upon Customary Trade Terms or on such other favorable terms to the Debtors as the Debtors and the Essential Supplier may otherwise agree for the remaining term of the Essential Supplier's agreement with the Debtors, and the Debtors' agreement to pay for such goods in accordance with such terms;

(d)   The Essential Supplier's agreement not to file or otherwise assert against any or all of the Debtors, their estates, or any other person or entity or any of their respective assets or property (real or personal) any lien (a "Lien"), regardless of the statute or other legal authority upon which such Lien is asserted related in any way to any remaining prepetition amounts allegedly owed to the Essential Supplier by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date, and, to the extent the Essential Supplier has already obtained or otherwise asserted such a Lien, the Essential Supplier shall take whatever actions are necessary to remove such Lien;

(e)   The Essential Supplier's acknowledgment that it has reviewed the terms and provisions of the Order and consents to be bound thereby; and

(f)   The Essential Supplier's agreement that it will not separately seek payment for reclamation claims outside the terms of the Order unless the Essential Supplier's participation in the program to pay Essential Supplier Claims pursuant to the Order is terminated; provided, however, that such reclamation claims shall, if thereafter raised by the Essential Supplier as permitted by the Order, be treated as though raised on the later of (i) the date of the Order and (ii) the date on which the Trade Agreement is executed by both parties.

An agreement executed by and between the Debtors and an Essential Supplier as set forth in this

paragraph shall be referred to as a "Trade Agreement."  This Order is intended to authorize, but

shall not require, the Debtors to enter into Trade Agreements, it being the express intention of

this Court that the Debtors shall enter into Trade Agreements only when the Debtors determine,

in their sole discretion, that it is appropriate to do so.

3

4.    The Debtors are authorized, in their sole discretion, to make payments on account of Essential Supplier Claims in the absence of a Trade Agreement after the Debtors have undertaken diligent efforts to cause the Essential Supplier to execute a Trade Agreement and if the Debtors determine, in their sole discretion, that failure to pay the Essential Supplier Claim is likely to result in irreparable harm to the Debtors' business operations.

5.    If an Essential Supplier refuses to supply goods and/or services to the Debtors on Customary Trade Terms following receipt of payment on its Essential Supplier Claim (regardless of whether such Essential Supplier has entered into a Trade Agreement), or fails to comply with any Trade Agreement entered into between such Essential Supplier and the Debtors, then the Debtors may, in their sole discretion and without further order of this Court, (a) declare that any Trade Agreement between the Debtors and such Essential Supplier is terminated (if applicable) and (b) declare that the payments made to the Essential Supplier on account of its Essential Supplier Claim be deemed to have been made in payment of then-outstanding postpetition claims of such suppliers without further order of this Court or action by any person or entity.  In the event that such events occur, an Essential Supplier shall then immediately repay to the Debtors any payment made to it on account of its Essential Supplier Claims to the extent that payments on account of such Essential Supplier Claims exceed the postpetition claims of such suppliers then outstanding without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or otherwise.  In the event that a Trade Agreement is terminated or an Essential Supplier refuses to supply goods and/or services to the Debtors on Customary Trade Terms following receipt of payment on its Essential Supplier Claim (regardless of whether such Essential Supplier has entered into a Trade Agreement), it is the explicit

4

intention of this Court to return the parties to their position immediately prior to the entry of this

Order with respect to all prepetition claims.

6.    The Debtors may, in their sole discretion, reinstate a Trade Agreement if:

(a)    the Debtors determination to terminate a Trade Agreement is subsequently reversed by this Court, after notice and a hearing following a motion by the Essential Supplier, for good cause shown that the determination was materially incorrect;

(b)    the underlying default under the Trade Agreement was fully cured by the Essential Supplier not later than five business days following the Debtors' notification to the Essential Supplier that a default had occurred; or

(c)    the Debtors, in their discretion, reach a favorable alternative agreement with the Essential Supplier.

7.    The Debtors are hereby authorized but not directed to waive and release their rights, and the rights of their respective estates, under section 547 of the Bankruptcy Code to avoid a prepetition transfers (each a "Prefunding Transfer") on account of the prefunding of obligations to a supplier (each a "Prefunded Suppliers") if, on or before November 7, 2005, such Prefunded Supplier enters into a Trade Agreement.  For the avoidance of doubt, nothing contained herein shall constitute a waiver or release of any of the Debtors' or their estates' rights under section 547 of the Bankruptcy Code with respect to any Prefunding Transfer absent the Debtors' express written agreement to waive and release their rights and the rights of their estates under section 547 of the Bankruptcy Code, the Debtors' entry into which shall only be authorized in accordance with the terms of the immediately-preceding sentence.

8.    The Debtors are hereby authorized but not the directed to elect, in their sole discretion, to waive the conditions of this Order for payment of a claim under the Essential Supplier Claims Cap (the "Waiver") and to conditionally pay the claim of such threatening supplier (the "Non-Conforming Supplier"), subject to the following procedures:

(a)    In the event that the Debtors grant a Waiver to a Non-Conforming Supplier, the Debtors shall, within three business days of payment pursuant to the Waiver (the

5

"Filing Deadline"), file with this Court (i) a Notice of Waiver, in substantially the form attached hereto as Exhibit B (the "Notice of Waiver"), and (ii) a proposed Order to Show Cause, in substantially the form attached hereto as Exhibit C (the "Order to Show Cause"), and shall serve such Notice of Waiver and Order to Show Cause on (v) the Non-Conforming Supplier, (w) the Office of the United States Trustee, (x) counsel for the official committee of unsecured creditors appointed in these cases (the "Creditors' Committee"), (y) counsel for the agent under the Debtors' prepetition credit facility, and (z) counsel for the agent under Debtors' proposed postpetition credit facility; provided, however, that the Debtors will not be required to file or serve a Notice of Waiver and an Order to Show Cause if, prior to the Filing Deadline, the Creditors' Committee ratifies the Waiver in writing to the Debtors.

(b)    At the first regularly-scheduled hearing occurring at least five business days following entry of the Order to Show Cause by this Court, the Non-Conforming Supplier shall be required to appear before this Court and demonstrate that such Non-Conforming Supplier should not be held in violation of the automatic stay.

(c)    Should the Court determine that, by its conduct, the Non-Conforming Supplier has violated the automatic stay, the Non-Conforming Supplier shall be required to disgorge the amount of the payment made by the Debtors pursuant to the Waiver, plus attorneys' fees and interest accrued on such amount at the rate specified under the relevant agreements governing the Debtors' debtor-in-possession credit facility or such other higher rate as this Court specifies, within three business days of entry of the order holding such Non-Conforming Supplier in violation of the automatic stay.

(d)    Nothing contained herein shall limit the Debtors' right to file any motions, adversary complaints, or other pleadings that they determine in their sole and absolute discretion are necessary or appropriate to pursue other remedies, including, without limitation, injunctive relief, or alter the burden of proof as to any violation of the automatic stay.

9.    The form of Notice of Waiver attached hereto as Exhibit B and the form of Order to Show Cause attached hereto as Exhibit C are hereby approved by this Court in all respects for use in accordance with the provisions of the foregoing paragraph.

10.    The Debtors are hereby authorized but not the directed to continue their prepetition vendor rescue program (the "Vendor Rescue Program") in the ordinary course of business, including, without limitation, by providing the following forms of support to those suppliers (the "Troubled Suppliers") which the Debtors determine, in the exercise of their business judgment, require such support to maintain their operations:

6

      (a)   the Debtors may purchase, on behalf of a Troubled Supplier, the raw materials necessary to manufacture the Debtors' parts when a Troubled Supplier lacks the available credit to purchase such materials for its own account;

      (b)   the Debtors may provide a lump sum subsidy to a Troubled Supplier when the Supplier is faced with an acute short-term economic problem;

      (c)   the Debtors may lend funds to a Troubled Supplier, either by purchasing a participation in the Troubled Supplier's existing credit facility or by lending funds under a promissory note;

      (d)   the Debtors may agree to pay their obligations under invoices from a Troubled Supplier on an accelerated basis;

      (e)   the Debtors may agree to provide the Troubled Supplier with operational assistance, either through the Debtors' own personnel or through use of an outside consulting firm; and

      (f)   the Debtors may enter into agreements necessary to effectuate the transactions entered into with Troubled Suppliers as part of the Vendor Rescue Program, including, without limitation, accommodation agreements, inventory repurchase agreements, and access agreements.

11.   The Debtors shall provide periodic reports to the Creditors' Committee which shall reflect payments of prepetition claims made to the Debtors' suppliers pursuant to this Order.

12.   Nothing herein shall be construed to limit, or in any way affect, the Debtors' ability to dispute any Essential Supplier Claim or as a waiver by any of the Debtors of their rights to contest any invoice of an Essential Supplier under applicable non-bankruptcy law.

13.   Nothing contained in the Motion or in this Order shall be deemed to constitute an assumption, adoption, or rejection of any executory contract or agreement between the Debtors and any third party or to require the Debtors to make any of the payments authorized herein.

7

14.    Notwithstanding the relief granted herein and any actions taken hereunder, nothing herein shall create, nor is intended to create, any rights in favor of, or enhance the status of any claim held by, any person.

15.    Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to the contrary, the Debtors are not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order, and the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

16.    This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

17.    Service of the Motion as provided therein shall be deemed good and sufficient notice of such Motion.

18.    The entry of this Order is final; provided, however, that (a) within ten business days after the Creditors' Committee has been formed and retained counsel, the Creditors' Committee may object to the prospective application of this Order from and after the date of such objection, and (b) within ten business days of the date of entry hereof, the agent for the Debtors' prepetition banks (the "Agent") may object to the prospective application of this Order from and after the date of such objection; provided further that if any such objection is timely made by the Creditors' Committee or the Agent, such objection shall be heard at the next regularly-scheduled omnibus hearing in these cases, and (c) pending such hearing, this Order shall remain in full force and effect.

8

19.    The requirement under Local Rule 9013-1(b) for the service and filing of a

separate memorandum of law is deemed satisfied by the Motion.


Dated:        New York, New York
              October 13, 2005


                                        /s/ ROBERT D. DRAIN
                                        UNITED STATES BANKRUPTCY JUDGE

9

# EXHIBIT 3

## ESSENTIAL SUPPLIER AGREEMENT

This Essential Supplier Agreement (the "**Agreement**") is made by and among DELPHI CORPORATION and certain of its subsidiaries and affiliates, debtors and debtors-in-possession (each a "**Debtor**" and, collectively, the "**Debtors**") in the jointly administered cases currently pending under Case No. 05-44481 (RDD) in the United States Bankruptcy Court for the Southern District of New York (collectively, the "**Case**"), on the one hand, and SETECH, INC. ("**Setech**"), on the other hand (Setech together with the Debtors, the "**Parties**").

## STIPULATIONS:

The Parties hereby stipulate as follows:

**A.**    On October 8, 2005, certain of the Debtors commenced in the United States Bankruptcy Court for the Southern District of New York ("**Court**") voluntary cases under Chapter 11 of Title 11 of the United States Code ("**Bankruptcy Code**"), and the remaining Debtors filed for Chapter 11 protection on October 14, 2005.

**B.**    On October 13, 2005, the Court entered an order (the "**Essential Supplier Order**") (Docket No. 197) granting certain relief and authority requested by the Debtors in that certain Motion for Order Under 11 U.S.C. §§105(a), 363, 364, 1107, And 1108 And Fed. R. Bankr. P. 6004 And 9019 Authorizing Continuation Of Essential Supplier/Vendor Rescue Program And Payment Of Prepetition Claims Of Financially-Distressed Sole Source Suppliers And Vendors Without Contracts ("**Essential Supplier Motion**") (Docket No. 17).

**C.**    On October 13, 2005, the Court entered an order ("**Human Capital Obligations Order**") (Docket No. 198) granting certain relief and authority requested by the Debtors in that certain Motion For Order Under 11 U.S.C. §§105(a), 363, 507, 1107, And 1108 (I) Authorizing Debtors To Pay Prepetition Wages And Salaries To Employees And Independent Contractors; (II) Authorizing Debtors To Pay Prepetition Benefits And Continue Maintenance Of Human Capital Benefit Programs In The Ordinary Course; And (III) Directing Banks To Honor Prepetition Checks For Payment Of Prepetition Human Capital Obligations ("**Human Capital Obligations Motion**") (Docket No. 12).

**D.**    On October 13, 2005, the Court entered an order ("**Lien Claimants Order**") (Docket No. 199) granting certain relief and authority requested by the Debtors in that certain Motion For Order Under 11 U.S.C. §§ 105, 363(b), 546(b), 1107 And 1108 Authorizing Payment Of Contractors And Service Providers In Satisfaction Of Liens ("**Lien Claimants Motion**") (Docket No. 23).

**E.**    Based on the accuracy of the Eddinger Declaration (hereinafter defined), the Debtors represent and warrant to Setech that under the authority granted to the Debtors by the Essential Supplier Order, the Human Capital Obligations Order, the Lien Claimants Order, and under applicable law, the Debtors are authorized to take the actions set forth herein without the requirement of any further notice to or approval from the Court or any third party.

F.    Under that certain Delphi/Setech Master Agreement dated July 1, 2005, and predecessor master agreements (collectively the "**Master Agreement**"), Setech has operated and continues to operate and function for the Debtors as: (i) an integrated on-site supply manager for the purpose of providing the on-site information, data base, and property systems and personnel essential to conduct and oversee Delphi's inventory management, which systems and personnel also are critical to the continued operation of certain manufacturing facilities owned by the Debtors; and (ii) a purchasing agent for the Debtors as disclosed principals for the purpose of procuring certain products, services and materials from vendors (collectively, the "**Agency Vendors**," and each an "**Agency Vendor**") critical to the continued operation of certain manufacturing facilities owned by the Debtors. Setech represents and warrants to the Debtors that, in furtherance of the terms of the Master Agreement, it has notified the Agency Vendors that it is a purchasing agent for a disclosed principal. No payment to Setech by the Debtors that Setech used to pay Agency Vendors under the Master Agreement constitutes a transfer to Setech under the Bankruptcy Code or under any similar law providing for avoidance, disgorgement, or other remedies in insolvency-related situations.

G.    The Agency Vendors have claims against the Debtors as a disclosed principal arising before the bankruptcy filings that the Parties estimate to total Eleven Million Three Hundred Seventy Eight Thousand Nine Hundred Ten and 79/100 Dollars ($11,378,910.79) ("**Agency Vendor Claims**"). For purposes of this Agreement only, goods delivered to Debtors that are logged into the system after the bankruptcy filings are deemed to give rise to post-petition claims to be paid in the ordinary course of business of the Debtors with those payments not subject to avoidance or disgorgement.

H.    Setech has certain claims against the Debtors under the Master Agreement as follows:

| | |
|---|---|
| Site Labor | $426,795.36 |
| Site Expenses (including carrier freight) | 369,559.29 |
| Management Fees | 1,091,476.97 |
| Less: Disputed Saginaw Amounts | (330,841.47) |
| **Total** | $1,556,990.15 |

(collectively the "**11/2/05 Balance**").

Under the Master Agreement, Setech typically bills the Debtors on a "second day, second month" basis (e.g., all amounts earned during August come due on the second day of October). The 11/2/05 Balance, however, is calculated through October 7, 2005, instead of September 30, 2005, with some pro-rations for the first week of October 2005, and includes the Debtors' obligations for all matters performed by Setech under the Master Agreement through October 7, 2005, with some pro-rations. The 11/2/05 Balance does not include material expenses because all such material expenses are the obligations of the Debtors and not Setech under section C. 4 of the Master Agreement.

I.    The Debtors made a Prefund Transfer (as such term is defined in the Essential Supplier Motion) to Setech on or about October 7, 2005, in the amount of $1,335,013.94 ("**Setech Prefund Transfer**").

- 2 -

**J.**    During the first week of October 2005, Setech received approximately $1.8 million from the Debtors to pay Agency Vendors, and Setech disbursed that money as the Debtors' agent to Agency Vendors during the second week of October 2005 ("**Agency Vendor Disbursements**").

**K.**    On October 27, 2005, Setech submitted the Declaration of Richard M. Eddinger Asserting Severe Financial Distress of Setech, Inc. and Imminent Risk of Cessation of Business Operations Absent Payment of Prepetition Claims (the "**Eddinger Declaration**"), a copy which is attached hereto as **Exhibit 1** and incorporated herein by reference, that contained representations that induced the Debtors to enter into this agreement and pay the amounts set forth herein.

**L.**    The Parties are entering into this Agreement as a means of resolving and handling claims and various rights and obligations of the Parties.

**NOW THEREFORE**, in consideration of the above recitals and the promises and covenants herein, the Parties agree as follows:

**1.**    **Continued Performance**. Unless a Notice of Rejection (hereinafter defined) is given by the Debtors to Setech, Setech and the Debtors shall timely perform their respective obligations arising after the date hereof under the Master Agreement for the Period of Performance (defined in the Master Agreement). Provided, however, the Debtors have not assumed the Master Agreement, are not doing so hereunder, and reserve their rights under § 365 of the Bankruptcy Code, including without limitation the right to reject the Master Agreement. Any monies due to Setech for services performed under the Master Agreement prior to its receipt of a Notice of Rejection from the Debtors shall give rise to an administrative claim in favor of Setech under section 503(b) of the Bankruptcy Code payable in the ordinary course of the Debtors' business in accordance herewith.

**2.**    **Setech Prefund Transfer and $221,976.21 Payment**. Upon execution hereof, Setech shall retain and apply the Setech Prefund Transfer in partial satisfaction of the 11/2/05 Balance. Additionally, by November 2, 2005, the Debtors shall pay Setech from the Escrow Funds an additional Two Hundred Twenty-One Thousand Nine Hundred Seventy-Six and 21/100 Dollars ($221,976.21) to be applied to the 11/2/05 Balance. These payments together shall be in complete satisfaction of any claims by Setech against the Debtors for goods or services provided by Setech to the Debtors under the Master Agreement on or prior to October 8, 2005, including, without limitation, claims for a disputed additional amount of $330,841.47, but not including obligations of the Debtors hereunder. The Debtors hereby release and waive any claim to avoid and recover, seek disgorgement of, or to assert as a defense or counterclaim the Setech Prefund Transfer to the fullest extent permitted under the Essential Supplier Order. Furthermore, based on the accuracy of the Eddinger Declaration, the Debtors represent and warrant that the $221,976.21 payment made hereunder is authorized under the Essential Supplier Order.

07646N.051607.645146:7:NASHVILLE

3. **Escrow Fund**. Upon execution hereof, Debtors shall deposit funds in an aggregate amount of Eight Million Five Hundred Eighty-Nine Thousand Six Hundred Eighty-Six and 80/100 Dollars ($8,589,686.80), calculated as $8,367,710.59 on account of the Agency Vendor Claims plus $221,976.21 as provided in paragraph 2 above, into an escrow account as set forth in the Escrow Agreement attached hereto as **Exhibit 2** (the "**Escrow Funds**"). The Escrow Funds shall be available exclusively for payment of Agency Vendor Claims pursuant to paragraph four below and for the purposes set forth in paragraph five below.

4. **Agency Vendor Claims Resolution Process**. The Agency Vendor Disbursements are authorized and approved to the extent the payments are made to Agency Vendors for goods or services not provided under any contract other than a spot basis contract; provided, however, that the Debtors reserve the right to seek recovery of such amounts directly from the Agency Vendors in the event such payments are deemed not to be authorized under the Essential Supplier Order. Setech shall cooperate and work as Debtors' agent to help identify the Agency Vendors most critical to the operation of the Debtors' facilities that are covered by the Master Agreement. Toward the end of settling and compromising Agency Vendor Claims, Setech shall send to certain Agency Vendors a proposed agreement from the Debtors (each an "**Agency Vendor Agreement**"), substantially in the form of the letter agreement attached as **Exhibit 3** hereto, requesting that in exchange for payment of the amount stated in the letter agreement, with amounts to be provided by Debtors, that the applicable Agency Vendor waives and relinquishes claims against Setech and the Debtors and execute and operate under the Agency Vendor Agreement. Subject to approval by the Debtors, Setech shall use the Escrow Funds to the extent necessary to make payments to the Agency Vendors pursuant to the terms of any executed and returned Agency Vendor Agreement.

5. **Indemnity**. The Debtors agree and acknowledge that: (i) Agency Vendor Claims are claims against the Debtors, not Setech, and (ii) payments made by Setech to Agency Vendors do not involve transfers to Setech under the Bankruptcy Code or under any similar law providing for avoidance, disgorgement, or other remedies in insolvency-related situations. This agreement and acknowledgment, but not the indemnity below, are premised on Setech's representations and warranties set forth in paragraph F. hereof. The Debtors agree to indemnify, defend, and hold harmless Setech and its affiliates, officers, directors, employees, agents, attorneys, partners, successors and assigns ("**Indemnified Parties**") from and as to any and all actions, attorney's fees, charges, claims, costs, demands, expenses, judgments and liabilities regarding any claim made or to be made against Setech in connection with any claims made by or any payment made to an Agency Vendor or its successors and assigns. The rights of the Indemnified Parties hereunder shall have administrative expense priority in the Case under section 503(b) of the Bankruptcy Code. Notwithstanding anything to the contrary herein, in no event shall the Debtors' liability under this section exceed the amount of any unused Escrow Funds plus $2,791,230.90.

Upon receipt of any claim for which an Indemnified Party is entitled to indemnification hereunder, the Indemnified Party shall promptly provide notice thereof to the Debtors. Setech shall make available to the Debtors' officers, counsel and accountants, at reasonable times and for reasonable periods, during normal business hours, all books and records of Setech relating to any such possible claim, and each Party shall render to the other such assistance as it may

- 4 -

reasonably require of the other in order to insure prompt and adequate resolution of such claim and/or the defense of any suit or proceeding arising out of such claim.

The Debtors shall be entitled to participate in the resolution of any claim described in the preceding paragraph and, to the extent that they determine, after notice thereof to the Indemnified Party, assume the defense of any suit or proceeding brought by a third party in connection with such claim (unless (1) one or more of the Debtors is also a party to such suit or proceeding and the Indemnified Party determines in good faith that joint representation would be inappropriate, or (2) the Debtors fail to provide reasonable assurance to the Indemnified Party of their financial capacity to defend such suit or proceeding and provide indemnification with respect to such suit or proceeding) with counsel selected by the Debtors but reasonably satisfactory to the Indemnified Party, and, after notice from the Debtors to the Indemnified Party of their election to assume the defense of such suit or proceeding, the Debtors shall not, as long as they diligently conduct such defense, be liable to the Indemnified Party under this Agreement for any fees of other counsel or any other expenses with respect to the defense of such suit or proceeding, in each case subsequently incurred by the Indemnified Party in connection with the defense of such suit or proceeding, other than reasonable costs of investigation. If the Debtors assume the defense of a suit or proceeding they may, in their discretion, effect a compromise or settlement of such claims without the Indemnified Party's consent; provided, that (1) there is no finding or admission of any violation of any legal requirement or any violation of the rights of any person by the Indemnified Party and no effect on any other claims that may be made against the Indemnified Party, (2) the sole relief provided is monetary damages with respect to the Indemnified Party that are paid in full by the Debtors, and (3) the Indemnified Party shall have no liability with respect to any compromise or settlement of such claims effected without its consent.

Setech will defend, indemnify, and hold the Debtors harmless with respect to any payment to an Agency Vendor made under paragraph 4 hereof to the extent that the payment is required under a contract other than a spot basis contract.

**6.   Customary Trade Terms.** Setech agrees to abide by the customary trade terms and other undertakings set forth in the Eddinger Declaration, which terms are fully incorporated herein by reference.

**7.   Notice of Rejection.** If the Debtors choose to reject the Master Agreement under section 365 of the Bankruptcy Code, then the Debtors shall provide Setech with a written notice of their intention to reject ("**Rejection Notice**"). Upon written receipt of a Rejection Notice, Setech may immediately cease working under the Master Agreement. To the extent, however, that Setech performs work under the Master Agreement at the Debtors' request after its receipt of the Notice of Rejection, then Setech shall have an administrative expense claim under section 503(b) of the Bankruptcy Code equal to the charge for that work as set forth in the Master Agreement or for the pro rata portion of that charge based on the percentage of work performed.

**8.   Notices.** All notices, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given:  (i) when personally delivered; (ii) upon

- 5 -

actual receipt (as established by confirmation of receipt or otherwise) during normal business hours, otherwise on the first business day thereafter, if transmitted by facsimile or telecopier with confirmation of receipt; (iii) when mailed by certified mail, return receipt requested, postage prepaid; or (iv) when sent by overnight courier; in each case, to the following addresses, or to such other addresses as a Party may from time to time specify by notice to the other Parties given pursuant hereto.

If to Debtors:

Delphi Corporation
Attention: Kevin F. Smith
5725 Delphi Drive
Troy, Michigan 48098
Facsimile: (248) 813-1576

and to

Delphi Corporation
Attention: Sean P. Corcoran
5725 Delphi Drive
Troy, Michigan 48098
Facsimile: (248) 813-2491

with a copy to:

Skadden, Arps, Slate, Meagher & Flom, LLP
Attention: John K. Lyons and Randall Reese
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
Facsimile: (312) 407-8532

If to Setech:

Setech, Inc.
Attention: Richard Eddinger
Chief Financial Officer
903 Industrial Drive
Murfreesboro, Tennessee 37129-4928
Facsimile: (615) 890-6516

With a copy to:

Stites & Harbison PLLC
Attention: Michael Hinchion
424 Church Street, Suite 1800
Nashville, Tennessee 37219
Facsimile: (615) 782-2371

- 6 -

9.    **Governing Law and Jurisdiction**.  This Agreement shall be governed and construed by the laws of the state of New York, without regard to applicable conflict of law rules. Any disputes arising in connection with this Agreement shall be adjudicated by the Court.

10.    **Original and Counterparts**.  This Agreement may be executed in separate and identical counterparts, each of which shall constitute an original, and all of which shall constitute a single agreement.  It shall not be necessary, in making proof of this Agreement, to produce or account for more than one complete set of counterparts.

11.    **Entire Agreement**.  This Agreement constitutes the entire agreement among the Parties with respect to the matters resolved herein.  No amendment or modification to this Agreement shall be effective or binding upon any of the Parties unless in writing and duly executed by the Parties.

12.    **Confidentiality**.  Except as set forth herein, Setech hereby agrees that it will keep the terms of this Agreement, together with all related settlement discussions, strictly confidential. Setech may disclose the terms of this Agreement only to (a) its management personnel that need to know such information to implement the terms of this Agreement, (b) the Agency Vendors, (c) legal counsel and other advisors with whom Setech has a recognized legal privilege, (d) its outside accounting firm and other financial professionals, and (e) its lenders and their respective attorneys, accountants and other professionals; provided that all such parties have been informed of the confidentiality restrictions contained herein. Setech further agrees that it will be responsible and liable to the Debtors for any breach of the confidentiality provisions set forth in this Agreement by its management personnel, legal counsel and other advisors, professionals and lenders. Setech acknowledges that failure to honor the confidentiality provisions contained herein would cause significant economic harm to the Debtors. Any discussions by Setech with any third parties, including the press or media or consultants, regarding this Agreement and its terms are expressly prohibited.

**WHEREOF**, the Parties execute this Agreement, effective as of the date signed by all of the Parties set forth below:

**THE DEBTORS**                    **SETECH, INC.**


By:_____         By: *Thomas N. Eisenman*
                                      Thomas N. Eisenman

Its:_____        Its: President

Date:_____       Date: October 27, 2005

9.    **Governing Law and Jurisdiction**.  This Agreement shall be governed and construed by the laws of the state of New York, without regard to applicable conflict of law rules.  Any disputes arising in connection with this Agreement shall be adjudicated by the Court.

10.    **Original and Counterparts**.  This Agreement may be executed in separate and identical counterparts, each of which shall constitute an original, and all of which shall constitute a single agreement.  It shall not be necessary, in making proof of this Agreement, to produce or account for more than one complete set of counterparts.

11.    **Entire Agreement**.  This Agreement constitutes the entire agreement among the Parties with respect to the matters resolved herein.  No amendment or modification to this Agreement shall be effective or binding upon any of the Parties unless in writing and duly executed by the Parties.

12.    **Confidentiality**.  Except as set forth herein, Setech hereby agrees that it will keep the terms of this Agreement, together with all related settlement discussions, strictly confidential.  Setech may disclose the terms of this Agreement only to (a) its management personnel that need to know such information to implement the terms of this Agreement, (b) the Agency Vendors, (c) legal counsel and other advisors with whom Setech has a recognized legal privilege, (d) its outside accounting firm and other financial professionals, and (e) its lenders and their respective attorneys, accountants and other professionals; provided that all such parties have been informed of the confidentiality restrictions contained herein.  Setech further agrees that it will be responsible and liable to the Debtors for any breach of the confidentiality provisions set forth in this Agreement by its management personnel, legal counsel and other advisors, professionals and lenders.  Setech acknowledges that failure to honor the confidentiality provisions contained herein would cause significant economic harm to the Debtors.  Any discussions by Setech with any third parties, including the press or media or consultants, regarding this Agreement and its terms are expressly prohibited.

**WHEREOF**, the Parties execute this Agreement, effective as of the date signed by all of the Parties set forth below:

THE DEBTORS                                  SETECH, INC.

By: _Karen Smith_____                      By: _Thomas N. Eisenman_____
                                                  Thomas N. Eisenman
Its: _Director, Global Supply_                Its: _President_____
     _Management_

Date: _October 27, 2005_____                 Date: _October 27, 2005_____

- 7 -

07646N.051607.645146.7.NASHVILLE

# EXHIBIT 4

STITES & HARBISON PLLC
Robert C. Goodrich Jr. (TN 10454)
Madison L. Cashman (TN 24027)
424 Church Street, Suite 1800
Nashville, TN 37219
Tel: (615) 244-5200   Fax: (615) 782-2371
Email: robert.goodrich@stites.com
        madison.cashman@stites.com
-and-
GAZES LLC
Ian J. Gazes (IG-7564)
Eric Wainer (EW-9783)
32 Avenue of the Americas
New York, NY 10013
Tel: (212) 765-9000
Fax: (212) 765-9675
Ian@GazesLLC.com

*Attorneys for Setech, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| -------------------------------------------------------- x | | |
| IN RE: | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, *et al.*, | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| -------------------------------------------------------- x | | |

**NOTICE OF WITHDRAWAL OF RECLAMATION DEMAND OF SETECH, INC.**

    Please take notice that Setech, Inc. respectfully WITHDRAWS its reclamation demand.

Dated: November 1, 2005

                        STITES & HARBISON, PLLC


                        /s/ Madison L. Cashman
                        Madison L. Cashman (TN 24027)
                        424 Church Street, Suite 1800
                        Nashville, TN 37219
                        Tel: (615) 244-5200   Fax: (615) 782-2371
                        Email:madison.cashman@stites.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Notice of Withdrawal has been served electronically upon all parties accepting electronic service, this 1st day of November, 2005.

/s/ Madison L. Cashman
Madison L. Cashman

07646N:051607:646825:1:NASHVILLE

# EXHIBIT 5

# DELPHI

May 16, 2007

Richard Eddinger
Setech, Inc.
903 Industrial Drive
Murfreesboro, TN. 37129
615-216-0935 Office

**Subject: Memorandum of Understanding (MOU)**

Delphi and Setech, Inc. agree to work in good faith to complete the Delphi/Setech
Master Procurement Agreement and the Transaction Agreement between the two
companies to cover the following Delphi plant locations:

- Kokomo
- Milwaukee
- Kettering
- Needmore
- Home Ave.
- Moraine
- Sandusky

Delphi and Setech, Inc. further agree to have the Delphi/Setech Master Procurement
Agreement and Transaction Agreement completed no later than August 1, 2007. If
the agreement is not in place by this time the MOU will expire.

Your signature on this document acknowledges that Setech, Inc. is in agreement
and Delphi authorizes Setech, Inc. to continue business as usual and required until
such agreements are signed or this MOU expires, whichever shall come first.

Delphi and Setech agree that Setech will continue normal and customary services in
compliance with the most recent Master Agreement and that Delphi will continue to
pay Setech it's normal and customary fees in compliance with the most recent
Master Agreement. The cost elements included are Management fees, Operating
fees, Freight and Labor as detailed below.

- Management fees (payable monthly):
  - Kokomo & Milwaukee: $136,543
  - Kettering: $65,806
  - Needmore: $83,333
  - Home Ave.: $38,000
  - Moraine: $64,980
  - Sandusky: $60,321

- Operating fees:  Setech's actual costs incurred
- Freight:  Setech's actual costs incurred
- Labor:  Setech's actual cots incurred

_____
Name
Setech, Inc.

Date_____May 16, 2007_____

_____
Industrial Supplies, Operations Buyer
Delphi Global Supply Management

Date___5/16/07___

_____
Purchasing Manager
Delphi Global Supply Management

Date___16MAY07___

# EXHIBIT 6

| From Complaint | | | Sum of ALLOCA | PMT_TYPE | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Amount | Type | GROUP | Exp Fee | Freight | Mgmt Fee | Product | Service Fee | TDB | Grand Total |
| 7/29/2005 | $598.64 | EFT | A | (8,626.40) | 1,883.22 | | 7,341.82 | | | 598.64 |
| 8/1/2005 | $790.50 | EFT | B | | | | 790.50 | | | 790.50 |
| 8/2/2005 | $7,170,977.31 | EFT | C | 351,156.11 | 59,931.55 | 509,395.00 | 6,295,327.25 | 37,530.00 | (82,362.60) | 7,170,977.31 |
| 8/3/2005 | $522,897.38 | EFT | D | 47,789.86 | 1,413.82 | | 237,909.47 | | 235,784.23 | 522,897.38 |
| 8/4/2005 | $388,503.32 | EFT | E | | | | 388,503.32 | | | 388,503.32 |
| 8/5/2005 | $590,135.53 | EFT | F | | | | 590,135.53 | | | 590,135.53 |
| 8/11/2005 | $659,392.78 | EFT | G | | | | 659,392.78 | | | 659,392.78 |
| 8/30/2005 | $996,551.38 | EFT | H | 30,744.00 | 714.82 | | 1,184,104.56 | | (219,012.00) | 996,551.38 |
| 8/31/2005 | $246,740.86 | EFT | I | | | | 246,740.86 | | | 246,740.86 |
| 9/2/2005 | $6,780,536.54 | EFT | J | 208,614.21 | 41,353.95 | 509,395.00 | 6,021,173.38 | | | 6,780,536.54 |
| 10/4/2005 | $1,249,563.52 | EFT | K | 103,969.46 | 5,748.16 | 85,304.00 | 1,054,541.90 | | | 1,249,563.52 |
| 10/5/2005 | $2,187,311.34 | EFT | L | 131,766.43 | 24,028.93 | 318,288.00 | 1,713,227.98 | | | 2,187,311.34 |
| 10/6/2005 | $1,335,013.94 | WIRE | M | 389,363.30 | 17,609.43 | 740,253.20 | | | 187,788.01 | 1,335,013.94 |
| 10/6/2005 | $23,139.33 | EFT | N | | | | 23,139.33 | | | 23,139.33 |
| 10/7/2005 | $514,970.97 | EFT | O | | | | 514,970.97 | | | 514,970.97 |
| | $22,667,123.34 | | Grand Total | 1,254,776.97 | 152,683.88 | 2,162,635.20 | 18,937,299.65 | 37,530.00 | 122,197.64 | 22,667,123.34 |
| | | | Percentages | 5.54% | 0.67% | 9.54% | 83.55% | 0.17% | 0.54% | 100.00% |

| | Exp Fee | Freight | Mgmt Fee | Product | Service Fee | TDB | Grand Total |
|---|---|---|---|---|---|---|---|
| Total W/O $1.3 n | 865,413.67 | 135,074.45 | 1,422,382.00 | 18,937,299.65 | 37,530.00 | (65,590.37) | 21,332,109.40 |
| Percentages | 4.06% | 0.63% | 6.67% | 88.77% | 0.18% | -0.31% | 21,332,109.40 |
| Enterd Into Sent | 4% | 1% | 7% | 88% | 100% | | |