**FOX ROTHSCHILD LLP**

Midtown Building, Suite 400
1301 Atlantic Avenue
Atlantic City, NJ  08401
Michael Viscount (Admitted *pro hac vice*)
Brian Isen (*Pro hac vice* pending)
Tel: (609) 348-4515

      -and-

100 Park Avenue, 15th Floor
New York, NY 10017
Fred Stevens
Tel: (212) 878-7905

**Hearing Date:  May 20, 2010 at 10:00 a.m.**
**Objection Deadline:  May 4, 2010**

*Attorneys for M&Q Plastic Products, LP*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DPH HOLDINGS CORP., <u>et  al</u>., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |

---------------------------------------------------------x

| | | |
|---|---|---|
| DELPHI CORPORATION, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Adv. Pro. No. 07-02743 (RDD) |
| vs. | : | |
| | : | |
| M&Q PLASTIC PRODUCTS AND M AND Q PLASTIC PRODUCTS., | : | |
| | : | |
| Defendants. | : | |

---------------------------------------------------------x

**OBJECTION OF M&Q PLASTIC PRODUCTS L.P. TO**
**REORGANIZED DEBTORS' MOTION FOR CASE MANAGEMENT ORDER**
<u>**ESTABLISHING PROCEDURES GOVERNING ADVERSARY PROCEEDINGS**</u>

M&Q Plastic Products L.P., purported defendant in the above-captioned adversary proceeding ("Defendant" or "M&Q")[1], by and through its undersigned counsel, hereby objects to Debtors' Motion for a Case Management Order Establishing Procedures Governing Adversary Proceedings (Docket No. 9) (the "Case Management Motion"), and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      This case  is one of the 177 adversary proceedings (the "Avoidance Actions") filed by Chapter 11 Debtors Delphi Corporation, et al (collectively, the "Debtors") on September 30, 2007, to avoid and recover transfers pursuant to 11 U.S.C. §§ 547 and 550.  Plaintiffs, who are the Debtors as reorganized and renamed DPH Holdings, Inc. (the "Reorganized Debtors" or "DPH") under a confirmed Chapter 11 plan, now seek the entry of a single, uniform Case Management Order that would apply to all 177 of the Avoidance Actions. Plaintiffs contend that establishment of such an order will allow the Court to "establish streamlined procedures to facilitate the efficient resolution of the adversary proceedings . . ."

2.      While Defendant has no objection to any effort by the Court to streamline the litigation and facilitate efficient resolution and disposition of this case at the earliest possible time, Defendant believes that entry of any Case Management Order at this juncture is premature. Furthermore, to the extent the Court believes that an order should be entered at this time, Defendant, for the reasons stated below, objects to several portions of the Case Management Order as proposed, because the proposed order will prejudice Defendant and will make defense and/or settlement of this Adversary Proceeding more burdensome and difficult.

---

[1] As will be discussed, *infra,* Defendant M&Q Plastic Products L.P. sold its operating assets to a third party and ceased doing business in early 2008.  The remaining assets of the Defendant were placed into a liquidating trust effective September 2009, and the company and its sole partners have each filed certificates of termination in the jurisdictions of their respective formations.

AC1 907840v3 05/04/10

3.      In fact, Defendant submits that the Plaintiffs' proposal for case management procedures is nothing more than an effort to implement Plaintiffs' strategy of depriving the Defendant of its due process rights and undermining the Defendant's ability to effectively defend the action by restricting the discovery available to the Defendant and limiting the information that Plaintiffs will have to produce.

## BACKGROUND[2]

A. Delphi and its Bankruptcy

4.      On October 8, 2005 and October 14, 2005 (as applicable, the "Petition Date"), the Debtors (sometimes herein referred to as "Delphi") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code to commence individual bankruptcy cases which have been jointly administered under the above referenced docket number (the "Bankruptcy Case").

5.      Prior to the bankruptcy filings, Delphi and its subsidiaries and affiliates (sometimes herein collectively referred to as, the "Company") were a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplied products to nearly every major global automotive original equipment manufacturer ("OEM").  As of December 31, 2007, the Company reported global net sales of $22.3 billion and global assets of approximately $13.7 billion.

6.      At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.

---

[2] The bulk of the information contained in this Background section of this pleading has been taken from pleadings filed by or on behalf of the Debtors in the bankruptcy case.

AC1 907840v3 05/04/10

7.      Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM remained as the Company's single largest customer, at the time of the bankruptcy filing more than half of Delphi's revenue was generated from non-GM sources.

8.      In the first two years following Delphi's separation from GM, the Company reported approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales. Reflective of a continued downturn in the marketplace, in 2005 Delphi reported net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors reported a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors reported a net loss of $3.1 billion.

9.      In the Bankruptcy Case, the Debtors maintained that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles

4

that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

10.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced the chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

   B.  The Defendant M&Q Plastic Products, L.P.

11.    Prior to the bankruptcy filings of Delphi in 2005, the Defendant supplied to various of the Debtors convoluted and other tubing used primarily by Delphi in the production of wire harnesses and fuel tube assemblies.   The supply relationship continued during the bankruptcy until the Defendant sold is assets and businesses and ceased doing business on March 14, 2008.

12.    Defendant filed a proof of claim which was assigned Claim No. 7579 (the "Claim").  Defendant sold the Claim to Goldman Sachs Credit Partners, L.P. in July 2006.  A Notice of the Transfer of Claim was filed in the Bankruptcy Case on or about August 8, 2006.

13.    Subsequently, Defendant M&Q sold its business and operating assets to a third party through a transaction that closed on March 14, 2008.  M&Q ceased doing business with the Debtors at that time, and has since terminated its existence, as has the two entities that were its partners.  The remaining assets of the Defendant are now held in a liquidation trust that was formalized on December 22, 2009, but by its terms was intended to be effective September 30, 2009.

AC1 907840v3 05/04/10

C.  Avoidance Actions Commenced in Secret

14.    On March 31, 2006, Delphi outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their current pension situation.

15.    Before it was able to file and confirm a plan, Delphi needed to address the fast approaching two (2) year statute of limitations for avoidance actions under Bankruptcy Code § 548.  Delphi wanted to maintain good relations with its suppliers and may have even expected that its vendors would be made whole under a confirmed plan that continued its business after the reorganization as contemplated.  In any event, Delphi did not want to have to file avoidance actions that were sure to upset the supply relationships needed for successful post effective date operations.  Thus, Delphi sought the Court's assistance through a motion for an order establishing procedures to preserve estate claims beyond the statute of limitations imposed by the Bankruptcy Code (Docket No. 8905) (the "Preservation of Estate Claims Motion") which was filed on August 6, 2007.

16.    Defendant has no record of being served or otherwise having been given notice by

the Debtors concerning the filing and/or content of the Preservation of Estate Claims Motion.

17.    On August 16, 2007, the Court entered an order (Docket No. 9105) (the "Preservation of Estate Claims Procedures Order") that permitted Delphi to: (a) file adversary proceeding complaints under seal; (b) directed the Clerk of Court to delay issuing summonses for complaints unless and until Delphi notified the Clerk of Court of their intent to prosecute such actions; (c) stayed each adversary proceeding unless and until Delphi made service of process on the respective defendants, and (d) extended until May 31, 2008, the deadline under Fed. R. Civ. P. 4(m) by which Delphi would have to serve process on M&Q and the other parties named as defendants in the adversary proceedings that had been filed under seal.

18.    On September 30, 2007, Delphi initiated the instant adversary proceeding against the Defendant by filing under seal a complaint seeking to recover 21 alleged preferential transfers made in the aggregate amount of $6,621,649.14, and at the same time a number of similar complaints reported to exceed 700 were filed under seal against other parties with whom Delphi had transacted business prior to its bankruptcy filings in 2005.

D.    Plan Confirmation

19.    On December 10, 2007, the Debtors filed their first amended joint plan of reorganization (Docket No. 11386) (the "Plan") and related disclosure statement (Docket No. 11388).  The Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order") on January 25, 2008, and the Confirmation Order became final on February 4, 2008.

20.    The Plan, as confirmed on January 25, 2008 (the "Confirmed Plan"), was based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases.  The Global Settlement Agreement and the

AC1 907840v3 05/04/10

Master Restructuring Agreement provide for a comprehensive settlement with GM, and both agreements were approved by the Court in the Confirmation Order.

21.     Section 7.24 of the Confirmed Plan provides that "Causes of Action against Persons arising under section 544, 545, 547, 548 or 553 of the Bankruptcy Code or similar state laws **shall not be retained** by the Reorganized Debtors **unless specifically listed** on Exhibit 7.24 hereto." (Emphasis added).  The cause of action against the Defendant is under section 547 of the Bankruptcy Code and was not listed on Exhibit 7.24 to the Confirmed Plan.

22.     After the Plan was confirmed, the Debtors focused their efforts on satisfying the conditions for the Plan to become effective.  The Debtors maintain that they satisfied those conditions and on April 4, 2008 began a formal closing process attended by representatives of GM, the exit lenders, and the Statutory Committees.  Also according to the Debtors, the Plan Investors refused to participate in the closing or fund their obligations under the Investment Agreement, and instead delivered written notices purporting to terminate the Investment Agreement based on both alleged breaches by the Debtors and the failure of the Plan's effective date to occur by April 4, 2008.

23.     On October 3, 2008, the Debtors filed a motion under 11 U.S.C. § 1127 for an order approving (i) certain modifications to the confirmed Plan and related disclosure statement and (ii) related procedures for re-soliciting votes on the confirmed Plan, as modified (Docket No. 14310) (the "Plan Modification Motion").  On June 1, 2009, the Debtors filed a supplement to the Plan Modification Motion (the "Motion Supplement"), which sought approval of (i) certain modifications to the confirmed Plan (the "Modified Plan"), (ii) supplemental disclosure, and (iii) procedures for re-soliciting votes on the Modified Plan.  The Court entered an order approving the Modified Plan (Docket No. 18707) (the "Plan Modification Order") on July 30, 2009.  All of

this happened after M&Q sold its claim, sold its business and was no longer a part of the Delphi supply chain.

24.     Section 7.9 of the Modified Plan has an identical provision to section 7.24 of the original Confirmed Plan and provides that "Causes of Action against Persons arising under section 544, 545, 547, 548 or 553 of the Bankruptcy Code or similar state laws shall not be retained by the Reorganized Debtors unless specifically listed on Exhibit 7.19 hereto."  This time, however, the listing on Exhibit 7.19 to the Modified Plan included all of the "Causes of Action" that were filed under seal in accordance with the Preservation of Estate Claims Procedures Order, and Exhibit 7.19 listed the various Avoidance Actions by reference to the adversary case number that had been assigned to each, but it did not name M&Q or any of the other defendants in those Causes of Action.

25.     Defendant has no record of being served or otherwise having been given notice by the Debtors concerning the filing and/or content of, or the proceedings concerning, the Plan Modification Motion, the Motion Supplement, or the Modified Plan.

26.     On October 6, 2009 (the "Effective Date"), the Debtors substantially consummated the Modified Plan, and closed on the transactions under the Master Disposition Agreement dated as of July 30, 2009, by and among Delphi, the reorganized General Motors Corporation ("New GM")[3], and the purchaser entity called DIP Holdco LLP, subsequently renamed Delphi Automotive LLP, a United Kingdom limited liability partnership (the "UK Buyer"), and the other sellers and buyers party thereto.  In connection therewith, the UK Buyer acquired substantially all of the Debtors' global core businesses, and subsidiaries of New GM acquired certain U.S. manufacturing plants and the Debtors' non-core steering business, respectively, leaving the Reorganized Debtors "emerged from chapter 11."

9

27.     The Reorganized Debtors have been renamed as DPH Holdings and affiliates, and they remain responsible for the post-Effective Date administration of these chapter 11 cases, including the disposition of certain retained assets and payment of certain retained liabilities as provided for under the Modified Plan, and the eventual closing of the cases.  Included among the "retained assets" was this adversary proceeding and the others like it which remained filed under seal and secret to the Defendant and others who are similarly situated.

E.   Prosecution of Avoidance Actions

28.     While the plan confirmation process played out, the Court acted by orders entered on March 28, 2008, April 30, 2008 and October 22, 2009 (the "Extension Orders"), to grant Delphi's motions for successive extensions of the deadline to serve process in this and another 176 similar adversary proceedings, with the final extension under the October 22 Order running until 180 days after substantial consummation of the Modified Plan.

29.     Defendant has no record of being served or otherwise having been given notice by the Debtors concerning the filing of, or the proceedings concerning, the various motions that lead to the Court's issuance of the Extension Orders.

30.     M&Q was served with the Complaint on or about March 22, 2010, over four years after the commencement of the underlying bankruptcy cases and over two and a half years after the Complaint was filed under seal.

31.     Delphi's complaint is "bare-boned," providing no information other than a listing of all payments made by the Debtors to M&Q in the 90 day period prior to the filing of bankruptcy by the Debtors all of which are alleged to be avoidable.  The Complaint does not even identify which of the Debtors made the transfers at issue, but instead seeks relief on behalf

---

[3] New GM emerged from bankruptcy on July 10, 2009.

AC1 907840v3 05/04/10

of "Delphi Corporation ('Delphi') and other [unnamed] above-captioned debtors and debtors in possession."

32.    On March 18, 2010, Delphi filed the instant Case Management Motion. Defendant was never formally served with the Case Management Motion, but M&Q learned of the motion from counsel representing a defendant in another adversary proceeding.

33.    There are also pending in the case various motions to vacate the Preservation of Estate Claims Procedures Order and the various other orders extending the deadline for the Debtors to unseal and serve the complaints and to dismiss complaints in the Adversary Proceedings.  Defendant has joined in those motions and has intends to file its own motion to dismiss before the May 14, 2010 deadline.[4]

34.    It is for these reasons that Defendant objects to the procedures proposed by Delphi in the Case Management Motion.

## ARGUMENTS

### I.    ENTRY OF A CASE MANAGEMENT ORDER IS PREMATURE

35.    Discovery should be held in abeyance pending resolution of the pending motions to dismiss which will, if granted, negate the need for discovery and the consequent burden to Delphi's estates and Defendant.  Indeed, to the extent that the motions to dismiss are denied, Defendant (and, upon information and belief, other defendants) may seek leave to file interlocutory appeals in order to defend their fundamental due process rights.  Defendant respectfully submits that no discovery should take place until the Court has had a chance to rule on the various motions to dismiss and until any interlocutory appeals have been exhausted.

---

[4] The deadline for filing "First Wave Dismissal Motions" was set by the Court's Order of April 23, 2010 filed in the Bankruptcy Case Establishing Procedures with Respect to Pending Motions to Dismiss Adversary Proceedings.

AC1 907840v3 05/04/10

36.     Further, logically no Case Management Order should be entered until discovery is ready to be commenced.  At that point, the parties and the Court will know much more about the scope of the issues going forward in the Adversary Proceedings and what discovery is likely to be required.  This information will assist in better shaping a Case Management Order.

## II.     DEFENDANT OBJECTS TO SEVERAL LIMITATIONS IN THE PROPOSED CASE MANAGEMENT ORDER

37.     To the extent the Court is inclined to enter a Case Management Order at this time, Defendant objects to several portions of the order proposed by Plaintiffs.

38.     Because Delphi has provided almost no information in its complaints, Defendant will be required to conduct extensive discovery to determine on which Debtor entities' behalf the claims are brought, to evaluate the merits of the avoidance claims asserted, and to formulate defenses and/or settlement positions.    This discovery will comprise, among other things, information and documents necessary to evaluate basic facts—which should have been pleaded in the Complaint—including: (a) whether the property transferred was an interest in property of the debtor entities which are plaintiffs; (b) which debtor entity made each of the transfers; (c) to whom the transfers were made; (d) the purpose of each transfer; (e) who was the initial transferee of each transfer; (f) information regarding the ordinary course of dealings between Delphi and M&Q; (g) the ordinary course of dealing by Delphi and its vendors in general; (h) new value; and (i) solvency of Delphi when the transfers were made during the time before the October 2005 Petition Dates.

39.     The necessity for robust discovery in this proceeding has been compounded by the fact that Delphi provided absolutely no notice to defendants of its "sealed" actions, and little if any notice designed to enable a Defendant like M&Q to understand, evaluate and protect its due process and other rights during the period prior to and after the complaint was filed under

AC1 907840v3 05/04/10

seal.  Any attempt by Delphi to limit discovery after keeping these actions a secret for over two years will severely prejudice the Defendant given that M&Q and its owners have  ceased to exist and have been liquidating after a sale of the Defendant's business in March of 2008.  Because M&Q had no notice of this Adversary Proceeding, it was not aware of the need to (i) take special steps to organize and preserve its accounting and the records of transactions Delphi, all of which must now be reconstructed from otherwise available information, including that in the possession and control of the Reorganized Debtors, (ii) hold exit interviews with former employees who were knowledgeable about the Delphi business relationships, or (iii) not make arrangements to keep in touch with those former employees to provide litigation information or serve as witnesses.

A.    Limits on R. 26 Disclosures

40.    Specifically, Defendant objects to the proposal in Paragraph 3 of the proposed Case Management Order which states that all parties are exempt from the initial disclosure requirements of Bankruptcy Rule 7026(a)(1).  Defendant is entitled to know why Delphi filed these avoidance actions, other than the obvious reason to create a fund to pay the professional fees and other administrative expenses in the Chapter 11 case.  In addition, Defendant needs to know the identity of the representatives of Plaintiffs who have information about the dealings between Delphi and M&Q.  Defendant has not even been able to identify the Trust Plan Administrator, who was supposed to be identified by Delphi or before the effective date.  The Confirmation Order suggests that the identity of the Administrator was released in the final confirmation hearing, however, the only person identified in the hearing transcript is John C. Brooks, a long-time employee of Delphi, who was designated as the authorized representative and sole officer of DPH Holdings.  Without the initial disclosures required by Rule 7026(a)(1),

13

M&Q cannot confirm the most necessary facts, such as who is responsible for administration of the Post-Confirmation Reorganized Holdings Share Trust. Moreover, to the extent that discovery is limited as requested by Delphi in the Case Management Order (limiting the number of interrogatories, requests for admission, and document production requests), information provided in the parties' initial disclosures will be critical, particularly in light of the lack of requisite detail contained in the Complaint.

B.  Limits on Motions

41.     Defendant also objects to Paragraph 4 of the proposed Case Management Order which would require approval of the Court before ***any*** motion can be filed. Instead, the Court's local rules should control, since the local rules already require that a telephone conference be held before certain motions are filed. See Rules 7007-1(a), 7056-1(a). As explained in the Comment to Rule 7056-1, "[t]he rule does not limit a party's right to file a motion . . . after the pre-motion conference." There is no need to expand the limitations contained in the Court's local rules to apply to "any" motion filed in this matter or to permit the barring of filing motions.

C.  Limits on Document Requests

42.     Defendant also objects to Paragraph 6 of the proposed Case Management Order which limits the number of document requests to twenty (20), including subparts and subsets. Any limitation to the number of document production requests that may be propounded (a limitation which appears nowhere in the Bankruptcy Rules) is unwarranted given the lack of detail contained in the complaints and Delphi's delay in unsealing its complaints. Indeed, as discussed above, robust discovery should be permitted given the substantial prejudice and loss of critical information that has been caused by Delphi's sealed filing of the avoidance actions years ago.

AC1 907840v3 05/04/10

### D.  Limits on Requests for Admissions

43.    Defendant also objects to Paragraphs 8 and 10 of the proposed Case Management Order which: (a) limits the timing of request for admission to "no sooner than thirty (30) days *after* the close of all other fact discovery . . ." and (b) limits the number of admission request to thirty (30), including subsets and subparts.  There is no reason to limit the timing of admission requests to "after" the close of other fact discovery and nothing in the Bankruptcy Rules supports such a limitation.  To the contrary, admission requests are often useful early in discovery to limit the issues in dispute or otherwise focus the parties' discovery efforts.  Such a tool is best employed at the outset of discovery.  The Bankruptcy Rules, moreover, do not limit the number of admission request that a party can propound (to 30 or otherwise) and no limit should be set in this case, particularly given the lack of detail contained in the complaints and Delphi's delay in prosecuting its claims.  And, in any event, there should be no limit on the number of request for admission which seek to authenticate documents.

### E.  Limits on Interrogatories

44.    Defendant also objects to Paragraph 9 of the proposed Case Management Order which limits the number of interrogatories to ten (10), including subsets and subparts.  In the Complaint, $6,621,649.14 is alleged to be recoverable from twenty-one (21) purported transfers.  The inequity of so large of a claim being allotted *less than* a single question per alleged transaction, let alone any questions to identify discoverable evidence or establish the safe harbor exception or any defenses, is palpable.  The Bankruptcy Rules permit twenty-five (25) interrogatories, including discrete subparts, subject to the right to seek leave to serve additional interrogatories.  See Federal Rule of Civil Procedure 33(a)(1).  Twenty-five (25) interrogatories (the very number provided for in the Rules) is probably insufficient in these Adversary

AC1 907840v3 05/04/10

Proceedings given the lack of detail contained in Delphi's complaints, Delphi's delay in prosecuting its claims, and the number of transactions and high dollar amounts at issue. Moreover, Paragraph 9, coupled with Paragraph 3, would require Defendant to utilize many, if not all, of its allotted interrogatories to discover information that Delphi would otherwise be required to provide as part of its Rule 26(a)(1) initial disclosures. Indeed, this number of interrogatories should be expanded if good cause is shown by the Defendant.

F.  Discovery Deadline

45.    Finally, Defendant objects to Paragraph 11 of the proposed Case Management Order which provides that fact and expert discovery will be closed on or before December 1, 2011. For the reasons discussed above, setting a discovery deadline is premature at this time.

**III.    PROVISION SHOULD BE MADE TO FACILITATE
AN EARLY AND COORDINATED EFFORT FOR DEFENDANTS
TO RETAIN EXPERTS AND GENERATE REPORTS
ON SOLVENCY AND OTHER MATTERS PERTINENT
TO AVAILABLE DEFENSES**

46.    One issue that should be addressed in a Case Management Order is a coordinated effort among defendants to retain common experts and generate common reports on the issue of Delphi's solvency during the 90 days prior to the Petition Date for relevant debtors and on other matters pertinent to available defenses such as the general course of business among Delphi and its supply chain during relevant periods prior to the Petition Date. This should include:

(i)    a timeframe for defendants to enter into one or more agreements for joint defense efforts and selection of one or more common experts;

(ii)    a deadline for the submission by defendants and response by the Plaintiffs concerning a joint request for production of relevant information from the Plaintiffs as to each transferor and for Debtor's response;

(iii)    deadlines for the reports of defense experts;

(iv)    deadlines for the identity of Plaintiff's experts and a final reports; and

(v)    a timeframe for the completing of expert deposition.

### IV.    OMNIBUS HEARING DATES ARE NEEDED

47.    Any Case Management Order should include procedures for omnibus hearing dates concerning the Adversary Proceedings, with Delphi required to file an agenda in each of the Adversary Proceedings and electronically serve counsel of record at least three business days before each hearing date.

### V.    ALL FILINGS SHOULD BE CROSS NOTICE IN MAIN BANKRUPTCY CASE

48.    Many of the issues facing defendants in the 177 adversary proceedings involving avoidance actions are the same.  The actions taken by the Debtors against some defendants may impact the others and certainly the responses and actions by some defendants will prove to be instructive and in many instances potentially beneficial to all in efforts to bring the Avoidance Actions to fair and efficient conclusions.

49.    In order to promote the fair and efficient administration of all of the Avoidance Actions, it will helpful if all parties can be made aware of the happenings in each other adversary proceeding.  One way to accomplish this is for the Court to require a notice filing on the docket of the Bankruptcy Case each time the Reorganized Debtors and other parties to the Avoidance Actions make a filing of any kind in the separate adversary proceedings.  Courts have found this to be beneficial to the court, the parties and the proceedings in other cases.  *See e.g.*, *Bank of America v. Nanco, et al.,* U.S. Dist. Ct., D.N.J., 3:07-cv-03603-JAP, Order at Docket No. 27 ("all filings in these [bankruptcy] cases shall be entered on the docket of the United States Bankruptcy Court and shall be noted on the docket of the District Court in Civil Action No. 07-3603").

17

AC1 907840v3 05/04/10

50.     The Adversary Proceedings have been conducted in secret for too long.  It is time

for the Court to require complete transparency by the Reorganized Debtors, and to provide

assistance to the former suppliers who are being sued.  A requirement for cross noticing as

suggested will accomplish both objectives.

WHEREFORE, Defendant requests that entry of the Case Management Order be denied

as premature or, in the alternative, the Case Management Order be modified consistent with the

above; and that the Court grant to Defendant such further relief as is proper and just.


Dated:   Atlantic City, New Jersey
         May 4, 2010
                                                FOX ROTHSCHILD LLP


                                        By:    */s/ Michael Viscount*
                                               Michael J. Viscount (Admitted *pro hac vice*)
                                               Brian Isen (*Pro hac vice* pending)
                                               Midtown Building, Suite 400
                                               1301 Atlantic Avenue
                                               Atlantic City, NJ  08401
                                               (609) 348-4515

                                                       -and-

                                               Fred Stevens
                                               100 Park Avenue, 15th Floor
                                               New York, New York 10017
                                               (212) 878-7900

                                               *Attorneys for Defendant M&Q Plastic Products, LP*

AC1 907840v3 05/04/10