**Hearing Date and Time:  May 20, 2010 @ 10:00 a.m.**

David S. Rosner (DR-4214)
Adam L. Shiff (AS-7571)
Daniel N. Zinman (DZ-7562)
Daniel A. Fliman (DF-2236)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway, 22nd Floor
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800

*Counsel to the Delphi Trade Committee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DPH HOLDINGS CORP., et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |

--------------------------------------------------------x

## REPLY OF THE DELPHI TRADE COMMITTEE IN FURTHER SUPPORT OF ITS APPLICATION FOR REIMBURSEMENT OF EXPENSES ARISING FROM SUBSTANTIAL CONTRIBUTION MADE IN THESE CASES

The ad hoc committee of creditors holding trade claims against Delphi Automotive Systems LLC and its domestic operating subsidiaries (the "Trade Committee"), by and through its undersigned counsel, hereby submits this reply in further support of its application (the "Application")[1] [Docket No. 19116] pursuant to Section 503(b)(3)(D), (b)(4) of Title 11 of the United States Code (the "Bankruptcy Code"), for payment of the Trade Committee's actual, necessary expenses incurred in making a substantial contribution to these Chapter 11 cases (the "Cases").  In support hereof, the Trade Committee respectfully states as follows:

---

[1] Capitalized terms used herein but undefined are ascribed the definitions in the Application.

**INTRODUCTION**

1. In the Application, the Trade Committee seeks reimbursement of its expenses pursuant to an agreement with the Debtors providing substantial consideration to these estates as reported on the record. Accordingly, the Trade Committee respectfully submits that its expenses, limited in accordance with that agreement to $1.5 million, were incurred in making a substantial contribution to these Cases.

2. On April 15, 2010, the Office of United States Trustee (the "US Trustee") filed the *Objection of the United States Trustee to Creditors' Applications for Reimbursement of Professional Fees and Expenses* [Docket No. 19860] (the "UST Objection"). On May 13, 2010, contrary to its agreement with the Trade Committee, the Debtors filed the *Reorganized Debtors' Objection to Substantial Contribution and Certain Other Applications Pursuant to 11 U.S.C. §§ 503(b)(3)-(4) and 1129(a)(4) for Reimbursement of Actual and Necessary Expenses and Professional Fees* [Docket No. 20064] (the "Debtors' Objection" and with the UST Objection, the "Objections").

3. For the reasons set forth below and those in the Application, the Trade Committee respectfully submits that the Court should overrule the Objections and grant the Application in full.

**I. THE TRADE COMMITTEE MADE A SUBSTANTIAL CONTRIBUTION TO THESE CASES.**

 **A. The Trade Committee's Substantial Contribution Benefitted All Unsecured Creditors.**

4. As discussed in detail in the Application, the Trade Committee made a substantial contribution to these Cases by, among other things (a) providing a unified voice of creditors of the Debtors' domestic subsidiaries with which the Debtors could conduct (and, indeed did conduct) direct and efficient plan negotiations in connection with the litigation over the first

2

Equity Participation and Contribution Agreement ("EPCA"), (b) through direct and efficient plan negotiations in connection with later iterations, (c) obtaining critical plan terms regarding the classification and the treatment of domestic trade creditors that facilitated the progression of these Cases through emergence, and (d) eliminating material objections to approval of the plan and the plan solicitation process. Accordingly, the Trade Committee's contribution benefitted the estates, as a whole, by assisting the Debtors at key times in the Cases and preventing avoidable delays, fees, and litigation uncertainties in the confirmation context.

5. The US Trustee wrongly argues that the Trade Committee's "actions benefited the members of the Trade Committee rather than all unsecured creditors." (US Trustee Objection, at 21). Citing to the Debtors' agreement at the December 6, 2007 hearing to reconcile the Trade Committee members' claims, the US Trustee contends that the substantial contribution benefitted only members of the Trade Committee, not other creditors. Due to the US Trustee's singular focus on just one aspect of the Debtors' agreement with the Trade Committee, it fails to recognize the following other benefits that the Trade Committee delivered:

- The Trade Committee assisted in resolving the litigation over the initial EPCA and did in fact resolve its objections providing for uniform and beneficial treatment at that time for all subsidiary trade creditors;

- The Trade Committee provided a unified voice to all holders of domestic trade debt (and other creditors of the Debtors' domestic operating subsidiaries), thereby streamlining negotiations and avoiding the Debtors the time, expense, and uncertainty inherent in multilateral negotiation with disparate creditors; thus benefitting *all* unsecured creditors, not just Trade Committee members;

- Through its objection to the EPCA Motion and extensive negotiations that ensued thereof, the Trade Committee successfully obtained amendments to the Plan Framework Support Agreement which, among other things, included agreements by the Debtors, the UCC, and the proposed plan sponsors under the Plan Framework Support Agreement to classify trade creditors (along with all other unsecured creditors of the domestic subsidiaries) with the senior subordinated unsecured notes, and to treat them all equally. This was a significant change from prior iterations contemplating different treatment for trade creditors as compared with other unsecured creditors and paying senior subordinated unsecured notes ahead of

3

domestic trade debt.  Thus, the Trade Committee's efforts inured to the benefit of *all* trade creditors, whose claims would be treated the same as other general unsecured claims; to the benefit of *all* general unsecured creditors, who would be paid at the same time as holders of senior subordinated unsecured notes; and to the benefit of *all* creditors because the amendments rendered the Confirmed Plan confirmable;

- Through the Trade Committee's litigation relating to the EPCA Motion, as well as extensive negotiations, the Debtors, the UCC, and the proposed plan sponsors under the Plan Framework Support Agreement agreed to pay post-petition interest to all unsecured creditors.  This resolution fixed a disabling absolute priority rule defect in the Debtors' plan.  Otherwise, the Debtors would have encountered extensive confirmation hurdles leading to protracted litigation and potentially insurmountable confirmation risks from both the Trade Committee and other parties in interest.  By avoiding those risks and the related costs, the Trade Committee conferred a benefit on *all* creditors; and

- The Trade Committee resolved its objections to the then-existing disclosure statement and plan at the Debtors' request to assist the estates in achieving confirmation.

6.      As such, the US Trustee's contention that the Trade Committee only benefitted itself, viewed in the context of the whole record, lacks merit.

### B.    **The Trade Committee Did Not Duplicate Others' Efforts.**

7.      Contrary to the US Trustee's contentions, the Trade Committee did not duplicate the UCC's and the Equity Committee's work.  (US Trustee Objection, at 21-22).  As discussed in the Application, the Trade Committee's involvement was essential particularly because the membership of the UCC included not only unions with widely diverging interests, but also Wilmington Trust, the Indenture Trustee for the senior subordinated unsecured notes, and the Pension Benefit Guaranty Company.  Despite the UCC's best efforts, it could not advocate directly or effectively for the interests of certain domestic trade creditors; not just the members of the Trade Committee, but all domestic trade creditors.  For this reason, the Trade Committee's contribution was vital to protecting creditors through plan provisions ensuring similar treatment for all general unsecured creditors rather than inferior allocations to trade creditors that could have rendered the plan unconfirmable.

4

8. The US Trustee identifies certain instances where the Trade Committee argued objections similar in part to those put forth by the UCC or the Equity Committee. (UST Objection, 22). Absent from the US Trustee's list, however, are the Trade Committee's disclosure statement objections based on unconfirmable plan provisions including the different treatment of claims in the same class, absolute priority rule violations, and lack of good faith. The UCC and Equity Committee did not make the same objections. Moreover, regardless of which objections overlapped on some issues, the Trade Committee represented a *different* constituency and, therefore, its independent objection was essential to avoid parties negotiating, proposing, or "settling-around" trade creditors. Finally, the Debtors' willingness to reach a separate settlement agreement with the Trade Committee (rather than relying on a resolution with just the UCC and Equity Committee) plainly embodies the Debtors' acknowledgement that the Trade Committee was a separate group, advancing unique interests, with the ability to affect the outcome of the Cases.

9. It is always the case that a creditor or creditor group takes part in a case and employs counsel to protect or to further its interests. However, as here, where the creditors' efforts support those of not only themselves but of a class or all unsecured creditors, then those efforts have substantially benefitted the estates. The Debtors certainly agreed at the time.

10. Delphi's outcome was far from certain when the Trade Committee made its substantial contribution. But those foreseeable events that altered its then-believed outcome did not change the purpose and conclusion of the agreement. The Court confirmed a plan. The Trade Committee did not oppose it.

## II. THE TRADE COMMITTEE'S FEES ARE REASONABLE.

11. The US Trustee challenges the reasonableness of the Trade Committee's fees based on certain, limited, technical requirements. The US Trustee does *not* dispute that the amount of hours worked, rates charges, and expenses incurred are reasonable.

12. <u>First</u>, from the Trade Committee's perspective, the Delphi case was a single project. Its counsel did not segregate time into discrete matters because it would have been hard to determine what such matters separated one from another and therefore what "separate" matters would be. Also, neither the Trade Committee nor its counsel knew at inception that it would provide a substantial contribution and reach an agreement with the Debtors. Certainly and contrary to the US Trustee's argument, the impracticality of separating time by project category does not render the fees unreasonable. *See* (US Trustee Objection, at 22). As this Court recently observed in *In re Bayou Group, LLC*, although some of the reasonableness standards applicable to substantial contribution applications also apply to fee applications governed by section 330 of the Bankruptcy Code, "[t]he exception is that, because the professional may not know that he or she will be submitting a fee and expense request, the Court need not necessarily enforce time record requirements as strictly as with requests under section 330 . . . ." 2010 Bankr. LEXIS 1228, at *41 (Bankr. S.D.N.Y. Apr. 5, 2010). And, for KBT&F now to separate 2,288 hours of work, over more than two years, to prepare the Application, is unduly burdensome and would require the Trade Committee to incur additional costs that benefit no one. Finally, had KBT&F separated its time by project category, nearly all time entries would have been designated as EPCA and related agreements, plan, or disclosure statement related providing little additional relevant information.

13. <u>Second</u>, the US Trustee challenges the reasonableness of the fees by alleging that certain tasks performed do not relate to the Trade Committee's substantial contribution. (US

6

Trustee Objection, at 22-23).  None of the US Trustee's identified items renders the fees unreasonable:

14. **Reviewing Pleadings / Rule 2019 Statement.**  KBT&F's fees incurred in preparing a Rule 2019 statement and reviewing Case pleadings inevitably resulted from the Trade Committee's appearance and participation in these Case.  Without that work, the Trade Committee could not have rendered a substantial contribution.

15. **Analysis of Claims.**  The US Trustee objects to the fact that between June 13, 2006 and December 15, 2006, KBT&F billed time "for analysis of the members' claims."  (US Trustee Objection, at 23).  As noted in the Application, "KBT&F separately billed individual members for claims resolution issues; none of which is included in the" fees and expenses sought in the Application.  (Application, note 10).  The US Trustee's referenced time entries primarily relate (a) to analyzing potential affirmative claims or means for recovery available to trade and other creditors; (b) to examining the likely treatment of trade claims under a substantive consolidation versus non-consolidation scenario; and (c) to evaluating the amount of general unsecured claims existing for purpose of the cut-off levels in the plans.  Moreover, KBT&F agrees to review any specific time entries which the US Trustee identified as potentially problematic and to provide further clarification or, if appropriate, transfer such entry to be billed solely to the corresponding individual members of the Trade Committee.

16. **Joint Interest / Fee Sharing Agreement**.  The US Trustee argues that the Trade Committee is not entitled to reimbursement for certain of KBT&F's and R&G's work concerning the joint interest and fee sharing arrangement among members of the Trade Committee.  (UST Objection, 23).  The Trade Committee believes that this time was necessary for its involvement in the Case and to ensure the group represented a wide cross-section of trade creditors.  In any event, as discussed in the Application, although there is no obligation to do so,

the Trade Committee and KBT&F decided to reduce their fees and expenses subject to the Application from $1,523,375.73 to $1,452,932.37, a $70,443.36 or 5% reduction. KBT&F believes this reduction exceeds the fees incurred working on the joint interest and fee sharing arrangement.

17. **Paraprofessional Time**. The US Trustee challenges the reasonableness of fees sought in the Application because KBT&F billed paraprofessionals' time for "reviewing the docket, downloading documents, and organizing exhibits." (US Trustee Objection, 23). KBT&F submits that its paraprofessionals' work assisted KBT&F attorneys to stay informed of developments and deadlines in the Cases and streamlined the process of identifying and reviewing filed documents. In this way, the paraprofessionals' work minimized certain of the KBT&F attorneys' otherwise billed fees. Regardless, the amount is *de minimis*: the Trade Committee seeks $17,884 as the total reimbursement for all KBT&F paraprofessional time.

\* \* \*

18. For the foregoing reasons, the fees sought in the Application are reasonable and the Trade Committee respectfully submits that the Court should approve their reimbursement.

### III. THE DEBTORS' NEGOTIATED SETTLEMENT WITH THE TRADE COMMITTEE PRECLUDES ITS OBJECTION TO THE APPLICATION.

19. The Debtors mischaracterize their agreement with the Trade Committee. In the Interim EPCA Order, the Debtors agreed that they "shall not oppose any application by the Committee of Delphi Trade Claim Holders for the payment of fees and expenses of their professionals pursuant to Section 503(b) of the Bankruptcy Code provided that . . . the Debtors may oppose the reimbursement of fees and expenses in excess of $750,000." There was no mention of reasonableness; just the Debtors' agreement not to object in any regard. At the December 6, 2007 hearing, when announcing the Debtors' settlement with the Trade Committee,

8

counsel for the Debtors stated the Debtors' agreement that the "cap contained in the prior order would be increased to 1.5 million." (Application, Exhibit A, at 11:15-16). Debtors' counsel's incorrect usage of the words "reasonable and documented fees and expenses" when describing the provisions of the Interim EPCA Order did not modify its unambiguous terms. At no point did the Debtors reserve *any* rights to object to the Trade Committee's substantial contribution application. That should end the issue.

20.    However, in a vague statement buried in a footnote of their objection to other substantial contribution applications, the Debtors appear to request permission to object to the Application. (Debtors' Objection, ¶ 7, note 2). The Debtors' argument – or so it seems from the unclear language – is that because case law requires courts to determine entitlement to reimbursement before testing reasonableness, and based on the Debtors' flawed contention that it reserved rights on reasonableness, the Court should relieve the Debtors from their agreement and allow them to challenge the Trade Committee's entitlement to reimbursement.

21.    The Debtors' substitution of itself for this Court is a direct breach of its agreement with the Trade Committee. The Debtors' mention of "substantive modifications to the Confirmed Plan in the Plan Modification Order", that provided for plan changes that were foreseeable should the EPCA terminate, cannot permit the Debtors to breach their agreement placed on the record that was negotiated in good faith and on which the Trade Committee relied by not pursuing its objections to confirmation of the Debtors' plan.[2] If anything, the Debtors' argument highlights that the Confirmed Plan – to which the Trade Committee did not object – enabled the Debtors' ultimate emergence from bankruptcy. The Trade Committee respectfully submits that the Court should not approve the Debtors' breach of their agreement because of plan

---

[2] Indeed, the Court has not seen a pleading nor the appearance of counsel for the Trade Committee other than a single time on behalf of individual members as to which the Trade Committee seeks no reimbursement from these estates.

9

changes utterly outside the Trade Committee's control when the Trade Committee performed its concomitant obligations to withdraw all pending objections and not to object to confirmation. The Trade Committee continues to adhere to its agreement by seeking reimbursement of only $1,500,000 out of more than $1,780,000 of costs it incurred.[3]

## CONCLUSION

WHEREFORE, for the reasons set forth herein and in the Application, the Trade Committee respectfully requests entry of an Order awarding payment of its administrative expense claim pursuant to 11 U.S.C § 503(b)(3)(D) and (b)(4) in the amount of $1,500,000, and awarding the Trade Committee such other and further relief deemed just and proper.

Dated: New York, New York
May 19, 2010

KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP

 */s/ David S. Rosner*
David S. Rosner (DR-4214)
Adam L. Shiff (AS-7571)
Daniel N. Zinman (DZ-7562)
Daniel A. Fliman (DF-2336)
1633 Broadway
New York, New York 10019
(212) 506-1700
(212) 506-1800 (facsimile)

---

[3] Also, the Trade Committee does not seek reimbursement for KBT&F's fees in representing individual members in claims disputes and, although under no obligation to do so, reduced KBT&F's fees and expenses by 5%.

10