1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481-RDD

- - - - - - - - - - - - - - - - - - - -x


In the Matter of:


DPH HOLDINGS CORP., et al.,


          Reorganized Debtors.


- - - - - - - - - - - - - - - - - - - -x


          U.S. Bankruptcy Court

          300 Quarropas Street

          White Plains, New York


          May 20, 2010

          10:12 AM


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1

2   Fifty-Fifth Omnibus Hearing:

3

4   Hearing re:  Furukawa Electric Company's Motion for Allowance

5   of Administrative Expense Claim - Motion Of Furukawa Electric

6   Company, Ltd. For Allowance Of An Administrative Expense

7   Claim, Pursuant To 11 U.S.C. 503(b)(1)(A) And, In The

8   Alternative, For Leave To File A Late Administrative Expense

9   Claim Pursuant To Bankruptcy Rule 9006(B)

10

11   Hearing re:  Salaried Retirees' Motion - Motion Of The

12   Salaried Retirees For Order Confirming That Second Amended

13   Complaint Does Not Violate The Modified Plan Or The Plan

14   Modification Order and Amended Motion Of The Salaried Retirees

15   For Order Confirming That Second Amended Complaint Does Not

16   Violate The Modified Plan Or The Plan Modification Order

17

18   Hearing re:  Davidson Kempner Capital Management LLC, et al.

19   Substantial Contribution Application - Application By Davidson

20   Kempner Capital Management LLC; Elliott Associates, L.P.;

21   Nomura Corporate Research & Asset Management, Inc.; Northeast

22   Investors Trust; SPCP Group, LLC; And Whitebox Advisors, LLC,

23   On Behalf Of Themselves And Senior Noteholders Previously

24   Represented, For Payment Of Fees And Expenses Pursuant To 11

25   U.S.C. § 1129(a)(4) And Bankruptcy Rule 9019

3

1

2    Hearing re:  Motion for Case Management Order Governing

3    Avoidance Action Adversary Proceedings - Reorganized Debtors'

4    Motion For A Case Management Order Establishing Procedures

5    Governing Adversary Proceedings

6

7    Hearing re:  Reorganized Debtors' Motion to Limit Service -

8    Reorganized Debtors' Motion For Order Under Fed. R. Bankr. P.

9    2002(m) And 9007 Supplementing Case Management Orders By (A)

10   Limiting Service Of All Future Filings And (B) Authorizing

11   Service By Electronic Mail For All Future Filings

12

13   Hearing re:  Forty-Seventh Omnibus Claims Objection -

14   Reorganized Debtors' Forty-Seventh Omnibus Objection Pursuant

15   to 11 U.S.C. § 503(b) and Fed. R. Bankr. P. 3007 to (I)

16   Disallow and Expunge (A) Certain Administrative Expense Books

17   and Records Claims, (B) a Certain Administrative Expense

18   Duplicate Claim, and (C) Certain Administrative Expense

19   Duplicate Substantial Contribution Claims, and (II) Modify

20   Certain Administrative Expense Claims

21

22   Hearing re:  Paul C. Mathis' Motion for Jury Trial - Paul C.

23   Mathis' Motion For Trial For Jury

24

25

4

1

2    Hearing re:  Motion of Methode Electronics, Inc. - Notice Of

3    Motion By Methode Electronics, Inc. For An Order (I)

4    Permitting Methode To Continue Post-Petition Litigation With

5    The Reorganized Debtors In Michigan And (II) Overruling The

6    Reorganized Debtors' Timeliness Objection To Methode's

7    Administrative Expense Claims

8

9    Hearing re:  IUE-CWA Substantial Contribution Application -

10   Motion Of IUE-CWA Pursuant To Sections 503(b)(3)(d) And (b)(4)

11   Of The Bankruptcy Code For Allowance And Payment Of Fees

12   Incurred In Making A Substantial Contribution To The Debtors'

13   Chapter 11 Case

14

15   Hearing re:  Certain Senior Noteholders Substantial

16   Contribution Application - Summary Sheet And Application Of

17   Certain Senior Noteholders Pursuant To Sections 503(b)(3) And

18   (4) Of The Bankruptcy Code For Allowance And Reimbursement Of

19   Reasonable Compensation And Actual, Necessary Expenses In

20   Making A Substantial Contribution In These Chapter 11 Cases

21

22

23

24

25

5

1

2    Hearing re:  Delphi Trade Committee Substantial Contribution

3    Application - Application Of The Delphi Trade Committee For

4    Reimbursement Of Expenses Arising From Substantial

5    Contribution Made In These Cases And Notice Of Filing Of

6    Exhibits To Application Of The Delphi Trade Committee For

7    Reimbursement Of Expenses Arising From Substantial

8    Contribution Made In These Cases

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1

2    Thirty-Third Claims Hearing:

3

4    Sufficiency Hearing Regarding Claims of Jose C. Alfaro and

5    Martha Alfaro - Sufficiency Hearing Regarding Claims of Jose

6    C. Alfaro and Martha Alfaro as Objected to on Reorganized

7    Debtors' Thirty-Sixth Omnibus Objection Pursuant To 11 U.S.C.

8    § 502(b) And Fed. R. Bankr. P. 3007 To (I) Modify And Allow

9    Claim And (II) Expunge Certain (A) Duplicate SERP Claims, (B)

10   Books And Records Claims, (C) Untimely Claims, And (D)

11   Pension, Benefit, And OPEB Claims and Reorganized Debtors'

12   Thirty-Seventh Omnibus Objection Pursuant To 11 U.S.C. §

13   502(B) And Fed. R. Bankr. P. 3007 To Expunge Certain (I)

14   Prepetition Claims, (II) Equity Interests, (III) Books And

15   Records Claims, (IV) Untimely Claims, (V) Paid Severance

16   Claims,(VI) Pension, Benefit, And OPEB Claims, And (VII)

17   Duplicate Claims

18

19

20

21

22

23

24

25

7

1

2     Sufficiency Hearing Regarding Claims of Marc Eglin -

3     Sufficiency Hearing Regarding Claims of Marc Eglin as Objected

4     to on Reorganized Debtors' Forty-Third Omnibus Objection

5     Pursuant To 11 U.S.C. § 503(b) And Fed. R. Bankr. P. 3007 To

6     (I) Expunge Certain Administrative Expense (A) Severance

7     Claims, (B) Books And Records Claims, (C) Duplicate Claims,

8     (D) Equity Interests, (E) Prepetition Claims, (F)

9     Insufficiently Documented Claims, (G) Pension, Benefit, And

10    OPEB Claims, (H) Workers' Compensation Claims, (II) Modify And

11    Allow Certain Administrative Expense Severance Claims, And

12    (III) Allow Certain Administrative Expense Severance Claims

13

14

15

16

17

18

19

20

21

22

23

24

25

8

1

2  Sufficiency Hearing Regarding Claims of James A. Luecke -

3  Sufficiency Hearing Regarding Claims of James A. Luecke as

4  Objected to on Reorganized Debtors' Thirty-Seventh Omnibus

5  Objection Pursuant To 11 U.S.C. § 502(B) And Fed. R. Bankr. P.

6  3007 To Expunge Certain (I) Prepetition Claims, (II) Equity

7  Interests, (III) Books And Records Claims, (IV) Untimely

8  Claims, (V) Paid Severance Claims,(VI) Pension, Benefit, And

9  OPEB Claims, And (VII) Duplicate Claims and Reorganized

10 Debtors' Forty-Fifth Omnibus Objection Pursuant To 11 U.S.C. §

11 503(b) And Fed. R. Bankr. P. 3007 To (I)Expunge Certain

12 Administrative Expense (A) Severance Claims, (B) Books And

13 Records Claims, (C) Duplicate Claims, (D) Pension And Benefit

14 Claims, And (E) Transferred Workers' Compensation Claims, (II)

15 Modify And Allow Certain Administrative Expense Severance

16 Claims, And (III) Allow Certain Administrative Expense

17 Severance Claims

18

19

20

21

22

23

24 Transcribed by:  Hana Copperman

25

9

1

2      A P P E A R A N C E S :

3      SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

4              Attorneys for the Debtors

5              155 North Wacker Drive

6              Chicago, IL 60606

7

8      BY:    LOUIS S. CHIAPPETTA, ESQ.

9              BRANDON M. DUNCOMB, ESQ.

10             JOHN K. LYONS, ESQ.

11             RON E. MEISLER, ESQ.

12

13

14     WACHTELL, LIPTON, ROSEN & KATZ

15             Attorneys for Methode Electronics, Inc.

16             51 West 52nd Street

17             New York, NY 10019

18

19     BY:    DOUGLAS MAYER, ESQ.

20             ALEXANDER LEES, ESQ.

21             EMIL KLEINHAUS, ESQ.

22

23

24

25

10

1

2     LOCKE LORD BISSELL & LIDDELL LLP

3          Attorneys for Methode Electronics, Inc.

4          111 South Wacker Drive

5          Chicago, IL 60606

6

7     BY:   ANN MARIE WALSH, ESQ.

8

9

10    KENNEDY, JENNIK, & MURRAY, P.C.

11         Attorneys for IUE-CWA

12         113 University Place

13         Seventh Floor

14         New York, NY 10003-4578

15

16    BY:   THOMAS M. KENNEDY, ESQ.

17          SUSAN JENNIK, ESQ.

18

19

20    KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

21         Attorneys for Trade Committee

22         1633 Broadway

23         New York, NY 10019

24

25    BY:   DAVID S. ROSNER, ESQ.

11

1

2    BENDINELLI LAW OFFICE, P.C.

3          Attorneys for Jose C. Alfaro and Martha Alfaro

4          9305 Wadsworth Parkway

5          Suite 4000

6          Broomfield, CO 80021

7

8    BY:    MARCO F. BENDINELLI, ESQ.

9

10

11    UNITED STATES DEPARTMENT OF JUSTICE

12          Office of the United States Trustee

13          33 Whitehall Street

14          21st Floor

15          New York, NY 10004

16

17    BY:    BRIAN S. MASUMOTO, ESQ.

18

19

20

21

22

23

24

25

12

1

2      BARNES & THORNBURG LLP

3            Attorneys for Bank of America, N.A.

4            171 Monroe Avenue, NW

5            Suite 1000

6            Grand Rapids, MI 49503

7

8      BY:   PATRICK E. MEARS, ESQ. (TELEPHONICALLY)

9

10

11     ALSO APPEARING:

12            JAMES LUECKE

13            PARTY PRO SE

14

15

16

17

18

19

20

21

22

23

24

25

13

                    P R O C E E D I N G S

1

2          THE CLERK:  All rise.

3          THE COURT:  Please be seated.  Okay.  DPH Holdings.

4          MR. MEISLER:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          MR. MEISLER:  Ron Meisler of Skadden, Arps on behalf

7     of DPH Holdings and its affiliated reorganized debtors.  Your

8     Honor, yesterday afternoon we filed a proposed agenda, and if

9     Your Honor is comfortable we'd like to proceed in that order.

10         THE COURT:  That's fine.

11         MR. MEISLER:  Thank you, Your Honor.  Your Honor, the

12    first matter on the agenda, Furukawa Electric Company's motion

13    for allowance of administrative expense, Your Honor, that's

14    been adjourned.

15         THE COURT:  Okay.

16         MR. MEISLER:  And Togut, Segal & Segal is handling

17    that matter.  Your Honor, if you're comfortable we'll go to the

18    next matter, the salaried retirees' motion.  Confirming that

19    the second amended complaint does not violate the modified plan

20    or the plan modification order.  Your Honor, we were in

21    discussions with them in the last few days.  We submitted a

22    scheduling order adjourning that matter to June 30th.  The

23    reorganized debtors are going to try and negotiate a

24    resolution --

25         THE COURT:  Right.

14

1      MR. MEISLER: -- so that no contested matter has to be

2    before Your Honor.

3      THE COURT:  Okay.  I think I've already signed that

4    order.

5      MR. MEISLER:  Terrific.  Thank you, Your Honor.  Your

6    Honor, the next matter on the agenda, number 3, is the senior

7    noteholders application for payment of certain fees and

8    expenses under 1129(a)(4).  Your Honor, again, that's another

9    matter that we've been in discussions with the senior

10   noteholders.  We've submitted a scheduling order.

11     THE COURT:  Right.  And I believe I -- it should be

12   added by now.  I signed it yesterday.  Both of those orders

13   limit the objections to today, I think, or yesterday, actually,

14   right?

15     MR. MEISLER:  With respect to the senior noteholders

16   and C.R. Intrinsic --

17     THE COURT:  Right.  Okay.

18     MR. MEISLER: -- that is correct.

19     THE COURT:  Okay.

20     MR. MEISLER:  Your Honor, the next matter on the

21   agenda is the motion for a case management order governing

22   avoidance actions and adversary proceedings handled by Butzel

23   Long.  Your Honor, this matter, as well, has been adjourned.

24     THE COURT:  Right.  Unless there have been recent

25   developments that you want to inform me of you don't need to go

15

1    through the adjournments or the --

2         MR. MEISLER:  Terrific.

3         THE COURT:  Okay.

4         MR. MEISLER:  Thank you.  Your Honor, for the next

5    matter on the agenda, which is the reorganized debtors' motion

6    to limit service, I'm going to turn the podium over to my

7    colleague, Brandon Duncomb, who will present that motion.

8         THE COURT:  Okay.

9         MR. DUNCOMB:  Good morning, Your Honor.

10        THE COURT:  Good morning.

11        MR. DUNCOMB:  Brandon Duncomb, Skadden, Arps, Slate,

12   Meagher & Flom, for the reorganized debtors.  Before I start I

13   had a pro hac application that I had submitted this morning.  I

14   think that's still pending.

15        THE COURT:  You should consider that granted.

16        MR. DUNCOMB:  Thank you, Your Honor.  So the

17   reorganized debtors' motion to limit service is at docket

18   number 19968.  Since the debtors emerged from bankruptcy in

19   October of last year they have incurred, on average, 75,000

20   dollars in fees attributable to service for parties on the

21   master service list and the 2002 list.  By this motion what

22   we're trying to do is, basically, two things, reconstitute both

23   of those service lists, and, then, with respect to the master

24   service list, replace the overnight filings with electronic

25   service by e-mail.

16

1          THE COURT:  You served all the parties on the existing

2     lists?

3          MR. DUNCOMB:  Yes.

4          THE COURT:  And I didn't see any objections to the

5     relief.

6          MR. DUNCOMB:  That's right.  That's uncontested.

7          THE COURT:  Okay.  All right.  Does anyone have

8     anything to say on this motion?  All right.  I have no problem

9     with it, and, therefore, I'll approve it.

10          MR. DUNCOMB:  Thank you, Your Honor.

11          THE COURT:  Thanks.  So I don't know if you're going

12     to be handing me orders at the end of the hearing or you can e-

13     mail me the order to chambers later.

14          MR. CHIAPPETTA:  Thank you, Your Honor.  Louis

15     Chiappetta on behalf of the reorganized debtors, Skadden, Arps.

16     Your Honor, the first contested matter on today's agenda is the

17     forty-seventh omnibus objection, which was filed April 16th at

18     docket number 19873 and was served in accordance with the

19     claims procedures order, including individualized

20     particularized notice.  Your Honor, there's eighty-eight claims

21     that were subject to this objection, one of which was filed by

22     Hyundai and resolved by stipulation number 20,000, and another

23     that was filed by Silver Point that was resolved by stipulation

24     at docket number 20,131

25          THE COURT:  Right.

17

 1          MR. CHIAPPETTA:  So there's eighty-six --

 2          THE COURT:  I think I've already signed those two.

 3          MR. CHIAPPETTA:  Correct, you have.  Thank you, Your

 4    Honor.

 5          THE COURT:  Okay.

 6          MR. CHIAPPETTA:  And there's eighty-six remaining

 7    claims.  Of those forty administrative expense claims have been

 8    adjourned by thirty-four filed responses.  Forty-six claims

 9    remain subject to the objection, which cover, in the aggregate,

10    about twenty-four million dollars.  The bulk of these claims,

11    Your Honor, are books and records claims that most have been

12    paid in the ordinary course, and the remaining are duplicate

13    claims and duplicate substantial contribution claims, which you

14    know are before Your Honor today.

15          I believe this is the level of detail that we've done

16    in the past for omnibus objections.  If you'd like I can go

17    into more detail.

18          THE COURT:  No, you don't need to.  Is there anyone

19    present who has anything to say on this omnibus objection?

20    Okay.

21          MR. MEARS:  Your Honor, Patrick Mears on behalf of

22    Bank of America.  I'm just listening in to confirm that our

23    matters, our various claims have been adjourned.  Reading the

24    response I believe that's the case.

25          MR. CHIAPPETTA:  Yes, Your Honor, I can confirm those

18

1    have been adjourned.

2         THE COURT:  Okay.  All right.  So today you're asking

3    for approval of the objection insofar as it applies to the

4    unopposed matters.

5         MR. CHIAPPETTA:  Correct, Your Honor.  All other

6    matters are adjourned.

7         THE COURT:  All right.

8         UNIDENTIFIED SPEAKER:  Wait.  Objection.  My matter

9    here meets at court today at 10 a.m.

10        THE COURT:  No, no, no.  We're just talking about this

11   omnibus.

12        UNIDENTIFIED SPEAKER:  Okay.  Sorry.

13        THE COURT:  This omnibus motion.

14        UNIDENTIFIED SPEAKER:  Okay.

15        THE COURT:  This specific one.

16        UNIDENTIFIED SPEAKER:  All right, Judge.

17        THE COURT:  So in light of there being no opposition

18   in the averments in the motion with regard to the unopposed

19   claims I'll grant that relief.

20        MR. CHIAPPETTA:  Thank you, Your Honor.

21        THE COURT:  Thanks.

22        MR. CHIAPPETTA:  Your Honor, the next contested matter

23   is the pleading that was filed by Paul C. Mathis at docket

24   number 19899 on April 21st.

25        THE COURT:  Right.

19

1        MR. CHIAPPETTA:  Your Honor, Mr. Mathis filed this

2   same exact pleading in the General Motors case In re Motors

3   Liquidation Company, and Judge Gerber denied this motion sua

4   sponte at docket number 5539.  It's unclear what Mr. Mathis is

5   exactly requesting, Your Honor, and outside of two claims that

6   have been previously expunged by this Court the reorganized

7   debtors are unaware of any relationship with Mr. Mathis.

8        THE COURT:  All right.  The pleading you're referring

9   to asks for a jury trial on something.

10       MR. CHIAPPETTA:  Correct.

11       THE COURT:  But, again, you are correct that except

12  for the two claims of Mr. Mathis, both of which have previously

13  been disallowed, I have no idea what the jury trial request

14  would apply to, and given that the two claims have been

15  disallowed and the jury trial request sets forth no basis under

16  Rules 9023 or 9024 -- it would be 9024 here, given the time --I

17  don't see any basis for the request.  Is Mr. Mathis here or on

18  the phone?  All right.  For that reason I'll grant the

19  objection.

20       MR. CHIAPPETTA:  Thank you, Your Honor.

21       MR. MEISLER:  Your Honor, the next matter on the

22  agenda is the motion of Methode Electronics.  Your Honor, for

23  that matter counsel for Methode is here in the courtroom.  If

24  it pleases Your Honor I'm going to cede the podium to counsel

25  and let them present their motion.

20

1          THE COURT:  Okay.

2          MR. MEISLER:  Your Honor, as a preliminary matter I'

3     just like to touch on the exhibits that were filed --

4          THE COURT:  Okay.

5          MR. MEISLER:  -- and the exhibits that we have with us

6     today.  There are twelve numbered items on the exhibit index

7     list that we are submitting into evidence for this matter.

8     Each of the first eleven have either been filed on the docket

9     in some place in the Delphi case or, now, the DPH case, and the

10    twelfth is the declaration of Ann Walsh, which has

11    approximately twenty-six exhibits.

12         Your Honor, we are okay with the exhibits being

13    admitted into evidence to show what was alleged and when.  But,

14    Your Honor, we would object to any of the exhibits being

15    entered to show the truth of the matter asserted.

16         THE COURT:  Okay.  Well, this is not a hearing on the

17    merits of the claim.  It's on the issue of timeliness as well

18    as the proper forum for the termination of the claims, so I'm

19    assuming there's no problem with the debtors' reservation on

20    this.

21         MR. MAYER:  No, Your Honor, Douglas Mayer from

22    Wachtell, Lipton, Rosen & Katz for Methode Electronics.  We

23    have no problem with that.  I mean, we just got the binder.  We

24    haven't reviewed what's in it.

25         THE COURT:  Okay.

21

1          MR. MAYER:  Based on what counsel says, that it's all

2     filings on the docket, then we have no difficulty with that,

3     because Your Honor's characterization of today's matter, I

4     think, is accurate.

5          THE COURT:  Okay.  All right.

6          MR. MAYER:  Okay.  Good morning,

7          THE COURT:  Good morning.

8          MR. MAYER:  Again, thank you.  So Wachtell, Lipton,

9     Rosen & Katz is bankruptcy counsel for Methode Electronics

10    here, the movant.  Also with us on this matter is the Locke

11    Lord Bissell law firm and, in particular, Ann Marie Walsh,

12    who's with us today and is counsel to Methode Electronics in

13    connection with the contract litigation that's extensively

14    discussed.  I believe that a pro hac motion was made for Ms.

15    Walsh's admission here for this matter.  I don't know that

16    that's been acted on by the Court.

17         THE COURT:  Okay.  Well, you should assume it's

18    granted.

19         MR. MAYER:  Yes.

20         THE COURT:  There have been a number of Delphi pro hac

21    motions recently, so I'm not -- I remember this one in

22    particular.  Okay.

23         MR. MAYER:  Thank you.  And as noted by the Court and

24    by Mr. Meisler for the debtor, what's before the Court today is

25    a request from Methode addressing the questions of form and

22

1    asking the Court, as well, to make a determination as to

2    timeliness with respect to these claims.  And I'm sure the

3    Court has viewed the papers that have been submitted by the

4    parties here, so I don't plan on rehearsing that detail for the

5    Court.  We're basically here to address the Court's questions

6    and concerns, although there are some specifics that I would

7    like to highlight for the Court's benefit.

8            THE COURT:  Okay.  Before you get to that, I just want

9    to make sure I understand what it is that is still being

10   contested by the parties.  As I understand it, leaving aside

11   the issue of the timeliness of the patent claim as it pertains

12   to alleged patent infringement before the --

13           MR. MAYER:  June 1, Your Honor.

14           THE COURT:  June 1, right.  I understand from the

15   debtors' response that the debtors don't oppose the

16   continuation of the patent litigation in the Michigan District

17   Court.

18           MR. MAYER:  That certainly was my understanding.

19   Obviously, the debtors will represent as they see fit.

20           MR. MEISLER:  Your Honor, subject to this Court's

21   determination on scope, that is correct, Your Honor.  We would

22   be amenable to lifting the plan injunction so that the patent

23   litigation could go forward in the federal court, Eastern

24   District of Michigan.

25           THE COURT:  Okay.  All right.  And, then, so that's --

23

1    that, I just, I believe, then, leaves the issue of the portion

2    of the claim that covers the alleged pre-June infringement,

3    because the rest of it, again, I think the debtors acknowledge,

4    is either outside of the scope of the administrative claims bar

5    date, because it's post bar date, post bright-line for the bar

6    date activity, and/or it's been picked up by the buyer.

7              MR. MAYER:  Yes.  That's my understanding, Your Honor.

8              THE COURT:  Okay.  So, then, turning to the contract

9    action, and this one, I think, is more of a question for

10   Methode, I have some confusion about the contract claim.

11   Methode states that, correctly, it filed an anticipatory breach

12   claim, and that was obviously one that, I think, arose pre

13   June, because that was part of its complaint in the state court

14   action, but that it also has an actual breach claim based upon

15   Delphi's termination of the contract, which was done after the

16   June date and, therefore, wouldn't be covered by the bar date.

17        And I guess my question is now that there's an actual

18   breach claim, what are we talking about as far as an

19   anticipatory breach claim?  Am I missing something or --

20             MR. MAYER:  No, you're not missing something, Your

21   Honor, and I thank you for bringing this up.  This was one of

22   those specific aspects that I did want to concentrate on,

23   because we realized, frankly, that it would be easy for the

24   Court not to see clearly what was still outstanding and what

25   wasn't.  So I think the Court is correct in nothing that in the

24

1    counterclaim that was discussed in the papers and that was

2    interposed by Methode in Michigan there was a claim stated for

3    anticipatory breach, which was back in January of 2009.

4            THE COURT:  Right.

5            MR. MAYER:  Needless to say, what's turned out is that

6    that which was anticipated ultimately occurred, in a sense

7    mooting that anticipatory breach claim, and just to cut through

8    it, then, what one has at this point in time as a live claim,

9    so to speak, in a colloquial sense, I think, is a claim where

10   we say that Delphi's termination, which occurred August

11   26th/27th of 2009, was in breach.  Delphi, of course, has their

12   merits arguments as to why that was not the case.

13           THE COURT:  Right.

14           MR. MAYER:  And that claim had not been pleaded in

15   Michigan.  It is a claim that can be pleaded in Michigan, just

16   like it could be pleaded anywhere else under the applicable

17   pleading rules, and is one that we would be prepared to proceed

18   forward with in Michigan in the event that the Court were to

19   either modify the injunction or consider the injunction to be

20   inapplicable.

21           THE COURT:  All right.  So just to be clear then.  At

22   this point Methode's contract claim is a claim predicated upon

23   post bar date conduct.

24           MR. MAYER:  That is certainly our view, Your Honor.  I

25   think what the debtors have suggested -- they suggested this in

25

1    their response papers, and obviously we'll hear from them.  I

2    think they would argue that in some sense one must view the

3    claim as relating back to the pre June 1 period, in that there

4    were events that occurred at that time that indicated that

5    there was an act of bad faith in entering into the contract.

6            THE COURT:  But if what you're saying -- what Methode

7    is saying is that its damage flow solely from the post bar date

8    breach.

9            MR. MAYER:  Yes.

10           THE COURT:  Then I --

11           MR. MAYER:  That is definitely our view.  In terms of

12   damages, I think that regardless of whether people may have had

13   motives or intentions or done other things that led up to a

14   termination in August prior to June 1, all the damage relates

15   to the balance of the term of the contract after the

16   termination, which was effective as of September.

17           THE COURT:  Okay.

18           MR. MAYER:  So I'm, again, I'm glad that Your Honor

19   raised this.

20           THE COURT:  So as far as Methode is concerned this is,

21   literally, the flip side of the patent case.  The only issue to

22   be argued here, as far as Methode is concerned, is the proper

23   forum for handling the contract claim.

24           MR. MAYER:  Well, Your Honor, I guess what I'm --

25           THE COURT:  There's no untimeliness --

26

1          MR. MAYER:  Yes.

2          THE COURT:  -- issue, because you're saying that the

3     claim here is all based upon a wrong by Delphi that occurred

4     after the bar date.

5          MR. MAYER:  That, again, that is our view.  I would

6     reiterate that -- I guess, maybe I should let the debtor speak

7     for themselves, that what they seem to be arguing in their

8     papers, and they'll say whatever they say today, is that

9     somehow there was enough of a nucleus of conduct prior to June

10    1 that that makes the claim, somehow, a pre June 1 claim.  I

11    don't get that.

12         THE COURT:  Okay.

13         MR. MAYER:  It doesn't make any sense to me.  But I

14    think that may be the position, so to that extent, I guess,

15    we're arguing about that today.

16         THE COURT:  All right.

17         MR. MAYER:  Unless the Court wants to defer that to

18    another occasion, frankly, even the Court in Michigan could

19    address that kind of an issue if it saw fit.

20         THE COURT:  Okay.  All right.  So why don't I hear

21    from you, Mr. Meisler on that issue.

22         MR. MEISLER:  Your Honor, I'm glad that you're

23    bringing up that clarification, because I guess I'm confused as

24    well.  I looked at their papers, and I --

25         THE COURT:  No, No.  The claim in the papers raised

27

1    the possibility, just as with the patent claim, that there's

2    some additional wrongdoing that gives rise to a basis for a

3    claim before the bar date.

4         MR. MEISLER:  That --

5         THE COURT:  But they're very clear on the record today

6    that that's not their position, that it's the breach in August

7    that is the basis for the claim.

8         MR. MEISLER:  Terrific, Your Honor.  With that record

9    I am similarly comfortable.

10        THE COURT:  Okay.  All right.  So I conclude, then,

11   that the issue of the timeliness of the -- I guess, when was it

12   filed?  September?

13        UNIDENTIFIED SPEAKER:  Sorry.  When was what filed,

14   Your Honor?

15        THE COURT:  Your proof of -- the admin claim.

16        UNIDENTIFIED SPEAKER:  Oh, no.  It was filed in early

17   November --

18        THE COURT:  I'm sorry.  November.

19        UNIDENTIFIED SPEAKER: -- within the -- with --

20        THE COURT:  The timeliness of the November claim as it

21   applies to the contract claim issue.  That issue is moot, given

22   the clear statement on the record today, which I think is

23   implicit in also the reply that you filed, that the contract

24   claim against DPH that's being asserted, and the only contract

25   claim that's being asserted on this contract, is based upon the

28

1    August termination, the claim of breach in August.  And,

2    obviously, a claim for anticipatory breach is different than a

3    claim for actual breach, and you're asserting a claim for

4    actual breach now, not anticipatory breach.

5            MR. MAYER:  Right. Because --

6            THE COURT:  Okay.

7            MR. MAYER:  -- there's no anticipating anymore.

8            THE COURT:  All right.

9            MR. MAYER:  That's right.

10            THE COURT:  So I think --

11            MR. MEISLER:  Your Honor?  For clarification, that

12    means that any conduct pre June 1st is time barred.

13            THE COURT:  Right.

14            MR. MEISLER:  So --

15            MR. MAYER:  Well, we can discuss -- I'm sorry.  I

16    don't want to interrupt the Court.

17            THE COURT:  Well, I'm sorry.  No, you should go ahead.

18            MR. MAYER:  I'm not sure what it means to say that

19    there is a bar with respect to conduct prior to June 1st.

20            THE COURT:  Well, it doesn't give rise to a claim.

21    The claim is based on a breach.  I mean --

22            MR. MAYER:  Right.  And, again -- yes.

23            THE COURT: -- the conduct may be relevant to --

24            MR. MAYER:  Yes.  That's --

25            THE COURT: -- whether there was a breach.

29

1          MR. MAYER:  That's exactly my point, Your Honor.

2    There could be plenty of relevant evidence.  I don't think that

3    it's --

4          THE COURT:  But it's not independently the basis a

5    claim.

6          MR. MAYER:  That's correct.  In terms of the elements

7    of a cause of action that is correct.  Again, there could be

8    evidence of bad faith.  In our view, all of that sort of thing

9    that occurred prior to the bar date, I don't think that the law

10   is, and it doesn't really make any sense to say that all has to

11   be excluded.

12         THE COURT:  But the basis -- well, that will be up to

13   either me or the state court.  But the basis --

14         MR. MAYER:  Right.

15         THE COURT:  -- for the claim is limited to a claim that

16   occurred after the bar date.

17         MR. MAYER:  Yes, I think I would agree with that.  All

18   these formulations a little bit slippery, as Your Honor

19   appreciates, and may --

20         THE COURT:  I don't think they are.  I think it has to

21   be clear.  I mean, you could, conceivably, although I think

22   it's probably, well, I don't know.  Maybe it isn't conceivable.

23   I guess you could assert a claim for anticipatory breach and

24   breach, but I think --

25         MR. MAYER:  Oh, no.  Yes.  That's not what I'm in any

30

1    way hesitant about.

2            THE COURT:  All right.

3            MR. MAYER:  That's --

4            THE COURT:  All right.

5            MR. MAYER:  That's absolutely right.  We're not doing

6    that.

7            THE COURT:  Okay.

8            MR. MEISLER:  Your Honor, to me it's crystal clear, so

9    for purposes of facilitating the dialogue between me and Mr.

10   Mayer, in particular, I just want to at least be clear on my

11   understanding, which is I had understood their papers to say

12   because of the bad faith that took place pre June 1st the clear

13   and unambiguous language of paragraph 11 of the terms and

14   conditions, which is the termination for convenience clause, is

15   not enforceable or is rendered null and void.  To be clear,

16   that argument, the bad faith argument, to me I actually thought

17   that was the claim that they were asserting that occurred, if

18   you will, post June 1.

19           THE COURT:  Delphi's alleged bad faith before the bar

20   date would not be a basis for this claim.

21           MR. MEISLER:  Terrific.  Thank you, Your Honor.

22           THE COURT:  I would not be a separate basis for the

23   claim.  That's, I think, different than saying that you can

24   look at Delphi's conduct, generally, to see whether there was a

25   breach post bar date.

31

1           MR. MAYER:  I mean, I don't -- and, again, I'm not --

2    I'm hesitating just to try to think about what Your Honor is

3    saying.  I don't disagree with that.

4           THE COURT:  You don't have a bad faith claim based

5    upon their whatever, you know, breach of duty of good faith and

6    fair dealing claim, for example, based on pre bar date

7    activity.

8           MR. MAYER:  Yes.  I think that is right.

9           THE COURT:  Okay.

10          MR. MEISLER:  Thank you, Your Honor.

11          MR. MAYER:  That's right.  I mean, cocounsel, I think,

12   perhaps, addressed this, and she's waving her hand at me if

13   Your Honor would please to hear from here.

14          THE COURT:  Okay.

15          MS. WALSH:  May I address the Court, Your Honor?

16          THE COURT:  Yes, but you should at least stand by that

17   microphone so you can be picked up?

18          MR. MAYER:  Do you want to do it there or over here?

19   It's up to you.

20          THE COURT:  Wherever you're comfortable.

21          MS. WALSH:  I guess I'm a little confused, Your Honor,

22   and thank you for permitting me to speak today.  Certainly

23   Delphi's bad faith during contract negotiations is the basis

24   for our counterclaim.  The important --

25          THE COURT:  No, it isn't.  It's not the -- that's what

32

1    we've just gone through.

2          MS. WALSH:  I know.

3          THE COURT:  It may be relevant to whether there was a

4    post bar date breach, but it's not --

5          MS. WALSH:  Okay.

6          THE COURT: -- the basis that gives rise to a claim.

7          MS. WALSH:  We are not bringing a claim for Delphi's

8    bad faith, just so I can clarify that.

9          THE COURT:  Okay.

10         MS. WALSH:  But the basis for -- Delphi's bad faith,

11   and the judge in Michigan certainly acknowledged this and

12   recognized this, Delphi's bad faith --

13         MR. MEISLER:  Your Honor, I object to that

14   characterization.

15         THE COURT:  I think -- let me anticipate what you're

16   trying to say, which is that you may assert as a response to

17   Delphi's argument that we had a perfect right to terminate the

18   contract.  Some sort of pre bar date fact, as long as that pre

19   bar date fact does not, in and of itself, give rise to a

20   separate claim.

21         MS. WALSH:  Yes.

22         THE COURT:  Okay.  I.e., the only claim you're

23   asserting is a post bar date breach.

24         MS. WALSH:  Yes.

25         THE COURT:  Okay.  All right.

33

1          MS. WALSH:  Thank you.

2          MR. MAYER:  Good.  We appreciate the clarification.

3          THE COURT:  Okay.

4          MR. MAYER:  All right.

5          THE COURT:  All right.  So that leaves, then, I think,

6    the issue of the pre June period for the patent claim and

7    whether that claim is barred by the bar provisions of the order

8    and the plan and then the forum issue on the contract claim.

9          MR. MAYER:  Okay.

10          THE COURT:  So you can argue those however you wish.

11          MR. MAYER:  Yes.  Good question.

12          THE COURT:  Or in what order you wish.

13          MR. MAYER:  Because, frankly, the parties, as I think

14    the Court saw, the parties didn't particularly focus on the

15    patent pre June claim to the extent it is an independent claim,

16    and I, I guess, my own perspective on that, respectfully, is

17    that that is an issue, the issue, if you will, of apportionment

18    or division or whatever one wants to call it with respect to

19    the infringement that is asserted, that that's an issue that, I

20    think, inevitably requires some substantial examination of the

21    law, patent law that is to say, the law relevant to the merits,

22    as well as the conduct, or the alleged conduct, that relates to

23    the acts of infringement.  And I would suggest that that's best

24    addressed by that forum which is dealing with the merits.

25          THE COURT:  But, I guess, the point is, though, that

34

1    why should DPH have to participate in that litigation on that

2    issue if it's barred?  Why should they even --

3           MR. MAYER:  Well, that's a fair question.  I mean,

4    they're there now --

5           THE COURT:  No, I know.

6           MR. MAYER: -- in that action.

7           THE COURT:  But you would have to spend some amount of

8    lawyer and judge time apportioning --

9           MR. MAYER:  Yes.

10          THE COURT: -- pre June and post June --

11          MR. MAYER:  Yes.

12          THE COURT: -- and if it's barred then no one would

13   have to do that.  If it's time barred.

14          MR. MAYER:  If --

15          THE COURT:  If the claim was late on that issue.

16          MR. MAYER:  But, Your Honor, my understanding is that

17   the debtors have conceded that with respect to the post June 1,

18   as I think this is where we started your set of questions, with

19   respect to the post June 1 that that's outside of the time bar.

20          THE COURT:  Oh, I know.  I understand.  So we're just

21   talking about that pre June 1 period.

22          MR. MAYER:  Right.  And my point --

23          THE COURT:  Do the debtors oppose that also being

24   adjudicated or are you relying on the bar date to bar the

25   adjudication of that --

35

1     MR. MEISLER:  Your Honor, we're relying on the bar

2  date to bar the adjudication of pre June --

3     MR. MAYER:  Sure.  No, that's -- and I didn't think

4  that they were not.

5     THE COURT:  Okay.

6     MR. MAYER:  My point is, Your Honor, that in order to

7  think specifically about the pre June 1 patent claim, that that

8  is a determination that requires delving into the merits of the

9  claim, and that it would be best done by the forum which is

10  going to --

11     THE COURT:  Oh, no.  The forum is --

12     MR. MAYER:  -- deal with the merits of the claim.

13     THE COURT:  If I determine that your claim is timely

14  or should be deemed timely then, clearly, the forum would

15  handle it.  I don't have any problem with that.  I'm now

16  talking just about the allowance issue.

17     MR. MAYER:  Okay.  Look, I mean, we can go through the

18  various points that we've made in our papers with respect to

19  the terms of the plan and the conduct of litigation and all

20  that.  That certainly applies to the patent litigation as well

21  as to the contract litigation.

22     THE COURT:  Okay.

23     MR. MAYER:  That's fine.  I don't think I need to go

24  over all that in detail for the Court.  I can to the extent you

25  want.  I mean, we think the same plan provisions that we cited

36

1     would say that there's been an agreed alternative resolution

2     process, would also determine the allowability, or the

3     allowance, I should say, of the pre June 1 patent infringement.

4          THE COURT:  Okay.  On the patent side I haven't seen

5     anything in the record to suggest that the debtors -- well, let

6     me -- as far as the patent claim is concerned, are you alleging

7     that debtors waived the issue of the bar date?

8          MR. MAYER:  Well, to a degree, yes, in the sense that

9     the structure that we argue is in the plan is a structure that

10    permits people to go off and litigate in a forum other than

11    this court to reach an allowance of a claim.  And, necessarily,

12    any allowance of any claim involves, among other things, its

13    timeliness.

14         THE COURT:  Okay.  But beyond that plan reading --

15         MR. MAYER:  Yes.

16         THE COURT: -- of the term allowed claim --

17         MR. MAYER:  Yes.

18         THE COURT: -- was there any conduct by Delphi in the

19    Michigan patent litigation that would indicate that, you know,

20    basically Delphi said to you all we're dealing with this here.

21         MR. MAYER:  Well, sure.  I mean, we --

22         THE COURT:  We're negotiating this --

23         MR. MAYER:  I'm sorry.  You were going to --

24         THE COURT:  We're, you know, let's negotiate this out

25    and --

37

1          MR. MAYER:  I don't know about negotiating it out,

2    Your Honor.

3          THE COURT:  Okay.

4          MR. MAYER:  That I have no knowledge of --

5          THE COURT:  Okay.

6          MR. MAYER: -- in any event.  But, certainly, as Your

7    Honor is aware from papers and the exhibits, a patent suit was

8    brought by Methode in the Northern District of Illinois against

9    Delphi.  Not the buyer, which didn't exist at that time.

10   Delphi did not seek to bring the claim here.  Delphi, at no

11   time, has even made the kind of motion that it made on the

12   contract side to say that the claim should come here, in which

13   papers in Michigan Delphi also suggested, for the first time,

14   that there was a time bar on the contract side.  There's never

15   been anything like that.  The patent case is, as I understand

16   it, continuing forward as to everybody, that is to say not just

17   the buyer and not just Marion, the third party, and Methode,

18   but also as to Delphi.  I think that there has been continuing

19   discovery in those kinds of events and probably happening

20   today.

21         THE COURT:  Okay.

22         MR. MAYER:  So at all points in time that's been the

23   case.

24         MR. MEISLER:  Your Honor, that's just that's not the

25   case.

38

1        THE COURT:  But isn't -- but isn't --

2        MR. MAYER:  Well, that's fine.  I don't want -- I'm

3   not trying to testify from the podium, and all I can speak to

4   is what we've put in the record, which I think is in the Walsh

5   declaration that the Court has with respect to that.

6        THE COURT:  Okay.  But isn't, I mean, consistent with

7   how we began this hearing, isn't that all understandable in

8   light of the fact that the patent litigation asserts ongoing --

9        MR. MAYER:  Yes.

10        THE COURT: -- including post bar date --

11        MR. MAYER:  Yes.

12        THE COURT: -- activity?

13        MR. MAYER:  You could say gee, everybody really means

14   that that only pertains to the post June 1 conduct.

15        THE COURT:  Right.

16        MR. MAYER:  Of course, nobody's ever said that.

17   That's not the reality of what's been said, and I think if

18   somebody has said that then I'm sure we'll hear about it

19   shortly.  But to my understanding, and based on what we've put

20   into the record, there's been nothing like that.  One could

21   interpret the record in that fashion, but I don't think it's a

22   reasonable interpretation, frankly.

23        THE COURT:  Okay.

24        MR. MAYER:  Okay.

25        THE COURT:  Okay.

39

1          MR. MEISLER:  Your Honor, for clarification, in

2     connection with the patent litigation there was no inducement

3     whatsoever or encouragement whatsoever that Methode refrained

4     from filing a claim in the bankruptcy case.  That did not

5     occur.  They were suing us for patent infringement.  It was the

6     beginning.  The case is in its infancy, and, so, all that's

7     really happened in that patent case is there's been some

8     discovery that's commenced.

9          THE COURT:  Okay.

10         MR. MAYER:  I mean, counsel can have time to say

11    whatever he wants.  I guess, again, I could dilate on the

12    details of what was done in the patent case.  I'm not

13    suggesting that anybody ever said one way or the other

14    definitively, in words of one syllable, that this either does

15    or does not pertain to both pre June 1 and post June 1

16    infringement.  I, frankly, have not combed the record for that

17    purpose, but I'm not aware of any statement one way or the

18    other on that subject.

19         THE COURT:  Okay.

20         MR. MAYER:  Okay.  So I think, then, the Court

21    understands, based on the papers, our argument from the plan

22    provisions, our argument that the litigation conduct is

23    certainly entirely consistent with the notion that everything

24    is at issue pre June 1, post June 1.  And to the extent the

25    Court doesn't believe that there was a lack of a need for a

40

1   timely claim with respect to the pre June 1 because of those

2   reasons then we can talk about 503(a), and to the extent the

3   Court thinks it's relevant, as well, the excusable neglect rule

4   as applicable to the patent case, again, I think, the

5   considerations on that front are laid out in the papers and are

6   relatively straightforward in the sense that what you have,

7   really, is continuing -- as to the patent claim we say a

8   continuing course of conduct started with events pre June 1.

9   Started with, in fact, this lawsuit by Delphi to obtain certain

10  drawings, which, as I understand it, and I just got involved

11  with this very recently, and I'm no patent lawyer, but as I

12  understand it all of that related to, and I think there's

13  record evidence about this in the Walsh declaration related to

14  a desire to move forward with resourcing or insourcing the

15  relevant designs.  And I think, in other words, that it's

16  highly germane to the dispute over who has a patent and who's

17  infringing on what, if anybody.

18      So that all began with Delphi's own choice of bringing

19  a suit in Michigan in order to obtain those drawings and that

20  going forward from there you're talking about the litigation

21  that we just alluded to, in which everybody has been proceeding

22  full speed ahead on the premise that there's no need to peel

23  off some stub for the pre June 1 period, and everybody's been

24  acting on the notion that it's all one ball of wax.

25      THE COURT:  Well, I guess that's the question I have.

41

1   How did that lead to the proof of claim being filed when it was

2   filed?  I mean, even though people have been acting like it was

3   one ball of wax, Methode, for some reason, filed a proof of

4   claim anyway.

5            MR. MAYER:  That's true.

6            THE COURT:  I guess the problem I'm having here is

7   even if you apply a for cause standard that doesn't take into

8   account the Pioneer excusable neglect analysis, what's the

9   cause?  I mean, what was different in November that didn't

10  exist in July as far as filing the claim?

11           MR. MAYER:  Well, I guess, here's where there is a

12  certain amount of intertwining.  I mean, just to go back to

13  what I said before, the whole litigation extravaganza began

14  with a lawsuit to get drawings, and that's not about breaches

15  of contract, per se, by Delphi.  My point is there's -- when

16  the contract was terminated, okay, and then there's an effort

17  to go an insource the parts, we're talking about a significant

18  overlap and intertwining of the conduct that's relevant on the

19  patent side and the conduct that's relevant on the contract

20  side.

21           So, obviously, the operative event here that's

22  relevant is Delphi saying we're out of here.  We're terminating

23  the contract formally, definitively.  We're not going to order

24  any more parts from you.  We're done in August.  And why were

25  they doing that?  Well, they're doing that because, obviously,

42

1    they're dealing with Marion or they're dealing with other

2    people to either make themselves or to procure the parts in

3    some other way, which gives rise to the patent issues as well.

4          So my point is that they're --

5          THE COURT:  But when you say --

6          MR. MAYER:  -- intertwined --

7          THE COURT:  When you say August --

8          MR. MAYER:  Excuse me.

9          THE COURT: -- you mean August of what year?

10         MR. MAYER:  August of 2009.

11         THE COURT:  But the patent action was filed in April

12    of 2009.

13         MR. MAYER:  Yes.

14         THE COURT:  So that can't be right.

15         MR. MAYER:  I'm sorry.  Can't be right that --

16         THE COURT:  It can't be right that a breach in August

17    of 2009 is really the precipitating event of the patent claim,

18    when the patent claim was filed three months before.

19         MR. MAYER:  I thought Your Honor was asking -- I may

20    have misunderstood Your Honor's question.  I thought Your Honor

21    was asking why was the proof of claim filed when it was filed.

22    I thought that was the question.

23         THE COURT:  Okay.

24         MR. MAYER:  And that's --

25         THE COURT:  Yes.  Oh, I see.

43

1          MR. MAYER:  -- what I was attempting to answer without

2     being the lawyer who filed it or --

3          THE COURT:  Oh, I see.  What you're saying is that it

4     was the termination of the contract that precipitated the

5     filing of proof of claim?

6          MR. MAYER:  I mean, that was the event in the world

7     that changed things in a decisive way, as we've already talked

8     about.

9          THE COURT:  But why -- what is -- well, how is --

10         MR. MAYER:  At that point they're not ordering from us

11    anymore.  They're off doing what they're doing.  And that's

12    what is also implicated on the patent side.

13         Again, my personal view, Your Honor, is this gets very

14    much to -- for me to give you a crisper and more effective

15    answer gets very much into the merits of all this patent issue.

16         THE COURT:  No, but, again, the issue I have is what

17    is the cause to relieve Methode of not having to have filed in

18    July as opposed to in November?

19         MR. MAYER:  I guess, my bottom line is it's a

20    continuous course of infringement, a continuous course of

21    litigation about infringement.  And that's putting to one side

22    the plan framework, which even if the Court were to find no,

23    no, you're misreading the plan, you're wrong, there's not this

24    alternative route, it's still, even if not fully operative,

25    something that could be taken into consideration in thinking

44

1    about whether there's cause or not, the notion that there was

2    an alternate route and that everybody was following it.

3         THE COURT:  I don't see any suggestion in the record

4    that someone actually looked at the plan and said oh, no, I

5    don't have to file a proof of claim for an admin expense

6    because the plan says that the parties can choose their forum.

7    There's nothing in the record that suggests that, right?

8         MR. MAYER:  I do not know of anything in the record

9    that suggests that.

10        THE COURT:  All right.

11        MR. MAYER:  That is right.

12        THE COURT:  Okay.  So, again, I'm still having a hard

13   time seeing what was the cause for the delay.  I understand

14   now, and I understand your answer now, that the precipitating

15   event may have been a breach, a termination, an actual

16   termination as opposed to an anticipatory termination, although

17   the claim didn't say the actual termination.  It attached the

18   complaint.  But I guess I don't understand, given that the

19   claim attached the complaint, a complaint had been prepared,

20   why that didn't, you know, why the bar date notice didn't set

21   off the light bulb then?

22        MR. MAYER:  You know, I hear Your Honor's point.  I

23   just -- I can only stand on what it said.

24        THE COURT:  Okay.  All right.

25        MR. MAYER:  Okay.  Let's see if there's anything else

45

1    on this before we talk about forum a little bit.

2            THE COURT:  That's fine.  On the contract claim.

3            MR. MAYER:  Yes.  I mean, on the --

4            THE COURT:  Tell me first, what has happened in the

5    state court litigation so far?  Working backwards, I know that

6    there has been litigation in the state court over whether the

7    plan injunction applies.

8            MR. MAYER:  Yes.

9            THE COURT:  But what has happened in the underlying

10   case besides that?

11           MR. MAYER:  Well, I can tell you a little bit.  Ms.

12   Walsh can tell you a lot more if you want to know details.

13           THE COURT:  Either one.  I just, we didn't, sort of

14   know the status of the case.  How familiar has the judge become

15   with the facts and --

16           MR. MAYER:  I'd let Ms. Walsh address that.  I think

17   the judge is familiar, because there was preliminary injunction

18   practice with evidence, but she can explain it better.

19           THE COURT:  Okay.

20           MS. WALSH:  Thank you, Your Honor.  We, in fact, have

21   spent a significant amount of time in Michigan State Court in

22   Oakland County.  Both sides have produced thousands of,

23   probably hundreds of thousands of pages of documents.  We have

24   had a trial date set three times, the most recent of which was

25   the matter is set for trial in July of 2010, but we had two

46

1    prior trial dates.  This is the rocket docket, so the case

2    moves very quickly.  We've had two motions for preliminary

3    injunction heavily briefed and argued.  We've had briefing and

4    oral argument --

5            THE COURT:  I'm sorry?  Two motions.

6            MS. WALSH:  Delphi moved for a preliminary injunction

7    and we moved for a preliminary injunction or a TRO.

8            THE COURT:  But your motion, then, was on the merits,

9    right, to stop on a breach?

10           MS. WALSH:  Right.

11           THE COURT:  Okay.

12           MS. WALSH:  And they moved to --

13           THE COURT:  Enforce --

14           MS. WALSH:  -- require us to turn over the --

15           THE COURT:  -- the plan order.

16           MS. WALSH:  -- Tulane (ph.) drawings.

17           THE COURT:  Oh, okay.

18           MS. WALSH:  Which the Court denied.

19           THE COURT:  All right.

20           MS. WALSH:  So we've had extensive written discovery.

21   Interrogatories, requests for production, requests to admit.

22   We've had our oral argument about a protective order.  We have

23   probably been in front of the Court at least ten times.  She is

24   intimately familiar with the facts.  We have probably spent no

25   less than probably ten hours or eleven hours, twelve, something

47

1    like that, with her law clerk arguing all these motions, and,

2    then, time in front of the Court ultimately arguing all of

3    these motions.  So we have had frequent visits to Detroit in

4    front of the Court.  She's intimately familiar with the facts.

5    And I would point out that Oakland County, Michigan is the

6    jurisdiction in the United States in which almost all

7    automotive contractual disputes are decided and determined.

8    That courthouse is very familiar with automotive litigations.

9    Most OEMs have a choice of venue provision, as did Delphi,

10   which required suit to be brought in Oakland County, Michigan

11   or in federal court in Michigan.  So Detroit, Oakland County,

12   the federal court in Michigan, is uniquely suited to hear

13   contract disputes.

14         This matter also gets into questions of just-in-time

15   manufacturing, automotive supply contracts, all those types of

16   things that in some ways are unique to the auto industry,

17   which, of course, is particularly suited to be heard in Oakland

18   County, Michigan.

19         THE COURT:  Has -- I --

20         MS. WALSH:  So, yes, Your Honor, we have spent a lot

21   of time in Oakland, because we were moving towards trial at the

22   time that Delphi raised this motion.

23         THE COURT:  I'm -- maybe I didn't hear you.  Is

24   there -- has discovery been completed at this point?

25         MS. WALSH:  No, Your Honor, it has not been completed.

48

1    Delphi filed -- after the first bar date and after the plan

2    confirmation date, had filed a motion to compel against us, and

3    we had filed one against them.  So we were in discovery

4    disputes, but it is -- discovery was not closed.

5         THE COURT:  So when -- is there a discovery cutoff

6    date in the case?

7         MS. WALSH:  There -- I believe so, and I think it's

8    probably past now since we spent -- we've been arguing this

9    bankruptcy issue since December 4th of '09.  But I'm sorry,

10   Your Honor, I don't know that date off the top of my head.  I

11   do know we had a July 2010 trial date.  We had previously had a

12   November 2009 trial date and one somewhere in the middle.

13        So we have spent a lot of time in Michigan.  And the

14   judge is intimately familiar with the facts, and every time we

15   go before her she says I know what you're talking about, you've

16   explained it to me before, let's cut to the chase.  So she's

17   certainly familiar with it.

18        Discovery closes March 23rd of 2010, but it's been

19   stayed.  She stayed the matter.  She said until this Court

20   permits her --

21        THE COURT:  And when was that stay issued?

22        MS. WALSH:  December was the ruling.  January.

23        MR. MAYER:  Yeah, January of this year, Your Honor.

24        THE COURT:  All right.

25        MS. WALSH:  We needed a clarification of the order.

49

1    She ruled on the motion in February of 2010.  We went back in

2    to just clarify that it wasn't an outright dismissal, Delphi

3    stipulated to that, and we presented a stipulation to the Court

4    that the case is not dismissed, it is just stayed --

5              THE COURT:  Okay.

6              MS. WALSH:  -- and that was on March 17th of 2010.

7              THE COURT:  Okay.

8              MR. MAYER:  Yes, Your Honor, I'm sorry, I did

9    misspeak.  It was indeed in February.  That's in the Walsh

10   declaration.

11             THE COURT:  Okay.

12             MR. MAYER:  I don't know if the Court has any more

13   questions about the specifics.  I just would just kind of go

14   back --

15             THE COURT:  Yeah, that's helpful, thank you.

16             MR. MAYER:  -- go back to first principles here with

17   respect to forum, that what everyone may think about the

18   argument that the plan provisions excuse from a time bar, the

19   plan provisions I think strongly support the notion that the

20   forum doesn't have to be this court if the parties choose

21   otherwise.  And there is a forum selection clause here which,

22   as the Court has seen from the briefing, has been heavily

23   relied upon by Delphi for Michigan to be the appropriate forum.

24             THE COURT:  I'm sorry, Delphi --

25             MR. MAYER:  Delphi has invoked the forum selection

50

1    clause, because you'll recall first of all, as I mentioned,

2    Delphi sued in Michigan --

3            THE COURT:  Right.

4            MR. MAYER:  -- on the contract side.  On the patent

5    side, which I think is nonetheless relevant here because it

6    shows what Delphi thinks about the clause, they actually made a

7    motion to transfer from the Northern District of Illinois

8    Federal Court the patent case, and insisted that this is a

9    Michigan-based dispute that belongs in Michigan, and the forum

10   selection clause, which is, they say and was accepted by the

11   federal judge in Chicago, exclusively Michigan jurisdiction to

12   hear disputes under the contract, that that should be applied.

13   It was applied so that that the patent case was transferred on

14   that basis.

15           So I would -- again, I would invoke the forum

16   selection clause, which I think is fully operative, as a

17   critical reason why the case belongs in Michigan, even if the

18   judge weren't as familiar as she is with it and as much hadn't

19   gone on as has gone on.

20           THE COURT:  Okay.

21           All right.  Do you have anything more to say on that

22   issue, then?

23           MR. MAYER:  I don't think so, Your Honor.  You

24   understand --

25           THE COURT:  You may after you hear Mr. Meisler.

51

1          MR. MAYER:  No, you understand the --

2          THE COURT:  Okay.

3          MR. MAYER:  -- the contentions.  Thank you.

4          THE COURT:  Okay.

5          MR. MEISLER:  Your Honor, with respect to the forum

6    selection clause, which is where I'll start, Your Honor, I

7    think the case law actually is pretty clear that there's a

8    policy argument that Courts wants to centralize especially core

9    matters in a bankruptcy court.  And --

10         THE COURT:  I understand that, but on the other hand

11   the lawsuit started in Michigan.

12         MR. MEISLER:  That's true, Your Honor, and it --

13         THE COURT:  There was the cross-claim -- I mean the

14   counterclaim, excuse me.

15         MR. MEISLER:  That's correct.  And at the time that

16   the suit started, as you will recall, and it was unfortunate,

17   but we were stuck in the Chapter 11; we didn't know at what

18   point we were going to emerge from Chapter 11.  And it was a

19   post-petition issue.  And I think on that point the law is also

20   clear that with respect to post-petition issues it is

21   appropriate to file those actions in a local court as opposed

22   to bringing those breach-of-contract issues into the bankruptcy

23   court.

24         THE COURT:  Right.

25         MR. MEISLER:  And so yes, Your Honor, we did file the

52

1   action in -- the contract-related action in the state court of

2   Michigan.

3         THE COURT:  I guess my -- where I'm leaning on this is

4   that, leaving aside the plan provision, given the status of the

5   litigation, how it commenced and how it's proceeded, shouldn't

6   I just lift the injunction?  I mean, at this point you have a

7   court that's relatively familiar with the matter; the parties

8   have been litigating there for quite a while.  The claim has to

9   be liquidated one way or the other.  I just don't see

10  particularly why, you know, we should start from scratch here.

11  We wouldn't start from scratch, obviously, because you would

12  have the discovery that you have.  But on the other hand,

13  what's to be served by moving it?

14        MR. MEISLER:  Your Honor, I think you raise a very

15  interesting question, and I think there's really two points of

16  distinction.  The first point of distinction is that what's

17  been litigated is the anticipatory breach claim.  That claim, I

18  think, Your Honor, you'll find that that's barred, that's pre-

19  June 1 conduct.

20        THE COURT:  Okay.

21        MR. MEISLER:  And so while the judge in the state

22  court of Michigan may be familiar with certain of the facts,

23  she has been focusing on anticipatory breach.

24        THE COURT:  Well, I understand that, but on the other

25  hand it seemed to me the best argument you had for keeping --

53

1    for -- not keeping -- for moving the claim dispute here is that

2    it involves the interpretation of my own orders.

3            MR. MEISLER:  That's correct, Your Honor.

4            THE COURT:  But I think we just cleared that away at

5    the start of the hearing.  And so, you know, I guess you still

6    have your issues in the -- that aren't claim issues, and you

7    have your objection to their breach claim.  They're pretty

8    closely entwined.  I understand that under the Second Circuit

9    law the admin claim is a core issue, but it's entwined with

10   your issue, which he's already heard preliminary injunction

11   issues on.  It just -- I -- given that we've cleared away the

12   underbrush of my orders, I'm just grasping at why -- or

13   wondering why -- you know, what the point of bringing it here

14   is at this point.

15           MR. MEISLER:  And I understand, Your Honor.  I think

16   what you'll find, however, is that there has been discovery

17   done.  That discovery was done late in the process; in fact,

18   that was done after Delphi emerged from Chapter 11.  Over

19   100,000 pages of documents were produced.  But it's all related

20   to this pre-June 1 conduct.  And, Your Honor, I think that this

21   Court is equally familiar, if not more familiar, with Delphi's

22   terms and conditions.  And the gist of their argument is that

23   those terms and conditions, paragraph 11, doesn't apply because

24   Delphi entered into the contract in bad faith.  Well, that

25   whole bad-faith argument, which is largely what the discovery

54

1    was based upon, is no longer appropriate to the adjudication of

2    the breach claim.

3          THE COURT:  Okay.  I mean, if this were a simple lift-

4    stay matter, though, wouldn't Sonnax say you lift the stay?

5          MR. MEISLER:  Your Honor, I don't think they would

6    satisfy the Sonnax factors.  I think that what has gone on in

7    the state court is largely discovery disputes, and I think that

8    this Court has similar familiarity with the terms and

9    conditions with Delphi --

10         THE COURT:  Is there even an objection to their claim

11   here pending?

12         MR. MEISLER:  There is, Your Honor.

13         THE COURT:  Other than on timeliness?

14         MR. MEISLER:  There is, Your Honor.

15         THE COURT:  I guess that's right. It did -- in the

16   omnibus objection, it did raise that.

17         MR. MEISLER:  That's correct, and we reserved on the

18   merits.

19         THE COURT:  Right.  Well, I did not get a sense --

20   maybe I'm missing this -- that Methode is contending at this

21   point that DPH is forum shopping.  Is -- I mean, I didn't get

22   the -- you haven't alleged, for example, that something bad has

23   happened for DPH in the Michigan action and therefore they've

24   changed their mind about where they want -- I didn't see that

25   as a suggestion.

55

1          MR. MAYER:  Your Honor, it is correct that we did not

2     identify a precipitating event in terms of a forum change,

3     other than debtors' obvious desire, as we would --

4          THE COURT:  Right.

5          MR. MAYER:  -- always be happy to be in front of an

6     intelligent jurist here.  But --

7          THE COURT:  No, but I think -- I mean, I think --

8     again, as I read their objection to your motion, a significant

9     part of it was bound up in the notion that they thought you

10    were trying to sidestep the bar date issue by arguing that this

11    litigation's fine to go ahead in Michigan and that I would --

12    I'm uniquely situated to interpret my own orders on that.  But

13    I think we dealt with that issue.

14         MR. MAYER:  Yeah, your orders are essentially out of

15    the case, I think --

16         THE COURT:  Yeah.

17         MR. MAYER:  -- so to speak.

18         THE COURT:  Okay.

19         MR. MAYER:  That's my understanding.

20         THE COURT:  Well, because they control.

21         MR. MAYER:  Right.

22         THE COURT:  Right.

23         MR. MAYER:  In other words, it's not a dispute that we

24    have to --

25         THE COURT:  Right.

56

1          MR. MAYER:  -- bring to you on that subject.

2          THE COURT:  Okay.

3          MR. MEISLER:  And, Your Honor, I do have some concern

4    as to the application or interpretation of your orders as to

5    the facts that are going to be at issue in these claims.

6          THE COURT:  Well, but, again, then you can come back

7    to me.  If someone's violating my order and the stipulation

8    that was set forth out on the record today, then that's easy

9    enough to remedy, I think.

10          MR. MEISLER:  Although I don't think it'll be as

11   crystal clear as a violation of the order.  I think it's going

12   to be --

13          THE COURT:  Well, but there's --

14          MR. MEISLER:  -- interpretation.

15          THE COURT:  -- judicial estoppel.

16          MR. MEISLER:  Your Honor, I agree.  I think it's more

17   efficient to handle it here in this court.  With our claims

18   procedures, we can be --

19          THE COURT:  Well, let me ask you that.  Why is that

20   the case?  I guess that's the last issue I'd want to decide

21   here.  Why isn't it more efficient to handle it in Michigan

22   given that the parties are there, that you have your own claim,

23   which is the precipitating claim?

24          MR. MEISLER:  Your Honor, in fact, the claim for

25   breach hasn't even been filed in the state court of Michigan.

57

1          THE COURT:  Well -- but we'd be bringing back your --

2     is it -- here's a question for you, I guess:  Is it a

3     compulsory counterclaim, under Michigan procedure, to their

4     claim?

5          MR. MAYER:  Your Honor, we think it's either compul --

6     we're not Michigan lawyers.  We think it's either compulsory or

7     the next closest thing to it in a state that may not have the

8     same rules about compulsory counterclaims as the Federal Rules.

9     We certainly think we have no choice but to bring it.  And

10    it's, you know, the same set of facts in terms of, kind of, a

11    common nucleus, that sort of analysis in terms of compulsory

12    counterclaim.

13         MR. MEISLER:  Your Honor, I dispute that.  While I'm

14    by no means an expert in compulsory counterclaim, but the

15    action that we filed was a breach of contract because they

16    didn't turn over the drawings.  So I'm not seeing how this is a

17    compulsory counterclaim.

18         THE COURT:  Well, I guess it's tied to your right to

19    terminate and your rights once you terminate.

20         MR. MEISLER:  Those are counterclaims that were filed

21    against our action for turnover.

22         THE COURT:  No, I understand that what we're talking

23    about is a to-be-filed counterclaim --

24         MR. MEISLER:  Correct, Your Honor.

25         THE COURT:  -- to your action.

58

1              MR. MEISLER:  Correct, Your Honor.  In addition, Your

2      Honor, we have procedures in these cases where within sixty-

3      five days we can adjudicate -- we can go from beginning to end

4      of a claim.  We've already been in the state court of Michigan

5      for months, and we just finished the discovery process.

6              THE COURT:  Well, I guess that's the other que -- what

7      is the -- I mean, what is the reserve for this claim?

8              MR. MEISLER:  Your Honor, there is no reserve for this

9      claim.

10             THE COURT:  There is no reserve.  I mean, is it still

11     a forty million dollar claim?  I mean --

12             MR. MAYER:  It's -- yeah, I'm not prepared to say

13     that, Your Honor.

14             THE COURT:  Okay.

15             MR. MAYER:  Just some unliquidated number at this

16     point in time.

17             THE COURT:  I mean, in a way, the -- because there's

18     no reserve, the timeliness issue is more their problem than

19     yours.

20             MR. MEISLER:  That's correct, Your Honor.  And let me

21     clarify for a moment.  We have reserved approximately 700,000

22     dollars for the termination for --

23             THE COURT:  Well, that's why I was asking about the

24     forty million versus the --

25             MR. MEISLER:  Yes.

59

1          THE COURT:  Because I know you reserved around 700 --

2          MR. MEISLER:  And we're prepared, and Methode knows

3     this, but we're prepared to settle that claim.  We do

4     acknowledge that there is a claim for --

5          THE COURT:  Termination.

6          MR. MEISLER:  -- termination for convenience.

7          THE COURT:  Right.

8          MR. MEISLER:  But what we have reserved is something

9     between 600,000 and 750,000 dollars, nothing near that 40

10    million dollar figure.

11         THE COURT:  Well, it seems to me that this litigation

12    in Michigan right now is going to proceed only on your claim,

13    because there really isn't any other claim at this point.  So I

14    guess you could initiate -- or pursue the claim objection here.

15    But it seems to me that if they amend their claim, it probably

16    makes sense to have the whole thing continue in Michigan.  It

17    seems to me there will probably be some common issues.  And

18    unless you're going to move your litigation here, which

19    doesn't -- which I don't think you're seeking to do --

20         MR. MEISLER:  Your Honor, I would confer with my

21    client, but we would be willing to withdraw our litigation,

22    withdraw our complaint, so that we don't even have to deal with

23    our issues.

24         THE COURT:  All right.

25         MR. MEISLER:  At this point --

60

1            THE COURT:  Well, look --

2            MR. MEISLER:  -- we no longer need those drawings.

3            THE COURT:  -- as far as this matter before me is

4    concerned, on the contract claim, it seems to me that, despite

5    the hour we spent on this, that it's really premature for me to

6    rule on this motion since the claim we're talking about now

7    isn't the claim that would be in the litigation.

8            MR. MAYER:  I mean, the difficulty with that, Your

9    Honor, of course is --

10           THE COURT:  You would want relief from the injunction

11   to file a claim.

12           MR. MAYER:  -- we can't do anything, yeah.

13           THE COURT:  Well --

14           MR. MEISLER:  And, Your Honor --

15           THE COURT:  -- you could ask for permission to file

16   that claim, I guess.  It's what we're talking about.

17           MR. MAYER:  Okay.

18           THE COURT:  And maybe in that context, DPH can rethink

19   its position as to whether, now that the record is clear as to

20   what that claim is, whether it really wants to fight having the

21   injunction being lifted.

22           MR. MAYER:  Certainly I would ask the Court for

23   permission.  We would --

24           THE COURT:  All right.

25           MR. MAYER:  -- in fact, file it pretty promptly.  I

61

1    think it's --

2         THE COURT:  All right, I think that's how we should

3    deal with it.

4         MR. MAYER:  -- pretty close to being ready.

5         THE COURT:  I mean, you could certainly tell where I'm

6    leaning.  And it's not based on an interpretation of the plan;

7    it's really based on what I would apply by analogy, which is

8    the Sonnax factors as applied to this stay in the plan

9    confirmation order and in particular my sense, particularly

10   after the injunction litigation, that the state court is very

11   familiar with your claims and Methode's defenses to them, and

12   that that's the main action in this litigation, and that this

13   breach claim is kind of an add-on -- in fact, it's not even

14   added on yet -- and that rather than have the breach claim

15   control the litigation, the litigation's pretty much controlled

16   by what the debtors initiated and which -- in what I think is

17   properly in Michigan.

18        MR. MEISLER:  Your Honor --

19        THE COURT:  But that's just a preliminary thought,

20   because, again, based upon the first half hour or so of this

21   hearing, I think the actual context of this motion no longer

22   applies, because we're really talking about a claim that isn't

23   before the Michigan Court yet, and there's not really leave to

24   file that type of claim in the Michigan Court.  I could

25   understand why I might grant such a motion, particularly if I

62

1    can see that it is like a compulsory counterclaim, or close to

2    it, under Michigan procedure, but that's all about I can do in

3    this context.

4            MR. MEISLER:  Thank you, Your Honor.  I'll be looking

5    for --

6            THE COURT:  And, you know, I think that that would be

7    a basis clearly -- if the debtor's worried about enforcing what

8    was set forth on the record at the beginning of this hearing,

9    that's clearly a basis for judicial estoppel.  I mean, I --

10   Methode prevails on its motion to let the thing go forward in

11   Michigan on the basis that we're dealing with a post-bar date

12   breach.

13           MR. MEISLER:  And, Your Honor, for clarity, I -- at

14   least my understanding of what our next steps are is that

15   counsel for Method would provide a form of complaint and

16   would -- we would either stipulate to lift the plan

17   injunction --

18           THE COURT:  Right.

19           MR. MEISLER:  -- or otherwise we'd be back before Your

20   Honor --

21           THE COURT:  Right.

22           MR. MEISLER:  -- on a motion to lift the plan

23   injunction.

24           THE COURT:  That's how I would conceive of it.

25           MR. MEISLER:  Okay.

63

1           THE COURT:  Yeah.  And, again, since the only reason I

2    would have had the litigation proceed here is because it would

3    involve my orders and the bar date and the like; and now that's

4    out, I think that you would come back to me, if somehow it

5    crept back in again, to enforce that stipulation.

6           MR. MEISLER:  Thank you, Your Honor.

7           THE COURT:  Okay.  All right, now, I still have to

8    rule on the nub or the -- or the sliver of the patent claim.

9    Do you have anything more to add on that one?

10          MR. MEISLER:  Your Honor, I don't.  I think that the

11   record is clear on the patent claim.

12          THE COURT:  Okay.

13          All right, I have before me a motion by Methode

14   Electronics, Inc. that, as relevant to this ruling, seeks a

15   determination that the objection by DPH Holdings Corporation to

16   its patent claim, on the basis that the patent claim is

17   untimely, is not valid and should be overruled.  Even that

18   aspect of the objection should be further qualified in that DPH

19   Holdings has confirmed that it is not DPH Holdings' position

20   that the ongoing patent infringement claim is barred by the

21   Court's administrative claims bar date order but rather only

22   that portion of Methode's patent claim that asserts claims that

23   arose -- or damages arising in respect of claims that arose

24   prior to June 1, 2009, which was the applicable date for the

25   claims covered by my original administrative claims bar date

64

1   order in this case.

2       The Court established an administrative claims bar

3   date order in this case requiring the filing of administrative

4   claims, with certain exceptions that do not apply here.  By

5   July 15th, 2009, the administrative claims bar date order and

6   notice were widely circulated, and Methode does not dispute

7   that it received such notice in a timely fashion that would

8   have enabled it to file an administrative claim, in respect of

9   its patent claim, before the July 15th bar date.  It was aware

10  of its patent infringement claim, because it had brought a

11  patent infringement action in April of 2009 in the Northern

12  District of Illinois.  Nevertheless, Methode did not file its

13  patent claim by the July 15th, 2009 administrative claims bar

14  date.  Rather, it did so on November 5th, 2009.

15      The courts have been clear that a bar date in a

16  Chapter 11 case is a significant event in the case.  Quote,

17  "The bar date serves the important purpose of enabling the

18  parties in interest to ascertain with reasonable promptness the

19  identity of those making claims against the estate and the

20  general amount of the claims, a necessary step in achieving the

21  goal of successful reorganization."  In re Calpine Corporation,

22  2007 U.S. Distr. LEXIS 86514, at pages 14 through 15 (S.D.N.Y

23  Nov. 21, 2007), citing First Fidelity Bank, N.A. v. Hooker

24  Investments, Inc. 937 F.2d 833, 840 (2d Cir. 1991).

25      In this case, the administrative claims bar date was

65

1    particularly significant given serious issues with regard to

2    the debtors' administrative solvency and the requirement under

3    Section 1129 of the Bankruptcy Code that a Chapter 11 plan may

4    not be confirmed unless it pays holders of allowed

5    administrative claims in full in cash, or in such other amounts

6    as they agree.

7          The Court took testimony at the confirmation hearing

8    with regard to the estimation of administrative claims and has

9    previously noted in other contexts -- I'm sorry, in regard to

10   other motions for leave to file an untimely administrative

11   claim, the importance of the bar date and the debtors'

12   husbanding of their cash in the confirmation process and also

13   the post-confirmation administration of the estate.

14         The motion contends that the plan permitted the

15   allowance of an administrative claim under alternative means

16   that could sidestep the bar date, and further asserts that the

17   debtor invoked those means by participating in the district

18   court patent litigation and having the litigation removed.

19         I've reviewed the provisions of the plan and the bar

20   date provision of the modification procedures order, and

21   conclude that the allowance provision, or the provision dealing

22   with allowed administrative claims in the plan, which permits

23   the parties to agree upon an alternative treatment of the

24   claim, does not, unless the parties affirmatively agree to such

25   alternative treatment, permit an administrative claimant to

66

1   sidestep the requirements of the bar date provisions of the

2   modification procedures order.

3         I believe that the language that the claimant here,

4   Methode, is relying upon is more properly viewed as customary

5   boilerplate language tracking Section 1129 of the Bankruptcy

6   Code's provision that lets the parties provide for less than

7   hundred percent payment of admin claims by agreement and that

8   the bar date order did not contemplate that parties to existing

9   litigation over admin claims in other forums would be excused

10  from having to file their claims by the bar date, simply

11  because the parties were pursuing that litigation together and

12  had in their post-petition documents agreed upon a forum

13  selection provision.  If that were the case, I believe it would

14  have been dealt with in the bar date order provisions itself.

15        The motion also states that the patent claim, as

16  asserted in April in the Illinois Court, should constitute an

17  informal proof of admin claim and therefore should be deemed to

18  be timely filed.  However, the requirements of an informal

19  proof of claim in the Second Circuit are fairly narrowly drawn

20  and are not satisfied here in two respects.  To qualify as an

21  informal proof of claim, a document purporting to evidence such

22  claim must have:  (1) been timely filed with the bankruptcy

23  court and have become part of the judicial record, (2) state

24  the existence and nature of the debt, (3) state the amount of

25  the claim against the estate, and (4) evidence the creditor's

1    intent to hold a debtor liable for the debt.  See Enron

2    Creditors Recovery Corporation, 370 B.R. 90, 99 (Bankr.

3    S.D.N.Y. 2007).  Here, the complaint in the patent litigation

4    in the district court was not filed with the bankruptcy court

5    until the November 5 proof of claim was filed, after the July

6    15th bar date, and also does not state a sum certain.

7            The first requirement is not, again, a mere procedural

8    gambit.  The requirement to have the informal proof of claim

9    filed with the bankruptcy court recognizes that bankruptcy

10   cases are collective proceedings and that parties-in-interest

11   other than the debtor, who is the party to the complaint -- to

12   the litigation, excuse me, in the patent litigation, have the

13   right to object to claims, and often do object to claims, and

14   cannot do so unless the claims are filed in the case in a way

15   that they can be made aware of.  Moreover, the existence of the

16   claim on the docket of the case also enables parties-in-

17   interest to do their own calculation and projection of what

18   potentially liable claims are.

19           Consequently, I believe that the majority view

20   requiring the claim to be filed in the -- or the document to be

21   filed in the bankruptcy court before it becomes an informal

22   proof of claim is the proper one.  I've ruled that way in this

23   case already, as the debtors have noted it in their response,

24   and have done so not only based on my own analysis but also on

25   the analysis in In re Houbigant, Inc., 190 B.R. 185, 187

68

1   through 8 (Bankr. S.D.N.Y. 1995).  Consequently, I don't

2   believe that the claim would -- or the -- I'm sorry, the

3   complaint as filed in the district court patent action should

4   be treated as an informal proof of claim.

5           That leaves, finally, Methode's argument that it

6   should be excused from filing its claim late under the bar date

7   order and that its claim therefore should be deemed to be

8   timely filed.  Section 503(a) of the Bankruptcy Code provides,

9   since 1994, quote, "An entity may timely file a request for

10  payment of an administrative expense, or may tardily file such

11  request if permitted by the court for cause."  Collier points

12  out that this provision was added in 1994 to overrule cases

13  which had held that effectively a court could not set an

14  administrative claims bar date.  And there have been relatively

15  few cases since then dealing with the for-cause language in

16  Section 503(a).  See 4 Collier on Bankruptcy, paragraph

17  503.02[2] (15th Ed. 2009) at 503.10.  Collier notes that the

18  term "cause" is not a defined term in either the Code or the

19  Rules:  Quote, "So the kinds of cause sufficient to permit

20  tardy filing of administrative expense claims is left to

21  judicial discretion and development in determining whether

22  cause exists.  Cases construing the for-cause-shown standard of

23  Bankruptcy Rules 3002(c)(1), 3003(c)(3) and 9006(b)(1) are

24  relevant," close quote.  Collier notes that at least one Court

25  has applied the excusable neglect standard of Bankruptcy Rule

69

1    9006(b)(1) in this context, citing In re Gillabo (ph.),

2    361 B.R. 87, 91 (Bankr. N.D.N.C. 2007).  The debtors point out

3    that the Gillabo case is not the only instance of a Court

4    applying the excusable neglect standard of Rule 9006(b) to a

5    tardily filed claim under Rule -- I'm sorry, under Section

6    503(a), and in fact that not only have Judge Lifland and Judge

7    Gropper also done so in In re Dana Corporation, 2007 WL 1577763

8    at page 3 (Bankr. S.D.N.Y. 2007) and In re Northwest Airlines

9    Corp., 2010 WL 502837 at pages 1 through 2 (Bankr. S.D.N.Y.

10   2010), but also this Court has done so in prior instances in

11   this very case.

12        It appears from my reading of those two cases, as well

13   as my recollection of my rulings, that no one made the point

14   that Methode is making here, that 5003(a) expressly says "for

15   cause" and that such language may override, therefore,

16   Bankruptcy Rule 9006(b)(1) which states that a Court, for cause

17   shown, may extend the date by which an act is required to be

18   done by order of the Court for cause shown only if the request

19   is made to do so within the deadline.

20        I do note, however, that the cause-shown language

21   precedes paragraph -- subparagraph (2) of 9006(b), which could

22   therefore be read as showing that cause shown includes that the

23   failure to act was the result of excusable neglect when the

24   motion is made after the expiration of the specified period.

25        I further note that employing the excusable neglect

70

1    standard in the context of a 503(a) bar date is to my mind no

2    logically different than applying it to a 501 or -2 claim bar

3    date, given the importance of -- or given the fact that the bar

4    dates are equally important in either context.

5           However, ultimately I believe that the issue, that is,

6    whether I should apply a looser for-cause standard or the

7    excusable neglect standard, as set forth in Pioneer Investment

8    Services Company v. Brunswick Associates Limited Partnership,

9    507 U.S. 380 (1993) and Midland Cogeneration Venture L.P. v.

10   Enron Corporation (In re Enron Corporation), 419 F.3d 115, 126

11   (2d Cir. 2005), is ultimately moot under these circumstances;

12   that is because I have not been able to find a valid basis for

13   finding cause under either standard in the late filing of this

14   proof of claim or proof of administrative expense.  First,

15   there are no notice issues.  Second, there is no contention

16   that the plan language that is now being relied upon, or was

17   now relied upon by Methode in this motion, had been relied upon

18   at the time of the bar date by it in failing to file a proof of

19   claim or a proof of administrative expense.  Third, there's no

20   suggestion that Delphi lulled Methode to sleep in filing its

21   claim.  And in that regard, I believe that the facts here are

22   materially different than the facts in the In re Eagle Bus

23   Manufacturing case relied upon heavily by Methode, 62 F.3d 730

24   (5th Cir. 1995).

25           In terms of not only the sophistication of the parties

1    but also the nature of the underlying claim and the underlying

2    litigation, and the absence of any ongoing negotiations by

3    Delphi and, finally, the fact that, as in contrast to the Eagle

4    Bus case, the litigation in the district court would

5    necessarily involve Delphi for the post-bar date period in any

6    event, so Delphi's continued participation in that litigation,

7    unlike in the Eagle Bus case, would not have -- or should not

8    have lulled Methode to sleep about the need of filing a claim

9    for the pre-bar date covered period.

10           Finally, I don't see a basis for Methode's filing the

11   claim in November as opposed to filing it in mid-July, as

12   required by the bar date, given that the patent claim itself

13   was -- the patent litigation was initiated in April of 2009,

14   and Methode was clearly in a litigation posture with Delphi

15   well before the date that it filed the claim and well before

16   the bar date.  In other words, a light bulb may have gone off

17   at Methode that led it to file its claim in November 2009, but

18   I see no rational basis as to why it should not have gone off

19   instead before the July 15th bar date.

20           Therefore, it appears clear to me that the delay was

21   well within Methode's control, which would be dispositive under

22   the excusable neglect standard, given the other facts here,

23   particularly as applied in the Second Circuit, under the

24   Midland Cogeneration case.

25           Moreover, though, again, it appears clear to me that

72

1   the debtors' estimate of administrative expenses and the

2   debtors' husbanding of its cash position based upon that

3   estimate are critical in this case.  This is not simply a

4   matter of reducing recoveries to creditors, since it's clear

5   that that doesn't really constitute prejudice under 9006(b)(1),

6   or generally which should constitute prejudice under a for-

7   cause analysis.  But the ability to rely upon an admin claim's

8   bar date in many respects is fundamental to the Court's ability

9   to confirm a plan and the debtors to go effective and then

10  implement their plan, since the plan provides that such claims,

11  as required by law, must be paid in full, unless agreed upon by

12  the parties.

13         So it seems clear to me that under either approach,

14  and frankly I continue to lean on the excusable neglect

15  approach as being the appropriate one, but, again, under either

16  approach, there's not cause to deem the claim timely filed and

17  therefore the pre-June 1, 2009 patent infringement damages or

18  claim should be barred in this case.

19         So the debtors should submit an order to that effect.

20         MR. MAYER:  Thank you, Your Honor.

21         THE COURT:  As far as the rest of the relief that was

22  in essence agreed to on the record, I'm happy to have the

23  record reflect that.  But if you want to have it memorialized

24  in an order, I'm happy to do that also, which is, again, to let

25  the -- to issue an order saying that the planned injunction

73

1   doesn't apply to the patent case insofar as it seeks damages

2   for a post-June 1, 2009 infringement.

3          MR. MAYER:  No, Your Honor, we're fine with so

4   ordering on the record.

5          THE COURT:  Okay.

6          MR. MAYER:  Thank you.

7          THE COURT:  Thank you.

8          Okay.

9          MR. MEISLER:  Thank you, Your Honor.

10         THE COURT:  Thank you.

11         MR. MEISLER:  Your Honor, the ninth matter on the

12  agenda is the substantial contribution application submitted by

13  the IUE-CWA.  Your Honor, Mr. Tom Kennedy is here, and I'm

14  going to cede the podium over to Mr. Tom Kennedy --

15         THE COURT:  Okay.

16         MR. MEISLER:  -- as this is his application.

17     (Pause)

18         MR. MEISLER:  Your Honor, my apologies for the

19  sidebar.

20         THE COURT:  It's okay.

21         MR. MEISLER:  Mr. Kennedy and I were just talking

22  about the exhibit binder that's been submitted --

23         THE COURT:  Right.

24         MR. MEISLER:  -- to chambers and that we're submitting

25  into evidence for not just the IUE-CWA substantial contribution

74

1   application but for all the applicants.  In fact, Your Honor,

2   as you mentioned on the record at the beginning of this

3   hearing, the deadlines for all the substantial contribution

4   applications, for their filings with respect to the affirmative

5   case, that deadline has passed.  And the rationale, for the

6   record, was that we didn't want any party to be advantaged or

7   disadvantaged by being adjourned to the June 30th date.

8          So, Your Honor, on that account, we have the exhibit

9   binder --

10          THE COURT:  Okay.

11          MR. MEISLER:  -- and --

12          THE COURT:  Let me --

13          MR. MEISLER:  -- and we're introducing it into

14   evidence.

15          THE COURT:  I have that binder.  There's also -- I

16   have a manila binder that says "Supplemental Exhibits"; I don't

17   know what that is.

18          MR. MEISLER:  Yes, Your Honor.  Those are the

19   confidential exhibits.

20          Is that correct?

21          THE COURT:  Oh, okay.  But you've been -- you two have

22   both been --

23          MR. KENNEDY:  I've seen no confidential exhibits, and

24   in fact I can't imagine there would be on the substantial

25   contribution --

75

1          THE COURT:  No, the -- I don't think these are --

2          MR. MEISLER:  Oh, these are -- Your Honor --

3          THE COURT:  No, these are not confidential.  This is

4     voting on the plan --

5          MR. MEISLER:  Sorry for the correction.  Those are

6     additional exhibits that we submitted this morning.

7          THE COURT:  Oh, all right.  I don't think they

8     applied, though, to this one.  This -- it may apply to the

9     trade committee, I guess?

10          MR. MEISLER:  That's correct.

11          THE COURT:  All right.

12          MR. MEISLER:  You're correct, Your Honor.

13          THE COURT:  It's just a list of the -- who voted.

14          MR. KENNEDY:  But --

15          THE COURT:  Okay.

16          MR. KENNEDY:  -- the motion turns on that.  I'll

17     respond.  Yes, and, Your Honor, we had submitted an Exhibit A

18     to our substantial contribution motion, the hourly records and

19     the summary of the hourly records --

20          THE COURT:  Right.

21          MR. KENNEDY:  -- and costs that we had expended.

22     And --

23          THE COURT:  Right.

24          MR. KENNEDY:  -- I'd like to think I can think quickly

25     on my feet, but that was a lot of documents to go over in the

1    last thirty or forty seconds.  So I'm hoping that the Court has

2    before it the hourly records that we submitted --

3            THE COURT:  Oh, yeah, I definitely do.

4            MR. KENNEDY:  -- as Exhibit A.

5            THE COURT:  I definitely do.  But as far as this

6    binder's concerned, is there any objection to these?

7            MR. KENNEDY:  No.

8            THE COURT:  Okay, so they're part of the record for

9    this motion.

10           MR. KENNEDY:  All right, Your Honor, thank you.  Tom

11   Kennedy, IUE-CWA, appearing with my partner Susan Jennik, from

12   the firm of Kennedy, Jennik & Murray.

13           Our motion of course, Your Honor, is pursuant to

14   Section 503(b)(3)(D) and (b)(4) of Title 11 of the United

15   States Code, and Rule 2016 of the Federal Rules of Bankruptcy.

16   We are looking for recovery of attorneys' fees and expenses

17   during the period from January 3rd, 2006 to May 6, 2009, in

18   which period of time it is our contention that the IUE-CWA made

19   a substantial contribution to the successful reorganization of

20   the debtors.

21           And given the response that's been filed by the

22   debtor -- and let me note, Your Honor, again, for the record,

23   that the agenda for this morning's hearing did not include the

24   fact that we submitted yesterday a response to that objection.

25           THE COURT:  I read that.

77

1         MR. KENNEDY:  Yes, and I believe the debtor has

2    acknowledged receiving a copy as well.

3         THE COURT:  Okay.

4         MR. KENNEDY:  I think there were four issues posed:

5    The first is, has the IUE-CWA made a substantial contribution

6    to the successful reorganization of the debtor; second, has the

7    IUE-CWA waived its right to seek a substantial contribution

8    recovery; third, can the IUE-CWA be compensated for its work in

9    connection with the EPCA and modified EPCA; and fourth, are any

10   of the hours for which IUE-CWA seeks compensation unreasonable

11   or otherwise compensable?

12        We think that the record is manifest that the IUE has

13   in fact made a substantial contribution.  And we would note

14   that that substantial contribution was carefully described by

15   us in our moving papers.  We did not seek reimbursement for the

16   IUE-CWA for all of the hours that were expended on this case;

17   rather, we narrowed it to particular areas.  The first was the

18   objection to and the settlement of the 1113/1114 motion to

19   modify collective bargaining agreements.  Ultimately, as you

20   know, that motion was withdrawn and was replaced with

21   agreements that were entered into.  Docket number 9107

22   represents the approval order of the memorandum of

23   understanding with the IUE-CWA, which affected 8,500 employees

24   and 3,000 retirees of Delphi at that time.  It resulted in

25   substantial changes in the terms and conditions and was reached

78

1   after very difficult, lengthy and significant negotiations in

2   which, I think it is fair to say, that the IUE played an

3   important part in securing not only for itself but really for

4   all of the non-UAW unions a reasonable conclusion of the issues

5   that were facing them.

6          Second, we made objections to proposed management

7   compensation plans.  We noted the docket numbers, there are

8   quite a few of them, that occurred during the period of the --

9   for which we seek reimbursement.  And I would of course focus

10  in that connection on the objection that was made to the EPCA

11  management compensation plan in which the debtors sought some

12  eighty million dollars in management compensation as a result

13  of reorganization.  And the Court, after hearing our

14  presentation, and I think it's fair to say that the IUE-CWA

15  played a leading role in that particular matter, reduced that

16  by some seventy million dollars.

17         Now, the -- it is of course true that unions have

18  sought and been granted substantial contribution motions in

19  bankruptcy cases.  We cited them in paragraph 12 of our

20  submission, In re ASARCO (ph.), In re Trans World Airlines,

21  In re Bethlehem Steel.  And we think if you look at those cases

22  and compare the role that the IUE-CWA played in this case to

23  the role that the unions played in that case, they support the

24  issuance of the substantial contribution award to the IUE-CWA.

25         THE COURT:  But weren't those cases where the debtors

79

1    negotiated those agreements as part of the --

2         MR. KENNEDY:  In most cases they were, Your Honor,

3    that's correct, and they were being objected to by others.  But

4    in this particular case -- and I'm glad you mentioned that,

5    because Section (g)(5) of the IUE-CWA memorandum of

6    understanding, Docket number 9106, provides an acknowledgment

7    that, quote, "The consideration provided by the IUE-CWA,

8    pursuant to this Agreement and all attachments to this

9    Agreement, constitutes a substantial contribution to Delphi's

10   plan of reorganization, that the contribution is necessary to

11   the success of Delphi's plan of reorganization."

12        So in our view, there is a negotiated agreement on the

13   part of the debtors that there has been a substantial

14   contribution to the IUE-CWA to the successful reorganization of

15   this debtor.  It is true that they did not agree upon an

16   amount, but we believe the amounts that have been submitted in

17   and of themselves are reasonable.

18        And I would of course note --

19        THE COURT:  Wait, could you read the first clause of

20   that again?

21        MR. KENNEDY:  Sure.  The parties acknowledge --

22        THE COURT:  Not the first clause.

23        MR. KENNEDY:  Sorry.

24        THE COURT:  Later.  But keep going.

25        MR. KENNEDY:  "(1) The consideration provided by the

80

1    IUE-CWA, pursuant to this Agreement and all attachments to this

2    Agreement, constitutes a substantial contribution to Delphi's

3    plan of reorganization."

4            THE COURT:  All right, but that doesn't reference the

5    work that the professionals did, right?  It just says the

6    consideration under this agreement?

7            MR. KENNEDY:  Well, but the consideration provided by

8    the IUE included the retention of its professionals that played

9    a leading role in the negotiations and in the court proceedings

10   that resulted in the ultimate agreement.  It is the union's

11   contribution which was manifold in the sense that, yes, members

12   gave up benefits and there were adjustments to wages and so

13   forth.  But there were also substantial contributions by the

14   IUE in paying for its professionals to be part of that process.

15           So we think, yes, this certainly does include the

16   participation by professionals for which we seek compensation

17   today.  There's certainly nothing in the language which

18   excludes the participation by professionals.  It simply refers

19   to consideration provided by the IUE; the consideration

20   included the participation by its professionals.

21           And we of course believe that it's noteworthy that the

22   U.S. Trustee, after reviewing our application, has joined with

23   us in observing that the IUE made a substantial contribution,

24   and they focus on the objections to the various KESIP plans and

25   the management compensation plan.  Delphi -- or DPH has said

81

1    nothing that undercuts the voice of the U.S. Trustee's

2    conclusion that in this case there has been a substantial

3    contribution.

4         Now, I wanted to address the waiver argument, because

5    I think that has two elements that --

6         THE COURT:  Well, before going to that --

7         MR. KENNEDY:  Sure.

8         THE COURT:  -- on the substantial contribution point,

9    I ruled in the union's favor on the exit bonus plan, but there

10   were a number of other objections by the union to various

11   executive bonus plans.  And I was -- in looking at the time

12   records attached to the application, they cover a period

13   that's -- that goes beyond that litigation where I ruled in

14   your favor, right?  They cover objections too?

15        MR. KENNEDY:  They cover two types of compensation

16   objections:  one, the continuing KESIP disagreements that the

17   union had; and second, the management compensation plan issue

18   that resulted in a seventy million dollar reduction.

19        THE COURT:  Right, but on the KESIP ones, I guess --

20   what was the benefit to the estate on that?

21        MR. KENNEDY:  Well, Your Honor, it was twofold.  The

22   existence of the unions as effective watchdogs in the KESIP

23   process resulted in changes in the amounts that would -- the

24   EBITDAR would have to be increased in order to justify a bonus

25   to the executives, and, as I remember correctly, resulted --

82

1    since it was originally presented with the approval at the time

2    of the creditors' committee, as a sliding scale, and Your

3    Honor, as a result of the union objections, moved it to a

4    binary system, they either made the judgment -- they made the

5    amount or they didn't.  There were consistent negotiations in

6    each quarter as to what the allowable targets would be.  I

7    remember Your Honor asked the question, Was it going to be a

8    lay-up or was it -- require a reach by management.

9         THE COURT:  Right.

10        MR. KENNEDY:  And in each case for those systems,

11   ultimately we did not continue to object each quarter, because

12   Your Honor had made it pretty clear what your rulings are going

13   to be.  But for a number of the quarters, we did object.  I

14   guess they're actually typically done twice a year in order to

15   ensure that the management standards were significant, that

16   they were a reach and not a lay-up.  And we addressed in each

17   case the amount of money that would have to be earned as an

18   EBITDAR in order to qualify.

19        So in our view, that was a substantial contribution in

20   each case.  Typically those were -- they had the effect of

21   policing the process in a way that no one else was doing.

22        THE COURT:  Well, I guess that's my next question.

23   The committee was involved in that process as well, right?

24        MR. KENNEDY:  Yes.

25        THE COURT:  So --

83

1        MR. KENNEDY:  Well, that brings up an interesting

2    point, Your Honor.  In our view, a committee composed, as it

3    necessarily is, of bankruptcy lawyers and management officials,

4    takes a relatively generous view, at least from our

5    perspective, of how management compensation should work.  And

6    there were -- well, I'm not in a position to reveal

7    conversations in the committee, but I will say that the

8    committee, I believe, was even publicly aware that the unions

9    would be mounting separate challenges, and frequently left to

10   the unions the articulation of specific objections to the

11   management compensation plans.

12       THE COURT:  But how do I know, given the committee's

13   involvement, what portion of this -- and I'm leaving aside for

14   the moment the bonus, you know, the eighty-two million bonus --

15   how much of the modifications on the KESIP targets is

16   attributable to the union as opposed to the committee?

17       MR. KENNEDY:  I think it's difficult to make a

18   specification of that amount, Your Honor.  I believe that the

19   track record of this case, in which it was the unions that

20   consistently tried to hold management accountable for the

21   compensation schemes they were presenting, is a benefit to the

22   estate even without being able to ascertain which dollar moved

23   where as a result of that persistent review.

24       THE COURT:  Okay.  And --

25       MR. KENNEDY:  With respect to the waiver arguments --

84

1          THE COURT:  No, sorry.

2          MR. KENNEDY:  All right.

3          THE COURT:  Sorry.  On the substantial contribution,

4    if the union had a unique role on the KESIP targets, that was a

5    role that the estate clearly benefited from, because those

6    targets were set on an ongoing basis and the cash that was paid

7    and the cash that wasn't paid because of the input by the union

8    and the committee was real cash.  On the incentive -- the exit

9    payments, the debtors make the point that even the amount that

10   I approved wasn't paid because of the turn of events in the

11   auto industry and in Delphi in particular.  So that therefore

12   even though there was a lot of litigation over this, and you

13   obtained a result that in that instance I can see clearly you

14   obtained as opposed to the committee, I'm having a hard time

15   seeing ultimately how the state benefited from it.

16          MR. KENNEDY:  Well, I think, Your Honor, as the

17   ultimate plan of reorganization was worked out, had -- and of

18   course there's some element of speculation in this; it's

19   impossible to have the conversation without acknowledging that.

20   But had the plan continued as it had originally been structured

21   in the EPCA, with a more than eighty million dollar management

22   bonus, in our view there was a much greater likelihood that

23   management would have continued to fight for some amount of

24   bonus in the subsequent plan that was ultimately approved.

25   The -- having taken that off the table, it became much easier

85

1    for the ultimate plan to not reflect an amount of management

2    compensation.

3           And I also think, although it is true that substantial

4    contribution motions are backward-looking in nature in the

5    sense that they evaluate at the end of the day what the impact

6    was, there is also an element in this case of looking at the

7    time at which the services were rendered:  Were they

8    reasonable, and did they provide a benefit?

9           And, in my view, the -- had the management

10   compensation plan, as drafted, been allowed to continue in

11   which all of the other stakeholders in the Delphi case,

12   including the employees and both union and salaried, been aware

13   that this small group of upper officials were going to get this

14   terrific bonus, it would have impacted on the administration of

15   the estate and the estate's ability to continue to manufacture

16   products effectively, on time and in a quality way.

17          But achieving, as we did, a leveling of the field

18   during the period from Your Honor's ruling through the point

19   that the matter went out of bankruptcy, in which Delphi

20   continued to produce domestically, continued to have a salaried

21   and a unionized workforce, that that was an advantage in and of

22   itself to the estate to having taken out what would have been

23   an irritant in relationships between the non-compensated

24   individuals and the management folks that would have

25   participated in that eighty million dollar pool.

86

1          So I don't think, from a backward-looking point of

2     view, you can ignore the ongoing value to the estate of

3     preventing what would have been seen, we believe, by

4     participants as a grab by management that would have thwarted

5     continued sacrifices that were necessary to ultimately

6     reorganize this debtor.

7          THE COURT:  Okay.

8          MR. KENNEDY:  The way the claims -- I just want to

9     touch on briefly, Your Honor, the --

10         THE COURT:  I'm sorry, I'm still --

11         MR. KENNEDY:  Okay.

12         THE COURT:  In your time records, on the category on

13    the KESIP/management compensation plan --

14         MR. KENNEDY:  Yes.

15         THE COURT:  -- there's -- there are references to an

16    AIP as well.  Is the AIP something other than management

17    compensation?

18         MR. KENNEDY:  No, the AIP is, I believe, another

19    acronym for KESIP.

20         THE COURT:  Okay.  Okay.

21         MR. KENNEDY:  I think it's annual incentive plan.

22         THE COURT:  All right.  And --

23         MR. KENNEDY:  I believe that, as originally presented,

24    the KESIP -- it may have been the annual incentive plan was for

25    the upper officers, I'm sort of --

87

1          THE COURT:  Right.

2          MR. KENNEDY:  -- remembering, Your Honor.

3          THE COURT:  And then there's also a number of

4    references to the EPCA objection motion, in addition to

5    references to the MCP, which was the bonus plan, the eighty-two

6    million bonus plan.  And I don't understand the references to

7    the EPCA motion.  It's about -- it's several pages in.  But

8    they're from December, 2007 and January of 2008.

9          MR. KENNEDY:  Well, we had made an objection to the

10   EPCA motion which primarily focused on the management

11   compensation plan.  But as I remember correctly, also it

12   concluded requirements that the labor contracts be assumed in

13   any subsequent -- by any subsequent purchaser or by the

14   reorganized Delphi.

15         THE COURT:  Right.

16         MR. KENNEDY:  And we consider that to be reasonable

17   and appropriate to the estate to clarify that these contracts,

18   especially for the non-UAW unions, would be ultimately carried

19   forward, and that is a role that in fact we played.

20         THE COURT:  No, I understand you guys did that.  I'm

21   just -- I didn't see how it related -- it was in the category

22   of the management bonuses, for example.

23         MR. KENNEDY:  Well, it should have more properly been

24   probably allocated to objections to the plan, then, Your Honor.

25         THE COURT:  Okay.  All right.  Okay, so now you could

88

1    get to the waiver.

2         MR. KENNEDY:  Thank you.

3         THE COURT:  Okay.

4         MR. KENNEDY:  The -- there's two waiver arguments; the

5    first is that the MOU, which is the 9106 docket number, that

6    the IUE-CWA entered into constitutes a release of the

7    opportunity for a substantial contribution motion, because the

8    MOU states at section 8.3, quote, "IUE-CWA waives and releases

9    any and all claims arising directly or indirectly from or in

10   any way related to any obligations under the collective

11   bargaining agreements."

12        We think it's absolutely clear that this motion is not

13   arising under the collective bargaining agreements.  It's not

14   even related to the collective bargaining agreements.  It's

15   arising under the Bankruptcy Code and the rules of the

16   bankruptcy court.

17        And, again, we would note that because there's a

18   reference to the IUE-CWA having made a substantial contribution

19   to the successful reorganization of the estate in the same

20   document that they're claiming constitutes a waiver, we simply

21   don't think there's any basis for that contention at all.

22        They also argue that the -- granting a substantial

23   contribution motion would in effect modify the collective

24   bargaining agreements, and again we think that's specious.  The

25   collective bargaining agreements are in place with the new

89

1    Delphi.  DPH Holdings does not have a collective bargaining

2    contract with the IUE-CWA or any other union, to my knowledge.

3    Modifi -- granting the substantial contribution would not work

4    a modification or effect in any way the existing collective

5    bargaining agreements.

6         The third point of waiver they argue is that the --

7    and this is the last point I make, Your Honor.  They argue that

8    the agreement under which Chanin was retained constitutes a

9    limit on a substantial contribution motion, because the

10   retention order provides, quote, "Any advisor fees paid by the

11   Debtor shall be applied against and considered part of any

12   distribution in respect to any resolution of any claims the

13   unions may have against the Debtors in these Chapter 11 cases,

14   whether by settlement agreement or judgment of this Court."

15        And that, Your Honor, because that order doesn't

16   preclude IUE-CWA from seeking reimbursement for the claims --

17   or I should say, for the fees paid to Chanin, even though they

18   were paid by the debtor, we view that as a zero-sum game.  We

19   are not seeking recovery of the fees that were already paid to

20   Chanin; it wouldn't be particularly sensible to do that.  I

21   doubt that Your Honor would grant it; it would hardly be fair.

22   But that is what that language refers to.  There's no waiver of

23   our right to obtain professional fees other than those that

24   were paid to Chanin as a result of that order.

25        The next point raised by the debtors is that the EPCA

90

1    and modified EPCA were not approved, and Your Honor's already

2    touched on that in our exchange.  And in our view, that doesn't

3    limit the ability of the IUE-CWA to obtain reimbursement of its

4    fees in connection with its opposition to those agreements.

5    The IUE played a leading role in doing that.  The process of

6    obtaining fairer EPCAs and modified EPCAs were important for

7    the estate, important for allowing Delphi to continue to

8    operate and ultimately to reorganize.

9         The -- Delphi also objected, somewhat randomly we

10   think, to 864,000 dollars of the compensation that IUE-CWA

11   sought.  And we took a look at those, Your Honor.  There are

12   367 time entries which the debtor asserted were non-

13   compensable.  Eighty percent of those were for either discovery

14   and document review or for attendance at a preparation for a

15   hearing.  If an entity has made a substantial contribution and

16   it's seeking recovery of its legal fees, the notion that you

17   could prevent recovery for discovery or document review or

18   preparing and attending a hearing, on its face, is silly.

19        The -- in many of the motions that we made, Your

20   Honor, we would be presented with hundreds of thousands of

21   pages of documents.  Actually, I think Skadden was pretty

22   cooperative in many instances and not simply opening the

23   floodgates.  But even on a reasonable estimation of what could

24   be responsive to the discovery demands we made, we had to work

25   twenty-four hour days, and quite a few of them, in order to

91

1    prepare ourselves for these hearings.  The hearings were

2    important, they resulted in significant advantages to the

3    estate, and it was a necessary element of those that we go

4    through that discovery document review and that we attend the

5    hearings and of course prepare for the hearings.

6          We underwent a cross-examination of their expert

7    witness in connection with the reduction of the bonus.  I don't

8    know if Your Honor recalls it, but there was a presentation by

9    an expert witness that reviewed how he had come up with their

10   management plans.  And we were able to use, I think

11   effectively, the e-mails that had been sent.  Out of thousands,

12   we selected some twenty or thirty, and we think they were very

13   effective in securing a better resolution for the estate.  We

14   could not have done that without a significant amount of time

15   on discovery and document review.  And certainly attending the

16   hearing and preparing for it were critical elements of

17   achieving that.

18         So we don't think they have made significant

19   objections.  As I said, eighty percent of them are either in

20   connection with discovery or attendance at a hearing.

21         The cases they cite, in our -- that they relied upon,

22   in our view, are distinguishable.  I just want to note that In

23   re Granite, in particular, is distinguishable from the IUE-CWA

24   application.  There the Court held that a party was seeking

25   recovery for losing an automatic stay litigation.  And the

92

1    Court described it as, quote, "like maiming a person, losing

2    the ensuing lawsuit, and then demanding kudos for clarifying

3    the law of battery", which is an amusing way to put it, but it

4    indicates that the level of support for the substantial

5    contribution application in that case was well below what the

6    IUE-CWA has been able to demonstrate.  We're simply not in that

7    position.

8         We did add substantial value with respect to each

9    matter for which we're seeking recovery.  Our position was

10   either upheld by the Court or a settlement was achieved that,

11   in our view, advantaged the estate.

12        I think there's also an issue raised by the debtor

13   about whether the IUE-CWA was acting solely in its own

14   interest.  I think we present an excellent example of a

15   litigant that, yes, had an interest; I'm not suggesting we

16   didn't.  But we pressed hard, and I think effectively, for

17   settlements that went well beyond what the IUE-CWA certainly

18   institutionally had as its interest.  We attempted to reach a

19   fair result so that the debtor could reorganize,

20   notwithstanding the burden it imposed upon our members.

21        The IUE-CWA, as an institution, as a union, got

22   virtually got nothing out of the long process of spending all

23   these professional fees and being involved in each one of these

24   confrontations.  We look to --

25        THE COURT:  I don't understand that.

93

1           MR. KENNEDY:  Well, I'll give you an example.  The New

2      Brunswick plant, we negotiated a closure and a -- in a

3      situation where there was a contractual obligation, in our

4      view, to keep the plant open, we negotiated a closure, a

5      severance benefit for the employees, on termination.  The

6      union, and this is not the way the union thinks but it's

7      appropriate, I think, to mention it here, was -- had a stream

8      of dues income from that plant for about 400 people that would

9      have continued, according to the contract, through 2011.

10     There's been no compensation to the union for the loss of that

11     dues income.  That dues income has been lost for approximately

12     6,000 active employees that were employed in 2005 when this

13     case was filed.  That is an enormous amount of money.  The

14     union neither sought nor regarded as appropriate a claim on its

15     part that it should recover for lost dues income.  I can tell

16     you, however, that the IUE-CWA, in working on behalf of the

17     employees and the communities they represent, and even

18     frequently on behalf of the other unions, was doing this for

19     more than just itself.

20          My point is that the union's role here was not simply

21     as though it were --

22          THE COURT:  But isn't that all bound up in being a

23     union?  I mean, --

24          MR. KENNEDY:  Yes.

25          THE COURT:  -- one of the things the union can tell

94

1    people is, yeah, we're not -- you join the union not just to

2    pay us dues but because we'll look after you?

3            MR. KENNEDY:  Exactly, and that's why we have never

4    articulated that before.  But I think the one --

5            THE COURT:  Okay.

6            MR. KENNEDY:  -- narrow corner where it makes sense to

7    make the point is, can the union be said to be acting solely as

8    a commercial creditor as though we were a trade entity that had

9    a contract with them and they owed us for some widgets?  That's

10   not the point.  We were acting in a broader larger scope,

11   ignoring our individual interests, because that is what the

12   union's supposed to do, and that is what we've done,

13   effectively, in this case.

14           THE COURT:  Well, are you saying, then, that a trade

15   creditor that offers generous trade terms or is willing to

16   waive a prepetition claim to give a debtor a break because it

17   wants to have a continued customer is entitled to 503 also?

18   That is, that --

19           MR. KENNEDY:  No.

20           THE COURT:  -- you know, the --

21           MR. KENNEDY:  No, I'm not.  I'm simply responding to a

22   very narrow point --

23           THE COURT:  Okay.

24           MR. KENNEDY:  -- of whether the IUE-CWA was acting

25   solely in its own interest in --

95

1          THE COURT:  Okay.

2          MR. KENNEDY:  -- taking the positions that it did in

3     this case, and our answer is no, it was more broadly focused

4     than that across the interests of our members but also the

5     interests of the estate as a whole and the communities in which

6     they reside.

7          THE COURT:  Okay.

8          MR. KENNEDY:  So for those reasons, Your Honor, we

9     request that the compensation and expenses we've sought be

10    granted.

11         THE COURT:  Okay.

12         MR. MEISLER:  Thank you, Your Honor.  First and

13    foremost, I'd like to say that Delphi does appreciate the

14    efforts of the IUE and all the represented hourly employees.

15    This was a difficult Chapter 11, there were a lot of sacrifices

16    by many parties, and we appreciate the efforts that were made

17    by the IUE and the other hourly represented employees, as well

18    as all the employees of Delphi.

19         But, Your Honor, I think the IUE is uniquely situated

20    with respect to, in particular, the drafting of the MOU.  If

21    you take a look at section (g)(5), Mr. Kennedy was singularly

22    focused on only the first prong of the language, which cites

23    substantial contribution, which, interestingly enough, is

24    language that was inserted into the MOU by General Motors.

25         But if you take a look at the third prong of the

96

1    language in (h)(5), it says, IUE-CWA would not have made this

2    contribution without obtaining the terms and releases provided

3    for herein.  And so, Your Honor, there was a quid pro quo,

4    here, and while it is true, there was a benefit obtained in

5    connection with the modifications to the collective bargaining

6    agreement, they also got benefits.  And those benefits are

7    contained within the MOU.

8         THE COURT:  Well, it's also a tie-in to the Metromedia

9    case.  I mean, the whole point of that language was so that

10   there would be a basis for an injunction of protecting third

11   parties.  That language is right out of the Second Circuit's

12   Metromedia case, which is why GM wanted it and the other third

13   parties wanted it.  It's -- you get the plan injunction when

14   you make a substantial contribution to the case, and therefore,

15   that justifies the issuance by the Court of an injunction.  It

16   protects you from third-party claims.

17        MR. MEISLER:  That's correct.  Thank you, Your Honor.

18        Your Honor, I'd also like to point to (h)(3), and

19   that's with respect to the waiver language.

20        THE COURT:  Which by the way, why GM wanted this to be

21   under a plan as opposed to a sale, unlike the GM case itself,

22   because they wanted the injunction.  I'm sorry, go ahead.

23        MR. MEISLER:  Thank you, Your Honor.  With respect to

24   the waiver language, Your Honor, we do think that it's broad

25   enough.  Mr. Kennedy would like to assert that it doesn't

97

1    explicitly state that they waived a claim under 503.  But Your

2    Honor, all these claims relate to the MOU.  We wouldn't have

3    been in the negotiating room but for the CBA.

4          THE COURT:  Well, the claims on the bonuses don't

5    relate to the MOU.

6          MR. MEISLER:  Your Honor, to some degree, I agree with

7    that.  Where I disagree with that is that the reason why -- the

8    policy reason why Mr. Kennedy was objecting to management

9    compensation is that there was the tension between management

10   and the hourly represented employees.

11         THE COURT:  You want to really read "related to" very

12   broadly to cover anything that's --

13         MR. MEISLER:  I do, Your Honor.

14         THE COURT:  All right.

15         MR. MEISLER:  Your Honor --

16         THE COURT:  It's not really -- I mean -- well, okay,

17   go ahead.

18         MR. MEISLER:  Your Honor, with respect to the IUE's

19   objections to management comp, Your Honor, you're of course

20   very familiar with the case law in your recent value opinion,

21   and I just want to emphasize or reiterate with respect to the

22   emergence cash, while yes, there was a contribution made, and

23   Mr. Kennedy did prevail in that litigation, ultimately, when

24   viewing in hindsight the result, the modified plan had no

25   emergence cash component and wouldn't have had an emergence

98

1    cash component regardless of the litigation that was commenced

2    by Mr. Kennedy because DPH doesn't have an employee.  It has a

3    consultant, but it doesn't have -- and that consultant has,

4    which is Mr. John Brooks, that consultant has a management --

5    or, a consulting contract.  But the management comp program

6    just wouldn't come into play.

7        Your Honor, with respect to KESIP, KESIP was heavily

8    negotiated between Delphi and the UCC.  Your Honor, we don't

9    see that the IUE provided a substantial contribution in

10   connection with KESIP.  We do think that what was at play, as I

11   mentioned, was the tension between the hourly looking at the

12   1113 motion that was filed, in particular, and management comp

13   programs that were being requested or sought, and of course,

14   there was that tension between management having an incentive

15   plan and hourly being asked to make certain concession.  And so

16   we believe the objections were self-interested.  Reducing KESIP

17   was an issue of self-interest, and therefore, under the case

18   law, his substantial contribution application, even for the

19   KESIP objections, shouldn't be permitted because of

20   duplications, as mentioned, and because of self-interest.

21       THE COURT:  What about Mr. Kennedy's point that even

22   though the emergence bonus went by the boards, that the

23   substantial reduction of it before it went by the boards

24   generated some amount of good will or peace in the -- within

25   the business, and therefore, was a demonstrable benefit?

99

1          MR. MEISLER:  Your Honor, unfortunately, I would

2    dispute that.  I think that there was actually considerable

3    adverse impact to morale on account of that ruling, and, Your

4    Honor, I think --

5          THE COURT:  Among the management people?

6          MR. MEISLER:  Among management and among salaried.

7          THE COURT:  Among salaried, too?

8          MR. MEISLER:  Correct, Your Honor.  That the emergence

9    cash was --

10         THE COURT:  Oh, I'm sorry, yes, of course, it would be

11   among --

12         MR. MEISLER:  -- fairly broad.

13         THE COURT:  Right.

14         MR. MEISLER:  At the same time, Your Honor, I think

15   that the ultimate plan was so vastly different that what Mr.

16   Kennedy objected to in connection with the plan management comp

17   program just didn't come into play.  And the economics of the

18   business were so vastly different in 2009 than they were in

19   late 2007 and early 2008 that it just didn't, in hindsight,

20   provide a contribution to where we ended up at emergence.

21         THE COURT:  Okay.

22         MR. MEISLER:  Your Honor, finally, with respect to the

23   offset, we think the language of the order -- it's the UAW and

24   IUE-CWA financial advisor payment order -- is clear.  And

25   that's paragraph 4, decretal paragraph 4 of the order.  We have

1    it at tab 2 of our exhibit binder.  And what that order says is

2    that the payments made to the financial advisors of the IUE-CWA

3    can be used as an offset to any claims that they have.  And

4    what they're doing here is they're asserting that they have

5    substantial contribution claims.

6            THE COURT:  But isn't it -- but don't they offset the

7    claim that they have for the financial advisors?

8            MR. MEISLER:  Your Honor, that's not the way that I

9    read it because the way that I read it is --

10           THE COURT:  But then they would have the claim for the

11   financial advisors.

12           MR. MEISLER:  Your Honor, I may be misreading it, but

13   the way that I read this order was we were authorized to pay

14   the financial advisors.

15           THE COURT:  Right.

16           MR. MEISLER:  But that any subsequent claim that the

17   IUE may have, we would be able to apply the four million dollar

18   payment against future distributions on account of those

19   subsequent claims.  And if I can read the language, "Any

20   advisor fees paid by the debtors shall be applied against and

21   considered part of any distribution in respect of any

22   resolution of any claims the unions may have against the

23   debtors of these Chapter 11 cases."

24           THE COURT:  But wasn't that dealt with in the

25   subsequent MOU when you fixed the claims?  I mean, unless

1    you're saying -- I mean, to me, this ties into your waiver

2    argument.  Unless you're saying that the MOU wasn't the last

3    word on the claims, then doesn't it trump this earlier order

4    because it fixes the claims?

5         MR. MEISLER:  Your Honor, yes, if I wasn't clear, this

6    is in the alternative, Your Honor.  If you don't see our

7    argument with respect to waiver, and you think that they do get

8    to assert a distinct on account --

9         THE COURT:  But, I mean, I under -- but it seems to me

10   it doesn't work both ways, that the MOU fixes what the claims

11   are, and that this amount that you paid in respect of the

12   advisors is part of that claim.  There's no additional --

13   there's no section of the MOU that says, oh, and by the way, if

14   we have any other claims, you can offset the amount that you've

15   paid for the advisors against that.  It just says these are the

16   claims, and this is how it will be dealt with.

17        MR. MEISLER:  Your Honor, I agree with that.  I agree

18   with that wholeheartedly.  I think, though --

19        THE COURT:  No, but what I'm saying is, that it -- to

20   my mind, it doesn't necessarily say that these are our 503(b)

21   claims, too.  But I think it does say that these are our

22   claims, and so if there's any crediting, it's already credited.

23        MR. MEISLER:  Against the claims they got in the MOU?

24        THE COURT:  Right, right.  I mean, I'm assuming that

25   they would have negotiated more -- if they felt that there was

1    this credit issue out there, they would have negotiated to get

2    that money and to have you say there's no offset.

3         MR. MEISLER:  Right.

4         THE COURT:  To me, it comes down to the language, is

5    whether this waiver is really specific enough to cover this

6    type of application.

7         MR. MEISLER:  Understood, Your Honor.

8         THE COURT:  And it seems to me, and maybe you can

9    address this, Mr. Kennedy, that it probably does on the 1113

10   and 1114 stuff, but may not on the other stuff.  Although maybe

11   it does because the "related to" is very broad, and your

12   argument is that the litigation over the KESIP and the

13   emergence bonus was all tied to balancing out the -- it was all

14   tied to the 1113 negotiations because of the shared sacrifice

15   aspect of 1113.

16        MR. MEISLER:  That's correct, Your Honor, and that

17   shared sacrifice language was language that was part of the

18   collective bargaining agreement and MOU.

19        Your Honor, Mr. Kennedy also -- and I know you pointed

20   it out, but Mr. Kennedy had mentioned that the IUE got

21   virtually nothing out of the case, and I just want to mention

22   and rattle off the fact that they got a top off of their

23   pensions, that they secured jobs with General Motors, that they

24   got an attrition plan, they got a VEBA.

25        THE COURT:  I'm assuming that the members of the

103

1    splinter unions would argue that --

2            MR. MEISLER:  Take significant issue with --

3            THE COURT:  -- they got a lot worse than the IEU

4    (sic).

5            MR. MEISLER:  That's correct, Your Honor.

6            THE COURT:  IUE, I mean.

7            MR. MEISLER:  Your Honor, my final point is with

8    respect to -- with respect to the Granite Partners case and

9    those services that, according to Judge Bernstein, can't

10   qualify as substantial contribution.  Your Honor, we simply

11   took the standards that Judge Bernstein set forth, and he said,

12   at page 453 of that opinion, that case administration

13   monitoring are not compensable services.  Attending hearings,

14   conducting discovery, reviewing papers and communicating with

15   clients --

16           THE COURT:  Well, it depe -- I mean, it depends on the

17   hearing.  If you're just monitoring, that's right.  If you're

18   actually doing the work that's the covered work, then obviously

19   it would be covered, right?

20           MR. MEISLER:  Correct, Your Honor.  Understood, Your

21   Honor.

22           Your Honor, you know, I had one last point, and that

23   is, to be clear with respect to the objections filed by the

24   IUE, in particular with respect to the EPCA and the plan, 1113,

25   and KESIP, they were one of many objectors.  And so, Your

104

1    Honor, we would argue that on all fronts, they would not

2    satisfy the prong which is that their work was not duplicative

3    of any other party.  On that note, Your Honor, I have nothing

4    further.

5            THE COURT:  Okay.

6            MR. KENNEDY:  Just a couple of points, Your Honor.  We

7    don't believe it would be appropriate to use the language of

8    the Chanin retention order as an offset against any of the

9    elements of the compensation that IUE-CWA is seeking this

10   morning.  If the Court were to conclude that that language

11   applied to other elements of IUE activity, we would have

12   included a 4.5 million dollar request for reimbursement for the

13   fees that were paid to Chanin.  And the debtor would say it

14   says right here that any recovery you make is offset by what

15   Chanin was paid, and we'd be back down to where we are today,

16   which is a 1.2 million dollar claim.  It's a zero sum gain.

17           THE COURT:  Well, I think -- I understand.  But what

18   Mr. Meisler was saying was that they weren't acknowledged --

19   that, in fact, the order acknowledged that it wasn't really a

20   claim, that it was just an amount you were paying now, and it

21   would be offset against whatever you owed in the future.

22           MR. KENNEDY:  But we could have made the claim because

23   it was a continuing --

24           THE COURT:  I know, but he's --

25           MR. KENNEDY:  -- obligation the IUE-CWA assumed.

1          THE COURT:  But he's saying that the order basically

2    says it's not a claim; that it's a gift, and that there is no

3    right to pay Chanin -- to have Chanin paid.  I think that's

4    what you're saying.

5          MR. MEISLER:  Correct, Your Honor.  In addition, Your

6    Honor, Chanin is not -- the substantial contribution statutory

7    language would not cover Chanin because they're not an

8    accountant.

9          THE COURT:  Okay.  But --

10          MR. KENNEDY:  But they were professional fees that we

11    obtained, and in fact, we did use them as an accountant, Your

12    Honor, and that was much of what they --

13          THE COURT:  All right.

14          MR. KENNEDY:  -- provided to us.  At the time of the

15    negotiation of the MOU, we believed the language that you

16    identified a moment ago as having been inserted by General

17    Motors was reached between IUE-CWA and Delphi and GM as part of

18    that MOU as an express acknowledgement that the IUE had made a

19    substantial contribution and would be making a motion for that

20    amount.  It was reached years after -- or, a year after the

21    Chanin order was entered.  At no point in those negotiations

22    did Delphi take the position that there could be no, or at

23    least any --

24          THE COURT:  It would be barred.

25          MR. KENNEDY:  -- it would be barred or any substantial

1   contribution motion would be subject to the amount paid to

2   Chanin.

3         THE COURT:  All right.

4         MR. KENNEDY:  The Chanin amounts were something that

5   we requested, that the company assumed --

6         THE COURT:  I think you win on this one.

7         MR. KENNEDY:  Fine.

8         THE COURT:  You don't need to --

9         MR. KENNEDY:  Okay.  With respect to the EPCA and the

10  modified EPCA, DPH took the position that it was all part of

11  the 1113/1114 tension, resolving the tension between employees

12  and their managers.  Let's just take a look at the timing.  The

13  MOU, which settled the collective bargaining issues, was

14  approved by this Court in August of 2007.  The EPCA and the

15  modified EPCA were subsequent to that.  You cannot argue that

16  the activities the IUE engaged in in connection with the EPCA

17  and the modified EPCA were an outgrowth or part of the 1113/14

18  proceeding.  They are separate.  And in fact, the company took

19  the position, and I think correctly, that labor transformation

20  was a critical part of the case, and they could not even

21  propose a modified, or I should say, the ultimate EPCA -- first

22  EPCA, then the second EPCA, until they'd already gotten in

23  place agreements with their unions.  So we'd already gone

24  through the hotly contested litigation over the 1113/1114,

25  negotiated a satisfactory solution to the estate -- that was

107

1    all done -- and then we went into the EPCA process in which the

2    IUE-CWA continued to make the objections it thought were

3    necessary for the estate.

4            THE COURT:  But those objections, again, were what?

5    Again, how did the estate benefit from those objections?

6            MR. KENNEDY:  Well, first, they were part of -- the

7    management compensation plan was part of the EPCA objections,

8    number one, of course.

9            THE COURT:  But that's a separate --

10           MR. KENNEDY:  It is separate.

11           THE COURT:  I mean, you separately accounted for that.

12   I'm just focusing now on other than that.  I'm sorry.

13           MR. KENNEDY:  Well, other than that, we made the

14   limited objections necessary for us to explore the EPCA, to get

15   discovery on the EPCA, to make sure that it continued that the

16   MOU would continue --

17           THE COURT:  Right.

18           MR. KENNEDY:  -- with the new employers.  I think,

19   frankly, it's a pretty small part of the compensation we're

20   seeking.

21           THE COURT:  Okay.

22           MR. KENNEDY:  The last exchange between Court and

23   counsel calls on me to comment that I think the Court has

24   observed that we did not monitor.  I've not been in this court

25   and my partner, Ms. Jennik, has not been in the court just

1    randomly attending hearings.  We were here when there were

2    matters of critical labor importance.  I assure you, the IUE-

3    CWA is not prepared to pay us to hang out on financing issues

4    and so forth that are simply not central to our purpose.  Every

5    time we attended in this court, it was because there was a

6    matter pending that was critical to the labor transformation

7    issues in the case, and that is the only thing for which we

8    seek compensation.

9           The compensation plans were a piece of that, but we

10   believe it was really a trilogy of events, all of which should

11   be compensated, which is to say the 1113/1114 motions, there

12   was no effective way with respect to any of that.  The IUE

13   played a leading role on that, and the U.S. trustee has

14   acknowledged that.  The management compensation and the EPCA

15   plans, the role of the unions -- and the IUE-CWA was the

16   leading union in doing this -- in objecting to these plans,

17   kept the estate honest in terms of management compensation and

18   gave a real benefit to this estate.  A real benefit to this

19   estate.  Without that, we would have continued to have up --

20   unlost (ph.) and it would have been very difficult for this

21   employer to continue, especially given the sacrifices they were

22   making.  They were asking of our employees that were staged in,

23   you'll remember, Your Honor, that over time, from August of '07

24   through the rest of '07, through '08, there were staged in

25   reductions and compensation and benefits, and for that to have

109

1   been happening while at the same time there was no effort that

2   management was similarly experiencing some level of

3   contribution to the pay-in would have made it very difficult

4   for the estate to continue.

5         So our view, Your Honor, is that we've adequately

6   supported the claims and that they should each be granted.

7         THE COURT:  Okay.

8         MR. MEISLER:  Your Honor, as a final point on the EPCA

9   and amended EPCA in particular, we would just mention two

10  things.  One is that we don't believe that the objections to

11  the EPCA and amended EPCA, on account of any parties, provided

12  a substantial contribution, because ultimately, those

13  agreements became irrelevant in hindsight.  And the other thing

14  I'd like to mention, and it's illustrated fairly clearly in

15  Exhibit 3 to our binder, is that the objections made by the

16  various parties were duplicative.  You can see that it goes

17  through on various grounds, and many of the stakeholders in our

18  cases objected on the same grounds.  Thank you, Your Honor.

19        THE COURT:  Okay.

20        All right, I have before me a motion by the IUE-CWA

21  under Sections 503(b)(3)(d) and (b)(4) of the Bankruptcy Code

22  for the allowance and payment of $1,238,304.85 in connection

23  with work done by its counsel in this Chapter 11 case on the

24  basis that the IUE and its counsel made a substantial

25  contribution in the case insofar as that work was done.

110

1       The debtors, now named DPH Holdings, have objected to

2  the application.  The U.S. trustee has submitted a statement in

3  support of the application.  The application, as I noted, is

4  governed by Section 503(b)(3)(d) and (b)(4) of the Bankruptcy

5  Code.  As I recently described in In re:  Bayou Group, LLC,

6  2010 W.L. 1416776, (Bankr. SDNY, April 5, 2010) the Court's

7  analysis of such a motion is a two step analysis.  First, the

8  Court is to determine whether, in fact, the creditor, through

9  its counsel, made a substantial contribution in the case, and

10  then secondly, as set forth in 503(b)(4), whether the

11  compensation requested by such counsel is reasonable based on

12  the time, the nature, the extent, and the value of such

13  services and the cost of comparable services, other than a case

14  under this title, as well as reimbursement of actual necessary

15  expenses incurred by such attorney.

16       The issue of whether a party has made a substantial

17  contribution in a case is one that has been frequently

18  addressed and written on by bankruptcy courts and appellate

19  courts, and certain basic principles are clear.  First, the

20  applicant has the burden of proof by a preponderance of the

21  evidence on both prongs of the analysis.  In re:  United States

22  Lines, Inc., 103 B.R. 427, 430 (Bankr. S.D.N.Y. 1989).

23       Secondly, in keeping with the general rule that

24  priorities must be narrowly construed -- and of course, this is

25  a claim that would be entitled to a hundred cents on the dollar

111

1    payment -- in light of the presumption in bankruptcy cases that

2    the debtor's limited resources will be equally distributed

3    among all unsecured creditors.  That also is set forth in the

4    U.S. Lines case, but the larger principle on a narrow

5    construction of claims for administrative expense is set forth

6    in Howard Delivery Service v. Zurich American Insurance

7    Company, 547 U.S. 651, 667 (2006) and by the Second Circuit in

8    In re:  Bethlehem Steel Corp., 479 F.3d 167, 172, (2d Cir.

9    2007).  See also In re:  Dana Corp., 390 B.R. 100, 108, (Bankr.

10   S.D.N.Y. 2008) and In re:  Granite Partners, L.P., 213 B.R.

11   440, 445, (Bankr. S.D.N.Y. 1997) in which Judge Bernstein said,

12   "Substantial contribution provisions must be narrowly construed

13   to, among other things, discourage mushrooming expenses and do

14   not change the basic rule that the attorney must look to his

15   own client for payment."

16        In addition to that basic rule, it also should be

17   noted that the Code establishes other claims and priorities for

18   such expenses, for example, of the -- as part of the unsecured

19   claim in cases where a creditor secured the secured claim of a

20   creditor.  See 11 U.S.C. Section 506(b) which covers a secured

21   creditor's right to legal fees and expenses from the debtor as

22   well as Travelers Casualty and Surety Company of America v.

23   PG&E, 549 U.S. 443, 453 (2007) and Ogle v. Fidelity & Deposit

24   Company, 586 F.3d 143, 149 (2d Cir. 2009), in which the Second

25   Circuit allowed a general unsecured claim for post-petition

1    attorneys' fees provided for in a prepetition contract.  Of

2    course, as a general unsecured claim, that claim, unlike a

3    claim under 503(b)(3) and (b)(4), would be paid in only "tiny"

4    bankruptcy dollars.

5          The courts have also been clear that mere active

6    participation in a Chapter 11 case does not give rise to a

7    right to be compensated under 503(b)(3) and (b)(4).  Rather,

8    the creditor must show that such participation resulted in a

9    demonstrable, or demonstrated, direct benefit to the estate,

10   the creditors, and in applicable instances, to stockholders.

11   In re:  McLean Industries, Inc., 88 B.R. 36, 38-39 (Bankr.

12   S.D.N.Y., 1988) and In re:  Alert Holdings, Inc., 157 B.R. 753,

13   757 (Bankr. S.D.N.Y., 1993) in which the Court stated that

14   extraordinary action must lead to direct, tangible benefits to

15   creditors for Section 503(b)(3)(D) claims to be allowed.  This

16   requirement for a direct benefit is stated in various ways in

17   the cases.  But what comes through clearly is that the benefit

18   to the estate must not only be a net benefit and material and

19   concrete, but also needs to be a benefit demonstrably for the

20   estate as a whole, as opposed to something that goes to the

21   creditor and, indirectly, those in the creditor's class.  See

22   In re:  Granite Partners, 213 B.R. at 446-47 where Judge

23   Bernstein extensively discusses those situations where such

24   requests had been granted and contrasts them with situations

25   where they have not been granted.

113

1          The motive of the creditor has unfortunately crept

2     into some of the cases in their analysis of whether the benefit

3     conferred was direct or indirect.  Some courts have taken the

4     view that acting in one's self interest bars a creditor from

5     making a substantial contribution claim.  Other courts, I

6     think, have properly recognized that mere motive should not be

7     determinative of the outcome.  However, that still leaves the

8     question of whether the benefit was, in fact, direct or rather

9     a mere consequence for others in the same class as the

10    claimant.  Se In re:  Pow Wow River Campground, Inc., 296 B.R.

11    81, 86 (Bankr. D. N.H., 2003) and In re:  DP Partners, Limited

12    Partnership, 106 F.3d 667, 673 (5th Cir., 1997), cert. denied

13    522 U.S. 815 (1997).

14         What the discussion about motive does highlight,

15    however, is the heavy burden that a creditor faces in showing

16    that it, in fact, made a direct contribution, as opposed to an

17    indirect benefit flowing from actions it's taken to further its

18    own interests in the case.  See In re:  Dana Corporation, 390

19    B.R. 100, 108 as well, again, as In re:  Granite Partners,

20    L.P., 213 at 445.

21         As I noted in the Bayou case, a corollary of the

22    requirement for direct contribution, which is also related to

23    the fact that claims for substantial contribution will not be

24    allowed where the work duplicated the work of others who are

25    already being compensated by the estate, including the debtors'

114

1   counsel and counsel for official committees, is that the

2   statute by its own terms, as well as the logic behind it,

3   focused the Court on the process of the case, the Chapter 11

4   case as a whole in which certain entities are charged with

5   fiduciary duties to act on behalf of not only themselves but

6   the whole group that they represent, the debtor, and the

7   creditors' committee, and, in this case, the equity committee,

8   and secondly, the fact that those entities are paid by the

9   estate in recognition to those duties and responsibilities.

10   Therefore, it's normally their job and their professionals' job

11   to ensure that the Chapter 11 case proceeds properly and

12   efficiently.

13         Third parties, such as the IUE, here, are generally,

14   in that context, representing themselves, although of course,

15   they interact with the debtor and indirectly may be benefiting

16   other parties by interacting with the debtor and the other

17   fiduciaries in the case.  And therefore, I think it is proper

18   that compensation of those types of third parties who do not

19   have such duties is reserved under Section 503(b)(3)(D) and

20   (b)(4) for "those rare and extraordinary circumstances where

21   the creditor's involvement truly enhances the administration of

22   the estate".  In re:  Dana Corp. 390 B.R. at 180.  And as Judge

23   Schwartzberg said in In re: Texaco, Inc., in addition to

24   showing an actual and demonstrable benefit to the estate,

25   compensation for fees incurred must substantially contribute to

115

1    the administration of the debtor's estates.  That's at 90 B.R.

2    622, 630 (Bankr. S.D.N.Y., 1988).

3         It's in that light that I had examined whether, in

4    fact, the IUE-CWA and its counsel made a substantial

5    contribution in the case.  The application contends that they

6    did so in three ways.  First, that as the party sitting across

7    the table from the debtors in connection with the debtors'

8    motions to reject the collective bargaining agreement under

9    Section 1113 and modify retiree benefits under Section 1114 of

10   the Bankruptcy Code, they facilitated an ultimate negotiated

11   solution of the issues that prompted the debtors' motion to

12   reject that resulted in an agreed upon MOU which ultimately

13   formed the basis for the buyers of the debtors' assets that

14   employ these union workers' collective bargaining agreement

15   with the IUE-CWA.

16        Second, they contend that the union and its counsel

17   was active in objecting to the so-called EPCA in its two

18   versions, pursuant to which certain proposed investors in the

19   debtor were to make an investment in the debtor, and in

20   essence, be sponsors of the debtors' reorganization.  Other

21   than objecting to aspects of the EPCA that dealt with

22   management compensation and bonuses, it appears that the work

23   done in this category related primarily to ensuring that the

24   terms of the previously-agreed upon MOU would continue as part

25   of the investment and the reorganization.

 1          Finally, the application asserts that the union was

 2     active and should be compensated for objecting to the debtors'

 3     motions for approval of the so-called KESIP, or key employee

 4     compensation plan, during the course of the case, as well as

 5     the debtors' proposal to have the Court approve substantial

 6     exit bonuses for management upon the -- that would become

 7     effective upon the emergence of the debtors from Chapter 11.

 8     With regard to the KESIP litigation, the Court approved, and

 9     periodically approved updates of a KESIP program that provided

10     for ongoing performance bonus targets for management on a

11     fairly widespread basis, as well as salaried workers.  The

12     Court largely overruled the union's objections to those

13     motions, although it is also the case that the original motion

14     was modified in light of, among other things, comments by the

15     Court at the hearing to address concerns that had been raised

16     at the hearing about the nature of the bonus program and that

17     those modifications and the spirit behind them reflected the

18     periodic extensions of that program and the development of the

19     targets for those extensions.

20          With regard to the exit bonus program, the union

21     largely prevailed in its objection, and the Court determined to

22     reduce the proposed bonuses from roughly eighty-two and a half

23     million dollars to approximately sixteen and a half million

24     dollars.  However, that bonus program, as opposed to the

25     ongoing performance bonus program, that is, the exit bonus

117

1    program never went into effect because, given the cataclysmic

2    events in the auto industry that ultimately led to GM and

3    Chrysler's Chapter 11 cases and clearly evaporated billions of

4    dollars of value in Delphi, the plan that was ultimately

5    confirmed in this case was a liquidating plan that did not

6    contemplate continued senior management role, and therefore,

7    did not contemplate any exit bonus incentive program, but

8    rather, the retention by DPH of an employee to manage the claim

9    allowance and objection process and the wind-down and

10    distribution process.

11         The Court's view of the KESIP litigation is that that

12    litigation, to the extent it was successful, was a combined

13    effort of the official unsecured creditors' committee and the

14    union, as well as the United Auto Workers union.  I cannot

15    separate out a benefit conferred directly by the IUE-CWA in

16    connection with the modifications of the KESIP that were

17    implemented during the case from the efforts of the unsecured

18    creditors' committee.  I further note that the objections by

19    the IUE-CWA, as well as the UAW, to the KESIP program were, in

20    fact, very closely related to an overall approach by the union

21    in response to the relief proposed by Delphi in the 1113/1114

22    motion context where one of the factors the Court needs to

23    consider is the, colloquially, sharing of pain by all

24    constituents in the case, and particularly by managerial and

25    salaried employees.  It appears to me, therefore, that while

118

1   there may have been some benefit that accrued, even given the

2   participation of the official unsecured creditors' committee,

3   that that benefit, to the extent it existed and can be

4   attributable to the IUE-CWA separately, was indirect and only a

5   consequence of the IUE-CWA acting as it would have acted in any

6   event as a creditor and target of the 1113/1114 motion.

7        With regard to the emergence bonus portion of the

8   request, it appears to me that if, in fact, the plan, as

9   confirmed and consummated, had included in it a provision for

10  ongoing senior management that would be compensated and would

11  include some form of emergence bonus and compensation, that in

12  that context, the IUE-CWA would be entitled to a 503(b) expense

13  because it appears to me, based on my experience in the case,

14  that unlike with the KESIP litigation, it took on a greater

15  role in the bonus litigation over and above, clearly, the role

16  of the official committees, and in fact, carried the laboring

17  oar in that litigation.  Moreover, it was successful in that

18  litigation.  However, the 503(b)(3)(D) and (b)(4) analysis of

19  whether there was a substantial contribution is retroactive

20  looking, and I cannot ignore the fact, therefore, that not only

21  were no bonuses implemented, but also there was no need for any

22  bonuses because the facts had so materially changed by the time

23  that the plan went effective and, consequently, the work that

24  was done, although it was valid and excellent work, did not

25  confer a direct benefit on the estate since there were no

1      managerial employees to receive emergence bonuses and ongoing

2      compensation under the plan that actually went effective.

3            The union has argued that its defeat, in large

4      measure, of the emergence bonus motion conferred, nevertheless,

5      a benefit on the estate by enhancing goodwill among the

6      debtors' hourly employees and union workers.  However, I

7      believe that that type of benefit is too amorphous or

8      unspecified to qualify under Section 503.  I don't believe it

9      can be quantified in any way, and it's not clear to me,

10     therefore, that there was, in fact, a benefit and that the

11     union has carried its burden on that point.

12           With regard to the role that the union played, in

13     respect of the negotiation and preparation of the MOU.

14     Clearly, the union was well-represented and addressed the

15     complex issues raised by the debtors' motions in an effective

16     and responsible way.  However, again, I believe that the

17     benefit conferred on the estate was indirect, and that it was

18     merely as a consequence of the union doing its job as a union

19     in negotiation a responsible agreement, in light of all the

20     facts.  As the courts have repeatedly noted, the Chapter 11

21     process is one that, by its very nature, involves not only

22     litigation but negotiation among multiple parties, and that the

23     norm in Chapter 11 cases is the negotiation of multiple

24     disputes that lead to a Chapter 11 plan.  Given that fact, it's

25     consistent with counsel's right to be compensated by his or her

120

1    client in a Chapter 11 case, and where there's an appropriate

2    basis for the client to have an unsecured claim against the

3    debtor for such work, but such work does not rise to the level

4    of compensability in hundred cent dollars under Section

5    503(b)(3)(D) and (b)(4).  Otherwise, again, one would be going

6    beyond the purpose of the statute and the narrow basis in which

7    it should be read.  See In re:  Columbia Gas Systems, Inc., 224

8    B.R. 540, 549 (Bankr. D. Del.) and In re:  Alumni Hotel

9    Corporation, 203 B.R. 624, 632 (Bankr. E.D. Mich. 1996).  This

10   does not mean, of course, that as part of the 1113/1114

11   negotiations, a debtor may agree to compensate the union for

12   the fees and expenses of its professionals, and in fact, the

13   debtor did that with regard to its financial advisors.  I

14   believe that is the context of the cases involving unions cited

15   by the IUE here, In re:  Trans World Airlines, Inc., 1993 W.L.

16   559245 (D. Del. June 22, 1993) and In re:  Bethlehem Steel

17   Corporation, 2003 W.L. 21738964 at 12 (S.D.N.Y. July 28, 2003).

18   It is true that those agreements were objected to by other

19   parties in the case, and the Court's approved the amounts under

20   Section 503(b).  However, I can't ignore the context in those

21   cases, which was one where this was a negotiated result in the

22   context of a negotiated modification of the collective

23   bargaining agreement.  That is not the context here.  That, to

24   my mind, means that the work done in connection with the

25   1113/1114 motion does not rest at the level of a claim under

1   Section 503(b).

2        That leads to the alternative grounds that the debtors

3   have raised for objecting to the motion that is that under MOU,

4   and in more particular, Section H.3 of the MOU, the union

5   waives the right to make this application in the first place,

6   and that when the Court approved the MOU, the union was, in

7   essence, estopped from making this request.  I've reviewed the

8   applicable language of Section H.3, and while I understand the

9   debtors' argument with regard to its applicability to the work

10  done in connection with 1113 and 1114 matters, I don't believe

11  it applies to the work done in connection with the EPCAs and

12  management bonuses and compensation.  I say that in part

13  because it doesn't refer to an administrative expense, but

14  rather to all claims.  But more importantly, because the

15  release is not specific enough on this type of claim.  On the

16  other hand, as I've stated, the management compensation and

17  EPCA work would not be covered, in any event, under 503(b).

18       The debtors have also objected to the reasonableness

19  of the work done by counsel for the IUE-CWA.  I believe, based

20  on my review of the time records, as well as my experience with

21  this case, that the work done by Mr. Kennedy's firm was,

22  clearly, reasonable and would be compensable if it were work

23  that would be tied to a substantial contribution in the case.

24  Mr. Kennedy's done an excellent job with this case, and I have

25  appreciated his approach to the case and approach to practicing

122

1   law.  But unfortunately, it's an approach -- unfortunately for

2   him, it's an approach that's only compensable by his client.

3       The ruling on reasonableness does not go, however, to

4   what would be covered by the timesheets if, in fact, I were to

5   allow any portion of these claims.  In my review of the

6   timesheets, it appears to me that some of the time that's

7   included in the various categories really shouldn't be there

8   but really pertains to other matters for which the IUE is not

9   seeking compensation.  So I would excise that time, if I were

10  to grant any other request.  But because I'm not granting the

11  request, we don't need to go through that exercise.

12      So for those reasons, I'm going to deny the

13  application in full, and the debtors can submit an order

14  consistent with my ruling.

15      MR. MEISLER:  Thank you, Your Honor.

16      Your Honor, the next matter on the agenda, matter 10,

17  certain senior noteholders substantial contribution

18  application, that's the C.R. Intrinsic.  Yesterday, we

19  submitted a scheduling order, so they've been adjourned to June

20  30th.

21      THE COURT:  Great.

22      MR. MEISLER:  Your Honor, the last matter on today's

23  omnibus hearing agenda is the ad hoc trade committee's

24  substantial contribution application.  Your Honor, the same

25  exhibit binder that I introduced into evidence for the IUE

123

1     would apply for the ad hoc trade.

2          THE COURT:  Okay.

3          MR. MEISLER:  I do want to make one preliminary

4     comment before Mr. Rosner takes the podium, and that is that

5     Mr. Rosner is going to say on the record, and he makes the

6     statement in his pleading that was filed yesterday that there's

7     been a violation of our agreement not to object to his

8     application.  And what I want to point out is two-fold.  Number

9     one, we think that there is language in the December 6, 2007

10    transcript that says that if there is a material change to

11    distributions to unsecured creditors, then there is no such

12    agreement.  But at the same time, that language was not clear,

13    so we also included in the footnote -- that was footnote 2 to

14    our objection -- that we would only object to the claim, number

15    one, to the extent that this Court agrees that we have the

16    right to object, and number two, to the extent that there's

17    grounds on reasonableness to object to the claim.

18         Thank you, Your Honor, and on that note --

19         THE COURT:  That objection, though, was to the IUE,

20    right?  That footnote appears in the objection to the IUE?

21         MR. MEISLER:  Your Honor, that objection applied to

22    the IUE --

23         THE COURT:  Yeah.

24         MR. MEISLER:  -- it applied to Highland, and then

25    there was a footnote --

124

1          THE COURT:  Right.

2          MR. MEISLER:  -- that had some discussion --

3          THE COURT:  I remember the footnote now, yeah.

4          MR. MEISLER:  Terrific.  Thank you, Your Honor.

5          THE COURT:  Okay.

6          MR. MEISLER:  Your Honor, I cede the podium to Mr.

7    Rosner.

8          MR. ROSNER:  Thank you.

9          THE COURT:  Okay.

10          MR. ROSNER:  Good afternoon, Your Honor.  David Rosner

11    from -- yes -- all right, this, like I, wish I was taller.

12    I'll do it like that.

13          THE COURT:  Okay.

14          MR. ROSNER:  From Kasowitz, Benson, Torres & Friedman

15    on behalf of the trade committee.  I also remember that

16    footnotes.  It was a very long footnote, so it's memorable, for

17    sure.  Just to respond to that point, I don't think it's a

18    hugely important point for this afternoon, but I actually think

19    that that sentence probably was one that I wrote that said we

20    won't object, unless, of course, you materially change things

21    for unsecured creditors, as opposed to if you materially change

22    things for unsecured creditors, you can now object to me.  I

23    think that's what that probably meant, Your Honor.  It was

24    certainly something that I wrote, but, as I stated, I don't

25    think it's --

125

1          THE COURT:  In any event, we have the U.S. trustee's

2    objection.

3          MR. ROSNER:  In any event, we have the U.S. trustee's

4    objection.  That's correct.

5          THE COURT:  Right.

6          MR. ROSNER:  You know, I read Bayou, which came out

7    after our application was filed, and I heard you loud and clear

8    in court just over the last hour -- or, last half hour in

9    dealing with the union's objection.  So there's going to be a

10   few points that I'd like to raise.  I'd like to talk about some

11   issues with Your Honor.  I think -- and I probably don't need

12   this anymore -- give you our view from the trade committee's

13   perspective and where committees like that actually fit in the

14   Chapter 11 process and whether determinations like today, with

15   the union, are going to either assist or going to actually

16   squash their participation in Chapter 11, or are going to

17   actually materially affect the way people deal with how they

18   deal with estate fiduciaries.

19         I want to go to the hindsight issue.  It was an

20   issue -- I don't recall, I don't believe you specifically

21   addressed it in Bayou, but you mentioned it today, and it's

22   certainly an issue that's mentioned in Granite Partners.  And

23   it puts an applicant in a very difficult position of giving up

24   or settling with the debtor significant rights, only later to

25   have, let's call it, its half of the bargain, its deal

126

1    eliminated because of changes that are unforeseen or

2    unforeseeable by the party at that time.  And it's clear that

3    when the party -- nobody hires a lawyer for a zero sum gain.  I

4    want the lawyer to do something so that I can then get the

5    lawyer to get paid, and that's all I really want it to

6    accomplish in the matter.  The lawyer is hired, the

7    professionals are hired --

8             THE COURT:  I disagree with that.  Some lawyers do

9    that with committees.  Some lawyers create unofficial

10   committees so that they can get paid because the unofficial

11   committee, they settle for peanuts and then get paid.  I'm not

12   saying it's you.  Some lawyers do that.

13            MR. ROSNER:  I hope you're not saying -- I mean,

14   it's --

15            THE COURT:  It's not you, but some lawyers do that.

16            MR. ROSNER:  Okay, well, I'm --

17            THE COURT:  And that's one of the reasons that Judge

18   Lifland in the case I cited where clearly 503(b) is not

19   supposed to be used to buy off a pest, we've been thinking

20   about this.

21            MR. ROSNER:  Okay, then let me state my point a little

22   bit --

23            THE COURT:  And I'm not -- you guys were not a pest.

24   I'm just saying that we have to keep that in mind when we

25   interpret this statute because that, I'm afraid, is what has

127

1    been happening.

2          MR. ROSNER:  Well, that's a -- from my own personal

3    perspective as a practitioner, as a lawyer, and as a bankruptcy

4    practitioner, that's a horrifying practice, I would think, and

5    I don't -- certainly wouldn't endorse it nor practice it.  And

6    I can state for the record, that the trade committee came to

7    me.  I didn't go to them.

8          But I do think that at the time -- the time matters

9    when people are taking positions and giving up positions and

10   there are material benefits to the estate that occur at that

11   time from the perspective of what happens later when there are,

12   as we saw in this instance, unforeseeable events that the

13   applicant, let's say, in our case, the trade committee said,

14   well, we are going to independently and for separate reasons,

15   we're going to fight the EPCA.  And we're going to fight the

16   EPCA because we see a creditors' committee who is doing its

17   job, frankly.  The debtor is doing what it needs to do, but

18   it's making a deal on the EPCA which we think is damaging to

19   the estate.  And we see the unsecured creditors' committee, and

20   it is doing its job.  But its job has to address a lot of

21   different questions.  What its job is not necessarily is only

22   to look at the interests of all of the trade creditors.

23         Now, you made a statement before that an indirect

24   benefit that only applies to a class of creditors may not be

25   subject of a substantial contribution.  And I --

1          THE COURT:  Well, I actually said if a creditor --

2          MR. ROSNER:  Okay.

3          THE COURT:  -- causes a benefit that indirectly

4     benefits its class.  I think an unofficial committee is a

5     little different than that.

6          MR. ROSNER:  Okay, because that's how I viewed it as

7     well.  I viewed if an unofficial committee is acting on behalf

8     of a class of creditors, and Your Honor is well aware, you

9     pointed out one of the real defects of -- apparent defects of

10    unofficial committees.  But unofficial committees, when they

11    serve their purpose as I believe the trade committee did, here,

12    they're not acting in their sole pecuniary interest.  In

13    fairness, they don't organize and hire a lawyer not for their

14    own pecuniary interest, but they seek it.  And in this

15    instance -- let me not speak generally -- in this instance,

16    they sought it for the benefit of all creditors in their class,

17    meaning, when we fought the EPCA and we fought it and said

18    there needs to be a fixing of the absolute priority rule, here,

19    there --

20         THE COURT:  I could cut this short.  I believe that

21    the absolute priority rule work that you did would, in normal

22    circumstances, be entitled to a 503(b) award.  I have serious

23    doubts about the other work because it seemed to be other

24    objections that the committee was making and others were

25    making, but clearly, no one was making that absolute priority

129

1  point that needed to be made.  So I don't have a problem with

2  that.  The issue comes in -- and I'm still dealing with it, I

3  haven't made up my mind on it -- is whether, given the change

4  in circumstances for this company, that even mattered.  And

5  what you're going to tell me is that there's a continuum and

6  peace over the plan process on this issue benefited the debtor

7  during that continuum until the bottom fell out.  And the

8  bottom didn't completely fall out, and so therefore, there was

9  some value there because there was some value to reorganize.

10      MR. ROSNER:  And there was value to reorganize then,

11 and it continues today.  That's the point.  That's the

12 continuum, I think, point that you were making.

13      THE COURT:  But how do I quantify that?

14      MR. ROSNER:  Well, we quantified it at 1.5 million,

15 right?  And I recognize that Your Honor's not going to quantify

16 that at 1.5 million.  And I do want to make this point because

17 I think it's an absolutely critical point to what happens when

18 unforeseen circumstances affect prior agreements amongst

19 parties.  And by agreements, I do not want to overstate what I

20 think our agreement was with the debtor.  I think our agreement

21 was a non-objection agreement.  It was not --

22      THE COURT:  Right, no, the record's really clear.  I

23 said that you still have to make an application and --

24      MR. ROSNER:  Which we did.  It was not a consent and

25 please, here --

130

1          THE COURT:  Right.

2          MR. ROSNER:  -- you will get paid.

3          THE COURT:  Right.

4          MR. ROSNER:  But I think all of the trade committee's

5    efforts on the subject that we were just discussing that were

6    geared towards the fair and equitable treatment on parity with

7    all other creditors and on the absolute priority rule, on a

8    consolidated basis with the fullest amount realized in

9    accordance with legal entitlements at the lowest possible cost

10   to the estate, at the least possible delay, and at the minimal

11   use of time through a confirmed plan.  All of that exists

12   today.  And all of that exists today by virtue of the efforts

13   that were taken a few years ago.

14         THE COURT:  Okay, but this is the issue I have.  There

15   seemed to me to be a need for an unofficial committee of trade

16   creditors.  And you all identified one area where the general

17   unsecured committee -- I mean, the official unsecured committee

18   and the debtor had not represented your clients', as a group,

19   interest, which is on the parent company bonds and the absolute

20   priority rule and the value of the individual subs.  But in

21   looking at the time entries, that's a pretty small portion of

22   the time entries.  I mean, there's a lot of -- I mean, there's

23   just an enormous stuff in here beyond that:  dealing with GM

24   and different claims.  And your clients, clearly, wanted you to

25   be active in more than just those specific issues related to

131

1    EPCA and the plan term sheet.  And it seems to me that the

2    committee was doing that.

3            MR. ROSNER:  Well --

4            THE COURT:  I don't fault them for hiring you, also,

5    to do it, because they wanted to have someone they could talk

6    to directly and share their strategies with and the like.  But

7    I don't see how that, unlike the other issue, really served a

8    purpose for the estate.

9            MR. ROSNER:  That issue can disappear very quickly in

10   a case like this with GM and the company sitting in a room and

11   deciding to make that change.  When we got to the point, we

12   hired an expert, I prepared an expert report, I deposed a bunch

13   of witnesses, we prepared to go to court, and we prepared to

14   fight on these issues.  And then we reached the agreement which

15   we reached, which we thought was an agreement that would

16   advance, and has advanced, and continues to advance these

17   estates through today.  I'm not at liberty, and I can't

18   recommend to any lawyer to then call it a deal and, while

19   things are moving at the pace that this case moved, because you

20   went from first EPCA to second EPCA, to MOU, to GM coming into

21   a room and things changing, and I cannot possibly be able to

22   represent either to a client or to other constituents in the

23   case that it doesn't matter because our transaction is

24   sacrosanct.  We've won that battle.  It will not -- because

25   remember, even in the first EPCA agreement, the paragraph that

132

1    says that -- all it says is they're not going to object to our

2    substantial contribution.  I have an agreement that we fix this

3    problem; there's no a plan term sheet that's to fix this

4    problem; there's a plan of reorganization that fixes this

5    problem both on substantive consolidation, both on the

6    treatment of the toppers as well as the treatment of the trade

7    creditors.  But how is this going to change going forward?

8            Your Honor, you saw me very infrequently in court.

9    You saw some of my colleagues, also, very infrequently in

10   court.  We did not take positions that we did not need to take.

11   But there were things that we needed to do in order to ensure

12   that that agreement continues forward and that that agreement,

13   actually, would not be sacrificed, particularly as things

14   started to go south.  And when the unforeseen circumstances

15   kicked in, and we saw that there could be material changes,

16   there were points in time where people were arguing that

17   absolute priority was still being recognized though values were

18   dropping to sixty-two cents on the dollar and the toppers were

19   being paid.  So I would submit to Your Honor that once having

20   achieved the substantial benefit to these estates, it does

21   nothing if that is not followed through to the end so that you

22   have established that you are able to actually close on the

23   benefit to the estates.  Now, that deals with that issue.

24           There are issues that we -- there are matters that we

25   undertook in this case that we think we're entitled to as a

133

1    substantial contribution.  But I heard Your Honor loud and

2    clear this morning, and there are a few points that I'm going

3    to -- if you want to cut me short on the other points that

4    we've raised --

5           THE COURT:  No, go ahead.

6           MR. ROSNER:  Okay.  We think it's impossible to

7    separate the need for a trade committee with the actual

8    organization of a trade committee, and that takes some time and

9    that takes --

10          THE COURT:  I understand that.

11          MR. ROSNER:  Okay.  We think that the negotiations,

12   beyond the points that I've said about the independent points

13   that we brought to the table, beyond that point, are

14   compensable and are necessary.

15          I think we've covered these.

16          THE COURT:  Well, why is the work on post-petition

17   interest necessary?  What -- I mean, the committee was pushing

18   that hard.

19          MR. ROSNER:  The committee had raised it.  The

20   committee was not necessarily pushing it to the point where

21   they had reached an agreement, or at least, they had said that

22   they were getting Tom -- I'm sorry, not Tom -- the plan

23   investors, let's call them, where they were considering post-

24   petition interest.  We then went in and -- that was exactly the

25   time that we brought our expert, and I handed Jack Butler an

134

1    expert report and said we are actually going to put this

2    guy -- this witness on the stand.  Here's the report; here's

3    what we're going to testify to.  At that point, they consented

4    with me to pay the post-petition interest.  Then they held back

5    and said that it was going to be at a statutory rate -- at

6    Michigan's statutory rate, which would be, if I recall

7    correctly, 4.875.  And I said I don't think that that's

8    appropriate, and I wanted it set for all trade creditors,

9    again -- not trade committee at ten and everybody else at

10   two -- but I thought it should be set at a very different rate,

11   and we ultimately, in the agreement, decided to leave it open

12   with a floor of Michigan.  So that was an agreement that was

13   made with me.  I can't tell you that -- I know that the

14   unsecured creditors had raised the issue of post-petition

15   interest, but they have a lot of other constituents to look

16   after, and I was looking after the domestic trade subsidiaries.

17          THE COURT:  Okay.

18          MR. ROSNER:  I've told you the reasons that we -- we

19   took a very hard look at the second EPCA and the disclosure

20   statement and the plan.  Now, I looked through the time

21   records, as well, and not as carefully, I think, as I should

22   have before we filed them because there is a break in between

23   two different things.  And what we tried to do, and I don't

24   think we successfully did -- either we didn't successfully do

25   it or we didn't enter our time records in a very strong manner.

1   But there were issues that we handled for individual members of

2   the committee, itself, and these were claims -- where they had

3   issues with claims.  And on those issues, we -- at my firm, we

4   set up separate matters under the names of the individual

5   creditor, and we billed them.  However, when I'm looking at

6   some of those entries, and I'm sure Your Honor is looking at

7   some of those entries, it doesn't -- it's not crystal clear

8   that we were able to separate out as well as we did.  We made a

9   rough justice agreement with -- not agreement -- I'm sorry; I

10  don't want to use the term agreement -- a rough justice offer

11  to the U.S. trustee that just said let's take five percent of

12  our total fees, rather than going and redoing these entries.  I

13  don't have any idea, not to put Brian on the spot or anything,

14  I don't know if that's fair.  We can certainly go back and do

15  it.

16       But there's a second issue that was raised during the

17  ultimate plan modification process, and that was claims

18  reconciliation in and of itself.  Now, it's been raised as an

19  argument against us that what we sought to do in the settlement

20  with the debtor was to advance our interests -- by "our" here,

21  I'm talking about the members of the trade committee -- at the

22  expense of other members of the class.  But that's not true.

23  What we asked for, there was a very short window -- Your Honor

24  knows, Mr. Butler likes to keep things to very short windows in

25  order to move things along and for lots of reasons -- and there

1   was a very short window of dealing with claims, administration.

2   There was maybe twenty or thirty days dealing with assignments

3   and all kinds of things.  And I think my partner, Adam Shiff,

4   was in front of Your Honor on a very specific matter for a very

5   specific client in that regard.  We had an issue, an overall

6   issue dealing with the claims reconciliation process that was

7   applicable to all claims that we were working on for the trade

8   committee.  And that was separate and apart from work that we

9   were doing for individual holders, you know, X, Y, Z clients

10  saying I've got this claim; how do I get it allowed, can you

11  speak to somebody.  We did, in that last settlement, however,

12  ask, as part of the settlement, that our members' claims get

13  moved from the bottom of the pile to the top of the pile if

14  there were a pile.  I can tell Your Honor, I can at least

15  represent to Your Honor, I can't imagine it made any difference

16  at all because we were fighting that pile tooth and nail as it

17  was, but we did seek that.

18        At confirmation, original and at the plan

19  modifications, we raised substantial objections that if

20  prosecuted, we think would have at least slowed down the

21  process if not changed the ultimate outcome at that time.  I

22  think Your Honor made it quite clear earlier, and everybody

23  recognizes that that may not have mattered, ultimately, because

24  of where we are today and what's happened, ultimately, with the

25  auto industry.  Nevertheless, it mattered a lot at that time.

137

1    And I have to in some ways push back on this hindsight analysis

2    because, well, for the obvious reason.  For the secondary

3    reason is that's an assignment of risk, is all we're talking

4    about, is a hindsight of analysis.  You're saying you're going

5    to benefit the estate, you're going to do it today, the

6    estate's going to take that benefit of the estate and it's

7    going to utilize it, and it's basically going to throw that

8    pebble into a pond.  Because none of us has the ability to take

9    history, pick one thing out of history, and then say everything

10   else is going to stay the same. Everything reacts together.  So

11   they'll take that benefit, it's going to go forward, and then

12   you say at the end of the day, we're going to go back, and

13   we're going to look at everything and say, you know what, turns

14   out, we threw that pebble in but somebody drained the pond.

15          THE COURT:  But this is pretty dramatic.  I mean,

16   there's no post-petition interest in the plan, for example.

17          MR. ROSNER:  I'm virtually certain there's no post-

18   petition interest in the plan.  And I recognize that.  But at

19   the time --

20          THE COURT:  I mean, I would contrast that with, for

21   example, your work on the absolute priority rule because that,

22   basically, ended a fight and people were wasting a lot of money

23   on the fight and it could have, you know, that could have

24   continued.

25          MR. ROSNER:  And I appreciate that, Your Honor.  I

138

1    just want to point to what happens -- what do I do the next

2    time that I face this issue of where I believe and the parties

3    believe and the parties represent that they believe by saying

4    we won't object to you.  I think what I have to do is I have to

5    make my agreement contingent on getting immediate approval and

6    payment of the fees.  And now, that doesn't mean that the

7    Court's going to allow it to happen that way, but I think that

8    I have to do that because otherwise, I'm bearing this risk of

9    what ultimately happens in the case.  And so --

10          THE COURT:  But isn't that what the statute says?  I

11   mean, how could I determine that you've conferred a direct

12   benefit anyway if the plan -- I mean, I would do that at the

13   confirmation hearing.

14          MR. ROSNER:  It wouldn't be a 503(b) application; it

15   would be a contractual term.  So what you'd have is you --

16          THE COURT:  There's no authority to do that.

17          MR. ROSNER:  There's always authority to -- I mean, in

18   my opinion, there's always authority to make a contract with

19   the debtor and have it approved that contains a provision for

20   the payment of legal fees at that time.  Not forward-looking

21   legal fees; I'm saying at that time.

22          THE COURT:  Then why have 503?

23          MR. ROSNER:  Well, 503(b) is a different section to go

24   under.  I mean, I have --

25          THE COURT:  But that's the point.  I mean, Congress

139

1   put in 503(b).  They decided that in addition to 503(a), when

2   it comes to professionals, you need (b).

3         MR. ROSNER:  But I don't -- I believe Your Honor has

4   probably been presented with agreements that provide, within

5   the agreement themselves that creditor X will do the following,

6   creditor Y will do -- I mean, a company will do this, and the

7   payment of the fees will be part of the agreement, and that

8   agreement's been put forward under a business judgment standard

9   and that it's been --

10         THE COURT:  I don't know.  I don't think I would

11   approve that.  That's why I asked the question at the hearing

12   when this came up.

13         MR. ROSNER:  In Lyondell, I can only say that it

14   was -- there have been cases in which I have been involved, for

15   example, the Mirin (ph.) case in which there was --

16         THE COURT:  Well, look.  If, for example, your

17   committee came in at the beginning of a case and negotiated a

18   DIP agreement, all right, instead of the unsecured committee --

19   for some reason, you were the key guys -- I believe -- I could

20   certainly approve that in that context because the money's

21   there.  The debtor has the benefit of that money.  But --

22         MR. ROSNER:  So what's the difference between that and

23   the debtor getting a benefit -- money's just a benefit.

24         THE COURT:  Well, I know, but it's quantifiable; you

25   can see it actually happening, and it keeps the debtor running,

140

1   whereas a benefit to negotiated post-petition interest claim

2   when the ultimate plan doesn't have post-petition interest,

3   it's -- I don't know whether that's --

4          MR. ROSNER:  I understand what you're saying, Your

5   Honor.  I'm moving away from the particular point of the post-

6   petition interest and just saying, as a general matter, what

7   happens if --

8          THE COURT:  Well, I think there's a continuum on some

9   things and not on others.  I think that's all I can say.  You

10  know, I think -- and I, you know, I was -- that was my view on

11  the IUE, too.  If they had been able to quantify more than sort

12  an amorphous sense that there was some goodwill, they might

13  have gotten something.  But they didn't, you know, from their

14  winning on the bonus point.  But it seemed to me that they

15  hadn't quantified any good will, really, by the wage employees,

16  and it was probably offset by the ill will from the salaried

17  employees.  So, you know, I -- but the idea of a continuum, I

18  accept.

19         MR. ROSNER:  Okay, and expanding on the idea of the

20  continuum, all I would want to close with, Your Honor, is to

21  say that -- and maybe this will fall into your amorphous

22  category, and I don't want it to fall into it, but I just said

23  that, so -- is that each and every step that you take that

24  advances the ball forward, it does provide, at that instant,

25  the benefit of the lack of delay, the time, and the money, and

141

1    the effort, and that will always be a benefit to the estate all

2    the way through.

3              THE COURT:  Right.

4              MR. ROSNER:  Because you don't have that time wasted,

5    the unforeseen circumstances don't change that.  You're in this

6    place because of that.

7              THE COURT:  Tell me again.  What was it that was done

8    with the second EPCA?

9              MR. ROSNER:  In the second EPCA --

10             THE COURT:  Because there were really two agreements

11   by the debtor.  There was a 750 and the 750.  And the second

12   one was the second EPCA, I think, right?

13             MR. ROSNER:  That's right.  Yeah, I mean, there was a

14   little bit of overlap; at the time of the 750, it really wasn't

15   750.  It was higher than 750.  But we agreed to a certain

16   number.

17             THE COURT:  But, what were your issues on the second

18   EPCA that were different from the committee's issues -- I mean,

19   the official committee's issues?

20             MR. ROSNER:  Our issue was that it was a procedurally

21   defective agreement, that it was actually something that was

22   brand new, and it had to -- and you know what, I'm not -- I

23   don't have with me a chart that says what was exactly different

24   than what the committee said.  We were very focused on the

25   usurpation of value from the trade creditors to the toppers,

142

1   which we viewed as continuing the issue of the absolute

2   priority rule.

3          THE COURT:  Right.

4          MR. ROSNER:  That's how we saw the --

5          THE COURT:  And did they try to sneak that in the

6   second EPCA?

7          MR. ROSNER:  Yes.

8          THE COURT:  The Appaloosa people, since they own the

9   toppers?

10         MR. ROSNER:  Yes.  That was a -- we made it a huge

11  point, and this was thrown back into -- back at me that we made

12  a huge point that we believed we understood that there was

13  large ownership of the toppers by the plan investors, and

14  therefore, that was a justification -- that was the reason that

15  they were demanding large payments to them, both on the

16  investment side but also changing the priority on the toppers.

17         THE COURT:  Right.

18         MR. ROSNER:  And that was a very -- that was a point

19  that was specific to us.  And then I think that -- and we only

20  adopted a few of the committee's objections.  But for the most

21  part, I think we were focusing on the absolute priority and the

22  continuation of that objection in the second EPCA.  But

23  ultimately, we did what I think Your Honor wants people to do

24  in acting responsibly in a Chapter 11 case, which is to

25  prosecute your issues, to bring them to the table, to not

143

1    necessarily want to be the best lawyer in the courtroom and

2    show everybody what you can do and cross-examine David Tepper

3    and tell everybody -- you know, but ultimately sit across the

4    table, get your issues resolved, and then withdraw everything

5    and then not be heard from again, which is, frankly, where you

6    saw us.  You didn't hear from me after that point.

7          So with that, Your Honor, I didn't address the

8    specific objections from the U.S. trustee, which I can.

9          THE COURT:  Okay.

10          MR. ROSNER:  Just let me see where --

11          Just running through them quickly, one of the main

12    objections that I think that was made, and I hope that I've

13    already spoken to, is that we may have benefited the trade

14    committee at the expense of others.  And we -- that -- there's

15    some implication or express statement that we did things solely

16    for our benefit, meaning the members of the trade committee.

17    Now, I'm here for the trade committee.  I'm not here for any

18    specific member of the trade committee.  But the trade

19    committee, nothing that we did was for anybody's benefit that

20    would have benefited them, but for the individual claim stuff

21    which, as I said, I meant to withdraw out of there, I would

22    withdraw out of there.  We made the five percent offer.  And

23    even if all of that is unsatisfactory, I'm prepared to go line

24    by line and take everyone of those things out.  The client who

25    gets the bill for those things may have a very different view

144

1    of it this late in the game, but I'm happy to do that.

2         On that specific point, and you actually -- Your Honor

3    actually asked this at the hearing, this specific point of us

4    asking if we could take our claims that -- this now being

5    members of the committee -- and put them to the top of the

6    pile, as there is a claims administration.  We did not seek to

7    have our claims allowed; we did not seek to have a leg up on

8    anybody else, nor did we seek to have anybody else's

9    disallowed.  We just said if you have to do all these things

10   and we're negotiating a deal with you, can you kind of put ours

11   to the top.  I can tell you, as I did before, I don't think it

12   helped very much.  We did try to reshuffle the deck, though.

13        I don't believe the U.S. trustee credited the efforts

14   that we undertook, and I think -- they stated that we had

15   duplication.  In our original EPCA obligation -- in our

16   original EPCA objection, we identified fourteen objections,

17   only one incorporating the UCC.  And I think the point there as

18   I've made at least once, is that the UCC could not singularly

19   represent a group.  And I do think, and I know -- and I believe

20   Your Honor does think that committees like this do serve a

21   purpose, particularly in multinational, multi-entity cases.

22   But they have to be confined to what they do, and they

23   shouldn't be out there on every single issue.  And I'd like to

24   believe that that's what we did.  There certainly was some

25   overlap with what other people did because if other people

145

1    settle and you haven't raised an objection, then they can say

2    you haven't raised that objection.  So however, we did raise

3    the objections on treatment and absolute priority as we

4    discussed.

5          And the not being able to settle around somebody is

6    important so that certain objections are not settled with one

7    party, and yet the trade creditors find themselves in a

8    position where they've been undercut.  And for that reason,

9    there need be, in certain instances, an adoption of other

10   people's arguments.

11         Your Honor, we honored our bargain.  The plan was

12   confirmed.  There's been a change in economics; we had nothing

13   to do with that.  Our fees are reasonable.  It is true, the

14   U.S. trustee is absolutely true that we did not put things into

15   separate projects.  We viewed this as Delphi.  I don't think

16   it's justified, at this point, to break it down.  I think the

17   entries say what they do.  I know there's somewhat of a relaxed

18   standard, but we didn't do that, and we also didn't go into

19   this case anticipating that we would be filing an application.

20   So I think that pretty much responds to everything.  And if

21   Your Honor has any other questions --

22         THE COURT:  Okay.

23         MR. ROSNER:  Okay.  Thank you.

24         THE COURT:  Thank you.

25         MR. MASUMOTO:  Good afternoon, Your Honor.  Brian

1    Masumoto for the Office of the United States Trustee.

2         THE COURT:  Good afternoon.

3         MR. MASUMOTO:  Your Honor, as indicated by Your Honor

4    as well as by counsel, the U.S. trustee did object to the

5    application under 503(b) for substantial contribution by the ad

6    hoc trade committee.  Bearing in mind your very extensive

7    discussion regarding the union, I won't belabor the factors

8    that go into the substantial contribution standard.  As with

9    Mr. Rosner, I would like to, however, highlight at the outset

10   one of the issues that seem to be a matter of dispute both

11   raised by the union as well as the trade committee, which is

12   the hindsight aspect of the case.  That is, in fact, the

13   pivotal point of the 503(b) statute.  That distinguishes the

14   professionals who apply under -- for substantial contributions

15   under 503(b) from professionals who are retained by the estate

16   and have a special fiduciary obligation.  As Your Honor is

17   aware, there is case law that indicates that retained

18   professionals cannot be, essentially, criticized or treated in

19   the same fashion in a hindsight fashion, that if, in fact,

20   actions are taken reasonably at the time they were taken, you

21   cannot, in retrospect, argue that since the results achieved at

22   some later date were not successful, but those reasonable

23   actions taken at the time are not, therefore, compensable.  So

24   the proposal by the union and the trade committee would be to

25   eliminate that distinction and to argue that, in fact, non-

1    retained professionals should be accorded that same criteria,

2    and that actions taken reasonably at the time taken should be

3    regarded from that viewpoint and not from the ultimate end

4    result, which would essentially eliminate the distinction

5    between having retained professionals and having other

6    professionals involved -- insert themselves in the case,

7    certainly, for the idea of being compensated.

8            THE COURT:  Let me ask you, though -- and I don't know

9    the answer to this.  I should, but -- and I did once.  During

10   the height of this case, which was basically the period over

11   the plan summary through, I guess, EPCA version two, do you

12   recall, or does anyone recall sort of what the either monthly

13   or weekly run rate was for professional fees in the case?

14           MR. MASUMOTO:  I'm sorry, Your Honor.  I don't have

15   that information.

16           THE COURT:  I mean, I would assume it would be in the

17   hundreds of thousands of dollars.

18           MR. MASUMOTO:   I think t7hat's quite likely.  And of

19   course, that wouldn't take into account all of the input by

20   either the union and/or the other committees.

21           THE COURT:  No, I understand.  But the reason I'm

22   asking is Mr. Rosner made the point that, you know, I shouldn't

23   treat this change in circumstances as an absolute cut-off or

24   vitiation of what they had done because the case really was a

25   continuum.  And taking that one step further, if they had, for

148

1    example, litigated these issues, which they settled, for even a

2    month longer, would it have cost the estate, you know, what?

3    Two million dollars?  I don't know.  I don't know the answer to

4    that.  That was why I was asking.

5         MR. MASUMOTO:  Well, Your Honor, that raises the issue

6    that I believe you started off with Mr. Rosner, which is

7    essentially, isn't that sometimes what an unofficial committee

8    might do?  They come in, insert themselves, litigate --

9         THE COURT:  Oh, know, I understand.  But here, they

10   weren't a pest.  I don't think they were a pest.  I mean, no

11   one said they were a pest, so --

12        MR. MASUMOTO:  And I'm not -- I'm not making that

13   statement either.

14        THE COURT:  Okay.

15        MR. MASUMOTO:  But then there becomes -- in this case,

16   obviously, again, a continuum --

17        THE COURT:  Right.

18        MR. MASUMOTO:  Where do you make the distinction that

19   one professional or one unofficial committee is a pest and

20   another is not?

21        THE COURT:  Well, you know pretty well.

22        MR. MASUMOTO:  Well --

23        THE COURT:  I think you can tell.

24        MR. MASUMOTO:  I think in some circumstances, but

25   where along that continuum does --

149

1        THE COURT:  Well, put it this way.  If they had

2   litigated that extra month or two and then had been bought off,

3   it would be a different story, right?

4        MR. MASUMOTO:  Absolutely, Your Honor.  But again, the

5   issue is where do you draw that line?  I mean, another week,

6   another month --

7        THE COURT:  Okay.

8        MR. MASUMOTO:  -- of the litigation?  Every

9   professional would be in the position to -- if you don't have

10  the bifurcation between --

11       THE COURT:  Well, that's the --

12       MR. MASUMOTO:  -- professionals --

13       THE COURT:  -- but in the way, that's kind of a nice

14  question mark over their heads, right?  Encourages them to

15  settle --

16       MR. MASUMOTO:  And that is the risk inherent of -- by

17  these individuals.  If, in fact, these professionals believe

18  that their participation is critical to the case, then they

19  should seek, in fact, a separate committee, recognized by the

20  Court, with the permission of retained professionals.  If you

21  don't, then they have to be subject to the standard under

22  503(b), which is a retroactive result-oriented perspective and

23  evaluation.

24       Getting back to the -- sort of the status of this case

25  and this particular claim, there's some reference to the -- I

150

1    guess the December 6th hearing, whereby there was an agreement

2    between debtors' counsel and I guess the official committee of

3    unsecured creditors and the ad hoc trade committee.  And again,

4    I believe initially, this was alluded to by Mr. -- or referred

5    to by Mr. Meisel (ph.), that there was a provision within the

6    agreement which provided that the objections by the trade

7    committee would not apply if, in fact, there were substantial

8    modifications to the plan that affected the unsecured

9    creditors.  It seems to me that in fact, that the corollary to

10   that would be the subsequently agreed upon compensation that

11   was allowed or not to be objected to by the creditors'

12   committee and debtors' counsel was essentially tied to that

13   same agreement.

14        Obviously, it wouldn't make sense that if, in fact,

15   the circumstances changed, as they did in this case, and the

16   terms by which the agreement had been agreed upon were no

17   longer applicable, which would then free up the trade creditors

18   from objecting to such a plan, that by the same token, they

19   would have the benefit of the agreed upon limitation -- the

20   agreed upon concession regarding their compensation.

21        So in fact, from my perspective -- and obviously,

22   since the U.S. Trustee wasn't a party to that agreement, I

23   would have thought the debtors would have been -- the debtors

24   and the creditors' committee would be in the position of saying

25   that look, the agreement on compensation is no longer

151

1       applicable.  We -- clearly the terms on which it was based,

2       which is the agreed upon EPCA provisions and so forth,

3       obviously are not applicable in the modified plan.  And

4       accordingly, any agreement with respect to compensation is no

5       longer in effect.

6              And just to -- and also to point out that at the time

7       this agreement was made by debtors' coun -- the concession by

8       debtors' counsel and the unsecured creditors' committee, there

9       was a perception that there was equity in the case.  So it

10      would have been a lot easier for both those parties, both the

11      debtor and the unsecured creditors' committee, to say whose ox

12      is being gored.  It's really the equity holders.  So if -- and

13      the equity holders didn't consent to the compensation that was

14      provided for here.  And so the expectation was, if anybody

15      would complain and would be in a position to and would want to

16      complain, it would be the equity holders.

17             Now, as events turned out, in fact, there is no equity

18      in the case.  And in fact, you don't even have an equity

19      constituent who would be motivated, at this time, to argue

20      against those fees.  So I think the agreement that the trade

21      committee relies upon to indicate that they should be somehow

22      insulated from any challenge under 503(b), is really not

23      applicable; that in fact, they are -- they have to completely

24      comply with the provisions and the requirements for a

25      substantial contribution.

152

1          And again, not to belabor the factors that Your Honor

2     mentioned.  I won't go into it anymore, but except to say that

3     in fact, your decision with respect to the union is quite

4     relevant here.  But ultimately examining the outcome of the

5     case, by looking at the modified plan, which seems to have been

6     a dramatic change from essentially I guess -- from many

7     perspectives, from a hundred percent plan to unsecured

8     creditors to what I believe currently, in discussions with

9     debtors' counsel is effectively a five percent plan to the

10    unsecured creditors, and equity has been wiped out.

11         Under those circumstances, by looking at the results

12    that have been achieved in this case, unfortunately, in

13    hindsight, one would have to conclude that the services

14    rendered by the trade committee, did not yield a benefit to the

15    estate.  It's unfortunate.  But those are the circumstances.

16    And that is the understanding on which these professionals

17    entered into the case and provided their services.  They cannot

18    avail themselves of the same standards that apply to retained

19    professionals and have to live by the outcome of this case.

20         As indicated in our papers, again, just to also -- to

21    highlight that as Your Honor did discuss, I believe with --

22    there was some colloquy with Mr. Rosner, that in fact, many of

23    the services rendered by the trade committee were, in fact,

24    also argued by and asserted by the unsecured creditors'

25    committee in some cases, earlier by the equity committee.  And

153

1   unless Your Honor would like to get into the specifics

2   regarding the reasonableness of the compensation, again, from

3   our standpoint, we believe that they have -- that the burden of

4   proof on the trade committee to establish their substantial

5   contribution has not been satisfied in this case.

6           But if Your Honor does believe that somehow the

7   reasonableness standard as to the existing compensation should

8   be examined, we'll certainly be willing to discuss certain

9   specifics.  Although, as indicated, we believe that there are a

10  great deal of services regarding analysis of claims, the

11  revisions to the joint interest in fee sharing agreements as

12  well as reviewing of the dockets and so forth, which should not

13  be compensable in any event.  So unless Your Honor has any

14  further questions, that's all I have.

15          THE COURT:  Okay.  Thank you.

16          MR. MASUMOTO:  Thank you.

17          MR. MEISLER:  Your Honor, I just had one comment in

18  particular, and that's with respect to your question regarding

19  the continuum and the absolute priority change to the plan that

20  was accomplished by Mr. Rosner and the ad hoc trade committee.

21          What I'd like to note is that at that time there were

22  unique dynamics at play that allowed the plan investors to get

23  the toppers a recovery.  At the time we were contemplating a

24  par plus accrued plan at plan values.  And so the plan

25  investors and stakeholders thought that there was some

154

1    reasonable likelihood that when this went out to vote,

2    creditors would consent to that treatment even if there was

3    some dispute as to the value or valuation of what that par plus

4    accrued at plan value meant.

5        In the plan that was ultimately consummated -- in the

6    modified plan -- there just simply was not sufficient value to

7    be able to put something forward that would have created the

8    same dynamics and would have had the same issues at play.  So

9    in the modified plan, there simply never would have been an

10   absolute priority issue to deal with.  Thank you, Your Honor.

11       THE COURT:  Okay.

12       MR. ROSNER:  Your Honor, may I just quickly --

13       THE COURT:  Sure.

14       MR. ROSNER:  -- argue it from here?

15       THE COURT:  Yes, that's fine.

16       MR. ROSNER:  Just, you know, very short points.  In

17   terms of whether somebody would toll out a hearing in order to

18   cause expenses, to accrue on an estate, I just want to state

19   that at no point did the trade committee seek an adjournment of

20   any hearing.  It sought to work only within the time frame that

21   was set by the debtors.

22       I think seeking a separate committee every time that a

23   group wants to represent a specific constituency would cause a

24   very large -- Your Honor lived through the equity committee

25   hearings themselves, and I think it not only is not such a

155

1   great idea for proliferation of committees, but also not just

2   for the amount of -- you know, the hearing time, in determining

3   whether there should be --

4         THE COURT:  But I think Mr. Masumoto's point is that

5   when there's -- when you are an unofficial committee --

6   representing an unofficial committee, there's always risk that

7   you won't get paid by the estate.  I mean, that's always a

8   risk.

9         MR. ROSNER:  Right.  And equally we recognize there's

10  a risk and the greater risk under 503(b).  That's why I'd like

11  to state that in the original EPCA order, just to be clear, it

12  actually did not reserve the right of the debtors or the

13  committees even to object on reasonableness.  That's not how it

14  was written.  However, I'm -- we always recognize that it's the

15  Court's province --

16        THE COURT:  Right --

17        MR. ROSNER:  -- to make this determination.

18        THE COURT:  -- all right.  We had that back and forth

19  at the hearing.

20        MR. ROSNER:  Yeah.

21        THE COURT:  Yeah.

22        MR. ROSNER:  Okay.  So and just Mr. Masumoto said, and

23  I think that I just wanted to be clear on this, because I think

24  he used the phrase "an agreement on fees."  There is no

25  agreement --

156

1          THE COURT:  No, there's no agreement.  I mean the

2   transcript's really clear.  I forget whether you attached it or

3   the trustee attached it.

4          MR. ROSNER:  We both -- I think they have it in the

5   record and we attached it as well.

6          THE COURT:  Yes, it's very clear.

7          MR. ROSNER:  So when both sides attach, it seems like

8   it should be okay.

9          THE COURT:  Right.  There's no agreement.

10         MR. ROSNER:  Okay, thank you, Your Honor.

11         THE COURT:  I mean, it is clear you have to apply

12  under 503(b) to get paid.

13         MR. MEISLER:  Your Honor, we do believe that we

14  reserved the right --

15         THE COURT:  Oh, that's a separate point.  I'm just --

16  I reacted to this other point that Mr. Rosner raised.

17         MR. MEISLER:  Understood.  We just wanted to clarify

18  that under reasonableness grounds, we do think that we reserved

19  the right to challenge the fees.

20         THE COURT:  Okay.  I'm not focusing on those in any

21  event.

22         I'm not going to repeat my discussion generally of

23  503(b)(3)(D) and (b)(4) in connection with this application,

24  which is by the unofficial trade creditors' committee in this

25  case.  I just gave that ruling and I'd just be repeating it if

1    I could remember it, word for word.  And I will, however, as I

2    said during oral argument, note that I believe there is one

3    difference that's a generic difference, between the prior

4    motion and this one, which is that the prior motion involved an

5    individual creditor.  I think the burden is hardest upon an

6    individual creditor to get a 503(b)(3)(D) and (b)(4) award,

7    because almost by definition, they're acting in their own

8    interest, and they have to have done something extraordinary in

9    terms of the administration of the case or filled a gap where

10   those who are charged with acting in the interest of groups

11   haven't acted, for them to be entitled to compensation from the

12   estate under 503(b).

13         That I think is a slightly different analysis, but an

14   importantly different analysis, when one comes to an unofficial

15   committee.  You have unofficial committees that work only for

16   themselves.  You also have unofficial committees that work for

17   a constituency that goes beyond the members of the committee.

18   The latter group uses that constituency as leverage, obviously,

19   in its negotiations and in its litigation, because they're

20   basically telling the parties across the table that they can

21   not only deliver the votes of their individual members, but

22   also persuade a larger constituency that what this focused

23   subgroup of them is doing is the right thing.

24         I think, at least with regard to that latter type of

25   unofficial committee, the Court's concern about only an

158

1    indirect benefit applying is less of a concern, because they're

2    effectively representing, if not in fact, in practice, a larger

3    group than the members who've undertaken to pay counsel.

4         The burden, however, is still upon the movant, even

5    where the movant is that type of unofficial committee, and the

6    other considerations that I previously laid out in connection

7    with the ruling on the IUE also apply.  A 503(b)(3)(D) and

8    (b)(4) award is an exception, and the request should be viewed

9    narrowly.  I also believe that it should be viewed as far as

10   whether there was a substantial contribution in hindsight,

11   taking into account what happened generally in the case.  Of

12   course reasonableness would be construed or reviewed -- the

13   reasonableness of their fees would be reviewed at the time that

14   the fees were incurred.

15        Having said that, it appears to me that the

16   substantial changes to Delphi's business and ultimately to the

17   plan and to the recoveries for creditors do affect my analysis

18   of whether there was a substantial contribution here from this

19   work.  I'm not prepared to say, however, that because the plan

20   that was ultimately confirmed was materially different on the

21   points that were negotiated, that all of the time involving the

22   committee's work here fails to satisfy the direct and material

23   contribution test.  But I do have to examine what, in fact, was

24   contributed by the committee to the debtor in the case from

25   today's perspective.

159

1        I also conclude that the debtors' and the official

2   committee's agreement to not object to the unofficial

3   committee's fees and expenses -- and in fact, it's really two

4   agreements, both at 750,000 dollars each -- was, at the time,

5   not unreasonable.  I noted that in the Bayou case, I concluded

6   that "503(b)(3)(D) and (b)(4) may not be used to buy off a pest

7   who did little if anything to advance and in fact may have

8   impeded the proper administration of the case."  That's at page

9   9 of the Bayou decision, and it cites In re Dana Corporation,

10  390 B.R. 100, 110-111 (Bankr. S.D.N.Y. 2008) as well as In re

11  Granite Partners, 213 B.R. 448-449.

12       I do not believe, based on my experience in this case,

13  that the unofficial trade committee would have fallen -- fell

14  into that category.  They, to the contrary, I think, settled

15  their differences at the appropriate time, and were looking out

16  for not only the members of the committee but the larger group

17  of trade creditors.

18       That being said, I believe that the work that they did

19  that was appropriately compensable, given the facts here,

20  consisted of organizing themselves because they knew that they

21  had an issue to deal with and dealing with the absolute

22  priority and subordinated bond issues, or the topper issues.

23  Primarily that was done in connection with the first agreement.

24  That work was done in connection with the first agreement.

25  There was an element, also, of their work that related to post-

160

1    petition interest as well as dealing with sorting through the

2    objections or the process for objecting to trade claims.

3            Clearly, the post-petition interest work, as it turned

4    out, had no benefit to anyone, given the distributions in this

5    case.  And I think that most of the concerns with the second

6    EPCA also fall into that category.  It was more a monitoring

7    function and making sure that there were not further problems

8    sneaking in that had been previously beaten back.

9            It's difficult for me to parse out from the time

10   records, based on the foregoing, what should be specifically

11   allowed and what shouldn't be.  I have to confess, I'm somewhat

12   on the fence about this in terms of directing counsel to do

13   that, as opposed to my taking a stab at it.  But I don't think

14   that's worthwhile here.  I think it's -- I think I should rule

15   on a specific amount.  And I'll do that in light of two other

16   factors that I haven't mentioned yet, although I think I

17   addressed them in oral argument.

18           The first is that if there had not been the basic deal

19   struck that led to the first agreement by the debtor and the

20   unsecured creditors' committee to support 750,000 dollars of

21   substantial contribution, I believe the estate would have

22   incurred substantially more fees by the professionals as well

23   as delay in the case as well as fees by the investors, which at

24   that time, were being paid.  And I think that on a continuum

25   analysis, that was money saved by the settlement that was

161

1  negotiated.  I'm comfortable in saying that, again, because of

2  my conclusion that it was not just a hold-up settlement.  It

3  was a real settlement dealing with real issues.  It wasn't

4  simply a buy-off of a pest, in other words.

5          Secondly, I think there should be some deduction here

6  for individual claim work, as Mr. Rosner acknowledged.  And

7  given the ultimate play-out of the claim review process, I

8  think it's not just individual work, but work on claims --

9  liquidation generally.

10          So taking all of those factors into account, I'll

11  grant the application in the amount of 700,000 dollars.

12          MR. ROSNER:  Thank you, Your Honor.

13          THE COURT:  Okay.

14          MR. ROSNER:  I don't have an order, but I'll --

15          THE COURT:  You should e-mail one to chambers, cc'ing

16  the U.S. Trustee and the debtor.

17          MR. ROSNER:  Okay.

18          THE COURT:  Debtor's counsel.

19          MR. ROSNER:  Thank you very much, Your Honor.

20          THE COURT:  Okay.  Thank you.

21          MR. MEISLER:  Thank you, Your Honor.  That concludes

22  the omnibus hearing.

23          THE COURT:  Okay.  Thank you.

24          MR. MEISLER:  And we can turn to the claims hearing.

25          THE COURT:  Let me get my other notebook.  Does anyone

162

1   want to take a break?  Do you all -- all right.  We can

2   continue then.  Okay.

3          MR. LYONS:  Good afternoon, Your Honor.  John Lyons on

4   behalf of the reorganized debtors.  This is our thirty-third

5   claims hearing, Your Honor.  And we have three matters that are

6   currently contested.  The rest of the matters have been

7   adjourned.  Two of the matters, I believe, are going to require

8   some argument, and counsel -- and in the case of Mr. Luecke,

9   he's here and present -- there will be some oral argument.  The

10  third matter, I'm hoping is rather straightforward and we can

11  dispatch with that --

12         THE COURT:  Okay.

13         MR. LYONS:  -- rather quickly.  Your Honor, item

14  number 11 on the agenda relates to the claims of Jose and

15  Martha Alfaro.

16         THE COURT:  Right.

17         MR. LYONS:  Your Honor, this relates to an accident

18  that occurred prepetition involving a Chevy Silverado.  Your

19  Honor, we have two bases to object to the claim that was filed.

20  The first is procedural.  The claim was filed late.  It is in

21  essence a duplicate of a timely filed claim that was expunged

22  earlier.  And again, Your Honor, it has passed the bar date.

23  As we have briefed, we do not believe there is excusable

24  neglect.

25         And the second point is more substantive.  When Delphi

1    filed for Chapter 11 and the automatic stay was in place,

2    General Motors continued to litigate this claim.  There is a

3    common central issue that underpins any liability against any

4    of the defendants, and that is whether the car -- there was a

5    defect that caused the injuries.  General Motors filed a motion

6    for summary judgment.  They filed a subsequent motion for

7    expedited consideration.  The Alfaros ultimately did file a

8    response, and the district court did rule on the matter and

9    found that there was no defect and accordingly granted summary

10   judgment.

11       THE COURT:  So you're alleging defensive collateral

12   estoppel or issue preclusion?

13       MR. LYONS:  Precisely, Your Honor.

14       THE COURT:  Okay.

15       MR. LYONS:  And we believe all the elements have been

16   met.  The one element, which is the opportunity to litigate, we

17   believe has been challenged by the Alfaros, and I'll let them

18   speak to it.  But again, Your Honor, we believe that there was

19   plenty of opportunity to litigate.  They actually did litigate

20   it.  And although they disagreed with the outcome and maybe the

21   conduct their lawyer had in that proceeding, nonetheless, Your

22   Honor, we believe that the issue of preclusion concept fully

23   applies here.

24       THE COURT:  Okay.  Do I have counsel for the Alfaros

25   on the phone or are they present?

1        UNIDENTIFIED ATTORNEY:  No, Your Honor, we're present.

2        THE COURT:  Okay.  You can come up then.

3        UNIDENTIFIED ATTORNEY:  Well, my colleague stepped

4   out.  We were thinking we were third on this --

5        THE COURT:  Okay.

6        UNIDENTIFIED ATTORNEY:  -- portion of the schedule.

7        THE COURT:  That's fine.  I'll hear you in a moment.

8        UNIDENTIFIED ATTORNEY:  Okay.  I'll go find him.

9        THE COURT:  That's fine.

10        UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

11        THE COURT:  Okay.  I'll remember Mr. Lyons' argument.

12        MR. LYONS:  Okay, Your Honor, well, then, why don't we

13   turn to the second matter, which again, I think will be more

14   easily dispatched.  And that's the claim of Marc Eglin, and

15   that's item number 12 on the agenda.  Your Honor, Mr. Eglin's

16   claim relates to a 2,000 dollar relocation claim --

17        THE COURT:  Right.

18        MR. LYONS:  -- that he wants to collect.  Your Honor,

19   we believe that that claim is not appropriate for the reason

20   that entitlement to the 2,000 dollars was predicated upon that

21   there would not be any medical benefits paid at the time of

22   separation.  In his proof of claim, Mr. Eglin attached the

23   separation agreement, which was effective January 1st.  He

24   further notes that -- in his proof of claim, that medical

25   benefits ceased on April 1st.  So therefore, by his own

165

1    admission, he was employed at the time of the separation, and

2    therefore was not entitled to the 2,000 dollars.

3              THE COURT:  Okay.  Is Mr. Eglin present or on the

4    phone?  No.  I agree with the debtors on this claim objection.

5    The separation agreement, which is clearly the basis for Mr.

6    Eglin's claim has an exception for the -- well, it's not really

7    an exception.  The 2,000 dollar transition assistance payment

8    only kicks in if the employee is not eligible for health care

9    and retirement at the time of his separation.  So given that he

10   was in fact eligible by his own admission and that he received

11   health care benefits through April 1, 2009, the separation

12   agreement has been complied with by the debtors.  And they

13   don't owe the 2,000 dollar transition assistance payment.

14             MR. LYONS:  Thank you, Your Honor.  We'll submit a

15   separate order on that.

16             THE COURT:  Okay.

17             MR. LYONS:  Well, then we'll jump to the last matter,

18   which is the claim of Mr. James A. Luecke.  That's item 13 on

19   the agenda.  And, Your Honor, if you recall, last time we were

20   here, you wanted some further briefing on section 96 -- or

21   paragraph 96 of the National Agreement -- the UAW agreement.

22             THE COURT:  Right.  I do remember.

23             MR. LYONS:  We did provide that to Your Honor.  Still,

24   there is no -- in the debtors' view -- any entitlement to this

25   separation pay or this -- or for lost wages, I should say, over

1   time.

2            MR. LUECKE:  May I step up here, Your Honor?

3            THE COURT:  Oh, yes.  Step right up.

4            MR. LUECKE:  Sorry -- excuse me for interrupting.

5            THE COURT:  That's okay.

6            MR. LUECKE:  Let me get into the mix here a little

7   bit.

8            THE COURT:  Are you Mr. Luecke?

9            MR. LUECKE:  Yes, I am.

10           THE COURT:  Okay.

11           MR. LUECKE:  Mr. Luecke, for the record.  I'm

12   appearing here in person.

13           MR. LYONS:  And, Your Honor, I'm certainly happy to

14   turn over to Mr. Luecke.  But again, I just wanted to make the

15   point that we still don't believe there's any entitlement or

16   any right in here that would create a legal right of Mr. Luecke

17   to collect this money from the debtors.

18           And even if it were a grievance under the UAW

19   agreement, that grievance would be assumed by GM when they did

20   so under the modified plan to take all grievances under the

21   collective bargaining agreements.

22           MR. LUECKE:  I don't object just to the grievance.  I

23   object to the malicious deskilling of my job title from

24   journeyman electronic technician to electronic technician in

25   training.  So I kind of have an objection to that.  So I feel

167

1   like that I'm due a payment for lost wages as a result of that

2   malicious intentional deskilling.  Do you have that in your

3   paperwork?

4         THE COURT:  But when you say -- I mean, is that based

5   on the --

6         MR. LUECKE:  That's based on the --

7         THE COURT:  -- the reply -- the reply -- or the

8   additional pleading that I asked the debtors to submit states

9   that you were a skilled person in training.  Or I didn't --

10         MR. LUECKE:  Yeah, I was deskilled -- I was hired in

11   as a --

12         THE COURT:  But does it -- but as a -- assuming that

13   you are not a person in training but a person who is trained --

14         MR. LUECKE:  Yes.

15         THE COURT:  -- and that the debtors' argument is that

16   the deal with the union --

17         MR. LUECKE:  Um-hum.

18         THE COURT:  -- only covered -- for this plan, only

19   covered two people, and it wasn't your job description.

20         MR. LUECKE:  Yes, that's actually a false statement by

21   the counsel there.

22         THE COURT:  But what is -- what do you have to counter

23   that?  Because they attach the deal.

24         MR. LUECKE:  Okay.  I'll go on record here as being a

25   skilled trades chairman of a skilled trades committee.

168

1          THE COURT:  I'll accept that.

2          MR. LUECKE:  Okay.

3          THE COURT:  That's fine.

4          MR. LUECKE:  Okay.  That I had firsthand knowledge of

5   the MOUs and memorandum.  And it specifically stated that there

6   were twenty-three available skilled trades positions for

7   bargaining units and tradesperson of that Delphi plant, and not

8   just two pipe fitters.  So they actually abrogated that

9   contract.

10         THE COURT:  But do you have -- I mean -- but there's

11  a -- what they attach is the underlying CBA provision that has

12  the parties bargaining when there's --

13         MR. LUECKE:  Yeah, there --

14         THE COURT:  -- a transition of -- or shutdown of a

15  facility.  And then they attach the agreement whereby they did

16  bargain through that.  And they -- there's a provision in there

17  that talks about the transfer of the skilled people -- you

18  know, the twenty-six.  And it says, of those, the two people or

19  the two slots, the two provisions, will be the ones who are to

20  transfer.

21         MR. LUECKE:  No, that was inequitable too, as stated

22  by the --

23         THE COURT:  Well, it's the agreement, though, right?

24  I mean --

25         MR. LUECKE:  It was not a signed agreement -- that

169

1    agreement that is presented by the defense counsel has no

2    signatures on it, and it's just a hearsay argument by the

3    defense or the debtors' attorneys here.

4              THE COURT:  Okay.  Was it signed?  I didn't think it

5    was signed?

6              MR. LYONS:  Your Honor, the copy I have is not signed.

7              THE COURT:  Okay.

8              MR. LYONS:  It was provided by the company.

9              THE COURT:  All right.

10             MR. LYONS:  You know, again, Your Honor, if there's

11   any --

12             THE COURT:  Do you have anything that's to the

13   contrary of that agreement?

14             MR. LUECKE:  Yes.  I'll swear under declaration or

15   under penalty of perjury that I had firsthand knowledge as

16   being the chairman of the skilled trades committee, that there

17   was to be twenty-three available positions in the 96(a)

18   transfer agreement, not just two pipe fitters.

19             THE COURT:  Well, I mean the proper evidence of this

20   is the actual agreement.

21             MR. LUECKE:  That's the agreement that I, as the

22   skilled trades chairman was presented with.

23             THE COURT:  Well, but there's got to be an agreement

24   in writing, right, somewhere?

25             MR. LUECKE:  Ask the defense counsel here --

170

1          THE COURT:  Well, I mean, the union must have an

2     agreement, right, one way or the other?

3          MR. LUECKE:  Well, if there is no agreement, then

4     Delphi here is in definitely breach of that contract.

5          THE COURT:  What contract?

6          MR. LUECKE:  Number one, the 96(a) transfer agreement,

7     and number one the contract personally what I have at Delphi as

8     being an employee of Delphi.

9          THE COURT:  Well, I'm going to have to -- I'm going to

10    adjourn this to see if there's an actual agreement.

11         MR. LUECKE:  Okay.

12         THE COURT:  On the other claim, I mean, it's not

13    really defamation.  No one's -- no one reads this except you

14    and me and them.  It's not -- it doesn't affect your

15    reputation.

16         MR. LUECKE:  Well, yeah.  Back to deskilling.  I was

17    deskilled without notice.  That --

18         THE COURT:  But that's -- they got the thing wrong in

19    the pleading.  It doesn't affect anybody.

20         MR. LUECKE:  Okay.  Yes, it does.  And then we have

21    also --

22         THE COURT:  But, no.  How?  How does it affect anyone?

23         MR. LUECKE:  -- we have a local agreement here too.

24    And it affected me by denying me a rightful overtime work and

25    wages.

171

1          THE COURT:  No, what they put in their pleading just

2     now?

3          MR. LUECKE:  What -- whose pleading?

4          THE COURT:  About they saying that they're -- I'm

5     sorry.  What are you referring to when you say deskilling?

6          MR. LUECKE:  Okay.  I was hired in as a journeyman

7     electronic technician.

8          THE COURT:  Right.

9          MR. LUECKE:  That's a skill level up here.  They

10    maliciously deskilled me with no notice --

11         THE COURT:  No, but when?  When?  What is the date of

12    when you say they deskilled you?

13         MR. LUECKE:  Okay.  The date of when they deskilled me

14    was 1-8 -- I have the deskilling notice here.  Excuse me while

15    I pile through my papers here.  I'm trying to make it quick for

16    you.

17         THE COURT:  That's all right.  No problem.

18       (Pause)

19         THE COURT:  Is that -- is the deskilling --

20         MR. LUECKE:  Here.

21         THE COURT:  -- set forth in your proof of claim?

22         MR. LUECKE:  Yes, it is.  We got approximately on or

23    about 1/18 of 2008.  So January 18th approximately -- on or

24    about that date.

25         THE COURT:  And what happened then?

172

1          MR. LUECKE:  I was deskilled from journeyman status

2     down to an in-training status, thereby denying my right to

3     overtime work provided by --

4          THE COURT:  Okay.

5          MR. LUECKE:  -- a local agreement here between Delphi

6     Corporation and the Local 438.  This is the agreement --

7          THE COURT:  All right.

8          MR. LUECKE:  -- right here.

9          THE COURT:  Okay.  Now, I thought you were referring

10    to something in their pleading.

11         MR. LUECKE:  Okay.

12         THE COURT:  As opposed to something that happened back

13    in January of '08.

14         MR. LUECKE:  Um-hum.

15         THE COURT:  Now, Delphi -- and that was part of your

16    griev -- was that part of your grievance?  Did you file a

17    grievance on that one?

18         MR. LUECKE:  Well, yeah, initially.  I do have the

19    grievance here.

20         THE COURT:  All right.  Is that something that the new

21    entities picked up on even though it happened back in 2008?

22         MR. LYONS:  Well, Your Honor, the provisions of the

23    modification order do include all grievances.  They went along

24    with the labor MOUs.

25         THE COURT:  Existing grievances?

1          MR. LYONS:  Yes.  And I refer you to -- it's the

2   modification approval order, paragraph 61.

3          THE COURT:  All right.

4          MR. LYONS:  And it says:  "Pursuant to the modified

5   plan, upon the effective date, and notwithstanding any other

6   provisions of the MDA, the applicable labor MOUs, which will

7   include all related collectively bargained agreements and

8   obligations including grievances, shall be assumed and assigned

9   to the GM buyer.

10         THE COURT:  All right.  So was that grievance ever

11  withdrawn or is it still pending?

12         MR. LUECKE:  That grievance was -- who know?  They

13  obstructed --

14         THE COURT:  No, no.  Did -- you didn't withdraw it?

15         MR. LUECKE:  I never withdrew a grievance, but I was

16  told -- I don't know what I was told.

17         THE COURT:  And was it ruled on by anybody?

18         MR. LUECKE:  No, it was thrown out.

19         THE COURT:  By whom?

20         MR. LUECKE:  I don't know who threw it out.

21         THE COURT:  Well, the reason I'm asking you this is

22  that it appears to me that the buyer -- and is the GM buyer or

23  is this the other buyer?

24         MR. LYONS:  The GM buyer.

25         MR. LUECKE:  This happened prior to the GM --

174

1          THE COURT:  No, I'm saying --

2          MR. LUECKE:  -- purchase agreement.

3          THE COURT:  -- what the debtor is saying is that GM

4    assumed this obligation.  Have you pursued it with GM?

5          MR. LUECKE:  I have no knowledge that GM pursued --

6    that the buyer or purchase agreement of General Motors included

7    this.

8          THE COURT:  Okay.  Well, they're saying it did.

9          MR. LUECKE:  Well, I'm saying this happened prior to

10   any purchase agreement with General Motors.

11         THE COURT:  I know.  But the language they're quoting

12   to me, and this is my recollection --

13         MR. LUECKE:  Well, I'm going to object to that then.

14         THE COURT:  -- well, no, it's a good thing for you.

15   You'd rather have GM pay you, right, than --

16         MR. LUECKE:  I guess.  Well, yeah --

17         THE COURT:  So this is what I suggest, is that we

18   adjourn this again --

19         MR. LUECKE:  Okay.

20         THE COURT:  -- you pursue this with GM, without

21   waiving your rights against the debtor.

22         MR. LUECKE:  Okay.

23         THE COURT:  And both -- and everyone hunt for the

24   actual agreement.

25         MR. LYONS:  Your Honor, exactly.  And if this --

175

1          THE COURT:  Okay.

2          MR. LYONS:  -- you know, if we can get a piece of

3    paper that shows what Mr. Luecke is saying, you know, we'll

4    certainly take a look at it.

5          THE COURT:  All right.  And also, if you get a signed

6    version of what you submitted to me --

7          MR. LYONS:  Yes.

8          THE COURT:  -- he should take a look at it.  Because I

9    think the problem with what they submitted to me was that it

10   wasn't signed.  That's really the issue.

11         MR. LYONS:  Right.

12         THE COURT:  I think if it had been signed, you would

13   have lost on that point --

14         MR. LUECKE:  Um-hum.

15         THE COURT:  -- on the transfer point, not on the

16   grievance point.  That's a separate issue.  But you should look

17   at -- you should follow through with GM on that.  Are you still

18   in the union?

19         MR. LUECKE:  Yes, I am.

20         THE COURT:  All right, so you should follow thr -- I

21   mean, Mr. Lyons will show you the language --

22         MR. LUECKE:  Yes.

23         THE COURT:  -- and that should enable you to present

24   this grievance to GM.

25         MR. LUECKE:  I had a -- well, I contacted the union as

176

1   well as -- well, General Motors.  And they find there's no

2   issue available at this point.

3          THE COURT:  Well --

4          MR. LUECKE:  So where do I stand here?  I'm just --

5   I'm standing at that Delphi was the last party responsible for

6   the --

7          THE COURT:  Not necessarily.  I --

8          MR. LUECKE:  Okay.  Well, maybe they can help with

9   clarification.

10          THE COURT:  Yes, they can help you with GM.

11          MR. LUECKE:  Okay.

12          THE COURT:  Okay.

13          MR. LUECKE:  Well, can you put a stipulation in here

14   that the debtors --

15          THE COURT:  I'm telling them to do it.

16          MR. LUECKE:  Okay.

17          THE COURT:  Okay?

18          MR. LYONS:  And I will let him know --

19          THE COURT:  And if GM comes up with some argument that

20   says we're not responsible, that I accept, then you can still

21   pursue your claim against the debtor.

22          MR. LUECKE:  Okay.  Very good.

23          THE COURT:  I mean, I haven't ruled on it yet, but --

24          MR. LUECKE:  Okay.

25          THE COURT:  -- it's not dead.

177

1          MR. LUECKE:  Okay.

2          THE COURT:  Okay?  Lastly, and I appreciate you came

3   in for this hearing, hopefully you won't have to come in again.

4   I do take people by phone, although you're going to be

5   testifying too, maybe, so I don't take testimony by phone,

6   usually.  But if there's a real problem, I might do it here,

7   because I've seen you.  But let's adjourn this for -- not to

8   the 30th, but the next one.

9          MR. LYONS:  The July hearing?

10         THE COURT:  Yes.

11         MR. LYONS:  Sure, Your Honor, we'll do so.

12         MR. LUECKE:  Okay.  Very good.  Thank you.

13         MR. LYONS:  Thank you, Your Honor.

14         THE COURT:  Okay.

15         MR. LYONS:  Your Honor, I think we're back to the

16  Alfaro matter.

17         THE COURT:  Okay.

18         MR. LUECKE:  Okay, I look forward to hearing back on

19  you on --

20         THE COURT:  Well, you should -- you should get Mr.

21  Lyons' card so that --

22         MR. LUECKE:  Okay.

23         THE COURT:  -- because what you really need to do -- I

24  mean, you look like you know how to submit a grievance.

25         MR. LUECKE:  Yeah, yeah.

178

1          THE COURT:  So you should get the language from the

2     order --

3          MR. LUECKE:  Okay.

4          THE COURT:  -- that has New GM picking up -- the GM

5     buyer picking up the grievances, and then you can send it to

6     them.

7          MR. LYONS:  And we'll work through that, Your Honor.

8          THE COURT:  Okay.

9          MR. LYONS:  I guess for edification of counsel, I did

10    just go through the summary of our motion and --

11         THE COURT:  All right.  That's fine.  So we're back on

12    the record, and let's pretend we're starting from the beginning

13    on the Alfaro claim and the objection to it.

14         MR. LUECKE:  Do you want to take over here?

15         MR. LYONS:  Yes, Your Honor.  In sum, again, the basis

16    of our objection is twofold.  We have a procedural objection,

17    the basis that the claim that currently is subject to the

18    objection is late.  There had been two other proofs of claim

19    that were filed that were both expunged.  And moreover, the

20    merits of the claim itself, we believe, are precluded under the

21    doctrine of issue preclusion by reason of the district court's

22    ruling on summary judgment, which held there's no genuine issue

23    of fact of a defect, which again, would underpin any liability,

24    albeit, GM or Delphi or any of the other defendants.

25              And with that, Your Honor, I'll cede the podium to the

179

1    Alfaros' counsel.

2         THE COURT:  Okay.

3         MR. BENDINELLI:  Good afternoon, Your Honor.  Your

4    Honor --

5         THE COURT:  You can stand there if you want.  Wherever

6    you're comfortable.

7         MR. BENDINELLI:  Thank you.  Mr. Lyons and I had

8    stipulated that Mr. Alfaro could offer some testimony by way of

9    affidavit.  And I have that for the Court, if I may approach?

10        THE COURT:  Okay.

11        MR. LYONS:  And we have no objection, Your Honor.

12        THE COURT:  Is this a new -- yes, this is a new aff --

13   this is not in the pleadings, right?

14        MR. BENDINELLI:  Correct, Your Honor.

15        THE COURT:  Let me just take a quick look at it.

16        MR. BENDINELLI:  Your Honor, Mr. Alfaro is a -- I'm

17   sorry, I thought you wanted to hear from me.

18        THE COURT:  I just want to take a quick look at what

19   you just gave me.

20        MR. BENDINELLI:  Yes, sir.

21        THE CLERK:  Excuse me, sir, can you state your

22   appearance?

23        MR. BENDINELLI:  Oh, Marc Bendinelli on behalf of Mr.

24   and Mrs. Alfaro.

25        THE COURT:  Okay, I've read it.

180

1          MR. BENDINELLI:  Your Honor, Mr. Alfaro's a seventy-

2    year-old retired chief of police from Goodland, Texas.  And

3    what happened in this case, he suffered catastrophic injuries

4    from a one-car accident where the restraint system failed to

5    activate.  And Delphi was the manufacturer of a component

6    involved in the restraint system.

7          On July 31, 2006, Mr. Alfaro submitted a claim for one

8    point -- a proof of claim for 1.5 million dollars.  Subsequent

9    to that, on January 4, 2007, Mr. Alfaro's counsel, attorney Don

10   Staab from Kansas, approached Mr. Alfaro requesting that he

11   reduce his proof of claim to a half million dollars.  Mr.

12   Alfaro -- Mr. and Mrs. Alfaro refused to give the attorney

13   authority to do so, did not sign the document that he had with

14   him.  And nonetheless, Attorney Staab submitted -- fraudulently

15   submitted a proof of claim form.

16         And if you look at the difference between the first

17   and the second claim form, and they are attached to the

18   debtors' exhibits in the supplemental filing --

19         THE COURT:  I've reviewed it.  I've reviewed both

20   claims.

21         MR. BENDINELLI:  Okay.  Well, you can see that it's a

22   rudimentary alteration on the second claim form, and he just --

23   it's the same form.  He just whited out the one --

24         THE COURT:  The one.

25         MR. BENDINELLI:  -- yes.  At that time the first proof

181

1    of claim was expunged and the second proof of claim was on the

2    record.  And subsequent to that, Your Honor -- I don't know the

3    technical terminology in bankruptcy court, and I thank the

4    Court for indulging a non-bankruptcy attorney time in this

5    court, indulging my lack of correct bankruptcy terminology.

6           THE COURT:  Okay.

7           MR. BENDINELLI:  What happened subsequent to that, six

8    months later, without the benefit of counsel, Mr. Alfaro filed

9    another proof of claim form trying to undo the damage that

10   Attorney Staab had done with the second proof of claim.  To

11   that claim form, the debtor objected that it was filed outside

12   the time line -- or it was time barred.

13          Also, the debtor is arguing that this claim has been

14   adjudicated in another forum.  Don Staab -- Attorney Staab had

15   also -- was also litigating this case in federal district court

16   in Colorado.  He failed to respond to a motion for summary

17   judgment filed by General Motors in this case.  General

18   Motors -- so this case was not -- in the Tenth Circuit, this

19   claim was not litigated to conclusion.  Don Staab failed to

20   respond to a motion for summary judgment.  It was filed on July

21   21st, '06.  The responsive pleading was due on August 10th.

22   And no response was filed.

23          General Motors then filed a motion to adjudicate the

24   summary judgment motion to which -- and finally plaintiff's

25   counsel responded, and the Court lambasted plaintiff's counsel,

1    basically, Don Staab, and said that it was an outrage that he

2    allowed his client to be dismissed on summary judgment and then

3    dismissed the plaintiff's claims.  Don Staab and his co-counsel

4    then filed a motion to reconsider, and the Court responded with

5    another order denying that motion, and saying that you failed

6    to respond to a summary judgment motion and you failed to

7    present any evidence.

8         So that claim was never adjudicated, Your Honor.

9    Those are -- the two orders issued by the Honorable Marcia

10   Krieger is attached as Defendant's Exhibits 6 and 8.  Those are

11   the two orders issued by Judge Krieger.  And you see that

12   the -- I'm sorry, Your Honor, it's 8 and 11 -- you can see that

13   Mr. Alfaro's claim was never adjudicated in that court.

14        Mr. Alfaro, he suffered over 800,000 dollars in

15   medical bills as a result of this car crash.  And the other

16   thing, Your Honor, General Motors at the time, they knew that

17   the -- this -- I think it's an SDM module -- it was currently

18   under a recall.  So General Motors was aware that this was a

19   faulty device manufactured by Delphi.  And because they could

20   not argue the merits, what they did was they attacked on a

21   technical defense.  And this was in the summary judgment

22   motion.  They claimed that plaintiff's expert failed to allege

23   with specificity the precise defect of the module and that the

24   counsel did not claim that the defect caused the harm.

25        When the summary judgment motion was filed, Don Staab

183

1    should have done a couple things.  He should have probably

2    calendared his response.  Additionally, he should have

3    contacted the expert whose report was attacked by General

4    Motors, because it failed to identify with specificity the

5    defect.  And Mr. Alfaro found out later that the reason that

6    Attorney Staab could not contact that expert on their research

7    out of California, is because there were outstanding bills that

8    Attorney Staab had racked up and failed to pay.

9            So, Your Honor, the debtors' argument basically is

10   that this case has been failed -- I mean, has been litigated in

11   another jurisdiction.  And that's an inaccurate representation.

12   Their other argument that the third claim form filed by Mr.

13   Alfaro should be time barred, Your Honor, we're requesting that

14   the first proof of claim be reinstated.

15           THE COURT:  On what grounds?

16           MR. BENDINELLI:  Your Honor, this is a court of

17   equity, and --

18           THE COURT:  But --

19           MR. BENDINELLI:  -- and when -- the standard is

20   excusable neglect.  That's a very low threshold.

21           THE COURT:  It's not really.  The standard for having

22   the first claim apply is Rule 60.  There's been an order

23   disallowing the claim.

24           MR. BENDINELLI:  Your Honor, it was disallowed by

25   fraudulent conduct of an attorney.

184

1       THE COURT:  Did your clients get notice of the

2   objection to their claim?

3       MR. BENDINELLI:  No, sir.  Within six months -- this

4   all happened within a six-month period when Attorney Staab

5   filed this claim form and then Mr. Alfaro, without counsel,

6   tried to fix it by filing a third proof of claim.

7       THE COURT:  But --

8       MR. BENDINELLI:  Procedurally, what he probably should

9   have done is ask that the second proof of claim be stricken and

10   the first claim of form -- proof of claim that was expunged be

11   reinstated.  And so he made a procedural error, I believe.

12   But, Your Honor, Delphi is now enjoying paying five cents on

13   the dollar for their claims.  And you have a retired chief

14   of --

15       THE COURT:  But that was the other question I had -- I

16   had another question for both of you.  This is not covered by

17   insurance?

18       MR. BENDINELLI:  No, sir, because the claim was never

19   litigated.  It got dismissed in district court.

20       THE COURT:  No, no.  Is a claim -- would you care if

21   this claim was covered by insurance, if they went against the

22   insurer?

23       MR. LYONS:  Well, Your Honor, actually the way the

24   insurance works, it's a -- it's what's called a fronting

25   policy, I believe.  So it actually would be paid -- if

185

1    insurance applies here, and I'm not so sure of that --

2           THE COURT:  No, but assuming --

3           MR. LYONS:  -- but ultimately it still would impact

4    DPH, even if it were to be covered by insurance, I believe.

5    But you know, Your Honor, we really have not looked into this

6    particular claim.

7           MR. BENDINELLI:  They're probably self-insured, with

8    maybe a million dollar retention then with an excess policy,

9    Your Honor.  So this would be Delphi's responsibility.

10          THE COURT:  All right.  So I come back to, you're

11   basically saying to me that the wrong proof of claim was

12   disallowed back when the claim that was first filed was

13   disallowed, right?

14          MR. BENDINELLI:  No, Your Honor, it was --

15          THE COURT:  I mean, that's really what you're saying.

16   You're saying that the second claim was a bogus claim.  It

17   wasn't authorized --

18          MR. BENDINELLI:  Correct.

19          THE COURT:  And that the first claim shouldn't have

20   been disallowed.  If there was any claim that should have been

21   disallowed, it was the second one that should have been

22   disallowed?

23          MR. BENDINELLI:  Correct.

24          THE COURT:  So it seems to me, then, that what your

25   complaint is, is that the first claim should not have been

186

1    disallowed.

2         UNIDENTIFIED ATTORNEY:  Your Honor --

3         THE COURT:  And that's an order that I entered.  You

4    have a right to move for relief from that order under Rule 60,

5    which is incorporated by Bankruptcy Rule 9024.  I don't -- but

6    from what you're telling me, I don't have the facts to make

7    that determination.

8         MR. BENDINELLI:  It's covered in the affidavit that

9    the first claim --

10        THE COURT:  No, no.  You've got to look at Rule 60 and

11   see whether you fit within it.  I don't know whether you do.  I

12   mean, that's not how this is couched.

13        The second question I have is what authority do you

14   rely upon for the proposition that the district court's

15   ruling -- the Colorado court's ruling -- is not collateral

16   estoppel?  But let's deal with the first issue first.

17        MR. BENDINELLI:  Well, Your Honor, I believe that when

18   something like this happens in the course of litigation, I

19   believe Your Honor has wide discretion to determine whether you

20   believe that claim was litigated to conclusion.

21        THE COURT:  I'd really like to see cases as opposed to

22   people just telling me I have wide discretion to do things.

23        MR. BENDINELLI:  Okay.

24        THE COURT:  Now, this was a case where it wasn't just

25   a simple default, all right?  There was opposition filed that

187

1    the Court treated as opposition to the summary judgment motion,

2    and then there was a motion to reconsider.  And yeah, it was a

3    case where the debtor -- I'm sorry, the debtor -- the plaintiff

4    had not paid the expert, and I'll accept that counsel wasn't

5    doing a good job.  But based on my experience with collateral

6    estoppel, in default situations even, which I'm not sure this

7    is, in those contexts, the courts say, well, I'm not going to

8    let the party get away with saying that it's not binding just

9    because they choose not to -- at this stage, not to pay their

10   expert.  So I'd really like to see some cases before I accept

11   your argument that this isn't binding.

12          But on Rule 9024, is this mistake inadvertent surprise

13   or excusable neglect?  Is this newly discovered evidence?  Is

14   this fraud by an opposing party?  Is the judgment void?  Or has

15   the judgment been satisfied, release or discharged?  No.  I

16   mean, I'm just -- I'm not sure there's a basis here for getting

17   relief under Rule 60.  Plus which it's happened -- you know,

18   it's six months later.

19          MR. BENDINELLI:  Well --

20          THE COURT:  I just -- you know, there are -- it's not

21   couched as a Rule 60 motion, and that's the reason you're not

22   addressing these points.  But I don't see -- I mean, that's the

23   argument you're making is that they disallowed the wrong claim.

24          MR. BENDINELLI:  Yes, Your Honor.  And I mean that --

25   you know, excusable neglect, inadvertence, mistake, those are a

188

1    very low threshold for granting the Court the discretion to set

2    aside a prior order.  I mean, it's not like clear --

3              THE COURT:  But who's --

4              MR. BENDINELLI:  -- convincing --

5              THE COURT:  -- but who's -- but that's the point.  You

6    don't have -- I don't have the facts at all on what happened in

7    connection with that prior order as far as who got notice and I

8    mean -- I'm assuming -- the debtor's practice is to give the

9    claimant notice.  That's part of my claims procedures rules --

10   individualized notice, and also notice of the entry of the

11   order disallowing the claim.

12             MR. BENDINELLI:  He was represented at the time, so --

13             THE COURT:  But I don't know whether he got notice

14   himself or just to his lawyer.

15             MR. LYONS:  Your Honor, if I may clarify --

16             THE COURT:  You need to stand up, too.

17             MR. LYONS:  I'm sorry, Your Honor.  The proof of claim

18   forms actually had -- the address was Jose C. and Martha

19   Alfaro, c/o Don C. Staab, who was the lawyer.

20             THE COURT:  Okay.

21             MR. LYONS:  So on the proof of claim forms -- and

22   that -- and I can represent, we have a certificate to the

23   effect that we did serve the omnibus objection, we did serve

24   the order expunging the claim on that address.  So Mr. Alfaro

25   did --

189

1          THE COURT:  On the lawyer.

2          MR. LYONS:  -- to the address.  Now, Your Honor, the

3     third claim that they filed to remedy the fraud still has Mr.

4     Staab as the addressee on the claim form.  So there's a little

5     bit of a contradiction there.  You know, here the first two

6     claims are expunged.  They filed a third one to remedy the

7     supposed fraud, and they put Mr. Staab on the proof of claim

8     form on the address line.

9          THE COURT:  Okay.  All right.

10         MR. LYONS:  So there's a little consternation there.

11    And I think, Your Honor, frankly, the collateral estoppel, we

12    did brief the issue and the standard in our motion.  And I

13    think it's clear.  You know, they may well have a claim for

14    malpractice against their lawyer, but this was litigated.  And

15    they did respond to the motion for summary judgment and attach

16    the plaintiff's expert's report.  And the district court even

17    looked at a motion to reconsider and looked at all this, and

18    entered summary judgment.  So the test is an opportunity to

19    litigate.  They had the opportunity to litigate and in fact

20    did, albeit maybe not perfectly.

21         MR. BENDINELLI:  Your know, Mr. Alfaro was represented

22    by a lawyer who was conducting fraudulent activities, who was

23    later censured by the Kansas State Bar for his activities

24    involving this case.  And it would be an injustice to punish

25    Mr. Alfaro for being defrauded by an attorney who did not

190

1    litigate this case to a conclusion.  There was -- no trier of

2    fact determined whether this mechanism was the cause of Mr.

3    Alfaro's injuries, which it was.

4            THE COURT:  Well, that was the summary judgment

5    motion, right?

6            MR. BENDINELLI:  No, sir.  The summary judgment motion

7    was based on a technical defense asserted by GM that the expert

8    report did not allege what -- with specificity, how the failure

9    occurred.  And that --

10           THE COURT:  But isn't that what --

11           MR. BENDINELLI:  -- that failure --

12           THE COURT:  -- wasn't that the plaintiff's burden in a

13   trial?  Wouldn't that have been the plaintiff's burden in a

14   trial?

15           MR. BENDINELLI:  Well, yes, Your Honor.  But it was

16   Mr. Staab's duty to respond to an MSJ, which he failed to do.

17   This case was not litigated to conclusion.

18           THE COURT:  But --

19           MR. BENDINELLI:  It was attacked --

20           THE COURT:  -- that's because the plaintiff didn't put

21   forward an expert's report --

22           MR. BENDINELLI:  -- well, Your Honor --

23           THE COURT:  -- except for what they deemed to be the

24   opposition.  So isn't that enough?

25           MR. BENDINELLI:  I don't believe so, Your Honor.  I

191

1    believe --

2            THE COURT:  On what basis?

3            MR. BENDINELLI:  -- if you have a member of the Bar

4    who is defrauding their clients --

5            THE COURT:  That's a separate issue.  He didn't

6    defraud them on this, on the summary judgment motion.  There's

7    no fraud there.

8            MR. BENDINELLI:  Yeah, well, Delphi was also no

9    part -- no longer a part of the lawsuit, but you know, it was

10   dismissed as to --

11           THE COURT:  That's collateral estoppel.

12           MR. BENDINELLI:  -- General Motors.  But, Your Honor,

13   Mr. Alfaro was not afforded his day in court.  He never had a

14   chance to present his claims against General Motors and Delphi.

15   I mean, if he was foolish enough to file pro se, I can

16   understand.  But he was relying on a member of the Bar.

17           THE COURT:  I just -- you're going to have to give me

18   a case under the right law.

19           MR. BENDINELLI:  Well, Your Honor, we have In re

20   Emmerling, 223 B.R. 860 (2d Cir. 1997) case that just says that

21   in the absence of showing meaningful prejudice to Delphi, the

22   Court is allowed to rectify a wrong --

23           THE COURT:  No, but that's not a -- I mean a

24   collateral estoppel case.

25           MR. BENDINELLI:  Your Honor, I'd like to have the

192

1    opportunity to submit supplemental authority by close of

2    business tomorrow.

3           THE COURT:  Sure.  And I may -- if the debtors want to

4    respond to that, they should ask chambers and I'll tell them

5    whether they need to or not.

6           MR. LYONS:  Thank you, Your Honor.

7           THE COURT:  Okay.  As far as the excusable neglect or

8    late claim issue, this is not a late claim case.  There's no

9    showing of excusable neglect here.  The issue is really one of

10   whether the wrong claim -- the timely claim was improperly

11   disallowed.  And that's an issue under Rule 60.

12          MR. BENDINELLI:  But we didn't file a Rule 60 motion

13   so --

14          THE COURT:  I know.

15          MR. BENDINELLI:  -- so then he's free to still file

16   one, then, correct?

17          THE COURT:  He is, if he thinks he can win one.  I'm

18   not sure he can.

19          MR. BENDINELLI:  Okay.

20          MR. LYONS:  Although, Your Honor, it may be moot if

21   you --

22          THE COURT:  Well, yes.  I mean, I think -- frankly,

23   you ought to deal with -- I mean, look, these claims are being

24   dealt with for a while.  So there's no reason for you to incur

25   the cost of preparing a Rule 60 motion until I rule on the

193

1    collateral estoppel point.

2          MR. BENDINELLI:  Your Honor --

3          THE COURT:  You may not have -- there may not be any

4    reason to -- if I find it's collaterally estopped, then that's

5    the end of the game.

6          MR. BENDINELLI:  I understand.  And I appreciate the

7    opportunity to present supplemental authority.  But I believe

8    that authority is going to say that the Court can -- that the

9    debtor has to show that he's been -- he's somehow been

10   prejudiced.

11         THE COURT:  No, it's collateral estoppel.  Collateral

12   estoppel's a whole different -- that's so you don't waste the

13   Court's time.  If something's already been decided, it's res

14   judicata.

15         MR. BENDINELLI:  I understand, Your Honor.  I

16   understand.

17         THE COURT:  And the parties should also focus on the

18   applicable law.  I'm not sure this is Colorado law.  I'm

19   sitting in New York.  So I think it probably should be New York

20   collateral estoppel, but you guys can focus on that.

21         MR. LYONS:  Your Honor, we will.  I think the thought

22   was that because the judgment was entered in Colorado --

23         THE COURT:  Well, no, I understand --

24         MR. LYONS:  -- but we will look at that.

25         THE COURT:  -- but I'm the one that's going to be

194

1    applying the collateral estoppel.

2            MR. LYONS:  We'll take a look at that, Your Honor.

3            THE COURT:  Okay.

4            MR. LYONS:  Thank you.

5            THE COURT:  All right.  So you can e-mail that to

6    chambers by end of the day tomorrow.

7            MR. BENDINELLI:  Okay.

8            THE COURT:  And I'll give the debtors till end of the

9    day Tuesday to let me know whether they want to respond to it

10   or not.  And I'll probably issue a ruling later that week.

11           MR. BENDINELLI:  Okay.  And we may simultaneously

12   submit a -- just a couple-page Rule 60 motion.

13           THE COURT:  If you want to get that on file, that's

14   fine.

15           MR. BENDINELLI:  Okay.

16           THE COURT:  Okay.

17           MR. BENDINELLI:  Thanks, Your Honor.  Thanks for your

18   indulgence.

19           MR. LYONS:  Thank you, Your Honor.

20           THE COURT:  Okay.

21           MR. LYONS:  That's all we have.  Thanks for your time

22   and --

23           THE COURT:  Okay.

24           MR. LYONS:  -- and effort.

25       (Proceedings concluded at 3:07 PM)

195

1

2                                    I N D E X

3

4                              RULINGS

5                                    Page      Line

6   Granting of Pro Hac Vice  15        15

7   Application for Brandon

8   Duncomb

9

10  Granting of Reorganized   16        9

11  Debtors' Motion to Limit

12  Service

13

14  Granting of Forty-Seventh 18        19

15  Omnibus Claims Objections

16  of Unopposed Claims

17

18  Denial of Paul Mathis'    19        18

19  Motion for a Jury Trial

20

21  Denial of Motion of       72        18

22  Methode Electronics, Inc.

23

24

25

```
 1
 2    IUE-CWA Substantial       122      12
 3    Contribution Application
 4    Denied in Full
 5
 6    Fee application granted   161      11
 7    in amount of 700,000
 8    dollars
 9
10    Objection to Marc Eglin's 165      13
11    claim is approved
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

197

1

2                          C E R T I F I C A T I O N

3

4      I, Hana Copperman, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6

7      _____

8      Hana Copperman

9      AAERT Certified Electronic Transcriber (CET**D-487)

10

11     Also transcribed by:    Clara Rubin (CET**D-491)

12

13     Veritext

14     200 Old Country Road

15     Suite 580

16     Mineola, NY 11501

17

18     Date:  May 25, 2010

19

20

21

22

23

24

25