# Exhibit H

# Part 1

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481-rdd

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION,


        Debtor.


- - - - - - - - - - - - - - - - - - - -x


            U.S. Bankruptcy Court

            One Bowling Green

            New York, New York


            July 29, 2009

            3:22 PM



B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

0544481091110000000000008

2

1

2    HEARING re Doc #16646; Motion to Approve (A) Supplement to

3    Motion for Order (I) Approving Modifications to Debtors' First

4    Amended Plan of Reorganization (As Modified) and Related

5    Disclosures and Voting Procedures and (II) Setting Final

6    Hearing Date to Consider Motion..

7

8    HEARING re Doc #14310; Motion to Approve Motion for Order (I)

9    Approving Modifications to Debtors' First Amended Plan of

10   Reorganization

11

12   HEARING re Doc #18668; Proposed Agenda for Plan Modification

13   Hearing (related document(s) [16646])

14

15   HEARING re Doc#18674; Response

16

17

18

19

20

21

22

23

24   Transcribed By:  Clara Rubin, Esther Accardi and Dena Page

25

3

```
 1
 2    A P P E A R A N C E S :
 3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
 4         Attorneys for Debtor, Delphi Corporation
 5         333 West Wacker Drive
 6         Suite 2100
 7         Chicago, IL 60606
 8
 9    BY:   JOHN (JACK) WM. BUTLER, JR., ESQ.
10          ALBERT L. HOGAN, III, ESQ.
11
12    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
13         Attorneys for Debtor, Delphi Corporation
14         Four Times Square
15         New York, NY 10036
16
17    BY:   KAYALYN A. MARAFIOTI, ESQ.
18          THOMAS H. KENNEDY, ESQ.
19
20    GROOM LAW GROUP
21         Attorneys for Debtor, Delphi Corporation
22         1701 Pennsylvania Avenue, N.W.
23         Washington, DC 20006
24
25    BY:   LONIE A. HASSEL, ESQ.
```

4

```
1

2    ARENT FOX LLP

3         Attorneys for Timken

4         1675 Broadway

5         New York, NY 10019

6

7    BY:   JAMES M. SULLIVAN, ESQ.

8

9

10   BARNES & THORNBURG LLP

11        Attorneys for Autocam Corporation

12        11 South Meridian Street

13        Indianapolis, IN 46204

14

15   BY:   DAVID M. POWLEN, ESQ.

16

17

18   BUCHANAN, INGERSOLL & ROONEY PC

19        Attorneys for Fiduciary Counselors, Inc.

20        1000 West Street

21        Suite 1410

22        Wilmington, DE 19801

23

24   BY:   MARY F. CALOWAY, ESQ.

25
```

5

```
 1    COHEN, WEISS AND SIMON LLP

 2          Attorneys for UAW

 3          330 West 42nd Street

 4          New York, NY 10036

 5

 6    BY:   BABETTE CECCOTTI, ESQ.

 7

 8    DAVIS POLK & WARDWELL LLP

 9          Attorneys for JPMorgan Chase Bank, N.A., DIP Agent

10          450 Lexington Avenue

11          New York, NY 10017

12

13    BY:   KARIN S. DAY, ESQ.

14          DONALD S. BERNSTEIN, ESQ.

15          JONATHAN E. ARMSTRONG, ESQ. (TELEPHONICALLY)

16

17    DECHERT LLP

18          Attorneys for Kensington International, Manchester

19           Securities, Springfield Associates, LLC

20          1095 Avenue of the Americas

21          New York, NY 10036

22

23    BY:   GLENN E. SIEGEL, ESQ.

24          CHARLES I. PORET, ESQ.

25          DANIEL C. MALONE, ESQ.
```

6

1

2    DUANE MORRIS LLP

3         Attorneys for the ACE Companies

4         30 South 17th Street

5         Philadelphia, PA 19103

6

7    BY:    MARGERY N. REED, ESQ.

8

9

10   GORLICK, KRAVITZ & LISTHAUS, P.C.

11        Attorneys for IBEW and IAM

12        17 State Street, 4th Floor

13        New York, NY 10004

14

15   BY:    BARBARA S. MEHLSACK, ESQ.

16

17

18   K&L GATES LLP

19        Attorneys for Wilmington Trust Company, as Indentured

20         Trustee

21        599 Lexington Avenue

22        New York, NY 10022

23

24   BY:    EDWARD M. FOX, ESQ.

25

7

```
 1

 2      KELLER ROHRBACK P.L.C.

 3           Attorneys for MDL ERISA Plaintiffs

 4           3101 North Central Avenue

 5           Suite 900

 6           Phoenix, AZ 85012

 7

 8   BY:   GARY A. GOTTO, ESQ.

 9

10   LATHAM & WATKINS LLP

11           Attorneys for Creditors' Committee

12           53rd at Third

13           885 Third Avenue

14           New York, NY 10022

15

16   BY:   MARK A. BROUDE, ESQ.

17         ROBERT J. ROSENBERG, ESQ.

18

19   MASUDA FUNAI EIFERT & MITCHELL, LTD.

20           Attorneys for American Aikoku

21           203 North LaSalle Street

22           Chicago, IL 60601

23

24   BY:   GARY VIST, ESQ.

25
```

8

1

2   MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

3        Attorneys for USW Union

4        1350 Broadway

5        Suite 501

6        New York, NY 10018

7

8   BY:   HANAN B. KOLKO, ESQ.

9

10   MILLER & CHEVALIER CHARTERED

11        Attorneys for Delphi Salaried Retirees Association

12        655 Fifteenth Street, N.W.

13        Suite 900

14        Washington, DC 20005

15

16   BY:   ANTHONY F. SHELLEY, ESQ.

17

18   MORRISON COHEN LLP

19        Attorneys for Delphi Salaried Retirees Association

20        909 Third Avenue

21        New York, NY 10022

22

23   BY:   JOSEPH T. MOLDOVAN, ESQ.

24        MICHAEL R. DAL LAGO, ESQ.

25

9

1

2      PREVIANT, GOLDBERG, UELMEN, GRATZ, MILLER & BRUEGGEMAN, S.C.

3           Attorneys for IBEW IAM

4           1555 North River Center Drive

5           Suite 202

6           Milwaukee, WI 53212

7

8      BY:   MARIANNE GOLDSTEIN ROBBINS, ESQ.

9

10

11     VEDDER PRICE P.C.

12          Attorneys for Export Development Canada

13          1633 Broadway

14          47th Floor

15          New York, NY 10019

16

17     BY:   MICHAEL L. SCHEIN, ESQ.

18

19

20     WEIL, GOTSHAL & MANGES LLP

21          Attorneys for General Motors

22          767 Fifth Avenue

23          New York, NY 10153

24

25     BY:   JEFFREY L. TANENBAUM, ESQ.

10

```
 1
 2    WHITE & CASE LLP
 3         Attorneys for Appaloosa Management L.P. and A-D
 4          Acquisition Holdings
 5         1155 Avenue of the Americas
 6         New York, NY 10036
 7
 8    BY:   DOUGLAS P. BAUMSTEIN, ESQ.
 9          GLENN M. KURTZ, ESQ.
10
11
12    WILLKIE FARR & GALLAGHER LLP
13         Attorneys for the Collective of DIP Lenders
14         787 Seventh Avenue
15         New York, NY 10019
16
17    BY:   MARC ABRAMS, ESQ.
18          MICHAEL J. KELLY, ESQ.
19          CHRISTOPHER J. ST. JEANOS, ESQ.
20          RICHARD MANCINO, ESQ.
21
22
23    EURGEICE KELLEY, ESQ.
24         Attorney for Texas Taxing Authority
25
```

11

1

2    PENSION BENEFIT GUARANTY CORPORATION

3        1200 K Street NW

4        Washington, DC 20005

5

6    BY:   JOHN A. MENKE, ESQ.

7

8    STATE OF NEW YORK

9        Office of the Attorney General - Andrew M. Cuomo

10       Environmental Protection Bureau

11       120 Broadway

12       New York, NY 10271

13

14   BY:   EUGENE J. LEFF, SECTION CHIEF

15

16   U.S. DEPARTMENT OF JUSTICE

17       United States Attorney's Office

18       86 Chambers Street

19       3rd Floor

20       New York, NY 10007

21

22   BY:   MATTHEW L. SCHWARTZ, AUSA

23       JOSEPH N. CORDARO, AUSA

24

25

12

1

2    ARENT FOX LLP

3        Attorneys for Creditor, Audio Mpeg

4        1050 Connecticut Avenue, NW

5        Washington, DC 20036

6

7    BY:   MARY JOANNE DOWD, ESQ. (TELEPHONICALLY)

8

9

10   FROST BROWN TODD, LLC

11       Attorneys for Interested Party, Toyota Motor Corporation

12       Lexington Financial Center

13       250 West Main

14       Suite 2800

15       Lexington, KY 40507

16

17   BY:   ROBERT V. SARTIN, ESQ. (TELEPHONICALLY)

18

19

20   WILLKIE FARR & GALLAGHER LLP

21       Attorneys for Interested Party, Silverpoint

22       787 Seventh Avenue

23       New York, NY 10019

24

25   BY:   KENNETH SICKLICK, ESQ. (TELEPHONICALLY)

13

1

2    WILLKIE FARR & GALLAGHER LLP

3         Attorneys for Creditor, Tranche C Lenders

4         787 Seventh Avenue

5         New York, NY 10019

6

7    BY:   MEGHAN E. SILHAN, ESQ. (TELEPHONICALLY)

8

9

10   DELPHI CORPORATION

11        For Creditor, Spectrum

12

13   BY:   JEFF P. BULLER (TELEPHONICALLY)

14

15

16   GREYWOLF CAPITAL MANAGEMENT LP

17        Interested Party

18        4 Manhattanville Road, Suite 201

19        Purchase, NY 10577

20

21   BY:   JARED WORMAN (TELEPHONICALLY)

22

23

24

25

14

1

2   JPMORGAN CHASE & CO.

3       Creditor

4       270 Park Avenue

5       New York, NY 10017

6

7   BY:   JACOB POLLACK (TELEPHONICALLY)

8

9

10  MONARCH ALTERNATIVE CAPITAL LP

11      Interested Party

12      535 Madison Avenue

13      New York, NY 10022

14

15  BY:   ROBERT BURNS (TELEPHONICALLY)

16

17

18  PENTWATER CAPITAL MANAGEMENT

19      Interested Party

20      Chicago, IL

21

22  BY:   JORDAN FISHER (TELEPHONICALLY)

23

24

25

15

1    SILVER POINT CAPITAL

2         Interested Party

3         2 Greenwich Plaza

4         Greenwich, CT 06830

5

6    BY:  JEFF FORLIZZI (TELEPHONICALLY)

7         CHAIM FORTGANG (TELEPHONICALLY)

8

9    WHIPPOORWILL ASSOCIATES, INC.

10        Interested Party

11        11 Martine Avenue

12        8th Floor

13        White Plains, NY 10606

14

15   BY:  ROGER TJONG (TELEPHONICALLY)

16

17   MICHIGAN DEPARTMENT OF ATTORNEY GENERAL

18        Attorneys for Creditor Michigan Department of

19         Environmental Quality

20        G. Mennen Williams Building

21        Sixth Floor

22        525 West Ottawa

23        Lansing, MI 48909

24

25   BY:  CELESTE GILL, AAG (TELEPHONICALLY)

16

```
1   NEW YORK STATE DEPARTMENT OF TAX AND FINANCE

2        Office of the Attorney General

3        Attorneys for Creditor, New York State Workers'

4         Compensation Board

5        The Capitol

6        Albany, NY 12224

7

8   BY:   NANCY HERSHEY LORD, ESQ. (TELEPHONICALLY)

9

10   JEFF GOLDFARB (TELEPHONICALLY)

11        Interested Party

12

13   JOHN LEFKORT (TELEPHONICALLY)

14        Interested Party

15

16   JOHN PAVELSKI (TELEPHONICALLY)

17        Interested Party

18

19   DAVID SHERBIN, IN PRO PER (TELEPHONICALLY)

20        Interested Party

21

22   JAMES SUMPTER, IN PRO PER (TELEPHONICALLY)

23

24   MIKE ZINDER (TELEPHONICALLY)

25        Interested Party
```

17

P R O C E E D I N G S

1

2          THE COURT:  Okay, in re:  Delphi Corporation.

3          MR. BUTLER:  Your Honor, good morning.  Jack Butler,

4     along with a number of my colleagues, including my partners,

5     Kayalyn Marafioti, Al Hogan, Ron Meisler, Eric Cochran and John

6     Lyons, here on behalf of Delphi Corporation for its plan

7     modification hearing.

8          Your Honor, today, we are asking you to consider a

9     series of modifications to the plan and confirmation order.  As

10    that confirmation order was entered on January 25, 2008 at

11    docket number 12359.  Your Honor, this hearing represents the

12    culmination of a tremendous amount of work by a tremendous

13    amount of parties.  Since the plan investors did not consummate

14    the original first amended joint plan of reorganization of

15    Delphi Corporation and its affiliated debtors and debtors-in-

16    possession back on April 4th of 2008.  As is customary, Your

17    Honor, in at least these cases, and I think, in Your Honor's

18    court, we are not going to -- the debtors are not going to make

19    any kind of an extensive opening statement.  We have a fair

20    amount of business to transact, in terms of getting things into

21    the record and addressing a variety of issues, including some

22    1900 plus objections that have been filed, many of which have

23    been resolved, but still need to be addressed.  And so I will,

24    Your Honor, at the appropriate time, toward the other end of

25    this hearing, ask for the opportunity to make a closing

18

1   argument and present Your Honor, really, the debtors'

2   perspective on what's transpired in these cases since January

3   25th of last year.

4          THE COURT:  Okay.

5          MR. BUTLER:  Your Honor, before moving to the formal

6   presentation of our case in chief, asking Your Honor to approve

7   these plan modifications under Section 1127 of the Bankruptcy

8   Code, I would like to introduce some of the principals that are

9   here today in court on behalf of the debtors that will be

10  presented as witness in this 1127 hearing.  I'd ask them -- you

11  know many of them, but I'd ask them, please -- the witnesses to

12  please stand when they're introduced.

13         First is Mr. Craig G. Naylor who's been a member of

14  our board of directors since 2005 and is the board's lead

15  independent director.  Mr. Naylor will offer testimony with

16  respect to the board of directors' approval of the modified

17  plan and the underlying transactions.  Is he in the courtroom

18  at the moment?  Our witnesses actually need to come in here, so

19  you should get them.  So Mr. Naylor will be testifying, as

20  well.  And I assume that's where Mr. Miller is, as well?  There

21  he is.

22         Second is Mr. Robert S. Miller, Jr.  Mr. Miller is the

23  executive chairman of the board of directors of Delphi

24  Corporation.  He was the chairman and chief executive of Delphi

25  when Delphi and its subsidiaries filed these Chapter 11 cases

19

1    and continued in that role until December 31, 2006 when the

2    board and he turned the reins of the CEO role over to Rodney

3    O'Neill.  Mr. O'Neill has led the company since that time,

4    together with Mr. Miller in partnership as Mr. Miller has

5    retained the role of executive chair.  And Mr. Miller will

6    testify to a number of issues today, including the major

7    objectives of the debtors' Chapter 11 cases, and the debtors'

8    role in the global automotive industry as well as the business

9    judgments that have been exercised by the debtors.

10              THE COURT:  Okay.

11              MR. BUTLER:  third person I'd like to introduce -- who

12    you know well -- is Mr. Sheehan.  John D. Sheehan is the vice-

13    president and chief financial officer of Delphi Corporation.

14    He's been before this Court on numerous occasions to offer

15    testimony in the past.  Today he will offer testimony with

16    respect to the negotiations and due diligence conducted in

17    connection with the debtors' entry into the MDA and related

18    auction process as well as the results of the auction process

19    that was conducted over two days earlier this week.  And he

20    will offer testimony in support of the various confirmation

21    requirements under Chapter 11 of the Bankruptcy Code as 1129 of

22    the Code is referenced within Section 1127, and therefore,

23    relevant to this hearing.

24              The next witness is Mr. Keith D. Stipp.  Mr. Stipp is

25    Delphi's executive director in charge of restructuring, and he

1    will offer testimony with respect to the MDA, the modified

2    plan, and the reorganized debtors' postemergent state

3    operations and feasibility issues associated with that.

4              THE COURT:  Okay.

5              MR. BUTLER:  And our two outside financial advisors

6    who have been involved from the beginning of these cases.

7    First Mr. Shaw, William R. Shaw, is a managing director at

8    Rothschild, Inc., a financial advisor, investment banker to the

9    debtor, to Delphi, and has been the debtors' lead strategic

10   financial advisor.  And he will offer testimony in connection

11   with the debtors' analysis of the transactions that have been

12   considered over the last number of weeks by the debtors.

13             And Mr. Randall S. Eisenberg is the senior managing

14   director at FTI consulting, the debtors' restructuring and

15   financial advisor, and he will offer testimony to, among other

16   things, the best interest test that needs to be revisited under

17   Section 1129 today.

18             Your Honor, what I'd like to do next, if I can, is

19   address the evidentiary record, and then I'm going to come back

20   and talk about voting and a number of other issues.

21             THE COURT:  Okay.

22             MR. BUTLER:  Your Honor, in support of the debtors'

23   case in chief, we have prepared a comprehensive joint exhibit

24   list that has been reviewed with the principal stakeholders and

25   what were formerly the principal objectors to this matter -- to

1     this motion, and from most of which we've now resolved their

2     objections.  The exhibit list has 634 documents listed, and the

3     documents are divided into 38 categories, as outlined.  I'm not

4     going to go through each of the categories.  I will offer the

5     declarants whose declarations we're going to put into evidence,

6     I will offer those for cross-examination and any questions that

7     the Court may have.  Before I move entry of these exhibits and

8     determine whether there are any objections to them, I do want

9     to make two statements about today's record.  And this record,

10    this really applies -- well, let me deal with them in order.

11            First, I want to state as follows.  That, if Your

12    Honor approves our 1127 motion, today, and there's a subsequent

13    termination of the MDA, and in connection with the parties'

14    reservation of rights there under, the parties to the MDA will

15    not be prejudiced by their support of the transaction at this

16    hearing or by the evidentiary record established at this

17    hearing, and in that event, all parties reserve their rights to

18    supplement and/or challenge the evidence submitted in any

19    further proceedings.  As Your Honor must surely understand,

20    this is an extraordinarily complex series of transactions.

21    There have been agreements reached and bridges built across

22    disparate interests in this case.  And those agreements all

23    center around the transaction that we're bringing -- the

24    debtors are bringing before the Court today.  If that

25    transaction somehow falls away, people don't want to be

22

1    prejudiced and want to be back to their original positions.

2    And they don't want the debtors, or frankly, anyone else, to

3    use the evidentiary record at today's hearing as a -- either a

4    shield or a sword in whatever might happen in that unlikely

5    event.

6           THE COURT:  Okay.  On the record, also, the debtors

7    have, in their motion, sought an alternative if approval under

8    1127 isn't granted, the alternative being a sale under Section

9    363.  Is it their intention that this record serve as the

10   record for both requests?

11          MR. BUTLER:  Your Honor, it would serve as the record,

12   but the debtor is to be clear.  The debtors are not moving

13   forward on the 363 motion.  And we would view this hearing to

14   really be in two parts, two stages.  We intend to present our

15   1127 motion first and seek Your Honor's approval of that

16   motion.  And if we fail in that effort, we would then ask for a

17   brief recess and we would then proceed with a 363 motion, the

18   alternative relief under this motion.

19          THE COURT:  Okay.

20          MR. BUTLER:  But we're not -- and we would rely on the

21   same exhibits, the same record.

22          THE COURT:  You would?

23          MR. BUTLER:  We would --

24          THE COURT:  Okay.

25          MR. BUTLER:  -- for those matters.

23

1          THE COURT:  All right.

2          MR. BUTLER:  We may actually supplement it in a few

3     ways at that time, that are -- some things that are unique to a

4     363 -- a stand-alone 363 set of transactions.  And certainly

5     some of my argument would be different in that circumstance,

6     but we would apply this evidentiary record to that alternative

7     relief if we have to go there.

8          THE COURT:  Okay.

9          MR. BUTLER:  Similarly, Your Honor, with respect to

10    our plan investors, Appaloosa has filed a limited objection and

11    there are various joinders to that, at docket number 18345,

12    18347, 18348, 18349, 18350, 18675, and 18677, and there may be

13    a few that I didn't note in terms of the filings made on behalf

14    of the plan investors.  I simply want to indicate, Your Honor,

15    the debtors' acknowledgement that this evidentiary record is

16    not to be used as any kind of either sword or shield in the

17    adversary proceedings that are currently before the Court in

18    the adversarial proceeding litigation involving the plan

19    investors.  So that the findings we're asking Your Honor to

20    consider making today and the record today could not, on its --

21    in terms of the record of the findings, be used as findings of

22    the Court in that litigation.

23          THE COURT:  Okay, that's fine.  Before you go on, I

24    know there are a number of people standing here and apparently

25    our overflow room overflowed.  So there's an additional room,

24

```
 1    Room 701, if you -- with audio and video, if you would prefer

 2    not to stand and would only be watching, in any event.  Okay.

 3            MR. BUTLER:  So, Your Honor, with those two

 4    understandings, at this time, Your Honor, the debtors submit to

 5    cross-examination on specific witnesses that I will deal with

 6    in a few minutes.  But the debtors would move for admission all

 7    634 documents listed on the joint exhibit index.

 8            THE COURT:  Okay.  Does anyone have any objection to

 9    their admission?

10            MR. FOX:  Edward Fox, Your Honor, for K&L Gates on

11    behalf of Wilmington Trust Company as indentured trustee.  Your

12    Honor, with respect to the plan modification motion, Wilmington

13    Trust will not be pursuing its objections, and we have no

14    objection to the introduction of the exhibits.  However, we do

15    reserve our rights, in the event the evidentiary record is

16    going to be used in any other proceeding, including a 363 sale

17    motion, in the event the plan modification is not approved.

18            THE COURT:  Okay, you can raise that at that point.

19            MR. FOX:  Thank you.

20            MR. ROSENBERG:  I assume that goes for the committee,

21    as well, Your Honor --

22            THE COURT:  Yes.

23            MR. ROSENBERG:  -- we can reserve it.  Okay.

24            THE COURT:  That's fine.  All right, I'll admit those

25    documents into evidence, then --
```

25

1           MR. BUTLER:  Thank you.

2           THE COURT:  -- subject to all the caveats and

3    reservations that have just been outlined on the record.

4    (634 Various Joint Exhibit Documents were hereby received into

5    evidence, as of this date.)

6           MR. BUTLER:  Thank you, Your Honor.

7           THE COURT:  Given the number of these documents,

8    rather than having me wrestle with them, which is what I've

9    done when there have been fewer binders, I'm going to ask you

10   all to give me copies of the witness book when you have a

11   witness.  That will make things go faster, too, I think.

12          MR. BUTLER:  Okay.

13          MS. MEHLSACK:  Your Honor, if I may.  Barbara Mehlsack

14   for the operating engineers and the IBW and UIM.  We had filed

15   an amended objection --

16          THE COURT:  I read that.

17          MS. MEHLSACK:  -- last night, and we just wanted

18   assurance that that was going to be included in the record, as

19   well.

20          THE COURT:  It's on the docket and I've reviewed it,

21   so yes.

22          MS. MEHLSACK:  Okay, thank you, Your Honor.

23          THE COURT:  Yes.

24          MR. BUTLER:  Can I have just one moment, Your Honor?

25          THE COURT:  Sure.

26

1       MR. BUTLER:  Your Honor, I'd like now, if I could, to

2  proceed to the witness declarations.  One of my colleagues will

3  pass up the declarations to you --

4       THE COURT:  Okay.

5       MR. BUTLER:  -- as we go through them along with the

6  appropriate exhibits.  We're going to start, Your Honor, if we

7  could, by offering Mr. Sheehan.

8       THE COURT:  Okay.

9       MR. BUTLER:  And we'd offer Mr. Sheehan with respect

10  to -- just get my -- we'd offer Mr. Sheehan with respect to

11  three declarations that have been filed that are Joint Trial

12  Exhibits 48, 49, and also Trial Exhibit 48-A dealing with the

13  plan modifications, the auction process, and due diligence

14  efforts.  Two of those declarations were prepared on July 19th.

15  The declaration dealing with the auction process and related

16  business decisions was dated July 28, 2009.  Mr. Sheehan's

17  declarations have been designated by the parties as highly

18  confidential, and they've been provided to the Court on that

19  basis.  And I would offer Mr. Sheehan for cross-examination by

20  any party as part -- and I think, just, I'll start this just

21  try and make it simpler because I can hear more reservations

22  coming.  I'm going to offer him in this morning's sessions for

23  cross-examination in connection with the debtors' request that

24  Your Honor approve the plan modification motion.  If we go into

25  the second phase of this proceeding, and I seek alternative

27

1    relief under the 363 sale, it's my intention to come back and

2    offer them again for purposes of those declarations being

3    considered in that context, and give any party who wants to

4    cross-examine them in that context for that relief, the

5    opportunity to do so, if that's acceptable to the Court.

6        THE COURT:  That's fine.

7        MR. BUTLER:  All right, so with that statement, then,

8    I'd offer Mr. Sheehan and his declarations, again, Joint

9    Exhibits 48, 48-A, and 49 for cross-examination by any party or

10   any questions the Court might have.

11       THE COURT:  Okay, does anyone want to cross-

12   examination Mr. Sheehan on his three declarations?  Okay,

13   hearing no one, I don't have any questions, having reviewed

14   those declarations.

15       MR. BUTLER:  Thank you, Your Honor.  Your Honor, I

16   would next like to present Mr. Keith D. Stipp to be cross-

17   examined with respect to his declaration which is Joint Exhibit

18   50, cross-examination by any party or any question that the

19   Court may have.

20       THE COURT:  Does anyone want to cross-examine

21   Mr. Stipp?  I guess the only question I had, and not

22   necessarily of Mr. Stipp.  It could be of you or another party,

23   is it appears to me the -- I wanted to nail down the likelihood

24   of obtaining the emergence capital which he briefly addresses

25   in his declaration.  You can address it, he could address it

1   based on his knowledge.

2          MR. BUTLER:  Your Honor, with respect to the emergence

3   capital that is being dealt with here, there is emergence

4   capital coming in a couple of different ways, and I'm not sure

5   which one you want.  Let me just briefly address each of them.

6   Mr. Sheehan's supplemental declaration, Exhibit 48-A, talks in

7   detail about the capitalization of, what I'm going to call for

8   this hearing, New Delphi, which is that entity that is going to

9   have the assets, substantially all the operating assets that

10  are not either being divested by Old Delphi under DPH Holdings

11  Company or having not been sold to General Motors through its

12  subsidiary.  And Mr. Sheehan has outlined the transactions that

13  have been agreed to by General Motors and by a number of DIP

14  lenders to capitalize that company, and that's described in

15  detail in Mr. Sheehan's declaration.  And when I get into the

16  argument, I'll go through it in some detail.  But the reality

17  is, though, and I think that Mr. Bernstein -- and let me just

18  address a bit of protocol, here.

19          This is the administrative agent's pure credit bid

20  that we'll be talking about a lot today, and so I will, because

21  under the protocol, it is the agent that acts, I will be

22  addressing Mr. Bernstein as the administrative agent.

23  Mr. Bernstein will be quick to remind me that in this

24  particular instance, the administrative agent acts pursuant to

25  directions that it has received from the required lenders under

29

1    the credit agreement that it has determined in its own judgment

2    to be valid directions that directs it to behave in a certain

3    way or conduct itself in a certain way on behalf of the

4    lenders.  And therefore, I fully expect, when I direct certain

5    statements to Mr. Bernstein or I attribute certain things to

6    Mr. Bernstein, that he will, in fact, designate someone on

7    behalf of the, what I would call the principal DIP lenders,

8    those folks who have been the driving forces behind this

9    consensual transaction and who own a very significant part of

10   the DIP facility to speak on their behalf.  And as Your Honor's

11   aware, those firms are represented, either the Tranche C

12   collective and that group of firms represented by Willkie Farr,

13   and Mr. Abrams is here in court with his colleagues to address

14   that, and its funds, and there are various funds that are

15   involved, are represented by Dechert, and Mr. Siegel's here in

16   court with respect to those individuals.

17        So as we go through this, even from the debtors'

18   perspective, this is a pure credit bid and I deal with the

19   administrative agent.  The fact is, the administrative agent

20   deals with the required lenders.  The required lenders are

21   essentially represented by the entities that Mr. Siegel and

22   Mr. Abrams represent.  And so as we go through that process, I

23   should just place that on the record because there will be,

24   from time to time, there will be comments that will be made and

25   Your Honor should understand some basis of why we're dealing

30

1    with this.

2            And in that regard, with respect to the capital

3    commitments I've just discussed, those are outlined in

4    Mr. Sheehan's supplemental declaration in Joint Exhibit 48-A.

5    Attached to Exhibit 48-A is the highly confidential transcript

6    of the auction proceedings that were held over some eighteen

7    hours on this past Sunday and Monday at our law firm which over

8    a hundred people participated starting at 1 o'clock in the

9    afternoon on Sunday and concluding at 7 o'clock in the evening

10    on Monday.

11            And during the course of those proceedings, there was

12    an occasion -- after the pure credit bid was submitted, there

13    was an occasion for the parties to overnight review the pure

14    credit bid, Sunday evening, Monday morning, and there was an

15    extended session on the record in which I asked, on behalf of

16    the debtors, a series of questions to the administrative agent

17    addressing a number of issues.  One of the issues was the issue

18    Your Honor talked about, capitalization.  Mr. Bernstein and the

19    administrative agent designated Mr. Lefkort, who is one of

20    Mr. Abrams' colleagues, to address those issues, and that is

21    both transcribed in the auction record and is discussed in

22    Mr. Sheehan's affidavit.

23            The second piece of capitalization is the

24    capitalization for DPH Holdings.  DPH Holdings capitalization

25    comes from a number of transactions under the proposed MDA.

31

1    Those would include some funding that comes from the parties

2    including principally from General Motors through a subsidiary

3    -- and when I say General Motors, here, or General Motors

4    Company, I'm talking about new GM to which this transaction has

5    been assigned in Judge Gerber's courtroom, and I am speaking as

6    -- generally, when I say General Motor's, just for the benefit

7    of the GM parties in the room, I'm meaning the particular

8    affiliate or subsidiary or designee under the documents.  I'm

9    not going to try to go up through the precise designations,

10   here.  But generally, under the MDA, there's funding that

11   occurs from the parties to DPH Holdings.  So there's

12   capitalization in that way, there's capitalization in the way

13   that there are retained assets as well as retained liabilities

14   in DPH Holdings, including non-core --

15            THE COURT:  You don't need to go through that.

16            MR. BUTLER:  Okay.

17            THE COURT:  My real concern was, where money is coming

18   from third parties, either DIP lenders or GM, the state of its

19   commitment.

20            MR. BUTLER:  Right.

21            THE COURT:  I know there is second tier level funding

22   that the DIP lenders are going to seek, but in terms of the

23   actual funding --

24            MR. BUTLER:  Right.

25            THE COURT:  -- the level of the commitment.

32

1          MR. BUTLER:  Right.  Let me state it and then

2  Mr. Bernstein can designate Mr. Abrams to respond or

3  Mr. Siegel.  But as it's been represented to the debtors, and

4  the base on which our board of directors exercises business

5  judgment, the commitments associated with all of the GM-related

6  funding are hard and firm, based on the terms of the

7  agreements, and the financing that is being taken on by those

8  parties that are financing the what I'll call New Delphi, those

9  financing transactions have been signed up to and committed to

10  on an initial basis by, essentially, Silver Point and Elliott,

11  and they have -- and I'll talk more about this later, but they

12  have, or they're providing an opportunity for other DIP lenders

13  to participate.

14          THE COURT:  Right.

15          MR. BUTLER:  But one of GM's requirements, and

16  eventually, Delphi was comforted by this, whatever backstop

17  there may be, these commitments, whatever rights offering, if

18  you will, or syndication, if you will, depending on how you

19  want to think about it of these transactions to other DIP

20  lenders to give them the opportunity to participate, the

21  obligations remain hard with the Silver Point and Elliott-

22  related entities.  I think Mr. Siegel and Mr. Abrams can

23  confirm that on the record.

24          MR. BERNSTEIN:  Your Honor, I'm going to -- Allen

25  Bernstein, for the administrative agent.  I am going to pass

33

1   the baton both to Mr. Abrams and Mr. Siegel.

2          THE COURT:  Okay.

3          MR. SIEGEL:  Good morning, Your Honor.

4          THE COURT:  Good morning.

5          MR. SIEGEL:  I can confirm that what Mr. Butler said

6   is, in fact, the case, that the Elliott funds have backstopped

7   the financing commitment that have put their own balance sheet

8   at risk, here, but they are offering it on to others.

9          MR. ABRAMS:  Your Honor, Marc Abrams.  The same is

10  true with respect to funds managed by Silver Point Capital.

11  Both Silver Point Cap and Elliott have committed to GM almost

12  900 million dollars in capital that would be utilized to

13  capitalize the New Delphi along with the GM contributions

14  Mr. Butler alluded to.  And then, again, as Your Honor has

15  already grasped, there will be a sell-down mechanism to spread

16  that risk.  But that sell-down mechanism does not impact the

17  commitment.

18         THE COURT:  Okay, thank you.  That was my only

19  question that was raised by the Stipp declaration.

20         MR. BUTLER:  Your Honor, then, moving on, our third

21  witness in support of our plan modification motion would be

22  that of Mr. Miller.  As you know, Steve Miller has been the

23  debtors' executive chairman throughout this process.  His

24  declaration is Joint Exhibit number 46, and I would present him

25  for cross-examination for any party in connection with the plan

34

1   modification motion or any questions the Court might have.

2        THE COURT:  Okay, does anyone wish to cross-examine

3   Mr. Miller on his declaration?  Okay, I don't have any

4   questions of Mr. Miller, either.

5        MR. BUTLER:  Thank you, Your Honor.  Your Honor, the

6   fourth witness the debtors would present in support of our plan

7   modification motion is Mr. Craig G. Naylor, our lead

8   independent director on Delphi's board of directors.  His

9   declaration is set forth as Joint Exhibit number 47.  Again, I

10  present him for cross-examination or any questions the Court

11  might have.

12       THE COURT:  Does anyone want to cross-examine

13  Mr. Naylor?  Okay, again, this probably could have been of

14  Mr. Sheehan, as well, it could be of you, Mr. Butler, also.

15  One feature of this transaction is the agreement by the winning

16  bidders to make a payment to the stalking horse, Platinum.  And

17  I took not only from Mr. Sheehan's supplemental declaration,

18  but from the fact that the board approved the entire

19  transaction, the board concluded that that payment didn't chill

20  the bidding but was made for valid purposes between GM and the

21  bidders on one hand and Platinum on the other.  But it wasn't

22  directly addressed by Mr. Naylor's affidavit.  I just want to

23  make sure that was something that was considered by the debtors

24  in seeking approval of the bid that they've identified as the

25  winning bid.

1            MR. BUTLER:  Your Honor, I can confirm that that's one

2    of the factors that we took into consideration.  I would also

3    say -- and I'm going to talk about this later, as well --

4    Platinum Equity has played a critical role in these Chapter 11

5    cases over the last several months, and indeed, in many ways,

6    over the last several years.  And they were absolutely critical

7    to the process over the last two months, two to three months,

8    since early April of this year.  And that will, I think, become

9    even -- if it's not already apparent to Your Honor from the

10   declarations, I hope to make it very apparent in my closing

11   argument.  And that included in participating in this auction

12   process.

13            As Your Honor is aware, when we filed our plan

14   modification motion on June 1st, we filed it in a transaction

15   with Platinum Equity and General Motors when the debtors had

16   concluded, based on the representations then having been made

17   at that time which were relevant at that time, that the lenders

18   weren't prepared to participate in the transaction and the

19   alternative to a deal was liquidation.  And we were able to

20   work out that transaction and then move forward with it, and

21   that has led to this auction process.  And the earlier hearings

22   on June 10th when Your Honor approved a resolicitation and

23   other procedures for this, Your Honor, on the record, at the

24   request of the lenders and the committee and others, Your Honor

25   wanted to make very sure that our duty under the June 1st

1   agreement to consider unsolicited alternative transactions in

2   accordance with our fiduciary responsibilities had as much

3   transparency as possible so that parties close to this

4   transaction could see it up close and examine it.  You asked

5   the creditors' committee to monitor that, which they did

6   faithfully throughout this process, and we administered it.

7   Under the supplemental procedures, which were Exhibit N to the

8   original order, the modification procedures order, we qualified

9   three third-party bidders that were being considered and did

10  due diligence and considered transactions.  And none of those

11  bidders, as Your Honor's aware, none of those bidders, by July

12  10th, which was the deadline for the submission of proposed

13  qualified alternative transactions, submitted any proposals.

14  That was one phase of this process, and so while it didn't

15  particularly surprise the debtors in terms of the outcome in

16  connection with that because of the complexity of this process

17  and the various risk allocation, other issues that have to be

18  considered, we ran that part of the process.  And a good

19  portion of, I think, what Your Honor -- at least the debtors'

20  belief of what Your Honor wanted us to do from June 10 forward,

21  was to run a transparent process that would give the parties

22  that are in this case and invest in this case an understanding

23  of whether a third-party would come in and propose a higher or

24  better alternative transaction.  And they would have the

25  information upon which to do that.  We ran that process, July

37

```
1   10th came, those three qualified bidders did not submit an
2   alternative.
3           At the same time we were going through this process,
4   as Your Honor is also intimately aware of, we had any number of
5   chamber conferences and discussions between the parties about
6   how a pure credit bid might be submitted.  And Your Honor
7   recognized, as the debtors did, that a pure credit bid is
8   different.  It's different in terms of the kinds of remedy it
9   is, it is different under 363(k), and Your Honor concluded in
10  the Court's judgment that some but not all of the supplemental
11  procedures should apply to a pure credit bid.  And Your Honor
12  crafted with the parties and entered orders, supplemental
13  orders that laid forth procedures to address that pure credit
14  bid.  So when we got to the auction process, we ended up in the
15  auction process in, really, as our press release and others
16  indicated, really running a process between the original June
17  1st transaction in which General Motors was a party along with
18  Platinum, and a pure credit bid, in which the lenders had taken
19  advantage of paragraph 46 of the modification procedures order
20  which had set forth the ability, specifically, for General
21  Motors to negotiate with third parties and to participate in
22  transactions with them.  Relief, Your Honor, that could not, as
23  Your Honor, I think, recognized at a prior hearing involving
24  Platinum, could not have been put in place without Platinum's
25  consent.  There was an arrangement put in that allowed,
```

1   essentially, GM to play, if you will, on both teams.   And that

2   made for a difference in the dynamics for the auction process.

3   And would that Your Honor had been in our auction room over the

4   weekend where these 125 people, all told, participated at one

5   point, you would have seen that, in fact, the various tables

6   were around, the bidder tables, there was Platinum on the one

7   hand, there were the administrative agent on the other with the

8   DIP lenders behind him, and right in the middle was General

9   Motors at its own table because it, in fact, was negotiating

10   with both sides and was parties to both and actually had

11   committed to the company and committed to the Court, and

12   commits here, today -- because we've designated the Platinum

13   transaction as the alternate transaction -- that it would

14   fulfill its responsibilities under either, and the modification

15   procedures already gave it that ability.   That dynamic, set up

16   by the modification procedures order, and in light of the fact

17   that there were the three third-party, if you will, sort of,

18   independent qualified bidders chose not to continue to

19   participate in the process really led from July 10th through, I

20   believe, this morning, a series of negotiations and discussions

21   which the company has encouraged that would cause the bids to

22   be presented to be the highest and best bids on both sides, but

23   also encouraged the parties to try to work together to come to

24   a consensual transaction.   It really was a continuation of the

25   efforts Judge Morris had begun both quite capably in the

1   judicial mediation to try to bring these parties together.  And

2   so I -- well, I can assure you that up until the minutes before

3   the auction was closed, I think Mr. Rosenberg would agree with

4   me as the monitor of the auction, there was no chilling of the

5   bidding going on between those parties, but there was -- and I

6   need to say on this record -- there was the unusual dynamic of

7   having General Motors involved in both bids, and there was the

8   desire of the debtors, and I think others, the people involved

9   in the auction of trying to have an environment where we ended

10  up at the end of the auction with the best MDA that did not

11  involve the DIP lenders, and the best pure credit bid MDA that

12  involved the DIP lenders.  So we'd have those two transactions

13  to look at.  I think we accomplished that.  As part of those

14  discussions -- and these discussions, by the way, did not

15  include the debtors, but we knew that they were going on --

16  Platinum, General Motors, and the DIP lenders that constituted

17  the required lenders had a series of discussions, and then they

18  placed an agreement on the record -- and it is on the auction

19  record, it is attached and described; we had it transcribed --

20  it is attached to Exhibit 48-A -- set forth in detail this

21  understanding that had been reached, and we did, both with the

22  monitors of the auction, which are the creditors' committee,

23  the UAW and the IUE -- although the IUE did not participate --

24  but with the monitors that did participate, and then

25  ultimately, with the board of directors, we reviewed all of the

40

1    events that had transpired at the auction, including the

2    agreement by those two parties to pay 30.5 million dollars in

3    expense reimbursement and other payments to Platinum.  And

4    coupled with that was an understanding that those parties would

5    continue to work with each other about Platinum's potential

6    involvement in the pure credit bid.  And as I understand it,

7    those discussions have been continuing over the last several

8    days.  We may have something to say about that before the

9    record, here, today, is closed.  The debtors viewed that

10   statement, and we consulted with Mr. Rosenberg about this.  The

11   cofiduciaries of the case viewed those payments as implicating

12   1129(a)(4) and believe that they needed to be publicly

13   disclosed and brought to Your Honor's attention, and we believe

14   they need to be approved under the Bankruptcy Code.

15             THE COURT:  Even though they're coming from a third --

16             MR. BUTLER:  Correct.

17             THE COURT:  -- party source, or two third-party

18   sources?

19             MR. BUTLER:  And the reason for that, Your Honor, is

20   because those two party sources, if Your Honor approves this

21   transaction, will actually be acquiring property of the estate.

22   And I think a literal reading of 1129(a)(4) says if you're a

23   party who's acquiring property of the estate, and you make

24   payments in connection with the consummation of the plan, those

25   fall, arguable, within the Court's purview.  And therefore, we

1   wanted there to be -- and particularly in light of Your Honor's

2   prior ruling when the debtors had brought an expense

3   reimbursement motion that was contested by some of these

4   parties for an amount that was not -- that's substantially

5   similar to what was agreed to, we believe that this needed to

6   have the transparency and light of day.  The debtors,

7   obviously, if we -- from a business judgment perspective, as

8   Your Honor knows, the debtors believed, under all the

9   circumstances, the prior motion was reasonable.  So you can

10  understand the board of directors, when they considered this

11  and added to it the support of the DIP lenders and General

12  Motors and the lack of opposition of the monitors at the

13  auction to this transaction, although Mr. Rosenberg agreed with

14  me that this needed to come forward under 1129(a)(4), we

15  believe that it was appropriate and do believe it's

16  appropriate, and do believe Your Honor should approve it as

17  part of this transaction.

18          THE COURT:  Okay.  All right.  I don't have any other

19  questions of Mr. Naylor.

20          MR. BUTLER:  Thank you, Your Honor.  Your Honor, the

21  fifth witness in support of our plan modification motion that

22  we'd like to present is William R. Shaw, the managing director

23  of Rothschild.  His declaration is Joint Exhibit 51.  And we're

24  presenting him for cross examination or for any questions the

25  party -- that Your Honor may have.

42

1          THE COURT:   Okay.   Does anyone want to cross examine

2     Mr. Shaw?

3          (Pause)

4          THE COURT:   Okay.   I don't have any questions of

5     Mr. Shaw.

6          MR. BUTLER:   Thank you, Your Honor.   Your Honor, our

7     sixth witness is Randall S. Eisenberg, who is a senior managing

8     director of FTI Consulting.   His declaration is at Exhibit 52.

9     I do want to point out, Your Honor, that this testimony, as we

10    have indicated in our plan modification order, is intended to

11    be introduced in connection with Your Honor's findings with

12    respect to the best interest test under Section 1129, and not

13    for other purposes.   And the findings we've asked you to make

14    in your order are limited to that purpose as it relates to

15    certain of the declarations -- certain aspects of

16    Mr. Eisenberg's declaration.

17         With that statement, Your Honor, I would offer

18    Mr. Eisenberg for cross examination or for any questions the

19    Court might have.

20         THE COURT:   Okay.   Does anyone want to question

21    Mr. Eisenberg?

22         (Pause)

23         THE COURT:   All right.   I have no question of him

24    either.

25         MR. BUTLER:   Your Honor, I'd like to move to voting,

43

1   then, and the voting declarations and address voting issues at

2   this time.

3         We start with the declaration of Evan Gershbein.

4   There are three declarations.  They are at Joint Exhibits 39,

5   40 and 41.  Mr. Gershbein is the senior managing consultant of

6   Kurtzman Carson Consultants LLC.  And --

7         THE COURT:  You don't need to give me those.  You

8   don't need to give me those.

9         MR. BUTLER:  Okay.  And I also, at the same time,

10  would present the declaration of Jane Sullivan, which is Joint

11  Exhibit number 42.  Ms. Sullivan is the executive director of

12  Financial Balloting Group LLC.  In connection with presenting

13  those declarations, Your Honor, I would call your attention to

14  Exhibit C to the declaration of Ms. Sullivan, which is also

15  contained in the demonstratives.

16        If I may, Your Honor, I have a couple of the

17  demonstrative books I could pass up, if I may --

18        THE COURT:  Okay.

19        MR. BUTLER:  -- for easier reference.  And Joint

20  Exhibit 53 has in it, which is -- and it's Chart 43 is the

21  proper reference, for the record -- shows the voting summary by

22  class.  And for purposes of today's hearing, there are five

23  classes that were impaired that voted in favor of the plan.

24  The balance of the classes voted against the plan.

25        And the parties that voted in favor of the plan, in

44

1     addition to three tax collectors -- in fact it was the same tax

2     collector with secured claims voting in three different

3     classes -- there was also classes of 1C-2 through 12C-2,

4     involving the PBGC claims.  The PBGC is by far the largest

5     prepetition creditor of these cases.  And they voted in favor.

6     And General Motors voted all of its claim in favor as well, at

7     1D to 12D.

8           I'm going to address a matter with the creditors'

9     committee in just a moment, but before I do that, Your Honor,

10    I'd like to get this evidence into the record.  And so I

11    present both Mr. Gershbein and Ms. Sullivan for cross

12    examination by any party or for any questions the Court might

13    have.

14          THE COURT:  Okay.  Does anyone want to cross examine

15    Mr. Gershbein on his voting declaration?  All right.  Does

16    anyone wish to cross examine Ms. Sullivan on her voting

17    declaration?  All right.  I don't have any questions of them,

18    either.

19          MR. BUTLER:  Thank you.  Your Honor, let me again

20    refer to Joint Exhibit 53, Chart 43, which is this large chart

21    that's in the demonstrative.  And obviously, one of the groups

22    of creditors that voted against this was class 1C-1, the Delphi

23    DAS debtors.  And while there are other classes that voted

24    against it, that is the class that had the most voting going

25    on, the most ballots cast, in connection with this.  And

45

1    Mr. Gershbein and Ms. Sullivan summarized those.  This

2    particular exhibit has only the percentages, but there were a

3    large number that voted against the plan.

4         I believe that there was a direct correlation to that

5    vote with the then recommendation of the creditors' committee,

6    which, as Your Honor knows, under the consideration that had

7    then been allocated to them, the creditors' committee

8    determined, in their good-faith deliberations, that they could

9    not recommend, notwithstanding what their assessment of where

10   they fall in the absolutely priority waterfall, they could not

11   recommend that the modifications be approved.

12        That has led to what I was confident would be --

13   hopeful that that was going to be the case, which was further

14   negotiations among the stakeholders.  There was, as we've

15   reported, and I indicated now -- there were resolutions of

16   objections reached, both with the creditors' committee and

17   Wilmington Trust to resolve the objections by the creditors'

18   committee, at docket 17034 and at 18291; and with Wilmington

19   Trust at dockets 17169, 18313 and 18471.

20        And that has -- with respect to the potential

21   distribution to holders of general unsecured claims and the

22   PBGC general unsecured claims under what I'll call the

23   waterfall schedule and the master disposition agreement, there

24   was an increase in the maximum from 180 million to 300 million.

25   And there was an agreement that starting at distributions in

46

1    excess of 7.2 billion, there would be for every -- I gather the

2    way I'm supposed to say this now is, for every sixty-seven and

3    a half cents of distributions under the waterfall, thirty-two

4    and a half cents would also be distributed to the holders of

5    those claims, which are -- and to emphasize them, those are

6    unsubordinated general unsecured claims.

7           Based on those negotiations, I think, based frankly on

8    the creditors' committee's role as a monitor of these

9    transactions since June 10th and their participation in the

10   assessment of all the due diligence activities that went on,

11   the conduct of the parties, their involvement in overseeing the

12   auction, all the things that weighed into this, I believe that

13   the conclusion of the creditors' committee now, is that in fact

14   they believe the plan modification motion -- and Wilmington

15   Trust as indenture trustee, believes the plan modification

16   motion should be approved and that I believe Mr. Rosenberg is

17   going to stand and confirm that he believes and the committee

18   believes that that approval -- it would be appropriate for the

19   Court to invoke the cram-down provisions of 1129(b) to

20   accomplish that result, as it relates to the class that they

21   represent.

22          THE COURT:   Okay.   Mr. Rosenberg, do you want to state

23   your views?

24          MR. ROSENBERG:   Your Honor, obviously, this is a

25   rather unusual situation where the creditors' committee urged a

1    negative vote.  The negative vote was overwhelmingly obtained.

2    But significant substantial increases in consideration were

3    subsequently negotiated, such that the creditors' committee now

4    feels that the result meets the lowest bounds of

5    reasonableness, I suppose is the best way to put it.

6            So it is an unusual situation where the committee has

7    withdrawn its objection to the plan amendment motion, not, I

8    would add, to the 363, if we get to that.  Because the

9    creditors' committee feels that the renegotiated consideration

10   is, as I suggest, within the lowest bounds of reasonableness.

11           So it is unusual, but -- and it obviously would have

12   been far better to have negotiated a result for a vote that the

13   creditors' committee could have recommended.  That didn't

14   happen.  But standing here today, we do withdraw our opposition

15   to the amended plan.

16           THE COURT:  Okay.  Thank you.

17           MR. BUTLER:  Your Honor, I believe that Mr. Fox will

18   stand to confirm that Wilmington Trust, being one of the

19   principal members of the committee, and having participated in

20   virtually all the same aspects of this proceeding that Mr.

21   Rosenberg did, similarly has agreed to withdraw their

22   objections and support requested of the modified plan.  There

23   is a mechanism that would call for a capped amount of their

24   fees and expenses to be paid.  It's -- that cap, actually, in

25   some respects is lower than the cap under the prior

1    confirmation order.  But that that cap amount be paid to them

2    invoking the reasonableness review that is set forth in the

3    prior confirmation order.

4           THE COURT:  Okay.

5           MR. FOX:  Edward Fox from K&L Gates for Wilmington

6    Trust, Your Honor.  Mr. Butler is correct.  I'd just join in

7    the comments that Mr. Rosenberg made with respect to the stance

8    that we're in.  But we believe at this time it is appropriate

9    to withdraw the objection, with respect to the plan

10   modification, not with respect the separate 363.

11          THE COURT:  Right.

12          MR. BUTLER:  Your Honor, let me just comment on the

13   current status of the modified plan and of the proposed plan

14   modification order.  The plan itself was first filed on June

15   1st -- excuse me -- filed on June 1st, that's correct.  But the

16   plan, after it had been reviewed by Your Honor at the June 10th

17   hearing, the plan that Your Honor ordered resolicitation of

18   certain classes on to check their -- to resolicit acceptances

19   or rejections of the plan modifications, that was filed

20   publically at docket number 17030 and is Joint Exhibit 1 to

21   this record.

22          The debtors then made further modifications to the

23   plan in connection with negotiations with its stakeholders.  It

24   included those modifications in an appendix to its omnibus

25   reply to objections that were filed.  It was filed on July 27th

49

1    at docket number 18659.  And those modifications are Joint

2    Trial Exhibit 632.

3         There have been further negotiations that have

4    occurred with respect to the modified plan.  And that black

5    line is set forth in Joint Exhibit 8.  And Joint Exhibit 8 is

6    the current form of the modified plan.  Prior to closing this

7    record, I'll want to consult with the principal parties to make

8    sure that there's nothing else to go in with respect to that.

9    But the current state of the modifications is Joint Trial

10   Exhibit 8.

11        With respect to the proposed form of plan modification

12   order, the order as originally proposed by the debtors after

13   consultation, but not acceptance -- but consultation with many

14   of its stakeholders, was also filed as an exhibit or an

15   appendix to our omnibus reply on July 27th.  Again, at docket

16   number 18659.  And it's also been marked Joint Trial Exhibit

17   632.

18        Since that time, over the last couple of days, we have

19   made further progress on obtaining a consensual form of order.

20   The state of that progress as of midnight last night is set

21   forth in Joint Trial Exhibit 11.  And there's a black-line at

22   Joint Trial Exhibit 9.

23        THE COURT:  And that's the one dated July 28th?

24        MR. BUTLER:  Correct.

25        THE COURT:  Okay.

50

1     MR. BUTLER:  And that one -- that actually represents

2   the state of the order as of midnight, getting ready for

3   today's hearing.

4     Your Honor, I'm not going to address those matters in

5   this morning's session any further.  There are continued

6   discussions that are going on between the parties into the form

7   of those, and we will address those in the afternoon session,

8   as it relates to those matters.  But that's the current -- I

9   just wanted to make sure we had the current state of those

10  documents on the record.

11    THE COURT:  Okay.  And the plan is -- the modification

12  is the one dated July 28th also, right?

13    MR. BUTLER:  Correct.

14    THE COURT:  Okay.

15    MR. BUTLER:  Your Honor, what I'd like to do now is

16  move to an overview of objections, and make some statements

17  about those objections, and find out if we can let some of

18  these folks go home, if they want to, unless they want to stay

19  to the end of the day or whenever this record is completed.

20    We have, Your Honor, filed a summary of the objections

21  by nature of objection.  Those are listed at Appendix B to our

22  reply at that same document filed at docket number 18659, and

23  at Joint Exhibit 32, which listed by category the objections as

24  the debtors understood them, after having reviewed all of the

25  objections.

51

1          And we also filed as a joint trial exhibit, the

2    objection-by-objection summary which is quite long, because

3    there were a lot of objections that were filed to the plan.

4    And those are set forth at Joint Trial Exhibits 215 and 216.

5    There were, in total, some 1,900-plus objections filed to the

6    plan, because we construed each of the letter objections

7    written either by severance parties or by pensioners, who wrote

8    Your Honor and complained about various elements of actions

9    that have occurred in this case -- any of those letters that

10   were filed subsequent to the -- that were docketed subsequent

11   to the 10th of June, we have deemed to be an objection to this

12   hearing.

13          It's the debtors' position, based on interpreting Your

14   Honor's order, that any of the letter objections that were

15   filed prior to June 10th, were subsumed within Your Honor's

16   order of June 16th, relating back to June 10th, which overruled

17   all objections as it related to those at that time.  So there

18   are some 1,900-plus objections.

19          First let me deal with contract-specific objections.

20   There were sixty-four objectors that filed a total of ninety-

21   two contract-related objections, regarding the assumption and

22   assignment, notices of nonassumption and assignment, cure

23   notices and related matters, that were, after consultation with

24   Your Honor previously, adjourned summarily to the August -- to

25   a hearing at 10 a.m. on Monday, August 17, 2009, and Your

52

1    Honor's findings in today's hearing with respect to those

2    objections -- or with the contracts that those objections

3    relate to, will be subject to those objections; and Your

4    Honor's resolution of those objections, if they're not

5    consensually resolved, on August 17th.

6           And therefore, we're not proceeding on any of those

7    objections today.

8           THE COURT:  And you've provided notice to all of those

9    parties of that?

10          MR. BUTLER:  We did, Your Honor.  We provided notice

11   in a number of different ways, including having people call

12   them up -- people on the telephone and send e-mails.  We

13   filed -- and our notice of when the auction results were

14   completed, we were required to send out another notice relating

15   to the fact that there's a new company buyer under the proposed

16   transaction.  We had to send notice out to everybody.  As Your

17   Honor recalls, from your prior procedures, that gives these

18   parties the right to file a supplemental objection, but only as

19   to the new company buyer, not as to cure other matters for

20   which objection deadline -- and in that notice, we told

21   everybody it was August 17th.

22          THE COURT:  Okay.

23          MR. BUTLER:  We sent e-mails it was on August 17th.

24   We've actually negotiated with a lot of people and said you

25   don't need to come today.  Some of those people are still here

53

1    because I think they wanted to hear me say what I'm saying on

2    the record.

3             THE COURT:  Okay.

4             MR. BUTLER:  So I'm saying on the record now at the

5    front end of the hearing so that they can take comfort that

6    their objections will be considered by Your Honor if they are

7    not otherwise resolved, on August 17th.

8             Your Honor, I also --

9             THE COURT:  Well, before you move on to the next

10   category.  I guess, if anyone is present who falls into that

11   category feels they need to say something now, as opposed to on

12   August 17th, this is the time to do it.

13            MR. MEARS:  Your Honor, I'm not planning to say

14   anything else.  This is Patrick Mears on behalf of Autocam

15   Corporation.  But we have had a number of discussions with

16   Mr. Butler and his colleagues, which I thank Mr. Butler for

17   arranging.

18            There are a number of contractual issues involved

19   here, just to briefly state, whether or not the purchase orders

20   can be considered separately from the long-term contracts, and

21   if they are, are they to be treated as post-petition contracts

22   not subject to Section 363, and also the adequate assurance of

23   future performance issues.

24            There are two contracts of ours that have been sought

25   to be assumed and assigned.  We understand that maybe more will

1   be coming, so that's a concern of ours as well.  We just want

2   to make sure of the following:  that all other Section 365

3   objections, and if applicable, state law objections, to

4   assignment are preserved.  And I think they are, based on what

5   I heard Mr. Butler say.

6        Secondly, if assignment notices are sent in the

7   future, we would have, obviously, the right to object to those.

8   There's some language that --

9        THE COURT:  You mean with regard to a new cont -- a

10  different contract?

11       MR. MEARS:  A different contract.  There's some

12  language in the order that if you read it one way it creates an

13  ambiguity, at least as I saw it.  And we would be able to

14  object on all the panoply of grounds that may be applicable.

15  And that if some or all of the remaining purchase orders are

16  sought to be assigned by Autocam as severable contracts, post-

17  petition contracts not subject to 365(f), then we would have

18  the right to object to those assignments in whatever court

19  would be entitled to hear it.  It could be this Court; it could

20  be some other Court.  And those issues would really involve,

21  most likely, nonseverability and adequate assurance of future

22  performance.  The severability, just briefly, relates to post-

23  petition purchase orders that relate to pre-petition contracts.

24  And there may be some reason that the debtor wants to sever

25  them.

55

1          So in light of all that, we have no problem with

2    adjourning the hearings to the 17th.  You've already done it,

3    but I did want to say that on the record.

4          THE COURT:  Okay.

5          MR. MEARS:  With respect to the sale order, there are

6    some problematic provisions in them.  We've discussed that with

7    Mr. Butler's colleagues, but right now we understand that

8    that's not before the Court.  This is kind of a two-step

9    process.

10         THE COURT:  That's right.

11         MR. MEARS:  Thank you.

12         THE COURT:  Thank you.

13         MR. BUTLER:  Your Honor, Mr. Mears and I have known

14   each other for many, many, many years, and I understand the

15   reservation of rights he's put on the record.  Obviously, the

16   debtors and other parties reserve their rights to the various

17   positions he might make.  I don't think we need to debate them

18   today, and we'll deal with them on August 17th.

19         THE COURT:  Okay.

20         MR. POWLEN:  Your Honor, you're getting a bit of a tag

21   team.  David Powlen, also from Barnes & Thornburg.  And

22   Mr. Mears spoke to Autocam.  The firm has also appeared and

23   filed objections on behalf of five other parties related to the

24   assumption and assignment of their contracts.  And Mr. Butler

25   and I also had a chance to visit, prior to the commencement of

1    this hearing, with respect to paragraph 35 on page 66 of the

2    proposed order.

3            THE COURT:  This is the sale order or the plan

4    modification order?

5            MR. POWLEN:  This is the sale order, Your Honor.

6            THE COURT:  All right.  But that's -- okay.

7            MR. POWLEN:  And it --

8            THE COURT:  I don't want to -- we don't need to get

9    into that one.

10           MR. POWLEN:  I understand, but we've confirmed and

11   he's willing to agree on the record that nothing in paragraph

12   35 is intended to impact in any way on the parties' objections

13   with respect to the assumption and assignment of contracts.

14           THE COURT:  Okay.

15           MR. BUTLER:  I'll just say, Your Honor, I don't

16   believe -- based on how we have taken Your Honor's guidance

17   about this hearing, I don't think we could adjourn the

18   assumption and assignment objections to August 17th and then

19   prejudice those objections by either of the two orders that

20   might be entered today.

21           THE COURT:  Okay.

22           MR. BUTLER:  Thank you.

23           MR. VIST:  Good morning, Judge.  Gary Vist on behalf

24   of American Aikoku.  We have filed three objections.  Two of

25   them are objections to notices of assumption and

1    nonassumption that we got in the past couple of weeks.  I

2    understand those will be adjourned.

3         The third objection that we filed is actually an

4    objection to the plan itself.  And the gist of the objection is

5    that the plan allows the debtor to violate the stipulation that

6    we have entered into about a year and a half ago.  And I would

7    like some guidance as to whether that objection will be heard

8    today or whether it will be postponed as well.

9         THE COURT:  I think it would be heard today.

10         MR. VIST:  Thank you, Judge.

11         THE COURT:  Okay.  All right.  Well, is there anyone

12    else?  No.  All right.  Anyone on the phone, or the gentleman

13    from Barnes & Thornburg or anyone else who's here just on a

14    contract issue, you can be excused.  And that would go for any

15    witness that doesn't want to stay around too.

16         MR. BUTLER:  Your Honor, I also would like to address

17    the letter objections that were dealing with some -- there were

18    some 600 plus severance related letter objections filed with

19    respect to the modified plan.  And the concern expressed by

20    those parties was that they might not receive all of the

21    installment severance that they were entitled to.

22         Just by way of reference, Your Honor, back in 2005

23    when these cases were filed, Your Honor entered a first-day

24    order that allowed us -- that authorized us but did not direct

25    us to be able to continue our human capital policies, but it

58

1   was clear in that order that we couldn't -- by continuing them

2   we couldn't create any administrative claims in the case,

3   necessarily.

4         There is, however, as Your Honor knows, a Second

5   Circuit precedent here as to parties severed in a -- persons

6   severed in a Chapter 11 case.  Absent any other determination

7   that might be case-specific, the Second Circuit's given pretty

8   specific guidance that those are administrative claims, that --

9   there are some exceptions to it, I believe, but there has

10  been -- and I think, frankly, in recent years, a number of

11  courts have been seeking to interpret the guidance from the

12  Second Circuit as to how it applies in today's world.  But

13  nonetheless --

14        THE COURT:  It's an issue.

15        MR. BUTLER:  -- that's been hanging out there.

16        THE COURT:  Okay.

17        MR. BUTLER:  The parties had -- the principal parties

18  to this transaction had negotiated with each other and have

19  agreed that those objections need not be considered by Your

20  Honor because the terms of this transaction, if you approve it,

21  will provide the wherewithal for those obligations to be

22  continued to be paid because the new Delphi would essentially

23  assume the payment of those obligations.  But there would be an

24  option -- and that would be over time, over installment basis

25  time -- but there's also going to be an option for parties to

59

1    receive seventy-five percent of the remaining severance

2    obligations in a lump sum now, prior to the effective date of a

3    modified plan.

4         And so parties that want the full pay-out and want to

5    assume the risks of a full pay-out, because as we've all

6    learned in this case and in other cases, the future is never

7    assured in any transaction.  And if people want to have the

8    comfort now, the parties have agreed to make capital available

9    to pay out seventy-five percent of any future payment stream on

10   a lump sum basis.  And that agreement and the agreement to

11   otherwise assume these liabilities, I think eliminates any

12   potential objection by those 600 objectors.

13        THE COURT:  All right.  Let me just address the early

14   payment option.  That would then be a provision of the MDA that

15   would go into effect prior to the effective date of the plan?

16        MR. BUTLER:  Right.  Yes, Your Honor.  We

17   essentially -- and another way of thinking about it is we

18   actually have -- I don't know if it's necessarily the MDA

19   they're going to effect prior to the plan, but I think I'm

20   saying this correctly and I will get help I know, today, if I

21   say things incorrectly.  But I believe the way in which that

22   particular matter will be implemented is that the debtors would

23   essentially --

24        THE COURT:  It wouldn't violate the MDA --

25        MR. BUTLER:  Right.

60

1          THE COURT:  -- for them to make that type of payment.

2          MR. BUTLER:  Correct.  The debtors will make those

3     payments prior to the effective date.  Our source of capital

4     for that will be the bridge financing that are being provided

5     by the DIP lenders under the DIP credit agreement through the

6     use of cash collateral accounts and by General Motors under the

7     GM arrangement.  Both of those would -- if Your Honor approved

8     these plan modifications, we will have three sources of funding

9     in -- the debtors, to bridge ourselves to emergence.  It will

10    be use of cash collateral accounts that we previously couldn't

11    use that are for the benefit of the DIP lenders; use of the

12    remaining funding under the LSA or the GM arrangement, as it's

13    known in this Court, with General Motors; and the repatriation

14    of excess global liquidity that we would then be able to

15    repatriate and use.  And there's a series of agreements that

16    have been worked out with the DIP lenders.  And this would not

17    be on the MDA side; this is actually on the administrative

18    agent side in agreements that will be documented.

19          In fact, there's an exhibit, accommodation agreement

20    amendment number 19, that does that, and there's, I believe, an

21    amended and restated GM arrangement on the GM side that deals

22    with how that will all work and how that fits together.  And

23    the only thing left to be done is to continue those

24    arrangements by further amendment to be coterminous with the

25    MDA.  And that would happen after -- presumably promptly after

61

1   Your Honor entered a plan modification, if Your Honor was

2   prepared to do that.

3          So that will be the source of our liquidity.   One

4   important feature of this transaction is that we will have

5   bridge liquidity to bridge us through a closing date which we

6   hope to be before the end of the third quarter of this year

7   and -- the quarter that we're currently in or we will soon be

8   in -- that we're currently in.   And it will be sufficient to

9   fund the settlements, among other things, Your Honor.

10          THE COURT:   Okay.   Does anyone who filed one of these

11   letter objections want to be heard on them?   All right.   I

12   agree with the debtors that these objections, given their

13   undertakings and agreements in connection with the MDA, are

14   moot.   To the extent they would not be, they're overruled.   I

15   believe there's sufficient funding as well as contractual

16   commitments for these obligations to be paid.

17          MR. BUTLER:   Thank you, Your Honor.   All right.

18   Continuing, Your Honor, with a summary of the sort of groups of

19   objections.   We obviously had objections filed in addition,

20   those filed by the creditors' committee and Wilmington Trust as

21   indenture trustee.   We had comprehensive objections filed by

22   the administrative agent and two groups of DIP lenders at

23   dockets number 18283, 18296, and 18300.   Several of those

24   objectors have filed supplemental statements in the last

25   twenty-four hours, and essentially, I think the best way to

62

1    summarize those is, assuming Your Honor enters the plan

2    modification order that approves the debtor's recommendation

3    accepting the pure credit bid on terms that are mutually

4    acceptable to the parties, including to those parties, they

5    will not pursue these objections, which I think is probably a

6    foregone conclusion to everyone, but I still need to check that

7    box and move on.

8              THE COURT:  Okay.

9              MR. BUTLER:  Now, if you look at the rest of the

10   objections, Your Honor, and we're focused on the objections

11   we've classified in various areas now.  I'll come back to them.

12   First I'd just like to summarize them and I'll come back to

13   individual objections.

14              In addition to the contract related objections,

15   there's nine other basic groups of objections, and this is

16   filing the groupings that we put in Joint Exhibits 215 and 216

17   and attached to our reply which is Joint Exhibit 632.  And

18   they're as follows.  There is some objections to the exercise

19   of business judgment by the debtors -- objecting to our

20   business judgment.  Mr. Kennedy in the IUE, for example, has

21   raised that objection in his objection.  So have a number of

22   the letter objectors.  And so I'm going to come back to that in

23   a few minutes.

24              The second broad category of objections are objections

25   by current and former employees, including the unions, and many

63

1    of those are pension related objections.  In fact, there are

2    well over 1,000 letter objections that are from pensioners that

3    object to what the debtors have done to date and what we are

4    proposing to do in connection with pension related matters.

5    And I'm going to come back to that because that, I think, is an

6    area of focus in this hearing.

7         The next category are government agency objections.

8    There were many agencies we had to work through, both federal

9    and state, in connection with preparing for this plan

10   modification hearing.  But the only surviving objection is that

11   of the Michigan's Workers' Compensation Agency at docket number

12   18264.  And while I'll address that down the line, my

13   understanding, as I've been advised, is that the state of

14   Michigan is going to rely on their pleadings that they filed on

15   their objection and are not going to present argument today.

16   Counsel's here and if I said it wrong they should tell me, but

17   I believe that's what I've been advised.  So we'll have to deal

18   with -- in category three we'll have to deal with Michigan

19   Workers' Comp.

20        In connection with the fourth category, which are

21   taxing authorities -- we had a lot of taxing authorities to

22   talk about in a lot of places.  We have resolved, I believe,

23   the objection -- there are only two remaining objections, one

24   of Howard County, Indiana at docket number 18218, which I

25   believe we have resolved, and one of the Texas taxing

64

1    authorities which is at docket number 18194, which I think at

2    the moment may not be resolved, but I have to sort that out in

3    a few minutes with some of our colleagues.

4         THE COURT:  Okay.

5       (Pause)

6         MR. BUTLER:  I'm advised, Your Honor, that Howard

7    County may want to address the Court on a limited aspect of its

8    objection, so we may have two of those objections to deal with

9    under taxing authorities.

10        With respect to areas that have been settled, there

11   are no remaining objections on four broad areas that would, I

12   think, otherwise have been contentious by parties.  There are

13   no longer any objections outstanding to release and discharge

14   obligations and mechanics under the plan.  There are no

15   outstanding objections to classification, impairment, or voting

16   issues, which is category 6.  There's no objections remaining

17   to the substantive consolidation mechanics of the plan.  And

18   there are no longer any objections to the 1129(a)(9) mechanics

19   and operation of that under the plan.

20        There are some miscellaneous objections -- that's

21   category 9 -- which we'll have to come back and deal with.  And

22   perhaps the most -- while we think it can be rather easily

23   dealt with by the Court, on the face of the papers the most

24   consequential of that is an objection filed by James Sumpter,

25   who filed both -- who actually filed it in the form of a COBRA

65

1    motion at docket number 18366.  And we filed an opposition at

2    docket number 16457.  But it's actually -- it's been construed

3    for these purposes as an objection to the plan.

4         So Your Honor, when we look at the various categories

5    of objections, there are a few individual objectors, you know,

6    an objector in governmental agency objections, two objectors in

7    taxing authorities, some miscellaneous objections dealing with

8    the COBRA matter.  And then there is, I guess, under

9    miscellaneous objections, I would add -- because I don't know

10    that it has been resolved yet -- is we do have a series of

11    objections filed by our former plan investors.  And I need, on

12    a break, to see where those discussions are before I address

13    the Court on those.

14         Our approach, Your Honor, would be to take those

15    objections -- I'd like, Your Honor, to ask for a brief recess

16    to consult with some of the parties, principal parties in this

17    case about where we are on some of these objections, and then I

18    would propose to go through the categories and take them

19    category by category and go through, if it's all right with

20    Your Honor, and litigate the objections and deal with them.

21         THE COURT:  Okay.

22         MR. BUTLER:  And then after we get through all those

23    objections, and at least get them on the record, Your Honor may

24    want to obviously -- you know, if we could just get argument on

25    the record at least from both sides.  We're going to want to

66

1    take a break and deal with any final issues relating to the

2    form of order and the form of the plan.  And then I don't know

3    if the other parties do, but the debtors certainly have a

4    closing argument we want to present.

5         THE COURT:  Okay.  Well, I may well rule on the

6    objections seriatim, which may affect the length of closing

7    argument.

8         MR. BUTLER:  Right.

9         THE COURT:  So how much -- I can give you half an

10   hour.  I can give you an hour.  I can give you ten minutes.

11   How -- what are you looking for here to consult with some of

12   the people who may have --

13        MR. BUTLER:  Can I have just a minute, Your Honor?

14        THE COURT:  Sure.

15      (Pause)

16        MR. BUTLER:  Your Honor, seeing as I have a track

17   record in this Court and in the board room of giving time lines

18   that people no longer have great confidence in, I will tell

19   Your Honor that I've decided, as I always have all along in

20   this case -- I've always decided that the shortest time line is

21   the best because you try to push people to it with no assurance

22   that we'll hit the mark.  And so I think, Your Honor, I'd like

23   to take a fifteen minute adjournment.  We'd advise --

24        THE COURT:  Okay.

25        MR. BUTLER:  -- chambers if we need any more time.

67

1          THE COURT:  That's fine.  Let me just -- is there

2    anyone else who thinks they have another objection that wasn't

3    summarized by category, just in case the debtors may want to

4    talk to you as well?  Okay.  So I'll be back at 12:15 unless

5    you notify chambers otherwise.

6          MR. BUTLER:  Thank you, Your Honor.

7          THE COURT:  And obviously you can leave all of your

8    materials here.

9        (Recess from 12:00 p.m. until 12:38 p.m.)

10          THE COURT:  Please be seated.  Okay, we're back on the

11    record in In re Delphi Corporation.

12          MR. BUTLER:  Thank you, Your Honor.  A couple of

13    housekeeping matters, if we could, Your Honor.

14          With Your honor's permission, the debtors would like

15    to release Ms. Sullivan and Mr. Gershbeim as witnesses?

16          THE COURT:  That's fine.  I said that any witnesses

17    who were not going to be testifying now are free to leave.

18          MR. BUTLER:  The other witnesses we've indicated are

19    subject to recall because if this flips to a 363 we'll need

20    them back.

21          THE COURT:  Okay.

22          MR. BUTLER:  Okay, thank you.

23        (Pause)

24          MR. BUTLER:  Your Honor, also, in connection with the

25    MDL litigation settlement that Your Honor approved at the July

68

1    23rd omnibus hearing, we've been asked to read a statement into

2    the record just for the abundance of caution, avoidance of

3    doubt that things we're doing here today aren't intended to

4    affect that settlement that was approved by you separately.

5    The settlement's been delinked from the plan.

6          THE COURT:  I thought the settlement was approved to

7    enable what you're doing today.

8          MR. BUTLER:  That's exactly right, Your Honor.

9          But I've been asked to read the following into the

10   record, and I shall as follows:

11         "With respect to the MDL plaintiffs, as the Court is

12   aware, the debtors have recently entered into modifications to

13   the MDL settlement that among other things delink the effective

14   date of the MDL settlement from substantial consummation of a

15   plan of reorganization.  This Court approved the modifications

16   in an order entered last week at the July 23rd omnibus hearing.

17   and the debtors are moving to a separate approval process in

18   the United States District Court for the Eastern District of

19   Michigan.

20         The releases of the debtors and any non-debtors

21   provided in the modified plan of reorganization are not

22   intended and shall not be construed to extend to the claim

23   asserted in the MDL actions, rather the releases of those

24   claims shall be as provided for in the MDL settlement as

25   modified as previously agreed to by Your Honor, approved by

69

1    Your Honor."

2            And the debtors agreed to that, Your Honor.

3            THE COURT:  Okay.

4            MR. BUTLER:  Your Honor, what we'd like to do before

5    what we hope would be a late lunch break is we'd like to be

6    able to take three or four of the categories of objections that

7    have one or two objectors in them and address them.

8            THE COURT:  All right.

9            MR. BUTLER:  We're going to deal with the business

10   judgment objections and the unions and pension-related

11   objections after the lunch break.

12           THE COURT:  Okay.

13           MR. BUTLER:  There are some unions that have indicated

14   they may have settled, and I'm going to try and confirm that,

15   and if there are I'll announce those before the lunch break,

16   but otherwise, we'll deal with any live objections, if it's all

17   right, Your Honor, after the lunch break.

18           I'm going to go to, sort of, category three under our

19   Exhibits 215 and 216, nature of objections.  Category 3 was

20   governmental agency objections.  I indicated to Your Honor that

21   the only objection is the State of Michigan Workers

22   Compensation Agency and Funds Administration.  The Michigan

23   agency which has filed its objection at docket number 18264.

24   I've just spoken to counsel during the break, I've spoken to

25   counsel to the agency and have confirmed with them that they

70

1    want to rest on the pleadings before you.

2              With respect to the debtors, Your Honor, I'd like   to

3    -- I would like to make an argument on their objection at this

4    time if that's acceptable.

5              THE COURT:  Okay.

6              MR. BUTLER:  Your Honor, by its objection, the agency

7    objects to the modified plan and the debtors' alternative

8    request to sell substantially all of its assets free and clear

9    of liens because the debtors estimate outstanding workers'

10   compensation obligations in Michigan account to a little more

11   than 121 million dollars with yearly payments of approximately

12   twenty-four million.  And the modified plan in the MDA do not

13   create in the agency's mind a sufficient commitment on behalf

14   of the purchasers to assume the workers -- the debtors'

15   workers' compensation obligations in Michigan.  They make the

16   following arguments:

17             First, they argue that the modified plan violates

18   1129(a)(3) because pre-petition workers' compensation claims

19   will not be paid in full from distributions under the modified

20   plan.

21             Second, they assert that these transactions could

22   leave injured workers without a source of benefit payment since

23   approval of the modified plan would render the estate's

24   security fund insolvent.

25             Finally, they assert that the modified plan and MDA if

71

1    approved could result in the debtors or purchasers lacking any

2    method to comply with their workers' compensation obligations

3    in Michigan, and that that would result in a violation of 28

4    U.S.C. Section 959(b). And, therefore, also would cause us to

5    not be non-compliant with 1129 among other statutes -- parts of

6    the Bankruptcy Code because we wouldn't be complying with

7    applicable laws.

8          In essence, Your Honor, what the Michigan agency is

9    saying to the Court, to the debtors and other stakeholders,

10   that their unfulfilled claims are superior to claims of all the

11   creditors because they assert that state regulatory

12   requirements compel the debtors to honor those obligations.

13         We believe that that's not how it works in bankruptcy.

14   The priority scheme under Section 507 of the Bankruptcy Code

15   and this Court's bar date orders govern the rights and remedies

16   of all creditors, private and governmental, including as Judge

17   Lifland ruled in the Olga Coal case at 194 B.R. 741 page 746, a

18   1996 case in this district, "That a claimant's right to

19   recovery on account of workers' compensation claims arises out

20   of pre-petition injuries. And estate's contingent claim for

21   reimbursement of workers' compensation benefits unpaid by a

22   debtor is one such claim and is subject to the requirements and

23   discharge provisions of the Bankruptcy Code notwithstanding any

24   state statutes to the contrary."

25         Now, it is a fact, Your Honor, that the Michigan

1    agency never filed any proofs of claim on a timely basis, never

2    filed a motion to file an untimely claim and you have a right

3    to file a tardy claim.  And, therefore, it's not to receive a

4    distribution under the modified plan as to the discharge of any

5    pre-petition liabilities.

6              I don't believe the Michigan agency is asserting that

7    they can file an untimely claim.  Although, I was advised prior

8    to the commencement of this hearing that they may have filed

9    such a claim in the last several days.  But I've not been able

10   to confirm it myself.

11             Just on that point, Your Honor, the Michigan Agency

12   was served, these are indisputable facts, I believe.  The

13   Michigan Agency was served with the bar date notice almost

14   three years ago but did not file a claim.  It hasn't sought to

15   file a late claim.  It hasn't made a requisite showing of

16   excusable neglect.  Other comparable agencies around the

17   country did file proofs of claims.  So it's not as though

18   workers' comp agencies around the country didn't realize that

19   it needed to do so.  And I don't believe that the agency can be

20   surprised by the outcome that is occurring in this case, vis-a-

21   vis the agency.  And, obviously, to the extent that the claim

22   was filed in the last couple of days, the debtors will

23   vigorously oppose that attempt on the grounds, among other

24   things, that their failure to file a proof of claim was a

25   conscious and a willful decision, and was without, at minimum,

73

1   excusable neglect.

2        Your Honor, we have been in conversation and dialogue

3   with regulatory authorities across the country about this case,

4   including most affected workers' compensation agencies.  And

5   what we shared with them and every agency had a different set

6   of facts, some filed claims, some didn't.  Some had letters of

7   credit, some didn't.  Some had insurance policies, some didn't.

8   Some had issues where they were substantially resolved and

9   others had issues that had to be dealt with.  But we have

10  consistently addressed a common theme.  That if a regulatory

11  agency for workers' comp had not filed a proof of claim before

12  the bar date that state would not be entitled to a distribution

13  under the modified plan and we would oppose any attempt to file

14  a late claim.

15       It's also I think very clear, Your Honor, especially

16  as Your Honor considers bar date orders, and this I don't think

17  we need to deal with in any detail in this hearing, but all

18  creditors, whether they're private or governmental, have to

19  abide by bar date orders, unless they forfeit distributions

20  under a plan, and I can't think of anything more compelling at

21  this point in time, then a claim that would intend to undue the

22  fabric of the compact that's been agreed to among stakeholders

23  in this case that will permit this company to complete a

24  modified plan of reorganization.

25       I also point out, Your Honor, that Michigan has

74

1    previously filed several proof of claims relating to taxes and

2    other matters, and Your Honor, actually adjudicated some of the

3    State of Michigan's claims in other hearings.

4              The argument the Michigan agency makes that its claims

5    are superior to the claims of all other creditors because of

6    state regulatory requirements, and therefore, the debtors are

7    compelled to honor workers' compensation obligations, simply

8    doesn't pass muster, particularly the focus of the preemption

9    concepts in federal law.  To the extent that this statue in

10   Michigan purports to establish the priority of their claims

11   over all other claims that statute is preempted by the

12   Bankruptcy Code and is of no further force and affect.  And in

13   our papers we have quoted to a number of cases, including In re

14   Law Corp. at 162 Bankruptcy 234, a 1993 Bankruptcy Court

15   decision in the District of Minnesota.  In re Redford Roofing

16   Company, an Illinois case in the Northern District, a 1995

17   case, it's 54 B.R. 254, 255.  And we tried to make clear that

18   to all the agencies we worked with and in Michigan that,

19   frankly, this Court is not going to use, and we believe in all

20   respects, absent a consent which does not exist here in the

21   plan or otherwise, is not going to use its equitable powers or

22   other principles to alter the Bankruptcy Code's priority

23   scheme.  And we have looked to U.S. v. Nolan, the Supreme Court

24   case at 517 U.S. 535, 1996 case, which I think addresses that

25   concept.

75

1           Your Honor, I think that the -- in terms of the

2     argument here that there's a violation of 1129(a)(3) of the

3     plan because they will not be paid in full.  Because the

4     agency's unfiled pre-petition workers' comp claims aren't

5     entitled to receive distributions under the Bankruptcy Code,

6     the conclusion that we think is inevitable from that that the

7     modified plan comports with 1129(a)(3) of the code.

8           They also point to an argument which is I think a bit

9     confusing.  They basically say that neither New Delphi, the

10    company buyer, or General Motors' subsidiary that's acquiring

11    four of the KEIP sites in Michigan plus the steering business,

12    that they can't -- they won't be able to qualify self-insurers

13    following confirmation of the modified plan and they won't be

14    able to comply with state law as it relates to fulfilling

15    workers' compensation obligations.  And, therefore, that's a

16    further violation of 1129(a)(3).

17          I don't understand that because in Michigan there are

18    multiple paths to be able to comply with that statute.  Self-

19    insurance is only one of them.  You can pool your workers'

20    compensation obligations.  There are other ways you can meet

21    the requirements.  And I don't believe there's anything they've

22    introduced in their objection, or anything in this record, that

23    would establish that there is no ability of either a General

24    Motors or the company buyer, to comply on a post-effective day

25    basis with the laws of the State of Michigan.

76

1        THE COURT:  And what about the reorganized debtor,

2    that the assets that remain behind?

3        MR. BUTLER:  I think that's the same situation, Your

4    Honor, particularly -- and we'll get to that.  The fact of the

5    matter is, that our reorganized DPH Holdings which is going to

6    hold assets that are going to be wound down is going to have

7    actually no employees.  It's going to have an authorized

8    representative which I'm going to identify in this hearing, as

9    part of the hearing.  And it's going to contract out on a

10   management services basis the activities it needs to undertake

11   to complete that.  And so I don't believe that that particular

12   activity, and reorganized DPH Holdings, may last for any period

13   of years while it undertakes its work, but it's not going to

14   have anyone, I think, going to necessarily be subject to those

15   laws.  To the extent that the company --

16       THE COURT:  If it did it would be a very small number

17   of people.

18       MR. BUTLER:  It would be a very small number of people

19   and the company would -- obviously, reorganized Delphi,  DPH

20   Holdings, expects to comply with all laws that are applicable

21   to it.

22       The other thing that they argue is that there's a

23   violation here.  I addressed it briefly before.  There's a

24   violation here under 28 U.S.C. 959(b) because they say that we,

25   as debtor-in-possession, won't comply with those applicable

77

1  laws.  But, again, I don't believe -- they've used that statute

2  and the argument to basically say that because the pre-

3  petition, what I believe will be discharged workers' comp

4  claims, aren't going to be paid that that is somehow a

5  violation of the Bankruptcy Code and of 28 U.S.C. 959(b).  And

6  I don't think you can basically turn the Bankruptcy Code on its

7  head and say okay, I didn't file a claim I'm going to be

8  discharged, those workers' comp claims aren't going to be paid

9  and, therefore, that's an independent basis under 959 to argue

10  that there's a violation.  Because that gets you sort of in the

11  circular -- a circulatory of argument I don't think the Court

12  should sustain.

13        State law may well establish priorities for the

14  benefit of workers' compensation claimants outside of

15  bankruptcy, but as I said before the Bankruptcy Code in our

16  view, clearly preempts conflicting state statutes as discussed.

17        And I think the only other thing I'd like to address,

18  Your Honor, is their reliance on Bickford v. Load Star Energy

19  Inc. at 310 B.R. 70 at page 76.  This was an Eastern District

20  of Kentucky case decided in 2004.  And that's a case that

21  apparently required payment of a pre-petition claim in full.

22  In Bickford a district court reversed a bankruptcy court order

23  enjoining state officials for enforcing a post-petition bonding

24  requirement against holders of surface mining permits in the

25  ground that bonding requirements served, not only the state's

78

1    pecuniary interest, but also protect the state's citizens

2    against dangers of unreclaimed land and came within the police

3    power exception of the automatic stay.

4         In contrast, here, the Michigan Agency is not

5    challenging the debtors' post-petition compliance with the

6    state workers' compensation statutes and regulations because

7    we, in fact, are in compliance and will remain in compliance

8    with the post-petition obligations imposed on us.

9         Rather, they're asking the Court to say because we are

10   not prepared to pay or to find a way through the MDA parties to

11   pay pre-petition claims that for which no proof of claim was

12   filed, that we are -- and because -- and notwithstanding the

13   preemption provisions that are applicable here, our failure to

14   do that somehow brings us back under -- apparently, under their

15   argument, the police power exception, and makes the Bickford

16   case applicable.

17        We simply believe it is not.  We ask Your Honor to

18   find that the objection is without merit and to overrule it.

19        THE COURT:  Okay.  I understood that the agency wanted

20   to rest on its papers, but having heard the argument does it

21   have anything further to say?

22        Okay.  I'm going to overrule this objection to

23   approval of the plan modification motion.

24        First, I seriously question the standing of the

25   Michigan Workers' Compensation Agency, given that it did not

1   file a claim by the bar date established in this case, and has

2   not sought over the last -- I guess it's over three years since

3   the bar date was established, to do so under Rule 9006.

4          But even assuming that the agency did have standing to

5   protect that hypothetical and currently barred claim, I believe

6   that the objection is not well taken.  As I read it, the

7   objection is focused upon the debtors' obligations with respect

8   to pre-petition workers' compensation claims which under the

9   Bankruptcy Code's priority scheme are not entitled to payment

10  in full given the value of these debtors as established by the

11  exhibits, including Mr. Shore's.

12         The federal priority scheme under the Bankruptcy Code

13  cannot be modified by state action.  In that regard, I agree

14  with the debtors and their citation to In Re Olga Coal Company,

15  194 B.R. 741 at 746 (Bankr. S.D.N.Y.), as well as In re Redford

16  Roofing Company, 54 B.R. 254, 255 (Bankr. M.D. Illinois 1985).

17         The argument that Michigan made by regulation override

18  the priority scheme of the Bankruptcy Code, I believe also is

19  inaccurate, at least as it applies to these claims.  This is, I

20  believe, a true pecuniary claim seeking payment of pre-petition

21  obligations.  And, therefore, I believe does not run afoul of

22  28 U.S.C. 959(b).  If it did, then the amounts would have been

23  sought and paid years ago.

24         The objection also, although, not that clearly, raises

25  perhaps an issue as to the payment of performance of workers'