# Exhibit H

# Part 2

1    compensation obligations going forward, that is after the

2    closing of the transactions contemplated by the plan

3    modification motion.   The debtors have confirmed their

4    agreement as the reorganized debtor to comply with their

5    obligations under the Michigan regulations with regard to

6    workers' compensation post-closing, based upon the exhibits and

7    the underlying agreements before me.   I believe that the

8    debtors are correct that those obligations will be minimal and

9    that the debtors will lack sufficient resources to perform the.

10         As far as the performance by GM, that is New GM, and

11    the DIP lender acquirers going forward, to the extent that is

12    an issue before me, I believe that they are (a) sufficiently

13    incentivized to perform their obligations in respect of workers

14    compensation going forward, and, secondly, have sufficient

15    wherewithal to do so.   Again, based upon the record before me.

16         The last basis for the objection is an argument that

17    the payment under the confirmed Chapter 11 plan of these

18    obligations or the provisions for their payment under the

19    confirmed Chapter 11 plan now estop the debtors under various

20    estoppel theories from treating them as a claim subject to the

21    priority rules of the Bankruptcy Code.   I conclude that there

22    is not a basis for estoppel on those facts.   The plan

23    modification exhibits make crystal clear that the debtors

24    financial circumstances have drastically changed between the

25    confirmation of the present plan on file and the plan

1    modification, such that clearly the debtors' resources are not

2    sufficient to pay a "par plus accrued recovery" to unsecured

3    creditors, as the original plan provided.  And, instead, the

4    debtors' estates have the value as detailed in the declarations

5    that have been submitted, and as borne out by the auction

6    process that provides for greatly reduced ability to pay pre-

7    petition claims.  Therefore, if the debtors today in fact tried

8    to pay these claims in full or a par plus accrued recovery,

9    they would be violating the Bankruptcy Code.

10             Clearly, the confirmed plan had as a condition to its

11    going effective, the closing of the EPCA or investor agreement,

12    which did not occur.  The plan obviously since it had that

13    condition to its going effective contemplated the possibility

14    of its not going effective, including the breach or termination

15    of the EPCA.  Consequently, I don't see a basis for estoppel

16    given that the document upon which estoppel is asserted

17    contemplates the possibility of the treatment that is currently

18    being afforded to the claims of the agency, to the extent it

19    has an assertible claim, as well as all other unsecured

20    creditors.

21             Moreover, as far as equitable estoppel is concerned,

22    as I said it would be highly inequitable to elevate these

23    claims which are substantially similar to other unsecured

24    claims over those claims.

25             So for those reasons, I'll deny the objection.

1          MR. BUTLER:  Thank you, Your Honor.

2          Your Honor, the next category of objections we'd like

3     to address is the taxing authority objections.  The are the

4     objections of Howard County Indiana, at docket number 18218.

5     And the Texas Taxing Authorities objection at docket number

6     18194.

7          I should indicate to the Court that both of these

8     objectors hold allowed claims.  In the case of Howard County I

9     believe it's an allowed priority claim and allowed secured

10    claim in different proportions.  In the case of Texas, the

11    Texas Taxing Authority is making a primarily allowed secured

12    claim.

13         The Howard Count taxes involved here relate, I

14    believe, to the Kokomo, Indiana facility, which is under the

15    proposed plan and under the master disposition agreement, going

16    to go to the General Motors subsidary.  And he Texas Taxing

17    Authorities taxes go to, I believe, assets that will be

18    retained in DPH Holdings Inc.

19         With respect to Howard County, my understanding is

20    that they have received the appropriate assurances that make it

21    crystal clear that to the extent that they hold an allowed

22    priority and secured claim and notwithstanding any discharge of

23    claims under the plan, that a General Motors subsidiary will

24    take those claims and pay them in accordance with the plan

25    treatment proposed.  I believe that their remaining objection

1   is now focused on whether or not the fact that they don't like

2   our proposed plan treatment in terms of the stretch out or

3   either the impairment of the secured claim by how we propose to

4   treat it or the stretch out of the priority claim which we

5   think this is a pre-BAPCPA case is permitted as we have

6   proposed.

7          And I believe that the Texas Taxing Authorities' claim

8   is similarly based on the objections to the treatment that we

9   propose.

10          So we should deal with those first, and I think

11   counsel for, both Howard County and Texas, are here to argue

12   their objections.

13          MR. POWLEN:  Thank you, Your Honor.  For the record,

14   my name is David Powlen with the law firm of Barnes and

15   Thornburg for the Taxing Authority Howard County Indiana.  Also

16   referred to under the MDA as Kokomo, Indiana.  We can think

17   about those two descriptions as one and the same, Your Honor.

18          Mr. Butler teed this up very well.  We have had the

19   good fortune this morning to have conversations with, both

20   debtors' counsel and counsel for the GM buyers, and have

21   confirmed that the GM buyers are picking up all three aspects

22   of the county's tax claims.  We have a post-petition

23   administrative claims, with respect to which we filed an

24   administrative expense claim form on July the 14th in the

25   amount of 11,369,193 dollars, which includes an estimated

1    component.  We also have, as Mr. Butler alluded to, both a pre-

2    petition secured claim which will be treated under Section 5.1

3    of the plan, and also, an unsecured priority claim to be

4    treated under Section 2.2 of the plan.

5            Now, that we've confirmed that it's the GM buyers

6    picking up these taxes, Your Honor, we would like to be heard

7    very briefly on the issue of the timing of the payment.  And as

8    a little bit of background, Howard County not only has the

9    Delphi bankruptcy impacting on its ability to collect taxes,

10   but also has been impacted by the Chrysler bankruptcy.  The

11   facilities for Chrysler in this county and the Delphi

12   facilities are literally just down the road from each other.

13           The proposed treatment, as I'm sure the Court is

14   aware, under Section 5.1 of the plan with respect to the

15   secured claim, is for a payment over seven years at an interest

16   rate, which is essentially based on the concept that the Till

17   case provided, with respect to a Chapter 13 case and with

18   respect to a party that's in the business of lending money.  We

19   respectfully submit, Your Honor, that the county is not in the

20   business of lending money.  We are completely different and

21   should be distinguished from the teachings of the Till case.

22   We are a tax collector.  And we're not in the business of

23   having our taxes strung out, potentially in this situation, up

24   to eleven years from March 1, 2005 for eleven years under

25   Section 5.1 of the plan with respect to our secured --

1           THE COURT:  Can you remind me, does 5.1 actually

2    specify a rate?

3           MR. POWLEN:  It provides a treasury bill rate, plus, I

4    believe, 200 basis points for a so-called risk, Your Honor.  We

5    would suggest that in lieu of that, Indiana provides a post-

6    judgment tax rate under Indiana Code 24-4.6-1-101(2).  It

7    provides for an interest rate of eighth percent on post-

8    judgment sums.  We would submit, Your Honor, that by analogy

9    the plan confirmation order, would equal a judgment with

10   respect to the Indiana Code provision.  And would ask that both

11   our secured claim and our priority unsecured tax claim in

12   Section 2.2 of the plan be treated with an eight percent

13   interest rate as opposed to what the plan has otherwise

14   provided.

15           THE COURT:  And the priority claim, that rate is not

16   specified, right.  It just says whatever rate is appropriate?

17           MR. POWLEN:  I believe that's the case, under

18   applicable -- I think it may be a reference to a statute or

19   other applicable law, that's correct.

20           Now, we also have a difficulty here, Your Honor, and

21   I'd like to introduce the legal basis for our argument for just

22   a moment.  Under 1127(b), the plan as modified becomes the plan

23   only if two things happen.  Number 1, if circumstances warrant

24   such modification and the debtor, otherwise, complies with all

25   the confirmation requirements under 1129.  We believe that with

86

1    respect to Howard County's unique circumstances that

2    Circumstances do not warrant a change.  Under the original

3    plan, as confirmed by this Court, Your Honor, there was a

4    provision that the secured portion of our tax claim would be

5    treated no worse than the payment period with respect to the

6    priority unsecured claims under Section 2.2 of the plan.

7    Translating that into specific dates, because the -- we're

8    dealing with the prior version of the code, we're dealing with

9    the pre-'05 amendments here in this case.  It's essentially

10    equal payments over not more than six years from the date of

11    assessments.  In this case the date of assessment was March 1

12    of 2005.  So with respect to the priority unsecured tax claims

13    that we have, the last installment would have to be paid to us

14    no later than March 1 of 2011.

15          Under the plan with respect to -- in contrast, with

16    respect to our secured claim, we are looking at seven years,

17    the last installment being paid to us up to seven years after

18    confirmation -- after the effective date, I should say, of this

19    plan.

20          We would respectfully ask, Your Honor, that the

21    debtors be required, because circumstances do not warrant it,

22    and also because it's not really fair and equitable under

23    1129(b) and the Court is well aware that 102 of the Bankruptcy

24    Code refers to the word "includes" as not limiting.  So we have

25    a mixed argument here that circumstances do not warrant, and

1    it's simply not fair and equitable for our secured claim to be

2    strung out much longer than our priority unsecured claim.  And

3    especially given that the original plan here, as confirmed by

4    this Court, provided for the same treatment for our secured tax

5    claim as it did for the priority unsecured tax claim.

6         Otherwise, Your Honor, we would reset on our written

7    submission, document number 18218.

8         THE COURT:  How does the eight percent satisfy Till?

9         MR. POWLEN:  Well, Your Honor, we would just say that

10   Till is distinguishable.  We are not in the business of lending

11   money.  We're in the business of collecting --

12        THE COURT:  No.  But the analysis that the Supreme

13   Court said to undertake in Till?

14        MR. POWLEN:  Well, again, I think it was in the

15   circumstance of a party that's in the business of lending money

16   that can adjust its -- the interest rate that are otherwise

17   charges to all of its borrowers based on the statistical

18   certainty that certain of those contracts will go under

19   default.  There's that risk factor that the Court, of course,

20   refers to in Till.  In this case we're a taxing authority,

21   we're not in the business to adjusting for anything to

22   accommodate for the possibility of default.  We would, again,

23   simply ask the Court to take us back to the default rate of

24   eight percent provided by the Indiana Code for post-judgment

25   interest.

1        As a further background, Your Honor, under the Indiana

2   Code, if we were outside of bankruptcy there would be a ten

3   percent penalty each six months that these installments of

4   taxes would not be paid.  We understand that that's obviously a

5   penalty that this Court is not going to allow that, but we're

6   simply asking for the next best thing, which would be a simple

7   interest rate of eight percent.

8        THE COURT:  Okay.

9        MS. KELLEY:  Eurgeice Kelley for the Texas Taxing

10  Authority.

11       THE COURT:  Can you speak up louder?

12       MS. KELLEY:  Sure.  The Texas Taxing Authorities are

13  dozens of municipal taxing authorities who are fully secured ad

14  valorem tax creditors holding unavoidable first priority

15  statutorily perfected liens.  We rely on timely payment of

16  taxes to meet budgets and provide vital services.

17       As such, we negotiated long and hard to reach an

18  agreement under the current plan to receive a superpriority

19  above other secured creditors, as reflected in paragraph 63 of

20  the confirmation order.

21       Under the modified plan we lose this special status

22  and are treated identically to other secured creditors,

23  uniquely penalizing us under the modified plan.  The proposed

24  seven-year payout for our 2005 taxes is unreasonable.  Our 2005

25  taxes won't be paid until 2015.  And we have liens on the

1    debtors' personal property and giving the deteriorating nature

2    of the collateral we object to such a lengthy payout.

3         The proposed modified plan violates Section 506

4    because it does not ensure payment of the Texas statutory rate

5    of post-petition interest of twelve percent.  The modified plan

6    failed to provide adequate post-confirmation interest.  You

7    were just discussing Till, and I think this situation is

8    distinct because we are not similarly situated as other secured

9    creditors.  As my colleague was just saying, we're not in the

10   business of lending money, we're municipalities providing

11   services.

12        We also want to confirm that if there's a 363 sale

13   that our liens would attach to the sold property in the order

14   and priority that they presently have.  And we understand

15   everyone is taking a haircut under the modified plan, but the

16   modified plan should, at least, maintain the same structure and

17   priorities that there were under the current plan and the

18   taxing authorities should not be treated as other secured

19   creditors.

20        We otherwise rest on what's in our papers.

21        THE COURT:  Well, ultimately, we're focused on 1129,

22   right, 1129(b), which applies to all secured creditors.  So

23   what distinguishes your client's right to get the present value

24   in the interest of the collateral over this time from anyone

25   else.  You know, why is twelve percent the right number when

1      the focus is on the requirement to provide you with deferred

2      cash payments totaling, at least, the amount of such claim of a

3      value as of the effective date of the plan, of the at least the

4      value of such holders interest in the estate's interest in such

5      property?

6              MS. KELLEY:  Section 506.  And I must admit, Your

7      Honor, I'm a local counsel.  So I can't provide the arguments

8      that the lead counsel would have.  But our argument is that

9      it's violating Section 506.

10             THE COURT:  Okay.  Mr. Powlen, you want to --

11             MR. POWLEN:  Yes, Your Honor.  I guess my analogies

12     we're asking for eight percent.  If I may --

13             THE COURT:  No, I understand.  It kind of cuts both

14     ways.

15             MR. POWLEN:  I'm happy to speak also --

16             THE COURT:  I mean, ultimately -- I appreciate that a

17     delay in payment may affect the counties' budgets and their

18     ability to deliver services.  But the requirement in the code

19     doesn't really talk about the impact on the creditors, so much

20     as preserving the present value interest rate, the value of the

21     collateral --

22             MR. POWLEN:  Your Honor, there's a strong policy here

23     that's evident under, both the current provisions of the

24     code -- you'll recall that under the current provisions of the

25     code a secured tax claim cannot be paid out over any longer

1    period of time than a priority unsecured tax claim.  If this

2    case had been filed a few days later we wouldn't be having this

3    argument right now.  Defaulting back again to our argument that

4    circumstances don't warrant, the debtors' original plan in this

5    case --

6         THE COURT:  No, I understand that point.  I just want

7    to focus on the Till argument and 1129.

8         MR. POWLEN:  Understand.  And, again, as we said

9    before, at least in my argument, the tax authorities are not in

10    the business of lending money.

11         THE COURT:  I understand that distinction.  But,

12    ultimately, we're looking at preserving the present value of

13    the collateral through these payments.  And why is eight

14    percent right, why is twelve percent right, why is T bills plus

15    2 right?  It's hard for me to know without having some facts

16    behind it.

17         MR. POWLEN:  Understand, Your Honor.  And the best

18    thing we can do is the Indiana post-judgment rate of eight

19    percent.  And I assume that the taxing authorities from

20    Texas --

21         THE COURT:  But that applies to anybody.  That could

22    apply to, you know, someone's old clunker pickup truck.

23         MR. POWLEN:  That's true.  But in that situation that

24    party was in the interest of lending money --

25         THE COURT:  No, I'm talking about -- that was a bad

1    analogy.  Say you got a lien on someone's house.  There house

2    is different to value and the risk on a house is different to

3    value, I assume, then a Kokomo plan run by GM.  I mean, how do

4    you propose that I determine how to preserve the present value

5    of Howard County's interest in this Kokomo plant, which is I

6    think probably unique, right?

7            MR. POWLEN:  Very good, Your Honor, yes.

8            THE COURT:  And it's operated by GM?

9            MR. POWLEN:  Yes.

10           THE COURT:  Not being shut down.

11           MR. POWLEN:  Yes.

12           THE COURT:  So why is the twelve percent interest rate

13   -- I mean, is there any correlation to anything there, are

14   there any secured financings secured by the Kokomo plant

15   currently?

16           MR. POWLEN:  I believe there would be pre-confirmation

17   and post-confirmation.  But I honestly can't address that rate,

18   Your Honor, I apologize.

19           THE COURT:  I have the same question as far as the

20   facilities in Texas.

21           MS. KELLEY:  Our argument is that the risk factor

22   described in Till is as applied to a taxing authority was built

23   into the statutory rate.

24           THE COURT:  But that can't be, right, because you have

25   all sorts of different pieces of collateral that would be

1    covered by a tax lien, that are a different risk.

2         MS. KELLEY:  Well, unlike other --

3         THE COURT:  Well, you could have a lien on a piece of

4    property that's just been warehoused and not being maintained

5    and falling apart.  You can have a lien on the most gleaming

6    new factory built.  You can have a lien on, you know, an

7    environmentally challenged facility, or a nuclear power plant.

8    All of those I think would have different rates on them,

9    wouldn't they?

10         MS. KELLEY:  Right.  But we didn't have an

11    underwriting process where we selected which property we were

12    going to have a lien on.  It's, you know, a statutory --

13         THE COURT:  Okay.

14         MR. BUTLER:  Your Honor, responding first to Howard

15    County.  The -- and, again, with respect to their secured

16    claim, I do think that we have met the requirements under

17    Section 3.2 of the modified plan.  We separately classified all

18    secured claims, and we have provided their liens will continue

19    on that property.  And we have provided that they will get

20    paid, you know, we believe an appropriate interest rate, that

21    certainly complies we think with Till v. SEC Credit Corp.  I

22    don't think you just have to be a lender of money to have the

23    Till concepts apply.

24         We --

25         THE COURT:  But how do I know that the T bill plus 2

1   is the right rate?

2           MR. BUTLER:  Your Honor, I mean, other than -- I don't

3   think there's any -- I think that's a good question in the

4   sense there's no magic to this.  I think that ultimately I

5   think the guidance from Till is that there be -- that the rate

6   of interest there was a base rate plus an interest rate

7   adjustment in accordance of the risk.  I don't think that

8   either of these objectors have introduced any competent

9   evidence to suggest that there's any special risk associated

10  with their collateral that would cause the Court to make an

11  adjustment from what the debtors' proposed in terms of its

12  treatment under the plan.

13          And it seems to me that the -- you know, certainly

14  saying we'd like to have the rate in our own state applies for

15  post-judgment rates, and it sounds like it's a default rate, by

16  the way, in the way it's constructed --

17          THE COURT:  Well, I don't know about Texas, the other

18  one I don't think is, right, because there's a penalty on top

19  of it, for Howard.

20          MR. BUTLER:  Right.

21          THE COURT:  Texas I'm not sure.

22          MR. BUTLER:  And, Your Honor --

23          THE COURT:  Twelve percent is pretty high.

24          MR. BUTLER:  Your Honor, we selected -- we

25  basically -- our plan is premised on the concept that the

 1     seven-year treasury rate was appropriate as we stretched these

 2     out for seven years.  When you look you just sort of say,

 3     what's the premise of maintaining value, which is the

 4     requirement when you're cramming down?  What is the requirement

 5     of maintaining value?  And we thought, and I still believe,

 6     that looking at the seven-year treasury rate is as good a proxy

 7     for that as appropriate as possible.  And then we assigned a

 8     premium to that recognizing the guidance in Till and the --

 9     and, you know, Till talked about some type of adjustment.  And

10     I think we picked sort of in the middle of the fairway in 200

11     basis points.  But I don't think there's anything more magical

12     than that.  That was the assessment we put in the plan, I think

13     it's a reasonable basis for it.  And I think an objector comes

14     before you they have to provide competent testimony and

15     evidence which suggests that that is an unreasonable rate.  Not

16     that you should just pick some other rate.

17          THE COURT:  So you think that the burden shifts to

18     them?

19          MR. BUTLER:  Well, I think my only burden, Your Honor,

20     in a plan is to propose a reasonable rate.  And I think it's --

21     I think the Court can sort of draw its own conclusions, but if

22     you're stretching something over seven years, you say what's a

23     reasonable base rate to apply, looking at the seven-year

24     treasury rate is as reasonable rate as any other rate I can

25     think of to think about that.  And then applying a premium to

1    it.  And we applied a premium.

2         And what's happening is Howard County is saying gee,

3    you applied a 200 basis point premium, I want a 500 basis point

4    premium, which is, essentially, how they worked out.  And you

5    say well, how come, 500 basis points as opposed to 200 basis

6    points?  And they don't really have the answer to that, we like

7    500 basis points because that equates to what our statute says.

8         And, essentially, Texas says give us 900 basis points

9    because we like twelve percent.  But there's no evidence in the

10   record to suggest that that's adjusting for some risk to the

11   collateral that the liens are attaching to.  And that's my only

12   point, Your Honor.  I mean, we've tried on that basis to

13   address things we think appropriately under the plan.

14         THE COURT:  And what about the point that Mr. Powlen

15   made about 1127, what circumstances require this change in the

16   plan?

17         MR. BUTLER:  I'm sorry, in terms of modifying what?

18         THE COURT:  Modifying the treatment of the taxing

19   authorities?

20         MR. BUTLER:  Your Honor, that I think is fairly simple

21   in terms of trying to sort out an overall transaction here that

22   was -- that meet the requirements of 1127 and would have the

23   support of all stakeholders to -- and as I think counsel for

24   Texas acknowledged, everybody here has had to sacrifice

25   something.  The conclusions that the debtors reached that we

1    need to impair pre-petition secured classes but still meet our

2    requirements which was to provide them the value of their

3    liens, to maintain the value of their liens over -- in this

4    case, we're proposing to pay the actual balance over time and

5    to pay them an interest rate to measure it with, we think, the

6    risk associated with it.  But it's nothing more than trying to

7    develop in a case where we've had to work very hard to provide

8    for administrative claims, and in a case where DIP lenders are

9    bidding in 3.4 billion dollars worth of debt, and not on the

10   effective date receiving anywhere near that, certainly in cash.

11   The construction of this modified plan was designed, Your

12   Honor, to take into account what was happening on the entire

13   waterfall.  And I'll talk about the waterfall later.  But

14   there's, in fact -- in fact, I can -- it's in  your -- let me

15   just go to that plan exhibit.  And if I can  ask -- it's in

16   your book, Your Honor, it's Exhibit 31.

17        (Pause)

18        MR. BUTLER:  Your Honor, Plan Exhibit 31 -- it's

19   actually Joint Exhibit 53, Slide 31 -- basically has the fabric

20   of the distributions under the modified plan in this pure

21   credit bid.  It says the scenario; it's actually the pure

22   credit bid transactions before the Court.  And everything

23   above -- this is a waterfall that includes both post-petition

24   and pre-petition liabilities.  And as was -- I think Your Honor

25   understands, there was not enough cash or enough value to

1    actually pay everything above the line, all the post-petition

2    liabilities in this case.  And they've all been negotiated on a

3    consensual basis.  And that consent was based on a transaction

4    structure that dealt with everything below the line getting

5    value where it might not otherwise have received value.  And I,

6    frankly, think it may very well be that the liens in the case

7    of Texas, in particular, the value of the liens of that

8    property may be highly speculative but it didn't matter for our

9    purposes because we're in the ones -- and frankly, I think the

10   value of the liens for Howard County absent a transaction where

11   Kokomo was actually operated by somebody as opposed to being

12   closed was also quite speculative.  And so, we tried to come up

13   with an overall transaction that worked.

14            As Your Honor sees in terms of the post-petition

15   liabilities here, there are some that are being dealt with in

16   cash or being paid a hundred cents.  But in the case of carve-

17   out claims, those are being paid cash.  The tranche A, B and C

18   claims are getting -- being treating under the pure credit bid.

19   The hedge obligations that are secured or cash are assumed by

20   General Motors.  If you go down the post-petition waterfall,

21   superpriority claims are being dealt with under the -- in cash

22   or assumed by GM under MDA.

23            If you look at administrative claims, they're being

24   dealt with either by cash being rolled over or assumed on a

25   very carefully negotiated structure.  General Motors has waived

1    the 1.7 billion dollar claim.  It's an administrative claim.

2    It's in order to make this work.  And those parties help the

3    debtors work out the structure of what would flow through on

4    the pre-petition side.  And the first one that you get is pre-

5    petition secured claims and priority claims.  And people

6    recognize the obligations under the Code if we're going to do

7    this through a plan as opposed to a sale.  And therefore, there

8    had to be value that was allocated to those.

9         In the case of the priority claims, there otherwise

10   would have been no value allocated to those at all.  They were

11   not secured; they had no property; they had no lien rights.

12   And the treatment you have under the plan, as we've described

13   it, using the stretch out and the applicable statutory --

14   applicable rate that would apply to that obligation.  And I

15   think, by the way, I take the point on priority claim one, Your

16   Honor, that the plan does not have a specific rate applicable

17   across all the claims because the intention was that it would

18   be the lowest applicable rate state by state that you could

19   look to to find what the applicable rate was as to that

20   particular treatment of that claim.

21        With respect to secured claims, we had an obligation

22   under Till to find a way to maintain an appropriate structure

23   and the structure for that, as I've described to you, was to

24   allow those holders to maintain their lien interests to pay the

25   balance debt on their -- to stretch them out over seven years

100

1    and use the seven year T-bill rate plus 200 basis points.  And

2    then I can go further down.  Obviously, Your Honor is aware of

3    the settlement with the general unsecured creditors.  I'm going

4    to get to the PBGC settlement in a few minutes.  And everything

5    else gets wiped out which was the effect of the MBL settlement

6    Your Honor approved last week, the revised settlement.

7            So the answer to the question, Your Honor, from the

8    debtors' perspective, as laid out in this exhibit, is in order

9    to provide value below the black line to pre-petition holders

10   of claims, except whatever nominal value a secured tax claim

11   could have had in property that might not have had much use in

12   a liquidation, the fabric of the deal above the line where we

13   had to deal with a hundred percent claims led to this overall

14   consensual transaction and we believe that the construct with

15   respect to pre-petition liabilities is entirely consistent with

16   the Bankruptcy Code and should be approved by Your Honor.

17           THE COURT:  Okay.  Under the original -- under the

18   plan that's currently confirmed, these claims -- the secured

19   claims were not cashed out, were they ?

20           MR. BUTLER:  No.  Under the -- well, on the effective

21   date of the plan, the secured claims would have been paid in

22   accordance with their terms.  There was no stretch-out.

23           THE COURT:  Okay.

24           MR. POWLEN:  We understand the Court's very familiar

25   now with our arguments, Your Honor.  We would just simply go

1    back to under 1127(b).  It's clearly the debtors' burden to

2    show that circumstances warrant.  It's also their burden to

3    show that our treatment is fair and equitable.  And we would

4    like to be excused, Your Honor, once this aspect of the hearing

5    is closed.

6              THE COURT:  Okay.  I'm still -- there's one issue --

7              MS. KELLEY:  We also just want to reiterate that

8    circumstances aren't warranted under 1127 and we would like to

9    be excused when this portion is over.

10             THE COURT:  Okay.

11             MS. KELLEY:  And even if we do not get twelve percent,

12   we certainly need more than the proposed rate,.  The Treasury

13   rate plus the premium work out to approximately five percent

14   per annum.  Our collateral are car parts in Texas and no

15   reasonable lender in the world would lend on mufflers and

16   transmissions for cars that may or may not be discontinued at

17   that rate.

18             THE COURT:  You don't cite any cases that -- I'm not

19   familiar with cases pre-BAPCPA that impose a BAPCPA type

20   requirement in this context.

21             MR. POWLEN:  I believe that may be the case, Your

22   Honor.  Honestly, I did not come fully briefed on that issue.

23   But we also have the debtors own plan here.  Again the repeat.

24   Their plan, as confirmed, as it sits right now before this

25   Court that it now wants to modify essentially mirrored the

102

1   concepts of the current Code provisions.  Again, that's

2   evidencing this policy that we're referring to, we again

3   respectfully submit that you have provisions in the Code with

4   accept taxing authority, some from the Till analysis just on

5   that basis.

6         THE COURT:  But not the Code, in effect, for this

7   case.

8         MR. POWLEN:  Right.  But again, it's the debtors' own

9   plan that mirrors the Code provisions here -- that are now in

10   effect for cases that get filed currently.  And they're now

11   changing.  They're now changing our treatment to the seven-year

12   stretch-out.  Otherwise, we'd have to get paid on the same time

13   frame as our priority unsecured claims which would make sense

14   since our secured claim obviously has a higher priority in the

15   absolute priority rule.

16         MR. BUTLER:  That just absolutely -- I got to say,

17   Your Honor, the last argument just makes no sense to me.  The

18   debtors -- and, Your Honor, I think the record in this case is

19   very clear.  The debtors have never assumed in this case any of

20   the burdens -- I guess some people think they're benefits but I

21   think they're mostly burdens -- of the amendments in 2005 with

22   respect to a debtor-in-possession.  And there's nothing in our

23   prior disclosure documents, the confirmation or anything else,

24   that imposes or assumes the burdens of the 2005 amendments

25   here.

1          What happened was that case was a case where in that

2     world we lived in when the unsecured creditors were getting

3     something at par plus accrued at a negotiated plan value of

4     north of twelve billion dollars that there was -- the secured

5     creditors across the board, not just taxing authorities, were

6     paid in accordance with their terms at that time.  I think

7     that -- at least, I certainly think the Court's already

8     recognized, but I would urge the Court to recognize based on

9     the uncontroverted testimony in the record from the debtors'

10    witnesses that the debtors have complied with 1127 in changed

11    circumstances.  There are extraordinary changed circumstances

12    in this case.  And I would again point to --

13          THE COURT:  No.  That's okay.  You don't need to do

14    that.

15          MR. BUTLER:  Okay.

16          THE COURT:  That's okay.

17          MS. KELLEY:  If I may, Your Honor, you were asking

18    about pre-BAPCPA cases.  The case we cited to, In re Marfin

19    Ready Mix Corp., 220 B.R. 148, Judge Cyganowski out on Long

20    Island found that tax claims got post-confirmation statutory

21    rate.

22          THE COURT:  No.  But I was focusing on any -- that

23    didn't really address my question which is whether BAPCPA was

24    simply implementing case law that existed before its enactment

25    on its treatment of secured claims, secured tax claims as

1    opposed to the priority claims.  I don't think that that case

2    really addresses that point.

3           All right.  I have two objections to the plan

4    modification motion by taxing authorities, Howard County in

5    Indiana and various Texas taxing authorities leading off with

6    Angelina County and ending with Valley View ISD.  Both

7    objectors raised similar issues although -- and I was just

8    looking through the objections again.  I think one of the

9    issues that was raised in oral argument today wasn't raised in

10   either of the objections.

11          Let me deal with that issue first which is that the

12   modification of the confirmed plan under 1127 to provide for a

13   uniform stretched out treatment of secured and priority tax

14   claims is not justified under the circumstances.

15       (Audio technical problem)

16          -- the Texas counties if you looked at them in

17   isolation.  Given the size of the Howard County tax claims, I

18   doubt that even if one were to look at Howard County in

19   isolation, that would be the case.  But I don't believe that I

20   should look at just the two objectors here in determining

21   whether circumstances warrant.  Instead, I should look at all

22   of the similarly situated creditors because I believe that the

23   circumstances that apply here are the fact that notwithstanding

24   the very adverse condition of the debtors' industry as well as

25   the condition of the capital markets, the debtors have been

105

1    able to negotiate a transaction that apparently will enable

2    them to exit Chapter 11 that involves a significant input of

3    new money and the assumption of liabilities so that the -- by

4    and large, except for the excluded assets, the assets subject

5    to liens including the liens of these two objectors (audio

6    technical problem) -- plant that secures the Howard County's

7    tax lien and the facility subject to the Texas County tax lien,

8    I'm told, although that neither the objection nor the reply

9    specifies the exact collateral will be in facilities acquired

10    by the DIP lender acquirer vehicle.

11            However, it appears clear to me that given the

12    difficulty of achieving those two transactions, neither GM nor

13    the DIP lenders have an open wallet and that their agreement to

14    operate these plants or these facilities is conditioned upon

15    the treatment under the plan of those having liens on them, at

16    least as far as GM is concerned.  And therefore, they're very

17    focused on the amount that would need to be paid in connection

18    therewith.  That also goes for the priority claims that GM is

19    assuming in connection with the Howard County facility.

20            So I believe circumstances do warrant the treatment

21    here of other secured claims and priority claims as differing

22    from the very -- from the treatment under the confirmed plan

23    which was confirmed under very different and far more

24    economically plushy circumstances.  So I believe that this plan

25    modification is warranted under Section 1127.

1        That leaves the issue of the appropriate period for

2    the payment of the claims and the appropriate rate to reflect

3    that the claims are being paid over time.  As far as the

4    appropriate period is concerned, I see nothing unreasonable in

5    connection with these objections related to the period that is

6    provided for in the plan.  It's true that Congress amended data

7    to address -- (audio technical problem) -- rate is appropriate

8    and there's no testimony that the collateral will disintegrate

9    or disappear or otherwise be affected sometime before the

10   period expires that the debtors can pick any appropriate

11   period.  And the period here, I believe, is appropriate in the

12   absence of any evidence to the contrary and assuming GM wants

13   the Kokomo plant because it wants to continue making cars there

14   for several years.

15        That leaves the amount of the rate.  And the Court

16   really is directed here to Section 1129(b)(2)(A)(i)(1) and (2)

17   in determining what the appropriate rate is for secured claims

18   that's not paid in full on the confirmation date in a cram down

19   situation.  And I am guided somewhat by Till v. SCS Credit

20   Corporation, 541 U.S. 465 (2004) in determining the proper

21   post-confirmation rate to apply in finding that the deferred

22   cash payments totaled at least the allowed amount of the

23   secured claim with a value as of the effective date of the plan

24   of at least the value of such holder's interest in the estate's

25   interest in the property.

1          The debtors propose a T-bill rate equal to the seven-

2     year payment period plus two percent as a risk factor.  That

3     certainly fits the general guidelines of Till which stated that

4     the Court should apply a formula which entails a

5     straightforward familiar and objective inquiry and minimizes

6     the need for potentially costly additional evidentiary

7     proceedings.  And stated however, in connection with that

8     directive that the Court should consider the state of financial

9     markets, the circumstances of the bankruptcy estate and the

10    characteristics of the loan, in extension of involuntary

11    credit.

12          Both the taxing authorities simply say that their own

13    statutory rate should apply.  However, I believe those

14    statutory rates -- they're little, if any, relationship to the

15    factors that I just outlined.  They don't fluctuate with the

16    economy.  They're fixed.  They apply to all collateral as

17    opposed to the debtors' property that serves as collateral for

18    these taxing authorities.  And they don't take into account

19    that this collateral will be operated by the respective

20    acquirers as a going concern.  And -- unless it's to be sold in

21    which case obviously the lien can be asserted.

22          So under all of those circumstances, it appears to me

23    that absent any additional evidence that the rate chosen across

24    the board by the debtors is appropriate here.  And therefore

25    I'll overrule the objection on that basis.

1          MR. POWLEN:  Your Honor, just one matter of

2     clarification.  You'll recall that Howard County also has the

3     unsecured priority --

4          THE COURT:  Well, that I view as -- I mean, I'm not

5     really --

6          MR. POWLEN:  I understand.

7          THE COURT:  There's no rate.  It's just the rate

8     proper under applicable law.  So --

9          MR. POWLEN:  We were seeking your guidance.

10          THE COURT:  And what Mr. Butler said, I think your

11     eight percent is the lowest rate.  Now maybe they'll find

12     another one for Howard County somewhere in the books but --

13          MR. POWLEN:  Fair enough.

14          MR. POWLEN:  Thank you.

15          MR. BUTLER:  Your Honor, can I have just one moment,

16     please?

17          THE COURT:  Yes.

18          MR. POWLEN:  And if we may be excused, Your Honor?

19          THE COURT:  Yes.  Oh, ma'am, I think the microphone

20     didn't pick up your name.  Could you state it again for the

21     transcript?

22          MS. KELLEY:  Eurydice, E-U-R-Y-D-I-C-E, Kelley with an

23     E-Y.

24          THE COURT:  Thank you.

25          MR. BUTLER:  Your Honor, one thing I want, if I can

1  bring to the Court's attention 'cause I do want the record to

2  be accurate.  I thought I said this during my argument but I

3  just want to make sure it doesn't change Your Honor's views.

4  With respect to Howard County, Howard County does, in fact --

5  this does reply to Kokomo.  Kokomo is moving under the proposed

6  transaction.  But I thought I'd said, and I want to say it

7  again, that DPH Holdings will retain the Texas tax liabilities.

8            THE COURT:  You did.  And I --

9            MR. BUTLER:  Okay.

10            THE COURT:  And I think I said that, too.

11            MR. BUTLER:  Okay.  I'm sorry.  I thought I heard

12  something different.  That's why I want --

13            THE COURT:  GM's doing Kokomo and the DIP acquirer is

14  doing Texas facilities.

15            MR. BUTLER:  Well, no.  That's why I want to be clear.

16  DPH Holdings Co. is going to be old Delphi as we sit and

17  describe --

18            THE COURT:  Oh, I'm sorry.

19            MR. BUTLER:  -- old Delphi.

20            THE COURT:  Okay.

21            MR. BUTLER:  And new Delphi at the moment is called

22  DIP Co. 3 or something.

23            THE COURT:  Well, in that case, it's --

24            MR. BUTLER:  It's going to get a different name.

25            THE COURT:  -- likely to be sold.

1           MR. BUTLER:  That's right.  It is, Your Honor.

2           THE COURT:  So then they can assert their lien

3    probably a lot faster than seven years from now.

4           MR. BUTLER:  That's probably correct, Your Honor.

5           THE COURT:  All right.  I don't think that changes my

6    ruling.

7           MR. BUTLER:  Okay.  I just wanted the record to be

8    clear.

9           THE COURT:  I appreciate that clarification.

10          MR. BUTLER:  Thank you, Your Honor.

11          THE COURT:  Okay.

12          MR. BUTLER:  Thank you.  Your Honor, what I'd like to

13   do now, if I can is, with the Court's permission, is I'd like

14   to address some settlements that have been reached.

15          THE COURT:  Okay.

16          MR. BUTLER:  So those parties can do it.  And then if

17   we can take a lunch break, Your Honor, that would be great.

18          THE COURT:  Okay.

19          MR. BUTLER:  So let me deal with the --

20       (Pause)

21          MR. BUTLER:  Just one moment, please.

22       (Pause)

23          MR. BUTLER:  Okay.  Your Honor, the first one we want

24   to deal with is in the miscellaneous bucket and it deals with

25   the objections filed by various of the former plan investors at

111

1    dockets number 18345, 18347, 18348 18349, 18350, 18675, 18677

2    and 18678.  These objections have been resolved based on an

3    agreement between General Motors Company and the plan investors

4    to language that we would be proposed to include as a new

5    paragraph in the plan modification order that we're working on.

6    And I'll read that section.  It says "Nothing in this order,

7    the modified plan, the MDA documents, or any supporting papers

8    shall (i)foreclose or otherwise prejudice or impair any claims,

9    defenses, or positions that any plan investors (other than

10   Goldman Sachs) (the "Objecting Plan Investors") have or may

11   have in the adversary proceedings number 08-01232 and 08-01233

12   (the "Plan Investor Litigation"), including, without

13   limitation, any alleged right of setoff against any party

14   asserting claims against the objecting plan investors

15   (collectively, the "Potential Defenses"), or (ii)foreclose or

16   otherwise prejudice GM Co and GM buyers' rights to object to

17   any such potential defenses.  This paragraph is not intended

18   to, nor shall it, create any liability in the part of Motors

19   Liquidation Company, GM Co., or the GM buyer with respect to

20   any counterclaims that the Objecting Plan Investors have

21   asserted or may assert in the Plan Investor Litigation against

22   any of the debtors."

23          The debtors agree that the inclusion of this language

24   is appropriate and this, along with my earlier comments on the

25   record at this hearing about not causing any prejudice in the

1    factual findings of this hearing and the adversary proceedings

2    resolves, we believe, all the objections.

3            MR. KURTZ:  Good afternoon, Your Honor.

4            THE COURT:  Good afternoon.

5            MR. KURTZ:  Glenn Kurtz of White & Case on behalf of

6    ADHH and AMLP.  I can confirm on behalf of each of the plan

7    investors, other than Goldman Sachs our consent to that

8    stipulation.

9            THE COURT:  Did Goldman Sachs file an objection?

10           MR. KURTZ:  They did not --

11           THE COURT:  Okay.

12           MR. KURTZ:  -- and they haven't been heard one way or

13   the other.

14           THE COURT:  All right.

15           MR. KURTZ:  And I just wanted to be sure that nobody

16   thought that we were authorized to represent anything.

17           THE COURT:  Okay.

18           MR. KURTZ:  I was not here unfortunately when Mr.

19   Butler confirmed the factual findings matter.  We were

20   resolving this with GM.  We had filed an objection.  This was

21   the language that we had suggested.  If there is no objection

22   after I read it then I'll sit.  If there's not, perhaps I can

23   address it.

24           "No statement contained in any of Delphi's

25   declarations or testimony offered in support of the plan

113

1    confirmation shall be used for purposes of supporting or

2    establishing any fact in adversary proceedings 08-01232 and 08-

3    1233 and no finding made by the Court in support of the plan

4    confirmation shall be final, binding or conclusive or be given

5    any weight for purposes of the adversary proceeding.  Nothing

6    in this order shall prejudice or waive the rights of any plan

7    investor to raise or assert any claims, defenses or positions

8    in the adversary proceeding."  And again, I'll clarify --

9              THE COURT:  He said that.

10             MR. KURTZ:  Okay.

11             THE COURT:  But that's fine.  Okay.

12             MR. KURTZ:  Thank you, Judge.

13             THE COURT:  Now, I want to make sure I understand --

14   this is for Mr. Butler.  The -- who acquires the litigation or

15   is it acquired?  I know that some of the proceeds are clearly

16   allocated, what, up to 145 million, is that right?

17             MR. BUTLER:  I just want to be very sure, Your   Honor

18   --

19             THE COURT:  All right.

20             MR. BUTLER:  -- I say this correctly.

21        (Pause)

22             MR. BUTLER:  I just want to be precise, Your Honor.

23   So Article 2.1.3 --

24             THE COURT:  If you want to confirm that after --

25             MR. BUTLER:  Yeah.  I know.  I just wanted to find it.

1    It is the GM buyer that obtains the right to any settlement

2    litigation in connection with the plan investor litigation.

3    And it set forth specifically in Article 2 of the MDA.

4          THE COURT:  Okay.  But then there's some -- isn't

5    there some amount that goes somewhere else?

6          UNIDENTIFIED SPEAKER:  That was a relic, Your Honor,

7    of the --

8          THE COURT:  Oh.  All right.

9          UNIDENTIFIED SPEAKER:  -- prior plan.

10         THE COURT:  Very well.  Okay.

11         MR. BUTLER:  May I proceed, Your Honor?

12         THE COURT:  Sure.

13         MR. BUTLER:  Okay.  The other settlements I wanted to

14   place on the record have to do with a sort of bucket number two

15   of objections dealing with the unions and some of the other

16   former employee objections.  And I believe that, if I have this

17   correct, and hopefully counsel will confirm it for me, but I

18   believe that we have a resolution with the UAW, the IUE-CWA and

19   the USW.  With respect to the UAW, the UAW -- I've been asked

20   to state on the record that the UAW CBAs are carved out of the

21   notice and cure procedures with the parties reserving their

22   rights to the extent of any issues.  The -- General Motors

23   and -- who is assuming the UAW contracts and the UAW would

24   rather address those issues between themselves outside of this

25   process.

115

1          THE COURT:  Okay.

2          MR. BUTLER:  I got that right?

3          UNIDENTIFIED SPEAKER:  Yes, you did.

4          THE COURT:  Okay.

5          MR. BUTLER:  That's all I need to say, right, on the

6     record?

7          UNIDENTIFIED SPEAKER:  Excuse me?

8          MR. BUTLER:  That's all I needed to say on the record,

9     right?

10          UNIDENTIFIED SPEAKER:  Yes.

11          THE COURT:  Okay.

12          MR. BUTLER:  With respect, Your Honor, to the IUE-CWA

13     and the USW, I'm advised that those unions agree to withdraw

14     their objections at dockets number 18258, 17793 and 18370 and

15     have confirmed with the buyers that it will assume any -- with

16     the company buyer that it will assume any existing

17     pre-closing --

18          (Audio technical problem)

19          MR. BUTLER:  It will assume any pre-closing

20     obligations under their collective bargaining agreements for,

21     among other things, grievances, accrued benefits including

22     vacation and sick pay, but excluding any obligations under

23     retained plans as that term is defined in Article 2.3.3 of the

24     MDA.  And I'd like Mr. Lefkort on behalf -- or Mr. Abrams on

25     behalf of Willkie Farr to acknowledge that and Mr. Tanenbaum on

1    behalf of General Motors if Mr. Tanenbaum is here or Mr. Lemons

2    to acknowledge the fact.  Well, Mr. Lemons is here.  I just

3    need someone from both groups.

4         MR. LEFKORT:  Maurice Lefkort, Willkie Farr &

5    Gallagher, Your Honor.  I think Mr. Butler added, if I may have

6    the paper, some two extra words, "among other things".  It was

7    for grievances and accrued benefits, not among other things.

8    But subject to that --

9         MR. BUTLER:  Well, I'm sorry.  You are assuming that

10   it's like the bargaining agreements, right?

11        MR. LEFKORT:  We are assuming going forward the terms

12   and conditions and we have agreed with them that we will assume

13   the pre-closing grievances and accrued benefits but excluding

14   the retained plans.

15        MR. BUTLER:  Right.

16        MR. LEFKORT:  You added the words "among other

17   things".  That was not part of our agreement with them.

18        MR. BUTLER:  So the debtors are aware, is there

19   anything other than the retained plans that you're not assuming

20   under the CBAs?

21        MR. LEFKORT:  We have expressly agreed to assume those

22   two categories of items.  I am not aware of other items.  It

23   doesn't mean that there aren't other items.

24        THE COURT:  But if you assume the agreement --

25        MR. LEFKORT:  This is my --

1       THE COURT:  -- you assume it subject to all of its

2   obligations, right?

3       MR. LEFKORT:  This is my understanding of the

4   settlement that we've reached with the unions.  If that's not

5   acceptable to the unions, I'm happy to discuss it further.

6       THE COURT:  Okay.

7       MR. BUTLER:  I'm sorry.  Let me get Mr. Lemons for GM.

8   Someone needs to speak for GM.

9       MR. LEMONS:  GM was fine with the settlement that was

10  agreed to by company buyers and the IUE.

11      MR. BUTLER:  Okay.

12      MR. LEMONS:  You said Mr. Lefkort --

13      MR. BUTLER:  Can you just say it on the record so they

14  can -- sorry.  But I need the --

15      MR. LEMONS:  Good afternoon.  Robert Lemons from Weil

16  Gotshal & Manges on behalf of the General Motors buyers.  GM

17  was fine with the language that Mr. Butler read as modified by

18  Mr. Lefkort.

19      MS. ROBBINS:  Excuse me.  Could you, for the benefit

20  of the other unions here, read that language again please?

21      MR. BUTLER:  Sure.

22      MR. KENNEDY:  I was just going to do that, Jack --

23      MR. BUTLER:  Okay.

24      THE COURT:  Okay.

25      MR. KENNEDY:  -- since we wrote it.  "The IUE-CWA and

1  USW agree to withdraw their objections, docket number 18258,

2  17793 and 18370, and have confirmed with Buyer that it will

3  assume any existing pre-closing obligations under their

4  collective bargaining agreements for grievances, accrued

5  benefits including vacation and sick pay, but excluding any

6  obligations under 'retained plans' as that term is defined in

7  Section 2.3.3 of the MDA."

8        MS. ROBBINS:  2.3.3?

9        MR. KENNEDY:  Yes.  2.3.3.  And we regard that as

10  being encompassing of the collective bargaining agreements with

11  the exception, of course, of the nonretained plans.  And we

12  agree to it as written.

13        THE COURT:  Okay.

14        MS. ROBBINS:  I apologize.  I heard both retained and

15  nonretained --

16        MR. BUTLER:  Okay.  Well, you know what?  Ms. Robbins,

17  I'm happy to tell you off the record what it is --

18        MR. KURTZ:  Well, I think if it's --

19        MR. BUTLER:  Your union hasn't settled.  And I'm happy

20  to do it with you off the record.

21        MS. ROBBINS:  Mr. Butler, we're talking about the

22  record.  And what I said is that I heard on the record both

23  retained and unretained plans.  And I would think you would

24  want that clear on the record so that the agreement is clear.

25  I'm not talking about us.  I'm talking about understanding

1    this.

2         MR. BUTLER:  Judge, do you want us to read it again?

3         THE COURT:  Well, does it say -- just the last part

4    about the plans.

5         MR. BUTLER:  It says "but excluding any obligations

6    under 'retained plans' as that term is defined in Article

7    2.3.3. of the master disposition agreement."

8         THE COURT:  Okay.  That's what I heard, too, I

9    confess.

10         MR. BUTLER:  Mr. Kennedy, will you also confirm   that

11    -- I did not read the docket number for your supplemental

12    objection that was filed last evening under seal.  Would you

13    indicate that's also withdrawn, please?

14         MR. KENNEDY:  Yes, It is.  It was our intent to

15    withdraw all of our pending objections.

16         THE COURT:  Okay.

17         MR. KENNEDY:  I just have one other thing I want to

18    add after Mr. Kolko speaks, Your Honor.

19         MR. KOLKO:  Your Honor, Hanan Kolko of the firm Meyer

20    Suozzi English & Klein on behalf of the USW.  And the agreement

21    that Mr. Kennedy and Mr. Butler both read is accurate and we

22    agree to it.  Thank you.

23         THE COURT:  Okay.  Thank you.

24         MR. KENNEDY:  Your Honor, just as a report to the

25    Court, as you know, we've had many sessions concerning the

120

1    post-retirement health obligations and the pension obligations

2    which have been involved both in this proceeding and others

3    that are payable to IUE-CWA represented employees.  And,

4    obviously, there's been substantial changes in those benefits

5    because of the bankruptcy of General Motors.  Just to report to

6    you that we are in discussions with General Motors about steps

7    to ameliorate the losses that have been sustained.  We're

8    making progress on those but we have not yet completed doing

9    that.  That's essentially in the context of the GM proceeding.

10           THE COURT:  Okay.  Thank you.

11           MS. CECCOTTI:  Good afternoon, Your Honor.  Babette

12   Ceccotti for the UAW.  The UAW filed a limited objection and

13   reservation of rights at number 18279 on the docket.  The

14   subject matter covered by the UAW's limited objection regarding

15   assumption of the UAW labor agreement, is addressed in proposed

16   plan modification order which, I believe, has been identified

17   as Joint Exhibits 9 and 11 in clean and blackline.  I'm not

18   sure which form corresponds to those exhibit numbers.  But in

19   any event, at paragraph 59 of Exhibits 9 and 11, as well as in

20   certain conforming revisions elsewhere in the order that either

21   have been made or are in progress.  The subject matter of the

22   limited objection is also addressed by the statement that Mr.

23   Butler just placed on the record regarding the notice and cure

24   process.

25           Assuming that paragraph 59 and the conforming changes

1   are, in fact, included in the modification approval order

2   entered by the Court, and, frankly, we have one other language

3   issue that I'm told we can't finalize now but it's sufficiently

4   discreet for me to be able to stand at this time.  But

5   assuming, I guess, the final form of that aspect of the order

6   is also resolved to our satisfaction and based on Mr. Butler's

7   representation regarding the notice and cure process, subject

8   to all of the foregoing, the UAW is prepared to withdraw its

9   limited objection and to waive to any extent a waiver is

10   required any UAW CBA restriction upon the sale.

11            I would like to just note that this statement is made

12   for the purpose of the current hearing that we're having which

13   is the plan modification hearing.  And although I believe it is

14   clear from my statement if for any reason that motion is not

15   approved and the debtors commence a 363 hearing, we'd obviously

16   have to readjust these issues.

17            THE COURT:  Okay.  Very well.  Thank you.

18            MS. CECCOTTI:  Thank you.

19            MR. BUTLER:  Your Honor, I think this would be an

20   appropriate time to take a lunch break if we could.

21            THE COURT:  There's some movement behind you.

22            MR. BUTLER:  Someone else may disagree with me.

23       (Pause)

24            MR. BUTLER:  Mr. Kelly reminded me of a provision of

25   the master disposition agreement and some of the ancillary

1    agreements that might further inform Your Honor the exchange

2    that you had with Mr. Abrams about the relics and the plan

3    investor litigation of what goes where.  Mr. Abrams'

4    statements, I think, were correct that there is no further

5    distribution of plan investor litigation to, if you will,

6    creditors of this estate, either pre-petition or post-petition.

7    But there is a sharing arrangement between the company buyer

8    and the GM buyer regarding that litigation.

9              THE COURT:  Okay.  That's what I was remembering.

10             MR. BUTLER:  And so -- but it's not --

11             THE COURT:  But the --

12             MR. BUTLER:  It's not used --

13             THE COURT:  But the GM buyer is, in effect, getting

14   assigned in a litigation.

15             MR. BUTLER:  Correct.

16             THE COURT:  Okay.

17             MR. BUTLER:  It is, Your Honor.  And there is a

18   sharing provision but it's not -- it's a sharing provision

19   between those entities.

20             THE COURT:  Right.  Okay.

21             MR. BUTLER:  All right.

22             THE COURT:  All right.  So I'll come back in an hour,

23   3:15.

24             MR. BUTLER:  Thank you, Judge.

25             THE COURT:  Thank you.

123

1          (Recess from 2:10 p.m. until 3:22 p.m.)

2          THE COURT:  Please be seated.  Okay, we're back on the

3     record in Delphi Corporation.

4          MR. BUTLER:  Good afternoon, Your Honor.  Jack Butler

5     again for the debtors, for the continuation of our plan

6     modification hearing.  Your Honor, prior to commencing this

7     next phase of the hearing to deal with remaining objections,

8     what I'd like to do is just do a little bit of checking to make

9     sure that I understand what's still at issue from objectors.

10    And our plan, Your Honor, would be to proceed in the following

11    order this afternoon after doing that.  I would first bring on

12    for determination by Your Honor, pursuant to Article 7.17(c) of

13    the modified plan, approval of the Delphi-PBGC settlement

14    agreement.  There are elements of the objections filed by the

15    three remaining unions that have not withdrawn their objections

16    that go to the PBGC settlement.  In addition, there are --

17    Charles Cunningham and Dennis Block have filed an objection

18    along with the Delphi Salaried Retirees Association at docket

19    number 18277.  DSRA has withdrawn that objection as it pertains

20    to the association, but it's still maintained by Mr. Block and

21    Mr. Cunningham.  Mr. Block and Mr. Cunningham -- there is an

22    objection of fiduciary counselors at 18282, and there's an

23    objection of Mr. Paul Dobosz, D-O-B-O-S-Z, at docket number

24    18458, which raises certain jurisdictional matters, all of

25    which would go, I think, to the PBGC settlement.  So in a

124

1    moment I'm going to ask whether counsel for those parties or

2    the parties themselves are prepared to press those objections

3    so I understand who's -- how we're going to be dealing with the

4    PBGC settlement.

5        Following the PBGC settlement motion, we would propose

6    to then take up the remaining objections of the unions, of the

7    three unions, that are not resolved and that don't go to the

8    PBGC settlement issues; followed by the objection of James

9    Sumpter, docket number 18366, as it relates to COBRA; followed

10   by the objections of Gary Cook and Cheryl Carter at dockets

11   number 18002 and 17951.  And I think those are the only

12   objections that haven't otherwise been resolved.

13       So one of my questions is, and I'm going to ask about

14   these individuals as well, and these entities, but other than

15   ones I have just described, the three remaining unions, James

16   Sumpter, Mr. Black and Mr. Cunningham, fiduciary counsels

17   Mr. Dobosz, Mr. Cook, Ms. Carter, and of course subsumed within

18   this PBGC discussion will also be the letter objections filed

19   by the pensioners as well, but other than those, I'd ask if

20   anyone in the courtroom is planning to prosecute any objection

21   to the plan modification motion.  If you are planning to do so,

22   would you please stand and identify yourself?

23           UNIDENTIFIED SPEAKER:  Stand over there.

24           MR. BUTLER:  Oh, yeah, excuse me.  Thank you.

25           That would be -- there are a couple others, I'm sorry,

125

1    I should have mentioned.  We've got to deal with American

2    Aikoku at docket number 18277 that we'll have to deal with.

3    And I think there's also -- let me just ask if there's anyone

4    else.

5            Yes?

6            MS. REED:  We have a stipulation resolving an

7    objection put on the record with Ace Companies.

8            MR. BUTLER:  With Ace, yeah.  I understand that that's

9    resolved.

10           MS. REED :  Correct.

11           MR. BUTLER:  Right.  Anyone else?

12           Okay.  Then let me just quickly look through these

13   objections.  I know that Ms. Mehlsack and Ms. Robbins are here

14   for the three unions and prepared to proceed.

15           Is Mr. Sumpter here and prepared to proceed with his

16   objection, or counsel for Mr. Sumpter here?

17           MR. SUMPTER:  I'm on the phone call --

18           MR. BUTLER:  Okay.  Thank you, sir.

19           MR. SUMPTER:  -- CourtCall.

20           MR. BUTLER:  Thank you, sir.  Is -- are Mr. Black and

21   Mr. Cunningham here and prepared to proceed with respect to

22   their objection of counsel?

23           UNIDENTIFIED SPEAKER:  They are here and represented

24   by counsel.

25           MR. BUTLER:  And counsel is, please?

1           UNIDENTIFIED SPEAKER:  Morrison Cohen and Miller &

2      Chevalier.

3           MR. BUTLER:  Thank you.

4           Fiduciary counselors, are you proceeding with your

5      objection?

6           UNIDENTIFIED SPEAKER:  Yes.

7           MR. BUTLER:  Thank you.  And Mr. Dobosz, D-O-B-O-S-Z?

8      Mr. Dobosz or counsel for Mr. Dobosz present?  Is Mr. Dobosz

9      present on CourtCall?

10          Your Honor, Mr. Dobosz's objection is summarized at

11     objection number 14 on the summary of objections by nature of

12     objection on page 7.  And it's an assertion that the bankruptcy

13     court lacks jurisdiction, and phrasing it in his words, "to

14     direct or approve a sale or forfeiture of assets allegedly

15     belonging to the beneficiaries of a vested pension plan, and

16     the termination of a vested defined benefit pension plan is a

17     violation of ERISA".  We filed our response to that, but if

18     Mr. Dobosz is not here and prepared to assert his objection,

19     I'd ask that it be overruled for lack of prosecution.

20          THE COURT:  Well, it raises a jurisdictional point,

21     which I'll address, notwithstanding his not being present.

22     What you are asking me to approve is a settlement agreement

23     between the debtors and the PBGC.  And, I believe, under

24     Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, I

25     clearly have jurisdiction to consider the propriety of the

127

1   debtors' entry into that settlement agreement.  This issue was

2   addressed -- this issue of conflicting jurisdiction allegedly

3   was addressed by the Seventh Circuit in In re UAL Corporation,

4   428 F.3d 677 at 681 (7th Cir. 2005) which reached the same

5   conclusion.  So I would overrule that objection and find that I

6   have jurisdiction to consider the debtors' request for approval

7   of entry into the PBGC settlement agreement.

8          MR. BUTLER:  Thank you, Your Honor.  Your Honor, just

9   for efficiency and the record, I heard counsel for Ace indicate

10  they had a settlement they wanted to put on the record.  I

11  don't want them to have to stay through a further contested

12  hearing if --

13         Are we ready for that?

14         THE COURT:  Counsel for Ace?

15         UNIDENTIFIED SPEAKER:  I'm sorry.

16         THE COURT:  We're going to put your settlement on the

17  record.

18         MR. BUTLER:  Are we ready for that?  Is there --

19         UNIDENTIFIED SPEAKER:  Shall I get Mr. Wharton?

20         MR. BUTLER:  Yes, I think, if we're ready for it.  I

21  didn't realize we were putting it on the record, but if we are,

22  that's fine.

23         While we're doing that, Your Honor, let me just try

24  and address a couple of other -- let me just address a couple

25  of other issues, Your Honor, while I'm waiting to do that.

128

1          Your Honor, there are a series of objections that

2     Toyota Motor Corporation and affiliates filed in connection

3     with the assignment of their contracts or dealing with them as

4     customers, at dockets number 18271, 18484, 18485 and 18486.

5     And I was asked to confirm on the record that, to the extent

6     they're not already resolved, those objections would be

7     adjourned to the August 17th hearing, subject to further

8     objection in accordance with the mechanisms that I've

9     previously placed on the record on how we're going to be

10    dealing with executory contracts.

11          THE COURT:  Okay.  All right, I think counsel for Ace

12    is behind you.

13          MR. BUTLER:  So that takes care of Toyota.

14          MS. REED:  Good afternoon, Your Honor.  Margery Reed

15    with Duane Morris.  I represent the ACE Companies.  And I'm

16    pleased to report we do have a settlement as to our plan

17    objection.  The settlement does preserve our objection to the

18    assignment of a ACE's policies and insurance agreements, which

19    will be heard at a later date.

20          In essence, Your Honor, the settlement preserves the

21    prior agreement with the debtors that the ACE Companies' claims

22    arising under their policies, both the assumed policies as well

23    as the post-petition policies and agreements, will flow through

24    as administrative expense claims that are allowed under the

25    modified plan and will be paid in the ordinary course either by

129

1   the debtors, the reorganized debtors or the buyers if the

2   policies and agreements are assigned to the buyers.

3          THE COURT:  Okay.

4          MS. REED:  There are some other provisions in the

5   stipulation, but that's the gist of it.  And we are in

6   agreement on the wording and have signed off on it and will be

7   submitting it to chambers today for Your Honor to approve and

8   enter it as an order.

9          THE COURT:  Okay.

10          Is that correct?

11          MS. REED:  Thank you.

12          THE COURT:  On the debtors' behalf, is that correct?

13          MR. BUTLER:  Yes, Your Honor, subject to the terms of

14   the stipulation that have been agreed to --

15          THE COURT:  All right.

16          MR. BUTLER:  -- and as it will be submitted to

17   chambers.

18          THE COURT:  Okay, that's fine.  Thank you.

19          MS. REED:  Thank you.

20          MR. BUTLER:  Your Honor, that was docket number 18216,

21   the ACE matter.

22          THE COURT:  Okay.

23          MR. BUTLER:  I guess I'd also like to find out if

24   either Mr. Cook or Ms. Carter are here with respect to dockets

25   number 18002 or 17951.

130

1          Let me just briefly address that, Your Honor.  One

2     moment, please.

3          THE COURT:  Okay.

4      (Pause)

5          MR. BUTLER:  Your Honor, these objections are

6     summarized -- no, not ACE, sorry.  One second.

7          Not ACE.  There they are.

8          Your Honor, they're described on page 30 of the

9     summary of objections that was provided to the Court

10    previously.  This is -- Mr. Cook and Ms. Carter objected to the

11    treatment of individual workers' compensation claims asserted

12    in the amounts of 311,850 million, plus interest.  Mr. Cook

13    argues his claim can't be modified under the modified plan

14    because it would violate a 2003 order issued by the Michigan

15    Department of Consumer Industry Services Bureau of the Workers'

16    Disability Compensation Board of Magistrates.

17         Our response, as we indicated, is that the plan does

18    not alter the debtors' injured employees' ability to seek

19    workers' compensation payments.  Those workers who would timely

20    file the claim will be entitled to a distribution under the

21    modified plan in accordance with the priority scheme under

22    Section 507 of the Bankruptcy Code.  To the extent that claim

23    has not already been paid following the petition date, pursuant

24    to the claims adjudication process, Your Honor's already

25    authorized in these cases.  To the extent that an individual

1    claim was not timely filed, that workers' compensation claim is

2    already barred by the bar date order entered by this Court.

3            Your Honor has dealt with Ms. Carter's claims on prior

4    occasions.  This is the latest, I guess, version of that claim.

5    But it's similar to the prior claims that had been dealt with

6    in the claims administration track.

7            And, Your Honor, as it relates to the plan

8    modification motion and hearing, we'd ask that Your Honor

9    overrule these objections.

10           THE COURT:  All right, well, and the debtors are

11   representing that Mr. Cook's claim was dealt with in connection

12   with the thirty-fourth omnibus claim objection and is now --

13           MR. BUTLER:  Yes, Your Honor.

14           THE COURT:  -- now allowed at zero dollars?

15           MR. BUTLER:  Right.  Mr. Cook's claim -- both of these

16   have been dealt with in the past.  Mr. Cook filed a proof of

17   claim at number 5408; it was modified in the debtors' thirty-

18   fourth omnibus claims objection from an unliquidated claim to a

19   general unsecured claim in the amount of zero.  And

20   Ms. Carter's proof of claim, 17951, was objected to on the

21   thirty-fourth omnibus claims objection.  She filed a response,

22   and the hearing on that objection has been adjourned under the

23   claims objection procedures authorized by this Court in the

24   earlier claims track procedures.

25           THE COURT:  Okay.  Well, again, I have serious

132

1    questions as to Mr. Cook's standing given the treatment of his

2    claim which was allowed at zero dollars.  But to the extent he

3    does have standing, and with regard to Ms. Carter's objection,

4    I overrule those objections for the same reasons that, assuming

5    for the moment that the Michigan agency had a claim, I

6    overruled the Michigan agency's objections, which is that the

7    objections are premised upon payment in full of the claims as

8    opposed to treatment of the claims under the Bankruptcy Code's

9    priority scheme, which I believe the plan follows.

10           So those two objections are overruled.

11           MR. BUTLER:  Thank you, Your Honor.  Your Honor, I'd

12   like now, I think, to turn to the PBGC settlement and the

13   various objections that are either directly or indirectly

14   related to that settlement.  The PBGC settlement has been filed

15   publicly in a series of public docket numbers and is also in

16   the trial exhibits.  The actual Delphi-PBGC settlement

17   agreement was filed at docket number 18559; it's Joint Trial

18   Exhibit 131.  It had two exhibits to it:  One was a true-up

19   agreement that the PBGC agreement required be entered into to

20   true up some of the prior transfers between Delphi and General

21   Motors.  That was filed at docket number 18682 and is Joint

22   Trial Exhibit 132A; that was Exhibit A to the Delphi-PBGC

23   settlement agreement.  And Exhibit B to the Delphi-PBGC

24   settlement agreement is the settlement separate agreement

25   between -- it's called a waiver and release agreement -- that

1   has been entered into by General Motors Company, Motors

2   Liquidation Company and PBGC.  Delphi's not a party to that.

3        We did condition moving forward with the settlement on

4   the public disclosure of that agreement as part of the

5   settlement proceeding.  And it's set forth as Exhibit B.  It

6   was filed as docket number 18657 and is Joint Trial Exhibit

7   132B.

8        As indicated, Your Honor, under our prior -- our plan

9   modification motion as supplemented, and pursuant to Article

10  7.17C of the modified plan, we are asking -- and the modified

11  plan constitutes our request to authorize and approve the

12  Delphi-PBGC settlement agreement pursuant to Section 1123(b)(3)

13  of the Bankruptcy Code and Bankruptcy Rule 9019.

14       Delphi and PBGC executed the settlement agreement on

15  July 21, 2009, and the debtors filed the notice of that filing

16  later that day.  That included the Delphi-PBGC settlement

17  agreement.  This agreement addresses the PBGC's claims in this

18  case, releases by PBGC needed to effectuate the master

19  disposition agreement and the potential involuntary termination

20  of the Delphi pension plans, including the Delphi HRP.

21       While the debtors were negotiating the original master

22  disposition agreement, which has now been designated the

23  alternative transaction, Delphi anticipated that GM would

24  address the Delphi HRP and believed that that meant that GM

25  would assume that obligation, although it understood that GM

1    was not expressly obligated to do so.

2          And I should emphasize on this record, Your Honor,

3    that the commitment that GM had undertaken to assume the second

4    transfer of the 4140, under the prior global settlement

5    agreement and master restructuring agreement Your Honor

6    approved last September, had a series of conditions in it.

7    Those conditions were not met when that -- based on events

8    subsequent that Your Honor's all too familiar with in terms of

9    what happened in the capital markets and in the automotive

10   sector, and the inability of Delphi to satisfy those

11   conditions.

12         So it is not the case that GM had a contractual

13   undertaking that they could be, if you will, forced to take the

14   second half of the 4140, although it was, at the time we made

15   our disclosures in late May/early June, at least the debtors'

16   understanding that that's what likely "addressed" meant. Your

17   Honor may recall, however, that you asked me those questions at

18   an earlier hearing back on June 10th when you approved the

19   supplement to the disclosure statement, and I was, I think,

20   candid with you that I did not know what "addressed" actually

21   meant.  And we actually amended the supplement to say that we

22   didn't know what "addressed" actually meant but that we would

23   find out and we would disclose that.

24         But what was clear, what we meant in our earlier

25   disclosure, was that it was clear Delphi, the debtors, would

1  have absolutely no obligation for the HRP when the transaction

2  that was then contemplated, the June 1st transaction, was

3  complete.  And we made it very clear in our announcements at

4  that time -- both the June 1st and again in the supplement that

5  Your Honor approved, and it was entered in the docket on June

6  16th and ultimately pursuant to which we re-solicited

7  acceptances, rejections of the modifications of the plan under

8  1127 -- that agreement and that disclosure made it clear that

9  this company, the debtors, had no financial wherewithal to be

10  able to continue to fund any of the defined benefit plans and

11  made it very clear that the company buyer had absolutely no

12  intention of assuming in any way, directly or indirectly, any

13  of the obligations associated with the defined benefit plans.

14  And it said that GM had no obligation to assume of the other

15  plans either -- although it would address the Delphi HRP.

16       When those -- as negotiations progressed -- and by the

17  way, there was one other, I think, not insignificant event,

18  which is, as we made those disclosures on or about June 1st,

19  General Motors -- the Old General Motors Corporation filed

20  Chapter 11.  They eventually sold their assets to the New

21  General Motors Company, Motors Liquidation Corporation or

22  Company -- I guess it's Corporation -- remains a debtor here in

23  the Southern District, and is addressing various liabilities

24  that it had.  And there's nothing with respect to the Delphi

25  HRP that in any way implicates General Motors Company, the new

1  entity, NewGM, and there was no obligation -- contractual

2  obligation with Delphi Corporation that Motors Liquidation

3  Company -- that would be enforceable against Motors Liquidation

4  Company as a result of Delphi's inability to meet the

5  conditions under the prior global settlement agreement and

6  master restructuring agreement.

7       Nonetheless, discussions ensued between Delphi and the

8  PBGC.  And ultimately a separate path of discussions ensued

9  between General Motors -- the two General Motors entities and

10  PBGC about what the effects on these various companies might be

11  in the event that PBGC took action based on all of the public

12  statements that had been made by both companies, both by

13  Delphi, that we had no longer had the financial wherewithal to

14  support these plans, and by General Motors, both Motors

15  Liquidation and General Motors Company, that they did not

16  intend to effectuate any further transfers of these assets.

17       And it was as a result of those discussions, and why

18  they were bilateral and not trilateral, we believed it was

19  important and we appreciated GM's willingness to acquiesce to

20  our request that their agreements be disclosed immediately in

21  these cases.  And we did so.

22       Once we learned of those events, the debtors made

23  additional public disclosure of that in a press release that

24  was released on July 21st of this year in which we announced,

25  among other things, that the U.S. hourly pension plan would not

1    be assumed by GM on the Delphi and PBGC-reached settlement on

2    the PBGC claims as they related to Delphi's estates.

3         We did not make -- we commented on what we believed

4    would ultimately be a settlement between GM and PBGC, and I

5    believe that GM issued a separate statement, but that agreement

6    wasn't completed until very recently and it was filed when it

7    was executed.

8         Your Honor, I think it is important, because I know

9    people have tried very hard to characterize this in ways that

10   the debtors believe are completely inappropriate, but Delphi,

11   in the discussions we had with PBGC, were very familiar with

12   the law, very familiar with In re UAL Corporation and the

13   decisions made in the Sixth Circuit with respect to these

14   matters, and approached these discussions at all time with an

15   understanding that PBGC would have to make its own independent

16   assessments of what it was going to do.  And the PBGC

17   settlement agreement between Delphi only addresses what would

18   happen in the event that PBGC made those determinations.

19        Obviously, there is a statement in here that provides

20   in our agreement -- that provides that in the event this Court,

21   in connection with this hearing, made a determination, which we

22   believe Your Honor should make, that under the United decision,

23   among others, but particularly relying on United, that PBGC's

24   unilateral decision to proceed with an involuntary termination

25   of the Delphi HRP is not in any way an abrogation by Delphi of

1    any of its collective bargaining agreements and, therefore, are

2    prepared -- the Court is prepared to make the findings that

3    we've requested in the plan modification order to that effect.

4         There is our provisions of the PBGC-Delphi settlement

5    agreement that would take into account the steps to be taken

6    after that fact.  Specifically, Your Honor, Section 3(B)(i) of

7    the Delphi-PBGC settlement agreement provides that if PBGC

8    decides to proceed with an involuntary termination of the

9    Delphi HRP, Delphi will consent to a termination and

10   trusteeship agreement, pursuant to Section 4042 of ERISA, only

11   if the Court finds that doing so does not violate either the

12   labor MOUs or the Court's orders approving the 1113/1114

13   settlement approval orders earlier in these cases.

14        To my knowledge, the only unions that are pursuing

15   objections now with respect to these matters are the three

16   remaining unions:  the IAM IBEW and the IOUE.

17        Now, I'm sorry, I get the letters wrong when I say it.

18   I think I got to correct it.

19        Those three unions may have comments to this

20   agreement.

21        In addition, Your Honor, there are a series of other

22   parties including pensioners, who've written letters, who

23   objected to the settlement agreement.  I believe the settlement

24   agreement and the benefits of the settlement agreement speak

25   for themselves.  We put them in our papers and I'm prepared to

1    address them at length in any response to the objections.  But

2    I think that's -- if it's all right with the Court, I think, is

3    a sufficient introduction to this matter.  And I then would ask

4    any objectors to the settlement to raise their objections,

5    unless Your Honor has questions of me.

6              THE COURT:  The form of voluntary termination and

7    trusteeship agreement --

8              MR. BUTLER:  Yes?

9              THE COURT:  -- that appears to me to be sort of a

10   standard form.  Is there anything --

11             MR. BUTLER:  Your Honor, you're speaking as to the

12   agreement for appointment --

13             THE COURT:  This is Exhibit C?

14             MR. BUTLER:  Right.  Correct.  It is very much --

15             THE COURT:  It has blanks for the sponsors.  This --

16             MR. BUTLER:  Yes.

17             THE COURT:  Could you give any background on the

18   origin of this form?

19             MR. BUTLER:  Your Honor, this is, I believe, a

20   standard form that would be used in the event that --

21   Ms. Hassel's here with me in the court, who's actually spent

22   more time on it than I have.  And I don't know if you want to

23   address the Court's point.

24             MS. HASSEL:  Your Honor, Lonie Hassel, Groom Law

25   Group, for Delphi.  This is a standard form that PBGC uses in

140

1   virtually all its terminations by agreement.  The names are

2   changed, obviously; the dates change.  But it's a very short

3   and simple document.

4           THE COURT:  Okay.  Thank you.

5           MR. BUTLER:  So, Your Honor, in terms of introduction,

6   I think I will stop there, unless the Court has other questions

7   of me, and ask the objectors to present their objections.

8           THE COURT:  Okay.

9           MS. MIEHLSACK:  Good afternoon, Your Honor.

10          THE COURT:  Good afternoon.

11          MS. MIEHLSACK:  Barbara Miehlsack for the operating

12   engineers Locals 18S, 101S and 832S.  And I'm here jointly with

13   Marianne Robbins who's representing the International

14   Brotherhood of Electrical Workers and the International

15   Association of Machinists and their district lodges and locals,

16   all collectively representatives of participants in the Delphi

17   HRP.

18          And we will be appearing jointly.  We've divided up

19   the issues that we have.  I will address, Your Honor, primarily

20   the settlement agreement and Exhibit B to the settlement

21   agreement and how it conflicts with the Employee Retirement

22   Income Security Act, and particularly Title IV of the Act.  And

23   Ms. Robbins will address the issues that are raised by the

24   agreement on the plan in connection with the MOUs that were

25   entered into by the unions and approved of by Your Honor, as

1    well as the implementation agreement.

2         Your Honor, collectively the three unions represent a

3    sum total of 120 participants in the Delphi HRP.  They are both

4    active employees, retirees and to-be retired employees.  The

5    active employees actually are currently employees at the

6    Rochester facility, which is one of the UAW keep sites that

7    will be acquired by General Motors, and those employees will be

8    working side by side with UAW employees will be provided

9    substantially different benefits than the operating engineer

10   represented employees.

11        In addition, all of the participants of the HRP who

12   are represented by the three unions are the same individuals

13   who've been affected by General Motors' determination not to

14   provide post-retirement health insurance and life insurance

15   under the terms of the term sheets and implementation

16   agreements that Your Honor approved in this case.

17        MS. MEHLSACK:  As a result, Your Honor, those

18   employees are suffering not just devastating cuts, likely

19   devastating cuts in their pension benefits, when the PBGC

20   terminates the plan, but in addition to that, substantial

21   reductions in their health insurance and their life insurance

22   and increases in the cost to them and their beneficiaries of

23   providing health insurance.  As a result of what we -- we have

24   asked, Your Honor, both Delphi and the PBGC under Title IV of

25   ERISA which governs the -- which is the plan termination

1    provisions of ERISA, we've asked both Delphi and the PBGC to

2    provide us with information.  The PBGC is obligated to provide

3    the administrative record of its termination decision and

4    Delphi is obligated to provide information that it provided the

5    PBGC in connection with the termination decision.  Delphi was

6    very cooperative, and last night, provided us with a

7    substantial amount of information that we've not had a chance

8    to digest yet.  The PBGC has fifteen days from the date of our

9    request to provide us with information.  So that we don't know,

10   Your Honor, the extent to which a PBGC termination will reduce

11   nonguaranteed benefits.  We are fairly certain, Your Honor,

12   that what's called the early retirement supplement in the plan

13   which persists until age sixty-two and results in, depending on

14   how many years of service the individual has, could result in

15   an individual maintaining a 3000 dollar a month benefit until

16   age sixty-two, and eligibility for Social Security.  That

17   benefit will go so that putting the best face on it, Your

18   Honor, a participant who has had a substantial number of years

19   of service in the Delphi plan and is earning an average benefit

20   of about 1600 dollars a month will end up, because of the

21   changes to the GM healthcare plan, paying close to if not more

22   than fifty percent, as the retirement benefit goes down, the

23   likelihood that that participant will be paying more than fifty

24   percent of their annual retirement benefit out of pocket for

25   healthcare until GM picks up any costs.  That's because the

143

1    healthcare befit that is going to be provided by GM required

2    7000 dollars out of pocket for a family participant.  So that

3    what we're looking at, Your Honor, is a devastating impact on

4    the 120 individuals who are represented by the three unions and

5    participants in the HRP.

6         You heard Mr. Kennedy say, earlier, that GM is in the

7    process of negotiating with the IUE to ameliorate the effects

8    of those two changes, the diminution in healthcare benefits and

9    the reduction in pension benefits that will come about as a

10   result of a termination.  No one, Your Honor, is negotiating

11   with the three splinter unions:  the IUOE, the IBW, and the

12   IAM.  And Ms. Robbins will address the fundamental inequities

13   of the structure that's been proposed by the plan, the MDA, and

14   the settlement agreement and Exhibit B of the settlement

15   agreement in violation of what we believe were the promises of

16   equitable treatment to all participants in the HRP under the

17   MOUs.

18        What I'm going to address, Your Honor, is the fact

19   that we believe there are irreconcilable conflicts between the

20   settlement agreement and Exhibit B of the settlement agreement

21   and certain provisions of Title IV of ERISA, provisions that

22   were not addressed, Your Honor, by the United Airlines case

23   because they didn't, apparently, come into play in the United

24   Airlines case.

25        Mr. Butler said, interestingly enough, that Exhibit B

1    is not an agreement with Delphi.  It's an agreement between the

2    PBGC and GM New -- both New and Old GM.  However, Exhibit B

3    provides for releases from the PBGC to Delphi, the Delphi group

4    and to all of the purchasers, not just the GM purchasers.  And

5    we believe those releases are simply irreconcilable with Title

6    IV.  And with all due respect, Your Honor, we do not believe

7    that you can grant the relief that's requested by Delphi today,

8    because if you do, you will disturb what the district court

9    called in the flight attendants' case in United Airlines a

10   finely tuned balance that Title IV affects between the aim to

11   protect employees' benefits and the aim to preserve employer

12   assets.  We don't think, Your Honor, that you can approve this

13   settlement without affecting that delicate balance in a way

14   that seriously undermines, if not totally impedes, the rights

15   of the unions and participants in the plan, and effectively the

16   rights of the PBGC under two provisions of Title IV.  Those

17   provisions, Your Honor, are Section 13 -- it's Act Section 4003

18   29 U.S.C 1303 and Act Section 4047, it's 29 U.S.C. 1347.

19        Your Honor, the United Airlines case, United Airlines

20   said to the flight attendants that -- the Court said a

21   settlement between the PBGC and United Airlines didn't violate

22   the voluntary termination provisions of Title IV.  Those are

23   the provisions of Title IV that require adherence to a

24   collective bargaining agreement.  And what the Court said is

25   first of all, nothing in this agreement mandates that the PBGC

145

1    terminate the plan, and so there's no violation.  And the

2    flight attendants had their rights under Section 1303

3    preserved.  Section 1303 provides that a participant in the

4    plan or a union representing participants in a plan may sue the

5    PBGC for equitable relief if the participant is adversely

6    affected by conduct of the PBGC or if the union is represented

7    in connection with its collective bargaining rights as a result

8    of the adverse effect on the participants.

9          Your Honor, we believe that the plan itself, the MDA

10   that provides that Delphi will have no obligation after the

11   closing, no obligation whatsoever in connection with the

12   plan -- not just no funding obligation but no obligation -- in

13   combination with the settlement agreement which implements,

14   which is, as Mr. Butler has acknowledged, as everybody has

15   acknowledged, once GM refused to accept responsibility for the

16   Delphi HRP, the implementing mechanism for relieving Delphi of

17   the responsibility is the agreement with the PBGC and the, we

18   believe, also, especially important are the waiver and release

19   provisions contained in Exhibit B, even though Mr. Butler says

20   Delphi's not a party to Exhibit B.  We --

21         THE COURT:  How does any of this violate 1303?

22         MS. MEHLSACK:  Under 1303, Your Honor, you can get

23   equitable relief, the kind of --

24         THE COURT:  As against the PBGC?

25         MS. MEHLSACK:  As against the PBGC, the kind of

146

 1    equitable relief, for example, is the right to have the PBGC to

 2    restore a plan.

 3          THE COURT:  Okay, but how does this violate 1303?

 4          MS. MEHLSACK:  The settlement provides that the PBGC

 5    releases Delphi from any obligation founded on any conceivable

 6    theory, legal or equitable.  What the effect of this would be,

 7    Your Honor, is if we had a basis for going in and saying to the

 8    PBGC you have to restore this plan, arguably Delphi can turn

 9    around and say PBGC, you can't restore this plan and you can't

10    restore the plan because the settlement agreement, the waiver

11    and release provision specifically says you may not -- you may

12    not on any legal or equitable theory, impose any kind of

13    liability on Delphi for this plan.

14          THE COURT:  The Second Circuit in Revco said that the

15    bankruptcy court reviews the settlement agreement from the

16    perspective of the debtor and its creditors, not from the

17    perspective of the other party and its creditors.  So why do I

18    even look at the PBGC?

19          MS. MEHLSACK:  Because the debtor is here asking you,

20    Your Honor, to approve an agreement that effectively -- why is

21    the debtor asking you to approve this agreement?

22          THE COURT:  Because it's a good deal for the debtor.

23    That's why they're asking me.  That's what they're telling me,

24    and that's what the Second Circuit and the Revco matter

25    involving the settlement with Sphinx said I should look at and

1   nothing else.

2           MS. MEHLSACK:  But the -- but Your Honor --

3           THE COURT:  To determine whether it is a good

4   agreement or not to the debtor.

5           MS. MEHLSACK:  -- this is a proposal that impedes --

6   the Court also said in UAL that looking -- you need to look at

7   ERISA, as well.  The bankruptcy at Code does not supersede

8   Title IV of ERISA.  And in fact --

9           THE COURT:  Does anything in this agreement do that?

10          MS. MEHLSACK:  Yes, Your Honor, it supersedes Section

11  4047.  What the United Court said was there's nothing wrong

12  with this agreement because the PBGC under 4067 has the right

13  to give up claims, pre-termination claims against the debtor.

14  There's absolutely nothing in 4047 that gives the PBGC the

15  right to waive its right to restore a plan.

16          THE COURT:  But I'm not authorizing the PBGC to enter

17  into this agreement.  The PBGC is already entered into it.  I'm

18  authorizing the debtor to enter into it and perform this

19  agreement.

20          MS. MEHLSACK:  But you're giving this agreement your

21  imprimatur, Your Honor, the bankruptcy court's imprimatur.

22          THE COURT:  As far as the law permits, which is,

23  again, from the debtors' perspective.

24          MS. MEHLSACK:  Your Honor, what we believe is you

25  can't approve the other terms of this agreement.  If Delphi is

1    prepared to go ahead with this transaction and GM is prepared

2    to go ahead with this transaction, without your approval for

3    those released in Exhibit B, then that's a decision that the

4    debtor has to make.  But what we're saying, Your Honor, is the

5    debtor has chosen to present that -- put that agreement before

6    you and is asking for your approval of the agreement.  We don't

7    think you can approve the agreement without creating a

8    structure that violates Title IV.  If you're saying I don't

9    have to approve that agreement and Delphi and GM are prepared

10   to go ahead with these transactions without that agreement,

11   then we're in a different transaction, Your Honor.  Our concern

12   --

13          THE COURT:  How does this agreement violate 1347?

14          MS. MEHLSACK:  If you look at Exhibit B, Your Honor,

15   to the settlement agreement at page 5, it says "release of

16   claims relating to pension plan termination" and it provides

17   the Delphi releasees, GMC, Old GM, all of the purchasers, and

18   going on, it's at subsection B, if you read down to the bottom,

19   toward the bottom of the page, "from any and all disputes,

20   controversies, suits, actions, judgments, liabilities,

21   obligations of any kind whatsoever upon any legal or equitable

22   theory, whether known or unknown that PBGC ever had, now has,

23   or hereafter can, shall, or may have from the beginning of

24   time, by reason of any matter, cause, or thing, whatever

25   relating to all pension plans that have terminated".  What

149

1    effectively this does, Your Honor, is -- and let me back up

2    because the Second Circuit --

3            THE COURT:  So this is a release by the PBGC --

4            MS. MEHLSACK:  To Delphi.

5            THE COURT:  -- of those parties.

6            MS. MEHLSACK:  That's right.

7            THE COURT:  Okay.

8            MS. MEHLSACK:  And what it says is, we, the PBGC,

9    can't come in and say to you, Delphi, we're going to restore

10   your plans.  And it means that we, the unions -- in effect, it

11   does what United said -- what the Court in United said that

12   agreement didn't do.  It does mandate the PBGC to maintain the

13   plan as a terminated plan even though the PBGC might find that

14   there were reasons to restore the plan.  And what it also does,

15   Your Honor, the Second Circuit, when it was considering the LTV

16   settlement found that the -- and this is PBGC v. LTV, 824 F.2nd

17   197, and the Court was considering the due process rights of

18   the participants and it made three points.  It said first of

19   all, the participants -- as to why the termination in LTV did

20   not violate the rights of the participants.  It said the

21   participants are free to make -- file claims against LTV for

22   not continuing the plan.  It's the position of the debtor that

23   we are not free to file claims against Delphi for their not

24   continuing the plan.

25           THE COURT:  Delphi or -- I'm sorry.

150

```
 1              MS. MEHLSACK:  The Second Circuit said the

 2    participants are free to file claims against LTV for not

 3    continuing the plan.

 4              THE COURT:  Okay, right.

 5              MS. MEHLSACK:  The participants have their rights,

 6    under a 1303 action, that was the second point.  And the third

 7    point was the PBGC can always restore the plan under 4047.  We

 8    don't have any of those protections, Your Honor.  It's the

 9    position of Delphi we have no right to claims against Delphi

10    for not continuing the plan.  It's their position under -- and

11    that's something we will be addressing in the claims

12    disallowance.  It's their position that under United

13    Engineering, the Sixth Circuit case, once the plan is taken

14    over by the PBGC, we don't have any right to claim against

15    Delphi.

16              THE COURT:  But I'm not deciding that today, right?

17              MS. MEHLSACK:  No, I understand that, Your Honor.

18    That's one of the provisions.  The second and third issue --

19              THE COURT:  And if I do decide it, it will be based

20    under applicable law as to whether you have a claim or not.

21              MS. MEHLSACK:  But the second and third provisions,

22    what I'm saying, Your Honor, is none of the --

23              THE COURT:  Well, let me -- Mr. Butler, does this

24    release by the PBGC and the order you're asking me to enter

25    give the PBGC immunity under 1303?
```

151

1      MR. BUTLER:  Not to my knowledge, Your Honor.  The --

2  first of all, we're not asking Your Honor to approve Exhibit B.

3  We insisted that it be disclosed.  We're asking Your Honor only

4  to approve the Delphi-PBGC agreement.  There are benefits in

5  the General Motors-PBGC agreement that are newer to Delphi

6  because of payments that General Motors is making.  But that

7  agreement is an agreement between GM, General Motors Company,

8  Motors Acquisition Corporation, and PBGC that's effective in

9  accordance with its terms.  We're a beneficiary of some of the

10  releases there, but that's not before the Court today.  All

11  that's before the Court today that we're asking you to approve

12  is the Delphi-PBGC agreement.  That was very clear in our

13  motions.

14      THE COURT:  Okay.

15      MS. MEHLSACK:  Your Honor, the Exhibit B is an exhibit

16  to the settlement agreement.  It's an exhibit in the documents

17  that are before the Court today.  There's been absolutely no

18  indication, and to the contrary, every indication what's being

19  sought today is an approval of Exhibit B.  If the debtor is

20  withdrawing Exhibit to the settlement agreement from its

21  motion, then that puts this case in a somewhat different

22  posture.  It doesn't end the issue, but if Mr. Butler is saying

23  we're withdrawing Exhibit B, Your Honor.

24      THE COURT:  No, I don't understand, still, how the

25  order that the debtors are asking me to enter would give the

1   PBGC a free pass under Section 1303.

2          MS. MEHLSACK:  What it does, Your Honor --

3          THE COURT:  I don't see -- I mean, I don't quite see

4   how I would have jurisdiction to do that anyway.

5          MS. MEHLSACK:  Well, Your Honor, we don't think you

6   have -- let me -- we don't think you have jurisdiction to

7   decide -- 1313 --

8          THE COURT:  Well, let me ask you a different question.

9   Where, in the relief they're seeking, do you believe that that

10  relief is included?

11         MS. MEHLSACK:  Well, let me ex -- Your Honor, what we

12  believe is included is the fact that these releases, first of

13  all, would prevent the PBGC from proceeding under 1347 to

14  restore the Delphi plan because the PBGC is precluded from

15  proceeding on any legal or equitable basis against Delphi in

16  connection with this plan.

17         THE COURT:  Let's focus -- let's get to the real

18  world, now, on this.  I mean, where the PBGC has restored plan

19  is where there's a follow-on plan.  I mean, where the debtor is

20  playing fast and loose with the shifting obligations under the

21  PBGC and then turning around and immediately entering into a

22  new plan.  This debtor's not even going to have any employees.

23  They're going to be contract people.  So what are we talking

24  about, here?

25         MS. MEHLSACK:  Your Honor, we believe that there are

1   the equivalent -- and this goes to the issues that are raised

2   by another provision of this agreement which references the

3   benefit guarantee and other contractual arrangements that are

4   being discussed.  We believe, Your Honor, and we know that the

5   consideration of benefit guaranty -- the PBGC considers a

6   benefit guaranty to be a follow-on plan.  And there are issues

7   that are raised by this agreement, raised by the negotiations

8   that are going on today, Your Honor, that effectively deny to

9   our clients the benefits of what are being called the top-ups,

10   what other people have called follow-on plans.  And

11   effectively, that would be -- you're absolutely right, Your

12   Honor -- that would be one basis upon which conceivably there

13   would be an action for restoration of the plan.

14          The other is, Your Honor, we don't know yet --

15          THE COURT:  But with the debtors as the sponsor?

16          MS. MEHLSACK:  Well, Your Honor, that -- this is a

17   very intricate transaction, Your Honor, and what the debtor has

18   done is present agreements to you that tie in and place before

19   you all of these transactions as one, you know, they're all

20   here, Your Honor, as exhibits, they're part of what the debtor

21   is asking you to approve.

22          THE COURT:  Can I interrupt you for a second?

23          MS. MEHLSACK:  Sorry?

24          THE COURT:  Can I interrupt you just for a second?

25          (Pause)

154

 1         MR. BUTLER:  Judge, while there's that brief

 2   interruption, could I just simply rise to point out one thing,

 3   and that is -- because maybe this will help with the argument

 4   and Ms. Mehlsack can focus on what we propose.  The proposed

 5   order that we filed with this Court, Your Honor, has, as it

 6   relates to the PBGC settlement agreement which is paragraph 56

 7   (a) and (b) in the order we filed to you attached to our reply.

 8   And it's paragraph 58 (a) and (b) in connection with the

 9   modified order that we -- that's a trial exhibit.  We say very

10   clearly that we're asking the Court to find quote, and this is

11   56(b) of what was filed with the omnibus replay, quote, "the

12   Court finds that the debtors may enter into such agreements

13   with respect to the Delphi HRP or the bargaining plan as

14   defined in the Delphi-PBGC settlement agreement without

15   violating the labor MOUs or other applicable collective

16   bargaining units, the union 1113, 1114 approval orders, Section

17   1113(f) of the Code or any other applicable law, and the Court

18   expressly authorizes the debtors to do so.  Nothing in this

19   order prohibits employees or unions adversely affected by any

20   plan termination from (a) seeking to intervene in any district

21   court action filed by PBGC under Section 4042 of ERISA at 29

22   U.S.C. Section 1342 to terminate the plans or (b) pursuing any

23   independent action against the PBGC regarding the termination

24   of the plan under Section 4003(f) of ERISA, 29 U.S.C. 1303(f)"

25   end quote.  Those rights are specifically preserved under the

1    proposed modification plan order.

2          MS. MEHLSACK:  Your Honor, that's not, I believe,

3    responsive to what we are saying.  I know that --

4          THE COURT:  Well, it's certainly responsive on the

5    1303 point.

6          MS. MEHLSACK:  No, it's responsive to our right to go

7    and ask for relief under 1313.  It's not responsive to the

8    issue that Exhibit B effectively cripples the ability of the

9    PBGC to seek relief or to respond to a claim for equitable

10   relief.

11         THE COURT:  Well, what is the PBGC?  They're a potted

12   plant?  I mean, come on, they have the right to settle under

13   1367.

14         MS. MEHLSACK:  But this is not 3067, Your Honor.  3067

15   is very limited.

16         THE COURT:  They can't give a release?

17         MS. MEHLSACK:  3067 does not talk about equitable

18   relief.  3047 is very specific and 3067 reads very differently

19   than 3047.  3047 says whenever the corporation determines that

20   a plan which is to be terminated or which is in the process of

21   being terminated should not be terminated as a result of such

22   circumstances as the corporation determines to be relevant, the

23   corporation is authorized to cease any activities undertaken to

24   terminate the plan --

25         THE COURT:  No, you misheard me.  I'm saying 29 U.S.C.

156

1    1367 which gives the PBGC the authority to settle.

2         MS. MEHLSACK:  But not to settle 3040 -- not to settle

3    the right to restore a plan, Your Honor.  Because 1367 only

4    talks about pre-termination liabilities.  1367 says, it's

5    titled recovery of liability for plan termination.  The

6    corporation is authorized --

7         THE COURT:  What language in Exhibit B is raising this

8    restoration issue with you?

9         MS. MEHLSACK:  The language that says the PBGC is

10   precluded from seeking any kind of equitable relief against

11   Delphi.  It's, again, at -- that's the settlement -- on page 5,

12   section 2(b), the PBGC -- the relief of claims relating to

13   pension plan terminations which precludes the PBGC from

14   asserting any and all disputes, controversies -- if you go

15   down, Your Honor, it's about, sort of, almost -- a little bit

16   more than halfway.  It says "the PBGC" -- it starts out "the

17   PBGC unconditionally and forever releases and discharges (1)

18   the Delphi group, (2) the sales companies, the JV companies,

19   GMC, Old GM, and all other purchasers or transferees of assets

20   pursuant to the MDA" and then it goes on together "in each

21   case" -- go down about ten lines -- "from any and all disputes,

22   controversies" -- I won't read of all shows and action --

23   "liens and obligations" --

24        THE COURT:  This is the release in the agreement

25   between, again, between PBGC and GM, right?

157

1              MS. MEHLSACK:  But it's a release to Delphi, Your

2      Honor.

3              THE COURT:  Right, okay.

4              MS. MEHLSACK:  And it says for -- "upon any legal or

5      equitable theory".

6              THE COURT:  Okay.

7              MS. MEHLSACK:  Your Honor, right now, it's my under --

8      first of all, the PBGC has issued a notice of termination

9      already.  If the -- were Your Honor to find that what the

10     PBGC's agreement with Delphi violates our MOUs or Your Honor

11     were to not find that it doesn't violate the MOUs, then the

12     settlement agreement provides that the PBGC must go in and seek

13     termination in the district court.  That, by the way, we think,

14     Your Honor, makes this mandatory in a way that the United

15     termination wasn't mandatory.  But it also means, Your Honor,

16     we believe, that were we to challenge that termination, and the

17     PBGC notice of termination provides that it's one of the bases

18     for the termination is that the plan liabilities are likely to

19     increase unreasonably, were we to challenge that termination,

20     okay, arguably, the PBGC, okay, is saying we don't have the

21     right -- we have released Delphi from any obligations under

22     this agreement.  And we don't have the right to go back in and

23     say Delphi, we're going to restore the plan.  Our calculations

24     are wrong.  Or for any other kind of equitable relief.

25              THE COURT:  And what court has put its imprimatur on

1    that position?

2           MS. MEHLSACK:  I think, Your Honor, by approving this

3    settlement agreement with Exhibit B, that you're putting an

4    imprimatur on the PBGC saying we don't have the right, any

5    more, to seek any kind of equitable relief against Delphi.

6           THE COURT:  Okay.

7           MS. MEHLSACK:  Your Honor, we also believe that the --

8    and Ms. Robbins will address the equities of the structure and

9    its implications for the MOUs.  We believe that by foreclosing

10   the PBGC from seeking equitable remedies against Delphi, GM --

11   Your Honor raised the question of follow-up plans.  Arguably

12   this -- Exhibit B certainly forecloses the PBGC from seeking

13   any kind of legal or equitable remedies from GM.  In other

14   words, GM -- the former sponsor of the Delphi HRP, knew --

15          THE COURT:  We're going -- I mean, as long as you

16   believe that the only basis for your argument is that I am

17   blessing the PBGC's actions instead of the debtors' actions if

18   I grant this motion, then you don't need to go further.

19          MS. MEHLSACK:  Well, I think you're blessing both,

20   Your Honor.  You're also --

21          THE COURT:  I'm not.  It's that simple, I'm not.  The

22   Second Circuit said so in 2007.

23          MS. MEHLSACK:  Your Honor, Ms. Robbins will address

24   the issues of the debtors' conduct in connection with the

25   collective bargaining agreement.  But we believe, Your Honor,

159

1    that the debtor has mandated that, unlike in the United case,

2    the agreement here effectively operates as a mandate on the

3    PBGC.  Thank you, Your Honor.

4              THE COURT:  Well, how is that?

5              MS. MEHLSACK:  Because it says to the PBGC you can't

6    go in and do anything else but terminate this plan.  If --

7              THE COURT:  But where does it say that?

8              MS. MEHLSACK:  It says -- Your Honor, first of all it

9    says if Your Honor doesn't find that our agreements are not

10   violated, it says the PBGC has to go to the District Court.

11             THE COURT:  No, no, no.  Let's read the provision, all

12   right?  Because that's obviously important.  It's 3(b) of the

13   agreement.

14             MS. MEHLSACK:  Now we're talking about the settlement

15   agreement?

16             THE COURT:  Right.  It says, "As soon as is reasonably

17   practical after entry of an order approving the modified plan

18   or a sale transaction at the alternative sale hearing, PBGC

19   staff will determine whether to initiate and/or proceed with

20   the involuntary termination under 29 U.S.C. Section 1342 of the

21   bargaining plan and/or the hourly plan, which termination shall

22   be effective on the termination date.  If and when PBGC issues

23   a notice of determination pursuant to 29 U.S.C. Section 1342

24   that the bargaining plan and/or the hourly plan shall terminate

25   on the termination date, PBGC shall seek termination of the