# Exhibit H

# Part 3

1    bargaining plan and/or the hourly plan pursuant to 29 U.S.C.

2    Section 1342(c)", which sort of makes sense since they've made

3    the determination at that point.

4          Then it says -- and I think this is the language

5    you've been referring to, "In connection with seeking

6    bankruptcy court approval of the agreement as contemplated

7    under Section 6(a) hereof, Delphi shall seek a finding by the

8    bankruptcy court that such termination, if and when determined

9    by the PBGC, is not in violation of the labor MOUs, the union

10   1113, 1114 settlement approval orders, or the local agreements.

11   In the event that the bankruptcy court approves this agreement

12   and makes the foregoing finding PBGC and Delphi shall execute

13   it."

14         So it's all conditioned upon the PBGC staff making the

15   determination and then the PBGC taking the action consistent

16   with the determination.

17         MS. MEHLSACK:  Your Honor, I actually was referring --

18   that termination -- I believe that such termination is a

19   termination in which the PBGC seeks the consent of the debtor.

20   That's the notice that's attached to the settlement agreement

21   and the PBGC has already actually issued that notice to

22   Delphi --

23         THE COURT:  Okay.

24         MS. MEHLSACK:   -- in which Delphi signs on to a

25   voluntary trusteeship and agrees to the appointment of the

161

```
 1    PBGC --
 2              THE COURT:  Right.
 3              MS. MEHLSACK:  -- as the trustee without the PBGC
 4    having -- and the PBGC has no requirement to go into the
 5    District Court.  In fact, that was the -- I believe it was LTV
 6    where the Court said there is absolutely no need for the PBGC
 7    to seek any kind of relief in the District Court.
 8              THE COURT:  If there's an agreement with --
 9              MS. MEHLSACK:  If there's an agreement.  But then the
10    next provision says that if Your Honor doesn't make that
11    ruling, then the PBGC has to go into the District Court and
12    get --
13              THE COURT:  If they've decided to do it.
14              MS. MEHLSACK:  But then, Your Honor, going back to --
15    they, in effect, are then required to -- they have no option to
16    seek to restore that plan or do anything else other than to
17    continue to seek the termination.  And in that sense, Your
18    Honor, we believe that it's mandatory in a way that the UAL
19    agreement was not mandatory.  We think that that's a
20    distinction with a difference.  But we believe that far more
21    important are the restrictions on 4047 and 1303, in terms of
22    the conflict with Title IV.
23              THE COURT:  Okay.
24              MS. MEHLSACK:  Thank you, Your Honor.
25              THE COURT:  Okay.
```

1          MS. ROBBINS:  Good afternoon, Your Honor.  I am not

2    going to talk on the ERISA action, but let me just start out by

3    pointing out to the Court the documents that you have in your

4    exhibit binders that relate to our agreements with Delphi that

5    we believe are violated by this plan of reorganization.

6          And most specifically -- certainly it's not the only

7    issue but it's so central that I will be talking about both the

8    plan and the PBGC agreement because for our issues they are so

9    intertwined.  Those exhibit numbers are 122 for the MOUs that

10   were entered into in July and August of 2007, and the

11   implementation agreement for our three unions is found at

12   Exhibit number 126.

13         As Ms. Mehlsack has indicated, the reason that we're

14   here is that our unions have members who worked for a very long

15   time for General Motors and then continued on the spin-off that

16   was Delphi from about 1999 until this bankruptcy proceeding.

17   And in the case of the members that my client represents, those

18   workers worked during the bankruptcy and negotiated these

19   closure agreements and lost their job sometime by January of

20   2008.  They had negotiated at that time -- as had

21   Ms. Mehlsack's client's represented employees -- agreements

22   which gave up a lot of their employment security but at least

23   provided some security for these long term workers in

24   retirement.

25         And that is particularly true for early retirees who

1    now find themselves with no employment and in a market where

2    it's very hard to get employment.  As she mentioned, these

3    workers have already lost eighty-five percent of the OPEB

4    benefit that was provided by these agreements.  That OPEB

5    responsibility was transferred to General Motors, and New

6    General Motors has only provided such a minimal benefit that I

7    think it was costed at about fifteen percent of what a full

8    health benefit would be.

9        Now we're faced in a situation where those same

10   workers will find that their pension benefit is cut in half,

11   these early retirees who are not yet sixty-two, because there's

12   a supplement that's not guaranteed by the Pension Benefit

13   Guaranty Corporation.

14       THE COURT:  And that's for people who retire between

15   the age of fifty and sixty-two?  Is that --

16       MS. ROBBINS:  Yes.  Yes.

17       THE COURT:  Okay.

18       MS. ROBBINS:  And of course, most of our clients had

19   no choice in that matter.  In a better economy they may have

20   had more choices, but at the present time if you're an older

21   person you're the first one gone if you ever find that job.

22   In any case, we find that they're stripped twice of their

23   health benefits and their pension benefits if this

24   reorganization goes through.  I'm just explaining to you why

25   we're here and why this is so important.

1              In terms of what our agreements provide, if you look

2      at Exhibit 122, d(2) of each of these agreements, you will see

3      that there is --

4              THE COURT:  Could you give me those -- 122 and 126?

5              MS. ROBBINS:  It's in the same binder.

6              THE COURT:  The fellow behind you is going to do it.

7         (Pause)

8              THE COURT:  Thanks.  Okay, you can go ahead.

9              MS. ROBBINS:  For the IBEW agreement, I'm looking --

10     unfortunately they're just all sort of put together.

11             THE COURT:  I have it.

12             MS. ROBBINS:  I'm looking at page 7 of 32, and it's

13     probably --

14             THE COURT:  I have it.

15             MS. ROBBINS:  -- ranked page in each of the

16     agreements.

17             THE COURT:  Right.

18             MS. ROBBINS:  And what you see in item number 1 is

19     that participants will be eligible for all benefits, including

20     but not limited to all applicable supplements.  And it

21     basically says that those benefits are as of the date

22     immediately preceding the effective date.  The applicable

23     supplements are mentioned again and again, as are a number of

24     specific benefits that were of concern, given the potential

25     shutdown.  So there is no question that pension benefits were a

165

1    central part of these agreements.

2           Now, initially, I think, there was some suggestion

3    that somehow we might have released our claims for these

4    agreements, but it's very clear that the release in Section E,

5    I believe, specifically excludes vested pension benefits.  And

6    the final release is very clear that benefits that are

7    explicitly provided for, explicitly not waived, are not

8    released.  So these unions have pension benefits, not just what

9    PBGC might have by statute guaranteed, but they have all of

10   their pension benefits as they existed right before the

11   effective date, and that includes the supplements that are not

12   guaranteed by PBGC.

13          Now, what Delphi is saying is, "In direct

14   contradiction to the MOUs, we just want to ignore those

15   benefits that we promised to provide you."  And one of the

16   things that Delphi says is "Well, you know, we didn't assume

17   those agreements."  And that was one of the arguments raised in

18   their response brief.

19          And they cite to (f)(4).  What they don't indicate to

20   the Court is that in (f)(3) the parties agreed that "the order

21   of the bankruptcy court approving this agreement shall provide

22   that any plan of reorganization consistent with this agreement

23   and any confirmation order entered into and with respect to

24   such plan shall include the following provisions."  And the

25   last one is this agreement, "And the agreements referenced in

1    Attachment A shall be assumed under 11 U.S.C. Section 365."

2        So this was an agreement that does provide for

3    assumption of our agreements, although it happens at the time

4    of the plan.  And the plan is to be consistent with these

5    agreements.  And if the plan is not consistent with these

6    agreements, then at that point there would have to be an 1113

7    proceeding.  A unilateral change of these agreements would be

8    in direct violation of 1113(f) which says you cannot alter

9    terms of a collective bargaining agreement without going

10    through 1113(f).

11        Now, Delphi's next position is "Well, we said in a

12    provision that we could seek a termination of the plan in

13    accordance with applicable law."  But the applicable law, 29

14    U.S.C. Section 1341(a)(3), says that they cannot terminate a

15    plan that violates a collective bargaining agreement.  And as

16    we've seen, this collective bargaining agreement provides for

17    these pension benefits.

18        So then the debtors say, "Well, there's some language

19    in the transformation agreement with GM that mentions that this

20    is only between the parties and it doesn't bind third parties

21    one way or the other", but that certainly doesn't mean that an

22    agreement that terminates these benefits violates this

23    agreement.  It has nothing to do with that.  It has to do with

24    rights outside this agreement.  This agreement says we have our

25    pension benefits.  And that's not what's happening, Your Honor.

1    They're being cut in half at the best.

2         THE COURT:  Well, Delphi says it's not seeking

3    termination and that the PBGC is, under 1342.

4         MS. ROBBINS:  Delphi has entered an agreement that

5    says the PBGC has to do this.

6         THE COURT:  We've already been through that.

7         MS. ROBBINS:  Yes.

8         THE COURT:  You're not going to win on that one.

9         MS. ROBBINS:  Well, I have to watch it in the sense

10   that I do -- I will say one thing about that issue, only in

11   response to a question about Mr. Butler's comment about well,

12   this doesn't involve Exhibit B, this just involves the other

13   parts of the agreement.  That PBGC agreement is very clear that

14   it is completely nonseverable.  Every piece relates to

15   everything else.

16        THE COURT:  I'm not particularly bothered by

17   Exhibit B.  I mean, I --

18        MS. ROBBINS:  Well, all I'm saying is you can't --

19   whether you're bothered about it or not, I know the Court will

20   make a determination.  What I'm saying is it can't be approved

21   on the basis that you look at only half the agreement --

22        THE COURT:  I'm looking at the whole thing.

23        MS. ROBBINS:  -- because it involves the whole thing.

24   And by its terms, it involves the whole item.

25        THE COURT:  But I think Delphi's argument is first,

1   PBGC is doing this under 1342, and we know from the LTV case

2   that it can.  And secondly, that, you know, the union

3   acknowledged there was a possibility that it could be

4   terminated.  I think that --

5            MS. ROBBINS:  It doesn't mean it doesn't violate this

6   agreement.

7            THE COURT:  I think that the second point is sort of a

8   gravy argument that they're making.  The first one is that this

9   is being done under 1342, not by Delphi but by the PBGC.

10           MS. ROBBINS:  It still violates what they have

11   committed to these unions.

12           THE COURT:  How does it do that?

13           MS. ROBBINS:  Because they promised us pension

14   benefits we're not going to get.

15           THE COURT:  But if --

16           MS. ROBBINS:  And --

17           THE COURT:  If the PBGC terminates it, then what's --

18   I mean, you know, I guess at best you have a claim, right?

19           MS. ROBBINS:  Well --

20           THE COURT:  If you have a claim.

21           MS. ROBBINS:  -- we do have a claim and we'll probably

22   be back seeing you about that claim.  But this says we get

23   these benefits.  And I want to --

24           THE COURT:  Well, the debtor can't give you benefits

25   that it can't give because the PBGC's taken the plan away.  How

1    can the debtor continue to administer a plan that the PBGC has

2    determined to terminate?

3              MS. ROBBINS:  Your Honor, all we know is that at this

4    point this debtor and General Motors believe that this plan --

5    and let me just address that for a moment since it goes to the

6    implementation agreement.  The only modification to the

7    agreements we're talking about was the implementation agreement

8    that was entered into in September of 2008.  And what that

9    implementation agreement did was it provided one basis on which

10   Delphi would not provide these pension benefits, and that was

11   that they were transferred through a 414(l) transfer to General

12   Motors.  That was what it provided for.  So there was one way,

13   in terms of our agreements, that Delphi wouldn't be

14   responsible --

15             THE COURT:  That you expressly consented to -- your

16   clients did.

17             MS. ROBBINS:  That we entered a binding agreement, and

18   it was binding on both parties.  And General Motors also signed

19   that agreement, Your Honor.  And here we are today in a

20   situation where both General Motors and Delphi are not abiding

21   by that agreement.

22             THE COURT:  Well, I don't see any contention in your

23   papers that GM breached that agreement.  I mean, the debtor has

24   rights against GM for breach of that agreement.

25             MS. ROBBINS:  Well, I think it's obvious that General

170

1     Motors has breached that agreement, Your Honor.

2          THE COURT:  Why is it obvious?   In fact, the debtor

3     says that GM was entitled not to perform the second half of the

4     assumption because of the conditions in the agreement.  And

5     there's been -- I mean, the objection doesn't say that the

6     debtors shouldn't be entering into this settlement because GM

7     should be forced to perform its agreement.  That's not said in

8     your objection, so --

9          MS. ROBBINS:  I think the point that I wanted to make,

10    Your Honor, is that GM was a party to the agreement.  It's not

11    separate from this.  GM is a party to our agreements.  And

12    whether or not Delphi sees GM as having breached those

13    agreement, we would like to point the Court to a provision in

14    our agreements and that deals with equitable treatment that

15    Ms. Mehlsack mentioned a moment ago which goes directly to the

16    pension benefits.  Excuse me, Your Honor, it's D(2)(b) --

17         THE COURT:  I'm sorry, which agreement is this in?

18         MS. ROBBINS:  This is in the MOU.

19         THE COURT:  Okay.  And what page of your client's one?

20         MS. ROBBINS:  Of our client's agreement?

21         THE COURT:  Yes, which page is it?  No, no, what --

22         MS. ROBBINS:  It's 6 of 32, Your Honor.

23         THE COURT:  Okay.

24         MS. ROBBINS:  At the bottom of the page.  And --

25         THE COURT:  So what -- I'm sorry, it's paragraph what?

1    2(b)?

2           MS. ROBBINS:  2(b).  And this deals with an

3    eventuality that benefits would be reduced, Your Honor.  "These

4    benefits will not be reduced from levels in effect as of the

5    date immediately preceding the effective date unless they are

6    similarly reduced for other retired Delphi HRP participants."

7    Now, that's not what's happening, Your Honor.  If you will

8    note, at the present time the larger unions are not here, and

9    their treatment, even though they have participants in the

10   Delphi HRP, is not the same as ours.

11          And if you look at Exhibit B to the PBGC settlement

12   agreement, the Court can see why that is true.  Among the

13   provisions -- and this is in Exhibit B -- excuse me, Your

14   Honor, I lost my place -- page 7, it's in paragraph 4(b).  It

15   basically allows -- and this is very unusual for a PBGC

16   agreement -- it basically allows that notwithstanding PBGC's

17   valuation and allocation of recoveries policy, PBGC's operating

18   manual, section 8.21, in spite of those provisions, General

19   Motors can provide the missing benefits for unions that it

20   determines it wants to do that for.

21          So there are follow-up plans on here -- selective

22   follow-up plans, but PBGC is allowing those.  And so what we

23   have is we have a circumvention of our contractual provision

24   that all Delphi HRP participants are going to be treated the

25   same.

1        THE COURT:  But --

2        MS. ROBBINS:  We are small unions, and that language

3    that we would not be treated differently was absolutely

4    critical.  And now we are in a situation where our members, the

5    IAM and the IBEW and IUOE members who worked right alongside

6    UAW members, are going to have entirely different pension

7    benefits even though they participate in the very same Delphi

8    HRP.

9        THE COURT:  But let me go back to the contractual

10   argument for a second.

11       MS. ROBBINS:  That is part of the contractual argument

12   because that's a contractual clause, Your Honor.

13       THE COURT:  Well, I want to focus on the whole

14   provision.  And this is 2(b), again, on page 6 of 32?  It says

15   "With regard to such amendment and freeze of the Delphi HRP,

16   Delphi will cause the frozen Delphi HRP to pay benefits in

17   accordance with the terms of the Delphi HRP and applicable law.

18   These benefits will not be reduced."  And then there's the

19   sentence after that that says, "The IBEW agrees that Delphi

20   reserves its right to seek termination consistent with

21   applicable law."

22       But doesn't "applicable law" include, in the first

23   sentence, 1342?  I mean, how can you continue to pay benefits

24   under a plan that under applicable law has been terminated?  It

25   just doesn't work, right?  There's no plan anymore.  There's no

1    benefit committee.  There's no administrator.  There's no

2    assets, other than as taken over by the PBGC.

3            MS. ROBBINS:  So you have the PBGC -- and we'll get to

4    the PBGC's agreement in just a moment and what that agreement

5    looks like, but what we have is the PBGC saying "Oh, we'll take

6    (indiscernible due to technical problem)."  And so it certainly

7    doesn't seem like (indiscernible due to technical problem).

8            THE COURT:  The "you" you're referring to here is GM,

9    right, not the debtor?  The debtors' not subsidizing payments

10   to the steelworkers or the autoworkers, right?  It's GM, which

11   has always been careful to say that it guaranteed certain of

12   their benefits but not the other unions.

13           MS. ROBBINS:  General Motors signed our implementation

14   agreement.  General Motors signed attachments to the MOUs, and

15   in signing the implementation agreement signed the MOU.

16   General Motors, everyone thought, had agreed to take the Delphi

17   HRP.  The MDA says General Motors will address the Delphi HRP.

18   General Motors had to negotiate a settlement with the PBGC as

19   part of an integrated document.  And until General Motors'

20   exhibit with its contribution was signed, there was no release

21   for these debtors.

22           General Motors is getting all of the assets it wants

23   from Delphi.  Even though the PBGC has a seven million dollar

24   claim, liens, and priority claims, what's happening is General

25   Motors is getting those benefits out from under the Pension

1    Benefit Guaranty Corporation and the benefit rights that our

2    clients have.

3          And then, after the PBGC basically walks away with

4    virtually nothing for all of its claims, it releases everybody

5    from having any responsibility for any of the pension plans.

6    And we're supposed to believe that this was PBGC's idea?

7          THE COURT:  Well, they signed it.

8          MS. ROBBINS:  And they're not here, are they?

9          MR. BUTLER:  Actually, they are in the courtroom.

10         MS. ROBBINS:  Well --

11         THE COURT:  But again --

12         MS. ROBBINS:  -- that's good.

13         THE COURT:  -- unless the debtor had the right to

14   force GM to do this -- what you want to have -- I don't see how

15   this is relevant to what's before me.

16         MS. ROBBINS:  We have an agreement that's being

17   violated, Your Honor.

18         THE COURT:  No, what -- I'm focusing now on the GM

19   part of it where you're saying -- are you saying GM violated an

20   agreement with you?

21         MS. ROBBINS:  I'm saying, Your Honor, there is such an

22   identity between these institutions.  General Motors was the

23   former owner of Delphi and is the future owner of Delphi.

24   General Motors employed our clients for more years than

25   Delphi did.  General Motors is not some third party entity that

1    can  be evaluated short of this entire enterprise and this

2    entire bankruptcy.  It hasn't from the very beginning to the

3    very end.

4            THE COURT:  Okay.  But it seems to me that point goes

5    to what Mr. Butler has described as sort of the judgment of the

6    debtors to enter into this agreement in the first place, as

7    opposed to -- and I don't mean just the PBGC settlement, I mean

8    the whole MDA.

9            MS. ROBBINS:  Right.

10           THE COURT:  Okay.

11           MS. ROBBINS:  I mean, not right, but I mean, I agree.

12           THE COURT:  Okay.

13           MS. ROBBINS:  I mean, from the very beginning the idea

14   was General Motors was taking over this pension plan.  It was

15   getting the assets.  It was going to take the remainder of the

16   pension plan.  And now it's, like, no, we'll take the assets

17   and now PBGC step in and take over the pension plan but don't

18   get any assets for it.

19           I wanted to talk for a moment -- I was going to give

20   the Court a cite on this idea that normally add-on plans are

21   not allowed, but in this case there's a special provision right

22   in the PBGC agreement for some of those plans.  And that's the

23   PBGC v. LTV Corp., 496 US 633 (1990) decision.

24           One thing I wanted to follow up on, and I've referred

25   to it, but without really any factual information.  In this

1    case, we know that PBGC has proofs of claim for seven billion

2    dollars.  More than a billion of those -- and I think the Court

3    could take judicial notice of this through the claims

4    registered -- were for priority claims.  They had liens as

5    well.  But instead, PBGC is taking the pension plan with only a

6    general unsecured claim of three billion dollars.  Even if you

7    add in the amount that General Motors is paying in, it's, like,

8    one percent of the PBGC claim.

9           And it seems to us that that's a huge violation of the

10   priority scheme that was established in this agreement, that

11   you have secured interests, priority interests being given away

12   for a general unsecured claim for the benefit of a purchaser.

13   And it is the pensioners who have been promised equal

14   treatment, through the provision I just mentioned, with all

15   others that will be paying the price.  And they will be paying

16   the price exclusively since the PBGC and all parties to that

17   have agreed that other people can have top-ups and only a few

18   people will be suffering the consequences.

19           THE COURT:  Well, let's parse that out just briefly.

20   First of all, this isn't the PBGC's bankruptcy case, right?

21   It's Delphi's?

22           MS. ROBBINS:  That's right, Your Honor.

23           THE COURT:  All right.  Then --

24           MS. ROBBINS:  And it's Delphi's responsibility to

25   provide our pension benefits.  And we would rather the PBGC

1    weren't part of it.

2            THE COURT:  Okay.  And --

3            MS. ROBBINS:  That is what we're arguing.

4            THE COURT:  And the second point, although I'm not

5    sure it's necessary, is as far as the priority aspect of PBGC's

6    claim, in terms of the payments that are being made to your

7    clients and the other participants in the plan by the PBGC,

8    don't those cash payments exceed the amount of the priority

9    claim?

10           MS. ROBBINS:  Excuse me, Your Honor, I didn't

11   understand --

12           THE COURT:  Doesn't the --

13           MS. ROBBINS:  -- first cash payments to our clients.

14           THE COURT:  The payments by the PBGC in taking over

15   the plan and guaranteeing the plan.  I understand the PBGC

16   won't be paying out over time the full benefits under the plan,

17   but the amounts that will be paid, don't they exceed the

18   priority claim of the PBGC?

19           MS. ROBBINS:  I would not know for sure, Your Honor,

20   but I would tend to doubt it.

21           THE COURT:  Why?  On what basis?

22           MS. ROBBINS:  Because I think that the PBGC's -- I'll

23   start with the first reason I would doubt it is that I would

24   not think that the existence of priority claims versus general

25   unsecured claims would have anything to do with the amount of

1    guaranteed benefits.

2            THE COURT:  I'm just talking about the -- never mind.

3            MS. ROBBINS:  I --

4            THE COURT:  It's not worth arguing this point.

5            MS. ROBBINS:  In terms of the question that I think

6    was asked of Ms. Mehlsack, whether there has ever been a

7    decision under ERISA that would prohibit what is going on here,

8    I don't believe there are any decisions that have allowed the

9    kind of global releases that exist here in this kind of

10   situation, or there's ever been a court that's been asked to

11   agree to those kinds of releases at this kind of stage.

12           THE COURT:  I didn't ask Ms. Mehlsack that question?

13           MS. ROBBINS:  Oh, then maybe it was Mr. Butler; my

14   apologies.

15           THE COURT:  Okay.

16           MS. ROBBINS:  Your Honor, just to conclude, we think

17   that this is a travesty.  And the fact that we represent 120

18   former Delphi employees rather than a larger number doesn't

19   make it any less a travesty.

20           THE COURT:  I don't -- I mean, every person who's

21   adversely affected by this counts.  So I agree with you that

22   the number of people doesn't matter.

23           MR. BUTLER:  Your Honor, do you want the debtors to

24   respond to these objectors first, or do you want to hear from

25   the other objectors?

1          THE COURT:  Let me hear from everyone.

2          MR. BUTLER:  So on my list, the next party I have --

3          THE COURT:  They're making their way up.

4          MR. BUTLER:  Mr. Black and Mr. Cunningham?

5          THE COURT:  Yes.

6          MR. MOLDOVAN:  Good afternoon, Your Honor, Joseph

7    Moldovan from Morrison Cohen.  Also with me is Michael Dal Lago

8    at the back of the court.  Allow me to introduce Anthony

9    Shelley --

10          MR. SHELLEY:  Good afternoon, Your Honor.

11          MR. MOLDOVAN:  -- from the firm of Miller & Chevalier,

12   who has been admitted pro hac into this case.  We are both here

13   on behalf of Dennis Black and Charles Cunningham who are also

14   present in the back of the court.  Mr. Black is also the

15   interim chair of the Delphi Salaried Retiree Association.

16          I know from our prior two experiences before Your

17   Honor that Your Honor is somewhat familiar with our issues, but

18   if Your Honor would permit, Mr. Shelley will continue and

19   present our objection brief to the Court.

20          THE COURT:  Okay.  That's fine.

21          MR. MOLDOVAN:  Thank you, Your Honor.

22          MR. SHELLEY:  Good afternoon.  Thank you, Your Honor.

23   I'm Anthony Shelley, here on behalf of objectors Dennis Black

24   and Charles Cunningham.  They are two participants in Delphi's

25   pension plan for salaried workers.  Workers in this plan,

180

1    during their careers, were not unionized.  The only entities

2    protecting their rights in the pension plan are they

3    themselves and, in an ideal world, the fiduciaries of the

4    plan.

5         They bring this objection solely because of their

6    interests in the pension plan.  The objection is a procedural

7    one in a sense.  We object to the modified reorganization plan

8    because it assumes the lawful termination of this plan because

9    that termination is not completed and will be challenged, in

10   fact, by us in termination proceedings.  The termination, in

11   our view, is speculative, and a reorganization plan with a

12   speculative provision such as this should not be approved in

13   our view.

14        THE COURT:  Is there any support for that?  I mean,

15   plans are conditioned on other events happening all of the

16   time.

17        MR. SHELLEY:  Correct, Your Honor.  Yes, a couple of

18   cases that there needs to be reasonable assurance that the plan

19   can be effectuated.  For instance, a Tenth Circuit case,

20   Ames v. Sundance 973 F.2d 849.  A case from the Eastern

21   District of Pennsylvania, In re Lakewood Partners, 1994 Bankr.

22   LEXIS 1291 (Bankr. E.D. Pa. 1994).  A third case I'd like to

23   mention, Crestar Bank v. Walker, 165 B.R. 994, where that Court

24   said that the provisions must be reasonably specific, can't

25   rely on specific and indefinite plans or they won't be

1    approved.

2         Obviously, it's a matter of discretion in the Court's

3    point of view, but our point is to just say there are

4    proceedings that are going to be going on in the Eastern

5    District of Michigan which affect this and make this plan

6    termination -- our salary plan termination not a done deal, and

7    as a result, a reorganization plan that rests on it being

8    terminated should not be approved.

9         We don't seek any substantive ruling from the Court on

10   the propriety of the termination.  Obviously the Court doesn't

11   have jurisdiction for that.  That's for the Eastern District of

12   Michigan.  It has exclusive jurisdiction.  And as the Court

13   knows, the salaried retirees intend to intervene in that

14   action, but will certainly come to you first before doing so to

15   make sure no stay provisions are violated.

16        Because our objection rests on the speculative nature

17   of the termination, I'd like to just talk a little bit about

18   the termination proceeding itself and why we think there are

19   substantial arguments to challenge the termination, therefore

20   making it an onerous and likely lengthy proceeding in the

21   Eastern District of Michigan that this reorganization plan

22   depends on.

23        There are two types of terminations under ERISA.

24   There are summary terminations and those that require full

25   adjudication.  The summary termination, I suspect, is the type

182

1   that the PBGC and Delphi are intending on pursuing because they

2   talk about the plan administrator entering an agreement to

3   terminate the plan.

4          It's our view that the plan administrator is a

5   fiduciary in that capacity and can only sign such an agreement

6   in the event that it's in the employee's best interest.  That

7   has to be the case because otherwise there's no one protecting

8   the employee's interests in such a transaction.

9          And we believe we'll be able to convince the Eastern

10  District of Michigan that because Delphi is actually treating

11  this issue as a corporate decision as opposed to a fiduciary

12  decision, that any agreement that is signed in that capacity

13  would be null and they have to go then to the second type of

14  plan termination which is the adjudicatory type.

15         In that instance, the PBGC will take on the role as a

16  plaintiff.  It has to prove its case in the District Court.  It

17  has to prove it by a preponderance of evidence.  It doesn't get

18  deference under a Chevron or an arbitrary and capricious type

19  of standard.

20         It will have to prove that the termination is in the

21  beneficiaries' best interests; that there will be unreasonable

22  risk to the PBGC's funds without a termination; that it

23  considered and reasonably rejected all reasonable options to

24  termination; and that the conditions associated with the

25  termination, including any amount kicked in by Delphi or GM or

183

1    whatever, are reasonable.

2         Again, we don't seek to litigate any of those

3    conditions or the propriety of termination.  We don't even know

4    what the conditions are, in a sense, because the PBGC has not

5    yet presented the administrative record in the Eastern District

6    of Michigan.  But we suspect that there will be substantial

7    arguments to challenge any effort to terminate.

8         We suspect there's discrimination against our

9    nonunionized workers in favor of unionized plans.  PBGC will

10   have to explain that.  The PBGC will have to prove that it was

11   reasonable to release the liens on other assets.  It'll have to

12   prove that it wasn't pressured by another part of the executive

13   branch to do this deal, instead it was only guided by the

14   standards in ERISA Section 1342, and that the releases were

15   reasonable.

16        All of those things are to be determined by the

17   District Court.  We don't think that it is clear that those

18   will be -- that the PBGC's termination effort will be approved,

19   and that the plan, therefore, under the terms currently as

20   presented in the various agreements and as we've heard through

21   the press -- because we don't get any actual information from

22   the fiduciaries of the plan at this point -- we think that

23   under those plans the termination will not be approved.  We

24   think it will be an arduous and long and complicated process.

25   And because of that, we don't think that the reorganization

184

1   plan that depends on it should be approved at this time.

2        THE COURT:  Okay.

3        MR. SHELLEY:  Thank you, Your Honor.

4        THE COURT:  Thank you.

5        MS. CALOWAY:  Good afternoon, Your Honor.  Mary

6   Caloway, Buchanan, Ingersoll & Rooney on behalf of Fiduciary

7   Counselors, Inc. or FCI.  FCI was appointed as the independent

8   fiduciary for the debtors' pension plans for the purpose of

9   pursuing, in these bankruptcy cases, claims for unpaid minimum

10   contributions.  And in that capacity, FCI has filed a number of

11   claims in these cases, including most recently claims seeking

12   administrative expense status for those unpaid minimum

13   contributions.  I suspect I will probably --

14        THE COURT:  Going back to something in one of the

15   earlier arguments, what's the amount of those claims, the

16   priority administrative claims?

17        MS. CALOWAY:  We have filed for the full amount of the

18   unpaid minimum contributions, which is in excess of 250 or 60

19   million dollars.

20        THE COURT:  Okay.  Thank you.

21        MS. CALOWAY:  And I think, Your Honor, my focus is a

22   little bit more in line with the counsel who spoke just before

23   me in that pointing to the fact that the PBGC settlement

24   agreement reached with the debtors, while it contemplates

25   potential -- I think Mr. Butler used that word or even Your

1    Honor used that word -- the potential termination of these

2    pension plans, as of today and, you know, as of tomorrow even,

3    if the settlement is approved, the pension plans are not yet

4    terminated.  And until the pension plans are terminated and

5    until -- or unless and until the pension plans are terminated

6    and the PBGC becomes the statutory trustee, FCI has a

7    continuing fiduciary obligation and duty to pursue its claims

8    for the minimum unpaid contributions, which I understand the

9    debtors and even the PBGC have included as sort of a subset, I

10    think, of that seven billion dollar claim that the PBGC has

11    filed.

12         But those claims belong to the plans.  They've never

13    been addressed other than in connection with the PBGC.  But the

14    PBGC does not have those minimum contribution claims yet,

15    except to the extent that they had the right to file for the

16    statutory liens.  And because FCI's obligation and duty

17    continues, as I said, until and unless the plans are

18    terminated, this reorganization plan doesn't contemplate those

19    claims.  It never treated them separately.  It never identified

20    them any separately.  It doesn't anticipate that there would be

21    any administrative expense priority for any or all of a portion

22    of those claims.

23         But as I have said, and I don't want to belabor the

24    point, as of today, those claims belong to FCI to assert on

25    behalf of the pension plans and for the benefit of the pension

186

1    plan's participants and we would suggest that a plan that does

2    not contemplate that should not be confirmed.

3              THE COURT:  Okay.

4              MS. CALOWAY:  Thank you, Your Honor.

5              THE COURT:  Can we deal with the last point first?

6              MR. BUTLER:  Sure.  Can we just -- one moment, Your

7    Honor.  I'm just going to set up something.

8              THE COURT:  Okay.

9         (Pause)

10             MR. BUTLER:  First, Your Honor, the last point raised

11   by Fiduciary Counselors is at docket number 18282.  And their

12   objection is Joint Trial Exhibit number 244.  I respect the

13   fact that Fiduciary Counselors, Inc. appears today, and I agree

14   with them that until the PBGC effectuates termination, they

15   remain -- FCI remains a player here.  And therefore, I respect

16   that fact that they were here.  It's one of the reasons we

17   didn't oppose their 3018 --

18             THE COURT:  But is the effectiveness of the plan

19   modification not conditioned upon the PBGC settlement and

20   termination, or --

21             MR. BUTLER:  No, the effect of the -- the modified

22   plan has as a condition to it that the PBGC settlement

23   agreement -- the Delphi-PBGC settlement agreement shall become

24   effective.  All right?  And that is true.  And that's one of

25   the reasons we're here seeking approval of that so that it

1    would become effective.  And what the PBGC has agreed to do is

2    to compromise the claims -- its seven billion dollar claim for

3    a three billion dollar claim -- as part of that agreement.

4            THE COURT:  Okay.  So as I take it, though, Fiduciary

5    Counselors' argument is that even though the settlement may be

6    approved and go effective, the condition under which the PBGC

7    would take over the claims hasn't necessarily occurred on the

8    effective date.

9            MR. BUTLER:  Well, on the --

10           THE COURT:  And therefore--

11           MR. BUTLER:  It won't occur --

12           THE COURT:  -- you need to show at least how the 100

13   cent dollar claims are provided for in the plan.

14           MR. BUTLER:  It won't have occurred on the plan

15   modification date, Your Honor, if Your Honor is to approve a

16   plan modification today.  But the fact of the matter is, this

17   current plan, as a plan as opposed to a 363 sale, would be

18   difficult to consummate unless the PBGC settlement agreement

19   was implemented and unless the PBGC reached an independent

20   determination about what it was going to do with the plans.

21           I think Your Honor can take notice -- it was already

22   introduced by others here and the PBGC is present in the

23   courtroom -- they've already -- and I'll address this in my

24   argument in a few minutes -- they've already made their

25   determination.  That determination was made in advance of

1   today.  And I can report it and the PBGC can report to you on

2   the determinations they've reached independently.

3        But as the debtors had indicated in our prior

4   disclosures, including in the disclosure supplement, we don't

5   have the wherewithal to fund these plans.  So if these plans

6   were not terminated, it is difficult to imagine that the

7   effective date here would occur under a plan.

8        But I do recognize, Your Honor, and we really haven't

9   been much at odds with Fiduciary Counselors, Inc.  They have a

10  role to play here at this point in time in terms of raising

11  these issues as a fiduciary.  We respect that.  But we believe

12  that their objection ought to be overruled because ultimately

13  Your Honor, I think, can take judicial notice of the

14  determination made by the PBGC.  And I also believe that this

15  modified plan could not become effective on a different

16  separate track.  We'd have to come back and propose something

17  else if these plans weren't ultimately terminated.

18       THE COURT:  Okay.  So you can address the other two

19  objections however you want to.

20       MR. BUTLER:  Okay.  Thank you, Your Honor.  First,

21  Your Honor, I just want to ground this discussion and this

22  response in a couple of, I think, important imperatives.  Your

23  Honor knows, I think as well as anyone in this courtroom, that

24  one of Delphi's five transformation objectives was to develop a

25  workable solution to our pension plans, which we did in

1   connection with the confirmed plan, and which involved, under

2   the confirmed plan, the assumption of our defined benefit plans

3   by Delphi.  And the world that's changed since January of 2008

4   now prevents Delphi from being in a financial position to do

5   that.

6          One of the great regrets in this case, I think, for

7   those of us who've worked on it so hard, is that we could not

8   have found a different solution.  The fact that we were able to

9   address some of the pension plans in the initial 414(l)

10  transfer is some solace, but the reality is we tried very hard

11  to be able to address these plans in a way that would have

12  avoided the real human suffering that will go on as a result of

13  what is, I think, inevitably at this point, based on

14  independent actions taken by the PBGC, as a hardship on many,

15  many people.  And I deeply regret that, but it is a reality of

16  the world that we are in now that we are not able to finance

17  these.

18         Having said that, then we need to sort of look at the

19  basic fabric of these objections.  And I want to address them

20  sort of together.  I guess I'll deal with -- because many of my

21  comments will address both.

22         But let me just also say, just so the record is clear,

23  in the United case, which Ms. Mehlsack tried to distinguish

24  because somehow in our agreement or in the GM-PBGC agreement

25  she reads into that some waiver of restoration rights.  I just

190

1  want Your Honor to know that I have the settlement agreement by

2  and between -- among UAL Corporation and its direct and

3  indirect subsidiaries and the PBGC in my hands, the one that

4  all of the case law is predicated on.

5       And at paragraph 6 of that agreement is a complete

6  waiver by the PBGC of all of its restoration rights.  I knew

7  that.  I knew it when Ms. Mehlsack was talking about it,

8  because working with our special counsel we tried to get that

9  same waiver in our agreements and were unable to.  But the fact

10  of the matter is that Ms. Mehlsack has it reversed.  The United

11  agreement had a full waiver or restoration rights.  The PBGC-

12  Delphi agreement does not.

13       The second thing I wanted to point out -- just to make

14  sure the record is clear on some of these points -- a lot has

15  been said about the Exhibit B to the agreement.  And I am,

16  frankly, glad that we exercised the judgment that we did to

17  insist that this agreement be publicly disclosed in these

18  proceedings so that it can be transparent and discussed here in

19  the light of this case.

20       The reality is -- I will say what I did before -- that

21  is, I'm not asking Your Honor to approve Exhibit B.  Yes, there

22  is benefits Delphi gets under it, but it is an independent

23  agreement between General Motors Company, the Motors

24  Liquidation Corporation, and PBGC that has been signed and

25  executed between them.  And we believe it ought to be

1    disclosed, in part because -- and I acknowledge this -- the

2    ultimate effectiveness of that agreement and the agreement

3    we're asking you to approve is cross-conditioned on both of

4    them becoming effective.  And we believed it ought to be

5    disclosed.

6        But there were a number of things said about the GM-

7    PBGC agreement that just, frankly, I'd ask Your Honor to read

8    the full provisions that were cited just so that the record is

9    clear here.  I don't believe that 4(b) of that agreement on

10   page 6 in fact is a follow-on agreement, but let me just read

11   the second sentence of 4(b).  Ms. Robbins spent some time and I

12   think Ms. Mehlsack spent some time talking about the first part

13   of that sentence which, by the way, wasn't dealing with a whole

14   bunch of unions, it was dealing with the UAW.

15       And it is true that New GM assumed and assigned from

16   Old GM the benefit guarantee agreement between Old GM and the

17   UAW.  That is a fact.  It's been publicly disclosed.  It's also

18   been publicly disclosed that New GM did not assume any other

19   similar benefit guarantees, a decision that has made many

20   stakeholders in this case, and perhaps even Delphi, not

21   particularly thrilled with that decision, but that is the

22   decision that they made.

23       But the provision in 4(b) says, and I quote,

24   "Notwithstanding the provisions of paragraphs 2(a) and 2(b) and

25   paragraph 3 hereof, none of PBGC, GMC, or any of its

1   subsidiaries or Old GM shall release or discharge any disputes,

2   controversies, suits, actions, causes of action, claims,

3   assessments, demands, debts, sums of money, damages, judgments,

4   liabilities, liens, and obligations of any kind whatsoever,

5   upon any legal or equitable theory, whether contractual, common

6   law, statutory, federal, state, local or otherwise, whether

7   known or unknown, that any of them ever had, now have, or

8   hereafter can, shall or may have, from the beginning of time,

9   by reason of any manner, cause, whatsoever against each other

10  relating to the calculation of the amount of or the ERISA title

11  for coverage of the GM UAW benefit guarantee or any similar

12  contractual guarantee by GMC or any of its subsidiaries." And

13  it excepts out the validity and application of certain of

14  PBGC's recovering policies.

15       But that was read to you and argued that in fact this

16  was a release.  I think it's exactly the opposite.  I think

17  PBGC made the determination, as I read the agreement, not to

18  release those issues but to preserve them for whatever that may

19  be.  And I just want the record here of what's being argued to

20  be clear.

21       Now, in connection with -- I want to go back now and

22  address, if I can, first I'm going to address in substance the

23  objection that was made by Mr. Black and Mr. Cunningham, the

24  former DSRA objection at docket number 18277.  One of the

25  fundamental mistakes, I think, made in the premises of that

1   objection is that continued assertion by Mr. Black and

2   Mr. Cunningham that someone other than Delphi is the plan

3   administrator of the salaried plan.  In fact, Delphi is the

4   plan administrator of the salaried plan.  And I'm not talking

5   about the salaried plans or the nonbargained plans.  It's very

6   important to make that distinction.

7           THE COURT:  But I think they went further and said

8   even if Delphi is the plan administrator and the committee is

9   it just its agents, that Delphi can't act because it's

10  conflicted.  So I think they're extending it to Delphi as plan

11  administrator.  They may not be waiving their rights that there

12  are these other people that should be replaced too, but they're

13  basically saying that because of a conflict of interest Delphi

14  can't act.

15          MR. BUTLER:  Your Honor, I'm not sure what the

16  conflict of interest is because I think you have to look to the

17  salaried plan documents themselves.  Article 6(a) of those

18  documents provides that the decision to terminate the salaried

19  plan is a decision that Delphi is entitled to make under the

20  terms of the plan.  And in making the decision, Delphi acts as

21  in a settler or nonfiduciary capacity.

22          And there is case law on this and we cited the case

23  law in our responsive papers.  They include Curtiss Wright v.

24  Schoonejongen, 514 U.S. 73, 78 (1995);  Lockheed Corp. v.

25  Spink, 517 U.S. 882, 890 (1996); and Hughes Aircraft Co. v.

194

1    Jacobson, 525 U.S.. 432, 444 (1999).

2         Termination of the salaried plan, Your Honor, under

3    the case law, simply does not raise the fiduciary issues

4    described in the objection.  It's just a misreading or

5    mis-assertion of the law.  Pursuant to the authority that

6    Delphi has -- Delphi -- under Section 6 of the salaried plan,

7    Delphi's board of directors has directed the plan

8    administrator, which is Delphi, to enter into the PBGC-Delphi

9    settlement agreement, and upon Your Honor's approval of it, to

10   execute a termination and trusteeship agreement if that

11   agreement is proposed by the PBGC.

12        So with respect to the non-negotiated, the

13   nonbargained plans, the way in which this settlement agreement

14   that's before you is set up is to the extent Your Honor

15   approves it and authorizes it and enters the modification

16   order, Delphi -- and PBGC reaches its unilateral determination

17   to terminate the plans, then in that instance Delphi will

18   execute a termination and trusteeship agreement if the PBGC

19   proposes it.

20        And I would simply say to Your Honor, as a basic, I

21   think, Supreme Court precedent, it is inconsistent to me that

22   their statement in their objections that somehow an independent

23   fiduciary needs to be appointed to consider whether this should

24   be terminated, I think it's simply inconsistent with precedent

25   which provides that it is the settler, the nonfiduciary, the

195

1    plan administrator, who makes the decisions to terminate a

2    pension plan in these circumstances.

3            Now, here are the facts.  Your Honor said earlier in

4    this argument we should get into the real world.  Here are the

5    facts.  The salaried plan is underfunded by almost three

6    billion dollars and has contributions totaling more than 200

7    million dollars that are due and unpaid.  There is no doubt,

8    frankly, not a scintilla of doubt in my mind and I think in any

9    reasonable person's mind, that Delphi cannot maintain the

10   salaried plan.  We do not have the financial wherewithal to do

11   so.

12           PBGC made an independent assessment of this.  On July

13   21st of this year PBGC determined, in accordance with 29 U.S.C.

14   1342(a)(1),(2) and (4) that the salaried plan had not met the

15   minimum funding standard under Section 412 of the Internal

16   Revenue Code; that the salaried plan will be unable to pay

17   benefits when due under its terms; that the possible long run

18   loss of the PBGC with respect to the salaried plan may

19   reasonably be expected to increase if the plan is not

20   terminated, and that therefore the salaried plan must be

21   terminated and PBGC appointed statutory trustee.

22           Under ERISA, upon making such finding, PBGC is

23   authorized to enter into an agreement with the plan

24   administrator terminating the plan and appointing PBGC

25   trustee of the plan without further procedural or

196

1    substantive safeguards for plan participants.  That is the law.

2    And that is the law in LTV v. United Steelworkers of America

3    824 F.2d 197, 200 (2d Cir. 1987), that I know Your Honor is

4    aware of.

5         The facts are that whenever PBGC makes a determination

6    under 1342(a) that a pension plan should or must be terminated,

7    as it has already done with the salaried plan, as we stand here

8    today, the PBGC is authorized, as a matter of statute under

9    Section 1342, to apply to the United States District Court in

10   order to terminate or to enter into an agreement with the plan

11   administrator.  Again, the LTV cite.

12        Here they have done both.  They have entered into a

13   provisional agreement with us that says that as to the salaried

14   plan and as to the subsidiary plans that are nonbargained, that

15   if in fact Your Honor authorizes us as a debtor-in-possession

16   to effectuate the agreement, that we will enter into the

17   trusteeship agreement with PBGC and that will be the end of it.

18   And I think it's irrefutable in these circumstances, under the

19   case law and under the statute, that a plan may be terminated

20   without any further court proceedings upon agreement with the

21   plan administrator.

22        So when I deal with the salaried plan or the

23   subsidiary plans, I go to 3(a) of the PBGC-Delphi agreement and

24   I look at the terms there, and I'm asking Your Honor for

25   permission, for your authority, based on the real facts of this

197

1    case, to approve the PBGC-Delphi settlement agreement as part

2    of the plan modification order and to allow us to implement it,

3    and we will implement it, with respect to the five plans that

4    are nonbargained.

5          And that's my response to Mr. Black and

6    Mr. Cunningham.  It's not a response I say with any degree of

7    satisfaction.  I've spent three and a half years with the team

8    here trying to get an alternative to this, but this is what is

9    here, this is what is necessary, and this is what will allow

10   Delphi to reorganize and to move forward.  And I wish we could

11   have come to a different result, but the capital markets and

12   the state of the auto industry does not permit it.

13         Now, talking about the bargain --

14         THE COURT:  No, afterwards -- sorry, I'm just telling

15   counsel for Black and Cunningham he can speak after you're

16   done.

17         MR. BUTLER:  Okay.

18         THE COURT:  But finish your argument on the other

19   objectors.

20         MR. BUTLER:  Okay.  With respect to the bargain plan,

21   here -- and I'm not going to focus this argument on the United

22   case.  We believe it's on all points with what we're doing.  We

23   believe, in fact, that we structured this to follow carefully

24   the requirements in United.  And Your Honor, our papers address

25   that in detail and I'm not going to make a further United

198

1    argument here unless Your Honor wants me to.  I'll be happy to

2    go into it.

3         THE COURT:  No, you don't need to.

4         MR. BUTLER:  What I would rather do here is focus on

5    certain aspects of the settlement, and then I'll focus on

6    Ms. Robbins' argument that somehow we have violated the labor

7    MOUs in violation of 1113(f).

8         I think Your Honor, having watched it stew in over an

9    almost fifteen-month period, I think Your Honor is aware of how

10   the labor MOUs came into being after an extended hearing under

11   Sections 1113, 1114 of the Bankruptcy Code.  And it's also

12   clear under those orders that Your Honor retained jurisdiction

13   to hear and determine all matters arising from the

14   implementation and performance of that order in the MOUs.

15        So Your Honor clearly has jurisdiction expressly

16   retained to make the findings we're asking Your Honor to make

17   today.  And we believe that the specific provision of the labor

18   MOUs establish Delphi's right to terminate the Delphi HRP even

19   more clearly.

20        And I agree, every person counts.  And the reality is

21   we need to address the IAM, IBEW, and IUOE objections with

22   their own merits.  I will note that the UAW, the IUE-CWA, and

23   the USW no longer contest -- they had contested on this

24   record -- no longer contest the determinations we're asking

25   Your Honor to make in the court order -- the plan modification

1    order today.

2         With respect to the IAM, IBEW, and IUOE MOUs, the

3    facts are that they contain explicit reservation of rights to

4    terminate the Delphi HRP.  Counsel acknowledged that each of

5    the MOUs has an agreement in it that agrees and acknowledges

6    that Delphi reserves its right to seek termination of the

7    Delphi HRP consistent with applicable law.

8         If that was all there was, we could be having a debate

9    here about whether we're seeking termination and whether that

10   alone was sufficient to give the Court comfort.  But the fact

11   is, Attachment C to the labor MOUs also indicates that the

12   agreement was without prejudice to Delphi, quote, "in any

13   pension termination proceeding under ERISA and/or under the

14   Bankruptcy Code."

15        An involuntary termination by the PBGC pursuant to the

16   Delphi-PBGC settlement agreement -- they make their unilateral

17   determination -- has to fall within this definition.  There can

18   be no reasonable argument that there's a unilateral

19   modification of these CBAs under Section 1113 of the Code when

20   the agreement specifically provides that the actions complained

21   of can be taken.

22        And here, in addition to the assertion that Delphi

23   reserves it right -- or agreement that Delphi reserves its

24   right to seek termination, there's a further agreement in

25   Attachment C which says that the agreement is without prejudice

200

 1    to Delphi in any pension termination proceeding under ERISA

 2    and/or under the Bankruptcy Code.  I don't think it could be

 3    any more explicit than that.

 4         Now, the IUOE, IBEW, and IAM further argue that

 5    termination of the HRP would somehow violate the implementation

 6    agreements executed following the labor MOUs.  And Ms. Robbins

 7    pointed out to Your Honor the exhibit that applied to her union

 8    was Joint Exhibit 126 was the implementation --

 9         THE COURT:  I'm sorry, before you -- could you just --

10    where does that appear in Attachment C?

11         MR. BUTLER:  Let me get it.  Let me get it, Your

12    Honor.

13       (Pause)

14         MR. BUTLER:  I've got to pull it, Your Honor.  One

15    second.

16         THE COURT:  Okay.

17         MR. BUTLER:  Your Honor, can I -- I gave you our only

18    binder --

19         THE COURT:  You can come back to that -- oh --

20         MR. BUTLER:  Can I get your binder back for just one

21    minute?

22         THE COURT:  Sure.  It had Attachment C, so --

23         MR. BUTLER:  Your Honor, we've been at this for almost

24    two and a half hours.  Can we take a five-minute recess and

25    I'll --

201

1          THE COURT:  That's fine.

2          MR. BUTLER:  Thank you.

3          (Recess from 5:36 p.m. until 5:54 p.m.)

4          THE COURT:  Okay.  We're back on the record in --

5          MR. BUTLER:  Thanks, Judge.  We've put the annotated

6    provision on your -- provided it to Your Honor.  It's paragraph

7    3(c), the bottom part of paragraph 3(c) of each of Attachment

8    C.  We also laid these all out in footnote 28 in our reply

9    brief as they are described there.

10         (Pause)

11         THE COURT:  Okay.  Thanks.

12         MR. BUTLER:   Moving on, Your Honor, to the

13   implementation argument, I believe that Ms. Robbins made the

14   argument that the IUOE, IBEW and IAM believe that termination

15   of the HRP would violate the implementation agreements executed

16   following the labor MOUs.  I don't understand that argument

17   because if you look at the implementation agreement, I was

18   making the point that Ms. Robbins identified Joint Exhibit 126

19   as the relevant implementation agreement.  All they did was

20   accelerate certain existing rights and obligations under the

21   MOUs.  Section 7 of those agreements provided, and I quote,

22   "other than as adjusted, conformed or modified by this

23   implementation agreement, or as required to carry out this

24   implementation agreement, the other terms and conditions of",

25   end quote, the MOUs with the unions remain unchanged.  So the

202

1    implementation agreements didn't alter in any respects Delphi's

2    rights with respect to termination of the HRP.  More

3    importantly, the acknowledgement of the three unions that the

4    termination of the HRP, either through a Delphi initiated

5    termination or through a pension termination proceeding, was

6    contemplated by those agreements.

7              For those reasons, Your Honor, we believe that the

8    Delphi PBGC Settlement Agreement should be approved, and Your

9    Honor should overrule the union objections to the modified plan

10   under Section 1113(f) of the Bankruptcy Code.  We believe that

11   Your Honor should make an express finding that Delphi may

12   consent to a termination and trusteeship agreement with the

13   PBGC without violating the labor MOUs, or the Section 1113,

14   1114 settlement approval orders, or Section 1113 of the

15   Bankruptcy Code.

16             I should point out, Your Honor, just so the record is

17   clear as to the UAW, USW and IUE-CWA, the record shouldn't be

18   construed that they've consented to this relief.  They have

19   simply withdrawn their objections to the relief, and then they

20   take no position on the relief.

21             THE COURT:  Okay.

22             MR. BUTLER:  And the record should be clear in that

23   respect.

24             THE COURT:  All right.  Okay.  I know that counsel for

25   Mr. Black and Mr. Cunningham wanted to say a brief report too.

203

1          MR. SHELLEY:  Thank you, Your Honor.  Just a few brief

2     points.  Most of the material Mr. Butler raised about settlor

3     functions and the administrative, the plan administrator's

4     obligations, those are really matters for the Eastern District

5     of Michigan to decide.  Those are substantive matters.  Our

6     only point is that there are arguments being made on both sides

7     that make the plan termination not inevitable, and, therefore,

8     speculative.  But I --

9          THE COURT:  Well, it may not be inevitable, but, I

10    mean, if you're raising an objection at all it's a feasibility

11    objection.  So I do have to consider feasibility --

12         MR. SHELLEY:  Sure.

13         THE COURT:  -- and so --

14         MR. SHELLEY:  Yes, and I do want to get to the more

15    substantive issue then.

16         THE COURT:  All right.

17         MR. SHELLEY:  The idea of a settlor function, this

18    being a settlor function to terminate this plan that Delphi is

19    exercising, it makes no sense.  They're not even terminating

20    it.  It's an involuntary termination.  It's PBGC versus Delphi.

21    So the idea that this would be a settlor function, we don't

22    think holds up.  It also is, under the statute, a function

23    that's given to someone called the plan administrator.  And,

24    typically, it's not given to the sponsor.  ERISA talks about

25    sponsors.  It's not given to the employer.  ERISA talks about

1    those too.  It's given to the plan administrator, and under

2    ERISA it's a fiduciary function if the plan administrator is

3    exercising any kind of discretion.  The idea that the plan

4    administrator would agree to a termination in one way, as

5    opposed to another, is a discretionary matter, and cases hold

6    that the method of termination, even if termination isn't -- is

7    a settlor function, is not, is itself a fiduciary function.

8           THE COURT:  But that didn't seem to be much of an

9    issue for the Courts in LTV, including the Supreme Court --

10          MR. SHELLEY:  Well, and the reason --

11          THE COURT:  -- or the Seventh Circuit in UAL.

12          MR. SHELLEY:  The Supreme Court cases that talk about

13   settlor functions, they aren't involuntary terminations.  There

14   are other types of terminations when everyone's made whole --

15          THE COURT:  No, but in LTV they agreed not to enter

16   it.  Once the PBGC had decided to terminate LTV agreed to the

17   procedure under 1142(c), the fourth sentence of it, and --

18          MR. SHELLEY:  Yes.

19          THE COURT:  -- that was LTV as plan administrator.  It

20   didn't seem to bother anyone.

21          MR. SHELLEY:  And it all makes sense if the plan

22   administrator is acting with an eye towards what's in the best

23   interest of the employees.  You can have a summary termination,

24   because those people who are harmed by it are being protected

25   by the usual fiduciary function that the plan administrator is

1    exercising.  But if they're conflicted, or they're thinking

2    about the corporate interest as opposed to the employee's

3    interest, then there's no question that in all the papers that

4    have been filed Delphi is saying plan administrator equals

5    Delphi.  That they're not taking it on as a fiduciary function.

6    So these are arguments we're going to make in --

7              THE COURT:  But why isn't 1303 the issue there?  I

8    mean isn't that the remedy --

9              MR. SHELLEY:  To go after the PBGC --

10             THE COURT:  -- 1303?

11             MR. SHELLEY:  -- for instance?

12             THE COURT:  Yes.

13             MR. SHELLEY:  Well, the plan has to be terminated

14   first.  It has not been terminated, and so we will go through a

15   1303 into the Eastern District of Michigan and raise our

16   arguments that this plan cannot be properly terminated, at

17   least it can't be summarily terminated, and that through an

18   adjudication we'll make all the arguments on the merits that we

19   think are appropriate as to why the termination standard itself

20   cannot be satisfied and a district court shouldn't approve

21   that.

22             The last point I'd like to make is that we very much

23   understand the real world, and that this plan has been run into

24   the ground, and that there isn't enough money, and it's likely

25   to be terminated in the end.  But it being terminated based on

1    the current terms and with the current strings attached or the

2    current conditions is one thing, and being terminated in

3    another way that the Eastern District of Michigan might say

4    complies with all of the standards of termination is quite

5    another thing.  So if this plan is terminated down the road,

6    that may happen, but that it will be terminated on the terms

7    and conditions that are expected right now is quite another

8    thing.  So our argument is that the termination should play out

9    before the Court should approve the modified reorganization

10   plan.

11            THE COURT:  Okay.

12            MR. SHELLEY:  Thank you.

13            MS. ROBBINS:  Your Honor, I wanted to just --

14            THE COURT:  I think you have to come closer to a

15   microphone.

16            MS. ROBBINS:  Two very quick points just on

17   interpretation of language, Your Honor.  If you look at 3(c) on

18   page 29 of the various MOUs that, first of all, only applies to

19   the SAPT, which is that attachment.  It does not apply to the

20   entire agreement.  It does not apply to the section on pension

21   we referred to earlier.  But the other point that I want to

22   point out to the Court is this is a reservation of rights for

23   all parties.  It is not something that provides a specific

24   right for Delphi.  It's basically saying we can continue to

25   take our positions so they can continue to take their positions

1   as to the SAPT, which is this attachment.  It's not something

2   that provides any rights or acknowledges any rights.

3        The other point that I would just make is that in that

4   section of the Attachment B to the PBGC agreement 4(b), while

5   there is a discussion about maintaining rights to address

6   calculations with respect to certain add-ons.

7        The very last reference that I made was excepting the

8   validity in the application.  Not accepting, E-X excepting the

9   validity and application of the PBGC policies.  Now, we haven't

10  gotten the discovery materials from the PBGC to know everything

11  about how this was negotiated or what it means, but it looks

12  like that last provision is excluded from the reservation of

13  rights, just looking at the language.  Thank you.

14        THE COURT:  Okay.

15        MS. MEHLSACK:  Your Honor?  Just briefly.  Mr. Butler

16  mentioned that the agreement in the United case had a broader

17  waiver with respect to the PBGC's rights than was able to be

18  obtained in this case.

19        THE COURT:  Well, actually a more specific waiver.

20        MS. MEHLSACK:  A more specific waiver.  Sorry.

21        MS. MEHLSACK:  Whatever it was, Your Honor, it was

22  clearly not raised before the United Court, and nor were the

23  4047 issues or 1303 issues that we raised, so that the United

24  case is not dispositive in this regard, because the issues

25  simply weren't raised before the Court.

 1          The other is, Your Honor, that, again, the provisions

 2     that Mr. Butler cites with respect to Exhibit C do nothing to

 3     derogate from the rights of the unions and the participants

 4     under the collective bargaining agreement that provide that any

 5     kind of a reduction in benefits shall be equitable when it

 6     comes to all participants in the HRP, and the effective of

 7     what, the consequences of what's happening here are there is

 8     not such an equitable reduction.  I know that Mr. Butler said

 9     well, that's GM's issue, not Delhi's issue, but the overall

10     purchase price of the assets that Delphi is transferring to GM

11     are what this plan is all about.  And so the question of how

12     much might be allocated to what are being called to-ups for the

13     other unions who are, yes, have withdrawn their objections and

14     who, as Mr. Kennedy acknowledged, are in the process of

15     negotiations, those are all issues that Delphi had the

16     opportunity to negotiate.  We haven't had that opportunity, nor

17     does it look like we will be getting that opportunity.  Thank

18     you, Your Honor.

19          THE COURT:  Okay.  All right.  We've been addressing

20     three objections to the plan modification motion and the

21     debtors' request for approval of an integral settlement to that

22     motion, which is the debtors' agreement with the PBGC dated as

23     of July 21, 2009.  The objection I'll deal with first is by

24     Messrs. Black and Cunningham, who are individuals who are

25     covered by the Salaried Workers' Pension Plan.  They contend

209

1    that the agreement between the debtors and the PBGC is one that

2    I shouldn't approve because the benefits of that agreement

3    which flow from the ultimate termination of the pension plans

4    and their being taken over by the PBGC, are too speculative for

5    me to consider that the plan itself is feasible in light of

6    that contention.  It's also contended that the agreement itself

7    is too indefinite.  To the extent that objection was originally

8    raised when it pertained to the original terms of the

9    modification that stated that the plans would be addressed by

10   GM, and the language in the disclosure statement that made it

11   clear that no one really knew from the debtors' perspective

12   what that meant, would have some real merit.  But since that

13   time the debtors entered into the PBGC settlement agreement,

14   and I believe that those terms are clear at this point and not

15   indefinite.  So, really, the only objection that is even

16   colorable is the feasibility objection.

17         On that score, the objection is somewhat coy in that

18   it raises for the Court the issue of the PBGC not being able to

19   terminate the plans, notwithstanding its authority under 29

20   U.S.C. 1342, but at the same time doesn't really provide me

21   with a lot of reasoning as to why that would not be the case.

22   To the extent that there have been arguments raised by the

23   objectors I have considered them, and I believe that for

24   purposes of determining feasibility of the plan as modified and

25   whether the debtors are entering into an agreement that is

1    illusory, I conclude that the objection should be denied.

2          The debtors do not ask for a determination that they

3    are authorized to enter into the termination agreement with the

4    PBGC under Section 3(b)(i) of the settlement agreement for all

5    purposes, but only that such termination would not be a

6    violation of the labor MOUs, the Union 1113, 1114 settlement

7    approval orders or the local agreement between Delphi,

8    Connection Systems, and Electronic and Space Technicians Local

9    1553.  So I'm not determining and not being asked to determine

10   whether Delphi as plan administrator would have the right to

11   enter into the termination and trusteeship agreement in the

12   form attached as Exhibit C to the settlement agreement

13   otherwise.

14          But I conclude that, there's certainly a reasonable

15   likelihood in my mind that a) that the PBGC's termination, to

16   terminate these plans will be upheld, and, b) that Delphi will

17   be able to enter into the termination and trusteeship agreement

18   to expedite that termination and reduce the costs thereof.

19          The record is clear and uncontroverted that these

20   plans are both seriously underfunded and that the debtors have

21   very substantial unpaid post-petition contributions to the plan

22   in the nature of hundreds of millions of dollars, and, more

23   importantly, that the debtors lack the cash to continue to make

24   post-petition contributions to these plans, given the fact that

25   they have no source of ongoing funding except as been agreed to

1    by GM and the DIP lenders in connection with facilitating the

2    transactions before me, all of which are an outgrowth of a

3    several month period where the debtor was living on week to

4    week and sometimes day-to-day extensions of forbearance under a

5    terminated DIP facility without any ability to obtain

6    replacement financing.

7           So it appears to me that it is reasonable to assume

8    that the PBGC settlement agreement is not illusory, that, in

9    fact, the determination by the PBGC to terminate the pension

10   plan under 29 U.S.C. Section 1142 is appropriate in that the

11   debtors will be enabled to facilitate that implementation

12   through the termination and trusteeship agreement referenced in

13   paragraph 3(b)(i).

14          So, again, without ultimately deciding the underlying

15   issues, including whether the only remedy for parties aggrieved

16   by such a determined by the PBGC is under 29 U.S.C. Section

17   1303, I conclude that the plan modification is feasible and

18   that the agreement is not illusory and that the debtors,

19   therefore, are exercising proper business judgment to enter

20   into it.

21          The objection by Fiduciary Counselors Inc. also,

22   ultimately, in my mind, is a feasibility objection, other than

23   simply a statement by FCI that it continues to protect the

24   rights of the plans for unpaid contributions unless and until

25   the PBGC takes over those rights upon a termination.    The

212

 1    debtors candidly acknowledge that if, in fact, after approval

 2    of the PBGC settlement agreement the PBGC is somewhat stymied

 3    in terminating the pension plans, the debtors would not be able

 4    to implement the plan as modified, and, therefore, that if that

 5    condition occurred the plan would not be feasible.  I am

 6    painfully aware of the consequences of confirming a plan, i.e.

 7    this plan, the one that's currently in place for the debtors,

 8    when there is an open contingency as to feasibility in that

 9    ultimately the current plan in effect was rendered infeasible

10    by the determination of the plan investors not to close.

11            However, again, for the reasons that I previously

12    stated with regard to Messrs. Black and Cunningham's objection,

13    it appears reasonable to me to conclude that the PBGC's

14    determination to terminate these plans which are, again, very

15    seriously underfunded and, more importantly, cannot be funded

16    going forward by the debtor, will stand up, and, consequently,

17    I believe that based on that reasonable assumption this plan

18    modification is feasible.  Obviously, FCI has reserved all of

19    its rights in the event that the plan is not terminated, and

20    I'm sure will be back pursuing its claims if that is the case,

21    although at that point one would wonder, and, frankly, given

22    the FTI liquidation analysis, which is uncontroverted, one

23    would assume that there would be no recovery on that claim at

24    that point, which is another reason why I believe that this

25    plan, to the extent it hinges upon the PBGC's termination of

213

1    these plans is feasible, in that that liquidation scenario with

2    no recovery beyond secured creditors is avoided.  So I will

3    overrule the FCI objection.

4           Finally, three of the debtors' unions have objected to

5    the plan modification and the PBGC's settlement.  The IUOE, the

6    IBEW and the IAM, those unions contend the settlement violates

7    their memorandums of understanding and the related agreements

8    to those that appear in Exhibits 122 and 126 in the record.

9    And, further, that the Court cannot make the finding sought by

10   the debtors, which, again, appears at paragraph 3(b)(i) of the

11   PBGC settlement, that the termination by the PBGC under 29

12   U.S.C. Section 1342 is not a violation of the agreements that

13   the debtors have with them.  The law I believe is clear that

14   the PBGC may terminate a pension plan under Section 1342

15   notwithstanding that a collective bargaining agreement has

16   within it as a provision that the plan be maintained.  See

17   Pension Benefit Guaranty Corporation v. LTD Corporation, 496

18   U.S. 633 at 639 (1990) in which the Supreme Court said, "The

19   PBGC may terminate a plan involuntarily notwithstanding the

20   existence of a collective bargaining agreement."  See also In

21   re Jones & Rothland Hourly Pension Plan in Pension Benefit

22   Guaranty Corporation v. LTD Corporation 824 F.2d 197 (2d Cir.

23   1987).  Which stands for the same proposition, and further

24   states that -- or stands for the proposition that under the

25   four-sentence subsection 1342(c) of 29 U.S.C. the PBGC need not

214

1    comply with the other requirements of the subsection and,

2    therefore, does not need to go through a pre-termination court

3    adjudication that would give a union a right to notice where

4    there has been an agreement following that determination to

5    terminate to enter into a termination and trusteeship agreement

6    with the plan sponsor and administrator such as is contemplated

7    by paragraph 3(b)(I) of the PBGC settlement.

8         So it appears to me clear that the action of the PBGC

9    under the PBGC settlement agreement, which is the termination

10   that is referred to in that subparagraph of paragraph 3 does

11   not violate the union agreements, or require determination

12   under Section 1113 or 1114 of the Bankruptcy Code.

13        This very issues was addressed relatively recently by

14   the Seventh Circuit in In re UAL Corporation, 428 F.3d 677 (7th

15   Cir. 2005). And, frankly, based on my review of the PBGC

16   settlement agreement and the language of the agreement between

17   the PBGC and United Airlines quoted in the Seventh Circuit

18   opinion I've just cited, it appears to me that the relief the

19   debtors are seeking is on all fours with the Seventh Circuit's

20   determination that entry into such a settlement agreement by a

21   debtor does not violate Section 1113 or 1114 of the Bankruptcy

22   Code. It's clear to me from reading the settlement agreement

23   that the termination under Section 1142 of the pension plans

24   described therein is left to the determination of the PBGC.

25   And it is only if and when the PBGC issues a notice of

215

1    determination pursuant to Section 29 U.S.C. 1342 that any

2    obligation of the debtors kicks in.  That's, I believe, on all

3    fours with the agreement at issue in the United Airlines case.

4    All of the language in the PBGC settlement agreement pertaining

5    to the determination by the PBGC is expressed in terms of a

6    condition occurring later or in precatory language, or as

7    stated to the extent that the PBGC so acts.

8           So the agreement insofar it deals with termination of

9    the pension plan hinges upon the PBGC's actions under 1142 and

10   not the debtors.

11          Further, I don't believe there's anything pretextual

12   or underhanded in the way that right of the PBGC is recognized

13   here.

14          It is also argued by the two unions that the

15   settlement agreement locks in the PBGC to actions that the PBGC

16   should not be locked into if the PBGC were acting properly.  It

17   is not my function or jurisdiction to evaluate whether the PBGC

18   is acting properly or not in the context of this motion.  I'm

19   not being asked to approve the PBGC's actions.  Rather, as the

20   Bankruptcy Code and case law is clear, I am supposed to

21   evaluate a settlement from the perspective of the debtors'

22   estate and creditors.  That point was made on a jurisdictional

23   basis in the UAL case as I previously ruled in dealing with the

24   jurisdictional objection made earlier in this hearing.

25          But it's also a principle of substantive law that my

216

1    review is based on what's in the best interest of the estate

2    and whether the settlement is fair and reasonable as far as the

3    debtors' estate and creditors are concerned.  Indeed, as

4    potential creditors of the PBGC under Section 1303, I think

5    it's -- it would be doubly improper for me to evaluate those

6    objections raised by the union that goes to the PBGC's

7    determination to enter into this agreement.  See generally In

8    re Refco Inc., 505 F.3d 109 (2d Cir. 2007).

9        It was also suggested, I think, that by compromising

10   the PBGC's claims which include potential secured claims as

11   well as priority administrative claims for post-petition

12   contributions the settlement would alter the priority rules of

13   the Bankruptcy Code.  I believe that was a backhanded reference

14   to the Second Circuit's Iridium decision.  However, that

15   decision addressed settlements that purported to alter the

16   rights of creditors who are not party to the settlement.  The

17   PBGC, once the plans are terminated, would have the claims,

18   itself, and is prepared and capable under 29 U.S.C. 1367 to

19   settle those claims which are contingent at this point

20   conditioned upon plan termination.  So I don't believe that

21   there's any question of violation of the fair and equitable

22   aspect of approval of a settlement as articulated by the Second

23   Circuit in In re Iridium.

24       I'd also note, that the PBGC, while not pursuant to

25   its statutory mandate, liable for paying all of the benefits

1    that are provided for under the plan's pre-termination will be

2    paying substantially more over time than the priority or

3    administrative claim benefits.  So under any argument, I don't

4    believe that the debtors by entering into this settlement are

5    somehow skewing anyone's rights to recover as a priority or

6    administrative creditor.

7            Finally, it was argued that the settlement agreement

8    would give this Court's blessing to actions by the PBGC as

9    opposed to authorizing the debtor to perform the settlement.

10    I've already addressed that point, I believe, including this

11    citation to the Refco case.  But I do note further that for

12    purposes of clarity the order that the debtors have asked me to

13    enter specifically reserves parties rights under 29 U.S.C.

14    Section 1303.

15            Other than that, all I can say is that it appears

16    reasonable to me for the PBGC to have acted in the way it did

17    sufficient for me to find, as I said previously, the

18    modification of the plan is feasible insofar as it depends upon

19    the termination of the pension plan.  And that to the extent

20    the PBGC actions in entering into that agreement are subject to

21    review, my order approving the settlement does not preclude

22    such review as a matter of law.  Although, if indeed, the

23    debtors enter into the termination and trustee agreement, the

24    degree of review may be significantly curtailed as set forth in

25    the Second Circuit LTD case that I've previously cited.

218

1          The debtors have further stated that various

2     provisions of their agreements with these unions in the -- in

3     particular paragraph 2(b) of the MOU at page 6 of 32 and

4     attachment C acknowledged the debtors' rights under the MOU to

5     seek termination of the plan or the plans.  But I believe

6     that's unnecessary to rely upon, given that the undertakings to

7     maintain the benefits under the plans are subject to applicable

8     law and I see no basis for the debtor to be compelled to

9     maintain an agreement that is terminatable by the PBGC without

10    any reference to whether the agreement is in a collective

11    bargaining agreement or not.

12          So for those reasons, I'll overrule the three unions'

13    objections to the modification motion and to the PBGC

14    settlement.

15          MR. BUTLER:  Your Honor, I was asked by counsel for

16    American Aikoku Alpha Inc., their objection is at docket number

17    17773, whether we could take up his objection next because of

18    some travel commitments that he has.

19          THE COURT:  Okay.

20          MR. BUTLER:  So I will turn to that objection and then

21    go back to some other matters.

22          THE COURT:  Okay.

23          MR. VIST:  Thank you, Mr. Butler.  Good evening,

24    Judge.  Gary Vist for American Aikoku.

25          The gist of our objection -- as I said it earlier, we

219

1    have three objections, two are specific to assumption -- non-

2    assumption notices.  I don't want to take up the Court's time

3    with these today.

4         The third objection is the objection to the plan,

5    itself.  Basically, my client and Delphi have entered into a

6    stipulation in May of 2008 under which my client is supposed to

7    get approximately 414,000 dollars upon the sale of the steering

8    and half shaft business.  The stipulation that we have entered

9    into also provides that to the extent that any order related to

10   the sale of the steering and half shaft business alters,

11   conflicts with, or derogates from the provision of this

12   stipulation this stipulation shall control.

13        Our understanding is that the steering and half shaft

14   business is being sold to GM as a part of this modification

15   plan.  It is the debtors' position that the plan allows them to

16   basically not pay the stipulation amount in full but to

17   basically make a partial payment under it.  We believe that the

18   language of the stipulation is clear and that the plan has to

19   be modified to provide that if there's any agreement between

20   the debtor and the creditor, that where a statutory agreement

21   says that the agreement would supersede any future order

22   conflicting with it, that the plan has to be modified to

23   provide that such agreement does take precedent over any

24   provision set forth, or any proceeding allowed by the plan.

25        And that is the gist of our objection.

1      (Pause)

2           MR. BUTLER:  Your Honor, just give me one moment.

3      (Pause)

4           MR. BUTLER:  Your Honor, as counsel indicated, two of

5      their three objections have been adjourned to the August 17th

6      hearing.

7           The objection that they're trying to assert now

8      somehow is that the stipulation attaches Exhibit C to the

9      objection, is somehow enforceable in the context of the

10     modified plan.  That objection resolved an objection to a sale

11     that later failed.  And if you look at the title of the

12     objection the title was, "A stipulation agreed order resolving

13     assumption or assignment of the executor contractor or

14     unexpired lease to the buyers in connection with the sale of

15     steering or half shaft."  That sale failed, it never went

16     forward.  And they've now asserted new objections with respect

17     to the current modified plan.  Those objections have moved

18     forward to the August 17th hearing.  And I don't believe that

19     you can interpret this order as suggesting that under every

20     circumstance in these cases if the sale that they were settling

21     in did not proceed, and, in fact, did not go forward, that they

22     ought to be able to get the kind of relief that they addressed

23     here.

24          I also would point out to Your Honor, that in addition

25     to this agreement being solely in the context of the selling of

221

1   Steering Solutions to what was actually Platinum at the time,

2   there is no obligation set forth anywhere in this stipulation

3   that obligates us to assume their contracts.  And these

4   involved to a certain extent, I believe expired purchase

5   agreements at this point.  And so I think that just in

6   referring to the overall objection as it relates to the plan, I

7   believe that the plan objection, Your Honor, should be

8   overruled.

9          MR. VIST:  Let me just briefly, Your Honor.

10          I believe most of the issues will be addressed on

11   August 17th with respect to the contracts, whether it expired

12   or not, et cetera.  But our position is that the stipulation is

13   not specific to the sale of Platinum.  Both pages 6 and 7 of

14   the stipulation which provide that we are going to get paid

15   upon the sale of the steering and half shaft business do not

16   state that we're going to get paid only if that business is

17   sold to Platinum.  The capital letters are not used, it's a

18   generic language.  And, again, therefore, we believe that we're

19   entitled to be paid whenever this division is sold to anyone,

20   and we believe the obligation is absolute.  And we believe that

21   paragraph 5 thus provides that the stipulation controls

22   vis-a-vis any future order that conflicts with it.

23          THE COURT:  But it refers to a cure payment, right?  I

24   mean, that's a 365 term, right, where a contract's assumed?

25          MR. VIST:  It does refer to a cure payment, but it

222

 1   doesn't specifically address assumption or non-assumption.  And

 2   in negotiations over it there were actually no assumption or

 3   non-assumption discussions.  And, obviously, again, I don't

 4   know how to bifurcate that with what we're going to argue or

 5   maybe not argue on August 17th.  But, at least, with respect to

 6   the plan we've tried to limit it where if the plan does allow

 7   the debtor to basically neglect to follow through on its

 8   obligations under a prior agreement we believe the plan should

 9   be modified to reflect that.

10         MR. BUTLER:  Your Honor --

11         THE COURT:  But that presumes that the debtor has

12   obligations under the agreement?

13         MR. VIST:  Yes.

14         MR. BUTLER:  Your Honor, that's precisely our point.

15   If you actually read the terms at page 7 of the stipulation it

16   basically says as soon as reasonably practical upon the closing

17   of the sale.  It doesn't say any sale, it's "the sale," the

18   sale that was part of the 365 agreements pursuant to which this

19   cure was entered into they should receive a cure payment.  No

20   sale occurred, they didn't receive a cure payment.  Paragraph

21   2, "Upon payment of the cure amount their claim shall be

22   disallowed and expunged."  No cure occurred, no payment was

23   made, their claims were not expunged.

24         The steering objection's irrelevant because that sale

25   never closed.  "And, similarly, upon payment of the cure amount

1    paragraph 4 American Aikoku shall be deemed to have withdrawn

2    with prejudice the reclamation demand, the cure proposal, the

3    response, the amended claim motion," none of which are deemed

4    withdrawn because they were not paid the cure amount.  And

5    what's happened since 2008 to now, I believe, when we'll find

6    out -- we'll deal with this on August 17th, is their contracts

7    have expired.  And I don't believe that they're going to be

8    able to assert, we'll determine at that point in time.  I think

9    this argument is in part because they received, I believe, a

10   notice of non-assumption for one of the contracts that expired,

11   and is no longer subject to cure, because it expired in

12   accordance with its terms.

13        And paragraph 5 says to the extent that any order

14   related to "the sale" of the steering -- "the sale" has to mean

15   this sale not any sale.  This was a 365 agreement that was

16   reached in the context of the assumption and assignment of this

17   contract to Platinum.  That assumption and assignment never

18   occurred, is not going to occur.  And just like all of the

19   other assumption and assignment agreements that were reached

20   back then in terms of the actual assignment over in connection

21   with steering, there are because of the passage of time and the

22   change in agreements, and I think counsel would acknowledge

23   that as to his own clients, the contracts have expired unless

24   he wants to argue they haven't at the time of the hearing on

25   August 17th, they don't exist anymore.  And you can't now go

1    back and get another pre-petition payment on something under

2    these circumstances.

3            But I'm not here to argue the cure issues, just to say

4    to Your Honor that as -- their general objection is somehow

5    this plan can't be confirmed because we're somehow violating

6    the Bankruptcy Code or violating prior orders of the Court, I

7    would ask Your Honor to find that there's no violation of this

8    order because this sale never closed, therefore no cure was

9    ever due and owing with respect to the sale.

10           THE COURT:  Okay.

11           MR. VIST:  If I may, just for the record, we are going

12    to argue that the contracts are still in existence on their

13    face, they're expiring in 2011.  But, again, we'll take that up

14    on August 17th.

15           THE COURT:  All right.  But as far as this objection

16    goes, I just don't read this stipulation and order, which is

17    attached as Exhibit C to Aikoku's objection, as requiring

18    payment of money other than in the context of a request to

19    assume the contract by the debtors.   The phrase used is "as

20    soon a reasonably practicable upon the closing of the sale of

21    the steering and half shaft business, American Aikoku shall

22    receive a cure payment of $413,908.96 to cure all default under

23    the purchase orders."  The word "cure" is a term of art under

24    the Bankruptcy Code, it's used in Section 365(b) in connection

25    with the right of a debtor to assume an executory contract or

1    unexpired lease.  The debtor has to cure all pre-petition

2    defaults or provide adequate assurance of prompt cure.

3    Otherwise, if the debtor is not assuming a contract, the debtor

4    is not authorized to pay pre-petition debt except in

5    extraordinary circumstances.  And, certainly, submission of a

6    stipulation and order like this under the circumstances under

7    which this was entered on May 28th, would not count as

8    extraordinary circumstances.

9        Furthermore, the introductory clauses putting the

10    order in context note that in connection with the request by

11    the debtors to approve a specific transaction, they filed as

12    was contemplated, an assumption notice and a notice of cure

13    amount, giving nondebtor parties to contracts an opportunity to

14    object to the proposed assumption of the contracts.  And, in

15    fact, the recital on page 5 states that American Aikoku filed

16    its notice of cure claims of American Aikoku Alpha Inc., docket

17    number 13010, the cure proposal asserting a cure amount of

18    415,761 dollars to cure defaults under the purchase orders.

19        So it appears to me clear from both the context and

20    plain language of the agreement as well as the obligations of

21    the debtor under the Bankruptcy Code, that the only reason

22    interpretation of this paragraph 1 is that it applies to a

23    specific request to assume the contracts.  So unless the

24    debtors are moving to assume this agreement, I don't believe

25    this is enforceable.

226

1          MR. VIST:  Thank you, Judge.

2          THE COURT:  Frankly, I think I've ruled that in this

3     case before in connection with someone else's arguments in

4     respect of an executory contract that was assumed, assuming

5     that the plan would be confirmed and go effective.

6          So to the extent it's not law of the case it is now.

7          MR. VIST:  Okay.

8          MR. BUTLER:  Your Honor, I don't see Ms. Robins and

9     Ms. Mehlsack here.  They had arguably some other objections in

10    their pleadings, and I'll need to check with them to see if

11    they intend to pursue them.

12         THE COURT:  I think it's the business judgment --

13         MR. BUTLER:  Right.

14         THE COURT:  -- of entering into these agreements in

15    the first place, or whatever standards you apply whether it was

16    appropriate to enter into these agreements.

17         MR. BUTLER:  And I'll be addressing those, Your Honor,

18    at the end, in what I think will be an abbreviated close.

19         With respect to the last objection that I think an

20    objector has indicated they wish to pursue, it would be Mr.

21    Sumpter who is on the telephone I believe, who filed a COBRA

22    motion under docket number 18366.  We filed an opposition to

23    that under docket number 16457.  And I would just say, Your

24    Honor, that the initial -- Mr. Sumpter is participating today

25    on a pro se basis.  I did want to say, Your Honor, at the

1    outset of this that this particular objector participated in

2    and was an objector in the OPEB termination litigation at which

3    these issues were addressed.  And we believe that the OPEB

4    termination order which Mr. Sumpter did not appeal acts on a

5    res judicata basis, his motion.  We do not believe that there

6    is a COBRA benefit that exists, this is -- Your Honor, may

7    recall we had that technical discussion on the record --

8            THE COURT:  The twelve-month issue?

9            MR. BUTLER:  Twelve month either way.  Twelve month

10   before you file, twelve month after you file, about a twenty-

11   four month window.  And this is occurring outside of the

12   window.  We had that -- that was discussed at length, and there

13   were pleadings filed at length on all sides as it relates to

14   those issues in the OPEB termination matters.

15           So I think, initially, Your Honor, the debtors believe

16   this would be barred by principle of res judicata.  And I

17   understand that Mr. Sumpter is appearing pro se.  So just --

18   and I think -- but I do think I have an obligation to raise it,

19   and I think Mr. Sumpter should acknowledge to the Court that he

20   was an objector to that hearing and probably recalls that these

21   issues were, in fact, discussed at that hearing and were part

22   of the record at that hearing.  I don't expect Mr. Sumpter

23   necessarily would understand the principles of res judicata and

24   I'm not trying to use a lot of fancy words in defending against

25   his objection, but I do have an obligation to raise that.

228

```
 1              THE COURT:  Okay.  Mr. Sumpter, you still on the
 2      phone.
 3              MR. SUMPTER:  Yes, I am.
 4              THE COURT:  All right.  You were a party -- you did
 5      object to that earlier motion, correct?
 6              MR. SUMPTER:  I objected to the termination of
 7      benefits without the 1114 committe.
 8              I received a notice I think around February 5th.  And
 9      I think it was a hearing -- they mailed the schedule for the
10      17th and then later -- but that is what I objected to.
11              THE COURT:  Okay.  All right.  Well, do you have
12      anything to add to the objection that you filed, which I know
13      my chambers had told you effectively this issue would be dealt
14      with as an objection to the plan.  And so that's why it's being
15      heard now, which I guess is -- in my view it was on all fours
16      with the other relief that you had sought.
17              MR. SUMPTER:  I'm sorry, I don't understand that.
18              THE COURT:  Do you have anything to add to the
19      objection -- to the pleading that you filed?
20              MR. SUMPTER:  Yes.  Yes, I do.
21              THE COURT:  Okay.
22              MR. SUMPTER:  First, if it's permitted, I'd like to
23      comment on the comments here.  The person just may not have
24      (indiscernible) had the same.
25              But in terms of discussing this part of the statute,
```

229

1    what I have in my information is that the debtors' attorney

2    started off with a response to a request for a stay.  And in

3    that comment or in that section it mentioned that you had ruled

4    before.  But there was no motion on to it and no ruling on it

5    from any source that I have.

6         But I did -- before I submitted this motion, I thought

7    it was important that I try to get a ruling from the Internal

8    Revenue Service and the Department of Labor because part of the

9    statutes say that they have to agree on certain determinations

10   and rulings.  And I've -- and the reason that I originally

11   asked for a stay was because I thought that we might have a

12   chance to get it done in a timely fashion.

13        I heard back from the Internal Revenue Service

14   yesterday, and they haven't taken action yet because there is

15   some discrepancy about how much the fee should be.  So that's

16   not resolved yet.

17        But I also heard back from the Department of Labor and

18   a gentleman from the Department of Labor, a Mr. Kevin Horahan,

19   he's Senior Employee Benefits Law Specialist and he appears to

20   be an attorney.  He suggested that perhaps we didn't need a new

21   ruling, and what he did was send me a copy and referred me to

22   what is 26 CFR 54.4980B.  And I sent a copy of this to Mr. Carl

23   Tullson, who I believe also is one of the attorneys; he's the

24   one I've been in contact with for Delphi.  Because I -- the

25   language in this is quite specific.  And I don't -- is it

230

1    possible they have a copy of this in the courtroom there, so

2    that I wouldn't necessarily burden the Court with my reading it

3    all?

4            THE COURT:  Well, I don't have a copy of this.

5            MR. SUMPTER:  Okay.

6            MR. BUTLER:  Can I have one moment, Your Honor?

7            THE COURT:  They're looking for it.

8            MR. SUMPTER:  Okay.

9        (Pause)

10           MR. BUTLER:  We're trying to locate it, Your Honor,

11   just give me one minute.

12           THE COURT:  Okay.  If they can't find it, I'll ask you

13   to read it.

14           MR. SUMPTER:  Okay.

15           THE COURT:  But they're looking for it.  Give it a

16   little more time.

17           MR. SUMPTER:  Okay.

18       (Pause)

19           MR. BUTLER:  Your Honor --

20           MR. SUMPTER:  If you have it, turn to page 295-296.

21           MR. BUTLER:  Right.  Your Honor, what we have is --

22   Your Honor, the -- just for the record, the exhibit number has

23   been marked Exhibit 342.  And it is the regs which we we'll

24   present to you and is the specific page he wants to refer to.

25           THE COURT:  Okay.  And so you, sir, you said it was

1    what page?  What, 2 --

2              MR. SUMPTER:  295.

3              THE COURT:  Okay.

4              MR. SUMPTER:  And it's an objection at 54.4980B-4.

5              THE COURT:  Right, I have that in front of me now.

6              MR. SUMPTER:  Okay.  And so then there's a part of

7    interest, it's under question and answer one, but down a bit

8    further than 6 which is near the bottom of the page.

9              THE COURT:  Right.  "A proceeding in bankruptcy under

10   Title 11 of the United States Code"?

11             MR. SUMPTER:  Yes.

12             THE COURT:  "With respect to an employer from whose

13   employment a covered employee retired at any time"?

14             MR. SUMPTER:  Yes.  And then goes on to talk about it

15   and it ends on page 296.  But there is no time limit on this

16   employee -- this event, a lot's been covered after this

17   bankruptcy.  The twelve months, according to Mr. Horahan is a

18   safe harbor for retirees, it kind of covers another situation

19   which continues on and is in the objection, I think it's on

20   page -- from 295 on to page 296.  But I contend that Delphi has

21   misread that statute and I think that the history of that

22   statute would support that.  I -- you know, if you get a chance

23   to read that detail I think you'd perhaps see what Mr. Horahan

24   was talking about.

25             But I also went back and found some legislative

232

```
1    history, and some congressional reports, and this you don't

2    have, I'm just going to mention it by reference, that this

3    (indiscernible) to provide whatever else.  But there's a CRF

4    issue brief, which is ID 87182, which is essentially

5    contemporaneous with the time that these laws were being

6    written in 1986 through '88.  And primarily responds to the LTV

7    bankruptcy.  And these -- there were three laws were written to

8    address the protection of employee and retirees particular

9    benefits in bankruptcy circumstances.

10          And I also have Senate report number 105-31, Report on

11   Aging.  And I also have a -- I guess a congressional record

12   which is defined as 133 Congressional Record H-8519, which was

13   on October 13, 1987, page 62 of that document.  It was actually

14   a comment by Congressman Rodino that introduced -- in

15   particular related to 100-334.  And he has a similar role also

16   in Public Law 99-509, which stipulated the COBRA benefits for

17   bankrupt retirees.  And he gave the motivation for Congress in

18   that respect.  And there are a number of others --

19          THE COURT:  But do any of those deal with the time

20   issue?

21          MR. SUMPTER:  Yes.  They say -- a couple of them

22   repeat the clause just as you have in there.  But others simply

23   say that if the benefit is reduced or terminated in a

24   bankruptcy then it results in lifetime COBRA benefits for

25   retirees.
```

233

1            THE COURT:  Okay.

2            MR. SUMPTER:  And another point I wanted to make and I

3      did make it in the motion that I filed, it was in fact that the

4      debtor asserts that it was only for twelve months before the

5      proceeding and then twelve months after the proceeding, then it

6      will provide no protection for retirees at all because a debtor

7      could wait until one day past twelve months and not have any

8      kind of obligation.  These events took place at a time when

9      Congress was dealing with the LTV bankruptcy, I think there was

10     a temporary law that was passed and extended three times.  And,

11     in fact, it expired before, I think it was -- I'm not sure --

12     100-344 was passed -- I'm not sure about the length of time

13     before Public Law 100-344 was passed.  And that had to be a

14     time that was far beyond the twelve months that the debtor

15     talked about.  And it would have made these COBRA protections

16     moot.

17            But I think there's a history of it.  But, also the he

18     documentation of what the congressional intent was and they --

19     continue to try to globally cover the retirement benefits and

20     expand as well.

21            And, so, the debtors' interpretation is contrary to

22     that.  And so I believe that they are still responsible for

23     their COBRA obligations.  And to the extent that they still

24     mark to the company or transfer assets, there is another

25     regulation with I cite in my document that says that those

1    COBRA obligations go the successor.  So that's why I've asked

2    the Court to enforce Delphi's obligations for retroactive COBRA

3    responsibilities back to April 1st and continuing on and to

4    make all those companies that are involved in these

5    transactions aware that there is this COBRA liability out

6    there, which makes me think that some parts of these agreements

7    may have to be reworked.  And that was my concern that if it's

8    comprehended in the -- somehow in this modified plan.

9            THE COURT:  Okay.

10           MR. SUMPTER:  And then I propose further that from a

11   retiree perspective that I have an exhibit in my -- but see

12   where I did is show what the -- what I project the value of

13   this COBRA expenses to be based on what the current non-COBRA

14   expenses are versus the current COBRA expenses.  And I show my

15   assumptions in this also, so I'm assuming that each retiree has

16   the -- the average life expectancy from this point for each

17   retirees is thirty years.  And so I recognize that there are

18   assumptions that could be negotiated.  But based on that, the

19   future value for these COBRA healthcare benefits is 532 million

20   dollars and probably change -- another 159,000 plus added to

21   that.

22           And I also wanted to point out there's 100 dollar a

23   day per retiree charge or excise tax that's been set by the

24   IRS.  So that, basically, Delphi I think, is accumulating a

25   600,000 dollar excise tax liability for not providing COBRA

235

1   benefits.  And by my calculations it's around seventy-two

2   million dollars as of today.

3                THE COURT:  Okay, Mr. Butler?

4                MR. BUTLER:  Your Honor, question answer A-1 of

5   Treasury Regulation Section 54.4980B-4, which is the section

6   that was given to you by Mr. Sumpter, page 295 -- starting page

7   295.  If you look at the beginning of that section, the

8   beginning of the answer A-1, it sets forth details about what

9   constitutes a qualifying event and describes and I quote "as an

10  event that satisfies paragraphs B, C and D of this question and

11  answer A-1".

12               Mr. Sumpter pointed Your Honor to the bottom of page

13  294 and to bankruptcy being a qualifying event.  That would

14  satisfy paragraph B.  What he did not talk about was the

15  paragraphs C and D, both of which have to be dealt with as Q

16  answers A-1 indicates.  Paragraph C describes an event that is

17  a loss of coverage which is quote "An increase in the premium

18  or contribution must be paid by a covered employee that results

19  from the occurrence of one of the events listed in paragraph B

20  of this Q and A-1, which would be a termination of employment."

21               Paragraph C goes on on the top of page 296, "To

22  clarify that a loss of coverage need not occur immediately

23  after the event, so long as the 'loss of coverage occurs before

24  the end of the maximum coverage period.'  The maximum coverage

25  period for a retiree with a loss of coverage outside of the

1    twenty-four month period is eighteen months from the date of

2    retirement."  And if you look at what would give rise to a

3    lifetime claim, both the section in the middle of the left-hand

4    column of page 296, that paragraph C language as well as the

5    actual statute, Code Section 4980(f)(3)(b) provides That loss

6    of coverage for a retiree means "a substantial limitation of

7    coverage that occurs 'within one year' before or after the date

8    of commencement of a bankruptcy proceeding," i.e., the twenty-

9    four month period."  So the reg here, and you can see that

10    reference, Your Honor, right in the middle of -- it's about

11    twelve lines down in the left-hand column on page 296 of the

12    reg.  So as you would expect, the reg does tack the code

13    section.  And it would provide that if you had a qualifying

14    event relating to bankruptcy proceeding there would be the

15    potential for lifetime coverage, or at least the assertion

16    there would be the potential for lifetime coverage.  But if

17    you're outside of that twenty-four month window, there is an

18    eighteen month limitation in toto.  And, so, Your Honor, I

19    think, again, we've argued all of this at the OPEB termination

20    motion, but the reality here is that the OPEB termination here

21    occurred outside of the twenty-four month window as

22    contemplated by the statute, as also contemplated by these

23    regs.  And I believe that Mr. Sumpter's objection is without

24    merit.

25            The debtors believe, first, it's barred under the

237

1    principles of res judicata.  Second, as I pointed out to you by

2    both the statute and the reg, including the reg that

3    Mr. Sumpter chose to call to your attention.  Unfortunately,

4    these -- the fact pattern of this case simply doesn't qualify.

5              THE COURT:  Okay.  Anything else?

6              MR. SUMPTER:  Your Honor, if I could just make one

7    comment?

8              THE COURT:  Sure.

9              MR. SUMPTER:  I take exception with the interpretation

10   that the debtor has about that twelve month before or after.  I

11   thought that's a convenient or useful interpretation for the

12   debtor.  But that's not what that clause means; it's not what's

13   been reflected in the congressional record, that's not what was

14   told to me by the Department of Labor.  I thought that

15   (indiscernible) the evidentiary stands.

16             But that twelve months only modifies the prepositions

17   before, it does not modify the preposition after.  And so it

18   means the twelve month before bankruptcy or anytime after.  And

19   then according to the Department of Labor all that is a safe

20   harbor for retirees, and it does not put the constraints he

21   insists, as I read it to that any loss of coverage, which

22   includes this reduction during bankruptcy, is a qualifying

23   event.

24             So I'm going through the process of having the

25   Internal Revenue issue a more definitive order, even though the

238

1    Department of Labor may not find that necessary.  But as I

2    pointed out in court as you look at this, I don't think that

3    from my understanding the -- this obligation will continue and

4    the excise tax is going to continue to accrue.  I think it's a

5    benefit to Delphi to address this matter, make those

6    retroactive payments and stop the bleeding.

7            THE COURT:  Okay.  I'll rule on this in the morning.

8            MR. BUTLER:  Okay.

9            THE COURT:  I understand your argument, Mr. Sumpter, I

10   just want to look at the statute again one last time before I

11   rule.

12           MR. SUMPTER:  All right.

13           MR. BUTLER:  Your Honor, I believe that's the last of

14   the objections that people are pressing today unless somebody

15   is raising another objection.  I did hear Your Honor indicate a

16   ruling tomorrow morning.  We are continuing to work on the form

17   of order and the final form of plan modifications as indicated

18   earlier.  My authority by the board of directors and I believe

19   by the parties to the MDA both require that the form be

20   mutually agreeable to them.  We're close but we're not finished

21   yet.  I've been on the record now, as Your Honor has, for nine

22   hours or something like that.

23           THE COURT:  I thought this would give you some time to

24   finish that up.

25           MR. BUTLER:  So I take indication from Your Honor that

239

1    we should get that completed before Your Honor rules on this

2    objection.  And we'd like to make a --

3                THE COURT:  Well, I could rule on the objection.  I

4    don't want to close everything until you have it completed.

5                MR. BUTLER:  Right.

6                THE COURT:  Until you have the order completed.

7                MR. BUTLER:  And, Your Honor, there are few matters

8    left including business judgment, a couple of other showings we

9    need to make under 1127.  And at least one item on 1129 that I

10   need to address.  But I'll do that in an abbreviated close.

11               THE COURT:  All right.  I mean, I have reviewed the

12   declarations again.  And am certainly familiar with the

13   debtors' financial condition.  I'm also familiar as set forth

14   in Mr. Sheehan's declarations with the debtors' efforts to

15   market themselves, including the auction process.  So I don't

16   think you're going to have to say much more, if anything, on

17   the debtors' determination to enter into this agreement with GM

18   and the DIP lenders.  To me it seems a valid exercise of

19   business judgment under the circumstances.  But if you want to

20   have anything more on the record, that's fine.  But I believe

21   the description by Mr. Sheehan and Mr. Shore of the debtors'

22   consideration of alternatives and of the sale process of the

23   mediation process and of the auction, is sufficient to show

24   that the debtors are pursing a path that's consistent with good

25   business judgment.

2e85bb9d4b0a5445

240

1          MR. BUTLER:  Thank you, Your Honor.  What time do you

2     want us back?

3          THE COURT:  Well, it's kind of up to you.  I know you

4     all have a propensity to work through the night even on

5     Sundays.  And I'm not encouraging that you do that.  So just

6     give me a sense.  I don't have anything else scheduled for

7     tomorrow, so I can begin at 10, I can begin at 11, I can begin

8     at 9:30, it's up to you.

9          MR. BUTLER:  Can you just give us a moment, Your

10    Honor?

11         MR. SUMPTER:  Your Honor, this is James Sumpter.  Can

12    I ask --

13         THE COURT:  You can appear by phone tomorrow so that

14    you can hear my ruling.

15         MR. SUMPTER:  Okay.

16         THE COURT:  So you should contact the same number or

17    the same -- you should go through the same process that you did

18    today --

19         MR. SUMPTER:  All right.

20         THE COURT:  -- to get on the phone for tomorrow.

21         MR. SUMPTER:  Okay.

22         THE COURT:  Okay.

23         MR. SUMPTER:  Could I ask one other question?

24         THE COURT:  Sure.

25         MR. SUMPTER:  I've referenced a couple of documents

241

1    that I have not had opportunity to make available to the Court.

2    Is it useful or proper that I submit those --

3              THE COURT:  Well, if the documents are matters of

4    public record, like the congressional record or Senate report

5    you can e-mail those to me.

6              MR. SUMPTER:  Yes.

7              THE COURT:  That's fine.  You should also e-mail them

8    to whoever you've been sending them to at Skadden Arps.

9              MR. SUMPTER:  Right.

10             THE COURT:  Okay.

11             MR. SUMPTER:  Okay.  All right.  Let me confirm one

12   thing on that e-mail address.  I had sent those letters to

13   Mr. Lightner before --

14             THE COURT:  Yeah, that's fine.

15             MR. SUMPTER:  Okay.  You can give me --

16             THE COURT:  Well, let me give you that

17   rdd.chambers@nysb.uscourts.gov.

18             MR. SUMPTER:  Okay.

19             THE COURT:  Thanks.

20             MR. SUMPTER:  All right.  Thank you.

21             MR. BUTLER:  Your Honor, I consulted with counsel.  I

22   think we'd like to tentatively recess until 10 o'clock tomorrow

23   morning.  If for some reason we can't be ready by 10 we'll

24   advise chambers.  But I think people would like to be concluded

25   with this and we'll endeavor to have everything finished by

1    that time.

2          One point that I'd like to do tonight, which I think I

3    can do unless someone thinks that I'm making a mistake, but I

4    think this is the correct thing to do.  Which is our

5    evidentiary record is complete.  And all the objections are in.

6    An, so, Your Honor, the only thing I have left is a reservation

7    of rights by our board that requires that we get a suitable

8    form of order.

9          THE COURT:  Okay.

10          MR. BUTLER:  And that's the only thing I've got left.

11    So unless Your Honor has some reason that you think we

12    shouldn't do this, I think I'd like to close the evidentiary

13    record tonight so we've got a complete record, and we'll deal

14    with argument tomorrow, if there is any, if that makes sense.

15          THE COURT:  Well, there's conceivably an evidentiary

16    record on this order, that's the only thing that would remain

17    open as far as I can se.

18          MR. BUTLER:  Right.  Aside from that, Your Honor, I

19    think --

20          THE COURT:  Mr. Abrams?

21          MR. ABRAMS:  Your Honor, I just rose to indicate that

22    we would support Mr. Butler's approach subject to Your Honor's

23    limited qualification with respect to the order itself.

24          THE COURT:  All right.  I agree, I think that's

25    appropriate.  The evidentiary record is closed.  The only thing

243

1    I'm reserving on is my ruling on Mr. Sumpter's objection and

2    review of the final version of the -- final proposed version of

3    the order.

4            MR. BUTLER:  Right.  As I said, Your Honor, I also

5    will give and I take Your Honor's guidance to heart, I may have

6    a few closing comments, but they will be abbreviated.

7            THE COURT:  All right, that's fine.  Thank you.

8            MR. BUTLER:  Thanks, Judge.

9            THE COURT:  And, again, you can leave your exhibits

10    and charts.

11            MR. BUTLER:  Thank you.

12            THE COURT:  Mr. Sumpter, I'll be back on the record at

13    10 tomorrow.

14            MR. SUMPTER:  All right, thank you.

15        (Proceedings concluded at 7:21 PM)

16

17

18

19

20

21

22

23

24

25

244

```
1
2                         I N D E X
3
4                       E X H I B I T S
5    PARTY   NO    DESCRIPTION                    ID.      EVID.
6               634 Various Joint Exhibit                  25
7               documents
8
9                       R U L I N G S
10   DESCRIPTION                                 PAGE     LINE
11
12   Objection by Michigan Workers Compensation   78       22
13   Agency and Funds Administration to plan,
14   overruled
15   Objections by Howard County Taxing          107       22
16   Authorities and Texas Taxing Authorities
17   to plan, overruled
18   IBEW and IAM's objection to feasibility     210        1
19   of plan denied
20   FCI's objection overruled                   213        3
21   Objections of the three unions to the       218       12
22   modification motion and PBGC settlement
23   overruled
24   Motion of American Aikoku to enforce        225       24
25   settlement agreement denied
```

245

```
 1
 2                   C E R T I F I C A T I O N
 3
 4      I, Clara Rubin, certify that the foregoing transcript is a true
 5      and accurate record of the proceedings.
 6      Clara Rubin
 7
 8      Clara Rubin
 9      AAERT Certified Electronic Transcriber (CET**D-491)
10      Also Transcribed By:    Esther Accardi (CET**D-485)
                                Dena Page
11
12
        Veritext LLC
13
        200 Old Country Road
14
        Suite 580
15
        Mineola, NY 11501
16
17
        Date: July 30, 2009
18
19
20
21
22
23
24
25
```

Digitally signed by Clara Rubin
DN: cn=Clara Rubin, c=US
Reason: I am the author of this document
Date: 2009.08.07 14:49:50 -04'00'