UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DPH HOLDINGS CORP., *et al.*, | : | Case No. 05-44481 (RDD) |
| | : | |
| Reorganized Debtors. | : | (Jointly Administered) |
| | : | |
| | : | Omnibus Hearing: July 22, 2010 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### SUPPLEMENT TO MOTION OF METHODE ELECTRONICS, INC. FOR AN ORDER (I) PERMITTING METHODE TO CONTINUE POST-PETITION LITIGATION WITH THE REORGANIZED DEBTORS IN MICHIGAN AND (II) OVERRULING THE REORGANIZED DEBTORS' TIMELINESS OBJECTION TO METHODE'S ADMINISTRATIVE EXPENSE CLAIMS

       1.     Methode Electronics, Inc. ("Methode") respectfully submits this supplement to its Motion for an Order (I) Permitting Methode to Continue Post-Petition Litigation with the Reorganized Debtors in Michigan and (II) Overruling the Reorganized Debtors' Timeliness Objection to Methode's Administrative Expense Claims (the "Motion") [Docket No. 19895].[1]

       2.     On April 20, 2010, Methode filed the Motion in this Court seeking an order modifying the Plan Injunction to permit Methode to continue prosecuting a contract claim against DPH-DAS LLC ("Delphi") in Michigan state court. The Motion further requested that the Court overrule Delphi's objection to Methode's contract claim to the extent Delphi sought disallowance of the claim on the grounds that it had been filed after the July 15, 2009, bar date for administrative claims that arose before May 31, 2009.

---

[1]     Capitalized terms not defined herein have the same meanings as in Methode's briefs in support of the Motion. [Docket Nos. 19896; 20164]

3. At the hearing on the Motion held on May 20, 2010, a transcript of which is attached hereto as Exhibit A, the Court determined that Methode's request to overrule Delphi's timeliness objection to Methode's contract claim was "moot" in light of Methode's stated intention to file an amended counterclaim in Michigan "based upon the August [2009] termination" of the Post-Confirmation Supply Agreement — rather than the alleged anticipatory repudiation of that agreement at an earlier date.  Ex. A at 27-28.  Accordingly, the Court held in abeyance Methode's request to modify the Plan Injunction as to the contract claim until the parties stipulated to the filing of an amended counterclaim in Michigan or Methode made a further submission to the Court.  *See id.* at 62.

4. The Court's June 14, 2010 Order in Respect of Administrative Expense Claims of Methode Electronics Inc. [Docket No. 20241], attached hereto as Exhibit B (the "Order"), confirmed the Court's oral ruling, stating that Methode's "request to overrule the Reorganized Debtors' timeliness objection with respect to the Contract [Action] is deemed moot"; and that Methode's "request to lift the Plan Injunction to allow litigation regarding the Contract [Action] in the Michigan state court is held in abeyance pending a stipulation between the parties or further application to this Court."  Ex. B ¶1.c.

5. As agreed at the Hearing and stated in the Order (¶1.c.), the Court's disposition is as set forth in the transcript of the Hearing.  At the Hearing, the Court concluded that Methode's contract claim would not run afoul of any bar date if "based on a breach" of the Post-Confirmation Supply Agreement that occurred in August 2009.  Ex. A at 28.  The Court also made clear, however, that conduct prior to May 31, 2009 "may be relevant to . . . whether there was a breach."  *Id.*  In other words, while Delphi's pre-May 31 conduct "would not be a separate basis for the claim," the Michigan court could of course look to "Delphi's conduct,

generally, to see whether there was a breach *post* bar date." *Id*. at 30 (emphasis added). And

Methode, moreover, "may assert as a response to Delphi's argument that [Delphi] had a perfect

right to terminate the [Post-Confirmation Supply Agreement] . . . [s]ome sort of pre bar date

fact, as long as that pre bar date fact does not, in and of itself, give rise to a separate claim." *Id*.

at 32.

6.        On June 15, 2010, Methode transmitted to Delphi a proposed First

Amended Counterclaim, attached hereto as <u>Exhibit C</u> (the "Amended Counterclaim"). The

Amended Counterclaim alleges *inter alia* that Delphi "breached the [Post-Confirmation Supply]

Agreement by prematurely and unlawfully terminating all purchases of the subject parts from

Methode *in August 2009*." Ex. C at ¶19 (emphasis added). Delphi's conduct prior to May 31,

2009 is referenced only to support the allegation that the Reorganized Debtors "cannot rely on

[the] termination for convenience clause in the [Post-Confirmation Supply] Agreement" as a

defense against Methode's claim for breach. *Id.* ¶20.

7.        On June 22, 2010, counsel for the Reorganized Debtors informed counsel

for Methode that the Reorganized Debtors would not stipulate to lifting the Plan Injunction to

allow Methode to pursue the Amended Counterclaim in the Michigan state courts.

8.        It is patent from the face of the Amended Counterclaim that the claim as

stated does not allege a "separate" claim based on pre-May 31, 2009 conduct. To the contrary,

the basis of the claim is Delphi's August 2009 breach of the Post-Confirmation Supply

Agreement by wrongful termination. Conduct occurring prior to May 31, 2009 is relevant to

the claim asserted in the Amended Counterclaim only insofar as it responds to Delphi's likely

contention that it was permitted to terminate the Post-Confirmation Supply Agreement.

9.      Accordingly, Methode respectfully requests entry of an order, substantially in the form attached hereto as <u>Exhibit D</u>, modifying the Plan Injunction and permitting Methode to pursue its claims in the Contract Action, as set forth in the Amended Counterclaim, in the state courts of Michigan.

Dated:  June 28, 2010
New York, New York

**WACHTELL, LIPTON, ROSEN & KATZ**

 /s/ Douglas K. Mayer                                              
 Douglas K. Mayer
 Emil A. Kleinhaus
 Alexander B. Lees
51 West 52nd Street
New York, New York  10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000

**LOCKE LORD BISSELL & LIDDELL LLP**
 Ann Marie Walsh
111 South Wacker Drive
Chicago, Illinois  60606
Telephone:  (312) 443-0654
Facsimile:  (312) 896-6654

*Attorneys for Methode Electronics, Inc.*

**<u>EXHIBIT A</u>**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481-RDD

- - - - - - - - - - - - - - - - - - - -x


In the Matter of:


DPH HOLDINGS CORP., et al.,


          Reorganized Debtors.


- - - - - - - - - - - - - - - - - - - -x


          U.S. Bankruptcy Court

          300 Quarropas Street

          White Plains, New York


          May 20, 2010

          10:12 AM


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1

2   Fifty-Fifth Omnibus Hearing:

3

4   Hearing re:  Furukawa Electric Company's Motion for Allowance

5   of Administrative Expense Claim - Motion Of Furukawa Electric

6   Company, Ltd. For Allowance Of An Administrative Expense

7   Claim, Pursuant To 11 U.S.C. 503(b)(1)(A) And, In The

8   Alternative, For Leave To File A Late Administrative Expense

9   Claim Pursuant To Bankruptcy Rule 9006(B)

10

11   Hearing re:  Salaried Retirees' Motion - Motion Of The

12   Salaried Retirees For Order Confirming That Second Amended

13   Complaint Does Not Violate The Modified Plan Or The Plan

14   Modification Order and Amended Motion Of The Salaried Retirees

15   For Order Confirming That Second Amended Complaint Does Not

16   Violate The Modified Plan Or The Plan Modification Order

17

18   Hearing re:  Davidson Kempner Capital Management LLC, et al.

19   Substantial Contribution Application - Application By Davidson

20   Kempner Capital Management LLC; Elliott Associates, L.P.;

21   Nomura Corporate Research & Asset Management, Inc.; Northeast

22   Investors Trust; SPCP Group, LLC; And Whitebox Advisors, LLC,

23   On Behalf Of Themselves And Senior Noteholders Previously

24   Represented, For Payment Of Fees And Expenses Pursuant To 11

25   U.S.C. § 1129(a)(4) And Bankruptcy Rule 9019

3

1

2     Hearing re:  Motion for Case Management Order Governing

3     Avoidance Action Adversary Proceedings - Reorganized Debtors'

4     Motion For A Case Management Order Establishing Procedures

5     Governing Adversary Proceedings

6

7     Hearing re:  Reorganized Debtors' Motion to Limit Service -

8     Reorganized Debtors' Motion For Order Under Fed. R. Bankr. P.

9     2002(m) And 9007 Supplementing Case Management Orders By (A)

10    Limiting Service Of All Future Filings And (B) Authorizing

11    Service By Electronic Mail For All Future Filings

12

13    Hearing re:  Forty-Seventh Omnibus Claims Objection -

14    Reorganized Debtors' Forty-Seventh Omnibus Objection Pursuant

15    to 11 U.S.C. § 503(b) and Fed. R. Bankr. P. 3007 to (I)

16    Disallow and Expunge (A) Certain Administrative Expense Books

17    and Records Claims, (B) a Certain Administrative Expense

18    Duplicate Claim, and (C) Certain Administrative Expense

19    Duplicate Substantial Contribution Claims, and (II) Modify

20    Certain Administrative Expense Claims

21

22    Hearing re:  Paul C. Mathis' Motion for Jury Trial - Paul C.

23    Mathis' Motion For Trial For Jury

24

25

4

1

2    Hearing re:  Motion of Methode Electronics, Inc. - Notice Of

3    Motion By Methode Electronics, Inc. For An Order (I)

4    Permitting Methode To Continue Post-Petition Litigation With

5    The Reorganized Debtors In Michigan And (II) Overruling The

6    Reorganized Debtors' Timeliness Objection To Methode's

7    Administrative Expense Claims

8

9    Hearing re:  IUE-CWA Substantial Contribution Application -

10   Motion Of IUE-CWA Pursuant To Sections 503(b)(3)(d) And (b)(4)

11   Of The Bankruptcy Code For Allowance And Payment Of Fees

12   Incurred In Making A Substantial Contribution To The Debtors'

13   Chapter 11 Case

14

15   Hearing re:  Certain Senior Noteholders Substantial

16   Contribution Application - Summary Sheet And Application Of

17   Certain Senior Noteholders Pursuant To Sections 503(b)(3) And

18   (4) Of The Bankruptcy Code For Allowance And Reimbursement Of

19   Reasonable Compensation And Actual, Necessary Expenses In

20   Making A Substantial Contribution In These Chapter 11 Cases

21

22

23

24

25

5

1

2    Hearing re:  Delphi Trade Committee Substantial Contribution

3    Application - Application Of The Delphi Trade Committee For

4    Reimbursement Of Expenses Arising From Substantial

5    Contribution Made In These Cases And Notice Of Filing Of

6    Exhibits To Application Of The Delphi Trade Committee For

7    Reimbursement Of Expenses Arising From Substantial

8    Contribution Made In These Cases

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1

2   Thirty-Third Claims Hearing:

3

4   Sufficiency Hearing Regarding Claims of Jose C. Alfaro and

5   Martha Alfaro - Sufficiency Hearing Regarding Claims of Jose

6   C. Alfaro and Martha Alfaro as Objected to on Reorganized

7   Debtors' Thirty-Sixth Omnibus Objection Pursuant To 11 U.S.C.

8   § 502(b) And Fed. R. Bankr. P. 3007 To (I) Modify And Allow

9   Claim And (II) Expunge Certain (A) Duplicate SERP Claims, (B)

10  Books And Records Claims, (C) Untimely Claims, And (D)

11  Pension, Benefit, And OPEB Claims and Reorganized Debtors'

12  Thirty-Seventh Omnibus Objection Pursuant To 11 U.S.C. §

13  502(B) And Fed. R. Bankr. P. 3007 To Expunge Certain (I)

14  Prepetition Claims, (II) Equity Interests, (III) Books And

15  Records Claims, (IV) Untimely Claims, (V) Paid Severance

16  Claims,(VI) Pension, Benefit, And OPEB Claims, And (VII)

17  Duplicate Claims

18

19

20

21

22

23

24

25

7

1

2    Sufficiency Hearing Regarding Claims of Marc Eglin -

3    Sufficiency Hearing Regarding Claims of Marc Eglin as Objected

4    to on Reorganized Debtors' Forty-Third Omnibus Objection

5    Pursuant To 11 U.S.C. § 503(b) And Fed. R. Bankr. P. 3007 To

6    (I) Expunge Certain Administrative Expense (A) Severance

7    Claims, (B) Books And Records Claims, (C) Duplicate Claims,

8    (D) Equity Interests, (E) Prepetition Claims, (F)

9    Insufficiently Documented Claims, (G) Pension, Benefit, And

10   OPEB Claims, (H) Workers' Compensation Claims, (II) Modify And

11   Allow Certain Administrative Expense Severance Claims, And

12   (III) Allow Certain Administrative Expense Severance Claims

13

14

15

16

17

18

19

20

21

22

23

24

25

8

Sufficiency Hearing Regarding Claims of James A. Luecke -

Sufficiency Hearing Regarding Claims of James A. Luecke as

Objected to on Reorganized Debtors' Thirty-Seventh Omnibus

Objection Pursuant To 11 U.S.C. § 502(B) And Fed. R. Bankr. P.

3007 To Expunge Certain (I) Prepetition Claims, (II) Equity

Interests, (III) Books And Records Claims, (IV) Untimely

Claims, (V) Paid Severance Claims,(VI) Pension, Benefit, And

OPEB Claims, And (VII) Duplicate Claims and Reorganized

Debtors' Forty-Fifth Omnibus Objection Pursuant To 11 U.S.C. §

503(b) And Fed. R. Bankr. P. 3007 To (I)Expunge Certain

Administrative Expense (A) Severance Claims, (B) Books And

Records Claims, (C) Duplicate Claims, (D) Pension And Benefit

Claims, And (E) Transferred Workers' Compensation Claims, (II)

Modify And Allow Certain Administrative Expense Severance

Claims, And (III) Allow Certain Administrative Expense

Severance Claims

Transcribed by:  Hana Copperman

9

1

2   A P P E A R A N C E S :

3   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

4        Attorneys for the Debtors

5        155 North Wacker Drive

6        Chicago, IL 60606

7

8   BY:   LOUIS S. CHIAPPETTA, ESQ.

9         BRANDON M. DUNCOMB, ESQ.

10        JOHN K. LYONS, ESQ.

11        RON E. MEISLER, ESQ.

12

13

14   WACHTELL, LIPTON, ROSEN & KATZ

15        Attorneys for Methode Electronics, Inc.

16        51 West 52nd Street

17        New York, NY 10019

18

19   BY:   DOUGLAS MAYER, ESQ.

20         ALEXANDER LEES, ESQ.

21         EMIL KLEINHAUS, ESQ.

22

23

24

25

10

1

2     LOCKE LORD BISSELL & LIDDELL LLP

3          Attorneys for Methode Electronics, Inc.

4          111 South Wacker Drive

5          Chicago, IL 60606

6

7     BY:   ANN MARIE WALSH, ESQ.

8

9

10    KENNEDY, JENNIK, & MURRAY, P.C.

11         Attorneys for IUE-CWA

12         113 University Place

13         Seventh Floor

14         New York, NY 10003-4578

15

16    BY:   THOMAS M. KENNEDY, ESQ.

17         SUSAN JENNIK, ESQ.

18

19

20    KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

21         Attorneys for Trade Committee

22         1633 Broadway

23         New York, NY 10019

24

25    BY:   DAVID S. ROSNER, ESQ.

11

1

2    BENDINELLI LAW OFFICE, P.C.

3        Attorneys for Jose C. Alfaro and Martha Alfaro

4        9305 Wadsworth Parkway

5        Suite 4000

6        Broomfield, CO 80021

7

8    BY:   MARCO F. BENDINELLI, ESQ.

9

10

11    UNITED STATES DEPARTMENT OF JUSTICE

12        Office of the United States Trustee

13        33 Whitehall Street

14        21st Floor

15        New York, NY 10004

16

17    BY:   BRIAN S. MASUMOTO, ESQ.

18

19

20

21

22

23

24

25

12

1

2    BARNES & THORNBURG LLP

3         Attorneys for Bank of America, N.A.

4         171 Monroe Avenue, NW

5         Suite 1000

6         Grand Rapids, MI 49503

7

8    BY:   PATRICK E. MEARS, ESQ. (TELEPHONICALLY)

9

10

11   ALSO APPEARING:

12        JAMES LUECKE

13        PARTY PRO SE

14

15

16

17

18

19

20

21

22

23

24

25

19

1      MR. CHIAPPETTA:  Your Honor, Mr. Mathis filed this

2  same exact pleading in the General Motors case In re Motors

3  Liquidation Company, and Judge Gerber denied this motion sua

4  sponte at docket number 5539.  It's unclear what Mr. Mathis is

5  exactly requesting, Your Honor, and outside of two claims that

6  have been previously expunged by this Court the reorganized

7  debtors are unaware of any relationship with Mr. Mathis.

8      THE COURT:  All right.  The pleading you're referring

9  to asks for a jury trial on something.

10     MR. CHIAPPETTA:  Correct.

11     THE COURT:  But, again, you are correct that except

12 for the two claims of Mr. Mathis, both of which have previously

13 been disallowed, I have no idea what the jury trial request

14 would apply to, and given that the two claims have been

15 disallowed and the jury trial request sets forth no basis under

16 Rules 9023 or 9024 -- it would be 9024 here, given the time --I

17 don't see any basis for the request.  Is Mr. Mathis here or on

18 the phone?  All right.  For that reason I'll grant the

19 objection.

20     MR. CHIAPPETTA:  Thank you, Your Honor.

21     MR. MEISLER:  Your Honor, the next matter on the

22 agenda is the motion of Methode Electronics.  Your Honor, for

23 that matter counsel for Methode is here in the courtroom.  If

24 it pleases Your Honor I'm going to cede the podium to counsel

25 and let them present their motion.

20

1        THE COURT:  Okay.

2        MR. MEISLER:  Your Honor, as a preliminary matter I'

3   just like to touch on the exhibits that were filed --

4        THE COURT:  Okay.

5        MR. MEISLER:  -- and the exhibits that we have with us

6   today.  There are twelve numbered items on the exhibit index

7   list that we are submitting into evidence for this matter.

8   Each of the first eleven have either been filed on the docket

9   in some place in the Delphi case or, now, the DPH case, and the

10  twelfth is the declaration of Ann Walsh, which has

11  approximately twenty-six exhibits.

12       Your Honor, we are okay with the exhibits being

13  admitted into evidence to show what was alleged and when.  But,

14  Your Honor, we would object to any of the exhibits being

15  entered to show the truth of the matter asserted.

16       THE COURT:  Okay.  Well, this is not a hearing on the

17  merits of the claim.  It's on the issue of timeliness as well

18  as the proper forum for the termination of the claims, so I'm

19  assuming there's no problem with the debtors' reservation on

20  this.

21       MR. MAYER:  No, Your Honor, Douglas Mayer from

22  Wachtell, Lipton, Rosen & Katz for Methode Electronics.  We

23  have no problem with that.  I mean, we just got the binder.  We

24  haven't reviewed what's in it.

25       THE COURT:  Okay.

21

1          MR. MAYER:  Based on what counsel says, that it's all

2     filings on the docket, then we have no difficulty with that,

3     because Your Honor's characterization of today's matter, I

4     think, is accurate.

5          THE COURT:  Okay.  All right.

6          MR. MAYER:  Okay.  Good morning,

7          THE COURT:  Good morning.

8          MR. MAYER:  Again, thank you.  So Wachtell, Lipton,

9     Rosen & Katz is bankruptcy counsel for Methode Electronics

10    here, the movant.  Also with us on this matter is the Locke

11    Lord Bissell law firm and, in particular, Ann Marie Walsh,

12    who's with us today and is counsel to Methode Electronics in

13    connection with the contract litigation that's extensively

14    discussed.  I believe that a pro hac motion was made for Ms.

15    Walsh's admission here for this matter.  I don't know that

16    that's been acted on by the Court.

17         THE COURT:  Okay.  Well, you should assume it's

18    granted.

19         MR. MAYER:  Yes.

20         THE COURT:  There have been a number of Delphi pro hac

21    motions recently, so I'm not -- I remember this one in

22    particular.  Okay.

23         MR. MAYER:  Thank you.  And as noted by the Court and

24    by Mr. Meisler for the debtor, what's before the Court today is

25    a request from Methode addressing the questions of form and

22

1    asking the Court, as well, to make a determination as to

2    timeliness with respect to these claims.  And I'm sure the

3    Court has viewed the papers that have been submitted by the

4    parties here, so I don't plan on rehearsing that detail for the

5    Court.  We're basically here to address the Court's questions

6    and concerns, although there are some specifics that I would

7    like to highlight for the Court's benefit.

8           THE COURT:  Okay.  Before you get to that, I just want

9    to make sure I understand what it is that is still being

10   contested by the parties.  As I understand it, leaving aside

11   the issue of the timeliness of the patent claim as it pertains

12   to alleged patent infringement before the --

13          MR. MAYER:  June 1, Your Honor.

14          THE COURT:  June 1, right.  I understand from the

15   debtors' response that the debtors don't oppose the

16   continuation of the patent litigation in the Michigan District

17   Court.

18          MR. MAYER:  That certainly was my understanding.

19   Obviously, the debtors will represent as they see fit.

20          MR. MEISLER:  Your Honor, subject to this Court's

21   determination on scope, that is correct, Your Honor.  We would

22   be amenable to lifting the plan injunction so that the patent

23   litigation could go forward in the federal court, Eastern

24   District of Michigan.

25          THE COURT:  Okay.  All right.  And, then, so that's --

23

1    that, I just, I believe, then, leaves the issue of the portion

2    of the claim that covers the alleged pre-June infringement,

3    because the rest of it, again, I think the debtors acknowledge,

4    is either outside of the scope of the administrative claims bar

5    date, because it's post bar date, post bright-line for the bar

6    date activity, and/or it's been picked up by the buyer.

7           MR. MAYER:  Yes.  That's my understanding, Your Honor.

8           THE COURT:  Okay.  So, then, turning to the contract

9    action, and this one, I think, is more of a question for

10   Methode, I have some confusion about the contract claim.

11   Methode states that, correctly, it filed an anticipatory breach

12   claim, and that was obviously one that, I think, arose pre

13   June, because that was part of its complaint in the state court

14   action, but that it also has an actual breach claim based upon

15   Delphi's termination of the contract, which was done after the

16   June date and, therefore, wouldn't be covered by the bar date.

17          And I guess my question is now that there's an actual

18   breach claim, what are we talking about as far as an

19   anticipatory breach claim?  Am I missing something or --

20          MR. MAYER:  No, you're not missing something, Your

21   Honor, and I thank you for bringing this up.  This was one of

22   those specific aspects that I did want to concentrate on,

23   because we realized, frankly, that it would be easy for the

24   Court not to see clearly what was still outstanding and what

25   wasn't.  So I think the Court is correct in nothing that in the

24

1    counterclaim that was discussed in the papers and that was

2    interposed by Methode in Michigan there was a claim stated for

3    anticipatory breach, which was back in January of 2009.

4         THE COURT:  Right.

5         MR. MAYER:  Needless to say, what's turned out is that

6    that which was anticipated ultimately occurred, in a sense

7    mooting that anticipatory breach claim, and just to cut through

8    it, then, what one has at this point in time as a live claim,

9    so to speak, in a colloquial sense, I think, is a claim where

10   we say that Delphi's termination, which occurred August

11   26th/27th of 2009, was in breach.  Delphi, of course, has their

12   merits arguments as to why that was not the case.

13        THE COURT:  Right.

14        MR. MAYER:  And that claim had not been pleaded in

15   Michigan.  It is a claim that can be pleaded in Michigan, just

16   like it could be pleaded anywhere else under the applicable

17   pleading rules, and is one that we would be prepared to proceed

18   forward with in Michigan in the event that the Court were to

19   either modify the injunction or consider the injunction to be

20   inapplicable.

21        THE COURT:  All right.  So just to be clear then.  At

22   this point Methode's contract claim is a claim predicated upon

23   post bar date conduct.

24        MR. MAYER:  That is certainly our view, Your Honor.  I

25   think what the debtors have suggested -- they suggested this in

25

1    their response papers, and obviously we'll hear from them.   I

2    think they would argue that in some sense one must view the

3    claim as relating back to the pre June 1 period, in that there

4    were events that occurred at that time that indicated that

5    there was an act of bad faith in entering into the contract.

6         THE COURT:  But if what you're saying -- what Methode

7    is saying is that its damage flow solely from the post bar date

8    breach.

9         MR. MAYER:  Yes.

10        THE COURT:  Then I --

11        MR. MAYER:  That is definitely our view.  In terms of

12   damages, I think that regardless of whether people may have had

13   motives or intentions or done other things that led up to a

14   termination in August prior to June 1, all the damage relates

15   to the balance of the term of the contract after the

16   termination, which was effective as of September.

17        THE COURT:  Okay.

18        MR. MAYER:  So I'm, again, I'm glad that Your Honor

19   raised this.

20        THE COURT:  So as far as Methode is concerned this is,

21   literally, the flip side of the patent case.  The only issue to

22   be argued here, as far as Methode is concerned, is the proper

23   forum for handling the contract claim.

24        MR. MAYER:  Well, Your Honor, I guess what I'm --

25        THE COURT:  There's no untimeliness --

26

1          MR. MAYER:  Yes.

2          THE COURT:  -- issue, because you're saying that the

3     claim here is all based upon a wrong by Delphi that occurred

4     after the bar date.

5          MR. MAYER:  That, again, that is our view.  I would

6     reiterate that -- I guess, maybe I should let the debtor speak

7     for themselves, that what they seem to be arguing in their

8     papers, and they'll say whatever they say today, is that

9     somehow there was enough of a nucleus of conduct prior to June

10    1 that that makes the claim, somehow, a pre June 1 claim.  I

11    don't get that.

12         THE COURT:  Okay.

13         MR. MAYER:  It doesn't make any sense to me.  But I

14    think that may be the position, so to that extent, I guess,

15    we're arguing about that today.

16         THE COURT:  All right.

17         MR. MAYER:  Unless the Court wants to defer that to

18    another occasion, frankly, even the Court in Michigan could

19    address that kind of an issue if it saw fit.

20         THE COURT:  Okay.  All right.  So why don't I hear

21    from you, Mr. Meisler on that issue.

22         MR. MEISLER:  Your Honor, I'm glad that you're

23    bringing up that clarification, because I guess I'm confused as

24    well.  I looked at their papers, and I --

25         THE COURT:  No, No.  The claim in the papers raised

27

1    the possibility, just as with the patent claim, that there's

2    some additional wrongdoing that gives rise to a basis for a

3    claim before the bar date.

4        MR. MEISLER:  That --

5        THE COURT:  But they're very clear on the record today

6    that that's not their position, that it's the breach in August

7    that is the basis for the claim.

8        MR. MEISLER:  Terrific, Your Honor.  With that record

9    I am similarly comfortable.

10       THE COURT:  Okay.  All right.  So I conclude, then,

11   that the issue of the timeliness of the -- I guess, when was it

12   filed?  September?

13       UNIDENTIFIED SPEAKER:  Sorry.  When was what filed,

14   Your Honor?

15       THE COURT:  Your proof of -- the admin claim.

16       UNIDENTIFIED SPEAKER:  Oh, no.  It was filed in early

17   November --

18       THE COURT:  I'm sorry.  November.

19       UNIDENTIFIED SPEAKER: -- within the -- with --

20       THE COURT:  The timeliness of the November claim as it

21   applies to the contract claim issue.  That issue is moot, given

22   the clear statement on the record today, which I think is

23   implicit in also the reply that you filed, that the contract

24   claim against DPH that's being asserted, and the only contract

25   claim that's being asserted on this contract, is based upon the

28

 1   August termination, the claim of breach in August.  And,

 2   obviously, a claim for anticipatory breach is different than a

 3   claim for actual breach, and you're asserting a claim for

 4   actual breach now, not anticipatory breach.

 5           MR. MAYER:  Right. Because --

 6           THE COURT:  Okay.

 7           MR. MAYER: -- there's no anticipating anymore.

 8           THE COURT:  All right.

 9           MR. MAYER:  That's right.

10           THE COURT:  So I think --

11           MR. MEISLER:  Your Honor?  For clarification, that

12   means that any conduct pre June 1st is time barred.

13           THE COURT:  Right.

14           MR. MEISLER:  So --

15           MR. MAYER:  Well, we can discuss -- I'm sorry.  I

16   don't want to interrupt the Court.

17           THE COURT:  Well, I'm sorry.  No, you should go ahead.

18           MR. MAYER:  I'm not sure what it means to say that

19   there is a bar with respect to conduct prior to June 1st.

20           THE COURT:  Well, it doesn't give rise to a claim.

21   The claim is based on a breach.  I mean --

22           MR. MAYER:  Right.  And, again -- yes.

23           THE COURT: -- the conduct may be relevant to --

24           MR. MAYER:  Yes.  That's --

25           THE COURT: -- whether there was a breach.

29

1          MR. MAYER:  That's exactly my point, Your Honor.

2     There could be plenty of relevant evidence.  I don't think that

3     it's --

4          THE COURT:  But it's not independently the basis a

5     claim.

6          MR. MAYER:  That's correct.  In terms of the elements

7     of a cause of action that is correct.  Again, there could be

8     evidence of bad faith.  In our view, all of that sort of thing

9     that occurred prior to the bar date, I don't think that the law

10    is, and it doesn't really make any sense to say that all has to

11    be excluded.

12         THE COURT:  But the basis -- well, that will be up to

13    either me or the state court.  But the basis --

14         MR. MAYER:  Right.

15         THE COURT: -- for the claim is limited to a claim that

16    occurred after the bar date.

17         MR. MAYER:  Yes, I think I would agree with that.  All

18    these formulations a little bit slippery, as Your Honor

19    appreciates, and may --

20         THE COURT:  I don't think they are.  I think it has to

21    be clear.  I mean, you could, conceivably, although I think

22    it's probably, well, I don't know.  Maybe it isn't conceivable.

23    I guess you could assert a claim for anticipatory breach and

24    breach, but I think --

25         MR. MAYER:  Oh, no.  Yes.  That's not what I'm in any

30

1    way hesitant about.

2         THE COURT:  All right.

3         MR. MAYER:  That's --

4         THE COURT:  All right.

5         MR. MAYER:  That's absolutely right.  We're not doing

6    that.

7         THE COURT:  Okay.

8         MR. MEISLER:  Your Honor, to me it's crystal clear, so

9    for purposes of facilitating the dialogue between me and Mr.

10   Mayer, in particular, I just want to at least be clear on my

11   understanding, which is I had understood their papers to say

12   because of the bad faith that took place pre June 1st the clear

13   and unambiguous language of paragraph 11 of the terms and

14   conditions, which is the termination for convenience clause, is

15   not enforceable or is rendered null and void.  To be clear,

16   that argument, the bad faith argument, to me I actually thought

17   that was the claim that they were asserting that occurred, if

18   you will, post June 1.

19        THE COURT:  Delphi's alleged bad faith before the bar

20   date would not be a basis for this claim.

21        MR. MEISLER:  Terrific.  Thank you, Your Honor.

22        THE COURT:  I would not be a separate basis for the

23   claim.  That's, I think, different than saying that you can

24   look at Delphi's conduct, generally, to see whether there was a

25   breach post bar date.

31

1       MR. MAYER:  I mean, I don't -- and, again, I'm not --

2   I'm hesitating just to try to think about what Your Honor is

3   saying.  I don't disagree with that.

4       THE COURT:  You don't have a bad faith claim based

5   upon their whatever, you know, breach of duty of good faith and

6   fair dealing claim, for example, based on pre bar date

7   activity.

8       MR. MAYER:  Yes.  I think that is right.

9       THE COURT:  Okay.

10      MR. MEISLER:  Thank you, Your Honor.

11      MR. MAYER:  That's right.  I mean, cocounsel, I think,

12  perhaps, addressed this, and she's waving her hand at me if

13  Your Honor would please to hear from here.

14      THE COURT:  Okay.

15      MS. WALSH:  May I address the Court, Your Honor?

16      THE COURT:  Yes, but you should at least stand by that

17  microphone so you can be picked up?

18      MR. MAYER:  Do you want to do it there or over here?

19  It's up to you.

20      THE COURT:  Wherever you're comfortable.

21      MS. WALSH:  I guess I'm a little confused, Your Honor,

22  and thank you for permitting me to speak today.  Certainly

23  Delphi's bad faith during contract negotiations is the basis

24  for our counterclaim.  The important --

25      THE COURT:  No, it isn't.  It's not the -- that's what

32

1    we've just gone through.

2         MS. WALSH:  I know.

3         THE COURT:  It may be relevant to whether there was a

4    post bar date breach, but it's not --

5         MS. WALSH:  Okay.

6         THE COURT: -- the basis that gives rise to a claim.

7         MS. WALSH:  We are not bringing a claim for Delphi's

8    bad faith, just so I can clarify that.

9         THE COURT:  Okay.

10        MS. WALSH:  But the basis for -- Delphi's bad faith,

11   and the judge in Michigan certainly acknowledged this and

12   recognized this, Delphi's bad faith --

13        MR. MEISLER:  Your Honor, I object to that

14   characterization.

15        THE COURT:  I think -- let me anticipate what you're

16   trying to say, which is that you may assert as a response to

17   Delphi's argument that we had a perfect right to terminate the

18   contract.  Some sort of pre bar date fact, as long as that pre

19   bar date fact does not, in and of itself, give rise to a

20   separate claim.

21        MS. WALSH:  Yes.

22        THE COURT:  Okay.  I.e., the only claim you're

23   asserting is a post bar date breach.

24        MS. WALSH:  Yes.

25        THE COURT:  Okay.  All right.

33

1          MS. WALSH:  Thank you.

2          MR. MAYER:  Good.  We appreciate the clarification.

3          THE COURT:  Okay.

4          MR. MAYER:  All right.

5          THE COURT:  All right.  So that leaves, then, I think,

6    the issue of the pre June period for the patent claim and

7    whether that claim is barred by the bar provisions of the order

8    and the plan and then the forum issue on the contract claim.

9          MR. MAYER:  Okay.

10          THE COURT:  So you can argue those however you wish.

11          MR. MAYER:  Yes.  Good question.

12          THE COURT:  Or in what order you wish.

13          MR. MAYER:  Because, frankly, the parties, as I think

14    the Court saw, the parties didn't particularly focus on the

15    patent pre June claim to the extent it is an independent claim,

16    and I, I guess, my own perspective on that, respectfully, is

17    that that is an issue, the issue, if you will, of apportionment

18    or division or whatever one wants to call it with respect to

19    the infringement that is asserted, that that's an issue that, I

20    think, inevitably requires some substantial examination of the

21    law, patent law that is to say, the law relevant to the merits,

22    as well as the conduct, or the alleged conduct, that relates to

23    the acts of infringement.  And I would suggest that that's best

24    addressed by that forum which is dealing with the merits.

25          THE COURT:  But, I guess, the point is, though, that

34

1       why should DPH have to participate in that litigation on that

2       issue if it's barred?  Why should they even --

3               MR. MAYER:  Well, that's a fair question.  I mean,

4       they're there now --

5               THE COURT:  No, I know.

6               MR. MAYER: -- in that action.

7               THE COURT:  But you would have to spend some amount of

8       lawyer and judge time apportioning --

9               MR. MAYER:  Yes.

10              THE COURT: -- pre June and post June --

11              MR. MAYER:  Yes.

12              THE COURT: -- and if it's barred then no one would

13      have to do that.  If it's time barred.

14              MR. MAYER:  If --

15              THE COURT:  If the claim was late on that issue.

16              MR. MAYER:  But, Your Honor, my understanding is that

17      the debtors have conceded that with respect to the post June 1,

18      as I think this is where we started your set of questions, with

19      respect to the post June 1 that that's outside of the time bar.

20              THE COURT:  Oh, I know.  I understand.  So we're just

21      talking about that pre June 1 period.

22              MR. MAYER:  Right.  And my point --

23              THE COURT:  Do the debtors oppose that also being

24      adjudicated or are you relying on the bar date to bar the

25      adjudication of that --

35

1        MR. MEISLER:  Your Honor, we're relying on the bar

2   date to bar the adjudication of pre June --

3        MR. MAYER:  Sure.  No, that's -- and I didn't think

4   that they were not.

5        THE COURT:  Okay.

6        MR. MAYER:  My point is, Your Honor, that in order to

7   think specifically about the pre June 1 patent claim, that that

8   is a determination that requires delving into the merits of the

9   claim, and that it would be best done by the forum which is

10  going to --

11       THE COURT:  Oh, no.  The forum is --

12       MR. MAYER:  -- deal with the merits of the claim.

13       THE COURT:  If I determine that your claim is timely

14  or should be deemed timely then, clearly, the forum would

15  handle it.  I don't have any problem with that.  I'm now

16  talking just about the allowance issue.

17       MR. MAYER:  Okay.  Look, I mean, we can go through the

18  various points that we've made in our papers with respect to

19  the terms of the plan and the conduct of litigation and all

20  that.  That certainly applies to the patent litigation as well

21  as to the contract litigation.

22       THE COURT:  Okay.

23       MR. MAYER:  That's fine.  I don't think I need to go

24  over all that in detail for the Court.  I can to the extent you

25  want.  I mean, we think the same plan provisions that we cited

36

1    would say that there's been an agreed alternative resolution

2    process, would also determine the allowability, or the

3    allowance, I should say, of the pre June 1 patent infringement.

4         THE COURT:  Okay.  On the patent side I haven't seen

5    anything in the record to suggest that the debtors -- well, let

6    me -- as far as the patent claim is concerned, are you alleging

7    that debtors waived the issue of the bar date?

8         MR. MAYER:  Well, to a degree, yes, in the sense that

9    the structure that we argue is in the plan is a structure that

10   permits people to go off and litigate in a forum other than

11   this court to reach an allowance of a claim.  And, necessarily,

12   any allowance of any claim involves, among other things, its

13   timeliness.

14        THE COURT:  Okay.  But beyond that plan reading --

15        MR. MAYER:  Yes.

16        THE COURT: -- of the term allowed claim --

17        MR. MAYER:  Yes.

18        THE COURT: -- was there any conduct by Delphi in the

19   Michigan patent litigation that would indicate that, you know,

20   basically Delphi said to you all we're dealing with this here.

21        MR. MAYER:  Well, sure.  I mean, we --

22        THE COURT:  We're negotiating this --

23        MR. MAYER:  I'm sorry.  You were going to --

24        THE COURT:  We're, you know, let's negotiate this out

25   and --

37

1          MR. MAYER:  I don't know about negotiating it out,

2      Your Honor.

3          THE COURT:  Okay.

4          MR. MAYER:  That I have no knowledge of --

5          THE COURT:  Okay.

6          MR. MAYER: -- in any event.  But, certainly, as Your

7      Honor is aware from papers and the exhibits, a patent suit was

8      brought by Methode in the Northern District of Illinois against

9      Delphi.  Not the buyer, which didn't exist at that time.

10     Delphi did not seek to bring the claim here.  Delphi, at no

11     time, has even made the kind of motion that it made on the

12     contract side to say that the claim should come here, in which

13     papers in Michigan Delphi also suggested, for the first time,

14     that there was a time bar on the contract side.  There's never

15     been anything like that.  The patent case is, as I understand

16     it, continuing forward as to everybody, that is to say not just

17     the buyer and not just Marion, the third party, and Methode,

18     but also as to Delphi.  I think that there has been continuing

19     discovery in those kinds of events and probably happening

20     today.

21         THE COURT:  Okay.

22         MR. MAYER:  So at all points in time that's been the

23     case.

24         MR. MEISLER:  Your Honor, that's just that's not the

25     case.

38

1          THE COURT:  But isn't -- but isn't --

2          MR. MAYER:  Well, that's fine.  I don't want -- I'm

3     not trying to testify from the podium, and all I can speak to

4     is what we've put in the record, which I think is in the Walsh

5     declaration that the Court has with respect to that.

6          THE COURT:  Okay.  But isn't, I mean, consistent with

7     how we began this hearing, isn't that all understandable in

8     light of the fact that the patent litigation asserts ongoing --

9          MR. MAYER:  Yes.

10         THE COURT: -- including post bar date --

11         MR. MAYER:  Yes.

12         THE COURT: -- activity?

13         MR. MAYER:  You could say gee, everybody really means

14    that that only pertains to the post June 1 conduct.

15         THE COURT:  Right.

16         MR. MAYER:  Of course, nobody's ever said that.

17    That's not the reality of what's been said, and I think if

18    somebody has said that then I'm sure we'll hear about it

19    shortly.  But to my understanding, and based on what we've put

20    into the record, there's been nothing like that.  One could

21    interpret the record in that fashion, but I don't think it's a

22    reasonable interpretation, frankly.

23         THE COURT:  Okay.

24         MR. MAYER:  Okay.

25         THE COURT:  Okay.

39

1          MR. MEISLER:  Your Honor, for clarification, in

2     connection with the patent litigation there was no inducement

3     whatsoever or encouragement whatsoever that Methode refrained

4     from filing a claim in the bankruptcy case.  That did not

5     occur.  They were suing us for patent infringement.  It was the

6     beginning.  The case is in its infancy, and, so, all that's

7     really happened in that patent case is there's been some

8     discovery that's commenced.

9          THE COURT:  Okay.

10          MR. MAYER:  I mean, counsel can have time to say

11     whatever he wants.  I guess, again, I could dilate on the

12     details of what was done in the patent case.  I'm not

13     suggesting that anybody ever said one way or the other

14     definitively, in words of one syllable, that this either does

15     or does not pertain to both pre June 1 and post June 1

16     infringement.  I, frankly, have not combed the record for that

17     purpose, but I'm not aware of any statement one way or the

18     other on that subject.

19          THE COURT:  Okay.

20          MR. MAYER:  Okay.  So I think, then, the Court

21     understands, based on the papers, our argument from the plan

22     provisions, our argument that the litigation conduct is

23     certainly entirely consistent with the notion that everything

24     is at issue pre June 1, post June 1.  And to the extent the

25     Court doesn't believe that there was a lack of a need for a

40

1    timely claim with respect to the pre June 1 because of those

2    reasons then we can talk about 503(a), and to the extent the

3    Court thinks it's relevant, as well, the excusable neglect rule

4    as applicable to the patent case, again, I think, the

5    considerations on that front are laid out in the papers and are

6    relatively straightforward in the sense that what you have,

7    really, is continuing -- as to the patent claim we say a

8    continuing course of conduct started with events pre June 1.

9    Started with, in fact, this lawsuit by Delphi to obtain certain

10   drawings, which, as I understand it, and I just got involved

11   with this very recently, and I'm no patent lawyer, but as I

12   understand it all of that related to, and I think there's

13   record evidence about this in the Walsh declaration related to

14   a desire to move forward with resourcing or insourcing the

15   relevant designs.  And I think, in other words, that it's

16   highly germane to the dispute over who has a patent and who's

17   infringing on what, if anybody.

18        So that all began with Delphi's own choice of bringing

19   a suit in Michigan in order to obtain those drawings and that

20   going forward from there you're talking about the litigation

21   that we just alluded to, in which everybody has been proceeding

22   full speed ahead on the premise that there's no need to peel

23   off some stub for the pre June 1 period, and everybody's been

24   acting on the notion that it's all one ball of wax.

25        THE COURT:  Well, I guess that's the question I have.

41

1     How did that lead to the proof of claim being filed when it was

2     filed?  I mean, even though people have been acting like it was

3     one ball of wax, Methode, for some reason, filed a proof of

4     claim anyway.

5            MR. MAYER:  That's true.

6            THE COURT:  I guess the problem I'm having here is

7     even if you apply a for cause standard that doesn't take into

8     account the Pioneer excusable neglect analysis, what's the

9     cause?  I mean, what was different in November that didn't

10    exist in July as far as filing the claim?

11           MR. MAYER:  Well, I guess, here's where there is a

12    certain amount of intertwining.  I mean, just to go back to

13    what I said before, the whole litigation extravaganza began

14    with a lawsuit to get drawings, and that's not about breaches

15    of contract, per se, by Delphi.  My point is there's -- when

16    the contract was terminated, okay, and then there's an effort

17    to go an insource the parts, we're talking about a significant

18    overlap and intertwining of the conduct that's relevant on the

19    patent side and the conduct that's relevant on the contract

20    side.

21           So, obviously, the operative event here that's

22    relevant is Delphi saying we're out of here.  We're terminating

23    the contract formally, definitively.  We're not going to order

24    any more parts from you.  We're done in August.  And why were

25    they doing that?  Well, they're doing that because, obviously,

42

1    they're dealing with Marion or they're dealing with other

2    people to either make themselves or to procure the parts in

3    some other way, which gives rise to the patent issues as well.

4            So my point is that they're --

5            THE COURT:  But when you say --

6            MR. MAYER:  -- intertwined --

7            THE COURT:  When you say August --

8            MR. MAYER:  Excuse me.

9            THE COURT: -- you mean August of what year?

10           MR. MAYER:  August of 2009.

11           THE COURT:  But the patent action was filed in April

12   of 2009.

13           MR. MAYER:  Yes.

14           THE COURT:  So that can't be right.

15           MR. MAYER:  I'm sorry.  Can't be right that --

16           THE COURT:  It can't be right that a breach in August

17   of 2009 is really the precipitating event of the patent claim,

18   when the patent claim was filed three months before.

19           MR. MAYER:  I thought Your Honor was asking -- I may

20   have misunderstood Your Honor's question.  I thought Your Honor

21   was asking why was the proof of claim filed when it was filed.

22   I thought that was the question.

23           THE COURT:  Okay.

24           MR. MAYER:  And that's --

25           THE COURT:  Yes.  Oh, I see.

43

1        MR. MAYER: -- what I was attempting to answer without

2    being the lawyer who filed it or --

3        THE COURT:  Oh, I see.  What you're saying is that it

4    was the termination of the contract that precipitated the

5    filing of proof of claim?

6        MR. MAYER:  I mean, that was the event in the world

7    that changed things in a decisive way, as we've already talked

8    about.

9        THE COURT:  But why -- what is -- well, how is --

10       MR. MAYER:  At that point they're not ordering from us

11   anymore.  They're off doing what they're doing.  And that's

12   what is also implicated on the patent side.

13       Again, my personal view, Your Honor, is this gets very

14   much to -- for me to give you a crisper and more effective

15   answer gets very much into the merits of all this patent issue.

16       THE COURT:  No, but, again, the issue I have is what

17   is the cause to relieve Methode of not having to have filed in

18   July as opposed to in November?

19       MR. MAYER:  I guess, my bottom line is it's a

20   continuous course of infringement, a continuous course of

21   litigation about infringement.  And that's putting to one side

22   the plan framework, which even if the Court were to find no,

23   no, you're misreading the plan, you're wrong, there's not this

24   alternative route, it's still, even if not fully operative,

25   something that could be taken into consideration in thinking

44

1    about whether there's cause or not, the notion that there was

2    an alternate route and that everybody was following it.

3            THE COURT:  I don't see any suggestion in the record

4    that someone actually looked at the plan and said oh, no, I

5    don't have to file a proof of claim for an admin expense

6    because the plan says that the parties can choose their forum.

7    There's nothing in the record that suggests that, right?

8            MR. MAYER:  I do not know of anything in the record

9    that suggests that.

10           THE COURT:  All right.

11           MR. MAYER:  That is right.

12           THE COURT:  Okay.  So, again, I'm still having a hard

13   time seeing what was the cause for the delay.  I understand

14   now, and I understand your answer now, that the precipitating

15   event may have been a breach, a termination, an actual

16   termination as opposed to an anticipatory termination, although

17   the claim didn't say the actual termination.  It attached the

18   complaint.  But I guess I don't understand, given that the

19   claim attached the complaint, a complaint had been prepared,

20   why that didn't, you know, why the bar date notice didn't set

21   off the light bulb then?

22           MR. MAYER:  You know, I hear Your Honor's point.  I

23   just -- I can only stand on what it said.

24           THE COURT:  Okay.  All right.

25           MR. MAYER:  Okay.  Let's see if there's anything else

45

1      on this before we talk about forum a little bit.

2              THE COURT:  That's fine.  On the contract claim.

3              MR. MAYER:  Yes.  I mean, on the --

4              THE COURT:  Tell me first, what has happened in the

5      state court litigation so far?  Working backwards, I know that

6      there has been litigation in the state court over whether the

7      plan injunction applies.

8              MR. MAYER:  Yes.

9              THE COURT:  But what has happened in the underlying

10     case besides that?

11             MR. MAYER:  Well, I can tell you a little bit.  Ms.

12     Walsh can tell you a lot more if you want to know details.

13             THE COURT:  Either one.  I just, we didn't, sort of

14     know the status of the case.  How familiar has the judge become

15     with the facts and --

16             MR. MAYER:  I'd let Ms. Walsh address that.  I think

17     the judge is familiar, because there was preliminary injunction

18     practice with evidence, but she can explain it better.

19             THE COURT:  Okay.

20             MS. WALSH:  Thank you, Your Honor.  We, in fact, have

21     spent a significant amount of time in Michigan State Court in

22     Oakland County.  Both sides have produced thousands of,

23     probably hundreds of thousands of pages of documents.  We have

24     had a trial date set three times, the most recent of which was

25     the matter is set for trial in July of 2010, but we had two

46

1    prior trial dates.  This is the rocket docket, so the case

2    moves very quickly.  We've had two motions for preliminary

3    injunction heavily briefed and argued.  We've had briefing and

4    oral argument --

5              THE COURT:  I'm sorry?  Two motions.

6              MS. WALSH:  Delphi moved for a preliminary injunction

7    and we moved for a preliminary injunction or a TRO.

8              THE COURT:  But your motion, then, was on the merits,

9    right, to stop on a breach?

10             MS. WALSH:  Right.

11             THE COURT:  Okay.

12             MS. WALSH:  And they moved to --

13             THE COURT:  Enforce --

14             MS. WALSH:  -- require us to turn over the --

15             THE COURT:  -- the plan order.

16             MS. WALSH:  -- Tulane (ph.) drawings.

17             THE COURT:  Oh, okay.

18             MS. WALSH:  Which the Court denied.

19             THE COURT:  All right.

20             MS. WALSH:  So we've had extensive written discovery.

21   Interrogatories, requests for production, requests to admit.

22   We've had our oral argument about a protective order.  We have

23   probably been in front of the Court at least ten times.  She is

24   intimately familiar with the facts.  We have probably spent no

25   less than probably ten hours or eleven hours, twelve, something

47

1    like that, with her law clerk arguing all these motions, and,

2    then, time in front of the Court ultimately arguing all of

3    these motions.  So we have had frequent visits to Detroit in

4    front of the Court.  She's intimately familiar with the facts.

5    And I would point out that Oakland County, Michigan is the

6    jurisdiction in the United States in which almost all

7    automotive contractual disputes are decided and determined.

8    That courthouse is very familiar with automotive litigations.

9    Most OEMs have a choice of venue provision, as did Delphi,

10   which required suit to be brought in Oakland County, Michigan

11   or in federal court in Michigan.  So Detroit, Oakland County,

12   the federal court in Michigan, is uniquely suited to hear

13   contract disputes.

14          This matter also gets into questions of just-in-time

15   manufacturing, automotive supply contracts, all those types of

16   things that in some ways are unique to the auto industry,

17   which, of course, is particularly suited to be heard in Oakland

18   County, Michigan.

19          THE COURT:  Has -- I --

20          MS. WALSH:  So, yes, Your Honor, we have spent a lot

21   of time in Oakland, because we were moving towards trial at the

22   time that Delphi raised this motion.

23          THE COURT:  I'm -- maybe I didn't hear you.  Is

24   there -- has discovery been completed at this point?

25          MS. WALSH:  No, Your Honor, it has not been completed.

48

1    Delphi filed -- after the first bar date and after the plan

2    confirmation date, had filed a motion to compel against us, and

3    we had filed one against them.  So we were in discovery

4    disputes, but it is -- discovery was not closed.

5         THE COURT:  So when -- is there a discovery cutoff

6    date in the case?

7         MS. WALSH:  There -- I believe so, and I think it's

8    probably past now since we spent -- we've been arguing this

9    bankruptcy issue since December 4th of '09.  But I'm sorry,

10   Your Honor, I don't know that date off the top of my head.  I

11   do know we had a July 2010 trial date.  We had previously had a

12   November 2009 trial date and one somewhere in the middle.

13        So we have spent a lot of time in Michigan.  And the

14   judge is intimately familiar with the facts, and every time we

15   go before her she says I know what you're talking about, you've

16   explained it to me before, let's cut to the chase.  So she's

17   certainly familiar with it.

18        Discovery closes March 23rd of 2010, but it's been

19   stayed.  She stayed the matter.  She said until this Court

20   permits her --

21        THE COURT:  And when was that stay issued?

22        MS. WALSH:  December was the ruling.  January.

23        MR. MAYER:  Yeah, January of this year, Your Honor.

24        THE COURT:  All right.

25        MS. WALSH:  We needed a clarification of the order.

VERITEXT REPORTING COMPANY

212-267-6868                                   516-608-2400

49

1    She ruled on the motion in February of 2010.  We went back in

2    to just clarify that it wasn't an outright dismissal, Delphi

3    stipulated to that, and we presented a stipulation to the Court

4    that the case is not dismissed, it is just stayed --

5            THE COURT:  Okay.

6            MS. WALSH:  -- and that was on March 17th of 2010.

7            THE COURT:  Okay.

8            MR. MAYER:  Yes, Your Honor, I'm sorry, I did

9    misspeak.  It was indeed in February.  That's in the Walsh

10   declaration.

11           THE COURT:  Okay.

12           MR. MAYER:  I don't know if the Court has any more

13   questions about the specifics.  I just would just kind of go

14   back --

15           THE COURT:  Yeah, that's helpful, thank you.

16           MR. MAYER:  -- go back to first principles here with

17   respect to forum, that what everyone may think about the

18   argument that the plan provisions excuse from a time bar, the

19   plan provisions I think strongly support the notion that the

20   forum doesn't have to be this court if the parties choose

21   otherwise.  And there is a forum selection clause here which,

22   as the Court has seen from the briefing, has been heavily

23   relied upon by Delphi for Michigan to be the appropriate forum.

24           THE COURT:  I'm sorry, Delphi --

25           MR. MAYER:  Delphi has invoked the forum selection

50

1    clause, because you'll recall first of all, as I mentioned,

2    Delphi sued in Michigan --

3         THE COURT:  Right.

4         MR. MAYER:  -- on the contract side.  On the patent

5    side, which I think is nonetheless relevant here because it

6    shows what Delphi thinks about the clause, they actually made a

7    motion to transfer from the Northern District of Illinois

8    Federal Court the patent case, and insisted that this is a

9    Michigan-based dispute that belongs in Michigan, and the forum

10   selection clause, which is, they say and was accepted by the

11   federal judge in Chicago, exclusively Michigan jurisdiction to

12   hear disputes under the contract, that that should be applied.

13   It was applied so that that the patent case was transferred on

14   that basis.

15        So I would -- again, I would invoke the forum

16   selection clause, which I think is fully operative, as a

17   critical reason why the case belongs in Michigan, even if the

18   judge weren't as familiar as she is with it and as much hadn't

19   gone on as has gone on.

20        THE COURT:  Okay.

21        All right.  Do you have anything more to say on that

22   issue, then?

23        MR. MAYER:  I don't think so, Your Honor.  You

24   understand --

25        THE COURT:  You may after you hear Mr. Meisler.

51

1          MR. MAYER:  No, you understand the --

2          THE COURT:  Okay.

3          MR. MAYER:  -- the contentions.  Thank you.

4          THE COURT:  Okay.

5          MR. MEISLER:  Your Honor, with respect to the forum

6    selection clause, which is where I'll start, Your Honor, I

7    think the case law actually is pretty clear that there's a

8    policy argument that Courts wants to centralize especially core

9    matters in a bankruptcy court.  And --

10         THE COURT:  I understand that, but on the other hand

11   the lawsuit started in Michigan.

12         MR. MEISLER:  That's true, Your Honor, and it --

13         THE COURT:  There was the cross-claim -- I mean the

14   counterclaim, excuse me.

15         MR. MEISLER:  That's correct.  And at the time that

16   the suit started, as you will recall, and it was unfortunate,

17   but we were stuck in the Chapter 11; we didn't know at what

18   point we were going to emerge from Chapter 11.  And it was a

19   post-petition issue.  And I think on that point the law is also

20   clear that with respect to post-petition issues it is

21   appropriate to file those actions in a local court as opposed

22   to bringing those breach-of-contract issues into the bankruptcy

23   court.

24         THE COURT:  Right.

25         MR. MEISLER:  And so yes, Your Honor, we did file the

52

1    action in -- the contract-related action in the state court of

2    Michigan.

3            THE COURT:  I guess my -- where I'm leaning on this is

4    that, leaving aside the plan provision, given the status of the

5    litigation, how it commenced and how it's proceeded, shouldn't

6    I just lift the injunction?  I mean, at this point you have a

7    court that's relatively familiar with the matter; the parties

8    have been litigating there for quite a while.  The claim has to

9    be liquidated one way or the other.  I just don't see

10   particularly why, you know, we should start from scratch here.

11   We wouldn't start from scratch, obviously, because you would

12   have the discovery that you have.  But on the other hand,

13   what's to be served by moving it?

14           MR. MEISLER:  Your Honor, I think you raise a very

15   interesting question, and I think there's really two points of

16   distinction.  The first point of distinction is that what's

17   been litigated is the anticipatory breach claim.  That claim, I

18   think, Your Honor, you'll find that that's barred, that's pre-

19   June 1 conduct.

20           THE COURT:  Okay.

21           MR. MEISLER:  And so while the judge in the state

22   court of Michigan may be familiar with certain of the facts,

23   she has been focusing on anticipatory breach.

24           THE COURT:  Well, I understand that, but on the other

25   hand it seemed to me the best argument you had for keeping --

53

1    for -- not keeping -- for moving the claim dispute here is that

2    it involves the interpretation of my own orders.

3            MR. MEISLER:  That's correct, Your Honor.

4            THE COURT:  But I think we just cleared that away at

5    the start of the hearing.  And so, you know, I guess you still

6    have your issues in the -- that aren't claim issues, and you

7    have your objection to their breach claim.  They're pretty

8    closely entwined.  I understand that under the Second Circuit

9    law the admin claim is a core issue, but it's entwined with

10   your issue, which he's already heard preliminary injunction

11   issues on.  It just -- I -- given that we've cleared away the

12   underbrush of my orders, I'm just grasping at why -- or

13   wondering why -- you know, what the point of bringing it here

14   is at this point.

15           MR. MEISLER:  And I understand, Your Honor.  I think

16   what you'll find, however, is that there has been discovery

17   done.  That discovery was done late in the process; in fact,

18   that was done after Delphi emerged from Chapter 11.  Over

19   100,000 pages of documents were produced.  But it's all related

20   to this pre-June 1 conduct.  And, Your Honor, I think that this

21   Court is equally familiar, if not more familiar, with Delphi's

22   terms and conditions.  And the gist of their argument is that

23   those terms and conditions, paragraph 11, doesn't apply because

24   Delphi entered into the contract in bad faith.  Well, that

25   whole bad-faith argument, which is largely what the discovery

54

1    was based upon, is no longer appropriate to the adjudication of

2    the breach claim.

3          THE COURT:  Okay.  I mean, if this were a simple lift-

4    stay matter, though, wouldn't Sonnax say you lift the stay?

5          MR. MEISLER:  Your Honor, I don't think they would

6    satisfy the Sonnax factors.  I think that what has gone on in

7    the state court is largely discovery disputes, and I think that

8    this Court has similar familiarity with the terms and

9    conditions with Delphi --

10         THE COURT:  Is there even an objection to their claim

11   here pending?

12         MR. MEISLER:  There is, Your Honor.

13         THE COURT:  Other than on timeliness?

14         MR. MEISLER:  There is, Your Honor.

15         THE COURT:  I guess that's right. It did -- in the

16   omnibus objection, it did raise that.

17         MR. MEISLER:  That's correct, and we reserved on the

18   merits.

19         THE COURT:  Right.  Well, I did not get a sense --

20   maybe I'm missing this -- that Methode is contending at this

21   point that DPH is forum shopping.  Is -- I mean, I didn't get

22   the -- you haven't alleged, for example, that something bad has

23   happened for DPH in the Michigan action and therefore they've

24   changed their mind about where they want -- I didn't see that

25   as a suggestion.

55

1      MR. MAYER:  Your Honor, it is correct that we did not

2  identify a precipitating event in terms of a forum change,

3  other than debtors' obvious desire, as we would --

4      THE COURT:  Right.

5      MR. MAYER:  -- always be happy to be in front of an

6  intelligent jurist here.  But --

7      THE COURT:  No, but I think -- I mean, I think --

8  again, as I read their objection to your motion, a significant

9  part of it was bound up in the notion that they thought you

10 were trying to sidestep the bar date issue by arguing that this

11 litigation's fine to go ahead in Michigan and that I would --

12 I'm uniquely situated to interpret my own orders on that.  But

13 I think we dealt with that issue.

14     MR. MAYER:  Yeah, your orders are essentially out of

15 the case, I think --

16     THE COURT:  Yeah.

17     MR. MAYER:  -- so to speak.

18     THE COURT:  Okay.

19     MR. MAYER:  That's my understanding.

20     THE COURT:  Well, because they control.

21     MR. MAYER:  Right.

22     THE COURT:  Right.

23     MR. MAYER:  In other words, it's not a dispute that we

24 have to --

25     THE COURT:  Right.

56

1          MR. MAYER:  -- bring to you on that subject.

2          THE COURT:  Okay.

3          MR. MEISLER:  And, Your Honor, I do have some concern

4     as to the application or interpretation of your orders as to

5     the facts that are going to be at issue in these claims.

6          THE COURT:  Well, but, again, then you can come back

7     to me.  If someone's violating my order and the stipulation

8     that was set forth out on the record today, then that's easy

9     enough to remedy, I think.

10         MR. MEISLER:  Although I don't think it'll be as

11    crystal clear as a violation of the order.  I think it's going

12    to be --

13         THE COURT:  Well, but there's --

14         MR. MEISLER:  -- interpretation.

15         THE COURT:  -- judicial estoppel.

16         MR. MEISLER:  Your Honor, I agree.  I think it's more

17    efficient to handle it here in this court.  With our claims

18    procedures, we can be --

19         THE COURT:  Well, let me ask you that.  Why is that

20    the case?  I guess that's the last issue I'd want to decide

21    here.  Why isn't it more efficient to handle it in Michigan

22    given that the parties are there, that you have your own claim,

23    which is the precipitating claim?

24         MR. MEISLER:  Your Honor, in fact, the claim for

25    breach hasn't even been filed in the state court of Michigan.

VERITEXT REPORTING COMPANY

212-267-6868                                              516-608-2400

57

1          THE COURT:  Well -- but we'd be bringing back your --

2     is it -- here's a question for you, I guess:  Is it a

3     compulsory counterclaim, under Michigan procedure, to their

4     claim?

5          MR. MAYER:  Your Honor, we think it's either compul --

6     we're not Michigan lawyers.  We think it's either compulsory or

7     the next closest thing to it in a state that may not have the

8     same rules about compulsory counterclaims as the Federal Rules.

9     We certainly think we have no choice but to bring it.  And

10    it's, you know, the same set of facts in terms of, kind of, a

11    common nucleus, that sort of analysis in terms of compulsory

12    counterclaim.

13         MR. MEISLER:  Your Honor, I dispute that.  While I'm

14    by no means an expert in compulsory counterclaim, but the

15    action that we filed was a breach of contract because they

16    didn't turn over the drawings.  So I'm not seeing how this is a

17    compulsory counterclaim.

18         THE COURT:  Well, I guess it's tied to your right to

19    terminate and your rights once you terminate.

20         MR. MEISLER:  Those are counterclaims that were filed

21    against our action for turnover.

22         THE COURT:  No, I understand that what we're talking

23    about is a to-be-filed counterclaim --

24         MR. MEISLER:  Correct, Your Honor.

25         THE COURT:  -- to your action.

58

1          MR. MEISLER:  Correct, Your Honor.  In addition, Your

2     Honor, we have procedures in these cases where within sixty-

3     five days we can adjudicate -- we can go from beginning to end

4     of a claim.  We've already been in the state court of Michigan

5     for months, and we just finished the discovery process.

6          THE COURT:  Well, I guess that's the other que -- what

7     is the -- I mean, what is the reserve for this claim?

8          MR. MEISLER:  Your Honor, there is no reserve for this

9     claim.

10          THE COURT:  There is no reserve.  I mean, is it still

11     a forty million dollar claim?  I mean --

12          MR. MAYER:  It's -- yeah, I'm not prepared to say

13     that, Your Honor.

14          THE COURT:  Okay.

15          MR. MAYER:  Just some unliquidated number at this

16     point in time.

17          THE COURT:  I mean, in a way, the -- because there's

18     no reserve, the timeliness issue is more their problem than

19     yours.

20          MR. MEISLER:  That's correct, Your Honor.  And let me

21     clarify for a moment.  We have reserved approximately 700,000

22     dollars for the termination for --

23          THE COURT:  Well, that's why I was asking about the

24     forty million versus the --

25          MR. MEISLER:  Yes.

59

1          THE COURT:  Because I know you reserved around 700 --

2          MR. MEISLER:  And we're prepared, and Methode knows

3    this, but we're prepared to settle that claim.  We do

4    acknowledge that there is a claim for --

5          THE COURT:  Termination.

6          MR. MEISLER:  -- termination for convenience.

7          THE COURT:  Right.

8          MR. MEISLER:  But what we have reserved is something

9    between 600,000 and 750,000 dollars, nothing near that 40

10   million dollar figure.

11         THE COURT:  Well, it seems to me that this litigation

12   in Michigan right now is going to proceed only on your claim,

13   because there really isn't any other claim at this point.  So I

14   guess you could initiate -- or pursue the claim objection here.

15   But it seems to me that if they amend their claim, it probably

16   makes sense to have the whole thing continue in Michigan.  It

17   seems to me there will probably be some common issues.  And

18   unless you're going to move your litigation here, which

19   doesn't -- which I don't think you're seeking to do --

20         MR. MEISLER:  Your Honor, I would confer with my

21   client, but we would be willing to withdraw our litigation,

22   withdraw our complaint, so that we don't even have to deal with

23   our issues.

24         THE COURT:  All right.

25         MR. MEISLER:  At this point --

60

1          THE COURT:  Well, look --

2          MR. MEISLER:  -- we no longer need those drawings.

3          THE COURT:  -- as far as this matter before me is

4    concerned, on the contract claim, it seems to me that, despite

5    the hour we spent on this, that it's really premature for me to

6    rule on this motion since the claim we're talking about now

7    isn't the claim that would be in the litigation.

8          MR. MAYER:  I mean, the difficulty with that, Your

9    Honor, of course is --

10         THE COURT:  You would want relief from the injunction

11   to file a claim.

12         MR. MAYER:  -- we can't do anything, yeah.

13         THE COURT:  Well --

14         MR. MEISLER:  And, Your Honor --

15         THE COURT:  -- you could ask for permission to file

16   that claim, I guess.  It's what we're talking about.

17         MR. MAYER:  Okay.

18         THE COURT:  And maybe in that context, DPH can rethink

19   its position as to whether, now that the record is clear as to

20   what that claim is, whether it really wants to fight having the

21   injunction being lifted.

22         MR. MAYER:  Certainly I would ask the Court for

23   permission.  We would --

24         THE COURT:  All right.

25         MR. MAYER:  -- in fact, file it pretty promptly.  I

61

1    think it's --

2         THE COURT:  All right, I think that's how we should

3    deal with it.

4         MR. MAYER:  -- pretty close to being ready.

5         THE COURT:  I mean, you could certainly tell where I'm

6    leaning.  And it's not based on an interpretation of the plan;

7    it's really based on what I would apply by analogy, which is

8    the Sonnax factors as applied to this stay in the plan

9    confirmation order and in particular my sense, particularly

10   after the injunction litigation, that the state court is very

11   familiar with your claims and Methode's defenses to them, and

12   that that's the main action in this litigation, and that this

13   breach claim is kind of an add-on -- in fact, it's not even

14   added on yet -- and that rather than have the breach claim

15   control the litigation, the litigation's pretty much controlled

16   by what the debtors initiated and which -- in what I think is

17   properly in Michigan.

18        MR. MEISLER:  Your Honor --

19        THE COURT:  But that's just a preliminary thought,

20   because, again, based upon the first half hour or so of this

21   hearing, I think the actual context of this motion no longer

22   applies, because we're really talking about a claim that isn't

23   before the Michigan Court yet, and there's not really leave to

24   file that type of claim in the Michigan Court.  I could

25   understand why I might grant such a motion, particularly if I

62

1    can see that it is like a compulsory counterclaim, or close to

2    it, under Michigan procedure, but that's all about I can do in

3    this context.

4          MR. MEISLER:  Thank you, Your Honor.  I'll be looking

5    for --

6          THE COURT:  And, you know, I think that that would be

7    a basis clearly -- if the debtor's worried about enforcing what

8    was set forth on the record at the beginning of this hearing,

9    that's clearly a basis for judicial estoppel.  I mean, I --

10   Methode prevails on its motion to let the thing go forward in

11   Michigan on the basis that we're dealing with a post-bar date

12   breach.

13         MR. MEISLER:  And, Your Honor, for clarity, I -- at

14   least my understanding of what our next steps are is that

15   counsel for Method would provide a form of complaint and

16   would -- we would either stipulate to lift the plan

17   injunction --

18         THE COURT:  Right.

19         MR. MEISLER:  -- or otherwise we'd be back before Your

20   Honor --

21         THE COURT:  Right.

22         MR. MEISLER:  -- on a motion to lift the plan

23   injunction.

24         THE COURT:  That's how I would conceive of it.

25         MR. MEISLER:  Okay.

63

1          THE COURT:  Yeah.  And, again, since the only reason I

2    would have had the litigation proceed here is because it would

3    involve my orders and the bar date and the like; and now that's

4    out, I think that you would come back to me, if somehow it

5    crept back in again, to enforce that stipulation.

6          MR. MEISLER:  Thank you, Your Honor.

7          THE COURT:  Okay.  All right, now, I still have to

8    rule on the nub or the -- or the sliver of the patent claim.

9    Do you have anything more to add on that one?

10         MR. MEISLER:  Your Honor, I don't.  I think that the

11   record is clear on the patent claim.

12         THE COURT:  Okay.

13         All right, I have before me a motion by Methode

14   Electronics, Inc. that, as relevant to this ruling, seeks a

15   determination that the objection by DPH Holdings Corporation to

16   its patent claim, on the basis that the patent claim is

17   untimely, is not valid and should be overruled.  Even that

18   aspect of the objection should be further qualified in that DPH

19   Holdings has confirmed that it is not DPH Holdings' position

20   that the ongoing patent infringement claim is barred by the

21   Court's administrative claims bar date order but rather only

22   that portion of Methode's patent claim that asserts claims that

23   arose -- or damages arising in respect of claims that arose

24   prior to June 1, 2009, which was the applicable date for the

25   claims covered by my original administrative claims bar date

64

1   order in this case.

2        The Court established an administrative claims bar

3   date order in this case requiring the filing of administrative

4   claims, with certain exceptions that do not apply here.  By

5   July 15th, 2009, the administrative claims bar date order and

6   notice were widely circulated, and Methode does not dispute

7   that it received such notice in a timely fashion that would

8   have enabled it to file an administrative claim, in respect of

9   its patent claim, before the July 15th bar date.  It was aware

10  of its patent infringement claim, because it had brought a

11  patent infringement action in April of 2009 in the Northern

12  District of Illinois.  Nevertheless, Methode did not file its

13  patent claim by the July 15th, 2009 administrative claims bar

14  date.  Rather, it did so on November 5th, 2009.

15       The courts have been clear that a bar date in a

16  Chapter 11 case is a significant event in the case.  Quote,

17  "The bar date serves the important purpose of enabling the

18  parties in interest to ascertain with reasonable promptness the

19  identity of those making claims against the estate and the

20  general amount of the claims, a necessary step in achieving the

21  goal of successful reorganization."  In re Calpine Corporation,

22  2007 U.S. Distr. LEXIS 86514, at pages 14 through 15 (S.D.N.Y

23  Nov. 21, 2007), citing First Fidelity Bank, N.A. v. Hooker

24  Investments, Inc. 937 F.2d 833, 840 (2d Cir. 1991).

25       In this case, the administrative claims bar date was

65

1   particularly significant given serious issues with regard to

2   the debtors' administrative solvency and the requirement under

3   Section 1129 of the Bankruptcy Code that a Chapter 11 plan may

4   not be confirmed unless it pays holders of allowed

5   administrative claims in full in cash, or in such other amounts

6   as they agree.

7        The Court took testimony at the confirmation hearing

8   with regard to the estimation of administrative claims and has

9   previously noted in other contexts -- I'm sorry, in regard to

10  other motions for leave to file an untimely administrative

11  claim, the importance of the bar date and the debtors'

12  husbanding of their cash in the confirmation process and also

13  the post-confirmation administration of the estate.

14       The motion contends that the plan permitted the

15  allowance of an administrative claim under alternative means

16  that could sidestep the bar date, and further asserts that the

17  debtor invoked those means by participating in the district

18  court patent litigation and having the litigation removed.

19       I've reviewed the provisions of the plan and the bar

20  date provision of the modification procedures order, and

21  conclude that the allowance provision, or the provision dealing

22  with allowed administrative claims in the plan, which permits

23  the parties to agree upon an alternative treatment of the

24  claim, does not, unless the parties affirmatively agree to such

25  alternative treatment, permit an administrative claimant to

66

1    sidestep the requirements of the bar date provisions of the

2    modification procedures order.

3            I believe that the language that the claimant here,

4    Methode, is relying upon is more properly viewed as customary

5    boilerplate language tracking Section 1129 of the Bankruptcy

6    Code's provision that lets the parties provide for less than

7    hundred percent payment of admin claims by agreement and that

8    the bar date order did not contemplate that parties to existing

9    litigation over admin claims in other forums would be excused

10   from having to file their claims by the bar date, simply

11   because the parties were pursuing that litigation together and

12   had in their post-petition documents agreed upon a forum

13   selection provision.  If that were the case, I believe it would

14   have been dealt with in the bar date order provisions itself.

15           The motion also states that the patent claim, as

16   asserted in April in the Illinois Court, should constitute an

17   informal proof of admin claim and therefore should be deemed to

18   be timely filed.  However, the requirements of an informal

19   proof of claim in the Second Circuit are fairly narrowly drawn

20   and are not satisfied here in two respects.  To qualify as an

21   informal proof of claim, a document purporting to evidence such

22   claim must have:  (1) been timely filed with the bankruptcy

23   court and have become part of the judicial record, (2) state

24   the existence and nature of the debt, (3) state the amount of

25   the claim against the estate, and (4) evidence the creditor's

67

1    intent to hold a debtor liable for the debt.  See Enron

2    Creditors Recovery Corporation, 370 B.R. 90, 99 (Bankr.

3    S.D.N.Y. 2007).  Here, the complaint in the patent litigation

4    in the district court was not filed with the bankruptcy court

5    until the November 5 proof of claim was filed, after the July

6    15th bar date, and also does not state a sum certain.

7         The first requirement is not, again, a mere procedural

8    gambit.  The requirement to have the informal proof of claim

9    filed with the bankruptcy court recognizes that bankruptcy

10   cases are collective proceedings and that parties-in-interest

11   other than the debtor, who is the party to the complaint -- to

12   the litigation, excuse me, in the patent litigation, have the

13   right to object to claims, and often do object to claims, and

14   cannot do so unless the claims are filed in the case in a way

15   that they can be made aware of.  Moreover, the existence of the

16   claim on the docket of the case also enables parties-in-

17   interest to do their own calculation and projection of what

18   potentially liable claims are.

19        Consequently, I believe that the majority view

20   requiring the claim to be filed in the -- or the document to be

21   filed in the bankruptcy court before it becomes an informal

22   proof of claim is the proper one.  I've ruled that way in this

23   case already, as the debtors have noted it in their response,

24   and have done so not only based on my own analysis but also on

25   the analysis in In re Houbigant, Inc., 190 B.R. 185, 187

68

1     through 8 (Bankr. S.D.N.Y. 1995).  Consequently, I don't

2     believe that the claim would -- or the -- I'm sorry, the

3     complaint as filed in the district court patent action should

4     be treated as an informal proof of claim.

5          That leaves, finally, Methode's argument that it

6     should be excused from filing its claim late under the bar date

7     order and that its claim therefore should be deemed to be

8     timely filed.  Section 503(a) of the Bankruptcy Code provides,

9     since 1994, quote, "An entity may timely file a request for

10    payment of an administrative expense, or may tardily file such

11    request if permitted by the court for cause."  Collier points

12    out that this provision was added in 1994 to overrule cases

13    which had held that effectively a court could not set an

14    administrative claims bar date.  And there have been relatively

15    few cases since then dealing with the for-cause language in

16    Section 503(a).  See 4 Collier on Bankruptcy, paragraph

17    503.02[2] (15th Ed. 2009) at 503.10.  Collier notes that the

18    term "cause" is not a defined term in either the Code or the

19    Rules:  Quote, "So the kinds of cause sufficient to permit

20    tardy filing of administrative expense claims is left to

21    judicial discretion and development in determining whether

22    cause exists.  Cases construing the for-cause-shown standard of

23    Bankruptcy Rules 3002(c)(1), 3003(c)(3) and 9006(b)(1) are

24    relevant," close quote.  Collier notes that at least one Court

25    has applied the excusable neglect standard of Bankruptcy Rule

1    9006(b)(1) in this context, citing In re Gillabo (ph.),

2    361 B.R. 87, 91 (Bankr. N.D.N.C. 2007).  The debtors point out

3    that the Gillabo case is not the only instance of a Court

4    applying the excusable neglect standard of Rule 9006(b) to a

5    tardily filed claim under Rule -- I'm sorry, under Section

6    503(a), and in fact that not only have Judge Lifland and Judge

7    Gropper also done so in In re Dana Corporation, 2007 WL 1577763

8    at page 3 (Bankr. S.D.N.Y. 2007) and In re Northwest Airlines

9    Corp., 2010 WL 502837 at pages 1 through 2 (Bankr. S.D.N.Y.

10   2010), but also this Court has done so in prior instances in

11   this very case.

12          It appears from my reading of those two cases, as well

13   as my recollection of my rulings, that no one made the point

14   that Methode is making here, that 5003(a) expressly says "for

15   cause" and that such language may override, therefore,

16   Bankruptcy Rule 9006(b)(1) which states that a Court, for cause

17   shown, may extend the date by which an act is required to be

18   done by order of the Court for cause shown only if the request

19   is made to do so within the deadline.

20          I do note, however, that the cause-shown language

21   precedes paragraph -- subparagraph (2) of 9006(b), which could

22   therefore be read as showing that cause shown includes that the

23   failure to act was the result of excusable neglect when the

24   motion is made after the expiration of the specified period.

25          I further note that employing the excusable neglect

70

1    standard in the context of a 503(a) bar date is to my mind no

2    logically different than applying it to a 501 or -2 claim bar

3    date, given the importance of -- or given the fact that the bar

4    dates are equally important in either context.

5          However, ultimately I believe that the issue, that is,

6    whether I should apply a looser for-cause standard or the

7    excusable neglect standard, as set forth in Pioneer Investment

8    Services Company v. Brunswick Associates Limited Partnership,

9    507 U.S. 380 (1993) and Midland Cogeneration Venture L.P. v.

10   Enron Corporation (In re Enron Corporation), 419 F.3d 115, 126

11   (2d Cir. 2005), is ultimately moot under these circumstances;

12   that is because I have not been able to find a valid basis for

13   finding cause under either standard in the late filing of this

14   proof of claim or proof of administrative expense.  First,

15   there are no notice issues.  Second, there is no contention

16   that the plan language that is now being relied upon, or was

17   now relied upon by Methode in this motion, had been relied upon

18   at the time of the bar date by it in failing to file a proof of

19   claim or a proof of administrative expense.  Third, there's no

20   suggestion that Delphi lulled Methode to sleep in filing its

21   claim.  And in that regard, I believe that the facts here are

22   materially different than the facts in the In re Eagle Bus

23   Manufacturing case relied upon heavily by Methode, 62 F.3d 730

24   (5th Cir. 1995).

25          In terms of not only the sophistication of the parties

1    but also the nature of the underlying claim and the underlying

2    litigation, and the absence of any ongoing negotiations by

3    Delphi and, finally, the fact that, as in contrast to the Eagle

4    Bus case, the litigation in the district court would

5    necessarily involve Delphi for the post-bar date period in any

6    event, so Delphi's continued participation in that litigation,

7    unlike in the Eagle Bus case, would not have -- or should not

8    have lulled Methode to sleep about the need of filing a claim

9    for the pre-bar date covered period.

10             Finally, I don't see a basis for Methode's filing the

11   claim in November as opposed to filing it in mid-July, as

12   required by the bar date, given that the patent claim itself

13   was -- the patent litigation was initiated in April of 2009,

14   and Methode was clearly in a litigation posture with Delphi

15   well before the date that it filed the claim and well before

16   the bar date.  In other words, a light bulb may have gone off

17   at Methode that led it to file its claim in November 2009, but

18   I see no rational basis as to why it should not have gone off

19   instead before the July 15th bar date.

20             Therefore, it appears clear to me that the delay was

21   well within Methode's control, which would be dispositive under

22   the excusable neglect standard, given the other facts here,

23   particularly as applied in the Second Circuit, under the

24   Midland Cogeneration case.

25             Moreover, though, again, it appears clear to me that

72

1   the debtors' estimate of administrative expenses and the

2   debtors' husbanding of its cash position based upon that

3   estimate are critical in this case.  This is not simply a

4   matter of reducing recoveries to creditors, since it's clear

5   that that doesn't really constitute prejudice under 9006(b)(1),

6   or generally which should constitute prejudice under a for-

7   cause analysis.  But the ability to rely upon an admin claim's

8   bar date in many respects is fundamental to the Court's ability

9   to confirm a plan and the debtors to go effective and then

10  implement their plan, since the plan provides that such claims,

11  as required by law, must be paid in full, unless agreed upon by

12  the parties.

13          So it seems clear to me that under either approach,

14  and frankly I continue to lean on the excusable neglect

15  approach as being the appropriate one, but, again, under either

16  approach, there's not cause to deem the claim timely filed and

17  therefore the pre-June 1, 2009 patent infringement damages or

18  claim should be barred in this case.

19          So the debtors should submit an order to that effect.

20          MR. MAYER:  Thank you, Your Honor.

21          THE COURT:  As far as the rest of the relief that was

22  in essence agreed to on the record, I'm happy to have the

23  record reflect that.  But if you want to have it memorialized

24  in an order, I'm happy to do that also, which is, again, to let

25  the -- to issue an order saying that the planned injunction

73

1  doesn't apply to the patent case insofar as it seeks damages

2  for a post-June 1, 2009 infringement.

3          MR. MAYER:  No, Your Honor, we're fine with so

4  ordering on the record.

5          THE COURT:  Okay.

6          MR. MAYER:  Thank you.

7          THE COURT:  Thank you.

8          Okay.

9          MR. MEISLER:  Thank you, Your Honor.

10         THE COURT:  Thank you.

11         MR. MEISLER:  Your Honor, the ninth matter on the

12  agenda is the substantial contribution application submitted by

13  the IUE-CWA.  Your Honor, Mr. Tom Kennedy is here, and I'm

14  going to cede the podium over to Mr. Tom Kennedy --

15         THE COURT:  Okay.

16         MR. MEISLER:  -- as this is his application.

17     (Pause)

18         MR. MEISLER:  Your Honor, my apologies for the

19  sidebar.

20         THE COURT:  It's okay.

21         MR. MEISLER:  Mr. Kennedy and I were just talking

22  about the exhibit binder that's been submitted --

23         THE COURT:  Right.

24         MR. MEISLER:  -- to chambers and that we're submitting

25  into evidence for not just the IUE-CWA substantial contribution

**<u>EXHIBIT B</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                          :
            In re                         :        Chapter 11
                                          :
DPH HOLDINGS CORP., et al.,               :        Case No. 05-44481 (RDD)
                                          :
                    Reorganized Debtors.  :        (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


ORDER IN RESPECT OF ADMINISTRATIVE EXPENSE CLAIMS
OF METHODE ELECTRONICS INC.

        Upon the Reorganized Debtors' Forty-Sixth Omnibus Objection Pursuant To 11

U.S.C. § 503(b) And Fed. R. Bankr. P. 3007 To (I) Disallow And Expunge Certain

Administrative Expense (A) Books And Records Claims, (B) Methode Electronics Claims, (C)

State Workers' Compensation Claims, (D) Duplicate State Workers' Compensation Claims, (E)

Workers' Compensation Claims, (F) Transferred Workers' Compensation Claims, (G) Tax

Claims, (H) Duplicate Insurance Claims, And (I) Severance Claims, (II) Disallow And Expunge

(A) A Certain Duplicate Workers' Compensation Claim, (B) A Certain Duplicate Tax Claim,

And (C) A Certain Duplicate Severance Claim, (III) Modify Certain Administrative Expense (A)

State Workers' Compensation Claims And (B) Workers' Compensation Claims, And (IV) Allow

Certain Administrative Expense Severance Claims (the "Forty-Sixth Omnibus Objection")

(Docket No. 19711); and upon Methode's Motion For An Order (I) Permitting Methode To

Continue Post-Petition Litigation With The Reorganized Debtors In Michigan And (II)

Overruling The Reorganized Debtors' Timeliness Objection To Methode's Administrative

Expense Claims (Docket Nos. 19895, 19896, and 19897) (the "Motion"); and upon the

Reorganized Debtors' Objection To Motion Of Methode Electronics, Inc. For An Order (I)

Permitting Methode To Continue Post-Petition Litigation With Reorganized Debtors In

Michigan And (II) Overruling The Reorganized Debtors' Timeliness Objection To Methode's

Administrative Expense Claims (Docket No. 20070); and upon the Reply In Support Of Motion

Of Methode Electronics, Inc. For An Order (I) Permitting Methode To Continue Post-Petition

Litigation With The Reorganized Debtors In Michigan And (II) Overruling The Reorganized

Debtors' Timeliness Objection To Methode's Administrative Expense Claims (Docket No.

20164); for the reasons stated on the record at the May 20, 2010 Omnibus Hearing with respect

to the Motion (the "Hearing") (Docket No. 20197), which are incorporated herein as findings of

fact and conclusions of law in support of entry of this Order; and after due deliberation thereon;

and good and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:[1]

A.      Methode Electronics, Inc. ("Methode"), the holder of proof of claim

numbers 19950 and 19951 (together the "Administrative Claims"), was properly and timely

served with a copy of the Notice Of Bar Date For Filing Proofs Of Administrative Expense (the

"Bar Date Notice"), which stated that pursuant to the Order (A)(I) Approving Modifications To

Debtors' First Amended Plan Of Reorganization (As Modified) And Related Disclosures And

Voting Procedures And (II) Setting Final Hearing Date To Consider Modifications To

Confirmed First Amended Plan Of Reorganization And (B) Setting Administrative Expense

Claims Bar Date And Alternative Transaction Hearing Date (Docket No. 17032) (the

"Modification Procedures Order"), as modified by the Stipulation And Agreed Order Modifying

Paragraph 38 Of Modification Procedures Order Establishing Administrative Expense Bar Date

---

[1]     Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings
of fact when appropriate.  See Fed. R. Bankr. P. 7052.

2

(Docket No. 18259), July 15, 2009 was the deadline for filing a proof of administrative expense

for the purpose of asserting an administrative expense request against any of the Debtors under

11 U.S.C. § 503(b) for the period from the commencement of these chapter 11 cases through

May 31, 2009.

        B.      The Court has jurisdiction over the Forty-Sixth Omnibus Objection and

the Motion, which are core proceedings under 28 U.S.C. § 157(b)(2), pursuant to 28 U.S.C.

§§ 157 and 1334.  Venue of these cases, the Forty-Sixth Omnibus Objection and the Motion in

this district is proper under 28 U.S.C. §§ 1408 and 1409.

        C.      Methode filed the Administrative Claims on November 5, 2009.  The

Administrative Claims assert liabilities in connection with the August/September 2008 supply

agreement (the "Supply Agreement") between Delphi Automotive Systems LLC ("Delphi") and

Methode (the "Contract Claim") and liabilities associated with Methode's claim of patent

infringement (the "Patent Claim").

        D.      For the reasons stated by this Court on the record at the Hearing, Methode

has failed to establish excusable neglect or cause to justify its failure to timely file its

Administrative Claims with respect to the Patent Claim pursuant to the Modification Procedures

Order and the Bar Date Notice for the period from the commencement of these chapter 11 cases

through May 31, 2009.

        E.      As stipulated by Methode on the record at the Hearing, the counterclaim

with respect to the Supply Agreement is moot as currently pleaded in the Michigan state court,

and Methode's Contract Claim does not seek to assert claims that arose prior to June 1, 2009.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

      1.      The Motion is granted in part, denied in part, and determined to be moot in part as set forth below.

      a.      The request to overrule the Reorganized Debtors' timeliness objection to that portion of the Patent Claim that arose prior to June 1, 2009 is denied, and the Reorganized Debtors' timeliness objection is granted with respect to the portion of the Patent Claim that arose prior to June 1, 2009. Accordingly, the Patent Claim is hereby disallowed with prejudice with respect to all claims that arose prior to June 1, 2009, and the Reorganized Debtors shall make no distribution on account of such claims.

      b.      Subject to the limitation in sub-paragraph 1(a) of this Order, the request to lift the Plan Injunction to allow continuation of the litigation regarding patent infringement pending in the federal district court for the Eastern District of Michigan is granted as stipulated between the parties on the record at the Hearing.

      c.      The disposition of the Motion and the Reorganized Debtors' timeliness objection with respect to the Contract Claim is as set forth in the transcript of the Hearing, which is hereby So Ordered by the Court. Accordingly, the request to overrule the Reorganized Debtors' timeliness objection with respect to the Contract Claim is deemed moot and the request to lift the Plan Injunction to allow litigation regarding the Contract Claim in the Michigan state court is held in abeyance pending a stipulation between the parties or further application to this Court.

      2.      Kurtzman Carson Consultants LLC is hereby directed to serve this Order in accordance with the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding

4

Objections To Claims And (ii) Certain Notices And Procedures Governing Objections to Claims

(Docket No. 6089).

        3.      This Court shall retain jurisdiction to hear and determine all matters

arising from the implementation of this Order.

Dated: White Plains, New York
      June 14, 2010

                         /s/Robert D. Drain
                         UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT C</u>**

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

DPH-DAS, LLC,
a Delaware limited liability company,

                    Plaintiff,                          Civil Action No.:  08-095518-CK

vs.                                                     Hon. Judge Nanci J. Grant

METHODE ELECTRONICS, INC.,

                    Defendant.

| | |
|---|---|
| Thomas S. Bischoff (P53753) | Ann Marie Walsh (*pro hac vice*) |
| Stephen W. King (P56456) | Helen Din (*pro hac vice*) |
| Attorneys for Delphi | Attorneys for Methode |
| Dykema Gossett PLLC | Locke Lord Bissell & Liddell LLP |
| 400 Renaissance Center, 35th Floor | 111 South Wacker Drive |
| Detroit, Michigan  48243 | Chicago, Illinois  60606 |
| (313) 568-5341 | (312) 443-0654 |
| | |
| Joseph E. Papelian (P26582) | John R. Trentacosta (P31856) |
| Co-counsel for Delphi | Larry S. Perlman (P71698) |
| Delphi Automotive Systems, LLC | Co-Counsel for Methode |
| M/C 483-400-603 | Foley & Lardner LLP |
| Troy, Michigan 48098-2815 | 500 Woodward Avenue, Suite 2700 |
| (248) 813-2535 | Detroit, Michigan  48226-3489 |
| | (313) 234-7100 |

## METHODE'S FIRST AMENDED COUNTERCLAIM

Methode Electronics, Inc. ("Methode") states as follows for its amended counterclaim

against DPH-DAS, LLC ("Delphi"):

## NATURE OF THE ACTION

1.  On August 26, 2009, Delphi breached a three-year supply agreement between Methode and

    Delphi ("the 2008 Agreement") after just ten months of performance.

2.  Due to Delphi's unlawful contract termination, Methode sustained substantial damages.

    Methode was forced to shut down an entire division that was devoted to the production of

parts for Delphi, a shut down that eliminated numerous jobs throughout Methode as it

sought to mitigate the significant loss of income. Methode also sustained additional

damages including unrecovered investments in capital, lost profits and loss of goodwill in

the industry, all of which stem from Delphi's breach of contract in August 2009.

## Jurisdiction and Venue

3.  Jurisdiction and venue are proper in this Court because the original claims to which this

counterclaim applies are pending in this Court and the Counter-Defendant has submitted to

the jurisdiction and venue of this Court.

## Parties

4.  Counter-Plaintiff Methode designs, manufactures, and markets component devices and parts

to the consumer and industrial markets, including supplying components to original

equipment manufacturers and suppliers in the automotive industry.

5.  Counter-Defendant Delphi is a supplier of various parts, including the Passive Occupant

Detection System (PODS), to the automotive industry. The PODS, which is installed in the

front passenger seat, provides a signal that controls and modifies airbag deployment

characteristics depending on the presence or weight of an occupant (such as a child) in the

passenger seat.

## GENERAL ALLEGATIONS

## Methode supplies parts to Delphi.

6.  Methode manufactured for Delphi certain bladder assemblies ("subject parts" or "bladders")

that are components of Delphi's PODS. Methode's bladder is critical to the determination

of whether a minimum threshold weight is pressing on the vehicle's passenger seat. If the

minimum threshold is met, the PODS activates the airbag for deployment when a

deployable event occurs. If the minimum threshold is not met, no signal is sent to the airbag, and thus the airbag will not deploy and possibly injure a small occupant.

7. Beginning in 2001, through a series of long-term supply agreements, Methode had been the exclusive supplier of the patented subject parts to Delphi. Each long-term supply agreement spanned several years.

8. The parties performed under a December 2004 agreement that was set to expire on June 30, 2008.

9. In the 2004 agreement, as in the prior contract, Methode provided annual price discounts. Delphi benefited from price decreases during the contract term, but as a consequence Methode had to absorb the price increases for the materials required to produce the parts, with no relief from Delphi. The increases in costs of materials were not passed on to Delphi.

### Methode advised Delphi of price increases beginning in December 2007, and the parties negotiated the terms of a new agreement.

10. In December 2007, seven months before the 2004 Agreement expired, Methode advised Delphi that it would need a price increase when the then-current agreement expired on June 30, 2008. Methode explained that prices for the new agreement would necessarily be higher to reflect: (1) increases in the prices of materials and other components used to manufacture the parts, and (2) significant declines in Delphi's demand for the parts—in excess of 50% from peak production volumes. In addition, since 2001 Methode had provided year-after-year price decreases to Delphi, which could not continue. Delphi, on the other hand, sought further price reductions from Methode in a new agreement.

11. Over the next nine months, Methode provided various pricing packages and the parties continued to negotiate the terms of the supply relationship.

12. At Delphi's specific request, on August 25 and 26, 2008, Methode provided revised one-
and three-year pricing. *See* Letter from Timothy Glandon to Mark Shively dated Aug. 25,
2008 (Ex. A); Letter from Timothy Glandon to Mark Shively dated Aug. 26, 2008 (Ex. B).
Methode's proposed piece-part prices for a three-year supply arrangement were lower than
those for a one-year supply arrangement because Methode's three-year pricing reflected
overhead and investment costs spread over a greater quantity of parts and a longer period of
time. Methode was only willing to provide lower prices if it could secure a confirmed
three-year deal.

13. On September 4, 2008, after approximately four months of negotiations, Delphi specifically
chose Methode's three-year pricing proposal and the parties consummated a new three-year
supply agreement ("2008 Agreement"). *See* Ltr from Mark Shively to Timothy Glandon
dated Sept. 4, 2008 (Ex. C). Delphi's election of three-year pricing resulted in a saving of
about $6 million over the one-year pricing.

14. Under the 2008 Agreement, Delphi agreed that between October 1, 2008 and June 30, 2011,
Methode would supply and Delphi would purchase 100% of Delphi's requirements for the
parts identified in the agreement. A 100% requirements contract means that neither Delphi
nor any other company could supply any of the subject parts to Delphi and that Methode
would be the exclusive source of the parts.

15. As part of the 2008 Agreement, Delphi benefitted from Methode's lower pricing based on a
three-year supply relationship, as opposed to the higher proposed pricing based on a one-
year supply. Methode relied on Delphi's promise of three years of business when providing
Delphi with the lower pricing in the parties' agreement. Because Delphi was gaining

4

substantial savings from having elected three-year pricing, Methode believed that Delphi would perform for the three-year term of the agreement.

16. Ten months after entering the three-year agreement, Delphi prematurely terminated its three-year contract with Methode by sending a notice of termination on August 26, 2009. Delphi's termination became effective on September 10, 2009. *See* Ltr from Beth Schwarting to Timothy Glandon dated Aug. 26, 2009 (Ex. D).

17. Methode would not have offered three-year pricing, nor would it have entered into the 2008 Agreement, if it had known that Delphi was going to in-source production of the subject parts before expiration of the 2008 Agreement and terminate the parties' exclusive supply agreement just ten months into the three-year contract. In order to offer Delphi the lower pricing, Methode had relied on Delphi's promise of three years of business.

## CLAIM FOR DELPHI'S BREACH OF THE 2008 AGREEMENT

18. Methode re-alleges each of the preceding paragraphs as if fully set forth herein.

19. Less than ten months after the parties entered the 2008 Agreement, Delphi breached the contract by prematurely and unlawfully terminating all purchases of the subject parts from Methode in August 2009.

20. Delphi cannot rely on its termination for convenience clause in the 2008 Agreement, because unbeknownst to Methode, Delphi lacked any good faith intention to perform its obligations under the supply agreement when it obtained Methode's commitment to three-year pricing. Delphi concealed its intent and its efforts to in-source production of Methode's bladders in order to induce Methode to enter a three-year agreement with lower pricing as opposed to entering a one-year agreement with higher pricing.

21. Methode would not have offered the three-year pricing and would not have entered into the 2008 Agreement if Methode had expected or contemplated that Delphi would terminate the

supply agreement ten months into the three-year contract.  Methode relied on Delphi's

commitment to three years of business in providing Delphi with the lower pricing set forth

in the parties' agreement.

22. The parties' three-year supply agreement was a valid executory contract at the time of

Delphi's premature termination.

23. At the time of Delphi's breach of the contract in August 2009, Methode had fully performed

and would have continued to perform its obligations under the three-year supply agreement.

24. Delphi's conduct constitutes a breach of the 2008 Agreement.

25. As a consequence of Delphi's breach of the 2008 Agreement in August 2009, Methode has

incurred substantial damages in an amount to be determined at trial.

WHEREFORE, Defendant Counter-Plaintiff Methode Electronics, Inc. requests the

following relief against the Plaintiff Counter-Defendant:

(1)    Entry of judgment in favor of Methode and against Delphi, including an award of

money damages in favor of Methode sufficient to compensate it for all forms of

economic loss incurred by it as a result of Delphi's breach of the parties'

agreement, including, without limitation, direct damages, indirect damages,

incidental damages, consequential damages, lost profits and lost goodwill;

(2)    An award of legal fees and other costs arising out of Delphi's breach; and

(3)    All such other relief as permitted by law.

Respectfully submitted,

METHODE ELECTRONICS, INC.

BY:

_____
    One of its Attorneys

Ann Marie Walsh (*pro hac vice*)
Helen Din (*pro hac vice*)
LOCKE LORD BISSELL & LIDDELL LLP
111 South Wacker Drive
Chicago, IL 60606
(312) 443-0654
(312) 896-6654  (fax)

and

John R. Trentacosta (P31856)
Larry S. Perlman (P71698)
FOLEY & LARDNER LLP
One Detroit Center
500 Woodward Avenue, Suite 2700
Detroit, MI  48226-3489
Date: June __, 2010         (313) 234-7100

7

# EXHIBIT A



**METHODE ELECTRONICS, INC.**

Corporate Headquarters
7401 West Wilson Avenue
Chicago, IL 60706-4548
708.867.6777 • Fax: 708.867.6999 • 877.316.7700

<u>Via e-mail</u>

August 25, 2008

Mr. Mark A. Shively
Delphi E & S
2151 East Lincoln Road
Kokomo, Indiana 46901

**Re: Methode/ Delphi - Long-Term Agreement**

Dear Mark:

As you know, Methode and Delphi do not currently have in place a long-term agreement but Methode has agreed to ship parts to Delphi at the prices provided in our May 1, 2008 letter. As indicated in our prior letters, these prices will be effective through September 30, 2008.

As we have previously communicated, Methode is interested in continuing as a supplier to Delphi and is interested in entering into a long-term agreement. Per your request, Methode is providing the attached pricing which will be in effect for three years, beginning October 1, 2008. This revised three-year pricing reflects the impact of material and component price increases since providing our May 1, 2008 pricing, as well as the impact of further, significantly reduced volumes. The May 1, 2008 pricing was based on anticipated 2009 model year volumes of 5,293,924 units. Based on the latest information available, including Delphi releases, however, the 2009 model year volumes will be closer to 4,300,000 units, if not lower. Please note the differential between this figure and the Finley volumes for the same period of 6,805,000 units.

Moving forward, we will use 4,300,000 units as the baseline for model year 2009 and 3,900,000 for model year 2010 and 2,500,000 for model year 2011. As previously committed, any shipments above this baseline quantity will be subject to a 5% rebate on the additional units. Further, in order to address your concerns as to possible pricing consequences for volumes 20% or more below the Finley volumes, we are withdrawing our right to readjust pricing. Note that we have also removed our requirement to review PODS D pricing after one year. Due to the significant reduction in GMT900 volume, updated pricing for the GMT900 PODS-D program is included in the attached prices.

As to the three-year pricing provided herein, we require the following conditions. First, as previously discussed, Methode must be placed on a material/component cost adder program. The material/component costs used to calculate the attached pricing will be the base line. On a quarterly basis any increases or surcharges would be passed along to Delphi for reimbursement which must be paid within 30 days.

Second, ZCRI payment terms must apply for the term of the agreement.

Third, as previously discussed Methode cannot agree to several terms of the purchase orders and the Delphi General Terms and Conditions ("Delphi T's & C's). One such term is paragraph 12 of PO# 550063028, which provides that "tools and equipment provided for performance of an operation by consignee remain the property of Delphi unless otherwise noted". As Delphi knows, not all tools and equipment used by Methode in the production of Delphi parts are the property of Delphi. As such, Methode objects to that term to the extent it was intended to include tools or equipment not paid for by Delphi.

Similarly, Methode cannot agree to paragraph 16 of the Delphi T's & C's to the extent that it grants Seller the right to take possession of and title to any part of any equipment owned by Methode if it was used in the production of Delphi parts.

Given the fact that the agreement would expire after three years, Methode can not agree to paragraph 18 of the Delphi T's and C's. Specifically, Methode does not agree to produce any service or replacement parts other than those that will be produced prior to September 30, 2011. Given the limited amount of service parts ordered and the resulting set-up costs incurred by Methode, the pricing for service parts will be determined by the order quantity.

Finally, Methode does not agree to paragraph 28 of the Delphi T's and C's regarding Delphi audits. In lieu of that paragraph, Methode will agree to the following term adapted from the OESA (Original Equipment Suppliers Association) Draft Model Terms and Conditions:

> Seller will maintain records as necessary to support amounts charged to
> Buyer in accordance with Seller's document retention policies. Buyer and
> its representatives may audit Seller's records of transactions completed
> within one year prior to the audit date, to the extent needed to verify the
> quantities shipped and that the prices charged match the agreed prices.
> Any audit will be conducted at Buyer's expense (but will be reimbursed
> by Seller if the audit uncovers material errors in the amounts charged), at
> reasonable times, and at Seller's usual place of business.

Methode will accept purchase orders with the attached pricing subject to the above conditions and exceptions through September 30, 2011. In order for Methode to accept purchase orders for product shipped after September 30, 2008, the purchase orders must have these exceptions noted as well as Delphi must remove any reference to pricing being "under protest". Delphi must also waive all rights or claims to having paid Methode "under protest" as to any past purchase orders.

Please provide written acceptance to this letter no later than close of business September 5, 2008.

Sincerely,

Timothy R. Glandon
Vice President & General Manager
North American Automotive Operations

# EXHIBIT B

 **ETHODE ELECTRONICS, INC.**

Corporate Headquarters
7401 West Wilson Avenue
Chicago, IL 60706-4548
708.867.6777 • Fax: 708.867.6999 • 877.316.7700

_Via e-mail_

August 26, 2008

Mr. Mark A. Shively
Delphi E & S
2151 East Lincoln Road
Kokomo, Indiana 46901

Re: Methode/Delphi - One Year Pricing

Dear Mark:

As you know, Methode and Delphi do not currently have in place a long-term agreement but Methode has agreed to ship parts to Delphi at the prices provided in our May 1, 2008 letter. As indicated in our prior letters, these prices will be effective through September 30, 2008.

As we have previously communicated, Methode is interested in continuing as a supplier to Delphi and is interested in entering into a long-term agreement. However, we understand that Delphi wishes to consider all of its options and has therefore requested Methode to provide one-year pricing. Per your request, Methode is providing the attached pricing which will be in effect for one year, beginning October 1, 2008. The May 1, 2008 pricing was based on anticipated 2009 model year volumes of 5,293,924 units. Based on the latest information available, including Delphi releases, however, the 2009 model year volumes will be closer to 4,300,000 units, if not lower and the attached pricing is based on those volumes. Please note the differential between this figure and the Finley volumes for the same period of 6,805,000 units.

As to the one-year pricing provided herein, we require the following conditions. First, ZCRI payment terms must apply for the term of the agreement.

Second, as previously discussed Methode cannot agree to several terms of the purchase orders and the Delphi General Terms and Conditions ("Delphi T's & C's). One such term is paragraph 12 of PO# 550063028, which provides that "tools and equipment provided for performance of an operation by consignee remain the property of Delphi unless otherwise noted". As Delphi knows, not all tools and equipment used by Methode in the production of Delphi parts are the property of Delphi. As such, Methode objects to that term to the extent it was intended to include tools or equipment not paid for by Delphi.

Similarly, Methode cannot agree to paragraph 16 of the Delphi T's & C's to the extent that it grants Seller the right to take possession of and title to any part of any equipment owned by Methode if it was used in the production of Delphi parts.

Given the fact that the agreement would expire after one year, Methode can not agree to paragraph 18 of the Delphi T's and C's. Specifically, Methode does not agree to produce any service or replacement parts other than those that will be produced prior to September 30, 2009. Given the limited amount of service parts ordered and the resulting set-up costs incurred by Methode, the pricing for service parts will be determined by the order quantity.

Methode does not agree to paragraph 28 of the Delphi T's and C's regarding Delphi audits. In lieu of that paragraph, Methode will agree to the following term adapted from the OESA (Original Equipment Suppliers Association) Draft Model Terms and Conditions:

> Seller will maintain records as necessary to support amounts charged to Buyer in accordance with Seller's document retention policies. Buyer and its representatives may audit Seller's records of transactions completed within one year prior to the audit date, to the extent needed to verify the quantities shipped and that the prices charged match the agreed prices. Any audit will be conducted at Buyer's expense (but will be reimbursed by Seller if the audit uncovers material errors in the amounts charged), at reasonable times, and at Seller's usual place of business.

Finally, Methode requires that Delphi provide written assurance that Delphi will not manufacture, use or sell products or induce any third party to manufacture, use or sell products that infringe Methode's patents. As you know, the applicable patents in the United States are D409,935 and 5,975,568 and 7,237,443.

Methode will accept purchase orders with the attached pricing subject to the above conditions and exceptions through September 30, 2009. In order for Methode to accept purchase orders for product shipped after September 30, 2008, the purchase orders must have these exceptions noted as well as Delphi must remove any reference to pricing being "under protest". Delphi must also waive all rights or claims to having paid Methode "under protest" as to any past purchase orders.

Please provide written acceptance to this letter no later than close of business September 5, 2008.


Sincerely,

Timothy R. Glandon
Vice President & General Manager
North American Automotive Operations

# EXHIBIT C

# DELPHI

Electronics & Safety

<u>Via E-Mail and UPS or FedX</u>

September 4, 2008

Mr. Timothy R. Glandon
Vice President & General Manager
North American Automotive Operations
111 W. Buchanan Street
P.O. Box 130
Carthage, IL 62321-0130

Re:    <u>Methode/Delphi</u>

Dear Tim:

Delphi accepts the three-year pricing proposal set out in your August 25, 2008 letter.

Methode will be placed on a material cost adder program. The material/component costs used to calculate the attached pricing will be the baseline. On a quarterly basis any increases or surcharges will be passed along to Delphi for reimbursement which must be paid within 30 days.

ZCRI payment terms to apply for the term of the agreement.

That portion of Paragraph 12 on the Purchase Order providing that "tools and equipment provided for performance of an operation by consignee remain the property of Delphi unless otherwise noted" shall be deleted as you have demanded.

Additionally, Paragraph 16 of Delphi's Terms and Conditions shall not be applicable to the extent that it allows Delphi to take possession of and title to any part of any equipment owned by Methode (not paid for by Delphi) if it was used in the production of Delphi parts.

In regard to service parts obligation in Paragraph 18 of Delphi's Terms & Conditions, Delphi is in agreement with your proposal as to service parts with the price to be determined by order quantity.

It is agreed that Paragraph 28 of Delphi's Terms & Conditions as to "Right to Audit and Inspect" shall not be applicable and that instead, the OESA Draft Model Terms and Conditions must apply:

> Seller will maintain records as necessary to support amounts charged to Buyer in accordance with the Seller's document retention policies. Buyer and its representatives may audit Seller's records of transactions completed within one year prior to the audit date, to the extent needed to verify the quantities shipped and that the prices charged match the agreed prices. Any audit will be conducted at Buyer's expense (but will be reimbursed by Seller if the audit uncovers material

errors in the amounts charged) at reasonable times, and at Seller's usual place of business.

Delphi will delete the reference to pricing being "under protest" and waive its right in regard to having paid Methode "under protest" as to past purchase orders.  Delphi will issue new Purchase Orders with the above exceptions with an expiration date of September 30, 2011.

A copy of your August 25, 2008 letter is attached hereto.  Purchase orders consistent with the terms of this letter will follow.

Sincerely,

*Mark A. Shively*
Mark A. Shively
Purchasing Manager
Delphi Electronics Group

# EXHIBIT D

  **DELPHI**                                    Electronics & Safety

*Via Email, Facsimile and Federal Express*
*tim.glandon@methode.com / 708.867-6999*

August 26, 2009

Mr. Timothy R. Glandon
Vice President & General Manager - North American Automotive Operations
Methode Electronics, Inc.
7401 West Wilson Avenue
Chicago, IL 60706-4548

> **Re:** **Termination for Convenience Notice Effective September 10, 2009; Termination for Lack of Service and Delivery and Breach; Termination for Lack of Price Competitiveness**

Dear Mr. Glandon:

Delphi Automotive Systems LLC, acting through its Delphi E&S Division ("Delphi"), notifies Methode Electronics, Inc, that effective September 10, 2009, Delphi hereby terminates the Delphi Purchase Order Requirements Contracts ("Contracts") issued to Methode as part of, incorporated into and pursuant to, among other things, Methode's August 25, 2008 letter to Delphi, Delphi's September 4, 2008 letter to Methode, and Delphi's modified General Terms and Conditions for supply of bladder assemblies used by Delphi in manufacturing Delphi's PODS products. This termination is pursuant to paragraph 11, entitled "Termination for Convenience," of Delphi's modified General Terms and Conditions incorporated into the Contracts.

In addition, effective September 10, 2009, Delphi terminates these Contracts for breach. This termination for breach is pursuant to paragraph 10, entitled "Termination for Breach," of Delphi's modified General Terms and Conditions incorporated into these Contracts and under Delphi's accumulated and vested rights pursuant to past and current contracts with Methode. Methode's breach of contract arises from its refusal to provide tooling drawings as well as prototype, pilot and production parts for new or upcoming OEM customer programs, as set forth in Delphi's Second Amended and Supplemented Verified Complaint for Breach of Contract and Injunctive or Other Relief, filed July 21, 2009 in the pending Michigan state court action between the parties.

Further, Delphi terminates these Contracts pursuant to Delphi's accumulated and vested rights from its various contracts with Methode. In particular, Delphi terminates these Contracts for Methode's lack of appropriate and satisfactory service and delivery for the reasons set forth above. In addition, Delphi terminates these Contracts for Methode's lack of price competitiveness. As set forth in Tim Hamashuk's July 20, 2009 letter to you, Methode is non-competitive as to pricing compared to pricing available to Delphi from others or from in-sourcing. Methode has not responded with an offer to meet the more competitive pricing.

Pursuant to Paragraph 11 of Delphi's General Terms and Conditions, please provide an inventory and cost breakdown of all raw materials, work-in-progress and finished goods inventory related to the goods under the Contracts which are usable and in a merchantable condition.

Respectfully,

Beth M. Schwarting
Vice President, Safety Systems
Delphi Electronics and Safety

**<u>EXHIBIT D</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                               :
In re                           :       Chapter 11
                               :
DPH HOLDINGS CORP., *et al.*,    :       Case No. 05-44481 (RDD)
                               :
            Reorganized Debtors. :       (Jointly Administered)
                               :
                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## ORDER PERMITTING METHODE ELECTRONICS, INC. TO PROSECUTE CONTRACT CLAIMS IN MICHIGAN STATE COURT

        Upon the Motion of Methode Electronics, Inc. ("Methode") for an Order (I) Permitting Methode to Continue Post-Petition Litigation with the Reorganized Debtors in Michigan and (II) Overruling the Reorganized Debtors' Timeliness Objection to Methode's Administrative Expense Claims (the "Motion"), filed by Methode on April 20, 2010; and upon the supplement to the Motion filed by Methode on June 28, 2010 (the "Supplement"); and the Court having jurisdiction to consider the Motion, the Supplement and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and due and proper notice of the Motion and the Supplement having been provided, and it appearing that no other or further notice need be provided; and based upon all the proceedings had before the Court; and after due deliberation thereon; and good and sufficient cause appearing therefor,

        IT IS HEREBY ORDERED THAT:

        1.       The relief requested in the Supplement is granted as set forth herein.

        2.     Neither this Court's July 30, 2009 Plan Modification Order [D.I. 18707]

nor any other order entered in these cases shall prohibit Methode from filing and prosecuting a

claim against DPH-DAS LLC in substantially the form set forth in the First Amended

Counterclaim submitted by Methode to this Court as Exhibit C to the Supplement, and the Plan

Modification Order and any other applicable order are hereby deemed modified to the extent

necessary to effectuate the foregoing.

Dated: _____, 2010
      White Plains, New York


_____
   UNITED STATES BANKRUPTCY JUDGE

2