*Hearing Date and Time: July 22, 2010 at 9:00 a.m. (EST)*

HAYNES AND BOONE, LLP
1221 Avenue of the Americas, 26th Floor
New York, New York 10020
Telephone: (212) 659-7300
Facsimile: (212) 884-8211
Lenard M. Parkins (NY Bar # 4579124)
Jonathan Hook (NY Bar # 4187449)

*Attorneys for Highland Capital Management, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------x
In re                                              :    Chapter 11
                                                   :
DPH HOLDINGS CORP., *et al.*,                      :    Case No. 05-44481 (RDD)
                                                   :
                    Reorganized Debtors.           :    (Jointly Administered)
------------------------------------------------------x

**DECLARATION OF PATRICK H. DAUGHERTY IN SUPPORT OF THE
APPLICATION OF HIGHLAND CAPITAL MANAGEMENT, L.P. PURSUANT TO 11
U.S.C. §§ 503(b)(3) AND 503(b)(4) FOR ALLOWANCE AND REIMBURSEMENT OF
REASONABLE PROFESSIONAL FEES AND ACTUAL, NECESSARY EXPENSES IN
<u>MAKING A SUBSTANTIAL CONTRIBUTION IN THESE CHAPTER 11 CASES</u>**

I, Patrick H. Daugherty, declare as follows:

1.   I am a partner and the head of Distressed and Private Equity Investments at Highland Capital Management, L.P. ("***Highland***"). During the period between December 2006 and October 2009, I was a partner, the head of Distressed and Special Situations Investing, and a Senior Portfolio Manager at Highland. My present responsibilities include managing the Distressed Investments Group and the Private Equity Investments Group for Highland. I formerly served as General Counsel to Highland. Prior to joining Highland in April 1998, I served as Vice President in the Corporate Finance Group at Bank of America Capital Markets, Inc. (formerly NationsBanc Capital Markets, Inc.) where I originated and structured leveraged

transactions of mid-cap companies located in the Southwest. I have over 15 years of experience in distressed, high yield and corporate restructuring. I have been involved in over 100 restructurings and held steering committee positions in over 40 bankruptcies. I received a BBA in Finance from The University of Texas at Austin and a Juris Doctorate from The University of Houston School of Law.

2.  I submit this Declaration (the "***Declaration***") in support of Highland's application (the "***Application***"),[1] pursuant to 11 U.S.C. §§ 503(b)(3) and 503(b)(4), for allowance and reimbursement of reasonable professional fees and actual, necessary expenses in making a substantial contribution in the above-captioned bankruptcy cases (the "***Cases***") of the above-captioned Reorganized Debtors (collectively, the "***Reorganized Debtors***" or "***Delphi***"). I have read the Application, as supplemented,[2] wherein Highland presently requests allowance and payment of $1,699,774.65 in fees for Haynes and Boone, LLP and $50,614.59 for expenses incurred by that firm to support Highland's efforts in providing a material contribution to the Delphi bankruptcy estates during the Cases. Such fees and expenses are reflected on **Exhibit "A"** attached hereto.

3.  I was the head of the team of ten investment professionals that monitored the investment of Highland's affiliates and related entities in Delphi, and I was personally involved and in charge of the matters described in this Declaration for Highland.

4.  If I were called upon to testify, I would testify to the facts set forth herein, which are based on my personal knowledge and knowledge obtained from the Highland-Delphi case team, a review of public filings, including those made in the Cases, and a review of Highland's records relating to Delphi. I am authorized to submit this Declaration on behalf of Highland.

---

[1] Docket No. 19112.
[2] Docket No. 20160 (the "***Supplement***").

5.  Beginning in late 2006 and continuing through the relevant times covered by this Application, certain of Highland's affiliates and related entities were, collectively, the second largest beneficial stockholder in Delphi with aggregate holdings of approximately 8.8% of the issued and outstanding common stock, par value $0.01 per share, of Delphi. These investment funds also held $30 million of junior debt, $211 million of bond debt, and $84 million of pre-petition bank debt dating back to October 2005.

6.  On December 18, 2006, Delphi filed an expedited motion (the "*Framework Motion*")[3] seeking court approval of an equity purchase and commitment agreement between Appaloosa Management, L.P. ("*Appaloosa*") and Delphi (the "*First Appaloosa EPCA*"). Pursuant thereto, Delphi was looking for a means to propose and confirm a Chapter 11 plan in order to exit bankruptcy, and the Appaloosa transaction provided Delphi with a means to do so. However, in Highland's opinion, the transaction would have transferred control of the company over to Appaloosa for far less than what the company was worth at the time and was not in the best interests of Delphi and its various creditors, stockholders, and other parties in interest.[4] Additionally, the transaction was structured in a way that would inevitably chill alternative proposals because it included a massive alternate transaction fee (a break-up fee) in the amount of $100 million payable to Appaloosa (in addition to reimbursement of fees and costs), the payment of which was dependent upon actions taken by parties other than Delphi, namely GM. In addition, Appaloosa was permitted to terminate the transaction even if the Court had already approved the disclosure statement associated with a plan of reorganization incorporating the transaction, creating what amounted to an entirely risk-free investment for Appaloosa.

---

[3] Docket No. 6179.
[4] Highland Commitment Letter, Docket No. 6330, Exhibit A.

7. When Highland analyzed the First Appaloosa EPCA, Highland determined that Appaloosa's proposed equity investment represented an underpayment for the equity to be received by Appaloosa and that consummation of the First Appaloosa EPCA would result in lost value for all of Delphi's stakeholders. Highland also determined that an additional grant of preferred stock to Appaloosa in a transaction that already granted it far too much control over Delphi was unnecessary.

8. In order to address these inequities, Highland felt it necessary to object to the Framework Motion and to put Appaloosa at economic risk of losing its deal. Therefore, Highland decided to put together an alternative proposal for Delphi to consider as its plan of reorganization instead of the Appaloosa proposal. Highland's goal was to support its objection with a formal capitalized proposal, which Highland believed was a higher and better proposal for Delphi than what Appaloosa was offering.

9. On December 21, 2006, three days after the First Appaloosa EPCA was filed with the Court, Highland submitted its proposal (the "*Highland Proposal*") to Delphi in the form of a commitment letter. Under the terms of the Highland Proposal, Highland offered to provide $4.7 billion of capital, a substantially lower $20 million break-up fee, and a board of directors that was independent from Highland as the plan investor—all without requiring a $1.2 billion preferred stock grant to Highland. Even though Highland was committing more capital to Delphi than Appaloosa, Highland did not require board control, and specifically wanted board representation spread throughout the capital structure so that a wide range of estate constituencies would have a direct interest and say in Delphi's success post emergence. Certain terms of the Highland Proposal were clarified in a subsequent letter to the Delphi board of

directors dated December 29, 2006. I was personally involved in the drafting of these two letters, which constitute the Highland Proposal, and signed each of these letters.

10. Many parties, including the Trade Committee, the Creditors' Committee, the United States Trustee (the "*UST*"), and the Official Committee of Equity Security Holders (the "*Equity Committee*"), filed objections to the initial Framework Motion and voiced concerns regarding the highly inequitable terms of the First Appaloosa EPCA, such as the unnecessarily large break-up fee, which could be triggered by actions of non-Debtors. The presence of the Highland Proposal, however, changed the landscape for all parties involved. The IUE-CWA, for instance, supplemented its earlier objection to the Framework Motion to utilize the Highland Proposal as an additional argument in favor of its objections.[5] The Equity Committee similarly supplemented its earlier objection to the Framework Motion twice to seize upon the Highland Proposal's "superior economics and governance provisions" as leverage in arguing for better treatment.[6]

11. After the Highland Proposal was presented to Delphi and the Court, significant negotiations took place between Delphi, Appaloosa, and the two official committees. In Delphi's reply to objections to the Framework Motion, Delphi expressly stated that the Highland

---

[5] Docket No. 6496 at 14 ("The Highland Capital proposal demonstrates that the proposal by the Proposed Investors was not necessary to attract other interested investors."); *id.* at 15 ("Since Highland Capital has offered to do this deal at a much lower break up fee, there is no reason to believe that the Proposed Investors need these proposed fees and expenses to remain interested in acquiring Delphi."); *id.* at 6 ("The Highland Capital proposal does not require the same extraordinarily broad corporate governance powers that are granted to the Proposed Investors under the Motion.").

[6] Docket No. 6497 at 26; *id.* at 3 ("Moreover, since the filing of the Equity Committee's First Supplemental Objection [], there has been a key development. [Highland], an alternative bidder, has provided the Debtors with a commitment letter to pursue transactions similar to those contemplated in the Agreements on terms more favorable to the Debtors and their estates than those proposed by the Plan Investors. The Highland proposal provides for a vastly improved capital and governance structure compared to the [structure] contemplated by the Agreements."); Docket No. 6543 at 3 ("With a higher offer on the table, the Debtors do not owe anything more to the Plan Investors, most especially deal protections.").

Proposal was used by Delphi as a negotiation tool against Appaloosa.[7] The negotiations led to numerous clarifications and modifications to the First Appaloosa EPCA prior to the January 11-12, 2007 Approval Hearing. Ultimately, these negotiations produced an amended equity purchase agreement between Delphi and Appaloosa (the "*Amended First Appaloosa EPCA*"), which greatly benefitted Delphi. The changes included:

- The list of events constituting a Change of Recommendation in the Equity Purchase and Commitment Agreement (the "*EPCA*") was changed to exclude actions taken by GM.

- The termination rights under the EPCA were modified so that (i) neither the Delphi's nor GM's termination of the Plan Framework Support Agreement ("*PSA*") provided Delphi with a termination right under the EPCA, and (ii) Delphi and the Plan Investors had, in addition to their other respective termination rights, an unconditional right to terminate the EPCA on or after August 31, 2007 if the Closing Date had not occurred.

- Various provisions of the EPCA governing the Rights Offering were changed so that holders of Rights could exercise those rights via a document separate from the ballot forms to be used in connection with solicitation of acceptances of the Plan.

- The EPCA, the PSA, and the Preferred Stock Term Sheet were changed so that various restrictions applicable to A-D Acquisition Holdings, LLC, Dolce Investments LLC, and/or the holders of Series A Preferred Stock would apply to their respective affiliates.

- The Preferred Stock Term Sheet was changed so that, if an event would cause shares of Series A Preferred Stock automatically to convert into shares of Series B Preferred Stock but for the lack of a registration statement covering resales of Series B Preferred Stock, such conversion would occur when such registration statement became effective.[8]

12. It is my belief that these benefits realized by Delphi's estates were a direct result of Highland's $4.7 billion alternative proposal. No party besides Highland even indicated a desire to present a financed alternative proposal to the First Appaloosa EPCA. No one but

---

[7] Docket No. 6531 at 18 ("In preparation for the January 10, 2007 Board meeting, the Debtors requested certain information from the Plan Investors regarding their view of the Highland proposal, and also asked them to consider beneficial modifications to the Framework Agreements in light of the Highland Proposal.").
[8] These changes are identified in the Delphi's Omnibus Reply to Objections to Plan Investment and Framework Support Approval Motion (Docket No. 6531) at 6-7.

Highland backed up their objection to the Appaloosa transaction with money or a different structure for a Chapter 11 plan. But for Highland's objection—supported by Highland's $4.7 billion alternative investment proposal—Appaloosa would not have had any economic incentive to agree to any of the modifications reflected in the Amended First Appaloosa EPCA. During the Cases, Appaloosa has proven to all concerned that it drives a very hard bargain, and I do not believe that negotiations that were not supported by a competing proposal would have moved Appaloosa. Thus, Highland provided a substantial contribution to the Cases during this initial period of the Appaloosa saga.

13. At the January 11 hearing to consider the Framework Motion, the Court approved Delphi's decision to proceed with Appaloosa rather than Highland. Even though Highland did not believe the Amended First Appaloosa EPCA went far enough, Highland did not press its legal options any further. Highland's main goal in presenting its proposal to Delphi and other constituencies was to provide a significantly better deal for Delphi and its stakeholders to consider while simultaneously creating an environment in which Delphi and the official committees could negotiate with Appaloosa from a position of some strength, backed by a real proposal rather than negotiating with empty hands against the only monied player in the house.

14. In the Spring of 2007, Delphi made several public disclosures regarding the inability of the parties to the Appaloosa transaction to secure the necessary approvals and agreements needed to proceed with that transaction. Highland still had an interest in Delphi and in trying to provide a more equitable allocation of value to shareholders and other stakeholders in the Cases. Highland reached out to Delphi in April of 2007 so advising Delphi of its continued interest in pursuing a transaction similar to that proposed by Highland in December of 2006. To

that end, Highland was having discussions with the chair of Delphi's Equity Committee with respect to a plan alternative to the Appaloosa transaction, which was in jeopardy of failure.

15.     Indeed on July 7, 2007, Delphi terminated the Amended First Appaloosa EPCA due to a valuation dispute with Appaloosa. Delphi made it known that they expected to enter into new framework agreements with Appaloosa at some point in July of 2007.

16.     In late June and early July of 2007, while Delphi was negotiating potential changes to the Appaloosa transaction, Highland generated a new investment proposal for consideration by Delphi and other stakeholders. Through a series of intense meetings and negotiating sessions during the first two weeks of July, Delphi developed a set of competing investment proposals from Highland and Appaloosa. Highland was able to immediately engage in these substantive discussions and prepare the necessary documentation only because of the work Haynes and Boone did in January of 2007 in the Cases. Absent those efforts, Highland could not have effectively participated in these negotiations nor would Delphi have been able to develop its set of documented competing investment proposals to use as leverage against Appaloosa when it was negotiating its new deal during this short two week period.

17.     Delphi played the Highland and Appaloosa proposals against each other during negotiations. A review of Delphi's motion to approve Appaloosa's final proposal in these negotiations,[9] which was filed on July 18, makes this absolutely clear. In fact, I spoke with John Sheehan, Delphi's Chief Restructuring Officer during this two week period, and he told me that this was Delphi's strategy—to use Highland against Appaloosa, and vice versa in order to come up with the best deal Delphi could get with the lowest costs in fees to the company.

---

[9] Expedited Motion for Order Authorizing and Approving Delphi-Appaloosa Equity Purchase and Commitment Agreement Pursuant to 11 U.S.C. §§ 105(a), 363(b), 503(b), and 507(a) (Docket No. 8673).

18.     On July 18, 2007, Delphi announced that they had accepted a new proposal for an equity purchase agreement with Appaloosa (the "*Second Appaloosa EPCA*"). Notably, certain key provisions were changed to be more beneficial to Delphi in this round of negotiations. And, I believe that these changes were a direct result of Highland's new competing proposal and Delphi's use of that proposal to leverage a new and better deal with Appaloosa.

19.     For instance, the Preferred Commitment Fee to be paid to Appaloosa was lowered from $21 million to $18 million and the Standby Commitment Fee was lowered from $55.125 million to $39.375 million with an Arrangement Fee of $6.375 million.[10] Delphi notes in its motion to approve the Second Appaloosa EPCA that the total fees payable to Appaloosa would be lowered by $19 million to $63.75 million. This fee total payable to Appaloosa is not a coincidence. Highland's proposed fees for its July 2007 proposal—negotiated at the same time that Delphi was negotiating with Appaloosa—were $60 million. The savings in fees Delphi negotiated and actually paid to Appaloosa were accomplished as a direct and proximate result of Delphi's use of Highland as a foil against Appaloosa in the July 2007 negotiations.

20.     The improvements in the new Appaloosa agreements were not limited to the economic terms of the transaction though. The newly negotiated transaction eliminated the "sole discretion" standard for many conditions to consummation of the investments contemplated by the First Appaloosa ECPA, it gave Delphi the ability to cure a deficiency in the satisfaction of certain conditions, and it provided for six of the nine board members to be independent of the Plan Investors.[11] For the second time, Highland's efforts provided Delphi with the ability to negotiate more advantageous terms with Appaloosa in a competitive environment and saved Delphi more than $19 million in real dollars.

---

[10] *See id.* at 17-20.
[11] *Id.* at 21-25.

21. On July 27, 2007, Highland filed a statement with the Court expressing disappointment but did not file an objection to Delphi's motion to approve the Second Appaloosa EPCA. Highland believed further litigation would diminish recovery to Delphi's stakeholders and elected not to pursue its legal rights further. On August 2, 2007, the Second Appaloosa EPCA was approved by the Court at an uncontested hearing.

22. On December 10, 2007, Delphi filed its First Amended Joint Plan of Reorganization (the "*Plan*"), incorporating the Second Appaloosa EPCA. On January 25, 2008, the Court confirmed the Plan, and the Confirmation Order became final on February 4, 2008.

23. Thereafter in March of 2008, in a very difficult credit market, Delphi was searching for financing in order to implement the Plan, if confirmed. Again, Highland stepped up to the plate for Delphi and agreed to provide a substantial part of that financing. It was during those negotiations for financing that John Sheehan acknowledged directly to me the substantial contribution that Highland had made to the administration of the Cases by repeatedly stepping up with restructuring proposals that Delphi used its negotiations with Appaloosa in order to reduce fees paid and try to get a better recoveries for stakeholders in the Cases. Mr. Sheehan evidenced those representations in writing to me in a series of e-mails dated during the period from March 19, 2008 through March 27, 2008, which were attached as Exhibit "A" to the Supplement. It was in reliance upon these representations that Highland has filed the Application.

24. On April 4, 2008, Appaloosa terminated the Second Appaloosa EPCA, thereby rendering Delphi unable to fully consummate the Plan.

25. On May 16, 2008, Delphi initiated litigation against Appaloosa for wrongful termination of the Second Appaloosa EPCA. This litigation was ultimately settled in the Fall of 2009.

26.    On July 30, 2009, the Court entered an order approving modifications to the Delphi Plan (the "*Modified Plan*")[12], which called for a reorganization pursuant to a sale under section 363 of the Bankruptcy Code. On October 6, 2009, following consummation of a sale via credit bid by certain of Delphi's secured creditors, the Modified Plan became effective[13] and Delphi exited bankruptcy.

27.    In sum, in order to distribute Delphi's value fairly for all creditor and equity constituents, Highland was willing to invest far more and expose itself to greater risk than Appaloosa. Highland saw an opportunity to create more value for the estates and all of the stakeholders and sought to provide a better deal than Appaloosa. Highland's actions were essential to Delphi to provide it the leverage needed to negotiate workable agreements and save it $19 million in fees reflecting a tangible real dollar savings to Delphi during the Cases. Of all the parties-in-interest in the Cases, only Highland submitted alternative investment offers and entered into serious negotiations with Delphi concerning plan alternatives that resulted in the hard dollar benefits described by me herein and acknowledged by Delphi.

I declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this 30th day of June, 2010 at New York, New York.

_____
Patrick H. Daugherty

---

[12] Docket No. 18707.
[13] *See* Notice of (A) Order Approving Modifications to First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession and (B) Occurrence of Effective Date (Docket No. 18958).