1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481-rdd

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION, et al.,


       Debtors.


- - - - - - - - - - - - - - - - - - - -x


           U.S. Bankruptcy Court

           One Bowling Green

           New York, New York


           August 20, 2009

           10:20 AM


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1    OMNIBUS HEARING

2

3    HEARING re "Notice Of PBR Knoxville Sale Motion" - Notice of

4    Motion Under 11 U.S.C. Section 363 and Fed. R. Bankr. P. 2002

5    and 6004 for Order Authorizing and Approving Entry by Delphi

6    Automotive Systems Tennessee, Inc. into Letter Agreement with

7    Robert Bosch LLC for Sale of Interest in PBR Knoxville LLC

8    (Docket No. 18716)

9

10   HEARING re "Shinwa Settlement Motion" - Expedited Motion Under

11   11 U.S.C. Section 363 and Fed. R. Bankr. P. 9019 for Approval

12   of Debtors' Compromise and Settlement with Shinwa International

13   Holdings, LTD. f/k/a Shinwa Co., LTD., and Samtech Corporation

14   (Docket No. 18770)

15

16   HEARING re Motion of Plymouth Rubber Company, LLC for Order

17   Deeming Administrative Claim Of Plymouth Rubber Company, LLC

18   Timely Filed and Related Relief (Docket No. 18714)

19

20   HEARING re "Motion for Authority to Apply Claims Objection

21   Procedures to Administrative Expense Claims" - Motion for Order

22   Pursuant to 11 U.S.C. Sections 105(a) and 503(b) for Order

23   Authorizing Debtors to Apply Claims Objections Procedures to

24   Administrative Expense Claims (Docket No. 18715)

25

3

1

2

3    HEARING re Order signed on 12/6/2006 (with Exhibits)

4    establishing (1) dates for hearings regarding objections to

5    claims and (II) certain notices and procedures governing

6    objections to claims (related document(s) [5453]).

7

8    HEARING re Notice of Hearing Proposed Forty-Sixth Omnibus

9    Hearing Agenda filed by John Wm. Butler Jr. on behalf of Delphi

10   Corporation.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed By:  Clara Rubin

4

```
 1
 2    A P P E A R A N C E S :
 3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
 4          Attorneys for Debtors and Debtors-in-Possession
 5          333 West Wacker Drive
 6          Suite 2100
 7          Chicago, IL 60606
 8
 9    BY:   JOHN (JACK) WM. BUTLER, JR., ESQ.
10
11
12    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
13          Attorneys for Debtors and Debtors-in-Possession
14          Four Times Square
15          New York, NY 10036
16
17    BY:   KAYALYN A. MARAFIOTI, ESQ.
18
19
20    BARNES & THORNBURG LLP
21          Attorneys for Howard County
22          11 South Meridian Street
23          Indianapolis, IN 46204
24
25    BY:   DAVID M. POWLEN, ESQ.
```

5

1

2      DUANE MORRIS LLP

3            Attorneys for Plymouth Rubber Company, LLC

4            1540 Broadway

5            New York, NY 10036

6

7      BY:   JAMES J. VINCEQUERRA, ESQ.

8

9

10     DUANE MORRIS LLP

11           Attorneys for Plymouth Rubber Company, LLC

12           470 Atlantic Avenue

13           Suite 500

14           Boston, MA 02210

15

16     BY:   KARA M. ZALESKAS, ESQ. (Admitted Pro Hac Vice)

17

18

19     LATHAM & WATKINS LLP

20           Attorneys for the Official Creditors' Committee

21           53rd at Third

22           885 Third Avenue

23           New York, NY 10022

24

25     BY:   MICHAEL RIELA, ESQ.

6

```
 1

 2    FOLEY & LARDNER LLP

 3          Attorneys for Interested Party, PBR Knoxville

 4          100 North Tampa Street

 5          Suite 2700

 6          Tampa, FL 33602

 7

 8    BY:   JENNIFER HAYES, ESQ. (TELEPHONICALLY)

 9

10    WARNER NORCROSS & JUDD LLP

11          Attorneys for Creditor, Robert Bosch

12          900 Fifth Third Center

13          111 Lyon Street NW

14          Grand Rapids, MI 49503

15

16    BY:   GORDON J. TOERING, ESQ. (TELEPHONICALLY)

17

18

19

20

21

22

23

24

25
```

7

1                    P R O C E E D I N G S

2           THE COURT:  Please be seated.  Okay, In re Delphi

3    Corporation.

4           MR. BUTLER:  Your Honor, good morning.  Jack Butler

5    and Kayalyn Marafioti here for the debtors in connection with

6    the forty-sixth omnibus hearing.  We filed an agenda, which

7    we'd use today.

8           THE COURT:  Okay.  That's fine.

9           MR. BUTLER:  Your Honor, I'd like to deal with matters

10   1 and 2 together.  In fact, the -- and I'll address 3 and 4,

11   all which deal with administrative claims, but let me just deal

12   with 1 and 2 to start with.  1 is the Sweetons' administrative

13   claim motion at docket number 16381, and number 2 is the CSX

14   Transportation Inc. administrative claim at docket number

15   16548.

16          Your Honor, assuming that Your Honor, during this

17   hearing, approves the administrative claims procedures, our

18   intention would be to treat both of these claims, these

19   motions, in connection with the claims that both these parties

20   have filed, under the administrative claims procedures.  And so

21   we would move them to the September 24th claims hearing docket

22   and treat them under the procedures.

23          There was the question with the Sweetons as to what

24   would be dealt with -- done in connection with their lease.  We

25   had advised you at earlier occasions that the debtors were

8

1  considering filing a motion to reject the lease deemed to an

2  earlier date.  The debtors concluded not to do that.  They were

3  scheduled in connection with the plan, and their lease will be

4  deemed rejected as of the effective date of the plan.

5        THE COURT:  Okay.

6        MR. BUTLER:  So the only issue that will be before the

7  Court will be what portion of their -- actually, there are two

8  issues; there's a pre-petition claim, but more importantly what

9  portion of their claim would be deemed an administrative claim.

10  And so as to both that matter and as to the CSX matter, we'd be

11  treating them under the claims procedures and setting them for

12  the September 24th claims docket.

13        THE COURT:  Okay.  Do they understand that?

14        MR. BUTLER:  CSX has consented to it, and we're going

15  to be advising -- depending on the outcome of this hearing,

16  we're going to be advising the Sweetons of that.  We have

17  advised them that -- how they'd be scheduled in connection with

18  their lease so that all --

19        THE COURT:  And also that it would be adjourned to the

20  24th?

21        MR. BUTLER:  Yes.

22        THE COURT:  Okay.

23        MR. BUTLER:  And then in terms of further

24  adjournments, Your Honor, we would just deal with it as we deal

25  with it under the claims procedures.

9

1          THE COURT:  Right.

2          MR. BUTLER:  With respect to matters 3 and 4, matter 3

3    is a motion of Furukawa Electric Company for leave to file an

4    administrative expense claim, at docket number 18706.  And

5    matter number 4 is a motion by the AT&T entities compelling

6    payment of administrative expenses or seeking to modify the

7    automatic stay to permit termination of what they claim to be

8    executory contracts, at docket number 18737.  Both of these

9    matters, because they involve items other than just an

10   administrative claim, per se, are being adjourned to the

11   September 24th omnibus hearing while we work out -- try to work

12   out the issues with the parties.

13         THE COURT:  Okay.  What is involved in them besides --

14   oh, one is to file a claim late --

15         MR. BUTLER:  And the other is to terminate to lift the

16   stay.

17         THE COURT:  Okay.  All right.

18         MR. BUTLER:  So we thought, because they invited some

19   other subject matters, we'd keep them on the omni docket --

20         THE COURT:  Okay.  Very well.

21         MR. BUTLER:  -- till those things were sorted out.

22         THE COURT:  Okay.

23         MR. BUTLER:  Your Honor, that takes us to item number

24   5 on the agenda, which is the PBR Knoxville sale motion at

25   docket number 18716.  This motion seeks authority, Your Honor,

10

1    for Delphi Automotive Systems Tennessee, Inc., one of the

2    forty-two debtors in these cases, to complete a transaction

3    pursuant to a letter agreement dated July 30th, 2009 with

4    Robert Bosch LLC for the sale of the debtors' entire forty-nine

5    percent membership interest in PBR Knoxville LLC, an existing

6    joint venture between the debtors and PBR Tennessee Inc.

7           There are no objections here.  My understanding is

8    counsel for Robert Bosch, Gordon Toering of Warner Norcross &

9    Judd, Grand Rapids, is on the phone for this.  The sale price

10   here is 1.75 million.  Normally, Your Honor, this would not

11   come before the Court before you have a pretty standard de

12   minimis assets sale order that would allow us to deal with

13   these matters under ten million, pursuant to the terms of that

14   order.  The reason that this has been brought up here is more a

15   matter of caution and disclosure because of the affiliation

16   between PBR Tennessee and Robert Bosch LLC.  There was a

17   question raised as to whether or not they were an affiliate and

18   whether, because they're an affiliate, broadly defined, whether

19   that -- which would be excluded from the de minimis assets

20   sales procedures, whether or not -- and therefore might be

21   deemed to be an insider under some circumstances.  And neither

22   the debtors nor Bosch conceded that point.  We thought it was

23   appropriate to bring this matter before the Court.

24          I don't think there's any other magic about this

25   motion beyond that --

1          THE COURT:  Okay.

2          MR. BUTLER:  -- of disclosure and caution.

3          THE COURT:  Have the debtors received any other bids

4     or proposals for this --

5          MR. BUTLER:  No.

6          THE COURT:  -- for this interest?

7          MR. BUTLER:  No, Your Honor, we have not.

8          THE COURT:  Okay.

9          All right, does anyone have anything to say on this

10    motion?

11         All right, I'll approve the motion, which is

12    unopposed.  The interest is not part of the debtors' business

13    plan and there are clearly good business reasons for selling

14    the asset, given the credit bid.  I'm not sure whether there

15    are any secured claims against this interest, but in any event,

16    there have been no objections, so it could be sold free and

17    clear under 363(m).

18         MR. BUTLER:  Thank you, Judge.

19         THE COURT:  I mean the credit bid --

20         MR. BUTLER:  Right.

21         THE COURT:  -- by the DIP lenders.

22         MR. BUTLER:  Right.  I think, Your Honor, as a

23    technical matter, that the liens will remain outstanding until

24    the effective date of the plan, but there is no objection

25    here --

12

1        THE COURT:  Right.

2        MR. BUTLER:  -- to this transaction.

3        THE COURT:  Okay.

4        MR. BUTLER:  Matter number 6, Your Honor, is the

5   Shinwa settlement motion at docket number 18770.  We're asking

6   Your Honor to approve the compromise and settlement with Shinwa

7   International Holdings, Ltd., which is formerly known as

8   Samtech Corporation, relating to a pending lawsuit filed by the

9   debtors against Shinwa.  The creditors' committee consented to

10  this being dealt with on ten days' notice.  There are no

11  objections.

12        To sort of make a long story short with respect to

13  this motion, Your Honor, we have the terms of the settlement;

14  there are four principal terms.  We would reactivate Shinwa on

15  the debtors' global supplier list as an eligible supplier for a

16  reward of business by the debtors within fourteen days after

17  the settlement was executed.  Shinwa will pay the debtors

18  300,000 dollars.  Shinwa will release and waive any pre-

19  petition claims against the debtors, and there'll be mutual

20  releases.

21        Your Honor, the business justification for this and

22  rationale under 9019 goes to a cost-benefit analysis of the

23  litigation.  There have been challenges in connection with the

24  discovery.  There's been a tremendous amount of money spent on

25  this claim.  And there is a fact that we think would have -- an

13

1   additional fact that would, I think, be implicated in the

2   litigation in that one of the principal OEMs that received the

3   CD players was General Motors, and General Motors waived a

4   substantial portion of their warranty claims in connection with

5   all the settlements that we had --

6         THE COURT:  So that would --

7         MR. BUTLER:  -- or dealt with.

8         THE COURT:  -- that would greatly reduce the fifteen

9   million in claims damages.

10        MR. BUTLER:  Arguably, Your Honor, it would.  I mean,

11  you know, you'd get in -- I think you'd get into an argument

12  about fungibility at the time, but that's what 9019 is designed

13  for us to assess.

14        THE COURT:  Right.

15        MR. BUTLER:  And, ultimately, the judgment reached was

16  this -- the settlements before Your Honor seem to be an

17  appropriate disposition of this litigation under these

18  circumstances.

19        THE COURT:  Okay.

20        Does anyone have anything to say on this motion?

21        All right, for the reasons stated in the motion, I'll

22  approve it as clearly a fair and reasonable settlement.

23        MR. BUTLER:  Your Honor, matter number 7 on the agenda

24  is the motion of Plymouth Rubber Company, LLC seeking to have

25  an administrative claim that was filed fifteen days after the

14

1    bar date to be deemed timely filed, at docket number 18714.

2    And counsel's here to present the motion.

3              THE COURT:  Okay.

4              MR. VINCEQUERRA:  Good morning, Your Honor.  James

5    Vincequerra, Duane Morris, for Plymouth Rubber Company, LLC.

6    I'll explain in a minute why I'm emphasizing the LLC.  With me

7    today is Kara Zaleskas from my -- Duane Morris' Boston office.

8              As a matter of housekeeping, Your Honor, Ms. Zaleskas

9    filed a pro hac vice motion approximately two weeks ago.  I

10   don't believe I saw the order on the docket yet.  I would just

11   ask, to the extent she is required to appear here --

12             THE COURT:  That's fine.  That's granted.

13             MR. VINCEQUERRA:  Thank you very much, Your Honor.  A

14   number of -- a lot of trees were killed in the filings in

15   connection with this matter.  We raise no less than five issues

16   as to why -- or reasons why our claim should be deemed timely

17   or should otherwise be -- or the new admin claims bar date

18   should not be deemed to apply to our claim.

19             I'm really going to focus here on two of the issues:

20   the improper notice issue first and then, to the extent that

21   Your Honor finds that the new bar date does apply to the claims

22   of Plymouth Rubber Company, LLC, the excusable -- the

23   components of excusable neglect.

24             I'll leave the balance of the arguments in our papers

25   with regard to the technicalities of the amended admin bar

VERITEXT REPORTING COMPANY

212-267-6868                                            516-608-2400

15

1    date, or the new admin bar date, the efficacy of that

2    admitted -- or modification order and the informal notice to

3    our papers.  I think they're argued fairly clearly there.

4            THE COURT:  The informal proof-of-claim argument?

5            MR. VINCEQUERRA:  Yes, that's right.

6            THE COURT:  Okay.

7            MR. VINCEQUERRA:  I apologize.  I'll leave those to my

8    papers and reserve any statements on those for rebuttal to the

9    extent we deem it's necessary.

10           As an initial matter, do you have any questions about

11   the papers, Your Honor?  I'd be happy to answer them.

12           THE COURT:  Well, I've reviewed them, so -- I guess

13   the issue on whether it's Inc. or LLC, to my mind, is -- it

14   seems to me it's a non-issue because it was actually received

15   by the claimant, right?  It was received?

16           MR. VINCEQUERRA:  It was received the day after the

17   bar date.

18           THE COURT:  Well, no, I mean it was received by the

19   individual who forwarded it on.

20           MR. VINCEQUERRA:  Well, really, the -- I mean, the

21   point we're getting to is proper notice, I would imagine.  And

22   a couple of points.  The debtor to points to 2002(g) and

23   service on LLC first through the law firm Burns and Levinson

24   and then at the former address of the Plymouth Rubber, Inc.

25   entity.  A couple of points here, Your Honor.  Service was made

16

1    pursuant to outdated -- you know, an outdated claims --

2    outdated exhibit-and-schedules lists and based on a claim that

3    was filed by a different entity.  Service was effected on

4    counsel for a different entity.  Burns and Levinson LLC, which

5    makes up a bulk of the notice argument, never represented the

6    LLC entity.  I mean, and it's important to understand --

7            THE COURT:  Was there any -- is there anything in the

8    record about notice of Plymouth Rubber Company Inc.'s Chapter

9    11 case and reorganization by --

10           MR. VINCEQUERRA:  Delphi actively participated in that

11   case, Your Honor.

12           THE COURT:  How do I know that?

13           MR. VINCEQUERRA:  Excuse me?

14           THE COURT:  How do I know that?  Or will they

15   acknowledge that?

16           MR. VINCEQUERRA:  Well, I can't imagine they won't

17   acknowledge it, Your Honor, as they filed stipulations in that

18   case as well as, I believe, a claim.

19           THE COURT:  When did the plan confirm?

20           MR. VINCEQUERRA:  Plymouth Rubber Inc. confirmed its

21   plan and emerged from bankruptcy on August 31st, 2006.  And

22   maybe I should back up a little bit, Your Honor, and give you a

23   little bit of a time line here because that may be helpful.

24           THE COURT:  I mean, I know they sued LLC.

25           MR. VINCEQUERRA:  That -- you know, that's the rub

17

1   here, Your Honor.  They served the objection -- the notice of

2   the new bar date on Inc. at seven different locations, or five

3   different locations, wherever it -- however many it was, served

4   counsel for Inc.  Burns and Levinson has never represented the

5   reorganized debtor, and -- but they got it right when they

6   wanted to sue the new entity under the new purchase order.

7            THE COURT:  But, again, Mr. Collins forwarded this

8   notice on to LLC, right?

9            MR. VINCEQUERRA:  Well, you're right, Your Honor,

10  they --

11           THE COURT:  And he was acting as LLC's agent, wasn't

12  he?

13           MR. VINCEQUERRA:  Right, as part of the wind-down

14  staff.  And if --

15           THE COURT:  Okay.

16           MR. VINCEQUERRA:  -- if Your Honor is -- you know,

17  wants it moved forward to the excusable neglect argument, which

18  I think is also a very good argument, I don't think the notice

19  was proper there.  I think, you know -- at footnote 3 of their

20  objection is very telling.  They note that for the purposes of

21  their objection they presume that LLC is the successor-in-

22  interest to Inc.  I'm not aware of any case law that says you

23  can get the benefit of that assumption for notice requirements

24  under an --

25           THE COURT:  But, again --

18

1          MR. VINCEQUERRA:  -- under an admin --

2          THE COURT:  -- Mr. Collins made the same presumption,

3     right?  He sent the notice on to LLC?

4          MR. VINCEQUERRA:  He did send it on, there's -- we do

5     not contest that fact.

6          THE COURT:  Okay.

7          MR. VINCEQUERRA:  So if you have no other questions

8     for me on the proper notice -- we don't contest the fact that

9     Mr. Collins did receive actual notice -- I can move on to

10    excusable neglect.

11         THE COURT:  Okay.

12         MR. VINCEQUERRA:  Debtors don't contest two components

13    of excusable neglect:  They don't contest that the -- regarding

14    the length of delay or Plymouth Rubber's good faith.  So,

15    really all that we're left with, Your Honor, is the prejudice

16    requirement and the reason for delay.

17         Mr. Butler indicated that a proof of claim was filed

18    fifteen or sixteen days after the bar date.  That's technically

19    true.  We alerted -- well, we alerted counsel for the debtor

20    the day after the bar date, asking them to deem the claim

21    timely filed; that's reflected in Ms. Zaleskas' affidavit.

22         But to get to the point of excusable neglect, Your

23    Honor, what happened here is really a perfect storm for my

24    client.  The prior entity, the Inc. entity, will have business

25    relationships with Delphi as a result of the Delphi bankruptcy

19

1    and things that happened which, to be quite honest with you, my

2    firm was not involved with.  They went into bankruptcy and

3    reorganized.  When they emerged from bankruptcy, they had new

4    equity, substantially new officers and directors, effectively a

5    new entity; entered into a new purchase order agreement with

6    Delphi on January 30th, 2008.  About nine months after that,

7    that's approximately a year and a half after, they emerged from

8    bankrupt -- the reorganized debtor emerged from bankruptcy.

9         Approximately nine months after entry into that

10   purchase order, Delphi sued Plymouth Rubber Company, LLC in

11   Michigan for breach of the contract, for breach of the purchase

12   order agreement.  Plymouth Rubber Company, LLC counterclaimed,

13   and that's the basis of our -- those are the bases of our --

14   that's the basis of our admin claims.

15        Six days after Delphi sued Yongel (ph.) -- the Yongel

16   Company, another -- a supplier of Plymouth Rubber Company also

17   sued Plymouth Rubber Company, LLC.  And in that case as well,

18   Plymouth Rubber Company filed counterclaims both against Yongel

19   and Delphi.

20        Both those cases were consolidated for mediation

21   purposes and they're in global mediation.  The -- as a result

22   of the lawsuits from their principal buyer and their principal

23   supplier, Plymouth Rubber Company, LLC started its own line

24   down in October of 2008 and approximately three months after

25   that laid of all of its employees.  And that's where we have,

20

1    you know, the sole employee of the debtor, Mr. Collins.

2          So, you know, it's important to remember -- oh, let me

3    jump -- I'm sorry, excuse me, Your Honor, let me jump to the

4    portions of excusable neglect that are in dispute:  reason for

5    delay.  We laid out some of these facts because, I mean,

6    clearly there is a legitimate reason for Plymouth Rubber

7    Company, LLC's one-day delay in providing notice to the debtors

8    with regard to their admin claim.

9          THE COURT:  I guess my one issue with that is why

10   didn't Mr. Collins open the envelopes?

11         MR. VINCEQUERRA:  Why did he open the envelopes?

12         THE COURT:  Why didn't he?

13         MR. VINCEQUERRA:  Why didn't he?

14         THE COURT:  Right.  I mean, he got them on the 9th.

15   He put them -- it doesn't say this, but I guess one can infer

16   that he didn't open them, he put them in another envelope and

17   mailed them to Mr. -- it begins with an S, let me get the right

18   name -- Mr. Schultz.

19         MR. VINCEQUERRA:  Yes, that's right.  His name is --

20         THE COURT:  I don't understand why he didn't open the

21   envelopes, because they weren't received by Mr. Schultz until

22   six days later.  I mean, particularly if he'd been waiting --

23   if they'd been -- you know, if he only checks the P.O. box

24   every two weeks, I don't understand why he wouldn't have opened

25   the envelopes.

21

1        MR. VINCEQUERRA:  Well, I mean, it's not in his

2   papers, Your Honor, and anything I say would be pure, you know,

3   suspicion and guesswork.  But the fact of the matter is that

4   the notices were not addressed to the entity that employed him.

5   They were addressed to an Inc. -- the Inc. entity.  So, LLC

6   never filed a notice of appearance in this case, has never

7   appeared in this case until this dispute, and they never felt

8   that they had a need to appear in this case because they were

9   party to a post-petition contract that, under the prior plan,

10  gave them an allowed amended claim.

11       So, I mean, while it's pure, you know, circumspection

12  as to why he did not open the letter for a day and put it in

13  regular mail, the letter wasn't addressed to the entity that

14  employed him and the entity that's in wind-down.

15       THE COURT:  Well, it didn't employ Mr. Schultz either,

16  did it?

17       MR. VINCEQUERRA:  No, it did not.  So, Your Honor, to

18  continue on with reason for the delays, you know, there was an

19  aggressive timetable here for the bar date, from the height of

20  the holiday season.  We're in -- Plymouth Rubber Company, LLC

21  is in its own wind-down, is on a short staff, and I think that

22  there's ample justification here for the reason of delay -- for

23  the reason for delay.

24       To move to the other component that's in contest, as

25  to prejudice, I don't see, you know, any realistic manner of

22

1    prejudice here for the debtors.  They learned of the claim one

2    day after the bar date.  There's no contest that Ms. -- there's

3    no question that Ms. Zaleskas -- I mean, it's not contested

4    Ms. Zaleskas alerted the debtors to the claim the day after the

5    bar date.  The claim was filed a week and a half to two weeks

6    later, followed shortly by this motion.  The claim is an

7    unliquidated amount, is in the nature of a counterclaim, you

8    know, brought as a response to suits against Plymouth Rubber

9    Company, LLC.

10        My understanding from my reading of the plan and

11   disclosure statement in this case and some things in the news

12   is admin claims are anticipated to be paid in full, and there

13   are literally hundreds of millions of dollars of admin claims.

14        So I see very little chance for prejudice there.  The

15   debtors make the argument that -- you know, the classic

16   floodgates argument that you commonly see in pioneer type of

17   cases.  The facts of this case are so unique I really don't see

18   that as a reasonable prospect.  Two creditors of the debtors

19   with substantially similar names but different entities, you

20   know, the claimant being in wind-down, I just don't see the

21   floodgates opening here.

22        So with that, Your Honor, if you have no questions,

23   I'll turn it over to, I guess -- is it Mr. Powlen?

24             MR. POWLEN:  Yeah.

25             THE COURT:  Is it -- was it a compulsory counterclaim?

23

1   Does it arise under the same transaction or occurrence?

2           MR. VINCEQUERRA:  Rises under the same purchase order

3   agreement.

4           THE COURT:  Okay.

5           MR. VINCEQUERRA:  Thank you very much, Your Honor.

6           MR. BUTLER:  Judge, just one moment, if you don't

7   mind.

8       (Pause)

9           MR. BUTLER:  Your Honor, I just want to make sure the

10  record is clear here.  I have, and I think counsel will

11  acknowledge that we obtained, and I have for the Court, a

12  certification of conversion from a corporation to a limited

13  liability company of Plymouth Rubber Company, Inc., a

14  Massachusetts corporation.  It's -- it is the same company.  I

15  mean, we hear that it's different companies and not successors.

16  I actually have the documentation from the State of Delaware

17  Secretary of State's Office that we obtained that shows that on

18  September 1st, 2006 the same legal entity was converted from

19  one kind of corporation in Delaware to another kind of

20  corporation in Delaware.

21          So, I mean, I think the suggestion that these are

22  fundamentally different entities just is not accurate.  And

23  I've got the evidence here.  I don't think that counsel,

24  Mr. Vincequerra, would dispute the Secretary of State of

25  Delaware as to what the entity is, and I have that.

24

1        So this is the same legal entity that was converted on

2   the -- on September 1st.

3        Second, Your Honor, Mr. Vincequerra, in his argument,

4   made a major point about the fact that there was a new purchase

5   order in January of 2008.  And, in fact, there was a purchase

6   order that was reissued on -- in January of 2008 after the 2006

7   reorganization to Plymouth Rubber, and it was purchase order

8   number P6850008, and it was issued to the address 500 Turnpike

9   Street in Canton, Massachusetts.  That was the business address

10  that the parties New Plymouth, Plymouth LLC, whatever one wants

11  to call it, that is the address that Plymouth used with Delphi

12  in connection with the new purchase order that Mr. Vincequerra

13  referred to, and the PO was issued to that address.  And the

14  notice of administrative claims bar date was -- one of the

15  places that it went to was to that address in Canton.

16       And so I think that the -- you know, the argument that

17  the notice, in addition to being actually received, it also was

18  the business address that Delphi and Plymouth Rubber Company,

19  LLC used between themselves in the January 2008 purchase order

20  and was the appropriate business address.

21       I don't think, Your Honor, that this matter should

22  turn in any respect on the issue of notice.  Appropriate notice

23  was given; it was given in connection with -- to the

24  appropriate -- you know, the legal entity, which really was the

25  same entity converted, to the business address that was used in

25

1   the 2008 contract between the companies.  And the notice was

2   actually, in fact, received.

3        I think the question is more the excusable neglect

4   question here, and I only have a few comments on that.  First,

5   we acknowledged in our papers that we did receive a call from

6   counsel the day after the bar date.  That isn't unusual.  We

7   receive those kinds of calls fairly regularly when there are

8   bar date issues, and our response is always the same, which is

9   it's not our bar date to change, it's the Court's bar date, and

10  that we don't have any ability to change the date and people

11  need to take whatever steps they need to take to protect their

12  clients.  And the same kind of -- the same discussion was had

13  with counsel for Plymouth Rubber.

14       The fact that they waited a couple of weeks -- and it

15  wasn't just a week, it was the fact they waited until after the

16  plan modification hearing to submit the proof of claim two

17  weeks later, is -- you know, kind of mystifies me as to why

18  they chose to do that.  But that's not excusable neglect.  They

19  could have filed something the next day.  According to

20  Mr. Vincequerra's argument, it would have been -- you know, all

21  they needed to do was to file an administrative claim that

22  attached the lawsuit and that that would have done that.

23       I think when you look at the -- from the company's

24  perspective, the issue here is -- Your Honor, I think, knows

25  from the plan modification hearing and all of the pleadings

1   filed in connection with that, Delphi was on a mission over the

2   last fifteen, sixteen months since the prior plan, before it

3   was modified, hadn't gone effective, to try and develop a

4   solution for these cases that would be successful, that would

5   involve modifying the plan, emerging pursuant to a plan and

6   providing for the payment of administrative expenses that are

7   allowed.  And that took an enormous amount of effort and

8   negotiation to do that.  And one of the things, the processes

9   we went through in the latter part of July, was to assess all

10  of the claims that were made in connection with the bar date

11  and to evaluate those with our chief restructuring officer and

12  with the representatives of our other major stakeholders,

13  particularly with the -- some of the advisors of the DIP

14  lenders in connection with their credit bid so that we were all

15  comfortable in proceeding on the 29th here.  And that was based

16  on having an assessment of what the world of administrative

17  claims was through July -- or through May 31st, understanding,

18  as Your Honor knows, under the modified plan that's now been

19  approved, the -- there's another window bar date that's going

20  to go out covering June 1st through the anticipated effective

21  date of September 30th.

22       But making the assessment of what the unpaid

23  administrative claims were from the -- from October 5, 2005

24  through May 31, 2008 was a real exercise in connection with

25  preparing for the plan modification hearing.  And the fact that

27

1   counsel or their client chose not to file the claim for a

2   couple of weeks after they had actual notice and they had had

3   actual conversations with us I don't think fits within the

4   factors of excusable neglect.

5           That's all, Your Honor, the debtors would have to say

6   on this.

7           THE COURT:  Well, let me explore that a little bit

8   more.  Is there or was there an estimate of allowed

9   administrative claims that was a factor in the DIP lenders and

10  GM going forward on the 29th to propose the winning plan

11  support agreement and lead to the modified confirmation --

12          MR. BUTLER:  Yes, Your Honor.  You --

13          THE COURT:  -- of the plan?  Because, I mean, I don't

14  remember any testimony --

15          MR. BUTLER:  No.

16          THE COURT:  -- on, you know, some floor that -- or

17  some ceiling for administrative claims or anything.

18          MR. BUTLER:  No, there's not, Your Honor.  There was

19  not.  What Your Honor may recall was that one of the charts

20  that we put up and went through explained how the

21  administrative liabilities were going to be allocated among the

22  parties.

23          THE COURT:  Right.

24          MR. BUTLER:  It was intentional that -- and one of the

25  things we fought for in the MDA was not to have dollar cap

28

1    limitations.  There were, in fact -- that was a subject of

2    protracted negotiation, actually, as to whether or not there

3    would be limitations and what those liabilities would be and,

4    instead, the agreement was to do it by category.  And Your

5    Honor saw those categories allocated between the GM entity, the

6    DIPCo entity and DPH Holdings, the reorganized entity.

7          THE COURT:  Right.

8          MR. BUTLER:  And there was also a focus, and Your

9    Honor may recall that Mr. Stipp, in his sworn testimony,

10   provided in his declaration a fair amount of discussion about

11   the assessment of administrative claims as it related to DPH

12   Holdings' ability to be able to deal with its -- or what it

13   needed to satisfy as it moved forward.  And so there was an

14   assessment that went on, there was -- Mr. Stipp did make those

15   evaluations and make those assessment, and there was that, if

16   you will, sort of informal feasibility discussion among the

17   parties.  Ultimately, that didn't arise to the level, Your

18   Honor, of having -- beyond the sworn testimony, there wasn't

19   any controversy at the plan modification hearing about it

20   because ultimately it had been negotiated out.

21         THE COURT:  So which of the three entities would be

22   responsible for any affirmative recovery here?

23         MR. BUTLER:  Without prejudicing the estate, because I

24   may get this wrong, but my sense is that this is a retained

25   liability of DPH Holdings.  I don't know that this -- and the

1    reason I say that is because this supplier no longer does

2    business with the company.  This is a -- but I'd have to check

3    that in terms of -- go back and check that under the plan in

4    the negotiations.  But this is a supplier -- this is a former

5    supplier who, from the company's perspective, failed to live up

6    to its obligations under the purchase order, and it required

7    Delphi to incur a very substantial expense in re-sourcing from

8    the supplier who failed to live up to the terms of their

9    contract in the company.  And that's only why we sued them, and

10   we re-sourced the product.

11        So I think the re-sourced product and the

12   administrative liabilities associated with them go to, in fact,

13   DIPCo, but I think that the exposure under this litigation is

14   likely a DPH Holding obligation.  But I'd have to confirm that,

15   Judge.  That's my best recollection.

16        THE COURT:  Okay.  Well --

17        MR. BUTLER:  And as you know, DPH Holdings --

18        THE COURT:  It wouldn't be -- I guess it wouldn't be a

19   GM one because this isn't a GM plant --

20        MR. BUTLER:  No, it's not -- no, no, it's -- and

21   that's what I'm saying to you.  My -- and I think Ms. Kraft

22   (ph.) is here from the company and we just told her about

23   this -- my believe is the retained liability for the litigation

24   exposure would be DPH Holdings.  And the supplier contract for

25   what was the re-sourced contract, which is with another entity,

30

1    that obligation and the administrative claims associated with

2    it, that went to DIP Holdco, or will go to DIP Holdco.

3            THE COURT:  Okay.

4            MR. BUTLER:  I think that's the proper -- at least

5    that was the philosophy behind the negotiation at the time.

6            THE COURT:  All right.  And it looks like to me the

7    counterclaim -- you can correct if I'm wrong -- the

8    counterclaim just seeks monetary damages, right?  It doesn't

9    seek specific performance or anything like that?

10           MR. BUTLER:  That's correct.

11           THE COURT:  It's an unliquidated claim.  Have there

12   been any discussion as to what the damages are asserted to be

13   as far as the counterclaim?  Either one of you --

14           MR. BUTLER:  There was, Your Honor -- I'm advised, and

15   Mr. Vincequerra may know, I was advised it was a mediation.  I

16   don't know what was --

17           THE COURT:  Right.

18           MR. BUTLER:  -- put on the table at the mediation.

19           THE COURT:  I mean, I don't want you to reveal

20   settlement proposals, but, just, has there been a settlement of

21   what the damages could be?

22           MR. VINCEQUERRA:  Yes, Your Honor, that's the irony of

23   this whole thing for my client is that while this bar date

24   procedure has been going on, my client has been across the

25   table --

31

 1          THE COURT:  No, I know there's been a mediation.  I'm

 2     just trying to figure out what --

 3          MR. VINCEQUERRA:  No, there have been -- you know, a

 4     mediation is fairly far along.  There have been numbers

 5     exchanged.

 6          THE COURT:  I don't want to hear settlement proposals.

 7     What I'm focusing on here is, on the issue of prejudice, you

 8     had made a good point that these claims are going to be paid in

 9     full under the modified plan.  The point I've just been

10     exploring with Mr. Butler is who's going to be paying them.  If

11     it is, as it would appear to me to be the case just from the

12     nature of the claim and the MDA, the remaining holding company,

13     the debtor wind-down company, then I did make a conclusion as

14     part of my ruling approving the modification of the plan that

15     that modification was feasible, and that was premised upon the

16     testimony about the likely amount of administrative claims and

17     the funding of the successor entity and the like.

18          So the reason I'm asking this question is to find out

19     how large your claim is.  It wasn't taken into account in that

20     testimony, and it was a large claim that may affect the

21     prejudice calculation.  I just don't know.  I mean, it's an

22     unliquidated claim.  I don't know whether it's large or not but

23     whether it's, you know, something that, for example, pales in

24     comparison to the debtors' claim.

25          So I'm not asking you about settlement discussions;

32

1    I'm asking what's been asserted, unless you want to tell me

2    what you think the realistic number is.  But that's up to you.

3          MR. VINCEQUERRA:  It's difficult to say , Your Honor,

4    because, to be quite honest with you, I haven't been involved

5    in the mediation.  I understand from our mediation statement

6    that that counterclaim number that we've been stuck at is

7    roughly twenty million dollars.  Again, that's as a

8    counterclaim that would be, obviously, offset against any

9    successful recovery that they have against us.

10          THE COURT:  Although it would seem to be it's

11    either/or, right?  Unless you settle it, either they breached

12    or you breached.  So I'm not sure there'd be much of an offset.

13          Okay.  All right.

14          MR. BUTLER:  Your Honor, that's all the debtors

15    have --

16          THE COURT:  Well --

17          MR. BUTLER:  -- unless you had a question.

18          THE COURT:  -- let me ask you, though, based upon a

19    twenty million dollar claim, how does that affect the -- was

20    any liability for this taken into account in the declarations

21    in support of the modification of the plan?

22          MR. BUTLER:  My understanding is the answer to that

23    question is no, there was no money allocated to this amount

24    through the -- whether the claims process was evaluated.

25          The -- and, you know, Your Honor, there has been a

33

1   wide variety of lawsuits started, stopped in hiatus, since

2   October of 2005.  And the debtors relied on the administrative

3   claims process here that went out to everybody as -- to catch

4   the claims that people were going to assert as part of the --

5   to understand as part of the plan modification process.

6           THE COURT:  And, again, this claim came in after the

7   plan modification hearing.

8           MR. BUTLER:  Correct.  It came in on the June 30 -- on

9   July 30th --

10          THE COURT:  The hearing was on the 29th.

11          MR. BUTLER:  -- and where the hearing was July 29th.

12  And the assessment was actually made in the days -- we spent

13  three or four days leading up to the July 29th hearing going

14  over this evaluation and assessment.

15          THE COURT:  Okay.

16          MR. BUTLER:  And I think -- you know, I don't have

17  Mr. Stipp here, Your Honor, but Ms. Kraft is here and she works

18  closely with Mr. Stipp.  I think that Mr. Stipp would tell you

19  that if he had an extra twenty million dollar -- if in fact,

20  taking their -- I think we disagree vigorously with the claim,

21  but if you add another twenty million dollars of litigation

22  exposure to the pot, would that be material, I think Mr. Stipp

23  would say yes, it's material.

24          THE COURT:  Well, what was funding again for --

25          MR. BUTLER:  Remember, the funding from -- I think it

34

1     was -- the entire funding from General Motors was fifty

2     million; plus, we had the plants that were retained which we

3     could sell off; plus, we had --

4            THE COURT:  But those are more dogs and cats than --

5            MR. BUTLER:  They were.

6            THE COURT:  Right.

7            MR. BUTLER:  Plus, we had the avoidance actions, to

8     the extent that there's collectability on some of the avoidance

9     actions.  And there were some other -- there were some -- I

10    think some other MRA payments, I think, from General Motors or

11    a few other sources of revenue.  But it was calibrated.  It

12    was -- you know, it was designed, as you know, to provide for

13    an efficient disposition of all of those assets and remediation

14    of the -- of some of the other issues and payment of the

15    liabilities.  So I think Mr. Stipp would argue that twenty

16    million was material in that calculation.

17           THE COURT:  Okay.

18           MR. BUTLER:  Thanks, Judge.

19           THE COURT:  Okay.

20           MR. POWLEN:  Just one minor point, Your Honor.

21    Mr. Butler -- I don't know if he passed it up, because I didn't

22    see him pass it up, but makes much of the fact that the

23    entities -- the LLC entity and the Inc. entity are the same.  I

24    know Your Honor said actual -- there was -- you know, the

25    notice was received, but they're the same entities.  And I know

35

1    Mr. Butler's familiar with the concept of a fresh start and a

2    reorganized debtor, but they're the same entities as they would

3    be in any post-effective date debtor that has entirely new

4    equity and has a fresh start in a bankruptcy.  That this was

5    not accomplished through a 363 sale and a transfer of assets

6    but rather an infusion of equity and a stock deal doesn't

7    change the fact that at the end of the day they were dealing

8    with a newly born entity.

9            Other than that, Your Honor, I have nothing further.

10    Thank you very much for your time.

11            THE COURT:  Okay.

12            Is -- neither Mr. Collins nor Mr. Schultz is here,

13    right?

14            MR. POWLEN:  No, Your Honor.

15            THE COURT:  They're not present?

16            MR. POWLEN:  No, Your Honor.  We had discussions with

17    Skadden, and prior to the hearing we agreed that we would just

18    rely on the affidavits.

19            THE COURT:  Okay.

20            Okay, anyone else?

21            Okay, I have before me a motion by Plymouth Rubber

22    Company, LLC for an order deeming its administrative expense

23    claim timely filed or for related relief.  The origin of this

24    dispute is that, in connection with proceeding to obtain the

25    modification and ultimate consummation of its confirmed but

36

1    unconsummated Chapter 11 plan, Delphi Corporation and its

2    affiliated debtors sought approval of an administrative claims

3    bar date for the Chapter 11 period through May of 2009.  The

4    debtors' confirmed Chapter 11 plan was not consummated because,

5    asserting breaches, the plan investors under that plan refused

6    to close in April of 2008.  That left Delphi with a significant

7    hole in the required funding for the confirmed plan.  Delphi

8    then spent close to a year dealing with ways to plug that hole

9    as well as to address the further deterioration in the

10   financial markets and in their perception of Delphi's value,

11   which led to a substantially different approach, ultimately, to

12   their exit from Chapter 11 under a Chapter 11 plan.

13        The debtors, in assessing their ability to emerge from

14   Chapter 11, and having entered into an agreement with an entity

15   called Platinum, as well as General Motors, that would have

16   provided for that combined entity's acquisition of most of the

17   debtors' business operations in return for sufficient cash to

18   deal with a portion of the administrative claims against the

19   debtors, plus stock -- I'm sorry, plus forms of contingent

20   consideration -- having entered into that transaction, the

21   debtors determined that they needed prompt means to calculate

22   the outstanding administrative claims other than the debtor-in-

23   possession financing claims against them, and, therefore,

24   obtained from the Court, in connection with establishing

25   procedures for consideration of the proposed modification to

37

1   the Chapter 11 plan involving GM and Platinum, the

2   administrative claims bar date.

3        The bar date notice provided for, for purposes of a

4   bar date, fairly short notice, but given the timing constraints

5   that the debtors faced, including, in essence, a week-to-week

6   extension of enforcement of remedies under the DIP facility and

7   a clear and short deadline from GM and Platinum, such notice

8   was appropriate under the circumstances.

9        The debtors sent out the notice and received timely

10   administrative claims from approximately 2,400 claimants.  The

11   claims procedures motion that is on the calendar for later

12   today states that approximately one billion dollars of

13   administrative claims were asserted in those proofs of claim,

14   plus unliquidated amounts.

15        Ultimately, the proposed modified plan was itself

16   modified, although not materially so for purposes of the issues

17   before me today -- and instead of Platinum acquiring

18   significant assets under the plan, along with GM, Platinum was

19   replaced by the debtors after an auction process by a

20   consortium of the debtor-in-possession lenders.  And that

21   group, plus GM, entered into an MDA with the debtors, which

22   formed the basis for the modified plan.  The Court held a

23   hearing on that modification and approved it on July 29th, two

24   weeks after the administrative claims bar date.

25        The rough structure of the plan provides for the

38

1    continuation of most of the debtors' businesses, either in the

2    hands of a GM acquisition company with respect to certain

3    facilities that primarily manufacture parts for GM vehicles, as

4    well as other assets that would go to the DIP lender

5    acquisition group.

6         The third split of the debtors' assets would be

7    retained by the debtors, since neither GM nor the DIP

8    acquisition group wanted to acquire them.  In addition, that

9    entity that would continue to hold those assets would receive a

10   cash payment by GM to enable that entity to pay administrative

11   claims against it that were not being assumed in connection

12   with the purchase of ongoing operations by the DIP acquisition

13   vehicle and GM acquisition vehicle.  And that amount of cash

14   was determined by the debtors in consultation with various

15   constituents, including GM, to be sufficient to have the

16   surviving debtor entity meet its obligations under the plan,

17   including the payment of allowed administrative claims.

18        The Court took testimony on that aspect of the

19   proposed plan modification in the form of an affidavit by

20   Mr. Stipp, in which he went through his analysis of likely

21   sources and uses of cash to pay that entity's administrative

22   claims.  No one cross-examined Mr. Stipp.  And based upon my

23   review of the MDA, the modified plan and the affidavits

24   submitted in support thereof, I concluded that the plan, as

25   modified, was feasible: that is, that it was not likely to be

39

1    succeeded by a liquidation under Chapter 7 and that it could be

2    performed, including the payment of administrative claims, as

3    contemplated by the plan.

4         The debtors sent out notice of the administrative

5    claims bar date as required by my order establishing the bar

6    date, and notice was actually received by Plymouth Rubber

7    Company, Inc. on -- it is acknowledged to have been received by

8    Plymouth Rubber Company, Inc. on July 9, 2009.  That's set

9    forth in the affidavit in support of Plymouth's motion of

10   Mr. Collins.

11        The debtors sent that notice to the address in their

12   post-petition purchase order between them and Plymouth Rubber

13   Company, LLC -- the same location.  The address on the envelope

14   was to Plymouth Rubber Company, Inc., which had been the entity

15   with which the debtors had done business prior to Plymouth's

16   Chapter 11 reorganization.

17        Mr. Collins, as I said, received the notice, which was

18   also sent to numerous other locations to Plymouth Rubber

19   Company, Inc., including to the counsel that filed the proof of

20   claim on behalf of Inc. in the Chapter 11 case.  Mr. Collins

21   did not open the notice but, instead, on July 10th, put it, and

22   apparently some other correspondence, in an envelope and

23   forwarded it to Mr. Schultz, who is described in the Collins

24   affidavit as a representative of Plymouth Rubber, LLC's parent,

25   or at least an affiliate, retained to manage Plymouth's

40

1   affairs, Versa Capital Management, Inc., which also manages the

2   funds which directly own the equity interest in Plymouth

3   Rubber.

4         Although mailed on July 10th, according to

5   Mr. Collins, the notice was not received by Mr. Schultz until

6   July 16th, at which point Mr. Schultz, unlike Mr. Collins,

7   opened the package, read the notice and immediately contacted

8   the debtors, seeking an extension of the bar date, which was

9   not agreed to.

10        It's undisputed that Plymouth did not file the proof

11   of claim and/or seek approval of an extension until July 30th,

12   after the plan modification hearing.

13        Plymouth requests that the Court consider its

14   administrative claim timely on a number of different grounds,

15   although most of the focus, properly so, of this hearing, has

16   been on the ground of excusable neglect.  Before I deal with

17   that issue and those factors, let me briefly deal with the

18   other bases for Plymouth's requested relief.

19        First, Plymouth contends that the Court did not have

20   power to establish the administrative claims bar date, given

21   the treatment of the administrative claims bar date in the

22   original plan and the confirmation order.  The plan itself

23   contemplated, in the definition of "administrative claim," the

24   potential for establishing a different administrative claims

25   bar date than was set forth in the plan, which was a date

41

1       forty-five days after the confirmation of the plan.  The plan

2       also reserved fully the debtors' rights in the event that the

3       plan did not go effective, which clearly was the case.

4             That plan, as I noted, contemplated a very different

5       outcome for creditors than the current modified plan.  Not only

6       was there no issue of the payment of all administrative claims,

7       requiring no determination, as a practical matter, by the Court

8       as to feasibility for potential failure to cover administrative

9       claims, but also the plan provided for full payment of

10      unsecured creditors at a deemed plan value, and a substantial

11      return to shareholders.  Consequently, the plan's

12      administrative claims bar date provision was appropriate for

13      that structure -- again, one where there was really no issue as

14      to whether the debtors would be able to pay all asserted

15      administrative claims.

16            The confirmation order similarly provided for a forty-

17      five day post-confirmation administrative claims bar date and

18      stated that it would govern in light of -- in the event of a

19      conflict between the plan and the confirmation order.  And

20      clearly it was an extant order.  However, the debtors' need to

21      set an earlier bar date, given the changes to their plan, was

22      clear and required the establishment of a different bar date,

23      clearly, in the context of the deadlines they were facing.  The

24      Court considered such a request to be appropriate, both in

25      light of the rights that the debtors reserved for themselves

42

1    under the confirmed but not consummated plan, as well as under

2    the Court's ability to amend the confirmation order, which on

3    this point, was quite clearly outdated.

4         Therefore, I believe that Plymouth's argument that the

5    Court exceeded its authority in setting a new administrative

6    claims bar date order, and that Delphi and the other parties

7    should be governed in this respect by the terms of the

8    confirmed plan and the confirmation order entered in 2008, is

9    not well taken and is denied.

10        Next, Plymouth argues, as a matter of due process,

11   that the notice to it of the administrative claims bar date was

12   deficient.  It does so on two grounds.  The first is that it

13   asserts the debtors were involved in post-petition litigation

14   commenced by the debtors in state court in Michigan against

15   Plymouth as well as subsequent litigation commenced by a third

16   party in Massachusetts.  The second is that the debtors knew

17   that Plymouth was represented by counsel in that litigation,

18   and, therefore, that in addition to the other places that the

19   debtors provided Plymouth with notice, they should have

20   provided notice to litigation counsel in the Michigan and

21   Massachusetts litigation. It should be noted that those counsel

22   did not file a notice of appearance in the Chapter 11 case and

23   that, in fact, they have not appeared in the Chapter 11 case

24   until this current motion.

25        The motion relies upon, primarily, on this point, In

43

1   re Grand Union Company, 204 B.R. 864 (Bankr. D. Del. 1997), in

2   which the bankruptcy court concluded in that case that the

3   debtors' direct mailing of notice to personal injury tort

4   claimants represented by counsel was inadequate notice of the

5   bar date, and that the notice should have been provided to the

6   personal injury counsel that Grand Union was dealing with.

7   That case flies in the face of a number of cases in the Second

8   Circuit, including in the Southern District of New York, which

9   state that notice requirements under the Bankruptcy Code,

10  including in respect of bar dates (and notices of similar

11  consequence), do not have to be sent to counsel representing

12  the claimant, but may instead only be sent -- or need only,

13  instead, be sent to the claimant itself.  See, for example, In

14  re Brunswick Baptist Church v. Brunswick Baptist Church, 2007

15  U.S. Dist. LEXIS 3319 (N.D.N.Y. Jan. 16, 2007); In re

16  Alexander's Inc. 176 B.R. 715 (Bankr. S.D.N.Y. 1995); In re

17  R.H. Macy & Company Inc. 161 B.R. 355 (Bankr. S.D.N.Y. 1993);

18  and Dependable Insurance Company v. Horton, 149 B.R. 49 (Bankr.

19  S.D.N.Y. 1992).

20       I should note further that Judge Walsh, in the Grand

21  Union case, made it clear that he was focusing on the unique

22  facts before him, where he found that the claimants who

23  received the notice were unsophisticated and that all dealings

24  in respect of their claims had previously been through their

25  respective counsel.  Clearly, Plymouth is not an

44

1    unsophisticated tort claimant here.

2         Consequently, based on the rationale of the Brunswick

3    Church case and the other cases I've cited, I do not believe

4    that the debtors were required to give notice to counsel of

5    record in the pending litigation, particularly as, as I noted,

6    that counsel had not appeared in the Chapter 11 case.

7         In addition, Plymouth contends that it filed through

8    its counterclaim in the pending non-bankruptcy litigation an

9    informal proof of claim that should be recognized by the Court,

10   and clearly that that proof of claim was timely in that it was

11   well before -- the counterclaim was filed well before the

12   expiry of the administrative claims bar date.  The argument,

13   however, again runs afoul of case law in this district and the

14   majority of the cases, including at the circuit court level

15   elsewhere: that is, that the document giving rise to the

16   informal proof of claim was not filed in this Court, but

17   rather, instead, only in the courts in Michigan and in

18   Massachusetts.

19        I should note that the cases that deal with this issue

20   are generally dealing with pre-petition claims.  But given the

21   practice of treating claims and disputes related to missed bar

22   dates for administrative claims the same way as the courts

23   treat missed bar dates for pre-petition claims, I find those

24   claims to be analogous -- those cases, I'm sorry, to be

25   appropriate here, and for all intents and purposes on all

45

1    fours.  For the close analogy see -- between disputes in

2    respect of late administrative claims and disputes in respect

3    of late pre-petition claims, see In re PT-1 Communications Inc.

4    386 B.R. 402 (Bankr. E.D.N.Y. 2007).

5         The informal proof of claim rule, as far as I can see,

6    has always, in the Second Circuit and in the Southern District,

7    been applied to claims that were not filed in the form of a

8    proof of claim, but that were filed in the bankruptcy court,

9    that show an intention to make a demand for money from the

10   debtors' estate.  See In re G.L. Miller & Company Inc. 45 F.2d.

11   115 (2d Cir. 1930), as well as the statement of the four-factor

12   test -- factor one of which is that the claim, the documents

13   have been timely filed with the bankruptcy court and had become

14   part of the judicial record -- in In re Enron Corporation 370

15   B.R. 90 (Bankr. S.D.N.Y. 2007).

16        The rationale for this, again, is the collective

17   nature of a bankruptcy case and the need to put more than just

18   the debtor on notice of the existence of the claim.  See also

19   In re M.J. Waterman & Associates Inc. 227 F.3d. 604 (6th Cir.

20   2000), and In re Trans World Airlines Inc. 182 B.R. 102 (D.

21   Del. 1995), which was reversed in part and affirmed in part,

22   reversed on other grounds, at 96 F.3d. 687 (3d Cir. 1996).

23   Consequently, I don't believe that the complaint or the

24   counterclaim asserted in the Massachusetts District Court

25   action and the Michigan State Court action would constitute an

1    informal proof of claim.

2         Lastly, the movant contends that notice was improper

3    because it was delivered, albeit at the same address, to

4    Plymouth Rubber Company, Inc. as opposed to Plymouth Rubber

5    Company, LLC.  The change in name resulted from the Chapter 11

6    reorganization of Plymouth Rubber Company, Inc., which is the

7    entity that had filed the proof of claim against the debtor's

8    estate.  The emerged, reorganized debtor changed its name to

9    Plymouth Rubber Company, LLC as the successor to Plymouth

10   Rubber Company, Inc., and that was the entity, again at the

11   same address, with which the debtor contracted post-petition

12   under the contract that is now the subject of the dispute in

13   Michigan and Massachusetts.

14        Plymouth contends that because the notice was sent to

15   "Inc." as opposed to "LLC," albeit at the same address, that

16   notice was constitutionally deficient.  Under the facts before

17   me, however, I do not accept that argument.  As set forth in

18   Mr. Collins' affidavit and in the motion itself, Mr. Collins

19   was the sole employee of Plymouth Rubber after it had

20   determined to wind down its affairs.  He was retained by the

21   managing - or manager for Plymouth Rubber, LLC as well as the

22   manager for other investments owned by the fund that owned the

23   debtor, Versa Capital Management.  And I believe that, as

24   evidenced by the fact that Versa opened the notice and that

25   Versa had hired Mr. Collins to look after LLC's affairs, and

47

1    that, therefore, he was acting as Versa's agent in this matter,

2    there was sufficient actual notice as of July 9th for due

3    process purposes.

4         The issue then comes down to whether the late filing

5    of the proof of administrative claim should be permitted under

6    Bankruptcy Rule 9006 for excusable neglect.  A claims bar date

7    is an important milestone in most Chapter 11 cases, and clearly

8    here the administrative claims bar date was an important

9    milestone in this case for the reasons that I've already

10   stated.  See First Fidelity Bank N.A. v. Hooker Investments

11   Inc.(In re Hooker Investments Inc.), 937 F.2d. 833, 840 (2d

12   Cir. 1991), in which the Court said, "A bar order does not

13   function merely as a procedural gauntlet, but as an integral

14   part of the reorganization process."  See also In re Musicland

15   Holding Corporation, 356 B.R. 603, 607 (Bankr. S.D.N.Y. 2006).

16        In most cases, the filing of a bar date order and the

17   existence of a bar date enables the debtor and other

18   constituents to determine whether the projected payments under

19   a plan will actually satisfy the parties' expectations; and, in

20   particular, an administrative claims bar date enables the

21   parties to determine whether the plan they're proposing is

22   feasible, in that administrative claims need to be paid in full

23   for a plan to be confirmed and consummated.

24        Nevertheless, the bankruptcy court may enlarge the

25   time for filing proofs of claim where the failure to act was

48

1  the result of excusable neglect, under Bankruptcy Rule

2  9006(b)(1).  The U.S. Supreme Court has adopted a two-part

3  framework for the movant to establish its excusable neglect

4  under Rule 9006(b)(1).  The movant has the burden in this

5  regard.  See Midland Cogeneration Venture Limited Partnership

6  v. Enron Corporation 419 F.3d. 115, 121 (2d Cir. 2005).

7         That framework was set forth in Pioneer Investment

8  Services Company v. Brunswick Associates Limited Partnership,

9  507 U.S. 380 (1993).  First a failure to file the proof of

10  claim must have been caused by neglect, which the Court defined

11  as inadvertence, mistake or carelessness, including intervening

12  circumstances beyond the party's control.  Id. at 388.  A

13  tactical, or simply a knowing, decision not to file a timely

14  claim will not suffice.

15         Second, the movant's neglect must have been excusable,

16  which is to be determined in the exercise of the Court's

17  equitable discretion taking into account all relevant

18  circumstances surrounding the failure to file a timely claim,

19  id. at 395, guided, however, by the following four factors:

20  "the danger of prejudice to the debtor; the length of the delay

21  and its potential impact on judicial proceedings; the reason

22  for the delay, including whether it was within the reasonable

23  control of the movant; and whether the movant acted in good

24  faith." Id.

25         The Second Circuit has taken a "hard line" when

49

1    applying the Pioneer factors to motions under Rule 9006(b)(1)

2    and other federal rules premised on excusable neglect.  Again,

3    see In re Enron Corporation 419 F.3d at 122.  Although all four

4    Pioneer factors should be considered, the Second Circuit places

5    the greatest weight on the reason for the delay and whether it

6    was in the movant's reasonable control.  In re Musicland

7    Holdings Corp. 356 B.R. at 607.

8            In the normal case, the movant has acted in good

9    faith, for example, and that's the case here.  Thus, the Second

10   Circuit said, "In the typical case, three of the Pioneer

11   factors, the length of the delay, the danger of prejudice and

12   the movant's good faith, usually weigh in favor of the party

13   seeking the extension.  We and other circuits have focused on

14   the third factor, the reason for the delay, including whether

15   it was within the reasonable control of the movant.  The

16   equities will rarely, if ever, favor a party who fails to

17   follow the clear dictates of a Court rule.  Where the rule is

18   entirely clear, we continue to expect that a party claiming

19   excusable neglect will, in the ordinary course, lose under the

20   Pioneer test."  In re Enron Corporation 419 F.3d at 122-23; see

21   also Canfield v. Van Atta Buick/GMC Truck Inc. 127 F.3d 248,

22   250-51(2d Cir. 1997).

23           Factors other than the reason for the delay usually

24   are relevant, therefore, only in close cases. In re Musicland

25   Holdings Corporation 356 B.R. at 608.  This is a somewhat close

50

1   case, in that I accept that Plymouth Rubber was clearly in

2   wind-down mode, where it only had one employee, who, consistent

3   with the very limited nature of its operations (which from

4   Mr. Collins' affidavit, which is uncontroverted, pertained

5   almost entirely to the two pending litigations) meant that

6   Mr. Collins checked the post office box only roughly once every

7   two weeks.  In addition, the time for the bar date notice was

8   shortened here from the normal time that would usually be

9   provided.  And, finally, there was potentially some room for

10  confusion, given that the notice was addressed to "Inc." as

11  opposed to "LLC."

12          On the other hand, I find it very hard to understand

13  why, given Mr. Collins' sole function, which appears to be to

14  monitor the mail, and the fact that he did so only roughly once

15  every two weeks, he did not open the mail, but instead simply

16  forwarded it to Mr. Schultz of Versa.  It would not seem to me

17  that he should have done that, given that Plymouth had

18  established the P.O. box that he checked as opposed to setting

19  up an automatic forwarding from Plymouth's address to Versa's.

20  It would appear, instead, to me appropriate for Mr. Collins to

21  have acted as someone who actually read the mail as opposed to

22  as a second mailman for delivery purposes.

23          So, clearly, it was within Plymouth's control to have

24  had notice of the bar date, at least by July 9th.  Moreover,

25  Plymouth did not file its claim until after the hearing on plan

51

1    modification, which it needn't have waited for.  It had the

2    claim or was aware of the late claim issue on July 16th, but,

3    nevertheless, waited two weeks thereafter to do so.  So, all

4    things being considered, it appears to me that while this is a

5    somewhat close case, the neglect here was largely within the

6    control of Plymouth.

7           Secondly, while the time between the bar date and the

8    filing of the claim was relatively short, I conclude that there

9    was prejudice to the debtor and other parties that resulted

10    from the delay.  If, in fact, the responsibility for paying

11    this administrative claim, to the extent it is allowed, rested

12    with either GM or the DIP lender acquisition vehicle, it would

13    appear to me, particularly given the balance of factors on

14    whether the delay was within Plymouth's control, that the lack

15    of prejudice to the estate would have argued for letting the

16    claim be filed late.  (The fact that some party receives a

17    smaller distribution or another third party pays more money as

18    a result of a claim being allowed to be filed late is not

19    sufficient prejudice, it is not the type of prejudice that the

20    courts have in mind when they evaluate the prejudice factor

21    under Pioneer.)

22           However, here, I believe there is prejudice to the

23    estate.  And also, again, some blame should be laid on Plymouth

24    for causing this prejudice by not filing the claim until after

25    the plan modification hearing.  As represented by Mr. Butler,

52

1   who clearly was involved in the preparation for the plan

2   modification hearing and the debtors' efforts to determine

3   whether, in fact, the MDA would result in a feasible plan, the

4   calculation of likely administrative claims against a surviving

5   debtor entity was a key factor in moving forward with the

6   hearing on July 29th.

7        It's been stated that a demand number under the

8   counterclaim by Plymouth is approximately twenty million

9   dollars.  That number would have had a significant impact on

10   the debtors' presentation of the modification of the plan on

11   July 29th and the Court's consideration of whether the plan is

12   feasible or was feasible, and would have, if asserted as a

13   recovery against the debtors -- the surviving debtors, as an

14   administrative claim it could have had a very significant

15   impact on feasibility.  Consequently, it would appear to me

16   that although the delay was short, it was very significant, and

17   that both the debtors as well as the other parties to the MDA,

18   and ultimately the Court, moved ahead in reliance on that claim

19   not being asserted.

20        So, that prejudice, as well as my conclusion that the

21   lateness of the claim, first in terms of its being verbally

22   asserted only on July 16th and then actually formally asserted

23   after the plan modification hearing, was largely, if not

24   entirely, within the control of Plymouth, leads me to deny

25   Plymouth's motion.

53

1          Obviously, to the extent that it is asserting a right

2     to setoff or recoupment, the lateness of the claim should not

3     matter, so that what this ruling effectively does is preclude

4     Plymouth from an affirmative recovery against the debtor's

5     estate as opposed to, again, a recoupment or setoff right in

6     the Michigan and Massachusetts litigation.

7          So Mr. Butler, you can submit an order to that effect.

8          MR. BUTLER:  Yes, Your Honor.

9          THE COURT:  Okay.

10         MR. BUTLER:  Your Honor, the last matter on the agenda

11    for today, matter number 8, is a motion for authority to apply

12    the claims objection procedures to administrative expense

13    claims, filed at docket number 18715.  Your Honor, by this

14    motion, what we're seeking to do is to use the claims

15    procedures that Your Honor is familiar with, that have been

16    running on a separate claims track for the last two and a half

17    years, to apply those to administrative claims.  And I think it

18    goes without saying that the -- and I think Your Honor has

19    observed in the past, that the procedures that have been

20    adopted by the Court here back on December 7th of 2006 at

21    docket number 6089, have served the debtors well and have dealt

22    with an expeditious treatment of almost 17,000 proofs of claim,

23    and through some 34 omnibus claims objections that addressed

24    over 14,000 of those claims, and have resulted in the

25    disallowance or withdrawal of over 10,000 of those claims.  So

54

1    it's been an efficient process we've been able to use.

2         As we've indicated to Your Honor in the papers that we

3    filed, there were 2,466 administrative claims filed as of July

4    15, 2009, in the aggregate of approximately 1 billion dollars

5    in liquidated amounts plus certain unliquidated amounts.  And I

6    think it's important to point out that our request here today

7    to use the claims objections procedures here does not conflict

8    with or override provisions in the modified plan with respect

9    to administrative claims, but really provides a mechanism to

10   implement them.  This is a procedural motion only, and it is

11   not intended to change the substantive terms of the plan as

12   Your Honor approved it at the plan modification hearing.

13        Your Honor -- and we would also expect that these

14   procedures, if Your Honor is prepared to apply them, would also

15   apply to the second bar date.  The administrative claims would

16   be filed under the second bar date that is contained in Your

17   Honor's plan modification order.

18        This is not contested.  If fact, this process is

19   supported by the principal stakeholders as we move forward.

20   The only -- there were two objections filed.  One of them we

21   had resolved in advance with respect to Plymouth Rubber, which

22   had indicated -- we'd indicated how we would deal with their

23   claim if Your Honor had determined it was timely filed.  That's

24   no longer relevant in light of the ruling that we just

25   received.

55

1          THE COURT:  Although, again, as far as setoff and

2    counterclaims, I mean setoff and recoupment are concerned

3    that -- I would assume that would just proceed in the

4    mediation.

5          MR. BUTLER:  Right.  It will be in the state -- that

6    would be in the other actions.

7          THE COURT:  The debtors always have the flexibility to

8    agree to something that's faster.

9          MR. BUTLER:  Correct.

10          THE COURT:  And it would seem to me, if you're in the

11    middle of mediation --

12          MR. BUTLER:  Right.

13          THE COURT:  -- that that's faster than --

14          MR. BUTLER:  The mediation, Your Honor, I think had

15    been largely completed without it being successfully resolved.

16    But we had agreed that -- and certainly as to the recoupment

17    and as to the setoff issues, those matters, we have agreed with

18    them, would proceed in the existing form --

19          THE COURT:  Okay.  All right.

20          MR. BUTLER:  -- as we move forward.  With respect to

21    Howard County, and I'll let counsel Mr. Powlen speak for

22    himself on this issue, but they basically were concerned

23    somehow that this administrative process might delay or impair

24    their payment of their claim.  Their claim has not been allowed

25    yet, although it's anticipated that their -- and this was dealt

56

1    with at the plan modification hearing -- but it's anticipated

2    that their claim will be resolved -- will be addressed in

3    connection with the effective date of the plan, and ultimately

4    payments made later in the calendar year.

5         This is a -- they have a -- Your Honor may recall, we

6    had some discussion at the plan modification hearing about this

7    being an element of an assumed liability by GM components.

8         THE COURT:  And GM said they would -- they are

9    assuming it, right?

10        MR. BUTLER:  Right.  And they said they are assuming

11   it.  And I believe that GM has provided some independent

12   assurances to Howard County, not involving the debtors, as

13   recently, perhaps, as yesterday, in terms of what their

14   expectation or anticipation is.

15        THE COURT:  Okay.

16        MR. BUTLER:  What I simply -- what I sort of said to

17   Howard County is that this form and this motion is not a time

18   to give -- for the debtors to give assurances to any creditor

19   about the substantive determination of the allowance or

20   disallowance or treatment of their claim.  And I wasn't

21   prepared to do that on this record.  But I anticipate that GM

22   will -- if the matter is moved forward, if the effective date

23   occurs as we anticipate it will occur towards the end of this

24   calendar quarter, that GM has made their separate assurances to

25   the Court that this is actually a claim that they are assuming

1   specifically, and they have given their independent assurances

2   to Howard County about how they intend to pay that claim.

3          But for our purposes, I don't think that requires any

4   relief on this record beyond those statements.  And I'd ask

5   Your Honor, subject to what Howard County wants to say, to

6   approve the procedures as we're requesting.

7          THE COURT:  Okay.

8          MR. POWLEN:  Good morning, Your Honor.

9          THE COURT:  Good morning.  Sorry you had to sit

10  through forty-five minutes of a ruling.

11         MR. POWLEN:  It's no problem, Your Honor.  It was

12  actually educational.  Hopefully, none of our clients will be

13  in that situation.

14         David Powlen with Barnes & Thornburg on behalf of the

15  Taxing Authority, Howard County, Indiana.  And of course,

16  again, these are the Kokomo facilities, Your Honor, that were

17  referenced in the MDA and in testimony before the Court during

18  the plan modification and confirmation proceedings.

19         Again, as is probably -- hopefully evident from our

20  filing, Your Honor, we're not here to make trouble, generally,

21  with respect to the debtors' proposed procedures.  We're here

22  to try to avoid our own trouble.  Kokomo, Indiana, the county,

23  has been faced with two bankruptcies, both Chrysler and the

24  Delphi cases.  So as you might imagine, the county authorities'

25  antennae are up about the timing of payments as well as who is

58

1    going to make those payments.  And as mentioned toward the end

2    of our filing, the county had asked me to try to be as

3    proactive as possible to obtain assurances as to the timing of

4    a payment as well as who might pay it.

5            We wanted to make sure that our claim would not get

6    hung up in the claim allowance procedures.  We parsed through

7    the debtors' July 31 motion -- I'm sure that Your Honor read

8    our papers -- and we were concerned about the timely payment of

9    our claim possibly being hung up in the claim -- the general

10   claim allowance process, notwithstanding the fact that GM would

11   be taking title to the property and it would -- has agreed to

12   independently make the payment.  And we just -- as a result of

13   having made this our filing, we did have conversation with GM's

14   counsel and an e-mail exchange of yesterday.  They have

15   confirmed that if the MDA transactions are closed and if the

16   plan becomes effective, they will be -- they do intend to make

17   the payment, even if it is not technically an allowed

18   administrative claim, capital A capital C, under the plan.

19           THE COURT:  Okay.  So, it worked.

20           MR. POWLEN:  I'm sorry?

21           THE COURT:  So, it worked.

22           MR. POWLEN:  Exactly, Your Honor.  On that front,

23   that's exactly right.  And we were simply hoping to obtain the

24   debtors' assurances that, again, our claim would not get hung

25   up for six months.

59

1          THE COURT:  Well, I can't force them to do that.  In

2     fact, I'd probably preclude them from doing that.  So that

3     aspect of your relief I'm going to deny.  I mean, if they have

4     a legitimate -- if you submitted a tax bill that wasn't the

5     expected tax bill but twice that, they would have to object to

6     it.

7          MR. POWLEN:  I understand.  And I guess that's another

8     way to look at our filing, which is to ask the general

9     question, to what extent will the debtors be involved in

10    reviewing and objecting to these claims --

11         THE COURT:  Well, that's --

12         MR. POWLEN:  -- that GM is assuming?

13         THE COURT:  -- that was a question I had.

14         MR. POWLEN:  Yes.

15         THE COURT:  I had two questions in connection, and

16    they're related, with this.  The first one is, the plan and

17    confirmation order and bar date order contemplate that the

18    debtors will be paying ordinary-course -- admin claims in the

19    ordinary course.  And you've budgeted for that.

20         MR. BUTLER:  Right.

21         THE COURT:  I imagine there are probably a lot of

22    these claims that may, out of an excess of caution, have been

23    filed that you're probably going to pay in the ordinary course

24    and not throw it into this process.  That wasn't really

25    something that was dealt with in the unsecured claim

1    procedures.  But I'm assuming that the first level of analysis

2    here is going to be someone on the claims team looking at this

3    with -- the payables person at Delphi, and saying, well, let's

4    weed all of these out, because these are just ordinary-course

5    claims.

6         And I wouldn't assume there would even be an omnibus

7    objection until -- maybe after they're paid you can do an

8    omnibus objection.  But it seemed like that would be an

9    additional layer you'd have to do.

10         MR. BUTLER:  Judge, I think when you look at the

11    administrative claims process, and Mr. Powlen had talked about

12    this, there is a statement in our motion, there is a statement

13    in the plan that talks about the fact that we've not obligated

14    to pay a claim until it becomes allowed.  There's also a

15    statement in the plan that says that the administrative claims

16    will be paid in the ordinary course of business unless

17    otherwise agreed to by the parties and so forth.

18         THE COURT:  Right.

19         MR. BUTLER:  And it doesn't refer to allowed

20    administrative claim.  But my anticipation is, both -- and the

21    debtors will play a role as it relates to claims allowance on

22    behalf of both of the two buyers.

23         THE COURT:  Well, that's my next question.

24         MR. BUTLER:  Right.

25         THE COURT:  So let's deal with this one first.  Are

61

1    you going to have someone who's looking at these and saying,

2    besides -- maybe the easiest way to do it is just to do an

3    omnibus objection when they're paid.

4            MR. BUTLER:  Right.

5            THE COURT:  To say, now there's no claim, that it's

6    been paid.

7            MR. BUTLER:  Right.

8            THE COURT:  I'm assuming that's what you're going to

9    do.

10           MR. BUTLER:  I do not believe the debtors intend to

11   use this claims process -- and I tried to say in the beginning

12   by pointing out that we're not trying to override any of the

13   provisions of the modified plan -- I don't think we're trying

14   to use this process before Your Honor to suggest that there's

15   180-day moratorium --

16           THE COURT:  It's not in the --

17           MR. BUTLER:  -- on the payment of ordinary-course

18   claims.

19           THE COURT:  Okay.  All right.

20           MR. BUTLER:  That's not what this is about.

21           THE COURT:  Okay.  So then, let's turn to the other

22   point, which is, to the extent that under the MDA either GM

23   acquisition or the DIP lender vehicle has picked up the claim,

24   are you guys going to be doing anything with those claims?

25           MR. BUTLER:  We're -- my understanding is that under

62

1    our arrangements with those parties, that we will be involved

2    in the claims administration process.

3            THE COURT:  Okay.  And they're going to be funding

4    that, then --

5            MR. BUTLER:  Right.

6            THE COURT:  -- because you're doing it for their

7    benefit?  Or have they already funded it?

8            MR. BUTLER:  Well it's interesting.  Part of that,

9    Your Honor, the people who will actually be doing that will, I

10   think, at the time, post-October 1st, will actually be employed

11   by DIP Co. --

12           THE COURT:  Right.

13           MR. BUTLER:  -- or DIP Holding Co. or whatever the

14   name of that --

15           THE COURT:  Although, at some point --

16           MR. BUTLER:  Yes.

17           THE COURT:  -- the ones that don't resolve that way

18   will be here?

19           MR. BUTLER:  Right.  But when I say that, Your Honor,

20   just in terms of how this will operate as a technical matter,

21   reorganized Delphi, which will be DBH Holdings Co., which will

22   remain before Your Honor in terms of coming in to deal with

23   these issues, will be handling under the MDA, claims objections

24   and the administrative claims.  And there are services

25   agreements and support agreements on how one does that.  So

63

1   ultimately, I think the reality of the circumstance will be,

2   that the actual people working on this will be in a unit at

3   Delphi which will be owned by DIP Hold Co. at the time.  Now,

4   how they choose to all allocate that in terms of cost among the

5   parties --

6        THE COURT:  Well, that's part of the service

7   agreement, I guess.

8        MR. BUTLER:  -- it's all being worked out between the

9   parties.

10       THE COURT:  And assuming the cost of -- to the extent

11  that the informal discussions and the mediation doesn't work,

12  you're here --

13       MR. BUTLER:  Right.

14       THE COURT:  -- that'll also be allocated --

15       MR. BUTLER:  Yes.

16       THE COURT:  -- under the service agreement?

17       MR. BUTLER:  Yes, Your Honor.  So DPH Holdings Company

18  is not going to have to pay from its limited resources the

19  costs associated of resolving a GM Acquisition company

20  administrative liability.  But it will be involved in it.

21       THE COURT:  Do you think --

22       MR. BUTLER:  As I understand it.

23       THE COURT:  -- is there a reason to put any of that in

24  the order or analyze that now that it's on the record?  I don't

25  think, given that they're parties to the agreement --

64

1          MR. BUTLER:  Right.

2          THE COURT:  -- and bound by the plan, that either GM

3     Acquisitions or the DIP vehicle can say that this order somehow

4     means that the reorganized debtor is assuming this cost.  But

5     I'm happy to put it in if you have any concerns about it.

6          MR. BUTLER:  You know, Your Honor, probably the best

7     thing to do so that there's no -- I mean, come post-October

8     1st, there's going to -- history will move on, and some of the

9     people that will be before Your Honor may change as well.  So

10    it may make sense for us to talk with counsel for Potoma (ph.),

11    Wilkie, and counsel for people, and just put in an appropriate

12    provision so there's no misunderstanding

13         THE COURT:  No confusion about it.

14         MR. BUTLER:  I think that's probably useful.

15         THE COURT:  But I'm approving this on the assumption

16    that it's -- to the extent you're carrying or the reorganized

17    debtors would be carrying GM's or the DIP people's water, that

18    they'll be paying for their share of that.

19         MR. BUTLER:  I understand, Your Honor.

20         THE COURT:  Okay.

21         MR. BUTLER:  And I think that's the agreement, and it

22    may make sense to make some reference to it.

23         THE COURT:  Okay.  All right.  Does anyone else have

24    anything to say on this motion on the procedures.  All right.

25         Clearly this sort of staged approach has worked with

65

1    the unsecured claims, and I think it is probably the most

2    efficient way to deal with admin claims too, so I'll approve it

3    as well.

4           MR. BUTLER:  Thank you, Your Honor.  Your Honor,

5    that's all we've got on today's agenda.

6           THE COURT:  Okay.  Thank you.

7         (Proceedings concluded at 12:10 PM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

66

```
 1
 2                           I N D E X
 3
 4                        R U L I N G S
 5    DESCRIPTION                                 PAGE    LINE
 6    Debtors' motion for order authorizing and    11      11
 7    approving entry by Delphi Automotive Systems
 8    Tennessee, Inc. into letter agreement with
 9    Robert Bosch LLC for sale of interest in PBR
10    Knoxville LLC approved
11    Debtors' motion for approval of debtors'      13      22
12    compromise and settlement with Shinwa
13    International Holdings, LTD. f/k/a
14    Shinwa Co., LTD., and Samtech Corporation
15    approved
16    Motion of Kara Zaleskas of Duane Morris LLP   14      12
17    to appear pro hac vice for Plymouth Rubber
18    Company, LLC granted
19    Motion of Plymouth Rubber Company, LLC for    52      20
20    order deeming administrative claim of
21    Plymouth Rubber Company, LLC timely filed
22    and related relief denied
23    Motion for authority to apply claims          64      23
24    objection procedures to administrative
25    expense claims approved
```

67

1

2               C E R T I F I C A T I O N

3

4       I, Clara Rubin, certify that the foregoing transcript is a true

5       and accurate record of the proceedings.

6

7       _____

8       Clara Rubin

9       AAERT Certified Electronic Transcriber (CET**D-491)

10

11      Veritext LLC

12      200 Old Country Road

13      Suite 580

14      Mineola, NY 11501

15

16      Date: August 21, 2009

17

18

19

20

21

22

23

24

25