Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 05-44481-rdd

5   - - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   DPH HOLDINGS CORP., ET AL.,

9

10          Reorganized debtors.

11

12   - - - - - - - - - - - - - - - - - - - - - -x

13

14                 U.S. Bankruptcy Court

15                 300 Quarropas Street

16                 White Plains, New York

17

18                 June 30, 2010

19                 10:18 AM

20

21   B E F O R E:

22   HON. ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25

Page 2

1

2    Notice of Hearing Proposed Fifty-Sixth Omnibus Hearing Agenda

3

4    Notice of Hearing Thirty-Fourth Claims Hearing Agenda

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dena Page

1

2    A P P E A R A N C E S :

3    SKADDEN ARPS SLATE MEAGHER & FLOM LLP

4         Attorneys for Debtor

5         155 N. Wacker Drive

6         Chicago, IL 60606

7

8    BY:   CARL T. TULLSON, ESQ.

9         LOUIS S. CHIAPPETTA, ESQ.

10        RON E. MEISLER, ESQ.

11        ALBERT L. HOGAN, III, ESQ.

12        JOHN K. LYONS, ESQ.

13        MICHAEL W. PERL, ESQ.

14        BRANDON M. DUNCOMB, ESQ.

15

16

17   GOODWIN PROCTER LLP

18        Attorneys for Davidson Kempner Capital Management, et al.

19        Exchange Place

20        Boston, MA 02109

21

22   BY:   GINA LYNN MARTIN, ESQ.

23

24

25

Page 4

1

2   STUTTMAN TREISTER & GLATT, P.C.

3        Attorneys for CR Intrinsic and Elliot Associates

4        1901 Avenue of the Stars

5        12th Floor

6        Los Angeles, CA 90067

7

8   BY:   ERIC D. GOLDBERG, ESQ.

9

10

11   DEPARTMENT OF JUSTICE

12        OFFICE OF THE UNITED STATES TRUSTEE

13        33 Whitehall Street

14        21st Floor

15        New York, NY 10004

16

17   BY:   BRIAN MASUMOTO, ESQ.

18

19

20   OXMAN TULIS KIRKPATRICK WHYATT & GEIGER LLP

21        120 Bloomingdale Road

22        White Plains, NY 10605

23

24   BY:   MARK S. TULIS, ESQ.

25

1

2    JONES DAY

3        222 East 41st Street

4        New York, NY 10017

5

6    BY:   LISA LAUKITIS, ESQ.

7

8

9    KIRKLAND & ELLIS LLP

10       Attorneys for Magnesium Aluminum Corp.

11       300 North LaSalle

12       Chicago, IL 60654

13

14   BY:   DAVID SPIEGEL, ESQ.

15

16

17   JACOB & WEINGARTEN

18       Attorneys for Den Black, Charles Cunningham, Kenneth

19           Hollis, and Delphi Salaried Retirees Association

20       2301 W. Big Beaver Road

21       Suite 777

22       Troy, MI 48084

23

24   BY:   ALAN J. SCHWARTZ, ESQ.

25

Page 6

1    GOODWIN PROCTER LLP

2          Attorneys for Senior Noteholders

3          620 Eighth Avenue

4          New York, NY 10018

5

6    BY:   K. BRENT TOMER, ESQ.

7

8

9    MILLER & CHEVALIER CHARTERED

10          Attorneys for Den Black, Charles Cunningham, Kenneth

11              Hollis, and Delphi Salaried Retirees Association

12          655 Fifteenth Street, N.W.

13          Suite 900

14          Washington, DC 20005

15

16    BY:   ANTHONY F. SHELLEY, ESQ.

17

18

19    U.S. DEPARTMENT OF JUSTICE

20          U.S. ATTORNEY'S OFFICE

21          86 Chambers Street

22          3rd Floor

23          New York, NY 10007

24

25    BY:   JOSEPH N. CORDARO, AUSA

Page 7

                    P R O C E E D I N G S

1

2        THE COURT:  DPH Holdings.

3        MR. MEISLER:  Good morning, Your Honor.  Ron Meisler

4   of Skadden Arps on behalf of DPH Holdings and its affiliated

5   reorganized debtors.  Your Honor, we have an omnibus hearing

6   and a claims hearing scheduled for today, and with the Court's

7   permission, we'd like to first proceed with the claims hearing.

8        THE COURT:  That's fine.

9        MR. MEISLER:  Your Honor, to proceed with the claims

10  hearing, I'm going to cede the podium to my colleague, Brandon

11  Duncomb who will take us through the claims hearing and the

12  agenda.

13       THE COURT:  Okay.

14       MR. DUNCOMB:  Good morning, Your Honor.  Brandon

15  Duncomb from Skadden, also on behalf of the reorganized

16  debtors.

17       We had nine claims up for today's hearing, all on a

18  sufficiency basis.  Of these, the first eight all relate to

19  workers' compensation obligations.  We originally noticed

20  fifteen for the hearing and seven of those have been adjourned.

21  Of the seven (sic) that remain, no responses have been filed.

22       It probably makes sense to just walk you through some

23  of these sufficiency objections.

24       THE COURT:  Yeah, why don't we go through them in

25  order?

Page 8

1          MR. DUNCOMB:  So I gave you a binder that looks like

2     this.  It says sufficiency hearing, workers' compensation

3     claims.

4          THE COURT:  Okay.

5          MR. DUNCOMB:  For the first six of these, our basis

6     was just that they didn't properly assert an administrative

7     claim.  And for each of these first six tabs, there's three

8     documents, the first being a proof of claim, the second being

9     the response, and the third is --

10          THE COURT:  Right.

11          MR. DUNCOMB:  -- additional documentation from the

12     reorganized debtors that we're not really relying on, but we

13     just confirmed from our records that these were all

14     prepetition.  So if you look at the --

15          THE COURT:  Okay, well, so -- and these documents were

16     also part of the objection -- I'm sorry, part of the objection

17     and also there were statements in the responses that confirmed

18     the basis for the objections.  So I reviewed this already.

19     With regard to Ms. Robinson, she acknowledges the claim's a

20     prepetition claim, so it's clearly not an administrative claim.

21          MR. DUNCOMB:  That's right, Your Honor.

22          THE COURT:  So that objection is granted to the

23     administrative claim.

24          MR. DUNCOMB:  Thank you, Your Honor.  So then --

25          THE COURT:  Mr. Stasik, Robert Stasik's the same way,

Page 9

1    so the administrative claim should be disallowed.  He's filed a

2    similar claim as a prepetition unsecured claim, and that's not

3    affected by this.

4            MR. DUNCOMB:  That's right; that's secured.

5            THE COURT:  Okay.  I guess the next one is Ms. Hatch,

6    Janice Hatch.  Again, that's -- she confirms in her response

7    that it was a prebankruptcy injury that gave rise to her claim,

8    so the administrative claim should be disallowed.

9            Mark Odette is the same as Ms. Hatch.  He has a

10   prepetition claim and the admin claim should be disallowed.

11           That's the same for Ms. Reid, Sheila Reid.  Her injury

12   is prepetition as she acknowledges.

13           Now, the Lyons', that's based on a settlement.  The

14   settlement is recognized, right?

15           MR. DUNCOMB:  The Lyons' is not the settlement.  The

16   Lyons' is the same basis as the other one.  Ms. Hooker is the

17   one where there's a --

18           THE COURT:  Oh, I'm sorry.

19           MR. DUNCOMB:  -- there's a settlement.

20           THE COURT:  I'm sorry.

21           MR. DUNCOMB:  And so Lyons, she asserted it as

22   executrice to her husband's estate --

23           THE COURT:  Right.

24           MR. DUNCOMB:  -- but it's the same basis.

25           THE COURT:  But it's a prepetition -- prepetition

1   injury.

2         MR. DUNCOMB:  That's right, in 2000.  And she still

3   has a prepetition claim --

4         THE COURT:  Right.

5         MR. DUNCOMB:  -- that's adjourned.

6         THE COURT:  Now, Ms. Hooker is based on a settlement,

7   a prepetition settlement.

8         MR. DUNCOMB:  And this claim was filed by Mr. Spencer

9   E. Gilbert (ph.) on behalf of the Mississippi Guaranty

10  Association as a protective objection, and I sent him a copy of

11  the settlement.  And I don't know if he's here on the phone

12  today, but after I sent him the settlement which has a full

13  release, he said I could represent to you that he has no

14  objection to this one being disallowed.

15        THE COURT:  Right.  So based on that, I'll grant that

16  objection as well.

17        MR. DUNCOMB:  And the final one was Mr. Dashkowitz.

18        THE COURT:  Right.

19        MR. DUNCOMB:  And if you looked at his response, it's

20  the second one back.

21        THE COURT:  Right, he acknowledges that his claim,

22  also, is prepetition.

23        MR. DUNCOMB:  And that it was his only -- it was his

24  intention to file only one claim.

25        THE COURT:  Right, so I have not looked at the two

1    claims.  The -- I'm assuming there's no difference, truly,

2    between them.

3              MR. DUNCOMB:  There may be a difference in the

4    asserted debtor.  I don't remember; one may be Delphi Corp. and

5    DOS LLC (ph.).

6              THE COURT:  Oh, right, right, right.

7              MR. DUNCOMB:  But now that we've merged them, they've

8    been subsequently consolidated.  It's the same basket that --

9              THE COURT:  So it doesn't matter.

10             MR. DUNCOMB:  Right.

11             THE COURT:  But as far as the amount, it's the same.

12             MR. DUNCOMB:  That's right, Your Honor.

13             THE COURT:  So that one claim will be allowed and the

14    other one will be disallowed as duplicative.

15             MR. DUNCOMB:  Thank you, Your Honor.

16             THE COURT:  Okay.

17             MR. DUNCOMB:  And then the last claim left today is

18    Alegre.

19             THE COURT:  Right.

20             MR. DUNCOMB:  Alegre had originally -- were objecting

21    to administrative claim 18727.  Originally, Alegre had filed

22    proof of claim 12363 which asserted the exact same reclamation

23    claim that's now asserted in 18727.  That was a reclamation

24    claim for $190,941.71.  We objected, and there was also an

25    unsecured portion to that, just under 230 million.  We objected

1    to that in connection with our twenty-fourth omnibus objection.

2    It was ordered modified subject to our right to further

3    objection which included our right to a certain prior lien

4    defense.  And then, per the Court's order, in connection with

5    the order of determining reclamation claims, the entire

6    amount's treated as unsecured.  And so what we're left with is

7    proof of claim 12193 modified to --

8              THE COURT:  Well, as --

9              MR. DUNCOMB:  -- both portions have been unsecured,

10    the $20,154.39 and the 2.19 million.

11             THE COURT:  As provided by my prior order.

12             MR. DUNCOMB:  That's right.

13             THE COURT:  I didn't see any response to the objection

14    by Alegre.

15             MR. DUNCOMB:  No.

16             THE COURT:  You haven't gotten any, or?  Okay.  The

17    objection puts the burden on them to show why the prior order

18    isn't res judicata with regard to this present claim, claim

19    18727.  And given that there's no response to the objection and

20    the averments to the objection, I'll grant the objection and

21    disallow 18727.

22             MR. DUNCOMB:  Thank you, Your Honor.

23             THE COURT:  And that's --

24             MR. DUNCOMB:  And that's the last claims matter for

25    today.

Page 13

1           THE COURT:  Okay.  So do you have an order covering

2     those?

3           MR. DUNCOMB:  We'll submit orders after the hearing.

4           THE COURT:  Fine, thank you.

5           MR. DUNCOMB:  Thanks.

6           MR. TULLSON:  Good morning, Your Honor.  Carl Tullson

7     on behalf of the reorganized debtors.  As a preliminary matter,

8     I have a pending pro hac motion at docket number 20272.

9           THE COURT:  You should consider that granted.

10          MR. TULLSON:  All right.  Your Honor, that concludes

11    our claims hearing, and we are now ready to commence the

12    omnibus hearing.

13          THE COURT:  Okay, that's fine.

14          MR. TULLSON:  We filed an agenda yesterday and with

15    this Court's permission, we would like to proceed in the order

16    of the agenda.

17          THE COURT:  Okay.

18          MR. TULLSON:  The first two matters, Furukawa's motion

19    for allowance of administration claims and Highland's

20    substantial contribution application have both been adjourned.

21          THE COURT:  Okay, is there -- on Highland I know there

22    was some back and forth with letters to chambers about

23    scheduling matters, and then we were told -- I had scheduled a

24    conference, but then it was resolved?

25          MR. TULLSON:  Yes, Your Honor.

Page 14

 1          THE COURT:  The scheduling and the issues were

 2    resolved?

 3          MR. TULLSON:  For Highland -- for Highland we

 4    submitted an order to chambers that is pending your approval

 5    and entry.

 6          THE COURT:  Okay, fine.

 7          MR. TULLSON:  The next matter on the agenda is the

 8    motion to enforce the plan injunction against Leigh Ochoa.

 9          THE COURT:  Leigh Ochoa?

10          MR. TULLSON:  Yes, Your Honor.

11          THE COURT:  Okay.

12          MR. TULLSON:  The reorganized debtors brought this

13    motion to enforce the injunction containing the modified plan

14    and modification approval order to enjoin the litigation

15    associated with the action commenced by Leigh Ochoa against the

16    reorganized debtors on November 6, 2009 -- I will refer to that

17    as non-bankruptcy company -- in the U.S. District Court for the

18    Eastern District of Michigan, Northern Division, case number

19    09-14383-TLO, asserting that Delphi Corporation improperly

20    terminated Ms. Ochoa to interfere with her alleged entitlement

21    to long-term disability benefits.

22          Your Honor, no objections were filed to this motion,

23    and the motion was served on Leigh Ochoa and her counsel in the

24    Michigan action, and that proof of service is at docket number

25    20235.  However, as a preliminary update on the proceedings in

Page 15

1    the Michigan action, counsel for Ms. Ochoa, on June 18th,

2    subsequent to filing a motion, did file a motion to amend the

3    complaint in the Michigan district court.  In the motion to

4    amend the complaint, Ms. Ochoa seeks to amend the complaint

5    against DPH Holdings by adding Ms. Ochoa's former supervisors,

6    Jim Miller and Kerry Baskins, as defendants and including a

7    claim that they conspired with General Motors to terminate

8    Ochoa in violation of ERISA.

9            THE COURT:  With General Motors?

10           MR. TULLSON:  Yes.

11           THE COURT:  Okay.

12           MR. TULLSON:  In the Michigan action, Ms. Ochoa

13   asserts damages --

14           THE COURT:  But they haven't dismissed Delphi?

15           MR. TULLSON:  No.

16           THE COURT:  Okay.

17           MR. TULLSON:  They just added an additional complaint.

18           THE COURT:  Okay.

19           MR. TULLSON:  Additional counts.

20           In the Michigan action, Ms. Ochoa asserts damages

21   relating from the termination of her employment with Delphi

22   Corporation which occurred on or before August 24th, 2009.

23   Because Ms. Ochoa's claims were based on alleged pre-effective

24   date actions committed by Delphi Corporation, the injunction

25   contained in paragraph 22 of the Court's modification approval

1    order and in Section 11.14 of the modified plan stays Ms.

2    Ochoa's cause of action against the reorganized debtors.

3    Moreover, Ms. Ochoa has not filed a timely administrative

4    expense claim, and accordingly, any such claims would be

5    automatically disallowed pursuant to paragraph 47 of the

6    modification approval order.

7         Your Honor, as we discussed in our papers, Ms. Ochoa

8    has refused to dismiss or stay the Michigan action despite

9    being served with a notice of effective date and being notified

10   that continuing the Michigan action violates the plan

11   injunction.  The reorganized debtors have a profound interest

12   in making sure that the unambiguous provisions of the modified

13   plan and modification approval order are enforced, and

14   therefore, request this Court enjoin Ms. Ochoa from proceeding

15   in the Michigan action and direct Ms. Ochoa to take such action

16   as is necessary to dismiss the Michigan action.

17        Your Honor, the bar dates established by this Court's

18   orders for asserting administrative expense claims were July

19   15th, 2009 for claims arising through June 1st, 2009, and

20   November 5th, 2009, for claims arising through October 6th,

21   2009, the effective date.

22        As far as the procedural history, despite these bar

23   dates, Ms. Ochoa filed the Michigan action on November 6th

24   without either filing an administrative expense claim in the

25   Chapter 11 cases or seeking leave of this Court to lift the

1    plan injunction.  She did so despite the fact that she and the

2    lawyer she retained to file the Michigan action collectively

3    receive some forty-eight notices of these bar date procedures.

4    On November 19th, 2009, Ms. Ochoa filed the amended non-

5    bankruptcy complaint in the Michigan District Court naming DPH

6    Holdings as the defendant, rather than Delphi Corporation.  In

7    the non-bankruptcy complaint, she seeks damages against the

8    reorganized debtors in association with her termination and

9    their alleged violation under 29 U.S.C. Section 1140.

10          THE COURT:  Has the Michigan District Court been asked

11   to rule on whether either my prior orders or the discharge bars

12   the lawsuit?

13          MR. TULLSON:  Well, jumping ahead, on June 1st, we did

14   file reply -- we filed a motion to stay, and on June 1st, we

15   filed a reply in support of that motion --

16          THE COURT:  Right.

17          MR. TULLSON:  -- explaining to the Michigan District

18   Court, this district, that the Court retained jurisdiction to

19   interpret its own orders and that that motion would be filed in

20   the bankruptcy court so that it could be heard on June 30th,

21   2010.  The District Court has not ruled on that motion.

22          THE COURT:  It has not ruled.  Is it slated to rule?

23          MR. TULLSON:  There -- the last update I saw was that

24   there was a conference scheduled for August 2nd.

25          THE COURT:  Okay.  All right.  I didn't see any

1    response to this.  Did you get any?

2        MR. TULLSON:  There was not.

3        THE COURT:  Fine.  The -- I don't see how the bar date

4    particularly affects this except on the merits, but as far as

5    the procedural issue of whether the litigation should proceed

6    against the debtor, and for that matter the debtors' former

7    officers or managers, it's clearly bound not to go forward by,

8    in the first instance, the continuation of the automatic stay

9    through the effective date, and then the plan injunction and/or

10   524.  So it's clearly a violation of the confirmation order and

11   the injunction.  They're already enjoined.  I will grant the

12   request for an additional injunction, but it's only to further

13   the -- or, to enforce, rather, the existing injunction and the

14   discharge.  And it seems to me that continued prosecution of

15   the litigation will result in sanctions.

16       MR. TULLSON:  Yes, Your Honor, and we included that in

17   the proposed order that was submitted to chambers --

18       THE COURT:  Right.

19       MR. TULLSON:  -- ordering them to dismiss the action

20   and saying that further prosecution of the action, including

21   the amended complaint, would subject them to contempt of court.

22       THE COURT:  Right.  You're not -- as I read it, you're

23   not looking for monetary sanctions for what you -- for this

24   motion, right?

25       MR. TULLSON:  That's correct, Your Honor.

DPH HOLDINGS CORP., ET AL.

1      THE COURT:  Okay, and of course, I think you'd be

2  entitled to, but that wasn't requested so I won't grant it.

3  But I will grant the request for the provision of the order

4  that provides for appropriate sanctions for any continued

5  violation of the confirmation order, specifically the plan

6  injunction and, with regard to the debtor, the discharge.

7      MR. TULLSON:  Thank you, Your Honor.

8      THE COURT:  All right.

9      MR. TULLSON:  Our local counsel will file a copy of

10  that order, once it's entered, in the district court.

11      Your Honor, the first contested matter on today's

12  agenda is the reorganized debtors' forty-eighth omnibus claims

13  objection at docket number 49976.  This objection is a bit

14  unique because it does not relate to proofs of claim, but

15  rather, it covers motions or requests for payment of

16  administrative expenses, they were not filed on a docket in

17  these cases and which were not previously resolved.  In advance

18  of the May 4th, 2010 deadline to object to administrative

19  claims, the reorganized debtors identified certain motions or

20  requests for payment of administrative expense claims that have

21  not been resolved.  Certain of these motions are duplicates of

22  other administrative expense claims already subject to the

23  claims procedures, and other motions are requests that are not

24  supported by the reorganized debtors' books and records.  Out

25  of an abundance of caution, the reorganized debtors filed a

1   forty-eighth omnibus objection to the administrative claims

2   asserted in the motion and request.

3           Your Honor, there were originally nine motions in this

4   omnibus objection.  Two motions, one filed by CSX Transport at

5   docket number 16548 and the other by Computer Sciences

6   Corporation at docket number 16601, have been resolved by

7   stipulation.  The CSX stipulation was entered at docket number

8   20243 and the computer sciences stipulation was submitted to

9   chambers yesterday.

10          In addition, pursuant to the notice of adjournment

11  found at docket number 20249, the reorganized debtors have

12  agreed with Furukawa Electric Company to adjourn the hearing on

13  the forty-eighth omnibus objection to July 22nd, 2010, solely

14  with respect to the two motions filed by Furukawa.

15          Your Honor, of the five remaining motions, two motions

16  was filed by ATEL Leasing Corp. in Appaloosa (ph.) County were

17  covered by two responses which we are asking to be adjourned in

18  accordance with the claims procedures.

19          This results in a total of three motions on the

20  proposed order which was submitted to Your Honor that will be

21  expunged.  The administrative expense claims asserted in the

22  three motions to be expunged total approximately 92,000 in the

23  aggregate, plus certain unliquidated amounts.

24          Your Honor, I believe that this is the level of detail

25  you have requested in respect to omnibus claims objections,

Page 21

1    although I can go into more detail if you want.

2            THE COURT:  No, I -- unless anyone is here to speak

3    with regard to those three matters, based on my review of the

4    objection and there being no opposition, I'll grant those three

5    objections.

6            MR. TULLSON:  Thank you, Your Honor.  We will submit

7    an order to chambers.

8            THE COURT:  Okay.

9            MR. TULLSON:  And I'll turn the podium over to my

10   colleague, Ron Meisler.

11           MR. MEISLER:  Thank you, Your Honor.  Ron Meisler from

12   Skadden Arps.

13           Matter number 5 on the agenda, Your Honor, is salaried

14   retirees' motion.  It's a motion seeking this Court's

15   confirmation that their second amended complaint does not

16   violate the modified plan or the plan modification order.

17   Since, Your Honor, it is the salaried retirees' motion, I'd

18   like to hand the podium over -- cede the floor to Mr. Shelley

19   and Mr. Schwartz.

20           THE COURT:  Okay, go ahead.

21           MR. SHELLEY:  Good morning, Your Honor.  Anthony

22   Shelley here on behalf of Den Black, Charles Cunningham,

23   Kenneth Hollis, and the Delphi Salaried Retirees Association --

24   Retirees Association, and with me is Alan Schwartz.  We're here

25   seeking confirmation that our second amended complaint in the

Page 22

1    Michigan court action does not violate the modified plan and

2    the plan modification order.  We've come as a precautionary

3    measure designed to ensure the proper removal of New GM from

4    the Michigan litigation in compliance with the Court's earlier

5    enforcement order.

6          The second amended complaint changes only the fifth

7    claim in the original complaint, which is against the Treasury,

8    the Auto Task Force, other individuals, but it doesn't alter

9    the substance of the first four claims against the PBGC.  The

10   DSRA, the salaried retirees worked out the pleadings language

11   with New GM, and New GM has not filed an objection to the

12   second amended complaint.

13         But an objection did arise from the debtors.  Not to

14   anything that was changed in claim number 5, but seemingly to

15   the first four claims against the PBGC.  They filed that

16   objection notwithstanding that they stipulated to the filing of

17   the original complaint, including those PBGC claims back in

18   September.  In our view, the objection is opaque and somewhat

19   ambiguous.  They don't object to any specific claim or even

20   specific language.  They do mention one line in the prayer for

21   relief that gives them pause, a line that was in the original

22   complaint, too, to which they did stipulate.  That line is

23   something on the order that the Michigan court should award

24   appropriate equitable relief against the defendants in the

25   Michigan litigation -- the defendants in the Michigan

DPH HOLDINGS CORP., ET AL.

Page 23

1   litigation -- which don't include the debtor -- to place the

2   parties in that litigation, which again don't include the

3   debtor, in the position they were in prior to the termination.

4   The debtors stated in their objection they object insofar as or

5   to the extent that or if the claims would result in the

6   relevant ERISA plan being restored to them.

7              We think the Court should reject the objection for

8   four reasons.  The first is a practical reason, and that is we

9   haven't sought restoration of the plan to the objectors.  The

10  second is that the stipulation should bar the objection, and

11  third, restoration to the debtors, if it was sought, wouldn't

12  violate the modified plan in our view, and finally, the

13  equitable mootness doctrine that they've invoked doesn't apply

14  here.

15             THE COURT:  But you've said you're not -- not only

16  have you not sought it, but you're not seeking restoration of

17  the plan, right?

18             MR. SHELLEY:  Correct.

19             THE COURT:  To the debtors?

20             MR. SHELLEY:  Correct.  The only party that's argued

21  for it is --

22             THE COURT:  The PBGC --

23             MR. SHELLEY:  -- the PBGC --

24             THE COURT:  -- as a way to protect itself.

25             MR. SHELLEY:  Correct.

1          THE COURT:  Saying that that couldn't be done.

2          MR. SHELLEY:  Correct, correct.  So it's, at best --

3     for the first reason, the practical reason, we haven't sought

4     the restoration.  And in fact, the Michigan Court has indicated

5     that that's not an option that it's going to -- that is

6     equitable at all, really, because it doesn't give us relief.

7          THE COURT:  Well, I'm not -- I'm not sure the Michigan

8     Court has definitively ruled on that issue --

9          MR. SHELLEY:  That's correct.

10         THE COURT:  -- from what your pleading says, but it's

11    more significant to me that you've stated to me in these

12    pleadings, as well as to the Michigan Court, that you are not

13    seeking restoration of the plan to the debtors.  I mean, to me,

14    if I grant your motion, that's just judicial estoppel.

15         MR. SHELLEY:  Correct.

16         THE COURT:  I'm basing -- I would be basing my ruling

17    on that position.

18         MR. SHELLEY:  Correct.  And, in fact, we've offered to

19    alter the claim for relief to specifically state that we're

20    seeking equitable relief requiring the PBGC to administer the

21    plan and provide benefits as if the plan had not been

22    terminated.

23         THE COURT:  I think it's clear from your pleadings

24    that that's what you're seeking.

25         MR. SHELLEY:  Exactly.  Yes, Your Honor.  So Your

1  Honor's correct, we aren't seeking that.  Second, the

2  stipulation agreed -- the debtors agreed to the claims as

3  stated in the original complaint.

4        THE COURT:  Maybe I can cut through this a little bit,

5  although I haven't heard from the debtors.  The stipulation was

6  signed at a particular time, September 2009, and it does have

7  this reservation which says that the plaintiffs to the action

8  shall not use the action or the proceedings thereto as a

9  collateral attack on any order of the Court including the order

10 confirming the modified plan.  The salaried workers reserve

11 their rights --

12       MR. SHELLEY:  To contest it.

13       THE COURT:  -- to say whether they'd be bound by that.

14 The order that you're asking me to sign today basically doesn't

15 continue that.  Basically, it says that -- all it says is that

16 the filing of the seconded amended complaint and the pursuit of

17 the relief requested therein will not violate the modified

18 plan, the plan modification order or any other order of this

19 Court.  And I guess if I was being a careful lawyer, I would

20 say does that order somehow trump the stipulation since the

21 stipulation has this reservation in it.  I think it's probably

22 belt and suspenders, but I would be more comfortable if there

23 was a similar proviso that said that -- provides -- and

24 particularly given the phrase "pursuit of the relief requested

25 therein" which is, you know, that's a little bit more open-

Page 26

1    ended.  The proviso would say that provided --

2           MR. SHELLEY:  We won't use it as a collateral

3    attack --

4           THE COURT:  Won't use it as a collateral attack on any

5    order of the Court or the discharge.

6           MR. SHELLEY:  We're fine with that.

7           THE COURT:  Okay.  I thought it was belt and

8    suspenders, but --

9           MR. SHELLEY:  Okay.

10          THE COURT:  -- just so that someone reading this three

11   years from now when it's on appeal to the Sixth Circuit.

12          MR. SHELLEY:  Right.  Do you want me to go further,

13   Your Honor?

14          THE COURT:  I mean, that would be my suggestion.  I

15   don't know, I mean, maybe -- I don't know where the debtors are

16   on this.

17          MR. MEISLER:  Your Honor, and Mr. Shelley, I'm happy

18   to speak right here so you can stay put, unfortunately, Your

19   Honor, that doesn't work for us.  We're not comfortable with

20   that.  And when Mr. Shelley characterizes our concern as the

21   equitable relief gives us pause, I would call it alarm.  And it

22   alarms us because the relief that they're seeking, it says any

23   appropriate equitable relief to undo the termination and put

24   the parties back to where they were prior to termination.

25          THE COURT:  But that was in there all along.

1          MR. MEISLER:  That's true, Your Honor, and in fact the

2     stipulation from September 2011 (sic), if we can just go back

3     on the history, in fact it's not a -- the agreement didn't

4     arise from events that happened in September of 2009; rather it

5     memorialized the reservation of rights that you granted to them

6     at the July 2009 confirmation hearing -- July 29th, to be

7     specific.  Your Honor, we did understand at that time that they

8     could seek their relief to challenge termination under 4003 of

9     ERISA which would challenge the termination, and under 4003,

10    gives -- the remedy is any appropriate equitable relief.  And

11    we understood that we had risk from July 2009 until we went

12    effective with respect to the possibility that that equitable

13    relief could include the PBGC restoring plan to Delphi.  But

14    once we went effective, once there was a substantial

15    consummation of the plan, we believe that they lost the

16    opportunity to have that equitable right include that salary

17    plan ever going back to the reorganized debtors.  Doing so,

18    Your Honor, would render DPH Holdings and its reorganized

19    debtors, its affiliated reorganized debtors immediately

20    insolvent, and we would not be able to complete implementation

21    of the plan which would be to the severe prejudice of the

22    administrative creditors -- the allowed claims and the

23    administrative creditors.  Your Honor, our concern -- and it's

24    actually that reservation of rights that's memorialized in

25    paragraph 2 of the stipulation -- is not just that Mr. Shelley

Page 28

```
 1    and his client or clients would present this collateral attack

 2    on the plan but rather the direction that they're heading,

 3    which, they're seeking equitable relief, even though they're

 4    asking for the PBGC to take the plan, and for the PBGC to

 5    administer the plan as though it's a plan sponsor, we don't

 6    understand that relief under the law.  The PBGC doesn't

 7    understand that relief under the law, and our cocounsel at

 8    Groom Law Group -- they're our ERISA experts -- they similarly

 9    don't understand that relief being requested.  So even if Judge

10    Tarnow were to grant that relief -- and candidly, it seems like

11    Judge Tarnow is moving in a direction that is favorable to Mr.

12    Shelley and unfavorable to PBGC -- we don't understand that

13    grant of relief under ERISA, and therefore, we see the PBGC

14    appealing the order, or otherwise moving to put that pension

15    plan back to DPH.  Should that happen, in our opinion, that is

16    the manifestation of a collateral attack on the plan because we

17    will not complete our job which is to implement the plan.

18            THE COURT:  But you're basically saying is that what

19    they're saying should be barred by doctrines of mootness or

20    estoppel, right?

21            MR. MEISLER:  Your Honor, that is correct because --

22            THE COURT:  But the relief they're seeking is only to

23    say that they're not violating the plan or the plan

24    modification order or orders of the Court with the

25    qualifications that we talked about.  They're not seeking a
```

1    determination that the relief they're seeking is not moot.

2    That's not -- I'm not ruling on that issue.

3         MR. MEISLER:  Your Honor, you're correct about that,

4    and I'd like to address two issues.  Number one, on equitable

5    mootness, we're actually at -- we realize, Your Honor, that in

6    their motion, they weren't seeking an equitable mootness issue,

7    they weren't seeking to unravel that issue.  But Your Honor,

8    we're asking you to look forward and look at what is bound to

9    happen and save the reorganized debtors the cost of taking this

10   matter into the Michigan Federal Court -- into the Federal

11   Court in the Eastern District of Michigan whether by appeal or

12   the district court because we know that where this is going to

13   end up is on an equitable mootness ground because it's going to

14   end up attacking the plan.  We're going to end up as a

15   recipient of the restoration of the plan or some move --

16        THE COURT:  But it is certainly conceivable that it

17   wouldn't.  I mean, it's conceivable that he could -- that the

18   District Court could say that the PBGC should pay for the

19   difference between what they're already paying for and the full

20   benefits, in which case it wouldn't affect anyone except the

21   taxpayers.

22        MR. MEISLER:  Your Honor, interestingly enough, Judge

23   Tarnow is moving in exactly that direction, but Your Honor, our

24   problem is that under ERISA, the PBGC has very strict

25   guidelines as to what it can or can't do.

1          THE COURT:  But that's, I mean, but what I'm saying is

2     that the issue of taxing the debtors with the cost doesn't seem

3     to be front and center.  I mean, they've sought payment from

4     the PBGC and from the Treasury and from individuals working on

5     behalf of the government.  I mean, there are a lot of other

6     pockets that they're seeking relief from.  It just -- and I'm

7     not the only Court that can make the mootness determination.

8          MR. MEISLER:  That's correct, Your Honor.  We thought

9     that this would short-circuit or shortcut and save the

10    reorganized debtors the cost of heading in --

11         THE COURT:  It just -- it seems to me that that really

12    isn't front and center here.  I mean, it really depends on your

13    argument that there's no other way for retirees to win here

14    except to impose the cost on the debtors.

15         MR. MEISLER:  That's right, Your Honor.

16         THE COURT:  And if that were the case, I'd believe it

17    would be moot.  But that -- I mean, clearly, that's not briefed

18    here.  That argument's not briefed here by anybody and it's

19    right in front of the District Court.  And the District Court,

20    at least on a preliminary basis, has ruled to the contrary.  So

21    it just seems to me that that's -- that makes this request of

22    yours premature.  And particularly with the extra bells and

23    whistles or belts and suspenders -- whatever cliche you want to

24    put in -- that I would put into the order that this order

25    essentially doesn't undo the -- maybe we should put in, also,

1    doesn't -- and also subject to the principles of mootness and

2    estoppel which are all not in front of me.

3            MR. MEISLER:  Understood, Your Honor.  The language

4    of -- sorry, let me back up just for a --

5            THE COURT:  Let me just -- let me back up.  It seems

6    to me that your argument here, which I think is different from

7    the objection, is that facts have changed since the stipulation

8    was entered into, i.e., the plan's gone effective.

9            MR. MEISLER:  That's correct, Your Honor.

10           THE COURT:  But on the other hand, they're not asking

11   for a determination that the relief they're seeking is not moot

12   basically because they're not seeking the relief that you're

13   worried about.  And I think until that relief is threatened to

14   be imposed, and given the status of the case in Michigan, it

15   just seems to me premature to raise the mootness issue.

16           MR. MEISLER:  Your Honor, what alarms us, though, is

17   that the concept of restoring the plan to DPH has been raised

18   in the pleadings in front of the Eastern District of Michigan.

19           THE COURT:  But not by the --

20           MR. MEISLER:  I one hundred percent agree, but

21   paragraph 2 of the stipulation from September 2009 specifically

22   states that not only do we reserve our rights in the event that

23   Mr. Shelley's clients attack the plan, but in fact, if it turns

24   out that the direction of the case in the Eastern District of

25   Michigan that another party collaterally attacks the plan --

1           THE COURT:  Right.

2           MR. MEISLER:  -- then again, we reserve our rights --

3           THE COURT:  But I think it's just a reservation.  I

4    mean, I just don't think we're there yet.  I mean, one of the

5    key findings on mootness is that you can't provide the relief.

6    And I think that's particularly the case with constitutional

7    mootness as opposed to Chapter 11 mootness.  And it's a -- we

8    haven't gotten to it.  But one of the four points that the

9    retirees make is that this isn't clearly on all fours with the

10   Chapter 11 in these cases because it's tied into the plan but

11   not an appeal and not directly the plan.  I think it's, I mean,

12   I think your best argument's constitutional mootness in the

13   fact that you can't really provide a remedy here without

14   providing notice to the thousands of people who relied on the

15   plan and the facts that have occurred over the last -- well,

16   since the effective date, the last year and several months.

17          MR. MEISLER:  And Your Honor, with respect to whether

18   it's an attack on the plan, now if we can depart for a moment

19   from equitable mootness, we do see it as a potential or we see

20   that the possibility of it becoming an attack on the plan

21   because if the plan were to be put back to DPH, then, of

22   course, that would eviscerate the PBGC settlement agreement.

23   Then we have a problem, what happens -- we have a problem

24   because we can't implement the plan.  We have a problem because

25   PBGC was granted a seventy million dollar cash award on the

1    effective date.  What is that, a windfall?  What happens to

2    that?

3            THE COURT:  No, I understand.  I think that if all of

4    those things are in prospect, then it would appear to be --

5    first of all, I don't think that the salaried retirees would be

6    able to request that type of relief because of the basis for

7    this motion.  Second of all, I think that if the Court were

8    somehow forcing it on them, which I don't think judicial

9    estoppel works that way, frankly, but if the Court were -- the

10   district court or the Sixth Circuit or someone were to force it

11   on them, I think that at that point, you have your mootness

12   argument.  But I just -- what I don't, I mean, in essence, what

13   you're saying here is that the lawsuit should be stopped, and

14   it seems to me, particularly given the at least initial ruling

15   by the District Court that he's already decided it shouldn't

16   stop on this very basis.

17           MR. MEISLER:  Your Honor, we don't think that the

18   litigation should stop.  We just, rather than having them seek

19   the equitable relief of putting the plan back, we would want

20   them to --

21           THE COURT:  But they're not looking to put it back to

22   Delphi.  They're looking to put a plan in place that PBGC

23   would, in essence, be the sponsor of or the government would be

24   the sponsor of.

25           MR. MEISLER:  Right, and to the extent that's

1    permitted by law, that would be okay with us.  But we're

2    concerned that it's not permitted by law and we --

3            THE COURT:  But he's -- you've offered that up as a

4    way to narrow the complaint.

5            MR. SHELLEY:  Correct.

6            THE COURT:  I mean, maybe that's your solution.  That

7    would give you more comfort than -- I mean, he's -- it's been

8    represented to me that the relief that the retirees are seeking

9    in Michigan does not seek to have the plan put back to Delphi,

10   that it seeks to extend its seeking equitable relief with

11   respect to restoration of a plan or the plan, it would be only

12   with the sponsor of the plan being someone other than entities

13   protected by the plan injunction.  It would be not GM and not

14   Delphi.

15           MR. SHELLEY:  In the specific language, we would offer

16   that the Court award equitable relief requiring the PBGC to

17   administer the plan and provide benefits as if the plan had not

18   been terminated.

19           THE COURT:  So, I mean, they've made it clear in their

20   pleadings, and it would be the basis for my granting relief

21   because you flagged the issue and it's highlighted and it's

22   been clarified that they're not seeking to impose any liability

23   on Delphi.  And I think that's enough for judicial estoppel,

24   frankly, but do you want to have that clarified in the order or

25   in the complaint?

1          MR. SHELLEY:  You know, that's fine, too.

2          MR. MEISLER:  Your Honor, that's very helpful.  The

3     last issue that concerns us is the -- and your reservation of

4     rights that you discussed that would be included in the --

5          THE COURT:  Well, yeah, that this order would not

6     provide that -- what we talked about and the reservation of

7     rights on mootness and estoppel.  But again, that's belt and

8     suspenders because they're not asking for that here.  They're

9     not asking for the obverse of that which is declaration that

10    the complaint is not barred by movants.

11         MR. MEISLER:  Understood, Your Honor, and that is very

12    helpful.  But my last concern is that in paragraph 2 of their

13    proposed order, I feel like the relief that they're seeking in

14    the order goes much further, it's much broader as they say

15    "pursuit of the relief requested therein will not violate the

16    modified plan".

17         THE COURT:  I understand.

18         MR. MEISLER:  And my concern is even with the

19    reservation of rights --

20         THE COURT:  Well, you could say "their pursuit of the

21    relief".

22         MR. MEISLER:  Your Honor, I was even hoping that we

23    could remove pursuit so that --

24         THE COURT:  Well, but it's the same thing.  It's

25    like -- I thought of removing it, actually, but I don't think

1    it works, I mean, because that basically means that they can't

2    say anything.  And I think they are free to say what they've

3    been saying in the Michigan court.  But you should be free to

4    say that if they start saying something different, that they're

5    barred by judicial estoppel or mootness or violation of the

6    orders.  And if someone else seeks that relief, this doesn't

7    even cover them.  I think it should say "their pursuit" as

8    opposed to, or "the retirees' pursuit", as opposed to "the

9    pursuit" because that suggests that anyone who moved -- who has

10   an axe to grind in that lawsuit is free from this order,

11   although I don't think that's the meaning or intention.

12          MR. MEISLER:  And Your Honor, so that a year or two

13   from now when someone else is looking back at this order, with

14   this Court's permission, I would like the proposed order to

15   read, actually, that should any other party try and --

16          THE COURT:  It doesn't need to say that.  It just says

17   that filing in -- I did have in here -- it's my last comment --

18   that the retirees' pursuit because, you know, that's all that

19   they're asking for.

20          MR. MEISLER:  Okay, thank you, Your Honor.

21          THE COURT:  So I think the record's clear.  I'm not

22   requiring you to amend the complaint.  I think that that may be

23   worthwhile, but I think the record's clear as to what the order

24   should say, which is that there are really two provisos that --

25   there's the provisos from the stipulation, and then secondly,

DPH HOLDINGS CORP., ET AL.

1   that they won't -- in addition to that, the discharge, you

2   know, this doesn't waive the discharge.  And then the last

3   point is that the debtors DPH's rights in respect of arguments

4   -- any arguments with respect to mootness or estoppel are fully

5   preserved which I think is implicit in this because they're not

6   asking for a ruling on this.  And I'm ruling on, expressly,

7   because of the representations, that the retirees are not

8   seeking to impose liability on or the plan on Delphi or any of

9   the protected parties under the injunction.

10          MR. MEISLER:  That's very helpful, and it would make

11  my client much more comfortable if prayer for relief in E was

12  modified consistent with what you had read on the record.

13          THE COURT:  Yeah, and that's certainly consistent with

14  the judge's ruling in Michigan and the position the retirees

15  have taken in Michigan, so that may be fine.

16          MR. SHELLEY:  We can do that one, too.

17          MR. MEISLER:  Thank you, Your Honor.

18          THE COURT:  So I think on this one, I'll grant the

19  motion as modified on the record.  You should work together on

20  the order.  And if there's a problem, you should settle the

21  order.  But I'm not expecting there'll be a problem.  I think

22  the transcript's clear.

23          MR. SHELLEY:  Okay, thank you, Your Honor.

24          MR. MEISLER:  I would agree.  Thank you, Your Honor.

25          THE COURT:  You should settle it on ten days' notice,

Page 38

1    but I don't think you'll get to that point.

2           MR. CORDARO:  Pardon me, Your Honor.  May I just be

3    heard for a minute on this?

4           THE COURT:  Sure.

5           MR. CORDARO:  I'm from the U.S. Attorney's Office.

6           THE COURT:  Sure.

7           MR. CORDARO:  I just want to make a -- Joseph Cordaro,

8    Assistant United States Attorney, and this may be just another

9    pair of suspenders, Your Honor, so I'll be very brief.  But

10   even though the United States has not taken any position on the

11   motion before Your Honor --

12          THE COURT:  Right.

13          MR. CORDARO:  -- which you just granted, obviously,

14   the federal defendants in Michigan reserve their rights to

15   litigate the Rule 15 issue, which would be an application to

16   amend the complaint --

17          THE COURT:  Oh, yeah.

18          MR. CORDARO:  -- before the district judge in

19   Michigan.

20          THE COURT:  Right, right.  And that's why I'm not

21   requiring you to amend the complaint because I don't think it's

22   necessary.  You know, that will be up to that judge to approve

23   the amendment.

24          MR. SHELLEY:  Okay.

25          MR. CORDARO:  Thank you, Your Honor.

1          MR. MEISLER:  Thank you.

2          Your Honor, moving to matter number 6, I'm going to

3    stay put since once again we have someone else's motion or

4    application.  Specifically, matter number 6 is Davidson Kempner

5    Capital Management LLC, et al. application for reimbursement of

6    fees and expenses, pursuant to Section 1129(a)(4) and

7    Bankruptcy Rule 9019.

8          Your Honor, since it is their application, I gladly

9    let them proceed.

10         THE COURT:  Okay.

11         MS. MARTIN:  Good morning, Your Honor.  Gina Martin of

12   Goodwin Procter on behalf of certain noteholders for payment of

13   fees and expenses pursuant Section 1129(a)(4) and Bankruptcy

14   Rule 9019.  Your Honor, as set forth in our application, and as

15   you may recall, the senior noteholders and the debtors entered

16   into a settlement with the debtors pursuant to Rule 9019 just

17   prior or at the first day of the confirmation hearing for the

18   first amended plan of reorganization of Delphi.  Pursuant to

19   that settlement, the debtors agreed to pay up to five million

20   dollars in actual, reasonable documented fees and expenses

21   incurred by the noteholders' professionals, which include

22   Goodwin Procter, Klestadt & Winters, and Maryann Keller and

23   Associates.  In exchange, the senior noteholder -- for the

24   payment of fees and expenses, the noteholders agreed to

25   withdraw their objection to the confirmation and certain other

1  motions that were coming at that time by the senior

2  noteholders.  The settlement provided that the senior

3  noteholders would be required to file an application for

4  payment and that the debtors would be required to pay such fees

5  when the Court approved -- if and when the Court approved the

6  application as being reasonable based on the totality of the

7  circumstances.  We filed our application in November of 2009.

8  Pursuant to that application, the noteholders seek

9  approximately 3.9 million dollars in fees and expenses.  That's

10  more than one million dollars below the amount that the debtors

11  agreed to support and pay.

12      Your Honor, I can go through more detail in the

13  application, which documents that the fees -- where the

14  professionals spent their time.  It says the reason -- it

15  documents the expenses, it certifies that those expenses are in

16  accordance with the rules of this district.  But Your Honor, no

17  objections to this application have been filed.  The United

18  States trustee did file an objection which included our

19  application but said that it found that our fees and expenses

20  requested were reasonable.

21      THE COURT:  Right.  I have viewed this application as

22  the plan modification provides, not under 503(b) but rather

23  under the terms of the actual settlement.  And I did have --

24  and consequently, whereas I might have had -- and I'm sure the

25  United States trustee would have serious issues with a lot if

1   not all of the requests under 503(b), I understand the United

2   States trustee's response here.  But I wanted to explore a

3   couple of aspects of it with you.  But before I do that, I see

4   Mr. Meisler standing up.

5           MR. MEISLER:  Thank you, Your Honor.  Your Honor, I of

6   course recognize DPH's obligation to support the reasonable

7   fees incurred by the senior noteholders under the standard of

8   totality of the circumstances.  But Your Honor, I also want to

9   the transcript, as well as to the confirmation order, the

10  January 25th, 2008 confirmation order to at least communicate

11  our perspective, which is we think the record is clear that DPH

12  or the reorganized debtors has the right to review and test the

13  fees being sought which are not reasonable under the totality

14  of the circumstances.  Your Honor, as we are all aware and as

15  was very painful for all of our stakeholders, circumstances

16  changed dramatically since the January 17, 2008 hearing, and

17  therefore, the lens through which reasonableness is viewed has

18  changed drastically.

19          Your Honor, the reorganized debtors believe that they

20  cannot separate the hindsight review set forth in substantial

21  contribution and 707 of the Bankruptcy Code where --

22          THE COURT:  503.

23          MR. MEISLER:  Sure, Your Honor, 503, correct, but I

24  wanted to raise 707 as well, and I mention that just because

25  that's an example of where totality of circumstances, the words

1    or the terms --

2              THE COURT:  Oh, okay.

3              MR. MEISLER:  -- are used in the Bankruptcy Code.

4    And, in fact, we believe that when viewing reasonableness for

5    the totality of circumstances, that concept includes the

6    perspective of hindsight.

7              THE COURT:  But wouldn't that -- okay, you can go

8    ahead.

9              MR. MEISLER:  That said, Your Honor, we want to be

10   clear.  We want to conduct ourselves in a manner consistent

11   with the agreement.  Your Honor, if your interpretation -- and

12   I can cite to you in the record, it's the January 17, 2008

13   transcript, page 21 lines 1 through 8 and your response on page

14   30 of the transcript, lines 5 through ten.  And in those

15   sections, it makes clear that the debtors or reorganized

16   debtors had reserved their right to challenge reasonableness.

17   Again, the question becomes what is totality?

18             THE COURT:  But there was -- at that hearing, there

19   was no discussion, for example, of what the meaning of totality

20   of the circumstances was or whether, for example, if the plan

21   didn't go effective, this wouldn't be allowed, or anything like

22   that.

23             MR. MEISLER:  Well, in fact, Your Honor, in the

24   transcript, in the January 17, 2008 transcript, there is

25   discussion because there was uncertainty regarding what

Page 43

1    totality of the circumstances meant, and in fact, it was the

2    United States trustee that analyzed this issue and had really

3    brought this to your attention.  And in the transcript, lines

4    19 through 25, page 30, you had actually mentioned that there

5    is substantial overlap between the 503 standard and the

6    totality of the circumstances.  You did acknowledge --

7           THE COURT:  You'd better show that to me because I

8    need to see that.

9           MR. MEISLER:  Your Honor, my version is annotated,

10   which counsel is welcome to look at, but we should, if you give

11   us a moment, we should have a clean copy.

12          MS. MARTIN:  Your Honor, I can read into the record --

13          MR. DUNCOMB:  It's tab 11 in here, Your Honor.

14          MS. MARTIN:  -- the sections --

15          THE COURT:  I'm sorry.

16          MS. MARTIN:  -- and your discussion.

17          THE COURT:  What did you say?

18          MR. MEISLER:  It's tab 11 in your binder on

19   substantial contributions.  It's one of the big black binders.

20   It should -- I think it has an unlabelled spine.  This is pages

21   29 and 30 --

22          THE COURT:  Okay.

23          MR. MEISLER:  -- line 16 on page 29, and it goes all

24   the way to the first line on page 30.

25          THE COURT:  Okay.

Page 44

1        (Pause)

2            THE COURT:  Okay.

3            MR. MEISLER:  Your Honor, if you want to hear from DPH

4    further, we would be happy to further discuss what we think

5    totality of the circumstances mean.  Again, I want to emphasize

6    that we're keeping in mind, Your Honor, that if you interpret

7    the record and your confirmation order from January 2008

8    differently regarding DPH's right to test what that standard of

9    totality of the circumstances means, we, of course, will fully

10   support your ruling and your interpretation.  We -- just to

11   repeat, we seek only to act in a manner consistent with the

12   agreement that we had with the senior noteholders and Your

13   Honor's order.

14           MS. MARTIN:  Your Honor, it seems to me that the

15   confirmation order says that "the debtors shall use their

16   reasonable best efforts to obtain Court approval of the payment

17   of such fees and expenses including without limiting preparing

18   and filing supportive pleadings, and if necessary, propounding

19   testimony in support of the fee applications and senior

20   noteholders' settlement."  They're now claiming that they're

21   not objecting.  What they're trying to do is elevate the

22   standard by which parties should review this.  It's clear from

23   the confirmation hearing that we didn't settle under a 503(b)

24   standard.  We settled pursuant to Bankruptcy Rule 9019.  And in

25   fact, if you go back in the transcript, it talks -- the United

1   States trustee objected and said that it should be subject to a

2   503(b) standard, and Your Honor ruled that, no, it didn't have

3   to be.  It was going to be somewhere in between 1129(a)(4) and

4   503(b).

5          We think that -- and we've said this in our

6   application and we've said this in our reply -- that in between

7   those two is probably something most akin to 330.  And under

8   330, we've demonstrated that the fees that we incurred at the

9   time were reasonable.

10          THE COURT:  Okay.

11          MR. MEISLER:  Your Honor, we just want to mention two

12   things.  Number one, counsel glosses over the most important

13   word of paragraph 62.c(3) which is that "the debtors shall use

14   their reasonable best efforts to obtain Court approval of the

15   payment of such fees", and I want to emphasize "such fees"

16   because "such" are those fees that are reasonable under the

17   totality of the circumstances.

18          THE COURT:  No, I don't think the debtor has done

19   anything here that would give the movants -- contrary to the

20   movants' reply -- some sort of rights under the stipulation.

21          MR. MEISLER:  Thank you, Your Honor.

22          THE COURT:  The stipulation set forth a standard; the

23   debtors agreed to support the fees within that standard.  But

24   that still leaves open the issue of the tweaking of the

25   standard between 330 and 503(b).  It clearly was not a 503(b)

1   standard because that was the objection that I overruled.  And

2   I did so on the basis that I believe the settlement in terms of

3   the cost of continuing the litigation with this substantial

4   constituency was reasonable with the caveat that I and the

5   other -- and the parties-in-interest would have the opportunity

6   to review the fees as actually sought in a fee application, and

7   then the second caveat about dealing with the work for the

8   former clients and having that be commentated on to the extent

9   that it benefits the current clients.  And the phrase "totality

10  of the circumstances," I viewed the totality of the

11  circumstances there as tied into the settlement, what was the

12  settlement for.  And that really leads to my questions here.

13          They are smaller categories, but there are three

14  categories here that seem to me not to fit within this deal.

15  The first one was dealing with the MDL.  The second is dealing

16  with the alternative investment -- heating investment approach.

17  And the third is the work that was done by Klestadt & Winters

18  with regard to the claim objection.  It seemed to me that the

19  deal was tied into the work that the firms had done in

20  connection with the confirmation fight, which included the

21  disclosure statement fight and coming up to speed, which

22  included organizing and the like.  But I think that the other

23  categories that I just listed don't really fall into that

24  group.

25          In addition to that, at least with regard to the

Page 47

1    alternative investment issue, I don't know whether that was for

2    former clients or not, but if it was for former clients, I

3    don't see how that really would have benefited the current

4    clients.  But that's really sort of a secondary basis for

5    raising that problem with the application.

6         So to summarize, it seems to me that under the

7    circumstances of the settlement, the fees sought for the

8    disclosure statement/plan objection and for organizing the

9    group in coming up to speed generally in the case were covered.

10   And I agree with the United States trustee and I guess

11   implicitly with everyone else since no one else has objected

12   that those fees are reasonable under Section 330 or under any

13   definition of reasonableness, but that looking at the -- these

14   other categories, I'm troubled that they don't really seem to

15   fit into the deal which was -- there was a pending objection

16   that had been hotly pursued and basically it was resolved on at

17   the confirmation hearing.

18        MS. MARTIN:  Your Honor, with respect to the

19   alternative investment agreement category, I can understand how

20   that didn't feed into any objection or --

21        THE COURT:  Right.

22        MS. MARTIN:  -- the like.  I mean, it could have, but

23   it never ultimately came to fruition, so --

24        THE COURT:  Was it for old clients too, or --

25        MS. MARTIN:  I don't believe so, but I --

1           THE COURT:  Not sure?

2           MS. MARTIN:  -- it's been a while.

3           THE COURT:  Okay.

4           MS. MARTIN:  But with respect to the multidistrict

5    litigation settlement, I mean, my understanding of that is that

6    part of what we were doing there was trying to enforce what

7    should have statutorily subordinated claims and trying to

8    prevent them from becoming elevated to being pari with the

9    senior noteholders' claims.  So to that extent, I think that

10   there was a benefit, that there was a reasonable basis for

11   pursuing that category.

12          THE COURT:  How is that tied into the plan objection

13   process, though?

14          MS. MARTIN:  Well, if you -- I don't -- again, it's

15   been a while, but my recollection is that one of the things

16   that we were seeking was enforcement of that.  But we had to

17   essentially keep the -- almost keep the litigation alive.  And

18   so when we withdrew our confirmation objections, we also

19   withdrew all of our objections with respect to the

20   multidistrict litigation settlement.  And so I would say that

21   the settlement that we made at the confirmation hearing

22   encompassed that.

23          THE COURT:  But I think the MDL was done before that,

24   wasn't it?

25          MR. MEISLER:  Your Honor, in fact, from the record on

1    the hearing, the controversy that was at issue was the

2    valuation fight.

3            THE COURT:  I think the MDL was done way bef -- I

4    mean, I just -- you know, that was done in the fall of 2007.  I

5    just --

6            MR. TOMER:  Your Honor --

7            MS. MARTIN:  My recollection --

8            MR. TOMER:  I'm sorry.

9            Your Honor, Brent Tomer from Goodwin Procter.  I

10   believe that the actual -- the portion of the objection to the

11   MDL settlement that senior noteholders made at the time while

12   the hearing occurred well prior to plan confirmation, that our

13   objection to the MDL settlement was held over to be heard in

14   connection with plan confirmation at the hearing --

15           THE COURT:  Was it reserved --

16           MR. TOMER:  -- were the objections were -- yes.

17           THE COURT:  -- on that issue?

18           MR. TOMER:  Yes, Your Honor.

19           THE COURT:  Okay.

20           MR. MEISLER:  Your Honor, looking at page 26 -- pages

21   26 and 27 of the transcript, starting at line 22, that provides

22   the clarity of what was at the heart of the settlement, which

23   was the potential protracted litigation on valuation at the

24   confirmation hearing.

25           And for background, the concern at the time that the

1   risk that the reorganized -- or, sorry, the debtors -- at the

2   time, we were the debtors.  The risk that concerned the debtors

3   was that we had a rights offerings that was going to price, and

4   we didn't want a valuation fight to prejudice our abilities to

5   launch or commence that rights offering.

6        (Pause)

7            THE COURT:  Let me just look at one --

8        (Pause)

9            MS. MARTIN:  Your Honor?

10       (Pause)

11           THE COURT:  Okay.

12           MS. MARTIN:  Your Honor, I don't know if -- I was

13   flipping through trying to find it, but on page 19 of the

14   transcript of the confirmation order, lines 17 through 25 where

15   Mr. Butler was introducing the settlement, the second paragraph

16   that I have starts on page 17:  "We have -- the understanding

17   that we have with the bondholders is that the objecting parties

18   would withdraw their objection to the plan.  They will" --

19           THE COURT:  And it refers to the MDL.

20           MS. MARTIN:  Yeah, right, and it does reference the

21   MDL.

22           THE COURT:  Yeah.  Okay.

23           All right.  As far as everything else?

24       (No response)

25           THE COURT:  Okay, I will grant the application except

1    for the fees sought with regard to -- now I lost my categories;

2    I think it's Category 5, the alternative investment.  I'm

3    sorry, Category 4, GP Services Rendered in Connection with

4    Competing Investment Agreement.  And the Klestadt & Winters

5    services which were in connection as with the claim objection,

6    I don't believe those were part of the settlement.

7        You could argue, and I'm sure probably someone who's

8    going to be ultimately paying this bill will be arguing it back

9    in his or her office, that we made a deal that covered

10    everything.  But I think the -- that wasn't the case as far as

11    what was actually approved by me.  I was approving a settlement

12    that really balanced the cost that I viewed at the time of

13    going ahead with the plan objections versus a settlement under

14    this standard.

15        And I don't think that it was contemplated by me or

16    perhaps anyone else, although the debtor may have -- I don't

17    know where the estimate of five million arrived, but I don't

18    think it was -- it was clearly not contemplated by me that an

19    alternative plan investment would -- that services rendered in

20    connection with that would be covered.

21        And similarly, I think that the claim objection

22    wouldn't be covered.  On the other hand, the work that was done

23    leading up to the confirmation hearing I think was clearly

24    covered.  The issues raised at the disclosure statement hearing

25    were primarily ones that were deferred to confirmation, so the

Page 52

1    work done in connection with those issues led to the issues

2    that were dealt with at the confirmation hearing.  The

3    transcript as well as your colleague's representation to me

4    that the MDL issue ultimately was one of the issues that was

5    reserved by this group for confirmation also means to my mind

6    that that was what was covered by the settlement.

7              So I believe that that's within the ambit of

8    reasonable fees under the totality of the circumstances, which

9    I view this as relating to the deal itself as opposed to

10   temporal circumstances.  But the deal itself I think really

11   covered the benefits to the estate of this group withdrawing

12   its plan objections, and the MDL was really part and parcel of

13   that even though it was not in the plan; it was on for that

14   hearing.

15             So I'll grant the application as to that extent.

16             MS. MARTIN:  Thank you, Your Honor.  Your Honor, we

17   should submit a --

18             THE COURT:  You should submit an order.

19             MS. MARTIN:  Okay, thank you.

20             THE COURT:  You don't need to settle it, but you

21   should circulate it to Mr. Meisler before you submit it.

22             MS. MARTIN:  Of course.

23             THE COURT:  Okay.

24             MR. MEISLER:  Thank you, Your Honor.  Your Honor, the

25   last matter on the agenda, matter number 7, is certain other

1   senior noteholders' substantial contribution application,

2   specifically C.R. Intrinsic and Elliott Associates.

3           Similarly, Your Honor, since this is their

4   application, I cede the microphone or podium to counsel for

5   C.R. Intrinsic and Elliot Associates.

6           MR. GOLDBERG:  Good morning, Your Honor.  Eric

7   Goldberg of Stutman Treister & Glatt, for the Applicant C.R.

8   Intrinsic and Elliott Associates.

9           I think we have in this one a simpler request and that

10  the standard is really clearly under 503, although this

11  request, I believe, is a bit more modest than the prior one.

12  And I think initially it's important to note here that none of

13  the parties with an economic interest opposed the allowance of

14  the administrative claim.  The creditors' committee has not

15  objected.

16          To be fair, the debtors have made the point that I

17  believe their fiduciary duty compels them to do, which is that

18  when this deal was made, obviously circumstances were

19  different.  However, they do recognize that they did make this

20  deal.  They did agree not to oppose the allowance of a request

21  for substantial contribution, subject only to a limitation for

22  reasonableness, and that to the extent they can bring to the

23  Court the concern that economic circumstances have changed

24  without disavowing their obligation to stand by their deal,

25  then that's what they're doing.

1          So at bottom, I think really what we have here is the

2     opposition from the U.S. Trustee who's raised objections under

3     the two grounds:  one, whether this satisfies the applicable

4     standard under 503, and we've set out our position papers and I

5     don't think we need to go further on that unless Your Honor has

6     any questions; and then the second issue also pertains back to

7     the debtors' objection -- their statement is reasonableness --

8     whether the amount that my clients are seeking here satisfies

9     the standard for reasonable compensation.

10          And, in particular, the objection the U.S. Trustee has

11     raised is whether my clients ought to be given a substantial

12     contribution claim for that portion of our request that relates

13     to fees prior -- fees and expenses incurred prior to the time

14     where the dispute really became live with regard to the global

15     settlement agreement and modification agreement motions.

16          THE COURT:  Okay.  What -- between the agreement that

17     was reached by the creditors' committee and the debtors with

18     GM, and the withdrawal of C.R. and Elliott's objection, what

19     changed in the GM agreement?

20          MR. GOLDBERG:  There were really two tweaks that were

21     incremental to what had been achieved in the resolution of the

22     committee's objection, and these basically pertain to

23     sweeteners in terms of what the entire creditor body would

24     receive depending on what GM received.  So these were

25     incremental sweeteners on top of the consideration that GM

Page 55

```
 1    would get either on account of its admin claim or if it were to

 2    receive stock.  But in each case there were -- and I don't

 3    recall the particulars, but marginal pieces of consideration

 4    that were not previously part of the deal that the committee

 5    had agreed to but that GM and the debtors agreed to put on the

 6    table in exchange for my clients' withdrawal of their

 7    objections to those motions.

 8            THE COURT:  Is it quantifiable?

 9            MR. GOLDBERG:  Well, at this point, yes in the sense

10    that those things ultimately --

11            THE COURT:  No, no, I mean --

12            MR. GOLDBERG:  -- did pan out.

13            THE COURT:  No, I understand --

14            MR. GOLDBERG:  Yeah.

15            THE COURT:  -- that, but I'm just -- I'm not using

16    hindsight at this moment.

17            MR. GOLDBERG:  I understand.

18            THE COURT:  I'm just trying to figure out -- assume

19    that that deal actually was implemented in a way that it

20    contemplated it; is it quantifiable what those changes were?

21            MR. GOLDBERG:  It's hard to say because it wasn't a

22    hard number; it wasn't, like, X dollars, these were

23    percentages, and if the preferred stock this.  But clearly at

24    the time that we negotiated this, and I was part of those

25    negotiations, we believed that the incremental value was worth
```

Page 56

1    at least five million dollars if not more than that.   In

2    hindsight, that value wasn't there, but, again, we don't

3    believe that the hindsight is the applicable standard.

4            THE COURT:  And, I'm sorry, and the nature of the

5    changes were that GM gave a greater percentage of --

6            MR. GOLDBERG:  Depending on --

7            THE COURT:  -- its recovery, or --

8            MR. GOLDBERG:  Depending on certain recoveries that

9    would have gone to GM, if those recoveries went to GM, there

10   was sort of a sharing mechanism where we would get an

11   additional cash component depending on payoffs that GM would

12   receive on account of its admin claim.

13           THE COURT:  Okay.

14           I'm just going to ask the debtors as a factual matter

15   is that how you recollect it, or -- did we have the two

16   agreements?

17           MR. MEISLER:  Your Honor, it's not my recollection.  I

18   was not in the room during negotiations.  I was --

19           THE COURT:  Well, do we have the first agreement or

20   the second agreement?

21           MR. MEISLER:  You know, we don't.  We have the record

22   on the transcript, and the record indicates the agreement

23   between -- the record indicates the -- sorry.

24           UNIDENTIFIED SPEAKER:  You want --

25           MR. MEISLER:  The record indicates --

Page 57

1          No, that's okay.  I can staple it.

2          The record indicates that there were changes to the

3     deal, but it was changes negotiated between the debtors and the

4     creditors' committees.  And so there's no --

5          THE COURT:  Well, that was the first deal, right,

6     before -- not the first deal.  The first deal was between GM

7     and the debtors, and the creditors' committee got involved

8     and --

9          MR. MEISLER:  That's right.

10          THE COURT:  -- we had a chambers conference and I said

11     you all need to settle this, looking at GM and Mr. Rosenberg.

12          MR. MEISLER:  Right.

13          THE COURT:  And they went off with your clients, I

14     trust.

15          MR. GOLDBERG:  Well, actually not.  They went -- after

16     the first hearing when Your Honor said let's take a break for a

17     couple days and try and work this out, and the debtors and the

18     creditors' committee negotiated for a few days, and they came

19     back with that deal.  Unfortunately we were not invited to

20     those negotiations.

21          So when the creditors' committee came back with the

22     deal they made with the debtor, that's not the same deal.  We

23     negotiated -- there was some additi -- the additional tweaks

24     are the basis for our substantial contribution claim, and it's

25     those additional pieces of consideration that we're relying on

Page 58

1    here.

2         We're not trying to glom onto the deal that the

3    creditors' committee had --

4         THE COURT:  Right.

5         MR. GOLDBERG:  -- agreed to, and certainly I don't

6    think Mr. Butler would have agreed to not oppose the

7    substantial contribution claim for something that he did with

8    the committee.

9         MR. MEISLER:  Your Honor, we simply couldn't figure

10   out what the incremental change was to the deal between GM, us

11   and the creditors' committee.  We do acknowledge that we had an

12   agree --

13        THE COURT:  Between that deal and the final deal?

14        MR. MEISLER:  That's right.  We couldn't see how that

15   metric changed.

16        THE COURT:  Okay.

17        MR. MEISLER:  We do acknowledge that they were

18   challenging the GM facility, they were challenging the amended

19   GSA number 8 (ph.), and more importantly they had -- more

20   importantly to us, they had a motion for an examiner.  And we

21   saw those challenges in the motion for an examiner as something

22   that could slow down our ability to move forward and get the

23   October 2008 plan consummated.  And so we thought that, under

24   that circumstance, to get rid of that motion for an examiner,

25   that we were willing to do -- to enter into an agreement for a

Page 59

1    substantial contribution claim -- or, rather, our agreement not

2    to object.

3         So that was the fundamental rationale behind the deal

4    that we cut.  But, Your Honor, we did similarly look to try and

5    understand how the construct between GM and Delphi changed, and

6    we just didn't see it.

7         THE COURT:  Okay.  I mean, I have to say, I don't see

8    it either in the papers or at the hearing and that you have the

9    burden of proof on that.  I mean, leaving aside the hindsight

10   issues -- I mean, I expect you've probably read the transcript

11   of the rulings on the splinter unions and on the trade

12   creditors' committee.  I believe there is an element of

13   hindsight.  At the same time, the debtors were saving some

14   money in entering into agreement with you all.

15        But I think before one gets into the hindsight

16   analysis at all on benefit, there has to have been some initial

17   benefit, and I just don't -- I don't see it.  I mean, maybe

18   it's there, but it's not here on this record.

19        MR. GOLDBERG:  Well, is Your Honor asking in terms of

20   specific details about which deal points exactly changed --

21        THE COURT:  Yeah.  I mean, I think -- I mean, for all

22   I know, after you were brought into the loop, not you

23   personally but your clients were brought into the loop, they

24   may have decided, well, this isn't such a bad deal.  And so,

25   you know, I know they're well-represented and they're

1   sophisticated people and they negotiated for the best way out

2   possible -- which was this agreement by the debtors and the

3   committee not to oppose a 503(b) application -- I think

4   probably relying on the fact that other people would.

5           MR. GOLDBERG:  Well, I guess, by the same token then,

6   the debtors and the committee are similarly well-represented

7   and at the time agreed to not --

8           THE COURT:  Well, that was a good deal on their part.

9   I mean, that was -- they made -- I mean, they didn't make as

10  good a deal with the Goodwin Procter group, but I guess that's

11  my problem with this -- my first problem with the application

12  is that I just don't see -- even if I weren't to distinguish

13  between benefit and reasonableness, which I think the provision

14  does, I think it requires you to analyze both.  And also,

15  again, as I said with the trade committee, I think there may be

16  some continuum even though at the end of the case the deal

17  doesn't materialize that everyone thought would be a benefit.

18  There may have been some benefit to the case just because there

19  was that deal, but I don't think I get to that point, because I

20  don't see what was added to by Elliott and C.R. from when it'd

21  previously been negotiated.  All I see is that there was a

22  second agreement, but I don't really know whether that

23  agreement was anything more than, you know, tweaks.

24          MR. GOLDBERG:  And I appreciate that.  And part of it,

25  Your Honor, I think, is that it's hard, in a context like that

Page 61

1   where you have an evolving deal and points are constantly

2   moving, to be able to allocate and attribute what changes --

3           THE COURT:  Well, I know, but --

4           MR. GOLDBERG:  -- that were announced that morning

5   were --

6           THE COURT:  -- I don't even have the two drafts.  I

7   mean, I don't have -- I mean, I can see how a deal changes, but

8   I don't have that.

9           MR. GOLDBERG:  Well, I mean, what you have, I think,

10  is the initial deal that was filed before the settlement with

11  the committee and the final deal as it was ultimately approved,

12  and I just don't know how --

13          THE COURT:  Where is that in the record?

14          MR. GOLDBERG:  Well, that's in the agreement that

15  was -- the order approving the agreement.  And I think the

16  problem that we had had --

17          THE COURT:  No, I'm sorry --

18          MR. GOLDBERG:  -- is how do we say how much of those

19  changes are --

20          THE COURT:  No, maybe -- is there something in the

21  record for this hearing that has the two -- the first GM deal

22  and the second GM deal, the one that the debtors and the

23  committee negotiated and then the second one that also had

24  Elliott's input?

25          MR. GOLDBERG:  I don't believe we have that in the

1    record, unless --

2            THE COURT:  Okay.

3            MR. MEISLER:  Your Honor, we --

4            MR. GOLDBERG:  -- if the debtors have it.

5            MR. MEISLER:  -- we do not have that in the record.

6            THE COURT:  All right.

7            MR. GOLDBERG:  Then what I'd ask Your Honor, if you'd

8    indulge it, is to allow us to adjourn the hearing and we can

9    supplement the record with that.

10           THE COURT:  Well --

11           MR. MEISLER:  Your Honor, that prejudices us.  We of

12   course bill by the hour, and if we have to prepare again and

13   come back and have to deal with this again, we don't think

14   that's equitable for our client, the reorganized debtors.

15   Moreover, Your Honor, we did enter into a scheduling order that

16   set this date, that set a timeline.  They were supposed to have

17   submitted all their exhibits and any sort of affirmative

18   evidence that they wanted to put in, whatever their affirmative

19   case might have been, and that should have been submitted prior

20   to the May 20th hearing.

21           MR. GOLDBERG:  Your Honor, in a case with over a

22   hundred million dollars of fees billed by the debtors, I think

23   it really doesn't speak well to a prejudice argument to say

24   that you would have to take up one additional matter, a

25   calendar that surely is going to involve more than today's

Page 63

1    hearing going forward.

2            MR. MEISLER:  Your Honor, that's just not relevant.

3    We're representing reorganized Delphi that has a very finite

4    budget, and that budget is largely comprised of a facility --

5    not even a facility; funding provided by General Motors.

6            THE COURT:  Well, it's your objections, Mr. Masumoto.

7    What do you have to say on this?

8            MR. MASUMOTO:  Your Honor, I do agree that, based upon

9    the agreements between the parties, they were to have provided

10   the documents prior to the hearing, which was in fact in May.

11   Since then, they did not even make any subsequent attempt to

12   supplement the record if they thought it was necessary.  And

13   under the circumstance --

14           THE COURT:  And actually you did -- there was a reply

15   to your objection which made this point.

16           MR. MASUMOTO:  That's correct.  I mean, they did file

17   something on the docket; however, we still maintain, as we set

18   forth in our paper, similar to the arguments that Your Honor

19   has raised, that from our standpoint it appears that there were

20   one of many members negotiating a plan, and under those

21   standards they do not even qualify for the substantial

22   contribution -- they do not meet the standard under 503(b).

23           So, accordingly, at this point we argue that their

24   application should be denied.  That's, again, taking -- not

25   even taking into account the point that Your Honor mentioned,

Page 64

1   looking at the hindsight.  I mean, I think that was pretty much

2   self-evident to everyone.  No one disputes the fact that

3   subsequent events essentially nullified any potential benefits

4   that have occurred.  Given that circumstance, I think it should

5   tip the balance toward denial of this particular application.

6          As Your Honor mentioned, even under the standard, if

7   you're looking at the time the deal was entered into, I don't

8   think they qualify.  But certainly taking into account the

9   hindsight factor, which is really a major factor -- in fact,

10  that is the most compelling characteristic of the 503(b) -- and

11  looking back to see whether or not there's a benefit to the

12  estate, that under that -- taking that into consideration,

13  essentially whether or not they did or did not satisfy the

14  benefit at the time is almost irrelevant.

15          THE COURT:  Okay.

16          What do you have to say on that second point?

17          MR. GOLDBERG:  On the second point, a couple of

18  things, Your Honor.  I think it goes -- the hindsight standard

19  really doesn't -- or shouldn't work, for a couple of reasons,

20  mostly policy-related.  But, first, if we allow this to be

21  governed by a hindsight standard, I think you have very

22  negative policy implications for the conduct of Chapter 11

23  cases.  A substantial contribution claim or the agreement by a

24  debtor not to oppose a substantial contribution claim is a

25  valuable currency or chit that a debtor can often use in a

1   Chapter 11 case.  It's a way of resolving objections; it's a

2   way of acknowledging a party's contribution without having to

3   somehow pay out cash in exchange for making a problem go away.

4   This is part of what greases the skids during many Chapter 11

5   cases.

6          And I think that a lot of the disputes that otherwise

7   can be resolved by deferring them or putting them offline, if

8   you will, to the substantial contribution issue are not going

9   to go away if parties that enter into those agreements, or

10  might otherwise enter into those agreements, know that it

11  doesn't mean anything to have a substantial contribution claim

12  if everything is going to be judged by perfect twenty-twenty

13  hindsight.

14         What is the incentive for a party in the midst of a

15  heavy dispute to say Okay, now we've made some changes and I'm

16  going to make some concessions, and part of the concessions you

17  make will be the agreement not to oppose or to grant a

18  substantial contribution claim when I in effect have to become

19  a guarantor of the economic value of that claim two years in

20  the future when things turn out differently than we think they

21  might due to circumstances that are completely unrelated to the

22  substantial contribution claimant?

23         THE COURT:  Well, in Granite Partners, Judge Bernstein

24  talks about two different types of substantial contribution

25  claims:  One type is similar to the work that was done by the

1   trade committee, that I've already ruled on in this case, where

2   basically they fill a gap that the retained professionals for

3   the debtor and the creditors, meaning the equity committee,

4   would normally fill but for some reason haven't.  And it seems

5   to me under those circumstances if you fill that gap, maybe you

6   should be treated like they are where you just look at

7   reasonableness at the time.

8           He has another category where people just do something

9   really remarkable that has the effect of really benefiting

10  everybody.  And I think under those circumstances it really

11  depends on it being something really remarkable, and if it

12  isn't -- if it turns out not to have been a good -- a real

13  benefit, I don't see how you'd have anything there.

14          And then there is of course the statute itself which

15  talks about conferring a benefit in the case.  And I read that

16  as, since it says "in the case" as opposed to "to the estate",

17  that it probably has some procedural aspect to it, or process

18  aspect to it, which again sort of ties into were you acting

19  like an estate professional.

20          But I guess that ties into the evidentiary showing, I

21  guess, here, which is -- I'm just having a hard time seeing how

22  these two entities actually were doing more than the committee.

23  I mean, it sounds like, to me, they were excluded from the

24  original negotiations.  If they'd been involved in the original

25  negotiations, I don't think they'd be entitled to an award

 1   because they'd be just -- you know, they'd be sitting in.

 2          MR. GOLDBERG:  Well --

 3          THE COURT:  The committee was there.

 4          MR. GOLDBERG:  No, I'm not sure about that, Your

 5   Honor, really for two reasons:  One, I think that if we had

 6   been allowed to participate certainly by virtue merely of the

 7   dollars represented by my clients, I don't think we would have

 8   had significant enough a role to dictate what the -- or to veto

 9   anything that the committee had agreed to; and then second, as

10   counsel pointed out, we weren't merely another facet of the

11   objections raised by the committee.  We had a different form of

12   relief in addition to the oppositions, but we were also seeking

13   the appointment of an examiner to address some of the issues

14   that were related to what -- the transactions that were subject

15   to those motions, as well as the earlier matter.  And I think

16   certainly we did confer a benefit, or at least the estate

17   received a benefit, but to the extent we elected as a result of

18   this settlement not to prosecute that examiner motion --

19          THE COURT:  See, that's where I have a real problem.

20   I mean, that -- to me, that's the type of precedent that's

21   really a bad one.  If I were to basically say that because you

22   withdrew your request for an examiner you made a substantial

23   contribution, I mean, that opens the door to anyone in a case

24   with more than five million dollars of public debt.  Just --

25   you know, it just -- it doesn't --

Page 68

         1           MR. GOLDBERG:  No, I understand, and I'm not

         2    suggesting that that's the sole basis.  But remember that that

         3    took place in this context --

         4           THE COURT:  Right.

         5           MR. GOLDBERG:  -- and that that -- and it's not just

         6    that we said here's what the statute said, we're entitled to an

         7    examiner, you know, give us money, we'll file the motion.

         8           THE COURT:  Right.

         9           MR. GOLDBERG:  That's not what happened.  But we did

        10    withdraw that in the context of an improved deal that provided

        11    a benefit --

        12           THE COURT:  See, but, again --

        13           MR. GOLDBERG:  -- for --

        14           THE COURT:  -- I just don't -- that's where there's

        15    the disconnect.  I don't see the proof of that.  It may be the

        16    case that it was approved, but it just doesn't really -- it's

        17    not established.

        18           And I actually do think that this issue shouldn't have

        19    come as a surprise today.  The U.S. Trustee raised it in saying

        20    that the motion really doesn't say what the benefit was.  And

        21    the motion responds but it doesn't -- it actually says "after

        22    several terms of the revised deal were clarified"; it doesn't

        23    even say "improved".  The noteholders agreed to withdraw their

        24    objections.  So I guess that's really ultimately the problem I

        25    have here.

1          I think, under certain circumstances, if there clearly

2    was an improved deal negotiated, and if in effect you acted

3    like the examiner in interrogating GM about all these issues,

4    then I think that that would probably defeat hindsight.  But I

5    just don't see it here.

6          So on that basis, I'm going to deny the motion.

7          MR. GOLDBERG:  Thank you, Your Honor.

8          THE COURT:  For the record, I very recently, on May

9    20th, set forth what I think is the proper standard for

10   reviewing an application under Section 503(b)(3)(B) and (b)(4),

11   and I'm going to rest on that explanation, except to note,

12   again, since it's not all in the same place -- most of it

13   appears at pages 109 through 115 of that transcript -- the

14   additional observation that clearly Chapter 11 generally, but

15   specifically this case, is a collective process.

16         And Congress has laid out various ways that the fees

17   of parties involved in that process are paid, including under

18   506(b) and 502, as set forth in the Travelers case, but that

19   the burden for getting paid under 503(b)(3) in hundred-cent

20   dollars is a high one.  And on this record I don't see the

21   demonstrable tangible benefit to the estate, because the

22   improvements, if there were any, in the GM settlement, over and

23   above those that had been negotiated by the creditors'

24   committee with the debtor, that the movants here allege have

25   been established, and my belief that the withdrawal of the

Page 70

1    examiner motion, is not the type of demonstrable tangible

2    benefit that Congress had in mind.

3         I think for the future that means that people may need

4    to negotiate their settlements differently, more along the

5    lines that the prior movants did, but that will raise a

6    different type of response to that settlement.  And in the

7    future, under different circumstances, a court, including this

8    court, might well agree with an objection by the U.S. Trustee

9    to that type of settlement, which frankly was a fairly close

10   call at the confirmation hearing when I didn't agree with the

11   U.S. Trustee.

12        So I don't think that the agreement by the debtors and

13   the committee to support a 503(b)(3) application is somehow

14   more than -- or somehow makes it easier to establish a

15   503(b)(3) request.

16        So, Mr. Masumoto, you should submit an order denying

17   the objection.

18        MR. MASUMOTO:  Very well.  Thank you, Your Honor.

19        THE COURT:  Thank you.

20        And, again, as far as the reasonableness of the fees

21   is concerned, I didn't have a problem with the reasonableness.

22   This is all on the analysis of benefit.

23        MR. GOLDBERG:  Thank you, Your Honor.

24        THE COURT:  Okay.

25        MR. MEISLER:  Thank you, Your Honor.  That concludes

1    today's hearing.

2              THE COURT:  Okay.

3              MR. MEISLER:  Thank you.

4         (Proceedings concluded at 2:44 PM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 72

```
1

2                           I N D E X

3

4                        R U L I N G S

5     DESCRIPTION                              PAGE      LINE

6     Objection to Claim Made by Ms. Robinson    8        22
      Granted

7

      Objection to Claim Made by Robert Stasik   9         1

8     Granted

9     Objection to Claim Made by Ms. Hatch       9         8
      Granted

10

      Objection to Claim Made by Mark Odette     9         9

11    Granted

12    Objection to Claim Made by Sheila Reid     9        11
      Granted

13

      Objection to Claim Made by Mississippi    10        15

14    Guaranty Association Granted

15    Objection to Claim Made by Mr. Dashkowitz  11       13
      Granted

16

      Objection to Claim 18727 Made by Alegre    12       21

17    Granted

18    Pro Hac Vice Motion for Carl Tullson       13        9
      Granted

19

      Reorganized Debtors' Motion for an Order   19        3

20    To Enforce Modified Plan and
      Modification Approval Order Injunction

21    Against Leigh Ochoa Granted

22    Forty-Eighth Omnibus Objections Granted    21        5

23    Motion of the Salaried Retirees for        37       18
      Order Confirming That Second Amended

24    Complaint Does Not Violate The
      Modified Plan or the Plan Modification

25    Order Granted as Modified On the Record
```

Page 73

1

    Application by Davidson Kempner        50      25

2    Capital Management LLC et al.

    For Payment of Fees and Expenses

3    Pursuant To 11 U.S.C. § 1129(a)(4)

    And Bankruptcy Rule 9019 Granted

4

    Substantial contribution application    69      6

5    Of CR Intrinsic and Elliott Associates

    Denied

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 74

1

2                    C E R T I F I C A T I O N

3

4   I, Dena Page, certify that the foregoing transcript is a true

5   and accurate record of the proceedings.

6

7

8   _____

9   Dena Page

10

11  Veritext

12  200 Old Country Road

13  Suite 580

14  Mineola, NY 11501

15

16  Date:  July 2, 2010

17

18

19

20

21

22

23

24

25