Hearing Date: August 12, 2010 at 10:00 a.m. ET
Objection Deadline: August 3, 2010 at 4:00 p.m. ET

HARRIS BEACH, PLLC
One Park Place, 4th Floor
300 south State Street
Syracuse, NY 13202
Telephone: (315) 423-7100

HARRIS BEACH, PLLC
100 Wall Street
New York, NY 10005
Telephone: (212) 687-0100

*Attorneys for Excellus Health Plans, Inc.
and its Affiliates*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:

DELPHI CORPORATION, et al.,

Debtors.

Chapter 11
Case No. 05-44481 (RDD)

(Jointly Administered)

## MOTION FOR ALLOWANCE AND PAYMENT OF EXCELLUS HEALTH PLANS, INC. AND ITS AFFILIATES TO PERMIT LATE FILED CLAIM PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9006

Excellus Health Plans, Inc. and its Affiliates ("Excellus"), by and through its counsel, Harris Beach PLLC, submits this Motion pursuant to Federal Rule of Bankruptcy Procedure 9006(b) seeking leave to allow a late filed administrative expense claim (the "Claim"). In support of the Motion, Excellus respectfully represents to the Court as follows:

### I.    JURISDICTION, VENUE, AND BASIS FOR RELIEF

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. This matter is a core proceeding under 28 U.S.C. §§ 157(b)(2)(G), (K) and (O).

219972 1400531.2

4. The basis for relief is §§ 503(a) and 503(b) of the Bankruptcy Code and Federal Rule Bankruptcy Procedure 9006.

## II. BACKGROUND

1. On October 8th and 14th, 2005 (the "Petition Dates") the Debtors commenced their cases in this Court under Chapter 11 of the Bankruptcy Code.

2. On the Petition Dates, Debtors were current on premium payments due to Excellus for health insurance coverage, which coverage provided necessary medical benefits to their employees through a medical benefits plan administered by Excellus (the "Medical Benefits").

3. The Debtors had been maintaining the Medical Benefits pursuant to a Level Premium Agreement ("LPA") executed by Delphi Corporation on or about October 27, 2003.

4. Pursuant to the LPA, the Debtors paid a fixed premium from January through December of each year (the "Rating Period"). The premium rate paid by the Debtors represented the present prevailing premium rate, as well as protected increases which would have been applied for and which Excellus would be able to charge within the Rating Period.

5. Prior to the end of each Rating Period, the fixed premium payments would be compared against the rates which actually prevailed during that time frame as approved by the Superintendent of Insurance. Any difference between the amount charged to the Debtors and the prevailing premium payment, called a Rate Variance, would be applied to increase or decrease the rate quote for the following year. The LPA further provided that any Rate Variance shall not increase or decrease the rate quote for the following year by more than 10%, or any such excess shall be paid in cash, after any other offsets are made. If amounts were due to the Debtors, a credit would be issued. A copy of the LPA is attached hereto as **Exhibit "A."**

6. Even prior to entry of the most recent LPA in 2003, the Debtors entered into a similar LPA with Excellus. For the contract year ending December 31, 2002, the Debtors owed a Rate Variance to Excellus of $633,116.36. The Debtors made a payment of $345,179.09 towards that Rate Variance. The balance of any variance was then "carried over" to the rate quote for the following year. A summary of the LPA accounting and history on this account from 2002-2008 is attached hereto as **Exhibit "B."**

7. Pursuant to the LPA, in the event the LPA is terminated, or if, for any reason, the Rate Variance described therein does not occur, then the Rate Variance shall be paid in cash, after first offsetting any other monies due to the Debtors. See Exhibit "B."

8. The LPA is silent regarding when the Rate Variance will be determined, invoiced, or due.

9. Generally speaking, there is no formal notification of cancellation of the LPA. If the Debtors did not approve of the rates for the upcoming year, the coverage would not be renewed. In many instances, an online renewal system is used whereby Excellus would establish the rates and benefits for an employer group for the upcoming year, and an employer group such as Delphi would accept or reject those rates.

10. On June 16, 2009, this Court entered an Order establishing July 15, 2009, as the administrative expense bar date, and set a procedure for filing proofs of administrative expenses with respect to claims that arose, accrued, or that were incurred on or before June 1, 2009.

11. On July 16, 2009, Excellus issued an invoice to the Delphi National Benefits Center in Lexington, Kentucky, in the amount of $411,318.50 (the "Final Rate Variance") for the Rate Variance due. The Due date on the invoice was July 30, 2009. A copy of that invoice is attached as **Exhibit "C."**

12. The Final Rate Variance was never paid.

13. Pursuant to a Notice of (A) Order Approving Modifications to First Amended Joint Plan of Reorganization of Delphi Corp. and certain affiliates, Debtors and Debtors in possession; and (B) Occurrence of Effective Date, the Effective Date of the Debtors' confirmed Plan was October 6, 2009. That Notice contained a provision that required that all administrative claims incurred after June 1, 2009 be filed on or before November 5, 2009.

### III. RELIEF REQUESTED

**A. The Final Rate Variance claim qualifies for administrative priority.**

14. Section 503(b) of the Bankruptcy Code provides that "after notice and a hearing, there shall be allowed, administrative expenses... including – (1)(A) the actual, necessary costs and expenses of preserving the estate". "The purpose of Sections 503(b)(1)(A) and 507(a)(1) is to facilitate the reorganization effort by encouraging third parties, who might otherwise be reluctant to deal with a debtor-in-possession, to transact such business." See In re Old Carco LLC f/k/a Chrysler, LLC, 424 B.R. 650, 656 (Bankr. S.D.N.Y. 2010).

15. In order for a claim to be entitled to administrative priority, the claim must satisfy two elements: (a) the claim must arise out of a transaction with the debtor-in-possession, and (b) the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession. See In re Adelphia Bus. Solutions, Inc., 296 B.R. 656, 662 (Bankr. S.D.N.Y. 2003).

16. The first prong can be met by proving that the Debtors induced the claimant to continue to perform after the bankruptcy filing. Id. "Where a 'debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to assume or reject the contract, the debtor-in-possession is obligated to pay for the reasonable value of

4

those services." In re Worldcom, Inc., 308 B.R. 157, 166 (Bankr. S.D.N.Y. 2004) (citations omitted).

17. The second prong requires a "benefit" to the estate that provides "a concrete, discernible benefit from actual use because a speculative benefit or the mere potential for benefit is not enough to warrant an administrative claim priority." Adelphia, 296 B.R. 662.

18. As outlined above, Excellus can meet the first prong as it will be undisputed that the Debtors continued to request, and receive Medical Benefits for its employees after the bankruptcy filing.

19. Throughout the bankruptcy case, the debtors in possession received and paid for those benefits pursuant to the LPA described above, and therefore it would be difficult to deny that the claim arose out of a transaction with the Debtor.

20. In demonstrating the second prong, that the consideration supporting Excellus' right to payment was both supplied to and beneficial to the debtor-in-possession, Courts have routinely recognized that there is a concrete discernable benefit from providing medical benefits to employees. In fact, the Debtors in these cases recognized the importance of continuing the Medical Benefits to their employees.

21. Pursuant to the Order of this Court dated October 13, 2005, the Debtors were authorized to pay pre-petition benefits and continue maintenance of human capital benefit programs in the ordinary course, which included health insurance, retirement, and other benefit programs. In seeking that Order, the Debtors represented to the Court that the maintenance of those health benefit programs was essential to the continued operations of the Debtor.

22. As a result, providing the Medical Benefits to the Debtors' employees would undeniably be consideration that was supplied to and benefitted the debtor-in-possession.

### IV. THE COURT SHOULD ALLOW THE ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO BANKRUPTCY RULE 9006(b)(1)

23. Section 503(a) of the Bankruptcy Code provides that "an entity may timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the Court for cause". 11 U.S.C. §503(a). In determining whether cause exists under §503(a) of the Bankruptcy Code, cases construing the "for cause shown" standard under Bankruptcy Rule 9006(b)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") are relevant. *See* 4 COLLIER ON BANKRUPTCY, ¶ 503.02 [2] (Alan N. Resnick & Henry J. Sommer eds. 16th ed. 2009)

24. Pursuant to Bankruptcy Rule 9006(b)(1), the Court may permit a claim to be filed after the bar date if the claimant's failure to comply with the deadline was the result of "excusable neglect".

25. The Supreme Court in <u>Pioneer Investment Services Company v. Brunswick Associates Limited Partnership</u>, has been described as the "seminal case interpreting the 'excusable neglect language of Bankruptcy Rule 9006(b)(1)." <u>In re Enron Corp.</u>, 298 B.R. 513, (Bankr. S.D.N.Y. 2003) (citing <u>Pioneer Investment Services Company v. Brunswick Associates Limited Partnership</u>, 507 U.S. 380, 113 S. Ct. 1489 (1993)).

26. <u>Pioneer Investment</u> set forth four factors that should be considered when evaluating whether to allow a late filed claim:

    i. The danger of prejudice to the Debtor;

    ii. The length of delay and its potential impact on judicial proceedings;

    iii. The reason for the delay, including whether it was within the reasonable control of the Movant; and

    iv. Whether the Movant acted in good faith.

See Pioneer Investment Services Company v. Brunswick Associates Limited Partnership, 507 U.S. 380, 395, 113 S. Ct. 1489 (1993).

23. The determination of whether excusable neglect exists "is at bottom an equitable one". Id. at 395. Moreover, "the enlargement of presented time periods under the excusable neglect standard of Rule 9006(b)(1) is not limited to situations where the failure to timely file is due to circumstances beyond the control of the filer. Id. at 391.

24. In fact, the Southern District of New York has found that the factors are all relevant but "that they all need not point in the same direction." In re Keene Corp., 188 B.R. 903, 909 (Bankr. S.D.N.Y. 1995).

25. Moreover, Courts are permitted, where appropriate, to allow late claims caused by "inadvertence, mistake, or carelessness". Pioneer Servs., 507 U.S. at 388.

26. Excellus respectfully submits that allowing its late filed administrative expense claim will not prejudice the Debtors. While the Pioneer Court did not define "prejudice," subsequent cases have identified a number of considerations, including the size of the late claim in relation to the estate, whether a Disclosure Statement or Plan has been filed or confirmed with knowledge of the existence of the claim, the disruptive effect that the late filing would have on a Plan close to completion, or upon the economic model upon which the Plan was formulated and negotiated. Keene, 188 B.R. at 913; In re Infiltrator Systems, Inc., 241 B.R. 278, 282 (Bankr. D. Conn. 1999).

27. Indeed, the Infiltrator court recognized that prejudice to the Debtor was a significant factor that is applied flexibly in determining whether to allow late-filed claims. Infiltrator, 241 B.R. at 282.

28. In this case, the length of the delay is insignificant and the allowance of the claim will have no impact on these judicial proceedings. The size of the claim is minimal compared to the

overall amount of administrative expenses in this mega case. Indeed, Excellus' claim represents only a very tiny fraction of the total administrative claims asserted against the Debtors in these cases. In addition, the short delay in Excellus formally asserting its claim should not delay or otherwise affect the proceedings. Moreover, as evidenced by the invoices attached hereto as Exhibit "C" and "D," the Debtors had actual knowledge of the claim before the bar date.

29. It should also be noted that, upon receiving information about this claim from Excellus, the undersigned counsel for Excellus promptly corresponded with counsel for the Debtors pursuant to email communications in May, 2010, in an attempt to resolve the claim. Therefore, counsel for the Debtors had knowledge of the amounts that Excellus believed were due as early as May, 2010.

30. More importantly, the Debtors were well aware that Excellus had continued to provide Medical Benefits under the LPA through the end of 2008. Based on the years of doing business with Excellus, they were aware of the Rate Variance that could accrue from year to year. In addition, the Debtors received the benefit of the LPA in the years where the Rate Variance weighed in the Debtors' favor, as was the case in 2007. See Exhibit "B."

31. In 2007, there was a balance due to Delphi, which was subsequently credited against the rates going forward. It was not until 2008 that there was a significant shortfall with respect to the Rate Variance, resulting in the administrative expense claim requested herein.

32. Based on the prior history with the Debtors, it would be the practice that any Rate Variance would simply be addressed in the 2009 LPA arrangement. However, when the actual accounting for the Final Rate Variance occurred, it resulted in the July 16, 2009 invoice being issued directly to the Debtors. Delphi simply never responded to this request for payment.

33.  As outlined herein, this claim is fairly small given the size of this case. In addition, upon information and belief, administrative claimants are still being paid pursuant to a fund specifically set up for administrative expenses. Therefore Excellus respectfully submits that there would be no disruptive effect on the Plan or prejudice to other claimants by allowing the claim for the Final Rate Variance as an administrative expense claim.

34.  With respect to the fourth <u>Pioneer</u> factor, Excellus submit that, at all times, Excellus acted in good faith, providing the necessary Medical Benefits to Delphi's employees, paying claims, and otherwise performing all of its obligations under the LPA.

35.  Excellus believes that it has met the standard for its claim to be entitled to administrative priority, and also the <u>Pioneer</u> standards to allow a late-filed claim. The equities of this case favor Excellus, who continued to provide valuable medical benefits to the Delphi employees during the post-petition period, and therefore Excellus requests an Order permitting a late filed administrative expense claim.

WHEREFORE, Excellus respectfully requests that the Court grant Excellus' Motion to allow a late filed administrative expense claim and direct payment of that allowed claim, and requests such other and further relief as the Court may deem just and proper.

Dated: July 14, 2010.                          HARRIS BEACH, PLLC

                                               _____
                                               Lee E. Woodard, Esq. (LEW 7286)
                                               Counsel for Excellus Health Plans, Inc.
                                               One Park Place, 4th Floor
                                               300 South State Street
                                               Syracuse, NY 13202
                                               Telephone: (315) 423-7100
                                               Facsimile: (315) 422-9331