**Hearing Date and Time:  September 24, 2010 at 10:00 a.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler


     - and -


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036

Attorneys for DPH Holdings Corp., et al.,
    Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| DPH HOLDINGS CORP., et al., | : | Case Number 05-44481 (RDD) |
|  | : |  |
|  | : | (Jointly Administered) |
| Reorganized Debtors. | : |  |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**REORGANIZED DEBTORS' RESPONSE TO THE SUPPLEMENTAL BRIEF OF
ILLINOIS TOOL WORKS, INC. AND ITW FOOD EQUIPMENT GROUP LLC
<u>IN SUPPORT OF CLAIM NOS. 11983, 11985, 11988, AND 11989</u>**

DPH Holdings Corp. and certain of its affiliated reorganized debtors in the above-captioned cases (collectively, the "Reorganized Debtors") hereby submit the Reorganized Debtors' Response To The Supplemental Brief Of Illinois Tool Works, Inc. And ITW Food Equipment Group LLC In Support Of Claim Nos. 11983, 11985, 11988, And 11989, and respectfully represent as follows:

## Preliminary Statement

1.    This matter is before the Court on the Reorganized Debtors' objection to proofs of claim numbers 11983, 11985, 11988, and 11989 (the "Claims") filed by Illinois Tool Works, Inc. and  ITW Food Equipment Group LLC (collectively, "ITW") relating to environmental contamination at the South Dayton Dump and Landfill in Ohio (the "Site").

2.    The Reorganized Debtors objected to the Claims on the grounds that the Debtors have no liability at the Site because the Site ceased accepting wastes for the disposal before the Debtors were formed as part of the divestiture by General Motors Corporation ("General Motors") of its Delphi Automotive Systems unit (the "Divestiture").  ITW attempts to avoid the fact that the Debtors did not exist when the Site operated by arguing that discovery will prove that the Debtors are liable as the successor to General Motors.  However, no amount of discovery will change the incontrovertible fact that, after the Divestiture,  General Motors continued to exist as an independent company with the majority of its assets and liabilities unaffected by the Divestiture.  This refutes ITW's arguments regarding successor liability in their entirety and leaves ITW with no valid claim against the Debtors.  Furthermore, no matter how ITW characterizes its claim against the Debtors, it is fundamentally a contingent claim for reimbursement of costs for which ITW is liable and therefore the claim must be disallowed under section 502(e)(1)(B) of the Bankruptcy Code.

## Argument

**I.    The Debtors Are Not the Successor to General Motors As a Matter of Law.**

3.    ITW's argument that the Debtors are the successors to General Motors is fundamentally flawed for two reasons.  First, ITW would have this Court apply Ohio law when, under New York choice of law principles,[1] Delaware law governs the question of corporate successorship in this case.  Second, ITW can prove no set of facts that would establish that the Divesture was a de facto merger, that ITW is a third-party beneficiary to the now-terminated contract between General Motors and the Debtors regarding the assumption and retention of environmental liabilities, or that the Debtors were a mere continuation of General Motors.  This is true under both Delaware and Ohio law, and therefore ITW has no valid claim against the Debtors.

**A.    Delaware Law Governs Whether the Debtors are the Corporate Successors to General Motors.**

4.    ITW contends that Ohio law governs its successor liability claims because the Site is located in Ohio and New York courts decide choice of law questions based on the *lex loci* test for tort claims.  Supplemental Brief Of Illinois Tool Works, Inc. And ITW Food Equipment Group LLC In Support Of Claim Nos. 11983, 11985, 11988 And 11989 ("ITW Supplemental Brief") ¶ 25 n.1.  The question of whether the Debtors are the corporate successors to General Motors, however, is not a matter of tort law and hence the *lex loci* test is irrelevant.  Instead, as the Southern District of New York has held, under the "paramount interest" test, the state of incorporation has the greatest interest in resolving questions of corporate successor

---

[1]    The Debtors agree with ITW that a federal court exercising bankruptcy jurisdiction over state law claims should apply the choice of law rules of the forum state. ITW Supplemental Brief ¶ 25 n.1; see Adelphia Commc'ns Corp. v. Bank of America, 365 B.R. 24, 26 (Bankr. S.D.N.Y. 2007).

liability.  <u>Soviet Pan Am Travel Effort v. Travel Comm., Inc.</u>, 756 F.Supp. 126, 131 (S.D.N.Y.

1991).  Accordingly, since both General Motors and Delphi are Delaware corporations,

Delaware state law governs whether Debtors are corporate successors to General Motors, not

Ohio law.

       5.      Ultimately, however, the choice of law question need not be resolved as

ITW cannot, as a matter of law, establish that the Debtors are the corporate successors to General

Motors under either Delaware or Ohio law.

     **B.**    **The Divestiture Was Not a *De Facto* Merger Between the Debtors and**
          **General Motors.**

       6.      ITW first tries to establish that the Debtors are successors to General

Motors by arguing that the Divestiture was a *de facto* merger.  This argument fails under either

Delaware or Ohio law.  To establish a *de facto* merger under Delaware law, a plaintiff must show

that: (1) the seller transferred all of its assets to the buyer; (2) payment was made in stock with

the buyer issuing its stock directly to the stockholders of the seller; and (3) the buyer agreed to

assume all debts and liabilities of the seller.  <u>Xperex Corp. v. Viasystems Techs. Corp., LLC</u>,

2004 Del. Ch. LEXIS 172, *4-5 (Del. Ch. July 22, 2004); <u>see</u> <u>also</u> <u>Drug, Inc. v. Hunt</u>, 168 A. 87,

96 (Del. 1933).

       7.      There can be no dispute that General Motors did not transfer all of its

assets to the Debtors; plainly, General Motors continued to own and operate assets after the

Divestiture.  Furthermore, the terms of the Master Separation Agreement, pursuant to which the

Divestiture occurred, make clear that only certain of General Motors' assets were transferred to

the Debtors.  <u>See</u> Master Separation Agreement Among General Motors Corporation, Delphi

Automotive Systems Corporation, Delphi Automotive Systems LLC, Delphi Technologies, Inc.

and Delphi Automotive Systems (Holding), Inc. (the "MSA") § 2.01.[2]  Accordingly, ITW cannot

prove the first element required for a *de facto* merger under Delaware law and its arguments

must be rejected.

8.       Moreover, ITW concedes that it cannot meet the third element for a *de

facto* merger by acknowledging that the Debtors agreed to assume only "certain environmental

liabilities of General Motors."  ITW Supplemental Brief at ¶ 31 (emphasis added).  By ITW's

own admission, the Debtors did not assume all of General Motors' environmental liabilities, let

alone all of its liabilities generally.  For example, the MSA provides that General Motors

retained certain liabilities associated with its Delphi Automotive Systems unit, including certain

product liability claims, identified general litigation claims, and employment-related claims.

MSA §§ 7.01, 7.02, 7.03.  Furthermore, as ITW concedes, the Debtors did not even assume all of

the environmental liabilities associated with the Delphi business unit of General Motors.  Rather,

the Debtors and General Motors entered into the Environmental Matters Agreement by and

between General Motors Corporation and Delphi Automotive Systems Corporation (the

"EMA")[3] which allocated such liabilities between the parties.  Specifically, General Motors

retained all liabilities associated with third-party waste disposal sites that were attributable to the

transferred assets to the extent such liabilities were known at the time of the Divestiture.  EMA ¶

2.3.  Accordingly, because General Motors retained a significant portion of the liabilities

associated with its former Delphi business unit, ITW simply cannot prove the third element

necessary for a *de facto* merger under Delaware law.

---

[2]     The MSA was attached as Exhibit D to Reorganized Debtors' Supplemental Reply To Responses Of Certain
Claimants To Debtors' Objections To Proofs Of Claim Nos. 11983, 11985, 11988, And 11989 Filed By Illinois
Tool Works Inc. And ITW Food Equipment Group LLC (Docket No. 19603) (the "Reorganized Debtors'
Supplemental Reply").

[3]     The EMA was attached as Exhibit E to the Reorganized Debtors' Supplemental Reply.

9.      The same result is reached applying Ohio law.  As ITW acknowledges, a *de facto* merger under Ohio law requires: "(1) the continuation of the previous business activity and corporate personnel, (2) a continuity of shareholders resulting from a sale of assets in exchange for stock, (3) the immediate or rapid dissolution of the predecessor corporation, and (4) the assumption by the purchasing corporation of all liabilities and obligations ordinarily necessary to continue the predecessor's business operations."  ITW Supplemental Brief ¶ 28; citing Welco Indus. Inc. v. Applied Cos., 617 N.E.2d 1129, 1134 (Ohio 1993).

10.      To support the first element, ITW asserts that the Debtors had "a continuity of management and personnel" following the Divestiture.  ITW Supplemental Brief ¶ 30.  The Debtors strongly dispute these facts and any assertion that the second element is satisfied, but the Court need not consider such facts because, as a matter of law, ITW cannot prove the third and fourth elements of a *de facto* merger under Ohio law.   In fact, ITW concedes that the Divestiture does not meet the third requirement by recognizing that "obviously General Motors did not cease its operations as result of the divestiture." Id. at ¶ 30.  ITW argues that this crucial fact is irrelevant because General Motors ceased the operations previously conducted by its Delphi Automotive Systems unit after the Divestiture.  Id.  But, dissolution of a corporation is entirely different from ceasing particular operations, and ITW's argument has already been rejected by Ohio courts and by federal courts applying Ohio law.  In Welco, for example, the Ohio Supreme Court held that the sale of the assets of a division is not a *de facto* merger even when the seller ceases all operations associated with that division as long as the selling corporate entity continues to exist after the transaction. 617 N.E.2d at 1134.  Consistent with this, the Ohio Court of Appeals has held that the *de facto* merger doctrine "presupposes that the predecessor corporation no longer exists." Telxon Corp. v. Smart Media of Del., Inc., 2005 Ohio 4931, slip

op. at *50 (Ohio Ct. App. 2005).  Likewise, the Third Circuit has noted that a critical element of

the *de facto* merger test under Ohio Law "is that one corporation survives while the other ceases

to exist."  Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 470 (3d Cir. 2006).  In Berg, the

court held that there was no *de facto* merger resulting from the sale of the assets of a corporate

division because the selling company continued to exist and continued to operate its other

divisions.  Id. at 470.  These cases are all factually similar to the present case and demonstrate

that, as a matter of law, ITW cannot establish that the Divestiture was a *de facto* merger under

Ohio law.

        11.    ITW also concedes that it cannot meet Ohio's fourth element of a *de facto*

merger.  As noted above, ITW concedes that the Debtors assumed some, but not all, of General

Motors' liabilities.  Accordingly, ITW's attempts to position the Divestiture as a *de facto* merger

under Ohio law must be rejected.

    **C.**    **The Environmental Matters Agreement Does Not Give ITW a Claim Against
the Debtors.**

        12.    ITW next asserts that it has a valid claiming arising under the EMA, which,

as discussed above, allocated environmental liabilities between General Motors and Delphi.  In

making this argument, ITW incorrectly states that the EMA was an executory contract that was

rejected by the Debtors and that ITW was a third-party beneficiary under the contract.

    **(i)**    **The EMA Was Not An Executory Contract Rejected by the Debtors.**

        13.    ITW concedes, as it must, that the EMA was terminated under the Master

Disposition Agreement Among Delphi Corporation, GM Components Holdings, LLC, General

Motors Company, Motors Liquidation Company, DIP Holdco 3 LLC and Other Companies,

Dated As Of July 30, 2009 (the "MDA").  The MDA was entered into as part of the First

Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors

7

And Debtors-In-Possession, As Modified (the "Modified Plan"), which was approved by this

Court pursuant to an order entered on July 30, 2009 (Docket No. 18707).

14.    Without explanation or any legal or factual support, ITW equates the

termination of the EMA with the rejection of an executory contract under Section 365 of the

Bankruptcy Code.  This is incorrect.  The EMA was terminated by the consent of both General

Motors and the Debtors under section 9.19 of the MDA.  See Modified Plan at Exhibit 7.7, §

9.19.1(C).  In contrast, the executory contracts that were rejected by the Debtors were rejected

unilaterally and listed on Exhibit 8.1(a) to the Modified Plan.  The EMA is not listed on this

exhibit.  See Modified Plan at Exhibit 8.1(a) and amendments thereto (Docket Nos. 17557,

18492, 18683, 18704).  Thus, ITW's threshold assumption with respect to the EMA is incorrect;

the EMA was not a rejected executory contract, and therefore ITW's argument that it has a claim

for rejection damages under Section 365(g) of the Bankruptcy Code necessarily fails.

**(ii)    ITW Was Not a Third-Party Beneficiary to the EMA.**

15.    Moreover, ITW cannot demonstrate that it was a third-party beneficiary to

the EMA.  As a threshold matter, ITW again directs the Court to the wrong governing law by

indicating that New York law should apply.  The correct choice of law is Delaware because the

EMA provides that it will be governed by the law of Delaware. EMA ¶ 9.8.  Under New York's

choice of law principles, if a contract has an express choice of law provision and the chosen

jurisdiction has sufficient contact with the transaction, this choice of law will govern disputes

arising out of the contract except in cases of fraud or violations of public policy.  Fieger v. Pitney

Bowes Credit Corp., 251 F.3d 386, 393 (2d Cir. 2001).  ITW has made no allegations of fraud or

violations of public policy and therefore Delaware governs ITW's claim that it is a third-party

beneficiary to the EMA.

8

16.    Under Delaware law, "[t]o qualify as a third-party beneficiary of a contract, (i) the contracting parties must have intended that the third party beneficiary benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract." Madison Realty Partners 7, LLC v. Ag ISA LLC, C.A. No. 18094, 2001 WL 406268, at *5 (Del. Ch. Apr. 17, 2001) (citing Guardian Constr. Co.v. TetraTech Richardson, Inc., 583 A.2d 1378, 1386-87 ((Del. Super. Ct. 1990)). ITW has not alleged any facts sufficient to meet these three prongs, nor has it even discussed these requirements; instead it bases its claim solely on the "notion that it is just and practical" for ITW to collect rejection damages for termination of the EMA. ITW Supplemental Brief ¶ 34 (internal quotations omitted). Such policy considerations, however, are irrelevant to whether ITW meets the requirements under Delaware law to be deemed a third-party beneficiary. And, clearly, ITW does not.

17.    First, General Motors and Delphi must have intended ITW to benefit from the EMA at the time it was entered. Hostetter v. Hartford Ins. Co., C.A. No. 85C-06-28, 1992 Del. Super. LEXIS 284, *17 (Del. Super. Ct. July 13, 1992) (since plaintiff was not named or identified in the contract and there was no indication that the contract was made with the specific intention to benefit plaintiff, plaintiff was not a third-party beneficiary). Clearly this is not the case as General Motors' liability at the Site was not known in 1998, the date of the EMA. This fact necessarily follows from the EMA, under which General Motors retained full liability for disposal sites that were known as of the date of the EMA and the Debtors assumed a portion of the liability at disposal sites where the liability was discovered after the EMA. See EMA §2.3. Thus, if the Debtors assumed any liability at the Site under the EMA, such liability necessarily

was unknown to General Motors and the Debtors at the time of the EMA.  Accordingly, ITW

cannot possibly prove that General Motors and the Debtors intended for the EMA to benefit ITW.

18.    ITW cannot avoid this result by asserting that the EMA was generally

intended to benefit other responsible parties at the newly identified waste sites.  Delaware law

distinguishes intended beneficiaries, who can be third-party beneficiaries, from incidental

beneficiaries, who have no rights under contracts to which they are not parties.  Hostetter, 1992

Del. Super. LEXIS 284 at 17-19.  Intended beneficiaries are those who are specifically

contemplated to be benefited by a contract at the time it was made, while incidental beneficiaries

are those who are not specifically contemplated by the contract but may otherwise benefit from it.

Id.  The court in Hostetter rejected the plaintiff's argument that because she was in a general

class of individuals that could benefit from the insurance contract, she was an intended

beneficiary and instead held that those potential benefits were incidental to the intended purpose

of the contract, which was to protect the contracting party's assets.  Id. at  17-18.  Since neither

General Motors nor Delphi knew that ITW could have a potential claim against General Motors

for liability at this Site, they could not have intended for ITW to specifically benefit from this

contract.

19.    ITW similarly cannot meet the second requirement to establish third-party

beneficiary status because General Motors and the Debtors did not intend the EMA to be a gift or

in satisfaction of a pre-existing obligation.  Because General Motors and Delphi had no

knowledge of General Motors' potential liability at the Site, there could be no intent that the

contract be a gift to ITW or in satisfaction of a pre-existing obligation.

20.    Finally, even if ITW could somehow establish that the EMA was intended

to benefit ITW as a gift or in satisfaction of a pre-existing obligation, Delaware law also requires

that the benefit to a third party must have been a material part of the purpose of the contract.

Insituform of N. Am., Inc. v. Chandler, 534 A.2d 257, 270 (Del. Ch. 1987) (concluding that the

effect of a contract, "whether beneficial or not, or intended or not, was merely instrumental to

achievement of the contract's purpose and was, legally, incidental to the contract").  ITW

conceded that this was not the case with the EMA, stating that "[t]he obvious purpose of the

EMA was to assign liability, by agreement, for environmental damages caused by former GM

facilities."  ITW Supplemental Brief ¶ 34.  Furthermore, as stated in the Reorganized Debtors'

Supplemental Brief, the EMA was entered into for the express purpose of implementing the

Divestiture.  See Reorganized Debtors' Supplement Brief at ¶ 21.  Accordingly, the purpose of

the EMA was to effectuate the allocation of liabilities between General Motors and the Debtors

as part of the Divestiture, not to benefit any third parties.  Any benefits that would have accrued

to ITW had the EMA not been terminated were incidental to the agreement and are insufficient

to give ITW enforceable rights under the contract.

### D.    The Debtors Were Not a Mere Continuation of General Motors.

21.    Finally, ITW's argument that the Debtors were a mere continuation of

General Motors must fail under both Delaware and Ohio law.   In Delaware, the mere

continuation theory of successor liability is interpreted narrowly and requires that "the new

company be the same legal entity as the old company."  Ross v. DESA Holdings Corp., 2008

WL 4899226, at *4 (Del. Super. Ct. Sept. 30, 2008).  Furthermore, whether the new company

continued the business operations of the old company is irrelevant; successor liability only

attaches if the new company is the "same legal person" as the old company.  Id.; see also, e.g.,

Fountain v. Colonial Chevrolet Co., 1988 WL 40019, at *9 (Del. Super. Ct. Apr. 13, 1988).

Similarly, under Ohio law, the mere continuation exception is "narrowly construed to protect

corporations from unassumed liabilities." <u>Flaugher v. Cone Automatic Mach. Co.</u>, 30 Ohio St. 3d 60, 64 (Ohio 1987). And, as ITW admits, the basis of this exception under Ohio law is "the continuation of the corporate entity, not the business operation, after the transaction." ITW Supplemental Brief ¶ 36 (<u>quoting</u> <u>Per-Co, Ltd. v. Great Lakes Factors</u>, 299 Fed. Appx. 559, 563 (6th Cir. 2008)).

22.    No amount of discovery will establish that the Debtors were the same legal entity as General Motors after the Divestiture. Clearly General Motors continued as a separate and distinct entity from the Debtors, as evidenced by the two companies' separate SEC filings, separate articles of incorporation and, indeed, separate bankruptcy proceedings, all of which this Court may take judicial notice of for purposes of this sufficiency hearing. Moreover, the mere fact that General Motors continued to exist at all after the Divestiture is fatal to ITW's argument under both Delaware and Ohio law. <u>Ross</u>, 2008 WL 4899226 at *4 (finding that the new company was not the mere continuation of the old company when the old company continued to exist after the sale); <u>Fehl v. S. W. C. Corp.</u>, 449 F.Supp. 48 (D. Del. 1978) (same); <u>see</u> <u>also</u> <u>Travis v. Harris Corp.</u>, 565 F.2d 443, 447 (7th Cir. 1977) (applying Ohio law and finding that the mere continuation theory requires "the existence of only one corporation at the completion of the transfer."); <u>McGaw v. South Bend Lathe, Inc.</u>, 598 N.E.2d 18, 21-22 (Ohio Ct. App. 1991) (stating that successor liability based on mere continuation cannot exist without "the seller's prompt extinction after the transfer").

23.    The only argument that ITW makes to support its mere continuation theory is that General Motors continued to own at least 80% of the stock of Delphi Corporation after the Divesture. But this does not establish that Delphi Corporation was the same legal entity as General Motors and is thus insufficient to establish liability. Furthermore, as set forth in the

MSA, as part of the Divestiture, General Motors was to distribute its ownership interest in the Delphi Corporation to its shareholders by means of an exchange offer and/or pro rata distribution. MSA at Recitals.  As shown by the records of the New York Department of Taxation and Finance, this distribution occurred in May 1999, a mere five months after the Divestiture.  <u>See</u> Advisory Opinion, State of New York Commissioner of Taxation and Finance, Petition No. C990610A, November 3, 1999 (attached hereto as Exhibit A).  This brief period of ownership of Delphi Corporation by General Motors is insufficient to render the Debtors the same legal entity as General Motors, as is the fact that some of Delphi Corporation's stock was owned by the shareholders of General Motors.  <u>Per-Co, Ltd.</u>, 299 Fed. Appx. at 564.  In <u>Per-Co, Ltd.</u>, the acquiring company planned to institute an employee stock ownership plan in which the stockholders of the selling corporation would own 79% of the stock of the acquiring corporation. The court concluded that this "alteration in ownership . . . would have made the 'mere continuation' theory inapposite."  <u>Id.</u> at 564.  Thus, under <u>Per-Co, Ltd.</u>, ITW's claim of successor liability based upon the theory of 'mere continuation' fails.

**II.      The Claims Are Barred by Section 502(e)(1)(B) of the Bankruptcy Code.**

24.      Finally, ITW attempts to avoid disallowance of the Claims under Section 502(e)(1)(B) of the Bankruptcy Code by arguing that it has a direct claim against the Debtors for the costs it will incur at the Site.  In doing so, ITW does not contest that it is a liable party at the Site or that its claim is contingent.  Instead, it argues that its "direct" claim against the debtors is not a claim for contribution or reimbursement.  However, this argument fails for two reasons. First, ITW describes its claim as one for "past and future response costs it has incurred or will incur itself."  ITW Supplemental Brief ¶ 43.  In other words, ITW seeks reimbursement of its costs, and as such the Claims fall squarely within the scope of §502(e)(1)(B) which requires the

disallowance of contingent claims "for reimbursement" by co-liable parties.  11 U.S.C. §

502(e)(1)(B).  Because ITW has not contested that its claim is contingent and that it is co-liable

with the Debtors, its claim for reimbursement of cleanup costs must be rejected.  <u>In re Hexcel

Corp.</u>, 174 B.R. 807 (Bankr. N.D. Cal. 1994) (claims for reimbursement of cleanup costs by co-

liable parties are disallowed under §502(e)(1)(B)).

   25. Second, ITW is wrong when it asserts that there is no risk of double

recovery against the Debtors because ITW is only attempting to recover the costs it will incur

directly at the Site.  The United States Environmental Protection Agency (EPA) has asserted a

claim against the Debtors that seeks recovery of <u>all</u> costs necessary to design the cleanup remedy

and implement it.  As set forth in EPA's proof of claim:

> EPA expects to incur future response costs in connection with the remedial design
> and remedial action for the South Dayton Site.  These costs have been estimated
> by EPA at between $20 and 50 million.  Along with other identified [liable
> parties], Delphi is jointly and severally liable to the United States for these
> amounts.

Proof of Claim #14309, ¶ 7, attached hereto as Exhibit B.  This makes clear that EPA intends to

seek the full amount of the cleanup costs – not just oversight costs – from the Debtors.

Accordingly, ITW's claim is in direct competition with EPA's claim and if ITW's claim is not

disallowed, the Debtors could be both jointly and severally liable to EPA for the full cleanup

costs at the Site and to ITW for its share of the cleanup costs.  This is precisely the type of

double recovery that Section 502(e)(1)(B) is designed to avoid.

   26. In this regard, all but one of the cases cited by ITW are inapposite because

those cases did not involve competing claims by governmental entities or other third parties

seeking to recover the cleanup costs from the debtors.  For example, in <u>In re Harvard Industries,

Inc.</u>, the court specifically noted that neither the federal nor the state environmental agencies had

14

filed a claim against the debtor for cleanup costs.  138 B.R. 10, 12 (Bankr. D. Del. 1992).

Similarly, the Court in In re Dant & Russell, Inc. noted that "third parties [were] not competing

over [the debtors'] funds for cleanup . . . – there is no third party creditor here."  951 F.2d 246,

248 (9th Cir. 1991).  Likewise, In re New York Trap Rock Corp. expressly acknowledged that

there was no "multiple liability on the debtor's part for the contingent claim asserted" by the

creditor.  153 B.R. 648, 651 (Bankr. S.D.N.Y. 1993).

      27.     The only other case cited by ITW is In re Allegheny Int'l, Inc. 126 B.R.

919, 923 (W.D. Penn. 1991).  That decision, however, has previously been criticized by the

Bankruptcy Court for the Southern District of New York for failing to recognize that,

fundamentally, claims for cleanup costs by co-liable parties are not direct claims but rather are

claims "to satisfy the obligation that both the debtor and the claimant had to the EPA for the

remediation of the properties."  In re Drexel Burnham Lambert Group, 148 B.R. 982, 989 (Bankr.

S.D.N.Y. 1991) (quoting In re Cottonwood Canyon Land Co., 146 B.R. 992 (Bankr. D. Colo.

1992).  The same is true here – ITW's claim is fundamentally a claim for reimbursement of the

costs necessary to satisfy the obligation to clean up the Site.  ITW admits its liability for this

obligation, and EPA has filed a claim against the Debtors for these same costs.  ITW's claim,

therefore, must be disallowed under  §502(e)(1)(B) of the Bankruptcy Code.

## Conclusion

      28.     ITW has not challenged the position that the Debtors did not exist at the

time the Site ceased accepting wastes for disposal.  Instead, it argues that the Debtors are liable

for General Motors' disposal of wastes because the Debtors are the corporate successors to

General Motors.  But, ITW cannot escape the plain fact that, after the Divestiture, General

Motors continued its own separate and distinct existence and that the Debtors did not acquire all

of General Motors' assets or assume all of its liabilities.  These facts preclude any finding that the

Debtors are corporate successors to General Motors under either the *de facto* merger or mere

continuation test.  Additionally, ITW has no valid claim under the EMA because that agreement

was terminated by the consent of both the Debtors and General Motors and was not a rejected

executory contract giving rise to rejection debtors.  Moreover, ITW clearly was not a third-party

beneficiary under the EMA and thus cannot assert any claims arising from the EMA.  Finally, as

contingent claims for reimbursement on an obligation for which ITW is liable, the Claims must

be disallowed under §502(e)(B)(1) of the Bankruptcy Code.

WHEREFORE the Reorganized Debtors respectfully request this Court enter an

order (a) sustaining the Reorganized Debtors' objection with respect to the Claims, (b)

disallowing and expunging the Claims in their entirety, and (c) granting such further and other

relief this Court deems just and proper.

Dated:   New York, New York
         August 20, 2010

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP

By:   /s/ John Wm. Butler, Jr.
      John Wm. Butler, Jr.
      John K. Lyons
      Ron E. Meisler
155 North Wacker Drive
Chicago, Illinois 60606

- and -

Four Times Square
New York, New York 10036

Attorneys for DPH Holdings Corp., <u>et al.</u>,
   Reorganized Debtors

## Exhibit A

**New York State Department of Taxation and Finance**

# Taxpayer Services Division
# Technical Services Bureau

TSB-A-99(27)C
Corporation Tax
November 3, 1999

STATE OF NEW YORK
COMMISSIONER OF TAXATION AND FINANCE

ADVISORY OPINION          PETITION NO. C990610A

On June 10, 1999, a Petition for Advisory Opinion was received from Delphi Automotive Systems Corporation, 1450 West Long Lake Road, Troy, Michigan 48098.

The issue raised by Petitioner, Delphi Automotive Systems Corporation, is whether it is a "new business" and thus entitled to the refundibility of investment tax credit, under section 210.12(e) of the Tax Law.

Petitioner submits the following statement of facts as the basis for this Advisory Opinion.

Before 1991, the production of parts by General Motors Corporation ("GM") was conducted by many separate automotive parts operations which GM had acquired over time. These operations were generally managed independently from each other within the GM organization and were accounted for as separate divisions within GM. In 1991, GM organized its component businesses into the Automotive Components Group in order to improve the competitiveness of these operations and increase its business through penetration of new markets. Since that time, the Group has been transformed from a North America-based, captive component supplier to GM into a global supplier of components, integrated systems and modules for a wide range of customers. In 1995, the group was given the name "Delphi Automotive Systems" ("Delphi") in order to establish its separate identity in the automotive parts industry.

Petitioner was incorporated in Delaware on September 16, 1998. Petitioner is a holding company that holds a 100 percent interest in Delphi Automotive Systems LLC ("Delphi LLC"), a company that operates in New York State through several divisions including the Delphi Harrison Thermal Division ("Delphi Harrison") and Delphi's Energy and Engine Management Systems Division. Delphi LLC was formed in Delaware on September 16, 1998. Petitioner will be treating Delphi LLC as a branch or division of Petitioner for federal income tax purposes as provided under section 301.7701-3 of the Treasury Regulations, and will also be treating it as a branch or division of Petitioner for purposes of Article 9-A of the Tax Law.

On January 1, 1999, GM transferred certain assets to Petitioner, and its subsidiaries, and Petitioner and its subsidiaries have assumed, or agreed to assume, pay, perform, satisfy and discharge, the related liabilities. This transaction qualified for "tax-free" treatment under section 351 of the Internal Revenue Code("IRC").

TSB-A-99(27)C
Corporation Tax
November 3, 1999

On February 5, 1999, immediately prior to which Petitioner was wholly owned by GM, Petitioner completed an initial public offering (the "IPO") of 100 million shares of Petitioner $.01 par value common stock thereby reducing GM's holdings to 82.3 percent.  On May 28, 1999, GM divested itself of its entire interest in Petitioner by distributing all of its shares of Petitioner's common stock to holders of GM's common stock (the "Distribution").   This Distribution was accomplished through a tax-free spin-off ( a pro rata distribution by GM of its shares of Petitioner's common stock to holders of GM's common stock) under section 355 of the IRC.

Petitioner is an independent publicly traded company headquartered in Troy, Michigan, that is listed on the New York Stock Exchange and other global exchanges.  Petitioner is an automotive supplier dealing in "Dynamics and Propulsion, Safety, Thermal and Electrical Architecture, and Electronics & Mobile Communications."  As a world leader in the automotive supply business, Petitioner is comprised of 196,000 employees operating 208 wholly-owned manufacturing sites, participates in 46 joint ventures and operates 27 technical centers in 36 countries.  Petitioner's integrated systems and modules are designed to simplify vehicle manufacturers' processes while meeting the demands of today's high-tech vehicles with its main focus being customer satisfaction through technology leadership, world class quality, cost, scheduled delivery and responsiveness.

Delphi Harrison's capital funding will be utilized for new product and process technologies such as newly designed compact / ultra-thin heat exchange products, newly designed compact air conditioning modules and new lean cell manufacturing processes.

Since May 28, 1999, the spin-off date from GM, not more than 50 percent of the number of shares of Petitioner's voting stock has been held by a taxpayer subject to tax under Article 9-A or any of the other provisions enumerated in section 210.12(j) of the Tax Law, because Petitioner is owned by many different investors, and is no longer owned by GM.  After the spin-off date, no shareholder owns more than 50 percent of Petitioner's voting stock.

Petitioner states that it is not substantially similar in operation to GM since Petitioner's business is the manufacture of automotive and non-automotive components while GM's business is the assembly and sale of motor vehicles.  Petitioner also states that for the years prior to 1999, the GM divisions that are now Delphi LLC operations that are still operating plants in New York State manufactured the following products:  Delphi Harrison which operates in Lockport, New York, manufactured condensers (which cover the complete range of automotive air conditioning needs), heater cores, evaporators, heating, ventilating and air conditioning modules, heavy-duty oil coolers, automotive oil coolers, radiators, powertrain cooling modules, accumulator dehydrators, 6-cylinder axial-type H-6 compressors, V-5f, V-6 and V-7 variable displacement compressors, and compact variable compressors; while Delphi's Energy and Engine Management Systems Division which operates in Rochester, New York, manufactured throttle bodies, fuel rails, fuel rail assemblies, integrated air fuel modules, exhaust gas recirculation valves (both linear and backpressure),

TSB-A-99(27)C
Corporation Tax
November 3, 1999

evaporative emissions canisters, and generator die casts.  No other GM plant manufactured similar products either in New York or in any other state during the years prior to 1999.

For calendar year 1999, Petitioner will be filing two short-period returns for both federal income tax purposes and New York State franchise tax purposes.  The first short period will be January 1, 1999 through May 31, 1999; the second short period will be June 1, 1999 through December 31, 1999.

It should be assumed for purposes of this advisory opinion that asset acquisitions by Petitioner will qualify for the investment tax credit under section 210.12(b)(1) of the Tax Law as property principally used by Petitioner in the production of goods by manufacturing.

**Discussion**

Section 301.7701-3(a) of the Treasury Regulations, provides that a business entity that is not required to be classified as a corporation is an "eligible entity" that can elect its classification for federal income tax purposes.  A domestic eligible entity that has a single member can elect to be classified as an association or elect to be disregarded as an entity separate from its owner.  Under section 301.7701-3(b)(1) of the Treasury Regulations, the default classification of an entity that has a single owner will be that it is not an entity separate from its owner.  If the entity wants to be classified as an association, it must make the election pursuant to section 301.7701-3(c) of the Treasury Regulations.

It has been established that the classification of an LLC for New York State tax purposes will follow the classification accorded the LLC for federal income tax purposes.  (See, FGIC CMRC Corp, Adv Op Comm T & F, April 1, 1996, TSB-A-96(11)C; and Department of Taxation and Finance Memorandum, TSB-M-94(6)I and (8)C, October 25, 1994.)  Following federal conformity with respect to classifying LLCs, a single member LLC which is a domestic eligible entity that does not make the election for federal income tax purposes pursuant to section 301.7701-3 of the Treasury Regulations would not be classified as an entity separate from its owner.  If its owner is a corporation, it would be considered a branch or division of the owner corporation.

In this case, Delphi LLC is treated as a division of Petitioner for federal income tax purposes and, therefore, Delphi LLC will be treated as a division of Petitioner for purposes of Article 9-A of the Tax Law.

Section 210.12 of the Tax Law allows an investment tax credit against the tax imposed under Article 9-A of the Tax Law.  For taxable years beginning after 1990, section 210.12 allows an investment tax credit equal to five percent with respect to the first $350 million of the investment credit base and four percent with respect to the investment credit base in excess of $350 million.  The

TSB-A-99(27)C
Corporation Tax
November 3, 1999

investment credit base is the cost or other basis for federal income tax purposes of qualified tangible personal property and other tangible property, including buildings and structural components of buildings.

Under section 210.12(b) of the Tax Law and section 5-2.2 of the Business Corporation Franchise Tax Regulations ("Article 9-A Regulations"), the term "qualified property" means tangible personal property and other tangible property, including buildings and structural components of buildings, which:

(1)    is acquired, constructed, reconstructed or erected by the taxpayer after December 31, 1968;

(2)    is depreciable pursuant to section 167 of the Internal Revenue Code;

(3)    has a useful life of four years or more;

(4)    is acquired by the taxpayer by purchase as defined in section 179(d) of the Internal Revenue Code;

(5)    has a situs in New York State; and

(6)    is principally used by the taxpayer in the production of goods by manufacturing, processing, assembling, refining, mining, extracting, farming, agriculture, horticulture, floriculture, viticulture or commercial fishing.

Section 210.12(e)(1) of the Tax Law, provides, in part, that:

if the amount of credit allowable under this subdivision for any taxable year reduces the tax to [the higher of the amounts prescribed in section 210.1(c) and (d) of the Tax Law] ... any amount of credit allowed for a taxable year commencing ... on or after [January 1, 1987] and not deductible in such year may be carried over to the fifteen taxable years next following such taxable year and may be deducted from the taxpayer's tax for such year or years.  In lieu of such carryover, any such taxpayer which qualifies as a new business under [section 210.12(j) of the Tax Law] may elect to treat the amount of such carryover as an overpayment of tax to be credited or refunded in accordance with the provisions of [section 1086 of the Tax Law], provided, however, the provisions of [section 1088(c) of the Tax Law] notwithstanding, no interest shall be paid thereon.

TSB-A-99(27)C
Corporation Tax
November 3, 1999

Section 210.12(e)(1) of the Tax Law provides that if the amount of investment tax credit allowed under section 210.12 of the Tax Law for any taxable year reduces the tax due for such year to less than the higher of the amounts prescribed in section 210.1(c) and (d) of the Tax Law, any amount of credit thus not deductible in such year may be carried over to the following 15 years, and may be deducted from the taxpayer's tax for such year or years. In lieu of such carryover, a taxpayer which qualifies as a "new business" under section 210.12(j) of the Tax Law, may elect to treat the amount of such carryover as an overpayment of tax to be credited or refunded in accordance with the provisions of section 1086 of the Tax Law.

Section 210.12(j) of the Tax Law provides that for purposes of section 210.12(e) of the Tax Law, a "new business" shall include any corporation except:

 1. a corporation in which over 50 percent of the number of shares of stock entitling their holders to vote for the election of directors or trustees is owned or controlled, either directly or indirectly, by a taxpayer subject to tax under Article 9-A; section 183, 184, 185, 186 of Article 9; Article 32 or 33 of the Tax Law; or

 2. a corporation that is substantially similar in operation and in ownership to a business entity or entities taxable, or previously taxable under Article 9-A; section 183, 184, 185, or 186 of Article 9; Article 32 or 33; or Article 23 or that would have been subject to tax under Article 23, as such article was in effect on January 1, 1980, or the income (or losses) of which is (or was) includable under Article 22 of the Tax Law whereby the intent and purpose of section 210.12(e) of the Tax Law with respect to refunding of credit to new business would be evaded; or

 3. a corporation that has been subject to tax under Article 9-A for more than four years (excluding short periods) prior to the taxable year during which the taxpayer first becomes eligible for the investment tax credit.

Therefore, a corporation is a "new business" *unless* it is described in any of these three conditions. For the short period January 1, 1999 through May 31, 1999, Petitioner was not a new business, pursuant to section 210.12(j)(1) of the Tax Law, because for that entire period it was more than 50 percent owned by GM, a taxpayer under "Article 9-A of the Tax Law.

After GM's divestiture of stock in Petitioner on May 28, 1999, Petitioner was no longer more than 50 percent owned or controlled by a taxpayer described in section 210.12(j)(1) of the Tax Law. Further, while immediately upon such divestiture Petitioner was substantially similar in ownership to GM, since Petitioner was as of that moment a 100 percent publicly traded corporation, it must be presumed that such similarity in ownership was immediately dissipated, such that the situation described in section 210.12(j)(2) of the Tax Law no longer applied. Therefore, with respect to

TSB-A-99(27)C
Corporation Tax
November 3, 1999


Petitioner's short period return, June 1, 1999 through December 31, 1999, Petitioner will satisfy the first and second conditions of section 210.12(j) of the Tax Law (i.e., was *not* as there described), from which it follows that Petitioner is and will be a new business with respect to qualifying property placed in service after May 28, 1999, and before the end of its first five taxable years (excluding short taxable periods).


DATED:  November 3, 1999                              /s/
                                                      John W. Bartlett
                                                      Deputy Director
                                                      Technical Services Bureau


        NOTE:          The opinions expressed in Advisory Opinions are
                       limited to the facts set forth therein.

## Exhibit B

FORM B10 (Official Form 10) (04/05)

| UNITED STATES BANKRUPTCY COURT  SOUTHERN   DISTRICT OF  NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>Delphi Automotive Systems LLC | Case Number<br>05-44640 (RDD) |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

**Received**

**AUG 0 9 2006**

**Kurtzman Carson**

Claim #14309
USBC SDNY
Delphi Corporation, et al.
05-44481 (RDD)

Name of Creditor (The person or other entity to whom the debtor owes money or property):

U.S. Environmental Protection Agency

Name and address where notices should be sent:

David J. Kennedy
Assistant U.S. Attorney, SDNY
86 Chambers Street, 3rd Floor
New York, NY 10007
Telephone number:   (212) 637-2733

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

Account or other number by which creditor identifies debtor:

Check here ☐ replaces
if this claim ☐ amends  a previously filed claim, dated:_____

**1. Basis for Claim**

☐ Goods sold
☐ Services performed      See attached.
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☐ Other _____

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)
Last four digits of SS #: _____
Unpaid compensation for services performed
from _____ to_____
    (date)              (date)

**2. Date debt was incurred:**
See attached.

**3. If court judgment, date obtained:**
See attached.

**4. Total Amount of Claim at Time Case Filed:  $  See attached.**
          (unsecured) _____ (secured) _____ (priority) _____ (Total) _____

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).     See attached.

Brief Description of Collateral:
☐ Real Estate   ☐ Motor Vehicle
☐ Other_____

Value of Collateral:   $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any:  $_____

**6. Unsecured Nonpriority Claim $_____**

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority  $_____
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).
☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units-11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. $10,000 and 180-day limits apply to cases filed on or after 4/20/05. Pub. L. 109-8.

**8.  Credits:**  The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9.  Supporting Documents:**   *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10. Date-Stamped Copy:**   To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim

THIS SPACE IS FOR COURT USE ONLY

U.S. BANKRUPTCY COURT
S.D.N.Y.
FILED
2006 JUL 31  P 3

| Date<br>7/31/06 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br><br>DAVID J. KENNEDY, A.U.S.A. |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years or both.  18 U.S.C. §§ 152 and 3571.

0544640060731000000000012616

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By: DAVID J. KENNEDY (DK-8307)
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York  10007
Tel. No.:  (212) 637-2733
Fax No.:  (212) 637-2686

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

In re:                                                        CHAPTER 11

DELPHI AUTOMOTIVE SYSTEMS LLC,                 Case No. 05-44640-rdd

                                                              Jointly Administered

                                     Debtors.

-----------------------------------------------------------x

## PROOF OF CLAIM OF THE UNITED STATES ON BEHALF OF
## THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

1.      The United States files this Proof of Claim at the request of the U.S.

Environmental Protection Agency ("EPA"), against debtor Delphi Automotive Systems LLC

("Delphi"), for response costs incurred and to be incurred by the United States under the

Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42

U.S.C. §§ 9601-9675 at the Superfund Sites set forth herein in Paragraphs 2 through 7, infra.  In

addition, with respect to equitable remedies that are not within the Bankruptcy Code's definition

of "claim," 11 U.S.C. § 101(5), this proof of claim is only filed in protective fashion.  See, e.g.,

Paragraphs 3, 8, 9, and 10, infra.

2.      Tremont City Landfill Superfund Site.  Delphi is liable to the United States under

CERCLA with respect to the Tremont City Landfill Superfund Site located at 3108 Snyder-

Domer Road, Tremont City, German Township, Clark County, Ohio (the "Tremont City Site").

The 80-acre Site includes several facilities including a closed 8.5 acre chemical waste landfill

(the "Barrel Fill" facility), a closed 56 acre sanitary landfill (the "Landfill" facility), and a 15.5

acre closed oil recycling and hazardous waste storage and transfer operation (the "Waste

Storage" facility).  Delphi is liable to the United States because by contract, agreement or

otherwise, it arranged for disposal or treatment, or arranged with a transporter for transport for

disposal or treatment, of hazardous substances owned or possessed by Delphi at the Barrel Fill

and Landfill facilities owned by another party or entity, and containing hazardous substances,

pursuant to Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).  Delphi disposed of drums

and bulk wastes containing, inter alia, paint sludge, polyester resins, polystyrene, sulfuric acid

sludge, paint waste, polyol resin and caustic sludge at the Barrel Fill facility and solid wastes at

the Landfill facility.  The closed Barrel Fill and Landfill operations are facilities within the

meaning of CERCLA.  There have been releases or threats of releases of hazardous substances,

including but not limited to, inorganic compounds (antimony, arsenic, thallium, cyanide and

lead) and volatile organic compounds (xylene, methylene chloride, ethyl benzene and acetone),

from the facilities at the Tremont City Site.  These hazardous substances have been released into

the waterways, surface water, soils, and sediments at the Tremont City Site.  Other potentially

responsible parties may, along with Delphi, also be jointly and severally liable to the United

States under CERCLA with respect to the Barrel Fill and Landfill facilities.

       3.      This Proof of Claim is filed in a protective manner with respect to Delphi's

obligations to perform work with respect to the Tremont City Site.  See Paragraph 8, infra.  On

October 3, 2002, EPA entered into an Administrative Order on Consent ("AOC")(Docket # V-

W-03-C-719) with Delphi that required Delphi, and six other respondents, <u>inter alia</u>, to conduct a

Remedial Investigation/Feasibility Study ("RI/FS") at the Tremont City Site. Delphi and the

remaining AOC respondents have completed the RI field work. EPA estimates that it may cost

the jointly and severally liable parties, including Delphi, approximately $1 million to complete

the required work under the AOC, some of which has already been performed. EPA has not yet

selected remedial action under CERCLA for the Barrel Fill and Landfill facilities at the Tremont

City Site and Delphi has therefore not yet been ordered to perform remedial work, but may be

ordered by a court or other authority found to have jurisdiction to do so in the future. Since

investigations at the Barrel Fill and Landfill facilities at the Tremont City Site are continuing and

remedial action has not yet been selected, the cost of Remedial Design/Remedial Action

("RD/RA") to Delphi is uncertain at this time, but the work with respect to these facilities could

cost the jointly and severally liable parties, including Delphi, as much as a total of $22.2 million

or more, in addition to the $1 million described above. EPA estimates that RD/RA work relating

to the Barrel Fill facility could cost the jointly and severally liable parties, including Delphi,

approximately $7 million. EPA estimates that RI/FS work and RD/RA work relating to the

Landfill facility could cost the jointly and severally liable parties, including Delphi,

approximately $14.5 million.

    4.      Response costs have been and will be incurred by EPA with respect to the

Tremont City Site not inconsistent with the National Contingency Plan promulgated pursuant to

Section 105 of CERCLA, 42 U.S.C. § 9605, and set forth at 40 C.F.R. Part 300, as amended.

Under the AOC, Delphi is also liable to make payments for future oversight costs to EPA, which

EPA estimates to be $100,000. In addition, the United States has incurred unreimbursed

response costs to date of approximately $820,000 with respect to the Barrel Fill and Landfill

facilities at the Tremont City Site for previous work, including inter alia, a Preliminary

Assessment/Site Investigation ("PA/SI"). Delphi is jointly and severally liable to the United

States for the above amounts. Delphi is also jointly and severally liable for interest due under 42

U.S.C. § 9607(a). Other potentially responsible parties may along with Delphi also be jointly

and severally liable to the United States for all of the above amounts plus interest due under 42

U.S.C. § 9607(a).

     5.    <u>South Dayton Dump & Landfill Superfund Site</u>. Delphi is liable to the United

States under CERCLA with respect to the South Dayton Dump and Landfill Superfund Site

("South Dayton Site") located at 1975 Dryden Road, Moraine, Ohio. Delphi is liable to the

United States because by contract, agreement or otherwise, it arranged for disposal or treatment,

or arranged with a transporter for transport for disposal or treatment, of hazardous substances

owned or possessed by Delphi at the South Dayton Site owned by another party or entity, and

containing hazardous substances, pursuant to Section 107(a)(3) of CERCLA, 42 U.S.C.

§ 9607(a)(3). Delphi arranged for the disposed of hazardous wastes, including but not limited to

asbestos, flyash, metallic dust, oil and grease sludge and paint wastes at the South Dayton Site

from several Delphi facilities in the Dayton and Kettering, Ohio area. The South Dayton Site is a

facility within the meaning of CERCLA. The South Dayton Site was proposed for inclusion on

the National Priorities List ("NPL"), pursuant to CERCLA Section 105, 42 U.S.C. § 9605, on

September 23, 2004 (<u>see</u> 69 <u>Fed</u>. <u>Reg</u>. 56970). There have been releases or threats of releases of

hazardous substances, including but not limited to, inorganic compounds (arsenic, cadmium,

chromium, mercury and lead) and volatile and semi-volatile organic compounds (1,2-

dichloroethene, tetrachloroethene, toluene, polychlorinated biphenyls ("PCBs")), at the South

Dayton Site. These hazardous substances have been released into the soil and groundwater at the

South Dayton Site. Other potentially responsible parties may, along with Delphi, also be jointly

and severally liable to the United States under CERCLA with respect to the South Dayton Site.

6.      Response costs have been and will be incurred by EPA with respect to the

South Dayton Site not inconsistent with the National Contingency Plan promulgated pursuant to

Section 105 of CERCLA, 42 U.S.C. § 9605, and set forth at 40 C.F.R. Part 300, as amended.

The United States has incurred unreimbursed response costs to date of approximately $404,349

with respect to the South Dayton Site. Delphi is liable to the United States for this amount.

Delphi is also liable for interest due under 42 U.S.C. § 9607(a). Other potentially responsible

parties may along with Delphi also be jointly and severally liable to the United States for all of

the above amounts plus interest due under 42 U.S.C. § 9607(a).

7.      EPA expects to incur future response costs in connection with the  remedial

design and remedial action for the South Dayton Site. These costs have been estimated by EPA

at between $20 and 50 million. Along with other identified PRPs, Delphi is jointly and severally

liable to the United States for these amounts.

8.      <u>Protective Filing For Work Obligations</u>. The United States is not required to file a

proof of claim with respect to Delphi's injunctive obligations to comply with work requirements

arising under Orders of Courts, Administrative Orders, and other environmental regulatory

requirements imposed by law that are not claims under 11 U.S.C. § 101(5). Delphi and any

reorganized debtor(s) must comply with such mandatory injunctive and regulatory and

compliance requirements. The United States reserves the right to take future actions to enforce

any such obligations of Delphi. While the United States believes that its position will be upheld

by the Court, the United States has filed only in protective fashion with respect to such

obligations and requirements as indicated herein to protect against the possibility that Delphi will

contend that it does not need to comply with any such obligations and requirements and the

Court finds that it is not required to do so. Therefore, a protective contingent claim is filed in

the alternative for such obligations and requirements but only in the event that the Court finds

that such obligations and requirements are dischargeable claims under 11 U.S.C. § 101(5) rather

than obligations and requirements that reorganized Delphi must comply with. Nothing in this

Proof of Claim constitutes a waiver of any rights of the United States or an election of remedies

with respect to such rights and obligations.

       9.    <u>RCRA Compliance and Work Obligations</u>. This Proof of Claim is filed in a

protective manner with respect to Delphi's compliance and work obligations under the Resource

Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 - 6992k. <u>See</u> Paragraph 8, <u>supra</u>.

RCRA establishes a comprehensive regulatory program for generators of hazardous waste and

for owners and operators of facilities that treat, store, or dispose of hazardous waste. Delphi is

the owner and operator of RCRA-regulated facilities in including, but not limited to, Vandalia,

Ohio (Vandalia Facility), as well as other locations. Pursuant to its authority under RCRA, EPA

has promulgated regulations applicable to such generators and such owners and operators of

hazardous waste management facilities. The federal RCRA implementing regulations are set

forth at 40 C.F.R. Part 260 <u>et seq</u>. Pursuant to Section 3006 of RCRA, 42 U.S.C. § 6926, EPA

has authorized various States to administer various aspects of the hazardous waste management

program in such States. Pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), these

6

authorized State hazardous waste management program are enforceable by EPA.  Under RCRA,

Delphi is required, inter alia, to operate in compliance with RCRA regulatory requirements,

implement closure and post-closure work and corrective action work, and perform any necessary

action with respect to any imminent and substantial endangerment to health or the environment,

see, e.g., 42 U.S.C. §§ 6924, 6928, 6973, as required by RCRA and/or RCRA permits or

Administrative Orders.  For example, in or about January 2002, EPA and Delphi entered into a

RCRA Administrative Order on Consent with regard to the Vandalia, Ohio Facility, which

requires, inter alia, the continuing implementation of a Corrective Measures Plan at that Facility.

Delphi is liable for injunctive and compliance obligations that it is required to perform under

RCRA, RCRA permits, and all work requirements under RCRA permits and administrative

orders.  It is the position of the United States that a proof of claim is not required to be filed for

injunctive, compliance, and regulatory obligations and requirements under RCRA.  See

Paragraph 8, supra.  Other liable parties may along with Delphi also be jointly and severally

liable to the United States under RCRA.

    10.    Property of the Estate.  Delphi also has or may in the future have environmental

liabilities for properties that are part of its bankruptcy estate and/or for the migration of

hazardous substances from property of its bankruptcy estate.   For example, Delphi has voluntary

corrective action agreements for ongoing investigations pursuant to schedules approved by EPA

for certain facilities set forth in Paragraph 9, supra.  In accordance with 28 U.S.C. § 959, Delphi

is required to comply with non-bankruptcy law, including all applicable environmental laws, in

managing and operating its property.  Upon confirmation of any Plan of Reorganization,

reorganized Delphi will be liable as owner or operator of property in accordance with applicable

7

environmental law.  The United States is not required to file a proof of claim relating to property

of the estate other than for response costs incurred prior to the petition date.  The United States

reserves the right to file an application for administrative expense or take other appropriate action

in the future with respect to property of the estate.  This Proof of Claim is filed only protectively

with respect to property of the estate.

11.    This Proof of Claim reflects certain known liabilities of Delphi to the United

States.  The United States reserves the right to amend this claim to assert subsequently

discovered liabilities.   This Proof of Claim is without prejudice to any right under 11 U.S.C.

§ 553 to set off, against this claim, debts owed (if any) to the debtor by this or any other federal

agency.

12.    The United States has not perfected any security interest on its claims against

Delphi.

13.    This claim is filed as a general unsecured claim except to the extent of any

secured/trust interest in insurance proceeds received by Delphi on account of environmental

liability to the United States, disputed past cost amounts held in escrow by Delphi pending

dispute resolution, and to the extent administrative expense priority exists relating to property of

the estate, post-petition violations of law, or otherwise.  In addition, the United States will file

any application for administrative expense priority at the appropriate time.  The United States'

position with respect to injunctive, compliance, regulatory, and work obligations that are not

claims under 11 U.S.C. § 101(5) is set forth in Paragraph 8, supra.

14.    Except as stated in this Proof of Claim, no judgments against Delphi have been

rendered on this Proof of Claim.

8

15.    This Proof of Claim is also filed to the extent necessary to protect the United

States' rights relating to any insurance proceeds received by Delphi relating to sites discussed

herein and any funds being held in escrow by Delphi relating to the sites discussed herein.

Dated:        New York, New York
              July 31, 2006

                              Respectfully submitted,

                              FOR THE UNITED STATES OF AMERICA:

                              MICHAEL J. GARCIA
                              United States Attorney for the
                              Southern District of New York

                              _____
                              DAVID J. KENNEDY (DK-8307)
                              Assistant United States Attorney
                              86 Chambers Street, Third Floor
                              New York, New York  10007
                              Tel. No.: (212) 637-2733
                              Fax No.: (212) 637-2730

                              _____
                              W. BENJAMIN FISHEROW
                              Deputy Section Chief
                              Environment and Natural Resources Division


                              ALAN S. TENENBAUM
                              National Bankruptcy Coordinator
                              Environmental Enforcement Section
                              Environment and Natural Resources  Division
                              U.S. Department of Justice
                              P.O. Box 7611, Ben Franklin Station
                              Washington, D.C. 20044-7611
                              (202) 514-5409

                              9

_Francis J. Biros_

FRANCIS J. BIROS
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources  Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
(202) 616-6552


OF COUNSEL:

DIANA L. EMBIL
THOMAS C. NASH
THOMAS WILLIAMS
Associate Regional Counsels
U.S. Environmental Protection Agency-- Region 5–Mail Code C14J
77 West Jackson Boulevard
Chicago, Illinois 60604-3594

10