**Hearing Date And Time:  August 27, 2010 at 10:00 a.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036

Attorneys for DPH Holdings Corp., et al.,
   Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                     :

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| DPH HOLDINGS CORP., et al., | : | Case No. 05-44481 (RDD) |
|  | : |  |
|  | : | (Jointly Administered) |
| Reorganized Debtors. | : |  |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

REORGANIZED DEBTORS' OBJECTION TO MOTION FOR
ALLOWANCE AND PAYMENT OF EXCELLUS HEALTH PLANS, INC.
AND ITS AFFILIATES TO PERMIT LATE FILED CLAIM PURSUANT
<u>TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9006</u>

("OBJECTION TO EXCELLUS HEALTH PLANS, INC.'S
MOTION TO FILE LATE CLAIM")

DPH Holdings Corp. ("DPH Holdings") and certain of its affiliated reorganized

debtors in the above-captioned cases (together with DPH Holdings, the "Reorganized Debtors"),

successors of Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, former

debtors and debtors-in-possession (collectively, the "Debtors"), hereby object (the "Objection")

to the Motion For Allowance And Payment Of Excellus Health Plans, Inc. And Its Affiliates To

Permit Late Filed Claim Pursuant To Federal Rule Of Bankruptcy Procedure 9006 (Docket No.

20439) (the "Motion"), dated July 14, 2010, filed by Excellus Health Plans, Inc. ("Excellus"),

and respectfully represent as follows:

<u>Preliminary Statement</u>

1.        On or before June 20, 2009, the Debtors caused three copies of the Notice

Of Bar Date For Filing Proofs Of Administrative Expense (the "June 2009 Notice") to be served

on Excellus.  The June 2009 Notice stated that July 15, 2009 was the deadline for asserting an

Administrative Claim (as defined below) for the period from the commencement of these chapter

11 cases through June 1, 2009 (the "Initial Administrative Claim Bar Date").  In addition, on or

before October 9, 2009, the Reorganized Debtors caused three copies of the notice of Effective

Date[1] to be served on Excellus (the Effective Date Notice, together with the June 2009 Notice,

the "Notices") which, among other things, provided notice of the November 5, 2009 deadline for

filing Administrative Claims arising on or after June 1, 2009 (the "Final Administrative Claim

Bar Date," and together with the Initial Administrative Claim Bar Date, the "Administrative

Claim Bar Dates").  Excellus does not dispute that it received the Notices and that it had actual

knowledge of the Administrative Claims Bar Dates.  Yet Excellus waited more than a year after

the Initial Administrative Claim Bar Date and eight months after the Final Administrative Claim

---

[1]    Capitalized terms not defined in this Preliminary Statement are defined below.

Bar Date to request permission from this Court to file a late administrative expense request under

11 U.S.C. § 503(b) (an "Administrative Claim"). Excellus, however, offers no evidence that

would excuse its late filing under the excusable neglect standard outlined by the U. S. Supreme

Court in <u>Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship</u>, 507 U.S. 380, 391-92 (1993),

and as applied by the United States Court of Appeals for the Second Circuit (the "Second

Circuit"). <u>See</u>, <u>e.g.</u>, <u>Midland Cogeneration Venture Ltd. P'ship v. Enron Corp.</u> (In re Enron

Corp.), 419 F.3d 115, 122-24 (2d Cir. 2005) (interpreting and applying Pioneer standard).

        2.      Although the Second Circuit has held that the reason for the delay is the

most important factor under the <u>Pioneer</u> analysis, Excellus fails to present any reason, let alone a

viable one, for its failure to file a timely Administrative Claim. Furthermore, Excellus contends

that its failure to file such a claim until a year after the Initial Administrative Claim Bar Date and

eight months after the Final Administrative Claim Bar Date is merely a "short delay." Permitting

Excellus to file a late Administrative Claim at this late stage in the process would encourage

other claimants in a similar position to come forward, resulting in significant prejudice to the

Reorganized Debtors who possess limited resources to satisfy such claims.

        3.      Excellus presents no reason for the delay and its failure to timely submit

an Administrative Claim was entirely within its control. Specifically, the addresses to which

copies of the Notices were sent included the business addresses the Debtors knew were used by

Excellus. Notwithstanding this ample and legally sufficient notice of the Administrative Claim

Bar Dates, Excellus did not take any action to submit an Administrative Claim.

        4.      Accordingly, Excellus has not met its burden to establish excusable

neglect. Because of its failure to timely file an Administrative Claim, Excellus is forever barred,

estopped, and enjoined from asserting an Administrative Claim against the Debtors. (<u>See</u>

Modification Procedures Order ¶ 38; Modified Plan Article 10.5; Modification Approval Order ¶

47.)  Accordingly, this Court should not permit Excellus to file a late Administrative Claim and the Motion should be denied.

Background

B.      Delphi and Excellus Enter Into A Level Premium Agreement

5.      On October 27, 2003, Delphi and Excellus entered into a Level Premium Agreement (the "LPA").  Under the LPA, Excellus administered a medical benefits plan which covered certain Delphi employees and Delphi paid certain premiums to Excellus.  The payments due to Excellus during a given calendar year (a "Rating Period") were based on a fixed rate that was set during the summer of the year prior to the Rating Period (the "Fixed Rate").  After the Fixed Rate was set for the Rating Period, in the fall prior to the Rating Period the Superintendent of Insurance of New York approved the prevailing premium rate (the "Prevailing Rate").  Because the Fixed Rate needed to be set before the Prevailing Rate was approved, at the end of the Rating Period, the Fixed Rate paid by Delphi during the rating period was compared to the Prevailing Rate and any difference between the payments made by Delphi under the Fixed Rates and the payments that would have been made under the Prevailing Rate (the "Rate Variance") would be applied to increase or decrease the Fixed Rate negotiated during the following calendar year.  For example, for the 2008 plan year, the Fixed Rate was determined in summer 2007 and the Prevailing Rate was set in October 2007.  At the beginning of 2009, the amount paid under the Fixed Rate was compared to the amount that would have been paid under the Prevailing Rate for 2008 and any shortfall or overpayment would have been applied to increase or decrease the Fixed Rate for 2010 that would have been set in the summer of 2009 if the contract were to be renewed for 2010.

6.      Pursuant to the LPA, if the agreement were to be terminated, the difference between the amounts that would have been paid under the final Rating Period's

4

Prevailing Rate and the actual payments made during that Rating Period (the "Final Rate Variance") would be paid by the relevant party in cash.  The LPA, however, does not address when the Final Rate Variance becomes due and payable.

7.    Delphi chose not to renew the LPA for the calendar year 2010 and the LPA was terminated.  Because the Prevailing Rate for 2008 was higher than the Fixed Rate paid by Delphi for 2008, on July 16, 2009, Excellus issued an invoice in the amount of $411,318.50 for the Final Rate Variance (the "Invoice").

C.    The Bar Dates And Deadlines For Asserting Claims

8.    Bar Date For § 503(b) Claims Arising Through June 1, 2009.  On June 16, 2009, this Court entered the Modification Procedures Order which, among other things, authorized the Debtors to commence solicitation of votes on their proposed modifications to their first amended joint plan of reorganization (the "Proposed Modifications"), established July 15, 2009 as the Initial Administrative Claim Bar Date,[2] and included a form to be used to submit an administrative expense claim (an "Administrative Claim Form").[3]  Accordingly, paragraph 38 of the Modification Procedures Order provided that:

> Any party that wishes to assert an administrative claim under 11 U.S.C. § 503(b) for the period from the commencement of these cases through June 1, 2009 shall file a proof of administrative

---

[2]    The Initial Administrative Claim Bar Date was established pursuant to paragraph 38 of the Order (A)(I) Approving Modifications To Debtors' First Amended Plan Of Reorganization (As Modified) And Related Disclosures And Voting Procedures And (II) Setting Final Hearing Date To Consider Modifications To Confirmed First Amended Plan Of Reorganization And (B) Setting Administrative Expense Claims Bar Date And Alternative Transaction Hearing Date, entered by this Court on June 16, 2009 (Docket No. 17032) (the "Modification Procedures Order").  On July 15, 2009, this Court entered the Stipulation And Agreed Order Modifying Paragraph 38 Of Modification Procedures Order Establishing Administrative Expense Bar Date (Docket No. 18259) to provide that paragraph 38 of the Modification Procedures Order should be amended to require parties to submit an Administrative Claim Form (as defined below) for Administrative Claims for the period from the commencement of these cases through May 31, 2009 rather than through June 1, 2009.

[3]    On June 20, 2009, in accordance with the Modification Procedures Order, the Debtors caused Kurtzman Carson Consultants LLC ("KCC") and Financial Balloting Group LLC or their agents to transmit notices containing certain procedures for asserting an Administrative Claim and a copy of the Administrative Claim Form.

> expense (each, an "Administrative Expense Claim Form") for the
> purpose of asserting an administrative expense request, including
> any substantial contribution claims (each, an "Administrative
> Expense Claim" or "Claim") against any of the Debtors.  July 15,
> 2009 at 5:00 p.m. prevailing Eastern time shall be the deadline for
> submitting all Administrative Expense Claims (the "Administrative
> Expense Bar Date") for the period from the commencement of
> these cases through June 1, 2009.

(Modification Procedures Order ¶ 38.)  In addition, paragraph 41 of the Modification Procedures

Order provides that:

> Any party that is required but fails to file a timely Administrative
> Expense Claim Form shall be forever barred, estopped and
> enjoined from asserting such claim against the Debtors, and the
> Debtors and their property shall be forever discharged from any
> and all indebtedness, liability, or obligation with respect to such
> claim.

(Id. at ¶ 41.)

9.      On or before June 20, 2009, the Debtors, through KCC, the claims and

noticing agent in these chapter 11 cases, served Excellus with a copy of the June 2009 Notice by

first class mail at each of the addresses listed below:

| Excellus Health Planblue Choice Daniel Zimmerman 165 Court St Rochester, NY 14647 | Excellus Health Plan Inc Eft Sharon Jackson Treasury Oper Bc Bs Of Rochester PO Box 9620 Rochester, NY 14604-0620 | Univera Healthcare Jennifer Ruberto An Excellus Company 205 Pk Club Ln Buffalo, NY 14221-5239 |
|---|---|---|

See Affidavit Of Service Of Evan Gershbein For Solicitation Materials Served On Or Before

June 20, 2009, dated June 23, 2009 (Docket No. 17267), the relevant portions of which are

attached hereto as Exhibit A.

10.      Bar Date For § 503(b) Claims Arising After June 1, 2009.  On July 30,

2009, this Court entered its Order Approving Modifications Under 11 U.S.C. § 1127(b) To (I)

First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates,

6

Debtors And Debtors-In-Possession, As Modified And (II) Confirmation Order (Docket No.

12359) (Docket No. 18707) (the "Modification Approval Order"), which approved the Debtors'

Proposed Modifications (the "Modified Plan").  Paragraph 47 of the Modification Approval

Order provides in part:

> [R]equests for payment of an Administrative [Expense] Claim
> (other than as set forth in the Modified Plan or otherwise
> contemplated by the Master Disposition Agreement, i.e., for such
> claims arising on or after June 1, 2009) must be filed, in
> substantially the form of the Administrative Claim Request Form
> attached as Exhibit 10.5 to the Modified Plan, with the Claims
> Agent and served on counsel for the Debtors and the Creditors'
> Committee no later than 30 days notice of after the Effective Date
> is filed on the docket of the Chapter 11 Cases.  **Any request for
> payment of an Administrative Claim pursuant to this
> paragraph that is not timely filed and served shall be
> disallowed automatically** without the need for any objection from
> the Debtors or the Reorganized Debtors.

(Modification  Approval Order ¶ 47 (emphasis added).)[4]

11.    On October 6, 2009 (the "Effective Date"), the Debtors substantially

consummated the Modified Plan and closed the transactions under the Master Disposition

Agreement, dated as of July 30, 2009, by and among Delphi, GM Components Holdings, LLC,

General Motors Company, Motors Liquidation Company (f/k/a General Motors Corporation),

DIP Holdco 3 LLC (which assigned its rights to DIP Holdco LLP, subsequently renamed Delphi

Automotive LLP, a United Kingdom limited liability partnership), and the other sellers and

buyers party thereto.  In connection therewith, DIP Holdco LLP, through various subsidiaries

and affiliates, acquired substantially all of the Debtors' global core businesses, and GM

---

[4]    Because the liabilities asserted in the Motion relate to amounts due under the LPA for the 2008 plan year and
which could have been calculated by early 2009, the Reorganized Debtors believe that Excellus was required to
file an Administrative Claim by the Initial Administrative Claim Bar Date.  If, however, this court were to
determine that Excellus had until the Final Administrative Claim Bar Date to file a timely Administrative Claim,
the Motion was still filed more than eight months after the Final Administrative Claim Bar Date.  As set forth
below, Excellus fails to meet the excusable neglect standard set forth in <u>Pioneer</u> regardless of which bar date
applies.

Components Holdings, LLC and Steering Solutions Services Corporation acquired certain U.S.

manufacturing plants and the Debtors' non-core steering business, respectively.  The

Reorganized Debtors have emerged from chapter 11 as DPH Holdings and affiliates and remain

responsible for the post-Effective Date administration of these chapter 11 cases, including the

disposition of certain retained assets, the payment of certain retained liabilities as provided for

under the Modified Plan, and the eventual closing of the cases.

     12.  In compliance with paragraph 47 of the Modification Approval Order, the

Notice Of (A) Order Approving Modifications To First Amended Joint Plan Of Reorganization

Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession And (B)

Occurrence Of Effective Date (Docket No. 18958) (the "Effective Date Notice") was filed with

this Court on October 6, 2009.  Upon the occurrence of the Effective Date on October 6, 2009,

the Final Administrative Claim Bar Date was recognized as November 5, 2009.  As set forth

above, paragraph 47 of the Modification Approval Order provides that any administrative claim

for which a party has failed to timely file and serve a request for payment is automatically

disallowed without the need for any objection from the Debtors or the Reorganized Debtors.

(Modification Approval Order ¶ 47.)

     13.  On or before October 9, 2009, KCC served Excellus by first class mail

with a copy of the Effective Date Notice (at the address set forth in the creditor matrix), which,

among other things, provided notice of the Final Administrative Claim Bar Date, at each of the

addresses listed below:

| Excellus Health Planblue Choice Daniel Zimmerman 165 Court St Rochester, NY 14647 | Excellus Health Plan Inc Eft Sharon Jackson Treasury Oper Bc Bs Of Rochester PO Box 9620 Rochester, NY 14604-0620 | Univera Healthcare Jennifer Ruberto An Excellus Company 205 Pk Club Ln Buffalo, NY 14221-5239 |
|---|---|---|

See Affidavit Of Service Of Evan Gershbein For Notice Of Effective Date Materials Served On

Or Before October 9, 2009, dated October 14, 2009 (Docket No. 18978), the relevant portions of

which are attached hereto as Exhibit B.

14.    Moreover, notice of the Final Administrative Claim Bar Date was also

published in The New York Times, USA Today (national and international editions), and The

Wall Street Journal (national and global editions). (See Affidavits of Publication at Docket Nos.

18990, 18989, and 19001.)

D.    Filing Of The Excellus Motion

15.    On July 19, 2010, more than a year after the Initial Administrative Claim

Bar Date and eight months after the Final Administrative Claim Bar Date, Excellus filed its

Motion seeking a determination that the failure to timely file an Administrative Claim was the

result of excusable neglect and asking this Court to permit a late filed Administrative Claim.

Argument

E.    Excellus Received Notice Of Administrative Claim Bar Dates

16.    Excellus does not dispute that it received the Notices setting forth the

Administrative Claim Bar Dates.  The Debtors provided adequate service of the June 2009

Notice and the Effective Date Notice and Excellus was therefore obligated to file any proofs of

claim by the applicable bar dates.[5]

17.    Because Excellus received the Notices, it was obligated to file any

Administrative Claims before the applicable Administrative Claim Bar Dates, in accordance with

---

[5]    As discussed above, Excellus was served with the June 2009 Notice and the Effective Date Notice.  Because the Debtors served copies of the Notices on Excellus directly, the Debtors' mailing of the Notices was proper and legally sufficient.  Courts uniformly presume that an addressee receives a properly mailed item when the sender presents proof that it is properly addressed, stamped, and deposited in the mail.  See, e.g., Hagner v. U.S., 285 U.S. 427, 430 (1932) ("The rule is well settled that proof that a letter properly directed was placed in a post office creates a presumption that it reached its destination in usual time and was actually received by the person to whom it was addressed.").

the procedures referenced in the Modification Procedures Order and Modification Approval

Order, or be barred, estopped, and enjoined from asserting those claims against the Reorganized

Debtors.  Accordingly, this Court should deny the Motion.

F.      Excellus Has Failed To Meet Its Burden Of Proof For Establishing Excusable Neglect

        18.     Because Excellus received proper notice of the Administrative Claim Bar

Dates, Excellus can obtain the relief requested in the Motion only if it meets its burden to

establish excusable neglect pursuant to Bankruptcy Rule 9006(b)(1).  See In re R.H. Macy & Co.,

Inc., 161 B.R. 355, 360 (Bankr. S.D.N.Y. 1993) ("the burden of proving 'excusable neglect' is on

the creditor seeking to extend the bar date"); see also In re Dana Corp., 2007 WL 1577763, at *3

(Bankr. S.D.N.Y. 2007) (finding that the excusable neglect analysis applies to administrative

expense claims under section 503); In re DPH Holdings Corp., Hr'g Tr. at 44-45, August 20,

2009 [6] ("given the practice of treating claims and disputes related to missed bar dates for

administrative claims the same way as the courts treat missed bar dates for pre-petition claims, I

find . . . those cases . . . to be appropriate here, and for all intents and purposes on all fours.").

        19.     Excellus has not met its burden for establishing excusable neglect under

the test outlined by the United States Supreme Court in Pioneer Investment Services Co. v.

Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993).  In Pioneer, the Supreme Court held

that excusable neglect is the failure to comply with a filing deadline because of negligence.  Id.

at 394.  In examining whether a creditor's failure to file a claim by the bar date constituted

excusable neglect, the Supreme Court found that the factors include "[a] the danger of prejudice

to the debtor, [b] the length of the delay and its potential impact on judicial proceedings, [c] the

reason for the delay, including whether it was within the reasonable control of the movant, and [d]

---

[6]     A copy of the relevant portion of the August 20, 2009 hearing transcript is attached hereto as Exhibit C.

whether the movant acted in good faith." Id. at 395.  The Second Circuit has held the most

important factor is the reason for the delay, including whether it was within the reasonable

control of the movant.  Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron

Corp.), 419 F.3d 115, 122-24 (2d Cir. 2005).  As this Court has consistently ruled on motions

under Bankruptcy Rule 9006(b)(1) seeking leave to file an untimely proof of claim, a movant

must first show that its failure to file a timely claim constituted "neglect," as opposed to

willfulness or a knowing omission.  Then, a movant must show by a preponderance of the

evidence that the neglect was "excusable."  See, e.g., Order Pursuant To 11 U.S.C. § 502(b) And

Fed. R. Bankr. P. 3007 (I) Denying United States Of America's Motion For Leave To File Late

Claim And (II) Disallowing And Expunging Proof Of Claim Number 16727, entered March 6,

2008 (Docket No. 12980) at Exh. A p. 2 (citing Pioneer), aff'd March 24, 2009 (Docket No.

16515).

      20.     Although the third factor of the Pioneer test – the reason for the delay – is

often dispositive, in this case three factors weigh in favor of the Reorganized Debtors: the reason

for the delay, the prejudice to the Reorganized Debtors, and the length of the delay.  Accordingly,

Excellus fails to meet the excusable neglect standard and the Motion should be denied.

(i)    Reason For The Delay

      21.     In the Second Circuit, the reason for the delay is the most important factor

and is often dispositive. See In re Enron Corp., 419 F.3d at 122-24; In re Musicland Holding

Corp., 356 B.R. 603, 608 (Bankr. S.D.N.Y. 2006) (noting that the Second Circuit emphasizes the

reason for the delay in determining excusable neglect and stating that, "[t]he other factors are

relevant only in close cases" (citing Williams v. KFC Nat'l Mgmt. Co., 391 F.3d 411, 415-16 (2d

Cir. 2004))).

22.     Excellus has offered no reason for this delay, let alone a viable reason. This is not surprising because Excellus does not dispute that it was properly served with the Notices.  In fact, the Notices were served on the same street address as the one listed on Excellus's Invoice for the Debtors to submit payment.  Moreover, as evidenced by the Invoice dated July 16, 2009, Excellus undoubtedly knew approximately four months in advance of the Final Administrative Claim Bar Date that the Final Rate Variance was due and payable.  Yet, more than a year went by since the Invoice was issued before Excellus sought leave of this Court to file an untimely Administrative Claim.

23.     Courts in the Second Circuit have "taken a hard line" in applying the Pioneer test and focus on the reason for the delay, including whether it was within the reasonable control of the movant.  Silivanch v. Celebrity Cruises, Inc., 333 F.3d 355, 368 (2d Cir. 2003). "[T]he equities will rarely if ever favor a party who fail[s] to follow the clear dictates of a court rule [and] where the rule is entirely clear, we continue to expect that a party claiming excusable neglect will, in the ordinary course, lose under the Pioneer test."  Midland Cogeneration, 419 F.3d at 122-23.  Because Excellus failed to follow this Court's order to file proofs of administrative expense by the Administrative Claim Bar Dates, the reason for the delay was entirely within the control of Excellus.  Accordingly, because Excellus has not provided a valid reason for its delay in filing an Administrative Claim, this factor weighs heavily in favor of the Reorganized Debtors.

(ii)     Danger Of Prejudice To The Debtor

24.     Allowing Excellus to file a late claim more than nine months after the consummation of the Modified Plan will prejudice the Reorganized Debtors as well as other creditors in these cases who filed timely administrative expense claims.  Allowing untimely claims at this time may open the floodgates to any potential claimant who failed to file an

administrative expense claim on or before the applicable administrative claim bar date.  Courts

often have recognized the danger of opening the floodgates to potential claimants.  See, e.g., In

re Enron Corp., 419 F.3d at 132 n. 2 ("courts in this and other Circuits regularly cite the potential

'flood' of similar claims as a basis for rejecting late-filed claims"); In re Kmart Corp., 381 F.3d

709, 714 (7th Cir. 2004) (noting that if court allowed all similar late-filed claims, "Kmart could

easily find itself faced with a mountain of such claims"); In re Enron Creditors Recovery Corp.,

370 B.R. 90, 103 (Bankr. S.D.N.Y. 2007) ("'It can be presumed in a case of this size with tens of

thousands of filed claims, there are other similarly-situated potential claimants. . . . Any deluge

of motions seeking similar relief would prejudice the Debtors' reorganization process.'" (citation

omitted)); In re Dana Corp., 2007 WL 1577763, at *6 ("the floodgates argument is a viable one").

Accordingly, Excellus's argument that their claim does not prejudice the Reorganized Debtors

because the $411,318.50  amount of the claim "is minimal compared to the overall amount of the

administrative expenses" and "only a tiny fraction of the total administrative claims asserted

against the Debtors in these cases," is without merit.

    25.  The Administrative Claim Bar Dates were established to identify

administrative expense claims that would be paid pursuant to the terms of the Modified Plan.

Allowing Excellus to prevail on the Motion may inspire many other similarly situated potential

claimants to file similar motions.  Any potential claimant who, by its own error, failed to file a

timely administrative expense claim may seek to follow Excellus's lead.  Accordingly,

establishing a precedent for allowing untimely claims without a compelling justification would

greatly prejudice the Reorganized Debtors, their estates, and their creditors and undermine the

Debtors' restructuring efforts.

(iii)    Length Of The Delay

26.    Finally, the length of the delay also favors denying Excellus's Motion. Given that Excellus had all the necessary information to complete its reconciliation of the 2008 premium payments by early 2009, it should have been aware of its Administrative Claim at that time, well in advance of the Administrative Claim Bar Dates.  Excellus, however, did not even issue its Invoice relating to the Final Variance Payment until July 16, 2009.  Furthermore, Excellus failed to file an Administrative Claim for more than a year after it had issued the Invoice.

27.    The Second Circuit has adopted a "strict" standard in the area of excusable neglect, Asbestos Personal Injury Plaintiffs v. Travelers Indem. Co.  (In re Johns-Manville Corp.), 476 F.3d 118, 120 (2d Cir. 2007).  Although Excellus waited more than a year to file its late claim, Excellus characterizes this as a "short delay."  However, Courts considering excusable neglect in this jurisdiction have characterized delays of six months as "substantial." See In re Dana Corp., 2007 WL 1577763, at *5 (citing In re Enron, 419 F.3d at 125 (delay of more than six months after bar date was "substantial")).  Accordingly, this factor also weighs in favor of the Reorganized Debtors and further supports denying the Motion.

Conclusion

28.    Excellus has failed to provide any evidence of circumstances justifying the extraordinary relief it seeks under the excusable neglect standard under Pioneer and has not met its burden for establishing excusable neglect.  The Motion should, therefore, be denied.

WHEREFORE the Reorganized Debtors respectfully request that this Court enter an order (a) denying the Motion, and (b) granting them such other and further relief as is just.

Dated: New York, New York
August 20, 2010

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: /s/ John Wm. Butler, Jr.
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

- and –

Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for DPH Holdings Corp., et al.,
Reorganized Debtors

## Exhibit A

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :

In re                    :    Chapter 11

                            :

DELPHI CORPORATION, et al.,    :    Case No. 05-44481 (RDD)

                            :

                Debtors.    :    (Jointly Administered)

                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

AFFIDAVIT OF SERVICE

       I, Evan Gershbein, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.  I submit this Affidavit in connection with the service of the solicitation materials for the **First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified)** [Docket No. 17030] ("the Plan").

       On December 1, 2005, the Court signed and entered an Order Pursuant to 28 U.S.C. § 156(c) Authorizing Retention and Appointment of Kurtzman Carson Consultants LLC as Claims, Noticing and Balloting Agent for Clerk of Bankruptcy Court [Docket No. 1374] designating KCC as the official Balloting Agent.

       KCC is charged with the duty of printing and distributing Solicitation Packages to creditors and other interested parties pursuant to the instructions set forth in the **Order (A)(I) Approving Modifications to Debtors' First Amended Plan of Reorganization (as Modified) and Related Disclosures and Voting Procedures and (II) Setting Final Hearing Date to Consider Modifications to Confirmed First Amended Plan of Reorganization and (B) Setting Administrative Expense Claims Bar Date and Alternative Transaction Hearing Date ("Modification Procedures Order")** [Docket No. 17032] ("Modification Procedures Order") as entered by the Court on June 16, 2009.

       The various solicitation materials consist of the following documents:

1) Ballot for Accepting or Rejecting First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified) (Class A Secured Claims) ("Class A Ballot") (attached hereto as Exhibit A);

2) Ballot for Accepting or Rejecting First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified) (Class C-1 General Unsecured Claims) ("Class C-1 Ballot") (attached hereto as Exhibit B);



3)  Ballot for Accepting or Rejecting First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified) (Class C-2 Pension Benefit Guaranty Corporation Claims) ("Class C-2 Ballot") (attached hereto as <u>Exhibit C</u>);

4)  Ballot for Accepting or Rejecting First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified) (Class D General Motors Corporation Claim) ("Class D Ballot") (attached hereto as <u>Exhibit D</u>);

5)  Notice of (1) Approval of Supplement; (2) Hearing on Modifications to Plan; (3) Deadline and Procedures for Filing Objections to Modifications of Plan; (4) Deadline and Procedures for Temporary Allowance of Certain Claims for Voting Purposes; (5) Treatment of Certain Unliquidated, Contingent, or Disputed Claims for Noticing, Voting, and Distribution Purposes; (6) Record Date; (7) Voting Deadline for Receipt of Ballots; and (9) Proposed Releases, Exculpation, and Injunction in Modified Plan ("Final Modification Hearing Notice") (attached hereto as <u>Exhibit E</u>);

6)  a letter from the Delphi Corporation Official Committee of Unsecured Creditors ("Creditors' Committee Letter") (attached hereto as <u>Exhibit F</u>);

7)  First Amended Disclosure Statement Supplement with Respect to First Amended Plan of Reorganization (As Modified), Modification Procedures Order and December 10, 2007 Solicitation Procedures Order, in CD-ROM format ("CD-ROM")

8)  Notice of Non-Voting Status with Respect to Certain Claims and Interests ("Notice of Non-Voting Status") (attached hereto as <u>Exhibit G</u>);

9)  Notice to Unimpaired Creditors of (I) Filing of Proposed Modified Plan of Reorganization, (II) Treatment of Claims Under Modified Plan, (III) Hearing on Approval of Modified Plan, and (IV) Deadline and Procedures for Filing Objections Thereto ("Unimpaired Notice") (attached hereto as <u>Exhibit H</u>);

10) a memorandum from Kurtzman Carson Consultants to additional notice parties of ballot recipients ("Ballot Notice Party Memo") (attached hereto as <u>Exhibit I</u>);

11) Notice of Bar Date for Filing Proofs of Administrative Expense ("Administrative Bar Date Notice") (attached hereto as <u>Exhibit J</u>); and

12) Administrative Expense Claim Form ("Administrative Expense Claim Form") (attached hereto as <u>Exhibit K</u>).

On or before June 20, 2009, I caused to be served a personalized Class A Ballot, Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Administrative Bar Date Notice, Administrative Expense Claim Form and a pre-addressed, postage pre-paid return envelope upon the parties listed on Exhibit L via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served a personalized Class C-1 Ballot, Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Administrative Bar Date Notice, Administrative Expense Claim Form and a pre-addressed, postage pre-paid return envelope upon the parties listed on Exhibit M via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served a personalized Class C-2 Ballot, Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Administrative Bar Date Notice, Administrative Expense Claim Form and a pre-addressed, postage pre-paid return envelope upon the party listed on Exhibit N via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served a personalized Class D Ballot, Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Administrative Bar Date Notice, Administrative Expense Claim Form and a pre-addressed, postage pre-paid return envelope upon the party listed on Exhibit O via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on Exhibit P via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Notice of Non-Voting Status, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on Exhibit Q via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Unimpaired Notice, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on Exhibit R via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Notice of Non-Voting Status, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on Exhibit S via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Ballot Notice Party Memo, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on Exhibit T via postage pre-paid U.S. mail.

3

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on Exhibit U via postage pre-paid U.S. mail.

Dated: June 23, 2009

_____
Evan Gershbein

State of California
County of Los Angeles

Subscribed and sworn to (or affirmed) before me on this 23rd day of June, 2009, by Evan Gershbein, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature _____

Commission Expires: _10-1-09_

L. MAREE SANDERS
Commission # 1610322
Notary Public - California
Los Angeles County
My Comm. Expires Oct 1, 2009

4

# EXHIBIT J

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
    In re                                :    Chapter 11
:
DELPHI CORPORATION, <u>et al.</u>,        :    Case No. 05-44481 (RDD)
:
                 Debtors.   :    (Jointly Administered)
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>NOTICE OF BAR DATE FOR FILING PROOFS OF ADMINISTRATIVE EXPENSE</u>

           PLEASE TAKE NOTICE that on June 16, 2009, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an order (the "Modification Procedures Order") (Docket No. 17032), which among other things, established **July 15, 2009** (the "Administrative Expense Bar Date") as the last date to file proof of administrative expense (each, an "Administrative Expense Claim Form") for the purpose of asserting administrative expense claims ("Administrative Expense Claims" or "Claims"), against Delphi Corporation ("Delphi") and its affiliated debtors and debtors-in-possession (the "Debtors" or "Company").  The Administrative Expense Bar Date and the procedure set out below for filing proofs of administrative expense with respect to Claims apply to all alleged postpetition Claims against the Debtors that arose, accrued, or that were incurred on or before **June 1, 2009**.

           PLEASE TAKE FURTHER NOTICE that the Modification Procedures Order requires all parties to file an Administrative Expense Claim Form with Kurtzman Carson Consultants LLC ("KCC"), the claims, noticing, and solicitation agent in these cases, **<u>so that such Administrative Expense Claim Form is received on or before 5:00 p.m., prevailing Eastern time, on the Administrative Expense Bar Date</u>**.

**WHO SHOULD FILE AN ADMINISTRATIVE EXPENSE CLAIM FORM**

           You must file an Administrative Expense Claim Form if you believe that you are entitled to an Administrative Expense Claim as described in 11 U.S.C. § 503, except as provided below.

           You do not need to file an Administrative Expense Claim Form for (i) any claim for postpetition goods and services delivered to the Debtors prior to June 1, 2009 that are not yet due and payable pursuant to the applicable contract terms, (ii) employee claims arising prior to June 1, 2009 for wages, salary, and other benefits arising in the ordinary course of business that are not yet due and payable; (iii) any claim for which the party has already properly filed an Administrative Expense Claim Form or a proof of claim form with the Court which has not been expunged by order of the Court and provided that such proof of claim clearly and unequivocally sets forth that such claim is made for an administrative expense priority; (iv) any claim for fees and/or reimbursement of expenses by a professional employed in these chapter 11 cases accruing through January 25, 2008, to the extent that such claim is subject to this Court's Interim

Compensation Orders;[1] or (v) any claim asserted by any Debtor or any direct or indirect subsidiary of any of the Debtors in which the Debtors in the aggregate directly or indirectly own, control or hold with power to vote, 50% or more of the outstanding voting securities of such subsidiary.

### TIME AND PLACE FOR FILING ADMINISTRATIVE EXPENSE CLAIMS

**A signed original of any Administrative Expense Claim Form, together with accompanying documentation, must be delivered to Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, CA 90245, so as to be received no later than 5:00 p.m., prevailing Eastern time, on the Administrative Expense Bar Date**.  Claims may be submitted in person or by courier service, hand delivery or mail addressed to KCC at the foregoing address.  Any Claim submitted by facsimile, e-mail, or by other electronic means will not be accepted and will not be deemed filed until such Claim is submitted by one of the methods described in the preceding sentence.  Claims will be deemed filed only when actually received by KCC.  If you wish to receive acknowledgment of KCC's receipt of your Claim, you must also submit a copy of your original Claim and a self-addressed, stamped envelope.

### CONSEQUENCES OF FAILURE TO TIMELY SUBMIT
### ADMINISTRATIVE EXPENSE CLAIM FORM

**ANY PARTY THAT IS REQUIRED BUT FAILS TO FILE AN ADMINISTRATIVE EXPENSE CLAIM FORM IN ACCORDANCE WITH THIS NOTICE ON OR BEFORE THE ADMINISTRATIVE EXPENSE BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH CLAIM AGAINST THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, AND THEIR PROPERTY SHALL BE FOREVER DISCHARGED FROM ANY AND ALL INDEBTEDNESS, LIABILITY, OR OBLIGATION WITH RESPECT TO SUCH CLAIM**.

---

[1]    See Order Under 11 U.S.C. § 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated November 4, 2005 (Docket No. 869) (the "Interim Compensation Order"); Supplemental Order Under 11 U.S.C. § 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated March 8, 2006 (Docket No. 2747) (the "Supplemental Compensation Order"); Second Supplemental Order Under 11 U.S.C. Section 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated March 28, 2006 (Docket No. 2986) (the "Second Supplemental Interim Compensation Order"); and Third Supplemental Order Under 11 U.S.C. § 331 Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of Professionals, dated May 5, 2006 (Docket No. 3630) (the "Third Supplemental Interim Compensation Order"); Fourth Supplemental Order Under 11 U.S.C. Section 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated July 13, 2006 (Docket No. 4545) (the "Fourth Supplemental Interim Compensation Order"); Fifth Supplemental Order Under 11 U.S.C. Section 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses, dated October 13, 2006 (Docket No. 5310) (the "Fifth Supplemental Interim Compensation Order"); Sixth Supplemental Order Under 11 U.S.C. Section 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated December 12, 2006 (Docket No. 6145) (the "Sixth Supplemental Interim Compensation Order"); and the Seventh Supplemental Order Under 11 U.S.C. §331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated January 28, 2008 (Docket No. 12367) (together with the Interim Compensation Order, the Supplemental Compensation Order, the Second Supplemental Interim Compensation Order, the Third Supplemental Interim Compensation Order, the Fourth Supplemental Interim Compensation Order, the Fifth Supplemental Interim Compensation Order, and the Sixth Interim Compensation Order, the "Interim Compensation Orders").

PLEASE TAKE FURTHER NOTICE that all pleadings and orders of the Bankruptcy Court are publicly available along with the docket and other case information by accessing the Delphi Legal Information Website at www.delphidocket.com and may also be obtained, upon reasonable written request, from the Creditor Voting Agent, Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, Att'n: Delphi Corporation, et al.

Delphi Legal Information Hotline:          Delphi Legal Information Website:
Toll Free:  (800) 718-5305                 http://www.delphidocket.com
International:  (248) 813-2698

Dated: New York, New York
       June 16, 2009

SKADDEN, ARPS, SLATE, MEAGHER  & FLOM LLP

John Wm. Butler, Jr.                       Kayalyn A. Marafioti
Ron E. Meisler                             Thomas J. Matz
333 West Wacker Drive, Suite 2100          Four Times Square
Chicago, Illinois 60606                    New York, New York 10036

Attorneys for Delphi Corporation, et al., Debtors and Debtors-in-Possession

# EXHIBIT K

**United States Bankruptcy Court**

Southern District of New York

Delphi Corporation et al. Claims Processing

c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue

El Segundo, California 90245

**Administrative Expense Claim Form**

| Debtor against which claim is asserted : | Case Name and Number |
|---|---|
| Delphi Corporation, *et al.* 05-44481 | In re Delphi Corporation., *et al.* 05-44481 |
| | Chapter 11, Jointly Administered |

**NOTE: This form should not be used to make a claim in connection with a request for payment for goods or services provided to the Debtors prior to the commencement of the case. This Administrative Expense Claim Form is to be used solely in connection with a request for payment of an administrative expense arising after commencement of the case but prior to June 1, 2009, pursuant to 11 U.S.C. § 503.**

| | |
|---|---|
| Name of Creditor<br>*(The person or other entity to whom the debtor owes money or property)*<br><br><br>Name and Address Where Notices Should be Sent<br><br><br><br>Telephone No. | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br>☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☐ Check box if the address differs from the address on the envelope sent to you by the court.<br><br>**THIS SPACE IS FOR COURT USE ONLY** |

| | |
|---|---|
| ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR: | Check here if this claim ☐ replaces<br>☐ amends a previously filed claim, dated: _____ |

| 1. BASIS FOR CLAIM | |
|---|---|
| ☐ Goods sold<br>☐ Services performed<br>☐ Money loaned<br>☐ Personal injury/wrongful death<br>☐ Taxes<br>☐ Other (Describe briefly) | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)<br>☐ Wages, salaries, and compensation (Fill out below)<br>Your social security number _____<br>Unpaid compensation for services performed<br>from _____ to _____<br>(date)                    (date) |

| 2. DATE DEBT WAS INCURRED | 3. IF COURT JUDGMENT, DATE OBTAINED: |
|---|---|

4. TOTAL AMOUNT OF ADMINISTRATIVE CLAIM: $_____

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all additional charges.

| 5. Brief Description of Claim (attach any additional information): | |
|---|---|

| | |
|---|---|
| 6. **CREDITS AND SETOFFS**: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to debtor.<br><br>7. **SUPPORTING DOCUMENTS**: *Attach copies of supporting documents*, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. Any attachment must be 8-1/2" by 11".<br><br>8. **DATE-STAMPED COPY**: To receive an acknowledgement of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim. | **THIS SPACE IS FOR COURT USE ONLY** |

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any) |
|---|---|

*The instructions below are general explanations of the law. In particular types of cases or circumstances, such as bankruptcy cases that are not filed voluntarily by a debtor, there may be exceptions to the general rules.*

| "DEFINITIONS" | | |
|---|---|---|
| **DEBTORS**<br>The person, corporation, or other entity that has filed a bankruptcy case is called the debtor.<br><br>**CREDITOR**<br>A creditor is any person, corporation, or other entity to whom the debtor owes a debt. | **ADMINISTRATIVE EXPENSE CLAIM**<br>Any right to payment constituting a cost or expense of administration of any of the Chapter 11 Cases arising under 11 U.S.C. § 503(b) of the Bankruptcy Code for the period from the commencement of these cases through June 1, 2009, provided however, that you do **not** need to file an Administrative Expense Claim Form for (i) any claim for postpetition goods and services delivered to the Debtors prior to June 1, 2009 that are not yet due and payable pursuant to the applicable contract terms; (ii) employee claims arising prior to June 1, 2009 for wages, salary, and other benefits arising in the ordinary course of business that are not yet due and payable; (iii) any claim for which the party has already properly filed an Administrative Expense Claim Form (as defined in the Modification Procedures Order) (Docket No. 17032) or a proof of claim form with the Court which has not been expunged by order of the Court and provided that such proof of claim clearly and unequivocally sets forth that such claim is made for an administrative expense priority; (iv) any claim for fees and/or reimbursement of expenses by a professional employed in these chapter 11 cases accruing through January 25, 2008, and which are subject to this Court's Interim Compensation Orders (as defined in Modification Procedures Order); or (v) any claim asserted by any Debtor or any direct or indirect subsidiary of any of the Debtors in which the Debtors in the aggregate directly or indirectly own, control or hold with power to vote, 50% or more of the outstanding voting securities of such subsidiary. | **ADMINISTRATIVE BAR DATE**<br>Pursuant to section 10.2 of the Modified Plan and paragraphs 38-39 of the Modification Procedures Order, all requests for payment of an Administrative Claim that has arisen between October 8, 2005 and June 1, 2009 must be filed no later than **July 15, 2009.** |

**Items to be completed in Administrative Expense Claim Form (if not already filled in):**

**Information about Creditor:**
Complete the section giving the name, address, and telephone number of the creditor to whom the Debtors owe money or property, and the Debtors' account number(s), if any. If anyone else has already filed an Administrative Expense Claim Form relating to this debt, if you never received notices from the bankruptcy court about this case, if your address differs from that to which the court sent notice, or if this Administrative Expense Claim Form replaces or changes an Administrative Expense Claim Form that was already filed, check the appropriate box on the form.

**1. Basis for Claim:**
Check the type of debt for which the Administrative Expense Claim Form is being filed. If the type of debt is not listed, check "Other" and briefly describe the type of debt. If you were an employee of the Debtors, fill in your social security number and the dates of work for which you were not paid.

**2. Date Debt Incurred:**
Fill in the date when the Debtors first owed the debt.

**3. Court Judgments:**
If you have a court judgment for this debt, state the date the court entered the judgment.

**4. Total Amount of Administrative Claim:**
Fill in the total amount of the entire Claim. If interest or other charges in addition to the principal amount of the Claim are included, check the appropriate place on the form and attach an itemization of the interest and charges.

**5. Brief Description of Claim:**
Describe the Administrative Expense Claim including, but not limited to, the actual and necessary costs and expenses of operating one or more of the Debtors' Estates or any actual and necessary costs and expenses of operating one or more of the Debtors' businesses.

**6. Credits and Setoffs:**
By signing this Administrative Expense Claim Form, you are stating under oath that in calculating the amount of your Claim you have given the Debtors credit for all payments received from the Debtors.

**7. Supporting Documents:**
You must attach to this Administrative Expense Claim Form copies of documents that show the Debtors owe the debt claimed or, if the documents are too lengthy, a summary of those documents. If documents are not available you must attach an explanation of why they are not available.

**8. Date-Stamped Copy:**
To receive an acknowledgement of the filing of your Claim, enclose a stamped, self-addressed envelope and copy of this Administrative Expense Claim Form.

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 357

# EXHIBIT U

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | Address4 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| EXCEL AIR TOOL CO INC | | 4778 DUES DR | | | | CINCINNATI | OH | 45246 | |
| EXCEL AIR TOOL CO INC EFT | | PO BOX 640212 | | | | CINCINNATI | OH | 45264-0212 | |
| EXCEL AUTOMATION | CHERYL WEBER | 9471 GREYSTONE | | | | BRECKSVILLE | OH | 44141 | |
| EXCEL CIRCUITS CO | | 50 NORTHPOINTE DR | | | | ORION | MI | 48359-1846 | |
| EXCEL CIRCUITS CO INC | | C/O WHITESELL R O & ASSOCIATE | 8332 OFFICE PK DR STE A | | | GRAND BLANC | MI | 48439-2035 | |
| EXCEL COMPUTER | | 3330 EARHART DR | STE 212 | | | CARROLLTON | TX | 75006 | |
| EXCEL ELECTROCIRCIRUIT INC EFT | | 50 NORTHPOINTE DR | | | | ORION | MI | 48359-1846 | |
| EXCEL ELECTROCIRCUIT INC | | 50 NORTHPOINTE DR | | | | ORION | MI | 48359-184 | |
| EXCEL ELECTROCIRCUIT INC | | C/O RO WHITESELL ASSOCIATES | 5900 S MAIN ST STE 100 | | | CLARKSTON | MI | 48346 | |
| EXCEL ELECTROCIRCUIT INC EFT | | FRMLY CIRCUIT BOARD OF AMERICA | FMLY ELCEL CIRCUITS CO | 50 NORTHPOINTE DR | | ORION | MI | 48359-1846 | |
| EXCEL ENERGY TECHNOLOGIES LTD | | 624 S BOSTON STE 300 | | | | TULSA | OK | 74119 | |
| EXCEL ENGINEERING INC | | 25925 GLENDALE | | | | REDFORD | MI | 48239 | |
| EXCEL FORAL DESIGNS INC | | 100 RENAISSANCE CTR STE 134 | | | | DETROIT | MI | 48243 | |
| EXCEL HEALTH ENTERPRISES | | 4018 COLUMBUS AVE | | | | ANDERSON | IN | 46013 | |
| EXCEL HEALTH ENTERPRISES | | INC | 4018 COLUMBUS AVE | | | ANDERSON | IN | 46013 | |
| EXCEL HEALTH ENTERPRISES INC | | EXCEL HEALTH & WELLNESS | 4018 COLUMBUS AVE | | | ANDERSON | IN | 46013 | |
| EXCEL INC | | 509 LEE AVE | | | | LINCOLNTON | NC | 28092 | |
| EXCEL INC | | PO DRAWER 459 | | | | LINCOLNTON | NC | 28093-0459 | |
| EXCEL INDUSTRIAL ELECTRONICS | TONY MOCERI | 44360 REYNOLDS DR | PO BOX 46009 | | | CLINTON TWP | MI | 48036 | |
| EXCEL INDUSTRIES INC | | POBOX 46009 | | | | MT CLEMENS | MI | 48046-6009 | |
| EXCEL PARTNERSHIP INC | | 75 GLEN RD | | | | SANDY HOOK | CT | 06482 | |
| EXCEL PARTNERSHIP INC | | 75 GLEN RD STE 200 | | | | SANDY HOOK | CT | 06482 | |
| EXCEL PARTNERSHIP INC | EXCEL PARTNERSHIP INC | | 75 GLEN RD STE 200 | | | SANDY HOOK | CT | 06482 | |
| EXCEL PARTNERSHIP INC EFT | | 75 GLEN RD STE 200 | | | | SANDY HOOK | CT | 06482 | |
| EXCEL PATTERN WORKS INC | | 7020 CHASE RD | | | | DEARBORN | MI | 48126-1751 | |
| EXCEL PATTERN WORKS INC | | 7020 CHASE RD | | | | DEARBORN | MI | 48126-1791 | |
| EXCEL PERSONNEL INC | | 3737 RUE NOTRE DAME QUEST | | | | MONTREAL | PQ | H4C 1P8 | CANADA |
| EXCEL QUANTRONIX CORP | | 45 ADAMS AVE | | | | HAUPPAUGE | NY | 11788 | |
| EXCEL SCREW MACHINE TOOLS INC | | 20300 LORNE | | | | TAYLOR | MI | 48180 | |
| EXCEL SCREW MACHINE TOOLS INC | | 20300 LORNE ST | | | | TAYLOR | MI | 48180-1969 | |
| EXCEL SCREW MACHINE TOOLS INC | | 20300 LORNE | | | | TAYLOR | MI | 48180 | |
| EXCEL TECHNICAL SERVICES | | INC | PMB 141 | 7111 DIXIE HWY | | CLARKSTON | MI | 48346-2077 | |
| EXCEL TECHNICAL SERVICES EFT | | INC | PMB 141 | 7111 DIXIE HWY | | CLARKSTON | MI | 48346-2077 | |
| EXCEL TECHNICAL SERVICES INC | | ETS | PMB 141 | 7111 DIXIE HWY | | CLASRKSTON | MI | 48346-2077 | |
| EXCEL TECHNICAL SERVICES INC | RICARDO CARVAJAL | PMB 141 | 7111 DIXIE HWY | | | CLARKSTON | MI | 48346-2077 | |
| EXCEL TECHNOLOGY INC | | 41 RESEARCH WAY | | | | EAST SETAUKET | NY | 11733-3454 | |
| EXCELDA DISTRIBUTING SPA | ACCOUNTS PAYABLE | 11078 HI TECH DR | | | | WHITMORE LAKE | MI | 48189 | |
| EXCELDA MANUFACTURING CO | | 12785 EMERSON DR | | | | BRIGHTON | MI | 48116 | |
| EXCELDA MANUFACTURING CO | | PO BOX 67000 DEPT 101101 | | | | DETROIT | MI | 48267-1011 | |
| EXCELDA MANUFACTURING CO INC | | 12785 EMERSON DR | | | | BRIGHTON | MI | 48116 | |
| EXCELDA MANUFACTURING CO INC | | 12785 EMERSON DR | | | | BRIGHTON | MI | 48116-8562 | |
| EXCELDA MANUFACTURING COMPANY | | 12785 EMERSON DR | | | | BRIGHTON | MI | 48116 | |
| EXCELL EXPRESS INC | | 540 N LAPEER RD 170 | | | | ORION TWP | MI | 48362 | |
| EXCELL LLC | | 3242 PATTERSON RD | | | | BAY CITY | MI | 48706 | |
| EXCELL LLC | | PO BOX 1607 | | | | BAY CITY | MI | 48706 | |
| EXCELLENCE MANUFACTURING INC | | 629 IONIA AVE SW | | | | GRAND RAPIDS | MI | 49503-5148 | |
| EXCELLENCE MANUFACTURING INC | ACCOUNTS PAYABLE | 629 IONIA AVE SOUTHWEST | | | | GRAND RAPIDS | MI | 49503 | |
| EXCELLON ACQUISITION LLC | | 24751 CRENSHAW BLVD | | | | TORRANCE | CA | 90505-5308 | |
| EXCELLON ACQUISITION LLC | | FILE NO 57346 | | | | LOS ANGELES | CA | 90074-7346 | |
| EXCELLON AUTOMATION CO | | 24751 CRENSHAW BLVD | | | | TORRANCE | CA | 90505-530 | |
| EXCELLON INDUSTRIES | | EXCELLON AUTOMATION DIVISION | 24751 CRENSHAW BLVD | | | TORRANCE | CA | 90505-0000 | |
| EXCELLOY INDUSTRIES | | 608 E MCMURRAY RD B3 | | | | MCMURRAY | PA | 15317 | |
| EXCELLOY INDUSTRIES EFT | | 608 E MCMURRAY RD B3 | | | | MCMURRAY | PA | 15317 | |
| EXCELLUS HEALTH PLAN INC EFT SHARON JACKSON TREASURY OPER | | BC BS OF ROCHESTER | PO BOX 9620 | | | ROCHESTER | NY | 14604-0620 | |
| EXCELLUS HEALTH PLANBLUE CHOICE | DANIEL ZIMMERMAN | 165 COURT ST | | | | ROCHESTER | NY | 14647 | |
| EXCELORANT LLC | | 1800 ST JULIAN PL | | | | COLUMBIA | SC | 29202 | |
| EXCELSIOR SPRINGS SEATING SYSTEMS | | 301 SOUTH MCCLEARY RD | | | | EXCELSIOR SPRINGS | MO | 64024 | |
| EXCHANGE BANK OF ALABAMA | SUSAN WILLETT | ASSIGNEE PACKAGING INTEGRITY | PO BOX 178 | | | GADSDEN | AL | 35902 | |
| EXCHANGE CLUB OF LOCKPORT | | PO BOX 692 | | | | LOCKPORT | NY | 14094 | |
| EXCHANGE CLUBS OF ANDERSON | | 8756 SURREY DR | | | | PENDLETON | IN | 46064 | |
| EXCIMER VISION LASER LP | SIMON YEO | 101 YGNACIO VALLEY RD | STE 340 | | | WALNUT CREEK | CA | 94596 | |

Delphi Corporation
Appendix

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | Address4 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| UNIVAR USA INC | | 2600 GARFIELD AVE | | | | LOS ANGELES | CA | 90040 | |
| UNIVAR USA INC | | 3025 EXON AVE | | | | CINCINNATI | OH | 45241 | |
| UNIVAR USA INC | | 30450 TRACY RD | | | | WALBRIDGE | OH | 43465 | |
| UNIVAR USA INC | | 3320 S COUNCIL | | | | OKLAHOMA CITY | OK | 73179 | |
| UNIVAR USA INC | | 3320 S COUNCIL RD | | | | OKLAHOMA CITY | OK | 73179 | |
| UNIVAR USA INC | | 7425 E 30TH ST | | | | INDIANAPOLIS | IN | 46219-111 | |
| UNIVAR USA INC | | 7603 NELSON RD | | | | FORT WAYNE | IN | 46803 | |
| UNIVAR USA INC | | CHEMCARE | 6100 CARILLON POINT | | | KIRKLAND | WA | 98033 | |
| UNIVAR USA INC | | MCKESSON CHEMICAL CO DIV | 6000 CASTEEL DR | | | CORAOPOLIS | PA | 15108 | |
| UNIVAR USA INC | | PO BOX 849027 | | | | DALLAS | TX | 75284-9027 | |
| UNIVAR USA INC | HDQTRS | 17425 NE UNION HILL RD | | | | REDMOND | WA | 98052 | |
| UNIVAR USA INC  EFT | | PO BOX 409692 | | | | ATLANTA | GA | 30384-9692 | |
| UNIVAR USA INC AS SUCCESSOR IN INTEREST TO PRILLAMAN CHEMICAL CORP | | 6100 CARILLON POINT | | | | KIRKLAND | WA | 98033 | |
| UNIVAR USA INC AS SUCCESSOR IN INTEREST TO PRILLAMAN CHEMICAL CORP | | 6100 CARILLON POINT | | | | KIRKLAND | WA | 98033 | |
| UNIVAR USA INC EFT | | FRMLY VAN WATERS & ROGERS INC | PO BOX 409692 | ADD CHNG CS 07 06 04 CS | | ATLANTA | GA | 30384-9692 | |
| UNIVAR USA INC EFT | | FRMLY VOPAK USA INC | PO BOX 409692 | ADD CHNG CS 06 29 04 | | ATLANTA | GA | 30384-9692 | |
| UNIVAR USA INC SUCCESSOR IN INTEREST TO PRILLAMAN CHEMICAL CORP | | 6100 CARILLON POINT | | | | KIRKLAND | WA | 98033 | |
| UNIVAR USA INC SUCCESSOR IN INTEREST TO PRILLAMAN CHEMICAL CORP | | 6100 CARILLON POINT | | | | KIRKLAND | WA | 98033 | |
| UNIVER OF TEXAS AT SAN ANTONIO | | 6900 N LOOP 1604 W | | | | SAN ANTONIO | TX | 78249-0607 | |
| UNIVER OF TEXAS AT SAN ANTONIO OFFICE OF BUSINESS MANAGER | | 6900 N LOOP 1604 W | | | | SAN ANTONIO | TX | 78249-0607 | |
| UNIVER OF TOLEDO AT SEAGATE | | CENTRE UNIVERSITY COLLEGE | DIV OF CONTINUING EDUCATION | 1111 RESEARCH DR | | TOLEDO | OH | 43614-2798 | |
| UNIVER OF WISCONSIN WHITEWATER | | STUDENT ACCOUNTS OFFICE | HYER HALL RM 110 | | | WHITEWATER | WI | 53190 | |
| UNIVERA HEALTHCARE | JENNIFER RUBERTO | AN EXCELLUS COMPANY | 205 PK CLUB LN | | | BUFFALO | NY | 14221-5239 | |
| UNIVERA HEALTHCARE CNY INC | | 8278 WILLETT PKWY | | | | BALDWINSVILLE | NY | 13027 | |
| UNIVERA HEALTHCARE CNY INC | | FMLY HEALTH SERVICES MEDICAL | 8278 WILLETT PKWY | | | BALDWINSVILLE | NY | 13027 | |
| UNIVERSAL ADHESIVE SYSTEMS LTD | | UNIT 18 JAMES WATT CLOSE | | | | DAVENTRY | NH | NN11 5RJ | GB |
| UNIVERSAL AIR CONDITIONING | | COMPANY INC | 5935 EAST FLORENCE AVE | | | BELL GARDENS | CA | 90201-4627 | |
| UNIVERSAL AIR CONDITIONING CO | | 5935 E FLORENCE AVE | | | | BELL | CA | 90201 | |
| UNIVERSAL AIR CONDITIONING COMPANY INC | | PO BOX 2008 | | | | BELL GARDENS | CA | 90202 | |
| UNIVERSAL AM CAN LTD | A/R | 11355 STEPHENS RD | | | | WARREN | MI | 48089 | |
| UNIVERSAL AM CAN LTD | A/R | 11355 STEPHENS RD | | | | WARREN | MI | 48089 | |
| UNIVERSAL AM CAN LTD EFT | | 11355 STEPHENS RD | SCAC OITP | | | WARREN | MI | 48089 | |
| UNIVERSAL AM CAN LTD EFT | | 11355 STEPHENS RD | | | | WARREN | MI | 48089 | |
| UNIVERSAL AM CAN LTD EFT | A R | 11355 STEPHENS RD | | | | WARREN | MI | 48090 | |
| UNIVERSAL AMCAN | RICK GNACKE | 11355 STEPHENS | | | | WARREN | MI | 48089 | |
| UNIVERSAL AMCAN | RICK GNACKE | PO BOX 33297 | | | | DETROIT | MI | 48232 | |
| UNIVERSAL AMERICA INC | | PO BOX 1240 | | | | GREENVILLE | TN | 37744-1240 | |
| UNIVERSAL AMERICA INC | | 109 COILE ST | | | | GREENEVILLE | TN | 37743 | |
| UNIVERSAL AMERICA INC | | 109 COLLIE ST | | | | GREENVILLE | TN | 37744-1240 | |
| UNIVERSAL AMERICA INC | | PO BOX 1240 | | | | GREENVILLE | TN | 37744-1240 | |
| UNIVERSAL AUTOMATIC CORPORATION | | 2064 MANNHEIM RD | | | | DES PLAINES | IL | 60018-2909 | |
| UNIVERSAL BEARINGS INC | | 431 BIRKEY DR | | | | BREMEN | IN | 46506-200 | |
| UNIVERSAL BEARINGS INC | | 431 N BIRKEY ST | | | | BREMEN | IN | 46506-2016 | |
| UNIVERSAL BEARINGS INC | | PO BOX 38 | 431 N BIRKEY DR | | | BREMEN | IN | 46506 | |
| UNIVERSAL BEARINGS INC | | PO BOX 38 | | | | BREMEN | IN | 46506 | |
| UNIVERSAL BEARINGS INC | MICHAEL B WATKINS | BARNES & THORNBURG LLP | 100 N MICHIGAN 600 1ST SOURCE BANK CENTER | | | SOUTH BEND | IN | 46601-1632 | |
| UNIVERSAL BEARINGS INC | MICHAEL B WATKINS | BARNES & THORNBURG LLP | 100 N MICHIGAN 600 1ST SOURCE BANK CTR | | | SOUTH BEND | IN | 46601-1632 | |
| UNIVERSAL BEARINGS INC | MICHAEL B WATKINS | BARNES & THORNBURG LLP | 100 NORTH MICHIGAN 600 1ST SOURCEBANK CENTER | | | SOUTH BEND | IN | 46601-1632 | |
| UNIVERSAL BEARINGS INC EFT | | 431 BIRKEY DR | | | | BREMEN | IN | 46506-2016 | |
| UNIVERSAL BEARINGS LLC | | PO BOX 38 | | | | BREMEN | IN | 46506-0038 | |
| UNIVERSAL BEARINGS LLC | | 431 BIRKEY DR | | | | BREMEN | IN | 46506-2016 | |
| UNIVERSAL BINDERY CO | | 15220 HARPER AVE | | | | DETROIT | MI | 48224 | |

**Exhibit B**

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AFFIDAVIT OF SERVICE

I, Evan Gershbein, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

On or before October 9, 2009, I caused to be served the document listed below upon the parties listed on Exhibit A hereto via postage pre-paid U.S. mail:

Notice of (A) Order Approving Modifications to First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession and (B) Occurrence of Effective Date (Docket No. 18958)

On or before October 13, 2009, I caused to be served the appropriate number of copies of the document listed below (i) upon the service list attached hereto as Exhibit B, for subsequent distribution to beneficial holders of Common Stock, CUSIP 172737 10 8; 6 ½% Notes due 2009, CUSIP 247126 AB 1; 7 1/8% Notes due 2029, CUSIP 247126 AC 9; 6.55% Notes due 2006, CUSIP 247126 AD 7; 6.50% Notes due 2013, CUSIP 247126 AE 5; 8 ¼% Adjustable Rate Subordinated Note due 2033, CUSIP 247126 AF 2; and 6.197% Junior Subordinated Note due 2033, CUSIP 247126 AG 0, via Overnight mail and hand delivery; (ii) upon the parties set forth on Exhibit C via postage pre-paid U.S. Mail; (iii) upon the registered holders of Common Stock listed on Exhibit D, provided by Computershare as transfer agent, via postage pre-paid U.S. Mail; and (iv) upon the service list attached hereto as Exhibit E via Electronic mail.

Notice of (A) Order Approving Modifications to First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession and (B) Occurrence of Effective Date (Docket No. 18958)

0544481091015000000000001

Dated: October 14, 2009

/s/ Evan Gershbein<br>
Evan Gershbein

State of California
County of Los Angeles

Subscribed and sworn to (or affirmed) before me on this 14th day of October, 2009, by
Evan Gershbein, proved to me on the basis of satisfactory evidence to be the person who
appeared before me.

Signature:  /s/ Shannon J. Spencer

Commission Expires: 6/20/10

# EXHIBIT A

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | Address4 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| EXCALIBUR REGISTRATIONS | ACCOUNTS RECEIVABLE | 6029 14 MILE RD STE 200 | | | | STERLING HEIGHTS | MI | 48312 | |
| EXCEL | | 10205 NORTHWEST 19TH ST | | | | MIAMI | FL | 33172-2535 | |
| EXCEL AIR TOOL | ARNIE THIES | 4525 WEST 160TH ST | | | | CLEVELAND | OH | 44135 | |
| EXCEL AIR TOOL CO INC | | 3800 MONROE AVE STE 19C | | | | ROCHESTER | NY | 14534 | |
| EXCEL AIR TOOL CO INC | | 4525 W 160TH ST | | | | CLEVELAND | OH | 44135 | |
| EXCEL AIR TOOL CO INC | | 4741 DEVITT DR | | | | CINCINNATI | OH | 45246 | |
| EXCEL AIR TOOL CO INC | | 4778 DUES DR | | | | CINCINNATI | OH | 45246 | |
| EXCEL AIR TOOL CO INC EFT | | PO BOX 640212 | | | | CINCINNATI | OH | 45264-0212 | |
| EXCEL AUTOMATION | | 9471 GREYSTONE PKWY | | | | BRECKSVILLE | OH | 44141 | |
| EXCEL AUTOMATION | CHERYL WEBER | 9471 GREYSTONE | | | | BRECKSVILLE | OH | 44141 | |
| EXCEL CIRCUITS CO | | 50 NORTHPOINTE DR | | | | ORION | MI | 48359-1846 | |
| EXCEL CIRCUITS CO INC | | C/O WHITESELL R O & ASSOCIATE | 8332 OFFICE PK DR STE A | | | GRAND BLANC | MI | 48439-2035 | |
| EXCEL COMPUTER | | 3330 EARHART DR | STE 212 | | | CARROLLTON | TX | 75006 | |
| EXCEL ELECTROCIRCUIT INC EFT | | 50 NORTHPOINTE DR | | | | ORION | MI | 48359-1846 | |
| EXCEL ELECTROCIRCUIT INC | | 50 NORTHPOINTE DR | | | | ORION | MI | 48359-184 | |
| EXCEL ELECTROCIRCUIT INC | | C/O RO WHITESELL ASSOCIATES | 5900 S MAIN ST STE 100 | | | CLARKSTON | MI | 48346 | |
| EXCEL ELECTROCIRCUIT INC EFT | | FRMLY CIRCUIT BOARD OF AMERICA | FMLY ELCEL CIRCUITS CO | 50 NORTHPOINTE DR | | ORION | MI | 48359-1846 | |
| EXCEL ENERGY TECHNOLOGIES LTD | | 624 S BOSTON STE 300 | | | | TULSA | OK | 74119 | |
| EXCEL ENGINEERING INC | | 25925 GLENDALE | | | | REDFORD | MI | 48239 | |
| EXCEL FORAL DESIGNS INC | | 100 RENAISSANCE CTR STE 134 | | | | DETROIT | MI | 48243 | |
| EXCEL HEALTH ENTERPRISES | | 4018 COLUMBUS AVE | | | | ANDERSON | IN | 46013 | |
| EXCEL HEALTH ENTERPRISES | | INC | 4018 COLUMBUS AVE | | | ANDERSON | IN | 46013 | |
| EXCEL HEALTH ENTERPRISES INC | | EXCEL HEALTH & WELLNESS | 4018 COLUMBUS AVE | | | ANDERSON | IN | 46013 | |
| EXCEL INC | | 509 LEE AVE | | | | LINCOLNTON | NC | 28092 | |
| EXCEL INC | | PO DRAWER 459 | | | | LINCOLNTON | NC | 28093-0459 | |
| EXCEL INDUSTRIAL ELECTRONICS | TONY MOCERI | 44360 REYNOLDS DR | PO BOX 46009 | | | CLINTON TWP | MI | 48036 | |
| EXCEL INDUSTRIES INC | | POBOX 46009 | | | | MT CLEMENS | MI | 48046-6009 | |
| EXCEL PARTNERSHIP INC | | 464 HERITAGE RD | | | | SOUTHBURY | CT | 06488 | |
| EXCEL PARTNERSHIP INC | | 75 GLEN RD | | | | SANDY HOOK | CT | 06482 | |
| EXCEL PARTNERSHIP INC | | 75 GLEN RD STE 200 | | | | SANDY HOOK | CT | 06482 | |
| EXCEL PARTNERSHIP INC | EXCEL PARTNERSHIP INC | 75 GLEN RD STE 200 | | | | SANDY HOOK | CT | 06482 | |
| EXCEL PARTNERSHIP INC EFT | | 75 GLEN RD STE 200 | | | | SANDY HOOK | CT | 06482 | |
| EXCEL PATTERN WORKS INC | | 7020 CHASE RD | | | | DEARBORN | MI | 48126-1751 | |
| EXCEL PATTERN WORKS INC | | 7020 CHASE RD | | | | DEARBORN | MI | 48126-1791 | |
| EXCEL PERSONNEL INC | | 3737 RUE NOTRE DAME QUEST | | | | MONTREAL | PQ | H4C 1P8 | CANADA |
| EXCEL QUANTRONIX CORP | | 45 ADAMS AVE | | | | HAUPPAUGE | NY | 11788 | |
| EXCEL SCREW MACHINE TOOLS INC | | 20300 LORNE ST | | | | TAYLOR | MI | 48180-1969 | |
| EXCEL SCREW MACHINE TOOLS INC | | 20300 LORNE | | | | TAYLOR | MI | 48180 | |
| EXCEL TECHNICAL SERVICES | INC | PMB 141 | 200 KIRTS BLVD STE A | | | TROY | MI | 48084-5286 | |
| EXCEL TECHNICAL SERVICES EFT | INC | PMB 141 | 200 KIRTS BLVD STE A | | | TROY | MI | 48084-5286 | |
| EXCEL TECHNICAL SERVICES INC | | ETS | PMB 141 | 200 KIRTS BLVD STE A | | TROY | MI | 48084-5286 | |
| EXCEL TECHNICAL SERVICES INC | | PMB 141 | 7111 DIXIE HWY | | | CLARKSTON | MI | 48346-2077 | |
| EXCEL TECHNICAL SERVICES INC | RICARDO CARVAJAL | PMB 141 | 7111 DIXIE HWY | | | CLARKSTON | MI | 48346-2077 | |
| EXCEL TECHNOLOGY INC | | 41 RESEARCH WAY | | | | EAST SETAUKET | NY | 11733-3454 | |
| EXCELDA DISTRIBUTING SPA | ACCOUNTS PAYABLE | 11078 HI TECH DR | | | | WHITMORE LAKE | MI | 48189 | |
| EXCELDA MANUFACTURING CO | | 12785 EMERSON DR | | | | BRIGHTON | MI | 48116 | |
| EXCELDA MANUFACTURING CO | | PO BOX 67000 DEPT 101101 | | | | DETROIT | MI | 48267-1011 | |
| EXCELDA MANUFACTURING CO INC | | 12785 EMERSON DR | | | | BRIGHTON | MI | 48116 | |
| EXCELDA MANUFACTURING CO INC | | 12785 EMERSON DR | | | | BRIGHTON | MI | 48116-8562 | |
| EXCELDA MANUFACTURING COMPANY | | 12785 EMERSON DR | | | | BRIGHTON | MI | 48116 | |
| EXCELL EXPRESS INC | | 540 N LAPEER RD 170 | | | | ORION TWP | MI | 48362 | |
| EXCELL LLC | | 3242 PATTERSON RD | | | | BAY CITY | MI | 48706 | |
| EXCELL LLC | | PO BOX 1607 | | | | BAY CITY | MI | 48706 | |
| EXCELLENCE MANUFACTURING INC | | 629 IONIA AVE SW | | | | GRAND RAPIDS | MI | 49503-5148 | |
| EXCELLENCE MANUFACTURING INC | ACCOUNTS PAYABLE | 629 IONIA AVE SOUTHWEST | | | | GRAND RAPIDS | MI | 49503 | |
| EXCELLON ACQUISITION LLC | | 24751 CRENSHAW BLVD | | | | TORRANCE | CA | 90505-5308 | |
| EXCELLON ACQUISITION LLC | | FILE NO 57346 | | | | LOS ANGELES | CA | 90074-7346 | |
| EXCELLON AUTOMATION CO | | 24751 CRENSHAW BLVD | | | | TORRANCE | CA | 90505-530 | |
| EXCELLON INDUSTRIES | | EXCELLON AUTOMATION DIVISION | 24751 CRENSHAW BLVD | | | TORRANCE | CA | 90505-0000 | |
| EXCELLOY INDUSTRIES | | 608 E MCMURRAY RD B3 | | | | MCMURRAY | PA | 15317 | |
| EXCELLOY INDUSTRIES EFT | | 608 E MCMURRAY RD B3 | | | | MCMURRAY | PA | 15317 | |
| EXCELLOY INDUSTRIES INC | | 608 E MCMURRAY RD STE B3 | | | | MCMURRAY | PA | 15317 | |
| EXCELLUS HEALTH PLAN INC EFT SHARON JACKSON TREASURY OPER | | BC BS OF ROCHESTER | PO BOX 9620 | | | ROCHESTER | NY | 14604-0620 | |
| EXCELLUS HEALTH PLANBLUE CHOICE | DANIEL ZIMMERMAN | 165 COURT ST | | | | ROCHESTER | NY | 14647 | |
| EXCELORANT LLC | | 1800 ST JULIAN PL | | | | COLUMBIA | SC | 29202 | |
| EXCELSIOR SPRINGS SEATING SYSTEMS | | 301 SOUTH MCCLEARY RD | | | | EXCELSIOR SPRINGS | MO | 64024 | |
| EXCHANGE BANK OF ALABAMA | SUSAN WILLETT | ASSIGNEE PACKAGING INTEGRITY | PO BOX 178 | | | GADSDEN | AL | 35902 | |
| EXCHANGE CLUB OF LOCKPORT | | PO BOX 692 | | | | LOCKPORT | NY | 14094 | |
| EXCHANGE CLUBS OF ANDERSON | | 8756 SURREY DR | | | | PENDLETON | IN | 46064 | |
| EXCIMER VISION LASER LP | SIMON YEO | 101 YGNACIO VALLEY RD | STE 340 | | | WALNUT CREEK | CA | 94596 | |
| EXCO TECHNOLOGIES LTD | | CASTOOL PRECISION TOOL | 17 STATE CROWN BLVD | | | SCARBOROUGH | ON | M1V 4B1 | CANADA |
| EXCO TECHNOLOGIES LTD | | CASTOOL PRECISION TOOL | 21 STATE CROWN BLVD | | | SCARBOROUGH | ON | M1V 4B1 | CANADA |
| EXCO TECHNOLOGIES LTD | | EXTEC | 60 SPY CT | | | MARKHAM | ON | L3R 5H6 | CANADA |
| EXEC WAREHOUSE INC | | PO BOX 37038 | | | | SOUTHDALE LONDON | ON | N6E 3T3 | CANADA |
| EXECT SEARCH INTERNATIONAL EFT | | DBA SANFORD ROSE ASSOCIATES | 5500 MAIN ST STE 340 | | | WILLIAMSVILLE | NY | 14221 | |
| EXECT SEARCH INTERNATIONAL INC | | SANFORD ROSE ASSOCIATES OF AMH | 5500 MAIN ST STE 340 | | | WILLIAMSVILLE | NY | 14221 | |
| EXECUTIVE BILINGUAL SERVICES | | 4466 OAKDALE ST | PO BOX 96 | | | GENESEE | MI | 48437 | |
| EXECUTIVE CENTER INC | | T A EXECUTIVE CTR OF GREENTREE | 1 EVES DR STE 111 | | | MARLTON | NJ | 08053 | |
| EXECUTIVE COMMITTEE OF DELPHI CORPS BOARD OF DIRECTORS | C/O SHEARMAN & STERLING | MARC D ASHLEY ESQ | 599 LEXINGTON AVE | | | NEW YORK | NY | 10022-6069 | |
| EXECUTIVE EDUCATION NETWORK | | PO BOX 911584 | | | | DALLAS | TX | 75391-1584 | |
| EXECUTIVE EDUCATION NETWORK | | PO BOX 98565 | | | | CHICAGO | IL | 60693-8565 | |
| EXECUTIVE EXPRESS | | TRANSPORTATION | 338 S SHARON AMITY RD | PMB 199 | | CHARLOTTE | NC | 28211-2806 | |

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | Address4 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| UNITIME SYSTEMS, INC | | 4900 PEARL EAST CIR STE 110 | | | | BOULDER | CO | 80301 | |
| UNITIVE ADVANCED SEMICONDUCTOR | | PACKAGING | PO BOX 14584 | RESEARCH TRIANGLE PK | | RTP | NC | 27709-4584 | |
| UNITIVE ELECTRONICS INC | | UNITIVE INC | 4512 S MIAMI BLVD STE 120 | | | DURHAM | NC | 27709 | |
| UNITIZE CO INC | | 1101 NAGLEY OL | | | | DAYTON | OH | 45402 | |
| UNITIZE COMPANY INC | | 1101 NEGLEY PL | | | | DAYTON | OH | 45407 | |
| UNITIZE COMPANY INC | | OBIT SHEET METAL CO INC | 1101 NEGLEY PL | | | DAYTON | OH | 45407-2258 | |
| UNITIZE COMPANY INC | | ORBIT MOVERS & ERECTORS INC | 1101 NEGLEY PL | | | DAYTON | OH | 60062 | |
| UNITIZE COMPANY INC | | ORBIT MOVERS & ERECTORS INC | 1101 NEGLEY PL | NTE 9910131254311 | | DAYTON | OH | 45407 | |
| UNITIZE COMPANY INC | | S&D OSTERFELD MECH CONT INC | 1101 NEGLEY PL | | | DAYTON | OH | 45407 | |
| UNITIZE COMPANY INC EFT | | S&D OSTERFELD MECH CONT INC | FMLY OSTERFELD H J CO INC | 1101 NEGLEY PL | | DAYTON | OH | 45407 | |
| UNITIZE COMPANY INC EFT | | ORBIT SHEET METAL INC | 1101 NEGLEY PL | | | DAYTON | OH | 45407-2258 | |
| UNITOG CO | | 6800 CINTAS BLVD | | | | CINCINNATI | OH | 45262 | |
| UNITOOLS PRESS CZ AS | | HRANICKA 328 | | | | VALASSKE MEZIRICI | | 75701 | CZECH REPUBLIC |
| UNITRACK INDUSTRIES INC | | 967 EAST MASTEN CIRCLE | | | | MILFORD | DE | 19963 | |
| UNITRACK INDUSTRIES INC | | 967 E MASTEN CIR | | | | MILFORD | DE | 19963 | |
| UNITRAK | | 299 WARD ST | | | | PORT HOPE | ON | L1A 3W4 | CANADA |
| UNITRAK | | PO BOX 330 | | | | PORT HOPE CANADA | ON | L1A 3W4 | CANADA |
| UNITRAK CORP LTD | | 299 WARD ST | | | | PORT HOPE | ON | L1A 4A4 | CANADA |
| UNITROL CORP | | 3321 N LAPEER | | | | AUBURN HILLS | MI | 48326 | |
| UNITROL CORP | | 3321 N LAPEER RD | | | | AUBURN HILLS | MI | 48326 | |
| UNITROL ELECTRONICS INC | | 702 LANDWEHR RD | | | | NORTHBROOK | IL | 60062 | |
| UNITROL ELECTRONICS INC | | 702 LANDWEHR RD | | | | NORTHBROOK | IL | 60062-231 | |
| UNITRON ELECTRONICS | | PO BOX 81488 | | | | ROCHESTER | MI | 48308-1488 | |
| UNITRON ELECTRONICS CO | | PO BOX 81488 | | | | ROCHESTER | MI | 48308-1488 | |
| UNITY CREDIT UNION | | 28820 MOUND RD | | | | WARREN | MI | 48092 | |
| UNITY CREDIT UNION | | 6060 COLLECTION DR | | | | SHELBY TOWNSHIP | MI | 48318 | |
| UNITY CREDIT UNION | | 6060 COLLECTION DR | | | | SHELBY TWP | MI | 48318 | |
| UNITY MANUFACTURING CO | ACCOUNTS PAYABLE | 1260 NORTH CLYBOURN AVE | | | | CHICAGO | IL | 60610 | |
| UNITY MANUFACTURING COMPANY | | 1260 NORTH CLYBOURN AVE | | | | CHICAGO | IL | 60610-1792 | |
| UNITY SALES LLC | | 10331 DAWSON CREEK BLVD 8A | | | | FORT WAYNE | IN | 46825 | |
| UNITY SALES LLC | | 10331 DAWSON CREEK BLVD A | | | | FORT WAYNE | IN | 46825-1908 | |
| UNIV OF AL AT BIRMINGHAM | | DEEP SOUTH CTR FOR | OCCUPATIONAL HEALTH & SAFETY | SCHOOL OF PUBLIC HEALTH | | BIRMINGHAM | AL | 35294-2010 | |
| UNIV OF ILLINOIS AT CHICAGO | | FINANCIAL SERVICES MC557 | 809 SOUTH MARSHFIELD AVE | ROOM 116A | | CHICAGO | IL | 60612 | |
| UNIV OF MICHIGAN CANCER CENTER | | 301 E LIBERTY STE 130 | | | | MACOMB | MI | 48042 | |
| UNIV OF TULSA DEPT OF GEOSCIENCES | | 600 S COLLEGE AVE | | | | TULSA | OK | 74104-3189 | |
| UNIV PARK MOBIL SERV CTR | | 10619 BRADDOCK RD | | | | FAIRFAX | VA | 22032 | |
| UNIVAR USA INC | | 1686 E HIGHLAND RD | | | | TWINSBURG | OH | 44087 | |
| UNIVAR USA INC | | 2000 GUINOTTE AVE | | | | KANSAS CITY | MO | 64120-1537 | |
| UNIVAR USA INC | | 2600 GARFIELD AVE | | | | LOS ANGELES | CA | 90040 | |
| UNIVAR USA INC | | 3025 EXON AVE | | | | CINCINNATI | OH | 45241 | |
| UNIVAR USA INC | | 30450 TRACY RD | | | | WALBRIDGE | OH | 43465 | |
| UNIVAR USA INC | | 3320 S COUNCIL | | | | OKLAHOMA CITY | OK | 73179 | |
| UNIVAR USA INC | | 3320 S COUNCIL RD | | | | OKLAHOMA CITY | OK | 73179 | |
| UNIVAR USA INC | | 7425 E 30TH ST | | | | INDIANAPOLIS | IN | 46219-111 | |
| UNIVAR USA INC | | 7603 NELSON RD | | | | FORT WAYNE | IN | 46803 | |
| UNIVAR USA INC | | CHEMCARE | 6100 CARILLON POINT | | | KIRKLAND | WA | 98033 | |
| UNIVAR USA INC | | MCKESSON CHEMICAL CO DIV | 6000 CASTEEL DR | | | CORAOPOLIS | PA | 15108 | |
| UNIVAR USA INC | | PO BOX 34325 | | | | SEATTLE | WA | 98124-1325 | |
| UNIVAR USA INC | | PO BOX 409692 | | | | ATLANTA | GA | 30384-9692 | |
| UNIVAR USA INC | | PO BOX 849027 | | | | DALLAS | TX | 75284-9027 | |
| UNIVAR USA INC  EFT | HDQTRS | 17425 NE UNION HILL RD | | | | REDMOND | WA | 98052 | |
| UNIVAR USA INC  EFT | | PO BOX 409692 | | | | ATLANTA | GA | 30384-9692 | |
| UNIVAR USA INC AS SUCCESSOR IN INTEREST TO PRILLAMAN CHEMICAL CORP | | 6100 CARILLON POINT | | | | KIRKLAND | WA | 98033 | |
| UNIVAR USA INC EFT | | FRMLY VAN WATERS & ROGERS INC | PO BOX 409692 | ADD CHNG CS 07 06 04 CS | | ATLANTA | GA | 30384-9692 | |
| UNIVAR USA INC EFT | | FRMLY VOPAK USA INC | PO BOX 409692 | ADD CHNG CS 06 29 04 | | ATLANTA | GA | 30384-9692 | |
| UNIVAR USA INC SUCCESSOR IN INTEREST TO PRILLAMAN CHEMICAL CORP | | 6100 CARILLON POINT | | | | KIRKLAND | WA | 98033 | |
| UNIVER OF TEXAS AT SAN ANTONIO | | 6900 N LOOP 1604 W | | | | SAN ANTONIO | TX | 78249-0607 | |
| UNIVER OF TEXAS AT SAN ANTONIO OFFICE OF BUSINESS MANAGER | | 6900 N LOOP 1604 W | | | | SAN ANTONIO | TX | 78249-0607 | |
| UNIVER OF TOLEDO AT SEAGATE | | CENTRE UNIVERSITY COLLEGE | DIV OF CONTINUING EDUCATION | | | TOLEDO | OH | 43614-2798 | |
| UNIVER OF WISCONSIN WHITEWATER | | STUDENT ACCOUNTS OFFICE | HYER HALL RM 110 | 1111 RESEARCH DR | | WHITEWATER | WI | 53190 | |
| UNIVERA HEALTHCARE | JENNIFER RUBERTO | AN EXCELLUS COMPANY | 205 PK CLUB LN | | | BUFFALO | NY | 14221-5239 | |
| UNIVERA HEALTHCARE CNY INC | | 8278 WILLETT PKWY | | | | BALDWINSVILLE | NY | 13027 | |
| UNIVERA HEALTHCARE CNY INC | | FMLY HEALTH SERVICES MEDICAL | 8278 WILLETT PKWY | | | BALDWINSVILLE | NY | 13027 | |
| UNIVERSAL ADHESIVE SYSTEMS LTD | | UNIT 18 JAMES WATT CLOSE | | | | DAVENTRY | | NN11 5RJ | GB |
| UNIVERSAL AIR CONDITIONING | | COMPANY INC | 5935 EAST FLORENCE AVE | | | BELL GARDENS | CA | 90201-4627 | |
| UNIVERSAL AIR CONDITIONING CO | | 5935 E FLORENCE AVE | | | | BELL | CA | 90201 | |
| UNIVERSAL AIR CONDITIONING COMPANY INC | | PO BOX 2008 | | | | BELL GARDENS | CA | 90202 | |
| UNIVERSAL AM CAN LTD | A/R | 11355 STEPHENS RD | | | | WARREN | MI | 48089 | |
| UNIVERSAL AM CAN LTD | ATTN REBECCA C JOHNSON ESQ | 12755 E NINE MILE RD | | | | WARREN | MI | 48089 | |
| UNIVERSAL AM CAN LTD EFT | | 11355 STEPHENS RD | SCAC OITP | | | WARREN | MI | 48089 | |
| UNIVERSAL AM CAN LTD EFT | A R | 11355 STEPHENS RD | | | | WARREN | MI | 48089 | |
| UNIVERSAL AM CAN LTD EFT | | 11355 STEPHENS RD | | | | WARREN | MI | 48090 | |
| UNIVERSAL AMCAN | RICK GNACKE | 11355 STEPHENS | | | | WARREN | MI | 48089 | |
| UNIVERSAL AMCAN | RICK GNACKE | PO BOX 33297 | | | | DETROIT | MI | 48232 | |
| UNIVERSAL AMERICA INC | | 109 COILE ST | | | | GREENEVILLE | TN | 37743 | |
| UNIVERSAL AMERICA INC | | 109 COLLIE ST | | | | GREENVILLE | TN | 37744-1240 | |
| UNIVERSAL AMERICA INC | | PO BOX 1240 | | | | GREENEVILLE | TN | 37744-1240 | |

## **Exhibit C**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481-rdd

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION, et al.,


        Debtors.



- - - - - - - - - - - - - - - - - - - -x


                U.S. Bankruptcy Court

                One Bowling Green

                New York, New York


                August 20, 2009

                10:20 AM


B  E  F  O  R  E :

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

13

1   additional fact that would, I think, be implicated in the

2   litigation in that one of the principal OEMs that received the

3   CD players was General Motors, and General Motors waived a

4   substantial portion of their warranty claims in connection with

5   all the settlements that we had --

6           THE COURT:  So that would --

7           MR. BUTLER:  -- or dealt with.

8           THE COURT:  -- that would greatly reduce the fifteen

9   million in claims damages.

10           MR. BUTLER:  Arguably, Your Honor, it would.  I mean,

11   you know, you'd get in -- I think you'd get into an argument

12   about fungibility at the time, but that's what 9019 is designed

13   for us to assess.

14           THE COURT:  Right.

15           MR. BUTLER:  And, ultimately, the judgment reached was

16   this -- the settlements before Your Honor seem to be an

17   appropriate disposition of this litigation under these

18   circumstances.

19           THE COURT:  Okay.

20           Does anyone have anything to say on this motion?

21           All right, for the reasons stated in the motion, I'll

22   approve it as clearly a fair and reasonable settlement.

23           MR. BUTLER:  Your Honor, matter number 7 on the agenda

24   is the motion of Plymouth Rubber Company, LLC seeking to have

25   an administrative claim that was filed fifteen days after the

14

1    bar date to be deemed timely filed, at docket number 18714.

2    And counsel's here to present the motion.

3            THE COURT:  Okay.

4            MR. VINCEQUERRA:  Good morning, Your Honor.  James

5    Vincequerra, Duane Morris, for Plymouth Rubber Company, LLC.

6    I'll explain in a minute why I'm emphasizing the LLC.  With me

7    today is Kara Zaleskas from my -- Duane Morris' Boston office.

8            As a matter of housekeeping, Your Honor, Ms. Zaleskas

9    filed a pro hac vice motion approximately two weeks ago.  I

10   don't believe I saw the order on the docket yet.  I would just

11   ask, to the extent she is required to appear here --

12           THE COURT:  That's fine.  That's granted.

13           MR. VINCEQUERRA:  Thank you very much, Your Honor.  A

14   number of -- a lot of trees were killed in the filings in

15   connection with this matter.  We raise no less than five issues

16   as to why -- or reasons why our claim should be deemed timely

17   or should otherwise be -- or the new admin claims bar date

18   should not be deemed to apply to our claim.

19           I'm really going to focus here on two of the issues:

20   the improper notice issue first and then, to the extent that

21   Your Honor finds that the new bar date does apply to the claims

22   of Plymouth Rubber Company, LLC, the excusable -- the

23   components of excusable neglect.

24           I'll leave the balance of the arguments in our papers

25   with regard to the technicalities of the amended admin bar

15

1    date, or the new admin bar date, the efficacy of that

2    admitted -- or modification order and the informal notice to

3    our papers.  I think they're argued fairly clearly there.

4              THE COURT:  The informal proof-of-claim argument?

5              MR. VINCEQUERRA:  Yes, that's right.

6              THE COURT:  Okay.

7              MR. VINCEQUERRA:  I apologize.  I'll leave those to my

8    papers and reserve any statements on those for rebuttal to the

9    extent we deem it's necessary.

10             As an initial matter, do you have any questions about

11   the papers, Your Honor?  I'd be happy to answer them.

12             THE COURT:  Well, I've reviewed them, so -- I guess

13   the issue on whether it's Inc. or LLC, to my mind, is -- it

14   seems to me it's a non-issue because it was actually received

15   by the claimant, right?  It was received?

16             MR. VINCEQUERRA:  It was received the day after the

17   bar date.

18             THE COURT:  Well, no, I mean it was received by the

19   individual who forwarded it on.

20             MR. VINCEQUERRA:  Well, really, the -- I mean, the

21   point we're getting to is proper notice, I would imagine.  And

22   a couple of points.  The debtor to points to 2002(g) and

23   service on LLC first through the law firm Burns and Levinson

24   and then at the former address of the Plymouth Rubber, Inc.

25   entity.  A couple of points here, Your Honor.  Service was made

16

1    pursuant to outdated -- you know, an outdated claims --

2    outdated exhibit-and-schedules lists and based on a claim that

3    was filed by a different entity.  Service was effected on

4    counsel for a different entity.  Burns and Levinson LLC, which

5    makes up a bulk of the notice argument, never represented the

6    LLC entity.  I mean, and it's important to understand --

7         THE COURT:  Was there any -- is there anything in the

8    record about notice of Plymouth Rubber Company Inc.'s Chapter

9    11 case and reorganization by --

10        MR. VINCEQUERRA:  Delphi actively participated in that

11   case, Your Honor.

12        THE COURT:  How do I know that?

13        MR. VINCEQUERRA:  Excuse me?

14        THE COURT:  How do I know that?  Or will they

15   acknowledge that?

16        MR. VINCEQUERRA:  Well, I can't imagine they won't

17   acknowledge it, Your Honor, as they filed stipulations in that

18   case as well as, I believe, a claim.

19        THE COURT:  When did the plan confirm?

20        MR. VINCEQUERRA:  Plymouth Rubber Inc. confirmed its

21   plan and emerged from bankruptcy on August 31st, 2006.  And

22   maybe I should back up a little bit, Your Honor, and give you a

23   little bit of a time line here because that may be helpful.

24        THE COURT:  I mean, I know they sued LLC.

25        MR. VINCEQUERRA:  That -- you know, that's the rub

VERITEXT REPORTING COMPANY

17

1    here, Your Honor.  They served the objection -- the notice of

2    the new bar date on Inc. at seven different locations, or five

3    different locations, wherever it -- however many it was, served

4    counsel for Inc.  Burns and Levinson has never represented the

5    reorganized debtor, and -- but they got it right when they

6    wanted to sue the new entity under the new purchase order.

7            THE COURT:  But, again, Mr. Collins forwarded this

8    notice on to LLC, right?

9            MR. VINCEQUERRA:  Well, you're right, Your Honor,

10   they --

11           THE COURT:  And he was acting as LLC's agent, wasn't

12   he?

13           MR. VINCEQUERRA:  Right, as part of the wind-down

14   staff.  And if --

15           THE COURT:  Okay.

16           MR. VINCEQUERRA:  -- if Your Honor is -- you know,

17   wants it moved forward to the excusable neglect argument, which

18   I think is also a very good argument, I don't think the notice

19   was proper there.  I think, you know -- at footnote 3 of their

20   objection is very telling.  They note that for the purposes of

21   their objection they presume that LLC is the successor-in-

22   interest to Inc.  I'm not aware of any case law that says you

23   can get the benefit of that assumption for notice requirements

24   under an --

25           THE COURT:  But, again --

18

1          MR. VINCEQUERRA:  -- under an admin --

2          THE COURT:  -- Mr. Collins made the same presumption,

3     right?  He sent the notice on to LLC?

4          MR. VINCEQUERRA:  He did send it on, there's -- we do

5     not contest that fact.

6          THE COURT:  Okay.

7          MR. VINCEQUERRA:  So if you have no other questions

8     for me on the proper notice -- we don't contest the fact that

9     Mr. Collins did receive actual notice -- I can move on to

10    excusable neglect.

11         THE COURT:  Okay.

12         MR. VINCEQUERRA:  Debtors don't contest two components

13    of excusable neglect:  They don't contest that the -- regarding

14    the length of delay or Plymouth Rubber's good faith.  So,

15    really all that we're left with, Your Honor, is the prejudice

16    requirement and the reason for delay.

17         Mr. Butler indicated that a proof of claim was filed

18    fifteen or sixteen days after the bar date.  That's technically

19    true.  We alerted -- well, we alerted counsel for the debtor

20    the day after the bar date, asking them to deem the claim

21    timely filed; that's reflected in Ms. Zaleskas' affidavit.

22         But to get to the point of excusable neglect, Your

23    Honor, what happened here is really a perfect storm for my

24    client.  The prior entity, the Inc. entity, will have business

25    relationships with Delphi as a result of the Delphi bankruptcy

19

1   and things that happened which, to be quite honest with you, my

2   firm was not involved with.  They went into bankruptcy and

3   reorganized.  When they emerged from bankruptcy, they had new

4   equity, substantially new officers and directors, effectively a

5   new entity; entered into a new purchase order agreement with

6   Delphi on January 30th, 2008.  About nine months after that,

7   that's approximately a year and a half after, they emerged from

8   bankrupt -- the reorganized debtor emerged from bankruptcy.

9        Approximately nine months after entry into that

10  purchase order, Delphi sued Plymouth Rubber Company, LLC in

11  Michigan for breach of the contract, for breach of the purchase

12  order agreement.  Plymouth Rubber Company, LLC counterclaimed,

13  and that's the basis of our -- those are the bases of our --

14  that's the basis of our admin claims.

15       Six days after Delphi sued Yongel (ph.) -- the Yongel

16  Company, another -- a supplier of Plymouth Rubber Company also

17  sued Plymouth Rubber Company, LLC.  And in that case as well,

18  Plymouth Rubber Company filed counterclaims both against Yongel

19  and Delphi.

20       Both those cases were consolidated for mediation

21  purposes and they're in global mediation.  The -- as a result

22  of the lawsuits from their principal buyer and their principal

23  supplier, Plymouth Rubber Company, LLC started its own line

24  down in October of 2008 and approximately three months after

25  that laid of all of its employees.  And that's where we have,

1    you know, the sole employee of the debtor, Mr. Collins.

2         So, you know, it's important to remember -- oh, let me

3    jump -- I'm sorry, excuse me, Your Honor, let me jump to the

4    portions of excusable neglect that are in dispute:  reason for

5    delay.  We laid out some of these facts because, I mean,

6    clearly there is a legitimate reason for Plymouth Rubber

7    Company, LLC's one-day delay in providing notice to the debtors

8    with regard to their admin claim.

9         THE COURT:  I guess my one issue with that is why

10   didn't Mr. Collins open the envelopes?

11        MR. VINCEQUERRA:  Why did he open the envelopes?

12        THE COURT:  Why didn't he?

13        MR. VINCEQUERRA:  Why didn't he?

14        THE COURT:  Right.  I mean, he got them on the 9th.

15   He put them -- it doesn't say this, but I guess one can infer

16   that he didn't open them, he put them in another envelope and

17   mailed them to Mr. -- it begins with an S, let me get the right

18   name -- Mr. Schultz.

19        MR. VINCEQUERRA:  Yes, that's right.  His name is --

20        THE COURT:  I don't understand why he didn't open the

21   envelopes, because they weren't received by Mr. Schultz until

22   six days later.  I mean, particularly if he'd been waiting --

23   if they'd been -- you know, if he only checks the P.O. box

24   every two weeks, I don't understand why he wouldn't have opened

25   the envelopes.

21

1          MR. VINCEQUERRA:  Well, I mean, it's not in his

2     papers, Your Honor, and anything I say would be pure, you know,

3     suspicion and guesswork.  But the fact of the matter is that

4     the notices were not addressed to the entity that employed him.

5     They were addressed to an Inc. -- the Inc. entity.  So, LLC

6     never filed a notice of appearance in this case, has never

7     appeared in this case until this dispute, and they never felt

8     that they had a need to appear in this case because they were

9     party to a post-petition contract that, under the prior plan,

10    gave them an allowed amended claim.

11         So, I mean, while it's pure, you know, circumspection

12    as to why he did not open the letter for a day and put it in

13    regular mail, the letter wasn't addressed to the entity that

14    employed him and the entity that's in wind-down.

15         THE COURT:  Well, it didn't employ Mr. Schultz either,

16    did it?

17         MR. VINCEQUERRA:  No, it did not.  So, Your Honor, to

18    continue on with reason for the delays, you know, there was an

19    aggressive timetable here for the bar date, from the height of

20    the holiday season.  We're in -- Plymouth Rubber Company, LLC

21    is in its own wind-down, is on a short staff, and I think that

22    there's ample justification here for the reason of delay -- for

23    the reason for delay.

24         To move to the other component that's in contest, as

25    to prejudice, I don't see, you know, any realistic manner of

22

1    prejudice here for the debtors.  They learned of the claim one

2    day after the bar date.  There's no contest that Ms. -- there's

3    no question that Ms. Zaleskas -- I mean, it's not contested

4    Ms. Zaleskas alerted the debtors to the claim the day after the

5    bar date.  The claim was filed a week and a half to two weeks

6    later, followed shortly by this motion.  The claim is an

7    unliquidated amount, is in the nature of a counterclaim, you

8    know, brought as a response to suits against Plymouth Rubber

9    Company, LLC.

10        My understanding from my reading of the plan and

11   disclosure statement in this case and some things in the news

12   is admin claims are anticipated to be paid in full, and there

13   are literally hundreds of millions of dollars of admin claims.

14        So I see very little chance for prejudice there.  The

15   debtors make the argument that -- you know, the classic

16   floodgates argument that you commonly see in pioneer type of

17   cases.  The facts of this case are so unique I really don't see

18   that as a reasonable prospect.  Two creditors of the debtors

19   with substantially similar names but different entities, you

20   know, the claimant being in wind-down, I just don't see the

21   floodgates opening here.

22        So with that, Your Honor, if you have no questions,

23   I'll turn it over to, I guess -- is it Mr. Powlen?

24        MR. POWLEN:  Yeah.

25        THE COURT:  Is it -- was it a compulsory counterclaim?

23

1    Does it arise under the same transaction or occurrence?

2         MR. VINCEQUERRA:  Rises under the same purchase order

3    agreement.

4         THE COURT:  Okay.

5         MR. VINCEQUERRA:  Thank you very much, Your Honor.

6         MR. BUTLER:  Judge, just one moment, if you don't

7    mind.

8      (Pause)

9         MR. BUTLER:  Your Honor, I just want to make sure the

10   record is clear here.  I have, and I think counsel will

11   acknowledge that we obtained, and I have for the Court, a

12   certification of conversion from a corporation to a limited

13   liability company of Plymouth Rubber Company, Inc., a

14   Massachusetts corporation.  It's -- it is the same company.  I

15   mean, we hear that it's different companies and not successors.

16   I actually have the documentation from the State of Delaware

17   Secretary of State's Office that we obtained that shows that on

18   September 1st, 2006 the same legal entity was converted from

19   one kind of corporation in Delaware to another kind of

20   corporation in Delaware.

21        So, I mean, I think the suggestion that these are

22   fundamentally different entities just is not accurate.  And

23   I've got the evidence here.  I don't think that counsel,

24   Mr. Vincequerra, would dispute the Secretary of State of

25   Delaware as to what the entity is, and I have that.

24

1          So this is the same legal entity that was converted on

2     the -- on September 1st.

3          Second, Your Honor, Mr. Vincequerra, in his argument,

4     made a major point about the fact that there was a new purchase

5     order in January of 2008.  And, in fact, there was a purchase

6     order that was reissued on -- in January of 2008 after the 2006

7     reorganization to Plymouth Rubber, and it was purchase order

8     number P6850008, and it was issued to the address 500 Turnpike

9     Street in Canton, Massachusetts.  That was the business address

10    that the parties New Plymouth, Plymouth LLC, whatever one wants

11    to call it, that is the address that Plymouth used with Delphi

12    in connection with the new purchase order that Mr. Vincequerra

13    referred to, and the PO was issued to that address.  And the

14    notice of administrative claims bar date was -- one of the

15    places that it went to was to that address in Canton.

16         And so I think that the -- you know, the argument that

17    the notice, in addition to being actually received, it also was

18    the business address that Delphi and Plymouth Rubber Company,

19    LLC used between themselves in the January 2008 purchase order

20    and was the appropriate business address.

21         I don't think, Your Honor, that this matter should

22    turn in any respect on the issue of notice.  Appropriate notice

23    was given; it was given in connection with -- to the

24    appropriate -- you know, the legal entity, which really was the

25    same entity converted, to the business address that was used in

25

1    the 2008 contract between the companies.  And the notice was

2    actually, in fact, received.

3           I think the question is more the excusable neglect

4    question here, and I only have a few comments on that.  First,

5    we acknowledged in our papers that we did receive a call from

6    counsel the day after the bar date.  That isn't unusual.  We

7    receive those kinds of calls fairly regularly when there are

8    bar date issues, and our response is always the same, which is

9    it's not our bar date to change, it's the Court's bar date, and

10   that we don't have any ability to change the date and people

11   need to take whatever steps they need to take to protect their

12   clients.  And the same kind of -- the same discussion was had

13   with counsel for Plymouth Rubber.

14          The fact that they waited a couple of weeks -- and it

15   wasn't just a week, it was the fact they waited until after the

16   plan modification hearing to submit the proof of claim two

17   weeks later, is -- you know, kind of mystifies me as to why

18   they chose to do that.  But that's not excusable neglect.  They

19   could have filed something the next day.  According to

20   Mr. Vincequerra's argument, it would have been -- you know, all

21   they needed to do was to file an administrative claim that

22   attached the lawsuit and that that would have done that.

23          I think when you look at the -- from the company's

24   perspective, the issue here is -- Your Honor, I think, knows

25   from the plan modification hearing and all of the pleadings

26

1  filed in connection with that, Delphi was on a mission over the

2  last fifteen, sixteen months since the prior plan, before it

3  was modified, hadn't gone effective, to try and develop a

4  solution for these cases that would be successful, that would

5  involve modifying the plan, emerging pursuant to a plan and

6  providing for the payment of administrative expenses that are

7  allowed.  And that took an enormous amount of effort and

8  negotiation to do that.  And one of the things, the processes

9  we went through in the latter part of July, was to assess all

10  of the claims that were made in connection with the bar date

11  and to evaluate those with our chief restructuring officer and

12  with the representatives of our other major stakeholders,

13  particularly with the -- some of the advisors of the DIP

14  lenders in connection with their credit bid so that we were all

15  comfortable in proceeding on the 29th here.  And that was based

16  on having an assessment of what the world of administrative

17  claims was through July -- or through May 31st, understanding,

18  as Your Honor knows, under the modified plan that's now been

19  approved, the -- there's another window bar date that's going

20  to go out covering June 1st through the anticipated effective

21  date of September 30th.

22      But making the assessment of what the unpaid

23  administrative claims were from the -- from October 5, 2005

24  through May 31, 2008 was a real exercise in connection with

25  preparing for the plan modification hearing.  And the fact that

27

1   counsel or their client chose not to file the claim for a

2   couple of weeks after they had actual notice and they had had

3   actual conversations with us I don't think fits within the

4   factors of excusable neglect.

5        That's all, Your Honor, the debtors would have to say

6   on this.

7        THE COURT:  Well, let me explore that a little bit

8   more.  Is there or was there an estimate of allowed

9   administrative claims that was a factor in the DIP lenders and

10  GM going forward on the 29th to propose the winning plan

11  support agreement and lead to the modified confirmation --

12       MR. BUTLER:  Yes, Your Honor.  You --

13       THE COURT:  -- of the plan?  Because, I mean, I don't

14  remember any testimony --

15       MR. BUTLER:  No.

16       THE COURT:  -- on, you know, some floor that -- or

17  some ceiling for administrative claims or anything.

18       MR. BUTLER:  No, there's not, Your Honor.  There was

19  not.  What Your Honor may recall was that one of the charts

20  that we put up and went through explained how the

21  administrative liabilities were going to be allocated among the

22  parties.

23       THE COURT:  Right.

24       MR. BUTLER:  It was intentional that -- and one of the

25  things we fought for in the MDA was not to have dollar cap

28

1    limitations.  There were, in fact -- that was a subject of

2    protracted negotiation, actually, as to whether or not there

3    would be limitations and what those liabilities would be and,

4    instead, the agreement was to do it by category.  And Your

5    Honor saw those categories allocated between the GM entity, the

6    DIPCo entity and DPH Holdings, the reorganized entity.

7            THE COURT:  Right.

8            MR. BUTLER:  And there was also a focus, and Your

9    Honor may recall that Mr. Stipp, in his sworn testimony,

10   provided in his declaration a fair amount of discussion about

11   the assessment of administrative claims as it related to DPH

12   Holdings' ability to be able to deal with its -- or what it

13   needed to satisfy as it moved forward.  And so there was an

14   assessment that went on, there was -- Mr. Stipp did make those

15   evaluations and make those assessment, and there was that, if

16   you will, sort of informal feasibility discussion among the

17   parties.  Ultimately, that didn't arise to the level, Your

18   Honor, of having -- beyond the sworn testimony, there wasn't

19   any controversy at the plan modification hearing about it

20   because ultimately it had been negotiated out.

21           THE COURT:  So which of the three entities would be

22   responsible for any affirmative recovery here?

23           MR. BUTLER:  Without prejudicing the estate, because I

24   may get this wrong, but my sense is that this is a retained

25   liability of DPH Holdings.  I don't know that this -- and the

29

1    reason I say that is because this supplier no longer does

2    business with the company.  This is a -- but I'd have to check

3    that in terms of -- go back and check that under the plan in

4    the negotiations.  But this is a supplier -- this is a former

5    supplier who, from the company's perspective, failed to live up

6    to its obligations under the purchase order, and it required

7    Delphi to incur a very substantial expense in re-sourcing from

8    the supplier who failed to live up to the terms of their

9    contract in the company.  And that's only why we sued them, and

10   we re-sourced the product.

11        So I think the re-sourced product and the

12   administrative liabilities associated with them go to, in fact,

13   DIPCo, but I think that the exposure under this litigation is

14   likely a DPH Holding obligation.  But I'd have to confirm that,

15   Judge.  That's my best recollection.

16        THE COURT:  Okay.  Well --

17        MR. BUTLER:  And as you know, DPH Holdings --

18        THE COURT:  It wouldn't be -- I guess it wouldn't be a

19   GM one because this isn't a GM plant --

20        MR. BUTLER:  No, it's not -- no, no, it's -- and

21   that's what I'm saying to you.  My -- and I think Ms. Kraft

22   (ph.) is here from the company and we just told her about

23   this -- my believe is the retained liability for the litigation

24   exposure would be DPH Holdings.  And the supplier contract for

25   what was the re-sourced contract, which is with another entity,

30

1    that obligation and the administrative claims associated with

2    it, that went to DIP Holdco, or will go to DIP Holdco.

3            THE COURT:  Okay.

4            MR. BUTLER:  I think that's the proper -- at least

5    that was the philosophy behind the negotiation at the time.

6            THE COURT:  All right.  And it looks like to me the

7    counterclaim -- you can correct if I'm wrong -- the

8    counterclaim just seeks monetary damages, right?  It doesn't

9    seek specific performance or anything like that?

10           MR. BUTLER:  That's correct.

11           THE COURT:  It's an unliquidated claim.  Have there

12   been any discussion as to what the damages are asserted to be

13   as far as the counterclaim?  Either one of you --

14           MR. BUTLER:  There was, Your Honor -- I'm advised, and

15   Mr. Vincequerra may know, I was advised it was a mediation.  I

16   don't know what was --

17           THE COURT:  Right.

18           MR. BUTLER:  -- put on the table at the mediation.

19           THE COURT:  I mean, I don't want you to reveal

20   settlement proposals, but, just, has there been a settlement of

21   what the damages could be?

22           MR. VINCEQUERRA:  Yes, Your Honor, that's the irony of

23   this whole thing for my client is that while this bar date

24   procedure has been going on, my client has been across the

25   table --

31

1       THE COURT:  No, I know there's been a mediation.  I'm

2    just trying to figure out what --

3       MR. VINCEQUERRA:  No, there have been -- you know, a

4    mediation is fairly far along.  There have been numbers

5    exchanged.

6       THE COURT:  I don't want to hear settlement proposals.

7    What I'm focusing on here is, on the issue of prejudice, you

8    had made a good point that these claims are going to be paid in

9    full under the modified plan.  The point I've just been

10   exploring with Mr. Butler is who's going to be paying them.  If

11   it is, as it would appear to me to be the case just from the

12   nature of the claim and the MDA, the remaining holding company,

13   the debtor wind-down company, then I did make a conclusion as

14   part of my ruling approving the modification of the plan that

15   that modification was feasible, and that was premised upon the

16   testimony about the likely amount of administrative claims and

17   the funding of the successor entity and the like.

18      So the reason I'm asking this question is to find out

19   how large your claim is.  It wasn't taken into account in that

20   testimony, and it was a large claim that may affect the

21   prejudice calculation.  I just don't know.  I mean, it's an

22   unliquidated claim.  I don't know whether it's large or not but

23   whether it's, you know, something that, for example, pales in

24   comparison to the debtors' claim.

25      So I'm not asking you about settlement discussions;

32

1    I'm asking what's been asserted, unless you want to tell me

2    what you think the realistic number is.  But that's up to you.

3           MR. VINCEQUERRA:  It's difficult to say , Your Honor,

4    because, to be quite honest with you, I haven't been involved

5    in the mediation.  I understand from our mediation statement

6    that that counterclaim number that we've been stuck at is

7    roughly twenty million dollars.  Again, that's as a

8    counterclaim that would be, obviously, offset against any

9    successful recovery that they have against us.

10          THE COURT:  Although it would seem to be it's

11   either/or, right?  Unless you settle it, either they breached

12   or you breached.  So I'm not sure there'd be much of an offset.

13          Okay.  All right.

14          MR. BUTLER:  Your Honor, that's all the debtors

15   have --

16          THE COURT:  Well --

17          MR. BUTLER:  -- unless you had a question.

18          THE COURT:  -- let me ask you, though, based upon a

19   twenty million dollar claim, how does that affect the -- was

20   any liability for this taken into account in the declarations

21   in support of the modification of the plan?

22          MR. BUTLER:  My understanding is the answer to that

23   question is no, there was no money allocated to this amount

24   through the -- whether the claims process was evaluated.

25          The -- and, you know, Your Honor, there has been a

33

1   wide variety of lawsuits started, stopped in hiatus, since

2   October of 2005.  And the debtors relied on the administrative

3   claims process here that went out to everybody as -- to catch

4   the claims that people were going to assert as part of the --

5   to understand as part of the plan modification process.

6        THE COURT:  And, again, this claim came in after the

7   plan modification hearing.

8        MR. BUTLER:  Correct.  It came in on the June 30 -- on

9   July 30th --

10       THE COURT:  The hearing was on the 29th.

11       MR. BUTLER:  -- and where the hearing was July 29th.

12   And the assessment was actually made in the days -- we spent

13   three or four days leading up to the July 29th hearing going

14   over this evaluation and assessment.

15       THE COURT:  Okay.

16       MR. BUTLER:  And I think -- you know, I don't have

17   Mr. Stipp here, Your Honor, but Ms. Kraft is here and she works

18   closely with Mr. Stipp.  I think that Mr. Stipp would tell you

19   that if he had an extra twenty million dollar -- if in fact,

20   taking their -- I think we disagree vigorously with the claim,

21   but if you add another twenty million dollars of litigation

22   exposure to the pot, would that be material, I think Mr. Stipp

23   would say yes, it's material.

24       THE COURT:  Well, what was funding again for --

25       MR. BUTLER:  Remember, the funding from -- I think it

34

1    was -- the entire funding from General Motors was fifty

2    million; plus, we had the plants that were retained which we

3    could sell off; plus, we had --

4            THE COURT:  But those are more dogs and cats than --

5            MR. BUTLER:  They were.

6            THE COURT:  Right.

7            MR. BUTLER:  Plus, we had the avoidance actions, to

8    the extent that there's collectability on some of the avoidance

9    actions.  And there were some other -- there were some -- I

10   think some other MRA payments, I think, from General Motors or

11   a few other sources of revenue.  But it was calibrated.  It

12   was -- you know, it was designed, as you know, to provide for

13   an efficient disposition of all of those assets and remediation

14   of the -- of some of the other issues and payment of the

15   liabilities.  So I think Mr. Stipp would argue that twenty

16   million was material in that calculation.

17           THE COURT:  Okay.

18           MR. BUTLER:  Thanks, Judge.

19           THE COURT:  Okay.

20           MR. POWLEN:  Just one minor point, Your Honor.

21   Mr. Butler -- I don't know if he passed it up, because I didn't

22   see him pass it up, but makes much of the fact that the

23   entities -- the LLC entity and the Inc. entity are the same.  I

24   know Your Honor said actual -- there was -- you know, the

25   notice was received, but they're the same entities.  And I know

35

1   Mr. Butler's familiar with the concept of a fresh start and a

2   reorganized debtor, but they're the same entities as they would

3   be in any post-effective date debtor that has entirely new

4   equity and has a fresh start in a bankruptcy.  That this was

5   not accomplished through a 363 sale and a transfer of assets

6   but rather an infusion of equity and a stock deal doesn't

7   change the fact that at the end of the day they were dealing

8   with a newly born entity.

9           Other than that, Your Honor, I have nothing further.

10  Thank you very much for your time.

11          THE COURT:  Okay.

12          Is -- neither Mr. Collins nor Mr. Schultz is here,

13  right?

14          MR. POWLEN:  No, Your Honor.

15          THE COURT:  They're not present?

16          MR. POWLEN:  No, Your Honor.  We had discussions with

17  Skadden, and prior to the hearing we agreed that we would just

18  rely on the affidavits.

19          THE COURT:  Okay.

20          Okay, anyone else?

21          Okay, I have before me a motion by Plymouth Rubber

22  Company, LLC for an order deeming its administrative expense

23  claim timely filed or for related relief.  The origin of this

24  dispute is that, in connection with proceeding to obtain the

25  modification and ultimate consummation of its confirmed but

36

1    unconsummated Chapter 11 plan, Delphi Corporation and its

2    affiliated debtors sought approval of an administrative claims

3    bar date for the Chapter 11 period through May of 2009.  The

4    debtors' confirmed Chapter 11 plan was not consummated because,

5    asserting breaches, the plan investors under that plan refused

6    to close in April of 2008.  That left Delphi with a significant

7    hole in the required funding for the confirmed plan.  Delphi

8    then spent close to a year dealing with ways to plug that hole

9    as well as to address the further deterioration in the

10   financial markets and in their perception of Delphi's value,

11   which led to a substantially different approach, ultimately, to

12   their exit from Chapter 11 under a Chapter 11 plan.

13          The debtors, in assessing their ability to emerge from

14   Chapter 11, and having entered into an agreement with an entity

15   called Platinum, as well as General Motors, that would have

16   provided for that combined entity's acquisition of most of the

17   debtors' business operations in return for sufficient cash to

18   deal with a portion of the administrative claims against the

19   debtors, plus stock -- I'm sorry, plus forms of contingent

20   consideration -- having entered into that transaction, the

21   debtors determined that they needed prompt means to calculate

22   the outstanding administrative claims other than the debtor-in-

23   possession financing claims against them, and, therefore,

24   obtained from the Court, in connection with establishing

25   procedures for consideration of the proposed modification to

37

1    the Chapter 11 plan involving GM and Platinum, the

2    administrative claims bar date.

3        The bar date notice provided for, for purposes of a

4    bar date, fairly short notice, but given the timing constraints

5    that the debtors faced, including, in essence, a week-to-week

6    extension of enforcement of remedies under the DIP facility and

7    a clear and short deadline from GM and Platinum, such notice

8    was appropriate under the circumstances.

9        The debtors sent out the notice and received timely

10   administrative claims from approximately 2,400 claimants.  The

11   claims procedures motion that is on the calendar for later

12   today states that approximately one billion dollars of

13   administrative claims were asserted in those proofs of claim,

14   plus unliquidated amounts.

15       Ultimately, the proposed modified plan was itself

16   modified, although not materially so for purposes of the issues

17   before me today -- and instead of Platinum acquiring

18   significant assets under the plan, along with GM, Platinum was

19   replaced by the debtors after an auction process by a

20   consortium of the debtor-in-possession lenders.  And that

21   group, plus GM, entered into an MDA with the debtors, which

22   formed the basis for the modified plan.  The Court held a

23   hearing on that modification and approved it on July 29th, two

24   weeks after the administrative claims bar date.

25       The rough structure of the plan provides for the

38

1    continuation of most of the debtors' businesses, either in the

2    hands of a GM acquisition company with respect to certain

3    facilities that primarily manufacture parts for GM vehicles, as

4    well as other assets that would go to the DIP lender

5    acquisition group.

6         The third split of the debtors' assets would be

7    retained by the debtors, since neither GM nor the DIP

8    acquisition group wanted to acquire them.  In addition, that

9    entity that would continue to hold those assets would receive a

10   cash payment by GM to enable that entity to pay administrative

11   claims against it that were not being assumed in connection

12   with the purchase of ongoing operations by the DIP acquisition

13   vehicle and GM acquisition vehicle.  And that amount of cash

14   was determined by the debtors in consultation with various

15   constituents, including GM, to be sufficient to have the

16   surviving debtor entity meet its obligations under the plan,

17   including the payment of allowed administrative claims.

18        The Court took testimony on that aspect of the

19   proposed plan modification in the form of an affidavit by

20   Mr. Stipp, in which he went through his analysis of likely

21   sources and uses of cash to pay that entity's administrative

22   claims.  No one cross-examined Mr. Stipp.  And based upon my

23   review of the MDA, the modified plan and the affidavits

24   submitted in support thereof, I concluded that the plan, as

25   modified, was feasible: that is, that it was not likely to be

39

1   succeeded by a liquidation under Chapter 7 and that it could be

2   performed, including the payment of administrative claims, as

3   contemplated by the plan.

4        The debtors sent out notice of the administrative

5   claims bar date as required by my order establishing the bar

6   date, and notice was actually received by Plymouth Rubber

7   Company, Inc. on -- it is acknowledged to have been received by

8   Plymouth Rubber Company, Inc. on July 9, 2009.  That's set

9   forth in the affidavit in support of Plymouth's motion of

10  Mr. Collins.

11       The debtors sent that notice to the address in their

12  post-petition purchase order between them and Plymouth Rubber

13  Company, LLC -- the same location.  The address on the envelope

14  was to Plymouth Rubber Company, Inc., which had been the entity

15  with which the debtors had done business prior to Plymouth's

16  Chapter 11 reorganization.

17       Mr. Collins, as I said, received the notice, which was

18  also sent to numerous other locations to Plymouth Rubber

19  Company, Inc., including to the counsel that filed the proof of

20  claim on behalf of Inc. in the Chapter 11 case.  Mr. Collins

21  did not open the notice but, instead, on July 10th, put it, and

22  apparently some other correspondence, in an envelope and

23  forwarded it to Mr. Schultz, who is described in the Collins

24  affidavit as a representative of Plymouth Rubber, LLC's parent,

25  or at least an affiliate, retained to manage Plymouth's

40

1    affairs, Versa Capital Management, Inc., which also manages the

2    funds which directly own the equity interest in Plymouth

3    Rubber.

4         Although mailed on July 10th, according to

5    Mr. Collins, the notice was not received by Mr. Schultz until

6    July 16th, at which point Mr. Schultz, unlike Mr. Collins,

7    opened the package, read the notice and immediately contacted

8    the debtors, seeking an extension of the bar date, which was

9    not agreed to.

10        It's undisputed that Plymouth did not file the proof

11   of claim and/or seek approval of an extension until July 30th,

12   after the plan modification hearing.

13        Plymouth requests that the Court consider its

14   administrative claim timely on a number of different grounds,

15   although most of the focus, properly so, of this hearing, has

16   been on the ground of excusable neglect.  Before I deal with

17   that issue and those factors, let me briefly deal with the

18   other bases for Plymouth's requested relief.

19        First, Plymouth contends that the Court did not have

20   power to establish the administrative claims bar date, given

21   the treatment of the administrative claims bar date in the

22   original plan and the confirmation order.  The plan itself

23   contemplated, in the definition of "administrative claim," the

24   potential for establishing a different administrative claims

25   bar date than was set forth in the plan, which was a date

41

1    forty-five days after the confirmation of the plan.  The plan

2    also reserved fully the debtors' rights in the event that the

3    plan did not go effective, which clearly was the case.

4         That plan, as I noted, contemplated a very different

5    outcome for creditors than the current modified plan.  Not only

6    was there no issue of the payment of all administrative claims,

7    requiring no determination, as a practical matter, by the Court

8    as to feasibility for potential failure to cover administrative

9    claims, but also the plan provided for full payment of

10   unsecured creditors at a deemed plan value, and a substantial

11   return to shareholders.  Consequently, the plan's

12   administrative claims bar date provision was appropriate for

13   that structure -- again, one where there was really no issue as

14   to whether the debtors would be able to pay all asserted

15   administrative claims.

16        The confirmation order similarly provided for a forty-

17   five day post-confirmation administrative claims bar date and

18   stated that it would govern in light of -- in the event of a

19   conflict between the plan and the confirmation order.  And

20   clearly it was an extant order.  However, the debtors' need to

21   set an earlier bar date, given the changes to their plan, was

22   clear and required the establishment of a different bar date,

23   clearly, in the context of the deadlines they were facing.  The

24   Court considered such a request to be appropriate, both in

25   light of the rights that the debtors reserved for themselves

42

1   under the confirmed but not consummated plan, as well as under

2   the Court's ability to amend the confirmation order, which on

3   this point, was quite clearly outdated.

4          Therefore, I believe that Plymouth's argument that the

5   Court exceeded its authority in setting a new administrative

6   claims bar date order, and that Delphi and the other parties

7   should be governed in this respect by the terms of the

8   confirmed plan and the confirmation order entered in 2008, is

9   not well taken and is denied.

10          Next, Plymouth argues, as a matter of due process,

11  that the notice to it of the administrative claims bar date was

12  deficient.  It does so on two grounds.  The first is that it

13  asserts the debtors were involved in post-petition litigation

14  commenced by the debtors in state court in Michigan against

15  Plymouth as well as subsequent litigation commenced by a third

16  party in Massachusetts.  The second is that the debtors knew

17  that Plymouth was represented by counsel in that litigation,

18  and, therefore, that in addition to the other places that the

19  debtors provided Plymouth with notice, they should have

20  provided notice to litigation counsel in the Michigan and

21  Massachusetts litigation. It should be noted that those counsel

22  did not file a notice of appearance in the Chapter 11 case and

23  that, in fact, they have not appeared in the Chapter 11 case

24  until this current motion.

25          The motion relies upon, primarily, on this point, In

43

1    re Grand Union Company, 204 B.R. 864 (Bankr. D. Del. 1997), in

2    which the bankruptcy court concluded in that case that the

3    debtors' direct mailing of notice to personal injury tort

4    claimants represented by counsel was inadequate notice of the

5    bar date, and that the notice should have been provided to the

6    personal injury counsel that Grand Union was dealing with.

7    That case flies in the face of a number of cases in the Second

8    Circuit, including in the Southern District of New York, which

9    state that notice requirements under the Bankruptcy Code,

10    including in respect of bar dates (and notices of similar

11    consequence), do not have to be sent to counsel representing

12    the claimant, but may instead only be sent -- or need only,

13    instead, be sent to the claimant itself.  See, for example, In

14    re Brunswick Baptist Church v. Brunswick Baptist Church, 2007

15    U.S. Dist. LEXIS 3319 (N.D.N.Y. Jan. 16, 2007); In re

16    Alexander's Inc. 176 B.R. 715 (Bankr. S.D.N.Y. 1995); In re

17    R.H. Macy & Company Inc. 161 B.R. 355 (Bankr. S.D.N.Y. 1993);

18    and Dependable Insurance Company v. Horton, 149 B.R. 49 (Bankr.

19    S.D.N.Y. 1992).

20          I should note further that Judge Walsh, in the Grand

21    Union case, made it clear that he was focusing on the unique

22    facts before him, where he found that the claimants who

23    received the notice were unsophisticated and that all dealings

24    in respect of their claims had previously been through their

25    respective counsel.  Clearly, Plymouth is not an

44

1     unsophisticated tort claimant here.

2          Consequently, based on the rationale of the Brunswick

3     Church case and the other cases I've cited, I do not believe

4     that the debtors were required to give notice to counsel of

5     record in the pending litigation, particularly as, as I noted,

6     that counsel had not appeared in the Chapter 11 case.

7          In addition, Plymouth contends that it filed through

8     its counterclaim in the pending non-bankruptcy litigation an

9     informal proof of claim that should be recognized by the Court,

10    and clearly that that proof of claim was timely in that it was

11    well before -- the counterclaim was filed well before the

12    expiry of the administrative claims bar date.  The argument,

13    however, again runs afoul of case law in this district and the

14    majority of the cases, including at the circuit court level

15    elsewhere: that is, that the document giving rise to the

16    informal proof of claim was not filed in this Court, but

17    rather, instead, only in the courts in Michigan and in

18    Massachusetts.

19         I should note that the cases that deal with this issue

20    are generally dealing with pre-petition claims.  But given the

21    practice of treating claims and disputes related to missed bar

22    dates for administrative claims the same way as the courts

23    treat missed bar dates for pre-petition claims, I find those

24    claims to be analogous -- those cases, I'm sorry, to be

25    appropriate here, and for all intents and purposes on all

45

1    fours.  For the close analogy see -- between disputes in

2    respect of late administrative claims and disputes in respect

3    of late pre-petition claims, see In re PT-1 Communications Inc.

4    386 B.R. 402 (Bankr. E.D.N.Y. 2007).

5          The informal proof of claim rule, as far as I can see,

6    has always, in the Second Circuit and in the Southern District,

7    been applied to claims that were not filed in the form of a

8    proof of claim, but that were filed in the bankruptcy court,

9    that show an intention to make a demand for money from the

10   debtors' estate.  See In re G.L. Miller & Company Inc. 45 F.2d.

11   115 (2d Cir. 1930), as well as the statement of the four-factor

12   test -- factor one of which is that the claim, the documents

13   have been timely filed with the bankruptcy court and had become

14   part of the judicial record -- in In re Enron Corporation 370

15   B.R. 90 (Bankr. S.D.N.Y. 2007).

16         The rationale for this, again, is the collective

17   nature of a bankruptcy case and the need to put more than just

18   the debtor on notice of the existence of the claim.  See also

19   In re M.J. Waterman & Associates Inc. 227 F.3d. 604 (6th Cir.

20   2000), and In re Trans World Airlines Inc. 182 B.R. 102 (D.

21   Del. 1995), which was reversed in part and affirmed in part,

22   reversed on other grounds, at 96 F.3d. 687 (3d Cir. 1996).

23   Consequently, I don't believe that the complaint or the

24   counterclaim asserted in the Massachusetts District Court

25   action and the Michigan State Court action would constitute an

46

1    informal proof of claim.

2         Lastly, the movant contends that notice was improper

3    because it was delivered, albeit at the same address, to

4    Plymouth Rubber Company, Inc. as opposed to Plymouth Rubber

5    Company, LLC.  The change in name resulted from the Chapter 11

6    reorganization of Plymouth Rubber Company, Inc., which is the

7    entity that had filed the proof of claim against the debtor's

8    estate.  The emerged, reorganized debtor changed its name to

9    Plymouth Rubber Company, LLC as the successor to Plymouth

10   Rubber Company, Inc., and that was the entity, again at the

11   same address, with which the debtor contracted post-petition

12   under the contract that is now the subject of the dispute in

13   Michigan and Massachusetts.

14        Plymouth contends that because the notice was sent to

15   "Inc." as opposed to "LLC," albeit at the same address, that

16   notice was constitutionally deficient.  Under the facts before

17   me, however, I do not accept that argument.  As set forth in

18   Mr. Collins' affidavit and in the motion itself, Mr. Collins

19   was the sole employee of Plymouth Rubber after it had

20   determined to wind down its affairs.  He was retained by the

21   managing - or manager for Plymouth Rubber, LLC as well as the

22   manager for other investments owned by the fund that owned the

23   debtor, Versa Capital Management.  And I believe that, as

24   evidenced by the fact that Versa opened the notice and that

25   Versa had hired Mr. Collins to look after LLC's affairs, and

47

1    that, therefore, he was acting as Versa's agent in this matter,

2    there was sufficient actual notice as of July 9th for due

3    process purposes.

4         The issue then comes down to whether the late filing

5    of the proof of administrative claim should be permitted under

6    Bankruptcy Rule 9006 for excusable neglect.  A claims bar date

7    is an important milestone in most Chapter 11 cases, and clearly

8    here the administrative claims bar date was an important

9    milestone in this case for the reasons that I've already

10   stated.  See First Fidelity Bank N.A. v. Hooker Investments

11   Inc.(In re Hooker Investments Inc.), 937 F.2d. 833, 840 (2d

12   Cir. 1991), in which the Court said, "A bar order does not

13   function merely as a procedural gauntlet, but as an integral

14   part of the reorganization process."  See also In re Musicland

15   Holding Corporation, 356 B.R. 603, 607 (Bankr. S.D.N.Y. 2006).

16        In most cases, the filing of a bar date order and the

17   existence of a bar date enables the debtor and other

18   constituents to determine whether the projected payments under

19   a plan will actually satisfy the parties' expectations; and, in

20   particular, an administrative claims bar date enables the

21   parties to determine whether the plan they're proposing is

22   feasible, in that administrative claims need to be paid in full

23   for a plan to be confirmed and consummated.

24        Nevertheless, the bankruptcy court may enlarge the

25   time for filing proofs of claim where the failure to act was

48

1   the result of excusable neglect, under Bankruptcy Rule

2   9006(b)(1).  The U.S. Supreme Court has adopted a two-part

3   framework for the movant to establish its excusable neglect

4   under Rule 9006(b)(1).  The movant has the burden in this

5   regard.  See Midland Cogeneration Venture Limited Partnership

6   v. Enron Corporation 419 F.3d. 115, 121 (2d Cir. 2005).

7        That framework was set forth in Pioneer Investment

8   Services Company v. Brunswick Associates Limited Partnership,

9   507 U.S. 380 (1993).  First a failure to file the proof of

10  claim must have been caused by neglect, which the Court defined

11  as inadvertence, mistake or carelessness, including intervening

12  circumstances beyond the party's control.  Id. at 388.  A

13  tactical, or simply a knowing, decision not to file a timely

14  claim will not suffice.

15       Second, the movant's neglect must have been excusable,

16  which is to be determined in the exercise of the Court's

17  equitable discretion taking into account all relevant

18  circumstances surrounding the failure to file a timely claim,

19  id. at 395, guided, however, by the following four factors:

20  "the danger of prejudice to the debtor; the length of the delay

21  and its potential impact on judicial proceedings; the reason

22  for the delay, including whether it was within the reasonable

23  control of the movant; and whether the movant acted in good

24  faith." Id.

25       The Second Circuit has taken a "hard line" when

49

1    applying the Pioneer factors to motions under Rule 9006(b)(1)

2    and other federal rules premised on excusable neglect.  Again,

3    see In re Enron Corporation 419 F.3d at 122.  Although all four

4    Pioneer factors should be considered, the Second Circuit places

5    the greatest weight on the reason for the delay and whether it

6    was in the movant's reasonable control.  In re Musicland

7    Holdings Corp. 356 B.R. at 607.

8          In the normal case, the movant has acted in good

9    faith, for example, and that's the case here.  Thus, the Second

10    Circuit said, "In the typical case, three of the Pioneer

11    factors, the length of the delay, the danger of prejudice and

12    the movant's good faith, usually weigh in favor of the party

13    seeking the extension.  We and other circuits have focused on

14    the third factor, the reason for the delay, including whether

15    it was within the reasonable control of the movant.  The

16    equities will rarely, if ever, favor a party who fails to

17    follow the clear dictates of a Court rule.  Where the rule is

18    entirely clear, we continue to expect that a party claiming

19    excusable neglect will, in the ordinary course, lose under the

20    Pioneer test."  In re Enron Corporation 419 F.3d at 122-23; see

21    also Canfield v. Van Atta Buick/GMC Truck Inc. 127 F.3d 248,

22    250-51(2d Cir. 1997).

23          Factors other than the reason for the delay usually

24    are relevant, therefore, only in close cases. In re Musicland

25    Holdings Corporation 356 B.R. at 608.  This is a somewhat close

50

1   case, in that I accept that Plymouth Rubber was clearly in

2   wind-down mode, where it only had one employee, who, consistent

3   with the very limited nature of its operations (which from

4   Mr. Collins' affidavit, which is uncontroverted, pertained

5   almost entirely to the two pending litigations) meant that

6   Mr. Collins checked the post office box only roughly once every

7   two weeks.  In addition, the time for the bar date notice was

8   shortened here from the normal time that would usually be

9   provided.  And, finally, there was potentially some room for

10  confusion, given that the notice was addressed to "Inc." as

11  opposed to "LLC."

12          On the other hand, I find it very hard to understand

13  why, given Mr. Collins' sole function, which appears to be to

14  monitor the mail, and the fact that he did so only roughly once

15  every two weeks, he did not open the mail, but instead simply

16  forwarded it to Mr. Schultz of Versa.  It would not seem to me

17  that he should have done that, given that Plymouth had

18  established the P.O. box that he checked as opposed to setting

19  up an automatic forwarding from Plymouth's address to Versa's.

20  It would appear, instead, to me appropriate for Mr. Collins to

21  have acted as someone who actually read the mail as opposed to

22  as a second mailman for delivery purposes.

23          So, clearly, it was within Plymouth's control to have

24  had notice of the bar date, at least by July 9th.  Moreover,

25  Plymouth did not file its claim until after the hearing on plan

51

1   modification, which it needn't have waited for.  It had the

2   claim or was aware of the late claim issue on July 16th, but,

3   nevertheless, waited two weeks thereafter to do so.  So, all

4   things being considered, it appears to me that while this is a

5   somewhat close case, the neglect here was largely within the

6   control of Plymouth.

7          Secondly, while the time between the bar date and the

8   filing of the claim was relatively short, I conclude that there

9   was prejudice to the debtor and other parties that resulted

10   from the delay.  If, in fact, the responsibility for paying

11   this administrative claim, to the extent it is allowed, rested

12   with either GM or the DIP lender acquisition vehicle, it would

13   appear to me, particularly given the balance of factors on

14   whether the delay was within Plymouth's control, that the lack

15   of prejudice to the estate would have argued for letting the

16   claim be filed late.  (The fact that some party receives a

17   smaller distribution or another third party pays more money as

18   a result of a claim being allowed to be filed late is not

19   sufficient prejudice, it is not the type of prejudice that the

20   courts have in mind when they evaluate the prejudice factor

21   under Pioneer.)

22          However, here, I believe there is prejudice to the

23   estate.  And also, again, some blame should be laid on Plymouth

24   for causing this prejudice by not filing the claim until after

25   the plan modification hearing.  As represented by Mr. Butler,

52

1    who clearly was involved in the preparation for the plan

2    modification hearing and the debtors' efforts to determine

3    whether, in fact, the MDA would result in a feasible plan, the

4    calculation of likely administrative claims against a surviving

5    debtor entity was a key factor in moving forward with the

6    hearing on July 29th.

7         It's been stated that a demand number under the

8    counterclaim by Plymouth is approximately twenty million

9    dollars.  That number would have had a significant impact on

10   the debtors' presentation of the modification of the plan on

11   July 29th and the Court's consideration of whether the plan is

12   feasible or was feasible, and would have, if asserted as a

13   recovery against the debtors -- the surviving debtors, as an

14   administrative claim it could have had a very significant

15   impact on feasibility.  Consequently, it would appear to me

16   that although the delay was short, it was very significant, and

17   that both the debtors as well as the other parties to the MDA,

18   and ultimately the Court, moved ahead in reliance on that claim

19   not being asserted.

20        So, that prejudice, as well as my conclusion that the

21   lateness of the claim, first in terms of its being verbally

22   asserted only on July 16th and then actually formally asserted

23   after the plan modification hearing, was largely, if not

24   entirely, within the control of Plymouth, leads me to deny

25   Plymouth's motion.

53

1          Obviously, to the extent that it is asserting a right

2    to setoff or recoupment, the lateness of the claim should not

3    matter, so that what this ruling effectively does is preclude

4    Plymouth from an affirmative recovery against the debtor's

5    estate as opposed to, again, a recoupment or setoff right in

6    the Michigan and Massachusetts litigation.

7          So Mr. Butler, you can submit an order to that effect.

8          MR. BUTLER:  Yes, Your Honor.

9          THE COURT:  Okay.

10         MR. BUTLER:  Your Honor, the last matter on the agenda

11   for today, matter number 8, is a motion for authority to apply

12   the claims objection procedures to administrative expense

13   claims, filed at docket number 18715.  Your Honor, by this

14   motion, what we're seeking to do is to use the claims

15   procedures that Your Honor is familiar with, that have been

16   running on a separate claims track for the last two and a half

17   years, to apply those to administrative claims.  And I think it

18   goes without saying that the -- and I think Your Honor has

19   observed in the past, that the procedures that have been

20   adopted by the Court here back on December 7th of 2006 at

21   docket number 6089, have served the debtors well and have dealt

22   with an expeditious treatment of almost 17,000 proofs of claim,

23   and through some 34 omnibus claims objections that addressed

24   over 14,000 of those claims, and have resulted in the

25   disallowance or withdrawal of over 10,000 of those claims.  So