# EXHIBIT D

- 1 -

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 05-44481 (RDD); Adv. Proc. No. 07-02619 (RDD);

5    Adv. Proc. No. 07-02242 (RDD); Adv. Proc. No. 07-02256 (RDD);

6    Adv. Proc. No. 07-02333 (RDD); Adv. Proc. No. 07-02580 (RDD);

7    Adv. Proc. No. 07-02661 (RDD); Adv. Proc. No. 07-02743 (RDD);

8    Adv. Proc. No. 07-02768 (RDD); Adv. Proc. No. 07-02769 (RDD);

9    Adv. Proc. No. 07-02790 (RDD); Adv. Proc. No. 07-02076 (RDD);

10    Adv. Proc. No. 07-02084 (RDD); Adv. Proc. No. 07-02096 (RDD);

11    Adv. Proc. No. 07-02125 (RDD); Adv. Proc. No. 07-02177 (RDD);

12    Adv. Proc. No. 07-02188 (RDD); Adv. Proc. No. 07-02211 (RDD);

13    Adv. Proc. No. 07-02212 (RDD); Adv. Proc. No. 07-02236 (RDD);

14    Adv. Proc. No. 07-02250 (RDD); Adv. Proc. No. 07-02262 (RDD);

15    Adv. Proc. No. 07-02270 (RDD); Adv. Proc. No. 07-02291 (RDD);

16    Adv. Proc. No. 07-02328 (RDD); Adv. Proc. No. 07-02337 (RDD);

17    Adv. Proc. No. 07-02348 (RDD); Adv. Proc. No. 07-02432 (RDD);

18    Adv. Proc. No. 07-02436 (RDD); Adv. Proc. No. 07-02449 (RDD);

19    Adv. Proc. No. 07-02479 (RDD); Adv. Proc. No. 07-02525 (RDD);

20    Adv. Proc. No. 07-02534 (RDD); Adv. Proc. No. 07-02539 (RDD);

21    Adv. Proc. No. 07-02551 (RDD); Adv. Proc. No. 07-02581 (RDD);

22    Adv. Proc. No. 07-02597 (RDD); Adv. Proc. No. 07-02618 (RDD);

23    Adv. Proc. No. 07-02623 (RDD); Adv. Proc. No. 07-02659 (RDD);

24    Adv. Proc. No. 07-02672 (RDD); Adv. Proc. No. 07-02702 (RDD);

25    Adv. Proc. No. 07-02723 (RDD); Adv. Proc. No. 07-02743 (RDD);

- 2 -

1    Adv. Proc. No. 07-02744 (RDD); Adv. Proc. No. 07-02750 (RDD);

2    Adv. Proc. No. 07-02188 (RDD)

3    - - - - - - - - - - - - - - - - - - - -x

4    In the Matter of:

5    DPH HOLDINGS CORP., et al.,

6                          Reorganized Debtors.

7    - - - - - - - - - - - - - - - - - - - -x

8    DELPHI CORPORATION, et al.,

9                          Plaintiffs,

10        -against-

11   SETECH INC., et al.,

12                         Defendants.

13   - - - - - - - - - - - - - - - - - - - -x

14   DELPHI CORPORATION, et al.,

15                         Plaintiffs,

16        -against-

17   DUPONT COMPANY, et al.,

18                         Defendants.

19   - - - - - - - - - - - - - - - - - - - -x

20   DELPHI CORPORATION, et al.,

21                         Plaintiffs,

22        -against-

23   ECO-BAT AMERICA LLC,

24                         Defendant.

25   - - - - - - - - - - - - - - - - - - - -x

- 3 -

1    - - - - - - - - - - - - - - - - - - - -x

2    DELPHI CORPORATION, et al.,

3                        Plaintiffs,

4        -against-

5    GLOBE MOTORS INC.,

6                        Defendant.

7    - - - - - - - - - - - - - - - - - - - -x

8    DELPHI CORPORATION, et al.,

9                        Plaintiffs,

10       -against-

11   PHILIPS SEMICONDUCTOR, et al.,

12                       Defendants.

13   - - - - - - - - - - - - - - - - - - - -x

14   DELPHI CORPORATION, et al.,

15                       Plaintiffs,

16       -against-

17   SUMMIT POLYMERS INC.,

18                       Defendant.

19   - - - - - - - - - - - - - - - - - - - -x

20   DELPHI CORPORATION, et al.,

21                       Plaintiffs,

22       -against-

23   M & Q PLASTIC PRODUCTS, et al.,

24                       Defendants.

25   - - - - - - - - - - - - - - - - - - - -x

- 4 -

```
 1    - - - - - - - - - - - - - - - - - - - -x

 2    DELPHI CORPORATION, et al.,

 3                        Plaintiffs,

 4        -against-

 5    RSR CORPORATION, et al.,

 6                        Defendants.

 7    - - - - - - - - - - - - - - - - - - - -x

 8    DELPHI CORPORATION, et al.,

 9                        Plaintiffs,

10        -against-

11    RSR/ECOBAT,

12                        Defendant.

13    - - - - - - - - - - - - - - - - - - - -x

14    DELPHI CORPORATION, et al.,

15                        Plaintiffs,

16        -against-

17    TYCO et al.,

18                        Defendants.

19    - - - - - - - - - - - - - - - - - - - -x

20    DELPHI CORPORATION, et al.,

21                        Plaintiffs,

22        -against-

23    AHAUS TOOL & ENGINEERING INC.,

24                        Defendant.

25    - - - - - - - - - - - - - - - - - - - -x
```

- 5 -

1    - - - - - - - - - - - - - - - - - - - -x

2    DELPHI CORPORATION, et al.,

3                          Plaintiffs,

4        -against-

5    A 1 SPECIALIZED SVC & SUPP., INC.,

6                          Defendant.

7    - - - - - - - - - - - - - - - - - - - -x

8    DELPHI CORPORATION, et al.,

9                          Plaintiffs,

10       -against-

11   A-1 SPECIALIZED SERVICES,

12                         Defendant.

13   - - - - - - - - - - - - - - - - - - - -x

14   DELPHI CORPORATION, et al.,

15                         Plaintiffs,

16       -against-

17   ATS AUTOMATION TOOLING SYSTEMS INC., et al.,

18                         Defendants.

19   - - - - - - - - - - - - - - - - - - - -x

20   DELPHI CORPORATION, et al.,

21                         Plaintiffs,

22       -against-

23   CORNING INC., et al.,

24                         Defendants.

25   - - - - - - - - - - - - - - - - - - - -x

- 6 -

1    - - - - - - - - - - - - - - - - - - - -x

2    DELPHI CORPORATION, et al.,

3                          Plaintiffs,

4         -against-

5    CRITECH RESEARCH INC.,

6                          Defendant.

7    - - - - - - - - - - - - - - - - - - - -x

8    DELPHI CORPORATION, et al.,

9                          Plaintiffs,

10        -against-

11   DOSHI PRETTL INTERNATIONAL, et al.,

12                         Defendants.

13   - - - - - - - - - - - - - - - - - - - -x

14   DELPHI CORPORATION, et al.,

15                         Plaintiffs,

16        -against-

17   D & R TECHNOLOGY LLC, et al.,

18                         Defendants.

19   - - - - - - - - - - - - - - - - - - - -x

20   DELPHI CORPORATION, et al.,

21                         Plaintiffs,

22        -against-

23   DSSI, et al.,

24                         Defendants.

25   - - - - - - - - - - - - - - - - - - - -x

- 7 -

1   - - - - - - - - - - - - - - - - - - - -x

2   DELPHI CORPORATION, et al.,

3                          Plaintiffs,

4        -against-

5   DANOBAT MACHINE TOOL CO. INC.,

6                          Defendant.

7   - - - - - - - - - - - - - - - - - - - -x

8   DELPHI CORPORATION, et al.,

9                          Plaintiffs,

10       -against-

11  EDS, et al.,

12                         Defendants.

13  - - - - - - - - - - - - - - - - - - - -x

14  DELPHI CORPORATION, et al.,

15                         Plaintiffs,

16       -against-

17  BP, et al.,

18                         Defendants.

19  - - - - - - - - - - - - - - - - - - - -x

20  DELPHI CORPORATION, et al.,

21                         Plaintiffs,

22       -against-

23  CARLISLE, et al.,

24                         Defendants.

25  - - - - - - - - - - - - - - - - - - - -x

- 8 -

1    - - - - - - - - - - - - - - - - - - - -x

2    DELPHI CORPORATION, et al.,

3                          Plaintiffs,

4        -against-

5    GKNS INTERMETALS,

6                          Defendant.

7    - - - - - - - - - - - - - - - - - - - -x

8    DELPHI CORPORATION, et al.,

9                          Plaintiffs,

10       -against-

11   EX-CELL-O MACHINE TOOLS INC.,

12                         Defendant.

13   - - - - - - - - - - - - - - - - - - - -x

14   DELPHI CORPORATION, et al.,

15                         Plaintiffs,

16       -against-

17   JOHNSON CONTROLS, et al.,

18                        Defendants.

19   - - - - - - - - - - - - - - - - - - - -x

20   DELPHI CORPORATION, et al.,

21                        Plaintiffs,

22       -against-

23   NILES USA INC., et al.,

24                        Defendants.

25   - - - - - - - - - - - - - - - - - - - -x

- 9 -

1    - - - - - - - - - - - - - - - - - - - -x

2    DELPHI CORPORATION, et al.,

3                        Plaintiffs,

4         -against-

5    METHODE ELECTRONICS INC., et al.,

6                        Defendants.

7    - - - - - - - - - - - - - - - - - - - -x

8    DELPHI CORPORATION, et al.,

9                        Plaintiffs,

10        -against-

11   MICROCHIP,

12                       Defendant.

13   - - - - - - - - - - - - - - - - - - - -x

14   DELPHI CORPORATION, et al.,

15                       Plaintiffs,

16        -against-

17   HEWLETT PACKARD, et al.,

18                       Defendants.

19   - - - - - - - - - - - - - - - - - - - -x

20   DELPHI CORPORATION, et al.,

21                       Plaintiffs,

22        -against-

23   OLIN CORP,

24                       Defendant.

25   - - - - - - - - - - - - - - - - - - - -x

- 10 -

```
 1    - - - - - - - - - - - - - - - - - - -x

 2    DELPHI CORPORATION, et al.,

 3                        Plaintiffs,

 4        -against-

 5    INTEC GROUP,

 6                        Defendant.

 7    - - - - - - - - - - - - - - - - - - -x

 8    DELPHI CORPORATION, et al.,

 9                        Plaintiffs,

10        -against-

11    VALEO, et al.,

12                        Defendants.

13    - - - - - - - - - - - - - - - - - - -x

14    DELPHI CORPORATION, et al.,

15                        Plaintiffs,

16        -against-

17    VANGUARD DISTRIBUTORS,

18                        Defendant.

19    - - - - - - - - - - - - - - - - - - -x

20    DELPHI CORPORATION, et al.,

21                        Plaintiffs,

22        -against-

23    VICTORY PACKAGING, et al.,

24                        Defendants.

25    - - - - - - - - - - - - - - - - - - -x
```

- 11 -

1  - - - - - - - - - - - - - - - - - - - -x

2  DELPHI CORPORATION, et al.,

3                         Plaintiffs,

4      -against-

5  WAGNER-SMITH COMPANY,

6                         Defendant.

7  - - - - - - - - - - - - - - - - - - - -x

8  DELPHI CORPORATION, et al.,

9                         Plaintiffs,

10      -against-

11  WELLS FARGO BUSINESS, et al.,

12                         Defendants.

13  - - - - - - - - - - - - - - - - - - - -x

14  DELPHI CORPORATION, et al.,

15                         Plaintiffs,

16      -against-

17  SELECT TOOL & DIE CORP.,

18                         Defendant.

19  - - - - - - - - - - - - - - - - - - - -x

20  DELPHI CORPORATION, et al.,

21                         Plaintiffs,

22      -against-

23  SHUERT INDUSTRIES INC.,

24                         Defendant.

25  - - - - - - - - - - - - - - - - - - - -x

- 12 -

```
 1   - - - - - - - - - - - - - - - - - - - -x

 2   DELPHI CORPORATION, et al.,

 3                        Plaintiffs,

 4        -against-

 5   SUMITOMO, et al.,

 6                        Defendants.

 7   - - - - - - - - - - - - - - - - - - - -x

 8   DELPHI CORPORATION, et al.,

 9                        Plaintiffs,

10        -against-

11   TECH CENTRAL,

12                        Defendant.

13   - - - - - - - - - - - - - - - - - - - -x

14   DELPHI CORPORATION, et al.,

15                        Plaintiffs,

16        -against-

17   PRUDENTIAL RELOCATION, et al.,

18                        Defendants.

19   - - - - - - - - - - - - - - - - - - - -x

20   DELPHI CORPORATION, et al.,

21                        Plaintiffs,

22        -against-

23   LDI INCORPORATED,

24                        Defendant.

25   - - - - - - - - - - - - - - - - - - - -x
```

- 13 -

1    - - - - - - - - - - - - - - - - - - - -x

2    DELPHI CORPORATION, et al.,

3                            Plaintiffs,

4        -against-

5    M & Q PLASTIC PRODUCTS, et al.,

6                            Defendants.

7    - - - - - - - - - - - - - - - - - - - -x

8    DELPHI CORPORATION, et al.,

9                            Plaintiffs,

10        -against-

11    REPUBLIC ENGINEERED PRODUCTS, et al.,

12                            Defendants.

13    - - - - - - - - - - - - - - - - - - - -x

14    DELPHI CORPORATION, et al.,

15                            Plaintiffs,

16        -against-

17    RIECK GROUP LLC,

18                            Defendant.

19    - - - - - - - - - - - - - - - - - - - -x

20    DELPHI CORPORATION, et al.,

21                            Plaintiffs,

22        -against-

23    CRITECH RESEARCH INC.,

24                            Defendant.

25    - - - - - - - - - - - - - - - - - - - -x

- 14 -

1           U.S. Bankruptcy Court

2           300 Quarropas Street

3           White Plains, New York

4

5           July 22, 2010

6           10:20 AM

7

8

9    B E F O R E:

10   HON. ROBERT D. DRAIN

11   U.S. BANKRUPTCY JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

- 15 -

1

2   RE: ADV. PROC. NO. 07-02619 (RDD):

3   HEARING re Setech, Inc.'s Motion to Vacate and to Dismiss

4   (Docket No. 20094)

5

6   RE: CASE NO. 0544481 (RDD):

7   HEARING re Joinder of E. I. du Pont de Nemours and Company to

8   Motions (I) to Vacate Prior Orders Establishing Procedures for

9   Certain Adversary Proceedings, Including Those Commenced by the

10  Debtors Under 11 U.S.C. Sections 541, 544, 545, 547, 548, or

11  549, and Extending the Time to Serve Process for Such Adversary

12  Proceedings, (II) Pursuant to Fed. R. Civ. P. 12(b) and Fed. R.

13  Bankr. P. 7012(b) Dismissing the Adversary Proceeding with

14  Prejudice, or (III) in the Alternative, Dismissing the

15  Adversary Proceeding on the Ground of Judicial Estoppel (Docket

16  No. 19999)

17

18  RE: ADV. PROC. NO. 07-02242 (RDD):

19  HEARING re Statement Of E. I. Du Pont De Nemours And Company

20  And Its Affiliates In Support Of Certain Reply Briefs Filed

21  With Respect To Motions (I) To Vacate Prior Orders Establishing

22  Procedures For Certain Adversary Proceedings, Including Those

23  Commenced By The Debtors Under 11 U.S.C. Sections 541, 544,

24  545, 547, 548, Or 549, And Extending The Time To Serve Process

25  For Such Adversary Proceedings, (II) Pursuant To Fed. R. Civ.

- 16 -

```
 1    P. 12(b) And Fed. R. Bankr. P. 7012(b), Dismissing The

 2    Adversary Proceeding With Prejudice, Or (III) In The

 3    Alternative, Dismissing The Adversary Proceeding On The Ground

 4    Of Judicial Estoppel (Docket No. 20323)

 5

 6    RE: ADV. PROC. NO. 07-02256 (RDD):

 7    HEARING re Complaint against Defendant 200A.

 8

 9    RE: ADV. PROC. NO. 07-02333 (RDD):

10    HEARING re Replies in Support of Motions (I) to Vacate Prior

11    Orders Establishing Procedures for Certain Adversary

12    Proceedings, Including Those Commenced by the Debtors Under 11

13    USC Sections 541, 544, 545, 547, 548, or 549, and Extending the

14    Time to Serve Process for Such Adversary Proceedings, (II)

15    Dismissing the Adversary Proceeding with Prejudice, or (III) In

16    The Alternative, Dismissing the Adversary Proceeding on the

17    Grounds of Judicial Estoppel (Docket No. 20341)

18

19    RE: ADV. PROC. NO. 07-02580 (RDD):

20    HEARING re Joinder Of Philips Semiconductor, Philips

21    Semiconductors, And Philips Semiconductors, Inc (N/K/A NXP

22    Semiconductors USA, Inc.) To (I) Reply Memorandum Of Law In

23    Support Of Motions Of Affinia, GKN, MSX And Valeo To: (A)

24    Vacate Certain Prior Orders Of The Court; (B) Dismiss The

25    Complaint With Prejudice; (C) And (D) Dismiss Claims Based On
```

- 17 -

1   Assumption Of Contracts; Or (E) In The Alternative, To Require

2   Plaintiffs To File A More Definite Statement And (II) Reply Of

3   HP Enterprise Services, LLC And Affiliates In Support Of Their

4   Motion For An Order Dismissing The Complaint With Prejudice,

5   And Vacating Certain Prior Orders Pursuant To Fed. R. Civ. P.

6   60 And Fed. R. Bankr. P. 9024 (Docket No. 20353)

7

8   ADV. PROC. NO. 07-02661 (RDD):

9   HEARING re Joinder Of Summit Polymers, Inc. To Motions (I) To

10  Vacate Prior Orders Establishing Procedures For Certain

11  Adversary Proceedings, Including Those Commenced By The Debtors

12  Under 11 U.S.C. Sections 541, 544, 545, 547, 548, Or 549, And

13  Extending The Time To Serve Process For Such Adversary

14  Proceedings; (II) Dismissing The Adversary Proceeding With

15  Prejudice; Or (III) In The Alternative, Dismissing The

16  Adversary Proceeding On The Ground Of Judicial Estoppel (Docket

17  No. 20)

18

19  RE: ADV. PROC. NO. 07-02743 (RDD):

20  HEARING re Joinder Of M&Q Plastic Products L.P. To Motions (I)

21  To Vacate Prior Orders Establishing Procedures For Certain

22  Adversary Proceedings, Including Those Commenced By The Debtors

23  Under 11 U.S.C. Sections 541, 544, 545, 547, 548, Or 549, And

24  Extending The Time To Serve Process For Such Adversary

25  Proceedings, (II) Dismissing The Adversary Proceeding With

- 18 -

1    Prejudice, Or (III) In The Alternative, Dismissing The

2    Adversary Proceeding On The Ground Of Judicial Estoppel (Docket

3    No. 19818)

4

5    RE: ADV. PROC. NO. 07-02768 (RDD):

6    HEARING re Complaint against Defendant 566A, Defendant 566B,

7    Defendant 566C

8

9    RE: ADV. PROC. NO. 07-02769 (RDD):

10   HEARING re Complaint against Defendant 567A

11

12   RE: ADV. PROC. NO. 07-02790 (RDD):

13   HEARING re Motion of Tyco Adhesives LP, and Joinder with

14   Motions of Fin Machine Co. Ltd. and Wagner-Smith Company, for

15   an Order: (I) Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr.

16   P. 9024 Vacating Prior Orders Establishing Procedures for

17   Certain Adversary Proceedings, Including Those Commenced by the

18   Debtors Under 11 U.S.C. Sections 541, 544, 545, 547, 548, or

19   549, and Extending the Time to Serve Process for Such Adversary

20   Proceedings, and (II) Pursuant to Fed. R. Civ. P. 12 and Fed.

21   R. Bankr. P. 7012, Dismissing the Adversary Proceeding with

22   Prejudice for Failure to State a Cause of Action Because it is

23   Barred by the Two Year Statute of Limitations, and (III)

24   Pursuant to Fed. R. Civ. P. 12 and Fed. R. Bankr. P. 7012

25   Dismissing the Adversary Proceeding with Prejudice for Failure

- 19 -

1   to State a Cause of Action Because it is Insufficiently Pled,

2   and (IV) Dismissing the Adversary Proceeding on the Ground of

3   Judicial Estoppel, and (V) Dismissing the Adversary Proceeding

4   on the Ground of Laches, or (VI) in the Alternative, Pursuant

5   to Fed. R. Civ. P. 12(e) and Fed. R. Bankr. P 7012(e),

6   Directing a More Definite Statement of the Pleadings (Docket

7   No. 20089)

8

9   RE: CASE NO. 05-44481 (RDD):

10  HEARING re Reply And Joinder In Further Support Of Motion Of

11  Johnson Controls, Johnson Controls Battery Group, Johnson

12  Controls GMBH & Co. KG And Johnson Controls, Inc. To: (A)

13  Vacate Certain Prior Orders Of The Court; (B) Dismiss The

14  Complaint With Prejudice; Or (C) In The Alternative, To Dismiss

15  The Claims Against Certain Defendants Named In The Complaint

16  And To Require Plaintiffs To File A More Definite Statement

17  (Docket No. 20298)

18

19  RE: CASE NO. 05-44481 (RDD):

20  HEARING re Response of Reorganized Debtors to Motions to Vacate

21  Certain Orders and Dismiss Adversary Actions filed by Eric

22  Fisher on behalf of DPH Holdings Corp. et al.

23

24  RE: CASE NO. 05-44481 (RDD):

25  HEARING re Joinder Of Vanguard Distributors, Inc. In Further

- 20 -

1    Support Of Motion For Order (I) Vacating Certain Prior Orders;

2    And (II) Dismissing The Adversary Proceeding With Prejudice

3    (Docket No. 20319)

4

5    RE: CASE NO. 05-44481 (RDD):

6    HEARING re Joinder Of Wells Fargo Bank, N.A. (Named Herein As

7    Wells Fargo Business And Wells Fargo Minnesota) To Replies (I)

8    To Vacate Certain Prior Orders Of The Court Pursuant To Fed. R.

9    Civ. P. 60 And Fed. R. Bankr. P. 9024; (II) To Dismiss The

10   Complaint With Prejudice; (III) To Dismiss The Claims Against

11   Certain Defendants Named In The Complaint; Or (IV) In The

12   Alternative, To Require Plaintiffs To File A More Definite

13   Statement (Docket No. 20338)

14

15   RE: CASE NO. 05-44481 (RDD):

16   HEARING re Reply Memorandum Of Law In Support Of Motions Of

17   Affinia, GKN, MSX And Valeo To: (A) Vacate Certain Prior Orders

18   Of The Court; (B) Dismiss The Complaint With Prejudice; (C) And

19   Dismiss The Claims Against Certain Defendants Named In The

20   Complaint; And (D) Dismiss Claims Based On Assumption Of

21   Contracts; Or (E) In The Alternative, To Require Plaintiffs To

22   File A More Definite Statement (Docket No. 20304)

23

24   RE: CASE NO. 05-44481 (RDD):

25   HEARING re Reorganized Debtors' Supplemental Reply To Response

- 21 -

1   Of Claimants To Reorganized Debtors' Objections To Proofs Of

2   Administrative Expense Claim Numbers 18742, 19717, 19719, And

3   20053 (Docket No. 20397)

4

5   RE: CASE NO. 05-44481 (RDD):

6   HEARING re Reorganized Debtors' Supplemental Reply To Response

7   On Behalf Of Claimant To Reorganized Debtors' Objection To

8   Proof Of Administrative Expense Claim Number 19568 Filed On

9   Behalf Of Paullion Roby (Docket No. 20398)

10

11  RE: CASE NO. 05-44481 (RDD):

12  HEARING re Claim Objection Hearing Regarding Claims of New

13  Jersey Self-Insurer's Guaranty Association as Objected to on

14  Reorganized Debtors' Forty-Sixth Omnibus Objection Pursuant To

15  11 U.S.C. Section 503(b) And Fed. R. Bankr. P. 3007 To (I)

16  Disallow And Expunge Certain Administrative Expense (A) Books

17  And Records Claims, (B) Methode Electronics Claims, (C) State

18  Workers' Compensation Claims, (D) Duplicate State Workers'

19  Compensation Claims, (E) Workers' Compensation Claims, (F)

20  Transferred Workers' Compensation Claims, (G) Tax Claims, (H)

21  Duplicate Insurance Claims, And (I) Severance Claims, (II)

22  Disallow And Expunge (A) A Certain Duplicate Workers'

23  Compensation Claim, (B) A Certain Duplicate Tax Claim, And (C)

24  A Certain Duplicate Severance Claim, (III) Modify Certain

25  Administrative Expense (A) State Workers' Compensation Claims

- 22 -

1   And (B) Workers' Compensation Claims, And (IV) Allow Certain

2   Administrative Expense Severance Claims (Docket No. 19711)

3

4   RE: CASE NO. 05-44481 (RDD):

5   HEARING re Notice Of Motion By Methode Electronics, Inc. For An

6   Order (I) Permitting Methode To Continue Post-Petition

7   Litigation With The Reorganized Debtors In Michigan And (II)

8   Overruling The Reorganized Debtors' Timeliness Objection To

9   Methode's Administrative Expense Claims (Docket No. 19895) and

10   Supplement To Motion Of Methode Electronics, Inc. For An Order

11   (I) Permitting Methode To Continue Post-Petition Litigation

12   With The Reorganized Debtors In Michigan And (II) Overruling

13   The Reorganized Debtors' Timeliness Objection To Methode's

14   Administrative Expense Claims (Docket No. 20274)

15

16   RE: CASE NO. 05-44481 (RDD):

17   HEARING re Joinder In Plaintiffs' Omnibus Response To Motions

18   Seeking, Among Other Forms Of Relief, Orders To Vacate Certain

19   Procedural Orders (Docket No. 20226)

20

21   RE: CASE NO. 05-44481 (RDD):

22   HEARING re Reorganized Debtors' Supplemental Reply With Respect

23   To Proofs Of Administrative Expense Claim Numbers 18602 And

24   19712 (New Jersey Self-Insurers Guaranty Association) (Docket

25   No. 20446)

- 23 -

1

2    RE: CASE NO. 05-44481 (RDD):

3    HEARING re Notice of Hearing on Proposed Fifty-Seventh Omnibus

4    Hearing Agenda

5

6    RE: CASE NO. 05-44481 (RDD):

7    HEARING re Notice of Hearing on Proposed Thirty-Fifth Claims

8    Hearing Agenda

9

10   RE: ADV. PROC. NO. 07-02076 (RDD):

11   HEARING re Joinder Of Ahaus Tool &Engineering Inc. To Motions

12   Seeking An Order (I) Pursuant To Fed. R. Civ. P. 60 And Fed. R.

13   Bankr. P. 9024, Vacating Prior Orders Establishing Procedures

14   For Certain Adversary Proceedings, Including Those Commenced By

15   The Debtors Under 11 U.S.C. Sections 541, 544, 545, 547, 548,

16   Or 549, And Extending The Time To Serve Process For Such

17   Adversary Proceedings, (II) Pursuant To Fed. R. Civ. P. 12(b)

18   And Fed. R. Bankr. P. 7012(b), Dismissing The Adversary

19   Proceeding With Prejudice, Or (III) In The Alternative,

20   Dismissing The Adversary Proceeding On The Ground Of Judicial

21   Estoppel And Replies To Debtors' Omnibus Response To Said

22   Motions (Docket No. 20336)

23

24   RE: ADV. PROC. NO. 07-02084 (RDD):

25   HEARING re Motion to Dismiss Adversary Proceeding and for

- 24 -

1    Related Relief filed by Deirdre Woulfe Pacheco on behalf of A 1

2    Specialized SVC & Supp., Inc. (Docket No. 21)

3

4    RE: ADV. PROC. NO. 07-02096 (RDD):

5    HEARING re Motion to Dismiss Adversary Proceeding and for

6    Related Relief filed by Deirdre Woulfe Pacheco on behalf of A-1

7    Specialized Services (Docket No. 22)

8

9    RE: ADV. PROC. NO. 07-02125 (RDD):

10   HEARING re ATS Automation Tooling Systems, Inc.'s Motion and

11   Brief of Defendant to: (A) Vacate Certain Orders of this Court;

12   and (B) Dismiss the Complaint (v. ATS Automation Tooling, et

13   al.) with Prejudice; or (C) in the Alternative, to Dismiss the

14   Claims Against Certain Defendants Named in the Complaint

15   (Docket No. 20088)

16

17   RE: ADV. PROC. NO. 07-02177 (RDD):

18   HEARING re Complaint against Defendant 152A, Defendant 152B,

19   Defendant 152C

20

21   RE: ADV. PROC. NO. 07-02188 (RDD):

22   HEARING re Joinder of Critech Research Inc. to Motions (I) to

23   Vacate Prior Orders Establishing Procedures for Certain

24   Adversary Proceedings, Including Those Commenced by the Debtors

25   Under 11 U.S.C. Sections 541, 544, 545, 547, 548, or 549, and

- 25 -

1    Extending the Time to Serve Process for Such Adversary

2    Proceeding with Prejudice, or (III) in the Alternative,

3    Dismissing the Adversary Proceeding on the Ground of Judicial

4    Estoppel (Docket No. 20106)

5

6    RE: ADV. PROC. NO. 07-02211 (RDD):

7    HEARING re Doshi Prettl International's Notice of Motion and

8    Brief of Defendant to: (A) Vacate Certain Orders of This Court;

9    and (B) Dismiss the Complaint with Prejudice; or (C) in the

10   Alternative, to Dismiss the Claims Against Certain Defendants

11   Named in the Complaint (Docket No. 20093)

12

13   RE: ADV. PROC. NO. 07-02212 (RDD):

14   HEARING re Joinder of D&R Technology, LLC to Motion (I) To

15   Vacate Prior Orders Establishing Procedures For Certain

16   Adversary Proceedings, Including Those Commenced By The Debtors

17   Under 11 U.S.C. Sections 541, 544, 545, 547, 548, Or 549, And

18   Extending The Time To Serve Process For Such Adversary

19   Proceedings, and (II) In The Alternative, Dismissing The

20   Adversary Proceedings On The Grounds Of Being Barred by the

21   Statute of Limitations and/or Judicial Estoppel

22

23   RE: ADV. PROC. NO. 07-02212 (RDD):

24   HEARING re Joinder of D&R Technology, LLC To Replies to

25   Reorganized Debtors Omnibus Response to Motions Seeking, Among

- 26 -

1   Other Forms of Relief, Orders to Vacate Certain Procedural

2   Orders Previously Entered by This Court and to Dismiss the

3   Avoidance Actions Against the Moving Defendants (Docket No.

4   20344)

5

6   RE: ADV. PROC. NO. 07-02236 (RDD):

7   HEARING re Reply Of DSSI Defendants To The Debtors' Omnibus

8   Response, And Joinder In Further Support Of The Motion Of The

9   DSSI Defendants Seeking An Order (I) Pursuant To Fed. R. Civ.

10  P. 60 And Fed. R. Bankr. P. 9024, Vacating Prior Orders

11  Establishing Procedures For Certain Adversary Proceedings,

12  Including Those Commenced By Delphi Corporation, Et Al. Under

13  11 U.S.C. Sections 541, 544, 545, 547, 548, And/Or 549, And

14  Extending The Time To Serve Process For Such Adversary

15  Proceedings; (II) Dismissing The Adversary Proceeding With

16  Prejudice Pursuant To Fed. R. Civ. P. 12(b) And Fed. R. Bankr.

17  P. 7012(b) (Docket No. 20325)

18

19  RE: ADV. PROC. NO. 07-02250 (RDD):

20  HEARING re Motion of Danobat Machine Tool Co., Inc. for An

21  Order (i) Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P.

22  9024, relieving it from the effect of prior orders establishing

23  procedures for certain adversary proceedings and extending the

24  time to serve process for such adversary proceedings, and (ii)

25  Pursuant to Fed. R. Civ. P. 12(b) and Fed. R. Bankr. P.

- 27 -

1   7012(b), dismissing the complaint with prejudice, or (iii) in

2   the alternative, dismissing the complaint with prejudice on the

3   grounds of Laches filed by Carmen H. Lonstein on behalf of

4   Danobat Machine Tool Co Inc. (Docket No. 12)

5

6   RE: ADV. PROC. NO. 07-02262 (RDD):

7   HEARING re Complaint against Defendant 201A, Defendant 201B,

8   Defendant 201C, Defendant 201D, Defendant 201E, Defendant 201F,

9   Defendant 201G

10

11   RE: ADV. PROC. NO. 07-02262 (RDD):

12   HEARING re Reply of HP Enterprise Services, LLC and Affiliates

13   in Support of their Motion for an Order Dismissing the

14   Complaint with Prejudice, and Vacating Certain Prior Orders

15   Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024,

16   dated July 2, 2010 (A.P. 02-02262 Docket No. 31)

17

18   RE: ADV. PROC. NO. 07-02270 (RDD):

19   HEARING re Motion to Dismiss Party filed by Christopher B.

20   Block on behalf of BP Microsystems Inc. (Docket No. 30)

21

22   RE: ADV. PROC. NO. 07-02270 (RDD):

23   HEARING re Motion to Dismiss Adversary Proceeding /Joinder to

24   Unifrax Corporation's Motion to Dismiss the Adversary

25   Proceeding with Prejudice and for the Other Relief Sought

- 28 -

1    Therein filed by James S. Carr on behalf of BP, BP Amoco Corp.,

2    BP Microsystems Inc., BP Products North America Inc., Castrol,

3    Castrol Industrial (Docket No. 26)

4

5    RE: ADV. PROC. NO. 07-02270 (RDD):

6    HEARING re Notice of Hearing filed by Christopher B. Block on

7    behalf of BP Microsystems Inc.

8

9    RE: ADV. PROC. NO. 07-02291 (RDD):

10   HEARING re Motion of Carlisle Companies Incorporated for

11   Judgment on the Pleadings and Joinder to Motions (I) to Vacate

12   Prior Orders Establishing Procedures for Certain Adversary

13   Proceedings, Including Those Commenced by the Debtors Under 11

14   U.S.C. Sections 541, 544, 545, 547, 548 or 549, and Extending

15   the Time to Serve Process for Such Adversary Proceedings, (II)

16   Dismissing the Adversary Proceeding with Prejudice, or (III) in

17   the Alternative, Dismissing the Adversary Proceeding on the

18   Ground of Judicial Estoppel (Docket No. 20082)

19

20   RE: ADV. PROC. NO. 07-02328 (RDD):

21   HEARING re Response to Joinder in Plaintiffs' Omnibus Response

22   to Motions Seeking, Among Other Forms of Relief, Orders to

23   Vacate Certain Procedural Orders

24

25

- 29 -

1

2    RE: ADV. PROC. NO. 07-02337 (RDD):

3    HEARING re Joinder And Reply In Support Of Motion By Ex-Cell-O

4    Machine Tools, Inc. Seeking An Order (I) Pursuant To Fed. R.

5    Civ. P. 60 And Fed. R. Bankr. P. 9024 Vacating Prior Orders

6    Establishing Procedures For Certain Adversary Proceedings,

7    Including Those Commenced By The Debtors Under 11 U.S.C.

8    Sections 541, 544, 545, 547, 548, Or 549, And Extending The

9    Time To Serve Process For Such Adversary Proceedings; (II)

10   Pursuant To Fed. R. Civ. P. 12(b) And Fed. R. Bankr. P. 7012

11   Dismissing This Adversary Proceeding With Prejudice; (III) In

12   The Alternative, Dismissing This Adversary Proceeding On The

13   Ground Of Judicial Estoppel; (Iv) In The Alternative,

14   Dismissing This Adversary Proceeding On The Ground Of Res

15   Judicata; And (V) In The Alternative, Dismissing This Adversary

16   Proceeding On The Grounds That It Fails To Plead Facts

17   Sufficient To State A Claim For Relief (Docket No. 20361)

18

19   RE: ADV. PROC. NO. 07-02348 (RDD):

20   HEARING re Motion to Dismiss Adversary Proceeding filed by

21   Kathleen Leicht Matsoukas on behalf of Johnson Controls,

22   Johnson Controls Battery Group, Johnson Controls GMBH & Co. KG,

23   Johnson Controls Inc.

24

25

- 30 -

1

2    RE: ADV. PROC. NO. 07-02348 (RDD):

3    HEARING re Response to Joinder in Plaintiffs' Omnibus Response

4    to Motions Seeking, Among Other Forms of Relief, Orders to

5    Vacate Certain Procedural Orders

6

7    RE: ADV. PROC. NO. 07-02348 (RDD):

8    HEARING re Reply to Motion filed by Kathleen Leicht Matsoukas

9    on behalf of Johnson Controls, Johnson Controls Battery Group,

10   Johnson Controls GMBH & Co. KG, Johnson Controls Inc.

11

12   RE: ADV. PROC. NO. 07-02414 (RDD):

13   HEARING re Complaint against Defendant 444A, Defendant 444B

14

15   RE: ADV. PROC. NO. 07-02432 (RDD):

16   HEARING re Joinder Of Methode Electronics, Inc. To Motions (I)

17   To Vacate Prior Orders Establishing Procedures For Certain

18   Adversary Proceedings, Including Those Commenced By The Debtors

19   Under 11 U.S.C. Sections 541, 544, 545, 547, 548, Or 549, And

20   Extending The Time To Serve Process For Such Adversary

21   Proceedings, and (II) In The Alternative, Dismissing The

22   Adversary Proceedings On The Grounds Of Being Barred by the

23   Statute of Limitations and/or Judicial Estoppel

24

25

- 31 -

1

2    RE: ADV. PROC. NO. 07-02432 (RDD):

3    HEARING re Replies Of Methode Electronics, Inc. To Reorganized

4    Debtors' Omnibus Response To Motions Seeking, Among Other Forms

5    Of Relief, Orders To Vacate Certain Procedural Orders

6    Previously Entered By This Court And To Dismiss The Avoidance

7    Actions Against The Moving Defendants

8

9    RE: ADV. PROC. NO. 07-02436 (RDD):

10   HEARING re Motion by Microchip Technology Incorporated Seeking

11   an Order (I) Pursuant to Fed.R.Civ.P.60 and Fed.R.Bankr.P.9024,

12   Vacating Prior Order Establishing Procedures for Certain

13   Adversary Proceedings, Including Those Commenced by the Debtors

14   Under 1 U.S.C. Sections 541, 544, 545, 547, 548, or 549, and

15   Extending the Time to Serve Process for Such Adversary

16   Proceedings, (II) Pursuant to Fed.R.Civ.P.12(b) and

17   Fed.R.Bankr.R.7012(b), Dismissing the Adversary Proceeding with

18   Prejudice, or (III) In the Alternative, Dismissing the

19   Adversary Proceeding on the Ground of Judicial Estoppel filed

20   on behalf of Microchip (Docket No. 10)

21

22   RE: ADV. PROC. NO. 07-02449 (RDD):

23   HEARING re Complaint against Defendant 289A, Defendant 289B,

24   Defendant 289C, Defendant 289D, Defendant 289E, Defendant 289F,

25   Defendant 289G

- 32 -

1

2    RE: ADV. PROC. NO. 07-02479 (RDD):

3    HEARING re Complaint against Defendant 460A

4

5    RE: ADV. PROC. NO. 07-02525 (RDD):

6    HEARING re Motion to Dismiss Adversary Proceeding /Motion of

7    Defendant The Intec Group, Inc. to Dismiss and Joinder in

8    Hewlett Packard Company and Affiliates' Motion to Dismiss

9    Plaintiffs' Complaint (A. P. 07-02525 Docket No. 21)

10

11   RE: ADV. PROC. NO. 07-02534 (RDD):

12   HEARING re Joinder In Plaintiffs' Omnibus Response To Motions

13   Seeking, Among Other Forms Of Relief, Orders To Vacate Certain

14   Procedural Orders

15

16   RE: ADV. PROC. NO. 07-02539 (RDD):

17   HEARING re Notice of Motion by Vanguard Distributors, Inc.

18   Seeking an Order (I) Pursuant to Fed. R. Civ. P. 12(b) and Fed.

19   R. Bankr. P. 7012(b), Dismissing The Adversary Proceeding with

20   Prejudice, and (II) Pursuant To Fed. R. Civ. P. 60 and Fed. R.

21   Bankr., P. 9024, Vacating Prior Orders Establishing Procedures

22   for Certain Adversary Proceeding, Including Those Commenced by

23   Delphi Under 11 U.S.C. Sections 541, 544, 545, 547, 548 and/or

24   549, and Extending The Time To Serve Process For Such Adversary

25   Proceedings, Or In the Alternative, (III) Dismissing The

- 33 -

1    Adversary Proceeding On The Ground of Judicial Estoppel; and

2    (2) Affidavit in Support of Motion filed on behalf of Vanguard

3    Distributors (Docket No. 24)

4

5    RE: ADV. PROC. NO. 07-02539 (RDD):

6    HEARING re Joinder Of Vanguard Distributors, Inc. In Further

7    Support Of Motion For Order (I) Vacating Certain Prior Orders;

8    And (II) Dismissing The Adversary Proceeding With Prejudice

9    (Docket No. 20319)

10

11    RE: ADV. PROC. NO. 07-02541 (RDD):

12    HEARING re Joinder In Plaintiffs' Omnibus Response To Motions

13    Seeking, Among Other Forms Of Relief, Orders To Vacate Certain

14    Procedural Orders

15

16    RE: ADV. PROC. NO. 07-02551 (RDD):

17    HEARING re Notice Of Motion Of Victory Packaging And Victory

18    Packaging LP For An Order (I) Dismissing The Complaint With

19    Prejudice, (II) Vacating Certain Prior Orders Pursuant To Fed.

20    R. Civ. P. 60 And Fed. R. Bankr. P. 9024 and (III) In The

21    Alternative, Requiring A More Definite Statement filed on

22    behalf of Victory Packaging, Victory Packaging LP (Docket No.

23    20)

24

25

- 34 -

1

2    RE: ADV. PROC. NO. 07-02581 (RDD):

3    HEARING re Motion to Dismiss Adversary Proceeding and Seeking

4    An Order: (I) Pursuant To Fed. R. Civ. P. 60 And Fed. R. Bankr.

5    P. 9024 Vacating Prior Orders Establishing Procedures For

6    Certain Adversary Proceedings, Including Those Commenced By The

7    Debtors Under 11 U.S.C. Sections 541, 544, 545, 547, 548, Or

8    549, And Extending The Time To Serve Process For Such Adversary

9    Proceedings, And (II) Pursuant To Fed. R. Civ. P. 12(b) And

10   Fed. R. Bankr. P. 7012(b), Dismissing The Adversary Proceeding

11   With Prejudice, Or (III) In the Alternative, Dismissing The

12   Adversary Proceeding

13

14   RE: ADV. PROC. NO. 07-02581 (RDD):

15   HEARING re Response of Reorganized Debtors to Motions to Vacate

16   Certain Orders and Dismiss Adversary Actions filed by Cynthia

17   J. Haffey on behalf of Delphi Corporation, et al.

18

19   RE: ADV. PROC. NO. 07-02597 (RDD):

20   HEARING re Motion to Dismiss Adversary Proceeding Filed by

21   Jeffrey A. Wurst on behalf of Wells Fargo Business, Wells Fargo

22   Minnesota

23

24   RE: ADV. PROC. NO. 07-02618 (RDD):

25   HEARING re Joinder Of Select Industries, Corp. In Further

- 35 -

1   Support Of Motion For Order (I) Vacating Certain Prior Orders;

2   And (II) Dismissing The Adversary Proceeding With Prejudice

3   (Docket No. 20321)

4

5   RE: ADV. PROC. NO. 07-02623 (RDD):

6   HEARING re Joinder of Shuert Industries, Inc. in Motions to:

7   (I) Vacate Certain Prior Orders of the Court Establishing

8   Procedures for Certain Adversary Proceedings, and (II) Dismiss

9   the Complaint with Prejudice (Docket No. 20036)

10

11  RE: ADV. PROC. NO. 07-02623 (RDD):

12  HEARING re Joinder Of Shuert Industries, Inc. In Replies Of

13  Other Preference Defendants In Support Of Joinder Of Shuert

14  Industries, Inc. In Motions To: (I) Vacate Certain Prior Orders

15  Of The Court Establishing Procedures For Certain Adversary

16  Proceedings, And (II) Dismiss The Complaint With Prejudice

17  (Docket No. 20293)

18

19  RE: ADV. PROC. NO. 07-02659 (RDD):

20  HEARING re Joinder of Sumitomo Corporation and Sumitomo Corp.

21  of America to Motions Filed by Various Preference Defendants to

22  (A) Vacate Certain Prior Orders of the Court; (B) Dismiss the

23  Complaint with Prejudice; or (C) in the Alternative, to Dismiss

24  the Claims Against Certain Defendants Named in the Complaint

25  and to Require Plaintiffs to File a More Definite Statement

- 36 -

1    (Docket No. 20086)

2

3    RE: ADV. PROC. NO. 07-02659 (RDD):

4    HEARING re Motion to Dismiss Adversary Proceeding Or, In The

5    Alternative, For Summary Judgment Filed By Lorraine S. McGowen

6    on Behalf of SUMCO USA Sales Corporation f/k/a Sumitomo Sitix

7    Inc.

8

9    RE: ADV. PROC. NO. 07-02659 (RDD):

10   HEARING re Joinder In Plaintiffs' Omnibus Response To Motions

11   Seeking, Among Other Forms Of Relief, Orders To Vacate Certain

12   Procedural Orders

13

14   RE: ADV. PROC. NO. 07-02672 (RDD):

15   HEARING re Joinder Of Tech Central In Motions To: (I) Vacate

16   Certain Prior Orders Of The Court Establishing Procedures For

17   Certain Adversary Proceedings; (II) Dismiss The Complaint With

18   Prejudice; Or (III) In The Alternative, To Require Plaintiffs

19   To File A More Definitive Statement (Docket No. 27)

20

21   RE: ADV. PROC. NO. 07-02702 (RDD):

22   HEARING re Joinder Of Prudential Relocation, Prudential

23   Relocation Inc. And Prudential Relocation Int'l To Reply Papers

24   Filed In Motions (I) To Vacate Prior Orders Establishing

25   Procedures For Certain Adversary Proceedings, Including Those

- 37 -

1    Commenced By The Debtors Under 11 U.S.C. Sections 541, 544,

2    545, 547, 548, Or 549, And Extending The Time To Serve Process

3    For Such Adversary Proceedings, (II) Dismissing The Adversary

4    Proceeding With Prejudice, Or (III) In The Alternative,

5    Dismissing The Adversary Proceeding On The Ground Of Judicial

6    Estoppel (Docket No. 26)

7

8    RE: ADV. PROC. NO. 07-02723 (RDD):

9    HEARING re Motion to Dismiss Adversary Proceeding

10

11   RE: ADV. PROC. NO. 07-02743 (RDD):

12   HEARING re Motion of M&Q Plastic Products L.P. Seeking an Order

13   (I) Dismissing the Complaint with Prejudice; (II) Vacating

14   Certain Prior Orders Pursuant to Fed. R. Civ. P. 60 and Fed. R.

15   Bankr. P. 9024; and (III) in the Alternative, Requiring a More

16   Definite Statement (Docket No. 20098)

17

18   RE: ADV. PROC. NO. 07-02744 (RDD):

19   HEARING re Motion to Dismiss Adversary Proceeding and Vacate

20   Certain Prior Orders filed on behalf of Republic Engineered

21   Products (Docket No. 19)

22

23   RE: ADV. PROC. NO. 07-02750 (RDD):

24   HEARING re Motion to Dismiss Case filed on behalf of Rieck

25   Group LLC (Docket No. 24)

- 38 -

1

2    RE: ADV. PROC. NO. 07-02188 (RDD):

3    HEARING re Joinder of Critech Research Inc. to Motions (I) to

4    Vacate Prior Orders Establishing Procedures for Certain

5    Adversary Proceedings, Including Those Commenced by the Debtors

6    Under 11 U.S.C. Sections 541, 544, 545, 547, 548, or 549, and

7    Extending the Time to Serve Process for Such Adversary

8    Proceeding with Prejudice, or (III) in the Alternative,

9    Dismissing the Adversary Proceeding on the Ground of Judicial

10   Estoppel (Docket No. 20106)

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Transcribed By:  Clara Rubin

25

- 39 -

1

2      A P P E A R A N C E S:

3      SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

4           Attorneys for the Reorganized Debtors

5           155 North Wacker Drive

6           Chicago, IL 60606

7

8      BY:   CARL T. TULLSON, ESQ.

9            RON E. MEISLER, ESQ.

10           JOHN K. LYONS, ESQ.

11           BRANDON M. DUNCOMB, ESQ.

12           MICHAEL W. PERL, ESQ.

13           LOUIS S. CHIAPPETTA, ESQ.

14           ALBERT L. HOGAN III, ESQ.

15

16

17     BUTZEL LONG

18           Attorneys for the Reorganized Debtors

19           380 Madison Avenue

20           22nd Floor

21           New York, NY 10017

22

23     BY:   ERIC B. FISHER, ESQ.

24

25

- 40 -

```
 1

 2    ARENT FOX LLP

 3          Attorneys for The Timken Company, The Timken Corporation,

 4           and MPB Corporation d/b/a Timken Super Precision

 5          1675 Broadway

 6          New York, NY 11019

 7

 8    BY:   JAMES M. SULLIVAN, ESQ.

 9

10

11    BARNES & THORNBURG LLP

12          Attorneys for the Johnson Control Entities

13          One North Wacker Drive

14          Suite 4400

15          Chicago, IL 60606

16

17    BY:   DEBORAH L. THORNE, ESQ.

18

19    BINGHAM MCCUTCHEN LLP

20          Attorneys for Sumitomo Corporation, Sumitomo Corporation

21           of America

22          One State Street

23          Hartford, CT 06103

24

25    BY:   KATE K. SIMON, ESQ.
```

- 41 -

1

2      BRADLEY ARANT BOULT CUMMINGS LLP

3            Attorneys for Defendant, Multi-Tronics

4            1600 Division Street

5            Suite 700

6            Nashville, TN 37203

7

8      BY:   ROGER G. JONES, ESQ.

9

10     BRADLEY ARANT BOULT CUMMINGS LLP

11           Attorneys for Defendant, Multi-Tronics

12           One Federal Place

13           1819 Fifth Avenue North

14           Birmingham, AL 35203

15

16     BY:   T. PARKER GRIFFIN, JR., ESQ. (TELEPHONICALLY)

17

18     BRYAN CAVE LLP

19           Attorneys for GBC Metals LLC and Spartech Polycom

20           One Metropolitan Square

21           211 North Broadway

22           Suite 3600

23           St. Louis, MO 63102

24

25     BY:   LLOYD A. PALANS, ESQ.

- 42 -

1

2    CLEARY GOTTLIEB STEEN & HAMILTON LLP

3         Attorneys for HP and EDS Defendants

4         One Liberty Plaza

5         New York, NY 10006

6

7    BY:   LISA M. SCHWEITZER, ESQ.

8

9

10   CLARK HILL PLC

11        151 South Old Woodward Avenue

12        Suite 200

13        Birmingham, MI 48009

14

15   BY:   MAHESH K. NAYAK, ESQ.

16

17

18   FROST BROWN TODD LLC

19        One Columbus

20        10 West Broad Street, Suite 2300

21        Columbus, OH 43215

22

23   BY:   MICHAEL K. YARBROUGH, ESQ.

24

25

- 43 -

```
 1

 2    HODGSON RUSS LLP

 3          The Lincoln Building

 4          60 East 42nd Street, 37th Floor

 5          New York, NY 10165

 6

 7    BY:   DEBORAH J. PIAZZA, ESQ.

 8

 9    HONIGMAN MILLER SCHWARTZ AND COHN LLP

10          Attorneys for Defendants, Valeo, Affnia, MSX

11           International, and GKN

12          2290 First National Building

13          660 Woodward Avenue

14          Detroit, MI 48226

15

16    BY:   I. W. WINSTEN, ESQ.

17          SETH A. DRUCKER, ESQ. (TELEPHONICALLY)

18

19    JENNER & BLOCK LLP

20          Attorneys for Defendant, Olin Corp.

21          919 Third Avenue, 37th Floor

22          New York, NY 10022

23

24    BY:   MARC B. HANKIN, ESQ.

25
```

- 44 -

1

2    K&L GATES LLP

3         Attorneys for NXP Semiconductors

4         599 Lexington Avenue

5         New York, NY 10022

6

7    BY:   ROBERT N. MICHAELSON, ESQ.

8

9

10   KATTEN MUCHIN ROSENMAN LLP

11        575 Madison Avenue

12        New York, NY 10022

13

14   BY:   MATTHEW W. OLSEN, ESQ.

15

16

17   KRAMER LEVIN NAFTALIS & FRANKEL LLP

18        Attorneys for Vishay Americas

19        1177 Avenue of the Americas

20        New York, NY 10036

21

22   BY:   JORDAN DANIEL KAYE, ESQ.

23

24

25

- 45 -

1

2    LAW OFFICE OF IRA S. SACKS LLP

3         Attorneys for Invotec Engineering

4         575 Madison Avenue

5         10th Floor

6         New York, NY 10022

7

8    BY:   TERENCE D. WATSON, ESQ.

9

10   HARRIS D. LEINWAND

11        Attorney for Ahaus Tool & Engineering Inc.

12        315 Madison Avenue

13        Suite 901

14        New York, NY 10017

15

16   BY:   HARRIS D. LEINWAND, ESQ.

17

18   LEWIS LAW LLP

19        Attorneys for CriTech Research, Inc.

20        120 Bloomingdale Road

21        Suite 100

22        White Plains, NY 10605

23

24   BY:   KENNETH M. LEWIS, ESQ.

25

- 46 -

```
1

2    LOCKE LORD BISSELL & LIDDELL LLP

3         Attorneys for Creditor, Method Electronics, Inc.

4         3 World Financial Center

5         New York, NY 10281

6

7    BY:   SHALOM JACOB, ESQ.

8

9

10   LOCKE LORD BISSELL & LIDDELL LLP

11        Attorneys for Creditor, Method Electronics, Inc.

12        111 South Wacker Drive

13        Chicago, IL 60606

14

15   BY:   COURTNEY E. BARR, ESQ. (TELEPHONICALLY)

16

17

18   MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

19        Attorneys for New Jersey Self-Insurers Guaranty

20         Association

21        Three Gateway Center

22        100 Mulberry Street

23        Newark, NJ 07102

24

25   BY:   JEFFREY BERNSTEIN, ESQ.
```

- 47 -

1

2    MORGAN, LEWIS & BOCKIUS LLP

3         Attorneys for Wagner-Smith Company

4         101 Park Avenue

5         New York, NY 10178

6

7    BY:   ANDREW D. GOTTFRIED, ESQ.

8

9

10   MORGAN, LEWIS & BOCKIUS LLP

11        Attorneys for Wagner-Smith Company

12        1701 Market Street

13        Philadelphia, PA 19103

14

15   BY:   RACHEL JAFFE MAUCERI, ESQ.

16

17

18   NANTZ, LITOWICH, SMITH, GIRARD & HAMILTON

19        Attorneys for LDI, Incorporated

20        2025 East Beltline SE

21        Suite 600

22        Grand Rapids, MI 49546

23

24   BY:   HAROLD E. NELSON, ESQ.

25

- 48 -

1

2    ORRICK, HERRINGTON & SUTCLIFFE LLP

3         Attorneys for SUMCO USA Sales Corporation

4         51 West 52nd Street

5         New York, NY 10019

6

7    BY:   ALYSSA D. ENGLUND, ESQ.

8

9

10   PHILLIPS LYTLE LLP

11        Attorneys for DuPont

12        437 Madison Avenue

13        34th Floor

14        New York, NY 10022

15

16   BY:   ALLAN H. HILL, ESQ.

17

18

19   POLSINELLI SHUGART PC

20        7 Penn Plaza

21        Suite 600

22        New York, NY 10001

23

24   BY:   JASON A. NAGI, ESQ.

25

- 49 -

1

2    SCHLANGER & SCHLANGER, LLP

3         Attorneys for Plasco, Inc.

4         105 Westchester Avenue

5         Suite 108

6         White Plains, NY 10604

7

8    BY:   MICHAEL SCHLANGER, ESQ.

9

10   SNELL & WILMER LLP

11        Attorneys for Microchip Technology Inc.

12        One Arizona Center

13        400 East Van Buren Street

14        Suite 1900

15        Phoenix, AZ 85004

16

17   BY:   STEVEN D. JEROME, ESQ.

18

19   STEVENS & LEE P.C.

20        Attorneys for Globe Motors, Inc. and Globe Motors

21        485 Madison Avenue

22        20th Floor

23        New York, NY 10022

24

25   BY:   CONSTANTINE D. POURAKIS, ESQ.

- 50 -

```
 1

 2    STITES & HARBISON PLLC

 3         SunTrust Plaza

 4         401 Commerce Street

 5         Suite 800

 6         Nashville, TN 37219

 7

 8    BY:   ROBERT C. GOODRICH JR.

 9

10

11    THOMPSON COBURN LLP

12         Attorneys for KMI Liquidating, LLC

13         One US Bank Plaza

14         St. Louis, MO 63101

15

16    BY:   DAVID D. FARRELL, ESQ.

17

18

19    THOMPSON HINE LLP

20         Special Counsel for the Debtors

21         2000 Courthouse Plaza, N.E.

22         10 W. Second Street

23         Dayton, OH 45402

24

25    BY:   JENNIFER L. MAFFETT, ESQ.
```

- 51 -

```
 1

 2    THOMPSON & KNIGHT LLP

 3         Attorneys for Creditor, Victory Packaging

 4         900 Third Avenue

 5         20th Floor

 6         New York, NY 10022

 7

 8    BY:   IRA L. HERMAN, ESQ.

 9         JENNIFER A. CHRISTIAN, ESQ. (TELEPHONICALLY)

10         GABRIELLE E. FARINA, ESQ. (TELEPHONICALLY)

11

12    TODTMAN, MACHAMIE, SPIZZ & JOHNS, P.C.

13         Attorneys for Select Industries

14         425 Park Avenue

15         New York, NY 10022

16

17    BY:   JANICE B. GRUBIN, ESQ.

18

19    TOGUT, SEGAL & SEGAL LLP

20         Attorneys for Plaintiffs

21         One Penn Plaza

22         New York, NY 10119

23

24    BY:   NEIL BERGER, ESQ.

25         DANIEL F.X. GEOGHAN, ESQ.
```

- 52 -

1

2   VEDDER PRICE P.C.

3         Attorneys for Intec Group

4         1633 Broadway

5         47th Floor

6         New York, NY 10019

7

8   BY:   MICHAEL L. SCHEIN, ESQ.

9

10

11   VORYS, SATER, SEYMOUR AND PEASE LLP

12         Attorneys for Carlisle Companies

13         52 East Gay Street

14         Columbus, OH 43216

15

16   BY:   TIFFANY STRELOW COBB, ESQ.

17

18

19   WACHTELL, LIPTON, ROSEN & KATZ

20         Attorneys for Methode Electronics

21         51 West 52nd Street

22         New York, NY 10019

23

24   BY:   DOUGLAS K. MAYER, ESQ.

25

- 53 -

1

2    WARNER NORCROSS & JUDD LLP

3         900 Fifth Third Center

4         111 Lyon Street, N.W.

5         Grand Rapids, MI 49503

6

7    BY:   MICHAEL B. O'NEAL, ESQ.

8

9

10   WILENTZ GOLDMAN & SPITZER P.A.

11        Attorneys for A-1 Specialized Services & Supplies, Inc.

12        90 Woodbridge Center Drive

13        Suite 900, Box 10

14        Woodbridge, NJ 07095

15

16   BY:   DAVID H. STEIN, ESQ.

17        LETITIA ACCARRINO, ESQ.

18

19

20   WINDELS MARX LANE & MITTENDORF, LLP

21        Attorneys for Tyco Adhesives LP

22        156 West 56th Street

23        New York, NY 10019

24

25   BY:   HOWARD L. SIMON, ESQ.

- 54 -

1

2     BODMAN LLP

3          Attorneys for Defendants, Freudenberg, et al.

4          1901 St. Antoine Street

5          6th Floor at Ford Field

6          Detroit, MI 48226

7

8     BY:   DAVID J. NOWACZEWSKI, ESQ. (TELEPHONICALLY)

9

10    BOSE, MCKINNEY & EVANS LLP

11         Attorneys for Decatur Plastic Products

12         111 Monument Circle

13         Suite 2700

14         Indianapolis, IN 46204

15

16    BY:   DAVID J. JURKIEWICZ, ESQ. (TELEPHONICALLY)

17

18    CALFEE, HALTER & GRISWOLD LLP

19         Attorneys for Defendants, Williams Advanced Materials,

20          Park Ohio Industries, and Blair Strip Steel

21         1400 KeyBank Center

22         800 Superior Avenue

23         Cleveland, OH 44114

24

25    BY:   NATHAN A. WHEATLEY, ESQ. (TELEPHONICALLY)

- 55 -

1

2      COHEN, POLLOCK, MERLIN & SMALL, P.C.

3           Attorneys for Creditor, Sasol Germany GMBH

4           3350 Riverwood Parkway

5           Suite 1600

6           Atlanta, GA 30339

7

8      BY:   KAREN F. WHITE, ESQ. (TELEPHONICALLY)

9

10     DYKEMA GOSSETT, PLLC

11          Attorneys for Defendant, MJ Celco

12          10 South Wacker Drive

13          Suite 2300

14          Chicago, IL 60606

15

16     BY:   ROBERT D. NACHMAN, ESQ. (TELEPHONICALLY)

17

18     FOX ROTHSCHILD LLP

19          Attorneys for Creditor, M&Q Plastic Products

20          Midtown Building, Suite 400

21          1301 Atlantic Avenue

22          Atlantic City, NJ 08401

23

24     BY:   BRIAN ISEN, ESQ. (TELEPHONICALLY)

25          MICHAEL J. VICSOUNT, JR., ESQ. (TELEPHONICALLY)

- 56 -

1

2      FOX ROTHSCHILD LLP

3            Attorneys for Defendant, DSSI

4            75 Eisenhower Parkway

5            Suite 200

6            Roseland, NJ 07068

7

8      BY:   RICHARD M. METH, ESQ. (TELEPHONICALLY)

9

10     GOLDBERG KOHN

11           Attorneys for Creditor, Johnson Controls

12           55 East Monroe Street

13           Suite 3300

14           Chicago, IL 60603

15

16     BY:   JEREMY M. DOWNS, ESQ. (TELEPHONICALLY)

17

18     GREENEBAUM DOLL & MCDONALD PLLC

19           Attorneys for Defendant, DSSI

20           3500 National City Tower

21           101 South Fifth Street

22           Louisville, KY 40202

23

24     BY:   CLAUDE R. "CHIP" BOWLES, JR., ESQ. (TELEPHONICALLY)

25

- 57 -

1

2    HASKELL SLAUGHTER

3          Attorneys for Defendant, Simco Construction Inc.

4          1400 Park Place Tower

5          2001 Park Place North

6          Birmingham, AL 35203

7

8    BY:   ROBERT H. ADAMS, ESQ. (TELEPHONICALLY)

9

10   ICE MILLER LLP

11         Attorneys for Creditor, Fin Machine Company

12         One American Square

13         Suite 2900

14         Indianapolis, IN 46282

15

16   BY:   HENRY A. EFROYMSON, ESQ. (TELEPHONICALLY)

17

18   KEATING, MUETHING & KLEKAMP PLL

19         Attorneys for Defendant, FA Pech

20         One East Fourth Street

21         Suite 1400

22         Cincinnati, OH 45202

23

24   BY:   JASON V. STITT, ESQ. (TELEPHONICALLY)

25

- 58 -

1

2    KELLEY DRYE & WARREN LLP

3         Attorneys for Creditor, Tata America International

4         101 Park Avenue

5         New York, NY 10178

6

7    BY:   GILBERT R. SAYDAH, ESQ. (TELEPHONICALLY)

8

9

10   KEMP KLEIN

11        Attorneys for Defendant, Shuert Industries, Inc.

12        201 W. Big Beaver Road

13        Suite 600

14        Troy, MI 48084

15

16   BY:   NORMAN D. ORR, ESQ. (TELEPHONICALLY)

17

18

19   KIRKLAND & ELLIS LLP

20        Attorneys for Defendant, Magnesium Aluminum Corp.

21        300 North LaSalle

22        Chicago, IL 60654

23

24   BY:   DAVID SPIEGEL, ESQ. (TELEPHONICALLY)

25

- 59 -

```
 1

 2   LAMBERT, LESER, ISACKSON, COOK & GIUNTA, P.C.

 3         Attorneys for Creditors, ProTech Machine and Stephenson &

 4          Sons

 5         309 Davidson Building

 6         916 Washington Avenue

 7         Bay City, MI 48708

 8

 9   BY:   SUSAN M. COOK, ESQ. (TELEPHONICALLY)

10

11   LOEB & LOEB, LLP

12         Attorneys for Interested Party, Kyocera

13         345 Park Avenue

14         New York, NY 10154

15

16   BY:   DANIEL B. BESIKOF, ESQ. (TELEPHONICALLY)

17

18   MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

19         Attorneys for Creditor, Techcenteral

20         150 West Jefferson

21         Suite 2500

22         Detroit, MI 48226

23

24   BY:   DONALD J. HUTCHINSON, ESQ. (TELEPHONICALLY)

25         TIMOTHY A. FUSCO, ESQ. (TELEPHONICALLY)
```

- 60 -

1

2    NIXON PEABODY LLP

3         For Defendant, Corning Inc.

4         437 Madison Avenue

5         New York, NY 10022

6

7    BY:   GREGORY J. MASCITTI, ESQ. (TELEPHONICALLY)

8

9    RUSKIN MOSCOU FALTISCHEK, P.C.

10        Attorneys for Creditors, Wells Fargo Business, Wells

11         Fargo Minnesota

12        East Tower, 15th Floor

13        1425 RXR Plaza

14        Uniondale, NY 11556

15

16   BY:   JEFFREY A. WURST, ESQ. (TELEPHONICALLY)

17

18   SCHAFER AND WEINER, PLLC

19        Attorneys for Defendant, Macsteel

20        40950 Woodward Avenue

21        Suite 100

22        Bloomfield Hills, MI 48304

23

24   BY:   RYAN D. HEILMAN, ESQ. (TELEPHONICALLY)

25

- 61 -

1

2   VARNUM LLP

3        Attorneys for Creditor, Summit Olymers

4        Bridgewater Place

5        Grand Rapids, MI 49501

6

7

8   BY:   BRYAN R. WALTERS, ESQ. (TELEPHONICALLY)

9

10   WOLFSON BOLTON

11        Attorneys for Defendant, Excelo Machine Tools & Access

12         One Technology Group, LLC

13        3150 Livernois

14        Suite 275

15        Troy, MI 48083

16

17   BY:   ANTHONY J. KOCHIS, ESQ. (TELEPHONICALLY)

18

19   AYALA HASSEL (TELEPHONICALLY)

20

21   GARY MILLER, IN PROPRIA PERSONA (TELEPHONICALLY)

22

23   RAMONA S. NEAL (TELEPHONICALLY)

24

25

- 62 -

1                 P R O C E E D I N G S

2            THE CLERK:  All rise.

3            THE COURT:  Please be seated.  Okay, good morning.

4     DPH Holdings.

5            MR. LYONS:  Good morning, Your Honor.  John Lyons on

6     behalf of the reorganized debtors.

7            With Your Honor's permission, given the amount of

8     matters that are up on the omnibus hearing, Your Honor, with

9     your permission we'd like to complete the claims hearing first,

10    which should go rather quickly -- there's only one contested

11    matter, which is not evidentiary, just argument -- and then

12    proceed to the omnibus hearing.

13            THE COURT:  Okay.

14            MR. LYONS:  Okay, Your Honor, this is the thirty-fifty

15    claims hearing.  Items -- I'll skip right to the matters that

16    are currently going forward today, which starts at item 4 on

17    the agenda, Your Honor.  Items 4 through 6 have been settled

18    and resolved, and I won't go into any more detail other than we

19    will be submitted, if we have not already submitted, agreed

20    orders for Your Honor's consideration --

21            THE COURT:  Okay.

22            MR. LYONS:  -- and entry.  To the contested matters,

23    Your Honor, we have two:  First we have the claim objection

24    regarding the New Jersey Self-Insurers Guaranty Association.

25    Your Honor, if I can skip over that and go to the next one,

- 63 -

1    which is item number 8, which is the sufficiency hearing

2    regarding the claim of Paullion Roby first and then we'll turn

3    back to the Guaranty Association --

4            THE COURT:  Okay.

5            MR. LYONS:  -- which is the only contested matter

6    today.

7            THE COURT:  All right.  So who's here on behalf of Mr.

8    Roby or the government agency?

9        (No response)

10           THE COURT:  No one?

11       (No response)

12           THE COURT:  All right.  I take it the basis for the

13   objection is that the proof of claim asserts no basis for Mr.

14   Roby's claim.  Obviously Mississippi asserts a basis in that

15   he's asserted that they've seen.  But did he not file --

16   there's no underlying proof of claim by him --

17           MR. LYONS:  No, there is a former proof of claim --

18           THE COURT:  -- in the case?

19           MR. LYONS:  -- that the Mississippi Guaranty

20   Association filed, but it's very generic.

21           THE COURT:  Right.

22           MR. LYONS:  There are no real specific details at all

23   from Mr. Roby.

24           THE COURT:  So he didn't file a proof of claim?

25           MR. LYONS:  He did not.

- 64 -

1          THE COURT:  And the claim that they have filed sets

2     forth a claim that they would have on a prima facie basis if in

3     fact he had a valid claim, but it doesn't attach his claim

4     either as asserted against Mississippi or as against the

5     Mississippi Workers' Comp Fund or against the debtor.

6          MR. LYONS:  Correct.

7          THE COURT:  And that's really the problem:  There's no

8     prima facie basis for the underlying claim upon which

9     Mississippi relies.

10         MR. LYONS:  That's right, Your Honor.

11         THE COURT:  So on that basis, the claim doesn't set

12    forth a prima facie basis for a claim.  Simply stating that Mr.

13    Roby has asserted a claim isn't enough to show that he has a

14    claim.  So on that basis, Mississippi's claim should be

15    disallowed.  They had notice of this hearing; they filed a

16    supplemental response.  But I think they were clearly on notice

17    of the debtors' -- the basis for the debtors' objection, which

18    is there was no underlying fact asserted in respect of Mr.

19    Roby's claim.  So I'll grant the claim objection.

20         MR. LYONS:  Thank you, Your Honor.  And then finally,

21    Your Honor, item number 7, which is the remaining matter on the

22    claims agenda; it's the objection to the New Jersey Guaranty

23    Association, relating to workers' compensation.

24         THE COURT:  Right.

25         MR. LYONS:  Your Honor, we made certainly our

- 65 -

1     arguments in our papers and we're more than happy to rely on

2     those arguments.

3              THE COURT:  Is anyone here for New Jersey?

4              MR. BERNSTEIN:  Good morning, Your Honor.  Jeffrey

5     Berns --

6              THE COURT:  I think you'd have to come up, because

7     it's the microphone that gets picked up --

8              MR. BERNSTEIN:  Thank you, Your Honor.

9              THE COURT:  -- for the transcript.

10             MR. BERNSTEIN:  Good morning, Your Honor.  Jeffrey

11    Bernstein, McElroy, Deutsch, Mulvaney, Carpenter, for the New

12    Jersey Self-Insurers Guaranty Association.

13             THE COURT:  Right.

14             MR. LYONS:  Your Honor, I know the Court has read the

15    papers, and I guess if the Court wants I could just summarize

16    our position, unless the Court has already reviewed --

17             THE COURT:  Well, I've read the papers.  What I don't

18    understand is this isn't really a claim objection, right?  This

19    is an objection over where the source of payment of the

20    underlying claims should be coming from?

21             MR. BERNSTEIN:  It's interesting, Your Honor.  I

22    agree.  Our hope would be that we would have no claim, that in

23    fact the proceeds of the bond would be used for the pre-

24    petition claims.  Your Honor entered an order Tuesday expunging

25    that claim consensually, because we understand and agree that

- 66 -

1    that's what the bond should be used for.  The concern is that

2    the debtor has indicated quite clearly that it intends to use

3    the bond for the post-petition claims.  And the problem is that

4    the post-petition claims should not be paid out of the bond.

5    The bond is not property of the bankruptcy estate.  The bond is

6    tendered to the State of New Jersey to provide assurances of

7    payment of the claims.

8         THE COURT:  Well, no one -- has -- I didn't see the

9    bond.  No one really -- no one attached the bond as far as I

10   could tell.

11        MR. BERNSTEIN:  Right.

12        THE COURT:  I don't really know what it's for.  I

13   don't know how it's supposed to be applied.  If a claim goes

14   unpaid, it's still supposed to just sit there?  I would assume

15   that if a claim goes unpaid, it's supposed to be applied to the

16   claim.

17        MR. BERNSTEIN:  Well, the bond is there to satisfy

18   claims.  And Your Honor makes a good point.  And I think the

19   position of the association is it doesn't really matter in this

20   sense to look at the bond.  Certainly the bond was fashioned

21   years ago.  The problem the association has --

22        THE COURT:  Well --

23        MR. BERNSTEIN:  -- is that under the plan, the

24   debtor's supposed to pay administrative expense --

25        THE COURT:  But if it --

- 67 -

1           MR. BERNSTEIN:  -- in the ordinary course.

2           THE COURT:  But if it could be paid from the bond, the

3      expenses aren't even owing, right, because there's a bond to

4      pay it?

5           MR. BERNSTEIN:  If the bond is sufficient.

6           THE COURT:  Well, it's sufficient until it's

7      insufficient, right?

8           MR. BERNSTEIN:  Well, there was an actuarial work done

9      by Oliver Wyman.  This was what resulted in the agreement to

10     expunge the pre-petition claim.  The bond is for 5.5 million.

11          THE COURT:  Right.

12          MR. BERNSTEIN:  The concern we have is that the

13     argument about the administrative expense is not just a

14     throwaway, because, for example, the Oliver Wyman conclusion

15     was that on a discounted basis, claims should reach perhaps 2.9

16     million.  We've already learned since the papers have been

17     filed --

18          THE COURT:  Post-petition.

19          MR. BERNSTEIN:  Total.

20          THE COURT:  Total.

21          MR. BERNSTEIN:  Total.  We've already learned since

22     the filing of our papers that two million has been drawn down

23     on the bond, that based on information I'm getting from the

24     client through the Department of Banking and Insurance in

25     Delphi, there's another 1.8 million dollar reserve, and then on

- 68 -

1   top of that there are administrative expenses.  So we're north

2   of four million.

3           So it's an important decision as to where to --

4           THE COURT:  But --

5           MR. BERNSTEIN:  -- take the funds from --

6           THE COURT:  -- I don't --

7           MR. BERNSTEIN:  -- if the estate can satisfy them.

8           THE COURT:  But, again, without saying -- is it

9   supposed to be an evergreen bond?  Does the debtor have an

10  obligation to keep replenishing it?  I mean, if it's there,

11  it's there to pay, and then the debtor has an obligation to pay

12  any difference.  I just don't -- I wasn't -- I really didn't

13  see a basis for the debtor objecting to the claim, because

14  unless it was a request for immediate payment out of the

15  debtors' own funds, which I didn't read the claim to be because

16  the claim says it's a claim to the extent that we, i.e., your

17  client, have to pay, and so far you haven't had to pay.

18          MR. BERNSTEIN:  That is correct.

19          THE COURT:  So --

20          MR. BERNSTEIN:  You know, we haven't had to pay.

21          THE COURT:  So, I don't -- I mean, I don't see how the

22  objection counts -- I don't see how the objection should be

23  sustained, because it's a contingent claim -- actually

24  contingent administrative --

25          MR. BERNSTEIN:  Right.

- 69 -

1          THE COURT:  -- expense claim.  But on the other hand,

2     on what's before me, I don't see a requirement that the debtor

3     replenish the bond or keep the bond from what it was intended

4     to do, as far as I can tell, which is to pay unpaid claims.

5          MR. BERNSTEIN:  Oh, yes, Your Honor, we're not asking

6     the debtor -- and, again, the State of New Jersey monitors and

7     administers the bond.  The Guaranty Association is the payor of

8     last resort.  There's no request whatsoever for the debtor to

9     replenish the bond.

10         THE COURT:  Okay.

11         MR. BERNSTEIN:  It's a matter of the Court protecting

12    what the bond should be used for.  And --

13         THE COURT:  But doesn't the bond govern that?  I mean,

14    doesn't the bond say what it's supposed to be used for?

15         MR. BERNSTEIN:  Well, I'm going to agree, Your Honor,

16    that at the time the bond was fashioned, we could just make a

17    reasonable conclusion years ago.  It was intended to pay

18    whatever valid workers' compensation claims they are.  Your

19    Honor, that's a sensible --

20         THE COURT:  Okay.

21         MR. BERNSTEIN:  -- approach of course.  But the

22    fundamental problem we have is, because this was a confirmed

23    case, because under applicable law, and I don't think the

24    debtor contests that, administrative expenses are to be paid by

25    DPH, they should in fact be paid by DPH, but not invading

- 70 -

1   property which doesn't belong to it.

2            THE COURT:  Well --

3            MR. BERNSTEIN:  The bond was tendered to the State of

4   New Jersey.

5            THE COURT:  But, again, what does the bond say?  I

6   mean, it's there for a purpose.  I'm not sure it's really

7   invading.  It may be there to pay these amounts.  That's my --

8            MR. BERNSTEIN:  All right.

9            THE COURT:  -- issue with this.

10           MR. BERNSTEIN:  Okay.

11           THE COURT:  So my inclination is to not allow the

12   objection.  The supplemental response raised a new basis for

13   the objection, which was 502(e).

14           MR. BERNSTEIN:  Right.

15           THE COURT:  I think, particularly given some of the

16   more recent case law, albeit in a different context in the

17   Second Circuit, in which the Second Circuit, for example, said

18   that 502(d) doesn't apply to administrative expenses, I'm not

19   sure here 502(e) would work.  But I don't think I have to get

20   to that, because this is a case where I would routinely later

21   permit reconsideration under 502(j) if in fact the agency did

22   have to pay.  So I don't think the claim should be disallowed,

23   frankly.  That doesn't make sense to disallow it.

24           MR. BERNSTEIN:  Thank you.

25           THE COURT:  On the other hand, I don't see even a

- 71 -

1  request.  But if there was a request, I don't see a basis on

2  this record to direct that the claims be paid out of the -- you

3  know, other cash of Delphi when there's a bond there that's

4  supposed to pay them.

5          MR. BERNSTEIN:  Your Honor, may I address one more

6  point, then?

7          THE COURT:  Okay.  I mean, unless there's some

8  statutory requirement to maintain a sufficient level of bond,

9  or the bond's supposed to be evergreen and -- I don't see that

10 in the papers, so --

11         MR. BERNSTEIN:  Okay.  If -- we're gratified.  If Your

12 Honor wants to sustain it, we'll still have a claim.  The

13 timing concern is --

14         THE COURT:  I mean, it's a liquidated claim.  You may

15 never -- you'd be happy not to have a claim, but --

16         MR. BERNSTEIN:  Right.  We'd be delighted.

17         THE COURT:  Right.  But --

18         MR. BERNSTEIN:  The problem with the 502, and I

19 understand Your Honor's point, is it sounds like, and I think

20 we all understand, that DPH is going to liquidate.  And they

21 did submit a budget, I understand, and they did submit it under

22 seal.  One would want to have the comfort that money would be

23 there --

24         THE COURT:  Well, it has an obligation to make the

25 payments of these claims, and that's an obligation under the

- 72 -

1    plan.  I don't really get a sense at this point that there's a

2    legitimate -- there's a concern but that there's -- we're at a

3    point where you're thinking that that won't happen.  So without

4    prejudice to your rights to come in later and say, you know,

5    these claims are not going to get paid and therefore the plan's

6    failed, I think the proper resolution here is to deny the

7    objection but not to require DPH to have these claims be paid

8    from any particular source.  If there's money in a bond that's

9    been allocated to pay them under the terms of the bond, that

10   should go to pay it.

11         I mean, it does have a reversionary interest in the

12   bond.  I mean, that -- it is property of the estate to that

13   extent.  To the extent that the claims come in below the 5.5

14   million, the surplus goes to the estate.

15         MR. BERNSTEIN:  I guess, then, Your Honor's saying

16   that if the actuarial experience as it evolves --

17         THE COURT:  Yeah.

18         MR. BERNSTEIN:  -- changes, we can come back in front

19   of Your Honor --

20         THE COURT:  I think you can.

21         MR. BERNSTEIN:  -- and revisit this question.

22         THE COURT:  Yeah, I think you should, because that

23   means that the debtors -- or DPH should be, you know,

24   husbanding all of its administrative payments at that point --

25         MR. BERNSTEIN:  Thank you, Your Honor.

- 73 -

1          THE COURT:  -- not just to the workers of New Jersey

2     but to every administrative claim that hasn't been paid yet.

3          MR. BERNSTEIN:  Thank you, Your Honor.  Maybe we'll do

4     that.

5          THE COURT:  Okay.

6          MR. BERNSTEIN:  Thank you.

7          THE COURT:  So do you want to submit an order to that

8     effect?

9          MR. LYONS:  Yes, Your Honor.  Now, one clarification;

10    I think it is important as we're winding down these claims.  So

11    as I understand it, as we get close to the end here and we

12    decide -- or request Your Honor to start closing cases, at that

13    point we're going to have to pick a finite time and either fund

14    these claims or --

15         THE COURT:  Right.

16         MR. LYONS:  -- Your Honor's going to have to decide

17    they're ultimately never going to come to fruition?

18         THE COURT:  That's fair, but --

19         MR. LYONS:  So they're going to be hanging --

20         THE COURT:  -- that should be on notice to --

21         MR. LYONS:  Absolutely.

22         THE COURT:  -- to entities like the New Jersey

23    Workers' Compensation --

24         MR. LYONS:  Very good.

25         THE COURT:  -- Fund.

                                                              - 74 -

1            MR. LYONS:  We'll submit an order to that effect.

2            THE COURT:  Okay.

3            MR. BERNSTEIN:  Thank you, Your Honor.

4            THE COURT:  Thank you.

5            MR. LYONS:  I'd like to turn over the podium to my

6    colleague Mr. Meisler who will begin the omnibus portion of the

7    hearing.

8            THE COURT:  Okay.

9            MR. MEISLER:  Good morning, Your Honor.

10           THE COURT:  Good morning.

11           MR. MEISLER:  Ron Meisler of Skadden Arps on behalf of

12   the reorganized debtors.

13           Your Honor, matters 1 through 4 -- I'm sorry, Your

14   Honor.  We submitted an agenda, am omnibus agenda --

15           THE COURT:  Right.

16           MR. MEISLER:  -- yesterday at about noon, and with

17   Your Honor's permission we'll proceed in that order.

18           THE COURT:  Okay.

19           MR. MEISLER:  Your Honor, matters 1 through 4 of the

20   agenda have been adjourned.  If Your Honor has any questions

21   about those matters, I'm here to answer those questions, but

22   otherwise we can move to matter 5 on the agenda.

23           THE COURT:  No, that's fine.

24           MR. MEISLER:  Thank you, Your Honor.  Matter number 5

25   is Method's motion for an approval to file an amended

- 75 -

1    counterclaim.  Your Honor, this matter dates back to the May

2    20th hearing.  And I turn over the podium to Mr. Mayer, who is

3    here on behalf of Methode.

4          THE COURT:  Okay.

5          MR. MAYER:  Good morning, Your Honor.  Douglas Mayer

6    from Wachtell, Lipton, Rosen & Katz, for Method Electronics.

7    I'll be very brief, Your Honor.

8          THE COURT:  Okay.

9          MR. MAYER:  If the Court will recall, as Mr. Meisler

10   said, we had a hearing back in May.  There was extensive

11   colloquy on a variety of matters.  Specifically, however,

12   what's now still at issue is what counterclaim for contract

13   breach and damages may Methode assert.  And I believe there's a

14   disposition that the Court made on the record at the hearing;

15   it's embodied in an order that the Court subsequently entered

16   to the effect that Methode should tender a proposed

17   counterclaim to the reorganized debtor, and the reorganized

18   debtor would either consent to that or we would return to Your

19   Honor for a determination as to whether that claim should

20   proceed -- could proceed, excuse me.

21         Substantively, the gist of what Your Honor determined

22   that's relevant at the May hearing is that a claim for a post-

23   bar date breach of the relevant contract by Delphi in August of

24   2009 when it terminated -- gave notice of termination of that

25   contract and gave rise to damages as a result of that breach,

- 76 -

1    where there had been prior performance of the contract between

2    the parties, up until that point was a claim that did not run

3    afoul of the bar date for -- the first bar date for

4    administrative claims in these cases.  And, hence, such a claim

5    could be proposed by Methode.  That is -- that rewrite of the

6    counterclaim, if you will, that amendment to the counterclaim,

7    is what we've tendered to Delphi.  Delphi has objected,

8    basically saying that this is really all still talking about

9    pre-bar date conduct, there's really nothing post-bar date

10   here.  I think our response is pretty straightforward, as Your

11   Honor has seen in the submission that, again, what we're

12   saying, which is precisely what we thought the Court had

13   ordered as appropriate to say, is we are stating a claim for

14   breach of contract based on an August notice of termination

15   which was post the bar date, and for damages that flow from

16   that post-bar date termination.

17          THE COURT:  But aren't you saying more than that?

18   Aren't you saying that the August termination, which standing

19   alone, obviously, is post-bar date, is a breach not because it

20   was sent in August but because it was unlawfully based on pre-

21   July 15th conduct?  I mean, that's what renders the termination

22   notice unlawful, right?

23          MR. MAYER:  Well, what renders the termination notice

24   unlawful is a -- is indeed bad-faith conduct, in our view.

25   Some of that conduct we could say is evidenced by pre-bar date

- 77 -

1    matters, including --

2            THE COURT:  But it actually is -- but --

3            MR. MAYER:  -- the negotiation phase.

4            THE COURT:  Well, it's more than evidenced.  It is the

5    pre-bar date conduct, right?

6            MR. MAYER:  I'm sorry, the pre -- there is pre-date

7    bar -- pre-bar date -- excuse me -- conduct that's -- that is

8    pertinent and that we think can be brought into the case.  We

9    think, however, that the bad faith is a bad faith in the

10   termination.  And, again, all the rest of the record of

11   conduct, which was both conduct that occurred before the bar

12   date and conduct that occurred after, in terms of these

13   resourcing activities that we've discussed, would be our basis

14   for asserting that the termination was made in bad faith.

15           THE COURT:  I just don't think your complaint parses

16   through this sufficiently.  It really covers the gamut here.  I

17   mean, paragraph 2 is the key thing; it says "Due to Delphi's

18   unlawful contract termination".  It was unlawful.  Right?  It

19   was unlawful for a reason.

20           MR. MAYER:  Yes.

21           THE COURT:  As per the contract, they had a right to

22   terminate.  So something else rendered it unlawful, right?

23           MR. MAYER:  Yes.

24           THE COURT:  So if that something else happened before

25   the bar date and was covered by the bar date order, then, as I

- 78 -

1    view it and as I view the prior order and the transcript, it's

2    out, because it gives rise to the right.  It gives right to the

3    claim.  If, on the other hand, you're saying that, you know,

4    there was something else that happened after the bar date, then

5    that's -- then that unlawfulness isn't covered by the bar date

6    order.  And what I did say is that you could use evidence from

7    the pre-bar date period to show or to help the Court understand

8    why the post-bar date conduct was unlawful or improper.

9         But it's not simply enough to say that they continued

10   to have the same idea that they had pre-bar date, because

11   that's just the same thing; that's just a continuation.

12        MR. MAYER:  Well, Your Honor, I guess what I'm not --

13   I think I'm not understanding and what's the Court's saying is

14   we're not just talking about having an idea; we're talking

15   about actions that were undertaken.

16        THE COURT:  But the complaint doesn't really say that.

17   I mean, that's what I thought you guys were going to be doing

18   in either your discussions or in a complaint that would be

19   filed.  Because of the bar date, I think the complaint here

20   needs to be more specific as to what actually rendered the

21   termination unlawful --

22        MR. MAYER:  Okay.

23        THE COURT:  -- for me or any court to know whether

24   that allegation is barred by the bar date order or not.

25        MR. MAYER:  Okay.

- 79 -

1          THE COURT:  All this says is it's unlawful.

2          MR. MAYER:  Yes.

3          THE COURT:  And it -- you know, that -- it just

4    doesn't really -- I mean, particularly knowing the history of

5    this from the May hearing and the argument and the colloquy

6    then, I can well imaging that what might be included in this

7    complaint is a -- you know, basically just say they continued

8    to think and act like they did before.  And I don't think

9    that's sufficient.  I think it has to be something new.

10         MR. MAYER:  Okay.  Well, I understand what Your

11   Honor's saying.

12         THE COURT:  And maybe there is.  I mean, maybe there

13   is something new.  That was the premise of why I -- well, it

14   was rendered moot because there was an assertion that it would

15   be something new and -- but I had you all sit down and talk

16   through what those things would be and then gave you the right

17   to file a proposed amended claim that wouldn't run afoul of the

18   bar date.

19         But if it's really based upon pre-bar date conduct and

20   just a continuation of that conduct, I just don't -- you know,

21   that would be covered by the bar date.  So -- and I don't -- I

22   mean, what happened here with the complaint is it actually

23   became less specific, which gave me some pause because I -- I

24   mean, I think it was really incumbent to be more specific as to

25   what was the post-bar date conduct.

- 80 -

1           Again, the termination here isn't the cause of action;

2    it's the wrongful termination based on something that, as I

3    gather, invalidates the right to terminate.

4           MR. MAYER:  Yes.

5           THE COURT:  Right?  So I think we're still focusing on

6    that.

7           MR. MAYER:  So --

8           THE COURT:  So it's not enough just to say they

9    terminated or terminated wrongfully, because -- or unlawfully,

10   as paragraph 2 says, because you still need to show that what

11   renders it unlawful or wrongful was conduct that was post-bar

12   date --

13          MR. MAYER:  Let me make --

14          THE COURT:  -- and not just a mere continuation of the

15   pre-bar date conduct.

16          MR. MAYER:  And, Your Honor, I just want to make sure

17   I understand what I think I understand, and try to clarify it.

18   Is -- you're saying that if there is new conduct that emerged,

19   that changes --

20          THE COURT:  I need to see --

21          MR. MAYER:  -- the Court's view.

22          THE COURT:  -- what it said.  I mean, I didn't see

23   what it is.

24          MR. MAYER:  I --

25          THE COURT:  That's -- I mean, that --

- 81 -

1          MR. MAYER:  I understand, Your Honor.  And --

2          THE COURT:  I'm not going to tell you what you have to

3     show --

4          MR. MAYER:  No, no, no.

5          THE COURT:  -- other than --

6          MR. MAYER:  I understand.

7          THE COURT:  -- just state it generically.

8          MR. MAYER:  Thank you.  But one other aspect of this:

9     To the extent that Methode was unaware of conduct that had

10    occurred and only learned of that conduct post-bar date, I

11    guess it's not clear to me --

12         THE COURT:  Well --

13         MR. MAYER:  -- what the Court --

14         THE COURT:  -- you know, there --

15         MR. MAYER:  -- is saying about that.

16         THE COURT:  -- that -- that's a -- we'll have to deal

17    with that when you file the amended complaint.  I mean, there

18    are a number of cases that deal with that --

19         MR. MAYER:  Yes.

20         THE COURT:  -- fact pattern, mostly in the tort --

21    mass tort area.

22         MR. MAYER:  Right.

23         THE COURT:  There's you know, the Third Circuit cases

24    leading -- what is it?  Chemtron, I think?  Anyway.  I'm not

25    sure that gets you off the hook.

- 82 -

1          MR. MAYER:  No, I understand.  I just wasn't sure if

2     the Court was addressing that at this time.

3          THE COURT:  No, I'm not.

4          MR. MAYER:  Okay.

5          THE COURT:  I'm not.

6          MR. MEISLER:  Your Honor, just for a little bit of

7     clarification, because I feel like we're now on strike number

8     2, and it's expensive for us to --

9          THE COURT:  Well, no, I understand but, on the other

10    hand, this isn't really a question of amending a complaint;

11    it's filing a claim that doesn't run afoul of the bar date.  So

12    I think, you know, they're allowed to have another try at it.

13         MR. MAYER:  Understood, Your Honor, but I just want to

14    point the Court to paragraph 20 of their amended counterclaim,

15    because at its core, yes, they're arguing that it's an unlawful

16    termination, but in fact the way I read their amended

17    counter --

18         THE COURT:  I understand.  I think it may be hard for

19    them to do this, but -- I'm now saying what -- you know, I'm

20    saying again what you need to show.  By the way, issues that

21    you may have about amending the complaint could be raised in

22    the underlying litigation.  But we're just dealing with

23    Methode's desire to comply with the bar date.

24         MR. MAYER:  Understood.

25         THE COURT:  It may be hard for them to do.  I'm

- 83 -

1    assum -- well, I'm not going to assume, but one could perhaps

2    infer that it was done this way because it couldn't be done

3    specifically.

4         MR. MAYER:  Understood, Your Honor.  But where I feel

5    like we are spinning our wheels, and spinning our wheels is

6    costing the estate money, is that we have provisions in our

7    terms and conditions that are clear and unambiguous.  We have

8    the provision 11, which is the termination for convenience, and

9    29 --

10         THE COURT:  I understand, but, you know, if they can

11    allege that Delphi did something new and taking the

12    complaint -- the original complaint at its face value

13    sufficiently outside of good faith and fair dealing post-

14    July -- you know, post-June 1, then they're okay.

15         MR. MAYER:  But, Your Honor, as I read it, and, Your

16    Honor, I do understand the ruling, but as I read it, what

17    they're saying is they negotiated a bad contract --

18         THE COURT:  I unders --

19         MR. MAYER:  -- and they have remorse.

20         THE COURT:  I'm saying this complaint doesn't do the

21    trick.

22         MR. MAYER:  Okay, Your Honor.  Thank you.

23         THE COURT:  Okay.

24         MR. MEISLER:  All right?

25         THE COURT:  Okay, so, Mr. Meisler, you can submit an

- 84 -

1     order to that effect.

2               MR. MEISLER:  Thank you, Your Honor.

3               THE COURT:  Okay.

4               MR. MEISLER:  Your Honor, the next matter on the

5     agenda is matter number 6, which is the first wave of motions

6     to dismiss the certain reorganized debtors' avoidance actions,

7     which will be led by Mr. Fisher.

8               With Your Honor's permission -- Mr. Lyons and I don't

9     have an active role in this part of the agenda, and with Your

10    Honor's permission, I would ask that we be excused.

11              THE COURT:  That's fine.

12              MR. MEISLER:  Thank you, Your Honor.

13              MR. FISHER:  Good morning, Your Honor.

14              THE COURT:  Good morning.

15              MR. FISHER:  Eric Fisher from the law firm of Butzel

16    Long, for the reorganized debtors.

17              Your Honor, I wanted to briefly describe what it is

18    that is before Your Honor with respect to the preference

19    actions this morning, in the way of a short inventory.  On

20    April 23rd, 2010, Your Honor entered a scheduling order

21    providing that any motions to dismiss filed with respect to

22    these preference actions on or before May 14, 2010 would be

23    heard today.  And that is of course what's on before Your

24    Honor.

25              In Exhibit A to the reorganized debtors' omnibus

- 85 -

1   response to the motions to the dismiss that were filed, we

2   provided a list of all of those motions that had been filed.

3   There are eighty-six motions listed there.  And in addition to

4   the eighty-six listed on Exhibit A, I wanted to report to Your

5   Honor one omission which was separately reported in a letter to

6   the Court, which is Regents Bank, Birmingham, also filed a

7   motion, and that's in Action 07-02737.  And in addition, GBC

8   Metals moved to intervene in the action of Olin Corp., which is

9   07-02479.  The reorganized debtors consented to that

10  intervention, and GBC Metals filed a motion to dismiss.

11         So in addition to the eighty-six listed on Exhibit A,

12  there are two additional motions that the Court should be aware

13  of that are not listed there.

14         THE COURT:  Okay.  And these are the first-wave

15  motions?

16         MR. FISHER:  Yes, these are all the first-wave

17  motions.

18         THE COURT:  Okay.

19         MR. FISHER:  With respect to Exhibit A, there are

20  three actions that have been resolved and dismissed.  Those

21  actions are Auramet Trading, LLC, which is 07-02130; Autocam,

22  which is 07-02135; and AKS Receivables, which is 07-02140.  And

23  our law firm represents DPH Holdings with regard to the

24  majority of these preference actions.  There are certain

25  actions that are being handled by the law firm of Togut, Segal

- 86 -

1   & Segal.  And movants that are on for the first-wave hearing

2   today that are represented, in which DPH Holdings is

3   represented by Togut, are referenced in Exhibit B.

4          And in just a moment, if it's acceptable to the Court,

5   I'll turn the podium over to Togut to just briefly describe for

6   Your Honor any developments with regard to those actions.

7          THE COURT:  Okay.

8          MR. FISHER:  And the movants have organized themselves

9   for purposes of today's argument.  It's my understanding that

10  the lion's share of the argument will be led by the law firms

11  of Cleary Gottlieb, Morgan Lewis, Honigman Miller, and Barnes &

12  Thornburg.  But of course I will leave it to the movants to

13  describe the issues and how they propose to organize the

14  argument before Your Honor.

15         And so I'd like to turn the podium over to Mr. Geoghan

16  from Togut Segal just to briefly address any changes to Exhibit

17  B that may have occurred since this was submitted to Your

18  Honor.

19         THE COURT:  Okay.

20         MR. GEOGHAN:  Good morning, Your Honor.  Dan Geoghan

21  from Togut, Segal & Segal, here on behalf of the plaintiffs.

22         Your Honor, there were a few small changes.  The

23  Prudential Relocation matter, 07-02702, is being dismissed.

24  The parties will submit a stipulation and order.  In addition,

25  Your Honor, issues raised by Defendant Sumitomo Sitix Silicon,

- 87 -

1    now known as SUMCO, I believe, USA Corporation, regarding

2    assumed contracts, have been largely resolved, subject to

3    Sumitomo's rights to assert defenses.  And there are things

4    that get to remaining transfers; we'll submit a stipulation on

5    that.

6           Sumitomo Electric Wiring Systems is being dismissed.

7    The parties will submit a stipulation on that.  And in

8    addition, Your Honor, the plaintiffs have settled with Sumitomo

9    Plastics, Sumitomo Plastics America, and NGK Sparkplugs USA,

10   and those matters are now resolved.

11          Thank you, Your Honor.

12          THE COURT:  Okay.

13          Okay, so why don't I hear from the movants.

14          MS. SCHWEITZER:  Good morning, Your Honor.  I'm Lisa

15   Schweitzer from Cleary Gottlieb Steen & Hamilton LLP, counsel

16   to the HP and EDS defendant in their respective adversary

17   proceedings.

18          First, we'd like to thank Your Honor; we didn't get to

19   do it in person last time.  So thank you for allowing us to

20   coordinate these various motions to dismiss.  As you're aware,

21   there are individual defendants with individual adversary

22   proceedings, but I believe we all benefit from the ability to

23   share the argument time and not rehash similar arguments over

24   an extended period of time.

25          As Mr. Butzel (sic) indicated that the defense counsel

- 88 -

```
 1    has been working together to the extent that we possibly can

 2    coordinate these efforts, and have briefed certainly at the

 3    reply brief stage to lead briefs, and people have chosen to

 4    join into that.  And as Mr. Butzel indicated that the primary

 5    arguments would be done by myself, Mr. Winsten of the Honigman

 6    firm, Mr. Gottfried of the Morgan Lewis firm, and Ms. Thorne of

 7    Barnes & Thornburg.

 8           One thing to make clear for Your Honor is that the

 9    other defense counsel that we spoke to, which is most if not

10    all of them, had agreed to this arrangement of us being lead

11    counsel, with the understanding that they would share in our

12    interest in avoiding duplication.  They don't want the lack of

13    eighty people standing up here to be seen as any less ferverous

14    (sic).  Certainly people have come in to show their fervent

15    support for the motion.  But also people understood that there

16    would be an opportunity, at the end of either our opening or at

17    some point in the hearing, for people to be able to address

18    their individual arguments that are nonduplicative and are

19    relevant to their individual adversary proceedings.

20           THE COURT:  That's fine.  I'm all in favor of freeing

21    people of the need to say "Me too" and just to say something

22    new.

23           MS. SCHWEITZER:  So I think all the parties in the

24    courtroom will stipulate to a fervent "me too" and allow their

25    arguments to be nonduplicative at the end.
```

- 89 -

1          THE COURT:  Okay.

2          MS. SCHWEITZER:  Just to give you a roadmap of how

3     we've defined the arguments, recognizing that they necessarily

4     wind up bleeding onto each other, particularly with the policy

5     aspects of what we're arguing, as the first batter, I'm going

6     to start with an overview and particularly focus on the various

7     arguments with the due-process umbrella and, within that,

8     address, among other things, the ceiling of the complaints

9     along the way and certain res judicata arguments that come out

10    of the plan.  I'm also going to address the failure to plead

11    properly under Rule 8 and Iqbal and Twombly cases that give us

12    guidance on that now.

13         Mr. Winsten from the Honigman firm will follow me,

14    focusing on the details of the Rule 4(m) arguments and the

15    various motions that were filed along the way, and the debtors'

16    abandonment of certain claims, under those motions.  He also

17    will address that if Your Honor were inclined to allow the

18    debtors to replead their complaints, which we would take the

19    position that it's untimely and they shouldn't be allowed to

20    replead complaints for failure to comply with Rule 8, but if

21    you were allowed to (sic), Mr. Winsten would like an

22    opportunity to address the standards for repleading and,

23    alternatively, dismissal.

24         Mr. Gottfried will focus on the due-process arguments,

25    but with a particular focus on defendants who were not

- 90 -

1   creditors at the time of the bankruptcy and did not receive any

2   notice of the motion prior to the service of the complaint.

3           And Ms. Thorne will focus on certain abandonment

4   arguments arising from the first plan, and the res judicata and

5   estoppel arguments that flow from the debtors' failure to

6   preserve these various avoidance actions on their exhibit to

7   their first plan.

8           As I said, after that, what I propose is the

9   individual defendants can either then or at the end, after

10  response, be allowed to get their own time to present their

11  individual arguments.

12          THE COURT:  I hate to put a crimp in what you've just

13  gone through, but it seems to me it's a good idea here, given

14  the number of motions and the number of issues raised in the

15  motions, to group -- not to revisit issues.  And as you went

16  through your list, it appeared to me that the issues dealing

17  with res judicata and abandonment should all be dealt with

18  in -- at one time.

19          MS. SCHWEITZER:  Okay.

20          THE COURT:  That may mean that there may be two of you

21  dealing with them, and I'll let you do it back to back.  But I

22  think there's a real overlap there, since you're basically

23  relying on res judicata with regard to various different orders

24  or -- of the Court.  And then I think you should also deal with

25  the due-process issues all at once.

- 91 -

1          MS. SCHWEITZER:  Fair enough, Your Honor.  So I will

2     lead off with the due process.  And since Mr. Winsten and Ms.

3     Thorne are sitting down, I'll allow them to work amongst

4     themselves, addressing the different abandonment arguments --

5          THE COURT:  Okay.

6          MS. SCHWEITZER:  -- and that the -- I think there are

7     two different ways people would argue they arise is under the

8     motion themself and under the plan, but I'll let them work out

9     among themselves how to divide that up.

10          So, Your Honor, obviously these motions raise

11     different nuanced statutory and Constitutional issues.

12     Ordinarily we would start with a brief overview of the facts,

13     but I think the facts are pretty well-known to us all.  Where

14     we started in 2007, the debtors were on the verge of confirming

15     a hundred-cent dollar plan and emerging as a reorganized

16     entity.  They had an inconvenient procedural or timing hiccup

17     in that on the eve of that emergence, they were facing a two-

18     year statute of limitations.  And inconvenient as it was, they

19     decided they wanted to preserve the option of pressing forward

20     with these different complaints in the event the plan fell

21     through.

22          They asked at that time for a brief sixty -- to file

23     the motion -- to file the adversary proceedings, fine; to file

24     a motion to extend the time to serve those adversary

25     proceedings, understandable, whether or not fine; and to seal

- 92 -

1   the avoidance action so that in the event in sixty days this

2   all went away, that no harm no foul to anyone.  They did that

3   again for another sixty days.

4        And quite frankly, Your Honor, I think the defendants

5   in the room would recognize that if it had all stopped there,

6   if it had just been this hundred-cent plan that fell apart very

7   quickly and it was an inconvenient, technical hiccup, we -- I

8   don't think anyone would say we wouldn't have arguments, but it

9   would be a lot harder arguments in front of Your Honor.

10       But we all know that that's not how in fact the facts

11  played out.  In fact, the plan was confirmed but then fell

12  apart in the spring of 2008.  And as the plan process eroded,

13  the debtors asked for a further extension of time, not nearly

14  for another sixty days but for an indefinite period of time,

15  until thirty days after the substantial consummation of either

16  the original plan or any modified plan, same or different, that

17  the debtors may propose down the road.

18       Another year and a half went by.  The debtors did in

19  fact confirm a substantially different plan, and the debtors

20  purported to preserve certain avoidance actions under that

21  plan.  The debtors then sought a further extension of time to

22  serve the defendants, lift the seal and stay the actions, even

23  after that confirmed plan, and yet another one for the foreign

24  defendants even after that.

25       And then in the spring of this year, the plaintiffs

- 93 -

1    and the debtors began to lift the seals on these various

2    avoidance actions and to start serving these defendants, who in

3    fact came to learn that they had in fact been sued two and a

4    half years earlier in October of 2007.

5            So as a result, you have companies, which I think the

6    latest count is eighty, a hundred, up there, opening there

7    mouths this spring to find out that they were defendants in

8    these preference actions.  And these companies had people

9    answering the question and asking the question and being forced

10   to figure out how didn't we know about this earlier, how did we

11   not know that there was a lawsuit pending against us for two

12   and a half years, and why did it take so long for this to be

13   served on us.

14           Now, we know the debtors' responses.  I got permission

15   from the Court and we got orders, and we filed those orders and

16   that should end the inquiry.  But I think at this stage, two

17   and a half years down the road, it's not enough for us merely

18   to end the inquiry that the orders were done and therefore were

19   done, particularly when in the light of day, seeing the passage

20   of time, seeing the debtors' explanation for the passage of

21   time, and seeing the nature of the complaints that were in fact

22   sealed, to question whether those rationales and grounds hold

23   up after all this time.  I mean, namely, did the debtors really

24   have to seal these complaints to not harm their business

25   relationships?  Does that rationale really hold water?  Were

- 94 -

1   they really maintaining the status quo and not prejudicing

2   defendants during this time?  When they say they offered what I

3   call the Goldilocks explanation, first 'I was too rich,' then

4   'I was too poor,' that there was never the just-right time to

5   sue these defendants.  So I really would have preferred to wait

6   until the end when the facts were clear and I was good and

7   ready to do this.

8           And of course their explanation now that 'Well, you

9   know, the complaints are bare-bone complaints, but they're good

10  enough.  And just like we've been fixing things along the way,

11  we can keep fixing them,' informally, we don't even need to

12  expend more time, money and waste of resources on the debtors'

13  side to acknowledge that these complaints are insufficient and

14  to formally amend them as they're required to under Rule 8.

15          And in the end of course they say 'Well, the

16  defendants weren't harmed and, if they were harmed, they would

17  have complained along the way.  And because no one objected, we

18  can take that as acquiescence.'  But in fact, given the manner

19  in which these complaints -- the original motions were drafted,

20  and the manner in which they were served or not served on

21  people, I don't know that that explanation holds water.

22          So when you prove each of these explanations, you have

23  to hold them against the law and against the relief we're

24  seeking in our various motions.  And obviously, as I said,

25  we'll start with the due-process argument and how to address

- 95 -

1   that these motions, whether well-intentioned upfront, whether

2   even appropriate upfront, when held to the light of day on all

3   the facts we know now, call into question whether there was a

4   breakdown of fundamental fairness to the process of the

5   debtors' prosecution of these actions such that they should not

6   be allowed to proceed further, on their face now or as amended.

7          Now, I think that, again, there are certain things

8   that no one disputes.  No one disputes that the deadline to

9   file an avoidance action and to commence that action was two

10  years after the petition date; it was October 2007.  And the

11  debtors say 'Well, I commenced the actions, I filed them, I put

12  them under seal, I put them in a drawer, and I met my

13  obligation.  And to the extent I had an obligation to serve

14  people, I got extensions to do so.'  Again, 'There's no due-

15  process violation.'

16         But as the Supreme Court has explained to us in the

17  order of Railroad Telegraph first case in 1944 and again in

18  more recent cases, that statute of limitations don't just have

19  one purpose.  It's not just forcing the plaintiff to come

20  forward and state their claims so that they're locked into

21  place.  It also has a secondary purpose of putting the

22  defendant on notice so the defendant has an opportunity to

23  react to that claim and has an expectation of when that claim

24  would be brought against them.

25         And as the Supreme Court had said, the statute of

- 96 -

1   limitations are designed to promote justice by preventing

2   surprises through the revival of claims that have been allowed

3   to slumber when evidence has been lost, memories have faded,

4   and witnesses have disappeared.  And the theory is that, even

5   if you have a just claim, it's unjust not to put the adversary

6   on notice to defend within the period of limitations.  And the

7   right to be free from stale claims in time comes to prevail

8   over the right to prosecute those claims, such that we can't

9   just keep saying 'I might have a valid claim and I have a free

10  option that I can exercise for an indefinite period of time

11  and, when I'm good and ready, raise it for the defense

12  counsel.'  I need to put the defendant on notice upfront, and I

13  need -- and that's the reason I need to timely serve them, in

14  order to allow them to defend against that claim.

15          Now, the debtors, we know, say, 'Well, there's no

16  prejudice to the defendants.  What's the big deal?  You know,

17  litigating a claim is litigating a claim' and that we have to

18  articulate a specific deprivation of life, liberty and property

19  before you can even consider whether there's been a due-process

20  violation.  And while that's the general sound byte that is in

21  these cases, in fact when the courts look at these cases of

22  undue delay and dilatory tactics, you find that the analysis is

23  not as rigid or narrow as the plaintiffs suggest.

24          And in the defendant -- in the case of the defendant,

25  it really comes to this right to appear and timely defend based

- 97 -

1    on nonstale evidence and based on the facts that exist when the

2    claim should have accrued and should have been asserted.

3            There's a case in the Fourth Circuit that I read.  And

4    while the facts spatially appear distinct, very distinct, it

5    really bears on the issues in play here.  That's the Lane

6    Hollow case in the Fourth Circuit where unfortunately there is

7    a person who worked in a coalmine.  The miner came down with

8    black-lung disease and sued, trying to figure out how he could

9    get compensated for that illness, which ultimately led to his

10   death.  He started the lawsuit against various people.  He

11   ultimately passed away, and his widow had to prosecute the

12   suite after him.

13           And along the time, several years after the

14   commencement of the original action, they sued a coalmine

15   operator.  It went to trial.  Ultimately the coalmine operator

16   was found to be liable and a judgment was entered against him.

17   The coalmine operator sought review of the award of the

18   judgment, and it went up to the Fourth Circuit, and the Fourth

19   Circuit reversed.  And what the Fourth Circuit said is that

20   there was inexcusable delay in notifying the operator about the

21   claim and that violated the operator's due-process rights to

22   mount a meaningful defense to the proposed deprivation of its

23   property; not that you got to the end and 'I didn't like the

24   answer and that was the deprivation of property, because the

25   judgment was entered at the end and it didn't feel right to

- 98 -

1    them,' but what they said is that due process is synonymous

2    with fundamental fairness.  You can't just have a just result;

3    you have to have a just process as well.

4         And there is a point at which the prejudice has to be

5    presumed and has to be recognized that -- and the issue there

6    wasn't the fact that the defendant was forced to defend against

7    the claim after the miner had died.  But the Court said that

8    the prejudice was that they didn't have the opportunity to

9    defend before the miner had died, when there was so much

10   ability to have brought the claim at that time.

11        So people die all the time, bad facts happen all the

12   time, but people have to recognize that when you sit on a claim

13   and you wait to prosecute it, and you wait two and a half years

14   after the statute of limitations to prosecute a claim, that the

15   facts change, and the facts change in prejudicial ways such

16   that you really at some point might corrupt the fundamental

17   fairness of allowing yourself to go forward with that claim.

18        THE COURT:  But isn't that a case-by-case

19   determination?  I mean, there are eighty -- ninety-plus motions

20   here.

21        MS. SCHWEITZER:  Well, I think that certainly the

22   defendant -- the debtors want us to think that we have to make

23   that showing individually.  I think that there's a couple

24   levels of that is that there are certain facts common to

25   people, and then there's also a point at which the facts have

- 99 -

1    to, in the totality, weigh to the point where the Court and the

2    litigants have to look and say 'To put the burden on me to

3    defend against a claim that I thought the limitations period

4    had passed, and to force me to spend the time and money to

5    prove the nonexistence of evidence and to prove my memories

6    have forgotten,' how do you prove a memory has faded?  To state

7    'Well, I think I would have remembered it two and a half years

8    earlier, but I wouldn't remember it now'?

9         And I think that there are some facts that are common,

10   as I said, to everyone in particular.  There's no a hundred-

11   cent dollar plan pending at this point; there was two and a

12   half years ago at the point that these claims would have been

13   filed.  And you sure bet that people -- the first motion they

14   would have brought is these claims are futile, these claims

15   should be mooted, and these claims should not be allowed to

16   proceed.  The debtor has to pick its remedies.

17        The second thing is exactly like the Lane Hollow case.

18   The debtors' business is not a vibrant business.  There's one

19   person working for the debtors at this point.  The debtors'

20   business has been sold; the employees are gone.  The debtors

21   said they preserved books and records.  But, again, there's

22   time and cost and delay involved in each time you're asking

23   defendants to come forward and to have to prove the

24   nonexistence of evidence, to prove the frustration of

25   litigants, to prove the passage of time.

- 100 -

1          The other thing that you --

2          THE COURT:  Can't those issues be dealt with if they

3     arise by burden-shifting?

4          MS. SCHWEITZER:  Well, I think, again, Your Honor, it

5     goes to the point that each of these -- it creates an imbalance

6     in the litigation such that you're asking defendants not only

7     to shift the burden to the plaintiffs but to spend the money

8     and time to defend against those claims, which -- those costs

9     are not compensated.  The cost of bringing this motion, the

10    cost of investigating claims that are five years old instead of

11    two and a half years old, the cost of digging up our evidence,

12    all don't get compensated by the fact that you've burden-

13    shifted.

14          And quite frankly, I have to say that the debtors'

15    conduct in responding to this motion calls into question how

16    many times we would have to bring those types of motions.  The

17    debtors, in their pleadings, say 'We didn't even abandon

18    foreign defendant claims.'  They have a motion in an order that

19    says 'We abandoned foreign defendant claims' and they want to

20    relitigate that issue.  It doesn't bode well for the time and

21    money and expense we're going to have to face.

22          THE COURT:  All right, but that's not a due -- I mean,

23    that's not a due-process right, right?  I mean, I want to

24    stick -- I'm dividing this up in my own mind, I guess, in a

25    hierarchy of objections.  And clearly Rule 4 contemplates that

- 101 -

1    you can commence litigation before the applicable limitations

2    period expires, and you have, on its face, 120 days thereafter

3    to serve and which -- you know, so there's 4 months in which an

4    opponent can be in the dark.  And then it permits extensions.

5          So, leaving aside for the moment some of the movants'

6    argument that Rule 4 might improperly impinge upon a

7    substantive right, the Rules acknowledge that a statute of

8    limitations is not the type of interest that can't be affected.

9          In addition to that, at least going back to the '40s

10   if not before, the Supreme Court has held that you can

11   retroactively change a limitations period without violating the

12   Fourteenth Amendment.  There's no Fourteenth Amendment interest

13   or -- you know, in a statue of repose.  So -- and that's Chase

14   Securities Corp. v. Donaldson.

15         So I understand full well the argument about

16   prejudice, and that's bound up in these motions in different

17   ways, including the laches point, including the point about

18   looking under either Rule 60 or -- and this I do understand the

19   due-process argument -- on due process grounds, at the

20   extension orders, to the extent that people didn't have notice

21   of those, and saying whether there was a -- you know, there was

22   something that should be undone in the extension orders.

23         But I have a difficult time seeing how on a blanket

24   basis the motion should be granted because of the delay, as

25   opposed to giving everyone an opportunity, with some guidance

- 102 -

1    obviously, to show their own prejudice, because I can envision,

2    you know, a real continuum there for people who had received

3    the disclosure statements and knew that there was a risk here

4    and were vendors to people who may have received the disclosure

5    statement but weren't vendors, and to people who didn't receive

6    the disclosure statement and were vendors, to people who not

7    only didn't receive the disclosure statement but were

8    subsequent buyers of vendors.  I mean, there's a whole range of

9    possibilities here, I think, for prejudice.

10          And then you have the claims themselves.  As I think

11   some of the replies have pointed out, or even acknowledged,

12   preference claims get into the facts largely on the defenses.

13   And I would -- I think if one is really dealing with these

14   issues on a case by case basis you deal with -- you may well

15   deal with that by shifting the burden on the debtor to show why

16   it wasn't in the ordinary course or wasn't a contemporaneous

17   exchange and the like.

18          Generally speaking, preference cases that are, you

19   know, cut and dried preference within the ninety days, to my

20   mind are not -- you know, there's not a lot of evidence on that

21   that comes from the defendant except for under the 547(c)

22   defenses.  And very often they just do it -- they do it on the

23   debtors' own documents to show that this is within a range of

24   what's normally paid out.

25          So, again, I'm not -- I don't want to cut you off on

- 103 -

1   this point, but to me the Constitutional issue, you know, the

2   due-process issue here, is not so much the running of time as

3   the issue of whether and how the defendants got notice of the

4   Rule 4 motions.  If they didn't get notice, then it's wide

5   open.  If they did get notice, I think there's a 60(b) hurdle.

6   But if they didn't get notice, it's wide open and I should look

7   at it as whether, you know, it was appropriate to have entered

8   those orders.  And they should have all their -- you know,

9   their right to say they shouldn't have been entered.

10           MS. SCHWEITZER:  Right.  Your Honor, I think Your

11  Honor -- as you're raising, there are very difficult questions

12  raised when you look at both sides of this argument.  You

13  raised several points and I'd like to take some of them in

14  turn.  The first one is just the raising of the 4(m) and the

15  fact the Supreme Court has said that there's no per se due-

16  process violation in terms of changing a statute of

17  limitations.  That's said in the context of policy decisions of

18  policymakers making a uniform decision that 'We're going to

19  change the rule.  We're going to change the law because BP has

20  now intoxicated the entire Gulf of Mexico and we need to say

21  it's not fair that people have a year to bring those claims.'

22  There's been no grand policy decisions here.

23           And in fact the debtors didn't need more time to bring

24  the claims.  The debtors said 'I'll file these claims in a

25  timely manner.'

- 104 -

1          THE COURT:  But, I mean, a policy could be un-

2     Constitutional too.  I mean, Congress may say that we want to,

3     you know -- well --

4          MS. SCHWEITZER:  Right.

5          THE COURT:  -- that 'We decide as a policy matter to

6     legalize slavery.  You know, that clearly violate the due-

7     process clause.  It's a policy decision, but --

8          MS. SCHWEITZER:  Right.

9          THE COURT:  So I don't --

10         MS. SCHWEITZER:  But --

11         THE COURT:  I mean, I think the point is that the

12    statute of limitations, I don't believe, is the type of

13    interest that's protected by due process.

14         MS. SCHWEITZER:  But I think that there's two

15    different things that happen here to the debtors is that they

16    claim that they satisfied the statute of limitations.  They

17    said 'We filed these timely,' right?  And 'We met the two and a

18    half year deadline.'

19         THE COURT:  Right.

20         MS. SCHWEITZER:  'But what we want to do after that

21    point is put these in a drawer, put them under lock and seal

22    and affirmatively not tell people about these claims' in two

23    different ways:  in filing these extension motions without

24    particularized notice, and I'll get to that; and the second way

25    is affirmatively sealing not only the complaint, which we now

- 105 -

1    know contains no confidential information, no commercial reason

2    that you need to sell this complain other than to let someone

3    know it doesn't exist.

4          THE COURT:  Right.

5          MS. SCHWEITZER:  And they not only sealed that, but

6    they actually sealed the docket itself so that any diligent

7    counterparty who regularly searches the federal docket to find

8    out if they've been sued and whether it's because they're

9    selling their company or because they want to take reserves or

10   because they want to do whatever they do in the ordinary

11   course, could not find this docket.

12         And the debtors' explanation for that is they want to

13   preserve business relationships with folks, folks I assume like

14   HP who has continued to do business with them.

15         THE COURT:  I understand, but to me that all goes to

16   laches.  I mean, it just -- it strikes me that tomorrow

17   Congress could say that for debtors-in-possession the two-year

18   period is a six-year period.  And there's nothing that you all

19   could do about that.

20         MS. SCHWEITZER:  But the fact --

21         THE COURT:  I mean, you could vote out your

22   congressmen, but that would be it.

23         MS. SCHWEITZER:  Right, and -- fair enough, but I

24   think that the answer there is that if you -- that these

25   arguments definitely do bleed into each other.  And whether you

- 106 -

1    want to say it's per se laches, which you can, again, decide on

2    a motion to dismiss, that there are facts that are common to

3    people, right?  That the complaints themselves were hidden from

4    everyone for two and a half years.

5            Rule 4(m) is an extension of time to serve people, not

6    to not serve people.  They asked for permission not to serve

7    people.  And what they said in their original motions, which is

8    probably different than how it played out, was, 'We want to

9    preserve business relationships.  We want to work with

10   people --

11           THE COURT:  No, I understand that point and it seems

12   to me it may make more sense to move from, sort of, the basic

13   due process argument that you started out with to the point

14   that the order shouldn't have been entered in the first place

15   and can be looked at, you know, on a blank slate for those who

16   didn't get notice of them.

17           MS. SCHWEITZER:  Right.  Well, I think that -- so

18   let's take the notice argument, because I know that is another

19   thing you raised and it's a fair point.  There are certain

20   defendants in the room such as Mr. Gottfried whose clients were

21   not creditors of the estate at all.  They didn't appear; they

22   weren't creditors; they closed their books; they weren't on

23   notice of the motion.  I think that's the most extreme version

24   of 'I, A, didn't know there was a claim against me, I didn't

25   even know I had to hire a lawyer to monitor this bankruptcy

- 107 -

1   case and I certainly was never told of the extension of

2   times' --

3            THE COURT:  Right.

4            MS. SCHWEITZER:  -- 'so I didn't have an opportunity

5   to contest that.'  I, quite frankly, think that's the slam

6   dunk, right?  Because you look at that and you say --

7            THE COURT:  Well, it's a slam dunk as far as looking

8   at the order as brand new.  I don't think it necessarily means

9   that the orders aren't effective as to that person; it just

10  means that that person can raise whatever issue they want as to

11  that order -- as to those orders.

12           MS. SCHWEITZER:  Right.  And I would happily go into

13  the arguments as looking as the orders as brand new, but I do

14  want to be respectful of not dupli --

15           THE COURT:  I'm sorry.  The arguments of?

16           MS. SCHWEITZER:  Of looking at each of these orders

17  brand new and how they played out --

18           THE COURT:  Okay.

19           MS. SCHWEITZER:  I do want to be respectful of the

20  fact that Mr. Winsten was going to address --

21           THE COURT:  All right.

22           MS. SCHWEITZER:  -- those arguments, so --

23           THE COURT:  Okay.

24           MS. SCHWEITZER:  -- I won't step on that point.

25           THE COURT:  That's fine.

                                                              - 108 -

1              MS. SCHWEITZER:  But I do want to address even the

2      idea of people who had, what the debtors would say of notice,

3      of the arguments because they were on a Rule 2002 service list

4      or the like of that.

5              THE COURT:  Right.

6              MS. SCHWEITZER:  What the debtors are saying is that

7      'We recognize that it's our duty to file and serve complaints.

8      We want to put these complaints under seal.  We want all this

9      motion, which is not only an extension motion; this motion says

10     we started out with 11,000 claims and we crossed out a whole

11     bunch of these claims.  We abandoned a whole bunch of other

12     claims.  We're concerned with protecting debtor relationships

13     and we intend to not sue most of these people under this

14     existing plan or any other plan, modified, that we file in the

15     future.  We generally do not want to preserve these claims.

16     But, we're moving quickly.  We know that we don't have the time

17     to think this through.  Allow us to put this placeholder in the

18     docket now and to go over time and figure out if we want these

19     claims to be pursued.'

20             And I will point, again, to the foreign defendants,

21     that if you're a foreign defendant as some of the HP and EDS

22     clients were, who didn't even have contracts with the debtor,

23     but if you were and you were diligent enough, these -- that

24     'I'm curious and I want to look at this motion, even though it

25     didn't pertain to appear to me and they're waiving it against

- 109 -

1   me', then what the debtor is saying was, 'Well, if you were

2   really curious, you would have called the debtor counsel and

3   asked'.  And why one of the 100 or 700 out of 11,000 that are

4   being preserved in the debtors' discretion, 'even though I have

5   continuing business relationships with you, even though I'm a

6   foreign defendant, even though I think I have ordinary course

7   defenses and you say you're not preserving any of those claims

8   at all.'

9          And this idea -- I understand; I don't mean to make

10  light of receiving notice on the 2002 service list, but this

11  idea that there's not particularized notice, you're not telling

12  the 700 or 177 people, 'This order related to you' is not

13  frivolous.  When you look at the time that these motions were

14  entered on the docket, the first motion was docket number

15  8,905.  So if you were getting stuff in the mail along the way

16  as the creditors do in the case, that means -- let's say, half

17  of those are affidavits of service.  Let's just cross out half

18  of them.  This is probably the 4,500th pleading you've received

19  in the mail at that point.  You're paying your attorney, what,

20  500 dollars an hour to review these pleadings, and let's say

21  they're spending a quarter of an hour reviewing each of these

22  pleadings.

23         At that point, you've asked your attorney to go

24  looking for ways the debtors could step on your rights, you've

25  spent 563,000 dollars just in monitoring the docket in a case

- 110 -

1   where the debtors themselves could have just said, the same way

2   they do for claims objections, the same way they do for

3   extensions of time to assume and reject leases, the same way

4   they do for every other motion that faces deadlines, they serve

5   you individualized notice and it says, 'You are one of the

6   small bucket of people who are not the 11,000 that we're

7   abandoning.  You're one of the 177 or the 762.'

8           The burden there was not so great on the debtors that

9   they should -- 'We should be forced to explain why we read the

10  motion, didn't understand it or didn't realize in the face of

11  it that it applied to me or didn't realize that the debtor

12  meant his when they said that, didn't realize that when they

13  said that they were protecting business relationships that

14  wasn't my business relationship with them.'

15          And what I think is especially --

16          THE COURT:  Well -- I'm sorry; go ahead.

17          MS. SCHWEITZER:  Okay.  No, go ahead.

18          THE COURT:  Well, I mean the -- it wasn't buried in a

19  motion, right?  The tile of the motion would have showed you

20  that there, you know, if you had a concern about a preference,

21  it would have alerted you to that, wouldn't it?

22          MS. SCHWEITZER:  It would have told you that the

23  debtors -- well, the first -- let's -- I think there's two

24  different portions of the motions, right?  There's the two --

25  first two motions; they're sixty-day extensions, right?  And I

- 111 -

1    don't want to say no harm, no foul, but it was understandable

2    and whether you want to say people looked at that, at that time

3    and said, 'I don't know, you know.  Maybe this is all going to

4    go away, whatever.  It doesn't seem so important.  It's

5    probably not me.'  Whatever people did or didn't say or they

6    didn't even read it -- who knows, right?

7            When you get to the third motion, docket entry, again,

8    13,361, so this is the seventh, eighth, ninth, hundredth,

9    thousandth pleading you've gotten in the mail and you see this

10   and you say, 'Okay, the debtors are saying of 11,000 people,

11   762 of them are the ones that I'm preserving actions against,

12   that, again, not today, but I want to work through.'

13           You would have to tell defendants that your job is to

14   call the debtor, to make the assumption that out of 11,000

15   claims, you're one of 762 people whose rights are possibly

16   being affected because the debtor might in the future, you

17   know, decided to prosecute that action against you, again, when

18   they're good and ready.

19           I think at the time that motion was entered, no one

20   necessarily saw that this was going to be another two and a

21   half year process, that the plan was going to change so

22   substantially, that this was going to evolve over time.  And

23   certainly, it's just -- it seems inconsistent with the law of

24   when you start with the premise that the law says you must

25   preserve an action, you must file it against a person and you

- 112 -

1   must serve it on them.  And the debtors saying, 'Oh, we have to

2   seal these complaints.  These are relationships that we want to

3   preserve.'

4          The debtors wouldn't have informally or formally

5   notified you the way that they do, quite frankly, in every

6   other case, which is the debtors panic; they get to a week

7   before, there's such --

8          THE COURT:  Well, if it was just filed, people

9   wouldn't have checked either, right, because they -- I mean,

10  you argue that it's not particularized, it's just file on the

11  docket, it's not served on them.

12         MS. SCHWEITZER:  But, that actually --

13         THE COURT:  I'm just not sure how the sealing really

14  fits into that at this point.

15         MS. SCHWEITZER:  I think the way the sealing fits in

16  is whether you want to take it in the context of the plan.  I

17  mean the plan would be the most extreme version, but it's the

18  same as the other adversary proceedings.  It's as if you said,

19  'Gee, I want to know if my rights are affected.  I want to know

20  if I should really be one of these people who's calling the

21  debtor.  I want to know if I should be concerned' --

22         THE COURT:  It would be easier to check the docket --

23         MS. SCHWEITZER:  it'd be --

24         THE COURT:  -- than to call the debtor.  Yeah, I agree

25  with that.  You could just -- you could use the electronic

- 113 -

1   docket to see if there was an adversary proceeding filed.  I

2   agree with that.

3           But let me ask.  The Supreme Court this year talked

4   about notice for due process purposes in the Espinosa case.

5   And they said that actual notice of the plan was enough, even

6   though it was the plan that improperly dealt with the

7   nondischargeable student loan.  That was -- it was enough to

8   take it out of 60(b)(4) and was, you know, was sufficient due

9   process.  How is this different from that?

10          MS. SCHWEITZER:  Well, what I think is different is

11  that the concern here is that you're taking a process and

12  taking literal procedures and turning on the head the

13  expectations of all parties involved in that process.  What

14  you're saying is I'm going to file a plan on you, right, and

15  I've got my plan disclosure statement in the mail.

16          The exhibit is missing on retained actions.  Thirteen

17  days before the objection deadline, I'm going to file a notice

18  of plan supplement on the docket that lists docket numbers, not

19  actual case names, docket numbers, and if you, when you get

20  served by mail in the thirteen days before the confirmation

21  deadline, go to look up that exhibit, you're going to find a

22  link again to 177 docket numbers out of 11,000 potential

23  claims.  You're going to go to those links and you're going to

24  hit a roadblock.

25          And so in those last ten days, if you really do

- 114 -

1    consider yourself on notice and you really did want to look

2    into this, you're running against the wall and you're running

3    against the wall to find out that the debtors have, in fact,

4    sued you two and a half years earlier.

5         Now, I understand there are things in bankruptcy that

6    are sometimes preferable notice, the best possible notice

7    versus minimally adequate notice, but the difference here is

8    the debtors didn't merely say, 'I want to tell -- give people

9    comfort that, look, I filed this against you, I don't really

10   mean it.'  Or, 'I don't know if I mean it.  Let's all sit

11   tight, let's all join the benefit of the breather and the

12   benefit of working through whether these are meritorious claims

13   and we can all do that together.'  The debtors, instead,

14   unilaterally, at every turn, said, 'I'm not going to tell you.'

15   And the due process cases around planned disclosure and the res

16   judicata cases around planned disclosure generally say, 'Well,

17   if the debtor preserves everything, everyone knows they're

18   affected.'  Right?  Or if was just too burdensome for the

19   debtor that they couldn't really possibly have gone through and

20   sorted out the cases so early on in their proceeding, we're

21   going to give them a little slack.

22        But here the debtors knew exactly what they were

23   preserving.  And they didn't serve that plan exhibit on anyone.

24   They didn't unseal the dockets at that point.  They didn't even

25   ask for effective relief to seal the dockets in the context of

- 115 -

1    the plan or to seal a schedule in the plan that would have

2    listed the peoples' names.  What they said was, 'Oh, we already

3    got that relief a year and a half earlier and we're going to

4    get it again after the plan is confirmed because it worked so

5    well.  Let's just keep doubling down', all on the principal of

6    'We're protecting ongoing business relationships.'

7            And to say to people that you, as the defendant, have

8    to be on the watch and you have to come forward when you think

9    something unjust is happening, really shifts the burden on you.

10   You're saying you don't just have a burden to defend against

11   claims; you have a burden to actively monitor dockets and

12   actively ferret out when the debtors are doing things contrary

13   to your expectations.  Not just things that they would

14   ordinarily would be entitled to do, but when they're actually

15   burying claims and putting them to the back of the road, well

16   beyond the initial purpose which was just status quo and

17   nonprejudice.  Now, you have to spend the time and money -- at

18   what point is a creditor allowed to tell their attorneys, 'Stop

19   spending money.'?

20           I mean, doing the same math they had given you, if you

21   look at the third extension that was after the plan, you get

22   over to a million dollars in monitoring the docket, spending

23   fifteen minutes a pleading; whether it's the plan or any other

24   motion, times the number of 13,000 motions.  You're talking

25   about over a million dollars -- and you're smiling because the

- 116 -

1    answer is no one spends a million dollars monitoring these

2    cases --

3              THE COURT:  No, I know, but no one spends fifteen

4    minutes on every pleading, either.  You know that that --

5              MS. SCHWEITZER:  Take it in half, take it in a

6    quarter, take it in a eighth; tell me my rates are outrageous

7    at 500 dollars an hour.  I'm fine with that, but you're telling

8    the clients, every one of these 11,000 transferees, that they

9    have to spend the time monitoring all 13,000 pleadings to make

10   sure there's no 'Gotcha' in there, to make sure the debtor is

11   not still holding on to a claim against them.  Because it's not

12   only the 177 that survived, in the debtors' world --

13             THE COURT:  Well, what --

14             MS. SCHWEITZER:  -- it's all 11,000 people.

15             THE COURT:  -- I guess what's missing here is the

16   ability to know whether any of these movants got actual notice.

17   I mean, I find it hard to believe that none of them was aware

18   of what was going on.

19             MS. SCHWEITZER:  Well, I think there are different

20   levels of "aware of what was going on".  I think there's a

21   level of 'I didn't know anything that was going on because I

22   didn't even know that Delphi was in bankruptcy.'  Right?  I

23   mean, there's that level.

24             THE COURT:  Right.

25             MS. SCHWEITZER:  There's 'I knew that Delphi was in

- 117 -

1   bankruptcy but I didn't know about the statute of limitations'

2   or 'I did know and I didn't see this motion' or 'I didn't

3   understand this motion'.  And then there are people who got the

4   motion in the mail, maybe, maybe not, but even people who got

5   the motion in the mail, did they really know that they were a

6   defendant?  And I don't think the debtors have ever suggested

7   that they voluntarily told anyone.  And I can certainly say for

8   my clients, it wasn't the typical case where you get the letter

9   in the mail warning you.

10          THE COURT:  But it's the -- for me to dismiss all of

11   these complaints on this theory, it has to apply to that last

12   group, right?  Someone that got it in the mail, maybe even put

13   two and two together and said, 'Oh, I may be at risk here.

14   Well, I'll just, you know, I'll let it go by.'  Isn't it the

15   case that to dismiss these complaints, I have to -- on these

16   motions, I have to find that?

17          MS. SCHWEITZER:  I think you have to find that the

18   debtors -- and, again, this is where it looks back to the due

19   process issues, is that the debtors' wholesale took a position

20   and created a strategy which whatever good intentions they had

21   when they first asked for it and whatever their intentions were

22   even in the spring of 2008, took you down the path where the

23   wholesale matter -- it's unfair to let these proceedings go

24   forward.  And particularly when you see the complaints that are

25   at hand because this isn't over in terms of figuring out how

- 118 -

1    we've been sued and what the notice is.  When you look at the

2    sufficiency of the complaints --

3         THE COURT:  Well, that's a separate issue.  I

4    understand that issue.  That's a separate issue.

5         MS. SCHWEITZER:  I think it's a separate issue, but I

6    think that -- I mean, first, my answer would be yes.  You can

7    take notice of the fact that there's a passage of time, that

8    there's been not only two things, a lack of notice -- a lack of

9    adequate notice, and not only a lack of notice but a concerted

10   effort to hide the complaints, coupled with the fact of the

11   passage of time and the things that have happened over that

12   time, the defendants didn't have an opportunity during this

13   time to use those complaints to their advantage, quite frankly.

14   That the -- whether to get information from the debtors before

15   the business were sold and, quite frankly, taking the debtors'

16   explanation at face value, 'We wanted to preserve business

17   relationships because we didn't want adverse consequences to

18   flow from the knowledge that these complaints existed.'

19        What did that mean?  People could have said, 'I'm

20   doing business with you and I don't want to keep doing business

21   with you.'  'I'm doing business with you but I want these

22   claims settled, as a part of doing business with you.'  'I'm

23   not doing business with you, but I would happily trade away

24   some of these claims for doing business with you.'  'I got a

25   plan in the mail but you know what?  Everything is going so

- 119 -

1    smoothly with you, I'm going to say' --

2           THE COURT:  But, again, isn't that on a case-by-case

3    basis?  I mean, I -- as far as I can see, there's one case that

4    concludes that 4(m) relief was improperly granted and that case

5    wasn't on due process grounds.  The Ninth Circuit just said,

6    'You know, we don't really set a standard for when it's

7    improperly granted, but it was improperly granted.'  So, I

8    mean, it just seems to me that it's much more of a case-by-case

9    analysis, depending on the, you know, the harm that happened to

10   people.

11          MS. SCHWEITZER:  Right.  Well, I guess --

12          THE COURT:  With the exception -- let me stop you.

13          MS. SCHWEITZER:  Okay.

14          THE COURT:  With the exception that under Rule

15   60(b)(4), if someone really didn't get notice of the extension

16   motions, then it would seem to me they should be able to argue

17   to me as if the motions were being made right now, although

18   I'll hear the debtors on that.  But, that seems to be the way

19   to look at it.

20          MS. SCHWEITZER:  Right.  Well, Your Honor --

21          THE COURT:  And then, the notice that would trigger

22   the Rule 60(b)(4) analysis would be due process notice and

23   consistent with not only Espinosa, but Mulane and the like.

24   It's true, if -- if the notice was buried or confusing or the

25   like, then I would understand that, too, as a violation of due

- 120 -

1    process.  I mean, a Chapter 13 plan is probably a little easier

2    to deal with than a case that probably has a hundred docket

3    entries, than thousands.

4         MS. SCHWEITZER:  Well, I would certainly take the

5    position that you're in a position to find a per se violation

6    but I do believe that there are facts of prejudice that

7    ultimately could and would be shown.  And I've highlighted some

8    of those and I think some of those are universal but in the

9    interest of not stepping on Mr. Winsten's time and also --

10        THE COURT:  Okay.

11        MS. SCHWEITZER:  -- recognizing that there are other

12   arguments to be had, I think that if it's all right with Your

13   Honor, I'd move to the Rule 8 arguments.

14        THE COURT:  Well, who is -- okay.  But --

15        MS. SCHWEITZER:  Or would you like Mr. Winsten --

16        THE COURT:  -- I'm happy to get to those, I just --

17   who is covering Rule 4(f)?

18        MS. SCHWEITZER:  Mr. Winsten.

19        THE COURT:  Okay.  So, I'll wait for you, then.

20        MS. SCHWEITZER:  Would you like --

21        THE COURT:  So, no, no --

22        MS. SCHWEITZER:  -- I'd be happy to cede the podium --

23        THE COURT:  -- Rule 8 --

24        MS. SCHWEITZER:  I'm happy to cede the podium in any

25   order --

- 121 -

1          THE COURT:  I just don't -- I don't want to -- no,

2     actually, I should really hear from the debtors on this point

3     so that it doesn't get stale by the time they speak.

4          MS. SCHWEITZER:  Okay, that's fine, Your Honor.

5          THE COURT:  Okay?  Okay.  Which is, again, the due

6     process point and, as I view it, that's really two separate

7     points.  One is whether the simple fact that these complaints

8     were kept under seal and were not served until years after the

9     statute of limitations is a violation of due process.  And then

10    secondly, whether there was insufficient notice for due process

11    purposes of the extension motions and therefore they can be

12    heard as if, you know, in essence, the orders are void or they

13    should be considered brand new, on a brand new basis.

14         MR. FISHER:  Your Honor, to begin by addressing just

15    precisely those two points and then perhaps just to address

16    more broadly some of the points that Ms. Schweitzer raised.

17         THE COURT:  Okay.

18         MR. FISHER:  Your first question ,Your Honor, is

19    whether the fact that these complaints were filed under seal

20    before the statute of limitations but then not unsealed and

21    served until years later is itself some kind of per se

22    violation of due process.  Of course, our position is that that

23    is not the case.  There is no violation of due process here.

24         And the reason for that is because the right to repose

25    is simply not a recognized liberty interest, as Your Honor has

- 122 -

1   pointed out, under the Constitution.  And it's also the case

2   that all the movants -- the movants have not cited a single

3   case in which that kind of violation is a deprivation for

4   purposes of due process.  And as a threshold matter, in order

5   to find a due process violation, Your Honor would have to find

6   that the movants' Constitutional rights had been deprived in

7   some way as a result of this procedure.  They haven't been.

8          What we're talking about here, Your Honor, is not the

9   deprivation of a Constitutional right, but we're talking about

10  litigation prejudice.  And Courts deal with litigation

11  prejudice all the time and we don't mean in any way to minimize

12  the possibility that certain movants very well may have

13  suffered certain kinds of prejudice as a result of the

14  extensive delay here in unsealing and serving the complaints.

15         THE COURT:  Well, is it just litigation prejudice?

16  Can't it be other prejudice, too?  For example, someone that

17  bought a company in reliance on the limitations period expiring

18  if the, you know, where there's a very large claim?

19         MR. FISHER:  So, that's a fair point.  With respect to

20  the overwhelming majority of movements (sic), the kinds of

21  prejudice that are raised are witness' memories have faded or

22  documents may no longer be available.  And I would note that

23  overwhelmingly, those representations are couched in the

24  permissive:  "This may have happened."  So, in and of itself,

25  the claim of litigation prejudice at this point, in so many of

- 123 -

1   the motions, is speculative.  But, of course, to the extent

2   that that kind of prejudice can be shown on a case-by-case

3   basis, the Court will need to fashion ways to deal with the

4   consequences of that prejudice and protect any particular

5   movant from the consequences of that prejudice, on a case-by-

6   case basis.

7          With regard to other claims of prejudice, again, Your

8   Honor, such as the example that you raised where an entity

9   purchased this business without knowledge and without reason to

10  know that these preference claims had been filed against the

11  purchased entity, that is a claim of prejudice that needs to be

12  addressed in its own right, on a case-by-case basis.  It's

13  certainly not a per se -- it's not a Constitutional issue, but

14  it is prejudice that would need to be addressed.

15         THE COURT:  Okay.  What about the notice of the actual

16  motions, the extension motions?

17         MR. FISHER:  So, Ms. Schweitzer described a range of

18  kinds of notice that various movants may have gotten.  And I

19  suppose that the extreme case which really puts a point on the

20  question is the case which I expect Mr. Gottfried will speak

21  to, but you know, the case of Wagner-Smith, for example, where

22  that entity was not a creditor, wasn't on the creditor matrix

23  and, as far as we know, didn't receive actual notice of the

24  preservation order.  And even in that case, Your Honor, I would

25  say that there is no Constitutional deprivation; this is not a

- 124 -

1    Constitutional issue.  And the reason is because --

2         THE COURT:  No, but wouldn't -- because there wasn't

3    such notice, wouldn't the order not be effective as to them?

4         MR. FISHER:  The reason I don't think so, Your Honor,

5    is because under the Rules -- and I think that these orders,

6    the first preserva -- we're talking about four orders; the

7    first preservation order, which is the only order that directed

8    sealing and then extended the 4(m) deadline for the first time,

9    and then there were three extension orders that modified that

10   first order only with respect to the 4(m) deadline and any

11   other elements of that first order remained intact.

12        With regard to sealing and with regard to 4(m),

13   there's no requirement of notice.  Typically, in the 4(m)

14   context, or often in the 4(m) context, there's no notice to the

15   named defendant; the complaint hasn't been served yet.

16   Frequently, a defendant cannot be located.  But even where a

17   defendant potentially could be located, under Rule 6, where

18   someone moves for an extension of a deadline before expiration

19   of that deadline, which is what happened here -- I mean, yes,

20   there was extensive delay with regard to the unsealing and

21   service of these complaints, but the debtors were diligent with

22   respect to making sure that the deadlines were protected and

23   for seeking relief from this Court in advance of the expiration

24   of each 4(m) deadline.  There's no notice that's required.  And

25   under Bankruptcy Rule 9018 which governs sealing, similarly,

- 125 -

1    there's no notice that's required.

2         So, in the absence of a notice requirement and in the

3    absence of proof of a deprivation, I don't see how there can be

4    a due process violation.  And I don't think that movants in

5    that position should be entitled to return to these orders as

6    though they had never been entered and make new arguments with

7    respect to those orders.

8         THE COURT:  But if you know the party is affected by

9    the relief, aren't they entitled to notice under 4(m)?

10        MR. FISHER:  Well, what's curious here, Your Honor, is

11   that -- and this goes to the rationale for sealing.  What

12   was -- these complaints don't contain state secrets; they

13   contain basic information about preferential transactions with

14   a whole host of defendants, most of which who were then current

15   suppliers to Delphi.  And it is, in fact, the fact that they

16   were named as defendants in the lawsuit.  That was the kind of

17   information that Delphi intended to seal and that is -- and the

18   reason is twofold.  It wasn't just because we didn't want to

19   disrupt then-current supplier relationships; although that is a

20   very important reason, because maintaining the supplier

21   relationships was critical to the reorganization proceeding.

22        THE COURT:  I understand your argument, but since they

23   didn't have the chance to respond to it, how should they be

24   bound by that order?  Since you knew who they were.  I mean,

25   why wouldn't it be covered by 60(b)(4)?

- 126 -

1          MR. FISHER:  I return, Your Honor, to Rule 6(b) and

2    Rule 9018, which provides that notice wasn't required.  And at

3    the end of the day, what happened to those movants, even the

4    rare movant who will claim that it didn't have any notice, is

5    that they are now subject to a complaint that was timely filed

6    but not served until well after expiration of the statute of

7    limitations.  And as a technical matter that's justified under

8    the Rules, to the extent that they've suffered any kind of

9    prejudice, that prejudice can and will be addressed by the

10   Court in the future, when the case is at an appropriate

11   juncture to do so.

12          Your Honor, I'd like to return to just some of the

13   points that Ms. Schweitzer made and respond to those, unless

14   Your Honor has additional questions on these two specific

15   points.

16          THE COURT:  Well, 9006(b) requires a showing of cause,

17   right?  And I guess the issue I have there is if they are not

18   given notice of anything that would let them know that this is

19   going on, how could one say that they are bound by an order

20   that says that it's for cause?  It means that they never had

21   the right either to dispute that or to appeal it.

22          MR. FISHER:  The -- first of all, Your Honor, as Your

23   Honor's aware, 4(m) does not require a showing of cause.

24          THE COURT:  I understand --

25          MR. FISHER:  But with regard to the 6(b) question, the

- 127 -

1   determination of cause was independent of what any movant would

2   say.  And that dovetails with the sealing because to invite

3   particular defendants into court and to say, 'You're the

4   subject of a preference action and we're going to put these on

5   hold for a while and if you have anything to say about that,

6   you know, come to court and be heard' defeats the purpose of

7   sealing.

8           THE COURT:  But they didn't know of it for the appeal

9   purposes either, right?  Anyway, I'll hear from the defendants

10  on this one.  You can go to the other points -- when you talk

11  on the other point.

12          MR. FISHER:  I think Ms. Schweitzer began by talking

13  about the history of the case.  And I think that in some sense,

14  as between the movants and the reorganized debtor -- debtors,

15  there are dueling versions of history here.  And the movants

16  are writing a kind of revisionist history.  Of course, from

17  2005 until Delphi emerged from bankruptcy in October 2009, the

18  spotlight was on the rehabilitation of Delphi and its emergence

19  from bankruptcy.

20          And now, we're out of that, and we're looking at these

21  claims that were preserved during the course of the

22  reorganization proceedings and asking what have the practical

23  consequences of that preservation been and how do we address

24  those consequences.  But the suggestion that there was, at any

25  point, some intent to delay or some intent to cause litigation

- 128 -

1     harm to any party, is misplaced.

2          And when counsel referred to this Goldilocks idea that

3     at first the debtors had so much money that it made sense to

4     keep these cases under seal and not cause people to needlessly

5     incur expenses and not impose those expenses on the debtor,

6     because they were unlikely to ever be pursued, and then later

7     the debtor had so little money that it would have been

8     impossible and threaten the reorganization to be spending time

9     and money prosecuting those cases, I think that that gives

10    short shrift to what really happened in the course of the

11    bankruptcy.  And the truth is that as a result of these sealing

12    orders, there are at least 565 named defendants who are not

13    being prosecuted, who are not incurring costs to defend

14    litigation, who are not imposing costs on the estate with

15    regard to the prosecution of the litigation.  And were it not

16    for the sealing orders, there'd be a very different picture.

17         I think that when the Court looks at each order in its

18    context, it will be clear that there was a record sufficient to

19    justify entry of each order.  And what the movants are seeking

20    today, which is essentially to go back and truly rewrite

21    history and vacate these four orders, talk about prejudice.  I

22    mean the ultimate prejudice here would be to DPH, which

23    conscientiously tried to take steps to ensure that these

24    valuable assets -- potentially valuable assets of the estate,

25    would be preserved, in the event that it became necessary to

- 129 -

1    prosecute those actions.

2          To now go back and rewrite history and say that those

3    orders that were properly entered and that were relied upon by

4    the debtors are going to be undone, would deprive the

5    reorganized debtors of enormously valuable claims after the

6    fact.  And I think that because we're not talking about a

7    constitutional issue here, we ought to be talking about a

8    balancing of prejudice.  And I think, on the one hand, the

9    prejudice to the reorganized debtors is extreme, because the

10   consequences would be the wholesale loss of these claims that

11   they attempted to preserve conscientiously through motions to

12   this Court and validly entered orders of this court, on the one

13   hand; and on the other hand, a host of movants who are

14   differently situated, each of them suffering particularized, or

15   claiming --

16         THE COURT:  But the response is going to be, how could

17   Delphi rely upon relief that was obtained without proper

18   notice.  I mean, that's going to be the response.  No lawyer

19   would rely on it.

20         MR. FISHER:  Well, Your Honor, as to the vast majority

21   of these cases, I don't think that there's a serious question

22   as to notice.  I mean, these -- the motions were served to the

23   entire creditor matrix.  They were entered on the docket.  The

24   plan and disclosure statement, it didn't require monitoring the

25   docket.  It was a public filing attached to Delphi's 8-K in

- 130 -

1    December 2007.  The preservation order provided that Delphi

2    could disclose the name of any particular defendant, if that

3    defendant inquired.

4         And so there was a fair amount of notice here to the

5    parties.  Also it was noted on the record with regard to the

6    first preservation motion and thereafter, that this entire

7    procedure was reviewed by both statutory committees, which is

8    an important thing to remember, because, of course, we're

9    talking in the first instance, about a context in which there's

10   an equity committee, and there's an expectation that everyone's

11   going to be paid in full and that all of these cases are going

12   to go away.

13        THE COURT:  Well, the equity committee reviews really

14   doesn't help at all.  But the creditors' committee review has

15   some -- helps your case somewhat.

16        MR. FISHER:  The creditors' committee reviewed it.

17   They have fiduciary duties to all of the unsecured creditors.

18   They did not object.  They approved the procedures.  And notice

19   was disseminated to the entire creditor matrix.  It was very

20   widespread notice.  There may be -- I'm aware of Wagner-Smith,

21   and we'll hear from Mr. Gottfried.  There may be a defendant

22   that received no notice.  But even there, as I've already

23   argued, I don't think that notice was required under the rules

24   with respect to the relief that was being sought, which is

25   sealing and a 4(m) extension.

- 131 -

 1           THE COURT:  Sealing of the complaints?

 2           MR. FISHER:  Yes, sealing of the complaints.

 3           THE COURT:  All right.  Okay.  I'm assuming your

 4    response to the point that the committee wants to maximize the

 5    value of this estate is that, in fact, creditors' committees

 6    very often look out for vendors who've received potential

 7    preferences, and often bargain on their behalf too, right?

 8           MR. FISHER:  Yes.  But the rationale for the -- in

 9    terms of the costs that were saved as a result of the sealing,

10    it's enormous costs to the estate, because hundreds of

11    defendants who never ended up getting sued would have retained

12    counsel, would have engaged in 26(f) conferences, would have

13    begun to litigate preference cases that ultimately never saw

14    the light of day.

15           And Ms. Schweitzer refers to how much it would cost to

16    monitor the docket to find out whether there was an order that

17    could potentially be of interest to a party that received a

18    payment during the ninety days before Delphi filed for

19    bankruptcy.  Well, think about how much more it would cost in

20    expenses, both to defendants and to the estate, if 742 cases

21    that weren't going to get prosecuted were filed, served,

22    counsel was retained, and litigation was begun.

23           THE COURT:  Okay.

24           MR. FISHER:  Unless Your Honor has further questions,

25    I'll --

- 132 -

1        THE COURT:  Well, the issue -- when we were talking

2    about notice, counsel raised issues about the confusion that

3    might have been experienced by foreign claimants and claimants

4    with claims below 250,000 dollars and the like.  I'm happy to

5    deal with that in connection with the res judicata argument,

6    unless people want to raise the notice issues now on those

7    people.  Do you want -- you're going to do that?

8        MR. WINSTEN:  I think -- Your Honor, I.W. Winsten.  I

9    think it may make sense to deal with the statute of limitations

10   4(m) issue.  That seems to be on the front lobe of the brain.

11       THE COURT:  That's fine.  That's fine.

12       MR. WINSTEN:  And it was the -- is the natural next

13   issue.

14       THE COURT:  Okay.

15       MR. WINSTEN:  The abandonment issues, I think --

16       THE COURT:  Just, I don't want people to forget, if

17   there is an issue that rendered notice inadequate in their

18   minds, based upon specific facts like if I was a foreign

19   creditor or I was a smaller creditor or something like that, we

20   should address that at some point.

21       MR. WINSTEN:  There are eighty-three moving parties

22   who aren't going to forget, Your Honor.

23       THE COURT:  Okay.  Okay.  So why don't I hear from

24   you, then.

25       MR. WINSTEN:  May it please the Court, I.W. Winsten,

- 133 -

1   Your Honor.  I'm with Honigman Miller Schwartz & Cohn, and we

2   represent the Affinia, Valeo, MSX, GKN and Rotor Coater

3   defendants in five separate actions.

4          I will give a subset of my argument right now.  There

5   were a number of different issues I was going to raise, but I

6   want to focus right now on what appears to be the core issue

7   for right now, which is the statute of limitations and the 4(m)

8   issues, which are related, Your Honor.

9          The basic facts that relate to my argument are very

10  few, and they're all admitted here or not contested by Delphi

11  in its papers.  Delphi filed these preference actions under

12  seal so it could keep them secret from the defendants.  That is

13  their acknowledged intent.  They then intentionally did not

14  serve them for the next two and a half years.  At all times,

15  they had the discretion under your order, to unseal and serve

16  whenever they wished during the two and a half year period.

17  This Court never required that they not serve.  And their

18  principal reason for sealing and not serving was, of course,

19  there was going to be a hundred-cent plan.  But that fell apart

20  by April of 2008, and they did not serve for the next two

21  years.

22          Now, Delphi does not contend in their responses to all

23  of these eighty-three motions, that they ever gave

24  particularized notice to any defendant.  They don't claim that

25  they gave particularized notice to a single one, even though

- 134 -

1   the case management order required that they do so.

2         They also concede, at page 29 of their omnibus brief,

3   that most defendants never got electronic notice, non-

4   particularized electronic notice.  In fact, they only contend

5   that of the 177 cases, they gave particularized notice in only

6   24 of them.  That's at page 29.  They list the 24 where they

7   claim they gave electronic notice.

8         THE COURT:  Well, I'm sorry.  Let me make sure we're

9   clear here.  I thought you were distinguishing between

10  electronic notice and particularized notice?

11        MR. WINSTEN:  I am.  Particularized notice, they have

12  not contended in their papers that they gave particularized

13  notice to a single defendant.

14        THE COURT:  Okay.

15        MR. WINSTEN:  And virtually all the defendants have

16  said in their motions by affidavit, we never got notice.  So we

17  put that --

18        THE COURT:  Even electronic ECF notice?

19        MR. WINSTEN:  Well, most defendants have said they

20  didn't get any notice in their papers.  Delphi is only

21  contending -- let's take at face value for a moment what they

22  contend -- they contend they gave electronic notice in 24 of

23  the 177 groups of cases.  Only 24.  So that there's 153 where

24  they're acknowledging there's no particularized notice and

25  there's no electronic notice.

- 135 -

1           THE COURT:  And what we're talking about here is of

2     the extension motion, right?

3           MR. WINSTEN:  Of the first -- the motion in August of

4     '07 or any of the subsequent ones.

5           THE COURT:  The motions?

6           MR. WINSTEN:  Yes.

7           THE COURT:  Okay.

8           MR. WINSTEN:  So they're, in effect, acknowledging --

9     we put the matter at issue in our papers, and they have

10    acknowledged as to the vast bulk of these people, no one got

11    notice.  And I think Mr. Fisher may have misspoke when he said

12    there was service on the entire matrix.  That's not the case.

13    There's an affidavit of service back in August of '07 of who

14    they served it on.  They're very specific.  It was not served

15    on the matrix.

16          Now, to obtain the right to seal and not serve, Delphi

17    represented in its August of '07 motion at paragraph 34 that

18    none of the defendants would suffer any prejudice from being

19    kept in the dark.  And we all now know that that's not true.

20    The defendants have suffered in many different ways.  There's a

21    range of prejudice, but a whole range of prejudice over those

22    two and a half years.

23          The only legal justification that Delphi offers, the

24    only one, for the tolling of the statute of limitations, by

25    filing under seal, is at page 31 of their brief.  It's one

- 136 -

1    page, just one page.  That's the entire portion of their brief

2    that tries to justify filing under seal as tolling the statute

3    of limitations.  And what they say is that the legal

4    justification for that can be found by looking at the criminal

5    cases, where an indictment can be sealed, and the statute of

6    limitations tolled, even though like here, the prosecutor

7    intentionally decides not to serve until well after the statute

8    of limitations has run.

9         Delphi relies on the criminal cases, because there are

10   no reported civil cases that address the combination of sealing

11   and intentionally not serving.  In the crimin --

12        THE COURT:  I'm sorry.  If -- to me it still seems

13   that the sealing point is largely a red herring.  If you're

14   saying that you don't get notice if it's either not

15   particularized or not ECF, how would filing it on the docket

16   have provided any more notice than having it be unsealed --

17        MR. WINSTEN:  Of course, Your Honor.

18        THE COURT:  -- or having it be sealed?

19        MR. WINSTEN:  What the courts say in the criminal

20   area --

21        THE COURT:  No, I don't -- frankly, I don't believe

22   that the criminal cases are particularly helpful here.  It's a

23   different -- different rules and different considerations.  I

24   think that the issue here is 4(m).

25        MR. WINSTEN:  Well, I will turn to 4(m) in just a

- 137 -

1    moment, Your Honor, and I will move on from this issue, because

2    I want to go where I'm getting traction with you.  But give me

3    the benefit of thirty seconds on this issue, okay?

4              THE COURT:  All right.

5              MR. WINSTEN:  Just give me the benefit of thirty

6    seconds to see if I can --

7              THE COURT:  Okay.

8              MR. WINSTEN:  -- turn you around on that, or go right

9    to 4(m).

10             THE COURT:  Okay.

11             MR. WINSTEN:  In the criminal area, not in speedy

12   trial basis, not in any special criminal areas, on plain, flat

13   statute of limitations basis, where the prosecutor seals and

14   doesn't serve, they look at it on a statute of limitations

15   basis thereafter, and they dismissed on statute of limitations

16   basis in three different circumstances.  First, the one you

17   mentioned on 4(m), which is the defendant gets to get up, once

18   he's served, and say you didn't have good ground on day one to

19   seal and not serve, and therefore the statute of limitations

20   wasn't tolled.

21             Secondly, even if you timely -- even if you properly

22   sealed, if you don't timely unseal, I get to challenge that.

23   And if you don't timely unseal, it gets dismissed on statute of

24   limitations grounds, just as if you filed after the statute had

25   run.  And third, the prejudice issue.  If you seal -- properly

- 138 -

1    seal and timely unseal, if I'm prejudiced during that time

2    period, I can get it dismissed again.

3          And the courts there, Your Honor -- and we cited the

4    cases -- they typically say, you know, we don't have to revisit

5    whether it was proper on day one to seal.  We don't have to go

6    there.  We can just look at whether they timely unsealed.  And

7    if they didn't, it's dismissed on statute of limitations

8    grounds.  I'll move to the 4(m) issue.

9          THE COURT:  I mean, I think the difference there is

10   that the service of the criminal complaint is important in a

11   criminal case.  It's not -- it doesn't have the same -- I mean,

12   the -- anyway, why don't we go to the --

13         MR. WINSTEN:  Well, why is it any more important in

14   the criminal case that the defendant be served than it is in a

15   civil case?  It's the same purpose.  Ultimately, it's to let

16   the defendant know and give him an opportunity to defend.  And

17   what they say in the criminal side is you're playing with fire

18   if you want to seal and not serve.  You can get away with it

19   under certain circumstances, but you're walking a tightrope,

20   and you can fall off in lots of different ways.  And if you

21   want to do this, you're taking that risk.  That's the

22   importance there.

23         And, Your Honor, there just aren't civil cases dealing

24   with sealing and not serving, which is why the criminal cases

25   provide an analogy.  But you know what, Your Honor?  In the

- 139 -

1    criminal cases, judges don't want to let criminals go.  They

2    don't want to get bad guys go because they sealed and didn't

3    serve.  So when they do, I think it's meaningful.  And it's

4    meaningful that they do it on a regular basis there.

5             But let me move to 4(m).  I think, as this Court has

6    said, you're not stuck with the orders you entered when you

7    granted the service extensions, if the defendants were not on

8    notice.  It's wide open.  And Delphi, in their papers -- these

9    are motions to dismiss --

10            THE COURT:  What is your best --

11            MR. WINSTEN:  -- we came forward --

12            THE COURT:  -- what is your best case on that point?

13            MR. WINSTEN:  Well, I --

14            THE COURT:  I mean, their argument is that 9006

15   permits an order to be entered ex parte and therefore you're

16   not deprived of the -- of any interest that would render the

17   judgment void for wont of service.

18            MR. WINSTEN:  Well, perhaps the best -- first of all,

19   we cited cases at page 29 of our opening brief.  And Hewlett

20   Packard cited some at page 7 of their reply brief.

21            But I think perhaps the best analogy, Your Honor, is

22   if I come to this Court and I ask for an ex parte TRO and you

23   grant that TRO, and I want it granted ex parte without the

24   defendant having a seat at the table; once the defendant gets

25   served, they get to come in and tell the rest of the story.

- 140 -

1    The Court revisits it fresh.  The moving party still has the

2    burden.  And courts frequently vacate those orders when they're

3    ex parte.

4         And so we have a situation, I think as the Court said

5    earlier, when Ms. Schweitzer was arguing, that if we didn't

6    have notice and Delphi had this opportunity to somehow argue in

7    response that they gave us notice, and as to the 153 of the

8    177, they're claiming no notice whatsoever, we have the

9    opportunity to revisit.  We're not stuck with these.  We've

10   cited the cases that say the Court can revoke, once the other

11   side comes in and gives the argument and that Delphi retains

12   the burden.  It's a fundamental angle of American principle of

13   jurisdiction that you're not stuck with orders that were

14   entered without notice to you.

15        And frankly, Your Honor, those orders were entered

16   when Delphi was saying oh, Judge, this is just going to

17   preserve the status quo; oh, don't worry, Judge, nobody's going

18   to be prejudiced.  Well, there's a whole range of prejudice.

19   And, oh, don't worry, Judge, we're giving notice to everybody

20   who's supposed -- well, actually, they argue both sides.

21        THE COURT:  Okay.  So let's assume that I'm looking at

22   the issue fresh -- the 4(m) issue fresh.

23        MR. WINSTEN:  Right.  I would submit to you, Your

24   Honor, if you're looking at this thing fresh, that this is a

25   pretty easy call.  The purpose of 4(m) is to force people to

- 141 -

1   prosecute their case and to get the case served.  Therefore,

2   you can give 4(m) extensions to facilitate service.  You're

3   having a problem; here's some more time.  You can't find them.

4   The purpose of 4(m) is not to authorize people to delay

5   service.  It turns it on its head.

6        We've cited a whole slew of cases that say you can't

7   use 4(m) to authorize a delay in service.  And they say -- and

8   we cited cases for every one of these principles -- you can't

9   grant the 4(m) extension because the plaintiff needs more time

10  to sort out the facts.  The case is complex.  The two-year

11  statute of limitations isn't enough time for them.

12       THE COURT:  But aren't I correct that all of those

13  cases are cases where courts upheld or made -- if they were a

14  trial court -- a finding that there was not cause or they

15  exercised their discretion in the non-cause context of 4(m)?

16       MR. WINSTEN:  Virtually all of the reported appellate

17  cases are cases in which the lower court denied the service

18  extension.  I would concede that there are very few appellate

19  cases which reverse the service extension.  It's the way they

20  come up is they give --

21       THE COURT:  I think there's only one, right?

22       MR. WINSTEN:  -- pardon?

23       THE COURT:  There's only one, right?

24       MR. WINSTEN:  Well, there aren't many.

25       THE COURT:  Okay.

- 142 -

1        MR. WINSTEN:  But the cases -- the collection of

2   cases, no matter how they come up, they have all said it's

3   wrong to grant a 4(m) extension because the plaintiff wants to

4   wait and see what happens with other events before it decides

5   whether to proceed.

6        THE COURT:  Well, let's look at the Zapata case, which

7   is Second Circuit.

8        MR. WINSTEN:  Okay.

9        THE COURT:  It seemed to me, Judge Jacobs went out of

10  his way to leave open what would be wrong if you exercised your

11  discretion as opposed to found cause.

12       MR. WINSTEN:  Well, if I recall that case, Your Honor,

13  that's a case where the Court said it was obvious that the

14  defendant suffered prejudice if there's a delay in service

15  until well after the statute --

16       THE COURT:  No.  I'm not -- maybe I wasn't clear.  In

17  Zapata, the Second Circuit upheld the district court's decision

18  not to extend --

19       MR. WINSTEN:  Correct.

20       THE COURT:  -- not to grant the 4(m) motion.  And it

21  was conceded that there was no cause for the extension.  And it

22  seems to me, at most what Zapata says, particularly given

23  footnote 7, is that the Court had the right not to grant the

24  extension in its discretion, not that that was the only

25  possible result.

- 143 -

1          MR. WINSTEN:  That case does not deal -- clearly I

2     agree, Your Honor -- with this circumstance.  It does say that

3     the Court has a fair amount of discretion.  But if you look at

4     the myriad of 4(m) cases, there isn't a single case out there

5     that I'm aware of under 4(m), and I've looked, that says that

6     it's proper to authorize the plaintiff to delay service because

7     it's an inconvenient time for them to be serving the defendant,

8     or it's okay to defer service because the plaintiff lacks the

9     financial resources to pursue the case.

10          And, Your Honor, if the 4(m) could be used for that

11     purposes, then there is no statute of limitations.  There is

12     none, because you could just enlarge the time then.  And I

13     would suggest that it's an abuse of discretion, clear abuse of

14     discretion to enlarge the time to serve or not serve because

15     the plaintiff just needs more time to get their act together,

16     because that's changing the statute of limitations.  4(m) is

17     designed, if you look at the legislative history, to force

18     people to diligently serve to the get the case going.

19          They put the 120 in to have a hard deadline.  They

20     gave court discretion because there's all kinds of

21     circumstances that can happen, where people need more time,

22     because stuff happens.  But the purpose is not to say, okay,

23     you filed the case, but you can take a year or two off now, or

24     two and a half years off, and we can more than double the

25     statute of limitations, because it's inconvenient for you to

- 144 -

1    proceed now.

2            THE COURT:  Well, there's more than that going on

3    here, though.  I mean, I think you could take your argument to

4    say that the only basis for an extension is cause.

5            MR. WINSTEN:  No, no.  No, I'm not saying that.  You

6    may have a circumstance where within the 120 days, the

7    plaintiff has been neglectful of trying to serve and did get

8    their act together towards the end, and then found out there

9    were all kinds of issues, and they come in and maybe they

10   haven't been diligent.  But the Court's going to give them some

11   extra time, because they're trying to serve, and the purpose is

12   to try to serve.

13           But you know what else, Your Honor?  What the cases

14   say and your brother judge in Global Crossings said this, is

15   you can't morph your reasons for the extension from extension

16   to extension.  You can't come in on day one and get a 4(m)

17   extension, and then come in later and ask for another extension

18   for a different reason.  You can't tack on different reasons

19   over time.  Judge Gerber held that in Global Crossings in 2008.

20   And he turned down the second extension request because it was

21   for a different reason than the first reason.

22           Here what happened was it started out with -- and

23   let's assume for purposes of this, that it was a darn good

24   reason.  Judge, it's going to be a hundred-cent plan, why

25   bother anybody, it's going to go away.  This is just a

- 145 -

1    technicality.  Let's file them under seal and extend, and it'll

2    all go away soon.  But that soon morphed from let's not bother

3    defendants because we're not going to pursue the claims to we

4    are in a free-fall and we need time to sort out what we're

5    going to do, and we don't want to antagonize the defendants by

6    letting them know we're serving them.

7            I mean the whole notion of did the defendants get

8    notice here, I think, to use your phrase from earlier, is a red

9    herring.  The whole purpose -- the admitted purpose of this,

10   from the plaintiff's standpoint, from Delphi's standpoint, was

11   to keep us in the dark.  And now they're saying, oh, but maybe

12   you could have found out this way; maybe you could have looked

13   under the door or through the crack in the wall and found out.

14   No.  They say the purpose was to keep us in the dark.

15   Therefore, you can't do this on a blanket basis.  And at a

16   minimum, they only claim twenty-four sets of defendants got

17   electronic notice.  They've said that.  They've laid it out for

18   you.  So as to the 153 they acknowledge there was no notice.

19           The Second Circuit said in Century Brass that it

20   doesn't matter if the debtor claims that the statute of

21   limitations hobbles its ability to reorganize.  It is what it

22   is.  And I would respectfully suggest, Your Honor, that if

23   you're using 4(m) for the purpose that they're alleging, what

24   you're really doing is -- what they're really suggesting you do

25   is to try to undo Century Brass through the back door.

- 146 -

1          But I also want to -- and frankly, Your Honor, this

2     mess is all Delphi's fault.  They're the ones that came up with

3     this construct.  Typically, you come in and you say look --

4     what they could have done is they could have come in and said

5     look, Judge, we got this issue.  It's August of '07.  Here's

6     what we want to do.  We want to file these, we want to serve

7     them, we want a stay.  We'll have them in place.  Everybody

8     will have an even playing field.  Everybody will know.  But

9     hopefully it's all going to go away.  They wanted, though, to

10    keep everybody in the dark.  They're the one that created this

11    problem.  And we shouldn't feel sorry for them.  They greatly

12    benefitted from keeping the defendants in the dark for the last

13    two and a half years, even if they can't pursue these

14    preference actions.

15          After Delphi was in a free-fall, they came into the

16    court in April of 2008, in their second extension motion, at

17    paragraph 22, and they said that the non-disruption of their

18    business relationships with suppliers was "necessary" to its

19    ongoing operations and eventual reorganization.  They were

20    able, Your Honor, to avoid disrupting its business relations by

21    keeping us in the dark and they benefitted from the peace that

22    they were able to obtain over the next two years.

23          And they had that uneven playing field, Your Honor.

24    They knew who they had sued, but we did not.  That gave them an

25    unfair advantage of contract negotiations in a whole myriad of

- 147 -

1    different ways.  They should not get both this unfair advantage

2    back then and the preference claims now.

3           And then also, Your Honor, if this Court had said to

4    Delphi back in August of '07, I'm not going to let you do this.

5    You want to sue, sue, serve, and maybe we'll stay them, but I'm

6    not going to let you keep the defendants in the dark, there was

7    a really good likelihood that Delphi never would have actually

8    proceeded with the suits against the defendants.  It expected a

9    hundred-cent plan.  It made no sense for them to pursue that.

10          THE COURT:  That, to me, is pure speculation.  As a

11   fiduciary, I think probably just the opposite would have

12   happened.

13          MR. WINSTEN:  Okay.

14          THE COURT:  That they would have --

15          MR. WINSTEN:  Well --

16          THE COURT:  -- they would have faced real issues if

17   they hadn't sued --

18          MR. WINSTEN:  -- as I said before, Your Honor --

19          THE COURT:  -- all the people.

20          MR. WINSTEN:  -- I'll go where I'll get traction.

21          This Court was understandably sympathetic to Delphi

22   when it had a hundred-percent plan.  But -- and so, while we

23   all are here arguing against what happened in August '07, that

24   was a different animal.  Come after April of '08, it was an

25   entirely different matter.  It was their decision not to serve.

- 148 -

1    It was their decision to keep us in the dark.  That was not

2    your order.

3             And I would end the 4(m) argument, Your Honor, by

4    saying this.  If 4(m) can be used, in effect, through the back

5    door to enlarge the statute of limitations, which is really

6    what's happened here, what's the standard?  Why stop at two and

7    a half years?  What about three, four or five or ten?  How do

8    you stop it?  Where does it stop?  I've got lots of cases I've

9    filed where it's an inconvenient time for my client to be

10   litigating.  I'd sure rather do it in a year or two.  The

11   answer, we suggest, Your Honor, is that there's a plain bright-

12   line rule; 4(m) extensions are granted to facilitate service,

13   not to authorize a delay.

14            And therefore we ask you to look at this fresh.

15   You've now had both arguments, you've had both -- you get to

16   look at it fresh.  You've heard what we've said; you've heard

17   what they said.  And I think that if you are looking at it

18   fresh now, my suggestion, Your Honor, is it's not a close call.

19   These 4(m) extensions should not have been granted.  And by

20   their own admission in their brief, as to 153 out of 177 of the

21   defendants, there was no notice whatsoever, not even

22   electronic.  And as to the entire 177, there was no

23   particularized notice.

24            I've got lots of other arguments, but the Court may

25   want to address things in the order that makes sense.

- 149 -

1          THE COURT:  It's different, isn't it, if someone knew

2    or should have known of the complaint, right?

3          MR. WINSTEN:  Your Honor, I don't -- when the

4    plaintiff's admitted purpose was to keep us in the dark, that's

5    the wrong standard.

6          THE COURT:  No but -- well, I --

7          MR. WINSTEN:  That's the wrong standard.  They're

8    saying we didn't want them to know, that's why we're doing

9    this.  And now after the fact, they're saying, but maybe you

10   could have found out?

11         THE COURT:  -- but the customary four-factor test for

12   exercise of discretion as opposed to good cause, includes, as

13   one of the factors, whether the plaintiff knew or didn't or --

14   I mean, whether the defendant knew or didn't know of the

15   lawsuit.

16         MR. WINSTEN:  Okay.  Well, on that issue, then, on the

17   issue of even though they were trying to keep us in the dark,

18   should we somehow, through our own whatever figured it out, I

19   would say this.  We didn't -- none of us got particularized

20   notice.  Most of us never got electronic notice.  They never

21   knocked on our door and said, oh, by the way.  And if somebody

22   happened to have looked at the preservation motion, what it

23   would say is we got 11,000, and 95 percent of them we're not

24   going to pursue.  And nobody ever sent me anything in the mail.

25   Why should I ever think I'm one of them?  And then after the

- 150 -

1   statute of limitations runs, why would I ever think?  So --

2          THE COURT:  What about the disclosure statement which

3   did to go every creditor?

4          MR. WINSTEN:  Well, but the disclosure statement

5   doesn't say you've been sued.  It doesn't say who's been sued.

6          THE COURT:  It merely says we've reserved this right.

7          MR. WINSTEN:  It says unknown people have been sued.

8   They're telling they want everybody in the dark, and that puts

9   me at inquiry where I'm at risk?  That doesn't seem right, Your

10  Honor.  That just doesn't seem fair.  This is -- I think this

11  is still America.  It doesn't work that way.  It's not my fault

12  they wanted to keep me in the dark.  It's not my problem they

13  wanted to keep me in the dark.  It's their problem.

14         THE COURT:  Well, I guess the issue is, are you really

15  in the dark?  I mean, it may depend on the size of the transfer

16  that went to you within ninety days of the petition date.

17         MR. WINSTEN:  Your Honor --

18         THE COURT:  I mean, usually, when a really big

19  customer files -- or not usually -- but it often happens that

20  if a really big customer files, a vendor will check to see what

21  transfers they got in the first ninety days--

22         MR. WINSTEN:  Let's assume --

23         THE COURT:  -- before the petition.

24         MR. WINSTEN:  -- that's true.  Let's take that

25  hypothetical.  Let's assume I'm a really big creditor.  I got

- 151 -

1   ten million --

2          THE COURT:  Well, not necessarily a big creditor.  You

3   know, you just have a relationship and you may have -- you want

4   to see whether we got a big payment within ninety days.

5          MR. WINSTEN:  Let's assume I got one.  Let's assume I

6   got ten million dollars, out of the ordinary course.  All

7   right?  Arguably out of the ordinary course -- within the

8   ninety days.  Delphi just filed.  Oh, my God.  I reserve for

9   that ten million.  The two years goes by and they never sue.  I

10  now, on reserve, I go live my life.  Two and a half years

11  later, I get a complaint.

12         THE COURT:  Well, but there's a missing step.  Should

13  that person be said to have been on notice if they got the

14  disclosure statement that said Delphi has reserved?

15         MR. WINSTEN:  How can you be, Your Honor?  How is it

16  fair -- how is it right to say I should have been on notice

17  because they said they've sued unspecified people -- they won't

18  tell me who they are -- who are a small subset, when their

19  admitted purpose was to keep me in the dark?  Why am I now on a

20  heightened level of inquiry, when they're telling you their

21  goal is to keep me in the dark?

22         THE COURT:  Well, at the same time, though, you

23  weren't necessarily in the dark.

24         MR. WINSTEN:  I guess what I -- Your Honor, I don't

25  get that argument.  I really don't.  I hear you saying it.  But

- 152 -

1    if you look at it and you say wait a minute, you've got a

2    plaintiff who's intentionally trying to keep them in the dark,

3    and now we're going to bend over backwards to try to figure out

4    if maybe they might have had an inkling because there were 800

5    cases filed under seal out of 11,000, and maybe that was one of

6    them, and therefore they're charged with knowledge that it's a

7    possibility, and therefore and therefore, that seems --

8           THE COURT:  Again, it seems to me, the issue should

9    be, there were none that were served as opposed to that were

10   under seal.  Because again, I -- it's as easy -- it's probably

11   easier to inquire about whether I'm one of the 800 than to go

12   searching the docket.

13          MR. WINSTEN:  Well, okay.  Well, they don't claim

14   by -- I mean, they don't say how many people inquired.  And

15   given the --

16          THE COURT:  Well, let me ask you -- let's just say

17   someone did inquire and they were told they're on the docket.

18   I know you're saying your clients didn't do this.  But say

19   someone did.  They say there were people who did that.  Why

20   should they have their motion to dismiss granted?

21          MR. WINSTEN:  That's a very good point.  Let me answer

22   it this way.  First, all five of my sets of clients have

23   affidavits in --

24          THE COURT:  No, I know.  Yours are not in this --

25          MR. WINSTEN:  -- they didn't know.

- 153 -

1          THE COURT:  -- yours are not in this group.

2          MR. WINSTEN:  We filed a motion.  The way the

3     adversary system works is they're supposed to respond.  There's

4     not one word from them --

5          THE COURT:  No, no.  No, that's not -- again, you're

6     talking for like a whole group here, so --

7          MR. WINSTEN:  Okay.

8          THE COURT:  -- I'm talking now about those who did

9     inquire.

10         MR. WINSTEN:  From 177 -- or rather for the 83 moving

11    parties, it was incumbent upon Delphi, if they claim that any

12    of those 83 moving parties had inquired, to tell this Court

13    that they were on notice.  This was their opportunity.  They

14    haven't said that.  Therefore, for purposes of this hearing,

15    none of the 83 inquired.

16         THE COURT:  Okay.

17         MR. WINSTEN:  Well, I think once Mr. Fisher responds

18    on the 4(m) statute of limitations argument, we're going to

19    need to figure out some organization on the remaining issues,

20    the Iqbal, the abandonment, the res judicata and the no notice

21    whatsoever on due process.

22         THE COURT:  Okay.  Why don't we deal with the last

23    point.  There's nothing in the response that says that any

24    particular movant actually had actual notice, right?

25         MR. FISHER:  But I think, Your Honor, the question of

                                                          - 154 -

1    actual notice -- the question of actual notice is a fact

2    question.  The question of what went out by e-mail, that can be

3    resolved by reference to affidavits of service.  But the

4    question of whether any defendant that was in receipt of a

5    preference payment knew that this procedure was going on and

6    knew that it might be among the named defendants is a fact

7    question.

8           THE COURT:  Well, what about those people who

9    submitted affidavits that say that they didn't know?  Those are

10   uncontroverted, right?

11          MR. FISHER:  Without the benefit of taking their

12   deposition, which was not something that we were going to

13   engage in, in advance of a hearing on a motion to dismiss,

14   there's no way to know whether they had actual notice or not,

15   whether they knew or should have known about these motions.  I

16   don't think that that's something that can properly be

17   addressed on a motion to dismiss, Your Honor.

18          THE COURT:  Okay.

19          MR. FISHER:  Your Honor asked about Zapata.  And I

20   just wanted to turn to Zapata for a moment, because as Your

21   Honor pointed out, in footnote 7, Judge Jacobs leave open, of

22   course, the question of what would happen where a lower court

23   approves a 4(m) extension, even without good cause.  But of

24   course, here we have an express finding of good cause.  Your

25   Honor found that on the record after hearing the motion for

- 155 -

1   sealing.  So we're talking about a 4(m) extension and sealing,

2   as to which the Court made an express finding of good cause.

3           Another reason why the Zapata case is salient, even

4   though it happens to be a case in which the district court

5   denied the request for a 4(m) extension, is that that case

6   says, quote -- apparently the lower court there had found that

7   the 4(m) extension was not justified because prejudice to the

8   defendant should be assumed as a result of the expiration of

9   the statute of limitations.  And the Second Circuit went out of

10  its way to actually correct that finding.  And it said, "Thus,

11  while we disagree with the district court's formulation that a

12  dispositive degree of prejudice to the defendant is assumed

13  when statute of limitations would bar the refiled action, we

14  leave to the district courts to decide on the facts of each

15  case, how to weigh the prejudice to the defendant that arises

16  from the necessity of defending an action after both the

17  original service period and the statute of limitations have

18  passed before service."

19          And, Your Honor, I believe that that dictum in that

20  important Second Circuit decision, supports the reorganized

21  debtors' argument here, which is that at the end of the day,

22  what the Court ought to do and is being asked to do, is to

23  balance prejudice.  This isn't a due process issue.  This is a

24  question about are there movants who have been prejudiced?

25  What's the nature of the prejudice?  Can that be corrected for

- 156 -

1   in some way on a case-by-case basis?  And again, on the other

2   hand, what is the prejudice to the reorganized debtors if

3   orders that were validly entered and they relied on are now

4   modified years later?

5           I understand that Your Honor doesn't find the criminal

6   cases to be all that analogous.  But of course, the reason that

7   they were referred to is because they are the cases that at

8   least address in some fashion the question of what happens when

9   a complaint is sealed or an indictment is served after

10  expiration of the statute of limitations period.  And we've

11  cited a number of cases from the criminal context that go our

12  way.

13          Mr. Winsten said well -- and you know, no one would go

14  out of their -- no one would bend over backwards to set a

15  criminal defendant free.  I would say, on the other hand,

16  actually, courts would bend over backwards to make sure that

17  any constitutional rights of a criminal defendant are

18  protected.

19          THE COURT:  But the cases -- they've cited cases too

20  where in the criminal context, they were dismissed.

21          MR. FISHER:  The cases go both ways.  But the point

22  is, there's no per se violation.  There's no per se due process

23  issue in pursuing these actions after expiration of the statute

24  of limitations.

25          THE COURT:  Well --

- 157 -

1          MR. FISHER:  Mr. --

2          THE COURT:  -- I think -- I agree with you on that.

3    The issue I still have is the one that I think both counsel for

4    the defendants raised, which is that particularly given the

5    apparent lack of notice of the extension motions, shouldn't I

6    look again at the various orders, and particularly after -- the

7    orders entered after April 2008, where it seems that the only

8    rationale at that point was not a rationale of saving the

9    estate money, but was really rationale of estate resources or

10   direction of the case, as opposed to saving -- not starting a

11   whole litigation festival; why at that point there would be a

12   basis for not starting these lawsuits?

13         MR. FISHER:  Your Honor, to return to a point I made

14   earlier.  I don't think that there's any grounds to look at the

15   orders fresh, even as to movants who may not have received

16   actual notice.

17         THE COURT:  Do you have any case to support that?

18         MR. FISHER:  I have the rules that say that sealing

19   and 4(m) extensions don't need to be made on notice; and of

20   course, the overwhelming authority that says that 4(m)

21   extensions are routinely granted in the discretion of the court

22   and affirmed on appeal.

23         But I would say that if the Court were to look fresh

24   at each of the orders, I don't -- I think that they would, of

25   course, continue to hold up, because they were justified on

- 158 -

1    each occasion when those orders were entered.  And I think that

2    what the movants are trying to elide here, is they're making it

3    seem as though there was an order entered back in 2007 that

4    provided that these would remain under seal and would not be

5    served for a period of two and a half years.  It's as if from

6    the get-go, the debtors intended to cause some extraordinary

7    delay in these cases.  And of course that's not true.

8            THE COURT:  No.  I think actually -- well, they may

9    have said that.  But I think they're also saying that actually

10   the facts, when they did change, after the plan investors

11   backed out --

12           MR. FISHER:  That's --

13           THE COURT:  -- and at that point, they really should

14   be looked at fresh.

15           MR. FISHER:  I think, Your Honor, when the facts

16   changed and when the plan investors backed out in April 2008,

17   if anything, there was only an additional reason to grant 4(m)

18   extensions with regard to these motions, and that is that in

19   addition to wanting to conserve estate resources, the estate

20   was in a crisis situation.

21           THE COURT:  But that happens in -- I mean, most --

22   what was unusual about the original context of this was that

23   people were contemplating a hundred-cent plan, and yet facing

24   this limitations period.  It's not only common, I think it's

25   probably generally the case that most debtors are in some form

- 159 -

1    of crisis mode during the course of their Chapter 11 case.  And

2    that, to me, doesn't necessarily argue for there being an

3    excuse to delay commencing litigation.

4          I mean, I -- one might argue that for a period after

5    April 2008, there was a prospect of -- before discovery and

6    before litigation of the specific performance lawsuit against

7    the investors, that the plan would, in effect, close anyway,

8    like a couple of other cases did during that period when

9    investors backed out and then were sued and then decided

10   discretion was the better part of valor and closed.  So maybe

11   you argue for another extension while that was happening, in

12   the light of distinct possibility of the specific performance.

13         But at some point, didn't Delphi look like almost

14   every other debtor, which is, a debtor that is not going to pay

15   its creditors in full and, of course, has to balance the cost

16   of bringing litigation against the benefits of bringing it, and

17   needs to go ahead and diligently pursue the litigation?

18         MR. FISHER:  Your Honor, with regard to the

19   consistency of the rationale supplied by the debtors for

20   extending the time to serve under Rule 4(m), I think that the

21   rationale actually remained consistent through that second

22   extension order.  And the second extension order was entered on

23   April 30, 2008.  The Appaloosa EPCA financing, they pulled out

24   about April 2nd --

25         THE COURT:  Right.

- 160 -

1          MR. FISHER:  -- 2008.  The motion was brought very

2     soon thereafter.  And as Your Honor pointed out, my

3     understanding is that there was, at that time, a hope, and

4     perhaps even an expectation, that there'd be some way to force

5     that financing to close and that we were still looking at a

6     hundred-cent plan, in fact.

7          THE COURT:  They'd done it before, in fact.  They'd

8     reneged once before and then decided it was better to go ahead.

9          MR. FISHER:  So that's --

10          THE COURT:  But that was only the second one.  There

11     were --

12          MR. FISHER:  There was one more.  There was the

13     preservation order, and then the first and second extensions.

14     All of them were granted in circumstances where the expectation

15     was --

16          THE COURT:  What was the second one?

17          MR. FISHER:  Well, it's the third one, I think.  The

18     last --

19          THE COURT:  The second extension?

20          MR. FISHER:  -- the second extension was the one that

21     I just described, Your Honor.  Just for purposes of

22     nomenclature, there was the preservation order and then that

23     was -- there were two extension orders -- there were three

24     extension orders following that.

25          THE COURT:  Okay.

- 161 -

1          MR. FISHER:  The final one is the one as to which it

2     can be argued that there was a slightly different rationale.

3     Because at then -- by then, the third extension order, it was

4     clear that this was not going to be a hundred-cent plan, and

5     far from it.  And the rationale that was supplied in the motion

6     in support of that --

7          THE COURT:  You were looking for people to serve at

8     that point.

9          MR. FISHER:  It wasn't even that.  It was also that

10    the plan contemplated dividing the reorganized debtors into

11    three different entities.  It was much more complex than was

12    originally anticipated.  And the debtors asked for a little bit

13    of time to accomplish consummation of the plan before they

14    turned their attention to service of the adversary proceedings.

15         And so it is -- with respect to the final order, the

16    record is clear that by then, of course, the rationale had

17    changed.  But the rationale had changed because the

18    circumstances had changed so dramatically.

19         THE COURT:  And what about -- this comes up in some of

20    the motions -- the notion that at some point Delphi should have

21    used its discretion, which it was granted in the order, and

22    consistent with the rationale of the order, not to -- I'm

23    sorry, to serve the complaints?

24         MR. FISHER:  Your Honor, to be very candid about that,

25    I don't think that that was something that would have crossed

- 162 -

1    the reorganized debtors' mind at the time, given what was going

2    on in the bankruptcy case and given the effort to bring this

3    plan to fruition and ultimately consummate the plan.  But you

4    know, with respect to sealing, with respect to the 4(m)

5    extensions, certainly to the extent that any defendant became

6    aware that there were cases that were under seal and that there

7    were cases as to which the 4(m) extension deadline had been

8    extended several times, any party-in-interest could have

9    brought a motion to unseal.  Any party-in-interest could have

10   challenged one of Your Honor's orders at that time saying how

11   can we vote on a disclosure statement until we know what those

12   actions -- what those actions filed under seal are.  And no

13   such motion was filed.

14          Instead, the defendants waited until these complaints

15   were served and then brought that argument as a motion to

16   dismiss.  And the argument could have been brought at any point

17   by any party-in-interest, Your Honor.

18          THE COURT:  Well, except those that didn't get --

19   weren't in the creditor matrix.

20          MR. FISHER:  Anyone who received the disclosure

21   statement was aware that there had been -- it recounted the

22   history -- was aware that these actions had been preserved, had

23   been filed under seal, and that the 4(m) deadline had been

24   extended.  And any creditor could have brought a motion

25   challenging that aspect of the plan on the grounds that are now

- 163 -

1    being asserted in a context of motions to dismiss and motions

2    to vacate the Court's orders.

3            THE COURT:  Okay.

4            MR. FISHER:  Mr. Winsten also accuses us of wholesale,

5    trying to undermine the statute of limitations.  And he refers

6    to the Century Brass decision of the Second Circuit and says

7    that we're trying to work an end-run around that case.  Not at

8    all.  That case just stands for the general proposition that a

9    debtor-in-possession is subject to the same two-year statute of

10   limitations that the trustee is subject to.

11           Again, there was no intent and there's no evidence of

12   any intent and there's nothing in the record to suggest any

13   intent on the part of the debtors to cause the kind of delay

14   that was occasioned here and to avoid the statute of

15   limitations.  Each order has to be evaluated on its merit.

16   With regard to each order, there was, at the time, good cause

17   for sealing and good cause for extending the deadline.  And

18   what we're dealing with today are simply the consequences of

19   that.  And the consequences of that ought to be dealt with by

20   balancing the need to preserve these actions, but to preserve

21   them in a way that minimizes or even eliminates any prejudice

22   to the defendants who've been named in the actions.

23           THE COURT:  Okay.

24           MR. FISHER:  Lastly, on the notice point, Your Honor

25   asked about whether it makes a difference if a defendant should

- 164 -

1  have known that it was potentially subject to a preference

2  action, because certainly, all the defendants who are sued

3  should have known that they had received payments --

4  substantial payments, given the group of cases that we're

5  talking about -- during the ninety-day preference period.

6          And on that point, I would turn Your Honor's attention

7  to Cohen v. TIC, which is in the Ampace bankruptcy.  It's a

8  2002 Delaware case.  And although it's not a 4(m) case, it

9  talks about preserving estate assets.  And it talks about the

10  standard of knew or should have known and where a preference

11  defendant knew or should have known that it was in receipt of a

12  payment, it similarly knew or should have known that it was

13  potentially the target of a preference action.

14          THE COURT:  Okay.  Am I right that neither side here

15  has a case that says that you can look at an extension order

16  fresh or any order fresh notwithstanding the authorization to

17  proceed under 9006(b) ex parte?

18          MR. WINSTEN:  Your Honor, I.W. Winsten.  At page 29 of

19  Affinia's opening brief, we cite to the McCray decision, which

20  is a 2004 Third Circuit decision, which says, "We discern no

21  reason why a district court cannot revoke its decision

22  afterwards," and it goes on and says that once the other side

23  comes in and says why it's wrong.  So we've cited that case.

24          THE COURT:  But that's more -- that's not 60(b)(4),

25  though.  That's a Court always has the ability to say I made a

- 165 -

1    mistake under (a).

2            MR. WINSTEN:  And I believe that Hewlett Packard, in

3    their reply brief, I think at page 7, cited some -- a case or

4    two saying that the Court can revisit and that the debtor has

5    the burden.  But I think it's just common sense, Your Honor,

6    that if you didn't have a seat at the table, you're not stuck

7    with what happened at the table.

8            THE COURT:  Well, except the rules say you can do it

9    ex parte.  That's what -- the rules say you can do it ex parte

10   for cause.

11           MR. WINSTEN:  Well, right.

12           THE COURT:  And the argument is that -- well, I

13   understand your point.  And we're covering old ground.

14           MR. WINSTEN:  All right.

15           THE COURT:  All right.  So shall we move to Rule 8 and

16   Iqbal?

17           MR. FISHER:  Well, we were just discussing whether it

18   made sense to go to Iqbal next or go to abandonment.  Whatever

19   your pleasure is.

20           MR. WINSTEN:  I would like, Your Honor, a couple

21   minutes on due process.

22           THE COURT:  Okay.

23           MR. WINSTEN:  I realize there's been a lot said about

24   it.

25           THE COURT:  Okay.  That's fine.

- 166 -

1          MR. FISHER:  Your Honor, just before I'm seated, I

2     wanted to make clear for the record, Mr. Winsten represents

3     Valeo defendants and NGK defendants.  And Butzel Long does not

4     represent the reorganized debtors with regard to those

5     actions --

6          THE COURT:  Okay.

7          MR. FISHER:  -- because of a conflict.

8          THE COURT:  That's fine.

9          MR. FISHER:  And so, to the extent there's any issue

10    unique to those defendants, that would be something that Mr.

11    Geoghan would speak to.

12         THE COURT:  Okay.  We've been talking generalities

13    here.

14         MR. WINSTEN:  Your Honor, also if I may, four short

15    points, in response to what Mr. Fisher said, very short.  I can

16    do it in thirty seconds.

17         THE COURT:  Okay.

18         MR. WINSTEN:  In addition to a motion to dismiss we

19    also have a motion to vacate.  It was incumbent upon them to

20    come up with facts if they had facts contrary to what we are

21    saying.  Number two, wherever they get an order ex parte

22    without notice to us, I don't know how in the world they can

23    claim prejudice and reliance on it.  Number three, they say

24    that -- well, number three, they could always have come in,

25    unsealed, and served and stayed.  They didn't do that.  And

- 167 -

1    then finally --

2            THE COURT:  I'm sorry, say that --

3            MR. WINSTEN:  They could have always, at any time --

4            THE COURT:  Oh, they could have.

5            MR. WINSTEN:  -- unseal and serve --

6            THE COURT:  I thought you said they always have.  I

7    understand your point.

8            MR. WINSTEN:  -- unsealed, served and stayed.  And

9    then finally, Mr. Fisher said at the end, nothing stopped any

10   defendant from coming in after they got the disclosure

11   statement and say, Judge, unseal.  Well, I don't think you have

12   standing unless you're one of the complaints that are under

13   seal.  And you have no way of knowing that, and they don't want

14   to tell you.  So how do you have standing?  You can't get in

15   the door.

16           THE COURT:  No, you'd have standing for that.

17   Obviously.  You're worried, right, that you may be covered.

18           MR. WINSTEN:  Well, there's got to be a nexus that

19   you're one of them.  And they're not telling.

20           THE COURT:  Well, of course, they say that they would

21   tell.

22           MR. FISHER:  And certainly, if you're a creditor who

23   has the opportunity to vote on the plan, you have standing to

24   find out what complaints have been filed under seal.

25           THE COURT:  All right.

- 168 -

1          MR. FISHER:  And the order provided for defendants to

2     find -- without unsealing -- provided for the debtors, in their

3     discretion, to let defendants know who had been served.

4          THE COURT:  Okay.

5          MR. GOTTFRIED:  Good afternoon, Your Honor.  Andrew

6     Gottfried, Morgan Lewis & Bockius, for defendant Wagner-Smith

7     Company.

8          We've heard a lot today about due process, so I'll try

9     to keep my piece of it short.  My client, and there are some

10    others, I believe, in this group, similarly situated, was not a

11    creditor of Delphi.  As such, it did not receive any notices of

12    any proceedings in the case, including the sealing order and

13    the extension order, didn't receive plan documents, and there

14    would be no reason for it to receive plan documents.  It was

15    not a creditor.  Whatever business relationship it had with

16    Delphi ceased pre-bankruptcy.

17         There's been a lot said today about the type of

18    notice, whether it's adequate if you got electronic, if you

19    should have looked at the docket, if you should have divined

20    something.  I think there's a case that hearkens back -- that

21    we should hearken back to.  And I appreciate Your Honor's

22    citation to a 1940s case.  This is just a tad more recent.

23    It's Second Circuit Judge Friendly in a case from forty-four

24    years ago, at the time was a rather large and important case.

25    It was Ira Haupt & Company.

- 169 -

1          And Judge Friendly set forth this maxim:  "The conduct

2     of bankruptcy proceedings not only should be right, but must

3     seem right."  What does this mean?  Well, the first part, "be

4     right", is simple enough.  They should be conducted in

5     accordance with the law and rules.  But as per Judge Friendly,

6     that is not enough.  What did Judge Friendly mean by the second

7     prong, that the conduct of bankruptcy must seem right?  And

8     that is, I believe, that the mere mechanical application of law

9     under the rules is not sufficient.  You have to look at the end

10    result and step back and decide, is that fair.

11         Because of the extraordinary arguments that I heard

12    this morning, I thought the most extraordinary was the notion

13    that two and a half years of extension in a sealing order could

14    be done entirely ex parte.  Because that's the only argument

15    that was made with respect to my client, a non-creditor, a non-

16    interested party in this Chapter 11 case, and that because two

17    and a half years of orders could be done ex parte, they can't

18    even be revisited now, that we don't even have the right to

19    tell you why those orders shouldn't have been entered, at least

20    with respect to --

21         THE COURT:  Did your client make a motion to vacate as

22    well as a --

23         MR. GOTTFRIED:  Yes.

24         THE COURT:  -- motion to dismiss?

25         MR. GOTTFRIED:  Yes, Your Honor.

- 170 -

1          THE COURT:  All right.

2          MR. GOTTFRIED:  We did.  We moved to vacate all of the

3     extension orders --

4          THE COURT:  All right.

5          MR. GOTTFRIED:  -- under rule 60.

6          THE COURT:  Okay.

7          MR. GOTTFRIED:  The notion that this process could go

8     on ex parte to us for two and a half years and we cannot be

9     heard as to the basis to these orders, I submit, Your Honor,

10    does not seem right, without getting to even the constitutional

11    procedural due process issue.  And even if --

12         THE COURT:  All right.  I don't want to go off too

13    much on this --

14         MR. GOTTFRIED:  Okay.

15         THE COURT:  You know, I would prefer, if we had more

16    equity powers, but a lot's happened since Ira Haupt, as far as

17    the plain meaning rule --

18         MR. GOTTFRIED:  Well, we have to look --

19         THE COURT:  -- and all that, so.

20         MR. GOTTFRIED:  -- we have to look at the basis for

21    those orders vis-a-vis a non-creditor.

22         THE COURT:  I don't want to cut you off, but I think I

23    am.  I understand that you've -- you have asserted -- and I

24    don't think it's been rebutted, that your client received no

25    notice of anything, even to the disclosure statement.  And I

- 171 -

1    understand the implications of that, I think.

2            MR. GOTTFRIED:  Okay.  Could I move on to another

3    point, then?

4            THE COURT:  Okay.

5            MR. GOTTFRIED:  There's been something said about

6    prejudice.  And some of it is admittedly obvious, and I'm not

7    going to dwell on that too long, about changed ownership of

8    businesses.  In the instance of my client, we've been

9    litigated -- liquidated -- excuse me -- liquidated during this

10   period of what I'll call the unknown litigation.  But there is

11   also policy reasons as to what was wrong with this process vis-

12   a-vis my client.

13           There are accounting and securities laws that require

14   financial disclosure.  And that disclosure should include

15   contingent liabilities and adequate reserve for those

16   contingent liabilities.

17           This process did not enable us or the other defendants

18   to do that.  There were also opportunities that we would have

19   had to mitigate potential loss had we known, in a timely

20   fashion, about the institution of these adversary proceedings.

21           As has been mentioned today, at the time these

22   adversary proceedings were commenced and sealed everyone was

23   expecting a 100 cent plan.  Not surprisingly claims against

24   Delphi at that time were trading at around 100 cents on the

25   dollar.

- 172 -

1          Had we known about the institution of this adversary

2    proceeding we would have had the opportunity to mitigate any

3    loss by just paying the adamnum (ph.) in the complaint and

4    selling our claim that would have arisen under 502(h), thereby

5    enabling us to have no loss or virtually no loss.

6          That is a real tangible prejudice that you can say is

7    speculative and, of course, indeed, there is an element of

8    that, because even we could not say what we would have, in

9    fact, done at the time had we known, because we didn't know.

10   But that's a clear option and right that we would have had that

11   did not exist because of the process employed:  the right to

12   mitigate our damages.

13         And that came at the expense -- at our expense because

14   the debtor wanted to preserve its options, its options to sue

15   if and when it wanted to.  That's genuine prejudice, Your

16   Honor, to us.  And that transcends everything here.

17         And, respectfully, Your Honor, the lack of notice had

18   we known about these -- the sealing motions and the extension

19   motion, we could have come in and said Your Honor, the reasons

20   proffered don't apply to us.  We're not a creditor.  There's no

21   reason they can't sue us now.  Certainly, no reason they can't

22   tell us about that they want to sue us now.  We don't have any

23   business relationship to mend or otherwise.  We're not involved

24   in the plan process, it doesn't apply to us.

25         They don't have a response to any of this other than

- 173 -

1    to say, in effect, well, we should just be lumped in with

2    everybody else because they had a lot of problems going on.

3    And I understand that argument, it's not sufficient, though.

4          We could have been sued at any time before the statute

5    of limitations passed.  Immediately afterwards, 100 days

6    afterward, 120 days afterwards.  And there was no genuine

7    reason not to sue us or let us know.  Maybe we would have

8    stipulated.  Maybe we would have paid the claimant as I said,

9    and mitigated our -- and mitigated our loss because of claims

10   occurring at that time.

11         Those are things that can't be corrected now by saying

12   okay, now you know.  Because we can't go back to them, Your

13   Honor.  Those opportunities have come and gone.  And that's

14   why, Your Honor, at least with respect to clients -- defendants

15   in the position of our client, no notice, not a part of this

16   case, not a creditor, there's just no justification for the

17   sealing, for the extension, or to say we don't have a right to

18   even challenge those orders at this time.

19         THE COURT:  Okay.

20         MR. GOTTFRIED:  Thank you, Your Honor.

21         THE COURT:  Sure.

22         MR. SULLIVAN:  Your Honor, can I just add one very

23   brief point as a follow-up to what was just said?

24         THE COURT:  Okay.  Have you given -- anyone who hasn't

25   given their name previously to the ECRO operator should state

- 174 -

1    it again.

2         MR. SULLIVAN:  Your Honor, James Sullivan of Arent

3    Fox, counsel for the various Timken defendants.

4         Just to kind of restate a little bit of what Mr.

5    Gottfried had said about parties having the ability to mitigate

6    their damages by selling their claims.

7         Timken submitted a declaration in connection with its

8    motion to dismiss, that just prior to entry of the sealing

9    order, and very shortly before the actual filing of the

10   complaint, it actually sold its claim for 102 cents on the

11   dollar.  Therefore -- and at the time of that -- it's also in

12   the declaration, at the time that it sold those claims the

13   purchase of the claims was basically saying are there any other

14   claims that you know about, we're dying to buy these claims

15   because we're hoping to own equity in the reorganized Delphi.

16   And, you know, the bonds were actually trading at this time,

17   again, at 115 cents/120 cents on the dollar.

18        So Timken's admitted declaration that not only could

19   it have sold its claims, but, in fact, it would have sold those

20   claims.  By entering in these various sealing orders, the

21   debtors effectively prevented Timken from, not only mitigating

22   its losses, but actually from earning a profit.  It would

23   have -- it could have earned a profit of 200 -- approximately

24   240,000 dollars on its twelve million dollars 502(h) claims.

25   So it certainly had a very large incentive to actually do that,

- 175 -

1    and it's not merely speculation, Your Honor.

2         THE COURT:  Let me just -- I guess you can get anyone

3    to buy anything.  But why would someone buy a 502(d) claim

4    which presumes --

5         MR. SULLIVAN:  502(h) claim, Your Honor.

6         THE COURT:  I'm sorry, 502(h) claim, right.  Which

7    presumes that you lost a preference lawsuit, which presumes

8    that there's a basis for pursuing the lawsuit, i.e., that

9    creditors aren't being paid in full.

10        MR. SULLIVAN:  Your Honor, once the 502 -- once the

11   claim -- the preference, the alleged preferential claim is

12   repaid you have a claim which is not subject to attack

13   thereafter.

14        THE COURT:  But why would you -- why would you pay

15   money upfront to get a claim where the only way that the debtor

16   would be pursuing it is if there's value for the unsecured

17   creditors, which would mean that there's less than 100 cents

18   distribution.

19        MR. SULLIVAN:  I can only tell you in the context of

20   this specific claim that the purchasers of the claims at those

21   time believed that the equity that they were going to be

22   acquiring in connection with the reorganized plan was

23   probably -- I think that --

24        THE COURT:  I understand that.  But that -- anyway,

25   it's not -- I understand that.

- 176 -

1        MR. SULLIVAN:  I mean, it's irrelevant from the

2    purpose -- from the perspective of a creditor like Timken

3    because --

4        THE COURT:  Again, I prefaced it by saying --

5        MR. SULLIVAN:  -- not only -- it's not really

6    speculative.  In fact, it could have sold its claim for 102

7    cents on the dollar.

8        THE COURT:  Again, I understand that.  I mean, again,

9    you can get people anything at some price.

10        MR. SULLIVAN:  Correct, Your Honor.

11        THE COURT:  Okay.

12        MR. SULLIVAN:  Thank you.

13        THE COURT:  Okay.

14        MR. FISHER:  Your Honor, just specifically on those

15    few points.

16        With regard to this argument of prejudice that arises

17    from claim trading or from Mr. Gottfried's argument that we

18    could have repaid the preference and then asserted a claim

19    against the estate, I don't think that that argument holds any

20    traction because often plans are confirmed and consummated

21    before expiration of the statute of limitations, and then

22    preference actions are prosecuted thereafter.

23        And, so frequently, creditors are in a situation where

24    the resolution or even whether preference claims will be

25    brought is unresolved during that period of time.  It's just --

- 177 -

1    the particular circumstances here of sealing an extended 4(m)

2    deadline from that point of view are just not unique.

3          Mr. Gottfried also made the point that, you know, his

4    client wasn't able to disclose this preference action as a

5    contingent liability, and I assume that's because his client

6    didn't know about the claim, and I'm not offering securities

7    law advice.  But if he did know and had no reason to know that

8    it doesn't have to be disclosed.  But if, based on the fact

9    that his client knew that it had received a significant payment

10   during the preference period, and if, based on our view of the

11   docket, there was reason to be concerned that it may have been

12   named in one of these sealed preference actions, the way the

13   orders were set up Mr. Gottfried's client could have enquired

14   of the debtor as to whether any of those preference actions

15   involved -- involved Wagner-Smith.

16         THE COURT:  But three's unrebutted allegations that

17   they had no notice, literary no notice of anything.

18         MR. FISHER:  They weren't -- they -- to my

19   knowledge -- they were not a creditor.  And, therefore, they

20   did not receive any of the electronic notices.  All they

21   knew -- they weren't a creditor, but what they knew was that

22   they received a preference payment during -- during the ninety-

23   day period.

24         THE COURT:  Oh, okay.

25         MR. FISHER:  If that's enough to put them on some kind

- 178 -

1    of inquiry notice, perhaps.  And if they didn't consider

2    themselves on inquiry notice and they didn't look, then it very

3    well may be that Wagner-Smith is the odd case where there's a

4    movant who didn't know and had no reason to know.

5         And as to Mr. Gottfried's last point, which is that he

6    ought to be able to argue about these orders afresh, because he

7    didn't have actual notice, of course our position is to the

8    contrary.  Because there's no notice requirement we don't think

9    that that's the case.  But we're not running away from that.  I

10   mean, our brief focuses on the fact that each of these four

11   orders was entered appropriately.  And that there was good

12   cause.

13        THE COURT:  Okay.

14        MS. SCHWEITZER:  Your Honor, Lisa Schweitzer.  I'll

15   come up without notes first, because I just want to get

16   guidance on where we're going in the next steps.

17        THE COURT:  Well, I think you were going to say that

18   you divided up some of you're --

19        MS. SCHWEITZER:  Right.  So --

20        MR. HERMAN:  Your Honor, before we go to the next step

21   can I just raise one issue on behalf of defendant Victory

22   Packaging --

23        THE COURT:  Okay.

24        MR. HERMAN:  -- that the Court should hear.

25        THE COURT:  That's fine.

- 179 -

1        MR. HERMAN:  Thank you, Judge.  We've heard a lot of

2    discussion, Judge, about --

3        THE COURT:  Oh, state your name again.

4        MR. HERMAN:  Ira Herman, Thompson & Knight for Victory

5    Packaging.

6        Your Honor, there's the unreported declaration of

7    Benjamin Samuels attached to the motion for Victory Packaging.

8        The motion sets forth, in fact, that Mr. Samuels was

9    sophisticated enough and was concerned that he may have

10   received a preference.  And he repeatedly, and his staff

11   repeatedly, contacted the debtors' representative to enquire

12   about that issue in terms of ongoing business relationships.

13       Now, this may have been unique, it may have not been

14   unique.  But Mr. Samuels was repeatedly given assurances that

15   he would not be hurt and that the contracts would be assumed,

16   which he believed they ultimately were.  Which is not an issue

17   that's before the Court today.

18       But in his affidavit, or declaration, rather, he sets

19   forth that he was given assurances, that there was detrimental

20   reliance on those assurances, and that eventually the

21   contracts, in fact, were assumed and cure payments paid.

22       So for the debtor to say that there was never

23   assurances given or parties were intentionally misled after

24   inquiry there's -- there are irrefuted facts in the record

25   saying that that's just not true.  And that representations

- 180 -

1    were made to business people by business people.

2            THE COURT:  Okay.

3            MR. HERMAN:  Thank you, Judge.

4            THE COURT:  Okay.

5            MS. SCHWEITZER:  So, Your Honor, to resume, I believe

6    the next -- what we were going to propose is to go to the

7    abandonment arguments next.  There's also Rule 8.  We can do

8    them in either order.  And then we have the foreign defendants

9    and some of the other -- I don't want to say lesser issues,

10   just more discreet issues to go through.

11           THE COURT:  Okay.  Do you want to take like a five-

12   minute break, does that make sense to people?  Why don't we

13   make it fifteen minutes, given the number of people here?

14           UNIDENTIFIED SPEAKER:  Could you tell us which one you

15   might do first?

16           THE COURT:  Well, abandonment -- is abandonment also

17   subsumed, res judicata and the like?

18           MS. SCHWEITZER:  I think abandonment -- there's two

19   different arguments in abandonment.

20           THE COURT:  All right.  So it's subsumed then.

21           MS. SCHWEITZER:  It's a res judicata, correct.

22           THE COURT:  I don't care, whatever you want to do.

23   Either way.

24           MS. SCHWEITZER:  Okay, thank you, Your Honor.

25           THE COURT:  So -- well, does this -- are people

- 181 -

1    hungry?  Is probably the place for lunch?  It makes sense it's

2    1:10?

3              UNIDENTIFIED SPEAKER:  I'm a little bit worried if we

4    go too late we'll miss our airplanes leaving out.  I don't want

5    to --

6              THE COURT:  Well, I can tell you that the issues we've

7    just covered --

8         (Recess from 1:08 p.m. until 2:10 p.m.)

9              THE COURT:  Please be seated.  Okay, we're back on the

10   record in In re DPH Holdings on the various preference

11   defendants' motions to dismiss and motions to vacate.

12             MS. THORNE:  Deborah Thorne from Barnes & Thornburg in

13   Chicago.  And I represent the Johnson Control entities.

14             I'm going to address two of the issues this afternoon

15   which relate to abandonment.

16             First of all, I should say that the Johnson Control

17   entities did not have notice either from ECF or any actual

18   notice of the claims preservation motions.  And our -- to our

19   surprise when we were served by the summons last spring, we did

20   some, what I would call, archeological digging, to try to

21   figure out what had happened in this case.

22             And what we are looking at, and what the basis for our

23   abandonment argument is, there really are those things that we

24   discovered in looking at the actual language of the various

25   motions and orders entered by this Court, as well as the first

- 182 -

1    amended plan and first amended disclosure statement, which all,

2    in our minds, I think make a very reasoned argument that these

3    actions were actually abandoned by the debtors.

4         The claims preservation order motions were filed in

5    August 2007.  And at the time, the language in those motions,

6    the debtors ask you to extend the time for service of summons.

7    But they also ask very specifically for the Court to grant the

8    debtors authority to abandon the causes of action without any

9    further order from this Court.  Basically, a self-effectuating

10   order.

11        If the debtors gave notice to the statutory committees

12   that they wish to abandon these causes of action, and there was

13   no objection raised in ten days those actions were abandoned.

14   And the order to -- approving the claims preservation order was

15   a final order of this Court, which was then, of course,

16   extended as we talked from time-to-time.

17        The abandonment was self-effectuating under the terms

18   of the order.  And in my review of trying to determine what

19   actually happened in this case, I went back and I looked at

20   what possibly could amount to abandonment.  And it was pretty

21   easy to find.

22        On December 12, 2007 the debtors provided notice in

23   their disclosure statement to the first amended plan that the

24   reorganized debtors would not retain the preference actions.

25   And in the following section; in 7.25, page 48 of the first

- 183 -

1    amended plan, the debtors say specifically that the debtors

2    abandoned in accordance with Section 7.24, which is a section

3    where the reorganized debtors do not retain the actions.  And

4    that order becomes final.

5           And one might ask well, that order never -- that plan

6    never became effective.  And the debtors very carefully crafted

7    the words of this plan, which was confirmed, and say that they

8    are abandoning it.  It doesn't say that the debtors are

9    abandoning these upon the effective date.  There are many

10   things in the plan which do not occur until the effective date.

11   But in this section, 7.25, the general reservation of rights,

12   it says that the debtors are abandoning causes of action under

13   544, 545, 547, 548 and 553, very specifically.  And with that,

14   Your Honor, the actions were abandoned.  The statutory

15   committees did not come in and object in the ten-day period

16   that they had, but the actions were abandoned.

17          Now, that's the first notice that my client and many

18   of the parties in this room today would have had of the

19   abandonment.  And had we known that the claims preservation

20   orders had been filed, and that we were actually defendants in

21   their sealed complaints we might have filed at that time a

22   motion to dismiss, or a motion -- a summary judgment motion,

23   that they didn't have standing to bring this because thy were

24   no longer assets of estate.  But we didn't have notice.  But

25   the fact is that these were abandoned.

- 184 -

1          This Court, I'm sure is quite aware of the Second

2    Circuit's view of abandonment.  Once an asset is abandoned from

3    a debtor's estate, it's no longer an asset of the estate.  It's

4    no longer property of the estate.  In the Chartschlaa v.

5    Nationwide Insurance, at 538 F.3d 116 the court very clearly

6    says that once an asset is abandoned it's removed from the

7    debtor's estate.  And this court no longer has any jurisdiction

8    over those assets, because they're no longer part of the

9    debtor's estate.

10          Moreover, in the -- these statements that are

11   contained in the first amended plan, and which then become part

12   of the plan confirmation order, are res judicata to the

13   abandonment.

14          THE COURT:  Can I stop you?

15          MS. THORNE:  Yes.

16          THE COURT:  What about paragraph 14.1 of that plan?

17      (Pause)

18          THE COURT:  I'll read it.

19          MS. THORNE:  Finally got it.

20          THE COURT:  Okay.  The heading is "Binding Effect.

21   Upon the effective date this plan shall be binding upon and

22   inured to the benefit of the debtors, the reorganized debtors,

23   all current and former holders of claims, all current and

24   former holders of interest and all other parties-in-interest

25   and their respective heirs, successors and assigns."

- 185 -

1          MS. THORNE:  Well, if, in fact, the plan is only

2    effective in the -- at the time that it goes effective to that,

3    then the whole exercise of going to confirmation and having a

4    final order of this Court, and the debtors' statement in this

5    saying that they were abandoned.  It doesn't say the

6    reorganized debtors and it doesn't say that at the time it

7    becomes effective that this is -- it says specifically that the

8    debtor abandons.  And so under the claims preservation order

9    they gave notice to everyone, including the statutory

10   committees that they were abandoning these actions.

11         So the debtor drafted this.  I think you have to go

12   back to even basic contract law.  The debtor drafted -- we're

13   bound by the words that the debtor put in this.  I didn't pick

14   the words, Your Honor didn't pick the words.  They specifically

15   say 7.25 that the debtors are abandoning it.  I think that 14.1

16   certainly the reorganized debtor doesn't come into being until

17   the effective date.  But the debtor, itself, has abandoned

18   these actions.  It's certainly noticed under the claims

19   preservation order.  And I would argue it's also res judicata.

20         There are many instances where orders are entered by

21   this Court and other courts where there is still something

22   that's going to happen in the future.  For example, a

23   settlement order, a 363 order approving a sale.  The sale may

24   never close, a settlement may fall apart.  But that doesn't

25   mean that the words of that order are for naught, or they

- 186 -

1    somehow disappear into the vapor.  It was still a real order

2    and it was a real notice to the creditors.

3            THE COURT:  Well, 7.24 says "Shall not be retained by

4    the reorganized debtors."

5            MS. THORNE:  Right.  But if you look at the next

6    paragraph the debtors, the only folks that hold those causes of

7    action at that time abandon them.  And they only keep them as

8    expensive posture if there are claims that they want to object

9    to.

10            THE COURT:  But that's in accordance with 7.24, right?

11    I just -- I can tell you this argument doesn't make sense to

12    me.  The reorganized debtors defined in one 1.168 as the

13    debtors after the effective date.  The abandonment is by the

14    reorganized debtors.  The language you're referring to that

15    uses the word debtors, referring to the actions abandoned

16    pursuant to 7.24.

17            And, in addition, it's completely inconsistent with

18    the rationale for the extension orders in the first place.

19    Which is that under this plan it would be abandoned but not if

20    the plan fell through.  And this plan was dependent upon a

21    transaction that hadn't closed, where the investors had once

22    before reneged on the transaction, or at least, some of them

23    had.  And then went back on the table.

24            It's just not consistent with any of the context as

25    well as the -- I think the plain language of the plan, which is

- 187 -

1   it's binding when the effective date occurs.  Which is when all

2   the transactions upon which the plan is premised occur.

3          MS. THORNE:  Well, Your Honor, respectfully disagree

4   that the debtors very carefully drafted this.

5          THE COURT:  I agree and that's why it's effective on

6   the effective date.

7          MS. THORNE:  Well, except for why didn't they say that

8   the reorganized debtors are going to abandon these?  Why didn't

9   they say --

10          THE COURT:  They did in 7.24.  That's where -- that's

11   where it says it's abandoned.

12          MS. THORNE:  It says they won't retain them.  But in

13   the following paragraph it says it's abandoned.

14          THE COURT:  Pursuant to 7.24.

15          MS. THORNE:  Well, I don't --

16          THE COURT:  I think we should move on, you're not

17   going to convince me on this one.

18          MS. THORNE:  Well, I guess if somebody else has said

19   you don't have traction you should move on.

20          THE COURT:  Well, no, I'm not faulting you.  It's just

21   I know there are a lot of people here and there are a lot of

22   matters to cover.

23          MS. THORNE:  Okay.  Well, I was going to address, very

24   briefly, res judicata, although -- because I do believe that by

25   the time this plan -- this order was entered, and this next

- 188 -

1    plan is introduced it only modifies it and, therefore, I think

2    it's pretty clear that these were abandoned and you can't get

3    them back.

4              THE COURT:  Okay.  But that's because this is --

5    that's because your interpretation of the first plan, though,

6    right?

7              MS. THORNE:  The only words I have to look at are

8    what's in that plan.

9              THE COURT:  Okay.

10             MS. THORNE:  And what was drafted and what was entered

11   as an order.

12             THE COURT:  Okay.

13             MR. WINSTEN:  Your Honor, I have the other half of the

14   abandonment argument, if I may.

15             THE COURT:  Okay.

16             MR. WINSTEN:  I.W. Winsten, again, Your Honor.

17             This Court has the opportunity even if it doesn't

18   dismiss these cases in the entirety, which it should, to prune

19   them down to a much more manageable size.  And abandonment with

20   respect to foreign suppliers and claims for under 250,000

21   dollars there's an excellent easy and simple way to do it.

22             We've asked the Court to dismiss because they've

23   expressly abandoned those claims under 554(a).  In their motion

24   in August of '07 they requested authority under 554(a) to

25   abandon these claims.  The motion did not ask, as to these

- 189 -

1    claims, for discretion in the future to decide whether or not

2    to abandon them.  Rather, as Delphi said in its August '07

3    motion, at page 15, "Decided these claims should not be

4    pursued."  And it requested the authority to abandon them then

5    and there.

6          This Court approved Delphi's request in its August '07

7    order, and upon entry of that order it was over.  The debtors

8    abandonment of these claims was effective and irrevocable.

9    There was nothing left to do.

10          Now, Delphi, as we all know, has refused to dismiss

11   these abandoned claims.  It says well, hey, we never really

12   intended to abandon these claims, even though, yeah, we did

13   request authority to do so, and even though the Court

14   unconditionally approved it.  According to them they must not

15   have intended to abandon them because they later included some

16   of these abandoned claims in their complaints when they rushed

17   to file the 800 preference actions under seal.  And they rely

18   on the technical abandonment cases under 554(c) where the Court

19   examines whether a trustee really meant to close the estate

20   without administering an asset.

21          However, Your Honor, with respect to 554(a),

22   abandonment, what Delphi later did does not matter.  It just

23   isn't relevant.

24          THE COURT:  I'm going to cut you short.  I think this

25   is what I want to hear the debtors on, because I am sympathetic

                                                              - 190 -

1    to your argument.

2              MR. WINSTEN:  Time to sit down.

3              MR. FISHER:  For me, Your Honor, I suppose time to

4    stand up.

5              THE COURT:  Yeah.

6              MR. FISHER:  Under the Second Circuit's Chartschlaa

7    case from 2008, that case involved a situation where a debtor

8    provided notice under 554(a) that it intended to abandon

9    certain claims.  And then subsequent to providing that notice

10   it engaged in efforts and sought bankruptcy court approval to

11   actually sell the same assets that it had previously indicated

12   in a 554(a) notice it intended to abandon.

13             And what the Second Circuit recognized there is that

14   abandonment is, for precisely the reason that movants' counsel

15   has indicated, it's precisely because it's irrevocable and

16   drastic that it requires unequivocal intent.  And,

17   specifically, the court said "In light of the impact of

18   abandonment on the rights of creditors, a trustee's intent to

19   abandon an asset must be clear and unequivocal."  So where the

20   trustee or the debtor-in-possession does one thing that would

21   seem to indicate abandonment, and then actually acts in a

22   manner that's inconsistent with that.  The Court cannot infer

23   from that that the abandonment has occurred because the

24   unequivocal intent, that's the precondition to abandonment,

25   hasn't been established.  That's one reason why we think the

- 191 -

1    Court should find that actions against foreign suppliers or

2    actions for amounts less than 250,000 dollars.

3             THE COURT:  But what is unequivocal about the relief

4    sought in the August 6th motion and granted in the August

5    order?

6             MR. FISHER:  A few things, Your Honor.  First of all,

7    the motion and the order are not crystal clear on the question

8    of whether the abandonment that was sought was self-

9    effectuating or required some further act on the part of the

10   debtor.

11            And I think in the disclosure statement that was filed

12   in December -- that was approved in December 2007, at least

13   what the debtors' intent is clarified there, because they refer

14   back to that order, and indicate that the debtors were

15   authorized but not directed to abandon.

16            THE COURT:  Well, but -- what's unequivocal in the

17   motion and the order?  I mean, it just -- I don't see anything

18   equivocal in them.

19            MR. FISHER:  I think the order --

20            THE COURT:  Particularly given the distinction between

21   getting the authority to abandon and then getting authority to

22   abandon other causes of action on consultation.

23            And then the reference to -- in footnote 15 to Service

24   Merchandise.  I just -- I mean -- it just seems to me there's

25   only one possible reading of this, which is that the debtor got

- 192 -

1    authority -- they abandoned them.  They made the determination

2    to abandon them and they did abandon them.

3           MR. FISHER:  Well, I think the order can be read, Your

4    Honor, to say that as to certain class of actions the debtors

5    were authorized to abandon without any further notice, and as

6    to the other class they were authorized to abandon only upon

7    providing notice.

8           The fact that the debtors didn't intend, by that

9    motion and by seeking that order, to abandon the foreign

10   supplier actions is confirmed by their later conduct.  In --

11   just a month later going ahead and filing all these actions,

12   including actions against these foreign suppliers.

13          THE COURT:  Well, they may have changed their mind,

14   but I don't see how the order gave them authority to.  It says

15   in paragraph 5 "The debtors are authorized" not authorized, you

16   know, with the discretion "but they're authorized to abandon

17   those causes of action or categories of causes of actions the

18   debtors propose in the motion to abandon."  I just -- I mean,

19   there was nothing about well, we might abandon them or we might

20   not.  It's just --

21          MR. FISHER:  Your Honor, I think that particularly in

22   light of the later indications that at least the debtors'

23   understanding of what had happened was that they had been

24   granted authority to abandon these actions, but that the order

25   wasn't, itself, self-effectuating.

- 193 -

1          THE COURT:  It's not in the transcript that's

2     attached, right.  Is there anything in the transcript where Mr.

3     Butler or anyone else says that we're just getting authority

4     but we may keep them?

5          MR. FISHER:  In the record I think the only -- the

6     only thing -- the most recent statement of the debtors that I

7     could point to comes after the hearing.  And it's the fact --

8     well, it's the fact of filing all these actions and then it's

9     later how the order is described in the December 2007

10    disclosure statement.  But I don't think, Your Honor, that

11    there's a statement on the record at the hearing, itself, that

12    would indicate that it was the debtors' view that this was not

13    self-effectuated.

14          THE COURT:  Okay.

15          MR. FISHER:  Your Honor, I also think that there's

16    ambiguity about what foreign suppliers means.  There's no --

17    it's not a defined term, and it's not a term that's capable of

18    a very simple meaning.  I can tell you, based on information

19    that's not in the record, that there was a very narrow class of

20    foreign suppliers that were intended by that statement.  But,

21    you know, the fact that that undefined term, foreign suppliers,

22    does not apply to the foreign defendants who are now moving to

23    dismiss, again, is simply confirmed by the fact that debtors

24    never acted consistent with any intent to abandon those

25    actions.

- 194 -

1          THE COURT:  But --

2          MR. FISHER:  They filed the actions and then they

3     diligently took steps to make sure the actions were preserved

4     at all times.

5          THE COURT:  Again, I don't see how anyone getting this

6     motion would think that that would be permitted.  Who received

7     this motion.  I mean, what does it mean that the debtors took

8     action contrary to it?  I just --

9          MR. FISHER:  Your Honor, how would any defendant

10    getting this motion know that they fit within the definition of

11    foreign supplier?

12         THE COURT:  Well, you would have to construe what

13    foreign supplier means.  But as far as -- you certainly know

14    whether it's for 250,000 dollars or less, that's just a matter

15    of money.  As far as foreign suppliers, it's not really

16    discussed to the motion, it's just listed.  It's just listed.

17    And I presume the reason is they didn't want to go after

18    someone who then might violate the automatic stay but wouldn't

19    care.

20         But, I would just provide a commonsense definition of

21    foreign supplier.  It didn't say foreign supplier who is X, Y

22    and Z, it just says foreign supplier.

23         MR. FISHER:  And the April 2nd hearing before Your

24    Honor -- April 2, 2010, that concerned extension of the service

25    deadline with respect to foreign suppliers, what we explained

- 195 -

1    then was that foreign supplier referred to those foreign

2    suppliers that had received payments pursuant to certain first-

3    day orders.  And that that was the class of foreign suppliers

4    intended by that language.  And I just, again, reiterate that

5    the fact that it was never intended to apply broadly to the

6    class of foreign suppliers is confirmed by the debtors' conduct

7    very soon after entry of that order.  It indicated that they

8    were acting under an impression other than believing that the

9    actions against those foreign suppliers had been abandoned.

10          THE COURT:  Well, the only colloquy on this motion was

11   about my attempts to make the order less ambiguous.  And that

12   appears at page 9 through 11 of the transcript.  It seems to me

13   if there was any issue about the debtor really meaning

14   something, other than the obvious reading of the motion or the

15   order, that was the chance for the debtor to stand up and say

16   oh, well, we don't really mean foreign suppliers, we mean

17   foreign suppliers who got payments under the first-day order,

18   or, you know, foreign suppliers who are -- have no contacts to

19   the U.S., and no property in the U.S., and just -- it's not

20   done.

21          MR. FISHER:  Your Honor, the record is what it is.

22          THE COURT:  Okay.

23          MR. FISHER:  It certainly can't be supplemented now.

24   But I would only emphasize that the Chartschlaa case requires a

25   finding of unequivocal intent.  And under the circumstances

- 196 -

1    here I don't think that there can be such a finding.

2             THE COURT:  Okay.

3             MR. FISHER:  And because abandonment is drastic if

4    there's conduct --

5             THE COURT:  You see -- I mean, it is drastic and

6    that's why the debtor made a big deal out of this motion.  I

7    mean, it was giving up significant rights.  It was cutting down

8    11,000 claims, and, you know, is it for me to say later that we

9    can sue a union.

10            You know, there are a number of causes here, potential

11   causes of action, you know, is it for me to say we can -- you

12   know, we didn't meet all charitable organizations, we just met

13   ones that, you know, the new owners like.  I mean --

14            MR. FISHER:  It was cutting it down, Your Honor, from

15   the 11,000 to approximately 740 actions.

16            THE COURT:  Right.

17            MR. FISHER:  Among those 740 actions were the 177 that

18   are currently being prosecuted.

19            THE COURT:  But it's not phrased that way.  It wasn't

20   phrased that we are permitting -- we are seeking authority to

21   ban everything other than the 722 actions that we intend to

22   file.

23            Do you have any response on the Second Circuit case

24   that's referred to?

25            MR. WINSTEN:  Would the microphone pick me up here

- 197 -

1   or --

2          THE COURT:  Wherever you're comfortable.

3          MR. WINSTEN:  I believe that was an attempted

4   abandonment of 554(a).  The trustee or the debtor then changed

5   its mind and it was before a court order approving it.  So it's

6   a meaningful distinction that --

7          THE COURT:  That was -- I mean, I read a lot of cases

8   over the last couple of days.  That's my recollection of that

9   case.  Was there a final order that the Second Circuit was

10  looking to undue in that case?

11         MR. WINSTEN:  No, it got --

12         THE COURT:  I'm asking Mr. Fisher.

13         MR. FISHER:  There was not, Your Honor, there was

14  notice but no order.

15         THE COURT:  All right.  I mean, I think that's the

16  real difference here.  I would take a broader view of the

17  Second Circuit, frankly, till it's an order, that people can

18  change their minds.  But I just don't -- I don't think there's

19  an issue here on this one.

20         I don't see anything ambiguous in here.  It may be as

21  a factual matter ambiguous who a foreign supplier is.  I just

22  have to take the commonsense plain English dictionary

23  definition of that if you have an issue on that.

24         MR. WINSTEN:  On that one point, Your Honor, for

25  whatever it's worth.  Delphi never argued an opposition to the

- 198 -

1  abandonment issue that that phrase was ambiguous.  They're

2  raising it for the first time here.  If they were going to

3  claim it was ambiguous they should have said so in the brief --

4          THE COURT:  Well, I don't think it is ambiguous.  I

5  think that it may raise a factual -- I mean, 250,000 dollars

6  doesn't raise a factual issue, that's 250,000 dollar.

7          MR. WINSTEN:  Right.

8          THE COURT:  Whether someone's a foreign supplier or

9  not may be a fact issue.  But I think that the debtors are

10 bound by the order granting this motion.

11         MR. FISHER:  Your Honor, we may not have used the word

12 ambiguous in our brief, but we argued that foreign suppliers

13 couldn't possibly mean those foreign movants who the debtors

14 actually sued after entry of that order.

15         THE COURT:  But I disagree with that one.  Okay.

16         MS. SCHWEITZER:  Your Honor, Lisa Schweitzer again.

17         I believe I would be up for the Rule 8 argument.  The

18 one argument which was briefed but I realize not touched upon

19 in this abandonment section was the idea of a res judicata

20 failure to adequately preserve under the second plan.  I feel

21 like we've addressed that to some extent already, I don't know

22 if you want to address that specifically --

23         THE COURT:  I think the parties have addressed it in

24 their -- in their pleadings.  I am of the view that under the

25 Second Circuit case law there's sufficient notice there.  I

- 199 -

1   don't think that the order approving the disclosure statement

2   led people to believe that they wouldn't be at risk.  And I

3   think that's really what would be the basis for a res judicata

4   ruling on the modified plan.

5          MS. SCHWEITZER:  I understand that, Your Honor.  Just

6   to pick up to something that you had earlier said in the day,

7   that -- we were talking about the idea of notice and prejudice,

8   that if, in fact, people could show that they didn't understand

9   the survey, had read the plan differently, or that it wasn't

10  acceptable to them --

11         THE COURT:  I figured this is not a subjective issue,

12  I think it's an objective one a reasonable person would have

13  known that the debtors were reserving their right to bring many

14  preference claims.

15         MS. SCHWEITZER:  Right.

16         THE COURT:  And they are not bringing claims that were

17  not identified in the disclosure statement.  If they'd done

18  that that would be res judicata I think.

19         MS. SCHWEITZER:  As a factual matter I would point out

20  for the record that the actual exhibit doesn't refer to the

21  preference actions being preserved, what it says is avoidance

22  actions under this earlier order.

23         THE COURT:  Right.

24         MS. SCHWEITZER:  Which leads to the possibility of

25  confusion, obviously, for the reasons we're talking about, of

                                                          - 200 -

1    people looking back and seeing other classes of claims.

2              THE COURT:  I just don't see --

3              MS. SCHWEITZER:  I don't want to belabor the point --

4              THE COURT:  Okay.

5              MS. SCHWEITZER:  -- but I wanted to --

6              THE COURT:  I think the parties have adequately -- I

7    mean, there are cases that deal with this issue for and again,

8    I think, the cases, particularly the cases from the Second

9    Circuit and this district under these facts would say that it's

10   not res judicata.

11             MS. SCHWEITZER:  Fair enough, Your Honor.  I would

12   certainly say that our client, in particular, did suffer from

13   actual confusion, so I would just put that out there, as a

14   fact --

15             THE COURT:  Okay.

16             MS. SCHWEITZER:  -- in terms of a later laches or a

17   prejudice issue that --

18             THE COURT:  That's a different point.  I mean, your --

19   it's one thing to argue laches, it's another to argue that the

20   debtors are taking contrary positions now in a litigation that

21   they won before, which is the disclosure statement.

22             MS. SCHWEITZER:  Right.

23             THE COURT:  I think those are two different --

24             MS. SCHWEITZER:  Right.

25             THE COURT:  Those are two different considerations.

- 201 -

1          MS. SCHWEITZER:  Right.  And I understand that, I just

2    wanted to put that forward as that I understand if that's your

3    ruling of res judicata, but I ask you to consider that in terms

4    of the prejudice point, that people could show actual confusion

5    that --

6          THE COURT:  Right.

7          MS. SCHWEITZER:  -- should be a distinction.

8          Turning to the Rule 8 argument, I -- again, I

9    certainly don't want to give it short shrift because I think

10   it's an important point, and I think it's actually a winning

11   point for us.

12         THE COURT:  This is another one where the debtors are

13   going to have to convince me.

14         MS. SCHWEITZER:  Fair enough.

15         THE COURT:  So do you want to -- I mean, I -- you're

16   pleadings are clear, so I need to hear from the debtors on

17   this.

18         MS. SCHWEITZER:  Right, fair enough.

19         MR. FISHER:  Your Honor, on the Rule 8 pleading point.

20   The complaints were filed before Twombly or Iqbal were decided.

21   And the case law's inconsistent about exactly what needs to be

22   pled to state a preference claim.  But there is plenty of

23   authority that would support the view that these claims were

24   adequately pled at the time that they were filed.  And we've

25   identified date, amount and the nature of the transfer.

- 202 -

1        The movants' complaint that we haven't identified the

2    specific debtor entity that made the transfer, and we haven't

3    identified the specific transferee.  And --

4        THE COURT:  And that there's an antecedent debt.

5        MR. FISHER:  An antecedent debt.  And I think that the

6    debtors have no choice but to concede that under Twombly and

7    Iqbal, more detailed pleading would be required, at least

8    according to some of the more recent cases, although, I don't

9    know that there's a controlling case in this circuit yet

10   describing exactly what that standard would entail.

11       And what we've attempted to do, and what we suggested

12   in our opposition brief, was a practical way of cutting through

13   this, and, essentially treating it as similar to a 12(e) motion

14   and saying that to the extent that there's any defendant who

15   cannot prepare its answer to this complaint, because knowing

16   the date and the amount of the transfer is insufficient to

17   allow it to track down the relevant information, we will

18   supplement that and provide whatever additional information is

19   needed in order to put them in a position to be able to respond

20   to the complaint, which, at the end of the day, is what Rule 8,

21   even after Twombly and Iqbal, is all about.

22       And so we're simply trying to be practical here.

23       THE COURT:  Well, is there any -- two things.  Is

24   there any authority for the notion and -- I guess Twombly was

25   after these were filed, too?

                                                          - 203 -

1          MR. FISHER:  Yes.

2          THE COURT:  Is there anything in the notion that you

3     don't have to comply with them because it was filed beforehand?

4          MR. FISHER:  I don't think that there's a case

5     directly on point.  Because, again, we have a situation where

6     the case was filed before Twombly and Iqbal and then served

7     after.  I'm not aware of a case that's directly on point.  So

8     the question is how to bring these cases up to --

9          THE COURT:  So then --

10         MR. FISHER:  -- date with the new pleading standards.

11         THE COURT:  Well, and on that, shouldn't there be a

12    motion to amend?  I mean, is there any authority for the

13    mechanism you're proposing?  I mean, if there's merit to the

14    argument that you had filed these complaints under the laws

15    that existed at the time, and there's, certainly, you know, the

16    case law in the Southern District, was probably more on your

17    side on that than not.  As far as what you needed to show back

18    then, wouldn't that just be a factor I'd take into account

19    among other factors in your motion to amend?  And then we'd

20    have an amended complaint and everyone would know the complaint

21    that they were looking to.

22         You know, if, in fact, you weren't able to show an

23    antecedent debt, or you weren't able to show which debtor made

24    the transfer, then, you know, there'd be a complaint that

25    someone could move to dismiss even if, you know, I thought

- 204 -

1   there was enough to let the complaint be filed.  But at least

2   they'd see it as a -- and that could be one of their factors in

3   objecting to the motion to amend, is that this complaint has no

4   chance of succeeding because they still haven't identified the

5   transferor, for example.

6          MR. FISHER:  We think that's there's something very

7   technical about the argument that's being made here.  And that

8   as a practical matter, based on the information that is

9   supplied in the complaint, the movants are in an adequate

10  position to respond intelligently to the complaint.

11         Sure, we could bring a motion seeking leave to amend

12  these complaints.  Alternatively, if the Court is going to rule

13  that the complaints need to be repled to comply with the

14  Twombly/Iqbal standard, we could do that.

15         THE COURT:  Well, I guess I want to go back to my

16  earlier question.  I haven't seen a solution like the one

17  you've proposed; do you have authority for that?

18         MR. FISHER:  I don't have a case, Your Honor --

19         THE COURT:  Okay.

20         MR. FISHER:  -- that essentially converts a 12(b)(6)

21  motion to a 12(e) motion.  But conceptually that is what we had

22  in mind.  But if the problem is if 12(e) requires more

23  information than what had been --

24         THE COURT:  I think it's more than just having the

25  defendant come to you and say I'm puzzled, I don't know how to

- 205 -

1    defend.  I think it is an affirmative requirement to state a

2    claim.  And under Iqbal and Twombly and the cases, including

3    Judge Gonzalez' case on preferences, there's certain key

4    elements of the claim that require more than just the -- a

5    recitation of the elements of the claim.  I mean, that's really

6    the -- that's really Twombly as opposed to Iqbal.

7              MR. FISHER:  Right.

8              THE COURT:  And that's, you know, basically, who made

9    the transfer, and what was the antecedent debt?  Something,

10   other than just saying it was for antecedent debt.  I mean, I

11   think by listing the amount and the date, I think it was

12   implicit that you're saying its defendant.  But maybe I'm wrong

13   about that.  If you're asserting against some of the people 550

14   relief then you probably should say how they got it.

15             MR. FISHER:  Well, I think that it's just that --

16             THE COURT:  Not immediate -- not the transferee but

17   subsequent transferee relief.

18             MR. FISHER:  The strange thing about applying Twombly

19   and Iqbal to a preference case is that what does it mean to say

20   that a preference claim is plausible?  I mean, it's plausible

21   that Delphi paid these defendants the amounts that are

22   indicated on the complaint on the dates that are indicated.

23   And it's plausible that those payments were on account of

24   antecedent debt.

25             THE COURT:  First of all, it's not Delphi, there's

- 206 -

1    like forty-two debtors here.  So it's not listed who did this.

2    I think that's important.  And that leaves the issue of

3    antecedent debt.

4         I'm somewhat sympathetic to your point on that,

5    although, the three judges that have considered this, including

6    Judge Gonzalez, aren't.  They all emphasize the need to say

7    something about the antecedent debt, other than the conclusory

8    statement that there's antecedent debt.  Your point is well,

9    why would any of the debtors be paying anyone unless there was

10   an antecedent debt?

11        Well, the thing is it may not be antecedent, they may

12   be paying in advance, they may be paying that day; COD.  You

13   know, that's the response I think.

14        MR. FISHER:  And, Your Honor, it is important to say

15   which debtor entity we're talking about.  It is important to

16   say exactly which transferee we're talking about.  As a

17   practical matter --

18        THE COURT:  Let me say -- I'm going to cut you short.

19        MR. FISHER:  Yes.

20        THE COURT:  As a -- it seems to me the problem with

21   what you're proposing is that you may not have a basis to say

22   in your books and records that -- at least for the face of the

23   complaint, that defendant X was owed a debt, that this was a

24   payment on account of you may not have it.  And I think your

25   method basically sort of puts the onus on them to make that

- 207 -

1    part of your case for you.

2            MR. FISHER:  What we're trying to avoid, Your Honor,

3    is a situation where we now go back and correct these

4    complaints by identifying the specific entities where we think,

5    as a practical matter, the movants know full well by checking

6    their own records --

7            THE COURT:  But that's not -- that's not -- I don't

8    think that's the test, because, again, that shifts the burden

9    of proof.  You know, you basically force them to show we don't

10   know.

11           MR. FISHER:  Well, then, we go back and we provide

12   them with this information.  We could provide it to them in

13   documentary form under 12(e), or we could provide it to them in

14   the form of an amended complaint.

15           THE COURT:  To me that's --

16           MR. FISHER:  And then say it's a new motion to

17   dismiss.

18           THE COURT:  To me that's part of the merits of a

19   motion to amend.  If, in fact, they knew and it's no big deal

20   and they know -- they've always known this, then that's a fact

21   in your favor as well as the fact that the law changed.  You

22   know, but I think it should all be viewed in the context of a

23   motion to amend.

24           Now, I have not reviewed every complaint.  But as I --

25   I've reviewed enough to see that I think they're form

- 208 -

1    complaints.

2          MR. FISHER:  Yes.

3          THE COURT:  I don't think they -- I think they all

4    follow this pattern that they don't identify the transferor or

5    the antecedent debt.  And I don't know if you have to say the

6    antecedent debt is down to the -- you know, the very invoice,

7    but you have to give some context to show that there's a debt

8    owing.  And as far as the transferee is concerned, I'm not able

9    to say, based on my review of the complaints, whether that's

10   going to be necessary or not.  It would seem to me that it

11   wouldn't be necessary for the initial transferee.  But if

12   you're including in the complaint subsequent transferees and

13   you're seeking really a 550 relief as against them, then you

14   may -- I think you may have to identify them as that.

15         MR. FISHER:  Your Honor, should we await Your Honor's

16   ruling on this Rule 8 issue, or should we file our motions to

17   amend.

18         THE COURT:  That's my -- I mean, I'm just -- I haven't

19   issued a ruling on any of these things, I'm just giving you my

20   thoughts on this at this point.

21         One of you two said something about -- at the

22   beginning of this hearing about arguing that they shouldn't be

23   given leave to seek an amendment.  My practice, generally, is

24   not to do these things without actually ruling on a motion.

25   I'm certainly amenable, given the number of defendants, to

- 209 -

1   allow sort of a coordinated response, if you want, to a motion

2   to amend.

3           MS. SCHWEITZER:  Your Honor, that's helpful guidance,

4   and certainly we're aware of the ruling case, the Supreme Court

5   said that there's point at which you should lose that right,

6   but, obviously, we're happy to defer those arguments until a

7   formal motion is made.

8           The other thing, obviously, folks will want to address

9   is if they were granted leave what type of timing they would be

10   given.

11          THE COURT:  Right.

12          MS. SCHWEITZER:  But that all, happily, can be saved

13   for another day.

14          I think we're not at the end, but getting closer.

15   We're getting farther down to the weeds.  I think Mr. Winsten

16   had wanted to address the issue of contracts being assigned --

17   I'm sorry, when they were assumed, at that reading.

18          While I'm up here I'll just take one little second to

19   say my own little parochial views and you can hopefully not

20   have to hear from me again today --

21          THE COURT:  Okay.

22          MS. SCHWEITZER:  -- which was just in the HP EDS

23   briefs.  One of the arguments that we had raised was the HP

24   Enterprise Services UK Limited.  It's a U.K. company so we

25   would say foreign defendant, but for what we heard today, and

- 210 -

1   maybe it's not; but certainly foreign defendant.  They're in

2   this last round of extensions of time to serve.  There is no

3   further extension given or sought either for those -- that

4   foreign defendant.  And the debtors concede that they had never

5   actually served on that defendant.  They make some argument

6   about I served affiliates, and you should have known.  But they

7   don't really make an agency argument out there.

8           THE COURT:  Is the one that had -- they served the

9   Canadian affiliate.

10          MS. SCHWEITZER:  They don't -- well, the first primary

11  issue is they never filed the --

12          THE COURT:  There was one of these where they served

13  the Canadian affiliate.  I'm not sure if it was your client.

14          MS. SCHWEITZER:  Yeah.  Here they didn't mention what

15  affiliate they served.  I believed they were trying to serve

16  the U.S. affiliate, but unfortunately, they never filed an

17  affidavit of service.  So, actually, the record before you

18  today doesn't prove that they served anyone on their behalf.

19          But I just wanted to make sure that that issue didn't

20  slip through the cracks.  As a foreign maybe they no longer

21  exist as of tomorrow, but I wanted to flag that for you.  I'm

22  happy to go on at length about the facts surround it, but it's

23  in the papers and I just wanted to make sure it wasn't

24  overlooked.

25          THE COURT:  Well, I don't think you're alone in

- 211 -

1    asserting that service on an affiliate was insufficient to --

2    for service on, you know, the actual defendant.  Am I right?

3    Is there someone else here or on the phone who's made that

4    argument?  Or maybe it is just you.

5            MS. SCHWEITZER:  We have a person in the back.

6            THE COURT:  Well, I don't know if we want to address

7    that at this point.

8            UNIDENTIFIED SPEAKER:  Yeah, Your Honor.

9            THE COURT:  Are you the one where they served the

10   Canadian affiliate?

11           UNIDENTIFIED SPEAKER:  No, I'm sorry, I'm not.

12           THE COURT:  Okay.

13           UNIDENTIFIED SPEAKER:  I've got a service issue but

14   it's not the Canadian entity, I apologize.

15           THE COURT:  Okay.  But is it a foreign entity?

16           UNIDENTIFIED SPEAKER:  No.  No.

17           THE COURT:  Why don't we hold off on that, then.

18           MS. SCHWEITZER:  I apologize --

19           THE COURT:  Maybe you were unique then, I thought it

20   was more than one.

21           MS. SCHWEITZER:  I'm sorry, my colleague is prompting

22   me that they did -- there were several affiliates, so I think

23   they worked beforehand to serve the Canadian affiliate.

24   Although, --

25           THE COURT:  Well, why don't we deal with this at the

- 212 -

1   end of this hearing, since it's just one entity?

2          MS. SCHWEITZER:  I'm fine to do that at the end.  I

3   just wanted to make sure.

4          THE COURT:  All right.

5          MS. SCHWEITZER:  Thank you.

6          MR. WINSTEN:  Your Honor, I.W. Winsten again.

7          I did want to be heard for just a brief moment on

8   Iqbal and what the Iqbal standard should be if they replead.

9          Given that it's been five years, given that as of

10  today we still don't know who the plaintiff is for each

11  transfer.  If you look at page 1 of their omnibus brief, it's

12  still being filed and behalf of unidentified affiliates.

13         THE COURT:  I'm told of that.

14         MR. WINSTEN:  Okay.  We would request that given the

15  prejudice and so forth that's occurred, not only should you

16  impose the most exacting Iqbal standard possible, there's an

17  argument you should go even further.

18         And my hunch is this, Your Honor.  My hunch is that

19  after five years either they don't have the facts available

20  anymore to support their claims, or they had them and lost

21  them, or they never had them, and they know it's going to

22  expose it so thin if they have to say who the transferor is,

23  who the plaintiff is, who the transferee is, who the antecedent

24  debt is, what's the purchase order, is it an initial

25  transferee, is it an immediate transferee, who's the defendant.

- 213 -

1      Requiring for them to do all those things seems to me

2    to be the minimum of fairness --

3           THE COURT:  Well, look, it's a motion for leave to

4    amend the complaint on unusual circumstances.  It's really

5    their risk if I turn them down again, right?  So --

6           MR. WINSTEN:  My only point was that it should be

7    Iqbal plus, not Iqbal minus.

8           THE COURT:  Well, I don't know what that means.  And,

9    frankly, I think the Supreme Court's been pretty careful not to

10   turn Iqbal into a plus.

11          MR. WINSTEN:  Right.

12          THE COURT:  So --

13          MR. WINSTEN:  But these are our --

14          THE COURT:  But I think that the risk of being turned

15   down on the basis of the complaint still isn't good enough is a

16   serious enough -- the consequences of that are serious enough

17   so I assume that the plaintiffs are going to be pretty careful.

18          MR. WINSTEN:  A suggestion when we get there is that

19   they ought to attach a draft --

20          THE COURT:  Well, you have to do that.

21          MR. WINSTEN:  Yes.  So we know --

22          THE COURT:  Yeah, absolutely.

23          MR. WINSTEN:  -- what the form's going to be.

24          THE COURT:  Got to do that.

25          MR. WINSTEN:  Let me move to assumed contracts.  This

- 214 -

1    is another way in which you can --

2         THE COURT:  Well, I don't think there's any issue on

3    this, right?  How about if the debtors acknowledge that if the

4    contract has been assumed there's no preference?

5         MR. WINSTEN:  Well, what's interesting, Your Honor, is

6    we --

7         THE COURT:  Well, let me just -- is there -- is that

8    an issue?

9         MR. GEOGHAN:  There's no debate about that, Your

10   Honor.  The concept we all agree on; the problem has been in

11   corroborating the information that's been supplied.  And what

12   we've done --

13        THE COURT:  Okay.

14        MR. GEOGHAN:  -- in any instance where a defendant has

15   said 'you have assumed our contract and the preference payment

16   that you're seeking to recover was made pursuant to that

17   contract' is we've compared notes and tried to get to the

18   bottom of it and where, in fact, that's the case then we

19   voluntarily dismiss either the particular claim or the action

20   as a whole if all of the claims were pursuant to an assumed

21   contract.  So there's no conceptual disagreement.

22        MR. WINSTEN:  Well, there is in this sense, Your

23   Honor, because we have three clients who had assumed contracts:

24   MSX, GKN and Valeo.  Take MSX that has four -- there's a four

25   million preference claim against them.  We believe it's all as

- 215 -

1    to assumed contracts.  We file our motion.  Not one word in

2    their brief in opposition in any way opposing dismissal of

3    those claims because they're assumed contracts.  Not one word

4    in opposition.  We give them a proposed order, 'please agree

5    that to the extent this claim is based upon transfers as to

6    these contracts, we're not seeking a dismissal of entirety.  To

7    the extent your claim is based upon transfers with respect to

8    these assumed contracts, they're out of the case'.  They won't

9    agree to do it.

10          Now, as to Valeo and GKN, which is represented by the

11   Togut firm, rather than just being silent, as the Butzel firm

12   has been as to MSX, the Togut firm says 'none of these were in

13   respect to assumed contracts; it's pointless to do so'.  Our

14   view is we don't need to worry about that now.  We have a hot

15   disagreement as to whether these were transfers with respect to

16   assumed contracts.  All we're looking for is a plain vanilla

17   order that says 'to the extent any of these transfers were with

18   respect to these identified assumed contracts in our motions,

19   they're out of the case'.  That's all.  We can start out later.

20          THE COURT:  But if there's a factual dispute as to

21   whether it was assumed or not, what does the order do?  It

22   doesn't say anything.

23          MR. WINSTEN:  Well, they're not even recognizing the

24   point I gave you.

25          THE COURT:  No, he just did.  And he would have to;

- 216 -

1    it's the law.

2           MR. WINSTEN:  Is the Togut firm recognizing your

3    point?

4           THE COURT:  He said that in his pleading.

5           MR. GEOGHAN:  We've recognized the point, Your Honor.

6    We were asked the question, we provided the information --

7           THE COURT:  He recognizes the legal -- he recognized

8    the legal point.

9           MR. GEOGHAN:  -- the contract numbers; everything in

10   support.

11          THE COURT:  The law's clear on that -- I just ruled on

12   this about four months ago in Coudert Brothers in pretty

13   egregious circumstances so if the plan trustee lost there, he's

14   going to lose here too if the contract was, in fact, assumed.

15   But there's the issue of whether it was, in fact, assumed.

16          MR. FISHER:  An example, though, Your Honor, of how we

17   really need to nail this down --

18          THE COURT:  Well, that goes to the complaint.

19          MR. FISHER:  Well, yeah, exactly.  We've asked the

20   Togut firm for that information.  They've given us information

21   but none of it's linked to purchase orders; none of it's --

22   it's all just them saying none of them --

23          THE COURT:  Well, that's why you need show the

24   antecedent debt in the complaint.

25          MR. WINSTEN:  You got it.  Exactly.  Just another

- 217 -

1    reason why.

2          THE COURT:  Okay.

3          MR. GEOGHAN:  Your Honor, if I may just briefly in

4    regard to that last statement; it was not wholly accurate.  We

5    provided all the remittance invoice information and the

6    purchase orders.

7          THE COURT:  I read the correspondence.  I think

8    there's a -- well, but it should be in the complaint.

9          MR. GEOGHAN:  Correct, Your Honor.  Counsel is simply

10   disagreeing without -- reasonable.

11         THE COURT:  Okay.  All right.

12         MR. GOTTFRIED:  One very quick point, Your Honor.  And

13   probably it's self-evident but to the extent that the debtors

14   are going to be obligated to replead, it might be extremely

15   helpful in connection with the contract assumption issue if the

16   debtors identify, when they're identifying specific antecedent

17   debt, which PO numbers the transfers relate to.  This way

18   defendants will be able to match those listed PO numbers

19   against the PO numbers that were assumed or rejected and

20   they'll note whether or not it falls within it.

21         THE COURT:  I'm not going to make a ruling on that at

22   this point.

23         MR. GOTTFRIED:  Okay.  Well, I wasn't asking for you

24   to necessarily rule on it.

25         THE COURT:  But you didn't see it when he was taking a

- 218 -

1   note.  Mr. Fisher was.

2        Okay.  So are we now at sort of one off for individual

3   issues?  I think we are.

4        MR. WINSTEN:  I think the only general issue that I

5   think is left, Your Honor, I.W. Winsten again, is the laches

6   issue, and there what I would say is I think I can do it in

7   thirty seconds.

8        That while we believe you to dismiss in total on the

9   laches basis, to the extent the Court disagrees and believes

10  it's fact specific and case specific, then I think as to the

11  eighty-three moving parties -- eighty-three moving cases, we

12  would urge the Court, at the front end, to have a threshold

13  evidentiary hearing on the issue of prejudice.  That we ought

14  not to move to the merits until we first have a prejudice

15  hearing because it's not fair to any of us to go to the merits.

16       THE COURT:  Okay.  What's your view on that, Mr.

17  Fisher?

18       MR. FISHER:  I'm reluctant, Your Honor, to have waves

19  of threshold issues to work through on a mass basis because --

20       THE COURT:  Well, wouldn't this be the threshold

21  issue?  I mean, it seems to me that the thrust of your

22  argument, generally, in response to this collective -- well,

23  not the abandonment res judicata, but the 4(m) Rule 60 due

24  process point is that prejudice can be dealt with on a case-by-

25  case basis.  It seems to me that that -- and I think your

- 219 -

1    response even suggested this, that that necessarily raises the

2    possibility of discrete rulings by the court that would

3    ameliorate or get rid of the prejudice or equal it out.  And I

4    don't see why we wouldn't do that in the context of a laches

5    hearing so that when people are doing generally their trial

6    preparation they know what they have to prove.

7            MR. FISHER:  I would think then, Your Honor, that the

8    laches hearing would -- should come after discovery.  Because

9    you could have -- what I'm concerned --

10            THE COURT:  Well, there's going to be some discovery

11    in connection with the laches, right?

12            MR. FISHER:  Right.  But if we do that -- if we do it

13    piecemeal, what ends up happening is we might take discovery

14    with regard to prejudice for purposes of a laches hearing; have

15    a wave of laches hearings.  Your Honor might find, in some

16    cases, that there's a laches problem because some particular

17    movant suffered such extreme prejudice and might find otherwise

18    that the prejudice suffered is such that it can be addressed

19    down the road --

20            THE COURT:  Well, you'd have to take some discovery in

21    connection with laches, right?

22            MR. FISHER:  Yes.

23            THE COURT:  And so -- again, my belief, generally, is

24    that there's not really a lot of discovery in preference

25    litigation.

- 220 -

1     (Music begins playing in courtroom)

2     (Laughter)

3     UNIDENTIFIED SPEAKER:  Somebody disagreed.

4     THE COURT:  Well, or maybe -- it's kind of cheerful

5    music, so maybe they agree.

6     I don't know.  If I were a defendant, maybe I'd want

7    to have all the discovery at once; I don't know.

8     MR. FISHER:  Because if the --

9     THE COURT:  I'm ready to hear from people on that.

10     MR. FISHER:  If the prejudice falls short of laches

11   but is the kind of prejudice that might warrant burden

12   shifting, or might warrant preclusion of debtors from putting

13   on certain evidence --

14     THE COURT:  It seems to me that maybe this should be

15   dealt with in a meet and confer where the parties can decide.

16   The whole point of dealing with laches this way is to do it on

17   a case-by-case basis.  Unlike what we've done today.  And so

18   some defendants may prefer to do it one way; some may prefer to

19   do another.  Maybe the thing to do is for the parties to meet

20   and confer -- this is actually an extra good reason to meet and

21   confer, under Rule 26, and decide how they want to proceed.

22   I'm pretty amendable to either way on this.

23     My view, generally, on the laches point is that to

24   dismiss the complaint on laches in this posture is unusual.

25   And in all likelihood, I wouldn't do it -- I'm not inclined to

- 221 -

1  do it without more specific inquiry.  The cases that have been

2  cited, I think, are in unusual contexts and where courts have

3  dismissed complaints based on laches in this situation or in

4  similar situation.  So I think the approach would be to have a

5  period where the plaintiff would have to meet and confer with

6  each defendant that it wants to raise the laches point and work

7  out a proposed procedure to deal with those issues.  And if

8  there are disputes over that, I would entertain them in a

9  telephonic conference or if you want to do it in person, in an

10  in-person conference.

11      Now, there are some individual or one-off motions to

12  dismiss like the two premised on failure to serve.  And those

13  we'd get rid of the lawsuit entirely, obviously, as would my

14  ruling on the claims under 250,000 dollars and if someone's

15  clearly a foreign supplier, those people.

16      I've already made it clear that the plaintiff will

17  have to make a motion to amend the complaint.  My inclination

18  is to have them do that before ruling on the 60(b)(4) -- Rule

19  60, generally, aspects of this.  That's in part because I think

20  that there are particularized notice issues that affect how I

21  would rule.  When I say "particularized notice" I don't mean

22  particularized notice to one of Weir (ph.) clients but

23  "particular notice" issues on how I would rule on that relief.

24  I don't think there's a blanket solution for the movants on

25  that basis.

- 222 -

1        But I'm happy to hear people on that point before

2    turning to the one-off aspects of various motions.  My view,

3    generally, with legal issues, is that I shouldn't get to the

4    more difficult issue and the issue that may raise more cost and

5    delay on appeal because it's a difficult issue if there's a

6    more simple issue that could be a first step.  It seems to me

7    whether someone gets leave to amend a complaint or not is a

8    more simple issue that should be a first step.  And appellate

9    courts are much better equipped to deal with that type of issue

10   as, frankly, I am than this really sui generis issue about when

11   does someone improperly exercise their discretion under Rule

12   4(m) combined with what is proper notice.

13        So my inclination is to hear the motion to amend first

14   which may lead to a number of complaints dropping out because

15   as you said, maybe the debtors don't have the ability to file

16   the complaint as it should be filed.  But I'm happy to hear

17   people on that.

18        MR. WINSTEN:  Your Honor --

19        THE COURT:  I will -- well, go ahead.

20        MR. WINSTEN:  Is what you're envisioning -- because I

21   think this is the only way that that plan could work from your

22   end -- that the debtor, as to those preference actions that it

23   elects to want to proceed with, has to have an amended -- a

24   motion to amend and an amended complaint; it's not one form.

25   Here's what I want to do, so that somebody in complaint number

- 223 -

1    88 can say 'look, this isn't sufficient for me; you've got to

2    do this and that'.  Otherwise it doesn't work if it's just a

3    form because --

4             THE COURT:  It would have to be individual complaints.

5             MR. WINSTEN:  Right.

6             THE COURT:  It would have to be the complaints for

7    each one of the defendants.  Absolutely.

8             MR. WINSTEN:  And would you be envisioning ruling --

9             THE COURT:  It would have to be a real complaint.

10            MR. WINSTEN:  Yeah.  Would you be envisioning ruling

11   in advance of that?  For example, the foreign defendants of

12   Banff, you know, 250 issues and so forth?

13            THE COURT:  Well, I would rule on that today.

14            MR. WINSTEN:  All right.

15            THE COURT:  And I'd rule on -- I would rule on

16   everything today with the exception of reconsideration on 4(m).

17   I'd hold that in abeyance.  That issue, I think, has relevance

18   also to a motion to amend.  And people could raise it in that

19   context too.  So, for example, if someone contends they didn't

20   get notice at all, even of the disclosure statement, then I

21   think that would be a factor in my considering whether there

22   should be leave to amend.

23            It'd still be a live issue.  I'm not going to have a

24   new hearing on it.  And I might end up -- if I grant the

25   motion, or some of the motions, I would probably have to rule

- 224 -

1    on that issue too.  I mean, I'm not going to grant a motion to

2    amend if it's Pyrrhic or moot, so I would have to grant it at

3    that point, I suppose.  If I am inclined to grant the motion to

4    amend, I'd have to deal with the 4(m) issues.

5            MS. SCHWEITZER:  Your Honor, Lisa Schweitzer.  The

6    only other thing I would ask is that you give the plaintiffs

7    direction as to what the deadline for bringing that --

8            THE COURT:  Oh, yes.

9            MS. SCHWEITZER:  -- motion would be.

10           THE COURT:  Yes.  Sure.

11           Did you have something to say, sir?

12           MR. GOODRICH:  I just have a question about the --

13           THE COURT:  I think you're going to have to come to a

14   microphone just to make sure you get picked up.

15           MR. GOODRICH:  Your Honor, Robert Goodrich for Sea Cap

16   (ph.).  In deferring the 4(m) issue, is the 60(b) issue coupled

17   with that?

18           THE COURT:  Yes.  Yes, that -- yes.

19           MR. GOODRICH:  That goes hand in hand that that would

20   come up in the context of a different time.  Because I think I

21   would defer my comments if --

22           THE COURT:  Correct.

23           MR. GOODRICH:  -- if we're going to raise those in the

24   context of a motion to amend, because that's going to come into

25   play in terms of notice.

- 225 -

1          THE COURT:  Well, let me make sure I understand what

2     you're saying.

3          MR. GOODRICH:  Well, that issue's going to come up --

4     all the issues that are in this motion are going to be -- if

5     the complaint is amended, those issues are still on the table.

6          THE COURT:  Right.

7          MR. GOODRICH:  And they'll probably be argued.

8          THE COURT:  Well, they'll be argued -- I mean, there's

9     been extensive argument on that; I'm not sure whether people

10    need to spend a lot more time arguing them.  But they'll be

11    argued in the context of a motion to amend.  That's the context

12    there.  Of course, if I grant the motion -- if I'm inclined to

13    grant the motion to amend, I still wouldn't grant it if I

14    concluded that I should give people relief on my 4(m) orders.

15         MR. GOODRICH:  Okay.

16         THE COURT:  But I could -- I mean, I do this

17    frequently.  I give people preliminary thoughts and rulings so

18    that they can adjust their behavior and sometimes their

19    briefing and sometimes their settlements.

20         My preliminary view is that people who truly did not

21    get notice of the extension motions can argue their merits on

22    the merits; it's not a Rule 60 requirement.  They can argue

23    them as if they were being argued for the first time.  But that

24    leaves a factual issue as to who got the notice and who didn't

25    and what did people know.

- 226 -

1          And then in arguing on the merits, there may be

2     another notice issue, which is did people have notice during

3     the course of this process.  Again, people have argued to me

4     today, and it's a reasonable argument, that there may have been

5     more discretion with the first two orders, for example.  If

6     someone had noticed by that time, they may be in a different

7     position.

8          And I guess before I get into all of those issues,

9     which may be individual factual issues, I think I really ought

10    to see what the amended complaints look like.

11          MR. GOODRICH:  Right.  Since I'm up here, if I could

12    make a very succinct point about those -- the people who got no

13    notice and the people who received it ECF notice?  The case

14    management order said that particularized notice was to be

15    send; we know it wasn't sent.  If you think about that, that's

16    just -- that's not only not notice, that's notice that you're

17    not in the group.

18          THE COURT:  Each of the motions said they complied

19    with the case management order.

20          MR. GOODRICH:  Right.

21          THE COURT:  And I understand that.  But in this -- I'm

22    not sure -- you haven't really discussed this, the plaintiffs

23    haven't.

24          My understanding of the case management order is that

25    if you're not on the service list, you've got to get the notice

- 227 -

1    if it's affecting you directly.

2            MR. GOODRICH:  Right.

3            THE COURT:  If you're on the service list and they

4    give you the notice, you've gotten the notice, I think.

5            MR. GOODRICH:  There's a very different point there.

6    You get a notice today for three years on ECF --

7            THE COURT:  Well --

8            MR. GOODRICH:  You're supposed to get a package that

9    says 'I'm in a different group.'  That's what the

10   particularized notice tells you.

11           THE COURT:  I -- that will be another issue we can

12   discuss.  I'm not sure it goes that far.  What's the point of

13   making it -- I mean, I don't think the debtor's supposed to, in

14   all cases, under that -- that would mean that that order means

15   the debtor has to figure out every possible person who might be

16   affected by this order.  And there are a lot of times in

17   bankruptcy cases where that's just impossible.

18           So that's really not the case with this really, if I

19   understand that, because the debtor knew who was going to be

20   covered, the 722 people or companies.  But I don't think that

21   was what's intended by that provision.  I think that the

22   particularized notice means if you don't appear on the service

23   list, you're supposed to get notice of something that affects

24   you directly, like, you know, a landlord, for example, when

25   your lease is being rejected.  If you make a demand to be on a

                                                              - 228 -

1    service list, you're going to have someone looking at the

2    notice.

3            MS. LEE:  Your Honor --

4            THE COURT:  But that's just a preliminary view because

5    we haven't really gotten into that and I was telling you about

6    ruling on this yet, this aspect of it.

7            MS. LEE:  Your Honor, Cathy Lee.  I represent Ambrake

8    Corporation and also Sumitomo Wiring Systems USA.  I just

9    wanted to understand, sort of, the figures that Your Honor is

10   laying out to make these sort of formative arguments and

11   actually show what individualized prejudice is.  Are you saying

12   that we would do that in response to a motion to amend?  And

13   the reason that I ask --

14           THE COURT:  No -- no.  And I understand why you're

15   asking me because I wasn't very clear on it.

16           MS. LEE:  Okay.

17           THE COURT:  People are free, in response to a motion

18   to amend the complaint, to raise whatever ports people raise in

19   response to motions to amend.  That might include things like

20   prejudice and delay and you know, that gets into lack of notice

21   and all of that.  It's in the context of a motion to amend.  As

22   far as the 4(m) issues are concerned, I'll -- if I'm inclined

23   to grant the motion to amend, I still have to rule on the 4(m)

24   issues because I'm not going to, obviously, give leave to

25   amend, where I concluded that the complaint can't succeed

- 229 -

1    because I would undo my 4(m) orders.

2           So those -- but those 4(m) issues are already briefed

3    and argued.  So I'm not going to have any more argument on them

4    in this context.  You can raise them in the context of -- to

5    the extent that it's appropriate to raise, in the context of a

6    motion to amend.

7           MS. LEE:  Okay.

8           THE COURT:  And then I -- this is me where I was

9    confusing you, I -- pardon me if you hear my rationale for

10   setting it up that way.  Giving you my preliminary view that I

11   probably would not simply say -- at least I don't believe I

12   would simply say that everyone gets off scot-free because of

13   the movants' arguments under 4(m) and Rule 60 and due process.

14          So I would probably -- my inclination at this point,

15   but I may change my mind after I review the transcript and look

16   at the papers and the briefs again, would be to say that, you

17   know, I'd probably have to look at those issues on a case-by-

18   case basis to some extent too.  I may not on some cases.  I

19   mean, the motion papers -- the individual movants' motions may

20   be strong enough on that issue that I would rule in their

21   favor.  You know, I confess.  You know, there are eighty-some

22   motions to dismiss; I concentrated on the global issues which

23   is what we've been dealt -- dealing with here.  It may be when

24   I look at all the pleadings, that there will be any number of

25   people who I believe the complaint should be dismissed, even if

- 230 -

1    they do plead it correctly, because of a belief that the

2    extension order should be undone.

3         MS. LEE:  The reason I ask this, Your Honor, is

4    because for our clients, we actually filed an answer.  So I

5    doubt that they're going to be trying to amend.  So I needed to

6    understand whether there's an opportunity for us to give the

7    Court the particularized individual case-by-case information

8    the Court is saying --

9         THE COURT:  I --

10        MS. LEE:  -- would have to be looked at --

11        THE COURT:  Only in the context of, like, a pretrial

12   conference, you know, a discovery conference.

13        MS. LEE:  Okay.  So you're saying other than these

14   first-wave motions, there's not an opportunity --

15        THE COURT:  Well, if you still have time to file them,

16   there's a whole set of people who still have time to file

17   motions to dismiss.  That'd be -- you know, if you still have

18   time to file motion to dismiss, you can make one.  But --

19        MS. LEE:  Thank you, Your Honor.

20        THE COURT:  But if you don't, then I think we're in a

21   different phase here, which is the discovery phase.

22        MR. FISHER:  Your Honor, just in terms of mapping the

23   path forward, I understand that the Court anticipates that

24   we're going to make a motion to amend the complaints.  And

25   presumably --

- 231 -

1           THE COURT:  That would actually be eighty-six motions

2      or however many you're up to.

3           MR. FISHER:  Right -- right.  And so we'd be amending

4      the complaints with respect to what we've called the first-wave

5      dismissal motions.

6           THE COURT:  Right.

7           MR. FISHER:  And so I think --

8           THE COURT:  I -- but frankly, you ought to do it all

9      over, right?  You know what's going to happen on the second

10     wave.

11          MR. FISHER:  Right but I think -- well -- and this is

12     more in the nature of housekeeping --

13          THE COURT:  Right --

14          MR. FISHER:  because --

15          THE COURT:  I'm not trying to be flip.  I'm just --

16          MR. FISHER:  There are already many movants who have

17     filed what is now being called second-wave dismissal motions

18     and we have a placeholder hearing date at the end of August but

19     I think we all recognized that how and when those went forward

20     would turn, in large part, on what happened with the first-wave

21     dismissal motions and what kind of guidance we got from the

22     Court.

23          THE COURT:  Right.

24          MR. FISHER:  And so, I think it may make a certain

25     amount of sense to essentially designate this -- these eighty-

- 232 -

1    plus first-wave motions as the trial balloons that are going to

2    give direction to the rest of these cases.  Because if we're

3    going to set about now, amending eighty-plus complaints and

4    then dealing with oppositions to our motion for leave to amend

5    and in that context, have the Court resolve all the issues that

6    have been raised today as well as potentially, certain other

7    issues, it may not make sense to, at the same time, have those

8    second-wave dismissal motions go forward.  They ought to await

9    the motion for leave to amend as well is what I'm saying.  I'm

10   just trying to -- because there are all these threshold issues

11   that are being addressed in comment, I'm just trying to map a

12   way forward.

13           THE COURT:  Well, I think it does make sense for you

14   to amend the complaints across the board, including these

15   second-wave ones.  The second-wave people can respond to that

16   by making all of these other arguments too in the context of

17   those motions, saying the obvious point which is, from their

18   point of view, why commit an order -- why sign an order

19   authorizing an amended complaint when the complaint's going to

20   be dismissed?

21           So I think the real issue is the amount of time that

22   would be appropriate for you to amend.  I don't know how many

23   are involved in the second-wave but how many complaints you

24   think they're amending.  I don't know what we're talking about.

25   It can't be more than 150, right?  It's probably less than

- 233 -

1    that.  I know it's less than that --

2           MR. FISHER:  If it --

3           THE COURT:  -- because you said some have already been

4    resolved.

5           MR. FISHER:  If it's just limited to movants, that's

6    right.  If it's all of the preference complaints that have been

7    preserved --

8           THE COURT:  Well, it's the ones who've moved.

9           MR. FISHER:  Yeah.

10          THE COURT:  I mean, the people who haven't moved -- if

11   they don't have any time left to move, that's a different

12   story.

13          MR. FISHER:  Right.

14          THE COURT:  So, the response said you had this

15   information so it seems to me it's -- you know, it's a fairly

16   mechanical matter although it is July 20th and you know, I

17   don't know, thirty days?

18          MR. FISHER:  Your Honor, I think we need a lot longer

19   than that.

20          THE COURT:  But -- well how long -- if someone called

21   you up and said, you know, we want to know our purchase order,

22   I mean, when were you going to get back to them?

23          MR. FISHER:  It would take a week to get back to

24   them -- to take up the information and get back to them.

25          MS. SCHWEITZER:  Your Honor, this has been two and

- 234 -

1    half years and we moved to dismiss in April already.  So

2    they've already been on notice of this issue for three months.

3               THE COURT:  Yeah.

4               MR. WINSTEN:  And their solution was in formal

5    discovery so presumably, they've already organized it.

6               THE COURT:  Well, that was -- that's where I was

7    concerned, seeing what I said earlier.  I'll make it forty-five

8    days, given the time of year, unless anyone has real hard

9    priority over that.  And again, it's amending each complaint

10   with a complaint attached.

11              MR. WINSTEN:  And Your Honor, when you ask --

12              THE COURT:  Not a real complaint.  I mean the

13   complaint that actually has the information in it.

14              MR. WINSTEN:  Right.  And you're asking whether

15   anyone, aside from me, has any hard priority over it?

16              THE COURT:  Well --

17              MS. COBB:  Your Honor, Tiffany Strelow Cobb of the law

18   firm Vorys, Sater, Seymour and Pease on behalf of the Carlisle

19   Companies Incorporated.  Just very briefly, I do have a

20   situation somewhat similar to counsel who was just before me at

21   the podium.  Our client filed a motion for judgment on the

22   pleadings but also a motion to vacate.  And Carlisle Companies

23   is one of the Wagner-type defendants who received no notice,

24   actual notice or service notice, they were not a creditor in

25   the case and so I would just seek some clarification on --

- 235 -

1           THE COURT:  Well, I think you're different than -- you

2       filed -- you moved on the pleadings, right?

3           MS. COBB:  Yes.

4           THE COURT:  You said -- I think that's different than

5       filing an answer.

6           MS. COBB:  We did file an answer and then we filed a

7       motion for judgment on the pleadings.

8           THE COURT:  Well --

9           MS. COBB:  And we also filed a motion to vacate so it

10      sort of leaves us in a little bit of a --

11          THE COURT:  What -- what?  Well, which one is it?  You

12      kind of covered all the bases there.

13          MS. COBB:  Well, that's a fair statement.

14          THE COURT:  I would consider the -- well, the motion

15      to vacate is sort of in the second-wave or are you in this

16      wave?

17          MS. COBB:  We're in this wave.

18          THE COURT:  I -- but you filed a motion on the

19      pleadings too so I think that should be covered in this.

20          MS. COBB:  In the motion to amend?

21          THE COURT:  Yeah.

22          MS. COBB:  Thank you.

23          THE COURT:  Okay.

24          MS. MAFFETT:  Jennifer Maffett with Thompson Hine,

25      Your Honor.  I -- my client regroup also falls within the no

- 236 -

1  notice category.  Can you give us some guidance on what sort of

2  evidence and declaration affidavit you would like to see --

3         THE COURT:  I --

4         MS. MAFFETT:  -- in response to the motion to amend?

5         THE COURT:  I can't really.  I won't do that.  I mean,

6  whatever you think works.

7         MS. MAFFETT:  Okay.  Thank you.

8         THE COURT:  Thank you.  And if you've already -- and

9  again, I apologize.  I have not -- I am not able to keep

10  straight who's filed what affidavits in this batch.  If you've

11  filed it already that you think works, then you can just say we

12  already filed one and we're referring to that one and attach

13  the same one.  But it's in a different legal context.

14         MR. HANKIN:  Good afternoon, Your Honor.  Marc Hankin,

15  Jenner & Block, representing Olin Corp.  Your Honor, I

16  appreciate the guidance in terms of next steps and respectfully

17  submit that Olin is one that can be dismissed now.  And the

18  reason for this, Your Honor, is that Olin actually received, as

19  we set forth in our papers, service of the motion establishing

20  the case management order.  So what Olin got, it understood

21  that what the debtors wanted in 2005 when this case was filed

22  was that if they had a particularized interest, it would get a

23  motion.  If they -- or because the case management motion

24  expressly reserved rights under -- for ex parte relief, it

25  could be ex parte but it couldn't be either or, Your Honor.  It

- 237 -

1    couldn't be well, we'll serve it on a bunch of people but even

2    if you have particularized interest, it won't be you and we can

3    come back and then argue to the Court, you know, four or five

4    years later, what we could've done in ex parte.

5            And so Your Honor, from our perspective, what Olin did

6    was to rely on that.  It was reasonable reliance on an order of

7    this Court made on a motion that was served on Olin.  And this

8    is really something that we haven't really heard discussed and

9    since that, Your Honor, Olin was not on the service list.  We

10   didn't get notice of either the preservation or any of the

11   extension motions.

12           And furthermore, Your Honor --

13           THE COURT:  Did it get the disclosure statement?

14           MR. HANKIN:  Your Honor, I don't know if we got the

15   disclosure statement?

16           THE COURT:  Was it a creditor?

17           MR. HANKIN:  It was a creditor at the beginning of the

18   case but I don't know what happened subsequent because - -this

19   is an important point, Your Honor, Olin transferred its claims,

20   shortly after the case, to Bank of America.  In November 2007,

21   Your Honor, Bank of America settled with the debtors and that

22   settlement was approved by this Court for about 9.1 million

23   dollars.  And in that settlement, Your Honor, it said that the

24   debtors waived any right to seek reconsideration or to re-

25   object to the claim.  So from Olin's perspective -- and there

- 238 -

1   was no 50(d) (sic), you know, reservation of rights taken.

2          And in fact -- so from the perspective of Olin, what

3   did it see?  It saw that the statute of limitations had passed.

4   It received no motion to which it was entitled seeking any

5   extension of that time, any extension of the foreign period.

6   It saw that there was a settlement entered without any 502(d)

7   reservation.  And in fact, what the debtors are really asking

8   for, Your Honor, is for Olin to be omniscient.  Because what

9   the debtors --

10          THE COURT:  Well, let me stop you.  What's -- remind

11   me of the debtors' view on the settlement -- the claim dispute

12   with Olin's transferee.

13          MR. FISHER:  Your Honor, I'm going to need a couple of

14   minutes --

15          THE COURT:  Okay.

16          MR. FISHER:  -- to look at that issue and be able to

17   respond to that.

18          THE COURT:  All right.  On the notice issues, again,

19   I'm not prepared to deal with those today.  If there was a

20   settlement of the claim, I think that you may be right.

21          MR. HANKIN:  Thank you, Your Honor.  And there's one

22   other fact which, as mentioned before, GBC has intervened as a

23   party defendant.  That's because in October 2007, shortly after

24   the statue of limitations was passed and we weren't served with

25   the complaint that was filed, the only division that sold

- 239 -

1   product to the debtors was the metals division and that was

2   sold in October 2007.  And in fact, the settlement was done

3   three days before the deal closed.

4        So these issues simply aren't even addressed in the

5   debtors' reply and I understand that Bryan Cave, representing

6   GBC, is here and they can talk more about prejudice.  But it

7   just goes to -- we think, Your Honor, that in perspective of

8   due process and all, we appreciate the arguments made before

9   but none of them were made from the perspective of someone

10   actually getting the motion, setting forth the rules and in our

11   papers, we cite all the cases that say when you have a case

12   management order, it has to be followed.  And the plaintiffs

13   have not cited a single case that say when a case management

14   order is violated, when there's an order of the Court saying

15   how notice is to be given, there's a very simple remedy.  It's

16   just simply that the order isn't enforceable against that party

17   who was told they were going to get the notice and then didn't.

18   It was a simple error, Your Honor.  Thank you.

19        THE COURT:  Okay.

20        MR. PALANS:  Good afternoon, Your Honor.  If the Court

21   please, my name is Lloyd Palans.  I'm with the Bryan Cave law

22   firm and I represent GBC Metals LLC.  And I'm here at this late

23   hour, to, basically, say you need to plus.  The plus really is

24   because we are unique and I think our facts and circumstances

25   justify carving us out, dismissing us today.  We've intervened

- 240 -

1    on behalf of GBC as a party defendant.  We've filed papers to

2    dismiss and vacate the orders, as well as reply to Delphi's

3    omnibus response.  Our papers were accompanied by a declaration

4    of the CEO of GBC, which is --

5              THE COURT:  That's right.  You're the company that

6    bought the other company?

7              MR. PALANS:  Yes, Your Honor.

8              THE COURT:  All right.  I do remember that.  I,

9    frankly, don't remember the other aspects of the person who

10   spoke before you.

11             MR. PALANS:  Your Honor, GBC is really the poster

12   child for prejudice and the harm caused by this process.  We,

13   in our papers, referenced various adages, perhaps too much.

14             THE COURT:  I'm going to cut you short.  I think

15   there's an underlying -- as I understand it -- and this was --

16   I'm sorry.  So, this was in your pleadings about the settlement

17   of the B of A -- with B of A?

18             MR. HANKIN:  Yes, Your Honor.  It was in both our

19   motion and our reply.

20             THE COURT:  All right.

21             MR. HANKIN:  We also attached the settlement as is.

22        (Pause)

23             THE COURT:  The -- I'm aware of your other issues and

24   I will, rule on them.  I'm just not prepared to rule on them

25   today.

- 241 -

1        MR. PALANS:  The prejudice is on the record --

2        THE COURT:  I'm just not prepared to rule --

3        MR. PALANS:  Okay.

4        THE COURT:  -- on them today.

5        MR. PALANS:  Okay.

6        THE COURT:  There may well be -- well there are two

7   other steps before I get to rule on them.  One is that the

8   settlement of the claim -- of the dispute, depending on the

9   release, may be sufficient as a matter of res judicata.  And

10  secondly, the complaint, as amended, may not work for you.  So

11  I'm not going to get into the other point.

12       MR. PALANS:  Thank you, Your Honor.

13       MR. FISHER:  Your Honor, at this point --

14       THE COURT:  Did you find that?

15       MR. FISHER:  No, Your Honor.  I have the reply brief.

16       THE COURT:  All right.

17       MR. FISHER:  I see the settlement issue but I'm not

18  prepared with a response.

19       THE COURT:  It just seems to me if in fact -- and I'll

20  go back and look at the settlement but it's the -- a settlement

21  that provides a release.  It doesn't have 502(d) carve-out.  It

22  doesn't have a -- you know, that may be sufficient.

23       MR. FISHER:  Your Honor, what I wanted to suggest and

24  it may apply to GBC, as well as it may apply to other one-off

25  arguments, is that in the process of going back and amending

- 242 -

1    each and every one of the complaints, that we may find that

2    complaints need to either be narrowed as a result of arguments

3    that came to our attention for the first in these motions to

4    dismiss or that certain actions can't be pursued because of --

5    assumption issues, for example, that have been raised for the

6    first time in this motion to dismiss or other issues.  And

7    so --

8              THE COURT:  Okay.

9              MR. FISHER:  I --

10             THE COURT:  I mean, I agree and part of -- you know,

11   part of your analysis is going to be whether there's a cost

12   benefit in pursuing this.  That's one of the reasons why I have

13   you my preliminary ruling.

14             MR. FISHER:  Thank you, Your Honor.

15             MR. SIMON:  Your Honor, Howard Simon from Windels

16   Marx.  We've moved on behalf of Tyco Adhesives L.P.  And we may

17   be a category of one or perhaps we fall into the other

18   categories but I just want to point out that our facts are that

19   Tyco was on the list on the creditors but fell off all the

20   affidavits of service and wasn't served with anything.

21             THE COURT:  Including the disclosure statement?

22             MR. SIMON:  Now, I can't -- I don't know the answer to

23   that.  My inquiry within my firm has been is there any

24   affidavit of service that indicates Tyco being served with

25   anything and the answer is no.

                                                                    - 243 -

1           THE COURT:  Okay.

2           MR. SIMON:  So I will -- we will have to check that

3   but Your Honor, one of the things I just want to point out is

4   one of the difficulties with placing burdens on the defendants

5   is there's been a lot of changes within Tyco Adhesives and I

6   don't even have a person at the company who I can ask for

7   information who would know the answer to any questions that

8   might be asked.  So it's a very difficult situation but I do

9   think we fall into the category of no notice.

10          THE COURT:  Okay.

11          MR. SIMON:  The question I want to ask, Your Honor, is

12  will you consider that on the motions to dismiss?  We have not

13  made a motion to vacate any of the orders.  Do we need to do

14  that?

15          THE COURT:  It's up to you.  I'm not going to tell

16  you.  I mean, I think there are different issues involved but,

17  you know, that's about all I can tell you.

18          MR. SIMON:  Your Honor, my second point is that Tyco

19  Adhesives is one of eight defendants, all with the name Tyco

20  name in it, the subject of a thirty-five million dollar

21  complaint with no distinction made as to which plaintiffs or

22  which parties were the transferees of any of the list of three

23  pages of transcripts.  And I think it's very important that in

24  the -- as far as the standard for the motion to amend, that

25  identifying particular amounts and dates and relating it to

- 244 -

1    specific transferees, is really critical.  Again, because --

2            THE COURT:  I agree with that although if the debtors'

3    books and records say, you know, "Tyco Svcs" and it's really

4    Tyco Services, I don't think that's what Iqbal's all about but

5    on the other hand, if you really can't track it down, that's a

6    different issue.

7            MR. SIMON:  Well -- and that's the reason I raised

8    that issue --

9            THE COURT:  All right.

10            MR. SIMON:  -- because again, of the same

11    circumstances.

12            THE COURT:  But you'll be able to raise that when you

13    see their complaint.

14            MR. SIMON:  Okay.  Thank you.

15            THE COURT:  I don't mean to cut people short but we

16    are -- I mean, I've already had, in his own word, the poster

17    child here on no notice.  And -- so, it's not going to help me

18    for other people to say they didn't get notice either.  You

19    know, I'll treat you all the same as far as the process here.

20    Obviously, if I get to the issue, the fact that you've alleged

21    that you've not gotten a list of something then I will take

22    into account and that may be a fact that distinguishes you from

23    other people.

24            MR. STEIN:  Your Honor, David Stein, Wilentz Goldman &

25    Spitzer, representing A-1 Specialized Services & Supplies, Inc.

- 245 -

1    Your Honor, just for the record, we were sued under two

2    separate adversary proceedings, basically, for the same dollar

3    amounts but the wrong dates.  That would be Adversary 2084 and

4    Adversary 2096.  Those --

5            THE COURT:  When you say the wrong dates, you mean --

6            MR. STEIN:  The wrong dates on the transfers.  They

7    both have different schedules with different but the right

8    dollar amounts.

9            THE COURT:  Okay.

10           MR. STEIN:  So I just want to bring that to Your

11   Honor's attention.  I'm assuming that that's going to be dealt

12   with vis-a-vis this motion to amend.

13           THE COURT:  I'm assuming that too.

14           MR. STEIN:  But I just wanted to get that out.  With

15   respect to my client, it's a metal trading company and we had

16   also filed a motion under 546.  And I believe that's subject to

17   the holding date before Your Honor.

18           THE COURT:  Right.

19           MR. STEIN:  But one other point is that we too had

20   entered into a settlement agreement with the debtor, providing

21   for certain releases in that document.

22           THE COURT:  Okay.

23           MR. STEIN:  And that was also a part.  And we'd

24   also --

25           THE COURT:  What I suggest -- I mean, obviously -- and

- 246 -

1   this is not to accuse anything or to not accuse anything but

2   the debtors' counsel had a lot of complaints that deal with --

3   I think you should follow up with them and point out -- if you

4   think there's a release that you can rely upon, point that out

5   to them.  You could have pointed out in response to the motion

6   to amend and if it's there, you know, it's not a great thing

7   for them.  So, you may as well show it to them now --

8         MR. STEIN:  I understand, Your Honor.  I just wanted

9   to --

10        THE COURT:  -- and they'll probably act accordingly.

11        MR. STEIN:  I understood, Your Honor.  I just wanted

12  to put that on the record.

13        THE COURT:  Okay.

14        MR. STEIN:  And we too, need to adopt all the prior

15  arguments.

16        THE COURT:  Okay.

17        MR. MICHAELSON:  Your Honor, Robert Michaelson of K&L

18  Gates.  I represent NXP Semiconductors.  They're a successor to

19  Philip Semiconductors, who is the alleged transferee.  This is

20  really very simple.  We attached to our joinder, a letter

21  indicating that our contracts were being assumed and that there

22  were agreed-upon cure amounts.  There was no response to that.

23        In lieu of the fact that there was no response to

24  that, I think the relief should be granted.  There's prima

25  facie evidence here that the contracts were assumed in a letter

- 247 -

1   dated May -- or excuse me, dated in June of 2009.  There being

2   no response, I think the relief needs to be granted.

3            MR. FISHER:  Your Honor, the question with regard to

4   these assumption issues is whether the payments at issue were

5   made pursuant to the assumed contracts.  There may have been

6   contracts that were assumed and there may have been payments

7   that were made pursuant to other contracts.  I think everything

8   is getting deferred to this amendment issue.

9            THE COURT:  Well --

10           MR. FISHER:  But as part of amending the complaints,

11  we're, of course, going to verify whether or not any of these

12  payments were subject to assumption.

13           THE COURT:  I don't recall this letter.  Does the

14  letter say that these payments -- identify the payments as

15  being under the contract?

16           MR. MICHAELSON:  Well it's more vague than that, Your

17  Honor.  The letter seems to be a form letter that was sent to

18  everyone who agreed upon a cure amount.  It's --

19           THE COURT:  But -- I'm sorry.  Does your motion say

20  that this is the only debt -- this contract is the only base --

21  only debt that we have?

22           MR. MICHAELSON:  There were multiple contracts, Your

23  Honor.  But all of our services -- goods and services were

24  supplied via contracts and this letter --

25           THE COURT:  Well, were they all assumed?

- 248 -

1          MR. MICHAELSON:  It purports to assume all the

2     contracts.  It doesn't differentiate between the contracts.

3     And in conversations with my client, they have explained to me

4     that these are all the contracts under which they were doing

5     business.

6          THE COURT:  Well, is that in the motion?

7          MR. MICHAELSON:  In other words, there's no affidavit

8     to that effect if that's your question, Your Honor.

9          THE COURT:  I think that I'm not going to grant the

10    motion at this point.  On the other hand, the principle is

11    clear, which is that if in fact the debt that is the antecedent

12    debt that was allegedly, preferentially paid is under an

13    assumed contract, then they're going to survive a motion to

14    dismiss.

15         MR. MICHAELSON:  But --

16         THE COURT:  The motion's out there --

17         MR. MICHAELSON:  I understand.

18         THE COURT:  -- if you want but I don't think that what

19    you've described to me is enough to pin them in their non-

20    response.

21         MR. MICHAELSON:  Well I'll engage in other

22    conversation --

23         THE COURT:  Okay.

24         MR. MICHAELSON:  -- with counsel for the debtors then.

25    Thank you.

- 249 -

1          THE COURT:  Okay.

2          MR. HEILMAN:  Your Honor, if I may, Ryan Heilman on

3   behalf of Macsteel.

4          THE COURT:  Okay.

5          MR. HEILMAN:  We have a very similar issue except in

6   our case, we do have an affidavit -- we have an assumption

7   agreement with a specific release and we also attached an

8   affidavit that these were the only contracts that all payments

9   from Delphi related only to these contracts.  And we've been

10  trying for the last three months to get some explanation from

11  the debtors as to why this release was not applicable and have

12  received absolutely nothing.

13         THE COURT:  Okay.  We wouldn't need the release if the

14  contract was assumed.

15         MR. HEILMAN:  Right.  It's an assumption agreement and

16  it says in addition to assuming -- I suppose just for the sake

17  of clarity, it says specifically that everything's released.

18         THE COURT:  Okay, is there any response on this one?

19  This does seem different than the last one.  The only basis as

20  alleged could be this contract, but it really does seem to me

21  to be uncontroverted.

22         MR. FISHER:  Your Honor, I'm aware of the affidavit on

23  the motion.  There is an inquiry to our client.  We don't have

24  a response.  An affidavit was not put in in opposition.

25         THE COURT:  Okay.  All right.  I will grant this

- 250 -

1    motion.

2           MR. FARRELL:  Your Honor, David Farrell on behalf

3    of --

4           THE COURT:  Can I interrupt --

5           MR. FARRELL:  -- KMI Liq --

6           THE COURT:  Can I interrupt?  I know there were some

7    people who mentioned they might have a plane or whatever.  You

8    should all feel free to leave if your issues have been covered.

9    You don't need to stay.

10          UNIDENTIFIED SPEAKER:  Are you intending to make a

11   ruling?  You had -- on the abandonment and foreign and 215 --

12          THE COURT:  You know what it is.  I mean, I --

13          UNIDENTIFIED SPEAKER:  Well, I understand but --

14          THE COURT:  I'm just -- if people want to get out of

15   here, that's all.  Otherwise, you know --

16          MR. FARRELL:  Your Honor, David Farrell on behalf of

17   KMI Liquidating, LLC, which is the defendant in adversary

18   proceeding 07-02372.  Your Honor, we filed a motion for

19   insufficiency of service of process and lack of personal

20   jurisdiction on the basis that we -- as of this date we have

21   never been served with the summons and complaint.  The summons

22   and complaint were served on a third party entity with which we

23   have no affiliation.  We raised that issue in our motion to

24   dismiss, obviously, that was filed in May.

25          The plaintiffs in their omnibus motion on page 45,

- 251 -

1   footnote 12, seem to acknowledge the lack of service and

2   obviously the lack of service is memorialized in our -- my

3   client's own affidavit and the affidavit of service filed by

4   plaintiff's counsel.  But in the omnibus motion the plaintiffs

5   indicate that to the extent that there are "service related

6   timing issues", quote/unquote, relating to my client, that

7   plaintiffs intend to move for relief under Rule 4(m) -- I guess

8   move for further relief under 4(m).  Well, Your Honor, I think

9   our motion to dismiss for lack of personal jurisdiction is

10  right for here and we've fully briefed it.

11          THE COURT:  What's the exact date of that motion?

12          MR. FARRELL:  Of the motion that we filed?  It was

13  filed on the 14th or 15th.

14          THE COURT:  Of --

15          MR. FARRELL:  I think we filed it at midnight.

16          THE COURT:  Of April, right?

17          MR. FARRELL:  Of May.

18          THE COURT:  Of May, okay.

19          MR. FARRELL:  And so the debtors filed their response

20  in June and here we are a month later, a month and a half later

21  and no further motion has been filed by the plaintiffs and I

22  mean, they're asking -- I assume that they're asking --

23  expecting the Court to deny our motion to dismiss, which

24  clearly the Court does not have personal jurisdiction over my

25  client.

- 252 -

1          They're asking the Court to deny that motion on the

2    basis that at some point in the future they're going to get

3    around to filing a 4(m) motion.  And Your Honor, I will submit

4    that's an unacceptable response.  If they felt that they had

5    grounds to ask for a further extension they should have done so

6    before the briefing on our motion to dismiss was complete and

7    before this matter was set for hearing today for disp -- as I

8    understood it, for disposition.

9          And I will go on to add, Your Honor, that to the

10   extent I think the record that is available indicates very

11   clearly that there is no reasonable likelihood that if the

12   debtors had filed a motion --

13          THE COURT:  I'm sorry, which --

14          MR. FARRELL:  Which adversary proceeding, Your Honor?

15          THE COURT:  No, you can go ahead.  I found the

16   reference.

17          MR. FARRELL:  Okay.  Well, I was starting to make the

18   point, Your Honor, that I don't think that the plaintiffs can

19   get up here and even argue that there's a reasonable likelihood

20   that if they had filed a motion under 4(m) that it would be

21   granted by this Court.  The time for the plaintiffs to serve my

22   client expired on April 4th.  And you know, at this point if

23   they were to come in and file a motion asking for a further

24   extension of time under Rule 4(m), we're not dealing with the

25   same standard that we talked about this morning and this

- 253 -

1    afternoon.

2          We're talking about when you're coming in post-

3    expiration and asking for additional time, you're talking about

4    one -- it clearly has to be filed on motion of notice but also

5    you -- much higher standard under Rule 6, or 9006 in the

6    bankruptcy context.  You have to show excusable neglect.  And

7    there's nothing in the record, Your Honor, that indicates that

8    there's any kind of excusable neglect.

9          But if you can bear with me for one minute, Your

10   Honor, what happened here, my client was sued back in September

11   of 2007.  About a month after we were sued, and of course we

12   didn't know about the lawsuit, we sell substantially all of our

13   assets to an unrelated entity, who for purposes of simplicity

14   I'll call Newco.

15         THE COURT:  So it's not a merger?

16         MR. FARRELL:  Not a merger.

17         THE COURT:  Because the footnote says "successor by

18   merger".

19         MR. FARRELL:  Well, that's because the -- what I'll

20   call the Oldco, my client, Oldco, merged into a liquidating

21   entity, and LLC liquidating entity because it sold all its

22   assets and had a pot of money to distribute to its shareholders

23   so for corporate -- I wasn't involved in the transaction so I

24   can't comment on the benefits of doing this, but for whatever

25   reason Oldco merges into an entity called KMI Liquidating.  But

- 254 -

1    meanwhile, the entity that was served --

2            THE COURT:  They didn't serve Oldco?

3            MR. FARRELL:  They didn't serve Oldco.  They didn't

4    serve the successor to Oldco.  They served unaffiliated Newco.

5            And again, Your Honor, the last extension that was

6    granted in October of last year, as I understood it, and as I

7    believe was represented to the Court at the hearing of April of

8    this year, was -- you know, the reason that the debtors were

9    given that additional five months was because they were

10   supposed to be researching all of these defendants and figuring

11   out who the appropriate party was to serve in the case.  Well

12   that clearly was not done in the case of my client because what

13   ended up happening is they waited to two days before the

14   deadline, April 2nd, and they stuck in an envelope the summons

15   and complaint and mailed it off to, quote/unquote, the "legal

16   department" of Newco.

17           So first of all, we've got the fact that they didn't

18   do their due diligence and find out who the real enti -- and I

19   should add, the Newco entity did not even exist during the

20   preference period.  So -- and that's something that could have

21   very easily been determined if -- you know, just by going to

22   the Secretary of State's Web site and checking.  That obviously

23   was not done during this five-month interval.  And you compound

24   that by the fact that the summon -- the service was -- you

25   know, it wasn't even directed to an officer or director or an

- 255 -

1    agent as required under Rule 7004.  They just simply put "legal

2    department" on there and threw it in an envelope two days

3    before the deadline.

4         I would submit, Your Honor, given that background,

5    there is not a record here that would suggest any reasonable

6    likelihood that the plaintiffs could demonstrate excusable

7    neglect.  And we'd ask that the motion to dismiss be granted

8    today.

9         THE COURT:  Okay.

10        MR. FISHER:  Your Honor, I'm not sure what to say

11   except that we served Newco and the service was not timely --

12   the service on Oldco was not timely.

13        THE COURT:  I'm sorry, but Oldco is the defendant,

14   right?

15        MR. FISHER:  We should have served Oldco and we did

16   not manage to serve Oldco.

17        THE COURT:  All right.  Was there any -- so there's no

18   confusion between the two.  My recollection of the last

19   extension was that it was going to be the last extension.  That

20   was how I remembered it.  So I'll grant your motion.

21        MR. FARRELL:  Thank you, Your Honor.

22        MR. NELSON:  Good afternoon, Your Honor.  I'm Harold

23   Nelson and I'm representing LDI, Incorporated.  Your Honor,

24   this is very similar to the last defendant that was up here.

25   We -- my client was not served within the fourth extension

- 256 -

1    period.  Apparently what happened is the debtor served LDI,

2    Ltd. which is a limited partnership in Ohio which is totally

3    unaffiliated with my client which is a corporation in Michigan.

4    And Your Honor, this is despite the fact that my LDI and its

5    Michigan address were set forth in the debtors' schedules, my

6    client filed a proof of claim with its proper name and its

7    proper Michigan address, and apparently no effort was made to

8    check those fairly obvious sources of finding out who and where

9    we are in order to serve the complaint.

10            We brought this issue before the Court when we filed

11   our motion to dismiss on May 13th.  There has been no request

12   filed by the debtor to have a nunc pro tunc for an extension.

13            THE COURT:  When did your client learn of the lawsuit?

14            MR. NELSON:  My client learned of the lawsuit on April

15   22nd when it received it in the mail.  Apparently LDI, Ltd. in

16   Ohio sent it back to the debtor and the debtor apparently did a

17   little more -- you know, engaged in some diligence and figured

18   out who we were.

19            Now, I should note for the record that at the April

20   1st hearing before this Court there was an exchange between

21   Your Honor and Mr. Fisher --

22            THE COURT:  About --

23            MR. NELSON:  -- where he said they were getting

24   addresses off the claims register.

25            THE COURT:  About the proofs of claim.

- 257 -

1        MR. NELSON:  But obviously, at least with respect to

2    my client, that was not the case.

3        THE COURT:  Okay.

4        MR. NELSON:  So I would request, Your Honor, that the

5    motion to dismiss be granted for LDI, Incorporated.

6        THE COURT:  Okay.  I'm not sure there was a response

7    on this one, was there?

8        UNIDENTIFIED SPEAKER:  No response.

9        THE COURT:  There was no response, so I'll grant your

10   motion.

11       MR. NELSON:  Okay.

12       THE COURT:  I think that -- and I have -- oh, I think

13   you attached the colloquy --

14       MR. NELSON:  I did, Your Honor.

15       THE COURT:  -- at the last extension.  And you're

16   reflecting it accurately, which is that there was a final

17   extension for domestic entities to get the addresses, and the

18   place to look was going to be the proofs of claim and the claim

19   register.  So I don't think there's a basis, in good faith, to

20   extend further and there's really no request to.  So I'll grant

21   your motion.

22       MR. NELSON:  Thank you, Your Honor.  For the record,

23   the adversary proceeding is --

24       THE COURT:  Well, no, for those -- I don't know if he

25   left.  For those people whose motions I have granted you should

- 258 -

1    e-mail chambers an order CC'ing the debtors' counsel.

2           MR. NELSON:  Okay, thank you, Your Honor.

3           THE COURT:  Okay.

4           MR. JEROME:  Your Honor, Steve Jerome on behalf of --

5           THE COURT:  I'm sorry, before -- I think that the

6    person who was here has left.  All right, so can you contact --

7    all right.

8           Go ahead.

9           MR. JEROME:  Thank you, Your Honor.  Steve Jerome of

10   Snell & Wilmer on behalf of Microchip Technologies, Inc.

11          I just would request a clarification on the Court's

12   Rule 8 ruling.  If a motion to amend is not filed within forty-

13   five days in my particular adversary, for whatever rea --

14          THE COURT:  That's a deadline.

15          MR. JEROME:  That's the deadline, and then so if it's

16   not filed the case is dismissed.

17          THE COURT:  Then what you can do is submit an e-mail

18   to chambers, again with CC'ing the debtor, representing that

19   the complaint was not filed -- I'm sorry, the motion to amend

20   with the attached complaint was not filed and submitting a

21   proposed order dismissing the case.

22          MR. JEROME:  All right, thank you.  I just wanted to

23   know the process.

24          THE COURT:  Okay.

25          MS. SCHWEITZER:  Your Honor, while we're on the

- 259 -

1   peculiar and parochial here, I think I just wanted to return to

2   the one EDS U.K. entity which I'm as impressed that you

3   remembered that their allegation was they served the committee

4   in affiliate, as --

5          THE COURT:  Okay.

6          MS. SCHWEITZER:  -- much as I'm embarrassed that I had

7   forgotten that fact.  But here's where we were at, which was

8   that this is a U.K. entity, there was no extension sought on

9   the last motion.  It was not captured in the last motion so the

10  deadline has passed in April.  And plaintiff's only argument

11  was that they served its affiliate, EDS Canada.  I'm not sure

12  that these aren't just foreign suppliers who are both getting

13  knocked out right now.  But certainly, as we briefed, the

14  plaintiff has a burden of showing the minimum contacts of the

15  foreign defendant.  And they haven't made the personal

16  jurisdiction showing or the proper service showing at this

17  point.

18          THE COURT:  Okay.  All right.

19          MR. FISHER:  Your Honor, I think that the personal

20  jurisdiction issue is going to be addressed in the amended

21  complaints because it's going to specifically identify the

22  debtor entity and the fact that these are U.S. debtor entities

23  that were doing business with the foreign entities in a

24  contract pursuant to which payments were made.

25          THE COURT:  But who is the -- the defendant has not

- 260 -

1    been served, right?

2           MS. SCHWEITZER:  Correct.

3           THE COURT:  I understand the personal jurisdiction

4    issues about the minimum contacts.  But the wrong entity was

5    served and --

6           MS. SCHWEITZER:  Right.

7           THE COURT:  -- as I read the response, the only

8    response was that well, they're an affiliate.  But I don't

9    think that's enough.  You've got to show that they're basically

10   a, you know, not independent agent type relationship, I think,

11   under the case law.  Personal jurisdiction is a different

12   issue, but I think that it's -- unless some other basis is

13   asserted I don't see how service on the affiliate would count

14   as service.

15          MR. FISHER:  Well, there are cases where service on

16   the affiliate resulted in actual notice to the defendant.

17          MS. SCHWEITZER:  And Your Honor, I would also point

18   out that there has been no affidavit of service filed in this

19   adversary proceeding, so in fact their statement that there was

20   service on the affiliate, I'm actually standing here today not

21   quite sure that that is true because as of the original motion

22   papers we had appeared on behalf of certain people who hadn't

23   been served.  But I'm not sure which way, honestly, that that

24   cuts at this point, if they ultimately were served or not.  But

25   there's certainly no affidavit of service in the record that

- 261 -

1    they can rely upon even for that statement.

2         THE COURT:  How do I know that EDS, Ltd. did receive

3    timely actual notice as opposed to the notice that the last two

4    defendants got which was they got notice but after the fact?

5         MR. FISHER:  How do you know, Your Honor, that they

6    were timely served or --

7         THE COURT:  Right.  Well, not -- even if they weren't

8    timely served, how did they get -- I mean, how did -- you say

9    they got actual notice, but it doesn't -- they weren't served,

10   right?  Within the deadline?

11        MR. FISHER:  Well, they are represented by the same

12   counsel, Your Honor.

13        THE COURT:  At the same -- at that time?  I mean --

14        MS. SCHWEITZER:  These are not --

15        THE COURT:  -- were you represent --

16        MS. SCHWEITZER:  We weren't counsel to -- we've only

17   been counsel for purposes of this adversary proceeding, so we

18   weren't prior counsel of record for any of these defendants.

19   So there was no service on counsel and there was no service --

20   we were representing zero people until people were served and

21   appeared and we brought motions.  But to say that now that

22   we've appeared and filed a motion on behalf of two people where

23   one of them we said this Person A wasn't served and Person B

24   was served, I don't --

25        THE COURT:  You weren't representing both parties when

- 262 -

1   EDS Canada was served?

2           MS. SCHWEITZER:  We weren't representing any parties

3   before they were served.  We haven't appeared.

4           THE COURT:  All right.

5           MS. SCHWEITZER:  This is the first time we've ever

6   appeared in this --

7           THE COURT:  And were you repre -- so you weren't --

8   ergo, you weren't representing EDS, Ltd. at the time that the

9   time to serve expired?

10          MS. SCHWEITZER:  Well, correct, because we were

11  representing everyone -- we were hired after the service went

12  out and we went and looked at who was served.

13          THE COURT:  But --

14          MS. SCHWEITZER:  I mean --

15          THE COURT:  -- you were hired by EDS, Ltd. before the

16  deadline to serve passed?

17          MS. SCHWEITZER:  No, I don't believe so, because I

18  believe we were -- I'd have to look at the date but we weren't

19  retained prospectively.  These were all under seal.  They came

20  in the mail.

21          THE COURT:  No, no, I -- no, I -- when it was actually

22  served.

23          MS. SCHWEITZER:  Okay, it was never actually --

24          THE COURT:  Well --

25          MS. SCHWEITZER:  It was never actually served.

- 263 -

1          THE COURT:  -- pursuant to the last order.

2          MS. SCHWEITZER:  Right.  It was never actually

3   served --

4          THE COURT:  No, no --

5          MS. SCHWEITZER:  -- on Ltd.

6          THE COURT:  -- I understand that.  But were you

7   representing EDS, Ltd. before the final deadline to serve

8   occurred?

9          MS. SCHWEITZER:  I would say -- I feel like it's a

10   tricky question but I would say no in that there was nothing to

11   represent them in.

12          THE COURT:  Well, but --

13          MS. SCHWEITZER:  That there is -- so the chronology is

14   that they served -- they had not served at the time, I

15   believe -- we can look at our motions paper, but I don't

16   believe they had served --

17          THE COURT:  No, no, no --

18          MS. SCHWEITZER:  -- Canada --

19          THE COURT:  -- let me make it simple.  EDS Canada got

20   served within the deadline.

21          MS. SCHWEITZER:  Right.

22          THE COURT:  Okay?  And --

23          MS. SCHWEITZER:  I'm not even sure that's true but

24   we'll go -- were they served within the deadline or not?  EDS

25   Canada?  Okay.

- 264 -

1           THE COURT:  Okay.

2           MS. SCHWEITZER:  I'm sorry, there are two Canadian

3      affiliates.

4           THE COURT:  All right.  And did they -- and they

5      retained your firm before the end of the deadline to serve?

6           MS. SCHWEITZER:  Was that -- do you remember?  What

7      was the deadline --

8           UNIDENTIFIED SPEAKER:  I don't know.

9           MS. SCHWEITZER:  What was the deadline --

10          THE COURT:  All right, that's question one.  The

11     second question is did EDS, Ltd. retain your firm before the

12     end of the deadline?

13          MS. SCHWEITZER:  Well, I would say we were not

14     formally retained by EDS, Ltd. so much as at the time it came

15     to prepare the motion to dismiss in reviewing --

16          THE COURT:  But that's after the deadline.

17          MS. SCHWEITZER:  That's after the deadline, correct.

18     So they didn't -- there was no formal, separate, individualized

19     engagement by Ltd. so much as when you go to do your motion to

20     dismiss and you pick up the fact that some of these folks have

21     not yet been served.

22          THE COURT:  Okay.

23          MS. SCHWEITZER:  And certainly, to go back to Your

24     Honor's original point that the law isn't just that there is

25     common counsel, in fact, because they made no effort to serve

- 265 -

1   counsel.  The law is that they have to show that there is an

2   agent or an alter ego.

3          THE COURT:  Well, I understand that.

4          MS. SCHWEITZER:  Right.

5          THE COURT:  I'm just trying to figure out whether

6   there's any real basis to say --

7          MS. SCHWEITZER:  Right.

8          THE COURT:  -- truly here no harm, no foul.  It sounds

9   to me that there is not such a basis, given the context of the

10   last extension order and what you've represented to me.  So

11   I'll grant your motion.

12          MS. SCHWEITZER:  Thank you, Your Honor.

13          MR. FUSCO:  Your Honor?

14          THE COURT:  Yes.

15          MR. FUSCO:  This is Timothy Fusco from Miller,

16   Canfield, Paddock and Stone in Detroit.  We represent a number

17   of entities, one of which, Niles America USA, has filed a

18   motion to dismiss on the basis that we, like other defendants,

19   entered into a settlement agreement in 2006.  I am working with

20   counsel at Butzel to resolve that.  I believe we are close to

21   doing it.  I just want to ensure that nothing done today will

22   prejudice us and we will continue to have the right to pursue

23   that defense in the event I'm unable to work out an agreement

24   with Butzel.

25          THE COURT:  I think this was mentioned at the

- 266 -

1   beginning of the hearing, was it?  Did you -- Mr. Fisher, did

2   you --

3          MR. FISHER:  I did not mention this particular case.

4          THE COURT:  Oh, okay.

5          MR. FISHER:  But certainly, from our point of view,

6   we'd like to continue to work out and resolve the matter

7   consensually.

8          THE COURT:  All right, okay, so I will defer

9   considering your motion until you inform me it's not been

10  resolved.

11         MR. FUSCO:  Thank you, Your Honor.  That's fine.

12         THE COURT:  Okay.

13         MS. ENGLUND:  Good afternoon, Your Honor.  Alyssa

14  Englund with Orrick, Herrington & Sutcliffe representing SUMCO

15  USA Sales Corporation.  And I'm not going to, obviously, repeat

16  any of the arguments made by others.  But there's one I think

17  I'd like to point out.

18         This morning Mr. Geoghan pointed out that they have

19  agreed to withdraw some of their claims as to certain transfers

20  that were made pursuant to assumed contracts.  That has reduced

21  the alleged preference to approximately 198,000 dollars.  And

22  we have preserved all of our defenses that we've alleged in our

23  motion, including no notice -- I think you're seeing where I'm

24  going.  But because at the time our transfers in the original

25  complaint were approximately one million dollars, we did not

- 267 -

1    make the abandonment argument.

2           THE COURT:  Yeah, I -- I'm not going to deal with that

3    now.  I think it raises --

4           MS. ENGLUND:  I just wanted to --

5           THE COURT:  I have not --

6           MS. ENGLUND:  -- put it on the record, Your Honor.

7           THE COURT:  I did not review my August order on the

8    motion in light of this possibility.  My inclination is it

9    doesn't cover it, but -- because it -- they didn't say they're

10   abandoning something if and when it becomes --

11          MS. ENGLUND:  Well, Your Honor --

12          THE COURT:  -- if and when it's reduced to 200 -- you

13   know, below 250,000 dollars.

14          MS. ENGLUND:  At the same time, it could --

15          THE COURT:  But I'm not ruling --

16          MS. ENGLUND:  Yeah.

17          THE COURT:  It wasn't made.

18          MS. ENGLUND:  Yep.

19          THE COURT:  Okay.

20          MS. ENGLUND:  And we are also just among the no

21   notice, absolutely not a creditor, no -- absolutely no notice

22   of the disclosure statement or any of the other pleadings or --

23   in the case and --

24          THE COURT:  Okay.

25          MS. ENGLUND:  Thank you.

- 268 -

1          THE COURT:  Thanks.

2          MR. VISCOUNT:  Your Honor, if I may, on the phone this

3     is Michael Viscount at Fox Rothschild.

4          THE COURT:  Good afternoon.

5          MR. VISCOUNT:  Good afternoon.  I wasn't going to say

6     this but somebody else just brought to my attention something

7     that is pertinent to my client which is M&Q Plastic Products.

8     We're adversary number 07-02743.  We settled with the

9     reorganized debtors last evening and a signed settlement

10    agreement is in place.  I know that there was some mention of

11    some matters that had been settled but I didn't hear my matter

12    mentioned earlier in the day.  It is not fully implemented yet

13    so I would ask that the motion we filed for M&Q Plastics just

14    be carried until further notice.

15         THE COURT:  Okay.  Any problem with that?

16         MR. FISHER:  No objection.  And Your Honor, at the

17    beginning of the hearing I identified only those actions that

18    had actually already been dismissed --

19         THE COURT:  Right.

20         MR. LYONS:  -- not matters that were in the process of

21    being resolved.

22         THE COURT:  Okay.

23         MR. VISCOUNT:  Thank you.

24         THE COURT:  Okay.  All right.  Anyone else?

25         (No response)

- 269 -

1          THE COURT:  All right.  Did I -- did we deal with A-1

2     Specialized Services or has that been separately dealt with?

3          MR. STEIN:  Your Honor, David Stein.  I had addressed

4     Your Honor on that.

5          THE COURT:  But this is on the service point.

6          MR. STEIN:  We just -- we adopt whatever position was

7     previously put on the record.

8          THE COURT:  All right.  On this one -- I mean, I think

9     it's just a question of fixing the caption.  I don't --

10          MR. STEIN:  We did have some issues vis-a-vis the

11     caption.  I was going into the --

12          THE COURT:  Well, I think it should just be fixed and

13     it should be fixed in the amended complaint.

14          MR. STEIN:  Well, it sounded like Your Honor was going

15     with a suggestion of the debtor that they were just going to

16     amend the complaints.  The other issue was that we had two

17     pending adversaries on the same dollar amount --

18          THE COURT:  Well, no that one we addressed.  It was

19     the incorrect caption that needed to be fixed.

20          MR. STEIN:  Right.

21          THE COURT:  I think that should be fixed as part of

22     the amended complaint too.

23          MR. STEIN:  And we'll reserve our rights to readdress

24     that issue.

25          THE COURT:  Right, that's fine.  That's fine.  All

- 270 -

1    right.  I know it's been a long afternoon and people probably

2    do have to leave so I'm going to be brief with my ruling which

3    I basically stated during the course of this hearing.

4          I have granted on the record a number of motions to

5    dismiss on the grounds of late service or -- well, late service

6    because the improper party was served, and I don't need to

7    reiterate those.  They're are all granted under Rule 7004.  And

8    again, the movants with respect to those motions need to submit

9    an order to chambers with a copy to the debtors' counsel.

10         The remaining motions raise several different grounds

11   for dismissal.  I will rule on some of them now and defer

12   ruling on others until I consider the motions for relief to

13   file an amended complaint to be made by the plaintiff here.

14   Before I turn to -- the debtors need to file an amended

15   complaint in order to sustain this cause of action or these

16   causes of action.

17         I am going to grant certain of the motions now without

18   deferring a ruling and deny certain of them now without

19   deferring the ruling.  And those aspects of the motion all

20   pertain to contentions that certain of the complaints are

21   barred by res judicata or judicial estoppel.

22         I will grant the motions that make that contention

23   with respect to claims for the avoidance of preferential

24   transfers in amounts below 250,000 dollars in value and

25   preferential transfers in respect of payments to foreign

- 271 -

1    suppliers.  Those two categories of preference claims or

2    potential preference claims were covered by paragraph 17 of

3    Delphi Corporation, et al.'s  motion dated August 6, 2007 to,

4    among other things, seek relief to abandon certain claims under

5    Section 554 of the Bankruptcy Code.  Among the claims to be

6    abandoned are, quote, "preference claims below 250,000 dollars

7    in value against noninsiders", and, quote, "payments" -- I'm

8    sorry, categories of preference actions including, quote,

9    "payments to foreign suppliers".

10          I have reviewed that motion and the order granting the

11   motion, and in particular paragraph 5 of that order which is

12   dated August 16, 2007, as well as the transcript of the hearing

13   on the motion, and I believe that the motion and the order

14   which granted the motion, and additionally specified in

15   paragraph 5 for the abandonment of these causes of action are

16   clear that in fact the debtors did abandon those causes of

17   action at that time.  Therefore, having prevailed on that

18   motion they're judicially estopped from seeking contrary relief

19   here, and in any event, the abandonment is res judicata that

20   would effectively prevent the debtors from having standing to

21   pursue a preference claim now.

22          It was also alleged that pursuant to the same August

23   16th order the debtors abandoned all other preference claims to

24   the extent that they provided a notice to the creditors'

25   committee that they had so abandoned the claims and that in

- 272 -

1   fact such a notice through the disclosure statement and plan

2   approved by the Court -- and now I'm referring to the plan in

3   the order dated January 25, 2008, confirming the first amended

4   joint plan of reorganization -- constituted an abandonment of

5   all other claims in the amended complaint.

6           I disagree with that contention and find that such an

7   abandonment has not occurred.  The abandonment is alleged to

8   have occurred in the first amended plan which was in fact

9   confirmed pursuant to the order that I've just referred to.

10  However, that plan did not go effective, that is, the effective

11  date under the plan did not occur.

12          The relevant Sections of the first amended plan are

13  Section 7.24, 7.25, 14.1, and the definition of the Reorganized

14  Debtor under the plan which appears at 1.168.

15          Section 7.24 provides that causes of action, which

16  include preference causes of action, against persons arising

17  under Section 547 of the Bankruptcy Code shall not be retained

18  by the Reorganized Debtors, a capitalized term, unless

19  specifically listed on Exhibit 7.24.  None of these preference

20  causes of action were listed on section -- on Exhibit 7.24.

21          Then Section 7.25, reservation of rights, states with

22  respect to any avoidance causes of action under Section 547 of

23  the Bankruptcy Code that the debtors abandoned in accordance

24  with Article 7.24 of this plan, which I've just quoted, "the

25  debtors reserve all rights, including the right under Section

- 273 -

1   502(d) of the Bankruptcy Code, to use defensively the abandoned

2   avoidance cause of action as a ground to object to all or any

3   part of a claim against any estate asserted by a creditor which

4   remains in possession of or otherwise obtains the benefit of

5   the avoidable transfer."

6          Section 14.1 of the plan states, "Binding effect: Upon

7   the effective date this plan shall be binding upon and inure to

8   the benefit of the Debtors, the Reorganized Debtors, all

9   current and former holders of claims, all current and former

10  holders of interest and all other parties-in-interest and their

11  respective heirs, successors, and assigns."  And then the term

12  Reorganized Debtors means "individually any debtor and

13  collectively all debtors, in each case from and after the

14  effective date".

15         Taking those four provisions together and noting that

16  it's a matter of record that the effective date of this first

17  amended Chapter 11 plan did not occur till the modification of

18  that plan, which modification preserved the avoidance claims

19  that are being asserted now, I believe it's clear that the

20  debtors' notice, if one wants to take the plan as a notice of

21  abandonment, made it clear that the abandonment would only be

22  in effect if the effective date occurred, and that it was at

23  that point that the preference claims would not be retained by

24  the Reorganized Debtors.

25         Again, since the effective date didn't occur, since

- 274 -

1    the Reorganized Debtors, as referred to in Section 7.24, never

2    came into being under this plan, there's no judicial estoppel

3    and no res judicata effect flowing from the plan or the

4    disclosure statement, the first amended plan and disclosure

5    statement.  That is, the debtor is not -- or the plaintiff here

6    is not taking a position contrary to the position taken by the

7    Delphi debtors in the first amended plan which was confirmed in

8    the confirmation order therefore.  See, generally, In re

9    Allegiance Telecom, Inc., 356 B.R. 93, 107 (Bankr. S.D.N.Y.

10   2006).

11        Lastly, the contention has been made that the

12   disclosures in the modified plan which do contain a reservation

13   of rights to bring these avoidance actions, including the

14   exhibit thereto that lists the index numbers for the actions,

15   are contrary to the positions taken in this case in pursuing

16   those actions by DPH Holdings, the successor to the proponent

17   of the modified plan that did go effective in this case.

18        I do not believe that the disclosure in the modified

19   plan and in connection with the debtors seeking confirmation of

20   the modified plan was such that the debtors succeeded in taking

21   a contrary position at that time from the position they're

22   taking today.  Rather, the debtors have disclosed their

23   intention to pursue the specific avoidance causes of action

24   that they're pursuing now, and that in light of that those who

25   would be relying upon the provisions of the modified plan and

- 275 -

1    the disclosure in connection therewith were not misled by a

2    position that's contrary to the position they're taking today.

3         (Pause)

4         On this point, although in each case the Court has to

5    review the facts at hand so no general rule will apply in a

6    generic way, see In re Ampace Corp., 279 B.R. 145, 159 (Bankr.

7    D. Del. 2002) and In re I. Appel Corp., 300 B.R. 564, 568

8    (S.D.N.Y. 2003) as well as In re P.A.. Bergner & Co., 140 F.3d

9    1111, 1117 (7th Cir.1998).  So that aspect of the motions to

10   dismiss is denied.

11        The motions to dismiss generally also assert that the

12   complaints as filed and served do not satisfy the pleading

13   requirements of Rule 7008, incorporating Rule 8 of the Federal

14   Rules of Civil Procedure.  I agree with that assertion.  And

15   more specifically, the complaints assert preference causes of

16   action under Section 547(b) of the Bankruptcy Code.  In

17   performing the analysis required by Atlantic Corporation v.

18   Twombly, 550 U.S. 544, (2007) and Ashcroft v. Iqbal, 129 S.Ct.

19   1937 (2009), the Court must do the following.

20        First, the Court must identify each element of the

21   cause of action.  Next the Court must identify the allegations

22   that are not entitled to the assumption of truth because they

23   are legal conclusions not factual allegations.  Finally, the

24   Court must assess the factual allegations in the context of the

25   elements of the claim to determine whether they plausibly

- 276 -

1   suggest an entitlement to relief.  See Iqbal, 129 S.Ct. at 149,

2   147, and 151.  The plausibility standard is not akin to a

3   probability requirement but it asks for more than a shear

4   possibility that a defendant has acted unlawfully, id. at page

5   149.

6        Here there are three key elements of a preference

7   claim that are asserted only in a generic way, i.e. only in the

8   sense of repeating the elements of the relevant statute and

9   stating that as a result the defendant harmed the plaintiff,

10  and therefore they do not satisfy the pleading requirements as

11  set forth in Twombly and Iqbal.

12       First, the complaint does not identify the particular

13  debtor, and there were over forty debtors here, who was the

14  transferor.  Secondly, the complaint does not allege a

15  particular antecedent debt on which the transfer was on account

16  of.  And third, the complaint, where there are multiple

17  transferees alleged, does not assert which defendant was the

18  initial transferee and which defendants were subsequent

19  transferees, those parties' rights being different under

20  Section 550 of the Bankruptcy Code.

21       In a similar context where, as here, the complaint did

22  identify the date of the transfer and the amount of the

23  transfer, bankruptcy courts, including the court in this

24  district have similarly concluded as I do now that the

25  preference complaint does not pass muster under Rule 8.  See In

- 277 -

1   re Hydrogen, LLC, 2010 WL 1609, 536 (Bankr. S.D.N.Y., April 20,

2   2010).  In re McLaughlin, 415 B.R. 23 (Bankr. D.N.H. 2009)

3   In re Caremerica Inc., 409 B.R. 737 (Bankr. E.D.N.C. 2009).

4            I've stated during oral argument why I believe all

5   three of these elements of the claim need to be pled with more

6   clarity in the context.  In particular, while it may seem at

7   first glance that anyone receiving money has to receive it for

8   some purpose and therefore it's reasonable to infer in the

9   context that that purpose is to pay an antecedent debt, that is

10  not always the case.  Debtors may pay COD or in advance.  And

11  in addition, in identifying the debt, a complaint may therefore

12  also enable a debtor to show that the creditor, or the

13  transferee, rather, received more than it would otherwise in a

14  Chapter 7 case which would, in the case of a contract that had

15  been subsequently assumed, be a basis for dismissing the claim.

16           So I concluded that the complaints need to be

17  dismissed, and I've given DPH Holdings forty-five days from

18  today to file a motion for each complaint seeking leave to

19  amend each complaint.  That motion should attach the form of

20  complaint -- or must attach the form of complaint that would be

21  proposed to be filed as an amended complaint.  And if such a

22  motion is not filed for any particular complaint, that

23  complaint will be dismissed upon the movant submitting to me a

24  proposed order dismissing the complaint, CC'ing on the e-mail

25  counsel for DPH and stating that in fact notwithstanding my

- 278 -

1    ruling today which is that the complaint would be dismissed,

2    i.e. that portion of the motion seeking relief to dismiss the

3    complaint was granted, I gave DPH forty-five days to make a

4    motion to amend and such a motion has not occurred.

5         The other bases for relief to dismiss the complaints

6    are ones that I will take under advisement.  They may be mooted

7    by the outcome of DPH Holdings' motions, to the extent they're

8    made, to amend the complaint.  And if they're not mooted of

9    course I will consider them and rule on them.

10        But my belief is that, in addition to my wanting to

11   review individual aspects of certain motions and their specific

12   allegations with respect to notice and prejudice, that it would

13   be premature for me to rule now on those other aspects of the

14   motions to dismiss.  And by those other aspects I mean the

15   contentions of the motions to dismiss that the defendants are

16   entitled to relief from my prior orders granting the debtors'

17   requests in four instances for an extension of their time to

18   serve the complaints and the initial order granting the

19   debtors' request to file the complaints under seal.  As I said

20   during oral argument, those motions raise unusual issues that I

21   think are better considered after I've had the benefit of

22   seeing any proposed amended complaints that DPH proposes to

23   seek leave to file.

24        The only other aspect of my ruling, unless anyone has

25   any questions, I think, is to make clear that I'm not denying

- 279 -

1   or granting any of the motions insofar as they seek to dismiss

2   the complaint on the basis that the movants' contract that

3   provided for the antecedent debt was the basis for the transfer

4   was subsequently assumed.

5           There was one exception to that where it was

6   undisputed that the specific debt could only have been under an

7   assumed contract.  That motion will be granted but all the

8   other ones will be denied without prejudice but only on the

9   basis of further factual development on whether the transfer

10  was under a contract that was assumed or not.  If it turns out

11  that the transfer was in respect of a debt under a contract

12  that was assumed, the debtors have acknowledged or DPH has

13  acknowledged that the complaint would be dismissed, which is

14  consistent with the law.

15          So are there any questions?

16      (No response)

17          THE COURT:  Okay.  I've also -- I just want to

18  reiterate that I have the individual motions, many of which

19  have affidavits attached to them.  I believe that the parties

20  in responding to a motion for leave to amend may want to, as

21  they have here, coordinate their arguments generally.  However,

22  if they want to rely on specific facts relevant to them they

23  need to outline them in an affidavit form or some other form

24  that's acceptable.  And I leave it to you on coordinating that

25  process.  Okay?  Thank you.

- 280 -

1          (Proceedings concluded at 4:46 PM)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

- 281 -

1                            I N D E X

2

3                        R U L I N G S

4    DESCRIPTION                                    PAGE      LINE

5    Mississippi's claim is disallowed               64        15

6    Reorganized Debtors' Objection To Proof         64        19

7    Of Administrative Expense Claim Number

8    19568 Filed On Behalf Of Paullion Roby,

9    Granted.

10   Reorganized Debtors' Objection Regarding        72         6

11   Claims of New Jersey Self-Insurer's

12   Guaranty Association, denied.

13   Macsteel's motion to dismiss granted           250         1

14   KMI Liquidating, LLC's motion to dismiss,      255        20

15   granted.

16   LDI, Incorporated's motion to dismiss,         257         9

17   granted.

18   EDS, Ltd.'s motion to dismiss granted          265        11

19   M&Q Plastic Products' motion carried           268        22

20   until further notice

21   Motions to dismiss claims for the              270        22

22   avoidance of preferential transfers

23   in amounts below 250,000 dollars

24   and preferential transfers for payments

25   to foreign suppliers, granted.

- 282 -

1    Debtors' contention that it abandoned        275        10

2    all other preference claims by providing

3    notice of abandonment to the creditors'

4    committee is denied.

5    The complaints as filed and served          275        11

6    do not satisfy the pleading

7    requirements of Rule 7008.

8    The complaints are dismissed unless         277        16

9    DPH Holdings files a motion within

10   forty-five days seeking leave to

11   amend each complaint.

12   All motions that seek to dismiss a          279         7

13   complaint on the basis that the contract

14   was assumed are denied without prejudice

15   except for the one motion, where it was

16   undisputed that the specific debt could

17   only have been under an assumed contract;

18   that single motion is granted.

19

20

21

22

23

24

25

- 283 -

1

2                    C E R T I F I C A T I O N

3

4    I, Clara Rubin, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7    _____

8    Clara Rubin

9    AAERT Certified Electronic Transcriber (CET**D-491)

10   Also transcribed by:    Esther Accardi (CET**D-485)

11

12   Veritext

13   200 Old Country Road

14   Suite 580

15   Mineola, NY 11501

16

17   Date: July 27, 2010

18

19

20

21

22

23

24

25