Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 05-44481-rdd

5    - - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    DPH HOLDINGS CORP., ET AL.,

9

10            Debtor.

11

12    - - - - - - - - - - - - - - - - - - - - -x

13

14                  United States Bankruptcy Court

15                  300 Quarropas Street

16                  White Plains, New York

17

18                  August 27, 2010

19                  10:24 AM

20

21    B E F O R E:

22    HON. ROBERT D. DRAIN

23    U.S. BANKRUPTCY JUDGE

24

25

1

2    Hearing re Proposed Fifty-Eighth Omnibus Hearing Agenda

3

4    Hearing re Proposed Thirty-Sixth Claims Hearing Agenda

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sara Bernstein

Page 3

1

2    A P P E A R A N C E S :

3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

4           Attorneys for the Reorganized Debtors

5           155 North Wacker Drive

6           Chicago, IL 60606

7

8    BY:   MICHAEL W. PERL, ESQ.

9           JOHN K. LYONS, ESQ.

10          LOUIS S. CHIAPPETTA, ESQ. (TELEPHONICALLY)

11          ALBERT L. HOGAN III, ESQ. (TELEPHONICALLY)

12

13

14   HARRIS BEACH PLLC

15          Attorneys for Excellus Health Plan, Inc.

16          100 Wall Street

17          New York, NY 10005

18

19   BY:   ERIC H. LINDENMAN, ESQ.

20

21

22

23

24

25

Page 4

```
 1
 2    MICHIGAN ATTORNEY GENERAL'S OFFICE
 3          Attorneys for Michigan Funds Administration
 4          525 West Ottawa Street
 5          Lansing, MI 48909
 6
 7    BY:   DENNIS J. RATERINK, ESQ.
 8
 9
10    FARELLA BRAUN + MARTEL LLP
11          Attorneys for Official Committee of Eligible Salaried
12          Retirees
13          235 Montgomery Street
14          17th Floor
15          San Francisco, CA 94104
16
17    BY:   DEAN M. GLOSTER, ESQ.
18          (TELEPHONICALLY)
19
20    ALSO APPEARING:
21    PHILIP J. CARSON
22    IN PROPRIA PERSONA/PRO SE
23
24
25
```

1          P R O C E E D I N G S

2          THE COURT:  Okay, DPH Holdings?

3          MR. PERL:  Good morning, Your Honor.  Michael Perl of

4     Skadden, Arps, Slate, Meagher & Flom LLP on behalf of the

5     reorganized debtors.  Your Honor, we're here today for the

6     fifth-eighth omnibus hearing.  We filed an agenda yesterday at

7     docket number 20545 and with Your Honor's permission, I'd like

8     to proceed in accordance with that agenda.

9          THE COURT:  Okay.  That's fine.

10         MR. PERL:  And one item of note, matter six on the

11    agenda, the motion of the VEBA committee, that has been

12    adjourned to the September hearing.  So that leaves only two

13    contested matters for today's omnibus hearing.

14         THE COURT:  Okay.  And I think Mr. Gloster's on in

15    respect to that -- on the phone.  Is that right?

16        (No response)

17         Well, maybe not.  Maybe he signed up for it but then

18    because of the adjournment, he's not on.  Okay.  All right.

19    So, why don't you proceed with the matters that are on the

20    agenda for actual hearing today.

21         MR. PERL:  The first contested matter is matter five,

22    which is the motion of Excellus to permit filing of a later

23    administrative claim.

24         THE COURT:  Right.

25         MR. PERL:  And I'd like to turn over the podium to

1   counsel for Excellus to present their motion.

2          THE COURT:  Okay.

3          MR. LINDENMAN:  Good morning, Your Honor.

4          THE COURT:  Good morning.

5          MR. LINDENMAN:  Eric Lindenman, Harris Beach for the

6   claimant Excellus.  Your Honor, the request to file late claims

7   is not new law.  There's nothing that's particularly

8   complicated about this.  Everyone is aware of the requirements

9   of Pioneer and related case law.  Your Honor, instead what I'd

10  like to do is explain to the Court what's not particularly

11  clear in the papers which is the issue regarding excusable

12  neglect.

13         I've had an opportunity to speak further with my

14  partners in our Syracuse officer which is the attorney who had

15  drafted the papers.  And my understanding is the issue appears

16  to stem, in large part, from the way this premium was built.

17  This was a sort of reconciliation at the end of one year and

18  then billed to the new year.  And given the timing of this, I

19  can see where their problem was -- Excellus.

20         And I'd like to try to explain that to Your Honor

21  because the papers did not see specifically detail the

22  excusable neglect.  And I certainly regret that it wasn't more

23  detailed in this regard.  The way these premiums work, Your

24  Honor, is with for a calendar year and based upon a variety of

25  factors, the premium was set, it was paid and then any actual

Page 7

1    cost during the course of the year, based upon a variety of

2    factors, was sort of trued up at the end of the year.  So if

3    they paid 400,000 dollars, for instance, and the actual cost of

4    the insurance was only 350, Excellus would give the debtor a

5    50,000 dollar credit towards the next year.  And it was up and

6    down in a variety of years, depending upon what the actual cost

7    was and related to other factors.

8         It appears that for the period that ended '08, the

9    recalculation and truing up occurred, amazingly enough, on the

10   day after it appears that the administrative claims bar date

11   occurred.  And for whatever reason, this is the way that

12   Excellus has calculated.

13        THE COURT:  But why would it take that -- I mean,

14   that's July 15th.  Why would it take seven -- or six and half a

15   months to do that?

16        MR. LINDENMAN:  That's part of the problem, Your

17   Honor.

18        THE COURT:  Okay.

19        MR. LINDENMAN:  And my office was not involved in that

20   aspect of it until, essentially, after the fact.  And as best

21   as we can determine, after that initial bar date and prior to

22   the final claims bar date in November, one of the people who

23   received notice was the sales representative for DPH.  There

24   clearly was a breakdown in the process and while happenstance

25   can readily explain the initial bar date in July, there is no

Page 8

1    ready explanation for why it failed in Excellus' office, other

2    than to say, Your Honor, that it simply did fail.  They did not

3    have a procedure in place to track this issue because when the

4    initial bar date came, they had no balance due because they

5    hadn't been trued-up for the prior year.

6         It was only after the July bar date that they learned

7    that there was a balance due.  But because of the way they bill

8    and the way they invoice and the way they track this, it didn't

9    come to their attention until well after -- I shouldn't say it

10   didn't come to their attention, Your Honor, because we don't

11   dispute the notices were received.  It didn't occur to the

12   people at Excellus that in fact, an unpaid claim remained due

13   from DPH holder.

14        They've since addressed their procedures in terms of

15   notice but during the course of this billing period and

16   ultimately, it came to their attention when DPH chose not to

17   renew and then they trued-up at the end of that and realized

18   there was this claim that was still due.  During the course of

19   the bankruptcy, because they showed no balance due as of the

20   initial bar date and then didn't show a balance due until

21   later, it never -- the light never turned out at Excellus with

22   regard to the existence of a claim that was subject to the

23   administrative bar date.

24        It's what happened, whether that falls under the

25   Pioneer Standard, obviously it's not for me to decide, Your

Page 9

1   Honor, but the fact is that there was a failure at Excellus to

2   recognize that a claim existed because the truing up process

3   didn't occur until much later.  And then when they saw that

4   there was a balance, they assumed that it would be, as always,

5   taken care of with either a credit or in this instance,

6   additional fee charged for the new premium.  There's really

7   nothing more that I can provide to Your Honor in terms of the

8   excusable neglect.  We don't believe that under the

9   circumstances it is an inordinately long period of time.  We

10  dealt with it as soon as my firm learned of it.  The --

11         THE COURT:  And that was May 2010?

12         MR. LINDENMAN:  Approximately right around when the

13  motion was ultimately filed.  We learned what we learned, took

14  appropriate action, had that conversation no one likes to have

15  with their client, "What were you thinking?"  And we learned

16  that they weren't thinking anything because of the way their

17  premium and billing system operated, they would not have been

18  aware of it until well after the fact.

19         THE COURT:  Okay.  All right.

20         MR. LINDENMAN:  Thank you, Your Honor.

21         THE COURT:  Thanks.

22         MR. PERL:  Michael Perl on behalf of the reorganized

23  debtors.  Your Honor, the reorganized debtors are prepared to

24  rely on their objection that was submitted.  We think that it's

25  pretty clear in this case notice is not in dispute.  Because

Page 10

1    the notice is not in dispute, Excellus has to meet the

2    excusable neglect standard set forth by the Supreme Court in

3    the Pioneer case as adopted by the Second Circuit.  There are

4    four factors, the danger to the prejudice of the -- the danger

5    of prejudice to the debtor, the length of the delay, the reason

6    for the delay as well as the good faith.

7         The Second Circuit, as applied by this Court -- by the

8    courts in this district, have put heavy weight on the reason

9    for the delay and in this case, we don't believe that Excellus

10   has provided a viable reason for delay.  And that alone should

11   be sufficient to deny their motion but in this case, Your

12   Honor, the length of the delay as well as the prejudice to the

13   debtors also weigh in favor of the reorganized debtors.  Your

14   Honor, just in response to counsel's point about the invoices

15   issued in July of 2009, you got -- it was more than a year

16   before the motion for leave to file a late claim was filed.

17   And as well, during that time period, the modified plan was

18   approved, the master disposition agreement was approved and the

19   plan went effective.  And all those factors were key in the

20   reorganized debtors' efforts during that key time period.

21        So unless Your Honor has any other further -- any

22   further questions, we respectfully request that the motion be

23   denied.

24        THE COURT:  Okay.

25        MR. LINDENMAN:  Your Honor, I'm sorry, just one last

DPH HOLDINGS CORP., ET AL.

Page 11

1   issue and I don't know if the Court if I can hear --

2          THE COURT:  No.  You can stand there.  The microphone

3   will pick you up.

4          MR. LINDENMAN:  Okay, fine.  We thought that what we

5   would note is that the July invoice was in fact forwarded to

6   the debtor so while there admittedly was not a timely file of

7   the administrative claim, the debtors were on constructive

8   notice in July when the invoice was ultimately issued that

9   there was a claim outstanding and that certainly given the

10  timing post-petition, that it was an administrative claim.  So,

11  not formal notice in terms of a filed administrative claim but

12  the debtor was on notice of the existence of this claim.  As it

13  would have been in all prior years, this was the form -- format

14  that was used.

15         Perhaps it's not the best and Excellus is moving

16  towards monitoring it more closely and changing but the debtor

17  certainly did have actual notice of the existence of the claim,

18  clearly in the post-petition period, clearly constituting an

19  administrative expense claim and the debtor -- I'm sorry,

20  Excellus, Your Honor, clearly did not file the timely claim but

21  they did have the notice.

22         THE COURT:  Okay.

23         MR. PERL:  Thank you.

24         THE COURT:  All right.  I have before me a motion by

25  Excellus Health Plans, Inc. for leave under Bankruptcy Rule

1    9006(b)(1) to file a late proof of administrative expense claim

2    in this Chapter 11 case, DPH Holdings, which is the successor

3    to the debtors.  For purposes of claims administration, it has

4    objected to the motion.

5         The facts are generally as follows, the Court set an

6    initial administrative claims bar date in this case, which

7    commenced in October of 2005, to be July 15th, 2009 for any

8    administrative claim that arose before June 1, 2009.  That is

9    for the period from the commencement of the case through June

10   1, 2009.  The reason for setting an administrative claims bar

11   date was that the debtors, although their first plan had been

12   confirmed, had been unable to consummate that plan.  And after

13   substantial negotiations and analysis had proposed a modified

14   plan, that was set by the plan modification procedures order

15   which was entered June 16th, 2009 for a confirmation hearing at

16   the end of July 2009.

17        One of the key requirements of confirmation of a

18   Chapter 11 plan was -- is that the plan provide for payment in

19   full of all allowed administrative expenses.  That was a

20   significant issue in this case with regard to the modified

21   plan's confirmation because of the debtors' deteriorated

22   financial condition and the concern that it would not have

23   sufficient cash to pay for the payment of all allowed

24   administrative expense claims.  So the bar date was set for

25   approximately two weeks before the confirmation hearing and the

Page 13

1    record on the debtors' best estimate of allowable

2    administrative claims was an important factor of the

3    confirmation hearing and the Court's determination ultimately

4    to confirm a plan here, which was confirmed by order dated July

5    30th, 2009.

6         The plan then went effective on October 6th, 2009.

7    Excellus calculated the amount owing for the period at issue

8    and in fact, billed the debtor for it in July, although a few

9    days after the bar date 2009, but it did not file an

10   administrative expense claim by the July 15th, 2009 bar date.

11   and in fact, did not inform the debtors of its desire to do so

12   until sometime in May 2010, several months after confirmation

13   and the effective date of the plan.

14        The claim is for approximately --well, it's for

15   exactly $411,318.50 which as an administrative claim, would be

16   paid in full and in cash in the case.  Bankruptcy Rule 9006(b)

17   permits a claimant to file a late proof of claim if the failure

18   to submit a timely proof of claim was due to "excusable

19   neglect".  The burden of proving excusable neglect is on the

20   claimant seeking to extend the bar date In re R.H. Macy & Co.,

21   161 B.R. 355, 360 (Bankr. SDNY 1993).  I have held in this

22   case, as did Judge Lifland in the Dana Corporation case, that

23   that burden applies to the claimant asserting a late proof of

24   administrative expense after the administrative expense bar

25   date as well as with regard to the general unsecured claims bar

1    date.  And Bankruptcy Rule 9006(b)(1) appears to me to apply

2    equally to such a request.  See In re Dana Corp., 2007 WL

3    157763, page 3 (Bankr. SDNY 2007) as well as the transcript

4    citation to my ruling earlier in this Chapter 11 case that's in

5    the debtors' supplemental response -- or DPH's supplemental

6    response to Excellus' motion.

7         The Supreme Court has developed a two-step test for

8    determining whether a late filing is due to excusable neglect

9    in Pioneer Investment Services Company v. Brunswick Associates

10   Limited Partnership 507 U.S. 380 (1993).  First, the movant

11   must show that its failure to file a timely claim constituted

12   neglect as opposed to willfulness or a knowing admission,

13   neglect generally being attributed to a movant's inadvertence,

14   mistake or carelessness ibid. at 387-88.

15        After establishing neglect as opposed to willfulness

16   or a knowing admission.  The movant must show, by preponderance

17   of the evidence, that its neglect was excusable.  That analysis

18   is undertaken on a case-by-case basis based on the particular

19   facts of the case although, the Court should be guided by and

20   make the determination balancing the following factors, a, the

21   danger of prejudice to the debtor, b, the length of the delay

22   and whether or not it would impact the case, c, the reason for

23   the delay, in particular, when the delay was in the control of

24   the movant and d, whether the movant acted in good faith, ibid.

25   395.

1          The third factor, the reason for the delay in a

2    particular way that the delay was within control of the movant

3    is a distinction from saying that the movant knowingly and

4    willfully chose not to file the claim and focuses instead on

5    the degree of the -- of control that the movant had over its

6    actions.  Inadvertence, ignorance of the rules or mistakes

7    construing the rules do not usually constitute excusable

8    neglect, Midland Cogeneration Venture LP v. Enron Corporation,

9    In re Enron Corporation 419 F. 3d 115 126 Second Circuit 2005

10   visiting Pioneer 507 U.S. at 392.

11         In Midland Cogeneration, the Second Circuit stated,

12   "We have taken a hard line in applying the Pioneer test.  In a

13   typical case, three of the Pioneer factors, the length of the

14   delay, the danger of prejudice and the movant's good faith

15   usually weigh in favor of the party seeking the extension.  We

16   noted though that we and other circuits have focused on the

17   third factor, the reason for the delay, including whether it

18   was within the reasonable control of the movant and we

19   cautioned the equities will rarely, if ever, favor a party who

20   fails to show -- I'm sorry -- who fails to follow the clear

21   dictates of a Court rule and that where the rule is entirely

22   clear, we continue to expect that a party claiming the

23   excusable neglect will, in the ordinary course, lose under the

24   Pioneer test", ibid. at 122 through 123, internal quotations

25   and citations omitted.  See also In re Musicland Holding

1  Corporation 2006 Bankr. Lexis 315 at pages 10 through 11

2  (Bankr. SDNY 2006) in which Chief Bankruptcy Judge Bernstein,

3  citing Enron, stated that the Second Circuit focuses on the

4  reason for the delay in determining excusable neglect under

5  Pioneer and that "The other factors are relevant only in closed

6  cases."

7        Here, before examining those factors, it should be

8  reiterated that the bar date in the Chapter 11 case always

9  serves the important purpose of enabling the parties in

10  interest to ascertain, with reasonable promptness, the identity

11  of those making claims against the estate and the general

12  amount of claims which is the necessary step in achieving the

13  goal of successful reorganization, In re Calpine Corp., U.S.

14  Dist. Lexis 86514, pages 14 through 15 (SDNY November 21,

15  2007).  Thus, the bar date or bar order does not merely

16  function as a procedural gauntlet but is an integral part of

17  the reorganization process, In re Hooker Investments Inc. 937

18  F. 2d 833, 840 (2d Cir. 1991).

19        Here, as I noted, the administrative expense bar date

20  was very much an important part of the Court determination to

21  confirm the modified plan and serve the function importantly to

22  enable other parties in interest besides the debtors to

23  evaluate the administrative claims.  In particular, it enabled

24  the debtors -- debtor possession lenders who in essence acquire

25  the debtors for their claims and for commitments to support the

1   debtors upon their emergence to evaluate the financial burden

2   that that would entail in terms of paying off allowed

3   administrative claims.

4         Here, there's no contention that the administrative

5   claims -- I'm sorry -- administrative bar date notice to

6   claimants was clear that the bar date needed to be complied

7   with, even with respect to contingent in liquidated claims.

8   It's also clear from the record that although Excellus was not

9   willful in failing to file a proof of claims i.e., it was

10  neglectful, that the ability to file a timely administrative

11  expense claim was well within its control.

12        It was able, one day after the bar date, to send a

13  bill to the debtors for the same amount that would be within

14  the proof of claim.  I'm assuming that calculation was not

15  made, literally, on July 16th but would have required some work

16  beforehand that it could have done if it had put two and two

17  together could have put into an administrative proof of claim.

18  It did not do so; indeed, it did not file an administrative

19  claim late along with the July 16th, 2009 bill and indeed, it

20  missed the second administrative claims bar date deadline of

21  November 5, 2009 which covered administrative expenses arising

22  after June 1, 2009 and was necessary for focusing on the

23  debtors' emergence on the effective date.  Instead, as I noted,

24  the first airing of the issue was in May of 2010 when counsel

25  was retained by Excellus and counsel reached out to the debtors

05-44481-rdd   Doc 20590   Filed 08/30/10   Entered 09/10/10 09:22:57   Main Document
DPH HOLDINGS CORP., ET AL.
Pg 18 of 69

1    about the issue of the late proof of administrative expense.

2         In light of that, I conclude that the reason for the

3    delay, the most important factor, weighs heavily against

4    Excellus and generally speaking, that I believe would resolve

5    the issue given the importance here of timely compliance with

6    the administrative expense bar date and the need for third

7    parties to seek such claims so they could do their analysis in

8    connection with the upcoming hearing on approval of the

9    modified plan.  In addition however, the length of the delay

10   here was substantial.  Some courts have even stated that that

11   factor's not dispositive if it's in favor of the movant if the

12   movant filed its claim one day late.  That clearly was not the

13   case here.  The claim wasn't asserted as a claim until May

14   2010, again, many months after the bar date.  And the motion

15   was not filed until even later.  The movant did act in good

16   faith but as Pioneer points out as well as Midland

17   Cogeneration, that's normally the case in these cases.

18        And I believe given the importance of the

19   administrative claims bar date, the fact that administrative

20   claims would be paid in full and the reliance on that by the

21   parties, in essence, funding the plan, I believe the danger of

22   prejudice to the debtor is significant here.  The debtor has

23   not contended that it lacks the cash to make the payment of the

24   claim or permitted to be filed late and then allowed.  However,

25   it points out that the allowance of this claim, under these

VERITEXT REPORTING COMPANY
212-267-6868          www.veritext.com          516-608-2400

1    circumstances, would open the door to requests of late filing

2    with respect to other claims and notes also that the Court has

3    ruled on similar requests already in a number of cases in this

4    case, denying several hundred motions, all highlighting the

5    validity of the so-called opening the floodgates argument which

6    is, I believe, a valid one here.

7           So in light of all those factors, I conclude that the

8    claim being late should not be deemed timely filed under Rule

9    9006.  I also conclude that the July 16th bill does not

10   constitute an informal proof of claim that should be deemed

11   timely as being only one date late.  A key element of the

12   informal proof of claim rule is that the claim had been timely

13   filed with the Bankruptcy Court and had become a part of the

14   judicial record, see Enron -- I'm sorry -- In re Enron

15   Creditors Recovery Corp., 370 B.R. 98-99 (Bankr. SDNY 2007) and

16   In re Houbigant 190 B.R. 185, 187 (Bankr. SDNY 1995).  That's

17   because, again, Chapter 11 is generally a collective process

18   and the bar date is not simply a means to duplicate the

19   debtors' own internal accounting but is to -- intended to

20   provide notice to the other parties interested in the case of

21   the claims that are actually on file and at least on a prima

22   facie validity basis, entitled to be paid.  As I stated before,

23   that was particularly important here in this case for those who

24   were looking to contribute and make concessions in respect of

25   the confirmation of the modified plan.  So for those reasons

Page 20

 1   I'll deny the motion and the debtor should submit an order

 2   consistent with that.

 3           MR. LINDENMAN:  Thank you, Your Honor.

 4           THE COURT:  Okay.  Thank you.

 5           MR. PERL:  Thank you, Your Honor.  Michael Perl on

 6   behalf of the reorganized debtors.  Your Honor, the next

 7   contested matter on the omnibus agenda is the letter that was

 8   filed by claimant Philip J. Carson.  I believe Mr. Carson's on

 9   the line and I'm happy to turn it over to Mr. Carson or provide

10   Your Honor with a brief summary of that one.

11           THE COURT:  Mr. Carson, are you on the phone?

12           MR. CARSON:  Yes, I am.

13           THE COURT:  Okay.  I want to make sure I understand

14   the history of this and I'll hear from both of you but let me

15   go through it and then see if there's anything I'm missing

16   here.

17           MR. CARSON:  Do you want me to tell you my side?

18           THE COURT:  Sorry?

19           MR. CARSON:  Do you want me to just tell you my side

20   of it or --

21           THE COURT:  Well, no.  I'm going to go through what I

22   think the --

23           MR. CARSON:  Okay.

24           THE COURT:  -- facts are and then either of you can

25   tell me if I'm missing something as far as the --

```
 1         MR. CARSON:  Okay.

 2         THE COURT:  -- you know, the step-by-step here.  As I

 3  understand it, there -- again, the debtors set an

 4  administrative claims bar date for filing claims that occurred

 5  between the start of Delphi's case, which was in October of

 6  2005 and June 1st of 2009 and that administrative claims bar

 7  date was July 15th, 2009.  They sent notice of that

 8  administrative claims bar date to you at 119 West Jefferson,

 9  Frankenmuth, Michigan.  And although you didn't meet the July

10  15th bar date, you filed a claim -- an administrative expense

11  claim with the form that was along with the notice on -- that

12  was received on August 12th, 2009 with the cover letter dated

13  August 5th, '09 to the debtors' claims agent, saying that, "I

14  explained to Mr. Kennedy who answered the Delphi legal hotline

15  that I hadn't received the administrative expense claim form

16  because I was tending to my mother in Florida for six weeks.

17  Tom instructed me to mail the form."  So that's when the claim

18  was asserted.

19         Then, Delphi objected to it as a late claim and sent

20  the objection to that same Michigan address.  And there was a

21  response that was received November 16th, 2009 by the counsel

22  for the debtors, Skadden Arps, in which you said that that --

23  in essence, you responded to the objection saying that, again,

24  because your mother was ill you were out of the state for about

25  six weeks and when you came back, you promptly contacted
```

Page 22

1   Kurtzman Carson, the claim consultants, and then got a call

2   back on July 31 from Tom Kennedy and then you filed the claim.

3   You also stated in this response that the claim amount was

4   100,000 dollars.  And finally, you said, "Please note my change

5   of address 1141 Vernon Avenue, Port Richey, Florida 34668."

6         Then the debtors, as is the -- required by the claims

7   procedures or in this case, noticed up a hearing on this

8   disputed objection and eventually, settled a proposed order on

9   you which they sent to the Michigan address.  And when there

10  was no response, submitted an order to the Court, which was

11  entered, that disallowed the claim as late.  And then after

12  that, there was a letter sent to the Court -- I'm sorry -- I'm

13  sorry -- excuse me -- to the debtors through its counsel from

14  July of this month, 25 July 2010, attaching, again, the

15  opposition and noting that you had a new address.  Is that a

16  fair summary?

17        MR. PERL:  Yes, Your Honor.  The one slight correction

18  I would make is that the claim was not noticed under the claims

19  procedures but because it was untimely, we filed a protocol

20  docket on these cases where we sent him a notice --

21        THE COURT:  Okay.

22        MR. PERL:  -- asking him to file a motion for leave to

23  file a late claim which he did not respond to.

24        THE COURT:  Okay.  Was -- the one question I had is at

25  the time that that notice went out and the order was settled,

1   did the debtors have the right address for Mr. Carson?  I know

2   that it wasn't filed with the Court but did the debtors have it

3   because of that letter?

4        MR. PERL:  Yes.  I mean, the claim was adjourned and

5   the thirty-seventh omnibus objection because we received the

6   undocketed response which listed the address but it was never

7   sent -- the letter -- Mr. Carson didn't send that to the claims

8   agent, not until April --

9        THE COURT:  Right.

10        MR. PERL:  -- of 2010, did the claims agent update the

11   address.

12        THE COURT:  But the right address was -- Skadden had

13   the right address?

14        MR. PERL:  Yes.

15        THE COURT:  Okay.  All right.  But your process is to

16   have Kurtzman send out the notices?

17        MR. PERL:  Correct.  And --

18        THE COURT:  Right.  That's fine.  Okay.  So, Mr.

19   Carson, was my summary accurate?

20        MR. CARSON:  It was good.

21        THE COURT:  Okay.

22        MR. CARSON:  Could I say something or --

23        THE COURT:  No.  Sure.  I just wanted to make sure

24   first that I had the notice points down correctly.

25        MR. CARSON:  Just a few -- a couple things I wanted to

Page 24

1    mention and although the -- I guess, if I go ahead and talk?

2         THE COURT:  Yeah, go ahead.

3         MR. CARSON:  First of all, I'm not familiar with the

4    law so I'll try to do the best I can.  And, yeah, I think at

5    first, at work and it wasn't good and anyway, you're right

6    about being late.  I was -- when I got back from Mom's, it was

7    late July and I really didn't know what to do because I'm not

8    familiar with the law real well so I had to make some phone

9    calls like you said and put the late claim in although, it was

10   kicked out.

11        And then, of course, like you said, I sent the letter

12   with -- let's see, that was 10/3/09 and find out whether I

13   should -- you know, I didn't know what the procedure was, if

14   there was one, to change an address or change my employer,

15   which I thought that was the right thing to do.  But in the

16   rebuttal letter from the law firm, which you have in front of

17   you there, it said that I should have notified KCC.  Well, I

18   don't know what a KCC is and so I notified your Court and the

19   Skadden and then also, Delphi and I thought that would've been

20   enough.

21        When the package came -- the denial package for the

22   claim, I never received it.  I didn't receive it until -- oh

23   jeez -- I think it was May of this year.  And then I

24   responded -- I really didn't know what to do so then I

25   responded like I did the 25th of July.  And that pretty well

```
 1    sums it up so --

 2              THE COURT:  Okay.

 3              MR. CARSON:  I -- you know --

 4              THE COURT:  All right.

 5              MR. CARSON:  I thought I followed the procedure

 6    properly and the notification of the address change and then my

 7    mother being ill, I couldn't really help that too much so

 8    that's why I feel under the gun, Judge so --

 9              THE COURT:  Okay.  And the letter says that the claim

10    is for 100,000 dollars, right?

11              MR. CARSON:  Well, the initial claim was one million.

12              THE COURT:  Right.  And then the response says that

13    claim is for a hundred thousand?

14              MR. CARSON:  Well, you know what?  I probably made a

15    mistake, you know?

16              THE COURT:  Okay.

17              MR. CARSON:  I guess I made a mistake.  It should have

18    been a million.

19              THE COURT:  All right.

20              MR. CARSON:  Because I lost a lot of work with the

21    chlorine gas in the lungs and everything and that's why I'm

22    down -- unemployed because I can't breather.  The cold air

23    bothers me --

24              THE COURT:  Okay.

25              MR. CARSON:  -- in the lungs.
```

Page 26

1        THE COURT:  all right.

2        MR. CARSON:  But, you know, I just tried to follow it

3    the way I just knew how to being my own legal consultant so it

4    looks like everything is good now.

5        THE COURT:  Okay.  I -- this -- I'm treating this -- I

6    know that Mr. Carson is representing himself.  He doesn't have

7    a lawyer on this.  I'm treating this as a motion under Rule

8    60(b) or Bankruptcy Rule 9024 that incorporates it and it seems

9    to me that given the address issue and the fact that the order

10   was really entered after the settlement without any --

11   settlement of the order without any opposition, that Mr. Carson

12   didn't act willfully here, which was one of the key factors of

13   the 60(b) analysis.

14       And I think he has asserted a colorable defense to the

15   underlying motion, which is again, that the claim was late and

16   therefore, should be disallowed, which is that he was out of

17   his home when the notice was received and didn't -- this is the

18   notice of the bar date now we're talking about -- and didn't

19   get back from Florida until after the bar date passed.

20   Obviously, that would be tested if the debtors -- if -- I'm

21   sorry -- if that I went further and said that their order

22   disallowing the claim should be vacated and then once you

23   consider under a request under 9006.  But on its face, it's at

24   least a plausible response.

25       So, my inclination is to grant Mr. Carson's request,

1    treat it as a request under Rule 60(b) and to grant it, which

2    means not that his claim is allowed but that it's not

3    disallowed at this point and needs to be dealt with.  Frankly,

4    my thought was that it would be more easily dealt with if it

5    was a hundred thousand dollar claim as asserted in the letter

6    objection than the one million dollar figure in the claim

7    itself.  And that may be a factor in my considering the Rule

8    9006 issue because the notice the debtors had that set forth

9    Mr. Carson's right address says a hundred thousand dollars.

10   So, unless I'm missing something -- unless you want to try to

11   persuade me otherwise, that's where I'm inclined to rule, i.e.,

12   again to sum it up, I would grant Mr. Carson's request to have

13   the order vacated that disallowed this claim under Rule 60(b).

14   And then that leaves the debtors the opportunity to object to

15   the claim.  Well, they've already objected to the claim and

16   I'll treat the objection as outstanding.  And then Mr. Carson

17   has to convince me that the reason for late filing was

18   excusable neglect.  I'm not going to do that over the phone.  I

19   don't take testimony over the phone.  I -- we need to assess

20   the witness' credibility.

21          So, if this does come up for a hearing, it will be the

22   evidentiary hearing where I have to actually see Mr. Carson

23   testify as to, you know, the basis for the lateness of the

24   original claim.  So I'm not going to require him to make a

25   formal 9006 motion because he's pro se and I'll treat his July

Page 28

1   25 -- I'm sorry -- I'll treat his letter that was received on

2   November 16th, 2009 as a motion for leave to file a late claim

3   or have the claim be treated late.  And the debtor should deal

4   with that as if their objection was outstanding.  So I'll look

5   for an order from Skadden on that relief.

6       MR. PERL:  Is that -- Your Honor, should we put that

7   on for the next omnibus hearing?

8       THE COURT:  I guess you should although I think you --

9   someone should probably talk to Mr. Carson.

10      MR. PERL:  Okay.

11      THE COURT:  Mr. Carson, I don't want to spend a lot

12  more time explaining what I just did because I thought was

13  fairly clear but -- because I have other people here and other

14  matters.  But let me just summarize it.  I've granted your

15  request to vacate the order that disallowed your claim, which

16  means that you still have a claim against the debtors.

17      MR. CARSON:  Okay.

18      THE COURT:  However, that claim hasn't been allowed

19  yet because the debtors have objected to it and they've

20  objected on the basis that it was late.  There's a rule -- a

21  bankruptcy rule, Rule 9006(b) that lets someone who filed a

22  late claim seek an order form the judge deeming that claim to

23  be timely, to be not late on the basis of excusable neglect.

24  I'm treating your letter that was received on November 16th,

25  2009 by the debtors' counsel, as a request to have your late

```
 1    claim be deemed timely filed under rule 9006 for excusable

 2    neglect.  The reason being your statement that you were out of

 3    the state for six weeks dealing with your mother's illness.

 4    That raises a factual issue.  I'll need to -- if it's not

 5    settled, need to hear testimony on it, you know, whether that

 6    in fact happened.  I need to see you when that happens.  I

 7    can't really evaluate testimony over the phone.

 8              MR. CARSON:  Right.

 9              THE COURT:  And I need to consider the other factors

10    that I need to take into account when I have such a motion,

11    which I outlined in the ruling that just preceded this with the

12    other company that I dealt with, the first matter on the agenda

13    today.  So that's what going to happen next.  I assume someone

14    from the debtor will contact you about the merits of your

15    excusable neglect issue and the merits of your underlying claim

16    and you know, I encourage both sides to consider whether the

17    matter might be settled, taking into account all the issues,

18    both the merits of the underlying claim and the merits of the

19    excusable neglect and including the fact that the letter said

20    it was a claim for 100,000 dollars and the like.  So, if it's

21    not settled, it will come on for a hearing in which I'll need

22    to see you up here.

23              MR. CARSON:  Okay.

24              THE COURT:  And that's where we stand.  And there will

25    be an order submitted by the lawyers for the debtors that lays
```

1    that out.

2         MR. CARSON:  Okay.

3         THE COURT:  Okay?

4         MR. CARSON:  Okay, thank you.

5         THE COURT:  All right.  Thank you.

6         MR. PERL:  And Your Honor, as Mr. Lyons points out, we

7    have quite a few matters up for September so we'll be in touch

8    with Mr. Carson, inform chambers and then we'll --

9         THE COURT:  Okay.

10        MR. PERL:  -- schedule that.

11        THE COURT:  That's fine.

12        MR. PERL:  Thank you.  Your Honor, that concludes the

13   omnibus hearing for today.

14        THE COURT:  Okay.

15        MR. PERL:  I'm going to turn the podium over to my

16   colleague, Mr. Lyons to -- for the claims hearing.

17        THE COURT:  Okay.

18        MR. LYONS:  Good morning, Your Honor.  John Lyons on

19   behalf of the reorganized debtors.  Your Honor, we have a

20   pretty streamlined claims hearing agenda.  I think only one

21   matter is really going to require any arguments so with your

22   Court's -- with Your Honor's permission, I'll go through the

23   agenda.

24        THE COURT:  Okay.  That's fine.

25        MR. LYONS:  First, Your Honor, we have item number one

Page 31

1    is the claim of Crown Enterprises.  That claim has already been

2    settled and we have already submitted a joint stipulation and

3    agreed order.  So that matter has been resolved.

4          The next item, item number two, is the claim of

5    Illinois Environmental Protection Agency.  The Illinois EPA

6    filed two proofs of claim, claims number 10884 and 10885.  One

7    was filed against Delphi Corp. and the other was filed against

8    Delphi Automotive Systems, LLC.  Under the plan, both those

9    estates were, in essence, combined so to avoid duplicative

10   claims, we propose to just to expunge proof of claim 10884 as

11   duplicative and leave in 10885.

12         THE COURT:  Okay and I've reviewed both claims.  They

13   are identical except for the name of the debtor so I'll grant

14   that objection --

15         MR. LYONS:  Thank you, Your Honor.

16         THE COURT:  -- which was unopposed.

17         MR. LYONS:  Thank you.  Item number three is the same

18   things at the Illinois EPA except this was filed by the Ohio

19   EPA and there again, we have three claims -- identical claims,

20   15345, 15346 and 15437 filed against three different debtor

21   entities, Delphi Automotive Systems, LLC, Delphi Automotive

22   Systems Services, LLC and Delphi Corporation.  Again, under the

23   plan, those three have been consolidated.  So for the same

24   reasons as the Illinois EPA claims, we propose to consolidate

25   and just have one claim remaining that claims -- I'm trying

Page 32

1    to -- oh, yeah.  The claims that would be expunged would be

2    15346 and 15347.  The surviving claim would be 15345.

3            THE COURT:  Okay.  And again, I've reviewed all three

4    of them.  They're the same except for the debtors listed.  So

5    for the same reasons as the Illinois DEPO, I'll grant the

6    debtors' objection to the Ohio EPA.

7            MR. LYONS:  Thank you, Your Honor.  Item number four

8    is the claim objection regarding Eoshanda Williams.  Ms.

9    Williams had filed a claim -- actually, it was filed on behalf

10   of Ms. Williams the Mississippi Workers' Compensation

11   Individual Self-Insured Guaranty Association, which we

12   understand is no longer pursuing the claim.  Nonetheless, we

13   did file our various papers and our records indicated that Ms.

14   Williams, who put in an unliquidated claim through the

15   Mississippi agency, actually did put an invoice in to the

16   debtors of 699 dollars which the debtors did pay.  And that was

17   just for an emergency room visit.  The debtors did decline her

18   claim on the merits earlier.  There has been no response to the

19   claim objection and Your Honor, we request -- we also have

20   submitted the declaration of Mr. Unrue that confirms the

21   company's belief that there is no claim.

22           THE COURT:  I'll grant this claim objection.  It's

23   unopposed and in addition, except for the amount that was

24   listed in the claim and that was paid, the claimant, who's

25   really claiming through Ms. Williams, hasn't met its initial

1  burden to allege sufficient facts to state the claim in the

2  first place.  And consequently, the proof of claim really isn't

3  entitled to prima facie validity under the bankruptcy rules.

4        MR. LYONS:  Thank you, Your Honor.  Your Honor,  I'll

5  pass item five for the moment and deal with item number six

6  which is the claim of Lee H. Young.

7        THE COURT:  Right.

8        MR. LYONS:  Your Honor, this is another claim that was

9  filed by the Mississippi Worker's Compensation Agency.  We did

10  attach to our reply a settlement release that was executed by

11  Mr. Lee.  This claim has been fully settled.

12        THE COURT:  Right.

13        MR. LYONS:  And for that reason, we ask it be

14  expunged.

15        THE COURT:  I will grant the objection on that basis.

16  And again, the objection is unopposed.  So you can submit

17  orders on all four of those.  It can be one order.  That's

18  fine.

19        MR. LYONS:  Thank you, Your Honor.  And the final

20  item -- and this is the one, which may require some argument,

21  is item number five which is the claim of the Michigan Funds

22  Administration.  Your Honor, the original claim -- or the

23  claim, I should say, that is on file by the Michigan Funds

24  Administration was to collect assessments that were due for the

25  workers' compensation scheme in Michigan that Delphi owed.  It

1     was calculated for 2008 and 2009 after we took a look at the

2     claim, we determined that all those payments were actually made

3     and were paid in full.

4            So in DPH's view, the claim that was filed by the

5     Michigan Funds Administration has been satisfied in full and

6     therefore we requested that the claim be expunged.  In the

7     midst of briefing this, Your Honor, which again, we thought

8     would be rather non-controversial, Michigan then filed an

9     amended administrative claim, adding to this claim, a liability

10    for 2009.  Your Honor, in our view -- you know, number one, if

11    they wished to pursue to that action, they should have a filed

12    a motion for leave to amend.  They -- instead, Michigan

13    unilaterally just filed an amended request.

14           In either event, Your Honor, we believe that this is

15    not a proper basis to amend a claim since it involves a very

16    distinct year, 2009, whereas the original claim was clearly

17    just for 2008.  There was no language in that -- in the

18    original request, Your Honor, that, you know, mentioned any

19    contingent possible claim for 2009.  It was clearly, on its

20    face, just for 2008.  And under the cases we cited, Your Honor,

21    in the brief that we filed yesterday, clearly, the great weight

22    of courts that have looked at this have found that when you

23    have liability for taxes, for example, in distinct years, that

24    that is a new claim and is not an appropriate basis to amend a

25    claim when the claim to be amended is just for a distinct tax

1    year.

2         So therefore, Your Honor, we believe amendment isn't

3    appropriate ere.  If Michigan so chooses to file a motion for

4    leave to file late claim, we'll respond at the appropriate time

5    but the original request by the debtor is to have that proof of

6    claim expunged on the basis that it's been satisfied in full is

7    the relief that we seek.

8         THE COURT:  Okay.

9       (Pause)

10        MR. RATERINK:  Good morning, Your Honor.

11        THE COURT:  Good morning.

12        MR. RATERINK:  Dennis Raterink appearing on behalf of

13   the Michigan Attorney General's office, representing the

14   Michigan Funds Administration.  In terms of this claim, if

15   you'll indulge me just for a minute to explain a little bit of

16   the background of the claim itself.  The nature is based on the

17   assessments levied by my clients, the Funds Administration

18   against Delphi due to its status as being a self-insured

19   employer in the state of Michigan.  It's -- that was the

20   preliminary paragraph in the request for administrative

21   payment.  The assessments in question are the sole source of

22   funding for my clients.  My clients receive no general funding

23   from the taxpayers of the state of Michigan.  This --

24   assessments that are levied against either self-insured

25   employers or insurance companies are the sole source of funding

1    for them.  The assessments are authorized by the statute in the

2    state of Michigan.  The assessments themselves and the

3    calculations used to determine the amounts of the assessments

4    are also determined by statute.

5         The formula is fairly complicated and really not

6    necessary to get into for the purpose of this argument.  I will

7    note however that one of the components to determine the amount

8    of the assessments on a year-to-year basis is the amount of

9    paid losses that the company had had in the previous calendar

10   year and paid losses for the sake of this assessment process is

11   limited to paid wage loss payments to the injured workers of

12   Delphi in the state of Michigan.  Those amounts are self-

13   reported to my client on a yearly basis and then used in the

14   calculation process.  The calculation process is then done in

15   March of every year as was stated in our original request that

16   the assessments are calculated in March, at the earliest.  In

17   this case, it's even later.  For the original assessments --

18   the original administrative expense claim, we specifically

19   indicated that for 2008, Delphi itself reported paid losses of

20   over 24.7 million dollars.  Those -- that number -- that paid

21   loss number is then put into the formula you'd use to determine

22   the assessments of the three separate funds that make up the

23   Funds Administration.  In the aggregate, the total amount of

24   those claims was over 1.1 million dollars.  Those assessments

25   were billed to Delphi in June of -- June 25th of 2009.  The

1    original administrative expense claim was filed in July 14th of

2    2009 and as Mr. Lyons correctly indicated, those assessments

3    were eventually paid by Delphi on July 29th of 2009.

4        Subsequent to that, when the assessment issue came up

5    again in 2010 for my client, the Funds Administration, they

6    again looked to the amounts that Delphi had paid in workers'

7    compensation benefits for the previous calendar year.  However,

8    Delphi had either failed or refused to submit the voluntary

9    amount to the paid losses.  It is the fund's policy and there

10   is an affidavit in our papers today to indicate that the fund's

11   policy is that if no voluntary reporting is done, the Funds

12   Administration utilizes the prior year's paid losses to form

13   the assessments for the next year.  However in this case, that

14   twenty-four million was not used because they wanted to

15   accurately reflect the idea that Delphi ceased to operate as an

16   ongoing entity with the confirmation of the plan in October of

17   2009.

18       So that twenty-four million dollars was in fact

19   apportioned over the period time between January 1st of 2009

20   and October 6th of 2009.  So the new paid loss number that was

21   used by my client was just over 18.8 million dollars.  That

22   loss figure then is plugged into the formula for the 2010

23   assessments and again, in the aggregate that those new amounts

24   are just over 820,000 dollars.  Those amounts were billed to

25   Delphi on May 28th of 2010 and the amended claim was just

Page 38

1   recently filed.

2        If I understand correctly, Your Honor, at this point,

3   the plaintiffs aren't challenging the basis or the amount of

4   the claim at this point.  The only objection is to the method

5   in which the claim was filed.  Your Honor, the -- Mr. Lyons was

6   correct; it was filed as an amended request for payment of the

7   administrative expenses.  Your Honor, if the more proper

8   designation had been a motion to allow for amended request or

9   amended payment, we would be happy to file that if the Court

10  would request that or we would just ask that the Court consider

11  that request as a motion for amended payment.  When we talk

12  about the amendment to the claim, I would point out to the

13  Court that the decision to permit an amendment of a proof of

14  claim rests within the sound discretion of the bankruptcy

15  judge.  That would be according to In re McLean 121 B.R. 704

16  (Bankr. SDNY 1990).

17       The test that's been utilized by the courts in

18  determining whether such an amendment should be allowed, goes

19  back as far as In re G.L. Miller 45 F. 2d 115 (Second Circuit,

20  1930).  The primary focus of that test is whether the initial

21  claim provided the debtor in possession with reasonable notice

22  of the later claim.  That test has been modified and added to

23  over the years.  I would cite again to In re McLean as one of

24  the examples so that it's now more of a two-part process.

25       The first part, looking again to see, is the proposed

Page 39

1    amendment reasonably related to that timely filed claim?

2    Number two, would the granting of the amendment be fair and

3    impose no undue hardship to any parties?  Your Honor, our

4    argument here is that we had one claim that's an assessment

5    claim.  If we'd had had two years of statistics and actual

6    amounts, we would have listed them all but it would have been

7    one claim.  In this case, we gave the Court the information

8    that we had and we also gave the Court information that more

9    amounts would be coming.  We did not use the word "contingent

10   claim".

11           THE COURT:  Where does it say that?  I didn't find

12   that.

13           MR. RATERINK:  I will cite right to the original

14   claim, Your Honor, in several different areas that give the

15   information and the idea that more claims, more

16   responsibilities will be due on owing.  On page 1 of the

17   request for administrative payment, it specifically indicates

18   again, as I've mentioned, that the worker's comp assessments

19   are based on the self-insured status of the company.  No

20   specific year is mentioned, no year in question of the specific

21   assessments --

22           THE COURT:  I'm sorry.  I have -- let me -- I have a

23   big notebook.

24           MR. RATERINK:  Sure.

25           THE COURT:  So you have an extra copy so I'm not

Page 40

1    fumbling through the --

2         MR. RATERINK:  I just have my original.  It's got

3    lines under it but I'd be happy to give it to Your Honor if

4    you'd like.

5         THE COURT:  Well, You're reading -- Does the debtor's

6    have an extra one?

7         MR. RATERINK:  I may have another copy in my notes.

8         THE COURT:  Okay.  Nope.  I -- my crack clerk found

9    it --

10        MR. RATERINK:  Okay.

11        THE COURT:  -- in like five seconds so -- all right.

12        MR. LYONS:  So that first reference then is page 1,

13   the first full paragraph that indicates the basis for the claim

14   stems from the status of Delphi Corporation as a self-insured

15   employer for purposes of workers' compensation claims in the

16   State of Michigan.  There's no reference to the 2009

17   specifically at that point.  It's just that -- giving the Court

18   notice, giving everyone notice that that these assessments are

19   based on Delphi's self-insured status.  Page 1 also indicates

20   that at the time of the original filing at least, that Delphi

21   continued to be a self-insured employer in the State of

22   Michigan.  That subsequently changed but that was the -- that

23   was the information at that time.

24        Page 2 of the document, again, indicates, the first

25   full paragraph, that assessments are calculated in March of

Page 41

1    each year.  And I should say, just for the record as well, Your

2    Honor, the assessments for the self-insured period during the

3    previous years of the bankruptcy had all been paid in due

4    course.  No issues had been raised, no disputes over the

5    amounts.  They had simply been paid just like they had with the

6    2009 assessment once the documentation was submitted.

7         But the report does indicate that the assessments are

8    calculated each year.  Page 2 also indicates that the

9    assessments are based on the payment of indemnity after the

10   petition/commencement date.  That would be in the third full

11   paragraph.  Obviously, to anyone reading the information --

12   reading the brief would know that Delphi had paid assessment --

13   or had paid indemnity for all of the years after the petition

14   commencement date.

15        At lastly and probably most importantly, Your Honor on

16   page 3 of the document at the top paragraph clearly lays out

17   that furthermore these assessments should be treated as

18   administrative expenses because the debtor' required to

19   continue to make payments even after it has stopped being a

20   self-insured entity.  Clearly giving the indication that

21   further assessments were possible and, in fact, likely.

22        We did not use the word contingent claim anywhere in

23   there and I will stipulate that the wording could have been

24   stronger and could have been better in that regard, however,

25   when you look at what the legal standard is, the legal standard

Page 42

1   of providing the debtor-in-possession of reasonable notice of

2   the later claim, I think it goes fully well enough to satisfy

3   that burden, fully well enough to let individuals know that

4   there is a possibility and, in fact likelihood, of more claims.

5        Is this reasonably related?  Yes.  For all the reasons

6   I've just stated.  Would granting the amendment be unfair or

7   impose undue hardships?  We would, again, argue that it would

8   not.  In the pleadings, the second supplemental proceeding

9   or -- excuse me -- the second supplemental responses from

10  debtor, they indicate a couple of issues in that regard.  They

11  claim that they would be prejudiced by the amendment because of

12  a lack of notice but, in this case, I think Your Honor, that

13  being required to pay a valid claim would not be prejudice.

14  It's simply a payment of what's due and necessary.

15        THE COURT:  Can I interrupt you?

16        MR. RATERINK:  Absolutely.

17        THE COURT:  On your -- in respect to your discussion

18  about the claim that covered 2008 --

19        MR. RATERINK:  Um-hum?

20        THE COURT:  -- and how it should have alerted people

21  that there'd also be an amount owing for 2009, how is that

22  argument different than the notion that there are only two

23  things in life that you are certain about; death and taxes.  I

24  mean the debtors' right.  There are a lot of cases that stand

25  for the general proposition that taxes assessed on an annual

1    basis must be asserted.  You can't use the amendment rubric to

2    have them relate back to an original proof of claim.

3              And, you know, people could have reasonably inferred

4    that Delphi would continue to owe taxes for the rest of 2009

5    but -- or for 2010 but, you know, this --

6              MR. RATERINK:  I would --

7              THE COURT:  -- the circuit courts basically say that,

8    you know, that that's not enough.  That you need to -- some

9    will say that you have to have a very explicit reservation or

10   some will say even with the reservation it's not enough unless

11   you actually say that you're also filing a contingent claim

12   based on some estimation.  And here, you know, Michigan did

13   have a basis to estimate which is what they did with the second

14   claim.

15             MR. RATERINK:  That's actually not correct, I don't

16   think, Your Honor.

17             THE COURT:  No?

18             MR. RATERINK:  And can I go back to that a minute?

19             THE COURT:  But -- well, yeah.  That was a two-part

20   question.

21             MR. RATERINK:  It is.

22             THE COURT:  Let's just deal with the first part.

23             MR. RATERINK:  Okay.  In regards to the tax analogy, I

24   think there are a couple of issues there.  First of all, the

25   assessments -- this is not just an inference we're asking.  We

Page 44

1    did not clearly say it's a contingent claim but it's more than

2    an inference, we would argue, that those -- the further

3    assessments would be levied.  The -- as far as providing an

4    estimation --

5            THE COURT:  But why isn't it just an inference?  I

6    mean, I don't -- it doesn't say that further assessments will

7    be levied.

8            MR. RATERINK:  No, it doesn't.  Maybe it's a strong

9    inference --

10           THE COURT:  Okay.

11           MR. RATERINK:  -- I guess would be the --

12           THE COURT:  All right.

13           MR. RATERINK:  -- what I would argue.

14           THE COURT:  Okay.

15           MR. RATERINK:  Is that there's a strong inference --

16           THE COURT:  All right.

17           MR. RATERINK:  -- within the pleadings themselves.

18           THE COURT:  Okay.

19           MR. RATERINK:  As far as the tax cases in particular,

20   Your Honor, I would ask the Court some leverage or some ability

21   to respond to those.  I just got the pleading this morning --

22           THE COURT:  Okay.

23           MR. RATERINK:  -- to be honest, regarding those cases.

24   I can't factually distinguish them because I haven't read them

25   yet.

Page 45

1          THE COURT:  All right.

2          MR. RATERINK:  They were just first brought to my

3    attention in those -- in that supplemental pleading.  So I

4    would be happy to respond to that but I'm kind of unable to at

5    this point.  I'd be happy to --

6          THE COURT:  Okay.

7          MR. RATERINK:  -- in subsequent briefing.

8          THE COURT:  All right.

9          MR. RATERINK:  As to the second issue about the

10   estimation idea, the estimation -- it's an incorrect

11   assumption.  Debtors do indicate that we were able to file an

12   administrative claim for over 5.5 million dollars on behalf of

13   the self-insured security fund.  And that was done.  And that

14   claim is still pending.

15         THE COURT:  Oh, I was making a different point.

16         MR. RATERINK:  I'm sorry.  Okay.

17         THE COURT:  When you look at the claim that was filed

18   in 2010 for 820,000 --

19         MR. RATERINK:  Yes.

20         THE COURT:  -- and change.

21         MR. RATERINK:  Oh, that estimation.

22         THE COURT:  Yeah.  It basically says we did make this

23   adjustment because the debtors stopped being self-insured at a

24   certain point.  But the method is one that they acknowledge --

25   the claim acknowledges where a self-insured employer fails to

Page 46

1    provide the required information, the funds administration

2    estimates the companies losses based on the indemnity benefits

3    paid out by the company in the previous year.  So, you

4    could've, based upon the 1.3 million dollar claim calculations,

5    have done that same thing that same day.

6            MR. RATERINK:  It's possible.  You're right.  That

7    could have been done.  The reason it wasn't done is that the

8    thought process was this claim was general enough to give

9    notice to the idea of the yearly assessments.  That once the

10   actual assessments were properly calculated that those amounts

11   would be submitted in an amended claim and that there wouldn't

12   have to be -- we were hoping that we'd actually get the actual

13   numbers.  We, in the end here, had to do another estimated

14   claim like I just explained.  We were hoping to actually have

15   the actual reporting though to give a particular amount that

16   would be accurate and not subject to further litigation or

17   determination.

18           So that's why it wasn't done at that point in time was

19   that we felt that we'd had the full ability to amend the claims

20   later on with the numbers that would be more particular to the

21   claim.  At this point -- you know, in retrospect, in would have

22   maybe been better to do so.  But we felt that enough notice had

23   been presented at the time to let everyone know that there

24   would be further assessments and thought we would just wait

25   until the actual amounts had been determined.

1          THE COURT:  Okay.

2          MR. RATERINK:  I don't know if you want me to respond

3     to debtors' argument about the 5.5 million dollar claim and why

4     that could have been used or not.

5          THE COURT:  Yeah.  Sure.

6          MR. RATERINK:  Okay.  That -- in essence, they're

7     arguing that since we had been able to come up with a 5.5

8     million dollar administrative claim on behalf of the self-

9     insured security fund, that that should have given us the basis

10    for determining the amounts that may be owed in terms of the

11    fund's administration assessments.  The problem with that is

12    that the self-insured security fund claim was based on an

13    estimate of the total amounts of money that the self-insured

14    security fund would have to pay out over the lifetime of all of

15    the workers that may fall under the liability -- payment

16    liability of the self-insured security fund.

17         The assessments are calculated on a paid loss -- on a

18    year by year basis which is a completely different mechanism.

19    It's completely different amounts of money.  Are we arguing

20    that it couldn't have been -- we couldn't have put a number in

21    there, it couldn't have been a reasonable facsimile, we

22    couldn't have used last year's -- no we're not arguing that.

23    But the 5.5 million dollars really has no relationship to the

24    amount of the esti -- to the amount of the assessment

25    calculation.

1        In the end, Your Honor, we would argue, Your Honor,

2   that no one is being prejudiced by this, that -- we will agree

3   with debtors' argument that there's no windfall to any other

4   parties.  The floodgates argument is used here, as well, as a

5   potential source of prejudice.  Your Honor, we'd argue two

6   things in regard to the floodgates argument.  Number 1, any

7   claimant that had an allegation of an amended claim would be

8   subject to the same scrutiny that this case is going through at

9   this point and there's simply evidence.  There may be evidence

10  of cases in terms of the late filing but this is not a late

11  filing case; it's an amended -- it's an amended filing case.

12        THE COURT:  But if I find that it is late, then -- I

13  mean, the way I view the second prong of this test on

14  amendments is that -- it's in essence a wrinkle on 9006.  If

15  the claimant is alleging, not withstanding that it -- I mean it

16  seems to me that the first step has to be that it relates back

17  in which case it's not really late.

18        MR. RATERINK:  Correct.

19        THE COURT:  So -- and there's a reason why it's the

20  first step.  That's' the first thing you look at.  And if it

21  doesn't relate back, some courts have said you can still

22  deem -- you know, deem it to be an amendment.  But those courts

23  are ones that, generally speaking, do it on pretty limited

24  grounds.  For example, in the Seventh Circuit case that's cited

25  a lot, Unroe.  The debtor actually scheduled the taxes.  So it

1   was on the schedule.  People saw it there, you know?  They knew

2   it.

3          On the other hand, it's often used by courts even

4   where it was said to relate back, it was still unfair because

5   it was such a big increase.

6          MR. RATERINK:  Oh, okay.

7          THE COURT:  You know?  And so I'm not sure that it

8   really changes the analysis much if the first step isn't

9   satisfied from Pioneer.  I mean, I think -- you know, if

10  someone schedules the claims in their schedules and then gets a

11  plan confirmed on that basis, it's hard to argue that there's

12  any prejudice because, you know, the plan was confirmed on that

13  basis.  But I'm not sure that really applies here.

14         MR. RATERINK:  Understand.  And you're relating it to

15  the floodgates argument saying that other parties could

16  potentially try to come in --

17         THE COURT:  Well, I would view it basically like, you

18  know, under Pioneer at that point.

19         MR. RATERINK:  Okay.  The last argument that had been

20  raised by debtors is the idea that the funds administration had

21  not proposed any ration or reason why the amended claim hadn't

22  been filed earlier or hadn't been filed before the deadline.

23  Well the reality was the original claim was filed not too long

24  before the deadline and we simply did not have the information.

25  If they were looking for the particular estimates, we didn't --

Page 50

1    or the particular assessments, we didn't have the information

2    and that's why we didn't include it in the first round.  We

3    were simply waiting for the accumulation of the information to

4    amend the claim late at a later time and give the Court the --

5    as precise number as possible.

6            THE COURT:  Okay.

7            MR. RATERINK:  Okay.  Thank you, Judge.

8            THE COURT:  Okay.  Thank you.

9            MR. LYONS:  Just a couple of very quick points, Your

10   Honor.  You know, I mean, taking a look, even in a fair minded

11   way, looking at the original proof of claim they filed.  I

12   mean, it was clearly for 2008 and, you know, with all due

13   respect to counsel, the second paragraph of the original

14   request said in 2009 the funds administration determined the

15   amount of Delphi's assessment for each fund.  So I mean,

16   Michigan, in its administrative request, determined the amount

17   which they thought was owed.  There is no language about

18   potential future adjustments or anything like that.

19           And if you would compare it, Your Honor, against the

20   amended request that they file, on the third page the second

21   paragraph, there they very clearly state that -- or reserve the

22   right that, you know, as loss numbers are possible being

23   calculated at this time, the funds administration is providing

24   notice of a contingent claim for more assessments in the

25   future.  So clearly if they were seeking to put in a contingent

Page 51

```
 1   claim for late assessment periods, that would bet he way to do

 2   it and it was not done in the original administrative request.

 3   So I think that's fairly clear.

 4          And again, I think -- you know, Your Honor, if Your

 5   Honor wants to take more briefing, that's fine.  I think it is

 6   pretty crystal clear though that this is a distinct period of

 7   time and distinct claim.  And again, I think the -- as Your

 8   Honor's identified, you can't use an amendment as a back door

 9   to a bar date.  And that's what I think clearly is the case

10   here.

11          And there would be very real prejudice.  You know,

12   number one, we don't even know what the true assessment amount

13   is according to the amended request for administrative claim.

14   Who knows if Michigan doesn't come up with some other

15   assessments to try to make up for the losses on the untimely

16   prepetition claim that they filed and Your Honor expunged and

17   has been affirmed on appeal.

18          So, Your Honor, there's just a real risk here of a

19   real floodgates argument and prejudice if this amendment is

20   allowed to stand.

21          THE COURT:  Okay.

22          MR. RATERINK:  Can I respond just real briefly, Judge.

23          THE COURT:  Sure.

24          MR. RATERINK:  Two things.  As far as the language in

25   the new claim, I will stand by my argument that we thought the
```

1   original claim fully gave notice as to the possibility, and in

2   fact probability, of further assessments.  Obviously, it didn't

3   sufficiently because it was objected to so it's coming around

4   this time, we did add further language to make it absolutely

5   clear beyond a shadow of a doubt that we were asking for that

6   as well.

7            You know, I do take a little bit of offense on the

8   idea that my client would make up further assessments --

9            THE COURT:  I thought you might but I think it was

10  like a parade of horribles argument.

11           MR. RATERINK:  Okay.  The reality is these assessments

12  are calculated by statutory formula.  There's the -- this is

13  the amount that we use.  If anything, the amounts -- if the

14  claim is allowed to continue and is challenged as to the

15  accuracy of the amounts, we may have to -- if we actually get

16  the amount of the information that's voluntarily supplied in

17  most cases, it could go up, it could go down.  I have no idea.

18  The reality of it is we put the assessment based on the amount

19  that we had access to at the time.

20           THE COURT:  Okay.

21           MR. RATERINK:  Thank you.

22           THE COURT:  All right.  I'm going to take, literally,

23  just like a two-minute break and then I'll be right back.

24  (Break)

25           THE CLERK:  All rise.

1        THE COURT:  Please be seated.  All right.  We're back

2    on the record In re DPH Holdings.  I have before me the

3    objection by the debtors to a proof of claim by the Michigan

4    Funds Administration.  The procedural history of this matter is

5    a little convoluted and it's worth noting in the context of my

6    ruling.  The Michigan Funds Administration filed an

7    administrative expense claim on the bar date for such claims,

8    July 15th, 2009, for amounts owing based on Delphi

9    Corporation's status as a self-insured employer.  That claim

10   was for $1,130,191.92.

11       The proof of claim -- or proof of administrative

12   expense, to be more accurate, stated that the claim is asserted

13   pursuant to the Michigan Workers' Disability Compensation Act,

14   MCL 418.551, and assessments to be made thereunder for amount

15   of indemnity to be paid in respect to the proceeding year.  As

16   the claim states, assessments are calculated in March of each

17   year and it's clear from the claim and the argument today that

18   assessments are calculated and made on an annual basis.

19       The claim states that in 2009, the Funds

20   Administrative determined the amount of Delphi's assessment for

21   each fund which is -- I've noted just now, would be for the

22   prior year of 2008.  And that that amount aggregates the

23   $1,130,191.92 asserted in the claim.  The claim does not assert

24   any claim for the 2009 year or reserve the right to do so but

25   merely lays out the claim as I've described it although it does

Page 54

1    generally describe the statute and the obligation of a self-

2    insured employer such a Delphi to comply with the statute.

3         Delphi does not dispute that claim and it has been

4    paid.  However, in the last week, the Michigan Funds have filed

5    another claim -- or again, more accurately and administrative

6    expense claim dated August 23, 2010.  This administrative

7    expense claim is also for amounts under MCL 418.551 that the

8    Michigan Funds Administration contends is owed by -- or are

9    owed by Delphi for the period starting with January 1, 2009

10   through the date that Delphi ceased being a self-insured

11   employer who would be covered by that statue.

12        Again, the claim states that assessments are

13   calculated under the statute in March of each year and are in

14   respect of the preceding year, i.e. that they're done on an

15   annual basis.  Further, the administrative expense claim form

16   states on page 2 "in circumstances where a self-insured

17   employer fails to require their required information, the funds

18   administration estimates the company's losses based on the

19   indemnity benefits paid out in the previous year.  In this

20   case, in 2008, Delphi reported the sum of $24,703,648.45 in

21   workers' compensation indemnity benefits."

22        The August 23 administrative expense claim is premised

23   upon that same figure prorated through the date October 6th,

24   2009 when Delphi ceased being a self-insured employer who paid

25   Michigan workers' compensation benefits.  Based on that

Page 55

1    proration, the August 23 claim asserts a claim of $820,654.07

2    as an administrative expense owed.  The claim would be untimely

3    in this case because it covers the period that is covered by

4    two administrative claims bar dates established by this Court

5    in prior orders.

6              First, the Court established an administrative claims

7    bar date of July 15th, 2009 for any administrative claim that

8    arose prior to June 1, 2009.  That is from the petition date in

9    October of 2005 through June 1, 2009.  The second and claims

10   bar date order set by the Court set a deadline of November 5th,

11   2009 for administrative expense claims arising on or after June

12   1, 2009.

13             The modified Chapter 11 plan for the Delphi debtors

14   was confirmed on July 30th, 2009 and went effective on October

15   6th, 2009.  As I've stated repeatedly in other hearings dealing

16   with requests to file late claims, the determination of

17   allowable administrative claims was an important factor in the

18   court's consideration whether to approve confirmation of the

19   modified plan in July of 2009 as well as an important factor in

20   whether the DIP lenders would, in fact, negotiate the treatment

21   of their claims which were entitled to a hundred cents on the

22   dollar as administrative claims as well as being fully -- as

23   well as being secured on the debtors' assets and agreeing to

24   provide funding for the feasibility of the plan.

25             Thus the two administrative claims bar bates served a

Page 56

1    very important and practical purpose in this case and were not

2    merely procedural gauntlets.  The Michigan Funds Administration

3    does not seek leave to file a late claim, notwithstanding the

4    timing of the August 23, 2010 claim in light of the two bar

5    date orders, but instead has couched that claim as an amendment

6    of the concededly timely claim for the 2008 year of

7    $1,130,191.92.  Although this issue came up very recently, the

8    debtors have responded to the contention that the August 23

9    claim was merely an amendment of the earlier claim and I

10   believe have convincingly refuted that assertion that no, this

11   is a matter of law in fact.

12        The funds administration has requested additional time

13   to brief the issue of whether the claim is, in fact, an

14   amendment or a new claim.  However, I believe that the standard

15   in this circuit and generally is clear enough so that I will

16   not need additional briefing.  In addition, I'll not that it

17   was the Michigan Funds Administration's choice to file the

18   claim and amended claim and therefore one could assume that it

19   would have anticipated the response to it by DPH including the

20   case law that DPH just cited and that the Court had located.

21        On the other hand, although I will issue my bench

22   ruling today and ask DPH to submit an order, the funds

23   administration, of course, has its rights under bankruptcy

24   rules 9023 and 9024 as well as Section 502(j) of the code.  But

25   I believe it's proper to couch its request for additional

1    briefing in that context as opposed to delaying the ruling on

2    this matter.

3         The decision to permit an amendment to a proof of

4    claim rests within the sound discretion of the bankruptcy

5    judge.  In re: McLean Industries Inc., 121 B.R. 704, 708

6    (Bankr. S.D.N.Y. 1990).  And generally amendments to claims are

7    freely allowed when "the purpose is to cure a defect in the

8    claim as originally filed, to describe the claim with greater

9    particularity or to plead a new theory of recovery on the facts

10   set forth in the original claim."  Mainland Co-Generation

11   Limited Partnership v. Enron Corporation, In re: Enron

12   Corporation 419 F.3d 115, 130 (2nd Cir. 2005).  Quotation

13   citation omitted.

14        The Court must however "subject post bar date

15   amendments to careful scrutiny to assure that there was no

16   attempt to file a new claim under the guise of amendment."  Id.

17   i.e. in particular where if it was a new claim, it would be

18   late as opposed to relating back to the prior filed claim.  A

19   determination of whether an amendment to a proof of claim is

20   permissible, requires a two-step inquiry.

21        First, courts examine "whether there was a timely

22   assertion of a similar claim or demand evidencing an intention

23   to hold the estate liable."  Id.  The tests were determining

24   the foregoing.  It's largely the same as the tests governing an

25   amendment to a pleading under Rule 159C) of the federal Rules

1   of Civil Procedure so that it dates back to the date of the

2   original filing.

3        Although it's not clear and in fact probably not the

4   case that 7015 would specifically apply to a contested matter

5   with respect to a claim objection.  See generally Id. and In re

6   Global Crossing Limited 324 B.R. 503, 508 (Bankr. S.D.N.Y.

7   2005).  That is "the Court must decide whether there is a

8   sufficient commonality of facts between the allegations

9   relating to the two causes of action to preclude the claim of

10  unfair surprise, i.e. the claim relates back to the original

11  pleading.  Id. See also In re Integrated Resources Inc., 157

12  B.R. 66, 71 (S.D.N.Y. 1993).

13       Secondly, if the amendment does relate back to the

14  timely file claim, by analogy at least, to Rule 7015 and the

15  authorities that I've cited, Court should engage in an

16  equitable consideration of the particular facts of the case to

17  determine whether it would be equitable to allow the amendment.

18  In re -- I'm sorry, Midland Cogeneration 419 F.3d at 133.

19  Under that equitable analysis, multiple factors are considered

20  including one, whether there was undue prejudice to the

21  opposing party, two, bad faith or dilatory behavior on the part

22  of the claimant, whether other creditors would receive a

23  windfall were the amendment not allowed, whether other

24  claimants might be harmed or prejudiced, the justification for

25  the inability to file the amendment at the time the original

Page 59

1    claim was filed.  See Id. And In re McLean Industries Inc., 121

2    B.R. 704, 708 (Bankr. S.D.N.Y. 1990).

3         The second circuit in the Midland Cogeneration case,

4    phrased the two prong inquiry as one that would in effect

5    preclude the second prong if the first prong is not satisfied.

6    That is the Second Circuit said if the amendment does relate

7    back, then the Court would consider the particular facts of the

8    case.  Judge Lifland has similarly phrased the two-[art test

9    twice; in In re Spiegel Ink 337 B.R. 816, 820 (Bankr. S.D.N.Y.

10   2006) and then in In re Calpine Corporation at least as

11   reported by the district court in its opinion appearing at 2007

12   U.S. Dist. LEXIS 86514 at pages 16-21 (S.D.N.Y. November 21,

13   2007).

14        Nevertheless, in both of those cases as well as in

15   Midland Cogeneration, although the courts found that the claim

16   would not relate back as being based on new facts, they

17   nevertheless went through the second prong analysis.  Most

18   clearly in Midland Cogeneration, the Second Circuit said that

19   that analysis where the claim does not relate back, you should

20   essentially be on the Pioneer test grounds as if it was to be a

21   new proof of claim that was late.  Although it noted that there

22   may well be emphasis in which a claim considered as an

23   amendment to an arrear filed claim might be permitted and, in

24   fact, probably should readily be permitted.  And further, there

25   might be instances where even if a claim related back, it

DPH HOLDINGS CORP., ET AL.

Page 60

1   shouldn't be permitted given the factors that I've -- or the

2   second prong factors that I had previously stated.  See 419

3   F.3d at 133.

4          Based on my review of the applicable case law and the

5   two proofs of administrative expense claim forms and

6   attachments field by the Michigan Funds Administration, I

7   conclude that it is not satisfied the first prong, that it

8   would not properly relate back.  That is that the August 23

9   claim would not properly relate back to the July 14th 2009

10  claim.  That is because the claim for the 2009 assessments set

11  forth in the August 23, 2010 claim is on the face of the

12  claims, and under the law, clearly a new claim for a new year

13  and not based on the facts of the assessment set forth in the

14  July 14th claim.

15         The courts have noted that there is some conflict in

16  the case law, generally dealing with tax claims, although some

17  tax claims where they're for unemployment insurance assessments

18  and the like closely resemble the present claims at issue,

19  should be treated as separate claims if they are based upon

20  annual calculations as these claims are.  And, there's no clear

21  reservation of rights or assertion of an unliquidated

22  contingent claim for the future set forth in the original proof

23  of claim.

24         The cases taking that position, I believe, are the

25  better reason cases and the cases that are sometimes cited as

1    taking a contrary position I believe are generally based upon

2    different facts where either the original proof of claim made

3    it clear that the claim was subject to adjustment or the

4    underlying tax was not one that was calculated on an annual

5    basis but was instead a running quarterly assessment or

6    calculation.

7         Therefore, I believe that based upon such cases as In

8    re Unroe, 937 F.2d 346 (7th Cir. 1991), In re PT-1

9    Communications Inc., 292 B.R. 482 (Bankr. E.D.N.Y. 2003) and In

10   re Sage-Dey Inc., 170 B.R. 46 (Bankr. N-D-N-Y 1994) and In re

11   Limited Gaming of American, Inc., (Bankr. N.D. Okla. 1997) the

12   August 23, 2010 claim should be viewed as a new claim for the

13   new 2009 assessment year.  This is distinguishable, therefore,

14   from the claims that were deemed to related back in Industrial

15   Commission on New York V. Schneider 162 F.2d 847 (2d Cir. 1947)

16   for the reasons discussed by the Court in In re Sage-Dey Inc.

17        More than arguable, that should end the inquiry under

18   the Midland Cogeneration case.  However, as the courts did in

19   Midland Spiegel and Calpine, and as some of the courts that

20   I've -- some of the decisions that I've just cited have done, I

21   have also considered the second prong of the test

22   notwithstanding that this should not be viewed as amendment but

23   rather as a new claim.  And I believe, based upon the facts,

24   that those equitable considerations which Midland says where

25   the claim is late, should, for all intensive purposes, follow

Page 62

1    Pioneer would not permit the claim to be treated as an

2    amendment.

3           First and most important I believe it was within --

4    well within the funds administration's control to file the

5    claim for 2009 within the -- either of the two bar dates set by

6    the Court, either the July 15th bar date or the November 5th,

7    2009 bar date.  As the claim itself recognizes, the funds

8    administration is capable of estimating the amount of the claim

9    based on the prior year's losses which it had already addressed

10   in the July 14th, 2009 claim.

11          Moreover, even if it couldn't have done that, it could

12   have filed a contingent and unliquidated claim in which case

13   the amendment would have  been -- the amendment that would

14   have filled in the numbers would have been regularly treated as

15   an amendment unless those numbers were way beyond reasonable

16   expectations.  Instead, the funds administration waited until

17   August 23 of this year to file the claim which was obviously

18   many months after the second bar date and over a year after the

19   first one as well as many months after the effective date of

20   the plan and over a year after the approval of the confirmation

21   of the amended plan.

22          Moreover, the Pioneer factors, as the finds

23   administration knows, would argue strongly against allowing the

24   claim to be deemed timely filed at this time given that the

25   timing of the claim, as I've just described, was well within

Page 63

1    the fund administration's control given the delay and given the

2    potential prejudice to the debtor and creditors because a

3    timely administrative claim for 2009 was not asserted.  See

4    generally Midland Cogeneration 419 F.3d 115 as well as this

5    court's -- a district court's ruling on other claims asserted

6    in this case on an untimely basis by the funds administration.

7         See also In re Delphi Corporation 2009 Bankr. LEXIS

8    571 (Bankr. S.D.N.Y. January 20, 2009) where the court noted

9    that uncertainty by a claimant in this type of situation as to

10   the amount of its claim or even, in fact, whether it has a

11   valid claim, is not a sufficient basis for the claimant's

12   failure to file a timely claim in the face of a bar date notice

13   that states that all claims, including contingent and

14   unliquidated claims, would be barred if not timely asserted.

15   Again, here the claim was readily calculatable on an estimated

16   basis as well as being assertable on contingent and

17   unliquidated basis and it wasn't.

18        Similar arguments were raised by the claimant in In re

19   Spiegel 337 B.R. 816 and found not to be persuasive under the

20   second prong of the amendment test by Judge Lifland who saw no

21   basis for the claimant to have waited as long as it did to file

22   the second claim, ostensibly on the basis that it was waiting

23   to calculate the exact amount of damages.

24        So, I will deny the request to have the August 23,

25   2010 claim deemed an amendment.  Technically, there is no

Page 64

1    request before me to have that claim be deemed a late filed

2    claim -- a timely filed claim, excuse me -- not withstanding

3    that it's late under Rule 9006 although, as I've noted, after

4    Midland, the Pioneer analysis does seem to dovetail into the

5    second prong of the amendment analysis and having applied it, I

6    conclude that there's no basis to deem the second claim an

7    amendment to the timely first claim that would relate back to

8    that date.

9          So, I guess the funds administration would be free to

10   file a request under Rule 9006(b) with respect to the August 23

11   claim but the debtors' right under the doctrines of both claim

12   and issue preclusion are fully preserved if such a motion would

13   be made.  So, in light of that ruling, the debtor should submit

14   an order that provides for the disallowance of the August 23

15   claim as being untimely and not an amendment, obviously, to the

16   prior claim.

17         MR. LYONS:  Very good, Your Honor.  And we'll also add

18   the expungement of the original claims since that's been paid.

19         THE COURT:  Well, that's been paid so I think

20   that's -- yeah, that's fine.

21         MR. LYONS:  Okay.  Very good.

22         MR. RATERINK:  Thanks, Judge.

23         THE COURT:  Okay.  Thank you.

24         MR. LYONS:  Just two quick housekeeping matters, Your

25   Honor.  We are now winding down the claims process as you can

1    see.  We have about 120 administrative claims and 80

2    prepetition claims so we're coming to the end.  And as a matter

3    of fact, we intend to file a motion to close about twenty of

4    the cases since those cases no longer have any claims or -- and

5    so therefore could be closed under the --

6            THE COURT:  Okay.

7            MR. LYONS:  -- under the local rule.  Also, September

8    looks to be a pretty busy day for claims.

9            THE COURT:  This is the other 123 that I'm going to

10   deal with?

11           MR. LYONS:  Yeah.  Not all 123 but we may need a

12   spillover date.  We, you know, don't want to tie up the Court's

13   calendar unnecessarily but --

14           THE COURT:  That's fine.  You should get one.  One or

15   more.

16           MR. LYONS:  Okay.  Very good.

17           THE COURT:  As you could see, as a practical matter on

18   disputed claims, I can pretty much deal with two or three.

19           MR. LYONS:  Right.

20           THE COURT:  But that's about it.

21           MR. LYONS:  Right.  That's what we've been trying to

22   do.

23           THE COURT:  Okay.

24           MR. LYONS:  Okay.  Thank you, Your Honor.  That's all

25   I have.

1          THE COURT:  Okay.

2          MR. RATERINK:  Thanks.

3          THE COURT:  We're off the record now.

4      (Proceedings concluded at 12:36 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 67

                                           I N D E X

                                              RULINGS

                                         Page        Line

1  Excellus Health Plan,       20           2
2  Inc.'s motion for late
3  Filing, Denied

4  Mr. Carson's motion to      27           13
5  vacate the order that
6  disallowed his claim,
7  Granted

8  Reorganized debtors'        31           14
9  objection to claim
10 number 10884 as
11 duplicative, Granted

12 Reorganized debtors'        32           6
13 objection to claims
14 numbered 15346 and 15347
15 as duplicative, Granted

Page 68

```
 1

 2                              I N D E X (cont)

 3

 4                              RULINGS

 5                         Page      Line

 6

 7   Reorganized debtors'     32        22

 8   objection to Eoshanda

 9   Williams' claim, Granted

10

11   Reorganized debtors'     33        15

12   objection to Lee H.

13   Young's claim, Granted

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                    C E R T I F I C A T I O N

3

4    I, Sara Bernstein, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    _____

8              Sara Bernstein

9

10   Veritext

11   200 Old Country Road

12   Suite 580

13   Mineola, NY 11501

14

15   Date: August 30, 2010

16

17

18

19

20

21

22

23

24

25