**Hearing Date and Time:  September 24, 2010 at 10:00 a.m. (prevailing Eastern time)**
**Supplemental Response Date and Time:  September 22, 2010 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

         - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036

Attorneys for DPH Holdings Corp., et al.,
    Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                                    :
         In re                                      :     Chapter 11
                                                    :
DPH HOLDINGS CORP., et al.,                         :     Case Number 05-44481 (RDD)
                                                    :
                                                    :     (Jointly Administered)
                 Reorganized Debtors.               :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

REORGANIZED DEBTORS' SUPPLEMENTAL REPLY TO RESPONSES OF CERTAIN
CLAIMANTS TO DEBTORS' OBJECTIONS TO PROOFS OF CLAIM
NOS. 10504, 10686, 11045, 11981, 11982, 11984, 11986, 11987, AND 11990

("SUPPLEMENTAL REPLY REGARDING THE TREMONT SITE CLAIMS")

DPH Holdings Corp. and certain of its affiliated reorganized debtors in the above-captioned cases (together with DPH Holdings Corp., the "Reorganized Debtors") hereby submit the Reorganized Debtors' Supplemental Reply To Responses Of Certain Claimants To Debtors' Objections To Proofs Of Claim Nos. 10504, 10686, 11045, 11981, 11982, 11984, 11986, 11987, And 11990 (the "Supplemental Reply"), and respectfully represent as follows:

A.    Preliminary Statement

1.    On October 8 and 14, 2005, Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, including Delphi Automotive Systems LLC ("DAS LLC"), former debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").

2.    On October 6, 2009, the Debtors substantially consummated the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified (the "Modified Plan"), which had been approved by this Court pursuant to an order entered on July 30, 2009 (Docket No. 18707), and emerged from chapter 11 as the Reorganized Debtors.

3.    On August 26, 2010, the Reorganized Debtors filed the Notice Of Sufficiency Hearing With Respect To Debtors' Objection To Proofs Of Claim Numbers 10504, 10686, 11045, 11981, 11982, 11984, 11986, 11987, And 11990 and Reorganized Debtors' Objection To Proofs Of Administrative Expense Claim Numbers 19797, 19798, 19799, 19800, And 19802 (Docket No. 20552) (the "Sufficiency Hearing Notice").

4.    The Reorganized Debtors filed the Sufficiency Hearing Notice and are filing this Supplemental Reply to implement Article 9.6(a) of the Modified Plan, which provides

2

that "[t]he Reorganized Debtors shall retain responsibility for administering, disputing, objecting

to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors and

making distributions (if any) with respect to all Claims and Interests."  Modified Plan, art. 9.6(a).

5.    By the Sufficiency Hearing Notice and pursuant to the Order Pursuant To

11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014

Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices

And Procedures Governing Objections To Claims, entered December 7, 2006 (Docket No. 6089)

(the "Claims Objection Procedures Order"), the Order Pursuant To 11 U.S.C. §§ 105(a) And

503(b) Authorizing Debtors To Apply Claims Objection Procedures To Address Contested

Administrative Expense Claims, entered October 22, 2009 (Docket No. 18998), the Eleventh

Supplemental Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016,

7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Objections To

Claims And (ii) Certain Notices And Procedures Governing Objections To Claims, entered April

5, 2010 (Docket No. 19776), and the Notice Of Rescheduling Of Fifty-Ninth Omnibus Hearing

And Thirty-Seventh Claims Hearing (Docket No. 20417), the Reorganized Debtors scheduled a

hearing (the "Sufficiency Hearing") on September 24, 2010 at 10:00 a.m. (prevailing Eastern

time) in this Court to address the legal sufficiency of each proof of claim filed by the claimants

listed on Exhibit A to the Sufficiency Hearing Notice and whether each such proof of claim and

proof of administrative expense claim states a colorable claim against the asserted Debtor.

6.    This Supplemental Reply is filed pursuant to paragraph 9(b)(i) of the

Claims Objection Procedures Order.  Pursuant to paragraph 9(b)(ii) of the Claims Objection

Procedures Order, if a Claimant wishes to file a supplemental pleading in response to this

Supplemental Reply, the Claimant shall file and serve its response no later than two business days before the scheduled Sufficiency Hearing – i.e., by **September 22, 2010.**

B.      Relief Requested

7.      By this Supplemental Reply, the Reorganized Debtors request entry of an order disallowing and expunging certain proofs of claim against the Debtors in their chapter 11 cases.

C.      The Tremont Claims

8.      Each of the proofs of claim listed on Exhibit A[1] hereto (the "Tremont Claims") was filed by an entity that is liable for contamination existing at the Tremont City Landfill Site in Tremont, Ohio (the "Site") and seeks contribution from the Debtors for the costs to investigate and remediate the environmental contamination at the Site.  During their review of the proofs of claim filed in these cases, the Reorganized Debtors determined that the Tremont Claims assert liabilities that are not owing pursuant to the Reorganized Debtors' books and records.  The Reorganized Debtors believe that none of the entities listed on Exhibit A are creditors of the Debtors with respect to the Site.  Accordingly, this Court should enter an order disallowing and expunging each of the Tremont Claims.

D.      Claimants' Burden Of Proof And Standard For Sufficiency Of Claims

9.      The Reorganized Debtors respectfully submit that the Tremont Claims fail to state a claim against the Debtors under rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The claimants asserting the Tremont Claims have not proved any facts to support a right to payment by the Reorganized Debtors on behalf of the

---

[1]     Exhibit A sets forth the following information regarding each proof of claim: the applicable claim number, the date the claim was filed, the name of the claimant, the applicable omnibus objection, the date of the applicable omnibus objection, the docket number of the claimant's response, the name of the debtor entity against which the claim is asserted, and the basis for the Reorganized Debtors' objections to the Claims.

Debtors. Accordingly, the Debtors' objections to each Tremont Claim should be sustained with respect to such proofs of claim and each Tremont Claim should be disallowed and expunged in its entirety.

10.    The burden of proof to establish a claim against the Debtors rests on the claimants and, if a proof of claim does not include sufficient factual support, such proof of claim is not entitled to a presumption of prima facie validity pursuant to Bankruptcy Rule 3001(f). In re Spiegel, Inc., No. 03-11540, 2007 WL 2456626, at *15 (Bankr. S.D.N.Y. Aug. 22, 2007) (the claimant always bears the burden of persuasion and must initially allege facts sufficient to support the claim); see also In re WorldCom, Inc., No. 02-13533, 2005 WL 3832065, at *4 (Bankr. S.D.N.Y. Dec. 29, 2005) (only a claim that alleges facts sufficient to support legal liability to claimant satisfies claimant's initial obligation to file substantiated proof of claim); In re Allegheny Int'l., Inc., 954 F.2d 167, 173 (3d Cir. 1992) (in its initial proof of claim filing, claimant must allege facts sufficient to support claim); In re Chiro Plus, Inc., 339 B.R. 111, 113 (Bankr. D.N.J. 2006) (claimant bears initial burden of sufficiently alleging claim and establishing facts to support legal liability); In re Armstrong Finishing, L.L.C., No. 99-11576-C11, 2001 WL 1700029, at *2 (Bankr. M.D.N.C. May 2, 2001) (only when claimant alleges facts sufficient to support its proof of claim is it entitled to have claim considered prima facie valid); In re United Cos. Fin. Corp., 267 B.R. 524, 527 (Bankr. D. Del. 2000) (claimant must allege facts sufficient to support legal basis for its claim to make a prima facie case).

11.    For purposes of sufficiency, this Court has determined that the standard of whether a claimant has met its initial burden of proof to establish a claim should be similar to the standard employed by courts in deciding a motion to dismiss under Bankruptcy Rules 7012 and 9014. See Transcript of January 12, 2007 Hearing (Docket No. 7118) (the "January 12, 2007

Transcript") at 52:24-53:1.  Pursuant to that standard, a motion to dismiss should be granted if a claimant fails to make "'[f]actual allegations . . . enough to raise a right to relief above the speculative level [to a plausible level],' assuming (of course) that all the allegations in the complaint are true." Bradley v. Rell, No. 1:07-CV-0148, 2010 U.S. Dist. LEXIS 29606, at *13 (N.D.N.Y. Mar. 25, 2010) (quoting Bell Atl. Corp. v. Twombly, 550 U.S 544, 555 (2007)). Essentially, the claimant must provide facts that plausibly support a legal liability against the Debtors.

12.     This Court further established that the sufficiency hearing standard is consistent with Bankruptcy Rule 3001(f), which states that "a proof of claim executed and filed in accordance with these Rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f) (emphasis added).  Likewise, Bankruptcy Rule 3001(a) requires that "the proof of claim shall conform substantially to the appropriate Official Form" and Bankruptcy Rule 3001(c) requires that "when a claim . . . is based on a writing, the original or a duplicate shall be filed with the proof of claim." Fed. R. Bankr. P. 3001(a), (c).  See January 12, 2007 Transcript at 52:17-22.

E.     Argument Regarding The Tremont Claims

13.     The Reorganized Debtors Are Not Liable Under CERCLA.  The Tremont Claims assert that Delphi and/or DAS LLC are liable parties under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, et seq ("CERCLA") for contamination at the Site.  However, neither Delphi nor DAS LLC existed at the time the Site operated as a landfill, and therefore these entities have no statutory liability for contamination at the Site under CERCLA.  CERCLA imposes liability on four classes of potentially responsible parties ("PRPs"): (a) the current owner or operator of a contaminated site; (b) anyone who owned or operated the contaminated site at the time hazardous substances were disposed of; (c) any

6

person who arranged for the disposal of any hazardous substances at the contaminated site; and

(d) any person who transported any hazardous substances to a contaminated site.  <u>See</u> 42 U.S.C.

§ 9607(a).

14.    Neither Delphi nor DAS LLC has ever had any ownership interest in the

Site, nor has either entity ever operated the Site.  Accordingly, any liability under CERCLA

would have to arise because Delphi or DAS LLC arranged for the disposal of hazardous

substances or transported hazardous substances for disposal at the Site.  However, such liability

is impossible because the landfill at the Site ceased accepting wastes for disposal and stopped

operations in 1995, at which point neither Delphi nor DAS LLC held any assets or conducted

any operations.  <u>See</u> "U.S. EPA Begins Investigation at the Tremont City Landfill Site," US EPA

Fact Sheet, April 2000, at 3, attached hereto as <u>Exhibit B</u>.[2]  Both Delphi and DAS LLC were

formed as part of the divestiture by General Motors Corporation ("General Motors") of its Delphi

Automotive Systems unit (the "Divestiture").  Specifically, General Motors formed DAS LLC

and incorporated Delphi Automotive Systems Corporation on September 16, 1998.  <u>See</u>

Certificate of Formation of Delphi Automotive Systems LLC, attached hereto as <u>Exhibit C</u>;

Certificate of Incorporation of Delphi Automotive Systems Corporation, attached hereto as

<u>Exhibit D</u>.  Delphi Automotive Systems Corporation later changed its name to Delphi

Corporation.  <u>See</u> Certificate of Ownership and Merger, attached hereto as <u>Exhibit E</u>.  General

Motors then transferred the assets that had previously been a part of its Delphi Automotive

Systems unit to these newly formed entities to effectuate the Divestiture.  <u>See</u> Master Separation

---

[2]    This Court may take judicial notice of the date that the site ceased operating as demonstrated by the EPA Fact
Sheet attached as <u>Exhibit B</u> hereto.  Judicial notice is permitted for facts that are "capable of accurate and ready
determination by resort to sources whose accuracy cannot be reasonably questioned."  Fed.R.Evid. 201.  Under
this standard, courts may take judicial notice of the "records of various public or quasi-public bodies."  <u>In re
Enron Corp.</u>, 323 B.R. 857, 869 (Bankr. S.D.N.Y. 2005).  Thus, the EPA Fact Sheet, as a record of the United
States Environmental Protection Agency, meets this standard.

Agreement Among General Motors Corporation, Delphi Automotive Systems Corporation,

Delphi Automotive Systems, LLC, Delphi Technologies, Inc. and Delphi Automotive Systems

(Holding), Inc., at Recitals, § 2.01,  attached hereto as Exhibit F (the "Master Separation

Agreement")[3].

15.    The Master Separation Agreement contemplated that General Motors and

Delphi would enter into certain ancillary agreements to further effect the Divestiture.  Id. at Art 3.

One such agreement was the Environmental Matters Agreement (the "EMA") by and between

General Motors Corporation and Delphi Automotive Systems Corporation, which addressed the

assumption and retention of environmental liabilities between General Motors and Delphi.  See

EMA attached hereto as Exhibit G.  The EMA was the sole agreement governing the assumption

of environmental liabilities under the Divestiture.  See Master Separation Agreement at § 3(b)

("to the extent that any Ancillary Agreement expressly addresses any matters addressed by this

Agreement, including without limitation, matters covered by Article 2 and Article 5 hereof

[assumption of liabilities], the terms and conditions of such Ancillary Agreement shall govern

the rights and obligations of the parties with respect to such matters."); see also Master

Separation Agreement at § 2.03(a) ("To the extent that the transfer of any Delphi Asset or the

assumption of any Delphi Liability is expressly provided for by the terms of an Ancillary

Agreement, the terms of such Ancillary Agreement shall determine the method of the transfer or

---

[3]    This Court may also take judicial notice of the corporate documents included as Exhibits C-F to this brief.
Under  Fed.R.Evid. 201, courts may take judicial notice of the "records of various public or quasi-public
bodies."  The Certificate of Formation, Articles of Incorporation and Certificate of Ownership attached as
Exhibits C-E are from the Secretary of the State of Delaware and therefore clearly meet the standard for judicial
notice set forth in Fed.R.Evid. 201 and  In re Enron Corp., 323 B.R.at  869.  Furthermore, the Master Separation
Agreement attached hereto as Exhibit F and the Environmental Matters Agreement attached hereto as Exhibit G
are from filings with the Securities and Exchange Commission, which have been recognized as matters of
which a court may take judicial notice.  In re Enron Corp., 323 B.R.at  869.; see also Kramer v. Time Warner,
Inc., 937 F.2d 767, 774 (2d Cir. 1991) ("[A] district court may take judicial notice of the contents of relevant
public disclosure documents required to be filed with the SEC as facts 'capable of accurate and ready
determination by resort to sources whose accuracy cannot reasonably be questioned.'").

the assumption.").  As part of the Modified Plan, the EMA was terminated, and therefore the

EMA cannot be used to support an argument that DAS LLC or Delphi assumed any

environmental liabilities arising from General Motors' operation of the Delphi Automotive

Systems unit prior to the Divestiture, including any liabilities at the Site.  <u>See</u> Modified Plan at

Exhibit 7.7, § 9.19.1(C); <u>see</u> <u>also</u> <u>Nat'l Labor Relations Bd. v. Cone Mills Corp.</u>, 373 F.2d 595,

598 (5th Cir. 1967) ("It is axiomatic in contract law that parties to an agreement are relieved of

their mutual obligations upon termination of the agreement. Restatement, Contracts § 386.").

Accordingly, any liability for wastes that were sent to the Site for disposal from any assets

related to General Motors' Delphi Automotive business unit would be General Motors' liabilities,

not the Reorganized Debtors.

   16. Furthermore, to the extent that any of the claimants asserting the Tremont

Claims asserts that the Reorganized Debtors are liable at the Site as corporate successors to

General Motors, we note that this issue has previously been briefed for the Court in connection

with the Reorganized Debtors' objection to proofs of claim numbers 11983, 11985, 11988, and

11989 filed by Illinois Tool Works, Inc. and  ITW Food Equipment Group LLC relating to

environmental contamination at the South Dayton Dump and Landfill in Ohio.  Rather than

repeat those arguments here, the Reorganized Debtors have included a copy of that brief as

<u>Exhibit H</u> hereto.

   17. <u>Disallowance Pursuant To Section 502(e)(1)(B) Of The Bankruptcy Code</u>.

Alternatively, the Reorganized Debtors request that this Court enter an order disallowing and

expunging the Tremont Claims pursuant to section 502(e)(1)(B) of the Bankruptcy Code.

Section 502(e)(1)(B) of the Bankruptcy Code provides that a bankruptcy court is to disallow any

claim for reimbursement or contribution  for which the claimant is co- liable with the debtor to

the extent that "such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution."  11 U.S.C. § 502(e)(1)(B).

18.    Courts have recognized three elements necessary for a claim to be disallowed under section 502(e)(1)(B):

> (i) the claim must be one for reimbursement or contribution; (ii) the entity asserting the claim for reimbursement or contribution 'must be liable with the debtor' on or have secured the claim of a creditor; and (iii) the claim must be contingent at the time of its allowance or disallowance.

In re Wedtech Corp., 85 B.R. 285, 289 (Bankr. S.D.N.Y. 1988) (quoting In re Provincetown-Boston Airline, Inc., 72 B.R. 307, 309 (Bankr. M.D. Fla. 1987).

19.    In analyzing each of these three elements, it is helpful to break the nine Tremont Claims into two groups.  The first group, consisting of proofs of claim numbers 11981, 11982, 11986, 11987,  10504, 11984, and 11990, was filed by entities that generated hazardous waste that was allegedly disposed of at the Site (the "Generator Claims").  The Generator Claims are all identical, except for the identity of the party asserting the claim.  The remaining Tremont Claims, proofs of claim numbers 11045 and 10686, were filed by transporters who allegedly transported wastes to the Site (the "Transporter Claims").  As shown below, both the Generator Claims and Transporter Claims meet each of the three elements required for disallowance under Section 502(e)(1)(B).

20.    First, the Generator Claims and Transporter Claims all seek contribution under CERCLA and/or reimbursement from the Debtors for costs the claimants will incur in cleaning up the Site.   This fact is made clear by the proof of claim forms themselves.  For example, each of the Generator Claims asserts that the Debtors are liable under CERCLA which gives "statutory contribution and cost recovery to parties that incur costs to remediate

contaminated sites" and asserts that the claimant will incur such costs.  See Rider to Generator

Claims at 1.  Thus, these claims seek contribution rights or reimbursement of cleanup costs by

their own description.  Likewise, the proof of claim forms for the Transporter Claims both state

that the bases for the claims are "Contribution & Indemnification."  It is well established that

claims for indemnification are claims for "reimbursement or contribution" under Section

502(e)(1)(B).  In re Wedtech Corp., 85 B.R. at 289 (disallowing indemnification claims because

"the concept of reimbursement includes indemnity");  In re GCO Servs., LLC, 324 B.R. 459,

465 (Bankr. S.D.N.Y. 2005) ("any claims for indemnification also fall within the scope of the

first prong of § 502(e)(1)(B)").

        21.    Furthermore, regardless of how the claimants characterize the Tremont

Claims, the phrase "reimbursement or contribution" in section 502(e)(1)(B) is a broad one

intended to capture all contingent claims that would result in double payment by the bankruptcy

estate if the claim is not disallowed.  Aetna Cas. And Sur. Co. v. Ga. Tubing Corp., No. 93-3659,

1995 WL 429018, at *3 (S.D.N.Y. July 20, 1995), aff'd 93 F.3d 56 (2d Cir. 1996).  In this case,

the United States has also filed a claim against the Debtors, proof of claim number 14309,

seeking to recover cleanup costs.  See Proof of Claim No. 14309 at ¶ 2-4.  Thus, if the Tremont

Claims are not disallowed, the Reorganized Debtors would have to pay the same damages (i.e.,

the costs to cleanup the Site) to multiple parties.  Indeed, the Reorganized Debtors face not only

double payment on the same liability, but multiple payment, since each of the nine Tremont

Claims and the United States' claim seek to recover the same cleanup costs for the same Site.

Accordingly, because the Tremont Claims would subject the Reorganized Debtors to multiple

payments arising from the same liability, the Tremont Claims satisfy the first element for

disallowance under section 502(e)(1)(B).

22.     The Tremont Claims also meet the second element in that each of the claimants is a liable party at the Site, a fact that is conceded by the claimants themselves.  All of the Generator Claims state that "Creditor and Debtor are among a group of PRPs which are potentially responsible under CERCLA for costs associated with the investigation and remediation of the Site."   See Riders to Generator Claims at 1.  Likewise, both Transporter Claims concede that the claimant transported wastes to the site and "has considerable financial exposure for the waste [General Motors] provided to [claimants] for transport" to the Site.  See Rider to Transporter Claims at 1.  Thus, by their own admissions, every claimant asserting a Tremont Claim is liable for the cleanup costs at the Tremont Site.

23.     Finally, each of the Tremont Claims meet the third element for disallowance under Section 502(e)(1)(B) because they are contingent.  Each Generator Claim seeks to recover the costs to implement future work at the site, which costs "are unknown at this time."  See Rider to Generator Claims at 1.  It is well established that a claim is contingent for purposes of Section 502(e)(1)(B) if the costs sought by the claimant have not yet been paid.  In re Drexel Burnham Lambert Group Inc., 148 B.R. 982, 990 (Bankr. S.D.N.Y. 1992) ("A contingent claim becomes fixed and allowable to the extent that the co-debtor has paid the underlying claim"); see also In re Eagle Picher Indus., Inc., 164 B.R. 265, 268 (S.D. Ohio 1996), aff'd, 164 B.R. 265 (S.D. Ohio 1994) ("the law is well-settled that the claim of a co-liable party under § 502(e)(1)(B) is contingent until the claimant has made payment on its underlying claim to the principle creditor and thereby fixes his own right to payment from the debtor").  Indeed, the contingent nature of claims to recover environmental cleanup costs has been recognized by courts in the context of 502(e)(1)(B).  See In re Charter Co., 862 F.2d 1500 (11th Cir. 1989) (claims by PRPs to recover environmental cleanup costs arising under theories of contribution,

12

reimbursement and indemnification disallowed under section 502(e)(1)(B)); In re Hexcel, 174

B.R. 807, 813 (Bankr. N.D. Cal. 1994) (disallowing claims for environmental cleanup costs by

co-liable parties). Thus, because the Generator Claims seek recovery of future cleanup costs,

they are contingent and must be disallowed.

24.        The Transporter Claims are also contingent.  Proof of claim number

11045 concedes that the claimant has not yet been contacted by the EPA regarding the Site.  See

Rider to Transporter Claims at 1.  This claimant may never incur costs at the Site and thus its

claim is clearly contingent. A contingent claim "is by definition a claim which has not yet

accrued and which is dependent upon some future event that may never happen." In re Drexel,

148 B.R. at 987 (quoting In re Provincetown-Boston Airlines, Inc., 72 B.R. 307, 309 (Bankr.

M.D. Fla. 1987).  The same is true for the other remaining Transporter Claim, proof of claim

number 10686.  For that claim, the claimant asserts that it has been contacted by EPA, but it does

not assert that it has or will incur costs at the Site.  Thus, until the claimant incurs costs, its claim

is contingent and meets the requirements for disallowance under Section 502(e)(1)(B).

25.        In sum, all of the Tremont Claims, by the claimants' own descriptions, are

contingent claims for contribution or reimbursement for which the claimants are liable.

Accordingly, to the extent that this Court finds that the Reorganized Debtors have liability at the

Site, the Tremont Claims must be disallowed under Section 502(e)(1)(B) of the Bankruptcy Code.

26.        For the foregoing reasons, the Reorganized Debtors assert that (a) the

claimants listed in Exhibit A have not met their burden of proof to establish a claim against the

Debtors, (b) the Tremont Claims are not entitled to a presumption of prima facie validity

pursuant to Bankruptcy Rule 3001(f), and (c) the Tremont Claims fail to state a claim against the

Debtors under Bankruptcy Rule 7012.  Because the claimants cannot provide facts or law

supporting the Tremont Claims, the objections listed on <u>Exhibit A</u> should be sustained as to the Tremont Claims, and each of the Tremont Claims should be disallowed and expunged in its entirety.

WHEREFORE the Reorganized Debtors respectfully request this Court enter an order (a) sustaining the Debtors' objections with respect to the Tremont Claims, (b) disallowing and expunging each Tremont Claim in its entirety, and (c) granting such further and other relief that this Court deems just and proper.

Dated:    New York, New York
          September 14, 2010

                                        SKADDEN, ARPS, SLATE, MEAGHER
                                           & FLOM LLP

                                        By:   <u>/s/ John Wm. Butler, Jr</u>
                                              John Wm. Butler, Jr.
                                              John K. Lyons
                                              Ron E. Meisler
                                        155 North Wacker Drive
                                        Chicago, Illinois 60606

                                              - and –

                                        Four Times Square
                                        New York, New York 10036

                                        Attorneys for DPH Holdings Corp., <u>et al.</u>,
                                           Reorganized Debtors

**Exhibit A - Environmental Claims**

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| Proof Of Claim Number | Date Filed | Claimant | Omnibus Claims Objection | Date Of Omnibus Claims Objection | Docket No. of Response | Debtor Named On Proof Of Claim | Basis for Objection |
| 10504 | 7/24/2006 | TREMONT CITY BARREL FILL PRP GROUP | Third Omnibus Claims Objection | 10/31/2006 | 5797 | DELPHI AUTOMOTIVE SYSTEMS LLC | Unsubstantiated Claims |
| 10686 | 7/26/2006 | PEERLESS TRANSPORTATION COMPANY | Third Omnibus Claims Objection | 10/31/2006 | 5819 | DELPHI CORPORATION | Unsubstantiated Claims |
| 11045 | 7/26/2006 | MAD RIVER TRANSPORTATION INC. | Third Omnibus Claims Objection | 10/31/2006 | 5820 | DELPHI CORPORATION | Unsubstantiated Claims |
| 11981 | 7/28/2006 | HOBART BROTHERS COMPANY | Third Omnibus Claims Objection | 10/31/2006 | 5617 | DELPHI AUTOMOTIVE SYSTEMS LLC | Unsubstantiated Claims |
| 11982 | 7/28/2006 | ILLINOIS TOOL WORKS INC.  FOR HOBART BROTHERS COMPANY | Third Omnibus Claims Objection | 10/31/2006 | 5617 | DELPHI AUTOMOTIVE SYSTEMS LLC | Unsubstantiated Claims |
| 11984 | 7/28/2006 | TRI MARK INC. | Third Omnibus Claims Objection | 10/31/2006 | 5617 | DELPHI CORPORATION | Unsubstantiated Claims |
| 11986 | 7/28/2006 | HOBART BROTHERS COMPANY | Third Omnibus Claims Objection | 10/31/2006 | 5617 | DELPHI CORPORATION | Unsubstantiated Claims |
| 11987 | 7/28/2006 | HOBART BROTHERS COMPANY | Third Omnibus Claims Objection | 10/31/2006 | 5617 | DELPHI CORPORATION | Unsubstantiated Claims |
| 11990 | 7/28/2006 | TRI MARK INC. | Third Omnibus Claims Objection | 10/31/2006 | 5617 | DELPHI AUTOMOTIVE SYSTEMS LLC | Unsubstantiated Claims |

**EXHIBIT B**



United States
Environmental Protection
Agency

Office of Public Affairs
Region 5
77 W Jackson Blvd.
Chicago, IL 60604

Illinois, Indiana
Michigan,
Minnesota,
Ohio, Wisconsin

155877

# U.S. EPA Begins Investigation at the Tremont City Landfill Site

**Tremont City, Ohio**                                    **April 2000**

<table>
<tr><td>

### This Fact Sheet Will Tell You About:

- History of Activities at the Site
- Investigation Beginning at the Site
- Opportunities for Public Involvement

### Public Meeting

The U.S. EPA will hold a public meeting to explain the planned investigation for the Tremont City Landfill Site.

**Date:**   May 10, 2000
**Time:**   7 p.m.
**Location:**  Springfield City Hall
76 East High Street
Springfield, OH

### Community Interviews

The U.S. EPA will hold community interviews in the Tremont City area from May 9 through May 11. The purpose of these interviews is to gather information on the Site from the community. If you are interested, please call Denise Battaglia of the U.S. EPA at 1-800-621-8431.

### Information Repositories

Site information will be available after May 9, 2000 in two local repositories listed on back page.

</td><td>

## Introduction

This fact sheet provides information about the Tremont City Landfill Site (the Site) near Tremont City, Ohio. The Site consists of three main areas: the barrel fill, the waste transfer facility, and the landfill. The Site, which is closed, is owned by Danis Industries, Inc. (Danis). Based on an extensive review of Site documents, the United States Environmental Protection Agency (U.S. EPA) will conduct a preliminary sampling program at the Site in June 2000 to determine if further work needs to be done.

The U.S. EPA will involve the public throughout the investigation at the Site. Activities will include informal interviews with community members and public meetings to inform the public of progress at the Site. The first public meeting will be held on May 10 at the Springfield City Hall to discuss the planned investigation and to answer questions and concerns. Also, the public is encouraged to review documents in the information repositories (see back page for locations). If you have any questions about this update or the Site in general, please contact the U.S. EPA or Ohio Environmental Protection Agency (Ohio EPA) staff listed on page 5.



Tremont City Landfill Site Location Map

</td></tr>
</table>

## Site History

**1969** – Ohio issues permit to Danis for landfill construction in June

**1976** – Ohio issues permit to install a hazardous waste facility

**1976-1979** – Drum disposal at barrel fill

**1977-1985** – Waste transfer facility in use by Danis and Chemical Waste Management

**1979** – Groundwater monitoring begins at barrel fill

**1982** – Groundwater and gas monitoring begins at landfill

**1984** – Geophysical survey to locate barrel fill cells

**1985** – Excavation of trench at barrel fill identifies chromium contaminated leachate; operations at waste transfer facility stopped.

**1988** – Residential well pit explosion; gas extraction wells installed by Danis

**1992** – Landfill improvements approved by Ohio EPA, cut-off wall and drains installed to control seep

**1993** – Danis excavates the lagoon at the waste transfer facility

**1994** – Groundwater monitoring program expanded at Site

**1995** – Landfill improvements completed, landfill closed, groundwater and landfill gas monitoring continues

**1999** – U.S. EPA begins to review Site history

## Site Background Information

The Tremont City Landfill Site is approximately 80 acres. It is bordered by Snyder-Domer Road and Chapman Creek to the south, ravines to the east and west, and open land to the north. Various companies operated at the Site from 1969 to the present. Background information on each of the three Site areas is discussed below.

### Barrel Fill

The barrel fill is an 8.5-acre area at the north end of the Site. The barrel fill was operated from 1976 to 1979 by Industrial Waste Disposal (IWD), a subsidiary of Danis.

Historical records indicate that approximately 47,000 drums of industrial waste were disposed of in the barrel fill. The drums and other bulk liquids and sludge, estimated at 52,000 gallons, were placed in a series of cells or trenches that were excavated to a depth of 15 to 25 feet. The disposal cells were then covered with soil.

In 1979, IWD began a groundwater sampling program in six monitoring wells around the barrel fill. A total of nine additional wells were installed in 1983 and 1986 to further investigate the ground water. Site operators continue to collect samples periodically. To date, the only contaminant in ground water at the barrel fill that is higher than the federal drinking water standards is chromium. Other ground water contaminants have been detected but at concentrations below the federal standards. These other contaminants include both metals and volatile organic compounds (VOCs). Similar contaminants were found in a seep on the east side of the barrel fill. A partial seep cutoff wall was installed in 1985 to address this problem.

An electromagnetic survey was conducted in 1984 to locate the disposal cells. In response to an anomalous reading, a trench was excavated on the west side of the barrel fill and chromium-contaminated leachate was found. Leachate and soil from the excavation were removed and disposed of at an approved off-site hazardous waste facility. Contaminant levels in ground water at the barrel fill have declined since the contaminated soil was removed.

### Waste Transfer Facility

The waste transfer facility is located on a 14-acre area south of the barrel fill and north of the landfill. This area was operated by Danis as a waste oil recycling facility from 1977 to 1980. The facility included an oil recovery lagoon and two sedimentation ponds. From 1977 to 1980,

- 2 -

biodegradable food industry wastes were "land farmed", or plowed into the ground, in this area. The facility was purchased by Chemical Waste Management (CWM) in 1980. CWM began processing solvents in addition to waste oil. For a short period, asbestos slurry was also accepted by the facility. Wastewater from the slurry was disposed of in the lagoon and the asbestos solids were landfilled.

Previously unknown underground storage tanks were found during excavation work on the west boundary of the waste transfer facility. Historical records also indicate that drummed wastes were stored at the facility before being transferred to other off-site facilities from 1980 to 1984.

CWM stopped operations at the facility in 1985 and submitted a closure plan to the Ohio EPA that same year. Site ownership was transferred back to Danis in 1986. In 1993, the lagoon was drained and excavated as part of the closure plan. The excavated lagoon sediments were landfilled at an approved off-site hazardous waste site and the lagoon area filled with clean soil.

Contaminants of concern in soil and ground water at the waste transfer facility are waste oil and solvents.

### Landfill

The State of Ohio issued a permit to Danis to construct and operate the landfill in 1969. The landfill area consists of approximately 58 acres. The landfill was primarily for sanitary waste, but occasionally accepted industrial waste. In 1982, Danis began monitoring groundwater quality. Benzene and arsenic were detected in ground water at concentrations above the federal drinking water standards. Numerous contaminants were identified in ground water in the roll-off container storage area at the landfill. As a result, Danis cleaned up the container storage area and installed a groundwater pumping system at the south end of the landfill. This system is designed to prevent contaminated ground water from entering Chapman Creek.

Water seeping from the west flank of the landfill was discovered in 1991. In 1992, the Ohio EPA collected samples from the seep that identified low levels of contaminants including metals and VOCs. Danis conducted investigations and installed a cutoff wall and perimeter drain in response to the contamination.

In 1984, the Ohio EPA collected surface water and sediment samples from Chapman Creek and a ravine at the landfill. The samples indicated that some impacts to surface water and sediments may have occurred as a result of landfill operations.

In 1992, the Ohio EPA approved landfill design improvements including a landfill gas control system, a collection system, and a stormwater leachate management system. Approximately one million gallons of landfill leachate are collected and treated at the Springfield Municipal Wastewater Treatment Plant every year.

In September 1995, the landfill stopped receiving wastes and a closure plan was developed to meet Ohio EPA and federal requirements. The closure plan includes ground water monitoring, landfill gas and leachate controls, and maintenance of the landfill cap.

| TREMONT CITY LANDFILL SITE - DESCRIPTION OF THREE AREAS | |
|---|---|
| Barrel Fill | Northernmost area of Site. Consists of 8.5 acres. Received and buried 47,000 drums of industrial waste between 1976 and 1979. |
| Waste Transfer Facility | Located between the barrel fill and landfill. Consists of 14 acres. Was used as an oil and solvent recycling facility, drummed waste transfer station, and for burial of biodegradable wastes. Operations in this area stopped in 1985. |
| Landfill | Southernmost area of Site. Consists of 58 acres. Received municipal and some industrial wastes between 1969 and 1995. Landfill owner performs routine ground water monitoring and maintains systems for landfill gas control, stormwater management and leachate collection and disposal. |

# SDMS US EPA REGION V
# COLOR-RESOLUTION - 2
## IMAGERY INSERT FORM

The following page(s) of this document include color or resolution variations.
Unless otherwise noted, these pages are available in monochrome. The original
document is available for viewing at the Superfund Records Center.

| | |
|---|---|
| **SITE NAME** | TREMONT CITY LANDFILL |
| **DOC ID #** | 155877 |
| **DESCRIPTION OF ITEM(S)** | FACT SHEET |
| **PRP** | RMD |
| **DOCUMENT VARIATION** | __X__ COLOR    OR    ___ RESOLUTION |
| **DATE OF ITEM(S)** | 04/01/00 |
| **NO. OF ITEMS** | 2 |
| **PHASE** | |
| **OPERABLE UNITS** | |
| **PHASE** (AR DOCUMENTS ONLY) | ___ Remedial ___ Removal ___ Deletion Docket __X__ Original ___ Update # ___ Volume _8_ of _12_ |
| **COMMENT(S)** | |



Tremont City Landfill

## Planned Investigation

To date, the U.S. EPA has conducted an extensive review of background historical information pertaining to the Site, and has determined that further investigation is required. Beginning in June 2000, a preliminary field investigation will be conducted by the U.S. EPA to evaluate the overall condition of ground water, surface water, and sediments and soil at the Site. This preliminary investigation will provide a baseline of environmental data that will be used by the U.S. EPA to assess potential risks to human health and the environment posed by the Site.

Groundwater monitoring wells at all three areas will be sampled for possible contamination. Soil samples also will be collected from the three areas of the Site. Sediment and surface water samples will be collected from seeps, ravines, the landfill sedimentation pond, and Chapman Creek. Most of these samples will be tested for an extensive list of possible contaminants including VOCs, semi-volatile organic compounds, metals, pesticides, and polychlorinated biphenyls (PCBs). The Ohio EPA will evaluate the ecological health of Chapman Creek upstream and downstream of the Site as part of this effort.

Evaluation of the barrel fill will begin with a geophysical survey to identify where the buried drums are located. Borings will be drilled to check soil conditions around the drum cells. Soil samples will be collected and analyzed to evaluate if wastes are present.

Evaluation of the waste transfer facility will begin with a geophysical survey of the land surface to check for possible buried tanks and waste containers. Soil samples will be collected to check surface and subsurface soil conditions in this area.

The baseline-sampling program also will include sampling of landfill gas at vent wells. The gas will be tested for methane and VOCs. Landfill leachate samples also will be collected and tested for contaminants.

The U.S. EPA will inform the public of the baseline sampling data and results of the investigation. The U.S. EPA will use the baseline sampling results to evaluate if additional investigation may be necessary.

## Public Involvement Opportunities

The U.S. EPA will involve the public throughout the investigation process at the Site. You can get information and stay involved through public meetings, community interviews and by reading information sent to you. Also, anyone interested in learning more about the Tremont City Landfill Site is encouraged to review documents in the information repositories that will be available after Tuesday, May 9, 2000 at the locations listed on the back page.

Community interviews will be conducted by the U.S. EPA on May 9 through May 11, 2000, in the Tremont City/Springfield area. Information gathered from these interviews will be used to develop the Community Involvement Plan. This plan will describe the strategy to keep you informed and involved throughout the investigation at the Site. The plan will be available this summer in the information repositories or from Denise Battaglia of the U.S. EPA.

The community is invited to attend the public meeting to be held on Wednesday, May 10, 2000, at the Springfield City Hall in the Forum Meeting Room, 201 South Fountain Street, Springfield, Ohio. The purpose of the meeting is to explain the planned investigation at the Site and to address your questions and concerns.

## Contacts

For additional information about the Tremont City Landfill site, please contact:

| U.S. EPA | | Ohio EPA |
|---|---|---|
| Denise Battaglia (P-19J)<br>Community Involvement Coord.<br>Office of Public Affairs<br>77 West Jackson Boulevard<br>Chicago, IL 60604-3590<br>(312) 886-9859 | John J. O'Grady (SR-6J)<br>Remedial Project Manager<br>Office of Superfund<br>77 West Jackson Boulevard<br>Chicago, IL 60604-3590<br>(312) 886-1477 | Randy Watterworth<br>Div. Emergency Remedial<br>Response<br>401 East Fifth Street<br>Dayton, OH 45402-2911<br>(937) 285-6062 |
| battaglia.denise@epa.gov | ogrady.johnj@epa.gov | randy.watterworth@epa.state.oh.us |
| Call 1-800-621-8431<br>View on the Internet: http://www.epa.gov/region5/sites | | |



**Denise Battaglia and John O'Grady**



**Randy Watterworth**

## INFORMATION REPOSITORIES

Anyone interested in learning more about the Tremont City Landfill Site is encouraged to review documents in the information repositories located at:

Clark County Public Library
201 South Fountain Street
Springfield, OH 45501
Hours: Mon-Fri 9 a.m. – 9 p.m.
Sat 9 a.m. – 6 p.m.
Sun 1 p.m. – 5 p.m.

Tremont United Methodist Church
98 North Mulberry Street
Tremont City, OH 45372

(937) 969-8553 (call for appointment)



U.S. Environmental Protection Agency
Region 5
Office of Public Affairs (P-19J)
77 West Jackson Boulevard
Chicago, IL 60604

**ADDRESS CORRECTION REQUESTED**

Official Business
Penalty for Private
Use $300

Tremont City Landfill Site Investigation Begins

**EXHIBIT C**

# Delaware

PAGE  1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "DPH-DAS LLC" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF FORMATION, FILED THE SIXTEENTH DAY OF SEPTEMBER, A.D. 1998, AT 10:01 O'CLOCK A.M.

CERTIFICATE OF MERGER, FILED THE THIRTIETH DAY OF SEPTEMBER, A.D. 2005, AT 1:16 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF MERGER IS THE THIRTIETH DAY OF SEPTEMBER, A.D. 2005, AT 11:59 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, CHANGING ITS NAME FROM "DELPHI AUTOMOTIVE SYSTEMS LLC" TO "DPH-DAS LLC", FILED THE SIXTH DAY OF OCTOBER, A.D. 2009, AT 12:38 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF AMENDMENT IS THE SIXTH DAY OF OCTOBER, A.D. 2009, AT 11:59 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE

Jeffrey W. Bullock, Secretary of State

2944910   8100H

100002839

AUTHENTICATION:  7734966

DATE:  01-04-10

You may verify this certificate online
at corp.delaware.gov/authver.shtml



# Delaware

**PAGE 2**

## The First State

*AFORESAID LIMITED LIABILITY COMPANY, "DPH–DAS LLC".*

*2944910   8100H*

*100002839*

Jeffrey W. Bullock, Secretary of State

*AUTHENTICATION: 7734966*

*DATE: 01-04-10*

CERTIFICATE OF FORMATION

OF

DELPHI AUTOMOTIVE SYSTEMS LLC

This Certificate of Formation of Delphi Automotive Systems LLC has been duly executed and is being filed by the undersigned, as an authorized person, to form a limited liability company under the Delaware Limited Liability Act (6 Del. C. § 18-101. et. seq.).

1.    The name of the limited liability company is Delphi Automotive Systems LLC (the "LLC")

2.    The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

3.    The name and address of the registered agent for service of process on the LLC in the State of Delaware is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation of Delphi Automotive Systems LLC this 16th day of September, 1998

By: _____
Name:    Martin I. Darvick
Its:    Authorized Person

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 10:01 AM 09/16/1998
981358883 - 2944910

**EXHIBIT D**

# Delaware

*PAGE  1*

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "DELPHI CORPORATION" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF INCORPORATION, FILED THE SIXTEENTH DAY OF SEPTEMBER, A.D. 1998, AT 10 O'CLOCK A.M.

RESTATED CERTIFICATE, FILED THE TWENTY-SIXTH DAY OF JANUARY, A.D. 1999, AT 4:30 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE SECOND DAY OF FEBRUARY, A.D. 1999, AT 7:30 O'CLOCK A.M.

CERTIFICATE OF OWNERSHIP, CHANGING ITS NAME FROM "DELPHI AUTOMOTIVE SYSTEMS CORPORATION" TO "DELPHI CORPORATION", FILED THE THIRTEENTH DAY OF MARCH, A.D. 2002, AT 3 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID CORPORATION, "DELPHI CORPORATION".

*2944832   8100H*

*090138516*

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 7135321

DATE: 02-13-09

You may verify this certificate online
at corp.delaware.gov/authver.shtml

# CERTIFICATE OF INCORPORATION
## OF
### DELPHI AUTOMOTIVE SYSTEMS CORPORATION

1. The name of the corporation is Delphi Automotive Systems Corporation

2. The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. the name of its registered agent at such address is The Corporation Trust Company.

3. The nature of the business or purposes to be conducted or promoted to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

4. The total number of shares of stock which the corporation shall have authority to issue is one hundred (100) and the par value of each of such shares is ten cents ($0.10) amounting in the aggregate to ten dollars ($10.00).

5. The board of directors is authorized to make, alter or repeal the bylaws of the corporation. Election of directors need not be by written ballot.

6. The name and mailing address of the sole incorporation is:

Barbara A. Lister
General Motors Corporation
3031 West Grand Boulevard
Mail Code 482-208-840
Detroit, Michigan 48232

I, THE UNDERSIGNED, being the incorporator hereinbefore named, for the purpose of forming a corporation pursuant to the General Corporation Law of the State of Delaware, do make this certificate, hereby declaring and certifying that this is my act and deed and the facts herein stated are true, and accordingly have hereunto set my hand this 16th day of September, 1998.

_____
Sole Incorporator

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 10:00 AM 09/16/1998
981358881 - 2944832

**EXHIBIT E**

# Delaware

*PAGE 1*

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "DELPHI CORPORATION" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF INCORPORATION, FILED THE SIXTEENTH DAY OF SEPTEMBER, A.D. 1998, AT 10 O'CLOCK A.M.

RESTATED CERTIFICATE, FILED THE TWENTY-SIXTH DAY OF JANUARY, A.D. 1999, AT 4:30 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE SECOND DAY OF FEBRUARY, A.D. 1999, AT 7:30 O'CLOCK A.M.

CERTIFICATE OF OWNERSHIP, CHANGING ITS NAME FROM "DELPHI AUTOMOTIVE SYSTEMS CORPORATION" TO "DELPHI CORPORATION", FILED THE THIRTEENTH DAY OF MARCH, A.D. 2002, AT 3 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID CORPORATION, "DELPHI CORPORATION".

2944832    8100H

090138516

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 7135321

DATE: 02-13-09

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 03:00 PM 03/13/2002
020167948 – 2944832

CERTIFICATE OF OWNERSHIP AND MERGER

MERGING

DELPHI CORPORATION

INTO

DELPHI AUTOMOTIVE SYSTEMS CORPORATION

* * * * * * *

Delphi Automotive Systems Corporation (the "Company"), a corporation organized and existing under the laws of Delaware,

DOES HEREBY CERTIFY:

FIRST: That the Company was incorporated on the 16th day of September, 1998, pursuant to Section 102 of the General Corporation Law of the State of Delaware.

SECOND: That the Company owns all of the outstanding shares of the stock of Delphi Corporation, a corporation incorporated on the 10th day of January, 2002, pursuant to Section 102 of the General Corporation Law of the State of Delaware.

THIRD: That the Company, by the following resolutions of its Board of Directors, duly adopted at a meeting held on the 13th day of March, 2002, determined to and did merge into itself said Delphi Corporation:

WHEREAS, the Board of Directors of Delphi Automotive Systems Corporation, a Delaware corporation (the "Company"), deems it to be advisable and in the best interests of the Company for the Company's name to be changed to "Delphi Corporation" through the merger of Delphi Corporation, a Delaware corporation and wholly-owned subsidiary of the Company ("Merger Sub"), with and into the Company pursuant to Section 253 of the Delaware General Corporation Law, as amended (the "DGCL");

NOW, THEREFORE, be it

RESOLVED, that effective upon the filing of a Certificate of Ownership and Merger with the Secretary of State of Delaware, Merger Sub shall be merged with and into the Company in accordance with Section 253 of the DGCL, with the Company being the surviving corporation (the "Merger");

FURTHER RESOLVED, that by virtue of the Merger and without any action on the part of the holders thereof, each outstanding share of capital stock of the Company (of any class or series) shall remain outstanding, in all respects remaining unaffected, and each outstanding share of capital stock of Merger Sub shall be canceled.  Holders of outstanding shares of capital stock of the Company or Merger Sub shall not receive any form of consideration as a result of the Merger;

FURTHER RESOLVED, that pursuant to, and at the effective time of, the Merger, Article I of the Amended and Restated Certificate of Incorporation of the Company shall be amended to read in its entirety as follows:

"The name of the corporation (hereinafter referred to as the 'Corporation') is Delphi Corporation."

FURTHER RESOLVED, that the officers of the Company be, and each of them hereby is, authorized to execute a Certificate of Ownership and Merger setting forth a copy of these resolutions, to cause it to be filed with the Secretary of State of Delaware and to do all acts and things, whether within or without the state of Delaware, which may be necessary or advisable to effect the Merger and the name change.

FOURTH:  Anything herein or elsewhere to the contrary notwithstanding, this merger may be amended or terminated and abandoned by the Board of Directors of Delphi Automotive Systems Corporation at any time prior to the time that this merger filed with the Secretary of State becomes effective.

IN WITNESS WHEREOF, said Delphi Automotive Systems Corporation has caused this Certificate to be signed by Diane L. Kaye, its Secretary, this 13th day of March, 2002.

DELPHI AUTOMOTIVE SYSTEMS CORPORATION

By: _____
        Diane L. Kaye, Secretary

**EXHIBIT F**

1

EXHIBIT 10.1

EXECUTION COPY

MASTER SEPARATION AGREEMENT

dated as of

December 22, 1998

among

GENERAL MOTORS CORPORATION,

DELPHI AUTOMOTIVE SYSTEMS CORPORATION,

DELPHI AUTOMOTIVE SYSTEMS LLC,

DELPHI TECHNOLOGIES, INC.

and

DELPHI AUTOMOTIVE SYSTEMS (HOLDING), INC.

2

# TABLE OF CONTENTS

----------------------------

## ARTICLE 1
### Definitions

Section 1.01    Defined Terms...............................................2

## ARTICLE 2
### Contribution and Assumption

Section 2.01    Contribution of Assets......................................6
Section 2.02    Assumption of Liabilities...................................7
Section 2.03    Methods of  Transfer and Assumption.........................7
Section 2.04    Nonassignable Contracts.....................................8
Section 2.05    Transition Services.........................................8

## ARTICLE 3
### Ancillary Agreements

Section 3.01    General....................................................10
Section 3.02    Priority...................................................10
Section 3.03    Extensions of Transition Services..........................10

## ARTICLE 4
### Covenants

Section 4.01    IPO and Distribution Agreement.............................10
Section 4.02    Registration Rights Agreement..............................10
Section 4.03    Delayed Asset Transfers....................................10

## ARTICLE 5
### Indemnification

Section 5.01    Indemnification by Delphi..................................11
Section 5.02    Indemnification Procedures.................................11
Section 5.03    Certain Limitations........................................12

## ARTICLE 6
### Access to Information

Section 6.01    Restrictions on Disclosure of Information..................13
Section 6.02    Legally Required Disclosure of Confidential Information....13
Section 6.03    Access to Information......................................13
Section 6.04    Record Retention...........................................14
Section 6.05    Production of Witnesses....................................16
Section 6.06    Reimbursement..............................................16

i

3

ARTICLE 7
Certain Claims and Litigation

Section 7.01    Product Liability Claims...................................16
Section 7.02    General Litigation........................................17
Section 7.03    Employment Related Claims.................................18
Section 7.04    Cooperation...............................................18

ARTICLE 8
Insurance Matters

Section 8.01    Delphi Insurance Coverage During the Transition Period.....19
Section 8.02    Delphi Insurance Coverage After the Transition Period......20

ARTICLE 9
Miscellaneous

Section 9.01    Entire Agreement..........................................20
Section 9.02    Governing Law.............................................20
Section 9.03    Descriptive Headings......................................20
Section 9.04    Notices...................................................20
Section 9.05    Parties In Interest.......................................21
Section 9.06    Counterparts..............................................21
Section 9.07    Binding Effect; Assignment................................21
Section 9.08    Dispute Resolution........................................21
Section 9.09    Severability..............................................22
Section 9.10    Failure or Indulgence Not Waiver; Remedies Cumulative......22
Section 9.11    Amendment.................................................22
Section 9.12    Authority.................................................22
Section 9.13    Interpretation............................................22

Schedule A      Ancillary Agreements
Schedule B      Delphi Financial Statements
Schedule C      Facilities to be Transferred
Schedule D      Covenants Not to Compete
Schedule E      Domestic Ownership Interest Transfers
Schedule F      International Ownership Interest Transfers
Schedule G      Extension of Eligibility in the GM Vehicle Purchase Program -
                Used Vehicle Program
Schedule H      Extension of Eligibility in the GM New Vehicle Purchase
                Program
Schedule I      Certain Agreements with Respect to Divested Businesses
Schedule J      Entities in Liquidation by 12/31/98 to be Retained by GM
Schedule K      General Litigation Claims to be Transferred to Delphi
Schedule L      General Litigation Claims to be Defended by GM at Delphi's
                Expense
Schedule M      Delphi Related General Litigation Claims for which GM will
                Retain Liability
Schedule N      Employment Related Claims to be Transferred to Delphi
Schedule O      Employment Related Claims to be Jointly Defended by GM and
                Delphi
Schedule P      Entities Included in Delphi Financial Statements which are to
                be retained by GM after 1/1/99

4

# MASTER SEPARATION AGREEMENT

This Master Separation Agreement ("Agreement") is entered into on December 22, 1998 among General Motors Corporation, a Delaware corporation ("GM"), Delphi Automotive Systems Corporation, a Delaware corporation ("Delphi"), Delphi Automotive Systems LLC, a Delaware limited liability company and, on the date hereof, a wholly owned subsidiary of GM ("DAS LLC"), Delphi Technologies, Inc., a Delaware corporation and, on the date hereof, a wholly owned subsidiary of GM ("DTI", and together with DAS LLC, the "Delphi U.S. Subsidiaries") and Delphi Automotive Systems (Holding), Inc., a Delaware corporation and, on the date hereof, a wholly owned subsidiary of GM ("Delphi International Subsidiary"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article 1 hereof.

## RECITALS

WHEREAS, the Board of Directors of GM has determined that it would be appropriate and desirable to completely separate the Delphi Automotive Systems Business from GM;

WHEREAS, GM has caused Delphi to be incorporated in order to effect such separation, GM currently owns all of the issued and outstanding common stock of Delphi, and Delphi currently conducts no business operations and has no significant assets or liabilities;

WHEREAS, the Boards of Directors of GM and Delphi have each determined that it would be appropriate and desirable for GM to contribute and transfer to Delphi, and for Delphi to receive and assume, directly or indirectly, substantially all of the assets and liabilities currently associated with the Delphi Automotive Systems Business, including those assets and liabilities currently held directly by GM in divisional form and the stock or similar interests currently held by GM in subsidiaries and other entities that conduct such business;

WHEREAS, GM and Delphi intend that the contribution and assumption of assets and liabilities will qualify as a tax-free reorganization under Section 368(a)(1)(D) of the Code;

WHEREAS, GM and Delphi currently contemplate that, following the contribution and assumption of assets and liabilities, Delphi will make an initial public offering of an amount of its common stock that will reduce GM's ownership of Delphi to not less than 80%;

WHEREAS, GM currently contemplates that, several months following such initial public offering, GM will distribute to the holders of its common stock, $1-2/3 par value, by means of an exchange offer and/or a pro rata distribution, all of the shares of Delphi common stock owned by GM (the "Distribution");

WHEREAS, GM and Delphi intend that the Distribution will be tax-free to GM and its stockholders under the Code; and

WHEREAS, the parties intend in this Agreement, including the Exhibits and Schedules hereto, to set forth the principal arrangements between them regarding the separation of the Delphi Automotive Systems Business from GM.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth below, the parties hereto agree as follows:

5

ARTICLE 1

DEFINITIONS

SECTION 1.01. Defined Terms. The following terms, as used herein, shall have the following meanings:

"AFFILIATE" of any specified Person means any other Person directly or indirectly Controlling, Controlled by, or under common Control with, such specified Person; provided, however, that for purposes of this Agreement, (i) GM and its subsidiaries (other than Delphi and its subsidiaries) shall not be considered Affiliates of Delphi and (ii) Delphi and its subsidiaries shall not be considered Affiliates of GM.

"AMENDED AND RESTATED TAX ALLOCATION AGREEMENT" means the Amended and Restated Agreement for the Allocation of Federal, United States, State and Local Income Tax, between GM and Delphi, a copy of which is attached hereto as Exhibit L-3.

"ANCILLARY AGREEMENTS" means each of the agreements which are listed on Schedule A hereto and which are attached as Exhibits A-1 through M-5 to this Agreement, including any exhibits, schedules, attachments, tables or other appendices thereto, and each agreement and other instrument contemplated therein.

"ASSETS" means, except for cash and cash equivalents, any and all assets, properties and rights, whether tangible or intangible, whether real, personal or mixed, whether fixed, contingent or otherwise, and wherever located, including, without limitation, the following:

(i)     real property interests (including leases), land, plants, buildings and improvements;

(ii)    machinery, equipment, vehicles (other than GM Product Evaluation Program vehicles), furniture and fixtures, leasehold improvements, supplies, repair parts, tools, plant, laboratory and office equipment and other tangible personal property, including any and all leases with respect thereto, together with any rights or claims arising out of the breach of any express or implied warranty by the manufacturers or sellers of any of such assets or any component part thereof;

(iii)   inventories, including raw materials, work-in-process, finished goods, parts and accessories;

(iv)    notes, loans and accounts receivable (whether current or not current), interests as beneficiary under letters of credit, advances and performance and surety bonds;

(v)     banker's acceptances, shares of stock, bonds, debentures, evidences of indebtedness, certificates of interest or participation in profit-sharing agreements, collateral-trust certificates, investment contracts, voting trust certificates, puts, calls, straddles, options, swaps, collars, caps and other securities or hedging arrangements of any kind;

(vi)    financial, accounting and operating data and records including, without limitation, books, records, electronic data, notes, sales and sales promotional data, purchasing materials and data, advertising materials, credit information, cost and pricing information, customer and supplier lists, reference catalogs, payroll and personnel records, facility blueprints and plant layouts, minute books, stock ledgers, stock transfer records and other similar property, rights and information;

(vii)   Intellectual Property;

(viii)  Contracts and all rights therein;

2

6

        (ix)    prepaid expenses, deposits and retentions held by third parties;

        (x)    claims, causes of action, choses in action, rights under insurance policies, rights under express or implied warranties, rights of recovery, rights of set-off, and rights of subrogation;

        (xi)    licenses, franchises, permits, authorizations and approvals; and

        (xii)   goodwill and going concern value.

    "BUSINESS DAY" means a day other than a Saturday, a Sunday or a day on which banking institutions located in the State of New York or Michigan are authorized or obligated by law or executive order to close.

    "CODE" means the Internal Revenue Code of 1986, as amended from time to time, together with the rules and regulations promulgated thereunder.

    "COMMERCIAL TRAVEL SERVICES SUPPLY AGREEMENT" means the Commercial Travel Services Supply Agreement, effective as of the date Contribution Date, between GM and Delphi (or their respective Affiliates), a copy of which is attached hereto as Exhibit J-2.

    "COMMISSION" means the Securities and Exchange Commission.

    "CONFIDENTIAL INFORMATION" means with respect to any party hereto, (i) any Information concerning such party, its business or any of its Affiliates that was obtained by another party hereto prior to the Contribution Date, (ii) any Information concerning such party that is obtained by another party under Section 6.03, or (iii) any other Information obtained by, or furnished to, another party hereto prior to the Contribution Date, in each case that (a) was marked "Proprietary" or "Company Private" or words of similar import by the party owning such Information, or any Affiliate of such party, or (b) the party owning such Information notified such other party in writing was confidential or secret by the Contribution Date.

    "CONSOLIDATED TAX PERIOD" has the meaning set forth in the Amended and Restated Tax Allocation Agreement.

    "CONTRACTS" means any contract, agreement, lease, license, sales order, purchase order, instrument or other commitment that is binding on any Person or any part of its property under applicable law.

    "CONTRIBUTION DATE" means January 1, 1999.

    "CONTROL" means the possession, direct or indirect, of the power to direct or cause the direction of the management of the policies of a Person, whether through the ownership of voting securities, by contract or otherwise. "CONTROLLING" and "CONTROLLED" have the corollary meanings ascribed thereto.

    "DELPHI ASSETS" means all of GM's right, title and interest in and to all Assets that (i) (x) are, except as set forth on Schedule P or as otherwise provided herein or in an Ancillary Agreement, reflected in the Delphi Financial Statements and not disposed of by GM after the date thereof and before the Contribution Date (including assets written off or expensed but still used by Delphi which Delphi can demonstrate to GM's reasonable satisfaction were paid for by the Delphi Automotive Systems Sector of GM) or (y) are to be transferred pursuant to Section 2.01(c) of this Agreement (as and when transferred thereunder) or (ii) are acquired by the Delphi Automotive Systems Business after the date of the Delphi Financial Statements and would be reflected in the financial statements of Delphi as of the Contribution Date if such financial statements were prepared using the same accounting principles under which the Delphi Financial Statements were prepared, or (iii) are expressly provided by this Agreement or any Ancillary Agreement to be transferred to Delphi, or (iv) are listed on Schedule C hereto (which sets forth the facilities to be transferred to Delphi) or (v) except as otherwise provided in an Ancillary Agreement or other express agreement of the parties, are used exclusively by the Delphi Automotive Systems Business as of the Contribution

3

7

Date; provided, unless the parties otherwise expressly agree, that if the accounting principles under which the Delphi Financial Statements were prepared would have required any Asset described in the preceding clause (v) to be reflected in the Delphi Financial Statements as of the date thereof, then such Asset shall be included in the "Delphi Assets" only if so reflected.

"DELPHI AUTOMOTIVE SYSTEMS BUSINESS" means the business conducted by the Delphi Automotive Systems Sector of GM at any time on or before the Contribution Date, including (i) all business operations whose financial performance is reflected in the Delphi Financial Statements, (ii) all business operations initiated or acquired by the Delphi Automotive Systems Sector of GM after the date of the Delphi Financial Statements and (iii) all business operations that were conducted at any time in the past by the Delphi Automotive Systems Sector of GM or by any predecessor of such Sector (including, without limitation, the GM Automotive Components Group) but were discontinued or disposed of prior to the date of the Delphi Financial Statements other than by transfer or disposition to any other Sector of GM.

"DELPHI COMMON STOCK" means the Common Stock, $0.01 par value per share, of Delphi.

"DELPHI FINANCIAL STATEMENTS" means the financial statements (including the notes thereto) of Delphi for the period ended September 30, 1998 as set forth in the IPO Registration Statement as amended at the date of this Agreement, a copy of which is set forth on Schedule B attached hereto.

"DELPHI LIABILITIES" means all of the Liabilities of GM that (i) (x) are, except as otherwise set forth on Schedule P or as otherwise provided herein or in an Ancillary Agreement, reflected in the Delphi Financial Statements and remain outstanding at the Contribution Date or (y) are to be transferred pursuant to Section 2.01(c) of this Agreement (as and when transferred thereunder), or (ii) arise in connection with the Delphi Automotive Systems Business after the date of the Delphi Financial Statements and would be reflected in financial statements of Delphi as of the Contribution Date if such financial statements were prepared using the same accounting principles under which the Delphi Financial Statements were prepared, or (iii) are expressly provided by this Agreement or any Ancillary Agreement to be transferred to and assumed by Delphi, or (iv) except as otherwise provided in an Ancillary Agreement or other express agreement of the parties, are related to or arise out of or in connection with the Delphi Assets, or (v) except as otherwise provided in an Ancillary Agreement or other express agreement of the parties, are related to or arise out of or in connection with the Delphi Automotive Systems Business (including but not limited to the covenants not to compete entered into by GM prior to the Contribution Date set forth on Schedule D hereto) whether before or after the date of the Delphi Financial Statements; provided, unless the parties otherwise expressly agree, that if the accounting principles under which the Delphi Financial Statements were prepared would have required any liabilities described in the preceding clause (v) to be reflected in the Delphi Financial Statements as of the date thereof, then such liabilities shall be considered to be "Delphi Liabilities" only if so reflected.

"DETERMINATION" has the meaning set forth in the NITA.

"DISTRIBUTION" has the meaning set forth in the preamble to this Agreement.

"DISTRIBUTION DATE" means the date to be determined by GM in its sole and absolute discretion when the Distribution is completed.

"EMPLOYEE MATTERS AGREEMENT" means the Employee Matters Agreement, effective as of the Contribution Date, between GM and Delphi (or their respective Affiliates), a copy of which is attached hereto as Exhibit B-1.

"FINANCIAL SERVICES SUPPLY AGREEMENT" means the Financial Services Supply Agreement, effective as of the Contribution Date, between GM and Delphi (or their respective Affiliates), a copy of which is attached hereto as Exhibit J-4.

4

8

"FINAL DETERMINATION" has the meaning set forth in the Amended and Restated Tax Allocation Agreement.

"INCOME TAX RETURNS" has the meaning set forth in the Amended and Restated Tax Allocation Agreement.

"INFORMATION" means all records, books, contracts, instruments, computer data and other data.

"INTELLECTUAL PROPERTY" means any and all domestic and foreign patents and patent applications, together with any continuations, continuations-in-part or divisional applications thereof, and all patents issuing thereon (including reissues, renewals and re-examinations of the foregoing); invention disclosures; mask works; copyrights, and copyright applications and registrations; trademarks, servicemarks, trade names, and trade dress, in each case together with any applications and registrations therefor and all appurtenant goodwill relating thereto; trade secrets, commercial and technical information, know-how, proprietary or confidential information, including engineering, production and other designs, notebooks, processes, drawings, specifications, formulae, and technology; computer and electronic data processing programs and software (object and source code), data bases and documentation thereof; inventions (whether patented or not); and all other intellectual property under the laws of any country throughout the world.

"IPO AND DISTRIBUTION AGREEMENT" means the agreement to be entered into between GM and Delphi on or before the IPO Effective Date, the form of which is attached hereto as Exhibit E-1.

"IPO EFFECTIVE DATE" means the date on which the IPO Registration Statement is declared effective by the Commission.

"IPO REGISTRATION STATEMENT" means the registration statement on Form S-1, Registration No. 333-67333 filed by Delphi with the Securities and Exchange Commission in connection with the initial public offering of the Delphi Common Stock, together with all amendments and supplements thereto.

"LIABILITIES" means any and all debts, liabilities, guarantees, assurances, commitments and obligations, whether fixed, contingent or absolute, asserted or unasserted, matured or unmatured, liquidated or unliquidated, accrued or not accrued, known or unknown, due or to become due, whenever or however arising (including, without limitation, whether arising out of any Contract or tort based on negligence or strict liability) and whether or not the same would be required by generally accepted accounting principles to be reflected in financial statements or disclosed in the notes thereto.

"NITA" means the Agreement for the Indemnification of United States Federal, State and Local Non-Income Taxes, between GM and Delphi, a copy of which is attached hereto as Exhibit L-2.

"NON-INCOME TAXES" has the meaning set forth in the NITA.

"PERSON" means an individual, partnership, limited liability company, joint venture, corporation, trust, unincorporated association, any other entity, or a government or any department or agency or other unit thereof.

"PRIOR RELATIONSHIP" means the ownership relationship between GM and Delphi at any time prior to the Contribution Date.

"REGISTRATION RIGHTS AGREEMENT" means the agreement to be entered into between GM and Delphi on or before the IPO Effective Date, the form of which is attached hereto as Exhibit E-2.

"REPRESENTATIVES" means directors, officers, employees, agents, consultants, advisors, accountants, attorneys and representatives.

9

"SUBSIDIARY" means with respect to any specified Person, any corporation, any limited liability company, any partnership or other legal entity of which such Person or any of its Subsidiaries Controls or owns, directly or indirectly, more than 50% of the stock of other equity interest entitled to vote on the election of the members to the board of directors or similar governing body.

"SUPPLY AGREEMENT" means the Component Supply Agreement, effective as of the Contribution Date, between GM and Delphi, a copy of which is attached hereto as Exhibit K-1.

"THIRD-PARTY CLAIM" means any claim, suit, arbitration, inquiry, proceeding or investigation by or before any court, governmental or other regulatory or administrative agency or commission or any arbitration tribunal asserted by a Person other than any party hereto or their respective Affiliates which gives rise to a right of indemnification hereunder.


ARTICLE 2

CONTRIBUTION AND ASSUMPTION

SECTION 2.01. Contribution of Assets.

(a) Except as provided for in Section 2.01(c), on the Contribution Date, GM (i) hereby transfers (or causes its appropriate Subsidiaries and Representatives to transfer) the Delphi Assets in the following order: (A) all intellectual property to be transferred pursuant to the intellectual property agreements attached hereto as Exhibits G-1 through G-5, to DTI (except that all Delco Electronics Corporation intellectual property shall be transferred to DTI after GM has transferred its stock ownership interest in DTI to Delco Electronics Corporation), (B) its stock ownership interest in DTI to Delco Electronics Corporation, (C) its stock ownership interest in Delco Electronics Corporation to DAS LLC and (D) all other Delphi Assets located in the United States, including the ownership interests listed on Schedule E but excluding those listed on Schedule F, to either Delphi or DAS LLC, and (ii) will have transferred or shall transfer as promptly as reasonably practicable (or cause its appropriate Subsidiaries and Representatives to transfer) the Delphi Assets located outside of the United States and the ownership interests of the United States and foreign entities listed on Schedule F owning such Delphi Assets, to either Delphi, the Delphi International Subsidiary, or such other Subsidiary as Delphi may direct. Each of Delphi, the Delphi U.S. Subsidiaries and Delphi International Subsidiary shall receive and accept such Delphi Assets, subject to the terms and conditions of this Agreement. GM further transfers to Delphi on the Contribution Date but after the transfers described in clause (i) above, its membership interest in DAS LLC and its stock ownership interest in the Delphi International Subsidiary, effective as of the Contribution Date. Each of Delphi, the Delphi U.S. Subsidiaries and Delphi International Subsidiary acknowledges and agrees that the foregoing transfers will be made "AS IS WHERE IS" and that neither GM nor any Subsidiary of GM has made or will make any warranty, express or implied, including without limitation any warranty of merchantability or fitness for a particular purpose, with respect to any Delphi Asset.

(b) On the Contribution Date, GM shall contribute to Delphi cash and/or cash equivalents in the aggregate amount of $1 billion. Additionally, GM shall contribute to Delphi such additional amounts as GM and Delphi agree, corresponding to the amounts Delphi will pay to GM (or an Affiliate of GM) in connection with the Canada and Brazil transactions described in Exhibits H-1 and H-2, respectively.

(c) Notwithstanding any other provision of this Agreement, this Agreement shall not transfer or effect the assignment or assumption of any Assets or Liabilities of the Delphi Automotive Systems Business provided for in the agreements constituting Exhibits H-1 through H-110 referred to in Schedule A to this Agreement, except as such Assets and Liabilities shall be transferred and assumed on the dates and in accordance with the terms set forth herein and in such agreements.

6

10

(d) GM and Delphi additionally shall comply with the terms of the letters from GM to Delphi, copies of which are attached hereto as Schedules G and H, which relate to the extension of eligibility for Delphi employees to participate in the GM Vehicle Purchase Programs.

SECTION 2.02.        Assumption of Liabilities.

(a) General. Effective as of the Contribution Date, each of Delphi and/or the Delphi U.S. Subsidiaries, as directed by Delphi, hereby assumes and on a timely basis shall pay, perform, satisfy and discharge in accordance with their terms the Delphi Liabilities relating to the operations of the Delphi Automotive Systems Business in the United States. Delphi International Subsidiary shall, and shall utilize its best efforts to recommend and encourage its respective Subsidiaries and Affiliates to, assume and on a timely basis pay, perform, satisfy and discharge in accordance with their terms, the Delphi Liabilities relating to the operations of the Delphi Automotive Systems Business outside of the United States.

(b) Divested Business. Delphi shall, with respect to the businesses and operations divested by the Delphi Automotive Systems Business, assume all Liabilities of GM related thereto; provided, however, that Delphi shall not assume those Liabilities relating to operations divested by the Delphi Automotive Systems Business to the extent such Liabilities are expressly retained by GM pursuant to the terms of this Agreement or the Ancillary Agreements (including without limitation, the Employee Matters Agreement, the Environmental Matters Agreement and the Real Estate Matters Agreement) and the Liabilities assumed by Delphi shall include, without limitation, the obligation to satisfy all of the obligations of GM under the various agreements pursuant to which the Delphi Automotive Systems Business effected such divestitures (the "Divestiture Agreements"); provided, further, however, that notwithstanding the foregoing or any other provision of this Agreement or any Ancillary Agreement, responsibility for certain obligations relating to certain divestitures shall be allocated between the parties as set forth on Schedule I hereto.

(c) Machinery and Equipment Leases Related to the Delphi Automotive Systems Business. The parties hereto hereby agree that to the extent that GM entered into a lease with a third party dated prior to the Contribution Date pursuant to which GM agreed to lease (i) machinery and/or equipment for use by the Delphi Automotive Systems Business and (ii) machinery and/or equipment for use by GM businesses other than the Delphi Automotive Systems Business, upon identification of any such lease, GM and Delphi will enter into a sublease with terms identical or as similar as possible to such original lease pursuant to which Delphi will sublease from GM that portion of the machinery and/or equipment used by the Delphi Automotive Systems Business covered under such original lease.

(d) Nonrecurring Costs and Expenses. Notwithstanding anything herein to the contrary, any nonrecurring costs and expenses incurred by the parties hereto to effect the transactions contemplated hereby which are not allocated pursuant to the terms of this Agreement or any Ancillary Agreement shall be the responsibility of the party which incurs such costs and expenses.

SECTION 2.03.        Methods of Transfer and Assumption.

(a) The parties shall enter into the Ancillary Agreements, other than the IPO and Distribution Agreement and the Registration Rights Agreement, on or about the date of this Agreement. To the extent that the transfer of any Delphi Asset or the assumption of any Delphi Liability is expressly provided for by the terms of any Ancillary Agreement, the terms of such Ancillary Agreement shall determine the manner of the transfer or assumption. It is the intent of the parties that pursuant to Section 2.01, the transfer and assumption of all other Delphi Assets and Delphi Liabilities shall be made effective as of the Contribution Date, provided, however, that circumstances in various jurisdictions outside the United States may require the transfer of certain Assets and the assumption of certain Liabilities to occur in such other manner and at such other time as the parties shall agree.

(b) The parties intend to complete the transfer of all Delphi Assets and the assumption of all Delphi Liabilities effective on or prior to the Contribution Date but shall, subject to Section 4.03 hereof, and to the extent

7

11

that any such transfers and assumptions are not completed prior to the
Contribution Date, take all actions reasonably necessary or appropriate to
complete such transactions as promptly thereafter as possible. In addition to
those transfers and assumptions accurately identified and designated by the
parties to take place but which the parties are not able to effect prior to the
Contribution Date, there may exist (i) Assets that the parties discover were,
contrary to the agreements between the parties, by mistake or omission,
transferred to Delphi or retained by GM or (ii) Liabilities that the parties
discover were, contrary to the agreements between the parties, by mistake or
omission, assumed by Delphi or not assumed by Delphi. The parties shall, between
the Contribution Date and the earlier of the Distribution Date or six months
from the Contribution Date, cooperate in good faith to effect the transfer or
re-transfer of such Assets, and/or the assumption or re-assumption of such
Liabilities, to or by the appropriate party and shall not use the determination
of remedial actions contemplated herein to alter the original intent of the
parties hereto with respect to the Assets to be transferred to or Liabilities to
be assumed by Delphi. Each party shall reimburse the other or make other
financial adjustments (e.g., without limitation, cash reserves) or other
adjustments to remedy any mistakes or omissions relating to any of the Assets
transferred hereby or any of the Liabilities assumed hereby.

        (c)    Each party shall execute and deliver to each other party all such
documents, instruments, certificates and agreements in appropriate form, and to
make all filings and recordings and to take all such other actions, as shall be
necessary or reasonably requested by such other party, whether before or after
the Contribution Date, in order to give full effect to and evidence and perfect
the transfer and contribution of the Delphi Assets and the Delphi Liabilities as
contemplated hereby. However, Delphi acknowledges and agrees that neither GM nor
any Subsidiary of GM will comply with the provisions of any bulk transfer law of
any jurisdiction in connection with the transfer of any Delphi Asset.

        (d)    Any Subsidiary of Delphi that will receive any Delphi Asset or
assume any Delphi Liability shall for all purposes be deemed to be a party to
this Agreement.

        SECTION 2.04. Nonassignable Contracts. Anything contained herein to the
contrary notwithstanding, this Agreement shall not constitute an agreement to
assign any Asset or Liability if an assignment or attempted assignment of the
same without the consent of another Person would constitute a breach thereof or
in any way impair the rights of a party thereunder or give to any third party
any rights with respect thereto. If any such consent is not obtained or if an
attempted assignment would be ineffective or would impair such party's rights
under any such Asset or Liability so that the party entitled to the benefits and
responsibilities of such purported transfer (the "Intended Transferee") would
not receive all such rights and responsibilities, then (x) the party purporting
to make such transfer (the "Intended Transferor") shall use commercially
reasonable efforts to provide or cause to be provided to the Intended
Transferee, to the extent permitted by law, the benefits of any such Asset or
Liability and the Intended Transferor shall promptly pay or cause to be paid to
the Intended Transferee when received all moneys received by the Intended
Transferor with respect to any such Asset and (y) in consideration thereof the
Intended Transferee shall pay, perform and discharge on behalf of the Intended
Transferor all of the Intended Transferor's Liabilities thereunder in a timely
manner and in accordance with the terms thereof which it may do without breach.
In addition, the Intended Transferor shall take such other actions as may
reasonably be requested by the Intended Transferee in order to place the
Intended Transferee, insofar as reasonably possible, in the same position as if
such Asset had been transferred as contemplated hereby and so all the benefits
and burdens relating thereto, including possession, use, risk of loss, potential
for gain and dominion, control and command, shall inure to the Intended
Transferee. If and when such consents and approvals are obtained, the transfer
of the applicable Asset shall be effected in accordance with the terms of this
Agreement. To the extent that the Delphi Liabilities include liabilities,
obligations or commitments pursuant to any contract, permit, license, franchise
or other Asset to which Delphi also has any rights, GM shall, to the extent such
asset is not a Delphi Asset, upon request by Delphi either assign such rights to
Delphi or assert and seek to enforce such rights for the benefit of Delphi.

        SECTION 2.05.  Transition Services.

        (a)    For a period of twelve months following the Contribution Date
(the "Transition Period"), GM shall use its reasonable best efforts to provide,
or cause its Affiliates to use their reasonable best efforts to provide,

8

12

to Delphi or its Affiliates all Transition Services in the manner and at a
relative level of service consistent in all material respects with that provided
by GM or its Affiliates to the Delphi Automotive Systems Business immediately
prior to the Contribution Date. Delphi shall use all commercially reasonable
efforts to obtain all such Transition Services from a source other than GM and
its Affiliates commencing upon the conclusion of the Transition Period; provided
that, if (x) Delphi cannot obtain any Transition Service from a source other
than GM and its Affiliates and (y) such Transition Service is necessary in order
to operate the Delphi Automotive Systems Business in substantially the same
manner as it was conducted immediately prior to the Contribution Date, then GM
(or its Affiliates) shall provide such Transition Service to Delphi (or its
Affiliates) for an additional period not to exceed six months. For the purpose
of this Section 2.05, "Transition Services" means any services provided by GM,
its Affiliates or their suppliers to the Delphi Automotive Systems Business
immediately prior to the Contribution Date which Delphi reasonably identifies
and requests in writing that GM provide to it during the Transition Period;
provided that Transition Services expressly excludes any such services which
shall be provided to Delphi or its Affiliates pursuant to the terms of other
sections of this Agreement or any of the Ancillary Agreements; provided,
further, that Transition Services expressly excludes any such services which GM
would not be legally permitted to provide to a third party.

(b)    Notwithstanding anything contained in this Agreement or in any
Ancillary Agreement to the contrary, except with respect to all services to be
provided by GM to Delphi pursuant to the Financial Services Supply Agreement,
the Commercial Travel Services Supply Agreement, any real estate leases and any
health care services to be provided by GM to Delphi pursuant to the Employee
Matters Agreement, for all Transition Services provided by GM (or its
Affiliates) to Delphi (or its Affiliates) pursuant to section 2.05(a) above and
for all other services to be provided by GM (or its Affiliates) to Delphi (or
its Affiliates) pursuant to any of the Ancillary Agreements, Delphi shall pay to
GM on or prior to the fifteenth day following the date of Delphi's receipt of an
invoice related to the provision of such services (x) in the case of any
Transition Service or any service to be provided pursuant to an Ancillary
Agreement in which a payment amount or formula has not been set forth, an amount
equal to the cost historically allocated to the Delphi Automotive Systems
Business as of the Contribution Date for such service, adjusted to reflect any
changes in the nature, cost or level of the services provided; provided that, if
no cost has historically been allocated to the Delphi Automotive Systems
Business for any Transition Service or for such other service, then Delphi shall
pay to GM (i) that portion of the total cost borne by GM which GM would have
allocated to Delphi under its internal allocation formula, plus (ii) any direct
user charges or similar type charges resulting from Delphi's use or services
which are not recouped by GM under the charges provided for in (i), plus (iii)
any other reasonable charges necessary to make GM whole for the provision of
such services or (y) in the case of any service to be provided pursuant to an
Ancillary Agreement in which a payment amount or formula has been set forth, the
amount owed pursuant to the terms of such Ancillary Agreement. Payments under
this Section made on or after the first business day following the forty-fifth
day after the date of Delphi's receipt of the invoice related to the provision
of the relevant service shall be accompanied by a payment of interest to be
calculated as follows:

Transitional Service (or other service) Payment x Prime Rate x Number of days late, to
                                                 ----------   the date of actual
                                                  365 days    payment.

As used in this Section 2.05(b), the "Prime Rate" shall mean to the prime rate
as published in the Wall Street Journal on the first business day following the
forty-fifth day after the date of Delphi's receipt of the invoice related to the
provision of the relevant service.

(c)    Notwithstanding anything contained in this Agreement or in any
Ancillary Agreement to the contrary, any charges to GM from outside suppliers
for the provision of Transition Services or any other services provided pursuant
to any Ancillary Agreement and any other costs which are attributable to the
operation of Delphi other than incidental costs provided in connection with
Transition Services or such other services which GM (or an Affiliate of GM)
incurs shall be submitted by GM to Delphi for payment and, except as GM may
otherwise agree in connection with any individual statement of charges which has
been submitted to GM, Delphi hereby agrees to make payment therefor either (i)
to such outside supplier in accordance with the payment terms of such outside
supplier or (ii) where GM is required to pay such outside supplier, on or before
the date on which GM notifies

9

13

Delphi it intends to make payment, or if GM does not provide such notice, immediately after GM provides notice to Delphi that GM has made such payment.

(d)    Notwithstanding anything to the contrary herein, Delphi shall be responsible for providing the transitional services agreed to by the parties (or, where no specific terms have been agreed to, then in accordance with the terms of Section 2.05(b) hereof) with respect to the businesses set forth on Schedule J hereto.

ARTICLE 3

ANCILLARY AGREEMENTS

(a)    General. GM and Delphi acknowledge that the Ancillary Agreements, other than the IPO and Distribution Agreement and the Registration Rights Agreement, have been or will be entered into prior to the Contribution Date by the parties hereto and/or by their respective Subsidiaries. GM and Delphi shall take all steps reasonably necessary to cause their respective Subsidiaries and Affiliates to enter into and perform such Ancillary Agreements in accordance with their terms.

(b)    Priority. Except with respect to Sections 2.05 (b) and (c) above, to the extent that any Ancillary Agreement expressly addresses any matters addressed by this Agreement, including, without limitation, matters covered by Article 2 and Article 5 hereof, the terms and conditions of such Ancillary Agreement shall govern the rights and obligations of the parties with respect to such matters.

(c)    Extensions of Transition Services. Delphi shall use all commercially reasonable efforts to obtain services provided to it by GM under the terms of the Ancillary Agreements relating to transitional services from a source other than GM. Certain Ancillary Agreements relating to transitional services provide that the parties may extend the transition service beyond the termination of the transition periods provided for therein. The parties expect that any such extension would be negotiated by GM and Delphi after the Distribution. In the event of an extension of any transitional service, GM and Delphi shall negotiate at arm's length the terms of any such extension, including fair market value pricing for all such services.

ARTICLE 4

COVENANTS

SECTION 4.01. IPO and Distribution Agreement. GM and Delphi hereby agree to execute and deliver, on or before the IPO Effective Date, the IPO and Distribution Agreement, in form and substance substantially as set forth on Exhibit E-1 hereto, with such modifications to such form as the parties shall mutually deem reasonably necessary and desirable; provided, that GM shall be entitled in its sole and absolute discretion at any time and from time to time to make any modifications to the provisions thereof relating to the preservation of the tax-free nature of the Distribution or the tax-free nature of the transactions contemplated hereby as it shall reasonably deem necessary or desirable.

SECTION 4.02. Registration Rights Agreement. GM and Delphi hereby agree to execute and deliver, on or before the IPO Effective Date, the Registration Rights Agreement, in form and substance substantially as set forth on Exhibit E-2 hereto, with such modifications to such form as the parties shall mutually deem reasonably necessary and desirable.

SECTION 4.03. Delayed Asset Transfers. GM and Delphi hereby agree to use their best efforts and, where applicable, to cause their subsidiaries to use their best efforts to consummate the transactions contemplated by

10

14

Section 2.01(c) hereof and the other provisions hereof as and when contemplated
in the relevant Ancillary Agreements.

ARTICLE 5

INDEMNIFICATION

SECTION 5.01. Indemnification by Delphi. Delphi and each Subsidiary of
Delphi which shall receive any Delphi Asset or Delphi Liability transferred
pursuant to the terms of this Agreement and their respective
successors-in-interest and assigns (the "Indemnifying Parties") shall jointly
and severally indemnify, defend and hold harmless GM and each of its
Subsidiaries and their respective successors-in-interest, and each of their
respective past and present Representatives (the "Indemnitees") against any
losses, claims, damages, liabilities or actions, resulting from, relating to or
arising, whether prior to or following the Contribution Date, out of or in
connection with (a) the Delphi Liabilities and/or (b) Delphi's conduct of its
business and affairs after the Contribution Date and the Indemnifying Parties
shall reimburse such entity, each such Subsidiary, each such
successor-in-interest and each such Representative for any reasonable attorneys'
fees or any other expenses reasonably incurred by any of them in connection with
investigating and/or defending any such loss, claim, damage, liability or
action.

SECTION 5.02.    Indemnification Procedures.

(a)    If any Indemnitee receives notice of the assertion of any
Third-Party Claim with respect to which an Indemnifying Party is obligated under
this Agreement to provide indemnification, such Indemnitee shall promptly give
such Indemnifying Party notice thereof (together with a copy of such Third-Party
Claim, process or other legal pleading) promptly after becoming aware of such
Third-Party Claim; provided, however, that the failure of any Indemnitee to give
notice as provided in this Section 5.02 shall not relieve any Indemnifying Party
of its obligations under this Section 5.02, except to the extent that such
Indemnifying Party is actually prejudiced by such failure to give notice. Such
notice shall describe such Third-Party Claim in reasonable detail.

(b)    An Indemnifying Party, at such Indemnifying Party's own expense
and through counsel chosen by such Indemnifying Party (which counsel shall be
reasonably acceptable to the Indemnitee), may elect to defend any Third-Party
Claim. If an Indemnifying Party elects to defend a Third-Party Claim, then,
within ten Business Days after receiving notice of such Third-Party Claim (or
sooner, if the nature of such Third Party claim so requires), such Indemnifying
Party shall notify the Indemnitee of its intent to do so, and such Indemnitee
shall cooperate in the defense of such Third-Party Claim. Such Indemnifying
Party shall pay such Indemnitee's reasonable out-of-pocket expenses incurred in
connection with such cooperation. Such Indemnifying Party shall keep the
Indemnitee reasonably informed as to the status of the defense of such
Third-Party Claim. After notice from an Indemnifying Party to an Indemnitee of
its election to assume the defense of a Third-Party Claim, such Indemnifying
Party shall not be liable to such Indemnitee under this Section 5.02 for any
attorneys' fees or other expenses subsequently incurred by such Indemnitee in
connection with the defense thereof other than those expenses referred to in the
preceding sentence; provided, however, that such Indemnitee shall have the right
to employ one law firm as counsel, together with a separate local law firm in
each applicable jurisdiction ("Separate Counsel"), to represent such Indemnitee
in any action or group of related actions (which firm or firms shall be
reasonably acceptable to the Indemnifying Party) if, in such Indemnitee's
reasonable judgment at any time, either a conflict of interest between such
Indemnitee and such Indemnifying Party exists in respect of such claim, or there
may be defenses available to such Indemnitee which are significantly different
from or in addition to those available to such Indemnifying Party and the
representation of both parties by the same counsel would, in the reasonable
judgment of the Indemnitee, be inappropriate, and in that event (i) the
reasonable fees and expenses of such Separate Counsel shall be paid by such
Indemnifying Party (it being understood, however, that the Indemnifying Party
shall not be liable for the expenses of more than one Separate Counsel
(excluding local counsel) with respect to any Third-Party Claim (even if against
multiple Indemnitees)) and (ii) each of such Indemnifying Party and such
Indemnitee shall have the right to conduct its own defense in respect of such
claim. If an Indemnifying Party elects not to defend against a Third-Party
Claim, or fails to notify an Indemnitee of its election as provided in this
Section 5.02 within the period of ten Business

11

15

Days described above, the Indemnitee may defend, compromise, and settle such Third-Party Claim and shall be entitled to indemnification hereunder (to the extent permitted hereunder); provided, however, that no such Indemnitee may compromise or settle any such Third-Party claim without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, the Indemnifying Party shall not, without the prior written consent of the Indemnitee, (i) settle or compromise any Third-Party Claim or consent to the entry of any judgment which does not include as an unconditional term thereof the delivery by the claimant or plaintiff to the Indemnitee of a written release from all liability in respect of such Third-Party Claim or (ii) settle or compromise any Third-Party Claim in any manner that would be reasonably likely to have a material adverse effect on the Indemnitee.

SECTION 5.03.    Certain Limitations.

(a)    The amount of any indemnifiable losses or other liability for which indemnification is provided under this Agreement shall be net of any amounts actually recovered by the Indemnitee from third parties (including, without limitation, amounts actually recovered under insurance policies) with respect to such indemnifiable losses or other liability. Any Indemnifying Party hereunder shall be subrogated to the rights of the Indemnitee upon payment in full of the amount of the relevant indemnifiable loss. An insurer who would otherwise be obligated to pay any claim shall not be relieved of the responsibility with respect thereto or, solely by virtue of the indemnification provision hereof, have any subrogation rights with respect thereto. If any Indemnitee recovers an amount from a third party in respect of an indemnifiable loss for which indemnification is provided in this Agreement after the full amount of such indemnifiable loss has been paid by an Indemnifying Party or after an Indemnifying Party has made a partial payment of such indemnifiable loss and the amount received from the third party exceeds the remaining unpaid balance of such indemnifiable loss, then the Indemnitee shall promptly remit to the Indemnifying Party the excess (if any) of (A) the sum of the amount theretofore paid by such Indemnifying Party in respect of such indemnifiable loss plus the amount received from the third party in respect thereof, less (B) the full amount of such indemnifiable loss or other liability.

(b)    The amount of any loss or other liability for which indemnification is provided under this Agreement shall be (i) increased to take account of any net tax cost incurred by the Indemnitee arising from the receipt or accrual of an indemnification payment hereunder (grossed up for such increase) and (ii) reduced to take account of any net tax benefit realized by the Indemnitee arising from incurring or paying such loss or other liability. In computing the amount of any such tax cost or tax benefit, the Indemnitee shall be deemed to recognize all other items of income, gain, loss, deduction or credit before recognizing any item arising from the receipt or accrual of any indemnification payment hereunder or incurring or paying any indemnified loss. Any indemnification payment hereunder shall initially be made without regard to this Section 5.03(b) and shall be increased or reduced to reflect any such net tax cost (including gross-up) or net tax benefit only after the Indemnitee has actually realized such cost or benefit. For purposes of this Agreement, an Indemnitee shall be deemed to have "actually realized" a net tax cost or a net tax benefit to the extent that, and at such time as, the amount of taxes payable by such Indemnitee is increased above or reduced below, as the case may be, the amount of taxes that such Indemnitee would be required to pay but for the receipt or accrual of the indemnification payment or the incurrence or payment of such loss, as the case may be. The amount of any increase or reduction hereunder shall be adjusted to reflect any Final Determination with respect to the Indemnitee's liability for taxes, and payments between such indemnified parties to reflect such adjustment shall be made if necessary.

(c)    Any indemnification payment made under this Agreement shall be characterized for tax purposes as if such payment were made immediately prior to the Contribution Date.

16

ARTICLE 6

ACCESS TO INFORMATION

SECTION 6.01  Restrictions on Disclosure of Information.

(a)   Without limiting any rights or obligations under any other
agreement between or among the parties hereto and/or any of their respective
Affiliates relating to confidentiality, for a period of three years following
the Contribution Date, each of the parties hereto agrees that it shall not, and
shall not permit any of its Affiliates or Representatives to, disclose any
Confidential Information to any Person, other than to such Affiliates or
Representatives on a need-to-know basis in connection with the purpose for which
the Confidential Information was originally disclosed. Notwithstanding the
foregoing, each of the parties hereto and its respective Affiliates and
Representatives may disclose such Confidential Information, and such Information
shall no longer be deemed Confidential Information, to the extent that such
party can demonstrate that such Confidential Information is or was (i) available
to such party outside the context of the Prior Relationship on a nonconfidential
basis prior to its disclosure by the other party, (ii) in the public domain
other than by the breach of this Agreement or by breach of any other agreement
between or among the parties hereto and/or any of their respective Affiliates
relating to confidentiality, or (iii) lawfully acquired outside the context of
the Prior Relationship on a nonconfidential basis or independently developed by,
or on behalf of, such party by Persons who do not have access to, or
descriptions of, any such Confidential Information. Additionally,
notwithstanding anything to the contrary herein, any Information provided by GM
to Delphi or by Delphi to GM shall, except as hereafter agreed to in writing by
the parties, not be deemed Confidential Information with respect to the use of
such Information by Delphi in the ordinary course of Delphi's business or by GM
in the ordinary course of GM's business, respectively.

(b)   Each of the parties hereto shall maintain, and shall cause their
respective Affiliates to maintain, policies and procedures, and develop such
further policies and procedures as shall from time to time become necessary or
appropriate, to ensure compliance with this Section 6.01.

SECTION 6.02. Legally Required Disclosure of Confidential Information.
If any of the parties to this Agreement or any of their respective Affiliates or
Representatives becomes legally required to disclose any Confidential
Information, such disclosing party shall promptly notify the party owning the
Confidential Information (the "Owning Party") and shall use all commercially
reasonable efforts to cooperate with the Owning Party so that the Owning Party
may seek a protective order or other appropriate remedy and/or waive compliance
with this Section 6.02. All expenses reasonably incurred by the disclosing party
in seeking a protective order or other remedy shall be borne by the Owning
Party. If such protective order or other remedy is not obtained, or if the
Owning Party waives compliance with this Section 6.02, the disclosing party or
its Affiliate or Representative, as applicable, shall (a) disclose only that
portion of the Confidential Information which its legal counsel advises it is
compelled to disclose or else stand liable for contempt or suffer other similar
significant corporate censure or penalty, (b) use all commercially reasonable
efforts to obtain reliable assurance requested by the Owning Party that
confidential treatment will be accorded such Confidential Information, and (c)
promptly provide the Owning Party with a copy of the Confidential Information so
disclosed, in the same form and format so disclosed, together with a description
of all Persons to whom such Confidential Information was disclosed.

SECTION 6.03. Access to Information. During the Retention Period (as
defined in Section 6.04 below), each of the parties hereto shall cooperate with
and afford, and shall cause their respective Affiliates, Representatives,
Subsidiaries, successors and/or assignees, and shall use reasonable efforts to
cause joint ventures that are not Affiliates (collectively, "Related Parties")
to cooperate with and afford, to the other party reasonable access upon
reasonable advance written request to all information (other than information
which is (i) protected from disclosure by the attorney client privilege or work
product doctrine, (ii) proprietary in nature or (iii) the subject of a
confidentiality agreement between such party and a third party which prohibits
disclosure to the other party) within such party's or any Related Party's
possession which was created prior to the Contribution Date or, with

13

17

respect to any information which would be relevant to the provision of a
transitional service pursuant to this Agreement or any Ancillary Agreement,
information created during the period in which one party is providing the other
party with such transition service. Access to the requested information shall be
provided so long as it relates to the requesting party's (the "Requestor")
business, assets or liabilities, and access is reasonably required by the
Requestor as a result of the parties' Prior Relationship for purposes of
auditing, accounting, claims or litigation (except for claims or litigation
between the parties hereto), employee benefits, regulatory or tax purposes or
fulfilling disclosure or reporting obligations including, without limitation,
Information reasonably necessary for the preparation of reports required by or
filed under the Securities Exchange Act of 1934, as amended, with respect to any
period entirely or partially prior to the Contribution Date.

        Access as used in this paragraph shall mean the obligation of a party
in possession of Information (the "Possessor") requested by the Requestor to
exert its reasonable best efforts to locate all requested Information that is
owned and possessed by Possessor or any Related Party. The Possessor, at its own
expense, shall conduct a diligent search designed to identify all requested
Information and shall collect all such Information for inspection by the
Requestor during normal business hours at the Possessor's place of business.
Subject to confidentiality and/or security provisions as the Possessor may
reasonably deem necessary, the Requestor may have all requested Information
duplicated at Requestor's expense. Alternatively, the Possessor may choose to
deliver, at its own expense, all requested Information to the Requestor in the
form it was requested by the Requestor. If so, the Possessor shall notify the
Requestor in writing at the time of delivery if such Information is to be
returned to the Possessor. In such case, the Requestor shall return such
Information when no longer needed to the Possessor at the Possessor's expense.

        In connection with providing Information pursuant to this Section 6.03,
each of the parties hereto shall upon the request of the other party make
available its respective employees (and those of their respective Related
Parties, as applicable) to the extent that they are reasonably necessary to
discuss and explain all requested Information with and to the requesting party.

        SECTION 6.04.  Record Retention.

        (a)    Books and Records. Delphi shall preserve and keep all books and
records included in the Delphi Assets or otherwise in the possession of Delphi
or its Related Parties, whether in electronic form or otherwise, for no less
than ten years from the Contribution Date, or for any longer period as may be
required by any government agency, GM's record retention schedule effective as
of the Contribution Date or as GM may subsequently notify Delphi that such
schedule has been modified, litigation (including applicable "Litigation
Holds"), law, regulation, audit or appeal of taxes, tax examination or the
expiration of the periods described in Section 6.04 (c), where applicable (the
"Retention Period") at Delphi's sole cost and expense. If Delphi wishes to
dispose of any books and records or other documents which it is obligated to
retain under this Section 6.04 after the Retention Period, then Delphi shall
first provide 90 days' written notice to GM and GM shall have the right, at its
option and expense, upon prior written notice within such 90-day period, to take
possession of such books or records or other documents within 180 days after the
date of Delphi's notice to GM hereunder. Written notice of intent to dispose of
such books and records shall include a description of the books and records in
detail sufficient to allow GM to reasonably assess its potential need to retain
such materials. In the event Delphi enters into an agreement with a third party
to sell a portion of its business, together with the books and records related
thereto, GM shall have the right to duplicate such books and records prior to
any such disposition and, should the purchaser of the Delphi business be a
competitor of GM, GM shall have the right to prohibit the transfer or disclosure
to such party of that portion of the former books and records of GM which GM
notifies Delphi contain confidential and proprietary information. To the extent
that books and records of GM or any of its Affiliates which contain information
relating to the Delphi Automotive Systems Business are not included in the
Delphi Assets, GM agrees to cooperate with Delphi in providing Delphi with any
such information upon Delphi's reasonable request to the extent that any such
information exists and is reasonably separable from GM information unrelated to
the Delphi Automotive Systems Business. Delphi shall reimburse GM for all of its
reasonable out-of-pocket costs incurred in connection with any such request.

18

(b)   Technical Documentation and Personnel. In addition to the retention requirements of Section 6.04(a), for a period no less than the Retention Period, Delphi, at its sole cost and expense, shall use its reasonable best efforts to maintain all technical documentation in its possession or in the possession of any of its Related Parties applicable to product design, test, release, and validation at locations at which such technical documents shall be reasonably accessible to GM upon request (at GM's sole cost and expense) and, to the extent reasonably possible, through employees of Delphi who formerly performed that task for GM. In addition to the obligations set forth in Section 6.05 hereof, Delphi shall, from time to time, at the reasonable request of GM, cooperate fully with GM in providing GM, to the extent reasonably possible through Delphi employees formerly employed by GM who previously performed the same functions on behalf of GM, with technical assistance and information in respect to any claims brought against GM involving the conduct of the Delphi Automotive Systems Business prior to the Contribution Date, including consultation and/or the appearance(s) of such persons on a reasonable basis as expert or fact witnesses in trials or administrative proceedings. GM shall reimburse Delphi for its reasonable out-of-pocket costs (travel, hotels, etc.) of providing such services, consistent with GM's policies and practices regarding such expenditures. Additionally, GM shall, from time to time, at the reasonable request of Delphi, cooperate fully with Delphi in providing Delphi, to the extent reasonably possible through applicable GM employees, with technical assistance and information in respect to any claims brought against Delphi involving the conduct of the Delphi Automotive Systems Business prior to the Contribution Date, including consultation and/or the appearance(s) of such persons on a reasonable basis as expert or fact witnesses in trials or administrative proceedings. Delphi shall reimburse GM for its reasonable out-of-pocket costs (travel, hotels, etc.) of providing such services, consistent with Delphi's policies and practices regarding such expenditures.

In particular, Delphi shall: (i) retain all documents required to be maintained by international, national, state, provincial, regional or local regulations and all documents that may be reasonably required to establish due care or to otherwise assist GM in pursuing, contesting or defending such claims; (ii) make available its documents and records in connection with any pursuit, contest or defense, including, subject to an appropriate confidentiality agreement or protective order, documents that may be considered to be "confidential" or subject to trade secret protection ; (iii) promptly respond to discovery requests in connection with such claim, understanding and acknowledging that the requirements of discovery in connection with litigation require timely responses to interrogatories, requests to produce, requests for admission and depositions and also understanding and acknowledging that any delays in connection with responses to discovery may result in sanctions; (iv) make available, as may be reasonably necessary and upon reasonable advance notice and for reasonable periods so as not to interfere materially with Delphi's business, mutually acceptable engineers, technicians or other knowledgeable individuals to assist GM in connection with such claim, including investigation into claims and occurrences described in this section and preparing for and giving factual and expert testimony at depositions, court proceedings, inquiries, hearings and trial; (v) make available facilities and exemplar parts for the sole and limited use of assisting GM in the contest or defense; and (vi) acknowledge that GM is responsible for and will control, as between GM and Delphi, the conduct of the pursuit, contest or defense.

(c)   Tax Related Records. GM and Delphi agree to retain all Income Tax Returns, related schedules and workpapers, and all material records and other documents as required under Section 6001 of the Code, as well as by any similar provision of state or local income tax law, until the later of (i) the expiration of the applicable statute of limitations for the tax period to which the records relate, or (ii) the Final Determination has been made with respect to all issues related to the final Consolidated Tax Period.

With respect to Non-Income Taxes, GM and Delphi agree to retain all Non-Income Tax Returns, related schedules and workpapers, and all material records and other documents as required under Federal, state or local law, until the later of (i) the expiration of the applicable statute of limitations for the tax period to which the records relate, or (ii) a Determination has been made with respect to all issues for the tax periods to which NITA applies.

If either party wishes to dispose of any such records or documents after such retention period, then the procedure described in (a) above shall apply.

15

19

SECTION 6.05. Production of Witnesses. Until the six-year anniversary of the Contribution Date, each of the parties hereto shall use all commercially reasonable efforts, and shall cause each of their respective Affiliates to use all commercially reasonable efforts, to make available to each other, upon written request, its directors, officers, employees and other Representatives as witnesses to the extent that any such Person may reasonably be required (giving consideration to the business demands upon such Persons) in connection with any legal, administrative or other proceedings in which the requesting party may from time to time be involved; provided, however, that with respect to any legal or administrative proceedings relating to the tax liability of any of the parties hereto or any of their respective Affiliates, each of the parties hereto shall, and shall cause each of their respective Affiliates to, make their directors, officers, employees and other Representatives available as witnesses until such time as the statute of limitations have expired with respect to all tax years prior to and including the year in which the asset transfers contemplated by this Agreement are consummated.

SECTION 6.06. Reimbursement. Unless otherwise provided in this Article 6, each party to this Agreement providing access, information or witnesses to another party pursuant to Sections 6.03, 6.04 or 6.05 shall be entitled to receive from the recipient, upon the presentation of invoices therefor, payment for all reasonable out-of-pocket costs and expenses (excluding allocated compensation, salary and overhead expense) as may be reasonably incurred in providing such information or witnesses.


ARTICLE 7

CERTAIN CLAIMS AND LITIGATION


Section 7.01.   Product Liability Claims.

(a)    Applicability. GM and Delphi agree to the allocation of liability for all claims and causes of action, however presented, alleging that parts, components or systems that have been (i) manufactured by the Delphi Automotive Systems Business or Delphi or its Affiliates, or (ii) manufactured by a third party, whether sold or otherwise supplied separately, or incorporated into components or systems of Delphi or its Affiliates, in each case, which have been sold or otherwise supplied by the Delphi Automotive Systems Business, Delphi or its Affiliates to GM, its Affiliates or customers of Delphi other than GM or its Affiliates (the foregoing collectively constituting "Delphi Products") have caused or been alleged to cause personal inuries, injuries to property or other damages as set forth in this Section 7.01. The provisions in this Section 7.01 cover claims which include but are not limited to the following types of claims: claims premised on theories of negligence, strict liability, express or implied warranties of merchantability, fitness for ordinary use and/or compliance with reasonable consumer expectations, failure to issue adequate warnings, negligent and/or intentional misrepresentation, negligent and/or intentional infliction of emotional distress, failure to provide replacement and/or retrofit parts, and failure to conduct a recall or adequately conduct a recall that has been issued. The provisions set forth in this Section 7.01 apply to claims for compensatory damages as well as all claims for punitive or exemplary damages and all claims for defective design as well as all claims for defective manufacture.

(b)        Parts Components or Systems Manufactured by the Delphi
           Automotive Systems Business Prior to January 1, 1999.

(i)  As between GM and Delphi, Delphi shall assume the defense of all such claims involving Delphi Products sold or otherwise supplied prior to January 1, 1999 to customers other than GM or an Affiliate or Subsidiary of GM. Delphi shall indemnify, defend and hold harmless GM and its Affiliates against any and all such claims. Delphi shall reimburse GM and its Affiliates for any reasonable attorneys' fees or other expenses reasonably incurred by GM subsequent to December 31, 1998 in connection with investigating and/or defending against any such claim.


16

20

(ii) GM shall retain and/or assume the defense of all such claims involving parts, components or systems manufactured by the Delphi Automotive Systems Business prior to January 1, 1999 and sold or otherwise supplied to GM or its Affiliates before, on, or after January 1, 1999. GM shall indemnify, defend and hold harmless Delphi and its Affiliates against any and all such claims. GM shall reimburse Delphi and its Affiliates for any reasonable attorneys' fees or other expenses reasonably incurred by Delphi or its Affiliates subsequent to December 31, 1998 in connection with investigating and/or defending any such claim or securing the indemnification and/or defense that GM is required to provide pursuant to this paragraph.

(c)   Parts, Components or Systems Manufactured, Sold or otherwise Supplied by Delphi on or Subsequent to January 1, 1999.

(i)   Delphi shall defend GM and its Affiliates against all claims involving (A) parts, components or systems manufactured by Delphi or its Affiliates which on or subsequent to January 1, 1999 are sold or otherwise supplied to customers other than GM or its Affiliates; and (B) parts, components or systems acquired by the Delphi Automotive Systems Business or Delphi or its Affiliates from suppliers thereto other than GM or its Affiliates and sold or otherwise supplied by Delphi or its Affiliates on or subsequent to January 1, 1999 to customers other than GM or its Affiliates. Delphi or its Affiliates shall indemnify, defend and hold harmless GM and its Affiliates against any and all such claims. Delphi or its Affiliates shall reimburse GM and its Affiliates for any reasonable attorneys' fees or other expenses reasonably incurred by GM and its Affiliates in connection with investigating and/or defending any such claim or securing the indemnification and/or defense that Delphi and its Affiliates are required to provide pursuant to this paragraph.

(ii) The rights, obligations and liabilities of GM and Delphi with respect to claims involving parts, components or systems manufactured by Delphi or its affiliates subsequent to December 31, 1998 which are sold by Delphi or its Affiliates to GM or its Affiliates shall be determined according to the terms of the agreements relating to such sale.

(d)   Recall and Warranty Campaigns. Claims of GM or its Affiliates against the Delphi Automotive Systems Business in the nature of warranty and recall campaigns relating to parts, components or systems sold by the Delphi Automotive Systems Business to GM or its Affiliates (regardless of when or by whom manufactured (but excluding parts or systems manufactured by GM or its Affiliates)) which arise prior to or after the Contribution Date shall be determined according to the terms of the agreements relating to the sale of such parts, components or systems, all of which agreements are assumed by Delphi and its Affiliates pursuant to the terms of the Supply Agreement.

(e)   Notice. GM and Delphi agree that in the case of claims covered by either paragraphs (b) or (c) above, the party receiving such a claim will notify the other party within 30 days of receipt of written notice of the claim. Thereafter, the party being notified of the claim shall have 30 days to respond. The party first receiving such a claim shall take all reasonable action necessary to defend against the claim including, but not limited to, responding to court ordered deadlines before the expiration of the time for response.

Section 7.02.  General Litigation.

(a)   Claims to Be Transferred to Delphi. On the Contribution Date, the legal responsibilities for the claims identified on Schedule K shall be transferred in their entirety from GM to Delphi. As of the Contribution Date and thereafter, Delphi shall assume the defense of these claims. Delphi shall indemnify, defend and hold harmless GM against these claims. Delphi shall reimburse GM for any reasonable attorneys fees and all other expenses reasonably incurred by GM subsequent to the Contribution Date in connection with investigating and/or defending against any such claim, including reimbursement for any services provided by members of the GM Legal Staff.

17

21

(b)    Claims to be Defended by GM at Delphi's Expense. GM shall defend the claims identified in Schedule L; provided, however, that (i) Delphi shall indemnify and hold harmless GM against any judgments entered against GM on the claims identified on Schedule L or settlements of the claims identified on Schedule L, provided that GM may not compromise or settle any such claim without the prior written consent of Delphi, which shall not be unreasonably withheld or delayed, (ii) GM shall promptly compromise or settle claim(s) identified on Schedule L if Delphi so directs, (iii) GM shall promptly permit Delphi to assume responsibility for the defense of the claims identified on Schedule L if Delphi so requests and (iv) Delphi shall reimburse GM for any reasonable attorneys' fees and all other expenses reasonably incurred by GM subsequent to the Contribution Date in connection with defending against the claims identified on Schedule L, including reimbursement for any services provided by members of the GM Legal Staff.

(c)    Claims for which GM will Retain Liability. GM shall defend the claims identified on Schedule M and shall indemnify and hold harmless Delphi against any judgments entered against Delphi on the claims identified in Schedule M or settlements of the claims identified on Schedule M. GM shall reimburse Delphi for any reasonable attorneys' fees and all other expenses reasonably incurred by Delphi subsequent to the Contribution Date in connection with defending against the claims identified on Schedule M, including reimbursement for any services provided by members of the Delphi Legal Staff.

Section 7.03.  Employment Related Claims.

(a)    Claims to Be Transferred to Delphi. On the Contribution Date, the legal responsibilities for the claims identified on Schedule N shall be transferred in their entirety from GM to Delphi. Thereafter, Delphi shall assume the defense of these claims. Delphi shall indemnify, defend and hold harmless GM against these claims. Delphi shall reimburse GM for any reasonable attorneys' fees and all other expenses reasonably incurred by GM subsequent to the Contribution Date in connection with investigating and/or defending against any such claim, including reimbursement for any services provided by members of the GM Legal Staff.

(b)    Claims to be Jointly Defended by GM and Delphi. GM and Delphi shall jointly defend the claims identified in Schedule O; provided, however, that (i) Delphi shall indemnify and hold harmless GM against any judgments entered against GM on the claims identified in Schedule O or settlements of the claims identified in Schedule O, provided that GM may not compromise or settle any such claim regarding employees of Delphi without the prior consent of Delphi, which consent shall not be unreasonably withheld or delayed and (ii) Delphi and GM shall split the attorneys' fees and all other expenses reasonably incurred subsequent to the Contribution Date in connection with defending against the unemployment claims identified in Schedule O based on the number of hourly employees of each organization that are claimants in the litigation.

(c)    Unscheduled Claims. Delphi will have financial responsibility for employment related claims regarding all Delphi Employees and Delphi Terminated Employees (as those terms are defined in the Employee Matters Agreement, a copy of which is attached hereto as Exhibit B-1) whether incurred before or after the Contribution Date. If a claim is not scheduled, Delphi and GM shall mutually determine whether the claim is treated under Paragraph (a) or (b) above. Responsibility for new U.S. claims will be treated in the same manner. Notwithstanding the above, U.S. claims for pension and welfare benefits from salaried employees who retire on or before the Contribution Date, and hourly employees who retire on or before October 1, 1999 shall remain the responsibility of GM.

Section 7.04. Cooperation. GM and Delphi and their respective Affiliates shall cooperate with each other in the defense of any and all claims covered under this Article 7 and afford to each other reasonable access upon reasonable advance notice to witnesses and information (other than information protected from disclosure by applicable privileges) that is reasonably required to defend these claims as set forth in Article 6 of this Agreement. The foregoing agreement to cooperate includes, but is not limited to, an obligation to provide access to qualified assistance to provide information, witnesses and documents to respond to discovery requests in specific lawsuits. In such cases, cooperation shall be timely so that the party responding to discovery may meet all court-imposed

18

22

deadlines. The party requesting information shall reimburse the party providing information consistent with the terms of Section 6.06 of this Agreement. The obligations set forth in this paragraph are more clearly defined in Section 6.01 through and including 6.06 of this Agreement, to which reference is hereby made.

ARTICLE 8

INSURANCE MATTERS

SECTION 8.01  Delphi Insurance Coverage During  the Transition Period.

(a)   Throughout the period beginning on the Contribution Date and ending on the earlier of the Distribution Date or the first anniversary of the Contribution Date (i.e., the "Insurance Transition Period"), GM shall, subject to insurance market conditions and other factors beyond its control, maintain policies of insurance, including for the benefit of Delphi or any of its Affiliates, directors, officers, employees or other covered parties (collectively, the "Delphi Covered Parties") which are comparable to those maintained generally by GM; provided, however, that this provision shall not apply to insurance applicable to employees and/or beneficiaries relating to benefits provided under ERISA governed benefit plans or to Personal Umbrella Liability Insurance; provided, further, however, that if GM determines that (i) the amount or scope of such coverage will be reduced to a level materially inferior to the level of coverage in existence immediately prior to the Insurance Transition Period or (ii) the retention or deductible level applicable to such coverage, if any, will be increased to a level materially greater than the levels in existence immediately prior to the Insurance Transition Period, GM shall give Delphi notice of such determination as promptly as practicable. Upon notice of such determination, Delphi shall be entitled to no less than 60 days to evaluate its options regarding continuance of coverage hereunder and may cancel all or any portion of such coverage as of any day within such 60 day period. Except as provided below, during the Insurance Transition Period, such policies of insurance shall cover Delphi Covered Parties for liabilities and losses insured prior to the Contribution Date. To the extent of any self insured or other loss retentions with respect to insurance policies in force, Delphi shall, during the Insurance Transition Period, be solely responsible for any losses, damages and related expenses, not included in GM insurance program expense allocations to Delphi, incurred by itself or Delphi Covered Parties within such loss or retentions and shall not seek reimbursement or indemnification thereof from GM.

(b)   GM will use all commercially reasonable efforts to assist Delphi Covered Parties in asserting claims under applicable insurance policies, and shall adjust such policies, as necessary and practicable, to provide for Delphi and GM recoveries consistent with their respective interests and shall not unduly favor one insured party over another.

(c)   Delphi shall promptly pay or reimburse GM, as the case may be, for premium expenses, and Delphi Covered Parties shall promptly pay or reimburse GM for any costs and expenses which GM may incur in connection with the insurance coverages maintained pursuant to this Section 8.01, including but not limited to any subsequent premium adjustments. All payments and reimbursements by Delphi and Delphi Covered Parties to GM shall be made within fifteen (15) days after Delphi's receipt of an invoice from GM. Late payments shall bear interest at the Prime Rate (as defined in Section 2.05(b) hereof) and shall be paid in accordance with the terms relating to payments of interest set forth in Section 2.05(b) of this Agreement.

(d)   To the full extent permitted by contract and law, the control and administration of such insurance policies, including claims against insurance policies and any modifications to terms or conditions of insurance policies, shall remain with GM (except that any such action taken by GM shall treat fairly all insured parties and their respective claims and shall not unduly favor one insured party over another). Delphi and Delphi Covered Parties shall make all reasonable efforts to facilitate GM's control and administration of such policies.

(e)   GM's insurance policies shall be applicable to Delphi losses, as follows: (i) with respect to any insurance policies where coverage is provided on a "claims-made" or "occurrences reported" basis, any events,

23

acts or omissions which may give rise to insured losses, or damages which give rise to claims thereunder, must have occurred and notice given to GM prior to expiration of the Insurance Transition Period; (ii) with respect to other types of insurance policies, including those provided on an "occurrence" basis, any events, acts or omissions giving rise to any insured losses or damages must have occurred prior to expiration of the Insurance Transition Period; and (iii) with respect to all claims under all insurance policies, coverage for events, acts or omissions shall be interpreted consistent with the terms of such policies and the intent of subparagraphs (i) and (ii) above.

(f)   With respect to claims comprehended by the insurance policies, GM and Delphi shall control the investigation, defense and settlement of all claims as provided for in Article 7 of this Agreement; provided, however, that Delphi may not effect any settlement with respect to any such claim without GM's prior written consent (which consent shall not be unreasonably withheld or delayed) unless such settlement (i) will have no direct impact on GM's future insurance recoveries under relevant insurance policies, and (ii) will require that only Delphi or Delphi Covered Parties, and not GM or its insurers, assume financial responsibility for the settlement (under applicable deductibles or self-insured retentions), any related expenses and/or any subsequent premium adjustments.

SECTION 8.02. Delphi Insurance Coverage After The Insurance Transition Period. From and after expiration of the Insurance Transition Period, except as provided herein, Delphi, and Delphi alone, shall be responsible for obtaining and maintaining insurance programs for its risk of loss and such insurance arrangements shall be separate and apart from GM's insurance programs. Notwithstanding the foregoing, (a) GM, upon the request of Delphi, shall use all commercially reasonable efforts to assist Delphi in the transition to its own separate insurance programs from and after the Insurance Transition Period, and shall provide Delphi with any information that is in the possession of GM and is reasonably available and necessary to either obtain insurance coverages for Delphi or to assist Delphi in preventing unintended self-insurance, in whatever form, (b) each of GM and Delphi, at the request of the other, shall cooperate with and use commercially reasonable efforts to assist the other in recoveries from claims made under any insurance policy for the benefit of any insured party; and (c) neither GM nor Delphi, nor any of their Affiliates, shall take any action which would intentionally jeopardize or otherwise interfere with either party's ability to collect any proceeds payable pursuant to any insurance policy.

ARTICLE 9

MISCELLANEOUS

SECTION 9.01. Entire Agreement. This Agreement, including all the Ancillary Agreements and all other Exhibits and Schedules attached hereto, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior written and oral and all contemporaneous oral agreements and understandings with respect to the subject matter hereof, other than with respect to the Cash and Debt Management Agreement, dated as of December 22, 1998, among the Corporate Sector of GM, the Global Automotive Sector of GM and the Delphi Automotive Systems Sector of GM.

SECTION 9.02. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware regardless of the laws that might otherwise govern under principles of conflicts of laws applicable thereto.

SECTION 9.03. Descriptive Headings. The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

SECTION 9.04. Notices. All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered in person, by telecopy with answer back, by express or overnight mail delivered by a nationally recognized air courier (delivery charges prepaid), or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties as follows:

24

if to GM:

> c/o General Motors Corporation
> 3031 West Grand Blvd.
> Detroit, MI  48202
> Attention:  Warren G. Andersen
> Telecopy:  (313) 974-0685

if to Delphi, the Delphi U.S. Subsidiaries or Delphi International Subsidiary:

> c/o Delphi Automotive Systems Corporation
> 5725 Delphi Drive
> Troy, MI  48098
> Attention:  General Counsel
> Telecopy: 248-813-2523

or to such other address as the party to whom notice is given may have previously furnished to the others in writing in the manner set forth above. Any notice or communication delivered in person shall be deemed effective on delivery. Any notice or communication sent by telecopy or by air courier shall be deemed effective on the first Business Day at the place at which such notice or communication is received following the day on which such notice or communication was sent. Any notice or communication sent by registered or certified mail shall be deemed effective on the fifth Business Day at the place from which such notice or communication was mailed following the day on which such notice or communication was mailed.

SECTION 9.05. Parties in Interest. This Agreement shall be binding upon and inure solely to the benefit of each party hereto and their legal representatives and successors, and each Subsidiary and each Affiliate of the parties hereto, and nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Agreement, except for Article 5 (which is intended to be for the benefit of the Persons provided for therein and may be enforced by such Persons).

SECTION 9.06. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.

SECTION 9.07. Binding Effect; Assignment. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives and successors. This Agreement may not be assigned by any party hereto. The Schedules and Exhibits attached hereto or referred to herein are an integral part of this Agreement and are hereby incorporated into this Agreement and made a part hereof as if set forth in full herein.

SECTION 9.08. Dispute Resolution. Except as otherwise set forth in the Ancillary Agreements, resolution of any and all disputes arising from or in connection with this Agreement (excluding matters related to the Supply Agreement), whether based on contract, tort, or otherwise (collectively, "Disputes"), shall be exclusively governed by and settled in accordance with the provisions of this Section 9.08. The parties hereto shall use all commercially reasonable efforts to settle all Disputes without resorting to mediation, arbitration, litigation or other third party dispute resolution mechanisms. If any Dispute remains unsettled, a party hereto may commence proceedings hereunder by first delivering a written notice from a Senior Vice President or comparable executive officer of such party (the "Demand") to the other parties providing reasonable description of the Dispute to the others and expressly requesting mediation hereunder. The parties hereby agree to submit all Disputes to non-binding mediation before a mediator reasonably acceptable to all parties involved in such Dispute. If, after such mediation, the parties subject to such mediation disagree regarding the mediator's recommendation, such Dispute shall be submitted to arbitration under the terms hereof, which arbitration shall be final, conclusive and binding upon the parties, their successors and assigns. The arbitration shall be conducted in Detroit, Michigan by three arbitrators acting by majority vote (the

21

"Panel") selected by agreement of the parties not later than ten (10) days after the delivery of the recommendation provided by the mediator as described above or, failing such agreement, appointed pursuant to the commercial arbitration rules of the American Arbitration Association, as amended from time to time (the "AAA Rules"). If an arbitrator so selected or appointed. The arbitration shall be conducted pursuant to the Federal Arbitration Act and such procedures as the parties subject to such arbitration (each, a "Party") may agree, or, in the absence of or failing such agreement, pursuant to the AAA Rules. Notwithstanding the foregoing: (i) each Party shall have the right to audit the books and records of the other Party that are reasonably related to the Dispute; (ii) each Party shall provide to the other, reasonably in advance of any hearing, copies of all documents which a Party intends to present in such hearing; and (iii) each Party shall be allowed to conduct reasonable discovery through written requests for information, document requests, requests for stipulation of fact and depositions, the nature and extent of which discovery shall be determined by the Parties; provided that if the Parties cannot agree on the terms of such discovery, the nature and extent thereof shall be determined by the Panel which shall take into account the needs of the Parties and the desirability of making discovery expeditious and cost effective. The award shall be in writing and shall specify the factual and legal basis for the award. The Panel shall apportion all costs and expenses of arbitration, including the Panel's fees and expenses and fees and expenses of experts, between the prevailing and non-prevailing Party as the Panel deems fair and reasonable. The parties hereto agree that monetary damages may be inadequate and that any party by whom this Agreement is enforceable shall be entitled to seek specific performance of the arbitrators' decision from a court of competent jurisdiction, in addition to any other appropriate relief or remedy. Notwithstanding the foregoing, in no event may the Panel award consequential, special, exemplary or punitive damages. Any arbitration award shall be binding and enforceable against the parties hereto and judgment may be entered thereon in any court of competent jurisdiction.

SECTION 9.09. Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the fullest extent possible.

SECTION 9.10. Failure or Indulgence Not Waiver; Remedies Cumulative. No failure or delay on the part of any party hereto in the exercise of any right hereunder shall impair such right or be construed to be a waiver of, or acquiescence in, any breach of any representation, warranty or agreement herein, nor shall any single or partial exercise of any such right preclude other or further exercise thereof or of any other right. All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

SECTION 9.11. Amendment. No change or amendment will be made to this Agreement or the Ancillary Agreements except by an instrument in writing signed on behalf of each of the parties to such agreement.

SECTION 9.12. Authority. Each of the parties hereto represents to the other that (a) it has the corporate or other requisite power and authority to execute, deliver and perform this Agreement and the Ancillary Agreements, (b) the execution, delivery and performance of this Agreement and the Ancillary Agreements by it have been duly authorized by all necessary corporate or other action, (c) it has duly and validly executed and delivered this Agreement and the Ancillary Agreements, and (d) this Agreement and each Ancillary Agreement is a legal, valid and binding obligation, enforceable against it in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equity principles.

SECTION 9.13. Interpretation. The headings contained in this Agreement, in any Exhibit or Schedule hereto and in the table or contents to this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Any capitalized term used in any Schedule or Exhibit but not

22

26

otherwise defined therein, shall have the meaning assigned to such term in this
Agreement. When a reference is made in this Agreement to an Article or a
Section, Exhibit or Schedule, such reference shall be to an Article or Section
of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated.
After the Contribution Date, the Delphi Automotive Systems Business shall be
deemed to no longer exist and all references made herein to Delphi as a party
which operate as of a time following the Contribution Date, shall be deemed to
refer to Delphi, the Delphi U.S. Subsidiaries and Delphi International
Subsidiary as a single party.

                    ******



                [SIGNATURES ON FOLLOWING PAGE]



                         23

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized on the day and year first above written.

GENERAL MOTORS CORPORATION


By:  /s/ G. Richard Wagoner
     -----------------------------------
     Name:  G. Richard Wagoner
     Title: President and Chief Operating Officer


DELPHI AUTOMOTIVE SYSTEMS CORPORATION


By: /s/ J.T. Battenberg, III
     -----------------------------------
     Name:  J.T. Battenberg, III
     Title: Chairman, Chief Executive Officer and
            President


DELPHI AUTOMOTIVE SYSTEMS LLC


By: /s/ J.T. Battenberg, III
     -----------------------------------
     Name:  J.T. Battenberg, III
     Title: Chief Executive Officer and
            President


DELPHI TECHNOLOGIES, INC.


By: /s/ Andrew Brown, Jr
     -----------------------------------
     Name:  Andrew Brown, Jr.
     Title: President


DELPHI AUTOMOTIVE SYSTEMS (HOLDING), INC.


By: /s/ John P. Arle
     -----------------------------------
     Name:  John P. Arle
     Title: President

**EXHIBIT G**

**Environmental Matters Agreement between Delphi Automotive Systems Corporation
(n/k/a Delphi) and GM, dated as of "October 1998"**

**Exhibit C-1**

## ENVIRONMENTAL MATTERS AGREEMENT

This Environmental Matters Agreement ("Agreement"), dated as of October, 1998, is made among General Motors Corporation, a Delaware corporation ("GM"), with its principal place of business in Detroit, Michigan, and Delphi Automotive Systems Corporation, a Delaware corporation ("Delphi"), with its principal place of business in Troy, Michigan. GM and Delphi are sometimes referred to herein as a "Party" and collectively as the "Parties."

### RECITALS

WHEREAS, GM and Delphi are Parties to a Master Separation Agreement entered into in connection with the separation of the business heretofore carried on by the Delphi Automotive Systems Division as a part of GM into a business owned and operated by Delphi and completely separate and independent from GM; and

WHEREAS, the Parties desire to enter into this Agreement regarding environmental matters.

NOW, THEREFORE, in consideration of the mutual covenants and provisions hereunder contained, the Parties agree as follows:

### ARTICLE 1

#### Definitions

**1.1. <u>Defined Terms</u>.** As used in this Agreement, the following terms (in singular and plural forms) shall have the meanings below. Capitalized terms used, but not defined, herein shall have the meaning set forth in the Master Separation Agreement or elsewhere in this Agreement.

"Contribution Date" has the same meaning assigned to this term in the Master Separation Agreement.

"Corporate Successor" means any successor in interest of a Party by reason of a merger, reorganization or sale of all or substantially all of the assets of such Party.

"Delphi Assets" means the equipment, machinery and other personal property acquired by purchase, lease or otherwise by Delphi from GM as of the Contribution Date in accordance with the terms of the Master Separation Agreement whether or not associated with a Delphi Facility.

"Delphi Facility" means each parcel of real property, including all facilities and improvements thereon, acquired by purchase, lease or otherwise by Delphi as of the Contribution Date in accordance with the terms of the Master Separation Agreement as the same may

1

hereafter be revised as a result of the "true-up" process provided for in the Real Estate Matters Agreement between the Parties.

"Environmental Claim" shall mean any third-party (i.e., non-Party) accusation, allegation, notice of violation, action, claim, lien, demand, abatement or other order or directive (conditional or otherwise) for personal injury (including sickness, disease or death), tangible or intangible property damage, damage to the environment, nuisance, pollution, contamination of or other adverse effect on the environment or human health, or for fines, penalties, or restrictions, resulting from or based upon: (i) the existence, or the continuation of the existence of, a Release (including without limitation a sudden or non-sudden accidental or non-accidental Release), or, exposure to, any Hazardous Material, in, into or onto the indoor or outdoor environment, including, but not limited to, the air, soil, surface water or groundwater, at, on, by, from or related to any Facility; (ii) the use, management, handling, transportation, storage, treatment or disposal of Hazardous Material in connection with any Facility; or (iii) the violation or alleged violation of any Environmental Law relating to the ownership, use, operation, or remediation of any Facility or to the use, management, handling, transportation. Release, storage, treatment or disposal of Hazardous Materials thereon or therefrom.

"Environmental Costs and Liabilities" shall mean any and all losses, liabilities, obligations, damages, fines, penalties, judgments, actions, claims, reasonable costs and reasonable expenses (including without limitation attorneys' fees, disbursements and expenses of legal counsel, experts, engineers, and consultants and the costs of Remedial Action) arising from or under or related to any Environmental Law.

"Environmental Damages" shall refer to any and all Environmental Costs and Liabilities and Environmental Claims, including, but not limited to, costs, expenses and attorneys' or other experts' or consultants' fees in connection with any Remedial Action or enforcing any right of indemnification hereunder against any Indemnitor; provided, however, that Environmental Damages do not include consequential, special or incidental damages, including, but not limited to, loss of profits, loss of business opportunity, loss of use, diminution in value, stigma damages, or any attorneys' or consultant's fees or other expenses as to any matter as to which an Indemnitor has accepted its defense and indemnity obligations.

"Environmental Law" means, collectively, all applicable foreign, domestic, federal, state or local laws, statutes, ordinances, rules, regulations, codes, common law doctrines, or other legally binding requirements, including, but not limited to, orders, judgments, settlement agreements, consent orders, consent decrees, consent judgments or Environmental Permits, relating to regulation and protection of human health, the environment, or natural resources, including, but not limited to, all laws regulating Releases or threatened Releases of Hazardous Materials, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.,* the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq.,* the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *el seq.,* the Clean Air Act, 42 U.S.C. § 7401 *el seq.,* the Clean Water Act, 33 U.S.C. § 1251 *et seq.,* and the Toxic Substances Control Act, 15 U.S.C § 52601 *et seq., as* any of the foregoing may have been, or may in the future be, amended.

2

3

"Environmental Permits" means permits, licenses, registrations, and other authorizations issued under any Environmental Law.

"Environmental Records" means any and all books, records, notes, reports, letters, memoranda, assessments, testing data, maps, Environmental Permits, certificates, applications, approvals, surveys or other written, printed, or electronically or magnetically recorded materials, communications or data relating to; (i) the use, management, handling, transportation. Release, storage, treatment or disposal of any Hazardous Material in, about or under any Delphi Facility; (ii) the environmental condition of the Delphi Facilities; and (iii) compliance with Environmental Laws at the Delphi Facilities. By way of example, Environmental Records includes the following as they directly or indirectly relate to Delphi Facilities: environmental bulletins, environmental performance criteria, NAO reference letters, EPCRA and TSCA manuals, environmental performance audit reports (IPSR & EPR), Phase I property transfer evaluations, release reports, GM SARA database, ISO 14001 certification guidance, Title V materials, (e.g., compliance assessments, compliance reports, outside counsel memoranda re issues, GM emission factors, and rule interpretations).

"Facility" means, as the context may require, either a GM Retained Facility or a Delphi Facility, or both.

"GM Retained Facility" means any and all real property and facilities which are not Delphi Facilities and which were owned, operated, occupied or possessed by GM or its direct or indirect wholly-owned subsidiaries prior to the Contribution Date.

"Hazardous Material" shall mean, collectively, any: (i) chemical, material or substance: (a) which is now or hereafter becomes defined as or included in the definition of "hazardous substance," "extremely hazardous substance," "hazardous waste," "hazardous material," "restricted hazardous waste," "contaminant," "pollutant," "toxic substance," or words of similar import under any Environmental Law; or (b) the emission, discharge, release, storage, transport, disposal, management, handling or use of which is regulated under or subject to any Environmental Law; and (ii) petroleum or petroleum products, or derivatives or fractions thereof, flammable materials, explosives, radioactive materials (including radon gas other than that which is naturally occurring), urea formaldehyde foam insulation ("UFI"), asbestos-containing materials ("ACM") and polychlorinated biphenyls ("PCBs").

"Identified Waste Disposal Sites" means those Off-Site Waste Disposal Sites known to the Parties as of the Contribution Date, where liability is known or alleged, which are identified on Exhibit A to this Agreement.

"Indemnifying Party" or "Indemnitor" means a person that is obligated to provide indemnification under Article 3 of this Agreement.

"Indemnitee" means a person that is entitled to seek indemnification under Article 3 of this Agreement.

3

"Newly Identified Waste Disposal Site" means an Off-Site Waste Disposal Site other than an Identified Waste Disposal Site where liability becomes known or is alleged after the Contribution Date.

"Off-Site Waste Disposal Site" means any site, other than a Facility, which is or becomes subject to an obligation for Remedial Action under an Environmental Law.

"Release" means any release, spill, emission, escape, abandonment of any container or receptacle containing any Hazardous Material, leaking, pumping, pouring, emptying, injection, deposit, disposal, discharge, dispersal, leaching, movement or migration of any Hazardous Material on or into the indoor or outdoor environment or into or out of any property.

"Remedial Action" means all investigations and/or actions to: (i) clean up, remove, remediate, treat, or in any other way address any Hazardous Material under or pursuant to any Environmental Law; (ii) prevent the Release or threatened Release, or minimize the further Release of, any Hazardous Material so that it does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; (iv) perform corrective actions or obtain timely closure or closure certification related to any underground or aboveground tank, container storage area, treatment, storage or disposal facility or operation, solid waste management unit or other location of Hazardous Material use, management, handling, transportation, treatment, storage, or disposal; or (v) bring any matter, activity, practice or conduct into compliance with any Environmental Law.

## ARTICLE 2

### Allocation of Environmental Liabilities

#### 2.1. <u>Responsibility for GM Retained Facilities.</u>

As of and after the Contribution Date, GM shall be solely responsible for all Environmental Damages arising from, relating to or in connection with all GM Retained facilities, whether or not the circumstances or claims giving rise to such Environmental Damages occurred or were asserted before or after the Contribution Date; provided, however, that Delphi shall be responsible for all Environmental Damages at the GM Retained Facilities to the extent caused by Delphi's acts or omissions first occurring or continuing after the Contribution Date. Where necessary for GM to fulfill its obligations under this Agreement, Delphi will use its best efforts to assign its rights with respect to GM Retained Facilities.

#### 2.2. <u>Responsibility for Delphi Facilities.</u>

(a) Subject to Section 2.2(b), as of and after the Contribution Date, Delphi shall be solely responsible for all Environmental Damages arising from, relating to or in connection with all Delphi Facilities and Delphi Assets, whether or not the circumstances or claims giving rise to such Environmental Damages occurred or were asserted before or after the Contribution Date; provided, however, that GM shall be responsible for all Environmental Damages at the Delphi

4

Facilities to the extent caused by GM's acts or omissions first occurring or continuing after the Contribution Date.

(b) Notwithstanding Section 2.2(a), GM shall be solely responsible for all payments relating to any contract for Remedial Action and other environmental-related service or goods procurement contracts, or any stipulated penalties, fines or other sanctions under orders, decrees, judgments or settlements with respect to any environmental matter at a Delphi Facility, actually incurred but not paid by GM prior to the Contribution Date for services performed or acts or omissions occurring before the Contribution Date. Before the Contribution Date, Delphi shall procure environmental-related goods and services only on commercially reasonable terms and conditions, and in no event shall GM be responsible for any materials purchased by Delphi before the Contribution Date and not utilized by Delphi within ninety (90) days after the Contribution Date. Except as otherwise specifically provided in this Section 2.2(b), Delphi shall be solely responsible for all payments under any contracts for Remedial Action, other environmental-related service or goods procurement contracts, and any stipulated penalties, fines or other sanctions under orders, decrees, judgments, or settlements with respect to any environmental matter at a Delphi Facility.

(c) Between the date of the execution of this Agreement and the Contribution Date, the Parties shall pursue, with reasonable diligence and in good faith, with respect to the Delphi Facilities: (i) compliance with Environmental Laws; (ii) the avoidance of any liability under any Environmental Law; and (iii) the resolution or continued performance of any activities necessary to resolve any Environmental Claim or satisfy or discharge any Environmental Damages before the Contribution Date.

**2.3. <u>Responsibility for Waste Disposal Sites</u>.**

(a) <u>Identified Waste Disposal Sites</u>.

As of and after the Contribution Date, GM shall be solely responsible for Environmental Damages and any other liabilities, to the extent due to contributions by GM before or after the Contribution Date, arising from, relating to or in connection with all Identified Waste Disposal Sites.

(b) <u>Newly Identified Waste Disposal Sites</u>.

Within twenty (20) days after receiving notice or other information as to the existence of a Newly Identified Waste Disposal Site as to which the other Party may have liability under an Environmental Law, the Party receiving such notice or information shall notify the other Party and provide copies of all relevant correspondence and other documents relating thereto.

(c) <u>Allocation</u>.

(i) The Parties' respective liability with respect to: (1) Newly Identified Waste Disposal Sites; and (2) contributions to Identified Waste Disposal Sites after the

5

Contribution Date, shall be allocated based on each Party's respective contributions thereto, as follows:

(a) GM's liability shall be based on contributions attributable to the GM Retained Facilities and any other facility owned or operated by GM before, on or after the Contribution Date except the Delphi Facilities.

(b) Delphi's liability shall be based on contributions attributable to the Delphi Facilities and any other facility owned or operated by Delphi on or after the Contribution Date, whether or not such contributions were made before or after the Contribution Date. Delphi shall not be responsible for contributions to Identified Waste Disposal Sites occurring before the Contribution Date.

(ii) The Parties shall use their reasonable best efforts to amicably resolve all liability and allocation issues using traditional factors, such as the volume, type and toxicity of the contributions to such Newly Identified Waste Disposal Site or Identified Waste Disposal Site by each Party.

**2.4.  Duty to Comply With Environmental Laws.**

(a) GM. As of and after the Contribution Date, GM shall comply with Environmental Laws at the GM Retained Facilities and the sole legal and financial responsibility for compliance with Environmental Laws applicable to GM's use of, operations at or occupancy
of the GM Retained Facilities shall be that of GM.

(b) Delphi. As of and after the Contribution Date, Delphi shall comply with Environmental Laws at the Delphi Facilities and the sole legal and financial responsibility for compliance with Environmental Laws applicable to Delphi's use of, operations at or occupancy
of the Delphi Facilities shall be that of Delphi.

(c) The sole remedy of the Parties for breach of this Section 2.4 shall be under the indemnification provisions of Article 3 of this Agreement.

**2.5.  No Representations or Warranties.** Except as otherwise expressly set forth in this Agreement, the Delphi Facilities and Delphi Assets are being conveyed in their "as is, where is" condition and with all faults and without any representation or warranty of any nature whatsoever, express or implied, oral or written, and in particular without any implied warranty of merchantability or fitness for a particular purpose.

6

7

## ARTICLE 3

### Indemnification

**3.1. <u>Indemnification by GM.</u>** GM shall indemnify, defend and hold harmless Delphi from and against all Environmental Damages which are caused by, relate to or arise in connection with:

(a) The GM Retained Facilities, including, but not limited to, Environmental Damages caused by, relating to or arising in connection with circumstances occurring or claims asserted either on, before or after the Contribution Date; provided, however, that GM shall have no indemnity or defense obligations hereunder with respect to Environmental Damages to the extent caused by, relating to, or arising in connection with Delphi's acts or omissions first occurring or continuing after the Contribution Date.

(b) Any act or omission by GM after the Contribution Date.

(c) Contributions before the Contribution Date to all Identified Waste Disposal Sites attributable to a Delphi Facility as well as contributions attributable to a GM Retained Facility.

(d) GM contributions to Newly Identified Waste Disposal Sites attributable to a GM Retained Facility.

(e) Any breach of this Agreement.

(f) Any imposition or acceleration of Environmental Costs and Liabilities or Environmental Claims regarding GM Retained Facilities under Section 9.2(b) under any applicable Environmental Transfer Law, as defined hereafter, as a result of the transactions contemplated by the Master Separation Agreement.

**3.2. <u>Indemnification by Delphi.</u>** Delphi shall indemnify, defend and hold harmless GM from and against all Environmental Damages which are caused by, relate to or arise in connection with:

(a) The Delphi Facilities and all Delphi Assets, including, but not limited to, Environmental Damages caused by, relating to or arising in connection with circumstances occurring or claims asserted either on, before or after the Contribution Date; provided, however, that Delphi shall have no indemnity or defense obligations hereunder with respect to Environmental Damages to the extent caused by. relating to or arising in connection with GM's acts or omissions first occurring or continuing after the Contribution Date.

(b) Any act or omission by Delphi after the Contribution Date.

(c) Any breach of this Agreement.

7

8

(d) Delphi contributions on or after the Contribution Date to Identified Waste Disposal Sites.

(e) Delphi contributions to Newly Identified Waste Disposal Sites attributable to a Delphi Facility.

(f) Any imposition or acceleration of Environmental Costs and Liabilities or Environmental Claims regarding Delphi Facilities under Section 9.2(b) under any applicable Environmental Transfer Law, as defined hereafter, as a result of the transactions contemplated by the Master Separation Agreement.

**3.3. <u>Indemnification Procedures.</u>**

(a) If any Indemnitee receives notice of any Environmental Claim or becomes aware of any Environmental Costs and Liabilities or other matter with respect to which an Indemnifying Party is or may be obligated under this Agreement to provide indemnification to such Indemnitee, the Indemnitee shall give the Indemnifying Party prompt written notice thereof (together with any information concerning the matter). Whenever practicable, such notice shall be provided at least ten (10) business days before the Indemnitee incurs any Environmental Damages in respect of such matter. If such advance notice is not practicable, then notice shall be provided as soon as practicable. Failure or delay of any Indemnitee to give notice as provided in this Section 3.3 shall not relieve any Indemnifying Party of its obligations except to the extent that such Indemnifying Party is actually prejudiced.

(b) An Indemnifying Party may elect to defend any Environmental Claim at its own expense and through its counsel (which counsel shall be reasonably acceptable to the Indemnitee). If an Indemnifying Party elects to defend an Environmental Claim, it shall notify the Indemnitee of its intent to do so within ten (10) business days after receiving notice of such Environmental Claim (or sooner, if the nature of such Environmental Claim so requires). The Indemnitee shall cooperate in the defense of such Environmental Claim. The Indemnifying Party shall keep the Indemnitee reasonably informed as to the status of the defense of such Environmental Claim. The Indemnifying Party shall also pay such Indemnitee's reasonable out-of-pocket expenses incurred in connection with such cooperation, but shall not be responsible for any legal or other expenses subsequently incurred by such Indemnitee in connection with the defense of such Environmental Claim. The Indemnifying Party shall not, without the prior written consent of the Indemnitee: (i) settle or compromise any Environmental Claim or consent to the entry of any judgment which does not include a written release from all liability to the Indemnitee; or (ii) settle or compromise any Environmental Claim in any manner that would be reasonably likely to have a material adverse effect on the Indemnitee. If an Indemnifying Party elects not to defend against a Environmental Claim, or fails to properly notify an Indemnitee of its election, the Indemnitee may defend, compromise, and settle such Environmental Claim and shall be entitled to indemnification to the extent permitted hereunder; provided, however, that the Indemnitee may not compromise or settle any such Environmental Claim without the prior written consent of the Indemnifying Party, which shall not be unreasonably withheld or delayed.

8

**3.4. <u>Mitigation.</u>** No Party shall have any obligation to indemnify the other Party with respect to any Environmental Damages to the extent such Environmental Damages could have reasonably been avoided or mitigated.

**3.5. <u>Exclusive Remedy.</u>** The Parties acknowledge that, except with respect to matters covered under Sections 9.3 and 9.4 of this Agreement: (a) the rights and obligations provided in this Agreement shall be the exclusive rights and obligations of the Parties with respect to environmental matters; and (b) the remedies in Articles 3 and 6 of this Agreement shall be the exclusive remedies of the Parties with respect to environmental matters and shall be in lieu of, and not in addition to, all other remedies which may exist in law, equity or under any other contract.

**3.6. <u>No Initiation of Third Party Claims.</u>** The Parties shall not initiate any action with any third party, including any governmental agency, which could reasonably be expected to lead to an Environmental Claim; provided, however, that nothing herein shall prevent either Party from performing its obligations or exercising its rights under this Agreement.

**3.7. <u>Cooperation On Third Party Claims.</u>** If either Party, in addressing a matter or in defending or resolving any Environmental Claim as to which it has defense or indemnification responsibility under this Agreement (for purposes of this Section 3.7, the "Indemnifying Party"), remediates or incurs costs or damages with respect to a matter for which a third party may be responsible or liable, the other party agrees to cooperate with the Indemnifying Party in pursuing any claim against such third party and the Parties shall assist each other so as to enable the Indemnifying Party to legally assert such claim against such third party and to recover its costs and damages from such third party, including acting as the real party in interest and assigning any rights or causes of action against any such third party relating to such claim or the proceeds thereof to the Indemnifying Party.

## ARTICLE 4

### Environmental Reserves

**4.1.** As of the Contribution Date, each Party shall be responsible for establishing its own reserves for environmental liabilities in accordance with generally accepted accounting principles. At the time of Contribution, the environmental reserves established for the Delphi Facilities are shown on Exhibit B. These reserves were established in accordance with the same principles used to establish reserves for GM Retained Facilities.

## ARTICLE 5

### Environmental Permits

**5.1.** Set forth on Exhibit C are all of the Environmental Permits identified and not yet expired with respect to the Delphi Facilities and the Delphi Assets. Exhibit C also identifies, with respect to each such Environmental Permit, whether each such Environmental Permit: (i)

9

relates to the Delphi Facilities and operations by GM on GM Retained Facilities, but shall not be transferred to Delphi by GM and shall remain with GM as permittee; (ii) may be transferred to Delphi under applicable Environmental Law; or (iii) may not be transferred to Delphi under applicable Environmental Law. The Parties shall use best efforts to: (i) effectuate the transfer of those Environmental Permits under clause (ii), above, that may be transferred to Delphi under applicable Environmental Law; (ii) obtain issuance to Delphi of new or replacement Environmental Permits for Delphi's operations now covered by the Environmental Permits described in clauses (i) or (iii), above; and (iii) mitigate problems that may arise during the transfer process. As of and after the Contribution Date, Delphi shall be solely responsible to obtain and comply with all Environmental Permits with respect to the Delphi Facilities and the Delphi Assets, whether or not GM was required under any Environmental Law to, but did not, obtain any such Environmental Permits. Prior to the Contribution Date, Delphi shall have obtained and GM shall also assist Delphi in obtaining new RCRA generator identification numbers which are or may be required under current or future Environmental Laws for hazardous waste, as defined under current or future Environmental Laws. If same cannot be obtained prior to the Contribution Date, Delphi will expeditiously obtain such identification number after the Contribution Date and, to the extent legally required, will use such number or obtain a substitute number for Delphi's use after the Contribution Date. Without the prior written consent of GM, Delphi will not use for any purpose any such numbers issued before the Contribution Date to GM with respect to the Delphi Facilities.

## ARTICLE 6

### Dispute Resolution

**6.1.** The Parties shall use good faith, best efforts and sound and accepted engineering judgment in making all determinations under this Agreement. In the event of a dispute or disagreement under this Agreement, the Parties shall consult in good faith with each other and shall use best efforts to resolve the matter. It is the express intent of the Parties that any such disputes or disagreements shall be resolved through negotiation between the Parties or, if mutually agreeable as to a specific matter in each Party's discretion, a form of alternative dispute resolution, including binding or non-binding arbitration. It is further understood and agreed, however, that alternative dispute resolution and litigation under this Agreement shall be viewed as a last resort and that the results of any non-litigation dispute resolution procedure under this Article 6 shall not be admissible for any purposes in any litigation in which the Parties are involved and relating to this Agreement unless the Parties otherwise agree as part of such resolution or are utilized to enforce the terms thereof. Either Party shall have the right, after making a reasonable and good faith effort to resolve such dispute through other means, to seek judicial relief in connection with any dispute arising under this Agreement, and in the event that either Party resorts to litigation in order to resolve a dispute (including any breach of this Agreement) under this Agreement, the Party prevailing in connection with such dispute shall be entitled to recover its reasonable and actual attorneys' fees and costs incurred in connection with such litigation. In the event that the matter in litigation relates to a dispute involving a Party's failure to comply with its defense and indemnification obligations under this Agreement and the Party in favor of whom such obligations run has, as a result of the successful assertion of an Environmental Claim, spent money to resolve or otherwise dispose of any resulting

10

Environmental Damages, the Indemnifying Party shall pay the Indemnitee's interest at the "prime rate" then in effect from the date due until fully paid, on and to the extent of any expenditures by the other Party in respect of such Environmental Damages. Except with respect to matters covered by Section 2.4 (Duty to Comply with Environmental Laws), the procedures under this Article 6 shall apply to all disputes arising under this Agreement.

## ARTICLE 7

### Transfer Obligations and Non-Assignability

**7.1. Duties Upon Transfer**. Each Party, in connection with the execution and delivery of any lease, sublease, assignment, agreement of sale or other transfer, assignment or conveyance agreement relating to the Delphi Facilities, Delphi Assets or GM Retained Facilities ("Conveyance Document") in which any interest in or portion of any Delphi Facility, Delphi Asset or GM Retained Facility, respectively, is conveyed, sold, contributed, assigned, transferred, leased or subleased, shall use its reasonable best efforts to provide in such Conveyance Document that the non-transferring Party shall have no liability or responsibility for, and shall be fully released and exculpated from, all Environmental Costs and Liabilities and Environmental Claims with respect to the specific Delphi Facility, Delphi Asset or GM Retained Facility subject to such Conveyance Document, and to impose the obligations under this Section 7.1 on any subsequent user, occupant or transferee.

**7.2. Non-Assignability**. The Parties' respective rights, obligations, duties and liabilities under this Agreement, including, but not limited to, the indemnification provisions of Article 3, are personal to each of them and may not be assigned to, or assumed by, any successor, assignee, or any other person without the prior written consent of the other Party, which consent may be granted or withheld in the sole discretion of such other Party; provided, however, that either Party may assign their respective rights under this Agreement to a Corporate Successor without the consent of the other Party, but only if such Corporate Successor also agrees to assume such Party's duties, obligations and liabilities under this Agreement. No such assignment or assumption shall relieve either Party of its obligations under this Agreement unless so agreed in writing by the other Party.

## ARTICLE 8

### Mutual Releases and Covenants Not to Sue

**8.1. Release**. Except as otherwise expressly set forth in Articles 3 and 6 of this Agreement, each Party hereby fully and forever releases and discharges the other Party and its officers, directors, employees, shareholders, direct and indirect wholly-owned subsidiaries, representatives and agents from all manner of action and causes of action, suits, proceedings, arbitrations, choses in action, contracts, covenants, claims, bonds, bills, debts, dues, sums of money, damages, demands and rights whatsoever, in law or in equity, now existing or which may hereafter accrue by reason of any known or unknown facts existing either before or after the Contribution Date and which relate to matters under Environmental Laws, whether or not specifically addressed in this Agreement, including, but not limited to, the environmental

11

12

condition and compliance status of the Delphi Facilities, the Delphi Assets, the GM Retained Facilities, the Identified Waste Disposal Sites, and the Newly Identified Waste Disposal Sites, and all Environmental Damages, Environmental Costs and Liabilities, and Environmental Claims relating thereto.

**8.2. Covenant Not to Sue**. Except as otherwise expressly set forth in Articles 3 and 6 of this Agreement, each Party hereby covenants that it shall not commence any action, arbitration, proceeding or suit, or participate or assist in any manner in the commencement or prosecution of any action, arbitration, proceeding or suit, in law or in equity, in any judicial, administrative, or other forum, based upon or arising out of any matter subject to a release by such Party under Section 8.1 of this Agreement.

### ARTICLE 9

### Miscellaneous

**9.1. Environmental Records**.

(a) As of the Contribution Date, GM shall transfer to Delphi either the originals or true and complete copies of all Environmental Records.

(b) Subject to Section 9.1(c), for a period of seven (7) years from and after the date hereof, each Party covenants and agrees to keep and maintain at reasonably accessible locations all of the Environmental Records in its possession or control as of the date hereof or otherwise coming into the possession or control of such Party after the date hereof. Following reasonable advance written notice, each Party shall make available for review and photocopying by the other Party each and all of its Environmental Records.

(c) With respect to matters in dispute between the Parties or subject to an Environmental Claim at the end of the seven (7) year record retention period, such retention period shall be extended and shall continue with respect to all Environmental Records that may be relevant to the matter until the matter is finally and fully resolved.

**9.2. Environmental/Real Property Transfer Laws**.

(a) The Parties shall reasonably cooperate in good faith with respect to compliance with any applicable Environmental Laws or other laws that require disclosures or other notifications regarding environmental matters to be made by or to either Party or any unit of government in connection with the transactions contemplated by the Master Separation Agreement (collectively, "Environmental Transfer Laws"). To the extent that any obligation exists under any Environmental Transfer Laws to report any information or make any report or notice, such obligation shall be jointly undertaken by the Parties. Each Party hereby waives any requirements under any such Environmental Transfer Law that disclosures or other reports or notifications be made before the Contribution Date and agree that such disclosures and other notifications may be made on the Contribution Date.

12

13

(b) The Parties shall each use their reasonable best efforts to avoid the imposition of or accelerating any Environmental Costs and Liabilities or Environmental Claims under any applicable Environmental Transfer Law as a result of the transactions contemplated by the Master Separation Agreement. Such avoidance strategies could include GM leasing assets to Delphi. Subject to the preceding sentence, neither Party shall be liable or responsible for any Environmental Costs and Liabilities or Environmental Claims regarding the other Party's facilities under any Environmental Transfer Law resulting from the transactions contemplated by the Master Separation Agreement, and each Party shall indemnify and defend the other with respect thereto in accordance with the terms of Article 3.

**9.3.** **Wastewaters, Stormwater and other Services Agreements**. The Parties may enter into a Wastewaters and Stormwater Services Agreement, or other agreements, under which one Party shall provide certain services for the other Party.

**9.4.** **Leases and Sub-leases Regarding Certain Facilities**. The Parties have entered or will enter into leases and sub-leases with respect to certain facilities. The terms and conditions with respect to environmental matters at such facilities shall be governed by the respective leases and sub-leases for those facilities.

**9.5.** **Entire Agreement**. Except for the Master Separation Agreement, the service agreements and the leases and sub-leases referenced in this Agreement, this Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings with respect to the subject matter hereof. In the event of a conflict between this Agreement and the Master Separation Agreement, the terms of this Agreement shall supersede those of the Master Separation Agreement. This Agreement is not intended to confer upon any other person any benefit, right or remedy.

**9.6.** **No Arrangement for Disposal.** The Parties each acknowledge that the transactions contemplated by this Agreement constitute a transfer of assets in the ordinary course of business and are not intended in any way, nor will they be deemed to be, an arrangement for treatment, storage or disposal of any of the Delphi Facilities or Delphi Assets or any substances or materials contained therein. Delphi agrees that GM will not have any liability under any Environmental Law by virtue of such transfer alone and Delphi will not assert any claim or cause of action against GM based solely thereon.

**9.7.** **Further Assurances.** The Parties hereto, at any time before or after the Contribution Date, shall, at their own expense, execute, acknowledge and deliver any further assurances, documents and instruments reasonably requested by one another and shall take any other action consistent with the terms of this Agreement that may reasonably be requested by one another for the purpose of consummating the transactions contemplated by or fulfilling the intent of this Agreement.

**9.8.** **Governing Law.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware regardless of the laws that otherwise govern under applicable principles of conflicts of laws.

13

14

**9.9. <u>Descriptive Headings.</u>** The descriptive headings herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

**9.10. <u>Notices.</u>** All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered in person, by express or overnight mail or messenger delivered by a nationally recognized air courier (delivery charges prepaid), or by registered or certified mail (postage prepaid, return receipt requested), to a Party as follows:

If to GM: Michelle T. Fisher, Esq.

If to Delphi: Mark A. Hester, Esq.

**9.11. <u>Amendment.</u>** No change or amendment shall be made to this Agreement except by an instrument in writing signed on behalf of each Party hereto.

**9.12. <u>Counterparts.</u>** This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

**9.13. <u>Severability.</u>** If any provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the subject matter hereof is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner so the intent hereof is fulfilled to the fullest extent possible.

**9.14. <u>Failure or Indulgence Not Waived.</u>** Subject to the express provisions of this Agreement, no failure or delay on the part of any Party hereto in the exercise of any right hereunder shall impair such right or be construed to be a waiver of, or acquiescence in, any breach of this Agreement, nor shall any single or partial exercise of any such right preclude other or further exercise thereof or of any other right.

**9.15. <u>Confidentiality.</u>** The terms of this Agreement shall remain confidential and each Party shall not disclose the same without the prior written consent of the other Party except: (a) to such Party's directors, officers, partners, employees, legal counsel, accountants, engineers,

14

15

contractors, financial advisors and similar professionals and consultants to the extent such Party deems it necessary or appropriate and such Party shall inform each of the foregoing persons of such Party's obligations under this paragraph and shall secure the agreement of such persons to be bound by the terms hereof; (b) pursuant to contractual obligations existing as of the date hereof; or (c) as otherwise required by law or regulation.

**9.16.** No rights are created in any third party by this Agreement.

**9.17.** Each Party will cause its direct and indirect wholly-owned subsidiaries to take such actions as may be reasonably necessary to assist such Party to perform its obligations under this Agreement.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by its authorized officers.

GENERAL MOTORS CORPORATION

By:/s/ [ILLEGIBLE]
    Name:    [ILLEGIBLE]
    Title:    [ILLEGIBLE]

DELPHI AUTOMOTIVE SYSTEMS CORPORATION

By:/s/ James A. Bertrand
    Name:    James A. Bertrand
    Title:    Vice President-Operations

EXECUTION RECOMMENDED
WORLDWIDE REAL ESTATE

BY  /s/ C. P. Schwartz

15

16

**EXHIBIT H**

Docket #20520  Date Filed: 8/20/2010

**Hearing Date and Time:  September 24, 2010 at 10:00 a.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler


    - and -


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036

Attorneys for DPH Holdings Corp., et al.,
    Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                                            :
             In re                                          :    Chapter 11
                                                            :
DPH HOLDINGS CORP., et al.,                                 :    Case Number 05-44481 (RDD)
                                                            :
                                                            :    (Jointly Administered)
                    Reorganized Debtors.                    :
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


REORGANIZED DEBTORS' RESPONSE TO THE SUPPLEMENTAL BRIEF OF
ILLINOIS TOOL WORKS, INC. AND ITW FOOD EQUIPMENT GROUP LLC
<u>IN SUPPORT OF CLAIM NOS. 11983, 11985, 11988, AND 11989</u>

0544481100820000000000003

DPH Holdings Corp. and certain of its affiliated reorganized debtors in the above-caption cases (collectively, the "Reorganized Debtors") hereby submit the Reorganized Debtors' Response To The Supplemental Brief Of Illinois Tool Works, Inc. And ITW Food Equipment Group LLC In Support Of Claim Nos. 11983, 11985, 11988, And 11989, and respectfully represent as follows:

### Preliminary Statement

1.      This matter is before the Court on the Reorganized Debtors' objection to proofs of claim numbers 11983, 11985, 11988, and 11989 (the "Claims") filed by Illinois Tool Works, Inc. and  ITW Food Equipment Group LLC (collectively, "ITW") relating to environmental contamination at the South Dayton Dump and Landfill in Ohio (the "Site").

2.      The Reorganized Debtors objected to the Claims on the grounds that the Debtors have no liability at the Site because the Site ceased accepting wastes for the disposal before the Debtors were formed as part of the divestiture by General Motors Corporation ("General Motors") of its Delphi Automotive Systems unit (the "Divestiture").  ITW attempts to avoid the fact that the Debtors did not exist when the Site operated by arguing that discovery will prove that the Debtors are liable as the successor to General Motors.  However, no amount of discovery will change the incontrovertible fact that, after the Divestiture,  General Motors continued to exist as an independent company with the majority of its assets and liabilities unaffected by the Divestiture.  This refutes ITW's arguments regarding successor liability in their entirety and leaves ITW with no valid claim against the Debtors.  Furthermore, no matter how ITW characterizes its claim against the Debtors, it is fundamentally a contingent claim for reimbursement of costs for which ITW is liable and therefore the claim must be disallowed under section 502(e)(1)(B) of the Bankruptcy Code.

2

<u>**Argument**</u>

**I.    The Debtors Are Not the Successor to General Motors As a Matter of Law.**

3.    ITW's argument that the Debtors are the successors to General Motors is fundamentally flawed for two reasons.  First, ITW would have this Court apply Ohio law when, under New York choice of law principles,[1] Delaware law governs the question of corporate successorship in this case.  Second, ITW can prove no set of facts that would establish that the Divesture was a de facto merger, that ITW is a third-party beneficiary to the now-terminated contract between General Motors and the Debtors regarding the assumption and retention of environmental liabilities, or that the Debtors were a mere continuation of General Motors.  This is true under both Delaware and Ohio law, and therefore ITW has no valid claim against the Debtors.

**A.    Delaware Law Governs Whether the Debtors are the Corporate Successors to General Motors.**

4.    ITW contends that Ohio law governs its successor liability claims because the Site is located in Ohio and New York courts decide choice of law questions based on the *lex loci* test for tort claims.  Supplemental Brief Of Illinois Tool Works, Inc. And ITW Food Equipment Group LLC In Support Of Claim Nos. 11983, 11985, 11988 And 11989 ("ITW Supplemental Brief") ¶ 25 n.1.  The question of whether the Debtors are the corporate successors to General Motors, however, is not a matter of tort law and hence the *lex loci* test is irrelevant.  Instead, as the Southern District of New York has held, under the "paramount interest" test, the state of incorporation has the greatest interest in resolving questions of corporate successor

---

[1]    The Debtors agree with ITW that a federal court exercising bankruptcy jurisdiction over state law claims should apply the choice of law rules of the forum state. ITW Supplemental Brief ¶ 25 n.1; <u>see</u> <u>Adelphia Commc'ns Corp. v. Bank of America</u>, 365 B.R. 24, 26 (Bankr. S.D.N.Y. 2007).

liability.  <u>Soviet Pan Am Travel Effort v. Travel Comm., Inc.</u>, 756 F.Supp. 126, 131 (S.D.N.Y.

1991).  Accordingly, since both General Motors and Delphi are Delaware corporations,

Delaware state law governs whether Debtors are corporate successors to General Motors, not

Ohio law.

     5.    Ultimately, however, the choice of law question need not be resolved as

ITW cannot, as a matter of law, establish that the Debtors are the corporate successors to General

Motors under either Delaware or Ohio law.

     **B.**    **The Divestiture Was Not a *De Facto* Merger Between the Debtors and General Motors.**

     6.    ITW first tries to establish that the Debtors are successors to General

Motors by arguing that the Divestiture was a *de facto* merger.  This argument fails under either

Delaware or Ohio law.  To establish a *de facto* merger under Delaware law, a plaintiff must show

that: (1) the seller transferred all of its assets to the buyer; (2) payment was made in stock with

the buyer issuing its stock directly to the stockholders of the seller; and (3) the buyer agreed to

assume all debts and liabilities of the seller.  <u>Xperex Corp. v. Viasystems Techs. Corp., LLC</u>,

2004 Del. Ch. LEXIS 172, *4-5 (Del. Ch. July 22, 2004); <u>see</u> <u>also</u> <u>Drug, Inc. v. Hunt</u>, 168 A. 87,

96 (Del. 1933).

     7.    There can be no dispute that General Motors did not transfer all of its

assets to the Debtors; plainly, General Motors continued to own and operate assets after the

Divestiture.  Furthermore, the terms of the Master Separation Agreement, pursuant to which the

Divestiture occurred, make clear that only certain of General Motors' assets were transferred to

the Debtors.  <u>See</u> Master Separation Agreement Among General Motors Corporation, Delphi

Automotive Systems Corporation, Delphi Automotive Systems LLC, Delphi Technologies, Inc.

and Delphi Automotive Systems (Holding), Inc. (the "MSA") § 2.01.[2]  Accordingly, ITW cannot

prove the first element required for a *de facto* merger under Delaware law and its arguments

must be rejected.

        8.      Moreover, ITW concedes that it cannot meet the third element for a *de*

*facto* merger by acknowledging that the Debtors agreed to assume only "certain environmental

liabilities of General Motors."  ITW Supplemental Brief at ¶ 31 (emphasis added).  By ITW's

own admission, the Debtors did not assume all of General Motors' environmental liabilities, let

alone all of its liabilities generally.  For example, the MSA provides that General Motors

retained certain liabilities associated with its Delphi Automotive Systems unit, including certain

product liability claims, identified general litigation claims, and employment-related claims.

MSA §§ 7.01, 7.02, 7.03.  Furthermore, as ITW concedes, the Debtors did not even assume all of

the environmental liabilities associated with the Delphi business unit of General Motors.  Rather,

the Debtors and General Motors entered into the Environmental Matters Agreement by and

between General Motors Corporation and Delphi Automotive Systems Corporation (the

"EMA")[3] which allocated such liabilities between the parties.  Specifically, General Motors

retained all liabilities associated with third-party waste disposal sites that were attributable to the

transferred assets to the extent such liabilities were known at the time of the Divestiture.  EMA ¶

2.3.  Accordingly, because General Motors retained a significant portion of the liabilities

associated with its former Delphi business unit, ITW simply cannot prove the third element

necessary for a *de facto* merger under Delaware law.

---

[2]    The MSA was attached as Exhibit D to Reorganized Debtors' Supplemental Reply To Responses Of Certain
Claimants To Debtors' Objections To Proofs Of Claim Nos. 11983, 11985, 11988, And 11989 Filed By Illinois
Tool Works Inc. And ITW Food Equipment Group LLC (Docket No. 19603) (the "Reorganized Debtors'
Supplemental Reply").

[3]    The EMA was attached as Exhibit E to the Reorganized Debtors' Supplemental Reply.

9.      The same result is reached applying Ohio law.  As ITW acknowledges, a *de facto* merger under Ohio law requires: "(1) the continuation of the previous business activity and corporate personnel, (2) a continuity of shareholders resulting from a sale of assets in exchange for stock, (3) the immediate or rapid dissolution of the predecessor corporation, and (4) the assumption by the purchasing corporation of all liabilities and obligations ordinarily necessary to continue the predecessor's business operations."  ITW Supplemental Brief ¶ 28; citing Welco Indus. Inc. v. Applied Cos., 617 N.E.2d 1129, 1134 (Ohio 1993).

10.      To support the first element, ITW asserts that the Debtors had "a continuity of management and personnel" following the Divestiture.  ITW Supplemental Brief ¶ 30.  The Debtors strongly dispute these facts and any assertion that the second element is satisfied, but the Court need not consider such facts because, as a matter of law, ITW cannot prove the third and fourth elements of a *de facto* merger under Ohio law.   In fact, ITW concedes that the Divestiture does not meet the third requirement by recognizing that "obviously General Motors did not cease its operations as result of the divestiture."  Id. at ¶ 30.  ITW argues that this crucial fact is irrelevant because General Motors ceased the operations previously conducted by its Delphi Automotive Systems unit after the Divestiture.  Id.  But, dissolution of a corporation is entirely different from ceasing particular operations, and ITW's argument has already been rejected by Ohio courts and by federal courts applying Ohio law.  In Welco, for example, the Ohio Supreme Court held that the sale of the assets of a division is not a *de facto* merger even when the seller ceases all operations associated with that division as long as the selling corporate entity continues to exist after the transaction. 617 N.E.2d at 1134.  Consistent with this, the Ohio Court of Appeals has held that the *de facto* merger doctrine "presupposes that the predecessor corporation no longer exists."  Telxon Corp. v. Smart Media of Del., Inc., 2005 Ohio 4931, slip

6

op. at *50 (Ohio Ct. App. 2005).  Likewise, the Third Circuit has noted that a critical element of

the *de facto* merger test under Ohio Law "is that one corporation survives while the other ceases

to exist."  Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 470 (3d Cir. 2006).  In Berg, the

court held that there was no *de facto* merger resulting from the sale of the assets of a corporate

division because the selling company continued to exist and continued to operate its other

divisions.  Id. at 470.  These cases are all factually similar to the present case and demonstrate

that, as a matter of law, ITW cannot establish that the Divestiture was a *de facto* merger under

Ohio law.

   11.  ITW also concedes that it cannot meet Ohio's fourth element of a *de facto*

merger.  As noted above, ITW concedes that the Debtors assumed some, but not all, of General

Motors' liabilities.  Accordingly, ITW's attempts to position the Divestiture as a *de facto* merger

under Ohio law must be rejected.

  **C.**  **The Environmental Matters Agreement Does Not Give ITW a Claim Against the Debtors.**

   12.  ITW next asserts that it has a valid claiming arising under the EMA, which,

as discussed above, allocated environmental liabilities between General Motors and Delphi.  In

making this argument, ITW incorrectly states that the EMA was an executory contract that was

rejected by the Debtors and that ITW was a third-party beneficiary under the contract.

   **(i)**  **The EMA Was Not An Executory Contract Rejected by the Debtors.**

   13.  ITW concedes, as it must, that the EMA was terminated under the Master

Disposition Agreement Among Delphi Corporation, GM Components Holdings, LLC, General

Motors Company, Motors Liquidation Company, DIP Holdco 3 LLC and Other Companies,

Dated As Of July 30, 2009 (the "MDA").  The MDA was entered into as part of the First

Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors

7

And Debtors-In-Possession, As Modified (the "Modified Plan"), which was approved by this

Court pursuant to an order entered on July 30, 2009 (Docket No. 18707).

14.      Without explanation or any legal or factual support, ITW equates the

termination of the EMA with the rejection of an executory contract under Section 365 of the

Bankruptcy Code.  This is incorrect.  The EMA was terminated by the consent of both General

Motors and the Debtors under section 9.19 of the MDA.  See Modified Plan at Exhibit 7.7, §

9.19.1(C).  In contrast, the executory contracts that were rejected by the Debtors were rejected

unilaterally and listed on Exhibit 8.1(a) to the Modified Plan.  The EMA is not listed on this

exhibit.  See Modified Plan at Exhibit 8.1(a) and amendments thereto (Docket Nos. 17557,

18492, 18683, 18704).  Thus, ITW's threshold assumption with respect to the EMA is incorrect;

the EMA was not a rejected executory contract, and therefore ITW's argument that it has a claim

for rejection damages under Section 365(g) of the Bankruptcy Code necessarily fails.

### (ii)      ITW Was Not a Third-Party Beneficiary to the EMA.

15.      Moreover, ITW cannot demonstrate that it was a third-party beneficiary to

the EMA.  As a threshold matter, ITW again directs the Court to the wrong governing law by

indicating that New York law should apply.  The correct choice of law is Delaware because the

EMA provides that it will be governed by the law of Delaware. EMA ¶ 9.8.  Under New York's

choice of law principles, if a contract has an express choice of law provision and the chosen

jurisdiction has sufficient contact with the transaction, this choice of law will govern disputes

arising out of the contract except in cases of fraud or violations of public policy.  Fieger v. Pitney

Bowes Credit Corp., 251 F.3d 386, 393 (2d Cir. 2001).  ITW has made no allegations of fraud or

violations of public policy and therefore Delaware governs ITW's claim that it is a third-party

beneficiary to the EMA.

8

16.    Under Delaware law, "[t]o qualify as a third-party beneficiary of a contract, (i) the contracting parties must have intended that the third party beneficiary benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract." Madison Realty Partners 7, LLC v. Ag ISA LLC, C.A. No. 18094, 2001 WL 406268, at *5 (Del. Ch. Apr. 17, 2001) (citing Guardian Constr. Co.v. TetraTech Richardson, Inc., 583 A.2d 1378, 1386-87 ((Del. Super. Ct. 1990)). ITW has not alleged any facts sufficient to meet these three prongs, nor has it even discussed these requirements; instead it bases its claim solely on the "notion that it is just and practical" for ITW to collect rejection damages for termination of the EMA.  ITW Supplemental Brief ¶ 34 (internal quotations omitted).  Such policy considerations, however, are irrelevant to whether ITW meets the requirements under Delaware law to be deemed a third-party beneficiary.  And, clearly, ITW does not.

17.    First, General Motors and Delphi must have intended ITW to benefit from the EMA at the time it was entered.  Hostetter v. Hartford Ins. Co., C.A. No. 85C-06-28, 1992 Del. Super. LEXIS 284, *17 (Del. Super. Ct. July 13, 1992) (since plaintiff was not named or identified in the contract and there was no indication that the contract was made with the specific intention to benefit plaintiff, plaintiff was not a third-party beneficiary).  Clearly this is not the case as General Motors' liability at the Site was not known in 1998, the date of the EMA.  This fact necessarily follows from the EMA, under which General Motors retained full liability for disposal sites that were known as of the date of the EMA and the Debtors assumed a portion of the liability at disposal sites where the liability was discovered after the EMA.  See EMA §2.3. Thus, if the Debtors assumed any liability at the Site under the EMA, such liability necessarily

was unknown to General Motors and the Debtors at the time of the EMA. Accordingly, ITW

cannot possibly prove that General Motors and the Debtors intended for the EMA to benefit ITW.

18.     ITW cannot avoid this result by asserting that the EMA was generally

intended to benefit other responsible parties at the newly identified waste sites. Delaware law

distinguishes intended beneficiaries, who can be third-party beneficiaries, from incidental

beneficiaries, who have no rights under contracts to which they are not parties. Hostetter, 1992

Del. Super. LEXIS 284 at 17-19. Intended beneficiaries are those who are specifically

contemplated to be benefited by a contract at the time it was made, while incidental beneficiaries

are those who are not specifically contemplated by the contract but may otherwise benefit from it.

Id. The court in Hostetter rejected the plaintiff's argument that because she was in a general

class of individuals that could benefit from the insurance contract, she was an intended

beneficiary and instead held that those potential benefits were incidental to the intended purpose

of the contract, which was to protect the contracting party's assets. Id. at 17-18. Since neither

General Motors nor Delphi knew that ITW could have a potential claim against General Motors

for liability at this Site, they could not have intended for ITW to specifically benefit from this

contract.

19.     ITW similarly cannot meet the second requirement to establish third-party

beneficiary status because General Motors and the Debtors did not intend the EMA to be a gift or

in satisfaction of a pre-existing obligation. Because General Motors and Delphi had no

knowledge of General Motors' potential liability at the Site, there could be no intent that the

contract be a gift to ITW or in satisfaction of a pre-existing obligation.

20.     Finally, even if ITW could somehow establish that the EMA was intended

to benefit ITW as a gift or in satisfaction of a pre-existing obligation, Delaware law also requires

10

that the benefit to a third party must have been a material part of the purpose of the contract.

Insituform of N. Am., Inc. v. Chandler, 534 A.2d 257, 270 (Del. Ch. 1987) (concluding that the

effect of a contract, "whether beneficial or not, or intended or not, was merely instrumental to

achievement of the contract's purpose and was, legally, incidental to the contract").  ITW

conceded that this was not the case with the EMA, stating that "[t]he obvious purpose of the

EMA was to assign liability, by agreement, for environmental damages caused by former GM

facilities."  ITW Supplemental Brief ¶ 34.  Furthermore, as stated in the Reorganized Debtors'

Supplemental Brief, the EMA was entered into for the express purpose of implementing the

Divestiture.  See Reorganized Debtors' Supplement Brief at ¶ 21.  Accordingly, the purpose of

the EMA was to effectuate the allocation of liabilities between General Motors and the Debtors

as part of the Divestiture, not to benefit any third parties.  Any benefits that would have accrued

to ITW had the EMA not been terminated were incidental to the agreement and are insufficient

to give ITW enforceable rights under the contract.

### D.    The Debtors Were Not a Mere Continuation of General Motors.

21.    Finally, ITW's argument that the Debtors were a mere continuation of

General Motors must fail under both Delaware and Ohio law.   In Delaware, the mere

continuation theory of successor liability is interpreted narrowly and requires that "the new

company be the same legal entity as the old company."  Ross v. DESA Holdings Corp., 2008

WL 4899226, at *4 (Del. Super. Ct. Sept. 30, 2008).  Furthermore, whether the new company

continued the business operations of the old company is irrelevant; successor liability only

attaches if the new company is the "same legal person" as the old company.  Id.; see also, e.g.,

Fountain v. Colonial Chevrolet Co., 1988 WL 40019, at *9 (Del. Super. Ct. Apr. 13, 1988).

Similarly, under Ohio law, the mere continuation exception is "narrowly construed to protect

corporations from unassumed liabilities."  Flaugher v. Cone Automatic Mach. Co., 30 Ohio St.

3d 60, 64 (Ohio 1987).  And, as ITW admits, the basis of this exception under Ohio law is "the

continuation of the corporate entity, not the business operation, after the transaction."  ITW

Supplemental Brief ¶ 36 (quoting Per-Co, Ltd. v. Great Lakes Factors, 299 Fed. Appx. 559, 563

(6th Cir. 2008)).

        22.    No amount of discovery will establish that the Debtors were the same

legal entity as General Motors after the Divestiture.  Clearly General Motors continued as a

separate and distinct entity from the Debtors, as evidenced by the two companies' separate SEC

filings, separate articles of incorporation and, indeed, separate bankruptcy proceedings, all of

which this Court may take judicial notice of for purposes of this sufficiency hearing.  Moreover,

the mere fact that General Motors continued to exist at all after the Divestiture is fatal to ITW's

argument under both Delaware and Ohio law.  Ross, 2008 WL 4899226 at *4 (finding that the

new company was not the mere continuation of the old company when the old company

continued to exist after the sale); Fehl v. S. W. C. Corp., 449 F.Supp. 48 (D. Del. 1978) (same);

see also Travis v. Harris Corp., 565 F.2d 443, 447 (7th Cir. 1977) (applying Ohio law and

finding that the mere continuation theory requires "the existence of only one corporation at the

completion of the transfer."); McGaw v. South Bend Lathe, Inc., 598 N.E.2d 18, 21-22 (Ohio Ct.

App. 1991) (stating that successor liability based on mere continuation cannot exist without "the

seller's prompt extinction after the transfer").

        23.    The only argument that ITW makes to support its mere continuation

theory is that General Motors continued to own at least 80% of the stock of Delphi Corporation

after the Divesture.  But this does not establish that Delphi Corporation was the same legal entity

as General Motors and is thus insufficient to establish liability.  Furthermore, as set forth in the

MSA, as part of the Divestiture, General Motors was to distribute its ownership interest in the

Delphi Corporation to its shareholders by means of an exchange offer and/or pro rata distribution.

MSA at Recitals.  As shown by the records of the New York Department of Taxation and

Finance, this distribution occurred in May 1999, a mere five months after the Divestiture.  See

Advisory Opinion, State of New York Commissioner of Taxation and Finance, Petition No.

C990610A, November 3, 1999 (attached hereto as Exhibit A).  This brief period of ownership of

Delphi Corporation by General Motors is insufficient to render the Debtors the same legal entity

as General Motors, as is the fact that some of Delphi Corporation's stock was owned by the

shareholders of General Motors.  Per-Co, Ltd., 299 Fed. Appx. at 564.  In Per-Co, Ltd., the

acquiring company planned to institute an employee stock ownership plan in which the

stockholders of the selling corporation would own 79% of the stock of the acquiring corporation.

The court concluded that this "alteration in ownership . . . would have made the 'mere

continuation' theory inapposite."  Id. at 564.  Thus, under Per-Co, Ltd., ITW's claim of successor

liability based upon the theory of 'mere continuation' fails.

## II.    The Claims Are Barred by Section 502(e)(1)(B) of the Bankruptcy Code.

24.    Finally, ITW attempts to avoid disallowance of the Claims under Section

502(e)(1)(B) of the Bankruptcy Code by arguing that it has a direct claim against the Debtors for

the costs it will incur at the Site.  In doing so, ITW does not contest that it is a liable party at the

Site or that its claim is contingent.  Instead, it argues that its "direct" claim against the debtors is

not a claim for contribution or reimbursement.  However, this argument fails for two reasons.

First, ITW describes its claim as one for "past and future response costs it has incurred or will

incur itself."  ITW Supplemental Brief ¶ 43.  In other words, ITW seeks reimbursement of its

costs, and as such the Claims fall squarely within the scope of §502(e)(1)(B) which requires the

disallowance of contingent claims "for reimbursement" by co-liable parties.  11 U.S.C. §

502(e)(1)(B).  Because ITW has not contested that its claim is contingent and that it is co-liable

with the Debtors, its claim for reimbursement of cleanup costs must be rejected.  <u>In re Hexcel</u>

<u>Corp.</u>, 174 B.R. 807 (Bankr. N.D. Cal. 1994) (claims for reimbursement of cleanup costs by co-

liable parties are disallowed under §502(e)(1)(B)).

       25.    Second, ITW is wrong when it asserts that there is no risk of double

recovery against the Debtors because ITW is only attempting to recover the costs it will incur

directly at the Site.  The United States Environmental Protection Agency (EPA) has asserted a

claim against the Debtors that seeks recovery of <u>all</u> costs necessary to design the cleanup remedy

and implement it.  As set forth in EPA's proof of claim:

> EPA expects to incur future response costs in connection with the remedial design
> and remedial action for the South Dayton Site.  These costs have been estimated
> by EPA at between $20 and 50 million.  Along with other identified [liable
> parties], Delphi is jointly and severally liable to the United States for these
> amounts.

Proof of Claim #14309, ¶ 7, attached hereto as Exhibit B.  This makes clear that EPA intends to

seek the full amount of the cleanup costs – not just oversight costs – from the Debtors.

Accordingly, ITW's claim is in direct competition with EPA's claim and if ITW's claim is not

disallowed, the Debtors could be both jointly and severally liable to EPA for the full cleanup

costs at the Site and to ITW for its share of the cleanup costs.  This is precisely the type of

double recovery that Section 502(e)(1)(B) is designed to avoid.

       26.    In this regard, all but one of the cases cited by ITW are inapposite because

those cases did not involve competing claims by governmental entities or other third parties

seeking to recover the cleanup costs from the debtors.  For example, in <u>In re Harvard Industries,</u>

<u>Inc.</u>, the court specifically noted that neither the federal nor the state environmental agencies had

14

filed a claim against the debtor for cleanup costs. 138 B.R. 10, 12 (Bankr. D. Del. 1992).

Similarly, the Court in In re Dant & Russell, Inc. noted that "third parties [were] not competing

over [the debtors'] funds for cleanup . . . – there is no third party creditor here." 951 F.2d 246,

248 (9th Cir. 1991). Likewise, In re New York Trap Rock Corp. expressly acknowledged that

there was no "multiple liability on the debtor's part for the contingent claim asserted" by the

creditor. 153 B.R. 648, 651 (Bankr. S.D.N.Y. 1993).

   27. The only other case cited by ITW is In re Allegheny Int'l, Inc. 126 B.R.

919, 923 (W.D. Penn. 1991). That decision, however, has previously been criticized by the

Bankruptcy Court for the Southern District of New York for failing to recognize that,

fundamentally, claims for cleanup costs by co-liable parties are not direct claims but rather are

claims "to satisfy the obligation that both the debtor and the claimant had to the EPA for the

remediation of the properties." In re Drexel Burnham Lambert Group, 148 B.R. 982, 989 (Bankr.

S.D.N.Y. 1991) (quoting In re Cottonwood Canyon Land Co., 146 B.R. 992 (Bankr. D. Colo.

1992). The same is true here – ITW's claim is fundamentally a claim for reimbursement of the

costs necessary to satisfy the obligation to clean up the Site. ITW admits its liability for this

obligation, and EPA has filed a claim against the Debtors for these same costs. ITW's claim,

therefore, must be disallowed under §502(e)(1)(B) of the Bankruptcy Code.

## Conclusion

   28. ITW has not challenged the position that the Debtors did not exist at the

time the Site ceased accepting wastes for disposal. Instead, it argues that the Debtors are liable

for General Motors' disposal of wastes because the Debtors are the corporate successors to

General Motors. But, ITW cannot escape the plain fact that, after the Divestiture, General

Motors continued its own separate and distinct existence and that the Debtors did not acquire all

of General Motors' assets or assume all of its liabilities.  These facts preclude any finding that the

Debtors are corporate successors to General Motors under either the *de facto* merger or mere

continuation test.  Additionally, ITW has no valid claim under the EMA because that agreement

was terminated by the consent of both the Debtors and General Motors and was not a rejected

executory contract giving rise to rejection debtors.  Moreover, ITW clearly was not a third-party

beneficiary under the EMA and thus cannot assert any claims arising from the EMA.  Finally, as

contingent claims for reimbursement on an obligation for which ITW is liable, the Claims must

be disallowed under §502(e)(B)(1) of the Bankruptcy Code.

WHEREFORE the Reorganized Debtors respectfully request this Court enter an

order (a) sustaining the Reorganized Debtors' objection with respect to the Claims, (b)

disallowing and expunging the Claims in their entirety, and (c) granting such further and other

relief this Court deems just and proper.

Dated:    New York, New York
          August 20, 2010

                                SKADDEN, ARPS, SLATE, MEAGHER
                                   & FLOM LLP

                                By:   /s/ John Wm. Butler, Jr.
                                      John Wm. Butler, Jr.
                                      John K. Lyons
                                      Ron E. Meisler
                                155 North Wacker Drive
                                Chicago, Illinois 60606

                                      - and -

                                Four Times Square
                                New York, New York 10036

                                Attorneys for DPH Holdings Corp., et al.,
                                   Reorganized Debtors

16

## Exhibit A

**New York State Department of Taxation and Finance**

# Taxpayer Services Division
# Technical Services Bureau

TSB-A-99(27)C
Corporation Tax
November 3, 1999

STATE OF NEW YORK
COMMISSIONER OF TAXATION AND FINANCE

ADVISORY OPINION                PETITION NO. C990610A

On June 10, 1999, a Petition for Advisory Opinion was received from Delphi Automotive Systems Corporation, 1450 West Long Lake Road, Troy, Michigan 48098.

The issue raised by Petitioner, Delphi Automotive Systems Corporation, is whether it is a "new business" and thus entitled to the refundibility of investment tax credit, under section 210.12(e) of the Tax Law.

Petitioner submits the following statement of facts as the basis for this Advisory Opinion.

Before 1991, the production of parts by General Motors Corporation ("GM") was conducted by many separate automotive parts operations which GM had acquired over time. These operations were generally managed independently from each other within the GM organization and were accounted for as separate divisions within GM. In 1991, GM organized its component businesses into the Automotive Components Group in order to improve the competitiveness of these operations and increase its business through penetration of new markets. Since that time, the Group has been transformed from a North America-based, captive component supplier to GM into a global supplier of components, integrated systems and modules for a wide range of customers. In 1995, the group was given the name "Delphi Automotive Systems" ("Delphi") in order to establish its separate identity in the automotive parts industry.

Petitioner was incorporated in Delaware on September 16, 1998. Petitioner is a holding company that holds a 100 percent interest in Delphi Automotive Systems LLC ("Delphi LLC"), a company that operates in New York State through several divisions including the Delphi Harrison Thermal Division ("Delphi Harrison") and Delphi's Energy and Engine Management Systems Division. Delphi LLC was formed in Delaware on September 16, 1998. Petitioner will be treating Delphi LLC as a branch or division of Petitioner for federal income tax purposes as provided under section 301.7701-3 of the Treasury Regulations, and will also be treating it as a branch or division of Petitioner for purposes of Article 9-A of the Tax Law.

On January 1, 1999, GM transferred certain assets to Petitioner, and its subsidiaries, and Petitioner and its subsidiaries have assumed, or agreed to assume, pay, perform, satisfy and discharge, the related liabilities. This transaction qualified for "tax-free" treatment under section 351 of the Internal Revenue Code("IRC").

TSB-A-99(27)C
Corporation Tax
November 3, 1999

On February 5, 1999, immediately prior to which Petitioner was wholly owned by GM, Petitioner completed an initial public offering (the "IPO") of 100 million shares of Petitioner $.01 par value common stock thereby reducing GM's holdings to 82.3 percent. On May 28, 1999, GM divested itself of its entire interest in Petitioner by distributing all of its shares of Petitioner's common stock to holders of GM's common stock (the "Distribution"). This Distribution was accomplished through a tax-free spin-off ( a pro rata distribution by GM of its shares of Petitioner's common stock to holders of GM's common stock) under section 355 of the IRC.

Petitioner is an independent publicly traded company headquartered in Troy, Michigan, that is listed on the New York Stock Exchange and other global exchanges. Petitioner is an automotive supplier dealing in "Dynamics and Propulsion, Safety, Thermal and Electrical Architecture, and Electronics & Mobile Communications." As a world leader in the automotive supply business, Petitioner is comprised of 196,000 employees operating 208 wholly-owned manufacturing sites, participates in 46 joint ventures and operates 27 technical centers in 36 countries. Petitioner's integrated systems and modules are designed to simplify vehicle manufacturers' processes while meeting the demands of today's high-tech vehicles with its main focus being customer satisfaction through technology leadership, world class quality, cost, scheduled delivery and responsiveness.

Delphi Harrison's capital funding will be utilized for new product and process technologies such as newly designed compact / ultra-thin heat exchange products, newly designed compact air conditioning modules and new lean cell manufacturing processes.

Since May 28, 1999, the spin-off date from GM, not more than 50 percent of the number of shares of Petitioner's voting stock has been held by a taxpayer subject to tax under Article 9-A or any of the other provisions enumerated in section 210.12(j) of the Tax Law, because Petitioner is owned by many different investors, and is no longer owned by GM. After the spin-off date, no shareholder owns more than 50 percent of Petitioner's voting stock.

Petitioner states that it is not substantially similar in operation to GM since Petitioner's business is the manufacture of automotive and non-automotive components while GM's business is the assembly and sale of motor vehicles. Petitioner also states that for the years prior to 1999, the GM divisions that are now Delphi LLC operations that are still operating plants in New York State manufactured the following products: Delphi Harrison which operates in Lockport, New York, manufactured condensers (which cover the complete range of automotive air conditioning needs), heater cores, evaporators, heating, ventilating and air conditioning modules, heavy-duty oil coolers, automotive oil coolers, radiators, powertrain cooling modules, accumulator dehydrators, 6-cylinder axial-type H-6 compressors, V-5f, V-6 and V-7 variable displacement compressors, and compact variable compressors; while Delphi's Energy and Engine Management Systems Division which operates in Rochester, New York, manufactured throttle bodies, fuel rails, fuel rail assemblies, integrated air fuel modules, exhaust gas recirculation valves (both linear and backpressure),

TSB-A-99(27)C
Corporation Tax
November 3, 1999

evaporative emissions canisters, and generator die casts.  No other GM plant manufactured similar products either in New York or in any other state during the years prior to 1999.

For calendar year 1999, Petitioner will be filing two short-period returns for both federal income tax purposes and New York State franchise tax purposes.  The first short period will be January 1, 1999 through May 31, 1999; the second short period will be June 1, 1999 through December 31, 1999.

It should be assumed for purposes of this advisory opinion that asset acquisitions by Petitioner will qualify for the investment tax credit under section 210.12(b)(1) of the Tax Law as property principally used by Petitioner in the production of goods by manufacturing.

**Discussion**

Section 301.7701-3(a) of the Treasury Regulations, provides that a business entity that is not required to be classified as a corporation is an "eligible entity" that can elect its classification for federal income tax purposes.  A domestic eligible entity that has a single member can elect to be classified as an association or elect to be disregarded as an entity separate from its owner.  Under section 301.7701-3(b)(1) of the Treasury Regulations, the default classification of an entity that has a single owner will be that it is not an entity separate from its owner.  If the entity wants to be classified as an association, it must make the election pursuant to section 301.7701-3(c) of the Treasury Regulations.

It has been established that the classification of an LLC for New York State tax purposes will follow the classification accorded the LLC for federal income tax purposes.  (See, FGIC CMRC Corp, Adv Op Comm T & F, April 1, 1996, TSB-A-96(11)C; and Department of Taxation and Finance Memorandum, TSB-M-94(6)I and (8)C, October 25, 1994.)  Following federal conformity with respect to classifying LLCs, a single member LLC which is a domestic eligible entity that does not make the election for federal income tax purposes pursuant to section 301.7701-3 of the Treasury Regulations would not be classified as an entity separate from its owner.  If its owner is a corporation, it would be considered a branch or division of the owner corporation.

In this case, Delphi LLC is treated as a division of Petitioner for federal income tax purposes and, therefore, Delphi LLC will be treated as a division of Petitioner for purposes of Article 9-A of the Tax Law.

Section 210.12 of the Tax Law allows an investment tax credit against the tax imposed under Article 9-A of the Tax Law.  For taxable years beginning after 1990, section 210.12 allows an investment tax credit equal to five percent with respect to the first $350 million of the investment credit base and four percent with respect to the investment credit base in excess of $350 million.  The

TSB-A-99(27)C
Corporation Tax
November 3, 1999

investment credit base is the cost or other basis for federal income tax purposes of qualified tangible personal property and other tangible property, including buildings and structural components of buildings.

Under section 210.12(b) of the Tax Law and section 5-2.2 of the Business Corporation Franchise Tax Regulations ("Article 9-A Regulations"), the term "qualified property" means tangible personal property and other tangible property, including buildings and structural components of buildings, which:

(1)     is acquired, constructed, reconstructed or erected by the taxpayer after December 31, 1968;

(2)     is depreciable pursuant to section 167 of the Internal Revenue Code;

(3)     has a useful life of four years or more;

(4)     is acquired by the taxpayer by purchase as defined in section 179(d) of the Internal Revenue Code;

(5)     has a situs in New York State; and

(6)     is principally used by the taxpayer in the production of goods by manufacturing, processing, assembling, refining, mining, extracting, farming, agriculture, horticulture, floriculture, viticulture or commercial fishing.

Section 210.12(e)(1) of the Tax Law, provides, in part, that:

if the amount of credit allowable under this subdivision for any taxable year reduces the tax to [the higher of the amounts prescribed in section 210.1(c) and (d) of the Tax Law] ... any amount of credit allowed for a taxable year commencing ... on or after [January 1, 1987] and not deductible in such year may be carried over to the fifteen taxable years next following such taxable year and may be deducted from the taxpayer's tax for such year or years.  In lieu of such carryover, any such taxpayer which qualifies as a new business under [section 210.12(j) of the Tax Law] may elect to treat the amount of such carryover as an overpayment of tax to be credited or refunded in accordance with the provisions of [section 1086 of the Tax Law], provided, however, the provisions of [section 1088(c) of the Tax Law] notwithstanding, no interest shall be paid thereon.

Section 210.12(e)(1) of the Tax Law provides that if the amount of investment tax credit allowed under section 210.12 of the Tax Law for any taxable year reduces the tax due for such year to less than the higher of the amounts prescribed in section 210.1(c) and (d) of the Tax Law, any amount of credit thus not deductible in such year may be carried over to the following 15 years, and may be deducted from the taxpayer's tax for such year or years.  In lieu of such carryover, a taxpayer which qualifies as a "new business" under section 210.12(j) of the Tax Law, may elect to treat the amount of such carryover as an overpayment of tax to be credited or refunded in accordance with the provisions of section 1086 of the Tax Law.

Section 210.12(j) of the Tax Law provides that for purposes of section 210.12(e) of the Tax Law, a "new business" shall include any corporation except:

1. a corporation in which over 50 percent of the number of shares of stock entitling their holders to vote for the election of directors or trustees is owned or controlled, either directly or indirectly, by a taxpayer subject to tax under Article 9-A; section 183, 184, 185, 186 of Article 9; Article 32 or 33 of the Tax Law; or

2. a corporation that is substantially similar in operation and in ownership to a business entity or entities taxable, or previously taxable under Article 9-A; section 183, 184, 185, or 186 of Article 9; Article 32 or 33; or Article 23 or that would have been subject to tax under Article 23, as such article was in effect on January 1, 1980, or the income (or losses) of which is (or was) includable under Article 22 of the Tax Law whereby the intent and purpose of section 210.12(e) of the Tax Law with respect to refunding of credit to new business would be evaded; or

3. a corporation that has been subject to tax under Article 9-A for more than four years (excluding short periods) prior to the taxable year during which the taxpayer first becomes eligible for the investment tax credit.

Therefore, a corporation is a "new business" *unless* it is described in any of these three conditions.  For the short period January 1, 1999 through May 31, 1999, Petitioner was not a new business, pursuant to section 210.12(j)(1) of the Tax Law, because for that entire period it was more than 50 percent owned by GM, a taxpayer under "Article 9-A of the Tax Law.

After GM's divestiture of stock in Petitioner on May 28, 1999, Petitioner was no longer more than 50 percent owned or controlled by a taxpayer described in section 210.12(j)(1) of the Tax Law.  Further, while immediately upon such divestiture Petitioner was substantially similar in ownership to GM, since Petitioner was as of that moment a 100 percent publicly traded corporation, it must be presumed that such similarity in ownership was immediately dissipated, such that the situation described in section 210.12(j)(2) of the Tax Law no longer applied.  Therefore, with respect to

TSB-A-99(27)C
Corporation Tax
November 3, 1999

Petitioner's short period return, June 1, 1999 through December 31, 1999, Petitioner will satisfy the first and second conditions of section 210.12(j) of the Tax Law (i.e., was *not* as there described), from which it follows that Petitioner is and will be a new business with respect to qualifying property placed in service after May 28, 1999, and before the end of its first five taxable years (excluding short taxable periods).

DATED:  November 3, 1999                                        /s/
                                                                John W. Bartlett
                                                                Deputy Director
                                                                Technical Services Bureau

        NOTE:           The opinions expressed in Advisory Opinions are
                        limited to the facts set forth therein.

## Exhibit B

ORIGINAL

# 14309

FORM B10 (Official Form 10) (04/05)

| UNITED STATES BANKRUPTCY COURT  SOUTHERN  DISTRICT OF  NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>**Delphi Automotive Systems LLC** | Case Number<br>**05-44640 (RDD)** |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

**Received**

AUG 0 9 2006

**Kurtzman Carson**

Claim #14309
USBC SDNY
Delphi Corporation, et al.
05-44481 (RDD)

Name of Creditor (The person or other entity to whom the debtor owes money or property):

**U.S. Environmental Protection Agency**

Name and address where notices should be sent:

David J. Kennedy
Assistant U.S. Attorney, SDNY
86 Chambers Street, 3rd Floor
New York, NY 10007
Telephone number:     (212) 637-2733

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.
☐ Check box if you have never received any notices from the bankruptcy court in this case.
☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

Account or other number by which creditor identifies debtor:

Check here ☐ replaces
if this claim ☐ amends     a previously filed claim, dated:_____

**1.  Basis for Claim**
☐ Goods sold
☐ Services performed          See attached.
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☐ Other _____

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)
Last four digits of SS #: _____
Unpaid compensation for services performed
from _____ to_____
(date)                    (date)

**2.  Date debt was incurred:**
See attached.

**3.  If court judgment, date obtained:**
See attached.

**4.  Total Amount of Claim at Time Case Filed:  $  See attached.**
(unsecured)        (secured)        (priority)        (Total)
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).          See attached.
Brief Description of Collateral:
☐ Real Estate   ☐ Motor Vehicle
☐  Other_____
Value of Collateral:   $_____
Amount of arrearage and other charges at time case filed included in secured claim, if any:  $_____

**6.  Unsecured Nonpriority Claim** $_____
☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7.  Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority  $_____
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).
☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units-11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. $10,000 and 180-day limits apply to cases filed on or after 4/20/05. Pub. L. 109-8.

**8.  Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9.  Supporting Documents:**  *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10. Date-Stamped Copy:**    To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim

THIS SPACE IS FOR COURT USE ONLY

FILED
2006 JUL 31  P 3
U.S. BANKRUPTCY COURT
S.D.N.Y.

| Date<br>7/31/06 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):   [signature]   DAVID J. KENNEDY, A.U.S.A. |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both.  18 U.S.C. §§ 152 and 3571.

0544640060731000000000126

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By: DAVID J. KENNEDY (DK-8307)
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Tel. No.:  (212) 637-2733
Fax No.:  (212) 637-2686

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re:                                                    CHAPTER 11

DELPHI AUTOMOTIVE SYSTEMS LLC,                            Case No. 05-44640-rdd

                                                          Jointly Administered

                              Debtors.

------------------------------------------------------------x

### PROOF OF CLAIM OF THE UNITED STATES ON BEHALF OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

     1.      The United States files this Proof of Claim at the request of the U.S.

Environmental Protection Agency ("EPA"), against debtor Delphi Automotive Systems LLC

("Delphi"), for response costs incurred and to be incurred by the United States under the

Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42

U.S.C. §§ 9601-9675 at the Superfund Sites set forth herein in Paragraphs 2 through 7, infra.  In

addition, with respect to equitable remedies that are not within the Bankruptcy Code's definition

of "claim," 11 U.S.C. § 101(5), this proof of claim is only filed in protective fashion.  See, e.g.,

Paragraphs 3, 8, 9, and 10, infra.

     2.      Tremont City Landfill Superfund Site.  Delphi is liable to the United States under

CERCLA with respect to the Tremont City Landfill Superfund Site located at 3108 Snyder-

Domer Road, Tremont City, German Township, Clark County, Ohio (the "Tremont City Site").

The 80-acre Site includes several facilities including a closed 8.5 acre chemical waste landfill

(the "Barrel Fill" facility), a closed 56 acre sanitary landfill (the "Landfill" facility), and a 15.5

acre closed oil recycling and hazardous waste storage and transfer operation (the "Waste

Storage" facility). Delphi is liable to the United States because by contract, agreement or

otherwise, it arranged for disposal or treatment, or arranged with a transporter for transport for

disposal or treatment, of hazardous substances owned or possessed by Delphi at the Barrel Fill

and Landfill facilities owned by another party or entity, and containing hazardous substances,

pursuant to Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3). Delphi disposed of drums

and bulk wastes containing, inter alia, paint sludge, polyester resins, polystyrene, sulfuric acid

sludge, paint waste, polyol resin and caustic sludge at the Barrel Fill facility and solid wastes at

the Landfill facility. The closed Barrel Fill and Landfill operations are facilities within the

meaning of CERCLA. There have been releases or threats of releases of hazardous substances,

including but not limited to, inorganic compounds (antimony, arsenic, thallium, cyanide and

lead) and volatile organic compounds (xylene, methylene chloride, ethyl benzene and acetone),

from the facilities at the Tremont City Site. These hazardous substances have been released into

the waterways, surface water, soils, and sediments at the Tremont City Site. Other potentially

responsible parties may, along with Delphi, also be jointly and severally liable to the United

States under CERCLA with respect to the Barrel Fill and Landfill facilities.

    3.    This Proof of Claim is filed in a protective manner with respect to Delphi's

obligations to perform work with respect to the Tremont City Site. See Paragraph 8, infra. On

October 3, 2002, EPA entered into an Administrative Order on Consent ("AOC")(Docket # V-

2

W-03-C-719) with Delphi that required Delphi, and six other respondents, inter alia, to conduct a

Remedial Investigation/Feasibility Study ("RI/FS") at the Tremont City Site. Delphi and the

remaining AOC respondents have completed the RI field work. EPA estimates that it may cost

the jointly and severally liable parties, including Delphi, approximately $1 million to complete

the required work under the AOC, some of which has already been performed. EPA has not yet

selected remedial action under CERCLA for the Barrel Fill and Landfill facilities at the Tremont

City Site and Delphi has therefore not yet been ordered to perform remedial work, but may be

ordered by a court or other authority found to have jurisdiction to do so in the future. Since

investigations at the Barrel Fill and Landfill facilities at the Tremont City Site are continuing and

remedial action has not yet been selected, the cost of Remedial Design/Remedial Action

("RD/RA") to Delphi is uncertain at this time, but the work with respect to these facilities could

cost the jointly and severally liable parties, including Delphi, as much as a total of $22.2 million

or more, in addition to the $1 million described above. EPA estimates that RD/RA work relating

to the Barrel Fill facility could cost the jointly and severally liable parties, including Delphi,

approximately $7 million. EPA estimates that RI/FS work and RD/RA work relating to the

Landfill facility could cost the jointly and severally liable parties, including Delphi,

approximately $14.5 million.

    4.    Response costs have been and will be incurred by EPA with respect to the

Tremont City Site not inconsistent with the National Contingency Plan promulgated pursuant to

Section 105 of CERCLA, 42 U.S.C. § 9605, and set forth at 40 C.F.R. Part 300, as amended.

Under the AOC, Delphi is also liable to make payments for future oversight costs to EPA, which

EPA estimates to be $100,000. In addition, the United States has incurred unreimbursed

3

response costs to date of approximately $820,000 with respect to the Barrel Fill and Landfill

facilities at the Tremont City Site for previous work, including inter alia, a Preliminary

Assessment/Site Investigation ("PA/SI").   Delphi is jointly and severally liable to the United

States for the above amounts.  Delphi is also jointly and severally liable for interest due under 42

U.S.C. § 9607(a).   Other potentially responsible parties may along with Delphi also be jointly

and severally liable to the United States for all of the above amounts plus interest due under 42

U.S.C. § 9607(a).

     5.    <u>South Dayton Dump & Landfill Superfund Site</u>.  Delphi is liable to the United

States under CERCLA with respect to the South Dayton Dump and Landfill Superfund Site

("South Dayton Site") located at 1975 Dryden Road, Moraine, Ohio. Delphi is liable to the

United States because by contract, agreement or otherwise, it arranged for disposal or treatment,

or arranged with a transporter for transport for disposal or treatment, of hazardous substances

owned or possessed by Delphi at the South Dayton Site owned by another party or entity, and

containing hazardous substances, pursuant to Section 107(a)(3) of CERCLA, 42 U.S.C.

§ 9607(a)(3).  Delphi arranged for the disposed of hazardous wastes, including but not limited to

asbestos, flyash, metallic dust, oil and grease sludge and paint wastes at the South Dayton Site

from several Delphi facilities in the Dayton and Kettering, Ohio area.  The South Dayton Site is a

facility within the meaning of CERCLA.  The South Dayton Site was proposed for inclusion on

the National Priorities List ("NPL"), pursuant to CERCLA Section 105, 42 U.S.C. § 9605, on

September 23, 2004 (see 69 Fed. Reg. 56970).  There have been releases or threats of releases of

hazardous substances, including but not limited to, inorganic compounds (arsenic, cadmium,

chromium, mercury and lead) and volatile and semi-volatile organic compounds (1,2-

dichloroethene, tetrachloroethene, toluene, polychlorinated biphenyls ("PCBs")), at the South

Dayton Site. These hazardous substances have been released into the soil and groundwater at the

South Dayton Site. Other potentially responsible parties may, along with Delphi, also be jointly

and severally liable to the United States under CERCLA with respect to the South Dayton Site.

6.    Response costs have been and will be incurred by EPA with respect to the

South Dayton Site not inconsistent with the National Contingency Plan promulgated pursuant to

Section 105 of CERCLA, 42 U.S.C. § 9605, and set forth at 40 C.F.R. Part 300, as amended.

The United States has incurred unreimbursed response costs to date of approximately $404,349

with respect to the South Dayton Site. Delphi is liable to the United States for this amount.

Delphi is also liable for interest due under 42 U.S.C. § 9607(a). Other potentially responsible

parties may along with Delphi also be jointly and severally liable to the United States for all of

the above amounts plus interest due under 42 U.S.C. § 9607(a).

7.    EPA expects to incur future response costs in connection with the  remedial

design and remedial action for the South Dayton Site. These costs have been estimated by EPA

at between $20 and 50 million. Along with other identified PRPs, Delphi is jointly and severally

liable to the United States for these amounts.

8.    Protective Filing For Work Obligations. The United States is not required to file a

proof of claim with respect to Delphi's injunctive obligations to comply with work requirements

arising under Orders of Courts, Administrative Orders, and other environmental regulatory

requirements imposed by law that are not claims under 11 U.S.C. § 101(5). Delphi and any

reorganized debtor(s) must comply with such mandatory injunctive and regulatory and

compliance requirements. The United States reserves the right to take future actions to enforce

5

any such obligations of Delphi.  While the United States believes that its position will be upheld

by the Court, the United States has filed only in protective fashion with respect to such

obligations and requirements as indicated herein to protect against the possibility that Delphi will

contend that it does not need to comply with any such obligations and requirements and the

Court finds that it is not required to do so.   Therefore, a protective contingent claim is filed in

the alternative for such obligations and requirements but only in the event that the Court finds

that such obligations and requirements are dischargeable claims under 11 U.S.C. § 101(5) rather

than obligations and requirements that reorganized Delphi must comply with.  Nothing in this

Proof of Claim constitutes a waiver of any rights of the United States or an election of remedies

with respect to such rights and obligations.

     9.    <u>RCRA Compliance and Work Obligations</u>.   This Proof of Claim is filed in a

protective manner with respect to Delphi's compliance and work obligations under the Resource

Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 - 6992k.  <u>See</u> Paragraph 8, <u>supra</u>.

RCRA establishes a comprehensive regulatory program for generators of hazardous waste and

for owners and operators of facilities that treat, store, or dispose of hazardous waste.  Delphi is

the owner and operator of RCRA-regulated facilities in including, but not limited to, Vandalia,

Ohio (Vandalia Facility), as well as other locations.  Pursuant to its authority under RCRA, EPA

has promulgated regulations applicable to such generators and such owners and operators of

hazardous waste management facilities.  The federal RCRA implementing regulations are set

forth at 40 C.F.R. Part 260 <u>et seq</u>.  Pursuant to Section 3006 of RCRA, 42 U.S.C. § 6926, EPA

has authorized various States to administer various aspects of the hazardous waste management

program in such States.  Pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), these

authorized State hazardous waste management program are enforceable by EPA.  Under RCRA,

Delphi is required, inter alia, to operate in compliance with RCRA regulatory requirements,

implement closure and post-closure work and corrective action work, and perform any necessary

action with respect to any imminent and substantial endangerment to health or the environment,

see, e.g., 42 U.S.C. §§ 6924, 6928, 6973, as required by RCRA and/or RCRA permits or

Administrative Orders.  For example, in or about January 2002, EPA and Delphi entered into a

RCRA Administrative Order on Consent with regard to the Vandalia, Ohio Facility, which

requires, inter alia, the continuing implementation of a Corrective Measures Plan at that Facility.

Delphi is liable for injunctive and compliance obligations that it is required to perform under

RCRA, RCRA permits, and all work requirements under RCRA permits and administrative

orders.  It is the position of the United States that a proof of claim is not required to be filed for

injunctive, compliance, and regulatory obligations and requirements under RCRA.  See

Paragraph 8, supra.  Other liable parties may along with Delphi also be jointly and severally

liable to the United States under RCRA.

    10.    Property of the Estate.  Delphi also has or may in the future have environmental

liabilities for properties that are part of its bankruptcy estate and/or for the migration of

hazardous substances from property of its bankruptcy estate.   For example, Delphi has voluntary

corrective action agreements for ongoing investigations pursuant to schedules approved by EPA

for certain facilities set forth in Paragraph 9, supra.  In accordance with 28 U.S.C. § 959, Delphi

is required to comply with non-bankruptcy law, including all applicable environmental laws, in

managing and operating its property.  Upon confirmation of any Plan of Reorganization,

reorganized Delphi will be liable as owner or operator of property in accordance with applicable

7

environmental law. The United States is not required to file a proof of claim relating to property

of the estate other than for response costs incurred prior to the petition date. The United States

reserves the right to file an application for administrative expense or take other appropriate action

in the future with respect to property of the estate. This Proof of Claim is filed only protectively

with respect to property of the estate.

11.     This Proof of Claim reflects certain known liabilities of Delphi to the United

States. The United States reserves the right to amend this claim to assert subsequently

discovered liabilities.    This Proof of Claim is without prejudice to any right under 11 U.S.C.

§ 553 to set off, against this claim, debts owed (if any) to the debtor by this or any other federal

agency.

12.     The United States has not perfected any security interest on its claims against

Delphi.

13.     This claim is filed as a general unsecured claim except to the extent of any

secured/trust interest in insurance proceeds received by Delphi on account of environmental

liability to the United States, disputed past cost amounts held in escrow by Delphi pending

dispute resolution, and to the extent administrative expense priority exists relating to property of

the estate, post-petition violations of law, or otherwise. In addition, the United States will file

any application for administrative expense priority at the appropriate time. The United States'

position with respect to injunctive, compliance, regulatory, and work obligations that are not

claims under 11 U.S.C. § 101(5) is set forth in Paragraph 8, supra.

14.     Except as stated in this Proof of Claim, no judgments against Delphi have been

rendered on this Proof of Claim.

8

15.     This Proof of Claim is also filed to the extent necessary to protect the United

States' rights relating to any insurance proceeds received by Delphi relating to sites discussed

herein and any funds being held in escrow by Delphi relating to the sites discussed herein.

Dated:        New York, New York
              July 31, 2006

                        Respectfully submitted,

                        FOR THE UNITED STATES OF AMERICA:

                        MICHAEL J. GARCIA
                        United States Attorney for the
                        Southern District of New York

                        _____
                        DAVID J. KENNEDY (DK-8307)
                        Assistant United States Attorney
                        86 Chambers Street, Third Floor
                        New York, New York  10007
                        Tel. No.: (212) 637-2733
                        Fax No.: (212) 637-2730

                        _____
                        W. BENJAMIN FISHEROW
                        Deputy Section Chief
                        Environment and Natural Resources Division


                        ALAN S. TENENBAUM
                        National Bankruptcy Coordinator
                        Environmental Enforcement Section
                        Environment and Natural Resources  Division
                        U.S. Department of Justice
                        P.O. Box 7611, Ben Franklin Station
                        Washington, D.C. 20044-7611
                        (202) 514-5409

9

FRANCIS J. BIROS
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources  Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
(202) 616-6552


OF COUNSEL:

DIANA L. EMBIL
THOMAS C. NASH
THOMAS WILLIAMS
Associate Regional Counsels
U.S. Environmental Protection Agency-- Region 5–Mail Code C14J
77 West Jackson Boulevard
Chicago, Illinois 60604-3594