**Hearing Date and Time:  September 24, 2010 at 10:00 a.m. (prevailing Eastern time)**
**Supplemental Response Date and Time:  September 22, 2010 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036

Attorneys for DPH Holdings Corp., et al.,
   Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| DPH HOLDINGS CORP., et al., | : | Case Number 05-44481 (RDD) |
| | : | (Jointly Administered) |
| Reorganized Debtors. | : | |

REORGANIZED DEBTORS' SECOND SUPPLEMENTAL REPLY TO RESPONSES TO
DEBTORS' OBJECTIONS TO ADMINISTRATIVE EXPENSE CLAIM
NUMBERS 17081 AND 18049 FILED BY JAMES A. LUECKE

("SECOND SUPPLEMENTAL REPLY REGARDING
CERTAIN JAMES A. LUECKE CLAIMS")

DPH Holdings Corp. and certain of its affiliated reorganized debtors in the above-captioned cases (together with DPH Holdings Corp., the "Reorganized Debtors") hereby submit the Reorganized Debtors' Second Supplemental Reply To Responses To Debtors' Objections To Administrative Expense Claim Numbers 17081 And 18049 Filed By James A. Luecke (the "Second Supplemental Reply"), and respectfully represent as follows:

A.  Preliminary Statement

1. On May 10, 2010, the Reorganized Debtors filed the Reorganized Debtors' Supplemental Reply To Responses To Debtors' Objections To Administrative Expense Claim Numbers 17081 And 18049 Filed By James A. Luecke (Docket No. 20002) (the "First Supplemental Reply").[1]

2. During the sufficiency hearing on May 20, 2010 (the "First Sufficiency Hearing"), this Court adjourned the hearing regarding the Reorganized Debtors' objections to proofs of administrative expense claim numbers 17081 and 18049 (the "Claims") filed by James A. Luecke (the "Claimant"). As evidenced from the documents attached to his Claims, Mr. Luecke apparently asserts that his Claims are based on a grievance that he filed alleging breaches of the UAW collective bargaining agreement, notwithstanding the fact that, to the Reorganized Debtors knowledge, all grievances filed by Mr. Luecke or on Mr. Luecke's behalf have been resolved.[2] Thus, because Mr. Luecke has no outstanding grievances and has no basis to assert any grievance, his Claims are without merit. All of Mr. Luecke's Claims stem from his alleged

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the First Supplemental Reply.

[2] To the extent that Mr. Luecke's Claims are not based on grievances, the Reorganized Debtors submit that his claims may also be without merit due to the UAW's release of claims on behalf of its members and former members which are present in the Modified Plan and the UAW-Delphi-GM Memorandum of Understanding, as defined in the Modified Plan.

employment transfer rights that arise from paragraph 96 ("Paragraph 96") of the national agreement (the "National Agreement") between the Debtors and the UAW.  Therefore, if Mr. Luecke has no claim pursuant to Paragraph 96 of the National Agreement, he has no claim at all.

   3. As established at the First Sufficiency Hearing and in the First Supplemental Reply, Mr. Luecke has no cognizable grievance because he had no transfer rights under Paragraph 96 of the National Agreement.

   4. At the First Sufficiency Hearing, this Court directed the Reorganized Debtors to (i) locate an executed memorandum of understanding between the Debtors and the UAW, governing the circumstances from which Mr. Luecke's Claims allegedly arise, stating that the only skilled trades openings identified for transfer to the Kokomo plant were for two pipefitters (the "2007 Milwaukee-Kokomo Paragraph 96 MOU")[3] and (ii) assist Mr. Luecke with any grievance that he may have against the GM Buyers.  As expressed by this Court at the First Sufficiency Hearing, if the Reorganized Debtors were able to locate a signed copy of the 2007 Milwaukee-Kokomo Paragraph 96 MOU, Mr. Luecke "would have lost on that point."  See In re DPH Holdings Corp., Hr'g Tr. at 175:5-13, May 20, 2010.  Neither the Reorganized Debtors nor the UAW were able to locate an original signed copy of the 2007 Milwaukee-Kokomo Paragraph 96 MOU.  However, both the Reorganized Debtors and the UAW affirmed that the 2007 Milwaukee-Kokomo Paragraph 96 MOU constituted the operative agreement between the parties and , as such, re-executed the 2007 Milwaukee-Kokomo Paragraph 96 MOU, a copy of which in

---

[3] Mr. Luecke was employed as an Electronic Technician – Employee in Training (ET-EIT), which was a skilled trades position at the Debtors' former Milwaukee Electronics & Safety (E&S) manufacturing facility and therefore had no transfer rights.

3

its executed form is attached hereto as <u>Exhibit A</u>.[4]  Because the Reorganized Debtors have a signed copy of the 2007 Milwaukee-Kokomo Paragraph 96 MOU, there is now an established documentary basis to disallow and expunge the Claims.  Therefore, there was no grievance or claim to transfer to the GM Buyers.  However, the Reorganized Debtors contend that even if Mr. Luecke had an existing claim, the Reorganized Debtors would not be responsible for such claim.

5.  Notwithstanding the fact the Reorganized Debtors have a signed copy of the 2007 Milwaukee-Kokomo Paragraph 96 MOU, which renders Mr. Luecke's Claims meritless and uncognizable, the Reorganized Debtors investigated Mr. Luecke's situation with the GM Buyers at the request of this Court.  The Reorganized Debtors have contacted Mr. Luecke and provided him with the name and number of a labor relations representative for the GM Buyers.  As discussed in the First Supplemental Reply, the Reorganized Debtors would not be liable for any grievance that Mr. Luecke may have because the grievance would be based on a union grievance that the Reorganized Debtors did not retain liability for pursuant to the Modification Approval Order.

B.    <u>Arguments Regarding The Claims</u>

6.  As discussed in the First Supplemental Reply, the assertion of Mr. Luecke that he is entitled to receive payment for lost wages, overtime, and severance is without merit.  Mr. Luecke bases his argument on alleged rights that arise from Paragraph 96 of the National Agreement.  For this Court's reference, a copy of the relevant portion of the National Agreement is attached hereto as <u>Exhibit B</u>.

---

[4]   This executed copy of the 2007 Milwaukee-Kokomo Paragraph 96 MOU is the same document that was attached to the First Supplemental Reply as Exhibit D.

7. The National Agreement governs situations where operations are transferred between plants. Paragraph 96 of the National Agreement states in part:

> When there is a transfer of major operations between plants, the case may be presented to the Corporation and, after investigation, it will be reviewed with the International Union in an effort to negotiate an equitable solution, in accordance with the principles set forth in the previous paragraph. Any transfer of employees resulting from this review shall be on the basis that such employees are transferred with full seniority, except as the parties may otherwise mutually agree.

8. In accordance with Paragraph 96, Delphi and the UAW engaged in negotiations to reach an "equitable solution" to the transfer of work. These negotiations resulted in two memorandums of understanding (collectively, the "MOUs") between the Debtors and the UAW to establish procedures for Milwaukee employees who were interested in working in Kokomo to apply for, and be considered for, any openings. Between the MOUs, the only skilled trades openings identified were for two pipefitters (see Exhibit A). No other skilled trades openings were identified, including for ET and ET-EIT classifications (indeed, Kokomo did not even have an ET or ET-EIT classification).

9. Nothing in Paragraph 96 required the Debtors to transfer every employee, every skilled trades employee, or every ET or ET-EIT employee. The Debtors and the UAW implemented Paragraph 96 through the MOUs, and jointly agreed that there were no openings for ET-EIT classifications in Kokomo, and thus no employees could be transferred with their ET-EIT classifications. This was the "equitable solution" through negotiation that Paragraph 96 was intended to create.

10. However, this does not mean that Mr. Luecke or other ET or ET-EIT employees were prohibited from transferring to Kokomo. To the contrary, skilled trades employees who wished to transfer were free to apply for nonskilled job offers. Although this would result in a lower base rate, once an employee established seniority in the Kokomo plant,

5

they could be considered for future skilled openings. However, Mr. Luecke never submitted an application for transfer to Kokomo.

       11. Thus, the decision not to permit Mr. Luecke to transfer to Kokomo as an ET-EIT was the result of a negotiated agreement between the Debtors and the UAW, as required by Paragraph 96 of the National Agreement. Accordingly, each of the Claims should be disallowed and expunged in its entirety.

       12. Moreover, as the documents attached to the Claims indicate, Mr. Luecke's claims are based on a grievance that he filed, notwithstanding the fact that, to the Reorganized Debtors knowledge, all grievances filed by Mr. Luecke or on Mr. Luecke's behalf have been resolved. Thus, because Mr. Luecke has no outstanding grievances and, as discussed above, has no basis to assert any grievance, his Claims are without merit. Even if Mr. Luecke could assert a grievance, as described in paragraph 61 of the Modification Approval Order, the UAW-Delphi-GM Memorandum of Understanding and all grievances under it were assumed by the GM Buyer (as defined in the Modification Approval Order).[5]

Labor MOUs[6]

---

[5] Further, under the Modified Plan and the Modification Approval Order, the UAW-Delphi-GM Memorandum of Understanding was assumed by the applicable Reorganized Debtor and assigned to the GM Buyer. Accordingly, the Reorganized Debtors are relieved from any liability for any breach of such contract occurring after such assignment pursuant to 11 U.S.C. § 365(k). Furthermore, even if section 365(k) does not cut off the Reorganized Debtors' liability, the Claims against the Reorganized Debtors should be disallowed because they are, at best, contingent upon the GM Buyer not fulfilling its obligation regarding the grievance. Because there is nothing in the record to indicate GM Buyer will not fulfill its obligation to the extent it is valid and legally enforceable, the Claims should be disallowed subject to any rights Mr. Luecke may have under 11 U.S.C. § 502(j).

[6] "Labor MOUs" means the UAW-Delphi-GM Memorandum of Understanding, the IUE-CWA-Delphi-GM Memorandum of Understanding, the USW-Home Avenue Memorandum of Understanding, the USW-Vandalia Memorandum of Understanding, the IUOE Local 832S Memorandum of Understanding, the IUOE Local 18S Memorandum of Understanding, the IUOE Local 101S Memorandum of Understanding, the IBEW E&S Memorandum of Understanding, the IBEW Powertrain Memorandum of Understanding, and the IAM-Delphi Memorandum of Understanding, each as defined in the Modified Plan.

    (a) <u>GM Buyer.</u> Pursuant to the Modified Plan, upon the Effective Date and notwithstanding any other provisions of the Master Disposition Agreement, the applicable Labor MOUs (which shall include all related collectively bargained agreements and obligations, **including grievances**), shall be assumed and assigned to the GM Buyer . . . .

Modification Approval Order ¶ 61 (emphasis added).

    13. Accordingly, the Reorganized Debtors assert that (a) the Claimant has not met his burden of proof to establish a claim against the Debtors, (b) the Claims are not entitled to a presumption of <u>prima</u> <u>facie</u> validity pursuant to Bankruptcy Rule 3001(f), and (c) the Claims fail to state a claim against the Reorganized Debtors under Bankruptcy Rule 7012.  Because the Claimant cannot provide facts or law supporting his claims, the Thirty-Seventh Omnibus Claims Objection should be sustained as to administrative expense claim number 17081 and the Forty-Fifth Omnibus Claims Objection should be sustained as to administrative expense claim number 18049, and each such claim should be disallowed and expunged in its entirety.

WHEREFORE the Reorganized Debtors respectfully request this Court enter an order (a) sustaining the objections with respect to the Claims, (b) disallowing and expunging each Claim in its entirety, and (c) granting such further and other relief this Court deems just and proper.

Dated:   New York, New York
         September 14, 2010

                                      SKADDEN, ARPS, SLATE, MEAGHER
                                        & FLOM LLP

                                    By:   /s/ John Wm. Butler, Jr.
                                          John Wm. Butler, Jr.
                                          John K. Lyons
                                          Ron E. Meisler
                                    155 North Wacker Drive
                                    Chicago, Illinois 60606

                                          - and -

                                    Four Times Square
                                    New York, New York 10036

                                    Attorneys for DPH Holdings Corp., et al.,
                                      Reorganized Debtors

# EXHIBIT A

---

**MEMORANDUM OF UNDERSTANDING
TRANSFER OF MAJOR OPERATIONS
PURSUANT TO DELPHI-UAW NATIONAL AGREEMENT
PARAGRAPH (96)
Electronics and Safety-Milwaukee (Local #438, Cisco 55968)
TO
Electronics and Safety- Kokomo (Local # 292, Cisco 55967)**

---

MEMORANDUM OF UNDERSTANDING entered into this __ day of _____, 2007 between Delphi Corporation, hereinafter referred to as the Corporation, and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, hereinafter referred to as the Union.

WHEREAS, the Delphi Electronics and Safety Milwaukee Plant, for a number of years produced various Powertrain Gas ECM's; and

WHEREAS, for business purposes and efficiency of operations, the production of E38 and E67 Gas ECM's will be discontinued at the E&S-Milwaukee Plant and relocated to the E&S Kokomo Plant between August 2007 and September 2007, and

WHEREAS, the transfer of such operations from the E&S- Milwaukee Plant could result in the layoff of a number of employees at that location; and

WHEREAS, certain E&S- Milwaukee Plant bargaining unit employees may desire transfer to the E&S Kokomo Plant; and

WHEREAS, the Union is the certified collective bargaining representative for certain employees of the E&S- Milwaukee Plant who will be offered employment at the E&S Kokomo Plant where the Union is also the certified collective bargaining representative for certain employees; and WHEREAS, it is the intent of the parties, and the purpose of the MEMORANDUM to the extent practicable:

---

Post-it® Fax Note  7671  Date  # of pages ▶
To Jeff Peterson   From ___ McDonald
Co./Dept.          Co.
Phone #            Phone #
Fax #              Fax #

Exhibit A

I.  To establish a procedure whereby certain employees who are employed in the E&S- Milwaukee Plant bargaining unit, who desire employment at the E&S Kokomo Plant may, within the limits hereinafter set forth, be offered such employment; and

II. To minimize grievances which might otherwise arise as a result of the employment of such employees and the changing of the job assignments during the transition period.

NOW THEREFORE, it is agreed between the parties that:

A.  <u>Application Procedure</u>

1.  An application procedure will be established by Management for the purpose of allowing certain employees, including those on layoff or approved leaves of absence, of the E&S- Milwaukee Plant bargaining unit to apply for 44 jobs at the E&S Kokomo Plant during an application period beginning August 27, 2007 and ending September 7, 2007.

2.  Eligible employees at the E&S- Milwaukee Plant bargaining unit who desire to transfer to the E&S Kokomo Plant may make application for transfer with the E&S- Milwaukee Plant Employment Office on forms provided by Management for this purpose, during regular business hours with the application period set forth in Paragraph A.1 above.

3.  Eligible employees on layoff or approved leaves of absence from the E&S- Milwaukee Plant bargaining unit will be notified of this opportunity by letter mailed <u>Certified Mail - Return Receipt Requested</u> dispatched to their address of record. Such employees who desire employment at the E&S Kokomo Plant must respond to this notification by filing a valid application with the E&S- Milwaukee Plant Employment Office by the close of business on September 7, 2007.

B. <u>Selection Procedure</u>

1. <u>Non-Skilled</u>

   a. In determining the eligibility of applicants for the job openings at the E&S Kokomo Plant, it is agreed that only those employees currently at work with seniority at the E&S- Milwaukee Plant, including those currently on layoff or leave of absence, at the time of making application, will be considered for such openings.

   b. Eligible applicants with seniority in the E&S- Milwaukee Plant bargaining unit at the time a job offer is made will be selected in seniority order to transfer to the E&S Kokomo Plant to fill an estimated 42 production job openings provided they are capable of doing the work.

2. <u>Skilled Trades</u>

   a. In determining the eligibility of Skilled Trades employees for job openings in the Skilled Trades at the Kokomo Plant, it is agreed that only those seniority employees with a Journeyperson or EITS status as of the time of making application, and when a job offer is made, will be considered for such openings.

   b. The number of employees specified, for the following classification(s) at the Kokomo Plant, will be selected from the designated classification in line with their skilled trades seniority provided they are capable of doing the work:

| Total Number | E&S Milwaukee Classification | E&S Kokomo Classification |
|---|---|---|
| 2 | Pipefitter | Pipefitter |

C. <u>General</u>

1. This MEMORANDUM is applicable only to those employees who meet the conditions set forth in A above. An employee's application will be open and pending until:
   a. The applicant has been offered and accepted employment.
   b. The applicant has rejected an offer of employment.
   c. Employment has been offered and accepted by the maximum number of employees provided in Paragraph A.1. above.

2. The seniority of any applicant who is transferred pursuant to this MEMORANDUM shall be the full seniority the employee has on record together with the employee's complete employment history and records and the rights to which the employee is or may thereafter become entitled under Supplemental Agreements, Exhibits "A", "B", "C", "D", "E", "F", "G", and I to the Delphi-UAW National Agreement dated September 18, 2003. Thereafter, the employee will have no further seniority rights or other rights in the E&S-Milwaukee Plant bargaining unit.

3. Employees transferred from the E&S- Milwaukee Plant to the E&S Kokomo Plant shall bring with them their full personnel record as though their full period of service had occurred at the E&S Kokomo Plant.

4. Employees on military leave whose seniority would have entitled them to an offer of employment at the E&S Kokomo Plant pursuant to the provisions of the MEMORANDUM had they been actively at work shall be given an opportunity to file an application to have their name placed on the seniority list at the E&S Kokomo Plant provided, following their discharge from military service, they would be entitled to reemployment pursuant to Paragraph (112) of the Delphi-UAW National Agreement. Thereafter, the National Agreement and applicable local agreement at the E&S Kokomo plant shall govern their employment at such plant.

5.  Employees at the E&S- Milwaukee plant who had previously worked in the bargaining unit and acquired seniority and who are transferred to an opening at the E&S Kokomo Plant and who are subsequently transferred from jobs outside the bargaining unit shall be treated as though their entire service had been at the E&S Kokomo Plant.

6.  All G.I.S. employees at the E&S- Milwaukee plant will be considered to have made application for openings at the E&S Kokomo Plant.

7.  The provisions of the Agreement as they relate to the assignment of manpower may be reviewed by the Corporation and the International Union at the request of either party.

8.  The signing of this MEMORANDUM does not prejudice or establish the position of either party in future cases with respect to Paragraph (96) of the Delphi-UAW National Agreement.

IN WITNESS WHEREOF, the parties have caused their names to be subscribed by their duly authorized representatives on the date first written above.

| INTERNATIONAL UNION, UAW | DELPHI CORPORATION |
|---|---|
| _[signature]_ 7-26-10 | _[signature]_ 7/26/10 |
| * A TRUE AND CORRECT COPY. | true and correct copy |

# EXHIBIT B

any kind of literature upon Corporation property other than as herein provided.

[See Doc. 6]
[See CSA #5]

## ESTABLISHMENT OF NEW PLANTS

**(95)** For twenty-four months after production begins in a new plant (including a non-represented plant), the Corporation will give preference to the applications of laid off employees having seniority in other plants over applications of individuals who have not previously worked for the Corporation, provided their previous experience in the Corporation shows that they can qualify for the job. When employed, such employees will have the status of temporary employees in the new plant. Such employees will retain their seniority in the plant where originally acquired until broken in accordance with the seniority rules herein.

[See Par. (56),(64)]
[See App. K.IV(C)15]

**(96)** When there is a transfer of major operations between plants, the case may be presented to the Corporation and, after investigation, it will be reviewed with the International Union in an effort to negotiate an equitable solution, in accordance with the principles set forth in the previous paragraph. Any transfer of employees resulting from this review shall be on the basis that such employees are transferred with full seniority, except as the parties may otherwise mutually agree.

[See App. A.K.IV(C)15]
[See Doc. 104]

**(96a)(1)** An employee whose seniority is transferred between Delphi Corporation plants pursuant to Paragraph (96) of this Agreement will be paid a Relocation Allowance, provided:

[See App. K.II.(C)]
[See Doc. 20]

74

**(a)** The plant to which the employee is to be relocated is outside the Area Hire Area as defined by the National Parties, and

**(b)** Application is made within six (6) months after commencement of employment at the plant to which the employee was relocated in accordance with the procedure established by the Corporation.

**(2)** When employees are relocated, they will be given a choice from the following Relocation Packages:

**(a)** Option 1 - Enhanced Relocation:

Employees will receive a Relocation Allowance up to a maximum of $25,000. $5,000 of which will be provided as a signing bonus to cover miscellaneous up-front cash expenditures. An additional amount of $15,000 will be paid to the employee at the new location.

In addition, spousal relocation assistance will be provided.

After one (1) year of employment, employees may receive $5,000 if they continue to be employees of the new location.

Employees who are placed in accordance with Appendix A and accept the Enhanced Relocation Allowance will not be eligible to initiate another Extended Area Hire placement or initiate an Area Hire placement as an active employee for a period of 36 months unless the employee's status changes to laid off or Protected. In the event the plant has employees on permanent indefinite layoff or placed on Protected status with no likelihood of recall into the active workforce, the 36 month period will be eliminated.

Employees receiving the Enhanced Relocation Allowance will terminate their seniority at

75

all other Delphi locations and, therefore, not be eligible for recall/rehire or Return to Former Community.

    **(b)** Option 2 - Basic Relocation:

Employee will receive Relocation Allowance based on mileage relocated from plant of layoff to plant of hiring based on the following table:

| Mileage | Relocation Allowance Amount |
|---|---|
| 50-99 | $3,038 |
| 100-299 | $3,347 |
| 300-499 | $3,511 |
| 500-999 | $4,146 |
| 1000+ | $4,767 |

The employee who accepts the Basic Relocation Option will be eligible to apply for return to former community or an Extended Area Hire application in accordance with the Memorandum of Understanding Employee Placement (Section VIII - Return to Former Community and Section II - Extended Area Hire) after working at the plant of relocation for a period of six (6) months or upon indefinite layoff from the plant of relocation.

Employees from an idled or closed location or employees from a location not included in an Area Hire Area with no prospect of recall who relocate in excess of 200 miles under the Basic Relocation Option will receive the specified relocation amount and an additional $1,280.

[See App. A]

(3) In the event an employee who is eligible to receive Relocation Allowance under these provisions is also eligible to receive a relocation allowance or its equivalent under any present or future Federal or State legislation, the employee must apply for such legislated relocation allowance prior to receiving any Relocation Allowance excluding the signing bonus provided in Paragraph (96a)(2)(a) above. The amount of Relocation Allowance provided under this Paragraph (96a), when added to the amount of relocation allowance provided by such legislation, shall not exceed the maximum amount of the Relocation Allowance the employee is eligible to receive under the provisions of this paragraph.

    (4) Materials designed to assist employees who relocate under the provisions of Paragraph (96) or the Memorandum of Understanding Employee Placement will be updated. Such materials will include information covering topics such as:

- Moving Household Goods
- Community Services
- Contractual Rights and Responsibilities
- New Community Orientation
- New Plant and Product Orientation
- Health and Safety
- Legal Services
- Relocation Allowance
- TAA or other Government Benefits
- Work/Family Program
- Real Estate Services

All materials developed regarding these topics are to be consistent with services available to laid off employees under the provisions of Document No. 110 Dislocated Workers.

76

77

National and/or local training funds will be used to support the efforts required to provide the above assistance. [See App. A]

## WAGES

(97) The establishment of wage scales for each operation is necessarily a matter for local negotiation and agreement between the Plant Managements and the Shop Committees.

[See Par. (46),(89a),(90)]
[See Doc. 85]
[See CSA #11]

(98) New employees hired on or after the effective date of this Agreement, who do not hold a seniority date in any Delphi Corporation plant and are not covered by the provisions of Paragraph (98b) below, shall be hired at a rate equal to seventy (70) percent of the maximum base rate of the job classification. Such employees shall receive an automatic increase to:

[See Par. (99),(101)(g)]
[See Doc. 87]
[See CSA #10]

(1) seventy-five (75) percent of the maximum base rate of the job classification at the expiration of twenty-six (26) weeks.

(2) eighty (80) percent of the maximum base rate of the job classification at the expiration of fifty-two (52) weeks.

(3) eighty-five (85) percent of the maximum base rate of the job classification at the expiration of seventy-eight (78) weeks.

(4) ninety (90) percent of the maximum base rate of the job classification at the expiration of one hundred and four (104) weeks.

(5) ninety-five (95) percent of the maximum base rate of the job classification at the expiration of one hundred and thirty (130) weeks.

(6) the maximum base rate of the job classification at the expiration of one hundred and fifty-six (156) weeks.

Such an employee who is laid off prior to acquiring seniority and who is re-employed at that plant within one year from the last day worked prior to layoff shall receive a rate upon re-employment which has the same relative position to the maximum base rate of the job classification as had been attained by the employee prior to layoff. Upon such re-employment, the credited rate progression period of an employee's prior period of employment at that plant shall be applied toward their rate progression to the maximum base rate of the job classification.

For the purpose of applying the provisions of this Paragraph (98), (98a), and (98b) only, an employee will receive one week's credit toward acquiring the maximum base rate of the job classification provided the employee had worked in that given week. Credit will not be given for any week during which for any reason, the employee does not work except as provided in Paragraph (108) and when the Christmas Holiday consists of a full week and the Independence Week Shutdown, provided the employee would otherwise have been scheduled to work. Notwithstanding other provisions of this Agreement, full weeks of time lost for vacation during the Plant Vacation Shutdown Week, bereavement, military duty and Family Medical Leave Act, if the employee would otherwise have been scheduled to work, will be considered as time worked. Each increase shall be effective at the beginning of the first pay period following the completion of the required number of weeks of employment.

(98a) Laid-off seniority employees hired in a job classification other than skilled trades, shall receive a