IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
          In re                           :    Chapter 11
                                          :
DPH HOLDINGS CORP., et al.,               :    Case No. 05-44481 (RDD)
                                          :
              Reorganized Debtors.        :    (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AFFIDAVIT OF SERVICE

        I, Darlene Calderon, being duly sworn according to law, depose and say that I am
employed by Kurtzman Carson Consultants LLC, the Court appointed claims and noticing
agent for the Reorganized Debtors in the above-captioned cases.

        On September 14, 2010, I caused to be served the documents listed below (i) upon
the parties listed on Exhibit A hereto via electronic notification, and (ii) upon the party
listed on Exhibit B hereto via postage pre-paid U.S. mail:

   1)  Reorganized Debtors' Supplemental Reply to Responses of Certain Claimants to
       Debtors' Objections to Proofs of Claim Nos. 10504, 10686, 11045, 11981, 11982,
       11984, 11986, 11987, and 11990 ("Supplemental Reply Regarding the Tremont
       Site Claims") (Docket No. 20592) [a copy of which is attached hereto as Exhibit C]

   2)  Notice of Claims Objection Hearing with Respect to Reorganized Debtors'
       Objection to Proof of Administrative Expense Claim Number 19089 (Etkin
       Management, L.L.C.) (Docket No. 20593) [a copy of which is attached hereto as
       Exhibit D]

   3)  Reorganized Debtors' Supplemental Reply to Response of Sensus Precision Die
       Casting, Inc. to Reorganized Debtors' Objections to Proofs of Administrative
       Expense Claim Numbers 19787, 19798, 19799, 19800, and 19802 ("Supplemental
       Reply Regarding Duplicate Claims of Sensus Precision Die Casting Inc.") (Docket
       No. 20594) [a copy of which is attached hereto as Exhibit E]

   4)  Reorganized Debtors' Second Supplemental Reply to Responses to Debtors'
       Objections to Administrative Expense Claim Numbers 17081 and 18049 Filed by
       James A. Luecke ("Second Supplemental Reply Regarding Certain James A.
       Luecke Claims") (Docket No. 20595) [a copy of which is attached hereto as Exhibit
       F]

On September 14, 2010, I caused to be served the document listed below upon the parties listed on <u>Exhibit G</u> hereto via overnight mail:

5) Reorganized Debtors' Supplemental Reply to Responses of Certain Claimants to Debtors' Objections to Proofs of Claim Nos. 10504, 10686, 11045, 11981, 11982, 11984, 11986, 11987, and 11990 ("Supplemental Reply Regarding the Tremont Site Claims") (Docket No. 20592) [a copy of which is attached hereto as <u>Exhibit C</u>]

On September 14, 2010, I caused to be served the document listed below upon the party listed on <u>Exhibit H</u> hereto via overnight mail:

6) Notice of Claims Objection Hearing with Respect to Reorganized Debtors' Objection to Proof of Administrative Expense Claim Number 19089 (Etkin Management, L.L.C.) (Docket No. 20593) [a copy of which is attached hereto as <u>Exhibit D</u>]

On September 14, 2010, I caused to be served the document listed below upon the parties listed on <u>Exhibit I</u> hereto via overnight mail:

7) Reorganized Debtors' Supplemental Reply to Response of Sensus Precision Die Casting, Inc. to Reorganized Debtors' Objections to Proofs of Administrative Expense Claim Numbers 19787, 19798, 19799, 19800, and 19802 ("Supplemental Reply Regarding Duplicate Claims of Sensus Precision Die Casting Inc.") (Docket No. 20594) [a copy of which is attached hereto as <u>Exhibit E</u>]

On September 14, 2010, I caused to be served the document listed below upon the party listed on <u>Exhibit J</u> hereto via overnight mail:

8) Reorganized Debtors' Second Supplemental Reply to Responses to Debtors' Objections to Administrative Expense Claim Numbers 17081 and 18049 Filed by James A. Luecke ("Second Supplemental Reply Regarding Certain James A. Luecke Claims") (Docket No. 20595) [a copy of which is attached hereto as <u>Exhibit F</u>]

Dated: September 17, 2010

_____/s/ Darlene Calderon_____
Darlene Calderon

State of California
County of Los Angeles

Subscribed and sworn to (or affirmed) before me on this 17th day of September, 2010, by Darlene Calderon, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: _/s/ Vanessa R. Quiñones_____

Commission Expires:_3/20/11_____

# EXHIBIT A

In re DPH Holdings Corp.

Post-Emergence Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|
| Barnes & Thornburg LLP | Deborah L. Thorne Kathleen L. Matsoukas | One N Wacker Drive | Suite 4400 | Chicago | IL | 60606 | 312-357-1313 | dthorne@btlaw.com kmatsoukas@btlaw.com | Counsel to Johnson Controls Battery Group, Inc.; Johnson Controls, Inc. (Power Solutions) |
| Delphi Automotive Systems LLP | Sean Corcoran Karen Craft David M. Sherbin | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com david.sherbin@delphi.com | Delphi Automotive Systems LLP |
| DPH Holdings Corp. | John Brooks | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2143 | john.brooks@delphi.com | Reorganized Debtors |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | fgorman@honigman.com rweiss@honigman.com | Counsel to General Motors Corporation |
| Ruskin Moscou Faltischek PC | Jeffrey A. Wurst, Esq. | 1425 RXR Plaza | 15th Floor | Uniondale | NY | 11556 | 516-663-6535 | jwurst@rmfpc.com | |
| Skadden, Arps, Slate, Meagher & Flom LLP | Ron E. Meisler | 155 N Wacker Drive | Suite 2700 | Chicago | IL | 60606-1720 | 312-407-0700 | rmeisler@skadden.com | Counsel to the Reorganized Debtor |
| Weil, Gotshal & Manges LLP | Harvey R. Miller Robert J. Lemons | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8500 | harvey.miller@weil.com robert.lemons@weil.com | Counsel to General Motors Corporation |

DPH Holdings Corp.
Post-Emergence 2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Adalberto Cañadas Castillo | | Avda Ramon de Carranza | 10-1º | Cadiz | | 11006 | Spain | 34 956 226 311 | adalberto@canadas.com | Representative to DASE |
| Adler Pollock & Sheehan PC | Joseph Avanzato | One Citizens Plz 8th Fl | | Providence | RI | 02903 | | 401-274-7200 | javanzato@apslaw.com | Attorneys for Fry's Metals Inc. and Specialty Coatings Systems Eft |
| Airgas, Inc. | David Boyle | 259 Radnor-Chester Road, Suite 100 | P.O. Box 6675 | Radnor | PA | 19087-8675 | | 610-902-6028 | david.boyle@airgas.com | Counsel to Airgas, Inc. |
| Akebono Brake Corporaton | Brandon J. Kessinger | 310 Ring Road | | Elizabethtown | KY | 42701 | | 270-234-5580 | bkessinger@akebono-usa.com | Representative for Akebono Corporation |
| Akin Gump Strauss Hauer & Feld, LLP | Christina M. Padien | 2029 Centure Park East | Suite 2400 | Los Angeles | CA | 90067 | | 310-229-1000 | cpadien@akingump.com | Counsel to Wamco, Inc. |
| Akin Gump Strauss Hauer & Feld, LLP | David M Dunn | 1333 New Hampshire Ave NW | | Washington | DC | 20036 | | 202-887-4000 | ddunn@akingump.com | Counsel to TAI Unsecured Creditors Liquidating Trust |
| Akin Gump Strauss Hauer & Feld, LLP | Ira S Dizengoff | One Bryant Park | | New York | NY | 10036 | | 212-872-1000 | idizengoff@akingump.com | Counsel to TAI Unsecured Creditors Liquidating Trust |
| Allen Matkins Leck Gamble & Mallory LLP | Michael S. Greger | 1900 Main Street | Fifth Floor | Irvine | CA | 92614-7321 | | 949-553-1313 | mgreger@allenmatkins.com | Counsel to Kilroy Realty, L.P. |
| Alliance for Sustainable Energy LLC | National Renewable Energy Laboratory | Jim Martin Senior Attorney | 1617 Golden Blvd MS 1734 | Golden | CO | 80401 | | 303-384-7497 | jim.martin@nrel.gov | Counsel for National Renewable Energy Laboratory |
| Alston & Bird, LLP | Craig E. Freeman | 90 Park Avenue | | New York | NY | 10016 | | 212-210-9400 | craig.freeman@alston.com | Counsel to Cadence Innovation, LLC |
| Alston & Bird, LLP | Dennis J. Connolly; David A. Wender | 1201 West Peachtree Street | | Atlanta | GA | 30309 | | 404-881-7269 | dconnolly@alston.com dwender@alston.com | Counsel to Cadence Innovation, LLC, PD George Co, Furukawa Electric Companay, Ltd., and Furukawa Electric North America APD, Inc. |
| American Axle & Manufacturing, Inc. | Steven R. Keyes | One Dauch Drive, Mail Code 6E-2-42 | | Detroit | MI | 48243 | | 313-758-4868 | steven.keyes@aam.com | Representative for American Axle & Manufacturing, Inc. |
| Anglin, Flewelling, Rasmussen, Campbell & Trytten, LLP | Mark T. Flewelling | 199 South Los Robles Avenue | Suite 600 | Pasadena | CA | 91101-2459 | | 626-535-1900 | mtf@afrct.com | Counsel to Stanley Electric Sales of America, Inc. |
| Arent Fox PLLC | Robert M. Hirsh | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | Hirsh.Robert@arentfox.com | Counsel to Pullman Bank and Trust Company |
| Arnall Golden Gregory LLP | Darryl S. Laddin | 171 17th Street NW | Suite 2100 | Atlanta | GA | 30363-1031 | | 404-873-8120 | dladdin@agg.com | Counsel to Daishinku (America) Corp. d/b/a KDS America ("Daishinku"), SBC Telecommunications, Inc. (SBC) |
| Arnold & Porter LLP | Joel M. Gross | 555 Twelfth Street, N.W. | | Washington | D.C. | 20004-1206 | | 202-942-5000 | joel_gross@aporter.com | Counsel to CSX Transportation, Inc. |
| ATS Automation Tooling Systems Inc. | Carl Galloway | 250 Royal Oak Road | | Cambridge | Ontario | N3H 4R6 | Canada | 519-653-4483 | cgalloway@atsautomation.com | Company |
| Balch & Bingham LLP | Eric T. Ray | PO Box 306 | | Birmingham | AL | 35201 | | 205-251-8100 | eray@balch.com | Attorney for Alabama Power Company |
| Barack, Ferrazzano, Kirschbaum & Nagelberg LLP | Kimberly J. Robinson | 200 W Madison St Ste 3900 | | Chicago | IL | 60606 | | 312-984-3100 | kim.robinson@bfkn.com | Counsel to Motion Industries, Inc., EIS, Inc. and Johnson Industries, Inc. |
| Barack, Ferrazzano, Kirschbaum & Nagelberg LLP | William J. Barrett | 200 W Madison St Ste 3900 | | Chicago | IL | 60606 | | 312-984-3100 | william.barrett@bfkn.com | Counsel to Motion Industries, Inc., EIS, Inc. and Johnson Industries, Inc. |
| Barnes & Thornburg LLP | Alan K. Mills | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | alan.mills@btlaw.com | Counsel to Mays Chemical Company |
| Barnes & Thornburg LLP | Damon R Leichty | 600 1st Source Bank Center | 100 North Michigan | South Bend | IN | 46601 | | 574-233-1171 | damon.leichty@btlaw.com | Counsel to Bank of America, N.A. |

In re: DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 1 of 22

9/15/2010 9:13 PM
Email (395)

DPH Holdings Corp.
Post-Emergence 2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Barnes & Thornburg LLP | David M. Powlen | 1000 N West Street | Suite 1200 | Wilmington | DE | 19801 | | 302-888-4536 | david.powlen@btlaw.com | Counsel to Howard County, Indiana |
| Barnes & Thornburg LLP | Deborah L. Thorne | One North Wacker Drive | Suite 4400 | Chicago | IL | 60606 | | 312-357-1313 | deborah.thorne@btlaw.com | Counsel to Johnson Controls Battery Group, Inc.; Johnson Controls, Inc. (Power Solutions) |
| Barnes & Thornburg LLP | John T. Gregg | 171 Monroe Avenue NW | Suite 1000 | Grand Rapids | MI | 49503 | | 616-742-3930 | jgregg@btlaw.com | Counsel to Priority Health; Clarion Corporation of America; Continental AG and Affiliates |
| Barnes & Thornburg LLP | Kathleen L. Matsoukas | One North Wacker Drive | Suite 4400 | Chicago | IL | 60606 | | 312-357-1313 | kathleen.matsoukas@btlaw.com | Counsel to Johnson Controls Battery Group, Inc.; Johnson Controls, Inc. (Power Solutions); Howard County, Indiana |
| Barnes & Thornburg LLP | Mark R. Owens | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | mark.owens@btlaw.com | Counsel to Clarion Corporation of America |
| Barnes & Thornburg LLP | Michael K. McCrory | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | michael.mccrory@btlaw.com | Counsel to Gibbs Die Casting Corporation; Clarion Corporation of America |
| Barnes & Thornburg LLP | Patrick E. Mears | 171 Monroe Avenue NW | Suite 1000 | Grand Rapids | MI | 49503 | | 616-742-3936 | pmears@btlaw.com | Counsel to Armada Rubber Manufacturing Company, Bank of America Leasing & Leasing & Capital, LLC, & AutoCam Corporation |
| Barnes & Thornburg LLP | Sarah Quinn Kuhny | 600 1st Source Bank Center | 100 North Michigan | South Bend | IN | 46601 | | 574-233-1171 | sarah.kuhny@btlaw.com | Counsel to Bank of America, N.A. |
| Barnes & Thornburg LLP | Wendy D. Brewer | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | wendy.brewer@btlaw.com | Counsel to Gibbs Die Casting Corporation |
| Bartlett Hackett Feinberg P.C. | Frank F. McGinn | 155 Federal Street | 9th Floor | Boston | MA | 02110 | | 617-422-0200 | ffm@bostonbusinesslaw.com | Counsel to Iron Mountain Information Management, Inc. |
| Beeman Law Office | Thomas M Beeman | 33 West 10th Street | Suite 200 | Anderson | IN | 46016 | | 765-640-1330 | tom@beemanlawoffice.com | Counsel to Madison County (Indiana) Treasurer |
| Bendinelli Law Office PC | Jerry Sumner | 11184 Huron Street | Suite 10 | Denver | CO | 80234 | | 303-940-9900 | js@colawfirm.com michelle@colawfirm.com | Counsel to Jose C Alfaro |
| Bernstein Litowitz Berger & Grossman | Hannah E. Greenwald | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1411 | hannah@blbglaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississipp; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfonds ABP |
| Berry Moorman P.C. | James P. Murphy | 535 Griswold | Suite 1900 | Detroit | MI | 48226 | | 313-496-1200 | murph@berrymoorman.com | Counsel to Kamax L.P.; Optrex America, Inc.; GKN Sinter Metals, Inc. |
| Bialson, Bergen & Schwab | Kenneth T. Law, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | klaw@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc.. |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 2 of 22

9/15/2010 9:13 PM
Email (395)

DPH Holdings Corp.
Post-Emergence 2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-------|------------------|
| Bialson, Bergen & Schwab | Lawrence M. Schwab, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | lschwab@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc.; Solectron Corporation; Solectron De Mexico SA de CV; Solectron Invotronics; Coherent, Inc.; Veritas Software Corporation |
| Bialson, Bergen & Schwab | Patrick M. Costello, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | pcostello@bbslaw.com | Solectron Corporation; Solectron de Mexico SA de CV; Solectron Invotronics and Coherent, Inc. |
| Bialson, Bergen & Schwab | Thomas M. Gaa | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | tgaa@bbslaw.com | Counsel to  Veritas Software Corporation |
| Bingham McCutchen LLP | Kate K Simon | One State Street | | Hartford | CT | 06103 | | 860-240-2700 | kate.simon@bingham.com | Counsel to Sumitomo Corporation and Sumitomo Corp. of America |
| Bingham McHale LLP | Whitney L Mosby | 10 West Market Street | Suite 2700 | Indianapolis | IN | 46204 | | 317-635-8900 | wmosby@binghammchale.com | Counsel to Universal Tool & Engineering co., Inc. and M.G. Corporation |
| Blank Rome LLP | Marc E. Richards | The Chrylser Building | 405 Lexington Avenue | New York | NY | 10174 | | 212-885-5000 | mrichards@blankrome.com | Counsel to DENSO International America, Inc. |
| Bodman LLP | Ralph E. McDowell | 100 Renaissance Center | 34th Floor | Detroit | MI | 48243 | | 313-393-7592 | rmcdowell@bodmanllp.com | Counsel to Freudenberg-NOK; General Partnership; Freudenberg-NOK, Inc.; Flextech, Inc.; Vibracoustic de Mexico, S.A. de C.V.; Lear Corporation; American Axle & Manufacturing, Inc. |
| Bond, Schoeneck & King, PLLC | Camille W. Hill | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | chill@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp. |
| Bond, Schoeneck & King, PLLC | Charles J. Sullivan | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | csullivan@bsk.com | Counsel to Diemolding Corporation |
| Bond, Schoeneck & King, PLLC | Stephen A. Donato | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | sdonato@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp; Diemolding Corporation |
| Boult, Cummings, Conners & Berry, PLC | Austin L. McMullen | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | amcmullen@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Boult, Cummings, Conners & Berry, PLC | Roger G. Jones | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | rjones@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Brembo S.p.A. | Massimilliano Cini | Administration Department via Brembo 25 | 24035 Curno BG | Bergamo | | | Italy | 00039-035-605-529 | massimiliano_cini@brembo.it | Creditor |
| Brown & Connery, LLP | Donald K. Ludman | 6 North Broad Street | | Woodbury | NJ | 08096 | | 856-812-8900 | dludman@brownconnery.com | Counsel to SAP America, Inc. |
| Buchalter Nemer, A Profesional Corporation | Shawn M. Christianson | 333 Market Street | 25th Floor | San Francisco | CA | 94105-2126 | | 415-227-0900 | schristianson@buchalter.com | Counsel to Oracle USA, Inc.; Oracle Credit Corporation |
| Buchanan Ingersoll & Rooney PC | Mary Caloway | The Brandywine Building | 1000 West Street, Suite 1410 | Wilmington | DE | 19801 | | 302-552-4200 | mary.caloway@bipc.com | Counsel to Fiduciary Counselors |
| Buchanan Ingersoll & Rooney PC | Peter S. Russ | 620 Eighth Ave | 23rd Floor | New York | NY | 10018 | | 212-440-4400 | peter.russ@bipc.com | Counsel to ATEL Leasing Corp. |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 3 of 22

9/15/2010 9:13 PM
Email (395)

DPH Holdings Corp.
Post-Emergence 2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-------|------------------|
| Buchanan Ingersoll & Rooney PC | William H. Schorling, Esq. | Two Liberty Place | 50 S. 16th St., Ste 3200 | Philadelphia | PA | 19102 | | 215-665-5326 | william.schorling@bipc.com | Counsel to Fiduciary Counselors |
| Butzel Long | Cynthia J. Haffey | 150 W. Jefferson | Suite 100 | Detroit | MI | 48226 | | 313-983-7434 | haffey@butzel.com | Counsel to Delphi Corporation |
| Butzel Long | Donald V. Orlandoni | 150 W. Jefferson | Suite 100 | Detroit | MI | 48226 | | 313-225-7063 | orlandoni@butzel.com | Counsel to Delphi Corporation |
| Cadwalader Wickersham & Taft LLP | Jeannine D'Amico | 1201 F St NW Ste 1100 | | Washington | DC | 20004 | | 202-862-2452 | jeannine.damico@cwt.com | Attorneys for the Audit Committee of Delphi Corporation |
| Cadwalader Wickersham & Taft LLP | John J. Rapisardi Esq Joseph Zujkowski Esq | One World Financial Center | | New York | NY | 10281 | | 212-504-6000 | john.rapisardi@cwt.com joseph.zujkowski@cwt.com | Counsel to the Auto Task Force of the U.S. Department of the Treasury |
| Cahill Gordon & Reindel LLP | Jonathan Greenberg | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | jonathan.greenberg@BASF.COM | Counsel to Engelhard Corporation |
| Cahill Gordon & Reindel LLP | Kevin Burke | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | kburke@cahill.com | Counsel to Engelhard Corporation |
| Calfee, Halter & Griswold LLC | Jean R. Robertson, Esq. | 1400 McDonald Investment Ctr | 800 Superior Ave | Cleveland | OH | 44114 | | 216-622-8404 | jrobertson@calfee.com | Counsel to Brush Engineered materials |
| Calinoff & Katz, LLP | Dorothy H. Marinis-Riggio Robert Calinoff | 140 East 45th Street | 17th Floor | New York | NY | 10017 | | 212-826-8800 | dhriggio@gmail.com rcalinoff@candklaw.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, I |
| Cantor Colburn LLP | Michael J Rye | 20 Church Street | 22nd Floor | Hartford | CT | 06103-3207 | | 860-286-2929 | mrye@cantorcolburn.com | Patent Counsel to Delphi Corporation et al., Debtors and Debtors-in-Possession |
| Carson Fischer, P.L.C. | Joseph M Fischer Patrick J Kukla | 4111 Andover Road | West 2nd Floor | Bloomfield Hills | MI | 48302 | | 248-644-4840 | brcy@carsonfischer.com | Counsel to Bing Metals Group, LLC; Behr America, Inc.; Findlay Industries; Vitec, LLC |
| Carson Fischer, P.L.C. | Robert A. Weisberg | 4111 Andover Road | West 2nd Floor | Birmingham | MI | 48302 | | 248-644-4840 | rweisberg@carsonfischer.com brcy@carsonfischer.com | Counsel to Cascade Die Casting Group, Inc.; Behr America, Inc. |
| Carter Ledyard & Milburn LLP | Aaron R. Cahn | 2 Wall Street | | New York | NY | 10005 | | 212-732-3200 | cahn@clm.com | Counsel to STMicroelectronics, Inc. |
| Chadbourne & Parke LLP | Douglas Deutsch, Esq. | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-408-5100 | ddeutsch@chadbourne.com | Counsel to EagleRock Capital Management, LLC |
| Clark Hill PLC | Joel D. Applebaum | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | japplebaum@clarkhill.com | Counsel to 1st Choice Heating & Cooling, Inc.; BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLC | Shannon Deeby | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | sdeeby@clarkhill.com | Counsel to BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLLC | Robert D. Gordon | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8572 | rgordon@clarkhill.com | Counsel to ATS Automation Tooling Systems Inc. |
| Cleary Gottlieb Steen & Hamilton LLP | Deborah M. Buell | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | maofiling@cgsh.com | Counsel to Arneses Electricos Automotrices, S.A.de C.V.; Cordaflex, S.A. de C.V. |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 4 of 22

9/15/2010 9:13 PM
Email (395)

DPH Holdings Corp.
Post-Emergence 2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Cleary, Gottlieb, Steen & Hamilton LLP | James L. Bromley | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | maofiling@cgsh.com | Counsel to Bear, Stearns, Co. Inc.; Citigroup, Inc.; Credit Suisse First Boston; Deutsche Bank Securities, Inc.; Goldman Sachs Group, Inc.; JP Morgan Chase & Co.; Lehman Brothers, Inc.; Merrill Lynch & Co.; Morgan Stanley & Co., Inc.; UBS Securities, LLC |
| Cohen & Grigsby, P.C. | Thomas D. Maxson | 11 Stanwix Street | 15th Floor | Pittsburg | PA | 15222-1319 | | 412-297-4706 | tmaxson@cohenlaw.com | Counsel to Nova Chemicals, Inc. |
| Cohen, Weiss & Simon LLP | Joseph J. Vitale Babette Ceccotti | 330 West 42nd Street | | New York | NY | 10036 | | 212-356-0238 | jvitale@cwsny.com bceccotti@cwsny.com | Counsel to International Union, United Automobile, Areospace and Agriculture Implement Works of America (UAW) |
| Cohn Birnbaum & Shea P.C. | Scott D. Rosen, Esq. | 100 Pearl Street, 12th Floor | | Hartford | CT | 06103 | | 860-493-2200 | srosen@cb-shea.com | Counsel to Floyd Manufacturing Co., Inc. |
| Connolly Bove Lodge & Hutz LLP | Jeffrey C. Wisler, Esq. | 1007 N. Orange Street | P.O. Box 2207 | Wilmington | DE | 19899 | | 302-658-9141 | jwisler@cblh.com | Counsel to ORIX Warren, LLC |
| Coolidge Wall Co. LPA | Ronald S. Pretekin | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | Pretekin@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany; Attorneys for Columbia Industrial |
| Covington & Burling | Susan Power Johnston Aaron R. Marcu | 620 Eighth Ave | | New York | NY | 10018 | | 212-841-1005 | sjohnston@cov.com | Special Counsel to the Debtor |
| Cox, Hodgman & Giarmarco, P.C. | Sean M. Walsh, Esq. | Tenth Floor Columbia Center | 101 W. Big Beaver Road | Troy | MI | 48084-5280 | | 248-457-7000 | swalsh@chglaw.com | Counsel to Nisshinbo Automotive Corporation |
| Curtin & Heefner, LLP | Daniel P. Mazo | 250 N. Pennslyvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | dpm@curtinheefner.com | Counsel to SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | Cindi Eilbott | 101 Park Avenue | | New York | NY | 10178-0061 | | 212-696-6936 | ceilbott@curtis.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Damon & Morey LLP | William F. Savino | 1000 Cathedral Place | 298 Main Street | Buffalo | NY | 14202-4096 | | 716-856-5500 | wsavino@damonmorey.com | Counsel to Relco, Inc.; The Durham Companies, Inc. |
| David P. Martin | | 519 Energy Center Blvd | Ste 1104 | Northport | AL | 35401 | | 205-343-1771 | davidpmartin@erisacase.com davidpmartin@bellsouth.net | Co-Counsel for David Gargis, Jimmy Mueller, and D. Keith Livingston |
| Day Pitney LLP | Richard M. Meth | P.O. Box 1945 | | Morristown | NJ | 07962-1945 | | 973-966-6300 | rmeth@daypitney.com | Counsel to Marshall E. Campbell Company |
| Day Pitney LLP | Ronald S. Beacher Conrad K. Chiu | 7 Times Square | | New York | NY | 10036 | | 212-297-5800 | rbeacher@daypitney.com cchiu@daypitney.com | Counsel to IBJTC Business Credit Corporation, as successor to IBJ Whitehall Business Credit Corporation |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 5 of 22

9/15/2010 9:13 PM
Email (395)

DPH Holdings Corp.
Post-Emergence 2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Dechert LLP | Glenn E. Siegel James O. Moore | 1095 Avenue of the Americas | | New York | NY | 10036-6797 | | 212-698-3500 | glenn.siegel@dechert.com james.moore@dechert.com | Counsel for Kensington International Limited, Manchester Securities Corp. and Springfield Associates, LLC |
| Denso International America, Inc. | Carol Sowa | 24777 Denso Drive | | Southfield | MI | 48086 | | 248-372-8531 | carol_sowa@denso-diam.com | Counsel to Denso International America, Inc. |
| DiConza Law, P.C. | Gerard DiConza, Esq. | 630 Third Avenue, 7th Floor | | New York | NY | 10017 | | 212-682-4940 | gdiconza@dlawpc.com | Counsel to Tyz-All Plastics, Inc.; Co-Counsel to Tower Automotive, Inc. |
| Dinsmore & Shohl LLP | John Persiani | 1900 Chemed Center | 255 East Fifth Street | Cincinnati | OH | 45202 | | 513-977-8200 | john.persiani@dinslaw.com | Counsel to The Procter & Gamble Company |
| DLA Piper Rudnick Gray Cary US LLP | Richard M. Kremen Maria Ellena Chavez-Ruark | The Marbury Building | 6225 Smith Avenue | Baltimore | Maryland | 21209-3600 | | 410-580-3000 | richard.kremen@dlapiper.com | Counsel to Constellation NewEnergy, Inc. & Constellation NewEnergy - Gas Division, LLC |
| Drinker Biddle & Reath LLP | Andrew C. Kassner | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | andrew.kassner@dbr.com | Counsel to Penske Truck Leasing Co., L.P. |
| Drinker Biddle & Reath LLP | David B. Aaronson | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | david.aaronson@dbr.com | Counsel to Penske Truck Leasing Co., L.P. and Quaker Chemical Corporation |
| Duane Morris LLP | Joseph H. Lemkin | 744 Broad Street | Suite 1200 | Newark | NJ | 07102 | | 973-424-2000 | jhlemkin@duanemorris.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC; and Hosiden America Corporation |
| Duane Morris LLP | Lewis R Olshin Esq | 30 South 17th Street | | Philadelphia | PA | 19103 | | 215-979-1129 | Olshin@duanemorris.com | Counsel to ACE American Insurance Company and Pacific Employers Insurance Company |
| Duane Morris LLP | Margery N. Reed, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | dmdelphi@duanemorris.com mreed@duanemorris.com | Counsel to ACE American Insurance Company and Pacific Employers Insurance Company |
| Duane Morris LLP | Wendy M. Simkulak, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1547 | wmsimkulak@duanemorris.com | Counsel to ACE American Insurance Company and Pacific Employers Insurance Company |
| Dykema Gossett PLLC | Douglas S Parker | 39577 Woodward Ave | Suite 300 | Bloomfield Hills | MI | 48304 | | 248-203-0703 | dparker@dykema.com | Counsel for Federal Screw |
| Dykema Gossett PLLC | Robert D. Nachman | 10 South Wacker Drive | Suite 2300 | Chicago | IL | 60606 | | 312-876-1700 | rnachman@dykema.com | Counsel to MJ Celco, Inc. |
| Dykema Gossett PLLC | Sharon A. Salinas | 10 South Wacker Dr | Suite 2300 | Chicago | IL | 60606 | | 312-627-2199 | ssalinas@dykema.com | Counsel to Tremont City Barrel Fill PRP Group |
| Electronic Data Systems Corporation | Ayala Hassell | 5400 Legacy Dr. | Mail Stop H3-3A-05 | Plano | TX | 75024 | | 212-715-9100 | ayala.hassell@eds.com | Representattive for Electronic Data Systems Corporation |
| Ellenberg, Ogier, Rothschild & Rosenfeld, P.C. | Barbara Ellis-Monro | 170 Mitchell Street, SW | | Atlanta | GA | 30303 | | 404-581-3818 | bem@eorrlaw.com | Counsel to Southwire Company |
| Entergy Services, Inc. | Alan H. Katz | 639 Loyola Ave 26th Fl | | New Orleans | LA | 70113 | | | akatz@entergy.com | Assistant General Counsel to Entergy Services, Inc |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 6 of 22

9/15/2010 9:13 PM
Email (395)

DPH Holdings Corp.
Post-Emergence 2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Epstein Becker & Green PC | Maura I. Russell Anthony B. Stumbo | 250 Park Ave | 11th Floor | New York | NY | 10177-1211 | | 212-351-4500 | MRussell@ebglaw.com | Counsel to SPCP Group LLC as agent for Silver Point Capital Fund LP and Silver Point Capital Offshore Fund Ltd |
| Ettelman & Hochheiser, P.C. | Gary Ettelman | c/o Premium Cadillac | 77 Main Street | New Rochelle | NY | 10801 | | 516-227-6300 | gettelman@e-hlaw.com | Counsel to Jon Ballin |
| Faegre & Benson LLP | Elizabeth K. Flaagan | 3200 Wells Fargo Center | 1700 Lincoln St | Denver | CO | 80203-4532 | | 303-607-3694 | eflaagan@faegre.com | Counsel to CoorsTek, Inc.; Corus, L.P. |
| Farrell Fritz PC | Louis A. Scarcella Patrick T. Collins | 1320 RexCorp Plaza | | Uniondale | NY | 11556-1320 | | 516-227-0700 | lscarcella@farrellfritz.com pcollins@farrellfritz.com | Counsel to Official Committee of Equity Holders |
| Filardi Law Offices LLC | Charles J. Filardi, Jr., Esq. | 65 Trumbull Street | Second Floor | New Haven | CT | 06510 | | 203-562-8588 | charles@filardi-law.com | Counsel to Federal Express Corporation |
| Finkel Goldstein Rosenbloom & Nash LLP | Ted J. Donovan | 26 Broadway | Suite 711 | New York | NY | 10004 | | 212-344-2929 | tdonovan@finkgold.com | Counsel to Pillarhouse (U.S.A.) Inc. |
| Foley & Lardner LLP | Ann Marie Uetz | 500 Woodward Avenue | Suite 2700 | Detroit | MI | 48226-3489 | | 313-234-7100 | auetz@foley.com | Counsel to PBR Tennessee |
| Foley & Lardner LLP | Jill L. Murch | 321 North Clark Street | Suite 2800 | Chicago | IL | 60610-4764 | | 312-832-4500 | jmurch@foley.com | Counsel to Kuss Corporation |
| Foley & Lardner LLP | John A. Simon | One Detroit Center | 500 Woodward Ave Suite 2700 | Detroit | MI | 48226-3489 | | 313-234-7100 | jsimon@foley.com | Counsel to Ernst & Young LLP |
| Foley & Lardner LLP | John R. Trentacosta Katherine R. Catanese | 500 Woodward Avenue | Suite 2700 | Detroit | MI | 48226-3489 | | 313-234-7100 | jtrentacosta@foley.com kcatanese@foley.com | Counsel to Kautex Inc. |
| Fox Rothschild LLP | Brian Isen | 1301 Atlantic Avenue | | Atlantic City | NJ | 08401 | | 609-348-2294 | bisen@foxrothschild.com | Counsel to M&Q Plastic Products L.P. |
| Fox Rothschild LLP | Fred Stevens | 100 Park Avenue | 15th Floor | New York | NY | 10017 | | 212-878-7900 | fstevens@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Frederick T. Rikkers | | 419 Venture Court | P.O. Box 930555 | Verona | WI | 53593 | | 608-848-6350 | ftrikkers@rikkerslaw.com | Counsel to Southwest Metal Finishing, Inc. |
| Frost Brown Todd LLC | Ronald E. Gold | 2200 PNC Center | 201 East Fifth Street | Cincinnati | OH | 45202-4182 | | 513-651-6156 | rgold@fbtlaw.com | Counsel to AKS Receivables, LLC |
| Fulbright & Jaworski LLP | David A Rosenzweig | 666 Fifth Avenue | | New York | NY | 10103-3198 | | 212-318-3000 | drosenzweig@fulbright.com | Counsel to Southwest Research Institute Attorney for Solvay Fluorides, LLC |
| Fulbright & Jaworski LLP | Michael M Parker | 300 Convent St Ste 2200 | | San Antonio | TX | 78205 | | 210-224-5575 | mparker@fulbright.com | Counsel to Southwest Research Institute |
| Genovese Joblove & Battista, P.A. | David C. Cimo | 100 S.E. 2nd Street | Suite 4400 | Miami | FL | 33131 | | 305-349-2300 | dcimo@gjb-law.com | Counsel to Ryder Integrated Logistics, Inc. |
| Gibbons P.C. | David N. Crapo | One Gateway Center | | Newark | NJ | 07102-5310 | | 973-596-4523 | dcrapo@gibbonslaw.com | Counsel to Epcos, Inc. |
| Goldberg Segalla LLP | Attn Bruce W Hoover | 665 Main St Ste 400 | | Buffalo | NY | 14203 | | 716-566-5400 | bhoover@goldbergsegalla.com | Attorneys for MasTec Inc. |
| Gorlick, Kravitz & Listhaus, P.C. | Barbara S. Mehlsack | 17 State Street | 4th Floor | New York | NY | 10004 | | 212-269-2500 | bmehlsack@gkllaw.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Goulston & Storrs, P.C. | Peter D. Bilowz | 400 Atlantic Avenue | | Boston | MA | 02110-333 | | 617-482-1776 | pbilowz@goulstonstorrs.com | Counsel to Thermotech Company |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 7 of 22

9/15/2010 9:13 PM
Email (395)

DPH Holdings Corp.
Post-Emergence 2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Grant & Eisenhofer P.A. | James J Sabella | 485 Lexington Ave | | New York | NY | 10017 | | 646-722-8520 | jsabella@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Grant & Eisenhofer P.A. | Jay W. Eisenhofer | 45 Rockefeller Center | 650 Fifth Avenue | New York | NY | 10111 | | 212-755-6501 | jeisenhofer@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Gratz, Miller & Brueggeman, S.C. | Matthew R. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | mrr@previant.com | Counsel to International Brotherood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Graydon Head & Ritchey LLP | J. Michael Debbeler, Susan M. Argo | 1900 Fifth Third Center | 511 Walnut Street | Cincinnati | OH | 45202 | | 513-621-6464 | mdebbeler@graydon.com | Counsel to Grote Industries; Batesville Tool & Die; PIA Group; Reliable Castings |
| Greenberg Traurig, LLP | Maria J. DiConza | MetLife Bldg | 200 Park Avenue | New York | NY | 10166 | | 212-801-9200 | diconzam@gtlaw.com | Counsel to Samtech Corporation |
| Greenberg Traurig, LLP | Shari L. Heyen | 1000 Louisiana | Suite 1800 | Houston | TX | 77002 | | 713-374-3500 | heyens@gtlaw.com | Counsel to Samtech Corporation |
| Greensfelder, Hemker & Gale, P.C. | Cherie Macdonald J. Patrick Bradley | 10 S. Broadway | Suite 200 | St. Louis | MO | 63102 | | 314-241-9090 | ckm@greensfelder.com jpb@greensfelder.com | Counsel to ARC Automotive, Inc. |
| Hahn Loeser & Parks LLP | Lawrence E Oscar Christopher W Peer | 200 Public Square | Suite 2800 | Cleveland | OH | 44114 | | 216-621-0150 | leoscar@hahnlaw.com cpeer@hahnlaw.com | Counsel to Casco Products, a Unit of Sequa Corporation and ARC Automotive, Inc. |
| Halperin Battaglia Raicht, LLP | Alan D. Halperin Christopher J.Battaglia Julie D. Dyas | 555 Madison Avenue | 9th Floor | New York | NY | 10022 | | 212-765-9100 | cbattaglia@halperinlaw.net ahalperin@halperinlaw.net jdyas@halperinlaw.net | Counsel to Pacific Gas Turbine Center, LLC and Chromalloy Gas Turbine Corporation; ARC Automotive, Inc |
| Hancock & Estabrook LLP | R John Clark Esq | 1500 Tower I | PO Box 4976 | Syracuse | NY | 13221-4976 | | 315-471-3151 | rjclark@hancocklaw.com | Counsel to Alliance Precision Plastics Corporation |
| Harrington, Dragich & O'Neill PLLC | David G Dragich | 21043 Mack Avenue | | Grosse Pointe Woods | MI | 48236 | | 313-886-4550 | ddragich@hdolaw.com | Counsel to Intermet Corporation |
| Harris D. Leinwand | Harris D. Leinwand | 315 Madison Avenue | Suite 901 | New York | NY | 10017 | | 212-725-7338 | hleinwand@aol.com | Counsel to Baker Hughes Incoporated; Baker Petrolite Corporation |
| Haskell Slaughter Young & Rediker LLC | Robert H. Adams | 2001 Park Place North | Suite 1400 | Birmingham | AL | 35203 | | 205-251-1000 | rha@hsy.com | Counsel to Simco Construction, Inc. |
| Haynes and Boone, LLP | Judith Elkin | 153 East 53rd Street | Suite 4900 | New York | NY | 10022 | | 212-659-7300 | judith.elkin@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Haynes and Boone, LLP | Lenard M. Parkins Kenric D. Kattner | 1 Houston Center | 1221 McKinney, Suite 2100 | Houston | TX | 77010 | | 713-547-2000 | lenard.parkins@haynesboone.com kenric.kattner@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Herrick, Feinstein LLP | Paul Rubin | 2 Park Avenue | | New York | NY | 10016 | | 212-592-1448 | prubin@herrick.com | Counsel to Canon U.S.A., Inc. and Schmidt Technology GmbH |
| Hewlett-Packard Company | Kenneth F. Higman | 2125 E. Katella Avenue | Suite 400 | Anaheim | CA | 92806 | | 714-940-7120 | ken.higman@hp.com | Counsel to Hewlett-Packard Company |

DPH Holdings Corp.
Post-Emergence 2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Hewlett-Packard Company | Ramona S. Neal | 11311 Chinden Blvd., M/S 314 | | Boise | ID | 83714-0021 | | 208-396-6484 | Ramona.neal@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Sharon Petrosino | 420 Mountain Avenue | | Murray Hill | NJ | 07974 | | 908-898-4760 | sharon.petrosino@hp.com | Counsel to Hewlett-Packard Financial Services Company |
| Hinckley Allen & Snyder LLP | Michael J Pendell | 185 Asylum St CityPlace I | 35th Floor | Hartford | CT | 06103-3488 | | 860-725-6200 | mpendell@haslaw.com | Counsel to Barnes Group, Inc. |
| Hiscock & Barclay, LLP | J. Eric Charlton | 300 South Salina Street | PO Box 4878 | Syracuse | NY | 13221-4878 | | 315-425-2716 | echarlton@hiscockbarclay.com | Counsel to GW Plastics, Inc. |
| Hodgson Russ LLP | Garry M. Graber | 60 E 42nd St 37th Fl | | New York | NY | 10165-0150 | | 212-661-3535 | ggraber@hodgsonruss.com | Counsel to Hexcel Corporation |
| Hodgson Russ LLP | Julia S. Kreher | One M&T Plaza | Suite 2000 | Buffalo | NY | 14203 | | 716-848-1330 | jkreher@hodgsonruss.com | Counsel to Hexcel Corporation |
| Hogan & Hartson L.L.P. | Audrey Moog | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | amoog@hhlaw.com | Counsel to Umicore Autocat Canada Corp. |
| Hogan & Hartson L.L.P. | Edward C. Dolan | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | ecdolan@hhlaw.com | Counsel to Umicore Autocat Canada Corp. |
| Hogan & Hartson L.L.P. | Scott A. Golden | 875 Third Avenue | | New York | NY | 10022 | | 212-918-3000 | sagolden@hhlaw.com | Counsel to XM Satellite Radio Inc. |
| Hogan Lovells US LLP | Matthew P Morris | 875 Third Avenue | | New York | NY | 10022 | | 212-918-3000 | matthew.morris@hoganlovells.com | Counsel to TESA AG |
| Honigman, Miller, Schwartz and Cohn, LLP | Donald T. Baty, Jr. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7314 | dbaty@honigman.com | Counsel to Fujitsu Ten Corporation of America |
| Honigman, Miller, Schwartz and Cohn, LLP | E. Todd Sable | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7548 | tsable@honigman.com | Counsel to Valeo Climate Control Corp.; Valeo Electrical Systems, Inc. - Motors and Actuators Division;Valeo Electrical Systems, Inc. - Wipers Division; Valeo Switches & Detection System, Inc. |
| Honigman, Miller, Schwartz and Cohn, LLP | I. W. Winsten, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7608 | iww@honigman.com | Counsel to Affina Group Holdings Inc. |
| Honigman, Miller, Schwartz and Cohn, LLP | Lawrence J. Murphy | 2290 First National Building | 660 Woodward Ave | Detroit | MI | 48226 | | 313-465-7488 | lmurphy@honigman.Com | Attorneys for Guide Corporation and Lightsource Parent Corporation |
| Honigman, Miller, Schwartz and Cohn, LLP | Seth A Drucker | 2290 First National Building | 660 Woodward Avenue Ste 2290 | Detroit | MI | 48226 | | 313-465-7626 | sdrucker@honigman.com | Counsel for Valeo Climate Control, Corp. |
| Howard & Howard Attorneys PC | Lisa S Gretchko | 39400 Woodward Ave | Ste 101 | Bloomfield Hills | MI | 48304-5151 | | 248-723-0396 | lgretchko@howardandhoward.com | Intellectual Property Counsel for Delphi Corporation, et al. |
| Howick, Westfall, McBryan & Kaplan, LLP | Louis G. McBryan | 3101 Tower Creek Parkway | Ste 600 One Tower Creek | Atlanta | GA | 30339 | | 678-384-7000 | lmcbryan@hwmklaw.com | Counsel to Vanguard Distributors, Inc. |
| Hunter & Schank Co. LPA | John J. Hunter | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | | 419-255-4300 | jrhunter@hunterschank.com | Counsel to ZF Group North America Operations, Inc. |
| Hunter & Schank Co. LPA | Thomas J. Schank | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | | 419-255-4300 | tomschank@hunterschank.com | Counsel to ZF Group North America Operations, Inc. |
| Hunton & Williams LLP | Steven T. Holmes | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | sholmes@hunton.com | Counsel to RF Monolithics, Inc. |
| Hurwitz & Fine P.C. | Ann E. Evanko | 1300 Liberty Building | | Buffalo | NY | 14202 | | 716-849-8900 | aee@hurwitzfine.com | Counsel to Jiffy-Tite Co., Inc. |

DPH Holdings Corp.
Post-Emergence 2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Ice Miller | Ben T. Caughey | One American Square | Box 82001 | Indianapolis | IN | 46282-0200 | | 317-236-2100 | Ben.Caughey@icemiller.com | Counsel to Sumco, Inc. |
| Ice Miller LLP | Henry A. Efroymson | One American Square | 29th Floor | Indianapolis | IN | 46482 | | 317-236-2397 | henry.efroymson@icemiller.com | Counsel to Fin Machine Co. Ltd |
| Infineon Technologies North America Corporation | Greg Bibbes | 1730 North First Street | M/S 11305 | San Jose | CA | 95112 | | 408-501-6442 | greg.bibbes@infineon.com | General Counsel & Vice President for Infineon Technologies North America Corporation |
| Infineon Technologies North America Corporation | Jeff Gillespie | 2529 Commerce Drive | Suite H | Kokomo | IN | 46902 | | 765-454-2146 | jeffery.gillispie@infineon.com | Global Account Manager for Infineon Technologies North America |
| International Union of Operating Engineers | Richard Griffin | 1125-17th Avenue, N.W. | | Washington | DC | 20036 | | 202-429-9100 | rgriffin@iuoe.org | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Jackson Walker LLP | Bruce J. Ruzinsky | 1401 McKinney St Ste 1900 | | Houston | TX | 77010 | | 713-751-4200 | bruzinsky@jw.com | Counsel to Constellation NewEnergy, Inc. |
| Jackson Walker LLP | Heather M. Forrest | 901 Main St Ste 600 | | Dallas | TX | 75202 | | 214-953-6000 | hforrest@jw.com | Counsel to Constellation NewEnergy, Inc. |
| James R Scheuerle | Parmenter O'Toole | 601 Terrace Street | PO Box 786 | Muskegon | MI | 49443-0786 | | 231-722-1621 | JRS@Parmenterlaw.com | Counsel to Port City Die Cast and Port City Group Inc |
| Jason, Inc. | Will Schultz, General Counsel | 411 E. Wisconsin Ave | Suite 2120 | Milwaukee | WI | 53202 | | 414-277-2110 | wschultz@jasoninc.com | General Counsel to Jason Incorporated |
| Jenner & Block LLP | Ronald R. Peterson | One IBM Plaza | | Chicago | IL | 60611 | | 312-222-9350 | rpeterson@jenner.com | Counsel to SPX Corporation (Contech Division), Alcan Rolled Products-Ravenswood, LLC, Tenneco Inc. and Contech LLC |
| Johnston, Harris Gerde & Komarek, P.A. | Jerry W. Gerde, Esq. | 239 E. 4th St. | | Panama City | FL | 32401 | | 850-763-8421 | gerdekomarek@bellsouth.net | Counsel to Peggy C. Brannon, Bay County Tax Collector |
| Jones Day | Corinne Ball | 222 East 41st Street | | New York | NY | 10017 | | 212-326-7844 | cball@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Jones Day | Peter J. Benvenutti Michaeline H. Correa | 555 California St 26th Floor | | San Francisco | CA | 94104 | | 415-626-3939 | pjbenvenutti@jonesday.com mcorrea@jonesday.com | Attorneys for Symantec Corporation, Successor-in-Interest to Veritas Corporation |
| Jones Day | Scott J. Friedman | 222 East 41st Street | | New York | NY | 10017 | | 212-326-3939 | sjfriedman@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Katten Muchin Rosenman LLP | John P. Sieger, Esq. | 525 West Monroe Street | | Chicago | IL | 60661 | | 312-902-5200 | john.sieger@kattenlaw.com | Counsel to TDK Corporation America and MEMC Electronic Materials, Inc. |
| Kaye Scholer LLP | Richard G Smolev | 425 Park Avenue | | New York | NY | 10022-3598 | | 212-236-8000 | rsmolev@kayescholer.com | Counsel to InPlay Technologies Inc |
| Kegler, Brown, Hill & Ritter Co., LPA | Kenneth R. Cookson | 65 East State Street | Suite 1800 | Columbus | OH | 43215 | | 614-426-5400 | kcookson@keglerbrown.com | Counsel to Solution Recovery Services |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 10 of 22

9/15/2010 9:13 PM
Email (395)

DPH Holdings Corp.
Post-Emergence 2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Keller Rohrback L.L.P. | Lynn Lincoln Sarko Cari Campen Laufenberg Erin M. Rily | 1201 Third Avenue | Suite 3200 | Seattle | WA | 98101 | | 206-623-1900 | lsarko@kellerrohrback.com claufenberg@kellerrohrback.com eriley@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Keller Rohrback P.L.C. | Gary A. Gotto | National Bank Plaza | 3101 North Central Avenue, Suite 900 | Phoenix | AZ | 85012 | | 602-248-0088 | ggotto@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Kelley Drye & Warren, LLP | Craig A. Wolfe | 101 Park Avenue | | New York | NY | 10178 | | 212-808-7800 | cwolfe@kelleydrye.com | Counsel to the Pension Benefit Guaranty Corporation |
| Kelley Drye & Warren, LLP | Merrill B. Stone | 101 Park Avenue | | New York | NY | 10178 | | 212-808-7800 | mstone@kelleydrye.com | Counsel to the Pension Benefit Guaranty Corporation |
| Kennedy, Jennick & Murray | Susan M. Jennik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | sjennik@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kennedy, Jennick & Murray | Thomas Kennedy | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | tkennedy@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kerr Russell & Weber PLC | James E. DeLine | 500 Woodward Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-961-0200 | jed@krwlaw.com | Counsel to Pontiac Coil, Inc. |
| Kerr Russell & Weber PLC | Patrick Warren Hunt | 500 Woodward Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-961-0200 | pwh@krwlaw.com | Counsel to Pontiac Coil, Inc. |
| King & Spalding, LLP | Daniel Egan | 1185 Avenue of the Americas | | New York | NY | 10036 | | 212-556-2100 | degan@kslaw.com | Counsel to KPMG LLP |
| King & Spalding, LLP | H. Slayton Dabney, Jr. | 1185 Avenue of the Americas | | New York | NY | 10036 | | 212-556-2100 | sdabney@kslaw.com | Counsel to KPMG LLP |
| Kirkland & Ellis LLP | David Spiegel | 300 North LaSalle | | Chicago | IL | 60654 | | 312-862-2000 | david.spiegel@kirkland.com | |
| Kirkland & Ellis LLP | Jim Stempel | 200 East Randolph Drive | | Chicago | IL | 60601 | | 312-861-2000 | jstempel@kirkland.com | Counsel to Lunt Mannufacturing Company |
| Kirkpatrick & Lockhart Nicholson Graham LLP | Edward M. Fox | 599 Lexington Avenue | | New York | NY | 10022 | | 212-536-4812 | efox@klng.com | Counsel to Wilmington Trust Company, as Indenture trustee |
| Kokomo Gas & Fuel Company | Patti E Pope Revenue Recovery Manager | Northern Indiana Public Service Company | 801 East 86th Avenue | Merrillville | IN | 46410 | | | pepope@nisource.com | Kokomo Gas & Fuel Company |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 11 of 22

9/15/2010 9:13 PM
Email (395)

DPH Holdings Corp.
Post-Emergence 2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Kramer Levin Naftalis & Frankel LLP | Jordan D Kaye | 1177 Avenue of the Americas | | New York | NY | 10036 | | 212-715-9489 | jkaye@kramerlevin.com | Counsel to HP Enterprise Services, LLC; Vishay Americas Inc. |
| Krugliak, Wilkins, Griffiths & Dougherty CO., L.P.A. | Sam O. Simmerman | 4775 Munson Street N.W. | P.O. Box 36963 | Canton | OH | 44735-6963 | | 330-497-0700 | sosimmerman@kwgd.com | Counsel to for Millwood, Inc. |
| Kutak Rock LLP | Jay Selanders | 1010 Grand Blvd Ste 500 | | Kansas City | MO | 64106 | | 816-502-4617 | jay.selanders@kutakrock.com | Counsel to DaimlerChrysler Corporation; DaimlerChrysler Motors Company, LLC; DaimlerChrylser Canada, Inc. |
| Kutchin & Rufo, P.C. | Edward D. Kutchin | Two Center Plaza | Suite 620 | Boston | MA | 02108-1906 | | 617-542-3000 | ekutchin@kutchinrufo.com | Counsel to Parlex Corporation |
| Kutchin & Rufo, P.C. | Kerry R. Northrup | Two Center Plaza | Suite 620 | Boston | MA | 02108-1906 | | 617-542-3000 | knorthup@kutchinrufo.com | Counsel to Parlex Corporation |
| Lambert. Leser, Isackson, Cook & Guinta, P.C. | Adam D. Bruski | 309 Davidson Building | PO Box 835 | Bay City | MI | 48707-0835 | | 989-893-3518 | adbruski@lambertleser.com | Counsel to Creditor Linamar Corp. |
| Lambert. Leser, Isackson, Cook & Guinta, P.C. | Susan M. Cook | 309 Davidson Building | PO Box 835 | Bay City | MI | 48707-0835 | | 989-893-3518 | smcook@lambertleser.com | Counsel to Linamar Corporation |
| Latham & Watkins | Mark A. Broude | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1384 | mark.broude@lw.com | UCC Professional |
| Latham & Watkins | Michael J. Riela | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | michael.riela@lw.com | UCC Professional |
| Latham & Watkins | Mitchell A. Seider | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | mitchell.seider@lw.com | UCC Professional |
| Latham & Watkins | Robert Rosenberg | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1370 | robert.rosenberg@lw.com | UCC Professional |
| Law Offices of Michael O'Hayer | Michael O'Hayer Esq | 22 N Walnut Street | | West Chester | PA | 19380 | | 610-738-1230 | mkohayer@aol.com | Counsel to A-1 Specialized Services and Supplies Inc |
| Lewis and Roca LLP | Rob Charles, Esq. | One South Church Street | Suite 700 | Tucson | AZ | 85701 | | 520-629-4427 | rcharles@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Lewis and Roca LLP | Susan M. Freeman, Esq. | 40 North Central Avenue | Suite 1900 | Phoenix | AZ | 85004-4429 | | 602-262-5756 | sfreeman@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Linear Technology Corporation | John England, Esq. | General Counsel for Linear Technology Corporation | 1630 McCarthy Blvd. | Milpitas | CA | 95035-7417 | | 408-432-1900 | jengland@linear.com | Counsel to Linear Technology Corporation |
| Linebarger Goggan Blair & Sampson, LLP | Diane W. Sanders | 1949 South IH 35 (78741) | P.O. Box 17428 | Austin | TX | 78760-7428 | | 512-447-6675 | austin.bankruptcy@publicans.com | Counsel to Cameron County, Brownsville ISD |
| Linebarger Goggan Blair & Sampson, LLP | Elizabeth Weller | 2323 Bryan Street | Suite 1600 | Dallas | TX | 75201 | | 214-880-0089 | dallas.bankruptcy@publicans.com | Counsel to Dallas County and Tarrant County |
| Linebarger Goggan Blair & Sampson, LLP | John P. Dillman | P.O. Box 3064 | | Houston | TX | 77253-3064 | | 713-844-3478 | houston_bankruptcy@publicans.com | Counsel in Charge for Taxing Authorities: Cypress-Fairbanks Independent School District, City of Houston, Harris County |
| Locke Lord Bissell & Liddell | Kevin J. Walsh | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | | 212-812-8304 | kwalsh@lockelord.com | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| Locke Lord Bissell & Liddell | Timothy S. McFadden | 111 South Wacker Drive | | Chicago | IL | 60606 | | 312-443-0370 | tmcfadden@lockelord.com | Counsel to Methode Electronics, Inc. |
| Loeb & Loeb LLP | P. Gregory Schwed | 345 Park Avenue | | New York | NY | 10154-0037 | | 212-407-4000 | gschwed@loeb.com | Counsel to Creditor The Interpublic Group of Companies, Inc. and Proposed Auditor Deloitte & Touche, LLP |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 12 of 22

9/15/2010 9:13 PM
Email (395)

DPH Holdings Corp.
Post-Emergence 2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-------|------------------|
| Loeb & Loeb LLP | William M. Hawkins | 345 Park Avenue | | New York | NY | 10154 | | 212-407-4000 | whawkins@loeb.com | Counsel to Industrial Ceramics Corporation |
| Lowenstein Sandler PC | Bruce S. Nathan | 1251 Avenue of the Americas | | New York | NY | 10020 | | 212-262-6700 | bnathan@lowenstein.com | Counsel to Daewoo International (America) Corp. |
| Lowenstein Sandler PC | Ira M. Levee | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | ilevee@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Lowenstein Sandler PC | Kenneth A. Rosen | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | krosen@lowenstein.com | Counsel to Cerberus Capital Management, L.P. |
| Lowenstein Sandler PC | Michael S. Etikin | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | metkin@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Lowenstein Sandler PC | Scott Cargill | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | scargill@lowenstein.com | Counsel to Cerberus Capital Management, L.P.; AT&T Corporation |
| Lowenstein Sandler PC | Vincent A. D'Agostino | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | vdagostino@lowenstein.com | Counsel to AT&T Corporation |
| Lyden, Liebenthal & Chappell, Ltd. | Erik G. Chappell | 5565 Airport Highway | Suite 101 | Toledo | OH | 43615 | | 419-867-8900 | egc@lydenlaw.com | Counsel to Metro Fibres, Inc. |
| Maddin, Hauser, Wartell, Roth & Heller PC | Alexander Stotland Esq | 28400 Northwestern Hwy | Third Floor | Southfield | MI | 48034 | | 248-354-4030 | axs@maddinhauser.com | Attorney for Danice Manufacturing Co. |
| Madison Capital Management | Joe Landen | 6143 South Willow Drive | Suite 200 | Greenwood Village | CO | 80111 | | 303-957-4254 | jlanden@madisoncap.com | Representative for Madison Capital Management |
| Margulies & Levinson, LLP | Leah M. Caplan, Esq. | 30100 Chagrin Boulevard | Suite 250 | Pepper Pike | OH | 44124 | | 216-514-4935 | lmc@ml-legal.com | Counsel to Venture Plastics |
| Mastromarco & Jahn, P.C. | Victor J. Mastromarco, Jr. | 1024 North Michigan Avenue | P.O. Box 3197 | Saginaw | MI | 48605-3197 | | 989-752-1414 | vmastromar@aol.com | Counsel to H.E. Services Company and Robert Backie and Counsel to Cindy Palmer, Personal Representative to the Estate of Michael Palmer |
| Masuda Funai Eifert & Mitchell, Ltd. | Gary D. Santella | 203 North LaSalle Street | Suite 2500 | Chicago | IL | 60601-1262 | | 312-245-7500 | gsantella@masudafunai.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC and Hosiden America Corporation |
| McCarter & English, LLP | David J. Adler, Jr. Esq. | 245 Park Avenue, 27th Floor | | New York | NY | 10167 | | 212-609-6800 | dadler@mccarter.com | Counsel to Ward Products, LLC |
| McCarter & English, LLP | Eduardo J. Glas, Esq. | Four Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4096 | | 913-622-4444 | eglas@mccarter.com | Counsel to General Products Delaware Corporation |
| McCarthy Tetrault LLP | Lorne P. Salzman | 66 Wellington Street West | Suite 4700 | Toronto | Ontario | M5K 1E6 | | 416-362-1812 | lsalzman@mccarthy.ca | Counsel to Themselves (McCarthy Tetrault LLP) |
| McDermott Will & Emery LLP | Gary O. Ravert | 340 Madison Avenue | | New York | NY | 10017-1922 | | 212-547-5477 | gravert@mwe.com | Counsel for Temic Automotive of North America, Inc. |

DPH Holdings Corp.
Post-Emergence 2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| McDermott Will & Emery LLP | James M. Sullivan | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5477 | jmsullivan@mwe.com | Counsel to Linear Technology Corporation, National Semiconductor Corporation; Timken Corporation |
| McDermott Will & Emery LLP | Stephen B. Selbst | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5400 | sselbst@mwe.com | Counsel to National Semiconductor Corporation |
| McDermott Will & Emery LLP | Steven P. Handler Monica M. Quinn | 227 W Monroe St | | Chicago | IL | 60606 | | 312-372-2000 | shandler@mwe.com mquinn@mwe.com | Counsel for Temic Automotive of North America, Inc. |
| McDonald Hopkins Co., LPA | Scott N. Opincar, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | sopincar@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McDonald Hopkins Co., LPA | Shawn M. Riley, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | sriley@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McElroy, Deutsch, Mulvaney & Carpenter, LLP | Jeffrey Bernstein, Esq. | Three Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4079 | | 973-622-7711 | jbernstein@mdmc-law.com | Counsel to New Jersey Self-Insurers Guaranty Association |
| McGuireWoods LLP | Aaron G McCollough Esq | One James Center | 901 East Cary Street | Richmond | VA | 23219-4030 | | 804-775-1000 | amccollough@mcguirewoods.com | Counsel to Siemens Energy & Automation, Inc. |
| McGuireWoods LLP | Daniel F Blanks | One James Center | 901 East Cary Street | Richmond | VA | 23219 | | 804-775-1000 | dblanks@mcguirewoods.com | Counsel for CSX Transportation, Inc. |
| McGuireWoods LLP | John H Maddock III | One James Center | 901 East Cary Street | Richmond | VA | 23219-4030 | | 804-775-1178 | jmaddock@mcguirewoods.com | Counsel to Siemens Logistics Assembly Systems, Inc.; Counsel for CSX Transportation, Inc. |
| Meyer, Suozzi, English & Klein, P.C. | Attn Thomas R Slome Esq | 990 Stewart Ave Ste 300 | PO Box 9194 | Garden City | NY | 11530-9194 | | 516-741-6565 | tslome@msek.com | Counsel for Pamela Geller; JAE Electronics, Inc. |
| Meyer, Suozzi, English & Klein, P.C. | Hanan Kolko | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | hkolko@msek.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Meyers Law Group, P.C. | Merle C. Meyers | 44 Montgomery Street | Suite 1010 | San Francisco | CA | 94104 | | 415-362-7500 | mmeyers@mlg-pc.com | Counsel to Alps Automotive, Inc. |
| Meyers, Rodbell & Rosenbaum, P.A. | M. Evan Meyers | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | emeyers@mrrlaw.net | Counsel to Prince George County, Maryland |
| Meyers, Rodbell & Rosenbaum, P.A. | Robert H. Rosenbaum | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | rrosenbaum@mrrlaw.net | Counsel to Prince George County, Maryland |
| Miami-Dade County Tax Collector | April Burch | Paralegal Unit | 140 West Flagler St Ste 1403 | Miami | FL | 33130 | | 305-375-5314 | mdtcbkc@miamidade.gov | Paralegal Collection Specialist for Miami-Dade County |
| Michael Cox | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | miag@michigan.gov | Attorney General for State of Michigan, Department of Treasury |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Dennis J. Raterink | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1176 | raterinkd@michigan.gov | Assistant Attorney General for Worker's Compensation Agency; Attorney for the Funds Administration for the State of Michigan |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Michael Cox | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | miag@michigan.gov | Attorney General for Worker's Compensation Agency; Attorney for the Funds Administration for the State of Michigan |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 14 of 22

9/15/2010 9:13 PM
Email (395)

DPH Holdings Corp.
Post-Emergence 2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Miles & Stockbridge, P.C. | Thomas D. Renda | 10 Light Street | | Baltimore | MD | 21202 | | 410-385-3418 | trenda@milesstockbridge.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Miller & Martin PLLC | Dale Allen | 150 Fourth Ave North | Ste 1200 | Nashville | TN | 37219 | | | vjones@millermartin.com | Counsel to Averitt Express |
| Miller Johnson | Thomas P. Sarb Robert D. Wolford | 250 Monroe Avenue, N.W. | Suite 800, PO Box 306 | Grand Rapids | MI | 49501-0306 | | 616-831-1748 616-831-1726 | sarbt@millerjohnson.com wolfordr@millerjohnson.com | Counsel to Pridgeon & Clay, Inc. |
| Miller, Canfield, Paddock and Stone, P.L.C. | Jonathan S. Green | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8452 | greenj@millercanfield.com | Counsel to Wells Operating Partnership, LP |
| Miller, Canfield, Paddock and Stone, P.L.C. | Marc N. Swanson | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-963-6420 | swansonm@millercanfield.com | Counsel to Brose North America Holding LP and its affiliates |
| Miller, Canfield, Paddock and Stone, P.L.C. | Timothy A. Fusco | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8435 | fusco@millercanfield.com | Counsel to Niles USA Inc.; Techcentral, LLC; The Bartech Group, Inc.; Fischer Automotive Systems |
| Mintz, Levin, Cohn, Ferris Glovsky and Pepco, P.C. | Paul J. Ricotta | One Financial Center | | Boston | MA | 02111 | | 617-542-6000 | pjricotta@mintz.com pricotta@mintz.com | Counsel to Hitachi Automotive Products (USA), Inc. and Conceria Pasubio |
| Molex Connector Corp | Jeff Ott | 2222 Wellington Ct. | | Lisle | IL | 60532 | | 630-527-4254 | Jeff.Ott@molex.com | Counsel to Molex Connector Corp |
| Morgan, Lewis & Bockius LLP | Andrew D. Gottfried | 101 Park Avenue | | New York | NY | 10178-0060 | | 212-309-6000 | agottfried@morganlewis.com | Counsel to ITT Industries, Inc.; Hitachi Chemical (Singapore), Ltd. |
| Morgan, Lewis & Bockius LLP | Menachem O. Zelmanovitz | 101 Park Avenue | | New York | NY | 10178 | | 212-309-6000 | mzelmanovitz@morganlewis.com | Counsel to Hitachi Chemical (Singapore) Pte, Ltd. |
| Morgan, Lewis & Bockius LLP | Richard W. Esterkin, Esq. | 300 South Grand Avenue | | Los Angeles | CA | 90017 | | 213-612-1163 | resterkin@morganlewis.com | Counsel to Sumitomo Corporation |
| Moritt Hock Hamroff & Horowitz LLP | Leslie Ann Berkoff | 400 Garden City Plaza | | Garden City | NY | 11530 | | 516-873-2000 | lberkoff@moritthock.com | Counsel to Standard Microsystems Corporation and its direct and indirect subsidiares Oasis SiliconSystems AG and SMSC NA Automotive, LLC (successor-in-interst to Oasis Silicon Systems, Inc.) |
| Munsch Hardt Kopf & Harr, P.C. | Raymond J. Urbanik, Esq., Joseph J. Wielebinski, Esq. and Davor Rukavina, Esq. | 3800 Lincoln Plaza | 500 North Akard Street | Dallas | RX | 75201-6659 | | 214-855-7590 214-855-7561 214-855-7587 | rurbanik@munsch.com jwielebinski@munsch.com drukavina@munsch.com | Counsel to Texas Instruments Incorporated |
| Nantz, Litowich, Smith, Girard & Hamilton, P.C. | Sandra S. Hamilton | 2025 East Beltline, S.E. | Suite 600 | Grand Rapids | MI | 49546 | | 616-977-0077 | sandy@nlsg.com | Counsel to Lankfer Diversified Industries, Inc. |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 15 of 22

9/15/2010 9:13 PM
Email (395)

DPH Holdings Corp.
Post-Emergence 2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Nathan, Neuman & Nathan, P.C. | Kenneth A. Nathan | 29100 Northwestern Highway | Suite 260 | Southfield | MI | 48034 | | 248-351-0099 | Knathan@nathanneuman.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| National City Commercial Capital | Lisa M. Moore | 995 Dalton Avenue | | Cincinnati | OH | 45203 | | 513-455-2390 | l.moore@pnc.com | Vice President and Senior Counsel to National City Commercial Capital |
| Nelson Mullins Riley & Scarborough | George B. Cauthen | 1320 Main Street, 17th Floor | PO Box 11070 | Columbia | SC | 29201 | | 803-7255-9425 | george.cauthen@nelsonmullins.com | Counsel to Datwyler Rubber & Plastics, Inc.; Datwyler, Inc.; Datwyler i/o devices (Americas), Inc.; Rothrist Tube (USA), Inc. |
| New Jersey Attorney General's Office Division of Law | Tracy E Richardson Deputy Attorney General | R.J. Hughes Justice Complex | 25 Market St P.O. Box 106 | Trenton | NJ | 08628-0106 | | 609-292-1537 | tracy.richardson@dol.lps.state.nj.us | Deputy Attorney General - State of New Jersey Division of Taxation |
| North Point | David G. Heiman | 901 Lakeside Avenue | | Cleveland | OH | 44114 | | 216-586-3939 | dgheiman@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Office of the Chapter 13 Trustee | Camille Hope | P.O. Box 954 | | Macon | GA | 31202 | | 478-742-8706 | cahope@chapter13macon.com | Office of the Chapter 13 Trustee |
| Office of the Texas Attorney General | Jay W. Hurst | P.O. Box 12548 | | Austin | TX | 78711-2548 | | 512-475-4861 | jay.hurst@oag.state.tx.us | Counsel to The Texas Comptroller of Public Accounts |
| Ohio Environmental Protection Agency | c/o Michelle T. Sutter | Principal Assistant Attorney General Environmental Enforcement Section | 30 E Broad St 25th Fl | Columbus | OH | 43215 | | 614-466-2766 | msutter@ag.state.oh.us | Attorney for State of Ohio, Environmental Protection Agency |
| Orbotech, Inc. | Michael M. Zizza, Legal Manager | 44 Manning Road | | Billerica | MA | 01821 | | 978-901-5025 | michaelz@orbotech.com | Company |
| O'Rourke Katten & Moody | Michael Moody | 55 W Wacker Dr | Ste 1400 | Chicago | IL | 60615 | | 312-849-2020 | mmoody@orourkeandmoody.com | Counsel to Ameritech Credit Corporation d/b/a SBC Capital Services |
| Orrick, Herrington & Sutcliffe LLP | Alyssa Englund, Esq. | 666 Fifth Avenue | | New York | NY | 10103 | | 212-506-5187 | aenglund@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Frederick D. Holden, Jr., Esq. | 405 Howard Street | | San Francisco | CA | 94105 | | 415-773-5700 | fholden@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Raniero D'Aversa, Jr. | 51 West 52nd Street at 6th Avenue | | New York | NY | 10103-0001 | | 212-506-3715 | Rdaversa@orrick.com | Counsel to Bank of America, N.A. |
| Pachulski Stang Ziehl & Jones LLP | Michael R. Seidl | 919 N. Market Street, 17th Floor | P.O. Box 8705 | Wilmington | DE | 19899-8705 | | 302-652-4100 | mseidl@pszjlaw.com | Counsel for Essex Group, Inc. |
| Pachulski Stang Ziehl & Jones LLP | Robert J. Feinstein Ilan D. Scharf | 780 Third Avenue, 36th Floor | | New York | NY | 10017-2024 | | 212-561-7700 | Rfeinstein@pszjlaw.com Ischarf@pszjlaw.com | Counsel for Essex Group, Inc. |
| Patterson Belknap Webb & Tyler LLP | Daniel A. Lowenthal | 1133 Avenue of the Americas | | New York | NY | 10036 | | 212-336-2720 | dalowenthal@pbwt.com | Counsel to American Finance Group, Inc. d/b/a Guaranty Capital Corporation |
| Patterson Belknap Webb & Tyler LLP | David W. Dykhouse Phyllis S. Wallitt | 1133 Avenue of the Americas | | New York | NY | 10036-6710 | | 212-336-2000 | dwdykhouse@pbwt.com | Attorneys for Fry's Metals Inc. and Specialty Coatings Systems Eft |

DPH Holdings Corp.
Post-Emergence 2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-------|------------------|
| Paul H. Spaeth Co. LPA | Paul H. Spaeth | 130 W Second St Ste 450 | | Dayton | OH | 45402 | | 937-223-1655 | spaethlaw@phslaw.com | Attorneys for F&G Multi-Slide Inc and F&G Tool & Die Co. Inc. |
| Paul, Weiss, Rifkind, Wharton & Garrison | Andrew N. Rosenberg | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | arosenberg@paulweiss.com | Counsel to Merrill Lynch, Pierce, Fenner & Smith, Incorporated |
| Paul, Weiss, Rifkind, Wharton & Garrison | Douglas R. Davis | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | ddavis@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Elizabeth R. McColm | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | emccolm@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Peggy Housner | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | housnerp@michigan.gov | Assistant Attorney General for State of Michigan, Department of Treasury |
| Penachio Malara LLP | Anne Penachio | 235 Main Street | Suite 600A | White Plains | NY | 10601 | | 914-946-2889 | apenachio@pmlawllp.com | Counsel to UVA Machine Company and its successors by acquisition |
| Pepe & Hazard LLP | Kristin B. Mayhew | 30 Jelliff Lane | | Southport | CT | 06890-1436 | | 203-319-4022 | kmayhew@pepehazard.com | Counsel for Illinois Tool Works Inc., Illinois Tool Works for Hobart Brothers Co., Hobart Brothers Company, ITW Food Equipment Group LLC and Tri-Mark, Inc. |
| Pepper, Hamilton LLP | Francis J. Lawall | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | lawallf@pepperlaw.com | Counsel to Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Pepper, Hamilton LLP | Henry Jaffe | 1313 Market Street | PO Box 1709 | Wilmington | DE | 19899-1709 | | 302-777-6500 | jaffeh@pepperlaw.com | Counsel to SKF USA, Inc. |
| Pepper, Hamilton LLP | Nina M. Varughese | 3000 Two Logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | varughesen@pepperlaw.com | Counsel to Capro, Ltd; Teleflex Automotive Manufacturing Corporation; Teleflex Incorporated; Ametek; Cleo, Inc.; Sierra International, Inc. |
| Pickrel Shaeffer & Ebeling | Sarah B. Carter Esq | 2700 Kettering Tower | | Dayton | OH | 45423-2700 | | 937-223-1130 | scarter@pselaw.com | |
| Pierce Atwood LLP | Jacob A. Manheimer | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | jmanheimer@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p.A. |
| Pierce Atwood LLP | Keith J. Cunningham | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | kcunningham@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p.A. |
| Pietragallo Bosick & Gordon LLP | Richard J. Parks | 54 Buhl Blvd | | Sharon | PA | 16146 | | 724-981-1397 | rjp@pbandg.com | Counsel to Ideal Tool Company, Inc. |
| Pillsbury Winthrop Shaw Pittman LLP | Karen B. Dine | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | karen.dine@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 17 of 22

9/15/2010 9:13 PM
Email (395)

DPH Holdings Corp.
Post-Emergence 2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Pillsbury Winthrop Shaw Pittman LLP | Margot P. Erlich | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | margot.erlich@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Mark D. Houle | 650 Town Center Drive | Ste 550 | Costa Mesa | CA | 92626-7122 | | 714-436-6800 | mark.houle@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |
| Pillsbury Winthrop Shaw Pittman LLP | Richard L. Epling | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | richard.epling@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Robin L. Spear | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | robin.spear@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Porzio, Bromberg & Newman, P.C. | Brett S. Moore, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | bsmoore@pbnlaw.com | |
| Porzio, Bromberg & Newman, P.C. | John S. Mairo, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | jsmairo@pbnlaw.com | Counsel to Neuman Aluminum Automotive, Inc. and Neuman Aluminum Impact Extrusion, Inc. |
| Previant, Goldberg, Uelman, Gratz, Miller & Brueggeman, S.C. | Jill M. Hartley and Marianne G. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | jh@previant.com mgr@previant.com | Counsel to International Brotherood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| PriceWaterHouseCoopers | Enrique Bujidos | Almagro | 40 | Madrid | | 28010 | Spain | 34 915 684 356 | enrique.bujidos@es.pwc.com | Representative to DASE |
| QAD, Inc. | Stephen Tyler Esq | 10,000 Midlantic Drive | Suite 100 West | Mt. Laurel | NJ | 08054 | | 856-840-2870 | xst@qad.com | Counsel to QAD, Inc. |
| Quarles & Brady LLP | Kasey C. Nye | One South Church Street | | Tucson | AZ | 85701 | | 520-770-8717 | knye@quarles.com | Counsel to Offshore International, Inc.; Maquilas Teta Kawi, S.A. de C.V.; On Semiconductor Corporation; Flambeau Inc. |
| Quarles & Brady LLP | Roy Prange | 33 E Main St Ste 900 | | Madison | WI | 53703-3095 | | 608-283-2485 | rlp@quarles.com | Counsel for Flambeau Inc. |
| Reed Smith | Ann Pille | 10 South Wacker Drive | | Chicago | IL | 60606 | | 312-207-1000 | apille@reedsmith.com | Counsel to Infineon; Infineon Technologies |
| Republic Engineered Products, Inc. | Joseph A Kaczka | 3770 Embassy Parkway | | Akron | OH | 44333 | | 330-670-3215 | jkaczka@republicengineered.com | Counsel to Republic Engineered Products, Inc. |
| Riddell Williams P.S. | Joseph E. Shickich, Jr. | 1001 4th Ave. | Suite 4500 | Seattle | WA | 98154-1195 | | 206-624-3600 | jshickich@riddellwilliams.com | Counsel to Microsoft Corporation; Microsoft Licensing, GP |
| Rieck and Crotty PC | Jerome F Crotty | 55 West Monroe Street | Suite 3390 | Chicago | IL | 60603 | | 312-726-4646 | jcrotty@rieckcrotty.com | Counsel to Mary P. O'Neill and Liam P. O'Neill |
| Russell Reynolds Associates, Inc. | Charles E. Boulbol, P.C. | 26 Broadway, 17th Floor | | New York | NY | 10004 | | 212-825-9457 | rtrack@msn.com | Counsel to Russell Reynolds Associates, Inc. |
| Satterlee Stephens Burke & Burke LLP | Christopher R. Belmonte | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | cbelmonte@ssbb.com | Counsel to Moody's Investors Service |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 18 of 22

9/15/2010 9:13 PM
Email (395)

DPH Holdings Corp.
Post-Emergence 2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Satterlee Stephens Burke & Burke LLP | Pamela A. Bosswick | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | pbosswick@ssbb.com | Counsel to Moody's Investors Service |
| Satterlee Stephens Burke & Burke LLP | Roberto Carrillo | 230 Park Avenue | Suite 1130 | New York | NY | 10169 | | 212-818-9200 | rcarrillo@ssbb.com | Attorney's for Tecnomec S.r.L. |
| Schafer and Weiner PLLC | Daniel Weiner | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | dweiner@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Howard Borin | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | hborin@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Michael R Wernette | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | mwernette@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Ryan Heilman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | shellie@schaferandweiner.com rheilman@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schiff Hardin LLP | Eugene J. Geekie, Jr. | 7500 Sears Tower | | Chicago | IL | 60606 | | 312-258-5635 | egeekie@schiffhardin.com | Counsel to  Means Industries |
| Schulte Roth & Zabel LLP | David J. Karp | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | david.karp@srz.com | Counsel to Parnassus Holdings II, LLC and Platinum Equity Capital Partners II, LP |
| Schulte Roth & Zabel LLP | James T. Bentley | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2273 | james.bentley@srz.com | Counsel to Panasonic Automotive Systems Company of America |
| Schulte Roth & Zabel LLP | Michael L. Cook | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | michael.cook@srz.com | Counsel to Panasonic Automotive Systems Company of America; D.C. Capital Partners, L.P. |
| Schwartz Lichtenberg LLP | Barry E Lichtenberg Esq | 420 Lexington Ave Ste 2400 | | New York | NY | 10170 | | 212-389-7818 | barryster@att.net | Counsel to Marybeth Cunningham |
| Seyfarth Shaw LLP | Paul M. Baisier, Esq. | 1545 Peachtree Street, N.E. | Suite 700 | Atlanta | GA | 30309-2401 | | 404-885-1500 | pbaisier@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | Robert W. Dremluk | 620 Eighth Ave | | New York | NY | 10018-1405 | | 212-218-5500 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | William J. Hanlon | World Trade Center East | Two Seaport Lane, Suite 300 | Boston | MA | 02210 | | 617-946-4800 | whanlon@seyfarth.com | Counsel to  le Belier/LBQ Foundry S.A. de C.V. |
| Shaw Gussis Fishman Glantz Wolfson & Towbin LLC | Brian L Shaw | 321 N. Clark St. | Suite 800 | Chicago | IL | 60654 | | 312-541-0151 | bshaw100@shawgussis.com | Counsel to ATC Logistics & Electronics, Inc. |
| Sheehan Phinney Bass + Green Professional Association | Bruce A. Harwood | 1000 Elm Street | P.O. Box 3701 | Manchester | NH | 03105-3701 | | 603-627-8139 | bharwood@sheehan.com | Counsel to Source Electronics, Inc. |
| Sheldon S. Toll PLLC | Sheldon S. Toll | 2000 Town Center | Suite 2550 | Southfield | MI | 48075 | | 248-358-2460 | lawtoll@comcast.net | Counsel to Milwaukee Investment Company |
| Sheppard Mullin Richter & Hampton LLP | Eric Waters | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | ewaters@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Malani J. Sternstein | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | msternstein@sheppardmullin.com | Counsel to International Rectifier Corp. and Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theodore A. Cohen | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | tcohen@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theresa Wardle | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | twardle@sheppardmullin.com | Counsel to International Rectifier Corp. |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 5353 Essen Lane | Suite 650 | Baton Rouge | LA | 70809 | | 225-757-2185 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |

In re: DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 19 of 22

9/15/2010 9:13 PM
Email (395)

DPH Holdings Corp.
Post-Emergence 2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 909 Poydras Street | 28th Floor | New Orleans | LA | 70112-1033 | | 504-299-2100 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |
| Shipman & Goodwin LLP | Kathleen M. LaManna | One Constitution Plaza | | Hartford | CT | 06103-1919 | | 860-251-5603 | bankruptcy@goodwin.com | |
| Sills, Cummis Epstein & Gross, P.C. | Andrew H. Sherman | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | asherman@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |
| Sills, Cummis Epstein & Gross, P.C. | Jack M. Zackin | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | jzackin@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |
| Sills, Cummis Epstein & Gross, P.C. | Valerie A Hamilton Simon Kimmelman | 650 College Rd E | | Princeton | NJ | 08540 | | 609-227-4600 | vhamilton@sillscummis.com skimmelman@sillscummis.com | Counsel to Doosan Infracore America Corp. |
| Silver Point Capital, L.P. | Chaim J. Fortgang | Two Greenwich Plaza | 1st Floor | Greenwich | CT | 06830 | | 203-542-4216 | cfortgang@silverpointcapital.com | Counsel to Silver Point Capital, L.P. |
| Smith, Katzenstein & Furlow LLP | Kathleen M. Miller | 800 Delaware Avenue, 7th Floor | P.O. Box 410 | Wilmington | DE | 19899 | | 302-652-8400 | kmiller@skfdelaware.com | Counsel to Airgas, Inc. |
| Sonnenschein Nath & Rosenthal LLP | D. Farrington Yates | 1221 Avenue of the Americas | 24th Floor | New York | NY | 10020 | | 212-768-6700 | fyates@sonnenschein.com | Counsel to Molex, Inc. and INA USA, Inc. and United Plastics Group |
| Sonnenschein Nath & Rosenthal LLP | Monika J. Machen | 8000 Sears Tower | 233 South Wacker Drive | Chicago | IL | 60606 | | 312-876-8000 | mmachen@sonnenschein.com | Counsel to United Plastics Group |
| Sonnenschein Nath & Rosenthal LLP | Oscar N. Pinkas | 1221 Avenue of the Americas | 24th Floor | New York | NY | 10020 | | 212-768-6700 | opinkas@sonnenschein.com | Counsel to Schaeffler Canada, Inc. and Schaeffler KG |
| Sonnenschein Nath & Rosenthal LLP | Robert E. Richards | 7800 Sears Tower | 233 South Wacker Drive | Chicago | IL | 60606 | | 312-876-8000 | rrichards@sonnenschein.com | Counsel to Molex, Inc. and INA USA, Inc.; Counsel to Schaeffler Canada, Inc. and Schaeffler KG |
| Squire, Sanders & Dempsey L.L.P. | G. Christopher Meyer | 4900 Key Tower | 127 Public Sq | Cleveland | OH | 44114 | | 216-479-8692 | cmeyer@ssd.com | Counsel to Furukawa Electric Co., Ltd.; Counsel for the City of Dayton, Ohio |
| State of California Office of the Attorney General | Sarah E. Morrison | Deputy Attorney General | 300 South Spring Street Ste 1702 | Los Angeles | CA | 90013 | | 213-897-2640 | sarah.morrison@doj.ca.gov | Attorneys for the State of California Department of Toxic Substances Control |
| State of Michigan Department of Labor & Economic Growth, Unemployment Insurance Agency | Roland Hwang Assistant Attorney General | 3030 W. Grand Boulevard | Suite 9-600 | Detroit | MI | 48202 | | 313-456-2210 | hwangr@michigan.gov | Assistant Attorney General for State of Michigan, Unemployment Tax Office of the Department of Labor & Economic Growth, Unemployment Insurance Agency |
| State of Michigan Labor Division | Susan Przekop-Shaw | PO Box 30736 | | Lansing | MI | 48909 | | 517-373-2560 | przekopshaws@michigan.gov | Assistant Attorney General as Attorney for the Michigan Workers' Compensation Agency |
| Steel Technologies, Inc. | John M. Baumann | 15415 Shelbyville Road | | Louisville | KY | 40245 | | 502-245-0322 | jmbaumann@steeltechnologies.com | Counsel to Steel Technologies, Inc. |
| Sterns & Weinroth, P.C. | Michael A Spero Simon Kimmelman Valerie A Hamilton | 50 West State Street, Suite 1400 | PO Box 1298 | Trenton | NJ | 08607-1298 | | 609-392-2100 | jspecf@sternslaw.com | Counsel to Doosan Infracore America Corp. |
| Stevens & Lee, P.C. | Constantine D. Pourakis, Esq. | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | | 212-319-8500 | cp@stevenslee.com | Counsel to Tonolli Canada Ltd.; VJ Technologies, Inc. and V.J. ElectroniX, Inc. |
| Stinson Morrison Hecker LLP | Mark A. Shaiken | 1201 Walnut Street | | Kansas City | MO | 64106 | | 816-842-8600 | mshaiken@stinsonmoheck.com | Counsel to Thyssenkrupp Waupaca, Inc. and Thyssenkrupp Stahl Company |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 20 of 22

9/15/2010 9:13 PM
Email (395)

DPH Holdings Corp.
Post-Emergence 2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Stites & Harbison PLLC | Madison L.Cashman | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | robert.goodrich@stites.com | Counsel to Setech, Inc. |
| Stites & Harbison PLLC | Robert C. Goodrich, Jr. | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | madison.cashman@stites.com | Counsel to Setech, Inc. |
| Stites & Harbison, PLLC | W. Robinson Beard, Esq. | 400 West Market Street | | Louisville | KY | 40202 | | 502-681-0448 / 502-587-3400 | wbeard@stites.com / loucourtsum@stites.com | Counsel to WAKO Electronics (USA), Inc.,Ambrake Corporation, and Akebona Corporation (North America) |
| Stutman Treister & Glatt Professional Corporation | Christine M. Pajak Eric D. Goldberg Isaac M. Pachulski Esq Jeffrey H Davidson Esq | 1901 Avenue of the Stars | 12th Floor | Los Angeles | CA | 90067 | | 310-228-5600 | cpajak@stutman.com egoldberg@stutman.com ipachulski@stutman.com jdavidson@stutman.com | Counsel to CR Intrinsic Investors, LLC, Elliot Associates, L.P., Highland Capital Management, L.P. |
| Taft, Stettinius & Hollister LLP | Richard L .Ferrell | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202-3957 | | 513-381-2838 | ferrell@taftlaw.com | Counsel to Wren Industries, Inc. |
| Taft, Stettinius & Hollister LLP | W Timothy Miller Esq | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202 | | 513-381-2838 | miller@taftlaw.com | Counsel to Select Industries Corporation and Gobar Systems, Inc. |
| Teitelbaum & Baskin LLP | Jay Teitelbaum Ron Baskin | 3 Barker Avenue | 3rd Floor | White Plains | NY | 10601 | | 914-437-7670 | jteitelbaum@tblawllp.com rbaskin@tblawllp.com | Counsel to Mary H. Schaefer |
| Tennessee Department of Revenue | Marvin E. Clements, Jr. | c/o TN Attorney General's Office, Bankruptcy Division | PO Box 20207 | Nashville | TN | 37202-0207 | | 615-532-2504 | agbanknewyork@ag.tn.gov | Tennesse Department of Revenue |
| Thacher Proffitt & Wood LLP | Jonathan D. Forstot | Two World Financial Center | | New York | NY | 10281 | | 212-912-7679 | jforstot@tpw.com | Counsel to TT Electronics, Plc |
| Thacher Proffitt & Wood LLP | Louis A. Curcio | Two World Financial Center | | New York | NY | 10281 | | 212-912-7607 | lcurcio@tpw.com | Counsel to TT Electronics, Plc |
| The Furukawa Electric Co., Ltd. | Mr. Tetsuhiro Niizeki | 6-1 Marunouchi | 2-Chrome, Chiyoda-ku | Tokyo | Japan | 100-8322 | | | niizeki.tetsuhiro@furukawa.co.jp | Legal Department of The Furukawa Electric Co., Ltd. |
| The Timpken Corporation BIC - 08 | Robert Morris | 1835 Dueber Ave. SW | PO Box 6927 | Canton | OH | 44706-0927 | | 330-438-3000 | robert.morris@timken.com | Representative for Timken Corporation |
| Thompson & Knight | Rhett G. Cambell | 333 Clay Street | Suite 3300 | Houston | TX | 77002 | | 713-654-1871 | rhett.campbell@tklaw.com | Counsel to STMicroelectronics, Inc. |
| Thompson & Knight LLP | Ira L. Herman | 919 Third Avenue | 39th Floor | New York | NY | 10022-3915 | | 212-751-3045 | ira.herman@tklaw.com | Counsel to Victory Packaging |
| Thompson & Knight LLP | John S. Brannon | 1700 Pacific Avenue | Suite 3300 | Dallas | TX | 75201-4693 | | 214-969-1505 | john.brannon@tklaw.com | Counsel to Victory Packaging |
| Thompson Coburn Fagel Haber | Lauren Newman | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | | 312-346-7500 | lnewman@tcfhlaw.com | Counsel to Aluminum International, Inc. |
| Thompson Coburn LLP d/b/a Thompson Coburn Fagel Haber | Dennis E. Quaid Esq | 55 E Monroe 37th Fl | | Chicago | IL | 60603 | | 312-580-2215 | dquaid@thompsoncoburn.com | Counsel for Penn Aluminum International Inc |
| Thompson Hine LLP | Jennifer L Maffett | 2000 Courthouse Plaza NE | 10 W Second St | Dayton | OH | 45402 | | 937-443-6600 | Jennifer.Maffett@ThompsonHine.com | Counsel to Rieck Group, LLC n/k/a Mechanical Construction Managers, LLC |
| TI Group Automotive Systms LLC | Timothy M. Guerriero | 12345 E Nine Mile Rd | | Warren | MI | 48089 | | 586-755-8066 | tguerriero@us.tiauto.com | General Counsel and Company Secretary to TI Group Automotive Systems LLC |
| Todd & Levi, LLP | Jill Levi, Esq. | 444 Madison Avenue | Suite 1202 | New York | NY | 10022 | | 212-308-7400 | jlevi@toddlevi.com | Counsel to Bank of Lincolnwood |
| Todtman Nachamie Spizz & Johns PC | Janice B. Grubin | 425 Park Avenue | 5th Floor | New York | NY | 10022 | | 212-754-9400 | jgrubin@tnsj-law.com | Counsel to Vanguard Distributors, Inc. |
| U.S. Department of Justice | Matthew L Schwartz Joseph N Cordaro | Assistant United States Attorneys | 86 Chambers St 3rd Fl | New York | NY | 10007 | | 212-637-1945 | matthew.schwartz@usdoj.gov Joseph.Cordaro@usdoj.gov | Counsel to Enviromental Protection Agency; Internal Revenue Service; Department of Health and Human Services; and Customs and Border Protection |
| Underberg & Kessler, LLP | Helen Zamboni | 300 Bausch & Lomb Place | | Rochester | NY | 14604 | | 585-258-2800 | hzamboni@underbergkessler.com | Counsel to McAlpin Industries, Inc. |
| Union Pacific Railroad Company | Mary Ann Kilgore | 1400 Douglas Street | MC 1580 | Omaha | NE | 68179 | | 402-544-4195 | mkilgore@UP.com | Counsel to Union Pacific Railroad Company |

DPH Holdings Corp.
Post-Emergence 2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| United Steel, Paper and Forestry, Rubber, Manufacturing, Energy | Allied Industrial and Service Workers, Intl Union (USW), AFL-CIO | David Jury, Esq. | Five Gateway Center Suite 807 | Pittsburgh | PA | 15222 | | 412-562-2546 | djury@usw.org | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Vorys, Sater, Seymour and Pease LLP | Tiffany Strelow Cobb | 52 East Gay Street | | Columbus | OH | 43215 | | 614-464-8322 | tscobb@vorys.com | Counsel to America Online, Inc. and its Subsidiaries and Affiliates |
| Wachtell, Lipton, Rosen & Katz | Richard G. Mason | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | RGMason@wlrk.com | Counsel to Capital Research and Management Company |
| Warner Norcross & Judd LLP | Gordon J. Toering | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2185 | gtoering@wnj.com | Counsel to Robert Bosch Corporation; Counsel to Daewoo International Corp and Daewoo International (America) Corp |
| Warner Norcross & Judd LLP | Michael G. Cruse | 2000 Town Center | Suite 2700 | Southfield | MI | 48075 | | 248-784-5131 | mcruse@wnj.com | Counsel to Compuware Corporation |
| Warner Norcross & Judd LLP | Stephen B. Grow | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2158 | growsb@wnj.com | Counsel to Behr Industries Corp. |
| Weltman, Weinberg & Reis Co., L.P.A. | Geoffrey J. Peters | 175 South Third Street | Suite 900 | Columbus | OH | 43215 | | 614-857-4326 | gpeters@weltman.com | Counsel to Seven Seventeen Credit Union |
| White & Case LLP | Glenn Kurtz Gerard Uzzi Douglas Baumstein | 1155 Avenue of the Americas | | New York | NY | 10036-2787 | | 212-819-8200 | gkurtz@ny.whitecase.com guzzi@whitecase.com dbaumstein@ny.whitecase.com | Counsel to Appaloosa Management, LP |
| White & Case LLP | Thomas Lauria Frank Eaton | Wachovia Financial Center | 200 South Biscayne Blvd., Suite 4900 | Miami | FL | 33131 | | 305-371-2700 | tlauria@whitecase.com featon@miami.whitecase.com | Counsel to Appaloosa Management, LP |
| Whyte, Hirschboeck Dudek S.C. | Bruce G. Arnold | 555 East Wells Street | Suite 1900 | Milwaukee | WI | 53202-4894 | | 414-273-2100 | barnold@whdlaw.com | Counsel to Schunk Graphite Technology |
| Wickens Herzer Panza Cook & Batista Co | James W Moennich Esq | 35765 Chester Rd | | Avon | OH | 44011-1262 | | 440-930-8000 | jmoennich@wickenslaw.com | Counsel for Delphi Sandusky ESOP |
| Winston & Strawn LLP | David Neier Carey D. Schreiber | 200 Park Avenue | | New York | NY | 10166-4193 | | 212-294-6700 | dneier@winston.com cschreiber@winston.com | Counsel to Ad Hoc Group of Tranche A & B DIP Lenders |
| Winthrop Couchot Professional Corporation | Marc. J. Winthrop | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | mwinthrop@winthropcouchot.com | Counsel to Metal Surfaces, Inc. |
| Winthrop Couchot Professional Corporation | Sean A. O'Keefe | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | sokeefe@winthropcouchot.com | Counsel to Metal Surfaces, Inc. |
| Womble Carlyle Sandridge & Rice, PLLC | Allen Grumbine | 550 South Main St | | Greenville | SC | 29601 | | 864-255-5402 | agrumbine@wcsr.com | Counsel to Armacell |
| Womble Carlyle Sandridge & Rice, PLLC | Michael G. Busenkell | 222 Delaware Avenue | Suite 1501 | Wilmington | DE | 19801 | | | mbusenkell@wcsr.com | Counsel to Chicago Miniature Optoelectronic Technologies, Inc. |
| Woods Oviatt Gilman LLP | Ronald J. Kisinski | 700 Crossroads Bldg | 2 State St | Rochester | NY | 14614 | | 585-362-4514 | rkisicki@woodsoviatt.com | |
| Zeichner Ellman & Krause LLP | Stuart Krause | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | skrause@zeklaw.com | Counsel to Toyota Tsusho America, Inc. |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 22 of 22

9/15/2010 9:13 PM
Email (395)

# EXHIBIT B

DPH Holdings Corp.
Post-Emergence Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| United States Trustee | Brian Masumoto | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | 212-510-0500 | Counsel to United States Trustee |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 1 of 1

9/15/2010 9:14 PM
Post-Emergence Master Service List 100820.xlsx US Mail (1)

# EXHIBIT C

**Hearing Date and Time:  September 24, 2010 at 10:00 a.m. (prevailing Eastern time)**
**Supplemental Response Date and Time:  September 22, 2010 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036

Attorneys for DPH Holdings Corp., et al.,
    Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -   -  x
                                                          :
        In re                                             :    Chapter 11
                                                          :
DPH HOLDINGS CORP., et al.,                               :    Case Number 05-44481 (RDD)
                                                          :
                                                          :    (Jointly Administered)
                Reorganized Debtors.                      :
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

REORGANIZED DEBTORS' SUPPLEMENTAL REPLY TO RESPONSES OF CERTAIN
CLAIMANTS TO DEBTORS' OBJECTIONS TO PROOFS OF CLAIM
NOS. 10504, 10686, 11045, 11981, 11982, 11984, 11986, 11987, AND 11990


("SUPPLEMENTAL REPLY REGARDING THE TREMONT SITE CLAIMS")

DPH Holdings Corp. and certain of its affiliated reorganized debtors in the above-caption ed cases (together with DPH Holdings Corp., the "Reorganized Debtors") hereby submit the Reorganized Debtors' Supplemental Reply To Responses Of Certain Claimants To Debtors' Objections To Proofs Of Claim Nos. 10504, 10686, 11045, 11981, 11982, 11984, 11986, 11987, And 11990 (the "Supplemental Reply"), and respectfully represent as follows:

A.    Preliminary Statement

1.    On October 8 and 14, 2005, Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, including Delphi Automotive Systems LLC ("DAS LLC"), former debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").

2.    On October 6, 2009, the Debtors substantially consummated the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified (the "Modified Plan"), which had been approved by this Court pursuant to an order entered on July 30, 2009 (Docket No. 18707), and emerged from chapter 11 as the Reorganized Debtors.

3.    On August 26, 2010, the Reorganized Debtors filed the Notice Of Sufficiency Hearing With Respect To Debtors' Objection To Proofs Of Claim Numbers 10504, 10686, 11045, 11981, 11982, 11984, 11986, 11987, And 11990 and Reorganized Debtors' Objection To Proofs Of Administrative Expense Claim Numbers 19797, 19798, 19799, 19800, And 19802 (Docket No. 20552) (the "Sufficiency Hearing Notice").

4.    The Reorganized Debtors filed the Sufficiency Hearing Notice and are filing this Supplemental Reply to implement Article 9.6(a) of the Modified Plan, which provides

2

that "[t]he Reorganized Debtors shall retain responsibility for administering, disputing, objecting

to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors and

making distributions (if any) with respect to all Claims and Interests."  Modified Plan, art. 9.6(a).

5.      By the Sufficiency Hearing Notice and pursuant to the Order Pursuant To

11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014

Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices

And Procedures Governing Objections To Claims, entered December 7, 2006 (Docket No. 6089)

(the "Claims Objection Procedures Order"), the Order Pursuant To 11 U.S.C. §§ 105(a) And

503(b) Authorizing Debtors To Apply Claims Objection Procedures To Address Contested

Administrative Expense Claims, entered October 22, 2009 (Docket No. 18998), the Eleventh

Supplemental Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016,

7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Objections To

Claims And (ii) Certain Notices And Procedures Governing Objections To Claims, entered April

5, 2010 (Docket No. 19776), and the Notice Of Rescheduling Of Fifty-Ninth Omnibus Hearing

And Thirty-Seventh Claims Hearing (Docket No. 20417), the Reorganized Debtors scheduled a

hearing (the "Sufficiency Hearing") on September 24, 2010 at 10:00 a.m. (prevailing Eastern

time) in this Court to address the legal sufficiency of each proof of claim filed by the claimants

listed on Exhibit A to the Sufficiency Hearing Notice and whether each such proof of claim and

proof of administrative expense claim states a colorable claim against the asserted Debtor.

6.      This Supplemental Reply is filed pursuant to paragraph 9(b)(i) of the

Claims Objection Procedures Order.  Pursuant to paragraph 9(b)(ii) of the Claims Objection

Procedures Order, if a Claimant wishes to file a supplemental pleading in response to this

<u>Supplemental Reply, the Claimant shall file and serve its response no later than two business</u>

<u>days before the scheduled Sufficiency Hearing – i.e., by **September 22, 2010.**</u>

B.    <u>Relief Requested</u>

7.    By this Supplemental Reply, the Reorganized Debtors request entry of an

order disallowing and expunging certain proofs of claim against the Debtors in their chapter 11

cases.

C.    <u>The Tremont Claims</u>

8.    Each of the proofs of claim listed on <u>Exhibit A</u>[1] hereto (the "<u>Tremont</u>

<u>Claims</u>") was filed by an entity that is liable for contamination existing at the Tremont City

Landfill Site in Tremont, Ohio (the "<u>Site</u>") and seeks contribution from the Debtors for the costs

to investigate and remediate the environmental contamination at the Site.  During their review of

the proofs of claim filed in these cases, the Reorganized Debtors determined that the Tremont

Claims assert liabilities that are not owing pursuant to the Reorganized Debtors' books and

records.  The Reorganized Debtors believe that none of the entities listed on <u>Exhibit A</u> are

creditors of the Debtors with respect to the Site.  Accordingly, this Court should enter an order

disallowing and expunging each of the Tremont Claims.

D.    <u>Claimants' Burden Of Proof And Standard For Sufficiency Of Claims</u>

9.    The Reorganized Debtors respectfully submit that the Tremont Claims fail

to state a claim against the Debtors under rule 7012 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules").  The claimants asserting the Tremont Claims have not

proved any facts to support a right to payment by the Reorganized Debtors on behalf of the

---

[1]    <u>Exhibit A</u> sets forth the following information regarding each proof of claim: the applicable claim number, the date the claim was filed, the name of the claimant, the applicable omnibus objection, the date of the applicable omnibus objection, the docket number of the claimant's response, the name of the debtor entity against which the claim is asserted, and the basis for the Reorganized Debtors' objections to the Claims.

4

Debtors. Accordingly, the Debtors' objections to each Tremont Claim should be sustained with respect to such proofs of claim and each Tremont Claim should be disallowed and expunged in its entirety.

10.       The burden of proof to establish a claim against the Debtors rests on the claimants and, if a proof of claim does not include sufficient factual support, such proof of claim is not entitled to a presumption of prima facie validity pursuant to Bankruptcy Rule 3001(f). In re Spiegel, Inc., No. 03-11540, 2007 WL 2456626, at *15 (Bankr. S.D.N.Y. Aug. 22, 2007) (the claimant always bears the burden of persuasion and must initially allege facts sufficient to support the claim); see also In re WorldCom, Inc., No. 02-13533, 2005 WL 3832065, at *4 (Bankr. S.D.N.Y. Dec. 29, 2005) (only a claim that alleges facts sufficient to support legal liability to claimant satisfies claimant's initial obligation to file substantiated proof of claim); In re Allegheny Int'l., Inc., 954 F.2d 167, 173 (3d Cir. 1992) (in its initial proof of claim filing, claimant must allege facts sufficient to support claim); In re Chiro Plus, Inc., 339 B.R. 111, 113 (Bankr. D.N.J. 2006) (claimant bears initial burden of sufficiently alleging claim and establishing facts to support legal liability); In re Armstrong Finishing, L.L.C., No. 99-11576-C11, 2001 WL 1700029, at *2 (Bankr. M.D.N.C. May 2, 2001) (only when claimant alleges facts sufficient to support its proof of claim is it entitled to have claim considered prima facie valid); In re United Cos. Fin. Corp., 267 B.R. 524, 527 (Bankr. D. Del. 2000) (claimant must allege facts sufficient to support legal basis for its claim to make a prima facie case).

11.       For purposes of sufficiency, this Court has determined that the standard of whether a claimant has met its initial burden of proof to establish a claim should be similar to the standard employed by courts in deciding a motion to dismiss under Bankruptcy Rules 7012 and 9014. See Transcript of January 12, 2007 Hearing (Docket No. 7118) (the "January 12, 2007

Transcript") at 52:24-53:1.  Pursuant to that standard, a motion to dismiss should be granted if a claimant fails to make "'[f]actual allegations . . . enough to raise a right to relief above the speculative level [to a plausible level],' assuming (of course) that all the allegations in the complaint are true." Bradley v. Rell, No. 1:07-CV-0148, 2010 U.S. Dist. LEXIS 29606, at *13 (N.D.N.Y. Mar. 25, 2010) (quoting Bell Atl. Corp. v. Twombly, 550 U.S 544, 555 (2007)). Essentially, the claimant must provide facts that plausibly support a legal liability against the Debtors.

12.     This Court further established that the sufficiency hearing standard is consistent with Bankruptcy Rule 3001(f), which states that "a proof of claim executed and filed in accordance with these Rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f) (emphasis added).  Likewise, Bankruptcy Rule 3001(a) requires that "the proof of claim shall conform substantially to the appropriate Official Form" and Bankruptcy Rule 3001(c) requires that "when a claim . . . is based on a writing, the original or a duplicate shall be filed with the proof of claim." Fed. R. Bankr. P. 3001(a), (c).  See January 12, 2007 Transcript at 52:17-22.

E.     Argument Regarding The Tremont Claims

13.     The Reorganized Debtors Are Not Liable Under CERCLA.  The Tremont Claims assert that Delphi and/or DAS LLC are liable parties under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, et seq ("CERCLA") for contamination at the Site.  However, neither Delphi nor DAS LLC existed at the time the Site operated as a landfill, and therefore these entities have no statutory liability for contamination at the Site under CERCLA.  CERCLA imposes liability on four classes of potentially responsible parties ("PRPs"): (a) the current owner or operator of a contaminated site; (b) anyone who owned or operated the contaminated site at the time hazardous substances were disposed of; (c) any

person who arranged for the disposal of any hazardous substances at the contaminated site; and

(d) any person who transported any hazardous substances to a contaminated site.  See 42 U.S.C.

§ 9607(a).

14.      Neither Delphi nor DAS LLC has ever had any ownership interest in the

Site, nor has either entity ever operated the Site.  Accordingly, any liability under CERCLA

would have to arise because Delphi or DAS LLC arranged for the disposal of hazardous

substances or transported hazardous substances for disposal at the Site.  However, such liability

is impossible because the landfill at the Site ceased accepting wastes for disposal and stopped

operations in 1995, at which point neither Delphi nor DAS LLC held any assets or conducted

any operations.  See "U.S. EPA Begins Investigation at the Tremont City Landfill Site," US EPA

Fact Sheet, April 2000, at 3, attached hereto as Exhibit B.[2]  Both Delphi and DAS LLC were

formed as part of the divestiture by General Motors Corporation ("General Motors") of its Delphi

Automotive Systems unit (the "Divestiture").  Specifically, General Motors formed DAS LLC

and incorporated Delphi Automotive Systems Corporation on September 16, 1998.  See

Certificate of Formation of Delphi Automotive Systems LLC, attached hereto as Exhibit C;

Certificate of Incorporation of Delphi Automotive Systems Corporation, attached hereto as

Exhibit D.  Delphi Automotive Systems Corporation later changed its name to Delphi

Corporation.  See Certificate of Ownership and Merger, attached hereto as Exhibit E.  General

Motors then transferred the assets that had previously been a part of its Delphi Automotive

Systems unit to these newly formed entities to effectuate the Divestiture.  See Master Separation

---

[2]      This Court may take judicial notice of the date that the site ceased operating as demonstrated by the EPA Fact
Sheet attached as Exhibit B hereto.  Judicial notice is permitted for facts that are "capable of accurate and ready
determination by resort to sources whose accuracy cannot be reasonably questioned."  Fed.R.Evid. 201.  Under
this standard, courts may take judicial notice of the "records of various public or quasi-public bodies."  In re
Enron Corp., 323 B.R. 857, 869 (Bankr. S.D.N.Y. 2005).  Thus, the EPA Fact Sheet, as a record of the United
States Environmental Protection Agency, meets this standard.

Agreement Among General Motors Corporation, Delphi Automotive Systems Corporation,

Delphi Automotive Systems, LLC, Delphi Technologies, Inc. and Delphi Automotive Systems

(Holding), Inc., at Recitals, § 2.01,  attached hereto as Exhibit F (the "Master Separation

Agreement")[3].

       15.     The Master Separation Agreement contemplated that General Motors and

Delphi would enter into certain ancillary agreements to further effect the Divestiture.  Id. at Art 3.

One such agreement was the Environmental Matters Agreement (the "EMA") by and between

General Motors Corporation and Delphi Automotive Systems Corporation, which addressed the

assumption and retention of environmental liabilities between General Motors and Delphi.  See

EMA attached hereto as Exhibit G.  The EMA was the sole agreement governing the assumption

of environmental liabilities under the Divestiture.  See Master Separation Agreement at § 3(b)

("to the extent that any Ancillary Agreement expressly addresses any matters addressed by this

Agreement, including without limitation, matters covered by Article 2 and Article 5 hereof

[assumption of liabilities], the terms and conditions of such Ancillary Agreement shall govern

the rights and obligations of the parties with respect to such matters."); see also Master

Separation Agreement at § 2.03(a) ("To the extent that the transfer of any Delphi Asset or the

assumption of any Delphi Liability is expressly provided for by the terms of an Ancillary

Agreement, the terms of such Ancillary Agreement shall determine the method of the transfer or

---

[3]    This Court may also take judicial notice of the corporate documents included as Exhibits C-F to this brief.
Under  Fed.R.Evid. 201, courts may take judicial notice of the "records of various public or quasi-public
bodies."  The Certificate of Formation, Articles of Incorporation and Certificate of Ownership attached as
Exhibits C-E are from the Secretary of the State of Delaware and therefore clearly meet the standard for judicial
notice set forth in Fed.R.Evid. 201 and  In re Enron Corp., 323 B.R.at  869.  Furthermore, the Master Separation
Agreement attached hereto as Exhibit F and the Environmental Matters Agreement attached hereto as Exhibit G
are from filings with the Securities and Exchange Commission, which have been recognized as matters of
which a court may take judicial notice.  In re Enron Corp., 323 B.R.at  869.; see also Kramer v. Time Warner,
Inc., 937 F.2d 767, 774 (2d Cir. 1991) ("[A] district court may take judicial notice of the contents of relevant
public disclosure documents required to be filed with the SEC as facts 'capable of accurate and ready
determination by resort to sources whose accuracy cannot reasonably be questioned.'").

the assumption.").  As part of the Modified Plan, the EMA was terminated, and therefore the

EMA cannot be used to support an argument that DAS LLC or Delphi assumed any

environmental liabilities arising from General Motors' operation of the Delphi Automotive

Systems unit prior to the Divestiture, including any liabilities at the Site.  See Modified Plan at

Exhibit 7.7, § 9.19.1(C); see also Nat'l Labor Relations Bd. v. Cone Mills Corp., 373 F.2d 595,

598 (5th Cir. 1967) ("It is axiomatic in contract law that parties to an agreement are relieved of

their mutual obligations upon termination of the agreement. Restatement, Contracts § 386.").

Accordingly, any liability for wastes that were sent to the Site for disposal from any assets

related to General Motors' Delphi Automotive business unit would be General Motors' liabilities,

not the Reorganized Debtors.

       16.    Furthermore, to the extent that any of the claimants asserting the Tremont

Claims asserts that the Reorganized Debtors are liable at the Site as corporate successors to

General Motors, we note that this issue has previously been briefed for the Court in connection

with the Reorganized Debtors' objection to proofs of claim numbers 11983, 11985, 11988, and

11989 filed by Illinois Tool Works, Inc. and  ITW Food Equipment Group LLC relating to

environmental contamination at the South Dayton Dump and Landfill in Ohio.  Rather than

repeat those arguments here, the Reorganized Debtors have included a copy of that brief as

Exhibit H hereto.

       17.    Disallowance Pursuant To Section 502(e)(1)(B) Of The Bankruptcy Code.

Alternatively, the Reorganized Debtors request that this Court enter an order disallowing and

expunging the Tremont Claims pursuant to section 502(e)(1)(B) of the Bankruptcy Code.

Section 502(e)(1)(B) of the Bankruptcy Code provides that a bankruptcy court is to disallow any

claim for reimbursement or contribution  for which the claimant is co- liable with the debtor to

9

the extent that "such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution."  11 U.S.C. § 502(e)(1)(B).

18.    Courts have recognized three elements necessary for a claim to be disallowed under section 502(e)(1)(B):

> (i) the claim must be one for reimbursement or contribution; (ii) the entity asserting the claim for reimbursement or contribution 'must be liable with the debtor' on or have secured the claim of a creditor; and (iii) the claim must be contingent at the time of its allowance or disallowance.

In re Wedtech Corp., 85 B.R. 285, 289 (Bankr. S.D.N.Y. 1988) (quoting In re Provincetown-Boston Airline, Inc., 72 B.R. 307, 309 (Bankr. M.D. Fla. 1987).

19.    In analyzing each of these three elements, it is helpful to break the nine Tremont Claims into two groups.  The first group, consisting of proofs of claim numbers 11981, 11982, 11986, 11987,  10504, 11984, and 11990, was filed by entities that generated hazardous waste that was allegedly disposed of at the Site (the "Generator Claims").  The Generator Claims are all identical, except for the identity of the party asserting the claim.  The remaining Tremont Claims, proofs of claim numbers 11045 and 10686, were filed by transporters who allegedly transported wastes to the Site (the "Transporter Claims").  As shown below, both the Generator Claims and Transporter Claims meet each of the three elements required for disallowance under Section 502(e)(1)(B).

20.    First, the Generator Claims and Transporter Claims all seek contribution under CERCLA and/or reimbursement from the Debtors for costs the claimants will incur in cleaning up the Site.   This fact is made clear by the proof of claim forms themselves.  For example, each of the Generator Claims asserts that the Debtors are liable under CERCLA which gives "statutory contribution and cost recovery to parties that incur costs to remediate

contaminated sites" and asserts that the claimant will incur such costs.  See Rider to Generator

Claims at 1.  Thus, these claims seek contribution rights or reimbursement of cleanup costs by

their own description.  Likewise, the proof of claim forms for the Transporter Claims both state

that the bases for the claims are "Contribution & Indemnification."  It is well established that

claims for indemnification are claims for "reimbursement or contribution" under Section

502(e)(1)(B).  In re Wedtech Corp., 85 B.R. at 289 (disallowing indemnification claims because

"the concept of reimbursement includes indemnity"); In re GCO Servs., LLC, 324 B.R. 459,

465 (Bankr. S.D.N.Y. 2005) ("any claims for indemnification also fall within the scope of the

first prong of § 502(e)(1)(B)").

   21.  Furthermore, regardless of how the claimants characterize the Tremont

Claims, the phrase "reimbursement or contribution" in section 502(e)(1)(B) is a broad one

intended to capture all contingent claims that would result in double payment by the bankruptcy

estate if the claim is not disallowed.  Aetna Cas. And Sur. Co. v. Ga. Tubing Corp., No. 93-3659,

1995 WL 429018, at *3 (S.D.N.Y. July 20, 1995), aff'd 93 F.3d 56 (2d Cir. 1996).  In this case,

the United States has also filed a claim against the Debtors, proof of claim number 14309,

seeking to recover cleanup costs.  See Proof of Claim No. 14309 at ¶ 2-4.  Thus, if the Tremont

Claims are not disallowed, the Reorganized Debtors would have to pay the same damages (i.e.,

the costs to cleanup the Site) to multiple parties.  Indeed, the Reorganized Debtors face not only

double payment on the same liability, but multiple payment, since each of the nine Tremont

Claims and the United States' claim seek to recover the same cleanup costs for the same Site.

Accordingly, because the Tremont Claims would subject the Reorganized Debtors to multiple

payments arising from the same liability, the Tremont Claims satisfy the first element for

disallowance under section 502(e)(1)(B).

22.    The Tremont Claims also meet the second element in that each of the claimants is a liable party at the Site, a fact that is conceded by the claimants themselves. All of the Generator Claims state that "Creditor and Debtor are among a group of PRPs which are potentially responsible under CERCLA for costs associated with the investigation and remediation of the Site." See Riders to Generator Claims at 1. Likewise, both Transporter Claims concede that the claimant transported wastes to the site and "has considerable financial exposure for the waste [General Motors] provided to [claimants] for transport" to the Site. See Rider to Transporter Claims at 1. Thus, by their own admissions, every claimant asserting a Tremont Claim is liable for the cleanup costs at the Tremont Site.

23.    Finally, each of the Tremont Claims meet the third element for disallowance under Section 502(e)(1)(B) because they are contingent. Each Generator Claim seeks to recover the costs to implement future work at the site, which costs "are unknown at this time." See Rider to Generator Claims at 1. It is well established that a claim is contingent for purposes of Section 502(e)(1)(B) if the costs sought by the claimant have not yet been paid. In re Drexel Burnham Lambert Group Inc., 148 B.R. 982, 990 (Bankr. S.D.N.Y. 1992) ("A contingent claim becomes fixed and allowable to the extent that the co-debtor has paid the underlying claim"); see also In re Eagle Picher Indus., Inc., 164 B.R. 265, 268 (S.D. Ohio 1996), aff'd, 164 B.R. 265 (S.D. Ohio 1994) ("the law is well-settled that the claim of a co-liable party under § 502(e)(1)(B) is contingent until the claimant has made payment on its underlying claim to the principle creditor and thereby fixes his own right to payment from the debtor"). Indeed, the contingent nature of claims to recover environmental cleanup costs has been recognized by courts in the context of 502(e)(1)(B). See In re Charter Co., 862 F.2d 1500 (11th Cir. 1989) (claims by PRPs to recover environmental cleanup costs arising under theories of contribution,

12

reimbursement and indemnification disallowed under section 502(e)(1)(B)); In re Hexcel, 174

B.R. 807, 813 (Bankr. N.D. Cal. 1994) (disallowing claims for environmental cleanup costs by

co-liable parties). Thus, because the Generator Claims seek recovery of future cleanup costs,

they are contingent and must be disallowed.

24.    The Transporter Claims are also contingent.  Proof of claim number

11045 concedes that the claimant has not yet been contacted by the EPA regarding the Site.  See

Rider to Transporter Claims at 1.  This claimant may never incur costs at the Site and thus its

claim is clearly contingent. A contingent claim "is by definition a claim which has not yet

accrued and which is dependent upon some future event that may never happen." In re Drexel,

148 B.R. at 987 (quoting In re Provincetown-Boston Airlines, Inc., 72 B.R. 307, 309 (Bankr.

M.D. Fla. 1987).  The same is true for the other remaining Transporter Claim, proof of claim

number 10686.  For that claim, the claimant asserts that it has been contacted by EPA, but it does

not assert that it has or will incur costs at the Site.  Thus, until the claimant incurs costs, its claim

is contingent and meets the requirements for disallowance under Section 502(e)(1)(B).

25.    In sum, all of the Tremont Claims, by the claimants' own descriptions, are

contingent claims for contribution or reimbursement for which the claimants are liable.

Accordingly, to the extent that this Court finds that the Reorganized Debtors have liability at the

Site, the Tremont Claims must be disallowed under Section 502(e)(1)(B) of the Bankruptcy Code.

26.    For the foregoing reasons, the Reorganized Debtors assert that (a) the

claimants listed in Exhibit A have not met their burden of proof to establish a claim against the

Debtors, (b) the Tremont Claims are not entitled to a presumption of prima facie validity

pursuant to Bankruptcy Rule 3001(f), and (c) the Tremont Claims fail to state a claim against the

Debtors under Bankruptcy Rule 7012.  Because the claimants cannot provide facts or law

supporting the Tremont Claims, the objections listed on <u>Exhibit A</u> should be sustained as to the

Tremont Claims, and each of the Tremont Claims should be disallowed and expunged in its

entirety.

WHEREFORE the Reorganized Debtors respectfully request this Court enter an

order (a) sustaining the Debtors' objections with respect to the Tremont Claims, (b) disallowing

and expunging each Tremont Claim in its entirety, and (c) granting such further and other relief

that this Court deems just and proper.


Dated:    New York, New York
          September 14, 2010

                              SKADDEN, ARPS, SLATE, MEAGHER
                                & FLOM LLP


                              By:  <u>/s/ John Wm. Butler, Jr</u>
                                   John Wm. Butler, Jr.
                                   John K. Lyons
                                   Ron E. Meisler
                              155 North Wacker Drive
                              Chicago, Illinois 60606

                                   - and –

                              Four Times Square
                              New York, New York 10036

                              Attorneys for DPH Holdings Corp., <u>et al.</u>,
                                 Reorganized Debtors

**Exhibit A - Environmental Claims**

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| Proof Of Claim Number | Date Filed | Claimant | Omnibus Claims Objection | Date Of Omnibus Claims Objection | Docket No. of Response | Debtor Named On Proof Of Claim | Basis for Objection |
| 10504 | 7/24/2006 | TREMONT CITY BARREL FILL PRP GROUP | Third Omnibus Claims Objection | 10/31/2006 | 5797 | DELPHI AUTOMOTIVE SYSTEMS LLC | Unsubstantiated Claims |
| 10686 | 7/26/2006 | PEERLESS TRANSPORTATION COMPANY | Third Omnibus Claims Objection | 10/31/2006 | 5819 | DELPHI CORPORATION | Unsubstantiated Claims |
| 11045 | 7/26/2006 | MAD RIVER TRANSPORTATION INC. | Third Omnibus Claims Objection | 10/31/2006 | 5820 | DELPHI CORPORATION | Unsubstantiated Claims |
| 11981 | 7/28/2006 | HOBART BROTHERS COMPANY | Third Omnibus Claims Objection | 10/31/2006 | 5617 | DELPHI AUTOMOTIVE SYSTEMS LLC | Unsubstantiated Claims |
| 11982 | 7/28/2006 | ILLINOIS TOOL WORKS INC.  FOR HOBART BROTHERS COMPANY | Third Omnibus Claims Objection | 10/31/2006 | 5617 | DELPHI AUTOMOTIVE SYSTEMS LLC | Unsubstantiated Claims |
| 11984 | 7/28/2006 | TRI MARK INC. | Third Omnibus Claims Objection | 10/31/2006 | 5617 | DELPHI CORPORATION | Unsubstantiated Claims |
| 11986 | 7/28/2006 | HOBART BROTHERS COMPANY | Third Omnibus Claims Objection | 10/31/2006 | 5617 | DELPHI CORPORATION | Unsubstantiated Claims |
| 11987 | 7/28/2006 | HOBART BROTHERS COMPANY | Third Omnibus Claims Objection | 10/31/2006 | 5617 | DELPHI CORPORATION | Unsubstantiated Claims |
| 11990 | 7/28/2006 | TRI MARK INC. | Third Omnibus Claims Objection | 10/31/2006 | 5617 | DELPHI AUTOMOTIVE SYSTEMS LLC | Unsubstantiated Claims |

# EXHIBIT B

United States
Environmental Protection
Agency

Office of Public Affairs
Region 5
77 W. Jackson Blvd.
Chicago, IL 60604

Illinois, Indiana
Michigan,
Minnesota,
Ohio, Wisconsin

155877

# U.S. EPA Begins Investigation at the Tremont City Landfill Site

**Tremont City, Ohio**                                                     **April 2000**

---

## This Fact Sheet Will Tell You About:

- History of Activities at the Site
- Investigation Beginning at the Site
- Opportunities for Public Involvement

### Public Meeting

The U.S. EPA will hold a public meeting to explain the planned investigation for the Tremont City Landfill Site.

**Date:**      May 10, 2000
**Time:**      7 p.m.
**Location:**  Springfield City Hall
               76 East High Street
               Springfield, OH

### Community Interviews

The U.S. EPA will hold community interviews in the Tremont City area from May 9 through May 11. The purpose of these interviews is to gather information on the Site from the community. If you are interested, please call Denise Battaglia of the U.S. EPA at 1-800-621-8431.

### Information Repositories

Site information will be available after May 9, 2000 in two local repositories listed on back page.

## Introduction

This fact sheet provides information about the Tremont City Landfill Site (the Site) near Tremont City, Ohio. The Site consists of three main areas: the barrel fill, the waste transfer facility, and the landfill. The Site, which is closed, is owned by Danis Industries, Inc. (Danis). Based on an extensive review of Site documents, the United States Environmental Protection Agency (U.S. EPA) will conduct a preliminary sampling program at the Site in June 2000 to determine if further work needs to be done.

The U.S. EPA will involve the public throughout the investigation at the Site. Activities will include informal interviews with community members and public meetings to inform the public of progress at the Site. The first public meeting will be held on May 10 at the Springfield City Hall to discuss the planned investigation and to answer questions and concerns. Also, the public is encouraged to review documents in the information repositories (see back page for locations). If you have any questions about this update or the Site in general, please contact the U.S. EPA or Ohio Environmental Protection Agency (Ohio EPA) staff listed on page 5.



Tremont City Landfill Site Location Map

## Site History

**1969** – Ohio issues permit to Danis for landfill construction in June

**1976** – Ohio issues permit to install a hazardous waste facility

**1976-1979** – Drum disposal at barrel fill

**1977-1985** – Waste transfer facility in use by Danis and Chemical Waste Management

**1979** – Groundwater monitoring begins at barrel fill

**1982** – Groundwater and gas monitoring begins at landfill

**1984** – Geophysical survey to locate barrel fill cells

**1985** – Excavation of trench at barrel fill identifies chromium contaminated leachate; operations at waste transfer facility stopped.

**1988** – Residential well pit explosion; gas extraction wells installed by Danis

**1992** – Landfill improvements approved by Ohio EPA, cut-off wall and drains installed to control seep

**1993** – Danis excavates the lagoon at the waste transfer facility

**1994** – Groundwater monitoring program expanded at Site

**1995** – Landfill improvements completed, landfill closed, groundwater and landfill gas monitoring continues

**1999** – U.S. EPA begins to review Site history

## Site Background Information

The Tremont City Landfill Site is approximately 80 acres. It is bordered by Snyder-Domer Road and Chapman Creek to the south, ravines to the east and west, and open land to the north. Various companies operated at the Site from 1969 to the present. Background information on each of the three Site areas is discussed below.

### Barrel Fill

The barrel fill is an 8.5-acre area at the north end of the Site. The barrel fill was operated from 1976 to 1979 by Industrial Waste Disposal (IWD), a subsidiary of Danis.

Historical records indicate that approximately 47,000 drums of industrial waste were disposed of in the barrel fill. The drums and other bulk liquids and sludge, estimated at 52,000 gallons, were placed in a series of cells or trenches that were excavated to a depth of 15 to 25 feet. The disposal cells were then covered with soil.

In 1979, IWD began a groundwater sampling program in six monitoring wells around the barrel fill. A total of nine additional wells were installed in 1983 and 1986 to further investigate the ground water. Site operators continue to collect samples periodically. To date, the only contaminant in ground water at the barrel fill that is higher than the federal drinking water standards is chromium. Other ground water contaminants have been detected but at concentrations below the federal standards. These other contaminants include both metals and volatile organic compounds (VOCs). Similar contaminants were found in a seep on the east side of the barrel fill. A partial seep cutoff wall was installed in 1985 to address this problem.

An electromagnetic survey was conducted in 1984 to locate the disposal cells. In response to an anomalous reading, a trench was excavated on the west side of the barrel fill and chromium-contaminated leachate was found. Leachate and soil from the excavation were removed and disposed of at an approved off-site hazardous waste facility. Contaminant levels in ground water at the barrel fill have declined since the contaminated soil was removed.

### Waste Transfer Facility

The waste transfer facility is located on a 14-acre area south of the barrel fill and north of the landfill. This area was operated by Danis as a waste oil recycling facility from 1977 to 1980. The facility included an oil recovery lagoon and two sedimentation ponds. From 1977 to 1980,

- 2 -

biodegradable food industry wastes were "land farmed", or plowed into the ground, in this area. The facility was purchased by Chemical Waste Management (CWM) in 1980. CWM began processing solvents in addition to waste oil. For a short period, asbestos slurry was also accepted by the facility. Wastewater from the slurry was disposed of in the lagoon and the asbestos solids were landfilled.

Previously unknown underground storage tanks were found during excavation work on the west boundary of the waste transfer facility. Historical records also indicate that drummed wastes were stored at the facility before being transferred to other off-site facilities from 1980 to 1984.

CWM stopped operations at the facility in 1985 and submitted a closure plan to the Ohio EPA that same year. Site ownership was transferred back to Danis in 1986. In 1993, the lagoon was drained and excavated as part of the closure plan. The excavated lagoon sediments were landfilled at an approved off-site hazardous waste site and the lagoon area filled with clean soil.

Contaminants of concern in soil and ground water at the waste transfer facility are waste oil and solvents.

### Landfill

The State of Ohio issued a permit to Danis to construct and operate the landfill in 1969. The landfill area consists of approximately 58 acres. The landfill was primarily for sanitary waste, but occasionally accepted industrial waste. In 1982, Danis began monitoring groundwater quality. Benzene and arsenic were detected in ground water at concentrations above the federal drinking water standards. Numerous contaminants were identified in ground water in the roll-off container storage area at the landfill. As a result, Danis cleaned up the container storage area and installed a groundwater pumping system at the south end of the landfill. This system is designed to prevent contaminated ground water from entering Chapman Creek.

Water seeping from the west flank of the landfill was discovered in 1991. In 1992, the Ohio EPA collected samples from the seep that identified low levels of contaminants including metals and VOCs. Danis conducted investigations and installed a cutoff wall and perimeter drain in response to the contamination.

In 1984, the Ohio EPA collected surface water and sediment samples from Chapman Creek and a ravine at the landfill. The samples indicated that some impacts to surface water and sediments may have occurred as a result of landfill operations.

In 1992, the Ohio EPA approved landfill design improvements including a landfill gas control system, a collection system, and a stormwater leachate management system. Approximately one million gallons of landfill leachate are collected and treated at the Springfield Municipal Wastewater Treatment Plant every year.

In September 1995, the landfill stopped receiving wastes and a closure plan was developed to meet Ohio EPA and federal requirements. The closure plan includes ground water monitoring, landfill gas and leachate controls, and maintenance of the landfill cap.

| TREMONT CITY LANDFILL SITE - DESCRIPTION OF THREE AREAS | |
|---|---|
| Barrel Fill | Northernmost area of Site. Consists of 8.5 acres. Received and buried 47,000 drums of industrial waste between 1976 and 1979. |
| Waste Transfer Facility | Located between the barrel fill and landfill. Consists of 14 acres. Was used as an oil and solvent recycling facility, drummed waste transfer station, and for burial of biodegradable wastes. Operations in this area stopped in 1985. |
| Landfill | Southernmost area of Site. Consists of 58 acres. Received municipal and some industrial wastes between 1969 and 1995. Landfill owner performs routine ground water monitoring and maintains systems for landfill gas control, stormwater management and leachate collection and disposal. |

# SDMS US EPA REGION V
# COLOR-RESOLUTION - 2
## IMAGERY INSERT FORM

The following page(s) of this document include color or resolution variations.
Unless otherwise noted, these pages are available in monochrome.  The original
document is available for viewing at the Superfund Records Center.

| | |
|---|---|
| **SITE NAME** | TREMONT CITY LANDFILL |
| **DOC ID #** | 155877 |
| **DESCRIPTION OF ITEM(S)** | FACT SHEET |
| **PRP** | RMD |
| **DOCUMENT VARIATION** | __X__ COLOR    OR    ___ RESOLUTION |
| **DATE OF ITEM(S)** | 04/01/00 |
| **NO. OF ITEMS** | 2 |
| **PHASE** | |
| **OPERABLE UNITS** | |
| **PHASE** (AR DOCUMENTS ONLY) | ___ Remedial ___ Removal ___ Deletion Docket __X__ Original ___ Update # ___ Volume _8_ of _12_ |
| **COMMENT(S)** | |



Tremont City Landfill

## Planned Investigation

To date, the U.S. EPA has conducted an extensive review of background historical information pertaining to the Site, and has determined that further investigation is required. Beginning in June 2000, a preliminary field investigation will be conducted by the U.S. EPA to evaluate the overall condition of ground water, surface water, and sediments and soil at the Site. This preliminary investigation will provide a baseline of environmental data that will be used by the U.S. EPA to assess potential risks to human health and the environment posed by the Site.

Groundwater monitoring wells at all three areas will be sampled for possible contamination. Soil samples also will be collected from the three areas of the Site. Sediment and surface water samples will be collected from seeps, ravines, the landfill sedimentation pond, and Chapman Creek. Most of these samples will be tested for an extensive list of possible contaminants including VOCs, semi-volatile organic compounds, metals, pesticides, and polychlorinated biphenyls (PCBs). The Ohio EPA will evaluate the ecological health

of Chapman Creek upstream and downstream of the Site as part of this effort.

Evaluation of the barrel fill will begin with a geophysical survey to identify where the buried drums are located. Borings will be drilled to check soil conditions around the drum cells. Soil samples will be collected and analyzed to evaluate if wastes are present.

Evaluation of the waste transfer facility will begin with a geophysical survey of the land surface to check for possible buried tanks and waste containers. Soil samples will be collected to check surface and subsurface soil conditions in this area.

The baseline-sampling program also will include sampling of landfill gas at vent wells. The gas will be tested for methane and VOCs. Landfill leachate samples also will be collected and tested for contaminants.

The U.S. EPA will inform the public of the baseline sampling data and results of the investigation. The U.S. EPA will use the baseline sampling results to evaluate if additional investigation may be necessary.

## Public Involvement Opportunities

The U.S. EPA will involve the public throughout the investigation process at the Site. You can get information and stay involved through public meetings, community interviews and by reading information sent to you. Also, anyone interested in learning more about the Tremont City Landfill Site is encouraged to review documents in the information repositories that will be available after Tuesday, May 9, 2000 at the locations listed on the back page.

Community interviews will be conducted by the U.S. EPA on May 9 through May 11, 2000, in the Tremont City/Springfield area. Information gathered from these interviews will be used to develop the Community Involvement Plan. This plan will describe the strategy to keep you informed and involved throughout the investigation at the Site. The plan will be available this summer in the information repositories or from Denise Battaglia of the U.S. EPA.

The community is invited to attend the public meeting to be held on Wednesday, May 10, 2000, at the Springfield City Hall in the Forum Meeting Room, 201 South Fountain Street, Springfield, Ohio. The purpose of the meeting is to explain the planned investigation at the Site and to address your questions and concerns.

## Contacts

For additional information about the Tremont City Landfill site, please contact:

| U.S. EPA | | Ohio EPA |
|---|---|---|
| Denise Battaglia (P-19J)<br>Community Involvement Coord.<br>Office of Public Affairs<br>77 West Jackson Boulevard<br>Chicago, IL 60604-3590<br>(312) 886-9859<br>battaglia.denise@epa.gov | John J. O'Grady (SR-6J)<br>Remedial Project Manager<br>Office of Superfund<br>77 West Jackson Boulevard<br>Chicago, IL 60604-3590<br>(312) 886-1477<br>ogra013y.johnj@epa.gov | Randy Watterworth<br>Div. Emergency Remedial<br>Response<br>401 East Fifth Street<br>Dayton, OH 45402-2911<br>(937) 285-6062<br>randy.watterworth@epa.state.oh.us |
| Call 1-800-621-8431<br>View on the Internet: http://www.epa.gov/region5/sites | | |



**Denise Battaglia and John O'Grady**



**Randy Watterworth**

# INFORMATION REPOSITORIES

Anyone interested in learning more about the Tremont City Landfill Site is encouraged to review
documents in the information repositories located at:

Clark County Public Library            Tremont United Methodist Church
201 South Fountain Street                  98 North Mulberry Street
Springfield, OH 45501                      Tremont City, OH 45372
Hours: Mon-Fri 9 a.m. – 9 p.m.
Sat 9 a.m. – 6 p.m.                     (937) 969-8553 (call for appointment)
Sun 1 p.m. – 5 p.m.



U.S. Environmental Protection Agency
Region 5
Office of Public Affairs (P-19J)
77 West Jackson Boulevard
Chicago, IL 60604

**ADDRESS CORRECTION REQUESTED**

Official Business
Penalty for Private
Use $300

Tremont City Landfill Site Investigation Begins

**EXHIBIT C**

# Delaware

PAGE 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "DPH-DAS LLC" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF FORMATION, FILED THE SIXTEENTH DAY OF SEPTEMBER, A.D. 1998, AT 10:01 O'CLOCK A.M.

CERTIFICATE OF MERGER, FILED THE THIRTIETH DAY OF SEPTEMBER, A.D. 2005, AT 1:16 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF MERGER IS THE THIRTIETH DAY OF SEPTEMBER, A.D. 2005, AT 11:59 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, CHANGING ITS NAME FROM "DELPHI AUTOMOTIVE SYSTEMS LLC" TO "DPH-DAS LLC", FILED THE SIXTH DAY OF OCTOBER, A.D. 2009, AT 12:38 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF AMENDMENT IS THE SIXTH DAY OF OCTOBER, A.D. 2009, AT 11:59 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE

2944910    8100H

100002839

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 7734966

DATE: 01-04-10

You may verify this certificate online
at corp.delaware.gov/authver.shtml

# Delaware

### The First State

*AFORESAID LIMITED LIABILITY COMPANY, "DPH-DAS LLC".*

2944910    8100H

100002839

Jeffrey W. Bullock, Secretary of State

*AUTHENTICATION: 7734966*

*DATE: 01-04-10*

# CERTIFICATE OF FORMATION

## OF

## DELPHI AUTOMOTIVE SYSTEMS LLC

This Certificate of Formation of Delphi Automotive Systems LLC has been duly executed and is being filed by the undersigned, as an authorized person, to form a limited liability company under the Delaware Limited Liability Act (6 Del. C. § 18-101. et. seq.).

1.    The name of the limited liability company is Delphi Automotive Systems LLC (the "LLC")

2.    The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

3.    The name and address of the registered agent for service of process on the LLC in the State of Delaware is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation of Delphi Automotive Systems LLC this 16th day of September, 1998

By: _____
Name:      Martin I. Darvick
Its:       Authorized Person

**EXHIBIT D**

# Delaware

*The First State*

PAGE 1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "DELPHI CORPORATION" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF INCORPORATION, FILED THE SIXTEENTH DAY OF SEPTEMBER, A.D. 1998, AT 10 O'CLOCK A.M.

RESTATED CERTIFICATE, FILED THE TWENTY-SIXTH DAY OF JANUARY, A.D. 1999, AT 4:30 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE SECOND DAY OF FEBRUARY, A.D. 1999, AT 7:30 O'CLOCK A.M.

CERTIFICATE OF OWNERSHIP, CHANGING ITS NAME FROM "DELPHI AUTOMOTIVE SYSTEMS CORPORATION" TO "DELPHI CORPORATION", FILED THE THIRTEENTH DAY OF MARCH, A.D. 2002, AT 3 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID CORPORATION, "DELPHI CORPORATION".

2944832   8100H

090138516

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 7135321

DATE: 02-13-09

You may verify this certificate online
at corp.delaware.gov/authver.shtml

CERTIFICATE OF INCORPORATION
OF
DELPHI AUTOMOTIVE SYSTEMS CORPORATION

1. The name of the corporation is Delphi Automotive Systems Corporation

2. The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. the name of its registered agent at such address is The Corporation Trust Company.

3. The nature of the business or purposes to be conducted or promoted to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

4. The total number of shares of stock which the corporation shall have authority to issue is one hundred (100) and the par value of each of such shares is ten cents ($0.10) amounting in the aggregate to ten dollars ($10.00).

5. The board of directors is authorized to make, alter or repeal the bylaws of the corporation. Election of directors need not be by written ballot.

6. The name and mailing address of the sole incorporation is:

Barbara A. Lister
General Motors Corporation
3031 West Grand Boulevard
Mail Code 482-208-840
Detroit, Michigan 48232

I, THE UNDERSIGNED, being the incorporator hereinbefore named, for the purpose of forming a corporation pursuant to the General Corporation Law of the State of Delaware, do make this certificate, hereby declaring and certifying that this is my act and deed and the facts herein stated are true, and accordingly have hereunto set my hand this 16th day of September, 1998.

Sole Incorporator

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 10:00 AM 09/16/1998
981358881 - 2944832

**EXHIBIT E**

# Delaware

*PAGE 1*

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "DELPHI CORPORATION" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF INCORPORATION, FILED THE SIXTEENTH DAY OF SEPTEMBER, A.D. 1998, AT 10 O'CLOCK A.M.

RESTATED CERTIFICATE, FILED THE TWENTY-SIXTH DAY OF JANUARY, A.D. 1999, AT 4:30 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE SECOND DAY OF FEBRUARY, A.D. 1999, AT 7:30 O'CLOCK A.M.

CERTIFICATE OF OWNERSHIP, CHANGING ITS NAME FROM "DELPHI AUTOMOTIVE SYSTEMS CORPORATION" TO "DELPHI CORPORATION", FILED THE THIRTEENTH DAY OF MARCH, A.D. 2002, AT 3 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID CORPORATION, "DELPHI CORPORATION".

2944832   8100H

090138516

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 7135321

DATE: 02-13-09

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 03:00 PM 03/13/2002
020167948 − 2944832

# CERTIFICATE OF OWNERSHIP AND MERGER

## MERGING

## DELPHI CORPORATION

## INTO

## DELPHI AUTOMOTIVE SYSTEMS CORPORATION

* * * * * * *

Delphi Automotive Systems Corporation (the "Company"), a corporation organized and existing under the laws of Delaware,

DOES HEREBY CERTIFY:

FIRST: That the Company was incorporated on the 16th day of September, 1998, pursuant to Section 102 of the General Corporation Law of the State of Delaware.

SECOND: That the Company owns all of the outstanding shares of the stock of Delphi Corporation, a corporation incorporated on the 10th day of January, 2002, pursuant to Section 102 of the General Corporation Law of the State of Delaware.

THIRD: That the Company, by the following resolutions of its Board of Directors, duly adopted at a meeting held on the 13th day of March, 2002, determined to and did merge into itself said Delphi Corporation:

WHEREAS, the Board of Directors of Delphi Automotive Systems Corporation, a Delaware corporation (the "Company"), deems it to be advisable and in the best interests of the Company for the Company's name to be changed to "Delphi Corporation" through the merger of Delphi Corporation, a Delaware corporation and wholly-owned subsidiary of the Company ("Merger Sub"), with and into the Company pursuant to Section 253 of the Delaware General Corporation Law, as amended (the "DGCL");

NOW, THEREFORE, be it

RESOLVED, that effective upon the filing of a Certificate of Ownership and Merger with the Secretary of State of Delaware, Merger Sub shall be merged with and into the Company in accordance with Section 253 of the DGCL, with the Company being the surviving corporation (the "Merger");

FURTHER RESOLVED, that by virtue of the Merger and without any action on the part of the holders thereof, each outstanding share of capital stock of the Company (of any class or series) shall remain outstanding, in all respects remaining unaffected, and each outstanding share of capital stock of Merger Sub shall be canceled. Holders of outstanding shares of capital stock of the Company or Merger Sub shall not receive any form of consideration as a result of the Merger;

FURTHER RESOLVED, that pursuant to, and at the effective time of, the Merger, Article I of the Amended and Restated Certificate of Incorporation of the Company shall be amended to read in its entirety as follows:

"The name of the corporation (hereinafter referred to as the 'Corporation') is Delphi Corporation."

FURTHER RESOLVED, that the officers of the Company be, and each of them hereby is, authorized to execute a Certificate of Ownership and Merger setting forth a copy of these resolutions, to cause it to be filed with the Secretary of State of Delaware and to do all acts and things, whether within or without the state of Delaware, which may be necessary or advisable to effect the Merger and the name change.

FOURTH: Anything herein or elsewhere to the contrary notwithstanding, this merger may be amended or terminated and abandoned by the Board of Directors of Delphi Automotive Systems Corporation at any time prior to the time that this merger filed with the Secretary of State becomes effective.

IN WITNESS WHEREOF, said Delphi Automotive Systems Corporation has caused this Certificate to be signed by Diane L. Kaye, its Secretary, this 13th day of March, 2002.

DELPHI AUTOMOTIVE SYSTEMS CORPORATION

By: _____
Diane L. Kaye, Secretary

**EXHIBIT F**

1

EXHIBIT 10.1

EXECUTION COPY

MASTER SEPARATION AGREEMENT

dated as of

December 22, 1998

among

GENERAL MOTORS CORPORATION,

DELPHI AUTOMOTIVE SYSTEMS CORPORATION,

DELPHI AUTOMOTIVE SYSTEMS LLC,

DELPHI TECHNOLOGIES, INC.

and

DELPHI AUTOMOTIVE SYSTEMS (HOLDING), INC.

2

TABLE OF CONTENTS

----------------------------

ARTICLE 1
Definitions

Section 1.01    Defined Terms..............................................2

ARTICLE 2
Contribution and Assumption

Section 2.01    Contribution of Assets.....................................6
Section 2.02    Assumption of Liabilities..................................7
Section 2.03    Methods of  Transfer and Assumption........................7
Section 2.04    Nonassignable Contracts....................................8
Section 2.05    Transition Services........................................8

ARTICLE 3
Ancillary Agreements

Section 3.01    General...................................................10
Section 3.02    Priority.................................................10
Section 3.03    Extensions of Transition Services........................10

ARTICLE 4
Covenants

Section 4.01    IPO and Distribution Agreement...........................10
Section 4.02    Registration Rights Agreement............................10
Section 4.03    Delayed Asset Transfers..................................10

ARTICLE 5
Indemnification

Section 5.01    Indemnification by Delphi................................11
Section 5.02    Indemnification Procedures...............................11
Section 5.03    Certain Limitations......................................12

ARTICLE 6
Access to Information

Section 6.01    Restrictions on Disclosure of Information................13
Section 6.02    Legally Required Disclosure of Confidential Information....13
Section 6.03    Access to Information....................................13
Section 6.04    Record Retention........................................14
Section 6.05    Production of Witnesses..................................16
Section 6.06    Reimbursement...........................................16

i

3

ARTICLE 7
Certain Claims and Litigation

Section 7.01    Product Liability Claims...................................16
Section 7.02    General Litigation........................................17
Section 7.03    Employment Related Claims.................................18
Section 7.04    Cooperation...............................................18

ARTICLE 8
Insurance Matters

Section 8.01    Delphi Insurance Coverage During the Transition Period.....19
Section 8.02    Delphi Insurance Coverage After the Transition Period......20

ARTICLE 9
Miscellaneous

Section 9.01    Entire Agreement..........................................20
Section 9.02    Governing Law.............................................20
Section 9.03    Descriptive Headings......................................20
Section 9.04    Notices...................................................20
Section 9.05    Parties In Interest.......................................21
Section 9.06    Counterparts..............................................21
Section 9.07    Binding Effect; Assignment................................21
Section 9.08    Dispute Resolution........................................21
Section 9.09    Severability..............................................22
Section 9.10    Failure or Indulgence Not Waiver; Remedies Cumulative.......22
Section 9.11    Amendment.................................................22
Section 9.12    Authority.................................................22
Section 9.13    Interpretation............................................22


Schedule A    Ancillary Agreements
Schedule B    Delphi Financial Statements
Schedule C    Facilities to be Transferred
Schedule D    Covenants Not to Compete
Schedule E    Domestic Ownership Interest Transfers
Schedule F    International Ownership Interest Transfers
Schedule G    Extension of Eligibility in the GM Vehicle Purchase Program -
              Used Vehicle Program
Schedule H    Extension of Eligibility in the GM New Vehicle Purchase
              Program
Schedule I    Certain Agreements with Respect to Divested Businesses
Schedule J    Entities in Liquidation by 12/31/98 to be Retained by GM
Schedule K    General Litigation Claims to be Transferred to Delphi
Schedule L    General Litigation Claims to be Defended by GM at Delphi's
              Expense
Schedule M    Delphi Related General Litigation Claims for which GM will
              Retain Liability
Schedule N    Employment Related Claims to be Transferred to Delphi
Schedule O    Employment Related Claims to be Jointly Defended by GM and
              Delphi
Schedule P    Entities Included in Delphi Financial Statements which are to
              be retained by GM after 1/1/99

ii

4

# MASTER SEPARATION AGREEMENT

This Master Separation Agreement ("Agreement") is entered into on December 22, 1998 among General Motors Corporation, a Delaware corporation ("GM"), Delphi Automotive Systems Corporation, a Delaware corporation ("Delphi"), Delphi Automotive Systems LLC, a Delaware limited liability company and, on the date hereof, a wholly owned subsidiary of GM ("DAS LLC"), Delphi Technologies, Inc., a Delaware corporation and, on the date hereof, a wholly owned subsidiary of GM ("DTI", and together with DAS LLC, the "Delphi U.S. Subsidiaries") and Delphi Automotive Systems (Holding), Inc., a Delaware corporation and, on the date hereof, a wholly owned subsidiary of GM ("Delphi International Subsidiary"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article 1 hereof.

## RECITALS

WHEREAS, the Board of Directors of GM has determined that it would be appropriate and desirable to completely separate the Delphi Automotive Systems Business from GM;

WHEREAS, GM has caused Delphi to be incorporated in order to effect such separation, GM currently owns all of the issued and outstanding common stock of Delphi, and Delphi currently conducts no business operations and has no significant assets or liabilities;

WHEREAS, the Boards of Directors of GM and Delphi have each determined that it would be appropriate and desirable for GM to contribute and transfer to Delphi, and for Delphi to receive and assume, directly or indirectly, substantially all of the assets and liabilities currently associated with the Delphi Automotive Systems Business, including those assets and liabilities currently held directly by GM in divisional form and the stock or similar interests currently held by GM in subsidiaries and other entities that conduct such business;

WHEREAS, GM and Delphi intend that the contribution and assumption of assets and liabilities will qualify as a tax-free reorganization under Section 368(a)(1)(D) of the Code;

WHEREAS, GM and Delphi currently contemplate that, following the contribution and assumption of assets and liabilities, Delphi will make an initial public offering of an amount of its common stock that will reduce GM's ownership of Delphi to not less than 80%;

WHEREAS, GM currently contemplates that, several months following such initial public offering, GM will distribute to the holders of its common stock, $1-2/3 par value, by means of an exchange offer and/or a pro rata distribution, all of the shares of Delphi common stock owned by GM (the "Distribution");

WHEREAS, GM and Delphi intend that the Distribution will be tax-free to GM and its stockholders under the Code; and

WHEREAS, the parties intend in this Agreement, including the Exhibits and Schedules hereto, to set forth the principal arrangements between them regarding the separation of the Delphi Automotive Systems Business from GM.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth below, the parties hereto agree as follows:

5

ARTICLE 1

DEFINITIONS

SECTION 1.01. Defined Terms. The following terms, as used herein, shall have the following meanings:

"AFFILIATE" of any specified Person means any other Person directly or indirectly Controlling, Controlled by, or under common Control with, such specified Person; provided, however, that for purposes of this Agreement, (i) GM and its subsidiaries (other than Delphi and its subsidiaries) shall not be considered Affiliates of Delphi and (ii) Delphi and its subsidiaries shall not be considered Affiliates of GM.

"AMENDED AND RESTATED TAX ALLOCATION AGREEMENT" means the Amended and Restated Agreement for the Allocation of Federal, United States, State and Local Income Tax, between GM and Delphi, a copy of which is attached hereto as Exhibit L-3.

"ANCILLARY AGREEMENTS" means each of the agreements which are listed on Schedule A hereto and which are attached as Exhibits A-1 through M-5 to this Agreement, including any exhibits, schedules, attachments, tables or other appendices thereto, and each agreement and other instrument contemplated therein.

"ASSETS" means, except for cash and cash equivalents, any and all assets, properties and rights, whether tangible or intangible, whether real, personal or mixed, whether fixed, contingent or otherwise, and wherever located, including, without limitation, the following:

(i)     real property interests (including leases), land, plants, buildings and improvements;

(ii)    machinery, equipment, vehicles (other than GM Product Evaluation Program vehicles), furniture and fixtures, leasehold improvements, supplies, repair parts, tools, plant, laboratory and office equipment and other tangible personal property, including any and all leases with respect thereto, together with any rights or claims arising out of the breach of any express or implied warranty by the manufacturers or sellers of any of such assets or any component part thereof;

(iii)   inventories, including raw materials, work-in-process, finished goods, parts and accessories;

(iv)    notes, loans and accounts receivable (whether current or not current), interests as beneficiary under letters of credit, advances and performance and surety bonds;

(v)     banker's acceptances, shares of stock, bonds, debentures, evidences of indebtedness, certificates of interest or participation in profit-sharing agreements, collateral-trust certificates, investment contracts, voting trust certificates, puts, calls, straddles, options, swaps, collars, caps and other securities or hedging arrangements of any kind;

(vi)    financial, accounting and operating data and records including, without limitation, books, records, electronic data, notes, sales and sales promotional data, purchasing materials and data, advertising materials, credit information, cost and pricing information, customer and supplier lists, reference catalogs, payroll and personnel records, facility blueprints and plant layouts, minute books, stock ledgers, stock transfer records and other similar property, rights and information;

(vii)   Intellectual Property;

(viii)  Contracts and all rights therein;

2

6

        (ix)    prepaid expenses, deposits and retentions held by third parties;

        (x)    claims, causes of action, choses in action, rights under insurance policies, rights under express or implied warranties, rights of recovery, rights of set-off, and rights of subrogation;

        (xi)    licenses, franchises, permits, authorizations and approvals; and

        (xii)    goodwill and going concern value.

    "BUSINESS DAY" means a day other than a Saturday, a Sunday or a day on which banking institutions located in the State of New York or Michigan are authorized or obligated by law or executive order to close.

    "CODE" means the Internal Revenue Code of 1986, as amended from time to time, together with the rules and regulations promulgated thereunder.

    "COMMERCIAL TRAVEL SERVICES SUPPLY AGREEMENT" means the Commercial Travel Services Supply Agreement, effective as of the date Contribution Date, between GM and Delphi (or their respective Affiliates), a copy of which is attached hereto as Exhibit J-2.

    "COMMISSION" means the Securities and Exchange Commission.

    "CONFIDENTIAL INFORMATION" means with respect to any party hereto, (i) any Information concerning such party, its business or any of its Affiliates that was obtained by another party hereto prior to the Contribution Date, (ii) any Information concerning such party that is obtained by another party under Section 6.03, or (iii) any other Information obtained by, or furnished to, another party hereto prior to the Contribution Date, in each case that (a) was marked "Proprietary" or "Company Private" or words of similar import by the party owning such Information, or any Affiliate of such party, or (b) the party owning such Information notified such other party in writing was confidential or secret by the Contribution Date.

    "CONSOLIDATED TAX PERIOD" has the meaning set forth in the Amended and Restated Tax Allocation Agreement.

    "CONTRACTS" means any contract, agreement, lease, license, sales order, purchase order, instrument or other commitment that is binding on any Person or any part of its property under applicable law.

    "CONTRIBUTION DATE" means January 1, 1999.

    "CONTROL" means the possession, direct or indirect, of the power to direct or cause the direction of the management of the policies of a Person, whether through the ownership of voting securities, by contract or otherwise. "CONTROLLING" and "CONTROLLED" have the corollary meanings ascribed thereto.

    "DELPHI ASSETS" means all of GM's right, title and interest in and to all Assets that (i) (x) are, except as set forth on Schedule P or as otherwise provided herein or in an Ancillary Agreement, reflected in the Delphi Financial Statements and not disposed of by GM after the date thereof and before the Contribution Date (including assets written off or expensed but still used by Delphi which Delphi can demonstrate to GM's reasonable satisfaction were paid for by the Delphi Automotive Systems Sector of GM) or (y) are to be transferred pursuant to Section 2.01(c) of this Agreement (as and when transferred thereunder) or (ii) are acquired by the Delphi Automotive Systems Business after the date of the Delphi Financial Statements and would be reflected in the financial statements of Delphi as of the Contribution Date if such financial statements were prepared using the same accounting principles under which the Delphi Financial Statements were prepared, or (iii) are expressly provided by this Agreement or any Ancillary Agreement to be transferred to Delphi, or (iv) are listed on Schedule C hereto (which sets forth the facilities to be transferred to Delphi) or (v) except as otherwise provided in an Ancillary Agreement or other express agreement of the parties, are used exclusively by the Delphi Automotive Systems Business as of the Contribution

3

7

Date; provided, unless the parties otherwise expressly agree, that if the
accounting principles under which the Delphi Financial Statements were prepared
would have required any Asset described in the preceding clause (v) to be
reflected in the Delphi Financial Statements as of the date thereof, then such
Asset shall be included in the "Delphi Assets" only if so reflected.

"DELPHI AUTOMOTIVE SYSTEMS BUSINESS" means the business conducted by
the Delphi Automotive Systems Sector of GM at any time on or before the
Contribution Date, including (i) all business operations whose financial
performance is reflected in the Delphi Financial Statements, (ii) all business
operations initiated or acquired by the Delphi Automotive Systems Sector of GM
after the date of the Delphi Financial Statements and (iii) all business
operations that were conducted at any time in the past by the Delphi Automotive
Systems Sector of GM or by any predecessor of such Sector (including, without
limitation, the GM Automotive Components Group) but were discontinued or
disposed of prior to the date of the Delphi Financial Statements other than by
transfer or disposition to any other Sector of GM.

"DELPHI COMMON STOCK" means the Common Stock, $0.01 par value per
share, of Delphi.

"DELPHI FINANCIAL STATEMENTS" means the financial statements
(including the notes thereto) of Delphi for the period ended September 30, 1998
as set forth in the IPO Registration Statement as amended at the date of this
Agreement, a copy of which is set forth on Schedule B attached hereto.

"DELPHI LIABILITIES" means all of the Liabilities of GM that (i) (x)
are, except as otherwise set forth on Schedule P or as otherwise provided herein
or in an Ancillary Agreement, reflected in the Delphi Financial Statements and
remain outstanding at the Contribution Date or (y) are to be transferred
pursuant to Section 2.01(c) of this Agreement (as and when transferred
thereunder), or (ii) arise in connection with the Delphi Automotive Systems
Business after the date of the Delphi Financial Statements and would be
reflected in financial statements of Delphi as of the Contribution Date if such
financial statements were prepared using the same accounting principles under
which the Delphi Financial Statements were prepared, or (iii) are expressly
provided by this Agreement or any Ancillary Agreement to be transferred to and
assumed by Delphi, or (iv) except as otherwise provided in an Ancillary
Agreement or other express agreement of the parties, are related to or arise out
of or in connection with the Delphi Assets, or (v) except as otherwise provided
in an Ancillary Agreement or other express agreement of the parties, are related
to or arise out of or in connection with the Delphi Automotive Systems Business
(including but not limited to the covenants not to compete entered into by GM
prior to the Contribution Date set forth on Schedule D hereto) whether before or
after the date of the Delphi Financial Statements; provided, unless the parties
otherwise expressly agree, that if the accounting principles under which the
Delphi Financial Statements were prepared would have required any liabilities
described in the preceding clause (v) to be reflected in the Delphi Financial
Statements as of the date thereof, then such liabilities shall be considered to
be "Delphi Liabilities" only if so reflected.

"DETERMINATION" has the meaning set forth in the NITA.

"DISTRIBUTION" has the meaning set forth in the preamble to this
Agreement.

"DISTRIBUTION DATE" means the date to be determined by GM in its sole
and absolute discretion when the Distribution is completed.

"EMPLOYEE MATTERS AGREEMENT" means the Employee Matters Agreement,
effective as of the Contribution Date, between GM and Delphi (or their
respective Affiliates), a copy of which is attached hereto as Exhibit B-1.

"FINANCIAL SERVICES SUPPLY AGREEMENT" means the Financial Services
Supply Agreement, effective as of the Contribution Date, between GM and Delphi
(or their respective Affiliates), a copy of which is attached hereto as Exhibit
J-4.

4

8

"FINAL DETERMINATION" has the meaning set forth in the Amended and Restated Tax Allocation Agreement.

"INCOME TAX RETURNS" has the meaning set forth in the Amended and Restated Tax Allocation Agreement.

"INFORMATION" means all records, books, contracts, instruments, computer data and other data.

"INTELLECTUAL PROPERTY" means any and all domestic and foreign patents and patent applications, together with any continuations, continuations-in-part or divisional applications thereof, and all patents issuing thereon (including reissues, renewals and re-examinations of the foregoing); invention disclosures; mask works; copyrights, and copyright applications and registrations; trademarks, servicemarks, trade names, and trade dress, in each case together with any applications and registrations therefor and all appurtenant goodwill relating thereto; trade secrets, commercial and technical information, know-how, proprietary or confidential information, including engineering, production and other designs, notebooks, processes, drawings, specifications, formulae, and technology; computer and electronic data processing programs and software (object and source code), data bases and documentation thereof; inventions (whether patented or not); and all other intellectual property under the laws of any country throughout the world.

"IPO AND DISTRIBUTION AGREEMENT" means the agreement to be entered into between GM and Delphi on or before the IPO Effective Date, the form of which is attached hereto as Exhibit E-1.

"IPO EFFECTIVE DATE" means the date on which the IPO Registration Statement is declared effective by the Commission.

"IPO REGISTRATION STATEMENT" means the registration statement on Form S-1, Registration No. 333-67333 filed by Delphi with the Securities and Exchange Commission in connection with the initial public offering of the Delphi Common Stock, together with all amendments and supplements thereto.

"LIABILITIES" means any and all debts, liabilities, guarantees, assurances, commitments and obligations, whether fixed, contingent or absolute, asserted or unasserted, matured or unmatured, liquidated or unliquidated, accrued or not accrued, known or unknown, due or to become due, whenever or however arising (including, without limitation, whether arising out of any Contract or tort based on negligence or strict liability) and whether or not the same would be required by generally accepted accounting principles to be reflected in financial statements or disclosed in the notes thereto.

"NITA" means the Agreement for the Indemnification of United States Federal, State and Local Non-Income Taxes, between GM and Delphi, a copy of which is attached hereto as Exhibit L-2.

"NON-INCOME TAXES" has the meaning set forth in the NITA.

"PERSON" means an individual, partnership, limited liability company, joint venture, corporation, trust, unincorporated association, any other entity, or a government or any department or agency or other unit thereof.

"PRIOR RELATIONSHIP" means the ownership relationship between GM and Delphi at any time prior to the Contribution Date.

"REGISTRATION RIGHTS AGREEMENT" means the agreement to be entered into between GM and Delphi on or before the IPO Effective Date, the form of which is attached hereto as Exhibit E-2.

"REPRESENTATIVES" means directors, officers, employees, agents, consultants, advisors, accountants, attorneys and representatives.

9

"SUBSIDIARY" means with respect to any specified Person, any corporation, any limited liability company, any partnership or other legal entity of which such Person or any of its Subsidiaries Controls or owns, directly or indirectly, more than 50% of the stock of other equity interest entitled to vote on the election of the members to the board of directors or similar governing body.

"SUPPLY AGREEMENT" means the Component Supply Agreement, effective as of the Contribution Date, between GM and Delphi, a copy of which is attached hereto as Exhibit K-1.

"THIRD-PARTY CLAIM" means any claim, suit, arbitration, inquiry, proceeding or investigation by or before any court, governmental or other regulatory or administrative agency or commission or any arbitration tribunal asserted by a Person other than any party hereto or their respective Affiliates which gives rise to a right of indemnification hereunder.


ARTICLE 2

CONTRIBUTION AND ASSUMPTION

SECTION 2.01. Contribution of Assets.

(a) Except as provided for in Section 2.01(c), on the Contribution Date, GM (i) hereby transfers (or causes its appropriate Subsidiaries and Representatives to transfer) the Delphi Assets in the following order: (A) all intellectual property to be transferred pursuant to the intellectual property agreements attached hereto as Exhibits G-1 through G-5, to DTI (except that all Delco Electronics Corporation intellectual property shall be transferred to DTI after GM has transferred its stock ownership interest in DTI to Delco Electronics Corporation), (B) its stock ownership interest in DTI to Delco Electronics Corporation, (C) its stock ownership interest in Delco Electronics Corporation to DAS LLC and (D) all other Delphi Assets located in the United States, including the ownership interests listed on Schedule E but excluding those listed on Schedule F, to either Delphi or DAS LLC, and (ii) will have transferred or shall transfer as promptly as reasonably practicable (or cause its appropriate Subsidiaries and Representatives to transfer) the Delphi Assets located outside of the United States and the ownership interests of the United States and foreign entities listed on Schedule F owning such Delphi Assets, to either Delphi, the Delphi International Subsidiary, or such other Subsidiary as Delphi may direct. Each of Delphi, the Delphi U.S. Subsidiaries and Delphi International Subsidiary shall receive and accept such Delphi Assets, subject to the terms and conditions of this Agreement. GM further transfers to Delphi on the Contribution Date but after the transfers described in clause (i) above, its membership interest in DAS LLC and its stock ownership interest in the Delphi International Subsidiary, effective as of the Contribution Date. Each of Delphi, the Delphi U.S. Subsidiaries and Delphi International Subsidiary acknowledges and agrees that the foregoing transfers will be made "AS IS WHERE IS" and that neither GM nor any Subsidiary of GM has made or will make any warranty, express or implied, including without limitation any warranty of merchantability or fitness for a particular purpose, with respect to any Delphi Asset.

(b) On the Contribution Date, GM shall contribute to Delphi cash and/or cash equivalents in the aggregate amount of $1 billion. Additionally, GM shall contribute to Delphi such additional amounts as GM and Delphi agree, corresponding to the amounts Delphi will pay to GM (or an Affiliate of GM) in connection with the Canada and Brazil transactions described in Exhibits H-1 and H-2, respectively.

(c) Notwithstanding any other provision of this Agreement, this Agreement shall not transfer or effect the assignment or assumption of any Assets or Liabilities of the Delphi Automotive Systems Business provided for in the agreements constituting Exhibits H-1 through H-110 referred to in Schedule A to this Agreement, except as such Assets and Liabilities shall be transferred and assumed on the dates and in accordance with the terms set forth herein and in such agreements.

6

10

(d) GM and Delphi additionally shall comply with the terms of the letters from GM to Delphi, copies of which are attached hereto as Schedules G and H, which relate to the extension of eligibility for Delphi employees to participate in the GM Vehicle Purchase Programs.

SECTION 2.02.   Assumption of Liabilities.

(a) General. Effective as of the Contribution Date, each of Delphi and/or the Delphi U.S. Subsidiaries, as directed by Delphi, hereby assumes and on a timely basis shall pay, perform, satisfy and discharge in accordance with their terms the Delphi Liabilities relating to the operations of the Delphi Automotive Systems Business in the United States. Delphi International Subsidiary shall, and shall utilize its best efforts to recommend and encourage its respective Subsidiaries and Affiliates to, assume and on a timely basis pay, perform, satisfy and discharge in accordance with their terms, the Delphi Liabilities relating to the operations of the Delphi Automotive Systems Business outside of the United States.

(b) Divested Business. Delphi shall, with respect to the businesses and operations divested by the Delphi Automotive Systems Business, assume all Liabilities of GM related thereto; provided, however, that Delphi shall not assume those Liabilities relating to operations divested by the Delphi Automotive Systems Business to the extent such Liabilities are expressly retained by GM pursuant to the terms of this Agreement or the Ancillary Agreements (including without limitation, the Employee Matters Agreement, the Environmental Matters Agreement and the Real Estate Matters Agreement) and the Liabilities assumed by Delphi shall include, without limitation, the obligation to satisfy all of the obligations of GM under the various agreements pursuant to which the Delphi Automotive Systems Business effected such divestitures (the "Divestiture Agreements"); provided, further, however, that notwithstanding the foregoing or any other provision of this Agreement or any Ancillary Agreement, responsibility for certain obligations relating to certain divestitures shall be allocated between the parties as set forth on Schedule I hereto.

(c) Machinery and Equipment Leases Related to the Delphi Automotive Systems Business. The parties hereto hereby agree that to the extent that GM entered into a lease with a third party dated prior to the Contribution Date pursuant to which GM agreed to lease (i) machinery and/or equipment for use by the Delphi Automotive Systems Business and (ii) machinery and/or equipment for use by GM businesses other than the Delphi Automotive Systems Business, upon identification of any such lease, GM and Delphi will enter into a sublease with terms identical or as similar as possible to such original lease pursuant to which Delphi will sublease from GM that portion of the machinery and/or equipment used by the Delphi Automotive Systems Business covered under such original lease.

(d) Nonrecurring Costs and Expenses. Notwithstanding anything herein to the contrary, any nonrecurring costs and expenses incurred by the parties hereto to effect the transactions contemplated hereby which are not allocated pursuant to the terms of this Agreement or any Ancillary Agreement shall be the responsibility of the party which incurs such costs and expenses.

SECTION 2.03.   Methods of Transfer and Assumption.

(a) The parties shall enter into the Ancillary Agreements, other than the IPO and Distribution Agreement and the Registration Rights Agreement, on or about the date of this Agreement. To the extent that the transfer of any Delphi Asset or the assumption of any Delphi Liability is expressly provided for by the terms of any Ancillary Agreement, the terms of such Ancillary Agreement shall determine the manner of the transfer or assumption. It is the intent of the parties that pursuant to Section 2.01, the transfer and assumption of all other Delphi Assets and Delphi Liabilities shall be made effective as of the Contribution Date, provided, however, that circumstances in various jurisdictions outside the United States may require the transfer of certain Assets and the assumption of certain Liabilities to occur in such other manner and at such other time as the parties shall agree.

(b) The parties intend to complete the transfer of all Delphi Assets and the assumption of all Delphi Liabilities effective on or prior to the Contribution Date but shall, subject to Section 4.03 hereof, and to the extent

7

11

that any such transfers and assumptions are not completed prior to the
Contribution Date, take all actions reasonably necessary or appropriate to
complete such transactions as promptly thereafter as possible. In addition to
those transfers and assumptions accurately identified and designated by the
parties to take place but which the parties are not able to effect prior to the
Contribution Date, there may exist (i) Assets that the parties discover were,
contrary to the agreements between the parties, by mistake or omission,
transferred to Delphi or retained by GM or (ii) Liabilities that the parties
discover were, contrary to the agreements between the parties, by mistake or
omission, assumed by Delphi or not assumed by Delphi. The parties shall, between
the Contribution Date and the earlier of the Distribution Date or six months
from the Contribution Date, cooperate in good faith to effect the transfer or
re-transfer of such Assets, and/or the assumption or re-assumption of such
Liabilities, to or by the appropriate party and shall not use the determination
of remedial actions contemplated herein to alter the original intent of the
parties hereto with respect to the Assets to be transferred to or Liabilities to
be assumed by Delphi. Each party shall reimburse the other or make other
financial adjustments (e.g., without limitation, cash reserves) or other
adjustments to remedy any mistakes or omissions relating to any of the Assets
transferred hereby or any of the Liabilities assumed hereby.

(c)    Each party shall execute and deliver to each other party all such
documents, instruments, certificates and agreements in appropriate form, and to
make all filings and recordings and to take all such other actions, as shall be
necessary or reasonably requested by such other party, whether before or after
the Contribution Date, in order to give full effect to and evidence and perfect
the transfer and contribution of the Delphi Assets and the Delphi Liabilities as
contemplated hereby. However, Delphi acknowledges and agrees that neither GM nor
any Subsidiary of GM will comply with the provisions of any bulk transfer law of
any jurisdiction in connection with the transfer of any Delphi Asset.

(d)    Any Subsidiary of Delphi that will receive any Delphi Asset or
assume any Delphi Liability shall for all purposes be deemed to be a party to
this Agreement.

SECTION 2.04. Nonassignable Contracts. Anything contained herein to the
contrary notwithstanding, this Agreement shall not constitute an agreement to
assign any Asset or Liability if an assignment or attempted assignment of the
same without the consent of another Person would constitute a breach thereof or
in any way impair the rights of a party thereunder or give to any third party
any rights with respect thereto. If any such consent is not obtained or if an
attempted assignment would be ineffective or would impair such party's rights
under any such Asset or Liability so that the party entitled to the benefits and
responsibilities of such purported transfer (the "Intended Transferee") would
not receive all such rights and responsibilities, then (x) the party purporting
to make such transfer (the "Intended Transferor") shall use commercially
reasonable efforts to provide or cause to be provided to the Intended
Transferee, to the extent permitted by law, the benefits of any such Asset or
Liability and the Intended Transferor shall promptly pay or cause to be paid to
the Intended Transferee when received all moneys received by the Intended
Transferor with respect to any such Asset and (y) in consideration thereof the
Intended Transferee shall pay, perform and discharge on behalf of the Intended
Transferor all of the Intended Transferor's Liabilities thereunder in a timely
manner and in accordance with the terms thereof which it may do without breach.
In addition, the Intended Transferor shall take such other actions as may
reasonably be requested by the Intended Transferee in order to place the
Intended Transferee, insofar as reasonably possible, in the same position as if
such Asset had been transferred as contemplated hereby and so all the benefits
and burdens relating thereto, including possession, use, risk of loss, potential
for gain and dominion, control and command, shall inure to the Intended
Transferee. If and when such consents and approvals are obtained, the transfer
of the applicable Asset shall be effected in accordance with the terms of this
Agreement. To the extent that the Delphi Liabilities include liabilities,
obligations or commitments pursuant to any contract, permit, license, franchise
or other Asset to which Delphi also has any rights, GM shall, to the extent such
asset is not a Delphi Asset, upon request by Delphi either assign such rights to
Delphi or assert and seek to enforce such rights for the benefit of Delphi.

SECTION 2.05.   Transition Services.

(a)    For a period of twelve months following the Contribution Date
(the "Transition Period"), GM shall use its reasonable best efforts to provide,
or cause its Affiliates to use their reasonable best efforts to provide,

8

12

to Delphi or its Affiliates all Transition Services in the manner and at a
relative level of service consistent in all material respects with that provided
by GM or its Affiliates to the Delphi Automotive Systems Business immediately
prior to the Contribution Date. Delphi shall use all commercially reasonable
efforts to obtain all such Transition Services from a source other than GM and
its Affiliates commencing upon the conclusion of the Transition Period; provided
that, if (x) Delphi cannot obtain any Transition Service from a source other
than GM and its Affiliates and (y) such Transition Service is necessary in order
to operate the Delphi Automotive Systems Business in substantially the same
manner as it was conducted immediately prior to the Contribution Date, then GM
(or its Affiliates) shall provide such Transition Service to Delphi (or its
Affiliates) for an additional period not to exceed six months. For the purpose
of this Section 2.05, "Transition Services" means any services provided by GM,
its Affiliates or their suppliers to the Delphi Automotive Systems Business
immediately prior to the Contribution Date which Delphi reasonably identifies
and requests in writing that GM provide to it during the Transition Period;
provided that Transition Services expressly excludes any such services which
shall be provided to Delphi or its Affiliates pursuant to the terms of other
sections of this Agreement or any of the Ancillary Agreements; provided,
further, that Transition Services expressly excludes any such services which GM
would not be legally permitted to provide to a third party.

(b)   Notwithstanding anything contained in this Agreement or in any
Ancillary Agreement to the contrary, except with respect to all services to be
provided by GM to Delphi pursuant to the Financial Services Supply Agreement,
the Commercial Travel Services Supply Agreement, any real estate leases and any
health care services to be provided by GM to Delphi pursuant to the Employee
Matters Agreement, for all Transition Services provided by GM (or its
Affiliates) to Delphi (or its Affiliates) pursuant to section 2.05(a) above and
for all other services to be provided by GM (or its Affiliates) to Delphi (or
its Affiliates) pursuant to any of the Ancillary Agreements, Delphi shall pay to
GM on or prior to the fifteenth day following the date of Delphi's receipt of an
invoice related to the provision of such services (x) in the case of any
Transition Service or any service to be provided pursuant to an Ancillary
Agreement in which a payment amount or formula has not been set forth, an amount
equal to the cost historically allocated to the Delphi Automotive Systems
Business as of the Contribution Date for such service, adjusted to reflect any
changes in the nature, cost or level of the services provided; provided that, if
no cost has historically been allocated to the Delphi Automotive Systems
Business for any Transition Service or for such other service, then Delphi shall
pay to GM (i) that portion of the total cost borne by GM which GM would have
allocated to Delphi under its internal allocation formula, plus (ii) any direct
user charges or similar type charges resulting from Delphi's use or services
which are not recouped by GM under the charges provided for in (i), plus (iii)
any other reasonable charges necessary to make GM whole for the provision of
such services or (y) in the case of any service to be provided pursuant to an
Ancillary Agreement in which a payment amount or formula has been set forth, the
amount owed pursuant to the terms of such Ancillary Agreement. Payments under
this Section made on or after the first business day following the forty-fifth
day after the date of Delphi's receipt of the invoice related to the provision
of the relevant service shall be accompanied by a payment of interest to be
calculated as follows:

Transitional Service (or other service) Payment x Prime Rate x Number of days late, to
                                                  ----------    the date of actual
                                                  365 days      payment.

As used in this Section 2.05(b), the "Prime Rate" shall mean to the prime rate
as published in the Wall Street Journal on the first business day following the
forty-fifth day after the date of Delphi's receipt of the invoice related to the
provision of the relevant service.

(c)   Notwithstanding anything contained in this Agreement or in any
Ancillary Agreement to the contrary, any charges to GM from outside suppliers
for the provision of Transition Services or any other services provided pursuant
to any Ancillary Agreement and any other costs which are attributable to the
operation of Delphi other than incidental costs provided in connection with
Transition Services or such other services which GM (or an Affiliate of GM)
incurs shall be submitted by GM to Delphi for payment and, except as GM may
otherwise agree in connection with any individual statement of charges which has
been submitted to GM, Delphi hereby agrees to make payment therefor either (i)
to such outside supplier in accordance with the payment terms of such outside
supplier or (ii) where GM is required to pay such outside supplier, on or before
the date on which GM notifies

9

13

Delphi it intends to make payment, or if GM does not provide such notice, immediately after GM provides notice to Delphi that GM has made such payment.

(d)    Notwithstanding anything to the contrary herein, Delphi shall be responsible for providing the transitional services agreed to by the parties (or, where no specific terms have been agreed to, then in accordance with the terms of Section 2.05(b) hereof) with respect to the businesses set forth on Schedule J hereto.


ARTICLE 3

ANCILLARY AGREEMENTS

(a)    General. GM and Delphi acknowledge that the Ancillary Agreements, other than the IPO and Distribution Agreement and the Registration Rights Agreement, have been or will be entered into prior to the Contribution Date by the parties hereto and/or by their respective Subsidiaries. GM and Delphi shall take all steps reasonably necessary to cause their respective Subsidiaries and Affiliates to enter into and perform such Ancillary Agreements in accordance with their terms.

(b)    Priority. Except with respect to Sections 2.05 (b) and (c) above, to the extent that any Ancillary Agreement expressly addresses any matters addressed by this Agreement, including, without limitation, matters covered by Article 2 and Article 5 hereof, the terms and conditions of such Ancillary Agreement shall govern the rights and obligations of the parties with respect to such matters.

(c)    Extensions of Transition Services. Delphi shall use all commercially reasonable efforts to obtain services provided to it by GM under the terms of the Ancillary Agreements relating to transitional services from a source other than GM. Certain Ancillary Agreements relating to transitional services provide that the parties may extend the transition service beyond the termination of the transition periods provided for therein. The parties expect that any such extension would be negotiated by GM and Delphi after the Distribution. In the event of an extension of any transitional service, GM and Delphi shall negotiate at arm's length the terms of any such extension, including fair market value pricing for all such services.


ARTICLE 4

COVENANTS


SECTION 4.01. IPO and Distribution Agreement. GM and Delphi hereby agree to execute and deliver, on or before the IPO Effective Date, the IPO and Distribution Agreement, in form and substance substantially as set forth on Exhibit E-1 hereto, with such modifications to such form as the parties shall mutually deem reasonably necessary and desirable; provided, that GM shall be entitled in its sole and absolute discretion at any time and from time to time to make any modifications to the provisions thereof relating to the preservation of the tax-free nature of the Distribution or the tax-free nature of the transactions contemplated hereby as it shall reasonably deem necessary or desirable.

SECTION 4.02. Registration Rights Agreement. GM and Delphi hereby agree to execute and deliver, on or before the IPO Effective Date, the Registration Rights Agreement, in form and substance substantially as set forth on Exhibit E-2 hereto, with such modifications to such form as the parties shall mutually deem reasonably necessary and desirable.

SECTION 4.03. Delayed Asset Transfers. GM and Delphi hereby agree to use their best efforts and, where applicable, to cause their subsidiaries to use their best efforts to consummate the transactions contemplated by

14

Section 2.01(c) hereof and the other provisions hereof as and when contemplated in the relevant Ancillary Agreements.

ARTICLE 5

INDEMNIFICATION

SECTION 5.01. Indemnification by Delphi. Delphi and each Subsidiary of Delphi which shall receive any Delphi Asset or Delphi Liability transferred pursuant to the terms of this Agreement and their respective successors-in-interest and assigns (the "Indemnifying Parties") shall jointly and severally indemnify, defend and hold harmless GM and each of its Subsidiaries and their respective successors-in-interest, and each of their respective past and present Representatives (the "Indemnitees") against any losses, claims, damages, liabilities or actions, resulting from, relating to or arising, whether prior to or following the Contribution Date, out of or in connection with (a) the Delphi Liabilities and/or (b) Delphi's conduct of its business and affairs after the Contribution Date and the Indemnifying Parties shall reimburse such entity, each such Subsidiary, each such successor-in-interest and each such Representative for any reasonable attorneys' fees or any other expenses reasonably incurred by any of them in connection with investigating and/or defending any such loss, claim, damage, liability or action.

SECTION 5.02.  Indemnification Procedures.

(a)   If any Indemnitee receives notice of the assertion of any Third-Party Claim with respect to which an Indemnifying Party is obligated under this Agreement to provide indemnification, such Indemnitee shall promptly give such Indemnifying Party notice thereof (together with a copy of such Third-Party Claim, process or other legal pleading) promptly after becoming aware of such Third-Party Claim; provided, however, that the failure of any Indemnitee to give notice as provided in this Section 5.02 shall not relieve any Indemnifying Party of its obligations under this Section 5.02, except to the extent that such Indemnifying Party is actually prejudiced by such failure to give notice. Such notice shall describe such Third-Party Claim in reasonable detail.

(b)   An Indemnifying Party, at such Indemnifying Party's own expense and through counsel chosen by such Indemnifying Party (which counsel shall be reasonably acceptable to the Indemnitee), may elect to defend any Third-Party Claim. If an Indemnifying Party elects to defend a Third-Party Claim, then, within ten Business Days after receiving notice of such Third-Party Claim (or sooner, if the nature of such Third Party claim so requires), such Indemnifying Party shall notify the Indemnitee of its intent to do so, and such Indemnitee shall cooperate in the defense of such Third-Party Claim. Such Indemnifying Party shall pay such Indemnitee's reasonable out-of-pocket expenses incurred in connection with such cooperation. Such Indemnifying Party shall keep the Indemnitee reasonably informed as to the status of the defense of such Third-Party Claim. After notice from an Indemnifying Party to an Indemnitee of its election to assume the defense of a Third-Party Claim, such Indemnifying Party shall not be liable to such Indemnitee under this Section 5.02 for any attorneys' fees or other expenses subsequently incurred by such Indemnitee in connection with the defense thereof other than those expenses referred to in the preceding sentence; provided, however, that such Indemnitee shall have the right to employ one law firm as counsel, together with a separate local law firm in each applicable jurisdiction ("Separate Counsel"), to represent such Indemnitee in any action or group of related actions (which firm or firms shall be reasonably acceptable to the Indemnifying Party) if, in such Indemnitee's reasonable judgment at any time, either a conflict of interest between such Indemnitee and such Indemnifying Party exists in respect of such claim, or there may be defenses available to such Indemnitee which are significantly different from or in addition to those available to such Indemnifying Party and the representation of both parties by the same counsel would, in the reasonable judgment of the Indemnitee, be inappropriate, and in that event (i) the reasonable fees and expenses of such Separate Counsel shall be paid by such Indemnifying Party (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one Separate Counsel (excluding local counsel) with respect to any Third-Party Claim (even if against multiple Indemnitees)) and (ii) each of such Indemnifying Party and such Indemnitee shall have the right to conduct its own defense in respect of such claim. If an Indemnifying Party elects not to defend against a Third-Party Claim, or fails to notify an Indemnitee of its election as provided in this Section 5.02 within the period of ten Business

11

15

Days described above, the Indemnitee may defend, compromise, and settle such
Third-Party Claim and shall be entitled to indemnification hereunder (to the
extent permitted hereunder); provided, however, that no such Indemnitee may
compromise or settle any such Third-Party claim without the prior written
consent of the Indemnifying Party, which consent shall not be unreasonably
withheld or delayed. Notwithstanding the foregoing, the Indemnifying Party shall
not, without the prior written consent of the Indemnitee, (i) settle or
compromise any Third-Party Claim or consent to the entry of any judgment which
does not include as an unconditional term thereof the delivery by the claimant
or plaintiff to the Indemnitee of a written release from all liability in
respect of such Third-Party Claim or (ii) settle or compromise any Third-Party
Claim in any manner that would be reasonably likely to have a material adverse
effect on the Indemnitee.

SECTION 5.03.  Certain Limitations.

(a)    The amount of any indemnifiable losses or other liability for
which indemnification is provided under this Agreement shall be net of any
amounts actually recovered by the Indemnitee from third parties (including,
without limitation, amounts actually recovered under insurance policies) with
respect to such indemnifiable losses or other liability. Any Indemnifying Party
hereunder shall be subrogated to the rights of the Indemnitee upon payment in
full of the amount of the relevant indemnifiable loss. An insurer who would
otherwise be obligated to pay any claim shall not be relieved of the
responsibility with respect thereto or, solely by virtue of the indemnification
provision hereof, have any subrogation rights with respect thereto. If any
Indemnitee recovers an amount from a third party in respect of an indemnifiable
loss for which indemnification is provided in this Agreement after the full
amount of such indemnifiable loss has been paid by an Indemnifying Party or
after an Indemnifying Party has made a partial payment of such indemnifiable
loss and the amount received from the third party exceeds the remaining unpaid
balance of such indemnifiable loss, then the Indemnitee shall promptly remit to
the Indemnifying Party the excess (if any) of (A) the sum of the amount
theretofore paid by such Indemnifying Party in respect of such indemnifiable
loss plus the amount received from the third party in respect thereof, less (B)
the full amount of such indemnifiable loss or other liability.

(b)    The amount of any loss or other liability for which
indemnification is provided under this Agreement shall be (i) increased to take
account of any net tax cost incurred by the Indemnitee arising from the receipt
or accrual of an indemnification payment hereunder (grossed up for such
increase) and (ii) reduced to take account of any net tax benefit realized by
the Indemnitee arising from incurring or paying such loss or other liability. In
computing the amount of any such tax cost or tax benefit, the Indemnitee shall
be deemed to recognize all other items of income, gain, loss, deduction or
credit before recognizing any item arising from the receipt or accrual of any
indemnification payment hereunder or incurring or paying any indemnified loss.
Any indemnification payment hereunder shall initially be made without regard to
this Section 5.03(b) and shall be increased or reduced to reflect any such net
tax cost (including gross-up) or net tax benefit only after the Indemnitee has
actually realized such cost or benefit. For purposes of this Agreement, an
Indemnitee shall be deemed to have "actually realized" a net tax cost or a net
tax benefit to the extent that, and at such time as, the amount of taxes payable
by such Indemnitee is increased above or reduced below, as the case may be, the
amount of taxes that such Indemnitee would be required to pay but for the
receipt or accrual of the indemnification payment or the incurrence or payment
of such loss, as the case may be. The amount of any increase or reduction
hereunder shall be adjusted to reflect any Final Determination with respect to
the Indemnitee's liability for taxes, and payments between such indemnified
parties to reflect such adjustment shall be made if necessary.

(c)    Any indemnification payment made under this Agreement shall be
characterized for tax purposes as if such payment were made immediately prior to
the Contribution Date.

12

16

ARTICLE 6

ACCESS TO INFORMATION

SECTION 6.01  Restrictions on Disclosure of Information.

(a)    Without limiting any rights or obligations under any other
agreement between or among the parties hereto and/or any of their respective
Affiliates relating to confidentiality, for a period of three years following
the Contribution Date, each of the parties hereto agrees that it shall not, and
shall not permit any of its Affiliates or Representatives to, disclose any
Confidential Information to any Person, other than to such Affiliates or
Representatives on a need-to-know basis in connection with the purpose for which
the Confidential Information was originally disclosed. Notwithstanding the
foregoing, each of the parties hereto and its respective Affiliates and
Representatives may disclose such Confidential Information, and such Information
shall no longer be deemed Confidential Information, to the extent that such
party can demonstrate that such Confidential Information is or was (i) available
to such party outside the context of the Prior Relationship on a nonconfidential
basis prior to its disclosure by the other party, (ii) in the public domain
other than by the breach of this Agreement or by breach of any other agreement
between or among the parties hereto and/or any of their respective Affiliates
relating to confidentiality, or (iii) lawfully acquired outside the context of
the Prior Relationship on a nonconfidential basis or independently developed by,
or on behalf of, such party by Persons who do not have access to, or
descriptions of, any such Confidential Information. Additionally,
notwithstanding anything to the contrary herein, any Information provided by GM
to Delphi or by Delphi to GM shall, except as hereafter agreed to in writing by
the parties, not be deemed Confidential Information with respect to the use of
such Information by Delphi in the ordinary course of Delphi's business or by GM
in the ordinary course of GM's business, respectively.

(b)    Each of the parties hereto shall maintain, and shall cause their
respective Affiliates to maintain, policies and procedures, and develop such
further policies and procedures as shall from time to time become necessary or
appropriate, to ensure compliance with this Section 6.01.

SECTION 6.02. Legally Required Disclosure of Confidential Information.
If any of the parties to this Agreement or any of their respective Affiliates or
Representatives becomes legally required to disclose any Confidential
Information, such disclosing party shall promptly notify the party owning the
Confidential Information (the "Owning Party") and shall use all commercially
reasonable efforts to cooperate with the Owning Party so that the Owning Party
may seek a protective order or other appropriate remedy and/or waive compliance
with this Section 6.02. All expenses reasonably incurred by the disclosing party
in seeking a protective order or other remedy shall be borne by the Owning
Party. If such protective order or other remedy is not obtained, or if the
Owning Party waives compliance with this Section 6.02, the disclosing party or
its Affiliate or Representative, as applicable, shall (a) disclose only that
portion of the Confidential Information which its legal counsel advises it is
compelled to disclose or else stand liable for contempt or suffer other similar
significant corporate censure or penalty, (b) use all commercially reasonable
efforts to obtain reliable assurance requested by the Owning Party that
confidential treatment will be accorded such Confidential Information, and (c)
promptly provide the Owning Party with a copy of the Confidential Information so
disclosed, in the same form and format so disclosed, together with a description
of all Persons to whom such Confidential Information was disclosed.

SECTION 6.03. Access to Information. During the Retention Period (as
defined in Section 6.04 below), each of the parties hereto shall cooperate with
and afford, and shall cause their respective Affiliates, Representatives,
Subsidiaries, successors and/or assignees, and shall use reasonable efforts to
cause joint ventures that are not Affiliates (collectively, "Related Parties")
to cooperate with and afford, to the other party reasonable access upon
reasonable advance written request to all information (other than information
which is (i) protected from disclosure by the attorney client privilege or work
product doctrine, (ii) proprietary in nature or (iii) the subject of a
confidentiality agreement between such party and a third party which prohibits
disclosure to the other party) within such party's or any Related Party's
possession which was created prior to the Contribution Date or, with

13

17

respect to any information which would be relevant to the provision of a
transitional service pursuant to this Agreement or any Ancillary Agreement,
information created during the period in which one party is providing the other
party with such transition service. Access to the requested information shall be
provided so long as it relates to the requesting party's (the "Requestor")
business, assets or liabilities, and access is reasonably required by the
Requestor as a result of the parties' Prior Relationship for purposes of
auditing, accounting, claims or litigation (except for claims or litigation
between the parties hereto), employee benefits, regulatory or tax purposes or
fulfilling disclosure or reporting obligations including, without limitation,
Information reasonably necessary for the preparation of reports required by or
filed under the Securities Exchange Act of 1934, as amended, with respect to any
period entirely or partially prior to the Contribution Date.

        Access as used in this paragraph shall mean the obligation of a party
in possession of Information (the "Possessor") requested by the Requestor to
exert its reasonable best efforts to locate all requested Information that is
owned and possessed by Possessor or any Related Party. The Possessor, at its own
expense, shall conduct a diligent search designed to identify all requested
Information and shall collect all such Information for inspection by the
Requestor during normal business hours at the Possessor's place of business.
Subject to confidentiality and/or security provisions as the Possessor may
reasonably deem necessary, the Requestor may have all requested Information
duplicated at Requestor's expense. Alternatively, the Possessor may choose to
deliver, at its own expense, all requested Information to the Requestor in the
form it was requested by the Requestor. If so, the Possessor shall notify the
Requestor in writing at the time of delivery if such Information is to be
returned to the Possessor. In such case, the Requestor shall return such
Information when no longer needed to the Possessor at the Possessor's expense.

        In connection with providing Information pursuant to this Section 6.03,
each of the parties hereto shall upon the request of the other party make
available its respective employees (and those of their respective Related
Parties, as applicable) to the extent that they are reasonably necessary to
discuss and explain all requested Information with and to the requesting party.

        SECTION 6.04.  Record Retention.

        (a)    Books and Records. Delphi shall preserve and keep all books and
records included in the Delphi Assets or otherwise in the possession of Delphi
or its Related Parties, whether in electronic form or otherwise, for no less
than ten years from the Contribution Date, or for any longer period as may be
required by any government agency, GM's record retention schedule effective as
of the Contribution Date or as GM may subsequently notify Delphi that such
schedule has been modified, litigation (including applicable "Litigation
Holds"), law, regulation, audit or appeal of taxes, tax examination or the
expiration of the periods described in Section 6.04 (c), where applicable (the
"Retention Period") at Delphi's sole cost and expense. If Delphi wishes to
dispose of any books and records or other documents which it is obligated to
retain under this Section 6.04 after the Retention Period, then Delphi shall
first provide 90 days' written notice to GM and GM shall have the right, at its
option and expense, upon prior written notice within such 90-day period, to take
possession of such books or records or other documents within 180 days after the
date of Delphi's notice to GM hereunder. Written notice of intent to dispose of
such books and records shall include a description of the books and records in
detail sufficient to allow GM to reasonably assess its potential need to retain
such materials. In the event Delphi enters into an agreement with a third party
to sell a portion of its business, together with the books and records related
thereto, GM shall have the right to duplicate such books and records prior to
any such disposition and, should the purchaser of the Delphi business be a
competitor of GM, GM shall have the right to prohibit the transfer or disclosure
to such party of that portion of the former books and records of GM which GM
notifies Delphi contain confidential and proprietary information. To the extent
that books and records of GM or any of its Affiliates which contain information
relating to the Delphi Automotive Systems Business are not included in the
Delphi Assets, GM agrees to cooperate with Delphi in providing Delphi with any
such information upon Delphi's reasonable request to the extent that any such
information exists and is reasonably separable from GM information unrelated to
the Delphi Automotive Systems Business. Delphi shall reimburse GM for all of its
reasonable out-of-pocket costs incurred in connection with any such request.

14

18

        (b)    Technical Documentation and Personnel. In addition to the
retention requirements of Section 6.04(a), for a period no less than the
Retention Period, Delphi, at its sole cost and expense, shall use its reasonable
best efforts to maintain all technical documentation in its possession or in the
possession of any of its Related Parties applicable to product design, test,
release, and validation at locations at which such technical documents shall be
reasonably accessible to GM upon request (at GM's sole cost and expense) and, to
the extent reasonably possible, through employees of Delphi who formerly
performed that task for GM. In addition to the obligations set forth in Section
6.05 hereof, Delphi shall, from time to time, at the reasonable request of GM,
cooperate fully with GM in providing GM, to the extent reasonably possible
through Delphi employees formerly employed by GM who previously performed the
same functions on behalf of GM, with technical assistance and information in
respect to any claims brought against GM involving the conduct of the Delphi
Automotive Systems Business prior to the Contribution Date, including
consultation and/or the appearance(s) of such persons on a reasonable basis as
expert or fact witnesses in trials or administrative proceedings. GM shall
reimburse Delphi for its reasonable out-of-pocket costs (travel, hotels, etc.)
of providing such services, consistent with GM's policies and practices
regarding such expenditures. Additionally, GM shall, from time to time, at the
reasonable request of Delphi, cooperate fully with Delphi in providing Delphi,
to the extent reasonably possible through applicable GM employees, with
technical assistance and information in respect to any claims brought against
Delphi involving the conduct of the Delphi Automotive Systems Business prior to
the Contribution Date, including consultation and/or the appearance(s) of such
persons on a reasonable basis as expert or fact witnesses in trials or
administrative proceedings. Delphi shall reimburse GM for its reasonable
out-of-pocket costs (travel, hotels, etc.) of providing such services,
consistent with Delphi's policies and practices regarding such expenditures.

        In particular, Delphi shall: (i) retain all documents required to be
maintained by international, national, state, provincial, regional or local
regulations and all documents that may be reasonably required to establish due
care or to otherwise assist GM in pursuing, contesting or defending such claims;
(ii) make available its documents and records in connection with any pursuit,
contest or defense, including, subject to an appropriate confidentiality
agreement or protective order, documents that may be considered to be
"confidential" or subject to trade secret protection ; (iii) promptly respond to
discovery requests in connection with such claim, understanding and
acknowledging that the requirements of discovery in connection with litigation
require timely responses to interrogatories, requests to produce, requests for
admission and depositions and also understanding and acknowledging that any
delays in connection with responses to discovery may result in sanctions; (iv)
make available, as may be reasonably necessary and upon reasonable advance
notice and for reasonable periods so as not to interfere materially with
Delphi's business, mutually acceptable engineers, technicians or other
knowledgeable individuals to assist GM in connection with such claim, including
investigation into claims and occurrences described in this section and
preparing for and giving factual and expert testimony at depositions, court
proceedings, inquiries, hearings and trial; (v) make available facilities and
exemplar parts for the sole and limited use of assisting GM in the contest or
defense; and (vi) acknowledge that GM is responsible for and will control, as
between GM and Delphi, the conduct of the pursuit, contest or defense.

        (c)    Tax Related Records. GM and Delphi agree to retain all Income Tax
Returns, related schedules and workpapers, and all material records and other
documents as required under Section 6001 of the Code, as well as by any similar
provision of state or local income tax law, until the later of (i) the
expiration of the applicable statute of limitations for the tax period to which
the records relate, or (ii) the Final Determination has been made with respect
to all issues related to the final Consolidated Tax Period.

        With respect to Non-Income Taxes, GM and Delphi agree to retain all
Non-Income Tax Returns, related schedules and workpapers, and all material
records and other documents as required under Federal, state or local law, until
the later of (i) the expiration of the applicable statute of limitations for the
tax period to which the records relate, or (ii) a Determination has been made
with respect to all issues for the tax periods to which NITA applies.

        If either party wishes to dispose of any such records or documents
after such retention period, then the procedure described in (a) above shall
apply.

19

SECTION 6.05. Production of Witnesses. Until the six-year anniversary of the Contribution Date, each of the parties hereto shall use all commercially reasonable efforts, and shall cause each of their respective Affiliates to use all commercially reasonable efforts, to make available to each other, upon written request, its directors, officers, employees and other Representatives as witnesses to the extent that any such Person may reasonably be required (giving consideration to the business demands upon such Persons) in connection with any legal, administrative or other proceedings in which the requesting party may from time to time be involved; provided, however, that with respect to any legal or administrative proceedings relating to the tax liability of any of the parties hereto or any of their respective Affiliates, each of the parties hereto shall, and shall cause each of their respective Affiliates to, make their directors, officers, employees and other Representatives available as witnesses until such time as the statute of limitations have expired with respect to all tax years prior to and including the year in which the asset transfers contemplated by this Agreement are consummated.

SECTION 6.06. Reimbursement. Unless otherwise provided in this Article 6, each party to this Agreement providing access, information or witnesses to another party pursuant to Sections 6.03, 6.04 or 6.05 shall be entitled to receive from the recipient, upon the presentation of invoices therefor, payment for all reasonable out-of-pocket costs and expenses (excluding allocated compensation, salary and overhead expense) as may be reasonably incurred in providing such information or witnesses.

ARTICLE 7

CERTAIN CLAIMS AND LITIGATION

Section 7.01.  Product Liability Claims.

(a)    Applicability. GM and Delphi agree to the allocation of liability for all claims and causes of action, however presented, alleging that parts, components or systems that have been (i) manufactured by the Delphi Automotive Systems Business or Delphi or its Affiliates, or (ii) manufactured by a third party, whether sold or otherwise supplied separately, or incorporated into components or systems of Delphi or its Affiliates, in each case, which have been sold or otherwise supplied by the Delphi Automotive Systems Business, Delphi or its Affiliates to GM, its Affiliates or customers of Delphi other than GM or its Affiliates (the foregoing collectively constituting "Delphi Products") have caused or been alleged to cause personal inuries, injuries to property or other damages as set forth in this Section 7.01. The provisions in this Section 7.01 cover claims which include but are not limited to the following types of claims: claims premised on theories of negligence, strict liability, express or implied warranties of merchantability, fitness for ordinary use and/or compliance with reasonable consumer expectations, failure to issue adequate warnings, negligent and/or intentional misrepresentation, negligent and/or intentional infliction of emotional distress, failure to provide replacement and/or retrofit parts, and failure to conduct a recall or adequately conduct a recall that has been issued. The provisions set forth in this Section 7.01 apply to claims for compensatory damages as well as all claims for punitive or exemplary damages and all claims for defective design as well as all claims for defective manufacture.

(b)       Parts Components or Systems Manufactured by the Delphi Automotive Systems Business Prior to January 1, 1999.

(i)   As between GM and Delphi, Delphi shall assume the defense of all such claims involving Delphi Products sold or otherwise supplied prior to January 1, 1999 to customers other than GM or an Affiliate or Subsidiary of GM. Delphi shall indemnify, defend and hold harmless GM and its Affiliates against any and all such claims. Delphi shall reimburse GM and its Affiliates for any reasonable attorneys' fees or other expenses reasonably incurred by GM subsequent to December 31, 1998 in connection with investigating and/or defending against any such claim.

16

20

(ii) GM shall retain and/or assume the defense of all such claims involving parts, components or systems manufactured by the Delphi Automotive Systems Business prior to January 1, 1999 and sold or otherwise supplied to GM or its Affiliates before, on, or after January 1, 1999. GM shall indemnify, defend and hold harmless Delphi and its Affiliates against any and all such claims. GM shall reimburse Delphi and its Affiliates for any reasonable attorneys' fees or other expenses reasonably incurred by Delphi or its Affiliates subsequent to December 31, 1998 in connection with investigating and/or defending any such claim or securing the indemnification and/or defense that GM is required to provide pursuant to this paragraph.

(c)    Parts, Components or Systems Manufactured, Sold or otherwise Supplied by Delphi on or Subsequent to January 1, 1999.

(i)    Delphi shall defend GM and its Affiliates against all claims involving (A) parts, components or systems manufactured by Delphi or its Affiliates which on or subsequent to January 1, 1999 are sold or otherwise supplied to customers other than GM or its Affiliates; and (B) parts, components or systems acquired by the Delphi Automotive Systems Business or Delphi or its Affiliates from suppliers thereto other than GM or its Affiliates and sold or otherwise supplied by Delphi or its Affiliates on or subsequent to January 1, 1999 to customers other than GM or its Affiliates. Delphi or its Affiliates shall indemnify, defend and hold harmless GM and its Affiliates against any and all such claims. Delphi or its Affiliates shall reimburse GM and its Affiliates for any reasonable attorneys' fees or other expenses reasonably incurred by GM and its Affiliates in connection with investigating and/or defending any such claim or securing the indemnification and/or defense that Delphi and its Affiliates are required to provide pursuant to this paragraph.

(ii) The rights, obligations and liabilities of GM and Delphi with respect to claims involving parts, components or systems manufactured by Delphi or its affiliates subsequent to December 31, 1998 which are sold by Delphi or its Affiliates to GM or its Affiliates shall be determined according to the terms of the agreements relating to such sale.

(d)    Recall and Warranty Campaigns. Claims of GM or its Affiliates against the Delphi Automotive Systems Business in the nature of warranty and recall campaigns relating to parts, components or systems sold by the Delphi Automotive Systems Business to GM or its Affiliates (regardless of when or by whom manufactured (but excluding parts or systems manufactured by GM or its Affiliates)) which arise prior to or after the Contribution Date shall be determined according to the terms of the agreements relating to the sale of such parts, components or systems, all of which agreements are assumed by Delphi and its Affiliates pursuant to the terms of the Supply Agreement.

(e)    Notice. GM and Delphi agree that in the case of claims covered by either paragraphs (b) or (c) above, the party receiving such a claim will notify the other party within 30 days of receipt of written notice of the claim. Thereafter, the party being notified of the claim shall have 30 days to respond. The party first receiving such a claim shall take all reasonable action necessary to defend against the claim including, but not limited to, responding to court ordered deadlines before the expiration of the time for response.

Section 7.02.    General Litigation.

(a)    Claims to Be Transferred to Delphi. On the Contribution Date, the legal responsibilities for the claims identified on Schedule K shall be transferred in their entirety from GM to Delphi. As of the Contribution Date and thereafter, Delphi shall assume the defense of these claims. Delphi shall indemnify, defend and hold harmless GM against these claims. Delphi shall reimburse GM for any reasonable attorneys fees and all other expenses reasonably incurred by GM subsequent to the Contribution Date in connection with investigating and/or defending against any such claim, including reimbursement for any services provided by members of the GM Legal Staff.

17

21

(b)    Claims to be Defended by GM at Delphi's Expense. GM shall defend the claims identified in Schedule L; provided, however, that (i) Delphi shall indemnify and hold harmless GM against any judgments entered against GM on the claims identified on Schedule L or settlements of the claims identified on Schedule L, provided that GM may not compromise or settle any such claim without the prior written consent of Delphi, which shall not be unreasonably withheld or delayed, (ii) GM shall promptly compromise or settle claim(s) identified on Schedule L if Delphi so directs, (iii) GM shall promptly permit Delphi to assume responsibility for the defense of the claims identified on Schedule L if Delphi so requests and (iv) Delphi shall reimburse GM for any reasonable attorneys' fees and all other expenses reasonably incurred by GM subsequent to the Contribution Date in connection with defending against the claims identified on Schedule L, including reimbursement for any services provided by members of the GM Legal Staff.

(c)    Claims for which GM will Retain Liability. GM shall defend the claims identified on Schedule M and shall indemnify and hold harmless Delphi against any judgments entered against Delphi on the claims identified in Schedule M or settlements of the claims identified on Schedule M. GM shall reimburse Delphi for any reasonable attorneys' fees and all other expenses reasonably incurred by Delphi subsequent to the Contribution Date in connection with defending against the claims identified on Schedule M, including reimbursement for any services provided by members of the Delphi Legal Staff.

Section 7.03.   Employment Related Claims.

(a)    Claims to Be Transferred to Delphi. On the Contribution Date, the legal responsibilities for the claims identified on Schedule N shall be transferred in their entirety from GM to Delphi. Thereafter, Delphi shall assume the defense of these claims. Delphi shall indemnify, defend and hold harmless GM against these claims. Delphi shall reimburse GM for any reasonable attorneys' fees and all other expenses reasonably incurred by GM subsequent to the Contribution Date in connection with investigating and/or defending against any such claim, including reimbursement for any services provided by members of the GM Legal Staff.

(b)    Claims to be Jointly Defended by GM and Delphi. GM and Delphi shall jointly defend the claims identified in Schedule O; provided, however, that (i) Delphi shall indemnify and hold harmless GM against any judgments entered against GM on the claims identified in Schedule O or settlements of the claims identified in Schedule O, provided that GM may not compromise or settle any such claim regarding employees of Delphi without the prior consent of Delphi, which consent shall not be unreasonably withheld or delayed and (ii) Delphi and GM shall split the attorneys' fees and all other expenses reasonably incurred subsequent to the Contribution Date in connection with defending against the unemployment claims identified in Schedule O based on the number of hourly employees of each organization that are claimants in the litigation.

(c)    Unscheduled Claims. Delphi will have financial responsibility for employment related claims regarding all Delphi Employees and Delphi Terminated Employees (as those terms are defined in the Employee Matters Agreement, a copy of which is attached hereto as Exhibit B-1) whether incurred before or after the Contribution Date. If a claim is not scheduled, Delphi and GM shall mutually determine whether the claim is treated under Paragraph (a) or (b) above. Responsibility for new U.S. claims will be treated in the same manner. Notwithstanding the above, U.S. claims for pension and welfare benefits from salaried employees who retire on or before the Contribution Date, and hourly employees who retire on or before October 1, 1999 shall remain the responsibility of GM.

Section 7.04. Cooperation. GM and Delphi and their respective Affiliates shall cooperate with each other in the defense of any and all claims covered under this Article 7 and afford to each other reasonable access upon reasonable advance notice to witnesses and information (other than information protected from disclosure by applicable privileges) that is reasonably required to defend these claims as set forth in Article 6 of this Agreement. The foregoing agreement to cooperate includes, but is not limited to, an obligation to provide access to qualified assistance to provide information, witnesses and documents to respond to discovery requests in specific lawsuits. In such cases, cooperation shall be timely so that the party responding to discovery may meet all court-imposed

18

22

deadlines. The party requesting information shall reimburse the party providing information consistent with the terms of Section 6.06 of this Agreement. The obligations set forth in this paragraph are more clearly defined in Section 6.01 through and including 6.06 of this Agreement, to which reference is hereby made.

ARTICLE 8

INSURANCE MATTERS

SECTION 8.01  Delphi Insurance Coverage During  the Transition Period.

(a)   Throughout the period beginning on the Contribution Date and ending on the earlier of the Distribution Date or the first anniversary of the Contribution Date (i.e., the "Insurance Transition Period"), GM shall, subject to insurance market conditions and other factors beyond its control, maintain policies of insurance, including for the benefit of Delphi or any of its Affiliates, directors, officers, employees or other covered parties (collectively, the "Delphi Covered Parties") which are comparable to those maintained generally by GM; provided, however, that this provision shall not apply to insurance applicable to employees and/or beneficiaries relating to benefits provided under ERISA governed benefit plans or to Personal Umbrella Liability Insurance; provided, further, however, that if GM determines that (i) the amount or scope of such coverage will be reduced to a level materially inferior to the level of coverage in existence immediately prior to the Insurance Transition Period or (ii) the retention or deductible level applicable to such coverage, if any, will be increased to a level materially greater than the levels in existence immediately prior to the Insurance Transition Period, GM shall give Delphi notice of such determination as promptly as practicable. Upon notice of such determination, Delphi shall be entitled to no less than 60 days to evaluate its options regarding continuance of coverage hereunder and may cancel all or any portion of such coverage as of any day within such 60 day period. Except as provided below, during the Insurance Transition Period, such policies of insurance shall cover Delphi Covered Parties for liabilities and losses insured prior to the Contribution Date. To the extent of any self insured or other loss retentions with respect to insurance policies in force, Delphi shall, during the Insurance Transition Period, be solely responsible for any losses, damages and related expenses, not included in GM insurance program expense allocations to Delphi, incurred by itself or Delphi Covered Parties within such loss or retentions and shall not seek reimbursement or indemnification thereof from GM.

(b)   GM will use all commercially reasonable efforts to assist Delphi Covered Parties in asserting claims under applicable insurance policies, and shall adjust such policies, as necessary and practicable, to provide for Delphi and GM recoveries consistent with their respective interests and shall not unduly favor one insured party over another.

(c)   Delphi shall promptly pay or reimburse GM, as the case may be, for premium expenses, and Delphi Covered Parties shall promptly pay or reimburse GM for any costs and expenses which GM may incur in connection with the insurance coverages maintained pursuant to this Section 8.01, including but not limited to any subsequent premium adjustments. All payments and reimbursements by Delphi and Delphi Covered Parties to GM shall be made within fifteen (15) days after Delphi's receipt of an invoice from GM. Late payments shall bear interest at the Prime Rate (as defined in Section 2.05(b) hereof) and shall be paid in accordance with the terms relating to payments of interest set forth in Section 2.05(b) of this Agreement.

(d)   To the full extent permitted by contract and law, the control and administration of such insurance policies, including claims against insurance policies and any modifications to terms or conditions of insurance policies, shall remain with GM (except that any such action taken by GM shall treat fairly all insured parties and their respective claims and shall not unduly favor one insured party over another). Delphi and Delphi Covered Parties shall make all reasonable efforts to facilitate GM's control and administration of such policies.

(e)   GM's insurance policies shall be applicable to Delphi losses, as follows: (i) with respect to any insurance policies where coverage is provided on a "claims-made" or "occurrences reported" basis, any events,

23

acts or omissions which may give rise to insured losses, or damages which give rise to claims thereunder, must have occurred and notice given to GM prior to expiration of the Insurance Transition Period; (ii) with respect to other types of insurance policies, including those provided on an "occurrence" basis, any events, acts or omissions giving rise to any insured losses or damages must have occurred prior to expiration of the Insurance Transition Period; and (iii) with respect to all claims under all insurance policies, coverage for events, acts or omissions shall be interpreted consistent with the terms of such policies and the intent of subparagraphs (i) and (ii) above.

(f)   With respect to claims comprehended by the insurance policies, GM and Delphi shall control the investigation, defense and settlement of all claims as provided for in Article 7 of this Agreement; provided, however, that Delphi may not effect any settlement with respect to any such claim without GM's prior written consent (which consent shall not be unreasonably withheld or delayed) unless such settlement (i) will have no direct impact on GM's future insurance recoveries under relevant insurance policies, and (ii) will require that only Delphi or Delphi Covered Parties, and not GM or its insurers, assume financial responsibility for the settlement (under applicable deductibles or self-insured retentions), any related expenses and/or any subsequent premium adjustments.

SECTION 8.02. Delphi Insurance Coverage After The Insurance Transition Period. From and after expiration of the Insurance Transition Period, except as provided herein, Delphi, and Delphi alone, shall be responsible for obtaining and maintaining insurance programs for its risk of loss and such insurance arrangements shall be separate and apart from GM's insurance programs. Notwithstanding the foregoing, (a) GM, upon the request of Delphi, shall use all commercially reasonable efforts to assist Delphi in the transition to its own separate insurance programs from and after the Insurance Transition Period, and shall provide Delphi with any information that is in the possession of GM and is reasonably available and necessary to either obtain insurance coverages for Delphi or to assist Delphi in preventing unintended self-insurance, in whatever form, (b) each of GM and Delphi, at the request of the other, shall cooperate with and use commercially reasonable efforts to assist the other in recoveries from claims made under any insurance policy for the benefit of any insured party; and (c) neither GM nor Delphi, nor any of their Affiliates, shall take any action which would intentionally jeopardize or otherwise interfere with either party's ability to collect any proceeds payable pursuant to any insurance policy.

ARTICLE 9

MISCELLANEOUS

SECTION 9.01. Entire Agreement. This Agreement, including all the Ancillary Agreements and all other Exhibits and Schedules attached hereto, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior written and oral and all contemporaneous oral agreements and understandings with respect to the subject matter hereof, other than with respect to the Cash and Debt Management Agreement, dated as of December 22, 1998, among the Corporate Sector of GM, the Global Automotive Sector of GM and the Delphi Automotive Systems Sector of GM.

SECTION 9.02. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware regardless of the laws that might otherwise govern under principles of conflicts of laws applicable thereto.

SECTION 9.03. Descriptive Headings. The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

SECTION 9.04. Notices. All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered in person, by telecopy with answer back, by express or overnight mail delivered by a nationally recognized air courier (delivery charges prepaid), or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties as follows:

20

24

if to GM:

     c/o General Motors Corporation
     3031 West Grand Blvd.
     Detroit, MI  48202
     Attention:  Warren G. Andersen
     Telecopy:  (313) 974-0685

if to Delphi, the Delphi U.S. Subsidiaries or Delphi International Subsidiary:

     c/o Delphi Automotive Systems Corporation
     5725 Delphi Drive
     Troy, MI  48098
     Attention:  General Counsel
     Telecopy: 248-813-2523

or to such other address as the party to whom notice is given may have previously furnished to the others in writing in the manner set forth above. Any notice or communication delivered in person shall be deemed effective on delivery. Any notice or communication sent by telecopy or by air courier shall be deemed effective on the first Business Day at the place at which such notice or communication is received following the day on which such notice or communication was sent. Any notice or communication sent by registered or certified mail shall be deemed effective on the fifth Business Day at the place from which such notice or communication was mailed following the day on which such notice or communication was mailed.

SECTION 9.05. Parties in Interest. This Agreement shall be binding upon and inure solely to the benefit of each party hereto and their legal representatives and successors, and each Subsidiary and each Affiliate of the parties hereto, and nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Agreement, except for Article 5 (which is intended to be for the benefit of the Persons provided for therein and may be enforced by such Persons).

SECTION 9.06. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.

SECTION 9.07. Binding Effect; Assignment. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives and successors. This Agreement may not be assigned by any party hereto. The Schedules and Exhibits attached hereto or referred to herein are an integral part of this Agreement and are hereby incorporated into this Agreement and made a part hereof as if set forth in full herein.

SECTION 9.08. Dispute Resolution. Except as otherwise set forth in the Ancillary Agreements, resolution of any and all disputes arising from or in connection with this Agreement (excluding matters related to the Supply Agreement), whether based on contract, tort, or otherwise (collectively, "Disputes"), shall be exclusively governed by and settled in accordance with the provisions of this Section 9.08. The parties hereto shall use all commercially reasonable efforts to settle all Disputes without resorting to mediation, arbitration, litigation or other third party dispute resolution mechanisms. If any Dispute remains unsettled, a party hereto may commence proceedings hereunder by first delivering a written notice from a Senior Vice President or comparable executive officer of such party (the "Demand") to the other parties providing reasonable description of the Dispute to the others and expressly requesting mediation hereunder. The parties hereby agree to submit all Disputes to non-binding mediation before a mediator reasonably acceptable to all parties involved in such Dispute. If, after such mediation, the parties subject to such mediation disagree regarding the mediator's recommendation, such Dispute shall be submitted to arbitration under the terms hereof, which arbitration shall be final, conclusive and binding upon the parties, their successors and assigns. The arbitration shall be conducted in Detroit, Michigan by three arbitrators acting by majority vote (the

21

25

"Panel") selected by agreement of the parties not later than ten (10) days after
the delivery of the recommendation provided by the mediator as described above
or, failing such agreement, appointed pursuant to the commercial arbitration
rules of the American Arbitration Association, as amended from time to time (the
"AAA Rules"). If an arbitrator so selected or appointed. The arbitration shall be
conducted pursuant to the Federal Arbitration Act and such procedures as the
parties subject to such arbitration (each, a "Party") may agree, or, in the
absence of or failing such agreement, pursuant to the AAA Rules. Notwithstanding
the foregoing: (i) each Party shall have the right to audit the books and
records of the other Party that are reasonably related to the Dispute; (ii) each
Party shall provide to the other, reasonably in advance of any hearing, copies
of all documents which a Party intends to present in such hearing; and (iii)
each Party shall be allowed to conduct reasonable discovery through written
requests for information, document requests, requests for stipulation of fact
and depositions, the nature and extent of which discovery shall be determined by
the Parties; provided that if the Parties cannot agree on the terms of such
discovery, the nature and extent thereof shall be determined by the Panel which
shall take into account the needs of the Parties and the desirability of making
discovery expeditious and cost effective. The award shall be in writing and
shall specify the factual and legal basis for the award. The Panel shall
apportion all costs and expenses of arbitration, including the Panel's fees and
expenses and fees and expenses of experts, between the prevailing and
non-prevailing Party as the Panel deems fair and reasonable. The parties hereto
agree that monetary damages may be inadequate and that any party by whom this
Agreement is enforceable shall be entitled to seek specific performance of the
arbitrators' decision from a court of competent jurisdiction, in addition to any
other appropriate relief or remedy. Notwithstanding the foregoing, in no event
may the Panel award consequential, special, exemplary or punitive damages. Any
arbitration award shall be binding and enforceable against the parties hereto
and judgment may be entered thereon in any court of competent jurisdiction.

SECTION 9.09. Severability. If any term or other provision of this
Agreement is invalid, illegal or incapable of being enforced by any rule of law
or public policy, all other conditions and provisions of this Agreement shall
nevertheless remain in full force and effect so long as the economic or legal
substance of the transactions contemplated hereby is not affected in any manner
materially adverse to any party. Upon such determination that any term or other
provision is invalid, illegal or incapable of being enforced, the parties hereto
shall negotiate in good faith to modify this Agreement so as to effect the
original intent of the parties as closely as possible in an acceptable manner to
the end that transactions contemplated hereby are fulfilled to the fullest
extent possible.

SECTION 9.10. Failure or Indulgence Not Waiver; Remedies Cumulative. No
failure or delay on the part of any party hereto in the exercise of any right
hereunder shall impair such right or be construed to be a waiver of, or
acquiescence in, any breach of any representation, warranty or agreement herein,
nor shall any single or partial exercise of any such right preclude other or
further exercise thereof or of any other right. All rights and remedies existing
under this Agreement are cumulative to, and not exclusive of, any rights or
remedies otherwise available.

SECTION 9.11. Amendment. No change or amendment will be made to this
Agreement or the Ancillary Agreements except by an instrument in writing signed
on behalf of each of the parties to such agreement.

SECTION 9.12. Authority. Each of the parties hereto represents to the
other that (a) it has the corporate or other requisite power and authority to
execute, deliver and perform this Agreement and the Ancillary Agreements, (b)
the execution, delivery and performance of this Agreement and the Ancillary
Agreements by it have been duly authorized by all necessary corporate or other
action, (c) it has duly and validly executed and delivered this Agreement and
the Ancillary Agreements, and (d) this Agreement and each Ancillary Agreement is
a legal, valid and binding obligation, enforceable against it in accordance with
its terms subject to applicable bankruptcy, insolvency, reorganization,
moratorium or other similar laws affecting creditors' rights generally and
general equity principles.

SECTION 9.13. Interpretation. The headings contained in this Agreement,
in any Exhibit or Schedule hereto and in the table or contents to this Agreement
are for reference purposes only and shall not affect in any way the meaning or
interpretation of this Agreement. Any capitalized term used in any Schedule or
Exhibit but not

22

26

otherwise defined therein, shall have the meaning assigned to such term in this
Agreement. When a reference is made in this Agreement to an Article or a
Section, Exhibit or Schedule, such reference shall be to an Article or Section
of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated.
After the Contribution Date, the Delphi Automotive Systems Business shall be
deemed to no longer exist and all references made herein to Delphi as a party
which operate as of a time following the Contribution Date, shall be deemed to
refer to Delphi, the Delphi U.S. Subsidiaries and Delphi International
Subsidiary as a single party.

******

[SIGNATURES ON FOLLOWING PAGE]

23

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized on the day and year first above written.

GENERAL MOTORS CORPORATION

By:  /s/ G. Richard Wagoner
-----------------------------------
    Name:  G. Richard Wagoner
    Title: President and Chief Operating Officer

DELPHI AUTOMOTIVE SYSTEMS CORPORATION

By: /s/ J.T. Battenberg, III
-----------------------------------
    Name:  J.T. Battenberg, III
    Title: Chairman, Chief Executive Officer and
           President

DELPHI AUTOMOTIVE SYSTEMS LLC

By: /s/ J.T. Battenberg, III
-----------------------------------
    Name:  J.T. Battenberg, III
    Title: Chief Executive Officer and
           President

DELPHI TECHNOLOGIES, INC.

By: /s/ Andrew Brown, Jr
-----------------------------------
    Name:  Andrew Brown, Jr.
    Title: President

DELPHI AUTOMOTIVE SYSTEMS (HOLDING), INC.

By: /s/ John P. Arle
-----------------------------------
    Name:  John P. Arle
    Title: President

**EXHIBIT G**

**Environmental Matters Agreement between Delphi Automotive Systems Corporation**
**(n/k/a Delphi) and GM, dated as of "October 1998"**

**Exhibit C-1**

## ENVIRONMENTAL MATTERS AGREEMENT

This Environmental Matters Agreement ("Agreement"), dated as of October, 1998, is made among General Motors Corporation, a Delaware corporation ("GM"), with its principal place of business in Detroit, Michigan, and Delphi Automotive Systems Corporation, a Delaware corporation ("Delphi"), with its principal place of business in Troy, Michigan. GM and Delphi are sometimes referred to herein as a "Party" and collectively as the "Parties."

### RECITALS

WHEREAS, GM and Delphi are Parties to a Master Separation Agreement entered into in connection with the separation of the business heretofore carried on by the Delphi Automotive Systems Division as a part of GM into a business owned and operated by Delphi and completely separate and independent from GM; and

WHEREAS, the Parties desire to enter into this Agreement regarding environmental matters.

NOW, THEREFORE, in consideration of the mutual covenants and provisions hereunder contained, the Parties agree as follows:

### ARTICLE 1

### Definitions

**1.1. <u>Defined Terms</u>.** As used in this Agreement, the following terms (in singular and plural forms) shall have the meanings below. Capitalized terms used, but not defined, herein shall have the meaning set forth in the Master Separation Agreement or elsewhere in this Agreement.

"Contribution Date" has the same meaning assigned to this term in the Master Separation Agreement.

"Corporate Successor" means any successor in interest of a Party by reason of a merger, reorganization or sale of all or substantially all of the assets of such Party.

"Delphi Assets" means the equipment, machinery and other personal property acquired by purchase, lease or otherwise by Delphi from GM as of the Contribution Date in accordance with the terms of the Master Separation Agreement whether or not associated with a Delphi Facility.

"Delphi Facility" means each parcel of real property, including all facilities and improvements thereon, acquired by purchase, lease or otherwise by Delphi as of the Contribution Date in accordance with the terms of the Master Separation Agreement as the same may

1

2

hereafter be revised as a result of the "true-up" process provided for in the Real Estate Matters Agreement between the Parties.

"Environmental Claim" shall mean any third-party (i.e., non-Party) accusation, allegation, notice of violation, action, claim, lien, demand, abatement or other order or directive (conditional or otherwise) for personal injury (including sickness, disease or death), tangible or intangible property damage, damage to the environment, nuisance, pollution, contamination of or other adverse effect on the environment or human health, or for fines, penalties, or restrictions, resulting from or based upon: (i) the existence, or the continuation of the existence of, a Release (including without limitation a sudden or non-sudden accidental or non-accidental Release), or, exposure to, any Hazardous Material, in, into or onto the indoor or outdoor environment, including, but not limited to, the air, soil, surface water or groundwater, at, on, by, from or related to any Facility; (ii) the use, management, handling, transportation, storage, treatment or disposal of Hazardous Material in connection with any Facility; or (iii) the violation or alleged violation of any Environmental Law relating to the ownership, use, operation, or remediation of any Facility or to the use, management, handling, transportation. Release, storage, treatment or disposal of Hazardous Materials thereon or therefrom.

"Environmental Costs and Liabilities" shall mean any and all losses, liabilities, obligations, damages, fines, penalties, judgments, actions, claims, reasonable costs and reasonable expenses (including without limitation attorneys' fees, disbursements and expenses of legal counsel, experts, engineers, and consultants and the costs of Remedial Action) arising from or under or related to any Environmental Law.

"Environmental Damages" shall refer to any and all Environmental Costs and Liabilities and Environmental Claims, including, but not limited to, costs, expenses and attorneys' or other experts' or consultants' fees in connection with any Remedial Action or enforcing any right of indemnification hereunder against any Indemnitor; provided, however, that Environmental Damages do not include consequential, special or incidental damages, including, but not limited to, loss of profits, loss of business opportunity, loss of use, diminution in value, stigma damages, or any attorneys' or consultant's fees or other expenses as to any matter as to which an Indemnitor has accepted its defense and indemnity obligations.

"Environmental Law" means, collectively, all applicable foreign, domestic, federal, state or local laws, statutes, ordinances, rules, regulations, codes, common law doctrines, or other legally binding requirements, including, but not limited to, orders, judgments, settlement agreements, consent orders, consent decrees, consent judgments or Environmental Permits, relating to regulation and protection of human health, the environment, or natural resources, including, but not limited to, all laws regulating Releases or threatened Releases of Hazardous Materials, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.,* the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq.,* the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *el seq.,* the Clean Air Act, 42 U.S.C. § 7401 *el seq.,* the Clean Water Act, 33 U.S.C. § 1251 *et seq.,* and the Toxic Substances Control Act, 15 U.S.C § 52601 *et seq., as* any of the foregoing may have been, or may in the future be, amended.

2

3

"Environmental Permits" means permits, licenses, registrations, and other authorizations issued under any Environmental Law.

"Environmental Records" means any and all books, records, notes, reports, letters, memoranda, assessments, testing data, maps, Environmental Permits, certificates, applications, approvals, surveys or other written, printed, or electronically or magnetically recorded materials, communications or data relating to; (i) the use, management, handling, transportation. Release, storage, treatment or disposal of any Hazardous Material in, about or under any Delphi Facility; (ii) the environmental condition of the Delphi Facilities; and (iii) compliance with Environmental Laws at the Delphi Facilities. By way of example, Environmental Records includes the following as they directly or indirectly relate to Delphi Facilities: environmental bulletins, environmental performance criteria, NAO reference letters, EPCRA and TSCA manuals, environmental performance audit reports (IPSR & EPR), Phase I property transfer evaluations, release reports, GM SARA database, ISO 14001 certification guidance, Title V materials, (e.g., compliance assessments, compliance reports, outside counsel memoranda re issues, GM emission factors, and rule interpretations).

"Facility" means, as the context may require, either a GM Retained Facility or a Delphi Facility, or both.

"GM Retained Facility" means any and all real property and facilities which are not Delphi Facilities and which were owned, operated, occupied or possessed by GM or its direct or indirect wholly-owned subsidiaries prior to the Contribution Date.

"Hazardous Material" shall mean, collectively, any: (i) chemical, material or substance: (a) which is now or hereafter becomes defined as or included in the definition of "hazardous substance," "extremely hazardous substance," "hazardous waste," "hazardous material," "restricted hazardous waste," "contaminant," "pollutant," "toxic substance," or words of similar import under any Environmental Law; or (b) the emission, discharge, release, storage, transport, disposal, management, handling or use of which is regulated under or subject to any Environmental Law; and (ii) petroleum or petroleum products, or derivatives or fractions thereof, flammable materials, explosives, radioactive materials (including radon gas other than that which is naturally occurring), urea formaldehyde foam insulation ("UFI"), asbestos-containing materials ("ACM") and polychlorinated biphenyls ("PCBs").

"Identified Waste Disposal Sites" means those Off-Site Waste Disposal Sites known to the Parties as of the Contribution Date, where liability is known or alleged, which are identified on Exhibit A to this Agreement.

"Indemnifying Party" or "Indemnitor" means a person that is obligated to provide indemnification under Article 3 of this Agreement.

"Indemnitee" means a person that is entitled to seek indemnification under Article 3 of this Agreement.

3

"Newly Identified Waste Disposal Site" means an Off-Site Waste Disposal Site other than an Identified Waste Disposal Site where liability becomes known or is alleged after the Contribution Date.

"Off-Site Waste Disposal Site" means any site, other than a Facility, which is or becomes subject to an obligation for Remedial Action under an Environmental Law.

"Release" means any release, spill, emission, escape, abandonment of any container or receptacle containing any Hazardous Material, leaking, pumping, pouring, emptying, injection, deposit, disposal, discharge, dispersal, leaching, movement or migration of any Hazardous Material on or into the indoor or outdoor environment or into or out of any property.

"Remedial Action" means all investigations and/or actions to: (i) clean up, remove, remediate, treat, or in any other way address any Hazardous Material under or pursuant to any Environmental Law; (ii) prevent the Release or threatened Release, or minimize the further Release of, any Hazardous Material so that it does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; (iv) perform corrective actions or obtain timely closure or closure certification related to any underground or aboveground tank, container storage area, treatment, storage or disposal facility or operation, solid waste management unit or other location of Hazardous Material use, management, handling, transportation, treatment, storage, or disposal; or (v) bring any matter, activity, practice or conduct into compliance with any Environmental Law.

## ARTICLE 2

### Allocation of Environmental Liabilities

#### 2.1. Responsibility for GM Retained Facilities.

As of and after the Contribution Date, GM shall be solely responsible for all Environmental Damages arising from, relating to or in connection with all GM Retained facilities, whether or not the circumstances or claims giving rise to such Environmental Damages occurred or were asserted before or after the Contribution Date; provided, however, that Delphi shall be responsible for all Environmental Damages at the GM Retained Facilities to the extent caused by Delphi's acts or omissions first occurring or continuing after the Contribution Date. Where necessary for GM to fulfill its obligations under this Agreement, Delphi will use its best efforts to assign its rights with respect to GM Retained Facilities.

#### 2.2. Responsibility for Delphi Facilities.

(a) Subject to Section 2.2(b), as of and after the Contribution Date, Delphi shall be solely responsible for all Environmental Damages arising from, relating to or in connection with all Delphi Facilities and Delphi Assets, whether or not the circumstances or claims giving rise to such Environmental Damages occurred or were asserted before or after the Contribution Date; provided, however, that GM shall be responsible for all Environmental Damages at the Delphi

4

5

Facilities to the extent caused by GM's acts or omissions first occurring or continuing after the Contribution Date.

(b) Notwithstanding Section 2.2(a), GM shall be solely responsible for all payments relating to any contract for Remedial Action and other environmental-related service or goods procurement contracts, or any stipulated penalties, fines or other sanctions under orders, decrees, judgments or settlements with respect to any environmental matter at a Delphi Facility, actually incurred but not paid by GM prior to the Contribution Date for services performed or acts or omissions occurring before the Contribution Date. Before the Contribution Date, Delphi shall procure environmental-related goods and services only on commercially reasonable terms and conditions, and in no event shall GM be responsible for any materials purchased by Delphi before the Contribution Date and not utilized by Delphi within ninety (90) days after the Contribution Date. Except as otherwise specifically provided in this Section 2.2(b), Delphi shall be solely responsible for all payments under any contracts for Remedial Action, other environmental-related service or goods procurement contracts, and any stipulated penalties, fines or other sanctions under orders, decrees, judgments, or settlements with respect to any environmental matter at a Delphi Facility.

(c) Between the date of the execution of this Agreement and the Contribution Date, the Parties shall pursue, with reasonable diligence and in good faith, with respect to the Delphi Facilities: (i) compliance with Environmental Laws; (ii) the avoidance of any liability under any Environmental Law; and (iii) the resolution or continued performance of any activities necessary to resolve any Environmental Claim or satisfy or discharge any Environmental Damages before the Contribution Date.

**2.3. <u>Responsibility for Waste Disposal Sites</u>.**

(a) <u>Identified Waste Disposal Sites</u>.

As of and after the Contribution Date, GM shall be solely responsible for Environmental Damages and any other liabilities, to the extent due to contributions by GM before or after the Contribution Date, arising from, relating to or in connection with all Identified Waste Disposal Sites.

(b) <u>Newly Identified Waste Disposal Sites</u>.

Within twenty (20) days after receiving notice or other information as to the existence of a Newly Identified Waste Disposal Site as to which the other Party may have liability under an Environmental Law, the Party receiving such notice or information shall notify the other Party and provide copies of all relevant correspondence and other documents relating thereto.

(c) <u>Allocation</u>.

(i) The Parties' respective liability with respect to: (1) Newly Identified Waste Disposal Sites; and (2) contributions to Identified Waste Disposal Sites after the

5

Contribution Date, shall be allocated based on each Party's respective contributions thereto, as follows:

(a) GM's liability shall be based on contributions attributable to the GM Retained Facilities and any other facility owned or operated by GM before, on or after the Contribution Date except the Delphi Facilities.

(b) Delphi's liability shall be based on contributions attributable to the Delphi Facilities and any other facility owned or operated by Delphi on or after the Contribution Date, whether or not such contributions were made before or after the Contribution Date. Delphi shall not be responsible for contributions to Identified Waste Disposal Sites occurring before the Contribution Date.

(ii) The Parties shall use their reasonable best efforts to amicably resolve all liability and allocation issues using traditional factors, such as the volume, type and toxicity of the contributions to such Newly Identified Waste Disposal Site or Identified Waste Disposal Site by each Party.

**2.4. <u>Duty to Comply With Environmental Laws</u>.**
(a) <u>GM</u>. As of and after the Contribution Date, GM shall comply with Environmental Laws at the GM Retained Facilities and the sole legal and financial responsibility for compliance with Environmental Laws applicable to GM's use of, operations at or occupancy
of the GM Retained Facilities shall be that of GM.

(b) <u>Delphi</u>. As of and after the Contribution Date, Delphi shall comply with Environmental Laws at the Delphi Facilities and the sole legal and financial responsibility for compliance with Environmental Laws applicable to Delphi's use of, operations at or occupancy
of the Delphi Facilities shall be that of Delphi.

(c) The sole remedy of the Parties for breach of this Section 2.4 shall be under the indemnification provisions of Article 3 of this Agreement.

**2.5. <u>No Representations or Warranties</u>.** Except as otherwise expressly set forth in this Agreement, the Delphi Facilities and Delphi Assets are being conveyed in their "as is, where is" condition and with all faults and without any representation or warranty of any nature whatsoever, express or implied, oral or written, and in particular without any implied warranty of merchantability or fitness for a particular purpose.

6

7

## ARTICLE 3

### Indemnification

**3.1. <u>Indemnification by GM.</u>** GM shall indemnify, defend and hold harmless Delphi from and against all Environmental Damages which are caused by, relate to or arise in connection with:

(a) The GM Retained Facilities, including, but not limited to, Environmental Damages caused by, relating to or arising in connection with circumstances occurring or claims asserted either on, before or after the Contribution Date; provided, however, that GM shall have no indemnity or defense obligations hereunder with respect to Environmental Damages to the extent caused by, relating to, or arising in connection with Delphi's acts or omissions first occurring or continuing after the Contribution Date.

(b) Any act or omission by GM after the Contribution Date.

(c) Contributions before the Contribution Date to all Identified Waste Disposal Sites attributable to a Delphi Facility as well as contributions attributable to a GM Retained Facility.

(d) GM contributions to Newly Identified Waste Disposal Sites attributable to a GM Retained Facility.

(e) Any breach of this Agreement.

(f) Any imposition or acceleration of Environmental Costs and Liabilities or Environmental Claims regarding GM Retained Facilities under Section 9.2(b) under any applicable Environmental Transfer Law, as defined hereafter, as a result of the transactions contemplated by the Master Separation Agreement.

**3.2. <u>Indemnification by Delphi.</u>** Delphi shall indemnify, defend and hold harmless GM from and against all Environmental Damages which are caused by, relate to or arise in connection with:

(a) The Delphi Facilities and all Delphi Assets, including, but not limited to, Environmental Damages caused by, relating to or arising in connection with circumstances occurring or claims asserted either on, before or after the Contribution Date; provided, however, that Delphi shall have no indemnity or defense obligations hereunder with respect to Environmental Damages to the extent caused by. relating to or arising in connection with GM's acts or omissions first occurring or continuing after the Contribution Date.

(b) Any act or omission by Delphi after the Contribution Date.

(c) Any breach of this Agreement.

7

8

(d) Delphi contributions on or after the Contribution Date to Identified Waste Disposal Sites.

(e) Delphi contributions to Newly Identified Waste Disposal Sites attributable to a Delphi Facility.

(f) Any imposition or acceleration of Environmental Costs and Liabilities or Environmental Claims regarding Delphi Facilities under Section 9.2(b) under any applicable Environmental Transfer Law, as defined hereafter, as a result of the transactions contemplated by the Master Separation Agreement.

### 3.3. <u>Indemnification Procedures.</u>

(a) If any Indemnitee receives notice of any Environmental Claim or becomes aware of any Environmental Costs and Liabilities or other matter with respect to which an Indemnifying Party is or may be obligated under this Agreement to provide indemnification to such Indemnitee, the Indemnitee shall give the Indemnifying Party prompt written notice thereof (together with any information concerning the matter). Whenever practicable, such notice shall be provided at least ten (10) business days before the Indemnitee incurs any Environmental Damages in respect of such matter. If such advance notice is not practicable, then notice shall be provided as soon as practicable. Failure or delay of any Indemnitee to give notice as provided in this Section 3.3 shall not relieve any Indemnifying Party of its obligations except to the extent that such Indemnifying Party is actually prejudiced.

(b) An Indemnifying Party may elect to defend any Environmental Claim at its own expense and through its counsel (which counsel shall be reasonably acceptable to the Indemnitee). If an Indemnifying Party elects to defend an Environmental Claim, it shall notify the Indemnitee of its intent to do so within ten (10) business days after receiving notice of such Environmental Claim (or sooner, if the nature of such Environmental Claim so requires). The Indemnitee shall cooperate in the defense of such Environmental Claim. The Indemnifying Party shall keep the Indemnitee reasonably informed as to the status of the defense of such Environmental Claim. The Indemnifying Party shall also pay such Indemnitee's reasonable out-of-pocket expenses incurred in connection with such cooperation, but shall not be responsible for any legal or other expenses subsequently incurred by such Indemnitee in connection with the defense of such Environmental Claim. The Indemnifying Party shall not, without the prior written consent of the Indemnitee: (i) settle or compromise any Environmental Claim or consent to the entry of any judgment which does not include a written release from all liability to the Indemnitee; or (ii) settle or compromise any Environmental Claim in any manner that would be reasonably likely to have a material adverse effect on the Indemnitee. If an Indemnifying Party elects not to defend against a Environmental Claim, or fails to properly notify an Indemnitee of its election, the Indemnitee may defend, compromise, and settle such Environmental Claim and shall be entitled to indemnification to the extent permitted hereunder; provided, however, that the Indemnitee may not compromise or settle any such Environmental Claim without the prior written consent of the Indemnifying Party, which shall not be unreasonably withheld or delayed.

8

9

**3.4. <u>Mitigation.</u>** No Party shall have any obligation to indemnify the other Party with respect to any Environmental Damages to the extent such Environmental Damages could have reasonably been avoided or mitigated.

**3.5. <u>Exclusive Remedy.</u>** The Parties acknowledge that, except with respect to matters covered under Sections 9.3 and 9.4 of this Agreement: (a) the rights and obligations provided in this Agreement shall be the exclusive rights and obligations of the Parties with respect to environmental matters; and (b) the remedies in Articles 3 and 6 of this Agreement shall be the exclusive remedies of the Parties with respect to environmental matters and shall be in lieu of, and not in addition to, all other remedies which may exist in law, equity or under any other contract.

**3.6. <u>No Initiation of Third Party Claims.</u>** The Parties shall not initiate any action with any third party, including any governmental agency, which could reasonably be expected to lead to an Environmental Claim; provided, however, that nothing herein shall prevent either Party from performing its obligations or exercising its rights under this Agreement.

**3.7. <u>Cooperation On Third Party Claims.</u>** If either Party, in addressing a matter or in defending or resolving any Environmental Claim as to which it has defense or indemnification responsibility under this Agreement (for purposes of this Section 3.7, the "Indemnifying Party"), remediates or incurs costs or damages with respect to a matter for which a third party may be responsible or liable, the other party agrees to cooperate with the Indemnifying Party in pursuing any claim against such third party and the Parties shall assist each other so as to enable the Indemnifying Party to legally assert such claim against such third party and to recover its costs and damages from such third party, including acting as the real party in interest and assigning any rights or causes of action against any such third party relating to such claim or the proceeds thereof to the Indemnifying Party.

## ARTICLE 4

### Environmental Reserves

**4.1.** As of the Contribution Date, each Party shall be responsible for establishing its own reserves for environmental liabilities in accordance with generally accepted accounting principles. At the time of Contribution, the environmental reserves established for the Delphi Facilities are shown on Exhibit B. These reserves were established in accordance with the same principles used to establish reserves for GM Retained Facilities.

## ARTICLE 5

### Environmental Permits

**5.1.** Set forth on Exhibit C are all of the Environmental Permits identified and not yet expired with respect to the Delphi Facilities and the Delphi Assets. Exhibit C also identifies, with respect to each such Environmental Permit, whether each such Environmental Permit: (i)

9

relates to the Delphi Facilities and operations by GM on GM Retained Facilities, but shall not be transferred to Delphi by GM and shall remain with GM as permittee; (ii) may be transferred to Delphi under applicable Environmental Law; or (iii) may not be transferred to Delphi under applicable Environmental Law. The Parties shall use best efforts to: (i) effectuate the transfer of those Environmental Permits under clause (ii), above, that may be transferred to Delphi under applicable Environmental Law; (ii) obtain issuance to Delphi of new or replacement Environmental Permits for Delphi's operations now covered by the Environmental Permits described in clauses (i) or (iii), above; and (iii) mitigate problems that may arise during the transfer process. As of and after the Contribution Date, Delphi shall be solely responsible to obtain and comply with all Environmental Permits with respect to the Delphi Facilities and the Delphi Assets, whether or not GM was required under any Environmental Law to, but did not, obtain any such Environmental Permits. Prior to the Contribution Date, Delphi shall have obtained and GM shall also assist Delphi in obtaining new RCRA generator identification numbers which are or may be required under current or future Environmental Laws for hazardous waste, as defined under current or future Environmental Laws. If same cannot be obtained prior to the Contribution Date, Delphi will expeditiously obtain such identification number after the Contribution Date and, to the extent legally required, will use such number or obtain a substitute number for Delphi's use after the Contribution Date. Without the prior written consent of GM, Delphi will not use for any purpose any such numbers issued before the Contribution Date to GM with respect to the Delphi Facilities.

## ARTICLE 6

### Dispute Resolution

**6.1.** The Parties shall use good faith, best efforts and sound and accepted engineering judgment in making all determinations under this Agreement. In the event of a dispute or disagreement under this Agreement, the Parties shall consult in good faith with each other and shall use best efforts to resolve the matter. It is the express intent of the Parties that any such disputes or disagreements shall be resolved through negotiation between the Parties or, if mutually agreeable as to a specific matter in each Party's discretion, a form of alternative dispute resolution, including binding or non-binding arbitration. It is further understood and agreed, however, that alternative dispute resolution and litigation under this Agreement shall be viewed as a last resort and that the results of any non-litigation dispute resolution procedure under this Article 6 shall not be admissible for any purposes in any litigation in which the Parties are involved and relating to this Agreement unless the Parties otherwise agree as part of such resolution or are utilized to enforce the terms thereof. Either Party shall have the right, after making a reasonable and good faith effort to resolve such dispute through other means, to seek judicial relief in connection with any dispute arising under this Agreement, and in the event that either Party resorts to litigation in order to resolve a dispute (including any breach of this Agreement) under this Agreement, the Party prevailing in connection with such dispute shall be entitled to recover its reasonable and actual attorneys' fees and costs incurred in connection with such litigation. In the event that the matter in litigation relates to a dispute involving a Party's failure to comply with its defense and indemnification obligations under this Agreement and the Party in favor of whom such obligations run has, as a result of the successful assertion of an Environmental Claim, spent money to resolve or otherwise dispose of any resulting

10

11

Environmental Damages, the Indemnifying Party shall pay the Indemnitee's interest at the "prime rate" then in effect from the date due until fully paid, on and to the extent of any expenditures by the other Party in respect of such Environmental Damages. Except with respect to matters covered by Section 2.4 (Duty to Comply with Environmental Laws), the procedures under this Article 6 shall apply to all disputes arising under this Agreement.

## ARTICLE 7

### Transfer Obligations and Non-Assignability

**7.1. Duties Upon Transfer**. Each Party, in connection with the execution and delivery of any lease, sublease, assignment, agreement of sale or other transfer, assignment or conveyance agreement relating to the Delphi Facilities, Delphi Assets or GM Retained Facilities ("Conveyance Document") in which any interest in or portion of any Delphi Facility, Delphi Asset or GM Retained Facility, respectively, is conveyed, sold, contributed, assigned, transferred, leased or subleased, shall use its reasonable best efforts to provide in such Conveyance Document that the non-transferring Party shall have no liability or responsibility for, and shall be fully released and exculpated from, all Environmental Costs and Liabilities and Environmental Claims with respect to the specific Delphi Facility, Delphi Asset or GM Retained Facility subject to such Conveyance Document, and to impose the obligations under this Section 7.1 on any subsequent user, occupant or transferee.

**7.2. Non-Assignability**. The Parties' respective rights, obligations, duties and liabilities under this Agreement, including, but not limited to, the indemnification provisions of Article 3, are personal to each of them and may not be assigned to, or assumed by, any successor, assignee, or any other person without the prior written consent of the other Party, which consent may be granted or withheld in the sole discretion of such other Party; provided, however, that either Party may assign their respective rights under this Agreement to a Corporate Successor without the consent of the other Party, but only if such Corporate Successor also agrees to assume such Party's duties, obligations and liabilities under this Agreement. No such assignment or assumption shall relieve either Party of its obligations under this Agreement unless so agreed in writing by the other Party.

## ARTICLE 8

### Mutual Releases and Covenants Not to Sue

**8.1. Release**. Except as otherwise expressly set forth in Articles 3 and 6 of this Agreement, each Party hereby fully and forever releases and discharges the other Party and its officers, directors, employees, shareholders, direct and indirect wholly-owned subsidiaries, representatives and agents from all manner of action and causes of action, suits, proceedings, arbitrations, choses in action, contracts, covenants, claims, bonds, bills, debts, dues, sums of money, damages, demands and rights whatsoever, in law or in equity, now existing or which may hereafter accrue by reason of any known or unknown facts existing either before or after the Contribution Date and which relate to matters under Environmental Laws, whether or not specifically addressed in this Agreement, including, but not limited to, the environmental

11

12

condition and compliance status of the Delphi Facilities, the Delphi Assets, the GM Retained Facilities, the Identified Waste Disposal Sites, and the Newly Identified Waste Disposal Sites, and all Environmental Damages, Environmental Costs and Liabilities, and Environmental Claims relating thereto.

**8.2. Covenant Not to Sue.** Except as otherwise expressly set forth in Articles 3 and 6 of this Agreement, each Party hereby covenants that it shall not commence any action, arbitration, proceeding or suit, or participate or assist in any manner in the commencement or prosecution of any action, arbitration, proceeding or suit, in law or in equity, in any judicial, administrative, or other forum, based upon or arising out of any matter subject to a release by such Party under Section 8.1 of this Agreement.

## ARTICLE 9

### Miscellaneous

**9.1. Environmental Records.**

(a) As of the Contribution Date, GM shall transfer to Delphi either the originals or true and complete copies of all Environmental Records.

(b) Subject to Section 9.1(c), for a period of seven (7) years from and after the date hereof, each Party covenants and agrees to keep and maintain at reasonably accessible locations all of the Environmental Records in its possession or control as of the date hereof or otherwise coming into the possession or control of such Party after the date hereof. Following reasonable advance written notice, each Party shall make available for review and photocopying by the other Party each and all of its Environmental Records.

(c) With respect to matters in dispute between the Parties or subject to an Environmental Claim at the end of the seven (7) year record retention period, such retention period shall be extended and shall continue with respect to all Environmental Records that may be relevant to the matter until the matter is finally and fully resolved.

**9.2. Environmental/Real Property Transfer Laws.**

(a) The Parties shall reasonably cooperate in good faith with respect to compliance with any applicable Environmental Laws or other laws that require disclosures or other notifications regarding environmental matters to be made by or to either Party or any unit of government in connection with the transactions contemplated by the Master Separation Agreement (collectively, "Environmental Transfer Laws"). To the extent that any obligation exists under any Environmental Transfer Laws to report any information or make any report or notice, such obligation shall be jointly undertaken by the Parties. Each Party hereby waives any requirements under any such Environmental Transfer Law that disclosures or other reports or notifications be made before the Contribution Date and agree that such disclosures and other notifications may be made on the Contribution Date.

12

13

(b) The Parties shall each use their reasonable best efforts to avoid the imposition of or accelerating any Environmental Costs and Liabilities or Environmental Claims under any applicable Environmental Transfer Law as a result of the transactions contemplated by the Master Separation Agreement. Such avoidance strategies could include GM leasing assets to Delphi. Subject to the preceding sentence, neither Party shall be liable or responsible for any Environmental Costs and Liabilities or Environmental Claims regarding the other Party's facilities under any Environmental Transfer Law resulting from the transactions contemplated by the Master Separation Agreement, and each Party shall indemnify and defend the other with respect thereto in accordance with the terms of Article 3.

**9.3. Wastewaters, Stormwater and other Services Agreements**. The Parties may enter into a Wastewaters and Stormwater Services Agreement, or other agreements, under which one Party shall provide certain services for the other Party.

**9.4. Leases and Sub-leases Regarding Certain Facilities**. The Parties have entered or will enter into leases and sub-leases with respect to certain facilities. The terms and conditions with respect to environmental matters at such facilities shall be governed by the respective leases and sub-leases for those facilities.

**9.5. Entire Agreement**. Except for the Master Separation Agreement, the service agreements and the leases and sub-leases referenced in this Agreement, this Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings with respect to the subject matter hereof. In the event of a conflict between this Agreement and the Master Separation Agreement, the terms of this Agreement shall supersede those of the Master Separation Agreement. This Agreement is not intended to confer upon any other person any benefit, right or remedy.

**9.6. No Arrangement for Disposal.** The Parties each acknowledge that the transactions contemplated by this Agreement constitute a transfer of assets in the ordinary course of business and are not intended in any way, nor will they be deemed to be, an arrangement for treatment, storage or disposal of any of the Delphi Facilities or Delphi Assets or any substances or materials contained therein. Delphi agrees that GM will not have any liability under any Environmental Law by virtue of such transfer alone and Delphi will not assert any claim or cause of action against GM based solely thereon.

**9.7. Further Assurances.** The Parties hereto, at any time before or after the Contribution Date, shall, at their own expense, execute, acknowledge and deliver any further assurances, documents and instruments reasonably requested by one another and shall take any other action consistent with the terms of this Agreement that may reasonably be requested by one another for the purpose of consummating the transactions contemplated by or fulfilling the intent of this Agreement.

**9.8. Governing Law.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware regardless of the laws that otherwise govern under applicable principles of conflicts of laws.

13

**9.9. <u>Descriptive Headings.</u>** The descriptive headings herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

**9.10. <u>Notices.</u>** All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered in person, by express or overnight mail or messenger delivered by a nationally recognized air courier (delivery charges prepaid), or by registered or certified mail (postage prepaid, return receipt requested), to a Party as follows:

If to GM: Michelle T. Fisher, Esq.

If to Delphi: Mark A. Hester, Esq.

**9.11. <u>Amendment.</u>** No change or amendment shall be made to this Agreement except by an instrument in writing signed on behalf of each Party hereto.

**9.12. <u>Counterparts.</u>** This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

**9.13. <u>Severability.</u>** If any provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the subject matter hereof is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner so the intent hereof is fulfilled to the fullest extent possible.

**9.14. <u>Failure or Indulgence Not Waived.</u>** Subject to the express provisions of this Agreement, no failure or delay on the part of any Party hereto in the exercise of any right hereunder shall impair such right or be construed to be a waiver of, or acquiescence in, any breach of this Agreement, nor shall any single or partial exercise of any such right preclude other or further exercise thereof or of any other right.

**9.15. <u>Confidentiality.</u>** The terms of this Agreement shall remain confidential and each Party shall not disclose the same without the prior written consent of the other Party except: (a) to such Party's directors, officers, partners, employees, legal counsel, accountants, engineers,

14

15

contractors, financial advisors and similar professionals and consultants to the extent such Party deems it necessary or appropriate and such Party shall inform each of the foregoing persons of such Party's obligations under this paragraph and shall secure the agreement of such persons to be bound by the terms hereof; (b) pursuant to contractual obligations existing as of the date hereof; or (c) as otherwise required by law or regulation.

**9.16.** No rights are created in any third party by this Agreement.

**9.17.** Each Party will cause its direct and indirect wholly-owned subsidiaries to take such actions as may be reasonably necessary to assist such Party to perform its obligations under this Agreement.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by its authorized officers.

GENERAL MOTORS CORPORATION

By:/s/ [ILLEGIBLE]
    Name:    [ILLEGIBLE]
    Title:    [ILLEGIBLE]

DELPHI AUTOMOTIVE SYSTEMS
CORPORATION

By:/s/ James A. Bertrand
    Name:    James A. Bertrand
    Title:    Vice President-Operations

EXECUTION RECOMMENDED
WORLDWIDE REAL ESTATE

BY  /s/ C. P. Schwartz

15

16

# EXHIBIT H

Docket #20520  Date Filed: 8/20/2010

**Hearing Date and Time:  September 24, 2010 at 10:00 a.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler


   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036

Attorneys for DPH Holdings Corp., et al.,
   Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                                          :
          In re                                           :     Chapter 11
                                                          :
DPH HOLDINGS CORP., et al.,                               :     Case Number 05-44481 (RDD)
                                                          :
                                                          :     (Jointly Administered)
          Reorganized Debtors.                            :
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


REORGANIZED DEBTORS' RESPONSE TO THE SUPPLEMENTAL BRIEF OF
ILLINOIS TOOL WORKS, INC. AND ITW FOOD EQUIPMENT GROUP LLC
<u>IN SUPPORT OF CLAIM NOS. 11983, 11985, 11988, AND 11989</u>

0544481100820000000000003

DPH Holdings Corp. and certain of its affiliated reorganized debtors in the above-captioned cases (collectively, the "Reorganized Debtors") hereby submit the Reorganized Debtors' Response To The Supplemental Brief Of Illinois Tool Works, Inc. And ITW Food Equipment Group LLC In Support Of Claim Nos. 11983, 11985, 11988, And 11989, and respectfully represent as follows:

## **Preliminary Statement**

1.       This matter is before the Court on the Reorganized Debtors' objection to proofs of claim numbers 11983, 11985, 11988, and 11989 (the "Claims") filed by Illinois Tool Works, Inc. and  ITW Food Equipment Group LLC (collectively, "ITW") relating to environmental contamination at the South Dayton Dump and Landfill in Ohio (the "Site").

2.       The Reorganized Debtors objected to the Claims on the grounds that the Debtors have no liability at the Site because the Site ceased accepting wastes for the disposal before the Debtors were formed as part of the divestiture by General Motors Corporation ("General Motors") of its Delphi Automotive Systems unit (the "Divestiture").  ITW attempts to avoid the fact that the Debtors did not exist when the Site operated by arguing that discovery will prove that the Debtors are liable as the successor to General Motors.  However, no amount of discovery will change the incontrovertible fact that, after the Divestiture,  General Motors continued to exist as an independent company with the majority of its assets and liabilities unaffected by the Divestiture.  This refutes ITW's arguments regarding successor liability in their entirety and leaves ITW with no valid claim against the Debtors.  Furthermore, no matter how ITW characterizes its claim against the Debtors, it is fundamentally a contingent claim for reimbursement of costs for which ITW is liable and therefore the claim must be disallowed under section 502(e)(1)(B) of the Bankruptcy Code.

2

## Argument

**I.     The Debtors Are Not the Successor to General Motors As a Matter of Law.**

        3.        ITW's argument that the Debtors are the successors to General Motors is fundamentally flawed for two reasons.  First, ITW would have this Court apply Ohio law when, under New York choice of law principles,[1] Delaware law governs the question of corporate successorship in this case.  Second, ITW can prove no set of facts that would establish that the Divesture was a de facto merger, that ITW is a third-party beneficiary to the now-terminated contract between General Motors and the Debtors regarding the assumption and retention of environmental liabilities, or that the Debtors were a mere continuation of General Motors.  This is true under both Delaware and Ohio law, and therefore ITW has no valid claim against the Debtors.

**A.     Delaware Law Governs Whether the Debtors are the Corporate Successors to General Motors.**

        4.        ITW contends that Ohio law governs its successor liability claims because the Site is located in Ohio and New York courts decide choice of law questions based on the *lex loci* test for tort claims.  Supplemental Brief Of Illinois Tool Works, Inc. And ITW Food Equipment Group LLC In Support Of Claim Nos. 11983, 11985, 11988 And 11989 ("ITW Supplemental Brief") ¶ 25 n.1.  The question of whether the Debtors are the corporate successors to General Motors, however, is not a matter of tort law and hence the *lex loci* test is irrelevant.  Instead, as the Southern District of New York has held, under the "paramount interest" test, the state of incorporation has the greatest interest in resolving questions of corporate successor

---

[1]     The Debtors agree with ITW that a federal court exercising bankruptcy jurisdiction over state law claims should apply the choice of law rules of the forum state. ITW Supplemental Brief ¶ 25 n.1; <u>see</u> <u>Adelphia Commc'ns Corp. v. Bank of America</u>, 365 B.R. 24, 26 (Bankr. S.D.N.Y. 2007).

liability. <u>Soviet Pan Am Travel Effort v. Travel Comm., Inc.</u>, 756 F.Supp. 126, 131 (S.D.N.Y.

1991). Accordingly, since both General Motors and Delphi are Delaware corporations,

Delaware state law governs whether Debtors are corporate successors to General Motors, not

Ohio law.

5.      Ultimately, however, the choice of law question need not be resolved as

ITW cannot, as a matter of law, establish that the Debtors are the corporate successors to General

Motors under either Delaware or Ohio law.

**B.      The Divestiture Was Not a _De Facto_ Merger Between the Debtors and General Motors.**

6.      ITW first tries to establish that the Debtors are successors to General

Motors by arguing that the Divestiture was a _de facto_ merger. This argument fails under either

Delaware or Ohio law. To establish a _de facto_ merger under Delaware law, a plaintiff must show

that: (1) the seller transferred all of its assets to the buyer; (2) payment was made in stock with

the buyer issuing its stock directly to the stockholders of the seller; and (3) the buyer agreed to

assume all debts and liabilities of the seller. <u>Xperex Corp. v. Viasystems Techs. Corp., LLC</u>,

2004 Del. Ch. LEXIS 172, *4-5 (Del. Ch. July 22, 2004); <u>see</u> <u>also</u> <u>Drug, Inc. v. Hunt</u>, 168 A. 87,

96 (Del. 1933).

7.      There can be no dispute that General Motors did not transfer all of its

assets to the Debtors; plainly, General Motors continued to own and operate assets after the

Divestiture. Furthermore, the terms of the Master Separation Agreement, pursuant to which the

Divestiture occurred, make clear that only certain of General Motors' assets were transferred to

the Debtors. <u>See</u> Master Separation Agreement Among General Motors Corporation, Delphi

Automotive Systems Corporation, Delphi Automotive Systems LLC, Delphi Technologies, Inc.

4

and Delphi Automotive Systems (Holding), Inc. (the "MSA") § 2.01.[2]  Accordingly, ITW cannot

prove the first element required for a *de facto* merger under Delaware law and its arguments

must be rejected.

8.    Moreover, ITW concedes that it cannot meet the third element for a *de

facto* merger by acknowledging that the Debtors agreed to assume only "certain environmental

liabilities of General Motors."  ITW Supplemental Brief at ¶ 31 (emphasis added).  By ITW's

own admission, the Debtors did not assume all of General Motors' environmental liabilities, let

alone all of its liabilities generally.  For example, the MSA provides that General Motors

retained certain liabilities associated with its Delphi Automotive Systems unit, including certain

product liability claims, identified general litigation claims, and employment-related claims.

MSA §§ 7.01, 7.02, 7.03.  Furthermore, as ITW concedes, the Debtors did not even assume all of

the environmental liabilities associated with the Delphi business unit of General Motors.  Rather,

the Debtors and General Motors entered into the Environmental Matters Agreement by and

between General Motors Corporation and Delphi Automotive Systems Corporation (the

"EMA")[3] which allocated such liabilities between the parties.  Specifically, General Motors

retained all liabilities associated with third-party waste disposal sites that were attributable to the

transferred assets to the extent such liabilities were known at the time of the Divestiture.  EMA ¶

2.3.  Accordingly, because General Motors retained a significant portion of the liabilities

associated with its former Delphi business unit, ITW simply cannot prove the third element

necessary for a *de facto* merger under Delaware law.

---

[2]    The MSA was attached as Exhibit D to Reorganized Debtors' Supplemental Reply To Responses Of Certain
Claimants To Debtors' Objections To Proofs Of Claim Nos. 11983, 11985, 11988, And 11989 Filed By Illinois
Tool Works Inc. And ITW Food Equipment Group LLC (Docket No. 19603) (the "Reorganized Debtors'
Supplemental Reply").

[3]    The EMA was attached as Exhibit E to the Reorganized Debtors' Supplemental Reply.

9.    The same result is reached applying Ohio law.  As ITW acknowledges, a *de facto* merger under Ohio law requires: "(1) the continuation of the previous business activity and corporate personnel, (2) a continuity of shareholders resulting from a sale of assets in exchange for stock, (3) the immediate or rapid dissolution of the predecessor corporation, and (4) the assumption by the purchasing corporation of all liabilities and obligations ordinarily necessary to continue the predecessor's business operations."  ITW Supplemental Brief ¶ 28; citing Welco Indus. Inc. v. Applied Cos., 617 N.E.2d 1129, 1134 (Ohio 1993).

10.    To support the first element, ITW asserts that the Debtors had "a continuity of management and personnel" following the Divestiture.  ITW Supplemental Brief ¶ 30.  The Debtors strongly dispute these facts and any assertion that the second element is satisfied, but the Court need not consider such facts because, as a matter of law, ITW cannot prove the third and fourth elements of a *de facto* merger under Ohio law.   In fact, ITW concedes that the Divestiture does not meet the third requirement by recognizing that "obviously General Motors did not cease its operations as result of the divestiture."  Id. at ¶ 30.  ITW argues that this crucial fact is irrelevant because General Motors ceased the operations previously conducted by its Delphi Automotive Systems unit after the Divestiture.  Id.  But, dissolution of a corporation is entirely different from ceasing particular operations, and ITW's argument has already been rejected by Ohio courts and by federal courts applying Ohio law.  In Welco, for example, the Ohio Supreme Court held that the sale of the assets of a division is not a *de facto* merger even when the seller ceases all operations associated with that division as long as the selling corporate entity continues to exist after the transaction. 617 N.E.2d at 1134.  Consistent with this, the Ohio Court of Appeals has held that the *de facto* merger doctrine "presupposes that the predecessor corporation no longer exists."  Telxon Corp. v. Smart Media of Del., Inc., 2005 Ohio 4931, slip

6

op. at *50 (Ohio Ct. App. 2005).  Likewise, the Third Circuit has noted that a critical element of

the *de facto* merger test under Ohio Law "is that one corporation survives while the other ceases

to exist."  Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 470 (3d Cir. 2006).  In Berg, the

court held that there was no *de facto* merger resulting from the sale of the assets of a corporate

division because the selling company continued to exist and continued to operate its other

divisions.  Id. at 470.  These cases are all factually similar to the present case and demonstrate

that, as a matter of law, ITW cannot establish that the Divestiture was a *de facto* merger under

Ohio law.

11.    ITW also concedes that it cannot meet Ohio's fourth element of a *de facto*

merger.  As noted above, ITW concedes that the Debtors assumed some, but not all, of General

Motors' liabilities.  Accordingly, ITW's attempts to position the Divestiture as a *de facto* merger

under Ohio law must be rejected.

**C.    The Environmental Matters Agreement Does Not Give ITW a Claim Against
the Debtors.**

12.    ITW next asserts that it has a valid claiming arising under the EMA, which,

as discussed above, allocated environmental liabilities between General Motors and Delphi.  In

making this argument, ITW incorrectly states that the EMA was an executory contract that was

rejected by the Debtors and that ITW was a third-party beneficiary under the contract.

**(i)    The EMA Was Not An Executory Contract Rejected by the Debtors.**

13.    ITW concedes, as it must, that the EMA was terminated under the Master

Disposition Agreement Among Delphi Corporation, GM Components Holdings, LLC, General

Motors Company, Motors Liquidation Company, DIP Holdco 3 LLC and Other Companies,

Dated As Of July 30, 2009 (the "MDA").  The MDA was entered into as part of the First

Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors

7

And Debtors-In-Possession, As Modified (the "Modified Plan"), which was approved by this

Court pursuant to an order entered on July 30, 2009 (Docket No. 18707).

14.     Without explanation or any legal or factual support, ITW equates the

termination of the EMA with the rejection of an executory contract under Section 365 of the

Bankruptcy Code.  This is incorrect.  The EMA was terminated by the consent of both General

Motors and the Debtors under section 9.19 of the MDA.  See Modified Plan at Exhibit 7.7, §

9.19.1(C).  In contrast, the executory contracts that were rejected by the Debtors were rejected

unilaterally and listed on Exhibit 8.1(a) to the Modified Plan.  The EMA is not listed on this

exhibit.  See Modified Plan at Exhibit 8.1(a) and amendments thereto (Docket Nos. 17557,

18492, 18683, 18704).  Thus, ITW's threshold assumption with respect to the EMA is incorrect;

the EMA was not a rejected executory contract, and therefore ITW's argument that it has a claim

for rejection damages under Section 365(g) of the Bankruptcy Code necessarily fails.

### (ii)     ITW Was Not a Third-Party Beneficiary to the EMA.

15.     Moreover, ITW cannot demonstrate that it was a third-party beneficiary to

the EMA.  As a threshold matter, ITW again directs the Court to the wrong governing law by

indicating that New York law should apply.  The correct choice of law is Delaware because the

EMA provides that it will be governed by the law of Delaware. EMA ¶ 9.8.  Under New York's

choice of law principles, if a contract has an express choice of law provision and the chosen

jurisdiction has sufficient contact with the transaction, this choice of law will govern disputes

arising out of the contract except in cases of fraud or violations of public policy.  Fieger v. Pitney

Bowes Credit Corp., 251 F.3d 386, 393 (2d Cir. 2001).  ITW has made no allegations of fraud or

violations of public policy and therefore Delaware governs ITW's claim that it is a third-party

beneficiary to the EMA.

16.     Under Delaware law, "[t]o qualify as a third-party beneficiary of a contract, (i) the contracting parties must have intended that the third party beneficiary benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract." Madison Realty Partners 7, LLC v. Ag ISA LLC, C.A. No. 18094, 2001 WL 406268, at *5 (Del. Ch. Apr. 17, 2001) (citing Guardian Constr. Co.v. TetraTech Richardson, Inc., 583 A.2d 1378, 1386-87 ((Del. Super. Ct. 1990)). ITW has not alleged any facts sufficient to meet these three prongs, nor has it even discussed these requirements; instead it bases its claim solely on the "notion that it is just and practical" for ITW to collect rejection damages for termination of the EMA.  ITW Supplemental Brief ¶ 34 (internal quotations omitted).  Such policy considerations, however, are irrelevant to whether ITW meets the requirements under Delaware law to be deemed a third-party beneficiary.  And, clearly, ITW does not.

17.     First, General Motors and Delphi must have intended ITW to benefit from the EMA at the time it was entered.  Hostetter v. Hartford Ins. Co., C.A. No. 85C-06-28, 1992 Del. Super. LEXIS 284, *17 (Del. Super. Ct. July 13, 1992) (since plaintiff was not named or identified in the contract and there was no indication that the contract was made with the specific intention to benefit plaintiff, plaintiff was not a third-party beneficiary).  Clearly this is not the case as General Motors' liability at the Site was not known in 1998, the date of the EMA.  This fact necessarily follows from the EMA, under which General Motors retained full liability for disposal sites that were known as of the date of the EMA and the Debtors assumed a portion of the liability at disposal sites where the liability was discovered after the EMA.  See EMA §2.3. Thus, if the Debtors assumed any liability at the Site under the EMA, such liability necessarily

9

was unknown to General Motors and the Debtors at the time of the EMA.  Accordingly, ITW cannot possibly prove that General Motors and the Debtors intended for the EMA to benefit ITW.

18.    ITW cannot avoid this result by asserting that the EMA was generally intended to benefit other responsible parties at the newly identified waste sites.  Delaware law distinguishes intended beneficiaries, who can be third-party beneficiaries, from incidental beneficiaries, who have no rights under contracts to which they are not parties.  Hostetter, 1992 Del. Super. LEXIS 284 at 17-19.  Intended beneficiaries are those who are specifically contemplated to be benefited by a contract at the time it was made, while incidental beneficiaries are those who are not specifically contemplated by the contract but may otherwise benefit from it. Id.  The court in Hostetter rejected the plaintiff's argument that because she was in a general class of individuals that could benefit from the insurance contract, she was an intended beneficiary and instead held that those potential benefits were incidental to the intended purpose of the contract, which was to protect the contracting party's assets.  Id. at  17-18.  Since neither General Motors nor Delphi knew that ITW could have a potential claim against General Motors for liability at this Site, they could not have intended for ITW to specifically benefit from this contract.

19.    ITW similarly cannot meet the second requirement to establish third-party beneficiary status because General Motors and the Debtors did not intend the EMA to be a gift or in satisfaction of a pre-existing obligation.  Because General Motors and Delphi had no knowledge of General Motors' potential liability at the Site, there could be no intent that the contract be a gift to ITW or in satisfaction of a pre-existing obligation.

20.    Finally, even if ITW could somehow establish that the EMA was intended to benefit ITW as a gift or in satisfaction of a pre-existing obligation, Delaware law also requires

10

that the benefit to a third party must have been a material part of the purpose of the contract.

Insituform of N. Am., Inc. v. Chandler, 534 A.2d 257, 270 (Del. Ch. 1987) (concluding that the

effect of a contract, "whether beneficial or not, or intended or not, was merely instrumental to

achievement of the contract's purpose and was, legally, incidental to the contract").  ITW

conceded that this was not the case with the EMA, stating that "[t]he obvious purpose of the

EMA was to assign liability, by agreement, for environmental damages caused by former GM

facilities."  ITW Supplemental Brief ¶ 34.  Furthermore, as stated in the Reorganized Debtors'

Supplemental Brief, the EMA was entered into for the express purpose of implementing the

Divestiture.  See Reorganized Debtors' Supplement Brief at ¶ 21.  Accordingly, the purpose of

the EMA was to effectuate the allocation of liabilities between General Motors and the Debtors

as part of the Divestiture, not to benefit any third parties.  Any benefits that would have accrued

to ITW had the EMA not been terminated were incidental to the agreement and are insufficient

to give ITW enforceable rights under the contract.

### D.    The Debtors Were Not a Mere Continuation of General Motors.

21.    Finally, ITW's argument that the Debtors were a mere continuation of

General Motors must fail under both Delaware and Ohio law.   In Delaware, the mere

continuation theory of successor liability is interpreted narrowly and requires that "the new

company be the same legal entity as the old company."  Ross v. DESA Holdings Corp., 2008

WL 4899226, at *4 (Del. Super. Ct. Sept. 30, 2008).  Furthermore, whether the new company

continued the business operations of the old company is irrelevant; successor liability only

attaches if the new company is the "same legal person" as the old company.  Id.; see also, e.g.,

Fountain v. Colonial Chevrolet Co., 1988 WL 40019, at *9 (Del. Super. Ct. Apr. 13, 1988).

Similarly, under Ohio law, the mere continuation exception is "narrowly construed to protect

corporations from unassumed liabilities." Flaugher v. Cone Automatic Mach. Co., 30 Ohio St. 3d 60, 64 (Ohio 1987).  And, as ITW admits, the basis of this exception under Ohio law is "the continuation of the corporate entity, not the business operation, after the transaction."  ITW Supplemental Brief ¶ 36 (quoting Per-Co, Ltd. v. Great Lakes Factors, 299 Fed. Appx. 559, 563 (6th Cir. 2008)).

        22.    No amount of discovery will establish that the Debtors were the same legal entity as General Motors after the Divestiture.  Clearly General Motors continued as a separate and distinct entity from the Debtors, as evidenced by the two companies' separate SEC filings, separate articles of incorporation and, indeed, separate bankruptcy proceedings, all of which this Court may take judicial notice of for purposes of this sufficiency hearing.  Moreover, the mere fact that General Motors continued to exist at all after the Divestiture is fatal to ITW's argument under both Delaware and Ohio law.  Ross, 2008 WL 4899226 at *4 (finding that the new company was not the mere continuation of the old company when the old company continued to exist after the sale); Fehl v. S. W. C. Corp., 449 F.Supp. 48 (D. Del. 1978) (same); see also Travis v. Harris Corp., 565 F.2d 443, 447 (7th Cir. 1977) (applying Ohio law and finding that the mere continuation theory requires "the existence of only one corporation at the completion of the transfer."); McGaw v. South Bend Lathe, Inc., 598 N.E.2d 18, 21-22 (Ohio Ct. App. 1991) (stating that successor liability based on mere continuation cannot exist without "the seller's prompt extinction after the transfer").

        23.    The only argument that ITW makes to support its mere continuation theory is that General Motors continued to own at least 80% of the stock of Delphi Corporation after the Divesture.  But this does not establish that Delphi Corporation was the same legal entity as General Motors and is thus insufficient to establish liability.  Furthermore, as set forth in the

MSA, as part of the Divestiture, General Motors was to distribute its ownership interest in the Delphi Corporation to its shareholders by means of an exchange offer and/or pro rata distribution. MSA at Recitals.  As shown by the records of the New York Department of Taxation and Finance, this distribution occurred in May 1999, a mere five months after the Divestiture.  See Advisory Opinion, State of New York Commissioner of Taxation and Finance, Petition No. C990610A, November 3, 1999 (attached hereto as Exhibit A).  This brief period of ownership of Delphi Corporation by General Motors is insufficient to render the Debtors the same legal entity as General Motors, as is the fact that some of Delphi Corporation's stock was owned by the shareholders of General Motors.  Per-Co, Ltd., 299 Fed. Appx. at 564.  In Per-Co, Ltd., the acquiring company planned to institute an employee stock ownership plan in which the stockholders of the selling corporation would own 79% of the stock of the acquiring corporation. The court concluded that this "alteration in ownership . . . would have made the 'mere continuation' theory inapposite."  Id. at 564.  Thus, under Per-Co, Ltd., ITW's claim of successor liability based upon the theory of 'mere continuation' fails.

## II.    The Claims Are Barred by Section 502(e)(1)(B) of the Bankruptcy Code.

24.    Finally, ITW attempts to avoid disallowance of the Claims under Section 502(e)(1)(B) of the Bankruptcy Code by arguing that it has a direct claim against the Debtors for the costs it will incur at the Site.  In doing so, ITW does not contest that it is a liable party at the Site or that its claim is contingent.  Instead, it argues that its "direct" claim against the debtors is not a claim for contribution or reimbursement.  However, this argument fails for two reasons. First, ITW describes its claim as one for "past and future response costs it has incurred or will incur itself."  ITW Supplemental Brief ¶ 43.  In other words, ITW seeks reimbursement of its costs, and as such the Claims fall squarely within the scope of §502(e)(1)(B) which requires the

disallowance of contingent claims "for reimbursement" by co-liable parties.  11 U.S.C. §

502(e)(1)(B).  Because ITW has not contested that its claim is contingent and that it is co-liable

with the Debtors, its claim for reimbursement of cleanup costs must be rejected.  In re Hexcel

Corp., 174 B.R. 807 (Bankr. N.D. Cal. 1994) (claims for reimbursement of cleanup costs by co-

liable parties are disallowed under §502(e)(1)(B)).

   25. Second, ITW is wrong when it asserts that there is no risk of double

recovery against the Debtors because ITW is only attempting to recover the costs it will incur

directly at the Site.  The United States Environmental Protection Agency (EPA) has asserted a

claim against the Debtors that seeks recovery of all costs necessary to design the cleanup remedy

and implement it.  As set forth in EPA's proof of claim:

> EPA expects to incur future response costs in connection with the remedial design
> and remedial action for the South Dayton Site.  These costs have been estimated
> by EPA at between $20 and 50 million.  Along with other identified [liable
> parties], Delphi is jointly and severally liable to the United States for these
> amounts.

Proof of Claim #14309, ¶ 7, attached hereto as Exhibit B.  This makes clear that EPA intends to

seek the full amount of the cleanup costs – not just oversight costs – from the Debtors.

Accordingly, ITW's claim is in direct competition with EPA's claim and if ITW's claim is not

disallowed, the Debtors could be both jointly and severally liable to EPA for the full cleanup

costs at the Site and to ITW for its share of the cleanup costs.  This is precisely the type of

double recovery that Section 502(e)(1)(B) is designed to avoid.

   26. In this regard, all but one of the cases cited by ITW are inapposite because

those cases did not involve competing claims by governmental entities or other third parties

seeking to recover the cleanup costs from the debtors.  For example, in In re Harvard Industries,

Inc., the court specifically noted that neither the federal nor the state environmental agencies had

14

filed a claim against the debtor for cleanup costs.  138 B.R. 10, 12 (Bankr. D. Del. 1992).

Similarly, the Court in In re Dant & Russell, Inc. noted that "third parties [were] not competing

over [the debtors'] funds for cleanup . . . – there is no third party creditor here."  951 F.2d 246,

248 (9th Cir. 1991).  Likewise, In re New York Trap Rock Corp. expressly acknowledged that

there was no "multiple liability on the debtor's part for the contingent claim asserted" by the

creditor.  153 B.R. 648, 651 (Bankr. S.D.N.Y. 1993).

   27.  The only other case cited by ITW is In re Allegheny Int'l, Inc. 126 B.R.

919, 923 (W.D. Penn. 1991).  That decision, however, has previously been criticized by the

Bankruptcy Court for the Southern District of New York for failing to recognize that,

fundamentally, claims for cleanup costs by co-liable parties are not direct claims but rather are

claims "to satisfy the obligation that both the debtor and the claimant had to the EPA for the

remediation of the properties."  In re Drexel Burnham Lambert Group, 148 B.R. 982, 989 (Bankr.

S.D.N.Y. 1991) (quoting In re Cottonwood Canyon Land Co., 146 B.R. 992 (Bankr. D. Colo.

1992).  The same is true here – ITW's claim is fundamentally a claim for reimbursement of the

costs necessary to satisfy the obligation to clean up the Site.  ITW admits its liability for this

obligation, and EPA has filed a claim against the Debtors for these same costs.  ITW's claim,

therefore, must be disallowed under  §502(e)(1)(B) of the Bankruptcy Code.

## Conclusion

   28.  ITW has not challenged the position that the Debtors did not exist at the

time the Site ceased accepting wastes for disposal.  Instead, it argues that the Debtors are liable

for General Motors' disposal of wastes because the Debtors are the corporate successors to

General Motors.  But, ITW cannot escape the plain fact that, after the Divestiture, General

Motors continued its own separate and distinct existence and that the Debtors did not acquire all

of General Motors' assets or assume all of its liabilities.  These facts preclude any finding that the

Debtors are corporate successors to General Motors under either the *de facto* merger or mere

continuation test.  Additionally, ITW has no valid claim under the EMA because that agreement

was terminated by the consent of both the Debtors and General Motors and was not a rejected

executory contract giving rise to rejection debtors.  Moreover, ITW clearly was not a third-party

beneficiary under the EMA and thus cannot assert any claims arising from the EMA.  Finally, as

contingent claims for reimbursement on an obligation for which ITW is liable, the Claims must

be disallowed under §502(e)(B)(1) of the Bankruptcy Code.

        WHEREFORE the Reorganized Debtors respectfully request this Court enter an

order (a) sustaining the Reorganized Debtors' objection with respect to the Claims, (b)

disallowing and expunging the Claims in their entirety, and (c) granting such further and other

relief this Court deems just and proper.

Dated:    New York, New York
        August 20, 2010

                SKADDEN, ARPS, SLATE, MEAGHER
                  & FLOM LLP

                By:  /s/ John Wm. Butler, Jr.
                    John Wm. Butler, Jr.
                    John K. Lyons
                    Ron E. Meisler
                155 North Wacker Drive
                Chicago, Illinois 60606

                  - and -

                Four Times Square
                New York, New York 10036

                Attorneys for DPH Holdings Corp., et al.,
                  Reorganized Debtors

16

## Exhibit A

**New York State Department of Taxation and Finance**

# Taxpayer Services Division
# Technical Services Bureau

TSB-A-99(27)C
Corporation Tax
November 3, 1999

STATE OF NEW YORK
COMMISSIONER OF TAXATION AND FINANCE

ADVISORY OPINION          PETITION NO. C990610A

On June 10, 1999, a Petition for Advisory Opinion was received from Delphi Automotive Systems Corporation, 1450 West Long Lake Road, Troy, Michigan 48098.

The issue raised by Petitioner, Delphi Automotive Systems Corporation, is whether it is a "new business" and thus entitled to the refundibility of investment tax credit, under section 210.12(e) of the Tax Law.

Petitioner submits the following statement of facts as the basis for this Advisory Opinion.

Before 1991, the production of parts by General Motors Corporation ("GM") was conducted by many separate automotive parts operations which GM had acquired over time. These operations were generally managed independently from each other within the GM organization and were accounted for as separate divisions within GM. In 1991, GM organized its component businesses into the Automotive Components Group in order to improve the competitiveness of these operations and increase its business through penetration of new markets. Since that time, the Group has been transformed from a North America-based, captive component supplier to GM into a global supplier of components, integrated systems and modules for a wide range of customers. In 1995, the group was given the name "Delphi Automotive Systems" ("Delphi") in order to establish its separate identity in the automotive parts industry.

Petitioner was incorporated in Delaware on September 16, 1998. Petitioner is a holding company that holds a 100 percent interest in Delphi Automotive Systems LLC ("Delphi LLC"), a company that operates in New York State through several divisions including the Delphi Harrison Thermal Division ("Delphi Harrison") and Delphi's Energy and Engine Management Systems Division. Delphi LLC was formed in Delaware on September 16, 1998. Petitioner will be treating Delphi LLC as a branch or division of Petitioner for federal income tax purposes as provided under section 301.7701-3 of the Treasury Regulations, and will also be treating it as a branch or division of Petitioner for purposes of Article 9-A of the Tax Law.

On January 1, 1999, GM transferred certain assets to Petitioner, and its subsidiaries, and Petitioner and its subsidiaries have assumed, or agreed to assume, pay, perform, satisfy and discharge, the related liabilities. This transaction qualified for "tax-free" treatment under section 351 of the Internal Revenue Code("IRC").

TSB-A-99(27)C
Corporation Tax
November 3, 1999

On February 5, 1999, immediately prior to which Petitioner was wholly owned by GM, Petitioner completed an initial public offering (the "IPO") of 100 million shares of Petitioner $.01 par value common stock thereby reducing GM's holdings to 82.3 percent.  On May 28, 1999, GM divested itself of its entire interest in Petitioner by distributing all of its shares of Petitioner's common stock to holders of GM's common stock (the "Distribution").  This Distribution was accomplished through a tax-free spin-off ( a pro rata distribution by GM of its shares of Petitioner's common stock to holders of GM's common stock) under section 355 of the IRC.

Petitioner is an independent publicly traded company headquartered in Troy, Michigan, that is listed on the New York Stock Exchange and other global exchanges.  Petitioner is an automotive supplier dealing in "Dynamics and Propulsion, Safety, Thermal and Electrical Architecture, and Electronics & Mobile Communications."  As a world leader in the automotive supply business, Petitioner is comprised of 196,000 employees operating 208 wholly-owned manufacturing sites, participates in 46 joint ventures and operates 27 technical centers in 36 countries.  Petitioner's integrated systems and modules are designed to simplify vehicle manufacturers' processes while meeting the demands of today's high-tech vehicles with its main focus being customer satisfaction through technology leadership, world class quality, cost, scheduled delivery and responsiveness.

Delphi Harrison's capital funding will be utilized for new product and process technologies such as newly designed compact / ultra-thin heat exchange products, newly designed compact air conditioning modules and new lean cell manufacturing processes.

Since May 28, 1999, the spin-off date from GM, not more than 50 percent of the number of shares of Petitioner's voting stock has been held by a taxpayer subject to tax under Article 9-A or any of the other provisions enumerated in section 210.12(j) of the Tax Law, because Petitioner is owned by many different investors, and is no longer owned by GM.  After the spin-off date, no shareholder owns more than 50 percent of Petitioner's voting stock.

Petitioner states that it is not substantially similar in operation to GM since Petitioner's business is the manufacture of automotive and non-automotive components while GM's business is the assembly and sale of motor vehicles.  Petitioner also states that for the years prior to 1999, the GM divisions that are now Delphi LLC operations that are still operating plants in New York State manufactured the following products:  Delphi Harrison which operates in Lockport, New York, manufactured condensers (which cover the complete range of automotive air conditioning needs), heater cores, evaporators, heating, ventilating and air conditioning modules, heavy-duty oil coolers, automotive oil coolers, radiators, powertrain cooling modules, accumulator dehydrators, 6-cylinder axial-type H-6 compressors, V-5f, V-6 and V-7 variable displacement compressors, and compact variable compressors; while Delphi's Energy and Engine Management Systems Division which operates in Rochester, New York, manufactured throttle bodies, fuel rails, fuel rail assemblies, integrated air fuel modules, exhaust gas recirculation valves (both linear and backpressure),

evaporative emissions canisters, and generator die casts. No other GM plant manufactured similar products either in New York or in any other state during the years prior to 1999.

For calendar year 1999, Petitioner will be filing two short-period returns for both federal income tax purposes and New York State franchise tax purposes. The first short period will be January 1, 1999 through May 31, 1999; the second short period will be June 1, 1999 through December 31, 1999.

It should be assumed for purposes of this advisory opinion that asset acquisitions by Petitioner will qualify for the investment tax credit under section 210.12(b)(1) of the Tax Law as property principally used by Petitioner in the production of goods by manufacturing.

## Discussion

Section 301.7701-3(a) of the Treasury Regulations, provides that a business entity that is not required to be classified as a corporation is an "eligible entity" that can elect its classification for federal income tax purposes. A domestic eligible entity that has a single member can elect to be classified as an association or elect to be disregarded as an entity separate from its owner. Under section 301.7701-3(b)(1) of the Treasury Regulations, the default classification of an entity that has a single owner will be that it is not an entity separate from its owner. If the entity wants to be classified as an association, it must make the election pursuant to section 301.7701-3(c) of the Treasury Regulations.

It has been established that the classification of an LLC for New York State tax purposes will follow the classification accorded the LLC for federal income tax purposes. (See, FGIC CMRC Corp, Adv Op Comm T & F, April 1, 1996, TSB-A-96(11)C; and Department of Taxation and Finance Memorandum, TSB-M-94(6)I and (8)C, October 25, 1994.) Following federal conformity with respect to classifying LLCs, a single member LLC which is a domestic eligible entity that does not make the election for federal income tax purposes pursuant to section 301.7701-3 of the Treasury Regulations would not be classified as an entity separate from its owner. If its owner is a corporation, it would be considered a branch or division of the owner corporation.

In this case, Delphi LLC is treated as a division of Petitioner for federal income tax purposes and, therefore, Delphi LLC will be treated as a division of Petitioner for purposes of Article 9-A of the Tax Law.

Section 210.12 of the Tax Law allows an investment tax credit against the tax imposed under Article 9-A of the Tax Law. For taxable years beginning after 1990, section 210.12 allows an investment tax credit equal to five percent with respect to the first $350 million of the investment credit base and four percent with respect to the investment credit base in excess of $350 million. The

TSB-A-99(27)C
Corporation Tax
November 3, 1999

investment credit base is the cost or other basis for federal income tax purposes of qualified tangible personal property and other tangible property, including buildings and structural components of buildings.

Under section 210.12(b) of the Tax Law and section 5-2.2 of the Business Corporation Franchise Tax Regulations ("Article 9-A Regulations"), the term "qualified property" means tangible personal property and other tangible property, including buildings and structural components of buildings, which:

(1)     is acquired, constructed, reconstructed or erected by the taxpayer after December 31, 1968;

(2)     is depreciable pursuant to section 167 of the Internal Revenue Code;

(3)     has a useful life of four years or more;

(4)     is acquired by the taxpayer by purchase as defined in section 179(d) of the Internal Revenue Code;

(5)     has a situs in New York State; and

(6)     is principally used by the taxpayer in the production of goods by manufacturing, processing, assembling, refining, mining, extracting, farming, agriculture, horticulture, floriculture, viticulture or commercial fishing.

Section 210.12(e)(1) of the Tax Law, provides, in part, that:

if the amount of credit allowable under this subdivision for any taxable year reduces the tax to [the higher of the amounts prescribed in section 210.1(c) and (d) of the Tax Law] ... any amount of credit allowed for a taxable year commencing ... on or after [January 1, 1987] and not deductible in such year may be carried over to the fifteen taxable years next following such taxable year and may be deducted from the taxpayer's tax for such year or years.  In lieu of such carryover, any such taxpayer which qualifies as a new business under [section 210.12(j) of the Tax Law] may elect to treat the amount of such carryover as an overpayment of tax to be credited or refunded in accordance with the provisions of [section 1086 of the Tax Law], provided, however, the provisions of [section 1088(c) of the Tax Law] notwithstanding, no interest shall be paid thereon.

TSB-A-99(27)C
Corporation Tax
November 3, 1999

Section 210.12(e)(1) of the Tax Law provides that if the amount of investment tax credit allowed under section 210.12 of the Tax Law for any taxable year reduces the tax due for such year to less than the higher of the amounts prescribed in section 210.1(c) and (d) of the Tax Law, any amount of credit thus not deductible in such year may be carried over to the following 15 years, and may be deducted from the taxpayer's tax for such year or years. In lieu of such carryover, a taxpayer which qualifies as a "new business" under section 210.12(j) of the Tax Law, may elect to treat the amount of such carryover as an overpayment of tax to be credited or refunded in accordance with the provisions of section 1086 of the Tax Law.

Section 210.12(j) of the Tax Law provides that for purposes of section 210.12(e) of the Tax Law, a "new business" shall include any corporation except:

> 1. a corporation in which over 50 percent of the number of shares of stock entitling their holders to vote for the election of directors or trustees is owned or controlled, either directly or indirectly, by a taxpayer subject to tax under Article 9-A; section 183, 184, 185, 186 of Article 9; Article 32 or 33 of the Tax Law; or

> 2. a corporation that is substantially similar in operation and in ownership to a business entity or entities taxable, or previously taxable under Article 9-A; section 183, 184, 185, or 186 of Article 9; Article 32 or 33; or Article 23 or that would have been subject to tax under Article 23, as such article was in effect on January 1, 1980, or the income (or losses) of which is (or was) includable under Article 22 of the Tax Law whereby the intent and purpose of section 210.12(e) of the Tax Law with respect to refunding of credit to new business would be evaded; or

> 3. a corporation that has been subject to tax under Article 9-A for more than four years (excluding short periods) prior to the taxable year during which the taxpayer first becomes eligible for the investment tax credit.

Therefore, a corporation is a "new business" *unless* it is described in any of these three conditions. For the short period January 1, 1999 through May 31, 1999, Petitioner was not a new business, pursuant to section 210.12(j)(1) of the Tax Law, because for that entire period it was more than 50 percent owned by GM, a taxpayer under "Article 9-A of the Tax Law.

After GM's divestiture of stock in Petitioner on May 28, 1999, Petitioner was no longer more than 50 percent owned or controlled by a taxpayer described in section 210.12(j)(1) of the Tax Law. Further, while immediately upon such divestiture Petitioner was substantially similar in ownership to GM, since Petitioner was as of that moment a 100 percent publicly traded corporation, it must be presumed that such similarity in ownership was immediately dissipated, such that the situation described in section 210.12(j)(2) of the Tax Law no longer applied. Therefore, with respect to

TSB-A-99(27)C
Corporation Tax
November 3, 1999

Petitioner's short period return, June 1, 1999 through December 31, 1999, Petitioner will satisfy the first and second conditions of section 210.12(j) of the Tax Law (i.e., was *not* as there described), from which it follows that Petitioner is and will be a new business with respect to qualifying property placed in service after May 28, 1999, and before the end of its first five taxable years (excluding short taxable periods).

DATED:  November 3, 1999                                    /s/
                                                                    John W. Bartlett
                                                                    Deputy Director
                                                                    Technical Services Bureau

NOTE:          The opinions expressed in Advisory Opinions are limited to the facts set forth therein.

**<u>Exhibit B</u>**

ORIGINAL
# 14309

FORM B10 (Official Form 10) (04/05)

| UNITED STATES BANKRUPTCY COURT  SOUTHERN    DISTRICT OF   NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>**Delphi Automotive Systems LLC** | Case Number<br>**05-44640 (RDD)** |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

**Received**

**AUG 0 9 2006**

**Kurtzman Carson**

Claim #14309
USBC SDNY
Delphi Corporation, et al.
05-44481 (RDD)

Name of Creditor (The person or other entity to whom the debtor owes money or property):

U.S. Environmental Protection Agency

Name and address where notices should be sent:

David J. Kennedy
Assistant U.S. Attorney, SDNY
86 Chambers Street, 3rd Floor
New York, NY 10007

Telephone number:   (212) 637-2733

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

Account or other number by which creditor identifies debtor:

Check here ☐ replaces
if this claim ☐ amends        a previously filed claim, dated:_____

**1.  Basis for Claim**
☐ Goods sold
☐ Services performed          See attached.
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☐ Other _____

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)
Last four digits of SS #: _____
Unpaid compensation for services performed
from _____ to_____
        (date)                     (date)

**2.  Date debt was incurred:**
See attached.

**3.  If court judgment, date obtained:**
See attached.

**4.  Total Amount of Claim at Time Case Filed: $   See attached.**
        (unsecured)        (secured)        (priority)        (Total)
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).          See attached.

Brief Description of Collateral:
☐ Real Estate    ☐ Motor Vehicle
☐ Other_____
Value of Collateral:    $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

**6.  Unsecured Nonpriority Claim $_____**
☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7.  Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority  $_____
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).
☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units-11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. $10,000 and 180-day limits apply to cases filed on or after 4/20/05. Pub. L. 109-8.

**8.  Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9.  Supporting Documents:**   *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10. Date-Stamped Copy:**   To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim

THIS SPACE IS FOR COURT USE ONLY

2006 JUL 31   P 3
S.D.N.Y.
FILED
U.S. BANKRUPTCY COURT

| Date<br>7/31/06 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>[signature]  DAVID J. KENNEDY, A.U.S.A. |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years or both.  18 U.S.C. §§ 152 and 3571.

0544640060731000000000121

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By: DAVID J. KENNEDY (DK-8307)
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York  10007
Tel. No.:  (212) 637-2733
Fax No.:  (212) 637-2686

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x

In re:

DELPHI AUTOMOTIVE SYSTEMS LLC,

Debtors.

CHAPTER 11

Case No. 05-44640-rdd

Jointly Administered

--------------------------------------------------------x

## PROOF OF CLAIM OF THE UNITED STATES ON BEHALF OF
## THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

1.       The United States files this Proof of Claim at the request of the U.S.

Environmental Protection Agency ("EPA"), against debtor Delphi Automotive Systems LLC

("Delphi"), for response costs incurred and to be incurred by the United States under the

Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42

U.S.C. §§ 9601-9675 at the Superfund Sites set forth herein in Paragraphs 2 through 7, infra.  In

addition, with respect to equitable remedies that are not within the Bankruptcy Code's definition

of "claim," 11 U.S.C. § 101(5), this proof of claim is only filed in protective fashion.  See, e.g.,

Paragraphs 3, 8, 9, and 10, infra.

2.       Tremont City Landfill Superfund Site.  Delphi is liable to the United States under

CERCLA with respect to the Tremont City Landfill Superfund Site located at 3108 Snyder-

Domer Road, Tremont City, German Township, Clark County, Ohio (the "Tremont City Site").

The 80-acre Site includes several facilities including a closed 8.5 acre chemical waste landfill

(the "Barrel Fill" facility), a closed 56 acre sanitary landfill (the "Landfill" facility), and a 15.5

acre closed oil recycling and hazardous waste storage and transfer operation (the "Waste

Storage" facility). Delphi is liable to the United States because by contract, agreement or

otherwise, it arranged for disposal or treatment, or arranged with a transporter for transport for

disposal or treatment, of hazardous substances owned or possessed by Delphi at the Barrel Fill

and Landfill facilities owned by another party or entity, and containing hazardous substances,

pursuant to Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3). Delphi disposed of drums

and bulk wastes containing, inter alia, paint sludge, polyester resins, polystyrene, sulfuric acid

sludge, paint waste, polyol resin and caustic sludge at the Barrel Fill facility and solid wastes at

the Landfill facility. The closed Barrel Fill and Landfill operations are facilities within the

meaning of CERCLA. There have been releases or threats of releases of hazardous substances,

including but not limited to, inorganic compounds (antimony, arsenic, thallium, cyanide and

lead) and volatile organic compounds (xylene, methylene chloride, ethyl benzene and acetone),

from the facilities at the Tremont City Site. These hazardous substances have been released into

the waterways, surface water, soils, and sediments at the Tremont City Site. Other potentially

responsible parties may, along with Delphi, also be jointly and severally liable to the United

States under CERCLA with respect to the Barrel Fill and Landfill facilities.

3.    This Proof of Claim is filed in a protective manner with respect to Delphi's

obligations to perform work with respect to the Tremont City Site. See Paragraph 8, infra. On

October 3, 2002, EPA entered into an Administrative Order on Consent ("AOC")(Docket # V-

2

W-03-C-719) with Delphi that required Delphi, and six other respondents, inter alia, to conduct a

Remedial Investigation/Feasibility Study ("RI/FS") at the Tremont City Site. Delphi and the

remaining AOC respondents have completed the RI field work. EPA estimates that it may cost

the jointly and severally liable parties, including Delphi, approximately $1 million to complete

the required work under the AOC, some of which has already been performed. EPA has not yet

selected remedial action under CERCLA for the Barrel Fill and Landfill facilities at the Tremont

City Site and Delphi has therefore not yet been ordered to perform remedial work, but may be

ordered by a court or other authority found to have jurisdiction to do so in the future. Since

investigations at the Barrel Fill and Landfill facilities at the Tremont City Site are continuing and

remedial action has not yet been selected, the cost of Remedial Design/Remedial Action

("RD/RA") to Delphi is uncertain at this time, but the work with respect to these facilities could

cost the jointly and severally liable parties, including Delphi, as much as a total of $22.2 million

or more, in addition to the $1 million described above. EPA estimates that RD/RA work relating

to the Barrel Fill facility could cost the jointly and severally liable parties, including Delphi,

approximately $7 million. EPA estimates that RI/FS work and RD/RA work relating to the

Landfill facility could cost the jointly and severally liable parties, including Delphi,

approximately $14.5 million.

    4.    Response costs have been and will be incurred by EPA with respect to the

Tremont City Site not inconsistent with the National Contingency Plan promulgated pursuant to

Section 105 of CERCLA, 42 U.S.C. § 9605, and set forth at 40 C.F.R. Part 300, as amended.

Under the AOC, Delphi is also liable to make payments for future oversight costs to EPA, which

EPA estimates to be $100,000. In addition, the United States has incurred unreimbursed

response costs to date of approximately $820,000 with respect to the Barrel Fill and Landfill

facilities at the Tremont City Site for previous work, including inter alia, a Preliminary

Assessment/Site Investigation ("PA/SI").   Delphi is jointly and severally liable to the United

States for the above amounts.  Delphi is also jointly and severally liable for interest due under 42

U.S.C. § 9607(a).   Other potentially responsible parties may along with Delphi also be jointly

and severally liable to the United States for all of the above amounts plus interest due under 42

U.S.C. § 9607(a).

   5.   South Dayton Dump & Landfill Superfund Site.  Delphi is liable to the United

States under CERCLA with respect to the South Dayton Dump and Landfill Superfund Site

("South Dayton Site") located at 1975 Dryden Road, Moraine, Ohio. Delphi is liable to the

United States because by contract, agreement or otherwise, it arranged for disposal or treatment,

or arranged with a transporter for transport for disposal or treatment, of hazardous substances

owned or possessed by Delphi at the South Dayton Site owned by another party or entity, and

containing hazardous substances, pursuant to Section 107(a)(3) of CERCLA, 42 U.S.C.

§ 9607(a)(3).  Delphi arranged for the disposed of hazardous wastes, including but not limited to

asbestos, flyash, metallic dust, oil and grease sludge and paint wastes at the South Dayton Site

from several Delphi facilities in the Dayton and Kettering, Ohio area.  The South Dayton Site is a

facility within the meaning of CERCLA.  The South Dayton Site was proposed for inclusion on

the National Priorities List ("NPL"), pursuant to CERCLA Section 105, 42 U.S.C. § 9605, on

September 23, 2004 (see 69 Fed. Reg. 56970).  There have been releases or threats of releases of

hazardous substances, including but not limited to, inorganic compounds (arsenic, cadmium,

chromium, mercury and lead) and volatile and semi-volatile organic compounds (1,2-

4

dichloroethene, tetrachloroethene, toluene, polychlorinated biphenyls ("PCBs")), at the South

Dayton Site. These hazardous substances have been released into the soil and groundwater at the

South Dayton Site. Other potentially responsible parties may, along with Delphi, also be jointly

and severally liable to the United States under CERCLA with respect to the South Dayton Site.

6.      Response costs have been and will be incurred by EPA with respect to the

South Dayton Site not inconsistent with the National Contingency Plan promulgated pursuant to

Section 105 of CERCLA, 42 U.S.C. § 9605, and set forth at 40 C.F.R. Part 300, as amended.

The United States has incurred unreimbursed response costs to date of approximately $404,349

with respect to the South Dayton Site. Delphi is liable to the United States for this amount.

Delphi is also liable for interest due under 42 U.S.C. § 9607(a). Other potentially responsible

parties may along with Delphi also be jointly and severally liable to the United States for all of

the above amounts plus interest due under 42 U.S.C. § 9607(a).

7.      EPA expects to incur future response costs in connection with the  remedial

design and remedial action for the South Dayton Site. These costs have been estimated by EPA

at between $20 and 50 million. Along with other identified PRPs, Delphi is jointly and severally

liable to the United States for these amounts.

8.      Protective Filing For Work Obligations. The United States is not required to file a

proof of claim with respect to Delphi's injunctive obligations to comply with work requirements

arising under Orders of Courts, Administrative Orders, and other environmental regulatory

requirements imposed by law that are not claims under 11 U.S.C. § 101(5). Delphi and any

reorganized debtor(s) must comply with such mandatory injunctive and regulatory and

compliance requirements. The United States reserves the right to take future actions to enforce

5

any such obligations of Delphi.  While the United States believes that its position will be upheld

by the Court, the United States has filed only in protective fashion with respect to such

obligations and requirements as indicated herein to protect against the possibility that Delphi will

contend that it does not need to comply with any such obligations and requirements and the

Court finds that it is not required to do so.   Therefore, a protective contingent claim is filed in

the alternative for such obligations and requirements but only in the event that the Court finds

that such obligations and requirements are dischargeable claims under 11 U.S.C. § 101(5) rather

than obligations and requirements that reorganized Delphi must comply with.  Nothing in this

Proof of Claim constitutes a waiver of any rights of the United States or an election of remedies

with respect to such rights and obligations.

            9.      RCRA Compliance and Work Obligations.   This Proof of Claim is filed in a

protective manner with respect to Delphi's compliance and work obligations under the Resource

Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 - 6992k.   See Paragraph 8, supra.

RCRA establishes a comprehensive regulatory program for generators of hazardous waste and

for owners and operators of facilities that treat, store, or dispose of hazardous waste.  Delphi is

the owner and operator of RCRA-regulated facilities in including, but not limited to, Vandalia,

Ohio (Vandalia Facility), as well as other locations.  Pursuant to its authority under RCRA, EPA

has promulgated regulations applicable to such generators and such owners and operators of

hazardous waste management facilities.  The federal RCRA implementing regulations are set

forth at 40 C.F.R. Part 260 et seq.  Pursuant to Section 3006 of RCRA, 42 U.S.C. § 6926, EPA

has authorized various States to administer various aspects of the hazardous waste management

program in such States.  Pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), these

authorized State hazardous waste management program are enforceable by EPA.  Under RCRA,

Delphi is required, inter alia, to operate in compliance with RCRA regulatory requirements,

implement closure and post-closure work and corrective action work, and perform any necessary

action with respect to any imminent and substantial endangerment to health or the environment,

see, e.g., 42 U.S.C. §§ 6924, 6928, 6973, as required by RCRA and/or RCRA permits or

Administrative Orders.  For example, in or about January 2002, EPA and Delphi entered into a

RCRA Administrative Order on Consent with regard to the Vandalia, Ohio Facility, which

requires, inter alia, the continuing implementation of a Corrective Measures Plan at that Facility.

Delphi is liable for injunctive and compliance obligations that it is required to perform under

RCRA, RCRA permits, and all work requirements under RCRA permits and administrative

orders.  It is the position of the United States that a proof of claim is not required to be filed for

injunctive, compliance, and regulatory obligations and requirements under RCRA.  See

Paragraph 8, supra.  Other liable parties may along with Delphi also be jointly and severally

liable to the United States under RCRA.

10.    Property of the Estate.  Delphi also has or may in the future have environmental

liabilities for properties that are part of its bankruptcy estate and/or for the migration of

hazardous substances from property of its bankruptcy estate.   For example, Delphi has voluntary

corrective action agreements for ongoing investigations pursuant to schedules approved by EPA

for certain facilities set forth in Paragraph 9, supra.  In accordance with 28 U.S.C. § 959, Delphi

is required to comply with non-bankruptcy law, including all applicable environmental laws, in

managing and operating its property.  Upon confirmation of any Plan of Reorganization,

reorganized Delphi will be liable as owner or operator of property in accordance with applicable

7

environmental law.  The United States is not required to file a proof of claim relating to property

of the estate other than for response costs incurred prior to the petition date.  The United States

reserves the right to file an application for administrative expense or take other appropriate action

in the future with respect to property of the estate.  This Proof of Claim is filed only protectively

with respect to property of the estate.

11.    This Proof of Claim reflects certain known liabilities of Delphi to the United

States.  The United States reserves the right to amend this claim to assert subsequently

discovered liabilities.   This Proof of Claim is without prejudice to any right under 11 U.S.C.

§ 553 to set off, against this claim, debts owed (if any) to the debtor by this or any other federal

agency.

12.    The United States has not perfected any security interest on its claims against

Delphi.

13.    This claim is filed as a general unsecured claim except to the extent of any

secured/trust interest in insurance proceeds received by Delphi on account of environmental

liability to the United States, disputed past cost amounts held in escrow by Delphi pending

dispute resolution, and to the extent administrative expense priority exists relating to property of

the estate, post-petition violations of law, or otherwise.  In addition, the United States will file

any application for administrative expense priority at the appropriate time.  The United States'

position with respect to injunctive, compliance, regulatory, and work obligations that are not

claims under 11 U.S.C. § 101(5) is set forth in Paragraph 8, supra.

14.    Except as stated in this Proof of Claim, no judgments against Delphi have been

rendered on this Proof of Claim.

15.     This Proof of Claim is also filed to the extent necessary to protect the United

States' rights relating to any insurance proceeds received by Delphi relating to sites discussed

herein and any funds being held in escrow by Delphi relating to the sites discussed herein.

Dated:      New York, New York
            July 31, 2006

                        Respectfully submitted,

                        FOR THE UNITED STATES OF AMERICA:

                        MICHAEL J. GARCIA
                        United States Attorney for the
                        Southern District of New York

                        _____
                        DAVID J. KENNEDY (DK-8307)
                        Assistant United States Attorney
                        86 Chambers Street, Third Floor
                        New York, New York  10007
                        Tel. No.:  (212) 637-2733
                        Fax No.:  (212) 637-2730

                        _____
                        W. BENJAMIN FISHEROW
                        Deputy Section Chief
                        Environment and Natural Resources Division


                        ALAN S. TENENBAUM
                        National Bankruptcy Coordinator
                        Environmental Enforcement Section
                        Environment and Natural Resources  Division
                        U.S. Department of Justice
                        P.O. Box 7611, Ben Franklin Station
                        Washington, D.C. 20044-7611
                        (202) 514-5409

9

FRANCIS J. BIROS
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources  Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
(202) 616-6552


OF COUNSEL:

DIANA L. EMBIL
THOMAS C. NASH
THOMAS WILLIAMS
Associate Regional Counsels
U.S. Environmental Protection Agency-- Region 5–Mail Code C14J
77 West Jackson Boulevard
Chicago, Illinois 60604-3594

# EXHIBIT D

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036

Attorneys for DPH Holdings Corp., et al.,
   Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                 :
        In re                          :     Chapter 11
                                                 :
DPH HOLDINGS CORP., et al.,      :     Case No. 05-44481 (RDD)
                                                 :
                                                 :     (Jointly Administered)
                Reorganized Debtors.     :
                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

NOTICE OF CLAIMS OBJECTION HEARING WITH RESPECT TO
REORGANIZED DEBTORS' OBJECTION TO PROOF OF
<u>ADMINISTRATIVE EXPENSE CLAIM NUMBER 19089</u>

(ETKIN MANAGEMENT, L.L.C.)

PLEASE TAKE NOTICE that on January 22, 2010, DPH Holdings Corp. and certain of its affiliated reorganized debtors (the "Reorganized Debtors"), successors of Delphi Corporation and certain of its subsidiaries and affiliates, former debtors and debtors-in-possession in the above-captioned cases (f/k/a In re Delphi Corporation, et al.) (collectively, the "Debtors") objected to proof of administrative expense claim number 19089 (the "Claim") filed by Etkin Management, L.L.C. (the "Claimant") pursuant to the Reorganized Debtors' Forty-Third Omnibus Objection Pursuant To 11 U.S.C. § 503(b) And Fed. R. Bankr. P. 3007 To (I) Expunge Certain Administrative Expense (A) Severance Claims, (B) Books And Records Claims, (C) Duplicate Claims, (D) Equity Interests, (E) Prepetition Claims, (F) Insufficiently Documented Claims, (G) Pension, Benefit, And OPEB Claims, (H) Workers' Compensation Claims, And (I) Transferred Workers' Compensation Claims, (II) Modify And Allow Certain Administrative Expense Severance Claims, And (III) Allow Certain Administrative Expense Severance Claims (Docket No. 19356) (the "Forty-Third Omnibus Claims Objection").

PLEASE TAKE FURTHER NOTICE that on October 6, 2009, the Debtors substantially consummated the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified (the "Modified Plan"), which had been approved by the United States Bankruptcy Court for the Southern District of New York pursuant to an order entered on July 30, 2009 (Docket No. 18707), and emerged from chapter 11 as the Reorganized Debtors.

PLEASE TAKE FURTHER NOTICE that Article 9.6(a) of the Modified Plan provides that "[t]he Reorganized Debtors shall retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the

2

Debtors and making distributions (if any) with respect to all Claims and Interests." Modified

Plan, art. 9.6(a).

PLEASE TAKE FURTHER NOTICE that pursuant to the Order Pursuant To 11

U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014

Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices

And Procedures Governing Objections To Claims, entered December 7, 2006 (Docket No. 6089)

(the "Order"), the Order Pursuant To 11 U.S.C. §§ 105(a) And 503(b) Authorizing Debtors To

Apply Claims Objection Procedures To Address Contested Administrative Expense Claims

(Docket No. 18998) (the "Administrative Claims Procedures Order"), and the Twelfth

Supplemental Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007,

7016, 7026, 9006, 9007, And 9014 Establishing (I) Dates For Hearings Regarding Objections To

Claims And (II) Certain Notices And Procedures Governing Objections To Claims, entered July

16, 2010 (Docket No. 20426), a claims objection hearing (the "Claims Objection Hearing") for

purposes of holding an evidentiary hearing on the merits of the Claim is hereby scheduled for

November 18, 2010, at 10:00 a.m. (prevailing Eastern time) in the United States Bankruptcy

Court for the Southern District of New York, 300 Quarropas Street, Room 118, White Plains,

New York 10601-4140 (the "Court").

PLEASE TAKE FURTHER NOTICE that the Claims Objection Hearing will

proceed in accordance with the procedures provided in the Order, unless such procedures are

modified in accordance with Paragraph 9(k) thereof.  Please review the Order carefully because

failure to comply with the procedures provided in the Order (or as modified pursuant to

Paragraph 9(k)) could result in the disallowance and expungement of your Claim. Copies of the

Order and the Administrative Claims Procedures Order are attached hereto for your convenience.

3

PLEASE TAKE FURTHER NOTICE that the Reorganized Debtors may further

adjourn the Claims Objection Hearing at any time at least five business days prior to the

scheduled hearing upon notice to the Court and the Claimant.


Dated:    New York, New York
          September 14, 2010

                              SKADDEN, ARPS, SLATE, MEAGHER
                                 & FLOM LLP


                              By:   /s/ John Wm. Butler, Jr.
                                    John Wm. Butler, Jr.
                                    John K. Lyons
                                    Ron E. Meisler
                              155 North Wacker Drive
                              Chicago, Illinois 60606


                                    - and -


                              Four Times Square
                              New York, New York 10036

                              Attorneys for DPH Holdings Corp., et al.,
                                 Reorganized Debtors

4

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                          :
          In re                           :        Chapter 11
                                          :
DELPHI CORPORATION, <u>et al.</u>,        :        Case No. 05-44481 (RDD)
                                          :
                          Debtors.        :        (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


ORDER PURSUANT TO 11 U.S.C. § 502(b) AND FED. R. BANKR. P. 2002(m),
3007, 7016, 7026, 9006, 9007, AND 9014 ESTABLISHING (I) DATES FOR
HEARINGS REGARDING OBJECTIONS TO CLAIMS AND (II) CERTAIN
<u>NOTICES AND PROCEDURES GOVERNING OBJECTIONS TO CLAIMS</u>

("CLAIM OBJECTION PROCEDURES ORDER")

Upon the Motion For Order Pursuant To 11 U.S.C. §§ 502(b) And 502(c) And

Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For

Hearings Regarding Disallowance Or Estimation Of Claims And (ii) Certain Notices And

Procedures Governing Hearings Regarding Disallowance Or Estimation Of Claims, dated

October 31, 2006 (the "Motion"), of Delphi Corporation and certain of its subsidiaries and

affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the

"Debtors"); and upon the objections to the Motion and the record of the hearing held on the

Motion; and after due deliberation thereon; and good and sufficient cause appearing therefor,



0544481061207000000000000015

IT IS HEREBY FOUND AND DETERMINED THAT:[1]

A.    Proper, timely, adequate, and sufficient notice of the Motion has been provided, such notice was good, sufficient and appropriate under the particular circumstances, and no other or further notice of the Motion is or shall be required.

B.    The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  The Motion is a core proceeding under 28 U.S.C. § 157 (b)(2).  Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

C.    The relief requested in the Motion and granted herein is in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.    This Court shall conduct special periodic hearings on contested claims matters in these cases (the "Claims Hearing Dates"), to be held in Courtroom 610, United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004 unless the Debtors and the parties whose claims are affected are otherwise notified by the Court. The following dates and times have been scheduled as Claims Hearing Dates in these chapter 11 cases:

December 13, 2006 at 10:00 a.m. (prevailing Eastern time)

January 12, 2007 at 10:00 a.m. (prevailing Eastern time)

February 14, 2007 at 10:00 a.m. (prevailing Eastern time)

March 1, 2007 at 10:00 a.m. (prevailing Eastern time)

---

[1]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Fed. R. Bankr. P. 7052.  Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion.

March 21, 2007 at 10:00 a.m. (prevailing Eastern time)

April 5, 2007 at 10:00 a.m. (prevailing Eastern time)

April 27, 2007 at 10:00 a.m. (prevailing Eastern time)

May 10, 2007 at 10:00 a.m. (prevailing Eastern time)

May 24, 2007 at 10:00 a.m. (prevailing Eastern time)

June 1, 2007 at 10:00 a.m. (prevailing Eastern time)

June 14, 2007 at 10:00 a.m. (prevailing Eastern time)

June 22, 2007 at 10:00 a.m. (prevailing Eastern time)

July 12, 2007 at 10:00 a.m. (prevailing Eastern time)

July 20, 2007 at 10:00 a.m. (prevailing Eastern time)

August 2, 2007 at 10:00 a.m. (prevailing Eastern time)

August 17, 2007 at 10:00 a.m. (prevailing Eastern time)

August 30, 2007 at 10:00 a.m. (prevailing Eastern time)

September 28, 2007 at 10:00 a.m. (prevailing Eastern time)

October 11, 2007 at 10:00 a.m. (prevailing Eastern time)

October 26, 2007 at 10:00 a.m. (prevailing Eastern time)

November 8, 2007 at 10:00 a.m. (prevailing Eastern time)

November 30, 2007 at 10:00 a.m. (prevailing Eastern time)

December 6, 2007 at 10:00 a.m. (prevailing Eastern time)

2.    Any response to a claims objection or an omnibus claims objection (a

"Response") must (a) be in writing, (b) conform to the Federal Rules of Bankruptcy Procedure,

the Local Bankruptcy Rules for the Southern District of New York, and the Amended Eighth

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

3

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered on October 26, 2006 (the "Amended Eighth

Supplemental Case Management Order") (Docket No. 5418), (c) be filed with the Bankruptcy

Court in accordance with General Order M-242 (as amended) – registered users of the

Bankruptcy Court's case filing system must file electronically, and all other parties-in-interest

must file on a 3.5 inch disk (preferably in Portable Document Format (PDF), WordPerfect, or

any other Windows-based word processing format), (d) be submitted in hard copy form directly

to the chambers of the Honorable Robert D. Drain, United States Bankruptcy Judge, United

States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610,

New York, New York 10004, and (e) be served upon (i) Delphi Corporation, 5725 Delphi Drive,

Troy, Michigan 48098 (Att'n: General Counsel) and (ii) counsel to the Debtors, Skadden, Arps,

Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Att'n:

John Wm. Butler, Jr., John K. Lyons, and Randall G. Reese), in each case so as to be received no

later than 4:00 p.m. (prevailing Eastern time) on the seventh calendar day prior to the Omnibus

Hearing for which the relevant claims objection or omnibus claims objection is scheduled.

        3.        Every Response must contain at a minimum the following:

        (a)        the title of the claims objection to which the Response is directed;

        (b)        the name of the claimant (each holder of a proof of claim, a "Claimant") and a brief description of the basis for the amount of the claim;

        (c)        a concise statement setting forth the reasons why the claim should not be disallowed, expunged, reduced, or reclassified, including, but not limited to, the specific factual and legal bases upon which the Claimant will rely in opposing the claims objection;

        (d)        unless already set forth in the proof of claim previously filed with the Court, documentation sufficient to establish a prima facie right to payment; provided, however, that the Claimant need not disclose confidential, proprietary, or otherwise protected information in the Response; provided further, however, that the Claimant shall disclose to the Debtors all information and provide copies of all documents that the Claimant believes to be

4

confidential, proprietary, or otherwise protected and upon which the Claimant intends to rely in support of its Claim, subject to appropriate confidentiality constraints;

(e)    to the extent that the claim is contingent or fully or partially unliquidated, the amount that the Claimant believes would be the allowable amount of such claim upon liquidation of the claim or occurrence of the contingency, as appropriate; and

(f)    the address(es) to which the Debtors must return any reply to the Response, if different from the address(es) presented in the claim.

4.    Only those Responses made in writing and timely filed and received will be considered by the Court.  If a Claimant whose proof of claim is subject to a claims objection and who is served with the relevant claims objection fails to file and serve a timely Response in compliance with the foregoing procedures, the Debtors may present to the Court an appropriate order seeking relief with respect to such claim consistent with the relief sought in the relevant claims objection without further notice to the claimant, <u>provided</u> that, upon entry of such an order, the claimant shall receive notice of the entry of such order as provided below; <u>provided</u>, <u>however</u>, that if the claimant files a timely Response, which does not include the required minimum information provided in paragraph 3 above, the Debtors shall seek disallowance and expungement of the relevant claim or claims only in accordance with the Claims Hearing Procedures provided in paragraph 9 below.

5.    To the extent that a Response is filed with respect to any claim listed in a claims objection (each, a "Contested Claim"), each such Claim and the objection to such Claim asserted in the claims objection shall be deemed to constitute a separate contested matter as contemplated by Bankruptcy Rule 9014.

6.    The Debtors are hereby authorized and directed to serve each Claimant whose proof of claim is listed in any omnibus claims objection with (a) a personalized Notice Of Objection To Claim which specifically identifies the Claimant's proof of claim that is subject to objection and the basis for such objection and (b) a complete copy of the relevant omnibus

claims objection without exhibits.  Service of omnibus claims objections in such manner shall constitute good and sufficient notice and no other or further notice to claimants of an omnibus claims objection shall be required.

7.    Kurtzman Carson Consultants, LLC (the "Claims Agent") is hereby authorized and directed to serve all orders entered with respect to any omnibus claims objections, including exhibits, upon only the master service list and the 2002 list.  The Claims Agent is hereby further authorized and directed to serve all claimants whose proofs of claim are the subject of an order entered with respect to an omnibus claims objection with a copy of such order, without exhibits, and a personalized Notice Of Entry Of Order in the form attached hereto as Exhibit A specifically identifying such Claimant's proof of claim that is subject to the order, the Court's treatment of such proof of claim, and the basis for such treatment, and advising the Claimant of its ability to view the order with exhibits free of charge on the Debtors' Legal Information Website.  Without limiting the foregoing, the Court hereby directs the Claims Agent to serve the First Omnibus Claims Order in the manner provided hereby.

8.    Any order entered by the Court with respect to an objection asserted in an omnibus claims objection shall be deemed a separate order with respect to each claim covered by such order.

9.    The following procedures shall apply with respect to the determination of Contested Claims (the "Claims Hearing Procedures"):

(a)    Adjournment Of Claims Hearing.

(i)    All Contested Claims for which a timely Response is filed shall be automatically adjourned to a future hearing, the date of which shall be determined by the Debtors, in their sole discretion, by serving the Claimant with notice as provided herein.  The Debtors may send such notice to each Claimant when they deem it appropriate to do so, subject to the requirements of the Bankruptcy Code, the Bankruptcy Rules, and any further order of this Court.

The Debtors shall schedule the further hearing upon each Contested Claim to a Claims Hearing of the Debtors' election:

> (A)       for a non-evidentiary hearing to address the legal sufficiency of the particular proof of claim and whether the proof of claim states a claim against the asserted Debtor under Bankruptcy Rule 7012 (a "Sufficiency Hearing"), by serving upon the relevant Claimant by facsimile or overnight delivery, and filing with this Court, a notice substantially in the form attached hereto as <u>Exhibit B</u> (a "Notice Of Sufficiency Hearing") and a copy of this Order at least 20 business days prior to the date of such Sufficiency Hearing, or

> (B)       for an evidentiary hearing on the merits of such Contested Claim (a "Claims Objection Hearing"), by serving upon the relevant Claimant by facsimile or overnight delivery, and filing with this Court, a notice substantially in the form attached hereto as <u>Exhibit C</u> (a "Notice Of Claims Objection Hearing" and, collectively with the Notice of Sufficiency Hearing, the "Notices of Hearing") and a copy of this Order at least 65 calendar days prior to the date of such Claims Objection Hearing.

> (ii)       The Debtors, in their sole discretion, are authorized to further adjourn a hearing scheduled in accordance herewith at any time by providing notice to the Court and the Claimant at least five business days prior to the date of the scheduled hearing; <u>provided</u>, <u>however</u>, that the hearing on any Contested Claim shall not be adjourned for more than a total of 180 calendar days from date of service of the initial Notice of Hearing set forth in paragraph 9(a)(i)(A) and (B) above without consent of the Claimant with respect thereto, unless otherwise ordered by the Court.

     (b)       <u>Sufficiency Hearing Procedures</u>.

> (i)       To the extent that a Contested Claim is adjourned to a Sufficiency Hearing, if the Debtors wish to file a supplemental pleading, they shall file and serve their pleading no later than ten calendar days before the scheduled Sufficiency Hearing.  The supplemental pleading shall not exceed fifteen single-sided, double-spaced pages.

> (ii)       To the extent that a Contested Claim is adjourned to a Sufficiency Hearing, if the Claimant wishes to file a supplemental response, the Claimant shall file and serve its response no later than two business days before the scheduled Sufficiency Hearing.  The supplemental response shall not exceed fifteen single-sided, double-spaced pages.

> (iii)       To the extent that this Court determines upon conclusion of the Sufficiency Hearing that a Contested Claim cannot be disallowed in whole or in part without further proceedings, the Debtors shall provide to the Claimant a Notice Of Claims Objection Hearing pursuant to the procedures set forth above.

     (c)       <u>Mandatory Meet And Confer</u>.

> (i)       If (A) (1) the amount in dispute for a Contested Claim exceeds $1,000,000 or (2) a Contested Claim asserts unliquidated claims (unless the Claimant irrevocably agrees in writing that the allowed amount of such Contested Claim shall be limited to a maximum of $1,000,000), (B) the Claimant (if an individual) or the Claimant's principal place of

7

business (if a governmental unit or a person, as defined in section 101(41) of the Bankruptcy Code, other than an individual) is located within 90 miles of Troy, Michigan, and (C) such Contested Claim is scheduled by the Debtors for a Claims Objection Hearing, the Debtors and the relevant Claimant  shall hold an in-person meet and confer (an "In-Person Meet and Confer") at a neutral location in Troy, Michigan, or such other location as is reasonably acceptable to the Debtors, within ten business days of service of the Notice Of Claims Objection Hearing.

(ii)    If (A) (1) the amount in dispute for a Contested Claim is less than or equal to $1,000,000, (2) a Contested Claim asserts unliquidated claims and the Claimant with respect thereto irrevocably agrees in writing that the allowed amount of such Contested Claim shall be limited to a maximum of $1,000,000, or (3) the Claimant (if an individual) or the Claimant's principal place of business (if a governmental unit or a person, as defined in section 101(41) of the Bankruptcy Code, other than an individual) is located more than 90 miles from Troy, Michigan, and (B) such Contested Claim is scheduled by the Debtors for a Claims Objection Hearing, the Debtors and the relevant Claimant shall hold a telephonic meet and confer (a "Telephonic Meet and Confer" and, collectively with In-Person Meet and Confers, the "Meet and Confers") within ten business days of service of the Notice Of Claims Objection Hearing.

(iii)    The following representatives of each of the Debtors and the Claimant shall attend the Meet and Confer: (A) counsel for each of the parties, except for a Claimant proceeding pro se, who shall be prepared to discuss the matter described in paragraph 9 (k) below, and (B) a person possessing ultimate authority to reconcile, settle, or otherwise resolve the Contested Claim on behalf of the Debtors and the Claimant, respectively; provided, however, that counsel for each of the parties may participate in the Meet and Confer telephonically.

(iv)    The Court will consider appropriate sanctions, including allowance or disallowance of the Contested Claim, if either party does not follow the foregoing procedures or conduct the Meet and Confer in good faith.

(d)    Debtors' Statement Of Disputed Issues.  Within five business days after service of the Notice Of Claims Objection Hearing, the Debtors shall file and serve a written statement of disputed issues (the "Statement Of Disputed Issues") upon the Claimant.  The Statement Of Disputed Issues shall contain a concise statement summarily setting forth the primary reasons why the claim should be disallowed, expunged, reduced, or reclassified as set forth in the claims objection, including, but not limited to, the material factual and legal bases upon which the Debtors will rely in prosecuting the claims objection, without prejudice to the Debtors' right to later identify and assert additional legal and factual bases for disallowance, expungement, reduction, or reclassification of the Contested Claim.  The Statement of Disputed Issues shall also include documentation supporting the disallowance, expungement, reduction, or reclassification of the Contested Claim, without prejudice to the Debtors' right to later identify additional documentation supporting the disallowance, expungement, reduction, or reclassification of the Contested Claim; provided, however, that the Debtors need not disclose confidential, proprietary, or otherwise protected information in the Statement of Disputed Issues; provided further, however, that the Debtors shall disclose to the Claimant all information and

8

provide copies of all documents that the Debtors believe to be confidential, proprietary, or otherwise protected, subject to appropriate confidentiality constraints.

        (e)    <u>Claimant's Supplemental Response</u>.  The following procedures apply to the Claimant's written supplemental response (the "Supplemental Response"), subject to modification pursuant to paragraph 9(k), filed in connection with a Claims Objection Hearing for a Contested Claim:

        (i)    The Claimant may file and serve its Supplemental Response (with a copy to chambers) no later than 30 business days prior to commencement of the Claims Objection Hearing.  The Supplemental Response shall not exceed 20 single-sided, double-spaced pages (exclusive of exhibits or affidavits).

        (ii)    If the Claimant relies on exhibits, the Claimant shall include such exhibits in its Supplemental Response (other than those previously included with either its Proof of Claim or its Response); <u>provided</u>, <u>however</u>, that the Claimant need not disclose confidential, proprietary, or otherwise protected information in the Supplemental Response; <u>provided</u> further, <u>however</u>, that the Claimant shall disclose to the Debtors all information and provide copies of all documents that the Claimant believes to be confidential, proprietary, or otherwise protected and upon which the Claimant intends to rely in support of its Contested Claim, subject to appropriate confidentiality constraints.  The Claimant shall include a certificate of counsel or a declaration or affidavit authenticating any documents attached to the Supplemental Response, as appropriate.

        (iii)    The Supplemental Response may include affidavits or declarations from no more than two witnesses setting forth the basis of the Contested Claim and evidence supporting the Contested Claim; <u>provided</u>, <u>however</u>, that if the Claimant intends to call a person not under such Claimant's control at the hearing, the Claimant shall, in lieu of an affidavit or declaration of such person, identify such person, the Claimant's basis for calling such person as a witness, and the reason that it did not file an affidavit or declaration of such person.  If an affiant or declarant does not attend the Claims Objection Hearing, such affiant or declarant's affidavit or declaration shall be stricken.  The Claimant shall not be permitted to elicit any direct testimony at the Claims Objection Hearing; instead, the affidavit or declaration submitted with the Supplemental Response, or such witnesses' deposition transcript if the witnesses were not under the Claimant's control, shall serve as the witnesses' direct testimony and the Debtors may cross examine the witnesses at the Claims Objection Hearing, or counter-designate deposition testimony.  No other or additional witnesses may introduce evidence at the hearing on behalf of the Claimant.

        (iv)    No later than three business days prior to commencement of the Claims Objection Hearing, if the Claimant timely filed a Supplemental Response, the Claimant may file and serve (with a copy to chambers) an amended Supplemental Response and a supplemental affidavit or declaration on behalf of each of its witnesses solely for the purpose of supplementing the Supplemental Response and the witnesses' prior affidavits or declarations with respect to matters adduced through the discovery provided by these Claims Hearing Procedures; <u>provided</u> that the amended Supplemental Response shall be subject to the page limitations set forth above.

(f)      Debtors' Supplemental Reply.  The following procedures shall apply to the Debtors' written supplemental reply, if any (the "Supplemental Reply"), subject to modification pursuant to paragraph 9(k) below, filed in connection with a Claims Objection Hearing with respect to a Contested Claim:

(i)      The Debtors may file and serve (with a copy to chambers) a Supplemental Reply no later than 20 business days prior to commencement of the Claims Objection Hearing.  The Supplemental Reply shall not exceed 20 single-sided, double-spaced pages (exclusive of exhibits or affidavits).

(ii)      If the Debtors rely on exhibits, the Debtors shall include such exhibits in their Supplemental Reply (other than those previously included with either their objection or reply); provided, however, that the Debtors need not disclose confidential, proprietary, or otherwise protected information in the Supplemental Reply; provided further, however, that the Debtors shall disclose to the Claimant all information and provide copies of all documents that the Debtors believe to be confidential, proprietary, or otherwise protected and upon which the Debtors intend to rely in support of their objection, subject to appropriate confidentiality constraints.  The Debtors shall include a certificate of counsel or a declaration or affidavit authenticating any documents attached to the Supplemental Reply.

(iii)      The Supplemental Reply may include affidavits or declarations from no more than two witnesses setting forth the Debtors' basis for objecting to the Contested Claim and evidence in support of such objection to the Contested Claim; provided, however, that if the Debtors intend to call a person not under the Debtors' control at the hearing, the Debtors shall, in lieu of an affidavit or declaration of such person, identify such person, the Debtors' basis for calling such person as a witness, and the reason that it did not file an affidavit or declaration of such person.  If an affiant or declarant does not attend the Claims Objection Hearing, as appropriate, such affiant or declarant's affidavit or declaration shall be stricken.  The Debtors shall not be permitted to elicit any direct testimony at the Claims Objection Hearing, instead, the affidavit or declaration submitted with the Supplemental Reply, or such witnesses' deposition transcript if the witnesses were not under the Debtors' control, shall serve as the witnesses' direct testimony and the Claimant may cross examine the witnesses at the Claims Objection Hearing or counter-designate deposition testimony.  No other or additional witnesses may introduce evidence at the hearing on behalf of the Debtors.

(iv)      No later than three business days prior to commencement of the Claims Objection Hearing, if the Debtors timely filed a Supplemental Reply, the Debtors may file and serve (with a copy to chambers) an amended Supplemental Reply and a supplemental affidavit or declaration on behalf of each of their witnesses solely for the purpose of supplementing the Supplemental Reply and the witnesses' prior affidavits or declarations with respect to matters adduced through the discovery provided by these Claims Hearing Procedures; provided that the amended Supplemental Reply shall be subject to the page limitations set forth above.

(g)      Mandatory Non-Binding Summary Mediation.  Except as set forth below, at least 15 business days prior to commencement of the Claims Objection Hearing, the Debtors and the Claimant shall submit to mandatory non-binding summary mediation (each, a

10

"Mediation") in an effort to consensually resolve the Contested Claim.  The Mediation shall be governed by General Order M-143 except as follows.  The following procedures shall apply to each Mediation, subject to modification pursuant to paragraph 9(k) below:

(i)    Each Mediation shall be assigned to one of the mediators listed by the Debtors on Exhibit D hereto (each, a "Mediator").  The Debtors and the Claimant shall agree upon the Mediator at the Meet and Confer; provided that, if the Debtors and the Claimant are unable to agree upon a Mediator, the parties shall promptly report such inability to agree to the Court.

(ii)    The Mediator shall not have the authority to require either the Debtors or the Claimant to provide any additional briefing with respect to the Mediation.

(iii)    If (A) (1) the amount in dispute for a Contested Claim exceeds $1,000,000 or (2) a Contested Claim asserts unliquidated claims (unless the Claimant with respect thereto irrevocably agrees in writing that the allowed amount of such Contested Claim shall be limited to a maximum of $1,000,000) and (B) the Claimant (if an individual) or the Claimant's principal place of business (if a governmental unit or a person, as defined in section 101(41) of the Bankruptcy Code, other than an individual) is located within 90 miles of Troy, Michigan, the Mediation shall be held at a neutral location in Troy, Michigan.

(iv)    If (A) (1) the amount in dispute for a Contested Claim exceeds $1,000,000 or (2) a Contested Claim asserts unliquidated claims (unless the Claimant with respect thereto irrevocably agrees in writing that the allowed amount of such Contested Claim shall be limited to a maximum of $1,000,000), and (B) the Claimant (if an individual) or the Claimant's principal place of business (if a governmental unit or a person, as defined in section 101(41) of the Bankruptcy Code, other than an individual) is located more than 90 miles from Troy, Michigan, the Mediation shall be held at a neutral location reasonably acceptable to the Debtors and the Claimant; provided that, if the Debtors and the Claimant are unable to agree upon a neutral location at the Meet and Confer, the parties shall promptly report such inability to agree to the Court.

(v)    If (A) the amount in dispute for a Contested Claim is less than or equal to $1,000,000 or (B) the Contested Claim asserts unliquidated claims and the Claimant with respect thereto irrevocably agrees in writing that the allowed amount of such Contested Claim shall be limited to a maximum of $1,000,000, participation in Mediation shall be voluntary and any Mediation may be held telephonically at either the Debtors' or the Claimant's request.

(vi)    A person possessing ultimate authority to reconcile, settle, or otherwise resolve the Contested Claim on behalf of each of the Debtors and the Claimant shall attend an in-person Mediation or participate in a telephonic Mediation, if any; provided, however, that the Debtors' counsel will not be precluded from attending and participating in a Mediation in the event that the claimant elects not to have its counsel attend or participate in a Mediation.

(vii)    Absent consent of each of the Claimant and the Debtors, the length of the Mediation shall be limited to one day.

11

(viii)    The Court will consider appropriate sanctions, including allowance or disallowance of the Contested Claim, if either party does not follow the foregoing procedures or conduct the Mediation in good faith.

(ix)    The Debtors and the Claimant shall each bear its own costs in participating in the Mediation.  The Debtors are hereby authorized to pay the Mediator's fees.

(h)    <u>Claims Objection Hearing Discovery</u>.  If a Claims Objection Hearing is scheduled for a particular Contested Claim, the Debtors and the Claimant shall be bound by the following discovery procedures, which shall otherwise be governed by the Bankruptcy Rules, subject to modification pursuant to paragraph 9(k) below:

(i)    No later than five business days after service of the Supplemental Response, the Debtors may request:

(A)    That the Claimant produce documents relevant to the Contested Claim.  Documents shall be produced at least ten business days prior to commencement of the Claims Objection Hearing.

(B)    That the Claimant respond to no more than 15 interrogatories, including discrete subparts.  Responses shall be produced at least ten business days prior to commencement of the Claims Objection Hearing.

(C)    That the Claimant respond to no more than ten requests for admission.  Responses shall be produced at least ten business days prior to commencement of the Claims Objection Hearing.

(ii)    No later than five business days after service of the Supplemental Reply, the Claimant may request:

(A)    That the Debtors produce documents relevant to the Contested Claim.  Documents shall be produced at least ten business days prior to commencement of the Claims Objection Hearing.

(B)    That the Debtors respond to no more than 15 interrogatories, including discrete subparts.  Responses shall be produced at least ten business days prior to commencement of the Claims Objection Hearing.

(C)    That the Debtors respond to no more than ten requests for admission.  Responses shall be produced at least ten business days prior to commencement of the Claims Objection Hearing.

(iii)    No earlier than fifteen business days prior to the commencement of the Claims Objection Hearing, but at least five business days prior to commencement of the Claims Objection Hearing, the Debtors may, at their election, take the deposition upon oral examination of each witness whose affidavit or declaration was proffered in support of the Claimant's Supplemental Response.  Each deposition shall not exceed three hours.

12

(iv)    No earlier than fifteen business days prior to the commencement of the Claims Objection Hearing, but at least five business days prior to commencement of the Claims Objection Hearing, the Claimant may, at its election, take the deposition upon oral examination of each witness whose affidavit or declaration was proffered in support of the Debtors' Supplemental Reply.  Each deposition shall not exceed three hours.

(v)    Except as provided in paragraph 9(g)(vi) above, nothing in this Order alters any obligation of opposing counsel with regard to communications with non-counsel opponents or any applicable law regarding corporations or other business entities to be represented by counsel.

(i)    <u>Conduct Of The Claims Objection Hearing</u>.  The Debtors and the Claimant shall each be permitted, subject to modification pursuant to paragraph 9(k) below, no more than one hour to present their respective cases, inclusive of time cross-examining their opponent's witnesses and making argument to the Court.  The parties shall coordinate with each other in advance of the hearing with respect to, joint exhibit binders, stipulated admission of evidence, anticipated disputes regarding the admission of particular evidence and any designated deposition testimony.

(j)    <u>Estimation Based Upon Claimant's Asserted Estimated Amount</u>.  To the extent that a Contested Claim would be subject to estimation pursuant to section 502(c) of the Bankruptcy Code and the Debtors have sought authority to estimate such Contested Claim pursuant to an omnibus claims objection and/or a motion to estimate claims, if the Claimant has filed a Response in accordance with the procedures outlined above which (i) acknowledges that the Contested Claim is contingent or fully or partially unliquidated and (ii) provides the amount that the Claimant believes would be the allowable amount of such Contested Claim upon liquidation of the Contested Claim or occurrence of the contingency, as appropriate (the "Claimant's Asserted Estimated Amount"), the Debtors are hereby authorized, in their sole discretion, to elect to provisionally accept the Claimant's Asserted Estimated Amount as the estimated amount of such Contested Claim pursuant to section 502(c) of the Bankruptcy Code for all purposes other than allowance, but including voting and establishing reserves for purposes of distribution, subject to further objection and reduction as appropriate and section 502(j) of the Bankruptcy Code.  The Debtors' election shall be made by serving the Claimant with a Notice Of Election To Accept Claimant's Asserted Estimated Amount in the form attached hereto as <u>Exhibit E</u>.  The Contested Claim will otherwise remain subject in all respects to the procedures outlined herein.

(k)    <u>Ability To Modify Procedures By Agreement Or Order Of Court</u>.  At the Meet and Confer, the parties shall discuss discovery parameters, briefing, evidence to be presented, the timing outlined herein, and any modifications thereto that are necessary due to the facts and circumstances of the relevant Contested Claim.  Should the parties be unable to agree on reasonable modifications to these Claim Hearing Procedures, if any, either party may request that the Court promptly schedule a teleconference to consider such proposed modifications.  No discovery, testimony, or motion practice other than that described herein, as modified, shall be permitted, unless otherwise agreed by the parties or ordered by the Court.

13

10.    The procedures approved herein shall not apply to claims filed by Banc of America Securities LLC (as to proof of claim number 10758), Barclays Capital Inc. (as to proof of claim number 11658), Bear, Stearns & Co. Inc. (as to proof of claim number 10732), Cadence Innovation LLC, Citigroup Global Markets, Inc. (as to proof of claim number 10731), Credit Suisse Securities (USA) LLC (as to proof of claim number 10763), Merrill Lynch, Peirce, Fenner & Smith Inc. (as to proof of claim number 10761), Morgan Stanley & Co. Inc. (as to proof of claim number 10762), the Pension Benefit Guaranty Corporation, Robert Bosch GmbH, the State of California Environmental Protection Agency, the State of Michigan Environmental Protection Agency, the State of Ohio Environmental Protection Agency, Technology Properties, Ltd., UBS Securities LLC (as to proof of claim number 10759), the United States Environmental Protection Agency, and Wachovia Capital Markets, LLC (as to proof of claim number 10760) (collectively, the "Excluded Parties") for any purpose, including, but not limited to, any objections to such claims or other litigation in respect of such claims; provided, however, that nothing contained herein shall preclude any of the Excluded Parties or the Debtors, after notice and an opportunity to be heard, from seeking to establish appropriate alternative claims resolution procedures.

11.    With respect to the claim of Gary Whitney ("Mr. Whitney") (claim number 10157) and NuTech Plastics Engineering, Inc. ("NuTech") (claim number 1279 against Delphi Automotive Systems LLC), nothing in this Order shall limit Mr. Whitney's or NuTech's ability to request relief from the automatic stay provisions under section 362 of the Bankruptcy Code subject to the Debtors' right to object to such request.

12.    The Debtors shall not serve a Notice of Hearing on Orix Warren, LLC ("Orix Warren") with respect to proof of claim number 10202 until the earliest of the following

14

to occur: (a) the Debtors assume the lease between Delphi Automotive Systems LLC and Orix

Warren with respect to property located at 4551 Research Parkway in Warren, Ohio (the "Orix

Lease"), (b) the Debtors reject the Orix Lease, or (c) the Orix Lease terminates or is terminated

pursuant to its terms.

13.     Nothing in this Order shall preclude any right to seek estimation of a claim

under section 502(c) of the Bankruptcy Code, any right to seek relief from the automatic stay

under section 362 of the Bankruptcy Code to liquidate a claim in a different forum, any right to

seek protection of information under section 107(b) of the Bankruptcy Code or any right not

specifically addressed in this Order.

14.     This Court shall retain jurisdiction to hear and determine all matters

arising from the implementation of this order.

15.     The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for

the United States Bankruptcy Court for the Southern District of New York for the service and

filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated: New York, New York
         December 6, 2006


                                        _____/s/Robert D. Drain_____
                                             UNITED STATES BANKRUPTCY JUDGE

15

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                              :
          In re                               :     Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :     Case No. 05-44481 (RDD)
                                              :
                         Debtors.             :     (Jointly Administered)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

NOTICE OF ENTRY OF ORDER WITH RESPECT
TO [_____] OMNIBUS CLAIMS OBJECTION

        PLEASE TAKE NOTICE that on _____ _, 200_, the United States Bankruptcy

Court for the Southern District of New York entered a [title of order] (the "Order").

PLEASE TAKE FURTHER NOTICE THAT a copy of the Order, excluding exhibits, is attached hereto.

PLEASE TAKE FURTHER NOTICE that the proof of claim listed below, which you filed against Delphi Corporation and/or other of its subsidiaries and affiliates that are debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), was the subject of the Order and was listed on Exhibit __ to the Order and was accordingly disallowed and expunged, unless otherwise provided below in the column entitled "Treatment Of Claim."

| Date Filed | Claim Number | Asserted Claim Amount[1] | Basis For Objection | Treatment Of Claim | Surviving Claim Number (if any) |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

---

[1] Asserted Claim Amounts listed as $0.00 generally reflect that the claim amount asserted is unliquidated.

PLEASE TAKE FURTHER NOTICE that you may view the complete exhibits to

the Order by requesting a copy from the claims and noticing agent in the above-captioned

chapter 11 cases, Kurtzman Carson Consultants LLC, at 1-888-259-2691 or by accessing the

Debtors' Legal Information Website at www.delphidocket.com.

Dated:  New York, New York
          _____ _, 200_

                                    BY ORDER OF THE COURT

                                    John Wm. Butler, Jr. (JB 4711)
                                    John K. Lyons (JL 4951)
                                    Ron E. Meisler (RM 3026)
                                    SKADDEN, ARPS, SLATE, MEAGHER
                                         & FLOM LLP
                                    333 West Wacker Drive, Suite 2100
                                    Chicago, Illinois  60606
                                    (312) 407-0700

                                       - and -

                                    Kayalyn A. Marafioti (KM 9632)
                                    Thomas J. Matz (TM 5986)
                                    SKADDEN, ARPS, SLATE, MEAGHER
                                         & FLOM LLP
                                    Four Times Square
                                    New York, New York 10036
                                    (212) 735-3000

                                    Attorneys for Delphi Corporation, et al.,
                                         Debtors and Debtors-in-Possession

3

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

       - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
        In re                             :       Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :       Case No. 05-44481 (RDD)
                                          :
                          Debtors.        :       (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF HEARING WITH RESPECT TO
DEBTORS' OBJECTION TO PROOF OF CLAIM NO. [_____]

        PLEASE TAKE NOTICE that on _____ _, 200_, Delphi Corporation and certain

of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), objected to proof of claim number _____ (the "Proof of Claim")

filed by _____ (the "Claimant") pursuant to the [Title Of Applicable Omnibus Claims

Objection] (the "Objection").

PLEASE TAKE FURTHER NOTICE that pursuant to the Order Pursuant To 11

U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014

Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices

And Procedures Governing Objections To Claims, entered December __, 2006 (the "Order"), a

sufficiency hearing (the "Sufficiency Hearing") to address the legal sufficiency of the Proof of

Claim and whether the Proof of Claim states a colorable claim against the asserted Debtor is

hereby scheduled for _____, 200_, at 10:00 a.m. (prevailing Eastern time) in the United

States Bankruptcy Court for the Southern District of New York (the "Court").

PLEASE TAKE FURTHER NOTICE that the Sufficiency Hearing will proceed

in accordance with the procedures provided in the Order, unless such procedures are modified in

accordance with Paragraph 9(k) thereof.  Please review the Order carefully – failure to comply

with the procedures provided in the Order (or as modified pursuant to Paragraph 9(k)) could

result in the disallowance and expungement of the Proof of Claim.  A copy of the Order is

attached hereto for your convenience.

PLEASE TAKE FURTHER NOTICE that the Debtors may further adjourn the

Hearing at any time at least five business days prior to the scheduled hearing upon notice to the

Court and the Claimant.


Dated:  New York, New York
          _____ _, 200_

                                    SKADDEN, ARPS, SLATE, MEAGHER &
                                      FLOM LLP

                                    By:_____
                                        John Wm. Butler, Jr. (JB 4711)
                                        John K. Lyons (JL 4951)
                                        Ron E. Meisler (RM 3026)
                                    333 West Wacker Drive, Suite 2100
                                    Chicago, Illinois  60606
                                    (312) 407-0700

                                    By:_____
                                        Kayalyn A. Marafioti (KM 9632)
                                        Thomas J. Matz (TM 5986)
                                    Four Times Square
                                    New York, New York 10036
                                    (212) 735-3000

                                    Attorneys for Delphi Corporation, et al.,
                                        Debtors and Debtors-in-Possession

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
          In re                           :     Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :     Case No. 05-44481 (RDD)
                                          :
                        Debtors.          :     (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF CLAIMS OBJECTION HEARING WITH
RESPECT TO DEBTORS' OBJECTION TO PROOF OF CLAIM NO. [_____]

          PLEASE TAKE NOTICE that on _____ _, 200_, Delphi Corporation and certain

of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), objected to proof of claim number _____ (the "Proof of Claim")

filed by _____ (the "Claimant") pursuant to the [Title Of Applicable Omnibus Claims

Objection] (the "Objection").

PLEASE TAKE FURTHER NOTICE that pursuant to the Order Pursuant To 11

U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014

Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices

And Procedures Governing Objections To Claims, entered December __, 2006 (the "Order"), a

claims objection hearing (the "Claims Objection Hearing") for purposes of holding an

evidentiary hearing on the merits of the Proof of Claim is hereby scheduled for _____, 200_,

at 10:00 a.m. (prevailing Eastern time) in the United States Bankruptcy Court for the Southern

District of New York (the "Court").

PLEASE TAKE FURTHER NOTICE that the Claims Objection Hearing will

proceed in accordance with the procedures provided in the Order, unless such procedures are

modified in accordance with Paragraph 9(k) thereof.  Please review the Order carefully – failure

to comply with the procedures provided in the Order (or as modified pursuant to Paragraph 9(k))

could result in the disallowance and expungement of the Proof of Claim.  A copy of the Order is

attached hereto for your convenience.

PLEASE TAKE FURTHER NOTICE that the Debtors may further adjourn the

Hearing at any time at least five business days prior to the scheduled hearing upon notice to the

Court and the Claimant.


Dated:  New York, New York
        _____ _, 200_

                                        SKADDEN, ARPS, SLATE, MEAGHER &
                                          FLOM LLP

                                        By:_____
                                            John Wm. Butler, Jr. (JB 4711)
                                            John K. Lyons (JL 4951)
                                            Ron E. Meisler (RM 3026)
                                        333 West Wacker Drive, Suite 2100
                                        Chicago, Illinois  60606
                                        (312) 407-0700

                                        By:_____
                                            Kayalyn A. Marafioti (KM 9632)
                                            Thomas J. Matz (TM 5986)
                                        Four Times Square
                                        New York, New York 10036
                                        (212) 735-3000

                                        Attorneys for Delphi Corporation, et al.,
                                            Debtors and Debtors-in-Possession

EXHIBIT D

## LIST OF MEDIATORS

Lawrence Abramcyzk
Marc Abrams
Ronald Barliant
Michael Baum
Morton Collins
Susan Cook
Samuel Damren
Eugene Driker
Jonathan Flaxer
Rozanne Giunta
Erwin Katz
Edward Moran
Alan Nisselson
Thomas Plunkett
Marty Reisig

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
        In re                               :    Chapter 11
                                            :
DELPHI CORPORATION, et al.,                 :    Case No. 05-44481 (RDD)
                                            :
                        Debtors.            :    (Jointly Administered)
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF DEBTORS' ELECTION TO ACCEPT CLAIMANT'S
ASSERTED ESTIMATED AMOUNT FOR PROOF OF CLAIM NUMBER [_____]

            PLEASE TAKE NOTICE that on _____ _, 200_, Delphi Corporation and certain

of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), objected to proof of claim number _____ (the "Proof of Claim")

filed by _____ (the "Claimant") pursuant to the [Title Of Applicable Omnibus Claims

Objection] (the "Objection").

  PLEASE TAKE FURTHER NOTICE that on _____ _, 200_, the Claimant filed

its response to the objection, wherein Claimant (i) acknowledged that the Proof of Claim asserts

claims that are contingent or fully or partially unliquidated and (ii) stated that the Claimant

believes that the allowable amount of the Proof of Claim upon liquidation of the Contested

Claim or occurrence of the contingency, as appropriate, is $_____ (the "Claimant's Asserted

Estimated Amount").

  PLEASE TAKE FURTHER NOTICE that pursuant to the Order Pursuant To 11

U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014

Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices

And Procedures Governing Objections To Claims, entered December __, 2006 (the "Order"), the

Debtors hereby provide notice that the Debtors elect to accept the Claimant's Asserted Estimated

Amount as the estimated amount of the Proof of Claim pursuant to section 502(c) of the

Bankruptcy Code as set forth in the Objection.  A copy of the Order is attached hereto.

  PLEASE TAKE FURTHER NOTICE that any hearing scheduled pursuant to the

Order is hereby cancelled.

2

PLEASE TAKE FURTHER NOTICE that the Debtors' election to accept the

Claimant's Asserted Estimated Amount is without prejudice to the Debtors' right to object to any

other claims in these chapter 11 cases, or to further object to the Proof of Claim, on any grounds

whatsoever.

Dated:  New York, New York
_____ \_, 200\_

SKADDEN, ARPS, SLATE, MEAGHER &
  FLOM LLP

By:_____
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

By:_____
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

3

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
     In re                             :    Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :    Case No. 05-44481 (RDD)
                                          :
                Debtors.         :    (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 503(b) AUTHORIZING
DEBTORS TO APPLY CLAIMS OBJECTION PROCEDURES TO
ADDRESS CONTESTED ADMINISTRATIVE EXPENSE CLAIMS

("ORDER AUTHORIZING USE OF ADMINISTRATIVE CLAIM OBJECTION PROCEDURES")

          Upon the motion (the "Motion"), dated July 31, 2009, of Delphi Corporation (now

known as DPH Holdings Corp.) and certain of its subsidiaries and affiliates, former debtors and

debtors-in-possession in the above-captioned cases (collectively, the "Reorganized Debtors"), for

entry of an order authorizing the Reorganized Debtors to apply the claims objection procedures

set forth in the Order Pursuant To 11 U.S.C. §§ 502(b) And 502(c) And Fed. R. Bankr. P.

2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings

Regarding Disallowance Or Estimation Of Claims And (ii) Certain Notices And Procedures

Governing Hearings Regarding Disallowance Or Estimation Of Claims on December 6, 2006

(the "Claim Objection Procedures Order") (Docket No. 6089) to contested administrative

expense claims; and upon the record of the August 20, 2009 hearing held on the Motion; and

counsel for the Reorganized Debtors having represented that GM Components[1] and DIP Holdco

---

[1]   Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion.



0544481091022000000000001

3 have agreed to the terms of this order; and after due deliberation thereon; and good and

sufficient cause appearing therefor,

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED

THAT:

1.    The Motion is GRANTED as provided herein.

2.    The Reorganized Debtors are authorized and directed to apply the claims

objection procedures set forth in the Claims Objection Procedures Order to any dispute with

respect to Administrative Claims.

3.    All Administrative Claims shall be subject to the Claims Objection

Procedures.

4.    With respect to any Administrative Claim that is to be paid by and/or is

the responsibility of either GM Components or DIP Holdco 3 pursuant to the DIP Lender-GM

Master Disposition Agreement (the "MDA"), DPH Holdings Corp. will (a) provide to GM

Components or DIP Holdco 3, as applicable, (i) written notice identifying the Administrative

Claim and (ii) reasonably requested documentation relating to the Administrative Claim, and (b)

work with GM Components or DIP Holdco 3, as applicable, to develop an appropriate strategy to

liquidate or seek disallowance of the Administrative Claim.

5.    DPH Holdings Corp. shall not enter into a settlement agreement or make a

payment on account of any Administrative Claim for which either GM Components or DIP

Holdco 3 is responsible without the express written consent of GM Components or DIP Holdco 3,

as applicable.  Additionally, to the extent GM Components or DIP Holdco 3 directs DPH

Holdings Corp. to resolve an Administrative Claim (for which GM Components or DIP Holdco 3

is responsible) in a particular manner, including the settlement or litigation of such claim, DPH

2

Holdings Corp. shall resolve the Administrative Claim in accordance with such direction at no further cost, liability, or expense to DPH Holdings Corp.

6.      If (a) GM Components or DIP Holdco 3, as applicable, requires DPH Holdings Corp. to liquidate or seek disallowance of an Administrative Claim or (b) after DPH Holdings Corp. applies the Claims Objection Procedures to liquidate or seek disallowance of an Administrative Claim and either GM Components or DIP Holdco 3 is subsequently determined to be responsible for such Administrative Claim pursuant to the MDA, the reasonable costs incurred by DPH Holdings Corp. of liquidating or seeking disallowance of such Administrative Claim, only to the extent incurred after DPH Holdings Corp. has given notice in accordance with paragraph 4(a), above, shall be reimbursed by whichever of GM Components or DIP Holdco 3 is responsible for such Administrative Claim pursuant to the MDA.  GM Components or DIP Holdco 3, as applicable, may elect at any time to assume responsibility for liquidating or seeking disallowance of any such Administrative Claim at its own expense.

7.      This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this order.

Dated: New York, New York
       October 22, 2009


____/s/Robert D. Drain_____
       UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT E

Hearing Date and Time:  September 24, 2010 at 10:00 a.m. (prevailing Eastern time)
Supplemental Response Date and Time:  September 22, 2010 at 4:00 p.m. (prevailing Eastern time)

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036

Attorneys for DPH Holdings Corp., et al.,
   Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| DPH HOLDINGS CORP., et al., | : | Case Number 05-44481 (RDD) |
| | : | |
| | : | (Jointly Administered) |
| Reorganized Debtors. | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

REORGANIZED DEBTORS' SUPPLEMENTAL REPLY TO RESPONSE OF
SENSUS PRECISION DIE CASTING, INC. TO REORGANIZED DEBTORS'
OBJECTIONS TO PROOFS OF ADMINISTRATIVE EXPENSE CLAIM
NUMBERS 19797, 19798, 19799,19800, AND 19802

("SUPPLEMENTAL REPLY REGARDING DUPLICATE CLAIMS
OF SENSUS PRECISION DIE CASTING INC.")

DPH Holdings Corp. and certain of its affiliated reorganized debtors in the above-captioned cases (together with DPH Holdings Corp., the "Reorganized Debtors") hereby submit the Reorganized Debtors' Supplemental Reply To Response Of Sensus Precision Die Casting, Inc. To Reorganized Debtors' Objections To Proofs Of Claim Numbers 19797, 19798, 19799, 19800, And 19802 (the "Supplemental Reply"), and respectfully represent as follows:

A.    Preliminary Statement

1.    On October 8 and 14, 2005, Delphi Corporation and certain of its subsidiaries and affiliates (the "Debtors"), predecessors of the Reorganized Debtors, filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended.

2.    On October 6, 2009, the Debtors substantially consummated the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified (the "Modified Plan"), which had been approved by this Court pursuant to an order entered on July 30, 2009 (Docket No. 18707), and emerged from chapter 11 as the Reorganized Debtors.

3.    On August 26, 2010, the Reorganized Debtors filed the Notice Of Sufficiency Hearing With Respect To Debtors' Objection To Proofs Of Claim Numbers 10504, 10686, 11045, 11981, 11982, 11984, 11986, 11987, And 11990 And Reorganized Debtors' Objection To Proofs Of Administrative Expense Claim Numbers 19797, 19798, 19799, 19800, And 19802 (Docket No. 20552) (the "Sufficiency Hearing Notice").

4.    The Reorganized Debtors are filing this Supplemental Reply to implement Article 9.6(a) of the Modified Plan, which provides that "[t]he Reorganized Debtors shall retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving

2

all Claims against, and Interests in, the Debtors and making distributions (if any) with respect to all Claims and Interests." Modified Plan, art. 9.6(a).

5.    By the Sufficiency Hearing Notice and pursuant to the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims, entered December 7, 2006 (Docket No. 6089) (the "Claims Objection Procedures Order"), the Order Pursuant To 11 U.S.C. §§ 105(a) And 503(b) Authorizing Debtors To Apply Claims Objection Procedures To Address Contested Administrative Expense Claims, entered October 22, 2009 (Docket No. 18998), the Eleventh Supplemental Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims, entered April 5, 2010 (Docket No. 19776), and the Notice Of Rescheduling Of Fifty-Ninth Omnibus Hearing And Thirty-Seventh Claims Hearing (Docket No. 20417), the Reorganized Debtors scheduled a hearing (the "Sufficiency Hearing") on September 24, 2010 at 10:00 a.m. (prevailing Eastern time) in this Court to address the legal sufficiency of each proof of claim and proof of administrative expense claim filed by the claimants listed on Exhibit A to the Sufficiency Hearing Notice and whether each such proof of claim and proof of administrative expense claim states a colorable claim against the asserted Debtor.

6.    This Supplemental Reply is filed pursuant to paragraph 9(b)(i) of the Claims Objection Procedures Order. Pursuant to paragraph 9(b)(ii) of the Claims Objection Procedures Order, if a Claimant wishes to file a supplemental pleading in response to this

Supplemental Reply, the Claimant shall file and serve its response no later than two business days before the scheduled Sufficiency Hearing – i.e., by **September 22, 2010.**

B.    Relief Requested

7.    By this Supplemental Reply, the Reorganized Debtors request entry of an order disallowing and expunging certain proofs of administrative expense claims filed against the Debtors in their chapter 11 cases.

C.    The Claims Filed Against The Debtors

8.    Each of the proofs of administrative expense claim listed on Exhibit A[1] hereto asserts an administrative claim in the amount of $1,119,135.77 stemming from goods sold (the "Claims").  During the Reorganized Debtors' review of the Claims, the Reorganized Debtors determined that the Claims are duplicative of proof of administrative expense claim number 19801.  Accordingly, this Court should enter an order disallowing and expunging each of the Claims in its entirety.

D.    Claimants' Burden Of Proof And Standard For Sufficiency Of Claim

9.    The Reorganized Debtors respectfully submit that the Claims fail to state a claim against the Debtors under rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The claimants have not proved any facts to support a right to payment by the Reorganized Debtors on behalf of the Debtors.  Accordingly, the Reorganized Debtors' objections to the Claims should be sustained and each of the Claims should be disallowed and expunged in its entirety.

---

[1]    Exhibit A sets forth the following information regarding each proof of administrative expense claim: the applicable claim number, the date the claim was filed, the name of the claimant, the applicable omnibus objection, the date of the applicable omnibus objection, the docket number of the claimant's response, the name of the debtor entity against which the claim is asserted, and the basis for the Reorganized Debtors' objections to the Claims.

4

10. The burden of proof to establish a claim against the Debtors rests on the claimant and, if a proof of claim does not include sufficient factual support, such proof of claim is not entitled to a presumption of prima facie validity pursuant to Bankruptcy Rule 3001(f). In re Spiegel, Inc., No. 03-11540, 2007 WL 2456626, at *15 (Bankr. S.D.N.Y. Aug. 22, 2007) (the claimant always bears the burden of persuasion and must initially allege facts sufficient to support the claim); see also In re WorldCom, Inc., No. 02-13533, 2005 WL 3832065, at *4 (Bankr. S.D.N.Y. Dec. 29, 2005) (only a claim that alleges facts sufficient to support legal liability to claimant satisfies claimant's initial obligation to file substantiated proof of claim); In re Allegheny Int'l., Inc., 954 F.2d 167, 173 (3d Cir. 1992) (in its initial proof of claim filing, claimant must allege facts sufficient to support claim); In re Chiro Plus, Inc., 339 B.R. 111, 113 (Bankr. D. N.J. 2006) (claimant bears initial burden of sufficiently alleging claim and establishing facts to support legal liability); In re Armstrong Finishing, L.L.C., No. 99-11576-C11, 2001 WL 1700029, at *2 (Bankr. M.D.N.C. May 2, 2001) (only when claimant alleges facts sufficient to support its proof of claim is it entitled to have claim considered prima facie valid); In re United Cos. Fin. Corp., 267 B.R. 524, 527 (Bankr. D. Del. 2000) (claimant must allege facts sufficient to support legal basis for its claim to make a prima facie case).

11. For purposes of sufficiency, this Court has determined that the standard of whether a claimant has met its initial burden of proof to establish a claim should be similar to the standard employed by courts in deciding a motion to dismiss under Bankruptcy Rules 7012 and 9014. See Transcript of January 12, 2007 Hearing (Docket No. 7118) (the "January 12, 2007 Transcript") at 52:24-53:1. Pursuant to that standard, a motion to dismiss should be granted if a claimant fails to make "'[f]actual allegations . . . enough to raise a right to relief above the speculative level [to a plausible level],' assuming (of course) that all the allegations in the

5

complaint are true." Bradley v. Rell, No. 1:07-CV-0148, 2010 U.S. Dist. LEXIS 29606, at *13

(N.D.N.Y. Mar. 25, 2010) (quoting Bell Atl. Corp. v. Twombly, 550 U.S 544, 555 (2007)).

Essentially, the claimant must provide facts that plausibly support a legal liability against the

Debtors.

　　　　　12.　　　This Court further established that the sufficiency hearing standard is

consistent with Bankruptcy Rule 3001(f), which states that "a proof of claim executed and filed

in accordance with these Rules shall constitute prima facie evidence of the validity and amount

of the claim." Fed. R. Bankr. P. 3001(f) (emphasis added).  Likewise, Bankruptcy Rule 3001(a)

requires that "the proof of claim shall conform substantially to the appropriate Official Form"

and Bankruptcy Rule 3001(c) requires that "when a claim . . . is based on a writing, the original

or a duplicate shall be filed with the proof of claim." Fed. R. Bankr. P. 3001(a), (c).  See January

12, 2007 Transcript at 52:17-22.

E.　　　Argument Regarding The Claims

　　　　　13.　　　It is axiomatic that creditors are not entitled to multiple recoveries for a

single liability against a debtor.  Sensus Precision Die Casting, Inc. (the "Claimant") filed six

proofs of administrative expense claim asserting an administrative claim against certain Debtors,

each in the amount of $1,119,135.77 stemming from goods sold: proofs of administrative

expense claim numbers 19797, 19798, 19799, 19800, 19801, and 19802.  These six proofs of

administrative expense claim are identical, with the exception of the Debtor against whom the

claim is asserted. Specifically, (i) claim 19797 asserts a claim against Delphi LLC, (ii) claim

19798 asserts a claim against Delphi Corporation, (iii) claim 19799 asserts a claim against

Delphi China LLC, (iv) claim 19800 asserts a claim against Delphi Automotive Systems

Overseas Corporation, (v) claim 19801 asserts a claim against Delphi Automotive Systems LLC,

and (vi) claim 19802 asserts a claim against Delphi Automotive Systems International, Inc.

14.    Accordingly, the Reorganized Debtors request that the Court disallow and
expunge proofs of administrative expense claim numbers 19797, 19798, 19799, 19800, and
19802 as duplicative of proof of administrative expense claim number 19801.  If such relief is
granted, the Reorganized Debtors will not subsequently object to proof of administrative expense
claim number 19801 on the basis that such Claim was asserted against Delphi Automotive
Systems LLC rather than against Delphi LLC, Delphi Corporation, Delphi China LLC, Delphi
Automotive Systems Overseas Corporation, Delphi Automotive Systems LLC, or Delphi
Automotive Systems International, Inc.

15.    For the foregoing reasons, the Reorganized Debtors assert that (a) the
Claimant has not met its burden of proof to establish a claim against the Debtors, (b) the Claims
are not entitled to a presumption of prima facie validity pursuant to Bankruptcy Rule 3001(f),
and (c) the Claims fail to state a claim against the Debtors under Bankruptcy Rule 7012.
Because the Claimant cannot provide facts or law supporting the Claims, the Forty-Third
Omnibus Claims Objection should be sustained as to the Claims, and each of the Claims should
be disallowed and expunged in its entirety.

7

WHEREFORE the Reorganized Debtors respectfully request this Court enter an order (a) sustaining the objection relating to the Claims, (b) disallowing and expunging each of the Claims in its entirety, and (c) granting such further and other relief this Court deems just and proper.

Dated:    New York, New York
          September 14, 2010

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP

By:  /s/ John Wm. Butler, Jr.
     John Wm. Butler, Jr.
     John K. Lyons
     Ron E. Meisler
155 North Wacker Drive
Chicago, Illinois 60606

        - and -

Four Times Square
New York, New York 10036

Attorneys for DPH Holdings Corp., et al.,
   Reorganized Debtors

## Exhibit A - Duplicate Claims

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| Proof Of Administrative Claim Number | Date Filed | Claimant | Omnibus Claims Objection | Date Of Omnibus Claims Objection | Docket No. of Response | Debtor Named On Proof Of Administrative Expense Claim | Basis for Objection |
| 19797 | 11/5/2009 | SENSUS PRECISION DIE CASTING, INC. | Forty-Third Omnibus Claims Objection | 1/22/2010 | 19515 | DELPHI LLC | Books And Records Claim |
| 19798 | 11/5/2009 | SENSUS PRECISION DIE CASTING, INC. | Forty-Third Omnibus Claims Objection | 1/22/2010 | 19515 | DELPHI COPORATION | Books And Records Claim |
| 19799 | 11/5/2009 | SENSUS PRECISION DIE CASTING, INC. | Forty-Third Omnibus Claims Objection | 1/22/2010 | 19515 | DELPHI CHINA LLC | Books And Records Claim |
| 19800 | 11/5/2009 | SENSUS PRECISION DIE CASTING, INC. | Forty-Third Omnibus Claims Objection | 1/22/2010 | 19515 | DELPHI AUTOMOTIVE SYSTEMS OVERSEAS CORPORATION | Books And Records Claim |
| 19802 | 11/5/2009 | SENSUS PRECISION DIE CASTING, INC. | Forty-Third Omnibus Claims Objection | 1/22/2010 | 19515 | DELPHI AUTOMOTIVE SYSTEMS INTERNATIONAL, INC. | Books And Records Claim |

# EXHIBIT F

**Hearing Date and Time:  September 24, 2010 at 10:00 a.m. (prevailing Eastern time)**
**Supplemental Response Date and Time:  September 22, 2010 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036

Attorneys for DPH Holdings Corp., et al.,
    Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                    :
        In re                                       :    Chapter 11
                                                    :
DPH HOLDINGS CORP., et al.,                         :    Case Number 05-44481 (RDD)
                                                    :
                                                    :    (Jointly Administered)
                Reorganized Debtors.                :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

REORGANIZED DEBTORS' SECOND SUPPLEMENTAL REPLY TO RESPONSES TO
DEBTORS' OBJECTIONS TO ADMINISTRATIVE EXPENSE CLAIM
NUMBERS 17081 AND 18049 FILED BY JAMES A. LUECKE

("SECOND SUPPLEMENTAL REPLY REGARDING
CERTAIN JAMES A. LUECKE CLAIMS")

DPH Holdings Corp. and certain of its affiliated reorganized debtors in the above-captioned cases (together with DPH Holdings Corp., the "Reorganized Debtors") hereby submit the Reorganized Debtors' Second Supplemental Reply To Responses To Debtors' Objections To Administrative Expense Claim Numbers 17081 And 18049 Filed By James A. Luecke (the "Second Supplemental Reply"), and respectfully represent as follows:

A.    Preliminary Statement

1.    On May 10, 2010, the Reorganized Debtors filed the Reorganized Debtors' Supplemental Reply To Responses To Debtors' Objections To Administrative Expense Claim Numbers 17081 And 18049 Filed By James A. Luecke (Docket No. 20002) (the "First Supplemental Reply").[1]

2.    During the sufficiency hearing on May 20, 2010 (the "First Sufficiency Hearing"), this Court adjourned the hearing regarding the Reorganized Debtors' objections to proofs of administrative expense claim numbers 17081 and 18049 (the "Claims") filed by James A. Luecke (the "Claimant").  As evidenced from the documents attached to his Claims, Mr. Luecke apparently asserts that his Claims are based on a grievance that he filed alleging breaches of the UAW collective bargaining agreement, notwithstanding the fact that, to the Reorganized Debtors knowledge, all grievances filed by Mr. Luecke or on Mr. Luecke's behalf have been resolved.[2]  Thus, because Mr. Luecke has no outstanding grievances and has no basis to assert any grievance, his Claims are without merit.  All of Mr. Luecke's Claims stem from his alleged

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the First Supplemental Reply.

[2]    To the extent that Mr. Luecke's Claims are not based on grievances, the Reorganized Debtors submit that his claims may also be without merit due to the UAW's release of claims on behalf of its members and former members which are present in the Modified Plan and the UAW-Delphi-GM Memorandum of Understanding, as defined in the Modified Plan.

2

employment transfer rights that arise from paragraph 96 ("Paragraph 96") of the national

agreement (the "National Agreement") between the Debtors and the UAW.  Therefore, if Mr.

Luecke has no claim pursuant to Paragraph 96 of the National Agreement, he has no claim at all.

  3. As established at the First Sufficiency Hearing and in the First Supplemental

Reply, Mr. Luecke has no cognizable grievance because he had no transfer rights under

Paragraph 96 of the National Agreement.

  4. At the First Sufficiency Hearing, this Court directed the Reorganized Debtors

to (i) locate an executed memorandum of understanding between the Debtors and the UAW,

governing the circumstances from which Mr. Luecke's Claims allegedly arise, stating that the

only skilled trades openings identified for transfer to the Kokomo plant were for two pipefitters

(the "2007 Milwaukee-Kokomo Paragraph 96 MOU")[3] and (ii) assist Mr. Luecke with any

grievance that he may have against the GM Buyers.  As expressed by this Court at the First

Sufficiency Hearing, if the Reorganized Debtors were able to locate a signed copy of the 2007

Milwaukee-Kokomo Paragraph 96 MOU, Mr. Luecke "would have lost on that point."  See In re

DPH Holdings Corp., Hr'g Tr. at 175:5-13, May 20, 2010.  Neither the Reorganized Debtors nor

the UAW were able to locate an original signed copy of the 2007 Milwaukee-Kokomo Paragraph

96 MOU.  However, both the Reorganized Debtors and the UAW affirmed that the 2007

Milwaukee-Kokomo Paragraph 96 MOU constituted the operative agreement between the parties

and , as such, re-executed the 2007 Milwaukee-Kokomo Paragraph 96 MOU, a copy of which in

---

[3] Mr. Luecke was employed as an Electronic Technician – Employee in Training (ET-EIT), which was a skilled trades position at the Debtors' former Milwaukee Electronics & Safety (E&S) manufacturing facility and therefore had no transfer rights.

its executed form is attached hereto as <u>Exhibit A</u>.[4]  Because the Reorganized Debtors have a signed copy of the 2007 Milwaukee-Kokomo Paragraph 96 MOU, there is now an established documentary basis to disallow and expunge the Claims.  Therefore, there was no grievance or claim to transfer to the GM Buyers.  However, the Reorganized Debtors contend that even if Mr. Luecke had an existing claim, the Reorganized Debtors would not be responsible for such claim.

5.    Notwithstanding the fact the Reorganized Debtors have a signed copy of the 2007 Milwaukee-Kokomo Paragraph 96 MOU, which renders Mr. Luecke's Claims meritless and uncognizable, the Reorganized Debtors investigated Mr. Luecke's situation with the GM Buyers at the request of this Court.  The Reorganized Debtors have contacted Mr. Luecke and provided him with the name and number of a labor relations representative for the GM Buyers.  As discussed in the First Supplemental Reply, the Reorganized Debtors would not be liable for any grievance that Mr. Luecke may have because the grievance would be based on a union grievance that the Reorganized Debtors did not retain liability for pursuant to the Modification Approval Order.

B.    <u>Arguments Regarding The Claims</u>

6.    As discussed in the First Supplemental Reply, the assertion of Mr. Luecke that he is entitled to receive payment for lost wages, overtime, and severance is without merit.  Mr. Luecke bases his argument on alleged rights that arise from Paragraph 96 of the National Agreement.  For this Court's reference, a copy of the relevant portion of the National Agreement is attached hereto as <u>Exhibit B</u>.

---

[4]    This executed copy of the 2007 Milwaukee-Kokomo Paragraph 96 MOU is the same document that was attached to the First Supplemental Reply as Exhibit D.

4

7.    The National Agreement governs situations where operations are transferred between plants.  Paragraph 96 of the National Agreement states in part:

> When there is a transfer of major operations between plants, the case may be presented to the Corporation and, after investigation, it will be reviewed with the International Union in an effort to negotiate an equitable solution, in accordance with the principles set forth in the previous paragraph.  Any transfer of employees resulting from this review shall be on the basis that such employees are transferred with full seniority, except as the parties may otherwise mutually agree.

8.    In accordance with Paragraph 96, Delphi and the UAW engaged in negotiations to reach an "equitable solution" to the transfer of work.  These negotiations resulted in two memorandums of understanding (collectively, the  "MOUs") between the Debtors and the UAW to establish procedures for Milwaukee employees who were interested in working in Kokomo to apply for, and be considered for, any openings.  Between the MOUs, the only skilled trades openings identified were for two pipefitters (see <u>Exhibit A</u>).  No other skilled trades openings were identified, including for ET and ET-EIT classifications (indeed, Kokomo did not even have an ET or ET-EIT classification).

9.    Nothing in Paragraph 96 required the Debtors to transfer every employee, every skilled trades employee, or every ET or ET-EIT employee.  The Debtors and the UAW implemented Paragraph 96 through the MOUs, and jointly agreed that there were no openings for ET-EIT classifications in Kokomo, and thus no employees could be transferred with their ET-EIT classifications.  This was the "equitable solution" through negotiation that Paragraph 96 was intended to create.

10. However, this does not mean that Mr. Luecke or other ET or ET-EIT employees were prohibited from transferring to Kokomo.  To the contrary, skilled trades employees who wished to transfer were free to apply for nonskilled job offers.  Although this would result in a lower base rate, once an employee established seniority in the Kokomo plant,

5

they could be considered for future skilled openings.  However, Mr. Luecke never submitted an application for transfer to Kokomo.

11. Thus, the decision not to permit Mr. Luecke to transfer to Kokomo as an ET-EIT was the result of a negotiated agreement between the Debtors and the UAW, as required by Paragraph 96 of the National Agreement.  Accordingly, each of the Claims should be disallowed and expunged in its entirety.

12. Moreover, as the documents attached to the Claims indicate, Mr. Luecke's claims are based on a grievance that he filed, notwithstanding the fact that, to the Reorganized Debtors knowledge, all grievances filed by Mr. Luecke or on Mr. Luecke's behalf have been resolved.  Thus, because Mr. Luecke has no outstanding grievances and, as discussed above, has no basis to assert any grievance, his Claims are without merit.  Even if Mr. Luecke could assert a grievance, as described in paragraph 61 of the Modification Approval Order, the UAW-Delphi-GM Memorandum of Understanding and all grievances under it were assumed by the GM Buyer (as defined in the Modification Approval Order).[5]

Labor MOUs[6]

---

[5]    Further, under the Modified Plan and the Modification Approval Order, the UAW-Delphi-GM Memorandum of Understanding was assumed by the applicable Reorganized Debtor and assigned to the GM Buyer. Accordingly, the Reorganized Debtors are relieved from any liability for any breach of such contract occurring after such assignment pursuant to 11 U.S.C. § 365(k).  Furthermore, even if section 365(k) does not cut off the Reorganized Debtors' liability, the Claims against the Reorganized Debtors should be disallowed because they are, at best, contingent upon the GM Buyer not fulfilling its obligation regarding the grievance.  Because there is nothing in the record to indicate GM Buyer will not fulfill its obligation to the extent it is valid and legally enforceable, the Claims should be disallowed subject to any rights Mr. Luecke may have under 11 U.S.C. § 502 (j).

[6]    "Labor MOUs" means the UAW-Delphi-GM Memorandum of Understanding, the IUE-CWA-Delphi-GM Memorandum of Understanding, the USW-Home Avenue Memorandum of Understanding, the USW-Vandalia Memorandum of Understanding, the IUOE Local 832S Memorandum of Understanding, the IUOE Local 18S Memorandum of Understanding, the IUOE Local 101S Memorandum of Understanding, the IBEW E&S Memorandum of Understanding, the IBEW Powertrain Memorandum of Understanding, and the IAM-Delphi Memorandum of Understanding, each as defined in the Modified Plan.

> (a) <u>GM Buyer.</u> Pursuant to the Modified Plan, upon the Effective Date and notwithstanding any other provisions of the Master Disposition Agreement, the applicable Labor MOUs (which shall include all related collectively bargained agreements and obligations, **including grievances**), shall be assumed and assigned to the GM Buyer . . . .

Modification Approval Order ¶ 61 (emphasis added).

13. Accordingly, the Reorganized Debtors assert that (a) the Claimant has not met his burden of proof to establish a claim against the Debtors, (b) the Claims are not entitled to a presumption of <u>prima facie</u> validity pursuant to Bankruptcy Rule 3001(f), and (c) the Claims fail to state a claim against the Reorganized Debtors under Bankruptcy Rule 7012.  Because the Claimant cannot provide facts or law supporting his claims, the Thirty-Seventh Omnibus Claims Objection should be sustained as to administrative expense claim number 17081 and the Forty-Fifth Omnibus Claims Objection should be sustained as to administrative expense claim number 18049, and each such claim should be disallowed and expunged in its entirety.

WHEREFORE the Reorganized Debtors respectfully request this Court enter an

order (a) sustaining the objections with respect to the Claims, (b) disallowing and expunging

each Claim in its entirety, and (c) granting such further and other relief this Court deems just and

proper.

Dated:   New York, New York
         September 14, 2010

                                    SKADDEN, ARPS, SLATE, MEAGHER
                                       & FLOM LLP

                                    By:   /s/ John Wm. Butler, Jr.
                                          John Wm. Butler, Jr.
                                          John K. Lyons
                                          Ron E. Meisler
                                    155 North Wacker Drive
                                    Chicago, Illinois 60606

                                          - and -

                                    Four Times Square
                                    New York, New York 10036

                                    Attorneys for DPH Holdings Corp., et al.,
                                       Reorganized Debtors

**EXHIBIT A**

## MEMORANDUM OF UNDERSTANDING
## TRANSFER OF MAJOR OPERATIONS
## PURSUANT TO DELPHI-UAW NATIONAL AGREEMENT
## PARAGRAPH (96)
### Electronics and Safety-Milwaukee (Local #438, Cisco 55968)
### TO
### Electronics and Safety- Kokomo (Local # 292, Cisco 55967)

MEMORANDUM OF UNDERSTANDING entered into this __ day of _____, 2007 between Delphi Corporation, hereinafter referred to as the Corporation, and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, hereinafter referred to as the Union.

WHEREAS, the Delphi Electronics and Safety Milwaukee Plant, for a number of years produced various Powertrain Gas ECM's; and

WHEREAS, for business purposes and efficiency of operations, the production of E38 and E67 Gas ECM's will be discontinued at the E&S-Milwaukee Plant and relocated to the E&S Kokomo Plant between August 2007 and September 2007, and

WHEREAS, the transfer of such operations from the E&S- Milwaukee Plant could result in the layoff of a number of employees at that location; and

WHEREAS, certain E&S- Milwaukee Plant bargaining unit employees may desire transfer to the E&S Kokomo Plant; and

WHEREAS, the Union is the certified collective bargaining representative for certain employees of the E&S- Milwaukee Plant who will be offered employment at the E&S Kokomo Plant where the Union is also the certified collective bargaining representative for certain employees; and WHEREAS, it is the intent of the parties, and the purpose of the MEMORANDUM to the extent practicable:

| Post-it® Fax Note | 7671 | Date | # of pages ▶ |
|---|---|---|---|
| To *Jeff Peterson* | | From *Ron McDonaII* | |
| Co./Dept. | | Co. | |
| Phone # | | Phone # | |
| Fax # | | Fax # | |

*Exhibit A*



I.   To establish a procedure whereby certain employees who are employed in the E&S-Milwaukee Plant bargaining unit, who desire employment at the E&S Kokomo Plant may, within the limits hereinafter set forth, be offered such employment; and

II.  To minimize grievances which might otherwise arise as a result of the employment of such employees and the changing of the job assignments during the transition period.

NOW THEREFORE, it is agreed between the parties that:

A.   <u>Application Procedure</u>

1.   An application procedure will be established by Management for the purpose of allowing certain employees, including those on layoff or approved leaves of absence, of the E&S- Milwaukee Plant bargaining unit to apply for 44 jobs at the E&S Kokomo Plant during an application period beginning August 27, 2007 and ending September 7, 2007.

2.   Eligible employees at the E&S- Milwaukee Plant bargaining unit who desire to transfer to the E&S Kokomo Plant may make application for transfer with the E&S- Milwaukee Plant Employment Office on forms provided by Management for this purpose, during regular business hours with the application period set forth in Paragraph A.1 above.

3.   Eligible employees on layoff or approved leaves of absence from the E&S- Milwaukee Plant bargaining unit will be notified of this opportunity by letter mailed <u>Certified Mail - Return Receipt Requested</u> dispatched to their address of record.  Such employees who desire employment at the E&S Kokomo Plant must respond to this notification by filing a valid application with the E&S- Milwaukee Plant Employment Office by the close of business on September 7, 2007.

B.   Selection Procedure

  1.   Non-Skilled

     a.   In determining the eligibility of applicants for the job openings at the E&S Kokomo Plant, it is agreed that only those employees currently at work with seniority at the E&S- Milwaukee Plant, including those currently on layoff or leave of absence, at the time of making application, will be considered for such openings.

     b.   Eligible applicants with seniority in the E&S- Milwaukee Plant bargaining unit at the time a job offer is made will be selected in seniority order to transfer to the E&S Kokomo Plant to fill an estimated 42 production job openings provided they are capable of doing the work.

  2.   Skilled Trades

     a.   In determining the eligibility of Skilled Trades employees for job openings in the Skilled Trades at the Kokomo Plant, it is agreed that only those seniority employees with a Journeyperson or EITS status as of the time of making application, and when a job offer is made, will be considered for such openings.

     b.   The number of employees specified, for the following classification(s) at the Kokomo Plant, will be selected from the designated classification in line with their skilled trades seniority provided they are capable of doing the work:

| Total Number | E&S Milwaukee Classification | E & S Kokomo Classification |
|---|---|---|
| 2 | Pipefitter | Pipefitter |

C.    General

1.    This MEMORANDUM is applicable only to those employees who meet the conditions set forth in A above. An employee's application will be open and pending until:

a.    The applicant has been offered and accepted employment.

b.    The applicant has rejected an offer of employment.

c.    Employment has been offered and accepted by the maximum number of employees provided in Paragraph A.1. above.

2.    The seniority of any applicant who is transferred pursuant to this MEMORANDUM shall be the full seniority the employee has on record together with the employee's complete employment history and records and the rights to which the employee is or may thereafter become entitled under Supplemental Agreements, Exhibits "A", "B", "C", "D", "E", "F", "G", and I to the Delphi-UAW National Agreement dated September 18, 2003. Thereafter, the employee will have no further seniority rights or other rights in the E&S-Milwaukee Plant bargaining unit.

3.    Employees transferred from the E&S- Milwaukee Plant to the E&S Kokomo Plant shall bring with them their full personnel record as though their full period of service had occurred at the E&S Kokomo Plant.

4.    Employees on military leave whose seniority would have entitled them to an offer of employment at the E&S Kokomo Plant pursuant to the provisions of the MEMORANDUM had they been actively at work shall be given an opportunity to file an application to have their name placed on the seniority list at the E&S Kokomo Plant provided, following their discharge from military service, they would be entitled to reemployment pursuant to Paragraph (112) of the Delphi-UAW National Agreement. Thereafter, the National Agreement and applicable local agreement at the E&S Kokomo plant shall govern their employment at such plant.

5.    Employees at the E&S- Milwaukee plant who had previously worked in the bargaining unit and acquired seniority and who are transferred to an opening at the E&S Kokomo Plant and who are subsequently transferred from jobs outside the bargaining unit shall be treated as though their entire service had been at the E&S Kokomo Plant.

6.    All G.I.S. employees at the E&S- Milwaukee plant will be considered to have made application for openings at the E&S Kokomo Plant.

7.    The provisions of the Agreement as they relate to the assignment of manpower may be reviewed by the Corporation and the International Union at the request of either party.

8.    The signing of this MEMORANDUM does not prejudice or establish the position of either party in future cases with respect to Paragraph (96) of the Delphi-UAW National Agreement.

IN WITNESS WHEREOF, the parties have caused their names to be subscribed by their duly authorized representatives on the date first written above.

INTERNATIONAL UNION, UAW                    DELPHI CORPORATION

*Dave Kosanke* 7-26-10                    *[signature]* 7/26/10

* A TRUE AND CORRECT COPY.                    true and correct copy

**EXHIBIT B**

(a) The plant to which the employee is to be relocated is outside the Area Hire Area as defined by the National Parties, and

(b) Application is made within six (6) months after commencement of employment at the plant to which the employee was relocated in accordance with the procedure established by the Corporation.

(2) When employees are relocated, they will be given a choice from the following Relocation Packages:

(a) Option 1 - Enhanced Relocation:

Employees will receive a Relocation Allowance up to a maximum of $25,000. $5,000 of which will be provided as a signing bonus to cover miscellaneous up-front cash expenditures. An  additional amount of $15,000 will be paid to the employee at the new location.

In addition, spousal relocation assistance will be provided,

After one (1) year of employment, employees may receive $5,000 if they continue to be employees of the new location.

Employees who are placed in accordance with Appendix A and accept the Enhanced Relocation Allowance will not be eligible to initiate another Extended Area Hire placement or initiate an Area Hire placement as an active employee for a period of 36 months unless the employee's status changes to laid off or Protected. In the event the plant has employees on permanent indefinite layoff or placed on Protected status with no likelihood of recall into the active workforce, the 36 month period will be eliminated.

Employees receiving the Enhanced Relocation Allowance will terminate their seniority at

75

---

any kind of literature upon Corporation property other than as herein provided.

[See Doc. 6]
[See CSA #5]

## ESTABLISHMENT OF NEW PLANTS

(95) For twenty-four months after production begins in a new plant (including a non-represented plant), the Corporation will give preference to the applications of laid off employees having seniority in other plants over applications of individuals who have not previously worked for the Corporation, provided their previous experience in the Corporation shows that they can qualify for the job. When employed, such employees will have the status of temporary employees in the new plant. Such employees will retain their seniority in the plant where originally acquired until broken in accordance with the seniority rules herein.

[See Par. (56),(64)]
[See App. K,IV(C)15]

(96) When there is a transfer of major operations between plants, the case may be presented to the Corporation and, after investigation, it will be reviewed with the International Union in an effort to negotiate an equitable solution, in accordance with the principles set forth in the previous paragraph. Any transfer of employees resulting from this review shall be on the basis that such employees are transferred with full seniority, except as the parties may otherwise mutually agree.

[See App. A,K,IV(C)15]
[See Doc. 104]

(96)(1) An employee whose seniority is transferred between Delphi Corporation plants pursuant to Paragraph (96) of this Agreement will be paid a Relocation Allowance, provided:

[See App. K,II,(C)]
[See Doc. 20]

74

legislation, the employee must apply for such legislated relocation allowance prior to receiving any Relocation Allowance excluding the signing bonus provided in Paragraph (96a)(2)(a) above. The amount of Relocation Allowance provided under this Paragraph (96a), when added to the amount of relocation allowance provided by such legislation, shall not exceed the maximum amount of the Relocation Allowance the employee is eligible to receive under the provisions of this paragraph.

(4) Materials designed to assist employees who relocate under the provisions of Paragraph (96) or the Memorandum of Understanding of Understanding Employee Placement will be updated. Such materials will include information covering topics such as:



- Moving Household Goods
- Community Services
- Contractual Rights and Responsibilities
- New Community Orientation
- New Plant and Product Orientation
- Health and Safety
- Legal Services
- Relocation Allowance
- TAA or other Government Benefits
- Work/Family Program
- Real Estate Services

All materials developed regarding these topics are to be consistent with services available to laid off employees under the provisions of Document No. 110, Dislocated Workers.

77



all other Delphi locations and, therefore, not be eligible for recall/rehire or Return to Former Community.

(b) Option 2 - Basic Relocation:

Employee will receive Relocation Allowance based on mileage relocated from plant of layoff to plant of hiring based on the following table:

| Mileage | Relocation Allowance Amount |
| --- | --- |
| 50-99 | $3,038 |
| 100-299 | $3,347 |
| 300-499 | $3,511 |
| 500-999 | $4,146 |
| 1000+ | $4,767 |

The employee who accepts the Basic Relocation Option will be eligible to apply for return to former community or an Extended Area Hire application in accordance with the Memorandum of Understanding Employee Placement (Section VIII - Return to Former Community and Section II - Extended Area Hire) after working at the plant of relocation for a period of six (6) months or upon indefinite layoff from the plant of relocation.

Employees from an idled or closed location or employees from a location not included in an Area Hire Area with no prospect of recall who relocate in excess of 200 miles under the Basic Relocation Option will receive the specified relocation amount and an additional $1,280.   [See App. A]

(3) In the event an employee who is eligible to receive Relocation Allowance under these provisions is also eligible to receive a relocation allowance or its equivalent under any present or future Federal or State

76

National and/or local training funds will be used to support the efforts required to provide the above assistance.

[See App. A]

## WAGES

(97) The establishment of wage scales for each operation is necessarily a matter for local negotiation and agreement between the Plant Managements and the Shop Committees.

[See Par. (46),(89a),(90)]
[See Doc. 85]
[See CSA #11]

(98) New employees hired on or after the effective date of this Agreement, who do not hold a seniority date in any Delphi Corporation plant and are not covered by the provisions of Paragraph (98b) below, shall be hired at a rate equal to seventy (70) percent of the maximum base rate of the job classification. Such employees shall receive an automatic increase to:

[See Par.(99),(101),(g)]
[See Doc. 87]
[See CSA #10]

(1) seventy-five (75) percent of the maximum base rate of the job classification at the expiration of twenty-six (26) weeks.

(2) eighty (80) percent of the maximum base rate of the job classification at the expiration of fifty-two (52) weeks.

(3) eighty-five (85) percent of the maximum base rate of the job classification at the expiration of seventy-eight (78) weeks.

(4) ninety (90) percent of the maximum base rate of the job classification at the expiration of one hundred and four (104) weeks.

(5) ninety-five (95) percent of the maximum

78

base rate of the job classification at the expiration of one hundred and thirty (130) weeks.

(6) the maximum base rate of the job classification at the expiration of one hundred and fifty-six (156) weeks.

Such an employee who is laid off prior to acquiring seniority and who is re-employed at that plant within one year from the last day worked prior to layoff shall receive a rate upon re-employment which has the same relative position to the maximum base rate of the job classification as had been attained by the employee prior to layoff. Upon such re-employment, the credited rate progression period of an employee's prior period of employment at that plant shall be applied toward their rate progression to the maximum base rate of the job classification.

For the purpose of applying the provisions of this Paragraph (98), (98a), and (98b) only, an employee will receive one week's credit toward acquiring the maximum base rate of the job classification provided the employee had worked in that given week. Credit will not be given for any week during which for any reason, the employee does not work except as provided in Paragraph (108) and when the Christmas Holiday consists of a full week and the Independence Week Shutdown, provided the employee would otherwise have been scheduled to work. Notwithstanding other provisions of this Agreement, full weeks of time lost for vacation during the Plant Vacation Shutdown Week, bereavement, military duty and Family Medical Leave Act, if the employee would otherwise have been scheduled to work, will be considered as time worked. Each increase shall be effective at the beginning of the first pay period following the completion of the required number of weeks of employment.

(98a) Laid-off seniority employees hired in a job classification other than skilled trades, shall receive a

79

# EXHIBIT G

DPH Holdings Corp.
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip |
|---------|---------|----------|----------|------|-------|-----|
| Hobart Brothers Illinois Tool Works Tri Mark | Kristin B Mayhew Esq | Pepe & Hazard LLP | 30 Jelliff Ln | Southport | CT | 06890 |
| Mad River Transortation Peerless Transportatin | Cathy McCoy Chris Bridges | One Specialty Pl | PO Box 1296 | Dayton | OH | 45401 |
| Mad River Transortation Peerless Transportatin | Christopher Aluotto Robert Brown | Rendigs Fry Kiely & Dennis | One W Fourth St Ste 900 | Cincinnati | OH | 45202-3688 |
| Tremont City Barrel Fill PRP Group | S Salinas J Maynard G Jordan | Dykema Gossett PLLC | 10 S Wacker Dr Ste 2300 | Chicago | IL | 60606 |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 1 of 1

9/15/2010 9:22 PM
Tremont Special Parties

# EXHIBIT H

DPH Holdings Corp.
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip |
|---------|---------|----------|----------|------|-------|-----|
| Honigman Miller Schwartz & Cohn LLP | E Todd Sable Adam K Keith | 2290 First National Bldg | 660 Woodward Ave | Detroit | MI | 48226 |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 1 of 1

9/15/2010 9:12 PM
Etkin Special Parties

# EXHIBIT I

DPH Holdings Corp.
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip |
|---|---|---|---|---|---|---|
| K&L Gates LLP | Attn George M Cheever | Henry W Oliver Bldg | 535 Smithfield St | Pittsburgh | PA | 15222-2312 |
| Sensus Precision Die Casting Inc | Robert N Michaelson | K&L Gates LLP | 599 Lexington Ave | New York | NY | 10022-6030 |

# EXHIBIT J

DPH Holdings Corp.
Special Parties

| Company | Address1 | City | State | Zip |
|---|---|---|---|---|
| James A Luecke | 3845 W College Ave | Milwaukee | WI | 53221 |

In re. DPH Holdings Corp., et al.
Case No. 05-44481 (RDD)

Page 1 of 1

9/15/2010 9:12 PM
Luecke Special Parties