Timothy T. Brock, Esq.
Abigail Snow, Esq.
SATTERLEE STEPHENS BURKE & BURKE LLP
230 Park Avenue, Suite 1130
New York, New York 10169
(212) 818-9200

*Co-Counsel with:*
Patricia L. Beaty, Esq.
KRIEG DEVAULT LLP
One Indiana Square, Suite 2800
Indianapolis, IN 46204
(317) 636-4341

*Co-Counsel for Delphi Salaried Retirees*
*Association Benefit Trust VEBA Committee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| DPH HOLDINGS CORP., *et al*., | Case No. 05-44481 (RDD) |
| Reorganized Debtors. | Jointly Administered |

**LIMITED OBJECTION OF THE VEBA COMMITTEE FOR THE**
**DELPHI SALARIED RETIREES ASSOCIATION BENEFIT TRUST**
**TO THE FINAL REPROPORT OF THE OFFICIAL COMMITTEE OF**
**RETIRED SALARIED EMPLOYEES PURSUANT TO 11 U.S.C. § 1114(d)**

The VEBA Committee (the "VEBA Committee") for the Delphi Salaried Retirees Association Benefit Trust (the "DSRA VEBA"), by its attorneys, Satterlee Stephens Burke & Burke LLP, hereby submits this Limited Objection (the "Objection"), to the Final Report of the Official Committee of Eligible Salaried Retirees appointed pursuant to 11 U.S.C. § 1114 (the "1114 Committee"). In support of the Objection, the VEBA Committee respectfully represents as follows:

1

814673_1C

**PRELIMINARY STATEMENT**

The VEBA Committee objects to the Final Report filed by the 1114 Committee to the extent that it asks the Court for "Instructions" concerning the governance of the VEBA Committee. (See Final Report, Intro. & ¶¶ 17-20.) There is no basis for the relief sought: the 1114 Committee has fulfilled its limited post-Confirmation purpose by establishing the VEBA Committee, overseeing the receipt by the DSRA VEBA of the settlement payments made by Reorganized Debtors, and filing the Final Report. Whatever authority the 1114 Committee once had has now been exhausted, as the Reorganized Debtors themselves recognize in the latter's Objection to the VEBA Committee's Motion to Compel (Ds' Obj. ¶ 14) (which Motion is to be withdrawn).

Unfortunately, the Reorganized Debtors are too sanguine in asserting that no Order need be issued disbanding the 1114 Committee. (Id.) The proven track record of the 1114 Committee and its membership in terms of meddling with the governance and operations of the VEBA Committee (as evinced in the Final Report itself) has been sufficiently severe that, in the absence of a formal Order being issued by this Court, the 1114 Committee will continue to tout its "Court-Appointed" status to to meddle in the governance of the VEBA Committee, regardless of the imminent closing of these jointly-administered Cases.

**THE ENTITIES REPRESENTING DELPHI RETIREES**

1. By way of brief background and clarification, three entities representing the interests of Delphi salaried retirees grew out of these bankruptcy cases. First was the organization representing such retirees generally, the Delphi Salaried Retirees' Association (the "DSRA"). The Court and the Office of the United States Trustee appointed the second such entity, i.e., the 1114 Committee, pursuant to the negotiations arising in the wake of the Debtors'

2

motion to terminate salaried retirees' health and welfare benefits. In resolution of the DSRA's and 1114 Committee's appeals of the Court's final order allowing for such termination ("Final OPEB Termination Order"), the Debtors (now-Reorganized) agreed to fund a VEBA trust (the "DSRA VEBA") which could secure government-subsidized benefits for Delphi retirees.

2. The third entity is Objector, the VEBA Committee, *i.e.*, the named fiduciary under the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and board of trustees for the DSRA VEBA, which was set up by, and whose members were appointed by, the 1114 Committee pursuant to a Trust Agreement that was executed on or about June 9, 2009 (the "Trust Agreement"). (See Final Report, Exhibit C.) With the eventual remittance of a final payment from the Reorganized Debtors and the filing of a Final Report by the 1114 Committee, the 1114 Committee would dissolve according to the terms of the Final OPEB Termination Order. In addition to the Trust Agreement, the governance of the VEBA Committee is also subject to the DSRA VEBA Bylaws.

3. These three entities thus have a shared goal (advancing the interests of Delphi salaried retirees), a shared history and – at times – shared or overlapping memberships. Yet there have been stark differences of opinion among the volunteers comprising these entities as to how such a goal should be met and, especially as to the VEBA Committee, this has led to a high turnover in membership.

**THE ENTITIES' MEMBERSHIPS AND THE
ESTABLISHMENT OF THE VEBA COMMITTEE**

4. The DSRA Board has, since early 2009 and through the present, consisted of: James R. Frost, Den Black, Paul Dobosz, Chet Gosik, Richard Davis, Bruce Gump and John Norris.

5. The Office of the United States Trustee appointed the following Delphi

3

814673_1C

retirees to comprise the 1114 Committee: James R. Frost, James A. Hagenbach, James Sumpter, James R. Conger, W. Ben Gifford, Cathy Carol and Robert Todd Nicholson. These individuals remain the members of the 1114 Committee.

6. The 1114 Committee initially appointed nine voting members to the VEBA Committee: Den Black, John Brooks, Richard Davis, Carol Harvey-Light, Elaine Hofius, Patricia Lott, John Norris, Vincent Wilson and Rick Strusienski. The 1114 Committee appointed Den Black and Carol Harvey-Light to serve as Co-Chairs, Elaine Hofius to serve as the Treasurer and John Norris to serve as the Secretary of the VEBA Committee. Subsequently, the 1114 Committee appointed to the VEBA Committee the following non-voting, ex-officio, members: Lana Baich, W. Ben Gifford and James R. Frost.

7. Upon appointment of its members, the VEBA Committee, as the ERISA fiduciary, had the weighty task of securing and administering government-subsidized benefits and a "hardship" program (to assist especially-beleaguered Delphi retirees) using the DSRA VEBA trust funds. Moreover, the volunteers comprising the VEBA Committee had a tight timeframe in which to accomplish these tasks for the then-coming year.

8. After its initial groundwork had been accomplished, the VEBA Committee suffered the loss of four members in June and July of 2009, who resigned for what were stated to be personal reasons: Baich, Norris, Brooks and Lott.

9. The 1114 Committee thereafter appointed James R. Frost, (Chairman of the 1114 Committee) and W. Ben Gifford (also an 1114 Committee member), to the VEBA Committee as voting members. The 1114 Committee simultaneously approved the appointment of James A. Baker and his spouse, Marianne Baker (who is not a retiree of Delphi) as voting members of the VEBA Committee.

4

814673_1C

10. Due to the schism within the VEBA Committee that soon erupted in subsequent months, see infra, a majority of the VEBA Committee requested, and received, Frost's resignation in November 2009. Frost thereafter made an initial attempt at retaliation using the 1114 Committee, of which he was and remains Chairman and over which he has great influence or outright control, to remove three of the trustees within the six-member majority in the VEBA Committee that were opposed to him.

11. This effort failed because, while the 1114 Committee retained the right to nominate "new" trustees to the VEBA Committee, it did not have the power to remove existing trustees. (Trust Agreement XI-3.) Those trustees aligned with Frost – Gifford, Davis and Strusienski – thereafter resigned by January 2010. Each of the latter cited his ongoing differences of opinion with the VEBA Committee leadership as to the direction of the VEBA Committee in doing so.

12. As permitted by Article XI, Paragraph 1 of the Trust Agreement, the remaining VEBA Committee trustees voted to reduce the membership thereof from nine to seven members in March 2010. There was, and remains, one vacancy that the VEBA Committee wishes to fill with an individual with experience in negotiating employee benefits. To date, no individual with this experience has been identified who is also willing to serve on the VEBA Committee.

13. Elaine Hofius resigned in May 2010. The VEBA Committee identified Joe McHugh as an acceptable replacement candidate and Treasurer. Although the VEBA Committee submitted McHugh's information to the 1114 Committee, the latter has not formally responded to McHugh's nomination.

14. Even if McHugh, who has not been nominated by the 1114 Committee, is

factored out, there has always been the required minimum of five members of the VEBA Committee, each of whom has been duly nominated and / or approved by a majority vote of the 1114 Committee.[1]  (Trust Agreement XI-1.)

15. Frost has resumed his attempt to control the VEBA Committee through the 1114 Committee by nominating a slate of three replacement trustees on August 15, 2010, ignoring the vote of the VEBA Committee to shrink the number of trustees.  Yet, the three proposed trustees – including Frost – do not have the type of experience that the VEBA Committee needs.  The proposed trustees thus would add nothing in the way of furthering the VEBA Committee's ability to pursue its fiduciary responsibilities under ERISA and in fact would only serve to resume the factional fight from within the VEBA Committee itself because two of the three proposed new members (W. Ben Gifford and Richard Strusienksi) are the same individuals who were previously members of the VEBA Committee (they resigned) and were obstacles, along with Frost, for the VEBA Committee with respect to its fulfilling its fiduciary duties under ERISA.  These trustees would merely complicate the VEBA Committee's activities and efforts to meet its responsibilities by again resuming the factional fight from within the VEBA Committee itself.

### THE VEBA COMMITTEE PERFORMS ITS TASKS IN FULFILLENT OF ITS FIDUCIARY DUTIES UNDER ERISA

16. Despite this factional fight, the VEBA Committee was able to implement the rolling out of the government-subsidized benefits packages for 2010.  The medical plans were rolled out and made available to participants in September of 2009, and each of the following has additionally been accomplished:

---

[1] Copies of the *curricula vitae* for each of the six members now comprising the VEBA Committee, including Mr. McHugh, are attached to this Objection as Exhibit "A".

6

814673_1C

(a) The VEBA Committee has established through Blue Cross Blue Shield of Michigan, medical, dental and vision coverage plans for enrollees under age 65.

(b) The VEBA Committee has established medical coverage through Hartford for enrollees over age 65.

(c) The VEBA Committee worked with the Internal Revenue Service and its administrator, Marsh, to be certain that all enrollees entitled to the Health Care Tax Credit ("HCTC") applied for and received that credit (which covers 80% of the enrollees' premium costs). Eighty percent of all of the enrollees are eligible for and receive the HCTC benefit.

(d) The VEBA Committee also secured fiduciary liability coverage for the VEBA Committee and the ERISA required fidelity bond in September of 2009. The VEBA Committee remains covered by a fiduciary liability policy and fidelity bond.

(e) From June of 2009 until August of 2010, all funds were invested in a trust account established with Comerica. In August of 2010 the VEBA Committee concluded its process of developing and sending out requests for proposals to potential investment advisors with the selection of T. Rowe Price. The majority of those funds are now held in an account at T. Rowe Price pursuant to an Investment Advisory Agreement and invested in various investment vehicles designed to provide a positive rate of return while being mindful of the need to preserve principal.

(f) The VEBA Committee prepared requests for proposals with respect to its ERISA audit and has engaged Grant Thorton to conduct such audit. The audit is currently underway.

7

814673_1C

(g) All current members have received extensive HIPAA training by ERISA counsel.

(h) The VEBA Committee conducted a survey of enrollees regarding their satisfaction with the current services provided, insurance providers and service options, including timing of resolutions of any problems arising related to either insurance coverage, claims or the HCTC credit and requested input as to what, if any, additional benefits should be put into place in the 2011 program. The results were received on or around July 1, 2010. The results showed a 93% satisfaction rating with current services, service providers and programs.

17. Thus, despite the alleged dysfunction prevailing within it, the VEBA Committee has proved able to meet its fiduciary duties of securing and administering these benefits, a fact that even one of the objectors to the VEBA Committee's Motion to Compel, Richard Davis, appears to recognize. (Davis Obj. ¶ 7.)

18. As evidenced by the amount of work completed by the VEBA Committee in such a short time, the legitimate fiduciary concerns raised by the VEBA Committee and which led to the schism, see infra, did not delay or impede the implementation of the benefit plans or enrollment of retirees.[2]

19. Now, in its overdue Final Report, the 1114 Committee asks that the Court intervene as to the VEBA Committee's governance to keep it from becoming "self-selecting"

---

[2] The 1114 Committee and various objectors to the Motion to Compel wrongfully accuse the VEBA Committee of unnecessary or counterproductive delays. For example, the VEBA Committee did advise retirees to be cautious about canceling their Delphi self-pay medical coverage because, at that time, the PBGC had not made a final determination with respect to whether it would take over the pension plan. A pension plan must be taken over by the PBGC before the HCTC becomes available. Without the HCTC, the rates received from Blue Cross Blue Shield of Michigan would have made coverage completely unaffordable to any retiree. Under the Delphi plan, medical coverage would cease at the time it was cancelled by the retiree (there was no grace period). Therefore, if a retiree enrolled in the VEBA, cancels his or her Delphi coverage, and the PBGC never took over the pension plan, those individuals would have been left completely without any medical coverage as the Delphi plan does not allow a retiree to re-enroll once he or she cancelled coverage. Thus, the VEBA Committee properly advised caution.

(Final Report ¶ 20), even though that is precisely what the Trust Agreement calls for once the Final Report has been filed. The Trust Agreement provides that "succession planning" will be the responsibility of the 1114 Committee until it is dissolved and thereafter becomes the responsibility of the DSRA through member voting. Because the DSRA only exists until such time as the pension issues are resolved, both entities are temporary in nature and as a result, succession planning will become the responsibility of the VEBA Committee.

20. Acceding to the 1114 Committee's unfounded request for such an intervention would be damaging. The current trustees have hard-won experience from the past year that the VEBA Committee cannot now afford to lose, especially given the current effort to secure finalization of coverage for the next year, the completion of the ERISA audit and the filing of the required Form 5500. Allowing, for instance, the 1114 Committee to purge the VEBA Committee's leadership and replace its trustees with more compliant, less-experienced volunteers would do a disservice to the VEBA Committee and could render it less able to fulfill its duties as an ERISA fiduciary (given that the members of the 1114 Committee do not have this experience or the experience that the VEBA Committee otherwise needs).

## THE JULY 2009 SCHISM OVER THE FROST / CONE LETTER

21. The factional schism that disrupted the VEBA Committee's composition, at its core, arose over the means towards achieving the generally agreed-upon goals of securing benefits for Delphi retirees and, above all, members who would do so.

22. Even before the Trust Agreement was executed and the VEBA Committee was appointed, Frost, allegedly on behalf of the 1114 Committee, wrote a curious one-page letter in March 2010 (the "Frost / Cone Letter") the meaning of which is unclear. But Frost is

814673_1C

understood to insist that it purports to vest in Cone Insurance Group ("CIG") for three years the lucrative right to issue Requests for Proposals ("RFPs") and secure insurance packages from third-party insurance providers on behalf of all "Delphi retire[e]s". A copy of the Frost / Cone Letter is attached to this Objection as Exhibit "B".

23. As explained in an email transmission from objector Paul Dobosz, a Delphi retiree, CIG's principal, Cathy Cone, had provided allegedly valuable assistance and advice in setting up DRSA and was seen as having particular experience that would be especially helpful in securing retiree benefits in the then-forthcoming VEBA context.

24. The VEBA Committee was and remains not so sure as to those supposed merits of retaining CIG. Although Cathy Cone had been involved, as a retired flight attendant, in at least one prior major airline bankruptcy and in the associated setting-up of a VEBA pursuant to that case, she herself possesses, as far as the VEBA Committee knows, no distinctive educational background or superior credentials. She and CIG (which she runs with her sister) generally did not (and do not) compare favorably with alternative providers of greater size, sophistication and market power.

25. After the VEBA Committee had been up and running for several months, the Frost-Cone Letter came to light and became of special concern to some of the members of the VEBA Committee because of Frost's contention that it purported to bind the VEBA Committee to the 1114 Committee's choice of CIG as insurance "broker of record" for a three-year period. The concerned members of the VEBA Committee openly questioned the meaning of the Frost / Cone Letter and whether it was sufficient to bind the VEBA Committee, the context of course being that these members were mindful of the VEBA Committee's fiduciary duties under ERISA.

10

814673_1C

26. When the Co-Chairs attempted to open up the issue of the meaning and propriety of the Frost / Cone Letter before the VEBA Committee, Frost and Gifford effectively blocked consideration of the issue by the Committee as a whole. Frost and Gifford asserted that the VEBA Committee was bound to accept the 1114 Committee's purported choice of broker of record and that the VEBA Committee would only be wasting valuable VEBA trust funds in investigating the issue and / or putting such funds at risk by possibly incurring legal liability to CIG.

27. The Co-Chairs thereafter, in their executive capacity on behalf of the VEBA Committee and in accordance with their fiduciary duties under ERISA, asked the VEBA Committee's counsel of record to investigate the issue as well as what then appeared to be a well-founded allegation that the Delta Airlines VEBA, of which Cathy Cone of Cone Insurance was understood to be a voting member, was under investigation by the U.S. Department of Labor ("U.S. DOL").

28. This investigation failed to turn up hard evidence that Delta Airlines VEBA was under U.S. DOL scrutiny, but appeared to be merited under the circumstances at the time. The investigation and Frost's various unrelated attempts to act without the VEBA Committee's authorization on its behalf did have some collateral effects in delaying the finalization and rolling-out of a proposed package of benefits for the then-forthcoming year, but certainly did not prevent the roll-out.

29. In order to help protect the VEBA Committee, the VEBA Committee's counsel recommended that a detailed and formal Memorandum of Understanding (the "MOU") between CIG and the VEBA Committee be executed. The Co-Chairs authorized the preparation of the draft MOU. As then perceived by the Co-Chairs, the MOU appeared to be a "win win" for

11

814673_1C

all parties concerned—CIG would be compensated for all of its assistance, whether to the VEBA Committee proper or for all of CIG's prior help to DRSA and the 1114 Committee—while the VEBA Committee would be protected, all while continuing with the effort of securing benefits to Delphi retirees.

30. As noted, Frost and Gifford renewed their argument that the VEBA Committee had to accept the Frost / Cone Letter as given and that the Co-Chairs had only succeeded in wasting VEBA trust funds on investigating CIG and having counsel prepare the MOU. Frost and Gifford were thus pushing the VEBA Committee to adopt a worrisome course of action directly contrary to the expressed opinion of the VEBA Committee's ERISA counsel, hardly a recipe conducive to ERISA compliance and the strict fiduciary obligations required thereunder.

31. The VEBA Committee, under pressure to ensure the roll-out of benefits for the then-coming year, allowed CIG to continue its efforts at negotiating and securing benefits from third-party insurance companies, even though CIG refused to sign the MOU, which remains unexecuted.[3]

32. Frost thereafter undertook efforts without the authorization of the VEBA Committee, such as seeking to expand DRSA VEBA benefits to non-salaried Delphi retirees before the costs of doing so had been assessed.

33. Frost also purportedly secured advice from Dean Gloster, counsel of record to the 1114 Committee, as to certain activities of the VEBA Committee of which he was then a member, despite Mr. Gloster's firm not being the VEBA Committee's counsel.

---

[3] CIG's relationship with the VEBA Committee remains contentious in certain respects. For example, CIG has recently refused the VEBA Committee's request to be given copies of the RFP's Cone is transmitting to insurers seeking quotes on the DSRA VEBA's behalf.

814673_1C

34. Frost had also renewed his efforts to remove his rivals, primarily Vincent Wilson and co-chair Den Black, from the VEBA Committee.

35. The VEBA Committee was concerned that, in furthering each of these various activities, Frost may have also disseminated confidential VEBA Committee information to outside parties (including the DSRA Board, CIG and Cathy Cone).

36. For these reasons, the Co-Chairs ultimately demanded that Frost tender his resignation from the VEBA Committee, which Frost did under protest on or about November 27, 2009.

37. In the following months, using his position as Chairman of the 1114 Committee, Frost would continue to attempt to influence or control the VEBA Committee, especially on this issue of the Frost / Cone Letter and CIG as the VEBA Committee's ongoing broker of record.  When Frost failed to remove certain members from the majority in the VEBA Committee opposed to him (continuing efforts also made before his resignation), Frost's remaining supporters on the VEBA Committee resigned, indicating differences in opinion with the VEBA Committee's direction, see supra.

38. It is thus the position of the VEBA Committee that, to the extent there was any "dysfunction" within its membership and assuming that this dysfunction had, in any way, any detrimental impact on the ultimate provision of benefits to Delphi retirees under the auspices of the DRSA VEBA, such dysfunction was caused by Frost and his coterie while they were in the VEBA Committee.  To the extent that such "dysfunction" continues, it is the VEBA Committee's position that such arises from, and is intentionally stoked by, the continued efforts of the 1114 Committee (and DRSA) to interfere with the governance of the VEBA Committee.  See infra.

814673_1C

### THE 1114 COMMITTEE'S CONTINUED ATTEMPTS
### TO UNDERMINE THE VEBA COMMITTEE

39. The 1114 Committee, not coincidentally, has construed its role as the VEBA Committee's ongoing overseer after Frost resigned from the VEBA Committee, which occurred roughly contemporaneously with the DRSA VEBA's receipt of the final payment from Reorganized Debtors. That is, although the Final OPEB Termination Order and the Trust Agreement do not foresee the 1114 Committee as remaining in existence after the filing of the Final Report, the very "dysfunction" that Frost and his supporters had themselves caused in the first place starts being cited by the 1114 Committee as the rationale for requiring some kind of indefinite external oversight over the VEBA Committee. This includes the 1114 Committee's current request in its Final Report that the Court allow it to stay in existence for a sufficiently long enough period to make certain changes to the Trust Agreement, which authority is reserved exclusively to the VEBA Committee pursuant to the terms of the Trust Agreement.

40. Towards this end, the 1114 Committee, in bad faith, intentionally delayed the 1114 Committee's filing of the Final Report. As far as the VEBA Committee can tell, the intent was (and remains) to retain leverage over the VEBA Committee as to its continued internal governance.

41. First, the 1114 Committee oppressively demanded more and unnecessary information from the VEBA Committee, asserting that such information was in fact necessary for the 1114 Committee to prepare the Final Report.

42. In March 2010, the VEBA Committee nevertheless relented and provided such information, consisting of minutes of all VEBA Committee meetings, history of all DSRA subsidies provided from inception through February of 2010, Hardship Award Committee's Appeals Process, Hardship Award Committee's Procedures and Processes, Hardship Committee

14

Award Summary, the Summary Plan Description, Trust Agreement, Bylaws, Financial Report and a complete copy of all financial records of the VEBA.

43. When the VEBA Committee again pressed the 1114 Committee to thereafter file its Final Report, the 1114 Committee refused, citing non-specific governance and operational issues and the VEBA Committee's supposed lack of compliance with the Trust Agreement, presumably in the context of its membership.

44. In its response dated June 7, 2010, the 1114 Committee brushed off the VEBA Committee's twice-repeated (in late May 2010) request that, now that it had complied with the 1114 Committee's request for additional information (however unnecessary or uncalled-for), the Final Report was due.

45. The 1114 Committee asserted that, because the Delphi bankruptcy proceeding would likely continue for some time (which rings hollow given Reorganized Debtors' pending Section 350 Motion to close these Cases), the 1114 Committee should continue to exist until a more significant portion of the VEBA DRSA trust funds had been spent and its governance concerns addressed.

46. The 1114 Committee, on its own motion, purportedly approved itself $50,000 of VEBA funds to use as a retainer to engage counsel to assist it in preparing its final report. After it approved itself these funds, Frost sent copies of the 1114 Committee minutes to the VEBA Committee and demanded that such self-approved motion be funded by the VEBA.

47. Not surprisingly, the VEBA Committee refused to provide the $50,000 in funds demanded by the 1114 Committee for the filing of a final report and, given the assertions then being made by the 1114 Committee, filed its Motion to Compel the 1114 Committee to File the Final Report (which Motion to Compel is to be withdrawn).

15

814673_1C

48. In response, the 1114 Committee has, among other things, belatedly filed the Final Report. Apparently, the $50,000 in additional requested VEBA DRSA funds proved unnecessary for it do so.

49. The 1114 Committee has continuously implied in its communications and actions that its status as a Bankruptcy Court-appointed entity somehow trumped the VEBA Committee's fiduciary status under ERISA and the Trust Agreement and that it possessed a supposedly special and nearly perpetual role in overseeing the VEBA Committee.

50. The VEBA Committee's Motion to Compel is being withdrawn because the core relief sought by the VEBA Committee therein—the filing of the Final Report—has now been accomplished.

51. The VEBA Committee submits, however, that the Court (whether itself or via a directive to the Office of the United States) must issue an Order expressly directing the dissolution of the 1114 Committee (even though, with the filing of the Final Report, the 1114 Committee should come to a natural end) because the 1114 Committee has demonstrated time and time again that it will continue to meddle in the affairs of the VEBA Committee until an Order of this Court dissolves it formally.

52. After all, given the imminent closing of these Cases, it is foreseeable that other courts may be asked to intercede given the 1114 Committee's persistence of its pattern of asserting its purported oversight authority over the VEBA Committee. Moreover, third-party vendors, such as CIG, would also certainly benefit from such a clear statement being issued by this Court as to from whom they should be taking direction.

## **CONCLUSION**

53. It is the position of the VEBA Committee that, having filed the Final

Report, the time has come for the 1114 Committee to be dissolved and that an Order doing so is necessary to prevent the members of the 1114 Committee from continuing to interfere with the governance and operations of the VEBA Committee.

WHEREFORE, the VEBA Committee respectfully requests that this Court sustain the present Limited Objection and refuse to grant the 1114 Committee the additional relief sought within the "Remaining Concerns" section of the Final Report.

Dated: New York, New York
September 17, 2010

        SATTERLEE STEPHENS BURKE & BURKE LLP

        By:   /s/ Timothy T. Brock
                Timothy T. Brock, Esq.
                Abigail Snow, Esq.
        230 Park Avenue
        New York, New York 10169
        (212) 818-9200

        Co-Counsel with:

        Patricia L. Beaty, Esq.
        KRIEG DEVAULT LLP
        One Indiana Square, Suite 2800
        Indianapolis, IN  46204
        (317) 636-4341

        *Co-Counsel for Delphi Salaried Retirees*
        *Association Benefit Trust VEBA Committee*

814673_1C