**MCELROY, DEUTSCH, MULVANEY
 & CARPENTER LLP**
Kristin B. Mayhew (9794)
30 Jelliff Lane
Southport, CT 06890-1436
Tel    (203) 319-4022
Fax    (203) 259-0251
*Admission Pro Hac Vice*
***Attorneys for Illinois Tool Works Inc., Illinois Tool Works for
Hobart Brothers Co., Hobart Brothers Company, ITW Food
Equipment Group LLC and Tri-Mark, Inc.***

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
| **DELPHI CORPORATION**, *et al.* | : |  |
|  | : | Case No.05-44481 (RDD) |
|  | : | (Jointly Administered) |
| Debtors. | : |  |
|  | : | **September 20, 2010** |

**ITW'S REPLY TO THE REORGANIZED DEBTORS' RESPONSE TO THE
SUPPLEMENTAL BRIEF OF ILLINOIS TOOL WORKS INC.
AND ITW FOOD EQUIPMENT GROUP LLC IN SUPPORT
OF CLAIM NOS. 11983, 11985, 11988 AND 11989**

Illinois Tool Works Inc. and ITW Food Equipment Group (collectively, "ITW"), by

and through its undersigned counsel, respectfully submits this reply to the Reorganized

Debtors' Response to the Supplemental Brief of ITW in Support of Claim Nos. 11983, 11985,

11988 and 11989 dated August 20, 2010 (the "Debtors' Response").

INTRODUCTION

The Reorganized Debtors seek dismissal of ITW's claims without giving ITW an

opportunity to conduct discovery and a full evidentiary hearing in support of same. Instead,

the Reorganized Debtors would have this Court prematurely dismiss ITW's claims based on

KBM/32073/63/987583v1
 09/20/10-HRT/DJP

the incomplete record before it and inaccurate factual representations made by the Reorganized Debtors. Such dismissal is wholly inappropriate.

ITW has submitted sufficient evidence substantiating its *prima facie* claims. As the Reorganized Debtors have correctly pointed out, in determining whether a claimant has met its initial burden of proof with respect to its claims, this Court will apply the same standard that it would use in deciding a motion to dismiss under Bankruptcy Rules 7012 and 9014 (Reorganized Debtors' Supplemental Reply to the Responses of Certain Claimants to Debtors' Objections to Proofs of Claim Nos. 11983, 11985, 11088 and 11989 filed by ITW (hereafter "Debtors' Supplemental Reply") at p. 6). Despite their latest missive, the Reorganized Debtors cannot meet the very high burden that, by their own admission, requires a showing that ITW can prove "no set of facts in support of its claim which would entitle him to relief." (Debtors' Supplemental Reply at p. 6). Viewing the minimal facts that are before the Court at this juncture in the light most favorable to ITW (as required by Rule 7012), ITW has demonstrated that the Reorganized Debtors are liable for the environmental contamination at the Site.[1]

Moreover, the inappropriateness of dismissing ITW's claims at this stage in the proceedings is highlighted by the fact that a key component of the Reorganized Debtor's argument appears to be factually inaccurate. The Reorganized Debtors argue that neither Delphi Corporation nor DAS LLC are liable under CERCLA because they did not exist at the time the landfill ceased accepting wastes for disposal and stopped operations in September, 1995. (Debtors' Supplemental Reply at p. 7). The Reorganized Debtors point to Exhibit E,

---

[1] All defined terms used herein shall have the same meaning ascribed to them in ITW's Response dated November 21, 2006 and its Supplemental Brief dated April 20, 2010.

2

Paragraph 9(a) of ITW's November 21, 2006 response to the Third Omnibus Claims Objection for their support that the landfill closed in 1995. Exhibit E, however, is an Administrative Settlement Agreement and Order on Consent that pertains to *The Landfill At The Tremont City Landfill Site, 3108 Snyder-Domer Road, Clark County, Ohio* (the "Tremont City Landfill"). While ITW has filed proofs of claim in these bankruptcy cases pertaining to its liability at the Tremont City Landfill (Claim Nos. 11986, 11984, 11981, and 11190)[2], the claims in question and at issue in these Sufficiency Hearing Proceedings (Claim Nos. 11988, 11985, 11983 and 11989) relate to the South Dayton Dump and Landfill located at 1975 Dryden Road (a/k/a Springboro Pike), Moraine, Montgomery County, Ohio (the "Site"). This factual misstatement, while likely the result of inadvertence or oversight, nonetheless highlights the dangers of prematurely dismissing ITW's claims based on the evidence before the Court. For, if the Site operated after Delphi and DAS were formed, and they contributed waste to the Site, then it is unnecessary for this Court to adjudicate the issues of successor liability and whether the Reorganized Debtors contractually assumed General Motors Corporation's ("GM") environmental liabilities. Such facts must be fully and fairly vetted before the Court considers the Reorganized Debtors' request for dismissal of ITW's Claims.

Even assuming for purposes of argument that the Reorganized Debtors can establish that neither Delphi nor DAS contributed waste to the Site, ITW will be able to establish that the Debtors are liable: (i) as the successor to GM; and (ii) for assuming GM's environmental liability under the Environmental Matters Agreement (the "EMA").

Finally, because ITW's claims for direct costs are not duplicative of the costs sought by the EPA, ITW's claims are not barred by Section 502(e)(1)(B) of the Bankruptcy Code.

---

[2] On September 20, 2010, ITW withdrew Claim Nos. 11981, 11982, 11984, 11986, 11987 and 11190.

3

**ARGUMENT**

I.    Delaware Law Is Not Applicable In Determining The Debtors' Successor Liability Under CERCLA

      The Reorganized Debtors assert that Delaware law governs the issue of successor liability because both Delphi and General Motors are Delaware corporations. (Debtors' Response at pp. 3-4). Relying on *Soviet Pan Am Travel Effort v. Travel Comm., Inc.*, 756 F.Supp. 126, 131 (S.D.N.Y. 1991), the Reorganized Debtors argue that because both corporations are incorporated in Delaware, Delaware has the greatest interest in resolving issues of successor liability. The Reorganized Debtors, however, completely ignore the fact ITW is asserting successor liability against Delphi and DAS in the context of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 *et seq.* ("CERCLA"). This is not a garden variety successor liability claim, but one that is rooted in CERCLA. CERCLA is a "sweeping" federal remedial statute, enacted in 1980 to ensure that "*everyone* who is potentially responsible for hazardous waste contamination may be forced to contribute to the costs of clean-up." *U.S. v. Bestfoods*, 524 U.S. 51, 56 n.1 (1988). Moreover, the Courts of Appeals that have addressed the issue "are unanimous in recognizing successor liability under CERCLA." *U.S. v. General Battery Corporation, Inc.*, 423 F.3d 294, 298 (3d Cir. 2005), *cert denied sub nom, Exide Techs v. U.S.,* 549 U.S. 941 (2006); *Anspec Co. v. Johnson Controls, Inc.,* 922 F. 2d 1240, 1245 (6th Cir. 1991) ("[w]hen Congress wrote 'corporation' in CERCLA it intended to include a successor corporation").

      The Courts, however, have not unanimously agreed as to what law should be applied to resolve successor liability claims under CERCLA. *See New York v. Nat'l Service Industries, Inc.*, 460 F.3d 201, 207-08 (2d Cir. 2006) ("the choice of law question is a complicated one

4

that has led our sister circuits to reach different answers") and collection of cases cited therein. The Third Circuit has expressly held that CERLCA requires uniform federal standards of successor and veil-piercing liability, respectively. *U.S. v. General Battery,* 423 F. 3d at 294, 299. That Court of Appeals rationalized that "uniform standards of indirect corporate liability are necessary under CERCLA, an environmental liability statute enforced under its own federal cause of action." *Id*. at 300. Absent national uniformity, "CERCLA aims may be evaded easily by a responsible party's choice to arrange a merger or consolidation under the laws of particular states which unduly restrict successor liability." *Beazer East, Inc. v. Mead Corp.*, 34 F.3d 206, 214 (3d Cir. 1994) (quoting *Smith Land & Improvement Corp. v. Celotex Corp.* 851 F. 2d 86, 92 (3d Cir. 1988)). Thus, the Third Circuit has concluded that "[a] more uniform and predictable federal liability standard corresponds with specific CERCLA objectives by encouraging settlement and facilitating a more liquid market in corporate and 'brownfield' assets." *U.S. v. General Battery*, 423 F. 3d at 302.

While recognizing the split among the Courts of Appeals on whether CERCLA requires national uniformity for purposes of determining successor liability, the Second Circuit declined to rule on the issue. *See The State of New York v. Nat'l Service Industries, Inc.*, 460 F. 3d 201, 207-08 (2d Cir. 2006). Even if the Second Circuit ultimately declines to adopt a federal uniform standard for successor liability for CERCLA purposes, it still does not follow that Delaware law is the appropriate law to apply. Successor liability is, in fact, most appropriately characterized as a torts question, and therefore, the *lex loci* test is applicable. *Savage Arms, Inc. v. Western Auto Supply Co.*, 18 P.3d 49 (Alaska 2001). "Successor liability is essentially

5

05-44481-rdd    Doc 20608    Filed 09/20/10    Entered 09/20/10 16:23:09    Main Document
Pg 6 of 16


an expansion of products liability law, which derives from tort principles of negligence and strict liability, and rejects contract-derived requirements such as privity." *Id.* at 53.

Applying New York's choice of law and hence the *lex loci* test for torts, it is clear that the law of the state of Ohio should apply. The waste was disposed of in Ohio, the Site is in Ohio, Delphi's facilities that sent waste to the Site are in Ohio and the Ohio EPA is involved in the clean-up. *See Cytec Industries, Inc. v. The B.F. Goodrich Co.*, 196 F. Supp. 2d 644, 654 (S.D. Ohio 2002) (Ohio law governed determination of whether successor liability was applicable where the CERCLA violations occurred in Ohio, the facility was located in Ohio, the waste disposed of at the Marietta facility originated in Ohio, and the Ohio EPA was involved in the cleanup effort).

A.      The Divestiture Was A *De Facto* Merger Under Ohio Law

None of the cases relied upon by the Reorganized Debtors in opposition to ITW's assertion that Delphi and DAS are liable as successors under the *de facto* merger theory involve CERCLA. To the contrary, each of the cases involves the issue of whether a successor corporation is liable for the *contractual obligations* of its predecessor. As discussed *supra*, CERCLA claims, like products liability claims sound in tort – not contract. Even in *Welco Industries*, a case cited by both parties, the Ohio Supreme Court acknowledged the justification for expanding the liability of successor corporations in products liability cases but not successor liability claims sounding in contract. *Welco Industries, Inc. v. Applied Companies*, 617 N.E.2d 1129, 1133 (Ohio 1993) (public policy considerations justify relaxation of the standards of successor liability in context of tort claims).

6

The Reorganized Debtors assert that the Divestiture of the Delphi Automotive Systems unit from GM to Delphi and DAS did not result in a *de facto* merger under Ohio law because ITW cannot establish the third or fourth element of that test. (Debtors' Response at pp. 4-7). The Reorganized Debtors mistakenly assume that each of the four hallmarks of a *de facto* merger must be established before the Court will hold a successor corporation liable under the *de facto* merger theory in the CERCLA context. "The Supreme Court of Ohio has never stated that it is an absolute requirement that all of the "hallmarks" of a *de facto* merger be present before concluding that a particular transaction is in fact a *de facto* merger." *Cytec Industries, Inc.,* 196 F.Supp.2d at 644 (finding of successor liability for CERCLA claims under the *de facto* merger theory). "A rule mandating the presence of all of the "hallmarks" of a *de facto* merger or always requiring an assets-for-stock transaction would be too rigid, as it would likely except some 'transaction[s] that result [] in the dissolution of the predecessor corporation and [that] [are] in the nature of a total absorption of the previous business into the successor.'" *Id., citing Welco*, 617 N.E.2d at 1134. Such a rule would dilute the *de facto* merger doctrine, which recognizes transactions that are mergers in fact without an official declaration of such. *See Id*.

The need for further discovery regarding the circumstances surrounding the Divestiture could not be more obvious. ITW's sole source of information concerning the transfer of GM's Delphi Automotive Systems unit to DAS and Delphi is the Master Separation Agreement attached to the Reorganized Debtors' Supplemental Reply. The entire transaction must be examined and consideration given to the "hallmarks" of a *de facto* merger before this

7

Court can determine whether the Reorganized Debtors have successor liability to ITW. Moreover, ITW should be given the opportunity to establish these facts through discovery.

      B.    <u>The Reorganized Debtors Assumed GM's Environmental Liabilities At The Site</u>

The Reorganized Debtors do not, because they cannot, deny the fact that under the EMA, Delphi and DAS assumed GM's liabilities associated with the Site. Under Ohio law,[3] while a buyer of corporate assets is generally not liable for the debts and obligations of the seller, such buyer becomes liable where it assumes such liability "expressly or impliedly." *U.S. Bank v. EPA,* 563 F.3d 199 (6th Cir. 2009) (finding that successor had assumed predecessor's CERCLA liabilities including liabilities to EPA based on the plain language of the sale agreement). The EMA at issue here makes it plain that Delphi and DAS assumed GM's environmental liabilities for waste contributed by the Delphi Automotive Systems unit to the Site. (Debtors' Supplemental Reply, Exhibit E, EMA, at pp. 5-6). Instead of refuting this incontrovertible fact, the Reorganized Debtors now claim that they are not liable to ITW because the EMA was terminated under the Master Disposition Agreement dated July 30, 2009 (the "MDA"). That argument is flawed for a number of reasons.

First, even if the MDA effectively terminated the EMA, a point ITW in no way concedes, such termination did not occur until July, 2009. It necessarily follows, that from 1998 (the date that the EMA was entered into) until July, 2009 (the alleged termination date of the MDA), Delphi and DAS were liable for all environmental liabilities that were assumed

---

[3] The Reorganized Debtors once again assert that Delaware law controls this Court's interpretation of the EMA because the EMA provides that it will be governed by Delaware law. (Debtors' Response at p. 8). The Reorganized Debtors err. In undertaking a successor liability analysis in the context of CERCLA, courts are not required to give effect to a party's choice of law provision in an asset purchase agreement. *Berg Chilling Systems, Inc. v. Hull Corporation*, 435 F.3d 455, 466-67 (3d Cir. 2006).

under the EMA as part of the Divestiture. ITW's claims against Delphi and DAS were made as early as 2006 – over three years prior to the alleged termination of the EMA. As such, the Reorganized Debtors are liable for claims that arose prior to the alleged termination date, including ITW's claims.

Second, while GM and the Reorganized Debtors can enter into a global resolution between them concerning, *inter alia*, environmental liabilities, such agreement cannot dispossess potentially responsible parties ("PRP") of their rights under CERCLA. ITW, as a PRP, is entitled to recover sums that it has directly expended and will expend to investigate and remediate the hazardous waste at the Site attributable to other PRPs, including Delphi and DAS. (§ 113(f) of CERCLA). Two parties simply cannot contract away liability to a third party; and ITW's environmental claims are no exception. "When a buyer expressly assumes liabilities of a seller, it becomes directly liable therefore, regardless of any language in the sale agreement otherwise purporting to generally disclaim third-party beneficiary rights." *In re Safety-Kleen Corp.*, 380 B.R. 716 (Bankr. D. Del. 2008) (finding purchaser of debtor's assets assumed debtor's CERCLA liability under the sale order and acquisition agreement).

Third, to give effect to the agreement between GM and the Reorganized Debtors to escape liability for environmental claims would serve a grave injustice upon ITW and violates public policy. "Congress enacted CERCLA to insure the prompt cleanup of hazardous waste sites and spills by placing the ultimate financial responsibility for the clean-up on those responsible for the improper release of hazardous waste." *Cytec Industries, Inc.,* 196 F. Supp. 2d at 654; *U.S. v. Chrysler Corp.*, 157 F.Supp. 2d 849, 854 (N.D. Ohio 2001) ("CERCLA is the primary statutory means by which harmful or potentially harmful hazardous waste disposal

9

sites are remediated"). "As its name implies, CERCLA is a comprehensive statute that grants the President broad power to command government agencies and private parties to clean up hazardous waste sites." *U.S. v. General Battery Corporation*, 423 F.3d 294, 297-98 (3d Cir. 2005). To permit GM and the Reorganized Debtors to unilaterally disclaim any responsibility to other PRPs for the environmental damages they caused and/or assumed, flies in the face of this federal law. Carried to its logical conclusion, were the Reorganized Debtors to prevail on this argument, then every purchaser of assets who has contractually assumed a seller's CERCLA liability would file for bankruptcy and strike an agreement with the seller terminating such liability. This cannot be what Congress intended.

Finally, CERCLA itself provides that a PRP cannot evade its liability because of an agreement to do so. 42 U.S.C. § 9607(e). The statute limits such transfers of liability to other parties as pertains to direct liability. Thus, the MSA is merely a distraction, and the parties are required to look at the statutory bases for liability. In this case, that is the law of successor liability.

  C. Delphi And DAS Have Successor Liability Based On The Mere Continuation Theory

Not only are Delphi and DAS successors to GM based on the *de facto* merger theory, but they are also successors under Ohio law based on the "mere continuation" theory. While conceding that Delphi and DAS had the same stockholders as GM immediately after the Divestiture, the Reorganized Debtors claim that they cannot be liable because "this brief period of ownership of Delphi Corporation by General Motors is insufficient to render the Debtors the same legal entity as General Motors . . ." (Debtors' Response at p. 13). This argument misses its mark. The length of time that GM held the stock post-Divestiture is wholly irrelevant to the

factual determination of whether a successor is the mere continuation of its predecessor. The critical issue that must be examined is whether there was an "identity of ownership" before and after the Divestiture – "a common identity of stockholders, directors, and stock". *Mickowski v. Visi-Trak Worldwide, LLC*, 415 F.3d 501, 515 (6th Cir. 2005). The obvious answer is yes. Prior to the Divestiture, GM owned the stock of Delphi and subsequent to the Divestiture, GM continued to own at least 80% of the stock of Delphi Corporation. (Debtors' Response at pp. 12-13). It matters not that five months after the Divestiture, GM distributed its ownership interest in Delphi Corporation to its shareholders. The fact remains that the same shareholders owned Delphi before and after the Divestiture. That fact alone is sufficient to establish successor liability under the "mere continuation" test.

II.     The EPA and ITW Are Not Seeking Recovery For The Same Costs And Therefore, ITW's Claims Are Not Barred By Section 502(e)(1)(B) of the Bankruptcy Code.

The Reorganized Debtors seek to disallow ITW's claims under Section 502(e)(1)(B) of the Bankruptcy Code on the basis that ITW's claims will subject them to double recovery by ITW and the Environmental Protection Agency for the same claim. (Debtors' Response at pp. 14-15). The Reorganized Debtors' assumptions are incorrect.

As explained in its Supplemental Brief, ITW seeks the recovery of the direct costs that it has and will incur at the Site for performance of work and reimbursement of EPA's oversight costs from the Reorganized Debtors. ITW's cost obligations arise from that certain Administrative Settlement Agreement and Order on Consent (ASAOC)[4] for the Remedial Investigation/Feasibility Study ("RI/FS") for the South Dayton Dump and Landfill Site in Moraine, Ohio. The ASAOC was signed by the U.S. EPA Region 5 Superfund Division

---

[4] The ASAOC is attached as an Exhibit to each of the proofs of claim filed by ITW that relate to the Site, and identified as Claim Nos. 11983, 11985, 11988 and 11989.

11

Director on August 10, 2006 and became effective on August 15, 2006. Pursuant to Paragraph 35 of the ASAOC, Respondents, including ITW, shall conduct the RI/FS, *i.e.*, perform or fund the work. In addition, pursuant to Paragraph 79 of the ASAOC, the Respondents "shall pay U.S. EPA all Future Response Costs," *i.e.,* those incurred under the ASAOC. To date, ITW has received three invoices from the EPA for oversight costs associated with the RI/FS.

On December 7, 2007, the EPA sent Respondents a billing statement for the period August 15, 2006 through August 14, 2007 for oversight costs related to the Site and incurred by it in the amount of $145,323.00 (the 12/7/07 EPA billing statement is attached hereto as **Exhibit A**). On October 26, 2009, the EPA sent Respondents a second billing statement for the period August 15, 2007 through August 14, 2008 for the oversight costs incurred by it in the amount of $205,346.16 (the 10/26/09 EPA billing statement is attached hereto as **Exhibit B**). Finally, on November 13, 2009, the EPA sent Respondents a third invoice for oversight costs in the amount of $218,907.67 incurred from August 15, 2008 through August 14, 2009 (the 11/13/09 EPA billing statement is attached hereto as **Exhibit C**).

As evidenced by that certain Trust Account Monthly Statement (the "Trust Account Statement") as of August 31, 2010, ITW has already paid $950,000 with respect to, *inter alia*, the oversight costs due the EPA as well as the Respondents' many consultants retained to complete the RI/FS. (Attached hereto as **Exhibit D** is a true and correct redacted copy of the 8/31/10 Trust Account Statement).

In addition to the monies ITW paid into the Trust Account to fund the RI/FS costs, ITW has spent approximately $1 million for attorneys, investigators and other expenses consistent with the national contingency plan and incurred as part of the RI/FS. It expects to

12

incur at least another $1 million in the discharge of its obligations under the RI/FS. These are all direct costs incurred by ITW pursuant to the ASAOC and recoverable from other PRP's, including Delphi and DAS, under § 107(a) of CERCLA.

The EPA, however, does not appear to be seeking reimbursement from the Reorganized Debtors for costs associated with the RI/FS. Nor can it. Other than the EPA's oversight costs (which have already been paid for), it has no direct costs associated with the RI/FS because such costs have been borne by ITW and the other Respondents. Therefore, there will be no double recovery vis-à-vis the Reorganized Debtors. As evidenced by its proof of claim, the EPA seeks payment for its "future response costs in connection with the remedial design and remedial action for the South Dayton Site." (Debtors' Response, Exhibit B). Thus, EPA's claim is for remedial design and remedial action (RD/RA) at the Site, not the RI/FS costs that have already been paid for by ITW and the other Respondents.

In addition, the EPA may seek reimbursement from the Reorganized Debtors for past costs that pre-date the ASAOC. As evidenced by the September 29, 2005 Special Notice Letter (the "SNL") from the EPA to ITW, the EPA had already incurred $400,000.00 for past costs associated with the Site. (SNL at p.3. A copy of the SNL is attached to each of ITW's proofs of claim.) EPA's claim for the recovery of past costs, like the recovery of future response costs must be differentiated from the direct costs ITW has and will have in connection with the RI/FS.

EPA is not entitled to double recovery, and thus may only seek its unreimbursed costs from other parties including Delphi and DAS. This prohibition arises both under common law and under CERCLA.

13

Double recovery is not permitted. The Restatement (Second) of Judgments limits a party to "one satisfaction . . . for a loss that is the subject of two or more judgments". Restatement (Second) of Judgments §49, comment a (1982). CERCLA provides authority for the EPA to enter into a settlement with one or more parties to perform a cleanup, but that does not allow for double recoveries. 42 USC §9622. The ASAOC is a settlement entered into by PRPs, including ITW, pursuant to 42 USC §9622. This settlement does not preclude EPA from pursuing non-settling parties for additional costs not covered by a settlement. 42 U.S.C. §9622(c)(2)(A) ("Nothing in section 122 shall affect the liability of any person under sections 106 and 107 . . . with respect to any costs or damages which are not included in the agreement").

Thus, CERCLA expressly permits the EPA (or any responsible party) to seek recovery of costs that are not part of a settlement. In this instance, the EPA can seek costs it will not recover under the ASAOC or any other settlement. *U.S. v. Occidental Chemical Corp.*, 200 F.3d 143 (3d Cir. 1999) (where the United States obtains less than complete relief in a settlement, it may pursue an action against any person who has not resolved its liability).

Therefore, contrary to the assertions of the Reorganized Debtors, ITW's claim is not in direct competition with the EPA's claim and will not subject the Reorganized Debtors to double recovery. Since ITW's claim is for costs separate and apart from those owed to the EPA with respect to the Site, Section 502(e)(1)(B) of the Bankruptcy Code does not bar ITW's claims.

14

## CONCLUSION

For the reasons set forth herein and those set forth in ITW's Response dated November 21, 2006 and its Supplemental Brief dated April 20, 2010, the Reorganized Debtors' Third Omnibus Objection as it relates to ITW's claims must be denied and ITW's claims shall be allowed in full.

        ILLINOIS TOOL WORKS INC. and
        ITW FOOD EQUIPMENT GROUP LLC


By:   /s/ Kristin B. Mayhew
        Kristin B. Mayhew (9794)
        McElroy, Deutsch, Mulvaney & Carpenter LLP
        30 Jelliff Lane
        Southport, CT  06890-1436
        Tel.   (203) 319-4022
        Fax    (203) 259-0251
        Email  kmayhew@mdmc-law.com
        Their Attorneys

## CERTIFICATE OF SERVICE

I, Kristin B. Mayhew, hereby certify that on this 20th day of September, 2010, the foregoing Reply by ITW to the Reorganized Debtors' Response To The Supplemental Brief Of Illinois Tool Works Inc. And ITW Food Equipment Group LLC In Support Of Claim Nos. 11983, 11985, 11988 And 11989 (the "Reply") was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic notification system (CM/ECF). Additionally, other parties may access this filing through the Court's electronic system.

In addition to service via ECF, I caused a true copy of the foregoing Reply to be served this 20th day of September, 2010 upon the persons set forth below:

<u>By Federal Express:</u>
DPH Holdings Corp.
Attn: President
5725 Delphi Drive
Troy, MI  48098

<u>By Federal Express:</u>
John Wm. Butler, Jr., Esq.
John K. Lyons, Esq.
Michael W. Perl, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
155 North Wacker Drive
Chicago, IL  60606

<u>By Federal Express:</u>
Brian S. Masumoto, Esq.
Office of the United States Trustee
33 Whitehall Street, 21st Floor
New York, NY  10004

        /s/ Kristin B. Mayhew
        Kristin B. Mayhew

16