**Hearing Date and Time:  September 24, 2010 at 10:00 a.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036

Attorneys for DPH Holdings Corp., et al.,
   Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -   -   x
                                       :
         In re                      :      Chapter 11
                                         :
DPH HOLDINGS CORP., et al.,         :      Case Number 05-44481 (RDD)
                                         :
                                         :      (Jointly Administered)
               Reorganized Debtors.     :
                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

REORGANIZED DEBTORS' RESPONSE TO ITW'S REPLY TO THE REORGANIZED DEBTORS'
RESPONSE TO THE SUPPLEMENTAL BRIEF OF ILLINOIS TOOL WORKS, INC. AND ITW
FOOD EQUIPMENT GROUP LLC IN SUPPORT OF CLAIM NOS. 11983, 11985, 11988, AND 11989

DPH Holdings Corp. and certain of its affiliated reorganized debtors in the above-captioned cases (collectively, the "Reorganized Debtors") hereby submit the Reorganized Debtors' Response To ITW's Reply To The Reorganized Debtors' Response To The Supplemental Brief Of Illinois Tool Works, Inc. And ITW Food Equipment Group LLC In Support Of Claim Nos. 11983, 11985, 11988, And 11989, and respectfully represent as follows:

<strong><u>Introduction</u></strong>

1.      The claims of Illinois Tool Works, Inc. and  ITW Food Equipment Group LLC (collectively, "ITW") must be disallowed because no amount of discovery will allow ITW to refute the fact that the Debtors did not exist at the time the South Dayton Dump and Landfill (the "Site") ceased operating and the Debtors are not corporate successors to General Motors. Additionally, regardless of how ITW describes its claim, to the extent that it seeks payment from the Debtors for future costs to cleanup the Site, the claim falls squarely within Section 502(e)(1)(B) and must be disallowed.

**<u>The Site Ceased Operating Before the Debtors Existed.</u>**

2.      ITW states that the Reorganized Debtors inadvertently pointed to the wrong exhibit when arguing that the Site ceased operations before the Debtors existed, but ITW does <u>not</u> actually contend that the Site operated after the Debtors were formed as part of the divestiture by General Motors Corporation ("General Motors") of its Delphi Automotive Systems unit (the "Divestiture").  Indeed, ITW could not credibly make such an assertion, as demonstrated by the attached Fact Sheet from the United States Environmental Protection Agency ("EPA") for the Site, which definitively states that the Site operated from 1941 to 1996. <u>Exhibit A</u>.   This is confirmed by the attached press release from EPA which again states that the Site "operated as a landfill from 1941 to 1996."  <u>Exhibit B</u>.   Thus, ITW has failed to raise any

2

actual factual dispute regarding when the Site operated, and the only relevant question is whether

the Debtors are liable for the wastes that General Motors sent to the Site prior to the Divestiture.

**Delaware Law is the Appropriate Choice of Law.**

      3.     ITW asserts that Ohio law should govern whether the Debtors are the

corporate successors to General Motors.[1]  In support of this assertion, ITW points to a state-court

opinion from Alaska dealing with a personal injury case.  Whatever Alaskan state courts may say

on this issue, the District Court for the Southern District of New York has made clear that, under

New York choice of law principles, the state of incorporation has the greatest interest in issues of

corporate successor liability and therefore that state's law applies.  Soviet Pan Am Travel Effort

v. Travel Comm., Inc., 756 F.Supp. 126, 131 (S.D.N.Y. 1991).  ITW tries to escape this

precedent by noting that ITW's claims arise under CERCLA.  CERCLA, however, is irrelevant

to the question of whether the Divestiture rendered the Debtors the corporate successors to

General Motors.  That question can be resolved without any reference to CERCLA and hinges

solely on the nature of the corporate transaction between General Motors and the Debtors.  Thus,

the ruling of Soviet Pan Am Travel Effort applies and Delaware law must govern the issue of

successor liability in this case.

      4.     ITW's brief makes no attempt to refute the Reorganized Debtors'

arguments that under Delaware law, the Debtors are not successors to General Motors.  Thus,

because ITW is incorrect that Ohio law applies, its arguments for liability fail.  Furthermore,

even under Ohio law, the Debtors are not successors to General Motors.

---

[1]    ITW cites a number of cases examining whether state law or federal common law should apply to successor liability issues under CERCLA.  This question remains unresolved in the Second Circuit, but it has been recognized that federal common law should not be used when there is no conflict between federal interests and state law.  New York v. Nat'l Serv. Indus. Inc., 460 F.3d 201, 208 (2d Cir. 2006).  In this case, ITW urges the application of Ohio state law and thus, presumably, agrees with the Debtors' position that state, not federal law, should apply.

**The Debtors Are Not Successors Under Ohio Law.**

5.    Ohio law recognizes four requirements for a *de facto* merger: "(1) the continuation of the previous business activity and corporate personnel, (2) a continuity of shareholders resulting from a sale of assets in exchange for stock, (3) the immediate or rapid dissolution of the predecessor corporation, and (4) the assumption by the purchasing corporation of all liabilities and obligations ordinarily necessary to continue the predecessor's business operations." Welco Indus. Inc. v. Applied Cos., 617 N.E.2d 1129, 1134 (Ohio 1993). The Debtors have argued that the ITW cannot establish the third and fourth factors of this test. ITW concedes this point, making absolutely no argument that it could establish these factors, and instead only asserts that it need not establish all four factors and that it is entitled to discovery. Both of these arguments must be rejected.

6.    The issue of whether all four factors must be established to find successor liability is irrelevant to this case because the Ohio Supreme Court, the Ohio Court of Appeals and the Third Circuit (applying Ohio law) have all held that the **critical** element of a *de facto* merger is the dissolution of the selling corporation after the transaction. Welco Indus. Inc. v. Applied Cos., 617 N.E.2d 1129, 1134 (Ohio 1993) (no *de facto* merger when selling corporation continues to exist after the sale of one of its divisions, even if the selling corporation no longer conducts the same operations of the division); Telxon Corp. v. Smart Media of Del., Inc., 2005 Ohio 4931, slip op. at *50 (Ohio Ct. App. 2005) (the *de facto* merger doctrine "presupposes that the predecessor corporation no longer exists."); Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 470 (3d Cir. 2006) (the critical element of the *de facto* merger test under Ohio Law "is that one corporation survives while the other ceases to exist.").

4

7.     No amount of discovery will allow ITW to prove that General Motors ceased to exist after the 1999 Divestiture. Indeed, ITW has conceded this fact in its briefs. Because this is a critical element of the *de facto* merger doctrine under Ohio law, ITW's assertion of successor liability under this doctrine necessarily fails and it is not entitled to discovery .

8.     Finally, we also note that ITW argues that there is a relaxed standard for corporate successor liability in tort claims. In making this argument, ITW cites only to the Welco case, but the Welco case expressly recognized that the Ohio Supreme Court has **declined** to relax such standards in tort cases. 617 N.E.2d at 1133, citing Flaugher v. Cone Automatic Mach. Co., 507 N.E.2d 331 (Ohio 1987). Thus, despite ITW's assertions, there is no basis under Ohio law for applying a less strict standard for successor liability for tort claims.

**The Termination of the EMA Eliminated Any Basis for the Debtors' Liability at the Site.**

9.     ITW previously argued that it was a third-party beneficiary under the Environmental Matters Agreement (the "EMA") by and between General Motors Corporation and Delphi Automotive Systems Corporation. ITW has not responded to any of the Debtors' arguments explaining why ITW does not have a valid claim for the costs at the Site under the EMA, but instead argues for the first time that the Debtors are liable at the Site because the EMA was not terminated until after ITW asserted its claims against the Debtors. This argument is not supported by any case law and is fundamentally flawed. ITW concedes that the EMA was terminated in July 2009 but then seeks to use that now-nullified agreement to hoist the pre-Divestiture liabilities of General Motors upon the Debtors. It is well-recognized that contracting parties are relieved of their obligations upon termination of the contract. See Restatement, Contracts § 386; Nat'l Labor Relations Bd. v. Cone Mills Corp., 373 F.2d 595, 598 (5th Cir.

1967) ("It is axiomatic in contract law that parties to an agreement are relieved of their mutual

obligations upon termination of the agreement.").

        10.     In making its arguments regarding the EMA, ITW confuses liability which

the Debtors may have under CERCLA and liabilities they may have had under the EMA.

CERCLA imposes liability on four classes of potentially responsible parties ("PRPs"):  (a) the

current owner or operator of a contaminated site; (b) anyone who owned or operated the

contaminated site at the time hazardous substances were disposed of; (c) any person who

arranged for the disposal of any hazardous substances at the contaminated site; and (d) any

person who transported any hazardous substances to a contaminated site.  42 U.S.C. § 9607(a).

The only relevant class of PRP that ITW has tried to assert in this matter is (c) – persons who

arrange for the disposal of wastes.  But because the Debtors did not exist at the time the Site

operated, no plausible argument can be made that the Debtors themselves fall into this class.

Thus, the Debtors are not PRPs under CERCLA and the only way the Debtors could have

liability for the wastes that were sent to the Site by General Motors is if the Debtors are corporate

successors to General Motors.  And, while it is true that the assumption of liability can be

grounds for successor liability, the fact of the matter is that since the EMA was terminated, there

is no agreement under which the Debtors assumed the liability for the Site.  By terminating the

EMA as part of their reorganization plan, the Debtors were relieved of all obligations under the

that agreement.

        11.     ITW's remaining arguments on the EMA must also be rejected.  ITW

argues that PRPs cannot contract away their liability to third parties and that CERCLA prohibits

PRPs from transferring away their direct liability.  These arguments are without merit because

they are premised on the assertion that the Debtors are the entities with statutory liability under

CERCLA, when it was General Motors that sent the wastes to the Site and thus has the direct

liability under CERCLA.  The termination of the EMA relieved the Debtors of any contractual

obligation to satisfy such liability on behalf of General Motors, but never did the Debtors have

any statutory liability under CERCLA.  Furthermore, the termination of the EMA did not

contract away the liability under CERCLA that General Motors, as a PRP, has at the Site.

12.    ITW also argues that the Debtors' position would allow the Debtors and

General Motors to escape liability at the Site.  This opposite of this is true.  As explained above,

the termination of the EMA relieved the Debtors of the obligation to satisfy General Motors'

liability at the Site, but it had no effect on General Motors' liability.  Indeed, from the moment

that ITW incurred costs at the Site, it could have sought recovery of those costs from General

Motors.

**The Debtors Are Not the Mere Continuation of General Motors.**

13.    ITW argues that because General Motors owned the stock of Delphi

Corporation before the Divestiture and for five months after, the Debtors are the mere

continuation of General Motors.  This argument must be rejected for two reasons.  First, it is

clear that under Ohio law, the mere continuation doctrine does not apply if there are two

corporations surviving after the transaction.  Travis v. Harris Corp., 565 F.2d 443, 447 (7th Cir.

1977) (applying Ohio law and finding that the mere continuation theory requires "the existence

of only one corporation at the completion of the transfer."); McGaw v. South Bend Lathe, Inc.,

598 N.E.2d 18, 21-22 (Ohio Ct. App. 1991) (stating that successor liability based on mere

continuation cannot exist without "the seller's prompt extinction after the transfer").  Again, no

amount of discovery will allow ITW to prove that General Motors was promptly dissolved after

the 1999 Divestiture.  Furthermore, the Cytec case, upon which ITW relies extensively,

7

expressly recognizes that, under Ohio law, there can be no successor liability based on the mere

continuation theory when the selling corporation continues to exist after the transaction.  Cytec

Industries, Inc. v. The B.F. Goodrich Co., 196 F.Supp.2d 644, 655 (S.D. Ohio 2002) (calling

reliance upon the mere continuation theory to establish corporate successor liability "misplaced"

when the selling entity "continued to exist as a viable corporation").

14.    Second, ITW completely ignores the Per-Co Ltd. case which recognized

that an alteration in the ownership of a company shortly after a transaction renders the mere

continuation theory "inapposite". Per-Co, Ltd. v. Great Lakes Factors, 299 Fed. Appx. 559, 563

(6th Cir. 2008).   Thus, because General Motors no longer owned the stock of Delphi

Corporation shortly after the Divestiture – and, indeed, this transfer of stock was expressly

contemplated as part of the Divestiture, as evidence by the Master Separation Agreement (see

Master Separation Agreement[2] at Recitals) – the mere continuation theory does not apply to this

case.

**ITW's Claims for Future Costs are Barred by Section 502(e)(1)(B).**

15.    ITW does not refute that it is barred, under section 502(e)(1)(B) from

recovering costs at the Site for which the Debtors and ITW may be liable to the EPA.  Instead, it

argues that it has incurred past costs at the Site.  The Debtors do not refute that costs that ITW

has incurred in the past are not subject to disallowance under section 502(e)(1)(B).  However,

any claims for future costs to cleanup the Site must be disallowed because, as has been

recognized by the Bankruptcy Court for the Southern District of New York, claims for cleanup

costs filed by co-PRPs at a site are fundamentally claims "to satisfy the obligation that both the

---

[2]    The Master Separation Agreement was attached as Exhibit D to Reorganized Debtors' Supplemental Reply To
Responses Of Certain Claimants To Debtors' Objections To Proofs Of Claim Nos. 11983, 11985, 11988, And
11989 Filed By Illinois Tool Works Inc. And ITW Food Equipment Group LLC (Docket No. 19603).

debtor and the claimant had to the EPA for the remediation of the properties." In re Drexel
Burnham Lambert Group, 148 B.R. 982, 989 (Bankr. S.D.N.Y. 1991). Thus, because ITW is
liable to EPA for future costs at the Site and those costs are contingent, ITW's claim seeking
reimbursement of those cost from the Debtors satisfies the requirements of section 502(e)(1)(B).

      16.    ITW's only argument on future costs is that there will be no double
recovery because, in ITW's interpretation of EPA's claim, EPA is not seeking the same costs as
ITW. This argument must be rejected for two reasons. First, the presence of a third-party
creditor asserting a claim for the same liability is not a prerequisite for disallowance under
Section 502(e)(1)(B). Indeed, courts have previously disallowed claims even when the
governmental agency failed to file any claim at all. In re Apco Liquidating Trust, 370 B.R. 625,
634(D. Del. 2007); In re Cottonwood Canyon Land Co., 146 B.R. 996, 997 (D. Colo. 1992); see
also In re Lull Corp., 162 B.R. 234, 238 (Bankr. D. Minn.1993). The above cases all recognized
that as long as the three elements for disallowance under section 502(e)(1)(B) are met, it does not
matter if the underlying claimant (in this case, EPA) has filed a claim against the Debtors for the
same costs sought by the co-liable party.

      17.    Furthermore, ITW's interpretation of EPA's claim is too narrow. ITW
claims that EPA seeks only certain costs from the Debtors. However, EPA's claim is not so
limited. It asserts that the Debtors are jointly and severally liable for all costs at the Site,
including future costs to perform the cleanup of the Site totally over $20 - $50 M. By asserting
that the Debtors are jointly and severally liable, EPA is, in fact, seeking to recover the entire
costs of the future work at the Site and there is no basis to interpret EPA's broad claim in a more
limited fashion.

18.     Finally, we note that, if EPA does not ultimately seek to recover from the Debtors their fair share (if any) of future cleanup costs at the Site, then ITW could always seek to have its claims reconsidered under section 502(j).  For now, however, because ITW's claims clearly meet the requirements for section 502(e)(1)(B), they should be disallowed.

WHEREFORE the Reorganized Debtors respectfully request this Court enter an order (a) sustaining the Reorganized Debtors' objection with respect to the Claims, (b) disallowing and expunging the Claims in their entirety, and (c) granting such further and other relief this Court deems just and proper.

Dated:     New York, New York
           September 21, 2010

                              SKADDEN, ARPS, SLATE, MEAGHER
                                 & FLOM LLP

                              By:   /s/ John Wm. Butler, Jr.
                                    John Wm. Butler, Jr.
                                    John K. Lyons
                                    Ron E. Meisler
                              155 North Wacker Drive
                              Chicago, Illinois 60606


                              Four Times Square
                              New York, New York 10036

                              Attorneys for DPH Holdings Corp., et al.,
                                 Reorganized Debtors

<u>Exhibit A</u>



http://www.epa.gov/region5/sites/sodayton/sodaytonfs200409.htm
Last updated on Thursday, September 03, 2009

## Region 5 Cleanup Sites

You are here: <u>EPA Home</u>    <u>Region 5</u>    <u>Where You Live</u>    <u>Cleanup Sites</u>    <u>South Dayton Dump and Landfill</u>    September 2004 Fact Sheet

# September 2004 Fact Sheet

United States Environmental Protection Agency

NATIONAL PRIORITIES LIST (NPL) September 2004
SOUTH DAYTON DUMP & LANDFILL
Moraine, Ohio

South Dayton Dump & Landfill (SDD) is located in Montgomery County, Ohio. SDD occupies at least 33 acres that include two 5 acre ponds, which are former extraction pits that have filled with water. Former disposal operations at SDD have resulted in soil and ground water contamination (vinyl chloride and trichloroethylene), which poses a threat to the underlying drinking water aquifer and the adjacent Great Miami River.

Extraction pits were excavated at SDD after 1936. Landfill operations conducted between 1941 and 1996 filled in the extraction pits. Before 1970, a significant disposal practice at SDD was open burning of materials, primarily vegetation and wood wastes. Between 1950 and 1970, drummed wastes were occasionally accepted at the landfill. The drums were emptied of their contents and either buried or sold to drum recyclers. Between June 1973 and July 1976, drums containing hazardous waste were accepted at SDD from two nearby Hobart Corporation (Hobart) facilities in Dayton, Ohio. The drums contained cleaning solvents (1,1,1-trichloroethane [TCA]; methyl ethyl ketone [MEK]; and xylene); cutting oils; paint; Stoddard solvent; and machine-tool, water-based coolants. In May 1978, the Montgomery County Combined General Health District (MCCGHD) and Ohio Environmental Protection Agency (OEPA) conducted an inspection of the landfill and noted several problems, including the presence of containers labeled "hazardous." Further evidence of hazardous waste disposal at SDD comes from a Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) Notification of Hazardous Waste Site Form submitted by Industrial Waste Disposal Company, Inc. (IWD) on June 9, 1981, indicating that SDD had been used as a disposal landfill for the industrial and municipal wastes of IWD's customers. Former landfill operations were conducted in at least the southern half of the Valley Asphalt Plant. In 2000, evidence of former landfill operations beneath the Valley Asphalt Plant was discovered when drums were encountered during excavation and installation of a new sewer line at the Valley Asphalt Plant. The drums contained: Aroclor 1254, benzene, 2-butanone, chlorobenzene, ethylbenzene, 4-methyl-2-pentanone, toluene, trichloroethylene, vinyl chloride, and xylene. The drums and associated soil contamination were removed by OEPA in 2000.

In 1985, OEPA prepared a preliminary assessment (PA) for SDD. The PA indicated that hazardous waste at SDD poses a threat to the underlying drinking water aquifer and the adjacent Great Miami River. In 1991, the U.S. EPA's field investigation team (FIT) conducted a screening site inspection (SSI). Soil analytical results indicated the presence of volatile organic compounds (VOCs), PAHs, polychlorinated biphenyls (PCBs), and metals at concentrations significantly above background concentrations. In 1996, OEPA conducted a Site Team Evaluation Prioritization (STEP) investigation, which included soil, sediment, and ground water sampling activities. Ground water analytical results indicated the presence of VOCs, including: 1,2-dichloroethylene (total) at concentrations up to 150 micrograms per liter (µg/L) (Maximum

EPA Region 5 Cleanup Sites - South Dayton Dump and Landfill - Sept...    http://www.epa.gov/R5Super/sites/sddumplandfill/nfs200409.htm

Contaminant Level 70 µg/L); 1,1-dichloroethane at concentrations up to 13 µg/L; toluene at concentrations up to 15 µg/L; and chloroethane up to 22 µg/L.

Between 1998 and 2002, SDD owners conducted several investigations at the landfill, including ground water and surface water sampling. Ground water analytical results from 2002 revealed maximum concentrations of vinyl chloride at 180 µg/L (Maximum Contaminant Level 2 µg/L) and trichloroethylene at 76 µg/L (Maximum Contaminant Level 5 µg/L).

The OEPA 1996 STEP documents elevated concentrations of VOCs in ground water beneath SDD. The ground water contamination is present in the Great Miami Aquifer, which is a sole source aquifer that provides drinking water to the following receptors within 4 miles of SDD:

(1) the employees of the Delphi Automotive Systems Plant,

(2) the residents of the Cities of Oakwood and West Carrollton, and

(3) residents of Montgomery County served by Montgomery County's standby wells.

*[The description of the site (release) is based on information available at the time the site was evaluated with the HRS. The description may change as additional information is gathered on the sources and extent of contamination. See 56 FR 5600, February 11, 1991, or subsequent FR notices.]*

For more information about the hazardous substances identified in this narrative summary, including general information regarding the effects of exposure to these substances on human health, please see the Agency for Toxic Substances and Disease Registry (ATSDR) ToxFAQs. ATSDR ToxFAQs can be found on the Internet at http://www.atsdr.cdc.gov/toxfaq.html or by telephone at 1-888-42-ATSDR or 1-888-422-8737.

Exhibit B

EPA proposes Superfund National
Priorities List sites in Danville, Ill., and
Copley and Moraine, Ohio
CONTACT:
Mick Hans, (312) 353-5050
For Immediate Release
No. 04-OPA146
CHICAGO (Sept. 23, 2004) -- U.S. Environmental Protection Agency has
proposed three new sites in the Great Lakes states for addition to the Superfund
National Priorities List. Hegeler Zinc, Danville, Ill., and two sites in Ohio, Copley
Square Plaza, Copley, and South Dayton Dump & Landfill, Moraine, were
among 14 new proposed sites across the Unites States named in today's
Federal Register.

The National Priorities List guides EPA in determining which sites warrant further
Federal action. Since Superfund's inception, cleanup at about 70 percent of NPL
sites has been paid for or performed by potentially responsible parties held
responsible for the contamination. For the newly listed or proposed sites, EPA
does not expect to need significant construction funds for several years, until
thorough investigations of the sites are completed.

TheHegeler Zinc site is a former zinc smelter in Vermilion County, about three
miles south of Danville, Ill. The site includes 5-acre slag waste pile contaminated
with heavy metals such as lead, arsenic and beryllium. A 2001 Illinois EPA study
of the area confirmed lead and cadmium-contaminated soil in some residential
areas. EPA is also concerned about an unnamed creek that flows through the
site into Grape Creek, which ultimately connects with the Vermilion River. In May
2002, EPA installed a 6-foot fence at the site to prevent public access.

TheCopley Square Plaza site is in Summit County, Ohio. The former Danton
Dry Cleaners, which operated from 1963 to 1994, has been identified as a
source of contamination. Past investigations by Ohio EPA have confirmed
ground-water contamination from dry-cleaning solvents including
tetrachloroethylene, or PCE.

TheSouth Dayton Dump & Landfill is a 33-acre site in Montgomery County
that operated as a landfill from 1941 to 1996. Past operations at the now-closed
landfill have resulted in soil and ground-water contamination, which poses a
threat to an underground drinking water aquifer and the Greater Miami River,
which runs along the west side of the property.

There are now 68 sites proposed for the list and awaiting final EPA action, and
1,244 final sites on the NPL, including 158 federal facilities. Cleanup
construction has been completed at 910 sites. More information is atwww.epa.
gov/superfund/sites/npl/current.htm.

# # #