Neil A. Goteiner (NG 1644)  
Dean M. Gloster (Admitted *Pro Hac Vice*)  
FARELLA BRAUN + MARTEL LLP  
235 Montgomery Street, 17th Floor  
San Francisco, CA  94104  
Telephone:  (415) 954-4400  
Facsimile:  (415) 954-4480  

Hearing Date & Time: September 24, 2010 at 10:00 a.m. (prevailing Eastern Time)

Attorneys for OFFICIAL COMMITTEE OF  
ELIGIBLE SALARIED RETIREES

UNITED STATES BANKRUPTCY COURT  
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x  
             In re:  

DPH HOLDINGS CORP., et al.,  

             Reorganized Debtors.  
---------------------------------------------------x  

Chapter 11  

Case No. 05-44481 (RDD)  

(Jointly Administered)  

# REPLY IN SUPPORT OF FINAL REPORT AND REQUEST FOR INSTRUCTIONS BY OFFICIAL COMMITTEE OF ELIGIBLE SALARIED RETIREES

The Official Committee of Eligible Salaried Retirees ("Salaried Retiree 1114 Committee") files this reply in connection with its Final Report and Request for Instructions (docket number 20527; re-filed as docket number 20617, because the text did not appear in the original filing accessible through the docket.)  The "VEBA Committee" consisting of some of the trustees of the VEBA Trust formed under orders of this Court to provide benefits to Delphi retirees that would be eligible for the Health Coverage Tax Credit[1] filed a limited opposition (docket number 20605) (the "Limited Opposition") not supported by any affidavits, arguing that

---

[1] There is a dispute as to whether some of them have been properly appointed under the trust agreement.

the Salaried Retiree 1114 Committee should be dissolved before any amendment to the trust agreement of the VEBA is adopted to provide basic protections.

The Salaried Retiree 1114 Committee had instead insisted that those trustees to cooperate with adding protective provisions to the trust agreement for the VEBA (1) capping the compensation of VEBA trustees; (2) continuing outside selection of trustees rather than a self-perpetuating board not subject to outside review; (3) limiting the ability of the trustees to amend the trust agreement to eliminate those protections; and (4) clarifying by mutual agreement who the trustees are, since the VEBA has refused to seat replacement trustees appointed by the Salaried Retiree 1114 Committee (in accordance with the trust agreement) to fill vacancies.  (The modest request of the Salaried Retiree 1114 Committee on that front is attached as Exhibit A to the Declaration of Dean Gloster filed herewith ("Gloster Decl."))

**Discussion**

1.	There have been a number of criticisms about how the VEBA has been run.  The issue, however, is not who would best run the VEBA, or what operational decisions it should make in the present or the future, or the appropriateness of its communications with third parties, including the Internal Revenue Service.  Because trustees of the VEBA have been defensive about criticism, further criticism in public filings is also counterproductive and inappropriate, particularly given that those trustees have served without compensation to date, for the benefit of all retirees, this is not a professional organization, and no one should expect perfect decision making or communication skills.

2.	There is also no question that the health, prescription drug, vision care and dental benefit programs provided through the VEBA have been a tremendous success of which everyone involved should be justifiably proud.  Under that program, thousands of Delphi retirees

2

who have had their pensions taken over by the PBGC are receiving 80% federal Health Coverage Tax Credit-subsidized benefits critical for health and well being.

3.  The only issue is whether basic protections should be built into the trust agreement for the VEBA before the Salaried Retiree 1114 Committee is dissolved.  This is important, because the Trust Agreement (as originally adopted, attached as Exhibit B to the Gloster Decl.) provided that the Salaried Retiree 1114 Committee is responsible for "[s]uccession planning and election of new VEBA Committee members" until it is dissolved and thereafter successor trustees are to be appointed by the <u>board</u> of the Delphi Salaried Retirees Association ("DSRA") by voting of board members.[2]  Gloster Decl., Exhibit B, p. 13, section 3. The VEBA board has refused to honor those provisions, has refused to seat trustees selected by the Salaried Retiree 1114 Committee to fill vacancies, has appointed its own replacement trustees, and insists that it has the power to determine tenure of trustees and to modify the Trust Agreement provisions providing that the DSRA Board members select trustees in the future. (Gloster Decl., ¶ 5.)  See also Limited Opposition at p. 9 (both mischaracterizing future selection of trustees as "member voting" of the DSRA, rather than vote by members of the DSRA board, and alleging that because the DSRA "is temporary in nature, as a result succession planning will become the responsibility of the VEBA Committee.")  The VEBA Board is clear that their purpose in seeking disbanding of the Salaried Retiree 1114 Committee is to prevent any change to the composition of the VEBA Board so that they may keep their positions.  See Limited

---

[2] The precise language of the Trust Agreement was that "Succession planning and election of new VEBA Committee members will be the responsibility of the 1114 committee until they have been dismissed by the court and thereafter becomes the responsibility of the DSRA Board through member voting." (Contrary to the statement in the Limited Opposition that after disbanding of the Salaried Retiree 1114 Committee trustee selection would be by voting of the members of the DSRA, it is by voting of members of the DSRA <u>Board</u>.)  Gloster Decl., Exhibit B, p.13, Article XI, section 3. Unfortunately, the VEBA board has instead selected its own replacement trustees and refused to seat the trustees designated by the Salaried Retiree 1114 Committee as provided in the Trust Agreement. Gloster Decl., ¶ 5.

3

Opposition, p. 9, ¶ 20.  Nor are they willing to even seat additional trustees appointed by the Salaried Retiree 1114 Committee to fill existing vacancies.  (Gloster Decl., ¶ 5.)

    4.    In response to the request by the Salaried Retiree 1114 Committee (Gloster Affidavit, Exhibit A), the VEBA board of trustees has indicated that it would consider caps on compensation (but so far, has not agreed that the trustees will be prohibited from later modifying those caps) that current trustees would agree to serve no more than six years (unless replacement trustees "could not be found"), and that the trustees would simply "solicit" future trustees from "current participants" (presumably meaning participants enrolled in the benefit plans being administered, in which several of the current trustees are not enrolled.)  Gloster Decl., ¶ 7.

    5.    None of the current trustees appear to have prior benefits experience.  (See Limited Opposition, Exhibit B)[3]  They are essentially self-appointed and in charge of an $8 million fund and a benefit program many times that size.  It is basic common sense to provide a cap on their future determination to compensate themselves out of trust assets and to continue to have some outside accountability in their selection and replacement.[4]  That would be true even if they had followed the Trust Agreement provisions on replacement trustees, had not responded to criticism by reducing the size of the board of trustees to prohibit further participation by others, and were not spending trust assets in this proceeding to preserve their positions as trustees.

---

[3] The biography of Carol Harvey-Light does reflect prior experience in "health and safety" but that appears to be OSHA-type accident and risk management safety work, not specifically with health benefits.

[4] In prior negotiations with the Debtor during the 1114 process, it is the experience of counsel that the Salaried Retiree 1114 Committee was not and is not "under the outright control" of its chairperson Jim Frost, as asserted by the Limited Opposition, p. 5, ¶ 10.  Gloster Affidavit, ¶.  Nevertheless, because the VEBA board of trustees objected that both the Salaried Retiree 1114 Committee and the board of the DSRA had opposed decisions made by the VEBA board of trustees and raised certain management and communication issues, the Salaried Retiree 1114 Committee proposed that future trustees could be selected by vote of the DSRA members (rather than the DSRA board, as the Trust Agreement provided) or by beneficiaries enrolled in the benefit program, as is done at annual meetings with other VEBAs.  See Gloster Affidavit, Exhibit A.

4

6. Since the requests of the Salaried Retiree 1114 Committee are reasonable and could be quickly implemented after a brief negotiation over amendments to the Trust Agreement, the Salaried Retiree 1114 Committee respectfully requests that it not be disbanded until that real negotiation can take place. If the Salaried Retiree 1114 Committee is disbanded, however, the trustees who filed the Limited Objection appear to believe they will become free to operate the VEBA without outside oversight, choosing their own successors because "succession planning will become the responsibility of the VEBA Committee." (Limited Opposition, p. 9, ¶ 19.)

### Specific Disputes

7. There are a number of criticisms that have been made of decisions and communications from an existing trustee or trustees, but as discussed above, it is inappropriate and unfair to air or repeat them as part of a public filing.

8. Separately, the Limited Opposition raises issues about engagement of a broker, Cone Insurance Group, by the Salaried Retiree 1114 Committee prior to the formation of the VEBA trust, and the VEBA trustees apparently felt it appropriate to attack their own broker who assisted them is setting up their benefit programs. (Limited Opposition, pp. 9-12.)[5] Cone Insurance Group was engaged by the Salaried Retiree 1114 Committee because the VEBA was not then yet organized or finalized, but someone (a broker) had to get to work getting claims and enrollment data, put together a request for proposal for a third party administrator and for health, prescription drug, vision care and dental benefits and educate those benefit providers about the provisions of the HCTC, which had been recently amended by the American Recovery and Reinvestment Act. Gloster Decl., ¶ 8. Those several months of efforts were extensive, with no certainty of compensation, because at the time they were undertaken, the pension plan had not

---

[5] The Limited Opposition incorrectly states Cone Insurance Group was engaged in "March 2010" by letter agreement. (Limited Opposition, p.9, ¶ 22.) That letter agreement, attached as Exhibit B to the Limited Opposition, was dated and entered into in March 2009.

5

yet been turned over to the PBGC.  Id.  (If the pension plan had not been turned over, there would have been no HCTC-eligible benefit, and no broker's commissions on such a benefit.)  It is clear from the Limited Opposition that the trustees continue to resent that their broker was originally engaged by the Salaried Retiree 1114 Committee and have explored terminating or replacing their broker.[6]

9. The Limited Opposition also complains that Jim Frost, who was chair of the Salaried Retiree 1114 Committee and also at that time a trustee of the VEBA "purportedly secured advice from [undersigned counsel] Dean Gloster, counsel of record to the 1114 Committee, as to certain activities of the VEBA Committee."  Limited Opposition at p. 12, ¶ 33.  At the request of the 1114 Committee <u>by agreement of the VEBA board</u>, undersigned counsel filed a motion in December 2009 seeking (and obtaining) authorization from this Court to expand eligibility for the HCTC-subsidized benefits administered by the VEBA to include hourly, not just salaried Delphi retirees, because hourly Delphi retirees also had their pensions turned over to the PBGC (the "VEBA Expansion Motion".)  (Gloster Decl., ¶ 10.) (See Docket 19185; Docket 19407.)

10. The Limited Opposition refers to a Salaried Retiree 1114 Committee request for a $50,000 retainer from the VEBA in connection with auditing or filing the final report.  (Limited Opposition, p. 15, ¶¶ 46-47.)  Undersigned counsel has not requested a $50,000 payment or

---

[6] Undersigned counsel does not represent Cone Insurance Group, but since August 2009 has been working with Cone Insurance Group in connection with setting up an HCTC-eligible eligible programs in an airline bankruptcy and in 2010 began working with Cone Insurance in other bankruptcies involving airlines and various other large companies.  Gloster Decl., ¶ 9.  Accordingly, undersigned counsel would have a potential conflict of interest in any dispute involving Cone Insurance Group.  In some of those other cases (but not this one), undersigned counsel would expect to have a joint financial interest with Cone Insurance Group in the success of the implementation and roll out of an HCTC-eligible benefit.  Gloster Decl. ¶ 9.

6

retainer in connection with the final report, nor is undersigned counsel being paid for this work or expecting to be paid for this work.[7] (Gloster Decl., ¶ 11.)

## Conclusion

11. It is understandable that, facing extensive criticism while working for free in an area where they have no background, individual VEBA trustees would conclude that the criticism is unjustified and their judgment is better than those with whom they might have to share responsibility under the Trust Agreement. It is also, however, completely inappropriate that as a response they would use their positions to perpetuate themselves as trustees in violation of the Trust Agreement.

12. It is similarly inappropriate that they are now using trust assets to attempt to accomplish that by seeking dissolution of the Salaried Retiree 1114 Committee before minimal protections are put in place for the benefit of the retiree beneficiaries they are to serve. And it is unconscionable that they would not agree to caps on their compensation and a mechanism to permit continued outside oversight.

13. Undersigned counsel would be delighted if this Court dissolved the Salaried Retiree 1114 Committee as soon as humanly possible, but that should only be done after the benefit program it set up under orders of this Court have some basic protections from future problems that are otherwise predictable to an order of certainty. Counsel is motivated to see the Salaried Retiree 1114 Committee dissolved, if for no other reason, than because undersigned counsel is not being compensated for these filings on its behalf. But those protections for the

---

[7] Undersigned counsel has no interest in representing the VEBA, now or in the future, and is not seeking compensation from the VEBA. Previously, there had been a discussion that counsel would be paid $4000 for filing the VEBA Expansion Motion on behalf of the Salaried Retiree 1114 Committee and reimbursed, if necessary, for the cost of obtaining a transcript of a hearing if that was necessary (it was not.) Gloster Decl. ¶ 11. Subsequently, however, given the disagreements between the Salaried Retiree 1114 Committee and certain of the VEBA trustees, undersigned counsel has not sought, and does not intend to seek, any compensation from the VEBA for work done on behalf of the Salaried Retiree 1114 Committee.

trust and its beneficiaries are not yet in place, and both the Salaried Retiree 1114 Committee and its counsel have a fiduciary duty to the retirees they represent.

14. Undersigned counsel is also seeking to set up similar HCTC-subsidized programs in several other large bankruptcies where retirees have had their pensions turned over to the PBGC, and it would be helpful if the result in this case continued to be a shining example of success, rather than a prescription for guaranteed future problems.

Dated:    San Francisco, California
         September 22, 2010

FARELLA BRAUN & MARTEL LLP

By:    */s/ Neil A. Goteiner*
       Neil A. Goteiner
       Dean M. Gloster

235 Montgomery Street, 17th Floor
San Francisco, California  94104
(415) 954-4400

Attorneys for OFFICIAL COMMITTEE OF ELIGIBLE SALARIED RETIREES