Neil A. Goteiner (NG 1644)  
Dean M. Gloster, *Pro Hac Vice*  
FARELLA BRAUN + MARTEL LLP  
235 Montgomery Street, 17th Floor  
San Francisco, CA  94104  
Telephone:  (415) 954-4400  
Facsimile:  (415) 954-4480  

Hearing Date:  September 24, 2010 at 10:00 a.m.

Attorneys for OFFICIAL COMMITTEE OF  
ELIGIBLE SALARIED RETIREES

UNITED STATES BANKRUPTCY COURT  
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------x  
In re:  

DPH HOLDINGS CORP., et al.,  

               Reorganized Debtors.  
-------------------------------------------------x  

Chapter 11  

Case No. 05-44481 (RDD)  

(Jointly Administered)

# DECLARATION OF DEAN M. GLOSTER IN SUPPORT OF REPLY IN SUPPORT OF FINAL REPORT AND REQUEST FOR INSTRUCTIONS BY OFFICIAL <u>COMMITTEE OF ELIGIBLE SALARIED RETIREES</u>

I, Dean M. Gloster, hereby declare:

    1. I am a partner at the law firm name of Farella Braun + Martel LLP, and have served in this matter as the attorney for the Official Committee of Eligible Salaried Retirees appointed by this Court under Bankruptcy Code Section 1114.  (The "Salaried Retiree 1114 Committee".)  Except as otherwise specifically stated below, I have personal knowledge of the facts set forth herein and, if called as a witness, I would testify thereto.

    2. My practice includes extensive representation of employee groups, retiree organizations, and retiree committees appointed under Bankruptcy Code Section 1114 in large

bankruptcies. I am currently representing most of the city workers in the Chapter 9 bankruptcy of Vallejo, California. Other recent engagements include representing the General Motors Retiree Association in the General Motors bankruptcy, the Nortel U.S. Retirement Protection Committee in the Nortel bankruptcy, the Official Committee of Non-Pilot Retirees in the Delta Air Lines bankruptcy.

3. Attached as Exhibit A is a true and correct copy of an email (the "Trust Proposal") I sent (and then re-forwarded when I did not get a response) to Patricia Beaty, the attorney representing the VEBA Committee (the "VEBA trustees.") for the Delphi Salaried Retirees Association Benefit Trust (the "VEBA Trust") on behalf of the Salaried Retiree 1114 Committee.

4. Attached as Exhibit B is a true and correct copy of the original executed Trust Agreement for the VEBA Trust (the "Trust Agreement") As provided in Article XI, section 3 of the Trust Agreement, "Succession planning and election of new VEBA Committee member will be the responsibility of the 1114 committee until they have been dismissed by the court and thereafter becomes the responsibility of the DSRA Board through member voting." Since the date of the Trust Agreement, I am informed and believe that the VEBA trustees have amended or purported to amend the Trust Agreement.

5. As provided in the Trust Agreement, the Salaried Retiree 1114 Committee previously appointed trustees to fill vacancies on the VEBA board, but the VEBA trustees refused to accept those appointments. Instead, Ms. Beaty confirmed to me that (1) those trustees appointed by the Salaried Retiree 1114 Committee would not be allowed to serve; (2) the VEBA trustees had selected their own preplacement trustees and then unilaterally reduced the size of the board of trustees to eliminate all remaining vacancies but one; (3) the VEBA trustees had

2

adopted requirements that any trustee filling the vacancy must have specific qualifications that none of the existing trustees had; (4) no trustee appointed by either the Salaried Retiree 1114 Committee or the DSRA Board would be acceptable to the VEBA trustees, now or in the future; and (5) the DSRA was an organization whose purpose had essentially ended with the turnover of the pensions to the PBGC and it should therefore not select VEBA board members in the future.

6. As provided in the Trust Proposal, in light of these startling actions of the VEBA trustees, the Salaried Retiree 1114 Committee made four simple requests to avoid future abuse of power by the VEBA trustees: (1) that the Trust Agreement provide a future cap on compensation of trustees; (2) that the Trust Agreement continue to provide for outside selection of VEBA trustees and if neither the Salaried Retiree 1114 Committee nor the DSRA Board provided for in the Trust Agreement were acceptable to the VEBA trustees, that trustees be regularly elected by DSRA members or beneficiaries of its benefit program; (3) that the Trust Agreement be amended to provide that the VEBA trustees could not amend it to change the protections in (1) and (2); and (4) that the VEBA trustees agree to expand or modify the composition of the VEBA trustees to permit additional representation.

7. The VEBA trustees rejected these requests. They offered only that (1) there could be limits on compensation (but not that those limits could not be changed in the future); (2) existing VEBA trustees would be limited to serving a maximum of six years (unless "replacement trustees could not be found"), with staggered expiration dates; and (3) future replacement trustees would be "solicited" (presumably by the existing VEBA trustees) from "beneficiaries." I understood this to mean that future replacement trustees would be selected from those actually enrolled in the benefit program. I am informed and believe that several of the existing trustees are not enrolled in the benefit program they are administering.

3

8.  Prior to the formation of the VEBA Trust by execution of the Trust Agreement, the Salaried Retiree 1114 Committee entered into a March 2009 letter agreement engaging Cone Insurance Group as the broker of record for itself and its successor in interest the VEBA Trust when formed, to obtain medical, prescription drug and other benefits for Delphi salaried retirees, both for under-65 retirees eligible for the Health Coverage Tax Credit ("HCTC") once the Delphi pensions were terminated and trusteed by the Pension Benefit Guaranty Corporation ("PBGC") and for over-65 retirees. Cone Insurance Group was engaged by the Salaried Retiree 1114 Committee because the VEBA was not then yet organized or finalized, but someone (a broker) had to get to work getting claims and enrollment data, put together a request for proposal for a third party administrator and for health, prescription drug, vision care and dental benefits and educate those benefit providers about the provisions of the HCTC, which had been recently amended by the American Recovery and Reinvestment Act. Those several months of efforts were extensive, with no certainty of compensation, because at the time they were undertaken, the pension plan had not yet been turned over to the PBGC. (If the pension plan had not been turned over, there would have been no HCTC-eligible benefit, and no broker's commissions on such a benefit.)

9.  Neither I nor my firm have any financial interest in any brokers' commissions or other remuneration of Cone Insurance Group in connection with the VEBA Trust programs in connection with this case. Nor do we represent Cone Insurance Group in this matter or any other. In August 2009, however, we entered into an engagement with DP3, Inc., an organization of retired Delta Air Line pilots and began working with Cone Insurance Group to put together a bankruptcy-court authorized VEBA for the Delta pilots to provide an HCTC-eligible benefit for their retirees, and later obtained a bankruptcy court order authorizing that formation. In 2010,

4

we have worked with Cone Insurance Group on putting together (or trying to put together) similar VEBAs for retirees other companies in bankruptcy in the airline, steel, and communication industries, and in those matters (but not this one) we have a substantial shared economic interest with Cone Insurance Group, where our firm is only compensated if those health benefit programs are actually successfully rolled out.  Accordingly, we would have a potential conflict of interest in any litigation involving Cone Insurance Group.

      10.      At the request of the 1114 Committee and by agreement of the VEBA board, I and my firm filed a motion in December 2009 seeking (and obtaining) authorization from this Court to expand eligibility for the HCTC-subsidized benefits administered by the VEBA to include hourly, not just salaried Delphi retirees, because hourly Delphi retirees also had their pensions turned over to the PBGC (the "VEBA Expansion Motion".)  In connection with the VEBA Expansion Motion, I was in intermittent contact with Jim Frost, in his capacity as chair of the Salaried Retiree 1114 Committee (on whose behalf I filed the motion) and his capacity as then member of the VEBA trustees, before his resignation or removal.

      11.      Neither I nor my firm have sought a $50,000 (or any other) retainer or compensation in connection with the filing of the Final Report.  Previously, there had been a discussion with then counsel for the VEBA Trust, Jon Cohen, that our firm would be paid $4000 for filing the VEBA Expansion Motion on behalf of the Salaried Retiree 1114 Committee and reimbursed, if necessary, for the cost of obtaining a transcript of a hearing if that was necessary in getting entry of the order (it was not.)  In that connection, I believe I sent one or more confirming emails that our firm would not receive compensation beyond that from the VEBA or otherwise.  Subsequently, however, given the disagreements between the Salaried Retiree 1114 Committee and certain of the VEBA trustees, undersigned counsel has not sought, and does not

5

intend to seek, any compensation from the VEBA for work done on behalf of the Salaried Retiree 1114 Committee in the amount of that $4000 or otherwise.  Neither I nor my firm wish to represent the VEBA in the future.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information and belief and that this Declaration was executed in San Francisco, California on September 22, 2010.

/s/ *Dean M. Gloster*
Dean M. Gloster
