Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 05-44481-rdd

5   - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   DPH HOLDINGS CORP., ET AL.,

9

10          Debtor.

11

12   - - - - - - - - - - - - - - - - - - - - -x

13

14                United States Bankruptcy Court

15                300 Quarropas Street

16                White Plains, New York

17

18                September 24, 2010

19                10:22 AM

20

21   B E F O R E:

22   HON. ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25

Page 2

1

2    Hearing re Notice of Hearing Proposed Fifty-Ninth Omnibus

3    Hearing Agenda filed by John Wm. Butler, Jr. on behalf of DPH

4    Holdings Corp., et al.

5

6    Hearing re Proposed Thirty-Seventh Claims Hearing Agenda filed

7    by John Wm. Butler, Jr. on behalf of DPH Holdings Corp., et al.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  Sara Davis

25

Page 3

1    A P P E A R A N C E S :

2    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

3         Attorneys for the Reorganized Debtors

4         155 North Wacker Drive

5         Chicago, IL 60606

6

7    BY:   KENNETH BERLIN, ESQ.

8          JOHN K. LYONS, ESQ.

9          ALBERT L. HOGAN III, ESQ. (TELEPHONICALLY)

10

11

12   MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

13        Attorneys for Illinois Tool Works and ITW Food

14           Equipment Group

15        30 Jelliff Lane

16        Southport, CT   06890-1436

17

18   BY:   KRISTIN B. MAYHEW, ESQ.

19

20   U.S. DEPARTMENT OF JUSTICE, OFFICE OF THE U.S. TRUSTEE

21        32 Whitehall Street, 21st Floor

22        New York, NY  10004

23

24   BY:   GREG M. ZIPES, ESQ.

25

Page 4

```
 1

 2     KRIEG DEVAULT

 3           Attorney for ERISA for the VEBA Committee

 4           One Indiana Square

 5           Suite 2800

 6           Indianapolis, IN  46204-2079

 7

 8     BY:   PATRICIA L. BEATY, ESQ.

 9

10     SATTERLEE STEPHENS BURKE & BURKE, LLP

11           Attorney for Board of Trustees overseeing the Delphi

12           Salaries Retirees Association Benefit Trust

13           230 Park Avenue

14           New York, NY  10169

15

16     BY:   TIMOTHY T. BROCK, ESQ.

17

18     FARELLA BRAUN & MARTEL LLP

19           Attorneys for Official Committee of Eligible Salaried

20           Retirees

21           235 Montgomery Street

22           17th Floor

23           San Francisco, CA  94104

24

25     BY:   DEAN M. GLOSTER, ESQ. (TELEPHONICALLY)
```

Page 5

1

2   KASARDA LAW

3          Attorney for the State of David Lyons

4          445 Hamilton Avenue

5          White Plains, New York   10601

6

7   BY:   STEVEN KASARDA, ESQ.

8

9   ALSO APPEARING:

10          JAMES A. LUECKE, PRO SE (TELEPHONICALLY)

11          BRIAN L. PENLEY, PRO SE (TELEPHONICALLY)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          MR. LYONS:  Good morning, Your Honor.  John Lyons on

3     behalf of the reorganized debtors.

4          THE COURT:  Good morning.

5          MR. LYONS:  Your Honor, we have an omnibus hearing, as

6     well as a claims hearing.  So with Your Honor's permission,

7     I'll proceed with the omnibus hearing first.

8          THE COURT:  That's fine.  Let me just get a little

9     organized here.

10         THE CLERK:  I'm sorry, your name?

11         MR. LYONS:  John Lyons.

12         THE COURT:  Okay.  All set.

13         MR. LYONS:  Okay.  Your Honor, turning to the agenda

14    that we previously filed with the Court for the fifty-ninth

15    omnibus hearing, we have a number of matters.

16         Your Honor, the first matter is the -- an adjourned

17    matter, Weevel Tool Works (ph), that hearing has been adjourned

18    to the October 21st, omnibus hearing.

19         THE COURT:  Okay.

20         MR. LYONS:  The next matter is item number two, the

21    motion to close Chapter 11 cases of 20 filing debtors.

22         Your Honor, we're at the point in the cases where we

23    can actually start to close some of them.  All the factors, as

24    laid out in our papers, we believe have been met.  We do,

25    however -- we're in the process of filing notice of dismissal

1    of certain of the avoidance actions that were unpreserved under

2    the plan, and that should be done by the end of the day today.

3    Once that is completed, we've proposed to hand to -- to give

4    Your Honor closing the 20 cases.

5            THE COURT:   Okay.  I saw no opposition to this motion.

6    If there are going to be any changes to the proposed order, I'd

7    just ask that you cc the U.S. Trustee on the e-mail to

8    chambers, but it's appropriate that the cases be granted -- I'm

9    sorry, that the motion be granted and the cases be dismissed.

10           MR. LYONS:   Very good, Your Honor.

11           THE COURT:   Or closed.

12           MR. LYONS:   We will do so.

13           THE COURT:   Okay.

14           MR. LYONS:   The next item on the agenda is item number

15   three.  It's the VEBA Committee motions for order.  The debtors

16   did file a pleading and my partner, Al Hogan is on the line to

17   address any concerns Your Honor may have vis-a-vie the

18   reorganized debtors.

19           THE COURT:   Okay.  Thank you.

20           MR. BROCK:   Good morning, Your Honor.  I'm Timothy

21   Brock of Satterlee Stephens Burke & Burke, on behalf of six

22   individuals who are the Board of Trustees overseeing the Delphi

23   Salaries Retirees Association Benefit Trust.  They are ERISA

24   fiduciaries, and they collectively refer to themselves as the

25   VEBA Committee.

Page 8

1          The resumes of this group are attached as Exhibit A to

2     the limited objection, also filed by the VEBA committee.  Four

3     of those six individuals are here today in the courtroom.  They

4     are Mr. James Baker, Dr. MaryAnn Baker, Mr. Joseph McQue (ph),

5     and Mr. Vincent Wilson.  Two other members, Dan Black and Carol

6     Harveylight (ph) are unable to be here today.

7          But, Your Honor, the enormous success of the Delphi

8     VEBA Trust thus far is largely, if not exclusively, the result

9     of the tireless efforts of this dedicated resourceful and

10    highly educated group.

11         Also with me today is Patricia Beaty, the Indianapolis

12    based attorney who represents this VEBA Committee with regard

13    to all ERISA compliance matters, as well as internal governance

14    matters.  Ms. Beaty has a pending motion for pro hac admission

15    before this Court, and I would like to ask that she be

16    permitted to address the Court today if circumstances warrant,

17    that is, if issues relating to governance or ERISA arise and

18    require some response from the VEBA Committee.

19         THE COURT:  That's fine.

20         MR. BROCK:  Ms. Beatty is also sworn an affidavit in

21    support of the VEBA Committee's limited objection.  That was

22    filed late last night, Your Honor.  We've delivered a copy to

23    chambers, and I've made copies available to the parties here in

24    the courtroom.

25         Your Honor, we saw two pleadings that are on the

Page 9

1    agenda for today.  One is the motion of the VEBA Committee to

2    compel the Section 1114 committee to file it's final report

3    with the Court, pursuant to the terms of the settlement order.

4    And secondly, to direct the office of the United States Trustee

5    to disband the Section 1114 committee.

6         The other pleading is the limited objection of the

7    VEBA Committee to the final report of the Section 1114

8    committee.

9         Obviously, a portion of our original motion to compel,

10   which was filed on July 23rd, was rendered moot by the filing

11   by the 1114 committee of its final report approximately 30 days

12   later on August 20th.  Yet, the final report raised certain

13   concerns and requested certain relief, mainly more delay.

14        The VEBA committee felt strongly that there needed to

15   be a limited objection filed because the final report

16   disingenuously characterizes the 1114 committee's demands as

17   related to basic protections that can be quickly implemented

18   after a brief negotiation.

19        Not so, says my client, the court demand laid bear is

20   to reinstate certain individuals, Mr. Frost and others, who

21   were once on the VEBA Committee but who have -- are no longer

22   on the committee.  And it -- we interpret this as a request to

23   perpetuate the turmoil that these individuals incited while

24   they were on the VEBA Committee.

25        Negotiations have occurred.  The Gloster declaration

Page 10

1    on file with this court recounts those negotiations, mostly

2    accurately.  We're simply at an impasse, thus in the limited

3    objection, we sought to convince this court that the only thing

4    genuinely necessary now for these -- from these proceedings, is

5    a formal official dissolution of the Section 1114 committee.

6         We sought to convince the Court of this by adding some

7    relevant transparency on only certain of the disputes that have

8    been ongoing, and which frankly, just need to cease.

9         First, we explained in our pleading, in our limited

10   objection, how the VEBA Committee is presently composed, and we

11   did so by presenting a chronology of its membership

12   composition, and each of the events were the composition and

13   size of the board of trustees has changed.

14        Second, we detailed the -- and, Your Honor, I might

15   add that presently of the six members of the VEBA Committee,

16   one person who has been vetted with the 1114 committee is -- we

17   still haven't heard from the 1114 committee, but the other five

18   members were either the original VEBA Committee appointed by

19   the Section 1114 committee, or they were subsequently approved

20   by that committee.

21        So secondly, Your Honor, we've detailed numerous

22   accomplishments of the VEBA Committee so as to dispel any

23   inaccurate impression the Court may derive from this, as to

24   whether the VEBA's Committee -- the VEBA Committee's work is

25   getting accomplished.  And this is not in dispute.

1    I would note that even the Gloster -- I should say the

2    1114 papers submitted yesterday admit that quote, there is no

3    question that the health prescription drug, vision care, and

4    dental benefit programs provided through the VEBA have been a

5    tremendous success, of which everyone should be justifiable

6    proud, unquote.

7    Third, we sought to shed light on certain of the

8    actual ongoing activities of the 1114 committee.  The

9    activities that my clients submit are manifestly wrongful and

10   possibly actionable.

11   To keep our pleadings simple and straight forward, we

12   focused on only two points that tend to show the workings of

13   the 1114 committee and we discussed -- we therefore discussed

14   the Cone Insurance (ph) disputes, and we discussed the 1114

15   committee's demand for a 50,000 dollar payment before it would

16   file the final report.  That payment was allegedly to fund a

17   retainer for counsel.

18   I prefer to say little about the Cone Insurance

19   dispute, frankly.  Suffice it to say that the VEBA Committee

20   has been repeatedly told by the Section 1114 committee that it

21   is saddled with an agreement with Cone Insurance, due to a

22   Frost-Cone letter that was promulgated before the VEBA

23   Committee was -- had been formed, and while Mr. Frost was the

24   chair of the 1114 committee.

25   And it occurs to me, Your Honor, that perhaps all that

1     really needs to be said about the Cone Insurance dispute now is

2     contained in paragraph number nine of the declaration of Dean

3     Gloster, which he filed yesterday.

4          In that paragraph, Mr. Gloster admits that his firm

5     has quote, a substantial shared economic interest with Cone

6     Insurance Group, where our firm is only compensated if those

7     health benefit programs are actually successfully rolled on.

8     Accordingly, we would have a potential conflict of interest in

9     any litigation involving Cone Insurance Group, unquote.

10         And then in the footnote number six to the 1114 reply,

11    to our limited objection, Mr. Gloster goes further to admit

12    that he would have a potential conflict of interest in any

13    dispute affecting Cone Insurance Group.

14         Well, Your Honor, the VEBA Committee is in an ongoing

15    dispute with Cone Insurance and has been for some time.  The

16    VEBA Committee has encountered aggressive tactics by the 1114

17    committee, represented by Mr. Gloster in defending Cone

18    Insurance and the interests of that firm, all at the expense of

19    the VEBA Trust.

20         Now, while the VEBA Committee does work with Cone

21    Insurance, it must do so with the heightened state of

22    vigilance, as the details of that firm's obligations to the

23    VEBA Trust are vague at best, while the alleged obligations of

24    the VEBA Trust to Cone Insurance are undesirable and of over-

25    long duration.

Page 13

```
 1            Why are they undesirable?  Well --

 2            THE COURT:  You don't need to get into this, all

 3    right.

 4            MR. BROCK:  Thank you.

 5            THE COURT:  In my mind, this whole dispute which

 6    frankly was not raised in your motion, which has colored my

 7    whole view of this, since your original motion, really didn't

 8    deal, as far as I'm concerned, with why your group is seeking

 9    this relief, which puts you behind the eight ball, is about the

10    control of the board.

11            And so I have one question for you, which is whether

12    the VEBA Committee or the board is prepared to have some form

13    of election of replacement board members on notice to the

14    beneficiaries, so that if there is some problem, that is

15    perceived by a majority of the beneficiaries with how the trust

16    is conducting itself, in addition to their right to sue under

17    ERISA.  They can simply replace the board.

18            Are your members prepared to accept that?

19            MR. BROCK:  Well, Your Honor, not surprisingly, we

20    haven't discussed that.

21            THE COURT:  Well, maybe you should.  Because right

22    now, I'm not prepared to grant your relief.  I'm troubled by

23    the notion that two sets of fiduciaries are squabbling and it

24    is not -- that squabble, until last night, has really not been

25    made evident to the actual beneficiaries, the retirees who you
```

Page 14

1    all represent.  Okay?  And I'm concerned, particularly given

2    the fact that you weren't even prepared to outline the issue to

3    me when you made the motion that someone is hiding the ball.

4          In my mind, the only way to deal with that is to make

5    sure that in the future, those who are the beneficiaries of

6    this trust, can replace the board if the board isn't acting

7    properly by a majority vote.  Not by some cabal on one

8    committee or some cabal on another committee, but in sunshine.

9          MR. GLOSTER:  Thank you, Your Honor.  This is Dean

10   Gloster representing the Official Committee of Eligible

11   Salaries Retirees appointed by this Court through Section 1114.

12   And frankly, that's all we want.

13         THE COURT:  Okay.

14         MR. GLOSTER:  We want --

15         THE COURT:  All right.  So I'm going to adjourn this

16   motion until the next omnibus day.  If there's something about

17   ERISA that is violated by such a provision or if somehow you

18   believe that this will impair the operation of the board as a

19   proper ERISA fiduciary, I'd like to hear about it, but frankly,

20   I've reviewed the agreement that set up this trust, and the way

21   it's drafted, and I think this is appropriate, given how this

22   whole matter started, is that the 1114 committee has the right,

23   I believe, to choose the board and replace the board.  And I

24   supervise that committee through the U.S. Trustee.

25         If that committee is not doing its job, they can be

DPH HOLDINGS CORP., ET AL.

Page 15

1   replaced.  But this is all, I think, a short -- a long-headed

2   way of my short response, which is that, as far as my

3   responsibilities to these retirees, to these beneficiaries, I

4   want to make sure that their fiduciaries are acting in their

5   best interests.

6          I'm not prepared to leave it up to ERISA litigation.

7   This is not an ERISA trust that was established by some company

8   on its own.  It was established through this Court's processes,

9   on notice to these beneficiaries.  And in part, because I

10  suggested to the company that notwithstanding what I believe to

11  be the company's legal rights, it negotiate to permit the

12  committee to be formed and to settle.

13         And so I feel that I have some stake in making sure

14  that the beneficiaries are getting the best representation they

15  can, to ensure that beyond this trust agreement, I believe you

16  need to have some voting process by the beneficiaries, so that

17  the trustees are accountable to them by vote.

18         There are enough of them here so that you're not going

19  to get some parochial interest to sway the vote.  And I'm

20  concerned given the history of this motion that someone on

21  either side may be acting parochially, and I don't want that to

22  happen.

23         I -- it seems appropriate to me that you could have a

24  staggered board, because you don't want to lose the expertise

25  of people, necessarily, but it shouldn't be super-staggered.

1    The beneficiaries should have a say on their rights.  Okay.  So

2    I'm going to adjourn this for a month or to the next omnibus

3    day.

4           MR. BROCK:  Thank you, Your Honor.

5           MR. GLOSTER:  Thank you, Your Honor.

6           THE COURT:  If there are any eminent decisions that

7    the board needs to make in the meantime, they should feel free

8    to make them as fiduciaries under ERISA.  All I'm focusing on

9    is some form of beneficiary governance here.

10          MR. GLOSTER:  Your Honor, we also requested that the

11   trustees agree to a cap on future trustee compensation, because

12   this time has actually --

13          THE COURT:  Well, I'm not prepared to insist on that

14   as a condition to keeping your committee in -- or not keep your

15   committee in place.  It seems to me that that's the type of

16   thing that under ERISA, the law is pretty clear, and they can,

17   you know -- if they -- and the trust agreement is clear on the

18   purposes the way the money can be allocated.

19          So if someone is paying themselves an improper amount,

20   they're going to suffer for it.

21          MR. GLOSTER:  And frankly, Your Honor, at your

22   suggestion, they agreed to comply with future voting, does put

23   a check on unreasonable compensation as well.

24          THE COURT:  Right.  Okay.

25          MR. GLOSTER:  Your Honor, since opposing counsel had

Page 17

1    made reference to a conflict of interest --

2            THE COURT:  I don't --

3            MR. GLOSTER:  -- do you want me to address that

4    briefly?

5            THE COURT:  -- need -- I stopped counsel because I

6    really view that as extraneous here.  I'm not going to decide

7    that issue.  I don't think it's appropriate for me to decide it

8    and I'm not going to get into the issues as to how the board

9    has been functioning, and how the committee's been functioning,

10   and how the professionals have been functioning.  I don't think

11   that's appropriate under my prior orders or frankly under my

12   jurisdiction.

13           MR. GLOSTER:  Sure.  Although I did want to note

14   that--

15           THE COURT:  I just want to make sure that there's

16   appropriate check on the board, and frankly, that check

17   probably goes beyond the requirements under ERISA.  But under

18   the circumstances here, where there's no company to pursue it,

19   and no company that acts as a trustee along with professionals,

20   I think that you need to basically revise the trust agreement

21   to reflect that it shouldn't be the board just perpetuating

22   itself subject to someone's right to take discovery and sue

23   them.  I just don't think that's appropriate under these

24   circumstances.

25           MR. GLOSTER:  I agree, Your Honor, and I would expect

1   that we could very quickly modify the trust agreement and have

2   the 1114 committee in a position to be disbanded at the next

3   omnibus hearing.

4          THE COURT:  Okay.

5          MR. GLOSTER:  I just do want to note, I do not have a

6   financial interest in any compensation given to the Cone

7   Insurance Group with respect to this matter and --

8          THE COURT:  Right.  And that's what you stated and I

9   accept that.  Okay.  Anything else?

10          MS. BEATY:  May I speak?

11          THE COURT:  Yes.

12          MS. BEATY:  I'm Patricia Beaty.  I am ERISA counsel

13   for the VEBA Committee and I just wanted to point out that

14   during our negotiations with the 1114 committee, we did talk

15   about having term limits and the beneficiaries voting on

16   members, so that's not something we're opposed to.

17          THE COURT:  Okay.

18          MS. BEATY:  But it just didn't work out that way.  So

19   we will --

20          THE COURT:  All right.

21          MS. BEATY:  -- go back and look at that issue.  And I

22   also wanted to speak about the compensation issue, but you're

23   absolutely correct in what you said --

24          THE COURT:  All right.

25          MS. BEATY:  -- so I don't need to now.

1          THE COURT:  Okay.  Very well.

2          MS. BEATY:  Thank you.

3          MR. GLOSTER:  Thank you, Your Honor.

4          THE COURT:  Okay.  So again, this matter will be

5    adjourned to the next omnibus hearing date.  I would ask you if

6    you do reach agreement, to notify the U.S. Trustee.  It may be

7    that there's -- you may want to memorialize your agreement on

8    the record, but I think the U.S. Trustee should be in a

9    position to disband the committee, and you should keep Mr.

10   Zipes in the loop once you've reached agreement.

11         MR. ZIPES:  Judge, Greg Zipes with the U.S. Trustee's.

12   I'll review with my office, it may be that we would need an

13   order from you directing us, but I'm just --

14         THE COURT:  Oh, I expect the parties will want

15   something on the record.  I just want to make sure that we

16   don't have to wait further, so that --

17         MR. ZIPES:  Yes, sir.

18         THE COURT:  -- you all would have to do your work too

19   at the last minute.  So if you could just tell the U.S. Trustee

20   or keep the U.S. Trustee up to speed as you move along on this

21   one point.

22         MR. BROCKS:  Thanks, Judge.

23         THE COURT:  Okay.

24         MR. ZIPES:  Thank you.

25         THE COURT:  Okay.

Page 20

1          MR. LYONS:  Your Honor, back to the omnibus agenda.

2    That is it for the omnibus agenda.  We have no further matters.

3          THE COURT:  Okay.

4          MR. LYONS:  So we'll turn to the claims hearing

5    agenda, the thirty-seventh claims hearing agenda.  We have a

6    number of matters ranging from larger in scope to smaller in

7    scope and we'll proceed, hopefully expeditiously.

8          THE COURT:  Okay.

9          MR. LYONS:  I'll skip over the adjourned matter.  Item

10   number two on the claims agenda, which Your Honor has, is the

11   motion for leave to file late claim Best Foam (ph).

12          Your Honor, this is a matter covered by the late

13   claims protocol, where they filed a late claim, we sent a

14   notice that they had to file a motion for leave to file a late

15   claim, or the Court would expunge the claim.  The deadline was

16   September 14th, and Best Foam has not filed a motion for leave

17   to file a late claim, so we'd ask that the Court enter an order

18   expunging that claim.

19          THE COURT:  All right.  I -- and again, you have --

20   you provided Best Foam with that order or those procedures?

21          MR. LYONS:  Correct.

22          THE COURT:  So in light of that, I'll grant the relief

23   on the basis that it's unopposed, and you can submit an order

24   on that.

25          MR. LYONS:  Okay.  And just for the record, the notice

1    of that deadline is Docket No. 20513.

2              THE COURT:  Okay.  Very well.

3              MR. LYONS:  The next item is the claims objection

4    regarding the Claimant, Steven Streeter.  That matter has been

5    settled and we did submit a joint stipulation resolving that

6    matter.

7              THE COURT:  Okay.  Very well.

8              MR. LYONS:  Similarly with item number four, the claim

9    of Census Precision Dye Casting, that matter as well has been

10   settled by stipulation, and that is, I believe, been filed with

11   the Court as well.

12             THE COURT:  All right.

13             MR. LYONS:  The next item, item number five is the

14   claim objection regarding the claim of Dennis Dashkavince (ph).

15   Your Honor, this is a claim for worker's compensation that was

16   actually transferred to General Motors pursuant to the terms of

17   the modified plan.

18             THE COURT:  This is a plan of the MDA that then

19   approved the plan?

20             MR. LYONS:  Correct.

21             THE COURT:  Approved by the plan.

22             MR. LYONS:  More precisely that's correct.

23             THE COURT:  Okay.  All right.

24             MR. LYONS:  And that liability has been transferred to

25   GM.  We have received no response to our papers, so again, we'd

Page 22

1    ask that that claim be expunged.

2          THE COURT:  All right.  I will grant that -- well, let

3    me -- is Mr. Dashkavince or his counsel is not on the phone,

4    right?  Okay.  And he's not here.  I'll grant that objection,

5    as I've said on some of these in the past.  It's my belief that

6    if for some reason GM disavows the obligation for good reason,

7    and I know of no good reason, but if it does do so for good

8    reason and it's concluded that, in fact, it doesn't have the

9    obligation, the creditor or the claimant has 502(j) at its

10   disposal to seek reconsideration.

11         But based on my understanding of the MDA, the

12   objection is valid and there doesn't need to be anything in

13   order reciting that.  It's just my belief that it's the best

14   way to handle these things, if in fact, GM somehow shows in the

15   future that it's not viable.

16         MR. LYONS:  Very good.  And actually in the present

17   form of the order, we do mention that is the subject of 502(j),

18   Your Honor.

19         THE COURT:  All right.  Well, that's fine, without any

20   lengthy -- it's just a clause there and that's fine.

21         MR. LYONS:  Okay.  Very good.  Item number six is the

22   claim or in the claim of estate of David Lyons.

23         THE COURT:  No relation?

24         MR. LYONS:  No relation, Your Honor.

25         THE COURT:  Okay.

1              MR. LYONS:  There are a lot of us out there.  Your

2    Honor, we do have counsel here in court and counsel, along with

3    us, have decided that they would just withdraw the claim --

4              THE COURT:  Okay.

5              MR. LYONS:  -- subject to Ms. Lyons' rights vis-à-vis

6    the State of Ohio for the guaranty association in essence and

7    Ohio's payment of that claim.

8              THE COURT:  All right.  Is that right, sir?

9              MR. KASARDA:  Yes, it is.

10             THE COURT:  Okay.  And have you given your name to the

11   operator before then, the ecro operator?

12             MR. KASARDA:  I have not.

13             THE COURT:  Okay.  If you could just state for the

14   record who you are.

15             MR. KASARDA:  Yes.  My name is Steven C. Kasarda, P.C.

16             THE COURT:  C-a --

17             MR. KASARDA:  K-a-s-a-r-d-a.

18             THE COURT:  Okay.  Thank you.  All right.  So are you

19   going to submit an order on that or will --

20             MR. LYONS:  Yes.  We'll submit an order withdrawing

21   the claims subject to rights --

22             THE COURT:  Okay.

23             MR. LYONS:  -- and we'll settle the order with

24   counsel.

25             THE COURT:  Fine.

1          MR. KASARDA:  Thank you.

2          THE COURT:  That's fine.

3          MR. LYONS:  Item number seven on the agenda is the

4    claim regarding the claim of Robert Stacek (ph).  This is

5    similar to the earlier claim.  Mr. Stacek has a worker's

6    compensation claim in New Jersey.

7          As Your Honor may recall in our hearing regarding the

8    New Jersey worker's comp, the debtors are over-collateralized

9    on account of the pre-petition claims.  They have a bond and

10   the collateral, as well in excess of any kind of run-out for

11   the pre-petition claim.  So accordingly, because the claim is

12   going to be paid by the State of New Jersey with the existing

13   collateral, we would seek that the claim be expunged, subject,

14   of course, to the 502(j) rights.

15         THE COURT:  Okay.  There's no one here on behalf of

16   Mr. Stacek?  No one on the phone on his behalf?

17         All right.  I think that the administrative claim

18   should be expunged with prejudice.  It's not an administrative

19   claim.  The claim as a pre-petition claim should be expunged

20   again with the clause, with reference to 502(j).

21         MR. LYONS:  Okay.  Very good, Your Honor.

22         Item number eight is the claim objection regarding the

23   claim of Kerry Roe, R-o-e.  This again is a claim filed as a

24   worker's compensation claim filed as an administrative claim.

25   From the face of the documents that Mr. Roe filed, the injury

1    occurred pre-petition, and under the old Nicole (ph) decision

2    that Judge Lifland decided, it's clear that for purposes of

3    determining when a claim accrues, that you look at the date of

4    injury for a worker's compensation claim, because it occurred

5    pre-petition, there's no basis for it to be an administrative

6    claim.

7         THE COURT:  Right.  Is anyone on the phone on behalf

8    of Mr. Roe?  On behalf of Terry Roe?

9         All right.  I've reviewed the objection and the

10   underlying claim.  It does, in fact, appear to me to be a pre-

11   petition claim, not an administrative expense claim, and

12   therefore, it should be disallowed as such and expunged.

13        I -- under the -- I mean, it's a late claim as a pre-

14   petition claim, so it should be expunged as a late claim under

15   the Court's bar date order.

16        MR. LYONS:  Very good, Your Honor.  Item nine, the

17   claim objection regarding the claim of Brian Lee Penley, and I

18   believe Mr. Penley is on the line.

19        Your Honor, we do lay out the basis for our objection.

20   The claim relates to a claim for tools that were apparently

21   allegedly lost at Delphi and Mr. Penley has asserted that

22   there's a conversion claim against Delphi, since the tools were

23   not returned.

24        This all occurred, no question, pre-petition.  He

25   asserted a priority claim and certainly there's no basis in our

1   view for, you know, any priority basis for this claim to begin

2   with.  And also, settlement was reached with the UAW over this

3   grievance, which did cover, in our view, this claim for lost

4   tools.  Mr. Penley did cash the check pursuant to that

5   settlement, although he did preserve his rights to pursue an

6   appeal of the grievance, which was settled, and which was

7   pursued to no avail to Mr. Penley.

8            So we believe for all those reasons, the claim should

9   be expunged.

10           THE COURT:  Okay.  Mr. Penley?

11           MR. PENLEY:  Yes, Your Honor.

12           THE COURT:  I guess I had two questions in connection

13  with this matter.  The first one was it didn't -- I didn't see

14  a basis for saying that the settlement was comprehensive.  It

15  looks from the face of the settlement that it's intended to

16  resolve all claims.  What is you response to that?

17           MR. PENLEY:  Yes?

18           THE COURT:  What is your response to that language?

19           MR. PENLEY:  The union, the UAW and management has

20  always taken the position that a grievance settlement for all

21  issues refers to that grievance only.

22           Now, Delphi's attorneys submitted all these other

23  documents, but they forgot to submit the most important one,

24  which was the original grievance that was filed and settled.

25  And that was for lost wages.  It was not for lost tools.

Page 27

```
 1            THE COURT:  Well, where is the original grievance?

 2            MR. PENLEY:  Delphi's attorneys chose not to file

 3    that.

 4            THE COURT:  No, but I --

 5            MR. PENLEY:  Oh.

 6            THE COURT:  You haven't filed it either, right?

 7            MR. PENLEY:  No.  I have not filed it either.  I don't

 8    believe I've ever received a copy of it.  I know it was filed

 9    and written when I was represented by the UAW, by the

10    committeemen, I seen how it was written, but I never received a

11    copy of it.

12            THE COURT:  And was that the grievance that was taken

13    up on appeal?

14            MR. PENLEY:  Taken up?  Yes.

15            THE COURT:  And --

16            MR. PENLEY:  I apologize for that.

17            THE COURT:  So if it --

18            MR. PENLEY:  It was a lot longer -- I was off a lot

19    longer than that, and I felt more wages should be due to me,

20    but that's what the UAW settled for.

21            THE COURT:  And but you say that grievance that was

22    taken up on appeal, was just for lost wages?

23            MR. PENLEY:  Yes.  They actually did not realize my

24    tool box was missing until after the agreement was reached in

25    April.
```

1              THE COURT:  Okay.  And then --

2              MR. PENLEY:  And didn't realize my tool box was

3    missing until some time in May --

4              THE COURT:  All right.

5              MR. PENLEY:  -- when they started looking for it.

6              THE COURT:  The second point is on the tool box, I

7    have a declaration that says that, along with the check, the

8    tools were returned to you, and I believe you acknowledged that

9    you didn't open the package, but sent it back?

10             MR. PENLEY:  That's a totally separate matter.  That

11   was settled, and I did not -- you know, I accepted the

12   settlement on that.  I worked in the factory.

13             THE COURT:  But wasn't -- but I guess the -- if the

14   claim is for tools and they sent it to you and you returned the

15   tools, why would you still have a claim for tools?

16             MR. PENLEY:  They were not the same tools.  That's

17   what I was getting ready to explain, Your Honor.

18             THE COURT:  Okay.  But I think didn't you say you

19   didn't open up the package, you just sent it back?

20             MR. PENLEY:  Yes.  I didn't accept delivery of that

21   package.  It was a small cardboard box.  It had contents of my

22   workbench that I worked on -- worked out of on the floor.  My

23   toolbox with my roll-around and tools was kept in the actual

24   shop area.  The two items are totally separate.

25             THE COURT:  Well, how would you know what was inside

1   the package and that it wasn't your tools?

2           MR. PENLEY:  Because my tools weigh about 800 pounds

3   and this is about a 20 pound package.

4           THE COURT:  Okay.  All right.  That's a pretty good

5   answer.  Okay.  Let me hear from the debtors on the first point

6   and the second point.

7           MR. LYONS:  You Honor, I think it's clear the

8   settlement agreement, and this has been confirmed with Mr.

9   Penley, it included, and I quote, the settlement agreement,

10  which settles all grievances or issues, including financial

11  claims for missing personal items are considered settled

12  between the parties.

13          When the debtors sent the check to Mr. Penley,

14  pursuant to the settlement agreement, Mr. Penley had a

15  question, well, you know, I want to make sure my -- that my

16  rights to appeal the grievance are preserved.  Delphi wrote

17  back and this is all on the record, Your Honor, and you have

18  the correspondence.

19          It reiterated the debtor's position that this did

20  settle claims for all missing personal items that Mr. Penley

21  had.  And, Your Honor, the fact that -- it's a little bit at

22  odds with what Mr. Penley is saying right now.  He did send a

23  letter to this Court October 26th, 2005 where he goes through

24  this whole dispute, and it was clear that the issue regarding

25  the tools was actually before the parties in April of 2004,

1  which was the date of the settlement agreement.  And that is

2  attached to the proof of claim.  And, Your Honor, I can --

3          THE COURT:  Can you hand that up?

4          MR. LYONS:  -- refer that to you.  Yes.

5          THE COURT:  Would you have a copy?

6          MR. LYONS:  I'll just rip it out of my book right now,

7  but it is in the record.

8          THE COURT:  Okay.  And you have the settlement

9  agreement there too.  I just want to take one last look at

10  that.

11          MR. LYONS:  Sure.

12          THE COURT:  Thank you.

13      (Pause)

14          MR. LYONS:  And again, Your Honor, the letter dated

15  October 27th was attached to Mr. Penley's proof of claim which

16  is number 350, claims number 350.

17          THE COURT:  Okay.

18          MR. LYONS:  So, you know, the basic purpose of

19  referring Your Honor to that letter is it clearly was

20  contemplated and, you know, the parties were cognizant that

21  this claim for missing tools was an issue in April 2004, which

22  adds, you know, further precision to the settlement agreement

23  that was signed by the UAW, which covered financial claims for

24  missing personal items.

25          So it's the debtor's view that this was covered by the

Page 31

1    release, and therefore, when the agreement was signed, as the

2    UAW had the authority to resolve grievances on behalf of Mr.

3    Penley that that fully resolved his claim for missing tools.

4              THE COURT:  Okay.  Mr. Penley, the letter does say

5    that in October of 2003, there was a problem at work, and I was

6    suspended and prevented by management from retrieving my

7    personal tools, which is well before the April 29th, '04 date

8    of the settlement.  So it does appear to me that the settlement

9    covers this.

10             MR. PENLEY:  Your Honor?

11             THE COURT:  Yes.

12             MR. PENLEY:  At that time, when that was taking place,

13   I had every faith that the union would negotiate to bring me

14   back.  I was at the time, the reason I was discharged, was

15   right before Halloween, we were in a jobs bank, we reported to

16   work, and just sat around all day, and I had wore fuzzy

17   slippers to be comfortable and a bathrobe to stay warm, because

18   they kept the room about 60 some degrees.  A lot of other

19   people were doing it but management sent me home, and that was

20   the reason I was discharged.

21             So I had every faith that I'd be reinstated.  So at

22   that point, it wasn't that big a deal.  My tools were in the

23   tool room, I thought they were safe.  I thought I would still

24   be coming back to work.  So I did not pursue it at that time.

25             The only time I started pursuing my tool box was when

Page 32

1    I accepted a transfer to another -- back to GM, which is like

2    working -- it was a totally separate company, but I had rights

3    to go back to GM, and I went back to GM.  So at that point, my

4    tools were not an issue.  I thought they were safe.  I didn't

5    -- you know, as far as the tools they sent, they were returned,

6    and they lost them, and I received a settlement for that, based

7    on what they had as inventory, and I accepted that.

8         But as far as the other tools, they even had a

9    supervisor, as I stated, a Tim Finell (ph), who still works

10   there, searching for them.  Because he was going around trying

11   to find them, he said he had them, he knew I had them there,

12   but they disappeared some time in the six or seven months I was

13   off.  I had no way of knowing that they'd disappear until I

14   asked about retrieving them.

15        THE COURT:  Okay.  But you were off until April 2004.

16        MR. PENLEY:  I was off -- I've never returned -- I

17   actually never returned to work to Delphi.

18        THE COURT:  Right.  It just seems to me --

19        MR. PENLEY:  I never physically came back into the

20   plant since October.

21        THE COURT:  I understand.  But since -- but the tools

22   were not in your possession during that whole period.  It just

23   would seem to me that that's -- you know, that that's something

24   you would be resolving as part of this settlement.

25        MR. PENLEY:  Well, I didn't believe I needed to

1    retrieve them, because I believe I was going back to work

2    there.  I did not know I was not going back to work till --

3              THE COURT:  Well, certainly by April 2004, you did.

4              MR. PENLEY:  Yes.  I accepted a transfer.  At that

5    time, they didn't reach the grievance settlement though until

6    April 29th, I believe, of 2004.

7              THE COURT:  Right.

8              MR. PENLEY:  And when I was informed that they reached

9    an agreement to settlement, that's when I inquired about my

10   other tool box, about retrieving it, and that's when they said,

11   well, we don't know where it's at.

12             THE COURT:  Well, I appreciate your -- what you're

13   telling me, but in looking at the settlement, and looking at

14   the fact that the check was cashed, it seems to me that it's

15   reasonable to assume and that the debtor --

16             MR. PENLEY:  Excuse me, Your Honor.  If it was

17   reasonable to assume, then why'd they'd offer to settle?

18             THE COURT:  Well, they did settle with you on this.

19             MR. PENLEY:  No.  They -- a copy of the attachment I

20   said -- I sent to court is they offered to settle for the full

21   amount of my claim at a 4.3 percent of the value.

22             THE COURT:  Well --

23             MR. PENLEY:  I sent a copy of that offer to the court.

24             THE COURT:  I understand.  But that's -- there are a

25   lot of reasons why people agree to that, so that for example,

Page 34

1    they don't have to pay their lawyers $400 an hour or more to

2    have this hearing.

3             So in light of my assessment of the facts here,

4    including the settlement agreement and the timing of it, I'm

5    going to grant the objection to the claim.  It appears to me

6    that particularly in light of the cashing of the check, given

7    the reference to missing personal items and Delphi's position

8    consistently, I think, that this covers anything that's left at

9    the site that the claim has been satisfied by the settlement.

10            MR. PENLEY:  Okay.  Thank you for listening to me,

11   Your Honor.

12            THE COURT:  Okay.  I -- you're welcome.  And that's

13   the basis, not the basis that you turned back to the tools, but

14   just that it was settled.

15            MR. PENLEY:  I know, after six years, I tried to

16   settle this in small claims court and --

17            THE COURT:  Okay.  All right.  I appreciate it.

18            MR. PENLEY:  -- I got drug through this, so.

19            THE COURT:  Very well.

20            MR. PENLEY:  Okay?

21            THE COURT:  Thank you.

22            MR. PENLEY:  I do appreciate your time.  Thank you.

23   bye.

24            THE COURT:  Okay.  So you can either submit this one

25   on a separate order, or as part of anything covered by this

Page 35

1   omnibus objection, whatever's more convenient.  That's the same

2   -- if there is more than one covered by an omnibus objection,

3   you can put them all on the omnibus objections order.  Okay.

4           MR. LYONS:  Okay.  Next, Your Honor, item number ten

5   is the sufficiency hearing regarding the claims of Mr. James A.

6   Lueke.

7           Your Honor, this actually was a matter that was

8   adjourned.  We had had an initial hearing --

9           MR. LUEKE:  Good afternoon.  This is James Lueke here.

10          THE COURT:  Good afternoon, Mr. Lueke.

11          MR. LUEKE:  Can you hear me?

12          THE COURT:  Yes, I can.  Can you hear me?

13          MR. LUEKE:  Just barely.

14          THE COURT:  All right.  I'll try to --

15          MR. LUEKE:  If you could speak at a little louder

16  tone, that'd be appreciated.

17          THE COURT:  Okay.  That's fine.  All right.  You can

18  go ahead, Mr. Lyons.

19          MR. LYONS:  Yes.  And, Your Honor, there were two --

20  the Court gave us two directions at the last hearing.  The

21  first was to try to see if there was a signed copy of this

22  agreement, which was entered into pursuant --

23          MR. LUEKE:  It's not a signed copy, a bona fide copy

24  of the original agreement.  Not some expo factor signed copy,

25  that's unacceptable.

Page 36

1          THE COURT:  Okay.  Mr. Lyons finish and then you can

2   have your say, Mr. Lueke.

3          MR. LUEKE:  Go ahead, Mr. Lyons.

4          MR. LYONS:  So again, Your Honor wanted us to find --

5   to locate a signed copy of the agreement that implemented

6   paragraph 96 of the national agreement, which requires the

7   parties to seek an equitable solution any time a plan is

8   closed, regarding the transfer between plans.  And also to see

9   if we could facilitate Mr. Lueke's presentation of his claim to

10  General Motors.

11         Under the MDA, there was -- it was -- there was

12  language that indicated that that type of a claim under UAW, a

13  grievance under a UAW agreement, may well have been transferred

14  to General Motors.

15         So pursuant to those two tasks, Your Honor, we did

16  search for a signed copy of this agreement.

17         MR. LUEKE:  Can you speak up?  I'm having trouble

18  hearing here.

19         MR. LYONS:  Sure.  I'm sorry.  Can you hear me now?

20         MR. LUEKE:  Yes.  Thank you very much.

21         MR. LYONS:  So we did try to locate a signed copy of

22  this -- what I'll call an implementing agreement.  Your Honor,

23  we could not locate a signed copy in Delphi's files.  We

24  reached out to counsel for the UAW, and they could not find a

25  signed copy as well.

1        However, both parties clearly understood that this was

2   the operative agreement between the parties.  So the parties

3   re-executed that agreement in July -- what?

4        UNIDENTIFIED SPEAKER:  September 2010.

5        MR. LYONS:  Oh, September, it was actually this month

6   they re-executed it.  Your Honor, why we couldn't find a signed

7   copy in the files, I can't really give an explanation, other

8   than there are several agreements that the parties have

9   negotiated between -- you know, between the UAW and the

10  debtors.  But clearly the UAW and Delphi understood that this

11  is the operative agreement regarding the equitable solution

12  under paragraph 96 of the national agreement.

13       THE COURT:  And that document was the one that was

14  submitted and it's the one that says it's not the full 26

15  workers that would be transferred, but the smaller number?

16       MR. LYONS:  Correct.  Just the two pipefitters.

17       THE COURT:  Right.  Okay.  Did that -- did you all get

18  an acknowledge -- I know that -- because I've read it.  It came

19  in, I guess, over night, Mr. Lueke's response, in which he says

20  that someone at GM has told him he wasn't covered.

21       Did you deal with that second aspect of it or was it

22  basically you were relying on the agreement that was executed

23  in September?

24       MR. LYONS:  We were relying on -- well, Your Honor, we

25  did view that language, that it could cover a claim by Mr.

1    Lueke.  GM -- I can report that GM has not acknowledged that.

2            THE COURT:  Okay.

3            MR. LYONS:  So there may be a dispute --

4            THE COURT:  Have they disavowed it to you?

5            MR. LYONS:  They -- well, not to debtor's counsel,

6    reorganized debtor's counsel.  But, Your Honor, I think it

7    would -- they haven't expressly disavowed to us, although they

8    have not acknowledged it either, so.

9            THE COURT:  Okay.  All right.  Okay.  So, Mr. Lueke, I

10   got your response.  The issue is, as I see it, that the

11   agreement that the debtors have submitted is not just an

12   agreement signed by the debtors, but by the UAW, too.  Is there

13   any reason why I should not assume that the UAW, since its

14   responsibility is to look out for its members, is somehow

15   changing the terms of the original agreement?

16           MR. LUEKE:  Yes.  Yes, as a matter of fact.

17           THE COURT:  Okay.  What would that be?

18           MR. LUEKE:  There's a number of different

19   circumstances.  They weren't upholding grievances.  They were

20   trying to push grievances aside.  They tried not to pay

21   people's overtime, especially people that weren't there a

22   longer period of time.  The UAW International Union failed to

23   represent them properly.  I mean, I just want to bring that

24   point in.

25           But getting back to the aspect of the Court record

1   here that Delphi, regardless of the actions of the UAW

2   International Union, Delphi is required to hold that

3   contractual agreement for the 96 A transfer, which included 110

4   people, of which 25 were supposed to be skilled trade.

5           Under bankruptcy law, they're supposed to provide and

6   pull all those documents and keep them in safe keeping and as

7   they need to be presented to the bankruptcy court, they should

8   be held accountable and those should be available for the

9   bankruptcy court in the proceeding.

10          THE COURT:  Well, I understand that when documents are

11   missing or not in the files, the Court can --

12          MR. LUEKE:  Your Honor --

13          THE COURT:  Can you hear me?

14          MR. LUEKE:  Yes.

15          THE COURT:  A court can hold a party accountable for

16   that in the underlying litigation.

17          MR. LUEKE:  Uh-huh.

18          THE COURT:  But it's not required to.  And one of the

19   circumstances when a court may not hold them accountable is if

20   the parties to those agreements actually acknowledge that the

21   agreement that isn't in the file, the unsigned agreement, was

22   in fact, their agreement.

23          MR. LUEKE:  Well, there's definite -- there's sworn

24   statements here of affidavits here --

25          THE COURT:  Well, they're actually unsworn.

1      MR. LUEKE:  That is not the original agreement that

2  was ratified by the union membership as part of that -- as part

3  of the restructuring agreement.  There was a vote being held.

4  This was representative addendum that there would be 110

5  positions offered available at the Kokomo plant up on shutdown

6  and the ratification of this restructuring agreement.  So if

7  that ratification process would be considered null and void

8  because the original agreement, the 96 transfer that was

9  represented here to the skilled trades committee, as well as to

10  the shop chairman, Scott Weber (ph), was for 110 people total,

11  25 of which would be skilled trades, and the operative

12  agreement, included all that.  It didn't just say two

13  pipefitters.  That's utterly ridiculous and a misrepresentation

14  there by Delphi and its attorneys.

15      As I even pointed last time they tried to come to

16  court with an unsigned, undated document and pass that off as

17  the operative agreement that's --

18      THE COURT:  All right.

19      MR. LUEKE:  -- fraud on the Court, Your Honor.

20      THE COURT:  All right.  But I've reviewed what you've

21  submitted, and as I understand it, that includes several

22  unsworn declarations by employees who state that that was their

23  understanding, consistent with your understanding.

24      And secondly, minutes of a meeting with

25  representatives and affected employees, but I guess in my mind,

Page 41

1   the agreement of the UAW to acknowledge that this document was,

2   in fact, their contract with the debtors overrides that.

3          MR. LUEKE:  That's not true.  That's ex post facto and

4   it doesn't include, where are those other people that

5   transferred?

6          THE COURT:  But they're the union.  They're your union

7   and they're doing this.  You may have some right against them.

8          MR. LUEKE:  It should be --

9          THE COURT:  You may have some right against them.  You

10  may have some right against the union, but they're saying, this

11  was our agreement, and you know, they're --

12         MR. LUEKE:  That is not the agreement.  Furthermore,

13  this statement is undated on the top, if you look at the

14  memorandum of understanding entered into blank date of blank.

15  There is no date on top.  That means to pass off an undated --

16  this is not the contract I saw, Your Honor.  This is -- the

17  contract I saw was officially dated and signed, and I think it

18  was signed by different parties as well.

19         THE COURT:  But the agreement entered into in

20  September by the union --

21         MR. LUEKE:  That's post facto three years later,

22  you're going to go back.  You're going to take something three

23  years later and then apply it to something that happened three

24  years ago?

25         THE COURT:  Well, if both sides --

1          MR. LUEKE:  That's not even in the court record, Your

2     Honor.

3          THE COURT:  If both sides agree to it, I think I would

4     and I think I will.

5          MR. LUEKE:  Well, I don't believe that the

6     jurisdiction of Dennis Kazinsky (ph) was the person that signed

7     the original agreement.  So we have a question of material fact

8     on the original agreement.

9          THE COURT:  I don't believe --

10         MR. LUEKE:  Either that's the original agreement or

11    not.

12         THE COURT:  -- that's the case given the

13    acknowledgement by the UAW.  And on that basis, I'll grant the

14    --

15         MR. LUEKE:  You're going to grant the objection?

16    That's fraud with that kind of agreement.  I'm sorry.

17         THE COURT:  Well, I don't believe it's fraud.  If you

18    believe the union has defrauded you, you have a right against

19    the union.  But they're your authorized representative and

20    they've taken this position.

21         MR. LUEKE:  What about a stipulation, Your Honor, to

22    hold GM for that grievance?

23         THE COURT:  Well, that's a separate issue.  You have

24    your rights against GM under the agreement.  Again, the union

25    can -- let me finish, sir.  I've given you a lot of leeway

Page 43

1    because you're pro se, but that does not give you the right to

2    interrupt you.

3              MR. LUEKE:  Okay.  I'm sorry.  Go ahead, Your Honor.

4              THE COURT:  You've got a right through the union to

5    pursue grievances against GM, based upon its apparent

6    assumption of obligations.  You can pursue those if you wish.

7    But as far as the debtor is concerned --

8              MR. LUEKE:  Uh-huh.

9              THE COURT:  -- I am satisfied with the acknowledgement

10   by the union, in essence, you're seeking to enforce the union

11   agreement --

12             MR. LUEKE:  Okay.

13             THE COURT:  -- it was an agreement that the union has

14   acknowledged is in the form that the debtors have also said it

15   is.

16             MR. LUEKE:  I'd like to --

17             THE COURT:  Now, if you think the union is somewhat

18   letting you down on this, you may have rights against the

19   union.  But these are the two parties to the agreement, and

20   they both say, this is what we agreed to.

21             MR. LUEKE:  Okay.  That's fine.  But I'd like to get

22   confirmation on those signatures, because I tried to get ahold

23   of that Dennis Kasinksy and he would not return my phone calls.

24             THE COURT:  Well --

25             MR. LUEKE:  And I'm not aware that that may or may not

Page 44

1    be --

2            THE COURT:  If --

3            MR. LUEKE:  -- his valid signature.

4            THE COURT:  If it is not, then you have a very clear

5    right to come back and seek relief from me.

6            MR. LYONS:  And, Your Honor, to that point, we did

7    follow-up after Mr. Lueke had raised a question as to his

8    authority, and I have an e-mail from the in-house counsel of

9    the UAW that he is not retired, and that he had full authority

10   to sign the document, which I'd be happy to hand up and make

11   part of the record.

12           THE COURT:  All right.  And does --

13           MR. LUEKE:  I tried to contact him and he would not

14   return my phone call.

15           THE COURT:  Mr. Lyons, why don't you send a copy of

16   that document to Mr. Lueke.

17           MR. LYONS:  We will.

18           MR. LUEKE:  Can you get him to swear under the penalty

19   of perjury that that's his signature and that's the full --

20           THE COURT:  Well, he's an attorney --

21           MR. LUEKE:  -- operative agreement?

22           THE COURT:  -- for the UAW, it's being represented to

23   the Court by an attorney for the UAW that, in fact, his client

24   was authorized to sign this on behalf of the UAW.  You're going

25   to have a copy of it sent to you.  That's sufficient for me.

Page 45

1          MR. LUEKE:  I'm saying that's just not the full

2    operative agreement, that's a --

3          THE COURT:  Well --

4          MR. LUEKE:  -- partial operative agreement.

5          THE COURT:  I understand.  But the party to the

6    agreement is disagreeing with you, both parties.  So on that

7    basis --

8          MR. LUEKE:  Well, then you can have them sign a

9    signature saying that's all they're taking is two pipefitters,

10   and you're denying Lueke's contractual rights --

11         THE COURT:  He's already --

12         MR. LUEKE:  -- against the UAW and that --

13         THE COURT:  The effect of what's being submitted does

14   that.  And again, the debtors will mail you the follow-up

15   letter on authorization.

16         MR. LUEKE:  So you have a signed -- all's I want to do

17   is get verification that that signature's correct, that that --

18   because like I said, I was not able to verify that from Dennis

19   Kazinsky himself, because he was not returning phone calls.

20         THE COURT:  You can follow-up with his lawyer, the in-

21   house lawyer for the UAW.

22         MR. LUEKE:  Well, I think that should be presented to

23   the Court and that should --

24         THE COURT:  It is being presented to the Court.  It's

25   a representation by a lawyer, who will get into enormous

Page 46

1    trouble if it's wrong, that his client was authorized to sign

2    it on behalf of the UAW.

3              MR. LUEKE:  Uh-huh.

4              THE COURT:  It's represented to me, as well as being

5    represented by the lawyers for the debtors.

6              MR. LUEKE:  It's not the full contract --

7              THE COURT:  Well, I'm sorry.

8              MR. LUEKE:  -- in ex parte.

9              THE COURT:  I've already found that it is based on

10   that agreement.  So we're going over old ground on that.  So

11   I'm going to have to move on at this point, but the debtors

12   should --

13             MR. LUEKE:  Well, if you can send that out about

14   verification or have it verified to the Court that's his

15   signature and that that's the full operative agreement, you

16   know, I have nothing to stand on.  I know this is a hack job,

17   you know.

18             THE COURT:  Well, all right, very well.  So the debtor

19   should submit an order on that point.

20             MR. LUEKE:  So the debtor -- that's it, I guess.

21             THE COURT:  Yes.

22             MR. LUEKE:  Okay.  Well, I appreciate your time there,

23   Judge Drain.

24             THE COURT:  Okay.  And again, this relief simply

25   affects the claim against the debtors.

Page 47

1          MR. LUEKE:  And can -- and I can submit a claim,

2     though, against General Motors or keep pushing it?

3          THE COURT:  That's up to you.  That's why I said this

4     just affects the claim against the debtors.

5          MR. LUEKE:  Okay.  You know I've been up against the

6     wall on this for so long because the UAW is trying to deny my

7     grievances as well, so.

8          THE COURT:  Okay.  All right.  Very well.

9          MR. LUEKE:  Okay.  Well, yeah, I know they sent all

10    the jobs out of the country here with the Delphi agreement.

11    But all right, have you a good day, Your Honor, and thanks for

12    the counsel there for Delphi.  You guys have a good day as

13    well.

14         THE COURT:  Okay.

15         MR. LUEKE:  Okay.  Bye.

16         MR. LYONS:  Item number 11, Your Honor, on the agenda

17    is the claim objection of Randy Austin.

18         Your Honor, this relates to a claim for allegedly

19    denied relocation services.

20         THE COURT:  Right.

21         MR. LYONS:  It has an awful lot of information in the

22    file, given the amount of the claim.  This is an evidentiary

23    hearing.  We did try to take some discovery from Mr. Austin to

24    get clarity, particular on what damages he alleged to have

25    suffered as a result of the denial of the relocation services.

Page 48

1          But at a threshold matter, in order to get relocation

2     services, you had to contact the relocation company within 60

3     days of your termination, and there is no evidence that he did

4     that within the 60 days.  There's some ambiguity in the

5     documents that he submitted.

6          THE COURT:  And the evidence that he did it outside of

7     the 60 days is based on what?  That it was on July 17th.

8     That's based on a declaration by the out-placement people?

9          MR. LYONS:  Well, Mr. Oneier (ph) who investigated the

10    claim pursuant to his role --

11         THE COURT:  Right.

12         MR. LYONS:  -- as claims administrator.

13         THE COURT:  But where do they come from?  I mean, how

14    did he know that it wasn't?

15         MR. LYONS:  Well and this is again, it's part of the

16    record.  He sent an e-mail to the company on July 17th, and I

17    guess he was speaking with a friend --

18         THE COURT:  Okay.

19         MR. LYONS:  -- who mentioned these relocation

20    services.

21         THE COURT:  So it's based on that e-mail and the

22    inference that until that point, he didn't do anything because

23    of the nature of the e-mail.

24         MR. LYONS:  I think a pretty clear inference could be

25    drawn from that e-mail, yes.

Page 49

1        THE COURT:  Okay.  It's not even clear whether he did

2   contact anyone there, when he actually contacted the out-

3   placement people.

4        MR. LYONS:  There's no evidence of that.  I mean, he

5   says he heard back from the person, but there's no written

6   documents that affect --

7        THE COURT:  And his response just basically says

8   around July.

9        MR. LYONS:  Yeah.  He never really comes out and says

10  he contacted us within the 60 days.

11       THE COURT:  Right.

12       MR. LYONS:  And then also just the other point is the

13  damages.  I mean, you know, we were trying to get itemized

14  detail, and you know, we understand he's pro se, so we gave him

15  the great latitude and -- but we just wanted precision.  I

16  mean, what -- how was he damaged, and he came up with a list of

17  college tuition and some other items, and we wanted them

18  itemized, we wanted proof of payment so we could see if they

19  even fell within the scope of a potential relocation services

20  claim.  And, Your Honor, there really was no kind of detail at

21  all.

22       THE COURT:  All right.  And, Mr. Austin, you're not on

23  the phone, right?  There's no one on the phone on his behalf?

24  No.  And he's not here.

25       In light of that, and in light of the Unrue (ph)

Page 50

1   declaration, as clarified on the record, I will grant the

2   objection.  Mr. Austin's request was untimely and further, he

3   has not established that he actually has a monetary claim.  The

4   debtors aren't providing out-placement services at this point,

5   right?

6            MR. LYONS:  No.

7            THE COURT:  No?  So there's no way to fix it.

8            MR. LYONS:  No.  And it --

9            THE COURT:  So it really is a monetary claim and there

10   is no monetary claim at this point?

11            MR. LYONS:  Right.  And it is really a firm policy

12   that the company has, that it has to be within 60 days.  I

13   mean, they obviously are administering this program --

14            THE COURT:  Okay.

15            MR. LYONS:  -- to, you know --

16            THE COURT:  Well, I'm just saying this is an

17   alternative basis.  I've already found the 60 days doesn't

18   apply, but separately and apart from that, I don't see any

19   damages here.

20            MR. LYONS:  Very good.

21            THE COURT:  Okay.

22            MR. LYONS:  Your Honor, I'd like to turn over the

23   podium to my partner, Ken Berlin, to deal with a number of

24   environmental claim objections.

25            THE COURT:  Okay.

Page 51

1          MR. BERLIN:  Good morning, Your Honor.  I'm Ken Berlin

2    representing the reorganized debtor.

3          There is a series of claims relating to two different

4    super fund sites that are before the Court today.  One set of

5    claims relates to the date and super fund site.  The claimants

6    are jointly called in the briefs, the ITW claimants and that's

7    how I'll refer to them today.

8          There are a second set of claims that relate to the

9    Tremont Land Fill and Barrel Site.  The ITW claimants

10   originally filed an objection to -- a response to our objection

11   to the claim.  They have since, however, withdrawn the claim.

12   We obviously don't -- we don't object to that and we would like

13   to see that claim withdrawn.

14          THE COURT:  Okay.  I know that the parties sometimes

15   use other terms for these sites.  Is it fair to just say this

16   is the date and site we're talking about at this point?

17          MS. MAYHEW:  Yes, that would be correct, Your Honor.

18          THE COURT:  Okay.  Fine.

19          MS. MAYHEW:  Kristin Mayhew-Macleroy, Deutsch,

20   Mulvaney & Carpenter on behalf of Illinois Tool Works and ITW

21   Food Equipment Group.

22          THE COURT:  Okay.

23          MS. MAYHEW:  Thank you.

24          THE COURT:  Good morning.

25          MR. BERLIN:  On Tuesday, two other parties to the

Page 52

1    Tremont sites, Peerless (ph) and Madriver (ph) did, in fact,

2    respond to our objection and they did file a response, in which

3    they basically incorporated the briefs that are filed in the

4    Dayton claim.  So I guess their claim is still live.  They

5    raised the same issues, and I thought I would argue both of

6    them at the same time.

7            THE COURT:  Okay.

8            MR. BERLIN:  Your Honor, let me start off by just

9    giving a brief introduction about the Dayton site, talk a

10   little bit about the super funds statute and talk about the

11   environmental matters agreement.

12           The Dayton super fund site is a site that stopped

13   operation in 1996.  There's no dispute about that.  We have

14   documents in the record from EPA, wherein EPA said the site

15   stopped operation in 1996.  The ITW claimants have been doing a

16   great deal of work at the site for many, many years.  They have

17   not filed any documents or really made -- or really even argued

18   that the site closed after that.

19           The consequence to that is that the hazardous waste

20   that was sent to the site was sent by General Motors before the

21   spin off of Delphi.  Under the super fund statute, General

22   Motors is responsible for clean-up at that site.

23           And as Your Honor knows, once you touch a super fund

24   site, you remain liable on that site really permanently, I

25   guess, their bankruptcy could affect that, but they remain

1   liable at the site, at least until the bankruptcy.  There was

2   nothing we could do in an agreement, or they could do in

3   agreement with Delphi that transfers that liability away from

4   General Motors to Delphi.  As a matter of law, with respect to

5   third parties, they remain liable at that site permanently.

6        In contrast, Delphi never sent any waste to the site.

7   It only was spun off after 1996, and under the super fund

8   statute, Delphi has no liability for clean-up at that site

9   under the statute.  It did not send waste.  It was formed after

10   the site was -- after the spin-off.

11        So General Motors has liability for the site under the

12   super fund.  Delphi has no liability.

13        In the environmental matters agreement, what Delphi

14   did is could not release General Motors from liability at the

15   site.  Essentially, what it did in the environmental matters

16   agreement was agree to satisfy the obligations of General

17   Motors at the site, at least as long as the environmental

18   matters agreement was in effect, and that agreement was

19   terminated as part of the MDA and the plan of reorganization,

20   and I'll talk about the legal implications of that.

21        Based on that set of facts, Your Honor, let me turn to

22   legal arguments that are made about Delphi's liability, and

23   they fit into two categories, successful liability and

24   assumption of liability, although assumption of liability, I

25   guess the category is successor.

1         The first argument that the ITW claimants make is that

2    there was, in fact, a de facto merger here when the spin off

3    took place.  And if Your Honor looks at the brief, there's a

4    lot of discussion, a choice of law issues, whether Delaware law

5    should apply or higher law should apply, or whether a federal

6    -- there should be a common federal standard at the sites.

7         We argue Delaware law based on a Southern District

8    case that says successful liability is governed by the law of

9    the state of incorporation of the party, but -- and, in fact,

10   the ITW claimants don't contest that a Delaware law applies, at

11   least they haven't submitted a brief, any briefing on it that

12   there would not be a de facto merger here.

13        But it doesn't matter, Your Honor, which law applies.

14   Because under Delaware law, under Ohio law, and under the

15   federal cases that are cited by ITW, there is one factor in

16   these cases that cannot be met by the ITW claimants.  And that

17   factor is, there has to be a dissolution of the company that

18   sold the assets.

19        That did not happen here.  General Motors is still in

20   existence and therefore, they can't prevail.  Under Ohio law,

21   which they argue, we cite an Ohio Supreme Court case, an Ohio

22   Court of Appeals case, the first was Welko (ph), the second one

23   was Texlon (ph), and a Third Circuit case applying Ohio law,

24   all of which say that they need, under Ohio law, a dissolution

25   of the company that transferred the assets.

1          In the Welko case, they say no de facto merger when

2     selling corporation continues to exist after the sale of one of

3     the divisions, even if the selling corporation no longer

4     conducts the same operation of the division.  And the Texlon

5     case says the de facto merger presupposes that the predecessor

6     corporation no longer exists.  In the federal cases they cite,

7     although they don't try and develop a federal standard, also

8     has that same factor there.

9          So on this ground, common throughout, any choice of

10    law that's made, a de facto merger doesn't apply, and that

11    makes sense.  There certainly was no -- nothing that anyone

12    would think of as a merger in this case.

13         They tried to make two arguments to respond to that in

14    their brief.  One is, it should be a relaxed standard because

15    this is a tort case, aside from the fact that we dispute

16    whether this was a tort case, a clean-up case, the Ohio law is

17    clear that there is no relaxed standard in tort cases in Ohio.

18         We cite the Flagra (ph) case and we also cite the

19    Welko case.  They cited it too, but what the Welko case

20    basically says that we're not going to allow that in these

21    cases because it would have too big a chilling effect on

22    mergers and acquisitions in the State of Ohio.

23         They also try and argue that you don't have to meet

24    all of the elements of a test for a de facto merger under the

25    super fund statute released in this case, but again, all of the

DPH HOLDINGS CORP., ET AL.

Page 56

1   cases I cite in Ohio say this is a factor that has to be met.

2        The only time that they -- the one case they cite

3   under that Ficite (ph) case, says that if, in fact, there is a

4   dissolution of a company, we're not going to let you out of the

5   de facto merger doctrine, just because one of the tests, the

6   asset fasak (ph) transaction is not met, because there, in

7   fact, has been a real dissolution of the company there.

8        When we turn to the mere continuation prong on this,

9   the second test, we have the exact same situation as we do in

10  the de facto merger.  There, the Ohio courts say that there has

11  to be only one company left after the transaction takes place.

12  We cite three cases, Travis, Magore (ph) and Cytec (ph), all of

13  which say that that is required.  And in the Preklow -- the

14  Perko (ph) case, the case that they cite, that case says as a

15  prerequisite all was -- substantially all of the assets of the

16  company have to be transferred or there has to be a sham (ph)

17  transaction.  Neither of those took place in this case, so we

18  don't think there's a basis for that.

19       Again, the only real response that the ITW claimants

20  make, is that the Perko factor is ownership in these cases.  If

21  there's the same ownership at the end, there is a mere

22  continuation of the company.  But all of those ownership cases

23  also pre-suppose that only one company is left after all the

24  assets have been transferred, if you look at the facts on that.

25  In any event, here, there is no continuation of ownership.  The

DPH HOLDINGS CORP., ET AL.

Page 57

1    agreement provided that the stock would be distributed.  It

2    took a few months to do that, but that was also the case with

3    Perko, the case that they rely on.

4         The third argument they make is an assumption of

5    liabilities argument, basically saying that once we signed the

6    environmental matters agreement, we assumed the liabilities of

7    General Motors.

8         Again, we have now canceled that agreement or

9    terminated the agreement.  The result of that termination is

10   that our agreement with General Motors to satisfy their

11   liabilities is gone, and now General Motors again remains

12   responsible for all the liabilities at the site, as they have

13   been, as a matter of law, throughout the entire period,

14   including the period of this agreement.

15        The ITW claimants are not third party beneficiaries of

16   the -- of this agreement.  They don't meet the tests.  They

17   need to meet that.  Two of the tests that aren't met are that a

18   material purpose of the agreement between General Motors and

19   Delphi would've had to be to protect their interest in this

20   case.  It actually had nothing to do with the agreement as we

21   negotiated at the time.  The purpose of that agreement was to

22   allocate various clean-up liabilities between Delphi and

23   General Motors.  General Motors agreed to take all known

24   liabilities at these super fund sites.  We agreed to take

25   unknown liabilities at the time at these sites.  And there's a

1    requirement that the agreement --

2              THE COURT:  I'm sorry.  Before we --

3              MR. BERLIN:  Sure, sure.

4              THE COURT:  -- go on to the second reason there, I

5    struggle with this a little bit.  Is your argument that it's --

6    the fact that it's an allocation agreement means that it's not

7    a material purpose to protect other contributing parties, based

8    upon the fact that GM is still liable, and is just an

9    allocation as between GM and Delphi?

10             MR. BERLIN:  Yes.  I mean, in other words, the --

11   there's no purpose -- the third parties do not -- they don't

12   really benefit from that in a sense.  GM has always been liable

13   under this agreement, as a matter of law to them, it stays

14   liable.  All we've really agreed under this is to step in and

15   satisfy GM's liabilities.  But that agreement's now been

16   canceled, so the liabilities go back to GM.

17             They have the rights against GM.  What they want is

18   the right essentially to go against two parties for the same

19   liability.  Because they have the right against GM, they have

20   the right against us.  If they were third party beneficiaries,

21   maybe, but this agreement was not done.  We did not even know

22   when we signed this agreement that they existed.  I mean, this

23   agreement only covered unknown sites at the time.

24             THE COURT:  But I guess that's -- that was maybe what

25   gave me pause.  It would seem to me that I don't see how that's

Page 59

1    relevant.  I mean, it would seem to me, in some respects, it

2    cuts against you, because you were allocating, you know,

3    rationally that the new buyer would take over things that were

4    unknown at the time, because that was the new buyer's risk.

5    You know, it had performed its due diligence, and it didn't

6    think there was anything there, but if there was something

7    there, it wasn't a new buyer, the transferee, but if Delphi

8    thought there was -- but if Delphi didn't think there was

9    anything there, then it should take the risk if there was

10   something there.

11        But again, to me, it all comes down to the primary

12   purpose.  Your argument really seems to hold weight if it does

13   at all, because it's the primary purpose of the agreement or

14   the only purpose of the agreement was to allocate as between

15   the parties, or shift the risk as between the parties.

16        MR. BERLIN:  Right.  And I think that's correct, Your

17   Honor.  Again, GM was shifting the risk to us on these unknown

18   sites.  They agreed to take that risk back when the

19   environmental matters agreement was canceled.  They remained

20   responsible.  But throughout this whole time period, even

21   though they shifted the risk to us, it was really only to us as

22   to private parties, because GM still remained liable to the ITW

23   claimants throughout this time period.  They could've sued GM

24   at that time period, as a legal matter, they would've had full

25   rights to recover against GM during this time period.

Page 60

1          THE COURT:  And I guess that raises my other question.

2     They -- the claimants assert that their claims arise during

3     this time period, because they've had to spend money during the

4     period where the EMA was in effect.  Is it your position that

5     under CERCLA they're not covered?

6          MR. BERLIN:  They have no rights against us under the

7     circumstances.

8          THE COURT:  So --

9          MR. BERLIN:  They have rights against General Motors.

10         THE COURT:  So this would -- so the only right you're

11    acknowledging here, because of the EMA, would be a right if

12    they were an intended third party beneficiary?

13         MR. BERLIN:  That's correct.

14         THE COURT:  And so that's based on state law, third

15    party beneficiary law, not based on CERCLA?

16         MR. BERLIN:  Right.  It's not based on CERCLA.  From

17    our standpoint, we have no liability under CERCLA.  The only

18    liability that we would have is a contractual liability that we

19    would have to -- this party is a contractual liability.  Has no

20    liability under CERLA.

21         There are four tests under CERCLA.  We would have had

22    to have arranged for the transportation of the waste, we didn't

23    do that.  We'd have to be the owner operator of the site at the

24    time of the release, we weren't.  We have to be the current

25    owner operator of the site at the time, we would've had to have

Page 61

1    transport the waste.  We never did any of those.  There is no

2    liability to us under CERCLA.

3            You know, essentially, this -- the other way to look

4    at it is it's equivalent of an indemnity agreement to General

5    Motors as part of this.  We took over their liability, even

6    though they continue -- we've agreed to pay their liability,

7    even though they continue to be liable under CERLCA --

8            THE COURT:  All right.

9            MR. BERLIN:  -- and we were not liable.

10           THE COURT:  There's -- neither side, I think, cites

11   any case where the parties to indemnification agreement or

12   contribution agreement, a private agreement like this

13   terminated the agreement, and someone tried to enforce it in an

14   environmental context, right.  I didn't see those cites.

15           MR. BERLIN:  I think we could find anything that was

16   really directly on point.

17           THE COURT:  I mean, it's unusual for it to happen.

18   Normally, someone's in GM's position would never terminate it.

19           MR. BERLIN:  Right.

20           THE COURT:  They had other reasons to terminate it.

21           MR. BERLIN:  Right, right.

22           THE COURT:  Okay.

23           MR. BERLIN:  Yes.  We could not find a relevant case

24   that was directly on point to what we're talking about here.

25           THE COURT:  Okay.

Page 62

1            MR. BERLIN:  So I think that --

2            THE COURT:  Except general third party beneficiary law

3    cases?

4            MR. BERLIN:  Right.  Except general third party

5    beneficiary law, which again is supportive.  And in a third

6    party beneficiary law is that the agreement has to be intended

7    to benefit the specific party.

8            Yeah, and in fact, the EMA also, Your Honor, has

9    specific -- has a specific statement and in paragraph 9.1.6, no

10   rights are created in any third party by this agreement.  So we

11   not only have the law of the state, we also have specific

12   language in the agreement, that no third party beneficiary

13   rights were being created.  This was just an allocation of risk

14   between the two parties.

15           THE COURT:  Okay.

16   ***01:22:44***

17           MR. BERLIN:  Just one second, Your Honor, I'm sorry.

18   (Pause)

19           MR. BERLIN:  Your Honor, it just was pointed out to me

20   that you enforced a no third party clause in the Light Source

21   (ph) matter in this case.

22           THE COURT:  That wasn't an environmental thing,

23   though, right?

24           MR. BERLIN:  That was not an environmental point.

25           THE COURT:  I mean it -- as I said, I'm not -- I

1  couldn't find or we couldn't find any cases in this context

2  either.  But it didn't seem -- maybe you can address this.  It

3  didn't seem to me that liability would exist under CERCLA based

4  on the EMA.

5          MR. BERLIN:  Right.

6          THE COURT:  And if there were -- I mean, I'm just

7  telling you to do it when you speak later, but that, you know,

8  if the agreement were worded appropriately or I found the facts

9  to be appropriate, there might be liability under contract law

10  principles or third party beneficiary law principles, so.

11          MS. MAYHEW:  Your Honor, would you like me to address

12  that now?

13          THE COURT:  No, no, just make a note.

14          MS. MAYHEW:  Okay.

15          THE COURT:  Okay.

16          MS. MAYHEW:  Thank you.

17          MR. BERLIN:  Okay.  And, Your Honor, the ITW claimants

18  also make a number of cases that really again relate on the

19  assumption of liabilities that relate to CERCLA.  You can't

20  dispossess the parties of their rights under CERCLA.  We agree

21  with that, but the party that can't be dispossessed the --

22  their rights were GM and not against us under CERCLA.

23          THE COURT:  You can't contract out of CERCLA.

24          MR. BERLIN:  Right.  We cannot contract --

25          THE COURT:  But you said you can contract in to --

1        MR. BERLIN:  Right.

2        THE COURT:  -- liability, but it's not under CERCLA.

3        MR. BERLIN:  That's correct.

4        THE COURT:  Okay.

5        MR. BERLIN:  Finally, Your Honor, the last argument

6   I'd like to make very briefly is the 502(e)(1)(B) argument, you

7   don't have to reach that obviously if you rule for us on the

8   first three on the issue of successful liability, on assumption

9   of liability.  But if you ruled against us, we can see that

10  there are some expenses that ITW has already paid, and

11  therefore, are not contingent, and therefore, they're not

12  subject to 502(e)(1)(B).  But any future expenses that are due

13  are, in fact, contingent expenses.

14        The EPA has filed a claim in this case against us

15  between 20 and 50 million dollars, seeking the same relief that

16  ITW would be seeking in this case.  And they cite three or four

17  cases to support their position on this, but all the cases

18  except for one do not involve a situation where there was a

19  claim by the government at the same time, seeking to recover

20  the same money.

21        They do cite a case, the Allegheny case outside the

22  circuit that did, in fact, looked at CERCLA and said, well,

23  this is really direct claim under CERCLA and not a contribution

24  claim.  So 502(e)(1)(B) doesn't apply, but that was criticized

25  in the In re: Drexel Burnam (ph) case in the circuit on the

Page 65

1    ground that 502(e)(1)(B) is not limited to contribution claim.

2    It's contribution or reimbursement claims and what's happening

3    here, the government is seeking recovery for the same funds

4    that the ITW claimants are seeking in that case.

5         I'm not sure whether ITW is even maintaining the

6    argument on contingent claims, but the contingent claims that

7    have not yet been paid are ones that should be barred by

8    502(e)(1)(B).  Thank you, Your Honor.

9         THE COURT:  Okay.  I mean, I guess 9613(f) does say,

10   may seek contribution.

11        MR. BERLIN:  I'm sorry?

12        THE COURT:  9 CERCLA, 42 USC 9613(f) says, any person

13   may seek contribution from any other person who's potentially

14   liable.  Your argument -- it's not only a reimbursement right.

15        MR. BERLIN:  Right.  Well, there are two sections of

16   CERCLA, one allows contribution and one allows direct claim.  I

17   actually don't think they're contesting that under the

18   contribution provisions --

19        THE COURT:  Okay.

20        MR. BERLIN:  -- the 502 language would apply.

21        THE COURT:  All right.

22        MR. BERLIN:  What they're saying is on direct

23   liability provisions, it should apply and we agree that if

24   they, in fact, spent money and it's not contingent, then it

25   doesn't apply.  But where they haven't spent money, it's

Page 66

1   contingent and the government is seeking to recover funds for

2   the exact same issue.  The fact that it's a direct claim should

3   be irrelevant, because it's a reimbursement claim.

4            THE COURT:  Okay.

5            MR. BERLIN:  Thank you.

6            THE COURT:  All right.  Well, I'm sorry, is it your

7   view then that -- well, I guess what you're saying then is if

8   the -- if DPH settled the EPA claim for, you know, some

9   relatively small amount, is that settlement then binding on the

10  ITW claimants for the amounts that they haven't yet incurred

11  out of pocket?

12           MR. BERLIN:  The -- usually the way -- you know,

13  because you really --

14           THE COURT:  Or would you have to have a contribution?

15  I'm just trying -- a contribution bar or --

16           MR. BERLIN:  Yeah.

17           THE COURT:  -- I'm just trying to think through that

18  issue.

19           MR. BERLIN:  I'm not sure the typical EPA settlement,

20  when they settle the contribution claim protects the CERCLAs

21  from any other claims by any other parties.  It's not quite as

22  clear yet how that works on these direct claims, because this

23  direct claim law is very recent.  It's just arisen in the last

24  year or two in these cases.

25           THE COURT:  Okay.

Page 67

1         MR. BERLIN:  So I'm not entirely sure how that would

2    work out.

3         THE COURT:  Okay.

4         MR. BERLIN:  But the claim is out there right now and

5    it's a contingent claim.  We don't know how it's going to be

6    resolved, but that's why you have that protection in 502, is

7    because you have to deal with these contingent claims now, and

8    it's contingent.

9         THE COURT:  Okay.

10        MR. BERLIN:  Thank you.

11        THE COURT:  Thank you.

12        MS. MAYHEW:  Good morning, Your Honor.

13        THE COURT:  Morning.

14        MS. MAYHEW:  Your Honor, ITW submits that the debtors

15   are liable under CERCLA for its direct cost associated with the

16   clean-up at the site for two separate reasons.

17        First of all, Delphi may have contributed waste

18   directly to the site and is a PRP, and secondly, Delphi has

19   successor liability for the waste contributing to the site by

20   GM.

21        ITW has made sufficient allegations substantiating its

22   prima facie claims necessary to withstand the debtor's

23   objections at this juncture.  As this Court is well aware, the

24   sufficiency hearing is to be treated as a 12(b)(6) motion, and

25   the claim should only be dismissed if ITW can prove no set of

Page 68

1   facts needed to establish its claims.  ITW can and will

2   establish these facts necessary to prove its claims.

3         It's premature to dismiss the claims at this juncture

4   without giving ITW to do additional discovery that may be

5   needed to flush out certain of the successor liability claims.

6         THE COURT:  Well, on the -- I read the response to the

7   debtor's last filing, and I guess the issue I have is what is

8   there in the claim beyond simply setting forth the elements,

9   the statutory elements of -- from CERCLA to suggest that Delphi

10  was actually an owner operator of the site when -- the site

11  that is at issue here, when the site was still operating, and

12  therefore, there might still be contamination costs, as opposed

13  to Delphi being a successor after the fact.

14        MS. MAYHEW:  Well, Your Honor, there are documents

15  that were attached to the debtor's pleading that demonstrate,

16  that appear to demonstrate that the -- that Delphi was not

17  organized or was not created pursuant to the divestiture until

18  1998, I believe it was.

19        However, in their most recent pleading, they attach

20  documents from a website that have not been authenticated.  We

21  don't know exactly what they demonstrate, and they don't

22  clearly say that the facility was closed in 1996.  They make

23  some reference to the fact that things occurred from 1941 to

24  1996, but there is -- the question remains as to whether or not

25  they did dispose of any waste at that site.  And the EPA, in

1    its proof of claim, and pursuant to its special notice letter

2    in December of 2005, have identified Delphi has a PRP, and are

3    asserting CERCLA liability against us.

4            THE COURT:  But what --

5            MS. MAYHEW:  So those are factual questions that need

6    to be resolved.

7            THE COURT:  But what facts have you -- I haven't seen

8    any facts that you've asserted that Delphi fell within any of

9    the four -- except the issue on successor liability.

10           MS. MAYHEW:  Well, it may be that they have

11   transported waste while they --

12           THE COURT:  But how --

13           MS. MAYHEW:  -- operated.  But we don't know whether

14   or not that's true.

15           THE COURT:  But is that enough to have a -- I mean,

16   aren't you just stating the terms of the statute?

17           MS. MAYHEW:  Yes, that is correct.

18           THE COURT:  So then you're forcing --

19           MS. MAYHEW:  But --

20           THE COURT:  -- them to prove a negative.  I mean,

21   you're basically saying, prove that you're not covered by

22   CERCLA.

23           MS. MAYHEW:  Well, I think they would have to -- the

24   EPA is asserting its claim that they do have CERCLA liability

25   and unless they down the road are able to demonstrate --

1          THE COURT:  But they may be -- they may -- I mean, is

2     there any fact in their claim other than successor liability

3     obligations?  I mean, I understand that this is a sufficiency

4     hearing, but I think you have some obligation to prove -- not

5     to prove, to assert some fact other than just reciting the

6     statute and saying that they violated the statute.

7          MS. MAYHEW:  And the fact that they've been named as a

8     PRP by the EPA and --

9          THE COURT:  But that --

10          MS. MAYHEW:  -- special notice letters were issued to

11    them for their contribution of waste to the site.

12          THE COURT:  But do those special notice letters refer

13    to any facts, as opposed to successor liability?

14          MS. MAYHEW:  To them specifically, I don't believe so.

15          THE COURT:  Okay.

16          MS. MAYHEW:  The special notice letters are issued to

17    all the PRPs --

18          THE COURT:  So I mean, if this -- I'm sorry, go ahead.

19          MS. MAYHEW:  No, go ahead.

20          THE COURT:  If this were a complaint and it was here

21    on a motion to dismiss, wouldn't this fall into the category of

22    a legal conclusion, because you're just reciting the statute,

23    you're not alleging any fact that would support -- I'm not

24    saying the fact has to be true, but you're --

25          MS. MAYHEW:  Sure.

Page 71

1          THE COURT:  -- not alleging any fact that would

2   support --

3          MS. MAYHEW:  In addition to the --

4          THE COURT:  -- falling within the four prongs, other

5   than successor liability, and we'll get to that.  I'm not

6   talking about successor --

7          MS. MAYHEW:  Right.

8          THE COURT:  -- liability here.  I'm talking about the

9   owner operator liability for, you know, actually causing the

10  problem or running the plant when there was a problem or, you

11  know, having to dispose of stuff when there was a problem.  I

12  just don't see that in the claim or any of the responses.

13         MS. MAYHEW:  I would say the fact that EPA is

14  asserting liability against them for this purpose, and that

15  through discovery we would establish and be able to determine

16  whether or not they did, in fact, dispose of waste.

17         THE COURT:  But I think the Supreme Court has

18  cautioned us that we, you know, there is a gatekeeper function

19  here, and you know, subjection in the discovery without having

20  any fact is, you know, a problem under Iqbal (ph) and you know,

21  the like.

22         MS. MAYHEW:  Right.  Other than the fact that they --

23         THE COURT:  This isn't a plausibility issue.  This is

24  basically the first step in the Iqbal analysis which is legal

25  conclusions, couched as factual allegations don't count.  And I

Page 72

1    think you're just basically saying that they fall within here

2    because they owned it at some point, and I'm not sure that's

3    enough.

4         MS. MAYHEW:  They -- well, we know that they owned the

5    facility that contributed waste to the site in 1998 and it

6    could very well --

7         THE COURT:  But there's -- no one has come out and

8    said in the proof of claim or subsequently, that they owned the

9    facility at a time when it was -- before it was shutdown.

10        MS. MAYHEW:  That is correct, Your Honor.

11        THE COURT:  And to me, I think that's necessary to get

12   into the facts on and enable you to take discovery on more than

13   that, on the PRP point.

14        MS. MAYHEW:  Understood.

15        THE COURT:  This has been going on for a while, too.

16   I have to assume that, you know, it's not like the -- you just

17   learned of this site a few days before the bar date.  I mean,

18   there's been time to develop the facts here by both the EPA and

19   the ITW, and both of this case and -- in connection with the

20   EPA claim.  I think you need more on that point.

21        So why don't we turn to successor liability and

22   assumption of liability.

23        MS. MAYHEW:  Okay.  Certainly, Your Honor.

24        One of the issues that needs to be addressed at the

25   outset is the choice of law.  The debtors have cited Sylvia Pan

1    Am (ph) for the proposition that Delaware law is the

2    appropriate law; however, that case does not involve successor

3    liability, and it appears that the more appropriate law to

4    apply would either be federal law governing CERCLA and

5    successor liability or Ohio claims.

6            It appears that the Second Circuit has not yet

7    addressed this issue, as to whether or not you need to apply

8    federal law in the context of successor liability, although

9    the --

10           THE COURT:  Well, for CERCLA purposes, right?

11           MS. MAYHEW:  For CERCLA purposes, that is correct.

12           THE COURT:  It certainly had other contexts.

13           MS. MAYHEW:  Yes, yes, but not with respect to CERCLA.

14   The Third Circuit, however, the rationale there is persuasive,

15   according to the Third Circuit, in order to prevent CERCLA's

16   goals of being invaded by states that unduly restrict successor

17   liability, it is appropriate to use federal law.

18           Alternatively, Your Honor, if the Court feels that

19   it's more appropriate to use state law and not adhere to

20   federal law, it is ITW's position that under New York's Lex

21   Lopi (ph) test, the Court should apply the law of the State of

22   Ohio, where the tort occurred.

23           The CERCLA violations did occur in Ohio, the waste was

24   disposed of in Ohio, the Delphi facilities are located in Ohio,

25   and the Ohio EPA has been involved in the clean-up of the site.

Page 74

1          THE COURT:  Well, in the briefing submitted by ITW,

2     there wasn't an express concession, but it seemed to me that

3     there was no focus on the underlying substantive law of either

4     Delaware or federal general law on successor liability.

5          Is it fair to me to assume that because of that, I

6     should infer that under federal law and Delaware law, that the

7     facts here preclude successor liability?

8          MS. MAYHEW:  No.  The facts do not preclude successor

9     liability under either of those laws as well.

10          THE COURT:  What -- why not?

11          MS. MAYHEW:  We did not brief those issues.  I, quite

12     frankly, did not believe that Delaware law would apply.

13     Federal law, because the Second Circuit has not yet ruled and

14     there's no binding authority on that issue, our focus was

15     really on the application of Ohio State law, to the issues of

16     successor liability.

17          THE COURT:  Okay.  Well, do you have any case law to

18     suggest that the fact that GM survived the spin off would

19     preclude -- I'm sorry, I think I'm saying a double negative

20     here.  Let me start over again.

21          Do you have any cases to show that notwithstanding the

22     fact that GM survived the spin off, that under either Delaware

23     law or federal law of -- as applied in the CERCLA context, that

24     Delphi would be liable as a successor?

25          MS. MAYHEW:  Your Honor, I do not have that standing

1    here today.  Certainly if Your Honor were to rule that Delaware

2    law is the appropriate law to apply, then we could certainly

3    brief that issue and provide you with the case law.

4         THE COURT:  Well, I mean, it has been briefed by the

5    debtors and they've cited cases that are pretty clear on this

6    issue, both under Delaware and federal law.  Why should I delay

7    further on that, unless you're able to give me something that

8    says something, you know, to the contrary?

9         MS. MAYHEW:  I don't have that right now, Your Honor.

10        THE COURT:  Okay.  All right.  Why under the New York

11   cases that deal with successor liability, if I don't apply

12   federal common law in the CERCLA context, would I turn to Ohio

13   law, as opposed to the law, the state of incorporation?

14        MS. MAYHEW:  I can --

15        THE COURT:  There are a lot of New York cases that say

16   when you're looking at successor liability, veil piercing, de

17   facto merger, you look to the state of incorporation.

18        MS. MAYHEW:  And I think those cases deal with

19   situations where you're dealing with a contract interpretation,

20   and you're not looking at them from a torts perspective or in

21   the context of CERCLA, where there is an injury, and I would

22   think that the state where the injury occurred is going to have

23   far more interest in making sure that the law is applied using

24   its laws, as opposed to an agreement.

25        If you're looking at what the parties agreed to, it

Page 76

1    may very well be that you look to the state of incorporation,

2    if you're interpreting a contract, but --

3            THE COURT:  But we're not interpreting a contract

4    here, are we?  We're trying to show whether in fact there's a

5    -- on an equitable basis, there should be a de facto merger or,

6    you know, a mere continuation or some form of successor

7    liability, right?  I mean --

8            MS. MAYHEW:  And that's why you would look to Ohio

9    where the injury occurred, because that state is going to have

10   the most interest in seeing that this issue is resolved in

11   accordance with its own laws.

12           THE COURT:  But generally speaking, the law of non-

13   contractual successor liability, where there's not an express

14   assumption of liability, isn't that focused on the conduct of

15   the two entities, the two corporations, vis a vis each other

16   and the use of their corporate form, and whether, in fact,

17   notwithstanding that the merger wasn't documented as of our --

18   it was in fact, or an equity, a merger.  And so you're looking

19   at not the wrong that was done to people because of it not

20   being treated as a merger, but whether it should be treated as

21   a merger in the first place.

22           In other words, you're not looking at underlying tort.

23   You're looking at the conduct of the corporations, and that to

24   me seems to be again, focusing on the law of the state of

25   incorporation, because the state of incorporation lays out and

Page 77

1    has a key interest, the key interest in when the limitation on

2    liability for a corporation will be disregarded.

3           MS. MAYHEW:  But wouldn't the result then be that

4    parties would be at liberty to choose those states when they're

5    setting up a transaction or a merger or a sale to go to those

6    states that may not be favorable to successor liability in

7    order to avoid certain torts down the road?

8           THE COURT:  Yes, to some extent.  I think that's

9    right.

10          MS. MAYHEW:  And so ITW's position would be that

11   parties should not be permitted to do that, to forum shop, and

12   select a state where it may be most favorable to successor

13   liability, and in fact, should look to the state where the harm

14   actually was occurred, and they are left addressing the issue.

15          THE COURT:  Okay.  All right.  So turning that to

16   Ohio, is there anything beyond the Cytec case that you can

17   point me to that would again answer in your client's favor my

18   earlier question, which is under the law of Ohio, could

19   successor -- I'm suing the term generically, successor

20   liability be found notwithstanding the fact that GM survived?

21          MS. MAYHEW:  That is the premier case that -- the

22   Southern District of Ohio case that we found that said that

23   under Ohio law, you're only required to look to the hallmarks

24   of whether or not a de facto merger occurred, but it is not the

25   critical issue as to whether or not there was a surviving

Page 78

```
 1    corporation after a sale.

 2          THE COURT:  Well, that's not what Cytec said.  It

 3    didn't say that -- maybe I misheard you.  Are you saying it's

 4    not critical that there was a surviving corporation?

 5          MS. MAYHEW:  I think that's one of the four elements

 6    that courts will look to determine whether or not there is a de

 7    facto merger.

 8          THE COURT:  Right.

 9          MS. MAYHEW:  But the Cytec court held that you did not

10    need to have all four of those elements, in order to

11    find --

12          THE COURT:  But the --

13          MS. MAYHEW:  -- that there could have been a de facto

14    merger.

15          THE COURT:  But the one that they said was not

16    necessary was not that point.

17          MS. MAYHEW:  That is correct, Your Honor.

18          THE COURT:  Right.

19          MS. MAYHEW:  Yes.

20          THE COURT:  Okay.  In that case, the creditors

21    would've been left holding the bag, because there was no

22    surviving other entity.

23          MS. MAYHEW:  Correct.

24          THE COURT:  Okay.

25          MS. MAYHEW:  Your Honor, with respect to the mere
```

DPH HOLDINGS CORP., ET AL.

1    continuation theory of successor liability, ITW submits that

2    Delphi is the mere continuation under -- because there is a

3    similarity of directors, a similarity of shareholders, and a

4    similarity of stock.

5         The debtor does rely on the Perko Limited versus Great

6    Lake Factors' case, and it is ITW's position that the debtors

7    misread that case.  That case actually is favorable to ITW, and

8    the Court there held that there was successor liability based

9    on a mere continuation theory, because the stock was held by

10   the same parties.

11        The -- had the buyer created an ESOP and had the stock

12   been transferred to the employees, then there would be no

13   successor liability, but in that case, they didn't transfer the

14   stock, and in fact, the Court held there was a mere

15   continuation of successor liability.

16        THE COURT:  Okay.  But again, the cases you're relying

17   on in this context are cases where -- tell me if I'm wrong.  I

18   mean, I don't think I am, but tell me if I'm wrong.  That

19   again, the -- unless the defendant was found to be a mere

20   continuation, then they'd be left -- that the creditors would

21   be left holding the bag, right?  There was no --

22        MS. MAYHEW:  I think the focus on the mere

23   continuation as distinguished from the de facto merger --

24        THE COURT:  Right.

25        MS. MAYHEW:  -- is whether or not there's an identity

DPH HOLDINGS CORP., ET AL.

Page 80

1    of ownership, are they the same corporate owners.  And our

2    position is that subsequently to the divestiture, GM still

3    retained an 80 percent stock ownership of Delphi, and

4    therefore, it is the same entity.

5           THE COURT:  Okay.

6           MS. MAYHEW:  Your Honor, turning to the third theory

7    of successor liability, which is whether or not Delphi assumed

8    GM's liabilities at the site.

9           It's undisputed that under the environmental matters

10   agreement, Delphi did agree to assume the environmental

11   liabilities associated with certain waste disposal sites,

12   including this site.

13          The debtors take the position that the assumption of

14   liability was negated by the master disposition agreement,

15   dated July 2009, and that that allegedly terminated that

16   agreement.  Your Honor, even if the termination were to be

17   given effect, ITW's claims predated that termination.  They

18   were filed in the bankruptcy case at least three years prior to

19   that, and actually existed well in advance of that.  Therefore,

20   the debtors are liable for the claims that arose before the

21   termination.

22          Secondly, even if GM and Delphi can enter into a

23   global resolution --

24          THE COURT:  I'm sorry.  On what basis would they be

25   liable, would Delphi be liable?

1           MS. MAYHEW:  Because the claims postdated the

2     environmental matters agreement and predated --

3           THE COURT:  Well --

4           MS. MAYHEW:  -- the termination.

5           THE COURT:  But they'd be liable to GM, right?

6           MS. MAYHEW:  They would be liable to GM, but as a

7     beneficiary of that agreement, ITW --

8           THE COURT:  All right.

9           MS. MAYHEW:  -- would be able to enforce it and that

10    is --

11          THE COURT:  So it would require me -- I'm sorry to

12    interrupt.  But it would require me then to find that ITW and

13    any other potentially responsible party would have a right

14    under CERCLA to seek contribution or direct claim was a

15    beneficiary of that agreement.

16          MS. MAYHEW:  That is correct, Your Honor.

17          THE COURT:  Okay.

18          MS. MAYHEW:  And the case that we cited in our brief

19    In re: Safety Clean (ph), from the bankruptcy from the District

20    of Delaware is directly on point and does support this

21    proposition that it says, if I quote, when a buyer expressly

22    assumes liabilities of a seller, it becomes directly liable

23    therefore, regardless of any language in the sale agreement,

24    otherwise purporting to generally disclaim third party

25    beneficiary rights.

1          THE COURT:  But in that case, the agreement was still

2    in effect, right?  And the judge carefully reviewed the entire

3    factual pattern to determine they were an intended beneficiary

4    or not.

5          MS. MAYHEW:  That is correct, Your Honor.

6          THE COURT:  Okay.

7          MS. MAYHEW:  And just because they terminated it after

8    the fact, doesn't mean that the -- their liability should

9    immediately evaporate.  I think that would be against public

10   policy where the debtors and GM --

11         THE COURT:  But you still have to -- I would still

12   have to find that the other PRPs were intended beneficiaries,

13   right?

14         MS. MAYHEW:  That is correct.

15         THE COURT:  Okay.  So what is the basis for saying

16   that they are?

17         MS. MAYHEW:  That they are third party beneficiaries?

18         THE COURT:  Yes.

19         MS. MAYHEW:  Well, the party was -- the agreement was

20   entered into so that GM would no longer be responsible for

21   certain environmental liabilities, but --

22         THE COURT:  But it is responsible under CERCLA.

23         MS. MAYHEW:  It is responsible under CERCLA but not

24   under the environmental matters agreement.  They transferred

25   their liability to Delphi.

1          THE COURT:  Well, I guess again, I guess that goes

2     back to the King case again.  It seems to me that the mere fact

3     that there's an indemnification agreement or the EMA agreement

4     isn't enough, there has to be more to show than intended

5     beneficiary relationship, right?  I mean, if it were just the

6     fact that they had an allocation of responsibilities, then

7     Judge Walsh wouldn't have to spend 30 pages going through a

8     detailed factual record about whether there was an intended

9     beneficiary or not.  It just would have said, look, the seller

10    wanted to get out from under exposure, and that's enough.

11         MS. MAYHEW:  Well, I think that there was an agreement

12    it wasn't necessarily benefiting Delphi that it had assumed

13    GM's liabilities.  It was for the benefit of third parties who

14    may be harmed by their conduct.

15         THE COURT:  But why would anyone agree to that?  That

16    just exposes them to folk like ITW.  I mean, again, I -- what

17    is --

18         MS. MAYHEW:  I can't speak to the logic as to why they

19    would do that, but that was part of the agreement, and

20    certainly the beneficiaries --

21         THE COURT:  No, but --

22         MS. MAYHEW:  -- but the intent was --

23         THE COURT:  I -- it seems to me you're coming back

24    again to relying on just the presence, did I say King, I meant

25    Safety Clean earlier.

1          MS. MAYHEW:  You said King.

2          THE COURT:  You're coming back to my mind to simply

3     the presence of the or the fact of the agreement in the first

4     place, to lead to the conclusion that the PRPs are intended

5     beneficiaries.  And again, I guess I say then if that were the

6     case, why would Judge Walsh need to spend 30 pages analyzing

7     the parties' intent?  You just look at the agreement and you

8     say, well, okay, obviously they assumed the responsibility of

9     paying the PRPs, so they're an intended beneficiary.

10         MS. MAYHEW:  But they didn't -- well, they were

11    identified as PRPs subsequently to that agreement.

12         THE COURT:  Right.  I understand, but I don't see a

13    distinction there.

14         MS. MAYHEW:  So -- well, they wouldn't have been named

15    at the time of the agreement, but they do say any newly

16    identified waste disposal sites, they'll have the liability for

17    that.

18         THE COURT:  Okay.  Is there anything other than the

19    fact that they were -- that the EMA was entered into, that I

20    should take away from either the EMA itself or any facts in the

21    record to show that -- or any facts pled that show that PRPs

22    were intended beneficiaries?

23         MS. MAYHEW:  I don't think at this juncture, without

24    the benefit of additional discovery, there's anything other

25    than the EMA.

1          THE COURT:  Okay.

2          MS. MAYHEW:  Your Honor, finally turning to Section

3     502(e)(1)(B) the --

4          THE COURT:  I'm sorry, one more thing.  I mean,

5     obviously the agreement in Safety Clean hadn't been terminated,

6     right?

7          MS. MAYHEW:  That is correct.

8          THE COURT:  So really the question there was whether,

9     in fact, they assumed it in the first place, whether there was

10    an EMA.  Here, everyone acknowledges that there was an EMA in

11    effect that would have covered your clients, right?

12         MS. MAYHEW:  And our position is, did cover our

13    clients --

14         THE COURT:  Right.  Okay.

15         MS. MAYHEW:  -- up until they alleged that in July of

16    2009 they terminate the agreement and then evaporate any

17    responsibility or liability that they would have had magically

18    disappears.

19         THE COURT:  Okay.  So isn't that different from the

20    facts in Safety Clean?

21         MS. MAYHEW:  They are not on all fours, that is

22    correct, Your Honor.  I could not find a case where there was

23    an agreement where some -- a party, a buyer assumed a liability

24    and then terminated it.

25         THE COURT:  Okay.  All right.

1          MS. MAYHEW:  With respect to 502(e)(1)(B), the debtor

2    does take the position that the claims are barred under that

3    section, and ITW disputes that 502(e)(1)(B) will prohibit them

4    from asserting their claim.  A claim will only be disallowed

5    under that section, if the debtors can prove three factors that

6    the claim was for reimbursement or contribution, that the party

7    asserting the claim is liable with the debtor to a third party,

8    and that the claim is contingent.

9          The debtor cannot establish all three of these

10   factors.  In particular, the debtor's argument fails with

11   respect to the second prong, because it's taking the position

12   that it has no liability to the EPA under CERCLA, and

13   therefore, it's not liable to ITW to the EPA.

14         So there can be no co-liability between ITW and the

15   debtor if the debtor's position is that there is no CERCLA

16   liability, and it is not on the hook for that.

17         THE COURT:  Well, let me stop you there.  So you're

18   saying that because of the alternative liability under the EMA,

19   these really aren't, at least that aspect of the claim, is not

20   a contingent reimbursement or a contribution claim?

21         MS. MAYHEW:  It's not contingent reimbursement.  It is

22   a direct claim that ITW is asserting, but in addition to that,

23   it has to be dual liability on account of the same claim, and

24   if the debtor's position is that they're not liable to EPA for

25   a CERCLA claim then their --

1          THE COURT:  I mean, they -- I don't understand.  That

2     doesn't -- I thought -- I accept your other argument, but that

3     one, I mean, you could always plead in the alternative.  You

4     can always say, I'm not liable to Mr. X, I'm not liable to Mr.

5     Y, but if I'm liable to both of them on the same claim, I only

6     have to pay one, right.

7          MS. MAYHEW:  True, but it does fall apart if they're

8     not liable to CERCLA.  They're not allowed to EPA under CERCLA,

9     excuse me.

10          THE COURT:  I agree that if they're liable under the

11     EMA to you, they're not going to be liable to the EPA

12     necessarily on that same basis.

13          MS. MAYHEW:  Correct.

14          THE COURT:  Okay.

15          MS. MAYHEW:  And therefore, they're not double claims.

16          Finally, Your Honor, again, as evidenced in our latest

17     submission, the claims for which ITW is seeking reimbursement

18     for --

19          THE COURT:  Right.

20          MS. MAYHEW:  -- they're wholly separate and apart from

21     the EPA's claims.  There's not subjecting the debtor to any

22     type of double recovery.

23          THE COURT:  Right.  And in any event, there wouldn't

24     be double recovery.

25          MS. MAYHEW:  Correct.

1          THE COURT:  Even if they were on the same claims.

2     Okay.

3          MS. MAYHEW:  For those reasons, Your Honor, we would

4     ask that the Court overrule the debtor's objections to our

5     claims.

6          THE COURT:  Okay.

7          MS. MAYHEW:  Thank you.

8          THE COURT:  Could you address Safety Clean first?

9          MR. BERLIN:  Yes, Your Honor.  I mean, I think you've

10    got a fundamentally different situation where the agreement

11    remains in effect going forward.  I think it's exactly what you

12    said, which was that in Safety Clean, the question really was,

13    was there an EMA in the first place, because that's what the

14    argument was about.

15         Here what happened is, the agreement was terminated,

16    and you know, we've heard a lot of talk about harm and --

17         THE COURT:  Well, can I interrupt you though?

18         MR. BERLIN:  Please.

19         THE COURT:  I think that Safety Clean was set up where

20    someone fairly analogous to Delphi sought a declaration that

21    they hadn't assumed a liability, right.  But wasn't it implicit

22    that or maybe it wasn't, you can tell me, that Judge Walsh at

23    least thought that PRPs could be the third party beneficiaries

24    of the agreement between the buyer and the seller?

25         MR. BERLIN:  When you say PRPs could be the third

Page 89

1    party beneficiaries?

2         THE COURT:  Yeah.  As opposed to -- well, it wasn't

3    just -- I think it was set up in a way that maybe you can argue

4    that the fight was really between parties analogous to you and

5    GM and GM's creditors, saying that you know, GM is getting

6    these claims against it, and GM wants to be able to assert

7    liability under the purchase agreement against Delphi, I'm

8    substituting the parties in Safety Clean, and therefore, it's

9    not really a third party beneficiary case at all, it's a case

10   between GM and Delphi.

11        But it seemed to me that maybe there was more to it

12   than that, and it also recognized that in the context of a

13   purchase agreement, where there was an allocation of future

14   liability and assumption, that the third parties could be the

15   intended beneficiaries of that agreement.

16        MR. BERLIN:  Well, I think it's fairly common when

17   you've got an indemnity type of agreement for the indemnitor to

18   be the party that's ultimately brought into these cases, and

19   people don't really challenge it on that ground --

20        THE COURT:  Right.

21        MR. BERLIN:  -- because they don't really benefit from

22   challenging in that particular situation, so it doesn't really

23   become an issue for them in the way you've described it.  We've

24   got a very different set of facts here, because we have now

25   terminated that agreement, and the fact of the matter is, by

1    terminating that agreement from a CERCLA standpoint, there is

2    no harm, and there's no avoidance of liability.

3            THE COURT:  No, I understand that.  But since the

4    agreement was in effect when they filed their claim, wouldn't

5    they be able to rely on it.  If they were a beneficiary.

6            MR. BERLIN:  Well, they had to be a third party

7    beneficiary to rely on it.

8            THE COURT:  Yeah.

9            MR. BERLIN:  And again, I think the state law, if you

10   look at it on that, it's very clear that they're not a third

11   party beneficiary in this case.  And, you know, again what they

12   want in this case is to be able to go after two parties for the

13   exact same liability, because they've always had the ability to

14   go after General Motors.

15           You know, again as long as our agreement is in effect

16   and they go after us, you know, General Motors is not really in

17   the picture, but now that General Motors has taken back that

18   risk, all we're really saying is, you go to the parties that

19   now has the risk and took it over, you weren't a beneficiary to

20   this agreement, you're not being harmed by the agreement being

21   terminated, because you can go back to the party that's

22   responsible under CERCLA to begin with, and they were always

23   responsible under that.  And we, as the third party, standing

24   between them and General Motors is just now out of the picture.

25           THE COURT:  Okay.  And what about -- I know you

1    addressed this the first time, but I'd like to go back and have

2    you address ITW's argument that this really does fit within at

3    least Ohio's continuation of business doctrine since quote, you

4    had the same owners and the same business.

5             MR. BERLIN:  Well, there are a couple of things, Your

6    Honor.  First of all, we cite in addition to the Perko case,

7    which we start off with, and which they rely on heavily, says

8    that as a prerequisite for the case being brought, all or

9    substantially all of the assets were acquired in a sham

10   transaction, or there was a sham transaction.

11            Here, all of the assets weren't acquired.

12            THE COURT:  Weren't?

13            MR. BERLIN:  Were not acquired.  All of the assets of

14   General Motors clearly were not acquired in this case.

15            Then you have three other cases in Ohio, Travis,

16   McGraw and Cytec which we cite, in which the courts say again,

17   as a prerequisite --

18            THE COURT:  There's this additional requirement.

19            MR. BERLIN:  Yeah.  You have to have had only one

20   company left afterwards.  The ownership becomes an issue in

21   these cases, because what happens in some of these

22   transactions, as I'm sure you've seen, is that people set them

23   up to try and avoid liability, and you know, the -- you know,

24   one of these cases, the main -- one of the main cases that was

25   relied on here, the father transferred a stock to the son, and

Page 92

1    they said there's the same ownership in that situation.  That's

2    why that became a critical issue, but there's a prerequisite in

3    all of these cases that there be either all or substantially

4    all the assets sold or only one company remaining at the end,

5    or there'd be a sham transaction, which again, nobody's argued

6    here is the case.  This was obviously a real transaction.

7             THE COURT:  So the fact that the companies each had

8    the same shareholders --

9             MR. BERLIN:  Oh, we would contest that, too, of

10   course, Your Honor, because --

11            THE COURT:  I understand.  But that fact standing

12   alone isn't enough because --

13            MR. BERLIN:  Right.

14            THE COURT:  -- there are two separate companies.

15            MR. BERLIN:  Yeah, two separate companies.  And the --

16   and you know, in Perko too, they had the same situation where

17   they set up a trust to distribute the stock and that obviously

18   would've taken some time to do also, but again, there is a

19   prerequisite that there can't be two companies left, and I

20   think Ohio was very, very clear on that.

21            THE COURT:  Okay.

22            MR. BERLIN:  Okay.  Those are really the only points I

23   wanted to make unless you have any additional questions.

24            THE COURT:  Okay.

25            MR. BERLIN:  Thank you very much, Your Honor.

Page 93

```
 1              THE COURT:  Ma'am, can you show me the language in
 2     Safety Clean you're relying on?  I just want to make sure I've
 3     looked at it one last time.
 4              MS. MAYHEW:  Yes, Your Honor.  I don't have a pinpoint
 5     site.  If you'd give me one moment.
 6              THE COURT:  I'm looking at language --
 7              MS. MAYHEW:  It's the last page of the opinion, Your
 8     Honor.
 9              THE COURT:  Right.
10              MS. MAYHEW:  About five paragraphs before the
11     conclusion, number 13.
12              THE COURT:  Paragraph 13.
13              MS. MAYHEW:  I'm sorry, it says number 13.
14              THE COURT:  Yeah, number 13.
15              MS. MAYHEW:  Yes.
16              THE COURT:  Right.
17              MS. MAYHEW:  I'm sorry, the --
18              MR. BERLIN:  And I might point out, at the end of that
19     paragraph, Your Honor --
20              THE COURT:  Right.  I was going to say the sale
21     order --
22              MR. BERLIN:  Expressly --
23              THE COURT:  -- expressly conferred third party
24     beneficiary rights.
25              MR. BERLIN:  Right.  And ours expressly does not.  I
```

DPH HOLDINGS CORP., ET AL.

Page 94

1    do think they relied on language in the sale order here.

2              THE COURT:  I'm sorry?

3              MR. BERLIN:  I do think the Court relied on --

4    significantly on language in the sale order here.

5              THE COURT:  Yeah.

6              MS. MAYHEW:  But I think it says irrespective of that,

7    it would also find that there was --

8              THE COURT:  All right.  I'm going to take a couple of

9    minutes.  I want to look at the case that Judge Walsh relied on

10   in that first sentence.  I'll be right back.

11   (Recessed at 12:24 p.m.; reconvened at 12:44 p.m.)

12             THE COURT:  Okay.  We're back on the record in In Re:

13   DPH Holdings Corporation, and in respect of the claims

14   sufficiency hearing, in respect of the remaining claims for

15   investigation and clean-up costs and related environmental

16   liability claims of ITW and others related to the Dayton and

17   Tremont sites.

18             I will refer to ITW throughout, the other claimants

19   have sought to be included in the logic in the rationale of

20   ITW's responses.

21             It is not in dispute that the Delphi debtors were

22   formed as part of spin off or divestiture transaction by

23   General Motors Company, GM, on September 16th, 1998.

24             The Dayton and Tremont sites, it is contended by the

25   debtors were closed before the debtors came into existence as a

Page 95

1    result of that spin-off transaction, and in fact, were closed

2    in 1996.  The claimants appear to accept that with regard to

3    the Dayton -- I'm sorry, the Tremont site, but not the Dayton

4    site.  However, the claimants also acknowledge that they have

5    asserted no facts, other than a recitation of the factors set

6    forth in the applicable statutes are under common law for

7    liability, that would show that the debtors were actually an

8    owner operator of either site before the -- either site closed.

9         ITW asserts a claim against the debtors on two

10   grounds.  First, it asserts that it has a cause of action

11   against the debtors under 42 USC 9601.  It also asserts that it

12   has a contribution cause of action under 42 USC 9613(f).  Both

13   of those sections of CERCLA require a finding of coverage or

14   potential liability by the debtors under 42 USC Section

15   9607(a), which sets forth foregrounds for an entity to be

16   covered under ERISA for liability; one, as an owner or operator

17   of a facility; two, as to any person who at the time of

18   disposal of any hazardous substance owned or operated any

19   facility in which such hazardous substances were disposed of;

20   three, any person who by contract, agreement, or otherwise,

21   arranged for disposal or treatment or arranged with a

22   transporter for transport for disposal or treatment of

23   hazardous substances owned or possessed by such person by any

24   other entity -- I'm sorry, by any other party or entity in any

25   facility owned or operated by another party or entity

Page 96

1   containing such hazardous substances; and four, any person who

2   accepts or accepted hazardous substances for transport or to

3   dispose or treatment facilities.

4        The second basis for the claim by ITW is based upon an

5   agreement known as the environmental matters agreement entered

6   into between Delphi Automotive Systems Corporation and GM in

7   connection with the spin off as of October 1998, pursuant to

8   which in Article 2, the parties allocated environmental

9   liabilities as defined in the EMA between each other, and under

10  Section 2.2, Delphi agreed to be solely responsible for all

11  environmental damages arising from or relating to or in

12  connection with all Delphi facilities and Delphi assets as

13  defined in the agreement.

14       It's acknowledged by the Delphi debtors, now known as

15  DPH Holdings, that the EMA would allocate as among GM and

16  Delphi responsibility with respect to the defined environmental

17  costs at the Dayton and Tremont facilities to Delphi.

18       ITW asserts that it is a beneficiary of this

19  agreement, notwithstanding paragraph 9.1.6 of the agreement,

20  which states that the -- it states, quote, no rights are

21  created in any third party by this agreement.

22       The debtors contend first that they are not a covered

23  person under CERCLA, and that includes their denial that they

24  have liability under CERCLA as a result of the application of a

25  de facto merger or mere continuation doctrine, that would make

Page 97

1    them a successor to GM, because they contend that under any

2    applicable law, there was no de facto merger in connection with

3    the 1998 spin off, and the mere continuation doctrine would not

4    apply to that spin off.

5         In addition, DPH Holdings contends that ITW is not an

6    intended beneficiary or proper third party beneficiary of the

7    environmental matters agreement, and that further, GM and

8    Delphi agreed on notice to the parties in interest in this

9    Chapter 11 case, to terminate the EMA in connection with their

10   master disposition agreement, and the Chapter 11 plan that has

11   been confirmed and consummated in this case.

12        This is, as I said, a sufficiency hearing.  Therefore,

13   the issues before the Court all relate to the facial

14   sufficiency of ITW's claim.  In that connection, the Court

15   conducts the analysis of the claim in a manner similar to an

16   analysis of a motion to dismiss under Rule 12(b)(6).

17        If the claimant survives the sufficiency hearing, then

18   it may proceed to take additional discovery and prove up on a

19   factual basis its claim.

20        With regard to the first aspect of the claim, I

21   conclude that the claimant here has not satisfied, as far as

22   the proof of claim is concerned, or the information submitted

23   in connection with the objection, a key element of Federal Rule

24   8, that is, with regard to the allegation that the debtors may

25   be liable as owner operators of the facilities before the

1   facilities were shutdown, and not on the other hand, is a

2   successor, to such owner operators.

3         They have merely made a formulaic recitation of the

4   elements of the CERCLA cause of action.  They have not asserted

5   any fact to support the contention that the Delphi debtors

6   operated the facility or, in fact, dealt with at all the

7   transport or disposal of hazardous substances at the

8   facilities.  And therefore, I believe that the complaint -- I'm

9   sorry, the proof of claim is not sufficient on -- or to the

10  extent that it asserts a claim on that ground.  See Bell

11  Atlantic Corp versus Twombly, 550 US 544-555, 2007, and

12  Ashcroft versus Iqbal, 1291 Supreme Court 1937, 1951, 2009.

13        That still leaves, of course, whether in fact Delphi

14  can be liable under CERCLA as a successor to GM which both

15  sides acknowledge was, in fact, an owner operator for purposes

16  of the statute.  It's also undisputed that if under applicable

17  law, Delphi is determined to be a successor to GM, it would

18  have liability under CERCLA, see New York versus National

19  Services Industries, Inc., 460 F3d 201, 206, Second Circuit,

20  2006.

21        The parties dispute which applicable law should apply

22  to determine whether, in fact, Delphi is a successor to GM for

23  purposes of CERCLA.  Although they agree that the Court's

24  determination of the applicable law should be decided under the

25  law of New York.  Although they also acknowledge that the

 1   choice of law analysis is colored by an appreciation of the

 2   fact that CERCLA is a national statute, and that in fact,

 3   therefore, when one gets to the choice of law determination, in

 4   addition to the option of choosing an applicable state's law,

 5   the Court should also consider whether federal law would govern

 6   the successor liability issue.

 7          I conclude that while it appears that the Court of

 8   Appeals in the National Service Industries' case did not

 9   clearly come down on the side of applying a non-federal law,

10   that the choice available to the Court, the proper choice

11   available to the Court is one between either the law of the

12   state of incorporation of the entity, against whom successor

13   liability is being asserted, and federal law.

14          I further conclude that I did not need to go further

15   to decide whether the law of Delaware, the state of

16   incorporation of Delphi, or federal law applies because the

17   result on the successor liability issue would be the same under

18   either law.  This, in effect, was also the result of the

19   National Services Industries' case, where the Court was mindful

20   of the need to take into account fundamental or foreign book

21   principles of applicable state law on the underlying merits,

22   and found that those principles did not conflict with in that

23   case, as they don't here, the principles of federal law.

24          I have reached the conclusion that the choice is

25   between Delaware law, the state of incorporation of Delphi and

1     federal law because it is clear under New York law, New York

2     choice of law principles that with respect to issues of

3     successor liability, the state having the greatest interest in

4     the litigation, which is a litigation here with the purpose of

5     determining whether successor liability should apply, is the

6     law of the state of incorporation of that corporate entity,

7     which clearly has an extremely strong interest in prescribing

8     the circumstances under which the limitation on liability for

9     separate corporations incorporated under its laws will be

10    disregarded.

11          See for example, Kalb Voorhis and Company versus

12    American Financial Corp., 8 F3d 130, 132, Second Circuit 1993

13    and Soviet Pan Am Travel Effort versus Travel Committee, Inc.,

14    756 F.Supp 126, SDNY 1991.  See also, Sophie Classic SA Dis a

15    Vey versus Horowitz (ph), 444 F.Supp 2d 321, 240 SDNY 2006.

16          I note that ITW has relied upon an Ohio case to

17    contend that I should focus on the site of the injury in my

18    choice of law determination, but in that case, the site of the

19    injury was also the state of incorporation of the entity

20    against which successor liability was sought.  That case is

21    Cytec Industries, Inc. versus B.F. Goodrich Company, 196 F.Supp

22    2d, 644, SD Ohio 2002.

23          So I do not believe that even were I to be bound by

24    such a case or believe it was a proper analysis under New York

25    choice of law principles, it would be relevant here.

Page 101

1          The claimant has not conceded expressly that under

2     either Delaware law or federal common law relating to successor

3     liability, it would not have a valid successor liability claim

4     against Delphi; however, it is not cited any authority for the

5     proposition that it would have such a claim under either of

6     those two potentially applicable laws.  And to the contrary,

7     the debtors have cited sufficient law in both context to

8     support their contention that certain undisputed facts preclude

9     the debtors from being viewed in this context as successors

10    under a de facto merger transaction or other successor

11    liability.

12          The general rule, of course, is that a corporation

13    that purchases or receives the assets of another corporation is

14    not liable for the seller's liabilities.  See U.S. versus

15    General Battery Corp., 423 F3d 294, 305, Third Circuit, 2005.

16          However, there are certain exceptions to that doctrine

17    or that general rule, recognized by both Delaware and under

18    federal common law in those jurisdictions that have applied

19    federal common law.

20          Under Delaware law, a de facto merger occurs

21    notwithstanding the documentation of the transaction, where one

22    corporation transfers all of its assets to another corporation

23    to payment is made in stock, including by the transferee

24    directly to the shareholders of the transferring corporation,

25    and through an exchange for their stock in that corporation,

1    the transferee agreeing to assume all the debts and liabilities

2    of the transferor, or finally where there's fraud in the

3    transaction designed to evade legitimate creditor claims.

4         It is not entirely clear whether each of these factors

5    must be shown, since the primary purpose of the doctrine is to

6    recognize what, in fact, should be viewed as a merger,

7    notwithstanding the documentation of the transaction.

8         But nevertheless, the fact that GM survived the spin

9    off, and in fact, survived as at that time, an extremely viable

10   company would, under Delaware law, preclude the application of

11   the de facto merger doctrine here.  See Xperex Corp, X-p-e-r-e-

12   x, versus Via Systems Technologies Corp, 2004 Delaware

13   Chancellery, LEXIS 172, Court of Chancellery, Delaware July 22,

14   2004.

15        The same fact also would preclude successor liability

16   under general federal law where the de facto merger doctrine

17   requires one, a continuation of the enterprise of the seller

18   corporation, so that there's a continuity of management

19   personnel, physical location, assets, and general business

20   operations, there's a continuity of shareholders, which results

21   from the purchasing corporation paying for the acquired assets

22   with shares of its own stock.  This stock ultimately coming to

23   be held by the shareholders of the seller corporation, so that

24   they become a constituent part of the purchasing corporation.

25        Three, the seller corporation ceases its ordinary

Page 103

1   business operations, liquidates and dissolves as soon as

2   legally and practically possible.  And four, the purchasing

3   corporation assumes those obligations of the seller, ordinarily

4   necessary for the uninterrupted continuation of the normal

5   business operations of the seller.

6        See United States versus General Battery Corporation,

7   Inc., 423 F3d 294, Third Circuit, 2005.  See also the general

8   Hornbook factors set forth in New York versus National Service

9   Industries, Inc., 460 F3d 201, which includes the fundamental

10  notion of cessation of ordinary business and dissolution of the

11  acquired corporation as soon as possible.

12       Again, under the acknowledged facts of this dispute,

13  that factor cannot be shown by the claimants.

14       While I have concluded that the only proper choice of

15  law here is either Delaware law, the state of incorporation of

16  Delphi, or general federal common law on successor liability, I

17  note alternatively that it appears to me on a sufficiency

18  hearing basis, that ITW cannot establish successor liability

19  under its asserted proper law, which would be the law of Ohio.

20       I say this with regard to the de facto merger doctrine

21  under Ohio law, for the same reason that I've so concluded with

22  respect to Delaware and federal law.  That is because under

23  Ohio's de facto merger doctrine, quote, the de facto merger

24  doctrine presupposes that the predecessor corporation no longer

25  exists, close quote, and that a de facto merger is a

1  transaction that results in the dissolution of the predecessor

2  corporation and is in the nature of a total absorption of the

3  previous business into the successor.  Welco Industries, Inc.

4  versus Applied Companies, 617 NE2d 1129, Ohio Supreme, 1993.

5          This fundamental proposition, in addition to being

6  fundamental as Judge Sotomayor noted in the State of New York

7  case that I've cited is one that runs through all of the Ohio

8  cases, that the parties have cited to me and that I have

9  reviewed.  See McGill versus South Bend Lathe, Inc. (ph), 598

10  NE2d 18, Ohio app. 1991; Erdy versus Columbus Paraprofessional

11  Institute, 599 NE2d 338, Ohio app. 1991; TexLaw Incorporation

12  versus Smart Media of Delaware, 2005 Ohio app. LEXIS 4475,

13  September 21, 2005.

14          The claimant asserts that the foregoing principle is

15  just one of several factors, in fact, four factors, cited by

16  the Ohio courts, and that it has been held that Ohio law does

17  not require all four factors to be found for there to be a de

18  facto merger, citing Cytec, C-y-t-e-c, Industries, Inc. versus

19  B.F. Goodrich Company, 196 F.Supp 2d at 658.

20          However, that case concerned a different and

21  traditionally less important factor in the de facto merger

22  doctrine than the factor of the dissolution, as soon as

23  practicable of the transferring or selling entity.  In fact, in

24  the Cytec case, it was clear that the transferring entity had

25  dissolved and liquidated at the same time that the defendant

1    acquired all of the assets.  Thus leaving the creditors of that

2    entity holding the bag, unless they could assert successor

3    liability against the defendant.

4         I do not believe that the district court in the Cytec

5    case meant to overturn the fundamental requirement that the

6    plaintiffs -- the claimant here simply will not be able to

7    show, which is that the transferring entity in one way or the

8    other promptly ceased to exist.

9         That fact also, I believe, means that the claimant

10   will not be able to assert successor liability on the

11   alternative ground under Ohio law of mere continuation as the

12   Court in Erdy versus Columbus Paraprofessional Institute, 599

13   NE2d 338 stated at 341, the basis of continuity theory lies in

14   the continuation of the corporate entity, not merely the

15   continuation of the business operation.  In this sense, the

16   business operation did continue -- I'm sorry, leave it at that.

17        Here notwithstanding a continuity of ownership and

18   management for a period following the transfer, GM continued as

19   a business operation separately from the spun off division, and

20   consequently, I believe that the mere continuation doctrine,

21   based on that undisputable fact, will not lie here.

22        With regard to the second basis for or actually the

23   third basis for the claimant's claim in this case, the claimant

24   relies upon the EMA.  It appears to me that notwithstanding the

25   termination of the EMA by the parties, that if in fact during

1    the effectiveness of it, the claimant was a beneficiary of the

2    agreement, it would have a claim against Delphi.

3            The claim would not be one under CERCLA but instead

4    would be one under applicable third party beneficiary law,

5    which here, I believe, would be the law again of Delaware given

6    both the state of incorporation, as well as the choice of law

7    by the parties.

8            The most important or one of the most important points

9    to keep in mind in connection with this issue is that Delphi's

10   argument does not result in a clearly potentially responsible

11   party, GM shirking its obligations under CERCLA, pursuant to a

12   private agreement between GM and Delphi.  Rather, the question

13   is whether in light of Delphi's entry into the EMA and its

14   effectiveness during the period that the claim is asserted and

15   the liability was alleged to have been incurred, the claimant

16   is a beneficiary of that agreement.

17           Under Delaware law, quote, to qualify as a third party

18   beneficiary of the contract, one, the contracting parties must

19   have intended that the third party beneficiary benefit from the

20   contract; two, the benefit must have been intended as a gift

21   during satisfaction of a pre-existing obligation to that

22   person; and three, the intent to benefit the third party must

23   be a material part of the party's purpose of entering into the

24   contract.  Madison Realty Partners 7 LLC versus AgIsa LLC (ph),

25   2001 WL 406 268 at page 5, Delaware Chancellery April 7, 2001,

Page 107

1   citing Guardian Construction Company versus Tritech Bridges and

2   Inc., 5838 2d 378, 1386-87, Delaware Superior Court, 1990.

3           Here, of course, no PRPs were named as intended

4   beneficiaries, and in fact, the parties in Section 9.16

5   specified their intention not to render their agreement

6   something that any third party could enforce or seek the

7   benefit of.

8           In addition, at the time that Delphi entered into the

9   agreement, it had no pre-existing obligation to any PRP

10  including the claimant here and there's no suggestion that it

11  intended gratuitously to benefit them.

12          In addition, it appears to me that the intention of

13  the parties was to allocate liabilities as between themselves,

14  that is particularly the case since GM would, as I said

15  earlier, always have potential liability under CERCLA for the

16  facilities that it had previously operated, even if the

17  environmental condition was not discovered until after the date

18  of the allocation over by the parties to Delphi.

19          In addition, and in this sense, the modification --

20  I'm sorry, the termination of the parties' rights under the

21  agreement is important.  The MDA pursuant to which the EMA was

22  terminated was on notice to the parties in interest in this

23  case, as part of the confirmation of Delphi's plan.  And this

24  aspect of the MDA was not opposed.  The termination of the MDA

25  -- I'm sorry, of the EMA, pursuant to the master disposition

Page 108

```
 1    agreement reflected a settlement as between -- a global

 2    settlement, as between GM and Delphi.

 3           In response to those contentions, all of which I find

 4    to be meritorious, the claimant ITW has cited In Re: Safety

 5    Clean Corporation, 380 BR 716, a Bankruptcy D. Delaware of 2008

 6    for the proposition that -- and this is a quote from the

 7    opinion, when a buyer expressly assumes liabilities of a

 8    seller, it becomes directly liable therefore, regardless of any

 9    language in the sale agreement, otherwise purporting generally

10    to disclaim third party beneficiary rights, close quote.  That

11    appears at page 739 of the decision.

12           I have reviewed the authorities relied upon by the

13    Court in that case, and frankly, did not find support for the

14    proposition in them.  Rosener, R-o-s-e-n-e-r, versus Majestic

15    Management, 321 BR 128, Bankruptcy D. Delaware 2005, does not

16    really deal with third party beneficiary law, but instead

17    discusses general exceptions to the limited liability of

18    corporations and cites the general rule setting forth the

19    factors under which a corporation may have successor liability,

20    including its assumption expressly of liability.

21           It cites, as does in the preceding paragraph, the

22    Safety Clean case, Brzozowski versus Corresponding Physicians

23    Services, Inc., 360 F3d 173, 177, Third Circuit, 2004, which

24    also stands for that proposition and involved a dispute between

25    the seller and the purchaser, not between the purchaser and
```

Page 109

1   perspective or possible third party beneficiaries.

2        I also note that the remark that I quoted in the

3   Safety Clean case, may be viewed as dicta because the Court

4   then goes on to state quote, moreover, the sale order expressly

5   conferred third party beneficiary rights on interested parties,

6   including the creditors of Safety Clean.  The order approving

7   the MDA in the settlement thereof, did not confer third party

8   beneficiary rights on potentially responsible parties here.

9        So in light of that and my conclusion that Delphi and

10  GM did not have as a material part of their purpose in entering

11  into the environmental matters agreement, to benefit other

12  potentially responsible parties, for example, even if as is the

13  case here, Delphi and GM resolved all of their issues and

14  determined to cancel the EMA, that ITW and other potentially

15  responsible parties are not third party beneficiaries of that

16  agreement.

17       Consequently, Delphi's objection should be granted and

18  Delphi should submit an order consistent with my ruling.

19       MR. LYONS:  Thank you, Your Honor, we will.

20       One other matter, Your Honor, that's not on the

21  agenda, the DPH is in the process of resolving a number of

22  avoidance actions, and in connection once an avoidance action

23  has been resolved, there is a resulting claim under 502(h).

24       THE COURT:  Right.

25       MR. LYONS:  So, Your Honor, what we -- you will see a

Page 110

1   lot of stipulations coming your way which will grant an allowed

2   claim under subject -- pursuant to 502(d) --

3           THE COURT:  Right.

4           MR. LYONS:  -- or 502(h), however, we want to keep the

5   amounts confidential, so the orders themselves would just be

6   generic, they would say they'd have an allowed claim pursuant

7   to the terms of the agreement and pursuant to 502(h).

8           So again, the stipulations and which would result

9   in --

10          THE COURT:  If it references the stipulation, I don't

11  have any problem with that.

12          MR. LYONS:  Very good.

13          THE COURT:  Just so that someone can see the order and

14  match it up with a stipulation in the future.

15          MR. LYONS:  Right.  And it would just say that there's

16  a claim that's been allowed, it would not have the amount of

17  the claim, because again, the amount of the claim --

18          THE COURT:  No.  But there's a stipulation that does

19  have the amount of the claim in it, and I want to be able to

20  make sure that anyone administering the claims would know what

21  to pay out.

22          MR. LYONS:  Yes.

23          THE COURT:  In reference to an actual agreement that's

24  referenced in the order.

25          MR. LYONS:  Yes.  And the amount again would be

DPH HOLDINGS CORP., ET AL.

                                                            Page 111

1    confidential.  It would not be --

2             THE COURT:  But the amount of stipulation will -- has

3    to be.  You don't have to attach the stipulation, but there's a

4    stipulation that --

5             MR. LYONS:  Governs the rights of the parties.

6             THE COURT:  It's going to be in the records of both

7    sides.

8             MR. LYONS:  Correct, exactly.  It's just that --

9             THE COURT:  And I'm not going to sign an order that

10   says that's confidential, that stipulation.  I'm assuming

11   you're not asking me for that.

12            MR. LYONS:  For the stipulation being confidential?

13            THE COURT:  Right.

14            MR. LYONS:  Well, the stipulation would not be

15   publicly filed.

16            THE COURT:  Right.  But that's a different thing.

17            MR. LYONS:  So the order would be -- very good.  And

18   then when that matches up to the claim number in the system,

19   the claims register, the amount similarly would not be publicly

20   available, it would just reference the stipulation.

21            THE COURT:  And your -- and the order will say that

22   it's allowed once they pay, right?

23            MR. LYONS:  Yes.  Once they pay the settlement amount,

24   correct.

25            THE COURT:  Okay.

1          MR. LYONS:  Okay.  That's all, Your Honor.  I don't

2   have anything further.

3          THE COURT:  Okay.

4          MR. LYONS:  Thank you very much.

5          THE COURT:  So you all can be excused.  Thank you.

6          MR. LYONS:  Thank you, Your Honor.

7          MR. BERLIN:  Thank you, Your Honor.

8          MS. MAYHEW:  Thank you, Your Honor.

9          THE COURT:  Okay.

10         (Proceedings concluded at 1:41 p.m.)

11                         *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 113

1                               I N D E X

2

3                               RULINGS

4                                           Page        Line

5    Thirty-Seventh Claims Hearing

6    Motion to close Chapter 11 cases of

7    20 filing debtors, granted and dismissed     7          9

8

9    Claims agenda, motion for leave to file

10   late claim Best Foam, granted                20         22

11

12   Environmental claim objections, granted      109        17

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 114

1

2                          C E R T I F I C A T I O N

3

4    I, Sara Davis, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6    Sara Davis        Digitally signed by Sara Davis
                       DN: cn=Sara Davis, o, ou,
                       email=digital1@veritext.com,
                       c=US
7    _____    Date: 2010.09.27 15:55:27 -04'00'

8    SARA DAVIS

9    Veritext

10   200 Old Country Road

11   Suite 580

12   Mineola, NY 11501

13

14   Date: September 27, 2010

15

16

17

18

19

20

21

22

23

24

25