Hearing Date and Time:  October 21, 2010 at 10:00 a.m. (prevailing Eastern time)
Response Date and Time:  October 14, 2010 at 4:00 p.m. (prevailing Eastern time)

BARNES & THORNBURG LLP
One North Wacker Drive, Suite 4400
Chicago, Illinois 60606
Telephone:  (312) 357-1313
Facsimile:  (312) 759-5646

Deborah L. Thorne (admitted *pro hac vice*)
Kathleen L. Matsoukas (KL-1821)
Telephone:  (312) 214-8307
Email:  deborah.thorne@btlaw.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DPH HOLDINGS CORP., *et al.*, | ) | No. 05-44481 (RDD) |
|  | ) |  |
| Reorganized Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) |  |
|  | ) |  |

## NOTICE OF MOTION OF JOHNSON CONTROLS INC. POWER SOLUTIONS AND JOHNSON CONTROLS BATTERY GROUP, INC. FOR AN ORDER COMPELLING DPH HOLDINGS TO COMPLY WITH THE TRANSFER AGREEMENT RELATING TO TRANSFER OF DELPHI'S NEW BRUNSWICK BATTERY FACILITY TO JOHNSON CONTROLS, INC., FOR ADEQUATE ASSURANCE OF FINANCIAL ABILITY TO PERFORM UNDER TRANSFER AGREEMENT, AND IN THE ALTERNATIVE, FOR LEAVE TO TAKE 2004 EXAMINATION OF DPH HOLDINGS CORP AND FOR OTHER RELIEF

PLEASE TAKE NOTICE THAT:

Upon the annexed motion, dated October 6, 2010, Defendants Johnson Controls Inc. Power Solutions ("JCI") and Johnson Controls Battery Group, Inc. ("JCBGI" and collectively ), through their attorneys, Barnes & Thornburg LLP, moves the Court for an Order (1) compelling DPH Holdings Corp. ("DPH") to comply with the Transfer Agreement Relating to Transfer of Delphi's New Brunswick Battery Facility to JCI ("Transfer Agreement"), and (2) in the

alternative, provide adequate assurance of financial ability to perform its obligations under the Transfer Agreement. In the event that DPH refuses to provide adequate assurance of its financial ability to perform under the Transfer Agreement, JCI seeks an Order authorizing it to take the 2004 Examination of DPH and for other relief (the "Motion"). A hearing with respect to the Motion will be held before the Honorable Judge Robert D. Drain, United States Bankruptcy Judge, of the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601, on October 21, 2010 at 10:00 a.m. (prevailing Eastern time), or as soon thereafter as counsel may be heard.

A copy of the Motion may be obtained by (a) contacting the attorneys for the Defendants, Barnes & Thornburg LLP, One North Wacker Drive, Suite 4400, Chicago, Illinois 60606-2833 (Attn: Deborah L. Thorne, Esq. and Kathleen L. Matsoukas, Esq.), Telephone: (312) 357-1313; (b) accessing the Court's website at http://www.nysb.uscourts.gov (please note that a PACER password is needed to access documents on the Court's website); (c) viewing the docket of these cases at the Clerk of the Court, United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004; or (d) accessing the public website maintained by the Debtors' court-appointed claims and noticing agent in these cases at www.kccllc.net.

The deadline to file any objections and responses to the Motion is **October 14, 2010 at 4:00 p.m. (prevailing Eastern time)** (the "**Objection Deadline**").

Objections and responses, if any, to the Motion must be in writing and must (a) conform to the Federal Rules of Bankruptcy Procedure, the Local Rules of the Bankruptcy Court for the Southern District of New York, and any case management orders in these chapter 11 cases, (b) set forth the name of the objecting party, the nature and amount of claims or interests held or

asserted by the objecting party against the Debtors' estates or property, and (c) set forth the basis

for the objection and the specific grounds therefore.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the Motion

shall be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-

242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy

Court's filing system, and (b) by all other parties in interest, on a 3.5 inch disk, preferably in

Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing

format (with hard copy delivered directly to Chambers), in accordance with General Order M-

242, and on (i) Barnes & Thornburg LLP, One North Wacker Drive, Suite 4400, Chicago,

Illinois 60606-2833 (Attn: Deborah L. Thorne, Esq. and Kathleen L. Matsoukas, Esq.); (ii) the

Debtors, DPH Holdings Corp. (f/k/a Delphi Corporation, et al.), Attn: John Brooks, 5725 Delphi

Drive, Troy, Michigan 48098; (iii) Ron E. Meisler, Esq., Skadden, Arps, Slate, Meagher & Flom

LLP, 115 N. Wacker Drive, Suite 2700, Chicago, IL 60606-1720; (iv) the Honorable Robert D.

Drain, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District

of New York, 300 Quarropas Street, White Plains, New York 10601 and (v) the Office of the

United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor,

New York, New York 10004 (Attn: Brian Masumoto, Esq.) so as to be received no later than the

**Objection Deadline**.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the

Hearing.  Failure to appear at the Hearing may result in relief being granted or denied upon

default.

Dated:  October 6, 2010                    Respectfully submitted,

                                           BARNES & THORNBURG LLP

                                           By:    /s/Kathleen L. Matsoukas
                                                  Deborah L. Thorne (admitted *pro hac vice*)
                                                  Kathleen L. Matsoukas (KL-1821)
                                                  One North Wacker Drive, Suite 4400
                                                  Chicago, Illinois 60606-2833
                                                  Telephone:  (312) 357-1313

                                           Counsel to Johnson Controls Inc. Power Solutions,
                                           and Johnson Controls Battery Group, Inc.

BARNES & THORNBURG LLP
One North Wacker Drive, Suite 4400
Chicago, Illinois 60606
Telephone:  (312) 357-1313
Facsimile:  (312) 759-5646

Deborah L. Thorne
Kathleen L. Matsoukas (KL-1821)
Telephone:  (312) 214-8307
Email:  deborah.thorne@btlaw.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| DPH HOLDINGS CORP., *et al.*, | ) No. 05-44481 (RDD) |
| | ) |
| Reorganized Debtors. | ) Jointly Administered |
| | ) |
| | ) |
| | ) |

**MOTION OF JOHNSON CONTROLS INC. POWER SOLUTIONS AND JOHNSON
CONTROLS BATTERY GROUP, INC. FOR AN ORDER COMPELLING DPH
HOLDINGS TO COMPLY WITH THE TRANSFER AGREEMENT RELATING TO
TRANSFER OF DEPHI'S NEW BRUNSWICK BATTERY FACILITY TO JOHNSON
CONTROLS, INC., FOR ADEQUATE ASSURANCE OF FINANCIAL ABILITY TO
PERFORM UNDER TRANSFER AGREEMENT, AND IN THE ALTERNATIVE, FOR
LEAVE TO TAKE 2004 EXAMINATION OF DPH HOLDINGS CORP AND FOR
OTHER RELIEF**

Johnson Controls Inc. Power Solutions ("JCI") and Johnson Controls Battery Group, Inc.

("JCBGI") (referred to collectively, as "JCI") move this Court for an Order (1) compelling DPH

Holdings Corp. ("DPH") to comply with the Transfer Agreement Relating to Transfer of

Delphi's New Brunswick Battery Facility to JCI ("Transfer Agreement"), and (2) in the

alternative, provide adequate assurance of financial ability to perform its obligations under the

Transfer Agreement.  In the event that DPH refuses to provide adequate assurance of its financial

ability to perform under the Transfer Agreement, JCI seeks an Order authorizing it to take the

2004 Examination of DPH and for other relief (the "Motion").

In support of the Motion, JCI states as follows:

## INTRODUCTION

On May 26, 2006, Delphi agreed to sell a battery manufacturing plant located in New

Brunswick, New Jersey (the "Property") to JCI under the terms of a Transfer Agreement which

this Court approved on June 26, 2006 (the "Sale Approval Order") [Docket No. 4363].  A true

and correct copy of the Transfer Agreement is attached to this Motion as Exhibit A.[1]  The

Property was used by Delphi to manufacture lead/acid automotive batteries before the sale and is

contaminated with lead and other hazardous substances.  Because the past use left the Property

contaminated, under the New Jersey Industrial Site Recovery Act, as amended ("ISRA"),

N.J.S.A. 13:1K-6 et seq., Delphi could not legally sell the Property in 2006 unless it either first

completed remediation under ISRA or entered into a remediation agreement with the New Jersey

Department of Environmental Protection ("NJDEP").  Because it did not complete the

remediation before the sale, Delphi on July 26, 2006 entered into a remediation agreement with

NJDEP which is discussed more thoroughly below.

The Transfer Agreement, which this Court authorized, requires Delphi to comply with

ISRA.  See, Transfer Agreement, § 4.1, Exhibit 3.6.H.  Delphi also agreed as a part of the

Transfer Agreement in section 2.1 of Exhibit 3.6.H to indemnify JCI for "Environmental

Damages arising from Pre-Closing Environmental Contamination, Pre-Closing Compliance

Matters or Pre-Closing Off-Site Liability."

---

[1] The Property was transferred to JCBGI on July 31, 2006.  JCBGI remains the owner of the Property.

ISRA requires Delphi to estimate publicly on July 26 of each year the cost of remediation of the Property and to verify that an amount equal to the estimated cost of remediation is deposited in a Trust fund, which is defined below. Delphi did not estimate the cost of remediation publicly on July 26, 2009 or July 26, 2010. Delphi has also failed to increase the amount in the Trust since January 2009, despite receiving from NJDEP twice after January 2009 requirements for additional work – and despite itself proposing to NJDEP in late 2009 to do more work than was initially proposed in early 2009. Delphi's estimate of total remedial costs is outdated. As a result, Delphi is required to provide a new estimate of the cost of remediation, one substantially more than the $1,825,000 estimated in January 2009, and to increase the amount in the Trust accordingly. Moreover, JCI has shared with Delphi information indicating that the estimated cost of remediation is approximately $8 million. Delphi is simply ignoring its obligation to revise the remediation estimate and increase the amount in the Trust accordingly and is therefore violating ISRA, which is a violation of the Transfer Agreement.

Because Delphi has failed to comply with ISRA and failed to comply with its obligations under the Transfer Agreement, JCI is radically insecure against the risk that Delphi will fail to remediate the Property, and the agreements JCI made in good faith in the Transfer Agreement are jeopardized. Delphi's omissions violate ISRA and leave JCBGI, as the current owner, liable to NJDEP to make up the difference if Delphi fails to complete the Property's remediation. These violations of ISRA trigger the indemnification provisions under the Transfer Agreement.

JCI filed an administrative claim in this case as a result of the indemnification provisions in the Transfer Agreement. The administrative claim represents the indemnification liability that Delphi owes to JCI on a post-petition basis plus additional costs which stem from the damages JCI has sustained post-sale as a result of Delphi's failure to remediate the Property on a timely

basis. Not only has Delphi filed an objection to the JCI administrative claims stating that it reflects no amounts due to JCI in its books and records [Docket No. 19356], it has also failed to acknowledge any liability in a face-to-face meeting between the parties. It is for these reasons, that JCI files this motion seeking adequate assurance that DPH Holdings has sufficient assets to perform its obligations under ISRA and under the Transfer Agreement.

JCI hereby seeks an Order requiring DPH to comply with the Transfer Agreement revising its estimate of the cost of the Property's remediation to reflect $8 million as the actual anticipated remediation cost; filing such higher estimate with NJDEP; increasing the financial assurance provided to NJDEP to $8 million through the Trust; or in the alternative, providing JCI with adequate assurance that DPH can pay JCI's indemnification claims. In the event DPH is unwilling to provide JCI with adequate assurance of its financial ability to provide indemnification, JCI seeks an order to allow JCI to take a limited Rule 2004 examination of DPH so that it might determine if DPH has sufficient assets to remediate the Property or honor its obligation to indemnify JCI if NJDEP forces it to complete the Property's remediation.

## BACKGROUND

*The Transfer Agreement and Its Indemnification Provisions*

1.      In Section 7.1.A of the Transfer Agreement, Delphi agreed to indemnify JCI and JCI's affiliates against damages, losses and expenses resulting from Delphi's breach of "any of its warranties or covenants" under the Transfer Agreement. (*See* Ex. A at § 7.1.A.)

2.      In Section 3.6.H of the Transfer Agreement, entitled "Environmental Matters," Delphi agreed to indemnify JCI as set forth in Exhibit 3.6.H of the Transfer Agreement. In Section 2 of Exhibit 3.6.H, Delphi specifically agreed to indemnify JCI for "Environmental Damages arising from Pre-Closing Environmental Contamination, Pre-Closing Compliance

4

Matters or Pre-Closing Off-Site Liability." (*See* Ex. A at Ex. 3.6.H, § 2.1.) "Environmental

Damages" is defined in Section 1.9 to include

> losses, liabilities, costs, damages, fines, penalties and expenses (including reasonable expenses of investigation and attorneys' fees) arising out of an Environmental Law, but in all cases excluding losses, liabilities, costs, damages and expenses deemed consequential or loss of profit, and also excluding expenses of investigating information for the purposes of making a claim for indemnification under this Exhibit.

(*Id.* § 1.9.)

The indemnification Delphi agreed to in the Transfer Agreement is a post-petition administrative

expense of the Delphi estate.

### ISRA and the Sale of the Property

3.      ISRA is a New Jersey statute enacted in part "to promote efficient and timely

cleanups" of places of business defined as "industrial establishments" before title to such

industrial establishments may be transferred.  N.J.S.A. 13:1K-7.

4.      When Delphi agreed to sell the Property, the Property was an "industrial

establishment" as defined by ISRA. *See* N.J.S.A. 13:1K-8.[2]

5.      Because past use of the Property to manufacture lead acid batteries had left the

soil and groundwater contaminated by lead and other hazardous substances, Delphi could not

legally sell the Property unless Delphi either first completed all compliance with ISRA or entered

into a remediation agreement with NJDEP which obligated Delphi to complete ISRA compliance

under NJDEP's oversight after the sale. *See* N.J.S.A. 13:1K-9(e).

---

[2] "'Industrial establishment'. means any place of business engaged in operations which involve the generation, manufacture, refining, transportation, treatment, storage, handling, or disposal of hazardous substances or hazardous wastes on-site, above or below ground, having a Standard Industrial Classification number within 22-39 inclusive, 46-49 inclusive, 51 or 76 as designated in the Standard Industrial Classifications Manual prepared by the Office of Management and Budget in the Executive Office of the President of the United States." N.J.S.A. 13:1K-8.

6.      To fulfill its obligations under New Jersey law which would allow Delphi to sell

the Property to JCI, on July 26, 2006, Delphi and NJDEP entered into a Remediation Agreement,

a true and correct copy of which is attached to this Motion as <u>Exhibit B</u>.  From the date it signed

the Remediation Agreement and "annually thereafter on the same calendar day," N.J.A.C.

7:26C-5.12(a), Delphi is required to submit to NJDEP "detailed estimated remediation costs

required to comply with this Remediation Agreement," along with "[t]he reason for any changes

from the previously submitted cost review."  *See* Ex. B at ¶9(b) and (c).

7.      Under ISRA, a person obligated to remediate a site such as the Property must

"establish and maintain a remediation funding source in the amount necessary to pay the

estimated cost of the required remediation."  N.J.S.A. 58:10B-3(a).  *See also* N.J.S.A. 13:1K-

9(c).  "Whenever the remediation cost estimate increases, the person required to establish the

remediation funding source shall cause the amount of the remediation funding source to be

increased to an amount at least equal to the new estimate."  N.J.S.A. 58:10B-3(a).  Establishment

and maintenance of a remediation funding source advances ISRA's goals of "assuring that

funding for cleanup is set aside at the time it is available from a transfer or closing, and . . . that

contaminated property is not abandoned to the State for cleanup."  N.J.S.A. 13:1K-7.

8.      On September 22, 2006, Delphi and J. P. Morgan Trust Company, National

Association entered into a Remediation Trust Agreement (the "Trust Agreement") which

established as the remediation funding source for the Property a trust fund (the "Trust") in the

initial amount of $535,000, the estimate NJDEP then approved as the total cost of remediation.

A true and correct copy of the Trust Agreement is attached to this motion as <u>Exhibit C</u>.  *See also*

Ex. B at ¶7.

9.      As required by New Jersey law, the Trust Agreement names NJDEP as its sole beneficiary and thereby protects the State of New Jersey from having to bear the cost of the Property's remediation if Delphi does not complete it. *See* N.J.A.C. 7:26C-5.4. *See also* Ex. C at 2. Delphi cannot use money in the Trust to indemnify JCI from any liability for the Property.

### *ISRA, the Transfer Agreement and Delphi's Actions After the Property's Sale*

10.     The Transfer Agreement obligates Delphi contractually to comply with ISRA. In Section 4.1 of Exhibit 3.6.H to the Transfer Agreement, encompassed under the heading "Remediation of Environmental Damage," Delphi agreed to investigate and clean up the Property as required by ISRA. (*See* Ex. A at Ex. 3.6.H, § 4.1.)

11.     In 2006 and 2007, Delphi investigated the Property, submitted to NJDEP filings ISRA required concerning the Delphi investigation, and then sought from NJDEP agreement that no further action was needed at certain areas of concern and that cleanup could begin without further investigation of other areas. NJDEP responded with a sixteen-page Notice of Deficiency dated May 8, 2009 (the "Deficiency Notice") which rejected Delphi's assertion that the Property had been sufficiently investigated and required Delphi to supplement its original investigation of the Property before submitting a cleanup plan.[3] A copy of the Deficiency Notice is attached to this Motion as Exhibit D.

12.     On January 28, 2009, months before NJDEP sent Delphi the Deficiency Notice, Delphi stated to NJDEP, in a letter attached to this Motion as Exhibit E, that "the projected ISRA remediation costs at the property are currently estimated to be $1,825,000. . . ."

---

[3] Section 4(D) of Exhibit 3.6.H of the Transfer Agreement requires that Delphi provide copies of all relevant correspondence sent to and received from NJDEP or other Competent Authority and keep JCI reasonably apprised of the progress of the conduct of the remediation. To date, JCI is confident it has not been copied on all correspondence directed to NJDEP or received from NJDEP by Delphi.

13.    On November 5, 2009, Delphi responded to the Deficiency Notice by filing a Supplemental Remedial Investigation Workplan ("Supplemental Plan") with NJDEP in which Delphi proposed to undertake certain additional investigative work.  The Supplemental Plan does not estimate the cost of performing the work it proposes.

14.    On January 25, 2010, in a letter attached as <u>Exhibit F</u> sent by Delphi to NJDEP more than eight months after NJDEP issued the Deficiency Notice and more than two months after Delphi submitted the Supplemental Plan, Delphi *again* stated to NJDEP that "the projected ISRA remediation costs at the property are currently estimated to be $1,825,000. . . ."

15.    NJDEP's regulations and the Remediation Agreement require Delphi to submit annually to NJDEP a revised estimate of the total cost of the Property's remediation and to maintain the amount of that revised estimate as the amount of the Trust.  *See* Ex. B at ¶¶7 and 9 and N.J.A.C. 7:26C-5.12(a).  Delphi has never submitted annually to NJDEP revised estimates as required by the Remediation Agreement.  Although NJDEP required Delphi on May 8, 2009 to perform substantial additional investigative work in the Deficiency Notice, and although Delphi proposed in the Supplemental Plan on November 5, 2009 to perform certain additional work, at the beginning of 2010 Delphi used the same number -- $1.825 million -- used at the beginning of 2009 to estimate the cost of the Property's remediation.

16.    Just as it had failed to file on July 26, 2009, Delphi again failed to file on July 26, 2010 a revised estimate of the costs to remediate the Property, as required by the Remediation Agreement and New Jersey law.  *See* Ex. B at ¶¶7 and 9.

17.    In August 2010, NJDEP gave Delphi extensive comments on the Supplemental Plan, rejecting certain proposals made concerning the extent and method of investigation of certain areas of concern and requiring substantial additional sampling of those areas.

18.     In summary, Delphi violated ISRA by not revising its remedial estimate as the Remediation Agreement and ISRA required, and by not maintaining the Trust "in the amount necessary to pay the estimated cost of the required remediation." N.J.S.A. 58:10B-3(a). *See also* N.J.S.A. 13:1K-9(c). Performing either the work NJDEP required in the Deficiency Notice or the proposals Delphi itself made in the Supplemental Plan will add substantially to the cost of the Property's remediation.

*The Site Remediation Reform Act and Delphi*

19.     On May 7, 2009, New Jersey changed its system for oversight over remediation of contaminated properties by enacting a new statute, the New Jersey Site Remediation Reform Act ("SRRA"), N.J.S.A. 58:10C-1 *et seq.*, and amending several pre-existing environmental statutes, including ISRA. SRRA did not remove any obligation to remediate contaminated property under ISRA and changed only the oversight of remediation, not the obligation to complete remediation under ISRA. SRRA and the amendments enacted with it largely remove NJDEP from overseeing cleanups of contaminated property; establish a system under which a private individual known as a licensed site remediation professional ("LSRP") must both oversee and perform remediation of contaminated properties; and require all parties subject to ISRA to hire an LSRP by May 7, 2012. N.J.S.A. 58:10B-1.3(b). Parties currently subject to ISRA may hire an LSRP before the May 7, 2012 deadline, but they are not statutorily required to do so until May 2012. N.J.A.C. 7:26C-2.3(b).

20.     In a letter to Delphi dated June 29, 2010, a true and correct copy of which is attached to this Motion as Exhibit G, NJDEP informed Delphi that NJDEP would no longer assign an ISRA case manager to oversee the Property's remediation.

21.    DPH has not hired an LSRP to complete investigation of the Property and clean it up. It is possible that DPH may not hire an LSRP before May 7, 2012, nor resume investigation or begin cleanup of the Property until after May 7, 2012, and thereby deny JCI the benefit of the bargain reached in the Transfer Agreement by failing to proceed to remediate the Property.

22.    Regardless of whether DPH hires an LSRP before May 7, 2012 to remediate the Site under SRRA, DPH nevertheless remains statutorily and contractually obligated at all times before May 7, 2012 to remediate the Property under ISRA. N.J.S.A. 58:10B-1.3(c)(1). *See also* Ex. A at Ex. 3.6.H, §4.1.

23.    Furthermore, Delphi remains contractually obligated to indemnify JCI against claims for contamination existing before Delphi sold the Property. *See* Ex. A at Ex. 3.6.H, § 2.1. JCI is not confident that DPH has sufficient assets to either contribute additional amounts to the Trust or to perform the required remediation of the Property. The obligation to fund the Trust is at least $8 million.

### *DPH and JCBGI Meeting Under Section 6.2 of the Transfer Agreement*

24.    The Transfer Agreement provides in Section 6.2 that in the event of a dispute between the parties that the parties must

> attempt to settle any and all claims or disputes arising in connection with [the Transfer] Agreement by good faith negotiations by senior management of each Party. If the dispute is not resolved by senior management within thirty (30) days after delivery of a written request for such negotiation by either party to the other, either Party may make a written demand (the "Demanding Party") for formal dispute resolution (the "Notice of Dispute") and specify therein in reasonable detail the nature of the dispute. Within ten (10) days after receipt of the Notice of Dispute, the receiving Party (the "Defending Party") shall submit to the other a written response. The Notice of Dispute" and the response shall include: (i) a statement of the respective Party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that Party and of any other person who will accompany the executive to meetings of the parties. Within fifteen (15)

days after such written notification, the executives (and other named in the
Notice of Dispute or response) will meet at a mutually acceptable time and
place, and thereafter as often as they reasonably deem necessary, to
attempt to resolve the dispute (the "Dispute Resolution Meeting"). All
reasonable requests for information made by one Party to the other will be
honored promptly.   All negotiations pursuant to this Section 6.2A are
confidential   and   shall   be   treated   as   compromise   and   settlement
negotiations for purposes of applicable rules of evidence.

25.      JCI and DPH met on July 20, 2010 in Michigan for the Dispute Resolution

Meeting pursuant to Section 6.2.  Although JCI is unable to disclose the exact nature of the

Dispute Resolution Meeting under the terms of Section 6.2A of the Transfer Agreement (which

provides that the discussions are to be kept confidential), JCI can represent that the dispute has

not been resolved and the Property is no closer to remediation than it was prior to the Dispute

Resolution Meeting.

***Risk of Non-Payment of JCI and JCBGI Administrative Claim***

26.      JCI believes there is serious risk that DPH will lack sufficient funds either to

complete investigation and cleanup of the Property or to indemnify JCI if JCI is required to

remediate the Property itself.

27.      Prior to the expiration of the Administrative Claims Bar Date, JCI filed

administrative claims for the indemnification and statutory claims for environmental

contamination of the Property (the "JC Claims").  True and correct copies of the JC Claims are

attached hereto as Exhibits H and I.  The total amount claimed under the JC Claims was

$13,058,705 plus oversight costs of NJDEP.

28.      On March 19, 2010, DPH filed objections to the JC Claims (the "Objections").

DPH asserted in the Objections that the amounts due under those claims are not reflected on the

DPH's books and records, despite the existence of the Transfer Agreement and the Trust

11

Agreement, and despite the representation, publicly made twice by Delphi to NJDEP, that

remediation of the Property would cost $1.825 million.  [Docket No. 19356]

29.    JCI filed timely responses to the objections (the "Responses") and, among other

things, disputed the timeliness of the Objections.  Although not specifically addressed in this

pleading, JCI does not waive the arguments contained in the Responses and reserves all rights in

connection with that and other arguments raised in the Responses filed on April 15, 2010

[Docket No. 19843].

30.    The JC Claims are still pending, and the Objections have not been resolved or set

for hearing.

31.    JCI understands that DPH was left with certain assets and liabilities as set forth in

the Modified Plan.  Specifically, DPH lists as assets certain idled plants, certain cash for payment

of administrative claims, the proceeds of Avoidance Actions, if any, proceeds from business

operations and deferred consideration under the Master Disposition Agreement.  See *Supplement*

*to First Amended Disclosure Statement with Respect to First Amended Joint Plan of*

*Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtor- in-Possession*

at *s-xvii through s-xxiii.*

32.    JCI cannot ascertain the extent of DPH's assets and determine if there will be

sufficient cash remaining in DPH at any time to pay for the remediation.  Although JCI has

inquired as to what assets DPH currently holds, DPH has refused to disclose this information.

33.    As set forth below, under the Transfer Agreement and as set forth in the JC

Claims, JCI is entitled to payment or escrow of its costs and expenses, which it estimates total $8

million plus NJDEP's oversight costs under ISRA, which are as yet undetermined and could be

asserted by NJDEP against JCI if Delphi were unable to pay them.  JCI is also entitled to

payment or escrow of its costs and expenses which have occurred as a result of the failure of
Delphi to remediate the property since June 26, 2006.

### *JCI's Need for Adequate Protection.*

34.     JCI has no way of determining if DPH will have on or after May 7, 2012 any
assets available for the remediation.  DPH's failure to maintain the Trust as required by ISRA
creates a shortfall which NJDEP could require JCI to close if Delphi fails to resume the
Property's remediation as ISRA and SRRA both require.

35.     Given Delphi's failure to maintain the Trust at adequate levels, JCI has no
confidence in DPH's promise in its Modified Plan that it will be able to pay all administrative
expenses when the JC Claims are liquidated.  Indeed, DPH has represented in the Objections that
the JC Claims are not even listed in DPH's books and records.

36.     JCI has been denied the benefit of its bargain under the Transfer Agreement
because Delphi has repeatedly violated ISRA, is not currently investigating or cleaning up the
Property, has not indicated that it will begin to meet either obligation before May 7, 2012, and
has not offered JCI any assurance that it will have the funds to meet its statutory and contractual
obligations on or after May 7, 2012.

### Relief Requested

### *Request for Order Requiring DPH to Comply with the Transfer Agreement and to Provide Adequate Assurance of Ability to Pay Administrative Claim*

37.     By this Motion, JCI requests entry of an Order compelling DPH (a) to develop
and file with NJDEP a revised estimate of the cost of Property's remediation of the Property
which considers the NJDEP requirements and the cost of the work Delphi itself has proposed to
do; (b) to increase the amount of money in the Trust to an amount equal to the revised estimate;
or in the alternative (c) to provide adequate assurance to Johnson Controls, in the form of a letter

13

of credit or establishment of an escrow account, to secure payment by DPH of the cost of the Property's remediation, estimated to be $8 million, or otherwise provide adequate assurance of its ability to indemnify JCI in the event JCI is required to remediate the Property.

38.    This Court has the authority to compel DPH to provide the appropriate adequate assurance under Section 105(a) of the Bankruptcy Code. Section 105(a) provides a bankruptcy court with broad powers in the administration of a bankruptcy case, stating that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." *See, e.g. In re Morristown & Erie R. Co.*, 885 F.2d 98, 100 (3d Cir. 1989).

39.    JCI should not be forced to assume the risk of administrative insolvency but should instead be assured that it will receive payment, since they will have liquidated administrative expense claims if DPH does not or cannot complete the Property's remediation or indemnify JCI as required.

40.    Although JCI requested that DPH provide information concerning the assets of DPH so that it could determine whether DPH is administratively solvent, DPH has refused to provide this information.

41.    Accordingly, JCI respectfully requests that the Court enter an Order requiring that DPH provide JCI with adequate assurance with respect to the JC Claims.

### *In the Alternative, JCI Should be Authorized to Take the Rule 2004 Examination of DPH*

42.    Because DPH has refused to provide information sufficient to determine whether assets exist to cover administrative expenses, including those encompassed in the JC Claims, JCI seeks to examine DPH pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure.

14

43.    Rule 2004(b) permits the use of a Rule 2004 examination post-confirmation, provided that the examination "is restricted to the administration of the case post-confirmation." *In re Cinderella Clothing Indus., Inc.*, 93 BR 373 (Bankr. E.D. Pa. 1988); *In re Express One Int'l, Inc.*, 217 BR 215, 217 (Bankr. E.D. Tex. 1998).

44.    As in this case, in the *Express One International* case, the administrative creditor was concerned that by the time its administrative claim was liquidated as to amount, the post-confirmation debtor would not have sufficient assets to pay administrative claims. The *Express One International* court held that a Rule 2004 examination for the limited scope of determining whether sufficient funds had been set aside to pay administrative claims was appropriate.

45.    Accordingly, JCI respectfully requests that the Court grant the Motion and permit JCI to undertake a limited Rule 2004 examination of DPH in order to determine whether sufficient funds have been set aside to cover the JC Claims.

46.    The person authorized to reconcile and resolve this objection is Deborah L. Thorne, Barnes & Thornburg LLP, One North Wacker Drive, Suite 4400, Chicago, Illinois 60606-2833.

WHEREFORE, Johnson Controls, Inc. and Johnson Controls Battery Group, Inc. request the entry of an Order as follows:

a.    Granting the Motion;

b.    Compelling DPH Holdings Corp. to Comply with the Requirements of the Transfer Agreement;

c.    Compelling DPH Holdings Corp. to Provide Adequate Assurance of Financial Ability to Perform its Obligations under the Transfer Agreement;

d.    Granting leave to JCI and JCBG to take the 2004 Examination of

DPH; and

e.    For such other relief as this Court deems just.

Dated:  October 6, 2010

BARNES & THORNBURG LLP
Counsel to Johnson Controls Battery Group, Inc.
and Johnson Controls, Inc. (Power Solutions)

By:    /s/Kathleen L. Matsoukas
        Deborah L. Thorne (admitted *pro hac vice*)
        Kathleen L. Matsoukas (KL-1821)
        Business Address:
        One North Wacker Drive, Suite 4400
        Chicago, Illinois 60606
        Telephone:  (312) 357-1313

CHDS01 DTHORNE 619306v7