| **United States Bankruptcy Court**<br>Southern District of New York<br><br>Delphi Corporation et al. Claims Processing<br>c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue<br>El Segundo, California 90245 | **Administrative<br>Expense Claim<br>Form** |
|---|---|

| Debtor against which claim is asserted :<br>Delphi Corporation, *et al.* 05-444481 | Case Name and Number<br>In re Delphi Corporation., *et al.* 05-44481<br>Chapter 11, Jointly Administered |
|---|---|

NOTE: This form should not be used to make a claim in connection with a request for payment for goods or services provided to the Debtors prior to the commencement of the case. This Administrative Expense Claim Request form is to be used solely in connection with a request for payment of an administrative expense arising after commencement of the case but prior to June 1, 2009, pursuant to 11 U.S.C. § 503.

| Name of Creditor<br>*(The person or other entity to whom the debtor owes money or property)*<br><br>Johnson Controls Battery Group, Inc.<br><br>Name and Address Where Notices Should be Sent<br>c/o Stephen T. Bobo<br>Reed Smith, LLP<br>10 S. Wacker Dr., 40th Flr., Chicago, IL 60606<br>Telephone No.<br>(312) 207-1000 | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br>☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☐ Check box if the address differs from the address on the envelope sent to you by the court.<br><br>THIS SPACE IS FOR<br>COURT USE ONLY |
|---|---|

COPY

| ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR: | Check here if this claim ☐ replaces<br>☐ amends   a previously filed claim, dated: _____ |
|---|---|

| 1. BASIS FOR CLAIM<br>☐ Goods sold<br>☐ Services performed<br>☐ Money loaned<br>☐ Personal injury/wrongful death<br>☐ Taxes<br>☒ Other (Describe briefly)   Environmental Claims | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)<br>☐ Wages, salaries, and compensation (Fill out below)<br>Your social security number _____<br>Unpaid compensation for services performed<br>from _____ (date) ____ to _____ (date) ____ |
|---|---|

| 2. DATE DEBT WAS INCURRED<br>Various | 3. IF COURT JUDGMENT, DATE OBTAINED: |
|---|---|

4. TOTAL AMOUNT OF ADMINISTRATIVE CLAIM: $ 13,058,705 + oversight costs of NJDEP

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all additional charges.

5. Brief Description of Claim (attach any additional information):

Indemnification and statutory claims for environmental contamination of New Brunswick, New Jersey facility.

| 6. **CREDITS AND SETOFFS**: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to debtor.<br><br>7. **SUPPORTING DOCUMENTS**: *Attach copies of supporting documents*, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. Any attachment must be 8-1/2" by 11".<br><br>8. DATE-STAMPED COPY: To receive an acknowledgement of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim. | THIS SPACE IS FOR<br>COURT USE ONLY<br><br>RECEIVED<br>JUL 1 4 2009<br>KURTZMAN CARSON CONSULTANTS |
|---|---|

| Date<br><br>July 13, 2009 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any) |
|---|---|

Stephen T. Bobo, Attorney for Johnson Controls, Inc.

**MEMORANDUM IN SUPPORT OF ADMINISTRATIVE EXPENSE CLAIMS OF
JOHNSON CONTROLS, INC. AND JOHNSON CONTROLS BATTERY GROUP, INC.**

Johnson Controls, Inc. ("JCI") and Johnson Controls Battery Group, Inc. ("JCBGI")
assert administrative expense claims against Delphi Automotive Systems LLC ("Delphi") arising
from Delphi's sale of certain real property commonly known as 760 New Jersey Avenue, New
Brunswick, New Jersey (the "Property") to JCI in 2006. JCI subsequently transferred the
Property to JCBGI, which remains the owner of the Property.

**A. Factual Background**

1.      Delphi sold the Property to JCI pursuant to a certain Transfer Agreement Relating
To Transfer of Delphi's New Brunswick Battery Facility To JCI entered into between those
parties and dated May 26, 2006 (the "Transfer Agreement"). The Transfer Agreement was
approved by an order dated June 26, 2006 entered by the United States Bankruptcy Court for the
Southern District of New York in Bankruptcy Case No. 05-44481 (RDD) (the "Sale Approval
Order"), and the transaction closed shortly thereafter. A copy of the Transfer Agreement is
attached hereto as Exhibit A.

2.      Before it could sell the Property, Delphi was required to comply with applicable
New Jersey law, including the New Jersey Industrial Site Recovery Act, as amended, N.J.S.A.
13:1K-6 et seq. ("ISRA"). In order to begin to comply with ISRA, Delphi entered into a
Remediation Agreement with the New Jersey Department of Environmental Protection
("NJDEP") dated July 26, 2006 (the "Remediation Agreement"). Pursuant to the Remediation
Agreement, Delphi agreed to investigate and clean up the Property after selling it and agreed to
establish financial assurance that it could complete the cleanup. NJDEP required Delphi to
establish financial assurance in the initial amount of $535,000.

3.      After entering into the Remediation Agreement with NJDEP, Delphi investigated
the Property and made several submissions to NJDEP regarding the results of its investigation
and sought from NJDEP a statement that no further action was needed for certain portions of the
Property. NJDEP responded in a lengthy letter to Delphi dated May 8, 2009 which rejected most
of Delphi's assertions that it had sufficiently investigated the Property. NJDEP required Delphi
to investigate the Property further before submitting a plan for its cleanup. Delphi has not
responded to NJDEP's May 8, 2009 letter and has indicated that it intends to seek additional time
until August 13, 2009 to respond to NJDEP.

4.      NJDEP has incurred oversight costs in response to the release or threatened
release of hazardous substances at the Property and will continue to incur such oversight costs.
If Delphi does not pay for these oversight costs, NJDEP could seek to recover them from JCBGI,
as the current owner of the Property, under either the federal Comprehensive Environmental
Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9601

et seq., or the New Jersey Spill Compensation and Control Act, as amended (the "Spill Act"), N.J.S.A. 58:10-23.11 et seq. Delphi's liability under ISRA for NJDEP's oversight costs does not prevent NJDEP from using its CERCLA or Spill Act authority to seek to recover these costs from JCBGI.

5.      JCI and JCBGI each assert contractual claims for indemnification arising under § 7.1.A of the Transfer Agreement. JCI also asserts contractual indemnification claims under Exhibit 3.6.H to the Transfer Agreement (the "Environmental Matters Exhibit"). Both JCI and JCBGI assert statutory claims against Delphi arising under CERCLA and the Spill Act.

## B.  Claims for Indemnification under Transfer Agreement § 7.1.A

6.      Both JCI and JCBGI are entitled to indemnification from Delphi under Transfer Agreement § 7.1.A against damages, losses and expenses resulting from Delphi's breach of "any of its warranties or covenants" under the Transfer Agreement. Delphi covenanted in § 4.1 of the Environmental Matters Exhibit to investigate and clean up the Property as required by NJDEP to satisfy ISRA.

7.      Delphi has already breached or will breach this covenant by failing to complete the ISRA cleanup and failing to provide adequate financial assurance for that cleanup's completion. It is now clear that Delphi intends to liquidate pursuant to its Amended Plan of Reorganization without either performing the ISRA cleanup itself or setting aside an adequate reserve to fund the cleanup work by a third party. Delphi does not intend even to respond to the NJDEP regarding its further investigation of the Property until well after: (i) the Administrative Expense claims bar date, (ii) the date set for filing objections to the Modified Plan of Reorganization, and (iii) the hearing on confirmation of the Modified Plan of Reorganization. Despite receiving the May 8, 2009 letter from NJDEP requiring substantial additional investigation of the Property, Delphi also has not increased the amount of financial assurance provided to NJDEP to provide for funding to complete the cleanup beyond the initial $535,000 posted in 2006. Consequently, Delphi is attempting to put its liquidating plan into effect without ensuring completion or adequate funding of the ISRA cleanup. These omissions violate its covenant in § 4.1 of the Environmental Matters Exhibit.

8.      Under § 7.2 of the Transfer Agreement, it is sufficient for purposes of indemnification that JCI and JCBGI know of facts which may become the basis of a third-party claim against them. In particular, Delphi's failure to complete its ISRA cleanup obligations will likely make JCI and JCBGI subject to one or more claims by NJDEP under either the Spill Act or CERCLA to compel either or both of them to clean up the Property themselves. Accordingly, JCI and JCBGI are entitled to indemnification for the costs of performing the ISRA cleanup (the "Cleanup Costs"), as well as related costs and expenses.

9.      As set forth on the remediation summary attached as Exhibit B, the cleanup work that ISRA requires to be done includes the following actions:  Cleaning of the Building Interior, Facility Decontamination, and Soil Remediation and Disposal. The estimated Cleanup Costs for this work total $8,973,550, plus the accrued and accruing oversight costs of NJDEP. In addition,

- 2 -

JCI and JCBGI are entitled under § 7.1.A to be reimbursed for the expenses of investigation and attorneys fees they have accrued and will continue to accrue. To date, JCI and JCBGI have incurred attorneys' fees totaling $178,916 in connection with environmental issues relating to the Property, and they expect to incur extensive additional attorneys' fees both in connection with this claim and in dealing with the NJDEP. In similar environmental litigation that was recently resolved through mediation, JCI and JCBGI incurred attorneys' fees totaling $996,475. Therefore the total expected legal expense that will be incurred is $1,175,391.

10.    The total amount that JCI and JCBGI are entitled to be indemnified for under §7.1.A of the Transfer Agreement is $10,148,941 plus the NJDEP oversight costs. Delphi must either pay this total amount directly to JCI and JCBGI or else place that amount in trust for the sole purposes of funding the ISRA Cleanup Costs and oversight costs relating to the Property and reimbursing JCI and JCBGI for their attorneys fees.

## C. Contractual indemnification claims under Environmental Matters Agreement § 2

11.    Section 2 of the Environmental Matters Exhibit requires Delphi to indemnify JCI for Environmental Damages arising from Pre-Closing Environmental Contamination. The New Jersey Attorney General's office has informed counsel for JCI that it believes that neither the Sale Approval Order nor the provisions of the Bankruptcy Code prevent NJDEP from asserting claims against JCI and JCBGI with respect to pre-closing environmental conditions at the Property.

12.    Under the definition of "Environmental Damages" in §1.9 of the Environmental Matters Exhibit, JCI is entitled to indemnification for any cost "arising out of an Environmental Law" and incurred under such law in response to contamination that Delphi caused.

13.    The clean up of the areas that Delphi has already disclosed to NJDEP under ISRA and whatever additional cleanup work is required as a result of Delphi's subsequent disclosures to NJDEP are required by ISRA. Therefore the cost of such work is also subject to indemnification under § 2.1 of the Environmental Matters Exhibit. The estimated Cleanup Costs are detailed on the attached schedule.

14.    JCI is entitled to indemnification under §2.1 of the Environmental Matters Exhibit in the amount of $8,973,550 for the Cleanup Costs to comply with ISRA, as set forth on the attached Exhibit B, plus NJDEP's oversight costs. In addition, JCI is entitled to indemnification for the attorneys fees it has already incurred in the amount of $178,916 and the attorneys fees it expects to the incur in the amount of $996,475. Therefore, JCI is entitled to indemnification in the total amount of $10,148,941 plus NJDEP's oversight costs pursuant to § 2.1 of the Environmental Matters Exhibit.

## D. Statutory Claims

15.    JCI and JCBGI are also entitled to administrative expense status for their statutory claims against Delphi, which are: (1) a claim for cost recovery against Delphi under Section

- 3 -

107(a) of CERCLA, 42 U.S.C. § 9607(a); and (2) a claim for contribution under the Spill Act.
See N.J.S.A. 58:10-23.11f.a(2)(a).

16.     JCBGI has incurred and continues to incur costs to remove lead from stormwater
which enters the Property and is required to do so under a New Jersey Pollutant Discharge
Elimination System permit issued by NJDEP (the "Stormwater Permit") pursuant to the New
Jersey Water Pollution Control Act, as amended, N.J.S.A. 58:10A-1 et seq.  Under the
Stormwater Permit, JCI has been incurring an annual cost of approximately $380,400 since 2006
to remove lead present in such stormwater as a result of Delphi's operations.

17.     JCI has incurred costs in response to the release or threat of release to the
environment of lead on floors in buildings at the Property.  The amount of such costs is $3,315.

18.     Neither JCI nor JCBGI operated a battery manufacturing operation on the
Property.  JCBGI operated a battery fill and form operation at the Property for a seven month
period.  These operations did not involve the receipt, processing, recycling or reclamation of
lead.

19.     Portions of the Property were operated by either Delphi or its predecessor,
General Motors Corporation, for more than sixty years, from 1945 until 2006, to manufacture
lead/acid storage batteries for, primarily, the automotive industry.  As described by Delphi in
submittals made on its behalf to NJDEP pursuant to ISRA, Delphi is a former owner and a
former operator of the Property that has discharged lead and a variety of other hazardous
substances at the Property.

20.     JCI and JCBGI are entitled under CERCLA § 107(a) and under the Spill Act to
recover from Delphi all costs JCBGI has incurred to remove lead from Property stormwater and
all costs JCI has incurred in response to the release or threat of release of lead from buildings at
the Property, since all such result results from the acts and omissions of Delphi or its predecessors.
The amounts that JCBGI can recover from Delphi for stormwater treatment are costs already
incurred, which total $760,800, and the costs that will continue to be incurred for ongoing
treatment in the future, the present value of which is $3,324,355, as set forth in the spreadsheet
attached as Exhibit C.

21.     In addition, provision should be made for the Cleanup Costs under the Spill Act
and CERCLA §107(a).  JCI and JCBGI are entitled to declaratory relief that Delphi is liable for
all contamination existing at the Property at the time it was sold to JCI, and either Delphi should
be required to escrow funds for the Cleanup Costs, or else JCI and JCBGI should be permitted to
recover that amount from Delphi.  The necessary cleanup work includes the following remedial
activities:  Cleaning of the Building Interior, Facility Decontamination, and Soil Remediation
and Disposal.  These Cleanup Costs are estimated to total $8,973,550, as set forth on the attached
Exhibit B.  In addition, JCI and JCBGI can recover NJDEP's oversight costs.

22.     JCI is entitled to recover the $3,315 it has already incurred in response to the
release or threat of a release to the environment under Section 107(a) of CERCLA and the Spill
Act, and is also entitled to have the Cleanup Costs amount of $8,973,550 plus NJDEP's

- 4 -

oversight costs either escrowed or paid over to JCI to use in connection with completing the cleanup of the Property.

23.    JCBGI is entitled to recover from Delphi under Section 107(a) of CERCLA and the Spill Act for the $760,800 it has incurred in connection with the stormwater cleanup, and JCBGI is also entitled to have Delphi either escrow $3,324,355 for the costs of future stormwater treatment and escrow $8,973,550 for the Cleanup Costs plus NJDEP's oversight costs, or pay those amounts over to JCBGI.

US_ACTIVE-101907451.4-STBOBO-319417-00077 7/13/09 5:42 PM

# EXHIBIT A

EXECUTION COPY

### TRANSFER AGREEMENT RELATING TO
### TRANSFER OF DELPHI'S NEW BRUNSWICK
### BATTERY FACILITY TO JCI

     **THIS AGREEMENT,** made and entered into this **26th** day of **May, 2006** by and between **JOHNSON CONTROLS, INC.,** a Wisconsin corporation ("**Buyer**") and **DELPHI AUTOMOTIVE SYSTEMS LLC,** a Delaware limited liability company ("**Seller**").

### R E C I T A L S:

     **WHEREAS,** Seller is engaged in the Business (as hereinafter defined).

     **WHEREAS,** on October 8, 2005 (the "**Petition Date**"), Seller and certain of its Affiliates filed voluntary petitions for relief (the "**Bankruptcy Cases**") under Chapter 11 of Title 11, U.S.C. §§101 et seq. (as amended) (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

     **WHEREAS,** upon the terms and subject to the conditions set forth in this Agreement, and as authorized under Sections 363 and 365 of the Bankruptcy Code, Seller wishes to sell to Buyer, all right, title and interest of Seller in and to the Acquired Assets (as hereinafter defined), and Buyer wishes to make such purchase; subject to the conditions set forth in this Agreement.

     **WHEREAS,** Buyer and Seller are parties to a Tier 2 Component Supply Agreement ("**CSA**") under which Seller manufactures SLI batteries, at the Seller's facility in New Brunswick, New Jersey (the "**Facility**").

     **NOW, THEREFORE,** in consideration of the mutual promises and covenants contained in this Agreement, Buyer and Seller agree as follows:

1.    **DEFINITIONS.**  As used in this Agreement, the following words, when capitalized, shall have the respective meanings set forth below:

     1.1    "**Acquired Assets**" means the Real Property and all of the following assets to the extent owned by Seller and used or held for use primarily or exclusively in the Business at the Facility: (i) Administrative Assets; (ii) Permits; (iii) Personal Property owned by Seller, located at the Facility and used for manufacturing Products for Buyer under the CSA, including any addition thereto or any replacement, adjustment or modification thereof; and (iv) certain Inventory of the Business.  Exhibit 1.1 to this Agreement contains a list of the Acquired Assets consisting of Personal Property and Real Property as of the date hereof to the best of Seller's Knowledge. For the avoidance of doubt, it is specified that the term "**Acquired Assets**" does not include: (i) any machinery, equipment and other assets owned by Buyer; (ii) any of Seller's assets within its Laurel, Mississippi or Flint, Michigan operations (which make plastic battery trays, covers and other plastic components of Products) or Fitzgerald, Georgia operations (without affecting JCI's rights to its bailed assets within those facilities); (iii) assets owned by third parties; (iv) except as set forth in Section 7.3 (Indemnity), the benefits of any of Seller's or Seller's Affiliates' insurance policies relating to the operation of the

Business (including any right to proceeds thereunder); (v) all finished goods Inventory and all inventories, products, rights, properties, assets and businesses of the Business which shall have been transferred or disposed of by Seller prior to Completion in the Ordinary Course of Business or not otherwise in breach of this Agreement; (vi) Any Inventory consisting of work in process (other than green group batteries), or raw materials not listed on Exhibit 1.11 of this Agreement, including the excluded raw materials Inventory set forth on Exhibit 1.1(vi); (vii) any Contracts; and (viii) any document or information the transfer of which is prohibited by law or regulation.

**1.2** "**Administrative Assets**" means books, records and other administrative assets including advertising and promotional materials, catalogues, price lists, correspondence, mailing lists, customer lists, vendor lists, photographs, production data, sales materials and records, purchasing materials and records, personnel records of employees, billing records, accounting records, other financial records, sale order files, tool routings, labor routings, facility blueprints, service blueprints and plant layouts; provided, however that Administrative Assets does not include Technical Documentation or information and materials protected by attorney-client privilege (the lack of which materials are not material to the operation of the Business under the CSA).

**1.3** "**Affiliate**" means with respect to any Party any business or other entity directly or indirectly controlling, controlled by or under common control with such specified entity. For purposes of this definition, control means ownership of more than fifty percent (50%) of the shares or other equity interest having power to elect directors or persons performing a similar functions.

**1.4** "**Agreement**" means this Transfer Agreement, including Exhibit 4.1 and all other exhibits to this Agreement.

**1.5** Intentionally omitted.

**1.6** "**Business**" means the manufacture of starting SLI batteries by Seller at the Facility.

**1.7** "**Completion**" means completion of the purchase of the Acquired Assets by Buyer resulting from and in accordance with this Agreement.

**1.8** "**Completion Date**" means the date of Completion of the transfer of the Facility to Purchaser under this Agreement.

**1.9** "**Contracts**" means purchase orders, service contracts, leases, product warranty or service agreements and other commitments, agreements and undertakings relating to the Business.

**1.10** "**Improvements**" means buildings, fixtures and other improvements to Real Property, including the Facility.

**1.11** "**Inventory**" included within the Acquired Assets means finished Products, raw materials set forth on Exhibit 1.11, work-in-process consisting of green group batteries, packaging, stores, stock, supplies, spare parts and other inventory used in making Products located at the Facility.

2

**1.12** "**Lien**" means any lien, mortgage, charge, pledge, security interest, restriction on transferability, easement, defect of title or other claim, easement, encroachment or other encumbrance of any nature whatsoever on any Acquired Asset.

**1.13** "**IUE Consent**" means the IUE waiver of "no sale" provisions contained in the Delphi-IUE-CWA National Agreement (as defined in Exhibit 4.1) and IUE waiver of the Buyer's assumption of the Unpublished Delphi IUE-CWA Neutrality Letter or any other neutrality agreement, included as part of Exhibit 1.13 of this Agreement.

**1.14** "**Purchase Price**" means the purchase price to be paid for the Acquired Assets, exclusive of any Transaction Taxes, equal to One Dollar ($1.00) plus (i) $20.00 for every green group battery, and (ii) the CSA price for all finished goods Inventory, in each case located at the Facility as of close of business on July 31, 2006, based on a physical inventory to be conducted by the parties.

**1.15** "**Ordinary Course of Business**" means the ordinary course of business of the Business, consistent with past practice and custom, including the CSA.

**1.16** "**Party**" or "**Parties**" means Buyer and/or Seller.

**1.17** "**Permits**" means permits, concessions, grants, franchises, licenses and other governmental authorizations and approvals issued to Seller and that relate exclusively to the Facility or the Acquired Assets, to the extent that Seller or any of its Affiliates has the power, authority or right to transfer or assign such Permits.

**1.18** "**Permitted Lien**" means: (i) any Lien for taxes not yet delinquent; (ii) any statutory Lien arising in the ordinary course of business by operation of law with respect to a liability that is not yet delinquent; (iii) purchase money security interests arising in the Ordinary Course of Business; (iv) security interests relating to vendor tooling arising in the Ordinary Course of Business; (v) Liens and encumbrances of record; and (vi) Liens consented to by Buyer (such consent not to be unreasonably withheld).

**1.19** "**Personal Property**" means tangible personal property other than Administrative Assets, Inventory, including production machinery, equipment, tools, dies, jigs, molds, patterns, gauges, production fixtures, material handling equipment, business machines, office furniture and fixtures, in-factory vehicles, trucks, model shop equipment, laboratory test fixtures and other tangible personal property used by the Business, whether located at the Facility, at the place of business of a vendor or elsewhere.

**1.20** "**Products**" means SLI batteries.

**1.21** "**Real Property**" means the real property used by the Business and owned by Seller, as described in Exhibit 1.21, and all Improvements located thereon.

**1.22** "**Sale Approval Order**" means an order or orders of the Bankruptcy Court issued pursuant to Sections 363 and 365 of the Bankruptcy Code substantially in the form set forth on Exhibit 1.22 to this Agreement, authorizing and approving, among other things, the sale, transfer and assignment of the Acquired Assets to Buyer in accordance with the terms and conditions of this Agreement, free and clear of all Liens other than Permitted Liens.

3

1.23    "**Seller's Knowledge**" or "**Knowledge of Seller**" means the knowledge of any of the individuals listed on Exhibit 1.23 with respect to their respective functional areas of expertise. For this purpose, an individual will be deemed to have Knowledge of a particular fact or other matter if: (i) such individual is actually aware of such fact or other matter; or (ii) a prudent individual would be expected to discover or otherwise become aware of such fact or other matter in the course of conducting a reasonable inquiry of Delphi's files and its employees who, in the ordinary course of their job responsibilities, would reasonably be expected to have actual possession or actual personal Knowledge of such information.

1.24    "**SLI Batteries**" means starting, lighting and ignition lead-acid batteries.

1.25    "**Technical Documentation**" means: (i) assembly and parts drawings, material specifications and drawings for Products; (ii) information to assemble Products; (iii) labor and tool routing sheets; drawings of special tools, fixtures, dies, jigs, gauges and patterns, and service information; and (iv) operating manuals, instructions and other available, relevant documents relating to the operation of the machinery and equipment located at the Facility.

1.26    "**Transaction Taxes**" mean any sales taxes, documentary and stamp taxes, transfer taxes, use taxes, excise taxes, value-added taxes, registration duties, gross receipts or similar charges, all charges for filing and recording documents in connection with the transfer of the Acquired Assets.

2.    **COMPLETION OF THE SALE OF THE ACQUIRED ASSETS:**

2.1    **Completion**. Subject to the conditions set forth in this Section 2.1, Completion shall take place on the Completion Date at the offices of Seller in Troy, Michigan or at such other place as Buyer and Seller may jointly determine.    The Completion date will be the later of August 1 (12:01AM EST), 2006 and the date that is ten (10) days after the date of the Sale Approval Order, unless otherwise agreed by the Parties. Each Party's obligation to perform at the Completion Date is subject to:

A.    Bankruptcy Court approval of the Sale Approval Order, including without limitation, approval of Exhibit 1.13.

B.    Completion of the implementation of the attrition plan set forth in Exhibit 1.13 (the "**Attrition Plan**") to reduce the number of U.S. Hourly Employees to approximately one hundred (100) U.S. Hourly Employees, in accordance with the terms of the IUE Consent;

C.    Seller must not have negotiated any other Collective Bargaining Agreement which purports to be applicable to the New Brunswick Facility.

D.    The other Party's being in compliance, in all material respects, with its agreements with respect to Employee Matters that are such other Party's responsibility, and to be performed before Completion as described in Exhibit 4.1 hereto, and with such Party's representations and warranties set forth in Section 3 of this Agreement being true and correct in all material respects as of

the Completion Date, except where a failure is due to the acts or omissions of the other Party;

E.    The other Party must not be in default in any material respect under, and must not have rejected, the CSA dated June 30, 2005;

F.    The Facility must be an operational plant producing Products in accordance with the CSA, with such changes as contemplated in Exhibit 1.13; and

G.    The other party shall be in compliance in all material respects with the Environmental Matters Agreement dated June 30, 2005 with respect to the Facility.

H.    Each Party undertakes to pay to the other or to the relevant tax authorities the Transaction Taxes as required by applicable law and in accordance with Section 1.26.

**2.2    Seller Deliveries at Completion.**  At Completion Seller shall deliver to Buyer:

A.    A Bill of Sale for the Personal Property and Inventory, substantially in the form of Exhibit 2.2A hereto, duly executed together with an invoice relating to the Acquired Assets transferred;

B.    A covenant deed for the Real Property;

C.    A certificate that all the representations and warranties made in Article 3 by Seller are true and correct in all material respects, and that it has complied with its obligations under this Section 2.2, with the same force and effect, and subject to the same qualifications, as though made at Completion;

D.    Officer's certificate stating that at least $12.5 million USD has been incurred by Delphi in furtherance of the Attrition Plan, as referred to in Section 3.A(xi) of Exhibit 4.1; and

E.    Such other documents as may be necessary to give Buyer good and valid title to and ownership of the Acquired Assets.

**2.3    Buyer Deliveries at Completion.**  At Completion Buyer shall:

A.    A certificate that all the representations and warranties made in Section 3 by Buyer are true and correct in all material respects, and that it has complied with its obligations under this Section 2.3, with the same force and effect, and subject to the same qualifications, as though made at Completion; and

B.    Pay to Seller the Purchase Price by wire transfer in accordance with wiring instructions to be provided by Seller before Completion.

**2.4    Transfer of Acquired Assets.** Seller and Buyer hereby agree that, as of the Completion Date, title and risk of loss to all Acquired Assets shall pass from Seller to Buyer.

**2.5    Post Closing Deliveries.** Buyer will pay for assets, goods or services ordered by Seller on or before Completion for the Business in the Ordinary Course of Business to the extent such assets, goods or services are received by the Business after the Completion Date; other than Inventory items that have been excluded from the Acquired Assets under Section 1.1(vi) of this Agreement. If any such excluded items are delivered to the facility after Completion, Buyer will promptly contact Seller and segregate such items in a reasonable manner, and Seller and Buyer will cooperate in Seller's removal of such items within 30 days after such notice as set forth in Section 8.15 below.

**2.6    Prorations, Adjustments of Expenses Following Completion:**

A.    **Prorations:**

(i)    To the extent that Seller makes any payment relating to the Business prior to, on or following the Completion Date with respect to any item listed in clause (ii) below relating to periods following the Completion Date for which Buyer will receive a benefit, Buyer shall reimburse Seller on a per diem basis, unless otherwise provided for; and

(ii)    To the extent Buyer makes any payment relating to the Business following the Completion Date with respect to any item listed below relating to periods on or prior to the Completion Date for which Seller received a benefit, Seller shall reimburse Buyer on a per diem basis, unless otherwise provided for, in each case for the following:

(a)    Personal, real property and other ad valorem Taxes, with real property Taxes allocated pursuant to Section 5.5.

(b)    Water, wastewater treatment, sewer charges and other similar types of charges and/or Taxes thereon and any other assessments payable with respect to the Business.

(c)    Electric, fuel, gas, telephone and other utility charges.

(d)    Reimbursable employee business expenses will be paid by Seller if incurred prior to or on the Completion Date or Buyer if incurred after the Completion Date.

(e)    Rentals and other charges under leases to be transferred to or assumed by the Buyer pursuant to this Agreement.

(f)    Payments and charges due pursuant to any Contract (other than pursuant to collective bargaining agreements,

6

Benefit Plans (as defined in Section 3(3) of ERISA)), employee payroll-related items except as set forth in clause (d), Permit, commitment or other binding arrangement to which Seller is a party or is obligated and which are being assumed by the Buyer pursuant to this Agreement or offered to Buyer by Seller on a transition services basis, as may be agreed by the Parties prior to Completion.

B.   **Further Assurance.**   To the extent that, after the Completion Date, Delphi, on the one hand, or Buyer, on the other hand, receives any bills or invoices for any of the items listed in this Section 2.6 or similar items, relating to both pre-Completion and post-Completion periods, such Party shall, within ten (10) business days, send any such bills or invoices to the other Party.   If necessary to avoid incurring interest, penalties and/or late charges, the Party receiving any such bill or invoice shall pay all amounts shown to be due thereon, and shall invoice the other Party for all amounts owed by such other Party thereunder, and such other Party shall reimburse such amounts in accordance with Section 2.6C.

C.   **Payments.**   Any payments due under this Section 2.6 shall be made within fifteen (15) days after the end of the month in which a bill or invoice is sent to a Party pursuant to Section 2.6C; provided, however, that the disputed portion of any such item shall be paid within fifteen (15) days after the final determination thereof on an item-by-item basis.   When any Party makes a payment to a third party which is required to be reimbursed to it by another Party, the reimbursement payment shall be considered the repayment of an advance. Such payments shall be made by wire transfer in immediately available funds.

2.7   **Approvals and Consents; Cooperation; Notification.**   Seller shall notify, as required by the Bankruptcy Court, all parties entitled to notice of the proposed sale of the Acquired Assets to Buyer, and Buyer will cooperate with Seller in attempting to obtain the Sale Approval Order.

2.8   **Fitzgerald.**   Regarding Delphi's supply of Products to JCI from Delphi's Fitzgerald, Georgia battery manufacturing facility, Delphi will continue to supply such batteries to JCI in accordance with the terms of the Component Supply Agreement between the parties dated July 1, 2005 ("CSA"), as amended. In no event shall the pricing of Products manufactured at Fitzgerald be modified other than the GM discounts and other changes and adjustments contemplated by the existing CSA terms.

3.   **REPRESENTATIONS, WARRANTIES AND INDEMNITIES:**

3.1   **Representations and Warranties made by each Party.**   Each of Seller and Buyer makes the representations and warranties contained in this Article 3 to the other Party except for those in Section 3.6, which are made solely by Seller to Buyer. The representations and warranties contained in this Article 3 are made on the date of this Agreement and are deemed to be repeated on the Completion Date.

3.2   **Power and Authority.**   Subject to Bankruptcy Court approval of the Sale Approval Order, it has the power to execute, deliver and perform this Agreement, and

7

has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby.

**3.3    Authorizations.**  Subject to Bankruptcy Court approval of the Sale Approval Order, all authorizations required in connection with the execution, delivery, performance, validity and enforceability of, and the transactions contemplated by, this Agreement have been obtained or effected and are in full force and effect, provided, however, that performance of this Agreement is subject to Buyer and Seller taking necessary action as required to meet their respective obligations regarding employee matters, as set forth on Exhibit 4.1 hereto.

**3.4    Enforceability.**  Subject to Bankruptcy Court approval of the Sale Approval Order, this Agreement constitutes its legal, valid and binding obligation enforceable against it in accordance with its terms.

**3.5    No Breach.**  Subject to Bankruptcy Court approval of the Sale Approval Order, entering into this Agreement and performing its undertakings hereunder shall not result in the breach of any provision of, or constitute a default under, any judgment, decree, indenture, mortgage or other agreement or instrument to which it is a party or by which it is bound.

**3.6    Miscellaneous Matters Relating to Business:**

     A.    **Ownership of the Acquired Assets.**  Seller has good, valid and marketable title to the Acquired Assets, and upon entry by the Bankruptcy Court of the Sale Approval Order, Seller shall transfer and convey the Acquired Assets free and clear of any Lien other than Permitted Liens.  Except for this Agreement and the Bankruptcy Court approvals reflected in the Sale Approval Order, the Real Property will be transferred free and clear of any restrictions with respect to the transferability or divisibility thereof.  At the Closing, Buyer will receive good and marketable fee title or leasehold title (as applicable) to all of the Real Property owned by Seller, free and clear of all Liens other than the Permitted Liens.

     B.    **Condition.**  The Real Property and Personal Property (other than Inventory) have been maintained as required by the CSA and are in such condition (considering age and purpose for which used) as to enable the Business to be conducted as currently conducted without material disruption.

     C.    **Inventory.**    SELLER MAKES NO WARRANTY OF WHATSOEVER KIND OR NATURE REGARDING INVENTORY, ALL OF WHICH IS BEING SOLD "AS IS" AND "WHERE IS", AND SELLER HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES, INCLUDING THE CONDITION OF THE INVENTORY AND EACH PART THEREOF, AND THE ADEQUACY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE INVENTORY OR ANY PART THEREOF.

     D.    **Real Property.**  To Seller's Knowledge, the use of the Real Property as currently used is a permitted use by right in the applicable zoning classification and is not a nonconforming use or a conditioned use, and no variances are needed and none have been granted with respect to the Real

Property. There are currently in full force and effect duly issued certificates of occupancy permitting the Real Property and the Facility to be legally used and occupied for the purpose of conducting the Business. The Real Property has rights of access to dedicated public highways. To Seller's Knowledge, no fact or condition exists that would prohibit or adversely affect the ordinary rights of access to and from the Real Property from and to the existing highways and roads, and there is no pending or, to Seller's Knowledge, threatened restriction or denial, governmental or otherwise, upon such ingress and egress. Seller has not received notice of: (i) any claim of adverse possession or prescriptive rights involving or affecting any of the Real Property; (ii) any structure located on any Real Property that encroaches on or over the boundaries of neighboring or adjacent properties; or (iii) any structure of any other person or entity that encroaches on or over the boundaries of any Real Property. None of the Real Property is located in a flood plain, flood hazard area, wetland or lakeshore erosion area within the meaning of any Law or Order.

E.    **No Condemnation, Expropriation or Similar Action.**    To Seller's Knowledge, neither the whole nor any portion of the Real Property is subject to any order to be sold (other than the Sale Approval Order) or is being condemned, expropriated or otherwise taken by any governmental entity with or without payment of compensation therefore, and no such condemnation, expropriation or taking has been planned, scheduled or proposed.

F.    **Compliance.**    The Real Property is, or at the time of Completion will be, in compliance in all material respects with any applicable law, regulation or ordinance, and Seller has not received any notice, written or to the best of Seller's knowledge oral, of any such violation.

G.    **Litigation.**    Except for matters disclosed prior to Completion and for which Seller will retain responsibility if so required under the terms of the CSA, there is no litigation or administrative proceeding and to Seller's Knowledge, threatened litigation or administrative proceeding which affects or could affect the Real Property or Buyer's ability to conduct the Business at the Facility.

H.    **Environmental Matters.**    Seller makes no representations or warranties regarding environmental matters in this Agreement (notwithstanding anything to the contrary herein). Notwithstanding the aforementioned, to the extent that the Sale Approval Order or other applicable provisions of the Bankruptcy Code fails to discharge liability with respect to any claims brought by a third party against Buyer relating to pre-Completion environmental matters at the Facility, Seller will indemnify Buyer as set forth in Exhibit 3.6.H to this Agreement.

I.    Seller represents and warrants that, except for the unpublished Neutrality Letter and Exhibit 1.13 referenced herein, Seller has no current agreements or understandings with the IUE-CWA which create obligations or liabilities for Buyer at its other plants if Buyer purchases the New Brunswick facility or assumes the terms of the Delphi IUE-CWA National Agreement or the Delphi IUE-CWA Local Agreement.

9

J.    EXCEPT FOR SPECIFIC REPRESENTATIONS AND WARRAN-
TIES CONTAINED IN THIS AGREEMENT, THE ACQUIRED ASSETS ARE
BEING SOLD ON AN "AS IS," "WHERE IS" BASIS AND SELLER DOES NOT
MAKE ANY WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY,
FITNESS OR OTHERWISE WITH RESPECT TO THE ACQUIRED ASSETS
WHICH EXTEND BEYOND THE AFORESAID SPECIFIC REPRESENTATIONS
AND WARRANTIES.

**3.7    Product Warranty/Liability:**

A.    **Buyer Indemnity.**    Buyer will defend, indemnify and hold
harmless Seller and its directors, officers, agents and employees, from and
against any and all claims, suits, causes of action, liabilities, losses, damages,
costs of settlement, and expenses (including reasonable attorney fees) which
may be imposed upon or incurred by Seller from claims, suits or causes of action
(including without limitation those for death, personal injury, or property damage)
by any Person whatsoever at any time against Seller and/or its directors, officers,
agents and employees to the extent arising from, caused or alleged to be caused
by: (a) defective or improper design or manufacture of any Products
manufactured by Seller under the CSA; (b) infringement of any intellectual
property right (including patent, trademark, copyright, moral, industrial design or
other proprietary rights, or misuse or misappropriation of trade secret) in
connection with the design or manufacture of any Products other than
infringement of U.S. Patent No. 4,906,540 or U.S. Patent No. 5,401,278; and/or
(c) the failure of the design of Products to comply with any applicable Laws.

B.    **Seller Indemnity.**    To the extent that the Sale Approval Order or
other applicable provisions of the Bankruptcy Code fails to discharge liability with
respect to any claims for Products manufactured at the Facility brought by a third
party against Buyer relating to pre-Completion Product warranty/liability matters,
Seller will defend, indemnify and hold harmless Buyer and its directors, officers,
agents and employees, from and against any and all claims, suits, causes of
action, liabilities, losses, damages, costs of settlement, and expenses (including
reasonable attorney fees) which may be imposed upon or incurred by Buyer from
claims, suits or causes of action (including without limitation those for death,
personal injury, or property damage) by any Person whatsoever at any time
against Buyer and/or its directors, officers, agents and employees to the extent
arising from or caused by: (a) infringement of U.S. Patent No. 4,906,540 or U.S.
Patent No. 5,401,278;    (b) infringement of any intellectual property right
(including patent, trademark, copyright, moral, industrial design or other
proprietary rights, or misuse or misappropriation of trade secret) other than in
connection with the design or manufacture of any Products; (c) the failure of the
Products manufactured by Seller at the Facility under the CSA to comply in any
material respect with the applicable specifications as a result of Seller's failure to
comply with the Manufacturing and Quality Procedures set forth in the CSA or
negligent workmanship; and/or (d) any and all claims related to the Facility, its
employees, Products to the extent arising in any manner out of facts or
circumstances in existence prior to July 1, 2005.

4.    **EMPLOYEE MATTERS.** The treatment of U.S. Hourly Employees and U.S. Salaried Employees, and the obligations of Seller and Buyer with respect thereto, will be as set forth in Exhibit 4.1.

5.    **TAX MATTERS:**

5.1    **Seller Responsibilities.** Seller shall file any Tax Returns and pay any Taxes which may be required by any federal, state, local or foreign tax authorities or governmental agencies by reason of business conducted by Seller on or prior to the Completion Date.

5.2    **Buyer Responsibilities.** Buyer shall file any Tax Returns and pay any Taxes which may be required by any federal, state, local or foreign tax authorities or governmental agencies by reason of business conducted by Buyer after the Completion Date. All United States or foreign, national, state or local sales taxes, documentary and stamp taxes, transfer taxes, registration taxes, use taxes, gross receipts taxes, registration duties and all charges for filing and recording documents in connection with the transfer of the Acquired Assets (including intellectual property filing and recording fees), as well any permit, transfer and filing fees required in order to obtain governmental approvals and consents relating to the transactions contemplated by this Agreement ("**Transfer Taxes**"), shall be borne by Buyer.

5.3    **Mutual Assistance.** Without affecting the foregoing responsibilities, Seller and Buyer shall provide reasonable assistance during normal business hours to one another to resolve any Tax issues which may relate to their respective business activities utilizing the Acquired Assets and personnel. Such assistance may include, without limitation, access to relevant business records and personnel in connection with: (i) the preparation and filing of Tax Returns, elections, consents, certifications and claims for refunds; (ii) the determination of liability for Taxes; and (iii) the response to tax audits, examinations and other proceedings. To the extent permitted by applicable law, Buyer and Seller agree to reasonably cooperate with each other to complete any and all exemption certificates or other documents that exempt any portion of the Purchase Price from any of the Transaction Taxes prior to either the Completion Date or the due date for such Transaction Tax.

5.4    **Definitions.** For purposes of this Agreement, the words "**Taxes**" and "**Tax Return**" are defined as follows:

A.    "**Taxes**" mean any tax or similar governmental charge, impost or levy whatsoever (including, without limitation, income, franchise, transfer, taxes, use, gross receipts, value added, employment, excise, ad valorem, property, withholding, payroll, minimum, windfall profit taxes, transfer fees, customs duties or registration duties), together with any related penalties, fines, additions to tax or interest, imposed by the United States or any state, county, local or foreign governmental or subdivision or agency thereof;

B.    "**Tax Return**" means any return, declaration, report, claim for refund or information return or statement, or any other similar filings related to Taxes, including any schedule or attachment thereto.

11

**5.5    Real Estate Taxes.** All real estate taxes and assessments assessed on the Real Property for the calendar year in which the Completion occurs shall be prorated between Buyer and Seller. The Seller shall be allocated tax liability for the portion of the year beginning on January 1 and ending on the Completion Date; the Buyer shall be allocated tax liability for the portion of the year beginning on the day following the Completion Date and ending on December 31. The percentage for each party will be the number of days in its portion of the year divided by the total number of days in the year. Since the actual determination of tax liability for a given calendar year occurs in June, if the Completion Date occurs before the tax has been determined for the year, the calculation of the prorated taxes will be made as soon as practical after the tax bill has been rendered for the calendar year. If the Completion Date occurs after the tax liability has been determined for the year, the calculation of the prorated taxes will take place at Completion. Each party will be responsible for paying or otherwise discharging any installments due in the year in which the Completion Date occurs based on ownership of the property at the time the installment is due. If the tax allocated to a party exceeds the installments paid or to be paid by that party, that party will make a payment to the other party equal to the excess of the prorated liability over the sum of the installment payments paid or to be paid. The parties agree to cooperate as necessary to accurately and promptly determine the prorated tax liability.

## 6.    GOVERNING LAW; DISPUTE RESOLUTION:

**6.1    Governing Law.** This Agreement shall be construed and enforced in accordance with the laws of the State of New York, without giving effect to rules governing the conflict of laws. Buyer and Seller irrevocably and unconditionally consent to submit to the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agree not to commence any litigation relating thereto except in the Bankruptcy Court).

**6.2    Dispute Resolution:**

A.    Buyer and Seller will, in the first instance, attempt to settle any and all claims or disputes arising in connection with this Agreement by good faith negotiations by senior management of each Party. If the dispute is not resolved by senior management within thirty (30) days after delivery of a written request for such negotiation by either Party to the other, either Party may make a written demand (the "**Demanding Party**") for formal dispute resolution (the "**Notice of Dispute**") and specify therein in reasonable detail the nature of the dispute. Within ten (10) days after receipt of the Notice of Dispute, the receiving Party (the "**Defending Party**") shall submit to the other a written response. The Notice of Dispute and the response shall include: (i) a statement of the respective Party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that Party and of any other person who will accompany the executive to meetings of the parties. Within fifteen (15) days after such written notification, the executives (and other named in the Notice of Dispute or response) will meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute (the "**Dispute Resolution Meeting**"). All reasonable requests for information made by one Party to the other will be honored promptly. All negotiations pursuant to this Section 6.2A are confidential and shall be treated as

compromise and settlement negotiations for purposes of applicable rules of evidence.

**B.** The parties agree that neither of them will initiate legal action in respect of a dispute within the period of fifteen (15) days following the Dispute Resolution Meeting. In the absence of agreement at the Dispute Resolution Meeting and following that fifteen (15) day period, any party shall be free to pursue its rights and remedies as it may see fit in accordance with this Agreement.

7. **INDEMNIFICATION:**

   7.1    **Indemnification:**

   A.    **Indemnification Provisions for Benefit of Buyer.** If Seller breaches any of its warranties or covenants contained in this Agreement, and Buyer makes a written claim for indemnification against Seller in accordance with the procedures set forth in Section 7.2 below within the applicable survival period, to the extent that the Sale Approval Order or other applicable provisions of the Bankruptcy Code fails to discharge the underlying third party claim, Seller agrees to indemnify Buyer and its Affiliates and their officers, directors, employees and agents (individually a **"Buyer Indemnitee"** and collectively the **"Buyer Indemnitees"**) and to hold each Buyer Indemnitee harmless from and against all damages, losses and expenses (including reasonable expenses of investigation and attorneys' fees) (**"Losses"**) to the extent caused by or arising out of: (i) any breach of warranty or inaccurate or erroneous representation of Seller contained in this Agreement or in any certificate delivered pursuant to this Agreement; or (ii) any breach of this Agreement. Buyer shall be named as an additional insured on Seller's General Liability and Excess Liability policies as related to the Business, but only to the extent of Seller's Indemnification Obligations under this Agreement. Buyer agrees that all claims for indemnification shall be presented to Seller in advance of its insurers to the extent that Buyer does not invalidate its obligations to ensure coverage of such claims is not jeopardized.

   B.    **Indemnification Provisions for Benefit of Seller.** If Buyer breaches any of its Warranties or covenants contained in this Agreement, and Seller makes a written claim for indemnification against Buyer in accordance with the procedures set forth in Section 7.2 below within the applicable survival period, Buyer agrees to indemnify Seller and its Affiliates and their officers, directors, employees and agents (individually a **"Seller Indemnitee"** and collectively the **"Seller Indemnitees"**) and to hold each Seller Indemnitee harmless from and against all Losses to the extent caused by or arising out of: (i) any breach of warranty or inaccurate or erroneous representation of Buyer contained in this Agreement or in any certificate delivered pursuant to this Agreement; (ii) any breach of this Agreement.

   C.    **Mitigation.** Notwithstanding anything to the contrary in this Section B, no Party shall have an obligation to indemnify the other Party with respect to any Losses to the extent such Losses could have reasonably been

avoided by such other Party, or the damage to such other Party from such Losses reasonably could have been mitigated.

D. **Deductible and Cap.** No Indemnitor shall be liable to an Indemnitee until the amount of all indemnifiable Losses of such Indemnitee in the aggregate exceeds USD One Hundred Thousand ($100,000.00) ("**Deductible Amount**") threshold, after which point the Indemnitor will be obligated to the Indemnitee from and against indemnifiable Losses in excess of the Deductible Amount until the amount of indemnifiable Losses paid by such indemnifying Party in the aggregate reaches a cap equal to USD Twenty Million ($20 million) (the "**Cap Amount**") after which point the indemnifying Party will have no further obligation with respect to Losses under this Agreement.

**7.2    Indemnification Procedure.** When a Party obtains knowledge of the commencement of any third-party claim, action, suit or proceeding or of the occurrence of any event or the existence of any state of facts which may become the basis of a third-party claim (any such claim, action, suit or proceeding or event or state of facts being hereinafter referred to in this Section as a "**Claim**"), in respect of which such Party (an "**Indemnitee**") is entitled to indemnification under this Agreement, such Indemnitee shall promptly notify the indemnitor under this Agreement (the "**Indemnitor**") of such Claim in writing; provided, however, that any failure to give such notice will not waive any rights of the Indemnitee except to the extent that the rights of the Indemnitor are prejudiced thereby. With respect to any Claim as to which such notice is given by the Indemnitee to the Indemnitor, the Indemnitor may, subject to the provisions below, assume the defense and settlement of such Claim; provided, however, that: (i) the Indemnitee shall cooperate with the Indemnitor in the defense and settlement of such Claim in any manner reasonably requested by the Indemnitor; the Indemnitee will not, and it will use all reasonable efforts to ensure that its employees will not, make an admission of liability in respect of any Third Party Claim and as soon as it becomes aware of a Third Party Claim it shall issue an instruction to relevant employees requiring them not to make any disclosure or statement to any third party in relation to any Third Party Claim or any product or service to which such Third Party Claim relates (except for notices to governmental authorities as required by applicable Laws) without the prior written consent of the Indemnitor (such consent not to be unreasonably withheld or delayed); (ii) the Indemnitee shall have the right to pay or settle such Claim at any time, in which event the Indemnitee shall be deemed to have waived any right to indemnification therefor by the Indemnitor; (iii) the Indemnitee shall be permitted to join in the defense and settlement of such Claim and to employ counsel at its own expense; and (iv) the Indemnitor shall not consent to the entry of any judgment or enter into any settlement with respect to such Claim without the written consent of the Indemnitee, provided further, however, that if Indemnitee fails to consent to a written settlement offer and judgment is subsequently entered in an amount exceeding the amount of such offer, then Indemnitor shall have no responsibility for the amount of such excess.

If: (i) the Indemnitor fails to assume the defense of such Claim or, having assumed the defense and settlement of such Claim, fails reasonably to contest such Claim in good faith; and (ii) the remedy sought by the claimant with respect to such Claim is not solely for money damages, the Indemnitee, without waiving its right to indemnification, may assume the defense and settlement of such Claim; provided, however, that: (a) the Indemnitor shall be permitted to join in the defense and settlement of such Claim and to employ counsel at its own expense; (b) the Indemnitor shall

14

cooperate with the Indemnitee in the defense and settlement of such Claim in any
reasonable manner requested by the Indemnitee; and (c) the Indemnitee shall not
consent to the entry of any judgment or enter into any settlement with respect to such
Claim without the written consent of the Indemnitor.

As used in this section, the term Indemnitee shall be deemed to include the plural
thereof where the rights or obligations of more than one Indemnitee may be involved.

**7.3    Sole and Exclusive Remedy.**  Each of Buyer and Seller acknowledge
and agree that the indemnification provided in this Article 7 shall be the sole and
exclusive remedy of the parties and their Affiliates and their respective successors and
assigns in respect of any claim for monetary damages arising out of or under this
Agreement.

## 8.    GENERAL PROVISIONS:

**8.1    No Inducement.**  The Parties represent to each other and each agrees
that, neither it nor any person acting on its behalf has, in contravention of any applicable
law, given or offered to give or will give or offer to give any sum of money or other
material consideration to any person, directly or indirectly, as an inducement to obtain
business hereunder or to influence the granting of licenses or other governmental
permissions to enter into this Agreement or perform obligations hereunder.

**8.2    Governing Approvals.**  Seller and Buyer, respectively, shall be
responsible for compliance with and for the obtaining of such approvals and/or permits
as may be required under national, state and local laws, ordinances, regulations and
rules as may be applicable to the performance of their respective responsibilities and
obligations under this Agreement.

**8.3    No Agency.**  This Agreement does not constitute either Party the agent
or legal representative of the other Party.   Neither Party is authorized to create any
obligation on behalf of the other Party.

**8.4    Successors and Assigns.**  This Agreement shall be binding upon and
inure to the benefit of Seller and Buyer and their respective successors and assigns. No
Party may assign this Agreement or any of its rights, interests or obligations hereunder
without the prior written consent of the other Party; provided, however, that Seller has
the right to assign any of its rights or obligations hereunder to any division, subsidiary or
affiliate of Seller or to any successor to any or all of Seller's business; provided that,
notwithstanding such assignment Seller shall remain liable for all of its obligations
hereunder.

**8.5    No Implied Waiver.**  The failure of either Party at any time to require
performance by the other Party of any provision hereof shall in no way affect the full right
to require such performance at any time thereafter. The waiver by either Party of a
breach of any provision hereof shall not constitute a waiver of the provision itself.  The
failure of either Party to exercise its rights provided under this Agreement shall not
constitute a waiver of such right.

15

8.6    **Notices**.    Any notice under this Agreement shall be in writing (letter, facsimile or telegram) and shall be effective when received by the addressee at its address indicated below:

Notice sent to Seller shall be addressed as follows:

> **DELPHI AUTOMOTIVE SYSTEMS LLC**
> 5725 Delphi Drive
> Troy, Michigan 48098
> Attn:  President-Delphi Energy & Chassis Systems
> Fax No.:  248-813-4301

with a copy to:

> **DELPHI AUTOMOTIVE SYSTEMS LLC**
> 5725 Delphi Drive
> Troy, MI 48098-2815
> Attention:  Assistant General Counsel
> Commercial & Transactional
> Fax: 248-813-2491

Notice sent to Buyer shall be addressed as follows:

> **JOHNSON CONTROLS, INC.**
> 5757 N. Green Bay Avenue
> PO Box 591
> Milwaukee, Wisconsin  53201-0591
> Attn:  President - Battery
> Fax No.:  414-524-2828

with a copy to:

> **JOHNSON CONTROLS, INC.**
> 5757 N. Green Bay Avenue
> PO Box 591
> Milwaukee, Wisconsin  53201-0591
> Attn:  General Counsel
> Fax No.:  414-524-2077

The parties by notice hereunder may designate other addresses to which notices shall be sent.

8.7    **Amendments**.    This Agreement and the Mutual Nondisclosure Agreement dated April 24, 2006 between the Parties, constitutes the entire agreement of the Parties, and supersedes all previous agreements, oral or written, between Buyer and Seller with respect to the subject matter hereof. No amendment or modification to this Agreement shall be binding upon either Party unless it is in writing and is signed by both parties.

8.8    **Expenses**.    Whether or not the transactions contemplated by this Agreement are consummated, Buyer and Seller shall each bear its respective

16

accounting, legal, financial, advisory and other expenses incurred in connection with the transactions contemplated by this Agreement.

**8.9    Headings.**   The Article and/or Section headings herein are used for convenience of reference only and shall not be deemed a part of this Agreement for any purpose.

**8.10    Severability.**   If any provision of this Agreement shall be held to be invalid, illegal or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, that provision shall be deemed severed to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the parties shall negotiate in good faith to arrive at an alternative replacement provision approximating the parties' original business objective. The remaining provisions hereof shall remain in effect.

**8.11    Counterparts.**   This Agreement may be executed in more than one counterpart, each of which shall for all purposes be deemed to be an original and all of which shall constitute one and the same agreement.

**8.12    Third Parties.**   Nothing contained in this Agreement is intended to or shall be construed to confer upon or give to any person, firm, corporation, association, labor union or trust (other than the Parties, their Affiliates and their respective permitted successors and assigns), any claims, rights or remedies under or by reason of this Agreement.

**8.13    Bulk Sales.**   Buyer hereby waives the requirements, if any, of all applicable bulk sales laws.

**8.14    Force Majeure.**   Each Party shall be temporarily excused from performing its obligations under this Agreement for so long as such performance is prevented or delayed by any event of Force Majeure. The term **"Force Majeure"** shall, for purposes of this Agreement, include: (i) any strike or lockout at the plant of a Party or any of its suppliers; (ii) any act or omission of any government authority; or (iii) any other cause beyond the reasonable control of a Party. A Party affected by an event of Force Majeure shall promptly notify the other Party and shall use its best efforts to overcome and mitigate such event of Force Majeure.

17

8.15    **Excluded Inventory**. Within 30 days after Completion, Seller will remove at its sole cost and expense all Inventory not included in the Acquired Assets. Buyer will cooperate with Seller and provide reasonable access to the Facility to facilitate such removal.

**THIS AGREEMENT** was executed as of the day and year first set forth above.

DELPHI AUTOMOTIVE SYSTEMS LLC

By:

Name:  **Keith Stipp**

Title:  **Finance Director,
Automotive Holdings Group**

**JOHNSON CONTROLS, INC.**

By:

Name: **Gregg M. Sherrill**

Title:    **Vice President, and General
Manager
Automotive Systems Group
Battery Division**

18

## EXHIBIT 1.1

| Inventory number | Asset | Cap.date | Asset description |
|---|---|---|---|
| DGT004763N01 | 1000654 | 12/1/1946 | GRADING & LANDSCAPING |
| DGT004765N01 | 1000655 | 12/1/1946 | ROADWAY |
| DGT004766N01 | 1000656 | 12/1/1946 | SIDEWALKS |
| DGT004768N01 | 1000657 | 12/1/1946 | SEWERS-STORM |
| DGT004770N01 | 1000658 | 12/1/1946 | SEWERS-SANITARY |
| DGT004771N01 | 1000659 | 4/1/1947 | GRADING & LANDSCAPING |
| DGT004772N02 | 1000660 | 12/1/1946 | RAILROAD TRACKS & SIDINGS |
| DGT004774N | 1000661 | 12/1/1946 | WATER LINES |
| DGT004776N | 1000662 | 12/1/1946 | TUNNELS |
| DGT004888N | 1000663 | 6/1/1946 | LAND-NEW BRUNSWICK |
| DGT004911N | 1000664 | 12/1/1953 | MAIN BUILDING-WEST ADDITION-SEWERS |
| DGT004925N | 1000665 | 8/1/1954 | MAIN BUILDING-WEST ADDITION-PAVEMENT |
| DGT004926N | 1000666 | 8/1/1954 | RETAINING WALL |
| DGT008569N | 1000667 | 12/1/1956 | ROADWAY |
| DGT008607N | 1000668 | 3/1/1958 | FENCE |
| DGT008675N | 1000669 | 12/1/1965 | LAND-NEW BRUNSWICK |
| DGT008680N | 1000670 | 4/1/1966 | LAND IMPROVEMENTS |
| DGT008711N | 1000671 | 10/1/1966 | PARKING AREA |
| DGT008712N | 1000672 | 12/1/1966 | LIGHTING-OUTSIDE |
| DGT008725N | 1000673 | 12/1/1968 | RAILROAD SIDING |
| DGT012029N | 1000674 | 10/1/1974 | LAND-NEW BRUNSWICK |
| DGT012052N | 1000675 | 9/1/1976 | CONCRETE PAD-PVC |
| DGT012053N | 1000676 | 9/1/1976 | CONCRETE PAD-MATERIAL STORAGE |
| DGT012054N | 1000677 | 9/1/1976 | LEAD RECLAIM BUILDING-CONCRETE PAD F/LEAD STORAGE |
| DGT012085N | 1000678 | 10/1/1977 | ACID MIX BUILDING-CONCRETE PAD |
| DGT012086N | 1000679 | 10/1/1977 | ACID MIX BUILDING-CONCRETE PAD |
| DGT012087N | 1000680 | 10/1/1977 | CONCRETE PAD-REAR OF POWER HOUSE |
| DGT012087N01 | 1000681 | 2/1/1978 | CONCRETE PAD-REAR OF POWER HOUSE |
| DGT012088N | 1000682 | 10/1/1977 | RETAINING WALL-WATER TOWER |
| DGT012110N | 1000683 | 7/1/1978 | GRADING & LANDSCAPING |
| DGT012221N | 1000685 | 2/1/1989 | WELLS-MONITORING |
| DGT012232N | 1000686 | 6/1/1995 | STORM WATER COLLECTION/TREATMENT SYSTEM |
| DGT690066 | 1000687 | 11/1/2001 | ELIMINATION OF UNDERGROUND PROCESS SEWER |
| DGT004779N01 | 2001722 | 12/1/1946 | MAIN BUILDING |
| DGT004779N02 | 2001723 | 11/1/2001 | PHASE III VENTILATION REPAIRS |
| DGT004779NO1 | 2001724 | 11/1/2001 | LIGHTING FIXTURES,PLANT WALL,GAS MAIN |
| DGT004781N01 | 2001726 | 12/1/1946 | GATE HOUSE |
| DGT004910N01 | 2001727 | 12/1/1953 | MAIN BUILDING-WEST ADDITION |
| DGT004912N | 2001728 | 12/1/1953 | MAIN BUILDING-FIRE PROOF ROOF |
| DGT004915N | 2001729 | 6/1/1954 | HOSE HOUSE |
| DGT004923N01 | 2001730 | 12/1/1954 | MAIN BUILDING-WEST ADDITION-ACCESS |
| DGT004928N02 | 2001731 | 12/1/1954 | MAIN BUILDING-EAST ADDITION |
| DGT004928N03 | 2001732 | 8/1/1954 | MAIN BUILDING-EAST ADDITION |
| DGT008542N | 2001733 | 5/1/1956 | WATER LINES |
| DGT008570N | 2001734 | 12/1/1956 | MAIN BUILDING-EAST ADDITION |
| DGT008594N | 2001735 | 5/1/1957 | MAIN BUILDING-LOCKER ROOM |
| DGT008649N | 2001736 | 7/1/1962 | OIL BUILDING |
| DGT008650N | 2001737 | 2/1/1963 | MAIN BUILDING-MEZZANINE-CASE |
| DGT008658N | 2001738 | 6/1/1963 | WAREHOUSE |
| DGT008664N | 2001739 | 8/1/1965 | MAIN BUILDING-ADDITION-MEZZANINE |
| DGT008674N | 2001740 | 12/1/1965 | MAIN BUILDING-ADDITION |
| DGT008720N | 2001741 | 12/1/1968 | SEWERS-SANITARY |
| DGT008721N | 2001742 | 12/1/1968 | SEWERS-STORM |
| DGT008738N | 2001743 | 9/1/1970 | MAIN BUILDING-MEZZANINE |
| DGT008744N | 2001744 | 7/1/1971 | ROOF-RAISE |
| DGT012049N | 2001745 | 9/1/1976 | LEAD RECLAIM BUILDING |
| DGT012049N01 | 2001746 | 6/1/1977 | LEAD RECLAIM BUILDING |
| DGT012049N02 | 2001747 | 8/1/1977 | LEAD RECLAIM BUILDING |
| DGT012050N | 2001748 | 9/1/1976 | ACID MIX BUILDING |
| DGT012050N01 | 2001749 | 10/1/1977 | ACID MIX BUILDING |
| DGT012079N | 2001750 | 2/1/1977 | CURE ROOM MODIFICATIONS |
| DGT012092N | 2001751 | 12/1/1977 | WASTE TREATMENT BUILDING |

| | | |
|---|---|---|
| DGT012092N01 | 2001752 | 5/1/1978 WASTE TREATMENT BUILDING |
| DGT012113N | 2001753 | 7/1/1978 STORAGE SHED-3 SIDED |
| DGT012143N | 2001754 | 3/1/1980 TRUCK DOCK ANNEX |
| DGT012145N | 2001755 | 6/1/1980 BATTERY STORAGE BUILDING |
| DGT012165N | 2001756 | 7/1/1971 MAIN BUILDING-MEZZANINE |
| DGT012175N | 2001757 | 6/1/1983 FIRE LOOP |
| DGT012175N01 | 2001758 | 9/1/1984 FIRE LOOP |
| DGT012175N02 | 2001759 | 10/1/1984 FIRE LOOP |
| DGT012175N03 | 2001760 | 11/1/1984 FIRE LOOP |
| DGT012183N | 2001761 | 12/1/1984 MAIN BUILDING-MEZZANINE |
| DGT012191N | 2001762 | 8/1/1986 MAIN BUILDING-MEZZANINE-PAINT MIXING |
| DGT012231N | 2001765 | 6/1/1995 OVERHEAD PROCESS SEWER |
| DGT105875 | 2001766 | 1/1/1998 FRONT ENTRANCE STEPS, RAMPS, RAILS |
| DGT105877 | 2001767 | 11/1/2001 NON-SLIP GRATING, ISLES BTWN CHARGE TABLES & FILL |
| DGT105909 | 2001768 | 1/1/2002 SAFETY STEPS AND HANDRAILS |
| DGT105922B | 2001769 | 11/1/2001 NON-SLIP GRATING FOR FORMATION FLOOR |
| DGT105923B | 2001770 | 11/1/2001 FOAM ROOF '98 |
| DGT105928 | 2001771 | 1/2/1998 UPGRADE HEATING SYSTEM |
| DGT690029 | 2001772 | 1/2/1998 1996 ROOF REPAIR |
| DGT690037 | 2001773 | 11/1/1998 AUTO SIZE CONTAINMENT DOOR |
| DGT690038 | 2001774 | 11/1/1998 AUTO SIZE CONTAINMENT DOOR |
| DGT690039 | 2001775 | 11/1/1998 AUTO SIZE CONTAINMENT DOOR |
| DGT690061 | 2001776 | 11/1/2001 TRENCH & FOUNDATION FOR THE X-MET LINE |
| DGT690062 | 2001777 | 11/1/2001 MEZZANINE FOR THE X-MET LINE |
| DGT690063 | 2001778 | 11/1/2001 ROOF ENCLOSURE FOR THE X-MET LINE |
| DGT690100 | 2001779 | 11/1/2001 REPLACE LIGHTING ON CHG FLOOR, REPLACE LIGHTING SE |
| DGT690170 | 2001780 | 11/1/2001 OUTDOOR SMOKING SHELTER – NEW BRUNSWICK BATTERY P |
| DGT690171 | 2001781 | 11/1/2001 OUTDOOR SMOKING SHELTER – NEW BRUNSWICK BATTERY P |
| DGT690197 | 2001782 | 11/1/2001 SECURITY/FIRE ALARM UPGRADE |
| DGT72424 | 2001783 | 11/1/2001 INSTALL SPRINKLER SYSTEM |
| DGTB690064 | 2001784 | 11/1/2001 INSTALLATION OF MEZZANINE FOR X-MET FROM MUNCIE TO |
| DGT690110 | 2004713 | 9/11/2002 REPAIR BATTERY FORMATION VENTILATION SYSTEM |
| DGTB690114 | 2004714 | 9/11/2002 REPLACE FLOOR IN WET HEAT SEALER AREA |
| DGTB690090 | 2004715 | 9/11/2002 REPAIR WALL OF BUILDING TO NEW CONDITION |
| DGT690175 | 2004716 | 9/11/2002 GREEN GROUP VENTILATION -- NB |
| DGT690221 | 2004717 | 9/11/2002 INSTALL NEW DUCTWORK ON CHARGE FLOOR |
| DGT690198 | 2004718 | 9/11/2002 GUARDING/FIRE PROTECTION TANK FARM |
| DGT690189 | 2004719 | 9/11/2002 VENTILATION COLLECTOR FOR GREEN GROUP LEAN CELL - |
| DGT690179 | 2004720 | 9/11/2002 NEW BRUNSWICK STEAM HOOD UPGRADE |
| DGT690223 | 2008539 | 9/23/2003 DESIGN FOR A NATURAL GAS LINE FOR PLANT |
| DGT690268 | 2008540 | 9/23/2003 HOT WATER HEATER SYS FOR MENS AND WOMENS SHOWER AR |
| DGT695041 | 2008556 | 10/17/2003 FORMATION VENTILATION STACK TOP ACID MIST FILTERS |
| DGT004779N03 | 2009360 | 1/31/2004 PHASE III VENTILATION REPAIRS |
| DGT012142N01 | 2009466 | 1/31/2004 FORMATION VENT REPAIRS/CHARGE TABLE 2 OF 2 |
| DGT012141N01 | 2009467 | 3/31/2004 FORMATION VENT REPAIRS/CHARGE TABLE 1 OF 2 |
| DGT004770N04 | 2009513 | 6/29/2004 ENGINEERING SERVICES TO LICENSE NEW STACK FOR VENT |
| DGT690275 | 2009514 | 1/1/2004 HEATING UPGRADES FOR PLANT CONVERSION TO NATURAL G |
| DGT690291 | 2010088 | 6/14/2005 FIRE SPRINKLER PROTECTION ON CHARGE FLOOR |
| DGT004898N | 3025115 | 2/1/1953 PROPANE TANK |
| DGT008580N | 3025119 | 9/1/1956 POWER EQUIPMENT-EAST |
| DGT008589N | 3025120 | 3/1/1957 SCREW CONVEYOR |
| DGT008595N | 3025121 | 5/1/1957 LINES)ELECTR |
| DGT008599N | 3025123 | 10/1/1957 DUST CNTR EQ |
| DGT008681N | 3025125 | 9/1/1964 SUBSTATION |
| DGT008682N | 3025126 | 10/1/1960 SUBSTATIONEQ |
| DGT008732N | 3025127 | 5/1/1969 COOLING TOWER |
| DGT008743N | 3025128 | 7/1/1971 SCREW CONVEYOR |
| DGT008750N | 3025129 | 6/1/1972 BOILER |
| DGT012003N | 3025130 | 1/1/1973 SWITCHGEAR |
| DGT012004N | 3025131 | 1/1/1973 RECTIFIER |
| DGT012004N01 | 3025132 | 2/1/1973 TRAILING CHARGES TO TAG #012004N |
| DGT012005N | 3025133 | 1/1/1973 SWITCHGEAR |
| DGT012006N | 3025134 | 1/1/1973 RECTIFIER |
| DGT012007N | 3025135 | 2/1/1973 ACID TANK |
| DGT012008N | 3025136 | 2/1/1973 ACID TANK |
| DGT012010N | 3025137 | 2/1/1973 ACID TANK |
| DGT012011N | 3025138 | 2/1/1973 ACID TANK |

| | | | |
|---|---|---|---|
| DGT012016N | 3025139 | 9/1/1973 | CONVEYOR |
| DGT012017N | 3025140 | 9/1/1973 | CONVEYOR |
| DGT012018N | 3025141 | 9/1/1973 | CONVEYOR |
| DGT012020N | 3025143 | 9/1/1973 | CONVEYOR |
| DGT012021N | 3025144 | 12/1/1973 | SUB STATION |
| DGT012022N | 3025145 | 12/1/1973 | CABLE |
| DGT012023N | 3025146 | 12/1/1973 | PLATFORM |
| DGT012024N | 3025147 | 3/1/1974 | VENTILATION |
| DGT012025N | 3025148 | 3/1/1974 | CONVEYOR |
| DGT012026N | 3025149 | 3/1/1974 | VENTILATION |
| DGT012027N | 3025150 | 3/1/1974 | VACUUM SYSTEM |
| DGT012034N | 3025151 | 8/1/1975 | VACUUM TO MOLDING |
| DGT012036N | 3025152 | 3/1/1976 | TRENCHES |
| DGT012038N | 3025153 | 5/1/1976 | VENTILATION |
| DGT012043N | 3025154 | 8/1/1976 | ACID TANK |
| DGT012044N | 3025155 | 8/1/1976 | ACID PUMPING SYSTEM FOR MEZZANINE |
| DGT012046N | 3025156 | 9/1/1976 | VENTILATION FOR LEAD POTS |
| DGT012047N | 3025157 | 9/1/1976 | FINAL ACID FILL |
| DGT012051N | 3025158 | 9/1/1976 | ACID TOP-OFF |
| DGT012055N | 3025159 | 9/1/1976 | SUB-STATION-LEAD STRIP |
| DGT012055N01 | 3025160 | 10/1/1977 | ADDITIONAL CHARGES TO TAG #012055N |
| DGT012057N | 3025161 | 10/1/1976 | LEAD MELT FURNACE |
| DGT012058N | 3025162 | 10/1/1976 | FOUNDATION & SUMPS FOR LEAD CASTER |
| DGT012060N | 3025163 | 12/1/1976 | VENTILATION FOR CHARGING UNITS |
| DGT012060N01 | 3025164 | 6/1/1980 | ADDITIONAL CHARGES TO TAG #012060N |
| DGT012062N | 3025165 | 1/1/1977 | ACID MIXING SYSTEM |
| DGT012064N | 3025167 | 1/1/1977 | ACID PUMPS RECLAIM |
| DGT012065N | 3025168 | 1/1/1977 | VENTILATION PLATE OVENS |
| DGT012066N | 3025169 | 1/1/1977 | ACID STORAGE TANK |
| DGT012067N | 3025170 | 1/1/1977 | ACID STORAGE TANK |
| DGT012068N | 3025171 | 1/1/1977 | ACID STORAGE TANK |
| DGT012069N | 3025172 | 1/1/1977 | ACID STORAGE TANK |
| DGT012070N | 3025173 | 1/1/1977 | ACID STORAGE TANK |
| DGT012071N | 3025174 | 1/1/1977 | ACID STORAGE TANK |
| DGT012072N | 3025175 | 1/1/1977 | ACID STORAGE TANK |
| DGT012073N | 3025176 | 1/1/1977 | ACID STORAGE TANK |
| DGT012074N | 3025177 | 1/1/1977 | ACID STORAGE TANK |
| DGT012075N | 3025178 | 1/1/1977 | ACID STORAGE TANK |
| DGT012076N | 3025179 | 1/1/1977 | ACID STORAGE TANK |
| DGT012077N | 3025180 | 1/1/1977 | ACID STORAGE TANK |
| DGT012080N | 3025181 | 2/1/1977 | COOLING FACILITIES FOR CASTER |
| DGT012083N | 3025182 | 7/1/1977 | SUB STATION LEAD RECLAIM |
| DGT012095N | 3025183 | 2/1/1978 | LINDBURG FURNACE |
| DGT012096N | 3025184 | 2/1/1978 | TRANSFER SYSTEM |
| DGT012097N | 3025185 | 9/1/1978 | STEAMER HOOD |
| DGT012098N | 3025186 | 9/1/1976 | STEAMER HOOD |
| DGT012099N | 3025187 | 1/1/1977 | STEAMER HOOD |
| DGT012100N | 3025188 | 1/1/1977 | STEAMER HOOD |
| DGT012102N | 3025189 | 4/1/1978 | WATER CONTAINMENT |
| DGT012109N | 3025190 | 12/1/1976 | PRIMARY SWITCH GEAR |
| DGT012109N01 | 3025191 | 12/1/1977 | TRAILING CHARGE TO TAG #012109N |
| DGT012109N02 | 3025192 | 3/1/1978 | TRAILING CHARGE TO TAG #012109N |
| DGT012117N | 3025193 | 10/1/1978 | CONVEYOR SYSTEM |
| DGT012118N | 3025194 | 10/1/1978 | ACID FILL STATION |
| DGT012119N | 3025195 | 10/1/1978 | REPAIR STATIONS (2) |
| DGT012120N | 3025196 | 11/1/1978 | EXTEND TRENCH/X-MET LINE |
| DGT012121N | 3025197 | 11/1/1978 | AIR MAKEUP UNIT |
| DGT012122N | 3025198 | 12/1/1978 | AIR MAKE UP SYSTEM |
| DGT012122N01 | 3025199 | 10/1/1979 | ADDITIONAL CHARGES TO TAG #012122N |
| DGT012123N | 3025200 | 12/1/1978 | BATROLIFE MEZZANINE |
| DGT012124N | 3025201 | 1/1/1979 | CONVEYOR FROM SETTLING CHAMBER |
| DGT012125N | 3025202 | 2/1/1979 | VENTILATION TUNNEL-EXTENSION |
| DGT012128N | 3025205 | 3/1/1979 | ROLLER TYPE CONVEYOR |
| DGT012129N | 3025206 | 3/1/1979 | INCLINE BELT CONVEYOR |
| DGT012130N | 3025207 | 4/1/1979 | POWER DROPS/C O S & PREHEAT |
| DGT012131N | 3025208 | 5/1/1979 | CONVEYOR FROM COLLECTOR |
| DGT012132N | 3025209 | 8/1/1979 | VENT FOR ELEMENT ASSEMBLY |

21

| | | | |
|---|---|---|---|
| DGT012132N01 | 3025210 | 9/1/1979 | TRAILING CHARGE TO TAG #012132N |
| DGT012137N | 3025212 | 9/1/1979 | OVERHEAD CONVEYOR |
| DGT012138N | 3025213 | 9/1/1979 | ELECTRIC CABLE & DROPS |
| DGT012139N | 3025214 | 9/1/1979 | SETTLING CHAMBER |
| DGT012140N | 3025215 | 11/1/1979 | LEAD DROP & CONTROLS FOR BARTON POT |
| DGT012141N | 3025216 | 12/1/1979 | CHARGE TABLES |
| DGT012142N | 3025217 | 12/1/1979 | CHARGE TABLES |
| DGT012146N | 3025218 | 6/1/1980 | LEAD MELT POT |
| DGT012147N | 3025219 | 6/1/1980 | VENTILATION F/POT |
| DGT012148N | 3025220 | 6/1/1980 | ELECTRIC CABLE & BUSWAY |
| DGT012150N | 3025222 | 6/1/1980 | COOLING TOWER |
| DGT012151N | 3025223 | 12/1/1980 | EXTEND TRENCHES FOR CONVEYOR |
| DGT012152N | 3025224 | 12/1/1980 | STORAGE RACKS & SPRINKLER |
| DGT012152N01 | 3025225 | 12/1/1981 | TRAILING CHARGE TO TAG #012152N |
| DGT012154N01 | 3025226 | 1/1/1998 | UPGRADE STORM WATER TREATMENT PLANT |
| DGT012156N | 3025227 | 12/1/1980 | RECEIVING OFFICE |
| DGT012159N | 3025229 | 12/1/1981 | CHARGE TABLES |
| DGT012160N | 3025230 | 12/1/1981 | (14) CHARGE TABLES |
| DGT012161N | 3025231 | 2/1/1982 | VENTILATION SYSTEM |
| DGT012162N | 3025232 | 2/1/1982 | LOAD/UNLOAD CONVEYOR |
| DGT012163N | 3025233 | 6/1/1982 | COLLECTOR |
| DGT012164N | 3025234 | 6/1/1980 | VESTIBULE |
| DGT012166N | 3025235 | 9/1/1982 | OWENS CORNING ACID TANK |
| DGT012167N | 3025236 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR 95995 |
| DGT012168N | 3025237 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR95996 |
| DGT012169N | 3025238 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR95997 |
| DGT012170N | 3025239 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR95998 |
| DGT012171N | 3025240 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR95999 |
| DGT012172N | 3025241 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR96000 |
| DGT012173N | 3025242 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR105751 |
| DGT012174N | 3025243 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR105752 |
| DGT012176N | 3025244 | 12/1/1983 | OXIDE ELEVATORS & CONVEYORS |
| DGT012176N01 | 3025245 | 10/1/1983 | MATERIAL HANDLING SYSTEM AT PASTE MIX |
| DGT012181N | 3025246 | 9/1/1984 | POWER ROLLER CONVEYOR |
| DGT012182N | 3025247 | 12/1/1984 | ACID & WATER SYSTEM |
| DGT012184N | 3025248 | 12/1/1984 | VENTILATION F/3 PAINT MIXERS |
| DGT012185N | 3025249 | 4/1/1985 | WOMEN'S REST ROOM-WEST |
| DGT012186N | 3025250 | 5/1/1985 | WOMEN'S LOCKER/SHOWER-EAST |
| DGT012187N | 3025251 | 12/1/1985 | CONVEYOR & VENTILATION FOR 6 TABLES |
| DGT012188N | 3025252 | 1/1/1986 | ROOF EXHAUSTERS |
| DGT012194N | 3025253 | 2/1/1987 | ACID PIT |
| DGT012200N | 3025256 | 5/1/1987 | TRANSFER CONVEYORS(ALL) |
| DGT012202N | 3025257 | 10/1/1987 | #26(82'CHG TABLE CONV) |
| DGT012203N | 3025258 | 10/1/1987 | #27(82'CHG TABLE CONV) |
| DGT012204N | 3025259 | 10/1/1987 | #28(82'CHG TABLE CONV) |
| DGT012205N | 3025260 | 10/1/1987 | #29(82'CHG TABLE CONV) |
| DGT012206N | 3025261 | 10/1/1987 | #30(82'CHG TABLE CONV) |
| DGT012207N | 3025262 | 10/1/1987 | 82 FT. CONVEYOR (#31) |
| DGT012208N | 3025263 | 10/1/1987 | #32(82'CHG TABLE CONV) |
| DGT012209N | 3025264 | 10/1/1987 | #33(82'CHG TABLE CONV) |
| DGT012210N | 3025265 | 12/1/1987 | #1 X-MET LINE(OFFBEAR CONV) |
| DGT012211N | 3025266 | 5/1/1988 | POWERED ROLLER CONV(4) |
| DGT012212N | 3025267 | 5/1/1988 | VENT FOR CAST ON STRAP MACH |
| DGT012215N | 3025268 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012216N | 3025269 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012217N | 3025270 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012218N | 3025271 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012219N | 3025272 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012220N | 3025273 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012222N | 3025274 | 6/30/1989 | CAPITALIZABLE MAINT. |
| DGT012223N | 3025275 | 3/1/1990 | VENTILATION FOR (8) BATTERY CHARGE TABLES |
| DGT012224N | 3025276 | 9/1/1990 | TEMPERATURE CONTROL |
| DGT012225N | 3025277 | 1/1/1991 | COS CONTROL |
| DGT012228N | 3025278 | 7/1/1994 | WASTE WATER TREATMENT SYSTEM |
| DGT012230N | 3025280 | 8/1/1995 | ACID LEVELER |
| DGT012233N | 3025281 | 3/1/1995 | AUTOMATIC LABELING MACHINE |
| DGT012234N | 3025282 | 1/1/1996 | RESERVE CAPACITY TESTERS (12) |

| | | |
|---|---|---|
| DGT012236N | 3025284 | 1/1/1996 110 OZ CONVERSION |
| DGT014722N | 3025285 | 6/1/1977 BAYSTONE PLATE STEAMER |
| DGT014729N | 3025286 | 6/1/1977 OXIDE SCREW CONVEYOR SYSTEM |
| DGT014737N | 3025287 | 7/1/1977 SCREW CONVEYOR |
| DGT014738N | 3025288 | 7/1/1977 SCREW CONVEYOR |
| DGT015201N | 3025289 | 12/1/1979 INSULATE STEAMER HOODS (6) |
| DGT020031D01 | 3025298 | 2/1/1947 LATHES-ENGIN |
| DGT020059D01 | 3025300 | 12/1/1946 DRILL-STANDA |
| DGT020726D01 | 3025301 | 7/1/1947 MIX CONVEYOR |
| DGT021837D | 3025305 | 2/1/1956 SETTLING CHR |
| DGT021838D | 3025306 | 2/1/1956 BARTON POT |
| DGT021840D | 3025307 | 2/1/1956 12R]DUSTCOLL |
| DGT022488D | 3025308 | 3/1/1957 COMPRESSORS} |
| DGT022506D | 3025309 | 4/1/1957 RECTIFIERS]E |
| DGT022510D | 3025310 | 5/1/1957 BARTON POT |
| DGT022511D | 3025311 | 5/1/1957 SETTLING CHR |
| DGT022530D | 3025312 | 10/1/1957 RECTIFIERS]E |
| DGT028031N | 3025315 | 6/1/1996 ALLEN BRADLEY CONTROL |
| DGT028785N | 3025316 | 10/31/1989 ACID DUMP SYSTEM |
| DGT028855N | 3025317 | 11/1/1991 CENTRIFUGAL BLOWER |
| DGT056948D | 3025318 | 6/1/1956 GRINDER |
| DGT058830D | 3025319 | 6/1/1957 BARTON POT |
| DGT060227D | 3025320 | 6/1/1954 BARTON POT |
| DGT060228D | 3025321 | 6/1/1954 BARTON POT |
| DGT060229D | 3025322 | 6/1/1954 BARTON POT |
| DGT060230D | 3025323 | 6/1/1954 SET]CHAMBER |
| DGT060231D | 3025324 | 6/1/1954 SET]CHAMBER |
| DGT060232D | 3025325 | 6/1/1954 SET]CHAMBER |
| DGT060233E | 3025327 | 11/1/2001 MODIF OF MISC LINE STROKER, PLATFORM, LEFT AND TAB |
| DGT060279D | 3025329 | 11/1/1960 POWER ROLLER |
| DGT060295D | 3025330 | 7/1/1961 IMPACT TESTI |
| DGT066940D | 3025331 | 6/1/1946 LATHE |
| DGT069865D | 3025333 | 2/1/1963 LATHE |
| DGT070211D | 3025335 | 6/1/1963 TOLEDO SCALE |
| DGT070253D | 3025336 | 8/1/1963 MILLING MACHINE |
| DGT070255D | 3025337 | 8/1/1983 SURFACEGRIND |
| DGT071020D | 3025338 | 5/1/1964 LATHE |
| DGT071037D | 3025339 | 7/1/1984 MILLING MCH |
| DGT071058D | 3025340 | 12/1/1964 BOILER |
| DGT071087D | 3025343 | 12/1/1965 BOILER |
| DGT072221D | 3025346 | 8/1/1966 EL AS SECT |
| DGT072222D | 3025347 | 9/1/1969 DUST COLLECTOR |
| DGT072223D | 3025348 | 9/1/1969 MATL COLL SYS |
| DGT072239D | 3025352 | 4/1/1967 LATHE |
| DGT072280D | 3025360 | 10/1/1968 CONVEYORS |
| DGT072284D01 | 3025361 | 3/1/1970 STARTER |
| DGT072292D | 3025366 | 6/1/1970 MOLD TEMP CONTR |
| DGT083874D | 3025367 | 5/1/1966 RECTIFIER |
| DGT087857D | 3025381 | 7/1/1970 PLATE SAW |
| DGT087872D | 3025385 | 2/1/1971 CONVEYOR |
| DGT093030D | 3025386 | 12/1/1973 PASTE MIXER |
| DGT095313D | 3025390 | 7/1/1971 PASTE MIXER |
| DGT095328D | 3025392 | 4/1/1972 HACKSAW |
| DGT095330D | 3025394 | 5/1/1973 DUST COLLECTOR |
| DGT095351D | 3025416 | 9/1/1973 CONVEYOR |
| DGT095352D | 3025417 | 9/1/1973 CONVEYOR |
| DGT095353D | 3025418 | 9/1/1973 GRANULATOR |
| DGT095354E | 3025420 | 11/1/2001 M & L FOR MODIF OF MAIN LINE STACKER PLATFORM, L/R |
| DGT095355D | 3025421 | 9/1/1973 CAST ON STRAP |
| DGT095356D | 3025422 | 9/1/1973 CAST ON STRAP |
| DGT095357D | 3025423 | 9/1/1973 CAST ON STRAP |
| DGT095358D | 3025424 | 9/1/1973 CAST ON STRAP |
| DGT095359D | 3025425 | 9/1/1973 SPOT FACE CONVEYOR |
| DGT095363D | 3025427 | 9/1/1973 EXT FUSION CONV |
| DGT095364D | 3025428 | 9/1/1973 AIR TEST CONVEYOR |
| DGT095365D | 3025429 | 9/1/1973 LABLER CONV |
| DGT095369D | 3025432 | 9/1/1973 LEAK TEST |

23

| | | | |
|---|---|---|---|
| DGT095370D | 3025433 | 9/1/1973 | DATE CODE |
| DGT095372D | 3025434 | 9/1/1973 | LEAD POT |
| DGT095373D | 3025435 | 9/1/1973 | LEAD POT |
| DGT095374D | 3025436 | 9/1/1973 | LEAD POT |
| DGT095375D | 3025437 | 9/1/1973 | LEAD POT |
| DGT095376D | 3025438 | 9/1/1973 | VACUUM SYSTEM STACKER |
| DGT095382D | 3025439 | 9/1/1973 | TEMPERATURE CONTROL |
| DGT095383D | 3025440 | 9/1/1973 | HEAT SEAL MACHINE |
| DGT095384D | 3025441 | 9/1/1973 | HEAT SEAL MACHINE |
| DGT095385D | 3025442 | 9/1/1973 | HEAT SEAL MACHINE |
| DGT095387D | 3025443 | 12/1/1973 | AIR COMPRESSOR |
| DGT095398D | 3025446 | 3/1/1974 | LIFT TRUCK |
| DGT095399D | 3025447 | 3/1/1974 | SLITTER |
| DGT095400D | 3025448 | 3/1/1974 | SLITTER |
| DGT095603D | 3025450 | 10/1/1974 | DUST COLLECTOR |
| DGT095604D | 3025451 | 10/1/1974 | DUST COLLECTOR |
| DGT095610D | 3025452 | 1/1/1975 | HEAT SEAL MACHINE |
| DGT095612D | 3025453 | 4/1/1975 | CONVEYOR SYSTEM |
| DGT095614D | 3025454 | 9/1/1975 | SOFTENING TANK |
| DGT095615D | 3025455 | 9/1/1975 | SOFTENING TANK |
| DGT095620D | 3025456 | 1/1/1976 | EXT-FUSION MACHINE |
| DGT095620D01 | 3025457 | 3/1/1976 | ADDITIONAL CHARGES TO TAG #095620D |
| DGT095621D | 3025458 | 2/1/1976 | HOIST |
| DGT095622D | 3025459 | 5/1/1976 | DIELECTRIC LINE |
| DGT095628D | 3025462 | 5/1/1976 | BRIDGE HOIST |
| DGT095638D | 3025472 | 6/1/1976 | SKID RACK |
| DGT095639D | 3025473 | 6/1/1976 | SKID RACK |
| DGT095640D | 3025474 | 6/1/1976 | SKID RACK |
| DGT095641D | 3025475 | 6/1/1976 | SKID RACK |
| DGT095646D | 3025476 | 9/1/1976 | BUTT WELDER |
| DGT095647D | 3025477 | 9/1/1976 | BUTT WELDER |
| DGT095654D | 3025479 | 7/1/1976 | HI-RATE TEST |
| DGT095657D | 3025480 | 7/1/1976 | SCRAP CONVEYOR SYSTEM |
| DGT095658D | 3025481 | 7/1/1976 | CONVEYOR |
| DGT095661D | 3025484 | 9/1/1976 | DE-REELER |
| DGT095662D | 3025485 | 9/1/1976 | DE-REELER |
| DGT095663D | 3025486 | 9/1/1976 | DE-REELER |
| DGT095664D | 3025487 | 9/1/1976 | DE-REELER |
| DGT095666D | 3025489 | 9/1/1976 | EXPANDING PRESS |
| DGT095670D | 3025491 | 9/1/1976 | LUG FORM PRESS |
| DGT095671D | 3025492 | 9/1/1976 | LUG FORM PRESS |
| DGT095674D | 3025495 | 9/1/1976 | MODICON-PASTE LINE |
| DGT095675D | 3025496 | 9/1/1976 | MODICON-PASTE LINE |
| DGT095676D | 3025497 | 8/1/1979 | OVEN CONVERSION |
| DGT095677D | 3025498 | 8/1/1979 | OVEN CONVERSION |
| DGT095681D | 3025501 | 9/1/1976 | PARTS CONVEYOR F/250 TON MOLD MACHINE |
| DGT095682D | 3025502 | 9/1/1976 | PARTS CONVEYOR F/250 TON MOLD MACHINE |
| DGT095685D | 3025503 | 9/1/1976 | CONVEYOR FOR PASTE MACHINE |
| DGT095688D | 3025504 | 9/1/1976 | PILOT HOLE PIERCE |
| DGT095689D | 3025505 | 9/1/1976 | PILOT HOLE PIERCE |
| DGT095698D | 3025510 | 10/1/1976 | BATTERY CHARGER LAB. FACILITIES |
| DGT095801D | 3025511 | 10/1/1976 | COLLECTION SYSTEM FOR OFFBEAR |
| DGT095801D01 | 3025512 | 10/1/1976 | COLLECTION SYSTEM FOR OFFBEAR |
| DGT095801D02 | 3025513 | 8/1/1979 | VENT & CURE OVEN |
| DGT095803D | 3025515 | 10/1/1976 | FOUR-ARM STORAGE TURNSTILE |
| DGT095804D | 3025516 | 10/1/1976 | SPECTROGRAPH |
| DGT095807D | 3025518 | 12/1/1976 | ROLLING MILL 7 STAND |
| DGT095809D | 3025519 | 12/1/1976 | CHARGING UNITS BATTERIES |
| DGT095809D01 | 3025520 | 12/1/1976 | TRAILING CHARGE TO TAG #095809D |
| DGT095809D02 | 3025521 | 6/1/1980 | ADDITIONAL CHARGES TO TAG #095809D |
| DGT095810D | 3025522 | 12/1/1976 | CHARGING UNITS BATTERIES |
| DGT095810D01 | 3025523 | 12/1/1976 | TRAILING CHARGE TO TAG #095810D |
| DGT095810D02 | 3025524 | 6/1/1980 | TRAILING CHARGE TO TAG #095810D |
| DGT095811D | 3025525 | 12/1/1976 | CHARGING UNITS BATTERIES |
| DGT095811D01 | 3025526 | 12/1/1976 | TRAILING CHARGE TO TAG #095811D |
| DGT095811D02 | 3025527 | 6/1/1980 | TRAILING CHARGE TO TAG #095811D |
| DGT095812D | 3025528 | 12/1/1976 | CHARGING UNITS BATTERIES |

| | | |
|---|---|---|
| DGT095812D01 | 3025529 | 12/1/1978 TRAILING CHARGE TO TAG #095812D |
| DGT095812D02 | 3025530 | 6/1/1980 TRAILING CHARGE TO TAG #095812D |
| DGT095818D | 3025531 | 1/1/1977 HEAT SEAL FINAL COVER |
| DGT095821D | 3025532 | 1/1/1977 TURNSTILE |
| DGT095822D | 3025533 | 1/1/1977 S O C INSERTER |
| DGT095823D | 3025534 | 1/1/1977 COIL UP UNIT |
| DGT095826D | 3025535 | 2/1/1977 WATER CHILLER PASTE MIXING |
| DGT095829D | 3025538 | 4/1/1977 COIL UP UNIT |
| DGT095830D | 3025539 | 4/1/1977 COIL UP UNIT |
| DGT095831D | 3025540 | 6/1/1977 PULL BOX CASTER |
| DGT095832D | 3025541 | 6/1/1977 PULL BOX CASTER |
| DGT095836D | 3025542 | 10/1/1977 FRONT END LOADER |
| DGT095837D | 3025543 | 10/1/1977 CHILLER FOR PULL BOX-20 TON |
| DGT095839D | 3025545 | 10/1/1977 COIN ROLL |
| DGT095840D | 3025546 | 10/1/1977 COIN ROLL |
| DGT095842D | 3025547 | 10/1/1977 ROLLING MILL-7 STAND |
| DGT095843D | 3025548 | 6/1/1976 SKID RACK |
| DGT095845D | 3025549 | 12/1/1977 CHARGING UNIT |
| DGT095845D01 | 3025550 | 12/1/1978 TRAILING CHARGE TO TAG #095845D |
| DGT095846D | 3025551 | 12/1/1977 CHARGING UNIT |
| DGT095846D01 | 3025552 | 12/1/1978 TRAILING CHARGE TO TAG #095846D |
| DGT095848D | 3025553 | 12/1/1977 CHARGING UNIT |
| DGT095848D01 | 3025554 | 12/1/1978 TRAILING CHARGE TO TAG #095848D |
| DGT095849D | 3025555 | 12/1/1977 CHARGING UNIT |
| DGT095849D01 | 3025556 | 12/1/1978 TRAILING CHARGE TO TAG #095849D |
| DGT095850D | 3025557 | 12/1/1977 CHARGING UNIT |
| DGT095850D01 | 3025558 | 12/1/1978 TRAILING CHARGE TO TAG #095850D |
| DGT095854D | 3025559 | 12/1/1977 CHARGING UNIT |
| DGT095854D01 | 3025560 | 12/1/1978 TRAILING CHARGE TO TAG #095854D |
| DGT095858D | 3025561 | 12/1/1977 CHARGING UNIT |
| DGT095858D01 | 3025562 | 12/1/1978 TRAILING CHARGE TO TAG #095858D |
| DGT095859D | 3025563 | 12/1/1977 CHARGING UNIT |
| DGT095859D01 | 3025564 | 12/1/1978 TRAILING CHARGE TO TAG #095859D |
| DGT095860D | 3025565 | 12/1/1977 CHARGING UNIT |
| DGT095860D01 | 3025566 | 12/1/1978 TRAILING CHARGE TO TAG #095860D |
| DGT095861D | 3025567 | 12/1/1977 CHARGING UNIT |
| DGT095861D01 | 3025568 | 12/1/1978 TRAILING CHARGE TO TAG #095861D |
| DGT095862D | 3025569 | 12/1/1977 CHARGING UNIT |
| DGT095862D01 | 3025570 | 12/1/1978 TRAILING CHARGE TO TAG #095862D |
| DGT095868D | 3025571 | 3/1/1978 TEST UNIT AND MODULES |
| DGT095870D | 3025572 | 4/1/1978 COVER HEAT SEAL |
| DGT095872D | 3025573 | 9/1/1978 BUTT WELDER |
| DGT095873D | 3025574 | 9/1/1978 DEREELER |
| DGT095874D | 3025575 | 9/1/1978 DEREELER |
| DGT095877D | 3025576 | 9/1/1978 LUG FORM PRESS |
| DGT095878D | 3025577 | 9/1/1978 ROTARY CUT OFF MACHINE |
| DGT095879D | 3025578 | 9/1/1978 PILOT HOLE PIERCE PRESS |
| DGT095880D | 3025579 | 9/1/1978 PLATE DRYING OVEN |
| DGT095882D | 3025581 | 6/1/1976 SKID RACK |
| DGT095883D | 3025582 | 6/1/1976 SKID RACK |
| DGT095884D | 3025583 | 7/1/1978 THERMO CARE WATER CHILLER |
| DGT095885D | 3025584 | 8/1/1978 FULLER BAG COLLECTOR |
| DGT095885D01 | 3025585 | 9/1/1978 TRAILING CHARGE TO TAG #095885D |
| DGT095887D | 3025586 | 9/1/1978 CAMBER SENSOR |
| DGT095888D | 3025587 | 11/1/1978 LABEL MACHINE |
| DGT095889D | 3025588 | 12/1/1978 BATTERY CHARGING UNIT |
| DGT095890D | 3025589 | 12/1/1978 BATTERY CHARGING UNIT |
| DGT095891D | 3025590 | 12/1/1978 BATTERY CHARGING UNIT |
| DGT095892D | 3025591 | 12/1/1978 BATTERY CHARGING UNIT |
| DGT095893D | 3025592 | 12/1/1978 BATTERY CHARGING UNIT |
| DGT095894D | 3025593 | 12/1/1978 BATTERY CHARGING UNIT |
| DGT095895D | 3025594 | 12/1/1978 BATTERY CHARGING UNIT |
| DGT095896D | 3025595 | 12/1/1978 BATTERY CHARGING UNIT |
| DGT095897D | 3025596 | 12/1/1978 BATTERY CHARGING UNIT |
| DGT095898D | 3025597 | 12/1/1978 BATTERY CHARGING UNIT |
| DGT095899D | 3025598 | 12/1/1978 BATTERY CHARGING UNIT |
| DGT095900D | 3025599 | 12/1/1978 BATTERY CHARGING UNIT |

| | | | |
|---|---|---|---|
| DGT095901A | 3025600 | 11/1/2001 | REBUILD #4 AIR COMPRESSOR - ORIGINAL TAG REFERENCE |
| DGT095901D | 3025601 | 12/1/1978 | AIR COMPRESSOR |
| DGT095901D01 | 3025602 | 7/1/1991 | ADDL CHG(STRUCTURE OF COMPRESSOR) |
| DGT095902D | 3025603 | 2/1/1979 | BASE FOR STACKER |
| DGT095903D | 3025604 | 2/1/1979 | FREEZER |
| DGT095906D | 3025606 | 2/1/1979 | FILL IN CONVEYOR |
| DGT095907D | 3025607 | 2/1/1979 | FILL IN CONVEYOR |
| DGT095908D | 3025608 | 2/1/1979 | FILL IN CONVEYOR |
| DGT095909D | 3025609 | 2/1/1979 | CONVEYOR TO STORAGE |
| DGT095910D | 3025610 | 2/1/1979 | CONVEYOR TO STORAGE |
| DGT095911D | 3025611 | 2/1/1979 | CONVEYOR TO STORAGE |
| DGT095912D | 3025612 | 2/1/1979 | CONVEYOR TO STORAGE |
| DGT095915D | 3025614 | 4/1/1979 | RIB TRIM MACHINE |
| DGT095916D | 3025615 | 4/1/1979 | TOP TERM ALIGNMENT MACHINE |
| DGT095919D | 3025618 | 4/1/1979 | CHILLER-15 TON |
| DGT095920D | 3025619 | 5/1/1979 | TEMPERATURE CONTROLLER |
| DGT095923D | 3025620 | 7/1/1979 | HEAT SEAL MACHINE |
| DGT095925D | 3025622 | 7/1/1979 | CASE GATHERING CONVEYOR FROM COS |
| DGT095927D | 3025624 | 7/1/1979 | CAMBER SENSOR |
| DGT095928D | 3025625 | 7/1/1979 | CAMBER SENSOR |
| DGT095932D | 3025628 | 8/1/1979 | OSI PLATE DRY OVEN |
| DGT095933D | 3025629 | 8/1/1979 | OSI PLATE DRY OVEN |
| DGT095934D | 3025630 | 8/1/1979 | 5 STATION EXT FUSION MACHINE |
| DGT095935D | 3025631 | 8/1/1979 | SLITTER & CHOPPER |
| DGT095936D | 3025632 | 8/1/1979 | SLITTER & CHOPPER |
| DGT095937D | 3025633 | 8/1/1979 | COOLING CHAMBER |
| DGT095938D | 3025634 | 8/1/1979 | GROUP PALLET CONVEYOR |
| DGT095940D | 3025635 | 8/1/1979 | WORK PLATFORM FOR (2) CAST ON STRAP |
| DGT095942D | 3025636 | 9/1/1979 | SCREW CONVEYOR SYSTEM |
| DGT095943D | 3025637 | 9/1/1979 | PASTE RECLAIM SYSTEM |
| DGT095944D | 3025638 | 9/1/1979 | TENNENT FLOOR SWEEPER |
| DGT095944D01 | 3025639 | 9/1/1979 | ADDITIONAL CHARGES TO TAG #095944D |
| DGT095946D | 3025641 | 10/1/1979 | CAST ON STRAP |
| DGT095947D | 3025642 | 10/1/1979 | GREEN GROUP SHORT TEST CONVEYOR |
| DGT095948D | 3025643 | 10/1/1979 | LEAK TEST CONVEYOR |
| DGT095949D | 3025644 | 10/1/1979 | GREEN GROUP SHORT TEST CONVEYOR |
| DGT095950D | 3025645 | 10/1/1979 | GREEN SHORT TEST CONVEYOR |
| DGT095953D | 3025646 | 12/1/1979 | CONVEYOR TO CHARGING TABLES |
| DGT095955D | 3025649 | 12/1/1979 | HOPPER AND CONVEYOR |
| DGT095957D | 3025650 | 12/1/1979 | VENTILATION SYSTEM |
| DGT095958D | 3025651 | 12/1/1979 | LEAK TEST |
| DGT095961D | 3025652 | 12/1/1979 | DROTT DECK CRANE |
| DGT095965D | 3025655 | 2/1/1980 | ROCKWELL BAND SAW |
| DGT095971D | 3025657 | 6/1/1980 | TIG WELDER |
| DGT095972D | 3025658 | 6/1/1980 | TIG WELDER |
| DGT095973D | 3025659 | 6/1/1980 | TIG WELDER |
| DGT095975D | 3025660 | 6/1/1980 | TIG WELD CONVEYOR SYSTEM |
| DGT095985D | 3025666 | 12/1/1981 | PASTE MIXER |
| DGT095985D01 | 3025667 | 12/1/1983 | INSTRUMENTS FOR/PASTE MIXER |
| DGT095986D | 3025668 | 12/1/1981 | PASTE MIXER |
| DGT095986D01 | 3025669 | 12/1/1983 | INSTRUMENTS FOR/PASTE MIXER |
| DGT095987D01 | 3025670 | 7/1/1984 | INSTRUMENTS FOR/PASTE MIXER |
| DGT095989D | 3025671 | 12/1/1981 | STOCK DEREELER |
| DGT095990D | 3025672 | 12/1/1981 | STOCK DEREELER |
| DGT095991D | 3025673 | 12/1/1981 | STRETCH WRAP MACHINE |
| DGT095992D | 3025674 | 12/1/1982 | SINGLE STAND MILL |
| DGT095993D | 3025675 | 12/1/1982 | WATER CHILLER |
| DGT095993D01 | 3025676 | 1/1/1983 | WATER CHILLER |
| DGT095994D | 3025677 | 12/1/1982 | WATER CHILLER |
| DGT095994D01 | 3025678 | 1/1/1983 | WATER CHILLER |
| DGT095995D | 3025679 | 12/1/1980 | VENTILATION F/COLLECTION SYSTEM |
| DGT095996D | 3025680 | 12/1/1980 | VENTILATION F/COLLECTION SYSTEM |
| DGT095997D | 3025681 | 12/1/1982 | VENILATION F/COLLECTION SYSTEM |
| DGT095998D | 3025682 | 12/1/1982 | VENTILATION F/COLLECTION SYSTEM |
| DGT095999D | 3025683 | 12/1/1982 | VENTILATION F/COLLECTION SYSTEM |
| DGT096000D | 3025684 | 12/1/1982 | VENTILATION F/COLLECTION SYSTEM |
| DGT098187D | 3025690 | 12/1/1972 | DUST COLLECTOR |

| | | | |
|---|---|---|---|
| DGT098361D01 | 3025691 | 10/31/1989 | REBUILD MOLDING MACHINE |
| DGT098361D02 | 3025692 | 3/1/1992 | ADDL CHG(700 T MOLDING MACH) |
| DGT100287D | 3025696 | 6/1/1977 | EXPAND PRESS |
| DGT100297D | 3025698 | 6/1/1977 | PASTE MIXER |
| DGT100306D | 3025699 | 6/1/1977 | BUTT WELDER |
| DGT100312D | 3025700 | 6/1/1977 | DEREELER |
| DGT100315D | 3025701 | 6/1/1977 | DEREELER |
| DGT100470D | 3025702 | 9/1/1977 | TIG TOP TERM BURN MACHINE |
| DGT102070D | 3025703 | 7/1/1978 | LUG TRIM PRESS |
| DGT102099D | 3025704 | 8/1/1978 | OSI PLATE DRY OVEN |
| DGT102511D | 3025708 | 7/1/1979 | SLITTER & CHOPPER |
| DGT102513D | 3025709 | 7/1/1979 | CAMBER SENSORS |
| DGT104491 | 3025710 | 2/1/1998 | LEVELATOR |
| DGT104492 | 3025711 | 2/1/1998 | LEVELATOR |
| DGT104493 | 3025712 | 2/1/1998 | LEVELATOR |
| DGT104494 | 3025713 | 2/1/1998 | LEVELATOR |
| DGT104495 | 3025714 | 2/1/1998 | LEVELATOR |
| DGT104496 | 3025715 | 2/1/1998 | LEVELATOR |
| DGT104497 | 3025716 | 2/1/1998 | LEVELATOR |
| DGT104498 | 3025717 | 2/1/1998 | LEVELATOR |
| DGT104499 | 3025718 | 2/1/1998 | LEVELATOR |
| DGT104500 | 3025719 | 2/1/1998 | LEVELATOR |
| DGT104501 | 3025720 | 2/1/1998 | LEVELATOR |
| DGT104502 | 3025721 | 2/1/1998 | LEVELATOR |
| DGT105567D | 3025724 | 6/1/1983 | STRETCH WRAP MACHINE |
| DGT105650D | 3025725 | 8/1/1983 | SINGLE STAND MILL |
| DGT105751D | 3025726 | 12/1/1982 | VENTILATION F/COLLECTION SYSTEM |
| DGT105752D | 3025727 | 12/1/1982 | VENTILATION F/COLLECTION SYSTEM |
| DGT105753D | 3025728 | 2/1/1983 | TRABON LUBE SYSTEM |
| DGT105754D | 3025729 | 2/1/1983 | TRABON LUBE SYSTEM |
| DGT105755D | 3025730 | 2/1/1983 | SINGLE STAND MILL |
| DGT105756D | 3025731 | 3/1/1983 | DIESEL FIRE PUMP |
| DGT105757D | 3025732 | 3/1/1983 | ELECTRIC FIRE PUMP |
| DGT105758D | 3025733 | 3/1/1983 | JOCKEY PUMP |
| DGT105761D | 3025734 | 12/1/1983 | HYDRAULIC PASTE BOX |
| DGT105762D | 3025735 | 12/1/1983 | HYDRAULIC PASTE BOX |
| DGT105763D | 3025736 | 12/1/1983 | ROTARY PILOT HOLE MACHINE |
| DGT105764D | 3025737 | 12/1/1983 | ROTARY PILOT HOLE MACHINE |
| DGT105765D | 3025738 | 12/1/1983 | TANK FOR MIXER |
| DGT105766D | 3025739 | 12/1/1983 | TANK FOR MIXER |
| DGT105769D | 3025741 | 6/1/1984 | LABEL MACHINE |
| DGT105770D | 3025742 | 8/1/1984 | TIG WELDER |
| DGT105770D01 | 3025743 | 1/1/1995 | ADDITIONAL CHARGES TO TAG #105770 |
| DGT105771D | 3025744 | 8/1/1984 | TIG WELDER |
| DGT105771D01 | 3025745 | 1/1/1995 | ADDITIONAL CHARGES TO TAG #105771 |
| DGT105772D | 3025746 | 8/1/1984 | TIG WELDER |
| DGT105772D01 | 3025747 | 1/1/1995 | ADDITIONAL CHARGES TO TAG #105772 |
| DGT105773D | 3025748 | 8/1/1984 | TIG WELDER |
| DGT105773D01 | 3025749 | 1/1/1995 | ADDITIONAL CHARGES TO TAG #105773 |
| DGT105774D | 3025750 | 10/1/1984 | PILOT HOLE MACHINE |
| DGT105775D | 3025751 | 12/1/1984 | HEVI DUTY TRANSFORMER-300KVA LIGHTING |
| DGT105776D | 3025752 | 12/1/1984 | TANK FOR MIXER |
| DGT105777D | 3025753 | 1/1/1985 | HYDRAULIC PASTE BOX |
| DGT105781D | 3025754 | 1/1/1985 | BATTERY WASHER |
| DGT105787D | 3025756 | 12/1/1985 | EXPANDER PRESS #2 |
| DGT105789D | 3025757 | 8/1/1986 | HI STACKER TIERING TRUCK |
| DGT105790D | 3025758 | 8/1/1986 | HI STACKER TIERING TRUCK |
| DGT105795D | 3025759 | 9/1/1986 | EPANDER PRESS #1LINE |
| DGT105796D | 3025760 | 10/1/1986 | PASTE MACH LINE#1 |
| DGT105797D | 3025761 | 10/1/1986 | BUTT WELDER LINE#1 |
| DGT105798D | 3025762 | 10/1/1986 | PASTE MIXER LINE #1 |
| DGT105800D | 3025763 | 10/1/1986 | HOT RUNNER CONTROLLER(500T CINN MOLD) |
| DGT105801D | 3025764 | 10/1/1986 | MOLD MONITOR MACH #12(500T MOLD MACH) |
| DGT105802D | 3025765 | 10/1/1986 | PARTS CONV(25T MOLD MACH)15'&7' |
| DGT105805D | 3025766 | 2/1/1987 | EXPANDER PRESS LN#1 |
| DGT105806D | 3025767 | 2/1/1987 | COVER HEAT SEAL |
| DGT105807D | 3025768 | 4/1/1987 | FINAL COVER FILT PLACER |

27

| | | |
|---|---|---|
| DGT105810D | 3025770 | 9/1/1987 CONV-HANDLE PLACEMENT |
| DGT105811D | 3025771 | 5/1/1988 CHARGE PANEL |
| DGT105812D | 3025772 | 5/1/1988 CHARGE PANEL |
| DGT105817D | 3025773 | 2/1/1988 S.O.C. PROGRAMMABLE CONTROLLER |
| DGT105818D | 3025774 | 2/1/1988 S.O.C. PROGRAMMABLE CONTROLLER |
| DGT105820D | 3025775 | 2/1/1988 1ST WATER CHILLER |
| DGT105822D | 3025776 | 5/1/1988 CAST ON STRAP MACH |
| DGT105823D | 3025777 | 5/1/1988 HI-RATE TESTER(5575L&R) |
| DGT105824D | 3025778 | 5/1/1988 AIR BLAST SYS BLOWER |
| DGT105825D | 3025779 | 5/1/1988 TOP TERM TIG BURN MACH |
| DGT105826D | 3025780 | 5/1/1988 HI-RATE CONVEYOR |
| DGT105828D | 3025782 | 11/1/1988 CHARGE FLOOR PROCESS FAN |
| DGT105830D | 3025784 | 12/1/1988 LABEL MACHINE |
| DGT105831D | 3025785 | 1/1/1989 SPOT FACE MACHINE |
| DGT105832D | 3025786 | 1/1/1989 SPOT FACE MACHINE |
| DGT105834D | 3025787 | 8/31/1989 AUTO STRETCH WRAP UNIT |
| DGT105837D | 3025788 | 10/31/1989 LEAD SULFATE SCALE RECOVERY SYSTEM |
| DGT105838D | 3025790 | 2/1/1990 CONVEYOR |
| DGT105840D | 3025791 | 2/1/1990 90 DEGREE EXIT CONV(RIGHT SIDE INFEED OHB) |
| DGT105842D | 3025793 | 8/1/1973 TRUCK POWERED SHOP |
| DGT105843D | 3025794 | 3/1/1980 TRUCK-POWERED-SHOP |
| DGT105845D | 3025795 | 8/1/1976 TRUCK-POWERED-SHOP |
| DGT105846D | 3025796 | 5/1/1991 ROTARY DRUM PASTE MACH |
| DGT105847D | 3025797 | 5/1/1991 ROTARY DRUM PASTE MACH |
| DGT105848D | 3025798 | 5/1/1991 ROTARY DRUM PASTE MACH |
| DGT105849D | 3025799 | 5/1/1991 ROTARY DRUM PASTE MACH |
| DGT105854D | 3025802 | 12/1/1991 PRESTRETCH UNIT |
| DGT105856D | 3025803 | 1/1/1993 ENCLOSURE F/3 DOORS |
| DGT105865D | 3025804 | 3/1/1994 SPIROMETER |
| DGT105869D | 3025806 | 2/28/1995 (9)TOLEDO SCALE WEIGHT CONTROLLERS |
| DGT105870D | 3025807 | 1/1/1996 AUTOMATIC PALLETIZER |
| DGT105870E | 3025808 | 11/1/2001 AUTOMATIC PALLETIZER |
| DGT105871 | 3025809 | 2/28/1997 (B) ULTRASONIC WELDER |
| DGT105871A | 3025810 | 12/1/1998 TRAILING CHARGE TO DGT105871 |
| DGT105871D | 3025811 | 1/1/1987 GENIE BOOM ELECTRIC MAN LIFT |
| DGT105872D | 3025813 | 3/1/1983 CLARK WALKING STYLE ELECTRIC SWEEPER/SCRUBBER |
| DGT105873 | 3025814 | 7/31/1997 AUTO OFF-BEAR SYS |
| DGT105874 | 3025816 | 7/31/1997 HEATING SYSTEM (UPGRADE) |
| DGT105876 | 3025817 | 11/1/2001 LEAD OXIDE VENTALATION ON XMET |
| DGT105878 | 3025818 | 11/1/2001 SYNTRON BOWL CONVERSION |
| DGT105880 | 3025819 | 11/1/2001 REBUILD CHANGE TABLE |
| DGT105881 | 3025820 | 11/1/2001 REBUILD CHARGE TABLES |
| DGT105883 | 3025821 | 11/1/2001 MANCOOLERS FOR C.O.S. |
| DGT105884 | 3025822 | 11/1/2001 REPAIR PERSON COOLERS - X-MET |
| DGT105886 | 3025824 | 11/1/2001 ROLLING MILL DRIVE UNIT |
| DGT105887 | 3025825 | 11/1/2001 REPLACE MODICON CONTROLLERS |
| DGT105888 | 3025826 | 11/1/1997 SAND FILTER |
| DGT105890 | 3025828 | 11/1/1997 POWERED SWEEPER |
| DGT105892 | 3025829 | 11/1/1997 HOT MELT EQUIPMENT |
| DGT105894 | 3025832 | 11/1/1997 RETENTION AREA |
| DGT105895 | 3025833 | 11/1/2001 LASER DATE CODE-CELL #1 |
| DGT105897 | 3025834 | 11/1/2001 HI RATE MACHINE FOR LEAN CELL #1 |
| DGT105898 | 3025835 | 11/1/2001 AIRCHECK FOR LEAN CELL #1 |
| DGT105899 | 3025836 | 11/1/2001 AIRCHECK PANEL FOR LEAN CELL #1 |
| DGT105902 | 3025837 | 11/1/2001 CARTON PRINTER MACHINE CELL #1 |
| DGT105903 | 3025838 | 11/1/2001 HANDLE PLACER MACHINE |
| DGT105906 | 3025839 | 11/1/2001 LOW VOLUME SHRING WRAP MACHINE |
| DGT105907 | 3025840 | 11/1/2001 HIGH SPEED SHRINK WRAP MACHINE |
| DGT105908 | 3025841 | 11/1/2001 INKJET PRINTER CELL #1 |
| DGT105911 | 3025842 | 11/1/2001 DESIGN OF ACID HANDLING SYSTEM |
| DGT105912 | 3025843 | 11/1/2001 PLANT UPGRADES FOR LEAN CELLS |
| DGT105913 | 3025844 | 11/1/2001 LABEL JET LABELLER |
| DGT105914 | 3025845 | 11/1/2001 LABEL JET LABELLER |
| DGT105915 | 3025846 | 11/1/2001 LABEL JET LABELLER |
| DGT105916 | 3025847 | 11/1/2001 LABEL JET LABELLER |
| DGT105917 | 3025848 | 11/1/2001 LABEL JET LABELLER |
| DGT105918 | 3025849 | 11/1/2001 LABEL JET LABELLER |

| | | | |
|---|---|---|---|
| DGT105920 | 3025850 | 11/1/2001 | HEAT SEAL FOR MISC. LINE |
| DGT105921 | 3025851 | 11/1/2001 | POLY STORAGE ELIMINATTION EQUIPMENT TO MOVE PLASTI |
| DGT105924 | 3025852 | 11/1/2001 | QC LAB BITRODE CYCLER FOR NEW BRUNSWICK |
| DGT106102D | 3025853 | 6/1/1984 | PILOT HOLE MACHINE |
| DGT106164D | 3025854 | 9/1/1984 | BRIDGEPORT TAPE MILL |
| DGT106164D01 | 3025855 | 10/1/1984 | TRAILING CHARGE TO TAG #106164D |
| DGT109106D | 3025858 | 12/1/1988 | PASTE MACH(ROTARY DRUM) |
| DGT111097D | 3025859 | 4/1/1993 | BOILER CONTROL FOR #1 |
| DGT111098D | 3025860 | 4/1/1993 | BOILER CONTROL FOR #2 |
| DGT111099D | 3025861 | 4/1/1993 | BOILER CONTROL FOR #3 |
| DGT111100D | 3025862 | 4/1/1993 | BOILER CONTROL FOR #4 |
| DGT111673D | 3025864 | 7/1/1994 | RED LEAD STORAGE SYSTEM |
| DGT111673D01 | 3025865 | 7/1/1994 | ADDITIONAL CHARGES TO TAG #111673D |
| DGT111673D02 | 3025866 | 1/1/1995 | TRAILING CHARGES TO TAG #111673D |
| DGT111674D | 3025867 | 7/1/1994 | RED LEAD DELIVERY SYSTEM |
| DGT111674D01 | 3025868 | 7/1/1994 | TRAILING CHARGE TO TAG #111674D |
| DGT112844 | 3025870 | 4/28/1999 | INFORMATION BOARD |
| DGT113107 | 3025871 | 7/31/1997 | ROBOT |
| DGT690000 | 3025872 | 1/2/1998 | LEVELATOR |
| DGT690001 | 3025873 | 1/2/1998 | LEVELATOR |
| DGT690002 | 3025874 | 1/2/1998 | LEVELATOR |
| DGT690003 | 3025875 | 1/2/1998 | LEVELATOR |
| DGT690004 | 3025876 | 1/2/1998 | LEVELATOR |
| DGT690005 | 3025877 | 1/2/1998 | LEVELATOR |
| DGT690006 | 3025878 | 1/2/1998 | LEVELATOR |
| DGT690007 | 3025879 | 1/2/1998 | LEVELATOR |
| DGT690008 | 3025880 | 1/2/1998 | LEVELATOR |
| DGT690009 | 3025881 | 1/2/1998 | LEVELATOR |
| DGT690010 | 3025882 | 1/2/1998 | LEVELATOR |
| DGT690011 | 3025883 | 1/2/1998 | LEVELATOR |
| DGT690012 | 3025884 | 1/2/1998 | LEVELATOR |
| DGT690013 | 3025885 | 1/2/1998 | LEVELATOR |
| DGT690014 | 3025886 | 1/2/1998 | LEVELATOR |
| DGT690015 | 3025887 | 1/2/1998 | LEVELATOR |
| DGT690016 | 3025888 | 8/1/1998 | TIG WELDER |
| DGT690017 | 3025889 | 1/2/1998 | DOCK LOCK |
| DGT690018 | 3025890 | 1/2/1998 | DOCK LOCK |
| DGT690019 | 3025891 | 1/2/1998 | DOCK LOCK |
| DGT690021 | 3025893 | 1/2/1998 | DOCK LOCK |
| DGT690022 | 3025894 | 1/2/1998 | DOCK LOCK |
| DGT690023 | 3025895 | 1/2/1998 | DOCK LOCK |
| DGT690024 | 3025896 | 1/2/1998 | DOCK LOCK |
| DGT690025 | 3025897 | 1/2/1998 | DOCK LOCK |
| DGT690027 | 3025899 | 1/2/1998 | SITE SIGN (DELPHI) |
| DGT690028 | 3025900 | 4/1/1998 | PERFORATOR LINE UPC |
| DGT690030 | 3025901 | 11/1/1998 | LIFT TABLE |
| DGT690031 | 3025902 | 11/1/1998 | LIFT TABLE |
| DGT690032 | 3025903 | 11/1/1998 | LIFT TABLE |
| DGT690033 | 3025904 | 11/1/1998 | NON SLIP FLOOR COATING-EXPANDER&PASTE MACH. AREAS |
| DGT690034 | 3025905 | 11/1/1998 | TRANSFORMER |
| DGT690035 | 3025906 | 11/1/1998 | LABEL MACHINE |
| DGT690036 | 3025907 | 11/1/1998 | ALARMED FEEDER TO FIRE PUMP HOSE |
| DGT690040 | 3025908 | 11/1/1998 | AUXILLARY REMOTE FIRE DEPT CONNECTION |
| DGT690041 | 3025909 | 11/1/1998 | AUTOMATIC PLATE STACKER SYS W/CONTROLS F/X-MET1 |
| DGT690042 | 3025910 | 11/1/1998 | AUTOMATIC PLATE STACKER SYS W/CONTROLS F/X-MET2 |
| DGT690043 | 3025911 | 11/1/1998 | AUTOMATIC PLATE STACKER SYS W/CONTROLS F/X-MET3 |
| DGT690044 | 3025912 | 1/2/1998 | ROBOT |
| DGT690045 | 3025913 | 1/2/1998 | ROBOT |
| DGT690046 | 3025914 | 1/2/1998 | ROBOT |
| DGT690047 | 3025915 | 1/2/1998 | ROBOT |
| DGT690048 | 3025916 | 11/1/1998 | ABB-IRB 6400 ROBOT FOR AUTOMATIC PLATE HANDLING |
| DGT690049 | 3025917 | 11/1/1998 | ABB-IRB 6400 ROBOT FOR AUTOMATIC PLATE HANDLING |
| DGT690050 | 3025918 | 11/1/1998 | ABB-IRB 6400 ROBOT FOR AUTOMATIC PLATE HANDLING |
| DGT690051 | 3025919 | 11/1/1998 | ABB-IRB 6400 ROBOT FOR AUTOMATIC PLATE HANDLING |
| DGT690052 | 3025920 | 1/2/1998 | AUTOMATED ORIENTATION ROBOT |
| DGT690053 | 3025921 | 1/2/1998 | TITAN CENTRAL CHILL |
| DGT690054 | 3025922 | 1/2/1998 | AIR DRYER |

| | | |
|---|---|---|
| DGT690055 | 3025923 | 1/2/1998 AIR DRYER |
| DGT690056 | 3025924 | 11/1/2001 BRIDGE CRANE |
| DGT690057 | 3025925 | 1/1/1999 NEW BRUNSWICK STORM WATER TREATMENT |
| DGT690058 | 3025926 | 11/1/2001 DUST COLLECTION SYSTEM FOR THE X-MET LINE |
| DGT690060 | 3025927 | 11/1/2001 ELECTRICAL DISTRIBUTION SYSTEM FOR THE X-MET LINE |
| DGT690065 | 3025928 | 11/1/2001 COULTER COUNTER PER DAVE MCCORD - MEASURES OXIDE P |
| DGT690068 | 3025929 | 11/1/2001 HEAT SEAL MACHINE #1 |
| DGT690069 | 3025930 | 11/1/2001 HEAT SEAL MACHINE #2 |
| DGT690070 | 3025931 | 11/1/2001 HEAT SEAL MACHINE #3 |
| DGT690071 | 3025932 | 11/1/2001 HEAT SEAL MACHINE #4 |
| DGT690072 | 3025933 | 11/1/2001 CONVERT BOILERS TO-ONLY MARK GOODWIN AUTHORIZATION |
| DGT690073 | 3025934 | 11/1/2001 ACID TANK |
| DGT690074 | 3025935 | 11/1/2001 ACID TANK |
| DGT690075 | 3025936 | 11/1/2001 ACID TANK |
| DGT690076 | 3025937 | 11/1/2001 ACID TANK |
| DGT690077 | 3025938 | 11/1/2001 NEW AIR WASHER FAN - INSTALLED |
| DGT690078 | 3025939 | 11/1/2001 NEW AIR WASHER FAN - INSTALLED |
| DGT690081 | 3025940 | 11/1/2001 BLOWER UNIT FOR AIR WASHER |
| DGT690082 | 3025941 | 1/1/2002 BLOWER UNIT FOR AIR WASHER |
| DGT690111 | 3025942 | 11/1/2001 FEED WATER PUMP #1 IN POWER PLANT |
| DGT690112 | 3025943 | 11/1/2001 FEED WATER PUMP #2 IN POWER PLANT |
| DGT690113 | 3025944 | 11/1/2001 BUSS DUCT UPGRADE |
| DGT690115 | 3025945 | 11/1/2001 FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690116 | 3025946 | 11/1/2001 FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690117 | 3025947 | 11/1/2001 FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690118 | 3025948 | 11/1/2001 FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690119 | 3025949 | 11/1/2001 FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690120 | 3025950 | 11/1/2001 FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690122 | 3025951 | 11/1/2001 SHEET METAL SHEAR |
| DGT690123 | 3025952 | 11/1/2001 SONIC WELDER SYSTEM |
| DGT690124 | 3025953 | 11/1/2001 HIGH VOLTAGE GREEN GRP TEST MACHINE |
| DGT690125 | 3025954 | 11/1/2001 HIGH VOLTAGE GREEN GRP TEST MACHINE |
| DGT690126 | 3025955 | 11/1/2001 AERIAL PLATFORM TRUCK - NEW |
| DGT690129 | 3025957 | 1/1/2002 PHASE II REPAIRS TO FORMATION VENTILATION - PROCES |
| DGT690132 | 3025958 | 11/1/2001 BATTERY LAB AIR CONDITIONER, UPGRADE |
| DGT690134 | 3025959 | 1/1/2002 SEPARATE PROPANE SYSTEMS FOR PROD PROC, PLANT BOIL |
| DGT690135 | 3025960 | 11/1/2001 WALMART J240H T BATTERY, APPLICATOR AND TUBING |
| DGT690136 | 3025961 | 11/1/2001 WALMART J240H T BATTERY, ELECTRICAL CONTROLS |
| DGT690137 | 3025962 | 11/1/2001 WALMART J240H T BATTERY, ELECTRICAL CONTROLS |
| DGT690138 | 3025963 | 11/1/2001 WALMART J240H T BATTERY, ENGINEERING DESIGN |
| DGT690139 | 3025964 | 11/1/2001 WALMART J240H T BATTERY, HOIST |
| DGT690140 | 3025965 | 11/1/2001 LEAD STRIP MILL (FROM MUNCIE) |
| DGT690141 | 3025966 | 11/1/2001 WALMART J240 HT BATTERY, MQ 2 MTL |
| DGT690147 | 3025967 | 11/1/2001 LIFT & ROTATE TABLE # 1 FOR BATTERY PLATE SKIDS |
| DGT690148 | 3025968 | 11/1/2001 LIFT & ROTATE TABLE # 2 FOR BATTERY PLATE SKIDS |
| DGT690149 | 3025969 | 11/1/2001 LIFT & ROTATE TABLE # 3 FOR BATTERY PLATE SKIDS |
| DGT690150 | 3025970 | 11/1/2001 LIFT & ROTATE TABLE # 4 FOR BATTERY PLATE SKIDS |
| DGT690151 | 3025971 | 11/1/2001 LIFT & ROTATE TABLE # 5 FOR BATTERY PLATE SKIDS |
| DGT690152 | 3025972 | 11/1/2001 LIFT & ROTATE TABLE # 6 FOR BATTERY PLATE SKIDS |
| DGT690153 | 3025973 | 11/1/2001 LIFT & ROTATE TABLE # 7 FOR BATTERY PLATE SKIDS |
| DGT690156 | 3025974 | 11/1/2001 LIFT & ROTATE TABLE # 8 FOR BATTERY PLATE SKIDS |
| DGT690157 | 3025975 | 11/1/2001 LIFT & ROTATE TABLE # 9 FOR BATTERY PLATE SKIDS |
| DGT690158 | 3025976 | 11/1/2001 LIFT & ROTATE TABLE # 10 FOR BATTERY PLATE SKIDS |
| DGT690159 | 3025977 | 11/1/2001 LIFT & ROTATE TABLE # 11 FOR BATTERY PLATE SKIDS |
| DGT690160 | 3025978 | 11/1/2001 LIFT & ROTATE TABLE # 12 FOR BATTERY PLATE SKIDS |
| DGT690161 | 3025979 | 11/1/2001 LIFT & ROTATE TABLE # 13 FOR BATTERY PLATE SKIDS |
| DGT690162 | 3025980 | 11/1/2001 LIFT & ROTATE TABLE # 14 FOR BATTERY PLATE SKIDS |
| DGT690163 | 3025981 | 11/1/2001 ACID RECLAIM PUMP # 1 |
| DGT690164 | 3025982 | 11/1/2001 ACID RECLAIM PUMP # 2 |
| DGT690165 | 3025983 | 11/1/2001 WALMART J240HT BATTERY, SCRAP COLLECTION SYSTEM |
| DGT690166 | 3025984 | 11/1/2001 INSTALL EQUIP TRANS FROM TRENTON |
| DGT690168 | 3025985 | 11/1/2001 HOOD FOR OPERATOR QUALITY TESTING EQUIPMENT |
| DGT690169 | 3025986 | 11/1/2001 ACID ABSORPTION TESTER |
| DGT690176 | 3025987 | 11/1/2001 HEAT EXCHANGER FOR WASH TUNNEL - NB |
| DGT690177 | 3025988 | 1/1/2002 PERSONNEL VACUUM SYS. ON CLEAN AREA DOORWAY (1 OF |
| DGT690178 | 3025989 | 11/1/2001 INSTALL HIGH SPEED ROLLUP DOOR TO SHIPPING DEPT |
| DGT690181 | 3025990 | 11/1/2001 REPLACE CHARGE TABLE BLOWER |

| | | | |
|---|---|---|---|
| DGT690194 | 3025991 | 11/1/2001 | BOILER CONTROLLER (1 OF 3) |
| DGT690195 | 3025992 | 11/1/2001 | BOILER CONTROLLER (2 OF 3) |
| DGT690196 | 3025993 | 11/1/2001 | BOILER CONTROLLER (3 OF 3) |
| DGT690218 | 3025994 | 1/1/2002 | PERSONNEL VACUUM SYS. IN CLEAN AREA DOORWAY (2 OF |
| DGT690219 | 3025995 | 1/1/2002 | PERSONNEL VACUUM SYS. IN CLEAN AREA DOORWAY (3 OF |
| DGT690220 | 3025996 | 1/1/2002 | PERSONNEL VACUUM SYS. IN CLEAN AREA DOORWAY (4 OF |
| DGT720001 | 3025997 | 4/28/1999 | ACID FILL MACHINE |
| DGT720002 | 3025998 | 4/28/1999 | MOD. TO VR |
| DGT720007 | 3025999 | 4/28/1999 | 50 AMP RECTIFIER |
| DGT720010 | 3026000 | 4/28/1999 | UPDATE STACKER SYSTEM |
| DGT72383 | 3026001 | 11/1/2001 | REBUILD 700 MOLDING MACHINE |
| DGT72395 | 3026002 | 1/1/2002 | CAST ON STRAP CONTROLS |
| DGT72396 | 3026003 | 1/1/2002 | PROPANE BACK UP SYSTEM FOR BOILERS |
| DGT72413 | 3026004 | 1/1/2002 | AUTO PLATE STIELER SYSTEM CONTROLS #4 |
| DGT74405 | 3026005 | 11/1/2001 | ACID FILL/PREWASH MACHINE CELL #1 |
| DGT74406 | 3026006 | 11/1/2001 | ACID MIX SYSTEM CELL #1 |
| DGT74407 | 3026007 | 11/1/2001 | WASHER/DRYER FOR FINISHED BATTERIES CELL #1 |
| DGT74408 | 3026008 | 11/1/2001 | BITROBE HIRATE CELL #1 |
| DGTEX095387D | 3026009 | 11/1/2001 | CAPITALIZABLE MAINTENANCE - RECONDITION I.R. AIR C |
| DGT018263N | 3026024 | 1/1/1979 | CASE GATHERING CONVEYOR |
| DGT018358N | 3026079 | 10/1/1986 | HOT RUNNER CONTROLLER SYSTEM |
| DGT018359N | 3026080 | 10/1/1986 | HOT RUNNER CONTROLLER SYSTEM |
| DGT018360N | 3026081 | 10/1/1986 | HOT RUNNER CONTROLLER SYSTEM |
| DGT018361N | 3026082 | 10/1/1986 | HOT RUNNER CONTROLLER SYSTEM |
| DGT018362N | 3026083 | 10/1/1986 | HOT RUNNER CONTROLLER SYSTEM |
| DGT081436D | 3026331 | 11/1/1974 | STRAP CAST MACHINE |
| DGT081437D | 3026332 | 11/1/1974 | STRAP CAST MACHINE |
| DGT081438D | 3026333 | 11/1/1974 | STRAP CAST MACHINE |
| DGT091798D | 3026399 | 12/1/1977 | CAST ON STRAP MACHINE |
| DGT101707D | 3026558 | 7/1/1985 | STRETCH WRAP MACHINE |
| DGT101750D | 3026598 | 1/1/1988 | OSI OVEN-ENERGY RECOVERY SYSTEM |
| DGT081611D | 3027025 | 4/1/1977 | VACUUM SYSTEM FOR INCAPTULATORS |
| DGT081622D | 3027033 | 7/1/1977 | PLATE ENCAPSULATOR |
| DGT081623D | 3027035 | 7/1/1977 | PLATE ENCAPSULATOR |
| DGT081648D | 3027064 | 8/1/1977 | SPECTROGRAPH |
| DGT081649D | 3027066 | 8/1/1977 | HEAT SEAL MACHINE FINAL |
| DGT081650D | 3027067 | 8/1/1977 | HEAT SEAL MACHINE FINAL |
| DGT081651D | 3027068 | 8/1/1977 | HEAT SEAL MACHINE FINAL |
| DGT081693D | 3027101 | 10/1/1977 | TEMPERATURE CONTROL FOR TERMINAL |
| DGT081705D | 3027112 | 11/1/1977 | FINAL COVER LEAK TEST |
| DGT081743D | 3027130 | 9/1/1978 | BUTT WELDER |
| DGT095750D | 3027192 | 12/1/1976 | X MAT EXPANDING PRESS |
| DGT095758D | 3027208 | 12/1/1976 | PASTE MIXER |
| DGT096940D | 3027221 | 5/1/1972 | WATER CHILLER |
| DGT100166D | 3027229 | 4/1/1977 | TIG BURN MACHINE |
| DGT100357D | 3027246 | 7/1/1977 | EDGE TRIM & CHOPPER UNIT |
| DGT100485D | 3027251 | 9/1/1977 | ENCAPSULATOR |
| DGT100486D | 3027252 | 9/1/1977 | ENCAPSULATOR |
| DGT103764D | 3027269 | 9/1/1978 | GROUP ALIGN CONVEYOR MACHINE |
| DGT103775D | 3027277 | 12/1/1978 | ENCAPSULATION & COLLATION MACHINE |
| DGT103776D | 3027279 | 12/1/1978 | ENCAPSULATION & COLLATION MACHINE |
| DGT103780D | 3027283 | 1/1/1979 | COVER HEAT SEAL |
| DGT103780D01 | 3027284 | 3/1/1979 | TRAILING CHARGE TO TAG #103780D |
| DGT103794D | 3027288 | 4/1/1979 | GREEN GROUP SHORT TEST CONVEYOR #1 |
| DGT103815D | 3027299 | 7/1/1979 | STRAP CAST STATION |
| DGT103833D | 3027307 | 10/1/1979 | WATER CHILLER-15 TON |
| DGT103848D | 3027313 | 12/1/1979 | DC DC MODULE |
| DGT103849D | 3027314 | 12/1/1979 | DC DC MODULE |
| DGT103850D | 3027315 | 12/1/1979 | DC DC MODULE |
| DGT103851D | 3027316 | 12/1/1979 | DC DC MODULE |
| DGT103852D | 3027317 | 12/1/1979 | DC DC MODULE |
| DGT103853D | 3027318 | 12/1/1979 | DC DC MODULE |
| DGT103854D | 3027319 | 12/1/1979 | DC DC MODULE |
| DGT103856D | 3027321 | 12/1/1979 | DC DC MODULE |
| DGT103857D | 3027322 | 12/1/1979 | DC DC MODULE |
| DGT103907D | 3027345 | 11/1/1982 | WATER CHILLER |
| DGT103933D | 3027353 | 9/1/1983 | HEAT TREAT FURNACE |

| | | | |
|---|---|---|---|
| DGT104743D | 3027392 | 6/1/1980 | BRANSON WELD UNIT |
| DGT107507D | 3027402 | 1/1/1986 | DUST COLLECTOR |
| DGT107566D | 3027438 | 3/1/1990 | EKG MACHINE |
| DGT107586D | 3027452 | 1/1/1991 | GMF ROBOT FOR C.O.S. LINE |
| DGT107588D | 3027454 | 6/1/1991 | JWI LEAD FILTER PRESS |
| DGT107609D | 3027463 | 1/1/1992 | LEBLOND MAKINO LATHE |
| DGT107619D | 3027469 | 2/1/1992 | DIGITAL READOUT FOR LEBLOND LATHE |
| DGT107621D | 3027470 | 4/1/1992 | TEMP CONTROLLER FOR MOLD MACH |
| DGT107636D | 3027479 | 4/1/1994 | SATELLITE SPIROMETER |
| DGT107647D | 3027487 | 1/1/1994 | CHILLER SYSTEM FOR #2 LEAD STRIP |
| DGT107678D | 3027499 | 7/1/1995 | SPRAYMATION HOT MELT EQUIPMENT |
| DGT107698 | 3027515 | 6/30/1997 | DIELECTRIC TEST CONTROL |
| DGT107700 | 3027517 | 7/31/1997 | AUTO OFF |
| DGT107723B | 3027544 | 6/1/1999 | FORMATION TABLE SYSTEM |
| DGT107731 | 3027549 | 11/1/2001 | LIFT TABLE FOR PLATES |
| DGT107732 | 3027550 | 11/1/2001 | LIFT TABLE FOR PLATES |
| DGT107733 | 3027551 | 11/1/2001 | LIFT TABLE FOR PLATES |
| DGT107734 | 3027552 | 11/1/2001 | LIFT TABLE FOR PLATES |
| DGT107735 | 3027553 | 11/1/2001 | LIFT TABLE FOR PLATES |
| DGT107736 | 3027554 | 11/1/2001 | LIFT TABLE FOR PLATES |
| DGT107744 | 3027559 | 4/1/2000 | TOP TERMINAL TIG WELDER |
| DGT600015 | 3027596 | 11/1/2001 | 44 X 52  4000LB CAPACITY SCISSOR LIFT |
| DGT600016 | 3027597 | 11/1/2001 | 44 X 55  4000LB CAPACITY SCISSOR LIFT |
| DGT600017 | 3027598 | 11/1/2001 | 44 X 52  4000LB CAPACITY SCISSOR LIFT |
| DGT600018 | 3027599 | 11/1/2001 | 44 X 52  4000LB CAPACITY SCISSOR LIFT |
| DGT600019 | 3027600 | 11/1/2001 | 44 X 52  4000LB CAPACITY SCISSOR LIFT |
| DGT600020 | 3027601 | 11/1/2001 | 44 X 52  4000LB CAPACITY SCISSOR LIFT |
| DGT600043 | 3027617 | 11/1/2001 | SEPERATOR ROLL LIFT, JIB CRANE, AND HOIST |
| DGT600044 | 3027618 | 11/1/2001 | SEPERATOR ROLL LIFT, JIB CRANE AND HOIST |
| DGT600045 | 3027619 | 11/1/2001 | PROTOTYPE WATER BATH FORMATION SYSTEM |
| DGT600049 | 3027622 | 11/1/2001 | FORMATION CHARGING TABLE #3 |
| DGT600056 | 3027625 | 11/1/2001 | ROBOT TO LOAD BATTERY GROUPS INTO CAST-ON-STRAP MA |
| DGT600106 | 3027656 | 11/1/2001 | WALMART J240HT BATT, SCRAP COLLECTION SYSTEM |
| DGT690101 | 3051124 | 9/11/2002 | SEPARATOR LIFTING JIB CRANE AND HOIST |
| DGT690099 | 3051125 | 9/11/2002 | DELPHI MACHINE TO TEST BATTERY CELLS FOR SHORTS |
| DGT690097 | 3051126 | 9/11/2002 | DELPHI WATER COOLING STATION |
| DGT690095 | 3051127 | 9/11/2002 | DELPHI STRETCH/PERFORATE MACHINE |
| DGT690094 | 3051128 | 9/11/2002 | DELPHI GROUP LOADING MACHINE STATION |
| DGT690093 | 3051129 | 9/11/2002 | DELPHI TOP TERMINAL COVER SPIN MACHINE |
| DGT690092 | 3051130 | 9/11/2002 | DELPHI GROUP LOADING MACHINE STATION |
| DGT690102 | 3051131 | 9/11/2002 | SEPARATOR LIFTING JIB CRANE AND HOIST |
| DGT690187 | 3051132 | 9/11/2002 | (#6) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690186 | 3051133 | 9/11/2002 | (#5) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690185 | 3051134 | 9/11/2002 | (#4) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690184 | 3051135 | 9/11/2002 | (#3) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690183 | 3051136 | 9/11/2002 | (2) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690182 | 3051137 | 9/11/2002 | (#1) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690103 | 3051138 | 9/11/2002 | FILTRATION SYSTEM FOR CHILLED WATER SUPPLY |
| DGT690212 | 3051139 | 9/11/2002 | WELDER #8 |
| DGT690211 | 3051140 | 9/11/2002 | WELDER #7 |
| DGT690210 | 3051141 | 9/11/2002 | WELDER #6 |
| DGT690209 | 3051142 | 9/11/2002 | WELDER #5 |
| DGT690208 | 3051143 | 9/11/2002 | WELDER #4 |
| DGT690207 | 3051144 | 9/11/2002 | WELDER #3 |
| DGT690206 | 3051145 | 9/11/2002 | WELDER #2 |
| DGT690213 | 3051146 | 9/11/2002 | WELDER #9 |
| DGT690083 | 3051147 | 9/11/2002 | BIG JOE LIFT TRUCK (REV. 1) |
| DGT105901 | 3051148 | 9/11/2002 | REPLACE HEAT SEALER |
| DGT105900 | 3051149 | 9/11/2002 | FIRE PTOTECTION FOR GREEN GROU/ VACUUM EXHAUSTER |
| DGT105896 | 3051150 | 9/11/2002 | REPLACE HEAT SEALERS |
| DGT690216 | 3051151 | 9/11/2002 | WELDER #12 |
| DGT690215 | 3051152 | 9/11/2002 | WELDER #11 |
| DGT690214 | 3051153 | 9/11/2002 | WELDER #10 |
| DGT690188 | 3051154 | 9/11/2002 | DELPHI MACHINE TO ALIGN TOP TERMINAL POSTS |
| DGT105910 | 3051170 | 9/11/2002 | RE ROUTE STORM OUTFALL |
| 72414 | 3051171 | 9/11/2002 | VACUUM EXHAUSTER |
| 72393 | 3051172 | 9/11/2002 | REBUILD TWO CHANGE TABLE |

| | | |
|---|---|---|
| DGT690202 | 3051173 | 9/11/2002 WATER CONSERVATION SYSTEM FOR BATTERY WASHER |
| DGT690191 | 3051174 | 9/11/2002 MISC CONVEYORS FOR LAYOUT CHANGES TO GRN GRP LEAN |
| DGT690190 | 3051175 | 9/11/2002 VENTILATION COLLECTOR FAN FOR GREEN GROUP LEAN CEL |
| 72370 | 3051176 | 9/11/2002 FIRE PROTECTION UPGRADE |
| DGT690109 | 3051182 | 9/11/2002 ROBOT TO LOAD BATTERY GROUPS INTO CAST-ON-STRAP MA |
| DGT690205 | 3051183 | 9/11/2002 WELDER #1 |
| DGT690130 | 3051209 | 9/11/2002 LINE INSTALL COSTS FOR MQ 1 VALIDATION |
| DGT690121 | 3051210 | 9/11/2002 DELPHI LEAN COVER TO CASE HEAT SEAL MACHINE |
| DGT690108 | 3051211 | 9/11/2002 INTER. COVER AIR CHECK MACHINE |
| DGT690107 | 3051212 | 9/11/2002 GROUP HOTMELT MACHINE |
| DGT690106 | 3051213 | 9/11/2002 TOP TERMINAL HOTMELT MACHINE |
| DGT690104 | 3051214 | 9/11/2002 DELPHI CAST-ON-STRAP MACHINE REBUILD OF DGS0099445 |
| DGT690096 | 3051215 | 9/11/2002 DELPHI SINGLE HEAD EF WELDER MACHINE |
| DGT690131 | 3051216 | 9/11/2002 PRODUCTIVE MTL FOR MQ 1 VALIDATION |
| DGT690203 | 3051217 | 9/11/2002 XMET PASTE MIXER #1 UPGRADE (REPLACES DGT100297D) |
| DGT690174 | 3051218 | 9/11/2002 #2 DR2-NB ENCAPSULATION/COLLATION MACHINE |
| DGT690173 | 3051219 | 9/11/2002 #1 DR2-NB ENCAPSULATION/COLLATION MACHINE |
| DGT690144 | 3051220 | 9/11/2002 UPGRADE BATTERY ACID RETENTION & DIST-TANK & COOLI |
| DGT690143 | 3051221 | 9/11/2002 UPGRADE BATTERY ACID RETENTION & DIST-CONSTR & INS |
| DGT690142 | 3051222 | 9/11/2002 UPGRADE BATTERY ACID RETENTION & DIST & ACID HOUSE |
| DGT690133 | 3051223 | 9/11/2002 NFPA VENTING ON PROPANE REGULATORS |
| DGT690087 | 3051228 | 9/11/2002 DELPHI LEAN TOP TERMINAL TIG WELDER |
| DGT690086 | 3051229 | 9/11/2002 DELPHI LEAN SIDE TERMINAL TIG WELDER |
| DGT056948 | 3051230 | 9/11/2002 OXIDE GRINDER CONTROL PANEL REBUILT |
| DGT72373 | 3051408 | 9/25/2002 replace sulfuric acid tank |
| DGT72387 | 3051409 | 9/25/2002 new brunswick security upgrade |
| DGT600175 | 3115835 | 2/10/2003 #5 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600174 | 3115836 | 2/10/2003 #4 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600173 | 3115837 | 2/10/2003 #3 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600172 | 3115838 | 2/10/2003 #2 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600171 | 3115839 | 2/10/2003 #1 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600176 | 3115841 | 2/10/2003 #6 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600178 | 3115842 | 2/10/2003 LOAD STATION & MAGAZINE FOR ROBOT LOAD |
| DGT600170 | 3115843 | 2/10/2003 ABB ROBOTS (4 OF 4) |
| DGT600169 | 3115844 | 2/10/2003 ABB ROBOTS (3 OF 4) |
| DGT600168 | 3115845 | 2/10/2003 ABB ROBOTS (2 OF 4) |
| DGT600167 | 3115846 | 2/10/2003 ABB ROBOTS (1 OF 4) |
| DGT600177 | 3115848 | 2/10/2003 CONVEYORS FOR DR3 |
| DGT600126 | 3115886 | 2/11/2003 #2 DR2-AN ENCAPSULATION/COLLATION MACHINE |
| DGT600125 | 3115887 | 2/11/2003 #1 DR2-AN ENCAPSULATION/COLLATION MACHINE |
| DGT600060 | 3115887 | 2/12/2003 INTERMEDIATE COVER. ASSY. MACHINE FOR MARINE |
| DGT600203 | 3115900 | 2/12/2003 FORMATION TABLE #2 |
| DGT600193 | 3115907 | 2/12/2003 OPERATOR ASSIST FOR DR-3 (1 OF 2)GREEN GROUP LEAN |
| DGT600194 | 3115908 | 2/12/2003 OPERATOR ASSIST FOR DR-3 (2 OF 2)GREEN GROUP LEAN |
| DGT600075 | 3115918 | 2/12/2003 HI VOLTAGE GREEN GROUP SHORT CHECK- MISC GREEN GRP |
| DGT600229 | 3117571 | 5/22/2003 LIFT ASSIST FOR DR-3 |
| DGT600230 | 3117572 | 5/22/2003 LIFT ASSIST FOR DR-3 |
| DGT600231 | 3117573 | 5/22/2003 LIFT ASSIST FOR DR-3 |
| DGT600204 | 3117578 | 5/22/2003 CONVEYOR SYSTEM FOR MISC LINE DR-3 |
| DGT800213 | 3117580 | 5/22/2003 CONVEYER FOR DR-3 #3&4 ON MISC. LINE |
| DGT690276 | 3151172 | 9/23/2003 BUSS DUCT FOR 1203 |
| DGT690180 | 3151173 | 9/23/2003 BACKFLOW PREVENTORS ON WATER MAINS |
| DGT690267 | 3151174 | 9/23/2003 NEW PROCESS BOILER FOR PLATE STEAM HOODS |
| DGT690262 | 3151175 | 9/23/2003 INSTALL NATURAL GAS LINE IN PLANT |
| DGT690260 | 3151163 | 9/23/2003 GRAPHITE HEAT EXCHANGER FOR ACID HOUSE |
| DGT690263 | 3151189 | 9/23/2003 LIFT PUMP #1 |
| DGT690259 | 3151190 | 9/23/2003 CHARGE TABLE 25 |
| DGT690258 | 3151191 | 9/23/2003 CHARGE TABLE 24 |
| DGT690236 | 3151192 | 9/23/2003 NEW CHARGE TABLE |
| DGT690235 | 3151193 | 9/23/2003 NEW CHARGE TABLE |
| DGT690224 | 3151194 | 9/23/2003 INSTALLATION OF MAJOR MECHANICAL,VENTILATION,ELECT |
| DGT690222 | 3151195 | 9/23/2003 DESIGN OF NEW CHARGE TABLE VENTILATION |
| DGT690265 | 3151196 | 9/23/2003 LIFT PUMP #2 |
| DGT695033 | 3152528 | 10/17/2003 PASTE MIXER BOWL |
| DGT690230 | 3153273 | 11/22/2003 LUG FORM PILOTED DIE (XMET LINE 3) |
| DGT690229 | 3153274 | 11/22/2003 LUG FORM CUT-OFF MACHINE (XMET LINE 2) |
| DGT690204 | 3153275 | 11/22/2003 BAR CODE ERROR PROOFING PROJECT |

| | | | |
|---|---|---|---|
| DGT690193 | 3153276 | 11/22/2003 | STATION TO REMOVE FORMATION CHARGE SPOOLS |
| DGT690283 | 3153277 | 11/22/2003 | HEAT SEAL MACHINE |
| DGT690234 | 3153278 | 11/22/2003 | REFURBISH SIDE TERMINAL PLACEMENT MACHINE |
| DGT690233 | 3153279 | 11/22/2003 | REFURBISH TOP TERMINAL PLACEMENT MACHINE |
| DGT690231 | 3153280 | 11/22/2003 | NEW SCRAP CONVEYOR (XMET LINE 4) |
| DGT890228 | 3153281 | 11/22/2003 | PASTE BOX & RAILS (XMET LINE 1) |
| DGT690232 | 3153282 | 11/22/2003 | NEW STRIP WIDTH GAGE (XMET LINE 5) |
| DGT695034 | 3153284 | 11/22/2003 | OIL PURIFICATION SYSTEM |
| DGT690281 | 3153285 | 11/22/2003 | BUFFER CONVEYOR FOR MISC LINE |
| DGT890257 | 3153286 | 11/22/2003 | CONTROLS SYS FOR CUTTING ON THE GRID FUNCTIONS |
| DGT890256 | 3153287 | 11/22/2003 | VISION SYS FOR NO SPIN CONDITION AND SPOT FACE QUA |
| DGT690255 | 3153288 | 11/22/2003 | SPARE EQUIPMENT TO CUT ON GRID JUNCTIONS (XMET) |
| DGT690254 | 3153289 | 11/22/2003 | SCRAP SYSTEM FOR PHASE 1 TO CUT ON GRID JUNCTIONS |
| DGT690253 | 3153290 | 11/22/2003 | NEW ACID FILL FOR MAIN LINE (WATERFALL) |
| DGT690226 | 3153291 | 11/22/2003 | NEW WASHER AND DRYER FOR MAIN LINE |
| DGT690155 | 3153301 | 11/22/2003 | POWER TRANSFORMER # 4 FOR LIFT AND ROTATE TABLES |
| DGT690154 | 3153302 | 11/22/2003 | POWER TRANSFORMER # 3 FOR LIFT AND ROTATE TABLES |
| DGT690146 | 3153303 | 11/22/2003 | POWER TRANSFORMER # 2 FOR LIFT AND ROTATE TABLES |
| DGT690145 | 3153304 | 11/22/2003 | POWER TRANSFORMER # 1 FOR LIFT AND ROTATE TABLES |
| DGT690067 | 3153306 | 11/22/2003 | OXIDE EQUIPMENT UPG (REACTOR CONTROLS) |
| DGT105892A | 3153307 | 11/22/2003 | HOT MELT EQUIPMENT (REBUILD) |
| DGT095660E | 3153308 | 11/22/2003 | REFURBISH #2 HEAT SEAL MACHINE |
| DGT095659E | 3153309 | 11/22/2003 | REFURBISH #2 HEAT SEAL MACHINE |
| DGT600124 | 3153354 | 11/25/2003 | CONTROLLER FOR TIG WELDER |
| DGT600123 | 3153355 | 11/25/2003 | CONTROLLER FOR TIG WELDER |
| DGT600046 | 3153358 | 11/25/2003 | GROUP CONVEYOR SYSTEM |
| DGT012095O | 3190741 | 1/31/2004 | CAPITALIZE REBUILT COST (SUBMERSIBLE HEATERS LINDB |
| DGT690227 | 3190742 | 1/31/2004 | SLURRY ROOM EQUIPMENT TO RECLAIM PASTE |
| DGT690278 | 3190743 | 1/31/2004 | HOT MELT MACHINE OVERHAUL |
| DGT690192 | 3190744 | 1/1/2004 | AUTOMATED ASSEMBLY CELL FOR CASES & TERMINAL ASSY' |
| DGT690250 | 3190745 | 1/31/2004 | AIR LEAK TEST MACHINE |
| DGT690273 | 3190750 | 1/31/2004 | OXIDE DELIVERY SYSTEM |
| DGT690277 | 3190751 | 1/31/2004 | INSULATOR DETECTION SYSTEM - MAINLINE |
| DGT690279 | 3190752 | 1/31/2004 | INSULATOR DETECTION SYSTEM - MISC LINE |
| DGT600222 | 3190754 | 2/24/2004 | #9 DR-3 ENCAPSULATION COLOLATION MACHINE |
| DGT690264 | 3190755 | 1/31/2004 | AUTOMATIC INSULATOR INSERTER FOR SATURN BATTERY |
| DGT690266 | 3190756 | 1/31/2004 | MACHINE TO INSTALL INSULATOR UNDER SIDE TERMINAL S |
| DGT690269 | 3190757 | 1/1/2004 | HIGH RATE MACHINE BASE |
| DGT690270 | 3190758 | 1/31/2004 | BITRODE VRL HIGH RATE |
| DGT690271 | 3190759 | 1/31/2004 | BITRODE VRL HIGH RATE LOAD |
| DGT600217 | 3190800 | 2/24/2004 | LOAD STATION & MAGAZINE FOR ROBOT LOAD |
| DGT600239 | 3190808 | 2/24/2004 | CONVEYOR FOR DR-3 |
| DGT600223 | 3191600 | 3/30/2004 | #10 DR-3 ENCAPSULATION COLLATION MACHINE |
| DGT690237 | 3191601 | 3/30/2004 | BATTERY CHARGE TABLE #4 |
| DGT600236 | 3191602 | 3/30/2004 | BATTERY CHARGE TABLE #3 |
| DGT600235 | 3191610 | 3/30/2004 | BATTERY CHARGE TABLE #2 |
| DGT600234 | 3191618 | 3/30/2004 | BATTERY CHARGE TABLE #1 |
| DGT690258A | 3192185 | 4/30/2004 | CHARGE TABLE 24 |
| DGT690259A | 3192186 | 4/30/2004 | CHARGE TABLE 25 |
| DGT004779N05 | 3193545 | 1/1/2004 | GENERAL SPENDING FOR MISC. PURCHASES - DESIGN, OUT |
| DGT012175N04 | 3193546 | 6/29/2004 | UPGRADE FIRE LOOP AT PLANT |
| DGT690272 | 3193547 | 1/1/2004 | HEATING SYSTEM FOR PLANT FOR 350000 CFM |
| DGT000254 | 3195184 | 9/16/2004 | RECTIFIER CABINET |
| DGT000255 | 3195185 | 9/16/2004 | RECTIFIER CABINET |
| DGT000256 | 3195186 | 9/16/2004 | RECTIFIER CABINET |
| DGT000257 | 3195187 | 9/16/2004 | RECTIFIER CABINET |
| DGT098361D03 | 3215010 | 11/30/2004 | ADDL CHG(700 T MOLDING MACH) |
| DGT690104A | 3215013 | 11/30/2004 | 007797 - DELPHI CAST-ON-STRAP M |
| DGT690295 | 3215132 | 12/1/2004 | LASER DATE CODE |
| DGT690298 | 3215133 | 12/1/2004 | TOP TERMINAL VISION SYSTEM 66 CELL |
| DGT690288 | 3220272 | 2/17/2005 | 48 HOUR STAND PROCESS LIFT TABLE EQUIPMENT |
| DGT690289 | 3220273 | 2/17/2005 | 48 HOUR STAND PROCESS SPOTFACE MACHINE |
| DGT690290 | 3220274 | 2/17/2005 | 48 HOUR STAND PROCESS TOPTIER MACHINE |
| DGT690297 | 3220275 | 2/17/2005 | AFTERMARKET LINE AHERN-SOPER LABEL ERROR PROOF |
| DGT690298 | 3220276 | 2/17/2005 | MAIN LINE AHERN-SOPER LABEL ERROR PROOF |
| DGT116709 | 3220311 | 1/1/2005 | VRL #2 |
| DGT1116710 | 3220312 | 1/1/2005 | LASER DATE CODE #2 |

| | | |
|---|---|---|
| DGT690096A | 3220861 | 3/14/2005 UPGRADE DELPHI SINGLE HEAD EF WELDER MACHINE |
| DGT690108A | 3220863 | 3/2/2005 INTERMEDIATE COVER AIR CHECK MACHINE |
| DGT690121A | 3220864 | 3/2/2005 LEAN COVER TO CASE HEAT SEAL MACHINE |
| DGT690301 | 3220865 | 3/2/2005 DR3 PLATE LIFTS |
| DGT690287 | 3220869 | 2/17/2005 48 HR STAND PROCESS STORAGE EQUIP |
| DGT690307 | 3222009 | 1/1/2005 INSTALL DATRONICS INKJET SYSTEM |
| DGT690043A | 3222460 | 5/9/2005 PLATE STACKER EQUIPMENT UPGRADE |
| DGT690188A | 3222463 | 5/9/2005 TOP POST ALIGNMENT EQUIPMENT UPGRADE |
| DGT690173A | 3222466 | 5/9/2005 #1 DR2 ENCAPSULATOR/COALATOR |
| DGT690299 | 3223037 | 6/14/2005 New Xmet Underground Scrap Conveyor |
| DGT690285 | 3223038 | 6/14/2005 SODIUM SULFATE DISPENSING SYSTEM EQUIPMENT |
| DGW690314 | 3223256 | 7/19/2005 MAIN LINE INCLINED CONVEYOR |
| DGT690293 | 3223278 | 7/20/2005 AUTO INSULATOR INSERTION MACH - MAIN LINE |
| DGT690294 | 3223279 | 7/20/2005 AUTO INSULATOR INSERTION MACH-MISC LINE |
| DGT012161N01 | 3223280 | 7/20/2005 INSTALL BAFFLES IN FORMATION TABLES |
| DGT690310 | 3223281 | 7/20/2005 WIRE BRUSH STATION-HONDA/TOYOTA LINE |
| DGT690317 | 3223282 | 7/20/2005 VRL REJECT PRINTER FOR HONDA/TOYOTA LINE |
| DGT690309 | 3223283 | 7/20/2005 VCI APPLICATOR FOR HONDA/TOYOTA LINE |
| DGT105868D | 3223831 | 1/30/1995 ICE MAKER |
| DGT690302 | 3223862 | 8/24/2005 ROBOTIC LOAD EQUIP FOR COS MACHINE |
| DGT690311 | 3223863 | 8/24/2005 CONTROLS FOR COS - DR3 PROJECT |
| DGT690286 | 3223958 | 8/26/2005 OXIDE REACTOR #5 |
| DGT690324 | 3223959 | 8/26/2005 OXIDE REACTOR #6 |
| DGT690292 | 3224765 | 9/29/2005 007651 - FORMATION TEMPERATURE MONITORING SYSTEM |
| DGT690305 | 3224771 | 9/29/2005 ROBOT GUARDING SYSTEM #1 |
| DGT690325 | 3224775 | 9/29/2005 ROBOT GUARDING SYSTEM #2 |
| DGT690326 | 3224776 | 9/29/2005 ROBOT GUARDING SYSTEM #3 |
| DGT690327 | 3224777 | 9/29/2005 ROBOT GUARDING SYSTEM #4 |
| DGT690328 | 3224778 | 9/29/2005 ROBOT GUARDING SYSTEM#5 |
| DGT690329 | 3224779 | 9/29/2005 ROBOT GUARDING SYSTEM#6 |
| DGT690318 | 3225240 | 10/17/2005 PACKOUT LEVELATOR FOR HONDA/TOYOTA LINE |
| DGT690323 | 3225241 | 10/17/2005 HONDA/TOYOTA FINISHING LINE MATL |
| DGT690303 | 3225242 | 10/17/2005 INSTALL FINAL COVER PLACER SYSTEM |
| DGT690315 | 3226228 | 11/29/2005 MISC LINE TUNNEL STRUCTURE |
| DGT690312 | 3226231 | 11/29/2005 CONTROLS FOR DR3 CONVEYORS |
| DGT690316 | 3226243 | 11/29/2005 MISC LINE DR3 CONVEYOR |
| DGT690304 | 3226254 | 11/29/2005 GROUP CONVEYOR SYSTEM DR3'S TO ROBOTS - MAIN LINE |
| DGT690330 | 3226402 | 11/29/2005 OSHAWA VRL SCRAP SAW |
| DGT690331 | 3226403 | 11/29/2005 OSHAWA BITRODE UNIT |
| DGT690332 | 3226404 | 11/29/2005 OSHAWA HONDA BANDER SYSTEM-SURPLUS |
| DGT690308 | 3226436 | 12/19/2005 DR#3 CAMCO UNIT 1 OF 3 |
| DGT690334 | 3226437 | 12/19/2005 DR#3 CAMCO UNIT 2 OF 3 |
| DGT690335 | 3226438 | 12/19/2005 DR#3 CAMCO UNIT 3 OF 3 |
| DGT690333 | 3227473 | 1/1/2006 OSHAWA INSPECTION VISION SYSTEM |
| DGT690322 | 3227475 | 1/1/2006 A BRADLEY CONTROLS FOR XMET LINE #4-MTL |
| DGT105866D | 5000713 | 10/1/1994 GM TKS INFORMATION CENTER |
| DGT105866D01 | 5000714 | 1/1/1995 TRAILING CHARGES TO TAG #105866D |

See Exhibit 1.21 for Real Property address

**EXHIBIT 1.1(vi)**
**EXCLUDED RAW MATERIALS**

Excluded raw materials Inventory includes the following parts numbers:

| Raw Materials | Part Number |
|---|---|
| PURE LEAD (red +) | 9599001 |
| ALUMINUM (white +) | 9692001 |
| CALCIUM | 9680001 |
| 3% ANT LEAD | 9595001 |
| 100 % TIN | 9681001 |
| Polypropylene | 9528001 |
| HOT MELT-1213 | 9521001 |
| DR4 EXPANDER | 9672025 |
| DR25 EXPANDER | 19060890 |
| POS GMX T/T BUSHING | 19062042 |
| NEG GMX T/T BUSHING | 19062043 |
| POS T/T BUSHING | 10457694 |
| NEG T/T BUSHING | 10457695 |
| HI-TEMP SIDE TERM | 19057272 |
| LEAD RING | 19057273 |
| CHROMA COLOR | 9515001 |
| RUBBER O-RING SEAL | 19057274 |
| 4.6 CRYSTEX PAPER | 9661046 |
| 3.5 CRYSTEX PAPER | 9661035 |
| 4.1 CRYSTEX PAPER | 9661041 |
| 3.75 CRYSTEX PAPER | 19060891 |
| LEXAN STRIP | 9574002 |
| 660 SEPARATOR | 10457660 |
| 658 SEPARATOR | 10457658 |
| 196 SEPARATOR | 19065196 |
| 889 SEPARATOR | 19060889 |
| DYNEL FIBER | 9502001 |
| SODIUM | 9448001 |
| TERMINAL SHEILDS | 10496263 |
| WAFER INSULATOR | 10454924 |
| INSULATOR ROLL | 19065509 |
| FLAME ARRESTORS | 1892323 |
| 10" Interm Cover - | 10472239 |
| 9" Interm Cvr | 10472230 |
| 9" Interm Cvr | 10472231 |
| 9" Interm Cvr | 10472233 |
| 9" Interm Cvr | 10472235 |

36

| | |
|---|---|
| 9" Interm Cvr | 10472236 |
| 9" Interm Cvr | 10472229 |
| 10" Interm Cover - | 10472241 |
| 10" Interm Cover - | 10472240 |
| 10" Interm Cover - | 10472243 |
| 10" Interm Cover - | 10472245 |
| 10" Interm Cover - | 10472238 |

37

### EXHIBIT 1.11

Raw Materials (direct materials) included in the Acquired Assets

| Raw Materials | Part Number | STP Qty | UM | Unit | Minimum Inventory |
|---|---|---|---|---|---|
| ACID | 9402001 | 45,000 | LB | 1 Tank | 860,000 |
| HYDROMETERS 1124 | 10491124 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 5478 | 10495478 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 2595 | 10492595 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 8954 | 10498954 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 8957 | 10498957 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 7495 | 19057495 | 1,400 | Pcs | Box | 5 |
| SLIPSHEETS- | 39"X45" | 300 | Pcs | 1 Pallet | 8 |
| SLIPSHEETS- | 42"X48" | 300 | Pcs | 1 Pallet | 5 |
| HONEYCOMB- | 37"x44"x1.5 | 29 | Pcs | 1 Pallet | 16 |
| HONEYCOMB- | 42"x44"x1 | 45 | Pcs | 1 Pallet | 6 |
| 13" SHRINKWRAP | 10457753 | 1,368 | LB | 1 Pallet | 3 |
| 12" SHRINKWRAP | 10453144 | 1,404 | LB | 1 Pallet | 3 |
| 11" SHRINKWRAP | 10457752 | 1,053 | LB | 1 Pallet | 1 |
| 10" HANDLE | 10457298 | 5,640 | Pcs | 1 Pallet | 3 |
| 9" HANDLE | 10457299 | 5,640 | Pcs | 1 Pallet | 3 |
| 8" HANDLE | 10457297 | 5,640 | Pcs | 1 Pallet | 1 |
| NEG SIDE TERMINAL CAP | 10467094 | 4,280 | Pcs | Crate | 10 |
| POS SIDE TERMINAL CAP | 10489952 | 4,280 | Pcs | Crate | 10 |
| TOP TERMINAL CAP | 10471203 | 2,000 | Pcs | Crate | 12 |
| TOP TERMINAL CAP | 10471204 | 2,000 | Pcs | Crate | 12 |
| TERMINAL ADAPTORS | 10469296 | 1,080 | Pcs | Box | 3 |
| HOT MELT-1246 | 9462001 | 31 | LB | Box | 2 |
| 083 FOAM BLOCK | 275083 | 2,310 | Pcs | 1 Pallet | 2 |
| 313 CARTON | 10468313 | 1,000 | Pcs | 1 Pallet | 1 |
| 325 CARTON | 10468325 | 1,200 | Pcs | 1 Pallet | 1 |
| 327 CARTON | 10468327 | 1,000 | Pcs | 1 Pallet | 1 |
| 073 CARTON | 10474073 | 1,000 | Pcs | 1 Pallet | 1 |
| 072 CARTON | 10474072 | 1,000 | Pcs | 1 Pallet | 1 |
| 561 CARTON | 10489561 | 1,000 | Pcs | 1 Pallet | 1 |
| AC DELCO PLACARD | 10457751 | 4,000 | Pcs | Box | 8 |
| BU DELPHI PLACARD | 10450883 | 4,000 | Pcs | Box | 2 |
| GMX Interm Cvr | 19063666 | 1320 | Pcs | Pallet | 6 |
| GMX Final Cvr | 19063668 | 4224 | Pcs | Pallet | 2 |

**EXHIBIT 1.13**

**IUE CONSENT**

### IUE-CWA - DELPHI
### MEMORANDUM OF AGREEMENT
### REGARDING THE SALE OF
### DELPHI NEW BRUNSWICK OPERATIONS AND
### SPECIAL ATTRITION PROGRAM

MEMORANDUM OF AGREEMENT entered into this 25th day of May, 2006 between Delphi Corporation ("Delphi") and the International Union, IUE-CWA and IUE-CWA Local 416 (collectively the "IUE-CWA" or the "Union").

WHEREAS, effective August 1, 2006, Delphi seeks to sell its New Brunswick, New Jersey Operations to Johnson Controls, Inc. ("JCI") as an ongoing business consistent with the terms of this Memorandum of Agreement; and

WHEREAS, pursuant to the "Sale of Business" letter attached to the 2003 IUE-CWA-Delphi National Agreement as Document 7, JCI is required to assume the applicable terms of the 2003 IUE-CWA-Delphi National Agreement and to otherwise assume the Local Agreements with respect to New Brunswick; and

WHEREAS, it is the intent of the parties and the purpose of this Memorandum to establish a Special Attrition Program for all but 100 employees of the New Brunswick bargaining unit identified in accordance with seniority and plant staffing requirements and to transfer to JCI approximately 100 of the current Delphi bargaining unit members at the established New Brunswick Tier III rate and JCI benefit level.    Therefore, the parties agree as follows:

    1.    The IUE-CWA agrees that:

        A.    Document 63 of the 2003 IUE-CWA-Delphi National Agreement is waived as to the sale of the New Brunswick Operations to JCI pursuant to the "New Brunswick Put and Call Agreement" between Delphi and JCI dated June 30, 2005;

        B.    JCI is not required to assume any contractual neutrality obligations collectively bargained by Delphi and the IUE-CWA; and

        C.    The International Union, IUE-CWA and Local 416 will continue to discuss Local Agreement modifications aimed at obtaining agreement on wage, benefits and work practices comparable to JCI's existing IUE-CWA bargaining agreements at JCI's St. Joseph, Missouri and Geneva, Illinois sites.

    2.    Delphi and the IUE-CWA agree on the following Special Attrition Program for all New Brunswick employees on active or on leave status with more than one year of seniority as of 8/1/06 and those employees in protected status assigned to the New Brunswick Operations who, except as to option 2.E. below, are participants in the Delphi Hourly-Rate Employees Pension Plan ("Delphi HRP"). Such employee may select one of the options set forth in clauses A through E below, as applicable to such employee:

        A.    If eligible to retire as of 8/1/06, retire as follows:

            (i)    $35,000, less applicable withholdings, for normal or early voluntary retirement (85 points 30 and out, 60 years old with 10 years or more years of credited service) retroactive to October 1, 2005; or

            (ii)    50 & 10 Mutually Satisfactory Retirement (MSR).

8.    Any employee with at least 27 and less than 30 years of credited service regardless of age will be eligible for special voluntary placement in a pre-retirement program under the following terms:

(i)    Employees electing this pre-retirement program must be eligible no later than August 1, 2006.

(ii)    Employees will retire without additional incentives when they first accrue 30 years of credited service under the provisions of the Delphi HRP.

(iii)    The gross monthly wages while in the program will be:

(a)    29 years credited service    $2,900

(b)    28 years credited service    $2,850

(c)    27 years credited service    $2,800

Wages, without COLA and vacation entitlement, will be paid weekly on an hourly basis (2,080 hours per year) and will remain at that rate until 30 years of credited service is accrued.

(iv)    Within ten (10) business days after the first date on which any employees are eligible to receive wage payments in accordance with Paragraph 2.B(iii) above, Delphi will establish a segregated payment account (the "Account") in an amount sufficient to fund the wage payments (the "Ceiling Amount"). The funds in the Account will be available to reimburse Delphi for the payment of weekly wage payments (which will be paid through Delphi's normal payroll process) under Paragraph 2.B(iii) above or for direct wage payments to employees entitled to receive such payments, as described in this Paragraph.

(a)    Delphi shall not draw funds from the Account for purposes of this Paragraph until a date (the "Permitted Draw Down Date"), which shall be the later of the Final Election Date or the Adequate Funding Date (see definitions below). Prior to the Permitted Draw Down Date, payments to satisfy the obligations to employee participants pursuant to this Paragraph will be drawn from Delphi's available cash.

(b)    If, on the Permitted Draw Down Date, the Anticipated Liability is less than the Ceiling Amount, Delphi shall be permitted to draw such funds out of the Account so that the balance remaining in the Account is equal to the Anticipated Liability.

The Final Election Date shall be the first of the month following the last day on which employees at New Brunswick can make an election to participate in the pre-retirement program described in Paragraph 2.B., or sooner if determined by the IUE-CWA-Delphi National Parties.

2

The Adequate Funding Date shall be the date on which the
Ceiling Amount is greater than or equal to the Anticipated
Liability.

The Anticipated Liability shall be an amount, calculated after the Final Election Date,
sufficient to pay all of the remaining liabilities under Paragraph 2.8(iii) for all employees
who have elected to participate in such program for the full remaining duration of such
program. The Anticipated Liability shall be calculated based on the number of eligible
employees, the remaining duration of the wage payments, and the applicable pay rates.

(c)    The funds in the Account shall be available to
satisfy the obligations of this Paragraph and for no other purpose.
The Bankruptcy Court order approving this Agreement shall
specifically provide that under no circumstances (including but not
limited to conversion of Delphi's Chapter 11 cases to Chapter 7
proceedings) shall the assets in the Account be available to satisfy
the claims of any party other than the employees.    This
Agreement is, in its entirety, contingent on entry of an order,
which, to the satisfaction of the IUE-CWA and Delphi National
Parties provides the protections described in this Paragraph.

C.    For current employees who are participants in the Delphi HRP, a
buyout of $140,000 (with ten or more years of seniority) or a buy out of $70,000
(with less than ten years of seniority), less applicable withholdings, to sever all
ties with Delphi, except vested pension benefits. Also, the employees electing
this option are eligible for up to $2,100 per year pursuant to the terms of the
Individual Upward Educational Plan for an additional two years beginning 8/1/06
and ending 7/31/08.

D.    For current employees who are participants in the Delphi HRP,
elect to remain on the active roll for one year and receive one year of health care
(at a total cost to Delphi of up to $15,000 depending on type of enrollee contract),
and a weekly payment of $2,403.84 (assuming $15,000 enrollee contract) less
withholdings, for one year (with ten or more years of seniority) or a weekly
payment of $1,057.69, less withholdings, for one year (with less than ten years of
seniority) and sever all ties with Delphi, except vested pension benefits, if any, at
the conclusion of the year. Also, the employees electing this option are eligible
for up to $2,100 per year pursuant to the terms of the Individual Upward
Educational Plan for an additional two years beginning 8/1/06 and ending
7/31/08.

E.    For competitive rate employees, who are not participants in the
Delphi HRP, percentage buyout prorated against $140,000 (with ten or more
years of seniority), or against $70,000 (with less than ten years of seniority but
more than one year of seniority) less applicable withholdings, to sever all ties
with Delphi. In each case, the buyout is calculated based upon the participant's
competitive wage rate as a percentage of the maximum traditional wage rate for
the participant's classification.

F.    All participants in options A through F will be required to sign a
release of all claims, except Workers Compensation claims.

3.    New Brunswick employees, except those on a leave of absence, who
have not selected, or who are not eligible to participate in one of the options identified
above, are eligible for transfer, with seniority, to JCI effective 8/1/2006, at the

3

established New Brunswick Tier III rate and with JCI Benefit Plans coverages. The offer of employment with JCI will sever all ties to Delphi, except for current vested benefits, if any. Traditional wage rate employees accepting such transfer will receive a $50,000 buy down (intended to represent an offset to a timed wage and benefit reduction) to the Tier III wage and the existing JCI benefit levels. Such employees transferred to JCI will be required to sign a release of all claims, except Workers Compensation, as a condition for receiving the $50,000 buy down amount. Employees on a leave of absence, who do not participate in the Special Attrition Program, will be eligible for transfer to JCI upon the conclusion of their leave.

4.    It is understood by all parties that JCI will employ approximately one hundred employees at the Tier III wage and JCI benefit levels. In the instance of excess employee participation in the Special Attrition Program, the lowest seniority employees will be retained for transfer to JCI and will not be permitted to participate in this Special Attrition Program, even if previously eligible, thereby providing JCI with a workforce of 100 employees. In the instance of insufficient participation in the Special Attrition Program, the 100 highest remaining seniority employees will transfer to JCI with eligibility for the $50,000 buy down, if applicable, with the remaining lower seniority employees being separated from Delphi, thereby providing JCI with a workforce of 100 employees. The terms of the Delphi-IUE-CWA Agreements and the ESCOP 2000 Agreement in effect at the time of this Memorandum will apply to all such Tier III employees, unless specifically modified by this Memorandum, and until an Agreement is reached between the IUE -CWA and JCI. JCI is not assuming Delphi's benefit plans and will provide its own retirement benefits to employees who accept employment at New Brunswick, in accordance with the terms of the ESCOP 2000 Agreement.

5.    Delphi and the IUE-CWA agree to the following:

A.    Delphi will use temporary employees as needed to bridge any difficulties arising from the implementation of the Special Attrition Program;

B.    Delphi and the IUE-CWA may agree to use separated employees as contract personnel on a case by case basis as needed to bridge any difficulties arising from the implementation of the Special Attrition Program; and

C.    If during the remaining course of Delphi's bankruptcy, materially different Special Attrition Program financial incentives are negotiated between Delphi and the IUE -CWA for the option selected by the employee, it is understood that the employee will not be advantaged or disadvantaged.

6.    The parties acknowledge that Delphi's participation in this Agreement is subject to (i) the approval of the U.S. Bankruptcy Court, which approval Delphi will seek at the next scheduled omnibus hearing; and (ii) the Closing of the sale of the New Brunswick Operations to JCI. In the event the Bankruptcy Court does not allow such participation, or the Closing does not occur, Delphi and the IUE-CWA will have no obligations hereunder.

7.    A.    The parties further agree that this Agreement is without prejudice to any party-in-interest in all other aspects of Delphi's Chapter 11 cases, including by illustration, all collective bargaining matters involving the parties, in any proceedings under Sections 1113 and/or 1114 of the Bankruptcy Code with respect to the IUE-CWA, in any pension termination proceeding under ERISA and/or the Bankruptcy Code, and all claims administration and allowance matters.

4

B.      Nothing in this Agreement, the Bankruptcy Court's approval of this Agreement, or the performance of any obligations hereunder  shall limit or otherwise modify: (i) Delphi's rights under Section 4041 of ERISA; or (ii) Delphi's rights under Section 1113 and/or 1114 of the Bankruptcy Code with regard to any obligations which pre-existed this Agreement (including pre-existing obligations referenced within this Agreement), such as (by way of illustration only) the obligation to maintain the hourly pension plan or provide retirees or active employees (including employees/retirees participating in the attrition programs contained in this Agreement) with levels of healthcare or other benefits as specified in pre-existing labor agreements.

C.      Nothing contained herein, the Bankruptcy Court's approval of this Agreement, or the performance of any obligations hereunder shall constitute an assumption of any agreement described herein, including, without limitation any collective bargaining agreement between the IUE-CWA and Delphi, nor shall anything herein, the Bankruptcy Court's approval of this Agreement, or the performance of any obligations hereunder, be deemed to create or give rise to an administrative or priority claim or convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party.


_____
Delphi Corporation

_____
Delphi Corporation

Date: __5/26/06____


_____
International Union, IUE-CWA

_____
International Union, IUE-CWA

Date: __5-26-06____


5

**EXHIBIT 1.21**

**REAL PROPERTY**

U.S:        760 Jersey Avenue
            New Brunswick, New Jersey  08903
                        United States

## EXHIBIT 1.22

## SALE APPROVAL ORDER

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
       In re                           :    Chapter 11
                                            :
DELPHI CORPORATION, et al.,                 :    Case No. 05-44481 (RDD)
                                            :
           Debtors.              :    (Jointly Administered)
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P. 2002 AND 6004 AUTHORIZING AND
APPROVING DEBTORS' ENTRY INTO TRANSFER AGREEMENT WITH JOHNSON CONTROLS,
INC. PROVIDING FOR (A) SALE OF ACQUIRED ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, AND ENCUMBRANCES (B) CONTINUATION AND TRANSITION OF SUPPLY TO
JOHNSON CONTROLS, INC. OF BATTERY PRODUCTS OUT OF FITZGERALD FACILITY AND
(C) IMPLEMENTATION OF ATTRITION PLAN WITH RESPECT TO NEW BRUNSWICK
FACILITY IN ACCORDANCE WITH IUE-CWA MEMORANDUM

("NEW BRUNSWICK TRANSFER ORDER")

         Upon the motion, dated May 26, 2006 (the "Motion"), of Delphi Corporation and

certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned

cases (collectively, the "Debtors"), for an order (the "Order") pursuant to 11 U.S.C. § 363(b) and

Fed. R. Bankr. P. 2002 and 6004 authorizing and approving the Debtors' entry into the Transfer

Agreement dated May 26, 2006 by and between Delphi Automotive Systems LLC, a Debtor in

these cases, and Johnson Controls, Inc. ("JCI"), a copy of which is attached hereto as Exhibit 1

(together, with the exhibits and schedules attached thereto, the "Transfer Agreement"), providing

for (a) sale of certain assets (the "Acquired Assets") of the Debtors' battery manufacturing

facility in New Brunswick, New Jersey (the "New Brunswick Facility") free and clear of liens,

claims, and encumbrances (the "Sale"), (b) the continuation and transition of supply to JCI of

battery products out of the Debtors' manufacturing facility in Fitzgerald, Georgia (the "Fitzgerald

Facility"), and (c) implementation of an attrition plan with respect to the New Brunswick facility;

and upon the record of the hearing held on the Motion; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

FOUND AND DETERMINED THAT:[1]

    A.    The court has jurisdiction over the Motion and the transactions contemplated by the Transfer Agreement pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N). Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

    B.    The statutory predicates for the relief sought in the Motion are sections 363 of 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), and Fed. R. Bankr. P. 2002 and 6004.

    C.    As evidenced by the affidavits of service previously filed with the Court, and based on the representations of counsel at the hearing on the Motion (the "Hearing"), (i) proper, timely, adequate and sufficient notice of the Motion, the Hearing and the sale of the Acquired Assets (as defined in the Transfer Agreement) has been provided in accordance with 11 U.S.C. §§ 102(l) and 363 and Fed. R. Bankr. P. 2002 and 6004, (ii) such notice was good and sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice of the Motion, the Hearing, or the Sale is or shall be required.

---

[1]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

2

D.      Each applicable Debtor (i) has full corporate power and authority to execute the Transfer Agreement and all other documents contemplated thereby, and the transfer and conveyance of the Acquired Assets by the Debtors has been duly and validly authorized by all necessary corporate action of each of the Debtors, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Transfer Agreement, and (iii) has taken all corporate action necessary to authorize and approve the Transfer Agreement and the consummation by such Debtor of the transactions contemplated thereby, and no consents or approvals, other than those expressly provided for in the Transfer Agreement, are required for each applicable Debtor to consummate such transactions.

E.      Approval of the Transfer Agreement and consummation of the Sale at this time are in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

F.      The Debtors have demonstrated good, sufficient, and sound business purpose and justification in that, among other things, the Debtors and their advisors diligently and in good faith analyzed all other available options in connection with the disposition of the Acquired Assets and determined that the terms and conditions set forth in the Transfer Agreement, and the transfer to JCI of the Acquired Assets pursuant thereto, represent a fair and reasonable purchase price and constitute the highest and best value obtainable for the Acquired Assets. A sale of the Acquired Assets at this time to JCI pursuant to 11 U.S.C. § 363(b) is the most favorable alternative to minimize the Debtors' losses attributable to the Acquired Assets, and maximizes the Debtors' estates for the benefits of all constituencies. Delaying approval of the Sale might result in JCI's termination of the Transfer Agreement and may result in an

3

alternative outcome that will achieve less value and cause greater losses for the Debtors, their estates, and their creditors.

G.    The Debtors have demonstrated good, sufficient, and sound business purpose and justification regarding the continuation and ultimate transition to JCI of the supply of battery products out of the Fitzgerald Facility pursuant to the Transfer Agreement.

H.    The Debtors have demonstrated good, sufficient, and sound business purpose and justification in that, among other things, the Debtors and their advisors diligently and in good faith analyzed the terms and conditions of the IUE-CWA Memorandum (as defined below) and determined that the terms and conditions thereof and in particular the terms and conditions of the IUE-CWA New Brunswick Attrition Plan (as defined below) set forth in the IUE-CWA Memorandum is an appropriate plan under the circumstances and is in the best interests of the Debtors, their estates, and their creditors.

I.    A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities, including: (i) the Office of the United States Trustee for the Southern District of New York, (ii) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon the Acquired Assets, including but not limited to environmental, employee, and product liability claims, (iii) all federal, state, and local regulatory or taxing authorities or recording offices, including but not limited environmental regulatory authorities, which have a reasonably known interest in the relief requested by the Motion, (iv) all entities known to have an interest in a transaction with respect to the Acquired Assets during the past six months, (v) the United States Attorney's office, (vi) the United States Department of Justice, (vii) the Securities and Exchange Commission, (viii) the Internal Revenue Service, (ix) all entities on the Master Service List (as defined by the

4

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(M), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures (Docket No. 2883) (the "Supplemental Case Management Order")) and such other entities that are required to be served with notices under the Supplemental Case Management Order, (x) counsel for JCI, (xi) counsel for the Official Committee of Unsecured Creditors appointed in these chapter 11 cases, and (xii) counsel for the Official Committee of Equity Security Holders appointed in these chapter 11 cases.

J.    JCI is not an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101(31).

K.    The Transfer Agreement was negotiated, proposed, and entered into by the Debtors and JCI without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtors nor JCI have engaged in any conduct that would cause or permit the Transfer Agreement to be avoided under 11 U.S.C. § 363(n).

L.    JCI is a good faith purchaser under 11 U.S.C. § 363(m) and, as such, is entitled to all of the protections afforded thereby.

M.    The consideration provided by JCI for the Acquired Assets pursuant to the Transfer Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

5

N.    The transfer of the Acquired Assets to JCI will be a legal, valid, and effective transfer of the Acquired Assets, and, except as expressly permitted or otherwise specifically provided for in the Transfer Agreement or this Order, will vest JCI with all right, title, and interest of the Debtors to the Acquired Assets free and clear of all liens, claims, and encumbrances, including, but not limited to those (A) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Debtors' or JCI's interest in the Acquired Assets, or any similar rights, (B) relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Debtors' battery business prior to the transfer of the Acquired Assets to JCI, and (C) mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens (including, without limitation, mechanics', materialmens', and other consensual and non-consensual liens and statutory liens), judgments, demands, encumbrances, rights of first refusal, offsets, contracts, recoupment, rights of recovery, claims for reimbursement, contribution, indemnity, exoneration, products liability, alter-ego, environmental, or tax, decrees of any Court or foreign or domestic governmental entity, or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, transfer, receipt of income, or other exercise of any attributes of ownership, debts arising in any way in connection with any agreements, acts, or failures to act, of any of the Debtors or any of the Debtors' predecessors or affiliates, claims (as that term is defined in the Bankruptcy Code), reclamation claims, obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests and matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or

6

unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated,

matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to

or subsequent to the commencement of these bankruptcy cases, and whether imposed by

agreement, understanding, law, equity or otherwise, including claims otherwise arising under

doctrines of successor liability (the items and concepts listed in (A), (B), and (C) above,

collectively, the "Interests or Claims").

       O.    If the Sale of the Acquired Assets were not free and clear of all Interests or

Claims as set forth in the Transfer Agreement and this Order, or if JCI would, or in the future

could, be liable for any of the Interests or Claims as set forth in the Transfer Agreement and this

Order, JCI would not have entered into the Transfer Agreement and would not consummate the

Sale or the transactions contemplated by the Transfer Agreement, thus adversely affecting the

Debtors, their estates, and their creditors.

       P.    The Debtors may sell their interests in the Acquired Assets free and clear

of all Interests or Claims because, in each case, one or more of the standards set forth in 11

U.S.C. § 363(f)(1)-(5) has been satisfied. All holders of Interests or Claims who did not object,

or withdrew their objections to the Sale, are deemed to have consented to the Sale, pursuant to 11

U.S.C. § 363(f)(2). Those holders of Interests or Claims who did object fall within one or more

of the other subsections of 11 U.S.C. § 363(f) and are adequately protected by having their

Interests or Claims, if any, attach to the cash proceeds of the Sale ultimately attributable to the

property against or in which they claim an Interest or Claim.

       Q.    The Debtors are authorized to sell, transfer, convey or assign to JCI, all of

the Debtors' right, title, and interest (including common law rights) to all of their intangible

property included in the Acquired Assets to the broadest extent permitted by law and the terms of the Transfer Agreement.

R.    Approval of the Transfer Agreement and consummation of the Sale of the Acquired Assets at this time are in the best interests of the Debtors, their creditors, their estates and other parties in interest.

S.    The liabilities being assumed by JCI under the Transfer Agreement, including but not limited to those liabilities set forth on Exhibit 3.6H (Environmental Matters) and Exhibit 4.1 (Employee Matters) to the Transfer Agreement, are an integral part of the Acquired Assets being purchased by JCI and, accordingly, such assumption is reasonable, enhances the value of the Debtors' estates, and does not constitute unfair discrimination.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

### General Provisions

1.    The Motion is GRANTED.

### Approval Of The Transfer Agreement

2.    Pursuant to 11 U.S.C. § 363(b), the Transfer Agreement, and all of the terms and conditions thereof, are hereby approved.

3.    Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized to perform their obligations under the Transfer Agreement and comply with the terms thereof and consummate the Sale in accordance with and subject to the terms and conditions of the Transfer Agreement.

8

4.    Each of the signatories to the Transfer Agreement is directed to take all actions necessary or appropriate to effectuate the terms of this Order with respect to the Sale.

5.    The Debtors are authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement, the Transfer Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Transfer Agreement, and to take all further actions as may be requested by JCI for the purpose of assigning, transferring, granting, conveying, and conferring to JCI or reducing to possession, the Acquired Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Transfer Agreement.

6.    This Order and the Transfer Agreement shall be binding in all respects upon all creditors (whether known or unknown) of any Debtor, JCI, all successors and assigns of JCI, the Debtors and their affiliates and subsidiaries, and any subsequent trustees appointed in the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code and shall not be subject to rejection.  To the extent any provision of this Order is inconsistent with the terms of the Transfer Agreement, this Order shall govern.

7.    The Transfer Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court; provided that any such modification, amendment, or supplement is not material.

## Sale And Transfer Of The Acquired Assets

8.    Except as expressly permitted or otherwise specifically provided for in the Transfer Agreement or this Order, pursuant to 11 U.S.C. §§ 363(b) and 363(f), upon the

9

consummation of the Transfer Agreement, the Acquired Assets shall be transferred to JCI free

and clear of all Interests or Claims, with all such Interests or Claims to attach to the cash

proceeds of the Sale in the order of their priority, with the same validity, force and effect which

they now have as against the Acquired Assets, subject to any claims and defenses the Debtors

may possess with respect thereto. Following the date of the completion of the transfer of the

New Brunswick Facility to JCI under the Transfer Agreement (the "Completion Date"), no

holder of any Interests or Claims in the Acquired Assets shall interfere with JCI's use and

enjoyment of the Acquired Assets based on or related to such Interests or Claims, or any actions

that the Debtors may take in their chapter 11 cases and no person shall take any action to prevent,

interfere with or otherwise enjoin consummation of the transactions contemplated in or by the

Transfer Agreement or this Order.

      9.     Except as expressly provided in the Transfer Agreement or this Order,

other than the liabilities assumed under the Transfer Agreement, including but not limited to

those liabilities set forth on Exhibit 3.6H (Environmental Matters) and Exhibit 4.1 (Employee

Matters) to the Transfer Agreement, the sale, transfer, assignment, and delivery of the Acquired

Assets pursuant to the Transfer Agreement shall not be subject to any Interests or Claims, and

Interests or Claims of any kind or nature whatsoever shall attach only to the net proceeds of the

Sale in their order of priority.  All persons and entities, including, but not limited to, all debt

security holders, equity security holders, governmental, tax, and regulatory authorities, lenders,

trade and other creditors, holding Interests or Claims arising in any way in connection with any

acts, or failure to act, of the Debtors or the Debtors' predecessors or affiliates, claims (as that

term is defined in section 101(5) of the Bankruptcy Code), obligations, demands, or guaranties of

any kind and nature against or in the Debtors or the Acquired Assets (whether legal or equitable,

secured or unsecured, matured or unmatured, contingent or noncontingent, senior or

subordinated), arising under or out of, in connection with, or in any way relating to the Debtors,

the Acquired Assets, the operation of the Debtors' battery business prior to the Completion Date,

or the transfer of the Acquired Assets to JCI, hereby are, and will be, forever barred, estopped,

and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Interests or

Claims of any kind or nature whatsoever against JCI, its successors or assigns, their property, or

any designee, such persons' or entities' Interests or Claims. Following the Completion Date, no

holder of an Interest or Claim (other than holders of liabilities assumed under the Transfer

Agreement, including but not limited to those liabilities set forth on Exhibit 3.6H (Environmental

Matters) and Exhibit 4.1 (Employee Matters) to the Transfer Agreement, on account of such

liabilities only) against the Debtors shall interfere with JCI's title to or use and enjoyment of the

Acquired Assets based on or related to such Interests or Claims and all such Interests or Claims,

if any, shall be and hereby are channeled, transferred and attached solely and exclusively to the

proceeds of the Sale in their order of priority.

        10.     Except as expressly provided in the Transfer Agreement or this Order, the

transfer of the Acquired Assets to JCI pursuant to the Transfer Agreement does not require any

consents other than as specifically provided for in the Transfer Agreement and constitutes a legal,

valid, and effective transfer of the Acquired Assets, and shall vest JCI with all right, title, and

interest of the Debtors in and to the Acquired Assets free and clear of all Interests or Claims of

any kind or nature whatsoever (except for the liabilities assumed under the Transfer Agreement,

including but not limited to those liabilities set forth on Exhibit 3.6H (Environmental Matters)

and Exhibit 4.1 (Employee Matters) to the Transfer Agreement).

11.     If any person or entity that has filed financing statements, mortgages,

mechanic's liens, lis pendens, or other documents or agreements evidencing Interests or Claims

against or in the Acquired Assets shall not have delivered the foregoing to the Debtors prior to

the Completion Date, in proper form for filing and executed by the appropriate parties,

termination statements, instruments of satisfactions, releases of all Interests or Claims that the

person or entity has with respect to the Acquired Assets, or otherwise, then (a) the Debtors are

hereby authorized to execute and file such statements, instruments, releases and other documents

on behalf of the person or entity with respect to the Acquired Assets and (b) JCI is hereby

authorized to file, register or otherwise record a certified copy of this Order, which, once filed,

registered or otherwise recorded, shall constitute conclusive evidence of the release of all

Interests or Claims in the Acquired Assets of any kind or nature whatsoever.

12.     This Order (a) shall be effective as a determination that, on the

Completion Date, all Interests or Claims of any kind or nature whatsoever existing as to the

Debtors or the Acquired Assets prior to the Completion Date have been unconditionally released,

discharged, and terminated (other than any surviving obligations), and that the conveyances

described herein have been effected and (b) shall be binding upon and shall govern the acts of all

entities including without limitation, all filing agents, filing officers, title agents, title companies,

recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies,

governmental departments, secretaries of state, federal, state, and local officials, and all other

persons and entities who may be required by operation of law, the duties of their office, or

contract, to accept, file, register or otherwise record or release any documents or instruments, or

who may be required to report or insure any title or state of title in or to any of the Acquired

Assets.

13.    Except as otherwise expressly provided in the Transfer Agreement, no person or entity, including, without limitation, any federal, state or local governmental agency, department or instrumentality, shall assert by suit or otherwise against JCI or its successors in interest any claim that they had, have or may have against the Debtors, or any liability, debt, or obligation relating to or arising from the Acquired Assets, or the Debtors' operation of the Business or use of the Acquired Assets, including, without limitation, any liabilities calculable by reference to the Debtors or their assets or operations, and all persons and entities are hereby enjoined from asserting against JCI in any way any such claims, liabilities, debts or obligations.

14.    Except as expressly provided in the Transfer Agreement or this Order, JCI is not assuming nor shall it in any way whatsoever be liable or responsible, as a successor or otherwise, for any liabilities, debts, commitments, or obligations (whether known or unknown, disclosed or undisclosed, absolute, contingent, inchoate, fixed, or otherwise) of the Debtors or any liabilities, debts, commitments, or obligations in any way whatsoever relating to or arising from the Acquired Assets or the Debtors' operation of their business or use of the Acquired Assets on or prior to the Completion Date or any such liabilities, debts, commitments, or obligations that in any way whatsoever relate to periods on or prior to the Completion Date or are to be observed, paid, discharged, or performed on or prior to the Completion Date (in each case, including any liabilities that result from, relate to or arise out of tort or other product liability claims), or any liabilities calculable by reference to the Debtor or their assets or operations, or relating to continuing conditions existing on or prior to the Completion Date, which liabilities, debts, commitments, and obligations are hereby extinguished insofar as they may give rise to successor liability, without regard to whether the claimant asserting any such liabilities, debts, commitments, or obligations has delivered to JCI a release thereof. Without

13

limiting the generality of the foregoing, except as expressly provided in the Transfer Agreement or this Order, JCI shall not be liable or responsible, as a successor or otherwise, for the Debtors' liabilities, debts, commitments, or obligations, whether calculable by reference to the Debtors, arising on or prior to the Completion Date and under or in connection with (i) any employment or labor agreements (including, without limitation, the payment of wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any and all pension plans) or any other payment to employees of Debtors while such individuals were employed by the Debtors), consulting agreements, severance arrangements, change-in-control agreements, or other similar agreement to which any Debtor is a party, (ii) any pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Debtors (including, without limitation, retention, benefit and/or incentive plan to which any Debtors are a party and relating to the battery business (including, without limitation, arising from or related to the rejection or other termination of any such agreement)), (iii) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, obligations that might otherwise arise from or pursuant to the Employee Retirement Income Security Act of 1974, as amended, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, COBRA, or the Worker Adjustment and Retraining Notification Act, (iv) workers' compensation, occupational disease, or unemployment or temporary disability insurance claims, (v) environmental liabilities, debts, claims, or obligations arising from

14

conditions first existing on or prior to Completion Date (including, without limitation, the

presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be

asserted on any basis, including, without limitation, under the Comprehensive Environmental

Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., (vi) any bulk sales or

similar law, (vii) any liabilities, debts, commitments, or obligations of, or required to be paid by,

the Debtors for any Taxes of any kind for any period, (viii) any liabilities, debts, commitments,

or obligations for any Taxes relating to the business of the Debtors or the Acquired Assets for or

applicable to the period prior to the Completion Date, (ix) any litigation relating to the Acquired

Assets for or applicable to the period prior to the Completion Date, and (x) any products liability

or similar claims, whether pursuant to any state or any federal laws or otherwise, relating to the

Acquired Assets for or applicable to the period prior to the Completion Date. JCI shall in no

way be deemed a party to or assignee of any such agreement set forth in (i), (ii), and (iii) above,

and no employee of JCI shall be deemed in any way covered by or a party to any such agreement,

and all parties to any such agreement are hereby enjoined from asserting against JCI any and all

claims arising from or relating to such agreement. Any and all notices, if any, required to be

given to the Debtors' employees pursuant to the Workers Adjustment and Retraining Notification

Act, or any similar federal or state law, shall be the sole responsibility and obligation of the

Debtors and JCI shall have no responsibility or liability therefore.

15.    Upon the completion of the transactions contemplated by the Transfer

Agreement, JCI shall not be deemed to (i) be the successor of the Debtors, (ii) have, de facto, or

otherwise, merged with or into the Debtors, (iii) be a mere continuation or substantial

continuation of the Debtors or the enterprise(s) of the Debtors, or (iv) be liable for any acts or

omissions of the Debtors in the conduct of the Debtors' business.

15

### Continuation And Transition Of Supply Out Of Fitzgerald

16.    The Debtors are hereby authorized to (a) continue manufacturing and supplying JCI with battery products manufactured at the Fitzgerald Facility in accordance with JCI's diminishing supply requirements and (b) to transition production of battery products manufactured at the Fitzgerald Facility to other JCI facilities.

17.    The Debtors and JCI are each directed to take all actions necessary or appropriate to effectuate the terms of this Order with respect to the supply and transition of battery products from the Fitzgerald Facility.

### IUE-CWA Consent And IUE-CWA New Brunswick Attrition Plan

18.    The Debtors are hereby authorized to enter into the agreement by and among Delphi Corporation, the International Union, IUE-CWA and IUE-CWA Local 416 (collectively the "IUE-CWA") attached to the Transfer Agreement as Exhibit 1.13 thereto (the "IUE-CWA Memorandum") and to implement the terms of such IUE-CWA Memorandum, including without limitation (i) that certain attrition plan between Delphi and the IUE-CWA (the "IUE-CWA New Brunswick Attrition Plan") with respect to the New Brunswick Facility and (ii) that certain consent to the waiver of that certain no-sale clause and neutrality obligations (the "IUE-CWA Consent").

19.    Each of the signatories to the IUE-CWA Memorandum is directed to take all actions necessary or appropriate to effectuate the terms of this Order with respect to the IUE-CWA Consent and the IUE-CWA New Brunswick Attrition Plan and the terms of the IUE-CWA Consent and the IUE-CWA New Brunswick Attrition Plan, including, without limitation, any

16

and all actions necessary or appropriate to its implementation of and performance under the IUE-CWA Consent and the IUE-CWA New Brunswick Attrition Plan.

### Additional Provisions

20.    The consideration provided by JCI for the Acquired Assets under the Transfer Agreement is hereby deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and under the laws of the United States, and any state, territory, possession, or the District of Columbia.

21.    On the Completion Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired Assets to JCI on pursuant to the terms of the Transfer Agreement.

22.    Except as otherwise provided in the Transfer Agreement, on the Completion Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release their respective Interests or Claims against the Acquired Assets, if any, as may have been recorded or may otherwise exist.

23.    Each and every federal, state, and governmental agency or department, and any other person or entity, is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Transfer Agreement.

24.    All entities who are currently, or as of the Completion Date may be, in possession of some or all of the Acquired Assets to be sold, transferred, or conveyed pursuant to

17

the Transfer Agreement are hereby directed to surrender possession of the Acquired Assets to
JCI on the Completion Date.

25.    The transactions contemplated by the Transfer Agreement are undertaken
by JCI in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and
accordingly, the reversal or modification on appeal of the authorization provided herein to
consummate the sale of the Acquired Assets shall not affect the validity of the Sale to JCI, unless
such authorization is duly stayed pending such appeal.  JCI is a purchaser in good faith of the
Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the
Bankruptcy Code.

26.    The consideration paid by JCI in the Sale for the Acquired Assets under
the Transfer Agreement is fair and reasonable, and may not be avoided or otherwise challenged
under 11 U.S.C. § 363(n).

27.    The Debtors, including but not limited to their respective officers,
employees, and agents, are hereby authorized to execute such documents and do such acts as are
necessary or desirable to carry out the transactions contemplated by the terms and conditions of
the Transfer Agreement and this Order.  The Debtors shall be, and they hereby are, authorized to
take all such actions as may be necessary to effectuate the terms of this Order.

28.    The terms and provisions of the Transfer Agreement and this Order shall
be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and
their creditors, JCI, and its respective affiliates, successors, and assigns, and any affected third
parties, including, but not limited to, all persons asserting an Interest or Claim in the Acquired
Assets to be sold to JCI pursuant to the Transfer Agreement, notwithstanding any subsequent
appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of

18

the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise shall be binding.

29.     Notwithstanding anything contained herein to the contrary, the term "Acquired Assets" as defined herein does not include property that is not property of the Debtors' estates, such as funds that are trust funds under any applicable state lien laws.

30.     To the extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Acquired Assets sold, transferred, or conveyed to JCI on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale.

31.     The failure specifically to include or to reference any particular provision of the Transfer Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Transfer Agreement be authorized and approved in their entirety.

32.     The Transfer Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court; provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates.

33.     The provisions of this Order are nonseverable and mutually dependent.

34.     Nothing in this Order shall alter or amend the Transfer Agreement and the obligations of the Debtors and JCI thereunder.

35.     This Court retains jurisdiction to enforce and implement the terms and provisions of the Transfer Agreement, all amendments thereto, any waivers and consents

19

thereunder, and of each of the agreements executed in connection therewith in all respects,
including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets
to JCI, (b) compel delivery of the purchase price, reimbursement of costs under the IUE-CWA
New Brunswick Attrition Plan, or performance of other obligations owed to the Debtors pursuant
to the Transfer Agreement, (c) resolve any disputes arising under or related to the Transfer
Agreement, except as otherwise provided therein, (d) interpret, implement, and enforce the
provisions of this Order, and (e) protect JCI against any Interests or Claims against the Debtors
or the Acquired Assets, of any kind or nature whatsoever, attaching to the proceeds of the Sale.

     36.    Notwithstanding Rule 6004(g) of the Federal Rules of Bankruptcy
Procedure or any other Bankruptcy Rule, this Order shall take effect immediately upon its entry.

     37.    The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for
the United States Bankruptcy Court for the Southern District of New York for the service and
filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated: New York, New York
      June \_\_\_, 2006

                                     _____
                                     UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT 1.23

## SELLER'S KNOWLEDGE

**GENERAL:**

Ron Pogue

**EMPLOYEES:**

Charu Manocha

42

**EXHIBIT 2.2A**

**BILL OF SALE**

        **BY THIS BILL OF SALE** made on _____, **200_** by _____, a Delaware _____ (**"Seller"**), for good and valuable consideration paid by _____, a _____ corporation (**"Buyer"**), receipt and sufficiency of which consideration are acknowledged by Seller, pursuant to the terms and provisions of that certain Transfer Agreement dated _____, **2006** between Buyer and Seller (the "**Agreement**"), Seller does bargain, grant, sell, convey, assign, transfer and deliver to Buyer and its successors and assigns, all right, title and interest of Seller in and to the Personal Property and Inventory (as those terms are defined in the Agreement) listed on Attachment A hereto.

Notwithstanding the foregoing, the provisions of this Bill of Sale are subject, in all respects, to the terms and conditions of the Agreement and all the representations and warranties, covenants and agreements contained therein, all of which shall survive the execution and delivery of this Bill of Sale as provided in the Agreement.

_____

By:_____
      Name:
      Title:

43

## ATTACHMENT A TO BILL OF SALE

**Exhibit 3.6.H**

ENVIRONMENTAL MATTERS

1.    DEFINITIONS:

    1.1    **"Business"** has the same meaning as given in the Transfer Agreement.

    1.2    **"Buyer"** has the same meaning as given in the Transfer Agreement.

    1.3    **"Completion Date"** has the same meaning as given in the Transfer Agreement.

    1.4    **"Competent Authority"** means a person, agency, department or subdivision thereof having governmental authority under an applicable Environmental Law, and/or a court or tribunal of competent jurisdiction.

    1.5    **"Compliance Matter"** means an event, condition, activity, practice, action or omission at the Real Property which gives rise to a breach or violation of an Environmental Law, but which excludes Environmental Contamination.

    1.6    **"Environment"** means any and all organisms (including humans), biota, ecosystems, land, natural resources, property, air, soil gas, water, groundwater, human beings, and buildings, fixtures and installations.

    1.7    **"Environmental Claim"** means a notice, claim, demand, action, suit, complaint or proceeding by a Competent Authority or a Third Party alleging liability or potential liability arising out of an Environmental Law.

    1.8    **"Environmental Contamination"** means the presence of a Hazardous Material at, in, under, on or about the Environment at the Real Property.

    1.9    **"Environmental Damages"** means losses, liabilities, costs, damages fines, penalties and expenses (including reasonable expenses of investigation and attorneys' fees) arising out of an Environmental Law, but in all cases excluding losses, liabilities, costs, damages and expenses deemed consequential or loss of profit, and also excluding expenses of investigating information for the purposes of making a claim for indemnification under this Exhibit.

    1.10    **"Environmental Law"** means, solely for those in force and effect as at the Closing date in the relevant jurisdiction, all applicable civil, criminal, administrative and any other federal, state, county and local (including common law) laws, rules, ordinances, orders, codes, guidance, directives, Environmental Permits (or lack thereof), approvals, decisions, decrees, remediation standards and regulations relating to or having the purpose or effect of the prevention of pollution or harm to the Environment or human health.

45

1.11    "**Environmental Permits**" means all licenses, consents, permits, registrations, approvals or authorizations made or issued by a Competent Authority under an Environmental Law in connection with the Business or the Real Property.

1.12    "**Hazardous Material**" means all matter (whether alone or in combination with other matter, and whether solid, liquid, gas or other state) which is a pollutant, contaminant, chemical, material, substance, constituent, or waste including without limitation petroleum, petroleum-based or petroleum-derived products, polychlorinated biphenyls, asbestos and asbestos-containing materials, and noxious, radioactive, flammable, corrosive, caustic materials, all of which are governed or regulated under an Environmental Law.

1.13    "**New Brunswick Real Property**" means the Real Property as defined in the Transfer Agreement.

1.14    "**Post-Closing Compliance Matter**" means a Compliance Matter first occurring after the Completion Date.

1.15    "**Post-Closing Environmental Contamination**" means Environmental Contamination first occurring after the Completion Date.

1.16    "**Post-Closing Off-Site Disposal Liability**" means liability for a Hazardous Material generated at the New Brunswick Real Property and disposed at a disposal site not at the New Brunswick Real Property, after the Completion Date, under an applicable Environmental Law.

1.17    "**Pre-Closing Compliance Matter**" means a Compliance Matter first occurring at prior to the Completion Date.

1.18    "**Pre-Closing Environmental Contamination**" means Environmental Contamination first occurring prior to the Completion Date.

1.19    "**Pre-Closing Off-Site Disposal Liability**" means liability for a Hazardous Material generated at the New Brunswick Real Property and disposed at a disposal site not at the New Brunswick Real Property, prior to the Completion Date, under an applicable Environmental Law.

1.20    "**Remedial Works**" means the works, designs, investigations and activities carried out by a Party in relation to Environmental Contamination, but excluding expenses of investigating information for the purposes of making a claim for indemnification under this Exhibit.

1.21    "**Remedy**" has the meaning given to it in Section 4 of this Exhibit.

1.22    "**Seller**" has the same meaning as given in the Transfer Agreement.

1.23    "**Third Party**" means any person not a Party or a Competent Authority.

2.    <u>**INDEMNIFICATIONS OF SELLER AND PURCHASER**</u>:

**2.1**    Subject to the provisions of this Exhibit, and solely with respect to the New Brunswick Real Property, the Seller shall indemnify the Buyer for Environmental Damages arising from Pre-Closing Environmental Contamination, Pre-Closing Compliance Matters or Pre-Closing Off-Site Liability.

**2.2**    Subject to the provisions of this Exhibit, and solely with respect to the New Brunswick Real Property, the Buyer shall indemnify the Seller for Environmental Damages arising from Post-Closing Environmental Contamination, Post-Closing Off-Site Liability or Post-Closing Compliance Matters.

**2.3**    Subject to the provisions of this Agreement, for those Environmental Damages arising from circumstances that may be considered both (i) Pre-Closing Environmental Contamination and Post-Closing Environmental Contamination, (ii) Pre-Closing Compliance Matters and Post-Closing Compliance Matters, or (iii) Pre-Closing Off-Site Liability and Post-Closing Off-Site Liability, such Environmental Damages shall be allocated between the Parties in proportion to the extent that such Environmental Damages arose pre- or post-Completion Date, and each Party shall indemnify the other for its share as determined by such allocation.

**3.**    **LIMITATIONS ON LIABILITY.**    Neither Party shall be liable under this Agreement for Environmental Damages:

**3.1**    In the case of Environmental Claims arising from Pre-Closing Compliance Matters or Post-Closing Compliance Matters (as the case may be), unless written notice of such claim has been served on the non-claiming Party on or before eighteen (18) months following the Completion Date;

**3.2**    In the case of Environmental Claims arising from a Pre-Closing Environmental Contamination, except for Remedial Works pursuant to clause 4.1 of this Exhibit, or Post-Closing Environmental Contamination (as the case may be), unless written notice of such claim has been served on the non-claiming Party on or before seven (7) years following the Completion Date. Remedial Works under clause 4.1 of this Exhibit shall be governed by the applicable statute of limitations under ISRA (as defined in clause 4.1 of this Exhibit).

**3.3**    Except for Remedial Works under clause 4.1 of this Exhibit (for which Seller is solely responsible), subject to clauses 3.1 and 3.2 of this Exhibit, no Party will be liable to the other under this Exhibit unless and until the aggregate amount of all Environmental Claims each of which exceeds the amount set forth in this clause 3.3 and which are determined to be payable by the Party on which the claim is made exceeds $500,000, and in such event the paying Party is liable solely for the amounts exceeding $500,000. For all purposes under this Article 3 and Section 7.1 of the Agreement, the Deductible Amount with respect to environmental claims shall be (i) the $500,000 amount referred to in this clause 3.3, less (ii) any amounts that may have been incurred by the relevant claiming party under environmental matters agreements entered into in connection with the sale of any of Seller's global battery operations to Buyer in 2005. The Cap Amount is as set forth Section 7.1.

**3.4**    In the case of Environmental Damages arising from Pre-Closing Environmental Contamination, unless the claiming Party discovers the facts and circumstances giving rise to such claim solely in connection with an investigation

required by an applicable Environmental Law, an order by a Competent Authority, a final judgment of a claim by a Third Party, or settlement of a claim by a Third Party to which the non-claiming Party has agreed (such agreement not to be unreasonably withheld).

3.5     Where Buyer uses the New Brunswick Real Property for a use other than an industrial use, or seeks to or changes the zoning or land use classification of the New Brunswick Real Property to a classification more sensitive than the industrial classification;

3.6     Where, subject to clause 3.7 below, and insofar as the Parties agree to treat this Agreement and all information gathered, known or obtained as a result of the sale and purchase of the Business or performing any obligation or exercising any right under this Exhibit as confidential, for any Environmental Damages claims to the extent that such claim would not have arisen or was increased or made more costly as a result of the claiming Party or any of its respective employees, agents or contractors volunteering or disclosing information to any Competent Authority or Third Party without the prior written consent of the non-claiming Party;

3.7     The following shall not be deemed to be or to have been volunteering or disclosing of information for the purpose of this clause 3.7:

          (i)     Where the disclosure is required by any law (including any Environmental Law),

          (ii)    Where the disclosure is specifically and formally required by any securities exchange or regulatory or other Competent Authority to which either Party is subject or submits wherever situated,

          (iii)   Where the information is clearly in the public domain through no fault of the claiming Party, or

          (iv)    Where the non-claiming Party has given prior written approval to the disclosure;

3.8     To the extent the claiming Party did not take reasonable steps to avoid or mitigate any Environmental Damages, acting in a reasonable and cost-effective manner; in the case of an emergency, where a Party takes any action to avoid or mitigate any Environmental Damages, (a) it shall for the avoidance of doubt not be in breach of this Agreement and shall not be precluded from recovering its Environmental Damages provided that the claiming Party notifies the other Party of such circumstances as soon as reasonably practicable and provided that such actions or steps are the minimum necessary to avert the emergency; and (b) the reasonable costs and expenses of all steps taken pursuant to the duty to mitigate contained in this clause 3.8 shall be deemed to be Environmental Damages.

3.9     Notwithstanding anything to the contrary in Section 7.1 of this Agreement, the Deductible Amount with respect to environmental claims shall be $500,000 less any amounts that may have been incurred by the relevant claiming party under environmental matters agreements entered into in connection with the sale of any of Seller's global battery operations to Buyer in 2005. The Cap Amount is as set forth Section 7.1. Subject to clauses 3.1 and 3.2 of this Agreement, set forth in Subject to

48

clauses 4.1, 4.2 and 4.3 of this Agreement, unless and until the aggregate amount of all Environmental Claims each of which exceeds the amount set forth in clause 4.4 of this Agreement and which are determined to be payable by the Party on which the claim is made exceeds $500,000, and in such event the paying Party is liable solely for the amounts exceeding $500,000; provided, however, that with respect to Pre-Closing Compliance Matters and Pre-Closing Environmental Contamination referred to in Paragraph 2.2 for which Seller has warranted that it will effect the Remedy with respect to such Pre-Closing Compliance Matters and Pre-Closing Environmental Contamination, Seller shall pay all amounts necessary to effect the Remedy of such issues, which amounts shall not be included in determining when the aggregate amount of claims exceed $500,000.

## 4.    REMEDIATION OF ENVIRONMENTAL DAMAGE:

4.1    Seller shall file such papers, and conduct such investigation and remediation as required by the New Jersey Department of Environmental Protection ("**NJDEP**") to satisfy the requirements of the State of New Jersey's Industrial Site Recovery Act, N.J.S.A. 13.1K-6 *et seq.*, and regulations promulgated thereto, N.J.A.C. Title 7, Chapter 26B (collectively "**ISRA**"), as ISRA is in effect as of the date of the Put Completion Date, as follows:    As soon as the Parties mutually agree that it is substantially certain that the third party consent needed prior to any exercise of the Put Option or Call Option will be obtained, Seller shall, pursuant to the requirements of ISRA, promptly prepare and submit to NJDEP a General Information Notice.  Thereafter, with reasonable diligence, Seller shall, pursuant to ISRA, continue to undertake the activities and to submit the required documentation to NJDEP necessary to complete its responsibilities under ISRA, according to any schedule approved by NJDEP and consistent with NJDEP requirements.  In all cases, Seller shall have the right at its sole discretion to seek reasonable extensions of the schedules approved by NJDEP where site conditions warrant.  Where the State of New Jersey requires any consent agreement into which Seller, the State of New Jersey and Buyer must enter pursuant to ISRA, Buyer shall sign such consent agreement.  Any such consent agreement shall be consistent with a remedial action for industrial property.

4.2    Where an Environmental Damage arises out of Environmental Contamination, the non-claiming Party shall be responsible for Remedial Works or the redressing of a Compliance Matter ("**Remedy**") to no less but no more than the minimum standards or levels of Environmental Laws; such Remedial Works may be determined using risk assessment and related risk evaluation methods.

4.3    The non-claiming Party shall, where a Remedy is required pursuant to this Agreement, have conduct of such Remedy.

4.4    The conduct of a Remedy shall be as follows:

A.    The non-claiming Party shall prepare appropriate work plans or scopes of work to satisfactorily undertake and complete the Remedy under this Agreement; such Party will provide the other Party with an opportunity to review and comment on such work plans or scopes of work, which comments the non-claiming Party may elect to

adopt where such comments do not increase any cost or liability of the Remedy;

B.      The non-claiming Party shall, at its sole discretion, either:

(i)      Determine to and obtain approval of the Remedy by the appropriate Competent Authority prior to implementation of the Remedy; when requested, the claiming Party shall cooperate with the non-claiming Party in any communications with the appropriate Competent Authority; after the non-claiming Party has obtained such approval, such Party shall provide notice of such approval to the claiming Party; or

(ii)      Determine to implement the Remedy without first seeking approval from the appropriate Competent Authority; the non-claiming Party shall provide notice to the claiming Party of such determination at the time the non-claiming Party provides the claiming Party with the work plan or scope of work set forth in clause 4.4A of this Exhibit;

C.      Where the Seller is the non-claiming Party, Seller will take all reasonable steps to avoid interfering with Buyer's operation of the Business or use of the Real Property, and Buyer will reasonably cooperate with Seller including providing access to the New Brunswick Real Property and the use of utilities in the conduct of the Remedy;

D.      Where applicable the non-claiming Party shall provide copies of all relevant correspondence sent to and received from a Competent Authority, and keep the claiming Party reasonably apprised of the progress of the conduct of the Remedy; and

E.      The conduct of the Remedy shall be deemed complete when, as the case may be:

(i)      The non-claiming Party has received approval regarding the Remedy by an applicable Competent Authority; or

(ii)      Subject to clause 4.2 of this Exhibit, the Remedy meets applicable standards which an applicable Environmental Law allows.

5.      **TRANSFER OF PERMITS AND LICENSES.**  On and after the Closing Date, Seller and Buyer shall cooperate in taking all reasonable steps to effect the transfer or procure the re-issuance of any Environmental Permits necessary to operate the Business.

<u>EXHIBIT 4.1</u>

<u>EMPLOYEE MATTERS</u>

1.     <u>Definitions:</u>

    A.     "**Buyer Employee Benefit Plans**" means Buyer's pension, thrift, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive or deferred compensation, hospitalization, "parachute", severance, vacation, sick leave, fringe or welfare benefits, any employment or consulting Contracts, "golden parachutes", collective bargaining agreements, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals and written or binding oral statements of policies, practices or understandings relating to employment.

    B.     "**Competitive Package**" means the wages and benefits payable to new hire U.S. Hourly Employees at the New Brunswick Facility under the Delphi-IUE-CWA Local Agreement.

    C.     "**Delphi-IUE-CWA Local Agreement**" means the local collectively bargained agreements in effect at the New Brunswick Facility, including but not limited to, the memorandum of understanding ("**MOU**") entitled "ESCOP Hiring Plan – Full and Temporary Part-Time Employees" dated June 3, 1998 ("**ESCOP Hiring Plan**"), the November 13, 2003 Local Seniority Agreement, a collective bargaining agreement between Seller and IUE-CWA Local 416, any letter agreements, MOUs (including the ESCOP Hiring Plan), and all applicable employee benefit plans, in effect between Seller and the IUE-CWA applicable only to the U.S. Hourly Employees.

    D.     "**Delphi-IUE-CWA National Agreement**" means the nationally negotiated collective bargaining agreements, including any letter agreements, MOUs, supplemental agreements and all applicable employee benefit plans in effect between Seller and the IUE-CWA.

    E.     "**Employment Rights**" means all obligations arising out of, or relating to, the employment relationship between the relevant company and the relevant employees, including, without limitation, payment of wages and salaries, employee benefits, taxes, vacation pay, sick leave and severance pay and any claims under any Laws dealing with employment.

    F.     "IUE-CWA" means the IUE-CWA, the Industrial Division of the Communication Workers of America, AFL-CIO and CLC.

    G.     "**Seller Employee Benefit Plans**" means Seller's pension, thrift, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive or deferred compensation, hospitalization, "parachute", severance, vacation, sick leave, fringe or welfare benefits, any employment or consulting Contracts, "golden parachutes", collective bargaining agreements, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals, and written or binding oral statements of policies, practices or understandings relating to employment.

H.     "**Successor Clause**" means Document 7 appended to the Delphi-IUE-CWA National Agreement.

I.     "**Transferred U.S. Hourly Employees**" means those hourly employees of Seller hired by Buyer pursuant to Section 3.A(ii) below.

J.     "**U.S. Hourly Employees**" means the hourly employees represented by the IUE-CWA who are employed by Seller at the New Brunswick, New Jersey plant immediately prior to the Completion Date and identified on Schedule 3.A(i) to this Exhibit 4.1 to be provided to Buyer by Seller concurrently with the Put Exercise Notice or within ten (10) days after Seller's receipt of a Call Exercise Notice, as applicable.

K.     "**U.S. Salaried Employees**" means the salaried employees and hourly non-union employees who are employed by Seller at the New Brunswick, New Jersey plant immediately prior to the Completion Date.

2.     **Pre-Completion Obligations of the Parties:**

A.     Prior to Completion, Seller will:

(i)     Endeavor to obtain Bankruptcy Court approval of the attrition plan set forth in the IUE Consent (attached as Exhibit 1.13 of this Agreement) and, upon receipt of necessary approvals, to implement the attrition plan set forth in Exhibit 1.13 (the "**Attrition Plan**") to reduce the number of U.S. Hourly Employees to approximately one hundred (100) U.S. Hourly Employees, in accordance with the terms of the IUE Consent [JCI to confirm the number as soon as possible after the date of this Agreement and no later than 5 days before Delphi commences the Attrition Plan]; and

(ii)     Take the lead in negotiating a plant-specific agreement and waiver of the Successor Clause, with Buyer's involvement as the parties deem appropriate.

B.     If waiver of the Successor Clause is obtained before the Completion Date:

(i)     Buyer will take the lead in negotiating a collective bargaining agreement with the IUE-CWA exclusive to the U.S. Hourly Employees at the New Brunswick, New Jersey plant; and

(ii)     Buyer will endeavor to obtain mutually agreed competitive work practices in a collective bargaining agreement, comparable to Buyer's existing IUE-CWA agreements at Buyer's St. Joseph, Missouri and Geneva, Illinois facilities.

C.     If waiver of the Successor Clause is not obtained before the Completion Date:

(i)     Until the Completion Date, Seller will endeavor to obtain mutually agreed competitive work practices in a collective bargaining agreement with the

52

IUE-CWA, comparable to Buyer's collective bargaining agreements with the IUE-CWA at Buyer's St. Joseph, Missouri and Geneva, Illinois facilities;

Subparagraphs 2.C(i) and 2.C(v) notwithstanding, to the extent that Buyer has not negotiated its own local agreement prior to Completion, as outlined in Section 2.C(i), Buyer will assume the terms and conditions of the Delphi-IUE-CWA National Agreement and Delphi-IUE-CWA Local Agreement applicable as of the Completion Date as they relate to the U.S. Hourly Employees, except that Seller has secured in the IUE Consent a waiver of the unpublished "Neutrality" letter in the Delphi-IUE-CWA National Agreement. Seller agrees that it is not Seller's intent to negotiate an agreement with the IUE-CWA after the effective date of this Agreement and prior to Completion that would impose additional material obligations or costs upon Buyer. To that end, and except as otherwise agreed by Buyer, Buyer will not assume terms and conditions relating to the following specified matters contained in any MOU, collective bargaining agreement or other agreement negotiated after the effective date of this Agreement which:

    a. Contains terms that would apply to or affect other facilities of Buyer;

    b. Contains any additional job security provisions for new hires not set forth in the ESCOP Plan;

    c. Introduces severance provisions that would make it impracticable to reduce the workforce;

    d. Requires that Buyer assume any Seller Employee Benefit Plans or participate in any multi-employer plan; or

    e. Guarantees specific levels of manning or requires that the New Brunswick Plant be operated in any specific way for any specific period of time

(iii) In connection with the foregoing clause 2.C(ii), Buyer will act in good faith and will not act unreasonably in order to avoid taking the New Brunswick plant.

(iv) Seller reaffirms its commitment to consult with Buyer's lead bargainer on an ongoing basis in the course of collective bargaining, Buyer's involvement to include option to be present on the premises, participate in specified briefing sessions, provide proposals to Seller, and the like. If in the course of such bargaining, matters which would significantly adversely impact New Brunswick plant competitiveness (compared year over year) arise, Buyer will not be obligated to assume related commitments without Buyer's consent, not to be unreasonably withheld.

(v) Buyer will endeavor to obtain waiver of the Successor Clause and obtain competitive work practices in a collective bargaining agreement with the IUE-CWA, comparable to Buyer's existing collective bargaining agreements with the IUE-CWA at Buyer's St. Joseph, Missouri and Geneva, Illinois facilities; and

(vi) Seller will obtain a waiver of, or otherwise remedy, any other materially significant document related to the Delphi-IUE-CWA National or Local Agreements, if any, that was not made available to Seller prior to July 1, 2005.

    D. If a mutually agreeable collective bargaining agreement between the IUE-CWA and JCI is ratified before completion, then the terms of such agreement would

apply to the Transferred U.S. Hourly Employees rather than the terms of Delphi's agreements referred to in Section 2.C(ii) above.  In the event of any conflict with the above terms of this Article 2 and the terms of the Memorandum of Agreement between Delphi and the IUE-CWA attached as Exhibit 1.13 to this Agreement (the "**Memorandum**"), the terms of the Memorandum will govern.

3.    **Obligations at Completion:**

A.    **Buyer Obligations – U.S. Hourly Employees:**

(i)    Within five (5) days prior to Completion, Seller will identify in a Schedule 3.A(i) to this Exhibit 4.1, in accordance with the terms of the Attrition Plan and Section 2.A(i) of this Exhibit 4.1, all U.S. Hourly Employees who are employed as of the Completion Date, by name, social security number, date of hire, job code and current hourly rate.    Seller and Buyer will confirm Schedule 3.A(i) of this Exhibit 4.1 as of the day prior to the Completion Date.

(ii)    Effective on the Completion Date, Buyer will offer employment to all U.S. Hourly Employees identified on Schedule 3.A(i) to Exhibit 4.1. U.S. Hourly Employees who accept Buyer's offer of employment (by reporting to work or otherwise acknowledging acceptance) will be referred to as Transferred U.S. Hourly Employees:

a.  U.S. Hourly Employees who are included in Schedule 3.A(i) and are not active as of the Completion Date due to disability, layoff, family medical leave or other approved leave of absence may elect to transfer to Buyer under the terms of the Attrition Plan, and will remain Seller's responsibility until any such U.S. Hourly Employee is ready to return to active employment in accordance with Seller's leave policies.

b.  Upon such U.S. Hourly Employee's return to active status, Buyer will offer employment in accordance with Section 3.A(ii) above, and, provided such individual accepts Buyer's offer of employment, will be considered a Transferred U.S. Hourly Employee as of such date.  In the event that a U.S. Hourly Employee is seeking to return to active employment from a medical-based leave, such individual's fitness for active employment must be approved by both Seller and Buyer provided such does not violate any applicable collective bargaining agreement.

c.  If Seller and Buyer do not agree as to such individual's fitness for active employment, the issue will be submitted to an independent medical evaluator, whose determination will be final and binding on the parties.  The cost of such independent medical evaluation will be shared equally by the parties.

(iii)    Consistent with Buyer's obligations under Section 2.C(ii) above, unless Buyer is otherwise able to negotiate a new collective bargaining agreement with the IUE-CWA for the Transferred U.S. Hourly Employees, Buyer will provide the Transferred U.S. Hourly Employees with the same level of wages and benefits as required under the Delphi-IUE-CWA National Agreement and

Delphi-IUE-CWA Local Agreement, as applicable, in effect as of the Completion Date.

(iv)    Buyer will assume and recognize the seniority status for all purposes of continued employment with Buyer.

(v)    Buyer will recognize a Transferred U.S. Hourly Employee's pre-Completion credited service with Seller for eligibility and vesting purposes but not benefit accrual purposes with respect to any Buyer Employee Benefit Plans. However, in no case will credited service be recognized under this provision if such recognition will cause a duplication of compensation or benefits as between Seller and Buyer.

(vi)    Transferred U.S. Hourly Employees' and their Beneficiaries' participation in and eligibility for benefits under the Buyer Employee Benefit Plans will commence as of the Completion Date.

(vii)    To the extent allowed under applicable law, Transferred U.S. Hourly Employees who become eligible for a distribution of their account balances in the Delphi Personal Savings Plan will be permitted, at their discretion, to transfer such account balances to Buyer's defined contribution plan. The manner of such transfer will be a direct rollover.

(viii)    Seller will retain responsibility to administer and all liability for labor grievances and arbitration proceedings (collectively the "**Grievances**") involving claims incurred prior to the Completion Date. For a period of ninety (90) days following the Completion Date, Buyer will notify Seller of any Grievances filed after the Completion Date which relate to claims incurred prior to the Completion Date. Buyer will be responsible to administer and bear all liability for Grievances involving claims incurred after the Completion Date. To the extent the administration or resolution of any Grievances require both the Buyer's and Seller's participation, the following apply:

a.    Buyer and Seller will cooperate in the defense of the Grievances.

b.    Buyer will not settle any Grievance without Seller's consent if such settlement will result in liability or obligation for Seller. Such consent will not be unreasonably withheld.

c.    Seller will not settle any Grievance without Buyer's consent if such settlement will result in liability for Buyer. Such consent will not be unreasonably withheld.

d.    If the seniority of a Transferred U.S. Hourly Employee is reinstated as a result of the disposition of a Grievance or a court or administrative order, Buyer will reinstate the Transferred U.S. Hourly Employee as if the Transferred U.S. Hourly Employee had been a Transferred U.S. Hourly Employee as of the Completion Date.

55

e.    For Transferred U.S. Hourly Employees who have been continuously employed, back pay liability to the extent relating to an event, occurrence or cause of action arising prior to the Completion Date will be allocated to Seller.  Liability relating to an event, occurrence or cause of action arising subsequent to the Completion Date will be allocated to Buyer, including but not limited to costs or other liability incurred by Seller as a result of loss of employment with Buyer, within one (1) year following Completion, by any Transferred U.S. Hourly Employee for any reason other than good cause relating to misconduct or performance under the applicable discipline procedure.

f.    For U.S. Hourly Employees who become Transferred U.S. Hourly Employees because they are reinstated through the grievance procedure, back pay liability relating to periods prior to the Completion Date will be allocated to Seller.  Liability relating to periods subsequent to the Completion Date will be allocated to Seller.

g.    The parties will discuss treatment of Grievances involving unusual circumstances or events that continue before and after the Completion Date.

h.    If either party withholds consent to a settlement or processing of a Grievance recommended by the other party or elects to continue to defend the Grievance, then such party will be liable for the portion of the back pay or other liability resulting from the ultimate disposition of such Grievance (or subsequent settlement) which is in excess of the liability that would have resulted from the settlement recommended and rejected.

(ix)    Subject to Seller's obligations under Section 3.C(iv)a, liabilities, obligations, commitments, costs and expenses for workers' compensation benefits related to injuries or illnesses incurred by Transferred U.S. Hourly Employees after the Completion Date, will be the responsibility of Buyer.

(x)    Buyer will not assume any Seller Employee Benefit Plans.

(xi)    At Completion, Buyer will pay Seller $12.5 million USD by wire transfer in accordance with wiring instructions to be provided by Seller before Completion, to reimburse Seller for costs incurred by Seller under the Attrition Plan, which costs would otherwise have been payable by Buyer under a predecessor agreement between the parties.

**B.    Buyer Obligations – U.S. Salaried Employees:**

(i)    Buyer will offer employment to all U.S. Salaried Employees, except as otherwise agreed by the parties prior to the time such offers have been made.  Buyer's employment offers to U.S. Salaried Employees will include salary and benefit packages substantially comparable in the aggregate to those provided by Seller immediately prior to the Completion Date.  Prior to tendering such offers, Buyer will provide Seller with information sufficient to satisfy Seller that such offers meet the "substantially comparable in the aggregate"

requirement. Seller's satisfaction that Buyer's offer meets this requirement may not be unreasonably withheld. Buyer will assume all Employment Rights relating to the U.S. Salaried Employees whom Buyer employs incurred on and after the date of hire. U.S. Salaried Employees whom Buyer hires will be subject to Buyer's policies and procedures, including any requirement that they execute agreements providing for the protection of Buyer's confidential information and adherence to Buyer's business conduct guidelines.

(ii)   Buyer will recognize the length of service date and all credited service at Seller that the U.S. Salaried Employees whom Buyer hires accrued at Seller for purposes of vesting and eligibility (but not benefit accrual) under the Buyer Employee Benefit Plans.

**C.   Seller Obligations – U.S. Hourly Employees:**

(i)   Seller will remain responsible for all Employment Rights of the U.S. Hourly Employees incurred or vesting prior to the date when they become Transferred U.S. Hourly Employees, except as otherwise provided herein. In accordance with the terms of the Attrition Plan, all Transferred U.S. Hourly Employees will transfer at the established New Brunswick Tier III rate and benefits in accordance with applicable terms of the Delphi-IUE-CWA Local Agreement and the Delphi-IUE-CWA National Agreement in effect at Completion, or such other agreement as may be applicable under Section 2.D of this Exhibit 4.1.

(ii)   Transferred U.S. Hourly Employees' and their Beneficiaries' participation in and eligibility for benefits under the Seller Employee Benefit Plans will cease as of the Completion Date. Notwithstanding the preceding sentence, the Seller Employee Benefit Plans will retain liability for all claims incurred by the Transferred U.S. Hourly Employees and their Beneficiaries on or prior to the Completion Date, including claims which are not submitted until after the Completion Date. A claim will be deemed incurred, as applicable:

a.   On the date of the occurrence of death or dismemberment in the case of claims under life insurance and accidental death and dismemberment Seller Employee Benefit Plans;

b.   On the date on which the service or treatment is provided in the case of claims under medical, hospital, dental and similar Seller Employee Benefit Plans; or

c.   On the date following a Transferred U.S. Hourly Employee's last day worked on which a physician legally licensed to practice medicine certifies to total disability under the applicable disability Seller Employee Benefit Plans.

(iii)   Regardless of the vesting date, Seller will pay to each Transferred U.S. Hourly Employee the amount of all accrued and unutilized vacation pay and any profit sharing due for the calendar year in which the Completion Date occurs on a pro-rata basis using the number of days worked by the Transferred U.S. Hourly Employees for Seller.

(iv)    Seller will retain responsibility for:

a.    All liabilities, obligations, commitments, costs and expenses for workers' compensation benefits related to injuries or illnesses incurred by Transferred U.S. Hourly Employees on or prior to the Completion Date and the pro rata portion, based on years of credited service with Seller compared with total years of credited service with Seller and Buyer, of liabilities, obligations, commitments, costs and expenses for workers' compensation benefits related to post-Completion Date exacerbation of pre-Completion Date injuries or illnesses; and

b.    Claims of the Transferred U.S. Hourly Employees (or a dependent thereof who becomes a "qualified beneficiary" within the meaning of Section 4980B(g)(1) of the Internal Revenue Code) related to compliance with the requirements of continuation coverage under Section 4980B of the Internal Revenue Code or Section 601 of ERISA or as the result of any "qualifying event" within the meaning of Section 4980B(f)(3) of the Internal Revenue Code which occurs on or prior to the Completion Date.

4.    <u>**Allocation of Liability; Indemnification; Cooperation:**</u>

A.    <u>**Buyer's Obligations:**</u>

(i)    In general, subject to other more specific provisions contained in this Agreement, Buyer will be responsible for and will bear all liability incurred after the Completion Date for Employment Rights of the Transferred U.S. Hourly Employees and U.S. Salaried Employees whom Buyer hires.

(ii)    Buyer will defend, indemnify and hold harmless Seller, its past and present employees, agents, representatives, shareholders, officers, directors, affiliates and assigns and successors, from and against all claims, actions, damages, liabilities, causes of action, losses, costs and expenses (including attorney's fees and defense costs), relating to:

a.    Any Employment Rights of any of the Transferred U.S. Hourly Employees, any U.S. Salaried Employees whom Buyer hires, and any person employed by Buyer after the Completion Date who is not a Transferred U.S. Hourly Employee or U.S. Salaried Employee, for any claims relating to or arising from events occurring after the Completion Date; and

b.    Buyer's failure to comply with the terms of this <u>Exhibit 4.1</u>.

B.    <u>**Seller's Obligations:**</u>

(i)    In general, subject to other more specific provisions contained in this Agreement, Seller will be responsible for and will bear all liability incurred on or prior to the Completion Date for Employment Rights of the U.S. Hourly Employees and U.S. Salaried Employees.

58

(ii)    Seller will defend, indemnify and hold harmless Buyer, its past and present employees, agents, representatives, shareholders, officers, directors, affiliates and assigns and successors, from and against all claims, actions, damages, liabilities, causes of action, losses, costs and expenses (including attorney's fees and defense costs), relating to:

a.    Any Employment Rights of any of the Transferred U.S. Hourly Employees, or of any person employed by Seller prior to the Completion Date who is not a Transferred U.S. Hourly Employee, for any claims relating to or arising from events occurring on or prior to the transfer to Buyer;

b.    Seller's failure to comply with the terms of this Exhibit 4.1; and

c.    Any Employment Rights of U.S. Salaried Employees who do not accept Buyer's offer of employment; provided, however, that such offer complies with the "substantially comparable in the aggregate" requirement of Section 3.B(i).

C.    <u>Cooperation:</u>

Seller and Buyer agree to provide each other with such records and information and otherwise cooperate as may be reasonably necessary or appropriate to carry out their respective obligations under this Exhibit 4.1.

# EXHIBIT B

## JCI - New Brunswick, NJ Battery Plant decommissioning

### Cleaning of Building Interior

| | Item | Cost | Est. Quantity | Total Cost | Comments | |
|---|---|---|---|---|---|---|
| 5 | Building Decontamination | $ 160,804.00 | 1 | $ 160,804.00 | Quoted 11/4/08 | |
| 7 | Jetting of approximately 3000 feet of process sewers | $ 10,800.00 | 1 | $ 10,800.00 | Quoted 7/17/08 | |
| 7 | Disposal and trans of oily water | $ 0.55 | 3500 | $ 1,925.00 | Quoted 11/4/08 | |
| 8 | Cleaning of piping tunnel leading from powerhouse to production floor | $ 5,400.00 | 1 | $ 5,400.00 | Quoted 7/17/08 | |
| 9 | Cleaning of ductwork for recycling | $ 32,400.00 | 1 | $ 32,400.00 | Quoted 7/17/08 | |
| 10 | Pit sludge removal and disposal | $ 23,021.00 | 1 | $ 23,021.00 | Quoted 7/17/08 | |
| | **Total for Scope of Services No. 1:** | | | **$ 234,350.00** | | |

### Asbestos Abatement

| | Item | Cost | Quantity | Total Cost | Comments | |
|---|---|---|---|---|---|---|
| 17 | Asbestos abatement of entire plant | $ 879,200.00 | 1 | $ 879,200.00 | Quoted 11/4/08 | JCI |
| | **Total for Scope of Services No. 3:** | | | **$ -** | *Excluding JCI* | |

### Total Facility Demolition

| | Item | Cost | Quantity | Total Cost | Comments | |
|---|---|---|---|---|---|---|
| 24 | Demolition of facility to slab | $ 773,294.00 | 1 | $ 773,294.00 | Quoted 11/4/08 | JCI |
| 25 | Demolition of slab | $ 655,200.00 | 1 | $ 655,200.00 | Quoted 11/4/08 | |
| 26 | Disposal of 100 yd3 of hazardous debris from charge floor tables | $ 186.00 | 100 | $ 18,600.00 | Quoted 11/4/08 | |
| 27 | Waste characterization (verify that concrete can legally remain on site) | $ 15,000.00 | 1 | $ 15,000.00 | Quoted 11/4/08 | |
| | **Total for Total Demolition Scope of Work:** | | | **$ 688,800.00** | *Excluding JCI* | |

### Miscellaneous Decommissioning Items

| | Item | Cost | Quantity | Total Cost | Comments | |
|---|---|---|---|---|---|---|
| 35 | Lab Pack | $ 22,000.00 | 1 | $ 22,000.00 | Quoted 11/4/08 | JCI |
| 36 | Acid tank decommissioning | $ 55,968.75 | 1 | $ 55,968.75 | Quoted 9/26/08 | JCI |
| 37 | Acid sludge disposal (from tank decommissioning) | $ 19,950.00 | 1 | $ 19,950.00 | Quoted 9/26/08 | JCI |
| 1 | Light bulb and ballast removal and disposal | $ 43,200.00 | 1 | $ 43,200.00 | Quoted 11/4/08 | JCI |
| | **Total for Miscellaneous Decommissioning Items:** | | | **$ -** | *Excluding JCI* | |

### Soil Remediation and Disposal (Entire Site Footprint)

| | Item | Cost | Quantity | Total Cost | Comments | |
|---|---|---|---|---|---|---|
| 45 | Excavate and stage soil for disposal (per ton) | $ 10.00 | 60,000 | $ 600,000.00 | | |
| 46 | Loading of soil | $ 3.00 | 60,000 | $ 180,000.00 | | |
| 47 | Disposal and trans of hazardous soil (D008) | $ 185.76 | 20,000 | $ 3,715,200.00 | | |
| 48 | Disposal and trans of non hazardous soil | $ 88.88 | 40,000 | $ 3,555,200.00 | Non hazardous material includes material that is below RCRA hazardous thresholds, although above levels permitted to remain on site by state agency. | |
| | **Total for Soil Remediation Scope of Work:** | | | **$ 8,050,400.00** | | |
| | **Total for all Services:** | | | **$ 8,973,550.00** | *Excluding JCI* | |

# EXHIBIT C

**Delphi Environmental Liability**
**Prepared July 13, 2009**

**Assumptions**

| | |
|---|---|
| Inflation Rate (CPI-U 10 year avereage) | 2.82% |
| Discount Rate (Moody's AAA Bond Index 6 month average) | 5.42% |
| Annual Cost | $380,400 |

| Liability | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | |
|---|---|---|---|---|---|---|---|---|---|
| Undiscounted, Pre-Inflation Adjusted | 3,804,000 | 380,400 | 380,400 | 380,400 | 380,400 | 380,400 | 380,400 | 380,400 | 3 |
| Undiscounted, Inflation Adjusted | 4,446,844 | 391,127 | 402,157 | 413,498 | 425,159 | 437,148 | 449,476 | 462,151 | 4 |
| Discounted, Inflation Adjusted | 3,324,355 | 371,018 | 361,868 | 352,943 | 344,238 | 335,748 | 327,467 | 319,391 | 3 |