UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481-rdd

- - - - - - - - - - - - - - - - - - - - - -x

In the Matter of:

DPH HOLDINGS CORP., et al.,

Reorganized Debtors.

- - - - - - - - - - - - - - - - - - - - - -x

U.S. Bankruptcy Court

300 Quarropas Street

White Plains, New York

October 21, 2010

10:06 a.m.

B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

RE: Doc. 20688 - Notice of Hearing Proposed Sixtieth Omnibus Hearing Agenda Filed by John Wm. Butler, Jr. on Behalf of DPH Holdings Corp., et al.

RE: Doc. 20689 - Notice of Hearing Proposed Thirty-Eighth Claims Hearing Agenda Filed by John Wm. Butler, Jr. on Behalf of DPH Holdings Corp., et al.

Transcribed by: Esther Accardi

A P P E A R A N C E S :

SKADDEN, ARPS, SLATE, MEAGHER, & FLOM LLP

Attorneys for Reorganized Debtors

333 West Wacker Drive

Chicago, Illinois 60606

BY: RON E. MEISLER, ESQ.

CARL T. TULLSON, ESQ.

ALBERT L. HOGAN, III, ESQ.

LOUIS S. CHIAPPETTA, ESQ.

BRANDON M. DUNCOMB, ESQ.

MICHAEL W. PERL, ESQ.

HAYNES AND BOONE, LLP

Attorneys for Highland Capital

1221 Avenue of the Americas

26th Floor

New York, New York 10020

BY: LENARD M. PARKINS, ESQ.

JONATHAN HOOK, ESQ.

A P P E A R A N C E S : (continued)

FARELLA BRAUN + MARTEL LLP

Attorneys for Official Committee of Eligible Salaried Retirees

235 Montgomery Street

17th Floor

San Francisco, California 94104

BY: DEAN M. GLOSTER, ESQ.

(Telephonically)

KRIEG DEVAULT LLP

Attorneys for ERISA for the VEBA Committee

One Indiana Square

Suite 2800

Indianapolis, Indiana 46204

BY: LAWRENCE W. SCHMITS, ESQ.

(Telephonically)

A P P E A R A N C E S : (continued)

SATTERLEE STEPHENS BURKE & BURKE LLP

Attorneys for the VEBA Committee

230 Park Avenue

New York, New York 10169

BY: TIMOTHY T. BROCK, ESQ.

UNITED STATES DEPARTMENT OF JUSTICE

OFFICE OF THE UNITED STATES TRUSTEE

271 Cadman Plaza East

Brooklyn, New York 11201

BY: ALICIA M. LEONHARD, ESQ.

RENKEMEYER CAMPBELL WEAVER, THE TAX LAWYERS

Attorneys for FKMT

7500 College Boulevard

Overland Park, Kansas 66210

BY: TROY RENKEMEYER, ESQ.

P R O C E E D I N G S

THE COURT: Please be seated. Okay, DPH Holdings.

MR. MEISLER: Good morning, Your Honor.

THE COURT: Good morning.

MR. MEISLER: Ron Meisler of Skadden Arps on behalf of the reorganized debtors; DPH Holdings.

Your Honor, if it's okay with this Court we'd like to begin with the claims hearing.

THE COURT: That's fine.

MR. MEISLER: And we would propose to move forward in the order of the agenda that was filed yesterday afternoon.

THE COURT: Okay. I understand from a phone call to chambers that the motion to enforce, the counsel on that mistakenly went to Manhattan. And they're on their way up here. I don't know if they've arrived yet, but we should probably put that at the end of the calendar.

MR. MEISLER: Terrific, Your Honor.

THE COURT: Other than that --

MR. MEISLER: That's actually why we're asking to start with the claims hearing.

THE COURT: Okay.

MR. MEISLER: We didn't know where Mr. Renkemeyer arrived.

THE COURT: No. They called about a half an hour ago. They should be here shortly.

MR. MEISLER: Terrific. Thank you, Your Honor.

THE COURT: Okay.

MR. MEISLER: And, Your Honor, just for clarification, counsel who mistakenly went to Manhattan, he's representing FKMT --

THE COURT: Right.

MR. MEISLER: -- which is a matter that's part of the omnibus hearing.

THE COURT: Right.

MR. MEISLER: Terrific.

THE COURT: So other than that, I'm happy to go in the order of the agenda.

MR. MEISLER: Excellent. Thank you, Your Honor.

Your Honor, matters 1 and 2 on the claims hearing are adjourned. So if it's okay with you I'll just move on to matters 3 through 5.

THE COURT: That's fine.

MR. MEISLER: Matters 3 through 5 have been settled. It's the claims of Carolyn Needham. Matter number 4 is Genpact International. And matter number 5 is the claims of AOL. All of which have been settled by stipulation and all stipulations have been submitted to chambers.

THE COURT: All right, okay.

MR. MEISLER: Your Honor, the last matter on the claims hearing; last matter on the agenda is the notice of

deadline to motion for leave to file late claim for Cadence Innovation LLC.

Your Honor, that's a matter that Cadence is seeking to submit a late claim on -- sought -- submitted a late claim on account of preference actions. The matter arose in August of 2008, long before the July 15th, 2009 bar date.

We submitted -- we sent a notice to Cadence that pursuant to orders entered by this Court that it had to submit a motion seeking leave to file a late claim. Cadence did not respond and, therefore, Your Honor, we're asking for an order just allowing an expunging of the claim submitted on October 21st by Cadence.

THE COURT: Let me make sure I understand this. You're saying -- you're not saying the preference action was brought before the bar date, right?

MR. MEISLER: That's correct. And I don't believe that there was a preference action brought. However, the preference action -- the rights to a preference action arose August 26th, 2008.

THE COURT: Do you have authorities for the proposition that a -- was it 502(h) claim? The claim that would arise upon disgorgement of preferences covered by a bar date, that that counts as a claim for purposes of a bar date?

MR. MEISLER: Your Honor, we didn't carve that out of our bar date.

THE COURT: No, I understand. But I'm just not sure that goes so far as to fall within the broad definition of a claim under the definition of claim under 101, since it's created only upon the debtors' success in winning a preference case. I mean, that would mean that every trade creditor would have to file a proof of claim even if it doesn't own one because there's a preference.

MR. MEISLER: Your Honor, that I understand. I think our issue with this one is that in August of 2008, which is approximately one year -- call it eleven months prior to our bar date, the right to the preference action arose. And so this debtor --

THE COURT: Well, when you say a right to the preference action what do you mean by that?

MR. MEISLER: That means by statute upon --

THE COURT: But there hadn't been a preference -- had a preference adversary been filed and served on them at that point?

MR. MEISLER: Had a preference adversary been filed by Cadence to the reorganized debtor you mean, right? Because Cadence --

THE COURT: I'm sorry, I have this totally backwards. I'm sorry. This is Cadence's preference claim?

MR. MEISLER: That's correct.

THE COURT: All right. I was thinking about the

converse that you were trying to assert that they should have filed their claim --

MR. MEISLER: I'm sorry.

THE COURT: -- because you were going to sue them for a preference?

MR. MEISLER: It's exactly the opposite.

THE COURT: All right.

MR. MEISLER: Correct. Cadence is the party with a preference action against Delphi.

THE COURT: Right.

MR. MEISLER: And Cadence knew about that --

THE COURT: No, I believe you're correct on that, and they need to file a late claim. A request for leave to file a late claim.

MR. MEISLER: Right.

THE COURT: So the claim would be expunged until they -- if and until they file that motion and it's granted.

MR. MEISLER: Terrific, thank you, Your Honor.

THE COURT: Okay.

MR. MEISLER: Your Honor, now moving forward with the omnibus hearing, as we've now concluded the claims hearing. We'd like to proceed in the order of the agenda, excluding the FKMT matter, which we'll put towards the end so we give counsel for FKMT time to arrive.

THE COURT: Okay.

MR. MEISLER: Your Honor, the first three matters are adjourned. So if it's okay with this Court I'd like to continue with matter number 5. Again, we're putting matter number 4 to the end. But matter number 5 is the matter that has arisen in connection with the VEBA committee.

THE COURT: Right.

MR. MEISLER: And Mr. Brock is here to represent the committee. And, Your Honor, if it's okay with this Court I'd like to cede the podium.

THE COURT: Okay. And we have on the phone Mr. Schmits and --

MR. SCHMITS: Yes, Your Honor.

THE COURT: -- and Mr. Gloster, correct?

MR. GLOSTER: Yes, Your Honor.

THE COURT: Okay.

MR. GLOSTER: And, Your Honor, this is Dean Gloster at Farella Braun & Martel on behalf of the official salaried retirees committee appointed by this Court under 1114.

This is a very simple matter, I think.

The Court had directed at the prior hearing that the parties try to agree on an amendment that would call for voting by the beneficiaries that would give the beneficiaries the power to have a meaningful say. And if the VEBA was not properly run to remove the board. And the Court directed that the terms could be staggered for board members, but not super

staggered to prevent that change in control.

Just two days ago the VEBA proposed amendments that call for no vote on the existing board for over a year and a half and a four-year -- sort of four successive elections to have to remove the board. And their justification is that they need to retain the expertise of the existing people on the board. And, in addition, they retain the right to change even that schedule in the future and to give themselves ten-year terms.

So I think the simple matter is they haven't followed the Court's direction to provide for meaningful voting that would give the beneficiaries the right to have a say on who's on the board, and I think it's critical that the beneficiaries do have that say. Because if the board is accountable to the beneficiaries, they're likely to make better decisions. And if they make catastrophic decisions they can be replaced.

THE COURT: Okay. Mr. Schmits, are you going to handle this on behalf of the VEBA committee, or is your colleague here in the court going to handle it.

MR. BROCK: Your Honor, this is Timothy Brock. You're familiar with Patricia Beaty who's appeared here earlier. My name is Timothy Brock from Satterlee Stephens on behalf of the VEBA committee.

Unfortunately, Ms. Beaty cannot participate in today's hearing for medical reasons, but Mr. Schmits is prepared to

carry the oar, Your Honor.

THE COURT: Okay.

MR. BROCK: And he's a gentleman with thirty-four years of ERISA experience.

THE COURT: Okay. So --

MR. SCHMITS: Thank you.

THE COURT: Mr. Schmits, have there been any further development on this since the supplement was filed a couple of days ago by the 1114 committee.

MR. SCHMITS: Your Honor, I have to defer that question to Mr. Brock, because I'm not entirely sure.

THE COURT: Okay.

MR. BROCK: Your Honor, the current state of affairs is set forth in a declaration that was filed by Patricia Beaty last night, rather late.

THE COURT: I haven't seen that. Do you have a copy of that?

MR. BROCK: Yes, Your Honor.

(Pause)

MR. GLOSTER: Your Honor, Dean Gloster of Farella Braun & Martel.

The only development was that Ms. Beaty indicated that the VEBA committee is unwilling to change the proposed terms.

THE COURT: Oh, okay. All right. Well, why is that?

MR. BROCK: Your Honor, the declaration does set forth

the explanation for the changes that the VEBA committee carefully considered with the advice of counsel. And it addresses Mr. Gloster's grievances with those revisions.

MR. GLOSTER: Your Honor, Dean Gloster, again.

THE COURT: You know what, I'm going to adjourn this. This is silly. You know, you shouldn't be doing this in real time, you should think about it a little more. All right.

And, frankly, I thought that most of Mr. Gloster's points made sense. I don't know why you're waiting until 2012 to have an election. And I don't know why you're giving yourselves the ability to change the rules, which I said you're expressly not supposed to do.

And I’m getting fed up with you. I'm getting fed up with the 1114 committee as you heard on the conference call on October 5th. That was no license for you all just to say you're going to entrench yourselves and give yourselves a license to do whatever you want. Go back and do what is right for your constituents.

You know, I don't understand. People want to represent these poor retirees and now you're just entrenching yourselves. I'm sick of it, and I'm sick of giving a response, and the fact that there was only a document submitted three days ago it's not how it's supposed to work. So I'm going to adjourn this a month, and that's it. And if you don't get it right I'm going to impose it.

This is ridiculous. There should be no payment for this. The trust should not pay the lawyers for this work over the last week.

MR. BROCK: Thank you, Your Honor.

MR. GLOSTER: Thank you, Your Honor.

THE COURT: And you report that to your colleague, Mr. Schmits. I don't care if you have thirty-five years of experience, it's not showing here.

MR. SCHMITS: Well, Your Honor, may I make one comment, please?

THE COURT: Yes.

MR. SCHMITS: I think it's a mischaracterization that there's an effort to entrench --

THE COURT: Why has this waited a month to be dealt with?

MR. SCHMITS: Well, Your Honor, if I may, the reason for that delay was because the VEBA committee was very busy with two important things that took all of its time.

One was dealing with the misguided attempt --

THE COURT: You know what, you can't -- you know, we dealt with that misguided attempt on October 5th; three weeks ago.

MR. SCHMITS: But the ramifications -- Your Honor, pardon me.

THE COURT: I’m sorry.

MR. SCHMITS: The ramifications --

THE COURT: I will not pardon you. This is as important as your mucking around with the insurance. And it's something that lawyers should be advising their clients on. And you had clear direction from me.

Frankly, I don't see anything wrong in Mr. Gloster's six bullet points in his supplement.

And this affidavit that's submitted last night doesn't really do it, it's just completely self-serving.

You know, the whole idea that you can't multitask here is just a farce. So think about it and come back in a month.

MR. SCHMITS: We will do so, thank you.

MR. BROCK: Thank you, Your Honor.

MR. GLOSTER: Thank you, Your Honor.

THE COURT: And I want a detailed explanation as to why each one of the six bullet points doesn't work if, in fact, you don't agree to any of them. And that's going to happen in a month. Not some self-serving affidavit that I get on the night before the hearing.

A detailed one, including why all of the beneficiaries of the trust wouldn't be allowed to vote. So do that in a month.

MR. BROCK: Your Honor, I think the affidavit was an attempt to address that, but we'll go back and revisit that affidavit. Thank you.

THE COURT: Well, I'd rather you just revisit the points.

MR. BROCK: Certainly. Certainly, Your Honor.

I think in fairness to -- especially the VEBA committee, itself, which has been very busy, there just was not a great deal of time. It was not an attempt --

THE COURT: When did we have the last hearing?

MR. BROCK: The 5th of --

THE COURT: No, that was a chambers conference. When did we have the hearing on this point, in September.

MR. BROCK: On the 24th of September.

THE COURT: Yeah, the 24th of September.

You know what, most lawyers I know would have gotten this done in a week. This is just posturing, this is just trying to get leverage. And I'm sick of it. These retirees need better representation by their fiduciaries and their counsel.

MR. BROCK: Well, Your Honor, I’m sorry you feel that way. Certainly --

THE COURT: I am, too.

MR. BROCK: Certainly, we're working very --

THE COURT: And I usually don't erupt like this, but this should have been done by now, it should have been done before September 25th.

MR. BROCK: Well, we'll do our best, Your Honor.

THE COURT: And I'm serious about the fees, they are not to be paid. Because I'm beginning to get the impression that this whole dispute is about fees. And I will look into it in more detail going back beyond the fees for the last month on this issue; on this drafting issue, if it's not resolved.

MR. BROCK: Understood, Your Honor. Thank you very much.

THE COURT: Okay. So it will be adjourned to the next omnibus day.

MR. MEISLER: Your Honor, matter number 6 on the agenda is the Highland Capital substantial contribution application.

THE COURT: Okay.

MR. MEISLER: Your Honor, just as a housekeeping matter, in connection with the May 20th hearing when we started the substantial contribution hearings, we submitted a binder of exhibits that were supposed to be used for all the substantial contribution hearings. It's largely comprised of publicly filed documents. And we, again today, shared the index with Mr. Parkins. And so -- Mr. Parkins, who is counsel for Highland. And so we would ask again that this be used as our exhibit binder.

In addition, as the Court knows, Mr. Parkins had requested to submit a declaration on behalf of his client, Mr. Daugherty. It did come in after the May 20th deadline. We

accommodated Mr. Parkins and so that, too, is considered to be part of the record.

In connection with Mr. Daugherty we did reach out to Mr. Parkins last night -- it was actually in the afternoon, but we let Mr. Parkins know that we would not have any questions for Mr. Daugherty and offered to have him save the trip -- he's from Texas, to come down. And we had intended on also seeking permission from your chambers, Your Honor.

The initial reaction from Mr. Parkins was that Mr. Daugherty was already here, so he's going to show up. And the conversation ended there. As it turns out Mr. Daugherty left; he left to go back to Texas and, therefore, he's not here this morning.

I admittedly was part of that confusion. I know you usually like to have an opportunity to --

THE COURT: Well, if no one wants to cross-examine him it's not an issue.

MR. MEISLER: Terrific.

THE COURT: I'll just take his affidavit as a proffer of the testimony.

MR. MEISLER: Thank you, Your Honor.

THE COURT: Okay. Was he -- I know at some point in this matter there was a back and forth about his deposition, was he ever deposed?

MR. MEISLER: He was deposed, Your Honor.

MR. PARKINS: Yes, Your Honor. He was deposed telephonically.

THE COURT: Is that part of the record, or are we just going on the affidavit at this point.

MR. MEISLER: We didn't submit it as part of the record.

THE COURT: Okay.

MR. MEISLER: It is possible that in connection with the questions you might have that we might show excerpts.

THE COURT: Okay.

MR. MEISLER: We'd be happy to give you a copy of the deposition.

THE COURT: Okay.

MR. MEISLER: But we didn't feel like it was necessary to submit it as part of the record.

THE COURT: All right. The U.S. Trustee objected also. Do you wish to cross-examine Mr. Daugherty on his affidavit?

MS. LEONHARD: Your Honor, Alicia Leonhard for the United States Trustee.

No, Your Honor.

THE COURT: Okay. All right.

MR. MEISLER: Your Honor, of course you know this is a matter --

THE COURT: I’m sorry. And then there was some

documents also submitted by Highland. And I’m assuming there's no objection to their admission into evidence also? It's the time records and the like?

MR. MEISLER: No, we have no issue with that, Your Honor.

THE COURT: Okay. So all of those are in the record.

MR. MEISLER: That's correct, Your Honor.

THE COURT: Okay.

MR. MEISLER: Your Honor, just as a brief introduction, this is Highland's substantial contribution application. They're seeking approximately 1,750,000 dollars in fees and expenses. That is a reduction from their original application that was in excess of two million dollars. In large part that's because they have withdrawn their application for their financial advisors to be part of their substantial contribution application.

Your Honor, on that note, it is Mr. Parkins' application, so, therefore, I’m going to cede the podium to Mr. Parkins.

THE COURT: Okay.

MR. MEISLER: Thank you.

MR. PARKINS: Good morning, Your Honor.

THE COURT: Good morning. I'm not generally in a bad mood. I'm not a Ranger's fan or a Philadelphia fan, it was just that prior matter's just been going on for too long.

Don't think it's going to carry over to your -- your morning.

MR. PARKINS: After thirty-four years it's hard to know once your going to be lobbed over. Thank you.

Lenard Parkins for Highland Capital, Your Honor.

Your Honor, I want to start off by saying I have read many times your ruling and view on 503(b)(4) discussed by the Court and presented on the May 20 hearing. And I'm aware of the Court's position. I think we fall within those parameters here.

We're not seeking compensation for negotiating or as the Court may recall back in the dark ages here in early of 2007, the fight we had with respect to a competing offer in the hearing. We're not seeking that, because the deal was a bust. We're not seeking that.

What we are seeking is focused on the fact that the work done there by Haynes and Boone for Highland was necessary to engage in what was a very intense set of negotiations that took place in July of 2007, when the original EPCA deal between the debtors and Appaloosa failed. And at that point in time the debtors were involved in negotiating a revised EPCA and Highland reinserted itself with desire to negotiate another proposal contrary to the one that had been terminated, not knowing what it was negotiating against because one was not yet developed; it was in the process of negotiating -- being negotiated.

So as the declaration in our pleadings state, Your Honor, what happened was in July, basically in a ten-day period, there was very intense negotiations that took place.

Contrary to a couple of points made by the debtors in their response filed a few days ago, I just want to tick off a few things which address some of the points you've addressed in your perspective of Section 503(b)(3) and (b)(4) on May 20 and the cases, and also address a point or two with respect to the U.S. Trustee's objection, which really --

(Pause)

THE COURT: Okay, sorry.

MR. PARKINS: Which really focus --

THE COURT: Some mood music for the --

MR. PARKINS: Which really focused on the Dana case. In fact, where Appaloosa and Centerbridge were before Judge Lifland --

THE COURT: Right.

MR. PARKINS: -- in a situation. I think that's very distinguishable from what we have here.

A few things and it's raised in the response filed by the debtors, or the reorganized debtors.

Number one is -- and it's obviously raised by Your Honor in the context of what do you have to show for 503(b)(3) and (b)(4), direct benefit, no duplication of efforts by any other party, and that it was a direct benefit, not an indirect

benefit. I think we meet those.

Number one -- I'm just tick off some of the points. The debtors raised that why -- that the creditors' committee and the other parties-in-interest were involved in negotiations and it wasn't Highland's efforts at submitting a competing bid which the debtors in their pleadings filed on -- in July seeking expedited motion for approval of the new transaction. So it was really fairly intense, if you go through that pleading which we cite in Mr. Daugherty's deposition in our pleadings. The negotiations were very intense between Delphi and Appaloosa and Delphi and Highland at the time.

And there was no negotiations --

THE COURT: I'm sorry, let me make sure -- I thought -- maybe you're not saying anything different --

(Pause)

THE COURT: We've been having some problems with CourtCall and I apologize for the interruptions.

MR. PARKINS: Rough day today.

THE COURT: No, I mean, the problems with CourtCall have been going for a while.

The -- I thought Highland acknowledged that in terms of negotiating with Appaloosa the negotiations were just between Appaloosa, on the one hand, and Delphi and/or maybe one or more of the committees, on the other.

MR. PARKINS: This is the context of July. And the

answer is, Judge, you're right, that's exactly what happened. But the debtors in their reply papers say that the benefit should go -- I'll just quote their reply papers filed earlier this week.

Is that "Thus Highland's belief that the lower commitment fees and the amended EPCA were the result of Highland's efforts is simply incorrect. Highland, therefore, cannot prove how its efforts separated from the efforts of Delphi, the committees, and other parties-in-parties with respect to that."

THE COURT: Oh, okay.

MR. PARKINS: So that didn't happen. And the reason I can say that didn't happen is I look at the debtors own pleadings it filed. And in paragraph 28 of their expedited motion filed in July it says "While discussion with potential investors were ongoing the debtors also kept their key stakeholders, including GM and the statutory committees. up to date on the plan investor developments." There was no ongoing negotiations involving where the creditors' committee or any constituent was involved negotiating, representing anybody with respect to these negotiations. It was the debtor, Appaloosa, the debtor, Highland. Separate rooms, separate negotiations. There was no intermediary, anybody representing any constituency on behalf of them.

THE COURT: Okay.

MR. PARKINS: So --

THE COURT: But the debtor was the one doing the negotiating, right?

MR. PARKINS: The debtor was having the direct discussions, that's correct.

THE COURT: Okay.

MR. PARKINS: They're not arguing about that. But their point that there's other people, as in Dana and things like that, where there were various committees, ad hoc committees, and --

THE COURT: Right.

MR. PARKINS: -- formal committees involved, that didn't happen here. It was just a negotiation between the debtor and Appaloosa, where the debtors' deal had been busted and they were trying to negotiate a deal. And Highland was negotiating a deal. Highland be negotiating in one room for hours, there'd be room -- negotiating in another room with Appaloosa going on, more or less contemporaneously.

The other thing, Your Honor, is that the reply filed a few days ago in response to our motion and Mr. Daughtery's declaration as to the relationship with respect to the fees and the reduction of fees it was negotiating, speaks repeatedly that it is likely that the reduction in fees were caused by X -- that's what they say, likely it was caused by Y, Y's caused because it was a reduction in the amounts, and,

therefore, the ratios became the same. The ratios drove the fees down rather than any benefit that Highland brought to the table.

Again, I go back to the pleading, which was real time, but what happened then, rather than what's been filed today.

The pleading speaks -- in paragraph 18 of the pleading filed in July of 2007, it says the following. I'm sorry, page 18 in that pleading. Paragraph 34(b) in transaction expenses. This is what the debtor said. The debtors said the fees have gone from eighteen down -- I'm sorry a commitment fee of eighteen down -- eighteen million dollars, and an aggregate commitment fee of 39.37 million dollars. And then they footnote that and they say the preferred commitment fee under the original EPCA was twenty-one, so it came down three million. And they stand by commitment fee under the original EPCA, it was 55.125 million.

Now, the debtor in its recent pleadings filed three days ago, say this is merely a consequence of a reduced offer and, therefore, the ratios went down. And it basically is the same amount. However, when they filed a pleading asking for you approval of the transaction they didn't say basically these are the same fees, they touted that they had, in fact, reduced the fees from what they had been earlier. They didn't say it's the same fees based on a ratio of reduced amount versus anything else. They touted this as a benefit, why this is a

good deal. We got the fees down.

Now, one thing I --

THE COURT: Well, but it's still -- I mean, the ultimate question for me, though, was still whether the fees were reasonable and market, it wasn't -- I mean, I understand there was -- they're trying to make it look good, but, ultimately, it's whether -- I mean, if they had reduced the amount of the commitment, say another billion dollars, and the fees were the same, they could say they were -- they'd gone down, but the ratio would have been, you know, three as opposed to 2.5, and that would have been a problem. I mean, there was --

MR. PARKINS: You are correct. But that was not pled nor argued.

THE COURT: I understand --

MR. PARKINS: Now they argue --

THE COURT: -- but it still would have been an issue.

MR. PARKINS: Now, they argue it.

THE COURT: All right.

MR. PARKINS: But the reason -- the one thing I think the Court can say and I think even counsel for the debtors will admit, that this is not a situation where you go mother, may I have a discount or a reduction from Appaloosa in this case. There was never a situation from the first time I was involved in December of '06 where anything came from Appaloosa without

pressure from somewhere. And in July of 2007 there was a bust in the deal and the debtor was trying to regroup. And there was Highland there negotiating. And Highland's fees, rich transaction, is pursuant to Mr. Daughtery's declaration, where about sixty million dollars.

Now, we say that's no happenstance because Mr. Daugherty in his declaration was talking with Mr. Sheehan; the CRO of this company. Who by the way, later next year, said we appreciate your substantial contribution to the case, we're not arguing that the debtor can't argue this today, obviously. That Mr. Sheehan was saying we're playing you against Delphi. We're playing you against Appaloosa, there was no committee involved. There was no one negotiating anything. We're playing you against them. And the negotiations were very intense for one week, ten days basically, I'm sorry. And they resulted in Highland making a proposal with a sixty million dollar aggregate fee, and their fee was about sixty-three million dollars. And they say we came down by the nineteen million dollars. They now say it's really 12.3 million dollars. But it's a substantial benefit.

Why is it a benefit? It's not driven by the fact that their ultimate plan was a bust. That happened, it's unfortunate. What happened was these fees got paid. These fees were actually paid. These checks were written by the debtor at a reduced amount during the case. And as a result of

having pressure negotiating, as we all know, there's no free ride from Appaloosa in this case, as a result of a competing negotiation which they taught in their papers filed in the middle of July, back and forth intense negotiation, but the board ultimately decided which way to go again. Those fees were reduced. Those fees were paid at a reduced amount from what they were in the original deal.

And the consequence of that is because there was pressure. Pressure that Mr. Sheehan invited Highland to negotiate. They did negotiate, they continued to negotiate and they got a reduction in the fees, which were paid. This is not any pie in the sky, well, we had a better deal. I read the transcripts of the other thing, the deals fell apart, and so the benefit that was anticipated from a confirmed plan didn't arise. This is not. This is checks that were written in a reduced amount. And Highland contributed to that directly. Because Highland brought pressure, through the debtor. The debtor had a carpenter who goes and builds a house without a hammer doesn't get very far. There's no hammer against Appaloosa with respect to anything unless you have leverage. And the leverage there was we had a competing offer, with reduced fees, presented by Highland, and they got the fees down to a commensurate level. And the fees were reduced from what they were and they were paid at a lower amount; real tangible benefit.

THE COURT: But the other --

MR. PARKINS: The other --

THE COURT: Can I ask you, though. I mean, Highland was actually negotiating to divide the company, right?

MR. PARKINS: True.

THE COURT: I mean, it wasn't doing this as just a strategy to get Appaloosa to make a better deal?

MR. PARKINS: Now, just as Mr. -- I don't know if you recall, Mr. Daugherty testified at the January hearing. Highland did make an offer to buy the company.

THE COURT: Right.

MR. PARKINS: But Highland did make an offer to buy the company I think in reality then, and, again, in July, knowing that unless you make -- put money down on the table that you're not going to get the other guy to do anything. So Highland was prepared to make an offer, prepared to negotiate an offer, made an offer in January, submitted a proposal to the company in July. But Highland also knew that to the extent there was an enhancement, and their offer was rejected again, as it was in January, if there's an enhancement to the deal for the estate that Highland and the other constituents in the estate would benefit. Highland was an equity owner.

THE COURT: But, then, how does this -- why wouldn't if I granted this relief, open the door for every qualified bidder, someone who's serious about buying the company, to

argue that all right, maybe I don't get a breakup fee because I wasn't chosen as the stalking horse, but I'm going to get, you know, at least my expenses paid, which may be considerable, for engaging in bidding. I mean, that basically means that the debtor's always paying a penalty for letting -- you know, for having an auction.

MR. PARKINS: This was not an auction.

THE COURT: Well, I mean, having --

MR. PARKINS: This --

THE COURT: Well, there could have been someone else show upon.

MR. PARKINS: No one else --

THE COURT: I mean -- but there could be. I mean, all I'm saying is why --

MR. PARKINS: But no one else did. And let me tell you why no one else could --

THE COURT: But I would think --

MR. PARKINS: I'm sorry.

THE COURT: I’m asking you a hypothetical as opposed to reality. But, I mean, assume for the minute that, you know, Blackstone showed up, or Blackrock showed up and said well, we want to buy, or you know, maybe more relevant; Silverpoint showed up and said we want to buy. So now there are two bidders, or three. Obviously, it's going to get more competitive the more bidders you have. Does each one of them

say my attorney's fees should be paid?

MR. PARKINS: I'm sure each one of them would ask.

THE COURT: Well, I know, but does it really --

MR. PARKINS: I'm sure in the hypothetical they would ask.

THE COURT: They would ask, but, I mean --

MR. PARKINS: But here's the difference here.

THE COURT: Okay.

MR. PARKINS: I have to move it from the hypothetical down to --

THE COURT: All right.

MR. PARKINS: -- 'cause the law says I've got to show what actually happened.

THE COURT: All right.

MR. PARKINS: Here's the difference. There was no one else ready and able. This wasn't I'm going to offer 500,000 dollars for a building, this was a multibillion dollar deal that was being negotiated within ten days. There was nobody else who was ready because with the work we had done in December and January, there was no one else who was ready to go and engage immediately in the confrontation of those negotiations to put an offer on the table, to give Mr. Sheehan the leverage against Appaloosa. There was no one else there. And the only reason we were ready was because of the work we had done in December and January and when -- when the original

EPCA collapsed we were able to proceed immediately, or else Mr. Sheehan would have been negotiating with Appaloosa as may I please have a better deal without any leverage whatsoever. We know that doesn't work here.

THE COURT: I'm assuming that one of the things you just said is also your answer to the debtors' point that Highland should only be asking for reimbursement of its attorney's fees for the July period --

MR. PARKINS: Well, they --

THE COURT: -- because you're saying that we had to do the work in advance to be --

MR. PARKINS: Right.

THE COURT: -- ready, willing and able.

MR. PARKINS: We could not have gotten an offer ready in five days. This is nobody who just flew in and said I'm going to try to do a deal now for four billion dollars. The only reason we were prepared to do it -- I think the debtor said I think in its papers repeatedly, December, January and July and I said in our amended papers, don't include August, November and December is I think what you said in your subsequent papers. There would have been no ability to give Mr. Sheehan a real tool here had we not had the benefit of December and January getting ready with a huge multibillion dollar deal offer here. You couldn't have done that in four days and made it realistic, because the debtors' pace, was as

usual, if you recall, immediate less five days. Immediate, immediately, we need to find something and get something done. We were the only party available who could stand in the breach, give Mr. Sheehan leverage against Appaloosa. Because absent leverage you don't go anywhere.

Now, obviously there was no duplication, the debtor negotiated. But the debtor, again, without any leverage had nothing to negotiate from. You don't have leverage against -- the Court can take judicial notice, you don't have leverage against Appaloosa, you're just going to get pushed around. And so the answer is they had leverage, Mr. Sheehan invited the negotiations, the negotiations continued until the board decided to go with the amended Appaloosa deal. Highland's expenses for Haynes and Boone were necessary in order to give Mr. Sheehan the hammer, of whatever extent it was used, obviously, to negotiate against Appaloosa, because without it he didn't have a hammer. He had nothing in his hand but a hope to negotiate a better deal from Appaloosa.

I think I want to talk just briefly a little bit about the U.S. Trustee's objection, which focused a great deal on Dana.

THE COURT: I'm sorry, before we do that --

MR. PARKINS: Sure.

THE COURT: -- I understand your point that what you're focusing on with this -- with the amended request in

light of the fact that Appaloosa -- the second Appaloosa deal ultimately cratered, is the lowering of the commitment fees.

MR. PARKINS: Right.

THE COURT: But if the debtor happened to have the leverage, there certainly would have been a point where if Appaloosa had been too greedy, for example, if it hadn't asked for a market commitment fee, or if it hadn't -- you know, if it had too many strings on its deal that it wouldn't have been approved. So how do I -- I mean, in a way the money was spent when maybe it shouldn't have been, by giving the debtor the leverage.

MR. PARKINS: Well, the debtor -- I'm sure the Court considers --

THE COURT: I mean, if there hadn't been any leverage maybe there wouldn't have been a deal and we would have been, you know, a year earlier dealing with GM and, you know, the DIP lenders.

MR. PARKINS: Your Honor, the answer is, and I think the Court heard the evidence and the Court went along with the debtors' business judgment. I can't rewrite that much history --

THE COURT: Okay.

MR. PARKINS: -- again. But the point is that the debtor decided to proceed in this direction. I think if they had come in with a fee that someone had objected to, or Your

Honor had said hey, this fee is way out of whack, it would have been addressed in the hearing, and it may be had then been addressed. But it was addressed in the context of negotiation and ultimately paid. If it had been a third less it still would have still been a benefit to the estate. And it was negotiated, Mr. Sheehan needed this leverage to negotiate it.

The last thing I want -- let me go onto the U.S. Trustee's point now.

The U.S. Trustee basically argues that what we did was basically covered by the work of other parties. But clearly the debtor was engaged. No other parties were engaged in July with respect to trying to fix the problem with respect to the first EPCA that came apart. No one else but the debtor and -- so Dana doesn't apply.

Judge Lifland, when you read the case, what that case has probably a lot of innuendos said and unstated in the case. But what is stated, in any event, in the case is that there was process established by Judge Lifland with respect to committees involved in the negotiations. The judge said obviously the committees had a tremendous role, there's no way to separate out what was done by Appaloosa and what was done by the committees in those context of negotiations. Certainly, one of the major points that Judge Lifland focuses on. We don't have that here. We're not seeking compensation just really for the period of January. We use that to be able to play and make a

bid in July, or else we couldn't make a bid.

The last point I think I want to talk about, Your Honor, is the fact that one of the most important, I think, statements of evidence we don't have here, is a response from Mr. Sheehan and Mr. Sherbin, to what Mr. Daugherty said was true. They believe that they were engaged in this dialogue because they needed Highland as leverage. And they also acknowledged in March of 2008 the substantial contribution that Highland made during the case. Now --

THE COURT: But aren't those e-mails all in the context of begging Highland for extra commitment for the exit financing?

MR. PARKINS: The answer was there was no expenses incurred by Highland then for legal fees at that point.

THE COURT: No, I understand. But, I mean, when you read the e-mails and you look back to how desperate the debtor was at that point to get the exit financing lined up, it particular to put Appaloosa in a box to have to close. I mean, it just comes through in the e-mails. It's all about thank you for, you know, committing to 225 million and --

MR. PARKINS: Well, that's certainly in the e-mails, but it's certainly -- nothing I've seen in response to Mr. Daugherty's declaration or any pleading that said hey, it was just because of that, it was just because of that scenario. The silence from Mr. Sherbin and from Mr. Sheehan is very loud,

that the debtors don't say hey, it was just because of that, just as you suggested, that isn't there.

THE COURT: Okay.

MR. PARKINS: In any event, Your Honor, I believe that we satisfied the requirements of 503. As again I've looked and studied your decision on May 20th. I recognize this is a tough hurdle. But this was a tough situation for the debtor. The debtor had no leverage. And the debtor did in its pleadings, didn't say I got relative fees reduced based on the relative size of the deal. They touted to you and everyone else they got a better deal. That better deal resulted from the negotiations, it didn't happen for any other reason.

THE COURT: Let me give you another hypothetical. Let's say that, you know, miracle of miracles, GM started to sell a lot more trucks in July 2007, that would have given the debtor leverage, too, right? I mean, that would have given the debtor a lot of leverage because it would have increased the value of the company. Why wouldn't GM under this theory have the right to, you know, say that we contributed to?

MR. PARKINS: I'll answer it based on your ruling. Unless you can show a tangible benefit, which I can, which is the reduced fees, okay, GM wouldn't get substantial contribution for selling more trucks.

THE COURT: I understand. But if it had the leverage. I mean, I understand your argument about the benefit, clearly

the fees from deal as originally proposed by Appaloosa and the deal approved by the Court went down, you know, twelve and a half/thirteen million dollars, but I’m still -- so I'm really dealing with the other aspect of this, which is does merely a fact of giving leverage satisfy the test, assuming that there is a benefit. I mean, lots of facts can give a debtor leverage. And one, for example, would be that GM --

MR. PARKINS: Let me answer your hypothetical with --

THE COURT: -- starting selling, you know, a lot more trucks.

MR. PARKINS: Let's talk about the trucks.

THE COURT: Okay.

MR. PARKINS: Okay. Here's my view. Is that if GM had walked in and said hey, you know what, you need my assistance and, therefore, I can tell you now that I've either going to make some financial accommodations or I'm selling more trucks and business is good, and, therefore, you have some leverage. Okay. That's not what happened, though.

THE COURT: I unders --

MR. PARKINS: What happened was an open invitation, Go ahead, you're prepared to bid, thank you very much. I need you. I need you because I have nothing in my pocket to negotiate with Appaloosa, who's not a friendly guy. And, therefore, I need you.

Now, your argument that every bidder can say you

needed me. This was a one-on-one deal. This wasn't an open invitation for bidders to come in. There was only one guy who was ready, willing and able to go forward. And I mean ready and willing. Ready means you're ready for a four billion dollar deal. Not everybody's going to do that in a day. GM, I doubt could move in a day on anything.

THE COURT: Why didn't the debtor or why didn't Highland, under the circumstances, if this was going to be, you know, a joint strategy ask for approval of an up-front fee for Highland to do this, of its reasonable expenses?

MR. PARKINS: Judge, I mean, here's --

THE COURT: I mean, that would have set the leverage, because then Appaloosa would have really have known that the Court was taking it seriously, and --

MR. PARKINS: First of all, the debtor would have to agree, that was not the debtors' strategy, the debtor was to use one against the other. And, second of all, we only had seven days, there was only a seven day windmill.

THE COURT: Right. No, I understand. But even --

MR. PARKINS: The debtor didn't want to do it.

THE COURT: But even -- well, was it asked?

MR. PARKINS: I don't -- I can't remember if it was asked or not, I don't know.

THE COURT: Okay. Because courts have in the past, you know, approved a -- something less than a stalking horse

fee to get people in the door.

MR. PARKINS: I think looking at the debtors' pleadings, when they filed in the middle of July and what actually happened, it was a very tough stressful time for the debtor to try to regroup, and try to put something together. And I think issues of going to court and getting someone -- fees blessed in advance was just something that no one was thinking about in the context of the intense negotiations going on in a seven-day period. It wasn't a seventeen-day period, it was a seven-day period what was going on there.

THE COURT: Okay.

MR. PARKINS: Thank you.

THE COURT: Okay.

MR. MEISLER: Your Honor, Ron Meisler on behalf of the reorganized debtors.

Mr. Parkins' presentation was very interesting, and I appreciate the explanation of where Highland is coming from. But I think what you cannot give a short trip to is that this was a process that was not ten days long. This started in -- at the end of 2006. And in December of 2006 when we were dealing with the original EPCA --

THE COURT: Let me make sure, when you say "this" what are you referring to; Highland's work or what?

MR. MEISLER: The negotiations with Appaloosa in particular.

THE COURT: Okay, all right.

MR. MEISLER: Together with Highland. Highland came in mid-December as we had already submitted our original EPCA for approval. And our original EPCA contemplated fees of approximately seventy-six million dollars.

Your Honor, at that time, and this is important for a benchmark, Highland also submitted an unsolicited bid. And the fees in that bid were 117 and a half million dollars.

When we were going through the process of getting approval of the original EPCA, we received a barrage of objections in particular to the fees. The unions objected, the creditors' committee objected, the equity committee objected, the ad hoc trade objected, and Highland objected as well. The pressure on the fees and the discussion on the fees of Appaloosa took place over the period of time from when the original EPCA was approved to the time when the amended EPCA was approved. We were in discussions with Appaloosa all the way through that period. And the reason -- or at least among the reasons why the original EPCA was not consummated was that one of the major parties in the original EPCA decided that the investment was not for them. So we didn't lose our anchor investor, we didn't lose Appaloosa, but Appaloosa needed to reconstitute the members of its investment group.

And, in addition, part of the discussion was lowering the investment; the amount of the investment. The amount of

the investment was reduced from a 3.4 billion dollar investment to a 2.55 billion dollar investment.

And it was the pressure that we were able to exert on account of the objections filed by all these constituents. And, in particular, the creditors' committee and equity committee. And the pressure that we were able to exert on account of the need to have the support of the statutory committees that was key to reducing the fees.

THE COURT: Well, I'm sorry. But there was no objection to the fees in the reconstituted EPCA, right?

MR. MEISLER: That's correct, Your Honor.

THE COURT: And so what in the record shows that the committees and the union objections led to the reduction of fees? I guess you're saying there isn't anything because the fees were consistent.

MR. MEISLER: That's correct. Your Honor, we had a benchmark. We knew, and Appaloosa knew, and our board knew that we tested -- Appaloosa tested what was the outer limit it supposed that it could get on the fees. And there was no chance that the statutory committees or our board was going to allow Appaloosa to test that limit again. And so it was the pressure that we were able to exert on account --

THE COURT: Do we have anything in the record that actually says that?

MR. MEISLER: We don't, Your Honor.

THE COURT: It's just the fact that the fees stayed the same ratio or roughly the same ratio.

MR. MEISLER: That's correct, Your Honor.

THE COURT: They actually went down a little bit in terms of the ratio.

MR. MEISLER: Uhh --

THE COURT: No, no, I'm sorry, they went up a tiny bit.

MR. MEISLER: It went up a fraction.

THE COURT: Yeah.

MR. MEISLER: That's correct, Your Honor. And part of what happened was they separated out -- they added a different fee, and that's why -- that's the discrepancy between Mr. Parkins' nineteen million dollar savings versus the approximately thirteen million dollar savings. But there was an arrangement fee that was added that was approximately six million dollars. And so the aggregate savings was in absolute terms about thirteen million dollars.

But there were many more factors at stake. And the biggest issue here, Your Honor, is that the burden of proof, which is the standards set forth in the Dana case, 390 B.R. 100 at 108, the standard that's set forth is that the burden of proof is on the applicant to demonstrate by a preponderance of evidence that it has made a substantial contribution in the case.

So, Your Honor, what my position is is that it's Mr. Parkins that has to prove that Highland caused the reduction. What he's telling the Court and what he shows in his papers, is there's circumstantial evidence. But that doesn't get over the burden of proof of that the preponderance of evidence, that he was the cause. There's case law that talks about -- and, Your Honor, we've discussed this in prior substantial contribution applications. Even if there's some portion of the cause that can be attributable to a party seeking substantial contribution, one would have to be able to quantify or allocate what portion of the substantial contribution is directly on account of the party seeking substantial contribution.

The other issue with respect to the fees that I'd like to highlight, and, again, I'm looking back to the Dana case, as well as In re Granite Partners, is that there is a heavy burden imposed upon a creditor in its need to show that, in fact, it made a direct contribution, as opposed to an indirect contribution, or an indirect benefit, flowing from actions that is taken to further its own interest in the case.

This is a perfect example of a bidder that is trying to win -- and I realize it's not a formal auction, but there was an auction. There was an informal auction and process. And to the extent that Highland played a role in improving terms of the amended EPCA suppose, those improvements were an indirect benefit to Highland in its pursuit of Delphi as a

target.

So, Your Honor, I guess to be clear, when Mr. Parkins says that there was no leverage without Highland that this was a carpenter without a hammer, Your Honor, we had leverage, we had the creditors' committee, we had the equity committee, and we had Delphi's board. In addition, we had many other constituents; the ad hoc trade. And, yes, Highland did object. And we had the U.S. Trustee, as well, that was also in support of reduced fees.

Your Honor, finally, I'd also like to address Mr. Parkins' comment about the Sheehan/Sherbin e-mail exchange. And, Your Honor, I'd like to make a mention that that exchange was in the midst of the freezing up of the credit market, where Delphi was focused intently or intensely on getting the subscriptions that it needed to fill the exit financing. The e-mail exchange did contemplate that the transaction with Appaloosa would close. That transaction was a par plus accrued situation, where there is much more liquidity; there was much more funding available for parties. We're now in just a completely different circumstance, which was not contemplated by that e-mail exchange.

THE COURT: Well, I -- maybe I'm missing something but when I reviewed -- this is more a question for Mr. Parkins. When I reviewed the e-mail exchange, as far as what Mr. Sheehan says as far as supporting substantial contribution, it seems to

be completely nebulous. I mean, he says he'll support something. I mean, I'm not -- am I missing something, was there any real discussion of what that would be?

MR. PARKINS: Your Honor, when I get a chance to respond I will discuss that.

THE COURT: Okay, all right. All right. And, again, it's clearly in the context of negotiations over getting the commitment.

MR. MEISLER: And, Your Honor, I actually would like to talk about that for a moment. And that is that as this Court knows there were circumstances where we did agree, to either not object or to support a substantial contribution.

I was involved in this case from before the filing until now, and I'm still very involved. The first time I ever saw the e-mail was when Mr. Parkins filed it on behalf of Highland. And my point is, specifically, that normally when there is an agreement of that sort and it becomes, let's suppose a binding agreement, there's disclosure to the Court. There's an agreement that's approved by this Court. This was an e-mail exchange regarding the fee review committee. And that Mr. Sheehan, in his role as a member of the fee review committee, would support the substantial contribution application. This was not Mr. Sheehan talking about him as representing the reorganized or the debtor, that Delphi, in front of this Court, would support his substantial contribution

application.

Your Honor, if you have any further questions for me, I'm happy to answer. Otherwise, I would ask the Court permission for Ms. Leonhard to take the podium.

THE COURT: Well, why don't you do that.

MS. LEONHARD: Good morning, Your Honor. Alicia Leonhard for the United States Trustee, for the record.

Your Honor, Highland has not met its burden of proof showing that it was acting -- it was not acting in its own self-interests. It's clear that from the very beginning, obviously, Highland wanted a deal with the debtors. Highland wasn't in this for altruistic reasons. And any benefit that was incurred was indirect. And I think that counsel, essentially, admitted that in its argument by saying the debtors were negotiating and Highland gave the debtors a tool. And that Highland was not involved in the negotiations on the amended EPCA, which is, in essence, what led to the approval of the amended EPCA.

So -- and I think if you look back at the pleadings and the affidavits that Highland filed in July 2007, the period we're discussing, every pleading was tailored to give notice that it has a proposal, that the debtor has approved it, that it's better than Appaloosa's proposal. And so it's main purpose was to get its deal approved.

And so, therefore, Highland has not met its burden of

proof that it provided a substantial contribution to the estate.

Unless the Court has questions we have nothing further.

THE COURT: Okay.

MS. LEONHARD: Thank you.

THE COURT: Thanks.

MR. PARKINS: May I respond, Your Honor?

THE COURT: Yes.

MR. PARKINS: Thank you. Your Honor, I'm going to refer to the deposition, I do want to make part of the record the Court considers here.

THE COURT: Okay.

MR. PARKINS: I refer to the deposition, it was taken on July 14 of this year by counsel for the debtor.

THE COURT: Of Mr. Donohue?

MR. PARKINS: Yes, Mr. Daugherty.

THE COURT: Daugherty, I mean, sorry.

MR. PARKINS: Yes. It's on page 26. And I'll just read, it's very brief, it won't take me but two or three minutes, if I may. Starting on line 4, page 26.

"Right. Right, I just want to talk for a moment about the e-mail exchange with Mr. Sheehan that you included in your supplemental filing."

"A. Okay.

"Q. This was the first time that supplement -- this is the first time we've seen it, we here are not familiar with it. I just want to ask you a question. I'm correct that the written communication was something that you were asking Mr. Sheehan for by way of confirmation in connection with Highland's agreement to participate in the exit financing syndicate, is that correct?

"A. No. They are really not linked. They really weren't linked. What I was talk -- taking the opportunity was just to reconfirm that that was still the case that they were going to support it. Sheehan had told me that they were going to support a petition for fees, that he thought we added value to the case specifically when we made our, you know, our plan proposal, I guess around July. You know he was very thankful and appreciative of that. He was able to use it to get a better deal out of Appaloosa.

And, again, that's another thing. When I told him after that and I think you even referenced this when we said we were -- I told him look, you know, we're going to walk away from this thing with class and dignity. We're not going to fight for the sake of fighting. You guys have made your choice. GM had already made to clear to us they weren't going to pick Highland. And I said look, you got a better deal out of it."

That continues through page 27, line 10.

That addresses, I think the question Your Honor raised. It has not been refuted by any evidence, not been refuted by any declaration by Mr. Sheehan or anyone else, Mr. Sherbin, by anyone. That is the evidence in the record.

That's what Mr. Sheehan and is there all -- anything Mr. Daugherty testified --

THE COURT: But it is hearsay, right?

MR. PARKINS: I'm sorry, I didn't --

THE COURT: It is hearsay, though, right?

MR. PARKINS: Yeah. Anything Mr. Daugherty said, Mr. Sheehan said is an admission by the CRO of the company at that time, therein. It's a matter of evidence. Thank you.

MR. MEISLER: Your Honor, we agree with you. We also think -- there's really two points here. Number one, we think the e-mail speaks for itself. And we think if Daugherty was here we would cross-examine him on that point.

But, in fact, we actually like the admission by Mr. Daugherty. Because if Mr. Daugherty is correct, just suppose for argument's sake, well, then, there's no consideration for the agreement between Mr. Sheehan, supposing it is an agreement.

THE COURT: Well, it would be an enforceable. I mean, Highland's not arguing that this is an enforceable agreement.

MR. PARKINS: That's right. I'm just arguing he acknowledged it was a benefit --

THE COURT: Right.

MR. PARKINS: -- given at the time that Highland did it. When it's a threshold I have to meet, was there a benefit.

THE COURT: But -- okay.

MR. PARKINS: And the debtor admitted it was. Mr. Sheehan admitted it. Thank you.

MR. MEISLER: Your Honor, I also want to point out there's something that's important to mention with respect to this deposition transcript in particular, that Mr. Daugherty mentions that GM wasn't going to support Highland. And that's true.

And the problem with that admission is that it's something that Appaloosa knew too. And so while it's easy for Mr. Parkins to stay that Highland was ready to close, Highland was there. Number one, we have no idea, they had the same outs that Appaloosa had.

But the other issue is that in the negotiations there was a significant concern about closing risks. And so it wasn't the pressure that Highland was exerting on account of its bid, but rather, it was all the other forces at play that enabled the debtor to reduce the fees and to improve the terms of the amended EPCA relative to the original EPCA. Thank you, Your Honor.

THE COURT: Okay. All right. I have before me a motion by Highland Capital Management LP for allowance and

payment of a claim under 11 U.S.C. Sections 503(b)(3) and (4) for the fees and expenses of its counsel in this case, in a specified amount. The fees being slightly under 1,700,000 dollars and expenses slightly over 50,000 dollars. For in the terms of Section 503(b)(3) of the Bankruptcy Code making a substantial contribution in this case.

The facts are in relevant part, I think, clear from the record. Highland was a substantial party-in-interest in the case, as well as a prospective funder of a Chapter 11 plan for the Delphi debtors. Under which, pursuant to its plan funding proposals it would acquire a substantial amount, and effectively, a controlling amount of the reorganized debtors' shares.

It first made such a proposal in connection with an objection to a proposal by another prospective plan funder, or more accurately, a group of prospective plan funders led by an entity called Appaloosa.

The original Appaloosa proposal which has been termed the EPCA; E-P-C-A, drew many objections, not only from Highland Capital but also from the official creditors' committee, the official equity committee, the United States Trustee and the debtors' major unions. There were some modifications to that proposal, and it was ultimately approved by the Court.

The proposal contemplated, as is relatively typical with such proposals, that the prospective investors receive up-

front fees in return for their commitment to the proposal and the debtors are correct in asserting that one of the major elements of the objections to the original EPCA related to those fees. There should be no reason why that -- or no doubt or question as to why that was the case. One of the other -- or, frankly, the other major objection to the Appaloosa EPCA proposal was that it had too many contingencies or conditions in it. Given that concern, obviously, parties-in-interest in the case had a concern about the debtor paying out too much money up-front, given the risk that the transaction might never close and that money would not be recoverable.

In fact, that is what happened with the original EPCA. One of the investors, or one or more of the investors, but I believe just one, either reneged or exercised its rights to terminate its participation in the EPCA. Which led to a legitimate concern on the debtors' part and other parties-in-interest in the case's part, that the EPCA would collapse. Which led and it turned to a renegotiation of the EPCA, still led by Appaloosa on the investor side.

In connection with that renegotiation Highland, again, surfaced on short notice. And, again, proposed an alternative to the EPCA transaction. This now was in July of 2007.

Highland contends as the basis for its substantial contribution request that its resurfacing as a legitimate and credible alternative to a renewed transaction with an

Appaloosa-led group materially improved the terms of what the debtors ultimately negotiated with that reconstituted Appaloosa-led group, which became the second EPCA, pursuant to which the debtors confirmed a Chapter 11 plan.

That EPCA also ultimately collapsed. And the plan upon which it was premised never went effective. Recognizing that fact and, I believe, tacitly recognizing that the substantial contribution analysis as far as its construction of whether there is a benefit or not to the estate is retroactive. That is viewed in hindsight.

Highland has limited its 503(b)(3) and (b)(4) request to the work it did in connection with the July 2007 negotiations over the EPCA, which it claims gave the debtor leverage to provide for a reduced up-front set of fees to Appaloosa.

It is acknowledged by the debtors that the commitment and other fees to the Appaloosa group were, in fact, reduced under the second EPCA from the similar fees under the first EPCA by approximately thirteen million dollars -- slightly under thirteen million dollars, which is, obviously, substantially more than the amount of Highland Capital's 503(b) request.

On the other hand, the amended EPCA fees, again, appears to be agreed were 2.5 percent of the proposed total investment under the amended EPCA. Whereas, the comparable

fees, at least those fees that would be required to be paid up-front, were approximately 2.24 percent of the proposed total investment under the original EPCA. So that in that regard the amended EPCA fees were somewhat increased on a percentage basis from the original EPCA.

In any event, Highland's argument is that because of its presence as an alternative credible bidder or buyer, it gave welcome leverage to the debtor to negotiate reasonable fees up-front as well as a reasonable transaction on an amended basis with Appaloosa. It asserts without serious reputation that the debtor welcomed its presence as an alternative to Appaloosa, and as a basis to keep the Appaloosa group from being too greedy in its negotiations in July of 2007.

And in light of the foregoing it contends that its entitled to reimbursement of the fees and expenses it incurred that enabled it to be ready, willing and able on short notice in July 2007 to, in fact, be a credible alternative to the Appaloosa group.

It acknowledges -- that is, Highland acknowledges, that it did not do this merely as a strategy concocted with the debtors. But that, rather, it was, in fact, serious about becoming the plan investor and would have done so if, in fact, it had been chosen to do so. Frankly, if it did not do that it would not have been a source of credible leverage to the debtor.

Highland also acknowledges that it did no more than provide leverage to the debtor in the debtors' negotiations with Appaloosa. That is, Highland, itself, did not negotiate with Appaloosa to improve the terms of Appaloosa's deal. That's not something that the Court would have expected it to do. Generally speaking, debtors keep competing offerers separate and play them off against each other. In fact, some debtors have been known to play up the credibility of a competing offer beyond its actual credibility in order to induce the other offer, or to improve its position.

But, in any event, it was Delphi that engaged in the negotiations with the Appaloosa group, and Delphi that engaged in the negotiations with Highland. And, ultimately, determined that Appaloosa's modified proposal, which came about based upon each side's -- that is, Delphi's and Appaloosa's, perspective of what was fair at the time, was the best alternative. And Delphi subsequently sought Court approval of it and obtained such approval.

The standard for considering a substantial contribution application is in some respect very well established. The substantial contribution inquiry under Section 503(b)(3) and (b)(4) is factual with the movant; that is Highland, bearing the burden by a preponderance of the evidence. In re United States Lines, Inc., 103 B.R. 427, 429 (Bankr. S.D.N.Y. 1989).

The provisions policy of promoting meaningful creditor participation, and in some instance shareholder participation, in the reorganization process is clearly intention with a contrasting policy that provisions establishing administrative expenses; that is expenses that must be paid in full before payment of general unsecured claims, should be construed narrowly and that administrative expenses should be kept to a minimum. Id. See also In re Granite Partners LP, 213 B.R. 440, 445 (Bankr. S.D.N.Y. 1997), where Judge Bernstein stated "Substantial contribution provisions must be narrowly construed" including to "discourage mushrooming expenses" and "do not change the basic rule that that attorney must look to his own client for payment." Accordingly, "The integrity of Section 503(b) can only be maintained by strictly limiting compensation to extraordinary creditor actions which lead directly to tangible benefits to the creditors, debtor or estate." In re Best Products Company, Inc., 173 B.R. 862, 866 (Bankr. S.D.N.Y. 1994).

Other courts have made similar pronouncements, requiring that the movant must show "Actual and demonstrable benefit to the debtor's estate." That's In re Granite Partners, 213 B.R. at 445. Or requiring "A significant intangible benefit" or "a concrete benefit" or "direct significant and demonstrable positive benefit" or a contribution that is "considerable in amount, value or worth."

See In re American Plumbing and Mechanical, Inc., 327 B.R. 273, 280 (Bankr. W.D. Tex. 2005).

As that Court noted beyond the requirement that you've got to show a money's worth of benefit which Highland's application purports to show by the net reduction in dollars of the Appaloosa group's up-front fees. These synonyms or definitions do little to shed any real light on how to apply the direct benefit rule in practice. Id. at 280-81.

However, case law and the statutes plain meaning, I believe has narrowed the imprecision arising from such phrases, or, perhaps better stated, have made it clear that there is more than one element to the direct benefit requirement. That is, there must be a tangible benefit. And that that benefit must have been directly incurred, as opposed to having been incidental to the movant's actions in the case.

Thus, the case law, particularly case law in this district, has held that a direct benefit cannot be established merely by the movant's extensive participation in the case, or be based on services that duplicated those of professionals already compensated by the estate; such as counsel for the debtor or an official committee. In re Granite Partners, 213 B.R. at 446, and In re Dana Corp., 390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008).

Relatedly, as stated by Judge Lifland in Dana, "Creditors face an especially difficult burden in passing the

substantial contribution test since they are presumed to act primarily for their own interests. And efforts undertaken by creditors solely to further their own self interest are not compensable under Section 503(b). And services calculated primarily to benefit the client, do not justify an award even if they also confer an indirect benefit on the estate." In re Dana Corp., 390 B.R. at 108.

I don't believe that this last consideration depends upon the creditor's mere motive. Although, some courts have so held. See In re Pow Wow River Campground, Inc., 296 B.R. 81, 86 (Bankr. D. N.H. 2003). As well as In re DP Partners Ltd. P'ship, 106 F.3d 667, 673 (5th Cir. 1997) cert. denied. 522 U.S. 815 (1997).

I believe that the focus on direct benefit is really a focus on process. And, again, on the fact that the statute requires the movant's contribution to be in the case. That is, the entire Chapter 11 case. Which, I believe recognizes that, generally speaking, there are other parties who are compensated by the estate to conduct the administration of the case. First and foremost, the debtor, which deals with all the facts, or is supposed to deal with all the facts at hand in representing the estate. As well as official committees. Third parties, therefore, who are generally representing only their client's interests, only indirectly contribute to the case's administration and, therefore, wouldn't be compensated by the

estate on an administrative priority basis.

This is, again, recognized in In re Dana Corporation, where the court said "Compensation under Section 503 is reserved for those where an extraordinary circumstances, where the creditor's involvement truly enhances the administration of the estate." In re Dana Corp., 390 B.R. at 108.

In this regard it's also worth noting that the code, in addition to Sections 330 and 331, which provides for compensation of debtor's professionals and official committee professionals, has other sections dealing with when Congress thought it was advisable to have other constituent's counsel fees paid. See 11 U.S.C. Section 506(b), allowing oversecured creditor's claim for fees and expenses to be paid from collateral. Travelers Casualty and Surety Co. of America v. PG&E, 549 U.S. 443, 453 (2007) and Ogle v. Fidelity & Deposit Co., 586 F.3d 143, 149 (2d Cir. 2009). Both of which recognize the possibility of the allowance of a general unsecured claim for post-petition and attorney's fees provided for in a pre-petition contract.

And numerous cases which are upon motion and the opportunity for a hearing have permitted potential acquirers and/or plan funders to be compensated by way of breakup fees or expenses. Not only, although, this is the most common form of such compensation, out of the proceeds of a higher and better transaction, but, also, in some instances where the alternative

or prospective purchaser is -- I'm sorry. Prospective purchaser's due diligence is and of itself valuable to the estate. Instances where up-front compensation of a due diligence fee or an investigation fee by counsel has been sought and approved.

In light of all this the majority of cases where courts have allowed creditors substantial contribution claims under Sections 503(b)(3) and (b)(4) have found that the creditor played a leadership role that normally would be expected of an estate compensated professional, but was not so performed.

Primarily these involved instances where the creditor actively facilitated the negotiation, successful confirmation of a Chapter 11 plan. Or in opposing a plan brought about the confirmation of a more favorable plan. See generally In re Granite Partners, 213 B.R. at 446-447. See also In re McLean Industries, Inc., 88 B.R. 36, 39 (Bankr. S.D.N.Y. 1988).

There have been cases where a movant's actions directly led to a materially enhanced bid for estate assets. Such as the In re McLean Industries case that I've just cited as well as In re Baldwin-United Corporation, 79 B.R. 321, 344 (Bankr. S.D. Ohio 1982). But those cases did not involve competing bidders so much as they involved parties who uncovered an opportunity to obtain more value, from either an existing bidder or from the asset, itself.

Indeed, as noted by Judge Lifland in the Dana case the -- in many respects the paradigm of an incidental benefit conferred on an estate that would not be entitled to a substantial contribution award is that of a competing buyer or bidder in bidding on the debtor's assets, and almost by definition, leading to greater competition for those assets, and a higher or better price by the ultimate bidder chosen by the debtor and the court. See In re Dana Corp., 390 B.R. at 109-110.

Highland is correct that in some respects the facts of the Dana case, which also involved a substantial party-in-interest who was a competing alternative, or offered a competing alternative to the alternative ultimately accepted by the debtor, is not on all fours with this case. Unlike in the Dana case Highland was not apparently at any time a pest or a gadfly or a holdup artist, or whatever other adjective you want to use, which does come through the subtext of the Dana case.

On the other hand, I believe it was merely conferring an indirect benefit by its presence as an alternative buyer. Even if I accept that the dollar reduction of the up-front fees to Appaloosa conferred a direct benefit on the estate and ignored the fact that the percentage of the commitment changed relatively modestly and in Appaloosa's favor between the first and second EPCA, I view the leverage that Highland conferred on the debtor as simply another fact that the debtor took into

account, and that Appaloosa had to take into account in the negotiations.

I don't believe that it is, or was qualitatively different than any other leveraged point. Such as, for example, an improvement in Delphi's business would have been, if, in fact, for example, its main customer, GM, started to sell more trucks. And I believe that conferring 503(b) status on someone that provides leverage would open the door too greatly for other parties to make similar arguments based on their changing the facts on the ground that the debtor had to deal with and could use.

I also believe that the code contemplates other means for someone in Highland's position to bargain for up-front compensation in the form of a reimbursement, as I've noted in this situation. Although, of course, that is something that the debtor could disagree with or could refuse to provide. But, in any event, I don't believe that 503(b) is construed by the courts including the courts in this district contemplates the allowance of a claim based upon the conferral of leverage. Even if, in fact, the leverage did provide a real benefit to the estate.

It's suggested by Highland that the debtors' primary point person in the case; Mr. Sheehan, acknowledged that Highland made a substantial contribution to the case, and, therefore, that I should as well. Highland correctly notes

that one officer of the debtor, even one given the task of being the point person in the case, is not able to bind the debtor on this type of claim, but rather that Congress required there be a motion on notice with an opportunity to object, not only by the debtor but by other parties-in-interest, including as here, United States Trustee.

I also will note that while Mr. Sheehan was the point person in the case, at the time, at least, of the supposed acknowledgement, which was in March of 2008, I doubt he was particularly well versed in the law of Section 503(b). Moreover, I believe that the context of his supposed acknowledgement was very much in a case where his primary focus was obtaining participation in the debtors' exit financing, including from Highland. As the e-mails make clear, Mr. Sheehan was particularly grateful for Highland's committing 225 million dollars to that financing. And may have spoken rather loosely at the time.

But even if I accept Mr. Daugherty of Highland's recollection of his conversations with Mr. Sheehan, that are not, obviously, since they were conversations reflected in the e-mail, whereby Mr. Sheehan thought that -- or expressed his belief that Highland had been quite helpful as well as very professional in its dealings with the debtor in July of 2007. I believe, as I've said earlier, that Mr. Sheehan and anyone else on behalf of the debtor would have been grateful for any

fact that would have improved Delphi's bargaining position against Appaloosa, but that such facts do not serve as the basis for a substantial contribution claim.

Accordingly, while I don't doubt that the work that Highland's counsel did was valid and appropriate as counsel for Highland, I do not believe it's entitled to payment under Section 503(b)(3) and (b)(4).

I do not believe in light of this ruling I need to consider the debtors and the U.S. Trustee's second objection to the Highland motion, which is that a substantial portion of the request is not properly tied to any direct benefit that could have resulted from July 2007 negotiations because the work goes back much farther than that date. Since I've concluded that whether or not there was a benefit, and given the ratios, I believe that the better view is that there was not a direct benefit resulting in that thirteen million dollar reduction, since the reduction was based upon a ratio that actually went up. But, in any event, whether there was a direct benefit or not -- I'm sorry, whether there was a benefit or not, I do not believe it was direct but was rather indirect, and was in the nature of a fact that the debtor used through its counsel to negotiate with Appaloosa.

And that, again, if the Court started to award 503(b)(3) and (4) expenses on the basis of such facts it would open the door to substantial contribution requests by entities

that would simply be indirectly benefiting the debtor in any way, and, therefore, inconsistent with the case law and purpose of the statute that I've discussed.

So, Mr. Meisler, you should submit an order consistent with that ruling.

MR. MEISLER: Thank you, Your Honor.

MR. PARKINS: Thank you, Your Honor.

UNIDENTIFIED SPEAKER: Thank you, Your Honor.

THE COURT: Okay. Has counsel for FKMT arrived?

(No audible response)

THE COURT: Okay, thank you.

(Pause)

MR. TULLSON: Good morning, Your Honor. Carl Tullson of Skadden Arps here on behalf of the reorganized debtors.

The final item on today's omnibus agenda is the reorganized debtors' motion to enforce the plan injunctions against FKMT. That could be found at docket number 30364.

In December of 2008 FKMT, formerly known as Monarch Transport LLC, filed a complaint against Delphi in Missouri State Court seeking to collect on approximately 240,000 dollars of unpaid receivables allegedly owed by Delphi in connection with shipping invoices that became due between May of 2004 and September of 2007.

By way of background, Your Honor, on November 30th, 2007, over two years after the petition dates in these cases,

and nineteen months after the initial bar date notice was sent in April 2006, Monarch Transport LLC sold the majority of its assets, including the company name, and changed its name to FKMT LLC.

FKMT retained the outstanding account receivables, yet failed to file a claim, change of address or any other pleading in this court until they responded to our motion in July of 2010.

Because these shipping invoices became due and payable prior to October 6th, 2009, the effective date of the modified plan, the injunction contained in paragraph 22 of this Court's modification approval order and Section 11.14 of the modified plan, operates to stay FKMT's cause of action against the reorganized debtors. Moreover, the claims have also been discharged. Previously in February of 2006 FKMT's predecessor executed the release agreement with Delphi Corporation releasing its pre-petition claims. And with respect to the post-petition claim FKMT never filed an administrative expense claim in these cases.

Continuing with the Missouri litigation therefore violates the plan injunction.

Beginning in April of this year local counsel for the reorganized debtors made repeated attempts to negotiate an amicable dismissal or even a stay of the Missouri action on account of the plan injunction and its direction. These

attempts were unsuccessful and FKMT has refused to dismiss the district court -- the state court complaint against DPH.

Accordingly, on June 25th, 2010 DPH filed a motion to hold the Missouri State Court proceedings in abeyance on the grounds that the claims asserted in the complaint were discharged and enjoined pursuant to this Court's modification and approval order.

On July 17th, 2010 the Missouri court granted the reorganized debtors' motion to hold the state court proceedings in abeyance. Accordingly, the reorganized debtors' motion to enforce the plan injunction is properly before this Court.

FKMT responded to the reorganized debtors' motion, and that response is at docket number 20445. And filed two motions of its own.

Essentially, these three pleadings assert three reasons for why the reorganized debtors should be denied -- motion should be denied.

First, FKMT asserts that it did not receive proper notice of Delphi's bankruptcy or the applicable arguments.

Second, FKMT asserts that Delphi waived its right to rely on the plan injunction based on statements made in the state court litigation.

And, third, FKMT asserts that the administrative expense claims bar date does not apply to its claims for shipping invoices.

Your Honor, I briefly would like to address the first two arguments.

With respect to notice, it is clear that FKMT knew the of debtors' bankruptcy, because almost immediately filed, after the petition date, Scott Crader, who is Mr. Renkemeyer's former business partner at Monarch Transport LLC, entered into an agreement taking advantage of this Court's first day shipping order to pay ninety percent of Monarch Transport LLC's estimated pre-petition trade claim.

Furthermore, on February 17th, 2006, following the reconciliation of the debtors' books and records with FKMT's books and records, FKMT entered into a release agreement with the debtors whereby it agreed that it no longer had any pre-petition amounts owing.

THE COURT: Wait, FKMT did or Monarch did? I mean, the Monarch deal didn't happen till after that, right?

MR. TULLSON: That's correct, Your Honor.

THE COURT: So it was Monarch?

MR. TULLSON: It was Monarch Transport LLC.

THE COURT: Okay. So you're contending that FKMT must have know about that because Monarch was basically -- I mean, FKMT was basically a -- people from Monarch formed FKMT? I don't --

MR. MEISLER: Your Honor, just for clarification, they're the same company, it's just that they changed the name.

THE COURT: They just changed their name.

MR. MEISLER: Right. It was Monarch Transport LLC and then after the transaction --

THE COURT: The outsider was the one that bought Monarch?

MR. TULLSON: That's correct.

MR. MEISLER: That's correct.

MR. TULLSON: That's Osage (ph.) Holdings LLC.

THE COURT: Okay, fine.

MR. TULLSON: Moreover, FKMT asserts that they never -- that they filed a formal change of address with Delphi. The document that FKMT submits as evidence that it requested a formal change of address actually proves the opposite. It merely submitted an EFT remit authorization form. Which does not operate to change the address where notices are sent under the applicable 2004 master transportation agreement, or under the law.

Moreover, FKMT did not satisfy Bankruptcy Rule 2002's requirement to changing a mailing address. So simply Rule 2002(g) provides that if the creditor has not filed a request designating a mailing address under Rule 2002(g)(1) or 5003(e) the notices should be mailed to the address shown on the list of creditors or scheduled liabilities, whichever is filed later.

Each of the bar date notices, including the notice of

effective date, were sent, both to the notice listed on the debtors' schedule, to the address listed on the debtors' schedule, as well as to Monarch Transport LLC's business address; 1616 Argentine Boulevard, Kansas City, Kansas 66105.

Therefore, we believe that FKMT as the successor to Monarch Transport received adequate notice, both in the bankruptcy filing and this Court's bar dates.

With respect to the waiver argument, FKMT also argues that the reorganized debtors waived their right to rely on the plan injunction and this Court's bar dates, based on Delphi Corporation's April 16th, 2009 interpleader filed in the Missouri action, which they assert specifically knowledge that a portion of the invoices in the Missouri action had not been paid.

The so-called acknowledgement hover was explicitly subject to review of the debtors' books and records. Moreover, the very correspondence FKMT points to in reliance of the debtors' alleged acknowledgement states that Delphi had no proof that these loads were ever actually delivered. That's attached as Exhibit D to our response.

Accordingly, the statements in Delphi's interpleader, cannot and do not, constitute a waiver of the plan injunction or the administrative expense claims bar date.

In addition, the reorganized debtors never represented or even suggested to FKMT that it did not need to comply with

this Court's orders.

Moreover, the modified plan provides that each holder of a claim, whether or not asserted, was deemed to have waived, among other things, its right to assert the claims against the debtors should be allowed absent an applicable filing in the bankruptcy court.

Your Honor, we address each of these arguments in more detail in our omnibus reply at docket number 20670. I'd be happy to answer any questions Your Honor has for the reorganized debtors. Otherwise, with your permission, Your Honor, counsel for FKMT is here today and we would be happy to let FKMT present its motion for a declaration that the administrative expense claim bar dates does not apply to its claims for post-petition shipping invoices. That motion is at docket number 20482, as well as its motion to lift the plan injunction at docket number 20444.

THE COURT: Okay.

MR. RENKEMEYER: Good morning, Your Honor. Troy Renkemeyer for FKMT.

THE CLERK: (Non-audible comment)

MR. RENKEMEYER: Troy Renkemeyer, R-E-N-K-E-M-E-Y-E-R.

I would first like to apologize for being late, Your Honor, this morning.

THE COURT: That's okay.

MR. RENKEMEYER: I went to the wrong --

THE COURT: I understand you went to the Manhattan courthouse.

MR. RENKEMEYER: Yes, I'm from Kansas City, so I -- I wasn't even aware that there were to different divisions.

THE COURT: It's okay.

MR. RENKEMEYER: So --

THE COURT: As you can tell I had another matter on, so there was no delay.

MR. RENKEMEYER: I'd like to begin by describing a little bit more about what happened with the transaction with what we called Old Monarch and New Monarch. I think there was a misstatement a second ago.

FKMT, formerly called Monarch Transport, who operated a trucking company at 1616 Argentine, sold it's assets to Osage Holdings LLC. The day after the sale per the agreement Monarch Transport, formerly called Monarch Transport, changed its named to FKMT, and Osage changed its name to Monarch Transport LLC. It operates at that same location; 1616 Argentine.

So there are two separate legal entities; FKMT, who as an address of 7500 College Boulevard, and there is Monarch Transport, with an address of 1616 Argentine. Two separate entities, both who have creditor claims with Delphi. They're own individual creditor claims with Delphi.

So our argument on the notice issue is that, one, we've never received actual notice of the administrative bar

date proceedings. We did, however, receive -- have actual knowledge and notice of the actual original bankruptcy proceedings filed in 2005. But we had never had any notices of anything after that. And --

THE COURT: When you say "we," you mean FKMT?

MR. RENKEMEYER: FKMT, yes.

THE COURT: And -- but the -- there was no forwarding instruction to the Oval (sic) company that changed its name to Monarch Transport to forward mail to FKMT?

MR. RENKEMEYER: Well, that's what -- I guess that's part of my argument, Your Honor, is that after the sale occurred litigation began in Johnson County Kansas.

THE COURT: No, that's not the answer to my question. Normally I would have expected that if there was going to be a sale like this and a survival of the selling company, and a name change to that effect, that you would have expected to get some mail for Old Monarch. No one had instructed or had any forwarding instructions for the mail?

MR. RENKEMEYER: Correct. There were and that's what that litigation was about.

THE COURT: There were what?

MR. RENKEMEYER: There were instruction.

THE COURT: Okay.

MR. RENKEMEYER: Old Monarch -- as we call Old Monarch and New Monarch. New Monarch was to forward mail to us and

they did send mail. But that litigation was about the receivables that came to their location. And receivables that comes to our location that were their receivables. Because as part of that sale the accounts receivable were not sold to New Monarch.

THE COURT: Right.

MR. MEISLER: So litigation resulted involving Old Monarch receiving New Monarch's receivables, and New Monarch receiving Old Monarch's receivables. The big part of that were Delphi receivables.

THE COURT: But, again, as far as mail not being forwarded, is there anything in the record to suggest that mail wasn't forwarded?

MR. RENKEMEYER: Yes. Mail had -- we had never been forwarded notices from Monarch Transport. I believe, partially, because it was addressed to Monarch Transport at that address and they may have believed that it as for their -- you know, notices for their creditor claims against Delphi. As they had creditor claims against Delphi they probably believed that it was addressed to them and it was for their benefit.

THE COURT: Well, they knew that -- I'm sorry. The accounts receivable stayed with Old Monarch, right, FKMT?

MR. RENKEMEYER: Correct. Correct.

THE COURT: So --

MR. RENKEMEYER: You see New Monarch shipped for

Delphi as well.

THE COURT: I understand.

MR. RENKEMEYER: They had their own creditor claims.

THE COURT: For new stuff.

MR. RENKEMEYER: Correct.

THE COURT: So wouldn't the bar date notice be for Old Monarch?

MR. RENKEMEYER: It could have been for Old or New Monarch. They both had creditor claims prior to administrative bar date.

THE COURT: Well, I guess what I want to understand is when you say -- although, I'm not sure there's any affidavit that says this, that FKMT didn't receive notice. Is that because the notices that FKMT got were addressed to Monarch Transport LLC, or literally, that FKMT didn't get any notice of any bar date?

MR. RENKEMEYER: FKMT has never received notice -- the first knowledge we've ever had of the administrative claims were when outside counsel for Delphi notified us in the spring of 2010 this year that they were requesting -- or demanding us to dismiss our action because of the bankruptcy. We had no knowledge of these proceedings before that date. And Delphi has had actual knowledge of our name change and our address change. They were given written notice hundreds of times, telephonic conversations, e-mail about this issue.

In fact, the case that they're involved with in Jackson County Missouri with FKMT and New Monarch centers on that very point. The point of that case that Delphi's been a part of for two years now is the fact that we moved out of that space. Our name is FKMT, that there's a new company called Monarch Transportation LLC at that address. And that receivable -- and that payments from Delphi went to the wrong locations. They are in the middle of that case, and that's the center point of the case. They've been on actual notice of that for two years. For them to say that they've not had actual notice of our name change and our address change is ridiculous.

THE COURT: Did -- now you've acknowledged that FKMT had notice of the bankruptcy and of the pre-petition bar date, right?

MR. RENKEMEYER: Correct.

THE COURT: Okay. And that was because that was received by Old Monarch and FKMT was aware of it?

MR. RENKEMEYER: Old Monarch -- we received that in 2005 --

THE COURT: When it was just Monarch.

MR. RENKEMEYER: -- when it was just Monarch and we signed the agreement to have ninety percent of them paid to continue shipping for Delphi.

THE COURT: Okay. Now, you've just told me that

FKMT's address is at 7500 College?

MR. RENKEMEYER: Yes.

THE COURT: Suite 900, Overland Park, Kansas.

MR. RENKEMEYER: Yes.

THE COURT: Now, that's what -- I've seen the e-mails that were attached to your motion. And they are addressed -- they list your address as Troy D. Renkemeyer, CPA, LLM, Partner, Renkemeyer Campbell LP, The Tax Lawyers. And then it has that address?

MR. RENKEMEYER: Correct.

THE COURT: And then it has a website address underneath that, which is www.RCWlawfirm.com.

MR. RENKEMEYER: Correct.

THE COURT: So that's also the law firm's addressed?

MR. RENKEMEYER: Yes. I mean, I personally was a partner of Monarch Transport.

THE COURT: Right.

MR. RENKEMEYER: Okay. And so after the sale we just moved our formal address to my office for winding-up purposes. Collecting the receivables and winding up the business. We had no idea it would take three years.

THE COURT: Did FKMT ever file anything in the bankruptcy case stating that that was the new address?

MR. RENKEMEYER: Your Honor, we had no idea that the bankruptcy case was going on.

THE COURT: Well, you just said you were aware of it and you got the bar date notice.

MR. RENKEMEYER: Sure, the original filings in 2005 we were paid our amounts owed to us and we were being paid month-to-month for two/three years after that, operating the trucking company before our sale. We had no information about -- or no need to know that there was a bankruptcy action still occurring because we were being every month from Delphi. And so we didn't follow the action, we didn't realize it was still going on, we were not part of it. And, so, no, we did not have any knowledge that it was being continued. And we sure did not have any notice or knowledge that we had -- that we had to file an administrative claim by a certain date. We had never gotten that notice.

And I guess our major argument is that Delphi has been put on actual notice a hundred times, written notice, that we changed our name and our address. I mean, outside counsel for Delphi --

THE COURT: Well, when you say you changed your name and address, the notices that I've seen attached say to send communications to you, a lawyer. That would be like, you know, Mr. Meisler saying send all communications to Delphi to me. Although, it doesn't really say that, but it does say this is where you should send the information to.

MR. RENKEMEYER: But other that, they have actual

knowledge of our -- of the company, itself, changing it's actual place that it receives mail and notices.

THE COURT: How?

MR. RENKEMEYER: Through the filings in Jackson County Court that they're a party of in that suit, it specifically states that.

THE COURT: But you understand that that suit was filed after the bar date, right?

MR. RENKEMEYER: No. It was filed two years prior to the bar date.

THE COURT: No, the pre-petition bar date that you got.

MR. RENKEMEYER: Correct.

THE COURT: And that suit seeks collection of pre-petition amounts?

MR. RENKEMEYER: No.

THE COURT: It doesn't?

MR. RENKEMEYER: No, our suit --

THE COURT: It says it seeks amounts starting from 2004.

MR. RENKEMEYER: The reason why it seeks those amounts -- the reason why it states that is we -- our records show invoices that were all post-petition deliveries. After doing a reconciliation with Delphi a couple of years later when this case began that we filed against Delphi in Jackson County

Missouri, we did a reconciliation with Delphi on it, and they had different records of what invoices that they had originally paid. We applied the payments differently than they applied payments in their records. Leaving some of the post-petition invoices paid per their records, and pre-petition invoices unpaid per their records. Where we have on our records all of them were post-petition.

So we claim that all of those invoices were actually post-petition invoices that are outstanding. Even though Delphi refers to some of them as pre-petition invoices.

THE COURT: Well, let's look at the complaint.

(Pause)

MR. RENKEMEYER: Even with that, Your Honor, most of the invoices that we're speaking of are post-petition.

THE COURT: I’m not talking about most. But I'm trying to figure out what you were doing, and what you knew. I mean, you said you knew about the bar date --

MR. RENKEMEYER: Not the administrative bar date.

THE COURT: I've looked at -- no, you knew about the pre-petition bar date, I understand. And Exhibit A included invoices which you say Delphi's acknowledged haven't been paid from 2005 -- 2006.

MR. RENKEMEYER: Correct. The October bar date in 2005 there were some of those invoices that they viewed were pre-petition invoices.

THE COURT: Right. And the complaint looks to collect on them. I mean, it was clearly pre-petition invoice because it's dated that date.

MR. RENKEMEYER: Except that we believe that that invoice -- we included pre-petition invoices and the post-petition invoices in that suit in Jackson County so they would all be covered in the suit. And they could -- we could show that the amounts owed in the post-petition invoices were the total amount owed to us, and that we wouldn't have to collect on the pre-petition. But in the alternative -- in the alternative we could argue that if their books and records were to be used, that they were those pre-petition invoices.

THE COURT: Right. Okay. So, again, then, you didn't file anything in the bankruptcy case?

MR. RENKEMEYER: No, we didn't because we were being paid all the amounts we felt was owed to us at the time.

THE COURT: Is there anything that states in the record that the address of Old Monarch has been changed to the College address?

MR. RENKEMEYER: Yes.

THE COURT: Okay.

MR. RENKEMEYER: Several places.

THE COURT: And I want to distinguish between changing the address to saying you should send correspondence to me, the lawyer.

MR. RENKEMEYER: Correct.

THE COURT: Okay. Where is that in the record?

MR. RENKEMEYER: Well, for one, we filed -- there's this Delphi claim form -- when we first initiated discussions with Delphi about how to collect -- I mean, or how -- try to collect the amounts that were still outstanding, they said well, you need to go to the Delphi help desk. We went to the Delphi help -- to change the information in our system about your address. So we went there. They forwarded us this form that we filled out. And this form shows the new address on it. And we felt -- we were told that this would change in the database of Delphi our name and address. So this was filed --

THE COURT: This is Exhibit F?

MR. RENKEMEYER: Your Honor, I'm not sure which exhibit in the filing it is and I don't have that up here.

THE COURT: Is this the one that says please complete and return this electronic funds transfer authorization form?

MR. RENKEMEYER: Yes.

THE COURT: How is that a claim form?

MR. RENKEMEYER: No, not a claim form. It's additional evidence that we put Delphi on notice of our change of name and address.

THE COURT: Well, but this says FKMT LLC c/o Troy Renkemeyer at an e-mail address that is Renkemeyer at RCWlawfirm.com.

MR. RENKEMEYER: Your Honor, on the left side there it's the name and the address. The company name and the remit address.

THE COURT: I understand. But you're obviously a lawyer, right?

MR. RENKEMEYER: Correct.

THE COURT: Okay.

MR. RENKEMEYER: There are also in the actual --

THE COURT: Do you represent other clients besides FKMT?

MR. RENKEMEYER: Yes. The FKMT, like I say, that was a company that I was a part owner of. But there are other written notices to Delphi of our name change and address. There are hundreds --

THE COURT: Are they in the record?

MR. RENKEMEYER: No, they're not, and that is the point.

THE COURT: Okay.

MR. RENKEMEYER: We -- I brought some examples. But the actual -- the filing made in the -- in Jackson County Kansas, which includes Delphi as a party, specifically goes through the analysis stating that we changed our name, we changed our address to this. New Monarch changed their -- or Osage changed their name to New Monarch and their address is at 1616 Argentine. They actually continue to ship for Delphi.

Delphi sent -- as far as we're concerned Delphi sent them notices of the administrative bar date, not us. They had creditor claims against Delphi as well.

THE COURT: Then, again, you had -- you had -- you had requested them to forward mail to you, but you contend they didn't do it.

MR. RENKEMEYER: Well, that was a problem as part of the litigation, that they didn't do it. They've never forwarded us any mail after the first couple of months, after the transaction occurred due to the litigation that occurred at the time between us and them.

THE COURT: And you were aware of that?

MR. RENKEMEYER: I was aware of -- I was aware of what, Your Honor?

THE COURT: That they didn't forward mail?

MR. RENKEMEYER: Well, there's primarily -- it was three months after the sale. We weren't expecting any mail. We weren't operating a business anymore. We were simply winding down a business --

THE COURT: But you were collecting accounts receivable, people are supposed to mail the accounts receivable, right? To the --

MR. RENKEMEYER: No, Your Honor, they went to lock boxes at the banks.

THE COURT: Okay.

MR. RENKEMEYER: They went to the lockboxes at the banks, so receivables were never going to that address.

THE COURT: So what was the lawsuit about again, where you know they weren't sending you mail?

MR. RENKEMEYER: The lawsuit was about receivables being paid to our lockbox which they claim were theirs and vice-versa.

THE COURT: So it doesn't have anything to do with them forwarding mail to you?

MR. RENKEMEYER: No, it had to do with the issue -- the fact that we changed our name and address and, therefore, clients were sending them our payments, rather than sending our --

THE COURT: I thought it was supposed to go to lockbox.

MR. RENKEMEYER: Right. But some of them went to their address as opposed to ours, because they didn't know which invoices to pay to which company.

As far as we know there has not been notice sent to New Monarch and Old Monarch, simply one notice of the bankruptcy went out, not -- you know, to FKMT and to New Monarch.

THE COURT: And you got nothing out of the PO box?

MR. RENKEMEYER: Nothing was sent to the PO box from Delphi.

THE COURT: Well, there's an affidavit that says that it was?

MR. RENKEMEYER: That was not our PO box, that's New Monarch's. I mean, that furthers my argument, that that was a notice sent to New Monarch.

THE COURT: But I'm saying you got nothing forwarded to you from the PO box?

MR. RENKEMEYER: No. The PO box and their pleadings was not our PO box, that was --

THE COURT: I understand that. But did you get anything forwarded to you from the PO box?

MR. RENKEMEYER: No, we had nothing forwarded to us at all.

THE COURT: Nothing at all?

MR. RENKEMEYER: Nothing at all. We have never gotten anything from Delphi. We've had -- all of our correspondence from Delphi has been to my office for three years, with their inside counsel, outside counsel, dealing with our accounts payable division, but never anything involving a bankruptcy issue. Or any notice of the bankruptcy issue. They had -- clearly had notice that that's where -- to send information to us was at my office because they sent it to my office for two or three years. We believe that they sent that notice to New Monarch related to their claims, not to FKMT related to our claims. Even in their pleadings they stated that they sent

stuff to that PO box. Well, that had to be given to them by New Monarch, because it was their PO box, it was never out PO box.

THE COURT: It was the amount -- it was on the schedules, though.

MR. RENKEMEYER: That was never our PO box. That was a Kansas City, Missouri PO box. Our PO box has always been in Kansas.

THE COURT: Now, when you say "our," do you mean Old Monarch or --

MR. RENKEMEYER: Old Monarch. I'm not aware of what that PO box was, I presume it's New Monarch's because they had a Missouri-based PO box, where ours was Kansas-based.

But in my opinion, we had never received notice of this case, they have had actual knowledge of our address change.

THE COURT: Now, that can't be right. Because you say you did have notice of the first bar date?

MR. RENKEMEYER: I'm speaking of --

THE COURT: And of the case.

MR. RENKEMEYER: I'm speaking of we never had notice of the administrative claim bar dates or that we needed to file an administrative claim to protect our interest. We've never -- we've never had notice of those.

THE COURT: Okay, all right.

MR. RENKEMEYER: And so I guess the second point I'd like to raise is the whole waiver action. Even beyond the administrative bar date in September of -- I believe it's September of '09, we continued being told by outside counsel for Delphi that they intend to pay our invoices. And I've got evidence of that as well, that -- letters and e-mails after the administrative date bar date they continue to say well, yeah, we intend to pay you.

Another issue is the interpleader action. Not so much that that's a waiver, but they filed an interpleader action based on this whole issue that we moved out of our space in this whole issue. They filed an interpleader action but failed to put the funds in the court. We asked them numerous times to put the funds in the court as you're required to for the interpleader action, they never did it.

And then later they said okay, well, wait a minute, now we're going to say that the bankruptcy, you know, you should have filed administrative bar date. More like for what -- what's that and what's that related to, and they explained.

So if those arguments are not sufficient what we would like to have -- like to request is a legal court to file an administrative claim based on the excusable neglect standard that plaintiffs addressed in their pleadings. We feel that we meet the criteria for the excusable neglect. The factors that

the plaintiffs had cited in their pleadings, we feel that we meet those factors, because we had -- because of the fact that we had no actual knowledge and no notice, we feel that we were not in the position to, or in control of the situation causing the delay in filing the administrative claim. It was not -- it was not a delay that was -- can be pointed to as the fault of FKMT, in our opinion.

In any event, it was clearly neglect as opposed to willful conduct that caused the delay. We just simply didn't know about the bar date. So in the alternative, we request that we have -- are granted leave of court to file an administrative claim.

THE COURT: You're telling me as a lawyer appearing in this court -- by the way, you need to make a pro hac vice motion, have you done that?

MR. RENKEMEYER: No, I have not.

THE COURT: You need to do that. That you were not aware when these receivables were incurred that Delphi was in bankruptcy?

MR. RENKEMEYER: No, Your Honor, we were aware at the time they filed in '05 and '06 that they were in bankruptcy. In 2006 I was under the impression that they were no longer in bankruptcy -- I’m sorry, in 2010 -- in 2009, 2010, whenever these dates had past, we had --

THE COURT: Well, let's start with December 1, 2008.

Were you aware whether the debtor -- that Delphi was in bankruptcy when you filed that complaint in Missouri State Court?

MR. RENKEMEYER: I was not cognizant of it. I don't recall if I was aware of it at that time, or not. I was not cognizant of the fact that they were in bankruptcy.

THE COURT: What's the difference between being aware and not being cognizant?

MR. RENKEMEYER: I don't remember. I wasn't thinking about it. I may not have had actual knowledge or knowledge that they finished their bankruptcy process or not, I never thought about it. Because I didn't view as relevant because these receivables were post-petition receivables. And all my dealings with Delphi for the prior six months or a year before I filed that date, were that they intended to pay these receivables, it's a matter of figuring out which ones were still owed. And we couldn't get them to respond or do it, because we finally filed the action.

So I didn't believe it was applicable to us, because these were all post-petition invoices that we were claiming to be paid.

So I don't recall if I was aware or not aware. I've never followed the bankruptcy proceedings of Delphi. I just recall receiving the news that they filed the bankruptcy in 2005. Of course, scared us, we were a small business. And we

were relieved to be able to get the ninety percent deal done. But after that our understand -- and I'm not a bankruptcy attorney, Your Honor, so I don't -- I'm not well versed with all the Bankruptcy Code and the need to file administrative claims at certain points.

(Pause)

THE COURT: Okay.

MR. RENKEMEYER: So I guess to sum up our argument, we feel we've never gotten notice of the administrative bar date. And, therefore, it shouldn't apply. And this was after Delphi having actual knowledge -- written knowledge -- actual knowledge from written notice, and verbal notice, and hundreds of e-mails and discussions of our name change, and address change, and even being part of a lawsuit that was centered on that point. We still didn't get notice of the administrative bar date. And -- but in the alternative, under the standards for an excusable neglect, we feel we should be able -- request granted -- the Court to grant us leave of court to file the administrative bar date.

THE COURT: Okay. Do you contest Delphi's assertion that you didn't comply with the contract provision on giving notice?

MR. RENKEMEYER: Well, per the contract I agree with that. Except the fact that we did give them actual notice, like I say, many times in writing and verbal of the change and

the address and the name after we sold the business.

THE COURT: And, again, just for the record, is there anything in the record that says that notice, something other than you at your law firm?

MR. RENKEMEYER: Yes. The recor -- the pleadings in the Missouri case, for example, specifically state -- it doesn't mention anything about -- you know, this being moved to my law firm. It simply states that our address is now 7500 College Boulevard.

THE COURT: Can you show me where it says that in the complaint?

MR. RENKEMEYER: I'm speaking of the Missouri pleadings.

THE COURT: I know. In the complaint, in the Missouri complaint.

MR. RENKEMEYER: I'm not sure if I've got that here, Your Honor.

THE COURT: Well, it's an exhibit.

MR. RENKEMEYER: The Missouri complaint?

THE COURT: Yeah.

(Pause)

MR. RENKEMEYER: It may not be in the complaint, Your Honor, I don't recall specifically, but it was in motions for summary judgment that were filed. There were plenty of filings made.

THE COURT: Is that in the record?

(Pause)

MR. RENKEMEYER: There are other e-mails I got with me here that discuss the fact that we changed our name and location.

Outside counsel, as I say, they've been sending all the correspondence to this address; to Delphi.

THE COURT: Well, that's because you're the lawyer. But what -- why don't you show me the e-mails. I mean, outside counsel is supposed to deal with the lawyer for the plaintiff who --

MR. RENKEMEYER: Your Honor, in addition, the accounts payable --

THE COURT: -- once the lawsuit's been started.

MR. RENKEMEYER: Your Honor, in addition, the accounts payable division of Delphi -- let me step back. After we sold the business my partner Scott Crader moved into my office as well. It wasn't just -- my law firm office served as FKMT's office, as well, not just a law firm. He moved into my office for several months while he was helping wind down the business of Monarch. And so he dealt with Delphi mostly himself, not me, with accounts payable division. They sent their data to him at that office, not to me as a lawyer.

THE COURT: Do you have something that says that?

MR. RENKEMEYER: Your Honor, I don't with me here.

 THE COURT: Okay.

(Pause)

MR. RENKEMEYER: But there were motions for summary judgment filed back and forth in the Missouri case, where Delphi was a party, that talk about the center of the point being the fact that we moved out of the space. That FKMT moved out of that space. And that there was a new company there located -- called Monarch Transport at that address which caused the problems. That was the center of the suit. So they had knowledge that that company occupying that space was not our old company

THE COURT: Okay, you have those?

MR. RENKEMEYER: Your Honor, the petition, itself, which is the exhibit, argues that point. That was the point of the case was that we moved out.

THE COURT: But it doesn't say -- it doesn't give an address.

MR. RENKEMEYER: But clearly Delphi knew that that address at 1616 was not us. That Monarch Transport -- the company called Monarch Transport at that address was not us. They clearly knew that per that petition in that lawsuit.

THE COURT: All right. But you're aware the case law says that the debtor doesn't have to inquire as to the new address, right? The debtor has to be told of the new address. That's what all the case law says.

MR. RENKEMEYER: Right. And we believe we did tell them in multiple other forms.

THE COURT: That's what I'm trying to find out. So far all I have I think in the record are e-mails and this one form about electronic funds transfer that says they could communicate through you at your law firm.

MR. RENKEMEYER: Well, they were -- they told us that this is the form that changes their database on where to find FKMT. Not just as a lawyer, but as a company.

THE COURT: Where does that -- where is that --

MR. RENKEMEYER: That's what we -- we were told that's why we needed this form.

THE COURT: It's just an electronic transfer form. It's just where to pay -- you know, it's where to send the checks.

MR. RENKEMEYER: Well, I've got some of their e-mails if I can show you that, they told us that it was other than that.

Can I approach, Your Honor?

THE COURT: Yes.

MR. MEISLER: Your Honor, we'd like to see whatever he's submitting.

(Pause)

THE COURT: You can just hand them up to me. Or you can tell me about it when you go back to the podium.

The first one is in the record, that's Exhibit F I think, which is the EFT payment authorization.

(Pause)

THE COURT: Okay. I've gone through them. I've looked through them. You want them back so you can tell me what they mean?

(Pause)

MR. RENKEMEYER: Okay, Your Honor, the -- the first e-mail on the stack dealt with our request for how we change the information in your system, so we can get paid. And she said well, you go get this form and then she said you can change the bank name, account numbers, and it included the word address, as in our address. So that's what she was telling us this form did, was to change the address. Delphi's acknowledged receiving the form. So that's, in my opinion, at least we were being told that this was our method to tell them how to change our address in their system formally. So we thought we did.

There's another e-mail that discusses them getting this form so that they can get payment sent by EFT, which is what they're claiming that all this is for. And then it says "or by check." Which would be by mail. So get this form filled out so we would know where to send our check, is what it says.

There's another one, and these are all pre -- before the administrative bar date, so it shows that they had actual

knowledge that we were no longer at that address. And it helps show that this EFT form was -- we were told that this form is used to put them on notice of where to send mailings.

There's additional e-mails in here, two or three of them that you looked at that --

THE COURT: I'm sorry, what's the date of the second thing? The second e-mail, saying asking for the address?

MR. RENKEMEYER: Okay. They were both in February of '09.

THE COURT: Okay.

MR. RENKEMEYER: Before the administrative bar date.

THE COURT: Okay.

MR. RENKEMEYER: Showing that they had that -- and we filed the Delphi form before -- in earlier '09, giving -- showing that they had actual notice.

These other e-mails --

THE COURT: Well, when you say you filed it you sent it to whom?

MR. RENKEMEYER: EFT -- I'm sorry, to Delphi. And we've got the e-mails where they acknowledge getting it and they changed it.

THE COURT: Okay.

MR. RENKEMEYER: There's also these other e-mails here that you've looked at that show that there's multiple discussions going on with Delphi about the fact that there's a

new company in place at that address and how -- there's an issue as to who to pay what invoices to and where.

THE COURT: When you say the new company you mean the Oval (sic) company, right?

MR. RENKEMEYER: Yes, Old Monarch versus New Monarch.

THE COURT: Right.

MR. RENKEMEYER: And in addition this was discovery that was conducted in the Kansas -- I'm sorry, the Missouri case, where Delphi had actually mailed the physical check to that address to New Monarch at that address for New Monarch's invoices, payable to Monarch transport, mailed to that address for their invoices. So they knew that there's a new entity there because that's where they mailed payment for their invoices to.

I mean, all of this shows that clearly over two years of arguments in court -- two different courts, by the way, one in Kansas and one in Missouri that they were involved with. They were a party in the Missouri case; they were involved with the Kansas case as a witness for two to three years -- actually, two and a half to three years. The center point issue of all those cases and discussions were that hey, there's a different company now called Monarch Transport located at that place. We're over here so there's an issue on these receivables. They had to have known.

THE COURT: Well, that's the next point. Again, the

we're over here point, that's in the EFT form which is Exhibit F and the e-mails, right?

MR. RENKEMEYER: And the e-mails, lots of letters, not just to me as lawyer.

THE COURT: I'm just talking about what you showed me and what's in the record.

MR. RENKEMEYER: Correct.

THE COURT: Okay.

MR. RENKEMEYER: Your Honor, that's all I've got.

THE COURT: Okay.

MR. RENKEMEYER: Thank you.

MR. TULLSON: Your Honor, Carl Tullson for the reorganized debtors.

If I can briefly respond to a few of the points Mr. Renkemeyer made.

First, FKMT is no longer an operating entity. All of the invoices in dispute in the complaint were -- the last one was from September of 2007; two months before the sale. So to the extent that there was an issue with FKMT's internal mail forwarding procedures, that's not the duty of the reorganized debtors, or the debtors didn't make inquiry. And any correspondence there was a connection with where the EFT remit should be made, that was in connection with the litigation totally outside of bankruptcy.

Mr. Renkemeyer has not complied with Rule 2002.

Although he acknowledges receiving the initial bar date notice as well as that his former business partner signed the release agreement, pre-petition claim. And approximately 40,000 dollars of invoices, attached as Exhibit A to the complaint, do relate to pre-petition amounts.

The lawsuit was about the money, about the amounts that were allegedly owed, not about the address. Again, these were all pre-sale invoices.

THE COURT: Is there anything in the record to show that FKMT knew about Delphi's bankruptcy at the time of the -- either the starting of the lawsuit or the -- either the first or second administrative claims bar date?

MR. TULLSON: Again, Mr. Renkemeyer has asserted that he had mail being forwarded. And it was related to Delphi and the collection of those receivables. But as far as what's in the record we have the agreement signed by his former business partner at Monarch Transport LLC.

THE COURT: Who was also sharing the office.

MR. TULLSON: Who was also sharing the office. And we have --

THE COURT: But when was that agreement signed?

MR. TULLSON: That agreement -- there were two agreements. One was signed four days after the bankruptcy pursuant to the shipping order, at docket number 202. And the second agreement was in February 2006; February 17th, also

signed by Mr. Crader, which resolved the pre-petition claims which Mr. Renkemeyer is attempting to relitigate in the Missouri action.

Moreover, prior to the sale when -- before FK -- when Monarch -- FKMT was still Monarch Transport LLC, they were at the address at 1616 Argentine Boulevard. And that notice was received in April of 2006. The sale did not occur until over a year later -- a year and a half later.

THE COURT: No, he's acknowledged that they got that notice. That they got --

MR. TULLSON: And nothing was filed in connection with the bankruptcy alerting Kurtzman Carson Consultants; the debtors' claim agent, debtors' counsel or a formal change of address in accordance with the terms of the contract, notifying us that the notices should be sent anywhere else.

THE COURT: And Mr. Renkemeyer says that he didn't really pay attention, even though he was aware of that notice, because he believed that their pre-petition claim was resolved. What is the debtors' response to that?

MR. TULLSON: Well, again, the complaint was filed in December of 2008, years after the release agreement was signed. And attached as Exhibit A to the complaint was pre-petition amounts. So the record does not support the contention that he didn't know that there were pre-petition amounts outstanding and that he didn't know that Delphi -- or was not cognizant

that Delphi was in bankruptcy. It's not consistent with what was attached to the December 2008 complaint.

THE COURT: Okay. Is there anything in the record to show how Delphi went about noticing people of the administrative claims bar date?

MR. TULLSON: Well, the addresses came from two sources. One was the schedule and statements filed at the beginning of the case. And any subsequent bankruptcy filings where a creditor requested that notice to be sent to a particular address or filed a proof of claim. Monarch Transport was also listed on the debtors' schedules, which are attached as Exhibit E-1 and E-2 of our reply.

THE COURT: Was it -- but the debtor was dealing with a number people -- a number of entities that had post-petition accounts payable that may not have had pre-petition claims, how did you give notice to them?

MR. TULLSON: I guess -- I'm not sure that -- for example, Mr. Renkemeyer's asserted that New Monarch is a creditor. We don't have any evidence that they are still owed, and they would be paid in the ordinary course.

THE COURT: No, but your -- all but 40,000 of this is for post-petition amounts, right?

MR. TULLSON: Yes. But that was -- I guess it's whose burden it is to update --

THE COURT: No, I understand that. But in practice --

let's assume for a moment that there was nothing owing on pre-petition. And, in fact, that Mr. Crader had settled the pre-petition and released the pre-petition claims so, therefore, Mr. Renkemeyer shouldn't have brought -- shouldn't have concluded that in the complaint. So the only thing that he's suing on is the post-petition AR.

There must have been other trade vendors who only had post-petition claims against Delphi. How did Delphi give them notice of the bar date?

MR. TULLSON: Delphi has an internal registry -- a claims register of all their vendors and suppliers with whom they do business. But that list was updated between when we initially filed in 2005 and when the bar date notice -- the administrative claims bar date notice was sent out in 2009.

THE COURT: Okay. So why wouldn't these -- why wouldn't FKMT have appeared on that?

MR. TULLSON: Because as of the date of the sale FKMT was no longer providing goods or services, or shipping anything to the debtors. They were a shell company whose sole asset is --

THE COURT: So your contract was really with Monarch.

MR. TULLSON: That's correct.

THE COURT: So that's what would have shown up on your vendor list.

MR. TULLSON: That's correct. And that's why the

notices continue to be sent to that address.

And with respect to the argument raised in more detail today at the hearing, that he should be allowed to file a late claim on the grounds of excusable neglect, I think that's belied by the entire strategy we've seen here today. He filed a motion for declaration of the administrative claims bar date does not even apply to those types of claims. He can't even show that the neglect was excusable because it's not the result of neglect. It's a deliberate strategy that he, although having actual knowledge that Delphi Corporation was in bankruptcy, there was no action required on his part to the claims.

THE COURT: Well, he denies that. He says he didn't know that they were in bankruptcy in December of 2008 or thereafter.

MR. TULLSON: There's nothing in the record to support that he would have reason to believe that the bar date notice he acknowledges was sent to the address where he was doing business in April of 2006 was not received.

MR. MEISLER: Your Honor, it's also implausible that he admits that he has actual knowledge of the bankruptcy case. It's turning the law on its head that suddenly it would impose the obligation on the debtor to go chase after a creditor, especially in a large Chapter 11 case with thousands of creditors. When he knew of the Chapter 11 case, and he should

have done the scintilla of work that it would have taken to just double-check to see if the Delphi bankruptcy is still in the midst of its Chapter 11. It would have been very simple to figure out, it would have been a couple of key strokes on a keyboard to his computer. And he very quickly would have figured out that there was a still a Chapter 11 case pending.

And to be clear, Mr. Renkemeyer is a lawyer. This is not something that should be completely foreign to Mr. Renkemeyer, counsel to FKMT, formerly known as Monarch Transport LLC.

THE COURT: Okay. And what is the debtors' response to FKMT's contention that this EFT payment authorization was notice of the change of address?

MR. TULLSON: If you look at paragraph 17 of the master transportation agreement, there's a paragraph that says how notice will be provided. And then paragraph 223 of the master transportation agreement, it says that -- provides a mechanism for modifying that agreement. A request for where payment should be sent is not equivalent to changing an address for an entity whom the debtors no longer receive services.

THE COURT: Okay. Mr. Renkemeyer, what are the overall outstanding accounts receivable of FKMT?

MR. RENKEMEYER: From Delphi?

THE COURT: No, overall?

MR. RENKEMEYER: To be honest, I can't answer that.

We stopped pursuing receivables a couple of years ago. This was three years ago that the sale occurred.

THE COURT: All right. Well, three years ago what were they?

MR. RENKEMEYER: About -- right at the time of the sale roughly 1.2 million, I want to say.

THE COURT: Okay.

MR. RENKEMEYER: 1.4 million. Within sixty days they were down to a few hundred thousand, which is mostly Delphi. Within ninety days, maybe, something like that, if I recall.

THE COURT: Okay. Well, given that why didn't you notify Delphi directly that those should go there under the contract with Delphi?

MR. RENKEMEYER: We did, Your Honor, in every way we knew possible.

THE COURT: Well, but the contract's right there. I mean, it's --

MR. RENKEMEYER: We did. We called them, we had correspondence with them.

THE COURT: No, I'm talking about the specific merger agreement -- not merger agreement, the contract, itself, paragraph 17.

MR. RENKEMEYER: The contract between Delphi and FKMT?

THE COURT: And Monarch?

MR. RENKEMEYER: I'm sorry, and Monarch?

THE COURT: Yes.

MR. RENKEMEYER: We did notify them of this. I guess -- can I approach -- can I use the podium over here?

(Pause)

MR. RENKEMEYER: Your Honor, we did everything we thought we could do to put them on notice of our address change. We asked them how to -- how to change in their database our address. And they said go to the Delphi help desk. We went to the Delphi help desk, they gave us this form. We filled it out, we sent it to them. They acknowledged that they got it. That's what we thought, per their instruction, was the process to change the name -- our name in their registry of who we were. So I'm not sure what else we could have done, other than what we did at the time. I mean, sitting here today --

THE COURT: But why --

MR. RENKEMEYER: -- I'm not sure what would be different.

THE COURT: I mean, the notice provisions says all required notices shall be in writing and will be considered given when delivered personally, express mail, courier, or registered or certified mail return receipt request addressed as follows. Or any other address that is specified in writing by either party.

MR. RENKEMEYER: And we believe that this EFT form was

that, and it was acknowledged by them as they -- you know, I made sure that they acknowledged that they received it, they never denied that, that they received that form. So we felt that we did do that.

And to respond to a couple of those comments. The 2002 -- Section 2002 issue. Again, I'm not well versed in bankruptcy law but I would think that for that to apply our requirement to notify the bankruptcy court of the change of address would only be effective if we had notice in the first place of the bankruptcy.

THE COURT: But you did, you've acknowledged you did.

MR. RENKEMEYER: No, I'm speaking of the administrative claim at that time --

THE COURT: No.

MR. RENKEMEYER: Because they're arguing that the 2002 we didn't change our address for purposes of being a creditor -- I mean, a creditor on the list of creditors with amounts owing them post-petition.

THE COURT: No.

MR. RENKEMEYER: We didn't believe we were post-petition.

THE COURT: No, no, no. You got a notice that was addressed to Monarch, right?

MR. RENKEMEYER: In 2005 of the bankruptcy.

THE COURT: Well, actually, 2006. But, yeah, of the

bar date.

MR. RENKEMEYER: Correct.

THE COURT: As well as in 2005 of the filing of the bankruptcy.

MR. RENKEMEYER: Correct.

THE COURT: So as far as the debtor is concerned when they give you that notice that's -- and under 2002 that's your address. So the question is why didn't you tell them that the address had changed --

MR. RENKEMEYER: Because --

THE COURT: -- by filing something -- since that's -- you know, that's where it says you're supposed -- is it just because you didn't know the rule or --

MR. RENKEMEYER: One, we didn't know the rule. But, number two, we had no knowledge that we were part of that. We felt that since we were paid the pre-petition invoices at the time that --

THE COURT: But why did you sue on them then?

MR. RENKEMEYER: We didn't. In our case on those invoices we make it clear that we believe all the amounts owing are for post-petition invoices. But because of the difference in the way Delphi booked payments it made compared to what we -- how owe booked payments that were made there was a difference. And that resulted in some of them being pre-petition. But we still felt that we were suing on post-

petition amounts, even those Delphi claim --

THE COURT: The complaint doesn't say that, right? It doesn't even mention the bar date?

MR. RENKEMEYER: No, not the bar date, but it mentions the fact that we believe that they had invoices --

THE COURT: But it says you're going to collect them no matter what, even if they're pre -- even if they're from 2005.

MR. RENKEMEYER: What we're asking is collect them -- to have them deemed post-petition invoices, what we asked for in the case.

THE COURT: The complaint doesn't ask for that. It doesn't say -- it doesn't make a distinction between pre and post-petition.

MR. RENKEMEYER: I believe it does, Your Honor.

THE COURT: If you're the bankruptcy judge -- I'm sorry, if you're the state court judge, you don't even see a reference to that in the complaint, do you?

MR. RENKEMEYER: I believe you do, Your Honor.

THE COURT: Well, why don't you show me.

MR. RENKEMEYER: And, again, I have not reviewed these pleadings in preparation of this. But I believe that we do. We've had many filings in that case, many filings in the case. motions for summary judgment multiple times that give two different exhibits. One for pre-petition and one for post-

petition.

THE COURT: That's after you were made aware of this issue.

MR. RENKEMEYER: No. That was two years before. That was in '08.

THE COURT: Oh, so in '08 you were aware of pre and post-petition.

MR. RENKEMEYER: Right. I was aware of initial --

THE COURT: So doesn't that contradict what you just told me?

MR. RENKEMEYER: No, Your Honor. I was aware --

THE COURT: That you weren't aware of the bankruptcy in 2008.

MR. RENKEMEYER: I was aware that there was a bankruptcy date that killed our invoices from 10 of 2005, so it made it -- it was a very important date as far as what was pre and post --

THE COURT: But you don't say that the bankruptcy was over, you say post-petition.

MR. RENKEMEYER: Right. For purposes of distinguishing --

THE COURT: Doesn't that contradict what you just told me as a representative of someone who's going to be admitted pro hac vice to this Court, that you weren't aware of the bankruptcy --

MR. RENKEMEYER: Your Honor, that's not --

THE COURT: -- in the litigation?

MR. RENKEMEYER: That's not -- not, because --

THE COURT: I’m going to adjourn this until you submit the summary judgment motions.

MR. RENKEMEYER: Okay. I'll do that. And then you can see what I was referring to.

THE COURT: And I want to see those very carefully. And if you represented something to me incorrectly, and I don't believe it would be a mistake, there'll be serious consequences.

MR. RENKEMEYER: Your Honor, if I can --

THE COURT: All right. So I’m going to adjourn this to the next omnibus date.

MR. RENKEMEYER: Can I make a statement real quick about that. The point is that that petition date was a very important date, because it was important whether or not we had -- some of those invoices were payable or not because it was pre-2005 invoices or post-2005 invoices.

THE COURT: I want to see --

MR. RENKEMEYER: Not that --

THE COURT: -- whether there's any pleading in advance of the bar date in this case, where you distinguish between pre and post-petition.

MR. RENKEMEYER: I can provide that.

THE COURT: And where you say or don't say that Delphi's case is over.

MR. RENKEMEYER: Oh, I don't know if it states that, if I knew whether it was over or not because it wasn't relevant to the case.

THE COURT: If you say it's post-petition and you don't say it's over, I'm going to draw an inference, and it's not going to be a pretty one for you.

MR. RENKEMEYER: I guess I don't understand, Your Honor, how that's relevant. I was --

THE COURT: It's relevant because you said you weren't aware of the bankruptcy case when you brought this litigation or thereafter until the debtors told you in 2010 about the bankruptcy case being still in effect.

MR. RENKEMEYER: I guess my point -- I mean, my point is that the pleadings don't say whether it's over or not over, it just references pre and post-petition.

THE COURT: Well, I think once you realized there's a post-petition case, the inference is going to be that you had to do something more than simply assume it wasn't over.

MR. RENKEMEYER: Well, I guess my point is that as a non-bankruptcy lawyer I have no idea that there is processes to go through to collect amounts owed you after -- for post-petition invoices. I thought that they would be just paid. I didn't realize that there was a administrative claim that you

have to file to be paid monies after, they are post-petition invoices.

THE COURT: Okay. I'm going to adjourn this for thirty days.

MR. MEISLER: Your Honor, if I may, please, make one mention so that some facts are at least foreseeable, or some consequences are foreseeable to Mr. Renkemeyer.

For us to come back on this pleading, among other things, DPH flew out its local counsel to be --

THE COURT: Well, I -- there's no request in this matter for damages or sanctions. It appears to be from the face of the complaint that the complaint clearly violated the automatic stay. You know, whether it also violated the discharge depends on knowledge issues. So, you know, that's an issue, obviously.

MR. MEISLER: Right. And I just want to make sure that Mr. Renkemeyer is aware that if we're going to continue incurring expenses on account of this matter that we will consider -- and I'm not saying that we will, but we will consider asking you to pay for those expenses.

THE COURT: Okay. Well, it depends on the facts. But I just -- I have a feeling I'm not really getting a straight story here. Maybe I'm wrong about that but I want to see those documents.

MR. RENKEMEYER: And, again, Your Honor, just so I'm

clear --

THE COURT: Let me spell out the rationale why so you'll understand this. And I appreciate you're not a bankruptcy lawyer, but you are a lawyer. And I don't accept that you're appearing here pro se as this creditor, you're appearing here as the lawyer for the creditor.

I believe that the facts are clear that you and the creditor were on notice of the bankruptcy case, and on notice of the pre-petition bar date. I also believe the facts show that the burden was on FKMT to notify Delphi of the change of address. Based on the notifications that I've been shown I think that what they show is that the correspondence can be sent, and money can be sent -- more particularly, just money, to FKMT care of you. And in all the notices I've seen, including the EFT form, the care of you is as their attorney.

The case law I think is clear. Particularly where it's not stated that the attorney is the only source for communication. That the debtor's obligation is to send notice to the address it had until its told otherwise, and not to the attorney. They cite cases in their memorandum to that effect, and that's generally where the case law goes.

The only exception to that is where the debtor has been instructed to deal only with the attorney. So, again, it's incumbent upon you to give notice of a change for your client; for FKMT. I don't think that was done.

That means that you're only chance of success here is that you honestly believed that you had been paid off on the pre-petition debt, and that as far as the post-petition amounts were concerned, you didn't even know there was a bankruptcy. And, therefore, you didn't have to deal with a discharge or with the bankruptcy case at all.

And you told me that was the case. But now I think I'm hearing from you that that's not the case. And that's a problem. Because I think that put the onus on you to do something more than simply file a lawsuit. Which, by the way, also, as far as I can see from reading the complaint, clearly would violate the automatic stay with regard to the pre-petition amount sought. And if you actually assumed the bankruptcy case was over, would have violated the discharge. So I think there's a pretty big hole to get out of here.

Now, maybe there's something in these summary judgment motions also where you acknowledge of course you're not looking to enforce a pre-petition debt. But, certainly, the correspondence that I've seen seems to be just ignored as far as -- you know, the debtor is saying that you've violating the discharge and the stay. So, you know, those documents are going to be important, what was actually filed in the lawsuit.

MR. RENKEMEYER: Can I clarify something, or --

THE COURT: And, you know, the debtor, certainly, over the next thirty days can take a deposition of your colleague

who was sharing an office with you, about what was understood as far as the bankruptcy.

MR. RENKEMEYER: Sure.

THE COURT: And maybe that will help you and maybe it will hurt you.

MR. RENKEMEYER: To clarify, Your Honor. What I think I said earlier about knowledge of the bankruptcy was not whether I had actual knowledge of it, rather I didn't think about it as -- I guess not as a bankruptcy attorney I didn't think that it was relevant whenever I was filing this lawsuit, and when I was doing these things. Because I didn't realize that there was a process that I would have to go through to collect these because they were post-petition amounts.

THE COURT: Well, but, it all goes to ensuring that you got actual notice or adequate notice. And, you know, it -- I -- it's not clear to me that you did enough on that point.

MR. RENKEMEYER: To give them notice of our change of address?

THE COURT: Yeah. I mean, you'd given them payment information. Any other communication should be to you, you know -- to them care of you. But it doesn't say exclusively it just -- you know -- I mean, it's a law firm. It's just -- and particularly when there's an issue with the other, you know, other guys, the Oval (sic) people. I don't -- you know, all the documents you showed me, which certainly showed confusion

on the debtors' part about who was who, there's no documents that say let me resolve that confusion. Any receivables from the sale date; May of -- well, no, not then. Any receivables that weren't transferred up through the sale date should be sent to this address. And any correspondence relating thereto should be sent to this address. Sometimes it's more than just money that people have an issue with. Right.

An EFT transfer is just money. So I didn't see anything that said that, you know, particularly in light of your belief just a few months after the transfer that the Oval (sic) people weren't forwarding mail to you, that there's nothing to say forward mail to this address because it's not being forwarded to me. And if there's a dis -- you know -- I just don't understand how something that was basically all of the assets of this company you wouldn't -- you would do more than just say send the money. That you'd say send correspondence as well.

MR. RENKEMEYER: And they did.

THE COURT: No, but -- you haven't said that. You haven't said send corre -- I don't see anything that says that, send correspondence also to this address.

MR. RENKEMEYER: I mean, as I stated earlier, they did forward us our mail for a period of time after the sale until the dispute arose, and then all the forwarding stopped.

THE COURT: Well, I understand. And at that point why

didn't you send them -- why didn't you send Delphi, which is your main account payor, a statement saying they've stopped forwarding us mail, forward us mail.

MR. RENKEMEYER: Your Honor, we did, we had many communications with them --

THE COURT: That's the EFT transfer.

MR. RENKEMEYER: No, but we had other telephone communications. We asked them how do we go about that process.

THE COURT: I'm sorry, that's not in the record, it's nowhere.

I'm sort of giving you a break to give you more time to show that, but there's nothing like that here, it doesn't say that.

MR. RENKEMEYER: But one of the e-mails I showed said okay, to change this go get this EFT form filed.

THE COURT: Yes. But that e-mail is all about paying money, it's not the address. It doesn't say that this is where you should send us correspondence. It just says send us the money. And, of course, when you do an EFT form you have to say your address because that's what the bank needs. It's a different thing.

So, anyway, I’m not ruling. I'll adjourn this for thirty days. But you should -- I'm trying to give you the parameters of what's guiding my ruling.

MR. RENKEMEYER: I understand.

THE COURT: Because I think if you were really aware of the bankruptcy and that there's a distinction between pre and post-petition that's not a good fact for you. That's why I went through it, you know, for several -- for a long time during oral argument to see whether -- you know, it's particularly not good on the 9006 Pioneer request.

MR. RENKEMEYER: I guess I don't understand that point why it's not good. Because my view on pre and post --

THE COURT: Because you should have given them notice at that point. If you're really aware and trying to make distinctions between pre and post-petition you should say what the address is so they can give you the notice.

MR. RENKEMEYER: I guess I wasn't distinguishing it for purposes of them giving me notice or the proceedings, I was distinguishing it because they were saying well, pre-petition invoices we won't pay, post-petition invoices we will. So we were distinguishing it for that reason, not for --

THE COURT: I understand. But it goes beyond that. They're still in a bankruptcy going on, they're -- they're -- and that resp -- at that point the burden's on you to make sure that they have the right notice, not just for sending money but for everything.

MR. RENKEMEYER: I mean, everything was sent to us at that address. But --

THE COURT: Well, no, you say it wasn't. You say it

wasn't sent to you.

MR. RENKEMEYER: It was --

THE COURT: That's the problem, it wasn't. You say the bar date notice -- the admin bar date notices weren't sent to you.

MR. RENKEMEYER: No, Your Honor. Everything from Delphi was sent to me at that address except the notice. I believe it went to --

THE COURT: Well, what was sent to you at that address? What mail did you get at that address?

MR. RENKEMEYER: All the communication regarding --

THE COURT: What mail?

MR. RENKEMEYER: From Delphi?

THE COURT: Yes.

MR. RENKEMEYER: Lots of stuff. Copies of invoices that we were -- because we spent months going back and forth from what invoices were outstanding.

THE COURT: Was this after the lawsuit?

MR. RENKEMEYER: Before and after, Your Honor.

THE COURT: Well, again, that's not in the record either. I'm just not seeing that.

MR. RENKEMEYER: Yeah. All of our mail was sent there.

THE COURT: Well, if it's after the lawsuit of course they're going to be doing it. And if --

MR. RENKEMEYER: And before.

THE COURT: And if they've hire -- if you're appearing as a lawyer of course they're going to be communicating with you as the lawyer in a dispute. They're not allowed to communicate with FKMT.

MR. RENKEMEYER: And, again, Delphi's accounts -- Delphi's accounts payable communicated with Scott Crader at my address and mailed him their packages to him there. Not as a lawyer, just that -- that was --

THE COURT: Well, again, that's not in the record either. I just -- you know, if that's in the record then maybe you all should settle this.

MR. RENKEMEYER: And -- and --

THE COURT: But I don't -- it's not here. There's nothing about that here.

MR. RENKEMEYER: Okay. I'll address that between now and the thirty days.

THE COURT: Okay.

MR. RENKEMEYER: And the other issue, Your Honor, is the two -- the question I have -- I've always maintained that any notices on the bankruptcy were obviously directed to New Monarch because why did they not have two Monarchs named in their registry. Not just the bankruptcy registry of creditors, but in their own internal database. They've never had an FKMT and a Monarch. Or they never had --

THE COURT: Because they weren't never given the change of address. That's -- that's -- I mean, that's actually not a good thing for you.

MR. RENKEMEYER: But they dealt with two different companies the whole time, with two different taxpayer ID numbers. They -- two completely different companies they are dealing with. And only one of them was in the registry. Because they only identified one of them as -- the New Monarch as being still a creditor.

THE COURT: But you've -- you never -- as far as I can see you never told them that all correspondence should go to, you know, this address. That's the issue. I mean, their accounts payable -- I guess what I don't understand is just -- is the flip side of that. Whereas, these accounts payable -- I mean, you had accounts payable from Delphi, that was the main asset, right?

MR. RENKEMEYER: Accounts receivable from Delphi.

THE COURT: I'm sorry, accounts payable, yes. Delphi had the payable to you, you had a receivable. That was the main asset.

MR. RENKEMEYER: Correct.

THE COURT: So I just -- I mean, I don't see why you didn't tell Delphi that you had them now.

MR. RENKEMEYER: See, we thought we did. We asked them how to change the address and they gave us the --

THE COURT: But that's a different --

MR. RENKEMEYER: -- the definition --

THE COURT: For payment. For payment.

MR. RENKEMEYER: We asked them how to change our information in their database, not just for payment but as who we are and our name.

THE COURT: Again, that's not really in the record either. I don't -- that's not in an affidavit, I don't see someone saying that.

MR. RENKEMEYER: I could provide some affidavits to that effect.

THE COURT: Okay.

MR. RENKEMEYER: I can maybe find some direct correspondence between our company --

THE COURT: All right.

MR. RENKEMEYER: -- and their company about that.

THE COURT: Okay. All right. So I'm going to adjourn this for thirty days to give you a chance to do that.

MR. RENKEMEYER: This will be coming back here in thirty days.

THE COURT: You can probably do it by phone since I'm not going to take anymore --

MR. RENKEMEYER: Okay.

THE COURT: -- representation testimony. But if you're going to have a witness you're going to have to be here

in person.

MR. RENKEMEYER: Okay. Thank you, Your Honor.

THE COURT: Okay. You should take the pre-petition stuff out right now. I mean, there's no -- there's no -- there's just no way that's going to get dealt with. It's just digging a hole for you. You should take the pre-petition stuff out of your complaint right now.

MR. RENKEMEYER: I don't think I'm allowed to right now while it's stayed, correct?

THE COURT: Well, you should -- you could -- no, you can do it. The debtors will I'm sure gladly agree to the modification of the Missouri court stay for that purpose. Okay.

MR. MEISLER: Thank you, Your Honor. That concludes today's omnibus hearing.

THE COURT: Okay.

(Whereupon these proceedings were concluded at 1:11 p.m.)

I N D E X

R U L I N G S


| | PAGE | LINE |
|---|---|---|
| Application by Highland Capital for Substantial Contribution Compensation Denied | 67 | 7 |

C E R T I F I C A T I O N

I, Esther Accardi, certify that the foregoing transcript is a true and accurate record of the proceedings.

Esther Accardi

Digitally signed by Esther Accardi
DN: cn=Esther Accardi, o, ou, email=digital1@veritext.com, c=US
Date: 2010.10.25 16:18:12 -04'00'

______________________________________

ESTHER ACCARDI (CET**D-485)

AAERT Certified Electronic Transcriber

Veritext

200 Old Country Road

Suite 580

Mineola, New York 11501

Date: October 25, 2010