13.     Except as otherwise expressly provided in the Transfer Agreement, no person or entity, including, without limitation, any federal, state or local governmental agency, department or instrumentality, shall assert by suit or otherwise against JCI or its successors in interest any claim that they had, have or may have against the Debtors, or any liability, debt, or obligation relating to or arising from the Acquired Assets, or the Debtors' operation of the Business or use of the Acquired Assets, including, without limitation, any liabilities calculable by reference to the Debtors or their assets or operations, and all persons and entities are hereby enjoined from asserting against JCI in any way any such claims, liabilities, debts or obligations.

14.     Except as expressly provided in the Transfer Agreement or this Order, JCI is not assuming nor shall it in any way whatsoever be liable or responsible, as a successor or otherwise, for any liabilities, debts, commitments, or obligations (whether known or unknown, disclosed or undisclosed, absolute, contingent, inchoate, fixed, or otherwise) of the Debtors or any liabilities, debts, commitments, or obligations in any way whatsoever relating to or arising from the Acquired Assets or the Debtors' operation of their business or use of the Acquired Assets on or prior to the Completion Date or any such liabilities, debts, commitments, or obligations that in any way whatsoever relate to periods on or prior to the Completion Date or are to be observed, paid, discharged, or performed on or prior to the Completion Date (in each case, including any liabilities that result from, relate to or arise out of tort or other product liability claims), or any liabilities calculable by reference to the Debtor or their assets or operations, or relating to continuing conditions existing on or prior to the Completion Date, which liabilities, debts, commitments, and obligations are hereby extinguished insofar as they may give rise to successor liability, without regard to whether the claimant asserting any such liabilities, debts, commitments, or obligations has delivered to JCI a release thereof. Without

limiting the generality of the foregoing, except as expressly provided in the Transfer Agreement or this Order, JCI shall not be liable or responsible, as a successor or otherwise, for the Debtors' liabilities, debts, commitments, or obligations, whether calculable by reference to the Debtors, arising on or prior to the Completion Date and under or in connection with (i) any employment or labor agreements (including, without limitation, the payment of wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any and all pension plans) or any other payment to employees of Debtors while such individuals were employed by the Debtors), consulting agreements, severance arrangements, change-in-control agreements, or other similar agreement to which any Debtor is a party, (ii) any pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Debtors (including, without limitation, retention, benefit and/or incentive plan to which any Debtors are a party and relating to the battery business (including, without limitation, arising from or related to the rejection or other termination of any such agreement)), (iii) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, obligations that might otherwise arise from or pursuant to the Employee Retirement Income Security Act of 1974, as amended, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, COBRA, or the Worker Adjustment and Retraining Notification Act, (iv) workers' compensation, occupational disease, or unemployment or temporary disability insurance claims, (v) environmental liabilities, debts, claims, or obligations arising from

14

conditions first existing on or prior to Completion Date (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., (vi) any bulk sales or similar law, (vii) any liabilities, debts, commitments, or obligations of, or required to be paid by, the Debtors for any Taxes of any kind for any period, (viii) any liabilities, debts, commitments, or obligations for any Taxes relating to the business of the Debtors or the Acquired Assets for or applicable to the period prior to the Completion Date, (ix) any litigation relating to the Acquired Assets for or applicable to the period prior to the Completion Date, and (x) any products liability or similar claims, whether pursuant to any state or any federal laws or otherwise, relating to the Acquired Assets for or applicable to the period prior to the Completion Date. JCI shall in no way be deemed a party to or assignee of any such agreement set forth in (i), (ii), and (iii) above, and no employee of JCI shall be deemed in any way covered by or a party to any such agreement, and all parties to any such agreement are hereby enjoined from asserting against JCI any and all claims arising from or relating to such agreement. Any and all notices, if any, required to be given to the Debtors' employees pursuant to the Workers Adjustment and Retraining Notification Act, or any similar federal or state law, shall be the sole responsibility and obligation of the Debtors and JCI shall have no responsibility or liability therefore.

15.     Upon the completion of the transactions contemplated by the Transfer Agreement, JCI shall not be deemed to (i) be the successor of the Debtors, (ii) have, de facto, or otherwise, merged with or into the Debtors, (iii) be a mere continuation or substantial continuation of the Debtors or the enterprise(s) of the Debtors, or (iv) be liable for any acts or omissions of the Debtors in the conduct of the Debtors' business.

### Continuation And Transition Of Supply Out Of Fitzgerald

16.     The Debtors are hereby authorized to (a) continue manufacturing and

supplying JCI with battery products manufactured at the Fitzgerald Facility in accordance with

JCI's diminishing supply requirements and (b) to transition production of battery products

manufactured at the Fitzgerald Facility to other JCI facilities.

17.     The Debtors and JCI are each directed to take all actions necessary or

appropriate to effectuate the terms of this Order with respect to the supply and transition of

battery products from the Fitzgerald Facility.

### IUE-CWA Consent And IUE-CWA New Brunswick Attrition Plan

18.     The Debtors are hereby authorized to enter into the agreement by and

among Delphi Corporation, the International Union, IUE-CWA and IUE-CWA Local 416

(collectively the "IUE-CWA") attached to the Transfer Agreement as Exhibit 1.13 thereto (the

"IUE-CWA Memorandum") and to implement the terms of such IUE-CWA Memorandum,

including without limitation (i) that certain attrition plan between Delphi and the IUE-CWA (the

"IUE-CWA New Brunswick Attrition Plan") with respect to the New Brunswick Facility and (ii)

that certain consent to the waiver of that certain no-sale clause and neutrality obligations (the

"IUE-CWA Consent").

19.     Each of the signatories to the IUE-CWA Memorandum is directed to take

all actions necessary or appropriate to effectuate the terms of this Order with respect to the IUE-

CWA Consent and the IUE-CWA New Brunswick Attrition Plan and the terms of the IUE-CWA

Consent and the IUE-CWA New Brunswick Attrition Plan, including, without limitation, any

16

and all actions necessary or appropriate to its implementation of and performance under the IUE-

CWA Consent and the IUE-CWA New Brunswick Attrition Plan.

### Additional Provisions

20.     The consideration provided by JCI for the Acquired Assets under the

Transfer Agreement is hereby deemed to constitute reasonably equivalent value and fair

consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform

Fraudulent Transfer Act, and under the laws of the United States, and any state, territory,

possession, or the District of Columbia.

21.     On the Completion Date, this Order shall be construed and shall constitute

for any and all purposes a full and complete general assignment, conveyance, and transfer of all

of the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired

Assets to JCI on pursuant to the terms of the Transfer Agreement.

22.     Except as otherwise provided in the Transfer Agreement, on the

Completion Date, each of the Debtors' creditors is authorized and directed to execute such

documents and take all other actions as may be necessary to release their respective Interests or

Claims against the Acquired Assets, if any, as may have been recorded or may otherwise exist.

23.     Each and every federal, state, and governmental agency or department,

and any other person or entity, is hereby directed to accept any and all documents and

instruments necessary and appropriate to consummate the transactions contemplated by the

Transfer Agreement.

24.     All entities who are currently, or as of the Completion Date may be, in

possession of some or all of the Acquired Assets to be sold, transferred, or conveyed pursuant to

17

the Transfer Agreement are hereby directed to surrender possession of the Acquired Assets to
JCI on the Completion Date.

25.    The transactions contemplated by the Transfer Agreement are undertaken
by JCI in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and
accordingly, the reversal or modification on appeal of the authorization provided herein to
consummate the sale of the Acquired Assets shall not affect the validity of the Sale to JCI, unless
such authorization is duly stayed pending such appeal. JCI is a purchaser in good faith of the
Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the
Bankruptcy Code.

26.    The consideration paid by JCI in the Sale for the Acquired Assets under
the Transfer Agreement is fair and reasonable, and may not be avoided or otherwise challenged
under 11 U.S.C. § 363(n).

27.    The Debtors, including but not limited to their respective officers,
employees, and agents, are hereby authorized to execute such documents and do such acts as are
necessary or desirable to carry out the transactions contemplated by the terms and conditions of
the Transfer Agreement and this Order. The Debtors shall be, and they hereby are, authorized to
take all such actions as may be necessary to effectuate the terms of this Order.

28.    The terms and provisions of the Transfer Agreement and this Order shall
be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and
their creditors, JCI, and its respective affiliates, successors, and assigns, and any affected third
parties, including, but not limited to, all persons asserting an Interest or Claim in the Acquired
Assets to be sold to JCI pursuant to the Transfer Agreement, notwithstanding any subsequent
appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of

18

the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise shall be binding.

29.    Notwithstanding anything contained herein to the contrary, the term "Acquired Assets" as defined herein does not include property that is not property of the Debtors' estates, such as funds that are trust funds under any applicable state lien laws.

30.    To the extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Acquired Assets sold, transferred, or conveyed to JCI on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale.

31.    The failure specifically to include or to reference any particular provision of the Transfer Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Transfer Agreement be authorized and approved in their entirety.

32.    The Transfer Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court; provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates.

33.    The provisions of this Order are nonseverable and mutually dependent.

34.    Nothing in this Order shall alter or amend the Transfer Agreement and the obligations of the Debtors and JCI thereunder.

35.    This Court retains jurisdiction to enforce and implement the terms and provisions of the Transfer Agreement, all amendments thereto, any waivers and consents

19

thereunder, and of each of the agreements executed in connection therewith in all respects,

including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets

to JCI, (b) compel delivery of the purchase price, reimbursement of costs under the IUE-CWA

New Brunswick Attrition Plan, or performance of other obligations owed to the Debtors pursuant

to the Transfer Agreement, (c) resolve any disputes arising under or related to the Transfer

Agreement, except as otherwise provided therein, (d) interpret, implement, and enforce the

provisions of this Order, and (e) protect JCI against any Interests or Claims against the Debtors

or the Acquired Assets, of any kind or nature whatsoever, attaching to the proceeds of the Sale.

36.    Notwithstanding Rule 6004(g) of the Federal Rules of Bankruptcy

Procedure or any other Bankruptcy Rule, this Order shall take effect immediately upon its entry.

37.    The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for

the United States Bankruptcy Court for the Southern District of New York for the service and

filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated: New York, New York
       June ____, 2006

_____
UNITED STATES BANKRUPTCY JUDGE

20

## EXHIBIT 1.23

## SELLER'S KNOWLEDGE

**GENERAL:**

Ron Pogue

**EMPLOYEES:**

Charu Manocha

<u>EXHIBIT 2.2A</u>

<u>BILL OF SALE</u>

**BY THIS BILL OF SALE** made on _____, **200_** by _____, a Delaware _____ ("**Seller**"), for good and valuable consideration paid by _____, a _____ corporation ("**Buyer**"), receipt and sufficiency of which consideration are acknowledged by Seller, pursuant to the terms and provisions of that certain Transfer Agreement dated _____, **2006** between Buyer and Seller (the "**Agreement**"), Seller does bargain, grant, sell, convey, assign, transfer and deliver to Buyer and its successors and assigns, all right, title and interest of Seller in and to the Personal Property and Inventory (as those terms are defined in the Agreement) listed on <u>Attachment A</u> hereto.

Notwithstanding the foregoing, the provisions of this Bill of Sale are subject, in all respects, to the terms and conditions of the Agreement and all the representations and warranties, covenants and agreements contained therein, all of which shall survive the execution and delivery of this Bill of Sale as provided in the Agreement.

_____

By:_____
        Name:
        Title:

## ATTACHMENT A TO BILL OF SALE

### Exhibit 3.6.H

### ENVIRONMENTAL MATTERS

1.    **DEFINITIONS:**

    **1.1**    **"Business"** has the same meaning as given in the Transfer Agreement.

    **1.2**    "**Buyer**" has the same meaning as given in the Transfer Agreement.

    **1.3**    "**Completion Date**" has the same meaning as given in the Transfer Agreement.

    **1.4**    "**Competent Authority**" means a person, agency, department or subdivision thereof having governmental authority under an applicable Environmental Law, and/or a court or tribunal of competent jurisdiction.

    **1.5**    "**Compliance Matter**" means an event, condition, activity, practice, action or omission at the Real Property which gives rise to a breach or violation of an Environmental Law, but which excludes Environmental Contamination.

    **1.6**    "**Environment**" means any and all organisms (including humans), biota, ecosystems, land, natural resources, property, air, soil gas, water, groundwater, human beings, and buildings, fixtures and installations.

    **1.7**    "**Environmental Claim**" means a notice, claim, demand, action, suit, complaint or proceeding by a Competent Authority or a Third Party alleging liability or potential liability arising out of an Environmental Law.

    **1.8**    "**Environmental Contamination**" means the presence of a Hazardous Material at, in, under, on or about the Environment at the Real Property.

    **1.9**    "**Environmental Damages**" means losses, liabilities, costs, damages fines, penalties and expenses (including reasonable expenses of investigation and attorneys' fees) arising out of an Environmental Law, but in all cases excluding losses, liabilities, costs, damages and expenses deemed consequential or loss of profit, and also excluding expenses of investigating information for the purposes of making a claim for indemnification under this Exhibit.

    **1.10**    "**Environmental Law**" means, solely for those in force and effect as at the Closing date in the relevant jurisdiction, all applicable civil, criminal, administrative and any other federal, state, county and local (including common law) laws, rules, ordinances, orders, codes, guidance, directives, Environmental Permits (or lack thereof), approvals, decisions, decrees, remediation standards and regulations relating to or having the purpose or effect of the prevention of pollution or harm to the Environment or human health.

1.11   "**Environmental Permits**" means all licenses, consents, permits, registrations, approvals or authorizations made or issued by a Competent Authority under an Environmental Law in connection with the Business or the Real Property.

1.12   "**Hazardous Material**" means all matter (whether alone or in combination with other matter, and whether solid, liquid, gas or other state) which is a pollutant, contaminant, chemical, material, substance, constituent, or waste including without limitation petroleum, petroleum-based or petroleum-derived products, polychlorinated biphenyls, asbestos and asbestos-containing materials, and noxious, radioactive, flammable, corrosive, caustic materials, all of which are governed or regulated under an Environmental Law.

1.13   "**New Brunswick Real Property**" means the Real Property as defined in the Transfer Agreement.

1.14   "**Post-Closing Compliance Matter**" means a Compliance Matter first occurring after the Completion Date.

1.15   "**Post-Closing Environmental Contamination**" means Environmental Contamination first occurring after the Completion Date.

1.16   "**Post-Closing Off-Site Disposal Liability**" means liability for a Hazardous Material generated at the New Brunswick Real Property and disposed at a disposal site not at the New Brunswick Real Property, after the Completion Date, under an applicable Environmental Law.

1.17   "**Pre-Closing Compliance Matter**" means a Compliance Matter first occurring at prior to the Completion Date.

1.18   "**Pre-Closing Environmental Contamination**" means Environmental Contamination first occurring prior to the Completion Date.

1.19   "**Pre-Closing Off-Site Disposal Liability**" means liability for a Hazardous Material generated at the New Brunswick Real Property and disposed at a disposal site not at the New Brunswick Real Property, prior to the Completion Date, under an applicable Environmental Law.

1.20   "**Remedial Works**" means the works, designs, investigations and activities carried out by a Party in relation to Environmental Contamination, but excluding expenses of investigating information for the purposes of making a claim for indemnification under this Exhibit.

1.21   "**Remedy**" has the meaning given to it in Section 4 of this Exhibit.

1.22   "**Seller**" has the same meaning as given in the Transfer Agreement.

1.23   "**Third Party**" means any person not a Party or a Competent Authority.

2.   **INDEMNIFICATIONS OF SELLER AND PURCHASER:**

46

**2.1**     Subject to the provisions of this Exhibit, and solely with respect to the New Brunswick Real Property, the Seller shall indemnify the Buyer for Environmental Damages arising from Pre-Closing Environmental Contamination, Pre-Closing Compliance Matters or Pre-Closing Off-Site Liability.

**2.2**     Subject to the provisions of this Exhibit, and solely with respect to the New Brunswick Real Property, the Buyer shall indemnify the Seller for Environmental Damages arising from Post-Closing Environmental Contamination, Post-Closing Off-Site Liability or Post-Closing Compliance Matters.

**2.3**     Subject to the provisions of this Agreement, for those Environmental Damages arising from circumstances that may be considered both (i) Pre-Closing Environmental Contamination and Post-Closing Environmental Contamination, (ii) Pre-Closing Compliance Matters and Post-Closing Compliance Matters, or (iii) Pre-Closing Off-Site Liability and Post-Closing Off-Site Liability, such Environmental Damages shall be allocated between the Parties in proportion to the extent that such Environmental Damages arose pre- or post-Completion Date, and each Party shall indemnify the other for its share as determined by such allocation.

**3.     <u>LIMITATIONS ON LIABILITY</u>.**     Neither Party shall be liable under this Agreement for Environmental Damages:

**3.1**     In the case of Environmental Claims arising from Pre-Closing Compliance Matters or Post-Closing Compliance Matters (as the case may be), unless written notice of such claim has been served on the non-claiming Party on or before eighteen (18) months following the Completion Date;

**3.2**     In the case of Environmental Claims arising from a Pre-Closing Environmental Contamination, except for Remedial Works pursuant to clause 4.1 of this Exhibit, or Post-Closing Environmental Contamination (as the case may be), unless written notice of such claim has been served on the non-claiming Party on or before seven (7) years following the Completion Date.  Remedial Works under clause 4.1 of this Exhibit shall be governed by the applicable statute of limitations under ISRA (as defined in clause 4.1 of this Exhibit).

**3.3**     Except for Remedial Works under clause 4.1 of this Exhibit (for which Seller is solely responsible), subject to clauses 3.1 and 3.2 of this Exhibit, no Party will be liable to the other under this Exhibit unless and until the aggregate amount of all Environmental Claims each of which exceeds the amount set forth in this clause 3.3 and which are determined to be payable by the Party on which the claim is made exceeds $500,000, and in such event the paying Party is liable solely for the amounts exceeding $500,000.  For all purposes under this Article 3 and Section 7.1 of the Agreement, the Deductible Amount with respect to environmental claims shall be (i) the $500,000 amount referred to in this clause 3.3, less (ii) any amounts that may have been incurred by the relevant claiming party under environmental matters agreements entered into in connection with the sale of any of Seller's global battery operations to Buyer in 2005. The Cap Amount is as set forth Section 7.1.

**3.4**     In the case of Environmental Damages arising from Pre-Closing Environmental Contamination, unless the claiming Party discovers the facts and circumstances giving rise to such claim solely in connection with an investigation

47

required by an applicable Environmental Law, an order by a Competent Authority, a final judgment of a claim by a Third Party, or settlement of a claim by a Third Party to which the non-claiming Party has agreed (such agreement not to be unreasonably withheld).

3.5    Where Buyer uses the New Brunswick Real Property for a use other than an industrial use, or seeks to or changes the zoning or land use classification of the New Brunswick Real Property to a classification more sensitive than the industrial classification;

3.6    Where, subject to clause 3.7 below, and insofar as the Parties agree to treat this Agreement and all information gathered, known or obtained as a result of the sale and purchase of the Business or performing any obligation or exercising any right under this Exhibit as confidential, for any Environmental Damages claims to the extent that such claim would not have arisen or was increased or made more costly as a result of the claiming Party or any of its respective employees, agents or contractors volunteering or disclosing information to any Competent Authority or Third Party without the prior written consent of the non-claiming Party;

3.7    The following shall not be deemed to be or to have been volunteering or disclosing of information for the purpose of this clause 3.7:

(i)    Where the disclosure is required by any law (including any Environmental Law),

(ii)    Where the disclosure is specifically and formally required by any securities exchange or regulatory or other Competent Authority to which either Party is subject or submits wherever situated,

(iii)    Where the information is clearly in the public domain through no fault of the claiming Party, or

(iv)    Where the non-claiming Party has given prior written approval to the disclosure;

3.8    To the extent the claiming Party did not take reasonable steps to avoid or mitigate any Environmental Damages, acting in a reasonable and cost-effective manner; in the case of an emergency, where a Party takes any action to avoid or mitigate any Environmental Damages, (a) it shall for the avoidance of doubt not be in breach of this Agreement and shall not be precluded from recovering its Environmental Damages provided that the claiming Party notifies the other Party of such circumstances as soon as reasonably practicable and provided that such actions or steps are the minimum necessary to avert the emergency; and (b) the reasonable costs and expenses of all steps taken pursuant to the duty to mitigate contained in this clause 3.8 shall be deemed to be Environmental Damages.

3.9    Notwithstanding anything to the contrary in Section 7.1 of this Agreement, the Deductible Amount with respect to environmental claims shall be $500,000 less any amounts that may have been incurred by the relevant claiming party under environmental matters agreements entered into in connection with the sale of any of Seller's global battery operations to Buyer in 2005.  The Cap Amount is as set forth Section 7.1.  Subject to clauses 3.1 and 3.2 of this Agreement, set forth in Subject to

clauses 4.1, 4.2 and 4.3 of this Agreement, unless and until the aggregate amount of all Environmental Claims each of which exceeds the amount set forth in clause 4.4 of this Agreement and which are determined to be payable by the Party on which the claim is made exceeds $500,000, and in such event the paying Party is liable solely for the amounts exceeding $500,000; provided, however, that with respect to Pre-Closing Compliance Matters and Pre-Closing Environmental Contamination referred to in Paragraph 2.2 for which Seller has warranted that it will effect the Remedy with respect to such Pre-Closing Compliance Matters and Pre-Closing Environmental Contamination, Seller shall pay all amounts necessary to effect the Remedy of such issues, which amounts shall not be included in determining when the aggregate amount of claims exceed $500,000.

## 4.    REMEDIATION OF ENVIRONMENTAL DAMAGE:

4.1    Seller shall file such papers, and conduct such investigation and remediation as required by the New Jersey Department of Environmental Protection ("NJDEP") to satisfy the requirements of the State of New Jersey's Industrial Site Recovery Act, N.J.S.A. 13.1K-6 *et seq.*, and regulations promulgated thereto, N.J.A.C. Title 7, Chapter 26B (collectively "ISRA"), as ISRA is in effect as of the date of the Put Completion Date, as follows:    As soon as the Parties mutually agree that it is substantially certain that the third party consent needed prior to any exercise of the Put Option or Call Option will be obtained, Seller shall, pursuant to the requirements of ISRA, promptly prepare and submit to NJDEP a General Information Notice.  Thereafter, with reasonable diligence, Seller shall, pursuant to ISRA, continue to undertake the activities and to submit the required documentation to NJDEP necessary to complete its responsibilities under ISRA, according to any schedule approved by NJDEP and consistent with NJDEP requirements.  In all cases, Seller shall have the right at its sole discretion to seek reasonable extensions of the schedules approved by NJDEP where site conditions warrant.  Where the State of New Jersey requires any consent agreement into which Seller, the State of New Jersey and Buyer must enter pursuant to ISRA, Buyer shall sign such consent agreement.  Any such consent agreement shall be consistent with a remedial action for industrial property.

4.2    Where an Environmental Damage arises out of Environmental Contamination, the non-claiming Party shall be responsible for Remedial Works or the redressing of a Compliance Matter ("**Remedy**") to no less but no more than the minimum standards or levels of Environmental Laws; such Remedial Works may be determined using risk assessment and related risk evaluation methods.

4.3    The non-claiming Party shall, where a Remedy is required pursuant to this Agreement, have conduct of such Remedy.

4.4    The conduct of a Remedy shall be as follows:

A.            The non-claiming Party shall prepare appropriate work plans or scopes of work to satisfactorily undertake and complete the Remedy under this Agreement; such Party will provide the other Party with an opportunity to review and comment on such work plans or scopes of work, which comments the non-claiming Party may elect to

adopt where such comments do not increase any cost or liability of the Remedy;

B.     The non-claiming Party shall, at its sole discretion, either:

(i)     Determine to and obtain approval of the Remedy by the appropriate Competent Authority prior to implementation of the Remedy; when requested, the claiming Party shall cooperate with the non-claiming Party in any communications with the appropriate Competent Authority; after the non-claiming Party has obtained such approval, such Party shall provide notice of such approval to the claiming Party; or

(ii)     Determine to implement the Remedy without first seeking approval from the appropriate Competent Authority; the non-claiming Party shall provide notice to the claiming Party of such determination at the time the non-claiming Party provides the claiming Party with the work plan or scope of work set forth in clause 4.4A of this Exhibit;

C.     Where the Seller is the non-claiming Party, Seller will take all reasonable steps to avoid interfering with Buyer's operation of the Business or use of the Real Property, and Buyer will reasonably cooperate with Seller including providing access to the New Brunswick Real Property and the use of utilities in the conduct of the Remedy;

D.     Where applicable the non-claiming Party shall provide copies of all relevant correspondence sent to and received from a Competent Authority, and keep the claiming Party reasonably apprised of the progress of the conduct of the Remedy; and

E.     The conduct of the Remedy shall be deemed complete when, as the case may be:

(i)     The non-claiming Party has received approval regarding the Remedy by an applicable Competent Authority; or

(ii)     Subject to clause 4.2 of this Exhibit, the Remedy meets applicable standards which an applicable Environmental Law allows.

5.     **TRANSFER OF PERMITS AND LICENSES.**  On and after the Closing Date, Seller and Buyer shall cooperate in taking all reasonable steps to effect the transfer or procure the re-issuance of any Environmental Permits necessary to operate the Business.

**EXHIBIT 4.1**

**EMPLOYEE MATTERS**

1.    **Definitions:**

A.    "**Buyer Employee Benefit Plans**" means Buyer's pension, thrift, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive or deferred compensation, hospitalization, "parachute", severance, vacation, sick leave, fringe or welfare benefits, any employment or consulting Contracts, "golden parachutes", collective bargaining agreements, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals and written or binding oral statements of policies, practices or understandings relating to employment.

B.    "**Competitive Package**" means the wages and benefits payable to new hire U.S. Hourly Employees at the New Brunswick Facility under the Delphi-IUE-CWA Local Agreement.

C.    "**Delphi-IUE-CWA Local Agreement**" means the local collectively bargained agreements in effect at the New Brunswick Facility, including but not limited to, the memorandum of understanding ("**MOU**") entitled "ESCOP Hiring Plan – Full and Temporary Part-Time Employees" dated June 3, 1998 ("**ESCOP Hiring Plan**"), the November 13, 2003 Local Seniority Agreement, a collective bargaining agreement between Seller and IUE-CWA Local 416, any letter agreements, MOUs (including the ESCOP Hiring Plan), and all applicable employee benefit plans, in effect between Seller and the IUE-CWA applicable only to the U.S. Hourly Employees.

D.    "**Delphi-IUE-CWA National Agreement**" means the nationally negotiated collective bargaining agreements, including any letter agreements, MOUs, supplemental agreements and all applicable employee benefit plans in effect between Seller and the IUE-CWA.

E.    "**Employment Rights**" means all obligations arising out of, or relating to, the employment relationship between the relevant company and the relevant employees, including, without limitation, payment of wages and salaries, employee benefits, taxes, vacation pay, sick leave and severance pay and any claims under any Laws dealing with employment.

F.    "**IUE-CWA**" means the IUE-CWA, the Industrial Division of the Communication Workers of America, AFL-CIO and CLC.

G.    "**Seller Employee Benefit Plans**" means Seller's pension, thrift, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive or deferred compensation, hospitalization, "parachute", severance, vacation, sick leave, fringe or welfare benefits, any employment or consulting Contracts, "golden parachutes", collective bargaining agreements, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals, and written or binding oral statements of policies, practices or understandings relating to employment.

H.      "**Successor Clause**" means Document 7 appended to the Delphi-IUE-CWA National Agreement.

I.      "**Transferred U.S. Hourly Employees**" means those hourly employees of Seller hired by Buyer pursuant to Section 3.A(ii) below.

J.      "**U.S. Hourly Employees**" means the hourly employees represented by the IUE-CWA who are employed by Seller at the New Brunswick, New Jersey plant immediately prior to the Completion Date and identified on Schedule 3.A(i) to this Exhibit 4.1 to be provided to Buyer by Seller concurrently with the Put Exercise Notice or within ten (10) days after Seller's receipt of a Call Exercise Notice, as applicable.

K.      "**U.S. Salaried Employees**" means the salaried employees and hourly non-union employees who are employed by Seller at the New Brunswick, New Jersey plant immediately prior to the Completion Date.

2.      **Pre-Completion Obligations of the Parties:**

A.      Prior to Completion, Seller will:

(i)      Endeavor to obtain Bankruptcy Court approval of the attrition plan set forth in the IUE Consent (attached as Exhibit 1.13 of this Agreement) and, upon receipt of necessary approvals, to implement the attrition plan set forth in Exhibit 1.13 (the "**Attrition Plan**") to reduce the number of U.S. Hourly Employees to approximately one hundred (100) U.S. Hourly Employees, in accordance with the terms of the IUE Consent [JCI to confirm the number as soon as possible after the date of this Agreement and no later than 5 days before Delphi commences the Attrition Plan]; and

(ii)      Take the lead in negotiating a plant-specific agreement and waiver of the Successor Clause, with Buyer's involvement as the parties deem appropriate.

B.      If waiver of the Successor Clause is obtained before the Completion Date:

(i)      Buyer will take the lead in negotiating a collective bargaining agreement with the IUE-CWA exclusive to the U.S. Hourly Employees at the New Brunswick, New Jersey plant; and

(ii)      Buyer will endeavor to obtain mutually agreed competitive work practices in a collective bargaining agreement, comparable to Buyer's existing IUE-CWA agreements at Buyer's St. Joseph, Missouri and Geneva, Illinois facilities.

C.      If waiver of the Successor Clause is not obtained before the Completion Date:

(i)      Until the Completion Date, Seller will endeavor to obtain mutually agreed competitive work practices in a collective bargaining agreement with the

IUE-CWA, comparable to Buyer's collective bargaining agreements with the IUE-CWA at Buyer's St. Joseph, Missouri and Geneva, Illinois facilities;

Subparagraphs 2.C(i) and 2.C(v) notwithstanding, to the extent that Buyer has not negotiated its own local agreement prior to Completion, as outlined in Section 2.C(i), Buyer will assume the terms and conditions of the Delphi-IUE-CWA National Agreement and Delphi-IUE-CWA Local Agreement applicable as of the Completion Date as they relate to the U.S. Hourly Employees, except that Seller has secured in the IUE Consent a waiver of the unpublished "Neutrality" letter in the Delphi-IUE-CWA National Agreement. Seller agrees that it is not Seller's intent to negotiate an agreement with the IUE-CWA after the effective date of this Agreement and prior to Completion that would impose additional material obligations or costs upon Buyer. To that end, and except as otherwise agreed by Buyer, Buyer will not assume terms and conditions relating to the following specified matters contained in any MOU, collective bargaining agreement or other agreement negotiated after the effective date of this Agreement which:

    a. Contains terms that would apply to or affect other facilities of Buyer;

    b. Contains any additional job security provisions for new hires not set forth in the ESCOP Plan;

    c. Introduces severance provisions that would make it impracticable to reduce the workforce;

    d. Requires that Buyer assume any Seller Employee Benefit Plans or participate in any multi-employer plan; or

    e. Guarantees specific levels of manning or requires that the New Brunswick Plant be operated in any specific way for any specific period of time

(iii) In connection with the foregoing clause 2.C(ii), Buyer will act in good faith and will not act unreasonably in order to avoid taking the New Brunswick plant.

(iv) Seller reaffirms its commitment to consult with Buyer's lead bargainer on an ongoing basis in the course of collective bargaining, Buyer's involvement to include option to be present on the premises, participate in specified briefing sessions, provide proposals to Seller, and the like. If in the course of such bargaining, matters which would significantly adversely impact New Brunswick plant competitiveness (compared year over year) arise, Buyer will not be obligated to assume related commitments without Buyer's consent, not to be unreasonably withheld.

(v) Buyer will endeavor to obtain waiver of the Successor Clause and obtain competitive work practices in a collective bargaining agreement with the IUE-CWA, comparable to Buyer's existing collective bargaining agreements with the IUE-CWA at Buyer's St. Joseph, Missouri and Geneva, Illinois facilities; and

(vi) Seller will obtain a waiver of, or otherwise remedy, any other materially significant document related to the Delphi-IUE-CWA National or Local Agreements, if any, that was not made available to Seller prior to July 1, 2005.

    D. If a mutually agreeable collective bargaining agreement between the IUE-CWA and JCI is ratified before completion, then the terms of such agreement would

apply to the Transferred U.S. Hourly Employees rather than the terms of Delphi's agreements referred to in Section 2.C(ii) above. In the event of any conflict with the above terms of this Article 2 and the terms of the Memorandum of Agreement between Delphi and the IUE-CWA attached as Exhibit 1.13 to this Agreement (the "**Memorandum**"), the terms of the Memorandum will govern.

3.    **Obligations at Completion:**

A.    **Buyer Obligations – U.S. Hourly Employees:**

(i)    Within five (5) days prior to Completion, Seller will identify in a Schedule 3.A(i) to this Exhibit 4.1, in accordance with the terms of the Attrition Plan and Section 2.A(i) of this Exhibit 4.1, all U.S. Hourly Employees who are employed as of the Completion Date, by name, social security number, date of hire, job code and current hourly rate. Seller and Buyer will confirm Schedule 3.A(i) of this Exhibit 4.1 as of the day prior to the Completion Date.

(ii)    Effective on the Completion Date, Buyer will offer employment to all U.S. Hourly Employees identified on Schedule 3.A(i) to Exhibit 4.1. U.S. Hourly Employees who accept Buyer's offer of employment (by reporting to work or otherwise acknowledging acceptance) will be referred to as Transferred U.S. Hourly Employees:

a. U.S. Hourly Employees who are included in Schedule 3.A(i) and are not active as of the Completion Date due to disability, layoff, family medical leave or other approved leave of absence may elect to transfer to Buyer under the terms of the Attrition Plan, and will remain Seller's responsibility until any such U.S. Hourly Employee is ready to return to active employment in accordance with Seller's leave policies.

b. Upon such U.S. Hourly Employee's return to active status, Buyer will offer employment in accordance with Section 3.A(ii) above, and, provided such individual accepts Buyer's offer of employment, will be considered a Transferred U.S. Hourly Employee as of such date. In the event that a U.S. Hourly Employee is seeking to return to active employment from a medical-based leave, such individual's fitness for active employment must be approved by both Seller and Buyer provided such does not violate any applicable collective bargaining agreement.

c. If Seller and Buyer do not agree as to such individual's fitness for active employment, the issue will be submitted to an independent medical evaluator, whose determination will be final and binding on the parties. The cost of such independent medical evaluation will be shared equally by the parties.

(iii)    Consistent with Buyer's obligations under Section 2.C(ii) above, unless Buyer is otherwise able to negotiate a new collective bargaining agreement with the IUE-CWA for the Transferred U.S. Hourly Employees, Buyer will provide the Transferred U.S. Hourly Employees with the same level of wages and benefits as required under the Delphi-IUE-CWA National Agreement and

e.     For Transferred U.S. Hourly Employees who have been continuously employed, back pay liability to the extent relating to an event, occurrence or cause of action arising prior to the Completion Date will be allocated to Seller.  Liability relating to an event, occurrence or cause of action arising subsequent to the Completion Date will be allocated to Buyer, including but not limited to costs or other liability incurred by Seller as a result of loss of employment with Buyer, within one (1) year following Completion, by any Transferred U.S. Hourly Employee for any reason other than good cause relating to misconduct or performance under the applicable discipline procedure.

f.     For U.S. Hourly Employees who become Transferred U.S. Hourly Employees because they are reinstated through the grievance procedure, back pay liability relating to periods prior to the Completion Date will be allocated to Seller.  Liability relating to periods subsequent to the Completion Date will be allocated to Seller.

g.     The parties will discuss treatment of Grievances involving unusual circumstances or events that continue before and after the Completion Date.

h.     If either party withholds consent to a settlement or processing of a Grievance recommended by the other party or elects to continue to defend the Grievance, then such party will be liable for the portion of the back pay or other liability resulting from the ultimate disposition of such Grievance (or subsequent settlement) which is in excess of the liability that would have resulted from the settlement recommended and rejected.

(ix)     Subject to Seller's obligations under Section 3.C(iv)a, liabilities, obligations, commitments, costs and expenses for workers' compensation benefits related to injuries or illnesses incurred by Transferred U.S. Hourly Employees after the Completion Date, will be the responsibility of Buyer.

(x)     Buyer will not assume any Seller Employee Benefit Plans.

(xi)     At Completion, Buyer will pay Seller $12.5 million USD by wire transfer in accordance with wiring instructions to be provided by Seller before Completion, to reimburse Seller for costs incurred by Seller under the Attrition Plan, which costs would otherwise have been payable by Buyer under a predecessor agreement between the parties.

B.     **Buyer Obligations – U.S. Salaried Employees:**

(i)     Buyer will offer employment to all U.S. Salaried Employees, except as otherwise agreed by the parties prior to the time such offers have been made. Buyer's employment offers to U.S. Salaried Employees will include salary and benefit packages substantially comparable in the aggregate to those provided by Seller immediately prior to the Completion Date. Prior to tendering such offers, Buyer will provide Seller with information sufficient to satisfy Seller that such offers meet the "substantially comparable in the aggregate"

e.    For Transferred U.S. Hourly Employees who have been continuously employed, back pay liability to the extent relating to an event, occurrence or cause of action arising prior to the Completion Date will be allocated to Seller.  Liability relating to an event, occurrence or cause of action arising subsequent to the Completion Date will be allocated to Buyer, including but not limited to costs or other liability incurred by Seller as a result of loss of employment with Buyer, within one (1) year following Completion, by any Transferred U.S. Hourly Employee for any reason other than good cause relating to misconduct or performance under the applicable discipline procedure.

f.    For U.S. Hourly Employees who become Transferred U.S. Hourly Employees because they are reinstated through the grievance procedure, back pay liability relating to periods prior to the Completion Date will be allocated to Seller.  Liability relating to periods subsequent to the Completion Date will be allocated to Seller.

g.    The parties will discuss treatment of Grievances involving unusual circumstances or events that continue before and after the Completion Date.

h.    If either party withholds consent to a settlement or processing of a Grievance recommended by the other party or elects to continue to defend the Grievance, then such party will be liable for the portion of the back pay or other liability resulting from the ultimate disposition of such Grievance (or subsequent settlement) which is in excess of the liability that would have resulted from the settlement recommended and rejected.

(ix)    Subject to Seller's obligations under Section 3.C(iv)a, liabilities, obligations, commitments, costs and expenses for workers' compensation benefits related to injuries or illnesses incurred by Transferred U.S. Hourly Employees after the Completion Date, will be the responsibility of Buyer.

(x)    Buyer will not assume any Seller Employee Benefit Plans.

(xi)    At Completion, Buyer will pay Seller $12.5 million USD by wire transfer in accordance with wiring instructions to be provided by Seller before Completion, to reimburse Seller for costs incurred by Seller under the Attrition Plan, which costs would otherwise have been payable by Buyer under a predecessor agreement between the parties.

B.    **Buyer Obligations – U.S. Salaried Employees:**

(i)    Buyer will offer employment to all U.S. Salaried Employees, except as otherwise agreed by the parties prior to the time such offers have been made. Buyer's employment offers to U.S. Salaried Employees will include salary and benefit packages substantially comparable in the aggregate to those provided by Seller immediately prior to the Completion Date.  Prior to tendering such offers, Buyer will provide Seller with information sufficient to satisfy Seller that such offers meet the "substantially comparable in the aggregate"

requirement.  Seller's satisfaction that Buyer's offer meets this requirement may not be unreasonably withheld.  Buyer will assume all Employment Rights relating to the U.S. Salaried Employees whom Buyer employs incurred on and after the date of hire.  U.S. Salaried Employees whom Buyer hires will be subject to Buyer's policies and procedures, including any requirement that they execute agreements providing for the protection of Buyer's confidential information and adherence to Buyer's business conduct guidelines.

(ii)     Buyer will recognize the length of service date and all credited service at Seller that the U.S. Salaried Employees whom Buyer hires accrued at Seller for purposes of vesting and eligibility (but not benefit accrual) under the Buyer Employee Benefit Plans.

C.     **Seller Obligations – U.S. Hourly Employees:**

(i)     Seller will remain responsible for all Employment Rights of the U.S. Hourly Employees incurred or vesting prior to the date when they become Transferred U.S. Hourly Employees, except as otherwise provided herein.  In accordance with the terms of the Attrition Plan, all Transferred U.S. Hourly Employees will transfer at the established New Brunswick Tier III rate and benefits in accordance with applicable terms of the Delphi-IUE-CWA Local Agreement and the Delphi-IUE-CWA National Agreement in effect at Completion, or such other agreement as may be applicable under Section 2.D of this Exhibit 4.1.

(ii)     Transferred U.S. Hourly Employees' and their Beneficiaries' participation in and eligibility for benefits under the Seller Employee Benefit Plans will cease as of the Completion Date.  Notwithstanding the preceding sentence, the Seller Employee Benefit Plans will retain liability for all claims incurred by the Transferred U.S. Hourly Employees and their Beneficiaries on or prior to the Completion Date, including claims which are not submitted until after the Completion Date.  A claim will be deemed incurred, as applicable:

a.     On the date of the occurrence of death or dismemberment in the case of claims under life insurance and accidental death and dismemberment Seller Employee Benefit Plans;

b.     On the date on which the service or treatment is provided in the case of claims under medical, hospital, dental and similar Seller Employee Benefit Plans; or

c.     On the date following a Transferred U.S. Hourly Employee's last day worked on which a physician legally licensed to practice medicine certifies to total disability under the applicable disability Seller Employee Benefit Plans.

(iii)     Regardless of the vesting date, Seller will pay to each Transferred U.S. Hourly Employee the amount of all accrued and unutilized vacation pay and any profit sharing due for the calendar year in which the Completion Date occurs on a pro-rata basis using the number of days worked by the Transferred U.S. Hourly Employees for Seller.

(iv)     Seller will retain responsibility for:

a.     All liabilities, obligations, commitments, costs and expenses for workers' compensation benefits related to injuries or illnesses incurred by Transferred U.S. Hourly Employees on or prior to the Completion Date and the pro rata portion, based on years of credited service with Seller compared with total years of credited service with Seller and Buyer, of liabilities, obligations, commitments, costs and expenses for workers' compensation benefits related to post-Completion Date exacerbation of pre-Completion Date injuries or illnesses; and

b.     Claims of the Transferred U.S. Hourly Employees (or a dependent thereof who becomes a "qualified beneficiary" within the meaning of Section 4980B(g)(1) of the Internal Revenue Code) related to compliance with the requirements of continuation coverage under Section 4980B of the Internal Revenue Code or Section 601 of ERISA or as the result of any "qualifying event" within the meaning of Section 4980B(f)(3) of the Internal Revenue Code which occurs on or prior to the Completion Date.

4.     **Allocation of Liability; Indemnification; Cooperation:**

A.     Buyer's Obligations:

(i)     In general, subject to other more specific provisions contained in this Agreement, Buyer will be responsible for and will bear all liability incurred after the Completion Date for Employment Rights of the Transferred U.S. Hourly Employees and U.S. Salaried Employees whom Buyer hires.

(ii)     Buyer will defend, indemnify and hold harmless Seller, its past and present employees, agents, representatives, shareholders, officers, directors, affiliates and assigns and successors, from and against all claims, actions, damages, liabilities, causes of action, losses, costs and expenses (including attorney's fees and defense costs), relating to:

a.     Any Employment Rights of any of the Transferred U.S. Hourly Employees, any U.S. Salaried Employees whom Buyer hires, and any person employed by Buyer after the Completion Date who is not a Transferred U.S. Hourly Employee or U.S. Salaried Employee, for any claims relating to or arising from events occurring after the Completion Date; and

b.     Buyer's failure to comply with the terms of this Exhibit 4.1.

B.     **Seller's Obligations:**

(i)     In general, subject to other more specific provisions contained in this Agreement, Seller will be responsible for and will bear all liability incurred on or prior to the Completion Date for Employment Rights of the U.S. Hourly Employees and U.S. Salaried Employees.

58

(ii)      Seller will defend, indemnify and hold harmless Buyer, its past and present employees, agents, representatives, shareholders, officers, directors, affiliates and assigns and successors, from and against all claims, actions, damages, liabilities, causes of action, losses, costs and expenses (including attorney's fees and defense costs), relating to:

a.      Any Employment Rights of any of the Transferred U.S. Hourly Employees, or of any person employed by Seller prior to the Completion Date who is not a Transferred U.S. Hourly Employee, for any claims relating to or arising from events occurring on or prior to the transfer to Buyer;

b.      Seller's failure to comply with the terms of this <u>Exhibit 4.1</u>; and

c.      Any Employment Rights of U.S. Salaried Employees who do not accept Buyer's offer of employment; <u>provided, however</u>, that such offer complies with the "substantially comparable in the aggregate" requirement of Section 3.B(i).

**C.      <u>Cooperation:</u>**

Seller and Buyer agree to provide each other with such records and information and otherwise cooperate as may be reasonably necessary or appropriate to carry out their respective obligations under this <u>Exhibit 4.1</u>.

# EXHIBIT B

JCI - New Brunswick, NJ Battery Plant decommissioning

## Cleaning of Building Interior

| | Item | Cost | Est. Quantity | Total Cost | Comments | |
|---|---|---|---|---|---|---|
| 5 | Building Decontamination | $ 160,804.00 | 1 | $ 160,804.00 | Quoted 11/4/08 | |
| 6 | Jetting of approximately 3000 feet of process sewers | $ 10,800.00 | 1 | $ 10,800.00 | Quoted 7/17/08 | |
| 7 | Disposal and trans of oily water | $ 0.55 | 3500 | $ 1,925.00 | Quoted 7/17/08 | |
| 8 | Cleaning of piping tunnel leading from powerhouse to production floor | $ 5,400.00 | 1 | $ 5,400.00 | Quoted 7/17/08 | |
| 9 | Cleaning of ductwork for recycling | $ 32,400.00 | 1 | $ 32,400.00 | Quoted 7/17/08 | |
| 10 | Pit sludge removal and disposal | $ 23,021.00 | 1 | $ 23,021.00 | Quoted 7/17/08 | |
| | **Total for Scope of Services No. 1:** | | | **$ 234,350.00** | | |

## Asbestos Abatement

| | Item | Cost | Quantity | Total Cost | Comments | |
|---|---|---|---|---|---|---|
| 17 | Asbestos abatement of entire plant | $ 879,200.00 | 1 | $ 879,200.00 | Quoted 11/4/08 | JCI |
| | **Total for Scope of Services No. 3:** | | | **$ -** | *Excluding JCI* | |

## Total Facility Demolition

| | Item | Cost | Quantity | Total Cost | Comments | |
|---|---|---|---|---|---|---|
| 24 | Demolition of facility to slab | $ 773,294.00 | 1 | $ 773,294.00 | Quoted 11/4/08 | JCI |
| 25 | Demolition of slab | $ 655,200.00 | 1 | $ 655,200.00 | Quoted 11/4/08 | |
| 26 | Disposal of 100 yd3 of hazardous debris from charge floor tables | $ 186.00 | 100 | $ 18,600.00 | Quoted 11/4/08 | |
| 27 | Waste characterization (verify that concrete can legally remain on site) | $ 15,000.00 | 1 | $ 15,000.00 | Quoted 11/4/08 | |
| | **Total for Total Demolition Scope of Work:** | | | **$ 688,800.00** | *Excluding JCI* | |

## Miscellaneous Decommissioning Items

| | Item | Cost | Quantity | Total Cost | Comments | |
|---|---|---|---|---|---|---|
| 35 | Lab Pack | $ 22,000.00 | 1 | $ 22,000.00 | Quoted 11/4/08 | JCI |
| 36 | Acid tank decommissioning | $ 55,968.75 | 1 | $ 55,968.75 | Quoted 9/26/08 | JCI |
| 37 | Acid sludge disposal (from tank decommissioning) | $ 19,950.00 | 1 | $ 19,950.00 | Quoted 9/26/08 | JCI |
| 38 | Light bulb and ballast removal and disposal | $ 43,200.00 | 1 | $ 43,200.00 | Quoted 11/4/08 | JCI |
| | **Total for Miscellaneous Decommissioning Items:** | | | **$ -** | *Excluding JCI* | |

## Soil Remediation and Disposal (Entire Site Footprint)

| | Item | Cost | Quantity | Total Cost | Comments |
|---|---|---|---|---|---|
| 45 | Excavate and stage soil for disposal (per ton) | $ 10.00 | 60,000 | $ 600,000.00 | |
| 46 | Loading of soil | $ 3.00 | 60,000 | $ 180,000.00 | |
| 47 | Disposal and trans of hazardous soil (D008) | $ 185.76 | 20,000 | $ 3,715,200.00 | |
| 48 | Disposal and trans of non hazardous soil | $ 88.88 | 40,000 | $ 3,555,200.00 | Non hazardous material includes material that is below RCRA hazardous thresholds, although above levels permitted to remain on site by state agency. |
| | **Total for Soil Remediation Scope of Work:** | | | **$ 8,050,400.00** | |
| | **Total for all Services:** | | | **$ 8,973,550.00** | *Excluding JCI* |

# EXHIBIT C

**Delphi Environmental Liability**
Prepared July 13, 2009

**Assumptions**

| | |
|---|---|
| Inflation Rate (CPI-U 10 year average) | 2.82% |
| Discount Rate (Moody's AAA Bond Index 6 month average) | 5.42% |
| Annual Cost | $380,400 |

| Liability | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Undiscounted, Pre-Inflation Adjusted | 3,804,000 | 380,400 | 380,400 | 380,400 | 380,400 | 380,400 | 380,400 | 380,400 | 380,400 | 380,400 | 380,400 |
| Undiscounted, Inflation Adjusted | 4,446,844 | 391,127 | 402,157 | 413,498 | 425,159 | 437,148 | 449,476 | 462,151 | 475,183 | 488,584 | 502,362 |
| Discounted, Inflation Adjusted | 3,324,355 | 371,018 | 361,868 | 352,943 | 344,238 | 335,748 | 327,467 | 319,391 | 311,514 | 303,831 | 296,337 |