# Exhibit A
# 1994 Loan Agreement

COUNTY OF TRUMBULL, OHIO

and

GENERAL MOTORS CORPORATION

LOAN AGREEMENT

Dated as of July 1, 1994

All right, title and interest of the County of Trumbull, Ohio in this Agreement (with the exception of its rights under Sections 4.2(b), 5.3(a) and 6.3 hereof) have been assigned pursuant to the Indenture referred to herein, for the benefit of the owners of, and as security for payment of, the Bonds of said Issuer described herein.

249109.01.13.B
2012276/MR:7/8/94

# LOAN AGREEMENT

(This Table of Contents is not
a part of this Loan Agreement
and is only for convenience of reference)

## TABLE OF CONTENTS

| SECTION | HEADING | PAGE |
|---|---|---|
| Parties | | 1 |
| Preambles | | 1 |
| ARTICLE I | DEFINITION OF TERMS | 1 |
| ARTICLE II | REPRESENTATIONS | 4 |
| Section 2.1. | Representations of the Issuer | 4 |
| Section 2.2. | Representations of the Company | 5 |
| ARTICLE III | CONSTRUCTION OF THE PROJECT; ISSUANCE OF BONDS | 6 |
| Section 3.1. | Agreement to Construct and Equip the Project | 6 |
| Section 3.2. | Agreement to Issue Bonds; Application of Bond Proceeds | 7 |
| Section 3.3. | Disbursements from the Construction Fund | 7 |
| Section 3.4. | Establishment of Completion Date; Obligation of the Company to Complete | 8 |
| Section 3.5. | Investments | 10 |
| Section 3.6. | Arbitrage Certifications | 10 |
| ARTICLE IV | LOAN OF BOND PROCEEDS; PAYMENT OBLIGATIONS | 10 |
| Section 4.1. | Loan of Bond Proceeds | 10 |
| Section 4.2. | Amounts Payable by Company | 11 |
| Section 4.3. | No Defense or Set-Off; Unconditional Obligation | 11 |
| Section 4.4. | Assignment and Pledge of Issuer's Rights | 12 |
| ARTICLE V | SPECIAL COVENANTS AND AGREEMENTS | 12 |
| Section 5.1. | Right of Access to the Project | 12 |
| Section 5.2. | Company to Maintain its Existence; Conditions Under Which Exceptions Permitted | 12 |
| Section 5.3. | Release and Indemnification Covenants | 13 |
| Section 5.4. | Validity and Tax-Exempt Status of the Bonds | 14 |
| Section 5.5. | Taxes and Governmental Charges | 15 |
| Section 5.6. | Maintenance and Repair; Insurance | 15 |
| Section 5.7. | Financial Reports | 15 |

Section 5.8.    Filings; Lien of Indenture...............................................................16
Section 5.9.    Operation of Project.......................................................................16

ARTICLE VI    EVENTS OF DEFAULT AND REMEDIES.................................................16

Section 6.1.    Events of Default...........................................................................16
Section 6.2.    Remedies on Default.......................................................................17
Section 6.3.    Agreement to Pay Attorneys' Fees and Expenses...........................18
Section 6.4.    No Remedy Exclusive.....................................................................18
Section 6.5.    No Additional Waiver Implied by One Waiver...............................19

ARTICLE VII    PREPAYMENT ...............................................................................19

Section 7.1.    Obligation to Prepay.......................................................................19
Section 7.2.    Option to Prepay............................................................................19
Section 7.3.    Redemption of the Bonds...............................................................20

ARTICLE VIII    MISCELLANEOUS ...........................................................................20

Section 8.1.    Notices.........................................................................................20
Section 8.2.    Assignments..................................................................................20
Section 8.3.    Severability...................................................................................20
Section 8.4.    Execution of Counterparts...............................................................21
Section 8.5.    Amounts Remaining in any Fund or with Trustee ............................21
Section 8.6.    Amendments, Changes and Modifications........................................21
Section 8.7.    Governing Law..............................................................................21
Section 8.8.    Authorized Company Representative ...............................................21
Section 8.9.    Term of this Agreement..................................................................21
Section 8.10.    Binding Effect................................................................................21
Section 8.11.    Limited Liability of Officers, Etc....................................................22

Testimonium ........................................................................................................22

EXHIBIT A

LOAN AGREEMENT

THIS LOAN AGREEMENT dated as of July 1, 1994, by and between the COUNTY OF TRUMBULL, OHIO, a county and political subdivision of the State of Ohio (the "Issuer"), and GENERAL MOTORS CORPORATION, a corporation duly organized and validly existing under the laws of the State of Delaware (the "Company");

WITNESSETH:

WHEREAS, pursuant to Chapter 165, Ohio Revised Code, as amended (the "Act"), the Issuer has the authority to issue its bonds to provide funds, by loans or otherwise, for acquiring, constructing, reconstructing, enlarging, improving, furnishing or equipping one or more projects (as defined in the Act) or parts thereof in furtherance of the public purposes in the Act; and

WHEREAS, pursuant to and in accordance with the provisions of the Act, and at the request of the Company, the Issuer has agreed to issue its Sewage Disposal Revenue Bonds (General Motors Corporation Project) Series 1994 in the aggregate principal amount of $2,750,000 (the "Bonds") in order to provide funds to be lent to the Company hereunder to finance costs of the Project hereinafter described; and

WHEREAS, the Bonds will be secured by an assignment and pledge of the Issuer's rights under this Agreement (except its rights under Sections 4.2(b), 5.3(a) and 6.3 hereof); and

WHEREAS, the execution and delivery of this Agreement have been in all respects duly and validly authorized by action of the Issuer's governing body;

NOW, THEREFORE, in consideration of the respective representations and agreements herein contained, the parties hereto agree as follows (provided, that in the performance of the agreements of the Issuer herein contained, any obligation it may thereby incur shall be payable solely out of the revenues and receipts derived from this Agreement, the sale of the Bonds and the income from the temporary investment thereof):

ARTICLE I

DEFINITION OF TERMS

All words and phrases defined in Article I of the Indenture shall have the same meanings in this Agreement. Certain terms used in this Agreement are hereinafter defined in this Article I. When used herein, such terms shall have the meanings given them by the language employed in this Article I defining such terms unless the context clearly indicates otherwise:

"Agreement" means this Loan Agreement, as from time to time supplemented and amended.

"Authorized Company Representative" means such person at the time and from time to time designated to act on behalf of the Company by written certificate furnished to the Issuer and the Trustee, containing the specimen signature of such person, signed on behalf of the Company by the chief executive officer, the chairman, any vice president, the treasurer, any assistant treasurer, the secretary or any assistant secretary of the Company.  Such certificate may designate an alternate or alternates.

"Bond Counsel" means the counsel who rendered the opinion as to the tax-exempt status of the interest on the Bonds on the date of the issuance, sale and delivery of the Bonds or such other nationally recognized municipal bond counsel of recognized expertise with respect to such matters as may be mutually satisfactory to the Issuer, the Company and the Trustee.

"Bond Fund" means the fund created and established in Section 5.2 of the Indenture.

"Bonds" means the Sewage Disposal Revenue Bonds (General Motors Corporation Project) Series 1994 of the Issuer, in the aggregate principal amount of $2,750,000, issued pursuant to the Indenture.

"Code" means the Internal Revenue Code of 1986, as amended, together with any regulations promulgated thereunder or applicable thereto.

"Company" means General Motors Corporation, a corporation duly organized and validly existing under the laws of the State of Delaware, and any surviving, resulting or transferee corporation as permitted by Section 5.2 hereof.

"Completion Date" means the date of completion of construction of the Project.

"Construction Fund" means the Construction Fund created and established in Section 5.6 of the Indenture.

"Construction Period" means the period between the beginning of construction of the Project or the date on which the Bonds are first delivered to the purchasers thereof, whichever is earlier, and the Completion Date.

"Cost of the Project" means the sum of the items authorized to be paid from the Construction Fund pursuant to the provisions of Section 3.3 hereof.

"Event of Default" means any occurrence or event specified as such in and defined as such by Section 6.1 hereof.

"Indenture" means the Indenture of Trust dated as of July 1, 1994, by and between the Issuer and the Trustee, as from time to time supplemented and amended.

"Issuer" means the County of Trumbull, Ohio, a county and political subdivision of the State of Ohio, and any successor body to the duties or functions of the Issuer.

"Permitted Investments" means:

(a)   Bonds or other obligations of the United States of America;

(b)   Bonds or other obligations, the payment of the principal and interest of which is unconditionally guaranteed by the United States of America;

(c)   Obligations issued or guaranteed as to principal and interest by any agency or person controlled or supervised by and acting as an instrumentality of the United States of America pursuant to authority granted by the Congress of the United States of America;

(d)   Securities or receipts evidencing ownership interests in obligations or specified portions (such as principal or interest) of obligations described in (a), (b) or (c) above;

(e)   Commercial or finance company paper which is rated either P-1 or A-1 or an equivalent by Moody's or S&P (including investments in pools or such commercial or finance company paper owned by the Trustee or any affiliate of the Trustee);

(f)   Obligations issued by or on behalf of any state of the United States of America, or any political subdivision of any such state, which are rated at least A (or an equivalent) by Moody's or S&P;

(g)   Funds comprised of obligations described in (f) above to the extent described in Treasury Regulation 1.148-8(e)(3)(iii), including any such fund managed by the Trustee or any affiliate of the Trustee;

(h)   Money market funds which are rated prime-1 or AAAm (or an equivalent) by Moody's or S&P, including any such money market fund managed by the Trustee or any affiliate of the Trustee;

(i)   repurchase agreements secured by (a) or (b) above which are authorized by law as security for public deposits, provided that no proceeding under any applicable insolvency or reorganization law has been commenced by or against the issuer of such bonds or obligations; or

(j)   Any other investment not prohibited by applicable law (as evidenced by an opinion of counsel furnished to the Trustee).

"Plans and Specifications" means the plans and specifications prepared for the Project by the Company, as amended from time to time prior to the Completion Date, which plans and specifications are on file at the principal office of the Company.

"Project" means facilities described in Exhibit A hereto, which are further described in the Project Certificate.

"Project Certificate" means the Company's Project Certificate delivered concurrently with the issuance of the Bonds, concerning facts, estimates and circumstances so as to enable Bond Counsel to render its approving opinion required under the Indenture.

"Rebate Fund" means the Rebate Fund established in accordance with the requirements of the Tax Agreement.

"Regulations" means the Treasury Regulations dealing with the tax-exempt bond provisions of the Code.

"State" means the State.

"Tax Agreement" means the Tax Exemption Certificate and Agreement, dated the date of delivery of the Bonds, by and among the Issuer, the Company and the Trustee, as from time to time supplemented and amended.

"Trustee" means the Trustee at the time serving as such under the Indenture.

"Underwriter" means First Commerce Capital, division of Morgan Keegan & Company, Inc., and its successors and assigns.

The words "hereof", "herein", "hereunder" and other words of similar import refer to this Agreement as a whole.

Unless otherwise specified, references to Articles, Sections and other subdivisions of this Agreement are to the designated Articles, Sections and other subdivisions of this Agreement as originally executed.

The headings of this Agreement are for convenience only and shall not define or limit the provisions hereof.

## ARTICLE II

### REPRESENTATIONS

**Section 2.1.   Representations of the Issuer.** The Issuer makes the following representations as the basis for the undertakings on its part herein contained:

(a)   The Issuer is a county and political subdivision of the State.

(b)   The Issuer has determined that the Project is a "Project" as that term is defined in the Act, is consistent with the purposes of the Act and will benefit the people of the Issuer by maintaining or increasing jobs and employment opportunities and promoting the economic development of the Issuer and the State.

(c)   Under the provisions of the Act and proceedings of the Issuer, the Issuer has the power and authority to enter into the transactions contemplated by, and to

-4-

execute and deliver, this Agreement, the Tax Agreement, the Indenture and the Bonds and to carry out its obligations hereunder and thereunder.

(d)    Neither the execution and delivery of this Agreement, the Indenture, the Tax Agreement and the Bonds, the consummation of the transactions contemplated hereby or thereby nor the fulfillment of or compliance with the terms and conditions of this Agreement, the Indenture, the Tax Agreement and the Bonds conflicts with or results in a breach of the terms, conditions or provisions of any restriction or any agreement or instrument to which the Issuer is now a party or by which it is bound, or constitutes a default under any of the foregoing.

(e)    The Bonds are to be issued under the Indenture and the payment of the principal of, premium, if any, and interest on the Bonds are to be secured under the Indenture by an assignment and pledge to the Trustee of all right, title and interest of the Issuer in and to this Agreement (except the rights of the Issuer under Sections 4.2(b), 5.3(a) and 6.3 hereof).

(f)    The Issuer has not assigned or pledged and will not assign or pledge its right, title or interest in or to this Agreement, other than to secure the Bonds and as otherwise provided in the Indenture.

**Section 2.2.    Representations of the Company.**    The Company makes the following representations as the basis for the undertakings on its part herein contained:

(a)    The Company is a corporation duly organized and validly existing under the laws of the State of Delaware, is authorized to do business in, and is in good standing under the laws of, the State, and has the power to enter into, and by proper corporate action has been duly authorized to execute and deliver, this Agreement and the Tax Agreement.

(b)    Neither the execution and delivery of this Agreement and the Tax Agreement, the consummation of the transactions contemplated hereby or thereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement and the Tax Agreement, conflicts with or results in a breach of any of the terms, conditions or provisions of any restriction or any agreement or instrument to which the Company is now a party or by which it is bound, or constitutes a default under any of the foregoing, or results in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of the property or assets of the Company or any subsidiary thereof in a manner which would result in any material adverse change in the consolidated financial position of the Company.

(c)    The statements, information and descriptions contained in the Project Certificate and in the Tax Agreement are true, correct and complete and such statements, information, description and estimates and assumptions contained in the Project Certificate and the Tax Agreement are based upon the best information available to the Company.

## ARTICLE III

### CONSTRUCTION OF THE PROJECT; ISSUANCE OF BONDS

**Section 3.1.  Agreement to Construct and Equip the Project.**  The Company agrees that it will acquire or construct, or complete the acquisition and construction of, the Project near Warren, Ohio substantially in accordance with the Plans and Specifications.

(a)  In the event that Exhibit A hereto is to be amended or supplemented in accordance with the provisions of Section 11.1 of the Indenture, the Issuer will enter into, and will instruct the Trustee to consent to, an amendment of or supplement to Exhibit A hereto upon receipt of:

(i)  a certificate of an Authorized Company Representative describing in detail the proposed changes; and

(ii)  a copy of the proposed form of amendment or supplement to Exhibit A hereto and such other documents, certificates and showings as may be required by counsel rendering the opinion in clause (iii) of this paragraph; and

(iii)  an opinion of Bond Counsel to the effect that such amendment complies with the requirements of this Section 3.1, is in proper form for execution and delivery by the Issuer and will not adversely affect the validity of the Bonds or the exemption from federal income taxes of the interest thereon.

(b)  All laborers and mechanics employed on the Project shall be paid at the prevailing rates of wages of laborers and mechanics for the class of work called for by the Project, which wages shall be determined in accordance with the requirements of Chapter 4115 of the Ohio Revised Code, for determination of prevailing wages, provided that should the Company or other non-public user beneficiary of the Project undertake, as part of the Project, construction to be performed by its regular collective bargaining unit employees who are covered under a collective bargaining agreement which was in existence prior to the date of the commitment instrument undertaking to issue the Bonds, then, in that event, the rate of pay provided under the collective bargaining agreement may be paid to such employees.  To the extent required by Section 4115.032 of the Ohio Revised Code, the Company shall comply, and shall require compliance by all contractors or subcontractors working on the Project, with all applicable requirements of Sections 4115.03 through 4115.16 of the Ohio Revised Code, including, without implied limitation, obtaining or causing to be obtained from the Ohio Department of Industrial Relations ("Department") its determination of the prevailing rates of wages to be paid for the class of work called for by the Project and requesting it to designate a prevailing wage coordinator ("Coordinator") for the Project, pursuant to Section 4115.032 of the Ohio Revised Code.  Prior to issuance of the Bonds, the Company shall be required to provide the Issuer with evidence that it has complied with the foregoing agreements.  In the event of failure or refusal by the Department to designate a Coordinator for the Project within thirty days of receipt of such request, the Issuer shall designate one of its employees to act as the interim Coordinator for

-6-

the Project until the Department designates a Coordinator, and the cost of such employee's services, based upon the time of such employee expended in performing such services at his or her usual rate of compensation, shall upon demand be reimbursed to the Issuer by the Company.

**Section 3.2.    Agreement to Issue Bonds; Application of Bond Proceeds.** In order to provide funds to finance the Cost of the Project, the Issuer agrees that it will issue under the Indenture, sell and cause to be delivered to the Underwriter, the Bonds, bearing interest and maturing as set forth in the Indenture. The Issuer will thereupon cause the accrued interest, if any, received upon the delivery of the Bonds to be deposited in the Bond Fund and the balance of the proceeds (net of underwriting discount) received from the sale of the Bonds to be deposited in the Construction Fund.

**Section 3.3.    Disbursements from the Construction Fund.** The Issuer hereby authorizes and directs the Trustee, upon compliance with Section 5.7 of the Indenture, to disburse the moneys in the Construction Fund to or on behalf of the Company for the following purposes (but, subject to the provisions of Sections 3.4 and 3.5 hereof, for no other purpose):

(a)    Payment to the Company of such amounts, if any, as shall be necessary to reimburse the Company in full for all advances and payments made by it at any time prior to or after the delivery of the Bonds for expenditures in connection with the preparation of the Plans and Specifications (including any preliminary study or planning of the Project or any aspect thereof) and the construction and acquisition of the Project.

(b)    Payment of the initial or acceptance fee of the Trustee, legal, financial and accounting fees and expenses, original issue discount, and printing and engraving costs incurred in connection with the authorization, issuance and sale of the Bonds, the execution and filing of the Indenture and the preparation and recording or filing of all other documents in connection therewith, and payment of all fees, costs and expenses for the preparation of this Agreement, the Tax Agreement, the Indenture and all other documents in connection with the authorization, issuance and sale of the Bonds.

(c)    Payment for labor, services, materials and supplies used or furnished in the construction and acquisition of the Project, and payment of amounts due under contracts for the acquisition, construction and installation of the Project, all as provided in the plans, specifications and work orders therefor.

(d)    Payment of the fees, if any, for architectural, engineering, legal, underwriting and supervisory services with respect to the Project.

(e)    To the extent not paid by a contractor for construction or installation with respect to any part of the Project, payment of the premiums on all insurance required to be taken out and maintained during the Construction Period.

(f)   Payment of the taxes, assessments and other charges, if any, that may become payable during the Construction Period with respect to the Project, or reimbursement thereof if paid by the Company.

(g)   Payment of expenses incurred in seeking to enforce any remedy against any contractor or subcontractor in respect of any default under a contract relating to the Project.

(h)   Interest on the Bonds during construction of the Project.

(i)   Payment of any other costs which constitute part of the Cost of the Project in accordance with generally accepted accounting principles and which are permitted by the Act and will not affect the exemption from federal income taxes of interest on any of the Bonds.

(j)   For transfer to the Rebate Fund in order to comply with the provisions of the Tax Agreement.

All moneys remaining in the Construction Fund after the Completion Date and after payment or provision for payment of all other items provided for in the preceding subsections (a) to (i), inclusive, of this Section, shall at the direction of the Company be used in accordance with Section 3.4 hereof.

**Section 3.4.   Establishment of Completion Date; Obligation of the Company to Complete.** As soon as practicable after the completion of construction of the Project, and in any event not more than ninety (90) days thereafter, the Company shall furnish to the Trustee a certificate signed by an Authorized Company Representative stating (i) that construction of the Project has been completed substantially in accordance with the Plans and Specifications, (ii) the Completion Date, (iii) the Cost of the Project, (iv) the portion of the Cost of the Project which has then been paid, (v) the portion of the Cost of the Project which has not yet been paid and (vi) that all bond proceeds have been applied solely to the payment of the Cost of the Project on account of which the Bonds were issued, as required by the Act.  Such certificate may state that it is given without prejudice to any rights against third parties which exist at the date of such certificate or which may subsequently come into being.  Moneys (including investment proceeds) remaining in the Construction Fund on the date of such certificate may be used, at the direction of an Authorized Company Representative, to the extent indicated, for one or more of the following purposes:

(1)   for the payment, in accordance with the provisions of this Agreement, of any Cost of the Project not then paid as specified in the above-mentioned certificate; or

(2)   for transfer to the Bond Fund, but only if, and to the extent that, such transfer is permitted by the Act and does not adversely affect the exemption from federal income taxes of interest on any of the Bonds; or

(3)    for the payment of redemption of Bonds in accordance with the provisions of Section 3.1(d) of the Indenture within 180 days following the filing of said completion certificate with the Trustee, such moneys to be used only to pay principal of Bonds upon any such redemption.

Any moneys (including investment proceeds) remaining in the Construction Fund on the date of the aforesaid certificate and not set aside for the payment of the Cost of the Project as specified in (1) above or transferred to the Bond Fund pursuant to (2) above shall on such date be placed by the Trustee in a separate and segregated escrow account and used to pay principal of Bonds upon the redemption thereof as provided in (3) above; provided that, until so used such moneys may also be used, at the direction of the Company, for one or more of the following purposes:

(a)    to pay all or part of the price of purchasing Bonds on tender, in the open market or at private sale, on or before such date or dates, for the purpose of cancellation;

(b)    for the payment of the cost of any purpose authorized under the Act, provided that prior to such use this Agreement is amended in accordance with Section 3.1 hereof to include such additional facilities within the definition of Project as used herein; or

(c)    for any other purpose;

provided that, no moneys on deposit in such escrow account may be used for any of the purposes specified in (a), (b) or (c) in this paragraph unless and until the Company delivers to the Trustee the opinion of Bond Counsel upon which the Trustee may rely to the effect that such use is permitted by the Act and does not adversely affect the exemption from federal income taxes of interest on any of the Bonds; and provided further that, until used for one or more of the foregoing purposes, moneys on deposit in such escrow account may be invested in investments authorized by the first paragraph of Section 3.5 of this Agreement, but may not be invested to produce a yield on such moneys (computed from the Completion Date and taking into account any investment of such moneys during the period from the Completion Date until such moneys were deposited in such escrow account) greater than the yield on the Bonds, all as such terms are used in and determined in accordance with relevant provisions of the Code and the Regulations.

In the event the moneys in the Construction Fund available for payment of the Cost of the Project should not be sufficient to pay the costs thereof in full, the Company agrees to pay directly, or to deposit in the Construction Fund moneys sufficient to pay, the costs of completing the Project as may be in excess of the moneys available therefor in the Construction Fund. The Issuer does not make any warranty, either express or implied, that the moneys which will be paid into the Construction Fund and which, under the provisions of this Agreement, will be available for payment of the Cost of the Project, will be sufficient to pay all the costs which will be incurred in that connection. The Company agrees that if after exhaustion of the moneys in the Construction Fund the Company should pay, or deposit moneys in the Construction Fund for the payment of, any portion of the Cost of the Project

pursuant to the provisions of this Section, it shall not be entitled to any reimbursement therefor from the Issuer or from the Trustee or from the owners of any of the Bonds, nor shall it be entitled to any diminution of the loan repayment installments or other amounts payable under Section 4.2 hereof.

**Section 3.5.   Investments.**  Any moneys held as a part of the Construction Fund or the Bond Fund shall be invested or reinvested by the Trustee, at the direction of the Authorized Company Representative as provided in Article VI of the Indenture and in the Tax Agreement, to the extent permitted by law in Permitted Investments.   Any such investment may be purchased at the offering or market price thereof at the time of such purchase.   The Trustee may make any and all such investments through its own bond department.

The investments so purchased shall be held by the Trustee and shall be deemed at all times a part of the Construction Fund or the Bond Fund, as the case may be, and the interest accruing thereon and any profit realized therefrom shall be credited to such fund and any net losses resulting from such investment shall be charged to such fund (on the date on which the proceeds of any such investment are needed for the purposes of such fund) and paid by the Company.

The Company covenants that any funds (including investment proceeds) on deposit in the Construction Fund more than three years after the date of delivery of the Bonds will not be invested to produce a yield greater than the yield on the Bonds, all as such terms are used in and determined in accordance with the regulations promulgated or proposed under relevant provisions of the Code and shall be treated as provided in the Tax Agreement.

**Section 3.6.   Arbitrage Certifications.**  The Company reasonably expects, based on its knowledge, information and belief, and hereby certifies and represents to the Issuer, and the Issuer hereby certifies that it reasonably expects, that the proceeds of the Bonds will not be used in a manner that would cause the Bonds to be classified as "arbitrage bonds" under Section 148 of the Code and Regulations prescribed under that Section.   The Issuer and the Company jointly and severally certify and covenant with all purchasers and owners of the Bonds from time to time outstanding that so long as any of the Bonds remain outstanding moneys on deposit in any fund or account in connection with the Bonds, whether or not such moneys were derived from the proceeds of the sale of the Bonds or from any other sources, will not be used in a manner which will cause the Bonds to be "arbitrage bonds" within the meaning of the Code and the Regulations.

## ARTICLE IV

## LOAN OF BOND PROCEEDS; PAYMENT OBLIGATIONS

**Section 4.1.   Loan of Bond Proceeds.**  The Issuer agrees, upon the terms and conditions in this Agreement, to lend to the Company the proceeds (exclusive of accrued interest, if any) received by the Issuer from the sale of the Bonds.

**Section 4.2.   Amounts Payable by Company.** (a) The Company covenants and agrees to pay to the Trustee as a loan repayment installment, on each date provided in or pursuant to the Indenture for the payment of principal (whether at maturity or upon redemption or acceleration) of, premium, if any, and/or interest on the Bonds, until the principal of, premium, if any, and interest on the Bonds shall have been fully paid or provision for the payment thereof shall have been made in accordance with the Indenture, in lawful money of the United States of America in federal or other immediately available funds, for deposit in the Bond Fund, a sum equal to the amount payable on such date as principal (whether at maturity or upon redemption or acceleration), premium, if any, and interest upon the Bonds as provided in the Indenture. Each payment pursuant to this Section 4.2(a) shall at all times be sufficient to pay the corresponding amount of interest and principal (whether at maturity or upon redemption or acceleration) and premium, if any, payable on the Bonds; provided that any amount held by the Trustee in the Bond Fund on any due date for an installment hereunder shall be credited against the amount due on such date to the extent available for such purpose; and provided further that, subject to the provisions of this Section 4.2(a), if at any time the amounts held by the Trustee in the Bond Fund are sufficient to pay all of the principal of and interest and premium, if any, on the Bonds as such payments become due, the Company shall be relieved of any obligation to make any further payments under the provisions of this Section 4.2(a). Notwithstanding the foregoing, if on any date the amount held by the Trustee in the Bond Fund is insufficient to make any required payments of principal of (whether at maturity or upon redemption or acceleration) and interest and premium, if any, on the Bonds as such payments become due, the Company shall forthwith pay such deficiency as an installment hereunder. If the Company shall fail to pay any amount under this Section 4.2(a), the amount so in default shall continue as an obligation of the Company until the amount so in default shall have been fully paid, and the Company agrees to pay the same with interest thereon until paid (to the extent legally enforceable) at a rate equal to the rate borne by the Bonds from time to time from the due date thereof until paid.

(b)   The Company also agrees to pay to the Issuer its fees, if any, for issuing the Bonds, plus the reasonable expenses of the Issuer incurred in fulfilling the Issuer's obligations under this Agreement and the Indenture, which are not otherwise required to be paid by the Company under the terms of this Agreement.

(c)   The Company also agrees to pay to the Trustee, Registrar and Paying Agent (l) the initial acceptance fee of the Trustee and the costs and expenses, including reasonable attorney's fees, incurred by the Trustee in entering into and executing the Indenture, and (2) during the term of this Agreement (i) an amount equal to the annual fee of the Trustee for the ordinary services of the Trustee, as trustee, rendered and its ordinary expenses incurred under the Indenture, including reasonable attorneys' fees, as and when the same become due, (ii) the fees, charges and expenses of the Trustee, the Paying Agent and the Registrar, as and when the same become due, and (iii) the fees, charges and expenses of the Trustee for the necessary extraordinary services rendered by it and extraordinary expenses incurred by it under the Indenture, including reasonable attorneys' fees, as and when the same become due.

**Section 4.3.   No Defense or Set-Off; Unconditional Obligation.** The obligations of the Company to make the payments required in Section 4.2(a) hereof shall be

-11-

absolute and unconditional, irrespective of any defense or any rights of set-off, recoupment or counterclaim it might otherwise have against the Issuer, the Trustee, the Paying Agent or the Registrar. The Company shall pay net during the term of this Agreement the payments to be made under Section 4.2(a) hereof free of any deductions and without abatement, diminution or set-off other than those herein expressly provided. Until such time as the principal of, premium, if any, and interest on the Bonds shall have been fully paid, or provision for the payment thereof shall have been made in accordance with the Indenture, the Company: (i) will not suspend or discontinue any payments provided for in Section 4.2(a) hereof; (ii) will perform and observe all of its agreements contained in this Agreement; and (iii) will not terminate this Agreement for any cause, including, without limiting the generality of the foregoing, the occurrence of any acts or circumstances that may constitute failure of consideration, destruction of or damage to the Project, commercial frustration of purpose, any change in the tax laws of the United States of America or the State or any political subdivision thereof, or any failure of the Issuer or the Trustee to perform and observe any agreement, whether express or implied, or any duty, liability or obligation arising out of or connected with this Agreement, except to the extent permitted by this Agreement.

Section 4.4.    Assignment and Pledge of Issuer's Rights.    As security for the payment of its Bonds, the Issuer will assign and pledge to the Trustee all right, title and interest of the Issuer in and to this Agreement, including the right to receive payments hereunder and thereunder (except the right to receive payments, if any, under Sections 4.2(b), 5.3(a) and 6.3 hereof and the rights to make determinations and receive notices as herein provided), and hereby directs the Company to make said payments directly to the Trustee. The Company herewith assents to such assignment and pledge and will make payments directly to the Trustee without defense or set-off by reason of any dispute between the Company and the Issuer or the Trustee.

## ARTICLE V

## SPECIAL COVENANTS AND AGREEMENTS

Section 5.1.    Right of Access to the Project.    The Company agrees that during the term of this Agreement the Issuer, the Trustee and their duly authorized agents shall have the right during regular business hours, with reasonable notice, to examine and inspect the Project. The Company agrees that the Issuer, the Trustee and their duly authorized agents shall have, subject to such limitations, restrictions and requirements as the Company may reasonably prescribe, such rights of access to the Project.

Section 5.2.    Company to Maintain its Existence; Conditions Under Which Exceptions Permitted.    The Company agrees that during the term of this Agreement it will maintain its corporate existence, will not dissolve or otherwise dispose of all or substantially all of its assets, and will not consolidate with or merge into another corporation or permit one or more corporations to consolidate with or merge into it unless the Company is the surviving, resulting or transferee corporation, as the case may be, provided, that the Company may, without violating the agreements contained in this Section 5.2, consolidate with or merge into another domestic corporation (i.e., a

-12-

corporation incorporated and existing under the laws of the United States of America or any state, district or territory thereof) or permit one or more other domestic corporations to consolidate with or merge into it, or sell or otherwise transfer to another domestic corporation all or substantially all of its assets as an entirety and thereafter dissolve, provided, in the event the Company is not the surviving, resulting or transferee corporation, as the case may be, that the surviving, resulting or transferee corporation (i) is a domestic corporation as aforesaid, (ii) is qualified to do business in the State, and (iii) assumes in writing all of the obligations of the Company under this Agreement and the Tax Agreement.

**Section 5.3.   Release and Indemnification Covenants.** (a) The Company agrees to indemnify and save the Issuer, its officials, officers and employees (each an "indemnified party") harmless against and from all claims by or on behalf of any person, firm or corporation arising from the conduct or management of, or from any work or thing done on, the Project or relating to the issuance of the Bonds, in each case while the Bonds remain outstanding, including but not limited to (i) any condition of the Project, (ii) any breach or default on the part of the Company in the performance of any of its obligations under this Agreement, the Tax Agreement or the Indenture, (iii) any act of negligence of the Company or of any of its agents, contractors, servants, employees or licensees, (iv) any act of negligence of any assignee or lessee of the Company, or of any agents, contractors, servants, employees or licensees of any assignee or lessee of the Company, (v) any violation by the Company of state or federal securities laws in connection with the offer and sale of the Bonds, or (vi) any performance by any indemnified party of any act required under this Agreement, the Tax Agreement or the Indenture or requested by the Company; excluding, however, claims occasioned by the negligence or willful misconduct of the indemnified party. The Company agrees to indemnify and save each indemnified party harmless from and against all costs and expenses incurred in or in connection with any such claim arising as aforesaid or in connection with any action or proceeding brought thereon. In case any such claim shall be made or action brought based upon any such claim in respect of which indemnity may be sought against the Company, upon receipt of notice promptly given to the Company in writing from the indemnified party setting forth the particulars of such claim or action, the Company shall assume the defense thereof including the employment of counsel and the payment of all costs and expenses. Each indemnified party shall have the right to employ separate counsel in any such action and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such indemnified party, unless (A) the employment of such counsel has been specifically authorized in writing by the Company, or (B) representation of both the indemnified party and the Company by the same counsel is inappropriate by applicable standards of professional conduct which attorneys maintain in the jurisdiction in which the suit shall have been instituted due to actual or potential conflicting interests (it being understood that the Company shall not be liable for the expense of more than one separate counsel representing such indemnified party unless representation by more than one counsel shall have been specifically authorized in writing by the Company).

(b)   The Company also agrees to pay and to indemnify and hold harmless the Trustee, the Registrar, any person who "controls" the Registrar or the Trustee within the meaning of Section 15 of the Securities Act of 1933, as amended, and any member, officer, director, official and employee of the Registrar or the Trustee (collectively called the

"Indemnified Parties") from and against, any and all claims, damages, demands, expenses, liabilities and losses of every kind, character and nature asserted by or on behalf of any person arising out of, resulting from, or in any way connected with, the condition, use, possession, conduct, management, planning, design, acquisition, construction, installation, renovation or sale of the Project or any part thereof. The Company also covenants and agrees, at its expense, to pay, and to indemnify and save the Indemnified Parties harmless of, from and against, all costs, reasonable counsel fees, expenses and liabilities incurred in any action or proceeding brought by reason of any such claim or demand subject, however, to the provisions contained below in this paragraph and excluding claims occasioned by the gross negligence or willful misconduct of the Indemnified Parties. In the event that any action or proceeding is brought against any Indemnified Party by reason of any such claim or demand, such Indemnified Party shall immediately notify the Company, which shall resist and defend any action or proceeding on behalf of such Indemnified Party, including the employment of counsel, the payment of all expenses and the right to negotiate and consent to settlement. Any one or more of the Indemnified Parties shall have the right to employ separate counsel in any such action and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Parties unless the (A) employment of such counsel has been specifically authorized in writing by the Company or (B) representation of both the Indemnified Parties and the Company by the same counsel is inappropriate by applicable standards of professional conduct which attorneys maintain in the jurisdiction in which the suit shall have been instituted due to actual or potential conflicting interests (it being understood that the Company shall not be liable for the expense of more than one separate counsel representing any of the Indemnified Parties unless representation by more than one counsel shall have been specifically authorized in writing by the Company). The Company shall not be liable for any settlement of any such action effected without its consent, but if settled with the consent of the Company or if there be a final judgment for the plaintiff in any such action, the Company agrees to indemnify and hold harmless the Indemnified Parties.

The rights of the Indemnified Parties under this Section 5.3(b) shall survive the payment in full of the Bonds and the discharge of this Agreement and the Indenture.

**Section 5.4.   Validity and Tax-Exempt Status of the Bonds**. The Company and the Issuer covenant and agree that they, and each of them, will not take or authorize or permit any action to be taken and have not taken or authorized or permitted any action to be taken which results in interest paid on the Bonds being included in gross income of any owner thereof for purposes of federal income taxation (other than an owner who is a "substantial user" of the Project or a "related person" within the meaning of Section 147(a) of the Code) or adversely affects the validity of the Bonds. If Treasury Regulation Section 1.150-1(c) or Proposed Treasury Regulation Section 1.103-10(a) or Section 144(a)(6) of the Code are applicable to the Bonds and result in the aggregation of the Bonds with any other obligation issued or to be issued by or on behalf of any state, territory or possession of the United States, or any political subdivision and body corporate and politic of the foregoing, or of the District of Columbia, which constitutes a "private activity bond" within the meaning of the Code, causing the interest on the Bonds to be or become subject to Federal income taxes pursuant to Section 103 of the Code, the Company shall be deemed to have failed to observe the foregoing covenant. Promptly after the

Company first becomes aware of any event which would result in a mandatory redemption of the Bonds under Section 3.1(b)(2) of the Indenture, the Company shall give written notice thereof to the Issuer and the Trustee.

**Section 5.5.   Taxes and Governmental Charges.**   The Company will promptly pay, as the same become due, all lawful taxes, assessments, utility charges and other governmental charges of any kind whatsoever levied or assessed by federal, state or any municipal government upon or with respect to the Project or any part thereof.   The Company may, at its expense and in its own name and behalf or in the name and behalf of the Issuer, if it is a necessary party thereto, in good faith contest any such taxes, assessments and other charges and, in the event of any such contest, permit the taxes, assessments or other charges so contested to remain unpaid during the period of such contest and any appeal therefrom, provided that such non-payment does not adversely affect the payment by the Company of all other amounts required to be paid by it hereunder or adversely affect the validity of the Bonds or the tax-exempt status of the interest thereon.

**Section 5.6.   Maintenance and Repair; Insurance.**   The Company will maintain the Project in a reasonably safe and sound operating condition, making from time to time all needed repairs thereto, and shall maintain insurance coverage (including self-insurance) with respect to the Project, all in accordance with its corporate practice for similar assets (subject, however, to its right to discontinue operation of any portion of the Project as provided in Section 5.9 hereof), and shall pay all costs of such maintenance, repair and insurance.

**Section 5.7.   Financial Reports.**   The Company shall furnish to the Trustee the following:

(a)   Within one hundred twenty (120) days after the end of the preceding fiscal year, copies of Form 10-K as filed with the Securities and Exchange Commission and the annual report to shareholders which includes the consolidated balance sheet of the Company and subsidiaries and the related statements of consolidated income, consolidated shareholders' equity and consolidated cash flows for the year ended that date, with its report thereon by the Company's public accountants.

(b)   Upon the request of any Bondholder, the Trustee may request and the Company shall provide copies of Form 10-Q as filed with the Securities and Exchange Commission.

(c)   Upon the request of any Bondholder, the Trustee may request and the Company shall provide copies of all regular or periodic financial statements or financial reports as the Company shall send to its shareholders and copies of all regular or periodic reports which are available for public inspection which the Company may be required to file with the Securities and Exchange Commission.

The Company agrees that any such information furnished to the Trustee in accordance with this Section 5.7 may be furnished by the Trustee to any Bondholder who so requests.

**Section 5.8.    Filings; Lien of Indenture.**  The Company will, at its expense, take all necessary action in cooperation with the Issuer and the Trustee to maintain and preserve the lien and security interest of the Indenture so long as the Bonds remain outstanding.

**Section 5.9.    Operation of Project.**  Although the Company intends to operate, or cause to be operated, the Project for its designed purposes until the date on which no Bonds are outstanding, the Company is not required by this Agreement to operate, or cause to be operated, any portion of the Project after the Company shall deem in its discretion that such continued operation is not advisable, and in such event it is not prohibited by this Agreement from selling, leasing or retiring all or any such portion of the Project, subject to the provisions of Section 5.4 hereof.  The Issuer will execute and deliver at the Company's expense such releases or other instruments as the Company may request in order to permit the Company to exercise any of its rights pursuant to this Section 5.9.  The net proceeds from such sale, lease or other disposition, if any, shall belong to, and may be used for any lawful purpose by, the Company, subject to the provisions of Section 5.4.  No such sale, lease or other disposition of all or any portion of the Project shall reduce or otherwise affect the Company's obligation to pay amounts under Section 4.2 hereof.

## ARTICLE VI

### EVENTS OF DEFAULT AND REMEDIES

**Section 6.1.    Events of Default.**  The occurrence and continuation of any one of the following shall constitute an Event of Default hereunder:

(a)    failure by the Company to pay any amounts required to be paid under Section 4.2(a) hereof on the dates and in the manner specified herein; or

(b)    failure by the Company to perform any covenant, condition or agreement on its part to be observed or performed in this Agreement, other than as referred to in subsection (a) above, for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Company by the Issuer or the Trustee, unless (i) the Issuer and the Trustee shall agree in writing to an extension of such time prior to its expiration or (ii) if the failure is such that it can be corrected but not within such 30-day period, corrective action is instituted by the Company within such period and diligently pursued until such failure is corrected; or

(c)    the dissolution or liquidation of the Company or the filing by the Company of a voluntary petition in bankruptcy, or failure by the Company promptly to lift any execution, garnishment or attachment of such consequence as will impair its ability to carry on its obligations hereunder, or an order for relief under Title 11 of the United States Code, as amended from time to time, is entered against the Company, or a petition or answer proposing the entry of an order for relief against the Company under Title 11 of the United States Code, as amended from time to time, or its reorganization, arrangement or debt readjustment under any present or future federal bankruptcy act or any similar federal or state law shall be filed in any court

-16-

and such petition or answer shall not be discharged within ninety (90) days after the filing thereof, or the Company shall fail generally to pay its debts as they become due, or a custodian (including without limitation a receiver, trustee, assignee for the benefit of creditors or liquidator of the Company) shall be appointed for or take possession of all or a substantial part of its property and shall not be discharged within ninety (90) days after such appointment or taking possession, or the Company shall consent to or acquiesce in such appointment or taking possession, or assignment by the Company for the benefit of its creditors, or the entry by the Company into an agreement of composition with its creditors, or the adoption of a resolution by the board of directors of the Company or the taking of any other corporate action to file a petition or answer proposing the entry of an order for relief against the Company under Title 11 of the United States Code, as amended from time to time, or its reorganization, arrangement or debt readjustment under any present or future federal bankruptcy act or any similar federal or state laws; provided, that the term "dissolution or liquidation of the Company", as used in this subsection (c), shall not be construed to include the cessation of the corporate existence of the Company resulting either from a merger or consolidation of the Company into or with another domestic corporation or a dissolution or liquidation of the Company following a transfer of all or substantially all of its assets as an entirety, under the conditions permitting such actions contained in Section 5.2 hereof; or

(d)    any material warranty, representation or other statement made by or on behalf of the Company contained herein, or in any document or certificate furnished by the Company in compliance with or in reference hereto, shall prove to have been false or misleading in any material respect when made; or

(e)    an "event of default" shall occur and be continuing under the Indenture.

    **Section 6.2.    Remedies on Default.** Whenever any Event of Default shall have occurred and be continuing hereunder, the Trustee may take any one or more of the following remedial steps:

(a)    The Trustee may exercise any right, power or remedy permitted to it by law, and shall have in particular, without limiting the generality of the foregoing, the right to declare the entire principal payable under Section 4.2(a) hereof, and all unpaid interest accrued thereon to the date of such declaration and any premium the Company shall have become obligated to pay to be immediately due and payable, if concurrently with or prior to such notice the unpaid principal of and all unpaid accrued interest and premium on the Bonds have become or have been declared to be due and payable under the Indenture, and upon such declaration the principal payable under Section 4.2(a) hereof, the unpaid accrued interest thereon and such premium shall thereupon become forthwith due and payable in an amount sufficient to pay the principal of, premium, if any, and interest on the Bonds under Section 8.2 of the Indenture, without presentment, demand or protest, all of which are hereby expressly waived.    The Company shall forthwith pay to the Trustee the entire principal, premium, if any, and interest payable under Section 4.2(a) hereof.    The Trustee shall waive, rescind and annul such declaration and the consequences thereof, when any

-17-

declaration of acceleration on the Bond has been waived, rescinded and annulled pursuant to and in accordance with Section 8.11 of the Indenture.

(b)    The Issuer or the Trustee may take whatever action at law or in equity may appear necessary or desirable to collect the payments and other amounts then due and thereafter to become due or to enforce the performance and observance of any obligation, agreement or covenant of the Company under this Agreement.

In case the Issuer or the Trustee shall have proceeded to enforce its rights under this Agreement, and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Issuer or the Trustee, as the case may be, then and in every such case the Company, the Issuer and the Trustee shall be restored respectively to their several positions and rights hereunder, and all rights, remedies and powers of the Company, the Issuer and the Trustee shall continue as though no such proceeding had been taken.

In case there shall be pending proceedings for the bankruptcy or for the reorganization of the Company under the federal bankruptcy laws or any other applicable law, or in case a receiver or trustee shall have been appointed for the property of the Company, or in the case of any other similar judicial proceedings relative to the Company, or to the creditors or property of the Company, the Trustee shall be entitled and empowered, by intervention in such proceedings or otherwise, to file and prove a claim or claims for the whole amount owing and unpaid pursuant to this Agreement and, in case of any judicial proceedings, to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee allowed in such judicial proceedings relative to the Company, its creditors or its property, and to collect and receive any moneys or other property payable or deliverable on any such claims, and to distribute the same after the deduction of its charges and expenses; and any receiver, assignee or trustee in bankruptcy or reorganization is hereby authorized to make such payments to the Trustee, and to pay to the Trustee any amount due it for compensation and expenses, including reasonable counsel fees incurred by it up to the date of such distribution.

**Section 6.3.    Agreement to Pay Attorneys' Fees and Expenses.**    In the event the Issuer or the Trustee should reasonably employ attorneys or incur other expenses for the collection of the payments due under this Agreement or the enforcement of the performance or observance of any obligation or agreement on the part of the Company herein contained, the Company agrees that it will on demand therefor pay to the Issuer or the Trustee the reasonable fees of such attorneys and such other expenses so incurred by the Issuer or the Trustee.

**Section 6.4.    No Remedy Exclusive.**    No remedy herein conferred upon or reserved to the Issuer or the Trustee is intended to be exclusive of any other available remedy or remedies but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement and the Indenture or now or hereafter existing at law or in equity or by statute. No delay or omission to exercise any right or power accruing upon any Event of Default hereunder shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be

-18-

exercised from time to time and as often as may be deemed expedient.  In order to entitle the
Issuer to exercise any remedy reserved to it in this Article VI, it shall not be necessary to
give any notice other than such notice as may be herein expressly required.  Such rights and
remedies as are given the Issuer hereunder shall also extend to the Trustee, and the Trustee
and the owners from time to time of the Bonds shall be deemed third party beneficiaries of
all covenants and agreements herein contained.

     **Section 6.5.    No Additional Waiver Implied by One Waiver.**  In the event
any agreement contained in this Agreement should be breached by the Company and
thereafter waived by the Issuer or the Trustee, such waiver shall be limited to the particular
breach so waived and shall not be deemed to waive any other breach hereunder.

### ARTICLE VII

### PREPAYMENT

     **Section 7.1.    Obligation to Prepay.**  The Company shall have the obligation to
prepay installments payable hereunder in whole (or in the case of the event stated in (b) of
this Section 7.1 in whole or in part), if either of the following shall have occurred:

     (a)    As a result of any changes in the Constitution of the State or the
Constitution of the United States of America or of legislative or administrative action
(whether state or federal) or by final decree, judgment or order of any court or
administrative body (whether state or federal) entered after the contest thereof by the
Company in good faith, this Agreement shall have become void or unenforceable or
impossible of performance in accordance with the intent and purposes of the parties as
expressed in this Agreement; or

     (b)    A final determination by the Internal Revenue Service or a court of
competent jurisdiction as a result of a proceeding in which the Company participates
to the degree it deems sufficient, which determination the Company, in its discretion,
does not contest by an appropriate proceeding, that, as a result of a failure by the
Company to observe any covenant, agreement or representation by the Company in
this Agreement, the interest payable on the Bonds or any of them is includable for
federal income tax purposes in the gross income of any owner or beneficial owner of
a Bond (other than an owner who is a "substantial user" of the Project or a "related
person" within the meaning of Section 147(a) of the Code and the applicable
Regulations).

     In case either of the events stated in this Section 7.1 shall occur, the Company agrees
it will fulfill its obligation and prepay within 180 days after the Company has notice or
actual knowledge of such event.

     **Section 7.2.    Option to Prepay.**  The Company shall have, and is hereby
granted, the option to prepay the principal payable under Section 4.2(a) hereof with respect
to the Bonds as a whole, or in part, by paying to the Trustee an amount sufficient to redeem

all or a portion of the Bonds then Outstanding, in the manner, at the redemption price and
on the dates specified in Section 3.1(a) of the Indenture.

**Section 7.3.   Redemption of the Bonds**.  To perform an obligation imposed
upon the Company or to exercise an option granted to the Company by this Article VII, the
Company shall give written notice to the Issuer, the Trustee and the Registrar, which notice
shall specify therein the date upon which prepayment of the principal payable under Sec-
tion 4.2(a) hereof (or a portion thereof) will be made, which date shall be not less than
forty (40) days from the date the notice is mailed (or such later date as is acceptable to the
Issuer and the Trustee), and shall specify that all of the principal amount payable under Sec-
tion 4.2(a) hereof or a specified portion thereof is to be so prepaid.  The Issuer has directed
the Trustee and the Registrar to take forthwith all steps (other than the payment of the
money required to redeem the Bonds) necessary under the applicable provisions of the
Indenture to effect the redemption of the Bonds (or a portion thereof) in amounts equal to
the amount of the principal so prepaid as provided in this Article VII.

## ARTICLE VIII

### MISCELLANEOUS

**Section 8.1.   Notices**.  All notices, certificates or other communications shall be
sufficiently given and shall be deemed given when the same are (i) deposited in the United
States mail and sent by first class mail, postage prepaid, or (ii) delivered by hand, in each
case, to the parties at the addresses set forth below or at such other address as a party may
designate by notice to the other parties:  if to the Issuer, at Board of County Commissioners,
County Administration Building, 1560 High Street N.W., Warren, Ohio  44481, Attention:
Clerk; and if to the Company, at 3044 West Grand Boulevard, Detroit, Michigan 48202,
Attention:  Office of the General Counsel; and 767 Fifth Avenue, 24th Floor, New York,
New York 10153, Attention:  Capital Markets; if to the Trustee, at One World Trade
Center, Suite 4911, 49th Floor, New York, New York  10048, Attention:  Corporate Trust
Department.  A duplicate copy of each notice, certificate or other communication given
hereunder by either the Issuer or the Company to the other shall also be given to the
Trustee.

**Section 8.2.   Assignments**.  This Agreement may not be assigned by either
party without the consent of the other and the Trustee, except that the Issuer shall assign and
pledge to the Trustee certain of its right, title and interest in and to this Agreement as
provided by Section 4.4 hereof, and the Company may without any consent assign to any
surviving, resulting or transferee corporation its rights under this Agreement as provided by
Section 5.2 hereof.

**Section 8.3.   Severability**.  If any provision of this Agreement shall be held or
deemed to be or shall, in fact, be illegal, inoperative or unenforceable, the same shall not
affect any other provision or provisions herein contained or render the same invalid,
inoperative or unenforceable to any extent whatsoever.

**Section 8.4.    Execution of Counterparts.**  This Agreement may be simultaneously executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

**Section 8.5.    Amounts Remaining in any Fund or with Trustee.**  It is agreed by the parties hereto that, subject to Section 5.12 of the Indenture, after payment in full of (i) the principal of, premium, if any, and interest on the Bonds, (ii) the fees, charges, and expenses of the Issuer, the Trustee and the Bond Registrar in accordance herewith and with the Indenture, and (iii) all other amounts required to be paid under this Agreement and the Indenture, any amounts remaining in any fund or account maintained under this Agreement or the Indenture and not applied to the payment of the above in accordance with the provisions of the Indenture or this Agreement shall belong to and be paid to the Company by the Trustee.

**Section 8.6.    Amendments, Changes and Modifications.**  Except as otherwise provided in this Agreement or the Indenture subsequent to the initial issuance of the Bonds and prior to their payment in full, this Agreement may not be effectively amended, changed, modified, altered or terminated without the written consent of the Trustee.

**Section 8.7.    Governing Law.**  This Agreement shall be governed exclusively by and construed in accordance with the applicable law of the State.

**Section 8.8.    Authorized Company Representative.**  Whenever under the provisions of this Agreement the approval of the Company is required or the Company is required to take some action at the request of the Issuer, the Trustee or the Registrar, such approval or such request shall be given for the Company by the Authorized Company Representative, and the Issuer, the Trustee and the Registrar shall be authorized to act on any such approval or request and neither party hereto shall have any complaint against the other or against the Trustee or the Registrar as a result of any such action taken.

**Section 8.9.    Term of this Agreement.**  This Agreement shall be in full force and effect from the date hereof, and shall continue in effect until the payment in full of all principal of, and premium, if any, and interest on the Bonds, or provision for the payment thereof shall have been made pursuant to Article VII of the Indenture, all fees, charges, indemnities and expenses of the Issuer and the Trustee have been fully paid or provision made for such payment (the payment of which fees, charges, indemnities and expenses shall be evidenced by a written certification of the Company that it has fully paid all such fees, charges, indemnities and expenses) and all other amounts due hereunder have been duly paid or provision made for such payment.  All representations, certifications and covenants by the Company as to the indemnification of various parties as described in Section 5.3 hereof, the payment of fees and expenses of the Issuer and the Trustee as described in Section 6.3 hereof, and all matters affecting the tax-exempt status of the Bonds shall survive the termination of this Agreement.

**Section 8.10.    Binding Effect.**  This Agreement shall inure to the benefit of and shall be binding upon the Issuer, the Company and their respective successors and assigns, subject, however, to the limitations contained in Sections 4.4 and 5.2 hereof.

Section 8.11.    Limited Liability of Officers, Etc.  No recourse shall be had for the payment of the principal of, premium, if any, and interest on the Bonds or for any claim based thereon or upon any obligation, covenant or agreement contained in this Agreement, the Indenture or the Bonds against any past, present or future officer, agent or employee of the Issuer, or any officer, agent or employee of any successor thereto, as such, either directly or through the Issuer or any successor thereto, under any rule of law or equity, statute or constitution or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such officer, employee or agent as such is hereby expressly waived and released as a condition of and in consideration for the execution of this Agreement and the Indenture and the issuance of the Bonds.

IN WITNESS WHEREOF, the Issuer and the Company have caused this Agreement to be executed in their respective names, all as of the date first above written.

COUNTY OF TRUMBULL, OHIO

By _____
County Commissioner

By _____
County Commissioner

By _____
County Commissioner

The form of the foregoing Agreement is hereby approved by the Office of the Prosecuting Attorney of the County of Trumbull, Ohio.

By _____
Prosecuting Attorney

GENERAL MOTORS CORPORATION

By _____
ATTORNEY-IN-FACT

-22-

## EXHIBIT A

Description of Project

The Project consists principally of the following sewage disposal facilities and associated building services, piping, electrical equipment and instrumentation (all as more fully described in the Project Certificate) at the Company's Packard Electric Division Plant in Warren, Ohio:

1.  Additional Final Clarification Equipment
2.  Recirculation System for Electrochemical Treatment Unit
3.  Replacement Blend Tank
4.  Upgrade and flow control to Final Lamella Clarifiers
5.  Increased pump capacity
6.  Additional Filtration
7.  Additional storage capacity
8.  Unloading Station