# EXHIBIT 6

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
In re                                                       :    Chapter 11
                                                            :
CHEMTURA CORPORATION, *et al.*,                             :    Case No. 09-11233 (REG)
                                                            :
                                  Debtors.                  :    (Jointly Administered)
                                                            :
------------------------------------------------------------x

BENCH DECISION[1] ON CONFIRMATION

APPEARANCES:

KIRKLAND & ELLIS LLP
*Attorneys for the Debtors and Debtors-in-Possession*
601 Lexington Avenue
New York, NY 10022
By:    M. Natasha Labovitz, Esq. (argued)
       Craig A. Bruens, Esq.
       Richard M. Cieri, Esq.

-and-

300 North LaSalle Street
Chicago, IL 60654
By:    David J. Zott, Esq. (argued)
       Nader R. Boulos, Esq. (argued)
       Micah E. Marcus, Esq.
       Benjamin T. Kurtz, Esq.

---

[1]    I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where the circumstances do not permit more leisurely drafting or more extensive or polished discussion. Because they often start as scripts for decisions to be dictated in open court, they typically have a more conversational tone.

DUANE MORRIS LLP
*Conflicts Counsel for the Debtors*
1540 Broadway
New York, NY 10036
By:   Gerard S. Catalanello, Esq.

-and-

30 South 17th Street
Philadelphia, PA 19103
By:   Lawrence J. Kotler, Esq.

AKIN, GUMP, STRAUSS, HAUSER & FELD LLP
*Counsel for the Official Committee of Unsecured Creditors*
One Bryant Park
New York, NY 10036
By:   David M. Zensky, Esq. (argued)
      Abid Qureshi, Esq. (argued)
      Daniel H. Golden, Esq.
      Philip C. Dublin, Esq. (argued)
      Meredith A. Lahaie, Esq.
      Jason Goldsmith, Esq.

JONES DAY
*Attorneys for the Ad Hoc Committee of Bondholders*
222 East 41st Street
New York, NY 10017
By:   Richard L. Wynne, Esq. (argued)
      Steven C. Bennett, Esq. (argued)
      Lance E. Miller, Esq.

-and-

555 South Flower Street, 50th Floor
Los Angeles, CA 90071
By:   Erin N. Brady, Esq.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
*Counsel for the Official Committee of Equity Security Holders*
Four Times Square
New York, NY 10036
By:   Jay M. Goffman, Esq. (argued)
      George A. Zimmerman, Esq. (argued)
      Michael H. Gruenglas, Esq.

-and-

One Rodney Square
P.O. Box 636
Wilmington, DE 19889
By:   Thomas J. Allingham, Esq. (argued)

COVINGTON & BURLING, LLP
*Attorneys for Fiduciary Counselors*
1201 Pennsylvania Avenue
Washington, D.C. 20004
By:   Michael St. Patrick Baxter, Esq. (argued)

SCHULTE, ROTH, & ZABEL LLP
*Attorneys for Interlachen Investcorp.*
919 Third Avenue
New York, NY 10022
By:   Lawrence Gelber, Esq. (argued)

Bench Decision on Confirmation ................................................................................................. 1
Findings of Fact ........................................................................................................................... 2
   1. Background .......................................................................................................................... 2
   2. Pre-Petition Debt and Liabilities ........................................................................................... 3
   3. Bankruptcy Filing ................................................................................................................. 4
   4. Post-Petition ......................................................................................................................... 4
   5. The Plan ............................................................................................................................... 5
   6. Marketing of the Company ................................................................................................. 10
   7. Valuation ............................................................................................................................ 10
      A. The Experts' Analyses .................................................................................................. 10
      B. The Experts' Methodologies ......................................................................................... 12
         i. Discounted Cash Flow ............................................................................................. 13
         ii. Comparable Companies .......................................................................................... 15
         iii. Precedent Transactions ......................................................................................... 18
      C. Valuation Conclusions ................................................................................................. 21
         i. Methodology ............................................................................................................ 22
         ii. DCF Analysis ......................................................................................................... 24
         iii. Comparable Companies Analysis .......................................................................... 28
         iv. Precedent Transactions Analysis ........................................................................... 30
         v. Marketing Efforts ................................................................................................... 33
         vi. Creditors' Preferences for Cash ............................................................................. 35
         vii. Credibility ............................................................................................................. 36
      D. Conclusions re: Valuation ............................................................................................ 40
   8. Reasonableness of the Settlement ....................................................................................... 41
   9. Good Faith ......................................................................................................................... 41
   10. Ultimate Findings of Fact ................................................................................................. 42
Discussion .................................................................................................................................. 43
   1. "Fair and Equitable" under Section 1129(b)(1) ................................................................. 43
   2. The Settlement ................................................................................................................... 45
      A. Standards for Approval of Settlement ........................................................................... 45
      B. Settlement Analysis ...................................................................................................... 48
         i. Issuance of New Common Stock ............................................................................. 48
         ii. Make-Whole and No-Call Provisions ..................................................................... 49
         iii. Other Settlement Components .............................................................................. 65
         iv. Other Iridium Factors ............................................................................................ 66
   3. Other Objections ................................................................................................................ 68
      A. Good Faith .................................................................................................................... 68
      B. Releases ........................................................................................................................ 71
      C. Dissolution of Equity Committee ................................................................................. 75
   4. Miscellaneous Objections .................................................................................................. 77
Conclusion ................................................................................................................................. 77

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE

In this contested matter in the chapter 11 cases of specialty chemicals company Chemtura Corporation ("**Chemtura**") and its affiliates (collectively, the "**Debtors**"), the Debtors seek confirmation of their chapter 11 plan (the "**Plan**"). Confirmation is supported by the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") and an *ad hoc* committee of Chemtura bondholders (the "**Bondholders Committee**,"[2] and together with the Debtors and the Creditors' Committee, the "**Plan Supporters**"). But confirmation is opposed by the Official Committee of Equity Security Holders ("the **Equity Committee**"), and two other entities that are equity holders or act on equity holders' behalf.

The Equity Committee expresses several objections to confirmation. But the most serious of them is that the Plan—which as described below, effects its distributions to bondholders and most other creditors by means of a combination of cash and stock—undervalues the Debtors, and that a global settlement of several constituencies' entitlements (the "**Settlement**"), upon which the Plan is based, does likewise. While the Plan proposes a distribution to equity, the Equity Committee contends that the Plan doesn't deliver enough—and, as relevant to the Code's requirements for confirmation, that each of the Settlement and the Plan provide for payment to creditors more than in full, violating section 1129(b)'s "fair and equitable" requirement.[3]

---

[2]   Members of the Bondholders Committee hold approximately 68% of the Debtors' bonds. See Verified Statement Of Jones Day Regarding Representation Of An Ad Hoc Committee Of Bondholders Pursuant To Federal Rule Of Bankruptcy Procedure 2019, ECF # 2879, at ¶ 1 (the "**Bondholders R.2019 Statement**").

[3]   The Equity Committee also contends that, apart from the valuation issue, an element of the settlement allocating value to bondholders for claims based on "make-whole" premium and "no-call" provisions in their contractual documents too generously respects the bondholders' likelihood of success on those issues, materially diverting value to those bondholders that would otherwise go to equity. See page 49 below.

1

To be sure, the Cognis transaction, like the Sumitomo-Nufarm transaction, also had unique characteristics. It was a control transaction, with synergies that would come out of it, once again suggesting that any valuation derived from it could be on the high side. But to its credit, Lazard used it anyway, and used its 6.2 multiple as a mid-range transaction, rather than as a high one. As with the Sumitomo-Nufarm transaction, I take the high-side character of the Cognis transaction into account.

Of course, the small number of transactions in the post-Lehman environment makes for a small sample size. That's a cause for some concern, and a reason for not giving this methodology as much weight as I otherwise would. But with two comparables coming in at 6.2x EBITDA in the post-Lehman bankruptcy era, I feel relatively comfortable in still giving some weight to this methodology. The upper end of Lazard's Precedent Transactions range ($2.315 billion) is somewhat higher than the upper end of Lazard's final valuation range ($2.2 billion).[105] But the transactions on which Lazard relies had synergistic and control characteristics, which would result in a higher implied valuation, and we know that Chemtura has historically traded lower than its peers. Lazard's Precedent Transactions upper end is of course well below the upper end of UBS's valuation (based solely on DCF and the aggressive projections) of $2.6 billion, and suggests that UBS' valuation is too high.

*v. Marketing Efforts*

Another matter that informs my finding that the Debtors' TEV doesn't exceed $2.05 billion is the lack of buyers or investors for the Debtors at higher values or values within the

---

[105] *See* Aronson Decl. ¶ 4.

33

Equity Committee's range—a species of "market" information that informs, though it does not solely support, my conclusion that the Debtors have met their burden as to value here.[106]

As I've discussed before,[107] the Debtors cooperated with Equity Committee efforts to market the company, which led to contacts with 19 potential investors, of whom 7 signed confidentiality agreements. UBS made presentations to potential investors valuing the company at $2.2 to $2.7 billion,[108] a valuation which would have the same midpoint (of $2.45 billion) as the present UBS valuation. But there were no takers, or offers, at that price or at any price that might ultimately lead to that price.[109] Nor were any members of the Equity Committee itself, though several were hedge funds, prepared to put their own money into the Debtors at those (or even lower) prices—a fact that I also find meaningful.[110] Though I hardly expect that investors

---

[106] Many observers believe that behavior in the marketplace is the best indicator of enterprise value. *See, e.g., Bank of America Nat. Trust and Sav. Ass'n v. 203 North La Salle Partnership*, 526 U.S. 434, 457 (1999) (acknowledging that "the best way to determine value is exposure to a market"). *See also In re Granite Broad. Corp.*, 369 B.R. 120, 140-43 (Bankr. S.D.N.Y. 2007) (Gropper, J.) ("***Granite Broadcasting***") (noting that what a willing purchaser is willing to pay "typically trumps all other[ ]" indications of value."). I don't believe that always to be the case, since as I saw in the *Global Crossing* and *Adelphia* cases on my watch, financial accounting techniques (such as capitalizing expenses without writing them down to realizable value) or fraud can give the marketplace a distorted impression of a company's worth. But as a general matter, where, as here, there isn't a suggestion that the company's financials or projections are inflated or misleading, I think the marketplace is often as good or better an indication of a company's value than expert testimony alone would be. *See VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d. Cir. 2007) ("Absent some reason to distrust it, the market price is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.") (internal citations omitted).

[107] *See* page 10 above.

[108] This was the Paulson Presentation, Debtors' Exhibit 70, discussed at page 10 above.

[109] Early in the marketing process, one Equity Committee member, hedge fund Strategic Value Partners, expressed the position that Chemtura was worth 7.5x 2011 normalized EBITDAR, or $3 billion, and three days later, UBS sent a presentation to the debtors with that same value. *See* Debtors Exhibits 52, 55. While the Debtors criticize UBS for that, contending that UBS was acting under pressure by Equity Committee members, see 9/22/10 Hrg. Tr. 45, I don't find fault with it. At that time, UBS was acting as an advocate for its constituency in a deal making process, a function customarily performed by investment bankers and financial advisors.

[110] *See Granite Broadcasting*, 369 B.R. at 140-41 ("there is no question that in appropriate circumstances, 'People who must back their beliefs with their purses are more likely to assess the value of the [asset] correctly than are people who simply seek to make an argument.'") (*quoting In re Central Ice Cream Co.*, 836 F.2d 1068, 1072 n.3 (7th Cir. 1987)).

would have simply accepted offers to invest at the prices that the presentations were putting forward, the lack of any interest in proposals at those values lends further support to my conclusion that a $2.45 billion midpoint would be too high.[111]

   vi. *Creditors' Preferences for Cash*

I take note of another kind of "market" type information—the fact that the Plan gave most creditors[112] and all bondholders the right to elect, within limits, to take stock or cash as the currency by which they'd get their distributions. The overwhelming majority of them elected to take the maximum recovery in cash, rather than stock.[113] A very major proportion of the Debtors' non-Diacetyl and environmental creditors (including all or substantially all of the Bondholders' Committee, which held about 68% of the bonds[114]) were hedge funds and other distressed debt investors, sophisticated in financial analysis and having the ability to efficiently dispose of stock if it were received as an alternative currency. Yet approximately 78% of the electing bondholders indicated a preference for cash[115]—even though they'd make an immediate

---

|     | |
|-----|---|
|     | Though there were indications, as the Bondholders' Committee notes (*see* Bondholders' Comm. Reply Br. at 6-7 & Exhibits 5, 6), that hedge fund members of the Equity Committee Strategic Value Partners and Canyon Capital Partners sought to advance their interests over "retail" equity holders—a matter that, if true, would be a matter of concern to me, as they were supposed to be fiduciaries—I don't now need to make findings in that regard. |
| 111 | Though I don't place reliance on what prospective investors said (as I regard those statements as hearsay, inherently self-serving, and, possibly, bottom-fishing), the bottom line is that there were no serious responses. |
| 112 | Recall that creditors with Diacetyl and environmental claims were in separate classes, and they'd simply get cash. *See* page 8 above. |
| 113 | *See* Klamser Voting Results Decl., ECF # 3955, at Exhibit D; Kjontvedt Voting Results Decl., ECF # 3956, at Exhibit C. |
| 114 | *See* Bondholders R.2019 Statement, ECF # 2879, at ¶ 1. |
| 115 | *See* Kjontvedt Voting Results Decl., ECF # 3956, at Exhibit C. |

my consideration and signature a separate confirmation order, and they may, if desired, also submit Findings of Fact and Conclusions of Law (either free-standing or as part of the confirmation order) supplementing those in this Decision so long as they're not inconsistent with it.

The time to appeal from the resulting confirmation order will run from the time of its entry, and not from the time of entry of this Decision.

Dated: New York, New York      *s/Robert E. Gerber*
       October 21, 2010                   United States Bankruptcy Judge