David H. Stein, Esq. (DS 8514)
Deirdre Woulfe Pacheco, Esq. (DP 6171)
Letitia Accarrino, Esq. (LA 8791)
**WILENTZ, GOLDMAN & SPITZER, P.A.**
90 Woodbridge Center Drive
Suite 900, Box 10
Woodbridge, New Jersey 07095-0958
Telephone: (732) 636-8000
    - and -
110 William Street, 26th Floor
New York, New York 10038-3927
Telephone: (212) 267-3091
*Attorneys for A-1 Specialized Services & Supplies, Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
|  |  |
|---|---|
| IN RE: | Chapter 11 |
| DELPHI CORPORATION, *et al.*, | Case No. 05-44481 (RDD) |
| Reorganized Debtors. | (Jointly Administered) |
| DELPHI AUTOMOTIVE SYSTEMS, LLC, | Adv. Pro. Nos. 07-02084 and 02096 (RDD) |
| Plaintiff, | **Hearing Date and Time:** |
| -against- | **February 17, 2011 at 10:00 a.m.** |
| A-1 SPECIALIZED SERVICES. & SUPPLIES, INC., | **Reply Deadline:** **January 28, 2011** |
| Defendant. |  |

-------------------------------------------------------X

### DECLARATION OF ASHOK KUMAR

ASHOK KUMAR, pursuant to 28 § U.S.C. 1746, hereby declares:

#3334847 (154642.002)

1. I am a Director and owner of A-1 Specialized Services & Supplies, Inc. ("A-1"), and am directly involved in management of the company.

2. I make this declaration based on my personal knowledge of the relevant facts and from my review of the relevant documents maintained in the ordinary course of business.

3. A-1's business is reclaiming and trading platinum, palladium and rhodium ("Platinum Group Metals," also known as "PGM").

4. The worldwide demands of manufacturers for very limited supplies of PGM result in highly volatile prices, and require that these commodities be carefully balanced and hedged among both regulated futures markets and networks of forward PGM merchants, e.g., mines, reclaimers and traders.

5. A-1 enters into private spot and forward transactions with other forward PGM merchants worldwide on a daily basis to provide and obtain supplies of PGM, and to assure future supplies at fixed prices. Entering into such transactions makes up the majority of A-1's business.

6. A spot transaction is one in which the price and quantity of metal are agreed and settlement of the trade, i.e., delivery and payment, generally occurs two business days later. In a forward transaction, a price and quantity of metal are agreed on a particular date, and settlement of the transaction occurs on a date in the future (more than two business days later than the date of the agreement).

7. A-1 also leases metal to customers for short terms, e.g. from 30 to 90 days, charging a fee and requiring return of the metal at the end of the lease. If the original metal delivered by A-1 is not available for return by the lessee at the end of the lease, an equivalent amount and quality of metal must be returned to A-1 from the lessee's other supplies, by purchase by the lessee of metal from other third party sources for the benefit of A-1, or by payment from the lessee to A-1 of the amount of money necessary for A-1 to purchase the return metal by itself from other third party sources, at then prevailing spot prices.

8. A lease of metal is a forward transaction because the leasing fee is based upon the difference between the spot price of metal at the beginning of the lease term and the forward price of metal to the end of the lease term, and because the return delivery of the metal at a specified future date is required. The return of the metal is part of the network of forward supply transactions entered into by A-1 within its network of forward PGM merchants; the metal has been previously promised by A-1 in other forward transactions based upon its assured availability on the date of required return.

9. Transactions by A-1 are privately negotiated, based upon the specialized knowledge of the parties within their networks of forward PGM merchants regarding current and future supply and demand, and with reference to indices in widespread use. Prices for platinum and palladium are commonly set in reference to the London Platinum and Palladium fixing price, published in London, and the price for rhodium is set in reference to the Johnson Matthey index published in the United States.

10. Before and after the commencement of the Debtors' bankruptcy cases, Delphi Automotive Systems LLC ("Delphi") was a manufacturer of automobile parts, primarily for General Motors. Some of these parts, primarily automotive catalytic converters, use PGM. The

precious metal is used as a coating for the channels of the cordierite matrix that fits inside the catalytic converter of each automobile. Therefore, Delphi was a buyer of these metals from A-1, as well as from other forward PGM merchants, in the ordinary course of its business.

11. Before and after the commencement of the Debtors' bankruptcy cases, A-1 has supplied Delphi with PGM for use in the manufacturing of automotive components, both through direct sale to DAS LLC and by reclaiming PGM from DAS LLC's automotive manufacturing scrap.

12. A-1 is a recycler of used automotive catalytic converters to obtain PGM. Thus, A-1 has its own source of PGM supply through reclamation. A-1 also routinely goes into the world market to obtain its necessary supplies of PGM.

13. Prior to the petition date, A-1 had entered into a reclamation agreement with DAS, LLC, dated September 16, 2002 ("Prepetition PGM Reclamation Agreement") (through which A-1 would reclaim PGM from catalytic converters supplied by DAS, LLC) and a supply agreement dated December 1, 2004 (" Prepetition PGM Supply Agreement")(both agreements attached hereto as **Exhibit A)**.

14. Delphi purchased PGM from A-1 and other forward PGM merchants both for immediate manufacturing needs and for anticipated future needs, and to assure itself of supplies at known prices. Delphi also had its own substantial sources of PGM from its manufacturing scrap, which was regularly reclaimed for extraction of PGM.

15. A-1 has supplied Delphi with PGM for use in the manufacturing of automotive components since the late 1990s through hundreds of spot and forward transactions involving PGM. These A-1 transactions are not made or traded on any exchange or financial market.

16. There are six sets of transfers (by set I mean transfers made on the same date) alleged in the complaints filed against A-1 by the Debtors.

1. 8/01/2005     $273,769.00
2. 8/23/2005     $1,771,600.00
3. 8/30/2005     $125,257.99
4. 9/01/2005     $286,263.00
5. 9/29/2005     $250,600.00
6. 10/3/2005     $295,888.00

(The correct dates of the transfers as evidenced by bank records are set forth above, rather than using the dates provided in the complaints which are in several cases incorrect). Therefore, I will discuss only six payments.

17. The documents evidencing each wire transfer from Delphi Corporation to A-1 are annexed hereto as **Exhibit B**. These documents clearly indicate that Delphi Corporation was the transferor of the payments to A-1 referenced in the Plaintiff's Proposed Amended Complaint.

18. Payments numbered 1, 4 and 6 above, totaling $855,920, all took place in accordance with the Prepetition PGM Supply Agreement (see **Exhibit A** hereto ) between A-1 and Delphi. This was a forward contract, calling for A-1 to deliver to Delphi fixed amounts of PGM at specified future times at the prices agreed in that contract. The Supply Agreement called for the monthly delivery by A-1 of 500 troy ounces of palladium and 100 troy ounces of rhodium to Delphi, with the option for Delphi to also make advance demands for additional quantities up to 3250 troy ounces of palladium and 650 troy ounces of rhodium per month.

19. In order to meet its obligations under the Prepetition PGM Supply Agreement, A-1 was obligated to arrange for advance purchases and forward supply agreements in the commodities markets for PGM and arrange for adequate supplies of metal on the scheduled

#3334847 (154642.002)

delivery dates. A-1 also had to hedge itself against any demand by Delphi for the additional quantities of metal that it was entitled to under its Prepetition PGM Reclamation Agreement option.

20.     The metal prices under the Prepetition PGM Reclamation Agreement were set according to published commodity prices: the prices for platinum and palladium were to be based on the average of the daily London Platinum and Palladium afternoon fixing price for the month prior to delivery minus $1.00 per troy ounce; and the price for rhodium was to be based on the average of the daily Johnson Matthey 9:30 a.m. EST price for the month prior to delivery minus 1.5% per troy ounce. Delivery was to be made into the Delphi pool account within the first 5 calendar days of each month, while payment was to be made by wire transfer to A-1's account by wire transfer, net 30 days.

21.     Payments 1, 4 and 6, in accordance with the Prepetition PGM Reclamation Agreement, were all made in settlement for contemporaneous deliveries to Delphi of 500 troy ounces of palladium and 100 troy ounces of rhodium, delivered in accordance with the contract between the parties at the beginning of each month, with payment by Delphi at the end of the month. The documents evidencing these transactions are annexed hereto as **Exhibit C**.

22.     Sometimes rather than buying palladium and rhodium from A-1, Delphi would lease it, providing temporary use of the metal to Delphi while leaving title to the metal with A-1. This is a common arrangement between precious metals industries and users of precious metals, whereby primary risks of short-term metal price volatility and supply uncertainty are bridged or hedged through the parties' avoidance of outright purchase or sale. It was the requirement of the lease and the intent of the parties that the same amount of metal would be returned by Delphi to A-1 at the end of the term. Since Delphi generally consumed, in

#3334847 (154642.002)

the manufacturing process for GM cars, some or all of the metal that A-1 had delivered to it under a lease, Delphi had several options available to it for return at the end of the lease: (1) it could request that A-1 postpone the return obligation by negotiating a renewal of the lease for an additional short term; (2) it could return other equivalent metal that it already owned, such as excess inventory or PGM reclaimed from its manufacturing scrap; (3) it could purchase equivalent metal from other third party sources and deliver it to A-1; or (4) it could deliver to A-1 a payment equal to the cost to A-1 to purchase equivalent metal from other third party sources, at then prevailing spot prices.

23. The value obtained by Delphi for the lease cost was the use of the metal during the agreed period of time, without purchase, in anticipation of future lower prices. A-1 bore the risk that that the metal's price would decline during the lease term, in exchange for a lease fee. In effect, the leases of metal were bets by the parties as to what the market price of metal would be at the conclusion of the lease term. Lease prices would rise if the volatility of the market for PGM increased because the risk was greater during the lease period. As lease periods increased, the potential for volatility rose and with it, the cost of leasing metal.

24. Payment 2, in the amount of $1,771,600.00, was in settlement of the PGM return obligation of Delphi for two leases of rhodium: 400 ounces first leased by Delphi on February 18, 2005, and 460 ounces first leased by Delphi on May 20, 2005.

25. Payment 3, in the amount of $125,257.99, and payment 5, in the amount of $250,600, were in settlement of lease fees for rhodium. The documents evidencing these transactions are annexed hereto as **Exhibit D**.

26. Until March of this year, A-1 had no knowledge that Delphi and its affiliates were planning to sue A-1 to recover over $3 million.

#3334847 (154642.002)

27.    Following A-1's filing of its proof of claim in the Delphi bankruptcy on November 21, 2005, A-1, through its counsel, negotiated and entered into a settlement agreement dated September 21, 2007 (the "Settlement Agreement," attached hereto as **Exhibit E**) granting A-1 an allowed claim in a modified amount. The settlement agreement also amended and restated the Prepetition PGM Supply Agreement, and amended and restated the Prepetition PGM Reclamation Agreement (together, the Amended Agreements) and provided for their assumption in the Plan. The Amended Agreements continue to govern A-1's relationship with DAS LLC today. A-1 also agreed to provide a deposit of metal with a value of at least $2 million or a letter of credit to secure its obligations under the amended reclamation agreement going forward.

28.    I was personally involved in the negotiations of the settlement agreement. Since there were and continue to be many transactions back and forth between A-1 and Delphi, I understood the settlement to liquidate the positions of the two parties as of the settlement date. In other words, I understood that the settlement incorporated any offsets or credits between the two parties into the final figure.

29.    The Settlement Agreement specifically stated that: "DAS LLC and A-1 have agreed to enter into this Settlement Agreement to: net and deliver the PGM each party owes to the other . . ." Exhibit E at 2. The Settlement Agreement recited the amount of metal each party held for each of the three types of metal held, platinum, palladium and rhodium, and netted the two amounts against each other.

30.    For example, it stated that A-1 currently owed DAS LLC 348.079 troy ounces of Platinum and DAS LLC currently held 500 troy ounces of A-1's Platinum secured A-1's performance under the prepetition Prepetition PGM Reclamation Agreement. These amounts

#3334847 (154642.002)

were offset against each other in the "Netting and Delivery of PGM" section of the Settlement Agreement so that on September 28, 2007 DAS LLC agreed to deliver 151.921 troy ounces of Platinum to A-1, netting the 348.079 ounces and the 500 ounces against each other.

31.    Clearly, then, the Settlement Agreement was meant to net and offset the current metal balances each party held against each other.

32.    This was in keeping with the constant trading back and forth of metal between the parties as part of their hedging agreements and as a result of the metal reclamation process.

33.    Had I known at that time that Delphi was filing the actions it now seeks to file in the amended complaint against A-1, the terms of any settlement agreement between the parties would have been very different.

34.    Had A-1 been aware that there would later be a demand for the refund of payments for pre-petition metal shipped or leased for Delphi's account, that would have resulted in a much larger amount of metal owed by Delphi to A-1 and the Netting And Delivery section of the Settlement Agreement would have been adjusted accordingly.

35.    Also, the terms of the amended and restated supply and reclamation agreements adopted by the Settlement Agreement would have been far different.

36.    The numbers, e.g. 185903, in the "Purchase Order/Invoice Number/Antecedent Debt column in Exhibit 1 of Delphi's proposed first amended complaint mystify me.

37.    A-1 issued its own invoices to ASEC. Delphi's numbers do not correspond to the invoices issued by A-1 to ASEC for which Delphi made the payments they now seek to recover through the proposed amended complaint.

#3334847 (154642.002)

38. To my knowledge, I have no documents in my possession which contain those numbers as identifiers, nor have I ever seen such documents. We can find among A-1's business records no documents containing those numbers.

39. Had I known in September of 2007 that Delphi had filed these actions against A-1, I would have taken special measures to preserve all documents relating to the alleged preferential transfers. During the time since the actions were filed, many documents relating to the alleged transfers, and to A-1's relationship with Delphi in general, have not been retained in the ordinary course of A-1's business.

40. I declare under penalty of perjury that the foregoing is correct to the best of my knowledge.

Executed at Croydon, Pennsylvania on November 18, 2010.

_____
ASHOK KUMAR

#3334847 (154642.002)