**Hearing Date and Time:  February 17, 2011 at 10:00 a.m.**
**Reply Deadline:  January 28, 2011**

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Judy B. Calton (P38733)
I.W. Winsten (P30528)
Jason R. Abel (P70408)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
Telephone: (313) 465-7344
Facsimile: (313) 465-7345
Email:  jcalton@honigman.com

Attorneys for Defendant MSX International, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————/

DELPHI CORPORATION, et al.                          Chapter 11
                                                    Case No. 05-44481 (RDD)
                                                    Jointly Administered

————————————————————/

DELPHI AUTOMOTIVE SYSTEMS, LLC

        Plaintiff,                                  Adv. Pro. No. 07-02484 (RDD)

Against

MSX INTERNATIONAL, INC.,

        Defendant.
————————————————————/

**MSX INTERNATIONAL, INC.'S BRIEF IN**
**OPPOSITION TO REORGANIZED DEBTORS'**
**MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS**

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................1

STATEMENT OF FACTS.......................................................................................2

    A.    MSX'S Business Relationships With Delphi .............................2

    B.    MSX Was Not A Creditor Or Party In Interest, And Received No
Notice, During The Relevant Times .............................................2

    C.    Delphi's Original Complaint.........................................................3

    D.    The Dismissal Of The Original Complaint....................................4

    E.    This Court's Statements That Proposed Defendants That Did Not
Receive Notice Of The Extension Orders May Now Challenge Them
*De Novo* ..........................................................................................4

    F.    MSX Can Challenge The Extension Motions Because MSX Did Not
Receive Notice Of The Extension Motions And Extension Orders ...................5

    G.    MSX Was Prejudiced By The Lack Of Notice ....................................6

    H.    DAS' Motion For Leave To Amend ......................................................8

        1.    The Proposed Amended Complaint Names DAS As The Sole
Plaintiff..............................................................................................8

        2.    The Proposed Amended Complaint Adds 102 Transfers And
More Than Doubles The Dollar Amount Requested ...........................8

        3.    MSX Never Received Any Of The New Transfers.................................9

    I.    The Proposed Amended Complaint Does Not Comply With The
September 7 Dismissal Order Regarding Antecedent Debt..............................9

        1.    DAS's Antecedent Debt Column Is Blank For $2,449,965 In
Transfers.............................................................................................9

        2.    The Antecedent Debt Column Does Not Provide Invoice
Numbers Or Bills Of Lading................................................................9

        3.    DAS Has Not Provided Antecedent Debt Information........................10

    J.    Despite MSX's Many Requests, DAS Has Refused To Provide
Purchase Orders................................................................................10

    K.    $3,341,468 Of DAS's Alleged Transfers Were Not Related To

               Obligations Owed By DAS ...........................................................................10

L.      $3,352,936 Of DAS's Alleged Transfers Were On  Account Of
        Contracts Assumed By Delphi ...........................................................11

M.     $540,603 Of DAS's Alleged Transfers Were Not On Account  Of
        Antecedent Debt Because They Were Duplicate Payments ...........................12

N.      MSX Satisfied $540,603 Of DAS's Claim Because It Returned the
        Overpayment ...............................................................................12

O.      DAS Was Solvent During the Preference Period ...............................................13

ARGUMENT ......................................................................................................15

I.     THE STANDARD FOR GRANTING LEAVE TO AMEND .....................................15

II.    DAS'S PROPOSED AMENDED COMPLAINT IS FUTILE ...................................16

    A.     DAS's Proposed Amended Complaint Fails To Comply With  The
        Dismissal Order By Not Setting Forth The Antecedent Debt .........................16

        1.    DAS Fails Even To Attempt To Identify Any Debt Owed To
           MSX...................................................................................17

        2.    DAS Fails To Identify A "Debt Owed By The Debtor".......................18

        3.    DAS Fails To Plead An "Antecedent" Debt .........................................19

    B.     DAS Cannot State A Preference Claim Against MSX .....................................19

        1.    The 102 New Alleged Transfers Added To DAS's Proposed
           Amended Complaint Are Barred By the Statute Of Limitations........19

        2.    MSX Never Received The Transfers  Added To DAS's
           Proposed Amended Complaint.............................................................21

        3.    DAS Cannot Recover $3,341,468 For Alleged Transfers  That
           Were Not Related To Obligations Owed By DAS................................22

        4.    DAS Cannot Recover $3,352, 936 For Alleged  Transfers
           Arising From Assumed Contracts.........................................................22

        5.    DAS Cannot Recover $540,603 For Alleged  Transfers Arising
           From Repaid Duplicate Payments........................................................22

    C.     The Proposed Amended Complaint Is Futile Because The Extension
        Orders Were Improvidently Entered And Should Be Vacated,
        Leaving DAS's Claims Barred By The Statute of Limitations ........................23

      1.     **MSX Received No *Actual Notice* Of Delphi's Extension Motions**................................................................................**23**

      2.     **MSX Was Not On Inquiry Notice Of Delphi's Extension Motions**................................................................................**25**

  D.    **MSX Was Not Required To Do Anything Even If It Were On Actual Notice**.......................................................................................**27**

  E.    **The Proposed Amended Complaint Is Futile Because  DAS Did Not Properly Plead And Cannot Prove It  Was Insolvent At The Time Of The Disputed Transfers**.............................................................**28**

III.    **THE PROPOSED AMENDED COMPLAINT   WOULD SUBSTANTIALLY PREJUDICE MSX**...................................................**30**

  A.    **Prejudice Is Presumed As A Matter Of Law**...........................**30**

  B.    **MSX Would Suffer Actual Prejudice From Amendment**.................**32**

  C.    **Delphi's Undue Delay Should Bar Amendment**.........................**32**

IV.    **NO FURTHER AMENDMENT SHOULD BE PERMITTED**.....................**34**

V.    **OTHER DEFENDANTS' BRIEFS ARE INCORPORATED**...................**34**

**CONCLUSION**.............................................................................**35**

## TABLE OF AUTHORITIES

**CASES**

*106 Mile Transp. Associates v. Koch*,
    656 F. Supp. 1474 (S.D.N.Y. 1987)......................................................................20

*Akers v. Koubourlis*,
    869 F.2d 1319 (9th Cir. 1989) ...........................................................................29

*Anderson, Anderson v. Air West, Inc.*,
    542 F.2d 522 (9th Cir. 1976) ........................................................................ 31-34

*Ashcroft v. Iqbal*,
    __ U.S. __, 129 S. Ct. 1937 (2009)...............................................................17, 29

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. La Salle P'ship*,
    526 U.S. 434 (1999).............................................................................................30

*Barrows v. Forest Laboratories, Inc.*,
    742 F.2d 54 (2d Cir. 1984)...................................................................................15

*City of New York v. New York, N.H. & H. R.R. Co.*,
    344 U.S. 293 (1953).............................................................................................26

*Dworsky v. Alanjay Bias Binding Corp.*,
    182 F.2d 803 (2d Cir. 1950)........................................................................... 20-21

*EBS Litigation LLC v. Barclays Global Investors, N.A.*,
    304 F.3d 302 (3rd Cir. 2002) ..............................................................................25

*Farhang v. Indian Inst. of Tech.*,
    2010 U.S. Dist. LEXIS 53975 (N.D. Cal. June 1, 2010) .......................................31

*Fimbres v. United States*,
    833 F.2d 138 (9th Cir. 1987) ..............................................................................24

*Fokkena v. Winston, Reuber, Byrne, P.C.*,
    189 B.R. 744 (Bankr. N.D. Iowa 1995) ..............................................................29

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
    159 F.3d 723 (2d Cir. 1998)................................................................................15

*IMF Sales Associates, Inc. v. Racal-Vadic Information Systems, Inc.*,
    94 B.R. 223 (Bankr. D. Mass 1988) ...................................................................29

*In re 360networks Inc.*,
  367 B.R. 428 (Bankr. S.D.N.Y. 2007); *see* .................................................................. 20-21

*In re Bennett Funding Group*,
  220 B.R. 739 (Bankr. 2d Cir. 1998) ............................................................................. 16

*In re Metzeler*,
  66 B.R. 977 (Bankr. S.D.N.Y. 1986) ............................................................................ 20

*In re Roblin Industries, Inc.*,
  78 F.3d 30 (2d Cir. 1996) ............................................................................................. 29

*In re Telilgent Inc.*,
  324 B.R. 479 (S.D.N.Y. 2005) ...................................................................................... 22

*Iridium IP LLC v. Motorola, Inc.*,
  373 B.R. 283 (Bankr. S.D.N.Y. 2007) (Peck, J.) ......................................................... 30

*John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*,
  22 F.3d 458 (2d Cir. 1994) ........................................................................................... 15

*Kam Kuo Seafood Corp. v. Hong Kong & Shanghai Bakery Corp.*,
  67 B.R. 304 (Bankr. S.D.N.Y. 1986) ............................................................................ 21

*Mackensworth v. S.S. Am. Merchant*,
  28 F.3d 246 (2d Cir. 1994) ........................................................................................... 19

*MBC Greenhouse Co. v. CTC Direct, Inc.*,
  307 B.R. 787 (Bankr. D. Del. 2004) ............................................................................. 21

*McLaughlin v. Anderson*,
  962 F.2d 187 (2d Cir. 1992) ......................................................................................... 15

*Murphy Brothers, Inc. v. Michetti Pipe Stringing, Inc.*
  526 U.S. 344 (1999) ...................................................................................................... 27

*Newman v. Warnaco Group, Inc.*,
  335 F.3d 187 (2d Cir. 2003) ......................................................................................... 25

*Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*,
  840 F. Supp. 243 (S.D.N.Y. 1993) ............................................................................... 25

*Redding v. Essex Crane Rental Corp. of Alabama*,
  752 F.2d 1077 (5th Cir. 1985) ...................................................................................... 32

*Richardson v. United White Shipping Co.*,
  38 F.R.D. 494 (N.D. Cal. 1965) ................................................................................... 31

*Ruffolo v. Oppenheimer & Co.*,
    987 F.2d 129 (2d Cir. 1993) ............................................................................................. 15

*Shannon v. GE*,
    186 F.3d 186 (2d Cir. 1999) ............................................................................................. 31

*Smith v. Pennsylvania Glass Sand Corp.*,
    123 F.R.D. 648 (N.D. Fla. 1988) ..................................................................................... 24

*Staehr v. Hartford Fin. Servs. Group*,
    547 F.3d 406 (2d Cir. 2008) ......................................................................................... 25-26

*Veazey v. Young's Yacht Sale & Service, Inc.*,
    644 F.2d 475 (5th Cir. 1981) ........................................................................................... 31

*VFB LLC v. Campbell Soup Co.*,
    482 F.3d 624 (3d. Cir. 2007) ........................................................................................... 30

*United Student Aid Funds, Inc. v. Espinosa*,
    __ U.S. __, 130 S. Ct. 1367, 1378 (2010) ....................................................................... 23

*Zapata v. New York,*
    502 F.3d 192 (2d Cir. 2007) ........................................................................................... 32

## STATUTES

11 U.S.C. § 547 ...................................................................................................................... 28

11 U.S.C. §550 ....................................................................................................................... 23

28 U.S.C. § 1446 .................................................................................................................... 27

## OTHER AUTHORITIES

Federal Rule of Bankrutpcy Procedure 7015 ......................................................................... 19

Federal Rule of Civil Procedure 15 .................................................................................. 15, 19

## **INTRODUCTION**

This Court should deny the Reorganized Debtors' motion for leave to amend, which asks this Court to exercise its discretion to permit Delphi Automotive Systems, LLC ("**DAS**") to file an amended complaint against MSX International, Inc. ("**MSX**") to recover $9,846,866 in alleged transfers.

The proposed amended complaint is futile, and MSX will be severely prejudiced by DAS's undue delay if this case is permitted to proceed. As explained below:

A. MSX was not served with, and had no notice – actual or otherwise – of the Reorganized Debtors' motions to extend the time to serve the preference actions (the "**Extension Motions**") or the orders that granted them (the "**Extension Orders**"). *See* Delphi Omnibus Response to the prior dismissal motions (MSX D.I. 35), at 29 & n.8.

B. Because MSX had no notice of the Extension Orders, it may now challenge them *de novo*. *See* July 22, 2010 Tr. at 103, 119 (If a defendant "didn't get notice, its wide open" and "they should be able to argue to me as if the motions were being made right now").

C. Delphi was not entitled to obtain the Extension Orders, including the April 30, 2008 Extension Order, because Rule 4(m) may be used only to facilitate service (and not to authorize a delay in service), and it was not proper for Delphi to use Rule 4(m) to avoid prosecuting preference actions for more than two years while it preserved its business relationship with unsuspecting defendants and used its resources in other areas it deemed more important.

D. Any preference action is time-barred without the Extension Orders.

E. DAS's proposed amended complaint fails to comply with this Court's September 7, 2010 Dismissal Order, and does not properly plead the antecedent debt for any transfer.

F. DAS's claims are futile because:

1. DAS may not add 102 new transfers to its Proposed Amended Complaint and more than double the amount that it was seeking in the original complaint.

2. MSX did not actually receive any of the new transfers added to DAS's Proposed Amended Complaint.

3.      DAS cannot recover regarding alleged transfers that were: (i) made on account of debts owed by Delphi, not DAS; (ii) made in connection with an assumed contract; or (iii) duplicate payments that MSX previously returned.

G.      DAS's claims are also futile because it was solvent at the time it made the alleged preferential transfers.  DAS had a net worth of over $2.6 billion as confirmed by its bankruptcy schedules, and it cannot establish the essential insolvency element.

H.      MSX has suffered great prejudice because of Delphi's more than two year delay in serving this action, during which time it terminated and lost track of the corporate personnel and contractors who had critical knowledge about its relationship with Delphi and did not preserve much of its Delphi data, including purchase orders, releases, remittance details, and communications necessary to challenge Delphi's claims.

Therefore, this Court should exercise its discretion to deny the motion and spare MSX the further expense of opposing claims that are unlikely to ever succeed.

## STATEMENT OF FACTS

A.      **MSX'S Business Relationships With Delphi**

MSX provides outsourced business services to clients, primarily in the automotive industry, including temporary and permanent staffing.  MSX provided staffing services to Delphi Corporation and various of its affiliates (collectively, "**Delphi**"), beginning with Delphi's spinoff from General Motors Corporation ("**GM**") until approximately May 2007.  MSX provided Delphi with a variety of staffing needs, including technical and administrative personnel and workers in subassembly operations.  Declaration of Frederick K. Minturn ("**Minturn Declaration**"), Exhibit A, ¶¶ 3-4.

B.      **MSX Was Not A Creditor Or Party In Interest,
And Received No Notice, During The Relevant Times**

There was a dispute between Delphi and MSX about alleged duplicate payments made by Delphi to MSX.  Delphi asserted that prepetition it had overpaid MSX $540,603 by making duplicate payments on previously paid invoices shortly before the commencement of Delphi's

bankruptcy cases.    Postpetition, Delphi demanded MSX repay the $540,603 overpayment. Minturn Declaration ¶10.

MSX and Delphi resolved the duplicate payment dispute by a Settlement Agreement, dated August 7 and 8, 2007, a copy of which is attached as Exhibit 1 to the Minturn Declaration. The Settlement Agreement provided, in summary, for the disallowance and expungement of MSX's proof of claim against Delphi, MSX's release of its claims against Delphi, and MSX repaying the duplicate payment by wire transfer to Delphi in August 2007.    Minturn Declaration ¶11.    The claim was expunged by the Joint Stipulation and Agreed Order Disallowing and Expunging Proof of Claim No. 11425 (MSX International, Inc.).    D.I. 9251.

Upon implementation of the Settlement Agreement, MSX was no longer a creditor of Delphi and had no interest in the Delphi case.    MSX instructed its attorneys to incur no more fees representing MSX in the Delphi case.    Sarah Seewer, the attorney who had represented MSX in the Delphi case, including negotiating the Settlement Agreement, then filed a notice in the Delphi case to withdraw from representing MSX and cease receiving notices.    (The Notice is attached as Exhibit 2 of the Minturn Declaration.)    *See* Minturn Declaration ¶¶ 11,13.

## C.    Delphi's Original Complaint

The Debtors' original Complaint to Avoid and Recover Transfers Pursuant to 11 U.S. C. §§ 547 and 550 (the "**Original Complaint**") was filed under seal on September 28, 2007, but not unsealed and served upon MSX until March 2010.    The "Plaintiffs" in the Original Complaint were "Delphi Corporation ('Delphi') and all of the other 'debtors and debtors-in-possession'."

The Original Complaint listed only 14 transfers from Delphi to MSX between July 28, 2005 and October 7, 2005 totaling $4,435,376.    Declaration of Kim Downey (the "**Downey Declaration**") at ¶8.    A copy of the Downey Declaration is Exhibit B hereto.    A copy of the

Exhibit 1 identifying the transfers in the Original Complaint is attached as Exhibit 2 to the Declaration.

### D.    The Dismissal Of The Original Complaint

In response to motions to dismiss filed by MSX and other defendants in the preference actions, the Court entered its September 7, 2010 Order Granting In Part First Wave Motions to Dismiss (MSX D.I. 40) (the "**Dismissal Order**").  The Dismissal Order dismissed the claims against MSX without prejudice because the debtors had failed to plead sufficient facts to state a claim.

The Court then permitted the Reorganized Debtors to file a motion to seek leave to file an amended complaint, and expressly ordered that the proposed amended complaint shall "set forth, *at a minimum*, the transfers, the transferee, any known subsequent transferee against whom relief is sought, the antecedent debt and which Reorganized Debtor is the Plaintiff."   *Id*. (emphasis supplied).

### E.    This Court's Statements That Proposed Defendants That Did Not Receive Notice Of The Extension Orders May Now Challenge Them *De Novo*

Recognizing that notice of Delphi's motions to extend the time to serve the Complaint may have been insufficient or in the case of some of the preference defendants, such as MSX, nonexistent, this Court has repeatedly held that such defendants could challenge the Extension Motions and Extension Orders *de novo*.  On April 1, 2010, for example, this Court recognized the inequity of binding defendants to decisions in adversary proceedings of which they were unaware.  According to the Court:

> Well, would they even have to seek relief if they're not a party.  I mean, it's odd to say that they'd be bound if they're not party to an adversary proceeding that's been . . . served yet.

April 1, 2010 Tr., at p. 13 (attached as Exhibit H).

4

Likewise, this Court concluded during the July 22, 2010 hearing on MSX's motion to dismiss that:

> [I]f [a Defendant] didn't get notice, it's wide open and I should look at it as whether, you know, it was appropriate to have entered these orders. And they should have all their – you know, their rights to say the[ Procedures Order and Extension Orders] shouldn't have been entered.
>
> * * *
>
> [I]f someone really didn't get notice of the extension motions, then it would seem to me they should be able to argue to me as if the motions were being made right now . . . .

July 22, 2010 Tr., at pp. 103, 119 (attached as Exhibit I). Indeed, this Court held that if, as here, a party had no notice of Delphi's motions, "***it's a slam dunk as far as looking at the order as brand new***." *Id*. at 107 (emphasis supplied).

**F.    MSX Can Challenge The Extension Motions Because MSX Did Not Receive Notice Of The Extension Motions And Extension Orders**

Significantly, as discussed above, MSX was not on the ECF notice list that Delphi used to serve its various "Extension of Avoidance Action Service Deadline Motions" (the "**Extension Motions**"), and the orders granting the Extension Motions (the "**Extension Orders**"). This lack of notice to MSX is demonstrated by Delphi's own affidavits of service:

1.    MSX did not receive notice of the August 6, 2007 Preservation of Estate Claims Motion. D.I. 8095, or the Order granting it. D.I. 9105. *See* Affidavit of Service. D.I. 9039, Affidavit of Service D.I. 9141.

2.    MSX did not receive notice of the February 8, 2008 Extension of Avoidance Action Service Deadline Motion, D.I. 12922 or the order granting it. D.I. 13277. *See* Affidavit of Service, D.I. 12970; Affidavit of Service, D.I. 13315.

3.    MSX did not receive notice of the April 20, 2008 Postconfirmation Extension of Avoidance Action Service Deadline Motion, D.I. 13361 or the order granting it. D.I. 13484. *See* Affidavit of Service. D.I. 13415; Affidavit of Service, D.I. 13540; and

4.    MSX did not receive notice of the October 2, 2009 Supplemental Postconfirmation Extension of Avoidance Action Service Deadline Motion, D.I.

18952 or order granting it.   D.I. 18999.   *See* Affidavit of Service. D.I. 18967.
Upon information and belief, D.I. 18999 was not served until after the Original
Complaint was unsealed.

Indeed, Delphi *admits* that it never served MSX with any of the Extension Motions or Orders.

*See* Delphi's Omnibus Response in opposition to the various defendants dismissal motions

(MSX D.I. 36), at p 29 and footnote 8.

In addition, given MSX's settlement with Delphi, MSX was not a creditor (or even a

contingent creditor) of Delphi and not a party in interest to the Delphi bankruptcy estate when

Delphi served its December 2007 Disclosure Statement.

MSX does not believe it received that Disclosure Statement.   But even if MSX had

received the December 2007 Disclosure Statement, MSX would not have read it, because MSX

was no longer a creditor of Delphi or interested in the Delphi bankruptcy case.   Minturn

Declaration ¶ 15.   Thus, the December 2007 Disclosure Statement gave no notice to MSX.

### G.      MSX Was Prejudiced By The Lack Of Notice

Having no notice that MSX had been sued or that the time for service of the secret

complaint against it had been extended multiple times, MSX no longer had need for and

terminated over 400 corporate staff personnel and contractors dedicated to the Delphi account

(the "**Former Personnel**").   The Former Personnel included the MSX headquarters personnel

who had direct contact with Delphi on behalf of MSX and were most knowledgeable about

MSX's relationship with Delphi.   Minturn Declaration ¶¶5-6.

At the time the Former Personnel were terminated, MSX made no arrangements to obtain

information about the issues raised by the lawsuit, whether in exit interviews or otherwise, or to

keep in touch with any of them.   By March 2010, when MSX learned of the lawsuit, it no longer

had knowledge of the whereabouts of the Former Personnel.   MSX's Human Resources

department has tried to contact corporate staff included in Former Personnel and was unable to

reach any of them. Minturn Declaration ¶¶ 6-7. The purchasing, payment and other personnel employed by Delphi with whom MSX worked also are no longer at Delphi and MSX does not know how to contact them or how to go about locating them. Minturn Declaration ¶ 9.

MSX is unable to locate most of the pertinent documents detailing the Delphi-MSX relationship. Among the documents MSX could not find are:

1. Purchase Order Documentation: MSX originally had copies of requests for quotes, statements of work, award letters, purchase orders and purchase order alterations, or amendments and differing versions for each purchase order. Statements of work, requests for quotes and award letters cannot be located. MSX estimates that it cannot locate more than half of the pertinent purchase orders and related purchase order alterations and versions. MSX is missing purchase order alterations, amendments or versions for virtually every purchase order it could find.

2. Releases: A release is an authorization from the customer, such as Delphi, to the supplier, such as MSX, to provide services under a purchase order and to bill for the services. A release always relates to a particular purchase order. An example is Release No. FDR28004, a copy of which is attached as Exhibit 1 to the Downey Declaration. MSX estimates that it could find less than one-third of the pertinent releases.

3. Remittance Detail. Remittance detail informs a supplier which invoices are being paid by a particular transfer. When MSX received payments from Delphi, the payments were not accompanied by advice from Delphi as to which invoices were being paid by those payments. Moreover, payment amounts did not necessarily match invoice amounts. Instead, remittance detail was generally available for MSX to access on a website maintained for Delphi (the "Delphi Website"). MSX could view that information, and if it chose, print a copy of it. Because the information, back in 2005, was readily available on the website, MSX did not regularly choose to print and store the data, but only intermittently printed and stored data. The Delphi Website and the information on it is no longer available to MSX. Now, MSX cannot locate remittance detail for a significant portion of the alleged transfers.

4. Communications. Delphi and MSX had regular written communications – usually in the form of emails. In addition, MSX people would create memos or notes documenting oral discussions with MSX. For example, not all remittance detail was provided on the Delphi Website, so that MSX would have to call Delphi to find out how to allocate payments it received. MSX cannot find notes or memos of many such discussions. In addition, based on the small amount of correspondence found, most of the correspondence was not preserved.

Downey Declaration ¶ 7.  Moreover, as a matter of policy, MSX cleaned the computer hard drives of its departed personnel and does not have the ability to locate the "scrubbed" data. Minturn Declaration ¶ 8.

**H.**     **DAS's Motion For Leave To Amend**

On September 7, 2010, the Reorganized Debtors' filed their Motion for Leave to File Amended Complaints (the "**Motion to Amend**") (MSX D.I. 39), which attached the proposed First Amended Complaint to Avoid and Recover Transfers Pursuant to 11 U.S.C. §§ 547 and 550 (the "**Proposed Amended Complaint**").

**1.**     **The Proposed Amended Complaint Names DAS As The Sole Plaintiff**

The Proposed Amended Complaint names only one Plaintiff:  DAS.  None of the other debtors and debtors-in-possession who were Plaintiffs in the Original Complaint, including Delphi Corporation, is a Plaintiff in the Proposed Amended Complaint.  Thus, only transfers on account of antecedent debt of DAS can be avoided; transfers by any of the other former Plaintiffs in the Original Complaint cannot be avoided.

**2.**     **The Proposed Amended Complaint Adds 102 Transfers
And More Than Doubles The Dollar Amount Requested**

The Proposed Amended Complaint increased the number of transfers DAS seeks to avoid from 14 transfers in the Original Complaint to 116 transfers.  In addition, the Proposed Amended Complaint more than doubles the claim to $9,846,886 from the $4,435,376 sought in the Original Complaint.  A copy of Exhibit 1 to the Proposed Amended Complaint is attached as Exhibit 3 to the Downey Declaration (Exhibit B hereto).  Downey Declaration ¶¶ 8-9.  The Motion to Amend and Proposed Amended Complaint give no reason for adding transfers and dollar amounts not included in the Original Complaint.

### 3.    MSX Never Received Any Of The New Transfers

MSX did not receive any of the new transfers in the Proposed Amended Complaint that total $5,411,509.85. Downey Declaration ¶¶ 10, 12. MSX cannot understand the basis for such erroneous pleading, because, as discussed below, page 10, DAS has failed to provide MSX with back-up for its Proposed Amended Complaint.

### I.    The Proposed Amended Complaint Does Not Comply With The September 7 Dismissal Order Regarding Antecedent Debt

In Paragraph 22 of the Proposed Amended Complaint, DAS alleges that it has identified the purchase orders, invoices or bills of lading evidencing the antecedent debt for the transfers. This is not true. Downey Declaration ¶ 15. Antecedent debt information is supposed to be supplied by a column on Exhibit 1 to the Proposed Amended Complaint entitled "Antecedent Debt/Purchase Order/Invoice Number" (the "**Antecedent Debt Column**"), but the information provided does not comply with the Dismissal Order.

### 1.    DAS's Antecedent Debt Column Is Blank For $2,449,965 In Transfers

The Antecedent Debt Column is blank with no information at all with respect to three transfers totaling $2,449,965.70, as follows:

| Transfer Date | Transfer Amounts | Antecedent Debt/Purchase Order/Invoice Number |
|---|---|---|
| 09/16/2005 | $1,658,429.59 | |
| 09/30/2005 | $354,483.50 | |
| 10/06/2005 | $437,052.61 | |
| Total | $2,449,965.70 | |

Downey Declaration ¶ 16.

### 2.    The Antecedent Debt Column Does Not Provide Invoice Numbers Or Bills Of Lading

There are additional examples of DAS's erroneous pleading in that none of the Antecedent Debt Column entries are invoice numbers. Downey Declaration ¶ 17. Likewise,

none of the entries in the Antecedent Debt Column are bills of lading. In any event, bills of lading are not used in the provision of services (as opposed to goods), such as MSX was supplying to Delphi. Downey Declaration ¶ 21.

### 3. DAS Has Not Provided Antecedent Debt Information

Only 29 of the 116 Antecedent Debt Column entries are purchase order numbers, as summarized on Exhibit 4 to the Downey Declaration ¶ 18. Thus, the remaining entries do not represent antecedent debt. For example, one Antecedent Debt Column entry, for $478,701 on 10/7/2005, is not a purchase order, invoice, release or bill of lading; it is in a format MSX does not recognize. Downey Declaration ¶ 19.

The remaining 83 Antecedent Debt Column entries are release numbers, showing authorization for MSX to provide services, but not purchase order numbers or invoice numbers. The releases do not represent antecedent debt. A list of these 83 release number entries is attached as Exhibit 5 to the Downey Declaration ¶ 20.

### J. Despite MSX's Many Requests, DAS Has Refused To Provide Purchase Orders

After receiving the Proposed Amended Complaint, MSX has repeatedly asked DAS for copies of the purchase orders for the transfers at issues, but DAS has failed to provide any of them. See e-mail dated October 15, 2010, attached as Exhibit C.

### K. $3,341,468 Of DAS's Alleged Transfers Were Not Related To Obligations Owed By DAS

The Proposed Amended Complaint asserts that DAS is the obligor of all of the 116 transfers. See Exhibit 3 to the Downey Declaration. The Amended Complaint identifies 23 transfers totaling $3,341,468 where, according to the Proposed Amended Complaint, DAS was the "Contracting Entity" and "Obligor." Downey Declaration ¶¶ 22-23.

However, the Contracting Entity and Obligor for these transfers was Delphi Corporation, not DAS. Thus, these transfers were not on account of any antecedent debt owed by DAS. Downey Declaration ¶ 24. These 23 transfers are identified in the Antecedent Debt Column by releases that relate to the following six purchase orders:

1. FDB01905
2. FDS81935
3. FDS82362
4. FDS82478
5. FDS82781
6. FDS82782

Each of these purchase orders was issued by Delphi Corporation as the buyer (collectively, the "**Delphi Purchase Orders**"), not DAS. Copies of the Delphi Purchase Orders are attached to the Downey Declaration as collective Exhibit 6. The $3,341,468 in transfers in the Amended Complaint which were transfers on account of the Delphi Purchase Orders instead of on account of antecedent debt owed by DAS are detailed on Exhibit 7 to the Downey Declaration. Downey Declaration ¶¶ 23, 25.

Obviously, because Delphi Corporation was the issuing party of the Delphi Purchase Orders, DAS was not the "Contracting Entity" for the Delphi Purchase Orders nor was DAS the "Obligor" for the transfers under the Delphi Purchase Orders. Downey Declaration ¶ 24.

**L.      $3,352,936 Of DAS's Alleged Transfers Were On
         Account Of Contracts Assumed By Delphi**

$3,352,936 of DAS's alleged transfers in the Proposed Amended Complaint are payments under Purchase Order 460006298 ("**P.O. 298**"), which Delphi has already assumed according to the Notice of Assumption and/or Assignment of Executory Contract or Unassumed Lease to Purchasers in Connection with Sale of Interiors and Closure Businesses (Docket No.

11

10963) (the "**Assumption Notice**").  *See* Downey Declaration ¶¶ 27, 29, Exhibit 9 (excerpted

copy of Assumption Notice); Exhibit 10 (summarizing transfers).

P.O. 298 was a continuation of Purchase Order FDB01831 ("**P.O. 1831**").  P.O. 298 and

P.O. 1831 cover the identical services for the identical time period (2/15/03 to 2/14/06) based on

the same Statement of Work ("SOW") and Request For Quote ("**RFQ**").  Downey Declaration

¶¶ 26, 28.  Copies of P.O. 298 and P.O. 1831 collectively are attached as Exhibit 8 to the

Downey Declaration.

Any claim with respect to these transfers is futile.

**M.    $540,603 Of DAS's Alleged Transfers Were Not On Account
Of Antecedent Debt Because They Were Duplicate Payments**

$540,603.63 of DAS's alleged transfers in the Proposed Amended Complaint were

duplicate payments of amounts previously paid.  They thus were not made on account of an

antecedent debt, since that antecedent debt had already been satisfied.  Attached as Exhibit 11 to

the Downey Declaration is Debtor's Statement of Disputed Issues With Respect to Proof of

Claim Number 11425 (MSX International, Inc.) (Docket No. 8849) (the "**Disputed Issues**

**Statement**"), where Delphi explains that, shortly before its bankruptcy cases commenced,

Delphi paid MSX invoices twice in the amount of $540,603.63 (the "**Overpayment**").  Downey

Declaration ¶¶ 30-31.

**N.    MSX Satisfied $540,603 Of DAS's Claim Because It Returned the Overpayment**

As discussed above, Delphi and MSX resolved the Overpayment dispute according to the

terms of a Settlement Agreement, a copy of which is attached as Exhibit 12 to the Downey

Declaration.  Under the Settlement Agreement, Delphi received satisfaction and recovery of the

$540,603 in claimed transfers from MSX by not paying MSX for $92,828 in postpetition

services and receiving a $447,775 payment from MSX. Downey Declaration ¶ 33. DAS thus impermissibly is seeking to recover the same $540,603 twice.

**O.**    **DAS Was Solvent During the Preference Period**

DAS's Proposed Amended Complaint pleads only the bare legal conclusion that it was insolvent at the time of the transfers. The sole allegation in the Proposed Amended Complaint with respect to insolvency is at Paragraph 23 and states only that "Plaintiff is presumed to have been, and was in fact, insolvent at the time the transfers were made." DAS's Proposed Amended Complaint offers no facts to support this conclusory statement or to make the allegation plausible.

And for good reason. DAS has *admitted* that it was clearly solvent at the time of the transfers. DAS's own schedules in this case admit that, *as of its petition date, DAS had over $2.6 billion in net equity*, with total assets of $8,133,427,809 and total liabilities of $5,526,447,015. *See* Notice of Amendments of Schedules of Assets and Liability dated April 18, 2006 (Case No. 05-44641 D.I. 10), excerpted pages of which are attached as Exhibit D.

DAS's solvency is consistent with the "transformational issues" that drove Delphi to file for bankruptcy. Delphi's Chapter 11 filing was elective, not driven by liquidity or balance sheet concerns. As this Court observed on March 22, 2006, Delphi's case was "not a simple balance sheet restructuring . . . because there is too much funded debt on the books." Transcript March 22, 2006 at page 174. Excerpted pages of the March 22, 2006 transcript are attached as Exhibit E. Instead, the bankruptcy filings were driven by Delphi's "transformational issues" such as labor, pension and GM problems. *Id*. at 174-175.

Based on DAS's schedules, DAS was not liable for the debts associated with these transformational issues, such as GM legacy obligations, pension obligations, indemnity of GM and certain labor agreements. Instead, the liabilities associated with these transformational

13

issues were at the level of Delphi Corporation, the ultimate parent. Compare Schedule G to the DAS Schedule (DAS D.I. 5) (not scheduling union contracts or collective bargaining agreements as executory contracts) with the Delphi Corporation Schedule G (D.I. 1854) (scheduling union contracts and collective bargaining agreements as executory contracts).

In fact, even DAS's parent, Delphi Corporation, appears to have been solvent during the preference period. Delphi "declared a dividend on Delphi common stock of $0.015 per share on June 22, 2005, which was paid on August 2, 2005." *See* attached Exhibit F, Delphi's Form 10-Q, for the period June 30, 2005 filed with the Securities and Exchange Commission ("**SEC**") on August 8, 2005 (the "**10-Q**"), at page 6. As of June 30, 2005, there were 561,415,901 outstanding shares of Delphi common stock. *Id.* at p. 1. Thus, the dividend amounted to a $8,421,238 payment to shareholders during the preference period. The dividend was from the capital surplus of Delphi's net assets in excess of its total liabilities. *See* Testimony of John B. Sheehan, Delphi's chief restructuring officer, Transcript of March 21, 2006 at pages 152-157, attached as Exhibit G. Tellingly, Delphi took no steps during its bankruptcy to recover this dividend.

During the preference period, Delphi's common stock also continuously traded between $2.00 and $5.90 per share. *See* attached Exhibit J, (over the counter daily prices for Delphi Corporation for the period 7/01/2005 to 10/15/2005). Thus, the market valued Delphi, during the preference period, as having an equity value of between $1,122,813,802 and $3,312,353,816.

Consistent with these facts, as late as February 2008, more than two years into its bankruptcy, Delphi was still proposing a 100 cent plan to its creditors.

14

**ARGUMENT**

## I.     THE STANDARD FOR GRANTING LEAVE TO AMEND

Leave to amend under Rule 15 of the Federal Rules of Civil Procedure is not granted automatically; instead "it is within the sound discretion of the court whether to grant leave to amend." *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir. 1994). "[C]onsiderations of undue delay, bad faith, and prejudice to the opposing party [are] all touchstones of a district court's discretionary authority to deny leave to amend." *Barrows v. Forest Laboratories, Inc.*, 742 F.2d 54, 58 (2d Cir. 1984).

Likewise, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). For example, "it is proper to deny leave to replead where there is no merit in the proposed amendments or amendment would be futile." *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 728 (2d Cir. 1998). Courts thus are justified in denying leave to amend where, as here, proposed amendments cannot withstand a motion to dismiss or fail to comply with a court's order regarding required allegations. *Ruffolo*, 987 F.2d at 131 (affirming denial of leave to amend where proposed amendment failed to allege necessary facts); *McLaughlin v. Anderson*, 962 F.2d 187, 195 (2d Cir. 1992) (affirming denial of leave to amend where proposed amendment failed to comply with court's order).

As explained below, Delphi's motion for leave to amend "is unlikely to be productive" as to MSX and should be denied.

## II.    DAS'S PROPOSED AMENDED COMPLAINT IS FUTILE

### A.    DAS's Proposed Amended Complaint Fails To Comply With The Dismissal Order By Not Setting Forth The Antecedent Debt

DAS's Proposed Amended Complaint fails to comply with the minimum requirements set forth in this Court's Dismissal Order.  Specifically, DAS's Proposed Amended Complaint once again fails adequately to plead facts regarding the antecedent debt for each transfer alleged by DAS.  DAS's allegations regarding the existence of any actual antecedent debt are bare-bones and are presented in Paragraph 22 of the Proposed Amended Complaint, where DAS alleges:

> Plaintiff made, or caused to be made, each Transfer listed on Exhibit 1 for, or on account of, an antecedent debt owed to Defendant as of the date on which each Transfer was made.  The documents evidencing the antecedent debt include the purchase orders and/or invoices/bills of lading identified on Exhibit 1, which purchase orders and/or invoices/bills of lading include evidence of the amount of the antecedent debt and the approximate dates the subject goods contemplated by the Agreements were ordered by Plaintiff pursuant to the Agreements and/or were provided by Defendant.

Pursuant to Section 547(b)(2) of the Bankruptcy Code, an avoidance action requires a transfer "for or on account of an antecedent debt owed by the debtor before such transfer was made."  11 U.S.C. § 547(b)(2).  The Bankruptcy Code does not define the term "antecedent debt."  The Bankruptcy Appellate Panel for the Second Circuit has opined, however, that:

> The case law is clear that for purposes of Section 547(b)(2) "an antecedent debt" is a pre-existing debt that was incurred when the debtor previously obtained a property interest in the consideration provided by the creditor that gave rise to the debt. The consideration may have been a loan or *the furnishing of goods or services*, but when the debtor *obtained the loan, goods or services*, the creditor had a claim, matured or unmatured, that it could then assert against the debtor's bankruptcy estate if payment was not made at the time a petition was filed. At that point the debt was "antecedent" for purposes of Section 547(b)(2).

*In re Bennett Funding Group*, 220 B.R. 739, 742 (Bankr. 2d Cir. 1998) (emphasis supplied).  An antecedent debt thus generally arises when the debtor "*obtain[s]*" the goods or services for which it contracted.  *Id*.  Indeed, DAS recognizes as much given its representation in its Proposed

Amended Complaint that Exhibit 1 "include[s] evidence of . . . the approximate dates the subject goods contemplated by the Agreements were ordered by Plaintiff pursuant to the Agreements and/or were provided by Defendant."  Proposed Amended Complaint ¶ 22.[1]

Factual allegations regarding an "antecedent debt" necessary to satisfy an avoidance action therefore must address three distinct elements: (i) a debt (evidenced by a contract and performance under that contract giving rise to an obligation to pay), (ii) which was owed by the debtor, and (iii) which was antecedent to the transfer.  DAS fails to plead any of these elements in anything more than a conclusory manner, which this Court, in dismissing Delphi's original complaint, has already recognized is impermissible.  *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

## 1.    <u>DAS Fails Even To Attempt To Identify Any Debt Owed To MSX</u>

Paragraph 22 of the Proposed Amended Complaint – DAS's sole antecedent debt allegation – fails to present any factual allegation establishing the existence of a debt with regard to the purported $9,846,866 in transfers to MSX.

### a.    **Only 29 Alleged Transfers Are Associated With**
<u>**Contracts Allegedly Giving Rise To Debts To MSX**</u>

For all but a few of the transfers at issue, the Proposed Amended Complaint fails to identify any contract or other agreement giving rise to a debt to MSX.  According to Paragraph 22, Exhibit 1 to the Proposed Amended Complaint identifies the "purchase orders," "invoices," and "bills of lading" underlying the debt for each of the alleged transfers.  But, in fact, it does not.

---

[1] DAS did not order or receive goods from MSX.  MSX provided services, not goods. Minturn Declaration ¶¶3-4; Downey Declaration ¶21.

Only 29 of the 116 Antecedent Debt Column entries on Exhibit 1 to the Proposed

Amended Complaint are purchase order numbers.  *See* Downey Declaration ¶ 18, Exhibit 4.

 Of the remaining Antecedent Debt Column entries:

- Three Antecedent Debt Column entries, totaling $2,449,965, are completely blank (*see* entries for 9/16/05, 9/30/05 and 10/06/05).  Downey Declaration ¶ 16.

- One Antecedent Debt Column entry, for $478,701 on 10/7/2005, is not a purchase order, invoice, release or bill of lading; it is in a format MSX does not recognize. Downey Declaration ¶ 19.

- The remaining 83 Antecedent Debt Column entries are merely release numbers, showing an authorization for MSX to provide services, without setting forth the terms on which those services were to be provided or any other contractual provisions giving rise to a debt.  The releases thus do not represent an antecedent debt. Downey Declaration ¶¶ 7(b), 20, Exhibit 5.

Contrary to DAS's express representation to this Court, 87 of DAS Antecedent Debt

Column entries thus do not identify "purchase orders," "invoices," and "bills of lading" and

completely fail to establish the existence of an antecedent debt.

<b>b.    DAS's Proposed Amended Complaint Fails To<br>Identify Performance By MSX Giving Rise To A Debt</b>

Exhibit 1 to the Proposed Amended Complaint also fails to identify any action by MSX,

such as the delivery of services, that would give rise to the existence of a debt under a purchase

order or other agreement (even if one had been alleged).  As discussed above, the case law is

clear that an antecedent debt does not arise until DAS actually "obtained" the services for which

it contracted, and there is no such allegation here.  *See supra* at 16.

DAS thus completely fails to comply with this Court's requirement that it identify the

specific antecedent debts underlying its transfers to MSX.

<b>2.    DAS Fails To Identify A "Debt Owed By The Debtor"</b>

DAS fails to make any allegation whatsoever that any of its purported transfers were

made based on a "debt owed ***by the debtor***" – by DAS, not Delphi or the other Reorganized

18

Debtors – as required to satisfy Section 547(b)(2) of the Bankruptcy Code. DAS instead merely alleges that the debt was "owed *to Defendant*," presumably because DAS does not know which of the Reorganized Debtors actually owed the debt. Proposed Amended Complaint ¶ 22 (emphasis supplied). Under the plain language of Section 547(b)(2) of the Bankruptcy Code, DAS cannot maintain an avoidance action based on such third-party debts.

### 3. DAS Fails To Plead An "Antecedent" Debt

DAS also fails to plead facts establishing that the alleged debts in question were actually "antecedent." Exhibit 1 to the Proposed Amended Complaint does not state when any alleged debt arose. There thus is no basis, other than DAS's conclusory assertions, for DAS to claim the existence of any "antecedent" debt as required to state a claim under Section 547(b)(2) of the Bankruptcy Code.

### B. DAS Cannot State A Preference Claim Against MSX

### 1. The 102 New Alleged Transfers Added To DAS's Proposed Amended Complaint Are Barred By the Statute Of Limitations

The 102 newly-minted transfer claims added to DAS's Proposed Amended Complaint conclusively are barred by the two-year statute of limitations for preference actions and do not relate back to Delphi's original complaint against MSX. Under Federal Rule of Civil Procedure 15(c)(1), made applicable by Bankruptcy Rule 7015, an amended pleading relates back to the original pleading if the claims in the amended pleading: "arose out of the conduct, transaction, or occurrence set forth . . . in the original pleading." In deciding issues of relation back, a court should not "undermine the purpose of repose for which statutes of limitations were designed." *Mackensworth v. S.S. Am. Merchant*, 28 F.3d 246, 252 (2d Cir. 1994) (affirming denial of leave to amend). Thus, "[i]f the facts in the original pleading do not provide defendant with notice of

facts out of which the time-barred claim arises then relation back is inappropriate." *106 Mile Transp. Associates v. Koch*, 656 F. Supp. 1474, 1487 (S.D.N.Y. 1987).

It is well-settled that the mere fact that DAS's Proposed Amended Complaint and Delphi's original complaint both alleged preferential transfers is not determinative of whether the 102 new transfers related back. Rather, "[i]n the context of preference actions, each potential preferential transfer is a separate and distinct transaction: a preference action based on one transfer does not put defendant on notice of claims with respect to any other unidentified transfers." *In re 360networks Inc.*, 367 B.R. 428, 432-34 (Bankr. S.D.N.Y. 2007); *see also In re Metzeler*, 66 B.R. 977, 984 (Bankr. S.D.N.Y. 1986) ("Courts have consistently treated preferential transactions as separate and distinct under Rule 15(c)").

The Second Circuit's decision in *Dworsky v. Alanjay Bias Binding Corp.*, 182 F.2d 803, 805 (2d Cir. 1950) is on point. The plaintiff in Dworsky initially sought to recover preferential transfers based on the broad allegation that: "on dates unknown to your petitioner while insolvent transfer property and various moneys amounting in the aggregate to the value or sum of $ 1,000, to various creditors. . . ." *Id*. at 803. The plaintiff then amended its petition, after the statute of limitations had passed, to allege four specific transfers totaling $1,226. *Id*. at 804. The court held, however, that these amended transfers did not relate back to the ambiguously defined transfers in the original petition, because the original petition "alleged preferential transfers in the round sum of $1,000 [and t]he four transfers alleged in the proposed amendment neither in part nor in total even approximate this figure." *Id*. at 805.

Here, DAS's Proposed Amended Complaint presents far more egregious amendments than the plaintiff's amendment in *Dworsky*. Unlike *Dworsky*, where the court refused to allow later claims to relate back even where plaintiff's original complaint was ambiguous and its

proposed amendment arguably just provided more definition, Delphi's original complaint was specific, seeking "the return of *certain* avoidable transfers (the "Transfers") that were made by Plaintiffs to Defendants as more *fully* and *particularly identified*" as the 14 transfers identified in Exhibit 1 to that complaint.   Original Compl. ¶ 3 (attached as Exhibit 3 to the Downey Declaration (Exhibit A hereto)).   Delphi's original complaint did not put MSX on notice that Delphi intended to challenge additional transfers.  *See* 360 Networks, 367 B.R. at 431, 433-434 (allegation that plaintiff made "at least $17,300,644.54" in transfers did not give defendant notice that plaintiff intended to challenge additional transfers);  *MBC Greenhouse Co. v. CTC Direct, Inc.,*  307 B.R. 787, 793-794 (Bankr. D. Del. 2004) (where complaint sought to avoid transfers in the amount of $2,880,141.32 as summarized in an exhibit to the complaint, plaintiff could not amend complaint after statute of limitations had passed to add 33 additional transfers because complaint only evidenced plaintiff's intent to avoid the transfers listed on the exhibit).[2] Moreover, whereas in *Dworsky*, the court rejected plaintiff's attempt to add only four transfers by amendment, here DAS attempts to add 112 to its initial 14.  DAS here is attempting to use these 112 new transfers to more than double its claim to $9,846,886.59 from $4,435,376.74.

There is no basis for DAS to assert that its 112 new transfers relate back to the claims in its original complaint, rendering amendment futile.

### 2.    MSX Never Received The Transfers Added To DAS's Proposed Amended Complaint

MSX did not receive any of the new transfers added to the Proposed Amended Complaint that total $5,411,509.  Downey Declaration ¶¶ 10, 12.

---

[2] Delphi's original complaint, which relied entirely on Exhibit 1 to identify the transfers it sought to avoid, should be contrasted with the complaint in *Kam Kuo Seafood Corp. v. Hong Kong & Shanghai Bakery Corp.,* 67 B.R. 304, 306 (Bankr. S.D.N.Y. 1986), which sought to avoid all transfers during the preference period.

**3.    DAS Cannot Recover $3,341,468 For Alleged Transfers
That Were Not Related To Obligations Owed By DAS**

As discussed above (*supra* at 10-11), 23 of DAS's alleged transfers – totaling $3,341,468 – relate to six purchase orders issued by Delphi Corporation, not DAS.  DAS was not a party to these purchase orders, nor was DAS the obligor for transfers made under the purchase orders.  Downey Declaration ¶ 23.  Thus, DAS has no basis to assert a preference claim as to any of them.  See 11 U.S.C. § 547(b)(2) (a preference claim requires a transfer "for or on account of an antecedent ***debt owed by the debtor*** before such transfer was made.") (emphasis supplied).

**4.    DAS Cannot Recover $3,352, 936 For Alleged
Transfers Arising From Assumed Contracts**

$3,352,936 of the transfers in the Proposed Amended Complaint are payments under Purchase Order 298, which previously was assumed by Delphi.  Downey Declaration ¶¶ 26-29, Exhibits 8-9.  It is well-settled "that a preference action may not be maintained for payments made in connection with an assumed executory contract." *In re Telilgent Inc.*, 324 B.R. 479, 485 (S.D.N.Y. 2005); *see also* July 22, 2010 Tr. at pp. 213-218 (Exhibit I hereto).  Thus, DAS cannot successfully bring a preference action with regard to these transfers, and DAS' proposed amendments regarding these transfers are futile.

**5.    DAS Cannot Recover $540,603 For Alleged
Transfers Arising From Repaid Duplicate Payments**

$540,603 of the transfers that form the basis for DAS's preference claim were duplicate payments related to previously paid invoices.  Downey Declaration ¶¶ 30-31.  These transfers were thus not on account of an ***antecedent*** debt – the actual antecedent debt had already been paid – and cannot form the basis for a preference action.

Moreover, it is indisputable that Delphi already settled its dispute with MSX regarding the duplicate $540,603 payment. Downey Declaration ¶ 33.  DAS cannot recover transfers more

than once.  11 U.S.C. §550(d).  Accordingly, DAS's preference claim regarding these transfers is completely without merit.

### C.    The Proposed Amended Complaint Is Futile Because The Extension Orders Were Improvidently Entered And Should Be Vacated, Leaving DAS's Claims Barred By The Statute of Limitations

For all for the reason set forth in MSX's prior motion to dismiss[3] and the dismissal motions filed by the other preference defendants, which are incorporated here, the Extension Orders were entered in violation of Fed. R. Civ. Proc. 4(m) and MSX's due process and other rights, and DAS may not unseal and serve preference complaints against it years after the limitations period expires.

Moreover, this Court has already determined that anyone, like MSX, who did not receive notice of Delphi's Extension Motions, may now challenge *de novo* the entry of the Extension Orders.  *See* July 22, 2010 Tr. at 103, 119 (Exhibit I) ("[I]f someone really didn't get notice of the extension motions, then it would seem to me they should be able to argue to me as if the motions were being made right now . . . .").

### 1.    MSX Received No *Actual Notice* Of Delphi's Extension Motions

The indisputable evidence, including Delphi's own admissions and documents, confirms that Delphi failed to provide MSX with *any* actual notice of its Extension Motions.[4]   Indeed,

---

[3] Motion Of MSX International, Inc. To: (A) Vacate Certain Prior Orders Of The Court; (B) Dismiss The Complaint With Prejudice; (C) Dismiss Claims Against Certain Defendants Named In The Complaint;  And (D) Dismiss Claims Based On Assumption Of Contracts; Or (E) In The Alternative, To Require Plaintiffs To File A More Definitive Statement.  (MSX D.I. 30) and supporting papers (i.e. MSX D.I. 31, 36, 37).

[4] The present case thus is unlike *United Student Aid Funds, Inc. v. Espinosa*, __ U.S. __, 130 S. Ct. 1367, 1378 (2010), where the petitioner, a student loan creditor, placed itself within the jurisdiction of the bankruptcy court and then did nothing after it was given advance notice that a material part of its claim would be extinguished.

Delphi admits, in its Omnibus Response in opposition to the various defendants' dismissal motions, that it never served MSX. *See* Omnibus Response (MSX D.I. 35), at 29 & n.8;

Delphi's 2007 Disclosure Statement, assuming it was even sent to MSX, which seems unlikely given that MSX was not a creditor at the time it was sent out, also failed to put MSX on actual notice that its rights were in jeopardy. The Disclosure Statement simply indicated that Delphi had **previously** filed adversary actions against certain **unspecified** defendants and **had already been granted** its Preservation of Estate Claims Order on August 16, 2007, which expired on March 31, 2008. *See* Disclosure Statement (D.I. 11388) at 193; Extension Order (D.I. 9105). The Disclosure Statement thus did not give MSX notice and an opportunity to object to or alert it that it could be exposed to any litigation after early 2008.

MSX can now challenge *de novo* the entry of the Extension Orders, including in particular, the April 2008 Extension Order. That Order was entered after Delphi's EPCA funding fell through on the new basis that Delphi purportedly needed more time to determine how it wished to proceed in light of the loss of the financing for its 100 cent plan. As explained in MSX's prior briefs, Rule 4(m) is designed to facilitate service, not non-service. Thus the Rule 4(m) extension should not have been granted. *See Fimbres v. United States*, 833 F.2d 138, 139 (9th Cir. 1987) (rejecting Rule 4(m) extension, explaining that the notion that the plaintiff lacked the financial resources to prosecute the action amounted to nothing more than an improper intentional delay in service); *Smith v. Pennsylvania Glass Sand Corp.*, 123 F.R.D. 648, 651 (N.D. Fla. 1988) ("Plaintiff cannot deliberately or even inadvertently 'wait and see' if his financial resources improve enough to allow him to diligently prosecute his case."). Indeed, if such a "wait and see" rationale were permitted, the statute of limitations would be rendered meaningless.

24

## 2.    MSX Was Not On Inquiry Notice Of Delphi's Extension Motions

MSX also was not on "inquiry notice" of the Extension Motions.  As an initial matter, the law is clear that "[a party] bear[s] a heavy burden in establishing that [another party] was on inquiry notice as a matter of law."  *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243, 249 (S.D.N.Y. 1993) (discussing "inquiry notice" in the context of fraud actions) (quoted in *Newman v. Warnaco Group, Inc.,* 335 F.3d 187, 195 (2d Cir. 2003).   Moreover, "[i]nquiry notice may be found as a matter of law only when uncontroverted evidence clearly demonstrates when the plaintiff should have discovered" the conduct at issue.  *Staehr v. Hartford Fin. Servs. Group*, 547 F.3d 406, 427 (2d Cir. 2008).

Here, MSX was not on inquiry notice of the Extension Motions or even that a preference action had been filed against it.  Simply put, there are no facts that show, or could show, that it was reasonable for MSX, having already settled what it thought were Delphi's only claims against it, to have inquired about the Extension Motions or preference action.[5]   In fact, Delphi admits that it intended to conceal from the preference defendants that they had been sued.

Thus, in *EBS Litigation LLC v. Barclays Global Investors, N.A.*, 304 F.3d 302 (3rd Cir. 2002), the court rejected the notion that "an objectively-reasonable shareholder" should have been on inquiry notice that a debtor may have a claim against it for return of a distribution, even though the debtor's bankruptcy petition should have alerted him to the fact that the debtor's earlier pronouncements regarding its solvency may have been incorrect, and especially where the

---

[5] As the Second Circuit explained, albeit in the context of a fraud action, "the critical factor for purposes of inquiry notice in **any** case is when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded."  *Id*. at 429 (emphasis in original) (internal quotations omitted); *see also Newman v. Warnaco Group, Inc*., 335 F.3d 187, 193 (2d Cir. 2003) ("[T]he information provided must trigger notice with sufficient storm warnings to alert a reasonable person to the probability that there were either misleading statements or significant omissions involved") (quoting *Morin v. Trupin*, 809 F. Supp. 1081, 1097 (S.D.N.Y. 1993)).

debtor continued to misrepresent its financial condition while in bankruptcy.  *Id*. at 306.  As the court emphasized:

> [W]e must not lose sight of the practical realities of the situation. We suspect it would not occur to an objectively-reasonable stockholder with full knowledge of the applicable law, even if he or she suspected that the distribution of D&B stock might be vulnerable to a challenge, to do anything about it unless such a challenge became a reality.

*Id*.  *EBS* thus refutes any suggestion that MSX should have been on inquiry notice.

This is especially true where MSX had no obligation to monitor Delphi's bankruptcy proceeding, even if MSX were aware of it.  *City of New York v. New York, N.H. & H. R.R. Co.*, 344 U.S. 293, 297 (1953) ("[E]ven creditors who have knowledge of a reorganization have a right to assume that the statutory 'reasonable notice' will be given them before their claims are forever barred" and have no obligation to monitor the proceedings before they receive formal notice).

That no defendant actually objected to the Extension Motions is not surprising given that Delphi's actions and representations were specifically intended to dissuade any such inquiry. Indeed, Delphi repeated its "no adversary proceedings" theme throughout much of the bankruptcy proceedings, assuring defendants that avoidance actions would be limited only to a few named parties that did not include MSX.  *See* 2/28/08 Extension Motion (D.I. 12922), ¶ 17 (Delphi would "not retain any causes of action asserted in the [adversary proceedings] except those specifically listed in Exhibit 7.24 of the Plan" (claims related to third parties)); March 19, 2008 Tr., at p. 22 (the Court stated that "[t]he plan [only] reserve[d] or retain[ed] the ability to pursue a very small number of avoidance actions.").  Based on Delphi's statements, MSX had no reasonable basis to inquire further.  *See Staehr*, 547 F.3d at 414 (holding that a party's

"seemingly benign explanation" of actions that suggested fraud made it "reasonable for Plaintiffs not to inquire" further).

Even Delphi's Disclosure Statement suggested that no inquiry was necessary. Indeed, the Disclosure Statement, assuming MSX received and reviewed it, would have given MSX every reason to believe that, as of March 31, 2008, the avoidance actions had been dropped. Specifically, the Disclosure Statement stated that "[t]he Debtors have until March 31, 2008 to serve each defendant with the summons and complaint, without prejudice to the Debtors' right to seek further extensions of the deadline." Disclosure Statement (D.I. 11388) at 196. Thus, immediately after March 31, 2008, having not been served with a summons and complaint or any notice of a motion to further extend the service deadline, MSX would have had no reason to believe that it was still the subject of a preference action.

This was particularly true here because DAS's schedules showed that it was solvent with more than $2.6 in net equity at the time of its petition. *See supra* at 13. Thus, a supplier could reasonably assume it could not be sued by DAS to avoid a preference long after the statute of limitation had passed.

### D. MSX Was Not Required To Do Anything Even If It Were On Actual Notice

It is also undisputed that MSX was never served with process in the sealed preference action until 2010 – years after the first Extension Order was entered in 2007. As such, MSX had the right to ignore the entire proceeding until it was formerly served. *Murphy Brothers, Inc. v. Michetti Pipe Stringing, Inc.* 526 U.S. 344, 350 (1999).

In *Murphy Brothers*, the defendant had actual notice of the lawsuit after it was provided a courtesy copy of the complaint by plaintiff's counsel. Despite having the complaint, the defendant ignored the lawsuit and took no action to remove it within the limited 30 day period mandated by 28 U.S.C. § 1446. When the defendant was later formally served with the

27

complaint, it attempted to remove the action to federal court.  The plaintiff argued that the

defendant had waived its removal right because it had actual notice of the lawsuit (through the

courtesy copy) and did not timely seek to remove.  In bluntly rejecting the plaintiff's contention

and endorsing the defendant's right to ignore the lawsuit until it was formally served, the Court

declared:

> Service of process, under longstanding tradition in our system of
> justice, is fundamental to **any procedural imposition** on a named
> defendant.
>
> \* \* \*
>
> In the absence of service of process (or waiver of service by the
> defendant), a court ordinarily may not exercise power over a party
> the complaint names as defendant. . . . ***Accordingly, one becomes
> a party officially, and is required to take action in that capacity,
> only upon service of a summons or other authority-asserting
> measure*** stating the time within which the party served must
> appear and defend. . . .  Unless a named defendant agrees to waive
> service, the summons continues to function as the *sine qua non*
> directing an individual or entity to participate in a civil action or
> forgo procedural or substantive rights.

*Id*. at 350-51 (internal citations omitted) (emphasis supplied).  The Court emphatically declared

that a defendant's "procedural rights [do not] slip away before service of a summons."  *Id*. at

356.  Here, no summons having been served on MSX, there can be no contention that MSX's

procedural rights, including its right to challenge *de novo* the Extension Orders, were ever lost.

### E.    The Proposed Amended Complaint Is Futile Because DAS Did Not Properly Plead And Cannot Prove It Was Insolvent At The Time Of The Disputed Transfers

DAS fails to properly plead in its Proposed Amended Complaint an essential element of

its avoidance claim:  that DAS – the only plaintiff named in the Proposed Amended Complaint –

made transfers to MSX at a time when it was insolvent. *See* 11 U.S.C. § 547(b) (authorizing a

trustee to avoid a transfer only if it was, among other things, "made while the debtor was insolvent"). Similarly, DAS cannot prove its insolvency during the preference period.

DAS's only allegation of insolvency is merely a bare bones, conclusory recitation of the avoidance statute, namely that: "[p]ursuant to Bankruptcy Code section 547(f), for purposes of this Adversary Proceeding, Plaintiff is presumed to have been, and was in fact, insolvent at the time the Transfers were made." Proposed Amended Complaint ¶ 24. This is exactly the "[t]hreadbare recital[] of the elements of a cause of action supported by mere conclusory statements," that the Supreme Court stated "does not suffice." *Iqbal*, 129 S. Ct. at 1949.

Delphi's failure to properly plead facts that show DAS's insolvency is no surprise. This is because DAS was solvent. *See supra* at 13-14. In fact, DAS's own bankruptcy schedules show DAS was solvent, and had more than $2.6 in net equity, at the time of its petition. These DAS admissions conclusively rebut any presumption of DAS's insolvency during the preference period. *See, e.g.*, *In re Roblin Industries, Inc.*, 78 F.3d 30, 34-35 (2d Cir. 1996) (schedules showing solvency rebutted presumption so that trustee bore burden of coming forward to prove insolvency); *Akers v. Koubourlis*, 869 F.2d 1319, 1322 (9th Cir. 1989) (debtors' schedules indicating greater assets than debts rebutted presumption); *IMF Sales Associates, Inc. v. Racal-Vadic Information Systems, Inc.*, 94 B.R. 223, 225 n.3 (Bankr. D. Mass 1988) ("Racal has rebutted the [section 547(f) presumption] by offering the schedules which show the debtor was solvent."); *Fokkena v. Winston, Reuber, Byrne, P.C.*, 189 B.R. 744, 747 (Bankr. N.D. Iowa 1995) ("Debtor's schedules filed in his chapter 11 case are sufficient to support a finding of solvency at the time of the transfers. The presumption was rebutted.").

Moreover, DAS's parent, Delphi, was also solvent. During the preference period, Delphi even distributed a dividend to its shareholders from capital surplus. *See* Exhibit F, at p. 6;

29

Exhibit G. This dividend was never recovered from the shareholders, presumably because Delphi was solvent at the time the dividend was made. Then, during the first two years of its bankruptcy, Delphi represented that it expected to confirm (and did confirm) a 100 cent plan.

Delphi's performance in the marketplace, which many observers believe is the best indicator of enterprise value, also confirms solvency. *See, e.g., Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. La Salle P'ship*, 526 U.S. 434, 457 (1999) (acknowledging that "the best way to determine value is exposure to a market"); *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d. Cir. 2007) ("Absent some reason to distrust it, the market price is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses."); *Iridium IP LLC v. Motorola, Inc.*, 373 B.R. 283, 293 (Bankr. S.D.N.Y. 2007) (Peck, J.) ("[T]he public trading market constitutes an impartial gauge of investor confidence and remains the best and most unbiased measure of fair market value and, when available to the Court, is the preferred standard of valuation."). For example, in the month leading up to Delphi's bankruptcy, Delphi was trading on the New York Stock Exchange at around $3-5 per share, suggesting a market capitalization of between $1,122,813,802 and $3,312,353,816. *See* Exhibit J (daily trading prices for Delphi Corporation stock for the period 7/01/2005 to 10/15/2005).

DAS's failure to plead insolvency properly and the fact that DAS was solvent (with a $2.6 billion net equity), makes any amendment futile. DAS cannot prove a crucial element of its avoidance action.

## III. THE PROPOSED AMENDED COMPLAINT WOULD SUBSTANTIALLY PREJUDICE MSX

### A. Prejudice Is Presumed As A Matter Of Law

In recognition of the natural prejudice resulting from a party's delay in prosecuting an action, including by delaying service of the complaint, the Second Circuit recognizes that

"prejudice to defendants resulting from unreasonable delay may be presumed . . . [and] is particularly appropriate where, as here, the plaintiff's delay was prolonged." *Shannon v. GE*, 186 F.3d 186 (2d Cir. 1999) (internal citations and quotations omitted).

Courts regularly recognize that "[f]ailure to use reasonable diligence in serving a summons is more fraught with possibilities of unfairness and abuse than failure to diligently prosecute an action after summons is served." *Richardson v. United White Shipping Co.*, 38 F.R.D. 494, 496 (N.D. Cal. 1965) (dismissal where service perfected 28 months after the filing of the action). This is because such delay "affects all the defendant's preparations." *Anderson*, *Anderson v. Air West, Inc.*, 542 F.2d 522, 525 (9th Cir. 1976) (dismissal under Rule 41(b) based on failure to serve for a year despite entry of order extending service period); *Farhang v. Indian Inst. of Tech.*, 2010 U.S. Dist. LEXIS 53975, at *14-15 (N.D. Cal. June 1, 2010) (delayed service prejudiced defendant "by depriving him of the opportunity to engage in earlier preparation and participation in the suit."). Indeed, "[d]elay alone can infuse an adverse element into the proper flow of litigation: evidence deteriorates or disappears, memories fade, and witnesses die or move away." *Veazey v. Young's Yacht Sale & Service, Inc.*, 644 F.2d 475, 478 (5th Cir. 1981) (dismissal under Rule 41(b) for failure to serve for nearly 21 months).[6]

In addition, where, as here, a plaintiff files its complaint immediately prior to the running of the statute of limitations and then fails to serve, prejudice to defendants is magnified:

---

[6] Unfortunately, based on Delphi's decision to delay prosecution of this action for five years, this action presents the unusual circumstance where amendment is sought at the beginning of the action, but years after the action was filed. To fully understand and analyze MSX's prejudice, resulting from Delphi's failure timely to effectuate service compounded by Delphi's attempt to amend, this Court should instead look to the more closely analogous context of dismissals for failure to prosecute under Fed. R. Civ. P. 41(b) – more specifically, where courts have considered the prejudice caused by failure to serve defendants timely. Had this Court not already dismissed Delphi's Complaint, Rule 41(b) would have provided yet another basis for dismissal.

31

> Once the statute [of limitations] has run, a potential defendant who has not been served is entitled to expect that he will no longer have to defend against the claim. If service can be delayed indefinitely once the complaint is filed within the statutory period, these expectations are defeated and the statute of limitations no longer protects defendants from stale claims.

*Anderson*, 542 F.2d at 525; *see also Zapata v. New York,* 502 F.3d 192, 198 (2d Cir. 2007) ("It is obvious that any defendant would be harmed by a generous extension of the service period beyond the limitations period for the action, especially if the defendant had no actual notice of the existence of the complaint until the service period had expired. . ."); *Redding v. Essex Crane Rental Corp. of Alabama*, 752 F.2d 1077, 1078 (5th Cir. 1985) (holding that it was an "obvious misuse of the judicial process" to prevent defendant from learning of action by failing to serve).

### B.    MSX Would Suffer Actual Prejudice From Amendment

Leaving aside the Second Circuit's presumption of prejudice, MSX has presented evidence of actual prejudice.  *See supra* at 6-8. Specifically, lacking knowledge of Delphi's preference action, MSX has suffered great prejudice because of Delphi's more than two year delay in serving this action, during which time MSX terminated and lost track of the corporate personnel and contractors who had critical knowledge about its relationship with Delphi and did not preserve most of its Delphi data, including the purchase orders, releases, remittance details, and communications necessary to challenge Delphi's claims.   MSX is thus at a great disadvantage in defending a preference action.

### C.    Delphi's Undue Delay Should Bar Amendment

This Court did not order Delphi to delay service on MSX or suggest that Delphi should do so.  Rather, this Court merely extended the deadline by which Delphi had to complete service. Delphi made the election to keep its avoidance action from MSX and the other defendants in order to negotiate more favorable contract terms than it otherwise would have been able to obtain

had the defendants known about the avoidance actions. Having made this election, Delphi clearly undertook a risk that, when the defendants were finally served, the avoidance actions would be dismissed for any number of reasons, including the bar of the statute of limitations. This risk certainly was not unknown. Indeed, this Court specifically reminded the Debtors that the extensions granted by the Court were without prejudice to the rights of the defendants in the avoidance actions to argue defenses other than statute of limitations. 10/22/09 Tr., at p. 6, excepts attached as Exhibit K.

Delphi's actions here thus are reminiscent of the plaintiff's failure to serve process in *Anderson v. Air West,* 542 F.2d 522 (9th Cir. 1976), which is instructive. In *Anderson*, the plaintiff filed suit the day before the statute of limitations was due to run. *Id.* at 524. The plaintiff then obtained an *ex parte* order extending indefinitely the time for serving defendants until he could obtain their addresses through discovery. *Id.* Rather than proceed with this discovery and diligently pursue service, however, the plaintiff delayed. *Id.*

When the plaintiff in *Anderson* ultimately did effectuate service – one year later – the trial court dismissed the action under Fed. R. Civ. P. 41(b), holding that the plaintiff, like Delphi here, "deliberately delayed, trying to decide whether he really wanted to serve the [Defendants]." *Id.* at 525. The Ninth Circuit then affirmed, stating that:

> The importance of personal service in triggering defense preparation is demonstrated by this case, where the defendants did not get together to plan their defense until after they had all been served. Plaintiff's assertion that they could, and should, have been planning earlier is an attempt to switch the burden of going forward with the action to the defendants. The plaintiff cannot in this manner escape her responsibility to diligently prosecute the action.

*Id*. at 525.

Here, as in *Anderson*, Delphi chose to keep this action a secret for well over two years *after* the statute of limitations expired, adopting a course of action that guaranteed the evils that the statutes of limitations were specifically designed to prevent – the loss of evidence, the fading of memories and the disappearance of witnesses. Delphi should not be allowed to take further advantage of the prejudice resulting from its undue delay by amending now.

## IV.    NO FURTHER AMENDMENT SHOULD BE PERMITTED

This Court made clear on the record during the hearing on the "First Wave Motions" that it would not tolerate Delphi presenting a proposed amended complaint that failed to meet its minimal pleading requirements.    Specifically, responding to MSX's counsel's request that Delphi should be held to a higher standard of pleading specificity given Delphi's five years to prepare for this adversary proceeding, this Court stated:

> [I]t's a motion for leave to amend the complaint on unusual circumstances. ***It's really their risk if I turn them down again, right***?  [I] think that the risk of being turned down on the basis [that] the complaint still isn't good enough [after amendment] is a serious enough – ***the consequences of that are serious enough*** so I assume that the plaintiffs are going to be pretty careful.

7/22/10 Tr., at p. 213, excepts attached as Exhibit I (emphasis supplied).

Despite this Court's admonition and despite having an unprecedented amount of time to acquire the data necessary to make out its *prima facie* case, Delphi's Proposed Amended Complaint still fails even to meet the minimum pleading requirements identified in the Dismissal Order.  Delphi has abused this process for too long and cost MSX and this Court far too much in both time and resources.  No further amendment is warranted, and Delphi's avoidance action against MSX should now be dismissed with prejudice.

## V.    OTHER DEFENDANTS' BRIEFS ARE INCORPORATED

MSX incorporates all of the other meritorious arguments raised by the other preference defendants in opposition to Delphi's motions for leave to amend.

## CONCLUSION

For all of the reasons set forth above, Delphi's Motion should be DENIED.


Respectfully submitted,

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Attorneys for MSX International Inc.

By: /s/  Judy B. Calton
    I. W. Winsten (P30528)
    Judy B. Calton (P38733)
    Jason R. Abel (P70408)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
Telephone:  (313) 465-7344
Facsimile:  (313) 465-7345
e-mail:  jcalton@honigman.com

Dated:  November 23, 2010

8480199.4