Lisa Pierce Reisz (admitted *pro hac vice*)

Tiffany Strelow Cobb (admitted *pro hac vice*)

Jesse Cook-Dubin (admitted *pro hac vice*)

**VORYS, SATER, SEYMOUR AND PEASE LLP**

52 E. Gay Street / P.O. Box 1008

Columbus, Ohio 43216-1008

Telephone:  (614) 464-8322

Facsimile:  (614) 719-4663

E-mail:  tscobb@vorys.com

*Attorneys for Carlisle Companies Incorporated*

**Hearing Date:  2/17/11 at 10:00 am (ET)**

**Response:  2/3/11 at 4:00 p.m. (ET)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | Case No. 05-44481 [RDD] |
| DPH Holdings Corp., et al. | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| ———————————————— | : | |
| | : | |
| Delphi Automotive Systems, LLC, | : | Adv. Case No. 07-02291 [RDD] |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Carlisle Companies, Inc., | : | |
| | : | |
| Defendant. | : | |

## OBJECTION OF DEFENDANT CARLISLE COMPANIES INCORPORATED TO REORGANIZED DEBTORS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS

Carlisle Companies Incorporated ("Carlisle Companies"), by and through its undersigned attorneys, and pursuant to Rules 7008, 7012 and 7015 of the Federal Rules of Bankruptcy Procedure, hereby files its Objection ("Objection") to the Reorganized Debtors' Motion for Leave to File Amended Complaints, filed on September 7, 2010, in the above-referenced adversary proceeding (the "Adversary Proceeding"), Docket No. 38 (the "Motion"). Carlisle

Companies submits the Declaration of Kevin Forster in support of this Objection (the "Declaration" or "Decl.").

## I.    PRELIMINARY STATEMENT

Carlisle Companies is a non-operating holding company and the sole shareholder of various subsidiaries. Carlisle Companies' subsidiaries serve the construction materials, commercial roofing, specialty tire and wheel, power transmission, heavy-duty brake and friction, foodservice, aerospace, and test and measurement industries. Carlisle Companies does not manufacture or sell any products. Decl., ¶ 2. During the preference period, one of Carlisle Companies' subsidiaries, Carlisle Engineered Products, Inc. ("CEP"), was in the process of selling substantially all of its assets and winding down its business and has now been defunct for several years. Decl., ¶ 7.

CEP was a supplier to the Debtors. Decl., ¶ 6. Carlisle Companies, however, was not. Decl., ¶ 4. At no time during the preference period (or prior to the preference period) did Carlisle Companies conduct business with any of the Debtors. Decl., ¶ 4. Carlisle Companies was also not a creditor of the Debtors. Decl., ¶ 4. Carlisle Companies merely received two discrete payments during the preference period from Delphi Corporation ("Delphi"), which represented *cash in advance* for a transaction between Delphi Thermal & Interior Systems Division of Delphi Corporation and CEP involving the sale of certain CEP equipment. Decl., ¶¶ 9, 11, 16.

Carlisle Companies objects to the Motion because amending the complaint would be futile and prejudicial.

It would be futile for the following reasons, among others:

- The proposed amended Complaint (the "Amended Complaint") still fails to state a claim under Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure. The

Motion's insinuation that the Amended Complaint should not be judged according to the standard articulated in the U.S. Supreme Court cases <u>Ashcroft v. Iqbal</u> and <u>Bell Atlantic Corp. v. Twombly</u> is unsupported by well-established precedent concerning the retroactivity of Supreme Court decisions in civil cases.

- Carlisle Companies only received two of the three payments that the Amended Complaint seeks to recover.  Carlisle Companies never received a payment from Delphi in the amount of $3,049,066.88.  Decl., ¶ 20.

- The two payments that Carlisle Companies received were not payments on account of an antecedent debt, in that they were made on a "cash in advance" basis as part of a transaction whereby CEP sold to Delphi certain equipment at a facility that CEP was in the process of closing.  Decl., ¶¶ 9, 11, 16.

Allowing the amendment would also unfairly prejudice Carlisle Companies, for reasons including the following:

- The complaint that initiated this adversary proceeding was filed under seal and only unsealed in March 2010—two-and-a-half years after the statute of limitations expired.

- Carlisle Companies is one of the "no notice" preference defendants.  Carlisle Companies had no notice whatsoever that it might be a defendant in a preference case prior to the unsealing of the complaint: not only was Carlisle Companies not served with any of the extension motions or related orders extending the 120-day period in which a plaintiff is required to serve a complaint and summons under Rule 4(m), but Carlisle Companies also did not receive service of either of the two sets of disclosure statements or chapter 11 plans served on other parties of interest in the Debtors' case.  Decl., ¶¶ 22-30.

- The passage of time has unfairly prejudiced Carlisle Companies in a number of ways, including the departures of Carlisle Companies and CEP personnel who were familiar with CEP's transactions with the Debtors that formed the impetus for the transfers Carlisle Companies received on CEP's behalf, the transfer of documents related to the asset sale between CEP and Delphi, and the loss of any meaningful ability Carlisle Companies would have had to obtain indemnification or contribution from CEP for any liability adjudged against Carlisle Companies in this case.  Decl., ¶¶ 21, 33-39.

- Carlisle Companies was additionally prejudiced by the loss of its ability to sell its Section 502(h) claim for its face amount, i.e., had Carlisle Companies been served with the complaint within 120 days after expiration of the statute of limitations, at which time, established claims traders were offering amounts in excess of 100% of the face amount for unsecured claims against Delphi, it might have made the business decision to sell its claim in a market paying in excess of 100% of the face value of the claim  That opportunity is now forever lost.

Finally, Carlisle Companies respectfully submits that upon a *de novo* review, Debtors' extension motions should be denied and the orders granting them should be vacated. Among other reasons for denying the relief sought in the extension motions, Debtors' stated grounds for the relief – that they did not want to disrupt customer relationships or the reorganization, and wanted to prevent preference defendants from using other actions in the case as leverage in preference cases (or vice versa) – are not "good cause" for extending the Rule 4(m) period. Extending the 120-day period shifted the risk from the Debtors to the preference defendants that the Debtors would not consummate a 100-percent-plan within two years of the petition date—in direct contravention of Congress's establishment of a two-year statute of limitations for preference actions. Certainly, the grounds stated in the extension motions would not justify the extension orders being entered *ab initio* today—as Debtors recognize by now offering different justifications for the extensions than those considered and relied upon by the Court in entering the extension orders.

## II.    FACTUAL BACKGROUND

### *A.    Facts*

In late August and early September 2005, CEP and Delphi agreed that as part of the winding down of CEP's Lake City, Pennsylvania facility, Delphi would buy certain machinery, tooling and parts (collectively, the "Equipment") from CEP for a total purchase price of $1,146,456. Decl., ¶ 8. Delphi indicated to CEP that it anticipated installing the machinery at multiple Delphi facilities. Id. The entire transaction was intended to be on cash in advance terms in light of Delphi's financial difficulties. Decl., ¶ 9.

In connection with the sale, Delphi issued four purchase orders to CEP: PO# LPS97754 for a CIPG gasket line, in the amount of $355,000; PO# LPS97755 for seven injection molding machines and related equipment, in the amount of $332,000; PO# JMS42298, for ten HVAC

presses, in the amount of $395,000.00; and PO# JMS42338 for equipment and tooling related to the HVAC presses, in the amount of $64,456. Decl., ¶ 10.

Delphi communicated to CEP that two of the HVAC presses in PO# JMS42298 – manufactured by Nissei, Serial Nos. K28T006 and 528R112B (the "Transfer A Presses") – were going to one of Debtors' non-debtor affiliates in Mexico and were needed urgently. Decl., ¶ 11. The agreed-upon purchase prices for the Transfer A Presses were $45,700 and $40,000, respectively. Id. CEP agreed to let Delphi pick up the Transfer A Presses sooner, provided that Delphi paid in advance for the two presses. Id. A wire transfer in the amount of $85,700.00 was credited to Carlisle Companies' account on September 2, 2005. Id. Delphi picked up the two Transfer A Presses on or about September 8, 2005. Id.

The two companies moved forward with the remainder of the transaction. On September 21, 2005, CEP provided Delphi with four invoices that mirrored the purchase orders:

- Inv.# 636498, for a CIPG Gen. 1 gasket line and related parts, drawings etc., in the amount of $355,000;

- Inv. #636499, for seven injection molding machines, in the amount of $332,000;

- Inv. #636494, for ten HVAC presses including two that were listed as "SHIPPED 9/8/05" (and indicating "$85,700.00 PAYMENT RECEIVED ON ITEMS SHIPPED"), in the amount of $395,000; and

- Inv. #636496, for several controllers and other items, in the amount of $64,456.

Decl., ¶ 12. Copies of these invoices are attached to the Declaration as Exhibit A.

On September 22, 2005,[1] CEP and Delphi entered into an Agreement for Purchase and Sale of Assets, a copy of which is attached to the Declaration as Exhibit B (the "APA"). Decl.,

---

[1] Although the APA and invoices are *dated* September 21, 2005, the execution version of the APA was not provided by counsel for Delphi until 2:38 a.m. on September 22, 2005. Delphi's counsel's cover email transmitting the execution version stated, *inter alia*, "It is my understanding that Delphi still needs Carlisle's wiring instructions. Delphi will be able to initiate the wire transfer, which at this point will not be received by Carlisle until tomorrow, upon receipt of a signed copy of the Agreement by fax, and a signed copy of the Bill of Sale by fax, which I understand Carlisle is preparing now." Decl., ¶ 14 and Exhibit C thereto.

¶ 13.   Debtor Delphi Automotive Systems LLC ("DAS LLC") was not a party to the APA at the time of its execution.   Id.   Pursuant to the APA, Delphi agreed to pay CEP the sum of $1,060,750—90 percent of which (i.e. $954,675.00) was due at the time of closing.   APA ¶ 3.1(a).   The remaining 10 percent of the purchase price was to serve as a holdback, payable in increments as Delphi determined that each piece of Equipment was fully functional and operating in the ordinary course of business at the plant where Delphi installed it.   APA ¶ 3.1(b); Decl., ¶ 15.

The APA further provided that Delphi was to pay the purchase price to CEP by wire transfer to a bank account designated by CEP.   APA ¶ 3.1(b); Decl., ¶ 15.   CEP provided wire instructions to Delphi, designating a bank account belonging to its parent company, Carlisle Companies, as the account to which the purchase price should be wired for its benefit.   Decl., ¶ 18.   On September 22, 2005 – the same day the APA was signed by both parties – Carlisle Companies received a wire transfer from Delphi in the amount of $954,675.00.   Decl., ¶ 16.   In turn, Carlisle Companies booked an intercompany transfer in the same amount to CEP, for whose benefit the transfer by Delphi was made as set forth in the APA.   Decl., ¶ 17.

At all times, CEP insisted upon, and the parties performed, a cash in advance transaction. Decl., ¶ 9.

As stated above, Carlisle Companies never conducted business with any of the Debtors, was not a supplier to the Debtors, and was not a creditor of the Debtors.   Decl., ¶ 4.

On or before February 28, 2006, the wind down of CEP was completed, and CEP ceased business operations.   As a result, Carlisle Companies' ability to defend itself has been significantly hampered by Debtors' two and one-half year delay in the prosecution of this adversary.   First, the CEP personnel with knowledge regarding these transfers are no longer

employed by CEP or Carlisle Companies.  Decl., ¶ 35.  Chuck Siczek assisted Carlisle Companies in its wind-down of CEP during the time of the transfers.  Decl., ¶ 36.  Mr. Siczek is no longer employed by Carlisle Companies or CEP.  Id.  Similarly, Philip Aldinger was the Controller of Carlisle Companies in 2005.  Decl., ¶ 37.  Mr. Aldinger retired in 2009, and is no longer employed by Carlisle Companies.  Id.  Second, documents necessary to Carlisle Companies' defense of this adversary have long since been transferred, in the course of the 2005 sale of CEP's assets, to Creative Engineered Polymer Products, LLC, an entity which was not affiliated with Carlisle Companies and which also no longer exists.  Decl., ¶ 39.

> **B.**     **Original Complaint, Extension Orders, and Service or Notice to Carlisle Companies**

On September 28, 2007, the Debtors filed their Complaint against Carlisle Companies, commencing the above-captioned adversary proceeding (the "Original Complaint").  The Original Complaint was filed under seal.

Debtors filed a motion on August 6, 2007 (Docket No. 8905), which in pertinent part, sought authority to file numerous avoidance complaints under seal and to extend the period within which to serve such complaints and the related summonses (the "First Extension Motion").  The First Extension Motion was granted by an Order entered on August 16, 2007 (Docket No. 9105) (the "First Extension Order").  On February 28, 2008, Debtors filed their motion seeking to extend the service deadline relative to certain avoidance complaints and summonses (Docket No. 12922) (the "Second Extension Motion").  The Second Extension Motion was granted by an Order entered on March 28, 2008 (Docket No. 13277) (the "Second Extension Order").  Thereafter, on April 10, 2008, Debtors filed a post-confirmation motion again seeking to extend the deadline within which to serve these avoidance complaints and summonses (Docket No. 13361) (the "Third Extension Motion").  The Third Extension Motion

was granted by an Order entered on April 30, 2008 (Docket No. 13484) (the "Third Extension Order"). Yet again, on October 2, 2009, Debtors filed their "supplemental" post-confirmation motion seeking to extend the service deadlines a fourth time (Docket No. 18952) (the "Fourth Extension Motion") (collectively with the First Extension Motion, Second Extension Motion and Third Extension Motion, the "Extension Motions"). The Fourth Extension Motion was granted by an Order entered on October 22, 2009 (Docket No. 18999) (the "Fourth Extension Order") (collectively with the First Extension Order, Second Extension Order and Third Extension Order, the "Extension Orders").

Carlisle Companies did not receive notice or service of the Extension Motions or Extension Orders until March 2010—long after the hearings on the Extension Motions or entry of the Extension Orders. Indeed, Carlisle Companies is not listed on any applicable Master Service List or Rule 2002 List in connection with the Debtors' Motions.[2]

Carlisle Companies likewise did not receive notice or service of the Disclosure Statement, the Plan, the Modified Disclosure Statement, or the Modified Plan.[3] Cf. Affidavit of Service (Docket No. 11974) (regarding plan solicitation packet for the Plan); Affidavit of Service (Docket No. 17267) (regarding plan solicitation packet for the Modified Plan); see Decl., ¶¶ 22-

---

[2] The law firm of Vorys, Sater, Seymour and Pease LLP ("Vorys") is listed on the Rule 2002 List; however, prior to March 2010, Vorys had not been retained by and did not represent Carlisle Companies and was only listed on the Rule 2002 list as counsel to other entities unrelated to Carlisle Companies. See Verified Rule 2019 Statement filed on October 26, 2005 (Docket No. 681); see also Amended Verified Rule 2019 Statement filed on December 21, 2005 (Docket No. 1584) (each identifying other clients unrelated to Carlisle Companies). Carlisle Companies first retained Vorys in March 2010 in connection with this Adversary Proceeding.

[3] The terms Disclosure Statement, Plan, Modified Disclosure Statement and Modified Plan, respectively, as used herein, refer to the First Amended Disclosure Statement with Respect to First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (Docket No. 11388), the First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (Docket No. 11386), the First Amended Disclosure Statement with Respect to First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified) (Docket No. 17030), and the First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified) (Docket No. 17031).

30.  Carlisle Companies consequently did not have notice of any of the statements made therein, including statements with respect to which causes of action the Debtors sought to preserve in the Plan and Modified Plan, or statements concerning entry of those Extension Orders that predated the Plan and/or Modified Plan.

Upon learning of the Original Complaint and Extension Orders, Carlisle Companies filed its Answer on April 9, 2010,  and, subsequently, its Motion for Judgment on the Pleadings and Joinder to Motions (i) Vacating Prior Orders Establishing Procedures for Certain Adversary Proceedings, Including those Commenced by the Debtors under 11 U.S.C. §§ 541, 544, 545, 547, 548, or 549, and Extending the Time to Serve Process for such Adversary Proceedings, (ii) Dismissing the Adversary Proceeding with Prejudice, or (iii) in the Alternative, Dismissing the Adversary Proceeding on the Ground of Judicial Estoppel (the "Motion to Vacate") on May 14, 2010.  This Court held a hearing on July 22, 2010, at which the Court ruled from the bench that the Original Complaint was dismissed for failure to state a claim under Rules 7008 and 7012 of the Federal Rules of Bankruptcy Procedure, but giving the Debtors until September 7, 2010 to file a motion for leave to amend the Original Complaint.

### C.    Debtors' Motion for Leave to Amend, and Amended Complaint

On September 7, 2010, the Debtors filed their Motion to Amend, attached to which was the proposed Amended Complaint.

The Amended Complaint asserts that Carlisle Companies received three transfers (the "Alleged Transfers") from one of the Debtors, DAS, as follows:

- 9/2/2005        $85,700              no ID# given              ("Transfer A")
- 9/26/2005       $954,675            ID# EW02AFC22675      ("Transfer B")
- 10/5/2005       $3,049,066.88     no ID# given              ("Transfer C")

Carlisle Companies does not dispute that it received Transfer A and Transfer B, on behalf of its subsidiary, CEP.  However, Carlisle Companies did not receive Transfer C.

## III.    LEGAL ARGUMENT

### A.    Standard for Leave to Amend Complaint

Except within 21 days after service of a qualifying pleading, "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a), incorporated by Fed. R. Bankr. P. 7015.  Whether justice requires leave to amend a pleading is discretionary with the trial court and may depend on a number of factors, including "undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility."  Monahan v. New York City Dep't of Corrections, 214 F.3d 275, 283 (2d Cir. 2000).  The equities in this case strongly favor Carlisle Companies, due to the futility of allowing the Amended Complaint, the undue prejudice to Carlisle Companies that would result from doing so, and the repeated, unjustified extensions of the deadline for Plaintiff to serve Carlisle Companies with the original Complaint without notice to Carlisle Companies.

### B.    Permitting the Amendment Would Be Futile Because the Amended Complaint Would Still Fail to State a Claim, Carlisle Companies Did Not Receive Transfer C, and Carlisle Companies Has Complete Defenses to Avoidance of Transfer A and Transfer B.

#### 1.    The Amended Complaint Is Insufficient to State a Claim Against Carlisle Companies for Avoidance of Any of the Alleged Transfers, but Especially Transfer A and Transfer C.

##### a.    Pleading Standard under Rule 8

A court considering a motion to dismiss for failure to state a claim must accept the complaint's factual allegations as true and must draw reasonable inferences in favor of the plaintiff.  Griffin v. Am. Home Mortgage Servicing, Inc. (In re Griffin), No. 10-08361-RDD,

2010 Bankr. LEXIS 3555, *3 (Bankr. S.D.N.Y. Aug. 31, 2010). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. For that reason, "the court is not bound to accept as true a legal conclusion couched as a factual allegation." Griffin, 2010 Bankr. LEXIS 3555, *3 (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986) (internal marks omitted)). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" Iqbal, 129 S. Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)). Pleadings that are no more than conclusions are not entitled to the presumption of truth. See id.

As this Court stated on the record at the July 22, 2010 hearing on numerous preference defendants' dismissal motions, the foregoing standard applies to complaints to avoid and recover alleged preferential transfers to the same extent as it does to any other cause of action. Transcript of Oral Argument, In re DPH Holdings Corp., Case No. 05-44481, at 204-05 (Bankr. S.D.N.Y. Jul. 22, 2010) (hereinafter "7/22/10 Transcript"). In order to establish its prima facie case under 11 U.S.C. § 547(b), Plaintiff must allege facts supporting that there occurred a transfer of an interest of the debtor in property,

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

11

       (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

   (5) that enables such creditor to receive more than such creditor would receive if—

       (A) the case were a case under chapter 7 of this title;

       (B) the transfer had not been made; and

       (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b); see Official Committee of Unsecured Creditors v. Blomen (In re Hydrogen, L.L.C.), 431 B.R. 337, 355 (Bankr. S.D.N.Y. 2010). A preference complaint "must allege enough facts with respect to each of the foregoing elements of section 547(b) in order to put Defendants on notice for the preference claims." Hydrogen, 431 B.R. at 355; see also 7/22/10 Transcript at 204-05 (describing obligation to plead sufficient facts as "an affirmative requirement," i.e., it is not sufficient that a plaintiff is willing to elaborate on its complaint when "the defendant come[s] to you and say[s] 'I'm puzzled, I don't know how to defend'").

### b.    Pleading of Antecedent Debt Element

Plaintiff has not sufficiently pled that the Alleged Transfers were for or on account of an antecedent debt. "In order to satisfy the pleading requirements under Iqbal, the trustee must allege facts regarding the ***nature and amount*** of the antecedent debt which, if true, would render plausible the assertion that a transfer was made for or on account of antecedent debt." Angell v. Haveri (In re Caremerica, Inc.), 409 B.R. 346, 351 (Bankr. E.D.N.C. 2009) (emphasis added). At the July 22, 2010 hearing, this Court reinforced that requirement and additionally instructed Debtors' counsel that any amended complaint should identify which Debtor owed the antecedent debt on account of each alleged preferential transfer:

> MR. FISHER: And, Your Honor, it is important to say which debtor entity we're talking about. It is important to say exactly which transferee we're talking about. As a practical matter --

12

THE COURT: Let me say -- I'm going to cut you short.

MR. FISHER: Yes.

THE COURT: As a -- it seems to me the problem with what you're proposing is that you may not have a basis to say in your books and records that -- at least for the face of the complaint, that defendant X was owed a debt, that this was a payment on account of [--] you may not have it. And I think your method basically sort of puts the onus on them to make that part of your case for you.

MR. FISHER: What we're trying to avoid, Your Honor, is a situation where we now go back and correct these complaints by identifying the specific entities where we think, as a practical matter, the movants know full well by checking their own records-

THE COURT: But that's not -- that's not -- I don't think that's the test, because, again, that shifts the burden of proof. You know, you basically force them to show we don't know.

7/22/10 Transcript, 206-07.

Yet the Amended Complaint fails to identify the antecedent debt supposedly paid by the Alleged Transfers. The Amended Complaint contends that Exhibit 1 identifies "purchase orders and/or invoices/bills of lading." Amended Complaint ¶ 22. Yet, Exhibit 1 does not. A mere glance at Exhibit 1 reveals an incomplete chart with a heading entitled antecedent debt with blank spaces beneath it. See Exhibit 1 to Amended Complaint.

Nor does the reference to a single invoice number in Exhibit 1 to the Amended Complaint – which presumably was Plaintiff's attempt to assert an amount of antecedent debt by implication – cure the failure to assert the amount expressly. While Exhibit 1 to the Amended Complaint refers to one invoice by number, *it does not purport to incorporate* that invoice. It is true that documents attached to a pleading are considered part of the pleading. See Fed. R. Bankr. P. 7010. However, a mere reference to an invoice number on an exhibit does not constitute an assertion of statements made in that invoice. Instead, such a reference appears to be another attempt by Plaintiff to shift the burden of pleading onto Carlisle Companies and to force Carlisle Companies to ask for more details in order to defend against the Amended Complaint—

13

the exact result this Court sought to avoid when it dismissed Plaintiff's Original Complaint on July 22, 2010.  See 7/22/10 Transcript, 206-07.

Even if a mere reference to an invoice number legally constituted a repetition of statements made in the invoice itself, Exhibit 1 to the Amended Complaint does not even state an invoice number (or any other identifying antecedent debt information) for Transfer A or Transfer C.  Of the Alleged Transfers on Exhibit 1, only Transfer B has an invoice number associated with it; for Transfer A and Transfer C, the column labeled "Purchase Order/Invoice Number/Antecedent Debt" is blank.  The failure to identify which invoices (if any) were paid by an alleged transfer would itself be reason to dismiss a complaint.  At a minimum, therefore, the Plaintiff should be barred from seeking to avoid Transfer A and Transfer C as Plaintiff has again failed to state a claim against Carlisle Companies related to these two transfers.

The Amended Complaint also fails to assert which Debtor owed the antecedent debts on account of which the Alleged Transfers were purportedly made.  See 7/22/10 Transcript, 206-07. Instead, the Amended Complaint sidesteps that question by referring to multiple Debtors and by using the passive voice to refer to the antecedent debt owed to Carlisle Companies.  The following excerpts from the Amended Complaint purport to address this element of § 547(b):

> 13.    Plaintiff and Delphi Corporation entered into certain supplier agreements (the "Agreements") with Defendant for the supply of goods to the Reorganized Debtors and Plaintiff assumed or otherwise became obligated for Delphi Corporation's payment obligations thereunder.
>
> * * *
>
> 15.    Pursuant to the terms of the Agreements, Defendant was required to deliver goods for the benefit of Plaintiff and Delphi Corporation the Reorganized Debtors.
>
> * * *
>
> 18. During the ninety (90) days preceding the Initial Filing Date, Plaintiff made certain payments to Defendant in satisfaction of amounts due for goods previously delivered by Defendant under

> the Agreements (the "Transfers"). Such Transfers are identified on
> Exhibit 1 attached hereto.
>
> * * *
>
> 22.    Plaintiff made, or caused to be made, each Transfer listed
> on Exhibit 1 for, or on account of, an antecedent debt **owed to
> Defendant** as of the date on which each Transfer was made.  The
> documents evidencing the antecedent debt include the purchase
> orders and/or invoices/bills of lading identified on Exhibit 1, which
> purchase orders and/or invoices/bills of lading include evidence of
> the amount of the antecedent debt and the approximate dates the
> subject goods contemplated by the Agreements were ordered by
> Plaintiff pursuant to the Agreements and/or were provided by
> Defendant.

Amended Complaint, at ¶¶ 13, 15, 18, 22 (emphasis added).   Exhibit 1 to the Amended

Complaint lists the "Contracting Entity/Entities" for each Alleged Preference as both DAS LLC

and Delphi Corp., and the "Obligor and Transferring Entity" as DAS LLC.

These assertions make it impossible to determine which Debtor, if any, owed Carlisle

Companies the alleged antecedent debt on account of which each Alleged Transfer was made.

First, the Amended Complaint provides no factual support for the bare legal proposition that

"Plaintiff assumed or otherwise became obligated for Delphi's payment obligations" under the

APA.   The Court is required to disregard the legal conclusion that "Plaintiff assumed or

otherwise became obligated for Delphi Corporation's payment obligations."   See Amended

Complaint, at ¶ 13.  The only relevant agreement of which Carlisle Companies is aware is the

APA between CEP[4] (Carlisle Companies' now-defunct subsidiary) and Delphi—not DAS LLC.

Nor does Carlisle Companies have any knowledge that Plaintiff assumed or became obligated for

the obligations of Delphi under the APA.   Although the First Amended Joint Plan of

---

[4] As recited above, in accordance with the terms of the APA, CEP instructed Delphi to send the purchase price to an
account controlled by Carlisle Companies.  Accordingly, Carlisle Companies acknowledges that it was the intended
payee of any Alleged Transfers made pursuant to the APA.  However, it remains unclear how DAS LLC could have
become a party to the APA.

Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified), filed June 1, 2009, provided for the substantive consolidation of Delphi and DAS LLC for certain purposes, those entities were not consolidated prior to the Petition Date.

Second, simply defining the term "Obligor and Transferring Entity" as referring to DAS LLC, without asserting any facts that would support the conclusion that DAS LLC owed an antecedent debt to Carlisle Companies, is not a sufficient allegation as to which entity owed Carlisle Companies the antecedent debt. The relevant provisions of the Amended Complaint do not expressly allege which Debtor was the obligor of the antecedent debt to Carlisle Companies. Cf. Amended Complaint, ¶¶ 13, 15, 18, 22. Although Exhibit 1 contains a column labeled "Obligor and Transferring Entity" – a heading that Carlisle Companies acknowledges could mean that the entities listed thereunder were obligors of an antecedent debt – neither the Amended Complaint nor Exhibit 1 makes that connection. Stated differently, the Amended Complaint does not define "Obligor and Transferring Entity" as an entity that owed an antecedent debt on account of which Carlisle Companies made the Alleged Transfers. Without such a definition, listing an entity under the heading "Obligor and Transferring Entity" becomes an empty description, not an assertion of a supportable fact. Nowhere in the Amended Complaint or Exhibit 1 has Plaintiff made a factual allegation that the Court is bound to accept as true regarding which entity owed an antecedent debt to Carlisle Companies. Consequently, the Amended Complaint does not sufficiently state which entity allegedly owed the antecedent debt on account of which the Alleged Transfers were made. See Griffin, 2010 Bankr. LEXIS 3555, *3.

16

c.     **Pleading of "To or For the Benefit of a Creditor" Element**

The Amended Complaint also fails to demonstrate a plausible claim for relief as to whether Transfer C[5] was made to or for the benefit of a creditor.  The only express allegations in the Amended Complaint that the Alleged Transfers were made to or for the benefit of a creditor are in Paragraphs 11 and 24: "Defendant was a creditor of Plaintiff prior to the filing of the Reorganized Debtors' chapter 11 cases," Amended Complaint ¶ 11; "Defendant was a general unsecured creditor of DAS and Delphi Corporation," Amended Complaint ¶ 24.  The Amended Complaint attempts to tie these unspecific assertions to Section 547(b)(1) of the Bankruptcy Code by asserting that "Plaintiff made, or caused to be made, the Transfers listed on Exhibit 1 to, or for the benefit of, Defendant."  Amended Complaint ¶ 20.

Even if Carlisle Companies had received Transfer C – which it did not (see Decl., ¶ 20) – the Amended Complaint would fail to assert sufficiently that Transfer C was made to or for the benefit of a creditor.  The Bankruptcy Code defines "creditor" as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10).  Just as it fails to identify any antecedent debt that was paid by the Alleged Transfers, the Amended Complaint does not identify any specific claim belonging to Carlisle Companies that was outstanding as of the Petition Date.  And without such a claim, Carlisle Companies cannot be a "creditor" of the Debtors under the Bankruptcy Code.

Although CEP was a creditor of one or more Debtors on the petition date, the Amended Complaint does not assert that Transfer C was made for or on behalf of CEP.  (As stated above in a footnote, the Amended Complaint also does not assert that Transfer A and Transfer B were

---

[5] Carlisle Companies acknowledges that Transfer A and Transfer B were for the benefit of CEP, which Carlisle Companies acknowledges was a creditor.  Nonetheless, the Amended Complaint does not sufficiently assert that point, and under Iqbal and Twombly, the Court would be required to dismiss the Amended Complaint for that defect.

made on behalf of CEP, but Carlisle Companies acknowledges that they were.  Not so with

Transfer C, which Carlisle Companies did not even receive.  <u>Compare</u> Decl., ¶ 18, <u>with</u> Decl.,

¶ 20.)  Instead, the Amended Complaint asserts that Transfer C was made "to, or for the benefit

of, Defendant."    Amended Complaint ¶ 20.    Having not sufficiently asserted that Carlisle

Companies was a creditor, this allegation fails to state a plausible claim under Section 547(b)(1).

**2.**     **<u>Permitting the Amendment Would Be Futile Because Carlisle Companies Did Not Receive Transfer C and Was Not a Creditor of the Debtors' as to the Amount of Transfer C.</u>**

Allowing the Amended Complaint to be filed would be futile as to Transfer C because

Carlisle Companies did not receive Transfer C.  Carlisle Companies' lack of any record of

receiving this $3,049,066.88 payment, combined with the Amended Complaint's failure to offer

any identifying information concerning Transfer C other than a date and amount, is exactly what

the United States Supreme Court was concerned about when it decided <u>Iqbal</u> and <u>Twombly</u>.  "To

survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true,

to state a claim to relief that is plausible on its face." <u>Iqbal</u>, 129 S. Ct. at 1949 (internal marks

omitted).  By failing to assert the nature or amount of the antecedent debt allegedly paid by

Transfer C, the Amended Complaint fails to create a facial plausibility that Carlisle Companies is

liable for repaying Transfer C.

**3.**     **<u>Permitting the Amendment Would Be Futile Because Transfer A and Transfer B Were Not Made on Account of Antecedent Debt, and Were Therefore Not Preferential Transfers.</u>**

In order for Plaintiff to prove its prima facie case under Section 547 of the Bankruptcy

Code, Plaintiff must establish (among other elements) that the Alleged Transfers were made for

or on account of antecedent debt.  11 U.S.C. § 547(b)(2).  As discussed at length above, Plaintiff

did not sufficiently allege this element.   But even if Plaintiff had done so, amending the

18

Complaint would be futile because Plaintiff cannot satisfy this element as to Transfer A and Transfer B (collectively, the "Received Transfers").

Delphi and CEP intentionally ensured that the Received Transfers would be cash in advance payments made by wire transfer at the time the sales of Equipment closed. Decl., ¶ 9. Carlisle Companies received Transfer A on September 2, 2005, and did not deliver to Delphi the two HVAC presses paid for by Transfer A until September 8, 2005. Decl., ¶ 11. As to Transfer B, the APA contained the following provisions regarding the deliveries Delphi and CEP were required to make at the closing:

> 8.2 <u>Seller Deliveries</u>. At the Closing, the Seller shall deliver to the Purchaser the following:
>
> (a) Bill of Sale transferring the Assets to Purchaser.
>
> (b) All other documents reasonably required from the Seller to consummate the transactions contemplated hereby, including, any UCC termination statements or other lien releases from parties with a lien against the Assets
>
> 8.3 <u>Purchaser Deliveries</u>. At the Closing, the Purchaser shall execute and/or deliver to the Seller the following:
>
> (a) The Purchase Price described in Section 3.1 of this Agreement.
>
> (b) All other documents required from the Purchaser to consummate the transactions contemplated hereby.

APA ¶¶ 8.2, 8.3; <u>see</u> Decl., ¶ 13. The parties carried out this intention: on September 22, 2005, CEP and Delphi executed the APA, Delphi initiated a wire transfer that was credited to Carlisle Companies' account, and CEP delivered the bill of sale to Delphi. Decl., ¶ 16. CEP subsequently delivered to Delphi the Equipment paid for by Transfer B. Decl., ¶ 18.[6]

---

[6] Alternatively, for the same reasons, Section 547(c)(1), the contemporaneous exchange defense, would be a complete defense to the avoidance of Transfer A and Transfer B.

**C.**     **Carlisle Companies Has Been Prejudiced By Plaintiffs' Decision to Seal the Original Complaint and to Delay Prosecution of the Adversary for Over Two and One-Half Years**

**1.**     **Carlisle Companies' Ability to Defend the Claims Asserted by Debtors Has Been Significantly Hampered by The Passage of Time**

Carlisle Companies falls in the "no notice" category of preference defendants.  Debtors filed their Original Complaint against Carlisle Companies under seal, and then sought multiple extensions of time under Rule 4(m) of the Federal Rules of Civil Procedure to serve the Complaint and Summons upon Carlisle Companies.  Carlisle Companies was never served with the Extension Motions, the Extension Orders or the disclosure statements or plans filed in this case.  See Decl., ¶¶ 22-30.  Not only was Carlisle Companies *never* served with such documents, it also did not receive a copy of the Original Complaint until two and one-half years after it was filed.  Decl., ¶¶ 31, 32.  Without notice, Carlisle Companies never had an opportunity to oppose the Extension Motions or to seek the dismissal of the Original Complaint.[7]

The Debtors' two and a half year delay has prejudiced Carlisle Companies in a number of ways:

First, Carlisle Companies' ability to defend the now stale claims asserted by Debtors has been significantly hampered by the passage of time.  The employees who are most knowledgeable about the Alleged Transfers were employed by CEP in September 2005.  Decl., ¶ 35.    These employees included Connie Miller, Rick Bruno, and David Forrest Dick.  Id.  CEP is now defunct.  Accordingly, ***none of these employees is still employed*** at CEP and they are no longer available to assist Carlisle Companies with its defense of Debtors' claims.  Id.  Similarly, Philip Aldinger, who was the Controller at Carlisle Companies in 2005, retired from Carlisle

---

[7] Even had Carlisle Companies been served with the Debtors' disclosure statements and plans, which it was not, Carlisle Companies could not have determined whether it had been named as a defendant in any event.  The Original Complaint had been filed under seal, and the plan documents did not disclose the defendants' identities.

Companies in 2009.  Decl., ¶ 37.  He is likewise no longer available to assist in Carlisle

Companies' defense.  Id.

Second, documents necessary to Carlisle Companies' defense of this Adversary

Proceeding have long since been transferred in the course of the sale of CEP's assets, to Creative

Engineered Polymer Products, LLC, an entity which was not affiliated with Carlisle Companies

and which also no longer exists.  Decl., ¶ 39.

Third, Carlisle Companies, which lacked any notice of the Original Complaint until two

and a half years after the passage of the applicable statute of limitations,[8] did not establish a

reserve and did not make the necessary corporate disclosures that it would have made had

Carlisle Companies known that there was a claim pending against it.  Decl., ¶¶ 33, 34.

### 2.    Carlisle Companies Has Been Further Prejudiced By CEP's Demise.

As was described above, Carlisle Companies' only relationship to the Alleged Transfers

was CEP's instruction to Delphi to wire two cash in advance payments for the purchase of CEP's

Equipment (during CEP's wind-down period) to a bank account belonging to Carlisle

Companies, for the benefit of CEP.  Decl., ¶ 18.  Indeed, Carlisle Companies noted the

appropriate intercompany transfer to evidence that the two payments were received on behalf of

CEP.  Decl., ¶ 17.  Carlisle Companies has never conducted business with Debtors.  Carlisle

Companies has never entered into any supplier agreements with Debtors, and was never

obligated to supply goods to Debtors.  Decl., ¶ 4.  Carlisle Companies has never received any

payments from Debtors for goods previously delivered to Debtors under any supplier agreement.

Id.  Carlisle Companies has never been a creditor of Debtors.  Id.

---

[8] Similarly, Debtors' bankruptcy filing itself did not provide constructive notice to Carlisle Companies of the
potential avoidability of the Alleged Transfers, because Carlisle Companies never conducted business with Debtors
and never received any payments from Debtors based on any business relationship that it had with Debtors.

Instead, it was CEP that had the business relationship with Debtors.  Decl., ¶ 6.  CEP supplied goods to Debtors under several long-term supplier agreements, and when the decision was made to wind down CEP, it was CEP and Delphi who entered into an agreement pursuant to which Delphi would purchase equipment from CEP.  Decl., ¶¶ 6, 8.  Carlisle Companies' bank account was merely the depository for the funds tendered by Delphi, in advance, for the purchase of the CEP Equipment.  Decl., ¶ 18.

But CEP is now defunct, thereby depriving Carlisle Companies of institutional memory necessary to defend against Plaintiff's claims, as well as a potential source of indemnification or contribution.  As a consequence of CEP's wind-down, Carlisle Companies must now attempt to defend the claims without CEP employees and without CEP documents.  Decl., ¶¶ 35-38.  Additionally, any indemnification rights that Carlisle Companies may have had against CEP were the Alleged Transfers avoided have now been rendered meaningless with the passage of two and one-half years time (and CEP's demise).  Nor did CEP reserve any funds for a potential judgment in this case, because, like Carlisle Companies, CEP had no notice of the Original Complaint, the Extension Motions or the Extension Orders.  Thus, Carlisle Companies – which was nothing more than a depository account for the business transaction between CEP and Delphi – is now left holding the proverbial "bag."

It was Plaintiff's conduct alone that caused this significant prejudice to Carlisle Companies.  Plaintiff should not be allowed to benefit from its own unilateral conduct at the expense of Carlisle Companies, whose ability to defend itself has been compromised by no doing of its own.  Accordingly, this Court should deny Plaintiff's motion to amend its Complaint.

### 3.  Carlisle Companies Has Been Prejudiced by Loss of Its Opportunity to Sell Its Section 502(h) Claim at a Time When Such Claim Had Value.

Carlisle Companies was additionally prejudiced by the loss of its ability to sell its Section 502(h) claim for its face amount, i.e., had Carlisle Companies been served with the Original Complaint within 120 days after expiration of the statute of limitations.  At that time, established claims traders were offering at or even above 100% of the face amount for unsecured claims against Delphi.  But irrespective of the *amount* at which claims were trading, it is indisputable that by keeping Carlisle Companies in the dark about the pendency of this Adversary Proceeding until after the Debtors failed to consummate the Plan, Plaintiff forever deprived Carlisle Companies of the opportunity to sell its Section 502(h) claim for an amount that would have mitigated or eliminated Carlisle Companies' exposure.  Likewise, timely notice of the filing of the Original Complaint – i.e., the type of notice contemplated by the Supreme Court and the Congress when they approved and reviewed the Federal Rules of Civil Procedure – would have allowed Carlisle Companies to use the value of its Section 502(h) claim as part of a settlement with the Plaintiff.  Those opportunities are forever lost.

### D.  Upon De Novo Review, the Extension Orders Should Be Vacated and the Extension Motions Should Be Denied.

During the Court's July 22, 2010 hearing, the Court explained that defendants who did not receive notice of the Extension Motions, Extension Orders or the Debtors' plans and disclosure statements may now challenge *de novo* the entry of the Extension Orders.  See 7/22/10 Transcript at pp. 103, 119 ("[I]f someone really didn't get notice of the extension motions, then it would seem to me they should be able to argue to me as if the motions were being made right now").  Carlisle Companies is one such defendant.  As set forth in Carlisle's Motion to Vacate and as further evidenced by the attached Declaration of Kevin Forster attached hereto, Carlisle Companies received *no notice* of the Extension Motions, the Extension Orders or the Debtors'

plans or disclosure statements.    Decl., ¶¶ 22-30.    Accordingly, in this Objection, Carlisle Companies challenges *de novo* the entry of the Extension Orders.

The Extension Motions should be or should have been denied because Debtors did not establish that "good cause" existed for granting an extension of the Rule 4(m) time period.  Good cause within the meaning of Rule 4(m) is generally found only where the plaintiff's failure to make timely service was the result of circumstances beyond its control.  Mused v United States, 169 F.R.D. 28, 33 (W.D.N.Y. 1996).  At a minimum, good cause for an extension must be limited to instances where the plaintiff is ***trying*** to serve the defendant.

The grounds for the Debtors' Extension Motions were not that the Debtors had tried and failed to serve Carlisle Companies (and other defendants).  Instead, the primary (initial) ground for the Extension Motions was that the Debtors, for purported business reasons, wanted to be excused from serving summonses on their suppliers and customers.  This intention may have seemed benign enough at a time when the Debtors were projecting a 100 percent distribution under the Plan.  But in hindsight, it shifted the risk that the Debtors would not have a consummated 100-percent-plan within two years of the petition date from the Debtors to the preference defendants—in direct contravention of Congress's establishment of a two-year statute of limitations for preference actions.

A secondary ground for the Extension Motions was to prevent preference defendants from tying the favorable resolution of their preference cases to other events in the case, possibly including voting on the Plan.  For example, the First Extension Motion cited "Debtors' intention to de-link the sealed adversary proceedings from all other activities in these chapter 11 cases and to prevent their use for any purpose by any party."  When stated this way, it appears that Debtors intended to prejudice the preference defendants, by forcing them to surrender bargaining power

without alerting them that the Debtors had filed preference complaints against them.  This is not "good cause" for extending the Rule 4(m) period.

Further, the grounds of the Extension Motions did not even apply logically to Carlisle Companies.  Carlisle Companies was not a supplier or customer of the Debtors.  Decl., ¶ 4.  As discussed above, Carlisle Companies only received payments on behalf of CEP in accordance with the terms of the APA between CEP and Delphi.  Carlisle Companies did not sell inventory to the Debtors or place orders with the Debtors.  No supplier relationship would have been disrupted or credit terms diminished.  Cf. First Extension Order at ¶ 37 ("Debtors . . . have negotiated or regained favorable credit terms with many suppliers and are continuing to do so").  Consequently, even if Debtors' assertions in the Extension Motions established good cause with respect to other Defendants, they did not do so as to Carlisle Companies.

### E.    Leave to Amend the Complaint Should Not Be Granted Simply Because Iqbal and Twombly Had Not Been Decided When the Adversary Proceeding Was Filed in 2007

Plaintiff's Motion for Leave to Amend the Complaint argues that the Court should be more inclined to grant leave to amend Plaintiff's Complaint because Iqbal and Twombly had not been decided when the Original Complaint was filed in 2007.  In Plaintiff's view, denying leave to amend would "penalize[]" Plaintiff for not anticipating the decision of Iqbal and Twombly when drafting the Original Complaint.

However, any penalty Plaintiff is suffering is due to Plaintiff's decision to file the Original Complaint under seal and to seek multiple extensions of the 120-day service period.  Courts lack "constitutional authority . . . to disregard current law or to treat similarly situated litigants differently."  Harper v. Virginia Dep't of Taxation, 509 U.S. 86, 97, 113 S. Ct. 2510, 125 L. Ed. 2d. 74 (1993).  Accordingly, when the Supreme Court decides a case concerning how to interpret a statute or rule, "all courts [are] required to apply that rule to the cases before them,

25

regardless of whether the events at issue predated" the Supreme Court decision.  Swede v. Rochester Carpenters Pension Fund, 467 F.3d 216, 220 (2d Cir. 2006).  Given that rules of law may change during litigation, the longer a case is pending, the greater the risk that a rule applicable to the case will change before a final judgment is entered.

Plaintiff intentionally caused a delay of over two years in this case, after waiting until the month before the statute of limitations expired to even file the Original Complaint.  This delay – which occurred without any notice to Carlisle Companies – worked significant prejudice upon Carlisle Companies, as explained above.  The Court should not allow Plaintiff to enjoy all the benefits of its decision to delay service of the Original Complaint while allowing Plaintiff to evade the risks of doing so.

### F.    Joinder and Incorporation of Arguments Not Expressly Stated Herein

Carlisle Companies joins in and incorporates all arguments made by other defendants to preference actions in the DPH Holdings Corp., et al. bankruptcy case, in opposition to the Debtors' motions for leave to amend their complaints, to the extent not inconsistent herewith. Carlisle Companies further incorporates, as if fully restated herein, its Motion to Vacate, as well as the Joinder of Defendant Carlisle Companies Incorporated to Motion and Brief of Defendant ATS Automation Tooling Systems Inc. from Fourth Order Extending Time to Serve Complaint (filed October 22, 2010).

## IV.    CONCLUSION

For the foregoing reasons, Carlisle Companies Incorporated respectfully requests that the Court deny Plaintiff's Motion for Leave to File Amended Complaints as to this adversary proceeding, clarify that Plaintiff's Complaint against Carlisle Companies has been dismissed,

vacate the Extension Orders, deny the Extension Motions, and grant such other relief to Carlisle

Companies as the Court deems appropriate.


Dated: November 23, 2010                    Respectfully submitted,



                                            /s/ Tiffany Strelow Cobb
                                            Lisa Pierce Reisz (admitted *pro hac vice*)
                                            Tiffany Strelow Cobb (admitted *pro hac vice*)
                                            Jesse Cook-Dubin Cobb (admitted *pro hac vice*)
                                            Vorys, Sater, Seymour and Pease LLP
                                            52 East Gay Street
                                            Columbus, Ohio 43215
                                            Telephone:  (614) 464-8322
                                            Facsimile:  (614) 719-4663
                                            E-mail:  tscobb@vorys.com

                                            Attorneys for Defendant
                                            Carlisle Companies Incorporated