Lisa Pierce Reisz (admitted *pro hac vice*)
Tiffany Strelow Cobb (admitted *pro hac vice*)
Jesse Cook-Dubin (admitted *pro hac vice*)
**VORYS, SATER, SEYMOUR AND PEASE LLP**
52 E. Gay Street / P.O. Box 1008
Columbus, Ohio 43216-1008
Telephone:  (614) 464-8322
Facsimile:  (614) 719-4663
E-mail:  tscobb@vorys.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | Case No. 05-44481 [RDD] |
| DPH Holdings Corp., et al. | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |
| ────────────────────────── | : | |
| | : | |
| Delphi Automotive Systems, LLC | : | Adv. Case No. 07-02291 [RDD] |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Carlisle Companies, Inc., | : | |
| | : | |
| Defendant. | : | |

### DECLARATION OF KEVIN FORSTER IN SUPPORT OF OBJECTION OF DEFENDANT CARLISLE COMPANIES INCORPORATED TO REORGANIZED DEBTORS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS ("OBJECTION")

I, Kevin Forster, declare and state as follows:

1.      I am currently the President – Asia Pacific Division of Carlisle Companies

Incorporated ("Carlisle Companies").  From approximately May 2002 to July 2007, I was the

Vice President and Director of Corporate Development for Carlisle Companies.  My

responsibilities included overseeing the winding down of discontinued operations.

2.      Carlisle Companies is a non-operating holding company and the sole shareholder of various subsidiaries.  Carlisle Companies' subsidiaries serve the construction materials, commercial roofing, specialty tire and wheel, power transmission, heavy-duty brake and friction, foodservice, aerospace, and test and measurement industries.  Carlisle Companies does not manufacture or sell any products.

3.      Carlisle Companies is a highly decentralized corporation with most functional decisions for each subsidiary made by each subsidiary's management team.

4.      Carlisle Companies has never conducted business with Delphi Automotive Systems, LLC ("DAS"), Delphi Corporation or any other debtor in the above-captioned bankruptcy case (collectively "Debtors").  Carlisle Companies has never entered into any supplier agreements with Debtors, was never obligated to supply goods to Debtors, and never has supplied any goods to Debtors.  Carlisle Companies has never received any payments from Debtors for goods previously delivered to Debtors under any supplier agreement.  Carlisle Companies has never been a creditor of Debtors.

5.      In 2005, Carlisle Engineered Products, Inc. ("CEP") was one of Carlisle Companies' wholly-owned subsidiaries.

6.      CEP supplied goods to Debtors under several long-term supplier agreements.

7.      In 2005, including from July 10, 2005 through October 8, 2005 (the "Preference Period"), Carlisle Companies was in the process of winding down CEP's operations.  CEP has now been defunct for several years.

8.      In late August and early September 2005, CEP and Delphi Thermal & Interior Systems (a division of Delphi Corporation) (hereinafter "DTIS" or "Delphi") agreed that as part of the winding down of CEP's Lake City facility, Delphi would buy certain machinery, tooling

-2-

and parts from CEP for a total purchase price of $1,146,456.00.  Delphi indicated to CEP that it

anticipated installing the machinery at multiple Delphi facilities.

      9.      Carlisle Companies insisted on, and the parties agreed to, a cash in advance

transaction in light of Delphi's financial difficulties.

      10.      In connection with the asset sale, Delphi issued four purchase orders to CEP:

PO# LPS97754 for a CIPG gasket line, in the amount of $355,000; PO#  LPS97755 for seven

injection molding machines and related equipment, in the amount of $332,000.00; PO#

JMS42298, for ten HVAC presses, in the amount of $395,000.00; and PO# JMS42338 for

equipment and tooling related to the HVAC presses, in the amount of $64,456.00.

      11.      During this transaction, Delphi communicated to CEP that two of the HVAC

presses in PO# JMS42298 – described as Nos. K28T006 and 528R112B – were going to Delphi

Mexico and were needed urgently.  The agreed-upon purchase price for these two presses was

$45,700 and $40,000, respectively.  CEP agreed to let Delphi pick up the two presses sooner,

provided that Delphi pay in advance for the two presses.  The wire transfer in the amount of

$85,700.00 was credited to Carlisle Companies' account on September 2, 2005.  Delphi picked

up the two presses on or about September 8, 2005.

      12.      CEP and Delphi then moved forward with the remainder of the transaction.  On

September 21, 2005, CEP provided Delphi with four invoices that mirrored the purchase orders

(collectively, the "Invoices"):

- Inv.# 636498, for a CIPG Gen. 1 gasket line and related parts, drawings etc., in the amount of $355,000;
- Inv. #636499, for seven injection molding machines, in the amount of $332,000;
- Inv. #636494, for ten HVAC presses including two that were listed as "SHIPPED 9/8/05" (and indicating "$85,700.00 PAYMENT RECEIVED ON ITEMS SHIPPED"), in the amount of $395,000; and

- Inv. #636496, for several controllers and other items, in the amount of $64,456.00.

A true and accurate copy of the Invoices is attached hereto as Exhibit A.

13.     On September 22, 2005, CEP and DTIS entered into an Agreement for Purchase and Sale of Assets, a copy of which is attached to this Declaration as Exhibit B (hereinafter the "Asset Purchase Agreement").  DAS was not a party to the Asset Purchase Agreement at the time of its execution.

14.     Although the Asset Purchase Agreement and Invoices are dated September 21, 2005, the execution version of the Asset Purchase Agreement was not provided by counsel for Delphi (Dickinson Wright PLLC in Bloomfield Hills, MI) until 2:38 a.m. on September 22, 2005.  A true and accurate copy of the September 22, 2005 E-mail from Christopher C. Maeso to Brett A. Lendzion and Mike Roberson (of which I received a copy) is attached hereto as Exhibit C.

15.     The Asset Purchase Agreement provided that DTIS would hold back ten percent of the purchase price allocated to each piece of equipment purchased, and that the holdback on each piece of equipment would only be released when DTIS determined that each piece of equipment was fully functional and operating in the ordinary course of business.  Accordingly, at closing, DTIS agreed to pay to CEP, by wire transfer to a bank account designated by CEP, to the sum of $954,675.00.  The $954,675.00 amount represents 90% of the adjusted purchase price for the Lake City assets, namely, $1,146,456.00 less $85,700.00 paid for the two HVAC presses that had already been delivered, as described above.

16.     On September 22, 2005, Carlisle Companies' account was credited with a wire transfer from Delphi in the amount of $954,675.00.  True and accurate (redacted) copies of

-4-

relevant excerpts of Carlisle Companies' bank account statement for September 2005 are attached hereto as Exhibit D.

17.     In turn, the appropriate intercompany transfer was entered on Carlisle Companies' books and records to reflect that Carlisle Companies received the $954,675.00 payment on behalf of CEP.

18.     Following Carlisle Companies' receipt of the $954,675.00 wire transfer in the bank account designated by CEP, CEP transferred to Delphi the remaining equipment listed in the schedules to the Asset Purchase Agreement, i.e., all equipment other than the two HVAC presses that had already been delivered.

19.     DTIS released the ten percent holdback at varying post-petition dates pursuant to the terms of the Asset Purchase Agreement ranging from October 8, 2005 to December 31, 2005, following delivery of each piece of equipment.

20.     Carlisle Companies never received a transfer from DAS in the amount of $3,049,066.88 (on October 5, 2005 or on any other date).

21.     Debtors' decision to file the adversary complaint against Carlisle Companies under seal on September 26, 2007, and to delay prosecution of this case has resulted in significant prejudice to Carlisle Companies.

22.     Carlisle Companies was not served with and never received notice of Debtors' August 6, 2007 motion, which in pertinent part, sought authority to file numerous avoidance complaints under seal and to extend the period within which to serve such complaints and the related summonses (the "First Extension Motion")

23.     Carlisle Companies was not served with and never received notice of this Court's Order granting the First Extension Motion on August 16, 2007.

24.     Carlisle Companies was not served with and never received notice of Debtors'
February 28, 2008 motion seeking to extend the service deadline relative to certain avoidance
complaints and summonses (the "Second Extension Motion").

25.     Carlisle Companies was not served with and never received notice of this Court's
Order granting the Second Extension Motion on March 28, 2008.

26.     Carlisle Companies was not served with and never received notice of Debtors'
April 10, 2008 post-confirmation motion again seeking to extend the deadline within which to
serve these avoidance complaints and summonses (the "Third Extension Motion").

27.     Carlisle Companies was not served with and never received notice of this Court's
Order granting the Third Extension Motion on April 30, 2008.

28.     Carlisle Companies was not served with and never received notice of Debtors'
October 2, 2009 supplemental post-confirmation motion seeking to extend the service deadlines
a fourth time (the "Fourth Extension Motion").

29.     Carlisle Companies was not served with and never received notice of this Court's
Order granting the Fourth Extension Motion on October 22, 2009.

30.     Carlisle Companies is not listed on any applicable Master Service List or Rule
2002 List in connection with any of Debtors' extension motions.

31.     Indeed, Carlisle Companies had no notice that it had been sued by DAS until after
the Complaint was unsealed and the summons issued on March 12, 2010 – over two and one-half
years following the filing of the Complaint and almost five years after the relevant preference
period.

32.     Further, Carlisle Companies would not even have had constructive notice of
filings arising out of Debtors' bankruptcy filing since Carlisle Companies never conducted

business with Debtors and never received any payments from Debtors based on any business relationship that it had with Debtors.

33.     As a result, Carlisle Companies did not establish a reserve to satisfy any potential judgment in this case because it did not have any notice that it had been sued by Debtors until the Complaint was unsealed in April 2010.

34.     Similarly, Carlisle Companies did not make any required corporate disclosures regarding Debtors' claims because it did not have any notice that it had been sued by Debtors until the Complaint was unsealed in April 2010.

35.     Since Debtors filed their complaint under seal in September 2007, all of the CEP employees with knowledge regarding the asset sale between CEP and Delphi are gone.  Indeed, CEP laid off all of its employees, including Rob Bruno, David Forrest Dick and Connie Miller, after CEP finished the wind-down of its business.

36.     Similarly, during the time the transfers at issue were made and continuing through the date on which Debtors filed their Complaint under seal, Chuck Siczek was assisting Carlisle Companies in its wind-down of CEP.  Mr. Siczek is no longer employed by Carlisle Companies or CEP.

37.     Finally, Philip Aldinger was the Controller of Carlisle Companies in 2005.  Mr. Aldinger retired in 2009, and is no longer employed by Carlisle Companies.

38.     No persons are currently employed by CEP.

39.     Documents necessary to Carlisle Companies' defense of this adversary proceeding have long since been transferred, in the course of the sale of CEP's assets, to Creative Engineered Polymer Products, LLC, an entity which was not affiliated with Carlisle Companies and which also no longer exists.

-8-

40.      A true and accurate copy of the e-mail communications that I sent and/or received

in 2005 relating to the sale of equipment from CEP to DTIS is attached hereto as Exhibit E.

I declare under penalty of perjury that the statements contained in this declaration are true

and correct.

Dated this 23rd day of November, 2010.


/s/ Kevin Forster
Kevin Forster