# EXHIBIT B

# AGREEMENT FOR
## PURCHASE AND SALE OF ASSETS

This Agreement for Purchase and Sale of Assets is made as of September 21, 2005 by and between CARLISLE ENGINEERED PRODUCTS, INC., a Delaware corporation ("Seller"), a wholly owned subsidiary of CARLISLE COMPANIES INCORPORATED ("Carlisle") and the DELPHI THERMAL & INTERIOR SYSTEMS DIVISION OF DELPHI CORPORATION, a Delaware corporation ("Purchaser").

### R E C I T A L S :

A.   In January 2005, Carlisle announced that Seller was placed on Carlisle's list of discontinued operations and Carlisle is in the process of selling all of the various assets associated with Seller.

B.   Seller and Purchaser are parties to several long term supply agreements ("Supply Agreements").

C.   One of Seller's facilities that supports the Supply Agreements is located at 10047 Keystone Drive, Lake City, Pennsylvania ("Lake City", also referred to as the "Lake City Business").

D.   Seller does not intend to include the sale of Lake City with its other assets but, rather, close Lake City, which closing will occur in all events by February 28, 2006.

E.   In conjunction with the closing of Lake City, Seller and Purchaser have agreed to transfer the Supply Agreements, from the Lake City Business, back to Purchaser.

F.   In order to continue to produce certain parts formerly made by Seller for Purchaser at Lake City, Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, on the terms and subject to the conditions set forth in this Agreement, the Assets (as defined in Section 1.1).

G.   Purchaser agrees to begin to accept Past Model Tooling and Molds, which are owned by Purchaser as set forth in this Agreement.

H.   Purchaser also agrees to remit payment for all finished goods inventory that Purchaser orders from Seller ("Finished Goods") and Seller delivers to Purchaser's designated location, as inventory, to facilitate the sale and transfer of the assets to Purchaser.

NOW, THEREFORE, in consideration of the premises, the respective covenants and commitments set forth in this Agreement, the parties agree as follows:

## I. Purchase and Sale of Assets and Other Related Matters

1.1    Assets. On the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Seller shall sell to Purchaser, and Purchaser agrees to purchase and acquire from Seller, the following assets owned by Seller in respect of the Lake City Business (the "Assets"):

(a)    Equipment. All of the equipment, machinery, tooling, dies, jigs, molds, presses, patterns, at Lake City owned by Seller listed on Schedule 1.1(a) (the "Equipment")

(b)    Auxiliary Equipment. All of the auxiliary equipment used in support of the Equipment as set forth above, owned by Seller listed on Schedule 1.1(b) (the "Auxiliary Equipment").

(c)    Spare Parts. All of the spare parts used in support of the Equipment.

(d)    Fixtures and Gauges. All fixtures and gauges relating to the Assets, and supporting prints and documentation.

(e)    Engineering and Production Data. All blueprints, drawings, forms, raw material specifications, manufacturing specifications, quality assurance specifications, engineering data, production data, development data, design data, formulae, plans, images, files, artwork and other data owned by Seller and used in the operation of the Lake City Business.

(f)    Manuals. All operating and maintenance records, manuals and documentation for the Equipment, and all other technical documents helpful in the operation of the Equipment and any other tangible or intangible asset needed to operate or maintain the Equipment.

(g)    General. All other assets and spare parts associated with the Equipment and Auxiliary Equipment and otherwise used to produce the goods Seller sells to Purchaser.

1.2    Last Production Part and PPAP Packages. Seller covenants and agrees to provide Purchaser, at no additional cost, the last production part for each part number previously or currently being delivered to Purchaser, including those listed on Schedule 1.2 and all existing PPAP packages associated with the Assets requested by Purchaser.

1.3    Condition of Assets. All of the Assets are being acquired on an "AS IS, WHERE IS" basis and, except as set forth in this Agreement, SELLER MAKES NO WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE CONDITION OF ANY OF THE ASSETS ACQUIRED BY PURCHASER HEREUNDER, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ALL SUCH WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED.

2

1.4   <u>Delivery and Removal of Assets</u>.   Following the Closing, Seller shall transfer possession and make delivery of all of the Assets "in place" at Lake City, and Purchaser shall take possession and accept delivery of the Assets in accordance with the Shipping Schedule attached hereto as Schedule 1.4, which shipping schedule may be delayed by Purchaser, in its sole discretion up to, but not beyond, February 28, 2006. In connection with such delivery, Purchaser's employees and agents, at Purchaser's expense, shall be permitted upon Seller's Lake City premises during Seller's regular business hours (or as otherwise mutually agreed upon) to tear down, rig, crate, load, and in general prepare the Assets for removal and shipment from Lake City to Purchaser's site(s). During this process, Seller, at its expense, will make available to Purchaser, the services of any necessary personnel for advice and consultation as may be reasonably required by Purchaser to prepare the Assets for removal and shipment, and Seller will be responsible for making sure that Purchaser does not encounter any union issues with Seller's employees or agents. Seller also will disconnect all wiring and plumbing not constituting part of the Assets at the machine lines themselves and shall take all other reasonable steps necessary to enable Purchaser to remove the Assets, and Purchaser shall not remove any machine constituting part of the Assets until the machine has been so disconnected. Purchaser shall be responsible, at its expense, to remove all braces, planking, packing materials, and similar items used in connection with its tear down, rigging, crating, loading and removal activities and shall broom clean the premises after removal of the Assets to the extent necessary to return the premises to the condition that existed before such removal. Purchaser shall also be responsible for all expenses incurred to transport the Assets to Purchaser's location. All other costs and expenses of the preparation and removal of the Assets, other than those set forth above, shall be at Seller's expense. Purchaser also shall be responsible for any injury or damage to persons or property that Purchaser or its contractors, subcontractors, agents, and/or employees cause in connection with the tear down, rigging, loading, removal, shipping, and/or other disposition of any of the Assets unless Seller's negligence contributed to such injury or damage, or unless injury or damage is covered by Seller's insurance.

1.5   <u>Continuation of Production</u>. From the Closing date until February 28, 2006, Seller will continue to manufacture Finished Goods using the acquired Assets at no additional charge to Seller for such use. Seller will act in a commercially responsible manner with respect to the use of the Assets during this period of operation, and the Assets will remain in the same condition as existed at Inspection (as defined in Section 1.9 below), except for ordinary wear and tear.

1.6   <u>Inventory</u>. Purchaser and Seller agree that Purchaser will remit payment for all Finished Goods contemporaneously with Seller's delivery of Finished Goods. Seller waives any right to seek adequate assurances or further contract modifications under the Uniform Commercial Code or other applicable law. Purchaser is only obligated to pay for Finished Goods it orders from Seller. Purchaser will not be charged any price increases, overtime or other increased costs by Seller—all such pricing will be as currently in effect. All Finished Goods will meet the quality standards and other conditions required by the terms of Purchaser's standard Terms and Conditions (the "Terms"), and Seller agrees that if Purchaser requires any engineering changes, Seller will make such changes. Seller will only deliver the Finished Goods to Purchaser on the dates requested by Purchaser and not prior to such dates.

1.7 <u>Past Model Tooling</u>. During the period in which Seller continues to manufacture the Finished Goods and contribute to the Inventory Bank (as defined in Section 1.8), Purchaser will begin to accept all Past Model Tooling and Molds which will be returned to Purchaser in stages but in all events by February 28, 2006. A list and description of the Past Model Tooling and Molds that Seller uses to produce Purchaser's inventory is set forth on Schedule 1.7. Prior to February 28, 2006, Purchaser shall also go to Lake City to inventory and remove the other Past Model Tooling and Molds that Purchaser sent to Seller.

1.8.    <u>Duration of Supply.</u>

(a)    Seller will continue to perform, manufacture and deliver to Purchaser's designated locations pursuant to this Agreement and, to the extent not inconsistent, the existing Terms and Supply Agreements, until the last to occur of the following (each a "Termination Event"): (i) the Purchaser has built up an inventory build of finished goods for each part in the amount set forth on Schedule 1.2, as such numbers are updated and agreed to by the parties pursuant to subsection (c) below (the "Inventory Bank"); and (ii) February 28, 2006. The parties agree and acknowledge that during this supply term Purchaser shall remove the Assets in stages in accordance with Schedule 1.4, which shipping schedule may be delayed by Purchaser, in its sole discretion up to, but not beyond, February 28, 2006 and, as such Assets are removed, Seller shall no longer have any obligation to produce the inventory or other products manufactured on the particular removed Asset. Notwithstanding the foregoing, Purchaser may send a removed Asset back to Seller, and Seller will restart producing Finished Goods and rebuilding the Inventory Bank to the required level for as long as Delphi requires (but not beyond February 28, 2006) but in such event, Delphi will pay Seller's one time set-up costs to restart production of such part. The parties further agree and acknowledge that Seller's supply obligation hereunder shall in no event extend beyond February 28, 2006.

(b)    Upon the occurrence of the last Termination Event Seller will transfer the Supply Agreements, from Seller's Lake City Business, back to Purchaser, such transfer to constitute the reciprocal release of the parties only as to any and all future obligations including the supply of additional product thereunder. Any obligations and liabilities existing on or prior to such date will not be deemed future obligations and will not be released, including, without limitation, any claims arising on or before such date or relating to events, inventory, deliveries or other actions or inactions occurring before such date.

(c)    The estimated shipping dates for the Assets and the estimated Inventory Bank for each part are set forth on Schedule 1.2. Such estimates will be finalized and approved by both parties prior to October 1, 2005, but both parties agree that such final Inventory Bank numbers will approximate a twelve week inventory build for each part, except that such inventory build will only approximate a one to five week inventory build for Parts 524-540, 523-500, 550-500, 108-500, 332-500 and 883-500. Purchaser may, however, delay the shipment of any Assets or Finished Goods from the dates set forth on any Schedule as Purchaser, in its sole discretion, deems necessary, but in any event, such delay may not extend beyond February 28, 2006. Purchaser's records with respect to the actual amount of parts in the Inventory Bank will control.

4

1.9 <u>Access</u>. Prior to the closing of the Lake City facility, Purchaser's employees and agents shall be permitted to enter Seller's Lake City premises from time to time, during Seller's regular business hours, or as otherwise mutually agreed upon, to (a) confirm that the Equipment and Auxiliary Equipment is currently operational and (b) run tests on the Equipment and otherwise inspect the Assets, (the "Inspection"). Seller agrees to cause its employees to operate the Equipment and Auxiliary Equipment and to run such tests and perform such inspections as Purchaser reasonably requests.

## II. <u>No Assumption of Liabilities</u>

2.1    <u>No Obligations to be Assumed by Purchaser</u>. Purchaser does not assume, and shall not pay or discharge any debts, liabilities, obligations, contracts, loans, commitments or other undertakings or Seller of any type or nature, whether fixed, contingent or otherwise, known or unknown.

## III. <u>Purchase Price</u>

3.1    <u>Purchase Price</u>.

(a)    The parties agree and acknowledge that the purchase price for the Assets shall be One Million Sixty Thousand Seven Hundred Fifty Dollars ($1,060,750) (the "Purchase Price").

(b)    At Closing, Purchaser shall pay to Seller, by wire transfer in Federal Funds or other immediately available funds to a bank account designated by Seller, an amount equal to Nine Hundred Fifty Four Thousand Six Hundred Seventy Five Dollars ($954,675). The Purchaser will hold back ten percent of the Purchase Price allocated to each piece of Equipment based on the price set forth on Schedule 1.1(a) (the "Holdback"), and the Purchaser will only release the Holdback on each piece of Equipment when Purchaser reasonably determines that such piece of Equipment is fully functional and operating in the ordinary course of business at the plant where Purchaser installs such Equipment.

## IV. <u>Representations and Warranties of Seller</u>

As a material inducement to the Purchaser to enter into this Agreement and with the understanding that the Purchaser will be relying thereon in consummating the transactions contemplated by this Agreement, Seller represents and warrants to the Purchaser as follows:

4.1    <u>Organization and Standing</u>. Seller is a corporation duly organized, validly existing and in good standing under the laws of Delaware.

4.2    <u>Corporate Authorization</u>. Seller has full corporate power and authority to enter into this Agreement and to sell the Assets in accordance with the terms of this Agreement. The execution,

delivery and performance of this Agreement by Seller, and all other agreements or instruments to be executed by Seller pursuant to this Agreement, have been duly and effectively authorized by its board of directors and no other corporate proceeding on Seller's part is necessary to authorize this Agreement or the transactions contemplated by this Agreement. This Agreement constitutes and such other agreements or instruments will constitute, the legal, valid and binding obligations of Seller, which are, or will be, enforceable in accordance with their respective terms.

4.3     No Liens or Encumbrances. On the Closing Date, Seller will transfer and convey to Purchaser good and marketable title to the Assets, free and clear of all mortgages, liens, claims, charges, encumbrances, leases, security interests, pledges, and title retention agreements of any kind or nature.

4.4     No Brokers or Finders. No person, firm or corporation has or will have, as a result of any act or omission by Seller, any right, interest or valid claim against the Purchaser for any commission, fee or other compensation as a finder or broker in connection with the transactions contemplated by this Agreement.

4.5     Sufficiency and Condition of Assets. To Seller's knowledge, the Equipment and Auxiliary Equipment (a) is in good condition and repair, subject to ordinary wear and tear, (b) is in operating condition, (c) is free from any defects (patent or latent), (d) has been properly maintained, (e) is not in need of material repair or replacement, and (f) has not been cannibalized for parts or pieces.

4.6     Real Estate. Seller owns, in fee simple, the Lake City land, building and improvements.

## V. Representations and Warranties of Purchaser

As a material inducement to Seller to enter into this Agreement and with the understanding that Seller will be relying thereon in consummating the transactions contemplated by this Agreement, the Purchaser, represents and warrants to Seller as follows:

5.1     Organization and Standing. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of Delaware.

5.2     Corporate Authorization. Purchaser has full corporate power and authority to enter into this Agreement and purchase the Assets in accordance with the terms of this Agreement. The execution, delivery and performance of this Agreement by Purchaser and all other agreements or instruments to be executed by Purchaser pursuant to this Agreement have been duly and effectively authorized and no other corporate proceeding on the part of Purchaser is necessary to authorize this Agreement or the transactions contemplated by this Agreement. This Agreement constitutes, and such other agreements and instruments will constitute, the legal, valid and binding obligations of Purchaser which are, or will be, enforceable against the Purchaser in accordance with their respective terms.

6

5.3   <u>No Brokers or Finders</u>.  No person, firm or corporation has or will have, as a result of any act or omission by the Purchaser, any right, interest or valid claim against the Seller for any commission, fee or other compensation as a finder or broker in connection with the transactions contemplated by this Agreement.

## VI.   Covenants

As a material inducement to Purchaser to enter into this Agreement, and with the understanding that Purchaser will be relying on such covenants, Seller covenants to Purchaser as follows:

6.1   <u>Employee Retention and Staffing Plan</u>.  Seller has implemented an employee retention and staffing plan, which plan is attached as Schedule 6.1.  Seller will use its reasonable commercial efforts to (a) retain its key personnel whose work is related to the Finished Goods, and (b) make sure that Seller retains adequate staffing to meet its obligations under this Agreement and the Supply Agreements. in each case, through February 28, 2006.

6.2   <u>Access</u>.  Purchaser will have, from time to time, access to Lake City's personnel and plant during normal business hours, or as otherwise mutually agreed, before and after Closing.

6.3   <u>Equipment Assistance.</u>  Seller will provide the necessary personnel resources to Purchaser to support the movement and installation of the Equipment at Purchaser's plants and the training of Purchaser's employees.  Seller will be responsible for the first $25,000 in travel related expenses and wages related to the foregoing services.  Any expenses caused by Purchaser in excess of this allowance will be Purchaser's responsibility.

6.4   <u>Insurance</u>.  Until the Assets have left Lake City, Seller covenants and agrees that Seller will keep the Assets fully insured for their fair market value.  In the event of any loss to the Assets, Seller will promptly repay Purchaser the purchase price for the Assets.

6.5   <u>Tagging</u>.  After Closing, Purchaser may tag the Assets as Purchaser's property and take such other steps as Purchaser deems necessary to evidence its ownership.  Seller shall further insure that no liens, other than those arising through Purchaser, attach to the Assets.

## VII.  Closing Conditions

The obligation of the Purchaser to purchase the Assets are subject to the following conditions being satisfied to Purchaser's sole satisfaction:

7.1   <u>Representations and Warranties.</u>  The Seller's representations and warranties set forth in this Agreement being true and correct in all respects when made, and which representations and warranties shall again be true and correct as of the Closing.

7

7.2    Performance by Seller.  Seller shall have performed and complied with all of the covenants, agreements and obligations under the Agreement in all respects.

## VIII. Closing

8.1    Time and Place.  The closing (the "Closing") shall take place concurrent with the execution of this Agreement (the "Closing Date") by facsimile transmission (and overnight mailing) of the signature pages to this Agreement and all ancillary agreements.  Seller shall as soon as practicable thereafter deliver to the Purchaser an original set of the closing documents.

8.2    Seller Deliveries.  At the Closing, the Seller shall deliver to the Purchaser the following:

(a)    Bill of Sale transferring the Assets to Purchaser.

(b)    All other documents reasonably required from the Seller to consummate the transactions contemplated hereby, including, any UCC termination statements or other lien releases from parties with a lien against the Assets

8.3    Purchaser Deliveries.  At the Closing, the Purchaser shall execute and/or deliver to the Seller the following:

(a)    The Purchase Price described in Section 3.1 of this Agreement.

(b)    All other documents required from the Purchaser to consummate the transactions contemplated hereby.

## IX. Set Off

If Seller breaches this Agreement, Purchaser may, upon notice to Seller specifying in reasonable detail the basis for such set off, set off against the Holdback. Neither the exercise of nor the failure to exercise such set off right will constitute an election of remedies or limit Purchaser in any manner in the enforcement of its remedies.  All of the Purchaser's remedies are cumulative and not exclusive, and this set off right is in addition to any set-off available under the Terms and Supply Agreement.

## X. Right to Lease

10.1  Right to Lease.

(a)    General.  Seller hereby grants Purchaser, or its designee, the right, but not the obligation (the "Option"), to lease and occupy Lake City to manufacture finished goods (the "Lease") for the one year period beginning March 1, 2006 and ending February 28, 2007 at a monthly rental equal to $15,000, which sum includes all

8

related taxes, insurance and other costs associated with the land and building. Purchaser may exercise the Option by providing Seller written notice prior to February 15, 2006.

(b)  Right to Terminate.  Purchaser shall have the absolute right to terminate the Lease at any time during the lease term upon thirty (30) business days written notice to Seller.

(c)  Cooperation.  Purchaser acknowledges that Seller has announced the discontinuance of all of its operations, including Lake City, and that all actions related thereto will be completed no later than February 28, 2006.  In accordance with such discontinuation, Seller has notified all of its employees of the imminent termination of their employment, all such terminations to occur no later than February 28, 2006 (all such employees hereinafter the "Former Employees").  In the event requested in writing by Purchaser, Seller agrees to cooperate and use all commercially reasonable efforts to assist Purchaser in obtaining the employment of the Former Employees.

## XI.  Miscellaneous

11.1  Binding Effect.  This Agreement shall be binding upon and inure to the benefit of and be enforceable against the parties and their respective successors and permitted assigns.

11.2  Notices.  All notices, consents, requests, demands, instructions or other communications provided for in this Agreement shall be in writing and shall be deemed validly given, made and served if delivered personally, or sent by certified or registered mail, postage prepaid, overnight courier or by telephone facsimile, pending the designation of another address, addressed as set forth below, and shall be deemed delivered (i) when actually delivered, if delivered personally or by facsimile, (ii) one (1) business day after being sent by courier or overnight delivery service, or (iii) five (5) business days after being sent by mail:

If to Seller:            Carlisle Engineered Products
                         13925 Ballantyne Corporate Place, Suite 400
                         Charlotte, NC  28277
                         Attn:  Kevin Forster
                         Fax No. (704) 501-1190

With a copy to:          Carlisle Companies Incorporated
                         250 S. Clinton Street, Suite 201
                         Syracuse, NY 13202-1258
                         Attn:  Michael L. Roberson, Esq.
                         Fax No. (315) 474-2008

If to Purchaser:         Delphi Corporation
                         1401 Crooks Road

9

Troy, MI 48084
Mail Code 480-009-160
Attn: Brett Lendzion,
Chemical Commodity Manager
Fax No. (248) 655-8350

With a copy to:                  Delphi Corporation
                                 5725 Delphi Drive
                                 Troy, MI 48098-2815
                                 Attn: Karen Craft
                                 Delphi Legal Staff
                                 Fax No. (248) 813-3445

11.3   Entire Agreement and Counterparts. This Agreement and the attached Schedules, evidence the entire agreement among the Purchaser and Seller relating to the purchase and sale of the Assets and supersede in all respects any and all prior oral or written agreements or understandings with respect to the purchase of the Assets. Unless a provision expressly provides otherwise, this Agreement will not supersede or change any of the provisions or obligations or agreements under the Supply Agreements (and the Term), all of which remain in full force and effect. This Agreement shall be amended or modified only by written instrument signed by the Purchaser and Seller. This Agreement may be executed in counterparts.

11.4   Headings. Section and article headings used in this Agreement have no legal significance and are used solely for convenience of reference.

11.5   Expenses. Each party shall pay for its own legal, accounting and other similar expenses incurred in connection with the transactions contemplated by this Agreement, whether or not such transactions are consummated.

11.6   Taxes. Any sales, use or excise taxes payable in connection with these transactions shall be paid by the party directly responsible in accordance with current municipal, county, state and federal tax laws. Each party agrees to execute all of the documents and to take such other action or corporate proceedings as the other party provides and reasonably requests and as may be necessary or desirable to structure the transaction which is the subject of this Agreement as an "exempt occasional sale" under applicable tax law, to obtain the relevant tax exemption certificates and to provide copies of such certificates to the other parties hereto.

11.7.   Disclosure. Except as provided in this Agreement, neither the Purchaser nor Seller shall disclose this Agreement or the transactions contemplated hereby except to the extent required by law.

11.8   Further Assurances. From and after the Closing Date, at either party's request and without further consideration, the other party will execute and deliver such other instruments and take such other action as the requesting party may reasonably request to more effectively carry out the terms of this Agreement.

10

11.9    <u>Severability</u>. Each and every provision of this Agreement shall be deemed valid, legal and enforceable in all jurisdictions to the fullest extent possible. Any provision of this Agreement that is determined to be invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be adjusted and reformed rather than voided, if possible, in order to achieve the intent of the parties. Any provision of this Agreement that is determined to be invalid, illegal or unenforceable in any jurisdiction which cannot be adjusted and reformed shall for the purposes of that jurisdiction, be voided. Any adjustment, reformation or voidance of any provision of this Agreement shall only be effective in the jurisdiction requiring such adjustment or voidance, without affecting in any way the remaining provisions of this Agreement in such jurisdiction or adjusting, reforming, voiding or rendering that provision or any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction.

11.10    <u>Jurisdiction</u>.  Any suit, claim, action or proceeding arising out of or relating to this Agreement or any ancillary document hereto may be brought only in a federal or state court located in the United States.

11.11    <u>Remedies</u>.  All remedies provided herein, including, without limitation, the right of set off and Right of Access, are cumulative, and in addition to all other rights and remedies available at law, equity and by agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth in the first paragraph.

CARLISLE ENGINEERED PRODUCTS, INC.        DELPHI CORPORATION

By: *Kevin G. Forster*                      By: *Brett A. Lendzion*
Name  KEVIN G. FORSTER                     Name  BRETT A. LENDZION
Title  V.P. CORPORATE DEVELOPMENT          Title  PURCHASING  MGR.

## LIST OF SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Equipment |
| Schedule 1.1(b) | Auxiliary Equipment |
| Schedule 1.2 | Part Numbers |
| Schedule 1.4 | Shipping Schedule for Assets |
| Schedule 1.7 | Past Model Tooling and Molds |
| Schedule 6.1 | Employee Retention and Staffing Plan |

G:\Legal\sford\FORMS\CEP\Delphi Corp\Purchase_AgreementRev3.DOC

B# 9/21/05    KBF 9/21/05

## SCHEDULE 1.1(a)
## EQUIPMENT

| DoveBid ID # | Carlisle Press No. | Manufacturer | Tonnage | Year | Price/ Amount Due | Press Availability Date | Paid Date |
|---|---|---|---|---|---|---|---|
| **HVAC** | | | | | | | |
| 11 | 44 | Nissei | 280 | 1998 | $0 | 9/9/2005 | 9/2/2005 |
| 32 | 68 | Cincinnati | 300 | 1995 | $32,500 | 9/25/2005 | |
| 8 | 73 | Nissei | 280 | 1997 | $1,800 | 9/9/2005 | 9/2/2005 |
| 7 | 74 | Nissei | 280 | 1997 | $45,000 | 10/12/2005 | |
| 41 | 79 | Nissei | 280 | 1997 | $45,000 | 11/15/2005 | |
| 40 | 80 | Nissei | 280 | 1997 | $45,000 | 11/8/2005 | |
| 39 | 81 | Nissei | 280 | 1997 | $45,000 | 10/4/2005 | |
| 38 | 82 | Nissei | 197 | 1998 | $35,000 | 10/4/2005 | |
| 37 | 85 | Nissei | 197 | 1998 | $35,000 | 10/15/2005 | |
| 1 | 102 | Nissei | 150 | 1998 | $25,000 | 10/7/2005 | |
| **TOTAL HVAC** | | | | | **$309,300** | | |

| DoveBid ID # | Carlisle Press No. | Manufacturer | Tonnage | Year | Agreed Price | Press Availability Date | Paid Date |
|---|---|---|---|---|---|---|---|
| **PTC** | | | | | | | |
| 16 | 69 | Nissei | 618 | 1997 | $125,000 | 10/18/2005 | |
| 28 | 83 | Nissei | 530 | 1998 | $65,000 | 10/18/2005 | |
| 29 | 84 | Nissei | 530 | 1998 | $65,000 | 11/3/2005 | |
| 44 | 45 | Nissei | 280 | 1998 | $47,500 | 10/18/2005 | |
| 9 | 104 | Nissei | 110 | 1998 | $20,000 | 11/3/2005 | |
| | Drain Plug Assembly for #104 | | | | $1,250 | 10/18/2005 | |
| 23 | 66 | Van Dorn | 150 | 1979 | $8,250 | 10/18/2005 | |
| **TOTAL PTC** | | | | | **$332,000** | | |
| **SUB-TOTAL PRESSES** | | | | | **$641,300** | | |

| DoveBid ID # | Carlisle Press No. | Manufacturer | Tonnage | Year | Agreed Price | CIPG Availability Date | Paid Date |
|---|---|---|---|---|---|---|---|
| **CIPG** | | | | | | | |
| Line 1 | Gen 1 | | | CIPG | $355,000 | 10/3/2005 | |

**TOTAL    $996,300**

## SCHEDULE 1.1(b)
## AUXILIARY EQUIPMENT

| DoveBid Item Number | Description | CEP Asset #'s | Quantity | Value Each | Total |
|---|---|---|---|---|---|
| **HVAC ITEMS** | | | | | |
| 46 | AEC Model True-Temp Series 9 KW | 40, 9, 44, 45, 38, 26, 46, 48, 51, 29, 25, 28, 41, 42, 7, 32, 10, 39, 12, 27, 43, 37, 31, 30 | 24 | $ 550 | $ 13,200 |
| 48 | DME Model MFP Series 6-Zone Hot Runner Control | 1, 2, 3, 4 | 4 | $ 850 | $ 3,400 |
| 49 | IMS 5-Zone Hot Runner Control | N/A | 2 | $ 1,125 | $ 2,250 |
| 56 | Thoreson McCosh Model D100T Dehumidifying Dryers with hoppers | 28, 24, 23, 11, 25, 22, 32, 31, 29, N/A | 10 | $ 2,000 | $ 20,000 |
| 59 | Advantage Model TS-925-41AD Water Temperature Control Units | 1, 35, 36, 49, 24, 6, 18, 23, 13, 4, 17, 47 | 12 | $ 288 | $ 3,450 |
| 66 | Rapid Model 1412K 14"x12" Plastics Granulator | 24 | 1 | $ 1,375 | $ 1,375 |
| 67 | Rapid Model 1418K 14"x18" Plastics Granulator | 25 | 1 | $ 2,750 | $ 2,750 |
| 76 | Conair Model SC-30 Carousel Dryer with hopper. | 10, N/A | 2 | $ 1,250 | $ 2,500 |
| **PTC ITEMS** | | | | | |
| 51 | Gordinier Electronics 12-Zone Hot Runner Controller | 8, 10, N/A | 3 | $ 1,125 | $ 3,375 |
| 53 | Thermal Care Model Aqua Therm RA Series 9W Temperature Control Unit | 62, 58, 73, 61, 88, 69, 63, 55, 60, 59, 71, 75 | 12 | $ 700 | $ 8,400 |
| 54 | GammaFlux Model 932 5-Zone Hot Runner Control 15Amp | 17, 20, N/A | 3 | $ 875 | $ 2,625 |
| 55 | GammaFlux Model 932 5-Zone Hot Runner Control 30Amp | 22 | 1 | $ 1,125 | $ 1,125 |

TOTAL          $ 64,450

## SCHEDULE 1.2
## PART NUMBERS

**HVAC Mold Transfer Agreement**
**Current Parts**

| MOLD SET | Part Number | Target Ship Date | Inventory Required | Notes |
|---|---|---|---|---|
| 1 | 52493323 | | 44,500 | Tool Shipped 9/8 |
| | 52458587 - Brazil | | 10,728 | Tool Shipped 9/8 |
| | 52495523 | 9/6/05 | 52,000 | Duplicate Tool - Shipped 9/8 |
| | 52495525 | | 83,384 | Additional parts being run to complete required inventory |
| | 52478198 | | 43,350 | Tool Shipped 9/8 |
| 3 | 52491905 | 9/12/2005 (TBD) | 61,878 | |
| | 52491906 (sub 52491907 / 08 / 09) | | 61,878 | |
| 4 | 52493315 | 9/20/2005 (TBD) | 34,630 | |
| | 52493313 | | 34,630 | |
| | 52493316 | | 34,630 | |
| | 52494670 | | 103,000 | |
| 5 | 52494441 | 10/2/2005 (TBD) | 158,000 | |
| | 52494906 | | 42 | Tool Shipped |
| | 52494261 | | 54,700 | |
| 6 | 52469155 | 10/5/2005 (TBD) | 7,312 | |
| | 52493317 | | 34,630 | |
| | 52472798 - Brazil | | 8,624 | |
| | 52494942 | | 56,838 | |
| | 52494952 | | 12,150 | |
| | 52458588 - Brazil | | 10,234 | |
| 7 A | 52495646 | 10/10/2005 (TBD) | 302,010 | |
| | 52494262 | | 110,000 | |
| | 52493162 (Sub 52493158 / 3159) | | 52,495 | |
| | 52493312 | | 91,807 | |
| 7 B | 52495904 (Sub 05 / 06) | 10/10/2005 (TBD) | 115,157 | |
| 8 | 52495524 See Note | 11/31/05 (TBD) | 52,000 | New tool in Fabrication T1 Korea 9/22. In Mexico 11/1 |

• Special Note - 52495524 - Carlisle will supply 100% of the volume until new tool is qualified

| AIM HVAC Transfer | | | |
|---|---|---|---|
| * | 52495520 | 10/15/05 | 51 | New Tool at AIM - T1 - 9/13, PPAP 10/1 |
| ** | 52495883 | 10/31/05 | 22,000 | Transition to AIM - Date ? |

* Being replaced by new tool at AIM 10/1/05

| Vandalia HVAC Transfer | | | |
|---|---|---|---|
| 52410840 | 10/31/05 | 12,700 | Transition to Vandalia - Expected start up 10/31 |
| 52493322 | 10/31/05 | 12,700 | Transition to Vandalia - Expected start up 10/31 |

12 week banks not required for these parts

**HVAC Mold Transfer Agreement**
**Current Parts**

## HVAC Service Parts

| MOLD SET | Part Number | Target Ship Date | Inventory Required | Notes |
|---|---|---|---|---|
| | Valves, Levers, Cams | | | |
| | D41943Q | 10/15/2005 | 0 | |
| | 52463099-U | 10/15/2005 | 0 | |
| | 52450233 (3091191) | 10/15/2005 | 0 | |
| | 52450223 (3091191/92) | 10/15/2005 | 0 | |
| | 3093026-U | 10/15/2005 | 0 | |
| | 4507341001 | 10/15/2005 | 0 | |
| | 52495812 | 10/15/2005 | 0 | |
| | 52494911 | 10/15/2005 | 0 | |
| | 52494910 | 10/15/2005 | 0 | |
| | 52494908 | 10/15/2005 | 0 | |
| | 52494907 | 10/15/2005 | 0 | |
| | 52494905 | 10/15/2005 | 0 | |
| | 52494493 | 10/15/2005 | 0 | |
| | 52494491 | 10/15/2005 | 0 | |
| | 52494107 | 10/15/2005 | 0 | |
| | 52493119 | 10/15/2005 | 0 | |
| | 52493118 | 10/15/2005 | 0 | |
| | 52492928 | 10/15/2005 | 0 | |
| | 52491723 | 10/15/2005 | 0 | |
| | 52489412 | 10/15/2005 | 0 | |
| | 52487574 | 10/15/2005 | 0 | |
| | 52487551 | 10/15/2005 | 0 | |
| | 52486942 | 10/15/2005 | 0 | |
| | 52484819 | 10/15/2005 | 0 | |
| | 52482269 | 10/15/2005 | 0 | |
| | 52481850 | 10/15/2005 | 0 | |
| | 52481609 | 10/15/2005 | 0 | |
| | 52481266 | 10/15/2005 | 0 | |
| | 52481016 | 10/15/2005 | 0 | |
| | 52480452 | 10/15/2005 | 0 | |
| | 52480425 | 10/15/2005 | 0 | |
| | 52479754 | 10/15/2005 | 0 | |
| | 52478874 | 10/15/2005 | 0 | |
| | 52478032 | 10/15/2005 | 0 | |

RDF 9/21/05 Page 1 of 11 - HVAC Service Parts

## HVAC Service Parts

| MOLD SET | Part Number | Target Ship Date | Inventory Required | Notes |
|---|---|---|---|---|
| | 52478030 | 10/15/2005 | 0 | |
| | 52477723 | 10/15/2005 | 0 | |
| | 52477374 | 10/15/2005 | 0 | |
| | 52477373 | 10/15/2005 | 0 | |
| | 52477273 | 10/15/2005 | 0 | |
| | 52477270 | 10/15/2005 | 0 | |
| | 52476547 | 10/15/2005 | 0 | |
| | 52475980 | 10/15/2005 | 0 | |
| | 52475908 | 10/15/2005 | 0 | |
| | 52474919 | 10/15/2005 | 0 | |
| | 52474918 | 10/15/2005 | 0 | |
| | 52473890 | 10/15/2005 | 0 | |
| | 52473684 | 10/15/2005 | 0 | |
| | 52473455 | 10/15/2005 | 0 | |
| | 52473186 | 10/15/2005 | 0 | |
| | 52472753 | 10/15/2005 | 0 | |
| | 52471655 | 10/15/2005 | 0 | |
| | 52471654 | 10/15/2005 | 0 | |
| | 52471651 | 10/15/2005 | 0 | |
| | 52471650 | 10/15/2005 | 0 | |
| | 52471440 | 10/15/2005 | 0 | |
| | 52470788 | 10/15/2005 | 0 | |
| | 52470786 | 10/15/2005 | 0 | |
| | 52470783 | 10/15/2005 | 0 | |
| | 52470781 | 10/15/2005 | 0 | |
| | 52470777 | 10/15/2005 | 0 | |
| | 52470636 | 10/15/2005 | 0 | |
| | 52470602 | 10/15/2005 | 0 | |
| | 52470601 | 10/15/2005 | 0 | |
| | 52470399 | 10/15/2005 | 0 | |
| | 52470203 | 10/15/2005 | 0 | |
| | **52470202** | 10/15/2005 | 0 | |
| | 52469902 | 10/15/2005 | 0 | |
| | 52469885 | 10/15/2005 | 0 | |
| | 52469884 | 10/15/2005 | 0 | |
| | 52469752 | 10/15/2005 | 0 | |
| | 52469710 | 10/15/2005 | 0 | |
| | 52469702 | 10/15/2005 | 0 | |
| | 52469701 | 10/15/2005 | 0 | |

KBJ 9/21/05    BJ 9/21/05    Page 2 of 11 - HVAC Service Parts

## HVAC Service Parts

| MOLD SET | Part Number | Target Ship Date | Inventory Required | Notes |
|---|---|---|---|---|
| | 52469699 | 10/15/2005 | 0 | |
| | 52469557 | 10/15/2005 | 0 | |
| | 52469324 | 10/15/2005 | 0 | |
| | 52469239 | 10/15/2005 | 0 | |
| | 52469155 | 10/15/2005 | 0 | |
| | 52468407 | 10/15/2005 | 0 | |
| | 52468102 | 10/15/2005 | 0 | |
| | 52468100 | 10/15/2005 | 0 | |
| | 52468099 | 10/15/2005 | 0 | |
| | 52467853 | 10/15/2005 | 0 | |
| | 52467121 | 10/15/2005 | 0 | |
| | 52466282 | 10/15/2005 | 0 | |
| | 52465908 | 10/15/2005 | 0 | |
| | 52465907 | 10/15/2005 | 0 | |
| | 52464026 | 10/15/2005 | 0 | |
| | 52464004 | 10/15/2005 | 0 | |
| | 52463892 | 10/15/2005 | 0 | |
| | 52463888 | 10/15/2005 | 0 | |
| | 52461637 | 10/15/2005 | 0 | |
| | 52461468 | 10/15/2005 | 23 | Will need to be evaluated by CEP |
| | 52460466 | 10/15/2005 | 0 | |
| | 52460461 | 10/15/2005 | 0 | |
| | 52460458 | 10/15/2005 | 0 | |
| | 52459910 | 10/15/2005 | 0 | |
| | 52458725 | 10/15/2005 | 0 | |
| | 52458714 | 10/15/2005 | 0 | |
| | 52458709 | 10/15/2005 | 0 | |
| | 52458588 | 10/15/2005 | 0 | |
| | 52458556 | 10/15/2005 | 0 | |
| | 52458503 | 10/15/2005 | 0 | |
| | 52458309 | 10/15/2005 | 0 | |
| | 52458292 | 10/15/2005 | 0 | |
| | 52457824 | 10/15/2005 | 0 | |
| | 52457539 | 10/15/2005 | 0 | |
| | 52456558 | 10/15/2005 | 0 | |
| | 52456373 | 10/15/2005 | 0 | |
| | 52456372 | 10/15/2005 | 0 | |
| | 52456371 | 10/15/2005 | 0 | |
| | 52456283 | 10/15/2005 | 0 | |

RDF 9/24/05

BAB 9/2/05

Page 3 of 11 - HVAC Service Parts

# HVAC Service Parts

| MOLD SET | Part Number | Target Ship Date | Inventory Required | Notes |
|---|---|---|---|---|
| | 52456149 | 10/15/2005 | 0 | |
| | 52456147 | 10/15/2005 | 0 | |
| | 52456146 | 10/15/2005 | 0 | |
| | 52455932 | 10/15/2005 | 0 | |
| | 52455840 | 10/15/2005 | 0 | |
| | 52455567 | 10/15/2005 | 0 | |
| | 52455525 | 10/15/2005 | 0 | |
| | 52455513 | 10/15/2005 | 0 | |
| | 52453778 | 10/15/2005 | 0 | |
| | 52453777 | 10/15/2005 | 0 | |
| | 52453660 | 10/15/2005 | 0 | |
| | 52453659 | 10/15/2005 | 0 | |
| | 52452807 | 10/15/2005 | 0 | |
| | 52452753 | 10/15/2005 | 0 | |
| | 52452748 | 10/15/2005 | 0 | |
| | 52452613 | 10/15/2005 | 0 | |
| | 52452047 | 10/15/2005 | 0 | |
| | 52451325 | 10/15/2005 | 0 | |
| | 52450976 | 10/15/2005 | 0 | |
| | 52450974 | 10/15/2005 | 0 | |
| | 52450972 | 10/15/2005 | 0 | |
| | 52411128 | 10/15/2005 | 0 | |
| | 5247337 | 10/15/2005 | 0 | |
| | 3099292 | 10/15/2005 | 0 | |
| | 3095072 | 10/15/2005 | 0 | |
| | 3095071 | 10/15/2005 | 0 | |
| | 3095070 | 10/15/2005 | 0 | |
| | 3095001 | 10/15/2005 | 0 | |
| | 3094912 | 10/15/2005 | 0 | |
| | 3094526 | 10/15/2005 | 0 | |
| | 3093274 | 10/15/2005 | 0 | |
| | 3093143 | 10/15/2005 | 0 | |
| | 3092978 | 10/15/2005 | 0 | |
| | 3092852 | 10/15/2005 | 0 | |
| | 3091171 | 10/15/2005 | 0 | |
| | 3091133 | 10/15/2005 | 0 | |
| | 3091077 | 10/15/2005 | 0 | |
| | 3091068 | 10/15/2005 | 0 | |
| | 3091056 | 10/15/2005 | 0 | |

## HVAC Service Parts

| MOLD SET | Part Number | Target Ship Date | Inventory Required | Notes |
|---|---|---|---|---|
| | 3091032 | 10/15/2005 | 0 | |
| | 3090987 | 10/15/2005 | 0 | |
| | 3090862 | 10/15/2005 | 0 | |
| | 3090861 | 10/15/2005 | 0 | |
| | 3090496 | 10/15/2005 | 0 | |
| | 3090495 | 10/15/2005 | 0 | |
| | 3090399 | 10/15/2005 | 0 | |
| | 3090372 | 10/15/2005 | 0 | |
| | 3090357 | 10/15/2005 | 0 | |
| | 3090355 | 10/15/2005 | 0 | |
| | 3059942 | 10/15/2005 | 0 | |
| | 3059931 | 10/15/2005 | 0 | |
| | 3059842 | 10/15/2005 | 0 | |
| | 3059282 | 10/15/2005 | 0 | |
| | 3059100 | 10/15/2005 | 0 | |
| | 3058621 | 10/15/2005 | 0 | |
| | 3058619 | 10/15/2005 | 0 | |
| | 3058143 | 10/15/2005 | 0 | |
| | 3056976 | 10/15/2005 | 0 | |
| | 3056736 | 10/15/2005 | 0 | |
| | 3056734 | 10/15/2005 | 0 | |
| | 3056291 | 10/15/2005 | 0 | |
| | 3055840 | 10/15/2005 | 0 | |
| | 3053902 | 10/15/2005 | 0 | |
| | 3053849 | 10/15/2005 | 0 | |
| | 3053341 | 10/15/2005 | 0 | |
| | 3045209 | 10/15/2005 | 0 | |
| | 3044159 | 10/15/2005 | 0 | |
| | 3043846 | 10/15/2005 | 0 | |
| | 3043845 | 10/15/2005 | 0 | |
| | 3042871 | 10/15/2005 | 0 | |
| | 3041939 | 10/15/2005 | 0 | |
| | 3040671 | 10/15/2005 | 0 | |
| | 3037721 | 10/15/2005 | 0 | |
| | 3037629 | 10/15/2005 | 0 | |
| | 3037565 | 10/15/2005 | 0 | |
| | 3037476 | 10/15/2005 | 0 | |
| | 3037253 | 10/15/2005 | 0 | |
| | 3037001 | 10/15/2005 | 0 | |

KDF 9/21/05

## HVAC Service Parts

| MOLD SET | Part Number | Target Ship Date | Inventory Required | Notes |
|---|---|---|---|---|
| | 3036888 | 10/15/2005 | 0 | |
| | 3036854 | 10/15/2005 | 0 | |
| | 3035325 | 10/15/2005 | 0 | |
| | 3034848 | 10/15/2005 | 0 | |
| | 3031579 | 10/15/2005 | 0 | |
| | 3021758 | 10/15/2005 | 0 | |

## HVAC Service Parts

| MOLD SET | Part Number | Target Ship Date | Inventory Required | Notes |
|---|---|---|---|---|
| | 3053982 | 10/15/2005 | 0 | |
| | 3053801 | 10/15/2005 | 0 | |
| | 3053201 | 10/15/2005 | 0 | |
| | 3053200 | 10/15/2005 | 0 | |
| | 3052458 | 10/15/2005 | 0 | |
| | 3052455 | 10/15/2005 | 0 | |
| | 3052131 | 10/15/2005 | 0 | |
| | 3050100 | 10/15/2005 | 0 | |
| | 3048905 | 10/15/2005 | 0 | |
| | 3048476 | 10/15/2005 | 0 | |
| | 3048181 | 10/15/2005 | 0 | |
| | 3047021 | 10/15/2005 | 0 | |
| | 3042500 | 10/15/2005 | 0 | |
| | 3042499 | 10/15/2005 | 0 | |
| | 3041153 | 10/15/2005 | 0 | |
| | 3037568 | 10/15/2005 | 0 | |
| | 3037541 | 10/15/2005 | 0 | |
| | 3037238 | 10/15/2005 | 3 | Will need to be evaluated by CEP |
| | 3035395 | 10/15/2005 | 0 | |
| | 3035252 | 10/15/2005 | 0 | |
| | 3034956 | 10/15/2005 | 0 | |
| | 3034697 | 10/15/2005 | 0 | |
| | 3034696 | 10/15/2005 | 0 | |

## HVAC Service Parts

| MOLD SET | Part Number | Target Ship Date | Inventory Required | Notes |
|---|---|---|---|---|
| **PTC Parts** | | | | |
| | 52406183 | 11/15/2005 | 13,000 | |
| | 52406186 | 11/15/2005 | 13,000 | |
| | 52494732 | 9/26/2005 | 5 days | |
| | 52494722 | 9/26/2005 | TBD | |
| | 52494723 | 9/26/2005 | TBD | |
| | 52402252 | 9/26/2005 | TBD | |
| | 52402253 | 9/26/2005 | 5 days | |
| | 52400302 | 9/26/2005 | TBD | |
| | 52495619 | 11/15/2005 | 5 days | |
| | 52495484 | 11/15/2005 | 5 days | |
| | 52495485 | 11/15/2005 | TBD | |
| | 52487507 | 11/15/2005 | TBD | |
| | 52487508 | 11/15/2005 | 5 days | |
| | 52494545 | 11/15/2005 | TBD | |
| | 52406473 | 9/26/2005 | 5 days | |
| | 52491755 | 9/26/2005 | TBD | |
| | 52491759 | 9/26/2005 | TBD | |
| | 52491753 | 9/26/2005 | 5 days | |
| | 52484907 | 11/15/2005 | 5 days | |
| | 52485517 | 11/15/2005 | 5 days | |
| | 52407424 | 11/15/2005 | 5 days | |
| | 52484906 | 11/15/2005 | 5 days | |
| | 52408816 | 10/3/2005 | 5 days | |
| | 52408818 | 10/3/2005 | 5 days | |
| | 52408820 | 10/3/2005 | 5 days | |
| | 52408826 | 10/3/2005 | 5 days | |
| | 52408828 | 10/3/2005 | 5 days | |
| | 52408830 | 10/3/2005 | 5 days | |
| | 52408832 | 10/3/2005 | 5 days | |
| | 52408834 | 10/3/2005 | 5 days | |
| | 52408824 | 10/3/2005 | 5 days | |

KBF 9/26/05

## HVAC Service Parts

| MOLD SET | Part Number | Target Ship Date | Inventory Required | Notes |
|---|---|---|---|---|
| **PTC Service Parts** | | | | |
| | 52400445 | 11/1/2005 | TBD | |
| | 52484915 | 11/1/2005 | TBD | |
| | 52473061 | 11/1/2005 | TBD | |
| | 52458380 | 11/1/2005 | TBD | |
| | 52489160 | 11/1/2005 | TBD | |
| | 52489358 | 11/1/2005 | TBD | |
| | 52485662 | 11/1/2005 | TBD | |
| | 52485658 | 11/1/2005 | TBD | |
| | 52485665 | 11/1/2005 | TBD | |
| | 52487540 | 11/1/2005 | TBD | |
| | 52487536 | 11/1/2005 | TBD | |
| | 52486578 | 11/1/2005 | TBD | |
| | 52407319 | 11/1/2005 | TBD | |
| | 52407317 | 11/1/2005 | TBD | |
| | 52481339 | 11/1/2005 | TBD | |
| | 52484896 | 11/1/2005 | TBD | |
| | 52487622 | 11/1/2005 | TBD | |
| | 52461482 | 11/1/2005 | TBD | |
| | 3091193 | 11/1/2005 | TBD | |
| | 3091194 | 11/1/2005 | TBD | |
| | 3094649 | 11/1/2005 | TBD | |
| | 3094650 | 11/1/2005 | TBD | |
| | 3094651 | 11/1/2005 | TBD | |
| | 3094652 | 11/1/2005 | TBD | |
| | 3094653 | 11/1/2005 | TBD | |
| | 3094655 | 11/1/2005 | TBD | |
| | 52457708 | 11/1/2005 | TBD | |
| | 52458226 | 11/1/2005 | TBD | |
| | 52458227 | 11/1/2005 | TBD | |
| | 52458378 | 11/1/2005 | TBD | |
| | 52458379 | 11/1/2005 | TBD | |
| | 52458381 | 11/1/2005 | TBD | |
| | 52461480 | 11/1/2005 | TBD | |
| | 52461483 | 11/1/2005 | TBD | |

KBJ 9/2/05    KBJ 9/2/05    Page 10 of 11 - HVAC Service Parts

## HVAC Service Parts

| MOLD SET | Part Number | Target Ship Date | Inventory Required | Notes |
|---|---|---|---|---|
| | 52461486 | 11/1/2005 | TBD | |
| | 52461487 | 11/1/2005 | TBD | |
| | 52461488 | 11/1/2005 | TBD | |
| | 52461489 | 11/1/2005 | TBD | |
| | 52461956 | 11/1/2005 | TBD | |
| | 52461957 | 11/1/2005 | TBD | |
| | 52467103 | 11/1/2005 | TBD | |
| | 52467104 | 11/1/2005 | TBD | |
| | 52467254 | 11/1/2005 | TBD | |
| | 52467255 | 11/1/2005 | TBD | |
| | 52467256 | 11/1/2005 | TBD | |
| | 52467257 | 11/1/2005 | TBD | |
| | 52467987 | 11/1/2005 | TBD | |
| | 52467989 | 11/1/2005 | TBD | |
| | 52470985 | 11/1/2005 | TBD | |
| | 52480324 | 11/1/2005 | TBD | |
| | 52480338 | 11/1/2005 | TBD | |
| | 52481342 | 11/1/2005 | TBD | |
| | 52485597 | 11/1/2005 | TBD | |
| | 52485757 | 11/1/2005 | TBD | |
| | 52486574 | 11/1/2005 | TBD | |
| | 52487060 | 11/1/2005 | TBD | |
| | 52487202 | 11/1/2005 | TBD | |

KDJ 9/21/05    BJ 9/21/05

## SCHEDULE 1.4
## SHIPPING SCHEDULE FOR ASSETS

| | Carlisle Presses Ship Schedule | |
|---|---|---|
| Press # | Press Description | Press Ship Date |
| Carlisle Press #44 | Nissei 280 Ton | 9/9/2005 |
| Carlisle Press #73 | Nissei 280 Ton | 9/9/2005 |
| Carlisle Press #74 | Nissei 280 Ton | 10/12/2005 |
| Carlisle Press #79 | Nissei 280 Ton | 12/15/2005 |
| Carlisle Press #68 | Cincinnati 300 Ton | 9/25/2005 |
| Carlisle Press #80 | Nissei 280 Ton | 11/8/2005 |
| Carlisle Press #102 | Nissei 150 Ton Roty | 10/7/2005 |
| Carlisle Press #81 | Nissei 280 Ton | 10/4/2005 |
| Carlisle Press #85 | Nissei 197 Ton | 10/15/2005 |
| Carlisle Press #82 | Nissei 197 Ton | 10/4/2005 |
| Carlisle Press #69 | Nissei 618 Ton | 10/18/2005 |
| Carlisle Press #83 | Nissei 530 Ton | 10/18/2005 |
| Carlisle Press #84 | Nissei 530 Ton | 11/3/2005 |
| Carlisle Press #45 | Nissei 280 Ton | 10/18/2005 |
| Carlisle Press #104 | Nissei 110 Ton | 11/3/2005 |
| Carlisle Press #66 | Van Dom 150 Ton | 10/18/2005 |
| Drain Plug Assembly Machine | N/A | 10/18/2005 |
| CIPG Line | N/A | 10/3/2005 |

The availability of the presses is a direct function of the ship schedules for the tools, and will be adjusted accordingly on an ongoing basis with agreement between Carlisle and Delphi.

## SCHEDULE 1.7
## PAST MODEL TOOLING AND MOLDS

| Mold | | Customer Part Number | Customer | Notes |
|---|---|---|---|---|
| 1 | 004-500 | 52464004 | Harrison | 2 tools |
| 2 | 004-600 | 52464004 | Harrison | |
| 5 | 052-500 | 3054052 | Harrison | |
| 6 | 052-600 | 3054052 | Harrison | |
| 8 | 073-500 | 52450973 | Harrison | 2 tools |
| 9 | 073-600 | 52450973 | Harrison | |
| 11 | 075-500 | 52450975 | Harrison | |
| 12 | 075-600 | 52450975 | Harrison | |
| 13 | 077-500 | 52450977 | Harrison | |
| 15 | 107-500 | 25164107 | Delphi | |
| 19 | 143-600 | 3093143 | Harrison | 2 tools |
| 20 | 144-500 | 52471440 | Harrison | |
| 21 | 172-500 | 3091172 | Harrison | |
| 22 | 172-600 | 3091172 | Harrison | |
| 23 | 173-500 | 3091173 | Harrison | 3 tools |
| 25 | 271-200 | 12132271 | Packard | 2 tools |
| 26 | 272-200 | 12132272 | Packard | |
| 29 | 398-500 | 52470398 | Harrison | |
| 31 | 699-500 | 52469699 | Harrison | 3 tools |
| 32 | 699-600 | 52469699 | Harrison | |
| 33 | 701-500 | 52469701 | Harrison | 2 tools |
| 34 | 702-500 | 52469702 | Harrison | 2 tools |
| 35 | 710-500 | 52469710 | Harrison | |
| 37 | 803-500 | 12176803 | Packard | |
| 44 | 897-500 | 52469897 | Harrison | |
| 47 | 1933 ? | 3091193 ? | Harrison | |
| 50 | 860-500 | 25312860 | Delphi e | |
| 51 | 089-500 | 25315489 | Delphi e | |
| 52 | 714-500 | 52458714 | Harrison | |
| 53 | 714-600 | 52458714 | Harrison | |

## SCHEDULE 6.1
## EMPLOYEE RETENTION AND STAFFING PLAN

The Retention and Staffing Plan for Carlisle Engineered Products, Inc. ("CEP") Lake City employees will be offered in exchange for a fully executed Separation Agreement and General Release. Severance payments will be made to each CEP employee at the earlier of their Notice of Termination, or the actual closing of the facility. In some cases positions, whether salaried or hourly, will be eliminated based on the needs of the operation. In other cases, depending on their specific duties and/or responsibilities, CEP employees will be expected to remain to support the Delphi Agreement until the facility is closed.

Salaried employees will be provided one (1) week per year of service. With regard to the hourly workforce, a $100,000 fund will be established which will be distributed on the basis of seniority.

The goal of the Retention and Staffing Plan is to reduce potential inefficiencies due to scrap, sabotage, absenteeism and workers compensation injuries or claims. Based on current union negotiations, and the general attitude of the Lake City facility, it is anticipated that the CEP employees, both salaried and hourly, will cooperate and generally accept the terms and conditions of the CEP Retention and Staffing Plan.