**Hearing Date And Time:  February 17, 2011 at 10:00 a.m.**
**Reply Deadline:  January 28, 2011**

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Judy B. Calton (P38733)
Seth A. Drucker (P65641)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
Telephone: (313) 465-7626
Facsimile: (313) 465-7627
Email: sdrucker@honigman.com

Attorneys for Defendant West
Michigan Spline, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
**In Re**                                       :        Chapter 11
**DELPHI CORPORATION,** et al.,                 :        Case No. 05-44481 (RDD)
                                                :
        Debtors.                                :        Hon. Robert D. Drain
------------------------------------------------------------x
DELPHI CORPORATION, et al.,                     :
                                                :
        Plaintiffs,                             :
Against                                         :
                                                :
WEST MICHIGAN SPLINE, INC.,                     :        Adv. Pro. No. 07-02600 (RDD)
                                                :
        Defendant.                              :
------------------------------------------------------------x

**WEST MICHIGAN SPLINE, INC.'S BRIEF IN**
**OPPOSITION TO REORGANIZED DEBTORS' MOTION**
**FOR LEAVE TO FILE AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION .................................................................................................................1

STATEMENT OF FACTS ....................................................................................................2

    A.    WMS's Relationship With Delphi ...............................................................2

    B.    The Two Spline Rolling Machines ...........................................................2

    C.    The Transfers Were in the Ordinary Course of Business ........................4

    D.    The Payments Were Also Consistent With The  Historical Pattern
        Between WMS and Delphi .......................................................................5

    E.    Delphi's Original Complaint.......................................................................5

    F.    The Dismissal Of The Original Complaint..............................................5

    G.    DAS's Motion For Leave To Amend .......................................................6

    H.    WMS Never Received Notice of  the Extension Motions and Orders ..................6

    I.    The December 2007 Disclosure Statement...............................................7

    J.    This Court's Statements That Proposed Defendants Which Did Not
        Receive  Notice Of The Extension Motions May Now Challenge Them De
        Novo......................................................................................................8

    K.    WMS Was Prejudiced By Lack of Notice ...............................................9

    L.    DAS Was Solvent During the Preference Period ..................................11

ARGUMENT........................................................................................................................11

    I.    DAS'S PROPOSED AMENDED COMPLAINT IS FUTILE.............................11

    II.    THE PAYMENTS WERE IN THE ORDINARY COURSE OF
        BUSINESS..............................................................................................12

    III.    THE PROPOSED AMENDED COMPLAINT IS FUTILE BECAUSE
        THE EXTENSION ORDERS WERE IMPROVIDENTLY ENTERED
        AND SHOULD BE VACATED, LEAVING DAS'S CLAIMS BARRED
        BY THE STATUTE OF LIMITATIONS................................................13

        A.    WMS Received No *Actual Notice* Of Delphi's Extension Motions..........14

B.    WMS Was Not On Inquiry Notice Of Delphi's Extension Motions .........16

C.    WMS Was Not Required To Do Anything Even If It Were On
Actual Notice ..........................................................................................18

IV.    OTHER DEFENDANTS' BRIEF ARE INCORPORATED ................................19

CONCLUSION.....................................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*City of New York v. New York, N.H. & H. R.R. Co.*,
  344 U.S. 293 (1953).................................................................................................17

*EBS Litigation LLC v. Barclays Global Investors, N.A.*,
  304 F.3d 302 (3rd Cir. 2002) ........................................................................... 16-17

*Fimbres v. United States*,
  833 F.2d 138 (9th Cir. 1987) ...................................................................................15

*Halpert v. Werthein & Co., Inc.*,
  81 F.R.D. 734 (S.D.N.Y. 1979) ...............................................................................12

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
  159 F.3d 723 (2d Cir. 1998)......................................................................................11

*In re E.S. Bankest, L.L.C.*,
  321 B.R. 590 (Bankr. S.D.Fla. 2005)........................................................................14

*In re JMP-Newcor International, Inc.*,
  225 B.R. 462 (Bankr. N.D. Il. 1998).........................................................................15

*In re North American Energy Conservation, Inc.*,
  339 B.R. 75 (Bankr. S.D.N.Y. 2006).........................................................................13

*In re Refco, Inc.*,
  505 F.3d 109 (2d Cir. 2007)......................................................................................15

*In re Southern Boulevard, Inc.*,
  207 B.R. 57 (S.D.N.Y. 1997).....................................................................................15

*In re Teligent, Inc.*,
  417 B.R. 197 (Bankr. S.D.N.Y. 2009) .....................................................................15

*McLaughlin v. Anderson*,
  962 F.2d 187 (2d Cir. 1992)......................................................................................12

*Murphy Brothers, Inc. v. Michetti Pipe Stringing, Inc.*
  526 U.S. 344 (1999)..................................................................................................18

*Newman v. Warnaco Group, Inc.*,
  335 F.3d 187 (2d Cir. 2003)......................................................................................16

*Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*,
  840 F. Supp. 243 (S.D.N.Y. 1993) .........................................................................16

*Ruffolo v. Oppenheimer & Co.*,
  987 F.2d 129 (2d Cir. 1993).......................................................................... 11-12

*Smith v. Pennsylvania Glass Sand Corp.*,
  123 F.R.D. 648 (N.D. Fla. 1988) .........................................................................15

*Staehr v. Hartford Fin. Servs. Group*,
  547 F.3d 406 (2d Cir. 2008)........................................................................... 16-17

*United Student Aid Funds, Inc. v. Espinosa*,
  __ U.S. __, 130 S. Ct. 1367 (2010).....................................................................14

*Vogel Van & Storage, Inc. v. Navistar Financial Corp.*,
  210 B.R. 27 (N.D.N.Y. 1997) ..............................................................................13

STATUTES

11 U.S.C. §547.......................................................................................................12

28 U.S.C. § 1446...................................................................................................19

OTHER AUTHORITIES

H.R.Rep. No. 95-595, *reprinted in* 1978 U.S.C.C.A.N. 5963 .......................................13

Fed. R. Civ. Proc. Rule 4(m) .............................................................................1, 13

## <u>INTRODUCTION</u>

This Court should deny the Reorganized Debtors' motion for leave to amend, which asks that the Court exercise its discretion to permit Delphi Automotive Systems, LLC ("DAS") to file an amended complaint against West Michigan Spline, Inc. ("WMS") to recover $614,915.10 in alleged transfers.

The proposed amended complaint is futile, and WMS will be severely prejudiced by DAS's undue delay if this case is permitted to proceed. As explained below:

A.    WMS was not served with, and had no notice – actual or otherwise – of the Reorganized Debtors' motions to extend the time to serve the preference actions (the "Extension Motions") or the orders that granted them (the "Extension Orders"). *See* Delphi Omnibus Response to the "First Wave" dismissal motions (i.e. D. I. 49 in Adv. Pro. No. 07-02198), at 29, n. 8.

B.    Because WMS had no notice of the Extension Orders, it may now challenge them *de novo*. *See* July 22, 2010 Transcript at 103, 119 (If a defendant "didn't get notice, its wide open" and "they should be able to argue to me as if the motions were being made right now").

C.    Delphi was not entitled to obtain the Extension Orders, including the April 30, 2008 Extension Order, because Rule 4(m) may be used only to facilitate service (and not to authorize a delay in service), and it was not proper for Delphi to use Rule 4(m) to avoid prosecuting preference actions for more than two years while it preserved its business relationships with unsuspecting defendants and used its resources in other areas it deemed more important.

D.    Any preference action is time-barred without the Extension Orders.

E.    DAS's claims are futile because the transfers to WMS are protected by the ordinary course of business safe harbor from avoidance.

F.    DAS's proposed amended complaint fails to comply with this Court's September 7, 2010 Dismissal Order because it insufficiently alleges insolvency and its claims are also futile because it was solvent at the time it made the allegedly preferential transfers. DAS had a net worth of over $2.6 billion as confirmed by its bankruptcy schedules, and it cannot establish the essential insolvency element.

G.    WMS has suffered great prejudice because of Delphi's more than two year delay in serving this action, during which time it entered into new business with Delphi without knowledge of the lawsuit.

Therefore, this Court should exercise its discretion to deny the motion and spare WMS the further expense of opposing claims that are unlikely to ever succeed.

WMS is incorporating the briefs of other defendants and will not repeat here all of their arguments nor attach all of their exhibits here.

## STATEMENT OF FACTS

### A.    WMS's Relationship With Delphi

WMS is a family owned business located in Holland, Michigan.  WMS designs, manufactures, repairs and refurbishes spline rolling machines used in the automotive and other industries.  Spline rolling machines are large pieces of industrial equipment, often costing hundreds of thousands of dollars to design, develop, and fabricate.  Manufacturing a spline rolling machine for a customer requires WMS to make a significant capital commitment to purchase the raw materials and components necessary to manufacture a spline rolling machine.

WMS's business relationship with Delphi Automotive Systems LLC ("**DAS**") and its various affiliates (collectively "**Delphi**") began in approximately 1988, when Delphi was still part of General Motors Corporation.  Over the past 22 years, WMS has manufactured, repaired, and refurbished multiple spline rolling machines for Delphi, and performed service on Delphi's existing spline rolling machines.  See Declaration of Gary Hill ("**Hill Declaration**") at ¶¶3-5, 78. The Hill Declaration is Exhibit 1 hereto.

### B.    The Two Spline Rolling Machines

The transfers at issue in the adversary proceedings were payments on two spline rolling machines manufactured for Delphi by WMS.  On October 12, 2004, Delphi issued purchase order number S2M81551 to WMS for the remanufacturing, re-tooling, and enhancement of an Anderson Cook Model 350-S Spline Rolling Machine.  The remanufactured spline rolling

machine was later assigned Asset Tag # 140082 ("**Spline Machine 1**").  Hill Declaration ¶9.  A copy of the purchase order for Spline Machine 1 is attached to the Hill Declaration as Exhibit A.

Also on October 12, 2004, Delphi issued purchase order number S2M81552 to WMS for the fabrication of a Model 48D Spline Rolling Machine, later assigned Asset Tag # 140080 ("**Spline Machine 2**").  The purchase orders are referred to individually as a "**Purchase Order**" and collectively as the "**Purchase Orders**".  Hill Declaration ¶2.  A copy of the purchase order for Spline Machine 2 is attached as Exhibit B to the Hill Declaration.

Each Purchase Order provided that payment of 90% of the purchase price for the applicable machine was due upon run-off of the machine at WMS's facility, to be paid on MNS-2, or second day, second month payment terms.  The final 10% of the purchase price of each machine was due after set-up and run-off of the machine at Delphi's facility, also on MNS-2 payment terms.  Hill Declaration ¶11.

"**Run-off**" is the process by which WMS demonstrates to Delphi that a machine performs to the specifications required by Delphi.  The 90% run-off occurs at WMS's facility and confirms for Delphi that the machine meets its specifications and is ready for shipment to its manufacturing facility.  The 10% run-off occurs after installation of the machine at Delphi's manufacturing facility to insure the machine still meets Delphi's specifications after shipping and reinstallation at Delphi's manufacturing facility.    Hill Declaration ¶12.

Delphi and WMS completed the run-off of Spline Machine 1 at WMS's facility on July 28, 2005.  WMS invoiced Delphi for 90% of the Purchase Order price - $254,185.20 – on August 31, 2005. Upon completion of the run-off, WMS shipped Spline Machine 1 to Delphi on September 9, 2005.  WMS received payment of the $254,185.20 via check dated October 3,

2005, from Delphi on October 6, 2005.  Hill Declaration ¶13. A copy of the invoice for 90%

payment on Spline Machine 1 is attached as Exhibit C to the Hill Declaration.

Delphi and WMS completed the run-off of Spline Machine 2 at WMS's facility on July 2,

2005.  Upon completion of the run-off, WMS shipped Spline Machine 2 to Delphi on July 14,

2005, and invoiced Delphi for 90% of the Purchase Order price - $360,729.90.  WMS received

payment of the $360,729.90 via check dated September 2, 2005, from Delphi, on September 6,

2005.  Hill Declaration ¶14. A copy of the invoice for 90% payment on Spline Machine 2 is

Exhibit D to the Hill Declaration.  Each payment is referred to individually as a "**Transfer**" and

collectively as the "**Transfers**".

## C.    The Transfers Were in the Ordinary Course of Business

There can be no dispute that the transfers to WMS were in the ordinary course of

business - which fact is supported by the three Delphi employees who handled the transaction

with WMS.  Gary Weiss and Mark Gendregske, the Delphi engineers responsible for the

Machines, so state in Exhibit F to the Hill Declaration:

> "[A]ll aspects of the equipment purchase [were] treated in the
> manner in which we [Delphi] treat all of our equipment suppliers.
> As to the specific payment terms, WMS was paid based on our
> standard contractual terms and conditions."

Mark Rovoll, the Delphi engineer responsible for approval and payment of the Machines states

the transactions were in the ordinary course of business of both Delphi and WMS, and according

to the industry terms, in the Declaration of Mark Rovoll, Exhibit G to the Hill Declaration,

> DAS' approval of the run-off of the Machines and the payment for
> the Machines was in the ordinary course of DAS' business and the
> business of machine suppliers to DAS.  There was nothing unusual
> or outside of the ordinary in the approval of the run-off or approval
> for payment for the Machines.
>
> Based on my experience in the automotive supply industry,
> WMS's supply of the Machines and DAS' approval of the run-off

4

of the Machines and payment for the Machines were according to ordinary business terms and standards in the automotive supply industry.

John Donnelly, an industry expert in the design, building and sale of machinery and tooling to automotive suppliers has also opined that Delphi's obligation to pay WMS was incurred in the ordinary course of business or financial affairs of both WMS and Delphi and that the $614,915.10 in payments were ordinary within the machine manufacturing and sales to automotive suppliers industry in 2005.  See Declaration of John Donnelly, Exhibit 2 hereto.

**D.      The Payments Were Also Consistent With The
          Historical Pattern Between WMS and Delphi**

WMS and Delphi over the years established an historical practice of payments between 35 and 60 days after WMS's invoices (the "**Historical Ordinary Course Range**").   Hill Declaration ¶32 and Exhibit H thereto.  On September 6, 2005, WMS issued invoice number 2-694 for the 90% payment due under the Purchase Order for Spline Machine 2.  Delphi paid invoice number 2-694 54 days after the invoice date, on the second day of the second month after the invoice date.  Each of the Transfers occurred within the Historical Ordinary Course Range between WMS and Delphi, and, therefore, Delphi may not avoid either of the Transfers as preferential.  Hill Declaration ¶¶33-35 and Exhibit I thereto.

**E.      Delphi's Original Complaint**

The Debtors' original Complaint to Avoid and Recover Transfers Pursuant to 11 U.S.C. §§ 547 and 550 (the "**Original Complaint**") was filed under seal on September 29, 2007, but not unsealed and served on WMS until December 2009.

**F.      The Dismissal Of The Original Complaint**

In response to the motion to dismiss by the other defendants in the preference actions, and a Second Wave motion to dismiss by WMS (WMS D.I. 26), the Court entered its September

5

7, 2010 Order Granting In Part First Wave Motions to Dismiss (WMS D.I. 30) (the "**Dismissal Order**").  The Dismissal Order dismissed the claims against WMS without prejudice because the Debtors had failed to plead sufficient facts to state a claim.  The Court then permitted the Reorganized Debtors to file a motion to seek leave to file an amended complaint, and expressly ordered that the proposed amended complaint shall "set forth, *at a minimum*, the transfers, the transferee, any known subsequent transferee against whom relief is sought, the antecedent debt and which Reorganized Debtor is the Plaintiff."  *Id.*

**G.     DAS's Motion For Leave To Amend**

On September 7, 2010, the Reorganized Debtors' filed their Motion for Leave to File Amended Complaints (the "**Motion to Amend**") (WMS D.I. 28), which attached the proposed First Amended Complaint to Avoid and Recover Transfers Pursuant to 11 U.S.C. §§ 547 and 550 (the "**Proposed Amended Complaint**").  The Proposed Amended Complaint seeks to avoid and recover the two transfers to WMS totaling $614,915.10.

**H.     WMS Never Received Notice of
         the Extension Motions and Orders**

WMS never filed a proof of claim against Delphi.  WMS was paid in full by Delphi by July 31, 2006, and therefore ceased to be a creditor of Delphi and did not hire an attorney to Monitor the case.  Hill Declaration ¶¶18-19.

MSX was not on the ECF notice list (the "**2002 List**") that Delphi used to serve its various motions regarding its sealing of preference complaints and extensions to serve the complaints (the "**Extension Motions**") and the orders granting the Extension Motions (the "**Extension Orders**").  Delphi's own affidavits of service demonstrate that WMS was not given notice:

1.  WMS did not receive notice of the August 6, 2007 Preservation of Estate Claims Motion, D.I. 8905, or the order granting it.  D.I. 9105.  *See* Affidavit of Service, D.I. 9039; Affidavit of Service, D.I. 9141.

2.  WMS did not receive notice of the February 8, 2008 Extension of Avoidance Action Service Deadline Motion, D.I. 12922 or the order granting it. D.I. 13277. *See* Affidavit of Service, D.I. 12970; *See* Affidavit of Service, D.I. 13315.

3.  WMS did not receive notice of the April 20, 2008 Postconfirmation Extension of Avoidance Action Service Deadline Motion, D.I. 13361 or the order granting it. D.I. 13484.  *See* Affidavit of Service. D.I. 13415; Affidavit of Service, D.I. 13540; and

4.  WMS did not receive notice of the October 2, 2009 Supplemental Postconfirmation Extension of Avoidance Action Service Deadline Motion, D.I. 18952 or order granting it.  D.I. 18999.  *See* Affidavit of Service. D.I. 18967. Upon information and belief, D.I. 18999 was not served until after the Original Complaint was unsealed

See Hill Declaration ¶19.  Delphi admitted as much in its Omnibus Response in opposition to the various defendants dismissal motions.  *See* D.I. 20225, at p. 29, fn. 8.

## I.    <u>The December 2007 Disclosure Statement</u>

The December 2007 Disclosure Statement was filed at a time when WMS was not a creditor or party in interest to the Delphi case.  The December 2007 Disclosure Statement provided for a 100 cent plan, did not disclose WMS had been sued, expressly stated that there was no intention to pursue the preference actions that had been filed under seal, noted that Delphi's Extension Orders were already a *fait accompli*, but provided that Delphi's extension of time to serve the preference complaints expired in March 2008.  Therefore, even if WMS had

received and read it, this Disclosure Statement would not have provided notice to WMS that it

had been sued, that it had the opportunity to object or be heard on any motion, or that there was

any risk if it was not served by March 2008.

**J.      This Court's Statements That Proposed Defendants Which Did Not Receive
Notice Of The Extension Motions May Now Challenge Them De Novo**

Recognizing that notice of Delphi's Extension Motions may have been insufficient or

non-existent with regard to some of the preference defendants, such as WMS, this Court has

repeatedly held that these defendants could challenge the Extension Motions *de novo*.   On

April 1, 2010, for example, this Court recognized the inequity of binding defendants to decisions

in adversary proceedings of which they were unaware.  According to the Court:

> Well, would they even have to seek relief if they're not a party.  I
> mean, it's odd to say that they'd be bound if they're not party to an
> adversary proceeding that's been . . . served yet.

April 1, 2010 Tr., at p. 13.

Likewise, this Court concluded during the July 22, 2010 hearing on the First Wave

motions to dismiss that:

> [I]f [a Defendant] didn't get notice, it's wide open and I should
> look at it as whether, you know, it was appropriate to have entered
> those orders.   And they should have all their – you know, their
> rights to say the [Procedures Order and Extension Orders]
> shouldn't have been entered.
>
>                                     * * *
>
> [I]f someone really didn't get notice of the extension motions, then
> it would seem to me they should be able to argue to me as if the
> motions were being made right now . . . .

July 22, 2010 Tr., at pp. 103, 119.  Indeed, this Court held that if a party such as MSX had no

notice of Delphi's Motions, "***it's a slam dunk as far as looking at the order as brand new***."  *Id.*

at 107 (emphasis supplied).

**K.**      **WMS Was Prejudiced By Lack of Notice**

Since October 2007, the WMS personnel who had direct contact on behalf of WMS with Delphi and were most knowledgeable about WMS' relationship and business dealings with Delphi ("**Former Key Employees**") have left WMS, and are no longer employed by WMS. These Former Key Employees include Johnny Coppinger, Keith Sytsma, Gary Parton, and Clyde Hinzman. Also, WMS's sales and service representative in Mexico, Dieter Koenig, no longer represents WMS. Hill Declaration ¶20.

Because WMS did not know it had been sued by Delphi, WMS followed its normal procedures, after preserving certain limited information, of cleaning the hard drives of the computers of its Former Key Employees, without taking steps to preserve information necessary or helpful to its defense of Delphi's lawsuit. Similarly, because WMS did not know it had been sued by Delphi, WMS made no arrangements with its Former Key Employees to obtain information about the issues in the lawsuit, conduct exit interviews, or to keep in touch with them. Gary Hill of WMS has no knowledge of how to contact Johnny Coppinger. Hill Declaration ¶¶21-22.

Because WMS did not know it had been sued by Delphi, WMS took no special steps to organize and preserve its records with respect to Delphi. If WMS had known that Delphi had sued it, WMS could and would have taken special steps to organize and preserve its records with respect to Delphi, hold exit interviews with Former Key Employees and make arrangements to maintain contact with the Former Key Employees in case WMS would need them to provide litigation information or serve as witnesses. Hill Declaration ¶23-24.

WMS was prejudiced in not knowing of the lawsuit, because it was induced to do business with Delphi while the complaint was sealed on favorable terms to Delphi when WMS had great business leverage with Delphi. During the more than two years between Delphi filing

9

the lawsuit and WMS learning about it, Delphi and WMS had numerous business discussions and reached agreement on significant new business, including business related to the re-tooling of Spline Machine 2. On August 31, 2009, Delphi issued WMS purchase order 450928130 (the "**2009 Purchase Order**") describing the new work WMS agreed to perform for Delphi. Hill Declaration ¶25. A copy of the 2009 Purchase Order is attached to the Hill Declaration as Exhibit E.

During the negotiation of the 2009 Purchase Order, Delphi did not disclose to WMS that it had already commenced a lawsuit against WMS. If WMS had known about the lawsuit Delphi had filed against it, WMS would have negotiated differently with Delphi. In particular, WMS had significant negotiating power with respect to the 2009 Purchase Order because Spline Machine 2 was based on WMS's proprietary designs. No other company had the knowledge or expertise to repair or modify Spline Machine 2 quickly and efficiently. Further, WMS had the only detailed engineering drawings and engineering specifications for Spline Machine 2. It would have been difficult, time consuming and expensive for Delphi to find another supplier to provide the services WMS agreed to provide related to Spline Machine 2 under the 2009 Purchase Order. Without the engineering specifications and drawings, any other service provider would be left to guess as to the mechanization and operation of Spline Machine 2, adding significant time and cost to the requested repair. If WMS had known of the lawsuit, WMS would have refused to accept the 2009 Purchase Order with Delphi unless Delphi agreed to release WMS from all future preference liability. Hill Declaration ¶26.

WMS has been substantially prejudiced by Delphi concealing from WMS for over two years that it was suing WMS, because had WMS known of the lawsuit, WMS would not have agreed to do business with Delphi on the terms outlined in the 2009 Purchase Order. After the

10

first quotation, Delphi sent two request for price reduction during the negotiations for this purchase order. Again, had WMS known of the lawsuit WMS would not have agreed to price reductions.

Further, during the period after Delphi commenced the lawsuit, but before Delphi served WMS with a copy of the complaint, Delphi requested WMS perform emergency maintenance on its spline rolling machines. These service calls were necessary to keep Delphi's operations from shutting down and disrupting the just-in-time supply chain Delphi was a key link in. Had WMS known of the lawsuit, it would not have performed the emergency service calls unless Delphi had agreed to waive all preference claims. Furthermore, during the period after Delphi commenced the lawsuit, but before Delphi served WMS with a copy of the complaint, Delphi had more than two years to prepare for the lawsuit that WMS was not afforded. During this period WMS could have, among other things, save funds for its defense, prepare a strategy, or delay the hiring of a new employee to cut costs event further then we had. Hill Declaration ¶¶28-29.

## L.    DAS Was Solvent During the Preference Period

WMS incorporates MSX International, Inc.'s Brief in Opposition to Reorganized Debtors' Motion For Leave to File Amended Complaints (D.I. 20857) (the "**MSX Brief**") to the effect that DAS (and Delphi) were solvent during the preference period.

## ARGUMENT

## I.    DAS'S PROPOSED AMENDED COMPLAINT IS FUTILE

"[W]here it appears that granting leave to amend is unlikely to be productive. … it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir. 1993). "[I]t is proper to deny leave to replead where there is no merit in the proposed amendments or amendment would be futile." *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 728 (2d Cir. 1998). Courts thus are justified in denying leave to

amend where, as here, the proposed amendment cannot withstand a motion to dismiss or for summary judgment. *Ruffolo*, 987 F.2d at 131 (affirming denial of leave to amend where proposed amendment failed to allege necessary facts); *McLaughlin v. Anderson*, 962 F.2d 187, 195 (2d Cir. 1992) (affirming denial of leave to amend where proposed amendment failed to comply with court's order); *Halpert v. Werthein & Co., Inc.*, 81 F.R.D. 734, 735 (S.D.N.Y. 1979) (leave to amend denied if amended complaint could not withstand a motion to dismiss).

As explained below, Delphi's motion for leave to amend "is unlikely to be productive" as to WMS and should be denied.

## II.    THE PAYMENTS WERE IN THE ORDINARY COURSE OF BUSINESS

The Proposed Amended Complaint is futile because the Transfers to WMS are protected from avoidance by the ordinary course of business exception of 11 U.S.C. §547(c)(2). Prior to the 2005 amendments, this exception provided:

> The trustee may not avoid under this section a transfer -
>
> ….
>
> (2) to the extent that such transfer was -
>
>> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>>
>> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>>
>> (C) made according to ordinary business terms;
>
> 11 U.S.C. § 547(c)(2).

The purpose of the ordinary course of business exception

> is to leave undisturbed normal financial relations, because [such an exception] does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.

H.R.Rep. No. 95-595, at 373, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6329.  There can be no

dispute that the Transfers were in the ordinary course of business where as here, the three Delphi

employees responsible for the transaction, WMS and an industry expert all agree the debts were

incurred in the ordinary course of business of Delphi and WMS, the payments were made in the

ordinary course of business of Delphi and WMS and made according to ordinary terms in the

automotive supply industry.  *See Vogel Van & Storage, Inc. v. Navistar Financial Corp.*, 210

B.R. 27, 34 (N.D.N.Y. 1997) (payments consistent with course of dealing between parties satisfy

subjective requirement of §547(c)(2)(B)); *In re North American Energy Conservation, Inc.*, 339

B.R. 75, 80 (Bankr. S.D.N.Y. 2006) ("consistency with other business transactions between the

debtor and the transferee indicates that it is subjectively ordinary.  To be deemed objectively

ordinary, the subject transfer must be shown to be consistent with the industry norm.").

The amendment would be futile because there can be no dispute that WMS is protected

by the ordinary course of business exception.

### III.    THE PROPOSED AMENDED COMPLAINT IS FUTILE BECAUSE THE EXTENSION ORDERS WERE IMPROVIDENTLY ENTERED AND SHOULD BE VACATED, LEAVING DAS'S CLAIMS BARRED BY THE STATUTE OF LIMITATIONS

For all for the reason set forth in the preference defendants' to prior motions to dismiss,

The MSX Brief and the briefs of other preference defendants, which are incorporated here, the

Extension Orders were entered in violation of Fed. R. Civ. Proc. 4(m) and WMS' due process so

that other rights, and DAS may not unseal and serve preference complaints against them years

after the limitations period expires.

Moreover, this Court has already determined that anyone, like WMS, who did not receive

notice of Delphi's Extension Motions, may now challenge *de novo* the entry of the Extension

Orders.  *See* July 22, 2010 Tr. at 103, 119 ("[I]f someone really didn't get notice of the extension

motions, then it would seem to me they should be able to argue to me as if the motions were being made right now . . . .").

### A.    WMS Received No *Actual Notice* Of Delphi's Extension Motions

The indisputable evidence, including Delphi's own admissions and documents, confirms that Delphi failed to provide WMS with **any** actual notice of its Extension Motions.[1]  Indeed, Delphi admits, in its Omnibus Response in opposition to the various defendants' dismissal motions, that it never served WMS.  *See* Omnibus Response (MSX D.I. 35), at 29 & n.8;

Delphi's 2007 Disclosure Statement, assuming it was even sent to WMS, which seems unlikely given that WMS was not a creditor at the time it was sent out, also failed to put WMS on actual notice that its rights were in jeopardy.  The Disclosure Statement simply indicated that Delphi had **previously** filed adversary actions against certain **unspecified** defendants and **had already been granted** its Preservation of Estate Claims Order on August 16, 2007, which expired on March 31, 2008.  *See* Disclosure Statement (D.I. 11388) at 193; Extension Order (D.I. 9105). The Disclosure Statement thus did not give WMS notice and an opportunity to object to or alert it that it could be exposed to any litigation after early 2008.

WMS, who after June 2006 was not a creditor of the estate and not a party in interest, would not even have had standing to object.  As a prospective defendant in an adversary proceeding which might be prosecuted on behalf of the estate, WMS would not have been a party in interest with standing to object because its interest in defending an adversary proceeding is antithetical to the interests of creditors of the estate in maximizing recovery to the estate.  *In re E.S. Bankest, L.L.C.*, 321 B.R. 590, 598 (Bankr. S.D.Fla. 2005) (noncreditor defendant in

---

[1] The present case thus is unlike *United Student Aid Funds, Inc. v. Espinosa***,** __ U.S. __, 130 S. Ct. 1367, 1378 (2010), where the petitioner, a student loan creditor, placed itself within the jurisdiction of the bankruptcy court and then did nothing after it was given advance notice that a material part of its claim would be extinguished.

adversary proceeding did not have standing to seek to convert chapter 11 case); *In re JMP-Newcor International, Inc.*, 225 B.R. 462, 464-465 (Bankr. N.D. Il. 1998) (former creditor defendant in adversary proceeding did not have standing to oppose decree closing case).

> Overly lenient standards [of standing] may potentially overburden the reorganization process by allowing numerous parties to interject themselves into the case on every issue, thereby thwarting the goal of a speedy and efficient reorganization.

*In re Refco, Inc.*, 505 F.3d 109, 118 (2d Cir. 2007) (affirming denial of standing to object to settlement to equity holder of creditor). *See also In re Teligent, Inc.*, 417 B.R. 197, 210 (Bankr. S.D.N.Y. 2009) (former attorney for defendant lacked standing to object to adversary proceeding settlement); *In re Southern Boulevard, Inc.*, 207 B.R. 57, 61 (S.D.N.Y. 1997), *aff'ing,* 199 B.R. 258 (Bankr. S.D.N.Y. 1996) (tenant in same building as debtor did not have standing to object to debtor's assumption and assignment of lease).

WMS can now challenge *de novo* the entry of the Extension Orders, including in particular, the April 2008 Extension Order. That Order was entered after Delphi's plan funding fell through on the new basis that Delphi purportedly needed more time to determine how it wished to proceed in light of the loss of the financing for its 100 cent plan. Rule 4(m) is designed to facilitate service, not non-service. Thus the Rule 4(m) extension should not have been granted. *See Fimbres v. United States*, 833 F.2d 138, 139 (9th Cir. 1987) (rejecting Rule 4(m) extension, explaining that the notion that the plaintiff lacked the financial resources to prosecute the action amounted to nothing more than an improper intentional delay in service); *Smith v. Pennsylvania Glass Sand Corp*., 123 F.R.D. 648, 651 (N.D. Fla. 1988) ("Plaintiff cannot deliberately or even inadvertently 'wait and see' if his financial resources improve enough to allow him to diligently prosecute his case."). Indeed, if such a "wait and see" rationale were permitted, the statute of limitations would be rendered meaningless.

15

### B.    WMS Was Not On Inquiry Notice Of Delphi's Extension Motions

WMS also was not on "inquiry notice" of the Extension Motions.  As an initial matter, the law is clear that "[a party] bear[s] a heavy burden in establishing that [another party] was on inquiry notice as a matter of law."  *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243, 249 (S.D.N.Y. 1993) (discussing "inquiry notice" in the context of fraud actions) (quoted in *Newman v. Warnaco Group, Inc.,* 335 F.3d 187, 195 (2d Cir. 2003).  Moreover, "[i]nquiry notice may be found as a matter of law only when uncontroverted evidence clearly demonstrates when the plaintiff should have discovered" the conduct at issue.  *Staehr v. Hartford Fin. Servs. Group*, 547 F.3d 406, 427 (2d Cir. 2008).

Here, WMS was not on inquiry notice of the Extension Motions or even that a preference action had been filed against it.  Simply put, there are no facts that show, or could show, that it was reasonable for WMS, who was not a creditor of Delphi, to have inquired about the Extension Motions or preference action.[2]    In fact, Delphi admits that it intended to conceal from the preference defendants that they had been sued.

Thus, in *EBS Litigation LLC v. Barclays Global Investors, N.A.*, 304 F.3d 302 (3rd Cir. 2002), the court rejected the notion that "an objectively-reasonable shareholder" should have been on inquiry notice that a debtor may have a claim against it for return of a distribution, even though the debtor's bankruptcy petition should have alerted him to the fact that the debtor's earlier pronouncements regarding its solvency may have been incorrect, and especially where the

---

[2] As the Second Circuit explained, albeit in the context of a fraud action, "the critical factor for purposes of inquiry notice in *any* case is when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded."  *Id*. at 429 (emphasis in original) (internal quotations omitted); *see also Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir. 2003) ("[T]he information provided must trigger notice with sufficient storm warnings to alert a reasonable person to the probability that there were either misleading statements or significant omissions involved") (quoting *Morin v. Trupin*, 809 F. Supp. 1081, 1097 (S.D.N.Y. 1993)).

16

debtor continued to misrepresent its financial condition while in bankruptcy. *Id*. at 306. As the court emphasized:

> [W]e must not lose sight of the practical realities of the situation. We suspect it would not occur to an objectively-reasonable stockholder with full knowledge of the applicable law, even if he or she suspected that the distribution of D&B stock might be vulnerable to a challenge, to do anything about it unless such a challenge became a reality.

*Id*. *EBS* thus refutes any suggestion that WMS should have been on inquiry notice.

This is especially true where WMS had no obligation to monitor Delphi's bankruptcy proceeding, even if WMS were aware of it. *City of New York v. New York, N.H. & H. R.R. Co*., 344 U.S. 293, 297 (1953) ("[E]ven creditors who have knowledge of a reorganization have a right to assume that the statutory 'reasonable notice' will be given them before their claims are forever barred" and have no obligation to monitor the proceedings before they receive formal notice). WMS was not a creditor at the time of the first three Extension Motions.

That no defendant actually objected to the Extension Motions is not surprising given that Delphi's actions and representations were specifically intended to dissuade any such inquiry. Indeed, Delphi repeated its "no adversary proceedings" theme throughout much of the bankruptcy proceedings, assuring defendants that avoidance actions would be limited only to a few named parties that did not include WMS. *See* 2/28/08 Extension Motion (D.I. 12922), ¶ 17 (Delphi would "not retain any causes of action asserted in the [adversary proceedings] except those specifically listed in Exhibit 7.24 of the Plan" (claims related to third parties)); March 19, 2008 Tr., at p. 22 (the Court stated that "[t]he plan [only] reserve[d] or retain[ed] the ability to pursue a very small number of avoidance actions."). Based on Delphi's statements, WMS had no reasonable basis to inquire further. *See Staehr*, 547 F.3d at 414 (holding that a party's

"seemingly benign explanation" of actions that suggested fraud made it "reasonable for Plaintiffs not to inquire" further).

Even Delphi's Disclosure Statement suggested that no inquiry was necessary. Indeed, the Disclosure Statement, assuming WMS received and reviewed it, would have given WMS every reason to believe that, as of March 31, 2008, the avoidance actions had been dropped. Specifically, the Disclosure Statement stated that "[t]he Debtors have until March 31, 2008 to serve each defendant with the summons and complaint, without prejudice to the Debtors' right to seek further extensions of the deadline." Disclosure Statement (D.I. 11388) at 196. Thus, immediately after March 31, 2008, having not been served with a summons and complaint or any notice of a motion to further extend the service deadline, WMS would have had no reason to believe that it was still the subject of a preference action. WMS negotiated and undertook new business with Delphi after March 31, 2008 and before it learned of the sealed complaint, not knowing Delphi had sued it.

This was particularly true here because DAS's schedules showed that it was solvent with more than $2.6 in net equity at the time of its petition. *See supra* at 13. Thus, a supplier could reasonably assume it could not be sued by DAS to avoid a preference long after the statute of limitations had passed.

### C.    WMS Was Not Required To Do Anything Even If It Were On Actual Notice

It is also undisputed that WMS was never served with process in the sealed preference action until late 2009 – years after the first Extension Order was entered in 2007. As such, WMS had the right to ignore the entire proceeding until it was formerly served. *Murphy Brothers, Inc. v. Michetti Pipe Stringing, Inc.* 526 U.S. 344, 350 (1999).

In *Murphy Brothers*, the defendant had actual notice of the lawsuit after it was provided a courtesy copy of the complaint by plaintiff's counsel. Despite having the complaint, the

18

defendant ignored the lawsuit and took no action to remove it within the limited 30 day period

mandated by 28 U.S.C. § 1446.    When the defendant was later formally served with the

complaint, it attempted to remove the action to federal court.    The plaintiff argued that the

defendant had waived its removal right because it had actual notice of the lawsuit (through the

courtesy copy) and did not timely seek to remove.    In bluntly rejecting the plaintiff's contention

and endorsing the defendant's right to ignore the lawsuit until it was formally served, the Court

declared:

> Service of process, under longstanding tradition in our system of justice, is fundamental to ***any procedural imposition*** on a named defendant.
>
> * * *
>
> In the absence of service of process (or waiver of service by the defendant), a court ordinarily may not exercise power over a party the complaint names as defendant. . . .  ***Accordingly, one becomes a party officially, and is required to take action in that capacity, only upon service of a summons or other authority-asserting measure*** stating the time within which the party served must appear and defend. . . .  Unless a named defendant agrees to waive service, the summons continues to function as the *sine qua non* directing an individual or entity to participate in a civil action or forgo procedural or substantive rights.

*Id*. at 350-51 (internal citations omitted) (emphasis supplied).    The Court emphatically declared

that a defendant's "procedural rights [do not] slip away before service of a summons."    *Id*. at

356.    Here, no summons having been served on WMS, there can be no contention that WMS's

procedural rights, including its right to challenge *de novo* the Extension Orders, were ever lost.

## IV.    OTHER DEFENDANTS' BRIEF ARE INCORPORATED

Numerous other objections to the Motion to Amend are being filed by the Defendants in

the other adversary proceedings who are similarly situated.    WMS incorporates the MSX Brief

and all applicable arguments raised by the other defendants.

## <u>CONCLUSION</u>

For all of the reasons set forth above, Delphi's Motion should be DENIED.


Respectfully submitted,

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Attorneys for the Affinia Defendants

By: /s/ _____
    Judy B. Calton (P38733)
    Seth Drucker (P65641)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
Telephone:  (313) 465-7344
Facsimile:  (313) 465-7345
e-mail:  jcalton@honigman.com

Dated:  November 24, 2010

8480522.1

**WEST MICHIGAN SPLINE**
**<u>EXHIBITS</u>**

1.      Declaration of Gary Hill

2.      Declaration of John Donnelly

8480522.1