Shalom Jacob
Zachary D. Silbersher
LOCKE LORD BISSELL & LIDDELL LLP
Three World Financial Center
New York, New York 10281-2101
Tel: (212) 415-8600
Fax: (212) 303-2754

-and-

Courtney E. Barr (CE 7768)
LOCKE LORD BISSELL & LIDDELL LLP
111 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 443-0700
Fax: (312) 443-0336

*Counsel for Methode Electronics, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| DPH HOLDINGS CORP., et al., | Case No. 05-44481 [RDD] |
| Reorganized Debtors. | (Jointly Administered) |

-------------------------------------------------x

| | |
|---|---|
| DELPHI CORPORATION, et al., | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 07-02432 [RDD] |
| METHODE ELECTRONICS INC., | |
| Defendant. | |

-------------------------------------------------x

**DECLARATION OF TIMOTHY R. GLANDON IN SUPPORT OF METHODE
ELECTRONICS, INC.'S OBJECTION TO THE REORGANIZED DEBTORS' MOTION
<u>FOR LEAVE TO FILE AMENDED COMPLAINTS</u>**

Timothy R. Glandon, hereby declares, pursuant to 28 U.S.C. § 1746, that the following is true to the best of my knowledge, information and belief:

1.      My name is Timothy R. Glandon. I am of sound mind, over the age of eighteen years, capable of making this declaration (the "Declaration") and fully competent to testify herein. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information provided to me by certain employees of Methode Electronics, Inc. ("Methode") with whom I manage, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the operations and financial affairs of Methode. If I were called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration.

2.      I submit this Declaration in connection with the above-captioned bankruptcy case (the "Case") and adversary proceeding (the "Adversary Proceeding") and in support of Methode's Objection to the Reorganized Debtors' Motion for Leave to File Amended Complaints (the "Objection").

3.      Methode is a global supplier of component parts to manufacturers in the consumer and industrial markets, including Original Equipment Manufacturers (OEMs) in the automotive industry.

4.      Since August 2001, I have been employed by Methode. I am currently employed as Vice President and General Manager of North American Automotive Operations at Methode.

5.      As Vice President and General Manager at Methode, I am familiar with the supply arrangements between Methode and Delphi Automotive Systems, LLC ("Delphi") and have been involved in Methode's business relationship with Delphi since coming to Methode in 2001.

6.      Methode manufactured for Delphi certain silicone-filled bladders (the "Parts") that are safety-critical components of Delphi's Passive Occupant Detection System ("PODS").

7. Since the launch of the PODS nearly a decade ago, Methode was the exclusive supplier of silicone-filled bladders to Delphi.

8. Generally, since joining Methode in 2001, Methode shipped the Parts to the Debtors[1] under "MNS-2" or "second day, second month" payment terms. Payments from Delphi to Methode were made pursuant to Delphi's Covisint payment system.

9. The Covisint system is an automated invoice and payment system that the Debtors required its suppliers to use. When the Parts were delivered to the Debtors, the Parts were scanned on delivery. The scanned data would then immediately be documented in the Covisint system, which would make an automatic notation that a payment was due to Methode for the Parts (if any, because such Parts may have been subject to "Cash in Advance" terms as described in the below paragraph) based upon pre-programmed pricing applicable under Methode's supply agreement with Delphi (as described in Section IV below). If a notation to pay Methode was made in the Covisint system for Parts delivered, payment for the Parts would then automatically be sent to Methode.

10. In the weeks leading up to the Debtors' petition dates in October 2005, the parties' negotiated a revision to their payment terms. On October 3, 2005, the parties executed an agreement (the "Revised Payment Term Agreement"), pursuant to which Delphi agreed to pay Methode for products on "Cash in Advance" terms in exchange for Methode providing a unit price discount of one percent (1%). A true and correct copy of the Revised Payment Term Agreement is attached hereto as Exhibit A.

11. Pursuant to paragraph 2(i) of the Revised Payment Term Agreement, on or about October 4, 2005, Delphi wired Methode approximately $3,000,000 (the "Initial Cash Payment")

---

[1] Capitalized terms used but not defined herein shall have the same meaning ascribed to them as they appear in the Objection.

3

as an initial advance payment for account payables for the subsequent seven day period. Between October 4 and the Petition Date, Methode drew daily amounts from the Initial Cash Payment sufficient to cover each day's shipments to Delphi. As of the Petition Date, the remaining balance of the Initial Cash Payment held by Methode was approximately $1,900,000 (the "Initial Cash Payment Balance").

## I.
## METHODE DID NOT RECEIVE PARTICULARIZED NOTICE OF THE EXTENSION MOTIONS AND ORDERS AND RELATED PLEADINGS

12. Methode was not served with any of the four Extension Motions by overnight mail, including the Preservation of Estate Claims Procedure Motion, the First Extension Motion, the Second Extension Motion, or the Third Extension Motion.

## II.
## METHODE RELIED UPON DELPHI'S REPEATED ASSURANCES TO CONTINUE DOING BUSINESS WITH DELPHI

13. In the weeks leading up to the Petition Date, and within the context of negotiating the Revised Payment Term Agreement, Delphi assured Methode multiple times that it should continue doing business with Delphi and stressed Delphi's critical need for the Parts.

14. Delphi's assurances culminated in the modification to the parties' payment terms to "cash in advance" pursuant to the Revised Payment Term Agreement.

15. Methode's reliance on Delphi's assurances that it should keep doing business with Delphi and the renegotiation of its payment terms with Delphi both leading up to and after the Petition Date lead Methode to reasonably believe that it would not be sued to recover the payments it received from Delphi in the days leading up to the Petition Date.

## III.
## THE AMENDED COMPLAINT'S LISTING OF PURCHASE ORDERS AND INVOICES INACCURATELY DETAILS THE ALLEGED DEBT OWED AND/OR PAYMENTS TO METHODE

16.     Methode has reviewed Exhibit 1 to the proposed Amended Complaint ("Exhibit 1"), which sets forth a list of alleged transfers to Methode and the alleged corresponding antecedent debt forming the basis for those transfers. The Debtors list either a purchase order number or an invoice number as the basis for the alleged antecedent debt relating to each alleged transfer.

17.     In its review of Exhibit 1, Methode has identified two substantial inaccuracies with the alleged transfers contained in the Amended Complaint. First, Exhibit 1 denotes DAS as both the debtor entity making the alleged transfers and also the debtor entity that owed the antecedent debt reflected on each purchase order and invoice contained in Exhibit 1. However, at least with respect to 103 purchaser orders and invoices, DAS is not the entity listed as "Buyer" of the Parts (the "Non-DAS Debt Purchase Orders"). In other words, because entities other than DAS are listed as the actual "Buyers" of the Parts in the 103 Non-DAS Debt Purchaser Orders, the antecedent debt relating to those purchaser orders and invoices is not owed by DAS. True and correct copies of a few examples of the Non-DAS Debt Purchase Orders are attached as Exhibit B, which indicate antecedent debts owed by entities other than DAS. In total, the Non-DAS Debt Purchase Orders account for $15,571,461.07 of the alleged transfers listed in Exhibit 1.

18.     The second basis for the inaccuracies contained in Exhibit 1 is the fact that a substantial number of the alleged antecedent debts/transfers listed in Exhibit 1 consist of: (i) purchase orders and invoices that the Debtors list as the basis for an antecedent debt, of which Methode has no record (collectively, the "No Record Purchase Orders"); and (ii) purchase orders

5

and invoices that the Debtors allege as relating to a larger amount paid to Methode than what Methode's records show as being received (the "Inaccurate Amount Purchase Orders"). A chart that summarizes a sampling of the No Record Purchase Orders is attached as Exhibit C. A chart that summarizes a list of the Inaccurate Amount Purchase Orders is attached as Exhibit D.[2]

## IV.
## METHODE WOULD NOT HAVE ENTERED INTO THE 2008 SUPPLY AGREEMENT IF DELPHI HAD NOT CONCEALED THE PREFERENCE SUIT

19. Methode and Delphi have operated under a series of long-term agreements for the supply of the subject parts to Delphi.

20. Each long-term agreement spanned several years: (i) 2001 to 2004 (the "2001 Agreement"); (ii) 2004 to June 30, 2008 (the "2004 Agreement"); and (iii) October 1, 2008 to what should have been September 30, 2011 but for Delphi's early termination (the "2008 Agreement").

21. In late 2007, as the 2004 Agreement was approaching expiration, the parties began discussing a new supply agreement.

22. For many months in 2008, the parties negotiated the 2008 Agreement and extensively discussed its duration and pricing terms.

23. Delphi specifically requested pricing based on varying lengths of supply for the subject Parts. In response to Delphi's specific request made during a meeting on August 7, 2008, Methode offered two different pricing structures—a one-year contract and, alternatively, a three-year contract.

24. Methode's proposed piece-part prices for a three-year supply arrangement were lower than those for a one-year supply arrangement because Methode's three-year pricing

---

[2] Exhibits C and D represent some of the inaccuracies contained in Exhibit 1 and Methode reserves the right to supplement or otherwise amend its listing of inaccuracies.

6

reflected overhead and investment costs spread over a greater quantity of parts and a longer period of time.

25. On September 4, 2008, the parties consummated the 2008 Agreement. Under that agreement, Methode was to be the exclusive supplier for the period October 1, 2008 through September 30, 2011, as Delphi was obligated to purchase 100% of its requirements for the Parts from Methode.

26. The 2008 Agreement was based on Methode's three-year pricing proposal, which Delphi specifically elected instead of Methode's one-year pricing proposal. This election resulted in savings to Delphi of about $6 million over the one-year pricing proposal.

27. With the exception of material price increases and surcharges, the parties contemplated that the prices in the 2008 Agreement were fixed for the entire three-year term.

28. During the parties' extensive negotiations of the terms of the 2008 Agreement, Delphi never disclosed its filing of a complaint in September 2007 that commenced the Adversary Proceeding against Methode to recover approximately $19.7 million as alleged preferential transfers (the "Preference Suit").

29. Methode would not have offered three-year pricing, nor would it have even entered into the 2008 Agreement, if it had known that Delphi had commenced the Preference Suit against it. If Methode had known of the Preference Suit and even agreed to continue doing business with Delphi, it would have negotiated a completely different supply agreement in 2008 and insisted upon Delphi's waiver or release of its alleged $19.7 million preference liability before it agreed to continue supplying Parts to Delphi. Given the general lack of inventory due to just-in-time manufacturing practices in the auto industry, Delphi would have been highly

7

motivated to reach an agreement with Methode regarding the alleged preference liability in order to maintain an orderly supply of parts for worldwide production.

30. Additionally, had Methode been aware of the Preference Suit, it would not have entered into the 2008 Agreement and it would have avoided: (i) the complex and costly litigation currently pending between the parties in two jurisdictions, a Michigan state court and this Court, resulting from the parties' supply relationship and claims related to the 2008 Agreement (the "2008 Agreement Litigation"); and (ii) the substantial damage to its business resulting from Delphi's termination of the 2008 Agreement (the "Business Damage").

31. In sum, by concealing the Preference Suit, Delphi stripped away all of Methode's bargaining power with respect to the renegotiation of its critical and exclusive supply agreements with Delphi, which resulted in severe prejudice and hardship to Methode in the form of the 2008 Agreement Litigation and the Business Damage.

**A.    The 2008 Agreement Litigation.**

32. Since October 2008, which is when Delphi sued Methode in Michigan state court, the parties have been involved in extensive litigation arising from their supply relationship and the 2008 Agreement, among other claims, which litigation has resulted in disputes between the parties in this Court, as the Court is aware.

33. To date, Methode has spent approximately $3,394,398 in legal fees and expenses associated with all of the 2008 Agreement Litigation.

**B.    The Business Damage to Methode.**

34. As a result of Delphi's termination of the 2008 Agreement, Methode has sustained significant damages including among other things: (1) the immediate shut-down of its AST division, which had been, since 2001, entirely devoted to making bladder assemblies for PODS for Delphi; (2) the termination of approximately 200 AST jobs including termination of

8

its valued employees who had the collective knowledge to produce this safety product and who were responsible for all aspects of the subject Parts, including design, production, quality testing, scheduling, and warehousing; (3) the loss of the un-recouped portion of Methode's $40 million investment in AST in reliance on Delphi's promise to purchase Parts; and (4) the permanent harm to Methode's established reputation in the industry.

35.     Methode would not have offered three-year pricing, entered into the 2008 Agreement, suffered the Business Damage and be embroiled in the 2008 Agreement Litigation, if it had known that Delphi commenced the Preference Suit against it.

## V.
## METHODE IS SUBJECT TO THE BLUE ANGEL LAWSUIT, WHICH IT COULD HAVE AVOIDED BUT FOR DELPHI'S CONCEALMENT OF THE PREFERENCE SUIT

36.     On May 3, 2006, Methode filed four proofs of claim (the "Proofs of Claims") reflecting general unsecured claims against related debtor entities of Delphi (collectively, with Delphi, the "Debtors") in the aggregate amount of $4,647,550.07.

37.     In June 2006, Methode negotiated a sale and assignment of the Proofs of Claims to Credit Suisse and received in exchange cash equaling 67.5% of the face value of the Unsecured Claims (the "Purchase Price"). Methode and Credit Suisse entered into a transfer agreement to memorialize the sale of the Proofs of Claim to Credit Suisse (the "Transfer Agreement").

38.     Also in June 2006, Credit Suisse subsequently sold and/or assigned the Unsecured Claims to Blue Angel Claims, LLC ("Blue Angel"). As assignee of the Proofs of Claim, Blue Angel succeeded to whatever rights that Credit Suisse possessed against Methode under the Transfer Agreement. Pursuant to certain provisions of the Transfer Agreement, to the extent that the Proofs of Claim become the subject of an alleged "impairment", the claims purchaser may

9

have certain rights to reclaim a certain, corresponding portion of the Purchase Price.

39. On October 25, 2010, Blue Angel sued Methode and certain of its divisions and/or subsidiaries to recover approximately $3.1 million for breach of the Transfer Agreement in New York state court, *Blue Angel Claims LLC v. Methode Electronics, Inc., et al.*, Index No. 651830/10, Supreme Court of the State of New York, County of New York (the "Blue Angel Action").

40. The Blue Angel Action is based on Blue Angel's contention that the Debtors' Forty-Fourth Omnibus Objection to Claims filed in this Case (the "44th Objection") against the Proofs of Claim amounts to an "impairment" that triggered Blue Angel's right to a return of the Purchase Price, plus interest and fees. Blue Angel contends that the basis for the 44th Objection was that all of the Proofs of Claim are asserted by a party that is a defendant to a preference action, and under section 502(d) of the Bankruptcy Code, such claims may be subject to disallowance.

41. If Methode had been aware of the Preference Action when Delphi filed it in 2007, as noted above, Methode would not have entered into the 2008 Agreement. In light of Methode's exclusive supplier status and Delphi's need to obtain the Parts, however, Methode would have been in the position to seek a release from Delphi of any preference liability in exchange for continuing to do business with Delphi. That release would have wholly nullified the "impairment" claim that is the subject of the Blue Angel Action.

42. Further, Methode's reliance upon Delphi's assurances to continue doing business with it and the parties' postpetition negotiations over pricing, during which Delphi never mentioned the Preference Suit, justifiably led Methode to believe that it was not going to be sued for the recovery of preferential transfers. If Methode had any indication that it would be the

subject of the Preference Action, Methode would never have agreed to the repurchase obligations contained in the Transfer Agreement.

43.     If the Preference Action was disclosed in September 2007, which was at a time when the plan of reorganization was expected to yield 100 cents on the dollar for the claims of unsecured creditors, Methode would have had the ability to purchase back and sell its Proofs of Claim at a high price and without the type of repurchase obligations contained in the Transfer Agreement or the substantial legal fees that it now faces in connection with the Blue Angel Action had Delphi not concealed the filing of the Preference Action until 2010.

I declare under the penalty of perjury and the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on November 23, 2010 at Chicago, Illinois.

*[signature]*

Timothy R. Glandon
Vice President and General Manager
North American Automotive Operations
Methode Electronics, Inc.