# Exhibit 1

Michael Schlanger, Esq.
SCHLANGER & SCHLANGER, LLP
1025 Westchester Avenue, Suite 108
White Plains, New York 10604
Tel.: 914-946-1981
Fax: 914-946-2930
Email:michael@schlangerlegal.com

Ira Rubin, Esq.
GOLDMAN, RUBIN & SHAPIRO
Dayton, Ohio 45432

1340 Woodman Drive
Tel.: 937-254-4455
Fax: 937-254-9754
Email: irarubin265@aol.com

*Attorneys for Plasco, Inc., sued herein as Plasco and Plasco, Inc.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | **Case No. 05-44481 (RDD)** |
| DELPHI CORPORATION, *et.al.*, | : | **(Jointly Administered)** |
| | : | |
| DELPHI CORPORATION, *et.al.*, | : | **Adv. Pro. No. 07-02287 (RDD)** |
| Plaintiffs, | : | |
| v. | : | |
| PLASCO and PLASCO, INC., | : | |
| Defendants. | : | |

-----------------------------------------------------------------X

**DECLARATION OF RON SCHWELLER, PRESIDENT OF PLASCO, INC**.

Ron Schweller declares as follows:

1. I am the President of Plasco, Inc., the adversary defendant in this action ("Plasco").

1 | P a g e

2. I make this Declaration upon personal knowledge and, if called as a witness, would testify to the facts contained herein.

3. I submit this Declaration in opposition to the Debtor's motion for leave to amend their complaint against Plasco to recover alleged preferential payments.

4. On April 1, 2010, Plasco was served with the original complaint in this action, and learned for the first time that Delphi Corporation and its affiliates or successors (collectively, "Delphi") had commenced a lawsuit under seal against Plasco in September 2007, that they were just then serving, seeking to avoid and recover over $5 million in alleged preferential transfers made by Delphi to Plasco.

## PLASCO'S LACK OF NOTICE

5. Plasco never received notice, actual or constructive, that Delphi had filed 742 Complaints under seal against any other adversary defendant in September 2007, including the Complaint filed against Plasco, specifically, Adversary Proceeding No. 07-02287.

6. Plasco never filed a proof of claim against Delphi. Plasco did not have an attorney appear for it or file a request for notice in the Delphi case. Therefore, Plasco was not on the Debtors' Master List or the ECF notice list (the "2002 List") that Delphi used to serve its various motions electronically. Upon information and belief, Plasco did not receive a copy of the Debtor's "Disclosure Statement" or a copy of the Plan, Amended Plan or Modified Plan.

7. Plasco did not receive actual or constructive notice of any of Debtor's four (4) extension motions (previously described innumerable times in motion papers before this Court) wherein Debtors sought extensions of their time to serve the adversary complaints filed under seal, or the Orders granting such extensions.

8. Plasco did receive by mail, on 11/28/05, a copy of the Debtors' "Motion for an Order Approving Procedures to Assume Certain Amended and Restated Sole Source Supplier Agreements" (one day prior to the motion return date of November 29, 2005).

## RELATIONSHIP BETWEEN DELPHI AND PLASCO

9. Plasco was a critical sole source supplier to Delphi, that is, it was Delphi's sole source for assembly of 99% of the Primary and Secondary Master Cylinder pistons, which I believe, were installed in every brake apply system the Debtors sold to their original equipment manufacturers domestically, which on information and belief, consisted of several large car manufacturers, including GM, Chrysler and Ford.

10. Plasco's lender knew that Delphi was Plasco's largest customer. As such, in April 2005, when Delphi's financial difficulties became common knowledge and known to Plasco's lender, it called in Plasco's loan. As a result, Delphi immediately sought to find a way to keep Plasco in business. To that end, when Plasco was unable to get replacement financing, Delphi, Plasco, and its lender negotiated over several months a way for Delphi to refinance Plasco's loan so that Plasco could continue production for Delphi under existing purchase orders/requirement contracts. A plan emerged under which Delphi and Plasco confirmed their respective obligations under all open purchase orders and Delphi agreed to pay Plasco's pre-petition debt as part of a three way agreement between Plasco, its bank and Delphi which was negotiated over several months and consummated on 11/17/05.

11. These negotiations resulted in agreements dated November 17, 2005, among them, an "Accommodation Agreement" wherein, among other things, the parties agreed:

    (a) That Plasco would continue to supply certain of the Debtors under numerous long-standing purchase orders/requirement contracts between the parties; and Delphi in turn agreed to continue to purchase Plasco's production under these orders and not to resource the products from another supplier provided Plasco performed;[1] and

    (b) Delphi would purchase the outstanding loan from Plasco's lender by paying the lender $850,000 and Plasco's own suppliers for the balance of the prepetition debt, it owed to Plasco (totaling $1,538,351.21) and paying the lender the balance in monthly installments over time.[2]

12. Debtors and Plasco continued doing business under the Accommodation Agreement and while Plasco obviously knew of the Debtors' bankruptcy filing, it never received any notice that a complaint had been filed against it or that Debtors were requesting the Court to extend the time by which it was obligated to serve same.

13. Moreover, by reason of Debtor's agreeing to and actually paying Plasco all of the pre petition debt due it (approximately $1,538,351.18) so that Plasco was not a creditor in the bankruptcy proceeding, and the parties continuing to do business with each other, it would have never have occurred to Plasco that Debtors were planning to seek to recover, as preferential, payments made by Debtors during the same pre petition period.

14. Both Delphi and Plasco continued doing business with each other under the Accommodation Agreement until all open purchase orders were completed; and on

---

[1] It is significant that Delphi agreed not to resource. This was tantamount to Delphi "assuming" the open purchase orders.

[2] Plasco would and did repay that entire loan to Delphi except for a credit pursuant to the Accommodation Agreement for Plasco's performing all of the purchase orders/requirement contracts until the end of their production periods (See Ex. 2, attached hereto).

04/22/09 when Plasco and Delphi, in writing, ended their relationship of thirty (30) years by settling all of their accounts, including Plasco selling and shipping certain of its molds and related special equipment to the entity to whom Delphi had sold that aspect of its business, and by the parties mutually releasing each other of all respective claims (See Ex. II, attached hereto and hereinafter the "4/22/09 Letter" or the "Release").

15. Our critical value to Delphi as their only supplier of Primary and Secondary Master Cylinder Pistons Assemblies was well known to them.  Plasco had extraordinary negotiating power with Delphi during this time.  Plasco had, over the period of 31 years, developed a particular expertise in the systematic application of automation to the assembly of Primary and Secondary Master Cylinder Pistons. No one else could touch us for low cost high volume assembly of this small range of products.

16. We developed and maintained a system for rapid part number change over. We delivered in the morning, that which was ordered yesterday afternoon. And in the afternoon, that which was ordered that morning. Our physical presence, along a smooth road, a 20-minute drive from Needmore Road (Delphi's main brake apply assembly/production facility) allowed us to make "just in time" deliveries.

17. Most importantly, we had developed special training for our operators of all of this equipment. The company had assembled all master cylinder pistons for Delphi since 1974, when Delphi was Delco Moraine, Division of General Motors. We grew up doing this. The few times over the years when Delphi tried to source a master cylinder piston with someone else, it came back to us within a year. They seldom tried. In short, Delphi's Purchasing liked our price, and its Engineering liked our process. It would have been suicide for Delphi to move this safety critical work in 2005 through when they closed

their facilities. This is why they did not; why our continued supplying them was absolutely critical to them and well-known to us; and why I believe they sought to conceal their attempts to conceal that they had filed a complaint against us and obtained extensions of time to serve it, all without giving us notice while we were still their only source of Master Cylinder Pistons.

18. As stated above, the parts we produced for Delphi were installed in almost every brake apply system that Delphi supplied to many of the top automobile manufacturers in the United States. As a critical sole source supplier, Plasco was being paid its pre-petition debt by order of this Court for that very reason. Timely deliveries were always absolutely critical in what we produced for Delphi and there was no practical alternative given the time constraints Delphi was under, but to deal with Plasco throughout this period. It is an indisputable understatement to say that it would have been extremely difficult, time consuming and expensive for Delphi to have even tried to resource what Plasco produced from an alternative supplier. They knew it and we did also.

## THE PREJUDICE TO PLASCO

19. Had I, as president of Plasco, been given notice or made aware of the adversary proceeding against Plasco at or about the time it was filed in September 2007, I can unequivocally state I would never have had Plasco undertake to continue to perform the purchase orders under the Accommodation Agreement nor to renew, extend or amend them nor to accept new purchase orders which Delphi sent in, as was constantly being done at that time, without negotiating for a formal dismissal or waiver of Delphi's claim for preferential payments, as alleged in the Amended Complaint.

20. Even in late 2007 by which time Delphi would have had to serve the complaint on Plasco, but for the extensions obtained, it was in dire need of Plasco's full cooperation:

(a) Deliveries were still twice a day or once on some Saturdays;

(b) Plasco was the only source capable of marshalling the efforts of the 35 or so fearful suppliers that comprised about 80% of our component parts; and

(c) We owned the special equipment needed for production according to pre-approved specifications insisted upon by Delphi's OEMs.

21. By never receiving notice of the claim against it or the continued requests for extending Debtors' time to serve same from late 2007 on, Plasco was denied the right to negotiate for its release. The harm is irreparable in that the time for such negotiations had obviously passed by the time Debtors unsealed and served the Complaint.

22.

(a) Had Plasco known, at the time that it should have received notice, i.e., on or about late 2007, of the potential adversary proceeding against it alleging over $5 million in preference payments, Plasco would have refused to continue to do business with Delphi unless the claims were released.

(b) In 2007 when I would have otherwise gotten notice of this complaint, Plasco had 110 employees and 3 operational plants. Today, it has 3 full-time employees, 3 unpaid shareholders/employees and 1 partially operational plant.

(c) I knew this contraction was coming for Plasco when we agreed to complete the open purchase orders and work with Plaintiff until they could close/sell its piston assembly plant in Dayton, but saw no downside in doing it. Had I known of this complaint however, I would never have "stayed in the game" just so as to let Delphi finish the

race, but leave Plasco in the above financial condition and still be left with a preference claim against it for more than $5,000,000.

(d) Alternatively, Plasco could have chosen to close down production and sell our manufacturing plant(s) and would have done so, had the claim not been released. Delphi needed Plasco more than we did them. Without our uninterrupted supplying Delphi on a twice a day basis, they would have been unable to meet their obligations to their OEMs. It was this very real economic reality that initially caused Delphi to step in and rescue our company when our lender called our loan five months before it filed. The same pressure would have been on them if we had refused to continue without a release of the preference claim had we notice of it. Denying Plasco that right to negotiate for a release of the preference claims against it was the actual prejudice caused by the lack of notice of this claim against it.

23. Indeed, on seeing it now, Delphi's conduct was intentionally misleading: it concealed superior knowledge that rightfully should have been disclosed and wasn't.

24. Besides being prejudiced by not being able to negotiate with Debtors for a waiver in return for continuing as their supplier, had Plasco known of the Debtors' intentions I am advised, it could have moved the Court to compel Debtors to assume or reject the purchase orders under the bankruptcy code which if formally assumed, would have precluded Debtors' right to claim a preference. Since Delphi had no alternative source for Plasco's product given the time and other constraints, Delphi would have I believe, had to formally assume the purchase orders. I am advised that such a formal assumption, in place of the Accommodation Agreement, which effectively had Debtors assume and agree to continue the existing executory purchase orders, would have precluded this

Declaration of Ron Schweller    Pg 10 of 13

preference complaint from being made. Being denied the right to have negotiated for the Accommodation Agreement to comport with said Assumption Order or to have made application to this Court to compel Delphi to assume the open purchase orders, constituted actual prejudice.

25. In fact, Delphi's tactics enabled it to string Plasco along under false pretenses for years even to the point of the final settling up between our two companies when, in the letter agreement between us dated 04/22/09 (Ex. 3, attached hereto and hereinafter the "04/22/09 Letter"), we mutually released each other from all claims. I say this because I am advised by counsel that Delphi's present counsel has claimed:

(a) The Accommodation Agreement between Delphi and Plasco was not an assumption of the executory contracts between us such that it qualifies as a complete defense to a preference claim because they contend it did not satisfy each and every one of the terms contained in the Assumption Order of this Court dated December 21, 2005; and

(b) That Delphi's releasing of Plasco of all claims in the 04/22/09 Letter (Ex. 3 attached hereto) was not effective and binding upon it for legal reasons I do not begin to understand.

26. There is no other way to describe what Delphi did to Plasco other than to say they completely misled and tricked me personally and substantially prejudiced Plasco. I was primarily responsible for struggling to have Plasco continue in business for the period from at or about the time of Delphi's filing, until we finished producing for them in 2009.

27. Debtor's argument of "no harm, no foul," argues that Plasco can defend itself now on the merits as well as it could back several years ago and therefore, has not truly been prejudiced. This is manifestly untrue and belies the economic reality of our relationship at

the time. The fact is that the negotiating position of Plasco was materially affected as explained above. That fact was obvious to Debtors, indeed, it was stated albeit in an offhanded way, as one of the stated reasons given for their need for the extensions. As such, their conduct should be seen for what it was; a slick gaming of the system giving false, perfunctory reasons to the Court without explaining the full impact to it at the time to conceal its true intentions from all defendants similar to Plasco, so as to deny us the right to negotiate and/or move to have Delphi assume our contracts had we known of the suits filed against us.

28. Delphi was Plasco's largest customer. To have Plasco perform for the period from 2005 through 2009 involved substantial sacrifices by my fellow shareholders and myself and, at the time, approximately 110 other dedicated employees. We all worked hard and were paid for our efforts. But to come to the end of the road having performed all of the open production orders at the time of Delphi's filing until 2009, negotiate for and obtain a signed release from all claims from Delphi which they now blithely ignore and be left with three paid employees and one barely operational plant only to find out that they had secretly reserved the right to sue Plasco all the time at a time when we were an absolutely critically essential supplier, is more than just prejudice or inconvenience. It is in my opinion, a dishonest abuse of the Court's procedures and conduct I would never expect this Court to countenance.

29. Additionally, because Plasco did not know it had been sued by Delphi, Plasco did not take special steps to organize and preserve its records with respect to Delphi. For example, Plasco has not retained copies of all corporate records of transactions with Delphi, or correspondence, such as emails and handwritten notes, all of which would be

relevant in Plasco's defense of this action. Plasco also did not secure names and addresses of many of its former employees whose testimony might be essential in Plasco's defense. Delphi has an unfair advantage, having had knowledge of a potential action since 2007 and the resulting opportunity to plan for, retain and gather information in support of its claims. This opportunity is forever unavailable to Plasco. In addition, Plasco's computer records for 2005 were purged sometime in mid 2008. What we are left with is incomplete paper records that are terribly difficult to access.

### **AS TO DEFICIENCIES IN THE AMENDED COMPLAINT**

30. The first alleged preferential transfers contained in the Exhibit 1 attached to the proposed First Amended Complaint lists a "transfer" of $1,200,000 on the day before Delphi filed their petitions. This money was never transferred or received by Plasco! Neither does the entry list a purchase order, nor even mention or allege that it was for an antecedent debt, as I am advised it is required to do. It was alleged to be transferred by "wire." Delphi can easily have verified that it was not transferred, but it has not done so. I am advised that Delphi's counsel was made aware of this error in writing, but has done nothing to remove it from the Proposed First Amended Complaint.[3]

31. For example, upon information and belief, Plasco did not receive any payments during the preference period from "DAS, LLC." We received the challenged EFT payments to our account from the Delphi Energy and Chassis, a subsidiary in Dayton and believe these payments were not made to Plasco by the Plaintiff. However, because Plasco has

---

[3] On 10/12/2005 and 10/18/2005, $250,000 was wired into Defendant's bank account without Plasco's knowledge or request as an advance of $500,000 and not on account of any antecedent debt, again further evidence of how critical Plaintiff viewed Plasco's continued production for Delphi. This advance was eventually repaid to Plaintiff and is specifically accounted for as an "advance" in the 04/22/09 Letter attached hereto as Exhibit 3.

not retained all of its records from 2005, it is difficult for Plasco to present evidence in support of that at this time.

32. The Amended Complaint alleges that "Plaintiff entered into certain purchase agreements (the "Agreement") with the Defendant for the performance of services to Plaintiff and the Reorganized Debtors." at ¶13 (emphasis added). However, most of Plasco's purchase orders which were assumed and continued pursuant to the Accommodation Agreement were with "Delphi Energy & Chassis Systems," not the Plaintiff named in the Amended Complaint. To the best of my knowledge, Plasco did not begin to amend purchase orders (originally in the name of Delphi Energy & Chassis Systems/Dayton) to the name of Delphi Automotive Systems, LLC, until 2006; and was paid by Delphi Energy & Chassis Systems/Dayton, not Plaintiff.

33. I make this Declaration under penalty of perjury.

_____
Ron Schweller, President of Plasco, Inc.

Sworn to before me this
24th day, November, 2010.

_____
Notary Public

JOSEPH P. LATHAM
Notary Public, State of Ohio
My Commission Expires December 25, 2013

12 | Page