HONIGMAN MILLER SCHWARTZ AND COHN LLP
Aaron M. Silver (P65481)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
Telephone: (313) 465-7560
Facsimile: (313) 465-7561
Email: asilver@honigman.com

Attorneys for Defendant Rotor Coaters International Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

| | | |
|---|---|---|
| **In Re** | : | Chapter 11 |
| **DELPHI CORPORATION,** et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | Hon. Robert D. Drain |

------------------------------------------------------------x

| | | |
|---|---|---|
| DELPHI CORPORATION, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| Against | : | |
| | : | |
| ROTOR COATERS INTERNATIONAL INC., | : | Adv. Pro. No. 07-02767 (RDD) |
| | : | |
| Defendant. | : | |

------------------------------------------------------------x

## DECLARATION OF JILL WARNER IN OPPOSITION TO DEBTORS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS

Jill Warner declares as follows:

1.    I was the Vice President of Finance of Rotor Coaters International Inc. ("**RCI**").

2.    I make this Declaration upon personal knowledge and if called as a witness would testify to the facts contained herein.

**RCI'S BUSINESS**

3.    RCI is a small business that has terminated all of its operations, terminated its employees and is no longer conducting business.

4.    When it was operating, RCI applied a coating to brake rotors for Delphi. Delphi was RCI's only customer. At all times, the rotors were owned by Delphi and RCI was paid only for the services it performed.

5.    On September 30, 2002, RCI and Delphi Automotive Systems LLC entered into that certain Amended and Restated Loan and Security Agreement, a copy of which is attached as Exhibit A. The outstanding balance on the loan as of September 30, 2002 was $4,371,300.

6.    On May 1, 2004, Delphi entered into a Management and Supply Agreement with RCI. The supply agreement provided for a break even pricing such that (i) to the extent the RCI's revenue exceeded its expenses, RCI would make payment to Delphi, and (ii) to the extent RCI's expenses exceeded the revenue, Delphi would make payment to RCI. The foregoing is referred to as the "True Up Payment."

7.    During the 90 days prior to Delphi's petition date, the outstanding balance on the loan payable by RCI to Delphi was at all times in excess of $1,800,000.

8.    Delphi continued to operate under the Management and Supply Agreement post-petition through the end of 2007.

9.    In third quarter of 2007 Delphi lost a major contract with General Motors thereby causing the termination of the services provided by RCI to Delphi under the Management and Supply Agreement.

10.    After Delphi initiated this proceeding but before RCI was aware of this adversary proceeding, RCI and Delphi negotiated an orderly wind-down whereby RCI liquidated all of its assets under the supervision of and for the benefit of Delphi. Delphi agreed that, upon liquidation of the assets and payment of the proceeds to Delphi, Delphi would forgive substantially all of the remaining unpaid balance of the loans owing by RCI. The intent of these negotiations was to permit RCI to wind down its affairs.

11.    By the end of 2007, RCI had liquidated all of its assets and paid down the balance of the Delphi debt to $739,936. Delphi agreed to forgive the balance of the loan owing by RCI to Delphi, except for $56,261, which amount was specifically negotiated to permit RCI to pay its remaining creditors.

12.    Because RCI was liquidating its assets and had believed that it had resolved all of its claims with Delphi, RCI did not hire bankruptcy counsel to monitor Delphi's bankruptcy case and the Court's docket. Accordingly, until December 2009, RCI did not know that Delphi had sought and obtained authority to file the complaint filed in this adversary proceeding under seal and extend the time for service of the complaint or that, in late September 2007 or October 2007, Delphi had commenced a lawsuit under seal against RCI seeking to avoid and recover $1,640,340.26

## DELPHI'S DELAY IN PROSECUTION OF THESE CASES HAS PREJUDICED RCI

13.    RCI has been substantially prejudiced by Delphi's concealment of the lawsuit. At nearly the same time that Delphi had filed the lawsuit and was actively concealing the lawsuit from RCI, RCI was negotiating an orderly wind-down of its affairs with Delphi, its largest creditor. Had RCI known about the lawsuit and the potential liability asserted in this adversary proceeding in connection with winding up its affairs, RCI would have handled its negotiations with Delphi differently by ensuring that RCI had no continuing liability to Delphi.

14.    Since October 2007, RCI personnel with direct contact with Delphi ("**Former Key Employees**") have left RCI and are no longer employed by RCI. These individuals include Thomas Root and Kurt Thurston. In addition, RCI's primary contacts at Delphi are no longer employed by Delphi, including Larry Sears, Commodity Manager Global Purchasing, Rich DeVilbiss, Senior Buyer Global Purchasing and Keith Stipp, Director of Finance.

15.    Because RCI did not know it had been sued by Delphi, RCI did not take steps to preserve information necessary or helpful to its defense of Delphi's lawsuit.

16.    Similarly, because RCI did not know it had been sued by Delphi, RCI made no arrangements with its Former Key Employees to obtain information about the issues in the lawsuit, conduct exit interviews, or to keep in touch with them.

17.    Because RCI did not know it had been sued by Delphi, RCI took no special steps to organize and preserve its records with respect to Delphi.

18.    If RCI had known that Delphi had sued it, RCI could and would have taken special steps to organize and preserve its records with respect to Delphi, hold exit interviews with Former Key Employees and make arrangements to maintain contact with the Former Key Employees in case RCI would need them to provide litigation information or serve as witnesses.

### THE ALLEGEDLY PREFERENTIAL TRANSFERS DID NOT PERMIT RCI TO RECEIVE MORE THAN IT WOULD HAVE RECEIVED IF THE CASE WERE A CASE UNDER CHAPTER 7

19.    Because RCI was indebted to Delphi at all times during the preference period for an amount that exceeded the amount of each allegedly preferential transfer, RCI was fully secured by a right of setoff.  Accordingly, the allegedly preferential transfers did not permit RCI to receive more that it would have received if the transfer had not been made and the case were a case under chapter 7.

20.    I make this Declaration under penalty of perjury.

_____
Jill Warner

Executed in Brighton, Michigan
on November 24, 2010

4

EXHIBIT LIST

Exhibit A          Amended and Restated Loan Agreement

ACTIVE.8485078.1

## AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT

**THIS AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT** (this "**Agreement**") is entered into on March 20, 2003 as of **September 30, 2002** by and between **DELPHI AUTOMOTIVE S YSTEMS L LC**, a Delaware limited liability company ("**Lender**"), with offices at 5725 Delphi Drive, Troy, Michigan 48098 and **ROTOR COATERS INTERNATIONAL, INC.**, a Michigan corporation ("**Borrower**"), with a principal place of business at 3265 Commerce Center Drive, Saginaw, Michigan 48601.

### R E C I T A L S:

A.     This Agreement supersedes, restates and replaces that certain Loan and Security Agreement dated November 20, 1998, as amended from time to time, including by that certain First Amendment to Loan and Security Agreement dated June 2, 1999, by that certain Second Amendment to Loan and Security Agreement dated January 4, 2000 and by that certain Third Amendment to Loan a nd S ecurity A greement dated February 1 5, 2 001, e ach b y a nd between GMAC Business Credit, LLC ("**GMAC**") and Borrower (collectively, the "**Original Agreement**").

B.     Pursuant to that certain Assignment and Assumption Agreement dated September 30, 2002 by and between GMAC and Lender (the "**Assignment**"), GMAC sold the Loans (as defined in the Assignment) to Lender and assigned, transferred and conveyed to Lender all of GMAC's right, title and interest in and to the Loans and the Loan Documents (as defined in the Assignment), including the collateral securing the Loans and all related subordinations and other rights, interests and documents to Lender.

C.     Pursuant to the Assignment, Lender purchased the Loans from GMAC and assumed all of GMAC's obligations, duties, liabilities and responsibilities under the Loan Documents arising from and after the date of the Assignment.

D.     This Agreement is not a new Agreement, but supersedes, restates and replaces the Original Agreement.  All liens and security interests granted to GMAC pursuant to the Original Agreement and assigned to Lender pursuant to the Assignment remain in full force and effect.

**NOW, THEREFORE,** in consideration of the foregoing premises and the representations, warranties, covenants and agreements contained below, the parties agree as follows:

### ARTICLE 1

### GENERAL LENDING TERMS

The following are the general terms of the loan to be made under this Agreement:

1.1     A $4,371,300.08 term loan as evidenced by an Amended and Restated Term Note of even date payable to the order of Lender (the "Term Loan" and the "Term Note", as applicable).

1.2     The applicable interest rate is the Prime Rate less one hundred (100) basis points (the "**Base Rate**").

1.3     Unless renewed as provided in Section 3.2 below, this Agreement expires on September 30, 2007 (the "**Initial Term**").

1.4     Borrower shall pay Lender an annual facility fee of $25,000 (the "**Annual Facility Fee**") on November 20, 2003 and on November 20th of each subsequent y ear during the term of this Agreement. The Annual Facility Fee will be fully earned on the date of this Agreement. Provided that no Event of Default exists under this A greement at the d ate the A nnual Facility Fee is due, Lender shall apply such Annual Facility Fee to the principal due under the Note.  No such application shall affect

Borrower's obligation to continue making all payments as specified in the Note until all Obligations have been paid in full.

## ARTICLE 2

## DEFINITIONS

In addition to the terms defined in this Agreement, the following terms have the given definitions:

**2.1** **"Accounts"** means all presently existing and hereafter arising accounts receivable, contract rights and all other forms of obligations owing to Borrower arising out of the sale or lease of goods or the rendition of services by Borrower, whether or not earned by performance, all credit insurance, guaranties and other security therefore, as well as all goods returned to or reclaimed by Borrower, and Borrower's Business Records relating to any of the foregoing.

**2.2** **"Business Day"** means a day on which Lender is open for business in Troy, Michigan.

**2.3** **"Business Records"** means all of Borrower's books and records, including all of the following: ledgers, records indicating, summarizing or evidencing Borrower's assets (including the Collateral) or liabilities; all information relating to Borrower's business operations or financial condition; and all computer programs, disk or tape files, printouts, runs or other computer prepared information, and the equipment containing such information.

**2.4** **"Claims"** means any demand, claim, action or cause of action, damage, liability, loss, cost, debt, expense, obligation, tax, assessment, charge, lawsuit, contract, agreement, undertaking or deficiency, of any kind or nature, whether known or unknown, fixed actual, accrued or contingent, liquidated or unliquidated (including interest, penalties, attorneys' fees and other costs and expenses incident to proceedings or investigations relating to any of the foregoing or the defense of any of the foregoing), whether or not litigation has commenced.

**2.5** **"Collateral"** means all of the following: the Accounts; the Equipment; the General Intangibles; the Inventory; the Negotiable Collateral; the Real Estate; any money or other assets of Borrower which hereafter come into the possession, custody or control of Lender; and all proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the Collateral, and any and all Accounts, Equipment, General Intangibles, Inventory, Negotiable Collateral, Business Records, money, deposit accounts or other tangible or intangible property resulting from the sale or other disposition of the Collateral or any portion thereof or interest therein, and the proceeds thereof.

**2.6** **"Environmental Laws"** means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the Resource Conservation and Recovery Act of 1976, the Hazardous Materials Transportation Act, the Toxic Substances Control Act, the regulations pertaining to such statutes, and any other safety, health or environmental statutes, laws, regulations or ordinances of the United States or of any state, county or municipality in which Borrower conducts its business or the Collateral is located.

**2.7** **"Equipment"** means all of Borrower's present and hereafter acquired equipment, machinery, machine tools, motors, furniture, furnishings, fixtures, motor vehicles, rolling stock, processors, tools, parts, dies, jigs, goods (other than consumer goods, farm products or Inventory), wherever located, and any interest of Borrower in any of the foregoing, and all attachments, accessories, accessions, replacements, substitutions, additions and improvements to any of the foregoing, wherever located.

**2.8** **"ERISA"** means the Employee Retirement Income Security Act of 1974, as

2

amended, and the regulations thereunder.

**2.9** **"ERISA Affiliate"** means each trade or business (whether or not incorporated and whether or not foreign) which is or may hereafter become a member of a group of which Borrower is a member and which is treated as a single employer under ERISA Section 4001(b)(1) or IRC Section 414.

**2.10** **"Expenses"** means all fees and out-of-pocket disbursements incurred by Lender, including fees of counsel and court costs, in any way arising from or in connection with this Agreement, any Loan Documents, any of the Collateral, any of the Obligations or the business relationship between Lender and Borrower, including, without limitation: (i) audit fees; (ii) the Annual Facility Fees and the Servicing Fees; (iii) all fees and expenses (including recording fees and insurance policy fees) of Lender and counsel for Lender for the preparation, examination, approval, negotiation, execution and delivery of, or the closing of any of the transactions contemplated by, this Agreement and any Loan Documents; (iv) all fees and out-of-pocket disbursements incurred by Lender, including attorneys' fees, in any way arising from or in connection with any reasonable action taken by Lender to monitor, advise, administer, enforce or collect any of the Obligations under this Agreement, any Loan Documents or any other obligations of Borrower, whether joint, joint and several, or several, under this Agreement (or any Loan Documents), or any other existing or future document or agreement, or arising from or relating to the business relationship between Lender and Borrower, or otherwise securing any of the Obligations, including any actions to lift the automatic stay or to otherwise in any way monitor or participate in any Insolvency Proceeding of Borrower; (v) all expenses and fees (including attorneys' fees) incurred in relation to, in connection with, in defense of (if Lender is the prevailing party) and/or in prosecution of any litigation instituted by any one or more of Borrower, Lender or any third party against or involving Lender arising from, relating to or in connection with any of the Obligations or Borrower's other obligations, this Agreement (or any Loan Documents), any of the Collateral or the business relationship between Lender and Borrower, including any so-called "Lender liability" action, any claim and delivery or other action for possession of, or foreclosure on, any of the Collateral, post-judgment enforcement of any rights or remedies, including enforcement of any judgments, and prosecution of any appeals (whether discretionary or as of right and whether in connection with pre-judgment or post-judgment matters); (vi) all reasonable costs, expenses and fees incurred by Lender or its agents in connection with any appraisals or environmental assessments of all or any of the Collateral (and Borrower shall fully cooperate with such appraisers and make its property available for appraisal in connection with as many appraisals or environmental assessments as Lender may request); and (vii) all reasonable costs, expenses and fees incurred by Lender and/or its counsel in connection with consultants, expert witnesses or other professionals retained by Lender and/or its counsel in order to assist, advise and/or give testimony with respect to any matter relating to this Agreement or any Loan Documents, the Collateral or the business relationship between Lender and Borrower (and Borrower shall fully cooperate with such consultant, expert witness or other professional and shall make their premises, books and records, accounting systems, computer systems and other media for the recordation of information available to such persons).

**2.11** **"General Intangibles"** means all of Borrower's present and future general intangibles and other personal property (including contract rights, rights arising under common law, statutes or regulations, choses or things in action, goodwill, going concern value, "blue sky", patents, trade names, trademarks, service marks, copyrights, blueprints, drawings, purchase orders, customer lists, monies due or recoverable from pension funds, monies due under any royalty or licensing agreements, route lists, infringement claims, computer programs, computer discs, computer tapes, literature, reports, catalogs, deposit accounts, insurance premium rebates, tax refunds and tax refund claims) other than goods and Accounts, and Borrower's Business Records relating to any of the foregoing.

**2.12** **"Hazardous Material"** means any substance, material, emission or waste which is or hereafter becomes regulated or classified as a hazardous substance, hazardous material, toxic substance or solid waste under any Environmental Law, asbestos, petroleum products, urea formaldehyde, polychlorinated biphenyls (PCBs), radon and any other hazardous or toxic substance,

3

material, emission or waste.

**2.13** **"Insolvency Proceeding"** means any proceeding commenced by or against Borrower under any provision of the Bankruptcy Code or under any other bankruptcy or insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with its creditors or proceedings seeking reorganization, liquidation, arrangement or other similar relief.

**2.14** **"Inventory"** means all present and future inventory in which Borrower has any interest, including goods held for sale or lease or to be furnished under a contract of service, Borrower's present and future raw materials, work in process, finished goods and supplies and materials used in or consumed in Borrower's business, goods which have been returned to, repossessed by or stopped in transit by Borrower, packing and shipping materials, wherever located, any documents of title representing any of the above and Borrower's Business Records relating to any of the foregoing.

**2.15** **"Loan Documents"** means, collectively, this Agreement, any Notes, any security agreements, pledge agreements, assignments, deeds of trust, mortgages or other encumbrances or agreements which secure or relate to the Obligations or the collateral security for the Obligations, any guaranties of the Obligations, any lock box or blocked account agreement and any other agreements entered into between Borrower and Lender relating to or in connection with this Agreement.

**2.16** **"Loan"** means the Term Loan.

**2.17** **"Multiemployer Plan"** means a multiemployer plan as defined in ERISA Sections 3(37) or 4001(a)(3) or IRC Section 414(f) which covers employees of Borrower or any ERISA Affiliate.

**2.18** **"Negotiable Collateral"** means all of Borrower's present and future letters of credit, notes, drafts, instruments, certificated and uncertificated securities, documents, leases and chattel paper and Borrower's Business Records relating to any of the foregoing.

**2.19** **"Note"** means the Term Note.

**2.20** **"Obligations"** means all Loans, advances, debts, liabilities (including all amounts charged to Borrower's loan account pursuant to any agreement authorizing Lender to charge Borrower's loan account), obligations, fees, lease payments, guaranties, covenants and duties owing by Borrower to Lender of any kind and description of money or otherwise (whether pursuant to or evidenced by the Loan Documents, by any Note or other instrument or by any other agreement between Lender and Borrower), whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, including any debt, liability or obligation owing from Borrower to others which Lender may obtain by assignment or otherwise, and all interest thereon, including any interest that, but for the provisions of the Bankruptcy Code, would have accrued, and all Expenses which Borrower is required to pay or reimburse pursuant to the Loan Documents, by law or otherwise.

**2.21** **"Permitted Liens"** means:

A.    Liens for taxes, assessments or governmental charges, and liens incident to construction, which are either not delinquent or are being contested in good faith by Borrower by appropriate proceedings, which will prevent foreclosure of such liens, and against which adequate reserves have been provided, and upon demand by Lender, with adequate security being posted with Lender;

B.    Liens or deposits in connection with workers' compensation or other insurance or to secure customs' duties, public or statutory obligations in lieu of surety, stay or appeal bonds or to secure performance of contracts or bids (other than contracts for the payment of money borrowed), or deposits required by law or governmental

4

regulations or by any court order, decree, judgment or rule as condition to the transaction of business or the exercise of any right, privilege or license; or other liens or deposits of a like nature made in the ordinary course of business; and

        C.      Security interests or mortgages granted to Lender.

      **2.22**   **"Plan"** means any plan described in ERISA Section 3(2) maintained for employees of Borrower or any ERISA Affiliate, other than a Multiemployer Plan.

      **2.23**   **"Prime Rate"** means the variable rate of interest, per annum, which is announced from time to time by Comerica, Detroit, Michigan as its "prime rate". The Prime Rate is nothing more nor less than an index for determining the interest rate payable under the terms of this Agreement. The Prime Rate is not necessarily the best rate, or any other definition of rates, offered by Comerica or Lender. The Prime Rate may change on a daily basis.

      **2.24**   **"Real Estate"** means all real estate and rights in real estate and all related property which is covered by any mortgages or deeds of trust executed by Borrower in favor of Lender.

      **2.25**   **"Reportable Event"** means a "reportable event" as that term is defined and applied in connection with ERISA.

      **2.26**   **"Tax Distributions"** means, for all periods, if any, in which Borrower is a "pass-through" entity for federal income tax purposes, an amount equal to each member's federal, state and local income tax attributable to Borrower's earnings which are allocated to Borrower's members or shareholders under applicable law in lieu of being paid by Borrower.

## ARTICLE 3

### INTEREST AND PAYMENTS

      **3.1**   **Interest Rate; Default Interest Rate.** The aggregate outstanding amount of all Obligations shall bear interest at the Base Rate, with all interest due and payable on the first day of each month. The aggregate outstanding amount of all Obligations shall bear interest, from and after the occurrence of an Event of Default and without constituting a waiver of any such Event of Default, at the rate of three (3%) percent per annum above the Base Rate. All interest payable under the Loan Documents shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed, based on the aggregate amount of the Obligations that are outstanding on each day. Interest shall continue to accrue until all of the Obligations are paid in full.

      **3.2**   **Payments.** All payments, including any prepayments, by Borrower on account of principal, interest, fees or other Obligations must be made without setoff or counterclaim to Lender at the address specified on the first page of this Agreement in lawful money of the United Sates of America and in immediately available funds. If any payment under this Agreement or any Note becomes due on a day other than a day which is a Business Day, its maturity will be extended to the next succeeding Business Day, and with respect to payments of principal and interest thereon, will be payable at the then-applicable rate during such extension.

      **3.3**   **Crediting Payments.** The receipt by Lender of any wire transfer or electronic funds transfer of funds, check or other item of payment shall not be considered a payment on account unless such wire transfer or electronic funds transfer is of immediately available federal funds and is made to the appropriate deposit account of Lender or unless and until such check or other item of payment is honored when presented for payment. For the purpose of calculating interest, the receipt by Lender of any wire transfer or electronic funds transfer, check or other item of payment shall be deemed to have occurred one (1) Business Day after the date Lender actually receives such item of payment. In the event any check or other item of payment is not honored when presented for payment, Borrower shall

be deemed not to have made such payment.  Notwithstanding anything to the contrary contained herein, any wire transfer, electronic funds transfer, check or other item of payment received by Lender after 1:00 p.m. Troy time shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day.

<h1 style="text-align:center">ARTICLE 4</h1>

<h2 style="text-align:center">INTENTIONALLY OMITTED</h2>

<h1 style="text-align:center">ARTICLE 5</h1>

<h2 style="text-align:center">SECURITY FOR THE OBLIGATIONS</h2>

**5.1**     **Grant of Security.**  Borrower hereby reaffirms and ratifies all liens and security interests previously granted to GMAC (and assigned to Lender) and grants Lender a continuing security interest in all presently existing and hereafter acquired or arising Collateral to secure prompt repayment of all Obligations and to secure the prompt performance by Borrower of each of its covenants and duties in this Agreement and any other agreements with Lender.  Lender's security interest in the Collateral shall attach to all Collateral without further act on the part of Lender or Borrower.  Other than sales of finished goods Inventory to buyers in the ordinary course of business, Borrower has no authority, express or implied, to dispose of, sell or transfer any of the Collateral.

**5.2**     **Negotiable Collateral.**  In the event that any Collateral, including proceeds, is evidenced by or consists of Negotiable Collateral, Borrower shall, upon the request of Lender, immediately endorse and assign such Negotiable Collateral to Lender and deliver physical possession of such Negotiable Collateral to Lender.

**5.3**     **Additional Documents.**  At the request of Lender, Borrower shall execute and deliver to Lender, all financing statements, continuation financing statements, fixture filings, security agreements, pledges, assignments, endorsements of certificates of title, applications for title, affidavits, reports, notices, schedules of accounts, letters of authority and all other documents that Lender may reasonably request, in form satisfactory to Lender, to perfect and continue perfected Lender's security interest in the Collateral and in order to fully consummate all of the transactions contemplated hereunder and under the other Loan Documents.

**5.4**     **Power of Attorney.**  Borrower hereby irrevocably designates, makes, constitutes and appoints Lender (and any of Lender's officers, employees or agents designated by Lender) as Borrower's true and lawful attorney-in-fact.  Pursuant to this power of attorney, Lender, or Lender's agent, may, without notice to Borrower and in either Borrower's or Lender's name, but at the cost and expense of Borrower, at such time or times as Lender in its sole discretion may determine: (i) upon the occurrence and continuation of an Event of Default, demand payment of the Accounts from the Account Debtors, enforce payment of the Accounts by legal proceedings or otherwise and generally exercise all of Borrower's r ights a nd r emedies w ith r espect t o t he collection of t he A ccounts; ( ii) t ake c ontrol, in a ny manner, of any item of payment or proceeds relating to any Collateral; (iii) upon the occurrence and continuation of an Event of Default, prepare, file and sign Borrower's name to a proof of claim in bankruptcy or similar document against any Account Debtor or to any notice of lien, assignment or satisfaction of lien or similar document in connection with any of the Collateral; (iv) sign Borrower's name on any of documents described in Section 5.3 or on any other similar documents to be executed, recorded or filed in order to perfect or continue perfected Lender's security interest in the Collateral; (v) upon the occurrence and continuation of an Event of Default, sign Borrower's name on any invoices, bills of lading, freight bills, chattel paper, documents, instruments or similar documents or agreements relating to the Accounts, Inventory or other Collateral, drafts against Account Debtors, schedules and assignments of Accounts, verifications of Accounts and notices to Account Debtors; (vi) send requests for verification of Accounts; (vii) endorse Borrower's name on any checks, notes, acceptances, money orders, drafts or other items of payment or proceeds relating to any Collateral that may come into Lender's possession and deposit the same to the account of Lender for application to the Obligations;

6

(viii) upon the occurrence and continuation of an Event of Default, do all other acts and things necessary, in Lender's determination, to fulfill Borrower's obligations under this Agreement or any of the other Loan Documents; (ix) upon the occurrence and continuation of an Event of Default, notify the post office authorities to change the address for delivery of Borrower's mail to an address designated by Lender, to receive and open all mail addressed to Borrower, and to retain all mail relating to the Collateral and forward all other mail to Borrower; (x) upon the occurrence and continuation of an Event of Default, use the information recorded on or contained in any data processing equipment and computer hardware and software relating to the Accounts, Inventory, Equipment and any other Collateral and to which Borrower has access; (xi) upon the occurrence and continuation of an Event of Default, make, settle and adjust all claims under Borrower's policies of insurance relating to the Collateral, make all determinations and decisions with respect to such policies of insurance and endorse the name of Borrower on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance; (xii) upon the occurrence and continuation of an Event of Default, sell or assign any of the Accounts and other Collateral upon such terms, for such amounts and at such time or times as Lender deems advisable; and (xiii) upon the occurrence and continuation of an Event of Default, settle, adjust or compromise disputes and claims respecting the Accounts directly with Account Debtors, for amounts and upon terms that Lender determines to be reasonable, and, in furtherance thereof, execute and deliver any documents and releases that Lender determines to be necessary. The appointment of Lender as Borrower's attorney-in-fact and each and every one of Lender's rights and powers, being coupled with an interest, is irrevocable until all of the Obligations have been fully repaid and performed and this Agreement has been terminated.

    **5.5**  **Right to Inspect.** Lender, through any of its officers, employees or agents, shall have the right, at any time or times during Borrower's usual business hours, or during the usual business hours of any third party having control over any of Borrower's Business Records, to inspect the Business Records in order to verify the amount or condition of, or any other matter relating to, the Collateral or Borrower's financial condition. Lender also shall have the right, at any time or times during Lender's usual business hours, to inspect and examine the Inventory and the Equipment and to check and test the same as to quality, quantity, value and condition. If an Event of Default has occurred or if Lender reasonably believes that an Event of Default has occurred, Lender may conduct any of the inspections referenced in this Section 5.5 at any time without regard to Borrower's or any third party's usual business hours.

## ARTICLE 6

## REPRESENTATIONS AND WARRANTIES

    In order to induce Lender to amend and restate the Original Agreement and accept the Note, Borrower represents and warrants to Lender as follows:

    **6.1**  **Organization.** Borrower is a corporation duly organized and existing under the laws of the State of Michigan, and the execution, delivery and performance of the Loan Documents, including this Agreement and the issuance of the Note as provided in this Agreement are within Borrower's corporate powers, have been duly authorized, are not in contravention of law or the terms of Borrower's Articles of Incorporation or Bylaws, and do not require the consent or approval of any governmental body, agency or authority. Borrower is duly licensed or qualified to do business in all jurisdictions in which Borrower has substantial property or business operations.

    **6.2**  **Financial Statements.** Borrower's balance sheets and the statements of profit and loss and surplus furnished to Lender from time to time will be in all material respects correct and complete and will fairly present Borrower's financial condition as of the relevant dates and the results of its operations for the applicable time periods.

    **6.3**  **Liens.** Except for Permitted Liens, Borrower has good and marketable title to all its assets, including all Collateral, free and clear of all liens and encumbrances.

**6.4    Absence of Conflicting Obligations.**  The making and execution of the Loan Documents and compliance with its terms and the issuance of the Note will not result in a breach of any of the terms and conditions of or result in the imposition of any lien, charge or encumbrance upon any property of Borrower pursuant to, or constituting a default under, any indenture or other agreement or instrument to which Borrower is a party or by which it is bound.

**6.5    Taxes.**  Borrower has no outstanding unpaid tax liabilities (except for taxes which are currently accruing from its current operations and ownership of property, and which are not delinquent), and no tax deficiencies have been proposed or assessed against Borrower.  There have been no audits of Borrower's federal income tax returns, which have resulted in or are likely to result in the assessment of any material tax liability against Borrower and all taxes shown by any returns have been paid.

**6.6    Absence of Material Litigation.**  Except for the lawsuit filed against Borrower and others by the estate of Mr. Wingard, Borrower is not a party to any litigation or administrative proceeding, nor so far as is known by Borrower is any litigation or administrative proceeding threatened against it, which in either case would, if adversely determined, cause any material adverse change in its properties or the conduct of its business.

**6.7    Absence of Environmental Problems.**  Except as disclosed in writing to Lender, Borrower is in full and complete compliance with all Environmental Laws involving Borrower's past or present operations, facilities and property.  Further, Borrower has not been cited for violating any applicable Environmental Laws and Borrower has all necessary environmental permits and licenses to operate its business.

**6.8    Legal Name.**  Borrower's full legal name is exactly as set forth on the signature page of this Agreement and Borrower has not changed its name since the date of its organization, nor has it used any assumed name, tradename or tradestyle.

**6.9    Financing Statements.**  Except for financing statements covering Permitted Liens and Lender's liens, no financing statements covering any Collateral, proceeds of Collateral, or any other Borrower's property are on file in any public office.

**6.10    ERISA.**  No Reportable Event has occurred with respect to any Plan.

**6.11    Broker's Fee.**  Borrower has made no commitment, and has taken no action, that could result in a claim for any brokers', finders' or similar fees or commitments in respect to the transactions described in this Agreement.  Borrower agrees to pay all finders' fees or similar fees payable to any persons or entities in connection with this Agreement and to defend and hold Lender harmless against any and all such fees.

**6.12    Principal Executive Office, Business Location:**

A.    Borrower's principal place of business, all physical Collateral, records concerning the Collateral and all other Business Records are located at or about the address set forth at the beginning of this Agreement; and

B.    Borrower will provide Lender with thirty (30) days prior written notice of any change with respect to any of the foregoing.

**6.13    Full Disclosure.**  So far as Borrower is aware, this Agreement and all of the Exhibits and other written material delivered by Borrower to Lender in connection with the transactions contemplated by this Agreement do not contain any statement that is false or misleading with respect to any material fact and do not omit to state a material fact necessary in order to make the statements therein not false or misleading.  There is no additional fact that Borrower is aware of that has not been

8

disclosed in writing to Lender that materially affects adversely or, so far as Borrower can reasonably foresee, will materially affect adversely Borrower's financial condition or business prospects.

**6.14    Flood Hazard.**  No location at which Borrower does business falls within the boundaries of a special flood hazard area so designated by the United States Federal Emergency Management Administration.

**6.15    Intellectual Property.**  To its knowledge, Borrower owns or possesses adequate licenses or other rights to use all patents, processes, trademarks, trade names and copyrights necessary to conduct its business as now conducted or presently intended to be conducted and Borrower has no reason to believe that any such rights conflict or will conflict with the rights of others. All of Borrower's patents, trademarks and copyrights are described in the Collateral Assignment of Intellectual Property and Security Agreement executed by Borrower in favor of Lender in connection with this Agreement.

**6.16    Compliance with Law.**  Borrower is in material compliance with all material laws and regulations applicable to it, its business and properties. Borrower has all licenses, permits, orders and approvals that are required under any governmental law or regulation in connection with Borrower's business and properties ("Permits"). No notice of any violation has been received with respect of any Permits and no proceeding is pending or, to the best of Borrower's knowledge, threatened to terminate, revoke or limit any Permits.

**6.17    Accounts.**  All of Borrower's Accounts constitute bona fide existing obligations created by the sale and delivery of Inventory or the rendition of services to Account Debtors in the ordinary course of Borrower's business, and, in the case of Accounts created by the sale and delivery of Inventory, the Inventory giving rise to such Accounts has been delivered to the Account Debtor.

**ARTICLE 7**

**NEGATIVE COVENANTS**

While any of the Obligations remain unpaid, Borrower must not agree to and must not (without Lender's prior written consent, which consent will not be unreasonably withheld):

**7.1    Restriction of Liens.**  Except for Permitted Liens, create or permit to be created or allow to exist any mortgage, pledge, encumbrance or other lien upon or security interest in any property or assets now owned or acquired in the future by Borrower.

**7.2    Restriction on Indebtedness.**  Create, incur, assume or have outstanding any indebtedness for borrowed money except:

A.    The Obligations;

B.    Indebtedness incurred in the ordinary course of Borrower's business for necessary materials, supplies, etc., all of which must be due not more than ninety (90) days from the date of invoice and none of which may be past due;

C.    Indebtedness for Permitted Liens.

**7.3    Mergers; Consolidations; Disposition of Assets.**  Merge with or into or consolidate with or into any other corporation or entity; or sell, lease, transfer or otherwise dispose of all or any part of its property, assets or business (other than by sales of Inventory made in the ordinary course of business).

**7.4    Sale and Leaseback.**  Enter into an agreement under which Borrower leases or purchases any property that Borrower has sold or is to sell.

9

**7.5   Dividends, Distributions and Redemptions.** Except for Tax Distributions and dividends payable in shares of its stock, pay or declare any dividend, or make any other distribution on account of any shares of any class of its stock, or redeem, purchase or otherwise acquire, directly or indirectly, any shares of any class of its capital stock.

**7.6   Investments.** Make any loans or advances to, or investments in, other persons, corporations or entities, except:

A.   Investments in: (i) bank certificates of deposit and savings accounts; (ii) obligations of the United States; and (iii) prime commercial paper maturing within ninety (90) days of the date of acquisition by Borrower.

B.   Loans and advances made to employees and agents in the ordinary course of business, such as travel and entertainment advances and similar items, not to exceed in the aggregate $20,000 in any fiscal year of Borrower.

**7.7   Contingent Liabilities.** Guarantee or become a surety or otherwise contingently liable for any obligations of others, except pursuant to the deposit and collection of checks and similar items in the ordinary course of business.

**7.8   Salaries and Other Compensation.** Except for compensation for services actually performed for or on behalf of Borrower, pay salaries, bonuses, profit sharing payments or any other compensation of any kind to Borrower's members, shareholders, affiliates, officers or directors.

**7.9   Stock.** Pledge, hypothecate or otherwise encumber or sell or otherwise transfer any shares of any class of its capital stock or make any change in Borrower's capital structure.

**7.10   Nature of Business.** Make any substantial change in the nature of its business from that engaged in on the date of this Agreement or engage in any other businesses other than those engaged in on the date of this Agreement.

**7.11   Insider Transactions.** Except for transactions between Borrower and BBK, Ltd. on terms disclosed to Lender, enter into, or permit or suffer to exist, any transaction or arrangement with any shareholder member, employee, director, officer, affiliate or member of management, except on terms that are reasonably comparable to what Borrower could obtain in arm's-length transactions, with persons who have no relationship with Borrower.

**7.12   Capital Asset Expenditures.** Expend sums for the acquisition of new or additional capital assets exceeding in the aggregate $500,000.00 per fiscal year, including payments under any new or additional lease of real or personal property. Provided, however, that any portion of the referenced $500,000.00 not utilized in any given fiscal year(s) may be carried forward to a future fiscal year(s).

## ARTICLE 8

## AFFIRMATIVE COVENANTS

While any of the Obligations remain unpaid, Borrower must, at all times:

**8.1   Insurance:** Maintain adequate fire and extended coverage and liability insurance covering all of its present and future real and personal property, including the Collateral, with Lender's loss payable and noncontributory mortgagee clauses in Lender's favor, protecting Lender's interest, as such interest may appear, together with such policies of business interruption insurance and products liability insurance as Lender may reasonably request and insurance in accordance with all applicable workers' compensation laws. Such insurance must be in such form, with such companies, and in such amounts as is acceptable to Lender, insuring against liability for damage to persons or property,

10

and must provide for thirty (30) days prior written notice to Lender of cancellation or material alteration. Borrower must provide Lender with the original policies of insurance for all such coverages or true copies of the policies, simultaneously with the execution of this Agreement, showing that Lender's interest has properly been endorsed on the applicable policy. Lender may, in its sole discretion, on thirty (30) days written notice to Borrower, require Borrower to obtain additional or different insurance coverages as Lender may reasonably request. The provisions in the Mortgage, if any, with respect to Lender's rights to retain insurance proceeds in the event of a casualty, are to be treated as consistent with those contained in this paragraph.

**8.2    Existence; Payment of Taxes and Other Liabilities.**    Maintain its corporate existence and pay all taxes, assessments and other governmental charges against it or its property, and all of its other liabilities, before the same become delinquent and before penalties accrue on these debts and obligations except to the extent and so long as the same are being contested in good faith by appropriate proceedings in such manner as not to cause any material adverse effect upon its financial condition, with adequate reserves provided for such payments, and, upon demand by Lender, posting with Lender of adequate security to protect Lender.

**8.3    Accounting Records; Reports.**    Maintain a standard and modern system for accounting in accordance with generally accepted accounting principles consistently applied throughout all accounting periods, and furnish to Lender upon Lender's written request:

A.    Within fifteen (15) calendar days after the end of each month, as of the last day of the preceding month, aging and summary reports of Accounts in such form and detail as Lender may request.

B.    A monthly listing of all Inventories of Borrower, Including raw material, work in process and finished goods in such form and detail as Lender may reasonably request.

C.    Within five (5) Business Days of Lender's request, a physical inventory report listing all of Borrower's Inventory, wherever located.

D.    Within thirty (30) calendar days after the end of each of the first eleven (11) months of each fiscal year, a balance sheet of Borrower as of the close of each such month and of the comparable month in the preceding fiscal year, and statements of income and surplus of Borrower for each month and for that part of the fiscal year ending with each such month and for the corresponding period of the preceding fiscal year, all in reasonable detail and certified as true and correct (subject to audit and normal year-end adjustments) by the chief financial officer of Borrower.

E.    Within forty-five (45) calendar days after the end of each quarter of each fiscal year, a balance sheet of Borrower as of the closing of such quarter and statements of income and surplus of Borrower for such quarter and for the corresponding period of the preceding fiscal year, on cumulative basis, all in reasonable detail and certified as true and correct (subject to audit and normal year-end adjustments) by the chief financial officer of Borrower.

F.    As soon as available, and in any event within one hundred and twenty (120) calendar days after the close of each fiscal year of Borrower, a copy of Borrower's detailed CPA reviewed financial statements report for such year and accompanying financial statements, as prepared by independent certified public accountants of recognized standing selected by Borrower and reasonably acceptable to Lender, together with all management letters, which report shall be accompanied by a statement of such accountants, in form satisfactory to Lender, to the effect that the financial statements fairly present the financial condition of Borrower and the results of operations as of the relevant dates, and each such financial statement shall be accompanied by a certification by the public accountants that there exists no Event of Default or other action, condition or event which, with the giving of notice or lapse of time or both, would

11

constitute an Event of Default under this Agreement, or if such condition does exist, stating the nature thereof and the action, if any, Borrower is taking to correct such condition.

G.      Within ninety (90) calendar days after the end of each fiscal year of Borrower, a schedule showing all insurance policies which Borrower had in force as of the end of such fiscal year, signed by an officer of Borrower.

H.      (1) As soon as possible, and in any event within thirty (30) calendar days after Borrower knows that any Reportable Event with respect to any Plan has occurred, a statement of the chief financial officer of Borrower setting forth details as to such Reportable Event and the action which Borrower proposes to take with respect to the Reportable Event, together with a copy of the notice of such Reportable Event given to the Pension Benefit Guaranty Corporation; (2) promptly after the filing with the United States Secretary of Labor or the Pension Benefit Guaranty Corporation, copies of each annual report with respect to each Plan administered by Borrower; and (3) promptly after receipt, a copy of any notices Borrower may receive from the Pension Benefit Guaranty Corporation or the Internal Revenue Service with respect to any Plan administered by Borrower; provided, however, this subpart (3) shall not apply to notices of general application promulgated by the Pension Benefit Guaranty Corporation or the Internal Revenue Service.

I.      Within ninety (90) calendar days after the end of each fiscal year, pro forma cash flow forecasts for the succeeding twelve (12) month period.

J.      Within sixty (60) calendar days after the end of each quarter of each fiscal year, a letter of "covenant compliance" regarding Borrower's obligations under this Agreement, delivered to Lender and prepared, in form and substance acceptable to Lender, signed by an officer of Borrower.

K.      All other reports, documents and information that Lender may reasonably request.

**8.4**    **Inspections.**  Permit Lender's representatives to visit and inspect any of Borrower's properties and premises and examine, copy (by electronic or other means) and abstract any Business Records and Collateral records at any reasonable time, during business hours, and as often as may be reasonably desired.

**8.5**    **Litigation.**  Promptly furnish Lender, in writing, the details of all material litigation, legal or administrative proceedings, or other actions of any nature adversely affecting Borrower, including, without limitation, any notices of violation, citation, commencement of administrative proceeding or similar notice under any applicable Environmental Laws, commenced after the date hereof, in which more than $50,000.00 is at issue and, upon the request of Lender, submit to Lender the opinion of Borrower's counsel as to the merits of such proceedings.

**8.6**    **Audits and Examinations.**  Permit Lender's representatives to conduct on-site audits and examinations (an "**Examination**") of Borrower's business operations and Business Records as often as Lender desires, but prior to an Event of Default occurring under this Agreement, Borrower will not be obligated to reimburse Lender for its costs and expenses of Examinations more frequently than one time per quarter. After the occurrence of an Event of Default, Borrower must reimburse Lender for all costs incurred in connection with all Examinations. The charge for Examinations will be $600 per day per auditor plus out-of-pocket expenses incurred by Lender for each Examination performed by or on behalf of Lender payable within ten (10) Business Days after receipt of an invoice for such Examinations.

**8.7**    **Compliance with Laws.**  Comply in all respects with all material applicable laws and regulations, in effect from time to time, including without limitation all applicable environmental laws and regulations.

12

**8.8    Maintenance of Properties.** Maintain and preserve all of its properties that are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted, and comply at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder.

**8.9    Further Assurances.** At Lender's reasonable request, promptly execute or cause to be executed and delivered to Lender any and all documents, instruments and agreements deemed necessary or appropriate to facilitate the collection of any of the Collateral, or otherwise to give effect to or carry out the terms, conditions or intent of this Agreement (or any agreements or documents referred to or incorporated herein).

## ARTICLE 9

## DEFAULTS

If any one or more of the following events (each an **"Event of Default"** and collectively, **"Events of Default"**) occurs, at Lender's option, the unpaid principal balance of, and accrued interest on, all Obligations will be after the expiration of any notice and cure period, due and payable without further notice of any kind, notwithstanding anything contained to the contrary in this Agreement or in any other agreement, Note or document:

**9.1    Default in Payment of Obligations.** Borrower fails to make a payment of any principal or interest when and as due on the Note or any other Obligations, including the Expenses.

**9.2    Default Under Any Agreements.** A default in the performance or observance of any term or conditions in this Agreement, or in any other agreement or instrument made or given by Borrower to Lender required to be observed or performed by Borrower, and such term or condition remains uncured after the expiration of any applicable cure periods.

**9.3    Representations or Statements False.** Any representation or warranty made by Borrower in this Agreement or any certificate delivered in accordance with this Agreement, or any financial statement delivered to Lender proves to have been false in any material respect as of the time when made or given.

**9.4    Default on Other Debt.** Borrower fails to pay all or any part of the principal of or interest on any indebtedness of or assumed by Borrower for borrowed money (other than trade debt) as and when due and payable, whether at maturity, by acceleration or otherwise, and such default is not cured within the period of grace, if any, specified in the document(s) evidencing such indebtedness.

**9.5    Judgments.** A judgment is entered against Borrower which, together with other outstanding judgments entered against Borrower, exceeds in the aggregate $25,000, and remains outstanding and unsatisfied, unbonded or unstayed for the shorter of sixty (60) days after the date of entry of such judgment or the date the party holding the judgment may lawfully commence enforcement thereof.

**9.6    Bankruptcy; Insolvency.** Borrower: (i) becomes insolvent; (ii) is unable, or admits in writing its inability to pay debts as they generally mature; (iii) makes a general assignment for the benefit of creditors or to an agent authorized to liquidate any substantial amount of its property; (iv) files on its behalf or consents to any Insolvency Proceeding; (v) has an Insolvency Proceeding filed or instituted against it; (vi) applies to a court for the appointment of a receiver, trustee or custodian for any of its assets; or (vii) has a receiver, trustee or custodian appointed for any of its assets (with or without its consent). With respect to subparagraphs (v), (vi) and (vii), such proceeding or appointment shall not be an Event of Default if Borrower shall cause such proceeding to be discharged, vacated, dismissed or stayed within forty-five (45) days after the commencement of such proceeding or appointment.

**9.7    Reportable Event.** If any Reportable Event occurs and continues for thirty (30)

13

days or any Plan is terminated within the meaning of Title IV of ERISA, or a trustee is appointed by the appropriate United States District Court to administer any Plan, or the Pension Benefit Guaranty Corporation institutes proceedings to terminate any Plan or to appoint a trustee to administer any Plan.

**9.8** **Material Loss or Adverse Change.** Borrower suffers (i) a casualty as to any material asset or assets used in the conduct of Borrower's business which is not, except for deductibles acceptable to Lender, fully covered by insurance conforming to the requirements of this Agreement; or (ii) a material adverse change in Borrower's business prospects or financial condition.

**9.9** **Insecurity.** Lender deems itself to be insecure as to repayment or performance of the Obligations or the Collateral.

**9.10** **Default under Other Documents.** If Borrower, any subordinated creditor or any other party to any agreement or instrument with or in favor of Lender entered into or delivered in connection with the Loan or the Collateral defaults under any such agreement or instrument and such default is not cured within the grace period, if any, contained in such agreement or instrument.

**9.11** **Government Lien.** A notice of lien, levy or assessment is filed of record with respect to any of Borrower's assets by the United States government, or any department, agency or instrumentality thereof, or by any state, county, municipal or other governmental agency, or any tax or debt owing at any time hereafter to anyone becomes a lien, whether choate or otherwise, upon any of Borrower's assets and the same is not paid on the payment date thereof.

**9.12** **Material Impairment.** There is a material impairment of the prospect of repayment of any portion of the Obligations owing to Lender or a material impairment of the value or priority of Lender's security interests or mortgages in the Collateral.

**9.13** **Levy or Attachment.** Any material portion of Borrower's assets is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any judicial officer.

**9.14** **Cure Period.** Notwithstanding anything to the contrary in this Agreement, Lender will provide Borrower with at least ten (10) Business Days' notice and an opportunity to cure any curable, non-monetary Events of Default.

## ARTICLE 10

## REMEDIES ON OCCURRENCE OF AN EVENT OF DEFAULT

**10.1** **Right and Remedies.** Upon the occurrence of an Event of Default (not cured within the time or grace period specifically provided in Section 9), Lender has all rights and remedies provided by law, and all such rights and remedies granted under any security agreement or Mortgage relating to the Collateral, and under all other existing and future agreements between Lender and Borrower. All such rights and remedies are cumulative. Upon the occurrence of an Event of Default, Lender may, at its election, without notice of its election and without demand, do any one or more of the following, all of which are authorized by Borrower.

A.      Declare all Obligations, whether evidenced by this Agreement, a Note, any of the other Loan Documents or otherwise, immediately due and payable in full;

B.      Terminate this Agreement and any of the other Loan Documents as to any future liability or obligation of Lender, but without affecting Lender's rights, security interests and mortgages in the Collateral and without affecting the Obligations;

C.      Settle or adjust disputes and claims directly with Account Debtors for

14

amounts and upon terms which Lender considers advisable and, in such cases, Lender will credit Borrower's Loan account with only the net amounts received by Lender in payment of such disputed Accounts, after deducting all Expenses incurred or expended in connection therewith;

D.    Cause Borrower to hold all returned Inventory in trust for Lender, segregate all returned Inventory from all other property of Borrower or in Borrower's possession and conspicuously label said returned Inventory as the property of Lender;

E.    Without notice to or demand upon Borrower, make such payments and do such acts as Lender considers necessary or reasonable to protect its security interest in the Collateral.  Borrower agrees to assemble the Collateral if Lender so requires and to deliver or make the Collateral available to Lender at a place designated by Lender.  Borrower authorizes Lender to enter any premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest or compromise any encumbrance, charge or lien that in Lender's determination appears to be prior or superior to its security interest and to pay all expenses incurred in connection therewith.  With respect to any of Borrower's owned premises, Borrower hereby grants Lender a license to enter into possession of such premises and to occupy the same, without charge, in order to exercise any of Lender's rights or remedies provided herein, at law, in equity or otherwise;

F.    Without notice to Borrower (such notice being expressly waived) and without constituting a retention of any Collateral in satisfaction of an obligation (within the meaning of Section 9-505 of the Uniform Commercial Code), hold or set off and apply to the Obligations any and all: (i) balances and deposits of Borrower held by Lender (including any amounts received in a lockbox or blocked account); or (ii) indebtedness at any time owing to or for the credit or the account of Borrower by Lender;

G.    Hold, or set off and apply, as cash collateral, any and all balances and deposits of Borrower held by Lender (including any amounts received in a lockbox or blocked account) to secure the Obligations;

H.    Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale and sell the Collateral (in the manner provided for herein).  Lender is hereby granted a license and right to use, without charge, Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale and selling any Collateral.  Borrower's rights under all licenses and all franchise agreements shall inure to Lender's benefit;

I.    Sell the Collateral at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including Borrower's premises) as Lender determines is commercially reasonable.  It is not necessary that the Collateral be present at any such sale;

J.    Lender shall give notice of the disposition of the Collateral as follows:

(i)    Lender shall give Borrower and each holder of a security interest in the Collateral who has filed with Lender a written request for notice, a notice in writing of the time and place of public sale or, if the sale is a private sale or some other disposition other than a public sale is to be made, then the time on or after which the private sale or other disposition is to be made;

(ii)    The notice will be personally delivered or mailed, postage prepaid, to Borrower as provided in Section 11.7, at least ten (10) Business Days before the date fixed for the sale, or at least ten (10) Business Days before the date on or after

15

which the private sale or other disposition is to be made, unless the Collateral is perishable or threatens to decline speedily in value. Notice to persons other than Borrower claiming an interest in the Collateral shall be sent to such addresses as they have furnished to Lender;

K.    Lender may credit bid and purchase at any public sale;

L.    Any deficiency that exists after disposition of the Collateral as provided above shall be paid immediately by Borrower. Any excess will be remitted without interest by Lender to the party or parties legally entitled to such excess; and

M.    In addition to the foregoing, Lender shall have the rights and remedies provided by law and any rights and remedies contained in any other Loan Documents. All such rights and remedies shall be cumulative.

**10.2    No Waiver.** No delay on the part of Lender in exercising any right, power or privilege under this Agreement or any Loan Document shall operate as a waiver, nor shall any single or partial exercise of any right, power or privilege under this Agreement or otherwise, preclude other or further exercise of the right, power or privilege or the exercise of any other right, power or privilege.

## ARTICLE 11

## GENERAL TERMS

**11.1    Expenses, Fees and Costs; Indemnification.**

A.    Borrower is responsible for the payment of all Expenses. Borrower also agrees to indemnify Lender for any and all Claims that may be imposed on, incurred by or asserted against Lender in connection with this Agreement or any Loan Document or transaction contemplated hereby or thereby or the business relationship between Lender and Borrower.

B.    Borrower's obligation to pay the Expenses and all of the reimbursement obligations and indemnification obligations provided for in this Section 11.1 are part of the Obligations, are secured by all of the Collateral and survive the repayment of the Obligations.

**11.2    Successors.** The provisions of this Agreement shall inure to the benefit of and be binding upon any successor to any of the parties to this Agreement and shall extend and be available to any holder of the Note; provided, however, that persons or entities which succeed to the rights of Borrower under this Agreement shall not be entitled to enforce any rights or remedies of Borrower under or by reason of the terms of this Agreement, or any other agreement referred to or incorporated by reference into this Agreement, unless they shall have obtained Lender's prior written consent to succeed to such rights.

**11.3    Anti-Waiver; Amendments; and Cumulative Remedies Provisions.** No failure or delay on the part of Lender or the holder of the Note in the exercise of any power or right, and no course of dealing between Borrower and Lender or the holder of the Note, shall operate as a waiver of such power or right, nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right. The remedies provided for herein are cumulative and not exclusive of any remedies which may be available to Lender at law or in equity. No notice to or demand on Borrower not required hereunder, or under the Note or other agreement, shall in any event entitle Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of Lender or the holder of the Note to any other or further action in any circumstances without notice or demand. Any waiver of any provision of this Agreement, the Note or other agreement, and any consent to any departure by Borrower from the terms of any provision of this Agreement, the Note or any other agreement, shall be effective only in the specific instance and for the specific purpose for which given. Neither this Agreement nor the Note or any other agreement nor any

16

terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by Borrower and Lender.

**11.4    Controlling Law.** This Agreement, the Note and any other agreements between the parties shall be governed by and construed in accordance with the internal laws of the State of Michigan applicable to contracts made and performed within Michigan without regard to conflict of laws provisions.

**11.5    Counterparts.** This Agreement may be signed in any number of counterparts with the same effect as if all signatures were upon the same instrument.

**11.6    Notices.** All communications or notices that are required or may be given under this Agreement shall be deemed to have been served when personally delivered or on the date when deposited in the United States mail, postage prepaid and addressed as follows (unless and until Lender or Borrower advises the other party, in writing, of a change in such address): (i) if Borrower, with the name and address of Borrower shown at the beginning of this Agreement with a copy to Donald F. Baty, Jr., Esq., Honigman Miller Schwartz and Cohn LLP, 2290 First National Building, Detroit, Michigan 48226; and (ii) if Lender, addressed to Lender, to the attention of Manager – Structured Finance and Troubled Suppliers, at the address set forth at the beginning of this Agreement with a copy to Assistant General Counsel – Commercial and Transactional, Delphi Legal Staff, 5725 Delphi Drive, Tory, Michigan 48098.

**11.7    Loan Agreement Controls.** Anything contained in any other agreement referred to in this Agreement or in any other agreement now existing between Lender and Borrower to the contrary notwithstanding, in the event of any express conflict between the terms and provisions of such other agreement and those contained in this Agreement, the terms of this Agreement shall govern and control.

**11.8    Partial Invalidity.** The unenforceability for any reason of any provision of this Agreement shall not impair or limit the operation or validity of any other provisions of this Agreement or any other existing or future agreements between Lender and Borrower.

**11.9    Legal Rate Adjustment.** This Agreement, the Note and all other Loan Documents between Borrower and Lender are expressly limited so that in no event whatsoever shall the amount of interest paid or agreed to be paid to Lender exceed the highest rate of interest permissible under applicable law. If, from any circumstances, fulfillment of any provision of this Agreement or the Note at the time performance of such provisions shall be due, shall involve exceeding the interest limitation validity prescribed by law which a court of competent jurisdiction may deem applicable to this Agreement and any Loans under this Agreement, then the obligation to be fulfilled shall be reduced to an amount computed at the highest rate of interest permissible under applicable law, and if, for any reason whatsoever, L ender s hall e ver r eceive as i nterest a n a mount w hich would b e d eemed u nlawful u nder applicable law, such interest shall be automatically applied to the payment of the principal of the Note, as the case may be (whether or not then due and payable), and not to the payment of interest, or shall be refunded to Borrower, if such principal has been paid in full.

**11.10    Setoff.** In addition to any rights and remedies of Lender provided by law, Lender has the right, without prior written notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by applicable law, upon the occurrence of any Event of Default and so long as such Event of Default is continuing, to set off and apply against any Obligations, whether matured or unmatured, of Borrower to Lender, any amount owing by Lender to Borrower, at or at any time after the happening of any of the above-mentioned events, and such right of setoff may be exercised by Lender against Borrower or against any assignee for the benefit of creditors, receiver or execution, judgment or attachment creditor of Borrower, or against anyone else claiming through or against Borrower of such assignee for the benefit of creditors, receiver or execution, judgment or attachment creditor, notwithstanding the fact that such right of setoff has not been exercised by Lender prior to the making, filing or issuance or service upon Lender of, or of notice of, assignment for the benefit of creditors, appointment or application for the appointment of a receiver, or issuance of execution, subpoena or order

or warrant.  Lender agrees promptly to notify Borrower after any setoff and application made by Lender, provided that the failure to give such notice shall not affect the validity of such setoff and application or give rise to claims or causes of actions in favor of Borrower or any other party.

    **11.11    No Marshalling.**  Borrower, on its own behalf and on behalf of its successors and assigns hereby expressly waives all rights, if any, to require a marshalling of assets by Lender or to require that Lender first resort to some or any portion of the Collateral before foreclosing upon, selling or otherwise realizing on any other portion thereof.

    **11.12    Reinstatement of Obligations and Security.**  To the extent that Borrower makes a payment to Lender or Lender receives any payment(s) or proceeds of Accounts or other Collateral for Borrower's benefit, which payment(s) or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal laws, common law or equitable doctrine, then, to the extent of such payment(s) or proceeds received, Borrower's obligations or part thereof intended to be satisfied thereby shall be reinstated and continue in full force and effect, and all collateral security therefor shall remain in full force and effect (or be reinstated), as if such payment(s) or proceeds had not been received by Lender, and an appropriate adjustment to Borrower's Loan balance may be recorded, until payment shall have been made to Lender, which payment shall be due on demand.

    **11.13    Survival; Reliance.**  All agreements, representations and warranties made in this Agreement (and all agreements referred to or incorporated herein) shall survive the execution of this Agreement (and all documents and agreements referred to or incorporated herein) and the making of the Loan and the execution and delivery of the Note.  Notwithstanding anything in this Agreement (or any documents or agreements referred to or incorporated herein) to the contrary, no investigation or inquiry by any party with respect to any matter which is the subject of any representation, warranty, covenant or other agreement set forth herein or therein is intended, nor shall it be interpreted, to limit, diminish or otherwise affect the full scope and effect of any such representation, warranty, covenant or other agreement.  All terms, covenants, agreements, representations and warranties of Borrower made herein (or in any documents or agreements referred to or incorporated herein), or in any certificate or other document delivered pursuant hereto shall be deemed to be material and to have been relied upon by Lender, notwithstanding any investigation heretofore or hereafter made by Lender or its agents.

    **11.14    Interpretation.**  This Agreement (and all agreements referred to or incorporated into this Agreement) are being entered into among competent persons, who are experienced in business and represented by counsel, and has been reviewed by the parties and their counsel.  Therefore, any ambiguous language in this Agreement (and all agreements referred to or incorporated herein) will not necessarily be construed against any particular party as the drafter of such language.

    **11.15    Independence of Covenants.**  All covenants hereunder are to be given independent effect so that if a particular action or condition is not permitted by any such covenant, the fact that it would be permitted by an exception to, or would be otherwise within the limitations of, another covenant shall not avoid the occurrence of a default or an Event of Default if such action is taken or such condition exits.

    **11.16    Certain Rules of Construction.**  For purposes of this Agreement:

        **A.      Certain References.**  The words "herein", "hereof" and "hereunder", and words of similar import, refer to this Agreement as a whole and not to any particular provision of this Agreement, and references to Sections, Paragraphs and Exhibits, and similar references, are to Sections or Paragraphs of, or Exhibits to, this Agreement unless otherwise specified.

        **B.      General Rules.**  Unless the context otherwise requires: (i) the singular includes the plural, and _vice versa_; (ii) all pronouns and any variations thereof refer to the masculine, feminine or neuter, as the identity of the person or persons may require; (iii) all

definitions and references to an agreement, instrument or document means such agreement, instrument or document together with all exhibits and schedules thereto and any and all amendments, restatements, supplements, replacements or modifications thereto as the same may be in effect at the time such definition or reference is applicable for any purpose; (iv) all references to any party shall include such party's successors and permitted assigns; (v) "include", "includes" and "including" are to be treated as if followed by "without limitation" whether or not they are followed by these words or words with a similar meaning; and (vi) attorneys' fees shall include allocated costs of in-house counsel.

        **C.**    **Accounting Terms and Determinations.** Except as otherwise provided in this Agreement, all accounting terms used in this Agreement must be interpreted, all accounting determinations hereunder must be made, and all financial statements required to be delivered hereunder must be prepared in accordance with generally accepted accounting principles; provided that, if Borrower adopts a change in Accounting principles (including any changes in generally accepted accounting principles) from those used in preparing the financial statements of Borrower or that affects in any material respect (as determined by Lender) the computation of or compliance with any of the provisions of this Agreement, then, unless this Agreement has been amended to modify such provisions to take account of such change in accounting principles, all financial restrictions, provisions and ratios must continue to be computed based upon accounting principles in effect prior to adoption of such change.

        **D.**    **Uniform Commercial Code.** All other terms contained in this Agreement shall have, when the context so indicates, the meanings provided for by the Uniform Commercial Code as adopted in the State of Michigan to the extent such terms are used or defined in the statute.

        **E.**    **Headings.** The headings of the various subdivisions hereof are for convenience of reference only and shall in no way modify or affect the interpretation of any of the terms or provisions hereof.

        **11.17**  **Entire Agreement of the Parties.** This Agreement, including all agreements referred to or incorporated into this Agreement and all recitals in this Agreement (which recitals are incorporated as covenants of the parties), constitute the entire agreement between the parties relating to the subject matter of this Agreement. This Agreement supersedes all prior agreements, commitments and understandings between the parties relating to the subject matter of this Agreement and cannot be changed or terminated orally, and shall be deemed effective as of the date noted above.

        **11.18**  **No Affect on Indemnification.** Nothing in this Agreement shall modify, amend or otherwise affect or impair that certain Amended and Restated Indemnification Agreement dated May 6, 1999 between Delphi Automotive Systems Corporation and BBK, Ltd.

        **11.19**  **ACKNOWLEDGEMENT OF BORROWER. THIS AGREEMENT HAS BEEN FREELY AND VOLUNTARILY ENTERED INTO WITH LENDER BY BORROWER, WITHOUT ANY DURESS OR COERCION, AND AFTER BORROWER HAS EITHER CONSULTED WITH COUNSEL OR HAS BEEN GIVEN AN OPPORTUNITY TO DO SO, AND BORROWER ACKNOWLEDGES THAT IT HAS CAREFULLY AND COMPLETELY READ AND UNDERSTANDS ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT.**

        **11.20**  **SUBMISSION TO JURISDICTION AND VENUE. ANY JUDICIAL PROCEEDING AGAINST BORROWER BROUGHT BY LENDER WITH RESPECT TO ANY TERM OR CONDITION OF THIS AGREEMENT, OR ANY OTHER PRESENT OR FUTURE AGREEMENT BETWEEN BORROWER AND LENDER MAY BE BROUGHT BY LENDER IN A COURT OF COMPETENT JURISDICTION IN THE STATE OF MICHIGAN, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, BORROWER AND LENDER ACCEPT FOR THEMSELVES AND IN CONNECTION WITH THEIR RESPECTIVE PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE NONEXCLUSIVE JURISDICTION OF THE AFORESAID COURTS, AND IRREVOCABLY AGREE**

TO BE BOUND BY ANY FINAL JUDGMENT RENDERED THEREBY IN CONNECTION WITH THIS AGREEMENT, OR ANY OTHER PRESENT AND FUTURE AGREEMENT BETWEEN BORROWER AND LENDER. BORROWER WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND OR SURETY WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF LENDER. NOTHING CONTAINED IN THIS SECTION AFFECTS THE RIGHT OF LENDER TO BRING ANY ACTION OR PROCEEDING AGAINST BORROWER OR ITS PROPERTY IN THE COURTS OF ANY OTHER JURISDICTION. ANY JUDICIAL PROCEEDING BY BORROWER AGAINST LENDER INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER OR CLAIM IN ANY WAY ARISING OUT OF, RELATED TO OR CONNECTED WITH THIS AGREEMENT OR ANY PRESENT OR FUTURE AGREEMENT BETWEEN BORROWER AND LENDER, MAY BE BROUGHT ONLY IN A FEDERAL COURT LOCATED IN THE STATE OF MICHIGAN OR IN STATE COURTS IN OAKLAND COUNTY, MICHIGAN. BORROWER WAIVES ANY OBJECTION TO JURISDICTION AND VENUE OF ANY ACTION INSTITUTED HEREUNDER OR IN CONNECTION HEREWITH AND MAY NOT ASSERT ANY DEFENSE BASED ON LACK OF JURISDICTION OR VENUE OR BASED UPON FORUM NON CONVENIENS. BORROWER OR LENDER MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE WAIVERS AND CONSENTS CONTAINED HEREIN.

11.21   <u>WAIVER OF JURY TRIAL</u>.  BORROWER AND LENDER ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. LENDER AND BORROWER, AFTER CONSULTING COUNSEL OF THEIR CHOICE, EACH HEREBY KNOWINGLY AND VOLUNTARILY, WITHOUT COERCION, WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES BETWEEN THEM. NEITHER BORROWER NOR LENDER SHALL BE DEEMED TO HAVE GIVEN UP THIS WAIVER OF JURY TRIAL UNLESS SUCH RELINQUISHMENT IS IN A WRITTEN INSTRUMENT SIGNED BY THE PARTY TO BE CHARGED.

**THIS AGREEMENT** was executed as of the date and year first set forth above.

ROTOR COATERS INTERNATIONAL, INC., a Michigan corporation


By: _Michael P. Thomas_
   Michael Thomas, President


DELPHI AUTOMOTIVE SYSTEMS LLC, a Delaware limited liability company


By: _John Blahut_

Title: VICE PRESIDENT AND TREASURER

20

AMENDMENT TO
AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT

This Amendment to Amended and Restated Loan and Security Agreement (this "Amendment") is entered into on May 1, 2004 between Delphi Automotive Systems LLC, a Delaware limited liability company ("Lender") and Rotor Coaters International, Inc., a Michigan corporation ("Borrower").

RECITALS:

A.    Lender and Borrower entered into an Amended and Restated Loan and Security Agreement on March 20, 2003 (the "Agreement").

B.    The Agreement may be amended by the written consent of Lender and Borrower.

C.    Lender and Borrower desired to enter into this Amendment in connection with the acquisition of Borrower by Karms, LLC, which shall be consummated simultaneously with the execution of this Amendment (the "Acquisition").

NOW, THEREFORE, the parties agree as follows:

1.    All capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Agreement.

2.    Section 7.11 of the Agreement is hereby amended to substitute "Karms, LLC" for "BBK, Ltd."

3.    Section 9.8 of the Agreement is hereby amended in its entirety to read as follows:

"9.8    Material Loss or Adverse Change.  Borrower suffers a casualty as to any material asset or assets used in the conduct of Borrower's business which is not, except for deductibles acceptable to Lender, fully covered by insurance conforming to the requirements of this Agreement."

4.    Section 9.9 of the Agreement is deleted in its entirety.

5.    Section 9.10 of the Agreement is hereby amended to add the following as the last sentence of the provision:

"Notwithstanding the foregoing, any default under the Management and Supply Agreement between Delphi Corporation, Borrower and Karms, LLC, dated as of May 1, 2004, shall not constitute an Event of Default under this Section 9.10 unless Borrower or Karms, LLC perform their obligations thereunder in a grossly negligent or otherwise engage in willful misconduct, and Delphi Corporation and Lender provide Borrower and Karms, LLC with thirty (30) days' written notice of Lender's intent to accelerate and the basis for such acceleration."

DET_B\418401.2

6.    Section 9.12 of the Agreement is hereby amended in its entirety to read as follows:

"9.12 Material Impairment. There is a material impairment of the value or priority of Lender's security interests or mortgages in the Collateral."

7.    Section 9.14 of the Agreement is hereby amended in its entirety to read as follows:

"9.14 Cure Period. Notwithstanding anything to the contrary in this Agreement, Lender will provide Borrower (i) with at least thirty (30) days' written notice and an opportunity to cure any curable, non-monetary Events of Default, and (ii) with at least three (3) business days' written notice and an opportunity to cure any monetary Events of Default."

8.    Section 11.6 of the Agreement is hereby amended to substitute "Alan M. Valade, Esq." For "Donald F. Baty, Jr., Esq."

9.    Section 11.10 of the Agreement is hereby amended to add the following as the last sentence of the provision:

"Notwithstanding anything to the contrary in this Agreement, the right of setoff described in this Section 11.10 shall only become effective after the expiration of any notice or applicable cure period in connection with any Event of Default."

10.    Section 11.18 of the Agreement is hereby amended in its entirety to read as follows:

"11.18 No Affect on Indemnification and Management and Supply Agreements. Nothing in this Agreement shall modify, amend or otherwise affect or impair that certain Indemnification Agreement, dated as of May 1, 2004, by and among Karms, LLC and Delphi Corporation, or that certain Management and Supply Agreement, dated as of May 1, 2004, by and among Karms, LLC, Delphi Corporation and Borrower."

11.    The Agreement, as amended by this Amendment, shall continue in full force and effect.

12.    Lender hereby acknowledges and agrees that Lender has been fully apprised of the Acquisition. Lender hereby consents to the Acquisition and hereby waives any claims or causes of action it may have under the Agreement in connection with the consummation of the Acquisition, including, but not limited to, any claim or cause of action pursuant to Section 7.9 of the Agreement.

13.    The Agreement and this Amendment shall be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, administrators, personal representatives,

2

successors and assigns, subject to the restrictions on transferability contained in the Agreement and this Amendment.

14.    This Amendment may be executed in two or more counterparts, each of which will be deemed an original, but together they will constitute one and the same instrument.

WHEREFORE, this Amendment was executed as of the date first written above.

ROTOR COATERS INTERNATIONAL, INC.,
a Michigan corporation

By: Steven E. March
Its: President


DELPHI AUTOMOTIVE SYSTEMS LLC, a
Delaware limited liability company

By: Brian M. Pandzik
Its: Senior Buyer
DET_B.418401.2

3

DET_B\418401.2