James M. Sullivan
Moses & Singer, LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
(212) 554-7800
*Attorneys for The Timken Company and*
*The Timken Corporation*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- x

In re                                                       :
                                                            :        Chapter 11
DPH HOLDINGS CORP, et al.,                                  :
                                                            :        Case No. 05-44481 (RDD)
                          Reorganized Debtors.              :        (Jointly Administered)
                                                            :
---------------------------------------------------- x
DELPHI AUTOMOTIVE SYSTEMS, LLC,                             :
                                                            :        Adv. Pro. No. 07-02688 (RDD)
                          Plaintiff,                        :
                                                            :
          -against-                                         :
                                                            :
THE TIMKEN COMPANY and THE                                  :
TIMKEN CORPORATION,                                         :
                                                            :
                          Defendants.                       :
---------------------------------------------------- X


### DEFENDANTS' OBJECTION TO REORGANIZED DEBTORS'
### MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS .................................................................................... 3

ARGUMENT ......................................................................................................... 16

I    THE MOTION SHOULD BE DENIED BECAUSE AMENDING THE
COMPLAINT WOULD BE FUTILE ................................................. 16

    A.    *The Amended Complaint Fails to Plead Facts Sufficient To State A
Claim For Relief* .............................................................................. 17

        *(i)  Antecedent Debt* ................................................................. 18

        *(ii)  Contract Assumption and Release* ..................................... 20

        *(iii)  Insolvency* ...................................................................... 21

    B.    *The Motion For Leave Should Be Denied Because The Amended
Complaint Does Not Relate Back To The Original Complaint*.................. 23

    C.    *The Amended Complaint Will Be Barred By Laches* ................................. 28

    D.    *The Amended Complaint is Barred by the Statute of Limitations and
Based On Insufficient Service of Process* ................................................... 34

    E.    *The Amended Complaint is Barred Based on the Settlement of
DAS's Claims Against Timken* ................................................................... 39

    F.    *The Amended Complaint is Barred by Judicial Estoppel* .......................... 42

II    ALTERNATIVELY, THE BURDEN OF PROOF WITH RESPECT TO
THE DEFENDANTS' AFFIRMATIVE DEFENSES SHOULD SHIFT TO
THE DEBTORS ................................................................................... 44

III    THERE IS NO BASIS FOR GRANTING DAS LEAVE TO AMEND THE
PROPOSED AMENDED COMPLAINT ............................................. 44

IV    TIMKEN INCORPORATES ALL APPLICABLE ARGUMENTS
RAISED BY OTHER DEFENDANTS IN THEIR OBJECTIONS ...................... 45

CONCLUSION ...................................................................................................... 46

# TABLE OF AUTHORITIES

## FEDERAL CASES

106 Mile Transport Associates v. Koch,
    656 F. Supp. 1474 (S.D.N.Y. 1987)....................................................................24

Akers v. Koubourlis (In re Koubourlis),
    869 F.2d 1319 (9th Cir. 1989) .......................................................................22

Angell v. Haveri (In re Caremerica, Inc.),
    409 B.R. 346 (Bankr. E.D.N.C. 2009) ...............................................................18

Ashcroft v. Iqbal,
    129 S. Ct. 1937 (2009)..............................................................17, 18, 22, 23

Bank of Cape Verde v. Bronson,
    167 F.R.D. 370 (S.D.N.Y. 1996) ......................................................................35

Barrows v. Forest Laboratories, Inc.,
    742 F.2d 54 (2d Cir. 1984).........................................................................16, 38

Bates v. Long Island R.R. Co.,
    997 F.2d 1028 (2d Cir.), cert. denied, 510 U.S. 992 (1993)). ..........................................43

Bell Atlantic Corp. v. Twombley,
    550 U.S. 544 (2007).................................................................17, 18, 22, 23

Burnett v. N.Y. Central R.R. Co.,
    380 U.S. 424 (1965).................................................................................36

Caliolo v. Azdel, Inc. (In re Cambridge Indus. Holdings, Inc.),
    No. 00-1919, 2003 WL 21697190 (Bankr. D. Del. Jul. 18, 2003) ............................41, 41

Caliolo v. TKA Fabco Corp. (In re Cambridge Indus. Holdings, Inc.), No. 00-1919, 2003
    WL 1818177 (Bankr. D. Del Apr. 2, 2003)...............................................................40, 41

Caliolo v. Saginaw Bay Plastics, Inc.,
    No. 00-1919, 2006 WL 516764 (D. Del. Mar. 2, 2006) ....................................................40

# TABLE OF AUTHORITIES

**Page**

Coan v. O&G Industrial Inc. (In re Austin Driveway Serv., Inc.),
179 B.R. 390 (Bankr. D. Conn. 1995) ..............................................................26

*In re Cornwall*,
99 Blatchf. 114, 6 F. Cas. 586 (C.C.D. Conn. Sept. Term 1871) ......................36

Diversified Hospitality Group, Inc. v. Carson Pirie Scott & Co.,
No. 90-2957, 1991 WL 35953 (S.D.N.Y. Mar. 8, 1991) ..................................36

Enron Corp. v. Granite Construction Corp.,
No. 03-93172, 2006 WL 2400369 (Bankr. S.D.N.Y. May 11, 2006) ...............24

In re Enron Corp.,
298 B.R. 513 (Bankr. S.D.N.Y. 2003) ..............................................................27

Family Golf Ctrs., Inc. v. Acushnet Co. (In re Randall's Island Family Golf Ctrs., Inc.),
288 B.R. 701 (Bankr. S.D.N.Y. 2003) ..............................................................36

Fleet National Bank v. Gray (In re Bankvest Capital Corp.),
375 F.3d 51 (1st Cir. 2004)........................................................................31, 32

Fokkena v. Winston, Reuber, Byrne, P.C. (In re Johnson),
189 B.R. 744 (Bankr. N.D. Iowa 1995)......................................................22, 23

Galerie Des Monnaies of Geneva, Ltd. v. Deutsche Bank, A.G., New York Branch (In re
Galerie Des Monnaies of Geneva Ltd.),
55 B.R. 253 (Bankr. S.D.N.Y. 1985), aff'd, 62 B.R. 224 (S.D.N.Y. 1986)................42, 43

Gordon v. Slaughter (In re Slaughter Co. and Associate, Inc.),
242 B.R. 97 (Bankr. N.D. Ga. 1999) ................................................................26

Gucci v. Sinatra (In re Gucci),
197 Fed. Appx. 58, 60 (2d Cir. 2006) ..............................................................28

In re Hamilton,
179 B.R. 749 (Bankr. S.D. Ga. 1995)................................................................32

Homeplace of America, Inc. v. Salton, Inc. (In re Waccamaw's Homeplace),
325 B.R. 524 (Bankr. D. Del. May 31, 2005)...................................................40

Hunt v. Alliance N. America Government Income Trust, Inc.,
159 F.3d 723 (2d Cir. 1998).............................................................................17

# TABLE OF AUTHORITIES

**Page**

IMF Sales Associates, Inc. v. Racal-Vadic Information Systems, Inc. (IMF Sales
    Associates, Inc.),
    94 B.R. 223 (Bankr. D. Mass 1988) ..................................................................22

John Hancock Mutual Life Insurance Co. v. Amerford International Corp.,
    22 F.3d 458 (2d Cir. 1994)...............................................................................16

Johns-Manville Corp. v. Chubb Indemnity Insurance Co. (In re Johns-Manville Corp.),
    600 F.3d 135 (2d Cir. 2010)..............................................................................31

Kimmelman v. Port Authority of New York and New Jersey (In re Kiwi International Air
    Lines, Inc.),
    344 F.3d 311 (3rd Cir. 2003) ...........................................................................20

LaRoche Industrial v. General America Transport Corp. (In re LaRoche Industrial, Inc.),
    284 B.R. 406 (Bankr. D. Del. 2002) .................................................................40

Lawson v. Ford Motor Co. (In re Roblin Industries, Inc.),
    78 F.3d 30 (2d Cir. 1996) .................................................................................22

McLaughlin v. Anderson,
    962 F.2d 187 (2d Cir. 1992)..............................................................................17

Morse v. Perrotta (In re Perrotta),
    406 B.R. 1 (Bankr. D. N.H. 2009) ..............................................................35, 36

Mused v. U.S. Department of Agriculture Food and Nutrition Serv.,
    169 F.R.D. 28 (W.D.N.Y. 1996).......................................................................38

New Bedford Capacitor, Inc. v. Sexton Can Co. (New Bedford Capacitor, Inc.),
    301 B.R. 375 (Bankr. D. Mass. 2003) .............................................................26

New Hampshire v. Maine,
    532 U.S. 742 (2001)..........................................................................................42

Official Committee of Unsecured Creditors v. Pirelli Communications Cables and
    Systems USA, LLC (In re 360Networks (USA) Inc.),
    367 B.R. 428 (Bankr. S.D.N.Y. 2007)..................................................23, 24, 25

Peltz v. CTC Direct, Inc. (In re MBC Greenhouse, Co.),
    307 B.R. 787 (Bankr. D. Del. 2004) ...........................................................25, 26

Rapf v. Suffolk County of New York,
    755 F.2d 282 (2d Cir. 1985)..............................................................................28

# TABLE OF AUTHORITIES

**Page**

Rhythms Netconnections Inc. v. Cisco Systems, Inc. (In re Rhythms Netconnections Inc),
    300 B.R. 404 (Bankr. S.D.N.Y. 2003) ........................................................................40, 41

Rosenshein v. Kleban,
    918 F. Supp. 98 (S.D.N.Y. 1996)...................................................................................42

Ruffolo v. Oppenheimer & Co.,
    987 F.2d 129 (2d Cir. 1993).........................................................................................17

Spinale v. United States,
    No. 03-1704, 2005 WL 659150 (S.D.N.Y. Mar. 16, 2005)..............................................35

In re Superior Toy & Manufacturing Co., Inc.,
    78 F.3d 1169 (7th Cir. 1996) .......................................................................................20

U.S. Brass & Copper Co. v. Caplan (In re Century Brass Products, Inc.),
    22 F.3d 37 (2d Cir. 1994) ............................................................................................37

United States v. Kolstad (In re Kolstad),
    928 F.2d 171 (5th Cir. 1991) .......................................................................................32

United States v. Srulowitz,
    819 F.2d 37 (2d Cir. 1987)...........................................................................................28

United States v. Watson,
    690 F.2d 15 (2d Cir. 1979)...........................................................................................28

In re Venture Mortgage Fund, L.P.,
    245 B.R. 460 (2000), aff'd, 282 F.3d 185 (2d Cir. 2002)
    *aff'd*, 282 F.3d 185 (2d Cir. 2002)...............................................................................42

Video Software Association v. Orion Pictures Corp. (In re Orion Pictures, Corp.),
    21 F.3d 24 (2d Cir. 1994) ......................................................................................33, 34

Zapata v. City of New York,
    502 F.3d 192 (2d Cir. 2007).........................................................................................33

## FEDERAL STATUTES

11 U.S.C. §502(d) ...............................................................................................39, 41, 42

11 U.S.C. § 546(a) ............................................................................................5, 10, 34, 37

# TABLE OF AUTHORITIES

**Page**

11 U.S.C. § 547(b)(3) ...............................................................................................21

11 U.S.C. § 541 ..............................................................................................4, 5, 34

11 U.S.C. § 544 ..............................................................................................4, 5, 34

11 U.S.C. § 545 ........................................................................................4, 5, 10, 34

11 U.S.C. § 546(a) ..................................................................................5, 10 34, 37

11 U.S.C. § 547 ........................................................4, 5 10, 12, 20, 21, 22, 34

11 U.S.C. § 548 ........................................................................................4, 5, 10, 34

11 U.S.C. § 553 ........................................................................................4, 5, 34, 29

28 U.S.C. § 2075 .....................................................................................................35

## FEDERAL RULES

Fed. R. Bank P.  7004(a).........................................................................................35

Fed. R. Bankr. P. 7008........................................................................................1, 18

Fed. R. Civ. P. 4(m) ..................................................4, 5, 6, 7, 8, 9, 35, 38

Fed. R. Civ. P. 8 .....................................................................................................22

Fed. R. Civ. P.  11 ..................................................................................................31

Fed. R. Civ. P.  15 ..................................................................................................16

Fed. R. Civ. P. 15(c) ...............................................................................................25

## LEGISLATIVE HISTORY

95th Cong., 1st Sess. 375 (1977) ............................................................................22

95th Cong., 2nd Sess. 89 (1978)..............................................................................22

The Timken Company and The Timken Corporation (collectively "Timken" or the "Defendants"), defendants in the above-captioned adversary proceeding (the "Adversary Proceeding") in the above-captioned chapter 11 cases (the "Cases"), joins and objects to Reorganized Debtors' Motion for Leave to File Amended Complaints (the "Motion for Leave"). In support hereof, the Defendants state as follows:

## PRELIMINARY STATEMENT

1.      On or about September 30, 2007, the above-captioned debtors commenced a preference action against the Defendants and certain of their affiliates under seal, seeking to avoid over $12 million in allegedly preferential transfers made more than five years ago.  This Court dismissed the complaint on September 7, 2010 for failure to comply with the pleading requirements of Federal Rule of Civil Procedure 8 and Federal Rule of Bankruptcy Procedure 7008.

2.      The Court's dismissal order allowed the debtors a "second bite at the apple" by permitting them to move for leave to amend the complaint with one that complied with the federal rules.  Rather than seizing the opportunity to replead to satisfy the mandates of the Court's dismissal order and the federal rules, the plaintiff filed another pleading devoid of factual allegations to which the Defendants could reasonably be expected to respond.

3.      Among other things, the proposed amended complaint replaces the 16 transfers referenced in the original complaint totaling $12,082,005.61 with 142 transfers totaling $12,161,059.64 (an increase of $79,054.03), despite the fact that the number of plaintiffs was reduced from 40 to 1 and the number of defendants from 5 to 2.  Only 8 of the 16 transfers in the original complaint can be found in the proposed amended complaint.  Presumably, the plaintiff dropped 8 of those transfers and replaced them with 134 completely new transfers.  Despite

repeated requests for an explanation regarding the increased demand and the additional transfers, as well as backup for each of the transfers, no explanation or backup was provided. Clearly the plaintiff's attempts to assert new claims long after the two year statute of limitations has expired is improper. Further, the plaintiff's failure to provide the requested backup has made it impossible to determine whether the allegedly preferential transfers are immune from suit based upon a partial release of such preference claims and the assumption of a number of the contracts between the plaintiff and the Defendants.

4.      Even as to the 8 transfers that are not barred by the statute of limitations, the proposed amended complaint fails to comply with the Court's dismissal order and the federal rules. For example, the proposed amended complaint fails to adequately plead the antecedent debt to which the transfers relate. Three of the transfers reference no antecedent debt at all. Others purport to reference an invoice number despite the fact that the proposed amended complaint states that the debtors did not accept physical invoices from the Defendants. In any case, the invoice numbers bear no resemblance to any type of record keeping number utilized by the Defendants. Still other transfers purport to reference purchase order numbers. However, purchase order numbers by themselves do not reference a debt but rather an order. Where only a purchase order number is referenced, the plaintiff has failed to allege facts showing the existence of a debt. Finally, whether the number referenced is an invoice number or a purchase order number, the plaintiff has failed to allege any facts showing that the purported debt is antecedent. It was incumbent upon the plaintiff to allege when each debt was incurred. The plaintiff's failure to make any such allegations is fatal to its motion.

5.      Further, even if the plaintiff's allegations of "antecedent debt" are legally sufficient, the plaintiff has failed to make any allegations that the plaintiff was insolvent at the

time of the alleged transfers.  In fact, the plaintiff's sworn schedules of assets and liabilities show just the opposite – that the plaintiff had an equity value in excess of $2.5 billion on the petition date.  Again, the plaintiff's pleading deficiency is fatal to its motion.

6.      Further, even if permitting the proposed amended complaint to be filed would not be futile because of its pleading deficiencies, the proposed amended complaint would be barred by laches given the clear prejudice the Defendants suffered as a result of the more than 2-1/2 year delay in unsealing the preference action.  Aside and apart from the delay resulting from the loss of records and witnesses as a result of the sale of the Defendants' needle bearing business, retirements, layoffs, computer upgrades, etc., the delay prevented the Defendants from completely mitigating their damages through the sale of their 502(h) claim at or above par.  It is beyond dispute that the Defendants sold their claims against the plaintiff to a third party for 102% of the face amount of their claim shortly before the filing of the preference claim and that the Defendants could have sold their 502(h) claim to the same purchaser for the same price had the Defendants known of the claim.  Accordingly, the motion for leave to amend should be denied.

## STATEMENT OF FACTS

7.      On October 8, 2005, Delphi Corporation ("Delphi") and certain of its subsidiaries (the "Initial Filers") each filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  On October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

8.      Prior to the commencement of the Debtors' cases, Timken provided goods and services to one of the Debtors, Delphi Automotive Systems, LLC ("Plaintiff" or "DAS").  (Declaration of Michael Hart ("Hart Decl."), ¶5).

*(i)*     ***Preservation of Estate Claims Procedures Motion and Order***

9.      By motion dated August 6, 2007 (the "Preservation of Estate Claims Procedures Motion"), the Debtors sought entry of an order seeking, among other things, the establishment of procedures for certain adversary proceedings, including those commenced by the Debtors under Bankruptcy Code §§ 541, 544, 545, 547, 548 or 553.  (Preservation of Estate Claims Procedures Motion, Doc. No. 8905, at ¶ 17).  As pertinent here, the procedures sought included (i) pursuant to Rule 4(m) of the Federal Rules of Civil Procedure (the "Federal Rules"), an extension of time beyond the initial 120-day period to serve certain adversary summonses and complaints, (ii) a stay of the applicable adversary proceedings until service of process was effected, and (iii) permitting the Plaintiffs to file the complaints under seal.  (*Id.* at ¶¶ 33-38).

10.     The aforementioned procedures were purportedly intended to permit the Debtors to "preserve the status quo," and "potentially valuable assets without disrupting the plan process or existing business relationships prematurely or prejudicing the rights of any defendants," as well as to "avoid having to force all potential defendants to retain counsel to defend against adversary proceedings when, in fact, most of them likely will be resolved by a reorganization plan and never pursued."  (*Id*. at ¶¶ 33-34).

11.     In addition, the Debtors also sought to file the complaints under seal, in order to "avoid unnecessarily alarming potential defendants," and because the "Debtors have worked to preserve and repair their business relationship with many of the potential defendants during these cases and have negotiated or regained favorable credit terms with many suppliers and are continuing to do so."  (*Id.* at ¶ 37).

12.     No notice was given to Timken that the Preservation of Estate Claims Procedures Motion included claims against Timken.  (Hart Decl., ¶19).

13.     On August 16, 2007, this Court entered the Preservation of Estate Claims

Procedures Order, granting the aforementioned relief requested in the Preservation of Estate

Claims Procedures Motion by (i) allowing the Debtors to file adversary proceeding complaints

under seal, (ii) directing the Clerk of the Court to delay issuing summonses for complaints unless

and until the Debtors notified the Clerk of their intent to prosecute such actions, (iii) staying each

adversary action unless and until the Debtors effectuated service of process on the respective

defendants, and (iv) extending the deadline under Federal Rule 4(m) by which the Debtors would

have to serve process to March 31, 2008, so that the complaints would not be subject to dismissal

under Federal Rule 4(m).  (Preservation of Estate Claims Procedures Order, at ¶¶ 7-10).

*(ii)*     ***Commencement of Adversary Proceeding Against Timken and Plan Confirmation***

14.     On September 30, 2007, Plaintiffs commenced an adversary proceeding (the

"Adversary Proceeding") by filing a complaint (the "Complaint") under seal with the Clerk.  The

Complaint sought to recover, pursuant to Bankruptcy Code §§ 547 and 550, alleged preferential

transfers made to Timken in the aggregate amount of $12,082,005.61.[1]

15.     Pursuant to Bankruptcy Code §546(a), the statute of limitations for commencing

avoidance actions pursuant to Bankruptcy Code §§ 541, 544, 545, 547, 548 or 553 expired on or

before October 8, 2007.

16.     On January 25, 2008, the Court entered an order confirming the Debtors' first

amended joint plan of reorganization (the "Plan").

*(iii)*     ***Extension of Avoidance Action Service Deadline Motion and Order***

17.     By motion dated February 28, 2008 (the "Extension of Avoidance Action Service

Deadline Motion"), the Debtors sought to modify Paragraph 8 of the Preservation of Estate

---

[1] The Complaint was filed on behalf of each of the Debtors as plaintiffs.  In addition, the Complaint was asserted against "Timken," Timken France, SAS, and Timken Super Precision.

Claims Procedures Order, so as to extend for a second time the deadline under Federal Rule 4(m)

by which the Debtors would be required to serve the Complaint, by an additional two months to

May 31, 2008.  (Extension of Avoidance Action Service Deadline Motion, Adv. Pro. Doc. No. 2,

at ¶ 18).

18.    The stated purpose for this extension was to "enable the Debtors to fulfill their

fiduciary responsibility to preserve valuable estate assets in a manner that would not unnecessarily

disrupt the emergence process or the Debtors' current business relationships with potential

defendants that are necessary to the Debtors' ongoing operations," as well as "reduce the

administrative and economic burdens of the [adversary proceedings] on the Debtors, the Court,

the Clerk of Court, and the potential defendants."  (*Id.* at ¶ 21).

19.    In the Extension of Avoidance Action Service Deadline Motion, the Debtors also

stated that they would "not retain any of the causes of action asserted in the [adversary

proceedings] except those specifically listed on Exhibit 7.24 to the plan."[2]  (*Id.* at ¶ 17).  In fact,

the Debtors explicitly stated that of the 742 adversary proceedings commenced under seal, only

the claims relating to Laneko Engineering Co., Wachovia Bank, National Association, Laneko

Engineering Co. Inc., and their affiliates and subsidiaries were subject to the Preservation of

Estate Claims Procedures Order.  (*Id.* at ¶ 17, n.4).

20.    On March 28, 2008, the Court entered the Extension of Avoidance Action Service

Deadline Order, modifying Paragraph 8 of the Preservation of Estate Claims Procedures Order so

that the time under Federal Rule 4(m) by which the Debtors must serve a defendant in the

adversary proceedings with a summons and complaint, was further extended to May 31, 2008.

(Extension of Avoidance Action Service Deadline Order, Doc. No. 13277, at ¶ 2).

---

[2]  Exhibit 7.24 to the Plan apparently was never filed with the Court.

*(iv)*    ***Postconfirmation Extension of Avoidance Action Service Deadline Motion and Order***

21.    By motion dated April 10, 2008 (the "Postconfirmation Extension of Avoidance Action Service Deadline Motion"), the Debtors sought to further modify Paragraph 8 of the Preservation of Estate Claims Procedures Order, as modified by the Extension of Avoidance Action Service Deadline Order, so as to extend for a third time the deadline under Federal Rule 4(m) by which the Debtors would have to serve process, until 30 days after substantial consummation of the Plan or any modified plan.  (Postconfirmation Extension of Avoidance Action Service Deadline Motion, Adv. Pro. Doc. No. 5, at ¶ 19).

22.    The stated purpose for this extension was identical to the purpose set forth in support of the Extension of Avoidance Action Service Deadline Motion, namely, to "enable the Debtors to fulfill their fiduciary responsibility to preserve valuable estate assets in a manner that would not unnecessarily disrupt the emergence process or the Debtors' current business relationships with potential defendants that are necessary to the Debtors' ongoing operations," as well as "reduce the administrative and economic burdens of the [adversary proceedings] on the Debtors, the Court, the Clerk of Court, and the potential defendants."  (*Id.* at ¶ 22).

23.    The Postconfirmation Extension of Avoidance Action Service Deadline Motion once again stated that (i) the Debtors would "not retain any of the causes of action asserted in the [adversary proceedings] except those specifically listed on Exhibit 7.24 to the Plan;" and (ii) of the 742 adversary proceedings commenced under seal, only the claims relating to Laneko Engineering Co., Wachovia Bank, National Association, Laneko Engineering Co. Inc., and their affiliates and subsidiaries were subject to the Preservation of Estate Claims Procedures Order.  (*Id.* at ¶ 18 and n.4).

24.    On April 30, 2008, the Court entered the Postconfirmation Extension of Avoidance Action Service Deadline Order, modifying Paragraph 8 of the Preservation of Estate Claims Procedures Order, as previously modified by the Extension of Avoidance Action Service Deadline Order, so that the time under Federal Rule 4(m) by which the Debtors must serve a defendant in the adversary proceedings with a summons and complaint was further extended until 30 days after the later of substantial consummation of the Plan or any modified Chapter 11 plan for the Debtors, and December 31, 2008.  (Postconfirmation Extension of Avoidance Action Service Deadline Order, Doc. No. 13482, at ¶ 2).

*(v)*    ***Entry of Modification Approval Order and Effective Date***

25.    On July 30, 2009, the Court entered an order (the "Modification Approval Order") approving certain modifications to the Plan (the "Modified Plan").  The effective date of the Modified Plan occurred on October 6, 2009.  (*Id.* at ¶ 3).

*(vi)*   ***Supplemental Postconfirmation Extension of Avoidance Action Service Deadline Motion and Order***

26.    By motion dated October 2, 2009 (the "Supplemental Postconfirmation Extension of Avoidance Action Service Deadline Motion"), the Debtors sought to further modify Paragraph 8 of the Preservation of Estate Claims Procedures Order, as modified by the Extension of Avoidance Action Service Deadline Order and the Postconfirmation Extension of Avoidance Action Service Deadline Order, so as to extend for a fourth time the deadline under Federal Rule 4(m) by which the Debtors were required to serve process, until 180 days after substantial consummation of the Modified Plan.  (Supplemental Postconfirmation Extension of Avoidance Action Service Deadline Motion, Doc. No. 18952, at ¶ 16).

27.    The Debtors stated that this further extension was necessary in light of the fact that the Debtors now anticipated that they would retain 177 of the adversary proceedings filed under seal.  The Debtors asserted that 30 days after substantial consummation of the Modified Plan was not sufficient time to "assess the ongoing relationship with certain defendants and whether events since initiating the [adversary proceedings] have impacted the Debtors' estimated recoveries," and determine whether to pursue such retained adversary proceedings.  The Debtors thus fell back to their rote justification and stated that an extension "would reduce the administrative and economic burdens of the [retained adversary proceedings] on the Debtors and the potential defendants."  (*Id.* at ¶ 17, 19).

28.    On October 22, 2009, the Court entered the Supplemental Postconfirmation Extension of Avoidance Action Service Deadline Order, modifying Paragraph 8 of the Preservation of Estate Claims Procedures Order, as previously modified by the Extension of Avoidance Action Service Deadline Order and the Postconfirmation Extension of Avoidance Action Service Deadline Order (collectively, the "Extension Orders"), so that the time under Federal Rule 4(m) by which the Debtors were required to serve a defendant in the adversary proceedings with a summons and complaint, was further extended until 180 days after substantial consummation of the Modified Plan.  (Supplemental Postconfirmation Extension of Avoidance Action Service Deadline Order, Doc. No. 18999, at ¶ 2).

29.    Debtors eventually decided to prosecute all 177 of the adversary proceedings filed under seal.  Apparently, nothing had changed between October 2, 2009 and March 25, 2010 when Debtors obtained issuance of the summons.  The justification offered for the 180 day extension, reducing the burden on the Debtors and potential defendants presumably by abandoning some or

all of the adversary proceedings, did not materialize.  The extension of time merely served to

further delay notice to the defendants of the sealed actions.

*(vii)*    ***Service of Process on Timken***

30.     Timken was served with the Complaint on or about April 8, 2010, well over two

years after the limitations period provided by Bankruptcy Code § 546(a) expired.  (Hart Decl.,

¶22).

*(viii)*    ***Motions to Dismiss***

31.     On May 14, 2010, Timken, along with MPB Corporation d/b/a Timken Super

Precision, filed a Motion Seeking An Order (I) Pursuant To Fed. R. Civ. P. 60 And Fed. R. Bankr.

P. 9024, Vacating Prior Orders Establishing Procedures For Certain Adversary Proceedings,

Including Those Commenced By The Debtors Under 11 U.S.C. §§ 541, 544, 545, 547, 548, Or

549, And Extending The Time To Serve Process For Such Adversary Proceedings, (II) Pursuant

To Fed. R. Civ. P. 12(b) And (c) And Fed. R. Bankr. P. 7012(b) And (c), Dismissing The

Adversary Proceeding With Prejudice, (III) In The Alternative, Dismissing The Adversary

Proceeding On Ground Of Judicial Estoppel) Or (IV) In The Alternative, Dismissing The

Adversary Proceeding On Ground Of Laches (the "Motion to Dismiss").  (Motion to Dismiss,

Adv. Pro. Doc. No. 33).

32.     On June 7, 2010, the Debtors filed the Reorganized Debtors' Omnibus Response

To Motions Seeking, Among Other Forms Of Relief, Orders To Vacate Certain Procedural Orders

Previously Entered By This Court And To Dismiss The Avoidance Actions Against The Moving

Defendants (the "Omnibus Response").  (Omnibus Response, Adv. Pro. Doc. No. 35).

33.     On July 2, 2010, the Defendants filed their reply memorandum of law in support of the Motion to Dismiss (the "Reply Memorandum").  (Reply Memorandum, Adv. Pro. Doc. No. 36).

34.     On September 7, 2010, the Court signed the Order Granting In Part First Wave Motions To Dismiss (the "Dismissal Order").  The Dismissal Order provided, *inter alia*, that the Debtors were required to file a motion for leave to amend each complaint for each Adversary Proceeding they intended to pursue.  The Court further ordered that each motion to amend must attach a proposed amended complaint which for each alleged transfer, "sets forth, *at a minimum*, the transferor, the transferee, any known subsequent transferee against whom relief is sought, the antecedent debt and which Reorganized Debtor is the plaintiff."  (Dismissal Order, Adv. Pro. Doc. No. 40, at ¶4) (emphasis added).

35.     On September 7, 2010, the Debtors filed the Motion for Leave and attached a proposed amended complaint (the "Amended Complaint") against the Defendants as an Exhibit. (Motion for Leave, Adv. Pro. Doc. No. 38).

*(ix)  Facts Underlying Prejudice Suffered by Timken*

36.     On June 2, 2006, The Timken Corporation and DAS entered into an Assumption Agreement (the "Assumption Agreement"), whereby DAS agreed that it would make a payment in the amount of $1,803,986.64 (the "Cure Amount") by December 31, 2006 in connection with the assumption of that certain Life Time Contract dated September 18, 2001 (as may have been amended from time to time).  (Hart Decl., ¶8).

37.     Paragraph 3 of the Assumption Agreement, entitled "Waiver of Avoidance Claims", provides:

The Debtors, on behalf of themselves and their chapter 11 estates, hereby waive and release Supplier of any and all avoidance claims or causes of action under chapter 5 of the United States Bankruptcy Code relating to any transfers made by the Debtors to Supplier relating to the Supply Agreement, to the fullest extent that such waiver would have otherwise occurred by operation of law upon assumption of the Supply Agreement (the "Supply Agreement Avoidance Claims").  The Debtors, on behalf of themselves and their chapter 11 estates, hereby further waive and release Supplier of any and all avoidance claims or causes of action under section 547 of the United States Bankruptcy Code relating to any transfers made by Debtors to Supplier in the 90 days prior to October 5, 2005 relating to goods supplied by Supplier to the Debtors in connection with the Grand Rapids Facilities other than with respect to the Supply Agreement (the "Other Avoidance Claims" and, collectively with the Supply Agreement Avoidance Claims, the "Avoidance Claims").

(Hart Decl., ¶19).

38.     On July 27, 2006, Timken and/or certain affiliates caused proof of claim number 11706 ("Claim 11706") to be filed against the Debtors.  (Hart Decl., ¶10).

39.     On July 31, 2006, Timken and/or certain affiliates caused proof of claim number 14319 ("Claim 14319") to be filed against the Debtors.  (Hart Decl., ¶11).

40.     On October 31, 2006, the Debtors objected to Claim 11706 and Claim 14319 (the "First Claim Objection").  (Hart Decl., ¶12).

41.     On December 19, 2006, pursuant to that certain Assignment of Claim agreement (the "Assignment Agreement"), Timken assigned certain general unsecured claims (the "Purchased Claims") it had against DAS at a price equal to 100% of the face amount of the claims.  (Hart Decl., ¶13 & Ex. A).

42.     On January 23, 2007, Timken filed proof of claim number 16499 against the Debtors ("Claim 16499"; and with Claim 11706 and Claim 14319, the "Timken Claims").  (Hart Decl., ¶14).

43.     On June 15, 2007, the Debtors objected to Claim 16499 (the "Second Claim Objection"; and with the First Claim Objection, the "Claim Objections"). (Hart Decl., ¶15; Doc. No. 8271).

44.     On July 31, 2007, Timken and the purchaser of the Purchased Claims (the "Purchaser") entered into that certain First Amendment to Assignment of Claim (the "First Amendment"), pursuant to which an additional claim against DAS was sold by Timken at a price equal to 102% of the face amount of the claim. (Hart Decl.,¶16 & Ex. B).

45.     The Purchaser expressed to Timken that it was willing to purchase additional claims against DAS at 102% of their face value. (Hart Decl., ¶17; Declaration of Robert E. Morris In Support of Motion to Dismiss (the "Morris Decl."), Adv. Pro Doc. No. 36, Ex. 1, ¶6).

46.     On September 7, 2007, the Court so ordered the Joint Stipulation and Agreed Order Disallowing and Expunging Proof of Claim Number 16499 (The Timken Company), pursuant to which the Debtors and Timken partially resolved certain objections to claims asserted by Timken. (Hart Decl., ¶ 20; Doc. No. 9282).

47.     On September 30, 2007, the Debtors filed under seal the Adversary Proceeding against Timken and certain of its affiliates. (Adv. Pro. Doc. No. 1).

48.     On our about November 9, 2007, the Debtors, Timken, and the Purchaser entered into a Notice of Presentment of a Joint Stipulation and Agreed Order Compromising and Allowing Proof of Claim Numbers 11706 and 14319 (the "Second Settlement Stipulation"), pursuant to which the Debtors, Timken, and the Purchaser resolved the Claim Objections. (Hart Decl., ¶ 24; Doc. No. 10875). Except for certain specified rights and obligations, which were specifically preserved, the Second Settlement Stipulation purported to be a comprehensive settlement of the claims among the parties. The Second Settlement Stipulation did not preserve any preference

claims. (Id.). Timken believed the statute of limitations for asserting such claims had already

expired. Had Timken been aware of the Adversary Proceeding, it would have negotiated the

settlement of its claims with DAS differently. (Hart Decl., ¶24).

49.    The Debtors filed a notice of presentment of the Second Settlement Stipulation on

November 9, 2007. (Doc. No. 10875).

50.    On November 16, 2007, the Court so ordered the Second Settlement Stipulation.

(Doc. No. 10971).

51.    Had Timken been aware of the Adversary Proceeding at the time it was filed,

Timken could have, and likely would have, repaid in full the allegedly preferential payments

identified in the Complaint and sold the resulting claim under section 502(h) of the Bankruptcy

Code at an immediate profit of 2%. (Hart Decl.,¶27; Morris Decl., Adv. Pro Doc. No. 36, Ex. 1,

¶7).

52.    Alternatively, in the unlikely event that Timken would not have been able to repay

the alleged preference and resell the resulting 502(h) claim at a profit, Timken could have, and

likely would have, moved to dismiss the complaint on numerous grounds, including that, given

that the Debtors were proposing to pay unsecured creditors in full under their chapter 11 plan,

DAS would not have been able to show that the allegedly preferential payments were in fact

preferential. (Hart Decl.,¶28; Morris Decl., Adv. Pro Doc. No. 36, Ex. 1, ¶8).

53.    Alternatively, in the unlikely event that Timken would not have been able to repay

the alleged preference and resell the resulting 502(h) claim at a profit, Timken would likely have

negotiated differently with DAS. In particular, Timken had significant negotiating power with

respect to the new contracts to continue supplying DAS with the same parts it had been supplying

under expiring contracts, because it would have been difficult, time consuming, and expensive for

DAS to resource the production to an alternative supplier.  If Timken had known of the Adversary

Proceeding, Timken likely would have refused to accept the new contracts to replace expiring

contracts unless DAS dismissed the Adversary Proceeding.  (Hart Decl., ¶29; Morris Decl., Adv.

Pro Doc. No. 36, Ex. 1, ¶9).

54.      In connection with DAS's chapter 11 case, DAS assumed numerous contracts and

purchase orders between DAS and Timken, including the long term agreement referenced in the

Assumption Agreement, (collectively the "Assumed Contracts").  In their proposed Amended

Complaint, however, DAS does not provide the purchase order numbers for each of the alleged

transfers or whether such transfers relate to the Assumption Agreement.  DAS's failure to do so

makes it impossible to know whether those transfers relate to an Assumed Contract.  (Hart Decl.,

¶30).

55.      At least three of the allegedly preferential payments that are the subject of the

Adversary Proceeding, namely the $1,000,000 payment dated September 28, 2005, the $1,100,000

payment dated October 3, 2005, and the $507,400 payment dated October 6, 2005, were

prepayments DAS agreed to send to cover new purchases of goods.  (Hart Decl., ¶31; Morris

Decl., Adv. Pro Doc. No. 36, Ex. 1, ¶12).

56.      After receiving the proposed Amended Complaint, the Defendants were not able to

locate any of the invoices or purchase orders referenced therein.  The "invoice numbers" bear no

resemblance to any type of record keeping number utilized by Timken.  (Hart Decl., ¶32).

57.      Between the time when the Adversary Proceeding was filed and sealed, and the

time it was served, Timken sold its needle bearing business, which did a significant amount of

business with DAS, and underwent significant downsizing rendering certain witnesses and

documents potentially relevant to the Adversary Proceeding outside of Timken's access or control.  (Hart Decl., ¶33).

58.      During that time, certain Timken employees with knowledge of the Timken/DAS relationship either retired or left the company, which will make it more difficult for Timken to defend this lawsuit.  (Hart Decl., ¶34).

59.      Timken also upgraded its computer systems starting in May 2006.  Accessing the old computer systems is not easy and many of the persons who had familiarity with that system have retired or are no longer employed by Timken.  Accordingly, the delay resulting from DAS's decision to file and keep the Adversary Proceeding under seal for more than two years has made it very costly, if not impossible, to access the older computer records.  (Hart Decl., ¶35).

60.      In addition, Robert Morris, who until September 1, 2010 was the General Manager of Credit at Timken, has retired from Timken.  Robert Morris previously submitted a declaration in support of Timken's motion to dismiss the preference complaint.  Timken no longer has control over Mr. Morris.  (Hart Decl., ¶36).

## ARGUMENT

## I      THE MOTION SHOULD BE DENIED BECAUSE AMENDING THE COMPLAINT WOULD BE FUTILE

61.      Leave to amend under Rule 15 of the Federal Rules of Civil Procedure is not granted automatically; instead "it is within the sound discretion of the court whether to grant leave to amend." *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir. 1994).  "[C]onsiderations of undue delay, bad faith, and prejudice to the opposing party [are] all touchstones of a district court's discretionary authority to deny leave to amend." *Barrows v. Forest Laboratories, Inc.*, 742 F.2d 54, 58 (2d Cir. 1984).

62.     Likewise, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993).  For example, "it is proper to deny leave to replead where there is no merit in the proposed amendments or amendment would be futile." *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 728 (2d Cir. 1998).  Courts thus are justified in denying leave to amend where, as here, proposed amendments cannot withstand a motion to dismiss or fail to comply with a court's order regarding required allegations.  *Ruffolo*, 987 F.2d at 131 (affirming denial of leave to amend where proposed amendment failed to allege necessary facts); *McLaughlin v. Anderson*, 962 F.2d 187, 195 (2d Cir. 1992) (affirming denial of leave to amend where proposed amendment failed to comply with court's order).

63.     Amendment of the Complaint here would be futile because (i) the Amended Complaint fails to plead facts with sufficient particularity; (ii) many of the transfers do not relate back to the original Complaint and are thus barred by the statute of limitations; (iii) the Amended Complaint is barred by laches; (iv) the Amended Complaint is barred by the statute of limitations and based on insufficient process; (v) the Amended Complaint is barred based on the settlement of DAS's claims against Timken; and (vi) the Amended Complaint is barred by judicial estoppel.

**A.     The Amended Complaint Fails to Plead Facts Sufficient To State A Claim For Relief**

64.     In *Bell Atlantic Corp. v. Twombley*, 550 U.S. 544 (2007), the Supreme Court established the standard by which federal courts are to determine motions to dismiss.  Under *Twombley*, to survive a motion to dismiss, the complaint must contain sufficient factual matter to "state a claim for relief that is plausible on its face." *Id.* at 570.  A pleading that only offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not suffice. *Id.* at 555; *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

65.    In *Angell v. Haveri (In re Caremerica, Inc.)*, 409 B.R. 346, 350 (Bankr. E.D.N.C. 2009), the bankruptcy court applied the Supreme Court's *Twombley* standard to a preference action.  The defendant filed a motion to dismiss the trustee's claims to avoid alleged preferential and fraudulent transfers.  The bankruptcy court concluded that the trustee's complaint did not meet the *Twombley* standard because it failed to identify which of the debtors made the alleged transfers, and because it failed to allege any facts to show the existence or nature of an antecedent debt.  *Id.* at 350-51.

66.    The Dismissal Order recognized that the original Complaint failed to satisfy the enhanced pleading standards promulgated by the Supreme Court in *Twombley* and *Iqbal*.  Indeed, in Paragraph 4 of the Dismissal Order, the Court dismissed, without prejudice, all claims in most of the Debtors' preference adversary proceedings on the grounds that "the Debtors have failed to plead sufficient facts to state a claim and have not complied with . . . Rule 7008 of the Federal Rules of Bankruptcy Proceedings."  More importantly, the Court stated the following in the Dismissal Order:

> By no later than September 7, 2010, the Reorganized Debtors shall file a motion for leave to amend the complaint in each Adversary Proceeding the Reorganized Debtors intend to pursue (each, a "Motion to Amend").  Each Motion to Amend shall attach a proposed amended complaint that, for each alleged transfer shall set forth, *at a minimum*, the transferor, the transferee, any known subsequent transferee against whom relief is sought, the antecedent debt and which Reorganized Debtors is the plaintiff.  (emphasis added)

**(i)  Antecedent Debt**

67.    DAS has grossly failed to comply with the Dismissal Order.  Most notably, DAS failed to plead with any particularity the antecedent debt that corresponds to each alleged transfer.  Indeed, the Amended Complaint is ripe with contradictions and misrepresentations.

849392                                          -18-

68.     First, three of the alleged transfers referenced in the Amended Complaint did not

disclose any antecedent debt.  In particular, the transfers dated September 28, 2005, October 3,

2005, and October 6, 2005 in the amounts of $1,000,000, $1,100,000, and $507,400, respectively,

reference no antecedent debt in the Antecedent Debt column of Exhibit 1 to the Amended

Complaint.  The reason no antecedent debt was referenced is that such transfers were pre-

payments for goods not yet shipped to DAS.  (Hart Decl.,¶ 31)  Because there is no antecedent

debt for such transfers, there is no preference liability for such transfers.  Accordingly it would be

futile to amend the Complaint as to such transfers.

69.     Second, in paragraph 17 of the Amended Complaint, DAS alleges that "Plaintiff

did not accept physical invoices from Defendants in connection with Defendants' shipment of

goods under the Agreements."  Yet, for the majority of the alleged preferential transfers listed on

Exhibit 1 of the Amended Complaint, DAS refers to "invoice numbers."  Further complicating the

matter, the Defendants do not recognize any of the alleged "invoice numbers," which bear no

resemblance to any type of record keeping number utilized by the Defendants.  (Hart Decl., ¶32)

70.     Furthermore, DAS merely makes the conclusory allegation that each of the alleged

preferential transfers were made on account of an antecedent debt but provides no information

regarding such alleged antecedent debt, including no allegation regarding when the alleged debt

was incurred.  Rather, in paragraph 23 of the Amended Complaint, DAS maintains that the

purchase orders and/or invoices / bills of lading include evidence of the amount of the antecedent

debt and the approximate date of shipment orders.  But that makes no sense considering DAS's

earlier statement that it did not accept physical invoices.  Nevertheless, as expressly required by

the Dismissal Order, it is the responsibility of DAS to specify the antecedent debt.  DAS is not

permitted to shift that burden onto Timken.  Listing a series of invoice numbers for invoices that

DAS apparently never received (and which bear no relation to Timken's records) hardly satisfies

DAS's pleading responsibilities.

71.      Further, referencing purchase order numbers alone does not satisfy DAS's pleading

obligations.  Purchase order numbers by themselves do not evidence a debt but rather an order.

Where only a purchase order number is referenced, the plaintiff has failed to allege facts showing

the existence of a debt.

72.      For each of the above reasons, DAS has failed to satisfy its pleading obligations as

to the existence of an antecedent debt for each of the allegedly preferential transfers.

 **(ii)  Contract Assumption and Release**

73.      DAS's failure to disclose the corresponding antecedent debt for each alleged

transfers has made it impossible to determine from the Amended Complaint whether any of the

alleged transfers are payments made pursuant to an Assumed Contract, including the Long Term

Contract referenced in the Assumption Agreement.  (Hart Decl., ¶30).  If any of the alleged

preferential transfers were payments made pursuant to an Assumed Contract, the Debtors are not

entitled to avoid such transfers under section 547 of the Bankruptcy Code because the debtor is

required to cure all defaults prior to assumption.  *See Kimmelman v. Port Authority of New York*

*and New Jersey (In re Kiwi Int'l Air Lines, Inc.)*, 344 F.3d 311, 318-19 (3rd Cir. 2003); *In re*

*Superior Toy & Mfg. Co., Inc.*, 78 F.3d 1169, 1174 (7th Cir. 1996).

74.      As this Court, at the April 1, 2010 hearing, specifically noted:

> "If your contract was assumed then you're not going to have a
> preference in respect of payments in the contract that was assumed.
>
> * * *
>
> [I]t's crystal clear that if the payment is in respect of an assumed
> contract then there's no issue."

(*See* Omnibus Response, at Ex. D (April 1, 2010 Tr. pp. 50, 52), Adv. Pro. Doc. No. 35).

75.     Similarly, the lack of detail in the Amended Complaint makes it impossible to determine whether any of the alleged transfers are transfers for which the Defendants were released from avoidance liability under the Assumption Agreement.  (Hart Decl., ¶30).

76.     Considering that Timken previously notified DAS that it assumed numerous agreements with the Defendants, and in some cases waived its right to avoid certain transfers, it was incumbent on DAS to disclose enough information from which the Defendants can determine whether such payments were made pursuant to the Assumed Contracts or released pursuant to the Assumption Agreement.  Further, following the filing of the Motion for Leave, counsel for Timken made repeated requests for copies of the invoices and purchase orders referenced in the proposed Amended Complaint.  (Decl. of James Sullivan ¶¶4-5 & Exs. A & B).  DAS's counsel promised to respond to the request, but to date has failed to do so.  (*Id.* ¶¶6-7 & Ex. C).  DAS's failure to provide this information in the proposed Amended Complaint provides adequate grounds to deny DAS's Motion for Leave.

*(iii)  Insolvency*

77.     The Amended Complaint also fails to plead any facts regarding whether DAS was insolvent at the time of the transfers.  An element of the prima facie case for recovery of a preferential transfer is that the transfer must have been made "while the debtor was insolvent."  11 U.S.C. § 547(b)(3).  Although section 547(f) does supply a presumption of insolvency for the ninety days prior to the filing of the petition, the presumption is rebuttable.  In fact, although "[t]he presumption requires the party against whom the presumption exists to come forward with some evidence to rebut the presumption . . . the burden of proof remains on the party in whose

favor the presumption exists." [House Report No. 95-585, 95th Cong., 1st Sess. 375 (1977);

Senate Report No. 95-989, 95th Cong., 2nd Sess. 89 (1978).]

78.    Further, section 547(f) does not excuse DAS from complying with its obligation to

plead insolvency with sufficient particularity as required under Federal Rule 8, as interpreted by

*Iqbal* and *Twombley*, and their progeny.  This is particularly true where the Debtors' own filings

indicate that DAS was solvent at that time.  For example, DAS's schedules of assets and

liabilities, which were verified under penalty of perjury by an authorized officer, at or near the

time of filing, indicate that as of the bankruptcy filing, DAS's assets were $8,129,515,432 and its

liabilities were $6,059,642,099.  (DAS Docket No. 5).  These schedules, which show a book value

positive net worth of more than $2 billion, was subsequently confirmed in four amendments to

DAS's schedules on February 1, 2006 (DAS Docket No. 8) (assets: $8,129,515,432; liabilities:

$5,799,503,881); April 18, 2006 (DAS Docket No. 10) (assets: $8,133,427,809; liabilities:

$5,526,447,015); October 12, 2007 (Docket No. 76), and October 10, 2008 (Docket No. 84).[3]

These schedules alone are sufficient to rebut the section 547(f) presumption of insolvency.  *See,*

*e.g.*, *Lawson v. Ford Motor Co. (In re Roblin Industries, Inc.)*, 78 F.3d 30, 34-35 (2d Cir. 1996)

(schedules showing solvency rebutted presumption so that trustee bore burden of coming forward

to prove insolvency); *Akers v. Koubourlis (In re Koubourlis)*, 869 F.2d 1319, 1322 (9th Cir. 1989)

(debtors' schedules indicating greater assets than debts rebutted presumption); *IMF Sales*

*Associates, Inc. v. Racal-Vadic Information Systems, Inc. (IMF Sales Associates, Inc.)*, 94 B.R.

223, 225 n.3 (Bankr. D. Mass 1988) ("Racal has rebutted the [section 547(f) presumption] by

offering the schedules which show the debtor was solvent."); *Fokkena v. Winston, Reuber, Byrne,*

*P.C. (In re Johnson)*, 189 B.R. 744, 747 (Bankr. N.D. Iowa 1995) ("Debtor's schedules filed in

---

[3] The final two amendments appear to only amend certain liabilities.

his chapter 11 case are sufficient to support a finding of solvency at the time of the transfers. The presumption was rebutted.").

79.    Given that the Plaintiff's own sworn schedules show that DAS was solvent during the preference period, the Plaintiff should have set forth specific facts in its complaint (if such are available), showing that DAS's financial condition was such that the sum of its debts was greater than all of its property at a fair valuation, exclusive of property that was fraudulently transferred. Instead, Plaintiff has made only a naked assertion of insolvency, failing to allege any specifics.  In light of the recent Supreme Court cases on pleading requirements and the plaintiff's own admissions in the schedules, the bare assertion is insufficient to validate the presumption.  The burden was on Plaintiff to provide more detailed allegations, and that burden has not been met.

80.    Considering DAS's own schedules, *Twombley* and *Iqbal* required DAS to do more than make conclusory allegations of insolvency.  The failure to plead facts showing that DAS was insolvent warrants dismissal of the Amended Complaint.

81.    Accordingly, because DAS, again, fails to plead with sufficient particularity the elements of a preference, in direct violation of the Dismissal Order, the Amended Complaint should be dismissed rendering the Motion for Leave futile.

**B.    The Motion For Leave Should Be Denied Because The Amended Complaint Does Not Relate Back To The Original Complaint**

82.    The United States Bankruptcy Court for the Southern District of New York addressed the issue of "relating back" in *Official Committee of Unsecured Creditors v. Pirelli Communications Cables and Systems USA, LLC (In re 360Networks (USA) Inc.)*, 367 B.R. 428 (Bankr. S.D.N.Y. 2007).  In *360*, the plaintiff filed a complaint seeking the avoidance and recovery of preferential transfers made to the defendant of "at least $17,330,644.54."  *360*

*Networks*, 367 B.R. at 430.  After the statute of limitations had expired, the plaintiff filed a motion

seeking leave to amend its complaint to add additional transfers totaling $12,350,815.69, and for a

finding that the proposed amended complaint would relate back to the filing of the original

complaint.  *Id.*

83.    After dismissing plaintiff's argument that the "at least" language in the complaint

obviated the need for it to amend the complaint to assert the additional preference claims, the

court addressed the key issue of "whether the additional transfers set forth in the amended

complaint would 'relate back' under Rule 15(c)."  *Id.* at 433.  The court noted that if the proposed

amendments did not relate back, allowing the plaintiff to amend the complaint would be futile,

and the moving party bears the burden of proof with respect to relation back under Fed. R. Civ. P.

15(c).  *Id.*

84.    "The primary consideration in determining whether the proposed amendment to the

Complaint should relate back is whether the Complaint put the defendant on notice that additional

transfers may be pursued at a later date."  *Id.*  "The principal inquiry is whether adequate notice of

the matters raised in the amended pleading has been given to the opposing party."  *Id.* (quoting

*Enron Corp. v. Granite Constr. Corp.*, No. 03-93172, 2006 WL 2400369, at *1, *10 (Bankr.

S.D.N.Y. May 11, 2006)).  "If the facts in the original pleading do not provide defendant with

notice of the facts out of which the time-barred claim arises then relation back is inappropriate."

*Id.* at 433-34 (quoting *106 Mile Transp. Associates v. Koch*, 656 F. Supp. 1474, 1487 (S.D.N.Y.

1987)).

85.    The court examined the original complaint to determine whether it put the

defendant on notice that plaintiff may challenge additional transactions.  The court noted that the

original pleading alleged only that "[o]n or within ninety (90) days before the Petition Date, *360*

made preferential transfers to … [defendant] in the aggregate sum of $17,330,644.54." *Id*. at 434.

The exhibit to the complaint listed specific transfers, but did not provide "any information from

which the Defendant [could] glean that the Debtor intended to challenge additional transfers." *Id*.

86.    The court also noted that the fact that all of the transactions, including those

proposed in the amended complaint, were potentially preferential was of no consequence to the

Rule 15(c)(2) analysis.  When determining whether relation back is appropriate, the court must

examine

> "each potential preferential transfer [a]s a *separate and distinct*
> *transaction* [because] a preference action based on one transfer does
> not put defendant on notice of claims with respect to any other
> unidentified transfers."  *Id*. (emphasis added).

87.    The court denied *360's* motion to amend, finding that relation back was not

appropriate because the defendant was not put on notice that additional transfers may be pursued

at a later date by the original pleading.

88.    The United States Bankruptcy Court for the District of Delaware reached a similar

conclusion in *Peltz  v. CTC Direct, Inc. (In re MBC Greenhouse, Co.)*, 307 B.R. 787 (Bankr. D.

Del. 2004).  The plaintiff in *Greenhouse* sought to amend its complaint to add additional

transactions and defendants to its avoidance complaint after the statute of limitations had run.  The

allegations in the original complaint provided:

> "Within ninety (90) days prior to the Petition Date, one or more of
> the Debtors made transfers to Defendant in the amount of
> $2,830,141.32 (the "Transfer").  A summary of the information
> concerning the Transfer is attached hereto as Exhibit A, and
> incorporated herein by reference."

*Greenhouse*, 307 B.R. at 793 n.2.  Exhibit A listed six alleged preferential transfers.  The amended

complaint sought to add 33 additional transfers, increasing the demand to $7,911,935.66.

89.    The *Greenhouse* court noted that the allegations of the original complaint did not put the defendant on notice that plaintiff intended to avoid *all* transfers made within the 90 days preceding the petition date, rather the complaint only evinced plaintiff's intent to avoid those transfers listed on Exhibit A.  The court further noted that the new transactions plaintiff sought to add were "a whole new set of specific transactions."  *Id.* at 792.  The court cited to *Gordon v. Slaughter (In re Slaughter Co. and Assoc., Inc.)*, 242 B.R. 97, 102-103 (Bankr. N.D. Ga. 1999) for the proposition that allowing a "Trustee to use the relation-back doctrine to bootstrap new transactions onto viable actions is an abuse of due process which cannot be allowed, even to maximize recovery to the estate."

90.    In addition to the *Slaughter* case, the *Greenhouse* court relied on *Coan v. O&G Indus. Inc. (In re Austin Driveway Serv., Inc.)*, 179 B.R. 390 (Bankr. D. Conn. 1995) and *New Bedford Capacitor, Inc. v. Sexton Can Co. (New Bedford Capacitor, Inc.)*, 301 B.R. 375 (Bankr. D. Mass. 2003).  The court in *Austin* held that "in the preference context, each alleged preference should be considered a distinct transaction which would not relate back to any other transaction in the absence of an underlying unifying scheme or course of conduct," and the debtor-creditor relationship alone is not such a unifying scheme.  *Austin*, 179 B.R. at 399.  The *Austin* court also suggested that absent such a scheme, "strict application of the statute of limitations will give trustees an incentive to pursue preferential transfers expeditiously, without prejudice to the goal of maximizing the estate."  *Id.*  Similarly, the *New Bedford* court, in holding that relation back was not warranted, stated "the debtor-creditor relationship alone [was] insufficient to warrant the conclusion that all payments during the preference period [were] part of the same conduct, transaction or occurrence."  *New Bedford*, 301 B.R. at 380.

91.    Generally, leave to amend is freely granted and is mandatory if the amended complaint alleges the same conduct, transactions and occurrences alleged in the original pleading. More particularly, the amendment will relate back to the original pleading if the amendment merely "spells out the details of the transaction originally alleged, … [or] merely increases the *ad damnum* clause."  The Reorganized Debtors, however, as the moving parties, bear the burden of proving "relation back."  *In re Enron Corp.*, 298 B.R. 513, 522 (Bankr. S.D.N.Y. 2003).  DAS fails that burden.

92.    DAS's proposed Amended Complaint does not simply state an increased amount but rather, appears to allege entirely different transactions than those alleged in the original Complaint.  Indeed, in the original Complaint, the Debtors alleged sixteen (16) transfers.  Each transfer was described as a stand-alone transfer.  The Amended Complaint, however, lists 142 transfers.  Of those 142 transfers, only 8 of them reflect the same amount as a transfer listed on the original Complaint.  Three of those 8 overlapping transfers are the same ones for which no antecedent debt was alleged because they were, in fact, prepayments for goods to be delivered.[4]

93.    Despite repeated requests for an explanation regarding the increased demand and the additional transfers, as well as backup for each of the transfers, no explanation or backup was provided.  (See Decl. of James Sullivan ¶¶4-7 & Exs. A-C).  Clearly DAS's attempts to assert new claims long after the two year statute of limitations has expired is improper.

94.    Accordingly, because only 8 of the 142 transfers alleged in the Amended Complaint arguably tie to the original Complaint, the Motion for Leave should be denied as to the 134 transfers that do not tie to the original Complaint.

---

[4] The three alleged transfers for which no antecedent was alleged were for $1,000,000, $1,100,000, and $507,400. The other five overlapping transfers were for the following amounts: $18,230.59; $97,658.20; $25,186.56; $2,361.24; and $18,496

**C.    The Amended Complaint Will Be Barred By Laches**

95.    The Amended Complaint will be barred by laches.  A defendant may prevail on a

laches defense if it establishes (1) that it lacked knowledge that the claim might be asserted

against it; (2) that the plaintiff delayed asserting the claim despite an opportunity to do so; and (3)

that it would be prejudiced if the claim were now allowed to go forward.  *Gucci v. Sinatra (In re*

*Gucci)*, 197 Fed. Appx. 58, 60 (2d Cir. 2006); *Rapf v. Suffolk County of New York*, 755 F.2d 282,

292 (2d Cir. 1985).  As the Second Circuit explained:

> But when the defendant can show substantial actual prejudice [as a
> result of the sealing of an indictment], the indictment must be
> dismissed, for even a legitimate prosecutorial interest is then
> insufficient to effectuate statute of limitations policies.

*United States v. Watson*, 690 F.2d 15, 16 (2d Cir. 1979); *see also United States v. Srulowitz*, 819

F.2d 37, 40 (2d Cir. 1987).

96.    As described above, Timken had no knowledge that a claim would be asserted

against it.  (Hart Decl.,¶¶19, 22).  Debtors, in their Extension of Avoidance Action Service

Deadline Motion, asserted that they would "not retain any of the causes of action asserted in the

[adversary proceedings] except those specifically listed on Exhibit 7.24 to the Plan."  (Extension

of Avoidance Action Service Deadline Motion, at ¶ 17).  Debtors further stated that of the 742

adversary proceedings commenced under seal, only the claims relating to Laneko Engineering

Co., Wachovia Bank, National Association, Laneko Engineering Co. Inc., and their affiliates and

subsidiaries were subject to the Preservation of Estate Claims Procedures Order.  (*Id.* at ¶ 17, n.4).

The Debtors reiterated this assertion in their Postconfirmation Extension of Avoidance Action

Service Deadline Motion.  (Postconfirmation Extension of Avoidance Action Service Deadline

Motion, at ¶ 18 and n.4).

97.     DAS had ample opportunity to assert its claim against Timken long before the
action was unsealed and the Complaint served on April 8, 2010.  The stated justification for filing
under seal—the intent to pay all creditors in full, and not wanting to prematurely prejudice
potential defendants—ceased to exist (if it ever existed) sometime between April and October
2008.  In April 2008, the plan sponsor withdrew from the deal.  In October 2008, Debtors sought
approval of proposed modifications to the confirmed plan that provided a recovery of only 38.8%.
At some point in between those two dates, Debtors knew that they could not pay creditors in full
and that litigating the Adversary Proceedings may be necessary.  Despite this knowledge, Debtors
continued to wait almost two years to unseal the Adversary Proceedings.

98.     Timken would be severely prejudiced if the action is allowed to go forward.  First,
Timken sold its needle bearing business in December 2009, and underwent significant downsizing
rendering certain witnesses and documents potentially relevant to the Adversary Proceeding
outside of Timken's access or control.  Indeed, Robert E. Morris, the former Manager of General
Credit of The Timken Corporation, has since retired.  Timken also upgraded computer systems
which made older files costly to retrieve or entirely unavailable.  (Hart Decl., ¶¶35, 36).

99.     Furthermore, as evidenced by the Declaration of Michael Hart, had Timken known
it was being sued, it could have mitigated its damages by repaying the alleged preferences and
selling the resulting claim under section 502(h) of the Bankruptcy Code.  (Hart Decl., ¶27).  In
fact, on December 19, 2006, Timken sold some its claims against DAS at a price equal to 100% of
the face amount of the claims.  And then on July 31, 2007, just sixteen days before the
Preservation of Estate Claims Procedure Order was entered and less than two months before the
Complaint was filed under seal, Timken sold additional claims for 102% of the face amount of the
claims.  (*See id.* at ¶ 5).  Further, the Purchaser had expressed to Timken a strong desire to

purchase additional claims at the same price. (*See id.* at ¶ 6). The sealing of the Complaint,

however, deprived Timken of the opportunity to sell its 502(h) claims for a profit and thus

mitigate its damages in full.[5]

100.    Moreover, the Debtors took advantage of the Defendants' ignorance regarding the

sealed Complaint when it negotiated its various claims objections, the settlement of which was

intended to provide a comprehensive resolution of the Defendants' claims. Indeed, the first claim

settlement was entered into *after* the Debtors filed the Preservation of Estate Claims Procedure

Motion. And, the second claim settlement was entered into shortly *after* the statute of limitations

for asserting preference claims had expired and *after* the Debtors filed the original Complaint

under seal. Therefore, unbeknownst to the Defendants, but fully known to the Debtors, such

resolution of claims was anything but comprehensive. The Debtors' bad faith conduct is

unacceptable and they should not be rewarded with the fruit of their deceit. The Defendants

would never have agreed to any agreement with respect to their claims without addressing the

preference liability. Accordingly, the Defendants have been severely prejudiced thus warranting

dismissal of the Amended Complaint.

101.    Similarly, had Timken been aware of the Adversary Proceeding at the time it was

filed, Timken would likely have negotiated differently with the Debtors with respect to future

supply contracts. (Hart Decl., ¶29). In particular, Timken had significant negotiating power with

respect to new contracts to continue supplying the Debtors with the same parts it had been

supplying under expiring contracts, because it would have been difficult, time consuming, and

expensive for the Debtors to resource the production to an alternative supplier. (*See id.*). If

---

[5]  Although Timken believes that the Purchaser has the obligation to purchase any 502(h) claims resulting from this
lawsuit, the Purchaser has denied such obligation.

Timken had known of the Adversary Proceeding, Timken likely would have refused to accept the new contracts to replace expiring contracts unless the Debtors dismissed the Adversary Proceeding.  (*See id.*).  The filing under seal, therefore, was not a benefit to Timken, but to the Debtors, as it provided the Debtors with optionality to which they were not entitled.

102.    Additionally, if the Complaint had not been sealed, Timken could have moved to dismiss on the basis that the Debtors would not have been able to prove that the payments to Timken were preferential given that the Debtors were proposing a 100-percent plan.  (*See id.* at ¶ 28).  In fact, the Debtors' decision to file the preference complaints at a time when a 100-percent plan was contemplated may have violated Rule 11 of the Federal Rules.

103.    Moreover, the Defendants were prejudiced by the Debtors' actions because had they known that they were being targeted as defendants in an adversary proceeding they could have exercised their right to object to the Preservation of Estate Claims Procedures Order or the Extension Orders.  *See Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 600 F.3d 135, 157-58 (2d Cir. 2010) (holding that Chubb Indemnity Insurance Company's due process rights were violated notwithstanding the fact that it had publication notice of the hearing that led to the order affecting it, because due process prohibits binding a third party where the party does not have sufficient information that would allow it to intelligently understand that its rights were going to be permanently affected thus necessitating the need to appear and defend).

104.    In addition, the lack of due process pursued by the Debtors had the bonus effect of disenfranchising Timken and other defendants from participating in the case and voting on the Plan and Modified Plan.  Indeed, under Section 502(h), it is implicit that "a transferee of an avoidable transfer has an allowable claim once it turns over such property for which it is liable," and that it may file a proof of claim on account of same.  *Fleet Nat'l Bank v. Gray (In re Bankvest*

*Capital Corp.)*, 375 F.3d 51, 57 n.4 (1st Cir. 2004).  That, in turn, allows it to "[participate] in the voting and distribution from the estate."  *In re Hamilton*, 179 B.R. 749, 752 (Bankr. S.D. Ga. 1995) (quoting *United States v. Kolstad (In re Kolstad)*, 928 F.2d 171, 174 (5th Cir. 1991)).  The Debtors knew that if Timken repaid an alleged preferential transfer, it would have been entitled to file a claim, participate in the case and vote on the Plan and the Modified Plan.  The justification for depriving Timken of its right to engage in the bankruptcy cases merely so the Debtors could avoid looking bad to Timken is patently improper and not justifiable under the Bankruptcy Code.

105.    Furthermore, the Debtors' suggestion that they were protecting the Defendants' from themselves (preventing the defendants from becoming "alarmed" and running off and incurring legal fees) is absurd.  First, how were the Debtors "benefitting" the defendants by preventing them from retaining counsel to protect their interests?  There is not a single case in the history of American jurisprudence that supports the view that a plaintiff may conceal both the filing of a complaint and a series of motions that eviscerate a defendant's legal rights, because informing the defendant would "unnecessarily alarm" the defendant and force it into the "inconvenient position" of retaining legal counsel to protect its interests.[6]

106.    Additionally, if, as the Debtors contend, everyone understood that the initial plan was going to pay 100 percent, there was no reason to believe that the Defendants would have acted irrationally.  Instead, had particularized notice been provided, documents and testimony relevant to the claims could have been preserved by the Defendants, and the parties could have entered into agreements tolling or staying the litigation.  By hiding these actions unnecessarily, the Debtors chose a course that prevented the Defendants from doing so.  Having chosen this course

---

[6]  In fact, as stated earlier and set forth in the Hart Declaration, Timken could have taken steps to protect itself, such as repaying the alleged preferential payment and selling the resulting 502(h) claim to a claim purchaser.  (Hart Decl., ¶27).

of action, the Debtors must now live with the consequences that the avoidance complaints should

be dismissed.

107.    Indeed, the Second Circuit has specifically declared that, in situations such as ours:

It is obvious that any defendant would be harmed by a generous
extension of the service period beyond the limitations period for the
action, ***especially if the defendant had no actual notice of the
existence of the complaint until the service period had expired.***

*Zapata v. City of New York*, 502 F.3d 192, 198 (2d Cir. 2007) (emphasis supplied).

108.    Moreover, the Debtors' arguments are disingenuous considering that they simply

could have moved to stay the adversary proceedings after they were timely filed and served.

109.    In reality, the Debtors sought to conceal the fact that an avoidance action (seeking

millions of dollars) had been filed in the first place.  By intentionally keeping the Defendants in

the dark, the Debtors were able to maintain an ***uneven playing field***, with one party, the Debtors,

having an informational advantage over the other during the parties' ongoing business dealings

and negotiations.  (Hart Decl., ¶¶24, 29)[7]

110.    And, of course, the Debtors' scheme, by the Debtors' own admission, worked.  The

Debtors were able to extract "favorable" terms during the parties' negotiations and then, years

after the limitations period expired, they were able to spring their avoidance actions on 177

unsuspecting defendants.  Cause cannot exist for sealing a complaint under such circumstances –

to facilitate uneven, bad faith negotiations.  *See Video Software Ass'n v. Orion Pictures Corp. (In

re Orion Pictures, Corp.)*, 21 F.3d 24, 27 (2d Cir. 1994) (defining "commercial information"

---

[7] Mr. Hart states at Paragraph 29 of his Declaration: "Alternatively, in the unlikely event that Timken would not
have been able repay the alleged preference and resell the resulting 502(h) claim at a profit, Timken would likely have
negotiated differently with DAS.  In particular, Timken had significant negotiating power with respect to the new
contracts to continue supplying DAS with the same parts it had been supplying under expiring contracts, because it
would have been difficult, time consuming, and expensive for DAS to resource the production to an alternative
supplier.  If Timken had known of the Adversary Proceeding, Timken likely would have refused to accept the new
contracts to replace expiring contracts unless DAS dismissed the Adversary Proceeding."

under § 107 to be "information which would cause an *unfair advantage to competitor*s by

providing them information as to the *commercial operations* of the debtor").

111.    Accordingly, the Defendants were prejudiced economically, on account of being

denied the undisputable opportunity to mitigate or eliminate their liability exposure.  Significantly,

the Defendants were also prejudiced, *inter alia*, by being denied certain defenses that would have

been otherwise available to them had they been timely served, and by being denied leverage with

respect to negotiating disputed claims and future supply contracts with the Debtors.  To have

argued that the extensions were for the benefit of the Defendants is simply disingenuous and

belied by the facts.  Therefore, because the Amended Complaint will be barred by laches,

amending the Complaint is futile.  Thus, the Motion for Leave should be denied.

**D.    The Amended Complaint is Barred by the Statute of Limitations and Based On Insufficient Service of Process**

112.    Section 546(a) of the Bankruptcy Code, which sets forth the statute of limitations

on avoiding powers, provides:

> An action or proceeding under section 544,545, 547,548, or 553 of
> this title may not be commenced after the earlier of - (1) the later of
> - (A) 2 years after the entry of the order for relief; or (B) 1 year after
> the appointment or election of the first trustee under section 702,
> 1104, 1163, 1202, or 1302 of this title if such appointment or such
> election occurs before the expiration of the period specified in
> subparagraph (A); or (2) the time the case is closed or dismissed.

11 U.S.C. § 546(a).  The deadline for commencing an adversary proceeding against Timken on

account of an allegedly avoidable preference expired on or before October 14, 2007.  The

Plaintiffs filed the Complaint under seal on September 30, 2007, but did not serve Timken with

such Complaint until April 8, 2010, well over two years after the statute of limitations contained

in Section 546(a) expired.

113.     To bridge the gap between the time that Timken should have been served with the

Complaint and the date on which it was actually served with the Complaint, the Plaintiffs rely on

the Extension Orders sought and entered, pursuant to Federal Rule 4(m), *ex parte* from the entities

that had an adverse interest, namely, Timken.  Federal Rule 4(m), made applicable by Rule

7004(a) of the Federal Rules of Bankruptcy Procedure, provides, in relevant part:

> ***Time Limit for Service.***  If a defendant is not served within 120
> days after the complaint is filed, the court - on motion or on its own
> after notice to the plaintiff - must dismiss the action without
> prejudice against that defendant or order that service be made within
> a specified time.  But if the plaintiff shows good cause for the
> failure, the court must extend the time for service for an appropriate
> period.

114.     The Extension Orders should not have been entered, as good cause did not exist to

extend the time to serve process as a matter of law.  Good cause generally exists under Federal

Rule 4(m) when service is attempted, but is not completed, on a named defendant within the

required 120-day period.  *Spinale v. United States*, No. 03-1704, 2005 WL 659150, at *1, *3

(S.D.N.Y. Mar. 16, 2005).  It does not exist, however, in situations where the plaintiff can serve

the named defendants, but simply chooses not to do so, and where the sole purpose in seeking the

extension of time is to prevent defendants from learning that they had been sued.[8]  The use of

procedural rules to obtain a result not contemplated by the accompanying substantive law is

simply not permitted.  *See* 28 U.S.C. **§** 2075 (rules prescribed by the United States Supreme Court

"shall not abridge, enlarge, or modify any substantive right"); *see also Morse v. Perrotta (In re*

---

[8]  As support for extending the time to serve process on defendants, the Debtors cited *Bank of Cape Verde v. Bronson*,
167 F.R.D. 370, 371-72 (S.D.N.Y. 1996), for the proposition that good cause existed where future events would have
likely obviated the need to serve the complaint" and when the plaintiff requested the extension before the deadline
expired.  This case is inapplicable to the facts here.  In *Bank of Cape Verde*, the third party plaintiff was pursuing
good faith settlement negotiations with the plaintiff and third-party defendants, and had already served all or most of
the parties to the action prior to the expiration of the 120-day deadline.  That is a far cry from the situation here, where
Timken was not, and could not have been in settlement negotiations with Plaintiffs, as it did not even know that it had
been sued.

*Perrotta)*, 406 B.R. 1, 8 (Bankr. D. N.H. 2009) ("Therefore, to the extent that the Bankruptcy Rules and the Bankruptcy Code are inconsistent, the statute controls.").

115.    Moreover, while it is true that courts have the discretion to extend the time for service of process, such extensions were not warranted here.  Courts have held that statutes of limitation are statutes of repose, and they "are enacted upon the presumption, that one having a well-founded claim will not delay enforcing it beyond a reasonable time, if he has the power to sue."  *In re Cornwall*, 9 Blatchf. 114, 6 F. Cas. 586, 591 (C.C.D. Conn. Sept. Term 1871).  Indeed, the purpose of statutes of repose is primarily to give notice to plaintiffs of the time within which to bring suit and to potential defendants of the time beyond which exposure to liability ceases.  *See Diversified Hospitality Group, Inc. v. Carson Pirie Scott & Co.*, No. 90-2957, 1991 WL 35953, at *1, *5 (S.D.N.Y. Mar. 8, 1991).

116.    Statutes of repose are only to be outweighed where "the interests of justice require vindication of the plaintiff's rights."  *Family Golf Ctrs., Inc. v. Acushnet Co. (In re Randall's Island Family Golf Ctrs., Inc.)*, 288 B.R. 701, 705 (Bankr. S.D.N.Y. 2003).  Such circumstances occur where the plaintiff has not slept on its rights, has commenced a timely state court action in a court of competent jurisdiction, the particular defect in the complaint is waivable and frequently waived, and the defendant *"could not have relied upon the policy of repose embodied in the limitation statute, for it was aware that [the plaintiff] was actively pursuing his . . . remedy." Id.* (quoting *Burnett v. N.Y. Cent. R.R. Co.*, 380 U.S. 424, 428-29 (1965)) (emphasis added).

117.    In fact, the Second Circuit has considered and rejected the Debtors' argument that the limitations period for preference actions can be extended beyond the statutory two-year period in order to allow the debtor "to pursue ongoing business operations through preservation of their supply base, and to continue developing a plan of reorganization that would allow the Debtors to

emerge from Chapter 11." *See U.S. Brass & Copper Co. v. Caplan (In re Century Brass Prods., Inc.)*, 22 F.3d 37 (2d Cir. 1994).  Specifically, in *Century Brass*, the Second Circuit overruled lower-court precedent that previously held that the two-year limitations period only applied to trustees, not debtors in possession ("DIP"), based on the belief that the premature initiation of preference actions would impede the debtors' reorganization.  Although the Second Circuit recognized that a "DIP is generally involved in attempts to reorganize and continue the debtor's business" and that many believed that "subjecting a DIP to the two-year limitations period would unduly hobble its efforts to reorganize or to negotiate with creditors," the Court rejected the notion that the two-year statute of limitations should not apply to DIPs, holding that the "two-year limitations period represents Congress's balancing of the interests of the debtor in negotiation . . . against the interest of other persons in the repose of claims that may be made against them."  *Id.* at 41.

118.    Thus, under *Century Brass*, a debtor's assertion that relief is needed in order to help it reorganize and continue its business – the exact same arguments made by the Debtors– cannot be used to extend or toll, as a practical matter, the statute of limitations.  The impact of *Century Brass* is clear:  the avoidance actions should be dismissed because the arguments that were relied upon in fashioning the Extension Orders have been rejected by the Second Circuit as insufficient to render the limitations period inapplicable to a debtor-in-possession.

119.    Here, Timken was entitled to rely, had no reason not to rely, and indeed relied, upon the policy of repose embedded within Section 546(a) of the Bankruptcy Code, having

received no notice for more than two years after the statute of limitations had expired that it had been sued by the Plaintiffs.[9]

120.    Thus, while it is generally the policy of the courts to decide cases on the merits where possible, if the Rules are to mean anything, parties must diligently try to follow them and courts must enforce them, even if it means that cases must sometimes be finally determined on procedural grounds rather than on their substantive merits. *Mused v. U.S. Dep't of Agriculture Food and Nutrition Serv.*, 169 F.R.D. 28, 35 (W.D.N.Y. 1996).  By not giving notice to Timken that it had been sued and denying Timken the right to be heard and object to the motions supporting the Preservation of Estate Claims Procedures Order and each of the Extension Orders, the Plaintiff maneuvered itself into this corner where the Complaint should be dismissed on procedural, and not substantive, grounds.  Having devised and imposed this scheme on Timken, however, DAS cannot now cry foul to the effects of its machinations.

121.    Accordingly, because the Complaint was not served within the time period set by Federal Rule 4(m) or within the statute of limitations, and because the Debtors made misrepresentations in order to obtain the relief provided in the Extension Orders, granting the Motion for Leave would be futile.[10]  As a result, the Motion for Leave should be denied.  *Barrows v. Forest Laboratories, Inc.*, 742 F.2d 54, 58 (2d Cir. 1984) ("[C]onsiderations of undue delay, bad faith, and prejudice to the opposing party [are] all touchstones of a district court's discretionary authority to deny leave to amend.").

---

[9]  Timken also could not have discovered on its own that it had been sued in light of the Complaint having been filed under seal.

[10]  The Defendants also incorporate by reference their due process arguments raised in the Motion to Dismiss and the Reply Memorandum.

**E.      The Amended Complaint is Barred Based on the Settlement of DAS's Claims Against Timken.**

122.    Section 502(d) of the Bankruptcy Code requires disallowance of a claim of an

entity which has received a preferential transfer:

> Notwithstanding subsections (a) and (b) of this section, the court **shall** disallow any claim of any entity from which property is recoverable under sections 542, 543, 550, or 553 of this title . . . unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. §502(d) (emphasis added).

123.    Following Timken's proof of claim and formal debtor objection thereto, the parties

negotiated for nearly a year and entered into a consent order granting Timken an allowed claim in

a modified amount.  As set forth in the Statement of Facts above, on or about November 9, 2007,

the Debtors, Timken and the Purchaser entered into a Second Settlement Stipulation allowing two

of Timken's claims against the Debtors.  (Hart Decl., ¶24).  This Court approved and signed the

Stipulation, thereby deeming Timken's claims allowed.

124.    Based upon the language of section 502(d), DAS is barred from bringing this

adversary proceeding.  If DAS wished to address allegations of preferential transfers to Timken, it

could have and should have done so during the claims allowance process.  DAS may not now re-

litigate claims they have already settled, and for which settlement has been approved by order of

this Court.

125.    The Debtors were charged with examining proofs of claim and objecting to the

allowance of any improper claim.  In their unique position, the DAS clearly knew about the

alleged preferential transfers to Timken prior to the settlement of Timken's claims, and it was

incumbent upon the DAS to raise any known objection contemporaneously:  the Adversary

Proceeding was filed on September 30, 2007, just a few short weeks before entering into the

Second Settlement Stipulation.

126.    Several courts have had an opportunity to consider whether debtors waive their

right to recover on an alleged preferential transfer to a creditor whose proof of claim has already

been adjudicated and whose claim has been allowed by order of the court.  The only reported case

on point in this District seems to be *Rhythms Netconnections Inc. v. Cisco Systems, Inc. (In re*

*Rhythms Netconnections Inc)*, 300 B.R. 404 (Bankr. S.D.N.Y. 2003), which found that Section

502 (d) should not bar assertion of preference claims under the facts of that case.  Other courts

have split on the issue.  *See e.g,. Caliolo v. Azdel, Inc. (In re Cambridge Indus. Holdings, Inc.)*,

No. 00-1919, 2003 WL 21697190, at *1, *5 (Bankr. D. Del. Jul. 18, 2003) ("*Cambridge II*")

(holding that if a claim has been allowed, there can no longer be an avoidable preference transfer

due from that claimant); *Caliolo v. TKA Fabco Corp. (In re Cambridge Indus. Holdings, Inc.)*,

No. 00-1919, 2003 WL 1818177, at *1, *2 (Bankr. D. Del Apr. 2, 2003) ("*Cambridge I*") (holding

that preference claim brought after claim was already allowed was barred on 'the principles of

claim preclusion'); *LaRoche Indus. v. Gen Am. Transp. Corp. (In re LaRoche Indus., Inc.)*, 284

B.R. 406, 408-09 (Bankr. D. Del. 2002) (concluding that "§502(d) stands for the proposition that

if a claim is allowed there is no longer a voidable transfer due from that claimant"); *but see*

*Caliolo v. Saginaw Bay Plastics, Inc.*, No. 00-1919, 2006 WL 516764, at *1 (D. Del. Mar. 2,

2006) (holding that there is no waiver of preference claim if not brought during the claims

allowance process); *Homeplace of Am., Inc. v. Salton, Inc. (In re Waccamaw's Homeplace)*, 325

B.R. 524, 535 (Bankr. D. Del. May 31, 2005) (same).

127.    However, Judge Lifland distinguished *Rhythms* on its facts from other cases which

had held differently.  In *Rhythms,* the settlement as to the creditor's contracts and claim was

signed less than two months after the petition date: "[t]he Debtors and their statutory Creditors'
Committee were in triage and were far from a point where they could be expected to have
commended a preference analysis or a claims review." *Rhythms*, 300 B.R. at 409.

128.    Timken contends that those decisions holding that a preference action is barred
where a creditor's claim has already been deemed allowed, *particularly where the debtor has
already conducted its "preference analysis" and already secretly filed the preference claim with
the court, before the settlement is finalized,* are the more reasoned decisions in this situation given
both the plain language and legislative history of Section 502(d).

129.    Judge Lifland pointed out in the *Rhythms* decision that in *Cambridge I*, the Court
decided against the sort of "sandbagging" that can happen after a claim is resolved if the debtor
commences an adversary proceeding alleging the receipt of an avoidable preference.  *Rhythms*,
300 B.R. at 409 (citing *Cambridge I* at *2).  Similarly, in *Cambridge II*, "the debtor filed a
preference action before the creditor filed its proof of claim, "allowing enough time to combine
and determine both cases correctly."  *Rhythms*, 300 B.R. at 409 (citing *Cambridge II* at *3).

130.    Timken's situation most closely matches the factual circumstances in *Cambridge
II*, although Timken's situation is the more egregious because, as the stipulation was being
negotiated, the Debtors knew that they had already filed a secret preference action against
Timken, whereas in *Cambridge II*, the creditor was aware that an adversary proceeding was
pending.  *Cambridge II* at *3.  Therefore, this Court should find that Section 502(d) of the
Bankruptcy Code precludes DAS's pursuit of any recovery of any allegedly preferential transfers
from Timken.

**F.       The Amended Complaint is Barred by Judicial Estoppel**

131.    The equitable principle of judicial estoppel "prevents a party from asserting a

factual position in a legal proceeding that is contrary to a position previously taken by [that party]

in a prior legal proceeding." *In re Venture Mortgage Fund, L.P.*, 245 B.R. 460, 471 (2000), *aff'd*,

282 F.3d 185 (2d Cir. 2002) (quoting *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1037 (2d

Cir.), *cert. denied*, 510 U.S. 992 (1993)).  The purpose of judicial estoppel is to "protect the

integrity of the judicial process . . . by prohibiting parties from deliberately changing positions

according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-50

(2001) (citations omitted); *see also Rosenshein v. Kleban*, 918 F.Supp. 98, 104 (S.D.N.Y. 1996)

("Judicial estoppel is invoked . . . to prevent the party from playing fast and loose with the courts,

and to protect the essential integrity of the judicial process.").

132.    In the Second Circuit, the following two factors must be satisfied to invoke the

doctrine of judicial estoppel: (i) the party against whom estoppel is asserted took an inconsistent

position in a prior proceeding, and (ii) the first tribunal adopted the inconsistent position in some

manner, such as by rendering a favorable judgment. *In re Venture Mortgage Fund, L.P.*, 245 B.R.

at 472.  The doctrine, however, does not depend upon prejudice to the party invoking it. *Galerie*

*Des Monnaies of Geneva, Ltd. v. Deutsche Bank, A.G., New York Branch (In re Galerie Des*

*Monnaies of Geneva Ltd.)*, 55 B.R. 253, 260 (Bankr. S.D.N.Y. 1985), *aff'd***,** 62 B.R. 224

(S.D.N.Y. 1986).

133.    Both factors are satisfied here.  First, in their Extension of Avoidance Action

Service Deadline Motion, the Debtors asserted that they would "not retain any of the causes of

action asserted in the [adversary proceedings] except those specifically listed on Exhibit 7.24 to

the Plan."  (Extension of Avoidance Action Service Deadline Motion, at ¶ 17).  In fact, the

Debtors stated that of the 742 adversary proceedings commenced under seal, only the claims

relating to Laneko Engineering Co., Wachovia Bank, National Association, Laneko Engineering

Co. Inc., and their affiliates and subsidiaries were subject to the Preservation of Estate Claims

Procedures Order.  (*Id.* at ¶ 17, n.4).  The Debtors reiterated this assertion in their

Postconfirmation Extension of Avoidance Action Service Deadline Motion.  (Postconfirmation

Extension of Avoidance Action Service Deadline Motion, at ¶ 18 and n.4).  Second, the Court, in

entering the orders upon the representations set forth in the Extension of Avoidance Action

Service Deadline Motion and the Postconfirmation Extension of Avoidance Action Service

Deadline Motion, adopted the inconsistent position.

134.    Thus, by seeking leave to file the Amended Complaint, DAS is now attempting to

reverse a legal position previously asserted in two of the Debtors' motions and adopted by the

Court in its entry of the Extension of Avoidance Action Service Deadline Order and the

Postconfirmation Extension of Avoidance Action Service Deadline Order.  Such action is

impermissible and, accordingly, leave to file the Amended Complaint should not be permitted.

*See Galerie Des Monnaies of Geneva Ltd.*, 55 B.R. at 260 (granting defendant's motion to dismiss

where debtor who stated in its disclosure statement that it has no preference actions "may not

thereafter reverse its field and commence a preference action for its own benefit.").  Therefore, the

Motion for Leave should be denied on grounds of futility.

## II    ALTERNATIVELY, THE BURDEN OF PROOF WITH RESPECT TO THE DEFENDANTS' AFFIRMATIVE DEFENSES SHOULD SHIFT TO THE DEBTORS

135.    Alternatively, if the Court concludes that DAS is entitled to leave to file the Amended Complaint, the burden of proof with respect to the Defendants' affirmative defenses should be shifted to the Debtors.  It cannot be disputed that Defendants have suffered irreparable harm as a result of the Debtors' unnecessary, self-serving delay in unsealing and serving of the Adversary Proceedings.  As mentioned, the Defendants no longer have the same access to information and witnesses they otherwise would have, had the Complaint been timely served. Moreover, DAS cannot dispute that but for the Debtors' dilatory conduct, the Defendants could have mitigated their claims completely by repaying the alleged preferential transfers, and then selling their section 502(h) claims.  While the Defendants believe that the Motion for Leave should be denied, at the very least, in the alternative, DAS should bear the burden of disproving the Defendants' affirmative defenses.

## III    THERE IS NO BASIS FOR GRANTING DAS LEAVE TO AMEND THE PROPOSED AMENDED COMPLAINT

136.    This Court made clear on the record during the hearing on the "First Wave Motions" that it would not tolerate DAS presenting a proposed amended complaint that failed to meet its minimal pleading requirements.  Despite this Court's admonition and despite having an unprecedented amount of time to acquire the data necessary to make out its prima facie case, DAS's proposed Amended Complaint still fails even to meet the minimum pleading requirements identified in the Dismissal Order.  DAS has abused this process for too long and has cost the Defendants and this Court far too much in both time and resources. No further amendment is

warranted, and DAS's avoidance action against the Defendants should now be dismissed with

prejudice.

## IV    TIMKEN INCORPORATES ALL APPLICABLE ARGUMENTS RAISED BY OTHER DEFENDANTS IN THEIR OBJECTIONS

137.    Numerous objections have been filed by the defendants in other various avoidance

actions.  Because the facts surrounding those actions are, in many respects, similar to those found

here, Timken incorporates all applicable arguments raised by the other defendants in their

dismissal motions and objections to the Motion for Leave.

## **CONCLUSION**

For the reasons set forth herein, the Motion for Leave should be denied and the Amended

Complaint should be dismissed with prejudice.

MOSES & SINGER LLP

By:      /s/ James Sullivan
James Sullivan
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Telephone: (212) 554-7800
Facsimile: (212) 554-7700
Email:  jsullivan@mosessinger.com

*Counsel to The Timken Company and The Timken Corporation*

Dated: November 24, 2010

849392

-46-