Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 05-44481-rdd

5  - - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  DPH HOLDINGS CORP., ET AL.,

9

10          Reorganized Debtors.

11

12  - - - - - - - - - - - - - - - - - - - - - -x

13

14               U.S. Bankruptcy Court

15               300 Quarropas Street

16               White Plains, New York

17

18               November 18, 2010

19               10:46 AM

20

21  B E F O R E:

22  HON. ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25

1    Motion of the VEBA Committee for the Delphi Salaried Retirees

2    Association Benefit Trust Pursuant to 11 U.S.C. Section 105 and

3    the Salaried OPEB Settlement Order to (I) Compel the Official

4    Committee of Eligible Salaried Retirees to File its Final

5    Report with the Court Pursuant to the Terms of the Salaried

6    OPEB Settlement Order and, (II) to Direct the Office of the

7    United States Trustee to Disband the Official Committee of

8    Eligible Salaried Retirees

9

10   Motion by David Armstrong to Deem Claim for Administrative

11   Expense Timely Filed Pursuant to Fed. R. Bankr. P. 9006(b) and

12   11 U.S.C. Section 503(b)

13

14   Reorganized Debtors' motion for Order Resolving Outstanding

15   Objections to Cure of Material Supply Agreements and Cure

16   Proposals for Certain Executory Contracts and Unexpired Leases

17

18   Notice of Motion of Johnson Controls Inc. Power Solutions and

19   Johnson Controls Battery Group, Inc. for an Order Compelling

20   DPH Holdings to Comply with the Transfer Agreement Relating to

21   Transfer of Delphi's New Brunswick Battery Facility to Johnson

22   Controls, Inc., for Adequate Assurance of Financial Ability to

23   Perform under Transfer Agreement, and in the Alternative, for

24   Leave to Take 2004 Examination of DPH Holdings Corp. and for

25   Other Relief

Page 3

1

2    Sufficiency Hearing Regarding Claim of ATEL Leasing Corporation

3    as Objected to on the Reorganized Debtors' Forty-Sixth Omnibus

4    Objection Pursuant to 11 U.S.C. Section 503(b) and Fed. R.

5    Bankr. P. 3007 to (I) Disallow and Expunge Certain

6    Administrative Expense (A) Books and Records Claims, (B)

7    Methode Electronics Claims, (C) State Workers' Compensation

8    Claims, (D) Duplicate State Workers' Compensation Claims, (E)

9    Workers' Compensation Claims, (F) Transferred Workers'

10   Compensation Claims, (G) Tax Claims, (H) Duplicate Insurance

11   Claims, and (I) Severance Claims, (II) Disallow and Expunge (A)

12   A Certain Duplicate Workers' Compensation Claim, (B) a Certain

13   Duplicate Tax Claim, and (C) a Certain Duplicate Severance

14   Claim, (III) Modify Certain Administrative Expense (A) State

15   Workers' Compensation Claims and (B) Workers' Compensation

16   Claims, and (IV) Allow Certain Administrative Expense Severance

17   Claims.

18

19   Sufficiency Hearing Regarding Administrative Expense Motion of

20   ATEL Leasing Corporation as Objected to on the Reorganized

21   Debtors' Forty-Eighth Omnibus Objection Pursuant to 11 U.S.C.

22   Section 503(b) and Fed. R. Bankr. P. 3007 to Disallow and

23   Expunge (A) Certain Books and Records Claims and (B) Certain

24   Duplicate Claims Asserted in Motions or Requests for Payment of

25   Administrative Expense

Page 4

1

2    Sufficiency Hearing Regarding Claim Filled by the Mississippi

3    Workers' Compensation Individual Self-Insurer Guaranty

4    Association on Behalf of Kaaren D. Washington as Objected to on

5    the Reorganized Debtors' Forty-Sixth Omnibus Objection Pursuant

6    to 11 U.S.C. Section 503(b) and Fed. R. Bankr. P. 3007 to (I)

7    Disallow and Expunge Certain Administrative Expense (A) Books

8    and Records Claims, (B) Methode Electronics Claims, (C) State

9    Workers' Compensation Claims, (D) Duplicate State Workers'

10   Compensation Claims, (E) Workers' Compensation Claims, (F)

11   Transferred Workers' Compensation Claims, (G) Tax Claims, (H)

12   Duplicate Insurance Claims, and (I) Severance Claims, (II)

13   Disallow and Expunge (A) A Certain Duplicate Workers'

14   Compensation Claim, (B) a Certain Duplicate Tax Claim, and (C)

15   a Certain Duplicate Severance Claim, (III) Modify Certain

16   Administrative Expense (A) State Workers' Compensation Claims

17   and (B) Workers' Compensation Claims, and (IV) Allow Certain

18   Administrative Expense Severance Claims

19

20

21

22

23

24

25   Transcribed by:  Dena Page

Page 5

1

2    A P P E A R A N C E S :

3    SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

4         Attorneys for Debtors

5         155 N. Wacker Drive

6         Chicago, IL 60606

7

8    BY:   CARL T. TULLSON, ESQ.

9         RON E. MEISLER, ESQ.

10        JOHN K. LYONS, ESQ. (TELEPHONICALLY)

11

12

13   BARNES & THORNBERG LLP

14        Attorneys for Johnson Controls and Johnson Controls

15          Battery Group, Inc.

16        Suite 4400

17        One North Wacker Drive

18        Chicago, IL 60606

19

20   BY:   DEBORAH L. THORNE, ESQ.

21

22

23

24

25

Page 6

1    BUCHANAN, INGERSOLL & ROONEY, PC

2          Attorneys for ATEL Leasing

3          50 South 16th Street

4          Suite 3200

5          Philadelphia, PA 19102

6

7    BY:   MARK PFEIFFER, ESQ. (TELEPHONICALLY)

8

9

10   DELPHI AUTOMOTIVE, LLP

11         Attorneys for Debtors

12         5725 Delphi Drive

13         Troy, MI 48098

14

15   BY:   MARK HESTER, ESQ. (TELEPHONICALLY)

16

17

18   FARELLA BRAUN + MARTEL LLP

19         Attorneys for Official Committee of Eligible

20           Salaried Retirees

21         235 Montgomery Street

22         17th floor

23         San Francisco, CA 94104

24

25   BY:   DEAN M. GLOSTER, ESQ. (TELEPHONICALLY)

Page 7

1

2    KRIEG DEVAULT LLP

3            Attorneys for VEBA Committee

4            One Indiana Square

5            Suite 2800

6            Indianapolis, IN 46204

7

8    BY:   PATRICIA L. BEATY, ESQ. (TELEPHONICALLY)

9

10

11   PEPPER HAMILTON LLP

12           Attorneys for Creditor, David Armstrong

13           3000 Two Logan Square

14           Eighteenth and Arch Streets

15           Philadelphia, PA 19103

16

17   BY:   NINA M. VARUGHESE, ESQ. (TELEPHONICALLY)

18

19

20   SATTERLEE STEPHENS BURKE & BURKE LLP

21           Attorneys for VEBA Committee

22           230 Park Avenue

23           New York, NY 10169

24

25   BY:   TIMOTHY T. BROCK, ESQ.

Page 8

1                P R O C E E D I N G S

2          THE COURT:  All right, DPH Holdings.

3          So, you all got to see what we do on nonomnibus days.

4    Somehow this got mixed up from the 16th to the 18th.  That's

5    why you're here today instead of on an omnibus day, I guess.

6          MR. TULLSON:  You know what, Your Honor --

7          THE COURT:  Anyway, it's fine.

8          MR. TULLSON:  -- I'm not aware.

9          THE COURT:  All right.  In any event, we're here on

10   both -- well, on the omnibus as well as the claims omnibus day.

11         MR. TULLSON:  Yes, Your Honor.

12         THE COURT:  Okay.

13         MR. TULLSON:  Good morning.  Carl Tullson, Skadden

14   Arps here on behalf of the reorganized debtors.  With your

15   permission, we'd like to proceed with the claims hearing first.

16         THE COURT:  Well, can we -- I have people here in

17   connection with the retiree matter, and I just thought we could

18   get that out of the way since they've reached an agreement at

19   this point and I just want to --

20         MR. TULLSON:  Sure.

21         THE COURT:  -- deal with that --

22         MR. TULLSON:  Okay.

23         THE COURT:  -- and be done with that, if we can.

24         MR. TULLSON:  Handle that matter first and then go

25   back?

Page 9

1          THE COURT:  Because the other matters may take some

2     more time.

3          MR. TULLSON:  Okay.

4          THE COURT:  I know there are two contested matters on

5     the claims side.

6          MR. TULLSON:  Yes.  That's right.

7          THE COURT:  Okay.

8          MR. TULLSON:  So on the omnibus hearing, the first

9     matter on the agenda was Wiegel Tool Works.  That matter has

10    been adjourned.  The second matter has been settled.  The

11    reorganized debtors' motion to enforce the plan injunction

12    against FKMT.  There was a stipulation entered.

13         THE COURT:  Right.

14         MR. TULLSON:  And then the third matter on the agenda

15    was the cure-related motion.  I'm happy to --

16         THE COURT:  Let's deal with that.

17         MR. TULLSON:  -- have VEBA address that first.

18         THE COURT:  Yeah.

19         MR. TULLSON:  And then we'll come back to that later?

20         THE COURT:  Let's come back to that.

21         MR. TULLSON:  Thank you.

22         MR. BROCK:  Thank you very much, Your Honor.  Timothy

23    Brock from Satterlee Stephens Burke & Burke --

24         THE COURT:  Right.

25         MR. BROCK:  -- on behalf of the VEBA trustees who I

1    refer to as the VEBA committee.

2            THE COURT:  Right.

3            MR. BROCK:  My co-counsel, Patricia Beaty from the

4    Krieg Devault firm in Indianapolis is on the phone.  I believe

5    that Mr. Gloster's on the phone, as well.

6            THE COURT:  Is that right?

7            MR. GLOSTER:  Good morning, Your Honor.  Dean Gloster

8    on behalf of the 1114 Salaried Retiree Committee.

9            THE COURT:  Okay.  And Ms. Beaty?

10           MS. BEATY:  Good morning, Your Honor.  Patricia Beaty

11   on behalf of the VEBA committee.

12           THE COURT:  Good morning.  I saw the letters or the e-

13   mails from the parties saying that they reached an agreement,

14   and I've seen the agreement.  I don't have any further issues

15   with it.

16           MR. BROCK:  That's great, Your Honor.  The -- we've

17   attached the true and correct copy of the modified amended

18   trust agreement to the pleading I filed, and Mr. Gloster filed

19   a copy with -- that's marked to show the changes.

20           THE COURT:  Right.

21           MR. BROCK:  So if the Court has no concerns with that,

22   I'd like to just address briefly something that Mr. Gloster has

23   raised in his document.

24           THE COURT:  Right.

25           MR. BROCK:  This is a joint request; we're

 1    cooperating.  On the motion that Mr. Gloster, on behalf of the

 2    1114 committee wants to file, that motion is described, and I

 3    would leave it to Mr. Gloster to describe it further, if that's

 4    necessary.  But we -- in this application, Mr. Gloster has

 5    indicated he'd like to have it heard at the next omnibus

 6    hearing.

 7            THE COURT:  Right, and this is the request to have the

 8    committee join in on getting a letter ruling from the IRS, I

 9    guess?

10            MR. GLOSTER:  Your Honor, the -- Dean Gloster of

11    Farella Braun + Martel.  The issue is that the provisions of

12    the American Recovery and Reinvestment Act expire at the end of

13    this year if not extended by Congress.

14            THE COURT:  Right.

15            MR. GLOSTER:  Congress is still working on the

16    extension, but there is a risk that the benefit subsidy will

17    terminate, and the IRS has now sent letters to the participants

18    indicating that their subsidy will terminate at the end of

19    January which creates a live controversy.  The VEBA has

20    indicated that it wishes to obtain a private letter ruling in

21    order to continue the subsidy for the benefits.  It would

22    assist the VEBA board in obtaining that if we got a designation

23    that the VEBA benefits were in lieu of COBRA continuation

24    coverage.  And there is some history there.  They essentially

25    are, because the 1114 committee chose not to create a large

Page 12

1    fight with Delphi over that issue.

2          THE COURT:  So the -- all that sounded fine to me.

3    The only -- the question I had is what relief do you need from

4    me in connection with that?

5          MR. GLOSTER:  Your Honor, we would sit down and

6    cooperate with the debtor, agree with them on a form of order,

7    and then specify on behalf of the retirees that the 1114

8    committee agrees that the VEBA benefit is to be designated in

9    lieu of any lifetime COBRA that the salaried retirees could

10   have attempted to insist on under certain provisions of the

11   COBRA statute.  And then --

12         THE COURT:  So you'd be looking for me to so order a

13   stipulation, in essence?

14         MR. GLOSTER:  Yes, Your Honor.  So essentially it

15   would be a settlement between the 1114 committee and the debtor

16   on behalf of the salaried retirees that the 1114 committee

17   represents that would provide clarity on that issue, and it

18   would also give the VEBA board an additional means by which

19   to --

20         THE COURT:  To request this --

21         MR. GLOSTER:  -- obtain a private letter ruling.

22         THE COURT:  Right, okay.  All right, well, I'm

23   amenable to having that be scheduled, although you could also

24   do it by notice of presentment, if it's a stipulation.

25         MR. BROCK:  That's exactly what I was going to ask the

1      Court, whether we could --

2              THE COURT:  Yeah.

3              MR. BROCK:  -- do that by notice of presentment.  I've

4      discussed it with debtors' counsel before today's hearing, and

5      I think the request is that we allow for objections to be filed

6      up until seven days before the next omnibus hearing, and if

7      none are received, the Court could enter the order.

8              THE COURT:  That's -- I'm happy to proceed that way.

9              MR. BROCK:  Time is very important, Your Honor.

10             THE COURT:  That's fine.

11             MR. BROCK:  Okay.

12             THE COURT:  And then, I guess, that would be the last

13     act of the committee, and then you can submit the order

14     disbanding the committee.  That was originally sought as part

15     of this.

16             MR. BROCK:  That's correct, Your Honor.

17             MR. GLOSTER:  Yes, Your Honor, and the committee has

18     no objection to being disbanded.

19             THE COURT:  Okay, so I'll look for that order at the

20     same time that you e-mail chambers with the proposed

21     stipulation for entry.

22             MR. BROCK:  Okay, thank you very much, Your Honor.

23             THE COURT:  All right, thank you.

24             MS. BEATY:  Thank you, Your Honor.

25             MR. GLOSTER:  Thank you, Your Honor.

Page 14

1           THE COURT:  Okay, all right.  I think that's it for

2      the -- well, we're going to deal with the cure claim issue

3      next, I guess.  But there's nothing else on the nonclaims

4      omnibus agenda?

5           MR. TULLSON:  No, Your Honor.  There's the motion of

6      JCI.

7           THE COURT:  I guess that kind of fits in between, too.

8      Okay.

9           MR. TULLSON:  And there's also the motion for leave to

10     file late claim filed by David Armstrong.

11          THE COURT:  But that's agreed, right?

12          MR. TULLSON:  That's agreed, and we've reached an

13     agreement with counsel for David Armstrong regarding language

14     adjourning the objection of the claims procedures, which will

15     be in the proposed order submitted to chambers.

16          THE COURT:  All right, so I have no problem with that

17     resolution of that Pioneer motion.

18          MR. TULLSON:  Thank you, Your Honor.

19          THE COURT:  Okay.

20          MR. TULLSON:  So back to item 3 of the agenda, the 8.2

21     and 8.2(b) cure-related motion, we filed a motion at docket

22     number 20761.  By this motion, the reorganized debtors request

23     the Court enter an order overruling four objections to the cure

24     amount notices and denying, now, two cure proposals.  It went

25     from three to two, Your Honor, because since the motion was

Page 15

```
 1   filed, Spartech filed a notice of withdrawal at docket number

 2   20780 consistent with our representation of the motion that the

 3   matter had been settled in principle.  And that withdrawal was

 4   filed on the basis of the representation that all of the

 5   contracts contained in the cure proposal were either post-

 6   petition or expired.

 7             THE COURT:  Okay.

 8             MR. TULLSON:  And accordingly, Spartech would not be

 9   included in the proposed order.  Your Honor, the motion is

10   uncontested, but I'm happy to answer any questions you may

11   have.

12             THE COURT:  No, I don't have any.  Based on the

13   averments in the motion and the uncontested nature of the

14   relief that you're now seeking and the resolution of the

15   Spartech aspect of it, I will grant the relief.

16             MR. TULLSON:  Thank you, Your Honor.  We'll submit an

17   order to chambers.

18             THE COURT:  Okay.

19             MR. TULLSON:  At this point, I'll turn it over to my

20   colleague, Ron Meisler, to address the JCI.

21             MR. MEISLER:  Your Honor, in turn, I'm actually going

22   to turn the podium over to counsel for JCI.  This is, just for

23   Your Honor's benefit, this is a bit of an alphabet soup.

24   You've got JCI, Johnson Controls, we have DPH, which is, of

25   course you know, DPH Holdings.  We've got DEP, which is the New
```

Page 16

1    Jersey Department of Environmental Protection, and then

2    finally, we have the LSRP, which is the Licensed Site

3    Remediation Professional

4            THE COURT:  Right.

5            MR. MEISLER:  With that, Your Honor, I turn the podium

6    over to counsel to JCI.

7            THE COURT:  Is there an LSRP?

8            MR. MEISLER:  That's in process, Your Honor.

9            THE COURT:  Okay.

10           MR. MEISLER:  We expect that -- we have the candidate

11   for LSRP selected, and we expect that early in the first

12   quarter of 2011, so the next sixty days or so, that we'll have

13   engaged the LSRP.  Keep in mind, Your Honor, that the deadline

14   set by DEP to engage the LSRP is May 2012, so we're expecting

15   to be something of the nature of sixteen to seventeen months in

16   advance of that deadline.

17           THE COURT:  Okay.

18           MS. THORNE:  Your Honor, Deborah Thorne from Barnes &

19   Thornburg on behalf of Johnson Controls, Inc. and Johnson

20   Controls Battery Group, Inc., and I'll refer to my client as

21   JCI.  I think that might make it easier.

22           THE COURT:  Okay.

23           MS. THORNE:  I'm very happy to hear that the LSRP is

24   in the works because that is news to Johnson Controls.  Our

25   motion, today, is to seek adequate assurance that DPH Holdings

1    can really perform and not so much perform, but that they have

2    the financial resources to perform under the transfer agreement

3    which Your Honor approved in May of 2006 and at the same time a

4    remediation agreement that Delphi signed with the State of New

5    Jersey.

6         And before I go on, I don't know if Robert Frank from

7    Reed Smith is on the phone.  He's my co-counsel in

8    environmental matters.

9         THE COURT:  I don't think he is.

10        MS. THORNE:  Okay, well, then, I'll proceed.

11        THE COURT:  No, I'm looking at the CourtCall roster

12   and he's not listed on it.

13        MS. THORNE:  Okay, well, I'll proceed without him.  As

14   you may recall, although there have been thousands of documents

15   in this case, there was a transfer agreement back in May of

16   2006 when Johnson Controls purchased the New Brunswick Battery

17   manufacturing facility where acid -- lead acid batteries had

18   been manufactured for many years.  And at the time that

19   agreement was entered into, under the New Jersey regulations

20   and under the Industrial Site Remediation Act, or known as

21   ISRA, Delphi agreed to remediate that property in the future.

22   It had, really, two choices at the time.  Either it couldn't

23   sell it until it remediated it or it could sign a remediation

24   agreement agreeing to remediate it in the future, and it chose

25   the latter.  Johnson Controls purchased the property pursuant

1    to the court order that was entered in this case and proceeded

2    to hold that property and still does.  Part of the transfer

3    agreement that was entered at the time obligated Delphi to

4    abide by New Jersey environmental laws and to ultimately

5    remediate that property.  As protection for Johnson Controls,

6    there was an indemnification that was entered at the time

7    indemnifying Johnson Controls in the case that Delphi was

8    unable or did not remediate the property.

9         Although this motion has been characterized by Delphi

10   or DPH as a ploy on Johnson Controls' part to somehow jump to

11   the head of the line on administrative claims, it's really not

12   that.  Our administrative claim is far more than -- it has

13   additional damages that we've asserted, and we understand that

14   in due course under the procedural order that this Court

15   entered, although we were not party of that order and were

16   never given notice of it, but that our number will come up

17   someday, and someday, our claim will be dealt with.

18        Meantime, we're very concerned that at the time that's

19   dealt with or if there is, actually, a remediation, that there

20   actually be sufficient funds in place so that we can be

21   protected and so that the land can be remediated.  And that's

22   really our fear, is that there won't be sufficient funds.

23   We've met with Delphi or with DPH Holdings, with John Brooks,

24   the president of DPH, last summer and point-blank asked him

25   what assets DPH Holdings had to ensure that they could

1   financially continue on and effect the remediation, and we were

2   told it was none of our business.  That, in large part,

3   prompted the motion that we filed because we do feel that it's

4   important that we know that there are sufficient assets there

5   to actually undertake the obligations that are part of the

6   transfer agreement which are post-petition obligations of this

7   Chapter 11 case.

8           I think in order for the Court, though, to understand

9   at least from a laymen's term, and I have to say I'm not an

10  environmental attorney; I'm a bankruptcy attorney.  But as I

11  understand ISRA and the obligations that were taken on by DPH

12  Holdings or by Delphi at the time they entered into the

13  remediation, they are briefly this.  On the anniversary of the

14  remediation, which comes up in the summer of every year, Delphi

15  or DPH Holdings is obligated to provide to the State of New

16  Jersey an estimate of what they believe it will take to

17  remediate this property.  And it's not actually a remediation

18  plan so much as a part of the investigation, but that would

19  lead to an actual amount that it was cause them to expend to

20  clean the property, and at that time, they are to deposit in a

21  trust that's been set up in JPMorgan Chase adequate funds for

22  the remediation.  Now, in 2006 when the remediation was entered

23  into, there were about 535,000 dollars that were placed into

24  that trust fund.  Each year, they're supposed to reevaluate

25  this as they work through the estimation process and the actual

DPH HOLDINGS CORP., ET AL.

Page 20

1   investigation process as to what it will take to remediate and

2   place additional funds.  In January of 2009, additional funds

3   were put into the trust that equal 1.86 million dollars.  After

4   that time, the State of New Jersey commented on the estimate

5   and the investigation that had been done to date and said there

6   are additional items on this to-do list, and logically, it

7   would seem to Johnson Controls and, I think, probably to the

8   State of New Jersey, that that would increase the cost of

9   remediation.  At any rate, no further funds have been deposited

10  in that.  A new estimate was provided in January of 2010,

11  again, for 1.86 million.  There was no additional expense

12  anticipated, I guess, on the part of DPH Holdings at that time.

13  And it's basically that Johnson Controls who has owned this

14  property since 2006, anticipating that Delphi or DPH Holdings

15  would undertake the remediation, has seen no progress towards

16  that.  It's incurring additional expenses relating to holding

17  that property.

18          But what it really wants to know, and what the point

19  of this motion is --

20          THE COURT:  But why isn't it up to the New Jersey DEP

21  to say that the January estimate was too low?

22          MS. THORNE:  Yes, it is, ultimately, and it's our

23  understanding that by November 30th, they're going to come back

24  with a comment from the letter that they filed yesterday.

25          THE COURT:  Okay.

Page 21

 1            MS. THORNE:  And so in some respects, maybe we should

 2    wait until December 1st to see what they say.  But we believe,

 3    based on Johnson Controls' investigation, it's going to cost at

 4    least eight million dollars to remediate.

 5            THE COURT:  But that's not the deal, right?  It isn't

 6    what Johnson Controls says it's going to cost; it's what the

 7    New Jersey DEP says it's going to cost.

 8            MS. THORNE:  Well, ultimately, there has to be a

 9    cleanup of the property.  That's what the State of New Jersey's

10    looking for.

11            THE COURT:  I've never known a party with a cleanup

12    obligation to -- unless they're the owner, but the obligation

13    is to comply with ISRA -- to pay more than what the

14    environmental people say should be paid.

15            MS. THORNE:  Well, Your Honor, the 1.8 -- let's say

16    the 1.86 million is --

17            THE COURT:  It's just, it's premature, isn't it?

18            MS. THORNE:  Well --

19            THE COURT:  I mean, what --

20            MS. THORNE:  -- it's not really premature, Your Honor.

21    The 1.86 million that's been put in the trust fund is not for

22    remediating the property.  That's a trust fund that's there to

23    secure the obligation.

24            THE COURT:  But there's a process in place, and that's

25    what the parties deal was, is to abide by ISRA.  Why go beyond

Page 22

1   that process?

2          MS. THORNE:  Well, Your Honor, we're asking for

3   assurance that there's actually going to be money.  Let's say

4   that 1.86 million is the appropriate amount.  We don't even

5   know, based on our inquiry, whether there's sufficient assets

6   to clean it up at that level at 1.86 million.

7          THE COURT:  Isn't it money in trust?  Maybe I'm

8   missing something.

9          MS. THORNE:  The money in trust does not remediate the

10  property.  It's there to protect them in case they don't do

11  that.

12         THE COURT:  No, but the 1.86 is --

13         MS. THORNE:  They can't take that out to go and start

14  digging and cleaning up the property?

15         THE COURT:  But isn't that the adequate assurance,

16  that it's there if they don't do it?

17         MS. THORNE:  No, that's adequate assurance, perhaps,

18  to the State of New Jersey.  That's not adequate assurance to

19  Johnson Controls.

20         THE COURT:  Well, why are you entitled to anything

21  more than that?

22         MS. THORNE:  We're entitled to know that they can

23  clean the --

24         THE COURT:  Under the contract?  The contract says

25  that Johnson Controls has the right to say you have to put up

1   more?

2        MS. THORNE:  Your Honor, I'm not saying what the

3   amount is.  I'm saying, do they have 1.86 million today to

4   clean up the property if that.

5        THE COURT:  It's in trust.

6        MS. THORNE:  They do ultimately have --

7        THE COURT:  It's money in trust, right?

8        MS. THORNE:  But they don't get to use that money to

9   clean it up.  That money sits there to protect the State of

10  New -- citizens of New Jersey.  But that's not money that

11  DPH --

12        THE COURT:  Why isn't that the adequate assurance?

13  You just said you don't know if they have the 1.86.

14        MS. THORNE:  But they'll never --

15        THE COURT:  If they don't, they have the 1.86 in

16  trust.

17        MS. THORNE:  I don't know if the State of New Jersey

18  is going to give that to anybody to go actually clean up the

19  property.  That's not what ISRA says.  ISRA says you have to

20  put that there.  At some point, perhaps the State of New Jersey

21  takes --

22        THE COURT:  For what purpose?

23        MS. THORNE:  I assume to protect the citizens of the

24  State of New Jersey.  It does nothing to protect Johnson

25  Controls.

1           THE COURT:  I just --

2           MR. MEISLER:  Your Honor, that's just wrong.  That is

3  just wrong on the law.  The money is there for cleanup

4  obligations in the event DPH defaults.  I happen to think that

5  adequate assurance is the wrong terminology for --

6           THE COURT:  Well, I agree.  I mean, we're using it

7  very loosely here.

8           MR. MEISLER:  That's right.

9           THE COURT:  There's nothing in the contract that

10  provides a right to Johnson Controls for adequate assurance,

11  right?

12          MS. THORNE:  The contract provides that DPH Holdings

13  has certain obligations to clean up the property.

14          THE COURT:  Right, and is there any suggestion that

15  that -- from the New York (sic) DEP that that's not being

16  complied with?

17          MS. THORNE:  The New Jersey DEP is going to comment on

18  it.

19          THE COURT:  All right.

20          MS. THORNE:  When they responded last time, they

21  didn't increase the amount even though there were additional

22  items that New Jersey said they had to include.

23          THE COURT:  All right, okay.

24          MS. THORNE:  So logically speaking, it should be an

25  amount more than 1.86 million.  But the problem is this pokes

1    along through all this --

2            THE COURT:  Well, I have to assume that they're

3    logical.  I just --

4            MS. THORNE:  Well, I think that DPH Holdings --

5            THE COURT:  -- this is really -- at best, this is

6    premature.  But I really -- I mean, at best.  But it seems to

7    me that the proper way to deal with this is if, in fact, the

8    New Jersey DEP has an issue, then DPH, who has its obligations

9    under ISRA, will deal with that.  And if it's not, then the New

10   Jersey DEP will deal with them.

11           MS. THORNE:  Well, Your Honor, our fear is we all

12   know -- I think everybody can take judicial notice at this

13   point, the State of New Jersey is very underfunded.  DPH

14   Holdings, it has the advantage of it poking through the New

15   Jersey system while they have no employees to take a look at

16   this.  Meanwhile, there are administrative claims in this case

17   that are going to have to be paid, either to the State of New

18   Jersy under ISRA or to Johnson Controls.  And our fear is as

19   everybody's taking advantage of the economic downturn and the

20   fact that the state is underfunded, that we're going to be at

21   the end of the road, maybe in five years, maybe in two years,

22   and there won't be any money left.

23           THE COURT:  I just --

24           MS. THORNE:  And if -- when we had the meeting last --

25           THE COURT:  You want me to assume that the New Jersey

Page 26

1    DEP is not doing its job?  You want a judicial order of that?

2         MS. THORNE:  No, I think the point is that they're --

3         THE COURT:  I mean, it seems to me -- first of all, I

4    have a serious question about my jurisdiction over your motion

5    in the first place.  This is post-confirmation, it involves a

6    relationship between DPH and, first and foremost, the New

7    Jersey DEP, so to the extent -- I take you at your word; you're

8    not trying to determine an admin claim today.

9         MS. THORNE:  No, I'm not.

10        THE COURT:  I understand that.  So to the extent it's

11   not an admin claim motion, I don't see why this isn't being

12   dealt with under New Jersey law and New Jersey with the DEP.  I

13   mean, I just don't -- I don't see what the -- why it's here.

14        MS. THORNE:  Our --

15        THE COURT:  I mean, and particularly when you're

16   telling me that I should be somehow forcing DPH to do something

17   because you're skeptical that the New Jersey DEP won't do its

18   job.  I mean that just doesn't -- I'm not going to do that.

19        MS. THORNE:  Your Honor, last summer when we met with

20   DPH Holdings, all we were asking is are you going to be

21   financially capable of performing this remediation as you're

22   obligated under the transfer agreement.

23        THE COURT:  But that assumes so much, in that

24   question.  That assumes what the cost of the remediation is and

25   what compliance with ISRA is, and I would -- it's a trick

Page 27

1    question.  I would answer the question by saying it's a trick

2    question.  I mean -- if you're -- there's one legitimate

3    concern that you have here, which is that based on adequate

4    information, the debtor is administratively insolvent.  But the

5    debtor is well aware of its obligations not to continue

6    operating if it's administratively insolvent.  But I just --

7    everything that I've seen, this is all way premature on that

8    point.

9         MR. MEISLER:  And Your Honor, they have no reasonable

10   basis to assume that we're administratively insolvent.  We have

11   done nothing to give JCI that indication.

12        What I see here at its heart, I see two things.

13   Number one, this is basically a feasibility objection to our

14   plan.  They got notice of our plan; they could have objected to

15   feasibility.  On that score, it's res judicata.  And then at

16   worst, Your Honor, I understand you said at best, we understand

17   what they're doing, but at worst, this is manipulation.

18   They're manipulating the claims procedures to try to do an end

19   run around the claims procedure.  Their motion was a carbon

20   copy of their proof of claim.

21        And they're running around talking to DEP, and based

22   on communications with DEP, there was a misunderstanding of

23   fact, or there wasn't a complete picture, that prompted the

24   DEP, on November 4th, to give us a notice of violation that was

25   simply wrong in fact.  And ironically, on November -- I think

Page 28

 1  it was November 5th, we got another notice from a different

 2  department in DEP telling us that our cost estimate is due on

 3  February 1st, 2011, realizing that we filed something in

 4  January 2010.  And so when we reached out to DEP to understand

 5  what was that notice of violation about, and we were going to

 6  comply, Your Honor -- and we have always said that we're going

 7  to comply -- the DEP suddenly understood that they were

 8  mistaken.

 9          Now, Your Honor, it's okay if they have comments or if

10  they -- there's a process under ISRA to deal with their

11  comments.  And we're complying with ISRA.  We have complied and

12  we will continue to comply.  And despite the comment in

13  counsel's papers that we have not complied and we will not

14  comply, that's false.

15          THE COURT:  But my question is why should I be

16  deciding whether you complied or not?  I mean, it's a matter of

17  New Jersey regulatory law.  I just don't --

18          MR. MEISLER:  Your Honor, on that score, I would ask

19  that I give more thought to that.  I do think that Your Honor

20  has jurisdiction under the order approving the transfer

21  agreement where you retained authority and jurisdiction to

22  implement the terms of the order.

23          THE COURT:  Well, that is only to construe the order.

24  But, I mean, this -- everyone agrees, I think, what the

25  contract says.  And that all depends on your compliance on

1    ISRA.  And that's an issue that -- I mean, if they have -- if

2    they dispute that you're complying with ISRA, it seems to me

3    that that's a matter of New Jersey law and the process should

4    work its way through on that.

5            MR. MEISLER:  And Your Honor, I would say that to

6    counsel that if we were not in compliance with New Jersey law,

7    we would get a legitimate notice of violation.

8            THE COURT:  Well, it makes sense to me.

9            MS. THORNE:  Your Honor, first of all, I want to just

10   refute one thing that counsel said and that somehow, Johnson

11   Controls should not be speaking to the Department of

12   Environmental Protection for New Jersey.  We're the landowner,

13   and we're under their --

14           THE COURT:  Well, I don't --

15           MS. THORNE:  -- we have to speak to them.

16           THE COURT:  -- there's -- it depends -- I don't know.

17   That's another issue.  Do people who deal with this on a daily

18   basis at the New Jersey DEP and the lawyers who deal with these

19   types of issues know whether -- which one of you is right on

20   that?  But it's another reason why I just think this motion

21   doesn't -- it really doesn't make a lot of sense to me at this

22   point.  I mean, I don't know why you're asking me to interject

23   myself in something that really doesn't even appear to be a

24   controversy at this point.

25           MS. THORNE:  Well, we certainly think that they have

1    not set aside enough money.  We have serious questions about

2    whether they're administratively solvent.  Maybe those

3    questions would be --

4              THE COURT:  But based on what?

5              MS. THORNE:  Well, Your Honor, based on the fact that

6    we were told it was none of our business if they had assets.

7              THE COURT:  But that doesn't mean --

8              MR. MEISLER:  Your Honor, it isn't.

9              MS. THORNE:  I mean, we're a creditor of this estate,

10   if nothing else; we're an administrative creditor that has a

11   lot at stake.  And you would think that within the bankruptcy

12   context, that the debtor, the post-confirmation debtor could

13   share with its administrative claim holders, even with this

14   dispute that we are not subject to -- that we don't appear in

15   their books and records, which is another issue for another

16   day, but the fact that they have said there that they don't owe

17   us any money, that they have these no obligations --

18              THE COURT:  But if --

19              MS. THORNE:  -- makes us very concerned that there may

20   not be any money at the end of the day.

21              THE COURT:  But if the million-eight, six is the right

22   number, they don't owe you any money.

23              MS. THORNE:  If they actually do the remediation.  If

24   they don't to the remediation, that 1.86 million may go to the

25   State of New Jersey.  It's not going to come to us.

1          THE COURT:  It's not?

2          MR. MEISLER:  Your Honor, counsel needs to look at

3     Section 4 of the --

4          THE COURT:  I'd be very surprised about that.  I'd be

5     very surprised that an environmental statute that requires, in

6     essence, a security deposit for a cleanup trust can be used to

7     pay New Jersey's school bill.  That just doesn't make sense to

8     me.

9          MS. THORNE:  I don't believe the statute's completely

10    clear, but I think that is a -- that's an issue for New Jersey.

11    But if the 1.86 is not --

12         THE COURT:  It certainly was -- none of this comes up

13    in your pleading.  I mean, you just say you're concerned and

14    the reason you're concerned is because they don't agree with

15    your number on the cost of the cleanup.

16         MS. THORNE:  Nor do we know that they have enough to

17    effectuate the cleanup, and that's our real concern.

18         MR. MEISLER:  Your Honor --

19         MS. THORNE:  Which I think could easily --

20         THE COURT:  But why do they have to tell you that they

21    have the amount that you think it's going to cost when New

22    Jersey is not telling them it's going to cost that.  Why do

23    they have to budget -- what's the amount of your claim?

24    Thirteen million dollars?  Why do they have to hold aside

25    thirteen million dollars when New Jersey's telling them that,

Page 32

1    as far as they know, the amount held in trust is the right

2    number?

3            MS. THORNE:  Well, as of a day ago, New Jersey didn't

4    say that.  Then they withdrew their letter yesterday.

5            THE COURT:  Well, all right.  So --

6            MS. THORNE:  So Your Honor, I don't know what New

7    Jersey thinks.  I think New Jersey will tell us what they

8    think --

9            THE COURT:  Well, I know what they thought as of

10   November 17th.

11           MS. THORNE:  Well, I know that they said that they're

12   going to make a comment on November 30th or before that, so.

13           THE COURT:  All right, well, I'm not going to get

14   ahead of them.  It's that simple.

15           MS. THORNE:  I think that's -- that's fair.

16           THE COURT:  Okay.

17           MR. MEISLER:  And Your Honor, for the benefit of

18   counsel, section 4 specifically deals with the funds that are

19   set aside -- and this is in the remediation trust fund

20   agreement -- and it specifically says that the funds set aside

21   are to be used for cleanup.  I just don't understand why she

22   would think that it could be used to pay the school bills.

23           MS. THORNE:  Just hypothetically speaking, if the

24   cleanup costs something between 1.86 million and the 8 million

25   that we believe, and there's only 1.86 million in that trust

Page 33

```
 1    fund, if counsel's correct, although the State of New Jersey

 2    has not confirmed that, that that could be used for the

 3    cleanup, we still are going to be left holding the bag for a

 4    greater deal of money.

 5              THE COURT:  But that's -- but that's -- but I don't

 6    think the contract says that they have to -- I think the

 7    contract says they have to comply with ISRA, right?

 8              MS. THORNE:  And the purpose of ISRA is to clean up

 9    the property.  And if they've --

10              THE COURT:  All right, but ISRA is a carefully-crafted

11    statute that has these intermediate steps just for this reason,

12    that, obviously, landowners are going to want the maximum

13    amount set aside and potentially responsible parties are going

14    to want to have the minimum amount set aside, and there's

15    someone who oversees it.

16              MS. THORNE:  Well, at the end of the day, the goal of

17    ISRA is to clean up the property.

18              THE COURT:  Well --

19              MS. THORNE:  And this is --

20              THE COURT:  -- yes, but again that begs the question

21    because there's a monitor of that.  Originally, it was the DEP,

22    then there's this process to hire the outside monitor --

23              MS. THORNE:  Right.

24              THE COURT:  -- and it's all supposed to work that way.

25    And I'm not going to assume it doesn't, it's not working that
```

Page 34

1    way.  It sounds like the DEP is focused on it.  So they have

2    their requirements; that's what the statute provides.  Why

3    compel -- I mean, again, I'm not sure it's really my place to

4    say this in the first place, but logically, why compel someone

5    to pay more than the statute requires?  It just -- I don't see

6    it.

7            MS. THORNE:  Your Honor, if we were given information

8    to know that no matter what New Jersey says when they comment

9    in November or when they comment later on when the LSRA's

10   involved, that there'll be enough funds to effectuate the

11   cleanup, I think that would satisfy Johnson Controls to a --

12           THE COURT:  But that accelerates the whole process.

13   That accelerates the whole estimate.  Look, people thought

14   enough funds to do the cleanup in 2006 was 550,000 dollars.  I

15   mean, these numbers change.  Why -- unless you're saying --

16   which I think you are, ultimately, saying which is why I think

17   you got the cold shoulder at your meeting -- that we want to

18   know that whatever it costs, and let's put as high a number as

19   possible on it, you'll have the money to pay whatever it costs,

20   that -- they're not required to do that.

21           MS. THORNE:  Well, it's a legitimate concern when

22   we're talking about DPH Holdings, an entity that does not

23   have --

24           THE COURT:  But they're not required to set aside

25   whatever it costs.

1          MS. THORNE:  Well, but they said, Your Honor, in their

2     plan, that they would be able to pay all administrative

3     expenses.

4          THE COURT:  And right now, the administrative expenses

5     are the amount that the responsible party for policing the

6     statute says that they are.

7          MS. THORNE:  And so all administrative creditors that

8     have claims of this nature, and I assume that there are others,

9     will just have to go on faith that there will be enough --

10         THE COURT:  I think that's a realistic -- well, on the

11    faith of the New Jersey DEP, yes.

12         MS. THORNE:  Well, but DPH Holdings has to ultimately

13    have enough assets to be able to perform under that.

14         THE COURT:  But there's no -- but right now, the

15    money's there.  The adequate assurance is there in a trust

16    fund.  I just -- I think you're asking to accelerate that

17    process in a way that neither the statute nor the agreement

18    contemplated.  And I just -- I don't think you have a right to

19    that relief.  I mean, if there was no trust fund and there was

20    a contractual cleanup obligation that didn't say comply with

21    ISRA, there might -- then you might have a basis to take some

22    discovery, at least, as to what their abi -- what that

23    financial condition is, but that's not what we're talking about

24    here.  You have someone who does that difficult task of

25    balancing the needs of the owner and the potentially

Page 36

1   responsible party or the responsible party, and that person is

2   a regulator who's charged with this job, and they're doing it.

3   And there's nothing to suggest that DPH is not complying with

4   them.  It has to comply with them.  So I just -- you're asking

5   for more than you're entitled to.

6         MS. THORNE:  Well, Your Honor, then in that case,

7   we'll hear what New Jersey says on November 30th.

8         THE COURT:  Yeah, but I don't want you running back to

9   me and shortchanging the process that ISRA has in place for

10  dealing with that back and forth on the comments.  There's --

11  I'm not going to turn myself into the New Jersey DEP.  It's not

12  my job.

13        MS. THORNE:  No, I'm certainly not, and I certainly

14  don't want you to think that Johnson Controls is asking you do

15  that.  Our concern is really --

16        THE COURT:  Well, if you're going to run back on

17  Nov -- if they say on November 23rd, we think you should

18  increase the trust fund to two millions or three million

19  dollars, if they say that, and DPH says, well, we exercise our

20  right under whatever provision, whatever reg, to meet and

21  confer with you, New Jersey DEP, and explain to you why it

22  should be a million-nine, I'm not going to shortchange that.

23        MS. THORNE:  Your Honor, and I have never asked -- I'm

24  not asking the Court to become the --

25        THE COURT:  Okay.

1          MS. THORNE:  -- New Jersey Department of Environmental

2     Protection.

3          THE COURT:  All right.

4          MS. THORNE:  What I'm only concerned about is that

5     ultimately, the cleanup will be able to be performed, and

6     there'll be adequate financial resources at that point.

7          THE COURT:  Well, all right, so I think what should

8     happen with this motion is that it should be adjourned without

9     date at this point.  And if and when there's a -- it is clear

10    that DPH is not complying with its obligations under ISRA, then

11    frankly, I think you should go and enforce your contract in New

12    Jersey, but I guess you could come back here at that point.

13         MS. THORNE:  Well, we very well may do that, and that

14    was --

15         THE COURT:  All right.

16         MS. THORNE:  And really, the purpose of this today was

17    to see if there could be a resolution short of filing a

18    lawsuit, but obviously, we're aware that that may be the only

19    option we have.

20         THE COURT:  Okay, but the lawsuit would not be to

21    collect on the claim.

22         MS. THORNE:  No, I certainly understand there's a

23    claims procedure.

24         THE COURT:  It would be to enforce your rights under

25    ISRA.

1          MS. THORNE:  Right, we understand.

2          THE COURT:  Okay.

3          MR. MEISLER:  Your Honor, if I may ask, I would ask

4    that the motion be denied without prejudice.

5          THE COURT:  All right, it's the same thing.  That's

6    fine.  I mean, you're going to have to refile it with new facts

7    anyway, so.

8          MS. THORNE:  I understand.

9          MR. MEISLER:  Right.

10          MS. THORNE:  Yeah, I understand.

11          THE COURT:  All right, so it shall be done.  You can

12    submit an order --

13          MR. MEISLER:  Thank you, Your Honor.

14          MS. THORNE:  Thank you.

15          THE COURT:  -- denying it without prejudice.

16          MR. TULLSON:  Your Honor, that concludes the omnibus

17    hearing.

18          THE COURT:  All right, well what -- am I missing

19    something?  I thought ATEL Leasing?

20          MR. TULLSON:  Your Honor, that's on the --

21          MR. PFEIFFER:  Your Honor, Mark Pfeiffer for ATEL.

22    I'm on CourtCall.

23          MR. TULLSON:  That's on the claims hearing.

24          THE COURT:  Oh, I thought you meant all the omnibus

25    hearing.

Page 39

1        MR. TULLSON:  No, no, just the matters scheduled for

2    the omnibus.

3        THE COURT:  All right, fine.  So let's deal with ATEL

4    Leasing, then, unless you want to go through the agenda, the

5    other matters.

6        MR. TULLSON:  Sure, I mean, item number 1 is

7    adjourned; items 2 through 5 are settled by stipulation.  Items

8    6 through 9 involve Continental claims; those are being handled

9    by Togut & Segal (sic) but those have been resolved and they'll

10   be submitting an order to chambers.

11       THE COURT:  Okay.

12       MR. TULLSON:  And that brings us to matters 10 and 11

13   on the agenda.

14       THE COURT:  Okay, which is the ATEL Leasing?

15       MR. TULLSON:  Yes, Your Honor.

16       THE COURT:  Okay.

17       MR. TULLSON:  And this involves sufficiency hearings

18   regarding the status of the claims of ATEL Leasing Corporation.

19       Your Honor, proof of administrative expense claim

20   number 18427 was rejected to on the reorganized debtors' forty-

21   sixth omnibus claims objection, and the motion of ATEL Leasing

22   Corporation found at docket number 6990 was objected to on the

23   reorganized debtors' forty-eighth omnibus claims objection.

24       Your Honor, ATEL has released any and all claims that

25   it may have had rising before October 7th, 2009.  On that date,

1    Your Honor entered the stipulation and agreed order resolving

2    all of ATEL Leasing Corporation's claims, and that was entered

3    at 18965.

4         Your Honor, paragraph 3 of the stipulation contains an

5    unambiguous release not only of the ATEL cure proposal or the

6    assumption and assignment objection, but also of all of their

7    claims arising prior to October 7th, 2009.  Specifically

8    paragraph 3 of the stipulation reads as follows:  "The ATEL

9    Leasing parties further release and waive any right to assert

10   any other claim, cause of action, demand, lien, or liability of

11   every kind and nature whatsoever including those arising under

12   contract, statute or common law, whether or not known or

13   suspected at this time which relate to the ATEL cure proposal

14   or assumption and assignment object, or which relate to ATEL

15   releasing parties' claims which they have ever had or hereafter

16   shall have against the debtors based on, arising out of,

17   related to, or by reason of any event, cause, thing, act,

18   statement, or admission occurring before the date of the

19   stipulation."  All of the amounts asserted in the motion of

20   ATEL Leasing Corporation arose before February 17th, 2007, and

21   all of the amounts asserted in claim 18427 arose before May

22   31st, 2009.  Thus the ATEL administrative expense claim and the

23   motion were fully released, pursuant to the stipulation.

24   Accordingly, each proof of administrative expense claim and the

25   motion should be denied and disallowed and expunged in their

 1    entirety.

 2           Your Honor, we did file a second supplemental reply

 3    yesterday addressing several of the arguments raised by ATEL.

 4           THE COURT:  Right, I've seen that.

 5           MR. TULLSON:  And a supplemental response.  But Your

 6    Honor, I'd be happy to cede the podium to counsel for ATEL.

 7           THE COURT:  Okay.

 8           MR. TULLSON:  Unless Your Honor has questions for me

 9    at this point.

10           THE COURT:  Well, I may after I hear from him.

11           And it's Mr. Pfeiffer?

12           MR. PFEIFFER:  Yes, Your Honor.  Mark Pfeiffer for

13    ATEL Leasing.

14           THE COURT:  Okay, good morning.

15           MR. PFEIFFER:  Good morning.  Your Honor, this is a

16    sufficiency hearing, the purpose of which is -- it's a

17    nonevidentiary hearing, the purpose is to address the legal

18    sufficiency of the claim and whether the claim states a claim

19    against the debtor under 7012 of the Rules.  Instead of looking

20    at the claim, the debtor is asking the Court to look at

21    extrinsic evidence, and the extrinsic evidence is the

22    stipulation.  My client --

23           THE COURT:  Well, can I stop you there?

24           MR. PFEIFFER:  Yes.

25           THE COURT:  I grant motions to dismiss and summary

Page 42

1    judgment motions all the time based on the plain meaning of the

2    documents upon which a claim is based.  I don't know why I

3    can't do that here if the documents that the parties are

4    relying on are clear and unambiguous.

5                MR. PFEIFFER:  In this case, Your Honor, the documents

6    are ambiguous --

7                THE COURT:  Okay.

8                MR. PFEIFFER:  -- and there's a material dispute of

9    fact which goes to the intent of the parties.

10               THE COURT:  How is the stipulation and agreed order

11   ambiguous on this issue?

12               MR. PFEIFFER:  It's ambiguous because there are three

13   areas that are not necessarily -- that are conflicting.  Two of

14   them are in favor of my client.  First of all, when you start -

15   - if you look at the stipulation, the heading itself, it says

16   "stipulation and agreed upon resolving objection of ATEL

17   Leasing Corporation notice of assumption and assignment".  The

18   heading doesn't say it's a general release.  And then when you

19   go to the recitals, the very last recital is the debtors and

20   ATEL have reached an agreement that settles and resolves the

21   ATEL cure proposal and the assumption and assignment objection.

22   It's not a recital which is the intent of the parties; it's not

23   a recital saying that the parties have agreed to resolve all of

24   the claims.  Looking at that --

25               THE COURT:  Can I interrupt you for a second?  Aren't

Page 43

1    your underlying claims that are referred to in the proof of

2    administrative claim, aren't those claims part of the claims

3    asserted in the cure proposal and the assumption and assignment

4    objection?

5            MR. PFEIFFER:  I do not know specifically if they

6    are -- there may be some that are part of that plan, and if

7    that's the case, Your Honor, then we have to parse them out

8    because it's not a relief of all claims.

9            THE COURT:  Well --

10           MR. PFEIFFER:  Or, the intent of the parties is not to

11   release all claims.

12           THE COURT:  Well, we'll get to the release language,

13   but I've read the cure proposal and the assumption and

14   assignment objection.  They refer to outstanding post-petition

15   claims well in excess of the amount of the proof of

16   administrative claim, and they cover, I think -- at least the

17   cure proposal does -- both of these contracts, both of these

18   leases, so it's hard for me to believe that the administrative

19   claim is not -- the amount of the administrative claim is not

20   subsumed within the $470,637.96 asserted in paragraph 18 as the

21   total amount due and owing post-petition under the leases.

22           MR. PFEIFFER:  Your Honor, if you look at the

23   stipulation, it is a stipulation that covers one contract

24   number in which my client got 13,000 --

25           THE COURT:  So you don't have an answer to my question

DPH HOLDINGS CORP., ET AL.

Page 44

1    as to whether your proof of claim amount was subsumed within

2    the ATEL cure proposal?

3            MR. PFEIFFER:  No, I think portions of it may be

4    outside, and that's an issue of fact --

5            THE COURT:  What do I have to believe that portions

6    would be outside of it?

7            MR. PFEIFFER:  I think it's outside of the scope of

8    what was being resolved here.

9            THE COURT:  I need to have some basis, though, to give

10   credence to your statement to me.  Why do you believe that

11   portions would be outside of it?

12           MR. PFEIFFER:  Well, Your Honor, my client would

13   intend to present evidence, present evidence of negotiations

14   between the parties as to what the parties intended to resolve,

15   and it didn't intend to resolve the entire universe of claims

16   that ATEL has in this particular bankruptcy.

17           THE COURT:  Well, the law is clear that we only get to

18   parol evidence in respect to the intent of the parties to an

19   agreement if, in fact, the agreement is ambiguous.  I'm still

20   trying to deal with whether the agreement is ambiguous.

21           MR. PFEIFFER:  Correct, and it's ambiguous because it

22   reflects two different intents.  And the two different intents

23   are that, as stated in the stip with the heading, it's only

24   resolving those two issues, and then the whereas clause, the

25   final whereas clause can only resolve the cure proposal and the

DPH HOLDINGS CORP., ET AL.

Page 45

1    assumption and assignment objections.

2          THE COURT:  Right, and I guess, although I asked this

3    question ten minutes ago, I'm going to ask it of you one more

4    time, why doesn't the cure proposal include, since it refers to

5    both of the leases that are the bases for the admin claim and

6    refers to post-petition amounts owing under them in excess of

7    the admin claim, why doesn't the ATEL cure proposal subsume the

8    admin claim?

9          MR. PFEIFFER:  Your Honor, I think you have to look at

10   specifically what's in there --

11         THE COURT:   I have.  I have, and I'm asking you why

12   it doesn't, because based on what I can see, it does.

13         MR. PFEIFFER:  But the intent of the parties was not

14   to resolve the entire universe.

15         THE COURT:  All right, let's go on.  I'm assuming the

16   answer to that, my question, is, then, that it does subsume or

17   you don't know.  So then let me ask you the next question.

18         If, in fact, the cure amount in respect of D450140635,

19   the one contract that you say this is all about, is the only

20   reason for this stipulation, why is there a separate admin

21   claim provided for in paragraph 2; why in paragraph 3 does this

22   say that the cure payment and the agreed admin amount are in

23   full satisfaction of all amounts asserted in the ATEL cure

24   proposal and assumption and assignment objection; and why in

25   paragraph 3 does it also say the ATEL Leasing parties further

Page 46

1    release and waive any right to assert any other claims which

2    relate to the ATEL cure proposal or assumption and assignment

3    objection or --

4           MR. PFEIFFER:  Well --

5           THE COURT:  Let me finish.  And this is the most broad

6    language, "or which the ATEL Leasing parties have, ever had, or

7    hereafter shall have against the debtors based upon, arising

8    out of, related to, or by reason of any event, cause, thing,

9    act, statement, or admission occurring before the date of the

10   stipulation."  Why isn't that a general release?

11          MR. PFEIFFER:  That language after the "or" is, of

12   course, the part that's most problematic for my client.  But it

13   does not reflect it -- the agreement of the parties is

14   reflected in their recital, the intent of the parties.  And

15   that's how you really have to --

16          THE COURT:  So the recitals govern over the actual

17   agreement?

18          MR. PFEIFFER:  Under that New York case where there's

19   a disagreement between the recital and the language of the

20   contract, that creates an ambiguity.

21          THE COURT:  Okay.

22          MR. PFEIFFER:  And because of that ambiguity, as a

23   matter of law, extrinsic evidence is required.  It's an

24   ambiguity as a matter of law because the intent is recited in

25   the front of the contract and there is language that is

DPH HOLDINGS CORP., ET AL.

1    arguably different from that, its intent in the back of the

2    contract.  And that --

3              THE COURT:  But again, you're referring to the last

4    "whereas" recital?

5              MR. PFEIFFER:  Correct.

6              THE COURT:  Okay.

7              MR. PFEIFFER:  And the heading of the agreement.

8              MR. TULLSON:  Your Honor, counsel's relying on the

9    Rickel case which we address in our papers, and we think that

10   that case is completely different, arises out of different

11   facts.  It was a situation where a former director fraudulently

12   or recklessly misrepresented the value of certain claims to the

13   debtors, and the debtors did not become aware of that claim

14   until eight months after the stipulation was entered.  Here,

15   ATEL filed the administrative claim prior to the execution of

16   the stipulation and the language is clear.  I don't think

17   Rickel stands for the proposition any time a party's --

18   sophisticated parties represented by counsel aren't happy with

19   the result of negotiated language, that they can say it's

20   ambiguous because I don't think it was my intent to release all

21   claims, even though the claim is in administrative expense

22   claim 18427 arise under the exact same leases.

23             MR. PFEIFFER:  Your Honor, Rickel is directly on

24   point, here.  It stands to the proposition, and this is a

25   quote, that ambiguity as a -- or, a paraphrase -- ambiguity is

Page 48

1   created as a matter of law where the agreement recites the

2   intent to settle a narrow issue but the agreement includes a

3   general release.  That's what the proposition under Rickel is.

4   There's an ambiguity as a matter of law --

5         THE COURT:  But the parties here defined what they

6   were settling.  Isn't that distinguishable?  I mean, the

7   parties actually, unlike in Rickel, the parties here specified

8   what they were settling.

9         MR. PFEIFFER:  Which was only two things.

10        THE COURT:  Well, I still have a -- I have a very --

11   and what are those two things, again, that you say they are?

12        MR. PFEIFFER:  The cure proposal and the assumption

13   and assignment objection.

14        MR. TULLSON:  Anything that relates to --

15        THE COURT:  And why is the cure proposal, which states

16   the amount of this claim, somehow -- I mean, why is that a good

17   fact for you?

18        MR. PFEIFFER:  Well, it's -- it's the amount that was

19   required to be paid at the time of the cure as opposed to the

20   general administrative claim.  It's not neces -- it may be a

21   timing issue.  It may be issues concerning the assumption and

22   assignment, but I think those are issues that I think you have

23   to have testimony on and evidence on to resolve.

24        THE COURT:  But the cure proposal asserts a post-

25   petition claim in excess of 400,000 dollars relating to these

1    two leases.  Why -- and then this stipulation says it's

2    settling anything related to that proposal, which includes a

3    post-petition claim for in excess of 400,000 dollars.

4              MR. PFEIFFER:  But that's the proposal for the cure,

5    and it's not necessarily a proposal for a broader general

6    administrative claim.

7              THE COURT:  What's broader than -- I mean, this is

8    smaller.  This claim is less than the amount that's asserted in

9    the cure proposal.

10             MR. PFEIFFER:  But the cure proposal is -- the timing

11   of the cure proposal's important.  What needed to be cured

12   before the allowance of the -- or, the assumption and

13   assignment.

14             THE COURT:  So?  I don't understand the -- I don't get

15   the significance of that point.  The cure proposal was made

16   well before the date of this stipulation, obviously, right?

17             MR. PFEIFFER:  Correct.

18             THE COURT:  And I don't see any contradiction of the

19   debtors' statement that the claims asserted in the

20   administrative prove of claim all occurred before the date of

21   the stipulation, October 7th, 2009.  Is there -- and the amount

22   set forth in the cure proposal is 300,000 dollars higher than

23   the proof of claim.

24             MR. TULLSON:  And Your Honor, going to the timing

25   point, paragraph 6 of the stipulation further reflects that the

1   unambiguous language of the agreement governed all claims

2   arising before the date of the stipulation because it preserves

3   their rights for any claims arising after the date of the

4   stipulation, or secondly, relating to the outstanding post-

5   petition obligations that are not yet due and payable in

6   connection with the ATEL contracts being assumed by the debtor

7   and assigned to the applicable buyer.  That's the reason why

8   paragraph 6 is included in the order.

9          MR. PFEIFFER:  Your Honor, paragraph 6 is entirely

10  consistent with an understanding that -- paragraph 6 is dealing

11  with the contracts being assumed.  Not necessarily all of these

12  contracts ended up being assumed, and that's what the issue is.

13  Not everything wound up being assumed, and that's -- the

14  remainder of that wasn't assumed is -- portion of that is

15  really what's at issue.

16         MR. TULLSON:  Your Honor, I think if that reading of

17  paragraph 6 was correct, you'd need commas.  You would need to

18  say any -- after "before and are not yet due and payable".  So

19  "or relating to post-petition obligations, that are not yet due

20  and payable," and that's just not how it's constructed.  This

21  is in addition to the fact that it's released both as related

22  to the cure proposal and the further release of any other

23  claims that they have before the date of the stipulation.

24         THE COURT:   I guess the other issue -- I mean, I

25  touched on this very briefly, but paragraph 2 doesn't deal with

1      cure.  It deals with an allowed administrative claim.

2            MR. TULLSON:  That's right.  And even on the argument

3      that you look at the recitals, it's not simply dealing with the

4      assumption and assignment objection.

5            MR. PFEIFFER:  Your Honor, I think the issue here is

6      there are certain contracts that were not assumed and assigned,

7      and this stipulation was intended to cover only those contracts

8      that were assumed and assigned.  And the mere fact that there's

9      a question concerning what paragraph 2 relates to, that creates

10     an ambiguity.  What did the parties intend?  Why is that in

11     there?  If it appears to stick out, why was it in there?  What

12     was the intent?  And if you go back, it looks like it was a

13     narrow intent from the recital.  And then there's a broader

14     language at the tail end, at the very tail end of the release

15     that conflicts with that narrow intent to only resolve the

16     issues concerning the claims that were assumed and assigned.

17     Because there wouldn't be any need to cure claims that weren't

18     being assumed.

19            THE COURT:  Okay.

20            MR. PFEIFFER:  And since you have this conflict, I

21     think you need testimony from the, A, the parties that

22     negotiated it, and B, what happened after the negotiations, and

23     we're ready to present evidence, Your Honor, that says what the

24     intent was and that this was not intended to get rid of all the

25     claims that we've asserted.  And we would like to present

1    evidence, but since this is a sufficiency hearing, I can't.

2            THE COURT:  Okay.

3            MR. TULLSON:  Your Honor, we don't see the ambiguity.

4    The agreement is clear.  You don't get to the point of -- if we

5    had an evidentiary hearing, we would just say this is the

6    unambiguous language of the stipulation.  I'm not even sure

7    what you could say in a meet and confer.  This is an agreement;

8    it clearly deals with more than the assumption and assignment

9    of contract number D450140635.  It's in paragraph 2 of the

10   stipulation, and it's in paragraph 3, and it's in paragraph 6.

11           THE COURT:  What's in paragraph -- I'm sorry, what are

12   you saying is in these paragraphs?

13           MR. TULLSON:  Well, that they obtained an allowed

14   administrative expense claim, and that is reflected in not only

15   the assumption and assignment of that one purchase order, but

16   the release of their entire cure proposal which covers the

17   exact same leases.

18           MR. PFEIFFER:  My client is just resolving the

19   assumption issue, resolving the leases that were assumed and

20   assigned.  This goes beyond that.  This release goes beyond

21   that, but the intent of the parties as set forth in the whereas

22   clause and in the heading is only dealing with the contracts

23   that were assumed and assigned.  That's where I think the

24   ambiguity is, and I think that's what's important to use

25   evidence to hear what the parties recall -- what actually

Page 53

1   occurred during the negotiations, what the intent was, and what

2   the discussions and correspondence back and forth, and what

3   happened afterwards.  And my client wants to submit evidence on

4   that because we think we have dispositive evidence.

5           THE COURT:  Okay, I'll take a couple minutes and then

6   be back with my ruling.

7           MR. TULLSON:  Thank you, Your Honor.

8       (Recess from 11:46 a.m. to 11:58 a.m.)

9           THE CLERK:  All rise.

10          THE COURT:  Please be seated.

11          Okay, we're back on the record in In re: DPH Holdings.

12  I've just heard oral argument in connection with the claims

13  sufficiency hearing with respect to DPH's objection to

14  administrative expense claim number 18427 filed by A-T-E-L, or

15  ATEL Leasing Corporation.

16          The objection as clarified by the supplemental

17  pleadings filed by DPH is premised upon DPH's contention that

18  the claim set forth in the proof of administrative expense

19  claim was settled and released by ATEL pursuant to a

20  stipulation and agreed order dated October 7th, 2009.  ATEL

21  disagrees with that basis, contending that the stipulation and

22  agreed order does not provide for such a release and in any

23  event is ambiguous and, therefore, entitles ATEL, as well as,

24  of course, DPH to submit evidence with regard to the parties'

25  intent in respect of whether the claim that's before the Court

1     was, in fact, released.  Under this Court's orders establishing

2     procedures for determining objections to claims and

3     administrative expenses in this case, the Court staged, in the

4     claim objection process, a hearing called a sufficiency

5     hearing, and that is the stage that we're at in connection with

6     this administrative expense claim objection.  The Court has

7     previously stated that such a hearing is a nonevidentiary

8     hearing and that it is, instead, one in which the issues before

9     the Court are analogous to a standard under Bankruptcy Rule

10    7012 which incorporates Federal Rule of Civil Procedure 12 with

11    respect to a motion to dismiss, although in addition, where the

12    claim on its face is premised upon documents that are not

13    ambiguous and/or the defense to the claim is premised upon

14    documents that are not ambiguous, the Court not only need not

15    take further evidence but should not take further evidence

16    since the unambiguous terms of a dispositive document will be

17    the sole evidence of the parties' intentions under that

18    document.  Therefore, if, in fact, the stipulation and agreed

19    order is not ambiguous and controls the outcome of the

20    objection, there is no reason to proceed beyond a sufficiency

21    hearing.

22            The law is clear that a stipulation and order is

23    subject to general principles of contract law.  See In re:

24    Rickel & Associates, Inc., 272 B.R. 74, 85 (Bankr. S.D.N.Y.

25    2002).  As is clear and undisputed, I believe, on the record,

1   under such general principles, the agreement or the stipulation

2   is to be interpreted so as to give effect to the intention of

3   the parties as expressed in the unequivocal language that they

4   have employed.  The best evidence of intent is the contract

5   itself.  If an agreement is complete, clear, and unambiguous on

6   its face, it must be enforced according to the plain meaning of

7   its terms.  Language whose meaning is otherwise nonambiguous is

8   not ambiguous merely because the parties urge different

9   interpretations in the litigation.  Rather, contractual

10  provisions are ambiguous only if they're objectively

11  susceptible, without reference outside the contract, to more

12  than one interpretation by a reasonably intelligent person.

13         Conversely, contract language is unambiguous if it has

14  a definite and precise meaning, unattended by danger of

15  misconception, and the purport of the contract itself in

16  concerning which there is no reasonable basis for a difference

17  of opinion.

18         Relatedly, a contract should be construed so as to

19  give full meaning and effect to all of its provisions.  Or,

20  stated in the negative, no provision of the contract should be

21  left without force and effect.  See generally, In re 18th

22  Avenue Realty, Inc., 2010 WL 1849403, pages 5 and 6 (Bankr.

23  SDNY May 7, 2010), and In re Rickel & Associates, Inc., 272

24  B.R. at 85, as well as the authorities cited therein.  See also

25  Wallace v. 600 Partners Company, 86 N.Y.2d 543, 548 (1995).

1   Here, it is contended by ATEL that "the intent of the

2   assumption and assignment stipulation" -- that's the way that

3   ATEL has defined the stipulation and order -- was to resolve

4   solely the parties' disputes concerning the cure amount and

5   administrative expense claim for one group of equipment

6   schedules, collectively known as contract D450140635.[Defined

7   term, the "subject contract"].  Specifically, the assumption

8   and assignment stipulation provided for a cure payment relating

9   to the subject contract in the amount of $13,669.83 and an

10  allowed administrative claim in the amount 21,750 dollars

11  relating to the subject contract."  That's at paragraph 9 of

12  ATEL's supplemental response to the claim objection.

13          I have reviewed the claim objection and the related

14  pleadings, and specifically reviewed at length the October 2009

15  stipulation and agreed order, and I believe that it is clear

16  from the plain language of that stipulation and agreed order

17  that the parties' agreement was not so limited as set forth in

18  the language I've just quoted from ATEL's supplemental

19  response.  In other words, the plain language of the

20  stipulation and order makes it clear that the stipulation and

21  order is not limited to the assumption and assignment of

22  contract number D450140635 and the cure amount therefor but

23  covers other rights and claims of ATEL and the parties for whom

24  it was acting.  This is clear from the entire context of the

25  stipulation as set forth in the language of the stipulation,

Page 57

1   which includes the whereas clause recitals.

2           The second whereas clause refers to a March 5th, 2008

3   ATEL -- cure claim of ATEL Leasing Corporation that appears on

4   the docket of this case, docket number 12976 and is defined in

5   that whereas clause as the "ATEL cure proposal."

6           The bottom whereas clause on page 3 of the stipulation

7   and order also refers to a limited objection of ATEL Leasing

8   Corporation of America to notice of assumption and assignment

9   with respect to certain executory contracts or unexpired leases

10  to be assumed and assigned to Parnassus II, LLC, docket number

11  18402 which is defined in that clause as the "assumption and

12  assignment objection."

13          The last whereas clause states that the debtors and

14  ATEL have reached an agreement to settle and resolve the ATEL

15  cure proposal -- that is the defined term relating back to the

16  March 5, 2008 pleading -- and the assumption and assignment

17  objection -- that's the, again, the defined term relating back

18  to the July 17th, 2009 pleading.  That is, the whereas clauses

19  refer to an agreement to settle the matters set forth in those

20  two pleadings by ATEL.

21          The operative provisions of the agreement provide

22  first, in paragraph 1, that the cure amount for contract number

23  450140635 shall be $13,699.83.  Paragraph 2 provides that upon

24  entry of this stipulation, the debtors shall grant ATEL an

25  allowed administrative claim in the amount 21,750 dollars,

Page 58

1   which shall be paid in accordance with the terms of the

2   modified plan.  That is, paragraph 2 does not refer to the cure

3   of the amounts owing under contract number D450140635, which is

4   dealt with in paragraph 1 of the stipulation, but rather, the

5   allowance of an administrative claim, which, based, in light of

6   the contract interpretation principles I've just recited, must

7   cover something other than the cure claim, or else it would

8   have been dealt with in paragraph 1.

9          Paragraph 3 then states that ATEL hereby acknowledges

10  that the cure payment of $13,699.83 and the payment of $21,750

11  on account of ATEL's allowed administrative claim, together,

12  the payments are in full satisfaction of all amounts asserted

13  in the ATEL cure proposal and assumption and assignment

14  objection.  I should note that the amounts asserted in the ATEL

15  cure proposal and in the assumption and assignment objection

16  refer to, among other things, post-petition amounts owing under

17  executory contracts between DPH's predecessor, the Delphi

18  debtors, and ATEL or that were assigned to DPH's predecessors

19  for post-petition amounts owing well in excess of the amounts

20  asserted in the administrative claim, and that the amounts

21  asserted in the administrative claim are for amounts under

22  those same contracts, the two leases referred to in the ATEL

23  cure proposal and in the proof of administrative claim and in

24  ATEL's response and supplemental response to the objection to

25  that claim.  Thus, in the first sentence of paragraph 3 of the

1    stipulation, ATEL acknowledges that the roughly 35,000 dollars

2    of cure payment and allowed administrative claim shall be in

3    full satisfaction of all amounts asserted in the ATEL cure

4    proposal, including, I believe, the amounts asserted in that

5    proposal which include amounts not only for contract number

6    D450140635 but also for amounts under contracts that have not

7    been assumed by the Delphi debtors, since the ATEL cure

8    proposal included those contracts.

9            Paragraph 3 goes on to state that ATEL hereby waives

10   any and all rights to assert against any and all of the debtors

11   that the claims asserted in the ATEL cure proposal and

12   assumption and assignment objection are entitled to any

13   treatment other than set forth herein.  Again, that sentence is

14   not limited to cure, but instead refers to claims and refers to

15   treatment, as opposed to cure.  In the next sentence of

16   paragraph 3, the parties agreed that the ATEL releasing parties

17   further "release and waive any right to assert any other claim,

18   cause of action, demand, lien, or liability of every kind and

19   nature whatsoever, including those arising under contract,

20   statute or common law, whether or not known or suspected at

21   this time, which relate to the ATEL cure proposal or assumption

22   and assignment objection" [and I'll note there, before

23   continuing to read the rest of the passage, that "relate to" is

24   broader than -- the phrase "which relate to" is broader than

25   the language in the prior clause] "which relate to the ATEL

1   cure proposal or assumption and assignment objection or which

2   the ATEL releasing parties have, ever had, or hereafter shall

3   have against the debtors based upon, arising out of, related to

4   or by reason of any event, cause, thing, act, statement, or

5   admission occurring before the date of the stipulation."

6          Paragraphs 4 and 5 then provide that the assumption

7   and assignment objection and the ATEL cure proposal are

8   withdrawn with prejudice.  And paragraph 6 then states that

9   "any claims arising after the date of the stipulation or

10  relating to outstanding post-petition obligations that are not

11  yet due and payable in connection with ATEL contracts being

12  assumed by the debtors and assigned to applicable buyers shall

13  either be paid in the ordinary course or subject to the

14  procedures set forth in the modified plan for the payment of

15  admin claims."

16         I believe that a fair reading of the foregoing

17  provisions makes it clear that the stipulation and order on its

18  face addresses not only amounts that would need to be paid as

19  cure under Section 365 of the Code, but also all amounts

20  asserted in the ATEL cure proposal, including in respect of

21  contracts addressed in that proposal that were never assumed by

22  the debtors, that it addresses all claims asserted in the ATEL

23  cure proposal -- again, notwithstanding the fact that the

24  debtors have not assumed all of the contracts asserted in the

25  ATEL cure proposal -- any other claims related to -- and again,

Page 61

1   that phrase, "related to", is a broad phrase in the ATEL cure

2   proposal -- or any other claims that ATEL and the ATEL

3   releasing parties had or shall have arising before the date of

4   this stipulation, which is again, October 7th, 2009.  The

5   administrative expense claim form was dated July 10th, 2009, so

6   clearly the claims asserted in that administrative expense

7   claim form arise prior to the operative date of the stipulation

8   and order.

9          It is asserted by ATEL that notwithstanding the

10  foregoing, the agreement, that is, the stipulation and order,

11  is ambiguous because the Court could fairly construe that it

12  nevertheless applies to cure claims, and in particular, ATEL

13  cites cases in support of the general proposition that where a

14  general release is given in a commercial dispute, although a

15  court is less likely to find such broad language inadvertent or

16  unintended, where the document includes recitals or other

17  language indicating an intention to settle a narrower dispute

18  than the claims arguably encompassed in the general release,

19  the scope of the release is ambiguous, and therefore, parol

20  evidence is admissible and summary judgment is inappropriate.

21  See again, In re: Rickel & Associates, Inc., 272 B.R. at 85-86

22  and the cases cited therein.  I don't disagree with that

23  proposition.

24          However, I believe that in addition to the general

25  release that appears in the last clause of paragraph 3, it is

Page 62

1    clear from the context and plain language of the agreement that

2    the parties intended to settle more than the cure amount to be

3    paid in respect of contract number D450140635, and therefore, I

4    believe that the ambiguity asserted by ATEL is not, in fact, a

5    true ambiguity.  The recital provisions make it clear, I

6    believe, that the parties are not resolving simply the cure

7    amount owing in respect of that contract, but, rather, they are

8    resolving on the terms of the agreement the issues that are

9    raised in the ATEL cure proposal -- a defined term -- and the

10   assumption and assignment objection.  This is clear, also, and

11   more importantly, from the operative provisions of the

12   agreement, which, as I noted, have two different paragraphs,

13   one dealing with the cure in respect of the specific contract

14   and in the second, paragraph 2, providing for an allowed

15   administrative claim which is not tied to any particular

16   agreement that is to be assumed or not.  Moreover, again, as

17   I've noted, even before one gets to the general release at the

18   end of paragraph 3 of the stipulation and order, the parties

19   have provided that ATEL waives its rights in respect of amounts

20   asserted and claims asserted and claims relating to the ATEL

21   cure proposal which, again, asserted amounts owing and claims

22   in respect of post-petition amounts under contracts that were

23   not assumed by the Delphi debtors.

24          The only language, then, that arguably creates an

25   ambiguity is the title of the stipulation and order which

1    states "Stipulation and Agreed Order Resolving Objection of

2    ATEL Leasing Corporation to Notice of Assumption and

3    Assignment."  However, it's perfectly consistent with that

4    title that the parties agreed to resolve the objection to

5    notice of assumption and assignment by dealing not only with

6    the cure amount owing in respect of the claim to be assumed and

7    assigned -- the contract to be assumed and assigned, that is

8    contract D450140635 -- but also the other issues raised by ATEL

9    in the ATEL cure proposal and assumption and assignment

10   objection, including the post-petition amounts alleged to be

11   owing by ATEL under other contracts that were not assumed by

12   the Delphi debtors.

13          The agreement, therefore, I believe, does not fall

14   into the exception noted in the Rickel case or in the cases it

15   cites (which I will note, also, involved situations and

16   recitals that were far more clearly in conflict with the

17   general release provided, and, in fact, in one case, would have

18   -- if not found to be narrowing the general release, have meant

19   that the parties would have agreed to a release that was

20   unlawful.).

21          Consequently, I believe that the intention of the

22   parties is set forth in the plain terms of the stipulation and

23   agreed order and that, therefore, this matter is appropriate

24   for resolution at this stage of the claim objection process

25   without the need to consider parol evidence, and in fact with

1    the obligation not to consider such evidence since the issue is

2    one involving the interpretation of agreement which is

3    unambiguous by its terms and, therefore, an issue that is a

4    question of law.  See Arcadian Phosphates, Inc. v. Arcadian

5    Corp., 884 F.2d 69, 73 (2d. Cir 1989) and Metropolitan Life

6    Insurance Company v. RJR Nabisco, Inc., 986 F.2d 884, 889 (2d.

7    Cir 1990).

8           So in light of that, I will sustain the debtors'

9    objection to the administrative expense claim.

10          MR. TULLSON:  Thank you, Your Honor.

11          THE COURT:  You should e-mail an order to chambers

12   consistent with my ruling; you should copy in Mr. Pfeiffer on

13   that e-mail.

14          MR. TULLSON:  Yes, Your Honor.

15          Your Honor, the final matter on today's claim agenda

16   is this matter number 12, the sufficiency hearing regarding the

17   claim of Kaaren Washington, proof of administrative claim

18   19572.  Neither Ms. Washington nor the Mississippi Workers'

19   Compensation Individual Self-Insure Guaranty Association has

20   alleged any facts --

21          THE COURT:  Right.

22          MR. TULLSON:  -- much less plausible facts in support

23   of their claim.  Moreover, the reorganized debtors conducted

24   their own independent investigation regarding this claim and

25   has concluded that it is without merit.

DPH HOLDINGS CORP., ET AL.

1          THE COURT:  I've dealt with several of these similar

2     claims in the past, and I will grant the objection -- in the

3     past in this case -- and I'll grant the objection on the same

4     basis --

5          MR. TULLSON:  Thank you.

6          THE COURT:  -- that it was incumbent upon the

7     claimant, in light of the bare bones nature of the claim, to do

8     more in light of the debtors' objection than they have done.

9     So you can submit an order on that.

10          MR. TULLSON:  We will do so.

11          THE COURT:  Okay.

12          MR. TULLSON:  And that concludes the matters on for

13     today's hearing.

14          THE COURT:  Thank you.

15        (Whereupon these proceedings were concluded at 12:33 PM)

16

17

18

19

20

21

22

23

24

25

Page 66

1

2                              I N D E X

3

4                                RULINGS

5                                      Page      Line

6    Reorganized Debtors'          15        15

7    motion for Order

8    Resolving Outstanding

9    Objections to Cure of

10   Material Supply

11   Agreements and Cure

12   Proposals for Certain

13   Executory Contracts and

14   Unexpired Leases Granted

15   Johnson Controls' Motion  38        13

16   for an Order Compelling

17   DPH Holdings to Comply

18   with the Transfer Agreement

19   Relating to Transfer of

20   Delphi's New Brunswick

21   Battery Facility to Johnson

22   Controls, Inc., for

23   Adequate Assurance of

24   Financial Ability to

25   Perform under Transfer

Page 67

```
 1   Agreement Denied without
 2   Prejudice
 3   Sufficiency Hearing         64       6
 4   Regarding Claim of ATEL
 5   Leasing Corporation as
 6   Objected to on the
 7   Reorganized Debtors'
 8   Forty-Sixth Omnibus
 9   Objection Pursuant to 11
10   U.S.C. Section 503(b)
11   and Fed. R. Bankr. P.
12   3007 Sustained
13   Sufficiency Hearing         64      24
14   Regarding Claim Filled
15   by the Mississippi Workers'
16   Compensation Individual
17   Self-Insurer Guaranty
18   Association on Behalf of
19   Kaaren D. Washington as
20   Objectedto on the Reorganized
21   Debtors' Forty-Sixth
22   Omnibus Objection
23   Pursuant to 11 U.S.C.
24   Section 503(b) and Fed.
25   R. Bankr. P. 3007 Granted
```

Page 68

1

2                          C E R T I F I C A T I O N

3

4    I, Dena Page, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7    Dena Page    Digitally signed by Dena Page
                  DN: cn=Dena Page, c=US
                  Reason: I am the author of this document
8    _____  Date: 2010.12.07 16:33:08 -05'00'

9    DENA PAGE

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date: November 22, 2010

17

18

19

20

21

22

23

24

25