# EXHIBIT B

05-44481-rdd    Doc 21096-2    Filed 01/28/11    Entered 01/28/11 16:56:43    Exhibit
Exh. B    Pg 1 of 7

EXHIBIT B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DPH HOLDINGS CORP., *et al.*,<br><br>          Reorganized Debtors. | Chapter 11<br><br>Case No. 05-44481 (RDD)<br>(Jointly Administered) |

## DECLARATION OF DEAN UNRUE

Dean Unrue declares, under penalty of perjury, as follows:

1.   I submit this declaration in support of the Reorganized Debtors' Omnibus Reply in Further Support of Motions for Leave to File Amended Complaints (the "Reply") in certain preference actions (collectively, the "Preference Actions") filed in the above-captioned chapter 11 proceedings (the "Chapter 11 Cases"). Capitalized terms not otherwise defined in this declaration have the meanings ascribed to them in the Reply.

2.   Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents and data, and my experience with and knowledge of the Reorganized Debtors' pre-petition relationships with their supply base and other creditors.

3.   Since 2006, I have served as the senior Delphi Claims Administrator and have been responsible for overseeing the reconciliation and settlement of approximately 16,700 proofs of claim filed against the Reorganized Debtors in the Chapter 11 Cases. By serving in this role, I have become familiar with the Reorganized Debtors' pre-petition business practices and relationships with their supply base and other creditors. Accordingly, since 2007, I have also been responsible for, among other things, compiling and reviewing certain information pertinent

to the Preference Actions, including compiling data that the Reorganized Debtors referred to in each of the exhibits to the proposed amended complaints ("PACs").

4. I am aware that each of the PACs alleges that the applicable Payments referenced were on account of antecedent debts arising from agreements either entered into by DAS with the Defendant(s) for the provision of various parts or services to the Reorganized Debtors (the "DAS Agreements"), or entered into by other Reorganized Debtors, in some cases together with DAS (the "Reorganized Debtor Agreements").

5. Notwithstanding the different contractual arrangements underlying the Preference Actions and the Payments, based on my familiarity with the Reorganized Debtors' pre-petition business practices, I have concluded that, except with respect to Preference Actions involving contracts entered into by Delphi Medical Systems Colorado Corporation, DAS owned the account that was the source of funds for each of the Payments, and each payment remitted by DAS was made through the Reorganized Debtors' accounts payable system.

**The Payment Processing System**

6. Due to the large and complex nature of the Reorganized Debtors' pre-petition business activities, the vast majority of the Reorganized Debtors relied on a centralized accounts payable recording system to determine when payments were owed to vendors and other creditors. This system was called the DACOR System (Disbursement Analysis Control and Online Reporting System). The DACOR system was used to pay all of DAS' vendors as well as to maintain all accounts payable records. Additionally, the DACOR System distributed approvals to users, generated checks, prepared payment vouchers that were sent to vendors, automated journal entries and input those entries into the general ledgers, and automated account

distributions. The DACOR System was updated daily and contained twelve months' worth of data. After twelve months, the data was archived.

7.  The main DACOR System fed a web-based program called E-DACOR, a data repository program. E-DACOR was a flat file that was updated nightly and listed all account payable information that was included on the DACOR System. Information could be viewed online or downloaded to a personal computer for sorting and further analysis. A user could search E-DACOR for both paid and unpaid invoices using the purchase order number, bill of lading number, or invoice number. Since 2003, moreover, all vendors who requested access to E-DACOR could view their own records online on E-DACOR. It was standard business practice that upon the receipt of a shipment from a vendor, the receiving department entered the shipment into the DACOR system. The receiving department would generally enter the shipment under either the bill of lading or shipping manifest number (collectively, "shipper numbers"), the invoice number, or the number for the purchase order for which such shipment was made. Due to the often differing documentation accompanying shipments (which may not have included all relevant reference numbers), the large volume of shipments received, and the large number of employees charged with shipment intake, the receiving departments were not always able to uniformly input the same information for each shipment into the DACOR System. In other words, on certain occasions, the receiving department may have used invoice numbers to catalogue the shipments it received. On other occasions, the receiving department may have used shipper numbers to catalogue shipments, without inputting the corresponding invoice numbers into the DACOR System (even if such invoice numbers were available).[1] Finally, on still other occasions, the receiving department may have used purchase order numbers to

---

[1]  Alternatively, depending on the documentation available and the individual performing the data entry, bill of lading numbers were sometimes recorded as "invoice" numbers.

3

catalogue shipments. These varying practices were reflected in the DACOR System because the system only allowed entry of a single number.[2]

8. Similarly, upon receipt of acknowledgment of service performed on service contracts, the accounting department would direct an entry for payment into the DACOR System. Due to the differing invoicing practices of various service providers and the large volume of services received by the Reorganized Debtors, the information input into the DACOR System was not always uniform. In certain cases, purchase order numbers would be used instead of invoice numbers, and in other cases, numbers corresponding to other documents related to the applicable service contract were entered into the DACOR System.

**Investigation into the Payments Sought to be Recovered in the PACs**

9. My staff undertook an extensive inquiry to determine which Payments to include in the PACs. Specifically, my staff searched its records from the DACOR System for information underlying each of the Payments. In doing so, my staff sought to ensure that each Payment made was on account of an obligation arising from the existence of a purchase agreement or service agreement previously entered into by any of the Reorganized Debtors and the respective defendant(s). My staff therefore searched for an invoice number, shipper number, or purchase order number relating to each Payment. My staff's findings with respect to the invoice, bill of lading, and purchase order numbers relating to each payment are set forth in each respective PAC.

10. While I am aware that certain Payments were included in the PACs without corresponding invoice, bill of lading, and purchase order numbers, it is my understanding that

---

[2] Regardless of which form of record was entered into DACOR, these record numbers correspond to documentation that show in detail the nature and amount of the obligation to each vendor (*i.e.*, the type of good ordered, the per unit price of such goods, and/or the contents and value of each shipment).

4

such Payments were nonetheless made on account of contracts previously entered into by the Reorganized Debtors. I reach this conclusion because, given the intricacies of the DACOR System, DAS generally did not initiate payments to vendors until the Reorganized Debtors verified that payment was owed as a result of the respective vendor's performance under its contract with the Reorganized Debtors. Thus, the mere act of payment alone was typically evidence that a preexisting obligation was owed to the payee, and the amount of such preexisting obligation was typically in the exact amount of the payment.

11.    Additionally, while certain fund transfers initiated by DAS lack corresponding invoice, bill of lading, or purchase order numbers in the PACs, the reason is generally due to DAS's accounting practices. In many instances, when DAS initiated fund transfers, it failed to record the specific invoice, bill of lading, or purchase order numbers relating to the transfer. Nonetheless, fund transfers typically were not initiated until the Reorganized Debtors analyzed the payee's prior request for payment and determined that payment was in fact owed.

*[Remainder of page intentionally left blank]*

*[Signature page to Declaration of Dean Unrue in Support of Reorganized Debtors' Reply]*

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on January 28, 2011

By:   /s/ Dean Unrue
      Dean Unrue