# EXHIBIT D

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                          :
                                                          :    Chapter 11
                                                          :
DPH HOLDINGS CORP., *ET AL.*,                             :    Case No. 05-44481 (RDD)
                                                          :
                        Reorganized Debtors.              :    (Jointly Administered)
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF RANDALL S. EISENBERG IN SUPPORT OF THE REORGANIZED DEBTORS OMNIBUS REPLY TO DEFENDANTS' RESPONSES TO THE MOTIONS FOR LEAVE TO FILE AMENDED COMPLAINTS

I, Randall S. Eisenberg, declare and state as follows:

1.        I am a Senior Managing Director at FTI Consulting, Inc. ("FTI"),

which maintains an office at Three Times Square, New York, New York 10036 and other offices

located throughout the world.  I submit this declaration in support of the motion of DPH

Holdings Corp. ("DPH" or "Reorganized Debtors") for leave to amend certain preference

complaints filed in the above-referenced case under chapter 11 of title 11 of the United States

Code.

2.        Except as otherwise indicated, I have personal knowledge of the

information contained herein either directly or through professionals at FTI working under my

direction, and am competent to testify as to the matters set forth herein.  I am authorized to

submit this declaration.  I am not being compensated specifically for this testimony other than

payments received by FTI as a professional retained by the Reorganized Debtors.

## BACKGROUND AND QUALIFICATIONS

3.        I have held the position of Senior Managing Director at FTI since

September of 2002.  Prior to that time, I was a partner in PricewaterhouseCoopers LLP's

1

4.        Business Recovery Services ("BRS") practice. The BRS practice within the United States was sold to FTI and I joined FTI as part of that transaction. For more than 20 years, I have advised senior management and boards of directors of companies in numerous industries in devising and implementing sound turnaround and restructuring strategies in out-of-court restructurings, chapter 11 cases and foreign insolvency proceedings. In particular, I have been involved in numerous large and complex restructurings, including, without limitation, Delphi Corporation, Visteon Corporation, US Airways Group, Inc., Kmart Corporation, Vertis, Inc., Anthracite Capital, Inc., Planet Hollywood International, Inc., Interpool, Inc. and RSL Communications, Ltd.

5.        I am a Certified Turnaround Professional, a past Chairman of the Turnaround Management Association, and a past President of the Association for Certified Turnaround Professionals, which was merged into the Turnaround Management Association in 2007. I am a Fellow in both the American College of Bankruptcy and the International Insolvency Institute. I have previously served as an Adjunct Professor at the John E. Anderson School of Management at the University of California Los Angeles and the University of Southern California School of Accounting, where I taught cost accounting in their graduate school programs. I am also a Certified Public Accountant licensed in the states of New York and California. I have a Bachelor of Science degree from the University of the Pacific and a Masters degree in Business Administration from the Kellogg School of Management at Northwestern University. Information regarding my compensation, recent publications, and recent testimony is attached hereto as Exhibit A.

## FTI'S QUALIFICATIONS

6.        FTI has a wealth of experience in providing advisory services in restructurings and reorganizations, and enjoys an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States. FTI is a leading advisor to companies in complex and high profile restructurings and bankruptcies. FTI possesses one of the largest and most experienced turnaround practices in the United States, with clients that include companies, creditors, corporate parents and financial sponsors, as well as acquirers of troubled assets.

7.        FTI has a longstanding relationship with the Reorganized Debtors, as well as its predecessors ("Delphi", the "Company" or the "Debtors"), extending back to 2005. Initially, FTI was retained by Delphi, on or about April 11, 2005, to assist in providing certain covenant and collateral analyses in connection with the Company's debt financing and was subsequently asked to prepare certain analyses in connection with a potential transaction with a financial sponsor. Subsequently, FTI was retained on August 1, 2005 to assist the Company with its restructuring efforts, including preparing for a possible chapter 11 filing and assisting with the development and execution of its transformation plan. This led to our retention as the Company's restructuring and financial advisor during the pendency of Delphi's chapter 11 cases. Most recently, we were retained by Butzel Long PC ("Butzel Long") on behalf of the Reorganized Debtors to assist them with prosecuting certain preference complaints.

8.        In total, FTI has spent close to six years working with DPH and the Debtors. During this time, we assisted them with, among other matters: (a) developing its business plan, (b) addressing cash management and liquidity issues, (c) developing and reviewing portions of its transformation plan, which included participating in weekly meetings with senior management and its advisors, (d) obtaining DIP financing, (e) preparing the Schedule

3

of Assets and Liabilities ("SOAL") and Statement of Financial Affairs ("SOFA") for each of the

Debtors, (f) formulating a plan of reorganization and accompanying disclosure statement,

including the development of hypothetical liquidation analyses, (g) analyzing substantive

consolidation for purposes of the plan of reorganization, (h) assisting in the development of

preference actions, (i) assisting in the coordination of the comprehensive due diligence process

undertaken both by potential investors and PricewaterhouseCoopers LLP, including working

locally with the Company's management and finance teams to assist in diligence coordination,

clarifying information requests and managing various data rooms, and (j) providing accounting

and reporting support as required by the Company.

      9.      During its multi-year relationship with Delphi, FTI has developed a

great deal of institutional knowledge regarding the Company's operations, finances, systems and

business units. As part of and in conjunction with FTI's work on the aforementioned processes,

FTI had access to the Company's most significant and critical non-public financial and operating

information prior to and as of the petition date, including such items as certain historical

financial data, business plan projections, cash flow forecasts, strategic operating plans, detailed

support for the SOFAs and SOALs, key operating metrics, collective bargaining agreements and

other employee contracts, as well as information contained in the data rooms utilized by potential

buyers and investors. As a result, FTI possesses an intimate knowledge and fundamental

understanding of the Company's operations both prior to and after its chapter 11 filing.

      10.      On January 8, 2010, FTI was retained by Butzel Long in conjunction

with its representation of the Reorganized Debtors to assist with prosecuting various preference

complaints. Notwithstanding the statutory presumption of insolvency, the Reorganized Debtors

4

requested FTI to evaluate the solvency of certain Debtors during the 90 days preceding the

bankruptcy filings ("Preference Period").

## THE PREFERENCE COMPLAINTS

11.        The Reorganized Debtors' pending motion for leave to amend

concerns the preference complaints that were filed on or around September 26, 2007, which

sought to recover certain payments made during the 90 days before the Debtors filed for relief

under chapter 11 on October 8th and 14th, 2005 ("Filing Dates").

12.        Attorneys from Butzel Long advised me that, in a bench ruling on July

22, 2010, subsequently reflected in an order entered by this Court on September 7, 2010, the

Court dismissed the preference complaints without prejudice and directed the Reorganized

Debtors to file a motion for leave to amend the preference complaints, in order to state their

claims with more specificity.

13.        In the proposed amended complaints that are the subject of the

Reorganized Debtors' pending motion, it is my understanding that Delphi Automotive Systems,

LLC ("DAS LLC") has been identified as the entity that made each of the transfers at issue in

each of the proposed amended complaints.

14.        Further, in opposition to the Reorganized Debtors' motion for leave to

amend the preference complaints, it is my understanding that a number of defendants have

argued that DAS LLC was not insolvent during the 90-day period before its chapter 11 case was

commenced.

15.        This declaration is submitted in response to defendants' arguments

about DAS LLC's insolvency during the 90 day period preceding the Filing Dates and in support

of the Reorganized Debtors' motion for leave to amend their preference complaints.

## PRELIMINARY SOLVENCY ANALYSIS

16.    FTI has performed sufficient analysis with respect to DAS LLC and certain related entities to preliminarily conclude, based upon the work performed, that DAS LLC was insolvent during the Preference Period ("Preliminary Solvency Analysis" or "Analysis"). While the Preliminary Solvency Analysis was conducted as of approximately the Filing Dates, FTI is not aware of any information that would lead it to conclude that the solvency of DAS LLC would have been substantially different at any point during the 90 days preceding the Filing Dates. Given the preliminary nature of the Analysis, FTI would need to complete its analysis prior to finalizing its views.

17.    In conducting the Analysis, FTI reviewed and analyzed information in its possession and conducted interviews with Company personnel to identify and obtain data relevant to the DAS LLC's solvency. I believe that the Preliminary Solvency Analysis is based on the best information currently available to FTI. At times, however, we were forced to choose between alternative data sets, such as more robust information as of a less optimum date or less detailed information as of a preferable date. In such cases, FTI selected the information that it felt was most credible and that would allow for the most complete and accurate analysis. As a result of this, certain key global assumptions, methodologies and data sets underlie the Analysis, as follows:

(1)    Balance sheet information used is as of September 30, 2005. This same information served in Court filings and other analyses as a proxy for the Filing Dates. This data represents the best and most robust available balance sheet information during the Preference Period since (a) quarterly information was subject to in-depth reviews as a result of 10-Q filing requirements and included certain accounting adjustments that were only made quarterly, and (b) the Statement of Financial Affairs ("SOFAs") and Schedule of Assets and Liabilities ("SOALs") were based in large part upon the Company's September 30, 2005 accounting records, resulting in

6

the current availability of substantially more detailed information than at any other time during the Preference Period.

(2)    Asset values were estimated at going concern values, which generally results in higher asset values than those of a liquidation. This is a conservative approach since, as described further below, Delphi's financial condition was rapidly deteriorating and, absent a chapter 11 filing, Delphi would have been unable to continue as a going concern.

(3)    North American operations, which were inclusive of the Canadian and Mexican entities, are used as a proxy for DAS LLC cash flows and projections. The Company did not prepare cash flow or business plan projections by legal entity. However, projections for the North American operations were prepared, and DAS LLC accounted for over 90% of these revenues.[1]  As such, the inclusion of non-DAS LLC entities in the projections is not material to the results of the Analysis.

18.    FTI largely relied on data, analyses and documents that existed prior to and around the Filing Dates to develop its Preliminary Solvency Analysis.  Key information used included Delphi's regional financial projections (finalized in September 2005) ("Projections"), board and management presentations, accounting records and certain public SEC filings.

19.    The Projections, after adjustment for chapter 11 related items, formed the basis for the Debtor-In-Possession ("DIP") financing budget that was submitted to the Court in support of the DIP hearing held on October 27, 2005 and, therefore, represent management's then current view of the operations of the Company.  The Projections reflected a "steady state" scenario and, accordingly, did not account for operational improvements that management concluded could only be achieved through a bankruptcy process, such as further labor transformation, the elimination of legacy pension and OPEB liabilities, divestitures, and the closing and/or consolidation of U.S. manufacturing facilities, among others.  Included in the

---

[1] In addition, Delphi's non-U.S. North American operations were projected to be cash flow positive and had approximately $70 million of cash as of September 30, 2005.  The Cash Flow Test (as defined later in this declaration) conservatively includes this cash as part of DAS LLC's cash.

7

Projections were actual and estimated results through August 2005 and projected amounts from September 2005 through December 2007 ("Projection Period"). Due to their intended purpose of demonstrating adequate liquidity after obtaining Debtor-In-Possession Financing, the Projections excluded such obligations that would be stayed in a bankruptcy, such as $1.3 billion in pension and OPEB funding requirements that were due in the first half of 2006. For purposes of the Analysis, FTI used the "steady state" scenario for the Projections cited above before adjustments for chapter 11 related items, and then adjusted these Projections to reflect the $1.3 billion in pension and OPEB liabilities that were due in the 1st half of 2006.

### FINANCIAL CONDITION PRIOR TO BANKRUPTCY

20.        During and prior to the Preference Period, Delphi was experiencing strong performance pressures caused by a number of internal and external factors that called into question its ability to be competitive and continue as a going concern, including issues relating to its customer base, labor structure, commodity costs and liquidity.

21.        Delphi's largest customer, GM, which comprised over 50% of Delphi's North American revenue in 2005, was experiencing year-over-year declines in market share and production, adversely impacting Delphi severely. For example, in 2005 alone, revenue associated with GM was expected to decrease by $2.5 billion or 16.4% from the previous year. As revenues decreased, Delphi's heavy fixed cost structure prevented it from adapting and, as a result, profitability and operating margins deteriorated. Compounding the decrease in GM volumes was a decrease in the content per GM vehicle, which also adversely impacted Delphi's revenue and profitability.

22.        Delphi was burdened with an uncompetitive OEM labor structure as a result of labor agreements assumed during its separation from GM. Delphi's all-in labor cost was in excess of $76 per hour, compared to the $17-$22 per hour enjoyed by its independent parts supplier competitors. These agreements were far above market and provided for wages and benefits, such as pensions, retiree health care and other entitlements, as well as certain operating restrictions, leaving Delphi in a disadvantaged position with enormous OEM legacy benefit liabilities. In addition, the collective bargaining agreements restricted Delphi from permanently reducing its workforce, preventing the Company from exiting non-strategic and unprofitable operations, further inhibiting its profitability.

23.        The rising cost of commodities from 2002 to 2005 had a substantial adverse impact on Delphi's financial performance. During this time period, the prices of many commodities used in Delphi's production increased dramatically. For example, oil and steel prices increased by approximately 240% and 104%, respectively, between January 31, 2002 and September 30, 2005. The effect was acute in 2005 and, in the third quarter, Delphi reported in its Q3 2005 SEC filing that it expected to incur approximately $300 million in higher commodity costs for full-year 2005 than it had in 2004. As a result of previously established contractual terms, Delphi had limited success in passing these commodity price increases to its consumers, negatively impacting profitability.

24.        Delphi's financial performance steadily declined from 2002 to 2005. Most of the losses generated by the consolidated entity were contributed by DAS LLC. For example, the Company had an operating profit of $0.1 billion and loss of $0.5 billion in 2003 and 2004, respectively, due primarily to DAS LLC operating losses of $0.7 billion and $1.6 billion in

these years.   In 2005 the Company projected operating losses of $1.5 billion, driven by DAS

LLC operating losses of $2.2 billion.

25.       By late 2005, Delphi was in a liquidity crisis.  High commodity prices

and labor costs quickly outpaced already declining revenues, and further compressed thin

margins. Pension and OPEB funding requirements of $1.3 billion due in the first half of 2006

compounded the Company's liquidity crisis, and Delphi expected to run out of cash, inclusive of

a fully drawn revolver, by the second quarter of 2006[2].  Even without the pension and OPEB

funding payments, Delphi was severely cash constrained, as operating losses in both 2006 and

2007 were projected to exceed $1.4 billion annually in each of these years.

26.       As Delphi's financial condition deteriorated and its credit metrics

worsened, its access to capital declined.  For example, in 2004, Delphi was able to issue

commercial paper in the US, Europe, and Asia to raise capital while, in 2005, Delphi no longer

had access to the commercial paper market.  In June 2005, Delphi engaged in the refinancing of

certain of its existing debt instruments through a transaction that granted a first lien security

interest in substantially all of the assets of the Company.  With this transaction, management felt

that Delphi's access to material additional funding in the U.S. was closed until its cost structure

issues could be resolved.

27.       In late 2004 and early 2005, Delphi began exploring options to address

its operational and financial issues, including seeking concessions from GM and its unions,

entering into new money or strategic party transactions and ultimately filing for chapter 11.  It

was clear, however, that Delphi's cost structure was not viable and that the achievement of any

---

[2] This assumes that Delphi could use all global cash to fund any obligations, regardless of the location of such
obligations.  As discussed later in this declaration, it is unlikely that all non-U.S. cash could have been used to
fund U.S. obligations, indicating that DAS LLC, a U.S. entity, would likely have run out of liquidity before
mid-2006.

material out-of-court restructuring alternatives would require labor modifications and support

from GM. The Company, therefore, aggressively negotiated with GM and its unions to help

mitigate its considerable pension and OPEB liabilities and its labor cost structure. As these

negotiations progressed, without reaching satisfactory resolution, Delphi's hopes of reaching an

out-of-court solution began to fade and, in early August 2005, the Company commenced a

bankruptcy contingency planning process. In early October 2005, management felt that it had

exhausted all possibilities of reaching a consensual agreement among key stakeholders, and that

Delphi's only remaining option to remain viable was to file for bankruptcy. In the end, Delphi

was trapped by contractual obligations and an inflexible cost structure. Management and the

Company's financial advisors spent months attempting to resolve Delphi's crisis, without

success. Absent a filing, the Company's projections indicate that it would have run out of

liquidity by mid-2006 and that it would not have been able to meet its obligations as they came

due.

## PENSION AND OPEB LIABILITIES

28.        U.S. pension and OPEB liabilities were a significant contributor to

DAS LLC's insolvency. These obligations had implications to a number of U.S. entities within

Delphi's complex global organizational structure.

29.        Important to the Analysis are three legal entities that resided at the

apex of Delphi's organization:

    (i)        Delphi Corporation ("Delphi Corp.) - the ultimate parent of all the Delphi
            subsidiaries and affiliates, the borrower under both the revolver and bond
            debt and the contracting entity for many of the organization's most
            significant contracts. Delphi Corp did not have any operations, employees

or material bank accounts.

(ii)     Delphi Automotive Systems LLC - a wholly-owned subsidiary of Delphi
         Corp., operator of substantially all of the U.S. operations as well as the
         provider of most of the corporate overhead functions (IT, finance,
         accounting, etc.).

(iii)    Delphi Automotive Systems Holding, Inc. ("DASHI") - 91% owned by
         Delphi Corp. indirectly through Delphi NY Holding Corporation and 9%
         by DAS LLC. DASHI owned nearly all material foreign operations.

30.     The contractual obligations for the U.S. Pension and OPEB liabilities
generally resided at Delphi Corp., as pension plan sponsor and signatory to the national
collective bargaining agreements ("CBAs"); however, Delphi Corp. did not benefit directly from
these employees as it did not have manufacturing operations.  DAS LLC, on the other hand,
which owned substantially all of the North American operations, relied on these employees to
operate its business.  For the reasons set forth in the Reorganized Debtors Omnibus Reply to
Defendants' Responses to the Motions for Leave to File Amended Complaints, FTI has accepted
as a premise of this Analysis that there was a co-employer relationship between Delphi Corp and
DAS LLC, and, as a result, these two entities would share employee related liabilities jointly and
severally.

31.     Most U.S. pension and OPEB obligations were included on Delphi
Corp's SOAL, reflecting its status as plan sponsor and the signor to the CBAs.  However, from
an accounting perspective, these obligations were reported on the books and records of DAS
LLC, matching labor costs to the underlying revenue stream. This fact is consistent with the
premise that there was a co-employer relationship between Delphi Corp. and DAS LLC.

12

## APPROACHES TO PRELIMINARY SOLVENCY ANALYSIS

32.      Three tests are typically applied by courts in evaluating a Company's solvency with respect to preference claims, any one of which is sufficient to establish a basis for insolvency.

(i)      The balance sheet test, to determine if a company's liabilities exceeded assets, at fair value, at the time the preference distributions were made ("Balance Sheet Test"). If so, the company is deemed insolvent.

(ii)     The cash flow test, to determine if the company had the ability to pay its debts as they become due ("Cash Flow Test"). If not, the company is deemed insolvent.

(iii)    The adequate capitalization test, to evaluate whether a company was operating with unreasonably small capital at the time of such distributions ("Adequate Capitalization Test"). A company with adequate capital has enough capital to finance its planned future operations, based on likely business conditions of the enterprise. A company without sufficient capital is deemed insolvent.

33.      In connection with the confirmation proceedings on January 25, 2008, and as illustrated further in Exhibit B, Delphi Corp., DAS LLC and certain of their subsidiaries ("Delphi-DAS Debtors") were substantively consolidated for voting and plan distribution purposes. Though solvency for preference purposes is typically evaluated on an individual legal entity basis, out of an abundance of caution, FTI analyzed solvency for DAS LLC both on a stand-alone basis and as part of the substantively consolidated Delphi-DAS Debtors entity.

13

## BALANCE SHEET TEST

34.    The Balance Sheet Test compares the fair value of a company's assets against the nominal value of its liabilities to determine whether positive equity exists. On a going concern basis, there are generally two approaches to evaluate the fair value of the assets: (1) individual asset analysis and (2) business enterprise valuation.

35.    Under the individual asset analysis approach, FTI estimated the going concern fair value of each individual asset category as of the September 30, 2005 balance sheet ("Balance Sheet") for DAS LLC as the basis for its analysis. This analysis considered (a) whether the assets were owned by DAS LLC, (b) whether there were any known unrecorded assets on the DAS LLC balance sheet, (c) the nature of the assets, (d) where available and applicable, internal and external asset valuation analyses, and (e) the balance sheets of DAS LLC's directly and indirectly owned subsidiaries and its interests in foreign entities. The balance sheets, which generally reflect the historical cost of assets, were then adjusted by FTI, as necessary, to approximate the going concern fair value of the assets.

36.    FTI then evaluated the liabilities recorded on DAS LLC's books. In doing so, FTI relied on its knowledge of the organizational and contractual relationships at the Company, documents in its possession and the legal conclusion of Butzel Long concerning the co-employer relationship between Delphi Corp. and DAS LLC. The Analysis considered (a) whether the liabilities recorded on the Balance Sheet related to DAS LLC, (b) whether the liabilities were stated at their proper values, and (c) whether any material liabilities, contingent or otherwise, related to DAS LLC were not recorded on the Balance Sheet.

37.    Exhibit C illustrates the book values and FTI adjusted values of the assets and liabilities of DAS LLC as of September 30, 2005. Both DAS LLC's book values and

14

adjusted book values implied negative equity value of approximately $8.0 billion and $2.3

billion, respectively, and thus insolvency, as of September 30, 2005.

38.        According to DAS LLC's Balance Sheet, the book value of its assets

was $10.1 billion. Material adjustments resulting from FTI's analysis included (a) an $550

million increase in DAS LLC's investments in subsidiaries primarily reflecting its 9% ownership

of DASHI at fair value, (b) an $800 million adjustment to estimate the fair value of intellectual

property held by its subsidiary, Delphi Technologies, Inc., and (c) a $1 billion reclassification,

which had no impact on the solvency analysis, of an accounting-related pension asset to offset

pension liabilities. These adjustments resulted in a net increase in DAS LLC's assets of

approximately $150 million.

39.        The book value of DAS LLC's liabilities as of September 30, 2005

totaled $18.1 billion, which FTI reduced by approximately $5.8 billion to $12.3 billion to (a)

include the reclassification adjustment noted above and (b) reflect the impact of the co-employer

arrangement between DAS LLC and Delphi Corp[3].

40.        The adjustments increased the net book value of DAS LLC by $5.6

billion; however, even after these adjustments, liabilities still exceeded assets by $2.3 billion,

indicating that DAS LLC was insolvent.

41.        As shown in Exhibit D, FTI also performed the Balance Sheet Test for

the Delphi-DAS Debtors under a substantive consolidation scenario. Under this approach, both

the book value and adjusted value of the Delphi-DAS Debtors reflected a negative equity

position as of September 30, 2005. Material adjustments made by FTI to the book values of

---

[3] This adjustment reflects the assumption that Delphi Corp. would have had primary responsibility for certain U.S.
    pension and OPEB liabilities. FTI's adjustment leaves DAS LLC with a pension and OPEB liability equal only
    to the portion of these liabilities that could not be satisfied by the value ascribed to Delphi Corp.

assets and liabilities of the Delphi-DAS Debtors included an increase in investments in subsidiaries of $6.1 billion to reflect the fair market value of these entities' interests in the foreign operations, an increase in the value of intellectual property to estimate going concern fair value of approximately $800 million, and the aforementioned reclassification of the $1 billion accounting-related pension asset from assets to an offset to pension liabilities. Prior to such adjustments, the $23.0 billion book value of the Delphi-DAS Debtors liabilities exceeded its assets by $8.9 billion. After FTI's adjustments, the Delphi-DAS Debtors' liabilities of $22.0 billion exceeded its assets by $2.3 billion, indicating that this consolidated group was insolvent.

42.    FTI also used the enterprise value approach to estimate the fair value of assets. Enterprise value represents the market value of a company, and is theoretically the price a willing buyer would pay to purchase a company on a debt-free basis. Given the financial distress of the Company and its projected operating losses, however, a buyer might more appropriately choose to employ a liquidation valuation methodology in considering its value. Liquidation values are typically lower than going concern asset values, as reflected in the individual asset analysis above. The hypothetical liquidation analysis included in the Debtors' December 10, 2007 First Amended Joint Plan of Reorganization ("December 2007 POR") resulted in liquidation values of $3.8 to $5.3 billion for the Delphi-DAS Debtors[4], which falls far below their September 30, 2005 liabilities of approximately $22.0 billion.

43.    FTI performed a high level traditional enterprise valuation approach to the Delphi-DAS Debtors using extremely conservative assumptions and without fully taking into consideration the negative impact to value of the Company's abnormally high pension and

---

[4] While the hypothetical liquidation analysis was conducted after the Preference Period and, thus, does not precisely represent the Company at this time, I believe that, had the liquidation analysis been conducted as of the Preference Period, the results would have been directionally similar.

OPEB obligations. This methodology consisted of three separate analyses, as follows

("Enterprise Value Approach"): (1) Income or Discounted Cash Flow Approach ("DCF") (2)

Guideline Publicly Traded Company Market Approach ("Comparable Companies") and (3)

Guideline Merged and Acquired Company Market Approach ("Comparable Transactions"). Each

of the values derived were equally weighted to estimate fair market value and summarized in

Exhibit E.

   44.  In the DCF approach, projected cash flows are discounted to

approximate the present value of the future cash flows of the entity. FTI used a discount rate of

11% in this approach, which was based on estimated Weighted Average Cost of Capital

("WACC") calculated by using the Capital Asset Pricing Model ("CAPM"). For conservative

purposes, the discount rate was not adjusted for Delphi's state of distress. If this was considered,

the discount rate would have been higher, thereby decreasing values. We calculated the net

present value of projected debt free cash flows to be -$1.7 billion for the Projection Period. FTI

then estimated a terminal value of $4.5 billion, resulting in a total value of $2.9 billion.

   45.  The Comparable Company approach uses ten companies in similar

lines of business and geographic areas to approximate a value representing an alternate similar

investment for a potential investor. The selection of comparable companies was informed by

valuation work performed by Rothschild during the Debtors' chapter 11 proceedings. FTI

evaluated these comparable companies and determined that they were appropriate for use as of

the Filing Dates and, thus, appropriate for this Analysis. A control premium of 23% was applied

to each comparable company's market capitalization, based on the assumption that a buyer

would pay a premium to control the company. Since Delphi was publicly traded at the time, a

marketability discount was not necessary. The ten comparable companies had a median

EBITDA to enterprise value multiple of 6.50. Delphi's EBITDA over the twelve months

("LTM") ended July 2005 was $229 million, thereby indicating an estimated fair market value

("FMV") of invested capital of approximately $1.5 billion. After including cash of

approximately $1.7 billion as of September 2005, the Delphi-DAS Debtors enterprise value is

estimated at approximately $3.1 billion.

46.    A total of 23 completed transactions in the automotive industry were

also reviewed between October 24, 2003 and September 30, 2005 to evaluate the enterprise value

of the Delphi-DAS Debtors ("Comparable Transactions Approach"), resulting in a median

EBITDA to enterprise value multiple of 6.94. Using this multiple and the aforementioned LTM

EBITDA ended July 2005 of $229 million, FTI estimated the FMV of invested capital of the

Delphi-DAS Debtors to be approximately $1.6 billion. After including cash of $1.7 billion as of

September 30, 2005, total enterprise value is estimated at approximately $3.2 billion.

47.    Under the Enterprise Value Approach, FTI estimated that the Delphi-

DAS Debtors had an enterprise value of approximately $3.1 billion. This was calculated by

equally weighting each of the valuations developed through the Discounted Cash Flow,

Comparable Companies and Comparable Transactions approaches. Comparing the

approximately $3.1 billion Delphi-DAS Debtors enterprise value resulting from the Enterprise

Value Approach to Delphi's consolidated long-term debt of approximately $5.4 billion as of

September 30, 2005, results in a negative equity value, implying insolvency.

48.    Since DAS LLC did not generate operating income after 2002, and did

not project to generate operating income or positive cash flow during the Projection Period, FTI

was unable to appropriately apply the above described approaches to evaluate its enterprise value

as a standalone entity. In such situations, traditional valuation methodologies, absent unusual

circumstances, typically use a liquidation value approach in determining value. As indicated

previously, liquidation asset values are generally lower than the going concern asset values used

in the individual asset analysis approach discussed previously, which found DAS LLC to be

insolvent.

49.        As demonstrated above, the Balance Sheet Test indicates that DAS

LLC was insolvent as of the Filing Dates. FTI performed every reasonable permutation of this

test, including (a) individual asset analysis and enterprise value analysis, (b) before and after FTI

adjustments, and (c) with DAS LLC both as a stand-alone and as part of a consolidated entity,

and in each case, the value of its liabilities exceeded the value of its assets, indicating insolvency.

## CASH FLOW TEST

50.        The Cash Flow Test assesses whether a company can meet its

obligations as they become due. FTI performed this test on both DAS LLC as a stand-alone

entity and on the combined Delphi-DAS Debtors.

51.        The results of the Cash Flow test are generally dependent upon four

factors: (a) the existence and availability of cash to cover any anticipated negative cash flows,

(b) the existence of sufficient sources of liquidity to allow the organization to continue to meet

its obligations in the event that available existing cash is insufficient to cover anticipated

negative cash flows, (c) the minimum operating cash requirements of the organization, and (d)

the cash flow projections of the organization being evaluated.

52.        As a large, complex company, Delphi maintained sophisticated cash

management systems to support its global operations. Cash was located throughout the world

and, outside of the U.S. and Europe, was generally maintained at a local entity level. In the U.S.,

most of the entities (including Delphi Corp.) participated in a centralized U.S. cash management

system where cash was consolidated and managed by DAS LLC, while a similar but less

centralized system, managed by Delphi France Holdings SAS, existed in Europe. These cash

management systems swept much of their respective regions' cash into centralized accounts on a

regular basis and then disbursed the cash, as needed, on behalf of or to the entities participating

in their respective cash management systems. Cash was also located in the accounts of various

consolidated other entities, not all of which were fully owned by the Company, in many

jurisdictions around the world. As a result of the aforementioned complex cash management and

ownership structure, not all of the Company's cash throughout the world was available to fund

the operations of DAS LLC or the combined Delphi-DAS Debtors. In Europe, for example,

where approximately $348 million of the Company's cash resided at September 30, 2005,

directors and officers can have personal and sometimes criminal liability if their companies

become insolvent. As a consequence of this, directors and officers will be less willing to transfer

cash out of these entities if there is concern that adequate funding may not be available to meet

the local entities' needs going forward. Specifically, some of Delphi's foreign subsidiary

officers and directors expressed concern about having adequate funding as the Company

approached the Filing Dates causing the Company to ultimately transfer cash to these entities in

advance of the filing to ensure that local directors did not either resign or initiate filings of

separate insolvency proceedings in their local jurisdictions.

   53.   In addition, other cash balances were located in jurisdictions and/or in

entities where governmental or ownership structure restrictions existed with respect to

repatriating cash. Extraction of such cash is also sometimes subject to taxes, resulting in the

inability to retrieve 100% of any cash distributions.

54.    Exhibit F provides an analysis of the Company's cash balances at September 30, 2005 and at June 30, 2006. Of the Company's September 30, 2005 $1.7 billion global cash balance, only $925 million resided in North America, European cash accounted for $348 million and cash in individual Asian and South American entities amounted to $384 million. By June 30, 2006, non-North American cash was projected to fall by approximately $100 million as a result of negative cash flows in Europe. Furthermore, as of June 30, 2005[5], approximately $144 million of Delphi's cash resided at consolidated, non-U.S. entities that were only partially owned by the Company. It is unlikely that Delphi would have had the ability to directly access or use all of this cash, since it did not fully own the underlying entities.

55.    During the Preference Period, Delphi had limited ability to raise additional capital[6]. As reported in its September 30, 2005 10-Q, Delphi was no longer able to access its U.S. accounts receivable securitization facility, located at Delphi Receivables LLC, nor its revolving credit facility, due to covenant violations. It had already extended the maturity of certain debt through a refinancing transaction in June 2005, which resulted in the pledge of substantially all of its assets as security. Given the Company's credit metrics, poor historical and projected operating results and the granting of security rights in substantially all of the Company's assets to lenders shortly before the Preference Period, it is unlikely (and was management's view) that the Company could have obtained material incremental financing in the U.S. Moreover, any incremental borrowing capacity in Europe would have been subject to the same repatriation issues as European cash in general. If it had been possible at all for some

---

[5] The Projections do not provide projected cash balance information for the partially owned entities.

[6] Though at the beginning of the Preference Period, the Company still had availability under its U.S. revolving credit facility, it fully drew down all available amounts prior to the end of the Preference Period and, as such, is reflected in the U.S. cash balance at September 30, 2005.

of Delphi's foreign entities to source limited financing locally, given the financial condition of

the organization as a whole, such financing would likely have been subject to severe restrictions

on transfers back to the U.S. operations.

56.    In addition to the more general restrictions on the availability of cash,

the Company also had certain minimum operating cash ("MOC") requirements. The Projections

indicate that the minimum operating cash requirement for the Company was approximately $500

million[7] in 2005, of which approximately $100 million[8] related to North America and $400

million related to the non-North American operations. This would have further limited the

ability of the foreign operations to transfer cash to the U.S. and also indicates that not all cash in

the U.S. would have been available to fund U.S. obligations while still allowing the Company to

continue operations as a going concern.

57.    Based on the facts and circumstances described above, DAS LLC and

the Delphi-DAS Debtors would not have had access to the entire projected $1.7 billion global

cash balance. After taking into consideration (a) the minimum operating cash requirements of

non-North American operations, (b) the projected cash flows of these regions, (c) the level of

distress at the Company and its likely effect on the willingness of foreign subsidiary officers and

directors to release cash, and (d) the existence of cash in entities not fully owned by the

Company or at entities where I believe restrictions exist as to the amount of cash that can be

---

[7] Minimum operating cash requirements per the Projections are low relative to my understanding of the needs of the Company during the Preference Period and at later dates. For example, in Delphi's December 2007 POR, by which time the Company had been reduced in size, this requirement was $700 million. For conservative purposes, FTI used a $500 million MOC requirement, which approximates the MOC shown in the Projections, for the Cash Flow Test.

[8] This requirement assumed the ability to draw upon the Company's revolving credit facility. This facility was fully drawn prior to the end of the Preference Period and, by September 2005, the Company was in violation of its covenants with respect to this facility. Absent a revolver, this requirement would have been higher. For conservative purposes, FTI did not increase the required minimum operating cash for the U.S. in the Analysis, the results of which would have increased required liquidity.

realized from repatriation activities, I believe that, under a very optimistic scenario, no more

than $100 million[9] in non-North American cash could have been made available to DAS LLC

and/or the Delphi-DAS Debtors to fund their operations through June 30, 2006.

58.    During the Preference Period and without filing for chapter 11, Delphi

was facing a liquidity crisis. The Company's global Projections, inclusive of the aforementioned

$1.3 billion adjustment to account for required pension and OPEB funding, indicated that the

Delphi-DAS Debtors would burn approximately $2.1 billion of cash per Exhibit F from October

1, 2005 through the end of the second quarter of 2006. As shown in Exhibit G, Scenario 1, even

if the entire global cash balance was available to fund this operating shortfall, it would have been

insufficient by approximately $600 million and the Delphi-DAS Debtors would have run out of

liquidity. The use of FTI's previously discussed analysis of likely available cash shows a more

realistic and likely shortfall of more than $1.2 billion.

59.    The Projections show that DAS LLC was expected to experience

negative cash flows of approximately $850 million from October 1, 2005 through the end of the

second quarter of 2006, before any adjustments for the $1.3 billion pension and OPEB funding

obligations, which as co-employers, would be shared between Delphi Corp. and DAS LLC.

Even under the assumptions that (a) the pension and OPEB obligations would be funded first by

Delphi Corp, with any residual funded by DAS LLC, and (b) the entire global cash balance was

available for use in the U.S. as reflected in Exhibit G, Scenario 2, there still would not have been

sufficient liquidity to cover DAS LLC's upcoming obligations, resulting in a cash shortfall of

---

[9] Based upon 6/30/06 foreign projected cash, less foreign MOC requirements, less 50% of cash held by consolidated
entities not fully owned by the Company, less an estimate of cash (a) required to be held in reserve by foreign
officers and directors, (b) that would be lost to taxes and (c) that could not be repatriated easily due to
jurisdictional issues, estimated at 25% of foreign cash held by 100% owned foreign subsidiaries in excess of the
foreign MOC requirements.

$600 million. Under FTI's more realistic cash repatriation scenario, the cash shortfall at DAS

LLC would have increased to over $1.2 billion.

60.    One option that the Company could have attempted to employ in order

to temporarily preserve liquidity was to seek a waiver from the IRS related to its pension funding

obligations[10]. A pension funding waiver request is by no means a certainty and, given the

financial condition of the Company, Delphi likely would have had difficulty in obtaining one;

however, even if a pension funding waiver was granted, the Projections indicate that the U.S.

still would have experienced cash burn from the Filing Dates through the second quarter of 2006

of approximately $850 million, with continuing negative projected cash flows thereafter.

Assuming that all global cash was available for use in the U.S., this scenario (Exhibit G,

Scenario 3a and 3b) would have left the Delphi-DAS Debtors and DAS LLC with cash of

approximately $450 million and $130 million, respectively, before consideration of MOC

requirements. Under FTI's more realistic cash repatriation scenario, the Delphi-DAS Debtors

and DAS LLC would have ended the second quarter of 2006 with cash shortfalls of

approximately $180, and $70, respectively. In addition, DAS LLC was forecasted to experience

negative cash flows in excess of $2.0 billion throughout the remainder of the Projection Period,

resulting in substantial additional future cash needs.

61.    Out of an abundance of caution, FTI also analyzed the unrealistic

scenario in which DAS LLC had no liability for pension and OPEB obligations related to Delphi

Corp. sponsored plans. This scenario assumed that (a) all global cash was available for use in

---

[10] Pension funding waivers are granted for one-year periods for up to three years and only provide temporary relief to a company. As mentioned previously, management determined that, outside of a bankruptcy process, the fundamental issues plaguing the Company, such as its labor structure, could not have been satisfactorily addressed. Given this, a pension waiver would likely at most only have delayed the Company's cash shortfall, rather than eliminating it.

the U.S. and allocated between Delphi Corp. and DAS LLC based on their proportionate

ownership shares of DASHI, (b) Delphi Corp. would fund, to the extent possible, required

pension and OPEB contributions, and (c) DAS LLC would make no contributions to required

pension and OPEB funding contributions. Under these assumptions, as reflected in Exhibit G,

Scenario 4, DAS LLC had cash of approximately $130 million, approximating its MOC

requirement and leaving no reserves to offset future projected operating losses. Under FTI's

more realistic cash repatriation scenario, DAS LLC would experience a minimal cash shortfall.

Importantly, this scenario does not address the PBGC and/or union reaction to the incomplete

funding of pension and OPEB obligations, which could have resulted in severe business

disruptions, or future projected negative cash flows in excess of $2.0 billion.

62.    As described above and more fully shown on Exhibit G, FTI

performed the Cash Flow Test for both the combined Delphi-DAS Debtors and for DAS LLC on

a stand-alone basis. The analysis considered several scenarios, including (a) the base case,

reflecting the co-employment arrangement between Delphi Corp. and DAS LLC, (b) an unlikely

scenario in which required pension funding was waived for 2006, and (c) an even more unlikely

scenario, based on my understanding of the co-employment arrangement between Delphi Corp.

and DAS LLC, in which DAS LLC was assumed to not have any liability for pension and OPEB

plans sponsored by Delphi Corp. In each of these scenarios, FTI further considered the impact of

the ability of the U.S. operations to repatriate cash from abroad by reflecting (a) the highly

conservative assumption that all global cash could be repatriated to the U.S. and (b) a more

realistic cash repatriation amount as determined by FTI.

63.    In the base case, the Delphi-DAS Debtors and DAS LLC would be

unable to pay their obligations under even the unrealistically conservative assumption that all

global cash would be available to fund their operations. In all of the other less realistic

scenarios, under the same assumption of full availability of global cash, cash would have been

insufficient to fund projected short-term future negative cash flows and meet MOC requirements.

Under a more realistic view of foreign cash repatriation, none of the alternative scenarios

indicated the existence of sufficient cash. The Cash Flow Test indicates that both the Delphi-

DAS Debtors and DAS LLC were insolvent.

## ADEQUATE CAPITALIZATION TEST

64.     The Adequate Capitalization Test evaluates whether a company has

sufficient capital to finance its planned future operations. A company with adequate capital has

sufficient resources to finance its continuing operations, under reasonable assumptions regarding

future business conditions.

65.     The Balance Sheet Test revealed that DAS LLC and the Delphi-DAS

Debtors had negative equity value under both the individual asset analysis and the enterprise

value approach. The Cash Flow Test demonstrated that the Company's financial situation was

quickly deteriorating and that, using very conservative assumptions, both the Delphi-DAS

Debtors and DAS LLC had insufficient liquidity to continue operations past the second quarter

of 2006. Furthermore, absent a bankruptcy filing, the Company did not have any feasible

alternatives to improve its outlook. Having already unsuccessfully pursued a number of out-of-

court restructuring options,  negotiating labor concessions and seeking support from GM, the

Company was burdened with an inflexible cost structure that would have required substantial

and unavailable capital to sustain its operations.

66.     I believe that Delphi was not adequately capitalized given its size and

projected operating losses and, as a result, does not pass the Adequate Capitalization Test for

solvency. Delphi's capital was unreasonably small given its size, the business in which it was engaged, and projected operating losses. As a result, it does not pass the Adequate Capitalization Test for solvency. Its liabilities exceeded its assets, it was unable to continue to service debts as they came due, it could not raise material incremental financing and it was unsuccessful in pursuing alternative solutions to resolve these issues.

## MARKET CAPITALIZATION

67.    One factor that, on its face, may suggest that Delphi was not insolvent during the Preference Period is that Delphi's stock traded at a positive value during this time. In certain cases, courts have considered positive stock trading values in evaluating the solvency of a company.

68.    It is common in cases when a public company files for bankruptcy to see its stock maintain values up to and after the Filing Dates, even after it becomes clear that creditors will be compromised. This was certainly the case in such highly publicized filings as Circuit City and General Motors, where it was clear that these companies were in severe financial distress and that creditors would likely be compromised, yet their stock traded at $1.99 and $1.80, respectively, 90 days prior to their bankruptcy filings (see Exhibit H). Though it is impossible to ascertain the exact the cause of this phenomenon, I believe that it is related to some combination of (a) a lack of complete information in the public domain regarding the true financial condition of the company, as soon-to-be worthless shares would otherwise not likely trade at a significant positive value, (b) inaccurate expectations of how the industry or company will perform, and (c) option value.

69.    I believe that the best analysis of solvency should be based upon actual facts, or at least the best information available at the time, rather than market sentiment.

As illustrated in Exhibit I, Delphi's market value significantly declined over the 90 days leading up to and a short time following its bankruptcy filing. On June 30, 2005, Delphi's equity market capitalization was $2.6 billion (based on $4.65 price per share). On September 30, 2005, it was $1.6 billion (based on $2.76 price per share) and by October 10, 2005, just after the first of its two Filing Dates, Delphi's market capitalization had fallen to $185 million (based on $0.33 price per share). FTI was retained and was working closely with the Company during the entire Preference Period and I was personally involved with the engagement for most of this time. I do not believe that the financial position of the Company materially changed during the Preference Period, with the possible exception of certain cash flow items, such as supplier terms contraction, that occurred as a result of concerns in the industry related to a potential bankruptcy filing. The view that stock trading values accurately reflected Delphi's actual value and that the true value of Delphi's equity somehow declined by approximately $2.4 billion or 93% over approximately 100 days defies logic.

70.    Even Delphi's December 2007 POR, based upon a significantly restructured and more valuable company which benefited from a number of factors that were only achievable in bankruptcy, including dramatically reduced labor costs, numerous additional labor concessions, significantly reduced pension and OPEB obligations, the elimination of unprofitable operations, and the injection of significant new capital, only provided out-of-the-money warrants to equity. As noted previously, absent a restructuring that could only be effectuated through a bankruptcy filing, equity had no value, indicating insolvency. Furthermore, Delphi's publicly traded stock effectively related to the Delphi-DAS Debtors. A separate publicly traded stock for DAS LLC as a stand-alone entity did not exist and, therefore, the market capitalization concept is not applicable.

### PRELIMINARY CONCLUSION

71.     The Preliminary Solvency Analysis demonstrates that DAS LLC, both as a stand-alone entity and as part of the Delphi-DAS Debtors, was insolvent. Though only one test must be failed to prove insolvency, each of the generally accepted Balance Sheet, Cash Flow, and Adequate Capitalization Tests indicate on a preliminary basis that, under reasonable and even conservative assumptions, DAS LLC was insolvent as of the Filing Dates and throughout the Preference Period.

72.     Under the Balance Sheet Test, both on an individual asset and enterprise value basis, both before and after FTI adjustments, for DAS LLC both as a stand-alone entity and as part of the Delphi-DAS Debtors, liabilities exceeded assets, indicating insolvency.

73.     Neither DAS LLC nor the Delphi-DAS Debtors had sufficient liquidity to meet their anticipated obligations as they came due, once again indicating insolvency.

74.     DAS LLC, both as a stand-alone entity and as part of the Delphi-DAS Debtors, also failed the Adequate Capitalization Test, as it clearly had negative equity value, did not have sufficient liquidity to meet upcoming obligations and was in all likelihood unable to raise sufficient additional capital to meet its needs.

75.     Finally, based upon my personal experience working with the Company, as well as a review of trial balance information and public filings related to this time period, I am not aware of any facts that would lead me to believe that DAS LLC's solvency, both as a stand-alone entity and as part of the Delphi-DAS Debtors, would have been materially different from that on the Filing Dates at any time during the Preference Period.

## CONCLUSION

76.    I hereby reserve my right to amend the testimony set forth herein as necessary if asked to perform additional procedures or if additional relevant information comes to my attention that changes my understanding of the facts and circumstances relating to DAS LLC's solvency.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this January 28, 2011

FTI CONSULTING, INC.

By:    /s/ Randall S. Eisenberg
       Randall S. Eisenberg
       Senior Managing Director
       FTI Consulting, Inc.

**Exhibit A**
**Randall S. Eisenberg Disclosures**

<u>**Publications**</u>

I have authored or coauthored the following publications in the past ten years:

Randall S. Eisenberg & DeLain E. Gray, <u>Chapter 9: Making Critical Decisions and Monitoring Performance during A Restructuring: A Field-Guide for Boards</u>. Navigating Today's Environment, the Directors' and Officers' Guide to Restructuring, published by Global White Page, Ltd. (2010).

Randall S. Eisenberg & Andrew Hinkelman, <u>Private Equity's New Day, "The First 100 Days"</u>, FTI Journal (2010).

Randall S. Eisenberg, <u>Trying to Make Sense of Consumer Confidence</u>, Turnaround Management III, published by the Institutional Investor (2004).

Randall S. Eisenberg & Jennifer L. Polli, <u>Navigating the Complex World of Accounting Restatements</u>. ABF Journal (2004).

Randall S. Eisenberg & John Yozzo, <u>Where's Your Rubicon</u>? President and CEO Magazine (2003).

Randall S. Eisenberg & John Yozzo, <u>Retailers, Reorganization, and Recidivism</u>, Turnaround Journal and Turnaround Management Guide, published by the Institutional Investor (2003).

Randall S. Eisenberg & John Yozzo, <u>Rethinking WACC on Estimating Reorganization Value</u>, American Bankruptcy Institute Journal (2003).

Various columns as President and Chairman, Journal of Corporate Renewal (2002-2003).

<u>**Compensation**</u>

I am not being compensated for my declarations or testimony in these cases, but FTI Consulting Inc. is being compensated on an hourly basis by DPH Holdings Corp., the Reorganized Debtors.

<u>**Testimony**</u>

In the past four years I have testified as an expert at trial by deposition, or by declaration in these cases and in the chapter 11 cases involving Vertis Holdings, Inc.



EXHIBIT B
DELPHI CORPORATION
SUBSTANTIVE CONSOLIDATION ORGANIZATIONAL STRUCTURE
PER DECEMBER 2007 PLAN OF REORGANIZATION

Note: ownership percentages are reflective of all changes through November 2007.

**EXHIBIT C**
**DAS, LLC**
**BOOK AND ADJUSTED BOOK BALANCE SHEETS**
**AS OF SEPTEMBER 30, 2005**

**DAS LLC**

| ($ in 000's) | Book Value as of 9/30/2005 | Adjustments | Adjusted Value | Notes |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash | $ 790,236 | $ - | $ 790,236 | |
| Accounts Receivables, net | 2,605,931 | 227,090 | 2,833,021 | (A) |
| Inventories, net | 1,045,274 | - | 1,045,274 | |
| Prepaid Expenses & Other Assets | 201,699 | (105,945) | 95,754 | (B) |
| PP&E, Net | 2,827,226 | - | 2,827,226 | |
| Investments in Allied | 1,438,762 | 552,197 | 1,990,959 | (C) |
| Deferred Income Taxes | 33,161 | - | 33,161 | |
| Intangible Assets | 21,704 | - | 21,704 | |
| Other Long-Term Assets | 1,117,803 | (824,032) | 293,771 | (D) |
| **TOTAL ASSETS** | **$ 10,081,796** | **$ (150,691)** | **$ 9,931,105** | |
| **LIABILITIES** | | | | |
| Notes Payable | $ 2,899,626 | $ - | $ 2,899,626 | |
| Accounts Payable | 1,360,119 | (74,650) | 1,285,468 | (E) |
| Accrued Liabilities | 406,133 | - | 406,133 | |
| Other Current Liabilities | 1,819,215 | - | 1,819,215 | |
| Long-Term Debt | 1,484,134 | - | 1,484,134 | |
| Pension | 2,588,293 | (1,861,590) | 726,703 | (F) |
| OPEB | 6,741,039 | (3,621,915) | 3,119,125 | (F) |
| Other Long-Term Liabilities | 776,341 | - | 776,341 | |
| Contingent Liabilities | - | 8,020 | 8,020 | (G) |
| **TOTAL LIABILITIES** | **$ 18,074,900** | **$ (5,550,135)** | **$ 12,524,766** | |
| **IMPLIED EQUITY** | **$ (7,993,104)** | **$ 5,399,444** | **$ (2,593,660)** | |

EXHIBIT C
DAS, LLC
NOTES FOR ADJUSTMENTS TO BOOK BALANCE SHEETS
AS OF SEPTEMBER 30, 2005

*Notes to Adjustments*

A  Adjusted to properly reclassify DAS LLC accounts receivables from Delphi Receivables LLC to DAS LLC and to eliminate the associated intercompany balance that was generated as a result of the initial transfer of the receivables to Delphi Receivables LLC.

B  Adjusted to account for approximately $75 million of vendor prepayments that were reclassified to offset against accounts payable and to eliminate a $31 million accounting derived amortizable non-cash asset that cannot be monetized.

C  Adjusted to reflect the estimated fair market value of DAS LLC's directly owned subsidiaries and its 9% interest in DASHI.

D  Adjusted to reflect the estimated fair market value of DAS LLC's 50% interest in Korea Delphi Automotive Systems and a $1 billion reclassification of an accounting-related pension asset to offset pension liabilities.

E  Adjusted to reflect the reclassification of vendor prepayments discussed in note (B).

F  Adjustment to reflect that that pension and OPEB obligations related to the Delpi Corp. and DAS LLC co-employer arrangement would be first funded by Delphi Corp. and that any remaining amounts would remain liabilities of DAS LLC.

G  Adjusted to reflect additional contingent liabilities relating to litigation that were not accounted for on the trial balance as of September 30, 2005.

## EXHIBIT D
## DELPHI-DAS DEBTORS
## BOOK AND ADJUSTED BOOK BALANCE SHEETS
## AS OF SEPTEMBER 30, 2005

*$ in 000's*

| | DELPHI-DAS DEBTORS | | | | |
|---|---|---|---|---|---|
| | Book Value as of | DAS LLC Adjustments (A) | Delphi-DAS Adjustments | Adjusted Value | Notes |
| **ASSETS** | | | | | |
| Cash | $ 857,023 | $ - | $ - | $ 857,023 | |
| Accounts Receivables, net | 2,932,358 | 227,090 | - | 3,159,448 | |
| Inventories, net | 1,045,274 | - | - | 1,045,274 | |
| Prepaid Expenses & Other Assets | 211,541 | (105,945) | - | 105,595 | |
| PP&E, Net | 2,827,226 | - | - | 2,827,226 | |
| Investments in Allied | 1,438,762 | 552,197 | 5,591,950 | 7,582,909 | (B) |
| Deferred Income Taxes | 33,161 | - | - | 33,161 | |
| Intangible Assets | 21,704 | - | - | 21,704 | |
| Other Long-Term Assets | 4,804,952 | (824,032) | - | 3,980,920 | |
| **TOTAL ASSETS** | $ 14,172,000 | $ (150,691) | $ 5,591,950 | $ 19,613,259 | |
| **LIABILITIES** | | | | | |
| Notes Payable | $ 4,909,532 | $ - | $ - | $ 4,909,532 | |
| Accounts Payable | 1,360,119 | (74,650) | - | 1,285,468 | |
| Accrued Liabilities | 490,153 | - | - | 490,153 | |
| Other Liabilities | 1,819,215 | - | - | 1,819,215 | |
| Long-Term Debt | 4,360,035 | - | - | 4,360,035 | |
| Pension | 2,588,293 | (1,861,590) | 843,845 | 1,570,548 | (C) |
| OPEB | 6,741,039 | (3,621,915) | 3,621,915 | 6,741,039 | (C) |
| Other Liabilities | 776,341 | - | - | 776,341 | |
| Contingent Liabilities | - | 8,020 | - | 8,020 | |
| **TOTAL LIABILITIES** | $ 23,044,727 | $ (6,550,135) | $ 4,465,759 | $ 21,960,352 | |
| **IMPLIED EQUITY** | $ (8,872,727) | $ 5,399,444 | $ 1,126,191 | $ (2,347,093) | |

**Notes to Adjustments**

A   See Exhibit C Notes for discussion of adjustments made to DAS LLC's balance sheet.

B   Adjusted to reflect the fair market value of Delphi Corp's 87% interest in DASHI.

C   Adjusted to eliminate DAS LLC stand-alone adjustment on Exhibit C and to state net Pension and net OPEB liabilities at their full amounts.

## EXHIBIT E
## DELPHI CORPORATION - CONSOLIDATED
## SUMMARY OF VALUATION APPROACHES
## AS OF SEPTEMBER 30, 2005

| Valuation Approach | Indicated Value ($000) | | | Indicated Value (Weighted) ($000) |
|---|---|---|---|---|
| **Income Approach** | | | | |
| Discounted Cash Flow Method | $ 2,863,685 | 33% | $ | 954,562 |
| **Market Approach** | | | | |
| Guideline Publicly Traded Company Method | 3,141,179 | 33% | | 1,047,060 |
| Guideline Merged & Acquired Company Method | 3,240,648 | 33% | | 1,080,216 |
| **Indicative Enterprise Value** | | | | $ 3,081,837 |

**EXHIBIT F**
**DELPHI CORPORATION CONSOLIDATED**
**ESTIMATED AVAILABLE CASH**
**AS OF JUNE 30, 2006**

| | Europe | South America | Asia & Other | Total - Foreign | NORTH AMERICA | Total |
|---|---|---|---|---|---|---|
| Cash-on-Hand: 9/30/2005 | $ 348 | $ 119 | $ 265 | $ 731 | $ 925 | $ 1,656 |
| Projected Cash Flow: 9/30/2005 - 6/30/2006 | (269) | 44 | 119 | (106) | (2,149) | (2,255) |
| **Projected Cash Available at 6/30/2006 before Minimum Operating Cash Requirement** | $ 79 | $ 162 | $ 383 | $ 625 | $ (1,224) | $ (599) |
| Minimum Operating Cash Requirement | (300) | (50) | (50) | (400) | (100) | (500) |
| **Projected Cash Available at 6/30/2006 after Minimum Operating Cash Requirement** | $ (221) | $ 112 | $ 333 | $ 225 | $ (1,324) | $ (1,099) |

**EXHIBIT (G)**
**DELPHI U.S. OPERATIONS**
**ESTIMATED CASH**
**AS OF JUNE 30, 2006**

$ in 000's

| Scenario: | Base Case | | | Alternative Scenarios | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | | 3a | 3b | | 4 | |
| | Delphi-DAS | DAS LLC | Delphi Corp. | Delphi-DAS | DAS LLC | Delphi Corp. | DAS LLC | Delphi Corp. |
| U.S. Cash-on-Hand: 9/30/2005 | $ 925 | $ 925 | $ - | $ 925 | $ 925 | $ - | $ 925 | $ - |
| U.S. Cash Flow: 9/30/2005 - 6/30/2006 | (849) | (849) | | (849) | (849) | | (849) | |
| Foreign Available Cash: 6/30/2006 | 625 | 56 | 569 | 625 | 56 | 569 | 56 | 569 |
| U.S. Pension / OPEB | (1,300) | (731) | (569) | (256) | | (256) | | (1,300) |
| U.S. Cash / (Cash Shortfall) - 6/30/06 | $ (599) | $ (599) | $ - | $ 445 | $ 133 | $ 313 | $ 133 | $ (731) |
| Minimum Operating Cash Requirement - U.S. | (100) | (100) | - | (100) | (100) | - | (100) | - |
| Minimum Operating Cash Requirement - Foreign | (400) | (400) | - | (400) | (36) | (364) | (36) | (364) |
| OPEB Funding Adjustment as a Result of Min. Op. Cash Requirements (3b Only) | | | | | (51) | 51 | | |
| U.S. Cash / (Cash Shortfall) After Min. Op. Cash - 6/30/06 | $ (1,099) | $ (1,099) | $ - | $ (55) | $ (54) | $ (0) | $ (3) | $ (1,095) |
| Adjustments for More Realistic Foreign Cash Availability: | | | | | | | | |
| Estimated minority ownership share of cash located at partially owned entities (1): | (72) | (72) | | (72) | (6) | (66) | (6) | (66) |
| Estimate of Unrepatriable Cash (2): | (56) | (56) | | (56) | (5) | (51) | (5) | (51) |
| More Realistic U.S. Cash (Cash Shortfall) After Min. Op. Cash - 6/30/06 | $ (1,227) | $ (1,227) | $ - | $ (183) | $ (65) | $ (117) | $ (15) | $ (1,212) |

(1) Calculated as 50% of 6/30/05 actual balances at consolidated subsidiaries where the Company holds less than a 100% ownership. 6/30/05 balances used due to the lack of available information regarding later actual or projected balances.

(2) Estimate of cash that would not be able to be repatriated into the U.S. due to cash reserve requirements imposed by foreign directors and officers, taxes and jurisdictional limitations. Calculated at 25% of the cash in excess of Minimum Operating Cash at 100% Company-owned foreign entities.

**Scenario 1:** Foreign cash is available to the U.S. operations. DAS LLC and Delphi Corp are consolidated. The consolidated Delphi-DAS entity receives the full benefit of foreign available cash and bears the full U.S. pension / OPEB obligation.

**Scenario 2:** Foreign cash is available to the U.S. operations. DAS LLC and Delphi Corp. remain separate legal entities and, as such, receive their ratable share of foreign available cash based on their respective ownership stakes in DASHI. As a result of the Co-Employer Arrangement, U.S. Pension / OPEB obligations are assumed to be funded first by Delphi Corp. with the residual funded by DAS LLC.

**Scenario 3a:** Foreign cash is available to the U.S. operations. DAS LLC and Delphi Corp are consolidated. A temporary pension waiver is assumed to be granted by the IRS, relieving Delphi-DAS of pension funding requirements through 6/30/2006.

**Scenario 3b:** Foreign cash is available to the U.S. operations. DAS LLC and Delphi Corp. are separate legal entities and, as such, receive their ratable share of foreign available cash based on their respective ownership stakes in DASHI. A temporary pension waiver is assumed to be granted by the IRS, relieving each Delphi Corp and DAS LLC of pension funding requirements through 6/30/2006. OPEB is assumed to be funded first by Delphi Corp. with any residual funded by DAS LLC. Delphi Corp. does not fund DAS LLC with its excess cash, if any, due to the existence of creditors (e.g. bondholders) at Delphi Corp.

**Scenario 4:** Foreign cash is available to the U.S. operations. DAS LLC and Delphi Corp. are separate legal entities and, as such, receive their ratable share of foreign available cash based on their respective ownership stakes in DASHI. DAS LLC is assumed to have no liability for U.S. pension / OPEB obligations and Delphi Corp funds these obligations to the extent its cash position allows.

# EXHIBIT H
## CIRCUIT CITY AND GENERAL MOTORS
### SHARE PRICES AT VARIOUS TIMES

| Business | Filing Date | Share Price - 90 Days Prior to Filing | Share Price - At Filing | Share Price - 90 Days Post Filing |
|---|---|---|---|---|
| General Motors Corp. | 6/1/2009 | 1.99 | 0.75 | 0.83 |
| Circuit City Corp. | 11/10/2008 | 1.80 | 0.25 | 0.01 |



EXHIBIT 1
DELPHI MARKET CAPITALIZATION
6/30/05 THROUGH 11/24/05