1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Lead Case No. 05-44481 (RDD)

5    - - - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    DPH HOLDINGS CORP., et al.,

9

10            Reorganized Debtors.

11    - - - - - - - - - - - - - - - - - - - - - -x

12

13                U.S. Bankruptcy Court

14                300 Quarropas Street

15                White Plains, New York

16

17                April 23, 2010

18                11:13 AM

19

20

21

22    B E F O R E:

23    HON. ROBERT D. DRAIN

24    U.S. BANKRUPTCY JUDGE

25

```
 1

 2    HEARING re Thirty-Second Claims Hearing Agenda filed by John

 3    William Butler Jr. on behalf of DPH Holdings Corp., et al.

 4

 5    Sufficiency Hearing Regarding Claims Of Robyn R. Budd As

 6    Objected To On Reorganized Debtors' Forty-Third Omnibus

 7    Objection Pursuant To 11 U.S.C. Section 503(b) And Fed. R.

 8    Bankr. P. 3007 To (I) Expunge Certain Administrative Expense

 9    (A) Severance Claims, (B) Books And Records Claims, (C)

10    Duplicate Claims, (D) Equity Interests, (E) Prepetition Claims,

11    (F) Insufficiently Documented Claims, (G) Pension, Benefit, And

12    OPEB Claims, (H) Workers' Compensation Claims, (II) Modify And

13    Allow Certain Administrative Expense Severance Claims, And

14    (III) Allow Certain Administrative Expense Severance Claims

15    (Docket No. 19356)

16

17    Sufficiency Hearing Regarding Claims Of Pamela Geller as

18    Objected To On The Debtors' Twenty-First Omnibus Objection

19    Pursuant To 11 U.S.C. Section 502(b) And Fed. R. Bankr. P. 3007

20    To Certain (A) Duplicate Or Amended Claims, (B) Untimely Equity

21    Claim, (C) Insufficiently Documented Claims, (D) Claims Not

22    Reflected On Debtors' Books And Records, (E) Untimely Claims,

23    And (F) Claims Subject To Modification, Tax Claim Subject To

24    Modification, And Modified Claims Asserting Reclamation (Docket

25    No. 9535)
```

```
 1

 2    Sufficiency Hearing Regarding Claims Of The New York State

 3    Department of Environmental Conservation As Objected To On The

 4    Debtors' (I) Third Omnibus Objection (Substantive) Pursuant To

 5    11 U.S.C. Section 502(b) And Fed. R. Bankr. P. 3007 To Certain

 6    (A) Claims With Insufficient Documentation, (B) Claims

 7    Unsubstantiated By Debtors' Books And Records, And (C) Claims

 8    Subject To Modification And (II) Motion To Estimate Contingent

 9    And Unliquidated Claims Pursuant To 11 U.S.C. Section 502(c)

10    (Docket No. 5452)

11

12    Sufficiency Hearing Regarding Claims Of Pasricha Atul As

13    Objected To On The Debtors' Twenty-First Omnibus Objection

14    Pursuant To 11 U.S.C. Section 502(b) And Fed. R. Bankr. P. 3007

15    To Certain (A) Duplicate Or Amended Claims, (B) Untimely Equity

16    Claim, (C) Insufficiently Documented Claims, (D) Claims Not

17    Reflected On Debtors' Books And Records, (E) Untimely Claims,

18    And (F) Claims Subject To Modification, Tax Claim Subject To

19    Modification, And Modified Claims Asserting Reclamation (Docket

20    No. 9535)

21

22

23

24

25
```

1

2   Sufficiency Hearing Regarding Claims Of Ronald E. Jorgensen as

3   Objected To On The Debtors' (I) Third Omnibus Objection

4   (Substantive) Pursuant To 11 U.S.C. Section 502(b) And Fed. R.

5   Bankr. P. 3007 To Certain (A) Claims With Insufficient

6   Documentation, (B) Claims Unsubstantiated By Debtors' Books And

7   Records, And (C) Claims Subject To Modification And (II) Motion

8   To Estimate Contingent And Unliquidated Claims Pursuant To 11

9   U.S.C. Section 502(c) (Docket No. 5452)

10

11   Sufficiency Hearing Regarding Claims Of Jeffrey A. Miller As

12   Objected To On The Reorganized Debtors' Thirty- Sixth Omnibus

13   Objection Pursuant To 11 U.S.C. Section 502(b) And Fed. R.

14   Bankr. P. 3007 To (I) Modify And Allow Claim And (II) Expunge

15   Certain (A) Duplicate SERP Claims, (B) Books And Records

16   Claims, (C) Untimely Claims, And (D) Pension, Benefit, And OPEB

17   Claims (Docket No. 18983)

18

19   Sufficiency Hearing Regarding Claims Of Stanley D. Smith As

20   Objected To On Debtors' Thirty-Seventh Omnibus Objection

21   Pursuant To 11 U.S.C. Section 502(B) And Fed. R. Bankr. P. 3007

22   To Expunge Certain (I) Prepetition Claims, (II) Equity

23   Interests, (III) Books And Records Claims, (IV) Untimely

24   Claims, (V) Paid Severance Claims,(VI) Pension, Benefit, And

25   OPEB Claims, And (VII) Duplicate Claims (Docket No. 18984)

1

2      Sufficiency Hearing Regarding Claims Of James A. Luecke As

3      Objected To On Debtors' Thirty-Seventh Omnibus Objection

4      Pursuant To 11 U.S.C. Section 502(B) And Fed. R. Bankr. P. 3007

5      To Expunge Certain (I) Prepetition Claims, (II) Equity

6      Interests, (III) Books And Records Claims, (IV) Untimely

7      Claims, (V) Paid Severance Claims,(VI) Pension, Benefit, And

8      OPEB Claims, And (VII) Duplicate Claims (Docket No. 18984) and

9      Reorganized Debtors' Forty-Fifth Omnibus Objection Pursuant To

10     11 U.S.C. Section 503(b) And Fed. R. Bankr. P. 3007 To (I)

11     Expunge Certain Administrative Expense (A) Severance Claims,

12     (B) Books And Records Claims, (C) Duplicate Claims, (D) Pension

13     And Benefit Claims, And (E) Transferred Workers' Compensation

14     Claims, (II) Modify And Allow Certain Administrative Expense

15     Severance Claims, And (III) Allow Certain Administrative

16     Expense Severance Claims (Docket No. 19423)

17

18     Sufficiency Hearing Regarding Claims Of Frank X. Budelewski As

19     Objected To On Debtors' Thirty-Seventh Omnibus Objection

20     Pursuant To 11 U.S.C. Section 502(B) And Fed. R. Bankr. P. 3007

21     To Expunge Certain (I) Prepetition Claims, (II) Equity

22     Interests, (III) Books And Records Claims, (IV) Untimely

23     Claims, (V) Paid Severance Claims,(VI) Pension, Benefit, And

24     OPEB Claims, And (VII) Duplicate Claims (Docket No. 18984)

25

1

2   Sufficiency Hearing Regarding Claims Of Walter A. Kunka As

3   Objected To On Debtors' Thirty-Seventh Omnibus Objection

4   Pursuant To 11 U.S.C. Section 502(B) And Fed. R. Bankr. P. 3007

5   To Expunge Certain (I) Prepetition Claims, (II) Equity

6   Interests, (III) Books And Records Claims, (IV) Untimely

7   Claims, (V) Paid Severance Claims,(VI) Pension, Benefit, And

8   OPEB Claims, And (VII) Duplicate Claims (Docket No. 18984)

9

10  Sufficiency Hearing Regarding Claims Of Gary L. Cook As

11  Objected To On Reorganized Debtors' Thirty-Ninth Omnibus

12  Objection Pursuant To 11 U.S.C. Section 503(b) And Fed. R.

13  Bankr. P. 3007 To Expunge Certain Administrative Expense (I)

14  Workers' Compensation Claims, (II) Workers' Compensation Claims

15  Transferred To GM Buyers, And (III) Severance Claims (Docket

16  No. 19045) and Reorganized Debtors' Forty-Sixth Omnibus

17  Objection Pursuant to 11 U.S.C. Section 503(b) and Fed. R.

18  Bankr. P. 3007 to (I) Disallow and Expunge Certain

19  Administrative Expense (A) Books and Records Claims, (B)

20  Methode Electronics Claims, (C) State Workers' Compensation

21  Claims, (D) Duplicate State Workers' Compensation Claims, (E)

22  Workers' Compensation Claims, (F) Transferred Workers'

23  Compensation Claims, (G) Tax Claims, (H) Duplicate Insurance

24  Claims, and (I) Severance Claims, (II) Disallow and Expunge (A)

25  a Certain Duplicate Workers' Compensation Claim, (B) a Certain

1   Duplicate Tax Claim, and (C) a Certain Duplicate Severance

2   Claim, (III) Modify Certain Administrative Expense (A) State

3   Workers' Compensation Claims and (B) Workers' Compensation

4   Claims, and (IV) Allow Certain Administrative Expense Severance

5   Claims (Docket No. 19711)

6

7   Sufficiency Hearing Regarding Claims Of Sharyl Y. Carter As

8   Objected To On Reorganized Debtors' Forty-Fifth Omnibus

9   Objection Pursuant To 11 U.S.C. Section 503(b) And Fed. R.

10  Bankr. P. 3007 To (I) Expunge Certain Administrative Expense

11  (A) Severance Claims, (B) Books And Records Claims, (C)

12  Duplicate Claims, (D) Pension And Benefit Claims, And (E)

13  Transferred Workers' Compensation Claims, (II) Modify And Allow

14  Certain Administrative Expense Severance Claims, And (III)

15  Allow Certain Administrative Expense Claims (Docket No. 19423)

16

17

18

19

20

21

22

23

24  Transcribed by:  Clara Rubin

25

```
 1
 2    A P P E A R A N C E S:
 3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
 4         Attorneys for the Debtors
 5         155 North Wacker Drive
 6         Chicago, IL 60606
 7
 8    BY:   JOHN K. LYONS, ESQ.
 9
10    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
11         Attorneys for the Debtors
12         1440 New York Avenue, N.W.
13         Washington, DC 20005
14
15    BY:   KENNETH BERLIN, ESQ.
16         ELIZABETH A. MALONE, ESQ.
17
18    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
19         Attorneys for the Debtors
20         155 N. Wacker Drive
21         Chicago, IL 60606
22
23    BY:   LOUIS S. CHIAPPETTA, ESQ.
24         MICHAEL W. PERL, ESQ. (TELEPHONICALLY)
25
```

```
 1    WEIL, GOTSHAL & MANGES LLP

 2         Attorneys for GM Components Holdings, LLC

 3         1300 Eye Street, N.W.

 4         Suite 900

 5         Washington, DC 20005

 6

 7    BY:   DAVID B. HIRD, ESQ.

 8         DAVID R. BERZ, ESQ.

 9

10    NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL

11         Attorney for the State of New York and the New York State

12          Department of Environmental Conservation

13         120 Broadway, 26th Floor

14         New York, NY 10271

15

16    BY:   EUGENE J. LEFF, AAG AND DEPUTY BUREAU CHIEF

17

18    DUANE MORRIS LLP

19         Attorneys for Creditor, ACE American Insurance Company

20          and Pacific Employers Insurance Company

21         30 South 17th Street

22         Philadelphia, PA 19103

23

24    BY:   MARGERY N. REED, ESQ. (TELEPHONICALLY)

25         WENDY M. SIMKULAK, ESQ. (TELEPHONICALLY)
```

1

2      JASPAN SCHLESINGER LLP

3            Attorneys for Creditor, JPMorgan Chase Bank

4            300 Garden City Plaza

5            5th Floor

6            Garden City, NY 11530

7

8      BY:    ANTONIA M. DONOHUE, ESQ. (TELEPHONICALLY)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Okay, In re DPH Holdings.

 3              MR. LYONS:  Good morning Your Honor.  John Lyons on

 4      behalf of the reorganized debtors.

 5              THE COURT:  Now you see what happens on nonomnibus

 6      days.

 7              MR. LYONS:  Your Honor, it's -- it was very

 8      illuminating to see Your Honor at work.

 9              Your Honor, I have here with me in court Mr. Denon Rue

10      (ph.), who, as you know, is the claims administrator, who's

11      back from Europe, good to know; Mark Castor (ph.), who's the

12      environmental consultant for DPH; and then I have my partner

13      Kenneth Berlin who's going to handle the New York environmental

14      matter; and also Louis Chiappetta, who you saw yesterday; and

15      Elizabeth Malone, another one of my colleagues.

16              THE COURT:  Okay.

17              MR. LYONS:  Your Honor, why don't I turn to the

18      agenda.  This is the thirty-second claims hearing.  And we're

19      now at the point, Your Honor, we've actually filed our last

20      omnibus objection to claims, so I guess that is a hallmark -- a

21      landmark in the case, and now we have to get through about

22      another 700 claims or so before we're done with the last claim.

23              THE COURT:  Okay.

24              MR. LYONS:  But that's from a total of over 18,000.

25              THE COURT:  And, I'm sorry, and the 700 are the ones
```

1       that are contested, or are they --

2               MR. LYONS:  That are adjourned in the procedures.  Two

3       hundred are --

4               THE COURT:  Right.

5               MR. LYONS:  -- approximately 200 are pre-petition and

6       500 are administrative.  So we're --

7               THE COURT:  Okay.

8               MR. LYONS:  -- we're moving through those claims.

9               THE COURT:  You're working through them.

10              MR. LYONS:  Your Honor, I'll turn to the agenda.  We

11      could skip over the first twenty-one matters which are just

12      continued or settled, and we have been, as you know, submitting

13      stipulations to Your Honor for entry.

14              So if we turn to item number 22, that is now

15      uncontested; that's the claim of Robin Budd.  Ms. Budd

16      confirmed to us that her claim for severance was paid in due

17      course, and we have an e-mail to that effect.  So we'll submit

18      an order expunging that claim.

19              THE COURT:  Okay.

20              MR. LYONS:  Item number 23 on the agenda is the claim

21      of Ms. Pamela Geller.  Your Honor, that one is also resolved.

22      Ms. Geller just wanted a proviso in the order that it's subject

23      to her rights under the insurance defense costs order.

24              THE COURT:  All right.

25              MR. LYONS:  And we're fine with that.

1          THE COURT:  I know you'd already agreed to that, so

2     that's fine.

3          MR. LYONS:  And now to the contested matters, Your

4     Honor.  The first matter, which is probably -- will require the

5     most argument, is item number 24, and that's the claim of the

6     New York State Department of Environmental Conservation.  So

7     I'll turn the podium over to Mr. Berlin.

8          MR. BERLIN:  Thank you, and good morning, Your Honor.

9     As this Court knows from taking a look at the briefs, in this

10    motion debtor seeks to disallow the claim of the New York State

11    Department of Environmental Conservation, the New York DEC, on

12    the ground that its claims relating to environmental cleanup

13    are contingent claims because GM, in the plan modification

14    order, agreed to take full responsibility for cleanup at the

15    two New York sites that are involved in this case.  GM is

16    contesting.  It's GM's view that they took only partial

17    liability of the cleanup at those sites going forward.

18          And I thought it might be helpful to start out by

19    trying to put this -- the provision in the plan modification

20    order in the context of how it was developed and therefore to

21    get a better understanding of what we were trying to do in that

22    order.

23          In the MD&A (sic), General Motors and Delphi agreed

24    that General Motors would not be assuming any of the

25    environmental liabilities of Delphi as a result of the

1    transaction, which took place in many states, but GM never took

2    the position that it was not taking some environmental

3    liabilities.  Even though it was not assuming the liabilities

4    of the debtor, under Superfund and other statutes, as the new

5    owner of property there are certain liabilities that are picked

6    up as the new owner of the property.  And GM never contested

7    that.  And in one of the e-mails that GM attached to their

8    reply motion, they specifically state in the e-mail that they

9    understand that they have that liability going forward.  In

10   that same e-mail, they also said that they were not -- they

11   wanted us to confirm they were not being treated as a successor

12   to Delphi.  We never really understood why they were making

13   that argument, because we didn't see any grounds to ever

14   consider them a successor.  And we sent an e-mail back

15   confirming that in fact they were not the successor.

16          But these e-mails and this understanding was pre- the

17   filing, essentially -- well, it was pre-resolution of the -- of

18   an objection by the New York DEC objecting to the plan of

19   reorganization on the ground that GM should be fully

20   responsible for the cleanup liabilities going forward.  And the

21   e-mails you have were done in the context of our discussing

22   with GM an evidentiary hearing that we have to have during the

23   plan confirmation to try and resolve the New York -- or to

24   object to the New York DEC claim.

25          We never got to that because we then negotiated -- we

1   and General Motors negotiated with the New York DEC a

2   resolution of the New York DEC claim as well as a similar

3   negotiation took place with the state of Maryland -- state of

4   Michigan, I'm sorry, to resolve similar claims on the state of

5   Michigan.

6          And the result of that negotiation was a provision

7   added to the plan modification order that basically said that

8   GM was taking full responsibility for cleanup at that site.  It

9   states "GM acknowledges that it shall be responsible for

10  conducting investigation and remediation of the Rochester

11  facility and the Lockport facility in accordance with

12  environmental law."

13         Now, again, GM had agreed going into this before we

14  even got into the litigation -- GM had taken the view that they

15  had liability as a buyer, as a new owner of the facility.  The

16  whole purpose of the negotiation was to expand that liability.

17  But GM's essential argument now is that their only liability is

18  a liability they have as the owner of the facility, despite the

19  language I just read.  They're saying the liability they got is

20  a liability as a buyer taking over a facility going forward.

21         And as I said, that -- if you take that position, this

22  provision in the plan modification order has no effect.  All

23  it's doing is confirming the original position of GM and

24  Delphi, and that was not what any of the parties intended here.

25  And it's also shown, I think, pretty clearly, Your Honor, by

1    the language in paragraph 63 of the plan confirmation order,

2    because that par -- the first paragraph of that says that

3    anybody who purchased these facilities remains liable under

4    environmental laws for whatever liability it has as a result of

5    buying the facility.  That's a provision that Your Honor may

6    have seen that the Department of Justice in all the cases I've

7    worked on insists goes in every agreement -- every sale

8    agreement, to make clear that, even though a buyer is not

9    assuming liabilities, the order doesn't mean that the buyer is

10   released from --

11            THE COURT:  Relieved of liabilities as a buyer.

12            MR. BERLIN:  Right.  Right.  So that's why that's in.

13   But then we added in a second paragraph in paragraph 63 that

14   dealt specifically with the New York sites, and the other

15   paragraph dealt with the Michigan sites, in which we said that

16   in those sites GM is taking over the liability for those sites

17   going forward.

18            So if you accept GM's position that all they're doing

19   is taking on the liability of a buyer, that next paragraph has

20   no meaning at all; it's a surplus paragraph that has no effect

21   going forward.  And that's not how you would normally read two

22   paragraphs together, and it's not what the parties intended in

23   this agreement.

24            That -- GM then goes on and argues that, well, if you

25   interpret it this way that we are picking up full liability,

1     that's inconsistent with the MD&A agreement in which we didn't

2     assume any liabilities.  But the whole point of this, Your

3     Honor, was that we were coming in and we were now negotiating

4     something different from the MD&A agreement.  We were -- that

5     basically superseded the MD&A agreement and said, with regard

6     to the New York and Michigan sites, not the other sites

7     involving the transaction, just these sites, with regard to

8     those sites, GM was taking on the liability going forward.

9           And the plan modification order recognizes clearly

10    that there may be conflicts between the MD&A and the plan

11    modification order.  It's got a provision in paragraph 3 that

12    explains how those conflicts are going to be resolved.  And in

13    the case of paragraph 63, it says, notwithstanding any of the

14    provisions of the MD&A and this order, paragraph 63 of the

15    order shall govern the provisions of the master disposition

16    agreement.  So we were clearly displacing that, and the

17    language on nonassumability in the MD&A agreement just has no

18    remaining impact on that.

19          GM then says -- if you take a look and parse through

20    the language of paragraph 63, paragraph 63 says -- starts off

21    by saying the buyer of the facility acknowledged its liability

22    under environmental laws.  Well, we agree; that's what they're

23    doing.  We weren't saying that the only liability they had was

24    as a buyer of the facility, though.  And that -- again, that

25    was the whole purpose of the paragraph.

```
 1              They also say that the language in the paragraph

 2     includes reference to something called site codes -- called

 3     site codes under New York law.  We have Eugene Leff from the

 4     New York Attorney General's Office here today and he may talk

 5     about that a little more.  What the site codes do is they

 6     identify the source of the contamination.  They don't in any

 7     way explain the extent of the cleanup that's required.  This

 8     whole debate here is about what cleanup is required.  So,

 9     basically what this says is these are the sources.  It doesn't

10     say what clean up is required.  And the normal course of any

11     kind of cleanup when you identify a source (sic) code is to

12     clean up the contamination.  It's not just in the area of the

13     source code; whatever cleanup is required going forward.  And

14     Mr. Leff will talk about that a little bit more in a minute.

15              We also -- Your Honor, it's, I think, relevant here;

16     the -- GM is basically saying that under this agreement it's

17     only responsible for about fifteen percent of the contamination

18     at these two facilities.  Yet in the documents, in the

19     agreements, Delphi agreed to transfer all of the documents

20     relating to these sites to General Motors.  They did not keep

21     any documents going forward.  And, obviously, if there had been

22     any liability left in the hands of Delphi for this

23     contamination that's not being covered by GM, then Delphi would

24     have kept the documents and would have needed the documents to

25     deal with those issues going forward.
```

1          Finally, Your Honor, only one last issue on this is

2     that there's a lot of discussion in the brief about GM's

3     liability under the New York Brownfield statute for cleanup.

4     We talk a little about other statutes under which GM may be

5     liable.  But the fundamental fact here is that if GM took over

6     all the liability at these facilities, those issues all go

7     away, because there's no dispute that if GM is the owner --

8     is -- I'm sorry, is responsible for all liability of these

9     facilities, then under the Brownfield statute it would be a

10    participant, because the Brownfield statute covers anybody

11    who's got legal liability at the facility; that comes -- that

12    goes beyond just being the owner of the facility.  There's no

13    doubt they'd be liable under other statutes out there also.

14          So by resolving the question of whether GM took over

15    full liability at these facilities, all those issues go away.

16    GM and New York DEC can go out, they can have their dispute

17    over how much cleanup needs to be done at these properties

18    going forward, but that would not be an issue for this Court.

19    It's not an issue for Delphi.  So if you can resolve this, we

20    can -- we -- if it's resolved in the way we're saying, GM would

21    have full responsibility, there'd be no liability left to

22    Delphi, and the New York DEC claim would be a contingent claim.

23          Thank you, Your Honor.

24          THE COURT:  Well, let me ask you.  You referenced a

25    couple e-mails that were attached to GM's last pleading.  I

1    take it, though, that you are basing the debtors' argument on

2    the plain language in the context of the order and not looking

3    to rely on anything about the negotiations that led to this

4    language.

5            MR. BERLIN:  No, that's correct, it's the context and

6    the plain language.  I just referenced those just to make it

7    clear that they were written at the time that GM and Delphi

8    were arguing that they -- that GM had not assumed these

9    liabilities, and then subsequently we negotiated the agreement

10   and that changed the -- how the -- how this would all be

11   enforced.

12           THE COURT:  Okay.  And then I'm not sure if this is a

13   question for you or maybe for each of the New York -- for each

14   of the parties here, i.e., NYDEC and GM, as well as Delphi.  In

15   the DEC's response to the objection, it particularizes in a

16   little more detail the elements of its two proofs of claim;

17   this is at paragraphs 11 through 14 of its response.  And this

18   isn't the last response; this was the one that was filed on

19   November -- at the end of November, November 21st.  And it --

20   on the Rochester site it lists:  roughly 2 million dollars for

21   removal of approximately 20,000 tons of contaminated soil;

22   850,000 dollars for installation of a 5 multiphase extraction

23   system -- or 5 multiphase extraction systems; 100,000 dollars

24   for an additional nonaqueous phase liquidation system; 100,000

25   dollars for existing fractured bedrock groundwater collection

1    system; payments for engineering services on the foregoing; and

2    annual operation, maintenance and monitoring costs of

3    approximately 496,000 dollars over 30 years, and another

4    estimated future administrative cost of 140,900 dollars.

5         My question is, on Rochester, are all of these things

6    expenses that GM says it's not liable for, or only just some of

7    them?

8         MR. BERLIN:  I think at Roch -- as I understand it,

9    Your Honor, and GM can confirm this, at Rochester the

10   cleanup -- the evaluation of cleanup is almost complete, and

11   the cleanup is all taking place on the Rochester facility.

12        THE COURT:  Right.

13        MR. BERLIN:  Therefore, I think GM is saying on

14   Rochester it has liability for the cleanup.

15        THE COURT:  It seemed to me from GM's response that

16   what they're arguing about is offsite responsibility.

17        MR. BERLIN:  Yes, they're only -- they're arguing

18   about offsite -- potentially, theoretically, if there were

19   other sources discovered onsite, I guess, but certainly offsite

20   is the primary argument.

21        THE COURT:  So as far as the actual claim filed on

22   Rochester, it wasn't clear to me that there was any real

23   dispute here.

24        MR. BERLIN:  I don't think there's any dispute on

25   Rochester; I think it's Lockport.

1          THE COURT:  Okay.  And on Lockport, it's down to, I

2     think, 255,000 for unliquidated future remedial costs?  Is that

3     it?

4          MR. BERLIN:  No, I -- because I think at Lockport --

5     what's happening at Lockport is there is evidence of offsite

6     contamination adjacent to the property.

7          THE COURT:  Right.

8          MR. BERLIN:  There might still -- it's not been fully

9     delineated yet, so it's not entirely clear whether it's -- it

10    would be GM's liability or another party's liability, assuming

11    they have full liability for the site.  So that's something

12    they would negotiate with New York DEC --

13         THE COURT:  But does --

14         MR. BERLIN:  -- whether they are responsible for it.

15    But --

16         THE COURT:  But does the -- I mean, the proof of claim

17    was for 405,000 dollars.  All right, there was a specific

18    dollar amount.  Did they res -- what -- I'm just wondering

19    whether we're fighting about something that's not really in the

20    proof of claim at this point.

21         MR. LEFF:  May I did address that, Your Honor?

22         THE COURT:  I thought it might be a question for you

23    as opposed to the debtors, but --

24         MR. LEFF:  I'm Eugene Leff for the State of New York

25    DEC.

```
 1              THE COURT:  Right.

 2              MR. LEFF:  The proofs of claims had two elements:

 3   past costs which were -- was a dischargeable claim; and an

 4   administrative claim at each site for undetermined future

 5   costs.

 6              THE COURT:  Okay.

 7              MR. LEFF:  There is no direct specific answer to your

 8   initial questions.

 9              THE COURT:  Because you're still looking.

10              MR. LEFF:  Exactly.  And the -- one of the issues at

11   stake today is whether it's GM Components that it will conduct

12   the investigation to get the answer to your questions.

13              THE COURT:  Okay.  Does that apply also to Rochester?

14   Is there an issue --

15              MR. LEFF:  Yes, it does.

16              THE COURT:  -- about offsite for Rochester also?

17              MR. LEFF:  Yes, there is.  We submitted two

18   affidavits:  one by an engineer for the Rochester site; the

19   other from the Lockport site.  And both gentlemen stated in the

20   affidavits that there were continuing investigations of

21   migration off the property, and in fact there was reason to

22   believe that the contamination offsite was characteristic of

23   the contamination onsite, that there was a match.

24              THE COURT:  Okay.  So is it fair to say that, with

25   regard to the liquidated amounts on the proof of claim, there's
```

1    really no dispute; GM accepts those as an owner, not as a --

2              MR. LEFF:  With respect --

3              THE COURT:  -- not as a -- not under the order, the

4    Court's order, but as an owner, as a buyer, they accept those?

5    But it's as to the unliquidated offsite amounts that we're

6    having a dispute, right?

7              MR. LEFF:  If I understand the terminology, the

8    specific past cost claims will be resolved with the debtor in

9    this proceeding.  General Motors Components agreed to a portion

10   of the administrative claim that we cannot be precisely

11   quantified.  The onsite cleanup they concede today, but we say

12   the order --

13             THE COURT:  Right.  No --

14             MR. LEFF:  -- entails the offsite as well.

15             THE COURT:  Right.  No, I understand that.  I'm just

16   trying to --

17             MR. BERLIN:  And, Your Honor, we of course don't

18   necessarily agree these were administrative claims.  These are

19   claims resulting from pre-bankruptcy releases, so we would not

20   call them administrative claims.  But whatever category they

21   fit in, it's our view that GM should be responsible for it.

22             THE COURT:  Right.  Okay.  Okay.

23             MR. BERLIN:  Okay, thank you, Your Honor.

24             THE COURT:  Sure.

25             MR. LEFF:  May I add a few remarks, Your Honor?

1                    THE COURT:  Yeah.

2                    MR. LEFF:  The initial issue today is whether the

3       debtors' motion to disallow the claims should be granted on the

4       ground that GM Components has fully accepted and will in fact

5       clean up the two properties.  It's entirely clear now, based on

6       the pleadings submitted by GM Components, that there is no

7       assurance that they will comply with the Court's modification

8       order.

9                    The second issue -- and therefore that motion to

10      disallow should be denied.

11                   The second issue is what does the Court's modification

12      order mean.  We can -- we submit that the order is a binding

13      commitment which makes General Motors Components responsible

14      for both investigation and remediation of both sites.  The

15      extent of that -- those obligations must be determined in

16      accordance with state law, and we do not -- and I don't

17      understand any of the parties to be asking Your Honor to

18      determine today what the extent under state law is.  However,

19      the order clearly -- and here is the language, the plain

20      language, of the provision -- makes General Motors Components

21      responsible for the hazardous substances related to these

22      sites.

23                   General Motors Components, however, argues that it has

24      made no commitment here in one portion of its papers.  All this

25      is -- this provision is, is a representation that it owns the

1      site.  We know that that's not the case, because an owner is

2      only potentially liable under federal and state law.  An owner

3      could, for example, have a defense that it's Delphi's fault

4      that it as a third party, in the terminology of the CERCLA

5      statute, for example, is solely responsible for the

6      contamination.

7             What we achieved in negotiating this provision is

8      that -- is the abandonment by GM Components of any defense,

9      whether it's the third-party defense, the apportionment

10     argument that only a small percentage of liability should apply

11     to the owner.  All of these are gone because they committed --

12     and this is language they accepted in paragraph 39 of their

13     April 13th statement -- they committed to be responsible.

14            They rely on e-mails which they claim show that

15     offsite migration was given up.  For one thing, the e-mail they

16     presented to the Court was never sent to the state.  You can

17     tell from the copyees and the addressees that I'm not listed,

18     and no other attorney or a party for the state is listed.

19            They say that we asked for an assumption of Delphi's

20     liability and we compromised or abandoned that demand.  The

21     fact is our prayer in the objection that we filed was very

22     clear in asking that the order obligate General Motors

23     Components to do the remediation and investigation.  We didn't

24     look for any particular form of legal transaction, like an

25     assumption or assignment of obligations or liabilities, from

1    Delphi to GM Components.  We were only concerned with the legal

2    result; that is, that under your order GM Components should be

3    responsible for the investigation and remediation.  They agreed

4    to do precisely that.  And when we used the word "assume", we

5    meant it in the sense of accept, and they did accept that

6    liability.

7           With respect to site codes that Mr. Berlin referred

8    to, it is a bureaucratic practice to identify contaminated

9    areas by site code.  There's absolutely no legal significance

10   in determining the obligation to clean up and the extent

11   geographically of that cleanup or investigation in the site

12   code itself.  Every property that is processed by DEC is

13   assigned this simply for identification.  And, in fact, the

14   modification order says that the properties in question here

15   are identified by their name and site code.  That's all that

16   means.

17          The extent of the cleanup and investigation is

18   determined by state law.  Under the regulations, every owner of

19   contaminated property, in any of our programs, has some

20   obligation for offsite contamination.  The obligation varies

21   depending on the circumstances, whether that part -- that owner

22   is in the Brownfields (sic) program, whether that owner was the

23   owner at the time of contamination, and so on.  Those are

24   issues that can be resolved either through the Brownfields

25   application process or in a state proceeding that may follow

1    the DEC's determination of the application.

2              In conclusion, we believe it's plain that --

3              THE COURT:  Well, if that's the case, why did you need

4    this?

5              MR. LEFF:  We needed -- we -- it is possible for the

6    current owner to take the position that it is only responsible

7    for onsite contamination plus a qualitative exposure assessment

8    form of investigation for offsite.  We wanted full

9    responsibility, and that's what we sought in the negotiation

10   and believed that we obtained.

11             THE COURT:  Okay.  On the issue of the site codes --

12             MR. LEFF:  Yes, sir.

13             THE COURT:  -- do -- are you telling me that in the

14   DEC's records you don't identify sites by their general name or

15   address but by these site codes?

16             MR. LEFF:  All three are used.

17             THE COURT:  Okay.  So what is the relevance of the

18   site codes, then?

19             MR. LEFF:  Very little.  We were very surprised to the

20   see the argument raised by General Motors Components.  What

21   they were suggesting is that the site code creates a regime for

22   cleaning up sites that is like a donut where you remove the

23   contamination in the middle, and anything outside the parcel

24   that's identified by the site code is left in place, any

25   contamination.

```
 1                    THE COURT:  Right.  Well, what does the site code --

 2        what does it signify?

 3                    MR. LEFF:  It's simply a method to -- like a civil

 4        action number for a case, to quickly retrieve information about

 5        the thing referred to.

 6                    THE COURT:  Why is it opened?

 7                    MR. LEFF:  It's opened to facilitate retrieval of

 8        information.

 9                    THE COURT:  But it doesn't start -- I mean, I'm just

10        picking up on what you just said.  It doesn't start a

11        proceeding?  It doesn't start a chain of events happening with

12        respect to that particular space?

13                    MR. LEFF:  It is something that happens at the time

14        that a proceeding, not necessarily an enforcement proceeding

15        but a process, begins.  But the code itself, like the civil

16        action number, doesn't constitute the beginning of a

17        litigation; it's something that occurs for convenience's sake

18        when the process began -- begins.

19                    THE COURT:  Okay, so what you're telling me is that a

20        site code doesn't prescribe the limits of DEC action or rights?

21                    MR. LEFF:  Absolutely.

22                    THE COURT:  The acknowledgment here in the last clause

23        in paragraphs 63(2) says -- acknowledges that it shall be

24        responsible for conducting investigation and remediation at the

25        two facilities.  I don't -- those two words, "investigation"
```

1    and "remediation", don't seem to me to be terms of art.  I

2    mean, I know what they generally mean, but am I missing

3    something there?  Does remediation automatically mean offsite

4    or onsite, or does -- I mean, what does --

5             MR. LEFF:  Remediation --

6             THE COURT:  Is there any term of art that I should

7    read into that word?

8             MR. LEFF:  Remediation means to eliminate the threat

9    to the public health and the environment posed by all

10   contamination at the -- related to the property in question.

11            THE COURT:  So you're saying it has a broad

12   interpretation; it's not a limited --

13            MR. LEFF:  It certainly does --

14            THE COURT:  -- term of art?

15            MR. LEFF:  -- because the regulations define what

16   remediation is required for a site, and that always entails

17   eliminating the threat, wherever it may be, that is

18   attributable to that site.

19        (Pause)

20            THE COURT:  Okay.  I'm going to ask you the same

21   question I asked the counsel for DPH, which is, you're relying

22   here on the plain language and the context, right?  You're not

23   offering up to me actual negotiations that occurred over this

24   language?

25            MR. LEFF:  I'm prepared to do so, to offer up a part

1    of the negotiations, but it's really unnecessary.

2              THE COURT:  Okay.  All right.

3              MR. LEFF:  Thank you, Your Honor.

4              THE COURT:  Okay.

5         (Pause)

6              THE COURT:  Oh, I'm sorry, and you could stay there.

7    I did have a --

8              UNIDENTIFIED SPEAKER:  Well, I've already --

9              THE COURT:  You're still -- I mean, you made the

10   point, which is a good one, that you're not really asking me to

11   specify what clearly falls within GM's responsibility as an

12   owner and what would be extraneous that might be picked up by

13   this language in the order, and I take it that's because you

14   want GM, which is an ongoing viable company, to take the

15   laboring oar in dealing with this site; you don't particularly

16   want DPH to do it, which is, you know, a shell at this point.

17             So how would -- I think I know the answer to this, but

18   as far as the claim objection is concerned, is it fair to say

19   that you're seeking the denial of the claim objection but at

20   the same time you are not at this point seeking to collect any

21   money from DPH?

22             MR. LEFF:  That's correct, but it's a very important

23   point to us that DPH remain liable.  They are jointly liable

24   with GM Components --

25             THE COURT:  Right.

```
1              MR. LEFF:  -- and if for any reason -- I don't know

2     what's going to happen to the automobile market.

3              THE COURT:  Right.

4              MR. LEFF:  It would --

5              THE COURT:  Or if some court somewhere says that GM

6     doesn't have to perform, then you want to be able to --

7              MR. LEFF:  Precisely.

8              THE COURT:  -- assert the claim against the debtor?

9     Okay.

10             MR. HIRD:  Good morning, Your Honor.  My name is David

11    Hird, from the law firm of Weil, Gotshal & Manges, and we're

12    representing General Motors Components, or GM Components.

13             GM did -- or Components did not assume any liability

14    or any responsibility.  What G -- what Components did is affirm

15    that as the new buyer it had certain obligations under law.

16    And this is clearly stated in the language, which refers to GM

17    Components, as buyer, acknowledging certain specific

18    representations.

19             The state had asserted that G -- it wanted GM to -- or

20    Components to assume the obligations of the debtors and we did

21    not.  And the e-mail traffic that we've shown has made it clear

22    that it was not our intention.

23             But the most important thing in order to understand

24    how this happened is to look at it in the concept of the

25    General Motors Corporation's own bankruptcy proceeding that was
```

1    going on at about the same time where the new GM was attempting

2    to purchase old -- assets from the old GM through the

3    bankruptcy proceeding, through a 363 sale.  And New York State

4    came in and made the same argument that it had raised in its

5    objection before this Court:  You can't do that without

6    stepping in the shoes and becoming -- and taking on all of the

7    responsibility of the old company.

8            We had argued that issue before Judge Gerber and had

9    prevailed, and the state knew it.  There are several pages in

10   Judge Gerber's opinion that talks about why the state's

11   argument does not succeed but recognizes that a purchaser of

12   property may have other obligations imposed by law.

13           When we received the proposal, which was drafted by

14   Mr. Leff I believe, we saw "acknowledge as a buyer", and we saw

15   that being consistent with the distinction that Judge Gerber

16   had drawn in his own opinion.  And we were fully prepared to

17   accept that language, because it's simply stated, but it is.

18   We own the facility now; as a buyer, we have certain things we

19   will do.

20           We are doing, with respect to the Lockport property --

21   I'm going to talk about each of these facilities separately, if

22   I may.  With regards to the Lockport property, we're doing all

23   environmental investigation and remediation which needs to

24   happen on the property.  And that was the reference to the site

25   code which we made in our brief.  It was not -- it was the

1    point that DEC had looked at the property and evaluated the

2    issue and had identified certain sources of contamination, and

3    we were addressing each of those sources of contamination.  We

4    pointed out that they amounted to fifteen percent of the land

5    area, not because we were saying we're not going to deal with

6    the land area; it's because the rest of the land area didn't

7    have contamination.  We were dealing with all of those.

8         The real importance of the site codes, which we

9    mention, is the language we included in it, from the database

10   that came out, that in each instance the DEC had determined at

11   the time we acquired it that there wasn't an offsite

12   responsibility involved with each of these issues.  And we

13   understood that when we went in.  We were taking five specific

14   onsite remediation projects because those were the only five on

15   the site and there were no offsite.

16        Subsequently in March of this year, apparently the DEC

17   has found some offsite contamination which it speculates may be

18   from the Lockport facility.  And it doesn't necessarily say

19   it's from any of these site codes.  It may be from operations

20   which ceased many years ago.  That is not something that we

21   took -- that was not -- that is not remediation at the

22   facility, because that is off the facility.  That is not

23   remediation under the site codes.  That is not something

24   that --

25        THE COURT:  Well, let me make sure I --

1          MR. HIRD:  -- we are responsible for.

2          THE COURT:  Maybe I missed this.  With regard to the

3     specific site codes --

4          MR. LEFF:  Yes.

5          THE COURT:  -- are you saying that, if it turns out

6     that the offsite contamination comes ultimately from that site

7     code area, that GM did undertake to do that, to remediate that?

8          MR. HIRD:  What we said is that with respect -- let's

9     pick a site code, one which involved Building 7.  If the

10    specific contamination identified in Building 7, with specific

11    contaminants, was continuing to go offsite, we would stop it

12    and deal with that and deal with stuff that is ongoing as it

13    goes offsite.

14         THE COURT:  But not what had happened before the sale?

15         MR. HIRD:  Not what had happened years before,

16    particularly if you don't have a continuous plume or anything

17    that does adjust the fact that gee, these constituents look

18    similar to the constituents that were on that property, so

19    maybe they must have come through.

20         THE COURT:  But as an owner wouldn't you have to stop

21    at any place that you owned the --

22         MR. HIRD:  If it was on a continuous ongoing release,

23    we would.

24         THE COURT:  Right.  So why would you reference the

25    site codes?

1          MR. HIRD:  Because what we -- first of all, the site

2     codes were proposed by the state and we accepted them.  The

3     reason why we reference the site codes is to point out to Your

4     Honor that we looked at the specific issues we were asked to

5     acknowledge.  And at the time we acknowledged, it was very

6     clear in the state's database there was no offsite liability

7     associated with them, because, if you read the printouts that

8     we attached as Exhibits A through E, they say we've done

9     offsite monitoring and there's nothing there.  One of the site

10    codes says the only thing that is contaminated is soil.

11         Now, we were not the people who proposed the site

12    codes; they came from the state.  But we looked at it when we

13    made the decision to accept this language, and those site codes

14    dealt specifically with contamination -- contaminated areas

15    that were onsite and had no offsite impact.

16         The state has made clear that under its law a new

17    buyer does not acquire offsite li -- responsibilities

18    acceptance.  They say in certain limited situations we're happy

19    to litigate that.  But that's not what Mr. Leff is arguing

20    here.  What Mr. Leff is arguing:  We can't rely on limitations

21    that we have on the -- as a buyer; we functionally step into

22    Delphi's shoes.  And that's not what we took -- there's no

23    reason why we would take that with Delphi property when we

24    wouldn't take that with old GM property.

25         THE COURT:  Well, I guess that was the next question I

```
 1    had.  Judge Gerber's opinion came out July 5th.  The hearing on

 2    this --

 3              MR. HIRD:  This was order was entered --

 4              THE COURT:  -- order -- the order was entered July --

 5              MR. HIRD:  30th.

 6              THE COURT:  -- 30th, but the hearing was after July

 7    5th.

 8              MR. HIRD:  And Mr. Berz's e-mail is completely

 9    understandable, his e-mail of July 19th, in the context of

10    the -- of Judge Gerber's order of the 5th, because --

11              THE COURT:  But --

12              MR. HIRD:  -- he talks about the very --

13              THE COURT:  -- my question is --

14              MR. HIRD:  -- issues that Gerber did.

15              THE COURT:  -- why didn't you just cite Judge Gerber's

16    order to me?  Why enter this language?

17              MR. HIRD:  Because we thought we were entering

18    language that simply said we're accepting the idea as a buyer.

19    We thought that this language essentially paralleled Judge

20    Gerber's order.  It did not use the term "assumed" --

21              THE COURT:  What is --

22              MR. HIRD:  -- which is what this Court is saying.

23              THE COURT:  What is your response to the debtor and

24    the DEC's argument that under your reading of paragraph 2

25    you've said this twice?  And why do you bother to say it twice,
```

 1     except perhaps to mislead the debtor and DEC and the Court?

 2            MR. HIRD:  My understanding, and this goes back to the

 3     underlying (sic), is we were comfortable once but -- in saying

 4     it once, but if you look at the first paragraph, it's in the

 5     negative, and we had heard that the state wanted to hear it in

 6     the positive.  So we said it once in the positive as a way to

 7     show yes we're acknowledging, as opposed to no we can't have

 8     that.  So that -- my understanding is that came from a specific

 9     state request to -- that they didn't like the first paragraph

10     in the -- to be in the negative and wanted it in the positive,

11     so that -- because it's -- it functionally said the same thing

12     but it was more palatable to their management.

13            Your Honor, the --

14            THE COURT:  And what is your take of paragraph 3?

15            MR. HIRD:  Our take of paragraph 3?

16            THE COURT:  Yeah, which says that GM and the DEC shall

17     confer in good faith to identify the remaining investigation

18     and remediation required.

19            MR. HIRD:  Because there is a remaining

20     investigation/remediation done on the onsite areas.  We're

21     talking about, in Lockport, a facility that's over 400 acres.

22            THE COURT:  Right.

23            MR. HIRD:  So there's a lot of investigation and

24     remediation in order to determine what needs to be done in the

25     onsite areas.

```
 1                With respect to the offs -- with respect to Rochester,

 2        the off -- we were doing -- and we accepted, and we say we

 3        accept, the operation of a barrier well system, which has the

 4        effect of drawing pollution back to the property.  It's done to

 5        prevent pollution from leaving the property, but it draws it

 6        back.  That's something we're accepting we're doing.

 7                THE COURT:  I guess what I -- I'm having a hard time

 8        seeing here is the concern that is behind this entire dispute,

 9        as far as I could tell, which is responsibility for offsite

10        cleanup of contamination that was caused before the sale, was

11        one that GM was aware of, quite aware of, before this language

12        was entered into, and yet it doesn't deal with that issue.  It

13        doesn't say we're not responsible for that.

14                MR. HIRD:  Yes, it does.

15                THE COURT:  Well --

16                MR. HIRD:  And I can explain --

17                THE COURT:  -- it doesn't say it in so many words,

18        that's for sure.

19                MR. HIRD:  It doesn't in so many words.  It says "at

20        the facilities" and "at the site codes".  It referred

21        specifically to specific pieces of property.  You know, they

22        mentioned the addresses are there.  The addresses are something

23        we're comfortable with, whatever is on those addresses.  But

24        here they're talking about --

25                THE COURT:  Well, that's a different -- that's a
```

1    different point, and that -- and that's --

2           MR. HIRD:  That's it, and they're talking about

3    something that is off the property.

4           THE COURT:  Well, that's --

5           MR. HIRD:  There is nothing here that says anything

6    about obligations off the property.

7           THE COURT:  Well, that's -- that, I think, goes to a

8    different point, and it's the question I asked counsel for the

9    DEC.  The key phrase here is it "acknowledges that it shall be

10   responsible for conducting investigation and remediation of the

11   Rochester facility and the Lockport facility in accordance with

12   applicable environmental laws".

13          MR. HIRD:  And those faci --

14          THE COURT:  So it's investigation and remediation of

15   the two facilities.

16          MR. HIRD:  Yes, and those --

17          THE COURT:  And --

18          MR. HIRD:  -- facilities --

19          THE COURT:  Let me just get my question out.

20          MR. HIRD:  I'm sorry.

21          THE COURT:  My question was, is that language --

22   should I read that language as precluding anything that goes

23   beyond the borders of those two facilities?

24          MR. HIRD:  I think you should for the following

25   reason:  The -- let's start with the Lockport facility.  It's

1    defined as the address, and we don't have a problem with

2    address, and it's defined as those five site codes.  And all of

3    those five site codes, when you look --

4            THE COURT:  Wait, let's accept for the moment -- you

5    don't have to agree with me on this, but let's accept for the

6    moment that it's the address, so that there's a boundary --

7            MR. HIRD:  Yes.

8            THE COURT:  -- to the facility.  Does remediation --

9    is it limited to what's within the boundary?

10           MR. HIRD:  It's limited to what's within the boundary.

11   And what we would do, because we independently, regardless of

12   this paragraph, as to the buyer --

13           THE COURT:  No, in the future.

14           MR. HIRD:  I'm going to say it as a -- if we came

15   today and we -- the first day we come in we see contamination

16   moving offsite --

17           THE COURT:  No, I understand that point.

18           MR. HIRD:  -- then we --

19           THE COURT:  But --

20           MR. HIRD:  -- we have to deal with that --

21           THE COURT:  But --

22           MR. HIRD:  -- and we also have to draw up that.

23           THE COURT:  But my question's a little different than

24   that, which is, in common parlance, or common understanding, if

25   GM got a direction or an order from the DEC that said we direct

1     you to remediate the Lockport facility, would it commonly be

2     understood to mean that remediation is limited to within the

3     borders of the facility?

4            MR. HIRD:  If it was identified as a specific owned

5     facility, yes.  Sometimes you have --

6            THE COURT:  Well, I'm sorry --

7            MR. HIRD:  Can I --

8            THE COURT:  -- when you say --

9            MR. HIRD:  Can I give you the complete answer?

10           THE COURT:  I know, I just want -- you can, but I want

11    to just --

12           MR. HIRD:  Oh, I'm sorry.

13           THE COURT:  When you say a "specific owned facility",

14    you're not referring to site codes, though; you're saying that

15    it's our facility that we own?

16           MR. HIRD:  Sometimes some --

17           THE COURT:  Some facilities are owned by multiple

18    parties?

19           MR. HIRD:  Sometimes the governments, both federal and

20    state, give a broader name, which includes multiple

21    properties --

22           THE COURT:  Right.

23           MR. HIRD:  -- to properties.

24           THE COURT:  Right.

25           MR. HIRD:  They might say, you know, Love Canal --

1          THE COURT:  Yeah.

2          MR. HIRD:  -- and it may be multiples.  But other

3     times they deal with specific facilities.  Here, if you look at

4     the language, the address was -- the phraseology --

5          THE COURT:  200 Upper Mountain, Lockport.

6          MR. HIRD:  It has an address.  It also had five site

7     codes, none of which had offsite -- thing.  So, from our

8     perspective, they're saying we want you to take these --

9     anything that is on the Lockport property.  And we said okay,

10    that's what we have anyway --

11         THE COURT:  But beyond your perspective, what I'm --

12         MR. HIRD:  Yeah.

13         THE COURT:  -- what I'm asking you is, in common

14    parlance, if you get a directive from New York DEC that says

15    you are to remediate the 200 Upper Mountain Lockport facility,

16    which is all owned by GM, it's -- you know, it's the same metes

17    and bounds that are in the mortgage -- you know, in the real

18    estate recordation.

19         Are you saying to me that that's understood to mean

20    you remediate just what's within those boundaries and nothing

21    else?

22         MR. HIRD:  If the facility is defined that way,

23    sometimes they pick a name that is more general.  For

24    example --

25         THE COURT:  No, I understand that point.

1          MR. HIRD:  -- if I was given a --

2          THE COURT:  No, no, you don't need to go over that

3     again.

4          MR. HIRD:  Okay.

5          THE COURT:  All I'm saying is --

6          MR. HIRD:  Yes.

7          THE COURT:  -- if you get --

8          MR. HIRD:  Yes.

9          THE COURT:  -- that notice, you understand --

10         MR. HIRD:  Yes.

11         THE COURT:  -- that you don't have to go --

12         MR. HIRD:  Particular --

13         THE COURT:  -- and --

14         MR. HIRD:  We would --

15         THE COURT:  -- find groundwater reaching out into, you

16    know, 300 --

17         MR. HIRD:  We would construe partic --

18         THE COURT:  -- Upper Mountain Road --

19         MR. HIRD:  -- particularly as a purchaser.  As a

20    purchaser, a volunteer, someone who did it --

21         THE COURT:  No, that's not --

22         MR. HIRD:  -- we would not understand that.

23         THE COURT:  I don't -- I'm just trying to figure out

24    these words.

25         MR. HIRD:  Yeah.

1          THE COURT:  You can argue the context in a moment.

2          MR. HIRD:  Okay.

3          THE COURT:  I'm just trying to figure out these words.

4     Does remediation mean -- is it -- when it says "remediation of

5     the facility" and the facility's identified and the facility's

6     wholly owned by you, does it mean the remediation is limited to

7     what's within the boundaries of that facility and it doesn't

8     cover, you know, the spillover into another facility?

9          MR. HIRD:  It depends on how that specific facility is

10    defined.  If -- I have to go back to what I was saying before.

11    There are some facilities that are defined with a name that

12    makes it clear it goes beyond that.  A facility defined this

13    way with a specific address and specific site codes would say

14    to us, and did say to us, this facility and not beyond it.

15         THE COURT:  And that's the case even if it leaves out

16    the site codes and just says the address?

17         MR. HIRD:  That would be us -- that would be the case

18    if it's the address.  The difference for us, and this is where

19    Rochester's different, we took an understanding, we had an

20    understanding, we knew, because the site code was added here,

21    that at Rochester there was some offsite impact but it was

22    being remediated through onsite activity.  We didn't know of

23    any offsite impact on Lockport.  And we took that system, and

24    we are operating that system, and it has offsite impact.

25         THE COURT:  But doesn't that --

1        MR. HIRD:  And we're continuing to --

2        THE COURT:  -- doesn't that just argue that your

3   guys -- your clients made a business decision based on the

4   information they had and took the risk that there might be more

5   offsite problems?

6        MR. HIRD:  No, we relied on the fact that we were

7   acknowledging the obligation as a buyer and not being asked to

8   assume.  The language that Mr. Leff pooh-poohs here was the

9   language that was important to us.  This was not understood in

10  any way by our people as a business decision that we were

11  taking anything more than we would have had as a purchaser, as

12  we were going to have as a purchaser, of the GM properties.  It

13  was simply, in order to avoid having an argument before Your

14  Honor, the state wanted to say it in a positive way as opposed

15  to a negative way, and we agreed to do that.

16       THE COURT:  Again, I mean, having won two weeks

17  before, I'm not sure why you wanted to avoid an argument with

18  language that at best is ambiguous for you.

19       MR. HIRD:  Well, we had --

20       THE COURT:  I mean, it's --

21       MR. HIRD:  -- we had Mr. Berlin's statement to us

22  that, you know, nobody's thinking of you as a successor.

23       THE COURT:  But that's totally different.  That's a

24  totally different issue.  That would make it easier for you to

25  win in front of me than in front of Judge Gerber.

1          MR. HIRD:  We thought that Mr. Leff was understanding

2     he would lose in front of you and was there for trying to have

3     a more positive phraseology to sell to his client.  And that's

4     what we did and, quite honestly, that was a mistake.

5          THE COURT:  Is there any evidence of that?

6          MR. HIRD:  The evidence of that, yeah, I believe, is

7     in the e-mails from Mr. --

8          THE COURT:  But --

9          MR. HIRD:  -- Leff where we've heard that Mr. Leff --

10         THE COURT:  But he's not a part of that e-mail chain.

11         MR. HIRD:  No, there's other e-mails, Your Honor, and

12    I can field those out for you.

13         THE COURT:  Are they in the record?

14         MR. HIRD:  They're not in the record at the moment

15    because I didn't think we needed to get into that until you

16    asked the question directly.

17         THE COURT:  Okay.

18         MR. HIRD:  Your Honor, we do agree with the state that

19    you don't have to determine the outer limits of what we took as

20    a buyer or what we're responsible for as a buyer.  But the

21    point is we didn't expand that responsibility, that we may be

22    responsible for what Mr. Leff says may be out there, we may

23    not; that's for another Court to decide.  But what we agreed to

24    was simply to acknowledge our responsibility as a buyer under

25    law, and that's what we're doing.

1              As a practical matter, I think most of the amounts

2       that Mr. Leff has claimed, as I understand listening to this,

3       involve work that will be done on the two properties --

4              THE COURT:  Well, all of those so far.

5              MR. HIRD:  -- and is work that we intend to be doing.

6       But Mr. Leff has now said oh, guess what, we've discovered this

7       huge offsite problem at Lockport that made some -- may not be

8       related.  There's no ongoing pollution.  That's not ours.

9              THE COURT:  Okay.

10             MR. HIRD:  And that was never ours under the original

11      proposal.

12             THE COURT:  Okay.

13             I have a question for the debtors.  It does seem to me

14      that this claim objection has morphed into a, in essence, a

15      declaratory judgment action about the meaning of my order.  As

16      a claim objection, I have a lot of sympathy with the DEC.

17      There's no release of the debtors by the DEC.  The debtors, I

18      think, under their theory, or -- and the DEC, I think,

19      acknowledges this, are not the first pocket that the DEC would

20      look to.

21             But as a claim objection, why should the claim be

22      disallowed at this point?  I mean, even if I rule that I accept

23      the debtors' argument and the DEC's argument that there was a

24      reason why there was a second paragraph in paragraph 63 and it

25      wasn't just belt-and-suspenders or surplusage, or however you

1    want to phrase it, it's certainly conceivable that GM

2    Components would default in the future or continue to fight it,

3    and at which point why wouldn't the debtor be liable under

4    those circumstances?

5         MR. BERLIN:  Well, I think for two reasons, Your

6    Honor.  One, of course, it strikes us this is a standard

7    contingent claim.  I mean, it is possible, I suppose, that ten,

8    twenty years from now GM might fail somewhere down the line,

9    but what could be a more standard contingent claim.  GM is

10   taking a hundred percent of the liability.  The only time we

11   have liability is if GM can't perform under that a long way

12   down the line, and that's something that is a standard

13   contingent claim.

14        THE COURT:  All right, but they're not asking you to

15   reserve anything for it.  I mean, it's just there.  I mean, it

16   may -- you may never have to pay anything.

17        MR. BERLIN:  Well, I understand that, but, again, we

18   would --

19        THE COURT:  It's like --

20        MR. BERLIN:  -- we would like a discharge again as a

21   standard contingent claim in that circumstance.  And we

22   obviously all hope GM is around and prospers and becomes a

23   national champion, but --

24        THE COURT:  But it's not a 502(e) claim, is it?  It's

25   just an unliquidated claim?  And I'm not even sure it's

1    contingent in the sense that they're -- they want to look to

2    the people who are on top of the property at this point.  I

3    mean, it makes sense for the DEC to do that, but I'm not even

4    sure it's even secondary.

5              MR. BERLIN:  Well, also, the -- also, though, their

6    claim becomes, of course, an unsecured claim.  It's not -- we

7    don't think it's an administrative claim.

8              THE COURT:  But that's a separate issue.

9              MR. BERLIN:  Yeah.

10             THE COURT:  I mean, we haven't really dealt with that

11   issue.  But --

12             MR. BERLIN:  But, again, as an unsecured claim, it

13   strikes us a standard unsecured claim that should be discharged

14   at this stage as contingent because there's -- you know, there

15   is another party that's fully responsible for this going

16   forward for at least an indefinite period of time on this.

17             THE COURT:  Well, even if I would rule in your favor,

18   if in fact GE defaulted or -- I'm sorry, GM defaulted or it was

19   ultimately determined that they didn't have to pay, I'd

20   certainly be amenable to a 502(j) motion for reconsideration.

21   I mean, that'd be a slam-dunk on their part.

22             MR. BERLIN:  Well, I don't think that if it's

23   determined they don't have to pay, if it ever gets to this --

24   because what we're really saying is that GM took over whatever

25   liability we have.  There may be a dispute, for example, on the

1    offsite liability, did it come from this facility, but if GM

2    wins on that, we would not pick up that liability.  That would

3    be --

4            THE COURT:  Right.

5            MR. BERLIN:  -- somebody else's liability.

6            THE COURT:  Okay.

7            MR. BERLIN:  So the only way that GM would get out of

8    this is if in fact they default and can't pay any more going

9    forward.  There's no other issue there that relates to that.

10           THE COURT:  Right.

11           MR. BERLIN:  And, obviously -- yeah, and I'd say we're

12   probably okay with 502(j) if we had to do that.  So that's

13   not -- we could go on that.  And the most important thing in

14   this hearing is getting a determination that GM has taken over

15   full liability of the cleanup of the site, from our

16   standpoint --

17           THE COURT:  Okay.

18           MR. BERLIN:  -- both on- and offsite.

19           THE COURT:  All right.

20           MR. BERLIN:  And just one last point, if I can, Your

21   Honor.  As far as GM's own proceeding goes, as you pointed out,

22   we of course knew about GM's own proceeding at the time, and

23   that's the whole reason we negotiated this provision, because

24   we're not contesting that the decision there was wrong; just

25   that GM agreed to something differently in this context in

1        order to get this claim -- in order to get their deal closed

2        and to get this plan approved.

3               THE COURT:  It -- okay, there are two issues I want to

4        raise:  One is a procedural issue; the other is -- I'd like

5        both your view and the state's view on GM's interpretation of

6        the phrase "investigation and remediation of the two

7        facilities", whether that by its terms means -- leaving aside

8        anything else about the context of this or, you know, whether

9        it was just belt-and-suspenders, GM's view or your view,

10       whether that phrase itself limits GM's responsibility to taking

11       action within the bounds of the two facilities and not outside

12       of them.

13              MR. BERLIN:  Well, I've been doing this for thirty

14       years; I've never really seen that argument made before.  I

15       think if you -- once you agree to remediate a facility, and

16       every facility is identified by location or by something like

17       that, you agree to do the cleanup and remediation required to

18       deal with the contamination there to prevent, as Mr. Leff said,

19       a threat to human health and safety.

20              And just think about it this way, Your Honor:  Suppose

21       we had the address of the facility, and suppose 300 yards away

22       from the facility offsite there's a drinking water supply.

23       Under GM's interpretation, remediation doesn't mean they have

24       to deal with the threat to the drinking water supply.

25              THE COURT:  Well, no, that's -- I don't think that's

1    right.  What he's saying is that he has to stop any leaching

2    over there that's ongoing, but he doesn't have to clean up --

3    you know, he's no different than someone that's a hundred miles

4    away.

5         MR. BERLIN:  Right.

6         THE COURT:  He doesn't have to clean up what someone

7    else caused before he bought the company.

8         MR. BERLIN:  Well, no, no, it's not cleaning up what

9    somebody else caused.  What I'm saying is that even if you stop

10   the contamination from your own property, if the adjacent

11   property is contaminated as a result of the release from your

12   property it's a hundred percent standard practice to say you've

13   got to clean that up as the property owner, because, as I said,

14   otherwise you have a situation where there's nobody

15   responsible.  You know, you basically caused the contamination

16   on the adjacent property and you're refusing to clean it and

17   you're saying that when we gave the remediation order we were

18   not intending that you had to deal with all the contamination

19   that resulted from your plume or your contamination.

20        The way groundwater works is there's a plume in the

21   ground that spreads out, and once it gets off your property

22   that doesn't mean you no longer have responsibility for what

23   has already left your property; that's what we're talking about

24   now.  It doesn't say you don't have that responsibility.  That

25   would make no sense from a public health and safety standpoint.

1     I've never seen it interpreted that way.

2              There are some provisions, for example, in the

3     Brownfield volunteer program, where in a specific program the

4     state is saying because of your special status you only have a

5     limited requirement to do cleanup.  But that's not -- when an

6     address is given, an order is given for cleanup at a location,

7     it always applies to the contamination resulting from that

8     site, wherever that contamination is, whether it's onsite or

9     offsite.

10             THE COURT:  Okay.

11             Does the DEC have a few (sic) on that point?

12             MR. LEFF:  Yes, we do.  First, in response to your

13    immediate question, if the owner of the property qualified as a

14    volunteer under the Brownfield cleanup program, it would have

15    limited offsite cleanup responsibility.  And the scenario Mr.

16    Hird described of past contamination caused before that owner

17    became the owner, that would in fact not be the cleanup

18    responsibility of the current owner.

19             But we negotiated a different commitment in this

20    order.  We got a plenary commitment to investigate and

21    remediate the property.  And with respect to your earlier

22    question, Your Honor --

23             THE COURT:  And, I'm sorry, does that -- you're

24    saying, in common environmental enforcement parlance, that

25    means not only within the property's boundaries but

1    contamination caused, whether past or present, outside of the

2    boundaries?  That's the common view of remediation of a

3    property?

4            MR. LEFF:  Certainly.

5            THE COURT:  Okay.

6            MR. LEFF:  Every -- Mr. Hird talked about designations

7    of multiple properties, perhaps contiguous properties, as a

8    single site.  This is an extremely unusual occurrence.  He

9    mentioned the Love Canal.  I litigated the Love Canal for many

10   years.  Love Canal was a discrete landfill, but when the

11   contamination flowed outside of that property into the creeks

12   and ultimately Niagara River, Hooker Chemical was responsible

13   for the entire remediation.

14           He also said earlier that the site code description

15   was determinative and restrictive.  This is --

16           THE COURT:  You don't need to cover that one.

17           MR. LEFF:  Okay.

18           MR. BERLIN:  And I just might add one thing.  In the

19   volunteer program, the limitation that results from the

20   volunteer program is not because of the use of the words

21   "remediation" and "investigation".  That's just a specific

22   limit in the program for various reasons that New York has put

23   in -- into that program, and it has nothing to do with the use

24   of the words "remediation" and "investigation".

25           THE COURT:  Okay.

1           So this is my procedural question.  This came up in

2    the context of a two-party dispute between DPH and the DEC as

3    to the allowance or disallowance of DEC's claim.  GM asked for

4    an adjournment so that -- because they were concerned,

5    notwithstanding that they're not a party to this dispute, that

6    my ruling might be binding on them based on the basis for the

7    debtors' objection to DEC's claim.  But they've done more than

8    that.  I mean, they've now appeared and argued the merits to

9    me.  It seems to me that, given that fact, I can decide, in a

10   way that is binding on GM, at least the outer parameters of my

11   order.  I mean, is there a dispute about that at this point?

12           MR. BERLIN:  No.

13           MR. HIRD:  Your Honor, what we did say is that you can

14   decide whether we took something other than what we would have

15   as a buyer.

16           THE COURT:  Okay.

17           MR. HIRD:  We don't think we did.  We think we just

18   did that --

19           THE COURT:  No, I understand that point.

20           MR. HIRD:  -- or you can decide that.  Just one point,

21   if I may, because Mr. Leff actually proved my point at one

22   point by saying that a purchaser would have only limited

23   offsite liability and responsibility at the end of the

24   facility -- when GM saw the site codes, the addresses and the

25   language "acknowledge as a buyer", all of that said to them --

1    and they're very knowledgeable about the New York program.

2    What he's asking us to say is we would have the responsibility

3    of a buyer, and that's what we agreed to do.  And we thought

4    that would be something that would provide some comfort.  We

5    did not think we were getting anything -- taking on anything

6    that we would not have in that code.

7         THE COURT:  But that -- to me, that's just arguing

8    that they made a mistake.  But there wasn't a mutual mistake.

9    I mean, how do -- I'm still having a hard time seeing that in

10   the language.  And there's certainly -- the other two parties

11   to this are telling me that's not their view.  So it was at

12   most a unilateral mistake as opposed to a mutual mistake.

13        MR. LEFF:  Certainly when we used the phrase "as

14   buyer", we had no intention of loading into that one two-letter

15   word "as" the entire provision that this means the owner is

16   limited in its offsite obligations.  We had no such intention.

17        MR. HIRD:  Your Honor, with regard to their last

18   statement and Mr. Leff's response, he has pointed out that

19   they -- he was the draftsman of this language; so if there's

20   ambiguity, that should be read against the state.  We did not

21   understand it the way we saw the language "as buyer".  We did

22   not see the word "assumed", which was the language that Mr.

23   Leff was insisting in his objection.

24        I don't understand; if he really wanted us to assume

25   all this obligation, why didn't he -- and thought we did, why

1    he did not use the word "assumed".

2            MR. BERLIN:  Well, Your Honor, the whole purpose of

3    this provision was to expand the liability of a buyer.  I mean,

4    we all knew that GM had the liability of a buyer.

5            THE COURT:  No, we're covering old ground here.

6            MR. BERLIN:  Yeah, okay, good.  Okay, thank you, Your

7    Honor.

8            THE COURT:  There's a -- one wrinkle to the procedural

9    aspect that I just raised, and I appreciate everyone's candor

10   in the response to that question.  We've spent some time on --

11   well, let me spell it out.  I can see a result here where I

12   conclude that GM did agree to take on more liability than it

13   had already taken on in paragraph 9.38 of the purchase

14   agreement or in paragraph 63(ii)(1) of the order when it also

15   took on paragraph 2 of that -- subparagraph of that order.

16           That still, frankly, does leave open in my mind what

17   it was that GM took on in addition to its liability as a buyer,

18   and that's because of the point that GM's counsel made that

19   when one is responsible for conducting investigation and

20   remediation of the -- of these two facilities, arguably it's

21   only within the facilities, particularly given that they

22   weren't there to begin with.

23           So I say that in particular because, having issued the

24   order and appreciating the context of the order, it's easy for

25   me, I think, or relatively easy for me, to reach the conclusion

1   that GM took on more than what it had already taken on in the

2   master disposition agreement with regard to these facilities.

3   Having said that, I don't have any particular expertise based

4   on my understanding of this case as to what was meant by

5   "investigation and remediation of the two facilities".  That,

6   to me, is either a term of art or it isn't, and I'm not quite

7   sure what it means ultimately or what the parties meant.

8          So it's conceivable to me that I can rule on the first

9   point and not the second point at this point and have, you

10  know, further evidence or briefing on what remediation of a

11  facility means.

12         Do you have any thoughts on that?

13         MR. BERLIN:  Well, you know, again, I have to say I

14  would look at it as sort of, in a way, an artificial issue

15  created by GM, sort of out of whole cloth, because I'm not sure

16  there's any real basis I've seen anywhere to put that

17  limitation on -- nor have I seen it used that way.  We --

18  certainly nobody thought about it at the time of the

19  negotiations.  The word "offsite", for example, is never used

20  in these documents.  I don't think it's used even in any of the

21  e-mails going forward.

22         THE COURT:  Although -- no, it was used in the

23  e-mails, I think.  I'm pretty sure it was used --

24         MS. MALONE:  Yep.

25         THE COURT:  -- in the e-mails.

 1          MR. BERLIN:  It was in the e-mails, okay.

 2          MS. MALONE:  It was in Berz's.

 3          THE COURT:  Yeah.

 4          MR. BERLIN:  Yeah, it -- okay, in one of the e-mails.

 5     Sorry.

 6          THE COURT:  Yeah.

 7          MR. BERLIN:  But, again, we'd be happy to brief it, if

 8     you'd like, Your Honor.  And then we do mention a couple of

 9     cases in our brief where in fact the courts -- in paragraph 11

10     of our submission to you, where the courts do list and say that

11     the use the word "facility" is broad enough to include all of

12     the adjacent contamination.  I don't think you see that very

13     often, because it's extremely unusual for somebody to challenge

14     that point and raise that as an issue.

15          THE COURT:  Right.

16          MR. LEFF:  Your Honor, you've heard our position on

17     what the phrase means, but the bifurcation, as I understand it,

18     is consistent with the state's position here that the

19     unresolved issue should rather be decided in a state court.

20          MR. BERLIN:  Well, I don't think it's a state court

21     issue.  This is a question of what we meant by the language in

22     the agreement, not by what the --

23          THE COURT:  I think that's --

24          MR. BERLIN:  -- cleanup responsibilities are.

25          THE COURT:  Yeah, I'm not sure I understand your point

1    on that point (sic), because it does seem to me this is an

2    issue of what the parties meant in this provision of the order

3    as opposed to what someone's responsibilities would be under

4    state law.

5          MR. HIRD:  Your Honor, we agree with both the debtor

6    and you that the question of the meaning of these terms is an

7    issue for this Court because it's an issue of the meaning of

8    the Court's order.  And if further briefing on the issue would

9    be helpful to -- in order for you to understand our position,

10   we think, in the context of this whole document, of this whole

11   phrase, the entire paragraph where it refers to the site codes

12   and the site addresses, it was clearly intended to deal with

13   the remediation and investigation of the property within those

14   addresses and referred to within the site codes, which did not

15   include any offsite contamination at the Lockport facility.

16         MR. BERLIN:  Well, Your Honor, I would assume the

17   question you're asking is not, again, what we mean by the

18   result of the negotiations.  I thought you were asking the

19   question of should there be additional briefing on what it

20   generally meant by term --

21         THE COURT:  Right.

22         MR. BERLIN:  -- "remediation and investigation".

23         THE COURT:  That's all I meant

24         MR. BERLIN:  That's a different question.  We wouldn't

25   go back through all the details we're talking about here; it

1       would just be a straight briefing on what those two terms mean

2       in common practice.

3              (Pause)

4              THE COURT:   I mean, the objection by New York that

5       prompted this whole issue, to my mind, certainly raised the

6       possibility of offsite responsibility and referred to

7       remedia -- completing the remedial work at the sites.  I mean,

8       that's the phrase they use in paragraph 9, "complete the

9       remedial work at those sites".  But, you know, it's talking --

10      the contaminants identified in the objection are things that

11      clearly migrate, so it's hard for me to see that that wasn't

12      contemplated.

13             All right, I have before me, under the claim

14      liquidation procedures orders that I've entered in this case,

15      the objection by DPH Holdings Corporation to two proofs of

16      claim, that include priority and administrative claims, filed

17      by the New York State Department of Environmental Conservation,

18      "New York DEC", in the Chapter 11 case of In re Delphi

19      Corporation. DPH Holdings is the successor for purposes of

20      claim objections to Delphi.

21             The two claims asserted by the New York DEC cover,

22      respectively, a former Delphi site, or DAS automotive site, in

23      Rochester called the Rochester site, and a site called the

24      Lockport site, again, a former system -- I'm sorry, a facility

25      run by Delphi Thermal Systems in Lockport, New York.  The

1    claims are in both liquidated and unliquidated amounts, and the

2    basis for DPH's objection to each claim is that, based upon

3    this Court's Order Approving Modifications, under 11 U.S.C.

4    Section 1127, to the First Amended Joint Plan of Reorganization

5    of Delphi Corporation and Certain Affiliates, Debtors and

6    Debtors-in-Possession, dated July 30, 2009, the responsibility

7    for performing the future cleanup of the sites, that is, for

8    the unliquidated portions of the two claims, belongs to GM

9    Components Holdings, LLC.

10        The New York DEC acknowledges that it would like to

11   look to GM Components, LLC to be primarily responsible for the

12   future cleanup but that, because GM Components has disclaimed

13   responsibility for at least a portion of that cleanup, its

14   claim should not be disallowed.  I note that the obligation of

15   DAS and Delphi Thermal Systems, in respect of any cleanup claim

16   at the Rochester or Lockport facilities -- or sites, was never

17   released by the DEC, and, therefore, the liability, leaving

18   aside whether it's an administrative or priority or an

19   unsecured pre-petition liability, does continue to exist on a

20   contingent basis even if, as both the DEC and DPH insist, GM

21   Components in fact took on the responsibility for the future

22   cleanup.

23        Because of the central importance of the contention

24   that GM had agreed to take on this cleanup liability, GM sought

25   an adjournment of the hearing on the claim objection and has

1     filed a statement and a reply statement in which it contends

2     that, other than an obligation as a new owner of these two

3     sites, it has no other obligation to New York State for

4     environmental liability and, consequently, at least some

5     foreseeable portion of the DEC's two claims are not its

6     responsibility and would fall directly on the debtor.  Under

7     those circumstances, I believe that issue is squarely before

8     me, including with respect to my determination of the claim

9     objection being binding not only on the DEC and DPH but also on

10    GM Components Holdings.

11          The assertion by DPH, in which the New York DEC joins,

12    is that, pursuant to paragraph 63(ii)(2), GM Components

13    acknowledged that it shall be responsible for conducting

14    investigation and remediation of the Rochester facility and the

15    Lockport facility in accordance with applicable environmental

16    laws.  Both DPH and the DEC contend that that undertaking by GM

17    Components was made in response to an objection to the proposed

18    Plan modification filed on July 14th by New York State DEC in

19    which it contended that I should not approve and modify the

20    Plan or the Master Disposition Agreement pursuant to which GM

21    Components Holdings, LLC would acquire the Rochester site and

22    the Lockport facility, without requiring GM Components to

23    confirm the obligation on the part of the proposed buyer to

24    complete the remedial work at those sites.

25          Paragraph 9 of the New York DEC's objection went on to

1    state, quote, "The MDA should be amended to state explicitly

2    that the obligation to clean up the Rochester site and the

3    Lockport facility will be assumed by the buyers of those sites,

4    including GM Components Holdings, LLC."

5         As I said, both DPH and the DEC assert that, in fact,

6    that was the effect of paragraph 63(ii)(2) of my order.  GM

7    takes a contrary position.  It asserts that sub paragraph 2 of

8    my order only represented an acknowledgment by it as the buyer

9    that it would be responsible for investigation and remediation

10   at the two facilities in accordance with applicable

11   environmental law in its capacity as a buyer; that is, without

12   any additional obligation or responsibility to continue

13   investigation and remediation, or to be responsible for

14   investigation or remediation that only the seller would be

15   responsible for.

16        I conclude, based on the plain language of my order,

17   which, with regard to the applicable paragraphs at issue, is a

18   consent order and therefore should be interpreted like a

19   contract under New York law to -- in an way that is consistent

20   with the parties' intentions, that the plain meaning of the

21   order is in accordance with DPH and the DEC's interpretation of

22   it.  I say that primarily in light of the context of the

23   paragraph that I have been quoting, both in terms of the

24   litigation -- pending litigation that it resolved as well as

25   the applicable provisions of the MDA and the Plan Modification

1       Order that relate to paragraph 62 -- I'm sorry, 63(ii)(2).

2               First, it is clear from the July 14th, 2009 New York

3       State DEC objection that the DEC was referring to the two sites

4       in toto; secondly, that it was referring to cleanup obligations

5       with regard to those two sites, comprehensively, under

6       applicable environmental laws; third, it is, I believe, clear,

7       based on the types of contaminants referred to in the DEC's

8       July 14, 2009 objection, that there was a distinct possibility,

9       if not a probability, that contamination emanating from the

10      site had spread beyond the site -- or the sites, and that such

11      contamination was within the contemplation of the cleanup

12      remedial work that the DEC wanted to have GM Components confirm

13      was going to be the responsibility going forward of GM

14      Components.  And it is primarily the offsite contamination that

15      GM Components says it has not assumed any responsibility for.

16              Secondly, GM Components points out that the issue of a

17      buyer such as GM Components taking free and clear of past

18      environmental remediation responsibilities of its seller had

19      very recently been ruled upon by Judge Gerber in GM's own

20      bankruptcy case, in a ruling dated July 5th, 2009 against,

21      among others, the New York DEC.  I view the relevance of this

22      ruling 180 degrees differently than GM does.  GM asserts that

23      based on that ruling it did not have to give the New York DEC

24      anything other than what it had already given the New York DEC

25      in paragraph 9.38 of the Master Disposition Agreement, which is

1    a statement, quote, "Nothing in this Agreement is intended to

2    nullify any liability to any federal, state or local

3    environmental agency under environmental laws that either

4    Seller and/or their Affiliates or any Buyer may have as a

5    result of their status as an owner or operator of any property

6    or facility, or as an arranger for disposal of any hazardous

7    materials generated at any property or facility."  That is, GM

8    has taken the position that, because of Judge Gerber's July 5th

9    ruling, it could have thumbed its nose at the DEC with respect

10    to obligations that were solely pre-closing seller obligations,

11    while of course affirming, as Judge Gerber required in his

12    ruling, that ongoing obligations, of course, would be taken on

13    by the new buyer, GM Components.  See In re General Motors

14    Corp., 407 B.R. 463, 507-08 (Bankr. S.D.N.Y. 2009).

15    Therefore, GM contends, paragraph 63(ii)(2) was merely

16    belt-and-suspenders, or ice in winter, or whatever cliche you

17    want to give to a meaningless concession, or whatever cliche

18    you want to use to describe a meaningless concession.  GM also

19    argues that it is perfectly consistent with paragraph 9.38 that

20    I've just quoted from the MDA, and should be read in harmony

21    with it as opposed to being construed as the undertaking of a

22    new and broader obligation.

23    I, however, do not see it that way.  First of all, it

24    is clear from the Plan Modification Order that it was intended

25    specifically that, notwithstanding any other provision of the

1     MDA or the order (and that would include the provision in the

2     same paragraph of the order which says "The provisions of the

3     Modified Plan, this Order and the Confirmation Order shall be

4     construed in a manner consistent with each other so as to

5     effect the purposes of each"), again, notwithstanding any of

6     the MDA or this order, including that language that I just

7     quoted, "paragraph 63 of this order shall govern the provisions

8     of the Master Disposition Agreement in all respects."  That is,

9     as stated in paragraph 3 of the Plan Modification Order, which

10    I just quoted, it was intended that paragraph 63 would do

11    something other than or over or in addition to the MDA,

12    including paragraph 9.38's recitation of the buyer's ongoing

13    liability as an owner under the environmental laws.

14          Paragraph 63 is entitled "Resolution of Modified Plan

15    Objections".  Subparagraph (ii) is headed "New York Department

16    of Environmental Conservation and Michigan Department of

17    Environmental Quality," obviously a reference to their two

18    objections and the solution to them.  Paragraph 1 of (ii),

19    paragraph 63, in essence repeats paragraph 9.38 of the MDA:

20    i.e., "Nothing in this Order or the Master Disposition

21    Agreement releases, nullifies or enjoins the enforcement of any

22    liability to a governmental unit under Environmental Laws (as

23    the term is defined in the Master Disposition Agreement) or

24    regulations or any associated liabilities for penalties,

25    damages, cost, recovery or injunctive relief that the buyers

1    would be subject to as the owner, lessor or operator of

2    property after the date of entry of this Order."

3            In addition to that paragraph, however, the parties

4    added paragraph 2, which is the basis for DPH and the DEC's

5    contention that GM assumed something more than what was set

6    forth in paragraph 9.38 of the MDA.  It states, again, "GM

7    Components, as buyer of the Delphi Automotive Systems site

8    located at 1000 Lexington Avenue, Rochester, New York,

9    identified in the New York State Department of Environmental

10   Conservation ('NYSDEC') Environmental Site Remediation Database

11   as Site Code 828064 (the 'Rochester Facility'), and the Delphi

12   Thermal Systems facility located at 200 Upper Mountain,

13   Lockport, New York, identified in the NYSDEC Environmental Site

14   Remediation Database as Site Codes C932138, C932139, C932140

15   and 932113 and the NYSDEC Spill Incidents Database as Site Code

16   065121 (collectively 'Lockport Facility'), acknowledges that it

17   shall be responsible for conducting investigation and

18   remediation of the Rochester Facility and the Lockport Facility

19   in accordance with applicable environmental laws."

20           Again, GM Components contends that this paragraph,

21   because it uses the phrase "as buyer" in the first clause and

22   states - acknowledges, that it shall be responsible as opposed

23   to assumes responsibility for, is, in essence, a simple

24   reformulation in the positive, as opposed to a statement in the

25   negative, of paragraph 1 of subparagraph (ii) as well as

1    paragraph 9.38 of the MDA.

2         I believe that in context that simply cannot be the

3    case.  I say that, first, in light of the general interpretive

4    maxim that every provision of an agreement should be read so

5    that it's not rendered superfluous.  I'm always somewhat wary

6    of interpretive maxims, however, given that there's almost

7    always a maxim, that could be held up for a contrary

8    proposition.  However, here, in this context, it appears to me

9    clear that the DEC was looking for something more than what

10   already existed in the MDA, and, in particular, was looking for

11   an acknowledgment by GM that it would be responsible not only

12   as the new owner but also for, with regard to these two

13   facilities, remediation that was before the sale the

14   responsibility of Delphi.

15        If it believed, as I have to assume that it believed,

16   that this paragraph did the trick on that point, it seems to me

17   that it was incumbent upon GM to make it clear that it did not

18   do so; i.e., to spell that fact out as opposed to submitting an

19   additional provision that on its face appears to acknowledge

20   additional responsibility, particularly in the context of

21   resolving the DEC's objection.

22        I believe that context is also consistent with the

23   fact that Judge Gerber had already ruled that in a contested

24   setting the DEC could be forced to back down from its position

25   or that its position would be overruled by the Court.  Instead

1   of doing that, this consent order was entered into, which I

2   view as, again, acceding to the DEC's position rather than

3   contesting it, which could have been done by either the

4   litigation route, relying on Judge Gerber's opinion of only a

5   couple of weeks before, or spelling out clearly in this

6   paragraph what GM Components was not taking on.

7         I also believe that subparagraph (3), which states

8   that "GM Components and NYSDEC shall confer in good faith to

9   identify the remaining investigation and remediation required,

10  under applicable environmental laws, for the Rochester and

11  Lockport Facilities," contemplates a continuum, not a new

12  starting point with the closing of the MDA but, rather,

13  conferring in good faith, identifying what work needs still to

14  be done in light of the past investigation and remediation.

15        So, in light of that reading, I conclude that, in

16  fact, paragraph 2 was intended, based on its plain meaning and

17  the context of the order as a whole and the MDA, under which GM

18  took on an additional obligation in addition to its owner

19  obligation under the MDA and paragraph 62 -- I'm sorry,

20  63(ii)(1), as well as its obligation under applicable law,

21  i.e., Judge Gerber's opinion, and that, therefore, it is

22  obligated to be responsible for conducting investigation and

23  remediation of the Rochester facility and the Lockport facility

24  in accordance with applicable environmental laws, not only as

25  the new owner but also in the continuum of the existing

1    investigations and remediations that were owed to the DEC by

2    the debtors.

3        The paragraph that the DEC and the debtors rely upon

4    identifies the sites not only by their addresses but also by

5    remediation database site codes, and uses the defined terms,

6    the applicable defined terms, following those site codes.  GM

7    Components has argued that if it was obligated to take on

8    debtor liability as well as it own owner liability under this

9    provision, it only had to do so in respect of those site code

10   areas.  I'm satisfied, based on the language of paragraph 2,

11   that -- and the representations made to me by counsel for the

12   DEC, that the site code numbers are not limiting in that

13   fashion but rather are additional identifiers, as far as DEC is

14   concerned, for any problems that may be at the two addressed

15   locations.

16       That leaves the issue of what the parties meant by

17   being responsible for conducting "investigation and

18   remediation" of the facilities.  GM contends that the phrase

19   "of the facilities" means only within the boundaries of those

20   facilities.  This issue may well arise because of the

21   contention by the DEC that offsite contamination was caused by

22   past releases at the facilities, which, I believe, was

23   reasonably contemplatable at the time and, in fact, based on

24   the exhibits attached to GM's statements in response to the

25   claim objection, was contemplated by GM as a possibility.  I

1    believe that the phrase "remediation of the facility" would

2    include the, at least under some circumstances, the offsite

3    cleanup.  The extent of that inclusion, I think, is properly

4    left to another day when the facts of the cleanup are better

5    known.  But I believe that the parties did contemplate that

6    whatever remediation Delphi was responsible for pre-closing

7    with regard to these facilities -- or of these facilities,

8    would be assumed and taken on by GM Components in this

9    paragraph.

10          What Delphi would be responsible for, since the DEC

11   has not yet liquidated that amount or the basis for that

12   responsibility, remains to be seen, but I believe that the

13   agreement here was that Components would take on that

14   responsibility in the first instance.  I say that with regard

15   to not knowing exactly what would be encompassed by Delphi's

16   responsibility, notwithstanding the debtors' citation to cases

17   under CERCLA which contemplate offsite contamination being

18   within the definition of a facility.  But, again, it's not

19   clear to me whether all the environmental laws are treated that

20   way.  See City of Tulsa v. Tyson Foods, Inc.,

21   258 F.Supp.2d 1263 (N.D.Okla. 2003) (vacated on other grounds),

22   as well as United States v. Vertac Chemical Corporation,

23   364 F.Supp.2d 941 (E.D.Ark. 2005).

24          However, to the extent that Delphi would be obligated,

25   in respect of those two facilities, to engage in remediation, I

1    believe that paragraph 2 represents GM Components' undertaking

2    to be responsible for such cleanup and remediation.

3         So, based upon all the foregoing, it appears to me

4    that the claim of the New York DEC is unliquidated, and, at

5    this point contingent, based upon a number of factors,

6    including GM's refusal, notwithstanding my finding as to the

7    meaning of paragraph 63 of the Plan Modification Order, to pay

8    and perform its obligations.  Therefore, I believe that the

9    claim should be disallowed, subject, however, to

10   reconsideration under Section 502(j) in the event that GM,

11   notwithstanding my ruling and facts that would require GM to

12   perform, either refuses or is unable to perform.  As I made

13   clear during oral argument, if that occurred, I believe that

14   the reconsideration of the claim would be a given under 502(j),

15   although of course the debtors have preserved their right to

16   dispute the priority of the claim and, of course, the amount.

17        So the debtors should submit an order consistent with

18   my ruling.  You don't need to settle it on the parties, but you

19   should certainly circulate it to them before you e-mail it to

20   chambers.

21        MR. LYONS:  Your Honor, the remaining matters -- I do

22   not believe anybody is here on the other side.

23        THE COURT:  Let me -- you can be --

24        MR. LYONS:  I'm sorry.

25        THE COURT:  Unless you -- I don't know if you're

1    rising to ask to be excused or if you have a question.

2              UNIDENTIFIED SPEAKER:  It's procedural.

3              MR. HIRD:  No, procedural question, Your Honor.

4              THE COURT:  Okay.

5              MR. HIRD:  Obviously, GM Components will want to

6    consider appealing this order.  I want to understand that the

7    order will not be deemed order until that draft --

8              THE COURT:  Oh, it's not entered until it's entered.

9              MR. HIRD:  Until it's entered.  And the Court would

10   view that as a final order, which we would be --

11             THE COURT:  It's a claim objection order, so I believe

12   it would be final --

13             MR. HIRD:  Yeah.

14             THE COURT:  -- although that's for the appellate court

15   to decide, I guess.  But --

16             MR. HIRD:  Thank you, Your Honor.

17             THE COURT:  Yeah.  I don't see why it wouldn't be

18   viewed as final.  It's a claim objection order.

19             MS. REED:  Your Honor, this is Margery --

20             THE COURT:  As I -- let me -- before we get on to

21   them, as I often do with long bench rulings, I might go over

22   the transcript and, in addition to correcting typos, might

23   decide that I should have said something better.  If I do

24   change the transcript as opposed to correcting it, I'll attach

25   that modified ruling to the order or file it on the docket, and

1    that will be my ruling.  It's not the transcript that's my

2    ruling.

3              MR. HIRD:  Thank you, Your Honor.

4              THE COURT:  Okay.  Thank you.  And you can certainly

5    be excused.

6              UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

7              THE COURT:  Okay.

8              Okay, another number of other contested claim

9    objections.

10             MR. LYONS:  Yes, Your Honor, and I'm hoping we can

11   move through these rather rapidly.

12             THE COURT:  Okay.

13             MR. LYONS:  I do not believe anyone has appeared in

14   person or on the phone with respect to the other matters, and

15   there have only been two responses filed relating to two of the

16   claims.

17             THE COURT:  Okay.  There's no one on the phone and

18   there's no one here in opposition, but I have read --

19             MS. REED:  Your Honor, this is --

20             THE COURT:  Oh, I'm sorry, maybe there is someone on

21   the phone.

22             MS. REED:  I'm sorry, this is Marjorie Reed.  I'm

23   participating telephonically.  But for --

24             THE COURT:  On behalf of whom?

25             MS. REED:  On behalf of the ACE Companies with respect

1    to a matter -- I believe it's number 19, which is stipulation

2    and agreed order.

3            THE COURT:  Oh.  Oh, I'm sorry.  We're -- that's a

4    decreed order.  That will get entered.

5            MR. LYONS:  Right.

6            MS. REED:  I was participating to see if the

7    stipulation has been submitted to the Court, or --

8            THE COURT:  It will be.  If it hasn't been, it will be

9    after this hearing.  And I will enter it.

10            MS. REED:  Okay, thank you, Your Honor.  May I be

11    excused?

12            THE COURT:  Absolutely.

13            MS. REED:  Thanks very much.

14            THE COURT:  Okay.

15            MR. LYONS:  Okay, Your Honor, turning to the agenda,

16    item 26 is the next matter that is up, and that is the claim of

17    Atul Pasricha.  Your Honor, this -- part of our argument was

18    filed under seal because there is a document that has

19    confidentiality protections.

20            THE COURT:  Right.

21            MR. LYONS:  I would think there are one of two ways we

22    could proceed:  Either we could rely entirely on our brief,

23    which I'm prepared to do for the reasons for disallowing Mr.

24    Pasricha's claim, and then I don't have to go through any

25    matters that could be confidential, or perhaps we could seal

1    the hearing and discuss it.

2            THE COURT:  Well, I think this claim asserts not just

3    one type of claim; it asserts, I guess, three types of claims.

4    I don't see a basis for the indemnification claim being

5    allowed.  There's no liquidation that's covered by 502(e).

6            MR. LYONS:  Correct.

7            THE COURT:  The -- I believe that the debtors are

8    correct that the KESIP participation led to the waiver of the

9    other claims other than, perhaps, the change-in-control claim.

10   So I think we're just talking about the change-in-control

11   claim.

12           MR. LYONS:  And that is the one that is conclusively

13   resolved --

14           THE COURT:  Right.

15           MR. LYONS:  -- in our view, by the confidential

16   matter.

17           THE COURT:  Okay, and leaving aside the confidential

18   nature of it, what is the debtors' -- do they have any

19   objection to that change-in-control claim other than the plain

20   terms of the agreement that's under seal?

21           MR. LYONS:  That's the basis for disallowance,

22   completely, the --

23           THE COURT:  Okay.  So I think this -- just this

24   portion of the record, starting now, and I'll say when it's

25   reopening, it should be treated as being under seal.  So the

1    transcriber should separately transcribe this -- the record

2    from this point to the point where I say we should go back on

3    the record and the record is unsealed.

4         (Portion under seal transcribed separately)

5         THE COURT:  So that -- we should go back on the

6    record, then, as far as the party transcribing the agreement,

7    and the record should reflect that I have determined that the

8    debtors' objection is well taken and that each of the claims

9    asserted by Mr. Pasricha should be disallowed, including the

10   change-of-control claim, given that the terms of the -- that

11   that claim was waived by the agreement under seal.

12        MR. LYONS:  Thank you, Your Honor.  Item 27 is the

13   claim of Ronald Jorgensen.  Your Honor, this is very similar to

14   the claim of Mr. Downey at the last hearing.  It is a claim

15   that Your Honor denied for -- on a sufficiency basis to

16   disallow the claim, because there were some claims of fraud in

17   connection with the purchase or sale of the security.

18        We're just seeking a finding from Your Honor that it's

19   subordinated under 510 and thus not entitled to a distribution.

20        THE COURT:  It's clearly a claim that arises from the

21   purchase or sale of a security, as that phrase has been

22   interpreted in this circuit.  The security here is Delphi

23   common stock.  And therefore under the plan, as well as Section

24   510(b) of the Code, it has the same treatment as common stock

25   interests, which means that it receives no distribution under

1    the plan.

2          MR. LYONS:  Thank you, Your Honor.

3          THE COURT:  And that's what the order should say as

4    opposed to disallowing the claim.

5          MR. LYONS:  Correct.  Your Honor, the next claim is

6    Mr. Miller, and that is item 28 on the agenda.  Your Honor, you

7    may recall we left one item open; it was a 37,000 dollar

8    component of Mr. Miller's claim, and that related to his

9    assertion that he was owed money under the KESIP plan.  From

10    his proof of claim itself it's clear that he quit on July 22nd.

11    The AIP order, paragraph 4, says a covered employee who quits

12    will not be eligible for any incentive compensation payment.

13    The payment came later --

14          THE COURT:  Right, I think that there's no --

15          MR. LYONS:  -- and I think that's crystal clear.

16          THE COURT:  -- there's no prorating under the KESIP,

17    right?  The debtors have never done that?

18          MR. LYONS:  No.

19          THE COURT:  If someone put it in the middle, they lost

20    it for that year.

21          MR. LYONS:  Correct, and the order actually made that

22    crystal clear.

23          THE COURT:  Okay.  I agree with that.  So that portion

24    of Mr. Miller's claim should be disallowed.  The other portions

25    were already dealt with.

1           MR. LYONS:  Item 29, Your Honor, the claim of Stanley

2     D. Smith, Mr. Smith asserts a priority claim for retiree health

3     benefits.  Your Honor, this is along with others who

4     unfortunately --

5           THE COURT:  I have already ruled on this issue.

6     Regretfully, I believe that, for the reasons I previously

7     stated, the debtors are permitted to terminate these benefits,

8     given the nature of the benefits agreements, subject to the

9     settlements that were reached with the retirees.

10          MR. LYONS:  And the next claim, Your Honor, item

11    number 30 is one filed by James Luecke, L-U-E-C-K-E, for

12    159,000 dollars.  His claim relates to supposed commitment of

13    the debtors to give him a job transfer.  Your Honor, we object

14    to this on a sufficiency basis because there's nothing in his

15    claim that details an offer by the debtors.  There's no

16    description as to who, what and where.  It just lacks all

17    specificity to in any way constitute an enforceable obligation

18    on the part of the debtors.  So --

19          THE COURT:  This is the one of these that I just

20    wasn't really sure on.  He does have here attached to his claim

21    a -- complaints filed with the NLRB and some buyout offers.

22    One of the elements of his claim was a buyout.  It's just not

23    clear to me that the statement that the debtor doesn't owe this

24    because it's not supported is enough to defeat the claim, given

25    what was attached to the claim.  It's Exhibit 16 in the claim

1    book.

2          First of all, he does say -- I don't know why it

3    says -- I think it's for -- yeah, I think it's for 96,000

4    dollars; that's the cap on it.  I don't see an amount that's

5    greater than that.  So I would lower it to that amount.

6          MR. LYONS:  Yeah, I'm referring to his administrative

7    expense claim form.  It says 159,000.

8          THE COURT:  All right, but what's attached to that --

9    I see that, but what's attached to it only asserts one for

10   89,000, I mean the backup only asserts 89,000, and I think the

11   form itself refers to the backup.

12         But there's this Employee Placement for Transfer to

13   Delphi Locations, and it says a phone number to sign up for

14   transfer.

15         MR. LYONS:  Correct, and I see that, Your Honor, but

16   this hardly rises to the level of a commitment to provide a

17   transfer.  As a matter of fact, it says a notification would

18   come by certified mail.

19         You know, our contention, Your Honor, is just that

20   there isn't any writing here or, frankly, any particulars as to

21   who gave him, you know, this supposed promise, which, you know,

22   for 12(b)(6) purposes we need to have some kind of

23   particularity as to who said what to whom and when.  It's just

24   that the employee placement memo itself doesn't really give any

25   kind of details.  It's frankly just a "If you want to sign up

1    for it, you should call a number," but it does not in any way

2    indicate any kind of a commitment.

3         (Pause)

4         THE COURT:  He also says that there's a violation of

5    paragraph -- let me read it here -- of the national agreement

6    about transfers, in his grievance.  I have not gone and looked

7    at the underlying agreement, but he is referring to a specific

8    provision that, I gather, he says gives him the right to a

9    transfer, or at least a right to request a transfer.

10        MR. LYONS:  You know, for purposes of a sufficient

11   claim, though, he should at least refer to it or attach or

12   state what the provision is.  You know, certainly no one is

13   here from the UAW is here to -- as part of Mr. Lu --

14        THE COURT:  No, I understand.  I guess -- well, he

15   says paragraph 96 of the national agreement.

16        Now that I took my glasses of, I got to read it.

17        (Pause)

18        THE COURT:  I just -- I'm reluctant, given that this

19   is a pro se individual, and given what he has attached, which

20   refers to a specific grievance that he filed and this form, to

21   rule on that on a sufficiency basis, plus which, part of his

22   claim is for a buyout.  Oh, I see, that's why it ads up to

23   159-.  I was reading it as 7,000.  It's 70,000.

24        What's the response on the buyout?  The 89- is for the

25   transfer; the 70- is for the buyout, which I read mistakenly as

1    7,000, but it's for 70-.  Did he -- is the point that he didn't

2    take the buyout?  That's not what he stated in the objection.

3    I just think perhaps, like the Miller one, you guys should look

4    at this a little more.

5          MR. LYONS:  Why don't we continue it to the next

6    hearing, Your Honor, and we'll try to get some more --

7    paragraph 96 so we can take a look at it and get it clear

8    answer for Your Honor.

9          THE COURT:  Okay.  And it's really two issues; one is

10   did he properly exercise his right to the buyout.  Was that

11   even something that is a claim against Delphi as opposed to GM?

12   I'm not sure who was pai -- which buyout this was.  And then,

13   secondly, does paragraph 96 say anything about a right to

14   transfer?

15         I accept that there's no other basis in the claim for

16   a right to transfer, other than that paragraph -- other than

17   the collective bargaining agreement.  I don't think the notice

18   suffices without more, without a statement that we accept you.

19   So, really, the focus would be on the collective bargaining

20   agreement and on his alleged request for a buyout.

21         MR. LYONS:  Okay, we'll take a look at that, Your

22   Honor, and we'll --

23         THE COURT:  Okay.

24         MR. LYONS:  -- be back to you next hearing.

25         Next, item 31 is Frank Budelewski.  This is a claim,

1     again, for OPEB --

2                 THE COURT:  Right.

3                 MR. LYONS:  -- and for disability benefits which were

4     terminated.

5                 THE COURT:  And, again, based on the law of the case,

6     the termination was proper.

7                 MR. LYONS:  Item number 32 is a claim filed by Walter

8     A. Kunka.  This is a claimant who is seeking to get the full

9     year accrual vacation pay.  He was -- the vacation policy, in

10    accordance with its terms, was changed by the debtors.  He then

11    voluntarily left employment after that change was in place.

12    So, Your Honor, I think his claim is without merit.  The policy

13    was changed --

14                THE COURT:  Well --

15                MR. LYONS:  -- in accordance with its terms.

16                THE COURT:  -- I think he's contending that the change

17    itself was a breach.  But there's no contract with him, and the

18    debtors had the ability to change their vacation policy, so I

19    don't think there's any claim here.  I think the claim itself

20    acknowledges that the new policy, the one that was in effect

21    when he left, doesn't provide for accrual.  And therefore if

22    that policy governed, which I find it does, then he's not

23    entitled to what he's claiming.

24                MR. LYONS:  Okay, we will submit orders on that.

25                THE COURT:  Yes.

1          MR. LYONS:  Item number 33, Gary Cook.  This is a

2     claim for pre-petition workers' compensation.  And there were

3     actually two claims filed:  one we actually put in the notice,

4     and we omitted -- inadvertently omitted a second exact

5     duplicate claim, and we'd just as soon address both.

6          THE COURT:  But they're both admin claims, right?

7          MR. LYONS:  Both of them are filed as admin claims.

8          THE COURT:  And that's what you're objecting to is the

9     admin status?

10          MR. LYONS:  Correct, and to have --

11          THE COURT:  Right, and clearly this -- I mean, by --

12     on its face, it's a pre-petition injury and therefore it can't

13     be allowed as an administrative claim.

14          To the extent he's suggesting that the debtor -- I

15     don't think he is, but to the extent he's suggesting that the

16     debtors have an obligation to continue on with the health

17     benefits, that's, again, the law of the case that they don't.

18          MR. LYONS:  Okay, then finally, Your Honor, item

19     number 34, Sharyl Carter.  We have been before you on this one

20     before, and you --

21          THE COURT:  Well, you were before me in the context of

22     the pre-petition claim.  Now she's asserting an admin claim, is

23     that right?

24          MR. LYONS:  Yes, Your Honor.  There was a whole flurry

25     of claims --

1                    THE COURT:  Right.

2                    MR. LYONS:  -- and it relates to the same subject

3        matter that you ruled on.

4                    THE COURT:  I've already ruled on this, and my ruling

5        was that the district court had already ruled on this and that

6        the claim is barred by res judicata.  So these new claims

7        should also be disallowed.

8                    MR. LYONS:  Thank you, Your Honor.

9                    THE COURT:  Okay.

10                   MR. LYONS:  I believe that's all we have on our claims

11       agenda.  So thank you, Your Honor, for your --

12                   THE COURT:  Okay.  Thank you.

13                   MR. LYONS:  -- your time.

14                   THE COURT:  Okay.

15            (Proceedings concluded at 1:27 PM)

16

17

18

19

20

21

22

23

24

25

```
 1

 2                          I N D E X

 3

 4                     R U L I N G S

 5     DESCRIPTION                           PAGE      LINE

 6     Claims of The New York State Department     74         5

 7     of Environmental Conservation, disallowed

 8

 9     Claims of Pasricha Atul, disallowed     79         5

10

11     No distribution to be allowed on the    79        21

12     claims of Ronald E. Jorgensen

13

14     Claims of Jeffrey A. Miller, disallowed   80        20

15

16     Claims of Stanley D. Smith, disallowed    81         3

17

18     Hearing on Claims of James A. Luecke,    84         5

19     continued

20

21     Claims of Walter A. Kunka, disallowed    85        18

22

23     Claims of Gary L. Cook, disallowed       86        13

24

25     Claims of Sharyl Y. Carter, disallowed   87        13
```

```
1

2                            C E R T I F I C A T I O N

3

4        I, Clara Rubin, certify that the foregoing transcript is a true

5        and accurate record of the proceedings.

6        Clara Rubin

7        _____

8        Clara Rubin

9        AAERT Certified Electronic Transcriber (CET**D-491)

10

11       Veritext

12       200 Old Country Road

13       Suite 580

14       Mineola, NY 11501

15

16       Date:  April 29, 2010

17

18

19

20

21

22

23

24

25
```

Digitally signed by Clara Rubin
DN: cn=Clara Rubin, c=US
Reason: I am the author of this document
Date: 2011.03.18 14:15:15 -04'00'