# EXHIBIT D

TOGUT, SEGAL & SEGAL LLP                                 **HEARING DATE:**  5/26/11
Bankruptcy Conflicts Counsel for DPH Holdings Corp, *et al.*,           **AT:**  **10:00 A.M.**
Reorganized Debtors
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut
Neil Berger
Lara Sheikh

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                             :
In re:                                                       :
                                                             :        Chapter 11
DPH HOLDINGS CORP., et al.,                                  :        Case No. 05-44481 [RDD]
                                                             :
                            Reorganized Debtors.             :        Jointly Administered
                                                             :
-------------------------------------------------------------x

## REORGANIZED DEBTORS' STATEMENT OF DISPUTED ISSUES WITH RESPECT TO PROOF OF ADMINISTRATIVE EXPENSE CLAIM NOS. 19069, 19087, 19088, 19123, 19124, 19125, 19602, <u>19603, 19604, 19815, 19816, AND 19817 (BANK OF AMERICA, N.A.)</u>

### ("STATEMENT OF DISPUTED ISSUES – BANK OF AMERICA, N.A.")

DPH Holdings Corp. and its affiliated reorganized debtors in the above captioned cases (collectively, the "Reorganized Debtors") hereby submit this Statement of Disputed Issues (the "Statement of Disputed Issues") With Respect to Proof of Administrative Claim Numbers 19069, 19087, 19088, 19123, 19124, 19125, 19602, 19603, 19604, 19815, 19816, and 19817 filed by Bank of America, N.A. (the "Claimant") and respectfully represent as follows:

## Background

1.      On October 8 and 14, 2005  (the "Petition Date"), Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, including Delphi Automotive Systems Human Resources LLC ("DAS HR") and Delphi Automotive Systems LLC ("DAS") (collectively, the "Debtors"), predecessors to the Reorganized Debtors, filed voluntary petitions under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Chapter 11 Cases").

2.      On October 6, 2009, the Debtors substantially consummated the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified, (the "Modified Plan"), which had been approved by this Court pursuant to an order entered July 30, 2009 (Docket No. 18707), and emerged from chapter 11 as the Reorganized Debtors.  Article 9.6(a) of the Modified Plan provides that "[t]he Reorganized Debtors shall retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors and making distributions (if any) with respect to all Claims and Interests."

A.      **The July 15, 2009 Claims**

3.      On or about July 15, 2009, Claimant filed Proofs of Administrative Claim 19087 and 19124 ("Claims 19087 and 19124") against DAS HR.  Claims 19087 and 19124 are exact duplicates and assert an administrative priority claim in an unliquidated amount in excess of $8,691,000, triggered by DAS HR's rejection of a certain Learjet aircraft lease dated March 30, 2001 (the "Learjet Lease") and a certain Challenger aircraft lease, dated March 30, 2001 (the "Challenger Lease," together with the Learjet Lease, the "Rejected Leases" or the "Leases") pursuant to the Modified Plan.

2

4.       On or about July 15, 2009, Claimant filed Proofs of Administrative Claim 19069 and 19125 ("Claims 19069 and 19125") against DAS.  Claims 19069 and 19125 are exact duplicates and assert an administrative priority claim in an unliquidated amount in excess of $8,691,000, arising from DAS's guaranty of DAS HR's obligations under the Rejected Leases.

5.       On or about July 15, 2009, Claimant filed Proofs of Administrative Claim 19088 and 19123 ("Claims 19088 and 19123") against Delphi.  Claims 19088 and 19123 are exact duplicates and assert an administrative priority claim in an unliquidated amount in excess of $8,691,000, arising from Delphi's guaranty of DAS HR's obligations under the Rejected Leases.

**B.       The September 15, 2009 Claims**

6.       On or about September 15, 2009, Claimant filed Proof of Administrative Claim 19602 ("Claim 19602") against DAS HR.  Claim 19602 asserts an administrative priority claim in an unliquidated amount in excess of $10,352,500, triggered by DAS HR's rejection of the Leases pursuant to the Modified Plan.

7.       On or about September 15, 2009, Claimant filed Proof of Administrative Claim 19603 ("Claim 19603") against DAS.  Claim 19603 asserts an administrative priority claim in an unliquidated amount in excess of $10,352,500, arising from DAS's guaranty of DAS HR's obligations under the Rejected Leases.

8.        On or about September 15, 2009, Claimant filed Proof of Administrative Claim 19604 ("Claim 19604") against Delphi.  Claim 19604 asserts an administrative priority claim in an unliquidated amount in excess of $10,352,500, arising from Delphi's guaranty of DAS HR's obligations under the Rejected Leases.

**C.      The November 2, 2009 Claims**

9.      On or about November 2, 2009, Claimant filed Proof of Administrative Claim 19815 ("Claim 19815") against DAS HR.  Claim 19815 asserts an administrative priority claim in an unliquidated amount in excess of $10,633,035, triggered by DAS HR's rejection of the Leases pursuant to the Modified Plan.

10.      On or about November 2, 2009, Claimant filed Proof of Administrative Claim 19816 ("Claim 19816") against Delphi.  Claim 19816 asserts an administrative priority claim in an unliquidated amount in excess of $10,633,035, arising from Delphi's guaranty of DAS HR's obligations under the Rejected Leases.

11.      On or about November 2, 2009, Claimant filed Proof of Administrative Claim 19817 ("Claim 19817") against DAS.  Claim 19817 asserts an administrative priority claim in an unliquidated amount in excess of $10,633,035, arising from DAS's guaranty of DAS HR's obligations under the Rejected Leases.

**D.      The Omnibus Objections and Responses Thereto**

12.      On October 15, 2009, the Debtors objected to Claim 19088 pursuant to The Debtors' Thirty-Seventh Omnibus Objection Pursuant to 11 U.S.C. § 503(b) and Fed. R. Bankr. P. 3007 to Expunge Certain (I) Prepetition Claims, (II) Equity Interest, (III) Books and Records Claims, (IV) Untimely Claims, (V) Paid Severance Claims (VI) Pension, Benefit and OPEB Claims and (VII) Duplicate Claims (the "Thirty-Seventh Omnibus Objection") (Docket No. 18984) on the ground that Claim 19088 is duplicative of Claim 19123.

13.      On October 27, 2009, Claimant filed its Response to the Thirty-Seventh Omnibus Objection (Docket No. 19018).

14.      On November 2, 2009, Claimant filed its Amended Response to the Thirty-Seventh Omnibus Objection (Docket No. 10922), in which Claimant requested

that one set of its claims filed on or about July 15, 2009 be deemed allowed and the other duplicative set of claims be conditionally disallowed.  Claimant asserted that in the event that the Reorganized Debtors object to one or more of the remaining allowed claims, then the conditionally disallowed claims should be deemed automatically reinstated and allowed.  The Thirty-Seventh Omnibus Objection was adjourned as to Claim 19088.

15.    On April 16, 2010, the Debtors objected to Claim 19069, Claim 19087, Claim 19123, Claim 19124, Claim 19125, Claim 19602, Claim 19603, Claim 19604, Claim 19815, Claim 19816, and Claim 19817 (together with Claim 19088, the "Claims"), pursuant to The Debtors' Forty-Seventh Omnibus Objection Pursuant to 11 U.S.C. § 503(b) and Fed. R. Bankr. P. 3007 to (I) Disallow And Expunge (A) Certain Administrative Expense Books and Records Claims, (B) A Certain Administrative Expense Duplicate Claim, and (C) Certain Administrative Expense Duplicate Substantial Contribution Claims, and (II) Modify Certain Administrative Expense Claims (the "Forty-Seventh Omnibus Objection") (Docket No. 19873) on the ground that the Claims are not reflected on the Debtors' books and records.

16.    On May 11, 2010, Claimant filed responses (each, a "Response," and, collectively, the "Responses") (Docket Nos. 20018, 20019, 20020, 20022, 20023, 20024, 20025, 20026, 20027 and 20028) to the Forty-Seventh Omnibus Objection, asserting that the Claims are valid administrative priority expenses that were incurred by Claimant upon rejection of the Leases relating to maintenance, remarketing, and diminution in value of the aircraft.  Specifically, in its Responses, Claimant asserts post-petition administrative expense claims against each of DAS HR, DAS and Delphi in an amount not less than $8,902,276.77 comprised of the following:

5

(a)      Administrative Remarketing Fee:  Claimant asserts an
"Administrative Remarketing Fee Claim" under Schedule 2-A Lease
Supplement No. 1 and the Maintenance and Return Addendum (the
"Addendum") to the Leases, pursuant to which "the Debtors agreed to
pay a remarketing fee for the [Aircraft] upon [their] return to the Bank."
Response ¶ 20(a), (b).  Claimant calculates the remarketing fee for the
Learjet at $1,001,268.00, and for the Challenger at $1,690,483.20.  *Id.*  The
Addendum to the Leases provides in relevant part that DAS HR shall
"upon the return of the Aircraft upon the expiration or other termination
of this Lease (whether following an Event or Default or otherwise), …pay
to Lessor the Remarketing Fee" (emphasis added).[1]

(b)      Administrative Maintenance Claims:  Claimant asserts an
"Administrative Maintenance Claim" pursuant to the Addendum.
Response ¶ 20(e), (f).  Specifically, the Addendum provides:

> Upon the expiration, cancellation or other
> termination of the Lease (whether following an Event
> or Default or otherwise), Lessee, at its own expense,
> will return the Aircraft (together with all Records) to
> Lessor at a location specified by the Lessor…in the
> condition in which the Aircraft is required to be
> maintained pursuant to this M&R Addendum and
> any other applicable provisions of the Lease.[2]

According to Claimant's inspection of the aircraft following termination of
the Leases, the Debtors' obligations under this provision of the
Addendum total $51,703.37 for the Learjet Lease, and $131,214.20 for the
Challenger Lease.  Response ¶ 20(e), (f).

Administrative Diminution Claims:  Finally, Claimant asserts an
"Administrative Diminution Claim" for the decrease in value of the aircraft
subject to the Leases during the pendency of the Chapter 11 cases.  Response ¶
20(g), (h).  Specifically, the Addendum provide that "upon the expiration,
cancellation or other termination of the Lease" the Debtor must pay for any
diminution in value of the Aircraft upon their return to the Lessor if (i) any
repairs were made to the Aircraft, or if (ii) the "Actual Annual Hours" for the
period from the "Acceptance Date" to the return date is ten percent greater than
"Estimated Annual Hours."[3]  Claimant asserts an Administrative Diminution
Claim of:  (i) $2,150,816 for the aircraft subject to the Learjet Lease, Response ¶
20(g), and (ii) $3,876,792 for the aircraft subject to the Challenger Lease, Response
¶ 20(h).

---

[1]   *See*, Learjet Aircraft Lease at 49, Challenger Aircraft Lease at 49.  True and correct copies of
the Leases are attached as Exhibit "1."

[2]   *See*, Learjet Aircraft Lease at 49, Challenger Aircraft Lease at 49.

[3]   *See*, Learjet Aircraft Lease at 49-50.  Challenger Aircraft Lease at 49-50.

### Disputed Issues

17.     The Debtors' books and records show no post-petition amounts due and owing under the Leases.  According to the Debtors' books and records, DAS HR remained current on all post-petition obligations under the Rejected Leases through the October 6, 2009 rejection date, including, without limitation, the payment of rent and maintenance of the aircraft subject to the Leases.

18.     The Claims are based entirely on provisions of the Leases that were triggered by the Debtors' rejection of the Leases and therefore, to the extent valid, are entitled to general unsecured status as rejection damages pursuant to Bankruptcy Code § 365(g)(1) and relevant caselaw.

19.     Claimant has separately filed general unsecured claims alleging damages arising from the Rejected Leases, which incorporate, among other amounts, the remarketing fees, maintenance and diminution in value claims that comprise the Claims, and the Debtors reserve all of their rights regarding those general unsecured claims.

20.     Based on the foregoing, there are no amounts owing on account of the Claims, which are entitled to administrative priority, and the Reorganized Debtors request that the Claims be disallowed and expunged.

**[Concluded on Following Page]**

7

<u>Reservation Of Rights</u>

21.    This Statement Of Disputed Issues is submitted by the Reorganized

Debtors pursuant to paragraph 9(d) of the Order Pursuant To 11 U.S.C. § 502(b) And

Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates

For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures

Governing Objections To Claims (Docket No. 6089) (the "Claims Objection Procedures

Order").  Consistent with the provisions of the Claims Objection Procedures Order, the

Reorganized Debtors' submission of this Statement Of Disputed Issues is without

prejudice to (a) the Reorganized Debtors' right to later identify and assert additional

legal and factual bases for disallowance, expungement, reduction, or reclassification of

the Claim(s) and (b) the Reorganized Debtors' right to later identify additional

documentation supporting the disallowance, expungement, reduction, or

reclassification of the Claim(s).


Dated:   New York, New York            DPH HOLDINGS CORP., *et al.*
         March 29, 2011                By their attorneys,
                                       TOGUT, SEGAL & SEGAL LLP
                                       By:


                                       /s/ Neil Berger
                                       NEIL BERGER
                                       A Member of the Firm
                                       One Penn Plaza
                                       New York, New York 10119
                                       (212) 594-5000


8

**EXHIBIT "1"**

**True and Correct Copies of the Leases**

# EXHIBIT A
# (PART 1)

8-115

| U.S. DEPARTMENT OF TRANSPORTATION FEDERAL AVIATION ADMINISTRATION **CROSS-REFERENCE—RECORDATION** | SEE CONVEYANCE NO FILING DATE: |
|---|---|

This form is to be used in cases where a conveyance covers several aircraft and engines, propellers, or locations. File original of this form with the recorded conveyance and a copy in each aircraft folder involved.

| TYPE OF CONVEYANCE **AIRCRAFT LEASE** | DATE EXECUTED 3-30-2001 |
|---|---|
| FROM **FLEET NATIONAL BANK** | DOCUMENT NO. T068688 |
| TO OR ASSIGNED TO **SM 5105 LLC** | DATE RECORDED January 29, 2002 |

**THE FOLLOWING COLLATERAL IS COVERED BY THE CONVEYANCE:**

| AIRCRAFT (List by registration number) | TOTAL NUMBER INVOLVED   1 |
|---|---|
| N699DA | |

| ENGINES | | TOTAL NUMBER INVOLVED  2 |
|---|---|---|
| MAKE(S) **PRATT & WHITNEY   PW305A** | SERIAL NO.  PCE-CA0319        PCE-CA0318 | |
| PROPELLERS | | TOTAL NUMBER INVOLVED |
| MAKE(S) | SERIAL NO. | |

| SPARE PARTS —LOCATIONS | TOTAL NUMBER INVOLVED |
|---|---|
| LOCATION | |

RECORDED CONVEYANCE FILED IN:  N699DA     LEARJET 60  SERIAL  237

AC FORM 8050-23 (1-96) (0052-00-582-6000)

0 0 0 0 0 0 0 1 3 9 7

CERTIFIED COPY-TO BE RECORDED

8-113

**AIRCRAFT LEASE**
**(N699DA)**

**DATED AS OF MARCH 30, 2001**

between

**FLEET NATIONAL BANK**
**as Lessor**

and

**SM 5105 LLC**
**as Lessee**

This is Counterpart No. 5 of a total of 5 counterparts. Only Counterpart No. 1 shall be considered chattel paper for purposes of the Uniform Commercial Code and a security interest may be perfected only by possession of Counterpart No. 1.

RSCOMBS 365237

(AIRCRAFT LEASE)

0 0 0 0 0 0 0 1 3 9 8                                      8-111

# TABLE OF CONTENTS

**Section 1.** Lease and Acceptance of Aircraft. ..................................................................1

**Section 2.** Conditions to Closing. ..................................................................................1

**Section 3.** Term and Rent. .............................................................................................1

**Section 4.** Title; Quiet Possession and Use. .................................................................2

**Section 5.** Disclaimer and Assignment of Warranties...................................................3

**Section 6.** Representations, Warranties and Agreements of Lessee. .........................4

**Section 7.** Net Lease. .....................................................................................................6

**Section 8.** Taxes. ...........................................................................................................7

**Section 9.** Compliance and Use.....................................................................................7

**Section 10.** Loss or Damage..........................................................................................8

**Section 11.** Indemnification.............................................................................................9

**Section 12.** Assignment and Sublease. ......................................................................10

**Section 13.** Events of Default......................................................................................14

**Section 14.** Remedies..................................................................................................15

**Section 15.** Notices......................................................................................................17

**Section 16.** Transaction Expenses..............................................................................17

**Section 17.** Miscellaneous. .........................................................................................18

**Section 18.** Amendments.............................................................................................19

**Section 19.** Truth in Leasing. ......................................................................................19

EXHIBIT A - Definitions
Lease Supplement No. 1
Schedule No. 1 to Lease Supplement No. 1
Schedule No. 2 to Lease Supplement No. 1
Schedule No. 2-A to Lease Supplement No. 1 *
Schedule No. 3 to Lease Supplement No. 1 *
Schedule No. 4 to Lease Supplement No. 1 *
Lease Supplement No. 2

RSCOMBS 366237                                    i                        (AIRCRAFT
LEASE)

0 0 0 0 0 0 0 1 3 9 9

8-109

EXHIBIT B - Warranty Bill of Sale
EXHIBIT C - Special Tax Indemnity Rider *
Insurance Addendum
Purchase, Early Purchase and Renewal Option Addendum
Maintenance and Return Addendum
Upgrade Addendum

*        to be deleted from FAA filing copy and copy of lease to be placed on board the Aircraft

0 0 0 0 0 0 0 1 4 0 0                                    8-107

* T 0 6 8 6 8 8

## AIRCRAFT LEASE

THIS AIRCRAFT LEASE (together with all Supplements, Exhibits, Riders and Addenda hereto, the "Lease") is made and entered into as of March 30, 2001 by and between FLEET NATIONAL BANK, a national banking association organized under the laws of the United States of America ("Lessor"), with a place of business at c/o Fleet Capital Corporation, One Financial Plaza, Fifth Floor, Providence, RI 02903-2305, and SM 5105 LLC, a Delaware limited liability company ("Lessee"), c/o 38500 Woodward Avenue, Suite 100, Bloomfield Hills, MI 48304. Certain capitalized terms as used in this Lease are defined in Exhibit A hereto, and such definitions are hereby incorporated herein and made a part hereof as though set forth herein in full.

**Section 1. Lease and Acceptance of Aircraft.**

Subject to the satisfaction of each condition set forth in Section 2, Lessor hereby agrees to purchase the Aircraft from the Supplier pursuant to that certain Aircraft Purchase Agreement specified in Section 1 of Lease Supplement No. 2 hereto and to lease the same to Lessee and Lessee hereby agrees to lease the same from Lessor for the Basic Term hereof pursuant to the terms and conditions of this Lease. The sale of the Aircraft to Lessor shall include all of Supplier's right, title and interest in and to the Aircraft.

Lessor hereby appoints Lessee as Lessor's agent for the sole and limited purpose of accepting delivery of the Aircraft from the Supplier. The execution by Lessee of Lease Supplement No. 1 shall evidence that the Aircraft is leased under, and is subject to all of the terms, provisions and conditions of, this Lease and constitute Lessee's unconditional and irrevocable acceptance of the Aircraft for all purposes of this Lease. Except as may be expressly set forth herein, this Lease is non-cancelable and non-terminable by Lessee.

**Section 2. Conditions to Closing.**

(a)   Conditions Precedent. Lessor's obligations to purchase the Aircraft from the Supplier and to lease the Aircraft to Lessee, shall each be both subject to and conditioned upon all of the following conditions being satisfied:

(i)   Lessor shall have received the Closing Documents set forth on Lease Supplement No. 2 hereto, all in form and substance reasonably satisfactory to Lessor.

(ii)   No material adverse change in the financial condition of Lessee has occurred since the date of the last financial statements furnished to Lessor as set forth on Schedule No. 2 to Lease Supplement No. 1.

(iii)   Lessee's acceptance of the Aircraft on or before the Acceptance Date.

(iv)   In addition to the above listed conditions precedent, Lessee covenants and agrees that upon Lessor's acknowledgment that all the conditions to the sale and lease as aforestated have been satisfied, Lessee shall authorize the release, and cause each Guarantor to release, from escrow, to Lessor of the documents held by FAA Counsel on behalf of Lessee and shall authorize FAA Counsel to file and record all appropriate documentation with the FAA on the Acceptance Date.

(b)   Conditions Subsequent. Lessee shall comply with the Conditions Subsequent set forth in Lease Supplement No. 2 hereto.

*#15*

*0 1354 1102135*
*12/20/01*

**Section 3. Term and Rent.**

RSCOMBS 366237                                                    (AIRCRAFT LEASE)

0 0 0 0 0 0 0 1 4 0 1

8-105

(a)    The leasing of the Aircraft by Lessor to Lessee shall commence on the Acceptance Date and end on the Expiration Date each as set forth on Schedule No. 2 to Lease Supplement No. 1, unless this Lease shall have been earlier terminated, cancelled or extended.

(b)    Lessee shall pay to Lessor as basic rent (herein referred to as "Basic Rent") the following:

(i)    On the Acceptance Date, an amount equal to the Daily Lease Rate, multiplied by the number of days elapsed from and including the Acceptance Date with respect to the Aircraft to but excluding the Rent Commencement Date.

(ii)    On the First Basic Rent Date and on each Basic Rent Date thereafter, to and including the Last Basic Rent Date, an amount equal to the Basic Rent set forth on Schedule 2-A to Lease Supplement No. 1.

(iii)    After the Expiration Date until the Aircraft is returned to the Lessor in accordance with the terms and conditions of this Lease, an amount equal to the Basic Rent. Such amount shall be payable from and after the Expiration Date until the return of the Aircraft to the Lessor as provided under this Lease. Such amount shall be payable on the same dates and with the same frequency as Basic Rent was payable during the Term.

(c)    In addition, Lessee shall pay to Lessor the following amounts (herein referred to as "Supplemental Rent" and, together with all Basic Rent, collectively as "Rent"): (i) any other amount payable hereunder which Lessee assumes the obligation to pay, or agrees to pay, under this Lease to Lessor or others; (ii) on the date provided herein, any amount payable hereunder as Casualty Value and/or any amounts due pursuant to any Rider or Addendum hereto plus any and all amounts regarding the same; and (iii) interest at the lesser of the Late Payment Rate or the highest rate of interest permitted by applicable law for the number of days actually elapsed on any amount payable hereunder not paid when due. The expiration, cancellation or other termination of Lessee's obligation to pay Basic Rent hereunder shall not terminate, limit or modify the obligations of Lessee with respect to Supplemental Rent, which shall survive such expiration, cancellation or other termination of the Lease.

(d)    All payments of Rent or other amounts required hereunder shall be made to Lessor in immediately available United States funds on the date payable hereunder at the address designated by Lessor for payment, by wire transfer to an account specified by Lessor or at such other address or to such other Person as Lessor may direct by notice in writing to Lessee.

Section 4. Title; Quiet Possession and Use.

Title to the Aircraft shall at all times remain in Lessor (or such other entity as Lessor shall designate) and at no time during the Term shall title become vested in Lessee. Unless Lessee exercises its purchase option, Lessee shall acquire no right, title or interest in or to the Aircraft except the right to use the Aircraft pursuant to the terms of this Lease.

Lessor warrants that during the term of this Lease, so long as no Event of Default has occurred and is continuing hereunder, Lessee's possession and use of the Aircraft shall not be divested or interfered with by Lessor or anyone claiming by, through or under Lessor.

The warranty set forth hereinabove is in lieu of all other warranties of Lessor, whether written, oral or implied, with respect to this Lease or the Aircraft, and Lessor shall not be deemed to have modified in any respect the obligations of Lessee pursuant to Section 7 hereof, which obligations are and shall remain absolute, irrevocable and unconditional under all events and circumstances whatsoever.

RSCOMBS 366237                    2                    (AIRCRAFT LEASE)

0 0 0 0 0 0 0 1 4 0 2

8-103

### Section 5. Disclaimer and Assignment of Warranties.

LESSEE EXPRESSLY ACKNOWLEDGES THAT IT HAS SELECTED THE AIRCRAFT WITHOUT ANY ASSISTANCE FROM LESSOR, ITS AGENTS OR EMPLOYEES AND LESSEE EXPRESSLY AGREES THAT IT IS LEASING THE AIRCRAFT FROM LESSOR IN AN "AS IS" CONDITION. LESSEE FURTHER ACKNOWLEDGES THAT THE LESSOR HAS NOT MANUFACTURED OR SUPPLIED THE AIRCRAFT AND THAT THE LESSOR ACQUIRED OR WILL ACQUIRE THE AIRCRAFT AND/OR THE RIGHT TO POSSESSION THERETO IN CONNECTION WITH THIS LEASE. LESSOR SHALL NOT BE DEEMED TO HAVE MADE, AND LESSOR HEREBY EXPRESSLY DISCLAIMS, ANY REPRESENTATION OR WARRANTY (EXCEPT FOR THE WARRANTY OF QUIET POSSESSION AND USE), EITHER EXPRESS OR IMPLIED, AS TO THE AIRCRAFT, ANY PART THEREOF, ANY RECORDS, OR ANY MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, THE DESIGN, CONDITION, CAPACITY OR DURABILITY OF THE AIRCRAFT, ITS MERCHANTABILITY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE, USE OR OPERATION, THE QUALITY OF THE MATERIALS OR WORKMANSHIP OF THE AIRCRAFT, ITS VALUE OR AIRWORTHINESS, TITLE, SAFETY, THE ABSENCE OF ANY PATENT, TRADEMARK OR COPYRIGHT INFRINGEMENT OR LATENT DEFECT (WHETHER OR NOT DISCOVERABLE BY LESSEE), COMPLIANCE OF THE AIRCRAFT WITH THE REQUIREMENTS OF ANY LAW, RULE, REGULATION OR STANDARD PERTAINING THERETO, OR THE CONFORMITY OF THE AIRCRAFT TO THE PROVISIONS AND SPECIFICATIONS OF ANY PURCHASE DOCUMENT RELATING THERETO OR ANY INTERFERENCE OR ANY COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE, NOR SHALL LESSOR BE LIABLE, REGARDLESS OF ANY ACTUAL OR ALLEGED NEGLIGENCE OF LESSOR, FOR ANY DEFECTS, EITHER PATENT OR LATENT (WHETHER OR NOT DISCOVERABLE BY LESSEE), IN THE AIRCRAFT OR ANY PART THEREOF OR ANY DIRECT OR INDIRECT DAMAGE TO PERSONS OR PROPERTY RESULTING THEREFROM OR FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES OR FOR STRICT OR ABSOLUTE LIABILITY IN TORT. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, LESSEE HEREBY WAIVES ANY CLAIM (INCLUDING ANY CLAIM BASED ON STRICT OR ABSOLUTE LIABILITY IN TORT OR INFRINGEMENT) IT MIGHT HAVE AGAINST LESSOR FOR ANY LOSS, DAMAGE OR EXPENSE (INCLUDING, WITHOUT LIMITATION, DIRECT, INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGE, ANY LOSS OF BUSINESS OR PROFITS OR ANY INTERRUPTION OR LOSS OF SERVICE OR USE THEREOF) CAUSED BY THE AIRCRAFT OR BY LESSEE'S LOSS OF USE THEREOF FOR ANY REASON WHATSOEVER.

If the Aircraft is not delivered, does not operate as warranted, becomes obsolete, or is unsatisfactory for any reason whatsoever, Lessee shall make all claims on account thereof solely against the Manufacturer or Supplier and not against Lessor, and Lessee shall nevertheless pay all Rent and other sums payable hereunder. Lessee acknowledges that neither the Manufacturer or Supplier nor any sales representative or agent thereof, is an agent of Lessor, and no agreement or representation as to the Aircraft or any other matter by any such sales representative or agent of the Manufacturer or Supplier shall in any way affect Lessee's obligations hereunder.

So long and only so long as an Event of Default hereunder shall not have occurred and be continuing, and so long and only so long as the Aircraft shall be subject to this Lease and Lessee shall be entitled to possession of the Aircraft hereunder, Lessor assigns to Lessee and authorizes Lessee, at Lessee's expense, to assert for Lessor's account, all rights, claims and powers of Lessor against any manufacturer, supplier, vendor or dealer, including without limitation, any rights arising under any manufacturer's, vendor's or dealer's warranty on the Aircraft or any part thereof, (including, without limitation, any warranty of Manufacturer or Supplier). Notwithstanding the foregoing, Lessee shall not attempt to enforce any such performance in the name of Lessor by legal proceeding without Lessor's prior written approval. Lessor reserves the right to approve all pleadings and legal process bearing its name. Further, Lessor agrees to provide its reasonable cooperation to Lessee, at Lessee's expense, in connection with Lessee's exercise of the rights and powers assigned above.

0 0 0 0 0 0 0 1 4 0 3

8-101

**Section 6.** Representations, Warranties and Agreements of Lessee.

Lessee represents, warrants and agrees as follows:

(a) _Due Organization_. Lessee has the form of business organization indicated in the caption of this Lease and is duly organized and existing in good standing under the laws of the state listed in the caption of this Lease and is duly qualified to do business wherever necessary to carry on its present business and operations, including, without limitation, the Primary Hangar Location, and to own its property.

(b) _Due Authorization; No Violation_. This Lease has been duly authorized by all necessary action on the part of Lessee consistent with its form of organization, does not require any further shareholder, member or partner approval, does not require the approval of, or the giving notice to, any Federal, state, local or foreign governmental authority (including, without limitation, the Department of Transportation and/or the FAA) and does not contravene any law binding on Lessee or contravene any provision of, or constitute a default under any certificate or articles of incorporation or organization or by-laws or partnership certificate or agreement, or any agreement, indenture, or other instrument to which Lessee is a party or by which it may be bound.

(c) _Enforceability_. This Lease has been duly executed and delivered by authorized representatives of Lessee and constitutes a legal, valid and binding obligation of Lessee enforceable in accordance with its terms.

(d) _Reserved_.

(e) _Furnishing of Information_. Lessee agrees that it shall furnish from time to time to Lessor such information relating to Lessee, its subsidiaries and/or affiliates as Lessor shall reasonably request.

(f) _Name and Location of Chief Executive Offices_. The chief executive offices and principal place of business of Lessee is located at the address set forth in Schedule No. 2 to Lease Supplement No. 1, and Lessee agrees to give Lessor thirty (30) days' prior written notice of any relocation of said chief executive offices or principal place of business from its present location, or of any change in its name or identity. Since its organization effective as of October 4, 2000, Lessee has not changed its name, done business under any other names, changed its chief place of business from its present location or merged or been the surviving entity of any merger.

(g) _Documents on Board_. A current and valid Registration Application or Certificate of Aircraft Registration and Standard Airworthiness Certificate (FAA Form AC 8100-2) pertaining to the Aircraft and a copy of this Lease and the Lease Supplements, will be kept on board the Aircraft at all times during the Term. In addition, for all operations outside the continental United States, the Lessee shall maintain either a permanent Certificate of Registration or "fly-time wire" (FAA Standard Form 14) on board the Aircraft.

(h) _Litigation_. There are no proceedings pending or, so far as the officers of Lessee know, threatened against or affecting Lessee or any of its property before any court, administrative officer or administrative agency which would, directly or indirectly, adversely affect or impair the title of Lessor to the Aircraft, or which, if decided adversely, materially and adversely affect the financial condition or operations of Lessee or the ability of Lessee to perform its obligations under this Lease.

(i) _No Adverse Mortgages_. The right, title and interest of Lessor in and to the Aircraft and the Rent will not be adversely affected or impaired by the terms of any mortgage, loan agreement or indenture or any other contract, agreement or instrument to which Lessee is a party, or under which it or any of its property is or may become bound. In addition, no mortgage, deed of trust, or other Lien which now covers or affects, or which may hereafter cover or affect, any property or interest therein of Lessee, now attaches or hereafter will attach to the Aircraft, the Airframe or any Engine, or in any manner affects or will affect adversely Lessor's right, title and interest therein.

RSCOMBS 366237                                        4                                        (AIRCRAFT LEASE)

0 0 0 0 0 0 0 1 4 0 4                    8-99

(j)   Taxes.  Lessee has filed or caused to be filed and will continue to file all Federal, state and local tax returns which are required to be filed, and has paid or caused to be paid and will continue to pay all taxes shown to be due and payable on such returns or (except to the extent being contested in good faith) on any assessment received by Lessee, to the extent that such taxes have heretofore or in the future become due and payable.

(k)   Possession and Liens.  Except as permitted by this Lease, Lessee will not sell, convey, transfer, exchange, lease or otherwise relinquish possession or dispose of the Aircraft, Engine or Part (except for delivery of possession of the Aircraft or any Engine or Part to another Person for testing, service, repair, maintenance, overhaul or, to the extent permitted hereby, alteration or modification), or attempt or offer to do any of the foregoing.  Lessee will not directly or indirectly, voluntarily or involuntarily, create, incur, assume or suffer to exist any Liens on or with respect to the Aircraft or any Part, Lessor's title thereto or any interest of Lessor therein (and Lessee will promptly, at its own expense, take such action as Lessor deems necessary or advisable to duly discharge any such Lien), except Permitted Liens.  In the event that Lessee fails to take action to discharge or remove any such Lien, Lessor may take such action as it deems necessary or appropriate to discharge or remove such Lien.  Lessee shall reimburse Lessor on demand for any costs incurred by Lessor in connection with such action together with interest at the Late Payment Rate.  Lessor's rights hereunder are in addition to, and not in derogation of, any other rights which Lessor may have hereunder, at law or in equity.

(l)   Good Title.  Lessor will be the owner of the Aircraft as of the Acceptance Date and will have good and marketable title to the Aircraft, free and clear of all Liens other than any Liens created in favor of Lessor under this Lease or other Permitted Liens.

(m)   Records.  Lessee has reviewed all Records with respect to the operation and maintenance of the Aircraft prior to the Acceptance Date and, to Lessee's knowledge, such Records have been kept in accordance with the requirements of the FAA rules and regulations and industry standards.  Lessee shall maintain all such Records during the Term in accordance with the requirements of the FAA, and any manufacturer's maintenance programs or requirements as the requirements of this Lease.

(n)   Addenda, Exhibits and Riders.  Lessee shall perform all of its agreements, undertakings and obligations set forth in the Addenda, Exhibits and Riders hereto and shall comply with all of the terms and conditions set forth in such Addenda, Exhibits and Riders.

(o)   U.S. Citizen.  Lessee is and will continue to be a "citizen of the United States" within the meaning set forth in 49 USC Section 40102 (a) (15).

(p)   Engines.  Each of the Engines has 750 or greater rated takeoff horsepower or the equivalent of such horsepower.

(q)   Incidental Use.  The operation of the Aircraft by Lessee is incidental to a business purpose of Lessee (other than the business of transportation by air),

(r)   Due Authorization of Guarantor, No Violation.  Each Guaranty has been duly authorized by all necessary action on the part of such Guarantor consistent with its form of organization, does not require any further approval, does not require the approval of, or the giving notice to, any Federal, state, local or foreign governmental authority (including, without limitation, the Department of Transportation and/or the FAA) and does not contravene any law binding on such Guarantor or contravene any provision of, or constitute a default under any certificate or articles of incorporation or organization or by-laws or partnership certificate or agreement, or any agreement, indenture, or other instrument to which such Guarantor is a party or by which it may be bound.

RSCOMBS 366237                          5                          (AIRCRAFT LEASE)

0 0 0 0 0 0 0 I 4 0 5

8-97

(s)    Binding Obligations of Guarantor. Each Guaranty has been duly executed and delivered by an authorized representative of such Guarantor and constitutes the legal, valid and binding obligations of such Guarantor enforceable against such Guarantor in accordance with its respective terms, except to the extent that enforcement may be limited under applicable bankruptcy and insolvency laws.

(t)    Litigation Regarding Guarantor. There are no proceedings pending or, so far as the officers or other authorized parties of Lessee know, threatened against or affecting either Guarantor or any of its property before any court, administrative officer or administrative agency that would, if decided adversely, materially and adversely affect the financial condition or operations of such Guarantor or the ability of such Guarantor to perform its obligations under the Guaranty to which it is a party.

(u)    Guarantor Financial Statements. Lessee agrees to cause Corporate Guarantor to make available to Lessor (i) as soon as available, and in any event within one hundred twenty (120) days after the last day of each fiscal year of Corporate Guarantor, a copy of the balance sheet of Corporate Guarantor as of the end of such fiscal year, and related statements of income and retained earnings of Corporate Guarantor for such fiscal year, all in reasonable detail prepared in accordance with generally accepted accounting principles consistently applied and certified by an independent certified public accounting firm of recognized standing and which is reasonably acceptable to Lessor, each on a comparative basis with corresponding statements for the prior fiscal year; and (ii) within forty five (45) days after the last day of each fiscal quarter of Corporate Guarantor (except the last fiscal quarter of any fiscal year), a copy of the balance sheet of Corporate Guarantor as of the end of each such quarter, and statement of income and retained earnings covering the fiscal year to date of Corporate Guarantor, each on a comparative basis with the corresponding period of the prior year, all in reasonable detail and certified by the treasurer or principal financial officer of Corporate Guarantor. Notwithstanding the foregoing, in the event that Corporate Guarantor has debt or equity securities regulated by the SEC, Corporate Guarantor shall make available to Lessor all reports, forms and other filings, if any, required to be made by Corporate Guarantor to the SEC including, without limitation, any SEC Forms 10-K and 10-Q and related reports or documents within thirty (30) days after the date on which they are filed and this shall be deemed to satisfy the requirements of this paragraph. All credit, financial and other information provided by Corporate Guarantor or at Corporate Guarantor's direction is, and all such information hereafter furnished will be, true, correct and complete in all material respects.

(v)    Consideration for Guaranty. Each Guarantor will receive reasonably equivalent value and adequate and sufficient consideration in exchange for the giving of the Guaranty to which it is a party. Neither Guarantor is insolvent on the date hereof and neither will become insolvent after giving effect to the Guaranty to which it is a party and the contingent liabilities contained herein. Each Guarantor has sufficient capital to perform its obligations under the Guaranty to which it is a party. The performance of the obligations by each Guarantor under the Guaranty to which it is a party will not cause each Guarantor to exceed its ability to pay its debts as they mature.

Section 7. Net Lease.

This Lease is a net lease, and Lessee acknowledges and agrees that Lessee's obligation to pay all Rent hereunder and the rights of Lessor in and to such Rent, shall be absolute, irrevocable and unconditional and shall not be subject to cancellation, termination, modification or repudiation by Lessee or any abatement, reduction, setoff, defense, counterclaim or recoupment (collectively, "Abatements") for any reason or under any circumstance whatsoever, including, without limitation, Abatements due to any present or future claims of Lessee against Lessor, its successors and assigns whether under this Lease or otherwise, the Manufacturer, the Supplier or any other Person for whatever reason. Lessee hereby waives any and all existing and future claims to any Abatement against such Rent, and agrees to pay all such Rent regardless of any Abatement which may be asserted in connection with this Lease, the Aircraft or otherwise. Except as otherwise expressly provided herein, this Lease shall not terminate, nor shall the obligations of Lessee be affected, by reason of any defect in or damage to, or any loss or destruction of, the Aircraft or any part thereof from whatsoever cause, or the invalidity or unenforceability or lack of due authorization of this Lease or lack of

RSCOMBS 366237                                        6                                    (AIRCRAFT LEASE)

0 0.0 0 0 0 0 1 4 0 6

8-95

right, power or authority of Lessor to enter into this Lease, or for any other cause, whether similar or dissimilar to the foregoing, any present or future law or regulation to the contrary notwithstanding, it being the express intention of Lessor and Lessee that all Rent payable to Lessor hereunder shall be, and continue to be, payable in all events unless and until the obligation to pay the same shall be terminated pursuant to the express provisions of this Lease.

## Section 8. Taxes.

Lessee agrees to: (i) file directly with all appropriate taxing authorities all declarations, returns, inventories and other documentation with respect to any personal property taxes (or any other taxes in the nature of or imposed in lieu of property taxes) due or to become due with respect to the Aircraft and shall pay on or before the date when due all such taxes assessed, billed or otherwise payable with respect to the Aircraft directly to the appropriate taxing authorities and (ii) (a) pay when due as requested by Lessor and (b) defend and indemnify Lessor against liability for all license and/or registration fees, assessments, and sales, use, property, excise, privilege and other taxes (including any related interest or penalties) or other charges or fees now or hereafter imposed by any governmental body or agency upon the Aircraft or with respect to landing, airport use, manufacturing, ordering, shipment, purchase, ownership, delivery, installation, leasing, operation, possession, use, return, or other disposition thereof or the rentals hereunder (other than taxes on or measured by the net income of Lessor or attributable to the period commencing on the later of (i) the return or sale to a third party of the Aircraft in accordance with the terms of this Lease or (ii) the expiration or earlier termination of this Lease in accordance with the terms hereof)(the items referred to in (i) and (ii) above being referred to herein as "Impositions"). Any Impositions which are not paid when due and which are paid by Lessor shall, at Lessor's option, become immediately due from Lessee to Lessor. Notwithstanding the foregoing, Lessee shall pay, indemnify Lessor for and hold Lessor harmless on a net after-tax basis from and against, all Impositions on or measured by the net income of Lessor imposed against Lessor by any local or foreign government or other local or foreign taxing authority if and to the extent that Lessor would not have incurred such Impositions but for the operation or presence of the Aircraft within the jurisdiction asserting an Imposition. Any payment described in the immediately preceding sentence shall not exceed an amount equal to the product of: (A) the tax rate of the government or other taxing authority imposing the tax, times (B) the Basic Rent which would have been allocated or apportioned to the taxing jurisdiction on a stand-alone basis separate from the Lessor's other income. Provided that no Event of Default has occurred and is continuing, Lessee may contest, if permitted by law to do so, and if not may request that Lessor contest, in either case at Lessee's sole expense, any assessment or billing of such Impositions in which the amount at issue exceeds $10,000 (and, if permitted by applicable law, may withhold payment of any such Impositions during the pendency of the contest), provided that any such contest does not result in the imposition of any Lien on, or risk of forfeiture of, the Aircraft. Lessor shall notify Lessee of any such billing or assessment, shall cooperate with Lessee in any contest conducted by Lessee, and shall not compromise any contest conducted by Lessor without Lessee's consent. Notwithstanding anything contained herein to the contrary Lessee will not be liable for any penalties, fines, or interest resulting from any acts or omissions of Lessor.

## Section 9. Compliance and Use.

Lessee agrees to comply with all laws, regulations and governmental orders related to this Lease and/or the Aircraft, its use or possession. The Aircraft shall be used in furtherance of Lessee's business or other objectives. The Aircraft shall be used solely in a passenger configuration for which Lessee is duly authorized by the FAA. Lessee will not operate or permit the Aircraft to be operated at any time or in any geographic area when or where insurance required by the provisions hereof shall not be in effect. Lessee will not operate or permit the Aircraft to be operated in a manner, for any time period, such that Lessor or a third party (except, where expressly permitted hereunder, an air carrier or air taxi operator certificated under Part 121 or Part 135 of the Federal Aviation Regulations) shall be deemed to have "operational control" of the Aircraft. Without the prior written consent of Lessor or except as otherwise expressly permitted hereunder, Lessee shall not operate or permit the Aircraft to be operated under Part 135 of the Federal Aviation Regulations. Throughout the Term, the possession, use and maintenance of the Aircraft shall be at the sole

RSCOMBS 365237                                7                                (AIRCRAFT LEASE)

0 0 0 0 0 0 0 1 4 0 7                                    8-93

risk and expense of Lessee and the Aircraft shall be based at the Primary Hangar Location set forth in Schedule No. 2 to Lease Supplement No. 1. At all times the Aircraft will be operated only by duly qualified, currently certificated pilots as required by the insurance policies required under this Lease. IN ADDITION, EXCEPT AS EXPRESSLY PERMITTED BY THE FOLLOWING PARAGRAPH, THE AIRCRAFT SHALL NOT BE OPERATED, USED OR LOCATED OUTSIDE THE CONTINENTAL UNITED STATES.

Notwithstanding the foregoing, Lessor agrees that the Aircraft may be flown temporarily to any country in the world in connection with the conduct of Lessee's business; provided, however, that in no event may the Aircraft temporarily fly, be operated, used or located in, to or over any such country or area (1) which is excluded from coverage by any insurance policy in effect with respect to such Aircraft or by any insurance policy required by the terms hereof or any country or area not specifically and fully covered by such insurance; (2) in a recognized or threatened area of hostility unless fully covered to Lessor's satisfaction by hull, political, expropriation, hijacking and war risk insurance or (3) with which the United States of America does not maintain favorable diplomatic relations. Lessee further agrees that it shall not operate the Aircraft, or permit the Aircraft to be operated in any manner unless the insurance coverages set forth herein are in full force and effect.

**Section 10.  Loss or Damage.**

(a)    Event of Loss with Respect to the Aircraft.  Upon the occurrence of any Event of Loss with respect to the Airframe and/or Aircraft, Lessee shall notify Lessor of any such Event of Loss within ten (10) days of the date thereof.  On the next Basic Rent Date which is at least sixty (60) days following the date of such notice, but in no event more than ninety (90) days after such notice (or, if such Event of Loss occurs after the Last Basic Rent Date, within sixty (60) days after such notice), Lessee shall pay to Lessor any Rent then due, plus the Casualty Value of the Aircraft determined as of the Basic Rent Date immediately following the date of such notice, together with interest at the Late Payment Rate for the period (if any) from the Basic Rent Date following the date of such notice through the date of payment. Upon making such payment and all Rent due and owing, Lessee's obligation to pay further Basic Rent for the Aircraft subsequent to such payment shall cease, but Lessee's obligation to pay Supplemental Rent as well as any other amounts due under this Lease, if any, for the Aircraft shall remain unchanged.  Except in the case of loss, permanent disappearance, destruction or Return to Manufacturer, and unless possession thereof is required to be delivered to a third party insurance carrier in order to settle an insurance claim, Lessor shall be entitled to recover possession of the Aircraft and Lessor shall be entitled to any salvage value in excess of the Casualty Value paid to Lessor.  In the event of a Return to Manufacturer, Lessor agrees that Lessee shall receive and retain all amounts payable to Lessor by the Manufacturer up to the amount, if any, of the Casualty Value actually paid by Lessee hereunder, but any excess shall be retained by Lessor.  With respect to a Requisition of Use, Lessor agrees that Lessee shall receive and retain all amounts paid by any governmental authority up to the Casualty Value actually paid by Lessee hereunder, and any excess shall be paid over to, and retained by, Lessor.  Lessor shall be under no duty to Lessee to pursue any claim against any Person in connection with an Event of Loss, but Lessee may at its own cost and expense and with Lessor's prior written consent pursue the same on behalf of Lessor in such manner as may be reasonably acceptable to Lessor, which consent (including as to the manner in which such claim is pursued), Lessor agrees shall not be unreasonably withheld.

(b)    Event of Loss with Respect to an Engine.  Upon an Event of Loss with respect to any Engine under circumstances in which there has not occurred an Event of Loss with respect to the Airframe upon which such Engine was installed, Lessee shall give Lessor prompt written notice thereof and shall within thirty (30) days after the occurrence of such Event of Loss, duly convey to Lessor title to a similar or better engine of the same make and model number as the Engine suffering the Event of Loss.  Such engine shall be free and clear of all Liens, have a value, utility, and useful life at least equal to, and be in as good an operating condition as, the Engine suffering the Event of Loss, assuming such Engine was of the value and utility and in the condition and repair required by the terms hereof immediately prior to the occurrence of such Event of Loss.  Lessee, at its own cost and expense, shall furnish Lessor with such documents to evidence such conveyance as Lessor shall request.  Upon full compliance by Lessee with the terms of this paragraph,

RSCOMBS 366237                                    8                                    (AIRCRAFT LEASE)

0 0 0 0 0 0 0 1 4 0 8                    8-91

Lessor will transfer to Lessee, without recourse, representation or warranty of any kind whatsoever other than as to the absence of Lessor's Liens, all of Lessor's right, title and interest, if any, in and to the Engine suffering the Event of Loss. SUCH TRANSFER SHALL BE "AS-IS, WHERE-IS" AND LESSOR SHALL NOT BE DEEMED TO HAVE MADE, AND LESSOR HEREBY DISCLAIMS, ANY REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, AS TO THE ENGINE SO TRANSFERRED TO LESSEE other than as to the absence of Lessor's Liens. Each such replacement engine shall, after such conveyance be deemed an "Engine" as defined herein and shall be deemed part of the same Aircraft as was the Engine replaced thereby. No Event of Loss with respect to an Engine shall result in any reduction or delay in the payment of Basic Rent or relieve Lessee of any obligation under this Lease.

(c)     Risk of Loss. Except as otherwise specifically provided in this Section, until Lessee tenders delivery of the Aircraft to Lessor in accordance with the provisions of the M&R Addendum, Lessee shall bear the risk of loss, damage or partial destruction of the Aircraft and shall not be released from its obligations hereunder in the event of any damage to the Aircraft or any part thereof or any Event of Loss relating thereto.

Section 11. Indemnification.

Lessee assumes liability for, and hereby agrees to indemnify, protect, save, defend and keep harmless Lessor, its agents, employees, officers, directors, shareholders, subsidiaries, affiliates, successors and assigns (collectively "Lessor"), on a net after-tax basis, from and against any and all liabilities, obligations, losses, damages, penalties, claims (including, without limitation, claims involving or alleging product liability or strict or absolute liability in tort), actions, suits, demands, costs, expenses and disbursements (including, without limitation, legal fees and expenses) of any kind and nature whatsoever ("Claims") which may be imposed on, incurred by or asserted against Lessor, whether or not Lessor shall also be indemnified as to any such Claim by any other Person, in any way relating to or arising out of this Lease or any documents contemplated hereby, or the performance or enforcement of any of the terms hereof or thereof, or in any way relating to or arising out of the assertion or enforcement of any manufacturer's, vendor's or dealer's warranties on the Aircraft or any part thereof, (including, without limitation, any warranty of any Manufacturer or Supplier), the manufacture, inspection, construction, purchase, pooling, interchange, acceptance, rejection, ownership, titling or re-titling, delivery, lease, sublease, possession, use, operation, maintenance, management, condition, registration or re-registration, sale, return, removal, repossession, storage or other disposition of the Aircraft or any part thereof or any accident in connection therewith (including, without limitation, latent and other defects, whether or not discoverable, and any Claim for patent, trademark or copyright infringement). Lessee's obligations to make indemnification payments to Lessor pursuant to this Section 11 shall be reduced by any insurance proceeds and any indemnity, contribution or similar payment if and to the extent actually received by Lessor in good and indefeasible funds; provided, however, (i) Lessor shall have no responsibility to pursue the recovery of any such amounts as a condition to pursuing or recovering any indemnity hereunder or otherwise, (ii) Lessee's obligations under this Section 11 shall not be conditioned upon or delayed by Lessee's or Lessor's recovery or pursuit of such amounts from any third party, and (iii) Lessor's rights hereunder shall not be limited, impaired or otherwise adversely affected by any action or omission relating thereto. To the extent that a Claim indemnified by the Lessee under this Section 11 is in fact paid in full by the Lessee and/or an insurer under a policy of insurance maintained by the Lessee, the Lessee and/or such insurer as the case may be shall, so long as no Default or Event of Default has occurred and is continuing, be subrogated to the extent of such payment to the rights and remedies of the Lessor party on whose behalf such Claim was paid with respect to the transaction or event giving rise to such Claim (other than the rights and remedies in respect of insurance policies maintained by such Lessor party).

Notwithstanding the foregoing, Lessee shall not be required to indemnify Lessor for (a) any Claim caused solely and directly by the gross negligence or willful misconduct of the Lessor or (b) any Claim in respect of the Aircraft arising from acts or events which occur after (x) possession of the Aircraft has been redelivered to Lessor (which return and delivery shall be in material compliance with the terms of this Lease) and (y) any and all other obligations of any kind whatsoever of the Lessee under this Lease which have been fully paid and/or performed, as the case may be, unless any such Claims were caused by Lessee (or any

RSCOMBS 366237                    9                    (AIRCRAFT LEASE)

0 0 0 0 0 0 0 1 4 0 9                     8-89

stockholder, director, officer, employee, successor, assignee, agent or servant of the Lessee) or resulted or arose, directly or indirectly, from any acts, events or omissions of any kind whatsoever during the Term of this Lease.

The liability of Lessee to make indemnification payments shall, notwithstanding any expiration, cancellation or other termination (whether voluntary, as the result of a Default or Event of Default, or otherwise) of this Lease, continue to exist until such indemnity payments are irrevocably made in full by Lessee and received by Lessor. If any Claim is made against Lessee or Lessor, the party receiving notice of such Claim shall promptly notify the other, but the failure of the party receiving notice to so notify the other shall not relieve Lessee of any obligation hereunder.

Notwithstanding the foregoing, Lessee's indemnification obligations with respect to Impositions are set forth in Section 8 hereto.

Section 12. Assignment and Sublease.

EXCEPT TO THE EXTENT EXPRESSLY PROVIDED FOR HEREIN OR IN ANY WRITTEN CONSENT ENTERED INTO IN CONNECTION HEREWITH, LESSEE SHALL NOT SELL, TRANSFER, ASSIGN, CHARTER, SUBLEASE (WITH OR WITHOUT ONE OR MORE CREWMEMBERS), CONVEY, PLEDGE, MORTGAGE OR OTHERWISE ENCUMBER ITS OR LESSOR'S INTEREST IN AND TO THE LEASE OR THE AIRCRAFT, AND ANY SUCH SALE, TRANSFER, ASSIGNMENT, CHARTER, SUBLEASE, CONVEYANCE, PLEDGE, MORTGAGE OR ENCUMBRANCE, WHETHER BY OPERATION OF LAW OR OTHERWISE, WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR (WHICH CONSENT SHALL NOT BE UNREASONABLY WITHHELD) SHALL BE NULL AND VOID. IN ADDITION, LESSEE SHALL NOT ENTER INTO ANY INTERCHANGE AGREEMENT AFFECTING THE AIRCRAFT OR RELINQUISH POSSESSION OF THE AIRFRAME OR ANY ENGINE OR INSTALL ANY ENGINE OR PART, OR PERMIT ANY ENGINE OR PART TO BE INSTALLED, ON ANY AIRFRAME OTHER THAN THE AIRFRAME LEASED HEREUNDER EXCEPT AS EXPRESSLY SET FORTH HEREIN. Notwithstanding the foregoing limitations Lessee shall be permitted to conduct the carriage of the Lessee and/or guests pursuant to 14 CFR Section 91.501 (b) (4), affiliated group operations pursuant to 14 CFR Section 91.501 (b) (5) and/or (6), demonstration flights pursuant to 14 CFR Section 91.501 (b) (3), time sharing or interchange operations pursuant to 14 CFR Section 91.501(b) (6), the carriage of customers pursuant to 14 CFR Section 91.501 (b) (9) and/or the carriage of candidates in Federal elections conducted pursuant to 14 CFR Section 91.321. In addition, the foregoing shall be not be deemed to prohibit the delivery of possession of the Aircraft, any Engine or Part to another Person for testing, service, repair, maintenance, overhaul or, to the extent permitted hereby, alteration or modification. No acceptance, assignment, subletting, relinquishment or installation shall in any event relieve Lessee of primary, absolute and unconditional liability for its duties and obligations under this Lease.

Notwithstanding the foregoing, Lessor acknowledges that Lessee may do as follows:

(a). Lessee may enter into a management agreement with regard to the Aircraft between Lessee and Manager (hereinafter the "Management Agreement" and Manager or its designee (pursuant to an agreement acceptable to Lessor in its reasonable discretion; which agreement, for the purposes hereof shall also be referred to as the "Management Agreement") and may charter the Aircraft (any such charterer, an "Operator") to any customer of Operator from time to time (hereinafter a "Charter") pursuant to the following terms and conditions:

(i) Any Management Agreement shall provide that it shall terminate at the option of Lessor, upon the expiration or earlier termination of this Lease, including, without limitation, any termination or expiration occasioned by the exercise by Lessee of its options set forth in the Purchase, Early Purchase and Renewal Option Addendum, and the term of any such Management Agreement shall not exceed the then remaining Term of this Lease (including, any Renewal Term as to which the option to renew has been irrevocably exercised).

RSCOMBS 366237                          10                          (AIRCRAFT LEASE)

0 0 0 0 0 0 0 1 4 1 0

8-87

(ii)    Operator shall maintain a current and valid Air Carrier Certificate issued by the FAA and Operator shall at all times be in full compliance with Federal Aviation Act Regulation Part 135 or any other applicable statutes, laws, rules, regulations and parts with respect to any such Management Agreement and/or use and operation of the Aircraft under any such Management Agreement.

(iii)    With respect to any Management Agreement, to the extent that it has not already done so, Lessee agrees to assign, and does hereby assign, as collateral security, and grant, and does hereby grant, to Lessor a security interest in (i) all proceeds of insurance payable to Lessee pursuant to the Management Agreement and Charter, and (ii) all rights and remedies of Lessee under the Management Agreement and proceeds from the exercise thereof all to secure payment and performance of all of Lessee's liabilities, obligations and indebtedness under this Lease. Lessor's security interest which is created hereby, if Lessor so elects, may be perfected by possession of the Management Agreement rather than filing, as provided in the UCC. Until the occurrence of an Event of Default hereunder, Lessee shall have the right to collect and receive, in accordance with the terms hereof, all sums payable under such Management Agreement and to retain, use and enjoy the same. The filing of this Lease with the FAA shall constitute notice to all third parties, including, without limitation, the Operator, of the security interest of Lessor in any such Management Agreement without the need for the filing of a specific assignment thereof.

(iv)    Lessee shall deliver to the Lessor a fully executed copy of each and every Management Agreement, which is, and will be, the only copy of such Management Agreement marked "Secured Party's Original." All copies of the Management Agreement shall bear the following legend: "To the extent, if any, this instrument constitutes chattel paper under the UCC, no security interest herein may be created through the transfer and/or possession of any counterpart other than the counterpart marked 'Secured Party's Original.'" All copies of each Management Agreement, other than the "Secured Party's Original" shall bear the following legend: "Copy." No interest herein may be created or the aircraft subject hereto through the transfer and/or possession hereof."

(v)    Any Management Agreement shall be expressly subject and subordinate to this Lease and the rights of Lessor hereunder and in and to the Aircraft. No amendment, termination, waiver or modification of any of the terms and/or conditions of such Management Agreement shall be effective unless consented to in writing in advance by Lessor, which consent shall not be unreasonably withheld, provided, however, that Lessor's consent shall not be necessary with respect to any amendment or modification of such Management Agreement which increases the amount of the monthly rentals under such Management or with respect to any renewal of such Management Agreement provided that the term of such Management Agreement, upon effecting such renewal is co-terminus with the then current Term of this Lease.

(vi)    Lessee shall deliver to Lessor a consent and acknowledgment executed by Lessee and the Manager and any other Operator in the form and substance satisfactory to Lessor along with such other instruments (including, without limitation, FAA recording documents and UCC financing statements) as Lessor may reasonably require. Lessee shall agree to take such other actions as are deemed necessary by Lessor to effect the terms and conditions of this Section.

(vii)    Such other terms and conditions as Lessor deems reasonably necessary and appropriate.

Lessor acknowledges that certain of the duties and obligations of Lessee hereunder shall be performed by Operator. Such acknowledgment on the part of Lessor does not, however, constitute an acceptance by Lessor of such performance by Lessor of such duties and obligations unless the performance of such duties and obligations fully and completely satisfies the requirements of this Lease. Lessee hereby acknowledges to Lessor that it is now and continues to be primarily and fully obligated by the terms and conditions of the Lease notwithstanding any delegation of duties or any other term of any kind whatsoever

RSCOMBS 366237                                    11                            (AIRCRAFT LEASE)

0 0 0 0 0 0 0 1 4 1 1                    8-85

to Operator or the assumption thereof by Operator. Any such delegation shall be effective only as between Lessee and Operator. Lessee acknowledges and agrees that the responsibility for performance of the duties and obligations of Lessee hereunder remain with Lessee regardless of the fact that Lessee may have contracted with or delegated to Operator with respect to the performance thereof.

(b)   Lessee may either sublease the Aircraft from time to time, or assign all of its rights and obligations under and with respect to this Lease, in either such case, to a solvent, domestic Affiliate pursuant to the following terms and conditions (hereinafter a "Sublease"):

(i)   Any Sublease shall provide that it shall terminate at the option of Lessor, upon the expiration or earlier termination of this Lease, including, without limitation, any termination or expiration occasioned by the exercise by Lessee of its options set forth in any Addendum hereto, and the term of such Sublease shall not exceed the then remaining Term of this Lease (including, any Renewal Term as to which the option to renew has been irrevocably exercised).

(ii)   Any Sublease shall not be a grant of a "security interest" as such term is used in Section 1-201 (37) of the UCC.

(iii)   With respect to any Sublease, to the extent that it has not already done so, Lessee agrees to assign, and does hereby assign, as collateral security, and grant, and does hereby grant, to Lessor a security interest in (i) the Sublease, (ii) all amounts payable thereunder, (iii) all proceeds of insurance payable to Lessee pursuant to the Sublease, and (iv) all rights and remedies of Lessee under the Sublease and proceeds from the exercise thereof all to secure payment and performance of all of Lessee's liabilities, obligations and indebtedness under this Lease. Lessor's security interest which is created hereby, if Lessor so elects, may be perfected by possession of the chattel paper original of the Sublease rather than filing, as provided in the UCC. Until the occurrence of a Default or an Event of Default hereunder, Lessee shall have the right to collect and receive, in accordance with the terms hereof, rent and other sums payable under such Sublease and to retain, use and enjoy the same. The filing of this Lease with the FAA shall constitute notice to all third parties, including, without limitation, Affiliate, of the security interest of Lessor in any such Subleases without the need for the filing of a specific assignment thereof.

(iv)   Lessee shall deliver to the Lessor a fully executed copy of each and every Sublease, which are, and will be, the only copies of such Sublease marked "Secured Party's Original." All copies of the Sublease shall bear the following legend: "To the extent, if any, this instrument constitutes chattel paper under the UCC, no security interest herein may be perfected through the possession of any counterpart other than the counterpart marked 'Secured Party's Original.'" All copies of each Sublease, other than the "Secured Party's Original" shall bear the following legend: "Copy.' No interest herein may be created in the aircraft subject hereto through the transfer and/or possession hereof."

(v)   Any Sublease shall be expressly subject and subordinate to this Lease and the rights of Lessor hereunder and in and to the Aircraft. No amendment, waiver or modification of any of the terms and/or conditions of such Sublease shall be effective if and to the extent such amendment, waiver, or modification would cause such Sublease to be inconsistent with the provisions of this Section 12, or otherwise cause Lessee to be in breach of its obligations under this Lease.

(vi)   With respect to any Sublease, Lessee shall deliver to Lessor a consent and acknowledgment executed by Lessee and any such permitted sublessee in form and substance satisfactory to Lessor. With respect to any assignment, Lessee and any such permitted assignee shall deliver to Lessor an assignment and assumption agreement in form and substance satisfactory to Lessor (providing for, among other things, such assignee's assumption of, and unconditional and absolute agreement to pay and perform, all of Lessee's obligations under the Lease and any and all other documents, instruments and agreements entered into in connection therewith). With respect to either a Sublease or an assignment, Lessee, each of the Guarantors and/or such permitted sublessee or permitted

RSCOMBS 366237                               12                               (AIRCRAFT LEASE)

0 0 0 0 0 0 0 1 4 1 2                                         8-83

assignee, as the case may be, shall also execute and deliver all such other assurances, confirmations, instruments (including, without limitation, FAA recording documents and UCC financing statements), officer's certificates, legal opinions and other documents and agreements, as Lessor may reasonably require. Without limiting the generality of the foregoing, as a condition precedent to the effectiveness of any such Sublease or assignment, each Guarantor shall provide a confirmation of the continuing nature of its Guaranty after giving effect to any such Sublease or assignment, and each Guarantor and any assignee shall provide to Lessor, if and to the extent requested, documents, agreements, filings and assurances similar to the Closing Documents. Lessee further agrees to take all such other actions as are deemed necessary by Lessor to effect the terms and conditions of this Section.

                (vii)     Lessee shall provide Lessor with written confirmation that a copy of the Sublease has been properly placed on the Aircraft.

                (viii)     Such other terms and conditions as Lessor deems reasonably necessary and appropriate.

          No such chartering and/or subleasing by Lessee will reduce any of the obligations of Lessee hereunder or the rights of Lessor hereunder, and all of the obligations of Lessee hereunder shall be and remain primary and shall continue in full force and effect as the obligations of a principal and not of a guarantor or surety. No such assignment by Lessee will reduce any of the obligations of Lessee hereunder or the rights of Lessor hereunder, and all of the obligations of Lessee hereunder shall be and remain primary and shall continue in full force and effect as the obligations of a principal and not of a guarantor or surety, in each such case, except to the extent effectively assigned and assumed in accordance with this Section.

          Lessor, may at any time, with or without notice to Lessee, mortgage, grant a security interest in or otherwise transfer, sell or assign all or any part of its interest in this Lease or the Aircraft or any Rent or other sums due or to become due hereunder and Lessee shall perform all of its obligations under this Lease for the benefit of such assignee, lender, creditor, mortgagee, transferee or Person (hereinafter an "Assignee") except that the interest of any such Assignee shall be subject to Lessee's rights of use and possession, renewal rights, and purchase options, if any, hereunder, so long as no Default or Event of Default has occurred and is continuing hereunder. Lessee agrees that the rights hereunder of any such Assignee shall not be subject to any defense, setoff, recoupment, abatement, reduction, claim or counterclaim (collectively the "Defenses") that Lessee has or may at any time have against Lessor for any reason whatsoever unless Assignee expressly assumes Lessor's obligations hereunder with respect thereto. Unless Lessor's obligations with respect to such Defenses are expressly assumed by Assignee, Lessee hereby waives any right to assert at any time any of the foregoing Defenses against any such Assignee. Lessee further agrees that any such Assignee shall have all of Lessor's rights hereunder, but none of the Lessor's obligations or duties. Lessor shall remain liable with respect to any Defenses which are not assumed by Assignee. Lessee acknowledges that any such assignment, transfer or sale will not materially change its duties or materially increase its burdens or risks hereunder and that any such assignment, transfer or sale shall be permitted even if the assignment, transfer or sale would be deemed to materially affect the Lessee's interests hereunder. Lessee further agrees, if so directed in writing, to, among other things, pay all sums due or to become due hereunder directly to the Assignee or any other party designated in writing by Lessor or any such Assignee. Upon the request of Lessor or any Assignee, Lessee also agrees (i) to promptly execute and deliver to Lessor or to such Assignee an acknowledgment of assignment in form and substance satisfactory to the requesting party and Lessee which, among other things, reaffirms the basic terms and conditions of this Lease and (ii) to comply with the reasonable demands of any such Assignee in order to perfect any such assignment or transfer.

          This Lease, including all agreements, covenants, representations and warranties, shall be binding upon and inure to the benefit of, and may be enforced by (a) Lessor and its successors, assigns, Assignees, agents and servants and (b) Lessee and its successors and, to the extent expressly permitted by Lessor, assigns.

RSCOMBS 366237                                    13                                    (AIRCRAFT LEASE)

0 0 0 0 0 0 0 1 4 1 3                                        8-81

**Section 13.**  Events of Default.

The term "Event of Default", wherever used herein, shall mean any of the following events or circumstances (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary, or come about or be effected by operation of law, or be pursuant to or in compliance with any judgment, decree or order of any court or any order, rule or regulation or any administrative or governmental body): ·

(a)    Lessee shall fail to make any payment of Rent, Casualty Value, if applicable, and/or any amount due pursuant to any Rider, Exhibit or Addendum hereto within ten (10) days after any or all of the same shall become due and payable, or, upon demand, any other amount required to be paid herein or under any other agreement with Lessor; or

(b)    Lessee shall fail to keep in full force and effect any of the insurance required hereunder, or shall operate the Aircraft at a time when, or at a place in which, such insurance shall not be in effect; or

(c)    Lessee shall fail to perform or observe any covenant, condition or agreement, (other than those specifically referred to in this Section) required to be performed or observed by it under this Lease or any Rider, Exhibit or Addendum hereto or any other agreement, document or certificate delivered by or on behalf of Lessee in connection herewith, and such failure shall continue for thirty (30) days after written notice thereof from Lessor to Lessee; provided, however, if by its nature such breach cannot be cured within thirty (30) days but can be cured by practical means within an additional sixty (60) days, then so long as no other Event of Default then exists, and Lessee is at all times diligently undertaking to cure such breach, Lessee shall have an additional sixty (60) days to complete such cure before an Event of Default shall be deemed to have occurred as a result of such breach; or .

(d)    Lessee or any of its Affiliates shall default in the payment or performance of any obligation to Lessor under any other aircraft lease (the "Other Aircraft Lease") entered into between Lessee, or such Affiliate (by assignment or otherwise) and Lessor, or under any other agreement, instrument or document entered into in connection with such Other Aircraft Lease (collectively with the Other Aircraft Lease, the "Other Lease Documents"), in either such case, after the giving of any notice and the expiration of any grace or cure period provided for in such Other Lease Documents; or

(e)    any representation or warranty made by Lessee herein or in any certificate, agreement, statement or document hereto or hereafter furnished to Lessor in connection herewith, including without limitation, any financial information disclosed to Lessor, shall prove to be or to have been false or incorrect in any material respect; or

(f)    the · commencement of any bankruptcy, insolvency, arrangement, · reorganization, receivership, liquidation or other similar proceeding by or against Lessee or any of its .properties or businesses, (which, in the case of a proceeding commenced against Lessee, has not been dismissed within sixty (60) days of the filing thereof) the appointment of a trustee, receiver, liquidator or custodian for Lessee or any of its properties or businesses, if Lessee suffers the entry of an order for relief under Title 11 of the United States Code or the making by Lessee of a general assignment or deed of trust for the benefit of creditors; or

(g)    Lessee shall default in any payment or performance in respect of any obligation for borrowed money or other financial accommodation having an aggregate principal balance or other liability which, upon acceleration in accordance thereof, shall be in excess of $50,000,000.00 owing to any parties, including Lessor or any Lessor Affiliate, and any applicable grace or cure period with respect thereto has expired; or

(h)    except as expressly permitted under this Lease, Lessee sells, transfers or disposes of all or substantially all of its respective membership interests, assets or property, merges with or into any other

RSCOMBS 366237                                14                                (AIRCRAFT LEASE)

0 0 0 0 0 0 0 1 4 1 4

8-79

entity and is not the surviving entity or engages in any form of reorganization in which it is not the surviving entity, becomes the subject of a leveraged buy-out or the Lessee shall terminate its existence by merger, consolidation or sale of substantially all of its assets or otherwise; or

(i)    if effective control of Lessee's or LLC Guarantor's membership interests issued and outstanding from time to time is not retained by the holders of such membership interests on the date of this Lease; provided however, that it will not constitute an Event of Default if such party remains an affiliate of Corporate Guarantor; or

(j)    there shall be a change in the ownership of Corporate Guarantor's stock such that Corporate Guarantor is no longer subject to the reporting requirements of the Securities Exchange Act of 1934, as amended, or no longer has a class of equity securities registered under Section 12 of the Securities Act of 1933, as amended; or

(k)    the failure to return the Aircraft to Lessor at the end of the Term in accordance and in compliance with the terms and conditions hereof, the Aircraft shall be abused, substantially damaged (without being repaired in accordance with the provisions hereof) or destroyed (without payment of the applicable Casualty Value in accordance with the terms and conditions hereof); or

(l)    except as otherwise permitted in this Lease, Lessee shall or shall attempt to remove, sell, transfer, charter, interchange, convey, pledge, mortgage, encumber, part with possession of, assign or sublet (with or without one or more crewmembers) the Aircraft or any part thereof, use the Aircraft for an illegal purpose or permit the same to occur or Lessee shall create, incur, assume or suffer to exist any Lien (other than Permitted Liens) with respect to the Aircraft, this Lease or Lessor's interests thereunder; or

(m)    any event or condition set forth in subsections (d) through (h) of this Section shall occur with respect to any Guarantor or other person responsible, in whole or in part, for payment or performance of this Lease, or there shall be an express repudiation of any Guaranty or a default under any Guaranty, and any applicable grace or cure period with respect thereto has expired.

Lessee shall promptly notify Lessor of the occurrence of any Default or Event of Default.

**Section 14.  Remedies.**

(a)    Upon the occurrence of any Event of Default and so long as the same shall be continuing, Lessor may, at its option, declare this Lease to be in default (provided that no such declaration shall be a condition to any suit against Lessee for specific performance of a defaulted covenant or for damages in respect of such default upon such occurrence or at any time thereafter), and at any time thereafter, whether or not such Event of Default shall be continuing, Lessor may exercise any one or more of the following remedies, as Lessor in its sole discretion shall lawfully elect:

(i)    Proceed by appropriate court action, either at law or in equity, to enforce performance by Lessee of the applicable covenants of this Lease or to recover damages for breach thereof.

(ii)    By notice cancel or terminate this Lease, whereupon all rights of Lessee to the use of the Aircraft or any part thereof shall absolutely cease and terminate but Lessee shall remain liable as hereinafter provided and thereupon (A) if so requested by Lessor, Lessee shall at its expense promptly return the Aircraft to the possession of Lessor at such place as Lessor shall designate and in the condition required upon the return thereof pursuant to and in accordance with the terms of this Lease, (B) Lessor, at its option, may enter upon the premises where the Aircraft is located and take immediate possession of and remove the same, together with any Engines and Parts by self-help, summary proceedings or otherwise without any liability of any kind whatsoever on the part of Lessor for or by reason of such entry or taking of possession and Lessee hereby waives any cause of action it may have arising from, or in connection with, the foregoing and/or (C) Lessee will provide storage as set forth in this Lease.  In addition, upon the written request of

RSCOMBS 366237                                    15                            (AIRCRAFT LEASE)

0 0 0 0 0 0 0 0 1 4 1 5

8-77

Lessor, Lessee, at its expense, will replace any engine installed on the Airframe with an Engine. Lessee shall, without further demand, forthwith pay to Lessor an amount equal to any unpaid Rent due and payable for all periods up to and including the Basic Rent Date following the date on which Lessor has declared this Lease to be in default, plus, as liquidated damages for loss of a bargain and not as a penalty, an amount equal to the Casualty Value of the Aircraft, computed as of the Basic Rent Date immediately following the date on which Lessor has declared this Lease to be in default (plus all costs, charges and expenses including, legal fees and disbursements incurred by Lessor by reason of the occurrence of any Event of Default or the exercise of any of Lessor's remedies with respect thereto or otherwise).

Following the return of the Aircraft to Lessor pursuant to this subparagraph (ii), Lessor shall proceed at its option to sell or otherwise dispose of the Aircraft by public or private sale, with or without notice, and without having the Aircraft present at the place of sale and in such manner as it shall deem appropriate, provided that Lessor, if it so elects, may purchase the Aircraft at such sale for a price not less than the highest bona fide bid given by a Person unrelated to Lessee. Lessee waives all its rights under laws governing such sale to the extent permitted by law. Lessor may apply any deposit or other cash collateral or sale or remarketing proceeds of the Aircraft at any time to reduce any amounts due to Lessor. Notwithstanding the foregoing, Lessor may at its option and in its sole discretion keep idle, lease, or use or operate all or part of the Aircraft without any liability whatsoever and may use Lessee's premises for storage pending lease or sale or for holding a sale without liability for rent or costs or any other matter whatsoever. The net proceeds of such sale or lease as provided above shall be applied by Lessor (x) first, to pay all costs, charges and expenses, including the cost of discharging all Liens, on the Aircraft and all legal fees and disbursements incurred by Lessor as a result of the Event of Default and/or the exercise of its remedies with respect thereto, (y) second, to pay to Lessor an amount equal to any unpaid Rent due and payable and the Casualty Value, to the extent not previously paid and (z) third, to reimburse Lessee for the Casualty Value to the extent paid by Lessee as liquidated damages. Any surplus remaining thereafter shall be retained by Lessor. To the extent that all Rent then due and payable with respect to the Aircraft and the Casualty Value have not been previously paid, Lessee shall forthwith pay upon demand to Lessor the sum of (AA) the amount by which (1) the sum of (aa) all Rent then due and payable with respect to the Aircraft, (bb) the Casualty Value or portion thereof not theretofore paid and (cc) the amount payable under clause (x) of the preceding sentence exceeds (2) the net proceeds of the sale or lease of the Aircraft actually received by the Lessor and (BB) interest at the Late Payment Rate on the full amount of said Casualty Value and Rent then due and unpaid, computed from the date such sums are due until the same are paid by Lessee. For purposes of computing liquidated damages under this subparagraph (ii) only, the proceeds of any releasing of the Aircraft shall be determined by discounting to present value, at the rate of seven percent (7.0%) per annum, the periodic rentals which are payable to Lessor pursuant to such re-lease, up to and including the expiration of the term of any such re-lease.

In addition to the other remedies provided for herein, upon the occurrence and during the continuance of an Event of Default, Lessor may (i) terminate or cancel the Sublease, without regard as to the existence of any event of default thereunder and recover or cause Lessee to relinquish possession and return the Aircraft, including the Engines and Parts, pursuant to this Section 14, and (ii) exercise any and all other remedies, in Lessee's stead, to the extent provided for under, or otherwise available to Lessee in connection with the Sublease.

If any Default or Event of Default occurs or if Lessee fails to perform or comply with any of its agreements contained herein, Lessor shall have the right, but shall not be obligated, to effect such performance or compliance and the amount of any out-of-pocket expenses and other reasonable expenses of Lessor incurred in connection with the performance of or compliance with such agreements, as the case may be, together with interest thereon at the Late Payment Rate, shall be payable by Lessee promptly upon demand, and any such action by Lessor shall not be deemed a cure or waiver of any Default or Event of Default hereunder.

0 0 0 0 0 0 0 1 4 1 6                                               8-75

(b)    Lessee shall be liable for all costs, charges and expenses, including legal fees and disbursements, incurred by Lessor by reason of the occurrence of any Event of Default, the exercise of any of Lessor's rights or remedies with respect thereto or otherwise.

(c)    Lessee hereby waives, to the maximum extent now or hereafter permitted by applicable law, for itself and for its successors or assigns any and all rights Lessee or Lessee's successors or assigns may have following an Event of Default under any bankruptcy, insolvency or similar laws, rules or regulations with respect to the continued possession or use of the Aircraft or relief from the payment of Rent therefor or otherwise with respect to this Lease. Rejection of this Lease by any bankruptcy trustee or debtor-in-possession shall entitle Lessor to the immediate return of the Aircraft and to liquidated damages calculated in the manner provided for in subsection 14(a)(ii) hereof with respect to an Event of Default.

(d)    No right or remedy referred to herein is intended to be exclusive, but each shall be cumulative and in addition to any other right or remedy referred to above or otherwise available to Lessor at law or in equity, including, without limitation, such rights and/or remedies as are provided for in the UCC. No express or implied waiver by Lessor of any Default or Event of Default hereunder shall in any way be, or be construed to be, a waiver of any future or subsequent Default or Event of Default. The failure or delay of Lessor in exercising any rights granted it hereunder upon the occurrence of any of the contingencies set forth herein shall not constitute a waiver of any such right upon the continuation or reoccurrence of any such contingencies or similar contingencies, and any single or partial exercise of any particular right by Lessor shall not exhaust the same or constitute a waiver of any other right provided for or otherwise referred to herein. All remedies set forth herein shall survive the expiration or other termination of this Lease for any reason whatsoever.

(e)    To the extent permitted by applicable law, Lessee hereby waives any rights now or hereafter conferred by statute or otherwise which may require Lessor to sell, lease or otherwise use the Aircraft in mitigation of Lessor's damages as set forth in this Section or which may otherwise limit or modify any of Lessor's rights or remedies under this Section. To the extent permitted by applicable law, Lessee waives any and all rights and remedies conferred upon a lessee by Section 2A-508 to 2A-522 (inclusive) of the UCC, including, without limitation, any rights of Lessee (a) to cancel or repudiate this Lease or any supplement or any document relating thereto, (b) to reject or revoke acceptance of the Aircraft or any component thereof and (c) to recover from Lessor any general or consequential damages, for any reason whatsoever.

Section 15.  Notices.

All communications and notices provided for herein shall be in writing and shall become effective (i) upon hand-delivery, (ii) upon delivery by an overnight delivery service, (iii) upon two (2) Business Days after being deposited in the United States mail with proper postage for first-class mail prepaid, sent by registered or certified mail, return receipt requested, and addressed to Lessor or Lessee at their respective addresses set forth under the signatures hereto or such other address as either party may hereafter designate by written notice to the other or (iv) or when sent by telecopy (with customary confirmation of receipt of such telecopy) on the Business Day when sent or upon the next Business Day if sent on other than a Business Day.

Section 16.  Transaction Expenses.

Lessee shall pay all actual and reasonable fees, costs and expenses incurred by Lessor in connection with this Lease, whether or not the transactions contemplated hereby are consummated, including, without limitation, appraisal fees, inspection fees, Lessor's internal and external counsel fees and expenses and FAA Counsel fees and expenses, and FAA and UCC title and lien searches, reports, filing and recording fees, charges and taxes. Lessee also agrees to pay all fees and expenses of Lessor's counsel, FAA Counsel and all other third parties who are engaged by Lessor to enforce Lessor's rights and/or remedies hereunder, to update any FAA or UCC title and/or lien reports and/or to review, file and record any and all documents and instruments as required by Lessor or the FAA during and after the Term of this Lease.

RSCOMBS 366237                          17                          (AIRCRAFT LEASE)

0 0 0 0 0 0 0 1 4 1 7

8-73

### Section 17.  Miscellaneous.

Any provision of this Lease which may be determined to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  To the extent permitted by applicable law, Lessee hereby waives any provision hereof prohibited or unenforceable in any respect. .

This Lease may be executed in any number of counterparts and by the different parties hereto on separate counterparts.  The division of this Lease into sections, the provision of a table of contests and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Lease.  The actual dates of execution hereof by the parties hereto are respectively the dates set forth under the signatures hereto, however this Lease shall be effective as of the date first above written.

Lessee hereby grants and conveys to Lessor, a security interest and lien in this Lease; any subleases relating to the Aircraft and any and all proceeds (including insurance proceeds) of any or all of the foregoing, to secure the prompt and full payment and performance as and when due of any and all obligations and indebtedness of Lessee to Lessor, now existing or hereafter created of any kind whatsoever.  Notwithstanding anything to contrary contained herein or otherwise, should a court of competent jurisdiction determine that this agreement is a grant of a security interest, then solely in that event and for the expressly limited purposes thereof, Lessee shall be deemed to have hereby granted and conveyed, and for such express purposes Lessee hereby grants and conveys to Lessor, a security interest and lien in the Aircraft to secure the prompt and full payment and performance as and when due of any and all obligations and indebtedness of Lessee to Lessor, now existing or hereafter created of any kind whatsoever.  The security interests granted herein shall survive the termination, cancellation or expiration of this Lease for any reason whatsoever and shall remain in full force and effect until such time as Lessee has no further obligations of any kind whatsoever under this Lease.

Lessee will promptly and duly execute and deliver to Lessor and any assignee, mortgagee and/or lender of the Lessor, such other documents and assurances, including, without limitation, such amendments to this Lease as may be reasonably required by Lessor and acceptable to Lessee (and by any assignee, mortgagee and/or lender of the Lessor), and UCC financing statements and continuation statements, and will take such further action as Lessor or any such assignee, mortgagee and/or lender may from time to time request in order to carry out more effectively the intent and purposes of this Lease and to establish and protect the rights and remedies created or intended to be created in favor of Lessor and of any such assignee, mortgagee and/or lender.  Upon the occurrence of any Event of Default, Lessee irrevocably appoints Lessor (and any assignee, mortgagee and/or lender of the Lessor) its attorney-in-fact to act in Lessee's name and on its behalf to make, execute, deliver and file any instruments or documents and to take

RSCOMBS 366237                          18                              (AIRCRAFT LEASE)

0 0 0 0 0 0 0 1 4 1 8                              8-71

any action as Lessor (and any such assignee, mortgagee and/or lender) deems necessary or appropriate to carry out the intent of this Lease or any agreements, documents or instruments related thereto. To the extent appropriate or permissible under applicable law, such appointment is coupled with an interest, shall be irrevocable and shall terminate only upon payment in full of the obligations set forth in this Lease and/or any agreements, documents or instruments related thereto.

Time is of the essence in the payment and performance of all of Lessee's obligations under the Lease. For purposes of 49 USC Section 44108 (c), Lessor and Lessee intend, by virtue of the Lessor having countersigned and accepted the Lease in Rhode Island and by virtue of this Lease being delivered for closing purposes to Lessor's office in Providence, Rhode Island, that this Lease has been executed and delivered in Rhode Island. In all other respects, this Lease shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to principles of conflicts of law or choice of law, including all matters of construction, validity and performance. Lessee hereby irrevocably consents and agrees that any legal action, suit or proceeding arising out of or in any way in connection with this Agreement may be instituted or brought in the courts of the State of New York or the United States District Court for the Southern District of New York, as Lessor may elect, and by execution and delivery of this Lease, Lessee hereby irrevocably accepts and submits to, for itself and in respect of its property, generally and unconditionally, the non-exclusive jurisdiction of any such court, and to all proceedings in such courts. To the extent permitted by applicable law, this Lease shall be deemed a "finance lease" under Section 2A-103(g) of the UCC. LESSEE ACKNOWLEDGES AND AGREES THAT THIS LEASE IS A COMMERCIAL TRANSACTION. LESSEE ALSO HEREBY KNOWINGLY AND FREELY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY LITIGATION ARISING HEREFROM OR IN RELATION HERETO.

Section 1. Amendments.

This Lease, and each related instrument, document, agreement and certificate, collectively constitute, and are intended to collectively constitute, the complete and exclusive statement of the terms of the agreement between Lessor and Lessee with respect to the purchase and leasing of the Aircraft. The Lease cancels and supersedes any and all prior or contemporaneous oral or written understandings, memoranda, negotiations, communications and agreements with respect thereto including, without limitation, any proposal letter, commitment letter and/or term sheet delivered to the Lessee by Lessor, unless, with respect to any such written materials only, any term and/or condition thereof expressly supersedes any term and/or condition of this Lease.

NO TERM OR PROVISION OF THIS LEASE MAY BE AMENDED, ALTERED, WAIVED, DISCHARGED OR TERMINATED ORALLY, EXCEPT IN A WRITING SIGNED BY A DULY AUTHORIZED OFFICER OF THE PARTY AGAINST WHOM THE ENFORCEMENT OF THE AMENDMENT, ALTERATION, WAIVER, DISCHARGE OR TERMINATION IS SOUGHT.

_____
LESSEE'S INITIALS

Section 2. Truth in Leasing.

THE AIRCRAFT, AS EQUIPMENT, BECAME SUBJECT TO THE MAINTENANCE REQUIREMENTS OF PARTS 91 AND/OR 135, AS APPLICABLE, OF THE FEDERAL AVIATION REGULATIONS ("FARS") UPON THE REGISTRATION OF THE AIRCRAFT WITH THE FAA. LESSEE CERTIFIES THAT DURING THE 12 MONTHS (OR PORTION THEREOF DURING WHICH THE AIRCRAFT HAS BEEN SUBJECT TO U.S. REGISTRATION) PRECEDING THE EXECUTION OF THIS LEASE, THE AIRCRAFT HAS BEEN MAINTAINED AND INSPECTED UNDER PARTS 91 AND/OR 135, AS APPLICABLE, OF THE FARS. LESSEE CERTIFIES THAT THE AIRCRAFT WILL BE MAINTAINED AND INSPECTED UNDER PARTS 91 AND/OR 135, AS APPLICABLE, OF THE FARS FOR OPERATIONS TO BE CONDUCTED UNDER THE LEASE. UPON EXECUTION OF THIS LEASE, AND DURING THE TERM HEREOF, THE LESSEE, WHOSE NAME AND ADDRESS ARE SET FORTH IMMEDIATELY BELOW, ACTING BY AND THROUGH THE SIGNATORY HERETO, WHO EXECUTES THIS SECTION SOLELY IN HIS CAPACITY OF THE LESSEE SET FORTH BELOW HIS SIGNATURE,

RSCOMBS 366237                              (AIRCRAFT LEASE)

0 0 0 0 0 0 0 1 4 1 9

8-69

CERTIFIES THAT LESSEE SHALL BE RESPONSIBLE FOR THE OPERATIONAL CONTROL OF THE AIRCRAFT UNDER THE LEASE (WHILE IT HAS POSSESSION OF THE AIRCRAFT), UNLESS THE AIRCRAFT IS SUBLEASED TO AN AIR CARRIER OR AIR TAXI OPERATOR CERTIFICATED UNDER PART 121 OR PART 135, RESPECTIVELY, OF THE FARS IF AND TO THE EXTENT SUCH SUBLEASE IS PERMITTED HEREUNDER. THE LESSEE FURTHER CERTIFIES THAT IT UNDERSTANDS ITS RESPONSIBILITIES FOR COMPLIANCE WITH APPLICABLE FARS, PROVIDED HOWEVER, THAT THE LESSEE SHALL NOT BE DEEMED TO BE RESPONSIBLE FOR THE OPERATIONAL CONTROL OF THE AIRCRAFT FOR SO LONG AS THE AIRCRAFT IS IN POSSESSION OF ANY SUBLESSEE THAT IS CERTIFICATED UNDER PART 121 OR PART 135 OF THE FARS IF AND TO THE EXTENT SUCH SUBLEASE IS PERMITTED HEREUNDER. AN EXPLANATION OF FACTORS BEARING ON OPERATIONAL CONTROL AND PERTINENT FARS CAN BE OBTAINED FROM THE NEAREST FEDERAL AVIATION FLIGHT STANDARD DISTRICT OFFICE, GENERAL AVIATION DISTRICT OFFICE OR AIR CARRIER DISTRICT OFFICE.

The execution hereof on behalf of Lessee and Lessor shall be deemed to constitute the acceptance by Lessee and Lessor of the terms and conditions of Exhibit A hereto and each and every Addendum set forth hereto as if each of such Exhibit A and Addendum was separately and individually executed on behalf of such party hereto.

[SIGNATURES ON NEXT PAGE]

# EXHIBIT A

# (PART 2)

00000001420                                    8-67

IN WITNESS WHEREOF, the parties hereto have caused the Lease to be duly executed by their respective officers thereunto duly authorized as of the date first written above.

Lessor:                                    Lessee:

FLEET NATIONAL BANK                         SM 5105 LLC

By: _____                By: _____
Name: John G / Hackleson, Jr.              Name: _____
Title: Banking Officer                      Title: _____

Address:    c/o Fleet Capital Corporation   Address:    c/o 38500 Woodward Avenue
            One Financial Plaza, 5th Floor               Suite 100
            Mail Stop: RI/DE/03705A                      Bloomfield Hills, Michigan  48304
            Providence, RI  02903


This is Counterpart No. 5 of a total of 5 counterparts.  Only Counterpart No. 1 shall be considered chattel paper for purposes of the Uniform Commercial Code and a security interest may be perfected only by possession of Counterpart No. 1.

0 0 0 0 0 0 0 1 4 2 1

8-65

IN WITNESS WHEREOF, the parties hereto have caused the Lease to be duly executed by their respective officers thereunto duly authorized as of the date first written above.

Lessor:

FLEET NATIONAL BANK

By: _____
Name: _____
Title: Banking Officer

Address:      c/o Fleet Capital Corporation
              One Financial Plaza, 5th Floor
              Mail Stop: RI/DE/03705A
              Providence, RI  02903

Lessee:

SM 5105 LLC

By: _John Blahnik_____
Name: _John Blahnik_____
Title: _Treasurer_____

Address:      c/o 38500 Woodward Avenue
              Suite 100
              Bloomfield Hills, Michigan  48304

This is Counterpart No. _5_ of a total of 5 counterparts.  Only Counterpart No. 1 shall be considered chattel paper for purposes of the Uniform Commercial Code and a security interest may be perfected only by possession of Counterpart No. 1.

RSCOMBS 366237

21.

(AIRCRAFT LEASE)

0 0 0 0 0 0 0 1 4 2 2

8-63

## EXHIBIT A

## DEFINITIONS

(a)  All References in the Lease to designated Sections and other subdivisions are to such designated Sections and other subdivisions only, and the words "herein," "hereof" and "hereunder" and other words of similar import refer to the Lease as whole and not to any particular Section or other subdivision.

(b)  Except as otherwise indicated, all the agreements and instruments defined herein or in the Lease shall mean such agreements and instruments as the same may from time to time be supplemented or amended, or as the terms thereof may be waived or modified to the extent permitted by, and in accordance with, the terms thereof.

(c)  The terms defined herein and in the Lease shall, for purposes of the Lease and all Lease Supplements, Schedules and Exhibits thereto, have the meanings assigned to them and shall include the plural as well as the singular as the context requires.

(d)  The following terms shall have the following meanings for all purposes of the Lease:

Basic Rent Date, Daily Lease Rate, Expiration Date, First Basic Rent Date, Last Basic Rent Date, Permitted Deductible, Remarketing Fee, Primary Hangar Location, and Rent Commencement Date shall have the meanings set forth in Schedules 2 and 2-A to Lease Supplement No. 1 to the Lease.

Abatements shall have the meaning set forth in Section 7 of the Lease.

Acceptance Date shall mean the date (which date shall be no later than the date designated as the "Last Acceptance Date" on Schedule No. 2 to Lease Supplement No. 1) on which Lessee irrevocably and unconditionally accepts the Aircraft for lease under the Lease as evidenced by the execution and delivery of Lease Supplement No. 1 relating thereto dated such date.

Additions shall have the meaning set forth in the Maintenance and Return Addendum hereto.

Affiliate shall mean any person controlling, controlled by, or under common control with Lessee, and for this purpose, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any such Person, whether through the legal or beneficial ownership of voting securities, by contract or otherwise, provided, however, that any person organized solely for the purpose of owning and operating aircraft shall not qualify as an Affiliate for purposes of the Lease.

Alterations shall have the meaning set forth in the Maintenance and Return Addendum hereto.

Aircraft shall mean (i) the Airframe, (ii) the Engines, and (iii) to the extent applicable, the Records.

Airframe shall mean (i) the Aircraft described in Schedule No. 1 to Lease Supplement No. 1, and shall not include the Engines and (ii) any and all Parts from time to time incorporated in, installed on or attached to such Aircraft and any and all Parts removed therefrom so long as title thereto shall remain vested in Lessor in accordance with the applicable terms of this Lease after removal from the Aircraft.

Assignee shall have the meaning set forth in Section 12 of the Lease.

Basic Rent shall have the meaning set forth in Section 3 of the Lease.

0 0 0 0 0 0 0 1 4 2 3

8-61

Basic Term shall mean the number of months set forth on Schedule No. 2 to Lease Supplement No. 1.

Business Day shall mean any day other than a Saturday, Sunday or other day on which banks located in Providence, Rhode Island are closed or are authorized to close.

Casualty Value for any Basic Rent Date shall be the amount equal to the Lessor's Cost multiplied by the factor set forth on Schedule No. 3 for such Basic Rent Date except that, in the case of an Event of Loss covered by the insurance covering loss or damage to the Aircraft required to be maintained by Lessee pursuant to the Lease (or which would have been covered by such insurance, had such insurance been maintained as required), Casualty Value shall mean the higher of Fair Market Value or the amount equal to the Lessor's Cost multiplied by the factor set forth on Schedule No. 3 to Lease Supplement No. 1.

Charter shall have the meaning set forth in Section 12 of the Lease.

Claims shall have the meaning set forth in Section 11 of the Lease.

Closing Documents shall mean the documents identified as such on Lease Supplement No. 2 and such other documents as Lessor shall consider necessary or advisable in order to convey to Lessor title to the Aircraft as contemplated under the Lease, which documents shall be in form and substance satisfactory to Lessor.

Consent and Assignment to Charter of Aircraft shall mean the Consent and Assignment to Charter of Aircraft by and among the charterer, Lessee and Lessor, and acknowledged by Guarantor.

Consent to Management Agreement shall mean the Consent to Management Agreement by and among the Manager, Lessee and Lessor, and acknowledged by Guarantor.

Corporate Guarantor shall mean that certain corporate guarantor (as more particularly described in Schedule No. 2-A to Lease Supplement No. 1) that entered into the Guaranty dated as of the Acceptance Date in favor of Lessor, and its successors and assigns.

Default shall mean an event or circumstance which, after the giving of notice or lapse of time, or both, would become an Event of Default.

Defenses shall have the meaning set forth in Section 12 of the Lease.

Engine shall mean (i) each of the engines and, if applicable, the auxiliary power units described and listed by manufacturer's serial numbers in Schedule No. 1 to Lease Supplement No. 1 and currently installed on the Airframe covered by such Lease Supplement whether or not thereafter installed on such Airframe or any other airframe from time to time; (ii) any engine and/or auxiliary power unit which may from time to time be substituted, pursuant to the applicable terms of this Lease, for an Engine leased hereunder and (iii) in each case set forth in clauses (i) and (ii) hereof, with any and all Parts incorporated in or installed on or attached to such Engine, engine and/or auxiliary power unit or any and all Parts removed therefrom so long as title thereto shall remain vested in Lessor in accordance with the applicable terms of this Lease after removal from such Engine. The term "Engines" means, as of any date of determination, all Engines leased hereunder.

Event of Default shall have the meaning set forth in Section 13 of the Lease.

Event of Loss with respect to the Aircraft, the Airframe or any Engine shall mean any of the following events with respect to such property (i) loss of such property or the use thereof due to theft, disappearance, destruction, damage beyond repair or rendition of such property permanently unfit for normal use for any reason whatsoever; (ii) any damage to such property which results in an insurance settlement with respect to

0 0 0 0 0 0 0 1 4 2 4                                    8-59

such property on the basis of a total loss or constructive total loss; (iii) the condemnation, confiscation or seizure of, or requisition of title to or use of, such property by the act of any government (foreign or domestic) or of any state or local authority or any instrumentality or agency of the foregoing ("Requisition of Use"); (iv) as a result of any rule, regulation, order or other action by any government (foreign or domestic) or governmental body (including, without limitation, the FAA or any similar foreign governmental body) having jurisdiction, the use of such property shall have been prohibited, or such property shall have been declared unfit for use, for a period of six (6) consecutive months, unless Lessee, prior to the expiration of six-month period, shall have undertaken and shall be diligently carrying forward all steps which are necessary or desirable to permit the normal use of such property by Lessee or, in any event, if use shall have been prohibited, or such property shall have been declared unfit for use, for a period of twelve (12) consecutive months; (v) with respect to an Engine, the removal thereof from the Airframe for a period of six (6) consecutive months or longer, whether or not such Engine is operational or (vi) an Engine is returned to the Manufacturer, other than for modification in the event of patent infringement or for repair or replacement (any such return being herein referred to as a "Return to Manufacturer"). The date of such Event of Loss shall be the date of such theft, disappearance, destruction, damage, Requisition of Use, prohibition, unfitness for use for the stated period, removal for the stated period or Return to Manufacturer. An Event of Loss with respect to the Aircraft shall be deemed to have occurred if an Event of Loss occurs with respect to the Airframe. An Event of Loss with respect to any Engine shall not, without loss of the Airframe, be deemed an Event of Loss with respect to the Aircraft.

FAA shall mean the United States Federal Aviation Administration and/or the Administrator of the Federal Aviation Administration and the Department of Transportation, or any person, governmental department, bureau, authority, commission or agency succeeding the functions of any of the foregoing.

FAA Counsel shall mean Messrs. Daugherty, Fowler, Peregrin & Haught, 204 North Robinson, Suite 900, Oklahoma City, Oklahoma 73102, or such other counsel as Lessor may designate.

Fair Market Value shall mean the amount which would be obtained in an arm's length transaction between an informed and willing buyer-user or lessee, as the case may be, (who is neither a lessee in possession nor a used equipment dealer) and an informed and willing seller or lessor, as the case may be, under no compulsion to sell or lease, as the case may be, and in such determination costs of removal of the Aircraft from its then location shall not be a deduction from such amount and it shall be assumed (whether or not the same be true) that the Aircraft has been maintained in accordance with the provisions of this Lease and would have been returned to Lessor in compliance with the requirements hereof.

Guarantor shall mean either or both LLC Guarantor and/or Corporate Guarantor, as the context may require.

Guaranty shall mean the Guaranty dated as of the Acceptance Date, by LLC Guarantor or Corporate Guarantor, as the case may be, in favor of Lessor.

Impositions shall have the meaning set forth in Section 8 of the Lease.

Late Payment Rate shall mean the lesser of a rate equal to (i) the 30-day London Interbank Offered Rate (LIBOR) as published in The Wall Street Journal in effect as of the 15th day of the month preceding the applicable payment date (or if The Wall Street Journal is not published on such day, the next preceding day on which The Wall Street Journal is published), plus 1.0% per annum or (ii) the highest rate permitted by applicable law . In the event The Wall Street Journal is not published or does not report a 30 day "London Interbank Offered Rate (LIBOR)" for seven consecutive Business Days, a comparable rate shall be selected by Lessor in its reasonable discretion. All interest hereunder shall be calculated on the basis of a year of 360 days comprised of 12 months of 30 days each.

0 0 0 0 0 0 0 1 4 2 5

8-57

Lease Supplement shall mean a supplement to the Lease to be entered into as of the Acceptance Date by Lessor and Lessee, which supplement shall be substantially in the form as attached to the Lease and identified as either Lease Supplement No. 1 or Lease Supplement No. 2 both of which are attached to the Lease and made a part thereof.

Lessor's Cost shall have the meaning set forth in Schedule No. 2 to Lease Supplement No. 1 to the Lease.

Lessor's Liens shall mean any Liens created or granted by Lessor with respect to Lessor's purchase or financing of the Aircraft or resulting from claims against Lessor not related to Lessor's ownership of the Aircraft.

Liens shall mean all liens, charges, security interests, and encumbrances of every nature and description whatever, including, without limitation, liens, charges, security interests and encumbrances with respect to Impositions, (other than Lessor's Liens) and rights of third parties under management, pooling, interchange, overhaul, repair or other similar agreements or arrangements.

LLC Guarantor shall mean that certain limited liability company guarantor (as more particularly described in Schedule 2-A to Lease Supplement No.1) that entered into the Guaranty dated as of the Acceptance Date in favor of Lessor, and its successors and assigns.

Management Agreement shall mean that certain Aircraft Management Agreement dated as of November 26, 2001, between Lessee and Manager.

Manager shall mean DaimlerChrysler Aviation Services, Inc., and its successors and assigns

Manufacturer shall mean the manufacturers identified on Schedule No. 1 to Lease Supplement No. 1 to the Lease and their respective successors and assigns.

Operator shall have the meaning set forth in Section 12 of the Lease.

Other Aircraft Lease shall have the meaning set forth in Section 13(d) of the Lease.

Other Lease Documents shall have the meaning set forth in Section 13(d) of the Lease.

Parts shall mean all appliances, avionics, parts, instruments, appurtenances, accessories, furnishings and other equipment of whatever nature (other than Additions or Engines), which may from time to time be incorporated or installed in or attached to the Airframe or any Engine for so long as title thereto shall be vested in Lessor in accordance with the applicable terms of this Lease.

Permitted Liens shall mean (a) the respective rights of others under agreements or arrangements to the extent expressly provided and permitted by the terms of Section 12 of the Lease, (b) Lessor's Liens and (c) Liens for taxes either not yet due or being contested by Lessee in good faith and inchoate materialmen's, mechanic's, workmen's, repairmen's, employee's or other like Liens arising in the ordinary course of business of Lessee for sums not yet delinquent or being contested in good faith (and for the payment of which adequate assurances and/or security have, in Lessor's sole judgment, been provided to Lessor) with due diligence and by appropriate proceedings, if counsel for Lessor shall have determined in its sole opinion that the nonpayment of any such tax or Lien or the contest of any such payment in such proceedings does not and will not adversely affect the title, property or rights of Lessor.

Person shall mean any individual, partnership, corporation, limited liability company, trust, association, joint venture, joint stock company, or non-incorporated organization or government or any department or agency thereof, or any other entity of any kind whatsoever.

0 0 0 0 0 0 0 1 4 2 6

8-55

Records shall mean any and all logs, manuals, certificates and date and inspection, modification, maintenance, engineering, technical and overhaul records (including all computerized data, records and materials of any kind whatsoever) with respect to the Aircraft, including, without limitation, all records required to be maintained by the FAA or any other governmental agency or authority having jurisdiction with respect to the Aircraft or any Manufacturer or Supplier of the Aircraft (or any part thereof) with respect to the enforcement of warranties or otherwise, which Records shall be at all times the property of the Lessor after the Acceptance Date.

Rent shall have the meaning set forth in Section 3 of the Lease.

Requisition of Use shall have the meaning set forth in the Event of Loss definition contained herein.

Return to Manufacturer shall have the meaning set forth in the Event of Loss definition contained herein.

SEC shall mean the Securities and Exchange Commission.

Sublease shall have the meaning set forth in Section 12 of the Lease.

Supplemental Rent shall have the meaning set forth in Section 3 of the Lease.

Supplier shall mean the "Supplier" or "Suppliers", as the case may be, identified as such on Schedule No. 1 to Lease Supplement No. 1 and their respective successors and assigns.

Term shall mean the Basic Term together with (i) the period, if any, from and including the Acceptance Date through, but not including, the Rent Commencement Date and (ii) any Renewal Term or Renewal Terms, if any, entered into pursuant to this Lease.

UCC shall mean the Uniform Commercial Code as in effect in the applicable jurisdiction.

Warranty Bill of Sale shall mean a warranty bill of sale in the form of Exhibit B hereto or such other form of warranty bill of sale as Lessor in its sole discretion shall deem satisfactory.

0 0 0 0 0 0 0 1 4 2 7

8-53

## LEASE SUPPLEMENT NO. 1
### (Acceptance Certificate)

AIRCRAFT LEASE dated as of March 30, 2001 (the "Lease") by and between FLEET NATIONAL BANK, as lessor ("Lessor"), and SM 5105 LLC, as lessee ("Lessee").

(a) The Aircraft.

Lessee hereby acknowledges, agrees and certifies that the Aircraft as set forth and described in Schedule No. 1 hereto is in Lessee's possession, has been inspected by Lessee to its complete satisfaction, has been found to be in good working order, repair and condition and fully equipped to operate as required under applicable law for its purpose, is of a size, design, capacity and manufacture selected by Lessee and suitable for Lessee's purposes, and is, as of the date set forth below, unconditionally, irrevocably and fully accepted by Lessee for lease under the Lease.  Lessee hereby further unconditionally and irrevocably reaffirms its acknowledgments and agreements in the Lease.  All capitalized terms used herein which are not otherwise defined herein shall have the meanings given to such terms in the Lease.

(b) Representations by Lessee.

Lessee hereby represents and warrants to Lessor that on the date hereof:

(1)  The representations and warranties of Lessee set forth in the Lease and all certificates and opinions delivered in connection therewith were true and correct in all material respects when made and are true and correct in all material respects as of the date hereof, with the same force and effect as if the same had been made on this date.

(2)  Lessee has satisfied or complied with all conditions precedent and requirements as set forth in the Lease and Lease Supplements which are required to be or to have been satisfied or complied with on or prior to the date thereof.

(3)  No Default or Event of Default under the Lease has occurred and is continuing on the date hereof.

(4)  Lessee has obtained, and there are in full force and effect, such insurance policies with respect to the Aircraft as are required to be obtained under the terms of the Lease.

(5)  Lessee has furnished no equipment for the Aircraft other than as stated on Schedule No. 1 hereto or permitted as an Addition thereto pursuant to the Lease.

(6)  The facts, terms, information, description and costs set forth in the attached Schedules No. 1, No. 2, No. 2-A, No. 3 and No. 4 hereto are true, complete, accurate and correct.

(7)  The Lease shall be deemed a "finance lease" under Section 2A-103 (g) of the UCC.

Date of unconditional, irrevocable and final acceptance by Lessee:

December 20, 2001.

RSCOMBS 399815                       27                    (LEASE SUPPLEMENT)

0 0 0 0 0 0 0 1 4 2 8

8-51

IN WITNESS WHEREOF, effective as of December __26__, 2001, Lessee has caused this Lease Supplement No. 1 to be duly executed by its officer thereunto duly authorized.

SM 5105 LLC

By: _John Blednik_
Name: _John Blednik_
Title: _Treasurer_

Address: c/o 38500 Woodward Avenue
Suite 100
Bloomfield Hills, MI  48304

RSCOMBS 399815

28

(LEASE SUPPLEMENT)

0 0 0 0 0 0 0 1 4 2 9                    8-49

## SCHEDULE NO. 1

### TO

### LEASE SUPPLEMENT NO. 1

**Description of Aircraft**

One 2001 Learjet 60 aircraft which consists of the following components:

(a)  Airframe bearing FAA Registration Mark N699DA and manufacturer's serial number 237.

(b)  Two (2) Pratt & Whitney Canada engines, model number PW305A, bearing manufacturer's serial numbers PCE-CA0319 and PCE-CA0318, (each of which has 750 or more rated takeoff horsepower or the equivalent of such horsepower).

(c)  Standard accessories and optional equipment and such other items fitted or installed on the Aircraft and as may be more particularly described hereinafter:

See Schedule A which is attached hereto and made a part hereof.

(d)  Those items of Lessee furnished equipment described in a bill of sale or bills of sale therefor (copies of which may be appended hereto), delivered by Lessee to Lessor which constitute appliances and equipment which will be installed on the Aircraft.

(e)  One (1) PATS, Inc. model T-20G-10C3A auxiliary power unit bearing manufacturer's serial number SP-E010358.

| | |
|---|---|
| Manufacturer of Airframe: | Learjet Inc. |
| Manufacturer of Engines: | Pratt & Whitney |
| Supplier: | Learjet Inc. |

RSCOMBS 399815                    29                    (LEASE SUPPLEMENT)

0 0 0 0 0 0 0 1 4 3 0

8-47

SCHEDULE A

### AVIONICS

Reduced vertical separation minimums (RVSM) compliant
Fireproofing protection per FAR 25.853 Appendix F compliant
EROS oxygen masks
FM Immunity for VIR-432 Nav Units
Heads-up Technologies Passenger Briefing System
Dual Collins VHF-422C comm with 8.33 khz channel spacing (exchange)
Honeywell Airborne flight information system (AFIS)
Collins traffic collision avoidance system (TCAS II)
Honeywell enhanced GPWS with windshear detection
Emergency locator transmitter
Magnastar C-2000 digital airborne telephone system (exchange)
Lighted control wheel chart holders
Floorplan M50-4 with exposed seat tracking on two (2) middle seats
Two (2) cabin throw rugs with the Delphi logo
110 VAC/60 hz power outlet (each)
Plated trim package
Pulsating recognition and landing lights
Hardwood trim strip
Wood veneer package
Collins TWR-850 enhanced weather radar (exchange)
Rosemount Ice Detection System
Dual rechargeable flashlights
Cockpit voice recorder
Fax/data outlet (without airshow network and/or Unilink selected)
Microwave
Detail Paint

Exterior: Matterhorn White with stripes of Gamma Grey, Fire Red, Sky Blue, Blue Green and Fed Ex
Purple


AND ALL STANDARD EQUIPMENT, ALL ADDITIONS, ACCESSIONS, MODIFICATIONS,
IMPROVEMENTS, REPLACEMENTS, SUBSTITUTIONS, AND ACCESSORIES THERETO AND
THEREFOR, ALL AVIONICS, ONBOARD EQUIPMENT, LOOSE EQUIPMENT LOCATED IN THE
AIRCRAFT, RECORDS, MANUALS, AND LOGBOOKS, IN BOTH WRITTEN AND COMPUTER DATA
FORM, AND WHETHER NOW EXISTING OR HEREAFTER ACQUIRED.

0 0 0 0 0 0 0 1 4 3 1

8-45

### SCHEDULE NO. 2

### TO

### LEASE SUPPLEMENT NO. 1

<u>Financial Terms</u>

| | |
|---|---|
| Rent Commencement Date: | December 20, 2001 |
| Basic Term: | 144 months commencing with the Rent Commencement Date through and including the Expiration Date |
| Basic Rent Dates: | the 20th day of each and every calendar month from and including the First Basic Rent Date through and including the Last Basic Rent Date |
| First Basic Rent Date: | December 20, 2001 |
| Last Basic Rent Date: | November 20, 2013 |
| Expiration Date: | December 19, 2013 |
| Primary Hangar Location: | Pentastar Aviation 7002 Highland Rd. Waterford, MI 48327 |
| Acceptance Date: | December 20, 2001 |
| Last Acceptance Date: | December 20, 2001 |
| Date of Last Financial Statements: | September 30, 2001 |
| Lessor's Cost: | $11,125,200.00 |

0 0 0 0 0 0 0 1 4 3 2

8-43

## SCHEDULE NO. 2-A

## TO

## LEASE SUPPLEMENT NO. 1

Intentionally omitted from FAA filing counterpart thereof as containing confidential financial information.

32

0 0 0 0 0 0 0 1 4 3 3                                          8-41

## SCHEDULE NO. 3 TO LEASE

### SUPPLEMENT NO. 1

Intentionally omitted from FAA filing counterpart thereof as containing confidential financial information.

33

0 0 0 0 0 0 0 1 4 3 4                    8-39

## SCHEDULE NO. 4

### TO

### LEASE SUPPLEMENT NO. 1

Intentionally omitted from FAA filing counterpart thereof as containing confidential financial information.

34

0 0 0 0 0 0 0 1 4 3 5

8-37

## LEASE SUPPLEMENT NO. 2
(Closing Terms)

AIRCRAFT LEASE dated as of March 31, 2001 (the "Lease") by and between FLEET NATIONAL BANK, as lessor ("Lessor"), and SM 5105 LLC, as lessee ("Lessee"). All capitalized terms used herein which are not otherwise defined herein shall have the meanings given to such terms in the Lease.

Closing Documents:

On or prior to the Acceptance Date, Lessee has delivered or caused to be delivered the following Closing Documents to Lessor:

1. The duly executed Aircraft Purchase Agreement between Supplier and SM 5105 LLC dated January 31, 2001, together with all addenda thereto, and, if applicable, the duly executed and authorized assignments of same to Lessor in form and substance satisfactory to Lessor.

2. Invoices for the Aircraft, including the Engines, from the Supplier showing Lessor as the purchaser thereof, and, if applicable, the duly executed and authorized assignments of same to Lessor in form and substance satisfactory to Lessor, and evidence that such invoices have been paid in full.

3. Evidence of reservation of an "N" number for the Aircraft, together with an assignment of Lessee's rights in such "N" number to Lessor.

4. A copy of the Standard Airworthiness Certificate (FAA Form 8100-2) issued by the FAA for the Aircraft.

5. A certificate or certificates, executed by the managing members or secretary, as the case may be, or other authorized representatives of Lessee and each Guarantor, as applicable, certifying: (A) that execution, delivery and performance of this Lease, the Guaranty to which such Guarantor is a party, and all ancillary documentation and the entrance by Lessee and such Guarantor into the transactions contemplated hereby and thereby have been authorized and (B) the name(s) of the person(s) authorized to execute and deliver such documents on behalf of Lessee and such Guarantor together with specimen signature(s) of such person, and (C) the organizational documents of Lessee and such Guarantor.

6. A certificate of insurance as to the coverage required under the Lease accompanied, if requested by Lessor, by the applicable policies and reports of insurance brokers or underwriters pursuant thereto as to the conformity of such coverage with such requirements.

7. Evidence that FAA Counsel has received in escrow: (A) the executed FAA AC Form 8050-2 Aircraft Bill of Sale (the "FAA Bill of Sale") in the name of Lessor; (B) the executed AC Form 8050-1 Aircraft Registration Application (the "Registration Application") (except for the pink copy which shall be available to be placed on the Aircraft upon acceptance thereof); (C) a Limited Liability Company application by and for each of Lessee and its managing member; (D) executed releases in form and substance satisfactory to FAA Counsel, Lessor's counsel and/or Lessor of any Liens; (E) such other documents as are necessary, in the opinion of Lessor's counsel and/or FAA Counsel to vest good title to the Aircraft in the name of Lessor; and (F) executed duplicates of the Lease, all Riders hereto requiring separate execution, and Lease Supplements No. 1 and 2 executed in triplicate, all the foregoing (except for the Warranty Bill of Sale) being in proper form for filing with the FAA.

8. UCC financing statements executed by Lessee with respect to the Aircraft and the Collateral (and, where needed, assignment, release and/or termination statements with respect to UCC financing statements of record evidencing an interest in the Aircraft and/or Collateral) in all

RSCOMBS 399815                          35                          (LEASE SUPPLEMENT)

0 0 0 0 0 0 0 1 4 3 6

8-35

places which are, in Lessor's opinion, necessary or appropriate to protect Lessor's interest therein.

9.    An opinion of FAA Counsel satisfactory to Lessor that title to the Airframe is vested in Lessor, Lessor has a valid and perfected interest in the Engines and that the Aircraft (including, without limitation the Airframe and Engines) is free and clear of all other liens and encumbrances of record.

10.    If requested by Lessor, an opinion of counsel for each of Lessee and each Guarantor in form and substance satisfactory to Lessor.

11.    If requested by Lessor, certificate(s) of good standing for Lessee and each Guarantor from the state of their organization and incorporation, respectively, and the state(s) where the Primary Hangar Location and chief executive offices and principal place of business of Lessee and each Guarantor are located.

12.    Such other documents, certificates and opinions, and evidence of such other matters, as Lessor, Lessor's counsel or FAA Counsel may reasonably request.

13.    A Guaranty from each of Corporate Guarantor and LLC Guarantor.

14.    The duly executed Consent to Management Agreement.

15.    The duly executed Consent and Assignment to Charter of Aircraft.

Conditions Subsequent:

On or subsequent to the Acceptance Date, but not later than the date of the Aircraft's first flight under the leasehold conveyed herein, Lessee shall provide written confirmation to Lessor that copies of the Registration Application and Standard Airworthiness Certificate (FAA Form AC 8100-2) pertaining to the Aircraft have been properly placed on the Aircraft.

In addition, if the Aircraft is more than 12,500 pounds maximum certificated takeoff weight, prior to the date of the Aircraft's first flight under the Lease, Lessee shall provide Lessor with written confirmation that:

1.    a copy of the Lease, including Lease Supplements No. 1 and No. 2, has been properly placed on the Aircraft;

2.    a copy of the Lease, including Lease Supplements No. 1 and No. 2 thereto, was mailed, within 24 hours following execution thereof, to the Flight Standards Technical Division of the FAA; and

3.    Lessee has notified the FAA (such notification to have been given by facsimile transmission, telephone or in person to the FAA Flight Standards District Office, General Aviation District Office nearest the airport where such flight will originate) concerning the first flight of the Aircraft under this Lease at least 48 hours prior to takeoff.

[SIGNATURES ON NEXT PAGE]

0 0 0 0 0 0 0 1 4 3 7

8-33

IN WITNESS WHEREOF, effective as of December __20__, 2001, the parties hereto have each caused this Lease Supplement No. 2 to be duly executed by their respective officers, thereunto duly authorized.

FLEET NATIONAL BANK

By: _____
Name: John C. Haslofsen, Jr
Title: Banking Officer

SM 5105 LLC

By: _____
Name: _____
Title: _____

Address: c/o 38500 Woodward Avenue
         Suite 100
         Bloomfield Hills, MI 48304

0 0 0 0 0 0 1 4 3 8

8-31

IN WITNESS WHEREOF, effective as of December 20 , 2001, the parties hereto have each caused this Lease Supplement No. 2 to be duly executed by their respective officers, thereunto duly authorized.

FLEET NATIONAL BANK

By: _____
Name: _____
Title: Banking Officer

SM 5105 LLC

By: _____
Name: _John Blalick_____
Title: _Treasurer_____

Address: c/o 38500 Woodward Avenue
Suite 100
Bloomfield Hills, MI 48304

RSCOMBS 399815

37

(LEASE SUPPLEMENT)

0 0 0 0 0 0 0 1 4 3 9

8-29

## EXHIBIT B

## TO AIRCRAFT LEASE

## WARRANTY BILL OF SALE [See Learjet Form, if different]

LEARJET INC. (the "Seller"), in consideration of the sum of _____ Dollars ($_____)
paid by FLEET NATIONAL BANK (the "Buyer"), receipt of which is acknowledged, hereby grants, sells,
assigns, transfers and delivers to Buyer the aircraft described below together with the engines installed
thereon and all appliances, parts, instruments, appurtenances, accessories, furnishings, avionics,
components and other equipment of whatever nature installed on said aircraft and all logbooks, manuals,
certificates, data and inspection, modification, maintenance, engineering, technical, overhaul and all other
books and records (including all computerized data, records and materials) as pertain to the operation and
maintenance of such aircraft (all of the foregoing hereinafter collectively referred to as the "Aircraft"), along
with whatever claims and rights Seller may have against the manufacturer and/or supplier of the Aircraft,
including, but not limited to, all warranties and representations. At Buyer's request, Seller will cause the
manufacturer and/or supplier of the Aircraft to execute an Acknowledgment in form and substance
satisfactory to Buyer in its sole discretion.

### DESCRIPTION OF AIRCRAFT

One (1) Learjet 60 aircraft bearing FAA Registration Mark N699DA and manufacturer's serial number _____
and ___ ( ) _____ engines, respectively, bearing manufacturer's serial numbers. ____
and ____ and [one (1) _____ auxiliary power unit bearing manufacturer's serial
number _____].

(See also Schedule A attached hereto and made a part hereof for further description of the Aircraft.)

Seller represents, warrants and agrees to Buyer that (1) Seller is the lawful owner of the full title to the
Aircraft and that Buyer will acquire by the terms of this Warranty Bill of Sale good and full title to the Aircraft
free and clear of all mortgages, leases, security interests, claims, charges, liens and encumbrances of any
kind whatsoever; (2) Seller has the right to sell the Aircraft as aforesaid; (3) Seller shall warrant and defend
title to the Aircraft and indemnify Buyer against the claims of any person, party, firm, corporation or entity of
any kind whatsoever and (4) the Aircraft had been delivered to Buyer in good order and condition and
conforms to the specifications and the requirements and standards applicable thereto.

Seller agrees to save and hold harmless Buyer from and against any and all foreign, Federal, state,
municipal and local license fees and taxes of any kind or nature, including, without limiting the generality of
the foregoing, any and all excise, personal property, privilege, use and sales taxes, and from and against any
and all liabilities, obligations, losses, damages, penalties, claims, actions and suits, including, without
limitation, attorney's fees, resulting therefrom and imposed upon, incurred by or asserted against Buyer as a
consequence of the sale of the Aircraft to the Buyer.

Seller agrees and acknowledges that the terms and conditions of this Warranty Bill of Sale, including,
without limitation, all representations, warranties and agreements for the benefit of Buyer, shall survive the
delivery of the Aircraft and the delivery, execution and recording of this or any Federal Aviation
Administration Bill of Sale.

RSCOMBS 366237                                    38                            (AIRCRAFT LEASE)

0 0 0 0 0 0 0 1 4 4 0

8-27

IN WITNESS WHEREOF, Seller has executed this Warranty Bill of Sale this _____ day of March, 2001

SELLER: _____

By: _____

Title: _____

00000001441

8-25

## EXHIBIT C

Intentionally omitted from FAA filing counterpart thereof as containing confidential financial information.

40 to 42

0 0 0 0 0 0 0 ! 4 4 2                                    8-23

**INSURANCE ADDENDUM** ("Insurance Addendum") to Aircraft Lease (N699DA) dated as of March 30, 2001 (the "Lease") by and between Fleet National Bank, as lessor ("Lessor"), and SM 5105 LLC, as lessee ("Lessee").

All capitalized terms used herein which are not otherwise defined herein shall have the meanings given to such terms in the Lease.  Except as set forth herein, all of the terms and conditions of the Lease and any supplements, schedules, addenda, exhibits or the like entered into pursuant to the Lease remain in full force and effect.  Execution of the Lease by Lessee and Lessor shall be deemed to constitute execution and acceptance of the terms and conditions hereof, whereupon this Insurance Addendum shall be deemed to be a part of the Lease.

The following provisions are hereby incorporated into the Lease:

Insurance.

(a) Aircraft Liability and Property Damage Insurance.  Lessee shall maintain at its own cost and expense for the entire Term with insurers satisfactory to Lessor, (i) comprehensive aircraft and general public liability insurance against bodily injury and property damage claims including, without limitation, contractual liability, premises damage, public liability, death and property damage liability, public and passenger legal liability coverage in an amount not less than $100,000,000.00 for each single occurrence and (ii) personal injury liability in an amount not less than $25,000,000.00.  Lessee shall also provide worker's compensation insurance with all-states coverage for the Aircraft's crew and maintenance personnel.

(b) Insurance Against Loss or Damage to the Aircraft.  Lessee shall maintain at its own cost and expense for the entire Term with insurers satisfactory to Lessor, all-risk ground and flight aircraft hull insurance covering the Aircraft, including foreign object damage, fire and explosion coverage resulting from a collision, cargo, environmental (limited to pollutants released because of a crash or collision of the Aircraft or related to an emergency causing abnormal operation of the Aircraft), damages resulting, from ingestion and lightning and associated electrical damage and comparable insurance with respect to any Engines or Parts while removed from the Aircraft, and with respect to any engines or parts while temporarily installed on the Aircraft, provided that such insurance shall at all times be in an amount not less than the Casualty Value of the Aircraft (such amount determined at the Rent Commencement Date and at each anniversary thereof for the next succeeding year throughout the Term).  Lessee shall maintain in effect hijacking (air piracy) insurance with respect to the Aircraft in a face amount of not less than the Casualty Value of the Aircraft (determined as described herein), which shall be in full force and effect worldwide throughout any geographical areas at any time traversed by the Aircraft.  Such insurance shall also include war risk, governmental confiscation and expropriation and related insurance.

(c) Lessor as Additional Insured; Notice.  Any policies of insurance carried in accordance with this Insurance Addendum and any policies taken out in substitution or replacement of any such policies (i) shall be amended to name Lessor as the owner of the Aircraft and as additional insured as its interests may appear, (ii) with respect to insurance carried in accordance with paragraph (b) of this Insurance Addendum covering the Aircraft, shall provide that any amount payable thereunder which exceeds $100,000.00 in the aggregate shall be paid directly to Lessor as sole loss payee and not to Lessor and Lessee jointly (and, so long as no Event of Default has occurred, such amounts shall be disbursed by Lessor to Lessee or other appropriate Persons in payment of the costs actually incurred with respect to repairs made to the Aircraft so as to restore it to the operating condition required by the M&R Addendum, or shall be disbursed by Lessor as otherwise required by the Lease), and that, provided no Default or Event of Default has occurred and is continuing, any amount(s) of less than $100,000.00 in the aggregate shall be paid to Lessee (and such amounts shall be applied by Lessee to pay the costs of such repairs), (iii) shall provide for thirty (30) days written notice by such insurer of cancellation, change, non-renewal or reduction and (iv) shall provide that in respect of the interests of Lessor in such policies, the insurance shall not be invalidated by any action or inaction of Lessee regardless of any breach or violation of any warranties, declarations or conditions

0 0 0 0 0 0 0 1 4 4 3                                              8-21

contained in such policies by or binding upon Lessee. Each shall be primary insurance, not subject to any co-insurance clause and shall be without right of contribution from any other insurance. Lessee shall arrange for appropriate certification as to the satisfaction of the requirements set forth above in this Insurance Addendum to be delivered to Lessor not later than the Acceptance Date by each such insurer or underwriter therefor, which certification shall specifically acknowledge that the insurance is in conformity with this Insurance Addendum. Notwithstanding the foregoing, Lessee shall promptly provide Lessor with a copy of each policy of insurance required hereunder if it so requests.

(d)  Reports, etc.  Annually on the anniversary of the Acceptance Date, Lessee shall furnish to Lessor a report describing in reasonable detail the insurance then carried and maintained on the Aircraft and certifying that such insurance complies with the terms hereof and, if Lessor shall so request, a copy of each applicable policy. In the event Lessee shall fail to maintain insurance as herein provided, Lessor may, at its option, provide such insurance, and Lessee shall, upon demand, reimburse Lessor for the cost thereof, together with interest at the Late Payment Rate from the date of payment through the date of reimbursement.

(e)  Agreed Value.  Anything herein to the contrary notwithstanding, at all times while the Aircraft is subject to this Lease, the insurance required hereunder shall be for an amount on an "agreed value" basis not less than the Casualty Value.

(f)  No Right To Self-Insure.  Lessee shall not self-insure (by deductible, premium adjustment, or risk retention arrangement of any kind) the insurance required to be maintained hereunder, except to the extent of deductibles usually and customarily maintained by companies engaged in the same or similar business as Lessee and operating the same or similar aircraft, but in no event shall any deductible exceed the Permitted Deductible amount on Schedule No. 2-A to Lease Supplement No. 1. Lessee agrees to give Lessor prompt notice of any damage to or loss of, the Aircraft, or any part thereof.

(g)  Attorney-In-Fact.  Effective upon the occurrence of an Event of Default, Lessee irrevocably appoints Lessor (and any assignee, mortgagee and/or lender of the Lessor) its attorney-in-fact to act in Lessee's name and on its behalf to make, execute, deliver and file any instruments or documents, settle, adjust, receive payment, make claim or proof of loss, endorse Lessee's name on any checks, drafts or other instruments in payment of such claims and to take any action as Lessor (and any such assignee, mortgagee and/or lender) deems necessary or appropriate to carry out the intent of this Insurance Addendum or any agreements, documents or instruments related thereto and to endorse Lessee's name on any checks, drafts or other instruments in payment of claims. To the extent appropriate or permissible under applicable law, such appointment is coupled with an interest, shall be irrevocable and shall terminate only upon payment in full of the obligations set forth in this Lease and/or any agreements, documents or instruments related thereto.

# EXHIBIT A

# (PART 3)

0 0 0 0 0 0 0 1 4 4 4

8-19

PURCHASE, EARLY PURCHASE AND RENEWAL OPTION ADDENDUM ("Option Addendum") to Aircraft Lease (N699DA) dated as of March 30, 2001 (the "Lease") by and between Fleet National Bank, as lessor ("Lessor"), and SM 5105 LLC, as lessee ("Lessee"):

All capitalized terms used herein which are not otherwise defined herein shall have the meanings given to such terms in the Lease. Except as set forth herein, all of the terms and conditions of the Lease and any supplements, schedules, addenda, exhibits or the like entered into pursuant to the Lease remain in full force and effect. Execution of the Lease by Lessee and Lessor shall be deemed to constitute execution and acceptance of the terms and conditions hereof, whereupon this Option Addendum shall be deemed to be a part of the Lease.

The following provisions are hereby incorporated into the Lease:

Purchase, Early Purchase and Renewal Options.

(a) End of Term Purchase Option. So long as (i) Lessee shall not have exercised its renewal option pursuant to paragraph (b) hereof and (ii) the Lease shall not have been earlier terminated or cancelled, Lessee shall be entitled, at its option, upon written notice to Lessor at least one hundred fifty (150) days but no more than two hundred forty (240) days prior to the expiration of the Basic Term, to purchase the Aircraft at the expiration of the Basic Term for an amount, payable in immediately available funds, equal to the greater of (i) fifty-seven percent (57%) of the Lessor's Cost, or (ii) the Fair Market Sales Value of the Aircraft as of the end of the Basic Term determined in accordance with paragraph (c) hereof, plus any applicable sales, excise or other taxes imposed as a result of such sale (other than gross or net income taxes attributable to such sale) together with any Basic Rent due and payable on or before such Basic Rent Date and all accrued and unpaid Rent then due and owing. Lessor's sale of the Aircraft shall be on an "AS-IS WHERE-IS" BASIS, WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OF ANY KIND WHATSOEVER, BY, OR RECOURSE TO, LESSOR.

(b) Renewal Option. So long as (i) no Default or Event of Default shall have occurred and be continuing under the Lease, (ii) Lessee shall not have exercised its purchase option pursuant to paragraph (a) hereof or its early purchase option pursuant to paragraph (e) hereof and (iii) the Lease shall not have been earlier terminated, Lessee shall be entitled, at its option, to extend the Term of the Lease with respect to the Aircraft at the expiration of the Basic Term for an additional period as set forth below. A Renewal Term shall commence at the expiration of the Basic Term. Lessee's option to renew the Lease for a Renewal Term shall be exercisable by giving written notice to Lessor at least one hundred fifty (150) days but no more than two hundred forty (240) days prior to the expiration of the Basic Term. All of the provisions of the Lease shall be applicable during the Renewal Term, except that, during the Renewal Term, the Basic Rent shall be an amount equal to the Aircraft's Fair Market Rental Value, which shall be determined in accordance with paragraph (c) hereof and the Expiration Date shall be changed to the date the last day of the Renewal Term. During the Renewal Term, Basic Rent shall be payable monthly in advance on the same day of each month as Basic Rent was payable during the Basic Term, which dates shall be deemed "Basic Rent Dates" for purposes of the Lease.

(c) Determination of Fair Market Sales and Rental Values. If Lessee has elected to exercise its purchase or renewal options, as provided in paragraphs (a) or (b) hereof, then as soon as practicable following Lessor's receipt of the written notice from Lessee of Lessee's intent to exercise such option, Lessor and Lessee shall consult for the purpose of determining the Fair Market Sales Value or Fair Market Rental Value, as applicable, (as defined below) of the Aircraft as of the end of the Basic Term, and any values agreed upon in writing shall constitute such Fair Market Sales Value or Fair Market Rental Value, as the case may be, of the Aircraft for the purposes of this Option Addendum. If Lessor and Lessee fail to agree upon such value prior to one hundred thirty-five (135) days before the expiration of the Basic Term, Lessor shall appoint an independent appraiser (reasonably acceptable to Lessee) to determine Fair Market Sales Value or Fair Market Rental Value, as the case may be, and that

RSCOMBS 366237                                   45                              (AIRCRAFT LEASE)

0 0 0 0 0 0 0 1 4 4 5                                    8-17

determination shall be final, binding and conclusive. Lessee and Lessor agree to split the costs and expenses of any such appraisal. For the purposes of this Option Addendum, "Fair Market Sales Value" and "Fair Market Rental Value" shall be determined on the basis of, and shall equal in value, the amount which would be obtained in an arm's length transaction between an informed and willing buyer-user or lessee, as the case may be, (who is neither a lessee in possession nor a used equipment dealer) and an informed and willing seller or lessor, as the case may be, under no compulsion to sell or lease, as the case may be, and in such determination costs of removal of the Aircraft from its then location shall not be a deduction from such Fair Market Sales Value or Fair Market Rental Value, as the case may be, and it shall be assumed (whether or not the same be true) that the Aircraft has been maintained by Lessee and returned to Lessor in accordance with the provisions of the Lease. If on the date upon which Lessee exercises its purchase option pursuant to paragraph (a) above, the actual average annual flight hours accumulated with respect to the Airframe (such product, the "Actual Annual Hours") for the period from the Acceptance Date to such purchase date (such period, the "Operating Period"), is greater than the Estimated Annual Hours (as defined below), then, Lessor and Lessee shall consult for the purpose of determining the Fair Market Sales Value and the Excess Use Amount (as defined below) of the Aircraft as of such purchase date, and any values agreed upon in writing shall constitute such Fair Market Sales Value and Excess Use Amount of the Aircraft for the purposes of this Option Addendum. If Lessor and Lessee fail to agree upon such values within 30 days after the purchase date, then Lessor and Lessee shall follow the appraisal procedure set forth in this paragraph (c) for the purpose of determining the Fair Market Sales Value and Excess Use Amount of the Aircraft. Lessee shall then pay to Lessor within ten (10) days of Lessor's written demand therefor (which demand shall, unless determination of the amount payable is otherwise agreed upon by Lessor and Lessee without consulting with an appraiser, be accompanied by a copy of an appraiser's report containing such determination), an amount equal to the Excess Use Amount. For the purposes of this Option Addendum, (A) "Excess Use Amount" shall mean the amount by which the Aircraft's Fair Market Sales Value has been diminished as a result of the Actual Annual Hours accumulated with respect to the Airframe during the Operating Period being greater than the Estimated Annual Hours per annum on average; and (B) "Estimated Annual Hours" shall mean the anticipated number of average annual flight hours as shown on Schedule 2-A to Lease Supplement No. 1. Without limiting the generality of any other provision of the Lease, Lessee's obligation to pay the Excess Use Amount shall survive the expiration of this Lease.

(d) Time to Exercise Option. Lessee shall be deemed to have waived the foregoing purchase option and renewal option unless Lessee provides Lessor with written notice of its irrevocable election to exercise the applicable option within fifteen (15) days after the Fair Market Sales Value and/or Fair Market Rental Value, as applicable, is determined (by agreement or appraisal).

(e) Early Purchase Option. So long as no Default or Event of Default (that can be cured by payment of money) shall have occurred and be continuing hereunder, Lessee shall be entitled, at its option, on each Early Purchase Date upon written notice to Lessor of at least one hundred twenty (120) but no more than one hundred eighty (180) days prior to the proposed Early Purchase Date, to purchase the Aircraft. Such early purchase by Lessee shall be effective upon the payment to the Lessor on the Early Purchase Date of an amount equal to the applicable Early Purchase Option Amount together any applicable sales, excise or other taxes imposed as a result of such sale (other than gross or net income taxes attributable to such sale), any Basic Rent due and owing on or before such Early Purchase Date and all accrued and unpaid Rent then due and owing for the Aircraft.

On the Early Purchase Date, but in no event prior to Lessor's receipt of the amounts specified in this paragraph (e), Lessor shall sell the Aircraft to Lessee on an "AS-IS, WHERE-IS" BASIS, WITHOUT ANY REPRESENTATION BY, OR RECOURSE OR WARRANTY, EXPRESS OR IMPLIED, OF ANY KIND WHATSOEVER TO LESSOR. Upon receipt of the amounts specified in the foregoing paragraph and upon consummation of the sale of the Aircraft, this Lease shall be deemed terminated.

0 0 0 0 0 0 0 1 4 4 6

8-15

Unless and until the foregoing payments and performance have been made and/or observed in full by Lessee, Lessee's obligations under this Lease, including, without limitation, the obligation to pay Basic Rent for the Aircraft, shall continue in full force and effect.

Notwithstanding anything to the contrary contained herein or otherwise, Lessee shall not be entitled to purchase the Aircraft pursuant to this paragraph (e) if an Event of Default or Default shall have occurred and be continuing, this Lease shall have been earlier terminated and/or the Aircraft purchased or upgraded on or prior to the proposed Early Purchase Date.

(f) Additional Definitions. For purposes of this Option Addendum and the Lease, the following terms shall have the following meanings:

Renewal Term shall mean a period of twelve months.

Early Purchase Date shall mean each of the Basic Rent Date designated as such on Schedule 2A to Lease Supplement No. 1.

Early Purchase Option Amount shall be the amount payable by the Lessee in the event that it exercises its option to purchase the Aircraft pursuant to paragraph (e) hereof, and shall be determined by multiplying the Lessor's Cost of the Aircraft by the percentage set forth opposite the applicable Early Purchase Date set forth on Schedule No. 2-A to Lease Supplement No. 1 to the Lease.

0 0 0 0 0 0 0 1 4 4 7

8-13

**MAINTENANCE AND RETURN ADDENDUM** ("M&R Addendum") to Aircraft Lease (N699DA) dated as of March 30, 2001 (the "Lease") by and between Fleet National Bank, as lessor ("Lessor"), and SM 5105 LLC, as lessee ("Lessee").

All capitalized terms used herein which are not otherwise defined herein shall have the meanings given to such terms in the Lease. Except as set forth herein, all of the terms and conditions of the Lease and any supplements, schedules, addenda, exhibits or the like entered into pursuant to the Lease remain in full force and effect. Execution of the Lease by Lessee and Lessor shall be deemed to constitute execution and acceptance of the terms and conditions hereof, whereupon this M&R Addendum shall be deemed to be a part of the Lease.

The following provisions are hereby incorporated into the Lease:

I. Maintenance of Aircraft.

(a) Maintenance and Operation. During the Term, Lessee, at its own cost and expense, shall (i) maintain, inspect, service, repair, overhaul and test the Airframe and each Engine in accordance with FAA approved and Manufacturer's recommended maintenance programs; (ii) maintain (in the English language) all Records and (iii) promptly furnish to Lessor such information as may be required to enable Lessor to file any reports required by any governmental authority as a result of Lessor's ownership of the Aircraft. All maintenance procedures shall be performed in accordance with all FAA and Manufacturer's standards and procedures by properly trained, licensed, and certified maintenance sources and maintenance personnel utilizing replacement parts approved by the FAA and the Manufacturer, so as to keep the Airframe and each Engine and Part in good operating condition, ordinary wear and tear alone excepted, and to enable the airworthiness certificate for the Aircraft to be continually maintained.

In the event any Engine is damaged or is being inspected or overhauled, Lessee, at its option, may substitute another engine of the same make and model as the Engine being repaired or overhauled provided such Engine is approved by the FAA and the manufacturer of the Airframe for use on the Aircraft (any such substitute engine being hereinafter referred to as a "Loaner Engine") during the period of such repair or overhaul and provided further (x) installation of the Loaner Engine is performed by an FAA and manufacturer certified mechanic with respect to an aircraft of the type of the Aircraft, (y) the Loaner Engine is removed and the repaired or overhauled original Engine is reinstalled on the Airframe promptly upon completion of the repair or overhaul of the original Engine but in no event later than the expiration, cancellation or earlier termination of the Term and (z) the Loaner Engine is free and clear of all Liens and is maintained in accordance herewith.

(b) Additions, Alterations and Replacement Parts. Lessee shall be entitled from time to time during the Term to acquire and install on the Aircraft at Lessee's own cost and expense (and Lessor hereby appoints Lessee to be Lessor's agent for such purpose, so long as no Event of Default has occurred and is continuing), any additional accessory, device or equipment as may be available at such time ("Additions") but only so long as such Additions (i) are ancillary to the Aircraft; (ii) are not required to render the Aircraft complete for its intended use by Lessee; (iii) will not impair the originally intended function or use of the Aircraft or diminish the value of the same; (iv) can be readily removed without causing material damage to the Aircraft and (v) in the event that Lessee has executed a Special Tax Indemnity Rider to the Lease, do not result in a "Tax Loss" as such term is defined in such Special Tax Indemnity Rider. Title to each Addition which is not removed by Lessee prior to the return of the Aircraft to Lessor shall vest in Lessor upon such return.

Any alteration or modification ("Alterations") with respect to the Aircraft that may at any time during the Term be required to comply with any applicable law or any governmental rule or regulation, including, without limitation, any airworthiness directives, shall be made at the expense of Lessee.

RSCOMBS 366237                                    48                                    (AIRCRAFT LEASE)

0 0 0 0 0 0 0 1 4 4 8

8-11

.Lessee, at its own cost and expense, will promptly replace all Parts which may from time to time become worn out, lost, stolen, taken, destroyed, seized, confiscated, requisitioned, damaged beyond repair or permanently rendered or declared unfit for use for any reason whatsoever.

Lessee shall repair all damage to the Aircraft resulting from the installation and removal of Additions, Alterations and/or replacement parts so as to restore the Aircraft to its condition prior to installation, ordinary wear and tear excepted.

Alterations and/or replacement parts shall be deemed accessions, and title thereto shall be immediately vested in Lessor without cost or expense to Lessor.

(c) Aircraft Marking. Lessee agrees, at its own cost and expense, to (i) cause the Airframe and the Engines to be kept numbered with the identification or serial number therefor as specified in Schedule No. 1 to Lease Supplement No. 1 hereof; (ii) prominently display on the Aircraft that "N" number, and only that "N" number, specified in Schedule No. 1 to Lease Supplement No. 1 or such other "N" number as has been approved in writing by the Lessor and duly recorded with the FAA; (iii) notify Lessor in writing thirty (30) days prior to making any change in the configuration, appearance or coloring of the Aircraft from the time the Aircraft is accepted by Lessee hereunder (other than changes in configuration mandated by the FAA or changes which are reasonably consistent with the configuration, appearance and coloring of the Aircraft as of the Acceptance Date) and in the event of any such change or modification of configuration, coloring or appearance, (other than as permitted hereby) at the request of Lessor to restore the Aircraft to the configuration, coloring and/or appearance of the Aircraft as of the Acceptance Date or, at Lessor's option to pay to Lessor an amount equal to the reasonable cost of such restoration and (iv) affix and maintain in the Airframe adjacent to the airworthiness certificate and on each Engine a two-inch by four-inch plaque made of metal or other permanent material or permanently painted stencil bearing the following legend:

"This property is Owned by and Leased from Fleet National Bank, c/o Fleet Capital Corporation, One Financial Plaza, Fifth Floor, Providence, Rhode Island 02903. Any removal, alteration, disposal or other change in the condition or location of this property must be approved by the Owner-Lessor."

and such other markings as from time to time may be required by law or otherwise deemed necessary or advisable by Lessor in order to protect the title of Lessor to the Aircraft and the rights of Lessor under this Lease.

II. Return of Aircraft.

(a) Condition Upon Return. Unless purchased by Lessee, upon the expiration, cancellation or other termination of the Lease (whether following an Event of Default or otherwise), Lessee, at its own expense, will return the Aircraft (together with all Records) to Lessor at a location specified by the Lessor within the continental United States and in the condition in which the Aircraft is required to be maintained pursuant to this M&R Addendum and any other applicable provisions of the Lease. The Aircraft shall be fully equipped with the Engines or the same number, make and model number of engines as are set forth on Schedule No. 1 to Lease Supplement No. 1, which shall fully comply with this M&R Addendum, and which, in the opinion of Lessor, have the same or improved utility, value, useful life, performance, and efficiency (normal wear and tear excepted) as the Engines had on the Acceptance Date and are suitable for use on the Airframe and owned by Lessor and properly installed thereon. Lessee shall not be relieved of any of its duties, obligations, covenants, or agreements under the Lease (including, without limitation, its obligation to pay Rent) prior to the return of the Aircraft in the manner and condition required with respect to such return. In addition, upon the return of the Aircraft, upon the expiration or other termination of this Lease (whether following an Event of Default or otherwise), Lessee shall pay to Lessor the Remarketing Fee. The Aircraft, at Lessee's expense, upon redelivery pursuant hereto (i) shall have a currently effective FAA airworthiness certificate; (ii) shall be free and clear of all Liens other than the Lease and any Lessor's Liens; (iii) shall be in the same configuration and in the

RSCOMBS 366237                              49                          (AIRCRAFT LEASE)

0 0 0 0 0 0 0 1 4 4 9                                8-9

same operating condition, ordinary wear and tear excepted, as when delivered to Lessee on the Acceptance Date; (iv) shall be in good operating condition, in good physical condition and good appearance (ordinary wear and tear excepted) with all systems operating normally; (v) shall have no damage history (including, without limitation, any damage history required to be reported on a FAA form #337 or pursuant to any other governmental reporting requirement), unless such damage history has been repaired in accordance with the provisions hereof, and after the making of such repairs, the value of the Aircraft has not been negatively affected (or in the event that the value of the Aircraft continues to be negatively affected after such repairs, Lessee may avoid any Default that might otherwise result therefrom by paying to Lessor an amount equal to the difference between the value of the Aircraft without such history and the value of the Aircraft with such history); (vi) shall have no open (and shall be in compliance with) all mandatory service bulletins, manufacturer's directives or airworthiness directives and all other applicable service, maintenance, repair and overhaul regulations issued by the FAA and/or any Manufacturer, and (vii) shall be otherwise in the condition and repair required under the Lease. For purposes of clause (v) of the preceding sentence, the existence and the extent of any diminution in value contemplated therein shall be determined by mutual agreement, and if no such agreement is reached between the parties within ten (10) Business Days of Lessor's notice that it desires a valuation with respect to such damage history (the "Damage History Notice"), the parties will use the appraisal process set forth in Paragraph (c) of the Option Addendum to determine the existence and extent of such diminution. The parties will use their best efforts to complete such valuation as promptly as practicable, but, in any event, within thirty (30) Business Days after the Damage History Notice. A final determination regarding the existence and extent of any diminution shall be binding and conclusive on both parties. Upon Lessor's request, Lessee shall assign to Lessor Lessee's rights under any manufacturer's or servicer's maintenance service contracts and/or extended warranties for the Aircraft, the Engines and/or any Parts. If at the time of the return of the Aircraft to Lessor, the actual average annual flight hours accumulated with respect to the Airframe (such product, the "Actual Annual Hours") for the period from the Acceptance Date to such return date (such period, the "Operating Period"), is ten percent (10%) greater than the Estimated Annual Hours (as defined below), then, Lessor and Lessee shall consult for the purpose of determining the Fair Market Sales Value and the Excess Use Amount (as defined below) of the Aircraft as of the return date, and any values agreed upon in writing shall constitute such Fair Market Sales Value and Excess Use Amount of the Aircraft for the purposes of this M&R Addendum. If Lessor and Lessee fail to agree upon such values within 30 days after the return date, then Lessor and Lessee shall follow the appraisal procedure set forth in paragraph (c) of the Option Addendum to the Lease for the purpose of determining the Fair Market Sales Value and Excess Use Amount of the Aircraft. Lessee shall then pay to Lessor within ten (10) days of Lessor's written demand therefor (which demand shall, unless determination of the amount payable is otherwise agreed upon by Lessor and Lessee without consulting with an appraiser, be accompanied by a copy of an appraiser's report containing such determination), an amount equal to the Excess Use Amount. For the purposes of this M&R Addendum, (A) "Excess Use Amount" shall mean the amount by which the Aircraft's Fair Market Sales Value has been diminished as a result of the Actual Annual Hours accumulated with respect to the Airframe during the Operating Period being greater than the Estimated Annual Hours per annum on average; and (B) "Estimated Annual Hours" shall mean the anticipated number of average annual flight hours as shown on Schedule 2-A to Lease Supplement No. 1.

        (b)  Mid-Life Condition.  At the time of such return (i) each Engine shall have available operating hours until both the next scheduled "hot section" inspection and the next scheduled major overhaul of not less than fifty percent (50%) of the total operating hours available between such "hot section" inspection or major overhaul, as the case may be; (ii) the Airframe shall have remaining not less than (aa) fifty percent (50%) of the available operating hours allowed between major airframe inspections; and (bb) fifty percent (50%) of number of available operating months allowed between major airframe inspections until the next scheduled major airframe inspection; and (iii) all life limited parts and components shall have remaining not less than fifty percent (50%) of the available hours, cycles and/or months, as the case may be, until the next scheduled replacement. In addition to the requirements set forth in clauses (i), (ii) and (iii) above, all inspections and scheduled maintenance required to be performed on the Airframe, Engines and all

0 0 0 0 0 0 0 1 4 5 0

8-7

life limited parts and components within one hundred twenty (120) days of the date of return and/or one hundred hours (100) of additional operation shall have been performed by Lessee.

(c) Engines. In the event that any Engine does not meet the conditions set forth in Section II (b)(i) above, for each such Engine Lessee shall pay Lessor an amount equal to the sum of (i) the current estimated cost of the next scheduled "hot section" inspection (including in such estimated cost, all required replacements of life limited parts) multiplied by the fraction wherein the numerator shall be the greater of (A) zero and (B) the remainder of (x) the actual number of operating hours since the previous hot section inspection, minus (y) 50% of the total operating hours allowable between hot section inspections, and the denominator shall be the total operating hours allowable between hot section inspections, plus (ii) for each such Engine, the product of the current cost of the next scheduled major overhaul (including in such estimated cost, all required replacements of life limited parts) multiplied by the fraction wherein the numerator shall be the greater of (A) zero and (B) the remainder of (x) the actual number of hours of operation since the previous major overhaul minus (y) 50% of the total operating hours allowable between major overhauls, and the denominator shall be the total operating hours allowable between major overhauls.

Notwithstanding the foregoing, the requirements of Section II (b)(i) above and the final sentence of Section II (b) above (but solely with respect to the Engines) shall be deemed to have been satisfied if at the time of return of the Engines (x) the Engines being returned to Lessor shall be covered by a service and maintenance contract in form and substance reasonably satisfactory to Lessor which provides for the maintenance and/or overhaul of the Engines ("Maintenance Contract"), (y) either (i) adequate reserves for future required maintenance and/or overhaul shall have been provided for pursuant to such Maintenance Contract or (ii) all amounts due and payable pursuant to such Maintenance Contract shall have been paid in full through the date of return and (z) the entity which provides the maintenance and/or overhaul services under such Maintenance Contract shall either (i) recognize the transfer by Lessee to Lessor of the rights and interests of Lessor (or its designee) under such Maintenance Contract or (ii) acknowledge the rights and interests of Lessor (or its designee) under such Maintenance Contract.

(d) Airframe. In the event that the Airframe does not meet the conditions set forth in Section II (b)(ii) above, Lessee shall pay Lessor an amount equal to the sum of the product of the current estimated cost of the next scheduled major airframe and pressure vessel inspection (including in such estimated cost, all required replacement of life limited parts) multiplied by the greater of the fraction wherein the numerator shall be the greater of (i) zero and (ii) the remainder of (x) the actual number of respective operating hours or months of operation since previous major airframe and pressure vessel inspection, minus (y) 50% of the respective total operating hours or months of operation allowable between scheduled major airframe and pressure vessel inspections, and the denominator shall be the respective total operating hours or months of operation between scheduled major airframe and pressure vessel inspections.

(e) Parts and Components. In the event any life limited part or component does not meet the conditions set forth in Section II (b)(iii) above, Lessee shall pay to Lessor with respect to each part or component for which said requirement is not met the dollar amount obtained by multiplying (i) the ratio that the life expended in excess of fifty percent (50%) of the available hours, cycles and/or months, as the case may be, until the next scheduled replacement bears to the total allowable life (measured in hours, cycles and/or months, as the case may be) for such part or component by (ii) Lessor's cost of replacement of such part or component. Lessor's cost of replacement of a part or component shall include Lessor's then current cost of purchasing the part or component itself and all of Lessor's current costs associated with the replacement.

(f) Treatment of Charges. All prorated inspection and/or overhaul charges, if any, shall be payable as Supplemental Rent and shall be due upon presentation to Lessee of an invoice setting forth in reasonable detail the calculation of such amounts due, including the names of all sources used for the

RSCOMBS 366237                                51                                (AIRCRAFT LEASE)

0 0 0 0 0 0 0 1 4 5 1

8-5

required cost estimates. Unless both Lessor and Lessee agree to an alternative source, the Manufacturers of the Airframe and Engines shall be used as the sources for all cost estimates.

(g) Fuel and Records. Upon the return of the Aircraft in accordance with the terms and conditions hereof; (i) each fuel tank shall contain no less than fifty percent (50%) of its full capacity or, in the case of differences in such quantity, an appropriate adjustment will be made at the then current market price of fuel and (ii) Lessee shall deliver all Records to Lessor. In the event any Records are missing or incomplete, Lessor shall have the right to cause any such Records to be reconstructed at the reasonable expense of Lessee.

(h) Storage. Upon the expiration, cancellation or other termination of the Lease, Lessee will, if requested by Lessor, permit Lessor to store the Aircraft at the Primary Hangar Location. During such storage period Lessee will, at its own cost and expense, keep the Aircraft properly hangared, and will permit Lessor or any Person designated by Lessor, including the authorized representatives of any prospective purchaser, lessee or user of the Aircraft to inspect the same. Lessee shall not be liable, except in the case of negligence, gross negligence or intentional misconduct of Lessee or of its employees or agents, for injury to, or the death of, any Person exercising, either on behalf of Lessor or any prospective purchaser, lessee or user, the rights of inspection granted hereunder. Lessee shall bear the risk of loss and shall pay any and all expenses connected with insuring and maintaining the Aircraft during such storage period. Notwithstanding the foregoing, upon the expiration of the Term for any reason other than an expiration, cancellation or termination which occurs as a result of an Event of Default, the storage period provided for in this paragraph and the obligation to hangar and insure the Aircraft shall be limited to fifteen (15) days.

(i) Replacement Engines. In the event that any engine not owned by Lessor shall be installed on the returned Airframe as set forth in Section II (a) hereof, then Lessee will, concurrently with such delivery, at its own expense, furnish Lessor with a full warranty bill of sale, in form and substance satisfactory to Lessor, with respect to each such engine and with a written opinion of FAA Counsel to the effect that, upon such return, Lessor will acquire a valid and perfected interest in such engine free and clear of all Liens (except Lessor's Liens). Thereupon, unless a Default or Event of Default shall have occurred and be continuing, Lessor will transfer to Lessee, on an "AS-IS, WHERE-IS" BASIS WITHOUT ANY REPRESENTATION OR WARRANTY BY, OR RECOURSE OR WARRANTY TO, LESSOR, all of Lessor's right, title and interest in and to any Engine not installed on the Airframe at the time of the return of such Airframe.

(j) Inspections. Not more than ninety (90) days prior to the expiration of the Lease, upon the written request of Lessor, Lessee shall, at its expense, review the maintenance records of the Aircraft to determine if the Aircraft is in the condition required by this M&R Addendum. Following such review, Lessee shall certify to Lessor that such Aircraft is in the condition required by this M&R Addendum according to the maintenance records for such Aircraft, or, if the maintenance records so indicate, indicate what maintenance or repair is needed to bring the Aircraft to the specified condition.

Lessor shall have the right, but not the duty, to inspect the Aircraft, any component thereof and/or the Records, at any reasonable time and from time to time, wherever located, upon reasonable prior written notice to Lessee. Upon request of Lessor, Lessee shall confirm to Lessor the location of the Aircraft and shall, at any reasonable time and from time to time, upon reasonable prior written notice to Lessee, make the Aircraft and/or the Records available to Lessor for inspection.

(k) Survival. The provisions of this M&R Addendum shall survive the expiration, cancellation or other termination of the Lease and the return of the Aircraft for any reason whatsoever.

(l) Injunctive Relief. Without limiting any other terms or conditions of the Lease, the provisions of this M&R Addendum are of the essence of the Lease, and upon application to any court of equity having jurisdiction, Lessor shall be entitled to a decree against Lessee requiring specific performance of the covenants of Lessee set forth herein.

RSCOMBS 366237                           52                           (AIRCRAFT LEASE)

0 0 0 0 0 0 0 1 4 5 2                                  8-3

**UPGRADE ADDENDUM** ("Upgrade Addendum") to Aircraft Lease (N699DA) dated as of March 30, 2001 (the "Lease") by and between Fleet National Bank, as lessor ("Lessor"), and SM 5105 LLC, as lessee ("Lessee").

All capitalized terms used herein which are not otherwise defined herein shall have the meanings given to such terms in the Lease. Except as set forth herein, all of the terms and conditions of the Lease and any supplements, schedules, addenda, exhibits or the like entered into pursuant to the Lease remain in full force and effect. Execution of the Lease by Lessee and Lessor shall be deemed to constitute execution and acceptance of the terms and conditions hereof, whereupon this Upgrade Addendum shall be deemed to be a part of the Lease.

The following provisions are hereby incorporated into the Lease:

Upgrade Option. So long as no Default or Event of Default shall have occurred and be continuing hereunder, Lessee shall be entitled, at its option, upon at least one hundred twenty (120) days but no more than two hundred forty (240) days prior written notice to Lessor, to replace the Aircraft on any Basic Rent Date commencing with the seventy-second (72nd) Basic Rent Date and ending with the one hundred eighth (108th) Basic Rent Date (any such date for purposes of this Section called an "Upgrade Date"), with an aircraft (the "Upgrade Aircraft") which has a value, utility, and useful life better than the Aircraft immediately prior to the exercise by Lessee of its option under this Upgrade Addendum to upgrade the Aircraft. Any such proposed Upgrade Aircraft shall be expressly subject to the prior written approval and consent of the Lessor, which approval and consent shall be given, if at all, in Lessor's sole discretion. On the Upgrade Date, the Lessee shall pay to Lessor in immediately available funds, (i) the Upgrade Option Amount, (ii) the Basic Rent due for the Aircraft on the Upgrade Date, (iii) all accrued and unpaid Rent then due and owing plus (iv) any applicable sales, excise or other taxes imposed as a result of the sale of the Aircraft (other than gross or net income taxes attributable to such sale). Upon full compliance by Lessee with the terms of this Upgrade Addendum, the Lease shall terminate and Lessor will transfer to Lessee or its designee, all of Lessor's right, title and interest, if any, in and to the Aircraft. SUCH TRANSFER SHALL BE "AS-IS, WHERE-IS," WITHOUT RECOURSE TO LESSOR, AND LESSOR SHALL NOT BE DEEMED TO HAVE MADE, AND LESSOR HEREBY DISCLAIMS, ANY REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, AS TO THE AIRCRAFT SO TRANSFERRED TO LESSEE.

Notwithstanding anything to the contrary contained herein or otherwise, until such time as the Lease is actually terminated pursuant to the terms hereof, in no event shall Lessee's exercise of this option to upgrade the Aircraft under the circumstances contemplated by the terms of this Upgrade Addendum result in any reduction in or delay in the payment of Basic Rent or any other payments of any kind whatsoever due under the Lease or relieve Lessee of any obligations of any kind whatsoever under the Lease or any document, agreement or instrument related thereto.

Lessor's Option to Lease. If the Lessor determines that the Upgrade Aircraft is acceptable, Lessor shall have the option, subject to satisfaction of Lessor's then current underwriting standards and completion of Lessor's then current underwriting process, to lease the Upgrade Aircraft to Lessee pursuant to the terms hereof. In the event that Lessor exercises its option to lease pursuant hereto, on the Upgrade Date Lessee, at its own cost and expense, shall convey to the Lessor good and marketable title to the Upgrade Aircraft, free and clear of any Liens or title defects of any kind whatsoever (for no additional cost to Lessor, including, without limitation, any purchase price amounts or any taxes of any kind whatsoever relating to the conveyance or the sale of the Upgrade Aircraft). Prior to or at the time of any such conveyance, Lessee, at its own cost and expense, will furnish Lessor with such documents to evidence such conveyance as Lessor shall request in its sole discretion, including, without limitation, bills of sale and opinions of Lessee's counsel and FAA Counsel comparable to those furnished on the Acceptance Date, which documents shall be in form and substance satisfactory in all respects to Lessor in its sole discretion. In addition, Lessor and Lessee agree that any such lease financing of the Upgrade Aircraft shall be effected utilizing documentation which reflects Lessor's then current standard aircraft lease financing documents, but taking into account the

0 0 0 0 0 0 0 1 4 5 3

8-1

negotiated points of the Lease, and the financial terms of such financing shall reflect Lessor's then current financial terms for similar customers and aircraft.

In the event, and only in such event, that Lessor elects not to exercise the foregoing option to lease, Lessee shall be entitled to exercise the upgrade option set forth in this Upgrade Addendum free and clear of Lessor's option to lease.

Additional Terms and Definitions.   For purposes of this Upgrade Addendum and the Lease, the following definitions and terms shall apply:

Upgrade Option Amount shall mean (i) in the event that Lessor exercises its option to lease the Upgrade Aircraft to Lessee:  an amount equal to the Lessor's Cost multiplied by the factor set forth on Schedule No. 4 to Lease Supplement No. 1 to the Lease for the applicable Upgrade Option Date or (ii) in the event that Lessor does not exercise its option to lease the Upgrade Aircraft to Lessee:  an amount equal to the greater of (A) the Fair Market Value of the Aircraft and (B) an amount equal to the Lessor's Cost multiplied by the factor set forth on Schedule No. 4 to Lease Supplement No. 1 to the Lease for the applicable Upgrade Option Date.

Determining Fair Market Value:  If Lessee has elected to exercise its upgrade option, then as soon as practicable following Lessor's receipt of the written notice from Lessee of Lessee's intent to exercise such option, Lessor and Lessee shall consult for the purpose of determining the Fair Market Value of the Aircraft as of the Upgrade Date.  Any values agreed upon in writing shall constitute such Fair Market Value of the Aircraft for the purposes of this Upgrade Addendum.  If Lessor and Lessee fail to agree upon such value within thirty (30) days after Lessee has elected its upgrade option, Lessor shall appoint an independent appraiser (reasonably acceptable to Lessee) to determine Fair Market Value and that determination shall be final, binding and conclusive.  Lessee agrees to pay the costs and expenses of any such appraisal.

8

**COMPARISON CERTIFICATE**
I have compared the foregoing instrument with the original and
the same is a true and correct copy thereof in all respects.

*Deeneta D. Carter*

# EXHIBIT B

FORM APPROVE!
OMB NO. 2120-004

UNITED STATES OF AMERICA

U.S. DEPARTMENT OF TRANSPORTATION FEDERAL AVIATION ADMINISTRATION

## CRAFT BILL OF SALE

FOR AND IN CONSIDERATION OF $ 1 and OVC THE
UNDERSIGNED OWNER(S) OF THE FULL LEGAL
AND BENEFICIAL TITLE OF THE AIRCRAFT DES-
CRIBED AS FOLLOWS:

RECORDED
FEDERAL AVIATION ADMINISTRATION

| UNITED STATES REGISTRATION NUMBER N 699DA | DATE 1/29/02 | TIME 7:55 |

AIRCRAFT MANUFACTURER & MODEL
Learjet Inc.    CONVEYANCE NUMBER T 068687

AIRCRAFT SERIAL No.    8637

COUNTIES EXAMINED

DOES THIS 20ᵗʰ DAY OF December, 2001,
HEREBY SELL, GRANT, TRANSFER AND
DELIVER ALL RIGHTS, TITLE, AND INTERESTS
IN AND TO SUCH AIRCRAFT UNTO:

Do Not Write In This Block
FOR FAA USE ONLY

NAME AND ADDRESS
(IF INDIVIDUAL(S), GIVE LAST NAME, FIRST NAME, AND MIDDLE INITIAL.)

**PURCHASER**

Fleet National Bank
One Financial Plaza
Providence, R.I. 02903

DEALER CERTIFICATE NUMBER

AND TO its Successors EXECUTORS, ADMINISTRATORS, AND ASSIGNS TO HAVE AND TO HOL[D]
SINGULARLY THE SAID AIRCRAFT FOREVER, AND WARRANTS THE TITLE THEREOF.

IN TESTIMONY WHEREOF I    HAVE SET my    HAND AND SEAL THIS 20ᵗʰ DAY OF Dec., 2001.

**SELLER**

| NAME (S) OF SELLER (TYPED OR PRINTED) | SIGNATURE (S) (IN INK) IF EXECUTED FOR CO-OWNERSHIP, ALL MUST SIGN.) | TITLE (TYPED OR PRINTED) |
|---|---|---|
| Learjet Inc. | Janice Williams | Manager Domestic Contracts |

ACKNOWLEDGMENT (NOT REQUIRED FOR PURPOSES OF FAA RECORDING: HOWEVER, MAY BE REQUIRE[D]
BY LOCAL LAW FOR VALIDITY OF THE INSTRUMENT.)

**(CERTIFIED COPY-TO BE RETURNED)**

PURCHASER'S COPY (This copy must be signed in ink if submitted to the FAA.)

AC Form 8050-2 (9/92) (NSN 0052-00-629-0003) Supersedes Previous Edition

# COPY - TO BE RETURNED

FORM APPROVED
OMB No. 2120-0042

UNITED STATES   AMERICA DEPARTMENT OF TRANSPORTATION
FEDERAL AVIATION ADMINISTRATION-MIKE MONRONEY AERONAUTICAL CENTER
AIRCRAFT REGISTRATION APPLICATION

CERT. ISSUE DATE

| UNITED STATES REGISTRATION NUMBER | N 699DA |

AIRCRAFT MANUFACTURER & MODEL
**Learjet Inc Model 60**

AIRCRAFT SERIAL No.
**237**

FOR FAA USE ONLY

### TYPE OF REGISTRATION (Check one box)

☐ 1. Individual   ☐ 2. Partnership   ☒ 3. Corporation   ☐ 4. Co-owner   ☐ 5. Gov't.   ☐ 8. Non-Citizen Corporation

NAME OF APPLICANT (Person(s) shown on evidence of ownership. If individual, give last name, first name, and middle initial.)

Fleet National Bank
c/o SM 5105 LLC

TELEPHONE NUMBER: (248) 813-2564
ADDRESS (Permanent mailing address for first applicant listed.)

Number and street: 38500 Woodward Ave, Suite 100

P.O. Box:

| Rural Route: CITY | STATE | ZIP CODE |
| Bloomfield Hills | MI | 48304 |

☐ **CHECK HERE IF YOU ARE ONLY REPORTING A CHANGE OF ADDRESS**

**ATTENTION!** Read the following statement before signing this application.
**This portion MUST be completed.**

A false or dishonest answer to any question in this application may be grounds for punishment by fine and / or imprisonment (U.S. Code, Title 18, Sec. 1001).

## CERTIFICATION

I/WE CERTIFY:

(1) That the above aircraft is owned by the undersigned applicant, who is a citizen (including corporations) of the United States.

(For voting trust, give name of trustee: _____ ), or:

CHECK ONE AS APPROPRIATE:

  a. ☐ A resident alien, with alien registration (Form I-151 or Form I-551) No. _____

  b. ☐ A non-citizen corporation organized and doing business under the laws of (state) _____ and said aircraft is based and primarily used in the United States. Records or flight hours are available for inspection at _____

(2) That the aircraft is not registered under the laws of any foreign country; and

(3) That legal evidence of ownership is attached or has been filed with the Federal Aviation Administration.

NOTE: If executed for co-ownership all applicants must sign. Use reverse side if necessary.

TYPE OR PRINT NAME BELOW SIGNATURE

| SIGNATURE | TITLE | DATE |
| | Banking Officer | 12/20/01 |
| SIGNATURE | TITLE | DATE |
| SIGNATURE John E. Haakenson, Jr. | TITLE | DATE |

EACH PART OF THIS APPLICATION MUST BE SIGNED IN INK

NOTE  Pending receipt of the Certificate of Aircraft Registration, the aircraft may be operated for a period not in excess of 90 days, during which time the PINK copy of this application must be carried in the aircraft.

AC Form 8050-1 (12/90) (0052-00-628-9007) Supersedes Previous Edition

# EXHIBIT C

## AIRCRAFT TITLE REPORT from FAA RECORDS SEARCH

**Account No.** 71281
**Phone No.** 616-742-3953

**For:** Barnes & Thornburg LLP
300 Ottawa, N.W. Suite 500
Grand Rapids, MI 49503

Attn: Laura Schmidt

**Insured Aircraft Title Service, Inc.**
P.O. BOX 19527    405-681-6663
OKLAHOMA CITY, OKLAHOMA 73144
TOLL FREE:    PHONE 800-654-4882

**Re:** N/A

#### FAA Records Search revealed the following TITLE information on the aircraft herein described.

| | | | |
|---|---|---|---|
| **Registration** | N699DA    Learjet Inc. | **Model** | 60 |
| **Record Owner:** | Bank of America, N.A. *<br>c/o 7310 Highland Rd., Waterford, MI 48327 | **Serial No.** | 237 |
| **Title:** | Vice President | **Type:** | Corporation |
| **Signed By:** | Deborah M. Hayes | **Date Regstrd:** | 1-29-02 |
| **Acquired By:** | Bill of Sale | **Date:** | 12-20-01 |
| **Date Filed:** | 12-20-01    **Recorded:** 1-29-02 | **FAA Doc. #** | T068687 |
| **Prev. Owner:** | Learjet Inc.<br>Manufacturer | **Date Regstrd:** | -- |

**Subject To:** Lease Agreement    **Dated:** 12-20-01    **Amount $**   Term: 144 months
**Filed at FAA:** 12-20-01    **Recorded:** 1-29-02    **FAA Doc. #** T068688 **
**Lessee:** Delphi Automotive Systems Human Resources LLC ***
5725 Delphi Dr., Troy, MI 48098
**Lessor:** Bank of America, N.A. *
One Financial Plaza, Fifth Fl., Providence, RI 02903-2305

* (successor by Merger to Fleet National Bank)
** Covers N699DA and 2 Pratt & Whitney PW305A engines, serial numbers PCE-CA0319 and PCE-CA0318
*** Delphi Automotive Systems Human Resources LLC assumed the equitable interest as lessee from SM 5105
LLC in the above described Lease Doc. #T068688 through an Assumption/Assignment Agreement, dated
12-16-03, recorded 2-18-04 as FAA Doc. #H110456, with the consent of the Lessor.

**Page 2   N699DA      Ser. No. 237**

**10/13/2005**

**For:**   Barnes & Thornburg LLP
300 Ottawa, N.W. Suite 500
Grand Rapids, MI 49503

Attn: Laura Schmidt

**Account No.**   71281

**Phone No.**   616-742-3953



Insured Aircraft Title Service, Inc.
P.O. BOX 19527      405-681-6663
OKLAHOMA CITY, OKLAHOMA 73144
TOLL FREE:   PHONE 800-654-4882

**Re:**   N/A

This search is subject to the filings reflected on the index of collateral provided by the FAA and Insured Aircraft Title Service, Inc. assumes no responsibility as to the accuracy of said source, and does not guarantee, insure, or warrant that said FAA index is free of error.

**10/13/2005**
**7:29 a.m. Central**
**INSURED AIRCRAFT TITLE SERVICE, INC.**

**By**_____**E. Cotton**_____
                                          **Title Examiner**

EC/eb

# EXHIBIT D

**CORPORATION SERVICE COMPANY**
www.incspot.com

CSC- Springfield
801 Adlai Stevenson Drive
Springfield, IL 62703
217-544-5900
217-492-2727 (Fax)

| | | | |
|---|---|---|---|
| Matter# | NOT PROVIDED | Order# | 652124-1 |
| Project Id : | | Order Date | 10/14/2005 |
| Additional Reference : | NOT PROVIDED | | |

| | |
|---|---|
| Subject : | **SM 5105 LLC** |
| Jurisdiction : | **DE-SECRETARY OF STATE** |
| Request for : | UCC Debtor Search |
| Result : | Records found |
| Thru Date : | October 04, 2005 |
| No. of findings : | 2 |
| Original UCC Filings : | 2 |
| Amendments : | 0 |
| Continuations : | 0 |
| Assignments : | 0 |
| Releases : | 0 |
| Corrections : | 0 |
| Terminations : | 0 |

Ordered by MARTHA LEDEZMA at BARNES & THORNBURG

Thank you for using CSC.  For real-time 24 hour access to the status of any order placed with CSC, access our website at www.incspot.com.

If you have any questions concerning this order or IncSpot,  please feel free to contact us.

Margaret Pike
mpike@cscinfo.com

**CSC Article 9 Compliant Searching**
Under Revised Article 9, in order to conduct proper due diligence, all UCC debtor searches must be performed in both the old Article 9 and Revised Article 9 jurisdictions. CSC accepts no responsibility for omissions resulting from an incomplete search request.

**Corporation Service Company(R) Terms and Conditions**
You agree that all information that Corporation Service Company furnishes to you will be used solely as one factor in your credit, insurance, marketing or other business decisions and will not be used (i) in determining a consumer's eligibility for credit or insurance where such credit or insurance is to be used primarily for personal, family or household purposes, (ii) for employment purposes, or (iii) for governmental licenses. Use of the information in the above manner is a violation of the Fair Credit Reporting Act.

**CORPORATION SERVICE COMPANY**
www.incspot.com

CSC- Springfield
801 Adlai Stevenson Drive
Springfield, IL 62703
217-544-5900
217-492-2727 (Fax)

Matter#    NOT PROVIDED
Project Id :
Additional Reference :                   NOT PROVIDED

Order#          652124-1
Order Date      10/14/2005

Subject :                      **SM 5105 LLC**

Jurisdiction :                 **DE-SECRETARY OF STATE**

Request for :                  **UCC Debtor Search**

Result :                       Records found

File Type :                    Original
File Number :                  20066583
File Date :                    11/30/2001
Current Secured Party of Record :      FLEET NATIONAL BANK

File Type :                    Original
File Number :                  20146930
File Date :                    12/17/2001
Current Secured Party of Record :      FLEET NATIONAL BANK

Ordered by MARTHA LEDEZMA at BARNES & THORNBURG

Thank you for using CSC.  For real-time 24 hour access to the status of any order placed with CSC, access our website at
www.incspot.com.

If you have any questions concerning this order or IncSpot,  please feel free to contact us.

Margaret Pike
mpike@cscinfo.com

Corporation Service Company(R) Terms and Conditions
You agree that all information that Corporation Service Company furnishes to you will be used solely as one factor in your credit, insurance, marketing or other
business decisions and will not be used (i) in determining a consumer's eligibility for credit or insurance where such credit or insurance is to be used
primarily for personal, family or household purposes, (ii) for employment purposes, or (iii) for governmental licenses. Use of the information in the above
manner is a violation of the Fair Credit Reporting Act.

**CORPORATION SERVICE COMPANY**
www.incspot.com

CSC- Springfield
801 Adlai Stevenson Drive
Springfield, IL 62703
217-544-5900
217-492-2727 (Fax)

| | | | |
|---|---|---|---|
| **Matter#** | NOT PROVIDED | **Order#** | 652124-1 |
| **Project Id :** | | **Order Date** | 10/14/2005 |
| **Additional Reference :** | NOT PROVIDED | | |

| | |
|---|---|
| **Subject :** | **SM 5105 LLC** |
| **Jurisdiction :** | **DE-SECRETARY OF STATE** |
| **Request for :** | **Federal Tax Lien Search** |
| Thru Date : | October 04, 2005 |
| **Result :** | Certified clear result retrieved |

Ordered by MARTHA LEDEZMA at BARNES & THORNBURG

Thank you for using CSC.  For real-time 24 hour access to the status of any order placed with CSC, access our website at www.incspot.com.

If you have any questions concerning this order or IncSpot,  please feel free to contact us.

Margaret Pike
mpike@cscinfo.com

Corporation Service Company(R) Terms and Conditions
You agree that all information that Corporation Service Company furnishes to you will be used solely as one factor in your credit, insurance, marketing or other business decisions and will not be used (i) in determining a consumer's eligibility for credit or insurance where such credit or insurance is to be used primarily for personal, family or household purposes, (ii) for employment purposes, or (iii) for governmental licenses. Use of the information in the above manner is a violation of the Fair Credit Reporting Act.

# Delaware

PAGE    1

## The First State

CERTIFICATE

SEARCHED OCTOBER 14, 2005, AT 10:37 A.M.
FOR DEBTOR "SM 5105 LLC"

| 1 OF | 2 | LEASE | | 20066583 |
| | EXPIRATION DATE: NOVEMBER 30, 2006 | | | |

```
  DEBTOR: SM 5105 LLC
          38500 WOODWARD AVENUE                      ADDED 11-30-01
          SUITE 100
          BLOOMFIELD              MI   48304
 SECURED: FLEET NATIONAL BANK
          ONE FINANCIAL PLAZA, 5TH FLOOR            ADDED 11-30-01
          PROVIDENCE                 RI   02903
               F I L I N G    H I S T O R Y
 20066583  FILED 11-30-01    AT  1:50 P.M.   LEASE
```

| 2 OF | 2 | FINANCING STATEMENT | | 20146930 |
| | EXPIRATION DATE: DECEMBER 17, 2006 | | | |

```
  DEBTOR: SM 5105 LLC
          38500 WOODWARD AVENUE                      ADDED 12-17-01
          SUITE 100
          BLOOMFIELD              MI   48304
 SECURED: FLEET NATIONAL BANK
          ONE FINANCIAL PLAZA                       ADDED 12-17-01
          PROVIDENCE                 RI   02903
               F I L I N G    H I S T O R Y
 20146930  FILED 12-17-01    AT 12:55 P.M.   FINANCING STATEMENT
          E N D   O F   F I L I N G   H I S T O R Y
```

THE UNDERSIGNED FILING OFFICER HEREBY CERTIFIES THAT THE
ABOVE LISTING IS A RECORD OF ALL PRESENTLY EFFECTIVE FINANCING
STATEMENTS, LAPSED FINANCING STATEMENTS, FEDERAL TAX LIENS AND
UTILITY SECURITY INSTRUMENTS FILED IN THIS OFFICE WHICH NAME THE
ABOVE DEBTOR, AS OF OCTOBER 4, 2005 AT 11:59 P.M.

*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

20053178937UCXL

050840455

AUTHENTICATION: 4226165

DATE: 10-14-05

**UCC FINANCING STATEMENT**
**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

PARASEARCH
222 Jefferson Boulevard
Warwick, RI 02888
(401) 732-2490 Fax: 739-7708

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 01:50 PM 11/30/2001
2006658 3 - 0000000
SRV: 010645612

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (1a or 1b) – do not abbreviate or combine names

| | 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | SM 5105 LLC | | | |
| | 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 38500 Woodward Avenue, Suite 100 | Bloomfield | MI | 48304 | USA |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION limited liability co. | 1f. JURISDICTION OF ORGANIZATION Delaware | 1g. ORGANIZATIONAL ID #, if any 3297657 ☒ NONE |
|---|---|---|---|---|

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (2a or 2b) – do not abbreviate or combine names

| | 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any ☐ NONE |
|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – insert only one secured party name (3a or 3b)

| | 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | Fleet National Bank | | | |
| | 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| c/o Fleet Capital Coproration One Financial Plaza, 5th floor | Providence | RI | 02903 | USA |

4. This FINANCING STATEMENT covers the following collateral: THOSE ASSETS INDICATED ON ITEM 16 OF THIS FINANCING STATEMENT. This financing statement continues each financing statement (a "pre-effective-date financing statement") identified below. Each identified pre-effective-date financing statement remains effective.

| Secretary of State, Michigan | 5/1/01 | D769440 | N/A | N/A |
|---|---|---|---|---|

5. ALTERNATIVE DESIGNATION [if applicable]: ☒ LESSEE/LESSOR   ☐ CONSIGNEE/CONSIGNOR   ☐ BAILEE/BAILOR   ☐ SELLER/BUYER   ☐ AG. LIEN   ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum   [if applicable]

7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   [optional]   ☐ All Debtors   ☐ Debtor 1   ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY – NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

BUSDOCS:941298.4

**UCC FINANCING STATEMENT ADDENDUM**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT

| | | | |
|---|---|---|---|
| | 9a. ORGANIZATION'S NAME | | |
| | SM 5105 LLC | | |
| OR | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |

10. MISCELLANEOUS:

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME -- insert only one name (11a or 11b) -- do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| | 11a. ORGANIZATION'S NAME | | | |
| OR | 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 11d. TAX ID #:  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | □ NONE |

12. □ ADDITIONAL SECURED PARTY'S  or  □ ASSIGNORS S/P'S NAME -- insert only one name (12a or 12b)

| | | | | |
|---|---|---|---|---|
| | 12a. ORGANIZATION'S NAME | | | |
| OR | 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

13. This FINANCING STATEMENT covers □ timber to be cut or □ as extracted collateral, or is filed as a □ fixture filing.

14. Description of real estate:

15. Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

16. Additional collateral description:

All Collateral described on the attached Exhibit A.

17. Check only if applicable and check only one box.

Debtor is a □ Trust or □ Trustee acting with respect to property held in trust or □ Decedent's Estate.

18. Check only if applicable and check only one box.
□ Debtor is a TRANSMITTING UTILITY
□ Filed in connection with a Manufactured-Home Transaction -- effective 30 years
□ Filed in connection with a Public-Finance Transaction -- effective 30 years

**FINANCING STATEMENT · FOLLOW INSTRUCTIONS CAREFULLY**
This Financing Statement is presented for filing pursuant to the Uniform Commercial Code and will remain effective, with certain exceptions, for a period of five years from date of filing.

**EXHIBIT A**

A. NAME & TEL. # OF CONTACT AT FILER [optional]

Robbin A. Gossman, Paralegal
Ober, Kaler, Grimes & Shriver
120 East Baltimore Street
Baltimore, Maryland 21202

B. FILING OFFICE ACCT. # [optional]

REC'D U.C.C. UNIT
05/01/01    9:00 AM
SECRETARY OF STATE
LANSING MI  D769440

D. OPTIONAL DESIGNATION [if applicable]: □ LESSEE/LESSOR   □ CONSIGNOR/CONSIGNEE   □ NON-UCC FILING

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b)

| 1a. ENTITY'S NAME | | | |
|---|---|---|---|
| SM 6105 LLC | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | COUNTRY | POSTAL CODE |
|---|---|---|---|---|
| 38500 Woodward Avenue, Suite 100 | Bloomfield Hills | MI | USA | 48304 |

| 1d. S.S. OR TAX I.D. # | OPTIONAL ADD'L INFO RE: ENTITY DEBTOR | 1e. TYPE OF ENTITY | 1f. ENTITY'S STATE OR COUNTRY OF ORGANIZATION | 1g. ENTITY'S ORGANIZATIONAL I.D. #, if any |
|---|---|---|---|---|
| | | limited liability company | Delaware | □ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b)

| 2a. ENTITY'S NAME | | | |
|---|---|---|---|

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

ACKNOWLEDGEMENT COPY

| 2c. MAILING ADDRESS | CITY | STATE | COUNTRY | POSTAL CODE |
|---|---|---|---|---|
| | | | USA | |

| 2d. S.S. OR TAX I.D. # | OPTIONAL ADD'L INFO RE: ENTITY DEBTOR | 2e. TYPE OF ENTITY | 2f. ENTITY'S STATE OR COUNTRY OF ORGANIZATION | 2g. ENTITY'S ORGANIZATIONAL I.D. #, if any |
|---|---|---|---|---|
| | | | | □ NONE |

3. SECURED PARTY'S (ORIGINAL S/P or ITS TOTAL ASSIGNEE) EXACT FULL LEGAL NAME - insert only one secured party name (3a or 3b)

| 3a. ENTITY'S NAME | | | |
|---|---|---|---|
| FLEET NATIONAL BANK | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | COUNTRY | POSTAL CODE |
|---|---|---|---|---|
| One Financial Plaza, 5th Floor | Providence | RI | USA | 02903 |

4. This FINANCING STATEMENT covers the following types or items of property:

The items of property set forth on the attached Schedule A, and all additions, accessions, modifications, improvements, replacements, substitutions and accessories thereto and therefor, whether now owned, leased or hereafter acquired (the "Equipment"), and the proceeds, products and income of any of the foregoing, including insurance proceeds. Debtor has possession of the Equipment under a true lease. Secured Party has a security interest in the Equipment to the extent necessary to protect its title and/or interest therein.

The Equipment is generally described as One (1) Canadair Challenger Model CL-600-2B16 Variant 604 aircraft (N599DA)

35459-01/tkd
File: XX  S/S: MI    Town/County:

5. CHECK BOX □ This FINANCING STATEMENT is signed by the Secured Party instead of the Debtor to perfect a security interest [if applicable]
(a) in collateral already subject to a security interest in another jurisdiction when it was brought into this state, or when the debtor's location was changed to this state, or (b) in accordance with other statutory provisions [additional data may be required]

7. If filed in Florida [check one]
□ Documentary    □ Documentary stamp
stamp tax paid     tax not applicable

6. REQUIRED SIGNATURE(S)
Signature:
Printed Name/Title: _John Blahnik_  Vice President of Trans...

8. □ This FINANCING STATEMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS Attach Addendum [if applicable]

Signature:
Printed Name/Title:

9. Check to REQUEST SEARCH CERTIFICATE(S) on Debtor(s) [ADDITIONAL FEE] [optional]  □ All Debtors  □ Debtor 1  □ Debtor 2

(1) FILING OFFICER COPY - NATIONAL FINANCING STATEMENT (FORM UCC-1) (TRANS) (REV. 12/18/95)     THIS SPACE FOR USE OF FILING OFFICER

# ATTACHMENT TO UNIFORM COMMERCIAL CODE FINANCING STATEMENT

1.   SECURED PARTY:       **FLEET NATIONAL BANK**
c/o Fleet Capital Corporation
One Financial Plaza, 5th Floor
Mail Stop: RI/DE/03705A
Providence, Rhode Island   02903

D769440

DEBTOR:              **SM 5105 LLC**
38500 Woodward Avenue
Suite 100
Bloomfield Hills, Michigan  48304

2.   DESCRIPTION OF PROPERTY:

Debtor hereby assigns to Secured Party, and grants to Secured Party a first priority
security interest in and with respect to, all of Debtor's rights, title and interests of
whatever kind or description (but none of its obligations) in and to: (a) the Purchase
Documents; (b) the Aircraft, and all present or future additions, attachments, or
accessories to the Aircraft, and replacements thereof; (c) all tools, manuals, service
records, software and similar information and materials incorporated into or located on
the Aircraft, and (d) the products, rents and profits and other proceeds therefrom or
thereof, including, without limitation, all refunds and other amounts payable by Vendor
under or with respect to the Purchase Agreement.

For purposes hereof:

"Aircraft" means the Canadair Challenger Model CL-600-2B16 Variant 604 (N599DA)
(including, without limitation, the airframe, engines, auxiliary power unit, avionics, parts and
records relating thereto) having a scheduled delivery date 4th quarter 2001, pursuant to the
Purchase Agreement.

"Purchase Agreement" means the Aircraft Purchase Agreement dated January 31, 2001,
between Debtor and Vendor, as amended from time to time.

"Purchase Documents" means any purchase orders or related documents, warranties and
agreements with Vendor, including the Purchase Agreement.

"Vendor" means Bombardier Aerospace Corporation.

GFJ 361814                                                          (UCC)

## "IN LIEU" INITIAL UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Ucc Fleet

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

PARASEARCH INC.
222 Jefferson Boulevard
Warwick, RI 02888
(401) 732-2490   Fax: (401) 739-7708

*STATE OF DELAWARE*
*SECRETARY OF STATE*
*DIVISION OF CORPORATIONS*
*FILED 12:55 PM 12/17/2001*
*2014693 0 - 0000000*
*SRV: 020022197*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| | 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|---|
| OR | SM 5105 LLC | | | | | |
| | 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |

| 1c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|
| 38500 Woodward Avenue, Suite 100 | | Bloomfield | MI | 48304 | USA |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| 38-3575295 | | limited liability co | Delaware | 3297657 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| | 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|---|
| OR | | | | | | |
| | 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |

| 2c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|
| | | | | | USA |

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| | 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|---|
| OR | Fleet National Bank | | | | | |
| | 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |

| 3c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|
| c/o Fleet Capital Corporation One Financial Plaza | | Providence | RI | 02903 | USA |

4. This FINANCING STATEMENT covers the following collateral:

Equipment generally described as, one (1) Learjet 60 aircraft, serial number 237 and FAA registration mark N699DA,
As further described in the attached Schedules U & A

5. ALTERNATIVE DESIGNATION (if applicable): ☐ LESSEE/LESSOR  ☐ CONSIGNEE/CONSIGNOR  ☐ BAILEE/BAILOR  ☐ SELLER/BUYER  ☐ AG. LIEN  ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum    (if applicable)
7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   [optional]   ☐ All Debtors  ☐ Debtor 1  ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA

Customer No. 35459-02

FILING OFFICE COPY – NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

BUSDOCS:967500.4

<u>SCHEDULE U</u>
(Leases)

Debtor:
SM 5105 LLC
38500 Woodward Ave., Suite 100
Bloomfield, MI 48304

Secured Party:
Fleet National Bank
c/o Fleet Capital Corporation
One Financial Plaza
Providence, RI 02903

The collateral is certain goods generally described as <u>one (1) Learjet 60, serial number 237 and FAA registration mark N699DA</u>, and more particularly described in the attached Schedule A's, in which the Debtor now or hereafter has rights, and all parts, accessories, accessions and attachments thereto, and all replacements, substitutions and exchanges (including trade-ins) for such goods, together with proceeds of all of the foregoing, including proceeds in the form of goods, accounts, chattel paper, documents, instruments, general intangibles, investment property, deposit accounts, letter of credit rights and supporting obligations.

*Initial financing statement to continue effectiveness of pre-effective-date financing statements.*  The following information is provided so that, upon the later of the filing date of this financing statement or the effective date of Revised Article 9 as applicable under the law of any relevant jurisdiction, this financing statement shall be effective to continue the financing statements (the *"pre-effective-date financing statements"*) identified below:

1. The above address of the Debtor is a mailing address of the Debtor.
2. The Debtor is an organization.
3. The Debtor's type of organization is a limited liability company.
4. The Debtor's jurisdiction of organization is <u>Delaware.</u>
5. The Debtor's organizational identification number is <u>3297657.</u>
6. The pre-effective-date financing statements are those identified on the schedule below.
7. Each pre-effective-date financing statement remains effective.

*Schedule identifying pre-effective date financing statements.*  The following schedule identifies each pre-effective-date financing statement:

| | | | | | |
|---|---|---|---|---|---|
| 35459-02 | Sec. Of State- MI | 5/1/01 | D769439 | N/a | N/a |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

## SCHEDULE A

## ATTACHMENT TO UNIFORM COMMERCIAL CODE FINANCING STATEMENT

1.    LESSOR:            **FLEET NATIONAL BANK**
                        c/o Fleet Capital Corporation
                        One Financial Plaza, 5th Floor
                        Mail Stop: RI/DE/03705A
                        Providence, Rhode Island   02903

      LESSEE:           **SM 5105 LLC**
                        38500 Woodward Avenue
                        Suite 100
                        Bloomfield Hills, Michigan  48304

2.    DESCRIPTION OF PROPERTY:

      Lessee hereby grants and conveys to Lessor a security interest in and lien on (1) the Aircraft Lease (N699DA) (the "Lease") dated as of March 30, 2001, between Lessor, as lessor, and Lessee, as Lessee, (2) the Aircraft (as defined below), (3) any subleases relating to the Aircraft, and (4) any and all proceeds (including insurance proceeds) of any or all of the foregoing.

      For purposes hereof:

      Aircraft shall mean (i) the Airframe, (ii) the Engines, and (iii) to the extent applicable, the Records.

      Airframe shall mean (i) the Aircraft described in Schedule A hereto and (ii) any and all Parts from time to time incorporated in, installed on or attached to such Aircraft and any and all Parts removed therefrom so long as title thereto shall remain vested in Lessor in accordance with the applicable terms of the Lease after removal from the Aircraft.

      Engine shall mean (i) each of the engines and the auxiliary power unit described and listed by manufacturer's serial numbers in Schedule A hereto and currently installed on the Airframe, whether or not thereafter installed on such Airframe or any other airframe from time to time; (ii) any engine and/or auxiliary power unit that may from time to time be substituted, pursuant to the applicable terms of the Lease, for an Engine leased thereunder; and (iii) in each case set forth in clauses (i) and (ii) hereof, with any and all Parts incorporated in or installed on or attached to such Engine, engine and/or auxiliary power unit or any and all Parts removed therefrom so long as title thereto shall remain vested in Lessor in accordance with the applicable terms of the Lease after removal from such Engine.

RSCOMBS 399738                                                                              (UCC)

Parts shall mean all appliances, avionics, parts, instruments, appurtenances, accessories, furnishings and other equipment of whatever nature (other than additions or complete Engines), that may from time to time be incorporated or installed in or attached to the Airframe or any Engine for so long as title thereto shall be vested in Lessor in accordance with the applicable terms of the Lease.

Records shall mean any and all logs, manuals, certificates and data and inspection, modification, maintenance, engineering, technical and overhaul records (including all computerized data, records and materials of any kind whatsoever) with respect to the Aircraft, including, without limitation, all records required to be maintained by the Federal Aviation Administration or any other governmental agency or authority having jurisdiction with respect to the Aircraft or any manufacturer or supplier of the Aircraft (or any part thereof) with respect to the enforcement of warranties or otherwise.

SCHEDULE A TO UCC

## DESCRIPTION OF AIRCRAFT

Learjet 60 aircraft which consists of the following components:

(a)   Airframe bearing FAA Registration Mark N699DA and manufacturer's serial number 237.

(b)   Two (2) Pratt and Whitney Canada, Model number PW305A, engines bearing manufacturer's serial numbers PCE-CA0319 and PCE-CA0318, (each of which has 750 or more rated takeoff horsepower or the equivalent of such horsepower).

(c)   Standard accessories and optional equipment and such other items fitted or installed on the Aircraft and as may be more particularly described hereinafter:

See Schedule A-2 which is attached hereto and made a part hereof.

(d)   Those items of Lessee furnished equipment described in a bill of sale or bills of sale therefor (copies of which may be appended hereto), delivered by Lessee to Lessor which constitute appliances and equipment which will be installed on the Aircraft.

(e)   one (1) PATS, Inc. model T-20G-10C3A auxiliary power unit bearing manufacturer's serial number SP-E010358.

SCHEDULE A-2 TO UCC

## AVIONICS

Reduced vertical separation minimums (RVSM) compliant
Fireproofing protection per FAR 25,853 Appendix F compliant
EROS oxygen masks
FM Immunity for VIR-432 Nav Units
Heads-up Technologies Passenger Briefing System
Dual Collins VHF-422C comm with 8.33 khz channel spacing (exchange)
Honeywell Airborne flight information system (AFIS)
Collins traffic collision avoidance system (TCAS II)
Honeywell enhanced GPWS with windshear detection
Emergency locator transmitter
Magnastar C-2000 digital airborne telephone system (exchange)
Lighted control wheel chart holders
Floorplan M50-4 with exposed seat tracking on two (2) middle seats
Two (2) cabin throw rugs with the Delphi logo
110 VAC/60 hz power outlet (each)
Plated trim package
Pulsating recognition and landing lights
Hardwood trim strip
Wood veneer package
Collins TWR-850 enhanced weather radar (exchange)
Rosemount Ice Detection System
Dual rechargeable flashlights
Cockpit voice recorder
Fax/data outlet (without airshow network and/or Unilink selected)
Microwave
Detail Paint

Exterior: Matterhorn White with stripes of Gamma Grey, Fire Red, Sky Blue, Blue Green and
Fed Ex Purple


AND ALL STANDARD EQUIPMENT, ALL ADDITIONS, ACCESSIONS, MODIFICATIONS, IMPROVEMENTS, REPLACEMENTS, SUBSTITUTIONS, AND ACCESSORIES THERETO AND THEREFOR, ALL AVIONICS. ONBOARD EQUIPMENT, LOOSE EQUIPMENT LOCATED IN THE AIRCRAFT, RECORDS, MANUALS, AND LOGBOOKS, IN BOTH WRITTEN AND COMPUTER DATA FORM, AND WHETHER NOW EXISTING OR HEREAFTER ACQUIRED.

# EXHIBIT E



## MICHIGAN DEPARTMENT OF STATE

Uniform Commercial Code Section
P.O. Box 30197
Lansing, Michigan 48909-7697
www.michigan.gov/sosucc

October 15, 2005

**Job Number:**    U20051013-0870

**Job Contents:**
**Search Request(s):**                                     2

**Special Handling Instructions:**

### Important Notice

**To comply with P.A. 212 of 2004, the UCC Unit is now mailing Debtor Notifications to individuals named as new debtors.** The notification includes a copy of the filed financing statement. Secured parties may receive calls from customers with questions or errors found in the filing. If a correction is needed, file a UCC3 Amendment.

Martha Ledezma
300 Ottawa Ave., NW
Suite 500
Grand Rapids MI  49503



## MICHIGAN DEPARTMENT OF STATE

Uniform Commercial Code Section
P.O. Box 30197
Lansing, Michigan 48909-7697
www.michigan.gov/sosucc

## Job Receipt

October 15, 2005

**Job Number:** U20051013-0870
**Account Number:**

### Charges

| Description | Filing Number | Filing Date/Time | Qty | Price | Amount |
|---|---|---|---|---|---|
| Information Request (Written Inquiry) | 0000722881-9 | | 1 | $6.00 | $6.00 |
| UCC Copy(ies) | 0000722881-9 | | 4 | $2.00 | $8.00 |
| Information Request (Written Inquiry) | 0000722882-1 | | 1 | $6.00 | $6.00 |
| Total | | | | | $20.00 |

### Payments

| Type | Description | Amount |
|---|---|---|
| | | $20.00 |
| Total | | $20.00 |



## MICHIGAN DEPARTMENT OF STATE

Uniform Commercial Code Section
P.O. Box 30197
Lansing, Michigan 48909-7697
www.michigan.gov/sosucc

### Search Request

October 15, 2005

**Job Number:**  U20051013-0870
**Reference Number:**  0000722881-9
**Certification Date:**  10/12/2005 17:00 PM

The filing officer certifies that the attached is a record, according to the search criteria specified, of all financing statements, [tax liens,] and amendments which name the debtor as filed with the Michigan Secretary of State, Uniform Commercial Code Section, as of the above certification date.

**Search Criteria:**
Debtor Name:   SM 5105 LLC
Lien Type:   UCC/Tax
Lien Status:   All (Including lapsed)

Michigan Department of State
Jeffry C. Nickerson
Filing Officer

### Disclaimer

Information relative to security interests and statutory liens obtained from the index is for information purposes only. Such information does not relieve any person or business from liability, alter priorities of security interest or liens, or affect any other legal rights or responsibilities. The index primarily contains information relative to security interests and statutory liens which have been filed for record on or before the above certification date. There may be security interests and statutory liens filed after that date which are valid. A search request limited under R 440.508(1) may not reveal all filings against the debtor search. The scarcher bears the risk of relying on the limited search.



# MICHIGAN DEPARTMENT OF STATE

Uniform Commercial Code Section
P.O. Box 30197
Lansing, Michigan 48909-7697
www.michigan.gov/sosucc

Financing Statement #D769439
FILED: 05/01/2001 09:00 AM

(D) S M 5105 LLC
    ORGANIZATION
    38500 WOODWARD AVE 100
    BLOOMFIELD HILLS, MI 48304

(S) FLEET NATIONAL BANK
    ORGANIZATION
    1 FINANCIAL PLAZA 5TH FL
    %FLEET CAPITAL CORP
    PROVIDENCE, RI 02903

| ACTIONS: | DATE | DOCUMENT # | PGS |
|----------|------|------------|-----|
| Initial Financing Statement | 05/01/2001 09:00 AM | D769439 | 2 |

Financing Statement #D769440
FILED: 05/01/2001 09:00 AM

(D) S M 5105 LLC
    ORGANIZATION
    38500 WOODWARD AVE 100
    BLOOMFIELD HILLS, MI 48304

(S) FLEET NATIONAL BANK
    ORGANIZATION
    1 FINANCIAL PLAZA 5TH FL
    %FLEET CAPITAL CORP
    PROVIDENCE, RI 02903

| ACTIONS: | DATE | DOCUMENT # | PGS |
|----------|------|------------|-----|
| Initial Financing Statement | 05/01/2001 09:00 AM | D769440 | 2 |

(D)=Debtor
(T)=Tax Payer

1 of 1

(S)=Secured Party
(L)=Lien Holder

THIS SPACE FOR USE OF FILING OFFICER

REC'D U.C.C. UNIT
05/01/01   9:00 AM
SECRETARY OF STATE
LANSING MI  D769439

MD0S 903459 - 2 04/11/2001
2001 95016 12016 1032
$3.00
UCC       NEW YEAR

**FINANCING STATEMENT – FOLLOW INSTRUCTIONS CAREFULLY**

A. NAME & TEL. # OF CONTACT AT FILER [optional]

B. FILING OFFICE ACCT. # [optional]

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Robbin A. Gossman, Paralegal
Ober, Kaler, Grimes & Shriver
120 East Baltimore Street
Baltimore, Maryland 21202

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (1a or 1b)

1a. ENTITY'S NAME
SM 6105 LLC

1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

1c. MAILING ADDRESS
38500 Woodward Avenue, Suite 100 | CITY Bloomfield Hills | STATE MI | COUNTRY USA | POSTAL CODE 48304

1d. TAX ID #: SSN OR EIN 98-3575295 | ADD'L INFO RE ENTITY DEBTOR | 1e. TYPE OF ENTITY limited liability company | 1f. ENTITY'S STATE OR COUNTRY OF ORGANIZATION Delaware | 1g. ENTITY'S ORGANIZATIONAL I.D. #, if any   ☐ NONE

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (2a or 2b)

2a. ENTITY'S NAME

2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

2c. MAILING ADDRESS | CITY | STATE | COUNTRY USA | POSTAL CODE

2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ENTITY DEBTOR | 2e. TYPE OF ENTITY | 2f. ENTITY'S STATE OR COUNTRY OF ORGANIZATION | 2g. ENTITY'S ORGANIZATIONAL I.D. #, if any   ☐ NONE

3. SECURED PARTY'S (ORIGINAL S/P or ITS TOTAL ASSIGNEE) EXACT FULL LEGAL NAME – insert only one secured party name (3a or 3b)

3a. ENTITY'S NAME
FLEET NATIONAL BANK

3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

3c. MAILING ADDRESS
One Financial Plaza, 5th Floor | CITY Providence | STATE RI | COUNTRY USA | POSTAL CODE 02903

4. This FINANCING STATEMENT covers the following types or items of property:

The items of property set forth on the attached Schedule A, and all additions, accessions, modifications, improvements, replacements, substitutions and accessories thereto and therefor, whether now owned, leased or hereafter acquired (the "Equipment"), and the proceeds, products and income of any of the foregoing, including insurance proceeds. Debtor has possession of the Equipment under a true lease. Secured Party has a security interest in the Equipment to the extent necessary to protect its title and/or interest therein.
   The Equipment is generally described as One [1] Learjet 60 aircraft, serial number 237.

35459-02/tkd
File: XX   S/S:  MI       Town/County:

5. CHECK ☐   This FINANCING STATEMENT is signed by the Secured Party in lieu of the Debtor to perfect a security interest...

6. REQUIRED SIGNATURE(S):
Signature: _John Blahnik_
Printed Name/Title: John Blahnik / Vice President-Treasurer

Signature:
Printed Name/Title:

(1) FILING OFFICER COPY – NATIONAL FINANCING STATEMENT (FORM UCC-1) (TRANS) (REV. 12/18/95)       THIS SPACE FOR USE OF FILING OFFICER

H74067
KAM

D769439

## ATTACHMENT TO UNIFORM COMMERCIAL CODE FINANCING STATEMENT

1.  SECURED PARTY:    **FLEET NATIONAL BANK**
    c/o Fleet Capital Corporation
    One Financial Plaza, 5th Floor
    Mail Stop: RI/DE/03705A
    Providence, Rhode Island  02903

    DEBTOR:    **SM 5105 LLC**
    38500 Woodward Avenue
    Suite 100
    Bloomfield Hills, Michigan  48304

2.  DESCRIPTION OF PROPERTY:

    Debtor hereby assigns to Secured Party, and grants to Secured Party a first priority security interest in and with respect to, all of Debtor's rights, title and interests of whatever kind or description (but none of its obligations) in and to: (a) the Purchase Documents; (b) the Aircraft, and all present or future additions, attachments, or accessories to the Aircraft, and replacements thereof, (c) all tools, manuals, service records, software and similar information and materials incorporated into or located on the Aircraft, and (d) the products, rents and profits and other proceeds therefrom or thereof, including, without limitation, all refunds and other amounts payable by Vendor under or with respect to the Purchase Agreement.

    For purposes hereof:

    "Aircraft" means the Learjet 60 (serial number 237) (including, without limitation, the airframe, engines, auxiliary power unit, avionics, parts and records relating thereto) having a scheduled delivery date 4th quarter 2001, pursuant to the Purchase Agreement.

    "Purchase Agreement" means the Aircraft Purchase Agreement dated March 22, 2001, between Debtor and Vendor, as amended from time to time.

    "Purchase Documents" means any purchase orders or related documents, warranties and agreements with Vendor, including the Purchase Agreement.

    "Vendor" means Learjet Inc.

RSCOMBS 367512.1 3/30/01 12:00 PM