**Hearing Date And Time:  April 21, 2011 at 10:00 a.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler


   - and -


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036

Attorneys for DPH Holdings Corp., et al.,
   Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :
         In re                      :    Chapter 11
                                    :
DPH HOLDINGS CORP., et al.,         :    Case No. 05-44481 (RDD)
                                    :
                                    :    (Jointly Administered)
              Reorganized Debtors.  :
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x


REORGANIZED DEBTORS' OBJECTION TO MOTION OF TAL-PORT INDUSTRIES, LLC
FOR ALLOWANCE OF AN ADMINISTRATIVE CLAIM PURSUANT TO 11 U.S.C. §
503(B)(1)(A) AND, IN THE ALTERNATIVE, FOR LEAVE TO FILE A LATE
ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO BANKRUPTCY RULE 9006(B)


("OBJECTION TO TAL-PORT INDUSTRIES, LLC'S
MOTION TO FILE LATE CLAIM")

DPH Holdings Corp. ("DPH Holdings") and its affiliated reorganized debtors in

the above-captioned cases (together with DPH Holdings, the "Reorganized Debtors"), successors

of Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, former debtors and

debtors-in-possession (collectively, the "Debtors"), hereby object (the "Objection") to the Motion

Of Tal-Port Industries, LLC For Allowance Of An Administrative Claim Pursuant To 11 U.S.C.

§ 503(b)(1)(A) And, In The Alternative, For Leave To File A Late Administrative Expense

Claim Pursuant To Bankruptcy Rule 9006(b) (Docket No. 21195) (the "Motion"), dated April 1,

2011, filed by Tal-Port Industries, LLC ("Tal-Port"), and respectfully represent as follows:

<u>Preliminary Statement</u>

1.        On or before June 20, 2009, the Debtors caused ten copies of the Notice

Of Bar Date For Filing Proofs Of Administrative Expense (the "June 2009 Notice") to be served

on Tal-Port.  The June 2009 Notice stated that July 15, 2009 was the deadline for asserting an

Administrative Expense Claim[1] for the period from the commencement of these chapter 11 cases

through June 1, 2009 (the "Initial Administrative Claim Bar Date").  In its Motion, Tal-Port does

not dispute that it received the June 2009 Notice and that it had actual knowledge of the Initial

Administrative Claims Bar Date.  Moreover, the invoices for which Tal-Port seeks payment

range from September 20, 2007 to May 8, 2008.  (Motion ¶ 5.)  Yet Tal-Port waited until more

than three months after the Initial Administrative Claim Bar Date to file its claim and twenty

months after the Initial Administrative Claim Bar Date to request permission from this Court to

file a late Administrative Expense Claim.  Tal-Port, however, offers no evidence that would

excuse its late filing under the excusable neglect standard outlined by the U.S. Supreme Court in

<u>Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship</u>, 507 U.S. 380, 391-92 (1993), and as

---

[1]    Capitalized terms not defined in this Preliminary Statement are defined below.

applied by the United States Court of Appeals for the Second Circuit (the "Second Circuit").  See,

e.g., Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.), 419 F.3d 115,

122-24 (2d Cir. 2005) (interpreting and applying Pioneer standard).

   2. Although the Second Circuit has held that the reason for the delay is the

most important factor under the Pioneer analysis, Tal-Port argues that the reason for its delay is

because the Debtors failed "to locate the applicable records" for Tal-Port prior to the Initial

Administrative Claim Bar Date.  (Motion ¶ 10.)  Specifically, Tal-Port asserts that it failed to

timely file its Administrative Claim because "Delphi could not ascertain the location of . . .

missing [shipping and receiving] records and could not determine with certainty the shipments

from Tal-Port to the Mission, Texas [warehouse] facility which had been paid for and which

shipments had not been paid."  (Motion ¶ 4.)  In other words, Tal-Port appears to concede that

the reason for its delay in filing its Administrative Expense Claim was a calculated decision to

wait for information from the Debtors and not the result of neglect at all.  Notably, when Tal-

Port did file its Administrative Expense Claim months later, it was based on invoices Tal-Port

had in its possession since May 2008.

   3. Even if the reason for the delay was neglect, Tal-Port's rationale for

ignoring the Initial Administrative Claim Bar Date and filing its claim "after several failed

attempts by Tal-Port to ascertain the location of the shipment and payment records" (Motion ¶ 5)

does not address why it chose to ignore the plain language of the June 2009 Notice.  Moreover,

there is no merit to the argument that a claimant's strategic decision to ignore a court-approved

bar date constitutes excusable neglect unless a chapter 11 debtor has first provided records to a

claimant supporting its claim.  See Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P.

3007 (I) Denying United States Of America's Motion For Leave To File Late Claim And (II)

Disallowing And Expunging Proof Of Claim Number 16727, at Ex. A p. 2, Mar. 6, 2008 (Docket

No. 12980) (citing <u>Pioneer</u>, 507 U.S. at 387-88), <u>aff'd</u> Mar. 24, 2009 (Docket No. 16515).  Tal-Port's explanation for why the delay was not within its control is refuted by the record in this case–Tal-Port did indeed file a claim, and the Motion, without documentation provided by Delphi.  Tal-Port's failure to file a timely Administrative Expense Claim was a conscious and willful decision, and was, at a minimum, without excusable neglect.

4.    Furthermore, Tal-Port contends that its failure to file such a claim until three months after the Initial Administrative Claim Bar Date "does not present a significant delay that would impact these proceedings in any way."  (Motion ¶ 13.)  Permitting Tal-Port to file a late Administrative Expense Claim at this late stage in the process would encourage other claimants in a similar position to come forward, resulting in significant prejudice to the Reorganized Debtors who possess limited resources to satisfy such claims.  This is especially true where, as here, Tal-Port argues that it was unable to timely file its claim or prosecute this Motion due to the Reorganized Debtors' "inability to locate vital and applicable records." (Motion ¶ 14.)

5.    Tal-Port presents no valid reason for the delay and its failure to timely submit an Administrative Expense Claim was entirely within its control.  Specifically, the addresses to which copies of the June 2009 Notices were sent included the business addresses the Debtors knew were used by Tal-Port.  Notwithstanding this ample and legally sufficient notice of the Initial Administrative Claim Bar Date, Tal-Port did not take any action to submit a timely Administrative Expense Claim.

6.    Accordingly, Tal-Port has not met its burden to establish excusable neglect.  Because of its failure to timely file an Administrative Expense Claim, Tal-Port is forever barred, estopped, and enjoined from asserting an Administrative Expense Claim against the Debtors.  (<u>See</u> Modification Procedures Order ¶ 38; Modified Plan Article 10.5; Modification

4

Approval Order ¶ 47.)  Accordingly, this Court should not permit Tal-Port to file a late

Administrative Expense Claim and the Motion should be denied.

Background

B.    Tal-Port's Relationship With Delphi

7.    As described in paragraphs 2-4 of the Motion, Tal-Port entered into a

business relationship with Delphi prior to the October 8, 2005 petition date in these chapter 11

cases (the "Petition Date").  Tal-Port "produced certain automotive components at its Yazoo,

Mississippi facility which were then picked up by Delphi transports and delivered to a warehouse

facility in Mission, Texas leased by Tal-Port."  (Motion ¶ 2.)

8.    Tal-Port asserts that it filed for chapter 11 protection in the United States

Bankruptcy Court for the Southern District of Mississippi on November 3, 2008 and, following

its bankruptcy filing, "began efforts to collect on past-due invoices from a number of entities,

including Delphi."  (Motion ¶¶ 3-4.)

C.    Bar Date For § 503(b) Claims Arising Through June 1, 2009

9.    On June 16, 2009, this Court entered the Modification Procedures Order

which, among other things, authorized the Debtors to commence solicitation of votes on their

proposed modifications to their first amended joint plan of reorganization (the "Proposed

Modifications"), established July 15, 2009 as the Initial Administrative Claim Bar Date,[2] and

---

[2]    The Initial Administrative Claim Bar Date was established pursuant to paragraph 38 of the Order (A)(I)
Approving Modifications To Debtors' First Amended Plan Of Reorganization (As Modified) And Related
Disclosures And Voting Procedures And (II) Setting Final Hearing Date To Consider Modifications To
Confirmed First Amended Plan Of Reorganization And (B) Setting Administrative Expense Claims Bar Date
And Alternative Transaction Hearing Date, entered by this Court on June 16, 2009 (Docket No. 17032) (the
"Modification Procedures Order").  On July 15, 2009, this Court entered the Stipulation And Agreed Order
Modifying Paragraph 38 Of Modification Procedures Order Establishing Administrative Expense Bar Date
(Docket No. 18259) to provide that paragraph 38 of the Modification Procedures Order should be amended to
require parties to submit an Administrative Expense Claim Form (as defined below) for Administrative Expense
Claims for the period from the commencement of these cases through May 31, 2009 rather than through June 1,
2009.

5

included a form to be used to submit an administrative expense claim (an "Administrative

Expense Claim Form").[3]  Accordingly, paragraph 38 of the Modification Procedures Order

provided that:

> Any party that wishes to assert an administrative claim under 11
> U.S.C. § 503(b) for the period from the commencement of these
> cases through June 1, 2009 shall file a proof of administrative
> expense (each, an "Administrative Expense Claim Form") for the
> purpose of asserting an administrative expense request, including
> any substantial contribution claims (each, an "Administrative
> Expense Claim" or "Claim") against any of the Debtors.  July 15,
> 2009 at 5:00 p.m. prevailing Eastern time shall be the deadline for
> submitting all Administrative Expense Claims (the "Administrative
> Expense Bar Date") for the period from the commencement of
> these cases through June 1, 2009.

(Modification Procedures Order ¶ 38.)  In addition, paragraph 41 of the Modification Procedures

Order provides that:

> Any party that is required but fails to file a timely Administrative
> Expense Claim Form shall be forever barred, estopped and
> enjoined from asserting such claim against the Debtors, and the
> Debtors and their property shall be forever discharged from any
> and all indebtedness, liability, or obligation with respect to such
> claim.

(Id. at ¶ 41.)

          10.     On or before June 20, 2009, the Debtors, through KCC, served Tal-Port

with a copy of the June 2009 Notice by first class mail at each of the ten addresses listed below:

| | |
|---|---|
| Tal Port Industries LLC<br>2003 Gordon Ave<br>RMT CHG 04 01 04 X7567<br>Yazoo City, MS 39194 | Tal Port Industries LLC<br>2003 Gordon Ave<br>Yazoo City, MS 39194 |

---

[3]   On June 20, 2009, in accordance with the Modification Procedures Order, the Debtors caused the claims and
noticing agent in these chapter 11 cases, Kurtzman Carson Consultants LLC ("KCC"), and Financial Balloting
Group LLC or their agents to transmit notices containing certain procedures for asserting an Administrative
Expense Claim and a copy of the Administrative Expense Claim Form.

| | |
|---|---|
| Tal Port Industries LLC<br>Ecology Tek<br>8 Industrial Rd<br>Prentiss, MS 39474 | Tal Port Industries LLC<br>PO Box 1253<br>Prentiss, MS 39474-1253 |
| Tal Port Industries LLC<br>PO Box 16089<br>Hattiesburg, MS 39404-6089 | Tal Port Industries LLC<br>3 Parklane Blvd Ste 1220W<br>Dearborn, MI 48126 |
| Tal Port Industries LLC<br>Richard Montague<br>PO Box 1970<br>Jackson, MS 39215-1970 | Tal Port Industries LLC<br>Warren R Graham Esq<br>Davidoff Malito & Hutcher LLP<br>605 Third Ave<br>New York, NY 10158 |
| Tal Port LLC<br>PO Box 1253<br>Prentiss, MS 39474-1253 | Tal Port LLC<br>Accounts Payable<br>PO Box 1253<br>Prentiss, MS 39474 |

See Affidavit Of Service Of Evan Gershbein For Solicitation Materials Served On Or Before

June 20, 2009, dated June 23, 2009 (Docket No. 17267), the relevant portions of which are

attached hereto as Exhibit A.

      11.    The June 2009 Notice provides, in relevant part, that

You must file an Administrative Expense Claim Form if you
believe that you are entitled to an Administrative Expense Claim as
described in 11 U.S.C. § 503, except as provided below.

***

**ANY PARTY THAT IS REQUIRED BUT FAILS TO FILE
AN ADMINISTRATIVE EXPENSE CLAIM FORM IN
ACCORDANCE WITH THIS NOTICE ON OR BEFORE
THE ADMINISTRATIVE EXPENSE BAR DATE SHALL BE
FOREVER BARRED, ESTOPPED, AND ENJOINED FROM
ASSERTING SUCH CLAIM AGAINST THE DEBTORS
AND REORGANIZED DEBTORS, AS APPLICABLE, AND
THEIR PROPERTY SHALL BE FOREVER DISCHARGED
FROM ANY AND ALL INDEBTEDNESS, LIABILITY, OR
OBLIGATION WITH RESPECT TO SUCH CLAIM.**

(See Docket No. 17267 Ex. J.)

D.      Substantial Consummation Of The Modified Plan.

        12.     On July 30, 2009, this Court entered its Order Approving Modifications

Under 11 U.S.C. § 1127(b) To (I) First Amended Joint Plan Of Reorganization Of Delphi

Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified And (II)

Confirmation Order (Docket No. 12359) (Docket No. 18707) (the "Modification Approval

Order"), which approved the Debtors' Proposed Modifications (the "Modified Plan").

On October 6, 2009 (the "Effective Date"), the Debtors substantially consummated the Modified

Plan.  The Reorganized Debtors have emerged from chapter 11 as DPH Holdings and affiliates

and remain responsible for the post-Effective Date administration of these chapter 11 cases,

including the disposition of certain retained assets, the payment of certain retained liabilities as

provided for under the Modified Plan, and the eventual closing of the cases.

E.      Tal-Port's Untimely Administrative Expense Claim

        13.     On October 27, 2009, Tal-Port filed its untimely administrative expense

request under 11 U.S.C. § 503(b) (the "Administrative Expense Claim") in the amount of

$89,459.02 for invoices "ranging in date from September 20, 2007 and continuing until May 8,

2008."  (Motion ¶ 5.)  On January 22, 2010, the Reorganized Debtors filed their Forty-Third

Omnibus Objection Pursuant To 11 U.S.C. § 503(b) And Fed. R. Bankr. P. 3007 To (I) Expunge

Certain Administrative Expense (A) Severance Claims, (B) Books And Records Claims, (C)

Duplicate Claims, (D) Equity Interests, (E) Prepetition Claims, (F) Insufficiently Documented

Claims, (G) Pension, Benefit, And OPEB Claims, (H) Workers' Compensation Claims, And (I)

Transferred Workers' Compensation Claims, (II) Modify And Allow Certain Administrative

Expense Severance Claims, And (III) Allow Certain Administrative Expense Severance Claims

(Docket No. 19356) (the "Forty-Third Omnibus Claims Objection"), which, among other things,

8

objected to the Administrative Expense Claim on the basis that the claim was not reflected in the

Reorganized Debtors' books and records.

14.      Upon further review of the Administrative Expense Claim, the

Reorganized Debtors identified the claim as untimely.  In accordance with this Court's

procedures, the Reorganized Debtors filed a Notice Of Deadline To File Motion For Leave To

File Late Administrative Expense Claim With Respect To Late Administrative Expense Claim

Filed By Tal-Port Industries, LLC (Administrative Expense Claim No. 19804) (Docket No.

21162) (the "Notice of Deadline").  The Notice of Deadline stated that if Tal-Port wished to

further prosecute its Administrative Expense Claim, Tal-Port must file a motion by April 1, 2011.

F.      Filing Of The Tal-Port Motion

15.      On April 1, 2011, more than twenty months after the Initial

Administrative Claim Bar Date and seventeen months after the Effective Date, Tal-Port filed its

Motion seeking a determination that the failure to timely file an Administrative Expense Claim

was the result of excusable neglect and asking this Court to permit a late filed Administrative

Expense Claim.

Argument

G.      Tal-Port Received Adequate Notice Of The Initial Administrative Claim Bar Date

16.      In its Motion, Tal-Port does not dispute that it received the June 2009

Notice setting forth the Initial Administrative Claim Bar Date.  And although Tal-Port did check

the box on its Administrative Expense Claim Form indicating that it had never received notices

in the Debtors chapter 11 cases, not only did Tal-Port submit a reclamation demand in these

cases,[4] but a copy of the June 2009 Notice was served at the same PO box identified on the

---

4      On October 14, 2005, the law firm of Davidoff Malito & Hutcher LLP sent a reclamation demand on behalf of
       Tal-Port to the Debtors asserting a reclamation claim in the amount of $76,952.04 (the "Reclamation Demand")
                                                                                              *(cont'd)*

9

untimely Administrative Expense Claim Form and at nine other addresses.  Accordingly, the

Debtors provided adequate service of the June 2009 Notice.[5]

17.    Tal-Port was therefore obligated to file any administrative expense request

for claims arising before June 1, 2009 by the applicable July 15, 2009 bar date, in accordance

with the procedures referenced in the Modification Procedures Order and Modification Approval

Order, or else it would be barred, estopped, and enjoined from asserting those claims against the

Reorganized Debtors.  Accordingly, this Court should deny the Motion.

H.    Tal-Port Has Failed To Meet Its Burden Of Proof For Establishing Excusable Neglect

18.    Because Tal-Port received proper notice of the Initial Administrative

Claim Bar Date, Tal-Port can obtain the relief requested in the Motion only if it meets its burden

to establish excusable neglect pursuant to Bankruptcy Rule 9006(b)(1).  See In re R.H. Macy &

Co., Inc., 161 B.R. 355, 360 (Bankr. S.D.N.Y. 1993) ("the burden of proving 'excusable neglect'

is on the creditor seeking to extend the bar date"); see also In re Dana Corp., 2007 WL 1577763,

at *3 (Bankr. S.D.N.Y. 2007) (finding that the excusable neglect analysis applies to

administrative expense claims under section 503); In re DPH Holdings Corp., Hr'g Tr. at 44-45,

August 20, 2009[6] ("given the practice of treating claims and disputes related to missed bar dates

for administrative claims the same way as the courts treat missed bar dates for pre-petition

_____

*(cont'd from previous page)*

on account of goods sold to the Debtors prior to the Petition Date.  (See Reclamation Demand, Docket No. 259.)
The Reclamation Demand demanded reclamation of goods pursuant to Section 2-702 of the UCC and 11 U.S.C.
§ 546(c) of the Bankruptcy Code and, in the alternative, demanded "a priority claim or lien in the amount of
$76,952.04."  (Reclamation Demand ¶ 3.)  Tal-Port and its counsel who submitted the Reclamation Demand
was served with a total of ten copies of the notice establishing the Initial Administrative Claim Bar Date.

5    As discussed above, Tal-Port was served with the June 2009 Notice.  Because the Debtors served copies of the
Notices on Tal-Port directly, the Debtors' mailing of the June 2009 Notice was proper and legally sufficient.
Courts uniformly presume that an addressee receives a properly mailed item when the sender presents proof that
it is properly addressed, stamped, and deposited in the mail.  See, e.g., Hagner v. U.S., 285 U.S. 427, 430 (1932)
("The rule is well settled that proof that a letter properly directed was placed in a post office creates a
presumption that it reached its destination in usual time and was actually received by the person to whom it was
addressed.").

6    A copy of the relevant portion of the August 20, 2009 hearing transcript is attached hereto as Exhibit B.

claims, I find . . . those cases . . . to be appropriate here, and for all intents and purposes on all fours.").

19.    Under Pioneer, courts must engage in a two-prong analysis.  Mich. Self-Insurers' Security Fund v. DPH Holdings Corp. (In re DPH Holdings Corp.), 434 B.R. 77, 82 (S.D.N.Y. 2010) (citing Pioneer, 507 U.S. at 388, 395).  First, a creditor must first show that its failure to file a timely claim was the result of "'neglect,' as opposed to willfulness or a knowing omission."  Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 (I) Denying United States Of America's Motion For Leave To File Late Claim And (II) Disallowing And Expunging Proof Of Claim Number 16727, at Ex. A p. 2, Mar. 6, 2008 (Docket No. 12980) (citing Pioneer, 507 U.S. at 387-88), aff'd Mar. 24, 2009 (Docket No. 16515).  Second, the creditor "must show by a preponderance of the evidence that the neglect was 'excusable.'"  Id.

20.    Under the present circumstances, it does not appear that Tal-Port can satisfy even the first prong of the Pioneer test.  Specifically, Tal-Port argues that the reason for the delay in filing its Administrative Expense Claim was that Tal-Port decided to wait for the Debtors to provide documentation to Tal-Port.[7]  (Motion ¶¶ 4-5, 14.)  Assuming this is the case, then Tal-Port's failure to file a timely claim was the result of a willful or knowing omission—its decision to allow the bar date to pass in the hopes that the Debtors would provide documentation to Tal-Port in support of its claims prior to the bar date—as opposed to "neglect."  The strategic decision to allow the Initial Administrative Claim Bar Date to pass therefore cannot support a claim of excusable neglect.

21.    Even if Tal-Port were able to demonstrate that its failure to timely file an administrative expense claim was the result of neglect, Tal-Port has not met its burden for

_____

[7]    Although Tal-Port asserts that the reason for its delay in filing its Administrative Expense Claim was due to waiting for the Debtors to provide documentation to Tal-Port, the earliest e-mail referenced in the Motion dates from February 2011, over 18 months after the Initial Administrative Claim Bar Date.  (Motion Ex. C.)

establishing that the neglect was excusable under the test outlined by the United States Supreme

Court in Pioneer, 507 U.S. 380, 395 (1993).  In examining whether a creditor's failure to file a

claim by the bar date constituted excusable neglect, the Supreme Court found that the factors

include "[a] the danger of prejudice to the debtor, [b] the length of the delay and its potential

impact on judicial proceedings, [c] the reason for the delay, including whether it was within the

reasonable control of the movant, and [d] whether the movant acted in good faith."  Id. at 395.

The Second Circuit has held the most important factor is the reason for the delay, including

whether it was within the reasonable control of the movant.  In re Enron Corp., 419 F.3d at 122-

24 (2d Cir. 2005).  As this Court has consistently ruled on motions under Bankruptcy Rule

9006(b)(1) seeking leave to file an untimely proof of claim, a movant must first show that its

failure to file a timely claim constituted "neglect," as opposed to willfulness or a knowing

omission.  Then, a movant must show by a preponderance of the evidence that the neglect was

"excusable."  See, e.g., Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 (I)

Denying United States Of America's Motion For Leave To File Late Claim And (II) Disallowing

And Expunging Proof Of Claim Number 16727, entered March 6, 2008 (Docket No. 12980) at

Ex. A p. 2 (citing Pioneer), aff'd March 24, 2009 (Docket No. 16515).

22.    Although the third factor of the Pioneer test – the reason for the delay – is

often dispositive, in this case three factors weigh in favor of the Reorganized Debtors: the reason

for the delay, the prejudice to the Reorganized Debtors, and the length of the delay.  Accordingly,

Tal-Port fails to meet the excusable neglect standard and the Motion should be denied.

(i)    Reason For The Delay

23.    In the Second Circuit, the reason for the delay is the most important factor

and is often dispositive.  See In re Enron Corp., 419 F.3d at 122-24; In re Musicland Holding

Corp., 356 B.R. 603, 608 (Bankr. S.D.N.Y. 2006) (noting that the Second Circuit emphasizes the

reason for the delay in determining excusable neglect and stating that, "[t]he other factors are relevant only in close cases" (citing <u>Williams v. KFC Nat'l Mgmt. Co.</u>, 391 F.3d 411, 415-16 (2d Cir. 2004))).

24.    Tal-Port argues that the reason for the delay in filing its Administrative Expense Claim was "not within the reasonable control of Tal-Port" because the Debtors did not provide Tal-Port with documentation supporting its claim.  (Motion ¶ 14.)  Yet Tal-Port was able to file its Administrative Expense Claim after the Initial Administrative Claim Bar Date <u>without</u> any of the records it believes to be in the possession of the Reorganized Debtors, based on invoices in Tal-Port's possession since May 2008.  (Motion ¶ 5.)  Tal-Port's proffered reason for the delay, therefore, not only shows that the reason for Tal-Port's delay in filings its claim was not due to neglect, but also that the reason for the delay was entirely within its control.

25.    Courts in the Second Circuit have "taken a hard line" in applying the <u>Pioneer</u> test and focus on the reason for the delay, including whether it was within the reasonable control of the movant.  <u>Silivanch v. Celebrity Cruises, Inc.</u>, 333 F.3d 355, 368 (2d Cir. 2003). "[T]he equities will rarely if ever favor a party who fail[s] to follow the clear dictates of a court rule [and] where the rule is entirely clear, we continue to expect that a party claiming excusable neglect will, in the ordinary course, lose under the <u>Pioneer</u> test."  <u>In re Enron Corp.</u>, 419 F.3d at 122-23.  Accordingly, because Tal-Port has not provided a valid reason for its delay in filing an Administrative Expense Claim, this factor weighs heavily in favor of the Reorganized Debtors.

(ii)    <u>Danger Of Prejudice To The Debtor</u>

26.    Allowing Tal-Port to file a late claim more than seventeen months after the consummation of the Modified Plan will prejudice the Reorganized Debtors as well as other creditors in these cases who filed timely administrative expense claims.  Allowing untimely claims at this time may open the floodgates to any potential claimant who failed to file an

administrative expense claim on or before the applicable administrative claim bar date.  Courts

often have recognized the danger of opening the floodgates to potential claimants.  See, e.g., In

re Enron Corp., 419 F.3d at 132 n. 2 ("courts in this and other Circuits regularly cite the potential

'flood' of similar claims as a basis for rejecting late-filed claims"); In re Kmart Corp., 381 F.3d

709, 714 (7th Cir. 2004) (noting that if court allowed all similar late-filed claims, "Kmart could

easily find itself faced with a mountain of such claims"); In re Enron Creditors Recovery Corp.,

370 B.R. 90, 103 (Bankr. S.D.N.Y. 2007) ("'[I]t can be presumed in a case of this size with tens

of thousands of filed claims, there are other similarly-situated potential claimants. . . . Any

deluge of motions seeking similar relief would prejudice the Debtors' reorganization process.'"

(citation omitted)); In re Dana Corp., 2007 WL 1577763, at *6 ("the floodgates argument is a

viable one").  Accordingly, Tal-Port's argument that their $89,459.02 claim does not prejudice

the Reorganized Debtors because the amount of the claim is minimal compared to the overall

amount of the administrative expenses and would not "disrupt any completed plan or economic

model upon which such plan was completed" is without merit.  (Motion ¶ 12.)

     27.    The Initial Administrative Claim Bar Date was established to identify

administrative expense claims that would be paid pursuant to the terms of the Modified Plan.

Allowing Tal-Port to prevail on the Motion may inspire many other similarly situated potential

claimants to file similar motions.  Any potential claimant who, by its own error, failed to file a

timely administrative expense claim may seek to follow Tal-Port's lead.  Accordingly,

establishing a precedent for allowing untimely claims without a compelling justification would

greatly prejudice the Reorganized Debtors, their estates, and their creditors and undermine the

Debtors' restructuring efforts.

(iii)    Length Of The Delay

28.    Finally, the length of the delay also favors denying Tal-Port's Motion.

Given that Tal-Port apparently had all the information included in its untimely Administrative

Expense Claim by May 2008, it was aware of its Administrative Claim at that time, well in

advance of the Initial Administrative Claim Bar Date.  Furthermore, Tal-Port failed to file an

Administrative Expense Claim until after the Effective Date, and did not seek leave of this Court

to file an untimely claim for more than twenty months after the applicable bar date.

29.    The Second Circuit has adopted a "strict" standard in the area of excusable

neglect, Asbestos Personal Injury Plaintiffs v. Travelers Indem. Co.  (In re Johns-Manville

Corp.), 476 F.3d 118, 120 (2d Cir. 2007).  Although Tal-Port waited months to file its claim and

more than twenty months to file its Motion, Tal-Port characterizes this as a "short delay."

However, Courts considering excusable neglect in this jurisdiction have characterized delays of

six months as "substantial." See In re Dana Corp., 2007 WL 1577763, at *5 (citing In re Enron

Corp., 419 F.3d at 125 (delay of more than six months after bar date was "substantial")).  Indeed,

a delay of only one day may be inexcusable.  In re Singer Co., No. M-47, 2002 WL 10452, at *3

(S.D.N.Y. Jan. 3, 2002) ("Although the Union's miscalculation as to the appropriate appeals

deadline was in good faith and resulted in only one day's delay, not every minor error can or

should be excused.  Compliance with deadlines is not a game of horseshoes; close doesn't

count.").  Accordingly, this factor also weighs in favor of the Reorganized Debtors and further

supports denying the Motion.

Conclusion

30.    Tal-Port has failed to provide any evidence of circumstances justifying the

extraordinary relief it seeks under the excusable neglect standard under Pioneer and has not met

15

its burden for establishing excusable neglect.  The Motion should, therefore, be denied and the

untimely Administrative Expense Claim disallowed and expunged.

WHEREFORE the Reorganized Debtors respectfully request that this Court enter an order (a) denying the Motion, and (b) granting them such other and further relief as is just.

Dated: New York, New York
April 14, 2011

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: /s/ John Wm. Butler, Jr.
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

- and –

Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for DPH Holdings Corp., et al.,
Reorganized Debtors

## Exhibit A

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :
      In re                          :      Chapter 11
                              :
DELPHI CORPORATION, et al.,      :      Case No. 05-44481 (RDD)
                              :
              Debtors.   :      (Jointly Administered)
                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

## AFFIDAVIT OF SERVICE

I, Evan Gershbein, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.  I submit this Affidavit in connection with the service of the solicitation materials for the **First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified)** [Docket No. 17030] ("the Plan").

On December 1, 2005, the Court signed and entered an Order Pursuant to 28 U.S.C. § 156(c) Authorizing Retention and Appointment of Kurtzman Carson Consultants LLC as Claims, Noticing and Balloting Agent for Clerk of Bankruptcy Court [Docket No. 1374] designating KCC as the official Balloting Agent.

KCC is charged with the duty of printing and distributing Solicitation Packages to creditors and other interested parties pursuant to the instructions set forth in the **Order (A)(I) Approving Modifications to Debtors' First Amended Plan of Reorganization (as Modified) and Related Disclosures and Voting Procedures and (II) Setting Final Hearing Date to Consider Modifications to Confirmed First Amended Plan of Reorganization and (B) Setting Administrative Expense Claims Bar Date and Alternative Transaction Hearing Date ("Modification Procedures Order")** [Docket No. 17032] ("Modification Procedures Order") as entered by the Court on June 16, 2009.

The various solicitation materials consist of the following documents:

1) Ballot for Accepting or Rejecting First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified) (Class A Secured Claims) ("Class A Ballot") (attached hereto as Exhibit A);

2) Ballot for Accepting or Rejecting First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified) (Class C-1 General Unsecured Claims) ("Class C-1 Ballot") (attached hereto as Exhibit B);

3) Ballot for Accepting or Rejecting First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified) (Class C-2 Pension Benefit Guaranty Corporation Claims) ("Class C-2 Ballot") (attached hereto as <u>Exhibit C</u>);

4) Ballot for Accepting or Rejecting First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified) (Class D General Motors Corporation Claim) ("Class D Ballot") (attached hereto as <u>Exhibit D</u>);

5) Notice of (1) Approval of Supplement; (2) Hearing on Modifications to Plan; (3) Deadline and Procedures for Filing Objections to Modifications of Plan; (4) Deadline and Procedures for Temporary Allowance of Certain Claims for Voting Purposes; (5) Treatment of Certain Unliquidated, Contingent, or Disputed Claims for Noticing, Voting, and Distribution Purposes; (6) Record Date; (7) Voting Deadline for Receipt of Ballots; and (9) Proposed Releases, Exculpation, and Injunction in Modified Plan ("Final Modification Hearing Notice") (attached hereto as <u>Exhibit E</u>);

6) a letter from the Delphi Corporation Official Committee of Unsecured Creditors ("Creditors' Committee Letter") (attached hereto as <u>Exhibit F</u>);

7) First Amended Disclosure Statement Supplement with Respect to First Amended Plan of Reorganization (As Modified), Modification Procedures Order and December 10, 2007 Solicitation Procedures Order, in CD-ROM format ("CD-ROM")

8) Notice of Non-Voting Status with Respect to Certain Claims and Interests ("Notice of Non-Voting Status") (attached hereto as <u>Exhibit G</u>);

9) Notice to Unimpaired Creditors of (I) Filing of Proposed Modified Plan of Reorganization, (II) Treatment of Claims Under Modified Plan, (III) Hearing on Approval of Modified Plan, and (IV) Deadline and Procedures for Filing Objections Thereto ("Unimpaired Notice") (attached hereto as <u>Exhibit H</u>);

10) a memorandum from Kurtzman Carson Consultants to additional notice parties of ballot recipients ("Ballot Notice Party Memo") (attached hereto as <u>Exhibit I</u>);

11) Notice of Bar Date for Filing Proofs of Administrative Expense ("Administrative Bar Date Notice") (attached hereto as <u>Exhibit J</u>); and

12) Administrative Expense Claim Form ("Administrative Expense Claim Form") (attached hereto as <u>Exhibit K</u>).

On or before June 20, 2009, I caused to be served a personalized Class A Ballot, Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Administrative Bar Date Notice, Administrative Expense Claim Form and a pre-addressed, postage pre-paid return envelope upon the parties listed on Exhibit L via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served a personalized Class C-1 Ballot, Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Administrative Bar Date Notice, Administrative Expense Claim Form and a pre-addressed, postage pre-paid return envelope upon the parties listed on Exhibit M via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served a personalized Class C-2 Ballot, Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Administrative Bar Date Notice, Administrative Expense Claim Form and a pre-addressed, postage pre-paid return envelope upon the party listed on Exhibit N  via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served a personalized Class D Ballot, Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Administrative Bar Date Notice, Administrative Expense Claim Form and a pre-addressed, postage pre-paid return envelope upon the party listed on Exhibit O  via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on Exhibit P via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Notice of Non-Voting Status, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on Exhibit Q via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Unimpaired Notice, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on Exhibit R via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Notice of Non-Voting Status, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on Exhibit S via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Ballot Notice Party Memo, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on Exhibit T via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on Exhibit U via postage pre-paid U.S. mail.

Dated: June 23, 2009

_____
Evan Gershbein

State of California
County of Los Angeles

Subscribed and sworn to (or affirmed) before me on this 23rd day of June, 2009, by Evan Gershbein, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature _____

Commission Expires: _10-1-09_

L. MAREE SANDERS
Commission # 1610322
Notary Public - California
Los Angeles County
My Comm. Expires Oct 1, 2009

4

# EXHIBIT U

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | Address4 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| MANUFACTURAS METALICAS Y LAMINADAS | | EJE VIAL JUAN GABRIEL NO 4470 | | | | CIUDAD JUAREZ | CHI | 32659 | MX |
| MANUFACTURAS METALICAS Y LAMINADAS | | FRACC JARUDO DEL NORTE | | | | CIUDAD JUAREZ | CHI | 32659 | MX |
| MANUFACTURAS PHILLIPS | | SCREW SA | POLIGONO INDUSTRIAL EITUA SN | 48240 BERRIZ BIZKAIA | | | | | SPAIN |
| MANUFACTURAS PHILLIPS  EFT SCREW SA | | POLIGONO INDUSTRIAL EITUA SN | 48240 BERRIZ BIZKAIA | | | | | | SPAIN |
| MANUFACTURAS PHILLIPS SCREW SA | | POLIGONO EITUA INDUSTRIALDEA | 48 | | | BERRIZ OLAKUETA | | 48240 | ES |
| MANUFACTURAS PHILLIPS SCREW SA | | MAFISA | CTRA DE BILBAO 77 | POL IND EITRA | | BERRIZ VIZCAYA | | 48240 | SPAIN |
| MANUFACTURAS PHILLIPS SCREW SA | | MAFISA | EITRA | | | BERRIZ VIZCAYA | | 48240 | SPAIN |
| MANUFACTURAS PHILLIPS SCREW SA | | MAFISA | EITRA C | TRA DE BILBAO 77 | | BERRIZ VIZCAYA | | 48240 | SPAIN |
| MANUFACTURAS PHILLIPS SCREW SA | | POLIGONO EITUA INDUSTRIALDEA 63 | | | | BERRIZ | 48 | 48240 | ES |
| MANUFACTURAS ZAPALINAME SA DE | | TAL PORT INDUSTRIES LLC | CARRETERA SALTILLO ZACATECAS K | PARQUE INDSTUSTRIAL LA ANGOST | | SALTILLO | | 25086 | MEXICO |
| MANUFACTURAS ZAPALINAME SA DE CV | | CARRETERA SALTILLO ZACATECAS KM 4 5 | | | | SALTILLO | COA | 25086 | MX |
| MANUFACTURAS ZAPALINAME SA DE CV | | KM 4 5 CARRETERA SALTILLO ZACATECAS | | | | SALTILLO | CZ | 25086 | MX |
| MANUFACTURERS & TRADERS TR CO | MARYLOU WYROBEK | ONE M & T PLAZA | | | | BUFFALO | NY | 14203 | |
| MANUFACTURERS ALLIANCE | | 1525 WILSON BLVD STE 900 | | | | ARLINGTON | VA | 22209-2411 | |
| MANUFACTURERS ALLIANCE | | MAPI INC | 1600 WILSON BLVD STE 1100 | | | ARLINGTON | VA | 22209-2594 | |
| MANUFACTURERS ALLIANCE GROUP | MIKE BALDWIN | 1535 OAK INDUSTRIAL LN | | | | CUMMING | GA | 30041 | |
| MANUFACTURERS ALLIANCE MAPI | | INC | 1600 WILSON BLVD STE 1100 | ADD CHG 03 11 05 AH | | ARLINGTON | VA | 22209-2594 | |
| MANUFACTURERS AND TRADERS TR CO | MARYLOU WYROBEK | ONE M AND T PLAZA | | | | BUFFALO | NY | 14203 | |
| MANUFACTURERS BRUSH CORP | | 69 KING ST | | | | DOVER | NJ | 07801 | |
| MANUFACTURERS BRUSH CORP | C/O REVENUE MANAGEMENT | ONE UNIVERSITY PLZ STE 312 | | | | HACKENSACK | NJ | 07601 | |
| MANUFACTURERS EQUIPMENT & EFT | | SUPPLY | PO BOX 387 | 2401 LAPEER RD | | FLINT | MI | 48501-0387 | |
| MANUFACTURERS EQUIPMENT & EFTSUPPLY | | 2401 LAPEER RD | | | | FLINT | MI | 48503-4350 | |
| MANUFACTURERS EQUIPMENT & SUPPLY | | PO BOX 67000 DEPT 271901 | | | | DETROIT | MI | 48267-2719 | |
| MANUFACTURERS EQUIPMENT & SUPPLY CO | | 2401 LAPEER RD | | | | FLINT | MI | 48503-435 | |
| MANUFACTURERS EQUIPMENT AND | CUST SERVICE | 2401 LAPEER RD | PO BOX 387 | | | FLINT | MI | 48501-0387 | |
| MANUFACTURERS INDUSTRIAL GROUP | | 450 MIG DR | | | | LEXINGTON | TN | 38351 | |
| MANUFACTURERS LIFE INS CO | | 3030 N ROCKY POINT DR W | STE 760 | | | TAMPA | FL | 33607 | |
| MANUFACTURERS NEWS INC | | | | | | EVANSTON | IL | 60201-1569 | |
| MANUFACTURERS NEWS INC | LINDA MCCANN | 1633 CENTRAL ST | | | | EVANSTON | IL | 60201-1569 | |
| MANUFACTURERS NEWS INC | LINDA MCCANN | 1633 CENTRAL ST | UPTD PER GOI 05 17 05 GJ | | | EVANSTON | IL | 60201-1569 | |
| MANUFACTURERS OF EMISSION | | 1660 L ST NW | STE 1100 | | | WASHINGTON | DC | 20036-5603 | |
| MANUFACTURERS OF EMISSION | | CONTROLS ASSOCIATION | 1660 L ST NW STE 1100 | | | WASHINGTON | DC | 20036-5603 | |
| MANUFACTURERS PRODUCTS | | 22555 E 11 MILE RD | | | | ST CLR SHORES | MI | 48081-1385 | |
| MANUFACTURERS PRODUCTS CO | | 22555 E 11 MILE RD | | | | ST CLR SHORES | MI | 48081-1385 | |
| MANUFACTURERS PRODUCTS CO | | 26020 SHERWOOD AVE | | | | WARREN | MI | 48091-1252 | |
| MANUFACTURERS PRODUCTS CO EFT | | 26352 LAWRENCE | | | | CENTER LINE | MI | 48015-1268 | |
| MANUFACTURERS PRODUCTS CO EFT | | 22555 E 11 MILE RD | | | | ST CLR SHORES | MI | 48081-1385 | |
| MANUFACTURERS PRODUCTS CO EFT | | 26352 LAWRENCE | | | | CENTER LINE | MI | 48015-1268 | |
| MANUFACTURERS SERVICE INC | | 9715 KLINGERMAN ST | | | | | CA | 91733 | |
| MANUFACTURERS SERVICES | | INDUSTRIES INC AKA MSI INC | 19041 TAYLOR LAKE RD | | | HOLLY | MI | 48442-8998 | |
| MANUFACTURERS SERVICES INDUSTR | | MSI | 19041 TAYLOR LAKE RD | | | HOLLY | MI | 48442 | |
| MANUFACTURERS SERVICES INDUSTR | | MSI | 2519 BRANCH RD | | | FLINT | MI | 48506 | |

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | Address4 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| TAKATA INC RESTRAINT SYSTEMS | | DEPT 77625 | PO BOX 77000 | | | DETROIT | MI | 48277 | |
| TAKATA PETRI | | BAHNWEG 1 | 637 ASCHAFFENBURG | | | GERMANY | | | |
| TAKATA PETRI | RODGER D YOUNG & STEVEN SUSSER | C/O YOUNG & SUSSER | 26200 AMERICAN DR | STE 305 | | SOUTHFIELD | MI | 48034 | |
| TAKATA PETRI AG | | BAHNWEG 1 | D-63743 ASCHAFFENBURG | | | WHITE RUSSIA | | | |
| TAKATA PETRI AG | | BAHNWEG 1 | D 63743 ASCHAFFENBURG | | | WHITE RUSSIA | | | BELARUS |
| TAKATA PETRI AG | | PETRI | BAHNWEG 1 | | | ASCHAFFENBURG | | 63743 | GERMANY |
| TAKATA PETRI AG | OLIVER ARMAS ESQUIRE | THACHER PROFFITT & WOOD | 11 WEST 42ND ST | | | NEW YORK | NY | 10036 | |
| TAKATA PETRI AG | RODGER D YOUNG ESQ | YOUNG & SUSSER PC | 26200 AMERICAN DR | STE 305 | | SOUTHFIELD | MI | 48034 | |
| TAKATA PETRI | TOM CRANMER | MIRO WEINER & KRAMER | | | | BLOOMFIELD HILLS | MI | | |
| TAKATA PETRI GMBH | ACCOUNTS PAYABLE | LISE MEITNER STRASSE 3 | | | | ULM | | 89081 | GERMANY |
| TAKATA PETRI INC | | PO BOX 67000 DEPT 268901 | | | | DETROIT | MI | 48267-2689 | |
| TAKATA PETRI INC | | 422 GALLIMORE DAIRY RD | | | | GREENSBORO | NC | 27409-9725 | |
| TAKATA PETRI INC | | PO BOX 67000 DEPT 268901 | | | | DETROIT | MI | 48267-2689 | |
| TAKATA PETRI PARTS POLSKA SP ZOO | ACCOUNTS PAYABLE | UL BETLEJEMSKA 16 | | | | KRZESZOW | | 58-405 | POLAND |
| TAKATA RESTRAINT SYSTEMS INC | | 629 GREEN VALLEY RD | | | | GREENSBORO | NC | 27408 | |
| TAKATA RESTRAINT SYSTEMS INC | | TAKATA AIRBAG GROUP | PO BOX 67000 DEPT 267001 | ADD CHG PER LTR 07 28 05 LC | | DETROIT | MI | 48267-2670 | |
| TAKATA RESTRAINT SYSTEMS INC TAKATA AIRBAG GROUP | | PO BOX 67000 DEPT 267001 | | | | DETROIT | MI | 48267-2670 | |
| TAKATA SEATBELT INC | ACCOUNTS PAYABLE | 4611 WISEMAN BLVD | | | | SAN ANTONIO | TX | 78251 | |
| TAKATA TK HOLDINGS INC | TODD MCCURRY | 629 GREEN VALLEY RD | | | | GREENSBORO | NC | 27401 | |
| TAKE A LABEL INC | | 16900 POWER DR | AD CHG PER GOI 04 11 05 GJ | | | NUNICA | MI | 49448 | |
| TAKENS WILLIAM | | 2666 INDIAN RIDGE NE | | | | GRAND RAPIDS | MI | 49505-3932 | |
| TAKK INDUSTRIES | | QUANTUMLINK | 8665 E MIAMI RIVER RD | | | CINCINNATI | OH | 45247 | |
| TAKK INDUSTRIES INC | | 8665 EAST MIAMI RIVER RD | | | | CINCINNATI | OH | 45247 | |
| TAKROURI TINA | | 17 WESTERN ST | | | | JAMESTOWN | OH | 45335 | |
| TAKUMI STAMPING INC | | 8945 SEWARD RD | | | | FAIRFIELD | OH | 45011 | |
| TAKUMI STAMPING INC | | 8945 SEWARD | | | | FAIRFIELD | OH | 45011-9109 | |
| TAKUMI STAMPING INC EFT | | 8945 SEWARD | | | | FAIRFIELD | OH | 45011-9109 | |
| TAKUMI STAMPING INC EFT | | 8955 SEWARD RD | | | | FAIRFIELD | OH | 45011 | |
| TAL MATERIALS INC | | 712 STATE CIRCLE | | | | ANN ARBOR | MI | 48108 | |
| TAL PORT INDUSTRIES LLC | | 2003 GORDON AVE | RMT CHG 04 01 04 X7567 | | | YAZOO CITY | MS | 39194 | |
| TAL PORT INDUSTRIES LLC | | 2003 GORDON AVE | | | | YAZOO CITY | MS | 39194 | |
| TAL PORT INDUSTRIES LLC | | ECOLOGY TEK | 8 INDUSTRIAL RD | | | PRENTISS | MS | 39474 | |
| TAL PORT INDUSTRIES LLC | | PO BOX 1253 | | | | PRENTISS | MS | 39474-1253 | |
| TAL PORT INDUSTRIES LLC | | PO BOX 16089 | | | | HATTIESBURG | MS | 39404-6089 | |
| TAL PORT INDUSTRIES LLC | | 3 PARKLANE BLVD STE 1220W | | | | DEARBORN | MI | 48126 | |
| TAL PORT INDUSTRIES LLC | RICHARD MONTAGUE | PO BOX 1970 | | | | JACKSON | MS | 39215-1970 | |
| TAL PORT INDUSTRIES LLC | WARREN R GRAHAM ESQ | DAVIDOFF MALITO & HUTCHER LLP | 605 THIRD AVE | | | NEW YORK | NY | 10158 | |
| TAL PORT LLC | | PO BOX 1253 | | | | PRENTISS | MS | 39474-1253 | |
| TAL PORT LLC | ACCOUNTS PAYABLE | PO BOX 1253 | | | | PRENTISS | MS | 39474 | |
| TALADA, CARL | | 460 E CRONK RD | | | | OWOSSO | MI | 48867 | |
| TALAGA RODGER | | 5737 2 MILE RD | | | | BAY CITY | MI | 48706-3125 | |
| TALANI, DENNIS | | 41 SAGEBRUSH LN | | | | LANCASTER | NY | 14086 | |
| TALARICO MELISSA | | 325 PORTSIDE CIRCLE | 13 | | | PERRYSBURG | OH | 43551 | |
| TALARICO MICHAEL | | 555 TRINWAY | | | | TROY | MI | 48098 | |
| TALASKI, MATTHEW | | PO BOX 192 | | | | OWENDALE | MI | 48754 | |
| TALBERT CAROL | | 4041 PEBBLE LN | | | | RUSSIAVILLE | IN | 46979 | |
| TALBERT LISA | | 924 BURLEIGH AVE | | | | DAYTON | OH | 45407 | |
| TALBERT PEGGY | | 423 MIRAGE DR | | | | KOKOMO | IN | 46901 | |
| TALBERT ROBERT | | 924 BURLEIGH | | | | DAYTON | OH | 45407 | |
| TALBERT ROY | | 3001 DOVE | | | | MISSION | TX | 78572 | |
| TALBERT SHERYL B | | 4048 COLTER DR | | | | KOKOMO | IN | 46902-4486 | |
| TALBERT, CAROL S | | 4041 PEBBLE LN | | | | RUSSIAVILLE | IN | 46979 | |
| TALBERT, CHARLES | | 1409 WOODMERE | | | | BAY CITY | MI | 48708 | |
| TALBOT CASE | | YUWA PARTNERS | MARUNOUCHI MITSUI BUILDING | 2 2 2 MARUNOUCHI | | CHIYODA KU TOKYO | | 100-0005 | |
| TALBOT ERIN | | 999 S WOODCOCK RD | | | | MIDLAND | MI | 48640 | |
| TALBOT JAMES W | | 88 NEWFIELD DR | | | | ROCHESTER | NY | 14616 | |
| TALBOT MICHELLE S | | 18402 E 99TH CT N | | | | OWASSO | OK | 74055 | |
| TALBOT THOMAS | | 2020 S 7 MILE RD | | | | MIDLAND | MI | 48640-8306 | |
| TALBOT, KYLE | | 11185 MARSHALL RD | | | | BIRCH RUN | MI | 48415 | |
| TALBOTT STEVEN | | 303 LETTINGTON AVE | | | | ROCHESTER | NY | 14624 | |
| TALBOTT TIMOTHY D | | 3931 EAGLE POINT DR | | | | BEAVERCREEK | OH | 45430-2086 | |
| TALBOTT TOWER | | 1230 TALBOTT TOWER | | | | DAYTON | OH | 45402 | |
| TALBOTT, STEVEN | | 303 LETTINGTON AVE | | | | ROCHESTER | NY | 14624 | |
| TALCOTT REALTY I LP | | C/O GRIFFIN COADD CHG 10 97 | 3800 W 80TH ST STE 920 | | | BLOOMINGTON | MN | 55431 | |

# Exhibit B

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481-rdd

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION, et al.,


        Debtors.



- - - - - - - - - - - - - - - - - - - -x


            U.S. Bankruptcy Court

            One Bowling Green

            New York, New York


            August 20, 2009

            10:20 AM


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

13

1    additional fact that would, I think, be implicated in the

2    litigation in that one of the principal OEMs that received the

3    CD players was General Motors, and General Motors waived a

4    substantial portion of their warranty claims in connection with

5    all the settlements that we had --

6                THE COURT:  So that would --

7                MR. BUTLER:  -- or dealt with.

8                THE COURT:  -- that would greatly reduce the fifteen

9    million in claims damages.

10               MR. BUTLER:  Arguably, Your Honor, it would.  I mean,

11   you know, you'd get in -- I think you'd get into an argument

12   about fungibility at the time, but that's what 9019 is designed

13   for us to assess.

14               THE COURT:  Right.

15               MR. BUTLER:  And, ultimately, the judgment reached was

16   this -- the settlements before Your Honor seem to be an

17   appropriate disposition of this litigation under these

18   circumstances.

19               THE COURT:  Okay.

20               Does anyone have anything to say on this motion?

21               All right, for the reasons stated in the motion, I'll

22   approve it as clearly a fair and reasonable settlement.

23               MR. BUTLER:  Your Honor, matter number 7 on the agenda

24   is the motion of Plymouth Rubber Company, LLC seeking to have

25   an administrative claim that was filed fifteen days after the

14

1    bar date to be deemed timely filed, at docket number 18714.

2    And counsel's here to present the motion.

3           THE COURT:  Okay.

4           MR. VINCEQUERRA:  Good morning, Your Honor.  James

5    Vincequerra, Duane Morris, for Plymouth Rubber Company, LLC.

6    I'll explain in a minute why I'm emphasizing the LLC.  With me

7    today is Kara Zaleskas from my -- Duane Morris' Boston office.

8           As a matter of housekeeping, Your Honor, Ms. Zaleskas

9    filed a pro hac vice motion approximately two weeks ago.  I

10   don't believe I saw the order on the docket yet.  I would just

11   ask, to the extent she is required to appear here --

12          THE COURT:  That's fine.  That's granted.

13          MR. VINCEQUERRA:  Thank you very much, Your Honor.  A

14   number of -- a lot of trees were killed in the filings in

15   connection with this matter.  We raise no less than five issues

16   as to why -- or reasons why our claim should be deemed timely

17   or should otherwise be -- or the new admin claims bar date

18   should not be deemed to apply to our claim.

19          I'm really going to focus here on two of the issues:

20   the improper notice issue first and then, to the extent that

21   Your Honor finds that the new bar date does apply to the claims

22   of Plymouth Rubber Company, LLC, the excusable -- the

23   components of excusable neglect.

24          I'll leave the balance of the arguments in our papers

25   with regard to the technicalities of the amended admin bar

15

1    date, or the new admin bar date, the efficacy of that

2    admitted -- or modification order and the informal notice to

3    our papers.  I think they're argued fairly clearly there.

4         THE COURT:  The informal proof-of-claim argument?

5         MR. VINCEQUERRA:  Yes, that's right.

6         THE COURT:  Okay.

7         MR. VINCEQUERRA:  I apologize.  I'll leave those to my

8    papers and reserve any statements on those for rebuttal to the

9    extent we deem it's necessary.

10        As an initial matter, do you have any questions about

11   the papers, Your Honor?  I'd be happy to answer them.

12        THE COURT:  Well, I've reviewed them, so -- I guess

13   the issue on whether it's Inc. or LLC, to my mind, is -- it

14   seems to me it's a non-issue because it was actually received

15   by the claimant, right?  It was received?

16        MR. VINCEQUERRA:  It was received the day after the

17   bar date.

18        THE COURT:  Well, no, I mean it was received by the

19   individual who forwarded it on.

20        MR. VINCEQUERRA:  Well, really, the -- I mean, the

21   point we're getting to is proper notice, I would imagine.  And

22   a couple of points.  The debtor to points to 2002(g) and

23   service on LLC first through the law firm Burns and Levinson

24   and then at the former address of the Plymouth Rubber, Inc.

25   entity.  A couple of points here, Your Honor.  Service was made

1    pursuant to outdated -- you know, an outdated claims --

2    outdated exhibit-and-schedules lists and based on a claim that

3    was filed by a different entity.  Service was effected on

4    counsel for a different entity.  Burns and Levinson LLC, which

5    makes up a bulk of the notice argument, never represented the

6    LLC entity.  I mean, and it's important to understand --

7            THE COURT:  Was there any -- is there anything in the

8    record about notice of Plymouth Rubber Company Inc.'s Chapter

9    11 case and reorganization by --

10           MR. VINCEQUERRA:  Delphi actively participated in that

11   case, Your Honor.

12           THE COURT:  How do I know that?

13           MR. VINCEQUERRA:  Excuse me?

14           THE COURT:  How do I know that?  Or will they

15   acknowledge that?

16           MR. VINCEQUERRA:  Well, I can't imagine they won't

17   acknowledge it, Your Honor, as they filed stipulations in that

18   case as well as, I believe, a claim.

19           THE COURT:  When did the plan confirm?

20           MR. VINCEQUERRA:  Plymouth Rubber Inc. confirmed its

21   plan and emerged from bankruptcy on August 31st, 2006.  And

22   maybe I should back up a little bit, Your Honor, and give you a

23   little bit of a time line here because that may be helpful.

24           THE COURT:  I mean, I know they sued LLC.

25           MR. VINCEQUERRA:  That -- you know, that's the rub

17

1    here, Your Honor.  They served the objection -- the notice of

2    the new bar date on Inc. at seven different locations, or five

3    different locations, wherever it -- however many it was, served

4    counsel for Inc.  Burns and Levinson has never represented the

5    reorganized debtor, and -- but they got it right when they

6    wanted to sue the new entity under the new purchase order.

7              THE COURT:  But, again, Mr. Collins forwarded this

8    notice on to LLC, right?

9              MR. VINCEQUERRA:  Well, you're right, Your Honor,

10   they --

11             THE COURT:  And he was acting as LLC's agent, wasn't

12   he?

13             MR. VINCEQUERRA:  Right, as part of the wind-down

14   staff.  And if --

15             THE COURT:  Okay.

16             MR. VINCEQUERRA:  -- if Your Honor is -- you know,

17   wants it moved forward to the excusable neglect argument, which

18   I think is also a very good argument, I don't think the notice

19   was proper there.  I think, you know -- at footnote 3 of their

20   objection is very telling.  They note that for the purposes of

21   their objection they presume that LLC is the successor-in-

22   interest to Inc.  I'm not aware of any case law that says you

23   can get the benefit of that assumption for notice requirements

24   under an --

25             THE COURT:  But, again --

18

1          MR. VINCEQUERRA:  -- under an admin --

2          THE COURT:  -- Mr. Collins made the same presumption,

3     right?  He sent the notice on to LLC?

4          MR. VINCEQUERRA:  He did send it on, there's -- we do

5     not contest that fact.

6          THE COURT:  Okay.

7          MR. VINCEQUERRA:  So if you have no other questions

8     for me on the proper notice -- we don't contest the fact that

9     Mr. Collins did receive actual notice -- I can move on to

10    excusable neglect.

11         THE COURT:  Okay.

12         MR. VINCEQUERRA:  Debtors don't contest two components

13    of excusable neglect:  They don't contest that the -- regarding

14    the length of delay or Plymouth Rubber's good faith.  So,

15    really all that we're left with, Your Honor, is the prejudice

16    requirement and the reason for delay.

17         Mr. Butler indicated that a proof of claim was filed

18    fifteen or sixteen days after the bar date.  That's technically

19    true.  We alerted -- well, we alerted counsel for the debtor

20    the day after the bar date, asking them to deem the claim

21    timely filed; that's reflected in Ms. Zaleskas' affidavit.

22         But to get to the point of excusable neglect, Your

23    Honor, what happened here is really a perfect storm for my

24    client.  The prior entity, the Inc. entity, will have business

25    relationships with Delphi as a result of the Delphi bankruptcy

19

1    and things that happened which, to be quite honest with you, my

2    firm was not involved with.  They went into bankruptcy and

3    reorganized.  When they emerged from bankruptcy, they had new

4    equity, substantially new officers and directors, effectively a

5    new entity; entered into a new purchase order agreement with

6    Delphi on January 30th, 2008.  About nine months after that,

7    that's approximately a year and a half after, they emerged from

8    bankrupt -- the reorganized debtor emerged from bankruptcy.

9         Approximately nine months after entry into that

10   purchase order, Delphi sued Plymouth Rubber Company, LLC in

11   Michigan for breach of the contract, for breach of the purchase

12   order agreement.  Plymouth Rubber Company, LLC counterclaimed,

13   and that's the basis of our -- those are the bases of our --

14   that's the basis of our admin claims.

15        Six days after Delphi sued Yongel (ph.) -- the Yongel

16   Company, another -- a supplier of Plymouth Rubber Company also

17   sued Plymouth Rubber Company, LLC.  And in that case as well,

18   Plymouth Rubber Company filed counterclaims both against Yongel

19   and Delphi.

20        Both those cases were consolidated for mediation

21   purposes and they're in global mediation.  The -- as a result

22   of the lawsuits from their principal buyer and their principal

23   supplier, Plymouth Rubber Company, LLC started its own line

24   down in October of 2008 and approximately three months after

25   that laid of all of its employees.  And that's where we have,

20

1    you know, the sole employee of the debtor, Mr. Collins.

2            So, you know, it's important to remember -- oh, let me

3    jump -- I'm sorry, excuse me, Your Honor, let me jump to the

4    portions of excusable neglect that are in dispute:  reason for

5    delay.  We laid out some of these facts because, I mean,

6    clearly there is a legitimate reason for Plymouth Rubber

7    Company, LLC's one-day delay in providing notice to the debtors

8    with regard to their admin claim.

9            THE COURT:  I guess my one issue with that is why

10   didn't Mr. Collins open the envelopes?

11           MR. VINCEQUERRA:  Why did he open the envelopes?

12           THE COURT:  Why didn't he?

13           MR. VINCEQUERRA:  Why didn't he?

14           THE COURT:  Right.  I mean, he got them on the 9th.

15   He put them -- it doesn't say this, but I guess one can infer

16   that he didn't open them, he put them in another envelope and

17   mailed them to Mr. -- it begins with an S, let me get the right

18   name -- Mr. Schultz.

19           MR. VINCEQUERRA:  Yes, that's right.  His name is --

20           THE COURT:  I don't understand why he didn't open the

21   envelopes, because they weren't received by Mr. Schultz until

22   six days later.  I mean, particularly if he'd been waiting --

23   if they'd been -- you know, if he only checks the P.O. box

24   every two weeks, I don't understand why he wouldn't have opened

25   the envelopes.

21

1          MR. VINCEQUERRA:  Well, I mean, it's not in his

2     papers, Your Honor, and anything I say would be pure, you know,

3     suspicion and guesswork.  But the fact of the matter is that

4     the notices were not addressed to the entity that employed him.

5     They were addressed to an Inc. -- the Inc. entity.  So, LLC

6     never filed a notice of appearance in this case, has never

7     appeared in this case until this dispute, and they never felt

8     that they had a need to appear in this case because they were

9     party to a post-petition contract that, under the prior plan,

10    gave them an allowed amended claim.

11         So, I mean, while it's pure, you know, circumspection

12    as to why he did not open the letter for a day and put it in

13    regular mail, the letter wasn't addressed to the entity that

14    employed him and the entity that's in wind-down.

15         THE COURT:  Well, it didn't employ Mr. Schultz either,

16    did it?

17         MR. VINCEQUERRA:  No, it did not.  So, Your Honor, to

18    continue on with reason for the delays, you know, there was an

19    aggressive timetable here for the bar date, from the height of

20    the holiday season.  We're in -- Plymouth Rubber Company, LLC

21    is in its own wind-down, is on a short staff, and I think that

22    there's ample justification here for the reason of delay -- for

23    the reason for delay.

24         To move to the other component that's in contest, as

25    to prejudice, I don't see, you know, any realistic manner of

22

1    prejudice here for the debtors.  They learned of the claim one

2    day after the bar date.  There's no contest that Ms. -- there's

3    no question that Ms. Zaleskas -- I mean, it's not contested

4    Ms. Zaleskas alerted the debtors to the claim the day after the

5    bar date.  The claim was filed a week and a half to two weeks

6    later, followed shortly by this motion.  The claim is an

7    unliquidated amount, is in the nature of a counterclaim, you

8    know, brought as a response to suits against Plymouth Rubber

9    Company, LLC.

10            My understanding from my reading of the plan and

11   disclosure statement in this case and some things in the news

12   is admin claims are anticipated to be paid in full, and there

13   are literally hundreds of millions of dollars of admin claims.

14            So I see very little chance for prejudice there.  The

15   debtors make the argument that -- you know, the classic

16   floodgates argument that you commonly see in pioneer type of

17   cases.  The facts of this case are so unique I really don't see

18   that as a reasonable prospect.  Two creditors of the debtors

19   with substantially similar names but different entities, you

20   know, the claimant being in wind-down, I just don't see the

21   floodgates opening here.

22            So with that, Your Honor, if you have no questions,

23   I'll turn it over to, I guess -- is it Mr. Powlen?

24            MR. POWLEN:  Yeah.

25            THE COURT:  Is it -- was it a compulsory counterclaim?

23

1    Does it arise under the same transaction or occurrence?

2            MR. VINCEQUERRA:  Rises under the same purchase order

3    agreement.

4            THE COURT:  Okay.

5            MR. VINCEQUERRA:  Thank you very much, Your Honor.

6            MR. BUTLER:  Judge, just one moment, if you don't

7    mind.

8        (Pause)

9            MR. BUTLER:  Your Honor, I just want to make sure the

10   record is clear here.  I have, and I think counsel will

11   acknowledge that we obtained, and I have for the Court, a

12   certification of conversion from a corporation to a limited

13   liability company of Plymouth Rubber Company, Inc., a

14   Massachusetts corporation.  It's -- it is the same company.  I

15   mean, we hear that it's different companies and not successors.

16   I actually have the documentation from the State of Delaware

17   Secretary of State's Office that we obtained that shows that on

18   September 1st, 2006 the same legal entity was converted from

19   one kind of corporation in Delaware to another kind of

20   corporation in Delaware.

21           So, I mean, I think the suggestion that these are

22   fundamentally different entities just is not accurate.  And

23   I've got the evidence here.  I don't think that counsel,

24   Mr. Vincequerra, would dispute the Secretary of State of

25   Delaware as to what the entity is, and I have that.

24

1          So this is the same legal entity that was converted on

2     the -- on September 1st.

3          Second, Your Honor, Mr. Vincequerra, in his argument,

4     made a major point about the fact that there was a new purchase

5     order in January of 2008.  And, in fact, there was a purchase

6     order that was reissued on -- in January of 2008 after the 2006

7     reorganization to Plymouth Rubber, and it was purchase order

8     number P6850008, and it was issued to the address 500 Turnpike

9     Street in Canton, Massachusetts.  That was the business address

10    that the parties New Plymouth, Plymouth LLC, whatever one wants

11    to call it, that is the address that Plymouth used with Delphi

12    in connection with the new purchase order that Mr. Vincequerra

13    referred to, and the PO was issued to that address.  And the

14    notice of administrative claims bar date was -- one of the

15    places that it went to was to that address in Canton.

16         And so I think that the -- you know, the argument that

17    the notice, in addition to being actually received, it also was

18    the business address that Delphi and Plymouth Rubber Company,

19    LLC used between themselves in the January 2008 purchase order

20    and was the appropriate business address.

21         I don't think, Your Honor, that this matter should

22    turn in any respect on the issue of notice.  Appropriate notice

23    was given; it was given in connection with -- to the

24    appropriate -- you know, the legal entity, which really was the

25    same entity converted, to the business address that was used in

25

1    the 2008 contract between the companies.  And the notice was

2    actually, in fact, received.

3         I think the question is more the excusable neglect

4    question here, and I only have a few comments on that.  First,

5    we acknowledged in our papers that we did receive a call from

6    counsel the day after the bar date.  That isn't unusual.  We

7    receive those kinds of calls fairly regularly when there are

8    bar date issues, and our response is always the same, which is

9    it's not our bar date to change, it's the Court's bar date, and

10   that we don't have any ability to change the date and people

11   need to take whatever steps they need to take to protect their

12   clients.  And the same kind of -- the same discussion was had

13   with counsel for Plymouth Rubber.

14        The fact that they waited a couple of weeks -- and it

15   wasn't just a week, it was the fact they waited until after the

16   plan modification hearing to submit the proof of claim two

17   weeks later, is -- you know, kind of mystifies me as to why

18   they chose to do that.  But that's not excusable neglect.  They

19   could have filed something the next day.  According to

20   Mr. Vincequerra's argument, it would have been -- you know, all

21   they needed to do was to file an administrative claim that

22   attached the lawsuit and that that would have done that.

23        I think when you look at the -- from the company's

24   perspective, the issue here is -- Your Honor, I think, knows

25   from the plan modification hearing and all of the pleadings

26

1    filed in connection with that, Delphi was on a mission over the

2    last fifteen, sixteen months since the prior plan, before it

3    was modified, hadn't gone effective, to try and develop a

4    solution for these cases that would be successful, that would

5    involve modifying the plan, emerging pursuant to a plan and

6    providing for the payment of administrative expenses that are

7    allowed.  And that took an enormous amount of effort and

8    negotiation to do that.  And one of the things, the processes

9    we went through in the latter part of July, was to assess all

10   of the claims that were made in connection with the bar date

11   and to evaluate those with our chief restructuring officer and

12   with the representatives of our other major stakeholders,

13   particularly with the -- some of the advisors of the DIP

14   lenders in connection with their credit bid so that we were all

15   comfortable in proceeding on the 29th here.  And that was based

16   on having an assessment of what the world of administrative

17   claims was through July -- or through May 31st, understanding,

18   as Your Honor knows, under the modified plan that's now been

19   approved, the -- there's another window bar date that's going

20   to go out covering June 1st through the anticipated effective

21   date of September 30th.

22        But making the assessment of what the unpaid

23   administrative claims were from the -- from October 5, 2005

24   through May 31, 2008 was a real exercise in connection with

25   preparing for the plan modification hearing.  And the fact that

VERITEXT REPORTING COMPANY

27

1  counsel or their client chose not to file the claim for a

2  couple of weeks after they had actual notice and they had had

3  actual conversations with us I don't think fits within the

4  factors of excusable neglect.

5       That's all, Your Honor, the debtors would have to say

6  on this.

7       THE COURT:  Well, let me explore that a little bit

8  more.  Is there or was there an estimate of allowed

9  administrative claims that was a factor in the DIP lenders and

10  GM going forward on the 29th to propose the winning plan

11  support agreement and lead to the modified confirmation --

12       MR. BUTLER:  Yes, Your Honor.  You --

13       THE COURT:  -- of the plan?  Because, I mean, I don't

14  remember any testimony --

15       MR. BUTLER:  No.

16       THE COURT:  -- on, you know, some floor that -- or

17  some ceiling for administrative claims or anything.

18       MR. BUTLER:  No, there's not, Your Honor.  There was

19  not.  What Your Honor may recall was that one of the charts

20  that we put up and went through explained how the

21  administrative liabilities were going to be allocated among the

22  parties.

23       THE COURT:  Right.

24       MR. BUTLER:  It was intentional that -- and one of the

25  things we fought for in the MDA was not to have dollar cap

1  limitations.  There were, in fact -- that was a subject of

2  protracted negotiation, actually, as to whether or not there

3  would be limitations and what those liabilities would be and,

4  instead, the agreement was to do it by category.  And Your

5  Honor saw those categories allocated between the GM entity, the

6  DIPCo entity and DPH Holdings, the reorganized entity.

7         THE COURT:  Right.

8         MR. BUTLER:  And there was also a focus, and Your

9  Honor may recall that Mr. Stipp, in his sworn testimony,

10  provided in his declaration a fair amount of discussion about

11  the assessment of administrative claims as it related to DPH

12  Holdings' ability to be able to deal with its -- or what it

13  needed to satisfy as it moved forward.  And so there was an

14  assessment that went on, there was -- Mr. Stipp did make those

15  evaluations and make those assessment, and there was that, if

16  you will, sort of informal feasibility discussion among the

17  parties.  Ultimately, that didn't arise to the level, Your

18  Honor, of having -- beyond the sworn testimony, there wasn't

19  any controversy at the plan modification hearing about it

20  because ultimately it had been negotiated out.

21         THE COURT:  So which of the three entities would be

22  responsible for any affirmative recovery here?

23         MR. BUTLER:  Without prejudicing the estate, because I

24  may get this wrong, but my sense is that this is a retained

25  liability of DPH Holdings.  I don't know that this -- and the

29

1   reason I say that is because this supplier no longer does

2   business with the company.  This is a -- but I'd have to check

3   that in terms of -- go back and check that under the plan in

4   the negotiations.  But this is a supplier -- this is a former

5   supplier who, from the company's perspective, failed to live up

6   to its obligations under the purchase order, and it required

7   Delphi to incur a very substantial expense in re-sourcing from

8   the supplier who failed to live up to the terms of their

9   contract in the company.  And that's only why we sued them, and

10  we re-sourced the product.

11         So I think the re-sourced product and the

12  administrative liabilities associated with them go to, in fact,

13  DIPCo, but I think that the exposure under this litigation is

14  likely a DPH Holding obligation.  But I'd have to confirm that,

15  Judge.  That's my best recollection.

16         THE COURT:  Okay.  Well --

17         MR. BUTLER:  And as you know, DPH Holdings --

18         THE COURT:  It wouldn't be -- I guess it wouldn't be a

19  GM one because this isn't a GM plant --

20         MR. BUTLER:  No, it's not -- no, no, it's -- and

21  that's what I'm saying to you.  My -- and I think Ms. Kraft

22  (ph.) is here from the company and we just told her about

23  this -- my believe is the retained liability for the litigation

24  exposure would be DPH Holdings.  And the supplier contract for

25  what was the re-sourced contract, which is with another entity,

30

1    that obligation and the administrative claims associated with

2    it, that went to DIP Holdco, or will go to DIP Holdco.

3            THE COURT:  Okay.

4            MR. BUTLER:  I think that's the proper -- at least

5    that was the philosophy behind the negotiation at the time.

6            THE COURT:  All right.  And it looks like to me the

7    counterclaim -- you can correct if I'm wrong -- the

8    counterclaim just seeks monetary damages, right?  It doesn't

9    seek specific performance or anything like that?

10           MR. BUTLER:  That's correct.

11           THE COURT:  It's an unliquidated claim.  Have there

12   been any discussion as to what the damages are asserted to be

13   as far as the counterclaim?  Either one of you --

14           MR. BUTLER:  There was, Your Honor -- I'm advised, and

15   Mr. Vincequerra may know, I was advised it was a mediation.  I

16   don't know what was --

17           THE COURT:  Right.

18           MR. BUTLER:  -- put on the table at the mediation.

19           THE COURT:  I mean, I don't want you to reveal

20   settlement proposals, but, just, has there been a settlement of

21   what the damages could be?

22           MR. VINCEQUERRA:  Yes, Your Honor, that's the irony of

23   this whole thing for my client is that while this bar date

24   procedure has been going on, my client has been across the

25   table --

31

1       THE COURT:  No, I know there's been a mediation.  I'm

2   just trying to figure out what --

3       MR. VINCEQUERRA:  No, there have been -- you know, a

4   mediation is fairly far along.  There have been numbers

5   exchanged.

6       THE COURT:  I don't want to hear settlement proposals.

7   What I'm focusing on here is, on the issue of prejudice, you

8   had made a good point that these claims are going to be paid in

9   full under the modified plan.  The point I've just been

10  exploring with Mr. Butler is who's going to be paying them.  If

11  it is, as it would appear to me to be the case just from the

12  nature of the claim and the MDA, the remaining holding company,

13  the debtor wind-down company, then I did make a conclusion as

14  part of my ruling approving the modification of the plan that

15  that modification was feasible, and that was premised upon the

16  testimony about the likely amount of administrative claims and

17  the funding of the successor entity and the like.

18      So the reason I'm asking this question is to find out

19  how large your claim is.  It wasn't taken into account in that

20  testimony, and it was a large claim that may affect the

21  prejudice calculation.  I just don't know.  I mean, it's an

22  unliquidated claim.  I don't know whether it's large or not but

23  whether it's, you know, something that, for example, pales in

24  comparison to the debtors' claim.

25      So I'm not asking you about settlement discussions;

32

1    I'm asking what's been asserted, unless you want to tell me

2    what you think the realistic number is.  But that's up to you.

3         MR. VINCEQUERRA:  It's difficult to say , Your Honor,

4    because, to be quite honest with you, I haven't been involved

5    in the mediation.  I understand from our mediation statement

6    that that counterclaim number that we've been stuck at is

7    roughly twenty million dollars.  Again, that's as a

8    counterclaim that would be, obviously, offset against any

9    successful recovery that they have against us.

10         THE COURT:  Although it would seem to be it's

11    either/or, right?  Unless you settle it, either they breached

12    or you breached.  So I'm not sure there'd be much of an offset.

13         Okay.  All right.

14         MR. BUTLER:  Your Honor, that's all the debtors

15    have --

16         THE COURT:  Well --

17         MR. BUTLER:  -- unless you had a question.

18         THE COURT:  -- let me ask you, though, based upon a

19    twenty million dollar claim, how does that affect the -- was

20    any liability for this taken into account in the declarations

21    in support of the modification of the plan?

22         MR. BUTLER:  My understanding is the answer to that

23    question is no, there was no money allocated to this amount

24    through the -- whether the claims process was evaluated.

25         The -- and, you know, Your Honor, there has been a

33

1   wide variety of lawsuits started, stopped in hiatus, since

2   October of 2005.  And the debtors relied on the administrative

3   claims process here that went out to everybody as -- to catch

4   the claims that people were going to assert as part of the --

5   to understand as part of the plan modification process.

6          THE COURT:  And, again, this claim came in after the

7   plan modification hearing.

8          MR. BUTLER:  Correct.  It came in on the June 30 -- on

9   July 30th --

10         THE COURT:  The hearing was on the 29th.

11         MR. BUTLER:  -- and where the hearing was July 29th.

12  And the assessment was actually made in the days -- we spent

13  three or four days leading up to the July 29th hearing going

14  over this evaluation and assessment.

15         THE COURT:  Okay.

16         MR. BUTLER:  And I think -- you know, I don't have

17  Mr. Stipp here, Your Honor, but Ms. Kraft is here and she works

18  closely with Mr. Stipp.  I think that Mr. Stipp would tell you

19  that if he had an extra twenty million dollar -- if in fact,

20  taking their -- I think we disagree vigorously with the claim,

21  but if you add another twenty million dollars of litigation

22  exposure to the pot, would that be material, I think Mr. Stipp

23  would say yes, it's material.

24         THE COURT:  Well, what was funding again for --

25         MR. BUTLER:  Remember, the funding from -- I think it

34

1    was -- the entire funding from General Motors was fifty

2    million; plus, we had the plants that were retained which we

3    could sell off; plus, we had --

4          THE COURT:  But those are more dogs and cats than --

5          MR. BUTLER:  They were.

6          THE COURT:  Right.

7          MR. BUTLER:  Plus, we had the avoidance actions, to

8    the extent that there's collectability on some of the avoidance

9    actions.  And there were some other -- there were some -- I

10   think some other MRA payments, I think, from General Motors or

11   a few other sources of revenue.  But it was calibrated.  It

12   was -- you know, it was designed, as you know, to provide for

13   an efficient disposition of all of those assets and remediation

14   of the -- of some of the other issues and payment of the

15   liabilities.  So I think Mr. Stipp would argue that twenty

16   million was material in that calculation.

17         THE COURT:  Okay.

18         MR. BUTLER:  Thanks, Judge.

19         THE COURT:  Okay.

20         MR. POWLEN:  Just one minor point, Your Honor.

21   Mr. Butler -- I don't know if he passed it up, because I didn't

22   see him pass it up, but makes much of the fact that the

23   entities -- the LLC entity and the Inc. entity are the same.  I

24   know Your Honor said actual -- there was -- you know, the

25   notice was received, but they're the same entities.  And I know

35

1    Mr. Butler's familiar with the concept of a fresh start and a

2    reorganized debtor, but they're the same entities as they would

3    be in any post-effective date debtor that has entirely new

4    equity and has a fresh start in a bankruptcy.  That this was

5    not accomplished through a 363 sale and a transfer of assets

6    but rather an infusion of equity and a stock deal doesn't

7    change the fact that at the end of the day they were dealing

8    with a newly born entity.

9            Other than that, Your Honor, I have nothing further.

10   Thank you very much for your time.

11           THE COURT:  Okay.

12           Is -- neither Mr. Collins nor Mr. Schultz is here,

13   right?

14           MR. POWLEN:  No, Your Honor.

15           THE COURT:  They're not present?

16           MR. POWLEN:  No, Your Honor.  We had discussions with

17   Skadden, and prior to the hearing we agreed that we would just

18   rely on the affidavits.

19           THE COURT:  Okay.

20           Okay, anyone else?

21           Okay, I have before me a motion by Plymouth Rubber

22   Company, LLC for an order deeming its administrative expense

23   claim timely filed or for related relief.  The origin of this

24   dispute is that, in connection with proceeding to obtain the

25   modification and ultimate consummation of its confirmed but

36

1   unconsummated Chapter 11 plan, Delphi Corporation and its

2   affiliated debtors sought approval of an administrative claims

3   bar date for the Chapter 11 period through May of 2009.  The

4   debtors' confirmed Chapter 11 plan was not consummated because,

5   asserting breaches, the plan investors under that plan refused

6   to close in April of 2008.  That left Delphi with a significant

7   hole in the required funding for the confirmed plan.  Delphi

8   then spent close to a year dealing with ways to plug that hole

9   as well as to address the further deterioration in the

10  financial markets and in their perception of Delphi's value,

11  which led to a substantially different approach, ultimately, to

12  their exit from Chapter 11 under a Chapter 11 plan.

13          The debtors, in assessing their ability to emerge from

14  Chapter 11, and having entered into an agreement with an entity

15  called Platinum, as well as General Motors, that would have

16  provided for that combined entity's acquisition of most of the

17  debtors' business operations in return for sufficient cash to

18  deal with a portion of the administrative claims against the

19  debtors, plus stock -- I'm sorry, plus forms of contingent

20  consideration -- having entered into that transaction, the

21  debtors determined that they needed prompt means to calculate

22  the outstanding administrative claims other than the debtor-in-

23  possession financing claims against them, and, therefore,

24  obtained from the Court, in connection with establishing

25  procedures for consideration of the proposed modification to

1    the Chapter 11 plan involving GM and Platinum, the

2    administrative claims bar date.

3        The bar date notice provided for, for purposes of a

4    bar date, fairly short notice, but given the timing constraints

5    that the debtors faced, including, in essence, a week-to-week

6    extension of enforcement of remedies under the DIP facility and

7    a clear and short deadline from GM and Platinum, such notice

8    was appropriate under the circumstances.

9        The debtors sent out the notice and received timely

10    administrative claims from approximately 2,400 claimants.  The

11    claims procedures motion that is on the calendar for later

12    today states that approximately one billion dollars of

13    administrative claims were asserted in those proofs of claim,

14    plus unliquidated amounts.

15        Ultimately, the proposed modified plan was itself

16    modified, although not materially so for purposes of the issues

17    before me today -- and instead of Platinum acquiring

18    significant assets under the plan, along with GM, Platinum was

19    replaced by the debtors after an auction process by a

20    consortium of the debtor-in-possession lenders.  And that

21    group, plus GM, entered into an MDA with the debtors, which

22    formed the basis for the modified plan.  The Court held a

23    hearing on that modification and approved it on July 29th, two

24    weeks after the administrative claims bar date.

25        The rough structure of the plan provides for the

38

1    continuation of most of the debtors' businesses, either in the

2    hands of a GM acquisition company with respect to certain

3    facilities that primarily manufacture parts for GM vehicles, as

4    well as other assets that would go to the DIP lender

5    acquisition group.

6         The third split of the debtors' assets would be

7    retained by the debtors, since neither GM nor the DIP

8    acquisition group wanted to acquire them.  In addition, that

9    entity that would continue to hold those assets would receive a

10   cash payment by GM to enable that entity to pay administrative

11   claims against it that were not being assumed in connection

12   with the purchase of ongoing operations by the DIP acquisition

13   vehicle and GM acquisition vehicle.  And that amount of cash

14   was determined by the debtors in consultation with various

15   constituents, including GM, to be sufficient to have the

16   surviving debtor entity meet its obligations under the plan,

17   including the payment of allowed administrative claims.

18        The Court took testimony on that aspect of the

19   proposed plan modification in the form of an affidavit by

20   Mr. Stipp, in which he went through his analysis of likely

21   sources and uses of cash to pay that entity's administrative

22   claims.  No one cross-examined Mr. Stipp.  And based upon my

23   review of the MDA, the modified plan and the affidavits

24   submitted in support thereof, I concluded that the plan, as

25   modified, was feasible: that is, that it was not likely to be

39

1   succeeded by a liquidation under Chapter 7 and that it could be

2   performed, including the payment of administrative claims, as

3   contemplated by the plan.

4        The debtors sent out notice of the administrative

5   claims bar date as required by my order establishing the bar

6   date, and notice was actually received by Plymouth Rubber

7   Company, Inc. on -- it is acknowledged to have been received by

8   Plymouth Rubber Company, Inc. on July 9, 2009.  That's set

9   forth in the affidavit in support of Plymouth's motion of

10  Mr. Collins.

11       The debtors sent that notice to the address in their

12  post-petition purchase order between them and Plymouth Rubber

13  Company, LLC -- the same location.  The address on the envelope

14  was to Plymouth Rubber Company, Inc., which had been the entity

15  with which the debtors had done business prior to Plymouth's

16  Chapter 11 reorganization.

17       Mr. Collins, as I said, received the notice, which was

18  also sent to numerous other locations to Plymouth Rubber

19  Company, Inc., including to the counsel that filed the proof of

20  claim on behalf of Inc. in the Chapter 11 case.  Mr. Collins

21  did not open the notice but, instead, on July 10th, put it, and

22  apparently some other correspondence, in an envelope and

23  forwarded it to Mr. Schultz, who is described in the Collins

24  affidavit as a representative of Plymouth Rubber, LLC's parent,

25  or at least an affiliate, retained to manage Plymouth's

40

1    affairs, Versa Capital Management, Inc., which also manages the

2    funds which directly own the equity interest in Plymouth

3    Rubber.

4            Although mailed on July 10th, according to

5    Mr. Collins, the notice was not received by Mr. Schultz until

6    July 16th, at which point Mr. Schultz, unlike Mr. Collins,

7    opened the package, read the notice and immediately contacted

8    the debtors, seeking an extension of the bar date, which was

9    not agreed to.

10           It's undisputed that Plymouth did not file the proof

11   of claim and/or seek approval of an extension until July 30th,

12   after the plan modification hearing.

13           Plymouth requests that the Court consider its

14   administrative claim timely on a number of different grounds,

15   although most of the focus, properly so, of this hearing, has

16   been on the ground of excusable neglect.  Before I deal with

17   that issue and those factors, let me briefly deal with the

18   other bases for Plymouth's requested relief.

19           First, Plymouth contends that the Court did not have

20   power to establish the administrative claims bar date, given

21   the treatment of the administrative claims bar date in the

22   original plan and the confirmation order.  The plan itself

23   contemplated, in the definition of "administrative claim," the

24   potential for establishing a different administrative claims

25   bar date than was set forth in the plan, which was a date

41

1     forty-five days after the confirmation of the plan.  The plan

2     also reserved fully the debtors' rights in the event that the

3     plan did not go effective, which clearly was the case.

4          That plan, as I noted, contemplated a very different

5     outcome for creditors than the current modified plan.  Not only

6     was there no issue of the payment of all administrative claims,

7     requiring no determination, as a practical matter, by the Court

8     as to feasibility for potential failure to cover administrative

9     claims, but also the plan provided for full payment of

10    unsecured creditors at a deemed plan value, and a substantial

11    return to shareholders.  Consequently, the plan's

12    administrative claims bar date provision was appropriate for

13    that structure -- again, one where there was really no issue as

14    to whether the debtors would be able to pay all asserted

15    administrative claims.

16         The confirmation order similarly provided for a forty-

17    five day post-confirmation administrative claims bar date and

18    stated that it would govern in light of -- in the event of a

19    conflict between the plan and the confirmation order.  And

20    clearly it was an extant order.  However, the debtors' need to

21    set an earlier bar date, given the changes to their plan, was

22    clear and required the establishment of a different bar date,

23    clearly, in the context of the deadlines they were facing.  The

24    Court considered such a request to be appropriate, both in

25    light of the rights that the debtors reserved for themselves

42

1    under the confirmed but not consummated plan, as well as under

2    the Court's ability to amend the confirmation order, which on

3    this point, was quite clearly outdated.

4        Therefore, I believe that Plymouth's argument that the

5    Court exceeded its authority in setting a new administrative

6    claims bar date order, and that Delphi and the other parties

7    should be governed in this respect by the terms of the

8    confirmed plan and the confirmation order entered in 2008, is

9    not well taken and is denied.

10        Next, Plymouth argues, as a matter of due process,

11   that the notice to it of the administrative claims bar date was

12   deficient.  It does so on two grounds.  The first is that it

13   asserts the debtors were involved in post-petition litigation

14   commenced by the debtors in state court in Michigan against

15   Plymouth as well as subsequent litigation commenced by a third

16   party in Massachusetts.  The second is that the debtors knew

17   that Plymouth was represented by counsel in that litigation,

18   and, therefore, that in addition to the other places that the

19   debtors provided Plymouth with notice, they should have

20   provided notice to litigation counsel in the Michigan and

21   Massachusetts litigation. It should be noted that those counsel

22   did not file a notice of appearance in the Chapter 11 case and

23   that, in fact, they have not appeared in the Chapter 11 case

24   until this current motion.

25        The motion relies upon, primarily, on this point, In

43

1    re Grand Union Company, 204 B.R. 864 (Bankr. D. Del. 1997), in

2    which the bankruptcy court concluded in that case that the

3    debtors' direct mailing of notice to personal injury tort

4    claimants represented by counsel was inadequate notice of the

5    bar date, and that the notice should have been provided to the

6    personal injury counsel that Grand Union was dealing with.

7    That case flies in the face of a number of cases in the Second

8    Circuit, including in the Southern District of New York, which

9    state that notice requirements under the Bankruptcy Code,

10   including in respect of bar dates (and notices of similar

11   consequence), do not have to be sent to counsel representing

12   the claimant, but may instead only be sent -- or need only,

13   instead, be sent to the claimant itself.  See, for example, In

14   re Brunswick Baptist Church v. Brunswick Baptist Church, 2007

15   U.S. Dist. LEXIS 3319 (N.D.N.Y. Jan. 16, 2007); In re

16   Alexander's Inc. 176 B.R. 715 (Bankr. S.D.N.Y. 1995); In re

17   R.H. Macy & Company Inc. 161 B.R. 355 (Bankr. S.D.N.Y. 1993);

18   and Dependable Insurance Company v. Horton, 149 B.R. 49 (Bankr.

19   S.D.N.Y. 1992).

20        I should note further that Judge Walsh, in the Grand

21   Union case, made it clear that he was focusing on the unique

22   facts before him, where he found that the claimants who

23   received the notice were unsophisticated and that all dealings

24   in respect of their claims had previously been through their

25   respective counsel.  Clearly, Plymouth is not an

44

1    unsophisticated tort claimant here.

2          Consequently, based on the rationale of the Brunswick

3    Church case and the other cases I've cited, I do not believe

4    that the debtors were required to give notice to counsel of

5    record in the pending litigation, particularly as, as I noted,

6    that counsel had not appeared in the Chapter 11 case.

7          In addition, Plymouth contends that it filed through

8    its counterclaim in the pending non-bankruptcy litigation an

9    informal proof of claim that should be recognized by the Court,

10   and clearly that that proof of claim was timely in that it was

11   well before -- the counterclaim was filed well before the

12   expiry of the administrative claims bar date.  The argument,

13   however, again runs afoul of case law in this district and the

14   majority of the cases, including at the circuit court level

15   elsewhere: that is, that the document giving rise to the

16   informal proof of claim was not filed in this Court, but

17   rather, instead, only in the courts in Michigan and in

18   Massachusetts.

19         I should note that the cases that deal with this issue

20   are generally dealing with pre-petition claims.  But given the

21   practice of treating claims and disputes related to missed bar

22   dates for administrative claims the same way as the courts

23   treat missed bar dates for pre-petition claims, I find those

24   claims to be analogous -- those cases, I'm sorry, to be

25   appropriate here, and for all intents and purposes on all

1    fours.  For the close analogy see -- between disputes in

2    respect of late administrative claims and disputes in respect

3    of late pre-petition claims, see In re PT-1 Communications Inc.

4    386 B.R. 402 (Bankr. E.D.N.Y. 2007).

5            The informal proof of claim rule, as far as I can see,

6    has always, in the Second Circuit and in the Southern District,

7    been applied to claims that were not filed in the form of a

8    proof of claim, but that were filed in the bankruptcy court,

9    that show an intention to make a demand for money from the

10   debtors' estate.  See In re G.L. Miller & Company Inc. 45 F.2d.

11   115 (2d Cir. 1930), as well as the statement of the four-factor

12   test -- factor one of which is that the claim, the documents

13   have been timely filed with the bankruptcy court and had become

14   part of the judicial record -- in In re Enron Corporation 370

15   B.R. 90 (Bankr. S.D.N.Y. 2007).

16           The rationale for this, again, is the collective

17   nature of a bankruptcy case and the need to put more than just

18   the debtor on notice of the existence of the claim.  See also

19   In re M.J. Waterman & Associates Inc. 227 F.3d. 604 (6th Cir.

20   2000), and In re Trans World Airlines Inc. 182 B.R. 102 (D.

21   Del. 1995), which was reversed in part and affirmed in part,

22   reversed on other grounds, at 96 F.3d. 687 (3d Cir. 1996).

23   Consequently, I don't believe that the complaint or the

24   counterclaim asserted in the Massachusetts District Court

25   action and the Michigan State Court action would constitute an

46

1    informal proof of claim.

2          Lastly, the movant contends that notice was improper

3    because it was delivered, albeit at the same address, to

4    Plymouth Rubber Company, Inc. as opposed to Plymouth Rubber

5    Company, LLC.  The change in name resulted from the Chapter 11

6    reorganization of Plymouth Rubber Company, Inc., which is the

7    entity that had filed the proof of claim against the debtor's

8    estate.  The emerged, reorganized debtor changed its name to

9    Plymouth Rubber Company, LLC as the successor to Plymouth

10    Rubber Company, Inc., and that was the entity, again at the

11    same address, with which the debtor contracted post-petition

12    under the contract that is now the subject of the dispute in

13    Michigan and Massachusetts.

14          Plymouth contends that because the notice was sent to

15    "Inc." as opposed to "LLC," albeit at the same address, that

16    notice was constitutionally deficient.  Under the facts before

17    me, however, I do not accept that argument.  As set forth in

18    Mr. Collins' affidavit and in the motion itself, Mr. Collins

19    was the sole employee of Plymouth Rubber after it had

20    determined to wind down its affairs.  He was retained by the

21    managing - or manager for Plymouth Rubber, LLC as well as the

22    manager for other investments owned by the fund that owned the

23    debtor, Versa Capital Management.  And I believe that, as

24    evidenced by the fact that Versa opened the notice and that

25    Versa had hired Mr. Collins to look after LLC's affairs, and

47

1    that, therefore, he was acting as Versa's agent in this matter,

2    there was sufficient actual notice as of July 9th for due

3    process purposes.

4         The issue then comes down to whether the late filing

5    of the proof of administrative claim should be permitted under

6    Bankruptcy Rule 9006 for excusable neglect.  A claims bar date

7    is an important milestone in most Chapter 11 cases, and clearly

8    here the administrative claims bar date was an important

9    milestone in this case for the reasons that I've already

10   stated.  See First Fidelity Bank N.A. v. Hooker Investments

11   Inc.(In re Hooker Investments Inc.), 937 F.2d. 833, 840 (2d

12   Cir. 1991), in which the Court said, "A bar order does not

13   function merely as a procedural gauntlet, but as an integral

14   part of the reorganization process."  See also In re Musicland

15   Holding Corporation, 356 B.R. 603, 607 (Bankr. S.D.N.Y. 2006).

16        In most cases, the filing of a bar date order and the

17   existence of a bar date enables the debtor and other

18   constituents to determine whether the projected payments under

19   a plan will actually satisfy the parties' expectations; and, in

20   particular, an administrative claims bar date enables the

21   parties to determine whether the plan they're proposing is

22   feasible, in that administrative claims need to be paid in full

23   for a plan to be confirmed and consummated.

24        Nevertheless, the bankruptcy court may enlarge the

25   time for filing proofs of claim where the failure to act was

1    the result of excusable neglect, under Bankruptcy Rule

2    9006(b)(1).  The U.S. Supreme Court has adopted a two-part

3    framework for the movant to establish its excusable neglect

4    under Rule 9006(b)(1).  The movant has the burden in this

5    regard.  See Midland Cogeneration Venture Limited Partnership

6    v. Enron Corporation 419 F.3d. 115, 121 (2d Cir. 2005).

7           That framework was set forth in Pioneer Investment

8    Services Company v. Brunswick Associates Limited Partnership,

9    507 U.S. 380 (1993).  First a failure to file the proof of

10   claim must have been caused by neglect, which the Court defined

11   as inadvertence, mistake or carelessness, including intervening

12   circumstances beyond the party's control.  Id. at 388.  A

13   tactical, or simply a knowing, decision not to file a timely

14   claim will not suffice.

15          Second, the movant's neglect must have been excusable,

16   which is to be determined in the exercise of the Court's

17   equitable discretion taking into account all relevant

18   circumstances surrounding the failure to file a timely claim,

19   id. at 395, guided, however, by the following four factors:

20   "the danger of prejudice to the debtor; the length of the delay

21   and its potential impact on judicial proceedings; the reason

22   for the delay, including whether it was within the reasonable

23   control of the movant; and whether the movant acted in good

24   faith." Id.

25          The Second Circuit has taken a "hard line" when

49

1   applying the Pioneer factors to motions under Rule 9006(b)(1)

2   and other federal rules premised on excusable neglect.  Again,

3   see In re Enron Corporation 419 F.3d at 122.  Although all four

4   Pioneer factors should be considered, the Second Circuit places

5   the greatest weight on the reason for the delay and whether it

6   was in the movant's reasonable control.  In re Musicland

7   Holdings Corp. 356 B.R. at 607.

8          In the normal case, the movant has acted in good

9   faith, for example, and that's the case here.  Thus, the Second

10  Circuit said, "In the typical case, three of the Pioneer

11  factors, the length of the delay, the danger of prejudice and

12  the movant's good faith, usually weigh in favor of the party

13  seeking the extension.  We and other circuits have focused on

14  the third factor, the reason for the delay, including whether

15  it was within the reasonable control of the movant.  The

16  equities will rarely, if ever, favor a party who fails to

17  follow the clear dictates of a Court rule.  Where the rule is

18  entirely clear, we continue to expect that a party claiming

19  excusable neglect will, in the ordinary course, lose under the

20  Pioneer test."  In re Enron Corporation 419 F.3d at 122-23; see

21  also Canfield v. Van Atta Buick/GMC Truck Inc. 127 F.3d 248,

22  250-51(2d Cir. 1997).

23         Factors other than the reason for the delay usually

24  are relevant, therefore, only in close cases. In re Musicland

25  Holdings Corporation 356 B.R. at 608.  This is a somewhat close

50

1    case, in that I accept that Plymouth Rubber was clearly in

2    wind-down mode, where it only had one employee, who, consistent

3    with the very limited nature of its operations (which from

4    Mr. Collins' affidavit, which is uncontroverted, pertained

5    almost entirely to the two pending litigations) meant that

6    Mr. Collins checked the post office box only roughly once every

7    two weeks.  In addition, the time for the bar date notice was

8    shortened here from the normal time that would usually be

9    provided.  And, finally, there was potentially some room for

10   confusion, given that the notice was addressed to "Inc." as

11   opposed to "LLC."

12           On the other hand, I find it very hard to understand

13   why, given Mr. Collins' sole function, which appears to be to

14   monitor the mail, and the fact that he did so only roughly once

15   every two weeks, he did not open the mail, but instead simply

16   forwarded it to Mr. Schultz of Versa.  It would not seem to me

17   that he should have done that, given that Plymouth had

18   established the P.O. box that he checked as opposed to setting

19   up an automatic forwarding from Plymouth's address to Versa's.

20   It would appear, instead, to me appropriate for Mr. Collins to

21   have acted as someone who actually read the mail as opposed to

22   as a second mailman for delivery purposes.

23           So, clearly, it was within Plymouth's control to have

24   had notice of the bar date, at least by July 9th.  Moreover,

25   Plymouth did not file its claim until after the hearing on plan

51

1    modification, which it needn't have waited for.  It had the

2    claim or was aware of the late claim issue on July 16th, but,

3    nevertheless, waited two weeks thereafter to do so.  So, all

4    things being considered, it appears to me that while this is a

5    somewhat close case, the neglect here was largely within the

6    control of Plymouth.

7             Secondly, while the time between the bar date and the

8    filing of the claim was relatively short, I conclude that there

9    was prejudice to the debtor and other parties that resulted

10   from the delay.  If, in fact, the responsibility for paying

11   this administrative claim, to the extent it is allowed, rested

12   with either GM or the DIP lender acquisition vehicle, it would

13   appear to me, particularly given the balance of factors on

14   whether the delay was within Plymouth's control, that the lack

15   of prejudice to the estate would have argued for letting the

16   claim be filed late.  (The fact that some party receives a

17   smaller distribution or another third party pays more money as

18   a result of a claim being allowed to be filed late is not

19   sufficient prejudice, it is not the type of prejudice that the

20   courts have in mind when they evaluate the prejudice factor

21   under Pioneer.)

22            However, here, I believe there is prejudice to the

23   estate.  And also, again, some blame should be laid on Plymouth

24   for causing this prejudice by not filing the claim until after

25   the plan modification hearing.  As represented by Mr. Butler,

52

1   who clearly was involved in the preparation for the plan

2   modification hearing and the debtors' efforts to determine

3   whether, in fact, the MDA would result in a feasible plan, the

4   calculation of likely administrative claims against a surviving

5   debtor entity was a key factor in moving forward with the

6   hearing on July 29th.

7            It's been stated that a demand number under the

8   counterclaim by Plymouth is approximately twenty million

9   dollars.  That number would have had a significant impact on

10  the debtors' presentation of the modification of the plan on

11  July 29th and the Court's consideration of whether the plan is

12  feasible or was feasible, and would have, if asserted as a

13  recovery against the debtors -- the surviving debtors, as an

14  administrative claim it could have had a very significant

15  impact on feasibility.  Consequently, it would appear to me

16  that although the delay was short, it was very significant, and

17  that both the debtors as well as the other parties to the MDA,

18  and ultimately the Court, moved ahead in reliance on that claim

19  not being asserted.

20           So, that prejudice, as well as my conclusion that the

21  lateness of the claim, first in terms of its being verbally

22  asserted only on July 16th and then actually formally asserted

23  after the plan modification hearing, was largely, if not

24  entirely, within the control of Plymouth, leads me to deny

25  Plymouth's motion.

53

1        Obviously, to the extent that it is asserting a right

2   to setoff or recoupment, the lateness of the claim should not

3   matter, so that what this ruling effectively does is preclude

4   Plymouth from an affirmative recovery against the debtor's

5   estate as opposed to, again, a recoupment or setoff right in

6   the Michigan and Massachusetts litigation.

7        So Mr. Butler, you can submit an order to that effect.

8        MR. BUTLER:  Yes, Your Honor.

9        THE COURT:  Okay.

10       MR. BUTLER:  Your Honor, the last matter on the agenda

11  for today, matter number 8, is a motion for authority to apply

12  the claims objection procedures to administrative expense

13  claims, filed at docket number 18715.  Your Honor, by this

14  motion, what we're seeking to do is to use the claims

15  procedures that Your Honor is familiar with, that have been

16  running on a separate claims track for the last two and a half

17  years, to apply those to administrative claims.  And I think it

18  goes without saying that the -- and I think Your Honor has

19  observed in the past, that the procedures that have been

20  adopted by the Court here back on December 7th of 2006 at

21  docket number 6089, have served the debtors well and have dealt

22  with an expeditious treatment of almost 17,000 proofs of claim,

23  and through some 34 omnibus claims objections that addressed

24  over 14,000 of those claims, and have resulted in the

25  disallowance or withdrawal of over 10,000 of those claims.  So