BARNES & THORNBURG LLP
Attorneys for Bank of America, N.A.
171 Monroe Avenue, NW, Suite 1000
Grand Rapids, MI 49503
Telephone: (616) 742-3930
Facsimile: (616) 742-3999

Patrick E. Mears (PM-6473)
Telephone: (616) 742-3936
Email: pmears@btlaw.com

Damon R. Leichty (*pro hac vice* pending)
Telephone: (574) 233-1171
Email: dleichty@btlaw.com

Sarah Quinn Kuhny (*pro hac vice* pending)
Telephone: (574) 233-1171
Email: skuhny@btlaw.com

Hearing Date: 5/26/2011
At: 10:00 a.m.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) ) | Chapter 11 Case |
| DELPHI CORPORATION, *et al*. | ) ) ) | No. 05-44481 |
| Debtors. | ) ) | (Jointly Administered) |

**BANK OF AMERICA, N.A.'S SUPPLEMENTAL RESPONSE TO CLAIMS
OBJECTION OF REORGANIZED DEBTORS AND TO REORGANIZED DEBTORS'
STATEMENT OF DISPUTED ISSUES WITH RESPECT TO PROOF OF
ADMINISTRATIVE CLAIM NOS. 19069, 19087, 19088, 19123, 19124, 19125, 19602,
<u>19603, 19604, 19815, 19816 and 19817 filed by BANK OF AMERICA, N.A.</u>**

Bank of America, N.A. (the "Bank" or "Claimant"), by and through its undersigned counsel, submits its supplemental response to the objection to the Bank's administrative claims numbered 19069, 19087, 19088, 19123, 19124, 19125, 19602, 19603, 19604, 19815, 19816 and 19817 (collectively, the "Claims") filed by DPH Holdings Corp. and certain of its affiliated reorganized debtors in the above-captioned cases (collectively, the "Reorganized Debtors"). The

Reorganized Debtors' objection to Claim No. 19088 is set forth in their Thirty-Seventh Omnibus Objection to Claims dated October 15, 2009 (the "Thirty-Seventh Claims Objection"; Doc. No. 18984) and to Claim Nos. 19069, 19087, 19123, 19124, 19125, 19602, 19603, 19604, 19815, 19816, and 19817 in their Forty-Seventh Omnibus Objection to Claims dated April 16, 2010 (the "Forty-Seventh Claims Objection"; Doc. No. 19873 and referred to with the Thirty-Seventh Claims Objection simply as the "Claims Objections"). To supplement its responses to the Claims Objections filed on October 27, 2009 (Doc. No. 19018), as amended on November 2, 2009 (Doc. No. 19022) and on May 11, 2010 (Doc. No. 20018, 20019, 20020, 20022, 20023, 20024, 20025, 20026 and 20028), the Bank states as follows:

## FACTUAL AND PROCEDURAL BACKGROUND

1.      On October 8 and 14, 2005, Delphi Corporation and certain of its affiliates including Delphi Automotive Systems, LLC ("DASLLC") and Delphi Automotive Systems Human Resources, LLC (collectively, the "Debtors"), who are the predecessors of the Reorganized Debtors, filed voluntary petitions with this Court for reorganization relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101-1330, as then amended (the "Bankruptcy Code").

2.      Prior to the commencement of these Chapter 11 cases, Fleet National Bank, the predecessor-in-interest to Claimant, leased two aircraft, engines and related avionics (collectively, the "Aircraft"), to SM5105 LLC, a Delaware limited liability company and predecessor-in-interest to Delphi Automotive Systems Human Resources, LLC ("Delphi HR"). One of the Aircraft was a Learjet 60 Aircraft (the "Learjet") and the other Aircraft was a Bombardier Challenger 604 Aircraft (the "Challenger," together with the Learjet referred to as, the "Aircraft"). The specifics of these two Aircraft leases (hereinafter collectively referred to as

2

the "Aircraft Leases") are described in detail in the exhibits to the Claims filed by the Bank (Exhibits A and F to each Claim).

3. Pursuant to the terms of the Aircraft Leases, Delphi HR granted to the Bank, as security for the performance of Delphi HR of its obligations under those leases, security interests and liens in the tangible and intangible property of Delphi HR including the following:

    a. all subleases, management agreements, interchange agreements, charter agreements, purchase orders or agreements, aircraft leases and/or other agreements of any kind whatsoever relating to any of the foregoing or to any other goods, documents, things or items described in financing statements filed in the State of Delaware and the proceeds thereof;

    b. all security deposits in connection with the Aircraft Leases;

    c. all present and future goods, accounts, chattel paper, documents, instruments, general intangibles, investment property, deposit accounts, letter of credit rights and supporting obligations relating to the Aircraft Leases and the personal property relating to these leases;

    d. all proceeds of any of the foregoing property; and

    e. all documents, books and records, and other information no matter where stored relating to the Aircraft Leases.

The foregoing property serving as collateral is hereinafter described as the "Ancillary Personal Property."

4. Payment and performance of the obligations of Delphi HR under the Aircraft Leases were guaranteed in writing by DASLLC and Delphi Corporation (collectively, the "Guarantors") pursuant to the terms of certain written guaranties executed by them for the benefit of the Bank.

5. As of the dates on which these Chapter 11 cases were commenced, the Aircraft Leases were in full force and effect and Delphi HR was in possession of the two Aircraft and Ancillary Personal Property. During the terms of the Aircraft Leases prior to October 8, 2005, Delphi HR was party to charter agreements concerning the two Aircraft pursuant to which the

3

Learjet and Challenger were chartered from time to time to third parties in return for rents and/or other charges payable to Delphi HR. These payments and the underlying obligations to make these payments by third parties falls within the category of "Ancillary Personal Property" and served as collateral for the Bank under the terms of the Aircraft Leases.

6. On November 11, 2005, the Bank filed with this Court its "Motion (I) to Provide Adequate Protection of Security Interest in Collateral; and (ii) to Terminate the Automatic Stay With Respect to Cash Collateral," (Doc. No. 1022; the "Adequate Protection Motion"). The Adequate Protection Motion addressed the Aircraft and the stream of revenues generated by Delphi HR's leasing/chartering of the Aircraft to third parties as described above. Delphi HR and the Guarantors thereafter objected to the Adequate Protection Motion (Doc. No. 1269). Ultimately, this contested matter was resolved pursuant to the terms of a certain "Consent Order Resolving Motion by Bank of America, N.A. for Adequate Protection Replacement Liens" entered by this Court on January 12, 2006 (Doc. No. 1805; the "Adequate Protection Order"). The Adequate Protection Order required Delphi HR to deposit into a segregated account all of the "Aircraft Cash Collateral" (as that term is defined in the order) minus the "agreed upon monthly expenses." The Adequate Protection Order confirmed the Bank's first priority security interest in all cash deposits made and to be made into this account (the "Cash Collateral Account").

7. On or about July 27, 2006, the Bank properly and timely filed three proofs of claim in these Chapter 11 cases, which were assigned claim numbers 11317, 11470 and 11457 ("Pre-Confirmation Proofs of Claim"). These claims were filed in the cases of Delphi HR, DASLLC and Delphi Corporation. The proof of claim filed in the Delphi HR case asserted a

4

security interest and lien in the monies then on deposit and to be deposited in the future in the Cash Collateral Account.

8.  On May 22, 2007, the Debtors objected to allowance of the Pre-Confirmation Proofs of Claim in their "Fifteenth Omnibus Objection (Substantive) Pursuant to 11 U.S.C. Section 502(b) and Fed. R. Bankr. P. 3007 to Certain (A) Insufficiently Documented Claims, (B) Claims Not Reflected on Debtors' Books and Records, (C) Untimely Claims and Untimely Tax Claim, and (D) Claims Subject to Modification, Tax Claims Subject to Modification, and Modified Claims Asserting Reclamation," which objection, hereinafter referred to as the "Fifteenth Omnibus Claims Objection," was assigned Doc. Number 7999 by this Court.

9.  On June 19, 2007, the Bank timely filed and served its Response to the Fifteenth Omnibus Claims Objection (Doc. No. 8309; the "Response to Fifteenth Omnibus Claims Objection"). As of that date, the Debtors had neither assumed nor rejected the Aircraft Leases.

10.  The Fifteenth Omnibus Claims Objection and the Response to Fifteenth Omnibus Claims Objection was resolved pursuant to the terms of a certain "Joint Stipulation and Agreed Order to Withdraw Without Prejudice Proofs of Claim 11317, 11470 and 11457 (Bank of America, N.A.)," (Doc. No. 9278; the "Joint Stipulation").

11.  Paragraph 1 of the Joint Stipulation provides that the Pre-Confirmation Proofs of Claim were withdrawn by Bank of America "without prejudice." Paragraph 2 of the Joint stipulation states that, in the event that the one or both of the Aircraft Leases were rejected by Debtors, then the Pre-Confirmation Proofs of Claim would be "automatically reinstated as timely filed claims without further notice or action required by [the Bank], subject to objection other than as to timeliness and/or prejudice arising from the withdrawal and/or reinstatement of the [Pre-Confirmation Proofs of Claim] pursuant to this Stipulation, and [the Bank] shall not have

5

been prejudiced by the withdrawal and/or reinstatement" of the Pre-Confirmation Proofs of Claim.

12. On December 10, 2007, the Debtors filed their first amended joint plan of reorganization (Doc. No. 11386) (the "Plan") and related disclosure statement (Doc. No. 11388). The Court entered an order confirming the Plan (as modified) (Doc. No. 12359) the ("Confirmation Order") on January 25, 2008. The Plan at that time contemplated that the Aircraft Leases would be assumed by the Debtors.

13. On October 3, 2008, the Debtors filed a motion under 11 U.S.C. §1127 for the entry of an order approving (i) certain modifications to the confirmed Plan and related disclosure statement; and (ii) related procedures for re-soliciting votes on the confirmed plan, as modified (Doc. No. 14310)(the "Plan Modification Motion"). On June 1, 2009, the Debtors filed a supplement to the Plan Modification Motion (Doc. No. 16646), which sought approval of (i) certain modifications to the confirmed Plan (the "Modified Plan"), (ii) supplemental disclosure; and (iii) procedures for re-soliciting votes on the Modified Plan. The Modified Plan now contemplated and provided for rejection of the two Aircraft Leases.

14. On July 30, 2009, this Court entered an order approving the Modified Plan (Doc. No. 18707) on July 30, 2009. On October 6, 2009, the Effective Date of the Modified Plan the Aircraft Leases were rejected. Consequently, in accordance with the Joint Stipulation, the Bank's Proofs of Claim 11317, 11470 and 11457 have been reinstated.

15. Section 5.1 of the Modified Plan provides that the partially secured claim of the Bank against Delphi HR, which collateral includes the funds in the Cash Collateral Account, will be treated as such under the terms of the Modified Plan and that the security interest in these funds continues unabated after the Effective Date of the Modified Plan.

6

16. After the Effective Date of the Modified Plan (*viz.*, October 6, 2009), the Debtors returned the Aircraft to the Bank but still retained the funds on deposit in the Cash Collateral Account subject to the Bank's valid, perfected and first priority security interests therein. Upon information and belief, the amount on deposit in the Cash Collateral Account is a sum not less than $1,211,000. This amount on deposit in this account has been confirmed periodically by the Reorganized Debtors to the Bank after the Modified Plan's Effective Date.

17. Between the dates on which these Chapter 11 cases were commenced until the date(s) on which the Aircraft were returned to the Bank, the Debtors used the Aircraft for their own benefit and leased/chartered the Aircraft to third parties for their benefit.

## BASES FOR ADMINISTRATIVE EXPENSE CLAIMS

18. Rejection of the Aircraft Leases is deemed to have occurred as of October 8, 2005.

19. The Bank holds an administrative expense claim, a portion of which is a superpriority administrative expense claim, in these Chapter 11 cases that arose from the losses suffered by the Bank after October 8, 2005 under the Aircraft Leases. As of November 2, 2009, when the Bank filed its last set of administrative expense claims, these postpetition losses totaled an amount not less than $10,633,035.00[1] and consisted of the following elements.

### Administrative Maintenance Claims

The Learjet Aircraft Lease contains a "Maintenance and Return Addendum" dated as of March 30, 2001 (Exhibits A and F to Claims), that requires the Debtors to maintain the Learjet during the term of the lease and to return the Learjet to the Bank at the end of the lease in a certain condition. This Addendum specifies precisely what maintenance and repairs to the

---

[1] Since that date, the Bank has adjusted the total amount of the administrative expense claims for which it is seeking payment. See the Conclusion below.

7

Learjet must be made by the Debtors during the lease term and at its end. *Id*. After return of the Learjet by the Debtors to the Bank, the Bank inspected the aircraft. The Debtors' obligations under the Learjet Addendum for events that occurred after the Petition Date amount to $66,894.70, all of which relates to Mid-Life Condition and Inspection and Maintenance Requirement (as such terms are defined in Stuart Schwartz's Affidavit). Details of the Bank's calculations are addressed in the Affidavit of Stuart Schwartz that accompanies this Supplemental Response. The Bank reserves its right to assert additional items of expense recoverable by it. The Bank also asserts a superpriority administrative expense claim for this amount under 11 U.S.C. § 507(b) to the extent that it is not paid from the funds on deposit in the Cash Collateral Account.

  The Challenger Aircraft Lease contains a "Maintenance and Return Addendum" dated as of March 30, 2001, that requires the Debtors to maintain the Challenger during the term of the lease and to return the Challenger to the Bank at the end of the lease in a certain condition. This Addendum specifies precisely what maintenance and repairs to the Challenger must be made by the Debtors during the lease term and at its end. After return of the Challenger by the Debtors to the Bank, the Bank inspected the aircraft and asserts that the Debtors' obligations under this Addendum for events that occurred after the Petition Date amount to $521,947.47, all of which relates to Mid-Life Condition and Inspection and Maintenance Requirement (as such terms are defined in Stuart Schwartz's Affidavit). Details of the Bank's calculations are addressed in the Affidavit of Stuart Schwartz that accompanies this Supplemental Response. The Bank reserves its right to assert additional items of expense recoverable by it. The Bank also asserts a superpriority administrative expense claim for this amount under 11 U.S.C. § 507(b) to the extent that it is not paid from the funds on deposit in the Cash Collateral Account.

**Administrative Diminution Claim**

During the pendency of these Chapter 11 cases while Delphi HR refused to return and instead used the Learjet, the value of the Learjet decreased dramatically. A valuation was done and during this period, the Learjet decreased in value by approximately $2,150,816 more than the Bank was compensated for by payments made by the Debtors to the Bank under the lease. Details of the Bank's calculations are contained in the Affidavit of John Prock and exhibits thereto. The Bank also asserts a superpriority administrative expense claim for this amount under 11 U.S.C. § 507(b) to the extent that it is not paid from the funds on deposit in the Cash Collateral Account.

The Bank believes that, during the pendency of these Chapter 11 cases while Delphi HR refused to return and used the Challenger, the value of the Challenger decreased dramatically. Claimant estimates that during this period, the Challenger decreased in value by approximately $3,876,792 more than the Bank was compensated for by payments made by the Debtors to the Bank under the lease. Details of the Bank's calculations are contained in the Affidavit of John Prock and exhibits thereto. The Bank also asserts a superpriority administrative expense claim for this amount under 11 U.S.C. § 507(b) to the extent that it is not paid from the funds on deposit in the Cash Collateral Account.

**Claim for Remarketing Fees**

Pursuant to Schedule 2-A to Lease Supplement No. 1 and Section II(a) of the Maintenance and Return Addendum to the Learjet Aircraft Lease (Exhibits A and F to Claims), the Debtors agreed to pay a remarketing fee for the Learjet upon its return to the Bank. The Bank has calculated this amount to be $1,001,268.00, which is 9% of the $11,125,200 Lessor's Cost of the Learjet.

Pursuant to Schedule 2-A to Lease Supplement No. 1 and the Maintenance and Return Addendum to the Challenger Aircraft Lease, the Debtors agreed to pay a remarketing fee for the

9

Challenger upon its return to the Bank. The Bank has calculated this amount to be $1,690,483.20, which is 7% of the $24,149,760 Lessor's Cost of the Challenger. The Bank has since determined not to seek administrative expense status for these claims but continues to assert that these claims are proper secured or unsecured prepetition claims.

20.     The Debtors may be entitled to certain credits against the Bank's prepetition claims arising from the following events, some of which were not described in the Claims. These credits are as follows:

   a.  September 2009 Rent Payment. On September 20, 2009, Bank received a rent payment of $252,228.46 for rental charges due under the Aircraft Leases. However, the Effective Date of the Modified Plan occurred on October 6, 2009, and the Learjet and Challenger were thereafter returned by Delphi HR to the Bank. The Bank has retained this entire rental payment pending this Court's determination of the various objections to the Bank's proofs of claim and requests for payment of administrative expenses filed in these Chapter 11 cases.

   b.  Sale of Learjet. On December 29, 2009, Bank sold the Learjet to a third party for $4,272,500. The Bank had $115,170.22 of expenses associated with this sale. Therefore, the net disposition proceeds for the Learjet total $4,157,429.78. The Bank has included this amount in its calculations contained in the Affidavit of John Prock to reduce its Administrative Diminution Claim.

   c.  Lease of Challenger. On April 21, 2010, the Bank leased the Challenger to a third party for a sixty month term with monthly rental payments of $76,767.51. The Bank believes the value of the disposition of the Challenger is $12,975,000.00[2], based upon market estimates. The Bank incurred $499,654.48 in expenses in disposing of the Challenger by means of this third-party lease and also spent $675,000 on improvements in order to lease the Challenger. Therefore, net proceeds of the disposition of the Challenger total $11,800,345.52. The Bank has included this amount in its calculations to reduce its Administrative Diminution Claim.

## ARGUMENT

---

[2] Section 14(a)(ii) of the Challenger Lease provides a method for valuing proceeds of a disposition by lease. This methodology would value the proceeds of the actual disposition by lease at $3,899,527.61. This understates the credit that should be given to the Debtors. The Bank therefore used methodology based on current market conditions.

**Burden of Proof for Administrative Claims**

11 U.S.C. §503(b)(1)(A) allows as administrative expenses, the actual, necessary costs and expenses of preserving the estate. This grant of priority to such expenses is to facilitate the debtor in possession to "rehabilitate the business for the benefit of all the estate's creditors." *Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986); *see also In re Wordlcom, Inc.*, 308 B.R. 157, 165 (Bankr. S.D.N.Y. 2004). Without this treatment, creditors would not conduct business with a debtor, thus inhibiting rehabilitation of the business and harming all creditors. *McFarlin's*, 789 F.2d at 101; *In re Worldcom, Inc.*, 308 B.R. at 165.

The burden of proving entitlement to administrative priority lies with the party asserting it. *In re Bethlehem Steel Corp. (Supplee v. Bethlehem Steel Corp.)*, 479 F.3d 167, 172 (2d Cir. 2007); *In re Patient Educ. Media, Inc.*, 221 B.R. 97, 101 (Bankr. S.D.N.Y. 1998). Entitlement must be demonstrated by a preponderance of the evidence. *In re Drexel Burnham Lambert Group*, 134 B.R. 482, 489 (Bankr. S.D.N.Y. 1991).

"A claim must meet two requirements under section 503(b)(1)(A): (1) it must arise out of a postpetition transaction between the creditor and the…debtor…and (2) be allowable only to the extent that the consideration supporting the claimaint's rights to payment was both supplied to and beneficial to the debtor's estate in the operation of its business." *In re A.C.E. Elevator Co., Inc.*, 347 B.R. 473, 480 (Bankr. S.D.N.Y. 2006)(internal quotation marks and citations omitted); *In re Patient Educ. Media, Inc.*, 221 B.R. at 101. "The focus on allowance of a priority is to prevent unjust enrichment of the estate." *In re Worldcom, Inc.*, 308 B.R. at 166. A court will look to the actual benefit conferred upon the estate. *Id.*

**The Bank is Entitled to an Administrative Claim for Maintenance and Repair Claims**

From the Petition Date in 2005 through the Rejection Date in 2009, the Debtors retained possession and use of the Aircraft. "If the debtor-in-possession elects to continue to receive

11

benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984). Further, 11 U.S.C. §365(d)(3) "requires a debtor-in-possession to timely perform all obligations of the debtor…notwithstanding section 503(b)(1) of this title…Expenses arising out of this performance are entitled to automatic administrative expense status." *In re B H S&B Holdings LLC*, 426 B.R. 478 (Bankr. S.D.N.Y. 2010) (internal quotations and citations omitted). The Debtors elected to retain and use the Aircraft in conducting their business for nearly four years while deciding whether to assume or reject the underlying Aircraft Leases; therefore, the Bank is entitled to recover the maintenance costs it incurred for the Aircraft upon their return, pursuant to the lease terms, as an administrative expense. *Id.*; *See also In re Patient Educ. Media, Inc.*, 221 B.R. at 102.

Courts have held that where, as here, debtors have failed to properly store, maintain and repair leased equipment, the lessor is entitled to an administrative expense claim. See, e.g., *In re Hayes Lemmerz Int'l, Inc.,* 340 B.R. 461 (Bankr. Del. 2006); *In re United Trucking Serv., Inc. (United Trucking Service, Inc. v. Trailer Rental Co.)*, 851 F.2d 159 (6th Cir. 1988). *See also In re Trans World Airlines Inc.*, 145 F.3d 124, 141-143 (3d Cir. 1998). For instance, in *United Trucking*, the Sixth Circuit Court of Appeals imposed administrative expense liability on the debtor for these repair costs:

> [Debtor's] asserted failure to maintain and repair the trailers in accord with the lease obligation allowed United, the debtor, to use the money saved and not paid for [Creditor's] benefit as contemplated under the lease, to continue its operations. This breach and misuse of [Creditor's] trailers did benefit the bankrupt estate.

*In re United Trucking Serv., Inc*., 851 F.2d at 162. By failing to make these repairs, the debtor freed up monies for payment for postpetition goods and services, thereby benefiting the debtor's estate. *Id*.

12

DASHR consciously elected to retain the Aircraft for use in conducting their businesses for nearly four years before rejecting the Aircraft Leases. As a consequence of this decision, DASHR became obligated to pay the Bank, as an administrative claim, the costs the Bank incurred for the performing repairs and required maintenance that the Debtors failed or refused to do so. The monies that DASHR conserved by not making these repairs and providing other maintenance were undoubtedly used to pay other postpetition obligations. As demonstrated by the Affidavit of Stuart Schwartz and supporting exhibits, the Debtors are obligated to the Bank as administrative expenses for repairs and maintenance on the Learjet in the amount of $66,894.70 and $521,947.47 for repairs and maintenance on the Challenger for a total administrative expense of $588,842.17.

## Diminution in Value of the Aircraft

DASHR had possession and control of the Learjet and Challenger from the date it commenced its Chapter 11 case, *viz.*, October 8, 2005, to the date on which it surrendered the Aircraft to the Bank, which occurred shortly after the Delphi Chapter 11 plan's effective date of October 6, 2009. During this four-year period, the DASHR had full use of the planes and permitted them to be chartered by third parties.

On November 11, 2005, the Bank filed its motion for adequate protection and for relief from the automatic stay (Dkt. No. 1022). Section 363(e) specifically protects lessors of personal property against postpetition depreciation in the value of leased property. DASHR opposed this motion and, after a hearing, the Bank and DASHR entered into a Consent Order Resolving the motion (Dkt. No. 1805) (the "Consent Order"). The Consent Order explicitly recognized the validity, perfection and first priority status of the Bank's security interest all charter revenues received by DASHR and directed their deposit (less agreed upon monthly expenses) into the

Cash Collateral Account. At present, the amount of cash collateral in this account exceeds $1,211,000. Not only were these funds segregated for adequate protection but they constitute "proceeds" of the Bank's prepetition collateral under section 9-315 of the Uniform Commercial Code and section 552(b)(1) of the Bankruptcy Code. In addition, the Bank's first priority security interest in these collateral proceeds was continued post-confirmation in these proceeds was specifically continued pursuant to section 5.1 of Delphi's First Amended Joint Plan of Reorganization. See, e.g., *In re Bennett Funding Group, Inc.,* 255 B.R. 616, 631 n.12 (N.D.N.Y. 2000) ("It is clear to the [c]ourt, and none of the parties contest" that lease payments flowing from office equipment leases are "proceeds" from the underlying collateral (i.e., leases subject to a perfected security interest) in accordance with the terms of section 552(b)(1)); *In re Keneco Financial Group, Inc.*, 131 B.R. 90, 94 (Bkrtcy. N.D. Ill. 1991) (if a creditor has a perfected security interest in an equipment lease, then the payments generated by such lease constitutes "proceeds" in which the creditor also has a perfected security interest under section 552(b)(1)).

As described above, the value of the Aircraft declined precipitously during the four-year post-petition and preconfirmation period by an amount not less than $6,027,608. Because the funds in the Cash Collateral Account were deposited for adequate protection purposes, and because this adequate protection measure was insufficient to protect against the diminution in value of the Aircraft postpetition, the remaining balance of the administrative diminution claim after application of the cash collateral funds should be treated as a superpriority administrative expense claim under 11 U.S.C. § 507(b). See generally *LNC Investments, Inc. v. First Fidelity Bank*, 247 B.R. 38 (S.D.N.Y. 2000); *Vincent Properties, Inc. v. Five Star Partners, L.P. (In re Five Star Partners, L.P.)*, 193 B.R. 603 (Bankr. N.D. Ga. 1996). Alternatively, the funds in the Cash Collateral Account constitute "proceeds" of collateral subject to the first priority security

14

interest of the Bank and should be applied to reduce this administrative expense claim or any other allowed claims held by the Bank.

## Conclusion

The Bank holds a total administrative expense claim allowable and payable under 11 U.S.C. 503(b)(1) against Delphi Corporation in the sum of $6,616,450.17.  To the extent that the Bank's entire claim of $6,616,450.17 is not satisfied by the turnover and application of the Cash Collateral, then the remaining balance of this claim should be granted superpriority status under 11 U.S.C. § 507(b).  Bank hereby reserves all of its rights and interests with respect to its remaining proofs of claim filed in these Chapter 11 cases.

WHEREFORE, Bank of America, N.A., respectfully requests that this Court enter an Order

   (i)   denying in its entirety the Claim Objection of the Reorganized Debtors to the Bank Administrative Expense Claim;

   (ii)  allowing the Bank Administrative Expense Claim as an administrative expense claim under 11 U.S.C. §§ 503(b)(1) and 507(a)(1) in an amount not less than $6,616,450.17;

   (iii) directing the turnover of all Cash Collateral to the Bank for application on the Bank Administrative Expense Claim

   (iv)  allowing the remainder of the Bank Administrative Expense Claim not satisfied by the application of Cash Collateral as a superpriority administrative expense claim under 11 U.S.C. § 507(b); and

   (v)   granting such other and further relief as may be just and proper under the circumstances of this case.

Dated: April 14, 2011                              BARNES & THORNBURG LLP
                                                   Attorneys for Bank of America, N.A.


                                                   By:    /s/Patrick E. Mears
                                                          Patrick E. Mears (PM-6473)
                                                          Damon R. Leichty, Esq.
                                                          Sarah Q. Kuhny, Esq.

                                                   Business Address:
                                                   171 Monroe Avenue, NW
                                                   Suite 1000
                                                   Grand Rapids, MI  49503
                                                   Telephone:  (616) 742-3936
                                                   Facsimile:  (616) 742-3999
                                                   pmears@btlaw.com