Westlaw

Page 1

--- B.R. ----, 2011 WL 1833244 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 1833244 (Bkrtcy.S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States Bankruptcy Court,
S.D. New York.
In re OLD CARCO LLC (f/k/a Chrysler LLC), et al.,
Debtors.
The Liquidation Trust, Plaintiff,
v.
**Daimler AG**, et al., Defendants.

Bankruptcy No. 09–50002 (AJG).
Adversary No. 09–00505 (AJG).
May 12, 2011.

Shearman & Sterling LLP, by Alan S. Goudiss, Esq., James L. Garrity, Jr., Esq., Jaculin Aaron, Esq., Paula H. Anderson, Esq., K. Mallory Tosch, Esq., New York, NY, for Daimler Entities.

Bois, Schiller & Flexner LLP, by Jonathan D. Schiller, Esq., William S. Ohlemeyer, Esq., Tricia J. Bloomer, Esq., New York, NY, for Daimler Entities.

Susman Godfrey L.L.P., by Stephen D. Susman, Esq., Jacob W. Buchdahl, Esq., Edgar G. Sargent, Esq., Suyash Agrawal, Esq., Houston, TX, for Liquidation Trust.

Stutzman, Bromberg, Esserman & Plifka, P.C., by Sander L. Esserman, Esq., Peter T. Brousseau, Esq., Peter D'Apice, Esq., Dallas, TX, for Trust.

OPINION CONCERNING MOTION OF DEFENDANTS DAIMLER AG, DAIMLER NORTH AMERICA CORPORATION, AND DAIMLER INVESTMENTS U.S. CORPORATION TO DISMISS THE SECOND AMENDED COMPLAINT

ARTHUR J. GONZALEZ, United States Chief Bankruptcy Judge.

**\*1** This adversary proceeding seeks to avoid certain transfers by a debtor under various theories alleging constructive fraud. The Court previously dismissed the first amended complaint filed in this adversary proceeding and afforded the plaintiff an opportunity to replead certain of the asserted constructive fraudulent conveyance claims, which resulted in the filing of the seconded amended complaint. In dismissing the first amended complaint with respect to these constructive fraudulent conveyance claims, the Court found that the plaintiff failed to state a claim for relief because of deficiencies in its allegations concerning the inadequacy of the consideration in the transaction at issue. Specifically, the Court concluded that the plaintiff failed to account for the total value of the consideration at issue by neglecting to mention, or undervaluing, assets or benefits received as part of the overall integrated transaction.

Notwithstanding slight adjustments to certain of the values ascribed to some assets and benefits transferred in the transaction at issue, the allegations of the second amended complaint continue to apply implausible valuations to some of the assets and benefits, and continue to ignore other elements of value. Indeed, the implausible undervaluing of one asset alone eliminates the alleged deficit in the calculation of what would constitute reasonably equivalent value or fair consideration.

Therefore, the motion to dismiss is granted. In addition, because the Trust has been afforded ample opportunity to plead a sustainable complaint and it has failed to do so, the dismissal is with prejudice.

*Procedural Background*

On April 30, 2009, Old Carco LLC f/k/a Chrysler LLC ("CarCo") and certain of its domestic direct and indirect subsidiaries [FN1] (collectively, the "Debtors") filed for protection under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Pursuant to orders entered by the Court, the Debtors' cases were jointly administered for procedural purposes, in accordance with Rule 1015(a) of the Federal Rules of Bankruptcy Procedure. On May 5, 2009, an Official Committee of Unsecured Creditors (the "Creditors' Committee") of CarCo was formed. On April 23, 2010, an order confirming the Second Amended Joint Plan of Liquidation of Debtors and Debtors in Possession, as Modified (the "Debtors' Plan"), was entered on the docket of the jointly administered cases. The Debtors' Plan became effective on April 30, 2010. Pursuant to the Debtors' Plan, a Liquidation Trust (the "Trust") was formed.

> [FN1]. On May 19, 2009, an additional affiliate filed a petition for relief under title 11.

This adversary proceeding commenced on August 17,

--- B.R. ----, 2011 WL 1833244 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 1833244 (Bkrtcy.S.D.N.Y.))**

2009, when the Creditors' Committee filed a complaint, which it subsequently amended by filing on January 4, 2010 the first amended complaint, dated December 31, 2009 (the "First Amended Complaint"). On May 5, 2010, an order was entered substituting the Trust as plaintiff in this adversary proceeding, in accordance with the terms of the Debtors' Plan. On August 3, 2010, an order was entered granting a motion that had been filed by the Daimler Entities (as hereinafter defined), on March 5, 2010, seeking dismissal of the First Amended Complaint. In that dismissal, certain of the counts alleged were dismissed with prejudice. However, the Court afforded the Trust the opportunity to replead, inter alia, certain of the counts alleging constructive fraud. On September 27, 2010, the Trust filed the second amended complaint (the "Second Amended Complaint").

**\*2** The Second Amended Complaint was filed against, inter alia, Daimler AG ("Daimler"), a stock corporation organized under the laws of the Federal Republic of Germany, Daimler North America Corporation (f/k/a DaimlerChrysler North America Holding Corporation) ("DCNAH"), a direct wholly owned subsidiary of Daimler, and Daimler Investments U.S. Corporation (f/k/a DaimlerChrysler Holding Corporation) ("DC Holding", and together with Daimler and DCNAH, the "Daimler Entities"), an indirect wholly owned subsidiary of Daimler.

As in the First Amended Complaint, in the Second Amended Complaint, the Trust alleges that Daimler stripped away valuable assets from CarCo prior to Daimler selling a controlling interest in the Chrysler entities (the "Chrysler Companies") to Cerberus Capital Management LP ("Cerebus"). The Trust alleges that immediately prior to the sale to Cerebus, Daimler engineered a complex restructuring of the Chrysler Companies, which transferred valuable assets from CarCo to DCNAH and DC Holding for little or no consideration. The Trust seeks to recover, as constructive fraudulent conveyances, the value of the transferred assets for the Debtors' estates.[FN2]

> **FN2.** In that regard, also listed as defendants in the Complaint are John Does 1–50, representing any subsequent transferees of assets that the Trust alleges were fraudulently transferred from the Debtor to Daimler, DCNAH and/or DC Holding.

The Court issued an Opinion, dated July 27, 2010 (the "July 27 Opinion"), setting forth the basis of its dismissal of the First Amended Complaint. *Liquidation Trust v. Daimler AG (In re Old CarCo),* 435 B.R. 169 (Bankr.S.D.N.Y.2010).[FN3] In the July 27 Opinion, the Court concluded that the restructuring of the Chrysler Companies, and Daimler's ultimate sale of a controlling interest in the Chrysler Companies, with its concomitant recapitalization of CarCo and other of the Chrysler entities, comprised one integrated transaction. *Id.* at 183–85. Inasmuch as the restructuring and recapitalization constituted a single integrated transaction, the Court concluded that the Trust's challenges to isolated elements of the restructuring as constituting fraudulent transfers were faulty. *Id.* at 187. The Court stated that the challenged transfers could not be properly valued without considering the entirety of the transaction, including the ultimate sale of the controlling interest in the Chrysler Companies to Cerberus with the resulting cash infusion into CarCo. *Id.* The Court further determined that the Trust failed to state a claim for constructive fraud because it did "not include, or even reference, the significant value received by CarCo pursuant to the overall transaction." *Id.* The Court afforded the Trust the opportunity to replead, inter alia, certain of the constructive fraud claims.[FN4] The Court specifically cautioned the Trust that, in any such newly filed complaint, it should "address the deficiencies in its allegations concerning the consideration that CarCo received in the single integrated transaction, including amplification as to all the assets received, as well as to clarify its position concerning the valuation of assets, both for the assessment of the consideration received in the integrated transaction and the insolvency analysis." *Id.* at 190.

> **FN3.** Many facts concerning this adversary proceeding, including the details of the underlying integrated transaction at issue, are set forth in the July 27 Opinion, and familiarity with it is assumed.

> **FN4.** For the reasons set forth in the July 27 Opinion, the Court dismissed, with prejudice, all of the intentional fraud counts and one of the constructive fraud counts.

**\*3** In filing the Second Amended Complaint, the Trust argued that even considering the entirety of the restructuring and the sale of the controlling interest to Cerberus, CarCo received consideration of lesser value than the assets that it transferred.[FN5] In the Second Amended Complaint the Trust attributes some value to certain of the assets to which it had not ascribed any value in the First Amended Complaint. The Trust alleges that, even with the values that it has now attributed to assets transferred, the consideration that CarCo received in the overall transac-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 1833244 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 1833244 (Bkrtcy.S.D.N.Y.))**

tion was inadequate, and that the shortfall in value was $1.695 billion.

> FN5. The Trust had asserted this as an alternative argument in the First Amended Complaint. However, before undertaking to address the argument, the Court afforded the Trust an opportunity to address the deficiencies with respect to the allegations concerning the putative inadequacy of the consideration transferred.

On November 16, 2010, the Daimler Entities filed a motion to dismiss the Second Amended Complaint, asserting that the allegations set forth therein, which concerned reasonably equivalent value and fair consideration, are inadequate because they do not sufficiently take into account all the elements of value received by CarCo in the overall transaction. The Daimler Entities assert that the deficiencies in the allegations include understating certain values and ignoring other value that CarCo received in the transaction. The Daimler Entities also maintain that the Trust's insolvency analysis is flawed.

The Trust contends that the motion to dismiss should be denied and that discovery should proceed. The Trust argues that it has plausibly alleged insufficient consideration and insolvency. A hearing (the "Hearing") concerning the motion to dismiss the Second Amended Complaint was conducted on March 8, 2011. FN6

> FN6. Following the Hearing, without seeking leave of Court, the Trust made additional submissions to supplement its argument. The Daimler Entities oppose consideration of the supplemental submissions as procedurally improper, while also arguing that the submissions add nothing to the record. The Court is not considering the supplemental submissions. First, the Trust did not seek leave to file such submissions. In addition, the purpose for granting a motion to file a surreply is to afford a party the opportunity to address arguments first raised in the opposing party's reply. Alexander v. FBI, 186 F.R.D. 71, 74 (D.D.C.1998). Here, the issues addressed in the surreply were not first raised in the reply. Rather, the arguments in the reply were responses by the Daimler Entities to issues raised by the Trust in its opposition papers. See Travelers Ins. Co. v. Buffalo Reins.Co., 735 F.Supp. 492, 495–96 (S.D.N.Y.1990), vacated in part on other grounds, 739 F.Supp. 209 (S.D.N.Y 2004) (granting motion to strike surreply because "[a]lthough defendants' reply papers addressed issues not raised in its moving papers, each point in the reply brief directly responds to an issue raised in [the other party's] opposition papers"). Here, the Trust first addressed the viability of the intercompany receivable in its opposition papers, and then sought to reargue that issue and supplement it in the surreply. Moreover, the Trust had a full and fair opportunity to respond at the Hearing to the reply, as well as to the Court's inquiries that flowed from issues regarding the intercompany receivable. In addition, nothing was raised in the reply or at the Hearing that would warrant any further submissions concerning the tax issues.

*Motion to Dismiss Standard*

Federal Rule of Civil Procedure ("Rule") 12(b)(6) is incorporated into bankruptcy procedure by Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7012(b). In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim for relief, the court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citations omitted). In addition, the court draws all reasonable inferences from the factual allegations in favor of the plaintiff. *Walker v. City of New York,* 974 F.2d 293, 298 (2d Cir.1992) (citation omitted); *Myvett v. Williams,* 638 F.Supp.2d 59, 64 (D.D.C.2009).

In considering such a motion, although a court accepts all the factual allegations in the complaint as true, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 2944, 92 L.Ed.2d 209 (1986). Bare assertions, "devoid of 'further factual enhancement[,]' " are not sufficient to withstand a motion to dismiss. *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citation omitted).

Moreover, the factual allegations must contain more than a mere "suspicion" that the claim can be legally recognized. *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1965 (citation omitted). Rather, the factual allegations must plausibly suggest that the defendant is liable for the conduct that is alleged. See *id.* at 557, 127 S.Ct. at 1966.

**\*4** Thus, in considering a motion to dismiss, a court first identifies those allegations that are actually legal conclusions and, therefore, "not entitled to the assumption

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 1833244 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 1833244 (Bkrtcy.S.D.N.Y.))**

of truth." *Iqbal,* 127 S.Ct. at 1950. The court then determines whether the remaining well-pleaded factual allegations, which are assumed to be true, "plausibly give rise to an entitlement to relief." *Id.*

As noted, to adequately support the claim, there must be sufficient facts identified to suggest that the legally vulnerable conduct is plausible. *Twombly,* 550 U.S. at 556, 127 S.Ct. at 1965. A complaint meets the plausibility standard when factual content is pled "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* ––– U.S. at ––––, 129 S.Ct. at 1949. In determining whether a complaint states a plausible claim for relief, a court focuses on the context of the allegations and "draw[s] on its judicial experience and common sense. *Iqbal,* ––– U.S. at ––––, 129 S.Ct. at 1950.

Although requiring plausibility "does not impose a probability requirement at the pleading stage[,]" *Twombly,* 550 U.S. at 556, 127 S.Ct. at 1965, nevertheless, it requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949. If the factual allegations "are merely consistent with a defendant's liability, [the complaint] stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citation and internal quotations omitted).

Once the plausibility threshold is met, the complaint survives even if the identified facts seem improbable or recovery is thought to be remote or unlikely. *See Twombly,* 550 U.S. at 556, 127 S.Ct. at 1965. Although *Twombly* was decided in the context of an antitrust litigation, the plausibility standard to test the sufficiency of a complaint applies in all civil actions. *Iqbal,* ––– U.S. at ––––, 129 S.Ct. at 1953 (discussing the applicability of *Twombly* ). The plausibility standard, however, does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974. Thus, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563, 127 S.Ct. at 1969.

"Although bald assertions and conclusions of law are insufficient, the pleading standard is nonetheless a liberal one." *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998); *see also Erickson,* 551 U.S. at 94, 127 S.Ct. at 2200 (noting that Rule 8(a)(2) sets forth "liberal pleading standards"). Pursuant to Rule 8(a), which is made applicable to adversary proceedings by Bankruptcy Rule 7008, in asserting a claim, the pleader need only set forth a short and plain statement of the claim showing that the pleader is entitled to relief. The purpose of the statement is to provide "fair notice" of the claim and "the grounds upon which it rests." *Erickson,* 551 U.S. at 93, 127 S.Ct. at 2200 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1964 (quoting, in turn, *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). Thus, specific facts are not necessary. *Id.*

**\*5** While detailed factual allegations are not necessary, the need to provide the "grounds" for entitlement to relief requires "more than labels and conclusions" and more than "a formulaic recitation of the elements of a cause of action." *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1964–65. The allegations must show that the right to relief is more than speculative. *See id.* at 553, 127 S.Ct. at 1965. There must be a "reasonably founded hope" that the discovery process will uncover relevant evidence. *Id.* at 559, 563 n. 8, 127 S.Ct. 1967, 1969 n. 8.

Rule 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Id.* at 555 n. 3, 127 S.Ct. at 1965 n. 3 (citation omitted). However, once the claim is adequately supported, specific facts beyond those needed to state the claim are not necessary. *See Id.* at 570, 127 S.Ct. at 1973–74. Indeed, other sections of the Federal Rules of Civil Procedure support a simplified notice pleading standard, including Rule 8(f), which provides that technical forms of pleading or motions are not required, and Rule 8(e)(1), which provides that pleadings are to be construed in a way that does substantial justice. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513–14, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002). The simplicity required by the rule, in forgoing additional factual detail, recognizes the ample opportunity afforded for discovery and other pre-trial procedures, which permit the parties to obtain more detail as to the basis of the claim and as to the disputed facts and issues. *Id.* at 512–13, 122 S.Ct. at 998; *see also Conley,* 355 U.S. at 47–48, 78 S.Ct. at 103. Based upon the liberal pleading standard established by Rule 8(a), even the failure to cite a statute, or to cite the correct statute, will not affect the merits of the claim. *Northrop v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 46 (2d Cir.1997). In considering a motion to dismiss, it is not the legal theory but, rather, the factual allegations that matter. *Id.*

In reviewing a Rule 12(b)(6) motion, a court may consider the allegations in the complaint; exhibits attached to the complaint or incorporated therein by reference; matters amenable to judicial notice, *Brass v. Am. Film*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 1833244 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 1833244 (Bkrtcy.S.D.N.Y.))**

*Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993); and a document of which plaintiff has notice and relied upon in bringing the claim or that is integral to the claim. *See Cortec Indus. v. Sum Holding, L.P.,* 949 F.2d 42, 48 (2d Cir.1991). However, mere notice or possession of the document is not sufficient. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002). Rather, a necessary prerequisite for a court's consideration of a document is that the plaintiff relied "on the terms and effect of a document in drafting the complaint." *Id.* As such, the document relied upon in framing the complaint is considered to be merged into the pleading. *Id.* at 153 n. 3 (citation omitted). In addition, even for documents that are integral to a complaint, it must be clear that there is no dispute concerning the authenticity, accuracy, or relevance of such document. *DiFolco v. MSNBC Cable, L.L.C.,* 622 F.3d 104, 111 (2d Cir.2010) (citation omitted).

**\*6** In contrast, when assessing the sufficiency of a complaint, a court does not consider extraneous material because considering such material would run counter to the liberal pleading standard, which requires only a short and plain statement of the claim showing entitlement to relief. *Chambers,* 282 F.3d at 154. Nevertheless, in deciding a Rule 12(b)(6) motion, a court may consider facts as to which the court may properly take judicial notice under Federal Rule of Evidence 201. *In re Merrill Lynch & Co., Inc.,* 273 F.Supp.2d 351, 357, 357 n. 13 (S.D.N.Y.2003) (citing *Chambers,* 282 F.3d at 153).

To survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove them. *Koppel v. 4987 Corp.,* 167 F.3d 125, 133 (2d Cir.1999). A court's role in ruling on a motion to dismiss is to evaluate the legal feasibility of the complaint, not to weigh the evidence which may be offered to support it. *Cooper,* 140 F.3d at 440. The determination is not whether a claimant will ultimately prevail, but whether the claimant should be allowed to offer evidence to support the claim. *Swierkiewicz,* 534 U.S. at 511, 122 S.Ct. at 997.

*The Restructuring and Sale of the Controlling Interest in the Chrysler Companies*

In 1998, Daimler acquired 100% of the equity interest in the Chrysler Companies.[FN7] In the following years, the operations of the Chrysler Companies were combined with the operations of other Daimler-owned brands and integrated within single subsidiaries. In late 2006, Daimler decided to sell the Chrysler Companies. To assist in that effort, Daimler engaged JPMorgan Chase ("JPMorgan") and Ernst & Young LLP ("E & Y") to restructure the Chrysler Companies. Such restructuring included separating the Daimler and Chrysler operations, and effectuating the "spin off" of its two most valuable subsidiaries (together, "FinCo") that comprised the financial services arm of the Chrysler Companies financing divisions. A restructuring plan comprised of numerous steps was proposed. The ultimate goal was to allow Daimler to obtain the best price for the contemplated sale of its interest in the Chrysler Companies. A higher price would result from ensuring that FinCo's assets were not available to CarCo's creditors.

> [FN7.] After this acquisition, and up until the restructuring that resulted in Daimler's sale of its majority interest in the Chrysler Companies, the various component Chrysler Companies were renamed DaimlerChrysler.

As a result of the restructuring, FinCo became a stand-alone entity to facilitate the ability to obtain third-party financing. In one of the steps of the restructuring plan, FinCo was transferred from CarCo to a newly formed holding company, DaimlerChrysler Holding LLC ("Holding"). Daimler caused DC Holding to create Holding as a special purpose company wholly owned by Daimler. Holding's purpose was to provide a vehicle through which Daimler could sell a controlling interest in the Chrysler Companies, including FinCo.[FN8] Holding also became CarCo's parent, thereby converting the relationship between CarCo and FinCo from that of parent-subsidiary to that of sister companies. As consideration for the transfer of FinCo, CarCo received stock in DaimlerChrysler Motors Corporation ("Motors"), as well as another entity, and a note from FinCo for $1.225 billion.

> [FN8.] By moving the Chrysler operations into Holding, a purchaser could acquire the Chrysler operations by acquiring that single holding company. Holding remained wholly owned and controlled by Daimler until the August 3, 2007 closing of the Cerberus transaction, pursuant to which Daimler sold the majority interest in Holding to Cerberus.

**\*7** The stock of Motors comprised the large component of the consideration received by CarCo as part of the transfer of FinCo. Prior to the restructuring, Motors was the parent of Daimler Chrysler Corporation n/k/a CarCo.[FN9] The two companies comprised the automotive operations of the Chrysler Companies. CarCo was the manufacturer of vehicles and Motors managed distribution and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 1833244 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 1833244 (Bkrtcy.S.D.N.Y.))**

sales.[FN10] (CarCo and Motors are together referred to as "Automotive"). Motors generated revenue by selling to dealers those vehicles and parts that Motors purchased from CarCo, thereby providing Motors with a stable profit and reducing CarCo's income. Automotive had been divided into two separate companies to take advantage of certain tax benefits.[FN11] In that regard, the relationship between the two companies was governed by a sale and distribution agreement (the "S & D Agreement"), which CarCo could elect to terminate upon giving six-months' notice.

> [FN9.] After the restructuring, the roles were reversed and CarCo became the parent of Motors.
>
> [FN10.] Motors sold and distributed to dealers both vehicles and parts. In addition, Motors managed warranty claims on vehicles manufactured by CarCo.
>
> [FN11.] The separation of CarCo from Motors allowed the enterprise to shift the assessment of taxable income for sales and marketing services to states with lower income tax rates.

Daimler retained Houlihan Lokey Howard & Zukin Financial Advisors, Inc. ("Houlihan Lokey") to value the consideration exchanged in the step of the reorganization plan involving the transfer of FinCo. In its valuation opinion, Houlihan Lokey valued FinCo and the related assets transferred by CarCo at $7.95 billion. With respect to the assets transferred to CarCo in that step of the restructuring plan, Houlihan Lokey valued Motors at $5.5 billion. CarCo also received a $1.225 billion note, which, added to the value assigned to Motors, totals assets worth $6.725 billion.

In addition to separating FinCo from CarCo, several other steps of the restructuring involved the transfer of assets from CarCo to companies controlled by Daimler. As a result of the restructuring, Holding was the direct or indirect holder of the equity interests of the various Chrysler Companies, including CarCo, FinCo, and Motors. Beginning around December 2006, with the assistance of JP Morgan and E & Y, Daimler initiated efforts to solicit offers for the sale of Automotive and FinCo. Five investors submitted bids, and the bid by Cerberus was the highest one.

Thereafter, certain Daimler entities executed an agreement (the "Contribution Agreement") with an affiliate of Cerberus (hereinafter, the affiliate will also be referred to as "Cerberus"). Daimler also executed the Contribution Agreement but solely as guarantor of the performance of various Daimler entities that were participants to the Contribution Agreement. The closing of the Contribution Agreement was on August 3, 2007. The fulfillment of all of the restructuring steps was a condition precedent to Cerberus's obligation to close on the Contribution Agreement.

Pursuant to the Contribution Agreement, Cerberus acquired 80.1% of the equity of Holding and, therefore, an indirect equity interest of an equal amount in the Chrysler Companies. As a result, Daimler's equity interest was diluted to 19.9%, thereby remaining a substantial investor. In exchange for acquiring an 80.1% interest in the Chrysler Companies, Cerberus made an equity contribution to the Chrysler Companies of $7.2 billion, a portion of which went to CarCo. In addition, Cerberus obtained $12 billion in new debt financing for the Chrysler Companies, consisting of $10 billion from large commercial and investment banks, a $1.5 billion loan facility from an affiliate of Daimler, and a $0.5 billion loan facility from Cerberus. The receipt of new debt financing was a condition to Cerberus's obligation to close.

**\*8** The Chrysler Companies also received other elements of value in the Cerberus transaction, including the cancellation of approximately $3 billion net in intercompany debt; the direct repayment in cash of $920 million of intercompany debt by Daimler to CarCo; the repayment of third-party debt guaranteed by Daimler; the assignment of a $500 million tax refund; and participation in numerous joint development, intellectual property, information technology, supply and transition agreements by which the parties agreed to cooperate on various projects.

The $7 billion recapitalization of the Chrysler Companies resulting from the Contribution Agreement was distributed as follows: $1.212 billion was transferred from Holding to DC Holding for certain expenses incurred in connection with the Cerberus transaction; $3.45 billion was contributed to CarCo as equity; and $2.275 billion was contributed to FinCo as equity. FinCo used $1.243 billion of this contribution to pay the principal and interest on the note that it had previously issued to CarCo.

*Parties' Contentions*
As noted, in the Second Amended Complaint the Trust seeks to recover, as constructive fraudulent conveyances, the value of the assets transferred from CarCo to the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 1833244 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 1833244 (Bkrtcy.S.D.N.Y.))**

Daimler Entities. The Trust alleges that the consideration received by CarCo as a result of the restructuring and Cerberus acquisition was $1.695 billion less than the value of the assets that CarCo relinquished in that overall transaction.[FN12] The Daimler Entities move to dismiss the Second Amended Complaint, arguing that the Trust's allegations are implausible. The Trust opposes that relief.

> FN12. As noted, in addition to the shortfall alleged with respect to the consideration paid for FinCo, the Trust argues that CarCo transferred other assets for little or no consideration. These other assets include a Mexican subsidiary, *DC Vehiculos Commerciales/DC Tractociamiones* ("Newco Truck"), and a Mexico-based financial services company that CarCo owned, DC Financial Services Mexico ("Newco Services"). The Trust arrives at the $1.695 billion dollar figure by comparing the $9.581 billion in value for the assets that it alleges CarCo surrendered and the $7.886 billion value in assets that it alleges CarCo received as a result of the restructuring and the Cerberus acquisition. All of the Trust's calculations are premised upon the values that the Trust attributes to the various assets and includes only those assets that the Trust deems should be counted. The Trust's enumerated lists are as follows:

| Assets CarCo surrendered | Value (in billions) |
|---|---|
| FinCo (minimum value) | $7.95 |
| Newco Truck | $0.548 |
| Newco Services | $0.383 |
| headquarters (minimum value) | *$0.7* |
| Total | |
| *Assets CarCo received* | |
| Cash contribution from Cerberus | $3.45 |
| Note from FinCo | $1.225 |
| Net Debt Forgiveness from Daimler | $2.036 |
| Motors (maximum value) | $0.450 |
| Tax Indemnification for Canadian pricing dispute | $0.400 |
| payment for headquarters building | *$0.325* |
| Total | |

| Assets CarCo surrendered | Value (in billions) | |
|---|---|---|
| FinCo (minimum value) | $7.95 | |
| Newco Truck | $0.548 | |
| Newco Services | $0.383 | |
| headquarters (minimum value) | $0.7 | |
| Total | | $9.581 |
| Assets CarCo received | | |
| Cash contribution from Cerberus | $3.45 | |
| Note from FinCo | $1.225 | |
| Net Debt Forgiveness from Daimler | $2.036 | |
| Motors (maximum value) | $0.450 | |
| Tax Indemnification for Canadian pricing dispute | $0.400 | |
| payment for headquarters building | $0.325 | |
| Total | | $7.886 |

The Daimler Entities contend that the allegations of the Second Amended Complaint fail to state a claim for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 1833244 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 1833244 (Bkrtcy.S.D.N.Y.))**

constructive fraudulent transfer. First, the Daimler Entities assert that the allegations regarding reasonably equivalent value or fair consideration are inadequate because they do not sufficiently take into account all the elements of value received by CarCo in the overall transaction.

The Daimler Entities argue that the Trust continues to undervalue or ignore assets and benefits that CarCo received as part of the transaction. Specifically, with respect to undervaluation, the Daimler Entities assert that, in the allegations, the Trust (i) attributes an implausibly low value to Motors, (ii) understates the value of the credit facilities made available to CarCo, (iii) understates the value of the tax benefits received by CarCo, and (iv) disregards the value of the ancillary agreements conferred on CarCo. The Daimler Entities state that the Trust's allegation concerning the value of Motors is implausible, and that taking away that allegation alone would eliminate the putative gap in the consideration received by CarCo. The Daimler Entities argue that the Trust's valuation of Motors is based on a faulty assumption that there was a 100% probability that the S & D Agreement would be terminated. The Daimler Entities assert that utilizing the $5.5 billion value attributed to Motors in the transaction by its financial advisors, and even accepting as true all of the other values asserted by the Trust, would result in an overall gain for CarCo of $3.375 billion.

**\*9** Other elements of value that the Daimler Entities assert were undervalued or completely ignored include (i) the repayment of intercompany debt, which the Daimler Entities argue allowed CarCo to establish a strong net-cash position, (ii) the value of Daimler's agreement to establish National Sales Centers in countries where it had previously managed distribution for of CarCo, as well as the value of related inventory of vehicles transferred to CarCo as part of that arrangement, and (iii) the benefit to CarCo of Daimler's undertaking to guarantee a certain amount of CarCo's pension obligations, particularly in its effect on forestalling the Pension Benefit Guaranty Corporation from seeking additional contributions from CarCo.

The Daimler Entities also argue that, in the allegations of the Second Amended Complaint, the Trust overstates the value of assets that CarCo transferred, including the headquarters property. As part of the Cerberus Transaction, that property was sold in August 2007 to a Cerberus subsidiary for $325 million. The Daimler Entities assert that the $225 million mortgage obtained at the time Cerberus acquired the property is a more reliable indicator of the property's market value at the time of the sale, as a purchaser would maximize the size of the mortgage. The Daimler Entities maintain that the $225 million mortgage amount is consistent with the $325 million value attributed to the headquarters property. The Daimler Entities contend that the valuations proffered by the Trust—a 2006 purchase offer that was not pursued and a property tax assessment—are unreliable and have no bearing on the market value at the time of the Cerberus Transaction.

In addition, the Daimler Entities contend that, as a general matter, the Trust's theory is implausible because of the participation of third-parties, which parties placed substantial amounts of capital at risk dependent upon the performance of CarCo. The Daimler Entities point to the participation by Cerberus, which made a $7.2 billion investment, a large portion of which was directed to the restructured CarCo, as well as making a $500 million loan facility available to CarCo. In addition, the Daimler Entities reference the lending syndicate that made a $10 billion credit facility available. The Daimler Entities argue that it is implausible that these discerning investors, who had access to relevant financial information, would place these large sums at risk if CarCo had been improperly stripped of its assets.

The Daimler Entities further argue that the Trust's allegations of insolvency are inadequate and implausible. The Daimler Entities contend that despite access to extensive data that was produced during the Bankruptcy Rule 2004 discovery, and the Trust's engagement of experts, their allegations remain conclusory, illogical, inconsistent, and unsupported.

As previously noted, the Trust contends that the motion to dismiss should be denied and that discovery should proceed. The Trust asserts that CarCo surrendered its most valuable asset-FinCo-in exchange for Motors and a $1.225 billion note. With respect to the valuations it attributes to the various components of the consideration, the Trust argues that (i) its allegation that the value of Motors was $450 million is plausible, (ii) the credit facilities provided no quantifiable benefit to CarCo, (iii) the tax benefits only conferred a $425 million benefit on CarCo, and (iv) the ancillary agreements provided no net benefit to CarCo.

**\*10** With respect to its valuation of Motors, the Trust maintains that Motors was worth no more than $450 million to CarCo. The Trust argues that Houlihan Lokey's $5.5 billion valuation of Motors was fundamentally flawed because it did not account for the fact that Motors' earnings depended on the continuation of the S & D Agreement with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 1833244 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 1833244 (Bkrtcy.S.D.N.Y.))**

CarCo, and that contract was terminable at will by CarCo. The Trust argues that because CarCo had the right to terminate that agreement on six-months' notice, CarCo could have immediately terminated that agreement and the income stream for that notice period would have totaled $430 million. The Trust further argues that, thereafter, any tax benefits CarCo otherwise would have received from having revenue reported at Motors could have been replicated by CarCo setting up a new subsidiary to serve the same purpose, at a cost of $20 million. Adding this to the $430 million results in a value of $450 million.

With respect to the other items that the Daimler Entities claim the Trust either undervalues or ignores, the Trust contends that it has not omitted any assets from its fair consideration analysis. The Trust argues that (i) the intercompany debt payment was off-set by a larger payment in Daimler's favor, (ii) the value of the National Sales Centers to CarCo was de minimus, and (iii) the pension guarantee conferred no benefit on CarCo.

The Trust also argues that it plausibly alleges that CarCo undervalued its headquarters building which it transferred in 2007 as part of the overall transaction. The Trust alleges that instead of the $325 million for which the property was sold in 2007, it was worth at least $700 million. The Trust argues that even that valuation is conservative because the value may have been as high as $1.2 billion. The Trust's valuation of the property is based on a third-party offer for the property received in 2006, the year before the Cerberus acquisition, and on property tax assessments. The Trust argues that, at a minimum, the valuation of the headquarters property involves questions of fact that are inappropriate to resolve on a motion to dismiss.

In addition, the Trust contends that it plausibly alleges that CarCo was insolvent after the execution of the restructuring and the Cerberus acquisition.

*Discussion*

Counts I through III of the Second Amended Complaint allege that the transfers CarCo made in the overall integrated transaction were constructively fraudulent under Bankruptcy Code sections 544, 548 and 550, and New York Debtor and Creditor Law ("N.Y. Debt. & Cred. Law") sections 273, 274 and 275. A transfer is constructively fraudulent only if the transferor was insolvent at the time of, or was rendered insolvent by, the transfer and if reasonably equivalent value under the Bankruptcy Code, or fair consideration under N.Y. Debt. & Cred. Law, was not received in exchange for the transfer. *Mellon Bank, N.A. v. Metro Commc'ns, Inc.,* 945 F.2d 635, 648 (3d Cir.1991); 11 U.S.C. § 548(a)(1)(B); *Murin v. Estate of Schwalen,* 31 A.D.3d 1031, 1032, 819 N.Y.S.2d 341, 343 (N.Y.2006); N.Y. Debt. & Cred. Law 273.

**\*11** Ordinarily, the burden of proof concerning whether a transfer was made for reasonably equivalent value or fair consideration is on the creditor that seeks to have the conveyance set aside as fraudulent. *Metro Commc'ns,* 945 F.2d at 650; *MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Servs. Co.,* 910 F.Supp. 913, 936–37 (S.D.N.Y.1995) (citations omitted); *see also Murin,* 31 A.D.3d at 1032, 819 N.Y.S.2d at 343. For the consideration to be fairly equivalent to the value of the property transferred or obligation assumed, the exchange does not require exact equivalence. *MFS/Sun,* 910 F.Supp. at 937. Instead it is sufficient that the values be "reasonably equivalent." [FN13] *Id.*

> FN13. Under New York state law, in addition to requiring that the exchange be for equivalent value, fair consideration requires that the conveyance be made in good faith. *Murin,* 31 A.D.3d at 1032, 819 N.Y.S.2d at 343. Some courts have indicated that the good faith at issue is that of the transferee, while at the same time questioning the relevance of the concept of "good faith" in the context of a constructive fraudulent conveyance claim where *intent* is not a consideration. *Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re State Street Bank & Trust Co.),* 403 F.3d 43, 54 & n. 4 (2d Cir.2005) (citations omitted). In any event, in the instant matter, the transferee's good faith is not at issue as a result of the Court's July 27 Opinion determining that the Trust's allegations of actual fraud were implausible, thereby eliminating the possibility that the transferee could be found not to have acted in good faith because of knowledge of any such fraud. *See id.* at 55 (quoting *HBE Leasing Corp. v. Frank,* 48 F.3d 623, 636 (2d Cir.1995) to the effect that the "good faith" statutory requirement is met if the transferee acts without knowledge-actual or constructive-of a fraudulent scheme). Moreover, the Trust alleges that the transferor and the transferee were both controlled by Daimler; therefore, the Court's July 27 Opinion concluding that the Trust's allegations of actual fraud with respect to Daimler are implausible forecloses, under the circumstances as pled by the Trust, the possibility of a finding

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 1833244 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 1833244 (Bkrtcy.S.D.N.Y.))**

that the transferee was not acting in good faith.

As previously noted, the Court dismissed the First Amended Complaint, affording the Trust leave to replead, inter alia, the constructive fraudulent conveyance claims. To address the Court's cautionary statements concerning the need to attribute some value to even contingent assets for the purposes of the reasonably equivalent value and fair consideration analysis, the Trust proceeded to supply de minimus values to certain of the assets, while continuing to ignore other elements of value that were transferred to CarCo.

*Motors*

As a result of the restructuring and Cerberus transaction, CarCo received the stock of Motors. In the First Amended Complaint, the Trust attributed a zero value to Motors premised upon its argument that the value of Motors was contingent upon the income stream from the S & D Agreement, and the fact that CarCo had the right to immediately terminate that agreement. In dismissing the First Amended Complaint, the Court indicated that discounting the value of Motors to zero was inappropriate because, among other reasons, even contingent cash flows are accorded value.

In the Second Amended Complaint, the Trust continues to assert that CarCo would immediately terminate the S & D Agreement, premising this assertion on the allegation that CarCo could replicate the operations of Motors by setting up a new subsidiary to perform the same functions. The Trust assigns a value of $450 million to the benefit that CarCo obtained from the acquisition of Motors. In recognition of the fact that any termination of the S & D Agreement required six-months' notice, the Trust makes allowance for the $430 million income stream that would be generated during the notice period were CarCo to terminate the S & D Agreement immediately. The additional $20 million of value is premised upon the alleged administrative cost to establish a subsidiary to perform the same functions as Motors.

The Trust does not challenge the methodology employed by Houlihan Lokely in arriving at its independent assessment of the proper valuation of Motors if the S & D Agreement were to have stayed in effect for the duration of its term. Rather, it alleges that it was improper for the financial advisor to assume that CarCo would not cancel the S & D Agreement. More specifically, the Trust argues that Motors' value should be based upon CarCo immediately terminating the S & D Agreement, premised upon the alleged ease of replicating Motors' operations for $20 million.

**\*12** In support of its argument, the Trust asserts that whether the S & D Agreement would be terminated must be viewed from the perspective of an independent third-party controlling the process on behalf of CarCo. The Trust contends that any such party would want to increase CarCo's assets. Inasmuch as CarCo had the unilateral right to cancel the S & D Agreement, reassert its right to those revenues, and have all of Motors' dealer contracts reassigned to CarCo, the Trust asserts that the income stream cannot be the basis for valuing Motors. The Trust's argument is that, because CarCo already controlled this revenue and could reclaim it at any time, it did not need to surrender FinCo. The Trust argues that its analysis accurately reflects that Motors was never worth $5.5 billion to CarCo, and that CarCo always could take over most of the value of Motors. According to the Trust, any tax benefits obtained from the arrangement with Motors could be replicated by setting up another subsidiary to serve the same purpose at a cost of $20 million.

The Trust's argument, however, is implausible and not supported by the record. The Trust fails to account for billions of dollars of value in Motors, including a large vehicle and parts inventory, as well as property, plant and equipment, and operating leases. In addition, the allegations of the Second Amended Complaint are premised upon CarCo immediately terminating a long-standing arrangement that provided tax benefits to CarCo. An immediate termination of the S & D Agreement, however, is implausible given, among other things, the $11.6 billion intercompany receivable that CarCo owed Motors, which related to sales and distribution of cars manufactured by CarCo. This intercompany receivable provided Motors with leverage concerning the substantial economic consequences that CarCo would have to consider before deciding to terminate the S & D Agreement.

The Trust argues that this receivable was not a legitimate intercompany debt, but rather an equity interest and that, in any event, CarCo did not have the wherewithal to pay the amount due on the receivable. As such, the Trust argues that the receivable was not collectible and had no value and, therefore, could not provide the basis to exert leverage against CarCo to continue to honor the S & D Agreement.

With respect to the legitimacy of the receivable, in the context of this bankruptcy proceeding, there are documents

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 1833244 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 1833244 (Bkrtcy.S.D.N.Y.))**

that are part of the public record, and of which the Court may take judicial notice. In that regard, the bankruptcy filings of CarCo and Motors show that CarCo treated the receivable as a liability in its filing, and that Motors treated it as an asset in its filing. The Trust contends that the absence of a challenge to those characterizations is not significant because CarCo's financial conditions did not provide a monetary incentive to dispute them. Of more importance in the public record, however, is the fact that, at the time of the filings in 2009, the amount owing on the intercompany receivable had been reduced by approximately $2 billion. This suggests that after the 2007 transaction, the receivable had been paid-down in that amount and, therefore, that the receivable had economic significance at the time of the transaction and was not worthless.[FN14] Inasmuch as the receivable had value, it would have to be factored into any analysis of whether to terminate the S & D Agreement.

> FN14. The Court is cognizant of the limitations in the context of a motion to dismiss of utilizing information obtained from the subsequent history to value the receivable at the time of the transaction. The subsequent pay-down of the receivable, however, is an indication that the receivable had economic significance at the time of the transaction.

**\*13** Further, even if CarCo and Motors were independent of each other and were each controlled by impartial third-parties, any decision by CarCo to refuse to honor its obligation on the receivable logically would be met with substantial litigation initiated by Motors. In addition, Motors held the inventory of cars and parts. Accordingly, for any amount payable to CarCo on the inventory,[FN15] Motors could attempt to set off that amount against the amount due on the receivable. Thus, these factors provided a motivation for CarCo to continue to honor the S & D Agreement. The ability to forestall efforts to enforce the intercompany receivable, which was obtained by CarCo in acquiring Motors, was a benefit conferred upon CarCo.

> FN15. Motors had an obligation to pay CarCo the wholesale value of the inventory upon its sale.

Therefore, it is not plausible that a third-party controlling CarCo would conclude that it simply could immediately terminate the S & D Agreement. Instead, such third-party would have to assess the consequences of terminating the agreement and the attendant risk of any resulting litigation concerning the receivable. As the Trust argues, it is proper to analyze the value of Motors from the perspective of what an independent third-party owner of CarCo would be willing to give up in value to acquire Motors. However, it is not correct to analyze the value of Motors to CarCo from the perspective of an unrelated third-party seeking to purchase Motors because certain synergies are involved particular to CarCo's purchase of the entity. The value of Motors is properly determined by inquiring what Motors was worth to any independent third-party owners of CarCo. It is not plausible that any such owners would immediately terminate the S & D Agreement because they would have to contend with a litigation concerning the receivable, regardless of how it were subsequently characterized. Thus, it was of value for CarCo to acquire Motors and forestall any immediate collection efforts on the receivable.

In addition, even if the S & D Agreement were terminated, CarCo would have to set up a new subsidiary to provide the same tax benefits. This would entail building a new network, reacquiring the inventory held by Motors, and myriad other tasks and costs to replicate the plants, property, equipment and operating leases that Motors had in place. As previously noted, after a cancellation of the S & D Agreement, any efforts to reacquire the inventory held by Motors potentially could be met with an attempt to set off the substantial value of the inventory against the receivable that CarCo owed Motors. In addition to all of these costs beyond the administrative costs of setting up a subsidiary, it would take time to build an infrastructure of that quality. CarCo and Motors had a long-standing relationship that was beneficial to CarCo and, although Motors was re-incorporated in the late 1990's, prior to that and as previously incorporated, Motors had functioned in the same capacity since the 1950's, in that all of the enterprise's direct sales agreements with dealers had been assigned to the then-Motors entity. *See* [Crawford Transp. Co. v. Chrysler Corp., 338 F.2d 934, 936 (6th Cir.1964)](#) (referencing Chrysler having organized Chrysler Motors Corporation in 1956 and assigning to it all of the direct sales agreements with dealer); *see also* [York Chrysler–Plymouth, Inc. v. Chrysler Credit Corp., 447 F.2d 786, 791 (5th Cir.1971)](#) (referencing the role of Chrysler Motors Corporation in distributing and marketing Chrysler products). The Trust does not account for the major disruptive effect on the enterprise that would have to accompany any immediate attempt to replicate Motors.[FN16] Further, the notion that a network and its attendant assets and relationships, capable of generating $5.5 billion in value, could be duplicated for $20 million is not plausible. Therefore, the $450 million figure posited by the Trust stems from an oversimplified analysis that fails to account

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 1833244 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 1833244 (Bkrtcy.S.D.N.Y.))**

for factors necessary to a determination of whether immediate termination was a plausible course of action.[FN17]

> FN16. In that regard, even if a determination were made to terminate the S & D Agreement, it is implausible that it could be accomplished in one-half year, given the long-established infrastructure that would have to be replicated.
>
> FN17. The Trust argues that its allegation of the value of Motors must be accepted as true for the purposes of the motion to dismiss. As previously noted, however, the Trust is not disputing the methodology used by Houlihan Lokey to value Motors if the S & D Agreement remained in effect. Rather, what the Trust argues is that the S & D Agreement would be immediately terminated. Based upon the record of the case, that allegation is implausible.

**\*14** The Trust has the burden concerning the issue of whether CarCo received reasonably equivalent value or fair consideration in the transaction; however, the $450 million value attributed to Motors by the Trust is absurd. Thus, discounting the implausible argument concerning the value of Motors, by itself, eliminates the $1.695 billion shortfall in consideration received by CarCo asserted by the Trust. Nevertheless, there are other elements of value that were also not factored into the Trust's analysis.

*The Credit Facilities*

As part of the overall restructuring and Cerberus transaction, approximately $12 billion in credit facilities were made available to CarCo: a $10 billion credit facility from a group of banks; a $1.5 billion loan facility from a Daimler affiliate, and a $500 million loan facility from a Cerberus affiliate. The Trust attributes no value to the access to funding provided by these facilities. The Trust further argues that even if CarCo benefitted from the credit facilities, the amount of such benefit cannot be quantified at this stage of the proceedings, and that any such measure would require a trial.

Notwithstanding the Trust's argument to the contrary, access to the availability of billions of dollars in capital provides a benefit to an automobile manufacturer. Among other things, the $12 billion in credit facilities offered the opportunity to develop new product lines and promote older lines. Thus, the funds afforded a benefit by facilitating continued operations or expansion of business. Moreover, the record of this case shows that the access to this capital provided a benefit to CarCo by facilitating its negotiations with unions and representatives of the retirees. The success of the latter negotiations resulted in the funding of a VEBA trust and the additional benefit of allowing CarCo to remove the OPEB liabilities from its balance sheet. The substantial capital made available to CarCo by the credit facilities was even more valuable in light of the tight credit market during that period of time. In this regard, the Daimler Entities cite to a document included by the Trust in its submissions that references the freeze in the credit markets in the period leading up to the Cerberus transaction.

In support of its position, the Trust referenced the July 27 Opinion, where the Court delineated certain of the direct and indirect values that were absent from the Trust's assessment and stated that the availability of the credit facility "could result in an indirect benefit if shown to facilitate additional business opportunities." *See MFS/Sun,* 910 F.Supp.2d at 937; *see also Off. Comm. of Unsec. Creds. of M. Fabrikant & Sons, Inc. v. JP Morgan Chase, N.A.* ( *In re M. Fabrikant & Sons, Inc.),* 394 B.R. 721, 738 (Bankr.S.D.N.Y.2008) (noting that indirect benefits may include increased access to capital)." While the Court cited to an example of where a credit facility would supply value, it was not the Court's intent to restrict such value determinations only to instances where indirect value was received from new business opportunities. Rather, the Court recognizes that "[t]he ability to borrow money has considerable value in the commercial world." *Metro Commc'ns,* 945 F.2d at 647. In addition to the business opportunities that such borrowing ability may make available, it may also afford "other imponderable[s] in the operation or expansion of [a] business." *Id.* An imponderable is an item that is difficult to estimate or measure. Therefore, the value to be placed on this ability to borrow money depends not only upon the business opportunities made available, but also on other measures that are difficult to quantify that facilitate the operation or expansion of the business. Moreover, the court in *Mellon Bank v. Off. Comm. of Unsec. Creds.* ( *In re R.M.L., Inc.),* 92 F.3d 139, 151 (3d Cir.1996), citing to *Metro Communications,* noted that intangible benefits that are not susceptible to precise calculation can be deemed to have provided value at the time of the transaction, even if they later failed to materialize. Nor was the Court in the July 27 Opinion ruling out the potential for a credit facility to afford a direct benefit.

**\*15** In any event, for the purposes of its motion to dismiss, the Daimler Entities are not seeking a ruling quantifying the exact amount of benefit conferred upon

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 1833244 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 1833244 (Bkrtcy.S.D.N.Y.))**

CarCo by the credit facilities. Instead, they reference the implausibility of the Trust's contention that CarCo received no value, or insignificant value, from the availability of $12 billion from the credit facilities. Indeed, it cannot be seriously disputed that the availability of $12 billion in credit has value, which, even if an indirect benefit, could have been quantified.

*Tax Benefits*

The Trust values the benefit to CarCo from certain tax agreements it had with Daimler at $400 million, based upon a $425 million reserve set aside for Daimler's responsibility to indemnify CarCo for certain Canadian tax obligations. However, Daimler had an unlimited indemnity obligation concerning the Canadian tax disputes. Thus, the amount of the reserve was not intended to cap or limit Daimler's responsibility to indemnify CarCo.

The Daimler Entities reference a form they filed concerning their financial information and performance (Chrysler Grp., General Form for Registration of Securities (Form 10) (Feb. 25, 2011), which is a public record that makes clear that Daimler has already paid in excess of $700 million with respect to the Canadian tax obligations. In addition, that document also estimates Daimler's future responsibility on that obligation at over one billion dollars. Thus, the Daimler Entities maintain that the Trust only valued a portion of this benefit, which is much more than $400 million.

In the context of this motion to dismiss, the Court is limited in what it may consider to determine the value of the tax benefits. The public record concerning the outcome of the parties dispute with respect to the tax benefits suggests that the tax benefits did have greater value than the amount of the reserve. However, based upon the tax reserve information of record that was available at the time of the transaction, it cannot be said that the Trust's allegation concerning the value of the tax benefits is implausible.

Nevertheless, even if the $400 million valuation based upon the reserve at the time of the transaction is plausible, and without considering any added value provided by the tax benefits, CarCo received sufficient value in the overall transaction to render implausible the Trust's allegations of lack of reasonable value or fair consideration.

*Ancillary Agreements*

CarCo and the Daimler Entities entered into forty-nine ancillary agreements as part of the overall transaction, and the Trust applies a zero value to these agreements. The docket of the case, however, reflects that most of these agreements must have had value to CarCo. First, New Chrysler, the new enterprise that emerged from the bankruptcy, assumed thirty-eight of those agreements, which is an indication of value. Further, during the course of the case, New Chrysler filed an action against Daimler concerning one of the agreements, alleging that Daimler's failure to perform on that agreement would threaten the viability of the business of one of the Debtors. This shows that the ancillary agreement was critical to the ongoing success of the new enterprise. Thus, the agreements had value and it is implausible to suggest that they had no value.

*Other Elements of Value*

**\*16** As part of the overall transaction, a $920 million intercompany debt was repaid to CarCo. This repayment was separate and apart from the netting out of intercompany debt. The Daimler Entities contend that this was real money made available to CarCo that enhanced its cash position.

The Trust asserts that no value was received from the repayment of the receivable because it was balance-sheet neutral. In addition, the Trust argues that certain one-month short term loans made by Daimler to CarCo during the course of the overall transaction that were immediately repaid should be netted from the receivable repaid to CarCo.

While it is true that the repayment of the $920 million receivable was balance-sheet neutral, it nonetheless provided cash availability, which represents added value. Moreover, unlike the short-term loans that were repaid by CarCo to Daimler, the intercompany receivable paid to CarCo was based upon a pre-existing receivable. CarCo benefitted by liquidating a receivable, while the payment by CarCo to Daimler was a very short-term, cash-in/cash-out transaction.

CarCo also received value in the form of the national sales companies ("NSC's"), which were Daimler's overseas distribution facilities, and the $1 billion in inventory that was transferred to CarCo as part of the transfer of the NSC's. The value of that inventory was not included in the valuation of those sales companies.

The Trust argues that the net value to CarCo from the $1 billion in inventory was negligible because any sale of the inventory carried a corresponding obligation to pay most of the proceeds to CarCo.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 1833244 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 1833244 (Bkrtcy.S.D.N.Y.))**

Although there was a cost incurred to liquidate the inventory, nevertheless, CarCo received value from Daimler having provided the $1 billion in inventory. The $900 million to operate the NSC's included the purchase of additional inventory and, therefore, cannot be applied entirely to offset the value of the inventory furnished by Daimler.

In addition, Daimler guaranteed up to $1 billion of CarCo's PBGC obligations, which guarantee was subsequently monetized to $600 million in a later settlement agreement. The Trust argues that this did not provide value because Daimler actually reduced its overall exposure on PBGC obligations from $4.5 billion to $1 bilion.

The $1 billion guarantee, however, provided immediate value to CarCo because it reduced the amount of payments otherwise required by the PBGC on an ongoing basis. It reduced CarCo's need to immediately seek more funding because the PBGC agreed to reduce CarCo's periodic obligations as a result of the guarantee.

*Headquarters Property*

In their motion to dismiss, the Daimler Entities also contend that the Trust overvalues the value of property that was transferred out of CarCo in the transaction. Specifically, the Trust references CarCo's transfer of the headquarters property to a Cerberus subsidiary in August 2007 for $325 million. The Trust alleges a $700 million value for this property, which the Trust maintains is a conservative valuation when considering a 2006 purchase offer for the property for $1.2 billion and a 2006 tax assessment.

**\*17** The Daimler Entities argue the measures utilized by the Trust do not reflect the market price for the property in August 2007, especially when considering the decline in the real estate values in 2007. The Daimler Entities argue that the $225 million mortgage that was obtained for the property provides a more reliable indicator of the value of the property at the time of the sale. The Daimler Entities contend that based upon a buyer's motivation to maximize the amount of the loan, it is not plausible that the value of the property was in excess of the $325 million purchase price.

While a factual issue may be present concerning the appropriate value of the property in the range between $325 million and $700 million, the $1.2 million valuation is not plausible. First, in the context of the acquisition of a commercial property where the purchaser would seek to maximize the amount of the mortgage,[FN18] the amount of the mortgage obtained at the time of the transfer was a contemporaneous market assessment of the value of the property. The fact that the mortgage was $225 million eliminates consideration of the $1.2 billion as the value of the property, as that would reflect a mortgage of only approximately 18% of the value. Moreover, even the high range nearing the $700 million mark would be at odds with a mortgage of that value. Nevertheless, even if one were to accept that a factual issue was presented concerning the value of the headquarters, up to the $700 million value posited by the Trust, that premise would imply the potential for up to $375 million of additional value that was transferred by CarCo. However, the value of assets received by CarCo in the overall transaction, for which the Trust failed to account, would more than offset this additional value.

> FN18. There is no allegation that the Daimler Entities did not act in such accord.

As previously noted, the creditor who seeks to set aside a conveyance as fraudulent, generally, has the burden of proof on the issue of whether such transfer was made for reasonably equivalent value or fair consideration. The allegations must show that a right to relief is beyond the merely speculative. The Trust's allegations that CarCo did not receive reasonably equivalent value in the overall transaction are not supported by the record and are implausible as a general matter.[FN19]

> FN19. Inasmuch as the Court has determined that the Trust's allegations concerning lack of reasonably equivalent value or fair consideration in the overall transaction are implausible, the Court does not address the allegations concerning solvency.

The record of this case shows that the Trust's allegations concerning the asset valuations that CarCo received in the transaction are implausible. First, the record of the case shows that it is implausible that CarCo would immediately terminate the S & D Agreement with Motors. At a minimum, even if a decision were made to terminate the agreement, it would take a substantial period of time to replicate the infrastructure and network associated with the enterprise. Moreover, the Trust's analysis does not account for billions of dollars in vehicle and parts inventory, nor does it account for operating leases.

In addition, the Trust's analysis does not attribute any

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 1833244 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 1833244 (Bkrtcy.S.D.N.Y.))**

value to the access to funding afforded by the credit facilities. There is no question that the ability to access credit is of substantial value in the commercial world, especially where the facilities make available $12 billion in funding. Further, the record of this case shows that it is implausible to assert that the ancillary agreements did not provide value. The agreements provided substantial value at the time of transaction, and thereafter were shown to be critical to the ongoing enterprise. While certain of these valuations cannot be readily quantified, it cannot be seriously disputed that they provided substantial value.

***18** The Trust's allegations concerning the gap in the consideration given and received by CarCo in the overall transaction are not plausible. Moreover, the allegations ignore the contemporaneous market information concerning the involvement of other sophisticated parties in the transactions. Indeed, the allegations are implausible in the context of the involvement of Cerberus, who paid billions of dollars in the transaction, the United Automobile Workers union, which accepted warrants in the restructured enterprise, the PBGC, which negotiated settlements with Carco, and the banks, which made available billions of dollars to CarCo. The Trust's allegations would require an inference that all of these parties were led astray. It is implausible that these sophisticated parties, who had access to the same financial information as Daimler, would invest and rely on the wherewithal of CarCo if it had been stripped of its assets and were unable to sustain its operations.[FN20]

> FN20. Although the result of the overall transaction may have been to enhance FinCo's value by separating it from CarCo, when one takes into account the involvement of all of these sophisticated parties, including Daimler, it does not plausibly lead to the conclusion that CarCo was the subject of fraudulent conveyances.

Finally, this is a case where full 2004 discovery powers were available to the Trust and to its predecessor in interest, the Creditors' Committee. Substantial investigation took place and there was a full and fair opportunity to attempt to present a sustainable complaint. Moreover, even within that context, upon determining that the overall transaction should be considered as one integrated transaction, and upon dismissing the First Amended Complaint, the Court afforded the Trust an opportunity to replead certain counts, including the constructive fraud counts. Thereafter, the Trust continued to have access to all prior discovery, nonetheless, it failed to cure the deficiencies in the allegations, and the Court dismisses the constructive fraud counts of the Second Amended Complaint with prejudice.

*Additional Claims*

Count IV and V of the Complaint, which allege unjust enrichment and alter ego liability, respectively, are premised upon the allegations of the earlier Counts, including the absence of reasonably equivalent value or fair consideration. Count V of the Complaint alleging alter ego liability was pled for the purpose of making Daimler accountable for any liability of the other Daimler Entities. As the Court has dismissed the constructive fraud counts with prejudice, accordingly, these counts are also dismissed with prejudice.

*Conclusion*

Based upon the foregoing, the Second Amended Complaint is dismissed with prejudice.

The Daimler Entities are to settle an order consistent with this Opinion.

Bkrtcy.S.D.N.Y.,2011.
In re Old Carco LLC
--- B.R. ----, 2011 WL 1833244 (Bkrtcy.S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.