Equity Purchase and Commitment Agreement, dated February 29, 2007, the "Original

EPCA").

(f)        After holding a contested evidentiary hearing on the Original Approval

Motion on January 11 and 12, 2007, and considering the evidentiary record, the

objections to the relief requested, and the arguments of counsel, the Bankruptcy Court

overruled all objections not withdrawn or settled and entered its order granting the relief

requested by the Debtors in the Original Approval Motion as it was modified at the

hearing (the "Original Approval Order").

(g)        On July 7, 2007, the Original EPCA was terminated pursuant to section

12(g) and the Original PSA was correspondingly terminated.  Due the Delphi's

termination of the Original EPCA under section 12 (g), no Alternate Transaction Fee (as

defined in the Original EPCA) is due and owing to the Original Plan Investors.  After the

termination of the Original EPCA, Delphi continued discussions with potential investors.

(h)        The parties subsequently agreed on a proposed equity investment by

certain affiliates of Appaloosa, Harbinger, Pardus Capital Management L.P. ("Pardus"),

Merrill, UBS, and Goldman Sachs & Co.("GS") (GS, together with Merrill, UBS, and

certain affiliates of Appaloosa, Harbinger, and Pardus, the "Investors") in Delphi (the

"Investment").

(i)        The Investment, which would be an integral component of the Plan, will

be made pursuant to the Delphi-Appaloosa EPCA, which sets forth the terms and

conditions under which the Investors would (i) purchase any unsubscribed shares issued

under a rights offering of new common stock of Delphi to be issued pursuant to the Plan

and (ii) purchase newly issued shares of common stock and preferred stock of Delphi.

(j)        In connection with the Delphi-Appaloosa EPCA, Appaloosa, Harbinger, and Pardus (collectively, the "Commitment Parties," and together with the Investors, the "Plan Investors") will provide the Commitment Letters to the Investors and Delphi, pursuant to which each Commitment Party will provide funding to the Investors under the terms and subject to the limitations set forth in the Commitment Letters.

(k)        The Investment Agreements are fair and equitable to all parties.

(l)        The Debtors' decision to enter into the Investment Agreements is a sound exercise of their business judgment, is consistent with their fiduciary duties, and is based on good, sufficient, and sound business purposes and justifications.

(m)        The Investment Agreements were negotiated at arms' length and in good faith.

(n)        The Investment Agreements are fair, reasonable, and in the best interests of the Debtors, their estates, shareholders, creditors, and all parties-in-interest.

(o)        The provisions in the Delphi-Appaloosa EPCA for the payment of the indemnities provided in Section 10 of the EPCA (the "Indemnity"), the Transaction Expenses, the Commitment Fees, the Arrangement Fee, and the Alternate Transaction Fee (each as defined in the Delphi-Appaloosa EPCA) are integral parts of the transactions contemplated by the Delphi-Appaloosa EPCA, without any one of which the Plan Investors would not enter into the Investment Agreements.

(p)        The incurrence of the Indemnity, the Transaction Expenses, the Commitment Fees, the Arrangement Fee, the Alternate Transaction Fee, and any damage claims ("Damage Claims") that may arise against the Debtors pursuant to the terms of the Delphi-Appaloosa EPCA shall be deemed to have been incurred in good faith, as such

6

term is used in section 363(m) of the Bankruptcy Code, and the priorities extended to the

Plan Investors pursuant to this order (as described below) shall be entitled to all of the

protections provided herein or otherwise contemplated hereby.

(q)     The relief requested in the Motion is in the best interests of the Debtors,

their estates, shareholders, creditors, and all parties-in-interest.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND

DECREED THAT:

1.     The Motion is GRANTED in its entirety, and shall not be subject to stay under

Bankruptcy Rule 6004(g).

2.     Any objection to the Motion not withdrawn or otherwise resolved as set forth in

this order is hereby overruled.

3.     Pursuant to sections 105(a), 363(b), 503(b), and 507(a) of the Bankruptcy Code,

the Debtors and the applicable Plan Investors are hereby authorized, but not directed, to execute,

deliver, and implement the Investment Agreements and all exhibits and attachments thereto, and

to take any and all actions necessary and proper to implement the terms of the Investment

Agreements, and such agreements and documents shall be binding and enforceable against the

Debtors, their estates, and the other parties thereto in accordance with their terms and subject to

the conditions contained therein.  The Debtors and the Plan Investors are authorized to amend the

Investment Agreements without further order of the Bankruptcy Court to the extent that such

amendments either are not material to the Investment Agreements or have not been objected to

by either the Creditors' Committee or the Equity Committee following five (5) business days

prior notice (or such shorter period as the Statutory Committees and the Debtors may agree).

4.        The Debtors are authorized to pay the Indemnity (if applicable), the Transaction

Expenses, the Commitment Fees, the Arrangement Fee, the Alternate Transaction Fee (if

applicable), and any Damage Claim (if applicable, and to the extent allowed), each in accordance

with its terms and as and when required by the Investment Agreements, except as otherwise

provided below, without further order of the Court.  The Debtors are authorized to make all other

payments to or for the benefit of the Plan Investors as and when required by the Investment

Agreements and any exhibit, schedule or attachment thereto, on the terms set forth therein,

without further order of the Court.  Any such payments shall be fully earned when paid, non-

refundable, and not subject to avoidance or disgorgement under any theory at law or in equity;

provided, however, that notwithstanding the foregoing, so long as the Creditors' Committee shall

support the Investment Agreements and the transactions contemplated thereby, the Plan Investors

shall provide to the Creditors' Committee an itemization of any Transaction Expenses for which

payment is being sought, together with appropriate back-up therefor, and 90% of such

Transaction Expenses shall be paid in accordance with the terms of the Investment Agreements

as and when required thereby without further order of the Court, with the remaining 10% (the

"Holdback") to be paid ten days subsequent to the delivery of such itemization and backup to the

Creditors' Committee, unless prior to the expiration of such ten-day period, the Creditors'

Committee objects to any of the amounts submitted for payment, in which case an amount equal

to the amount of Transaction Expenses objected to (up to the maximum amount of the Holdback)

shall be retained and not paid to the Investors pending resolution of the dispute with the

Creditors' Committee or further order of the Court, and subject to further to the U.S. Trustee's

review.

5.    Each of the Indemnity (if applicable), the Transaction Expenses, the Commitment Fees, the Arrangement Fee, the Alternate Transaction Fee (if applicable), and any Damage Claim against the Debtors (if applicable) provided for or permitted by the Investment Agreements shall constitute allowed claims pursuant to sections 503(b)(1)(A) and 507(a)(1) of the Bankruptcy Code and shall be paid as and when provided for in the Investment Agreements without further application to or order of the Bankruptcy Court except that (i) in the case of any Damage Claim against the Debtors provided for or permitted by the Investment Agreements, such Damage Claim shall be allowed in the amount determined by the Bankruptcy Court after notice and a hearing, (ii) in the case of any Indemnity claim against the Debtors provided for or permitted by the Investment Agreements, such claim shall be resolved in a manner pursuant to the Investment Agreement with any disputes to be resolved by the Bankruptcy Court, and (iii) in the case of the Transaction Expenses incurred by A-D Acquisition Holdings, LLC (an affiliate of Appaloosa) ("ADAH") or its affiliates on or prior to May 17, 2006 (see Delphi-Appaloosa EPCA § 2(j)), as set forth in the transcript of the hearing of the Original Approval Motion (Transcript of January 12, 2007 Hearing at 79:16-84:18).  In addition, to the extent permitted under any order authorizing the Debtors to obtain postpetition financing and/or to utilize cash collateral then or thereafter in effect (each, a "Financing Order"), the Transaction Expenses incurred from and after the date of entry of the Initial Approval Order shall be protected by and entitled to the benefits of the carve-out for professionals as provided in any such Financing Order.

6.    If the Committee of Delphi Trade Claim Holders has not subsequently withdrawn, qualified or modified in a manner adverse to the Plan Investors (or resolved to do any of the foregoing) its support for the entry of this order, the implementation of the Investment Agreements, or any of the transactions contemplated by the Investment Agreements, the Plan

Investors, the Debtors, and the Creditors' Committee shall not oppose any application by the

Committee of Delphi Trade Claim Holders for the payment of fees and expenses of their

professionals pursuant to section 503(b) of the Bankruptcy Code provided that the Plan

Investors, the Creditors' Committee and the Debtors may oppose the reimbursement of fees and

expenses in excess of $750,000.

7.    Nothing in this order shall limit the rights of any party-in-interest to object or

present any evidence or argument in opposition to the confirmation of any plan of reorganization

that may be filed in the Chapter 11 Cases, or the approval of any disclosure statement filed in

connection therewith, which are reserved in all respects.

8.    This order is a final and non-interlocutory order and is immediately subject to

appeal pursuant to 28 U.S.C. § 158(a).

9.    Notwithstanding Rule 6004(g) of the Federal Rules of Bankruptcy Procedure or

any other Bankruptcy Rule, this order shall take effect immediately upon its entry.

10.    This Court shall retain jurisdiction to hear and determine all matters arising from

the implementation of this order.

11.    The requirement under Local Rule 9013-1(b) for the service and filing of a

separate memorandum of law is deemed satisfied by the Motion.


Dated:    August 2, 2007
          New York, New York

                                        /s/ Robert D. Drain
                                        _____
                                        UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT 1</u>**

July 18, 2007


Delphi Corporation
5725 Delphi Drive
Troy, MI  48098

Attn:   Robert S. "Steve" Miller
        Chairman and Chief Executive Officer

Re: Proposed Investment in Delphi Corporation

Dear Mr. Miller:

    As you know, the signatories hereto have been engaged in discussions with Delphi Corporation ("Delphi" or the "Company") and various other parties in interest in the jointly administered chapter 11 cases (the "Chapter 11 Cases") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") with respect to Delphi and certain of its subsidiaries (collectively, the "Debtors") regarding a potential global resolution of the Chapter 11 Cases that would be implemented pursuant to a plan of reorganization for the Debtors (the "Plan") and be funded in part by an equity investment in Delphi (the "Investment").

    Pursuant to the Company's request, the undersigned severally, not jointly, submit this proposal (the "Proposal") to make the Investment on the terms and subject to the conditions contained in the attached form of Equity Purchase and Commitment Agreement (the "Investment Agreement"). Upon the entry by the Bankruptcy Court of the Initial Approval Order (as defined and described below) and the satisfaction of the other conditions described in this letter, the undersigned will severally, not jointly, enter into the Investment Agreement and each of A-D Acquisition Holdings, LLC, Pardus DPH Holding LLC and Harbinger Del-Auto Investment Company, Ltd. will deliver an Equity Commitment Letter in the form attached hereto. Our several obligations to enter into the Investment Agreement, however, are subject to your using your commercially reasonable efforts to have the Bankruptcy Court enter the Initial Approval Order by, among other things: (a) preparing and filing with the Bankruptcy Court, no later than July 18, 2007, the Approval Motion referred to in the Investment Agreement and (b) using commercially reasonable efforts to obtain a hearing on the Initial Motion on or before August 16, 2007.

    The undersigned and their advisors have devoted substantial time and resources to preparing this Proposal. We appreciate the significant amount of time and resources that Delphi has dedicated to assist our teams in developing a deeper understanding of the Company's business. Based on this work, the undersigned are prepared to take appropriate action to move forward toward the full formulation and implementation of the transactions contemplated by the Investment Agreement, including engaging in the preparation and negotiation of additional definitive documents as contemplated thereby and supporting the Debtors' efforts to obtain entry of the Initial Approval Order.

This Proposal is subject to, and expressly conditioned on, (1) the execution and delivery by all signatories thereto of the Investment Agreement in the form attached to this letter and (2) the entry by the Bankruptcy Court of an order, in form and substance reasonably satisfactory to each of us (the "Initial Approval Order"): (a) approving, and authorizing the Debtors to enter into and perform their obligations under the Investment Agreement and (b) authorizing the payment of the Commitment Fees, the Arrangement Fee, the Alternate Transaction Fee and Transaction Expenses (as such terms are defined in the Investment Agreement) on the terms and subject to the conditions set forth in the Investment Agreement.

This Proposal will remain open until 5:00 p.m., Eastern Standard Time on July 18, 2007, at which point it will expire unless Delphi has filed a motion, in form and substance reasonably acceptable to us, seeking entry by the Bankruptcy Court of the Initial Approval Order and requesting a hearing on such motion on or before August 16, 2007. In addition, even if accepted by Delphi this Proposal shall terminate and be of no further force of effect if, on or before August 16, 2007: (1) the Initial Approval Order has not been entered by the Bankruptcy Court, (2) the Investment Agreement has not been executed and delivered to us by Delphi, or (3) any of the undersigned determines in its sole discretion that either (a) the conditions to the obligations of the undersigned contained in the Investment Agreement are incapable of being satisfied or (b) the undersigned is entitled to exercise a termination right contained in the Investment Agreement.

*    *    *    *

Based on our work to date, we are very enthusiastic about Delphi and look forward to pursuing the transactions contemplated by the Investment Agreement to an expeditious and mutually successful conclusion.

A-D ACQUISITION HOLDINGS, LLC

By: _James E. Brbin_____
    Name:
    Title:


HARBINGER DEL-AUTO INVESTMENT
    COMPANY, LTD.


By:_____
    Name:
    Title:

MERRILL LYNCH, PIERCE, FENNER &
    SMITH INCORPORATED


By:_____
    Name:
    Title:


UBS SECURITIES LLC


By:_____
    Name:
    Title:


By:_____
    Name:
    Title:

Based on our work to date, we are very enthusiastic about Delphi and look forward to pursuing the transactions contemplated by the Investment Agreement ~~and the Plan Support Agreement~~ to an expeditious and mutually successful conclusion.

A-D ACQUISITION HOLDINGS, LLC

By:_____
    Name:
    Title:

HARBINGER DEL-AUTO INVESTMENT
    COMPANY, LTD.

By:_____
    Name:  Charles D. Miller
    Title:  Vice President

MERRILL LYNCH, PIERCE, FENNER &
    SMITH INCORPORATED

By:_____
    Name:
    Title:

UBS SECURITIES LLC

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

Based on our work to date, we are very enthusiastic about Delphi and look forward to pursuing the transactions contemplated by the Investment Agreement to an expeditious and mutually successful conclusion.

A-D ACQUISITION HOLDINGS, LLC

By:_____
    Name:
    Title:

HARBINGER DEL-AUTO INVESTMENT
    COMPANY, LTD.

By:_____
    Name:
    Title:

MERRILL LYNCH, PIERCE, FENNER &
    SMITH INCORPORATED

By:_____
    Name: Graham Goldsmith
    Title: Managing Director

UBS SECURITIES LLC

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

Based on our work to date, we are very enthusiastic about Delphi and look forward to pursuing the transactions contemplated by the Investment Agreement ~~and the Plan Support Agreement~~ to an expeditious and mutually successful conclusion.

A-D ACQUISITION HOLDINGS, LLC

By:_____
      Name:
      Title:

HARBINGER DEL-AUTO INVESTMENT
COMPANY, LTD.

By:_____
      Name:
      Title:

MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED

By:_____
      Name:
      Title:

UBS SECURITIES LLC

By:_____
      Name: Steven Smith
      Title: Managing Director

By:_____
      Name: Andrew Kramer
      Title: Managing Director

GOLDMAN SACHS & CO.

By: _____
Name: Thomas A. Nagual
Title: Managing Director

PARDUS DPH HOLDING LLC

By: _____
Name:
Title:

Jul 17 07 07:28p    Joseph Thornton    973 490 6164    p.2

GOLDMAN SACHS & CO.

By:_____
   Name:
   Title:

PARDUS DPH HOLDING LLC

By:_____
   Name:
   Title:

Signature Page for Bid Letter

## EQUITY PURCHASE AND COMMITMENT AGREEMENT

THIS EQUITY PURCHASE AND COMMITMENT AGREEMENT (as from time to time amended, restated, amended and restated, modified or supplemented in accordance with the terms hereof, this "**Agreement**"), dated as of  **[_____  __]**, 2007, is made by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware ("**ADAH**"), Harbinger Del-Auto Investment Company, Ltd., an exempted company incorporated in the Cayman Islands ("**Harbinger**"), Merrill Lynch, Pierce, Fenner & Smith Incorporated, a Delaware corporation ("**Merrill**"), UBS Securities LLC, a Delaware limited liability company ("**UBS**"), Goldman Sachs & Co., a New York limited partnership ("**GS**"), Pardus DPH Holding LLC, a Delaware limited liability company ("**Pardus**"), and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "**Company**").  ADAH, Harbinger, Merrill, UBS, GS and Pardus are each individually referred to herein as an "**Investor**" and collectively as the "**Investors**".  Capitalized terms used in the agreement have the meanings assigned thereto in the sections indicated on Schedule 1 hereto.

WHEREAS, the Company and certain of its subsidiaries and affiliates (the "**Debtors**") commenced jointly administered cases (the "**Chapter 11 Cases**") under United States Bankruptcy Code, 11 U.S.C. §§ 101-1330, as amended and in effect on October 8, 2005 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, ADAH, Harbinger, UBS, Merrill, Dolce Investments LLC ("**Dolce**") (collectively, the "**Original Investors**") and the Company negotiated and entered into that certain Equity Purchase and Commitment Agreement, dated as of January 18, 2007 (the "**Original Agreement**").  The Original Agreement set forth the terms on which the Original Investors would provide certain financial accommodations that would facilitate the implementation of a plan of reorganization under the Bankruptcy Code for the Debtors having terms consistent with the Original Agreement and that certain Plan Framework Support Agreement, dated as of December 18, 2006 by and among the Company, General Motors Corporation ("**GM**"), Appaloosa Management L.P. ("**Appaloosa**"), Cerberus Capital Management, L.P. ("**Cerberus**"), Harbinger Capital Partners Master Fund I, Ltd. ("**Harbinger Fund**"), Merrill and UBS (as previously amended by the Amendment and Supplement to the Plan Framework Support Agreement, dated as of January 18, 2007, the "**Original PSA**");

WHEREAS, the Company filed a motion (the "**Original Approval Motion**") with the Bankruptcy Court for entry of an order:  (i) approving and authorizing the Company to enter into the Original Agreement and the Original PSA; (ii) authorizing the Company to make certain payments contemplated by the Original Agreement; and (iii) granting certain related relief;

WHEREAS, after holding a contested evidentiary hearing on the Original Approval Motion on January 11 and 12, 2007, and considering the evidentiary record, the objections to the relief requested, and the argument of counsel, the Bankruptcy Court over-ruled such objections and entered its order granting the relief requested by the Company in the Original Approval Motion as it was modified at the hearing (the "**Original Approval Order**");

WHEREAS, the Original Agreement and the Original PSA were terminated by the Company on July 7, 2007;

WHEREAS, the Company has filed its motion (the "**Approval Motion**") seeking an order (the "**Approval Order**") from the Bankruptcy Court that all of the findings, conclusions and rulings contained in the Original Approval Order (i) apply to this Agreement (including the Commitment Fees, the Arrangement Fee, the Alternate Transaction Fees and the Transaction Expenses provided for herein), the Plan Terms attached hereto as Exhibit B (the "**Plan Terms**"), the parties thereto and the transactions contemplated thereby, and (ii) continue in full force and effect with respect thereto;

WHEREAS, the Company intends to propose and submit to the Bankruptcy Court for its approval a plan of reorganization for the Debtors that is consistent with this Agreement and the Plan Terms;

WHEREAS, the Company has requested that the Investors participate in the plan of reorganization, and the Investors are willing to participate in the plan of reorganization, on the terms and subject to the conditions contained in this Agreement; and

WHEREAS, each of Appaloosa, Harbinger Fund and Pardus Special Opportunities Master Fund L.P. (collectively, the "**Commitment Parties**") will provide, on the date hereof, commitment letters addressed to ADAH, Harbinger and Pardus respectively, and the Company whereby each Commitment Party will confirm its commitment to provide equity financing to ADAH, Harbinger and Pardus, respectively, on the terms and subject to the limitations set forth in the commitment letters.

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, each of the parties hereto hereby agrees as follows:

1.      Rights Offering.

(a)      The Company proposes to offer and sell shares of its new common stock, par value $0.01 per share (the "**New Common Stock**"), pursuant to a rights offering (the "**Rights Offering**") whereby the Company will distribute at no charge to

each holder (each, an "**Eligible Holder**") of Common Stock, including, to the extent applicable, the Investors, that number of rights (each, a "**Right**") in respect of shares of Common Stock outstanding and held of record as of the close of business on a record date (the "**Record Date**") to be set by the Board of Directors of the Company that will enable each Eligible Holder to purchase up to its pro rata portion of 41,026,311 shares in the aggregate of New Common Stock (each, a "**Share**") at a purchase price of $38.39 per Share (the "**Purchase Price**").

(b)     The Company will conduct the Rights Offering pursuant to a plan of reorganization of the Debtors (such plan of reorganization, the "**Plan**"), which shall reflect the Company's proposed restructuring transactions described in this Agreement, the Summary of Terms of Preferred Stock attached hereto as Exhibit A (the "**Preferred Term Sheet**") and the Plan Terms.

(c)     The Rights Offering will be conducted as follows:

(i)     On the terms and subject to the conditions of this Agreement and subject to applicable law, the Company shall offer Shares for subscription by holders of Rights as set forth in this Agreement.

(ii)     Promptly, and no later than four (4) Business Days, following the occurrence of both (1) the date that the Confirmation Order shall have been entered by the Bankruptcy Court and (2) the effectiveness under the Securities Act of 1933, as amended (the "**Securities Act**"), of the Rights Offering Registration Statement filed with the Securities and Exchange Commission (the "**Commission**") relating to the Rights Offering, the Company shall issue to each Eligible Holder, Rights to purchase up to its pro rata portion of 41,026,311 Shares in the aggregate (the date of such distribution, the "**Rights Distribution Date**").  The Company will be responsible for effecting the distribution of certificates representing the Rights, the Rights Offering Prospectus and any related materials to each Eligible Holder.

(iii)     The Rights may be exercised during a period (the "**Rights Exercise Period**") commencing on the Rights Distribution Date and ending at the Expiration Time.  The Rights shall be transferable.  "**Expiration Time**" means the date that is 30 days after the Rights Distribution Date, or such later date and time as the Company, subject to the prior written approval of ADAH, may specify in a notice provided to the Investors before 9:00 a.m., New York City time, on the Business Day before the then-effective Expiration Time.  The Company shall use its reasonable best efforts to cause the effective date of the Plan (the "**Effective Date**") to occur as promptly as reasonably practicable after the Expiration Time.  For the

purpose of this Agreement, "**Business Day**" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in New York City are generally authorized or obligated by law or executive order to close.  Each Eligible Holder who wishes to exercise all or a portion of its Rights shall (i) during the Rights Exercise Period return a duly executed document to a subscription agent reasonably acceptable to the Company and ADAH (the "**Subscription Agent**") electing to exercise all or a portion of the Rights held by such Eligible Holder and (ii) pay an amount, equal to the full Purchase Price of the number of Shares that the Eligible Holder elects to purchase, by wire transfer of immediately available funds by the Expiration Time to an escrow account established for the Rights Offering.

(iv)     Unless otherwise required by ADAH, there will be no over-subscription rights provided in connection with the Rights Offering.

(v)      As soon as reasonably practicable following the Effective Date, the Company will issue to each Eligible Holder who validly exercised its Rights the number of Shares to which such Eligible Holder is entitled based on such exercise.

(vi)     The Company hereby agrees and undertakes to give each Investor by electronic facsimile transmission the certification by an executive officer of the Company of either (i) the number of Shares elected to be purchased by Eligible Holders pursuant to validly exercised Rights, the aggregate Purchase Price therefor, the number of Unsubscribed Shares and the aggregate Purchase Price therefor (a "**Purchase Notice**") or (ii) in the absence of any Unsubscribed Shares, the fact that there are no Unsubscribed Shares and that the commitment set forth in Section 2(a)(iv) is terminated (a "**Satisfaction Notice**") as soon as practicable after the Expiration Time and, in any event, reasonably in advance of the Closing Date (the date of transmission of confirmation of a Purchase Notice or a Satisfaction Notice, the "**Determination Date**").

(vii)    The Rights Offering will provide each Eligible Holder who validly exercised its Rights with the right to withdraw a previous exercise of Rights after the withdrawal deadline established in the Rights Offering Registration Statement if there are changes to the Plan after the withdrawal deadline that the Bankruptcy Court determines are materially adverse to the holders of the Rights and the Bankruptcy Court requires resolicitation of votes under Section 1126 of the Bankruptcy Code or an opportunity to change previously cast acceptances or rejections of the Plan.

2.      <u>The Commitment; Fees and Expenses</u>.

(a)      On the terms and subject to the conditions set forth in this Agreement:

(i)      each Investor agrees, severally and not jointly, to subscribe for and purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to subscribe for and purchase, and the Company agrees to sell and issue, on the Closing Date (A) for the Purchase Price per Share, each Investor's proportionate share of 4,558,479 Shares as is set forth opposite such Investor's name on Schedule 2 hereto (the "**Direct Subscription Shares**") and (B) for $38.39, that number of shares of Series B Senior Convertible Preferred Stock, par value $0.01 per share (the "**Series B Preferred Stock**"), as is set forth opposite such Investor's name on Schedule 2 hereto, which shares shall be created pursuant to a Certificate of Designations (the "**Series B Certificate of Designations**") that is consistent with the terms set forth in the Preferred Term Sheet and, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to ADAH;

(ii)      [Reserved];

(iii)      ADAH agrees to subscribe for and purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to subscribe for and purchase, and the Company agrees to sell, on the Closing Date, for the purchase price of $31.28 per Share (the "**Series A Purchase Price**"), 12,787,724 shares of Series A-1 Senior Convertible Preferred Stock, par value $0.01 per share (the "**Series A Preferred Stock**") which shares shall be created pursuant to a Certificate of Designations (the "**Series A Certificate of Designations**") that is consistent with the terms set forth in the Preferred Term Sheet and with such other terms that, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to ADAH; and

(iv)      each Investor agrees, severally and not jointly, to purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to purchase, on the Closing Date, and the Company agrees to sell for the Purchase Price per Share that number of Shares issuable pursuant to the aggregate number of Rights that were not properly exercised by the Eligible Holders thereof during the Rights Exercise Period, in proportion to the Investor's share of the Direct Subscription Shares (such Shares in the aggregate, the "**Unsubscribed**

**Shares**"), rounded among the Investors as they may determine, in their sole discretion, to avoid fractional shares.

In connection with each of clauses (i) through (iv) above, subject to delivering prior written notice to each other Investor and the prior approval of ADAH, prior to the Securities Act Effective Date each Investor shall have the right to arrange for one or more of its Affiliates (each a "**Related Purchaser**") (A) to purchase Investor Shares, by written notice to the Company, which notice shall be signed by the Investor and each Related Purchaser, shall contain the Related Purchaser's agreement to be bound by this Agreement and shall contain a confirmation by the Related Purchaser of the accuracy with respect to it of the representations set forth in <u>Section 4</u> or (B) to designate that some or all of the Investor Shares be issued in the name of and delivered to, one or more Related Purchasers which designation shall be signed by the Investor and each Related Purchaser, shall contain the Related Purchaser's agreement to be bound by this Agreement and shall contain a confirmation by the Related Purchaser of the accuracy with respect to it of the representations set forth in <u>Section 4</u>; <u>provided</u>, that the total number of Investors, Related Purchasers and Ultimate Purchasers shall not exceed the Maximum Number.  The "**Maximum Number**" shall be 35 unless the Company consents to a higher number, such consent not to be unreasonably withheld; <u>provided</u>, <u>further</u>, that nothing in this Agreement shall limit or restrict in any way any Investor's ability to transfer or otherwise dispose of any Investor's Shares or any interests therein after the Closing Date pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements thereunder and subject to applicable state securities laws.  The Investors agree that each Related Purchaser will be a "Qualified Institutional Buyer" under Rule 144A of the Securities Act.

The Series A Preferred Stock and the Series B Preferred Stock are referred to herein collectively as the "**Preferred Shares**".  The Unsubscribed Shares, the Direct Subscription Shares and the Preferred Shares are referred to herein collectively as the "**Investor Shares**".  The term "**Affiliate**" shall have the meaning ascribed to such term in Rule 12b-2 under the Securities Exchange Act of 1934 in effect on the date hereof.

(b)    Upon the occurrence of an Investor Default or a Limited Termination, within five (5) Business Days of the occurrence of such Investor Default or Limited Termination, the Investors (other than any non-purchasing Investor) shall have the right to agree to purchase on the Closing Date, in the case of a Limited Termination, or to purchase, in the case of an Investor Default (or, in either case, arrange for the purchase through a Related Purchaser or an Ultimate Purchaser), all but not less than all, of the Available Investor Shares on the terms and subject to the conditions set forth in this Agreement and in such proportions as determined by the Investors in their sole discretion (an "**Alternative Financing**");

provided, that only in the case of a Limited Termination, ADAH will be required within ten (10) Business Days of the occurrence of such Limited Termination to agree to purchase on the Closing Date (or arrange for the purchase through a Related Purchaser or an Ultimate Purchaser) any Available Investor Shares attributable to the Limited Termination and not otherwise purchased pursuant to the Alternative Financing (unless ADAH has otherwise terminated this Agreement in accordance with its terms); provided, further, that the total number of Investors, Related Purchasers and Ultimate Purchasers pursuant to this Agreement shall not exceed the Maximum Number.  The term "**Investor Default**" shall mean the breach by any Investor of its obligation to purchase any Investor Shares which it is obligated to purchase under this Agreement.  The term "**Available Investor Shares**" shall mean any Investor Shares which any Investor is not purchasing as a result of an Investor Default or Limited Termination.  The exercise by any Investor of the right to purchase (or arrange a purchase of) any Available Investor Shares shall not relieve any defaulting Investor of any obligation to each other Investor or the Company of such defaulting Investor's breach of this Agreement.

(c)    As soon as practicable after the Expiration Time, and in any event reasonably in advance of the Closing Date, the Company will provide a Purchase Notice or a Satisfaction Notice to each Investor as provided above, setting forth a true and accurate determination of the aggregate number of Unsubscribed Shares, if any; provided, that on the Closing Date, on the terms and subject to the conditions in this Agreement, the Investors will purchase, and the Company will sell, only such number of Unsubscribed Shares as are listed in the Purchase Notice, without prejudice to the rights of the Investors to seek later an upward or downward adjustment if the number of Unsubscribed Shares in such Purchase Notice is inaccurate.

(d)    Delivery of the Investor Shares will be made by the Company to the account of each Investor (or to such other accounts as any Investor may designate in accordance with this Agreement) at 10:00 a.m., New York City time, on the Effective Date (the "**Closing Date**") against payment of the aggregate Purchase Price for the Investor Shares by wire transfer of immediately available funds in U.S. dollars to the account specified by the Company to the Investors at least 24 hours prior to the Closing Date.

(e)    All Investor Shares will be delivered with any and all issue, stamp, transfer, sales and use, or similar Taxes or duties payable in connection with such delivery duly paid by the Company.

(f)    The documents to be delivered on the Closing Date by or on behalf of the parties hereto and the Investor Shares will be delivered at the offices of White & Case

LLP, 1155 Avenue of the Americas, New York, New York 10036 on the Closing Date.

(g)     Subject to the provisions of Sections 2(a), 2(b) and 2(k) hereof, and subject to prior written notice to each other Investor and the prior approval of ADAH, any Investor may designate that some or all of the Unsubscribed Shares, Direct Subscription Shares or shares of Preferred Stock be issued in the name of, and delivered to, one or more Ultimate Purchasers.

(h)     On the basis of the representations and warranties herein contained, the Company shall pay the following fees to the Investors in accordance with Section 2(i) or 12(g), as the case may be:

(i)     an aggregate commitment fee of eighteen million dollars ($18,000,000) to be paid to the Investors in proportion to their undertakings herein relative to Preferred Shares as set forth in Schedule 2 (the "**Preferred Commitment Fee**");

(ii)    an aggregate commitment fee of thirty nine million, three hundred seventy five thousand dollars ($39,375,000) to be paid to the Investors as set forth in Schedule 2 to compensate the Investors for their undertakings herein relative to Investor Shares other than Preferred Shares (the "**Standby Commitment Fee**" and together with the Preferred Commitment Fee, the "**Commitment Fees**");

(iii)   a fee of six million, three hundred seventy five thousand dollars ($6,375,000) to ADAH to compensate ADAH for arranging the transactions contemplated hereby (the "**Arrangement Fee**"); and

(iv)    an Alternate Transaction Fee, if any, which shall be paid by the Company as provided in Section 12(g).

(i)     Seven million, five hundred twenty-five thousand dollars ($7,525,000) of the Commitment Fees shall be paid on the first Business Day following the first date that the Approval Order is issued by the Bankruptcy Court, and twenty-one million, one hundred sixty-two thousand, five hundred dollars ($21,162,500), representing the balance of the first fifty percent (50%) of the Commitment Fees, on the first Business Day following the Disclosure Statement Filing Date.  The balance of twenty-eight million, six hundred eighty-seven thousand, five hundred dollars ($28,687,500), representing the remaining fifty percent (50%) of the Commitment Fees, shall be paid on the first Business Day following the

Disclosure Statement Approval Date.  The Arrangement Fee shall be paid to
ADAH upon entry of the Approval Order.  Payment of the Commitment Fees,
Arrangement Fee and the Alternate Transaction Fee, if any, will be made by wire
transfer of immediately available funds in U.S. dollars to the account specified by
each Investor to the Company at least 24 hours prior to such payment.  The
Commitment Fees, Arrangement Fee and the Alternate Transaction Fee, if any,
will be nonrefundable and non-avoidable when paid.  The provision for the
payment of the Commitment Fees and Arrangement Fee is an integral part of the
transactions contemplated by this Agreement and without this provision the
Investors would not have entered into the Agreement and such Commitment Fees
and Arrangement Fee shall constitute an allowed administrative expense of the
Company under Section 503(b)(1) and 507(a)(1) of the Bankruptcy Code.

(j)      The Company will reimburse or pay, as the case may be, the out-of-pocket costs
and expenses reasonably incurred by each Investor or its Affiliates (which, for the
avoidance of doubt, shall not include any Ultimate Purchaser) to the extent
incurred on or before the first to occur of the date on which this Agreement
terminates in accordance with its terms and the Effective Date (and reasonable
post-closing costs and expenses relating to the closing of the transactions
contemplated hereby), including reasonable fees, costs and expenses of counsel to
each of the Investors or its Affiliates, and reasonable fees, costs and expenses of
any other professionals retained by any of the Investors or its Affiliates in
connection with the transactions contemplated hereby (including investigating,
negotiating and completing such transactions) and the Chapter 11 Cases and other
judicial and regulatory proceedings related to such transactions and the Chapter
11 Cases other than costs and expenses relating to any transactions with Ultimate
Purchasers and, with respect to expenses that would not otherwise be incurred by
the related Investor, Related Purchasers (collectively, "**Transaction Expenses**");
from and after (i) in the case of ADAH and Harbinger, December 1, 2006, (ii) in
the case of GS, July 3, 2007, in the case of Pardus, June 18, 2007 and in the case
of UBS and Merrill, July 30, 2006, promptly upon submission to the Company of
summary statements therefor by such Investor, in each case, without Bankruptcy
Court review or further Bankruptcy Court order, whether or not the transactions
contemplated hereby are consummated and, in any event, within 30 days of the
submission of such statements.  Notwithstanding the foregoing, (i) Transaction
Expenses incurred by ADAH or its Affiliates on or prior to May 17, 2006 in an
amount not to exceed $5,000,000 shall be paid if and when the effective date of
any plan of reorganization for the Company occurs and only if such plan results in
holders of Common Stock receiving any recovery under such plan, (ii)
Transaction Expenses incurred by Pardus on or prior to June 18, 2007 shall be
paid to the extent that they comprise the reasonable fees, costs and expenses of
legal counsel to Pardus related to the negotiation of this Agreement, the non-
disclosure agreement between Pardus and the Company dated June 18, 2007 and
the Transactions contemplated hereby or thereby, (iii) Transaction Expenses
incurred by GS on or prior to July 3, 2007 shall be paid to the extent that they
comprise the reasonable fees, costs and expenses of legal counsel to GS related to
the negotiation of this Agreement, the non-disclosure agreement between GS and

the Company and the Transactions contemplated hereby or thereby and (iv) the filing fee, if any, required to be paid in connection with any filings required to be made by any Investor or its Affiliates under the HSR Act or any other competition laws or regulations shall be paid by the Company on behalf of the Investors or such Affiliate when filings under the HSR Act or any other competition laws or regulations are made, together with all expenses of the Investors or its Affiliates incurred to comply therewith.

The provision for the payment of the Transaction Expenses is an integral part of the transactions contemplated by this Agreement and without this provision the Investors would not have entered into this Agreement and such Transaction Expenses shall constitute an allowed administrative expense of the Company under Section 503(b)(1) and 507(a)(1) of the Bankruptcy Code.  In addition, to the extent permitted under any order authorizing the Debtors to obtain post-petition financing and/or to utilize cash collateral then or thereafter in effect (each a "**Financing Order**"), the Transaction Expenses incurred from and after the date of entry of the Original Approval Order shall be protected by and entitled to the benefits of the carve-out for professional fees provided in any such Financing Order.

(k)     The Company acknowledges that the Investors and certain persons and entities (collectively, the "**Ultimate Purchasers**") have entered into an agreement and may, prior to the Securities Act Effective Date, enter into one or more new agreements or amend existing agreements (collectively, the "**Additional Investor Agreement**"), pursuant to which the Investors have arranged for a number of Ultimate Purchasers to purchase certain of the Unsubscribed Shares and the Direct Subscription Shares.  The Investors severally and not jointly acknowledge that they have not agreed and, without the prior written consent of ADAH, will not prior to the Closing agree, directly or indirectly, to sell, transfer, assign, pledge, hypothecate, donate or otherwise encumber or dispose of any Investor Shares or any interest or participation therein other than pursuant to the Additional Investor Agreement (as it may be amended from time to time) and other than an arrangement that was entered into among ADAH, Merrill, Harbinger and certain of their Affiliates regarding participation interests in the Series A-2 Senior Convertible Preferred Stock that was to be issued pursuant to the Original Agreement, which agreement has been terminated.  The total number of Investors, Related Purchasers and Ultimate Purchasers as of the Closing Date shall not exceed the Maximum Number.  Each Additional Investor Agreement shall contain each Ultimate Purchaser's agreement to be bound by this Agreement and a confirmation by each Ultimate Purchaser of the accuracy with respect to it of the representations set forth in Section 4 and a copy of such confirmation shall be provided to the Company prior to the Securities Act Effective Date.  Each Investor proposing to enter into an Additional Investor Agreement with any Ultimate Purchaser or proposing to transfer Investor Shares to, or to arrange for Investor Shares to be purchased by or delivered to, any Related Purchaser, in either case, which would result in the Maximum Number being exceeded agrees to notify the Company and ADAH prior to entering into such agreement or

effecting such transfer and will not undertake such agreement or effect such transfer without the consent of the Company and ADAH, which shall not be unreasonably withheld.  The Investors severally and not jointly agree that with respect to any offer or transfer to an Ultimate Purchaser prior to the Closing Date, they have not offered and shall not offer any Investor Shares to, and they have not entered into and shall not enter into the Additional Investor Agreement with, any person or entity (A) on or after the Securities Act Effective Date and (B) that is not a "Qualified Institutional Buyer" as defined in Rule 144A under the Securities Act; provided, that the total number of Investors, Related Purchasers and the Ultimate Purchasers pursuant to this Agreement shall not exceed the Maximum Number; provided, further, that nothing in this Agreement shall limit or restrict in any way any Investor's ability to transfer or otherwise dispose of any Investor's Shares or any interest therein after the Closing Date pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements thereunder and pursuant to applicable state securities laws.

3.      Representations and Warranties of the Company.  Except as set forth in a disclosure letter to be delivered pursuant to Section 5(s) (the "**Disclosure Letter**"), the Company represents and warrants to, and agrees with, each of the Investors as set forth below.  Any item disclosed in a section of the Disclosure Letter shall be deemed disclosed in all other sections of the Disclosure Letter to the extent the relevance of such disclosure or matter is reasonably apparent and shall qualify the representations and warranties contained in this Section 3.  Except for representations, warranties and agreements that are expressly limited as to their date, each representation, warranty and agreement shall be deemed made as of the date of delivery of the Disclosure Letter (the "**Disclosure Letter Delivery Date**") and as of the Closing Date:

(a)      Organization and Qualification.  The Company and each of its Significant Subsidiaries has been duly organized and is validly existing in good standing under the laws of its respective jurisdiction of incorporation, with the requisite power and authority to own its properties and conduct its business as currently conducted.  Each of the Company and its Subsidiaries has been duly qualified as a foreign corporation or organization for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties or conducts any business so as to require such qualification, except to the extent that the failure to be so qualified or be in good standing has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  For the purpose of this Agreement, "**Material Adverse Effect**" means (i) any material adverse effect on the business, results of operations, liabilities, property or condition (financial or otherwise) of the Company or its Subsidiaries, taken as a whole, or (ii) any material adverse effect on the ability of the Company, subject to the approvals and other authorizations set forth in Section 3(g) below, to consummate the transactions contemplated by this Agreement or the Plan other than, in either case, any effect relating to or resulting from (i) changes in general economic conditions or securities or

financial markets in general that do not disproportionately impact the Company and its Subsidiaries; (ii) general changes in the industry in which the Company and its Subsidiaries operate and not specifically relating to, or having a disproportionate effect on, the Companies and its Subsidiaries taken as a whole (relative to the effect on other persons operating in such industry); (iii) any changes in law applicable to the Company or any of its Subsidiaries or any of their respective properties or assets or interpretations thereof by any governmental authority which do not have a disproportionate effect on, the Company and its Subsidiaries; (iv) any outbreak or escalation of hostilities or war (whether declared or not declared) or any act of terrorism which do not have a disproportionate effect on, the Company and its Subsidiaries; (v) the announcement or the existence of, or compliance with, this Agreement and the transactions contemplated hereby (including without limitation the impact thereof on relationships with suppliers, customers or employees); (vi) any accounting regulations or principles or changes in accounting practices or policies that the Company or its Subsidiaries are required to adopt, including in connection with the audit of the Company's financial statements in accordance with GAAP or any failure to timely file periodic reports or timely prepare financial statements and the costs and effects of completing the preparation of the Company's financial statements and periodic reports; or (vii) any change in the market price or trading volumes of the Company's securities (it being understood for the purposes of this subclause (vii) that any facts underlying such change that are not otherwise covered by the immediately preceding clauses (i) through (vi) may be taken into account in determining whether or not there has been a Material Adverse Effect). For the purposes of this Agreement, (x) a "**Subsidiary**" of any person means, with respect to such person, any corporation, partnership, joint venture or other legal entity of which such person (either alone or through or together with any other subsidiary), owns, directly or indirectly, more than 50% of the stock or other equity interests, has the power to elect a majority of the board of directors or similar governing body, or has the power to direct the business and policies, and (y) a "**Significant Subsidiary**" is a Subsidiary that satisfies the definition contained in Article 1, Rule 1-02 of Regulation S-X promulgated pursuant to the Securities Act of 1933, as amended.

(b)    <u>Corporate Power and Authority</u>.

(i)    The Company has or, to the extent executed in the future, will have when executed, the requisite corporate power and authority to enter into, execute and deliver this Agreement and each other agreement to which it will be a party as contemplated by this Agreement (this Agreement and such other agreements collectively, the "**Transaction Agreements**") and, subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Rules 6004(h) and 3020(e) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), respectively, to perform its obligations hereunder and thereunder,

including the issuance of the Rights and Investor Shares.  The Company has taken or will take all necessary corporate action required for the due authorization, execution, delivery and performance by it of this Agreement, including the issuance of the Rights and Investor Shares.

(ii)    Prior to the execution by the Company and filing with the Bankruptcy Court of the Plan, the Company and each Subsidiary entering into the Plan will have the requisite corporate power and authority to execute the Plan and to file the Plan with the Bankruptcy Court and, subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rule 3020(e), to perform its obligations thereunder, and will have taken by the Effective Date all necessary corporate actions required for the due authorization, execution, delivery and performance by it of the Plan.

(c)    <u>Execution and Delivery; Enforceability</u>.

(i)    Each Transaction Agreement has been, or prior to its execution and delivery will be, duly and validly executed and delivered by the Company, and, upon the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rule 6004(h), each such document will constitute the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

(ii)    The Plan will be duly and validly filed with the Bankruptcy Court by the Company and each of its Subsidiaries executing the Plan and, upon the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rule 3020(e), will constitute the valid and binding obligation of the Company and such Subsidiary, enforceable against the Company and such Subsidiaries in accordance with its terms.

(d)    <u>Authorized and Issued Capital Stock</u>.  The authorized capital stock of the Company consists of (i) 1,350,000,000 shares of Common Stock and (ii) 650,000,000 shares of preferred stock, par value $0.10 per share.  At the close of business on June 30, 2007 (the "**Capital Structure Date**") (i) 561,781,500 shares of Common Stock were issued and outstanding, (ii) no shares of the preferred stock were issued and outstanding, (iii) 3,244,317 shares of Common Stock were held by the Company in its treasury, (iv) 85,978,864 shares of Common Stock were reserved for issuance upon exercise of stock options and other rights to purchase shares of Common Stock and vesting of restricted stock units (each, an "**Option**" and, collectively, the "**Options**") granted under any stock option or stock-based compensation plan of the Company or otherwise (the "**Stock Plans**"),

and (v) 200,000 shares of Series A participating preferred stock were reserved for issuance pursuant to that certain Rights Agreement by and between the Company and BankBoston, N.A., as Rights Agent, dated as of February 1, 1999, as amended (the "**Existing Shareholder Rights Plan**").  All issued and outstanding shares of capital stock of the Company and each of its Subsidiaries have been duly authorized and validly issued and are fully paid and nonassessable, and the holders thereof do not have any preemptive rights.  Except as set forth in this Section 3(d) or issuances pursuant to the Stock Plans, at the close of business on the Capital Structure Date, no shares of capital stock or other equity securities or voting interest in the Company were issued, reserved for issuance or outstanding.  Since the close of business on the Capital Structure Date, no shares of capital stock or other equity securities or voting interest in the Company have been issued or reserved for issuance or become outstanding, other than shares described in clause (iv) of the second sentence of this Section 3(d) that have been issued upon the exercise of outstanding Options granted under the Stock Plans and other than the shares to be issued hereunder or pursuant to the Plan Terms.  Except as described in this Section 3(d), and except as will be required by the Plan, neither the Company nor any of its Subsidiaries is party to or otherwise bound by or subject to any outstanding option, warrant, call, subscription or other right (including any preemptive right), agreement or commitment which (w) obligates the Company or any of its Subsidiaries to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed or otherwise acquired, any shares of the capital stock of, or other equity or voting interests in, the Company or any security convertible or exercisable for or exchangeable into any capital stock of, or other equity or voting interest in, the Company, (x) obligates the Company or any of its Subsidiaries to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, contract, arrangement or undertaking, (y) restricts the transfer of any shares of capital stock of the Company or (z) relates to the voting of any shares of capital stock of the Company.  On the Effective Date, the authorized capital stock of the Company and the issued and outstanding shares of capital stock of the Company shall be consistent with the description set forth in the Preferred Term Sheet, the Plan Terms and the Plan.  On the Effective Date, the authorized capital stock of the Company shall consist of such number of shares of New Common Stock as shall be set forth in the Amended and Restated Constituent Documents and 23,207,104 shares of new preferred stock.  On the Effective Date, assuming consummation of the transactions contemplated by this Agreement: (i) 124,400,000 shares of New Common Stock will be outstanding; (ii) 12,787,724 shares of Series A Preferred Stock will be issued and outstanding and (iii) 10,419,380 shares of Series B Preferred Stock will be issued and outstanding.

(e)    Issuance.  The Investor Shares to be issued and sold by the Company to the Investors hereunder, when the Investor Shares are issued and delivered against payment therefor by the Investors hereunder, shall have been duly and validly authorized, issued and delivered and shall be fully paid and non-assessable, and

free and clear of all Taxes, liens, preemptive rights, rights of first refusal, subscription and similar rights, other than (i) any rights contained in the terms of the Preferred Shares as set forth in the Company's Certificate of Incorporation and (ii) any rights contained in any shareholders agreement to which one or more of the Investors shall be a party.

(f)    <u>No Conflict</u>.  Subject to the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, the distribution of the Rights, the sale, issuance and delivery of the Shares upon exercise of the Rights, the consummation of the Rights Offering by the Company and the execution and delivery (or, with respect to the Plan, the filing) by the Company of the Transaction Agreements and the Plan and compliance by the Company with all of the provisions hereof and thereof and the Preferred Term Sheet and the Plan Terms and the consummation of the transactions contemplated herein and therein (including compliance by each Investor with its obligations hereunder and thereunder) (i) will not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent to be specified in the Plan, in the acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound or to which any of the property or assets of the Company or any of its Subsidiaries is subject, (ii) will not result in any violation of the provisions of the Certificate of Incorporation or Bylaws of the Company or any of its Subsidiaries, (iii) will not result in any material violation of, or any termination or material impairment of any rights under, any statute or any license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Company or any of its Subsidiaries or any of their properties, and (iv) will not trigger the distribution under the Existing Shareholders Rights Plan of Rights Certificates (as defined therein) or otherwise result in any Investor being or becoming an Acquiring Person, except in any such case described in subclause (i) for any conflict, breach, violation, default, acceleration or lien which has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(g)    <u>Consents and Approvals</u>.  No consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Company or any of its Subsidiaries or any of their properties is required for the distribution of the Rights, the sale, issuance and delivery of Shares upon exercise of the Rights or the Investor Shares to each Investor hereunder and the consummation of the Rights Offering by the Company and the execution and delivery by the Company of the Transaction Agreements or the Plan and performance of and compliance by the Company with all of the

provisions hereof and thereof and the Preferred Term Sheet and the Plan Terms and the consummation of the transactions contemplated herein and therein, except (i) the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, (ii) the registration under the Securities Act of the issuance of the Rights and the Shares pursuant to the exercise of Rights, (iii) filings with respect to and the expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "**HSR Act**"), and any other comparable laws or regulations in any foreign jurisdiction relating to the sale or issuance of Investor Shares to the Investors, (iv) the filing with the Secretary of State of the State of Delaware of the Certificate of Incorporation to be applicable to the Company from and after the Effective Date and (v) such consents, approvals, authorizations, registrations or qualifications (x) as may be required under the rules and regulations of the New York Stock Exchange or the Nasdaq Stock Exchange to consummate the transactions contemplated herein, (y) as may be required under state securities or Blue Sky laws in connection with the purchase of the Investor Shares by the Investors or the distribution of the Rights and the sale of Shares to Eligible Holders or (z) the absence of which will not have or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(h)     Arm's Length.  The Company acknowledges and agrees that the Investors are acting solely in the capacity of an arm's length contractual counterparty to the Company with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering) and not as a financial advisor or a fiduciary to, or an agent of, the Company or any other person or entity.  Additionally, the Investors are not advising the Company or any other person or entity as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.  The Company shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby, and the Investors shall have no responsibility or liability to the Company, its Affiliates, or their respective shareholders, directors, officers, employees, advisors or other representatives with respect thereto.  Any review by the Investors of the Company, the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of the Investors and shall not be on behalf of the Company, its Affiliates, or their respective shareholders, directors, officers, employees, advisors or other representatives and shall not affect any of the representations or warranties contained herein or the remedies of the Investors with respect thereto.

(i)      Financial Statements.  The financial statements and the related notes of the Company and its consolidated Subsidiaries included or incorporated by reference in the Company SEC Documents and the Rights Offering Registration Statement, and to be included or incorporated by reference in the Disclosure Statement and

the Rights Offering Registration Statement and the Rights Offering Prospectus, comply or will comply, as the case may be, in all material respects with the applicable requirements of the Securities Act, the Securities Exchange Act of 1934, as amended, and the rules and regulation of the Commission thereunder (the "**Exchange Act**") and the Bankruptcy Code, as applicable, and present fairly or will present fairly in all material respects the financial position, results of operations and cash flows of the Company and its Subsidiaries as of the dates indicated and for the periods specified; such financial statements have been prepared in conformity with U.S. generally accepting accounting principles ("**GAAP**") applied on a consistent basis throughout the periods covered thereby (except as disclosed in the Company SEC Documents filed prior to the date hereof), and the supporting schedules included or incorporated by reference in the Company SEC Documents and the Rights Offering Registration Statement, and to be included or incorporated by reference in the Disclosure Statement, the Rights Offering Registration Statement and the Rights Offering Prospectus, present fairly or will present fairly the information required to be stated therein; and the other financial information included or incorporated by reference in the Company SEC Documents and the Rights Offering Registration Statement, and to be included or incorporated by reference in the Disclosure Statement, Rights Offering Registration Statement and the Rights Offering Prospectus, has been or will be derived from the accounting records of the Company and its Subsidiaries and presents fairly or will present fairly the information shown thereby; and the pro forma financial information and the related notes included or incorporated by reference in the Company SEC Documents and the Rights Offering Registration Statement, and to be included or incorporated by reference in the Disclosure Statement, Rights Offering Registration Statement and the Rights Offering Prospectus, have been or will be prepared in accordance with the applicable requirements of the Securities Act and the Exchange Act, as applicable, and the assumptions underlying such pro forma financial information are reasonable and are set forth in the Company SEC Documents and will be set forth in the Disclosure Statement, Rights Offering Registration Statement and the Rights Offering Prospectus.

(j)     Company SEC Documents and Disclosure Statement.  The Company has filed all required reports, schedules, forms, statements and other documents (including exhibits and all other information incorporated therein but not including the Rights Offering Registration Statement or the other documents referred to in Section 3(k) below) with the Commission ("**Company SEC Documents**").  As of their respective dates, each of the Company SEC Documents complied in all material respects with the requirements of the Securities Act or the Exchange Act and the rules and regulations of the Commission promulgated thereunder applicable to such Company SEC Documents.  The Company has filed with the Commission all "material contracts" (as such term is defined in Item 601(b)(10) of Regulation S-K under the Exchange Act) that are required to be filed as exhibits to the Company SEC Documents.  No Company SEC Document filed after December 31, 2005, when filed, contained any untrue statement of a material

fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.  The Disclosure Statement, when submitted to the Bankruptcy Court and upon confirmation and effectiveness, will conform in all material respects to the requirements of the Bankruptcy Code.  The Disclosure Statement, when submitted to the Bankruptcy Court and upon confirmation and effectiveness, and any future Company SEC Documents filed with the Commission prior to the Closing Date, when filed, will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading.

(k)     Rights Offering Registration Statement and Rights Offering Prospectus.  The Rights Offering Registration Statement and any post-effective amendment thereto, as of the applicable Securities Act Effective Date and, if applicable, as of the date of such post-effective amendment, will comply in all material respects with the Securities Act, and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading; and as of the applicable filing date of the Rights Offering Prospectus, the Rights Offering Prospectus, and as of the filing date of any amendment or supplement thereto and during the Rights Offering Period, and as of the Closing Date, the Rights Offering Prospectus as so amended or supplemented, will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.  On the Rights Distribution Date, during the Rights Offering Period, and at the Expiration Time, the Investment Decision Package will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.  Each Issuer Free Writing Prospectus, at the time of use thereof, when considered together with the Investment Decision Package, will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.  Each Preliminary Rights Offering Prospectus, at the time of filing thereof, complied (in the case of a Preliminary Rights Offering Prospectus filed prior to the date hereof) and will comply in all material respects with the Securities Act and did not (in the case of a Preliminary Rights Offering Prospectus filed prior to the date hereof) and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.  Notwithstanding the foregoing, the Company makes no representation and warranty with respect to any statements or omissions made in reliance on and in conformity with information relating to each Investor or the Ultimate Purchasers furnished to the Company in writing by such Investor or the Ultimate Purchasers

expressly for use in the Rights Offering Registration Statement and the Rights Offering Prospectus and any amendment or supplement thereto.  On March 21, 2007, the Staff of the Commission delivered a letter to the Company which will be included in Schedule 3(k) of the Disclosure Letter.

For the purposes of this Agreement, (i) the term "**Rights Offering Registration Statement**" means the Registration Statement filed with the Commission relating to the Rights Offering, including all exhibits thereto, as amended as of the Securities Act Effective Date, and any post-effective amendment thereto that becomes effective; (ii) the term "**Rights Offering Prospectus**" means the final prospectus contained in the Rights Offering Registration Statement at the Securities Act Effective Date (including information, if any, omitted pursuant to Rule 430A and subsequently provided pursuant to Rule 424(b) under the Securities Act ), and any amended form of such prospectus provided under Rule 424(b) under the Securities Act or contained in a post-effective amendment to the Rights Offering Registration Statement; (iii) the term "**Investment Decision Package**" means the Rights Offering Prospectus, together with any Issuer Free Writing Prospectus used by the Company to offer the Shares to Eligible Holders pursuant to the Rights Offering, (iv) the term "**Issuer Free Writing Prospectus**" means each "issuer free writing prospectus" (as defined in Rule 433 of the rules promulgated under the Securities Act) prepared by or on behalf of the Company or used or referred to by the Company in connection with the Rights Offering, (v) the term "**Preliminary Rights Offering Prospectus**" means each prospectus included in the Rights Offering Registration Statement (and any amendments thereto) before it becomes effective, any prospectus filed with the Commission pursuant to Rule 424(a) under the Securities Act and the prospectus included in the Rights Offering Registration Statement, at the time of effectiveness that omits information permitted to be excluded under Rule 430A under the Securities Act; and (vi) "**Securities Act Effective Date**" means the date and time as of which the Rights Offering Registration Statement, or the most recent post-effective amendment thereto, was declared effective by the Commission which shall not be requested by the Company before the Confirmation Order is issued without the prior consent of ADAH.

(l)    <u>Free Writing Prospectuses</u>.  Each Issuer Free Writing Prospectus will conform in all material respects to the requirements of the Securities Act as of the date of first use or as otherwise provided for in Rule 433 under the Securities Act, and the Company will comply with all prospectus delivery and all filing requirements applicable to such Issuer Free Writing Prospectus under the Securities Act.  The Company has retained in accordance with the Securities Act all Issuer Free Writing Prospectuses that were not required to be filed pursuant to the Securities Act.

(m)    <u>Absence of Certain Changes</u>.  Since December 31, 2006, other than as disclosed in the Company SEC Documents filed prior to the date hereof, and except for actions to be taken pursuant to the Transaction Agreements and the Plan:

(i)    there has not been any change in the capital stock from that set forth in <u>Section 3(d)</u> or any material change in long-term debt of the Company or any of its Subsidiaries, or any dividend or distribution of any kind declared, set aside for payment, paid or made by the Company on any class of capital stock;

(ii)    no event, fact or circumstance has occurred which has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(iii)    neither the Company nor any of its Subsidiaries has made any changes with respect to accounting policies or procedures, except as required by law or changes in GAAP;

(iv)    neither the Company nor any of its Subsidiaries has paid, discharged, waived, compromised, settled or otherwise satisfied any material Legal Proceeding, whether now pending or hereafter brought, (A) at a cost materially in excess of the amount accrued or reserved for it in the Company SEC Documents filed prior to the date hereof, (B) pursuant to terms that impose material adverse restrictions on the business of the Company and its Subsidiaries as currently conducted or (C) on a basis that reveals a finding or an admission of a material violation of law by the Company or its Subsidiaries;

(v)    other than in the ordinary course of business, neither the Company nor any of its Subsidiaries has (A) made, changed or revoked any material Tax election, (B) entered into any settlement or compromise of any material Tax liability, (C) filed any amended Tax Return with respect to any material Tax, (D) changed any annual Tax accounting period, (E) entered into any closing agreement relating to any material Tax, (F) knowingly failed to claim a material Tax refund for which it is entitled, or (G) made material changes to their Tax accounting methods or principles;

(vi)    there has not been (A) any increase in the base compensation payable or to become payable to the officers or employees of the Company or any of its Subsidiaries with annual base compensation in excess of $500,000 (except for compensation increases in the ordinary course of business and consistent with past practice) or (B) except in the ordinary course of

business and consistent with past practice, any establishment, adoption, entry into or material amendment of any collective bargaining, bonus, profit sharing, thrift, compensation, employment, termination, severance or other plan, agreement, trust, fund, policy or arrangement for the benefit of any director, or for the benefit of a group of employees or for any individual officer or employee with annual base compensation in excess of $500,000, in each case;

(vii)   except in a manner consistent with (i) the Company's transformation plan previously disclosed in the Company SEC Documents prior to the date hereof (the "**Transformation Plan**") and (ii) (A) prior to the satisfaction of the condition with respect to the Business Plan in accordance with Section 9(a)(xxviii) of this Agreement, that certain draft business plan delivered to the Investors dated February 28, 2007, as amended by the revisions thereto delivered to the Investors dated April 5, 2007 (collectively the "**Draft Business Plan**") or (B) after the satisfaction of the condition with respect to the Business Plan in accordance with Section 9(a)(xxviii) of this Agreement, the Business Plan approved by ADAH in accordance with this Agreement neither the Company nor any of its Subsidiaries have sold, transferred, leased, licensed or otherwise disposed of any assets or properties material to the Company and its Subsidiaries, taken as a whole, except for (A) sales of inventory in the ordinary course of business consistent with past practice and (B) leases or licenses entered into in the ordinary course of business consistent with past practice; and

(viii)   except in a manner consistent with (i) the Transformation Plan and (ii) (A) prior to the satisfaction of the condition with respect to the Business Plan in accordance with Section 9(a)(xxviii) of this Agreement, the Draft Business Plan or (B) after the satisfaction of the condition with respect to the Business Plan in accordance with this Section 9(a)(xxviii) of Agreement, the Business Plan approved by ADAH in accordance with this Agreement, neither the Company nor any of its Subsidiaries have acquired any business or entity material to the Company and its Subsidiaries, taken as a whole, by merger or consolidation, purchase of assets or equity interests, or by any other manner, in a single transaction or a series of related transactions, or entered into any contract, letter of intent or similar arrangement (whether or not enforceable) with respect to the foregoing.

(n)   Descriptions of the Transaction Agreement.  The statements in the Rights Offering Registration Statement and the Rights Offering Prospectus insofar as they purport to constitute summaries of each of the Transaction Agreements, the Plan, the Original Approval Order or the Approval Order and the Confirmation Order, or the terms of statutes, rules or regulations, legal or governmental

proceedings or contracts, will constitute accurate summaries in all material respects.

(o)    <u>No Violation or Default; Compliance with Laws</u>.  Neither the Company nor any of its Significant Subsidiaries is in violation of its charter or by-laws or similar organizational documents.  Neither the Company nor any of its Subsidiaries is, except as a result of the Chapter 11 Cases, in default, and no event has occurred that, with notice or lapse of time or both, would constitute such a default, in the due performance or observance of any term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound or to which any of the property or assets of the Company or any of its Subsidiaries is subject, except for any such default that has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Neither the Company nor any of its Subsidiaries is, or has been at any time since January 1, 2002, in violation of any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority, except for any such violation that has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(p)    <u>Legal Proceedings</u>.  Except as described in the Company SEC Documents filed prior to the date hereof, there are no legal, governmental or regulatory actions, suits, proceedings or, to the knowledge of the Company, investigations pending to which the Company or any of its Subsidiaries is or may be a party or to which any property of the Company or any of its Subsidiaries is or may be the subject that, individually or in the aggregate, has had or, if determined adversely to the Company or any of its Subsidiaries, would reasonably be expected to have a Material Adverse Effect, and no such actions, suits or proceedings or, to the knowledge of the Company, investigations are pending, threatened or contemplated, by any governmental or regulatory authority or by others.  There are no current or pending legal, governmental or regulatory actions, suits or proceedings that are required under the Exchange Act to be described in the Company SEC Documents or the Rights Offering Registration Statement or Rights Offering Prospectus that are not or will not be so described, and there are no statutes, regulations or contracts or other documents that are required under the Exchange Act to be filed as exhibits to the Company SEC Documents or the Rights Offering Registration Statement or Rights Offering Prospectus or described in the Company SEC Documents or the Rights Offering Registration Statement or Rights Offering Prospectus that are not so filed or described.

(q)    <u>Independent Accountants</u>.  Ernst & Young LLP ("<b><u>E&Y</u></b>"), the Company's public accountants, are independent public accountants with respect to the Company and its Subsidiaries as required by the Securities Act.

(r)    <u>Labor Relations</u>.  Except as set forth in the Company SEC Documents filed prior to the date hereof:

(i)    neither the Company nor any of its Subsidiaries is a party to, or bound by, any material collective bargaining agreement, contract or other agreement or understanding with a labor union or labor organization (other than contracts or other agreements or understandings with labor unions or labor organizations in connection with products and services offered and sold to such unions and organizations by the Company or its Subsidiaries);

(ii)    neither the Company nor any of its Subsidiaries is the subject of any proceeding asserting that it or any Subsidiary has committed an unfair labor practice or sex, age, race or other discrimination or seeking to compel it to bargain with any labor organization as to wages or conditions of employment, which, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect;

(iii)    there are no material current or, to the knowledge of the Company, threatened organizational activities or demands for recognition by a labor organization seeking to represent employees of the Company or any Subsidiary and no such activities have occurred during the past 24 months;

(iv)    no grievance, arbitration, litigation or complaint or, to the knowledge of the Company, investigations relating to labor or employment matters is pending or, to the knowledge of the Company, threatened against the Company or any of its Subsidiaries which, except as has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(v)    the Company and each of its Subsidiaries has complied and is in compliance in all respects with all applicable laws (domestic and foreign), agreements, contracts, and policies relating to employment, employment practices, wages, hours, and terms and conditions of employment and is not engaged in any material unfair labor practice as determined by the National Labor Relations Board (or any foreign equivalent) except where the failure to comply has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(vi)    the Company has complied in all respects with its payment obligations to all employees of the Company and its Subsidiaries in respect of all wages, salaries, commissions, bonuses, benefits and other compensation due and payable to such employees under any Company policy, practice,

agreement, plan, program or any statute or other law, except to the extent that any noncompliance, either individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect; and

(vii)   the Company has complied and is in compliance in all material respects with its obligations pursuant to the Worker Adjustment and Retraining Notification Act of 1988 (and any similar state or local law) to the extent applicable, and all material other employee notification and bargaining obligations arising under any collective bargaining agreement or statute.

(s)   <u>Title to Intellectual Property</u>.  The Company and its Subsidiaries own or possess valid and enforceable rights to use all material patents, patent applications, trademarks, service marks, trade names, trademark registrations, service mark registrations, copyrights, licenses and know-how (including trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures) (collectively, "**Intellectual Property**") used in the conduct of their respective businesses other than Intellectual Property, the failure to own or possess which has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  All registrations with and applications to governmental or regulatory authorities in respect of such Intellectual Property are valid and in full force and effect, have not, except in accordance with the ordinary course practices of the Company and its Subsidiaries, lapsed, expired or been abandoned (subject to the vulnerability of a registration for trademarks to cancellation for lack of use), are not the subject of any opposition filed with the United States Patent and Trademark Office or any other applicable Intellectual Property registry.  The consummation of the transaction contemplated hereby and by the Plan will not result in the loss or impairment of any rights to use such Intellectual Property or obligate any of the Investors to pay any royalties or other amounts to any third party in excess of the amounts that would have been payable by Company and its Subsidiaries absent the consummation of this transactions.  The Company and its Subsidiaries have taken reasonable security measures to protect the confidentiality and value of its and their trade secrets (or other Intellectual Property for which the value is dependent upon its confidentiality), and no such information, has been misappropriated or the subject of an unauthorized disclosure, except to the extent that such misappropriation or unauthorized disclosure has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  The Company and its Subsidiaries have not received any notice that it is or they are, in default (or with the giving of notice or lapse of time or both, would be in default) under any contract relating to such Intellectual Property.  No Intellectual Property rights of the Company or its Subsidiaries are being infringed by any other person, except to the extent that such infringement has not had and would not have, individually or in the aggregate, a Material Adverse Effect.  The conduct of the businesses of the Company and its Subsidiaries will

-24-

not conflict in any respect with any Intellectual Property rights of others, and the Company and its Subsidiaries have not received any notice of any claim of infringement or conflict with any such rights of others which has had or would in any such case be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(t)     Title to Real and Personal Property.  The Company and its Subsidiaries have good and marketable title to all real property owned by the Company and its Subsidiaries and good title to all other tangible and intangible properties (other than Intellectual Property covered by Section 3(s)) owned by them, in each case, free and clear of all mortgages, pledges, liens, security interests, claims, restrictions or encumbrances of any kind except such as (i) are described in the consolidated balance sheets included in the Company SEC Documents filed prior to the date hereof or (ii) individually and in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect.  All of the leases and subleases to which the Company or its Subsidiaries are a party are in full force and effect and enforceable by the Company or such Subsidiary in accordance with their terms, and neither the Company nor any Subsidiary has received any notice of any claim of any sort that has been asserted by anyone adverse to the rights of the Company or any Subsidiary under any of the leases or subleases mentioned above, or affecting or questioning the rights of the Company or such Subsidiary to the continued possession of the leased or subleased property by under any such lease or sublease, except where any such claim or failure to be enforceable would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(u)     No Undisclosed Relationships.  As of the date hereof, no relationship, direct or indirect, exists between or among the Company or any of its Subsidiaries, on the one hand, and the directors, officers, stockholders, customers or suppliers of the Company or any of its Subsidiaries, on the other, that is required by the Exchange Act to be described in the Company SEC Documents and that are not so described, except for the transactions pursuant to this Agreement.

(v)     Investment Company Act.  As of the date hereof, the Company is not and, after giving effect to the consummation of the Plan, including the offering and sale of the Investor Shares and Shares upon exercise of Rights, and the application of the proceeds thereof, will not be required to register as an "investment company" or an entity "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, and the rules and regulations of the Commission thereunder.

(w)     Licenses and Permits.  The Company and its Subsidiaries possess all licenses, certificates, permits and other authorizations issued by, and have made all declarations and filings with, the appropriate federal, state, local or foreign