reasonably satisfactory to such Indemnified Person; provided that if the
defendants in any such Proceedings include both such Indemnified Person and the
Indemnifying Party and such Indemnified Person shall have concluded that there
may be legal defenses available to it that are different from or additional to those
available to the Indemnifying Party, such Indemnified Person shall have the right
to select separate counsel to assert such legal defenses and to otherwise participate
in the defense of such Proceedings on behalf of such Indemnified Person.  Upon
receipt of notice from the Indemnifying Party to such Indemnified Person of its
election so to assume the defense of such Proceedings and approval by such
Indemnified Person of counsel, the Indemnifying Party shall not be liable to such
Indemnified Person for expenses incurred by such Indemnified Person in
connection with the defense thereof (other than reasonable costs of investigation)
unless (i) such Indemnified Person shall have employed separate counsel in
connection with the assertion of legal defenses in accordance with the proviso to
the next preceding sentence (it being understood, however, that the Indemnifying
Party shall not be liable for the expenses of more than one separate counsel in any
jurisdiction, approved by the Investors, representing the Indemnified Persons who
are parties to such Proceedings), (ii) the Indemnifying Party shall not have
employed counsel reasonably satisfactory to such Indemnified Person to represent
such Indemnified Person within a reasonable time after notice of commencement
of the Proceedings or (iii) the Indemnifying Party shall have authorized in writing
the employment of counsel for such Indemnified Person.

(c)      The Indemnifying Party shall not be liable for any settlement of any Proceedings
effected without its written consent (which consent shall not be unreasonably
withheld).  If any settlement of any Proceeding is consummated with the written
consent of the Indemnifying Party or if there is a final judgment for the plaintiff in
any such Proceedings, the Indemnifying Party agrees to indemnify and hold
harmless each Indemnified Person from and against any and all Losses by reason
of such settlement or judgment in accordance with, and subject to the limitations
of, the provisions of this Section 10.  Notwithstanding anything in this Section 10
to the contrary, if at any time an Indemnified Person shall have requested the
Indemnifying Party to reimburse such Indemnified Person for legal or other
expenses aggregating in excess of $250,000 in connection with investigating,
responding to or defending any Proceedings in connection with which it is entitled
to indemnification or contribution pursuant to this Section 10, the Indemnifying
Party shall be liable for any settlement of any Proceedings effected without its
written consent if (i) such settlement is entered into more than (x) 60 days after
receipt by the Indemnifying Party of such request for reimbursement and (y) 30
days after receipt by the Indemnified Person of the material terms of such
settlement and (ii) the Indemnifying Party shall not have reimbursed such
Indemnified Person in accordance with such request prior to the date of such
settlement.  The Indemnifying Party shall not, without the prior written consent of
an Indemnified Person (which consent shall not be unreasonably withheld), effect
any settlement of any pending or threatened Proceedings in respect of which
indemnity has been sought hereunder by such Indemnified Person unless (i) such

settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Proceedings and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

(d)      All amounts paid by the Company to an Indemnified Person under this <u>Section 10</u> shall, to the extent the transactions contemplated hereby or the Plan are consummated and to the extent permitted by applicable law, be treated as adjustments to Purchase Price for all Tax purposes.

11.    <u>Survival of Representations and Warranties, Etc.</u>

(a)      The representations and warranties made in this Agreement shall not survive the Closing Date.  Other than <u>Sections 2(b)</u>, <u>2(c)</u>, <u>2(e)</u>, <u>2(h)</u>, <u>2(i)</u>, <u>2(j)</u>, <u>2(k)</u>, <u>5(d)</u>, <u>5(e)</u>, <u>5(f)</u>, <u>5(j)</u>, <u>5(k)</u>, <u>5(l)</u>, <u>5(m)</u>, <u>10</u>, <u>11</u>, <u>13</u>, <u>14</u>, <u>15</u>, <u>16</u>, <u>18</u> and <u>20</u>, which shall survive the Closing Date in accordance with their terms (except <u>Section 5(l)</u> which shall survive for 90 days following the Closing Date), the covenants contained in this Agreement shall not survive the Closing Date.

(b)      Other than with respect to <u>Sections 2(h)</u>, <u>2(i)</u> and <u>2(j)</u> and <u>Sections 10</u> through <u>18</u>, which shall continue and survive any termination of this Agreement, (i) none of the Investors may assert any claim against the Company (both as Debtors-in-possession or the reorganized Debtors), and the Company (both as Debtors-in-possession or the reorganized Debtors), may not assert any claim against any Investor, in either case, arising from this Agreement other than for willful breach, and (ii) the Investors hereby release the Company (both as Debtors-in-possession and the reorganized Debtors) from any such claims, and the Company (both as Debtors-in-possession or the reorganized Debtors) hereby releases the Investors from any such claims.  Notwithstanding the foregoing (w) the aggregate liability of all of the Investors under this Agreement for any reason (under any legal theory), including for any willful breach, for any act or omission occurring on or prior to the Disclosure Statement Approval Date shall not exceed $100 million, (x) the aggregate liability of all of the Investors under this Agreement for any reason (under any legal theory), including for any willful breach, for any act or omission occurring after the Disclosure Statement Approval Date shall not exceed $250 million, (y) the aggregate liability of all of the Debtors under this Agreement for any reason (under any legal theory), including for any willful breach, for any act or omission occurring on or prior to the Disclosure Statement Approval Date shall not exceed $100 million, and (z) the aggregate liability of all of the Debtors under this Agreement for any reason (under any legal theory), including for any willful breach, for any act or omission occurring after the Disclosure Statement Approval Date shall not exceed $250 million.  Notwithstanding the foregoing, nothing contained in this <u>Section 11(b)</u> shall limit the liability of the Company for any

Transaction Expenses pursuant to <u>Section 2(j)</u> or <u>12(g)</u>.  The Investors and the Company acknowledge that such liability under subclauses (w) and (x) shall be on a several and not joint basis with respect to any willful breach occurring on or prior to the Disclosure Statement Filing Date.  The Investors and the Company acknowledge and agree that such liability under subclauses (w) and (x) shall be on a joint and several basis with respect to any willful breach occurring after the Disclosure Statement Filing Date; <u>provided</u>, that the aggregate liability of Harbinger shall not exceed $38,944,000, the aggregate liability of Merrill shall not exceed $16,358,805, the aggregate liability of UBS shall not exceed $16,358,805, the aggregate liability of GS shall not exceed $39,215,500 and the aggregate liability of Pardus shall not exceed $33,593,000.  Subject to the terms, conditions and limitation set forth in this <u>Section 11(b)</u>, (i) the joint and several obligations referred to in the immediately preceding sentence mean that each Investor (an "**Assuming Investor**") assumes liability on a joint and several basis for any willful breach of this Agreement by any other Investor (a "**Breaching Investor**"), whether or not the Assuming Investor has breached this Agreement or is in any way responsible for such willful breach by the Breaching Investor and (ii) the Assuming Investors' obligations shall be a commitment to assure payment, not collection.  Under no circumstances shall any Investor be liable to the Company (as Debtors-in-possession or reorganized Debtors) for any punitive damages under this Agreement or any Equity Commitment Letter.  Under no circumstances shall the Company (both as Debtors-in-possession and reorganized Debtors) be liable to any Investor for any punitive damages under this Agreement.

12.     <u>Termination</u>.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date:

(a)     by mutual written consent of the Company and ADAH;

(b)     by any Investor if any of the Chapter 11 Cases shall have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or an interim or permanent trustee shall be appointed in any of the Chapter 11 Cases, or a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases;

(c)     by any party to this Agreement if any statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority or any judgment, injunction, decree or order of any federal, state or foreign court shall have become final and non-appealable, that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms or the GM Settlement;

(d)      by ADAH upon written notice to the Company and each other Investor:

(i)      if the Approval Order has not become a Final Approval Order on or prior to the earlier of (A) the tenth (10th) day after the Bankruptcy Court enters the Approval Order, or, if such day is not a Business Day, the next Business Day and (B) August 16, 2007; provided, that notice of termination pursuant to this Section 12(d)(i) must be given on or prior to August 31, 2007;

(ii)     at any time prior to the last date established by the Bankruptcy Court for the filing of objections to the Disclosure Statement, if the Company shall not have delivered a Disclosure Letter as contemplated by Section 5(s) on or prior to the tenth (10th) Business Day preceding the Disclosure Statement Filing Date or shall have delivered a Disclosure Letter which shall not have satisfied the condition with respect to the Disclosure Letter in accordance with Section 9(a)(xxviii).

(iii)    on or after March 31, 2008 (such date, being the "**Closing Date Outside Date**"); provided that the Closing Date has not occurred by such date;

(iv)     on or after January 31, 2008 (such date, being the "**Disclosure Statement Outside Date**"); provided that the Disclosure Statement has not been filed for approval with the Bankruptcy Court by such date;

(v)      if the Company or any Investor shall have breached any provision of this Agreement, which breach would cause the failure of any condition set forth in Section 9(a)(xvi) or (xvii) hereof to be satisfied, which failure cannot be or has not been cured on the earliest of (A) the tenth (10th) Business Day after the giving of written notice thereof to the Company or such Investor by any Investor and (B) the third (3rd) Business Day prior to the Closing Date Outside Date; provided, that the right to terminate this Agreement under this Section 12(d)(v) shall not be available to any Investor whose breach is the cause of the failure of the condition in Section 9(a)(xvi) or (xvii) to be satisfied; provided, further, that the right to terminate under this Section 12(d)(v) shall not be available as a result of a breach of Section 5(o) to the extent, and only to the extent, that the circumstances giving rise to the breach of Section 5(o) previously gave rise to a termination right under Section 12(d)(vii) and ADAH did not exercise such termination right under Section 12(d)(vii) by the end of the twenty (20) day period referred to therein;

     (vi)     (A) there shall have been a Change of Recommendation or (B) the Company shall have entered into an Alternate Transaction Agreement; or

     (vii)     for a period of twenty (20) days following any Cure Period if ADAH has delivered a deficiency notice in accordance with Section 9(a)(xxviii)(C) and the condition set forth in Section 9(a)(xxviii) shall not have been satisfied at the end of such Cure Period;

provided, that notwithstanding anything in the foregoing to the contrary, any Investor other than ADAH shall be entitled to terminate this Agreement as to itself (but not as to any other party) at any time on or after June 30, 2008 (a "**Limited Termination**");

(e)     [Reserved]

(f)     by the Company upon written notice to each Investor:

     (i)     subject to the establishment of Alternative Financing in accordance with Section 2(b), if any Investor shall have breached any provision of this Agreement, which breach would cause the failure of any condition set forth in Section 9(c)(iv) or (v) hereof to be satisfied, which failure cannot be or has not been cured on the earliest of (A) the tenth (10th) Business Day after the giving of written notice thereof to the Investors by the Company and (B) the third (3rd) Business Day prior to the Closing Date Outside Date;

     (ii)     if the Company enters into any Alternate Transaction Agreement; provided, that the Company may only terminate this Agreement under the circumstances set forth in this Section 12(f)(ii) if: (x) the Company's board of directors has determined in good faith, after having consulted with its outside legal counsel and its independent financial advisors, that such Alternate Transaction is a Superior Transaction and the failure to enter into such an Alternate Transaction Agreement would result in a breach of the applicable fiduciary duties of the board of directors, (y) before taking such action the Company has given the Investors at least ten (10) Business Days' (or, in the event of any Alternate Transaction that has been materially revised or modified, at least five (5) Business Days') prior written notice (the "**Consideration Period**") of the terms of such Alternate Transaction and of its intent to take such action, and, during the Consideration Period, the Company has, if requested by any Investor, engaged in good faith negotiations regarding any revisions to this Agreement, the Plan or any other agreement or document proposed by

ADAH and again has determined in good faith, after consultation with its outside legal counsel and its independent financial advisors, that such Alternate Transaction remains a Superior Transaction and (z) prior to or contemporaneously with such termination the Company shall pay to the Investors the Alternate Transaction Fee;

(iii)    on or after March 31, 2008; <u>provided</u>, that the Closing Date has not occurred by such date; or

(iv)    in accordance with <u>Section 5(t)</u>.

For the purposes of this <u>Section 12(f)</u>, a "**Superior Transaction**" shall mean an Alternate Transaction, which the board of directors of the Company, after consultation with its outside legal counsel and its independent financial advisors, determines in good faith to be more favorable to the bankruptcy estate of the Company than the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms and the Plan, taking into account, all legal, financial, regulatory and other aspects of such Alternate Transaction, the likelihood of consummating the Alternate Transaction, the likely consummation date of the Alternate Transaction and the identity of the parties or proposed parties to such Alternate Transaction and after taking into account any revisions to the terms of this Agreement, the Plan and/or any other agreement or document proposed during the Consideration Period.

(g)    In addition to any other rights or remedies any Investor may have under this Agreement (for breach or otherwise), the Company shall pay a fee of $82,500,000 (the "**Alternate Transaction Fee**") to the Investors in such proportions as are set forth on <u>Schedule 2</u> hereto, and, in any case, the Company shall pay to the Investors any Transaction Expenses and any other amounts certified by the Investors to be due and payable hereunder that have not been paid theretofore if this Agreement is terminated pursuant to one of the following:

(i)    pursuant to (x) <u>Section 12(d)(vi)(B)</u> or (y) <u>Section 12(f)(ii)</u>;

(ii)    pursuant to <u>Section 12(d)(vi)(A)</u> and, within the twenty-four (24) month period following the date of such termination, an Alternate Transaction Agreement is entered into or an Alternate Transaction is consummated; or

(iii)    pursuant to <u>Section 12(d)(v)</u> based on a willful breach by the Company and within the twenty-four (24) month period following the date of such

termination, an Alternate Transaction Agreement is entered into or an Alternate Transaction is consummated.

Payment of the amounts due under this Section 12(g) will be made (i) no later than the close of business on the next Business Day following the date of such termination in the case of a payment pursuant to Section 12(g)(i)(x), (ii) prior to or contemporaneously with such termination by the Company in the case of a payment pursuant to Section 12(g)(i)(y) and (iii) prior to or contemporaneously with the entry into an Alternate Transaction Agreement or the consummation of an Alternate Transaction in the case of a payment pursuant to Sections 12(g)(ii) or (iii). Under no circumstances shall the Company be required to pay more than one Alternate Transaction Fee plus Transaction Expenses. The provision for the payment of the Alternate Transaction Fee is an integral part of the transactions contemplated by this Agreement and without this provision the Investors would not have entered into this Agreement and shall constitute an allowed administrative expense of the Company under Section 503(b)(1) and 507(a)(1) of the Bankruptcy Code.

(h)    Upon termination under this Section 12, all rights and obligations of the parties under this Agreement shall terminate without any liability of any party to any other party except that (x) nothing contained herein shall release any party hereto from liability for any willful breach and (y) the covenants and agreements made by the parties herein in Sections 2(h), 2(i) and 2(j), and Sections 10 through 18 will survive indefinitely in accordance with their terms.

13.   Notices. All notices and other communications in connection with this Agreement will be in writing and will be deemed given if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the parties at the following addresses (or at such other address for a party as will be specified by like notice):

(a)    If to:

A-D Acquisition Holdings, LLC
c/o Appaloosa Management L.P.
26 Main Street
Chatham, New Jersey 07928
Facsimile:  (973) 701-7055
Attention:  James Bolin

with a copy to:

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard

Suite 4900
Miami, Florida 33131-2352
Facsimile:  (305) 358-5744/5766
Attention:  Thomas E. Lauria

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Facsimile:  (212) 354-8113
Attention:  John M. Reiss
                Gregory Pryor

(b)     If to:

Harbinger Del-Auto Investment Company, Ltd.
c/o Harbinger Capital Partners Offshore Manager, LLC
555 Madison Avenue, 16th Floor
New York, NY 10022
Attn:  Philip A. Falcone

with a copy to:

Harbert Management Corp.
One Riverchase Parkway South
Birmingham, AL 35244
Facsimile:  (205) 987-5505
Attention:  General Counsel

with a copy to:

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131-2352
Facsimile:  (305) 358-5744/5766
Attention:  Thomas E. Lauria

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Facsimile:  (212) 354-8113
Attention:  John M. Reiss
                Gregory Pryor

with a copy to:

Kaye Scholer LLP
425 Park Avenue
New York, NY  10022-3598
Facsimile:  (212) 836-8689
Attention:  Benjamin Mintz and Lynn Toby Fisher

(c)    If to:

Merrill Lynch, Pierce, Fenner & Smith Incorporated.
4 World Financial Center
New York, New York  10080
Facsimile:  (212) 449-0769
Attention:  Robert Spork / Rick Morris

with a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Facsimile:  (212) 757-3990
Attention:  Andrew N. Rosenberg

(d)    If to:

UBS Securities LLC
299 Park Avenue
New York, New York  10171
Facsimile:  (212) 821-3008 / (212) 821-4042
Attention:  Steve Smith / Osamu Watanabe

with a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York  10006
Facsimile:  (212) 225-3999
Attention:  Leslie N. Silverman

(e)    If to:

Goldman Sachs & Co
1 New York Plaza
New York, NY  10004
Facsimile:  (212) 823-0145
Attention:  David Mullen / Tom Wagner

with a copy to:

Goldman Sachs & Co.
1 New York Plaza
New York, NY  10004
Facsimile:  (212) 428-4769
Attention:  Sandip Khosla

with a copy to:

Sullivan & Cromwell
125 Broad Street
New York, NY  10004
Facsimile:  (212) 558-3588
Attention:  Robert Reeder

(f)     If to:

Pardus DPH Holding LLC
590 Madison Avenue
Suite 25E
New York, NY 10022
Facsimile: (212) 381-7771
Attention: Timothy Bass

with a copy to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, N.Y. 10019-6099
Facsimile: (212) 728-8111
Attention: Rachel C. Strickland
              Morgan D. Elwyn

    (g)    If to the Company, to:

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098
Attention:  John Sheehan – Facsimile:  (248) 813-2612
                David Sherbin / Sean Corcoran – Facsimile:  (248) 813-2491

with a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Facsimile:  (212) 735-2000/1
Attention:  Eric L. Cochran
              Marie L. Gibson

and

Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Chicago, IL 60606
Facsimile:  (312) 407-0411
Attention:  John Wm. Butler, Jr.
              George Panagakis

14.    <u>Assignment; Third Party Beneficiaries</u>.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement will be assigned by any of the parties (whether by operation of law or otherwise) without the prior written consent of the other parties, except to an Ultimate Purchaser or to a Related Purchaser pursuant to <u>Sections 2(a)</u>, <u>2(b)</u> and <u>2(k)</u>.  Notwithstanding the previous sentence, subject to the provisions of <u>Sections 2(a)</u>, <u>2(b)</u> and <u>2(K)</u>:  this Agreement, or the Investors' obligations hereunder, may be assigned, delegated or transferred, in whole or in part, by any Investor to any Affiliate of such Investor over which such Investor or any of its Affiliates exercise investment authority, including, without limitation, with respect to voting and dispositive rights; <u>provided</u>, that any such assignee assumes the obligations of such Investor hereunder and agrees in writing to be bound by the terms of this Agreement in the same manner as such Investor.  Notwithstanding the foregoing or any other provisions herein, except pursuant to an Additional Investor Agreement acceptable to the Company and ADAH no such assignment will relieve an Investor of its obligations hereunder if such assignee fails to perform such obligations.  Except as provided in <u>Section 10</u> with respect to the Indemnified Persons, this Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any person other than the parties hereto any rights or remedies under this Agreement.

15.    <u>Prior Negotiations; Entire Agreement</u>.  This Agreement (including the agreements attached as exhibits to and the documents and instruments referred to in this Agreement)

constitutes the entire agreement of the parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement, except that the parties hereto acknowledge that any confidentiality agreements, heretofore executed among the parties will continue in full force and effect.

16.     GOVERNING LAW; VENUE.  THIS AGREEMENT WILL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK.  THE INVESTORS HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS.  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR VALIDITY OF THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

17.     Counterparts.  This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the parties and delivered to the other party (including via facsimile or other electronic transmission), it being understood that each party need not sign the same counterpart.

18.     Waivers and Amendments.  This Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms and conditions of this Agreement may be waived, only by a written instrument signed by all the parties or, in the case of a waiver, by the party waiving compliance, and subject, to the extent required, to the approval of the Bankruptcy Court.  No delay on the part of any party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.  The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at law or in equity.

19.     Adjustment to Shares.  If, in accordance with the terms of this Agreement, the Company effects a reclassification, stock split (including a reverse stock split), stock dividend or distribution, recapitalization, merger, issuer tender or exchange offer, or other similar transaction with respect to any shares of its capital stock, references to the numbers of such shares and the prices therefore shall be equitably adjusted to reflect such change and,

as adjusted, shall, from and after the date of such event, be subject to further adjustment in accordance herewith.

20.    <u>Headings</u>.  The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

21.    <u>Publicity</u>.  The initial press release regarding this Agreement shall be a joint press release. Thereafter, the Company and Investors each shall consult with each other prior to issuing any press releases (and provide each other a reasonable opportunity to review and comment upon such release) or otherwise making public announcements with respect to the transactions contemplated by this Agreement and the Plan, and prior to making any filings with any third party or any governmental entity (including any national securities exchange or interdealer quotation service) with respect thereto, except as may be required by law or by the request of any governmental entity.

22.    <u>Knowledge; Sole Discretion</u>.  The phrase "**knowledge of the Company**" and similar phrases shall mean the actual knowledge of the Chief Restructuring Officer of the Company and such other officers as the Company and ADAH shall reasonably agree. Whenever in this Agreement any party is permitted to take an action or make a decision in its "sole discretion," the parties hereto acknowledge that such party is entitled to make such decision or take such action in such party's sole and absolute and unfettered discretion and shall be entitled to make such decision or take such action without regard for the interests of any other party and for any reason or no reason whatsoever.  Each party hereto acknowledges, and agrees to accept, all risks associated with the granting to the other parties of the ability to act in such unfettered manner.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed by their respective officers thereunto duly authorized, all as of the date first written above.

DELPHI CORPORATION

By: _____
       Name:
       Title:

A-D ACQUISITION HOLDINGS, LLC

By: _____
       Name:
       Title:

HARBINGER DEL-AUTO INVESTMENT COMPANY, LTD.

By: _____
       Name:
       Title:

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED

By: _____
       Name:
       Title:

UBS SECURITIES LLC

By: _____
     Name:
     Title:


By: _____
     Name:
     Title:


GOLDMAN SACHS & CO.

By: _____
     Name:
     Title:


PARDUS DPH HOLDING LLC

By: _____
     Name:
     Title:

<u>Defined Term</u>                                                                   <u>Section</u>

ADAH ................................................................... Preamble
Additional Investor Agreement ........................................ Section 2 (k)
Affiliate ................................................................. Section 2 (a)
Agreement ............................................................. Preamble
Alternate Transaction .................................................. Section 9 (a)(v)
Alternate Transaction Agreement .................................... Section 9 (a)(v)
Alternate Transaction Fee ............................................. Section 12 (g)
Alternative Financing .................................................. Section 2 (b)
Amended and Restated Constituent Documents .............. Section 8 (c)
Appaloosa .............................................................. Recitals
Approval Motion ...................................................... Recitals
Approval Order ........................................................ Recitals
Arrangement Fee ...................................................... Section 2 (h)(iii)
Assuming Investor .................................................... Section 11 (b)
Available Investor Shares ............................................ Section 2 (b)
Bankruptcy Code ..................................................... Recitals
Bankruptcy Court ..................................................... Recitals
Bankruptcy Rules ..................................................... Section 3 (b)(i)
Breaching Investor .................................................... Section 11 (b)
Business Day ........................................................... Section 1 (c)(iii)
Business Plan .......................................................... Section 5 (s)
Capital Structure Date ................................................ Section 3 (d)
Cerberus ................................................................ Recitals
Change of Recommendation ......................................... Section 9 (a)(vi)
Chapter 11 Cases ..................................................... Recitals
Closing Date ........................................................... Section 2 (d)
Closing Date Outside Date ........................................... Section 12 (d)(iii)
Code .................................................................... Section 3 (z)(ii)
Commission ............................................................ Section 1 (c)(ii)
Commitment Fees ..................................................... Section 2 (h)(ii)
Commitment Parties ................................................... Recitals
Company ................................................................ Preamble
Company ERISA Affiliate ............................................ Section 3 (z)(ii)
Company Financing Proposal ........................................ Section 5 (t)
Company Plans ........................................................ Section 3 (z)(i)
Company SEC Documents ............................................ Section 3 (j)
Confirmation Order .................................................... Section 9 (a)(vii)
Confirmed Plan ........................................................ Section 9 (a)(viii)
Consideration Period .................................................. Section 12 (f)(ii)
Cure Period ............................................................ Section 9(a)(xxviii)(C)(1)
Debt Financing ........................................................ Section 5 (t)
Debtors ................................................................. Recitals
Determination Date .................................................... Section 1 (c)(vi)

| Defined Term | Section |
|---|---|
| DGCL | Section 3 (oo) |
| Direct Subscription Shares | Section 2 (a)(i) |
| Disclosure Letter | Section 3 |
| Disclosure Letter Delivery Date | Section 3 |
| Disclosure Statement | Section 5 (b) |
| Disclosure Statement Approval Date | Section 5 (b) |
| Disclosure Statement Filing Date | Section 5 (p) |
| Disclosure Statement Outside Date | Section 12 (d)(iv) |
| Disinterested Director | Section 8 (c) |
| Dolce | Recitals |
| Draft Business Plan | Section 3 (m)(vii) |
| Due Diligence Expiration Date | Section 12 (d)(ii) |
| Effective Date | Section 1 (c)(iii) |
| Eligible Holder | Section 1 (a) |
| Environmental Laws | Section 3 (x)(i) |
| Equity Commitment Letter | Section 4 (o) |
| ERISA | Section 3 (z)(i) |
| Exchange Act | Section 3 (i)(i) |
| Existing Shareholder Rights Plan | Section 3 (d) |
| Expiration Time | Section 1 (c)(iii) |
| E&Y | Section 3 (q) |
| Final Approval Order | Section 9 (a)(i) |
| Financing Decision Date | Section 5 (t) |
| Financing Notice | Section 5 (t) |
| Financing Order | Section 2 (j) |
| GAAP | Section 3 (i)(i) |
| GM | Recitals |
| GM Settlement | Section 5 (p) |
| GS | Preamble |
| Harbinger | Preamble |
| Harbinger Fund | Recitals |
| HSR Act | Section 3 (g) |
| Indebtedness | Section 9 (a)(xxvii) |
| Indemnified Person | Section 10 (a) |
| Indemnifying Party | Section 10 (a) |
| Intellectual Property | Section 3 (s) |
| Investment Decision Package | Section 3 (k) |
| Investor | Preamble |
| Investor Default | Section 2 (b) |
| Investors | Preamble |
| Investor Shares | Section 2 (a) |
| Issuer Free Writing Prospectus | Section 3 (k) |
| IUE-CWA | Section 5 (u) |
| knowledge of the Company | Section 22 |

| Defined Term | Section |
|---|---|
| Limited Termination | Section 12 (d) |
| Losses | Section 10 (a) |
| Material Adverse Effect | Section 3 (a) |
| Material Investment Documents | Section 9 (a)(xxviii) |
| Maximum Number | Section 2 (a) |
| Merrill | Preamble |
| Money Laundering Laws | Section 3 (ee) |
| Monthly Financial Statements | Section 5 (r) |
| Multiemployer Plans | Section 3 (z)(ii) |
| New Common Stock | Section 1 (a) |
| OFAC | Section 3 (ff) |
| Option | Section 3 (d) |
| Options | Section 3 (d) |
| Original Agreement | Recitals |
| Original Approval Motion | Recitals |
| Original Approval Order | Recitals |
| Original Investors | Recitals |
| Original PSA | Recitals |
| Pardus | Preamble |
| Plan | Section 1 (b) |
| Plan Terms | Recitals |
| Preferred Commitment Fee | Section 2 (h)(i) |
| Preferred Debt Financing | Section 5 (t) |
| Preferred Shares | Section 2 (a) |
| Preferred Term Sheet | Section 1 (b) |
| Preliminary Rights Offering Prospectus | Section 3 (k) |
| Proceedings | Section 10 (a) |
| Purchase Notice | Section 1 (c)(vi) |
| Purchase Price | Section 1 (a) |
| Record Date | Section 1 (a) |
| Registration Rights Agreement | Section 8 (c) |
| Related Purchaser | Section 2 (a) |
| Relevant Date | Section 9 (a)(xxviii)(A)(i) |
| Resale Registration Documents | Section 8 (c) |
| Resale Registration Statement | Section 8 (c) |
| Restricted Period | Section 5 (j) |
| Right | Section 1 (a) |
| Rights Distribution Date | Section 1 (c)(ii) |
| Rights Exercise Period | Section 1 (c)(iii) |
| Rights Offering | Section 1 (a) |
| Rights Offering Prospectus | Section 3 (k) |
| Rights Offering Registration Statement | Section 3 (k) |
| Satisfaction Notice | Section 1 (c)(vi) |
| Securities Act | Section 1 (c)(ii) |

| Defined Term | Section |
|---|---|
| Securities Act Effective Date | Section 3 (k) |
| Series A Certificate of Designations | Section 2 (a)(iii) |
| Series A Preferred Stock | Section 2 (a)(iii) |
| Series A Purchase Price | Section 2 (a)(iii) |
| Series B Certificate of Designations | Section 2 (a)(i) |
| Series B Preferred Stock | Section 2 (a)(i) |
| Share | Section 1 (a) |
| Shareholders Agreement | Section 8 (c) |
| Significant Subsidiary | Section 3 (a) |
| Single-Employer Plan | Section 3 (z)(ii) |
| Standby Commitment Fee | Section 2 (h)(ii) |
| Stock Plans | Section 3 (d) |
| Subscription Agent | Section 1 (c)(iii) |
| Subsidiary | Section 3 (a) |
| Superior Transaction | Section 12 (f) |
| Takeover Statute | Section 3 (oo) |
| Taxes | Section 3 (y) |
| Tax Returns | Section 3 (y)(i) |
| Transaction Agreements | Section 3 (b)(i) |
| Transaction Expenses | Section 2 (j) |
| Transformation Plan | Section 3 (m)(vi) |
| UAW | Section 3 (pp) |
| UAW MOU | Section 3 (pp) |
| UBS | Preamble |
| Ultimate Purchasers | Section 2 (k) |
| Unsubscribed Shares | Section 2 (a)(iv) |
| USW | Section 5 (u) |

SCHEDULE 2

| Investor | Direct Subscription Shares | Direct Subscription Shares Purchase Price | Maximum Backstop Shares | Maximum Backstop Shares Purchase Price | Maximum Total Common Shares | Maximum Total Common Shares Purchase Price | Series A Preferred Stock[1] | Purchase Price | Series B Preferred Stock[2] | Purchase Price | Total Purchase Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ADAH | 1,761,878 | $67,638,500 | 15,856,906 | $608,746,500 | 17,618,784 | $676,385,000 | 12,787,724 | $400,000,000 | - | $- | $1,076,385,000 |
| Del-Auto | 702,594 | $26,972,600 | 6,323,348 | $242,753,400 | 7,025,942 | $269,726,000 | - | - | 3,321,178 | $127,500,000 | $397,226,000 |
| Merrill | 265,347 | $10,186,650 | 2,388,118 | $91,679,850 | 2,653,465 | $101,866,500 | - | - | 1,693,149 | $65,000,000 | $166,866,500 |
| UBS | 265,347 | $10,186,650 | 2,388,118 | $91,679,850 | 2,653,465 | $101,866,500 | - | - | 1,693,149 | $65,000,000 | $166,866,500 |
| GS | 950,768 | $36,500,000 | 8,556,914 | $328,500,000 | 9,507,682 | $365,000,000 | - | - | 911,696 | $35,000,000 | $400,000,000 |
| Pardus | 612,545 | $23,515,600 | 5,512,907 | $211,640,400 | 6,125,452 | $235,156,000 | - | - | 2,800,208 | $107,500,000 | $342,656,000 |
| Total | 4,558,479 | $175,000,000 | 41,026,311 | $1,575,000,000 | 45,584,790 | $1,750,000,000 | 12,787,724 | $400,000,000 | 10,419,380 | $400,000,000 | $2,550,000,000 |

**Proportionate Share of Preferred Commitment Fee:**

| Investor | |
|---|---|
| ADAH | 50.4861% |
| Del-Auto | 15.9375% |
| Merrill | 8.1250% |
| UBS | 8.1250% |
| GS | 3.8889% |
| Pardus | 13.4375% |
| Total | 100% |

**Proportionate Share of Standby Commitment Fee:**

| Investor | |
|---|---|
| ADAH | 40.3977% |
| Del-Auto | 15.4712% |
| Merrill | 6.0769% |
| UBS | 6.0769% |
| GS | 18.5397% |
| Pardus | 13.4375% |
| Total | 100% |

**Proportionate Share of Alternate Transaction Fee[3]:**

| Investor | If full Commitment Fee received | If no Commitment Fee received |
|---|---|---|
| ADAH | 54.3750% | 46.8555% |
| Del-Auto | 15.9375% | 15.7150% |
| Merrill | 8.1250% | 7.1475% |
| UBS | 8.1250% | 7.1475% |
| GS | 0% | 9.6970% |
| Pardus | 13.4375% | 13.4375% |
| Total | 100% | 100% |

[1] Common stock equivalent units.

[2] Common stock equivalent units.

[3] Percentages will fluctuate depending on the amount of any Commitment Fee received.

<u>EXHIBIT A</u>

## SUMMARY OF TERMS OF
## PREFERRED STOCK

   *Set forth below is a summary of indicative terms for a potential investment in Delphi Corporation by entities or funds controlled by Appaloosa Management, Harbinger Capital Partners, Merrill Lynch, Pierce, Fenner & Smith Incorporated., UBS Securities, Goldman Sachs & Co. and Pardus Special Opportunities Master Fund L.P. The investment is being made in connection with a Plan of Reorganization of Delphi Corporation under chapter 11 of the Bankruptcy Code. The terms set forth below are intended solely to provide a framework for the parties as they proceed with discussions of the proposed transaction and do not constitute any agreement with respect to the definitive terms for any transaction or any agreement to agree or any solicitation of acceptances or rejections of any plan of reorganization. While the parties expect to negotiate in good faith with respect to the terms for a transaction, any party shall be free to discontinue discussions and negotiations at any time for any reason or no reason. No party shall be bound by the terms hereof and only execution and delivery of definitive documentation relating to the transaction shall result in any binding or enforceable obligations of any party relating to the transaction.*

| | |
|---|---|
| **Issuer**: | Delphi Corporation (the "***Company***"), a corporation organized under the laws of Delaware and a successor to Delphi Corporation, as debtor in possession in the chapter 11 reorganization case (the "***Bankruptcy Case***") pending in the United States Bankruptcy Court for the Southern District of New York. |
| **Investors**: | Entities or funds controlled by Appaloosa Management ("***Appaloosa***"), Harbinger Capital Partners ("***Harbinger***"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("***Merrill***"), UBS Securities ("***UBS***"), Goldman Sachs & Co. ("***GS***") and Pardus Special Opportunities Master Fund L.P. ("***Pardus***" and together with Harbinger, Merrill, UBS and GS, the "***Co-Lead Investors***"), with the Series B Preferred Stock to be purchased by the Co-Lead Investors allocated as follows: (a) Harbinger—31.875%; (b) Merrill—16.25%; (c) UBS—16.25%; (d) GS—8.75%; and (e) Pardus—26.875%. Appaloosa or any Permitted Holder (as defined below) shall be the exclusive purchaser and sole beneficial owner for all purposes hereunder of the Series A-1 Preferred Stock (as defined below). Appaloosa, Harbinger, Merrill, UBS, GS and Pardus are collectively referred to as the "***Investors***." |
| **Securities to be Issued**: | Series A-1 Senior Convertible Preferred Stock, par value $0.01 per share (the "***Series A-1 Preferred Stock***"). The Series A-1 Preferred Stock shall convert to Series A-2 Preferred Stock (the "***Series A-2 Preferred Stock***" and, together with the Series A-1 Preferred Stock, the "***Series A Preferred Stock***") in certain circumstances described in this term sheet. |
| | Series B Senior Convertible Preferred Stock, par value $0.01 per share (the "***Series B Preferred Stock***" and, together with the Series A |

Preferred Stock, the *"Preferred Stock"*).

The Series B Preferred Stock shall be identical in all respect to the Series A-1 Preferred Stock except as specifically set forth below.

The Series A-2 Preferred Stock shall be identical in all respect to the Series A-1 Preferred Stock except it shall not have Voting Rights and Governance Rights (as defined below).

The (i) Series A-1 Preferred Stock and the shares of Common Stock underlying such Series A-1 Preferred Stock may not be, directly or indirectly, sold, transferred, assigned, pledged, donated, or otherwise encumbered or disposed of by any Series A Preferred Stock Holder (as defined below), during the two years following the effective date (the *"Effective Date"*) of the Company's plan of reorganization in the Bankruptcy case (the *"Plan"*) other than in whole pursuant to a sale of the Company (as defined below) (provided, however, that in any sale of Series A-1 Preferred Stock in connection with a sale of the Company, the seller of the Series A-1 Preferred Stock may receive consideration with a value no greater than the greater of (i) the fair market value of the Series A-1 Preferred Stock (or a preferred security of equivalent economic value), such fair market value not to reflect the value of the Voting Rights and Governance Rights attributable to the Series A-1 Preferred Stock, and (ii) the Liquidation Value) and (ii) Series B Preferred Stock and the shares of Common Stock underlying such Series B Preferred Stock, or any interest or participation therein may not be, directly or indirectly, sold, transferred, assigned, pledged or otherwise encumbered or disposed of (including by exercise of any registration rights) during the ninety days following the Effective Date other than in whole pursuant to a sale of the Company (each of (i) and (ii), the *"Transfer Restriction"*). A *"sale of the Company"* means the sale of the Company to a party or parties other than, and not including, Appaloosa or any affiliate of Appaloosa (for this purpose, an "affiliate" of Appaloosa shall not include any company in which a fund managed by Appaloosa or its affiliates invests and does not control) pursuant to which such party or parties acquire (i) the capital stock of the Company possessing the voting power under normal circumstances to elect a majority of the Company's Board of Directors (whether by merger, consolidation or sale or transfer of the Company's capital stock) or (ii) all or substantially all of the Company's assets determined on a consolidated basis.

| | |
|---|---|
| **Purchase of Preferred Stock**: | At the Effective Date, (i) Appaloosa will purchase all of the 12,787,724 shares of Series A-1 Preferred Stock for an aggregate purchase price of $400 million and (ii) the Co-Lead Investors shall purchase all of the 10,419,880 shares of Series B Preferred Stock, for an aggregate purchase price of $400 million. The aggregate stated value of the Series A-1 Preferred Stock shall be $400 million and the aggregate stated value of |

the Series B Preferred Stock shall be $400 million (in each case, the "*Stated Value*").

**Mandatory Conversion into Common Stock:**

The Company shall convert into Common Stock all, but not less than all, of the (i) Series A Preferred Stock on the first date the Mandatory Conversion Requirements are satisfied (but in no event earlier than June 30, 2012[1]) at the Conversion Price (as defined below) of the Series A Preferred Stock in effect on such conversion date, and (ii) Series B Preferred Stock on the first day the Mandatory Conversion Requirements are satisfied (but in no event earlier than the third anniversary of the Effective Date) at the Conversion Price (as defined below) of the Series B Preferred Stock in effect on such conversion date.

The "*Mandatory Conversion Requirements*" set forth in this section are as follows: (i) the closing price for the Common Stock for at least 35 trading days in the period of 45 consecutive trading days immediately preceding the date of the notice of conversion shall be equal to or greater than $55[2] per share and (ii) the Company has at the conversion date an effective shelf registration covering resales of the shares of Common Stock received upon such conversion of the Preferred Stock.

The Company will provide each Preferred Stock Holder (as defined below) with notice of conversion at least five (5) business days prior to the date of conversion.

The holders of the Series A Preferred Stock (the "*Series A Preferred Stock Holders*" and each, a "*Series A Preferred Stock Holder*") will agree not to take any action to delay or prevent such registration statement from becoming effective.

**Liquidation Rights:**

In the event of any liquidation, dissolution or winding up of the business of the Company, whether voluntary or involuntary, the holders of Preferred Stock (the "*Preferred Stock Holders*" and each, a "*Preferred Stock Holder*") shall receive, in exchange for each share, out of legally available assets of the Company, (A) a preferential amount in cash equal to (i) the Stated Value plus (ii) the aggregate amount of all accrued and unpaid dividends or distributions with respect to such share (such amount being referred to as the "*Liquidation Value*") and (B) a non-preferential amount (if any) (the "*Common Equivalent Amount*") equal to (i) the amount that Preferred Stock Holder would have received pursuant to the liquidation if it had converted its Preferred Stock into Common Stock immediately prior to the liquidation minus (ii) any amounts received pursuant to (A)(i) and (ii) hereof (the Stated Value and dividends and distributions). For the avoidance of doubt, this paragraph

---

[1]    Assuming emergence by January 1, 2008. Conversion date to be adjusted day-by-day to reflect any later emergence.

[2]    Equivalent to a TEV of $15.3 billion at emergence.

should operate so that in the event of a liquidation, dissolution or winding up of the business of the Company, a Preferred Stock Holder shall receive a total amount equal to the greater of: (i) the Liquidation Value and (ii) the amount that a Preferred Stock Holder would have received pursuant to the liquidation, dissolution or winding up of the business if it converted its Preferred Stock into Common Stock immediately prior to the liquidation.

**Ranking:**

The Series A Preferred Stock and the Series B Preferred Stock shall rank *pari passu* with respect to any distributions upon liquidation, dissolution or winding up of the Company. The Preferred Stock will rank senior to any other class or series of capital stock of the Company with respect to any distributions upon liquidation, dissolution or winding up of the Company.

**Conversion of Preferred Stock into Common Stock:**

Each share of Preferred Stock shall be convertible at any time, without any payment by the Preferred Stock Holder, into a number of shares of Common Stock equal to (i) the Liquidation Value <u>divided by</u> (ii) the Conversion Price. The Conversion Price shall initially be $[___][3], with respect to the Series A Preferred Stock, and $[___][4] with respect to the Series B Preferred Stock, in each case subject to adjustment from time to time pursuant to the anti-dilution provisions of the Preferred Stock (as so adjusted, the "***Conversion Price***"). The anti-dilution provisions will contain customary provisions with respect to stock splits, recombinations and stock dividends and customary weighted average anti-dilution provisions in the event of, among other things, the issuance of rights, options or convertible securities with an exercise or conversion or exchange price below the Conversion Price, the issuance of additional shares at a price less than the Conversion Price and other similar occurrences.

**Conversion of Series A-1 Preferred Stock Into Series A-2 Preferred Stock:**

If (a) Appaloosa or any Permitted Holder (as defined below) sells, transfers, assigns, pledges, donates or otherwise encumbers to any person other than a Permitted Holder, or converts into Common Stock, shares of Series A-1 Preferred Stock with an aggregate Liquidation Value in excess of $100 million, or (b) David Tepper no longer controls Appaloosa and James Bolin is no longer an executive officer of Appaloosa, then all the shares of Series A-1 Preferred Stock shall automatically convert into Series A-2 Preferred Stock without any action on the part of the holder thereof; <u>provided</u>, that with respect to clause (a), no such conversion shall be effective until the Company has in effect a registration statement covering resales of the Common Stock issuable upon conversion of the Preferred Stock. The Series A Preferred Stock Holders will agree not to take any action to delay or prevent such

---

[3] Equivalent to a TEV of $11.75 billion at emergence.
[4] Equivalent to a TEV of $12.8 billion at emergence.

registration statement from becoming effective.

If Appaloosa transfers shares of Series A-1 Preferred Stock to any person other than an affiliate of Appaloosa (such affiliate being a "*Permitted Holder*"), then all the shares of Series A-1 Preferred Stock so transferred shall automatically convert into Series A-2 Preferred Stock without any action on the part of the holder thereof.

The direct or indirect transfer of ownership interests in any Permitted Holder that owns shares of Series A-1 Preferred Stock such that such Permitted Holder ceases to be an affiliate of Appaloosa shall constitute a transfer of such Series A-1 Preferred Stock to a person other than a Permitted Holder for the purpose of this provision.

Each event described above in the previous two paragraphs of this section "Conversion of Series A Preferred Stock into Series A-2 Preferred Stock" is referred to as a "*Series A-2 Conversion Event*."

Subject to compliance with applicable securities laws and the Transfer Restriction, shares of Preferred Stock will be freely transferable.

**Dividends:** Each Preferred Stock Holder shall be entitled to receive dividends and distributions on the Preferred Stock at an annual rate of 6.5% of the Liquidation Value thereof, with respect to the Series A Preferred Stock, and 3.25% of the Liquidation Value thereof, with respect to the Series B Preferred Stock, in each case payable quarterly in cash as declared by the Company's Board.  Unpaid dividends shall accrue.  In addition, if any dividends are declared and paid on the Common Stock, the Series A Preferred Stock shall be entitled to receive, in addition to the dividend on the Series A Preferred Stock at the stated rate, the dividends that would have been payable on the number of shares of Common Stock that would have been issued on the Series A Preferred Stock had it been converted immediately prior to the record date for such dividend.

**Preference with Respect to Dividends:** Each Preferred Stock Holder shall, prior to the payment of any dividend or distribution in respect of the Common Stock or any other class of capital stock of the Company ranking junior to the Preferred Stock, be entitled to be paid in full the dividends and distributions payable in respect of the Preferred Stock.

**Restriction on Redemptions of Junior Stock:** So long as shares of Series A Preferred Stock having a Liquidation Value of $200 million or more remain outstanding, the Company shall not and shall not permit any of its subsidiaries to, purchase, redeem or otherwise acquire for value any shares of Common Stock or any shares of any other class of capital stock of the Company ranking junior to the Preferred Stock, except customary provisions with respect to repurchase of employee equity upon termination of employment and except for

purchases, redemptions or other acquisitions for value of Common Stock not to exceed $50 million in any calendar year.

**Governance –
Board of
Directors:**

A committee (the "*Search Committee*") shall be appointed consisting of one (1) representative of Appaloosa, one (1) representative of the Company, being the Company's lead director (currently John Opie), one (1) representative of the Unsecured Creditors Committee, being David Daigle, one (1) representative of the Co-Lead Investors other than UBS, GS and Merrill (who shall be determined by Appaloosa), and one (1) representative of the Equity Committee reasonably acceptable to the other members of the Search Committee.  Each member of the Search Committee shall be entitled to require the Search Committee to interview any person to serve as a director unless such proposed candidate is rejected by each of the Appaloosa representative, the Company representative and the representative of the Unsecured Creditors' Committee.  The entire Search Committee shall be entitled to participate in such interview and in a discussion of such potential director following such interview.

The board of directors of the Company shall consist of nine (9) directors (which number shall not be expanded at all times that the Series A-1 Preferred Stock has Series A-1 Board Rights (as defined below)), three (3) of whom (who shall be Class III Directors) shall initially be nominated by Appaloosa and elected at the time of emergence from Chapter 11 by the Series A Preferred Stock Holders (and thereafter shall be elected directly by the Series A Preferred Stock Holders) (the "*Series A Directors*"), one (1) of whom (who shall be a Class I Director) shall be the Executive Chairman selected as described below under "Executive Chairman", one (1) of whom (who shall be a Class I Director) shall be the Chief Executive Officer, one (1) of whom (who shall be a Class II Director) shall initially be selected by the Co-Lead Investor representative on the Search Committee with the approval of either the Company or the Unsecured Creditors' Committee (the "*Joint Investor Director*"), one (1) of whom (who shall be a Class I Director) shall initially be selected by the Unsecured Creditors' Committee and two (2) of whom (who shall be Class II Directors) shall initially be selected by the Unsecured Creditors' Committee (such directors selected by the Unsecured Creditors' Committee and the Joint Investor Director, being the "*Common Directors*").  For the avoidance of doubt, all directors selected in accordance with this paragraph, shall have been interviewed and/or discussed by the Search Committee.  Each director so selected shall be appointed to the initial Board of Directors of the Company unless at least three members of the following four members of the Search Committee objects to the appointment of such individual: the Appaloosa representative,  the Company representative;  the representative of the Unsecured Creditors' Committee; and the representative of the Equity Committee.  Initially, the Board shall be

comprised of (a) six (6) directors who satisfy all applicable independence requirements of the relevant stock exchange on which it is expected the Common Stock would be traded and (b) six (6) directors who are independent from the Investors; provided, that the requirements of this sentence may be waived by the unanimous consent of the Company, Appaloosa and the Unsecured Creditors Committee. Additionally, the Joint Investor Director must be independent from the Investors.

Directors initially will be placed as set forth above in three (3) classes: directors in the first class will have an initial term expiring at the annual meeting of stockholders to be held in 2009 (each a "*Class I Director*"), directors in the second class will have an initial term expiring at the annual meeting of stockholders to be held in 2010 (each a "*Class II Director*"), and directors in the final class will have an initial term expiring at the annual meeting of stockholders to be held in 2011 (each a "*Class III Director*"). After the expiration of each initial term of each class of directors, the directors will thereafter each have a one year term elected annually.

Following the initial election of the Executive Chairman and the Chief Executive Officer, the Executive Chairman and Chief Executive Officer shall be nominated for election to the Board by the Nominating and Corporate Governance Committee of the Board and elected to the board by the holders of the Common Stock and the Preferred Stock, voting as a class. The Executive Chairman of the Board shall be selected as described below under "Executive Chairman." The initial Chief Executive Officer shall be Rodney O'Neal, who shall become the Chief Executive Officer and President not later than the effective date of the Plan.

After the initial selection of the Series A Directors, until the earlier of the expiration of the term of the Class III Directors and the conversion of all Series A-1 Preferred Stock to Series A-2 Preferred Stock or Common Stock, (a) the Series A Preferred Stock shall continue to directly elect (including removal and replacement) the Series A Directors subject to the ability of the Nominating and Corporate Governance Committee to, by majority vote, veto the selection of up to two proposed Series A Directors for each Series A director position on the Board and (b) the number of directors on the board of directors may not be increased. The rights of Series A-1 Preferred Stock described in this paragraph are referred to as "*Series A-1 Board Rights*". Upon the earlier of such date, the Series A-1 Directors shall serve out their remaining term and thereafter be treated as Common Directors.

After the initial selection of the Common Directors, the nominees for election of the Common Directors shall be determined by the Nominating and Corporate Governance Committee of the Company's

Board of Directors, with the Series A Directors on such committee not entitled to vote on such determination at any time the Series A-1 Preferred Stock retains Series A-1 Board Rights, and recommended to the Company's Board of Directors for nomination by the Board. Only holders of Common Stock, Series B Preferred Stock and Series A Preferred Stock that is not entitled to Series A Board Rights shall be entitled to vote on the election of the Common Directors.

The Search Committee shall determine by majority vote the Committee assignments of the initial Board of Directors; provided, that for the initial Board and at all times thereafter that the Series A-1 Preferred Stock retains Series A-1 Board Rights at least one Series A Director shall be on all committees of the Board and a Series A Director shall constitute the Chairman of the Compensation Committee of the Board; provided, further, that so long as the Series A-1 Preferred Stock retains Series A-1 Board Rights, the Series A Directors shall not constitute a majority of the Nominating and Corporate Governance Committee. Committee assignments shall be subject to all applicable independence and qualification requirements for directors including those of the relevant stock exchange on which the Common Stock is expected to be traded. Pursuant to a stockholders' agreement or other arrangements, the Company shall maintain that composition.

**Governance – Executive Chairman:**

The Executive Chairman shall initially be selected by majority vote of the Search Committee, which must include the approval of the representatives of Appaloosa and the Unsecured Creditors' Committee. Any successor Executive Chairman shall be selected by the Nominating and Corporate Governance Committee of the Board, subject (but only for so long as any of the Series A-1 Preferred Stock remains outstanding) to the approval of the Series A-1 Preferred Stock Holders. Upon approval, such candidate shall be recommended by the Nominating and Corporate Governance Committee to the Company's Board of Directors for appointment as the Executive Chairman and nomination to the Board. The Preferred Stock Holders will vote on the candidate's election to the Board on an as-converted basis together with holders of Common Stock. Notwithstanding the foregoing, if there shall occur any vacancy in the office of the Executive Chairman during the initial one (1) year term, the successor Executive Chairman shall be nominated by the Series A-1 Preferred Stock Holders (but only for so long any of as the Series A-1 Preferred Stock remains outstanding) subject to the approval of the Nominating and Corporate Governance Committee of the Board.

The Executive Chairman shall be a full-time employee of the Company with his or her principal office in the Company's world headquarters in Troy, Michigan and shall devote substantially all of his or her business activity to the business affairs of the Company.

The Executive Chairman shall cause the Company to and the Company shall be obligated to meaningfully consult with the representatives of the Series A-1 Preferred Stock Holders with respect to the annual budget and material modifications thereto prior to the time it is submitted to the Board for approval.

The employment agreements entered into by the Company with the Executive Chairman and the Chief Executive Officer shall provide that (i) upon any termination of employment, the Executive Chairman and/or the Chief Executive Officer shall resign as a director (and the employment agreements shall require delivery at the time such agreements are entered into of an executed irrevocable resignation that becomes effective upon such termination) and (ii) the right to receive any payments or other benefits upon termination of employment shall be conditioned upon such resignation.  If for any reason the Executive Chairman or the Chief Executive Officer does not resign or the irrevocable resignation is determined to be ineffective, then the Series A-1 Preferred Stock Holders may remove the Executive Chairman and/or Chief Executive Officer as a director, subject to applicable law.  The employment agreement of the Chief Executive Officer will provide that if the Chief Executive Officer is not elected as a member of the Company's Board, the Chief Executive Officer may resign for "cause" or "good reason".

The special rights of the Series A-1 Preferred Stock referred to in "Governance – Board of Directors" and in this "Executive Chairman" section are referred to as the "***Governance Rights***".

| | |
|---|---|
| **Governance – Voting Rights:** | Except with respect to the election of directors, who shall be elected as specified above, the Preferred Stock Holders shall vote, on an "as converted" basis, together with the holders of the Common Stock, on all matters submitted to shareholders. |

The Series A-1 Preferred Stock Holders shall be entitled to propose individuals for appointment as Chief Executive Officer and Chief Financial Officer, subject to a vote of the Board.  The Series A-1 Preferred Stock Holders shall also have the non-exclusive right to propose the termination of the Executive Chairman (but only during the initial one (1) year term of the Executive Chairman and only for so long as the Series A-1 Preferred Stock remains outstanding), the Chief Executive Officer and Chief Financial Officer, in each case, subject to a vote of the Board.  If the Series A Preferred Stock Holders propose the appointment or termination of the Chief Executive Officer or Chief Financial Officer, the Board shall convene and vote on such proposal within ten (10) days of the Board's receipt of notice from the Series A-1 Preferred Stock Holders; provided, that the then current Chief Executive Officer shall not be entitled to vote on either the appointment or

termination of the Chief Executive Officer and shall not be entitled to vote on the termination of the Chief Financial Officer.

The Company shall not, and shall not permit its subsidiaries to, take any of the following actions (subject to customary exceptions as applicable) unless (i) the Company shall provide the Series A-1 Preferred Stock Holders with at least 20 business days advance notice and (ii) it shall not have received, prior to the 10th business day after the receipt of such notice by the Series A-1 Preferred Stock Holders, written notice from all of the Series A-1 Preferred Stock Holders that they object to such action:

- any action to liquidate the Company;

- any amendment of the charter or bylaws that adversely affects the Series A Preferred Stock (any expansion of the Board of Directors would be deemed adverse); or

- at all times that the Series A Preferred Stock is subject to the Transfer Restriction:

  - a sale, transfer or other disposition of all or substantially all of the assets of the Company and its subsidiaries, on a consolidated basis;

  - any merger or consolidation involving a change of control of the Company; or

  - any acquisition of or investment in any other person or entity having a value in excess of $250 million in any twelve-month period after the Issue Date.

The approval rights set forth above shall be in addition to the other rights set forth above and any voting rights to which the Series A Preferred Stock Holders are entitled above and under Delaware law.

In a merger or consolidation involving a change of control of the Company (a "*Change of Control*"), the Series A-1 Preferred Stock will be converted into the greater of (i) the consideration with a value equal to the fair market value of the Series A-1 Preferred Stock (or a preferred security of equivalent economic value), such fair market value shall not reflect the value of the Voting Rights and Governance Rights attributable to the Series A-1 Preferred Stock, and (ii) the Liquidation Value. In a Change of Control transaction, the Series B Preferred Stock will be converted into the greater of (i) the consideration with a value equal to the fair market value of the Series B Preferred Stock (or a preferred security of equivalent economic value) and (ii) the Liquidation Value.

The special rights of the Series A-1 Preferred Stock described above in

this section "Governance – Voting Rights" are referred to as the "***Voting Rights***". The Series A-1 Preferred Stock Holders shall have no Voting Rights after no shares of Series A-1 Preferred Stock are outstanding.

Appaloosa and the Permitted Holders shall not receive, in exchange for the exercise or non-exercise of voting or other rights in connection with a any transaction subject to Voting Rights, any compensation or remuneration; <u>provided</u>, that this restriction shall not prohibit the reimbursement of expenses incurred by Appaloosa or any Permitted Holders and shall not prohibit the payment of fees by the Company to Appaloosa or any Permitted Holder if the Company has engaged Appaloosa or its affiliates as an advisor or consultant in connection with any such transaction.

|                              |                                                                                                                                                                                                                     |
| ---------------------------- | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| **Reservation of Unissued Stock:** | The Company shall maintain sufficient authorized but unissued securities of all classes issuable upon the conversion or exchange of shares of Preferred Stock and Common Stock. |
| **Transferability:**          | The Series A Preferred Stock Holders may sell or otherwise transfer such stock as follows: |

- to any Permitted Holder; or

- subject to the Transfer Restriction, to any other person; <u>provided, however</u>, that upon any such transfer, the shares of Series A-1 Preferred Stock so transferred shall automatically convert into Series A-2 Preferred Stock.

|                        |                                                                                                                                                                                                                                                    |
| ---------------------- | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| **Registration Rights:** | The Investors shall be entitled to registration rights as set forth below. The registration rights agreement shall contain customary terms and provisions consistent with such terms, including customary hold-back, cutback and indemnification provisions. |

<u>Demand Registrations</u>. Subject to the Transfer Restriction, the Preferred Stock Holders shall be entitled to an aggregate of five (5) demand registrations, in addition to any shelf registration statement required by the Equity Purchase and Commitment Agreement among the Company and the Investors (which shelf registration shall be renewed or remain available so long as the Company is not eligible to use Form S-3); <u>provided</u>, that all but one such demand right requires the prior written consent of Appaloosa and the one demand not requiring the consent of Appaloosa shall be at the request of the holders of a majority of the shares of Series B Preferred Stock; <u>provided, further</u>, that following the time that the Company is eligible to use Form S-3, the Preferred Stock Holders shall be entitled to an unlimited number of demand registrations (without the need for Appaloosa's consent). Any demand registration may, at the option of the Preferred Stock Holders be a "shelf"

registration pursuant to Rule 415 under the Securities Act of 1933. All registrations will be subject to customary "windows."

Piggyback Registrations. In addition, subject to the Transfer Restriction, the Preferred Stock Holders shall be entitled to unlimited piggyback registration rights, subject to customary cut-back provisions.

Registrable Securities: The Series B Preferred Stock, any shares of Common Stock issuable upon conversion of the Preferred Stock, any other shares of Common Stock held by any Investor (including shares acquired in the rights offering or upon the exercise of preemptive rights), and any additional securities issued or distributed by way of a dividend or other distribution in respect of any securities. Securities shall cease to be Registrable Securities upon sale to the public pursuant to a registration statement or Rule 144, or when all shares held by an Investor may be transferred without restriction pursuant to Rule 144(k).

Expenses. All registrations shall be at the Company's expense (except underwriting fees, discounts and commissions agreed to be paid by the selling holders), including, without limitation, fees and expenses of one counsel for any holders selling Registrable Securities in connection with any such registration.

|  |  |
|---|---|
| **Preemptive Rights:** | So long as shares of Series A-1 Preferred Stock having a Liquidation Value of $250 million or more remain outstanding, the Preferred Stock Holders shall be entitled to participate *pro rata* in any offering of equity securities of the Company, other than with respect to (i) shares issued or underlying options issued to management and employees and (ii) shares issued in connection with business combination transactions. |
| **Commitment Fee:** | (a) A commitment fee of 2.25% of total commitment shall be earned by and payable to the Investors and (b) an additional arrangement fee of 0.25% of total commitment shall be earned by and payable to Appaloosa, all as provided for in the EPCA. |
| **Standstill** | For a period of five (5) years from the Closing Date, Appaloosa will not (a) acquire, offer or propose to acquire, solicit an offer to sell or donate or agree to acquire, or enter into any arrangement or undertaking to acquire, directly or indirectly, by purchase, gift or otherwise, record or direct or indirect beneficial ownership (as such term is defined in Rule 13d-3 of the Exchange Act) of more than 25% of the Company's common stock or any direct or indirect rights, warrants or options to acquire record or direct or indirect beneficial ownership of more than 25% of the Company's common stock or (b) sell, transfer, pledge, dispose, distribute or assign ("*Transfer*") to any person in a single transaction, Company Common Stock or any securities convertible into or exchangeable for or representing the right to acquire the Company's |

Common Stock ("**_Common Stock Equivalents_**") representing more than 15% of the Company's then issued and outstanding (on a fully diluted basis) Common Stock; <u>provided</u>, that Appaloosa shall be permitted to Transfer the Company's Common Stock or Common Stock Equivalents (i) to Permitted Holders, (ii) as part of a broadly distributed public offering effected in accordance with an effective registration statement, (iii) in a sale of the Company, (iv) pursuant to any tender or exchange offer or (v) as otherwise approved by (A) during the initial three year term of the Series A Directors, a majority of Directors who are not Series A Directors or (B) after the initial three year term of the Series A Directors, a majority of the Directors (customary exceptions shall apply for Transfers to partners, stockholders, family members and trusts and Transfers pursuant to the laws of succession, distribution and descent).

| | |
|---|---|
| **Stockholders Agreement:** | Certain of the provisions hereof will be contained in a Stockholders Agreement to be executed and delivered by ADAH and the Company on the Effective Date. |
| **Governing Law:** | State of Delaware |

AMENDED

EXHIBIT B

PLAN FRAMEWORK AND SPECIAL STATUTORY COMMITTEE PROVISIONS

FRAMEWORK PROVISIONS

The Plan shall contain all of the following terms; provided, however, that nothing herein shall constitute an offer with respect to any securities or a solicitation of acceptances of a chapter 11 plan.  Such offer or solicitation only will be made in compliance with all applicable securities laws and/or provisions of the Bankruptcy Code:

1.1     A condition precedent to the effectiveness of the Plan (subject to the waiver provisions to be negotiated in connection with the Plan) shall be that the aggregate amount of all trade claims and other unsecured claims (including any accrued interest) (excluding (i) unsecured funded debt claims, (ii) Flow-Through Claims (defined below), (ii) GM claims, which shall be treated as set forth below, and (iii) securities claims, which shall be treated as set forth below) (collectively, the "Trade and Other Unsecured Claims") that have been asserted or scheduled but not yet disallowed as of the effective date of the Plan shall be allowed or estimated for distribution purposes by the Bankruptcy Court to be no more than $1.7 billion, excluding all allowed accrued postpetition interest thereon.

1.2     All senior secured debt shall be refinanced and paid in full and all allowed administrative and priority claims shall be paid in full.

1.3     Trade and Other Unsecured Claims and unsecured funded debt claims shall be placed in a single class.  All such claims that are allowed (including all allowed accrued interest, which for trade claims shall be at a rate to be agreed to or determined by the Bankruptcy Court, it being understood that with respect to trade claims, the Debtors and Plan Investors will not take the position that there should not be an entitlement to postpetition interest) shall be satisfied in full with (a) $3.48 billion of common stock (77.3 million out of a total of 147.6 million shares,[1] at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi and (b) the balance in cash[2]; provided, however, that the common stock and cash to be distributed pursuant to the immediately preceding clause shall be reduced proportionately by the amount that allowed Trade and Other Unsecured Claims are less than $1.7 billion, excluding allowed accrued postpetition interest thereon.

---

[1]     Inclusive of distributions to subordinated creditors under Section 1.6 below.  References herein to the total number of shares of common stock gives effect to the conversion of the preferred stock issued pursuant to the Investment Agreement to common stock.  The actual number of shares of common stock to be issued by Delphi and to be distributed to various classes under Sections 1.3, 1.6 and 1.8 of this Exhibit B is subject to final adjustment and reconciliation as well as negotiation of plan distribution mechanics in the Plan.

[2]     Such amounts to be adjusted by proceeds from the par rights offering to be conducted by Delphi in connection with Section 1.8(iv).

1.4     (i) Customer and environmental obligations, (ii) employee-related (excluding collective bargaining-related obligations) and other obligations (in each instance as to be agreed by the Debtors and Appaloosa) and (iii) litigation exposures and other liabilities that are covered by insurance (as to be agreed by the Debtors and Appaloosa and scheduled in the Plan) ((i), (ii) and (iii) together, the "Flow-Through Claims") will be unimpaired and will be satisfied in the ordinary course of business (subject to the preservation and flow-through of all estate rights, claims and defenses with respect thereto which shall be fully reserved).

1.5     GM will receive an allowed general unsecured claim for all claims and rights of GM and its affiliates (excluding in respect of the 414(l) Assumption, all Flow Through Claims and all other claims and amounts to be treated in the normal course or arising or paid pursuant to the Delphi/GM Definitive Documents) that will be satisfied with $2.70 billion in cash.

1.6     All Delphi subordinated debt claims (including all accrued interest thereon) will be allowed and, in resolution of the subordination rights of Delphi senior debt, all cash otherwise distributable to Delphi subordinated debt claims pursuant to Section 1.3 shall be distributed to Delphi senior debt, and the allowed Delphi subordinated debt claims will be satisfied with $478 million of common stock (10.6 million out of a total of 147.6 million shares, at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi; provided, however that the $478 million referred to above shall be increased by post-petition interest accruing after July 1, 2007 as provided for in the Plan.

1.7     Any allowed securities claims, including all claims in the MDL litigation pending in the United States District Court for the Eastern District of Michigan, will be satisfied solely from available insurance or as otherwise agreed by Delphi and Appaloosa.

1.8     The equity securities class in the Plan shall receive, in the aggregate, (i) $66 million of common stock (1.5 million out of a total of 147.6 million shares, at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi, (ii) transferable rights to purchase 45.6 million out of a total of 147.6 million shares of common stock (to be reduced by the guaranteed minimum of 10% of the rights for the Plan Investors) in reorganized Delphi for $1.75 billion (at an estimated exercise price of $38.39/share which is based on discounted TEV of $12.8 billion at emergence), (iii) 5-year warrants to purchase for $45/share an additional 5% of the common stock of Delphi, and (iv) non-transferable rights to purchase, on a proportionate basis, $572 million of the common stock that would otherwise be distributable to unsecured claims pursuant to Section 1.3 for a price of $45/share consisting of: (x) $522 million of the common stock that would otherwise be distributable to all general unsecured claims (less the plan value of the common stock made available for the par rights offering pursuant to subparagraph (z) hereof), (y) $50 million of the common stock in excess of subparagraph (x) hereof that would otherwise be distributable to Appaloosa, and (z) all of the common stock that would otherwise be distributable pursuant to the claim allowed pursuant to paragraph 8 of the Order Under 11 U.S.C §§ 363, 1113, And 1114 And Fed. R. Bankr. P. 6004 And 9019 Approving Memorandum Of Understanding Among UAW, Delphi, And General Motors Corporation Including Modification Of UAW Collective Bargaining Agreements And Retiree Welfare Benefits For Certain UAW-Represented Retirees (Docket No. 8693, July 19, 2007)  (the "par rights offering"); provided, that Appaloosa (in its capacity as a stockholder of Delphi) shall agree not to participate in the par rights offering and shall use commercially reasonable efforts to