obtain such agreement from the other Plan Investors.  The record date for the rights offering and the par rights offering shall be not earlier than the date on which the Confirmation Hearing is first scheduled to commence.[3]

     1.9     The preferred stock to be issued pursuant to the Plan in connection with the Investment Agreement and the corporate governance of Reorganized Delphi shall be subject to the terms listed on the term sheet attached to the Investment Agreement ("Summary of Terms of Preferred Stock"), which are incorporated by reference herein.

     1.10     Delphi will arrange for funding as of the effective date of the Plan for all amounts required to meet ERISA funding requirements through 2011 for its US pension obligations as estimated on the effective date of the Plan.  Such payment will include GM taking up to $2.0 billion of net pension obligations pursuant to a 414(l) transaction (the "414(l) Assumption"), which amount shall be reduced to no less than $1.5 billion if (a) Delphi or Appaloosa determine that any greater amount will have an adverse impact on the Debtors or (b) Appaloosa determines that any greater amount will have an adverse impact on the Plan Investors' proposed investment in the Debtors.  GM will receive a note from Delphi in the amount of the 414(l) Assumption transferred in the 414(l) transaction, subject to agreed market terms to be specified in the Delphi/GM Definitive Documents; provided, however, that such note will be due, payable and paid in full at par plus accrued interest in cash within ten (10) days following the effective date of the Plan.

     1.11     A joint claims oversight committee shall be established on the effective date of the Plan or as soon thereafter as practicable to monitor claims administration, provide guidance to the Debtors, and address the Bankruptcy Court if such post-effective date joint claims oversight committee disagrees with the Debtors' determinations requiring claims resolution.  The composition of the joint claims oversight committee shall be reasonably satisfactory to Appaloosa, but in any case, shall include at least one representative appointed by Appaloosa.

     1.12     Ongoing management compensation, including the SERP, stock options, restricted stock, severance, change in control provisions and all other benefits will be on market terms (as determined by the Board of Directors, based on the advice of Watson-Wyatt, and such management compensation plan design shall be described in the Disclosure Statement and included in the Plan) and reasonably acceptable to Appaloosa; claims of former management and terminated/resigning management will be resolved on terms acceptable to Delphi and Appaloosa or by court order.  Equity awards will dilute all equity interests pro rata.

     1.13     The amended and restated certificate of incorporation of Delphi to be effective immediately following the effective date of the Plan shall prohibit: (A) for so long as Appaloosa owns any shares of Series A Preferred Stock, any transactions between Delphi or any of its Subsidiaries (as defined in the Investment Agreement), on the one hand, and Appaloosa or its respective Affiliates (as defined in the Investment Agreement), on the other hand (including any "going private transaction" sponsored by Appaloosa) unless such transaction shall have been

---

[3]     Inclusion in the Plan of subsections 1.8 (iii) and (iv) is conditioned upon the "Equity Committee" (as defined below) supporting entry of the Approval Order and not subsequently appealing or seeking reconsideration or termination of such Approval Order (none of which the Equity Committee would be entitled to seek following its support of entry of such order).

approved by directors constituting not less than 75% of the number of Common Directors (as defined in the Investment Agreement), and (B) any transaction between Delphi or any of its Subsidiaries, on the one hand, and a director, on the other hand, other than a director appointed by holders of Series A Preferred Stock (as defined in the Investment Agreement), unless such transaction shall have been approved by directors having no material interest in such transaction (a "Disinterested Director") constituting not less than 75% of the number of Disinterested Directors.

<u>SPECIAL STATUTORY COMMITTEE PROVISIONS</u>

So long as the official committee of unsecured creditors appointed on October 17, 2005 in the Chapter 11 Cases (the "Creditors' Committee") and the ad hoc committee of trade creditors (the "Ad Hoc Trade Committee") shall support entry of the Approval Order and so long as the Creditors' Committee shall support the implementation of the Investment Agreement, this Exhibit B, and each of the transactions contemplated by the Investment Agreement and this Exhibit B, the following provisions shall be in effect, and to the extent such provisions are inconsistent with any other provisions of this Exhibit B, the following provisions shall supplant and supersede such; provided, that if the Creditors' Committee, in the exercise of its fiduciary duties, shall subsequently withdraw, qualify or modify in a manner adverse to the Plan Investors (or resolve to do any of the foregoing) its support for the entry of the Approval Order, the implementation of the Investment Agreement, this Exhibit B, or any of the transactions contemplated by the Investment Agreement or this Exhibit B, or shall have approved or recommended any competing or other transaction inconsistent with the Investment Agreement or this Exhibit B (each such action, a "Withdrawal of Support"), then Sections 2.1 (as it relates to the Creditors' Committee) and Sections 2.2 and 2.3 shall terminate and shall be of no further force or effect; provided further, that if the Creditors' Committee (a) objects in any pleading to (i) any of the terms of any Plan Document solely on the basis of comments provided by the Creditors' Committee pursuant to Section 2.1 hereof, but rejected by the Debtors or Appaloosa, or (ii) the position that the Debtors, any Plan Investor or any other Party takes as to the appropriate rate of interest on Trade and Other Unsecured Claims as permitted by Section 1.3 of this Exhibit B as amended hereby, or (b) unsuccessfully seeks the termination of the Investment Agreement pursuant to Section 2.3, then in each such case such objection or action shall not be considered a Withdrawal of Support.  So long as the official committee of equity security holders appointed in the Chapter 11 Cases (the "Equity Committee") shall support entry of the Approval Order and so long as the Equity Committee shall support the implementation of the Investment Agreement, this Exhibit B, and each of the transactions contemplated by the Investment Agreement and this Exhibit B, the following provision shall be in effect (as it relates to the Equity Committee), and to the extent such provision is inconsistent with any other provisions of this Exhibit B, the following provisions shall supplant and supersede such; provided, that if the Equity Committee takes any action that constitutes a Withdrawal of Support, then Section 2.1 (as it relates to the Equity Committee) shall terminate and shall be of no further force or effect; provided further, that if the Equity Committee objects in any pleading to any of the terms of any Plan Document solely on the basis of comments provided by the Equity Committee pursuant to Section 2.1 hereof, but rejected by the Debtors or Appaloosa,  then such objection or action shall not be considered a Withdrawal of Support; provided further, that Section 1.8 (iii) and (iv) shall terminate and be of no further force and effect only if the Equity Committee fails to affirmatively support entry of the Approval Order at the Bankruptcy Court hearing held with respect to entry

of such order or, following entry of such order, should the Equity Committee seek to appeal, reconsider or terminate such order.

2.1    The Debtors will provide Creditors' Committee and the Equity Committee with periodic working drafts of the Plan, the Disclosure Statement, the Confirmation Order and any Plan Documents that each such committee reasonably believes could have a material impact on the recovery of their constituents, and any amendments thereto, and with a reasonable opportunity to review and comment on such documents prior to such documents being filed with the Bankruptcy Court.  The Debtors and the Plan Investors will consider in good faith any comments consistent with the Investment Agreement and this Exhibit B, and any other reasonable comments of the Creditors' Committee and/or the Equity Committee, and will not reject such comments without first discussing the reasons therefore with counsel to the Creditors' Committee and/or the Equity Committee and giving due consideration to the views of the Creditors' Committee and/or the Equity Committee.  The Debtors will continue to consult with the Creditors' Committee and the Equity Committee, as they have been doing, with respect to issues relating to the MDL litigation referenced in Section 1.7 hereof, including, without limitation, any resolution and/or settlement thereof.

2.2    The Creditors' Committee will have consultation rights through the Confirmation Date with respect to executive compensation under the Plan and as described in the Disclosure Statement.  The Creditors' Committee shall also have one representative of the Creditors' committee placed on the joint claims oversight committee contemplated by Section 1.11 of this Exhibit B, it being understood that such member shall not have veto rights over any committee action.

2.3    In the event that the Debtors and the Plan Investors agree to (a) substantive and material changes in the overall deal as set forth in the Investment Agreement and this Exhibit B after the date of the Approval Order, (b) Flow-Through Claims (as defined in Section 1.4 of this Exhibit B) other than claims arising out of or resulting from customer claims and environmental claims, or (c) any alternative treatment of securities claims from estate assets other than available insurance, any of which would have a material adverse effect on the economics of the recovery of general unsecured creditors under the plan of reorganization to be funded through the EPCA, the Creditors' Committee shall have the right to seek termination of the EPCA by the Bankruptcy Court by establishing by a preponderance of the evidence that there has been a material adverse effect on the economics of the recovery to general unsecured creditors under the plan of reorganization to be funded through the EPCA as a result of such actions.

**APPALOOSA MANAGEMENT L.P.**
26 Main Street
Chatham, New Jersey  07928

[   ], 2007

A-D Acquisition Holdings, LLC
c/o Appaloosa Management L.P.
26 Main Street
Chatham, New Jersey, 07928
Attention: Jim Bolin

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098

Ladies and Gentlemen:

Reference is made to that certain Equity Purchase and Commitment Agreement (the "Agreement"), dated as of the date hereof, by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware (the "Investor"), Harbinger Del-Auto Investment Company, Ltd., an exempted company formed under the laws of the Cayman Islands, Merrill Lynch, Pierce Fenner & Smith Incorporated, a Delaware corporation, UBS Securities LLC, a limited liability company formed under the laws of the State of Delaware, Goldman Sachs & Co., a New York limited partnership, and Pardus DPH Holding LLC, a limited liability company formed under the laws of the State of Delaware, on the one hand, and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company"), on the other hand.  Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

This letter will confirm the commitment of Appaloosa Management L.P. ("AMLP"), on behalf of one or more of its affiliated funds or managed accounts to be designated, to provide or cause to be provided funds (the "Funds") to the Investor in an amount up to $1,076,400,000, subject to the terms and conditions set forth herein.  If (i) a Limited Termination has occurred, (ii) the Agreement has not been terminated by the Investor in accordance with its terms within ten (10) Business Days of the occurrence of such Limited Termination, and (iii) the Investor becomes obligated in accordance with Section 2(b) of the Agreement to purchase the Available Investor Shares as a result of such Limited Termination (an "Escalation Trigger"), the maximum amount of Funds referred to in the immediately preceding sentence shall be increased as follows: (i) by $166,860,000 if an Escalation Trigger arises as a result of a Limited Termination by Merrill Lynch, Pierce, Fenner & Smith Incorporated; (ii) by $166,860,000 if an Escalation Trigger arises as a result of a Limited Termination by UBS Securities LLC; (iii) by $397,230,000 if an Escalation Trigger arises as a result of a Limited Termination by Harbinger Del-Auto Investments Company, Ltd.; (iv) by $400,000,000 if an Escalation Trigger arises as a result of a Limited Termination by Goldman Sachs & Co.; and (v) by $342,650,000 if an Escalation Trigger arises as a result of a Limited Termination by Pardus DPH Holding LLC.  The Funds to be

A-D Acquisition Holdings, LLC
Delphi Corporation
[      ], 2007
Page 2

provided by or on behalf of AMLP to the Investor will be used to provide the financing for the Investor (i) to purchase the Investor Shares pursuant to the Agreement (the "Purchase Obligation") and (ii) to satisfy the Investor's other obligations under the Agreement, if any; provided, however, that the aggregate liability of AMLP under the immediately preceding clauses (i) and (ii) shall under no circumstances exceed the Cap (as defined below). AMLP shall not be liable to fund to the Investor any amounts hereunder (other than to fund the Purchase Obligation), unless and until, any party to the Agreement, other than the Company, commits a willful breach of the Agreement. For purposes of this letter agreement, the "Cap" shall mean (i) at all times on or prior to the Disclosure Statement Approval Date, $100,000,000 and (ii) after the Disclosure Statement Approval Date, $250,000,000. Our commitment to fund the Investor's Purchase Obligation is subject to the satisfaction, or waiver in writing by AMLP and the Investor, of all of the conditions, if any, to the Investor's obligations at such time contained in the Agreement.

Notwithstanding any other term or condition of this letter agreement, (i) under no circumstances shall the liability of AMLP hereunder or for breach of this letter agreement exceed, in the aggregate, the Cap for any reason, (ii) under no circumstances shall AMLP be liable for punitive damages and (iii) the liability of AMLP shall be limited to monetary damages only. There is no express or implied intention to benefit any person or entity not party hereto and nothing contained in this letter agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than the Investor and the Company. Subject to the terms and conditions of this letter agreement, the Company shall have the right to assert its rights hereunder directly against AMLP.

The terms and conditions of this letter agreement may be amended, modified or terminated only in a writing signed by all of the parties hereto. AMLP's obligations hereunder may not be assigned, except its obligations to provide the Funds may be assigned to one or more of its affiliated funds or managed accounts affiliated with AMLP, provided that such assignment will not relieve AMLP of its obligations under this letter agreement.

This commitment will be effective upon the Investor's acceptance of the terms and conditions of this letter agreement (by signing below) and the execution of the Agreement by the Company and will expire on the earliest to occur of (i) the closing of the transactions contemplated by the Agreement, and (ii) termination of the Agreement in accordance with its terms; provided, however, that in the event that the Agreement is terminated, AMLP's obligations hereunder to provide funds to the Investor to fund the Investor's obligations under the Agreement on account of any willful breach of the Agreement for which the Investor would be liable shall survive; provided, further, that the Company shall provide AMLP with written notice within 90 days after the termination of the Agreement of any claim that a willful breach of the Agreement has occurred for which the Investor would be liable and if the Company fails to timely provide such notice then all of AMLP's obligations hereunder shall terminate, this letter agreement shall expire and any claims hereunder shall forever be barred. Upon the termination

A-D Acquisition Holdings, LLC
Delphi Corporation
[     ], 2007
Page 3

or expiration of this letter agreement, all rights and obligations of the parties hereunder shall terminate and there shall be no liability on the part of any party hereto.

AMLP hereby represents and warrants as follows:

(a) AMLP is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

(b) AMLP has the requisite limited partnership power and authority to enter into, execute and deliver this letter agreement and to perform its obligations hereunder and all necessary action required for the due authorization, execution, delivery and performance by it of this letter agreement has been taken.

(c) This letter agreement has been duly and validly executed and delivered by AMLP and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d) AMLP has, and will have on the Closing Date, available funding necessary to provide the Funds in accordance with this letter agreement.

No director, officer, employee, partner, member or direct or indirect holder of any equity interests or securities of AMLP, or any of its affiliated funds or managed accounts, and no director, officer, employee, partner or member of any such persons other than any general partner (collectively, the "Party Affiliates") shall have any liability or obligation of any nature whatsoever in connection with or under this letter or the transactions contemplated hereby, and each party hereto hereby waives and releases all claims against such Party Affiliates related to such liability or obligation.

This letter agreement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the conflict of laws principles thereof). AMLP, THE INVESTOR AND THE COMPANY HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS.

This letter agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and same instrument.

\* \* \* \*

A-D Acquisition Holdings, LLC
Delphi Corporation
[      ], 2007
Page 4

Sincerely,

**APPALOOSA MANAGEMENT L.P.**


By: _____
    Name:
    Title:

Agreed to and accepted as of the date first
above written:

**A-D ACQUISITION HOLDINGS, LLC**


By:_____
    Name:
    Title:


**DELPHI CORPORATION**


By:_____
    Name:
    Title:

**Harbinger Capital Partners Master Fund I, Ltd.**
c/o 555 Madison Avenue
New York, New York 10122

[      ], 2007

Harbinger Del-Auto Investment Company Ltd.
c/o Harbinger Capital Partners Master Fund I, Ltd.
555 Madison Avenue
New York, New York 10022

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098

Ladies and Gentlemen:

   Reference is made to that certain Equity Purchase and Commitment Agreement (the "Agreement"), dated as of the date hereof, by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware, Harbinger Del-Auto Investment Company, Ltd., an exempted company formed under the laws of the Cayman Islands (the "Investor"), Merrill Lynch, Pierce Fenner & Smith, Incorporated, a Delaware corporation, UBS Securities LLC, a limited liability company formed under the laws of the State of Delaware, Goldman Sachs & Co., a New York limited partnership, and Pardus DPH Holding LLC, a limited liability company formed under the laws of the State of Delaware, on the one hand, and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company"), on the other hand. Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

   This letter will confirm the commitment of Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), on behalf of one or more of its affiliated funds or managed accounts to be designated, to provide or cause to be provided funds (the "Funds") to the Investor in an amount up to $397,230,000, subject to the terms and conditions set forth herein. The Funds to be provided by or on behalf of Harbinger to the Investor will be used to provide the financing for the Investor (i) to purchase the Investor Shares pursuant to the Agreement (the "Purchase Obligation") and (ii) to satisfy the Investor's other obligations under the Agreement, if any; provided, however, that the aggregate liability of Harbinger under clauses (i) and (ii) shall under no circumstances exceed the Cap (as defined below). Harbinger shall not be liable to fund to the Investor any amounts hereunder (other than to fund the Purchase Obligation), unless, and until, any party to the Agreement other than the Company commits a willful breach of the Agreement. For purposes of this letter agreement, the "Cap" shall mean at all times $38,944,000. Our commitment to fund the Investor's Purchase Obligation is subject to the satisfaction, or waiver in writing by Harbinger and the Investor, of all of the conditions, if any, to the Investor's obligations at such time contained in the Agreement.

   Notwithstanding any other term or condition of this letter agreement, (i) under no circumstances shall the liability of Harbinger hereunder or for breach of this letter agreement exceed, in the aggregate, the Cap for any reason, (ii) under no circumstances shall Harbinger be liable for punitive damages, and (iii) the liability of Harbinger shall be limited to monetary damages only. There is no express or implied intention to benefit any person or entity not party

Harbinger Del-Auto Investment Company Ltd.
Delphi Corporation
[          ], 2007
Page 2

hereto and nothing contained in this letter agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than the Investor and the Company. Subject to the terms and conditions of this letter agreement, the Company shall have the right to assert its rights hereunder directly against Harbinger.

The terms and conditions of this letter agreement may be amended, modified or terminated only in a writing signed by all of the parties hereto. Harbinger's obligations hereunder may not be assigned, except its obligations to provide the Funds may be assigned to one or more of its affiliated funds or managed accounts affiliated with Harbinger, provided that such assignment will not relieve Harbinger of its obligations under this letter agreement.

This commitment will be effective upon the Investor's acceptance of the terms and conditions of this letter agreement (by signing below) and the execution of the Agreement by the Company and will expire on the earliest to occur of (i) the closing of the transactions contemplated by the Agreement, and (ii) termination of the Agreement in accordance with its terms; provided, however, that in the event that the Agreement is terminated, Harbinger' obligations hereunder to provide funds to the Investor to fund the Investor's obligations under the Agreement on account of any willful breach of the Agreement for which the Investor would be liable shall survive; provided, further, that the Company shall provide Harbinger with written notice within 90 days after the termination of the Agreement of any claim that a willful breach of the Agreement has occurred for which the Investor would be liable and if the Company fails to timely provide such notice then all of Harbinger' obligations hereunder shall terminate, this letter agreement shall expire and any claims hereunder shall be forever barred. Upon the termination or expiration of this letter agreement all rights and obligations of the parties hereunder shall terminate and there shall be no liability on the part of any party hereto.

Harbinger hereby represents and warrants as follows:

(a)  Harbinger is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

(b)  Harbinger has the requisite corporate power and authority to enter into, execute and deliver this letter agreement and to perform its obligations hereunder and all necessary action required for the due authorization, execution, delivery and performance by it of this letter agreement has been taken.

(c)  This letter agreement has been duly and validly executed and delivered by Harbinger and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d)  Harbinger has, and will have on the Closing Date, available funding necessary to provide the Funds in accordance with this letter agreement.

No director, officer, employee, partner, member or direct or indirect holder of any equity interests or securities of Harbinger, or any of its affiliated funds or managed accounts, and no director, officer, employee, partner or member of any such persons other than any general partner (collectively, the "Party Affiliates") shall have any liability or obligation of any nature whatsoever in connection with or under this letter or the transactions contemplated

Harbinger Del-Auto Investment Company Ltd.
Delphi Corporation
[          ], 2007
Page 3

hereby, and each party hereto hereby waives and releases all claims against such Party Affiliates related to such liability or obligation.

> This letter agreement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the conflict of laws principles thereof). HARBINGER, THE INVESTOR AND THE COMPANY HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS.

> This letter agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and same instrument.

Harbinger Del-Auto Investment Company Ltd.
Delphi Corporation
[          ], 2007
Page 4

Sincerely,

HARBINGER CAPITAL PARTNERS MASTER
FUND I, LTD.

By:    Harbinger Capital Partners Offshore
       Manager, L.L.C., as investment manager

By:_____
       Name:  Philip A. Falcone
       Title:    Senior Managing Director

Agreed to and accepted as of the date first
above written:

**Harbinger Del-Auto Investment Company, Ltd.**

By:_____
     Name:
     Title:

DELPHI CORPORATION

By:_____
     Name:
     Title:

_____, 2007

Pardus DPH Holding LLC
590 Madison Ave.
Suite 25E
New York, NY 10022


Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098


Ladies and Gentlemen:

Reference is made to that certain Equity Purchase and Commitment Agreement (the "Agreement"), dated as of the date hereof, by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware, Harbinger Del-Auto Investment Company, Ltd., an exempted company formed under the laws of the Cayman Islands, Merrill Lynch, Pierce Fenner & Smith Incorporated, a Delaware corporation, UBS Securities LLC, a limited liability company formed under the laws of the State of Delaware, Goldman Sachs & Co., a limited partnership formed under the laws of the State of New York and Pardus DPH Holding LLC, a limited liability company formed under the laws of the State of Delaware (the "Investor"), on the one hand, and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company"), on the other hand. Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

This letter will confirm the commitment of Pardus Special Opportunities Master Fund L.P. ("Pardus"), to provide or cause to be provided funds (the "Funds") to the Investor in an amount up to $342,650,000, subject to the terms and conditions set forth herein. The Funds to be provided by or on behalf of Pardus to the Investor will be used to provide the financing for the Investor (i) to purchase the Investor Shares pursuant to the Agreement (the "Purchase Obligation") and (ii) to satisfy the Investor's other obligations under the Agreement, if any; provided, however, that the aggregate liability of Pardus under the immediately preceding clauses (i) and (ii) shall under no circumstances exceed the Cap (as defined below). Pardus shall not be liable to fund to the Investor any amounts hereunder (other than to fund the Purchase Obligation), unless and until, any party to the Agreement, other than the Company, commits a willful breach of the Agreement. For purposes of this letter agreement, the "Cap" shall mean $33,593,000. Our commitment to fund the Investor's Purchase Obligation is subject to the satisfaction, or waiver in writing by Pardus and the Investor, of all of the conditions, if any, to the Investor's obligations at such time contained in the Agreement.

Notwithstanding any other term or condition of this letter agreement, (i) under no circumstances shall the liability of Pardus hereunder or for breach of this letter agreement exceed, in the aggregate, the Cap for any reason, (ii) under no circumstances shall Pardus be

Delphi Corporation
_____, 2007
Page 2

liable for punitive damages and (iii) the liability of Pardus shall be limited to monetary damages only. There is no express or implied intention to benefit any person or entity not party hereto and nothing contained in this letter agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than the Investor and the Company. Subject to the terms and conditions of this letter agreement, the Company shall have the right to assert its rights hereunder directly against Pardus.

The terms and conditions of this letter agreement may be amended, modified or terminated only in a writing signed by all of the parties hereto. The obligations of Pardus hereunder may not be assigned, except its obligations to provide the Funds may be assigned to one or more of its affiliated funds or managed accounts affiliated with Pardus, provided that such assignment will not relieve Pardus of its obligations under this letter agreement.

This commitment will be effective upon the Investor's acceptance of the terms and conditions of this letter agreement (by signing below) and the execution of the Agreement by the Company and will expire on the earliest to occur of (i) the closing of the transactions contemplated by the Agreement, and (ii) termination of the Agreement in accordance with its terms; provided, however, that in the event that the Agreement is terminated, the obligations of Pardus hereunder to provide funds to the Investor to fund the Investor's obligations under the Agreement on account of any willful breach of the Agreement for which the Investor would be liable shall survive; provided further, that the Company shall provide Pardus with written notice within 90 days after the termination of the Agreement of any claim that a willful breach of the Agreement has occurred for which the Investor would be liable and if the Company fails to timely provide such notice then all of the obligations of Pardus hereunder shall terminate, this letter agreement shall expire and any claims hereunder shall forever be barred. Upon the termination or expiration of this letter agreement, all rights and obligations of the parties hereunder shall terminate and there shall be no liability on the part of any party hereto.

Pardus hereby represents and warrants as follows:

(a) Pardus is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

(b) Pardus has the requisite limited partnership power and authority to enter into, execute and deliver this letter agreement and to perform its obligations hereunder and all necessary action required for the due authorization, execution, delivery and performance by it of this letter agreement has been taken.

(c) This letter agreement has been duly and validly executed and delivered by Pardus and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d) Pardus has, and will have on the Closing Date, available funding necessary to provide the Funds in accordance with this letter agreement.

Delphi Corporation
_____, 2007
Page 3

        No director, officer, employee, partner, member or direct or indirect holder of any
equity interests or securities of Pardus, or any of its affiliated funds or managed accounts, and no
director, officer, employee, partner or member of any such persons other than any general
partner (collectively, the "Party Affiliates") shall have any liability or obligation of any nature
whatsoever in connection with or under this letter or the transactions contemplated hereby, and
each party hereto hereby waives and releases all claims against such Party Affiliates related to
such liability or obligation.

        This letter agreement shall be governed by, and construed in accordance with, the
laws of the State of New York (without giving effect to the conflict of laws principles thereof).
PARDUS, THE INVESTOR AND THE COMPANY HEREBY IRREVOCABLY SUBMIT TO
THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY
COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY
OBJECTION BASED ON FORUM NON CONVENIENS.

        This letter agreement may be executed in any number of counterparts and by the
parties hereto in separate counterparts, each of which when so executed shall be deemed to be an
original and all of which taken together shall constitute one and same instrument.


                                    *   *   *   *




                        Sincerely,

                        **PARDUS SPECIAL OPPORTUNITIES MASTER
                        FUND L.P.**


                        By: Pardus Capital Management L.P., its
                            Investment Manager


                        By: Pardus Capital Management LLC, its
                            general partner


                        By: _____
                            Name: Karim Samii
                            Title: Sole Member



                                    - 3 -

Delphi Corporation
_____, 2007
Page 4

Agreed to and accepted as of the date first
above written:

**PARDUS DPH HOLDING LLC**

By:_____
    Name:
    Title:

**DELPHI CORPORATION**

By:_____
    Name:
    Title:

# EXHIBIT E

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
    In re                               :    Chapter 11
                                        :
DELPHI CORPORATION, et al.,             :    Case No.  05 - 44481 (RDD)
                                        :
                    Debtors.            :    (Jointly Administered)
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SIXTH AMENDED ORDER SUSPENDING FURTHER PROCEEDINGS ON DEBTORS' MOTION
FOR ORDER UNDER 11 U.S.C. § 1113(c) AUTHORIZING REJECTION OF
COLLECTIVE BARGAINING AGREEMENTS AND AUTHORIZING
MODIFICATION OF RETIREE WELFARE BENEFITS UNDER 11 U.S.C. § 1114(g)

("SIXTH AMENDED SECTION 1113 AND
1114 PROCEEDINGS SUSPENSION ORDER")

Upon the Motion, dated October 8, 2005 (the "Motion"), of Delphi Corporation ("Delphi") and

certain of its domestic subsidiaries and affiliates, debtors and debtors-in-possession in the above-

captioned cases (collectively, the "Debtors"), for an order under 11 U.S.C. §§ 1113 and 1114 of the

Bankruptcy Code[1] and Fed. R. Bankr. P. 2002(m) and 9006 establishing notice procedures, briefing

schedule, and hearing date regarding the Debtors' Motion To (a) Reject Collective Bargaining

Agreements Under Section 1113(c) And (b) Eliminate Retiree Medical And Life Insurance Benefits

For Union-Represented Retirees Under Section 1114(g) (the "1113/1114 Motion"); and this Court

having entered an order granting the Motion on October 13, 2005 (Docket No. 232);[2] and the Court

having received and reviewed various objections and responses to the 1113/1114 Motion filed by

---

[1]     As used herein, the term "Bankruptcy Code" means chapter 11 of title 11 of the United States Code, 11 U.S.C. §§
        101-1330, as amended and in effect on October 8, 2005.
[2]     Subsequent scheduling orders have been entered by the Court at docket nos. 2225, 2425, 2996, 4170, 5058, 5221,
        5399, 5539, 5662, 6148, and 6419.

various parties (collectively, the "Respondents");[3] and the Court having commenced the contested

hearing on the 1113/1114 Motion on May 9, 2006 and conducted hearings on the contested motion on

various trial dates in May and June 2006; and the Court on November 22, 2006 having adjourned the

contested hearing on the 1113/1114 Motion to a date to be determined and the deadlines for a ruling on

the 1113/1114 Motion to January 31, 2007 pursuant to the Ninth Amended Section 1113 And 1114

Scheduling Order (Docket No. 5662); and the Court having conducted in-camera status conferences

from time to time so that the Court could be apprised by the Debtors and the Respondents of the status

of negotiations regarding consensual resolution of the 1113/1114 Motion; and the Debtors having filed

an Expedited Motion For Order Authorizing And Approving The Equity Purchase And Commitment

Agreement (the "EPCA") Pursuant To Sections 105(a), 363(b), 503(b) and 507(a) Of The Bankruptcy

Code And The Plan Framework Support Agreement (the "PSA") Pursuant To Sections 105(a), 363(b),

And 1125(e) Of The Bankruptcy Code on December 18, 2006 (collectively, the "Framework

Agreements") (Docket No. 6179) (the "Plan Investment and Framework Support Motion"); and the

Court having issued an order authorizing and approving the Plan Investment And Framework Support

Motion (Docket No. 6589); and the Court having entered six orders suspending further proceedings on

the 1113/1114 Motion until further order of the Court and extending the date by which a ruling on the

1113/1114 Motion shall be issued (each, a "Section 1113 And 1114 Suspension Order") (Docket Nos.

6779, 7819, 8128, 8437, 8596 and 8736); and Delphi having confirmed on July 9, 2007 that it had

formally terminated the EPCA and the PSA; and the Court having entered on July 13, 2007 the Fourth

Section 1113 And 1114 Suspension Order (Docket No. 8596) which combined the chambers

conference scheduled for July 19, 2007 under the Third Section 1113 And 1114 Suspension Order

(Docket No. 8437) with the chambers conference required therein as a result of the termination of the

---

[3]    Objections and responses have been filed at docket numbers 3314, 3317, 3322, 3330, 3332, 3342, 3346, 3353, 3356, 3561, and 3628.

EPCA or the PSA; and the Court having entered an order on July 19, 2007 (Docket No. 8693) under 11

U.S.C. §§ 363, 1113, and 1114 of the Bankruptcy Code and Fed. R. Bankr. P. 6004 and 9019

approving (i) a memorandum of understanding regarding Delphi's restructuring entered into among the

United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"),

Delphi, and General Motors Corporation, dated June 22, 2007, (ii) withdrawal without prejudice of the

1113/1114 Motion solely as it pertains to the UAW and approving the parties' settlement of the

1113/1114 Motion solely as it pertains to the UAW, and (iii) modification of retiree welfare benefits

for certain UAW-represented retirees of the Debtors; and the Court having entered on July 26, 2007

the most recent Section 1113 And 1114 Suspension Order (the "Fifth Section 1113 And 1114

Suspension Order") (Docket No. 8736); and after due deliberation thereon; and good and sufficient

cause appearing therefor, it is hereby

ORDERED, ADJUDGED, AND DECREED THAT:

Further proceedings on the 1113/1114 Motion continue to be suspended until further

order of the Court. The Fifth Section 1113 And 1114 Suspension Order shall be amended in its entirety

to read as follows:

1.    The Court shall conduct a telephonic, in-camera chambers conference pursuant to 11 U.S.C. § 105(d)(1) with the Debtors, the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America ("IUE-CWA"), the remaining non-union Respondents, and the official committee of equity security holders at 2:00 p.m. (prevailing Eastern time) on August 9, 2007 so that the Court can be apprised by these parties of the status of the activity regarding negotiations and related matters regarding the consensual resolution of the 1113/1114 Motion.

2.    The date by which a ruling on the 1113/1114 Motion with respect to the IUE-CWA shall be issued pursuant to 11 U.S.C. § 1113(d)(2) and 11 U.S.C. § 1114(k)(2) shall be extended, with the consent of the Debtors and the IUE-CWA (to the extent required by statute), to August 10, 2007.  These parties reserve their right to agree to additional extensions beyond these dates.

3

3.      The Court shall conduct an in-person, in-camera chambers conference
        pursuant to 11 U.S.C. § 105(d)(1) with the Debtors, the remaining
        Respondents, and the official committee of equity security holders at
        2:00 p.m. (prevailing Eastern time) on August 16, 2007 so that the Court
        can be apprised by these parties of the status of the activity regarding
        negotiations and related matters regarding the consensual resolution of
        the 1113/1114 Motion.  These parties shall be permitted to participate
        telephonically in such chambers conference.

4.      The date by which a ruling on the 1113/1114 Motion shall be issued
        pursuant to 11 U.S.C. § 1113(d)(2) and 11 U.S.C. § 1114(k)(2) shall be
        extended, except with respect to the IUE-CWA as set forth in Paragraph
        2 above, with the consent of the Debtors and the remaining Respondents
        (to the extent required by statute), to August 17, 2007.  These parties
        reserve their right to agree to additional extensions beyond these dates.


Dated:      New York, New York
            August 3, 2007


                                    /s/Robert D. Drain
                                    UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT F

**Hearing Date And Time: August 16, 2007, At 10:00 A.M.**
**Objection Deadline: August 13, 2007, At 4:00 P.M.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:  http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
         In re                            :     Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :     Case No. 05-44481 (RDD)
                                          :
                                          :     (Jointly Administered)
                        Debtors.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXPEDITED MOTION FOR ORDER UNDER 11 U.S.C. §§ 102(1)(A), 105(a), 107, 108(a)(2),
AND 546(a) AND FED. R. BANKR. P. 7004, 9006(c), AND 9018 (i) AUTHORIZING
DEBTORS TO ENTER INTO STIPULATIONS TOLLING STATUTE OF LIMITATIONS
WITH RESPECT TO CERTAIN CLAIMS, (ii) AUTHORIZING PROCEDURES TO IDENTIFY
CAUSES OF ACTION THAT SHOULD BE PRESERVED, AND (iii) ESTABLISHING
PROCEDURES FOR CERTAIN ADVERSARY PROCEEDINGS INCLUDING
THOSE COMMENCED BY DEBTORS UNDER 11 U.S.C. § 541, 544, 545, 547, 548, OR 553

("PRESERVATION OF ESTATE CLAIMS PROCEDURES MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), submit this expedited motion (the "Motion") for an order (the "Order") under 11 U.S.C. §§ 102(1)(A), 105(a), 107, 108(a)(2), and 546(a) and Federal Rules of Bankruptcy Procedure 7004, 9006(c), and 9018 (i) authorizing the Debtors to enter into stipulations tolling the statute of limitations with respect to certain claims, (ii) authorizing procedures for the Debtors to identify causes of action that should be preserved and granting authority to abandon certain causes of action, and (iii) establishing procedures for certain adversary proceedings, including those commenced by the Debtors under 11 U.S.C. § 541, 544, 545, 547, 548, or 553, and respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. The Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the official committee of unsecured creditors, the "Statutory Committees").

2

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are sections 102(1)(a), 105(a), 107, 108(a)(2), 502(d), 541, 544, 545, 546(a), 547, 548, and 553 of the Bankruptcy Code and Rules 7004, 9006(c), and 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.    Current Business Operations Of The Debtors

5.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.[2]

6.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines,

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[2]    On March 20 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding. The application was approved by the Spanish court on April 13, 2007. On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007. The Spanish court approved the social plan on July 31, 2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

3

and is one of the largest global suppliers of vehicle electronics, transportation components,

integrated systems and modules, and other electronic technology.  The Company supplies

products to nearly every major global automotive original equipment manufacturer

("OEM").

7.    Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM

conducted the Company's business through various divisions and subsidiaries.  Effective

January 1, 1999, the assets and liabilities of these divisions and subsidiaries were

transferred to the Company in accordance with the terms of a Master Separation

Agreement between Delphi and GM.  In connection with these transactions, Delphi

accelerated its evolution from a North American-based, captive automotive supplier to a

global supplier of components, integrated systems, and modules for a wide range of

customers and applications.  Although GM is still the Company's single largest customer,

today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

8.    In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter,

however, with the exception of 2002, the Company has suffered losses.  In calendar year

2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net

sales.[3]  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net

_____

[3]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the
recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The
Company's net operating loss in calendar year 2004 was $482 million.

losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006, the

Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related

to the U.S. employee special attrition programs.

9.      The Debtors believe that the Company's financial performance has

deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of

which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle

production environment for domestic OEMs resulting in the reduced number of motor

vehicles that GM produces annually in the United States and related pricing pressures, and

(iii) increasing commodity prices.

10.      In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities,

product portfolio, operational issues, and forward-looking revenue requirements.  Because

discussions with its major stakeholders had not progressed sufficiently by the end of the

third quarter of 2005, the Company commenced these chapter 11 cases for its U.S.

businesses to complete its transformation plan and preserve value for its stakeholders.

D.      The Debtors' Transformation Plan

11.      On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations.  The Debtors stated that they needed to focus on five key areas:[4] first,

---

[4]      In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their
        execution of an equity purchase and commitment agreement with certain investors, and a plan
        framework support agreement with those investors and GM.  On July 9, 2007, Delphi confirmed that it
        had formally terminated the equity purchase and commitment agreement and related plan framework

modifying the Company's labor agreements to create a competitive arena in which to

conduct business;[5] second, concluding their negotiations with GM to finalize GM's

financial support for the Debtors' legacy and labor costs and to ascertain GM's business

commitment to the Company;[6] third, streamlining their product portfolio to capitalize on

their world-class technology and market strengths and make the necessary manufacturing

alignment with their new focus;[7] fourth, transforming their salaried workforce to ensure

---

support agreement but that it expected to enter into new framework agreements with plan investors
presently.  Subsequently, on July 18, 2007, Delphi announced that it had accepted a new proposal for an
equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group
comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger
Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities
LLC) as well as, Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P.
(collectively, the "New Plan Investors").  Under the Delphi-Appaloosa EPCA, the New Plan Investors
would invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the
Company's transformation plan and plan of reorganization.  This Court approved the Delphi-Appaloosa
EPCA on August 2, 2007.

[5]   Among the progress made to date, on June 22, 2007, Delphi reached an agreement with the International
Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW")
and GM that (a) modifies, extends, or terminates provisions of the existing collective bargaining
agreements among Delphi, the UAW, and its various locals, (b) provides that Delphi and GM will
undertake certain financial obligations to Delphi's UAW-represented employees and retirees to facilitate
these modifications, and (c) modifies retiree welfare benefits for certain UAW-represented retirees of the
Debtors.  This agreement, which was approved by this Court on July 19, 2007, should facilitate the
Debtors' reaching consensual resolutions of their labor issues with the remaining unions and GM and
permit the Debtors to continue to implement their transformation plan and to develop, prosecute,
confirm, and consummate a plan of reorganization.  As of August 6, 2007, similar agreements have been
reached with the International Association of Machinists and Aerospace Workers and its District 10 and
Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663,
International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication
Workers of America and its local unions, and Locals 832S, 18S, and 101S of the International Union of
Operating Engineers.  Delphi is currently engaged in settlement discussions with its remaining U.S.
labor union and is working to conclude discussions with that union as soon as practicable.

[6]   On July 9, 2007, Delphi confirmed that its discussions with GM on a comprehensive settlement
agreement had entered the documentation phase and that it expected that a settlement with GM would be
incorporated into the Debtors' plan of reorganization rather than filed with this Court for separate
approval.

[7]   In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core"
and "non-core" product lines and plants.  The Debtors have been working to divest non-core assets so as
to maximize the value of the estate for stakeholders.  During the 2006 and 2007 calendar years, for
example, the Debtors sold substantially all of the assets related to MobileAria, Inc., its chapter 11
affiliate, obtained court approval for the sale of substantially all of the assets of their brake hose and

that the Company's organizational and cost structure is competitive and aligned with its

product portfolio and manufacturing footprint[8] and devising a workable solution to their

current pension situation.[9]

   12. Upon the conclusion of the reorganization process, the Debtors

expect to emerge as a stronger, more financially sound business with viable U.S.

operations that are well-positioned to advance global enterprise objectives.  In the

meantime, Delphi will marshal all of its resources to continue to deliver high-quality

products to its customers globally.  Additionally, the Company will preserve and continue

the strategic growth of its non-U.S. operations and maintain its prominence as the world's

premier auto supplier.

---

Saltillo, Mexico brake plant businesses, and obtained court approval of bid procedures related to the upcoming sale of substantially all assets used in their catalyst business.  In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering, interior, and closures businesses.

[8] As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.  The Debtors also made significant progress in ensuring that their organizational and cost structure is competitive in obtaining the entry of this Court's Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order").  The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[9] To that end, on May 31, 2007, the Bankruptcy Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 plan year funding waivers, which were approved by the IRS, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Plans").  On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 28, 2008, respectively.

E.    Revised Plan Framework Agreements And Preserving Estate Causes Of Action

13.    The Debtors have made significant progress toward confirming a
plan of reorganization:  they have obtained the support of their Statutory Committees for
and Court approval of the Delphi-Appaloosa EPCA, they have negotiated agreements with
five of their six U.S. labor unions, they are engaged in the documentation phase for a
comprehensive settlement agreement with GM, and they have scheduled a hearing in
October 2007 to seek approval of their proposed disclosure statement and of solicitation
procedures for a reorganization plan.  The Delphi-Appaloosa EPCA approved by this
Court on August 2, 2007 details the New Plan Investors' commitment to invest in the
reorganized Delphi and attaches a proposed framework for a reorganization plan pursuant
to which the Debtors expect to emerge from chapter 11 by the end of the year.  The
proposed treatment of claims under this reorganization plan would generally provide that
all claims be paid or satisfied in full through distributions of cash, common stock, or both.
Accordingly, avoiding preferential transfers would provide no benefit to the Debtors'
estates because any party returning such a transfer would be entitled to a claim for the
same amount, to be paid in full under such a plan.  For the same reasons, avoiding
statutory liens or prepetition setoffs would provide little to no benefit to the estates.  As a
result, the Debtors contemplate that their reorganization plan will waive or release most if
not all avoidance causes of action.

14.    At present, the Debtors estimate that they may have more than
11,000 potential preference claims arising from transfers totaling approximately $5.8
billion (before taking into account potential defenses such as transfers made in the ordinary
course of business).  The constructively fraudulent transfer reach-back period, made

8

applicable by Bankruptcy Code section 544(b) and state law, is generally six years under

the law of Michigan and New York.[10] Thus, with a company of Delphi's size, there are

literally hundreds of thousands of transactions that occurred during these constructively

fraudulent transfer reach-back periods.   Under the Bankruptcy Code, each Debtor has until

two years after the entry of the order for relief to commence adversary proceedings

asserting avoidance causes of action, as well as certain causes of action where the

applicable statute of limitations has been tolled by the Bankruptcy Code during the initial

two years of these chapter 11 cases.

       15.     Although the Debtors do not intend to pursue avoidance actions in

light of their anticipated reorganization, as a precautionary measure they must preserve

these actions in some manner.  The Debtors have explored various alternatives to filing

avoidance actions before the two-year deadline, such as executing tolling agreements with

potential defendants.  The logistical challenges of circulating and executing agreements

with such a large number of potential defendants, however, make that solution impractical.

The Debtors, therefore, must timely commence these actions or take other action in the

coming months or risk losing forever potential causes of action that should be preserved.[11]

---

[10]   By examining transactions during this reach-back period to identify potential fraudulent transfer claims
that should be preserved, the Debtors do not concede that they were insolvent, undercapitalized, or
unable to pay their debts as they became due at any time during the reach-back period.

[11]   As noted above, Delphi has been in discussions with GM on a comprehensive settlement agreement that
they anticipate incorporating into the Debtors' reorganization plan.  Because of GM's unique role in these
cases, in addition to filing a sealed complaint governed by the procedures sought in this Motion, the
Debtors request leave for the Debtors and GM to file, under seal, a stipulation that contains tolling
provisions, consistent with this Motion, and other agreements of the parties with respect to the sealed
complaint involving GM, which stipulation shall be deemed "so ordered" and shall be sealed in
accordance with the terms of the order sought herein.

16.     Once these actions have been commenced, the Debtors will proceed no further and will not use them for any purpose while they focus on confirming a reorganization plan.  The procedures proposed in this Motion are designed to permit the Debtors to preserve these claims while otherwise maintaining the status quo among all parties in interest.  The causes of action would remain dormant and become relevant again only in the unlikely event that the Debtors do not timely emerge from chapter 11.

<u>Relief Requested</u>

17.     As set forth in the proposed order attached hereto as <u>Exhibit A</u>, the Debtors seek to implement procedures applicable to Adversary Proceedings that will permit all parties to preserve the status quo as the Debtors are finalizing preparations for confirming a reorganization plan by year's end.  By this Motion, the Debtors seek the following relief:

<u>Tolling Agreement</u>

- *Approval Of Form.*  The Debtors seek court approval of a form of stipulation (attached as <u>Exhibit B</u>) which would, without further order of this Court, toll the applicable statute of limitations on claims against parties with whom the Debtors seek to enter into such stipulations.

- *Intercompany Tolling.*  The Debtors also seek to have this Court "deem" all Debtors to have entered into a stipulation with each of the other Debtors and affiliated non-Debtor entities.

<u>Approval Of Avoidance Evaluation Procedures And Authority To Abandon Claims</u>

- *Preference Claims Below $250,000 In Value.*  The Debtors request authority to abandon these preference actions.  To the extent that these actions are against insiders or involve persons or transactions associated with the SEC investigation of the Debtors, the Debtors also will be authorized to abandon those actions after notice to the Statutory Committees.  If a Statutory Committee objects within 10 days after service of the notice, the Debtors may bring the matter before this Court for a ruling on whether the proposed abandonment satisfies section 554(a) of the Bankruptcy Code.

10

- *Select Categories Of Preference Claims*. The Debtors seek authority to abandon the following categories of preference actions: (i) payments to parties with a secured or priority interest in such payment, (ii) union dues, (iii) pension plan contributions, (iv) payments required under the terms of collective bargaining agreements, (v) payments to reimburse employee business expenses, (vi) ordinary course wages, salaries, and benefits to employees, (vii) payments required by a garnishment to satisfy third-party judgments and obligations, (viii) contributions to charitable organizations, (ix) payments to foreign suppliers, (x) payments to the Debtors' shippers, (xi) payments to the Debtors' insurance providers, and (xii) payments to the Debtors' utilities.

- *Scope Of Fraudulent Transfer Review*.  The Debtors seek entry of an order directing that, for purposes of identifying and preserving potential fraudulent transfer claims, the Debtors need only review the following categories of transactions: merger and acquisition deals at or exceeding $20 million, transfers to Delphi's board of directors or strategy board members other than for compensation or ordinary-course expense reimbursement (if any), unusual securities transactions, dividend distributions to 5% shareholders, and Delphi's financially troubled supplier program.

- *Additional Authority For Abandonment After Notice To Statutory Committees*.  The Debtors seek authority to abandon, after notice to the Statutory Committees, and without further order of this Court or further notice under Bankruptcy Rule 6007, claims (i) with insignificant value, (ii) where litigation costs would likely exceed expected recovery, (ii) where the potential harm to businesses outweighs expected recovery, or (iv) where valid defenses exist.  If a Statutory Committee objects within 10 days after service of the notice, the Debtors may bring the matter before this Court for a ruling on whether the proposed abandonment satisfies section 554(a) of the Bankruptcy Code.

Commencement Of The Adversary Proceedings And Service Of Process

- *Deferral Of Issuance Of Summons*.  The Clerk of Court would be directed by this Court to defer issuing a summons after the filing of a complaint, unless and until the Debtors intend to pursue the claims in the complaint.

- *Extension Of Fed. R. Civ. P. 4(m) Time Period*.  The Debtors would have until March 31, 2008 to serve each defendant with a summons and a copy of the complaint, without prejudice to the Debtors' right to seek further extensions of the deadline.

11

● *Service Of Order With Summons And Complaint*. The Debtors would be required to serve a copy of any order approving this Motion upon each defendant in any adversary proceeding either if and when the Debtors serve process on the defendant or as soon thereafter as practicable.

Stay Of Adversary Proceedings Until Service Of Process And Interim Sealing

● *Activity During The Stay*. During the stay, the Debtors may (i) amend their complaint, and (ii) after notice to the Statutory Committees, dismiss it.

● *Expiration Of The Stay*. The stay would continue until the earlier of (i) service of process and (ii) further order of this Court.

● *Filing Of The Complaints Under Interim Seal*. The Debtors seek authority to file under seal paper copies (with PDF copies on appropriate electronic media) of the complaints in the adversary proceedings and to have the docket for such proceedings likewise sealed.

Basis For Relief

18.     The Debtors believe that implementing the proposed procedures

would help enable the Debtors fulfill their fiduciary responsibility to preserve valuable

estate assets in a manner that would not unnecessarily disrupt the plan process or the

Debtors' existing business relationships with potential defendants that are necessary to the

Debtors' ongoing operations.  These procedures would also reduce the administrative and

economic burdens of the Adversary Proceedings on the Debtors, this Court, and potential

defendants.  Most if not all of the avoidance actions will likely remain unnecessary in light

of the terms of the Debtors' prospective reorganization plan.

F.     Approval Of Form Of Tolling Agreements

19.     The Debtors desire to preserve their respective rights and to

continue negotiation and settlement discussions with certain parties without incurring the

expense of filing complaints before the expiration of the applicable statute of limitations

12

period.  The Debtors anticipate entering into stipulations with, among others, (i) GM,
(ii) professional firms retained by the Debtors, and (iii) insiders who received transfers
from the Debtors.

20.    Assuming that a potential defendant is willing to enter into a
stipulation extending the statute of limitations, the Debtors request authorization to enter
into such a stipulation, substantially in the form attached as <u>Exhibit B</u>.  The principal terms
of the stipulation would be as follows:

- *Statute Of Limitations*: Execution of the stipulation would toll the statute of limitations provided for under sections 108 and 546(a) of the Bankruptcy Code and other applicable law.

- *Term*: The applicable statute of limitations would be extended up to and including the first business day that is nine months following the entry of an order confirming a plan, as the same may have been amended or modified before its entry (the "Tolling Period").

- *Binding Effect*: The stipulation would bind and inure to the benefit of the successors, representatives, assigns, and heirs of the parties.

- *Termination*: The Debtors or their respective successors and assigns would be permitted during the Tolling Period to commence litigation against (a) other Debtors, (b) affiliated non-Debtor entities, and (c) third parties.

- *Effective Date*: The stipulation would become effective immediately upon execution thereof.

- *Prior Court Approval*: The stipulation would be deemed "so ordered" upon execution.

21.    Allowing the Debtors to enter into the stipulations tolling the
applicable statute of limitations with respect to the claims would be the most efficient and
cost-effective means of preventing unnecessary motion practice and litigation and
preserving the Debtors' and potential defendants' respective legal rights without allowing

13

the applicable statute of limitations period to expire and without acknowledging in any way that valid claims, causes of action, or defenses thereto do or do not exist.

22.     In view of the number of potential claims and causes of action that the Debtors must preserve, obtaining Court approval for each tolling stipulation would result in burdensome administrative expenses such as the time and cost of drafting, serving, and filing separate approval pleadings and the time incurred by attorneys in preparing for, and appearing at, related hearings before this Court.  Accordingly, the Debtors request authority to enter into stipulations tolling the statute of limitations with respect to the claims without seeking further Court approval.

23.     Likewise, requiring each of the 42 Debtors in these chapter 11 cases to enter into individual stipulations with each of the other Debtors would require the Debtors to execute more than 1,500 stipulations.  Execution of stipulations between the Debtors and affiliated non-Debtor entities would add hundreds more.  Obviously, such actions and the costs and expenses associated therewith are unnecessarily burdensome and time-consuming in light of the related nature of the claims.  Accordingly, the Debtors also seek an order that "deems" them to have entered into a stipulation with each of the other Debtors and affiliated non-Debtor entities.

G.     Approval Of Avoidance Evaluation Procedures And Authority To Abandon Certain Causes Of Action

24.     The Debtors request approval of their proposed criteria for reviewing, evaluating, and selecting those potential causes of action that should be preserved in accordance with the procedures discussed herein.  These criteria strike a sensible balance between the Debtors' duty to preserve valuable estate assets and the

14

extraordinary costs to preserve then when, as here, there is little chance that the Debtors will prosecute any of the thousands of actions it will be commencing.

### Preference Claims Below $250,000 In Value

25.     In particular, the Debtors seek authority not to pursue any preference action against an entity if the aggregate value of transfers to or for the benefit of that entity is less than $250,000 in value.  Although this threshold would eliminate 9,894 of 11,544 potential preference recoveries, the aggregate amount eliminated would be merely 4.5% of the billions in total potential preferential transfers (before taking into account potential preference defenses).   By focusing on the 1,650 entities which benefited from transfers of $250,000 or more, the Debtors would preserve billions in potential claims (before defenses are considered) while saving the estates from incurring significant legal and other costs and avoiding any disruption to commercial relationships and the Debtors' efforts to emerge from chapter 11.  If the preference action is against an insider or involves a person or transaction associated with the SEC investigation of the Debtors, then the Debtors would be authorized to abandon such actions after notice to the Statutory Committees.  If a Statutory Committee objects within 10 days after service of the notice, the Debtors propose that they would bring the matter before this Court for a ruling on whether the proposed abandonment satisfies section 554(a) of the Bankruptcy Code.

### Select Categories Of Preference Claims

26.     In addition, the Debtors seek authority to abandon the following categories of potential preference actions which the Debtors, in their business judgment, have decided should not be pursued:  (i) payments to parties with a secured or priority

interest in such payment, (ii) union dues, (iii) pension plan contributions, (iv) payments

required under the terms of collective bargaining agreements, (v) payments to reimburse

employee business expenses, (vi) ordinary course wages, salaries, and benefits to

employees, (vii) payments required by a garnishment to satisfy third-party judgments and

obligations, (viii) contributions to charitable organizations, (ix) payments to foreign

suppliers, (x) payments to the Debtors' shippers, (xi) payments to the Debtors' insurance

providers, and (xii) payments to the Debtors' utilities.

<u>Scope Of Fraudulent Transfer Review</u>

27.    As noted above, potential fraudulent transfer claims are likely

subject to a six-year reach-back period during which the Debtors engaged in hundreds of

thousands of transactions, the vast majority of which indisputably involved the Debtors'

receipt of reasonably equivalent value or involved amounts that do not warrant the

mammoth undertaking of examining each and every transaction.  To balance the need for a

review of transactions effected during the reach-back period and avoiding unnecessary

costs, the Debtors propose to identify and review all business or asset acquisition or

divestiture transactions that equal or exceed $20 million in value.  This would include a

review of whether the Debtors followed their own internal procedures for the transaction

and, as necessary, interviews with managers to follow up on any issues identified during

the review process.

28.    The Debtors also would review (i) certain transfers to insiders,

including payments or indemnifications to current and former members of the Delphi

Board of Directors and of the Delphi Strategy Board other than for compensation or

16

ordinary-course expense reimbursement (if any), (ii) large or unusual securities transactions (if any) such as large capitalizations or recapitalizations, derivatives, foreign currency, hedging transactions, or commercial paper transactions, (iii) all dividend distributions to 5% shareholders, and (iv) the financially troubled supplier program.  As discussed below, the Debtors would enter into tolling agreements for all intercompany transactions that involve a Debtor or insiders of a Debtor.

29.    The Debtors request authority to abandon the causes of action described above in accordance with the proposed procedures, without the need for any further order or any further notice under Bankruptcy Rule 6007(a).

Additional Authority To Abandon

30.    With respect to other categories of causes of action, the Debtors anticipate that during their review they may identify additional causes of action which, in the exercise of their reasonable business judgment, should not be pursued.  The Debtors seek approval for the abandonment of those causes of action which the Debtors determine, upon completion of their review and after notice to counsel to the Statutory Committees, (i) are of insignificant value to the estates, (ii) would impose costs in excess of the value of any reasonably expected recovery, (iii) could pose other potential harm to the Debtors' businesses that would outweigh the expected recovery value, or (iv) with respect to which the Debtors believe the defendants would have valid defenses.

31.    If a Statutory Committee objects within 10 days after service of the notice, the Debtors may bring the matter before this Court for a ruling on whether the proposed abandonment satisfies section 554(a) of the Bankruptcy Code.

<u>Preservation Of The Debtors' Rights Under 11 U.S.C. § 502(d)</u>

32.    Although the Debtors are proposing to abandon certain avoidance

causes of action, the Debtors have decided to abandon them based, in part, on their

determination that they will have a right to use the avoidance claim liability to seek the

disallowance of claims asserted against the estates, as permitted by section 502(d) of the

Bankruptcy Code. Under that section, the Debtors may seek to preclude a creditor subject

to an avoidance cause of action from asserting a claim against the estate as long as the

creditor remains in possession of, or otherwise obtains the benefit of, the avoidable claim

or transfer.[12]

H.    <u>Extending Time For Service Of Process</u>

33.    Fed. R. Civ. P. 4(m), made applicable here by Bankruptcy

Rule 7004(a)(1), requires this Court either to dismiss without prejudice any adversary

proceeding for which the summons and complaint are not served on the defendant within

120 days of the filing of the complaint or direct that service be effected within a specified

time, unless the plaintiff in the adversary proceeding can show good cause for extending

the 120-day period.  The Debtors request an extension of the time within which the

Debtors must serve the summonses and complaints to March 31, 2008[13]—less than 60 days

beyond the initial 120-day deadline.  The Debtors seek the extension to preserve the status

---

[12]    In light of an appellate ruling from this district, <u>United States Lines, Inc. v. U.S.</u> (In re McLean Indus.),
196 B.R. 670, 675-77 (S.D.N.Y. 1996) (Cote, J.), <u>aff'g</u> 184 B.R. 10 (Bankr. S.D.N.Y. 1995) (Blackshear,
J.), and this Court's prior ruling, <u>In re Metiom, Inc.</u>, 301 B.R. 634, 641 (Bankr. S.D.N.Y. 2003), that
section 502(d) may continue to be used defensively after an action on the underlying avoidance action
has become time-barred, the Debtors have concluded that no affirmative relief with respect to this
Motion is required to preserve the Debtors' ability to use section 502(d) defensively.  The Debtors
expressly reserve all rights with respect to section 502(d).

[13]    March 31, 2008 is the current deadline for closing under the Delphi-Appaloosa EPCA.  <u>See</u>
Section 12(d)(iii).

quo and to avoid having to force all potential defendants to retain counsel to defend against

adversary proceedings when, in fact, most of them likely will be resolved by a

reorganization plan and never pursued. The Debtors propose the following procedures

concerning the commencement of the Adversary Proceedings and service of process:

- *Deferral Of Issuance Of Summons*. The Clerk of Court would be directed by this Court to defer issuing a summons after the filing of a complaint filed in accordance with these procedures, unless and until the Debtors notify the Clerk of Court that they intend to litigate the claims alleged in the complaint.

- *Extension Of Fed. R. Civ. P. 4(m) Time Period*. The Debtors would have until March 31, 2008 to serve each defendant with a summons and a copy of the complaint, without prejudice to the Debtors' right to seek further extensions of the deadline.

- *Service Of Order With Summons And Complaint*. The Debtors would be required to serve a copy of any order approving this Motion upon each defendant in any Adversary Proceeding either when the Debtors serve the summons and complaint on the defendant or as soon thereafter as practicable.

34.    These procedures would permit the Debtors to preserve potentially

valuable assets without disrupting the plan process or existing business relationships

prematurely or prejudicing the rights of any defendants.

I.    Stay Of Adversary Proceedings Until Service Of Process

35.    For the same reasons that the Debtors seek an extension of their time

to serve potential defendants with process, the Debtors also request that the Adversary

Proceedings filed pursuant to the proposed procedures be temporarily stayed, without

prejudice to the Debtors' right to amend their complaints during the stay. Under the

proposed procedures, the Debtors also would be authorized to file, without further order of

this Court, a notice of dismissal of the Adversary Action in accordance with Bankruptcy

19

Rule 7041 and Fed. R. Civ. P. 41(a) if it is decided that the Adversary Action should not be pursued after notice to the Statutory Committees or as otherwise provided in a plan of reorganization or confirmation order.  If a Statutory Committee objects within 10 days after service of the notice, the Debtors request that they be permitted to bring the matter before this Court for a ruling on whether the proposed dismissal satisfies section 554(a) of the Bankruptcy Code.  The stay would be lifted upon the Debtors' service of the summons and complaint, without further order of this Court.

J.    Filing Of The Complaints Under Seal

36.    Maintaining the status quo would also be promoted by permitting the filing of the complaints under seal.  Once filed, the actions would remain dormant.  The Debtors do not intend to prosecute the actions while pursuing plan confirmation.  Sealing the complaints will keep the actions inactive and would be consistent with the Debtors' intention to de-link the sealed adversary proceedings from all other activity in these chapter 11 cases and to prevent their use for any purpose by any party.  Thus, sealing should promote the plan process and avoid needless costs relating to actions that remain unnecessary under the Debtors' prospective plan.

37.    Moreover, sealing the actions would avoid unnecessarily alarming potential defendants.  The Debtors have worked to preserve and repair their business relationship with many of the potential defendants during these cases and have negotiated or regained favorable credit terms with many suppliers and are continuing to do so.  The Debtors are also engaged in negotiations with some of the potential defendants on issues unrelated to avoidance actions.