38.    To enable the Debtors to preserve these potential causes of action,
yet allow the Debtors to continue to implement their transformation plan and to promptly
develop, negotiate, prosecute, confirm, and consummate a plan of reorganization, the
Debtors seek authorization to file under seal paper copies (along with discs containing
complaints in PDF format) of the complaints filed in each Adversary Proceeding against
the potential defendants under seal.  The Debtors also request that the case docket for any
adversary proceedings initiated by the complaints likewise be sealed and not available for
public access.  The Debtors will coordinate with the Clerk to ensure an efficient, cost-
effective approach to filing under seal the numerous actions contemplated by this Motion.

<u>Applicable Authority</u>

39.    This Court has broad statutory authority to approve the relief
requested in this Motion.  The Court may "issue any order, process or judgment that is
necessary or appropriate to carry out the provisions of" the Bankruptcy Code.  11 U.S.C.
§ 105(a).  Under section 105(a) of the Bankruptcy Code, this Court has expansive
equitable powers to fashion any order or decree that is in the interest of preserving or
protecting the value of the debtor's assets.  <u>See</u> <u>Schwartz v. Aquatic Dev. Group, Inc.</u> (In re
Aquatic Dev. Group, Inc.), 352 F.3d 671, 673 (2d Cir. 2003) (Straub, J., concurring)
(quoting <u>In re Momentum Mfg. Corp.</u>, 25 F.3d 1132, 1136 (2d Cir. 1994) ("[I]t is
axiomatic that bankruptcy courts are 'courts of equity, empowered to invoke equitable
principles to achieve fairness and justice in the reorganization process.'"); <u>Bird v. Crown
Convenience</u> (In re NWFX, Inc.), 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding
consideration in bankruptcy . . . is that equitable principles govern.") (citations omitted); <u>In</u>

21

re Cooper Properties Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986)

("[T]he Bankruptcy Court is one of equity and as such it has a duty to protect whatever

equities a debtor may have in property for the benefit of its creditors as long as that

protection is implemented in a manner consistent with the bankruptcy laws.").  Likewise,

this Court has "exclusive jurisdiction of all the property, wherever located, of the debtor as

of the commencement of [its] case, and of property of the estate,"  28 U.S.C. § 1334(e),

and causes of action generally constitute property of a debtor's estate.  See, e.g., Citicorp

Acceptance Co. v. Robison (In re Sweetwater), 884 F.2d 1323, 1326 (10th Cir. 1989).

K.      Approval Of Form Of Tolling Agreements

          40.      The two-year deadline imposed by section 546(a) can be waived or

extended by agreement of the non-debtor party to the action.  See In re Rodriguez, 283

B.R. 112, 114 (Bankr. E.D.N.Y. 2001); Pugh v. Brook (In re Pugh), 158 F.3d 530, 532-38

(11th Cir. 1998); McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.), 52 F.3d 1330,

1337-38 (5th Cir. 1995); Brandt v. Gelardi (In re Shape, Inc.), 138 B.R. 334, 337 (Bankr.

D. Me. 1992) (plain reading of statute and legislative history support determination that

section 546(a) is statute of limitations, waivable either by stipulation or failure to assert it

as defense in answer, rather than jurisdictional provision, which is not subject to expansion

by court order or otherwise); In re Iron-Oak Supply Corp., 162 B.R. 301, 307 (Bankr. E.D.

Cal. 1993) (rejecting argument that section 546(a)(1) is statute of repose); In re M & L

Bus. Machs. Inc., 153 B.R. 308, 311 (D. Colo. 1993) aff'd, 160 B.R. 850 (D. Colo. 1993)

(section 546 limitations period is not jurisdictional but is waivable and subject to equitable

tolling); see also Cepa Consulting Ltd. v. New York Nat'l Bank (In re Wedtech), 187 B.R.

105, 110-11 (S.D.N.Y. 1995) (treating section 546(a) as a non-jurisdictional statute of

limitation that must be raised by opposing party in a timely fashion).  But see Martin v.

First Nat'l Bank of Louisville (In re Butcher), 829 F.2d 596, 599-600 (6th Cir. 1987)

(characterizing section 546(a) as "jurisdictional" or "substantive" statute of limitations, not

subject to expansion by Bankruptcy Rule 9006(a) requiring that Saturday and Sunday be

excluded in computing two-year limitations period).  The Debtors should therefore be

authorized to enter into stipulations tolling all applicable statutes of limitations.

L.    Approval Of Avoidance Evaluation Procedures And Authority To Abandon Certain
      Causes Of Action

            41.    The Bankruptcy Code expressly authorizes a debtor to abandon

property of the estate that it determines is burdensome or of inconsequential value.

11 U.S.C. § 554.  Specifically, section 554 of the Bankruptcy Code provides: "After notice

and a hearing, the trustee may abandon any property of the estate that is burdensome to the

estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a).  In

determining the value and benefits of particular property for purposes of the decision to

abandon the property, the debtor is afforded significant discretion.  See, e.g., In re

Interpictures, Inc., 168 B.R. 526, 535 (Bankr. E.D.N.Y. 1994) ("courts have placed the

burden of proving an abuse of discretion of the trustee's action or inaction on abandonment

on the party seeking to make the trustee act"); In re Slack, 290 B.R. 282, 284 (Bankr.

D.N.J. 2003) ("Courts defer to the trustee's judgment and place the burden on the party

opposing the abandonment to prove a benefit to the estate and an abuse of the trustee's

discretion."); In re Cult Awareness Network, Inc., 205 B.R. 575, 579 (Bankr. N.D. Ill.

1997) (decision to abandon property "must rest on a reasonable basis").  This Court need

only ensure that the decision to abandon "reflects a business judgment made in good faith."

Cult Awareness Network, 205 B.R. at 579.[14]

      42.     Notwithstanding abandonment, the failure to file a complaint by the

two-year deadline set forth in section 546(a) of the Bankruptcy Code does not prevent the

Debtors from later using section 502(d) defensively.  Section 502(d) provides, in pertinent

part, as follows:

> the court shall disallow any claim of any entity from which property
> is recoverable under section 542, 543, 550, or 553 of this title or that
> is a transferee of a transfer avoidable under section 522(f), 522(h),
> 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or
> transferee has paid the amount, or turned over any such property, for
> which such entity or transferee is liable under section 522(i), 542,
> 543, 550, or 553 of this title.

11 U.S.C. § 502(d).

      43.     Courts applying section 502(d) of the Bankruptcy Code have barred

any and all claims asserted by creditors who are in receipt of avoidable transfers, unless the

creditor first repays the amount of the avoidable transfer to the debtor's estate.  See, e.g.,

Glinka v. Murad (In re Housecraft Indus. USA, Inc.), 310 F.3d 64, 72 n.8 (2d Cir. 2002);

Germain v. Conn. Nat'l Bank, 988 F.2d 1323, 1327 (2d Cir. 1993); In re Centennial

Textiles, Inc., 209 B.R. 31, 33 (Bankr. S.D.N.Y. 1997).  Further, this Court, as well as

other courts in the Southern District of New York and elsewhere, has specifically held that

the section 502(d) defense may be asserted after the expiration of the two-year statute of

limitations set forth in section 546(a)(1) of the Bankruptcy Code.  See In re Metiom, Inc.,

---

[14] Similar relief was granted in In re Safety-Kleen Corp., No. 00-2303 (PJW) (Bankr. D. Del. May 17,
2002.  See Order (I) Establishing Omnibus Filing And Pretrial Procedures For Certain Adversary
Proceedings, Including Adversary Proceedings Under 11 U.S.C. § 544, 545, 547, 548 Or 550, And
(II) Granting Authority To Abandon Certain Causes Of Action,) (Docket No. 4108).

301 B.R. 634, 641 (Bankr. S.D.N.Y. 2003) (Drain, J.); see also United States Lines, Inc. v.

U.S. (In re McLean Indus.), 196 B.R. 670, 675-77 (S.D.N.Y. 1996) (Cote, J.); In re Asia

Global Crossing, Ltd., 344 B.R. 247, 251 (Bankr. S.D.N.Y. 2006) (Bernstein, J.); In re Mid

Atl. Fund, Inc., 60 B.R. 604, 609-11 (Bankr. S.D.N.Y. 1986) (Abram, J.); El Paso City v.

Am. W. Airlines, Inc. (In re Am. West Airlines, Inc.), 217 F.3d 1161, 1167 (9th Cir. 2000);

cf. Comm. of Unsecured Creditors v. Commodity Credit Corp. (In re KF Dairies, Inc.), 143

B.R. 734, 736-38 (B.A.P. 9th Cir. 1992) (permitting section 502(d) defense after expiration

of section 549 statute of limitations).  But see In re Marketing Assocs. of Am., 122 B.R.

367, 369 (Bankr. E.D. Mo. 1991) (holding that "the Trustee may not use section 502(d)

defensively").

      44.    Here, the Debtors have proposed reasonable criteria and procedures

for determining which avoidance claims should be preserved and which causes of action

the Debtors should be authorized to abandon.  Accordingly, the Debtors seek approval of

these procedures.[15]

M.    Extending Time For Service Of Process

      45.    The Bankruptcy Rules and Federal Rules of Civil Procedure grant

this Court discretion to adopt and implement guidelines, such as those proposed herein,

that will aid in the administration of adversary proceedings.  Bankruptcy Rule 9006(b)(1)

---

[15]   Similar relief was granted in In re Service Merchandise, et al., Case No. 399-02649 (Bankr. M.D. Tenn. Mar. 21, 2001) (Paine, J.), where the bankruptcy court authorized the debtors to abandon claims against critical vendors.  See Order Authorizing Abandonment And/Or Stay Of Certain Estate Causes Of Action And For Related Relief.  The bankruptcy court also authorized the debtors to abandon four categories of claims: (i) claims less than $5,000, (ii) payments of rent to landlords, (iii) customer refunds, and (iv) ordinary course reimbursements to employees.  See Order (i) Establishing Omnibus Initial Filing And Pretrial Procedures For Adversary Proceedings Under 11 U.S.C § 544, 545, 547, 548, Or 553 And Certain Adversary Proceedings, (ii) Granting Authority, Pursuant to Fed. Bankr. R. P. 9019, To Compromise And Settle Such Actions, And (iii) Granting Authority To Abandon Certain De Minimis Claims And Causes Of Action dated February 27, 2001.

provides for the enlargement of time to perform acts required under the Bankruptcy

Rules.[16]  As previously discussed, Fed. R. Civ. P. 4(m) requires the court to extend the

period for service of process after the filing of a complaint upon a showing of good cause.

Even absent good cause, this Court has discretion to extend the 120-day service period.

Mejia v. Castle Hotel, Inc., 164 F.R.D. 343, 345 (S.D.N.Y. 1996).

46.    Here, the Debtors request an extension to March 31, 2008, an

extension of less than 60 days.  By permitting the Debtors to timely file the Adversary

Proceedings but to defer serving process on defendants, the procedures would enable the

Debtors to preserve valuable business relationships and to continue developing a plan of

reorganization.  The Debtors submit that permitting the Debtors to preserve potentially

valuable assets without prejudicing the rights of any defendant constitutes good cause for

the requested extension.[17]

N.    Stay Of Adversary Proceedings Until Service Of Process

47.    "[T]he power to stay proceedings is incidental to the power inherent

in every court to control the disposition of the causes on its docket with economy of time

and effort for itself, for counsel, and for litigants."  Landis v. North American Co., 299

U.S. 248, 254 (1936); see also Air Line Pilots Ass'n v. Miller, 523 U.S. 866, 879 n.6

(1998).  This inherent power is vested in bankruptcy courts as well.  See Uni-Rty Corp. v.

---

[16]    Bankruptcy Rule 9006(b)(1) provides in relevant part as follows: "[W]hen an act is required or allowed
to be done at or within a specified period by these rules or by a notice given thereunder or by order of
court, the court for cause shown may at any time in its discretion . . . order the period enlarged if the
request therefor is made before the expiration of the period originally prescribed or as extended by a
previous order . . . ." Fed. R. Bankr. P. 9006(b)(1).

[17]    Similar relief was granted in In re Ames Dep't Stores, Inc., No. 01-42217 (REG) (Bankr. S.D.N.Y.
Feb. 3, 2004).  See Order Extending Time For Service Of Process With Respect To Certain Preference
Actions (Docket No. 2524).

Guangdong Building, Inc. (In re Uni-Rty Corp.), No. 96 Civ. 4573 (DAB), 1998 WL

299941, at *7 (S.D.N.Y. 1998) (recognizing that bankruptcy courts possess inherent

authority to stay proceedings); In re Hagerstown Fiber Ltd. P'ship, 277 B.R. 181, 199

(Bankr. S.D.N.Y. 2002) (court has inherent power to stay proceedings before it,

particularly where stay will promote judicial economy); In re Cleveland, 353 B.R. 254, 260

(Bankr. E.D. Cal. 2006) (staying adversary proceeding pursuant to court's inherent power

to stay proceedings before it); Swift v. Bellucci (In re Bellucci), 119 B.R. 763, 770 (Bankr.

E.D. Cal. 1990) ("a bankruptcy court has the inherent power to control its docket,

including controlling the timing of proceedings on that docket"). The determination

whether a stay of proceedings is appropriate "calls for the exercise of judgment, which

must weigh competing interests and maintain an even balance." Landis, 299 U.S. at 248,

254-55.  The party seeking the stay "bears the burden of demonstrating the wisdom and

justice of a stay." John's Insulation, Inc. v. Siska Const. Co., Inc., 671 F. Supp. 289, 297

(S.D.N.Y. 1987). "[T]he basic goal [is] to avoid prejudice." Volmar Distributors v. New

York Post Co., 152 F.R.D. 36, 39 (S.D.N.Y. 1993).[18]

48.    Here, for essentially the same reasons that the Debtors have

articulated for deferring issuance of summonses and service of legal process, this Court

should likewise stay the proceedings while the Debtors pursue plan confirmation.  The stay

will not prejudice the potential defendants.  In fact, the potential defendants will benefit

from the stay inasmuch as they will not need to expend time or resources investigating the

---

[18]    The Volmar court articulated the following factors that may guide a court's exercise of its inherent
power: "(1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as
balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the
defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation;
and (5) the public interest." Id. at 39.

facts relating to, or defending, a lawsuit that the Debtors likely will never need to pursue.

Under these circumstances, this Court should stay each proceeding unless and until the

Debtors request the Clerk of Court to issue summons in that particular proceeding.[19]

O.      Filing Of The Complaints Under Seal

49.      Section 107 of the Bankruptcy Code provides bankruptcy courts

with the power to issue orders that will protect entities from potential harm that may result

from the disclosure of certain confidential information.  Section 107(b)(1) of the

Bankruptcy Code specifically provides in part as follows: "On request of a party in interest,

the bankruptcy court shall . . . protect an entity with respect to a trade secret or confidential

research, development, or commercial information . . . ."  11 U.S.C. § 107(b)(1).

50.      The Second Circuit has held that section 107(b) of the Bankruptcy

Code and Rule 9018 of the Bankruptcy Rules do "not require that commercial information

be the equivalent of a trade secret before protecting such information." Video Software

Dealers Ass'n v. Orion Pictures Corp.  (In re Orion Pictures Corp.), 21 F.3d 24, 28 (2d Cir.

1994).  Indeed, other courts in this district have stated that it "is required to grant that relief

upon the motion of a party in interest, assuming the information is of the type listed in

section 107(b)." In re Global Crossing Ltd., 295 B.R. 720, 723 n.7 (Bankr. S.D.N.Y. 2003)

(citing Video Software, 21 F.3d at 27).  In addition, the Second Circuit has held that a

party seeking the sealing of information is required only to show that the information is

confidential and commercial, and no showing of "good cause" is necessary.  See Video

---

[19]    Similar relief was granted in In re Service Merchandise, Case No. 399-02649 (Bankr. M.D. Tenn.
Mar. 21, 2001), where the bankruptcy court granted the debtors authority to stay certain adversary
proceedings while the debtors were continuing to investigate whether they would ultimately pursue
them.  See Order Authorizing Abandonment And/Or Stay Of Certain Estate Causes Of Action And For
Related Relief.

Software, 21 F.3d at 28.  Thus, a bankruptcy court may enter a sealing order under the

broad confidentiality protections in bankruptcy proceedings where necessary to protect

confidential information.  Id.; see also Global Crossing, 295 B.R. at 725 (The "whole point

of [Bankruptcy Rule 9018] is to protect business entities from disclosure of information

that could reasonably be expected to cause the entity commercial injury.").

   51. Upon the request of a party in interest, a court has no discretion and

must deny public access to information that falls within one of the categories under

Bankruptcy Code section 107(b).  Orion Pictures Corp., 21 F.3d at 27.  If, however, the

information to be protected does not fit into any of the specified categories, then the court

has discretion to decide if the requesting party has shown cause to permit filing under seal.

See In re Bennett Funding Group, Inc., 226 B.R. 331, 336 (Bankr. N.D.N.Y. 1998) (citing

Nixon v. Warner Communications, Inc., 435 U.S. 589, 599 (1978)); Orion Pictures Corp.,

21 F.3d at 27 ("In limited circumstances, courts must deny access to judicial documents").

   52. The power to seal also arises from the inherent power of the court to

control dissemination of its records.  See In re Robert Landau Assocs., Inc. 50 B.R. 670,

676, 677 (Bankr. S.D.N.Y. 1985) (court's inherent power to seal, despite section 107(b)'s

inapplicability, is implicit in section 704(7)'s exception to disclosure—"unless the court

orders otherwise"); In re I.G. Servs. Ltd., 244 B.R. 377, 388 n.14 (Bankr. W.D. Tex. 2000)

(concluding that if section 107 applied to records not filed with court, court still had power

to control dissemination of information beyond scope of section 107), rev'd on other

grounds sub nom. San Antonio Express-News v. Blackwell (In re Blackwell), 263 B.R.

505 (W.D. Tex. 2000); In re Apex Oil Co., 101 B.R. 92, 101-02 (Bankr. E.D. Mo. 1989)

(citing Robert Landau Assocs.); In re EPIC Assocs. V, 54 B.R. 445, 450 (Bankr. E.D. Va.

1985) (exercising inherent supervisory power over its own records and files).   When

deciding to allow a debtor to file documents under seal, courts should look at all relevant

facts and circumstances and weigh the competing interests of the debtor seeking protection

with the general right of the public to access documents filed in a bankruptcy case.

Bennett Funding, 226 B.R. at 336.  Relevant factors include (1) whether the debtor will

suffer irreparable harm if the information is disclosed, (2) whether the debtor can

demonstrate that disclosure will have a negative impact on its estate such that the debtor

would be at a disadvantage in comparison with competitors, and (3) whether the debtor is

seeking to protect the information on a temporary basis or on a permanent basis.  See

generally In re Hemple, 295 B.R. 200, 202 (Bankr. D. Vt. 2003).

    53.    The circumstances of this case demonstrate the need for

confidentiality to preserve the status quo and to avoid unnecessary harm to the Debtors and

others that would be caused by filing these complaints publicly.[20]

            *     *     *

    54.    In light of the benefits that the relief requested would provide to the

Debtors, defendants in Adversary Proceedings, and other stakeholders, and given the

---

[20]   Similar relief was granted in In re Service Merchandise, et al., Case No. 399-02649 (Bankr. M.D. Tenn.
Feb. 27, 2001), the bankruptcy court granted the debtors authority to file under seal certain adversary
proceedings so that the debtors could continue negotiations with defendants, who were also the debtors'
business partners, and to ensure that such defendants continued doing business with the debtors.  See
Order (i) Establishing Omnibus Initial Filing And Pretrial Procedures For Adversary Proceedings Under
11 U.S.C § 544, 545, 547, 548, Or 553 And Certain Adversary Proceedings, (ii) Granting Authority,
Pursuant to Fed. Bankr. R. P. 9019, To Compromise And Settle Such Actions, And (iii) Granting
Authority To Abandon Certain De Minimis Claims And Causes Of Action (permitting debtor to file
documents under seal in any adversary proceeding in which debtors also sought to stay the proceeding).

authority in support of such relief, the Debtors believe that entry of the proposed order is justified and appropriate.

### Notice Of Motion

55.     Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883) (the "Supplemental Case Management Order"), and the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered October 26, 2006 (Docket No. 5418) (together with the Supplemental Case Management Order, the "Case Management Orders").[21]  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

### Memorandum Of Law

56.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

---

[21]    In addition to giving notice in accordance with the Case Management Orders, the Debtors will describe the relief obtained through this Motion in their disclosure statement for the Debtors' plan of reorganization.

31

WHEREFORE the Debtors respectfully request that this Court enter an

order (i) granting the Motion and (ii) granting them such other and further relief as is just.

Dated:    New York, New York
          August 6, 2007

                                        SKADDEN, ARPS, SLATE, MEAGHER
                                          & FLOM LLP

                                        By:    /s/ John Wm. Butler, Jr.
                                               John Wm. Butler, Jr. (JB 4711)
                                               George N. Panagakis (GP 0770)
                                               Ron E. Meisler (RM 3026)
                                        333 West Wacker Drive, Suite 2100
                                        Chicago, Illinois 60606
                                        (312) 407-0700

                                                    - and -

                                        By:    /s/ Kayalyn A. Marafioti
                                               Kayalyn A. Marafioti (KM 9632)
                                               Thomas J. Matz (TM 5986)
                                        Four Times Square
                                        New York, New York 10036
                                        (212) 735-3000

                                        Attorneys for Delphi Corporation, et al.,
                                          Debtors and Debtors-in-Possession

32

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                             :
      In re                              :        Chapter 11
                                             :
DELPHI CORPORATION, et al.,                  :        Case No. 05-44481 (RDD)
                                             :
                 Debtors.       :        (Jointly Administered)
                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. §§ 102(1)(A), 105(a), 107, 108(a)(2),
AND 546(a) AND FED. R. BANKR. P. 7004, 9006(c), AND 9018
(i) AUTHORIZING DEBTORS TO ENTER INTO STIPULATIONS
TOLLING STATUTE OF LIMITATIONS WITH RESPECT TO CERTAIN
CLAIMS, (ii) AUTHORIZING PROCEDURES TO IDENTIFY CAUSES OF
ACTION THAT SHOULD BE PRESERVED, AND (iii) ESTABLISHING
PROCEDURES FOR CERTAIN ADVERSARY PROCEEDINGS INCLUDING THOSE
COMMENCED BY DEBTORS UNDER 11 U.S.C. § 541, 544, 545, 547, 548, OR 553

("PRESERVATION OF ESTATE CLAIMS PROCEDURES ORDER")

        Upon the motion, dated August 6, 2007 (the "Motion"), of Delphi

Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-

possession in the above-captioned cases (collectively, the "Debtors"), for an order (the

"Order")  under 11 U.S.C. §§ 102(1)(A), 105(a), 107, 108(a)(2), and 546(a) and Federal

Rule of Bankruptcy Procedure 7004, 9006(c), and 9018 (i) authorizing the Debtors to enter

into stipulations tolling the statute of limitations with respect to certain claims,

(ii) authorizing procedures to identify causes of action that should be preserved, and

(iii) establishing procedures for certain Adversary Proceedings[1] commenced by the

Debtors under 11 U.S.C. § 541, 544, 545, 547, 548, or 553; and upon the record of the

---

[1]    Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

hearing held on the Motion; and this Court having determined that the relief requested in

the Motion is in the best interests of the Debtors, their estates, their creditors, and other

parties-in-interest; and it appearing that proper and adequate notice of the Motion has been

given and that no other or further notice is necessary; and after due deliberation thereon;

and good and sufficient cause appearing therefor, it is hereby

ORDERED, ADJUDGED, AND DECREED THAT:

1.      The Motion is GRANTED.

2.      The filing and service procedures set forth and required under the

Bankruptcy Rules, the Local Rules, and any orders of this Court in these chapter 11 cases

are modified or waived, as appropriate, as set forth herein with respect to the Adversary

Proceedings.

3.      Scope Of The Procedures.  The procedures established by this Order

apply to each Adversary Proceeding that the Debtors identify to the Clerk as being subject

to these procedures.

4.      Approval Of Tolling Agreements.  The Debtors are hereby

authorized to enter into stipulations, substantially in the form annexed to the Motion as

Exhibit B, tolling the statute of limitations with respect to claims described in the Motion.

Each Debtor is deemed to have entered into a stipulation with other Debtors and affiliated

non-Debtor entities.

5.      Procedures To Identify Causes Of Action And Abandonment

Authority.  The procedures set forth in the Motion to identify causes of action that should

be preserved are approved.  The Debtors are authorized, without the need for any further

order or any further notice under Bankruptcy Rule 6007(a), to abandon those causes of

action or categories of causes of action that Debtors propose in the Motion to abandon.

Subject to the procedures set forth in the Motion, the Debtors are further authorized to

abandon certain causes of action not specifically identified in the Motion that they

determine should not be pursued, including the categories of actions set forth in the

Motion, without the need for any further order or any further notice under Bankruptcy

Rule 6007(a). The Debtors may abandon additional causes of action after giving notice to

the Statutory Committees. If a Statutory Committee objects within 10 days after service of

the notice, the Debtors may bring the matter before this Court for a ruling on whether the

proposed abandonment satisfies section 554(a) of the Bankruptcy Code.

      6.    <u>Scope Of Fraudulent Transfer Review</u>. For purposes of identifying

and preserving potential fraudulent transfer claims, the Debtors need only review the

following categories of transactions: merger and acquisition deals at or exceeding

$20 million, transfers to Delphi's board of directors or strategy board members other than

for compensation or ordinary-course expense reimbursement (if any), unusual securities

transactions (if any), dividend distributions to 5% shareholders, and Delphi's financially

troubled supplier program.

      7.    <u>Filing Of Complaints Under Seal</u>. The Clerk of Court is directed to

accept for filing, under seal, paper copies of the complaint in each Adversary Proceeding

that the Debtors indicate are subject to these procedures. The Clerk of Court also is

directed to seal the case docket for any such Adversary Proceeding so that it is not

available for public access. The Debtors shall coordinate with the Clerk of Court to

accomplish an efficient and cost-effective filing of the complaints contemplated by this

order.  The Debtors shall submit to the Clerk, under seal, appropriate electronic media

containing PDF copies of the complaints.  This order shall not preclude the Debtors, in

their sole discretion, from making a copy of a complaint available to parties.  The Debtors

and GM shall have leave to file, under seal, a stipulation that contains tolling provisions,

consistent with this order, and other agreements of the parties with respect to the sealed

complaint involving GM, which stipulation shall be deemed "so ordered" and shall be

sealed in accordance with the terms of this order.

        8.     <u>Modification Of Federal Rule Of Civil Procedure 4(m)</u>.  The

Debtors shall have until March 31, 2008 to serve each defendant with summons and

complaint, without prejudice to further extensions.

        9.     <u>Stay Of Adversary Proceedings</u>.  All activity in the Adversary

Proceedings that the Debtors indicate are subject to these procedures shall be stayed until

the earlier of (i) the Debtors' service of a summons and complaint on the defendant in any

Adversary Proceeding and (ii) further order of this Court.  Notwithstanding the stay, the

Debtors may amend their complaint during the stay.  Also, during the stay, the Debtors

may dismiss any Adversary Proceeding after notice to counsel to the Statutory

Committees.  If a Statutory Committee objects within 10 days after service of the notice of

dismissal, the Debtors may bring the matter before this Court for a ruling on whether the

proposed dismissal satisfies section 554(a) of the Bankruptcy Code.

10.    <u>Deferral Of Issuance Of Summons</u>.  The Clerk of Court is directed
not to issue summons until either the stay is lifted with respect to a particular Adversary
Proceeding or the Debtors request the Clerk of Court to issue a summons.

11.    <u>Service Of Order With Summons And Complaint</u>.  The Debtors
must serve a copy of this order upon each defendant in any Adversary Proceeding either
when the Debtors serve a summons and complaint on the defendant or as soon thereafter as
practicable.

12.    <u>Additional Procedures</u>.  This Order is without prejudice to the
Debtors' seeking additional procedures to govern the Adversary Proceedings.

13.    This Court shall retain jurisdiction to hear and determine all matters
arising from the implementation of this order.

14.    The requirement under Rule 9013-1(b) of the Local Bankruptcy
Rules for the United States Bankruptcy Court for the Southern District of New York for
the service and filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated: August ___, 2007
     New York, New York

_____
    UNITED STATES BANKRUPTCY JUDGE

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
     Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
          In re                               :     Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :     Case No. 05-44481 (RDD)
                                              :
                                              :     (Jointly Administered)
                         Debtors.             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### STIPULATION TOLLING APPLICABLE STATUTES OF LIMITATIONS WITH RESPECT TO CLAIMS AGAINST [DEFENDANT]

          Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the

1

"Debtors"), and [Defendant], and its affiliates and subsidiaries, hereby agree and state as follows:

WHEREAS on October 8, 2007 and October 14, 2007 (together, the "Filing Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

WHEREAS in the course of the Debtors' bankruptcy cases, claims and causes of action under or through various provisions of the Bankruptcy Code, including, without limitation, sections 502, 541, 544, 545, 547, 548, 550, and 553 of the Bankruptcy Code, might be asserted by one or more of the Debtors or asserted on behalf of the Debtors' estates against [Defendant].

WHEREAS [Defendant] might wish to assert defenses, setoffs, and counterclaims to such claims or causes of action by the Debtors.

WHEREAS the Debtors and [Defendant] seek to avoid the cost and expense of unnecessary motion practice and litigation and seek to preserve all of their respective legal rights without allowing any applicable statute of limitations to expire and without acknowledging in any way that valid claims, causes of action, or defenses thereto exist or do not exist.

THEREFORE, the Debtors and [Defendant] stipulate and agree as follows:

1.    The running of any applicable statute of limitations under sections 108 and 546(a) of the Bankruptcy Code, and all other time limitations or time-based defenses concerning any claim or cause of action against [Defendant] which might

2

be asserted by one or more of the Debtors or asserted on behalf of the Debtors' estates under or through various provisions of the Bankruptcy Code, including, without limitation, any of sections 502, 541, 544, 545, 547, 548, and 553 of the Bankruptcy Code (the "Claims"), is hereby tolled.

2.      The time elapsed during the Tolled Period (defined below) with respect to the Claims is excluded from any computation of time for purposes of any argument or defense based on statutes of limitations, laches, estoppel, waiver, and any other time-based defense or right.  As of the termination of this stipulation, the rights of each of the undersigned parties and their successors, assigns, and legal representatives with respect to the Claims will be as they were immediately before the execution of this stipulation with respect to the interposition of any argument or defense based on statutes of limitations, laches, estoppel, waiver, and any other time-based defense or right.  This stipulation does not revive any Claim which was barred by the statute of limitations or any other time-based defense before the date this stipulation was executed.

3.      The provisions of this stipulation extend up to and include the first business day nine months following entry of an order confirming the Plan, as the same may have been amended or modified before its entry (the "Tolled Period").

4.      Notwithstanding the provisions contained herein, in the sole and absolute discretion of the Debtors, or their respective successors and assigns, the Debtors or such successors and assigns are permitted to commence any litigation against [Defendant] during the Tolled Period.

3

5.      Each of the parties acknowledges that it has read all of the terms of this stipulation and enters into those terms voluntarily and without duress.

6.      This stipulation contains the entire agreement between the parties regarding the provisions set forth above and may be modified only in a writing signed by the parties or their duly appointed agents, upon notice to counsel for the an official committee of unsecured creditors

7.      This stipulation is not to be construed, and is not intended, as an admission or suggestion that any valid claim or cause of action exists against [Defendant] or that any valid defense to any such claim or cause of action exists.

8.      Except as expressly set forth in this stipulation, each of the parties hereto reserves all rights and remedies that it may have against the other.

9.      The parties intend that this stipulation and Order and the tolling contemplated hereby shall not impair, diminish, or eliminate any jurisdiction of the Bankruptcy Court, to the extent that it has jurisdiction as of the date of execution of this stipulation, to adjudicate any claim, action, or proceeding relating to or arising out of any matter referred to above.  In particular, the parties understand, and the Bankruptcy Court by approving this stipulation or form of stipulation finds and determines, that section 546(a) of the Bankruptcy Code constitutes a true statute of limitations which may be tolled by the parties' agreement.  The parties nevertheless recognize that there exist dicta in certain reported cases indicating that some courts (which have considered section 546(a) of the Bankruptcy Code to impose a temporal limit on the jurisdiction of the Bankruptcy Court) might hold that section 546(a) could not be tolled by agreement.  If a final and non-

4

appealable order of a court of competent jurisdiction determines that (i) the time

limitations described in section 546(a) cannot be effectively tolled by agreement and

(ii) the Bankruptcy Court therefore cannot adjudicate any such claim, action, or

proceeding, then the non-Debtor party to each stipulation (as a new and separate obligation

and in consideration of the forbearance provided for hereby) must pay to each Debtor that

amount, if any, which the Bankruptcy Court by final order determines would have been the

ultimate net liability of the non-Debtor party to such Debtor on any such claim, action, or

proceeding if an adversary proceeding on such claim, action, or proceeding had been

commenced in Bankruptcy Court on the date this stipulation was executed, but giving full

effect to any and all other defenses or counterclaims of any kind or nature that the non-

Debtor party could assert in such an adversary proceeding.  If the Bankruptcy Court is not

competent to make such a determination, the determination will be made by binding

arbitration, and the Debtors and the non-Debtor party hereby irrevocably submit to such

binding arbitration in accordance with the arbitration rules of [_____]

(but only in the event that the Bankruptcy Court is not competent to make the

determination as described above) and to entry of judgment upon the arbitration award in

the Bankruptcy Court or any court of competent jurisdiction.

        10.    This stipulation is deemed to have been jointly drafted by the parties

hereto, and, in constructing and interpreting this stipulation, no provision may be construed

and interpreted for or against any of the parties because such provision or any other

provision of this stipulation, or this stipulation as a whole, was purportedly prepared or

requested by that party.

5

11.    This stipulation and the rights and obligations of the parties hereunder are governed by, and construed and interpreted in accordance with, the laws of the State of New York and, to the extent applicable, federal bankruptcy law, and any action or proceeding to enforce the rights and obligations of the parties hereunder must originally and exclusively be brought in the Bankruptcy Court.

12.    This stipulation is effective as of the date it is fully executed and is binding upon, and inures to the benefit of, the successors, representatives, assigns, and heirs of the parties hereto.

13.    Each stipulation is deemed "So Ordered" upon execution thereof.

14.    This stipulation may be executed in counterparts and by facsimile signature, and all executed counterparts and facsimile signatures taken together constitute one document.

15.    Except as otherwise expressly provided herein, the use of the singular of any word includes the plural and the use of the plural includes the singular.

6

DATED: New York, New York
            _____, 2007


[Debtor-in-Possession]                         [Defendant]

By: _____              By: _____


[Attorneys for Debtor-in-Possession]           [Attorneys for Defendant]

By: _____              By: _____

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                 :
    In re                        :     Chapter 11
                                 :
DELPHI CORPORATION, et al.,  :     Case No. 05-44481 (RDD)
                                 :
                 Debtors.  :     (Jointly Administered)
                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF EXPEDITED MOTION FOR ORDER UNDER 11 U.S.C. §§ 102(1)(A),
105(a), 107, 108(a)(2), AND 546(a) AND FED. R. BANKR. P. 7004, 9006(c),
AND 9018 (i) AUTHORIZING DEBTORS TO ENTER INTO STIPULATIONS
TOLLING STATUTE OF LIMITATIONS WITH RESPECT TO
CERTAIN CLAIMS, (ii) AUTHORIZING PROCEDURES TO IDENTIFY CAUSES
OF ACTION THAT SHOULD BE PRESERVED, AND (iii) ESTABLISHING
PROCEDURES FOR CERTAIN ADVERSARY PROCEEDINGS INCLUDING
THOSE COMMENCED BY DEBTORS UNDER 11 U.S.C. § 541, 544, 545, 547, 548, OR 553

PLEASE TAKE NOTICE that on August 6, 2007, Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), filed an Expedited Motion For Order Under 11 U.S.C. §§ 102(1)(A), 105(a), 107, 108(a)(2), And 546(a) And Fed. R. Bankr. P. 7004, 9006(c), And 9018 (i) Authorizing Debtors To Enter Into Stipulations Tolling Statute Of Limitations With Respect To Certain Claims, (ii) Authorizing Procedures To Identify Causes Of Action That Should Be Preserved, And (iii) Establishing Procedures For Certain Adversary Proceedings Including Those Commenced By Debtors Under 11 U.S.C. § 541, 544, 545, 547, 548, Or 553 (the "Motion").

PLEASE TAKE FURTHER NOTICE that a hearing to consider approval of the Motion will be held on August 16, 2007, at 10:00 a.m. (prevailing Eastern time) (the "Hearing") before the Honorable Robert D. Drain, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610, New York, New York 10004.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion must (a) be in writing, (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and the Supplemental Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, and Administrative Procedures, entered March 20, 2006 (Docket No. 2883) (the "Supplemental Case Management Order") and the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates and Certain Notice, Case Management, and Administrative Procedures, entered October 26, 2006 (Docket No. 5418)

2

(together with the Supplemental Case Management Order, the "Case Management Orders"),

(c) be filed with the Bankruptcy Court in accordance with General Order M-242 (as amended) –

registered users of the Bankruptcy Court's case filing system must file electronically, and all

other parties-in-interest must file on a 3.5 inch disk (preferably in Portable Document Format

(PDF), WordPerfect, or any other Windows-based word processing format), (d) be submitted in

hard-copy form directly to the chambers of the Honorable Robert D. Drain, United States

Bankruptcy Judge, and (e) be served upon (i) Delphi Corporation, 5725 Delphi Drive, Troy,

Michigan 48098 (Att'n: General Counsel), (ii) counsel to the Debtors, Skadden, Arps, Slate,

Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Att'n: John

Wm. Butler, Jr.), (iii) counsel for the agent under the postpetition credit facility, Davis Polk &

Wardwell, 450 Lexington Avenue, New York, New York 10017 (Att'n: Donald Bernstein and

Brian Resnick), (iv) counsel for the Official Committee of Unsecured Creditors, Latham &

Watkins LLP, 885 Third Avenue, New York, New York 10022 (Att'n: Robert J. Rosenberg and

Mark A. Broude), (v) counsel for the Official Committee of Equity Security Holders, Fried,

Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004

(Att'n: Bonnie Steingart), and (vi) the Office of the United States Trustee for the Southern

District of New York, 33 Whitehall Street, Suite 2100, New York, New York 10004 (Att'n:

Alicia M. Leonhard), in each case so as to be **received** no later than **4:00 p.m. (prevailing

Eastern time) on August 13, 2007** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that only those objections made as set forth

herein and in accordance with the Case Management Orders will be considered by the

Bankruptcy Court at the Hearing.  If no objections to the Motion are timely filed and served in

accordance with the procedures set forth herein and in the Case Management Orders, the

Bankruptcy Court may enter an order granting the Motion without further notice.


Dated:          New York, New York
                August 6, 2007
                                    SKADDEN, ARPS, SLATE, MEAGHER
                                     & FLOM LLP

                                    By:    /s/ John Wm. Butler, Jr.
                                           John Wm. Butler, Jr. (JB 4711)
                                           George N. Panagakis (GP 0770)
                                           Ron E. Meisler (RM 3026)
                                    333 West Wacker Drive, Suite 2100
                                    Chicago, Illinois 60606
                                    (312) 407-0700

                                            - and -


                                    By:    /s/ Kayalyn A. Marafioti
                                           Kayalyn A. Marafioti (KM 9632)
                                           Thomas J. Matz (TM 5986)
                                    Four Times Square
                                    New York, New York 10036
                                    (212) 735-3000

                                    Attorneys for Delphi Corporation, et al.,
                                      Debtors and Debtors-in-Possession

4

# EXHIBIT G

**Hearing Date And Time: August 16, 2007 at 10:00 a.m.**
**Objection Deadline: August 13, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

     -and-

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

     -and-

O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
Tom A. Jerman (TJ 1129)
Jessica Kastin (JK 2288)

Attorneys for Delphi Corporation, et al.,
   Debtor and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698
Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                         :
         In re             :     Chapter 11
                         :
DELPHI CORPORATION, et al.,   :     Case No. 05-44481 (RDD)
                         :
             Debtors. :     (Jointly Administered)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXPEDITED MOTION FOR ORDER UNDER 11 U.S.C. §§ 363, 1113, AND 1114 AND FED. R. BANKR. P. 6004 AND 9019
APPROVING (I) MEMORANDA OF UNDERSTANDING AMONG IUOE, IBEW, IAM, DELPHI,
AND GENERAL MOTORS CORPORATION INCLUDING MODIFICATION OF IUOE, IBEW, AND IAM
COLLECTIVE BARGAINING AGREEMENTS AND RETIREE WELFARE BENEFITS FOR CERTAIN IUOE, IBEW, AND IAM-
REPRESENTED RETIREES AND (II) MODIFICATION OF, AND TERM SHEET REGARDING,
RETIREE WELFARE BENEFITS FOR CERTAIN NON-REPRESENTED HOURLY ACTIVE EMPLOYEES AND RETIREES

("IUOE, IBEW, AND IAM 1113/1114 SETTLEMENT
AND RETIREE BENEFIT APPROVAL MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this expedited motion (the "Motion")[1] for an order under 11 U.S.C. §§ 363, 1113,

and 1114 of the Bankruptcy Code and Fed. R. Bankr. P. 6004 and 9019 approving (i)

memoranda of understanding regarding Delphi's restructuring entered into among the

International Union of Operating Engineers Locals 832S, 18S, and 101S ("IUOE"),[2] the

International Brotherhood of Electrical Workers and its Local 663 ("IBEW"),[3] and the

International Association of Machinists and Aerospace Workers and its District 10 and Tool and

Die Makers Lodge 78 ("IAM"),[4] Delphi, and General Motors Corporation ("GM") (collectively,

the "IUOE, IBEW, and IAM Settlement Agreements" or the "Memoranda of Understanding"),[5]

---

[1]   A copy of the informational notice provided to active Delphi hourly employees and hourly retirees represented by the IUOE, IBEW, and IAM, as well as certain non-represented hourly such employees and retirees, in connection with the Motion is attached hereto as Exhibit 1.

[2]   There are three IUOE memoranda of understanding that are the basis of this Motion, the first with the International Union of Operating Engineers Local 832S (the "IUOE Local 832S Settlement Agreement" or the "IUOE Local 832S Memorandum of Understanding"), the second with the International Union of Operating Engineers Locals 18S (the "IUOE Local 18S Settlement Agreement" or the "IUOE Local 18S Memorandum of Understanding"), and the third with the International Union of Operating Engineers Local 101S (the "IUOE Local 101S Settlement Agreement" or the "IUOE Local 101S Memorandum of Understanding"). Notwithstanding any language therein to the contrary, Attachment B to each of these three IUOE memoranda of understanding and Attachment C to the IUOE Local 832S Memorandum of Understanding and IUOE Local 18S Memorandum of Understanding are clarified to provide that the International Union of Operating Engineers is not a party to these agreements; rather, only its aforesaid locals are parties to each local's respective agreements.

[3]   There are two IBEW memoranda of understanding that are the basis of this Motion, the first with the International Brotherhood of Electrical Workers and its Local 663 relating to Delphi Electronics and Safety (the "IBEW E&S Settlement Agreement" or the "IBEW E&S Memorandum of Understanding") and the second with the International Brotherhood of Electrical Workers and its Local 663 relating to Delphi Powertrain (the "IBEW Powertrain Settlement Agreement" or the "IBEW Powertrain Memorandum of Understanding").

[4]   There is one IAM memorandum of understanding that is the basis of this Motion (the "IAM Settlement Agreement" or the "IAM Memorandum of Understanding").

[5]   Copies of the IUOE, IBEW, and IAM Settlement Agreements are annexed to the Proposed Order which is attached hereto as Exhibit 2. Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the IUOE, IBEW, and IAM Settlement Agreements.

2

comprehensive agreements that (a) modify, extend, or terminate provisions of the existing

collective bargaining agreements among Delphi, the IUOE, IBEW, IAM, and their various locals

(the "IUOE, IBEW, and IAM CBAs") and (b) provide that GM and Delphi will undertake certain

financial obligations to Delphi's IUOE, IBEW, and IAM-represented employees and retirees to

facilitate these modifications, (ii) withdrawal without prejudice of the Debtors' Motion For Order

Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And

Under 11 U.S.C. § 1114(g) Authorizing Modification Of Retiree Welfare Benefits (the

"1113/1114 Motion") solely as it pertains to the IUOE, IBEW, and IAM and IUOE, IBEW, and

IAM-represented retirees and approving the parties' settlement of the 1113/1114 Motion solely

as it pertains to the IUOE, IBEW, and IAM and IUOE, IBEW, and IAM-represented retirees,

(iii) modification of retiree welfare benefits for certain IUOE, IBEW, and IAM-represented

retirees of the Debtors pursuant to the IUOE, IBEW, and IAM Settlement Agreements, and (iv)

pursuant to 11 U.S.C. § 363, modification of retiree welfare benefits for certain non-represented

hourly active employees and retirees of the Debtors and approval of a term sheet between Delphi

and GM regarding Delphi's cessation and GM's provision certain benefits for such employees.

Introduction

      1.      The IUOE, IBEW, IAM, Delphi, and GM have discussed the challenges

impacting Delphi and its IUOE, IBEW, and IAM-represented operations.  These parties

acknowledge that restructuring actions are necessary and commit to take specific actions to

protect the needs of these parties and their constituencies, continuing progress already made

toward transforming Delphi's labor cost structure and ongoing business operations.

2.      The IUOE, IBEW, IAM, Delphi, and GM have agreed to the "Term Sheet – Delphi Cessation and GM Provision of OPEB"[6] and the assumption of significant OPEB liabilities by GM, thereby reducing Delphi's ongoing benefit costs and liabilities.

3.      In addition, to enable continued transformation to more competitive wage and benefit levels, to address capacity and staffing level issues, to facilitate the freeze of the Delphi HRP, and to better position Delphi to retain existing business and attract new business, the IUOE, IBEW, IAM, Delphi, and GM have entered into various agreements in the Memoranda of Understanding on a two-party or three-party basis, as applicable, subject to ratification.

4.      The Debtors filed the 1113/1114 Motion on March 31, 2006, after they were unable to consummate consensual modifications to the Debtors' collective bargaining agreements and retiree welfare benefits with the IUOE, IBEW, and IAM and the other unions representing certain of the Debtors' U.S. employees and retirees (the "Unions")[7] during the first six months of their chapter 11 reorganization cases.  The Debtors believe that they continued to negotiate with the Unions even after they filed the 1113/1114 Motion, and represented that they would continue to negotiate with the Unions even if Debtors obtained the order requested in the 1113/1114 Motion.[8]  The parties were unable to reach a consensus before the scheduled

---

[6]    This agreement is Attachment B to the Memoranda of Understanding.

[7]    These unions include the United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), the United Steelworkers of America (the "USW"), the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America (the "IUE-CWA"), and their local affiliates.

[8]    The Debtors' proposed modifications to the IUOE, IBEW, and IAM CBAs upon which their 1113/1114 Motion was based are described in detail in the 1113/1114 Motion and the accompanying Declaration Of Darrell Kidd In Support of the 1113/1114 Motion (Docket No. 3039).  In sum, the Debtors' proposed modifications contemplated two possible scenarios: one in which they received no or inadequate financial support from GM (the "Competitive Benchmark Proposals") and the other in which they received financial support from GM adequate to offer less restrictive or severe modifications to their national and local labor agreements (the "GM Consensual Proposals").  The IUOE, IBEW, and IAM, as well as the Debtors' other Unions, rejected the

commencement of the hearing on the 1113/1114 Motion on May 9, 2006. This Court conducted

hearings on the contested motion on various trial dates in May and June 2006, the record of

which constitutes part of the basis for the relief requested in this Motion. Throughout the

1113/1114 proceedings, however, the Debtors and the Unions continued to seek negotiated

alternatives to litigation.

5.      On June 8, 2006, the Debtors and all respondents to the 1113/1114 Motion

conducted a "meet and confer" at which the parties agreed to submit a scheduling order to this

Court which provided for a recess of the hearings until August 11, 2006 (Docket No. 4170).

During the next five months, the Debtors' discussions with the Unions, GM, and other

stakeholders continued. As a consequence of those negotiations, the parties submitted to this

Court further scheduling orders adjourning the 1113/1114 Motion through the balance of 2006

and, on January 31, 2007, this Court suspended further proceedings on the 1113/1114 Motion

(Docket No. 6779). Further orders continuing the suspension of the 1113/1114 Motion have

been granted by this Court with the intention of allowing the parties additional time to negotiate

consensual modifications to Delphi's labor agreements.

6.      On June 22, 2007, Delphi reached a tentative agreement and signed a

Memorandum of Understanding with the UAW and GM covering site plans, workforce

transition, and other comprehensive transformational issues (the "UAW Settlement Agreement"),

which was ratified by the UAW on June 28, 2007. On August 5, 2007, the Debtors reached

similar tentative agreement with the IUE-CWA (the "IUE-CWA Settlement Agreement"). The

UAW Settlement Agreement is analogous to the IUOE, IBEW, and IAM Settlement Agreements

---

Competitive Benchmark Proposals and took the position that the Competitive Benchmark and GM Consensual
Proposals did not provide a framework for resolution. The Memoranda of Understanding that are the basis of
this Motion are essentially fully negotiated GM Consensual Proposals on terms acceptable to the IUOE, IBEW,
IAM, Delphi, and GM.

because the UAW Settlement Agreement similarly is a comprehensive agreement that modifies,

extends, or terminates provisions of the existing collective bargaining agreements among Delphi,

the UAW, and its various UAW locals and provides that GM and Delphi will undertake certain

financial obligations to Delphi's UAW-represented employees and retirees to facilitate these

modifications.  On June 29, 2007, Delphi filed a motion with this Court for an order approving

the UAW Settlement Agreement, approving withdrawal without prejudice of the 1113/1114

Motion solely as it pertains to the UAW and UAW-represented retirees, approving the settlement

of the 1113/1114 Motion solely as it pertains to the UAW and UAW-represented retirees, and

approving modification of retiree welfare benefits for certain UAW-represented retirees of

Delphi.  After a hearing on this motion on July 19, 2007, this Court issued an order approving

that motion (Docket No. 8693).  By a motion filed on August 6, 2007, Delphi is also seeking an

order approving the IUE-CWA Settlement Agreements.

   7.  The IUOE, IBEW, and IAM Settlement Agreements apply only to the

IUOE, IBEW, and IAM and do not resolve the 1113/1114 Motion as to the remaining Unions.

As of the date of this Motion, however, the Debtors have achieved a settlement with the IUE-

CWA and stand ready to renew bargaining with the USW in an effort to reach a consensual

agreement.  Any such agreement could be considered by this Court as early as the September 27,

2007 omnibus hearing or perhaps earlier if an expedited notice and hearing schedule is approved

by this Court.

   8.  The IUOE, IBEW, and IAM Settlement Agreements, among other subject

matters, provide that: [9]

---

[9] The summary of the IUOE, IBEW, and IAM Settlement Agreements set forth in this Motion is qualified
entirely by and is subject to the actual terms and conditions of the IUOE, IBEW, and IAM Settlement
Agreements.

6

(A)    Effective upon the later of entry of this Court's approval order in respect of the Motion[10] or the first Monday following receipt of written notice of ratification from the respective Union:[11]

- Certain collective bargaining agreements are extended until September 14, 2011, subject to their termination provisions, certain operations are scheduled to be closed, and certain operations are acknowledged as closed;

- A workforce transition program is implemented for eligible employees that provides eligible employees with transformation plan options, including (i) attrition options similar to the previously-approved UAW and IUE-CWA attrition program for eligible employees who are participants in the Delphi Hourly-Rate Employees Pension Plan, (ii) provision of a lump sum "buy-down" payment totaling $10,000 for eligible employees, and (iii) severance payments up to $40,000 to eligible employees who are permanently laid off prior to September 14, 2011;[12]

- Certain terms of certain collective bargaining agreements are modified;[13] and

- All employee, retiree, and union asserted and unasserted claims are settled (except for waiver of rights to vested pension benefits, workers compensation benefits, unemployment compensation

---

[10]    The IUOE Local 101S Settlement Agreement becomes effective upon entry of this Court's approval order in respect of the Motion without ratification because there are no active bargaining unit members at the Olathe site.

[11]    Until the effective date of a plan of reorganization, nothing in the IUOE, IBEW, and IAM Settlement Agreements will constitute an assumption of any agreement described in the IUOE, IBEW, and IAM Settlement Agreements, including, without limitation, any collective bargaining agreement between any of these aforesaid unions and Delphi (except as provided for in Section E.3 of the IUOE Local 101S Settlement Agreement and Section F.3 of the other IUOE, IBEW, and IAM Settlement Agreements) or any commercial agreement between GM and Delphi, nor will anything in the IUOE, IBEW, and IAM Settlement Agreements be deemed to create an administrative or priority claim with respect to GM or convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party.  The IUOE, IBEW, and IAM Settlement Agreements also provide that the respective parties agree (and the order approving this Motion must also provide) that the IUOE, IBEW, and IAM Settlement Agreements are without prejudice to any interested party (including the respective parties and the statutory committees) in all other aspects of Delphi's chapter 11 cases and the respective parties reserve all rights not expressly waived in the IUOE, IBEW, and IAM Settlement Agreements.

[12]    The IUOE Local 101S Settlement Agreement does not contain this workforce transition program because there are no remaining active or laid off employees at the Olathe facility.  GM will receive certain claims in connection with certain of these commitments as specified in Attachment C to the other IUOE, IBEW, and IAM Settlement Agreements.

[13]    The IUOE Local 101S Settlement Agreement terminates and supersedes the 2003 IUOE Local 101S – Delphi Agreements and all related agreements and understandings.

7

benefits, and the right to pursue pending ordinary course grievance except for employees who have signed individual releases of claims).

(B) Effective upon the execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial, and other matters between Delphi and GM and substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by this Court which incorporates, approves, and is consistent with all of the terms of the IUOE, IBEW, and IAM Settlement Agreements and Delphi-GM settlement:

- Delphi's obligation to provide certain retiree welfare benefits is eliminated and GM is obligated to provide certain retiree welfare benefits for certain IUOE, IBEW, and IAM-represented retirees and eligible employees covered as provided in the Term Sheet – Delphi Cessation and GM Provision of OPEB;[14]

- Delphi's existing pension plan is frozen in certain respects effective upon emergence from chapter 11 for certain IUOE, IBEW, and IAM-represented employees as provided in Section C of the IUOE Local 101S Settlement Agreement and Section D.2 of the other IUOE, IBEW, and IAM Settlement Agreements;

- The Memoranda of Understanding (including certain collective bargaining agreements) are assumed pursuant to 11 U.S.C. § 365;

- Certain released parties are exculpated and released in connection with the Memoranda of Understanding and Delphi's chapter 11 cases; and

- Delphi and GM receive releases from the IUOE, IBEW, and IAM, all employees and former employees of Delphi represented or formerly represented by the IUOE, IBEW, and IAM, and all persons or entities with claims derived from or related to any relationship with such employees of Delphi arising directly or indirectly from or in any way related to any obligations under the collective bargaining agreements or the Memoranda of Understanding (except for claims for benefits provided for or explicitly not waived under the Memoranda of Understanding, including, but not limited to, workers' compensation benefits and unemployment compensation benefits against Delphi, its

---

[14] Delphi has agreed to reimburse GM for 50% of the actual liability assumed by GM for IUOE, IBEW, and IAM retirees and those IUOE, IBEW, and IAM employees that "check the box" and 100% of other IUOE, IBEW, and IAM employees.

subsidiaries, or affiliates that are otherwise assertable under applicable law).

9.    This Motion also requests that the Court approve modification of retiree welfare benefits for certain non-represented hourly active employees and retirees of the Debtors pursuant to 11 U.S.C. § 363.  There are six current active employees and 23 current Delphi retirees who are not represented by any of the Unions but who participate in the same health and welfare plans as the Union-represented retirees at the respective work sites.  On July 23, 2007, Delphi and GM agreed to the treatment of these non-represented hourly individuals, and on August 3, 2007, this agreement was formalized in the Term Sheet – Delphi Cessation and GM Provision of OPEB For Certain Non-Represented Delphi Employees and Retirees (the "Non-Represented Term Sheet").[15]

10.    Upon the effective date[16] of the Non-Represented Term Sheet, GM will provide post-retirement medical benefits to certain of the non-represented hourly active employees and retirees in accordance with all the ongoing terms, conditions, and eligibility requirements of the GM Health Care Program for Hourly Employees and GM will provide the applicable level of post retirement medical benefits consistent with the terms of the Modified Plan, as defined in the settlement agreement approved by the court in the case IUE, et al. v. General Motors Corporation (case number 2:06-cv-12151), on the same basis as such benefits are provided to GM-IUE-CWA hourly employees who retired from GM with eligibility to participate in the GM Health Care Program.  Further, GM will provide all employer-paid post-

---

[15]    A Copy of the Non-Represented Term Sheet is annexed as Exhibit 7 to the Proposed Order.  The summary of the Non-Represented Term Sheet set forth in this Motion is qualified entirely by and is subject to the actual terms and conditions of the Non-Represented Term Sheet.

[16]    The Non-Represented Term Sheet requires execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial, and other matters between Delphi and GM and substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by this Court which incorporates, approves, and is consistent with all of the terms of the Non-Represented Term Sheet and Delphi-GM settlement.

9

retirement Basic Life Insurance benefits to certain of the non-represented hourly active employees and retirees in accordance with all the ongoing terms, conditions, and eligibility requirements of the GM Life and Disability Benefits Program for Hourly Employees and at the level provided for non-represented hourly retirees on the date immediately preceding the GM's provision of such benefits, provided, however, that GM will not be required to provide life insurance benefits at a level and scope that exceeds that being provided for similarly situated IBEW or IAM-represented hourly retirees of GM.  Delphi has in turn agreed to reimburse GM for the actuarial present value of GM's actual liability with respect to the provision of OPEB to certain of Delphi's non-represented hourly active employees and retirees.  The six active non-represented hourly active employees, each working at the same IUE-CWA worksite, may be eligible for a future attrition program substantially similar to the special attrition program, known as the SAP-T, currently agreed to by the IUE-CWA (for submission through a separate motion to this Court for approval) patterned after the UAW SAP-T previously approved by this Court.

11.    The Debtors submit that approval of non-represented hourly retiree welfare benefit modification under 11 U.S.C. § 363 and approval of the IUOE, IBEW, and IAM Settlement Agreements, which resolve Delphi's 1113/1114 Motion as it pertains to the IUOE, IBEW, and IAM, are in the best interests of the Debtors and their stakeholders.  The Debtors believe that approval of the IUOE, IBEW, and IAM Settlement Agreements will facilitate the Debtors' continued progress toward transformation and emergence.

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

12.    On October 8 and 14, 2005 (collectively, the "Petition Date"), the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The

Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

13.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

14.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

15.    The statutory predicates for the relief requested herein are sections 363, 1113, and 1114 of the Bankruptcy Code and Rule 6004 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.    Business Operations Of The Debtors

16.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[17]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from this Court.[18]

---

[17]   The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[18]   On March 20 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency

17.     The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

18.     Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.     Events Leading To The Chapter 11 Filing

19.     In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[19]

---

proceeding.  The application was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

[19]   Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006, the Debtors incurred

a net loss of $5.5 billion, $3.0 billion of which comprised charges related to Special Attrition

Programs.

20.    The Debtors believe that the Company's financial performance has

deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which

have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production

environment for domestic automakers resulting in the reduced number of motor vehicles that

GM produces annually in the United States and related pricing pressures, and (iii) increasing

commodity prices.

21.    In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the

Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors'

transformation plan and preserve value for its stakeholders.

22.    On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations.  The Debtors stated that they needed to focus on five key areas:[20] first, modifying the

---

[20]    In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their
execution of an equity purchase and commitment agreement with certain investors, and a plan framework
support agreement with those investors and GM.   On July 9, 2007, Delphi confirmed that it had formally
terminated the equity purchase and commitment agreement and related plan framework support agreement but
that it expected to enter into new framework agreements with plan investors presently.  Subsequently, on July
18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment

Company's labor agreements to create a competitive arena in which to conduct business;[21]

second, concluding their negotiations with GM to finalize GM's financial support for the

Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[22]

third, streamlining their product portfolio to capitalize on their world-class technology and

market strengths and make the necessary manufacturing alignment with their new focus;[23]

fourth, transforming their salaried workforce to ensure that the Company's organizational and

---

agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as, Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "New Plan Investors").  Under the Delphi-Appaloosa EPCA,  the New Plan Investors would invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization.  This Court approved the Delphi-Appaloosa EPCA on August 2, 2007.

[21]    Among the progress made to date, on June 22, 2007, Delphi reached an agreement with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") and GM that (a) modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the UAW, and its various locals, (b) provides that Delphi and GM will undertake certain financial obligations to Delphi's UAW-represented employees and retirees to facilitate these modifications, and (c) modifies retiree welfare benefits for certain UAW-represented retirees of the Debtors.  This agreement, which was approved by this Court on July 19, 2007, should facilitate the Debtors' reaching consensual resolutions of their labor issues with the remaining unions and GM and permit the Debtors to continue to implement their transformation plan and to develop, prosecute, confirm, and consummate a plan of reorganization.  As of August 6, 2007, similar agreements have been reached with the International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America and its local unions, and Locals 832S, 18S, and 101S of the International Union of Operating Engineers.  Delphi is currently engaged in settlement discussions with its  remaining U.S. labor union and is working to conclude discussions with that union as soon as practicable.

[22]    On July 9, 2007, Delphi confirmed that its discussions with GM on a comprehensive settlement agreement had entered the documentation phase and that it expected that a settlement with GM would be incorporated into the Debtors' plan of reorganization rather than filed with this Court for separate approval.

[23]    In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants.  The Debtors have been working to divest non-core assets so as to maximize the value of the estate for stakeholders.  During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., its chapter 11 affiliate, obtained court approval for the sale of substantially all of the assets of their brake hose and Saltillo, Mexico brake plant businesses, and obtained court approval of bid procedures related to the upcoming sale of substantially all assets used in their catalyst business.  In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering, interior, and closures businesses.

cost structure is competitive and aligned with its product portfolio and manufacturing footprint;[24] and devising a workable solution to their current pension situation.[25]

D.       The Debtors' Prior Special Attrition Programs

23.       The Debtors and GM have previously entered into agreements with the UAW and the IUE-CWA that provided similar options to those presented in the IUOE, IBEW, and IAM Settlement Agreements.  On March 22, 2006, Delphi, GM and the UAW entered into a three-party agreement establishing a special attrition program, which was approved by order of this Court on May 8, 2006 (Docket No. 3648) and amended on May 12, 2006 (Docket No. 3754). On June 5, 2006, Delphi, GM, and the UAW agreed on a supplemental program and on June 16, 2006, Delphi, GM, and the IUE-CWA reached agreement on the terms of a special attrition program which mirrored in all material respects the prior UAW attrition programs.  The UAW supplemental attrition program and the IUE-CWA attrition program were approved by this Court on June 29, 2006, and on July 7, 2006, this Court entered the approval order (Docket No. 4461).

24.       These attrition programs provided nearly two-thirds of Delphi's existing UAW and IUE-CWA represented long-term hourly employees (as of September 26, 2006 and

---

[24]   As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.  The Debtors also made significant progress in ensuring that their organizational and cost structure is competitive in obtaining the entry of this Court's Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order").  The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[25]   To that end, on May 31, 2007, this Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 plan year funding waivers, which were approved by the IRS, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Plans").  On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 28, 2008, respectively.

August 18, 2006, respectively) with "soft landings" through a combination of incentivized

retirement programs and, as to UAW-represented employees, GM flowback rights.

E.    This Court Has Already Approved A Similar Settlement Of The 1113/1114 Motion As It
      Pertained To The UAW Through The UAW Settlement Agreement

      25.    On June 22, 2007, Delphi signed the UAW Settlement Agreement with the

UAW and GM covering site plans, workforce transition, and as other comprehensive

transformational issues, which was ratified by the UAW on June 28, 2007.  Similar to the IUOE,

IBEW, and IAM Settlement Agreements, the UAW Settlement Agreement is a comprehensive

agreement that modifies, extends, or terminates provisions of the existing collective bargaining

agreements among Delphi, the UAW, and its various UAW locals and provides that GM and

Delphi will undertake certain financial obligations to Delphi's UAW-represented employees and

retirees to facilitate these modifications.  On June 29, 2007, Delphi filed a motion with this Court

for an order approving the UAW Settlement Agreement, approving withdrawal without prejudice

of the 1113/1114 Motion as it solely pertains to the UAW and UAW-represented retirees,

approving the settlement of the 1113/1114 Motion as it solely pertains to the UAW and UAW-

represented retirees, and approving modification of retiree welfare benefits for certain UAW-

represented retirees of Delphi.  After a hearing on this motion on July 19, 2007, this Court issued

an order approving that motion (Docket No. 8693).

F.     Settlement Of The 1113/1114 Motion As It Pertains To The IUOE, IBEW, And IAM
       Through The IUOE, IBEW, And IAM Settlement Agreements Presented For This Court's
       Approval On The Instant Motion

            26.     On July 31 and August 1, 2007, the Debtors reached the IUOE, IBEW,

and IAM Settlement Agreements that include significant and necessary modifications to the

IUOE, IBEW, and IAM CBAs, subject to ratification.[26]

            27.     As set forth above, Attachment B to all IUOE memoranda of

understanding and Attachment C to the IUOE Local 832S Memorandum of Understanding and

IUOE Local 18S Memorandum of Understanding are clarified to provide that the International

Union of Operating Engineers (the "International") is not a party, to these agreements and

instead, only its Locals 832S, 18S, and 101S are respective parties to these agreements.  In this

vein, Debtors' counsel received a letter dated August 6, 2007 from Barbara Mehlsack of Gorlick,

Kravitz & Listhaus, P.C., counsel to the International, stating that such counsel was authorized to

advise Delphi, on behalf of International, that International (i) is not, and never has been, a party

to the IUOE CBAs, (ii) is not, and never has been, a representative under 11 U.S.C. §§ 1113 and

1114 of any IUOE bargaining-unit employees, (iii) is not a party to any of the IUOE memoranda

of understanding, including their respective Attachment Bs and/or Attachment Cs, (iv) has no

position on any of the IUOE memoranda of understanding, and (v) does not have any claims

against the Debtors or GM in connection with the IUOE bargaining units, their members, or

_____

[26]   The Debtors do not believe that the IUOE, IBEW, and IAM Settlement Agreements or the Non-Represented
       Term Sheet will have any material adverse effect on the Debtors' five year business plan through December,
       2011 or the Debtors' ability to comply with Section 1.1 of Exhibit B to the Delphi-Appaloosa EPCA which
       requires that the aggregate amount of all trade claims and other unsecured claims (including any accrued
       interest but excluding certain categories of other unsecured claims) that have been asserted or scheduled but not
       yet disallowed as of the effective date of the reorganization plan shall be allowed or estimated for distribution
       purposes by this Court to be no more than $1.7 billion, excluding all allowed accrued postpetition interest
       thereon.

retirees.  Notwithstanding any language to the contrary in the 1113/1114 Motion, the Debtors

confirm that International is not a named party to the 1113/1114 Motion.

        28.     The IUOE Local 832S Settlement Agreement, among other subject

matters, provides that:

     (A)     Effective upon the later of entry of this Court's approval order in respect of
the Motion or the first Monday following receipt of written notice of
ratification from the International Union of Operating Engineers and its
Local 832S ("IUOE Local 832S"):

- The 2003 IUOE Local 832S – Delphi Powertrain – Rochester
Agreements and all related agreements and understandings are
extended until September 14, 2011, subject to their termination
provisions;

- A workforce transition program is implemented for eligible IUOE
Local 832S-represented employees that provides eligible
employees with transformation plan options, including (i) attrition
options similar to the previously-approved UAW and IUE-CWA
attrition program for eligible IUOE Local 832S employees who are
participants in the Delphi Hourly-Rate Employees Pension Plan, (ii)
provision of a lump sum "buy-down" payment totaling $10,000 for
eligible employees, and (iii) severance payments up to $40,000 to
eligible employees who are permanently laid off prior to
September 14, 2011;

- Certain terms of certain IUOE CBAs are modified with respect to
wages, personal savings plans, Independence Week Pay, holidays,
vacation accrual, GIS, job security and/or guaranteed employment
levels, subsidized discount programs, tuition assistance, attendance,
representation, and dispute resolution; and

- All employee, retiree, and union asserted and unasserted claims are
settled (except for waiver of rights to vested pension benefits,
workers compensation benefits, unemployment compensation
benefits, and the right to pursue pending ordinary course grievance
except for employees who have signed individual releases of
claims).

     (B)     Effective upon the execution by Delphi and GM of a comprehensive
settlement agreement resolving certain financial, commercial, and other
matters between Delphi and GM and substantial consummation of a plan
of reorganization proposed by Delphi in its chapter 11 cases and
confirmed by this Court which incorporates, approves, and is consistent

with all of the terms of the IUOE Local 832S Settlement Agreement and Delphi-GM settlement:

- Delphi's obligation to provide certain retiree welfare benefits is eliminated and GM is obligated to provide certain retiree welfare benefits for certain IUOE Local 832S-represented retirees and eligible employees covered as provided in the Term Sheet – Delphi Cessation and GM Provision of OPEB;

- Delphi's existing pension plan is frozen in certain respects effective upon emergence from chapter 11 for certain covered IUOE Local 832S-represented employees as provided in Section D.2 of the IUOE Local 832S Settlement Agreement;

- The Memorandum of Understanding (including certain IUOE CBAs) is assumed pursuant to 11 U.S.C. § 365;

- The IUOE Local 832S released parties are exculpated and released in connection with the IUOE Local 832S Memorandum of Understanding and Delphi's chapter 11 cases; and

- Delphi and GM receive releases from the IUOE Local 832S, all employees and former employees of Delphi represented or formerly represented by the IUOE Local 832S, and all persons or entities with claims derived from or related to any relationship with such employees of Delphi arising directly or indirectly from or in any way related to any obligations under the collective bargaining agreements or the IUOE Local 832S Memorandum of Understanding (except for claims for benefits provided for or explicitly not waived under the IUOE Local 832S Memorandum of Understanding, including, but not limited to, workers' compensation benefits and unemployment compensation benefits against Delphi, its subsidiaries, or affiliates that are otherwise assertable under applicable law).

29.     The IUOE Local 18S Settlement Agreement, among other subject matters,

provides that:

(A)     Effective upon the later of entry of this Court's approval order in respect of the Motion or the first Monday following receipt of written notice of ratification from the International Union of Operating Engineers and its Local 18S ("IUOE Local 18S"):

- The IUOE Local 18S, Delphi, and GM acknowledge that the Delphi Thermal & Interior – Columbus operation is scheduled to be closed;

- The term of the 2003 IUOE Local 18S – Delphi Agreements and all related agreements and understandings are extended until September 14, 2011, subject to their termination provisions;

- A workforce transition program is implemented for eligible IUOE Local 18S-represented employees that provides eligible employees with transformation plan options, including (i) attrition options similar to the previously-approved UAW and IUE-CWA attrition program for eligible IUOE Local 18S employees who are participants in the Delphi Hourly-Rate Employees Pension Plan, (ii) provision of a lump sum "buy-down" payment totaling $10,000 for eligible employees, and (iii) severance payments up to $40,000 to eligible employees who are permanently laid off prior to September 14, 2011;

- Certain terms of certain IUOE CBAs are modified with respect to wages, personal savings plans, Independence Week Pay, holidays, vacation accrual, GIS, job security and/or guaranteed employment levels, Plant Closing and Sale Moratorium, subsidized discount programs, tuition assistance, and representation;

- On a case-by-case basis, Delphi employees transferring from a Delphi plant to another Delphi plant may be eligible for a Relocation Allowance based on actual expenses incurred, up to a maximum of $10,000; and

- All employee, retiree, and union asserted and unasserted claims are settled (except for waiver of rights to vested pension benefits, workers compensation benefits, unemployment compensation benefits, and the right to pursue pending ordinary course grievance except for employees who have signed individual releases of claims).

(B)     Effective upon the execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial, and other matters between Delphi and GM and substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by this Court which incorporates, approves, and is consistent with all of the terms of the IUOE Local 18S Settlement Agreement and Delphi-GM settlement:

- Delphi's obligation to provide certain retiree welfare benefits is eliminated and GM is obligated to provide certain retiree welfare benefits for certain IUOE Local 18S-represented retirees and eligible employees covered as provided in the Term Sheet – Delphi Cessation and GM Provision of OPEB;

- Delphi's existing pension plan is frozen in certain respects effective upon emergence from chapter 11 for certain covered IUOE Local 18S-represented employees as provided in Section D.2 of the IUOE Local 18S Settlement Agreement;

- The Memorandum of Understanding (including certain IUOE CBAs) is assumed pursuant to 11 U.S.C. § 365;

- The IUOE Local 18S released parties are exculpated and released in connection with the IUOE Local 18S Memorandum of Understanding and Delphi's chapter 11 cases; and

- Delphi and GM receive releases from the IUOE Local 18S, all employees and former employees of Delphi represented or formerly represented by the IUOE Local 18S, and all persons or entities with claims derived from or related to any relationship with such employees of Delphi arising directly or indirectly from or in any way related to any obligations under the collective bargaining agreements or the IUOE Local 18S Memorandum of Understanding (except for claims for benefits provided for or explicitly not waived under the IUOE Local 18S Memorandum of Understanding, including, but not limited to, workers' compensation benefits and unemployment compensation benefits against Delphi, its subsidiaries, or affiliates that are otherwise assertable under applicable law).

30.    The IUOE Local 101S Settlement Agreement, among other subject matters, provides that:

(A)    Effective upon the entry of this Court's approval order in respect of the Motion:

- The International Union of Operating Engineers Local 101S ("IUOE Local 101S"), Delphi, and GM acknowledge that the Delphi Automotive Holdings Group – Olathe operations are closed, and that Delphi no longer employs any Olathe bargaining unit employees;

- The IUOE Local 101S Settlement Agreement terminates and supersedes the 2003 IUOE Local 101S – Delphi Agreements and all related agreements and understandings; and

- All employee, retiree, and union asserted and unasserted claims are settled (except for waiver of rights to vested pension benefits, workers compensation benefits, unemployment compensation benefits, and the right to pursue pending ordinary course grievance

21

except for employees who have signed individual releases of claims).

(B)     Effective upon the execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial, and other matters between Delphi and GM and substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by this Court which incorporates, approves, and is consistent with all of the terms of the IUOE Local 101S Settlement Agreement and Delphi-GM settlement:

- Delphi's obligation to provide certain retiree welfare benefits is eliminated and GM is obligated to provide certain retiree welfare benefits for certain IUOE Local 101S-represented retirees and eligible employees covered as provided in the Term Sheet – Delphi Cessation and GM Provision of OPEB;

- Delphi's existing pension plan is frozen in certain respects effective upon emergence from chapter 11 for certain covered IUOE Local 101S-represented employees as provided in Section C of the IUOE Local 101S Settlement Agreement;

- The Memorandum of Understanding (including certain IUOE agreements) is assumed pursuant to 11 U.S.C. § 365;

- The IUOE Local 101S  released parties are exculpated and released in connection with the IUOE Local 101S Memorandum of Understanding and Delphi's chapter 11 cases; and

- Delphi and GM receive releases from the IUOE Local 101S , all employees and former employees of Delphi represented or formerly represented by the IUOE Local 101S, and all persons or entities with claims derived from or related to any relationship with such employees of Delphi arising directly or indirectly from or in any way related to any obligations under the collective bargaining agreements or the IUOE Local 101S Memorandum of Understanding (except for claims for benefits provided for or explicitly not waived under the IUOE Local 101S Memorandum of Understanding, including, but not limited to, workers' compensation benefits and unemployment compensation benefits against Delphi, its subsidiaries, or affiliates that are otherwise assertable under applicable law).

31.     The IBEW E&S Settlement Agreement, among other subject matters,

provides that:

(A)     Effective upon the later of entry of this Court's approval order in respect of
the Motion or the first Monday following receipt of written notice of
ratification from the IBEW:

- The IBEW, Delphi, and GM acknowledge that the Delphi
Electronics & Safety – Milwaukee operation is scheduled to be
closed;

- The term of the 2003 IBEW – Delphi E&S Agreements and all
related agreements and understandings are extended until
September 14, 2011, subject to their termination provisions;

- A workforce transition program is implemented for eligible IBEW-
represented employees that provides eligible employees with
transformation plan options, including (i) attrition options similar
to the previously-approved UAW and IUE-CWA attrition program
for eligible IBEW employees who are participants in the Delphi
Hourly-Rate Employees Pension Plan, (ii) provision of a lump sum
"buy-down" payment totaling $10,000 for eligible employees, and
(iii) severance payments up to $40,000 to eligible employees who
are permanently laid off prior to September 14, 2011;

- Certain terms of the IBEW CBAs are modified with respect to
wages, personal savings plans, Independence Week Pay, holidays,
vacation accrual, Plant Closing and Sale Moratorium, GIS, job
security and/or guaranteed employment levels, tuition assistance,
subsidized discount programs, strikes, and stoppages; and

- All employee, retiree, and union asserted and unasserted claims are
settled (except for waiver of rights to vested pension benefits,
workers compensation benefits, unemployment compensation
benefits, and the right to pursue pending ordinary course grievance
except for employees who have signed individual releases of
claims).

(B)     Effective upon the execution by Delphi and GM of a comprehensive
settlement agreement resolving certain financial, commercial, and other
matters between Delphi and GM and substantial consummation of a plan
of reorganization proposed by Delphi in its chapter 11 cases and
confirmed by this Court which incorporates, approves, and is consistent
with all of the terms of the IBEW E&S Settlement Agreement and Delphi-
GM settlement:

- Delphi's obligation to provide certain retiree welfare benefits is
eliminated and GM is obligated to provide certain retiree welfare
benefits for certain IBEW-represented retirees and eligible
employees covered as provided in the Term Sheet – Delphi
Cessation and GM Provision of OPEB;

23

- Delphi's existing pension plan is frozen in certain respects effective upon emergence from chapter 11 for certain covered IBEW-represented employees as provided in Section D.2 of the IBEW E&S Settlement Agreement;

- The Memorandum of Understanding (including certain IBEW CBAs) is assumed pursuant to 11 U.S.C. § 365;

- The IBEW released parties are exculpated and released in connection with the IBEW E&S Memorandum of Understanding and Delphi's chapter 11 cases; and

- Delphi and GM receive releases from the IBEW, all employees and former employees of Delphi represented or formerly represented by the IBEW, and all persons or entities with claims derived from or related to any relationship with such employees of Delphi arising directly or indirectly from or in any way related to any obligations under the collective bargaining agreements or the IBEW E&S Memorandum of Understanding (except for claims for benefits provided for or explicitly not waived under the IBEW E&S Memorandum of Understanding, including, but not limited to, workers' compensation benefits and unemployment compensation benefits against Delphi, its subsidiaries, or affiliates that are otherwise assertable under applicable law).

32.    The IBEW Powertrain Settlement Agreement, among other subject matters, provides that:

(A)    Effective upon the later of entry of this Court's approval order in respect of the Motion or the first Monday following receipt of written notice of ratification from the IBEW:

- The IBEW, Delphi, and GM acknowledge that the Delphi Powertrain – Milwaukee operation is scheduled to be closed;

- The term of the 2003 IBEW – Delphi Powertrain (formerly Delphi E&C) – Milwaukee Operations Agreements and all related agreements and understandings are extended until September 14, 2011, subject to their termination provisions;

- A workforce transition program is implemented for eligible IBEW-represented employees that provides eligible employees with transformation plan options, including (i) attrition options similar to the previously-approved UAW and IUE-CWA attrition program for eligible IBEW employees who are participants in the Delphi Hourly-Rate Employees Pension Plan, (ii) provision of a lump sum "buy-down" payment totaling $10,000 for eligible employees, and

24

(iii) severance payments up to $40,000 to eligible employees who are permanently laid off prior to September 14, 2011;

- Certain terms of the IBEW CBAs are modified with respect to wages, personal savings plans, Independence Week Pay, holidays, vacation accrual, Plant Closing Restrictions, GIS, job security and/or guaranteed employment levels, tuition assistance, subsidized discount programs, strikes, and stoppages; and

- All employee, retiree, and union asserted and unasserted claims are settled (except for waiver of rights to vested pension benefits, workers compensation benefits, unemployment compensation benefits, and the right to pursue pending ordinary course grievance except for employees who have signed individual releases of claims).

(B)   Effective upon the execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial, and other matters between Delphi and GM and substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by this Court which incorporates, approves, and is consistent with all of the terms of the IBEW Powertrain Settlement Agreement and Delphi-GM settlement:

- Delphi's obligation to provide certain retiree welfare benefits is eliminated and GM is obligated to provide certain retiree welfare benefits for certain IBEW-represented retirees and eligible employees covered as provided in the Term Sheet – Delphi Cessation and GM Provision of OPEB;

- Delphi's existing pension plan is frozen in certain respects effective upon emergence from chapter 11 for certain covered IBEW-represented employees as provided in Section D.2 of the IBEW Powertrain Settlement Agreement;

- The Memorandum of Understanding (including certain IBEW CBAs) is assumed pursuant to 11 U.S.C. § 365;

- The IBEW released parties are exculpated and released in connection with the IBEW Powertrain Memorandum of Understanding and Delphi's chapter 11 cases; and

- Delphi and GM receive releases from the IBEW, all employees and former employees of Delphi represented or formerly represented by the IBEW, and all persons or entities with claims derived from or related to any relationship with such employees of Delphi arising directly or indirectly from or in any way related to any obligations under the collective bargaining agreements or the

25

IBEW Powertrain Memorandum of Understanding (except for claims for benefits provided for or explicitly not waived under the IBEW Powertrain Memorandum of Understanding, including, but not limited to, workers' compensation benefits and unemployment compensation benefits against Delphi, its subsidiaries, or affiliates that are otherwise assertable under applicable law).

33.    The IAM Settlement Agreement, among other subject matters, provides that:

(A)    Effective upon the later of entry of this Court's approval order in respect of the Motion or the first Monday following receipt of written notice of ratification from the IAM:

- The IAM, Delphi, and GM acknowledge that the Delphi Electronics & Safety – Milwaukee operation is scheduled to be closed;

- The term of the 2003 IAM – Delphi Electronics & Safety – Milwaukee Operations Agreements and all related agreements and understandings are extended until September 14, 2011, subject to their termination provisions;

- A workforce transition program is implemented for eligible IAM-represented employees that provides eligible employees with transformation plan options, including (i) attrition options similar to the previously-approved UAW and IUE-CWA attrition program for eligible IAM employees who are participants in the Delphi Hourly-Rate Employees Pension Plan, (ii) provision of a lump sum "buy-down" payment totaling $10,000 for eligible employees, and (iii) severance payments up to $40,000 to eligible employees who are permanently laid off prior to September 14, 2011;

- Certain terms of the IAM CBAs are modified with respect to wages, personal savings plans, Independence Week Pay, holidays, vacation accrual, Plant Closing and Sale Moratorium, GIS, job security and/or guaranteed employment levels, tuition assistance, subsidized discount programs, strikes, and stoppages; and

- All employee, retiree, and union asserted and unasserted claims are settled (except for waiver of rights to vested pension benefits, workers compensation benefits, unemployment compensation benefits, and the right to pursue pending ordinary course grievance except for employees who have signed individual releases of claims).

26

(B)    Effective upon the execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial, and other matters between Delphi and GM and substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by this Court which incorporates, approves, and is consistent with all of the terms of the IAM Settlement Agreement and Delphi-GM settlement:

- Delphi's obligation to provide certain retiree welfare benefits is eliminated and GM is obligated to provide certain retiree welfare benefits for certain IAM-represented retirees and eligible employees covered as provided in the Term Sheet – Delphi Cessation and GM Provision of OPEB;

- Delphi's existing pension plan is frozen in certain respects effective upon emergence from chapter 11 for certain covered IAM-represented employees as provided in Section D.2 of the IAM Settlement Agreement;

- The Memorandum of Understanding (including certain IAM CBAs) is assumed pursuant to 11 U.S.C. § 365;

- The IAM released parties are exculpated and released in connection with the IAM Memorandum of Understanding and Delphi's chapter 11 cases; and

- Delphi and GM receive releases from the IAM, all employees and former employees of Delphi represented or formerly represented by the IAM, and all persons or entities with claims derived from or related to any relationship with such employees of Delphi arising directly or indirectly from or in any way related to any obligations under the collective bargaining agreements or the IAM Memorandum of Understanding (except for claims for benefits provided for or explicitly not waived under the IAM Memorandum of Understanding, including, but not limited to, workers' compensation benefits and unemployment compensation benefits against Delphi, its subsidiaries, or affiliates that are otherwise assertable under applicable law).

34.    As set forth above, Delphi, GM, and the IUOE, IBEW, and IAM will

implement certain terms of the IUOE, IBEW, and IAM Settlement Agreements as of the

Effective Date (defined in the IUOE, IBEW, and IAM Settlement Agreements as the later of

entry of an order by the Court approving the IUOE, IBEW, and IAM Settlement Agreements that

is satisfactory to the parties (the "Approval Order") or the first Monday following receipt by

Delphi of written notice of ratification from the IUOE, IBEW, and IAM.[27]

35.    The IUOE, IBEW, and IAM Settlement Agreements settle the 1113/1114

Motion as it pertains to the IUOE, IBEW, and IAM, enabling the Debtors to seek authority by

this Motion to withdraw, without prejudice, the 1113/1114 Motion with respect to the IUOE,

IBEW, and IAM.

G.    Agreement With GM Regarding Non-Represented Hourly Active Employees And
Retirees Participating In Delphi's Health And Welfare Plans Presented For This Court's
Approval On The Instant Motion

36.    There are six current active employees and 23 current Delphi retirees who

are not represented by any of the Unions.  Historically, these non-represented hourly individuals

received substantially the same terms and conditions of employment, including retiree benefits,

as those Union-represented employees and retirees working at the same site.  These individuals

participate in the same health and welfare plans as Union-represented retirees at the respective

work sites.

37.    This Motion also requests that the Court approve modification of retiree

welfare benefits for certain non-represented hourly active employees and retirees of the Debtors

pursuant to 11 U.S.C. § 363.  On July 23, 2007, Delphi and GM agreed to the treatment of these

non-represented hourly individuals, and on August 3, 2007, this agreement was formalized in

Non-Represented Term Sheet.  Upon the effective date of the Non-Represented Term Sheet, GM

will provide post-retirement medical benefits to certain of the non-represented hourly active

employees and retirees in accordance with all the ongoing terms, conditions and eligibility

requirements of the GM Health Care Program for Hourly Employees and GM will provide the

---

[27]    As noted above, the effective date of certain provisions of the IUOE, IBEW, and IAM Settlement Agreements
is conditioned upon confirmation of the Debtors' reorganization plan and resolution of certain financial,
commercial, and other issues between Delphi and GM.

applicable level of post retirement medical benefits consistent with the terms of the Modified

Plan, as defined in the settlement agreement approved by the court in the case IUE, et al. v.

General Motors Corporation (case number 2:06-cv-12151), on the same basis as such benefits

are provided to GM-IUE-CWA hourly employees who retired from GM with eligibility to

participate in the GM Health Care Program.  Further, at that time GM will provide all employer-

paid post-retirement Basic Life Insurance benefits to certain of the non-represented hourly active

employees and retirees in accordance with all the ongoing terms, conditions, and eligibility

requirements of the GM Life and Disability Benefits Program for Hourly Employees and at the

level provided for non-represented hourly retirees on the date immediately preceding the GM's

provision of such benefits, provided, however, GM will not be required to provide life insurance

benefits at a level and scope that exceeds that being provided for similarly situated IBEW or

IAM-represented hourly retirees of GM.  Delphi has in turn agreed to reimburse GM for the

actuarial present value of GM's actual liability with respect to the provision of OPEB to certain

of the non-represented hourly active employees and retirees.

38.    In addition, although it is under no obligation to provide such benefits,

Delphi may provide a future attrition program for its six non-represented hourly active

employees at the same IUE-CWA Packard Warren site offering substantially similar benefits to

those currently proposed to the IUE-CWA, patterned after the UAW SAP-T previously approved

by this Court.

<u>Relief Requested</u>

39.    By this Motion, the Debtors seek entry of an order under 11 U.S.C. §§

363, 1113, and 1114 of the Bankruptcy Code and Fed. R. Bankr. P. 6004 and 9019 approving (i)

the IUOE, IBEW, and IAM Settlement Agreements, (ii) withdrawal without prejudice of the

1113/1114 Motion solely as it pertains to the IUOE, IBEW, and IAM and approving the parties'

settlement of the 1113/1114 Motion solely as it pertains to the IUOE, IBEW, and IAM, (iii)

modification of retiree welfare benefits for certain IUOE, IBEW, and IAM-represented retirees

of the Debtors pursuant to the IUOE, IBEW, and IAM Settlement Agreements, and (iv) pursuant

to 11 U.S.C. § 363, modification of retiree welfare benefits for certain non-represented hourly

active employees and retirees of the Non-Represented Term Sheet.

Basis For Relief

40.    The IUOE, IBEW, and IAM Settlement Agreements require a court order

approving the IUOE, IBEW, and IAM Settlement Agreements, which encompasses a settlement

of the 1113/1114 Motion as it pertains to the IUOE, IBEW, and IAM.  See IUOE Local 101S

Settlement Agreement, Section E and other IUOE, IBEW, and IAM Settlement Agreements,

Section F.  Thus, as noted above and consistent with the terms and spirit of the IUOE, IBEW,

and IAM Settlement Agreements, this Motion is brought under sections 363, 1113, and 1114 of

the Bankruptcy Code and Bankruptcy Rules 6004 and 9019.[28]  Consistent with the spirit of these

Settlement Agreements, this Motion also seeks approval for modification of retiree welfare

benefits for certain non-represented hourly active employees and retirees of the Debtors.[29]

---

[28]    The Debtors do not concede through this Motion that the modifications to the IUOE, IBEW, and IAM CBAs
contained in the IUOE, IBEW, and IAM Settlement Agreements require court approval either because such
modifications are outside the ordinary course of business under section 363 or pursuant to sections 1113 or
1114 of the Bankruptcy Code.  Out of an abundance of caution in connection with GM's unique role here and
consistent with the terms of the IUOE, IBEW, and IAM Settlement Agreements, however, the Debtors are
seeking this Court's approval of the IUOE, IBEW, and IAM Settlement Agreements.  See In re The Leslie Fay
Cos., 168 B.R. 294, 303 (Bankr. S.D.N.Y. 1994) (debtors can enter into agreement modifying existing
collective bargaining agreements postpetition without notice or hearing).

[29]    The Debtors do not concede through this Motion that the modifications of certain non-represented hourly active
employees' and retirees' welfare benefits require court approval either because such modifications are outside
the ordinary course of business under section 363 or pursuant to section 1114 of the Bankruptcy Code.  Out of
an abundance of caution in connection with GM's unique role here, however, the Debtors are seeking this
Court's approval of such modifications under 11 U.S.C. § 363.

30

H.    Approval Of The IUOE, IBEW, and IAM Settlement Agreements And Modification Of
Retiree Welfare Benefits For Certain Non-Represented Hourly Active Employees And
Retirees Is Warranted Under Bankruptcy Code Section 363

41.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1).  Whether modifications to a collective bargaining agreement are ordinary-

course transactions under section 363 of the Bankruptcy Code or whether such modifications are

outside the ordinary course requiring approval under the Bankruptcy Code has generally been

determined on a case-by-case basis.  See In re N. Am. Royalties, Inc., 267 B.R. 587, 593 (Bankr.

E.D. Tenn. 2002) (collecting and comparing relevant authority).

42.    Use of estate property outside the ordinary course of business may be

authorized if the debtor demonstrates a sound business justification for it.  See Comm. Of Equity

Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (business

judgment rule requires finding that good business reason exists to grant debtor's application

under section 363(b)); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 178-179 (D.

Del. 1991).

43.    The Second Circuit has held that, although the bankruptcy court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming an "arbiter of disputes between

creditors and the estate."  Orion Pictures Corp. v. Showtime Network, Inc. (In re Orion Pictures

Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's consideration of a debtor's section

363(b) motion is a "summary proceeding," intended merely as a means "to efficiently review the

. . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate.  It

is not the time or place for prolonged discovery or a lengthy trial with disputed issues."  Id. at

1098-99.

31

44.     Once the debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." <u>Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc.</u> (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." <u>Id.</u>  To satisfy its burden, it is not enough for an objector simply to raise and argue an objection.  Rather, an objector "is required to produce some evidence respecting its objections." <u>Lionel Corp.</u>, 722 F.2d at 1071.

45.     As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" <u>In re Aerovox, Inc.</u>, 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting <u>In re Interco, Inc.</u>, 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

46.     The Debtors have demonstrably sound business reasons for entering into the IUOE, IBEW, and IAM Settlement Agreements at this time.  The IUOE, IBEW, and IAM Settlement Agreements, which are the result of careful deliberations and extensive negotiations, include modifications to the IUOE, IBEW, and IAM CBAs that equitably address many of the Debtors' substantial financial, transformational, and labor relations roadblocks in a manner that will best serve the economic interests of the Debtors' estates and their stakeholders.

47.     First, once implemented, the modifications to the IUOE, IBEW, and IAM CBAs contemplated by the IUOE, IBEW, and IAM Settlement Agreements will generate a level of labor cost savings that will improve the Debtors' ability to emerge from chapter 11 successfully.

32

48.    Second, the IUOE, IBEW, and IAM Settlement Agreements provide the

Debtors with the flexibility necessary to transform their operations to compete as a supplier to

nearly every major global automotive original equipment manufacturer while furthering the

legitimate interests of Delphi's employees, retirees, and other stakeholders.  As evidenced by the

summaries provided above, the IUOE, IBEW, and IAM Settlement Agreements achieve

significant cost savings through wage reductions, work rule and operational changes, and buy-

outs and buy-downs that will enable Delphi to better meet its competitive challenges.

Accordingly, there is a sound business purpose for consummating the transactions contemplated

in the IUOE, IBEW, and IAM Settlement Agreements promptly.

49.    In the exercise of their business judgment, the Debtors believe that the

terms of the IUOE, IBEW, and IAM Settlement Agreements are reasonable based upon the

significant benefits that they will receive, as summarized above, as well as the potential harm to

the estates if the relief requested herein is not granted.[30]

50.    Similarly, the Debtors have demonstrably sound business reasons for

modifying the retiree welfare benefits of their non-represented hourly active employees and

retirees.  The modifications offered to such individuals are akin to those being offered to Delphi-

represented employees with respect to OPEB and an attrition option.   The terms of those

agreements are the product of extensive negotiations with Delphi's Unions and are consistent

with the pattern treatment that Delphi has historically afforded these non-represented hourly

---

[30]    For certain of the agreements in the IUOE, IBEW, and IAM Settlement Agreements to be implemented, the
Debtors' plan of reorganization must contain provisions consistent with the IUOE, IBEW, and IAM Settlement
Agreements and the confirmation order for such plan must provide for the assumption of the IUOE, IBEW, and
IAM Settlement Agreements and the agreements referenced in Attachment A thereto under section 365 of the
Bankruptcy Code.  Indeed, by their terms, the IUOE, IBEW, and IAM Settlement Agreements themselves do
not constitute an assumption of the IUOE, IBEW, and IAM CBAs.  See IUOE Local 101S Settlement
Agreement, Section E and the other IUOE, IBEW, and IAM Settlement Agreements, Section F.  It is relevant to
note that this undertaking by the Debtors constitutes a condition to the effectiveness of certain provisions rather
than a covenant by the Debtors that might impermissibly restrict the plan of reorganization that could be
prosecuted by them.

active employees and retirees. Cessation of Delphi's OPEB obligations for its represented

employees while maintaining those same benefit plans for the sole purpose of providing them to

a small group of non-represented hourly active employees and retirees is clearly not in the best

interests of the Debtors and their estates. Thus, the Debtors have determined in their business

judgment that the proposed modifications to retiree welfare benefits, and a potential

accompanying attrition program offered to the six current active non-represented hourly

employees, are in the best interest of the Debtors and their estates.

I.      Approval Of The IUOE, IBEW, and IAM Settlement Agreements Is Warranted Under
        Bankruptcy Rule 9019

        51.     Bankruptcy Rule 9019 provides, in relevant part, that "[o]n motion by the

trustee and after notice and a hearing, the court may approve a compromise or settlement."

Bankruptcy Rule 9019(a). Settlements and compromises are "a normal part of the process of

reorganization." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.

Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. L.A. Lumber Prods. Co., 308 U.S. 106,

130 (1939)); In re Adelphia Communications Corp., 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005)

(decision to accept or reject settlement lies within sound discretion of bankruptcy court), adhered

to on reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005).

        52.     In addition, Rule 9019 applies to settlements such as the IUOE, IBEW,

and IAM Settlement Agreements that modify (i) the terms of a collective bargaining agreement

pursuant to 11 U.S.C. § 1113 and (ii) retiree benefits pursuant to 11 U.S.C. § 1114. See Nellis v.

Shugrue, 165 B.R. 115, 116-17, 121 (S.D.N.Y. 1994) (applying Bankruptcy Rule 9019 to

approval of settlement under 11 U.S.C. § 1113); In re Tower Automotive, 241 F.R.D. 162, 170

(S.D.N.Y. 2006) (applying Bankruptcy Rule 9019 to approval of settlements and compromises

34

under 11 U.S.C. § 1114); <u>see also</u> <u>In re GF Corp.</u>, 120 B.R. 421, 425 (Bankr. D. Ohio 1990) (applying Bankruptcy Rule 9019 to settlement pursuant to 11 U.S.C. §§ 1113, 1114).[31]

53.    Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate when the compromise is fair and equitable and is in the best interests of the debtor's estate.  <u>See, e.g.</u>, <u>TMT Trailer Ferry</u>, 390 U.S. at 424; <u>Adelphia</u>, 327 B.R. at 159 ("The settlement need not be the best that the debtor could have obtained.  Rather, the settlement must fall 'within the reasonable range of litigation possibilities.'") (citations and internal quotations omitted); <u>Nellis</u>, 165 B.R. at 121 ("The obligation of the bankruptcy court is to determine whether a settlement is in the best interest of an estate before approving it.")  In general, compromises in the bankruptcy context should be approved unless they "'fall below the lowest point in the range of reasonableness.'"  <u>Cosoff v. Rodman</u> (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (citation omitted).

54.    The Supreme Court in <u>TMT Trailer Ferry</u> set forth the following factors that courts should consider in determining whether a proposed settlement or compromise is in the best interests of a debtor's estate:  (a) the probability of the debtor's success in the litigation, (b) the difficulties associated with collection, (c) the complexity of the litigation and the attendant expense, inconvenience, and delay, and (d) the paramount interests of the estate's creditors. <u>TMT Trailer Ferry</u>, 390 U.S. at 424-25; <u>see also</u> <u>Nellis</u>, 165 B.R. at 122.

55.    Courts in this district have further elaborated on the following relevant factors: (a) the balance between the likelihood of plaintiffs' or defendants' success should the

---

[31]    No retiree committee was formed under section 1114 of the Bankruptcy Code in these cases because under the Order (I) Appointing Unions As Authorized Representatives For Union Represented Retirees Under 11 U.S.C. §§ 1114(c) And 1114(d) Or, In The Alternative, (II) Establishing Procedures For Solicitation, Nomination, And Appointment Of Committee Of Retired Employees granted by this Court on October 13, 2005 (Docket No. 231), the IUOE, IBEW, and IAM (and the other Unions) elected to serve and have been acting as the authorized representative for purposes of section 1114 of the Bankruptcy Code throughout these chapter 11 cases of the Delphi retirees who were previously represented by the Unions as active employees.