UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                    :
     In re                          :        Chapter 11
                                    :
DELPHI CORPORATION, et al.,         :        Case No. 05-44481 (RDD)
                                    :
             Debtors.        :        (Jointly Administered)
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


ORDER UNDER 11 U.S.C. §§ 363, 1113, AND 1114 AND FED. R. BANKR. P.
6004 AND 9019 APPROVING MEMORANDUM OF UNDERSTANDING AMONG
IUE-CWA, DELPHI, AND GENERAL MOTORS CORPORATION INCLUDING
MODIFICATION OF IUE-CWA COLLECTIVE BARGAINING AGREEMENTS AND
RETIREE WELFARE BENEFITS FOR CERTAIN IUE-CWA-REPRESENTED RETIREES

("IUE-CWA 1113/1114 SETTLEMENT APPROVAL ORDER")

          Upon the expedited motion ("IUE-CWA 1113/1114 Settlement Approval Motion"

or the "Motion"), dated August 6, 2007, of Delphi Corporation ("Delphi") and certain of its

subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), for an order under 11 U.S.C. §§ 363, 1113, and 1114 of the

Bankruptcy Code and Fed. R. Bankr. P. 6004 and 9019 approving (i) a memorandum of

understanding regarding Delphi's restructuring entered into among the International Union of

Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of

America ("IUE-CWA"), Delphi, and General Motors Corporation ("GM"), dated August 5, 2007

(with the attachments thereto, the "IUE-CWA Settlement Agreement" or the "Memorandum of

Understanding"), that (a) modifies, extends, or terminates provisions of the existing collective

bargaining agreements among Delphi, the IUE-CWA, and its various locals (the "IUE-CWA

CBAs") and (b) provides that Delphi and GM will undertake certain financial obligations to

Delphi's IUE-CWA-represented employees and retirees to facilitate these modifications, (ii)

withdrawal without prejudice of the Debtors' Motion For Order Under 11 U.S.C. § 1113(c)

Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g)

Authorizing  Modification Of Retiree Welfare Benefits, dated March 31, 2006 (the "1113/1114

Motion") solely as it pertains to the IUE-CWA and approving the parties' settlement of the

1113/1114 Motion solely as it pertains to the IUE-CWA, and (iii) modification of retiree welfare

benefits for certain IUE-CWA-represented retirees of the Debtors, all as more fully set forth in

the IUE-CWA 1113/1114 Settlement Approval Motion; and the only remaining conditions to the

effectiveness of the IUE-CWA Settlement Agreement pursuant to Section H.1 thereof being

ratification of the IUE-CWA Settlement Agreement by IUE-CWA membership and this Court's

entry of an approval order satisfactory in form and substance to the IUE-CWA, GM, and Delphi;

and this Court having been advised by counsel to the IUE-CWA, GM, and Delphi that the form

and substance of this order is satisfactory to each of the IUE-CWA, GM, and Delphi as required

by Section H.1 of the IUE-CWA Settlement Agreement; and this Court having determined that

the relief requested in the Motion is in the best interests of the Debtors, their estates, their

creditors, and other parties-in-interest; and it appearing that proper and adequate notice of the

Motion has been given and that no other or further notice is necessary; and after due deliberation

thereon; and good and sufficient cause appearing therefor, it is hereby

ORDERED, ADJUDGED, AND DECREED THAT:

1.      The Motion is GRANTED.

2.      The Debtors are hereby authorized to enter into the IUE-CWA Settlement

Agreement, a copy of which is attached hereto as Exhibit 1, and to implement the terms of such

IUE-CWA Settlement Agreement.

3.    Each of the signatories to the IUE-CWA Settlement Agreement (each such party, a "Signatory," and collectively, the "Signatories") is directed to take all actions necessary or appropriate to effectuate the terms of this order and the terms of the IUE-CWA Settlement Agreement, including, without limitation, any and all actions necessary or appropriate to such Signatory's implementation of and performance under the IUE-CWA Settlement Agreement.

4.    The IUE-CWA Settlement Agreement is binding on the Debtors, GM, and the IUE-CWA subject to its terms and constitutes a valid and binding amendment to the IUE-CWA CBAs with authorized representatives of all individuals who were or are in a bargaining unit represented by the IUE-CWA, as permitted by section 1113 of the Bankruptcy Code and the IUE-CWA CBAs as amended, or otherwise, and the IUE-CWA CBAs, in accordance with the IUE-CWA Settlement Agreement, are binding on the Debtors and the IUE-CWA.

5.    The IUE-CWA Settlement Agreement constitutes a valid and binding amendment to existing retiree health and welfare benefits, as permitted by section 1114 of the Bankruptcy Code, or otherwise.

6.    Notice of the IUE-CWA 1113/1114 Settlement Approval Motion was properly and timely served in accordance with the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered on October 26, 2006 (Docket No. 5418), the Supplemental Order Under 11 U.S.C. Sections 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered on March 17, 2006 (Docket No. 2883), and by service upon (a) the IUE-CWA, 501 Third Street, NW Washington, D.C.  20001-2797, (b) counsel to the IUE-

CWA, Kennedy Jennik & Murray, P.C., 113 University Place, 7th Floor, New York, New York 10003, and (c) the active Delphi hourly employees and hourly retirees who are represented by the IUE-CWA at their individual addresses, pursuant to an informational form of notice, a copy of which was attached to the IUE-CWA 1113/1114 Settlement Approval Motion as Exhibit 1.

7. The Debtors are authorized to withdraw, without prejudice, their 1113/1114 Motion solely as it pertains to the IUE-CWA. The 1113/1114 Motion is settled solely as it pertains to the IUE-CWA.

8. Subject to Section H.2.e of the IUE-CWA Settlement Agreement, the IUE-CWA shall receive an allowed general unsecured prepetition claim against Delphi in the amount of $126 million in complete settlement of all asserted and unasserted IUE-CWA claims, including, but not limited, to IUE-CWA/Delphi Joint Activities Center (the "JAC") asserted and unasserted claims (the "Allowed Claim"). The proceeds realized by the IUE-CWA and/or the VEBA Trust (as defined below) from a $26 million dollar portion of the Allowed Claim, shall be paid directly to a voluntary employees' beneficiary association trust ("VEBA Trust") to be established and sponsored by the IUE-CWA to provide supplemental retiree health insurance to certain eligible Delphi employees and their dependents; the proceeds realized by the IUE-CWA and/or the VEBA Trust from a $90 million dollar portion of the Allowed Claim, shall be paid directly to a VEBA Trust to be established and sponsored by the IUE-CWA for the purpose of funding employee benefits for active and retired employees and their dependents; and the proceeds realized by the IUE-CWA and/or a VEBA Trust from a $10 million dollar portion of the Allowed Claim, shall be paid directly to the successor to the JAC[1] entity which shall be established and administered by the IUE-CWA.

---

[1] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Memorandum of Understanding.

9.    Debtors, GM, and Delphi will cause the IUE-GM National Joint Skill Development and Training Committee to quitclaim any rights to the JAC Building to the IUE-CWA International or to an agreed upon not-for-profit entity and the IUE-CWA and Delphi shall cause the IUE-CWA-Delphi Joint Activities Center to agree to and assist with this transfer.

10.    As a condition precedent to the effectiveness of certain obligations of the parties pursuant to Section H.2 of the IUE-CWA Settlement Agreement and as provided in Section H.3 of the IUE-CWA Settlement Agreement, any Debtors' plan of reorganization (the "Delphi Reorganization Plan") that is consistent with the IUE-CWA Settlement Agreement and any confirmation order entered into with respect to such plan shall include the following provisions:

(a)    On the effective date of the Delphi Reorganization Plan, the IUE-CWA, all employees and former employees of Delphi represented or formerly represented by the IUE-CWA, and all persons or entities with claims derived from or related to any relationship with such employees or former employees of Delphi, shall waive and release and be deemed to have waived and released any and all claims of any nature, whether liquidated or unliquidated, contingent or non-contingent, asserted or unasserted, existing and/or arising in the future against Delphi, its subsidiaries, or affiliates, the Delphi HRP, the Delphi Health Care Program for Hourly Employees and the Delphi Life and Disability Benefits Program for Hourly Employees, GM, its subsidiaries or affiliates, the GM HRP, the GM Health Care Program for Hourly Employees, and the GM Life and Disability Benefits Program for Hourly Employees, and the officers, directors, employees, fiduciaries, and agents of each, arising directly or indirectly from or in any way related to any obligations under the IUE-CWA CBAs and the collective bargaining agreements between GM and the IUE-CWA related to such employees and the IUE-CWA-GM-Delphi Memorandum of Understanding regarding pension and other matters concerning the employment of GM employees with Delphi Automotive Systems related to such employees (provided, however, that claims for benefits provided for or explicitly not waived under the provisions of the IUE-CWA Settlement Agreement (including, but not limited to, workers' compensation benefits against Delphi, its subsidiaries, or affiliates that are

5

otherwise assertable under applicable law) are not waived).

(b)     A plan exculpation and release provision (which provision shall be at least as comprehensive as the plan exculpation and release provision under the Delphi Reorganization Plan) for the IUE-CWA released parties (which shall include the IUE-CWA and each of their current or former members, officers, committee members, employees, advisors, attorneys, accountants, investment bankers, consultants, agents and other representatives) with respect to any liability such person or entity may have in connection with or related to the Delphi bankruptcy cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation, or consummation of any of the Delphi Reorganization Plan, the disclosure statement concerning the plan, the IUE-CWA Settlement Agreement, or the Agreements on Attachment E thereto, or any contract, employee benefit plan, instrument, release, or other agreement or document created, modified, amended, or entered into in connection with either the Delphi Reorganization Plan or any agreement between the IUE-CWA or Delphi, or any other act taken or omitted to be taken consistent with the IUE-CWA Settlement Agreement in connection with the Delphi bankruptcy.

(c)     The IUE-CWA Settlement Agreement and the agreements referenced in Attachment E thereof shall be assumed under 11 U.S.C. § 365.

11.     Effective upon allowance of the general unsecured prepetition claim in Paragraph 8 above of this order, all claims referenced in the IUE-CWA Settlement Agreement (other than any claims of GM against any of the Debtors), including those claims listed on Exhibit 2, a copy of which is attached hereto, are hereby deemed waived and withdrawn with prejudice.

12.     Nothing contained in the IUE-CWA Settlement Agreement shall constitute an assumption of any agreement described therein, including, without limitation, any IUE-CWA CBA (except as provided for in Section H.3 of the IUE-CWA Settlement Agreement) or any commercial agreement between GM and Delphi, nor shall anything therein be deemed to create an administrative or priority claim with respect to GM or convert a prepetition claim into a

6

postpetition claim or an administrative expense with respect to any party.  The IUE-CWA

Settlement Agreement is without prejudice to any party-in-interest (including the parties to the

IUE-CWA Settlement Agreement and the Debtors' statutory committees) in all other aspects of

Delphi's chapter 11 cases and each party to the IUE-CWA Settlement Agreement shall reserve all

rights not expressly waived therein.  Further, nothing in the Motion, the IUE-CWA Settlement

Agreement, this Court's approval of such agreement, the performance of any obligation

thereunder, or any other document shall prejudice any right or remedy of any Debtor against any

other Debtor with respect to the allocation of Delphi's obligations under the IUE-CWA

Settlement Agreement or claims asserted against, or payments by, Delphi thereunder, all of

which rights are expressly preserved.

        13.      This Court shall retain jurisdiction to hear and determine all matters

arising from the implementation and performance of this order and the IUE-CWA Settlement

Agreement, and over each of the Signatories in connection therewith, through the effective date

of a plan of reorganization proposed by the Debtors and confirmed by this Court (and thereafter

to the extent provided for in such reorganization plan); provided, however, that the Court's

jurisdiction shall not extend to any bilateral agreements of the IUE-CWA and GM.

        14.      Notwithstanding Rule 6004(g) of the Federal Rules of Bankruptcy

Procedure or any other Bankruptcy Rule, (a) this order shall take effect immediately upon its

entry, (b) upon entry of this order, the Debtors are authorized to take any and all necessary

actions to implement the terms of the IUE-CWA Settlement Agreement, including executing any

amendments to existing collective bargaining agreements consistent in all material respects with

the IUE-CWA Settlement Agreement, and (c) the IUE-CWA Settlement Agreement shall

become effective upon entry of this order and, to the extent required, satisfaction of the

conditions set forth in the IUE-CWA Settlement Agreement.

15.     The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for

the United States Bankruptcy Court for the Southern District of New York for the service and

filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated: New York, New York
        August 16, 2007


                        _/s/Robert D. Drain_____
                        UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

**IUE-CWA Settlement Agreement**

**<u>Exhibit 2</u>**

**IUE-DELPHI-GM**
**MEMORANDUM OF UNDERSTANDING**
**DELPHI RESTRUCTURING**

**AUGUST 5, 2007**

## INTRODUCTION

The International Union, IUE-CWA and its Local Unions representing Delphi facilities (collectively the "IUE-CWA"), Delphi Corporation and General Motors Corporation ("the Parties") have discussed the challenges impacting Delphi and its IUE-CWA represented operations.  As GM's largest supplier and the employer of thousands of IUE-CWA represented employees, indirectly supporting thousands of dependents, retirees and surviving spouses, the Parties have a critical interest in Delphi's successful emergence from bankruptcy with certain IUE-CWA represented operations.  The Parties acknowledge that restructuring actions are necessary and commit to take specific actions to protect the needs of the Parties and their constituencies, continuing progress already made toward transforming Delphi's labor cost structure and ongoing business operations.

The IUE-CWA has already agreed to an attrition program pursuant to which thousands of employees at traditional Big Three wages and benefits took Buy Outs or retired.  The Parties have also agreed to the "Term Sheet – Delphi Pension Freeze and Cessation of OPEB, and GM Consensual Triggering of Benefit Guarantee" (attached as Attachment B, hereinafter the "Term Sheet"), facilitating the freeze of Delphi's pension plan and the assumption of significant OPEB liabilities by GM, thereby reducing Delphi's ongoing benefit costs and liabilities.

In addition to the above, to enable continued transformation to more competitive wage and benefit levels, to address capacity, divestiture, work rules and staffing level issues, and to better position Delphi to retain existing business and attract new business, the Parties agree as follows on a two-party or three-party basis, as applicable, (the "Agreement") subject to ratification by the membership.

### A.  DURATION

1.  This Agreement will continue until 11:59 p.m. on October 12, 2011.

2.  The 2003-2007 IUE-CWA - Delphi National Agreement, and including without limitation the supplemental agreements attached as exhibits thereto (the "National Agreement"), are hereby extended, as modified herein, until 11:59 p.m. on October 12, 2011.

3. Except as modified by this Agreement, and as may be mutually modified by the Parties pursuant to Section D below, Delphi and the IUE-CWA agree that the current Local Agreements (the "Local Agreements") shall remain in effect until the earlier of 11:59 p.m. on October 12, 2011, or the first day of the month following the month when Delphi operations at a facility cease, whereupon the Local Agreements applicable to that plant will terminate unless extended by mutual agreement between the parties. All living agreement provisions in the current Local Agreements permitting midterm modifications or termination following written notice or otherwise will be eliminated.

4. The agreements comprising the IUE-CWA Delphi collective bargaining agreements, national and local, following the date of this Agreement are set forth in the matrix of modified and eliminated provisions in Attachment E hereto.

## B. SITE PLAN

The IUE-CWA, GM and Delphi agree to implement the site plans as outlined below and described in detail in Attachment A.

1. Sites to remain owned and operated by Delphi ("Keep Sites"):

   Brookhaven
   Clinton
   Warren

2. Site to be held for divestiture as ongoing businesses by Delphi ("Sell Site"):

   Gadsden (see Attachment A)

3. Footprint Site

   Kettering (see Attachment A)

4. Sites to be wound down by Delphi in accordance with Delphi's restructuring plan and timing ("Wind Down Sites"):

   Moraine
   Anaheim

### C. WORKFORCE TRANSITION

1. <u>Special Employee Placement Opportunities (SEPO) at General Motors</u>

   The Parties agree that active IUE-CWA Delphi employees (except employees at Gadsden) with unbroken seniority as of the Effective Date of this Memorandum of Understanding who were actively employed by Delphi (including employees on leave of absence or temporary layoff)  prior to October 18, 1999, and who were not temporary employees on or after that date, will be given an opportunity as set forth in Attachment G to make application to be considered for employment at General Motors UAW-represented sites based upon their longest unbroken seniority date at Delphi.  Eligible employees will be considered after all GM collectively bargained contractual obligations have been satisfied.  Eligible applicants will then be considered for employment with General Motors based upon their current seniority date from an integrated list of eligible IUE-CWA employees, eligible UAW-ACCI employees and eligible UAW-Guide employees and hired in a ratio that is on a one-for-one basis with a GM "new hire" applicant.  Within ten days of the Effective Date GM will communicate the administrative guidelines (e.g. application process, documentation) associated with the implementation of this provision.  Benefit plan, fringe benefit and seniority treatment will be in accordance with Attachment G.

2. <u>Delphi to Delphi Transfers</u>

   The IUE-CWA and Delphi agree that Delphi employees (excluding employees at Gadsden and temporary employees) represented by the IUE-CWA with seniority as of the Effective Date, defined in Section H below, will have rights to other Delphi plants outside their Area Hire area prior to permanent new hires and will be eligible for relocation allowance in accordance with Paragraph (60a) of the National Agreement.  The parties will develop procedures to implement Delphi-to-Delphi transfers.

3. <u>Transformation Program Options</u>

   Delphi and the IUE-CWA agree on the following Transformation Program options which will be offered at all Delphi IUE-CWA represented sites, except Gadsden, to employees who are (i) active (excluding current pre-retirement program participants), (ii) on leave of absence, (iii) on temporary layoff with unbroken seniority, or (iv) are indefinitely laid off from Moraine or Kettering on or after August 1, 2007. Moraine and Kettering employees indefinitely laid off on or after August 1, 2007 will receive additional options as provided in

Attachment A ("the Moraine Options").  Moraine and Kettering employees who elect Option 2 of the Moraine Options are not eligible for the Buy Down Payments option provided below.  The Retirement Incentives and Buy Out are subject to the terms of Attachment C, and are generally described below.  No transformation options will be afforded to any Delphi employee hired on or after October 8, 2005 or who was a temporary employee on or after that date

a.  <u>Retirement Incentives –Employees Participating in the Delphi Hourly-Rate Employees Pension Plan ("Delphi HRP")</u>

Delphi, the IUE-CWA, and GM as applicable, agree to the following Special Attrition Program for such Delphi employees who are participants in the "Delphi HRP".  Retirement options will be provided for eligible Delphi employees to be effective no later than October 1, 2007 as described in Attachment C and summarized below:

1)  $35,000 for normal or early voluntary retirements

2)  50 & 10 Mutually Satisfactory Retirement (MSR)

3)  Pre-retirement program covering employees with at least 26 years of credited service but less than 30 years as of October 1, 2007, to be effective when the employee's services are no longer required but no later than October 1, 2007

4)  These retiring employees will be considered to have transitioned to GM for purposes of retirement ("Check the Box") and be treated consistent with the Check the Box retirements under the 2006 IUE-CWA-Delphi-GM Special Attrition Program.

5)  Participation is conditioned on release of claims

b.  <u>Buy Out – Eligible Employees (Delphi HRP Participants Hired Prior to October 8, 2005)</u>

1)  The amount of the Buy Out Payments shall be as follows, subject to release of claims:

i.  Eligible employees with 10 or more years of seniority or credited service, whichever is greater, will be eligible for a Buy Out payment of $140,000.

ii.   Eligible employees with 3 years of seniority or credited service, whichever is greater, but less than 10 years will be eligible for a Buy Out payment of $70,000.

iii.  Eligible employees with less than 3 years of seniority or credited service, whichever is greater, will be eligible for a Buy Out payment equal to $1,500 for each month of his/her combined service with Delphi, not to exceed $40,000.

2)  Buy Outs will be effective when the employee's services are no longer required, but in any event no later than October 1, 2007. Employees will sever all ties with GM and Delphi except for any vested pension benefits (as such no pension supplements are payable).

3)  As necessary, employees who have accepted a Buy Out may be rehired as temporary employees to satisfy any operating needs. Any employee rehired as a temporary employee will not be eligible for any coverage or benefits under the Term Sheet. Further, any employee rehired as a temporary employee shall receive the starting wage rate applicable for a new temporary employee.  Such temporary employees will not be eligible for any future attrition or Severance Payments.

c.   Buy Down

1)  Effective October 1, 2007 all eligible production and skilled trades employees, except at the Gadsden plant, , other than pre-retirement program participants and Moraine and Kettering employees electing Option 2 of the Moraine Options, will be bought down to the wage and benefit levels provided in Attachment A, and will be covered by all other modifications set forth in this Agreement.  Moraine and Kettering employees who elect Option 3 will only be eligible for a reduced Buy Down payment in accordance with the Moraine Options.

2)  Buy Down payments will be made to such eligible production employees and will not exceed $105,000.

a)   Production employees on active status (including Protected Status, but excluding pre-retirement program participants), and on temporary layoff as of October 1, 2007 will be eligible for the Buy Down payments as described in (b) below.

b)   The Buy Down payments for production employees will be made on the basis of the employee's current base wage as

described in Attachment F (for Kettering, see details in Attachment A).  The payments will be paid out in three (3) equal installments less applicable withholding, in the first pay ending after October 1, 2007, October 1, 2008, and October 1, 2009 provided the employee is on active status, receiving holiday pay, paid vacation, jury duty pay, bereavement pay, military leave, or temporary layoff status on each of those three (3) dates.  The October 1, 2008 and October 1, 2009 payments will be prorated based on the number of pay periods worked.  Treatment of employees on disability or Workers' Compensation leave is in accordance with (d) and (e), below.

c) Production and skilled trades employees who are on a leave of absence other than Sickness and Accident (S&A), Extended Disability (EDB), and Workers Compensation on October 1, 2007 will be eligible for the first payment, less applicable withholding, at the time they return to work if they return to work prior to October 1, 2008.  The two (2) subsequent payments will be pro-rated based on the number of pay periods worked during the year immediately prior to the October 1st date. Additionally, the two (2) subsequent payments also will be adjusted by time spent on disability during the year immediately prior to the October 1st date, as described in (e), below.

d) Sickness & Accident (S&A) benefits, Extended Disability Benefits (EDB), health care, life insurance and other applicable benefits will be reduced on October 1, 2007 to modified levels as detailed in this Agreement for production and skilled employees who are on disability or Workers' Compensation leave on October 1, 2007.  Production and skilled trades employees on S&A or EDB will be eligible to receive a Buy Down payment on October 1, 2007, unreduced for number of weeks spent on leave prior to that date.

e) Production and skilled trades employees who are eligible for Buy Down payments and who are on or commence a disability or Worker's Compensation leave on or after October 1, 2007, will be eligible for the 2nd and 3rd Buy Down payments pro-rated for the time they spent on disability or Worker's Compensation leave during the year immediately preceding the date of each subsequent Buy Down payment. The pro-rated amount that will be included in the Buy Down payment for the period spent on disability or Workers'

Compensation leave will have the same percentage relationship to the full Buy Down amount as the employee's applicable Sickness & Accident or Extended Disability Benefit schedule of benefits has to their base hourly rate for the applicable periods of leave.

f) Production and skilled trades employees on active status (including Protected Status, but excluding pre-retirement program participants), and employees on temporary layoff as of October 1, 2007 who do not elect an option as described in Attachment C will be bought down to the wage and benefit levels defined in Attachment A, and will be covered by all other modifications set forth in this Agreement.

g) Production and skilled trades employees who are in a plant that is wound down by October 1, 2007 who do not elect an option under the Special Attrition Program – Transformation (Attachment C), will be bought down to the wage and benefit levels defined in Attachment A, and will be covered by all other modifications set forth in this Agreement and will be placed on layoff effective October 1, 2007.  The employees will receive the October 1, 2007 Buy Down payment, less applicable withholding.  These laid off employees will not be eligible for any future Buy Down payments, but can collect SUB, as provided in Section F.15 and based on the employee's wage rate as specified in Attachment A, if otherwise eligible.

3) The Buy Down payments for skilled trades employees will be as follows:

a) $75,000 for skilled trades employees at Warren
b) $80,000 for skilled trades employees at Clinton
c) $80,000 (first installment only in accordance with Section C.3.c.2)g) for skilled trades employees at Anaheim, and those skilled trades employees at Moraine and Kettering who select Option 3 (see the Moraine Options).

The payments will be paid out in three (3) equal installments, as applicable, less withholding, in the first pay ending after October 1, 2007, October 1, 2008, and October 1, 2009 provided the employee is on active status, receiving holiday pay, paid vacation, jury duty pay, bereavement pay, military leave, or temporary layoff status on each of those three (3) dates.  The October 1, 2008 and October 1, 2009 payments will be prorated based on the number of pay periods worked.  Treatment of

employees on disability or Workers' Compensation leave is in accordance with C.3.c.2)d) through C.3.c.2)e), above.

4) No further unpaid portion of the Buy Down payments will be payable to any employee who becomes employed by GM or severs their employment with Delphi.

5) Employees must sign a Conditions of Participation Release form in order to receive the Buy Down payments..

6) Employees electing a Buy Down will retain eligibility for OPEB and pension benefit treatment under the Term Sheet without regard to such election.

d. Special Payment – Gadsden Operations

Delphi and the IUE-CWA agree that all employees at Gadsden as of the Effective Date of this Agreement will be eligible for a special payment in accordance with the chart below, less withholdings. One half of the payment amount will be paid as soon as practicable after the Effective Date of this Agreement. The other half of the payment will be paid after 12 months provided the employee's seniority remains unbroken, or upon transfer to the new owner, if earlier.

| Seniority | Amount |
|---|---|
| 120 days but less than one (1) year | $    500.00 |
| One (1) but less than six (6) years | $  1,000.00 |
| Six (6) but less than seven (7) years | $  2,000.00 |
| Seven (7) but less than eight (8) years | $  4,000.00 |
| Eight (8) but less than nine (9) years | $  5,000.00 |
| Nine (9) but less than ten (10) years | $  7,000.00 |
| Ten years and over | $  9,000.00 |

4. Severance Payments

Delphi and the IUE-CWA agree that any employee on the active employment rolls as of the Effective Date of this Agreement (except employees at Gadsden) at any "Keep," "Footprint" or "Wind Down" sites (excluding employees who previously received a Buy Out payment from Delphi and were rehired as temporary employees), who are permanently laid off prior to October 12, 2011, shall be eligible for a lump sum severance payment equal to $1,500 for each month of his/her combined service with Delphi and, in the case of Kettering, the

new owner.  The maximum amount of severance pay is $40,000, less applicable withholdings.  Employees must sign a Conditions of Participation Release Form in order to receive the Severance Payment.  The Parties agree that employees who are separated will sever all ties with GM and Delphi except for any vested pension benefits (as such no pension supplements are payable) or workers' compensation claims, if any.

Employees who are on roll on the Effective Date of this Agreement who are also eligible for Supplemental Unemployment Benefits (SUB), as provided in Section F.15 will have their choice of SUB or the Severance Payment specified above but will not be paid both.

Employees hired after the Effective Date of this Agreement who have 3 or more years of seniority at the time their services are no longer required but prior to October 12, 2011 may elect a $40,000 severance payment or SUB as specified in Section F.15.

5. Issues arising over the implementation of Section C.3, Transformation Program Options, and Section C.4, Severance Payments, will be discussed on an expedited basis by the National Parties.

## D.  LOCAL NEGOTIATIONS

The IUE-CWA and Delphi agree local negotiations for all Keep and Footprint sites conducted concurrently with the negotiations resulting in this Agreement are final and binding upon ratification of this Agreement. The local parties are encouraged to continue discussions through the term of the Local Agreements aimed at achieving additional mutually agreeable competitive local work practices as set forth in Attachments A and D.  At facilities to be sold/transferred, such local negotiations will include the prospective new owner.

## E.  PENSION AND OPEB / BENEFIT GUARANTEE

The Parties have agreed to a Term Sheet with respect to the freezing of Delphi's pension plan, the cessation of Other Post Employment Benefits (OPEB) for Delphi employees and retirees and the consensual triggering of the Benefit Guarantee.  That agreement, the Term Sheet, is attached as Attachment B, and is incorporated by reference herein.

## F.  NATIONAL AND LOCAL AGREEMENT MODIFICATIONS

1. <u>Wages and Benefits</u>

   a. <u>Wages</u>

   1) The IUE-CWA and Delphi agree that wages are modified as provided in Attachment A.

   2) <u>General Increases</u>

   Effective December 17, 2007 and December 20, 2010, each employee covered by the IUE-CWA – Delphi National Agreement shall receive a 3% wage increase in the employee's straight time hourly wage rate (exclusive of shift premium, seven-day operations premiums and any other premiums).

   3) <u>Performance Bonus Payments</u>

   In 2008 and 2009, a Performance Bonus will be paid to each eligible employee covered by the IUE-CWA – Delphi National Agreement as follows:

   | Eligibility Date | Amount | Payable During Week Ending |
   |---|---|---|
   | November 24, 2008 | 3% of Qualified Earnings | December 21, 2008 |
   | November 23, 2009 | 3% of Qualified Earnings | December 20, 2009 |

   Eligibility requirements and calculation of Qualified Earnings will be in accordance with Paragraphs (65b)(2) through (65b)(4) of the IUE-CWA – Delphi National Agreement, except that COLA and Independence Week Shutdown Pay are no longer applicable.

   4) <u>Cost of Living Allowance (COLA)</u>

   As of the Effective Date of this Agreement, COLA will be frozen at its current level for all employees.  Effective October 1, 2007, COLA will be eliminated.

   b. <u>Benefits</u>

   Effective October 1, 2007 the IUE-CWA and Delphi agree to the following benefit package for all employees (excluding Gadsden) except Level 2 employees who have opted not to receive benefits, and Level 3 employees (who are not eligible for benefits except for

26 weeks of Sickness & Accident benefits over the life of the Agreement).

1) Vacation Entitlement capped at a max of 160 hours, provided that unused vacation paid in February 2008 shall be paid at the employee's wage rate prior to the buy down.
2) Defined Contribution pension of 7%.  Employees earning pension credit from the GM hourly rate pension plan pursuant to Attachment B will not be eligible for this payment.
3) Additional Defined Contribution of 1% in lieu of OPEB.  Eligible employees who are entitled to GM OPEB pursuant to Attachment B or the VEBA (described in Section G.2) will not be eligible for this payment.
4) Life insurance per employee of $30,000
5) Sickness and Accident Pay
   i.  1 year seniority but less than 3 years seniority – 26 weeks.
   ii.  3 or more years seniority – 52 weeks.
6) Extended Disability Benefits
   i.  1 year seniority but less than 3 years seniority – 13 weeks.
   ii.  3 years seniority but less than 5 years seniority – 26 weeks.
   iii.  5 or more years seniority – the same duration as provided in the extended 2003 IUE-Delphi Extended Disability Plan.
7) Supplemental Unemployment Benefits
   o  Less than 1 year – 0 weeks
   o  1 year seniority but less than 3 years seniority – 26 weeks
   o  3 or more years of seniority – 156 weeks
   o  Work related expenses are $15.00
8) Paid Holidays  - No Independence Week Pay or Additional Time Off
9) Healthcare – National Medical Value Plan (See Following Chart)
   o  Out of pocket max "In Network" of $1,000/$2,000
   o  Annual Deductible $175/$350
   o  Vision (5 years of seniority) and MVP Dental (after 3 years seniority).  Employees who are bought down retain current dental and vision coverages for which they are enrolled.

| Major Cost Sharing | National Medical Value Plan | |
| --- | --- | --- |
| | In Network | Out-of-Network |
| **Deductibles** | | |
| Individual | $175 | $350 |
| Family | $350 | $700 |
| **Co-Insurance** | | |
| Employee | 20% | 40% |
| Plan | 80% | 60% |
| **Out-of-Pocket Maximum** | | |
| Individual | $1,000 | None |
| Family | $2,000 | None |
| **Prescription Drug** Retail: Generic Brand | 20% | 75% of R&C less applicable copayment |
| Home Delivery: Generic Brand | 20% | No Benefits Available |

2.  Transfer of Pension Assets and Liabilities – (414)(l)

A transfer of pension assets and liabilities will occur as provided in Attachment B.

3.  Existing JAC/Legal Services

The Parties agree as follows:

a.  As soon as practicable after October 1, 2007, the IUE-CWA-Delphi Legal Services Plan and all Delphi participation in the Joint Activity Center (JAC) will be terminated. Certain joint programs will continue but will be administered solely at the plant level (see Attachment E). The joint programs that will be continued at the local level are the Health & Safety Program, Quality Network Program, Employee Assistance Program, Diversity initiatives as appropriate, and those Joint Skill and Development and Training Programs that support the continuing programs mentioned. Any costs incurred for these matters will be the responsibility of Delphi. All pending IUE-CWA-Delphi Legal Services Plan matters opened prior to the Effective Date of this Agreement will be processed through completion.

b.  Status of the JAC Building

The Parties, as applicable, pursuant to an order of the Bankruptcy Court, will cause the IUE-GM National Joint Skill Development and

Training Committee, which holds the deed to the JAC Building to quitclaim to the IUE-CWA International or to a not-for-profit entity agreed upon by the Parties, any rights to the JAC Building.

4. <u>Holiday Schedule</u>

Except for the Gadsden and Kettering plants, Delphi and the IUE-CWA agree to adopt the same specified holidays as agreed to by General Motors and the UAW through October 12, 2011 (not including any paid Independence Week days except for the specified Independence Day holiday itself).  The local parties at the Gadsden plant will adopt a separate schedule of holidays specifically for that location.

5. <u>Temporary Employees</u>

The IUE-CWA and Delphi agree that temporary employees may not be used to satisfy need-to-run requirements without the agreement of the Union except during the 90 day period after implementation of the SAP-T program, unless extended by the parties.

6. <u>Existing Agreements</u>

The IUE-CWA and Delphi agree that the National Agreement dated November 14, 2003 and the supplemental agreements attached as Exhibits thereto, all Local Agreements and all related national and local agreements and understandings (collectively the "Existing Agreements") are modified or eliminated to conform to the provisions of this Agreement, consistent with Attachment E.

7. <u>Document 63</u>

The IUE-CWA and Delphi agree that Document 63 is extended for the term of this Agreement for the Keep Sites as defined in Section B.1 of this Agreement.  For the Sell, Footprint and Wind Down sites, Document 63 is waived to the extent necessary to implement the site plans as outlined in Sections B.2, B.3 and B.4 of this Agreement and described in detail in Attachment A.

8. <u>Appendix F</u>

The IUE-CWA and Delphi agree that the terms of the existing Appendix F provisions of the National Agreement will be applicable with the understanding that upon the conclusion of these negotiations, the IUE-CWA and Delphi will identify the proper variable wage and benefit cost elements to be utilized in the Net Present Value Costing Methodology.

9. GIS

The IUE-CWA and Delphi agree that the Guaranteed Income Stream (GIS) Program (Exhibit E to the National Agreement) will be eliminated.

10. AOL

The IUE-CWA and Delphi agree that the Corporation-paid subsidy for AOL will be discontinued.

11. Vacation Entitlement

The maximum annual vacation entitlement for employees shall be 160 hours.

12. Independence Week Period

National Agreement Paragraphs (101u) (3), (101u) (4), (101u) (5), (101u) (6) will be deleted.  For any days on which an employee is not scheduled to work during the Independence Week Period, such employee will have the option of using Vacation Entitlement hours, if available, or be granted an unpaid leave of absence.

13. Job Security, Lifetime Job and Income Security (LJISA) and Guaranteed Employment Levels

The IUE-CWA and Delphi agree that Appendix D, Documents 4 and 65 of the National Agreement, all related provisions of the National and Local Agreements, and all other agreements related to and including Lifetime Job and Income Security Agreements and guaranteed employment levels are eliminated.

14. Hiring Requirements

All provisions of the National or Local Agreements, associated, documents, Supplemental Agreements and any related understandings, practices or settlements, written or unwritten, that would impose ongoing or future hiring requirements or obligations will be eliminated, including apprentices under Document 80 of the National Agreement.

15. Supplemental Unemployment Benefits

IUE-CWA and Delphi agree to the following supplemental unemployment benefits for the life of the Agreement:
• Less than 1 year – 0 weeks

- 1 year seniority but less than 3 years seniority – 26 weeks
- 3 or more years of seniority – 156 weeks
- Work related expenses are $15.00

## G. SETTLEMENT OF ALL EMPLOYEE, RETIREE, AND UNION ASSERTED AND UNASSERTED CLAIMS

The Parties agree to the following in partial consideration for the IUE-CWA entering into this Agreement and in consideration for the releases to be provided pursuant to Section H:

1. Individual settlements pursuant to Transformation Program terms and conditions.

2. The IUE-CWA will receive an allowed general unsecured pre-petition claim against Delphi in the amount of $126 million in complete settlement of all asserted and unasserted IUE-CWA claims, including but not limited to IUE-CWA/Delphi Joint Activities Center asserted and unasserted claims ("the Allowed Claim"), pursuant to an order of the Bankruptcy Court.  The Bankruptcy Court order shall provide that (i) the proceeds realized by the IUE-CWA and/or the VEBA trust, described herein, from a $26 million dollar portion of the Allowed Claim shall be  paid directly to a voluntary employees' beneficiary association (VEBA) trust to be established and sponsored by the IUE-CWA to provide supplemental retiree health insurance to certain eligible Delphi employees and their dependents (ii) the proceeds realized by the IUE-CWA and/or the VEBA trust, described herein, from a $90 million dollar portion of the Allowed Claim shall be paid directly to a VEBA trust to be established and sponsored by the IUE-CWA for the purpose of funding employee benefits  for active and retired employees and their dependents and (iii) the proceeds realized by the IUE-CWA and/or a VEBA trust, described herein, from a $10 million dollar portion of the Allowed Claim shall be paid directly to the successor to the JAC entity which shall be established and administered by the IUE-CWA.

3. The Parties, as applicable, will cause the IUE-GM National Joint Skill Development and Training Committee, which holds the deed to the JAC Building, to quitclaim to the IUE-CWA International or to a not – for-profit entity agreed upon by the Parties, any rights to the JAC Building, pursuant to an order of the Bankruptcy Court.

4. Excludes waiver of rights to vested pension benefits, workers compensation benefits, unemployment compensation benefits and pursuance of pending ordinary course grievances of employees

remaining in the workforce.

5.  All other consideration and concessions provided by GM and Delphi under the terms of this Agreement and all attachments to this Agreement.

The Parties also acknowledge that (i) the consideration provided by GM pursuant to this Agreement and all attachments to this Agreement constitutes a substantial contribution to Delphi's plan of reorganization, (ii) this contribution is necessary to the success of Delphi's plan of reorganization, and (iii) GM would not have made this contribution without obtaining the waivers and releases provided for herein.  The Parties further acknowledge that nothing in the preceding sentence shall give rise to or entitle GM to seek or be allowed any claim against or consideration from any entity, including Delphi, other than as specifically approved by the Bankruptcy Court as agreed to by Delphi and GM in a comprehensive settlement agreement resolving the financial, commercial, and other matters between them.

The Parties also acknowledge that (i) the consideration provided by IUE-CWA pursuant to this Agreement and all attachments to this Agreement constitutes a substantial contribution to Delphi's plan or reorganization, (ii) this contribution is necessary to the success of Delphi's plan of reorganization, and (iii) IUE-CWA would not have made this contribution without obtaining the terms and releases provided for herein. The Parties further acknowledge that nothing in the preceding sentence shall give rise to or entitle IUE-CWA to seek or be allowed any claim against or consideration from any entity, including Delphi, other than as specifically approved by the Bankruptcy Court.

## H.  EFFECTIVE DATES AND BANKRUPTCY PROCEEDINGS

1.  Subject to its terms and conditions, this Agreement is a final, binding and conclusive commitment and agreement that will be effective on the later of entry of an Order by the U.S. Bankruptcy Court approving this Agreement that is satisfactory to the IUE-CWA, GM and Delphi (the "Approval Order"), or the first Monday following receipt by Delphi of written notice of ratification from the IUE-CWA (the "Effective Date"). The ratification process will commence as soon as practical following the date of this Agreement. In connection with Delphi's prosecution of a motion to obtain entry of the Approval Order in the Bankruptcy Court, (a) Delphi shall use its best efforts to file a motion for approval of this Agreement in form and substance reasonably acceptable to the Parties to be heard not later than the first monthly omnibus hearing at which the motion can be considered under the case management orders

entered in the Bankruptcy Court, (b) Delphi shall provide, to the extent reasonably practicable, both the IUE-CWA and GM with copies of, and a reasonable opportunity to comment on, all motions, applications, proposed orders, pleadings and supporting papers prepared by Delphi for filing with the bankruptcy court relating to court approval of this Agreement, and (c) the Parties shall support the approval of this Agreement in the Bankruptcy Court without condition, qualification or exception.

2.   The parties acknowledge that the following provisions of this Agreement will not become effective until all of the following events have occurred and as of the date when the last of such events shall have occurred:  (a) execution by Delphi and GM of a comprehensive settlement agreement resolving the financial, commercial, and other matters between them and (b) the substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by the Bankruptcy Court which incorporates, approves and is consistent with all of the terms of this Agreement and the comprehensive settlement agreement between Delphi and GM:

   a.   The Benefit Guarantee Term Sheet (Attachment B)
   b.   Delphi pension freeze (Section E and Attachment B)
   c.   Cessation of Delphi OPEB (Section E and Attachment B)
   d.   414(l) transfer (Section F.2 and Attachment B)
   e.   Section G.2

3.   The Parties agree that the order of the Bankruptcy Court approving this Agreement shall provide that any plan of reorganization consistent with this Agreement and any confirmation order entered into with respect to such plan shall include the following provisions:

   a)   On the effective date of such plan of reorganization, the IUE-CWA, all employees and former employees of Delphi represented or formerly represented by the IUE-CWA, and all persons or entities with claims derived from or related to any relationship with such employees or former employees of Delphi, waive and release and be deemed to have waived and released any and all claims of any nature, whether liquidated, unliquidated, contingent, non-contingent, asserted or unasserted, existing and/or arising in the future against Delphi, its subsidiaries or affiliates, the Delphi HRP, the Delphi Health Care Program for Hourly Employees and the Delphi Life and Disability Benefits Program for Hourly Employees, GM, its subsidiaries or affiliates, the GM HRP, the GM Health Care Program for Hourly Employees and the GM Life and Disability Benefits Program for Hourly Employees, and the officers, directors, employees, fiduciaries, and agents of each,

arising directly or indirectly from or in any way related to any obligations under the collective bargaining agreements between Delphi and the IUE-CWA and between GM and the IUE-CWA related to such employees and the IUE-CWA-GM-Delphi Memorandum of Understanding regarding pension and other matters concerning the employment of GM employees with Delphi Automotive Systems related to such employees (provided, however, that claims for benefits provided for or explicitly not waived under the provisions of this Agreement (including, but not limited to, workers' compensation benefits against Delphi, its subsidiaries, or affiliates that are otherwise assertable under applicable law) are not waived).

b)   A plan exculpation and release provision (which provision shall be at least as comprehensive as the plan exculpation and release provision under the plan of reorganization for the debtor) for the IUE-CWA released parties (which shall include the IUE-CWA and each of their current or former members, officers, committee members, employees, advisors, attorneys, accountants, investment bankers, consultants, agents and other representatives) with respect to any liability such person or entity may have in connection with or related to the Delphi bankruptcy cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any of the plan of reorganization, the disclosure statement concerning the plan of reorganization, this Agreement or the Agreements on Attachment E hereto or any contract, employee benefit plan, instrument, release or other agreement or document created, modified, amended or entered into in connection with either the plan of reorganization or any agreement between the IUE-CWA or Delphi, or any other act taken or omitted to be taken consistent with this Agreement in connection with the Delphi bankruptcy.

c)   This Agreement and the agreements referenced in Attachment E shall be assumed under 11 U.S.C. §365.

4.   Nothing contained herein shall constitute an assumption of any agreement described herein, including, without limitation any collective bargaining agreement between the IUE-CWA and Delphi (except as provided for in Section H.3) or any commercial agreement between GM and Delphi, nor shall anything herein be deemed to create an administrative or priority claim with respect to GM or convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party.  The Parties further agree (and the Bankruptcy Court order shall also provide) that this Agreement is

without prejudice to any interested party (including the parties to this Agreement and the statutory committees) in all other aspects of Delphi's Chapter 11 cases and that each Party to this Agreement reserves all rights not expressly waived herein.

5.  Unless this Agreement is consummated following all required approvals, nothing herein shall bind any of the Parties nor shall the Agreement be admissible in any judicial or other proceeding on behalf of or against any Party.

6.  The Parties agree that they will cause the IUE-GM National Joint Skill Development and Training Committee to enter into a consent order in the Bankruptcy Court agreeing to the treatment of JAC Building provided for in Section G of this Agreement.

7.  The IUE and Delphi agree that they will cause the IUE-CWA-Delphi Joint Activities Center to enter into a consent order in the Bankruptcy Court agreeing to the treatment of the JAC claim provided for in Section G of this Agreement.

The Parties, by their duly authorized officers and representatives, agree accordingly this 5th day of August 2007.

| International Union, IUE-CWA and its Local Unions | Delphi Corporation | General Motors Corporation |
|---|---|---|
| *(signatures)* | *(signatures)* | *(signatures)* |

| International Union, IUE-CWA and its Local Unions | Delphi Corporation | General Motors Corporation |
|---|---|---|
| _(signature)_ | | |
| _(signature)_ | | |
| _(signature)_ | | |
| _(signature)_ | | |
| _(signature)_ | | |
| _(signature)_ | | |
| Terry Grimes | | |
| _(signature)_ | | |
| _(signature)_ | | |
| _(signature)_ | | |
| Michael O'Donnell | | |
| _(signature)_ | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Attachment A**

## SITE PLANS

## <u>OVERVIEW</u>

- The following site documents describe GM's and Delphi's product program commitments to the Keep, Sell and Footprint Sites.  At the Sell Site (Gadsden) and the Footprint Site (Kettering), the Parties understand that the new owners' involvement and perspective will be needed as part of the process.
- General Motors will suspend all Sourcing on current products and new products (identified in Attachment A-1) at the Footprint Site as detailed in the following Kettering site document.
- General Motors will suspend all Sourcing on current products and new products (identified in Attachment A-1) at the Keep Sites for the duration of the IUE-CWA National Agreement (Oct 12, 2011).
- Program name changes will not alter the commitments made for the Keep and Footprint Sites in this document.  In the event a product program identified in Attachment A-1 is cancelled, discussions will be held between General Motors, Delphi and the IUE-CWA to find alternative solutions.
- General Motors will award new work to the Keep Sites as identified in Attachment A-1, and Delphi will produce the associated products at the Keep Sites.
- Delphi will suspend all Sourcing relative to the products identified in Attachment A-1, for the duration of the IUE-CWA National Agreement (Oct. 12, 2011) for the vehicle programs associated with these commodities. Delphi will continue to utilize the current significant product manufacturing processes relative to the programs identified in Attachment A-1, except as such processes may need to be modified to be more efficient/competitive or may change due to technological changes.
- Revenue and jobs as identified in this document (including Attachment A-1) are based on current estimates of program volumes which are subject to change based on future market conditions and GM's wiring and component sourcing actions and are not financial or volume guarantees.
- Investment and engineering figures are estimates based on the current understanding of program requirements which are subject to change based on future program revisions, and are not financial or volume guarantees.

# WARREN

## CURRENT STATE

- Booked revenue is projected to decline from $647 million in 2007 to $418 million in 2011 (reference Attachment A-1).

## GM PRODUCT PROGRAM COMMITMENT

- GM will commit to new product programs starting in 2010 – 2012, including wiring programs related to the Global Epsilon II (Compact), the GMT 900 extension (through MY 2012), GMT-7XX and the C3XX. These wiring programs support the production of resin blend, connectors, terminals and cable.  GM will commit the GMT 900 BEC extension that will support the production of BEC components in Warren.  GM is committing these product programs (for specific program details see the charts included in Attachment A-1) with the potential for additional new product programs as they are released.

- GM continues to reserve the right to globally source selected wiring programs, however guarantees component penetration will be maintained by directing the tier to buy Delphi connection systems.

## DELPHI COMMITMENT

- Upon award (receipt of Purchase Order) of the product programs discussed above, Delphi will immediately commence the required engineering and development activities necessary to maintain GM program timing.

- Delphi will allocate the work to the Warren facility in time to support GM program timing requirements and the product has not been globally sourced by GM.

- Engineering and capital investment of approximately $50 million will be made by Delphi at the Warren facility as required to support the above-designated product programs.

## IUE/CWA COMMITMENT

- Negotiate and implement a Competitive Operating Agreement (COA) for all employees.

## <u>WARREN</u>

# Packard Electrical / Electronic Architecture
## Warren Operations
### August 5, 2007

### *<u>Memorandum of Understanding</u>*

This Agreement is entered into this 5th day of August, 2007 between Delphi Packard Electrical / Electronic Architecture, Warren Operations and the IUE-CWA Local 717, the Industrial Division of the Communications Workers of America, AFL-CIO, CLC.

### <u>Site Plan</u>
The Local Parties have had numerous discussions over the past ten months regarding the Warren Site Plan.  As a result, the Keep Products (Plants) for the Warren Operations will be as follows:
- Plant 7 Rootstown – Compound
- Plant 10 NRR – Cable Make
- Plant 11 NRR – Metal Stamping
- Plant 45 Cortland – Plastic Molding
- Plant 47 Vienna – Plastic Molding

The revenue and headcount projections associated with the above products will be provided in Attachment A and A-1 of the National MOU.

### <u>Wages - Production</u>
The Parties agree to different levels of permanent employment for production workers in the Warren Operations.  These different levels will allow the Parties to achieve an all-in (wage, wage related, legally required and benefits) blended rate designed to improve the future viability of the Warren Operations.  The Production Levels to be utilized are as follows:

**Level 1**
**Production**
**Legacy**
- All remaining Legacy Production employees will be considered Level 1 employees
- Level 1 Legacy employees will be paid an hourly rate of $16.50 in addition to benefits negotiated at the National level.
- Buy-down amounts for these employees will be negotiated between the National Parties.
  - The payment schedule for this buy-down will coincide with the nationally agreed payment schedule for production workers.

**Level 2**
**Production**
**Permanent**
- The Parties agree to a new level (Level 2) of permanent production employment at the Warren Operations.  Level 2 will be populated in seniority order after fulfilling the requirements of Level 3 (see below).

**Non-Legacy**

At the time of placement in Level 2, employees will be given the following package:

- o ***Wage and Benefits:*** An hourly wage of $11.00 and a benefit package negotiated by the National Parties.

- Once a Level 3 employee is placed in Level 2 status such an employee will not be reclassified as a Level 3 employee thereafter to satisfy the Level 3 percentage of population requirement.

**Level 3**
**Production**
**Permanent**
**Non-Legacy**

- The Parties agree to a new entry level (Level 3) of production employment. Employees assigned to Level 3 will receive an hourly wage of $10.50 in addition to receiving Holiday Pay, Paid Vacation Entitlement, and Sickness and Accident benefits for 26 weeks over the life of the Agreement. Provisions of Level 3 include:
  - o 25% of Warren production employees will be assigned to Level 3
  - o as attrition is experienced in Level 1 or Level 2, a Level 3 employee will be promoted to Level 2 on a one for one basis in line with seniority as long as the 25% requirement is met.
  - o Attrition, as referred to above, is defined as quit, die, retire, or placement into skilled or permanent salaried position.
  - o Qualifying employees in Level 3 will be placed into openings in Level 2 on the first Monday of the month following the month eligibility is obtained.
  - o upon mutual agreement of the Local Parties the percentage of Level 3 employees may be adjusted in order to attract and secure new business

## Wages - Skilled

The Parties agree to two different levels of permanent employment for skilled workers in the Warren Operations. These different levels will allow the Parties to achieve an all-in (wage, wage related, legally required and benefits) blended rate designed to improve the future viability of the Warren Operations. The Levels to be utilized are as follows:

**Level 1**
**Skilled**
**Legacy**

- All remaining skilled Legacy employees will be considered Level 1 employees
- Level 1 Legacy skilled trades persons will be paid an hourly rate of $26.00 in addition to benefits negotiated at the National level.
- Buy-down amounts for these employees will be $75,000. The payment schedule for this buy-down will coincide with the nationally agreed payment schedule for production workers.

**Level 2**
**Skilled**
**Non-Legacy**

- The Parties agree to establish a new level (Level 2) of permanent skilled employment at the Warren Operations. Level 2 will be populated as required by newly hired skilled trades persons. Wages and benefits for

Level 2 skilled trades will be as follows:

- o **Wages:**  An hourly wage of $20.00 is established for skilled new hires.  These employees will receive a $0.50/hour increase every twenty-six weeks until an hourly rate of $22.00 is attained.  Increases will be paid in the pay period following an employee's accumulation of twenty-six pay periods.  The Parties agree that time on leave, excluding Workers' Compensation leave, is not to be counted towards the twenty-six weeks.
- o **Benefits:**  The benefit package for Level 2 Skilled employees will be negotiated by the National Parties.

| | |
|---|---|
| **Level 2 Skilled** | • The Parties agree to establish a new level (Level 2) of permanent skilled employment at the Warren Operations. Level 2 will be populated as required by new hires. Wages and benefits for Level 2 skilled will be as follows: |

  o ***Wages:*** An average hourly wage of $20.00/hr. is established for skilled new hires. These employees will receive a $0.50/hour increase each six months until an average rate of $22.00 is attained. The Parties agree that time on leave is not to be counted towards the six months.

  o ***Benefits:*** The benefit package for Level 2 Skilled employees will be negotiated by the National Parties.

During these negotiations the Parties discussed the ability of employees to opt in or out of benefits. The Parties recognize the frequent changing of benefit eligibility may not be in the best interest of the employee or the company. As a result, after these Negotiations, the Parties will discuss the periodic review of benefit election. Procedures and guidelines will be established within any legal requirements.

### Temporary Employment

By mutual agreement of the Local Parties, International Union, and Delphi, Temporary Employees may be utilized in the Warren Operations in accordance with local practice and after jointly reviewing the following items:

  o The Number of Temporary Employees
  o The Duration of the Temporary employment
  o The Assignment for Temporary Employees

The Parties agree that in cases where Temporary Employees are utilized, the rate of pay will be $10.00/hour.

The Parties discussed the utilization of Temporary employees should not be a factor in determining the requirements of meeting the percentages identified in Level 1 and Level 3. As a result, the number of Temporary Employees will not be included in the calculation of the Level 1 or Level 3 percentages.

# BROOKHAVEN

## CURRENT STATE

- Booked revenue is projected to decline from $141 million in 2007 to $85 million in 2011.

## GM PRODUCT PROGRAM COMMITMENT

- GM will commit new product programs starting in 2010 – 2012, including wiring programs related to the Global Epsilon II (Compact), GMT-7XX, the C3XX and the GMT 900 wiring extension / GMT 900 BEC extension (through MY 2012).  These wiring programs support the production of LSR seals.  GM will also commit the C3XX BEC to the site. GM is committing these product programs (for specific program details see the charts included in Attachment A-1) with the potential for additional new product programs as they are released.

## DELPHI COMMITMENT

- Upon award (receipt of Purchase Order) of the product programs discussed above, Delphi will immediately commence the required engineering and development activities necessary to maintain GM program timing.

- Delphi will allocate the work to the Brookhaven facility in time to support GM program timing requirements and the product has not been globally sourced by GM.

- Engineering and capital investment of approximately $11 million will be made by Delphi at the Brookhaven facility as required to support the above-designated product programs.

## IUE/CWA COMMITMENT

- Implement the Competitive Operating Agreement (COA) for all employees.

**BROOKHAVEN**

# Packard Electrical / Electronic Architecture
### Brookhaven Operations
#### August 5, 2007

### *Memorandum of Understanding*

This Agreement is entered into this 5th day of August, 2007 between Delphi Packard Electrical / Electronic Architecture, Brookhaven Operations and the IUE-CWA Local 718, the Industrial Division of the Communications Workers of America, AFL-CIO, CLC.

**Modified Site Plan**

The Local Parties agree to the following product portfolio in Brookhaven

- Liquid Silicone Rubber
- BEC Molding and Assembly

The revenue and headcount projections associated with the above products will be provided in Attachment A and A-1 of the National MOU.

**Wages**

The Parties agree to establish different levels of permanent employment for production workers in the Brookhaven Operations. These different levels will allow the Parties to achieve an all-in (wage, wage related, legally required and benefits) blended rate designed to improve the future viability of the Brookhaven Operations. The Levels to be utilized are as follows:

**Level 1**
- Level 1 will make up no less than 20% of the production workforce
- All 57 remaining Legacy employees will be considered Level 1 employees
- Level 1 will be paid an hourly rate of $16.38/hour with the exception of:
  - Team Leaders will be paid an hourly wage of $16.96/hour
  - The nine Legacy employees currently making more than $16.50/hour will be reduced to $16.50/hour not $16.38/hour. If any of these employees are Team Leaders, they will receive the 16.96/hour
    - Buy-down amounts for these employees will be negotiated between the National Parties
- If additional Level 1 employees are required to fulfill the 20% requirement, Level 2 employees will be promoted to Level 1 in seniority order

- o Level 2 Wage and Benefit employees promoted to Level 1 will receive an hourly wage of $12.50.
- o Level 2 Wage only employees promoted to Level 1 will receive an hourly wage of $17.50 (includes Holiday Pay and Vacation Entitlement)
- Level 1 Legacy employees may elect to opt out of Health Care and receive an additional $3.00/hour

**Level 2**
- The Parties agree to establish a new level (Level 2) of permanent employment at the Brookhaven Operations. Level 2 will be populated, in seniority order, after fulfilling the requirements of Level 3 (see below). At the time of placement in Level 2, employees will be given a choice of selecting between two packages:
  - o *Wage and Benefits:* An hourly wage of $10.00/hr. and a benefit package negotiated by the National Parties.
  - o *Wage Only:* An hourly wage of $15.00 with Holiday Pay and Vacation Entitlement.
- If a Team Leader is a Level 2 employee, they will receive $0.50/hour increase over the Level 2 rate

**Level 3**
- The Parties agree to establish a new entry level of production employment having an "all-in" rate of approximately $13.23/hour. Employees assigned to Level 3 will receive an hourly wage of $10.00 in addition to receiving Holiday Pay, Vacation Entitlement and 26 weeks of S&A benefits over the life of the Agreement. Provisions of Level 3 include:
  - o 35% of Brookhaven production employees will be assigned to Level 3
  - o as attrition is experienced in Level 1 or Level 2, a Level 3 employee will be promoted to Level 2 on a one for one basis in line with seniority as long as the 35% requirement for Level 3 is met
  - o with mutual agreement, the Local Parties have the ability to increase the percentages of Level 3 employees in order to attract and secure new business
- If a Team Leader is a Level 3 employee, they will receive $0.50/hour increase over the Level 3 rate

The Local Union requested the National Parties discuss during these Negotiations the issue of Sickness and Accident benefits not being paid to employees excluded from coverage by the terms of this agreement (Level 2 - $15.00/hour and Level 3).

During these negotiations the Parties discussed the ability of employees to opt in or out of benefits. The Parties recognize the frequent changing of benefit eligibility may not be in the best interest of the employee or the company. As a result, after these Negotiations,

the Parties will discuss the periodic review of benefit election.  Procedures and guidelines will be established within any legal requirements.

### Temporary Employment

By mutual agreement of the Local Parties, the International Union and Delphi, Temporary Employees may be utilized in the Brookhaven Operations in accordance with local practice and after jointly reviewing the following items:
- The Number of Temporary Employees
- The Duration of the Temporary employment
- The Assignment for Temporary Employees

The Parties agree that in cases where Temporary Employees are utilized, the rate of pay will be $9.95/hour.

The Parties discussed the utilization of Temporary employees should not be a factor in determining the requirements of meeting the percentages identified in Level 1 and Level 3.  As a result, the number of Temporary Employees will not be included in the calculation of the Level 1 or Level 3 percentages.

## CLINTON

### CURRENT STATE

- Booked revenue is projected to decrease from $204 million in 2007 to $130 million in 2011.

### GM PRODUCT PROGRAM COMMITMENT

- GM will commit to new product programs starting in 2010 – 2012, including wiring programs related to the Global Epsilon II (Compact), the GMT 900 extension (through MY 2012), GMT-7XX and the C3XX. These wiring programs support the production of connectors, terminals and cable.  GM is committing these product programs (for specific program details see the charts included in Attachment A-1) with the potential for additional new product programs as they are released.

- GM continues to reserve the right to globally source selected wiring programs, however guarantees component penetration will be maintained by directing the tier to buy Delphi connection systems.

### DELPHI COMMITMENT

- Upon award (receipt of Purchase Order) of the product programs discussed above, Delphi will immediately commence the required engineering and development activities necessary to maintain GM program timing.

- Delphi will allocate the work to the Clinton facility in time to support GM program timing requirements and the product has not been globally sourced by GM.

- Engineering and capital investment of approximately $5 million will be made by Delphi at the Clinton facility as required to support the above-designated product programs.

### IUE-CWA COMMITMENT

- Negotiate and implement a Competitive Operating Agreement (COA) for all employees.

<u>**CLINTON**</u>

# Packard Electrical / Electronic Architecture
## Clinton Operations
### August 5, 2007

*<u>Memorandum of Understanding</u>*

This Agreement is entered into this 5th day of August, 2007 between Delphi Packard Electrical / Electronic Architecture, Clinton Operations and the IUE-CWA Local 698, the Industrial Division of the Communications Workers of America, AFL-CIO, CLC.

**<u>Modified Site Plan</u>**
The Local Parties agree to support the Packard tool optimization plan by consolidating metal stamping and some conventional molding to Warren.  As a result the Keep Products (Plants) for the Clinton Operations will be as follows:
- Premo Molding
- Conventional Molding
- Cable Manufacturing

The revenue and headcount projections associated with the above products will be provided in Attachment A and A-1 of the National MOU.

Management estimates it will take approximately 120 days after ratification to implement the tool optimization plan.  As a result, the Parties agree the least senior 150 current Temporary Employees will retain their status of temporary employees during the implementation of the tool optimization plan.  It is understood that these employees will receive a $10.25/hr wage during this period.  If the services of these employees are required after the plan, they will be converted to Level 3 status in line with their seniority.

**<u>Wages - Production</u>**
The Parties agree to establish different levels of permanent employment for production workers in the Clinton Operations.  These different levels will allow the Parties to achieve an all-in (wage, wage related, legally required and benefits) blended rate designed to improve the future viability of the Clinton Operations.  The Levels to be utilized are as follows:

**Level 1**
**Production**
- Level 1will make up no less than 25% of the production workforce
- All 108 remaining Legacy employees will be considered Level 1 employees
- Level 1 will be paid an average hourly rate of $16.50/hour
  - The Local Parties will establish the appropriate rates of pay for the classifications taking into consideration the weighted average
- Buy-down amounts for these employees will be negotiated between the

National Parties
- If additional Level 1 employees are required to fulfill the 25% requirement, Level 2 employees will be promoted to Level 1 in seniority order
  - Level 2 employees promoted to Level 1 will receive an hourly wage of $12.50
  - Level 2 Wage only employees promoted to Level 1 will receive an hourly wage of $17.50 (includes Holiday Pay and Vacation Entitlement)
- Level 1 Legacy employees may elect to opt out of Health Care and receive an additional $3.00/hour

**Level 2**
**Production**
- The Parties agree to establish a new level (Level 2) of permanent production employment at the Clinton Operations.  Level 2 will be populated in seniority order after fulfilling the requirements of Level 3 (see below).  At the time of placement in Level 2, employees will be given a choice of selecting between two packages:
  - ***Wage and Benefits:***  An hourly wage of $10.50/hr. and a benefit package negotiated by the National Parties.
  - ***Wage Only:***  An hourly wage of $15.00 with Holiday Pay, Vacation Entitlement and 26 weeks of Sickness and Accident benefits over the life of the Agreement

**Level 3**
- The Parties agree to establish a new entry level of production employment having an "all-in" rate of approximately $13.23/hour. Employees assigned to Level 3 will receive an hourly wage of $10.25 in addition to receiving Holiday Pay, Vacation Entitlement and 26 weeks of Sickness and Accident benefits over the life of the Agreement. Provisions of Level 3 include:
  - 35% of Clinton production employees will be assigned to Level 3
  - as attrition  is experienced in Level 1 or Level 2, a Level 3 employee will be promoted to Level 2 on a one for one basis in line with seniority as long as the 35% requirement is met
  - with mutual agreement, the Local Parties have the ability to increase the percentages of Level 3 employees in order to attract and secure new business

**Wages - Skilled**
The Parties agree to establish different levels of permanent employment for skilled workers in the Clinton Operations.  These different levels will allow the Parties to achieve an all-in (wage, wage related, legally required and benefits) blended rate designed to improve the future viability of the Clinton Operations.  The Levels to be utilized are as follows:

| | |
|---|---|
| **Level 1 Skilled** | • All 53 remaining skilled Legacy employees will be considered Level 1 employees<br>• Level 1 will be comprised of classifications with a weighted average of $24.00 an hour<br>    o The Parties agree to determine the appropriate classifications and wage rates in order to achieve a weighted average of $24.00/hour within 30 days of ratification<br>• Buy-down amount of $80,000will be paid to these employees.  The timing of the pay-out will be negotiated by the National Parties.<br>• Level 1 employees may elect to opt out of Health Care and receive an additional $3.00/hour |
| **Level 2 Skilled** | • The Parties agree to establish a new level (Level 2) of permanent skilled employment at the Clinton Operations.  Level 2 will be populated as required by new hires.  Wages and benefits for Level 2 skilled will be as follows:<br>    o ***Wages:*** An average hourly wage of $20.00/hr. is established for skilled new hires.  These employees will receive a $0.50/hour increase each six months until an average rate of $22.00 is attained.  The Parties agree that time on leave is not to be counted towards the six months.<br>    o ***Benefits:*** The benefit package for Level 2 Skilled employees will be negotiated by the National Parties.<br>• Level 2 skilled employees may elect to opt out of Health Care and receive an additional $3.00 per hour. |

The Local Union requested the National Parties discuss during these Negotiations the issue of Sickness and Accident benefits not being paid to employees excluded from coverage by the terms of this agreement (Level 2 - $15.00/hour and Level 3).

During these negotiations the Parties discussed the ability of employees to opt in or out of benefits.  The Parties recognize the frequent changing of benefit eligibility may not be in the best interest of the employee or the company.  As a result, after these Negotiations, the Parties will discuss the periodic review of benefit election.  Procedures and guidelines will be established within any legal requirements.

Within ninety days of ratification, the Local Parties will meet to discuss future skilled trade requirements as a result of the Special Attrition Program.  During these discussions the feasibility of an apprentice / upgrader program will be evaluated.

## Temporary Employment

By mutual agreement of the Local Parties, International Union, and Delphi, Temporary Employees may be utilized in the Clinton Operations in accordance with local practice and after jointly reviewing the following items:
- o The Number of Temporary Employees
- o The Duration of the Temporary employment

o   The Assignment for Temporary Employees

The Parties agree that in cases where Temporary Employees are utilized, the rate of pay will be $9.95/hour.

The Parties discussed the utilization of Temporary employees should not be a factor in determining the requirements of meeting the percentages identified in Level 1 and Level 3.  As a result, the number of Temporary Employees will not be included in the calculation of the Level 1 or Level 3 percentages.

# GADSDEN

## GENERAL

- Intent of all parties is to complete the divestiture as soon as possible and in any event by end of 2007.
- Objective is to accomplish a transfer of operations to a new owner as an on-going business.

## CURRENT STATE

- Booked revenue projected to be stable between 2007 and 2011 at an annual level of approximately $62 million (reference Attachment A-1).
- New work opportunities at Delphi's Gadsden plant (supplier to the Mercedes assembly plant) include future cockpit programs. This new business represents a continued annual revenue stream of approximately $62 million. Winning this new business will be dependent upon the plant's ability to satisfy Mercedes' requirements in the areas of quality, technology and cost.
- The basis of competition for production of this product is generally dominated by low-cost U.S.-based assemblers/molders. Therefore, it is critical for the future of the plant that the parties work together to address this ongoing competitive challenge.

## DELPHI COMMITMENT

- Support the sale of the business.
- Agree to sale of assets as appropriate to support sale the business.
- Support hourly workforce transformation.
- Support the transition of technical expertise and resources.

## IUE-CWA COMMITMENT

- Waive Document 63 of the National Agreement to the extent necessary to complete the sale/transformation.
- Implement the competitive agreement to support the plant in winning new business.

## GADSDEN

The IUE-CWA and Delphi, with the involvement and concurrence of the prospective buyer, agree to the following wage provisions for all production employees, including employees who are active, on any leave of absence or on temporary layoff in the Gadsden Operations:

1)  Production Employees

    a.  For employees hired before the effective date of this agreement:

        Each Employee's base wage rate (excluding all premiums, overtime, night shift premium, team leader premium, quality premium, etc.) will be increased by 3% on the following dates:

                    November 15, 2007
                    November 15, 2008
                    November 15, 2009
                    November 15, 2010

        Any employees whose base wage rate is below $9.00 will immediately be raised to $9.00 on the effective date of this agreement.

    b.  For employees hired on or after the effective date of this agreement, the following wage scale will apply:

        | Years of seniority | Wage rate |
        |---|---|
        | Start | $9.00 |
        | 1 but < 2 | $9.27 |
        | 2 but < 3 | $9.55 |
        | 3 but < 4 | $9.83 |
        | 4 but < 5 | $10.13 |
        | 5 but < 6 | $10.43 |

1.2    Employees selected and functioning as Team Leaders will be paid their regular base wage plus an additional $1.00 per hour.

1.3    Employees selected and functioning in a NTBU capacity will be paid their regular base wage plus an additional $.50 per hour.

2)  Outline of Benefits

    •  320 Health Care Plan after 7 months of seniority
    •  Dental and prescription drug coverage under 320 health plan

- Defined Contribution Plan – Employer contribution as percentage of base wage rate on all compensated hours
  - o 4% - 5 years of seniority or less
  - o 8% - more than 5 years of seniority
- Employer paid Basic Life Insurance after one month following date of hire – 10 year grow in to full coverage

Disability Benefits – 60% of base pay for up to 52 weeks.  Ten year grow in to full coverage

## KETTERING

### GENERAL

- The Parties agree to complete the transition to Newco as soon as possible.
- Objective is to accomplish the transfer of operations to Newco, currently Tenneco, as an on-going business.
- Objective is to maintain a presence in the Dayton, Ohio area.

### CURRENT STATE

- Booked revenue projected to decline from $235 million in 2007 to $111 million in 2011 (reference Attachment A-1).
- New work for the plant includes a variety of struts, strut modules and shock absorber programs (reference Attachment A-1 for specific commitments).  This new business generates an annual revenue stream of approximately $111 million in 2011.  Winning this new business was dependent upon the plant's ability to satisfy the customer's requirements in the areas of quality, technology and cost and negotiate a competitive local agreement.

### GM COMMITMENT

- GM will award new product programs to Newco as outlined in Attachment A-1, which includes struts, strut modules and shock absorber programs.
- Grant Newco a ROLR for next generation replacement programs as they are identified through the GM Product Development Process for the programs described above.
- The job opportunities described above will provide an initial commitment of approximately 325 jobs at inception with 200 jobs through the life of the Agreement.

### DELPHI COMMITMENT
- Support the transfer of the business.
- Agree to sale of assets as appropriate for transfer of Kettering.
- Consider facility lease proposals as appropriate with respect to the transfer process.
- Support hourly workforce transformation.
- Support the transition of technical expertise and resources as appropriate.

### IUE-CWA COMMITMENT

- Waive Document 63 of the National Agreement to the extent necessary to complete the sale/transformation.