Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 05-44481-rdd

5  - - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  DPH HOLDINGS CORP., ET AL.,

9

10          Debtors.

11

12  - - - - - - - - - - - - - - - - - - - - - -x

13

14                U.S. Bankruptcy Court

15                300 Quarropas Street

16                White Plains, New York

17

18                June 21, 2011

19                10:10 AM

20

21  B E F O R E:

22  HON. ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25

Page 2

1

2    Hearing Re:  Whether the Reorganized Debtors' Proposed Amended

3    Complaints meet the Rule 8 pleading standard pursuant to

4    Twombly and Iqbal and also comply with the Dismissal Order

5    entered by this Court on September 7, 2010.

6

7    Hearing Re:  Whether certain individual preferential transfers

8    alleged in the Proposed Amended Complaints, but not alleged in

9    the Original Complaints, should now be dismissed because they

10   do not relate back to the dates the Original Complaints were

11   filed.

12

13   Hearing Re:  With respect to Defendants that raise a contract

14   assumption defense at the hearing, whether the factual disputes

15   between the Reorganized Debtors and those Defendants warrants

16   further discovery and investigation.

17

18   Hearing Re the Fourth Extension Challenges.

19

20   Hearing Re:  The procedures to be implemented to adjudicate the

21   case-sensitive, nonpleading-based, factual issues that the

22   Defendants originally raised in their Motions to Vacate and

23   Dismiss, and then raised again in opposition to the Motions.

24   Those issues include, by way of example and not limitation,

25   issues related to notice and prejudice in connection with the

1   Rule 4(m) orders.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Dena Page

Page 4

```
 1

 2   A P P E A R A N C E S :

 3   BUTZEL LONG, P.C.

 4         Attorneys for the Reorganized Debtors

 5         Suite 100

 6         150 West Jefferson

 7         Detroit, MI 48226

 8

 9   BY:   CYNTHIA J. HAFFEY, ESQ.

10         BRUCE L. SENDEK, ESQ.

11         DONALD V. ORLANDONI, ESQ.

12

13

14   BUTZEL LONG, P.C.

15         Attorneys for the Reorganized Debtors

16         Stoneridge West

17         41000 Woodward Avenue

18         Bloomfield Hills, MI 48304

19

20   BY:   THOMAS B. RADOM, ESQ.

21         SHELDON H. KLEIN, ESQ.

22

23

24

25
```

Page 5

1

2

3    TOGUT, SEGAL & SEGAL, LLP

4         Attorneys for the Reorganized Debtors

5         One Penn Plaza

6         New York, NY 10019

7

8    BY:   RICHARD K. MILIN, ESQ.

9

10

11   ARCHER & GREINER, P.C.

12        Attorneys for Magnesium Electron, Inc.

13        One Centennial Square

14        Haddonfield, NJ 08033

15

16   BY:   JERROLD S. KULBACK, ESQ.

17

18

19   BOSE, MCKINNEY & EVANS

20        Attorneys for Decatur Plastic Products

21        111 Monument Circle

22        Suite 2700

23        Indianapolis, IN 46204

24

25   BY:   DAVID J. JURKIEWICZ, ESQ. (TELEPHONICALLY)

Page 6

1

2    BRADLEY, ARANT, BOULT CUMMINGS LLP

3          Attorneys for the Calsonic Entities, Multi-Tronics

4          1600 Division Street

5          Suite 700

6          Nashville, TN 37203

7

8    BY:   ROGER G. JONES, ESQ.

9          T. PARKER GRIFFIN, ESQ. (TELEPHONICALLY)

10

11

12   BRYAN CAVE LLP

13          Attorneys for Spartech Polycom

14          211 North Broadway

15          Suite 3600

16          St. Louis, MO 63102

17

18   BY:   CHRISTOPHER LAWHORN, ESQ. (TELEPHONICALLY)

19

20

21

22

23

24

25

Page 7

1

2    CALFEE, HALTER & GRISWOLD LLP

3           Attorneys for Williams Advanced Materials, Blair Strip

4             Steel Co., and Park Ohio

5           1400 KeyBank Center

6           800 Superior Avenue

7           Cleveland, Ohio 44114

8

9    BY:   KEVIN P. SHANNON, ESQ. (TELEPHONICALLY)

10

11

12    CLARK HILL PLC

13           Attorneys for Detroit Products, International, successor

14             to Doshi Prettl International

15           151 South Old Woodward Avenue

16           Suite 200

17           Birmingham, MI 48009

18

19    BY:   JOEL D. APPLEBAUM, ESQ.

20           MAHESH K. NAYAK, ESQ.

21

22

23

24

25

Page 8

1

2    FOX ROTHSCHILD LLP

3         75 Eisenhower Parkway

4         Suite 200

5         Roseland, NJ 07068

6

7    BY:   RICHARD M. METH, ESQ.

8

9

10   FROST BROWN TODD LLC

11        Attorneys for Republic Engineered Products

12        2200 PNC Center

13        201 East Fifth Street

14        Cincinnati, OH 45202

15

16   BY:   DOUGLAS L. LUTZ, ESQ.

17

18

19   GOODWIN PROCTER LLP

20        Attorneys for ANSYS Inc. successor to Fluent Inc.

21        620 Eighth Avenue

22        New York, NY 10018

23

24   BY:   BRIAN W. HARVEY, ESQ.

25

Page 9

1

2    GREENEBAUM DOLL & MCDONALD PLLC

3         Attorneys for DSSI LLC

4         3500 National City Tower

5         101 South Fifth Street

6         Louisville, KY 40202

7

8    BY:   CLAUDE R. "CHIP" BOWLES, JR., ESQ.

9

10

11   H. BUSWELL ROBERTS, JR., PLLC

12        Attorneys for Owens Corning

13        1000 Jackson Street

14        Toledo, OH 43604

15

16   BY:   H. BUSWELL "BUZZ" ROBERTS, ESQ. (TELEPHONICALLY)

17

18

19   HODGSON RUSS, LLP

20        Attorneys for Unifrax Corp.

21        140 Pearl Street

22        Suite 100

23        Buffalo, NY 14202

24

25   BY:   JAMES C. THOMAN, ESQ. (TELEPHONICALLY)

Page 10

1

2   HONIGMAN MILLER SCHWARTZ & COHN, LLP

3         Attorneys for Tech Central, et al.

4         2290 First National Building

5         660 Woodward Avenue

6         Detroit, MI 48226

7

8   BY:   JUDY B. CALTON, ESQ. (TELEPHONICALLY)

9         I. W. WINSTEN, ESQ. (TELEPHONICALLY)

10

11

12   HOWICK, WESTFALL, MCBRYAN & KAPLAN, LLP

13         Attorneys for Vanguard Distributors, Inc.

14         Suite 600, One Tower Creek

15         3101 Tower Creek Parkway

16         Atlanta, GA 30339

17

18   BY:   LOUIS G. MCBRYAN, ESQ.   (TELEPHONICALLY)

19

20

21

22

23

24

25

Page 11

1

2   JAECKLE, FLEISCHMANN & MUGEL, LLP

3        Attorneys for Jamestown Container Corporation

4        12 Fountain Plaza

5        Suite 800

6        Buffalo, NY 14202

7

8   BY:   BEVERLY S. BRAUN, ESQ. (TELEPHONICALLY)

9

10

11   KEATING, MUETHING & KLEKAMP, PLL

12        Attorneys for FA Pech

13        One East Fourth Street

14        Suite 1400

15        Cincinnati, OH 45202

16

17   BY:   JASON V. STITT, ESQ. (TELEPHONICALLY)

18

19

20

21

22

23

24

25

Page 12

1

2    KELLEY DRYE & WARREN LLP

3        Attorneys for TCS America International Corp.,

4            BP Amoco Corp., BP Products North America, Inc.,

5        Castrol and Castrol Industrial

6        101 Park Avenue

7        New York, NY 10178

8

9    BY:   GILBERT R. SAYDAH, JR., ESQ.

10

11

12   KIRKLAND & ELLIS, LLP

13        Attorneys for Magnesium Aluminum Corp.

14        300 North LaSalle

15        Chicago, IL 60654

16

17   BY:   DAVIS SPIEGEL, ESQ. (TELEPHONICALLY)

18

19

20

21

22

23

24

25

Page 13

1

2    LAMBERT, LESER, ISACKSON, COOK & GIUNTA, P.C.

3         Attorneys for Stephenson & Sons and ProTech Machine

4         309 Davidson Building

5         916 Washington Avenue

6         Bay City, MI 48708

7

8    BY:   SUSAN M. COOK, ESQ. (TELEPHONICALLY)

9

10

11   LOCKE LORD BISSELL & LIDELL LLP

12        Attorneys for Methode Electronics

13        3 World Financial Center

14        New York, NY 10281

15

16   BY:   ZACHARY D. SILBERSHER, ESQ.

17        SHALOM JACOB, ESQ.

18

19

20   MCGRAIL & BENSINGER LLP

21        Attorneys for Solid State Stamping

22        676A Ninth Avenue #211

23        New York, NY 10036

24

25   BY:   DAVID C. MCGRAIL, ESQ.

Page 14

1

2    MOSES & SINGER LLP

3        Attorneys for the Timken Company and the Timken

4         Corporation

5        405 Lexington Avenue

6        New York, NY 10174

7

8    BY:   JAMES M. SULLIVAN, ESQ.

9

10

11   POLSINELLI SHUGHART, P.C.

12       Attorneys for Florida Production Engineering

13       222 Delaware Avenue

14       Suite 1101

15       Wilmington, DE 19801

16

17   BY:   SHANTI M. KATONA, ESQ. (TELEPHONICALLY)

18

19

20   REED SMITH LLP

21       Attorneys for Wells Fargo Bank, N.A.

22       599 Lexington Avenue

23       New York, NY 10022

24

25   BY:   MARK D. SILVERSCHOTZ, ESQ.

Page 15

1

2    REED SMITH LLP

3         Attorneys for Wells Fargo, N.A.

4         2500 One Liberty Place

5         1650 Market Street

6         Philadelphia, PA 19103

7

8    BY:   DEREK J. BAKER, ESQ.

9

10

11   RUSKIN MOSCOU FALTISCHEK, P.C.

12        Attorneys for Wells Fargo, N.A.

13        East Tower, 15th Floor

14        1425 RXR Plaza

15        Uniondale, NY 11556

16

17   BY:   MICHAEL T. ROZEA, ESQ.

18         JEFFREY A. WURST, ESQ.

19

20

21

22

23

24

25

Page 16

1

2     SNELL & WILMER LLP

3          Attorneys for Microchip Technologies, Inc.

4          One Arizona Center

5          Phoenix, AZ 85004

6

7     BY:   STEVEN D. JEROME, ESQ.

8

9

10    STEVENS & LEE, P.C.

11         Attorneys for Globe Motors, Inc.

12         485 Madison Avenue

13         20th Floor

14         New York, NY 10022

15

16    BY:   CONSTANTINE D. POURAKIS, ESQ.

17

18

19    TAFT, STETTINIUS & HOLLISTER, LLP

20         Attorneys for Select Industries, Corp.

21         425 Walnut Street

22         Suite 1800

23         Cincinnati, OH 45202

24

25    BY:   PAIGE L. ELLERMAN, ESQ. (TELEPHONICALLY)

Page 17

1

2    THE MICHAELSON LAW FIRM

3         Attorneys for NXP Semiconductors, successor to Philips

4          Semiconductors

5         11 Broadway

6         Suite 615

7         New York, NY 10004

8

9    BY:   ROBERT N. MICHAELSON, ESQ.

10

11

12   THOMPSON HINE LLP

13        Attorneys for Rick Group

14        2000 Courthouse Plaza, N.E.

15        10 West Second Street

16        Dayton, Ohio 45402

17

18   BY:   JENNIFER L. MAFFETT, ESQ. (TELEPHONICALLY)

19

20

21

22

23

24

25

Page 18

1

2    THOMPSON & KNIGHT LLP

3         Attorneys for Victory Packaging

4         900 Third Avenue

5         20th Floor

6         New York, NY 10022

7

8    BY:   IRA L. HERMAN, ESQ.

9

10

11   TODTMAN, NACHAMIE, SPIZZ & JOHNS, P.C.

12        Attorneys for Select Industries Corp.

13        425 Park Avenue

14        New York, NY 10022

15

16   BY:   JANICE B. GRUBIN, ESQ.

17

18

19   VORYS, SATER, SEYMOUR & PEASE LLP

20        Attorneys for Carlise Companies, Inc.

21        52 East Gay Street

22        Columbus, OH 43215

23

24   BY:   TIFFANY S. COBB, ESQ. (TELEPHONICALLY)

25

1

2   WARNER NORCROSS & JUDD LLP

3          900 Fifth Third Center

4          111 Lyon Street, N.W.

5          Grand Rapids, MI 49503

6

7   BY:   MICHAEL B. O'NEAL, ESQ.

8

9

10  WINDELS MARX LANE & MITTENDORF, LLP

11         156 West 56th Street

12         New York, NY 10019

13

14  BY:   HOWARD L. SIMON, ESQ.

15

16

17  WINEGARDEN HALEY LINDHOLM & ROBERTSON, P.L.C.

18         Attorneys for HSS, LLC

19         G-9460 South Saginaw Road

20         Suite A

21         Grand Blanc, MI 48439

22

23  BY:   DENNIS HALEY, ESQ. (TELEPHONICALLY)

24

25

Page 20

1

2  WOLFSON BOLTON PLLC

3        Attorneys for Ex-cell-o Machine Tools

4        3150 Livernois

5        Suite 275

6        Troy, MI 48083

7

8  BY:   ANTHONY J. KOCHIS, ESQ.

9

10

11  YOUNG, CONAWAY, STARGATT & TAYLOR, LLP

12        Attorneys for Tyco Electronics Corp.

13        1000 West Street

14        17th Floor

15        Wilmington, DE 19801

16

17  BY:   JOSEPH BARRY, ESQ. (TELEPHONICALLY)

18

19

20

21

22

23

24

25

Page 21

1                    P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.

4              Okay, good morning.  In re DPH Holdings.

5              MS. HAFFEY:  Good morning, Your Honor.

6              Good morning, Your Honor.  I'm Cynthia Haffey from the

7    law firm of Butzel Long representing the reorganized debtors in

8    forty-seven of the preference cases subject to today's hearing.

9              Also here, today, is the law firm of Togut, Segal &

10   Segal which as conflicts counsel, represents the reorganized

11   debtors in the remaining preference actions.

12             Seated with me at counsel table this morning are Bruce

13   Sendek, Sheldon Klein, all from Butzel Long.  Along with

14   myself, Mr. Klein and Mr. Sendek will be addressing issues that

15   arise from the reorganized debtors' motions for leave to amend

16   their original complaints, as well as from the motion that was

17   filed by certain of the preference defendants requesting relief

18   from the Court's fourth order extending the time to serve the

19   preference complaints.

20             If I may, Your Honor, first, in the interest of

21   housekeeping, and very briefly by way of background, I thought

22   I'd give the Court a status as to the preference actions in

23   total.  As this Court may recall, we filed a total of 179

24   preference complaints.  And Butzel Long is counsel in 168 of

25   those cases, and Togut, as I said earlier, has the balance of

Page 22

1    the actions.

2         Prior to filing the motions for leave to amend, the

3    Butzel actions were reduced; we resolved 45 of those 168.  So

4    when we filed the motions for leave to amend in September, we

5    filed in 123 of those actions.

6         Since filing those motions to amend, we have resolved

7    an additional 52 of those 123 cases, so of only 168 cases, only

8    71 remain.  Of those, we've had several cases in which we have

9    not had counsel file an appearance, and we have twenty-four of

10   those actions where the motion, today, is unopposed.  And I

11   will ask Mr. Milin from Togut to give you a brief update on the

12   Togut cases, Your Honor.

13        THE COURT:  Okay.

14        MR. MILIN:  Your Honor, we filed eleven actions.

15   We're down to six.  Of the six, there are three who have filed

16   motions.  One of them does not raise Rule 8 issues and so it

17   won't be at issue today.  Of the two that do raise Rule 8

18   issues, one, we've reached a settlement in principle leaving a

19   sole defendant at issue today.

20        THE COURT:  Okay.

21        MS. HAFFEY:  Now, regarding today's agenda, the Court

22   may recall that back in December -- I think it was December

23   17th of 2010 -- there was a conference call between the parties

24   and the Court in which the issue of today's agenda was

25   discussed and agreed upon.  Prior to that call, the Butzel firm

DPH HOLDINGS CORP., ET AL.

Page 23

1    sent this Court a list of its proposed issues, and the Honigman

2    firm, generally -- and I believe the Dickinson Wright firm, if

3    I recall, Your Honor, generally on behalf of the responding

4    defendants, each submitted a proposed hearing agenda to

5    chambers, as well.

6           On the call, the parties agreed to work from the

7    defendants' agenda list, and during that call, this Court

8    decided what issues that it would hear today.  And those can be

9    summarized into five topics.

10          First, whether the reorganized debtors' proposed

11   amended complaints meet the Rule 8 pleading standard under

12   Twombly and Iqbal as well as under this Court's dismissal order

13   that was entered on September 7, 2010.

14          Second, whether individual preferential transfers that

15   are alleged in the proposed amended complaints, but that were

16   not alleged in the original complaints, relate back to the

17   original complaints.

18          Third, to the extent that there is a defendant who

19   raises a contract assumption defense today, whether the

20   reorganized debtors have sufficiently investigated the defense

21   and dispute in good faith such that dismissal at this stage is

22   unwarranted.

23          Fourth, in addition to those issues, as I mentioned a

24   moment ago, we also have a motion that was filed by certain

25   defendants seeking relief from the Court's fourth order under

DPH HOLDINGS CORP., ET AL.

Page 24

```
 1    Rule (m) (sic).
 2           And then finally, the Court also advised that it would
 3    address today what procedures it would put in place to
 4    adjudicate the case-sensitive, nonpleading-based, factual
 5    issues that the defendants originally raised in their motions
 6    to dismiss, to vacate and then raised again in their
 7    oppositions to the reorganized debtors' motion to seek leave.
 8    And those issues include, by way of example but not limitation,
 9    issues related to notice and prejudice in connection with the
10    Rule 4(m) orders.
11           In presenting today's argument, let me just --
12           THE COURT:  Let me just interrupt you there.
13           MS. HAFFEY:  Sure.
14           THE COURT:  Do the objectors agree with that agenda?
15           MR. SULLIVAN:  No, Your Honor.
16           THE COURT:  Okay.
17           MR. SULLIVAN:  I was going to get into a little bit of
18    an introductory argument, but just -- if you want me to limit
19    it to just the agenda --
20           THE COURT:  No, I just want to focus on the agenda.
21           MR. SULLIVAN:  Okay.  James Sullivan from Moses &
22    Singer, counsel for the Timken Company and the Timken
23    Corporation.
24           Your Honor, it took a while, but the defendants really
25    have been trying their best to try to work collaboratively
```

DPH HOLDINGS CORP., ET AL.

Page 25

1   together, and the group decided, for some reason, to elect me

2   to represent them in laying out what they proposed should be

3   the agenda for today's hearing.

4           And to start, Your Honor, the defendants would like to

5   address the defendants' failure to abide by the Court's

6   directives during -- I'm sorry -- address the

7   debtors'/plaintiffs' failure to abide by the Court's directives

8   during the December 17th status hearing.  Specifically, the

9   debtors were ordered to individually brief each of the

10  arguments raised by the defendants, and second, the debtors

11  were ordered to respond to requests for documents and

12  information bearing on the contract assumption and release

13  issues by early January.  The plaintiffs have done neither of

14  these things.  They failed to comply, and this issue was

15  noticeably omitted from the plaintiffs' proposed agenda.

16          Ira Herman will be taking the lead on this issue,

17  and --

18          THE COURT:  Well, isn't that subsumed, though -- the

19  latter point, isn't that subsumed in the contract assumption

20  issue?

21          MR. SULLIVAN:  The latter point, yes, Your Honor, we

22  can address it in connection with the contract assumption, but

23  aside and apart from the merits of that argument, it goes to

24  compliance with Your Honor's directives.

25          THE COURT:  Okay, and on the first point, I treat that

1    as subsumed within the Rule 8 leave to amend issues, although,

2    I mean, in both cases, there's a burden of proof issue, and I

3    think the failure to respond is a burden of proof issue.  So --

4              MR. SULLIVAN:  Sure, Your Honor.

5              THE COURT:  All right, so --

6              MR. SULLIVAN:  Sure, Your Honor, but I thought it was

7    worth kind of --

8              THE COURT:  All right, no, I understand.  Okay.

9              MR. SULLIVAN:  -- I thought it was a threshold issue,

10   Your Honor --

11             THE COURT:  Fine.

12             MR. SULLIVAN:  -- may want to get into.

13             THE COURT:  All right.

14             MR. SULLIVAN:  And that's why we thought that it

15   should be addressed up front.

16             THE COURT:  All right, are there any other agenda

17   issues?  And in particular, I had one, and I just wanted to

18   make sure that we're on the same page with this.  Both counsel

19   for the plaintiffs have referred to the first issue as whether

20   the proposed amended complaints meet Rule 8 and the

21   requirements of my September 7th, 2010 order.  That isn't the

22   only aspect of a Rule 15 motion.

23             MR. SULLIVAN:  Correct, Your Honor.

24             THE COURT:  And while I understand that this was not

25   set up as a factual hearing on prejudice, for example, nor an

DPH HOLDINGS CORP., ET AL.

Page 27

1    evidentiary hearing on prejudice, it would seem to me that if,

2    in fact, there are other aspects of the Rule 15(a) standard

3    that you all can show are not satisfied as a matter of law,

4    then that should be part of this, whether it's compliance with

5    Rule 8 or some other aspect of Rule 15(a).  Am I missing

6    something on that?

7            MR. SULLIVAN:  Your Honor, I think, among other

8    things, for example, bad faith, undue delay, and dilatory

9    motive are also components of Rule 15.

10           THE COURT:  Right.  Well, among other things, people

11   have asserted that they never got notice of the original

12   orders.  I mean, at some point, maybe this is not a factual

13   issue; it's really an issue of law.  I mean, I don't know.  I'm

14   asking you all, is that something you all agreed to keep out of

15   this hearing?

16           MS. HAFFEY:  Your Honor --

17           THE COURT:  And I'm making a distinction between this

18   not being an evidentiary hearing and a hearing where there is a

19   burden of proof, albeit a fairly light one on the plaintiff in

20   a motion to amend that it needs to carry, and there are

21   assertions that have been made that I'm not sure have been

22   rebutted in some respects that pertain to more than just Rule

23   8.

24           MR. SULLIVAN:  I agree, Your Honor.

25           MS. HAFFEY:  Your Honor, may --

```
 1            THE COURT:  All right, let me -- I mean, it's a

 2   question addressed to you as much as to the defendants.

 3            MS. HAFFEY:  Thank you, Your Honor.  And I would refer

 4   the Court to page 33.  The Court was wise enough to have a

 5   transcript of our conference on December 17th, and on page 33,

 6   line 3 and 4, when addressing the issue of the "no notice"

 7   defendants, if I can refer to them in that category, the Court

 8   said, "All right, I'm not going to deal with the notice issues

 9   on the 17th."  And at that time, this hearing was scheduled for

10   February 17th.  So you expressly stated that we would not be

11   dealing with no notice at today's hearing.  And in fact,

12   plaintiffs have relied on that --

13            THE COURT:  All right, but that wasn't in the context

14   of the 4(m), as opposed to Rule 15?

15            MS. HAFFEY:  It was in the context of Rule 15, Your

16   Honor.  It wasn't -- we dealt with the 4(m) later on in the

17   conference.

18            And then, in regards to the broader issues, in fact,

19   the conversation with the Court during the December 17th

20   hearing was with Mr. Sullivan, and he was making some of these

21   arguments to the Court, and on page 36, the Court said that "I

22   understand that the people would like to have a complete

23   resolution on their particular claim, but I don't think that

24   can happen on an omnibus basis.  What can happen is an analysis

25   of the amended complaint and whether on its face, it's unlikely
```

DELPHI HOLDINGS CORP., ET AL.

Page 29

1    to succeed and/or failing the Twombly-Iqbal standards," and

2    that's already been briefed.

3              MR. SULLIVAN:  Your Honor, the first thing I'd like to

4    say is that I think the plaintiff sort of did the defendants a

5    favor by not responding to a bunch of the arguments.  I think

6    as a matter of law, you can find that they basically waived or

7    abandoned the ability to oppose those arguments, and therefore,

8    we should win it as a matter of law on a host of different

9    issues.  I attach as an exhibit to the Timken surreply, just

10   for something for informational purposes for the Court which

11   kind of lays out some of the arguments that each of the

12   defendants raised, and each of these arguments were unrebutted

13   by counsel for the plaintiffs.  And therefore, as a matter of

14   law, I think Your Honor can find that they've abandoned, waived

15   those issues, and therefore, we don't even need to move on to

16   the other issues, Your Honor.

17             MS. HAFFEY:  Just so we're clear, Your Honor, when I

18   quoted from the transcript earlier and said that it's already

19   been briefed, that was not the briefing for this hearing.  The

20   briefing for this hearing wasn't filed by the reply brief on

21   behalf of this --

22             THE COURT:  As you can see, I have a lot of binders up

23   here and I'm looking for the transcript of the December

24   teleconference that we had.

25             MS. HAFFEY:  I would be happy to hand you my copy.

1          THE COURT:  Okay, thanks.

2          MS. HAFFEY:  May I approach?

3          THE COURT:  Yes.

4          MS. HAFFEY:  In the -- on page 34, Your Honor, where I

5    just quoted a moment ago --

6       (Pause)

7          THE COURT:  Okay, all right.  I think the one issue --

8    John, can you give that back?

9          I think the one issue that wasn't really dealt with,

10   although maybe it was meant to be was -- and a couple of people

11   have raised this -- is the existence of, on an aggregate basis

12   against an individual defendant less than 250,000, I think that

13   was also meant to be covered by this motion for today.

14         MS. HAFFEY:  I don't believe we have any defendants

15   that have that issue.

16         MR. SULLIVAN:  That's not true, Your Honor.

17         THE COURT:  No, I think there are a couple.

18         MR. SULLIVAN:  There are people in this courtroom that

19   would beg to differ, Your Honor.

20         THE COURT:  Yeah, no, there are a couple.  At least

21   they've asserted it.  But I think that the other -- I think the

22   other issues are properly -- with the caveat that Mr. Sullivan

23   raised about individualized responses on the relate points and

24   the contract assumption points, I think that, unless I'm

25   missing something, the agenda for today that counsel laid out

Page 31

1    is accurate.

2           MR. SULLIVAN:  Your Honor, we understand that, for the

3    most part, it was more about the way certain things were worded

4    and the glaring omission of the December 17th directives.

5           THE COURT:  Okay.

6           MR. SULLIVAN:  But we can probably --

7           THE COURT:  All right.

8           MR. SULLIVAN:  Our agenda was a little bit more

9    specific because we broke it down by different speakers.

10           THE COURT:  Okay.

11           MR. SULLIVAN:  And so if it pleases Your Honor, I can

12    kind of lay out which counsel are going to take the lead on

13    certain issues.

14           THE COURT:  No, that's fine.  I just wanted to make

15    sure we were all on the same page.  And I think the one --

16    you've raised the two points, and I think the one other point

17    that the transcript reminded me of was the -- some people have

18    raised this -- whether, in the aggregate, certain defendants

19    are being sued for less than 250,000 dollars.

20           MS. HAFFEY:  And we'll be prepared to respond to that,

21    Your Honor.  That's --

22           THE COURT:  Okay, all right.

23           MS. HAFFEY:  Mr. Sullivan, did you want to inform the

24    Court now who was going to be arguing, and then I'll go on with

25    the --

 1            THE COURT:  That's okay.  You can do that when it

 2    comes up.

 3            MR. SULLIVAN:  Okay, and just so Your Honor -- just to

 4    kind of lay out the procedures, then, Your Honor, although

 5    we've kind of picked a lead for each issue, others may want to

 6    kind of chime in at the end, and instead of doing it at the

 7    very end, we would like to do it at the end of each segment of

 8    the argument, if that's okay?

 9            THE COURT:  That's fine; that's a good idea.  Okay.

10            UNIDENTIFIED SPEAKER:  Will counsel on the phone be

11    allowed to note their appearances?

12            THE COURT:  Well, when you speak.  When you speak, and

13    I'm not urging -- I mean, no one has to speak if they don't

14    want to, but when you speak, you should note your appearance

15    and who you're representing.  And obviously, if you come back

16    again, you're going to have to do the same thing since the ECRO

17    operator can't see you.

18            Okay.

19            MS. HAFFEY:  Thank you, Your Honor.

20            THE COURT:  Please.

21            MS. HAFFEY:  Our order, Your Honor, in presenting

22    today's arguments on behalf of the reorganized debtors, I will

23    cover the Rule 8 and the pleading standard, as well as the

24    standard set by this Court set on September 7th, 2010, as well

25    as the argument relating to the transfers under the alleged

Page 33

```
 1    assumed contracts.  Mr. Klein, then, will address whether DAS

 2    LLC is the proper plaintiff in the proposed amended complaints,

 3    and why the named defendants in the proposed amended complaints

 4    are the proper defendants.  And then Mr. Sendek, to Mr. Klein's

 5    left, will focus on why the proposed amended complaints

 6    properly allege insolvency, and in addition will argue for the

 7    reorganized debtors in response to the motion seeking relief

 8    from the fourth order extending the time to serve under the

 9    last 4(m) order.

10         Before I move on, Your Honor, with the Rule 8 motion,

11    I thought I would deal with the assumption argument first --

12         THE COURT:  Okay.

13         MS. HAFFEY:  -- and maybe we can resolve that, as well

14    as a relation-back argument.

15         This Court, in July, told the reorganized debtors that

16    any contracts that had been assumed needed to be dismissed --

17         THE COURT:  Well, no.  I actually said that if a

18    transfer -- if the antecedent debt was under a contract that

19    had been assumed, then it had to be dismissed --

20         MS. HAFFEY:  Yes.

21         THE COURT:  -- under TeleGen and all the other cases.

22         MS. HAFFEY:  Correct.

23         THE COURT:  Okay.

24         MS. HAFFEY:  And in fact, Your Honor, we went through

25    the complaints and where our records show that that was the
```

DPH HOLDINGS CORP., ET AL.

Page 34

1    case, we did dismiss either actions entirely or actions in

2    part.  I have, personally, I had numerous conversations with

3    defense counsel on these issues, and we have dismissed all but

4    ten of the actions.  In certain of those actions, we have

5    agreed that there are transfers under assumed contracts; we

6    have agreed and stated that we would dismiss those, and have

7    asked opposing counsel to enter into an order with us to

8    dismiss those.

9          But in each of those cases, with one exception, in

10   each of those cases, the defendant has disagreed with our

11   analysis and have argued that all of the transfers have been

12   assumed.  We have a good faith dispute; we have records that

13   show what transfers were assumed -- what POs, I should say,

14   Your Honor, were assumed, what POs were not assumed.  A general

15   argument of the defendants is well, we had a master supply

16   agreement and we generally operated under a master supply

17   agreement, and therefore, everything should have been assumed.

18   But Delphi didn't assume things at the master supply agreement

19   level with few exceptions, early on, back in 2006.  It assumed

20   things at the purchase order level.  And we have records of

21   notices of nonassumption that went out to some of these

22   defendants as to these POs.  And despite those discussions, we

23   continue to have this good faith dispute, and it is a good

24   faith dispute.  And I can provide the Court with a list of

25   those defendants later, if the Court would like.

1          THE COURT:  Well, I mean, certain defendants, and I'm

2     not sure whether you've resolved these since the -- any of

3     these since the objections were filed, but certain of the

4     defendants assert with an affidavit that the only contract we

5     had was contract X with whatever Delphi entity -- I guess,

6     generally, with DAS, and that contract was assumed they show

7     the assumption order.  And so I think at that point, it's

8     incumbent upon the debtors as part of the futility argument to

9     show that it wasn't assumed, that there was some other -- that

10    the purchase order or some other contract wasn't assumed.

11         MS. HAFFEY:  If --

12         THE COURT:  Are you prepared to do that?

13         MS. HAFFEY:  If the debtor -- if I can have two

14    responses -- if the debtor provided us or attached a contract

15    that showed at the master supply level that it was assumed,

16    we've assumed those, Your Honor.  So without knowing what

17    particular defendant the Court's referring to -- I mean,

18    recently, we've dismissed --

19         THE COURT:  Well, so I think what I ought to do here

20    is counsel says that there are ten remaining complaints that

21    some portion of which, at least, involve transfers where the

22    defendant asserts that the claim would be futile because the

23    contract was assumed that gave rise to the antecedent debt.  So

24    I'm going to ask the objectors who have objected on that basis

25    to identify themselves and tell me, and then the debtors would

Page 36

1    need to give me a response.

2           MR. HERMAN:  Good morning, Your Honor.  Ira Herman,

3    Thompson & Knight for Victory Packaging.  Your Honor, we filed

4    our surreply dated June 14th.  Your Honor, we've provided the

5    debtors -- the reorganized debtors with copies of the supply

6    agreement which is denominated "Packaging Commodity Management

7    Agreement" which was attached to the proof of claim, Your

8    Honor.

9           THE COURT:  Okay.

10           MR. HERMAN:  Nowhere in the debtors' filings have they

11    asserted in writing that that agreement had not been assumed.

12    In fact, Your Honor, the only evidentiary matter before Your

13    Honor is the affidavit of Leah Borrello that was filed in

14    support of the opposition to the motion to file the amended

15    complaint.

16           Your Honor, the debtor has taken, as you've heard, a

17    position that there were open POs that could be amenable to

18    assumption or rejection.  The facts, Your Honor, are that the

19    debtor, in 2007, paid cure amounts and assumed the supply

20    agreement under the plan of reorganization paragraph 8.1.

21    Those payments in 2007, Your Honor, on account of open account

22    receivable, not open POs, we don't know what these "POs" the

23    debtors' talking about are because in 2007, Your Honor, when

24    the cure payments were made, no deliveries of new corrugated

25    was made by Victory Packaging -- we supplied boxes to them

Page 37

1    every day -- because there was nothing to supply.  There was no

2    executory contract, PO by PO.  There was one overarching

3    Packaging Commodities Management Agreement which, Your Honor, I

4    can hand up to you if you want to take a look at it.  There was

5    an ongoing relationship between the parties, many years.  I'm

6    not sure what the debtors' internal recordkeeping shows.  Our

7    clients, Victory Packaging, would sign an affidavit in one

8    second that they did not receive any "notices of

9    nonassumption".  We have no idea what a notice of

10   nonassumption.

11          Unless Your Honor has any questions, I'll sit down and

12   respond to argument by counsel for the reorganized debtors

13   because the argument that there were open POs to be assumed or

14   rejected in 2007 goes beyond credibility, Judge.  There just

15   was nothing there.

16          MS. HAFFEY:  May I respond, Your Honor?

17          THE COURT:  Okay.

18          MS. HAFFEY:  In discussions with counsel, and I've had

19   many with Mr. Herman, I have provided him with the list of

20   those POs in which they received notices of nonassumption.  I

21   also, Your Honor, have -- and I would be happy to share with

22   the Court, if I could approach -- an e-mail between the

23   reorganized debtors and Victory Packaging in which they refer

24   to "Please make sure all your future business is POs; let's put

25   this in payment terms."

1          MR. HERMAN:  Your Honor, I haven't seen that document,

2    and there's no foundation for the alleged list that she has

3    mentioned.  And as Your Honor said, this is not an evidentiary

4    hearing.

5          THE COURT:  What is -- let me turn to your objection.

6    This is probably in volume 6, right?

7        (Pause)

8          THE COURT:  Okay, this is -- do you -- what I'm

9    looking for, here, and I'm not sure I have it, is evidence on

10   your part that the contracts were the only contracts and they

11   were all assumed.

12          MR. HERMAN:  Pardon, Your Honor?  The evidence, Judge,

13   is the plan paragraph 8.1 and the cure checks that the debtor

14   delivered to the debtor after confirmation, 8.1 --

15          THE COURT:  8.1 says everything's assumed unless it's

16   rejected.

17          MR. HERMAN:  Every -- that's in existence, correct,

18   and we received cure payments marked "cure".  So they cured

19   them.

20          THE COURT:  So --

21          MS. HAFFEY:  We --

22          THE COURT:  -- is there any evidence of any rejection

23   of the contracts?

24          MS. HAFFEY:  Well, Your Honor, there were --

25          MR. HERMAN:  No, Judge.

Page 39

1           MS. HAFFEY:  If I may, Ira.

2           I have asked Mr. Herman for the contract to which they

3    rely on, and for, I don't know, over a month now that we've had

4    these discussions, and they --

5           THE COURT:  But I think 8.1 means that he doesn't have

6    to provide that because unless the debtors took the step of

7    rejecting the contract, it was deemed assumed.

8           MS. HAFFEY:  Unless notices of nonassumption were also

9    sent out, in which we sent out notices of nonassumption.

10          THE COURT:  All right, well, do you have those?

11          MS. HAFFEY:  Yes, well, I have the list of the notices

12   of nonassumption.

13          MR. HERMAN:  Your Honor, a list is a computer run.

14   Your Honor, our client has told me that we've never received

15   those; we don't know what they're talking about.  There were no

16   open POs to reject or to not assume, because all the goods

17   ordered under the Packaging Commodities Management Agreement in

18   2004 and '05 were sold and delivered.  In fact --

19          THE COURT:  The POs would have expired, in other

20   words.

21          MR. HERMAN:  Your Honor, we supplied packaging to them

22   every day.  The facts will show, if we ever get into it, that

23   sometimes, it was delivered without POs, sometimes with POs,

24   sometimes under a blanket PO.  It was division by division by

25   Delphi.  But the Packaging Commodities Agreement required

DPH HOLDINGS CORP., ET AL.

Page 40

1    Victory Packaging to hold the corrugated on their floor so they

2    could delivery daily.  And if Victory had not delivered daily,

3    they would have been in breach of a contract.

4         And Your Honor --

5         THE COURT:  Well --

6         MR. HERMAN:  -- she handed me --

7         THE COURT:  I'm sorry.

8         MR. HERMAN:  -- counsel handed me this June 1, '06 e-

9    mail; I don't know if she's handed it up to the Court yet, Your

10   Honor.  But Victory and Delphi entities continued doing

11   business post-bankruptcy daily.

12        THE COURT:  But I guess --

13        MR. HERMAN:  So this is irrelevant.

14        THE COURT:  I guess the --

15        MS. HAFFEY:  If I could just have that back.

16        THE COURT:  I think --

17        MS. HAFFEY:  The e-mail that's relevant --

18        THE COURT:  I think I may have spoken too quickly, Mr.

19   Herman.  You rely on 8.1 which is fine if there's an overall

20   executory contract that covers all of these relationships.  But

21   if, in fact, each one is a standalone payment, then I guess

22   apropos of what you were saying, the earlier transfers weren't

23   part of an executory contract; they were part of an earlier

24   relationship.

25        MR. HERMAN:  No, Your Honor.

Page 41

1             THE COURT:  An earlier standalone purchase order.

2             MR. HERMAN:  There was one supply agreement in effect

3    on the filing date, everything was sold and delivered pursuant

4    to this agreement.  If Your Honor will review the agreement,

5    you'll see that there were obligations, back and forth, in

6    fact, under the agreement.  As I said, Victory was required to

7    use certain inventory maintenance system; Victory was required

8    to keep corrugated on its floor.

9             THE COURT:  All right, is there any dispute about

10   that --

11            MS. HAFFEY:  Yes, Your Honor, there is.

12            THE COURT:  -- that there's one overall agreement that

13   covered the relationship of the parties?

14            MS. HAFFEY:  Delphi, like a lot of other automotive

15   suppliers, Your Honor, had what they called master service

16   agreements that dealt with some terms.  But Delphi, as per

17   individual contract, dealt at the PO level, and it assumed

18   contracts at the PO level.  And this e-mail right here, I

19   think -- Your Honor, if I could pass it up to you -- dated

20   September 13th, 2005 demonstrates that the parties who operated

21   at a provisional PO level and here they're changing payment

22   process.

23            MR. HERMAN:  Your Honor, I haven't seen that e-mail,

24   and Your Honor --

25            MS. HAFFEY:  I just showed it to you.

1          MR. HERMAN:  No, it's a different e-mail.

2          MS. HAFFEY:  No, it's what I just handed --

3          MR. HERMAN:  Okay, that doesn't look like the page.

4          But Your Honor, yes, during the ninety days before the

5     preference period, we improved the terms under the master

6     packaging agreement and gave them better terms and gave them

7     bigger discounts.  So while Ms. Haffey is taking correspondence

8     out of context, we had one supply agreement, and Your Honor

9     will see that it's an integrated agreement, and the argument

10    that each separate PO issued under this agreement is a separate

11    contract is nonsense.

12         THE COURT:  Okay, what about the defendants' argument

13    we shouldn't be doing this on the fly at the hearing, this

14    should've been addressed in your response.

15         MS. HAFFEY:  Well, Your Honor, when we filed our

16    responses, we were -- and I'm just relying on the transcript

17    again, here, the Court says, that "I don't want to shift any

18    burden and I don't think that we should be wasting our time at

19    a hearing on something like this if the contracts have been

20    identified," and went on to indicate that we would have to look

21    at this and have a hearing on these individual bases.  And I

22    can't find it right now in the transcript, but on that point,

23    that is what the defendants relied on, Your Honor, was what was

24    decided on December 17th in filing its response.

25         We did, however, take very much to heart the Court's

Page 43

1  statement that you wanted us to resolve these issues, and we

2  did, and we have, everywhere where the parties -- where the

3  defendants have shown us or through our own records have seen

4  that we assumed every transfer on the complaint, which goes

5  back to my conversation with Mr. Herman.  We have a good faith

6  dispute, here, and I think this is a prime example as to why

7  this is better left for an evidentiary hearing.

8       MR. HERMAN:  Your Honor, may I respond to that?  We

9  attempted to engage Ms. Haffey's firm, pursuant to your

10  directive, back in January.  We were ignored until last week.

11  That's the facts.  I have the e-mail trail if Your Honor really

12  wants to see it; I don't want to get into it.

13       Your Honor, the debtor had all the time in the world

14  to respond, to develop the issue.  These cases were filed in

15  2007; we had the hearing in December; we were supposed to have

16  a hearing in February.  That was the twelfth hour, Your Honor.

17  They have not done what they were supposed to do, Your Honor.

18  We have provided this Court with evidence that there was an

19  assumed contract.  That evidence has not been rebutted by the

20  debtor.  They've waived the right to rebut that.

21       MS. HAFFEY:  I don't think the Court wants to start

22  reviewing e-mail of counsel to show our due diligence --

23       THE COURT:  Well, let me just go to the --

24       MS. HAFFEY:  -- because I --

25       THE COURT:  -- basic point, which is why haven't you

Page 44

1   waived the right to rebut that?  I mean, the response is the

2   footnote, right in the reply which says we disagree?

3          MS. HAFFEY:  Well, again, Your Honor, we were relying

4   on what was discussed at our December 17th hearing.  But to Mr.

5   Herman's point where he says that we haven't been diligent on

6   this, I have a very fresh memory of a conversation with him

7   around the holiday season, because it wasn't the most pleasant

8   conversation I've ever had with opposing counsel, and I have e-

9   mail to that effect.  And if -- he called me the following

10  Monday to apologize, to his credit, but we have been diligent,

11  and we have asked from day one for that underlying contract.

12  If he says that all the POs were assumed, please give us the

13  underlying contract.  We don't have it; we have no record of

14  it.  Our records show entirely different, that we worked at the

15  PO level with the supplier and sent out notices of

16  nonassumption.

17         MR. HERMAN:  Your Honor --

18         THE COURT:  Okay.

19         MR. HERMAN:  -- the only evidence on the record is

20  that there was an assumed contract.  It's never been

21  controverted.  You have the affidavit of Leah Borrello in the

22  record supporting the fact that cure payments were received in

23  2007 on account of something.  The only thing that was in

24  existence at that time was the master service agreement that

25  we've talked about called the Packaging Commodity Management

DPH HOLDINGS CORP., ET AL.

Page 45

1   Agreement.  That was the only item.  When payments were

2   received in 2007, Judge, they were just payments on account of

3   2004 and 2005 invoices.  The debtor did not expect and Victory

4   did not deliver any goods in exchange for those cure amounts.

5          MS. HAFFEY:  Again, Your Honor, we relied on what we

6   understood our briefing was supposed to entail.  If the Court

7   would like, we would be happy to file an affidavit on

8   reorganized debtors' behalf within a very short period of time

9   on each one of these matters so that the Court can see there is

10  a good faith dispute.

11         THE COURT:  Is there any notice of nonassumption?

12         MS. HAFFEY:  For Victory Packaging?  Yes, there are.

13  What I have with me today is our business record of those that

14  was provided by the client.

15         THE COURT:  But I mean, was there any literal notice

16  that went to them --

17         MS. HAFFEY:  Oh, yes.

18         THE COURT:  -- in the form of a notice of

19  nonassumption.

20         MS. HAFFEY:  Yes.

21         THE COURT:  Okay.  Why don't I hear from the other --

22         MS. HAFFEY:  Now, I understand Mr. Herman says that

23  they didn't receive them, but yes.

24         THE COURT:  All right, why don't I hear from the other

25  nine?

1          MR. SULLIVAN:  Your Honor, James Sullivan, counsel for

2     Timken.  I submitted a supporting declaration -- numerous

3     supporting declarations, actually, evidencing the fact that

4     Delphi assumed, among others, a long-term agreement way back in

5     the beginning of the case, back in 2006.  I sent numerous e-

6     mails to counsel for the debtors, pursuant -- even before your

7     December 17th directive, but subsequent to your December 17th

8     directive as well, asking for documents related to the

9     allegedly preferential transfers to show that -- so we could

10    review them to determine whether -- to confirm that, in fact,

11    these transfers related to the contract that was assumed.  We

12    received no documents or information in response to those

13    requests.

14          I hear Ms. Haffey talking about these records that

15    they are apparently, allegedly looking at to determine whether

16    or not transfers relate to a contract.  I haven't seen them;

17    I've made numerous requests and have received nothing.  In

18    fact, when I spoke to Ms. Haffey in January of this year, she

19    told me she had no records.  So I don't know what records the

20    debtors are looking at, but I've been told they have none.

21    I've received none in response to numerous requests, despite

22    the fact that Your Honor directed them to turn them over.  And

23    they have offered no justification whatsoever for ignoring Your

24    Honor's directive and for failing and refusing to respond to my

25    requests for information regarding these transfers.

1          THE COURT:  Okay.  So what's the response to the

2   argument that --

3          MS. HAFFEY:  I'm looking --

4          THE COURT:  -- that the debt was not pursuant to the

5   contract that was assumed?

6          MS. HAFFEY:  Again, Your Honor, we have notices of

7   nonassumption on Timken.  I have had several conversations with

8   Mr. Sullivan.  I have an e-mail in front of me where I sent him

9   the POs in which we have notices of nonassumption, and had --

10  my recollection of our conversations was he was going to go

11  back to his client and see whether or not they agree.  I asked

12  him to send me a copy of the waiver of avoidance claims that

13  they reference in their brief.  I never received that from

14  them.

15         MR. SULLIVAN:  That's not true, Your Honor.  I e-

16  mailed it the same day she asked for it.

17         MS. HAFFEY:  Well, that was June -- if that's the

18  case, Your Honor, that was June 16th, so that was just Thurs --

19         MR. SULLIVAN:  That was the first time she asked for

20  it.  I put in numerous --

21         THE COURT:  That --

22         MR. SULLIVAN:  -- declarations indicating, Your Honor.

23         THE COURT:  I'm sorry, that isn't -- I remember --

24         MR. SULLIVAN:  For example, the declaration of Michael

25  Hart, dated November 24, 2010.

1          THE COURT:  Well, do you have a copy of the release or

2     waiver?

3          MS. HAFFEY:  The waiver.

4          MR. SULLIVAN:  I quoted the language.  It was -- there

5     was a confidentiality provision; that's the reason why I did

6     not attach it as an exhibit.  And I don't actually think I

7     brought a copy of it with me, today, but I quoted a lot of the

8     relevant language, Your Honor, and I did e-mail --

9     notwithstanding what Ms. Haffey said, I did e-mail her a copy

10    of it the same day she requested it, earlier this week --

11         THE COURT:  Okay.

12         MR. SULLIVAN:  -- or end of last week.

13         MS. HAFFEY:  That may have been the first time I

14    requested it, Your Honor, on the 16th because I was --

15         THE COURT:  Is there an issue with it?

16         MS. HAFFEY:  Is there an issue?

17         THE COURT:  With the release?

18         MS. HAFFEY:  Your Honor, it came to me at 10:40 p.m.

19    on Thursday, June 16th, and I have -- in preparing for this

20    hearing and reviewing a lot of other things, I have not had a

21    chance to review --

22         THE COURT:  Okay, well, why don't --

23         MS. HAFFEY:  -- the document.

24         THE COURT:  -- why don't you or one of your colleagues

25    look at it during the course of today's hearing?

1          MS. HAFFEY:  Okay.

2          UNIDENTIFIED SPEAKER:  Your Honor?

3          MR. SULLIVAN:  And Your Honor, I don't want to belabor

4    the point, Your Honor, but look, we've been ask -- we've been

5    telling her about this for a long, long time, and for them to

6    sit here today and try to say, oh, we didn't have a chance to

7    look at it or think about this when I've been banging on the

8    door for a very long time on this issue, you know, it's

9    really -- it's a bit frustrating, Your Honor.

10         THE COURT:  Okay.

11         MS. HAFFEY:  And all I can say, Your Honor, is we

12   have, in turn, informed Mr. Sullivan that we -- despite what he

13   says is the waiver agreement says, and we will look at it, we

14   have notices of nonassumption for certain POs.  So we will

15   look -- we will look at it, and if it says that everything was

16   assumed, then we will dismiss that action.

17         THE COURT:  Okay.

18         MS. HAFFEY:  I --

19         MR. SULLIVAN:  Your Honor, their opportunity to

20   respond with that was a long time ago.  They can't show up in

21   court and say look, we'll look at it when we get around to it.

22         MS. HAFFEY:  No, I --

23         MR. SULLIVAN:  Your Honor was very clear at the last

24   hearing, December 17th, you said if they don't respond, they're

25   going to have to live with the consequences, Your Honor.

DPH HOLDINGS CORP., ET AL.

Page 50

1    That's what Your Honor said.

2         MS. HAFFEY:  Mr. Sullivan, I was just responding to --

3         MR. SULLIVAN:  It's their motion; they're asking for

4    you to rule in their favor, here, and they should have thought

5    of that before they came in here with nothing, Your Honor.

6         MS. HAFFEY:  Mr. Sullivan, I was just responding to

7    the Court asking us to look at it today, and we will --

8         THE COURT:  All right.

9         MS. HAFFEY:  -- since I just received it on the 16th.

10        THE COURT:  Okay.

11        MS. HAFFEY:  Thank you.

12        THE COURT:  So I've heard from two of the ten?

13        MR. LAWHORN:  Good morning, Your Honor.  This is Chris

14   Lawhorn on the telephone on behalf of defendant Spartech

15   Polycom.

16        THE COURT:  Good morning.

17        MR. LAWHORN:  If it would please the Court, I'd be

18   happy to quickly address our client's issue which is similar to

19   the last two defendants'.

20        THE COURT:  Okay.

21        MR. LAWHORN:  Your Honor, we are also party to a long-

22   term contract between our client, Spartech Polycom, and the

23   debtors.  Back in October, we sent a copy of that long-term

24   contract to opposing counsel.  We expressed our belief that the

25   contract was assumed under the terms of the plan, and the

Page 51

1    contract expressly incorporates all purchase orders.

2         Your Honor, following the December 17th teleconference

3    with Your Honor, we reached out to opposing counsel to again

4    assert our position and request a response as to how, why, or

5    where it is possible that that long-term contract was not

6    assumed.  We've heard nothing.  For six months, Your Honor, our

7    phone calls have gone unreturned, our e-mails have gone

8    unreturned, until just last Thursday, after the close of

9    business, we finally received a phone call from opposing

10   counsel, and we still have no explanation as to how it is our

11   long-term contract is not assumed.  So Your Honor, we believe

12   we are like the other defendants who have spoken to the Court

13   this morning, in that the motion as to our clients should be

14   denied and the case dismissed.

15        THE COURT:  Okay.

16        MS. HAFFEY:  Your Honor, Don Orlandoni from the Butzel

17   firm has been handling the Spartech matter, so I'm going to ask

18   him to respond.

19        MR. ORLANDONI:  Yes, good morning, Your Honor.  And I

20   will echo some points that I discussed with Mr. Lawhorn in a

21   telephone conference last week.  And my client has investigated

22   this asserted assumed contract defense, and based on my

23   client's investigation, with respect to the master agreement

24   that Mr. Lawhorn cites, my client has identified two part

25   numbers that pertain to that master long-term agreement.  And

DPH HOLDINGS CORP., ET AL.

Page 52

1    with respect to the POs that are subject to our preference

2    claims in this action, those could only represent -- and we're

3    still investigating, but those could only represent, at most,

4    18,000 dollars' worth of our 8.6 -- approximately 8.6 million

5    dollar claim in this case.  My client has also identified only

6    one PO, one Spartech PO that was assumed during the bankruptcy

7    case.  That PO is not subject to this adversary proceeding.

8         As I informed Mr. Lawhorn last week, and in fact -- we

9    have a fundamental disagreement, again, that our position, and

10   the Delphi practice, in fact, was that it assumed contracts on

11   a PO-by-PO level, and not -- didn't assume master agreements.

12   That's the case in this matter.  Our client did the

13   investigation, and our client's investigation supports that, in

14   fact, that was the practice.  And so again, this is another

15   case where there's a genuine good-faith dispute.  We've

16   performed the inquiry as directed by the Court during the

17   December 17th conference call, and a good-faith dispute

18   remains.

19        THE COURT:  Well, I'm not sure -- let me make sure I

20   understand what you're saying.  Are you saying that this long-

21   term contract only covers part of the business between Delphi

22   and Spartech?

23        MR. ORLANDONI:  Based on our investigation, the master

24   agreement cites to two part numbers.  And again, yes, Your

25   Honor, what you say is correct.  It's only part of the

Page 53

1    transactions that are subject to this adversary proceeding, and

2    again, the most -- the most that those transactions would

3    represent in terms of the amount of our claim is 18,000 dollars

4    out of our claim in the aggregate, which is approximately 8.6

5    million dollars.

6              THE COURT:  Okay, what is Spartech's response to that?

7              MR. LAWHORN:  Your Honor, we disagree.  Factually,

8    that's just not accurate as we understand the facts, number

9    one.  Number two, none of that is included anywhere in the

10   papers filed by the reorganized debtor.  Number three, Your

11   Honor, in eight months, that's the most we've heard about the

12   reorganized debtors' understanding of our relationship.

13             Your Honor had required, back in December that

14   opposing counsel reach out to us and talk to us.  That hasn't

15   happened until last Thursday, and Your Honor, we believe, as

16   the other defendants have articulated, that the time has now

17   passed for this type of argument, and that we believe the

18   motion should be denied and our case dismissed.

19             THE COURT:  Okay, I'm just taking a quick look at your

20   pleading, here.

21             MR. ORLANDONI:  Your Honor, if I could make one more

22   point when it suits the Court.

23             THE COURT:  Okay.  Is the -- your factual allegations

24   about the contract are not in the objection to the motion to

25   amend, right?  There's no affidavit or --

1          MR. LAWHORN:  Your Honor, we did set forth the

2     argument and cite the relevant provisions of the reorganized

3     plan.  And we did that in our opposition to the reorganized

4     debtors' motion for leave to file.  It is not mentioned in our

5     surreply.  And no, Your Honor, we did not submit affidavits in

6     support.

7          THE COURT:  Okay.  All right.  Okay, thank you.

8          MR. NAYAK:  Your Honor, this is Mahesh Nayak from

9     Clark Hill representing defendant Detroit Products

10    International.  And I just have a point of clarification for

11    Your Honor as we're proceeding this morning.

12         At the December hearing, Your Honor was clear that it

13    was the burden of the plaintiff to rebut, to handle on a case-

14    by-case, each of the individualized issues that were briefed by

15    the defendants in the oppositions for the motions for leave to

16    amend.  In my instance, for example, there was an issue

17    regarding service of some of the critical pleadings, including

18    the fourth extension motion -- I know this is off topic -- on

19    the issue of the assumption.

20         I only raise it now, Your Honor, to understand from

21    Your Honor whether, if an issue, whatever that issue may have

22    been, went unrebutted, that there are no proofs, that there are

23    no affidavits, that there's no information that's been supplied

24    by the plaintiff in response to our oppositions from those

25    motions for leave to amend at all, whether those issues are

DPH HOLDINGS CORP., ET AL.

Page 55

1    waived, and on that basis, as a matter of law, Your Honor is

2    going to dismiss these complaints today, upon proper

3    presentation of the information.

4          THE COURT:  Well, you are jumping out of order.  But

5    as -- I mean, it depends on how the issue is raised.  I mean,

6    on the Spartech issue, for example, Spartech has submitted as

7    much factual support for its contention as the debtors have.

8    There's nothing.  It's just a lawyer's statement.  So I think

9    there there's a factual dispute, although there was an

10   additional issue, which I do have to factor into my analysis,

11   which is not a waiver issue one way or the other, which is I

12   did require the debtors to focus on this diligently.  And

13   that's a separate issue.

14         But I believe there's a distinction between the

15   debtors' obligation to respond on that level, than there is to

16   respond and be closed out today in response to actual evidence

17   which Timken has, for example.  I mean, Timken has affidavits.

18   They have a reference to a contract.  And, you know, I think

19   that makes it incumbent, as a matter of pleading to respond on

20   the debtors' part.

21         MR. NAYAK:  And Your Honor, with respect, my

22   opposition also includes affidavits, albeit on the issue of

23   service.

24         THE COURT:  Yes, well that's a different issue.  So

25   we'll deal with that later, although we dealt with it in the

1   agenda too.  I don't see anything about service on the agenda.

2          MR. NAYAK:  And, Your Honor, I just wanted to know

3   when.  Because I know we discussed the flow of the arguments

4   today.

5          THE COURT:  Well, we spent the first fifteen minutes

6   on the agenda, and service isn't on the agenda.  I raised that

7   issue, and I asked everyone is it on or off, and people said

8   it's off.  So I guess it's off, right?

9          MR. NAYAK:  No, Your Honor, it's --

10          THE COURT:  You weren't listening during the first

11   fifteen minutes?  Should it be on the agenda and on what basis?

12          MR. NAYAK:  Yes, it should be on the agenda, Your

13   Honor, as an issue --

14          THE COURT:  Okay.

15          MR. NAYAK:  -- it's an issue that has gone unrebutted.

16   And I think we did discuss today as to issues that have gone

17   unrebutted.

18          THE COURT:  No, it's -- it's not necessarily an issue

19   that they had to respond to as far as today's hearing.  That's

20   why I asked if people agree with the agenda or not.

21          MR. NAYAK:  Your Honor, my --

22          THE COURT:  It may be relevant to the fourth extension

23   challenge, but I don't see it being relevant to Rule 8 or

24   relation back or contract assumption.

25          MR. NAYAK:  Well, we did discuss the fact that one of

DPH HOLDINGS CORP., ET AL.

Page 57

1    the topics that were going to be discussed today were the

2    plaintiffs' compliance with this Court's previous orders.  And

3    one of the orders of the Court, coming back to the December --

4              THE COURT:  Look, let's get to that when we get to it.

5    I'm not going to take this on a whole sidetrack at this point.

6    All right?

7              MR. NAYAK:  Thank you, Your Honor.

8              THE COURT:  We're dealing with this one issue on the

9    contract assumption, and we are three-tenths of the way through

10   with it.

11             MR. NAYAK:  Thank you.

12             MR. HERMAN:  Your Honor, I think it's clear that the

13   Victory proof is similar to the Timken proof, that it's

14   submitted by affidavit --

15             THE COURT:  I just signaled on Timken not to go over

16   the whole thing again.  But I think the --

17             MR. HERMAN:  Thank you, Judge.

18             THE COURT:  -- I think the Spartech may be a little

19   different.

20             All right.  So is there -- are there other parties who

21   are asserting contract assumption?

22             MR. JURKIEWICZ:  Your Honor?

23             THE COURT:  Yes.

24             MR. JURKIEWICZ:  This is David Jurkiewicz representing

25   Decatur Plastics in 07-2098.

1          THE COURT:  Right.

2          MR. JURKIEWICZ:  I have a slightly different variation

3     of the facts you've heard.  We filed our response in the main

4     case as 20879.  And attached thereto as Exhibit A, a long-term

5     contract dated February 9, 2004.

6          THE COURT:  Right.  I'm just getting your pleading,

7     here.  Right.  And you assert there's no other -- there are no

8     other contracts besides that one.  And that's in your

9     affidavit.

10         MR. JURKIEWICZ:  Correct, Your Honor.  There is no

11    affidavit, but that is what we assert.

12         THE COURT:  Okay.

13         MR. JURKIEWICZ:  And I'll be able to tie this argument

14    together with POs later, Your Honor.

15         THE COURT:  Okay.  That's right.  Let me just --

16    that's right.  It's the pleading that says there are no other

17    contracts.

18         MR. JURKIEWICZ:  Correct.

19         THE COURT:  Okay.  So what is the response on Decatur?

20         MS. HAFFEY:  Your Honor, you have to compare Decatur

21    and the document that was just referred to the Court under the

22    long-term contract and the exhibit that says the contract would

23    be assumed or assigned, and that it specifically relates to

24    certain PO numbers.  So again, as what the reorganized debtors

25    have been saying, they assumed contracts at the PO level.

1           When you look at these POs and the proposed amended

2    complaint, they're not all assumed.  And I've gone through it

3    on a line-by-line detail.  I've had this conversation with

4    opposing counsel.

5           THE COURT:  Okay.

6           MR. JURKIEWICZ:  Your Honor, here's where I think we

7    differ.  If you look at the notice of assumption that relates

8    to this contract, which is 11165, Exhibit 1 purports to assume

9    the long-term contract between Delphi acting through its safety

10   and interiors division and Decatur Plastic Products, dated

11   February 9, 2004.  That seems like the big contract, not the

12   baby POs, Your Honor.

13          MS. HAFFEY:  Well, but then it goes on and says that

14   it relates to PO numbers, and then it gives those three PO

15   numbers as to what it relates to.

16          THE COURT:  Okay.  So this is really a legal issue as

17   to what the assumption entails.

18          MS. HAFFEY:  We agree with that, Your Honor.

19          THE COURT:  All right.  Okay.  Okay, very well.

20          MR. MICHAELSON:  Good morning, Your Honor.  Robert

21   Michaelson on behalf of NXP Semiconductors.  They're a

22   successor to Philips Semiconductors.  Following the December

23   17th hearing, Your Honor, numerous efforts were made to speak

24   to plaintiffs' counsel concerning our assumption of contract

25   defense, and a chronology of those efforts are listed in a

DPH HOLDINGS CORP., ET AL.

Page 60

1    surreply that was filed with this Court late last week.

2          Despite numerous efforts, which are documented --

3    exhibits are attached to the surreply -- there was no effort

4    other than a promise that we would talk, come forth -- coming

5    from the debtors.  So in other words, what has happened here is

6    that the debtor has failed to abide by the Court's directive,

7    for which, I submit that there needs to be some consequence.

8    The efforts were repeated.  They were done in good faith --

9          THE COURT:  I don't think I have your surreply.  I'm

10   sorry.  When was it filed?

11         MR. MICHAELSON:  It was filed on Thursday, I believe,

12   Your Honor.

13         THE COURT:  Okay.

14         MR. MICHAELSON:  NXP Semiconductors.

15         THE COURT:  So maybe it's -- oh, I'm sorry.  You're

16   with -- but it's listed under Philips.

17         MR. MICHAELSON:  It's listed under Philips, yes.  We

18   are the successor to Philips.

19         THE COURT:  Okay.

20         MR. MICHAELSON:  Right.  So basically, Your Honor, we

21   believe that we have assumed contracts.  We have no affidavit.

22   We did submit a notice of assumption in earlier pleadings, but

23   we don't have an affidavit.  And I'll submit as well, that

24   after conversations with my client, that we received no notice

25   of nonassumption.  So essentially what we have here is a

Page 61

1   situation in which, despite our best efforts, there has not

2   been a reciprocation, which is in direct contravention of this

3   Court's directive, for which we submit there needs to be some

4   serious consequence.

5          THE COURT:  Okay.  What's the response on Philips.

6          MS. HAFFEY:  My records reveal a different story in

7   regards to a conversation, Judge.  I've got handwritten notes

8   from a conversation dating back to earlier in the summer.  I

9   have had several conversations with Mr. Michaelson.  And this

10  is another one of those cases where our client says that they

11  sent out notices of nonassumption, and that some of these

12  transfers may have been assumed and others not.  And when that

13  has happened, I have told opposing counsel, we'll be glad to

14  file a stipulated order of dismissal as to those that we agree

15  are assumed.

16         THE COURT:  Okay.  All right.  Very well, thank you.

17         MR. MICHAELSON:  Your Honor, if I may just quickly

18  reply?  There was no response to the argument that were raised

19  in the surreply in the papers that were submitted to the Court

20  most recently, by the debtor.  And I also respectfully disagree

21  with Ms. Haffey concerning her characterization of our

22  conversations.  My records, which I think are well maintained,

23  reflect that we had one telephone conversation in January of

24  this year.  There were a couple of e-mail correspondences in

25  which it was promised that we would have further conversations,

Page 62

1   but they were never forthcoming.  That's what my records

2   reflect, and that's what our submission to the Court last week

3   says.

4              THE COURT:  Okay.  My copy of your objection here

5   doesn't have Exhibit A to it.  Can I see that?  Do you have a

6   copy of that?  It's the letter agreement pursuant to which

7   they're --

8              MR. MICHAELSON:  Yes, Your Honor.  I have it here.

9              THE COURT:  -- assumed.

10             MR. MICHAELSON:  It was excluded, Your Honor.  It was

11  an error, and I apologize.  That's actually from a different

12  pleading, but it is the same --

13             THE COURT:  This is Exhibit A to your --

14             MR. MICHAELSON:   That would be Exhibit A --

15             THE COURT:  -- to your objection to the motion to

16  amend?

17             MR. MICHAELSON:  Yes.

18       (Pause)

19             THE COURT:  Okay.  Well, the notice in the letter

20  refers to certain contracts -- it uses that phrase "certain

21  contracts that are being assumed".  And it says "accommodation

22  contract" and it gives the number.  Let me make sure I

23  understand this.  Is the debtors' position that none of the

24  transfers are under these numbers?

25             MS. HAFFEY:  No, the debtors' position, Your Honor, is

DPH HOLDINGS CORP., ET AL.

Page 63

1   we have agreed as -- we agree as to certain of the transfers

2   were assumed.  I'm just looking for my notes right now.  And I

3   will have to review it better, Your Honor.  But my recollection

4   of this one is that we agreed that certain were assumed but not

5   all, as to what --

6            THE COURT:  But what I'm -- I just want to --

7            MS. HAFFEY:  -- but I really need to look at my --

8            THE COURT:  -- I want to make clear -- I want to make

9   sure I understand your position here.  On some of these you've

10  taken the position that there's a master agreement and the

11  debtor didn't assume master agreements, it assumed specific

12  purchase order numbers.

13           MS. HAFFEY:  Unless there's a contract that says

14  otherwise.

15           THE COURT:  Unless there's a contract that says

16  otherwise.

17           This notice doesn't refer to purchase orders per se.

18  It says, "accommodation contract", and then it has specific

19  numbers, about forty of them, you know, each of which has pre-

20  petition arrearage and an agreed upon cure amount; in excess --

21  more than forty.  And my question is, it seems to me that the

22  PO argument doesn't seem to apply here.  This is like specific

23  contracts that are being assumed.  So it would seem to me that

24  you really don't have an argument here, to the extent that any

25  of the transfers covered in the complaint is made pursuant to

1   any one of these contract numbers.

2         MS. HAFFEY:  The contract numbers are PO numbers, Your

3   Honor.

4         THE COURT:  All right.  So --

5         MS. HAFFEY:  Those are --

6         THE COURT:  -- so are you -- so you've carved out all

7   of these numbers from your complaint, and your point is, you're

8   referring to the other ones?

9         MS. HAFFEY:  No, what we're saying is, as to the POs

10  that are on this Exhibit 1, we agree that some are assumed, but

11  we don't agree that all are.

12        THE COURT:  Well, how can that be?  Because they're

13  all here on the list saying that they're being assumed.

14        MS. HAFFEY:  I'm sorry.  I'm sorry, Your Honor.  I'm

15  sorry.

16        THE COURT:  It's okay.

17        MS. HAFFEY:  As to the Exhibit 1, the POs that show up

18  on Exhibit 1 --

19        THE COURT:  Right.

20        MS. HAFFEY:  -- some of these numbers appear on

21  Exhibit 1.  Other POs that appear in Exhibit 1 are not on this

22  exhibit.  And that --

23        THE COURT:  All right.  And those are the only ones

24  that you're looking to proceed in the complaint on?

25        MS. HAFFEY:  That's correct.  And that's true of the

Page 65

1    other defendants we've heard from today.  Where we agree that

2    there is an assumed PO --

3            THE COURT:  Well, but the other defendants don't have

4    a letter.  They're just relying on 8.1 and their statement

5    that -- okay.  So that seems to be their -- I mean, you're

6    relying on an assumption notice.  They're saying that they've

7    carved out of their complaint every transfer that would be

8    under these particular contracts.  So --

9            MR. MICHAELSON:  But that's -- that would be a factual

10   question, Your Honor.

11           THE COURT:  Right.

12           MR. MICHAELSON:  We disagree --

13           THE COURT:  All right.

14           MR. MICHAELSON:  -- that there are any excluded ones.

15   But I can't --

16           THE COURT:  All right.  So I think -- I'm not going to

17   delay on this one.  I think that with record being clear, the

18   only issue is as to whether the transfers that they've

19   identified that they continue to seek to avoid are under POs or

20   accommodation contracts different than the ones listed on this

21   Schedule 1.

22           MR. MICHAELSON:  That would be correct, Your Honor.

23   We would have hoped to have had this conversation months ago.

24   We haven't had it.

25           THE COURT:  All right.  And that's the diligence

1    issue?

2              MR. MICHAELSON:  Yes.

3              THE COURT:  Okay.  All right.

4              MS. HAFFEY:  And we disagree with that

5    characterization --

6              THE COURT:  Okay.

7              MS. HAFFEY:  -- strongly, Your Honor.

8              THE COURT:  Thank you.  Okay.  Anyone else?

9              MR. HARVEY:  Good morning, Your Honor.  Brian Harvey

10   from Goodwin Procter on behalf of ANSYS Inc., success to Fluent

11   Inc., adversary proceeding case number 07-2312.

12             Your Honor, I'm not sure if ANSYS is on the

13   illustrious list of ten, but we have had a number of

14   conversations and correspondence with the debtor concerning the

15   assumption issue.  ANSYS provided software and software support

16   to Delphi.  And ANSYS has actually been in conversations with

17   Delphi since early 2010 and sent Delphi a letter in July of

18   2010, explaining the assumption argument, attaching POs and the

19   software license agreement.  And it does principally rely on

20   the assumption under the plan.

21             The reply that we got, which was a sort of oral reply

22   in a conversation sometime after we sent the letter, was that

23   the debtor simply disagreed and needed additional information.

24   There was never a mention of ANSYS having received a notice of

25   nonassumption.  And this is actually the first I'm sort of

1    hearing of that today.

2            ANSYS filed a joinder to the various objections to the

3    motion to amend in January of this year.  And then last

4    Wednesday we received a call -- I received a call from Ms.

5    Haffey basically asking for another copy of the letter we had

6    sent the previous July and noting that maybe we can work it

7    out.  I haven't heard anything since then.

8            But in the event that we're not on this list, we

9    certainly are -- ANSYS is asserting that argument that the

10   agreements were assumed under the plan --

11           THE COURT:  All right.

12           MR. HARVEY:  -- and all of its rights are preserved.

13           THE COURT:  But that's not asserted in the joinder?

14           MR. HARVEY:  It is not.

15           THE COURT:  Okay.  All right.  I don't know if they're

16   on the list or not.  I would -- I mean, for purposes of this

17   hearing, I don't think they are, although you still need to

18   work with them.

19           MS. HAFFEY:  Would you care for a response, Your

20   Honor?

21           THE COURT:  No, I think this is more of just a case

22   you need to follow up with them.

23           THE COURT:  All right.  Any more?

24           MR. MCGRAIL:  Good morning, Your Honor.  Dave McGrail

25   on behalf of Solid State Stamping.  The adversary is 07-2633.

1    Briefly, Your Honor.  I sent a letter to counsel for the debtor

2    on May 9th.  That letter referenced Section 8.1 of the plan,

3    and then working within the framework that I think has been

4    discussed today, actually attached the executory contract

5    schedule and proposed Exhibit 1 to the amended complaint, and

6    cross referenced the purchase orders that were in both with

7    asterisks, so it couldn't be any clearer.

8           Your Honor, we did not attach that letter to the

9    surreply, which was basically a joinder.  But we did file a

10   joinder back in October where we attached an affidavit that

11   said that the defendant had only received two pleadings and no

12   other pleadings in the case, and by implication, no notice of

13   nonassumption.

14          Your Honor, we also sent a letter in March, earlier

15   this year, requesting documents.  And this goes to our

16   prejudice issue, but we won't get into that.  We've received no

17   response to either letter.  I followed up with an e-mail last

18   week to counsel for the debtor.  We exchanged some e-mails, but

19   have not had a conversation.  We've only had one conversation

20   in the case as a whole.  So, Your Honor, we'd request that Your

21   Honor dismiss as to those purchase orders that we identified in

22   our letter as overlapping and assumed.  Thank you.

23          MS. HAFFEY:  Your Honor, my records indicate that

24   Solid State did not raise this issue in their brief in

25   opposition, so it was not a --

Page 69

1          THE COURT:  All right.  But I mean, they've

2     identified -- I mean, are you -- they did identify it in their

3     letter, so why -- I mean, is there any issue there on the ones

4     that they have identified?

5          MS. HAFFEY:  I need to refer to my notes, Your Honor.

6     Excuse me.  My notes, Your Honor, say that we provided info as

7     to those that were not assumed and we requested evidence of a

8     contract that Solid State relies on.  So it's another issue.

9     And in fact, I think what opposing counsel just said is his own

10    asterisk on this exhibit shows that they think that certain of

11    the POs were assumed and others were not assumed.

12          So assuming that counsel and I can agree on that, then

13    as I stated earlier, to the extent that we agree that some are

14    assumed, we will dismiss those as we are required to do.

15          THE COURT:  Mr. McGrail, what is the evidence of the

16    assumption?

17          MR. MCGRAIL:  Your Honor, because of our prejudice

18    issue, we simply have the executory contract list and the

19    exhibit that -- the exhibit contract list that was filed --

20          THE COURT:  So you're relying on --

21          MR. MCGRAIL:  -- on the docket and 8.1.  Yes.

22          THE COURT:  -- 8.1.

23          MR. MCGRAIL:  Yes.  We don't -- just very briefly,

24    Your Honor.  The company merged three years ago.  We purged all

25    of those documents.  And that goes to the reason why we

Page 70

1    requested whatever documents the debtor --

2           THE COURT:  Well, is there anything in the debtors'

3    records about notice of nonassumption?

4           MR. MCGRAIL:  We have -- all we have is the affidavit

5    that says that we received only two hard copies --

6           THE COURT:  Right.  No, I'm talking to counsel for

7    the --

8           MR. MCGRAIL:  Oh, I'm sorry.

9           MS. HAFFEY:  It's my understanding from my client that

10   we sent notices of nonassumption as to certain of these POs.

11   And I don't think opposing counsel disagrees with that.

12          MR. MCGRAIL:  I have no way of knowing.  I mean, all I

13   have is the affidavit which says that we only received two

14   documents and that's it.  That does not include a notice of

15   nonassumption.  And, Your Honor, we did not receive the

16   response of counsel referred to earlier regarding providing

17   additional information.

18          THE COURT:  Is there a certificate of service or

19   affidavit of service on the notices of nonassumption?

20          MS. HAFFEY:  There should be.  I believe there are,

21   Your Honor.

22          UNIDENTIFIED SPEAKER:  Yes.

23          MS. HAFFEY:  Yes.

24          THE COURT:  I mean --

25          MS. HAFFEY:  There are.  That --

05-44481-rdd   Doc 21490   Filed 06/27/11   Entered 07/15/11 11:24:40   Main Document
Pg 71 of 326
DPH HOLDINGS CORP., ET AL.

Page 71

1              THE COURT:  Maybe one of your colleagues should go get

2      on his computer, get on PACER and pull it up?

3              MS. HAFFEY:  I'm sorry, Your Honor.

4              THE COURT:  Maybe one of your colleagues should get on

5      PACER and pull it up?  Okay.

6              Okay, anyone else?

7              MR. SAYDAH:  Good morning, Your Honor.  For the

8      record, Gilbert Saydah of Kelley, Drye & Warren, here today on

9      behalf of TCS America International Corp.

10             THE COURT:  I'm sorry, TCS?

11             MR. SAYDAH:  Tata, TCS.

12             THE COURT:  TCS, right.

13             MR. SAYDAH:  TCS, correct.

14             THE COURT:  Okay.

15             MR. SAYDAH:  It's adversary number 07-02668.  And also

16     representing various BP and Castrol entities in Adversary

17     number 07-02270.

18             Your Honor, we are probably not among the illustrious

19     ten.  My client has had various difficulties finding records

20     back this far, due to the age of these cases.  However, it's my

21     understanding that with respect to at least TCS, Tata, there

22     was a notice of assumption that we're attempting to get a copy

23     of.  I've spoken orally with counsel for the reorganized

24     debtors approximately a month ago, raised this issue, and asked

25     if they had any evidence to the contrary.  I have not heard

DELPHI HOLDINGS CORP., ET AL.

Page 72

1   back.  Being that it's not prominently raised in our pleadings,

2   I don't expect a response in court today.  But I just want to

3   make --

4           THE COURT:  Okay.

5           MR. SAYDAH:  -- the Court aware that with respect to

6   both the BP entities and with respect to Tata, that that is a

7   defense that we are raising.

8           THE COURT:  Okay.

9           MR. SAYDAH:  Thank you, Your Honor.

10          THE COURT:  You don't need to respond to that one.

11          MS. HAFFEY:  I'm sorry?

12          THE COURT:  You don't need to respond to that one.

13          MS. HAFFEY:  Okay.

14          MR. KULBACK:  Good morning, Your Honor.  Jerry Kulback

15  with Archer & Greiner on behalf of defendant Magnesium

16  Electron, Inc.  It's adversary number 07-2758.

17          Your Honor, I find myself in the unique position of

18  being a defendant in this action for which an exhibit was not

19  attached to the proposed amended complaint that was filed in

20  the adversary proceeding itself.  The proposed amended

21  complaint was filed in September.  Magnesium Electron raised

22  this issue in its opposition that was filed in November.  When

23  the debtors filed their reply in January, they did not address

24  the issue at all.

25          THE COURT:  I'm sorry, is this an executory contract

1    case?

2             MR. KULBACK:  It is, Your Honor.

3             THE COURT:  All right.

4             MR. KULBACK:  Magnesium Electron filed a sureply in

5    June -- on June 17th.  And yesterday, at about 4:30, I finally

6    received a sureply from the debtor indicating that in fact,

7    the exhibit was attached and buried in exhibits on the main

8    docket and not in the adversary proceeding itself.  This was

9    the first time that I've seen a schedule that actually

10   identifies the purchase orders for which the payments allegedly

11   relate.

12            I haven't had a chance to speak with my client, having

13   received it at 4:30 yesterday afternoon, as to whether, in

14   fact, those payments or those purchase orders were assumed.  I

15   know that certain purchase orders of Magnesium Electron were

16   assumed.  We received notice of assumption as part of, I

17   believe it was the sale of the automotive division.  I just

18   haven't had time to speak with my client and look into that

19   issue further at this point and discuss with debtors' counsel.

20            I didn't want my silence and the fact that I may not

21   be on the list of ten, to be taken as a waiver of the issue.

22            THE COURT:  All right.  That's fine.

23            MR. KULBACK:  Thank you.

24            THE COURT:  But this wasn't an issue that you've

25   raised over the last few months or anything like that with

1    them?

2             MR. KULBACK:  The assumption issue?

3             THE COURT:  Right.

4             MR. KULBACK:  Well, we didn't know --

5             THE COURT:  You've been waiting to see what the POs

6    were?

7             MR. KULBACK:  -- we wanted to know what the POs were,

8    Your Honor.

9             THE COURT:  You wanted to see the complaint.

10            MR. KULBACK:  And we're reserving our rights on that.

11   I think it's sufficient at this --

12            THE COURT:  Well, that's fine.  I understand.

13            MS. HAFFEY:  And we'll work it out with them, Your

14   Honor.

15            THE COURT:  All right.

16            MS. GRUBIN:  Good morning, Your Honor.

17            THE COURT:  Good morning.

18            MS. GRUBIN:  Janice Grubin from Todtman Nachamie.  And

19   I'm co-counsel to Select Industries Corp.  And my co-counsel,

20   Paige Ellerman from the Taft Stettinius firm is on the phone

21   right now.

22            I'm not sure that we are one of the ten identified

23   adversaries.  Our adversary number is 07-02618.  And really

24   what I intend to speak to goes to the diligence standard,

25   because we are differently situated.  Specifically, Your Honor,

1    we did not know that we had an assumption and release defense

2    until after the December 17th hearing, because we really -- our

3    client has not preserved most of the books and records and

4    witness testimony critical and necessary to prove its defense.

5         But nonetheless, we did entreat upon them many times

6    to continue to look and investigate, and we did come up with,

7    in our continuing investigation, with several -- with a number

8    of purchase orders and invoices that were assumed, and in some

9    cases assigned, under transactions that are either being

10   performed with the debtor today or with third parties under

11   assumption matters.  And we are still undergoing a continuing

12   investigation.

13        We did not attach -- we did not raise this in our

14   opposition to the original motion, although we did raise it in

15   our surreply which we filed last Thursday.  We do not have any

16   supporting affidavits at this time, because our discussion --

17   our investigation is ongoing.  We -- it's our view, frankly,

18   Your Honor, that under the Court's December 17th direction,

19   this was the continuing duty that the debtors had and that they

20   should really have been reaching out to all the defendants to

21   see if they had assumption and release issues.

22        This came to the fore, Your Honor, when we prepared

23   and submitted to Mr. Fischer on May 20th, a settlement letter.

24   And one of the three issues was assumption and release.  We

25   subsequently had a discussion with Ms. Haffey, I believe on or

1    about May 31st, and we were going to exchange documents.  We

2    heard nothing.  We called her on the 17th, had a flurry of

3    calls over the weekend, and we don't agree with each other.

4    But I wanted to raise this and let the Court know that this was

5    a very live issue relating to Select and the alleged complaint

6    and the preferences.

7           THE COURT:  All right.  Listen, if someone -- I mean,

8    I don't need to hear from seventy-seven people who -- and I'm

9    not faulting you on this.  I'm just saying now that I've heard

10   a couple people on this issue, I don't need to hear from

11   seventy-seven people saying we reserve our rights on this

12   issue; if we find a release or an assumption later, we don't

13   want to be deemed to have waived it.  You won't have waived it.

14   This is really just going to the specific context that we're in

15   here, right now.

16           MS. GRUBIN:  Thank you, Your Honor.

17           THE COURT:  Okay.

18           MS. HAFFEY:  I just want to briefly address, Your

19   Honor, because I feel like I'm being wrongfully characterized

20   in not addressing things.  I did speak with Ms. Grubin.  We had

21   a very pleasant conversation.  She says it was the end of May,

22   sometime in that -- actually I think it was the first of June,

23   because it was the last day of school of my youngest son, so it

24   would have been that Friday, the first week in June.

25           And at that time, it was the first time she raised the

1   assumption agreement with me.  I told her I would get with my

2   client and get information from them.  My client then

3   diligently looked through its records, did that, and then I

4   have since sent her a very long list of POs that we say were

5   not assumed, and we have agreed to work together, as I have

6   with the other defendants, in resolving that matter.

7           THE COURT:  Okay.

8           MR. LUTZ:  Your Honor, Douglas Lutz, Frost Brown Todd,

9   on behalf of Republic Engineered Products.  We have the same

10  issue that you just addressed.  And I don't want to go into our

11  prejudice argument, but candidly, we just found out about

12  assumed contracts ourselves within the past month, and we

13  attached a notice of assumed contracts to our surreply.  And

14  the reorganized debtor did respond in their reply and said they

15  were going to investigate and, you know, discuss this with us

16  and dismiss assumed POs.

17          I really would appreciate it if we would give the

18  reorganized debtor a deadline to that.  That's all I have to

19  say.

20          THE COURT:  Okay.

21          MR. LUTZ:  Thank you.

22          THE COURT:  Okay.  Anyone else?

23          MS. HAFFEY:  Can I say -- make one last statement,

24  Your Honor, in regards to some -- a legal case that I'd like

25  the Court to look at?

DPH HOLDINGS CORP., ET AL.

Page 78

1          THE COURT:  All right.

2          MS. HAFFEY:  It's out of the Southern District of New

3    York, In re Adelphia Business Solutions, Inc., 322 B.R. 51.

4    And I believe it's 2005.  And in this case, Your Honor, the

5    court found that when you have a single contract like a master

6    agreement or a supply contract, they can be separately assumed

7    and they are divisible.  So again, it's Delphi's contention

8    that though we have some defendants here that argue that they

9    had a supply agreement, this case states that despite that, it

10   can be a divisible contract and it can be assumed at a -- in

11   this case, a PO level.

12         THE COURT:  But I think the -- I mean, I understand

13   that issue, and it depends on the wording of the contracts,

14   whether they integrate it or not.  But there's another, I

15   think, overriding fact here, that's asserted by at least a

16   couple of the parties, which is that under the plan, as is

17   often the case, all contracts -- they didn't have to be

18   identified -- all contracts were being assumed unless

19   specifically rejected.

20         And -- or unless there's a specific notice of

21   nonassumption.  So I guess there's a sub-issue to that, which

22   is that -- it's your argument, I guess, that certain purchase

23   orders covered in the complaints were not executory at that

24   time.

25         MS. HAFFEY:  That's correct.  And we --

1          THE COURT:  Although it's not clear to me that those

2     have been identified as opposed to relying on notices of

3     nonassumption.

4          MS. HAFFEY:  Well, we also have notices of assumption,

5     Your Honor, for POs.

6          THE COURT:  Well, but you don't need that.  You don't

7     need notices of assumption.

8          MS. HAFFEY:  Well, I guess that kind of highlights the

9     point.

10          THE COURT:  What you're saying is, you mean the

11     notices of -- the assumptions occurred before the plan, right?

12     Is that what you -- because there's no reason to send out

13     notices of assumption unless you were working out specific cure

14     amounts.

15          MS. HAFFEY:  That's correct.

16          THE COURT:  Well, I'm a little at a loss here.  You

17     identified ten of these where there was an argument that had

18     been made that the contract had been assumed, under which the

19     antecedent debt arose.  And I have tried to keep track of this

20     through the seventy-seven or so responses here.  I didn't

21     really see ten.  I did see Victory and Timken and Spartech.

22          MS. HAFFEY:  When I referred to ten earlier, Your

23     Honor, I wasn't limiting it to those that had raised it in

24     their opposition.

25          THE COURT:  Oh, okay.  All right.

05-44481-rdd   Doc 21490   Filed 06/27/11   Entered 07/15/11 11:24:40   Main Document
DELPHI HOLDINGS CORP., ET AL.
Pg 80 of 326

Page 80

1           MS. HAFFEY:  But just to let the Court know that

2    they'd been brought to our attention.

3           THE COURT:  That you'd been focusing on them.  Okay.

4           MS. HAFFEY:  Exactly.

5           THE COURT:  All right.  So I'm going to assume, then,

6    that everyone who has raised the issue for today, in addition

7    to those who didn't raise it today, but wanted to preserve

8    their rights, and that I clarified that everyone's rights are

9    preserved on that score to raise the issue later, has said

10   their piece.

11          And it seems to me that there are two issues here.

12   One is whether there is evidence that has been asserted in the

13   opposition to the motion to amend that is uncontroverted, in

14   which case the motion to amend would not be granted, because it

15   would be futile.  And the second issue is whether I should deny

16   the motion to amend because even though there is a live factual

17   issue, the debtor has not been diligent in resolving that

18   issue, as I had instructed back in December of 2010.

19          MS. HAFFEY:  May I respond to either of those, Your

20   Honor?

21          THE COURT:  Okay.

22          MS. HAFFEY:  I'll take the last one first.

23          THE COURT:  Okay.  And I think, in that category of

24   the last one is Spartech and Decatur Plastics and NXP, as well

25   as, of course, Timken and Victory, but they also, I think, fall

Page 81

1    under the first category.

2         MS. HAFFEY:  I think the issue of diligence is a

3    factual question, Your Honor.  I hear what defendants have

4    asserted, and the reorganized debtors feel differently and

5    argue differently.  I do not have my entire case files here

6    with me to be able to demonstrate to the Court the

7    conversations that we've had with not only the defendants but

8    also with our clients, and the amount of work and time that it

9    took in some of these cases to get to the bottom, if you may,

10   of some of these particular issues.

11        And as you heard today, some of these defendants

12   raised these issues in a sliding scale of time as to when they

13   were brought to our attention.  You know, most recently, Ms.

14   Grubin's defendants, Select Tools.

15        In regards to evidence asserted in response to the

16   opposition to the motion, I'll just repeat what I said earlier,

17   Your Honor.  It was our understanding from the December 17th

18   conference with the Court, that this issue was going to be

19   taken up at a later time, in a later hearing, and that all we

20   to be briefing -- because that was one of the purposes that we

21   understood for that conference, was not only to determine what

22   was going to be at the hearing today, but also how to direct

23   our briefing, because of the number of issues that were raised

24   in the -- I think there was ninety-some oppositions filed to

25   the motions to amend.

Page 82

1          And so we intentionally took that off the table,

2     because we didn't understand that it was going to be heard

3     today.  So we would just ask the Court's indulgence in regards

4     to that and allow us, then, to respond singly to that issue.

5          THE COURT:  All right.  That's the first point -- on

6     the first point I made?

7          MS. HAFFEY:  Yes.

8          THE COURT:  Okay.  All right.  I think on the

9     diligence point, I am not going to preclude the debtors from

10    being able to amend the complaint solely on this issue.  If

11    there are other cumulative issues pertaining to these parties,

12    it will be a factor.  But I am going to require that the

13    debtors make a definitive response to anyone who presents

14    either an assumption notice as did Decatur Plastics, or a

15    statement under oath that our only contractual relationship was

16    under these contracts and they've all been assumed under 8.1 of

17    the plan.  That the debtor make a definitive response to that

18    within thirty days.  I think you're in a position to do that at

19    this point.

20          And that definitive response really needs to show

21    either documents showing that it's covered by other purchase

22    orders, as is the argument on Decatur Plastics, or that there

23    was a notice of nonassumption, as is the response on, I

24    believe, Philips Semiconductors/NXP, or a specific legal

25    argument that the contractual relationship was at the purchase

Page 83

1    order level, and that the applicable purchase orders that serve

2    as the basis for the antecedent debt in the complaint, were not

3    executory at the time the plan was confirmed.

4         And I think that leaves Victory Packaging and Timken.

5    On Victory Packaging there's the -- I think there were two

6    responses.  One is that we sent notices of nonassumption.

7    That's something that could be established today, it would seem

8    to me, by a certificate of service.  If it's there, then there

9    will be a factual -- that will be dealt with if the parties

10   can't resolve it.  If it's not there, then I think if that's

11   the basis for the response, then Victory Packaging wins.  If --

12   why don't we make it tomorrow, since this may be a long

13   hearing -- as opposed to today.

14        The other issue is -- and that's the same, again, for

15   Timken.  I don't know whether the issue was really raised with

16   regard to either Timken or Victory that the POs that are

17   involved in the complaint were not executory at the time the

18   plan was confirmed.  Is that another issue, another defense?

19        MR. HERMAN:  Your Honor --

20        THE COURT:  Has it been raised before.

21        MR. HERMAN:  -- Your Honor, I think we agree that it

22   was executory, because there weren't any POs that were open

23   from the 2004 and 2005 period --

24        THE COURT:  Right.

25        MR. HERMAN:  -- and 2007.  I think Ms. Haffey may say

Page 84

1   they weren't executory because we got notices of nonassumption.

2   So I would be very careful when we say nonexecutory.  It is

3   Victory's view that there were no open POs -- pre-petition POs

4   that could have possibly been assumed or rejected at the time

5   the cure payments were --

6           THE COURT:  No, I understand.  But that's not

7   necessarily good for Victory, because then 8.1 doesn't

8   necessarily help you.

9           MR. HERMAN:  Well, Your Honor -- no it does, because

10  of the supply agreement.  That was the only thing they could

11  have assumed.

12          THE COURT:  Well, they have a straight legal dispute

13  on that.

14          MR. HERMAN:  I understand, Your Honor.

15          THE COURT:  All right.  So I think that issue is an

16  open issue.  And on Timken, what I haven't addressed is the

17  waiver and release.  And I think there -- I'd like to hear

18  later today a response on that, after someone's looked at it.

19          MR. SULLIVAN:  And, Your Honor, you know, I've been

20  asking for information and documents --

21          THE COURT:  I understand you've --

22          MR. SULLIVAN:  -- and they say they have none.

23          THE COURT:  -- been asking.

24          MR. SULLIVAN:  So I'm not sure how they're going to be

25  able to --

```
 1              THE COURT:  Well --

 2              MR. SULLIVAN:  -- to respond.

 3              THE COURT:  -- you gave them -- you gave it to them.

 4              MR. SULLIVAN:  I gave them the assumption agreement

 5    with the --

 6              THE COURT:  So they can look at that.

 7              MR. SULLIVAN:  -- agreement.  Yes.

 8              THE COURT:  Okay.  So I want to hear on that today,

 9    because that's -- you can do that at lunchtime.

10              MS. HAFFEY:  Mr. Sullivan, do you have that available

11    with you today?

12              MR. SULLIVAN:  I didn't bring it with me today.

13              THE COURT:  But you sent it, right?

14              MR. SULLIVAN:  It's in the declarations, and I quoted

15    relevant --

16              THE COURT:  Right.

17              MR. SULLIVAN:  -- language.  And I e-mailed it her the

18    same day --

19              THE COURT:  Well --

20              MR. SULLIVAN:  -- she asked for it.

21              THE COURT:  -- well someone can look at it back at the

22    office, right?

23              MS. HAFFEY:  Yes.

24              THE COURT:  Okay.  All right.

25              Okay, so I think that covers point 3, which is
```

1    contract assumption.

2         MS. HAFFEY:  We're moving along.

3         MR. HERMAN:  Your Honor, could we have someone back at

4    the office also look at whether or not there are affidavits or

5    certificates of services on these supposed notices of

6    nonassumption?

7         THE COURT:  Well, that's fair.  Someone should be able

8    to do that, rather than waiting for -- rather than waiting till

9    tomorrow.

10        MR. HERMAN:  Thank you, Judge.

11        THE COURT:  Okay.

12        MS. HAFFEY:  Would the Court entertain a five-minute

13   break so that I can get people working on this, Your Honor?

14        THE COURT:  Yes.  That's fine.

15        MS. HAFFEY:  Thank you.

16      (Recess from 11:44 a.m. until 11:50 a.m.)

17        THE CLERK:  All rise.

18        THE COURT: Please be seated.  All right.  We're back

19   on the record in the various DPH Holdings adversary

20   proceedings.

21        MS. HAFFEY:  Judge, I have one more cleanup issue that

22   I want to bring to the Court's attention, and it relates to a

23   relation-back argument.  There are certain of the proposed

24   first amended complains where, when the complaints were

25   prepared and the information that we received from Delphi

1  Automotive Systems, whether through clerical error,

2  administrative error, frankly I don't know which -- but certain

3  of the complaints, the amounts in the complaints were doubled.

4  We talked to defendants' counsel in the situations -- we've

5  seen this has happened when it's been raised to us. And we

6  will be reducing those at whatever direction this Court gives

7  us, either by stipulation or preparing a new exhibit. But it's

8  very clear on most of the faces of them, which ones these are,

9  that they doubled.

10        In other situations, there are certain of transfers

11  where it's just one or two transfers that were doubled or the

12  amount changed to a certain degree. But what we're

13  representing to the Court is that we're not going to be

14  asserting any claim against any of the defendants for any

15  amount greater than what was on the original complaint.

16        THE COURT: Okay.

17        MS. HAFFEY: Okay. As to -- I'm going to get into the

18  pleading standards now, under Rule 8 and Iqbal-Twombly. And as

19  this Court, and I think everyone in this room is all too aware,

20  to state a preference claim there are certain things that a

21  plaintiff must allege. It's got to allege that there was a

22  transfer in interest of the debtor in the property, to or for

23  the benefit of the creditor, on account of an antecedent debt,

24  made while the debtor was insolvent, on or within ninety days

25  before filing of the bankruptcy, and that it enabled the debtor

1    to receive more than it would have, if the debtor had brought

2    its case under Chapter 7 and the transfer hadn't been made, and

3    the defendant received payment of such debt, to the extent

4    provided by the Bankruptcy Code.

5             Rule 8 of the Federal Rules of Civil Procedure

6    requires that a complaint contain a short and plain statement.

7    And relatively recently, again, as we all know, Twombly and

8    Iqbal decisions clarified that Rule 8 pleading standard to now

9    require that the complaints contain sufficient factual

10   allegations to make the asserted claims facially plausible.

11   And plausible is the key here, Your Honor.

12            Contrary to what several of the defendants have

13   asserted, the new plausibility standard under Twombly and

14   Iqbal, doesn't require that the defendant -- excuse me -- that

15   the plaintiff provide factual information in its complaint to a

16   heightened pleading level.  Rather, what Twombly and Iqbal say

17   is that it has to reach a plausibility standard, taken in

18   context with the situation and with this Court's guidance and

19   common sense, to determine whether or not the plaintiffs have

20   alleged a plausible complaint.  So it's context-specific, Your

21   Honor.

22            Notwithstanding that, the defendants are going to

23   argue to this Court differently, and they're going to rely on a

24   string of cases out of the Bankruptcy Court in North America

25   (sic), the Comerica decisions.

Page 89

1             THE COURT:  North Carolina.

2             MS. HAFFEY:  Excuse me.  What did I say?

3             THE COURT:  North America.

4             MS. HAFFEY:  I'm sorry, North Carolina.  Context is

5      important.  And here the context is preference litigation.  And

6      so the appropriate plausibility inquiry must proceed in that

7      context, informed, of course, as Iqbal requires, by this

8      Court's experience and of common sense.  And this Court has a

9      lot of experience with the Delphi bankruptcy and how Delphi

10     operated.

11            To point out, as a bankruptcy court in Florida

12     recently said -- and this is the TOUSA Homes decision -- that

13     any requirement that a preference complaint provide more

14     information than the who transferred what to whom and when, is

15     to mandate pedantry and to return to those dates to gotcha

16     pleadings.  Plaintiffs are allowed to rely on discovery to

17     further enhance their case as defendants are allowed to rely on

18     discovery to support their defenses.

19            Now, Twombly and Iqbal are recent decisions, so there

20     are relatively few post-Iqbal decisions in which courts have

21     interpreted what this standard is.  And again, defendants rely

22     substantially on the Comerica bankruptcy decisions out of North

23     Carolina.  Plaintiffs, however, on the other hand, point

24     this -- well first, plaintiffs point out to this Court that the

25     Comerica decisions have never been adopted by this Court.  And

DPH HOLDINGS CORP., ET AL.

Page 90

1    in fact, Comerica relies on a decision called Valley Media.

2    And Valley Media was expressly not adopted -- rejected by this

3    Court.

4            And a decision that is instructive is a recent

5    decision of the Southern District of New York; HydroGen, it was

6    April of 2010.  And in that case, while the complaint was

7    dismissed and the plaintiff was allowed to amend, the reason

8    why is the court there said that it didn't provide a single

9    relevant detail such as date, amount or type of transfer.  The

10   complaints in this case, Your Honor, do that and so much more.

11           The other standard, Your Honor, is the standard, as I

12   stated earlier, is your order of September 7, 2010, the

13   dismissal order, where this Court said that we had to set forth

14   the transferor, the transferee, any known subsequent transferee

15   against whom relief is sought, the antecedent debt, and which

16   reorganized debtor is the plaintiff.  And this Court

17   specifically said that you were not going to state whether or

18   not it had to go down to the specific invoice level, and we

19   were going to look at it in context.

20           I'm going to deal with antecedent debt, as I said

21   earlier.  Mr. Klein will be dealing with the debtor, and then,

22   Mr. Sendek will be dealing with the insolvency issue.

23           Antecedent debt has two significant components, the

24   antecedent and the debt.  And this Court defined debt in In re

25   Enron as liability for a payment, whether or not such liability

1    is reduced to judgment, liquidated, unliquidated, fixed,

2    contingent, mature, unmatured, disputed, undisputed, legal,

3    equitable, secured or unsecured.

4           The Bankruptcy Code does not define the overall term

5    "antecedent debt", except that Section 547(b)(2) requires the

6    subject debt to be owed by the debtor before the transfer was

7    made.  And as I just said, Mr. Klein will be dealing with the

8    section of "by the debtor".

9           There's no single formula as to how to plead

10   antecedent debt.  And specifically in the context of preference

11   actions, there's no specific formula.  And again, it goes back

12   to because this is a context-specific analysis.  Every business

13   has its own unique set of practices and its own unique way of

14   documenting its transactions.  So for that reason, every debtor

15   pleading a preference claim will also have its own way of

16   pleading antecedent debt.

17          In this case, Delphi Automotive Systems operated with

18   a DACOR system.  First of all --

19          THE COURT:  A what?  I'm sorry.

20          MS. HAFFEY:  A DACOR payment system.  But let me back

21   up just a moment, because I think it's important to understand

22   that DAS was -- and I know the Court is very familiar with

23   this -- was a material and automotive part supplier. In fact,

24   at the time of its filing, it was part of an affiliated group

25   of companies that was the largest automotive supplier in the

DPH HOLDINGS CORP., ET AL.

Page 92

1    world.  It offered a very diverse range of products to various

2    automotive OEMs.  And because of that, its supply base was

3    extremely large, deep, and very diverse.  So it operated on an

4    automated payment system.  And I referred to it at DACOR just a

5    moment ago, and that stands for Disbursement Analysis Control

6    and On-Line Reporting system.

7              In addition, DAS's terms and conditions expressly

8    provided and told its suppliers that it was using this

9    automated system.  I believe the purchase orders often

10   referenced the DACOR system, but certainly the suppliers were

11   informed of the DACOR system.  And that is how --

12             THE COURT:  Could you just -- I mean, just for the

13   transcript, could you spell, when you're saying DACOR, what

14   you --

15             MS. HAFFEY:  Sure.  It's an acronym.  It's D-A-C-O-R.

16             THE COURT:  Okay.  And this --

17             MS. HAFFEY:  Disbursement Analysis Control and On-Line

18   Reporting.

19             THE COURT:  -- and this is for D-A-S, DAS.

20             MS. HAFFEY:  That's correct.

21             THE COURT:  Delphi Automotive Systems.  Okay.

22             MS. HAFFEY:  And DAS's use of this system is pled in

23   our proposed first amended complaints in paragraphs 16 and 17,

24   where we state that plaintiff did not accept physical invoices

25   from defendant in connection with defendants' shipments of

Page 93

1    goods or provisions.

2            In effect, what happened, Your Honor, is that when the

3    supplier -- the supplier would receive a purchase order from

4    DAS.  When the supplier then was ready to perform its service,

5    whether it was producing goods, whether it was producing

6    tooling, whether it was providing services, either a shipping

7    bill, a bill of lading, something was provided to the -- to

8    DAS, and at that time, then, entered into its DACOR system that

9    it had received:  a service, tooling, goods; and a payable

10   entry was recorded.  And it's that system that shows that there

11   was an antecedent debt because it was a payable.

12           Now, in our first amended complaints -- I'll walk you

13   through paragraph by paragraph to show how we pled antecedent

14   debt.  First of all, in paragraph 13, we've alleged the

15   existence of agreements.  Secondly, in the same paragraph, DAS

16   alleges the nature of that agreement, where we say if it was a

17   purchase for goods; where we say it was a purchase for tooling;

18   where we say it was a purchase for services.  And I understand

19   a couple of defendants have said, oops, you've got it wrong; we

20   weren't goods, we were tooling.  The POs that we reference

21   attached at Exhibit 1 make it clear what it was and what the

22   nature of the agreement was.  Some of those instances, the

23   parties sometimes had both goods and tooling services provided.

24           In paragraph 15, we say what the defendant was

25   required to do.  More specifically, we allege that the creditor

DPH HOLDINGS CORP., ET AL.

Page 94

1   was required to ship certain goods or certain tooling or to

2   provide services.

3           Next, then, in paragraph 18, we allege that the

4   defendant actually performed its obligation under the contract,

5   whether by shipping the goods or tooling or providing the

6   services.  And then, also in paragraph 18, we allege, after the

7   date of defendants' performance, DAS made the specific

8   payments.

9           Now, this -- what I just read you, those paragraphs,

10  those are the face of the complaints.  In support of the face

11  of the complaint, and to complement the complaint and add to

12  the complaint, the exhibits to the complaint are extremely

13  important.  And as this Court may recall -- if not I'd be happy

14  to show the Court -- what the original complaints in this

15  matter looked like.

16          The original complaints had, on the face of them, a

17  Delphi Corporation, et al. identified as the plaintiff, and

18  attached an exhibit of I think twenty-some reorganized debtors

19  but didn't identify which particular plaintiff was bringing the

20  preference action.  In multi-defendant cases it identified on

21  the case caption and in the recitals of the complaint the

22  various defendants.  But then through the face of the complaint

23  and on the exhibit, it didn't identify which of the defendants

24  received which transfer.  And then on the exhibit, all it

25  showed was an amount -- it showed an amount -- excuse me --

1    date, amount and whether it was a wire, EFT or a check.

2         We went back -- when those complaints were filed, it

3    was pre-Twombly, it's my recollection as far as the date.  But

4    they were filed understanding that they were meeting the

5    pleading standards at that time.  But after this Court ruled us

6    to go back and amend, we went back, and the exhibits now

7    attached to the complaint are far more detailed.  We have

8    included on the complaint the transferring entity down to --

9    excuse me -- the transfer entity.  We have indicated the

10   transferee.  And where there are multiple entities, we have

11   listed by transfer line item, which transferee received that

12   transfer.

13        We've provided the date for each transfer.  And then

14   where in the past complaints it was a lump sum item for days --

15   so let's say, for instance, we're talking about August 4th, and

16   there would be a lump sum of 650,000 dollars, going back and

17   looking at DACOR and the payment system, that 650,000 dollars

18   may have been a payment that when you broke it down it was for

19   a number of -- payments on a number of different invoices or

20   POs.  We broke that down by the line level so that the

21   suppliers would have that information.  We had complaints that

22   went from one-page exhibits to over 300 pages of line items.

23   That's how detailed those exhibits are.

24        And then lastly, we identified for them purchase

25   orders.  We identified what we have labeled in the column as an

1    invoice.  And maybe a more accurate description would be called

2    a process number.  When that DACOR system received the payable

3    information -- let me back up for a moment.

4         Delphi was a paperless company.  And it told its

5    suppliers not to send it invoices.  So when it got information

6    as to a shipment and that information, that payable information

7    was input into DACOR, DACOR then would designate a process

8    number.  So that's what the number is on the complaints.  It's

9    either a PO number, it's a process number, and in some

10   situations, I think it's a check number.  And then we

11   identified how the transfer was made.  It was either by an EFT,

12   which is either a wire or another type of electronic fund

13   transfer, or it was paid by check.

14        Again, a tremendous amount of information.  It took

15   DAS a tremendous amount of time to go through its system and to

16   compile all of this information.

17        So the defendants come to you today and say that's

18   still not enough.  They have the date in which the tran -- and

19   again, going back to the context of a preference action and

20   what these transfers were about, it's payment for the goods and

21   the services that their clients provided.  And it gives the

22   date in which they received the payment.  It gives the date in

23   which the amount was provided to them, down to, again, the

24   invoice or the PO level.  Because we understand, some of these

25   suppliers are large, and they had large relationships with DAS.

1   But they can look, now, down to the individual transaction that

2   they provided to our client, and which we then made a payable

3   against.

4        So any argument that these complaints, the exhibits,

5   don't provide antecedent debt, Your Honor, we think is just

6   inaccurate.  It's requiring a pleading level that is far beyond

7   what is required under even the Comerica cases.  And certainly

8   it's far more than what has been required under a large

9   majority of the circuits that have reviewed Twombly and Iqbal.

10       And I'd point this Court to the attention of C.R.

11  Stone, which is 434 B.R. 208 out of Massachusetts, where there

12  the antecedent debt that was pled was very -- frankly rather

13  vague.  It says, "By unilaterally and wrongfully holding monies

14  due to C.R. Stone we paid," and it lists certain entities, "at

15  that time".  And the Court there said that that was sufficient

16  for preference claims.

17       And In re N.M. Holdings Co. LLC -- and this is a 2009

18  decision of the Bankruptcy Court out of the Eastern District of

19  Michigan -- the court said there, naming the debtor-transferor,

20  the transferee, the form of transfer, check, and then the

21  amount, was sufficient under the Twombly-Iqbal standards.

22  Similarly In re Allou Distributors, which is a bankruptcy

23  decision out of the Eastern District of New York in 2008, had

24  the same result as the Eastern District of Michigan decision.

25       I think I've stated already that the Comerica decision

1   has not been adopted by this circuit, so we don't think it's a

2   decision that the Court should rely on.  But even if it did, we

3   have sufficiently alleged that.

4           Now, defendants I think are going to say, Your Honor,

5   they haven't pled the nature and the amount of each antecedent

6   debt.  But I think what they're forgetting -- or not -- maybe

7   forgetting is not the right word -- what they're not

8   considering is the fact that we have, again, identified on the

9   exhibits, the purchase orders and/or the process numbers that

10  were driven from the very documents that their clients supplied

11  to us when they shipped the goods.  And it is on those very

12  documents, the purchase orders or the billing shippers, which

13  that process number relates back to, that identified the very

14  nature of this agreement, whether it's a shipment of goods,

15  whether it was a provision of services.

16          And the case of -- and I may destroy the name here --

17  Meg Giafica (ph.) v. Blumenthal, which is out of the Second

18  Circuit, says that when we incorporate documents and refer to

19  documents in our complaint, it's incorporated.  So those POs

20  and those invoices are all incorporated within our complaint.

21          Now, because of the DACOR system and the way it

22  operated, and it generated a payable, that shows that the debt

23  was on account of an antecedent debt.  There would not have

24  been that payable but for the service being performed, but for

25  the goods being delivered.  So, again, by attaching the exhibit

1      in the detail that we have we have demonstrated that the nature

2      of the debt and that the debt was antecedent.

3              THE COURT:  What if the exhibit, as is the case in

4      some of these complaints, is blank in that box?  The purchase

5      order invoice number.

6              MS. HAFFEY:  I'm sorry?  I didn't hear the last part,

7      Your Honor.

8              THE COURT:  In some of these complaints, like in the

9      Applied Biosystems complaint, the antecedent debt purchase

10     order/invoice number box is blank.  What should I take away

11     from that?

12             MS. HAFFEY:  Well, I guess, two things as to that one.

13     Applied Biosystems hasn't filed an opposition, but, more

14     broadly, Your Honor, in regards to the -- there are a, and it

15     is a relatively few number but a significant number and,

16     actually, an important number, of transfers where there was a

17     blank.  And it relates back to that DACOR system that I was

18     referring to earlier.  The DACOR system is a system that's,

19     again, an automated payment processing system.  Leading up to

20     Delphi's bankruptcy there was in the news the potential

21     imminent threat of bankruptcy, and the supplier base was

22     getting nervous.  They were getting concerned.  They were

23     calling Delphi and in certain situations were demanding what

24     Delphi internally referred to "hostage payments".  And there

25     were then payments that were made to defendants that were on

Page 100

1    account of the antecedent debt but that were due yet they were

2    accelerated payments, and they demanded to be paid on modified

3    payment terms.  They demanded to be paid accelerated payment

4    terms, and, generally, those were in lump sum payments.

5            Now, at the time when DAS was directed by this Court

6    to go through and to provide additional information we went

7    through our payment system and provided that information, and

8    it wasn't until a little later we started noticing that we have

9    these blanks and why.  And we started digging deep down, and

10   you couldn't pull it off of the payment system because they

11   weren't there.  These weren't payments that were made off of

12   the DACOR system.  So we did a deeper dive into the records,

13   and what've we discovered, Your Honor, are these are the exact

14   payments that the statute is designed to protect the estate to

15   avoid.  These are the payments that are out of ordinary course

16   and that the supplier base was demanding that Delphi provide to

17   them.

18           Now, the question is but does that show me antecedent

19   debt.

20           THE COURT:  No, my question is is that in the

21   complaint?  I don't think so.  What you just told me isn't in

22   any of the complaints, is it?

23           MS. HAFFEY:  Well, actually, I think it is.

24           THE COURT:  It is?

25           MS. HAFFEY:  And where it is, it's on the exhibit.

1           THE COURT:  Okay.

2           MS. HAFFEY:  Because if you look back at the exhibit

3    what you see there is you see a payment on the day, on the

4    amount -- excuse me.  To the transferee on the day and on the

5    amount that their client specifically negotiated to receive

6    these payments.  So, again, we're going back to a plausibility

7    standard in which it --

8           THE COURT:  But you're relying, I guess, on -- I mean,

9    it could be a payment in advance or a COD.

10          MS. HAFFEY:  We're --

11          THE COURT:  You're relying on the -- just on the

12   relationship, right, that they - -

13          MS. HAFFEY:  We're relying on the relationship.

14          THE COURT:  That they had a supplier relationship or a

15   service or service relationship.

16          MS. HAFFEY:  And I'll give you an example, Your Honor.

17   Methode has an argument and claims, and I believe Mr. Jacob may

18   be here today and may be speaking to the Court, but Methode

19   Electronics makes an argument that they received this payment

20   and it's not on account of antecedent debt.  And our records

21   show that it has a statement on the -- Delphi ended up doing a

22   paper document that we've, again, since, in this deeper dive

23   discovered that has on it that it's an expedited payment, and

24   to the tune of three million dollars on October 6th on the cusp

25   of bankruptcy.

DPH HOLDINGS CORP., ET AL.

Page 102

1           Now, there's a legitimate dispute between the entities

2     as to whether or not that was -- they claim it was on account

3     of -- not on account of antecedent debt, and we argue that it

4     was, because it says it has an expedited payment.  Again, this

5     is a plausibility standard, and by having the date --

6           THE COURT:  Well, is it just plausibility?  I mean,

7     Twombly says you're not supposed to just plead the statute, and

8     Iqbal reiterated that you -- I, rather, must identify the

9     allegations that are not entitled to the assumption of truth

10    because they are legal conclusions, not factual allegations.

11          MS. HAFFEY:  And not just --

12          THE COURT:  So if you're just pleading antecedent debt

13    alone, without what you just told me, for example, or,

14    alternatively, an invoice, isn't it just pleading the statute?

15          MS. HAFFEY:  No, because it's not formulatic (sic)

16    pleading in the sense that we had provided the suppliers with

17    the date and the transfer and the amount as to what the payment

18    was.

19          THE COURT:  But not whether it's antecedent.  Isn't

20    that one of the statutory elements?

21          MS. HAFFEY:  Well, again, on the face of the

22    complaint, though, we do state that these were all made for the

23    payment of goods or services, and then the Exhibit 1 supports

24    that.  So --

25          THE COURT:  So you're -- but I think that goes back to

Page 103

1   my question.  Your point about where the exhibit has a blank as

2   opposed to an invoice, what's in the complaint to support the

3   fact that it's antecedent debt is the paragraph in the

4   complaint that says that the defendant supplied goods or

5   services.

6            MS. HAFFEY:  And that the goods -- and that it was

7   paid on account of the performance of those goods and services.

8            THE COURT:  Okay.

9            MS. HAFFEY:  And I would like to, again, point back to

10  this Court that --

11           THE COURT:  All right.  Well, why don't we look at the

12  Methode one just to see if that --

13           MS. HAFFEY:  Well, Methode doesn't have a blank, so

14  maybe it's not the greatest example --

15           THE COURT:  Oh, okay.

16           MS. HAFFEY: -- for you.

17           THE COURT:  All right.  Well -- all right.  Then we

18  can -- I'm sorry.  I got you up when I didn't need to.

19           UNIDENTIFIED SPEAKER:  Okay.

20           THE COURT:  All right.

21           MS. HAFFEY:  Generally, Your Honor, there is --

22           THE COURT:  I mean, your point on Methode is that --

23           MS. HAFFEY:  My point on Methode --

24           THE COURT:  There's just a dispute between you and

25  them on whether it's antecedent or not, but that you said it's

DPH HOLDINGS CORP., ET AL.

Page 104

1    antecedent and that's enough for --

2          MS. HAFFEY:  And --

3          THE COURT:  -- Rule 8.

4          MS. HAFFEY:  And the underlying documents, which are

5    on the date, the amount of, and to the transfer show that there

6    was a payment made on that day and the underlying documents,

7    our underlying document says that it was an expedited payment.

8          Now, as to others, what is a typical scenario, Your

9    Honor, is typically on October 4th, October 6th or October 7th

10   tended to be the dates these payments were made to the

11   defendant, and they are, again, those very payments, and this

12   is where we ask the Court to use its common sense here, we're

13   leading up to bankruptcy.  The bankruptcy filing was on October

14   8th.  And you have inordinate payments here, in some amounts,

15   that you didn't have before when looking at the rest of the

16   transactions, and we provided the date and who the payment went

17   to, and it is the suppliers.  I mean, if any -- if there was

18   any transfer on the exhibits that the supplier base is most

19   aware of and understand that it's an antecedent debt it's

20   particularly these transfers.

21         THE COURT:  Okay.

22         At the very least, Your Honor, the stage we're at

23   right now, we are at the stage of seeking leave for a first

24   amendment.  And the pleading standards here are very liberal,

25   and this Court can allow DAS to go back as to those one line

1    items now that we have -- because we have found for these, and

2    I can show you examples of them, the payment deviation forms

3    that show -- that record that these are no net seven day

4    payments.  These are an expedited payment to pay for these past

5    two invoices.  Some of them have settlement agreements

6    demanding payment.  We can go back and fill in that column, and

7    the standard here is only if it would be futile to allow us to

8    do so.  And it would not be futile to allow us to do so.

9          THE COURT:  This is where there's a blank on the --

10         MS. HAFFEY:  That's correct.

11         THE COURT: -- schedule?  Okay.  Okay.

12         MS. HAFFEY:  I don't know if you would like to

13   entertain --

14         THE COURT:  Why don't I -- so that this is -- you're

15   done on the antecedent debt point --

16         MS. HAFFEY:  Yes.

17         THE COURT: -- subject to rebuttal, of course.  Okay.

18   So why don't I hear from the objectors on this point?

19         MR. BOWLES:  Your Honor, Chip Bowles, Greenebaum Doll

20   & McDonald, for DSSI.  As we talked earlier, there were certain

21   people who were selected.  I am one of the people selected on

22   lead defendant to address the entire issue of antecedent debt.

23   I can go through that generally or I can answer Your Honor's

24   last client, because my client is one that does, in fact, have

25   not only blanks but the debtors' admission that they had no

Page 106

```
 1    documents at the time you required them to file the amended

 2    complaint that would support that there was any antecedent

 3    debt.

 4             THE COURT:  Well, let's go to the blanks point first.

 5    I --

 6             MR. BOWLES:  I you want, Your Honor, I have a copy of

 7    their proposed amended complaint.

 8             THE COURT:  No, I have it right here.

 9             MR. BOWLES:  Okay.

10             THE COURT:  And I'm looking at the Exhibit 1.

11             MR. BOWLES:  If you look at Exhibit 1 for Delphi it

12    has a transfer recipient, contracted entities, obligor

13    entities, transfer date, transfer amounts, transfer time.  Not

14    a single statement about antecedent debt.

15             THE COURT:  Well, they have a column that says

16    "Antecedent Debt:  Purchase Order/Invoice Number".

17             MR. BOWLES:  In the Delphi?  In DSSI?  This would be

18    07-02236.

19             THE COURT:  Oh, no.  I'm looking -- I'm sorry.  I am

20    looking at --

21             MR. BOWLES:  If I might approach?  This might be

22    easier, Your Honor.

23             THE COURT:  This is not DAS v. Methode Electronics?

24             MR. BOWLES:  No.

25             THE COURT:  All right.
```

Page 107

```
 1              MR. BOWLES:  This is DSSI.

 2              THE COURT:  All right.  All right.  You have either --

 3      give me that one.

 4              MR. BOWLES:  Here.

 5              THE COURT:  Oh, okay.  So this is not Methode.

 6              MR. BOWLES:  No, no, no, no.

 7              THE COURT:  All right.  All right.  Fine.

 8              MR. BOWLES:  You were asking for one.  I just happened

 9      to be the person who was going to do it and happened to have

10      one that is.

11              THE COURT:  Okay.  Very well.  Yes, this exhibit,

12      right, does not have --

13              MR. BOWLES:  Right.

14              THE COURT: -- invoice --

15              MR. BOWLES:  And if Your Honor will --

16              THE COURT: -- or PO numbers.

17              MR. BOWLES: -- will turn to, I believe it is paragraph

18      18 of their complaint, which has their statement about

19      antecedent debt.  If you'll note in that paragraph they admit

20      that they have no evidence of antecedent debt.  Their entire

21      pleading -- I'm not sure of the exact paragraph number,

22      because, unfortunately, it's my only copy, they say on

23      information and belief the documents that may prove antecedent

24      debt are in the defendants' possession.

25              Your Honor, one important thing that I think Ms.
```

Page 108

1   Haffey has been overlooking is the important date of when these

2   allegations and arguments may, as Your Honor has so rightly

3   noted, was when they filed either their proposed amended

4   complaint under this Court's orders or, perhaps, even their

5   response.  They did neither.  So I think, Your Honor, as a

6   matter of law under Iqbal and Twombly and your orders, if there

7   are blanks or, as we were going to argue earlier, functional

8   blanks that do not show antecedent debt but just have a string

9   of numbers that are not debt obligations I think that's the end

10  of their case.

11        THE COURT:  Well, I'm sorry.  Let's just take on this

12  point first.

13        MR. BOWLES:  That's fine.

14        THE COURT:  This, and I apologize for taking your

15  copy.  It wasn't paragraph 13.  It was paragraph 23.  And it

16  says "Plaintiff made or caused to be made each transfer".

17  We're still on Exhibit 1.  And it does list the transfers.  And

18  then it simply says "for or on account of antecedent debt".  I

19  don't see any, Ms. Haffey, I don't see anything in this

20  particular complaint, other than paragraph 14, which says that

21  "DTI", which is not a plaintiff here, "and plaintiff entered

22  into certain service agreements with defendants for the

23  performance of various services.  And plaintiff assumed or

24  otherwise became obligated for all payment obligations

25  thereunder".  That's the paragraph that sets up a relationship,

DPH HOLDINGS CORP., ET AL.

Page 109

```
 1    a service agreement, but then it just says that the transfers
 2    were on account of antecedent debt, which seems to me at least
 3    verging on making a conclusory allegation by just repeating the
 4    statute.
 5             MR. BOWLES:  Yes, Your Honor.  And one small thing in
 6    mind.  Ms. Haffey has been saying but, Your Honor, we should
 7    get another bite of the apple.  That's more of a general
 8    argument.  But one thing she keeps talking about is discovery
 9    can cure this.
10             THE COURT:  No, it can't.
11             MR. BOWLES:  Right.  The Twombly case very clearly
12    says --
13             THE COURT:  You have to get -- I mean, that's the
14    whole reason for Twombly and Iqbal is to avoid discovery --
15             MR. BOWLES:  Right.
16             THE COURT:  -- where there's nothing on its face other
17    than a conclusory allegation --
18             MR. BOWLES:  Right.
19             THE COURT:  -- ala Twombly or an implausible allegation
20    ala Iqbal.
21             MR. BOWLES:  Right.  And if there's any argument she's
22    going to make, as it said, it wasn't made by them in the
23    pleadings this Court required, so I don't think it has any
24    relevance at all what they may or may not, could or could not
25    have discovered.  They would just file by the day, I believe it
```

Page 110

1    was September 7th, the proposed amended complaints.  If they

2    did that by then, whatever they alleged in there is before this

3    Court.  Anything they found subsequent, Your Honor, which they

4    haven't brought to this Court's attention until very recently

5    or this day, I think, is pretty much irrelevant.  But in our

6    case, as Your Honor said, we don't think there's any showing of

7    antecedent debt or, for that matter, even that these were

8    payments on debt.  And they also admit they have absolutely no

9    documents that would ever show that, so --

10           THE COURT:  Okay.  So what's the response on that all?

11           MS. HAFFEY:  Yes.  Thank you, Your Honor.  First I'd

12   like to say that this particular complaint with the paragraph

13   that was cited to you by counsel is a one of a kind and unique

14   complaint.  You won't see that language anywhere else and --

15           THE COURT:  Right.

16           MS. HAFFEY:  -- my response to that is, Your Honor, and

17   I go back to the futility argument.  What I was saying earlier

18   was not that we should be allowed to do discovery.  It's clear

19   that under Twombly/Iqbal we have to state a claim that is

20   plausible on its face.  It's also clear, though, that this

21   Court has the ability, if it thinks that the complaint on its

22   face right now does not meet a standard, we have an amended --

23   this Court can allow us an opportunity to rectify, fix,

24   provided additional information --

25           THE COURT:  All right.  But that's a discretionary

1    issue.

2         MS. HAFFEY:  It is a --

3         THE COURT:  But I first need to decide whether this

4    complies with Twombly and Iqbal, and, again, I view Twombly and

5    then as reinforced by Iqbal as saying more than plausible on

6    its face.  I think it's also saying that, you know, again, as

7    Iqbal says, before you get to plausibility you've got to decide

8    which allegations are not entitled to the assumption of truth

9    because they're legal conclusions not factual allegations.  And

10   I'm having a hard time seeing why this isn't a legal conclusion

11   as opposed to a factual allegation.

12        MS. HAFFEY:  And, again, I go back to, Your Honor, the

13   factual allegation is when you look at the date and you look at

14   the transfer amount and the transfer it went to, those were on

15   account of antecedent debt.  I mean, they were transfers for

16   payables.

17        THE COURT:  But, see, that -- I mean, you're basically

18   saying that the date indicates that the -- because it was right

19   around the time when Delphi was at its most susceptible to

20   pressure that I should assume that it was on account of

21   antecedent debt as opposed to simply succumbing to pressure.

22   It could have been a deposit.  It could have been COD.

23        THE COURT:  And I'm relying on those decisions that I

24   referred to earlier, Your Honor, in where they found that the

25   date, the amount, the transferor and the transferee was

DPH HOLDINGS CORP., ET AL.

Page 112

1    sufficient under the Twombly/Iqbal standards --

2              THE COURT:  But isn't that --

3              MS. HAFFEY: -- which is what we had there.

4              THE COURT:  At least the last case that you cited,

5    wasn't that a case where it wasn't an ongoing contractual

6    relationship.  It was a case where they -- the facts themselves

7    were pled, as opposed to just that they were supply

8    relationships.

9              MS. HAFFEY:  Well, the facts here are pled as well,

10   too, Your Honor.

11             THE COURT:  But it's a debt -- I mean, the facts to

12   establish that it was an antecedent debt as opposed to just the

13   fact that --

14             MS. HAFFEY:  I mean, again, the facts here --

15             THE COURT: -- they were in business together.

16             MS. HAFFEY:  Well, but there's more --

17             THE COURT:  I mean, it was that they were holding

18   money and they needed to pay the money to get release of

19   something else.  I mean, that was the -- it seemed to be

20   specifically alleged in that case.

21             MS. HAFFEY:  And the facts here show more.  They do

22   show more.  They show that they provided services.  We've got a

23   column on this one that shows what a contracting entity was

24   here.  And I do want to go back, Your Honor, so that the Court

25   understands if it would have obliged DAS in situations -- if

1    the Court would allow as to these blanks to allow DAS to

2    provide additional information.  Counsel just said that and we

3    don't have any information.  And that's not true, and he knows

4    that's not true.  I have provided him with the very specific

5    deviation wire transfer forms that show where the transfers

6    went to with this client, and where it says that, and I'll

7    quote, it says "Payment of payables under payment term

8    deviation requests", so --

9            THE COURT:  All right.  But I don't want to get into

10   an additional whether I should order today that you -- that the

11   debtors have no more opportunity to amend.  That includes a lot

12   of other factors besides just this one issue on antecedent

13   debt.  So I appreciate that you're responding to something that

14   counsel raised so you're feeling you have to respond.  I don't

15   really want to --

16           MS. HAFFEY:  Well --

17           THE COURT:  -- get into that issue at this point.  I'm

18   really just focusing on the face of this proposed amended

19   complaint.

20           MS. HAFFEY:  And I know I'm beating a bush here, but

21   going back to the date and the amount and looking at -- and not

22   relying on the payment deviation form, but what the date and

23   the amount does, it shows to the supplier that this was on the

24   amount of antecedent debt.  Because when they have that

25   transfer, and they have the date, and they have the amount of

DPH HOLDINGS CORP., ET AL.

Page 114

1    it, and they know who it came from and who it went to, using

2    that information they know it's on account of an antecedent

3    debt.  And I --

4            THE COURT:  Well, they may not.  They may say it's

5    not --

6            MS. HAFFEY:  And --

7            THE COURT: -- in which case you force them to answer

8    when the complaint is, kind of, taking a guess.

9            MS. HAFFEY:  But the --

10           THE COURT:  Right?  I mean, you don't really know.

11           MS. HAFFEY:  Well --

12           THE COURT:  On the face of the complaint you don't

13   know.

14           MS. HAFFEY:  Except that --

15           THE COURT:  And, so, you're putting to them -- to the

16   task of having to prove something, and, you know, basically

17   just crossing your fingers that they'll -- they won't.  And I

18   think that's what Twombly and Iqbal were designed not to do.

19           MS. HAFFEY:  Except in, and, again, DSSI is a

20   unique --

21           THE COURT:  I understand that.

22           MS. HAFFEY: -- situation on its own.

23           THE COURT:  Right.

24           MS. HAFFEY:  If you look at the other complaints where

25   you have --

Page 115

1          THE COURT:  Well, I think we should move to the other

2    complaints.

3          MS. HAFFEY:  Okay.

4          THE COURT:  Because I think we are, I mean, I

5    appreciate -- I'm not faulting you for it, but I think we are

6    getting to the point where we're repeating ourselves on this

7    one.  But, so then there was, I think -- can we deal with the

8    actual Methode complaint?  I mean, all of them that -- all the

9    transfers are listed there.  The POs are listed on the exhibit.

10   So I'm not sure what the argument on an antecedent debt is

11   where there isn't all the -- all the transfers are listed.  Is

12   there an argument there that the complaint doesn't --

13         MS. HAFFEY:  But we don't think that --

14         THE COURT:  No, I'm talking to the objectors.

15         MS. HAFFEY:  Okay.

16         THE COURT:  Is anyone arguing the point that where the

17   exhibit lists a purchase order/invoice number in the antecedent

18   debt column that the debtors, nevertheless, have not shown an

19   antecedent -- or not sufficiently pled payment of an antecedent

20   debt?

21         MR. SULLIVAN:  Your Honor, counsel for Timken.  I

22   would make that argument, because in one of the declarations

23   that my clients have been in connection with its opposition

24   indicated that the invoice number -- where it references an

25   invoice number those invoice numbers bear no resemblance to any

DPH HOLDINGS CORP., ET AL.

Page 116

```
1    invoice number that Timken ever would have issued, and couple

2    that with the complaint which says that Delphi didn't accept

3    invoice numbers, you know --

4              THE COURT:  Well, but that just means it's a purchase

5    order number, then, instead.

6              MR. SULLIVAN:  No, no, no.  It says it's an invoice

7    number.

8              THE COURT:  No, it says purchase order/invoice number.

9              MR. SULLIVAN:  On the exhibit that was attached to the

10   complaint of Timken it --

11             THE COURT:  All right.  Well, let me --

12             MR. SULLIVAN:  -- specified whether it was an invoice

13   number or a PO number.

14             THE COURT:  I'm sorry.  Let me get to Timken here.

15             MR. SULLIVAN:  Sure.

16             THE COURT:  Okay.

17             UNIDENTIFIED SPEAKER:  And what I'd want to --

18             THE COURT:  Well, I mean, Timken says --

19             MR. SULLIVAN:  If you look at the --

20             THE COURT:  -- that --

21             MR. SULLIVAN:  -- second to last column it says

22   purchase order or invoice number, and it says invoice, and then

23   later on some of them say PO.

24             THE COURT:  Okay.

25             MR. SULLIVAN:  So it either identifies invoice or PO.
```

DPH HOLDINGS CORP., ET AL.

Page 117

```
 1           THE COURT:  All right.  But -- all right.  So let's

 2    stick with this point, though.  At this point, you know,

 3    subject to Rule 11, they are referring to a fact that they

 4    have.  You may disagree with that fact, and on summary judgment

 5    you may win on that, but I don't see why that should throw out

 6    the complaint.

 7           MR. SULLIVAN:  Your Honor, counsel made a statement

 8    today that these complaints incorporated these invoices and POs

 9    by reference.  They will not be able to produce an invoice that

10    says this.  In fact, I had a conversation with Ms. Haffey, and

11    there's been numerous e-mails back and forth which are

12    documented in the declaration that I submitted with this

13    Court --

14           THE COURT:  But --

15           MR. SULLIVAN:  -- in which he says she doesn't have any

16    invoices or POs that she can produce to me, because I asked for

17    them.

18           THE COURT:  But we're just dealing -- look.  We're

19    just dealing with the issue of whether, under Rule 8, they

20    properly pled antecedent debt.  I think you're going beyond

21    that at this point.

22           MR. SULLIVAN:  I guess it really goes to a futility

23    argument under Rule 15, Your Honor.

24           THE COURT:  Exactly.  So why don't we, I mean, I just

25    want to, I mean, they structure it this way so we can do this
```

DPH HOLDINGS CORP., ET AL.

Page 118

```
 1   piecemeal.

 2          MR. SULLIVAN:  Oh, okay.  I apologize.  I didn't mean

 3   to jump ahead.

 4          THE COURT:  That's all right.  That's okay.  I did

 5   ask, sort of, does everyone have any point on this.  Yes?

 6          MR. BOWLES:  Your Honor, on the general argument on

 7   antecedent debt that --

 8          THE COURT:  Maybe you need to pull a little closer to

 9   a microphone.

10          MR. BOWLES:  Oh.  On the general argument on

11   antecedent debt, Your Honor, that the defense group has done,

12   yes, we have an argument that basically as pled -- it takes a

13   while to do it, and I don't want to jump out of order, but if

14   you want to -- basically, the numbers that they've put in those

15   columns really do not prove it, because coming down here, and I

16   can go to that, there are actually -- pardon me.  There are

17   actually three elements to preferences.  One, was the transfer

18   for the payment of a debt.  Not for anything else.  Courts work

19   2L18L41 >>on.  Two, was it owed by the plaintiff?  In this

20   particular case, Your Honor, those are other issues.  And,

21   three, was it incurred before the transfer the debtor seeks to

22   be made.  In this particular case, Your Honor, going to the

23   numbers issue that we have, which is, basically --

24          THE COURT:  I'm sorry.  Are we back on Methode's

25   complaint?
```

DELPHI DIAGS CORP., ET AL.

Page 119

1          MR. BOWLES:  No, no, no, no.  Not any specific

2    complaint.

3          THE COURT:  Okay.  Fine.

4          MR. BOWLES:  This is on the general one.

5          THE COURT:  All right.

6          MR. BOWLES:  This is generally.  Because in this

7    particular case what we were talking about -- and, I'm sorry,

8    I'm having to get out of here, so I just have to find it.

9    Basically, in this particular case when you incorporate the

10   documents by reference that is, in fact, the correct law if you

11   reference that in the document that is incorporated.  However,

12   Your Honor, it's not the allegation that's made on the document

13   is, in fact, what the actual document says.  Both this Court,

14   and I'm more familiar with the Seventh Circuit in Northern Gun

15   Outdoor Shows v. City of South Bend who said where an

16   instrument is incorporated into a pleading it, basically,

17   anything that's in that will trump any allegation.  So unless

18   the documents which were referred to by various numbers

19   specifically show that DAS is obligated to a defendant that's

20   all they can do.  If they don't show that then the allegation

21   is basically rendered a nullity.  In other words, Your Honor,

22   they can say gee, these documents are evidence of it, but if

23   the documents themselves, since they're incorporated in the

24   pleadings you can look at those.  Although this isn't a

25   12(b)(6) standard, when you're looking at these for both

Page 120

1    futility under Rule 8 they, in fact, have to show them and look

2    at them.  If they don't have them, Your Honor, then that

3    allegation is as if they had never even referred to them,

4    because you do have the right to review those, because once you

5    incorporate them by reference they, in fact, you have the right

6    to look and see what they say.

7           Further, Your Honor --

8           THE COURT:  Well, does anyone say what they say?

9           MR. BOWLES:  Well -

10          MR. SULLIVAN:  Well, they don't exist, Your Honor.

11   They're just made up numbers.  There are no such invoices.

12   That's the problem.

13          MS. HAFFEY:  Your Honor, may I respond to that?

14          THE COURT:  No, but has anyone looked at the purchase

15   order information?  No one is disputing this, right, at this

16   point?

17          MR. SULLIVAN:  Your Honor, I mean, from Timken's

18   perspective.  I have to apologize.  We keep interrupting, but I

19   submitted a declaration that says we don't recognize any of

20   those POs or invoice numbers.  We asked, pursuant to Your

21   Honor's direction, for copies of all these things.  Mr. Haffey

22   says she or her client do not have them, and she would not be

23   able to provide them.  That's what I was told.

24          MS. HAFFEY:  I have two responses to that, Your Honor.

25          THE COURT:  Okay.

Page 121

1          MS. HAFFEY:  And maybe one I'll -- well.  As I said

2     earlier Delphi was a paperless company.  It expressly told its

3     suppliers do not send us an invoice.  So when it got the bill

4     of lading, the shipper -- sometimes they send invoices --

5     whatever piece of document that they sent to the receiving

6     entity, the person there in the receiving department then

7     entered into that DACOR system that we received goods or

8     services were provided, we got the tooling.  And that system,

9     then, entered into a processing number, invoice number that

10    Delphi assigned to it.  It's not their invoices, and their

11    clients will tell them, they were expressly told by Delphi,

12    don't send us invoices.  That was how Delphi operated, which is

13    very common in the automotive industry to be paperless.  So

14    what that documents is, Your Honor, it's a reference to the

15    shipment or to the service performance of goods that got put

16    into the payable system that would then generate a payment.

17    So --

18          THE COURT:  Well, I'm assuming since you came up with

19    specific numbers that, for example, if a defendant asked for

20    evidence of -- I'll just take the first item on the Timken

21    exhibit, S3S30957, there'd be some screen that would pop up

22    that would print out that would show a date that says that

23    number on it, right?

24          MS. HAFFEY:  And I'd have to -- I assume that to be

25    true, because this is the date that my client gave me this

Page 122

1    information to generate that exhibit.  So yes, taking a screen

2    shot is something I have to believe is entirely possible.  But

3    because it was a paperless entity, and again, very, very

4    common, is it going to be able to go through an old file drawer

5    and pull out that bill or that shipper?  No, I mean, it's set

6    up, this system, so that it didn't have to retain all of those

7    documents and those papers.

8            THE COURT:  All right, so I'm trying to follow; what

9    is the argument about why that's not sufficient to show that

10   this was in respect of --

11           MS. HAFFEY:  I don't know.

12           MR. BOWLES:  Basically, Your Honor, it comes down to

13   this, what they --

14           THE COURT:  You'd better move a little closer to the

15   microphone.

16           MR. BOWLES:  I'm sorry, I'll move closer.

17           And it can come from if you have Delphi's omnibus

18   response, specifically Mr. Unrue's affidavit, page 3 -- he

19   basically describes what these numbers were.  And he described

20   it more of the receiving department would get a shipment under

21   either a bill lading or shipping manifest numbers -- they were

22   called shipping numbers.  I'm not going to read a long quote

23   into the record other than noted page 3; he basically says that

24   there were a large number of ones -- and they pick various

25   numbers -- some of the receiving department may have shipper

Page 123

1    numbers to catalog shipments.  Those are just basically

2    warehouse entries, Your Honor; to say there's that many goods

3    in the warehouse.

4           You have on other occasions, they may have used

5    purchase order numbers to catalog shipments.  Mr. Unrue

6    basically says they put in a number because -- as he said in

7    the last one -- these varying practices were reflected in

8    DACOR's system, because the system only allowed the entry of a

9    single number; in other words, DACOR needed a number whenever

10   you did something on.

11          Secondly, Your Honor, what you described here, goes to

12   the fact that these aren't evidences of antecedent debt for

13   this reason.  If you look in each of the complaints and in

14   their omnibus response, they don't say DACOR was set up, and

15   DACOR approved every antecedent debt.  What they said was, is

16   these numbers -- whatever they define them as -- would show an

17   antecedent debt.  Your Honor, I -- I don't have any numbers, so

18   I don't know about this, but, basically as long as you have a

19   number -- and I think there are numerous people that have

20   disputed that those numbers have any meaning to show antecedent

21   debt -- unless they can show the underlying whatever the number

22   was, they basically cannot stand on the fact of this number,

23   does it?

24          I mean, they can say it's incorporated, and that's

25   true, but there are people who have done that; not my client,

DELPHI DINGS CORP., ET AL.

Page 124

1    because we have absolute no numbers, but as a general rule that

2    doesn't do it, and I think it's by their own person's affidavit

3    that simply says how strange it was, because they used a

4    variety of things for these "numbers", not just simply

5    invoices, shipping, or anything else, but things they were more

6    inventory and the like.

7              So, I don't think -- given what you have in Twombly

8    and Iqbal, they haven't pledged specifically enough to pass

9    that, even if they have numbers; my case is different, but

10   that's the general argument.

11             MR. NAYAK:  Your Honor, this is Mahesh Nayak speaking

12   for Detroit Products, International; I just want to add one

13   other point to what Mr. Bowles said, in that the schedule

14   attached to our complaint, the one against Detroit Products,

15   International, identifies -- I guess what I'll call these D

16   numbers -- which we're having trouble deciphering what they

17   are.

18             THE COURT:  Is Detroit Products, International a

19   successor to something?  I have a list of the --

20             UNIDENTIFIED SPEAKER:  Doshi.

21             MR. NAYAK:  Doshi Prettl International --

22             THE COURT:  Doshi -- oh, fine.

23             MR. NAYAK:  -- thank you, Your Honor.

24             But in any case, the fine point I wanted to add, is

25   that both within the body of the complaint and on the

DPH HOLDINGS CORP., ET AL.

Page 125

```
1    attachment, Delph -- DAS reflects that these D numbers are

2    invoices, purchase orders, or bills of lading.  And I think

3    they just told you today -- or what I'm hearing -- is that

4    they're none of the above.  In my complaint, they very

5    specifically identify these D numbers as purchase orders; they

6    are not purchase orders -- that's what I'm hearing DAS say

7    today.

8            THE COURT:  Well, we -- their complaint says

9    otherwise.  I don't know, I mean as far as the facial validity

10   of the complaint is concerned, I'm just going on about what's

11   in it, which says this is our rec -- you know, it says -- well,

12   I'm going back to Timken, I'll turn to yours in a second -- but

13   plaintiff -- the documents evidencing the antecedent debt

14   include the purchase orders and/or invoices/bills of lading

15   identified on our Exhibit 1.

16           Which purchase orders and/or invoices include evidence

17   of the amount of the antecedent debt, and the approximate dates

18   the subject goods contemplated by the agreements were

19   ordered -- for order.  So -- I mean that sets up an antecedent

20   debt relationship.  It may turn out not to be the case, but as

21   far as the validity of the complaint is concerned I don't see

22   why it doesn't meet Rule 8.

23           MR. NAYAK:  The point that I'm struggling with, Your

24   Honor, is they have very specifically identified these as

25   purchase orders, invoices or bills of lading.
```

1           THE COURT:  I understand.

2           MR. NAYAK:  And today I'm hearing that they're saying

3     that they're none of the above.

4           THE COURT:  Well --

5           MR. NAYAK:  These D numbers don't let us know, for

6     example, when parts were shipped; they're not purchase orders,

7     they're not invoices, they're not --

8           THE COURT:  I don't know; I don't know that.

9     That's -- to me, that's a summary judgment type of issue, or a

10    trial issue, as opposed to a pleading issue.

11          MR. NAYAK:  Presumably --

12          THE COURT:  If they had put in their complaint that we

13    have an entry of some sort of transaction, we don't know what,

14    but some sort of transaction, then I would understand your

15    point.  But that's not what they say.

16          MR. NAYAK:  And Your Honor, I'm sorry, I'm hearing

17    what you're saying, I just -- the disconnect for me is that

18    they told the Court that the antecedent debt is one thing in

19    their complaint and in their schedule, and today they're saying

20    it's another.

21          THE COURT:  Well --

22          MR. NAYAK:  That it is none of the above.

23          THE COURT:  I think that may be what you all are

24    saying, as opposed to them.

25          MS. HAFFEY:  Yes.

1          MR. NAYAK:  I heard today that a D number is a

2     computer entry that reflects neither a invoice, a purchase

3     order --

4          THE COURT:  Debit -- she didn't --

5          MR. NAYAK:  -- or a bill of lading.

6          THE COURT:  -- she didn't use the phrase "D number".

7          MR. NAYAK:  Well --

8          THE COURT:  The first time I heard the phrase "D

9     number" was when you spoke.

10         MR. NAYAK:  It's the number listed under their

11    antecedent debt column, for which many of us is a D number; for

12    others I think is a number which is preceded with some other

13    letter.  I don't know if D corresponds to decor or what, but --

14    unless Ms. Haffey can clarify for me today, I don't know -- and

15    she hasn't told me one way or the other, but my understanding

16    is that there are no purchase orders or invoices or bills of

17    lading bearing a D and a sequence of numbers.  Is that

18    incorrect?

19         MS. HAFFEY:  I'm certainly not in a position today,

20    Your Honor, to make that statement for as large as DAS was and

21    the many suppliers that it has, it --

22         MR. NAYAK:  But Your Honor, they have -- under the

23    standards that are imposed on them in connection with this

24    motion for leave to amend, alleged that these D numbers are

25    indeed invoices, purchase orders or bills of lading; and today

1    they're telling us that they're not in a position to say

2    whether they're any of the above.

3            THE COURT:  Let me turn to your complaint.

4            MR. THOMAN:  Your Honor, this is Jim Thoman, for

5    Unifrax, could -- I'm just wondering is Ms. Haffey could speak

6    a little closer to the microphone, I'm having trouble hearing

7    her?

8            THE COURT:  John, why don't you add line 1 of the

9    complaints?

10           MS. HAFFEY:  I would be happy to.

11           THE COURT:  John?

12           MR. THOMAN:  And I have one comment to make when

13   you're ready.

14           THE COURT:  Wait, maybe it's -- I'm sorry, it's right

15   here, I got it.

16           MS. HAFFEY:  Your Honor?

17           THE COURT:  No, let me just --

18           MR. NAYAK:  Your Honor, if I could guide you, if

19   you're looking at our complaint, to paragraph 22, where it said

20   "plaintiff made, or cause to be made, each transfer listed on

21   Exhibit 1, for or" --

22           THE COURT:  Right, I -- that's what I -- it's the same

23   language from the Temkin complaint that I just read.

24           MR. NAYAK:  Oh, thank you.

25           THE COURT:  So, all right.  And they say it evidences

1    the amount of the debt, so you could look at it.  You're saying

2    they've acknowledged it doesn't, right?

3            MR. NAYAK:  I'm sorry --

4            THE COURT:  Is there -- you say it doesn't evidence

5    antecedent debt?

6            MR. NAYAK:  That is correct.

7            THE COURT:  All right, and what's that based upon?

8            MR. NAYAK:  It's based on the fact that their claim of

9    what is antecedent debt -- which are these -- they identify the

10   antecedent debt as these D numbers.  And they identify in their

11   complaint that the D numbers are invoices, purchase orders or

12   bills of lading.  They've got to identify for us -- under

13   Twombly and Iqbal, an applicable law -- what the nature of the

14   transfers where, what the transfers were for; these D numbers

15   are neither invoices, purchase orders or bills of lading.

16   They're computer-generated screen shots, they don't show when

17   ship -- pardon me -- when good were shipped.

18           THE COURT:  Well you -- you don't know.

19           MR. NAYAK:  Neither do they, Your Honor; I don't know,

20   you're correct.

21           THE COURT:  Well, you're basing this, I believe, your

22   statement that the debtors' counsel has made an admission today

23   in open court, right?  That these screen entries do not show

24   the existence of an antecedent debt, right?  That's what you're

25   basing it on?  Because you haven't seen them, so it must based

Page 130

1   on that.

2          MR. NAYAK:  Well, to be more specific, Your Honor, I'm

3   saying that what they're saying in their complaint is not the

4   case; that they have said that these D numbers are not --

5          THE COURT:  But based on what?  I'm just asking you,

6   based on what's been said in court today?

7          MR. NAYAK:  Yes.

8          THE COURT:  All right.  So, what is -- do you agree

9   that these don't show the --

10          MS. HAFFEY:  No, and I had not said what counsel here

11   claims that I have said.  I think I've been very clear on what

12   I have said.

13          THE COURT:  This is -- I believe what you have said,

14   is that this is the memorialization, or recordation, of an

15   order, right?

16          MS. HAFFEY:  Of the receipt of the goods or services.

17          THE COURT:  Right.

18          MS. HAFFEY:  So that a payable is owed.

19          THE COURT:  Right, it's like --

20          MS. HAFFEY:  Exactly.

21          THE COURT:  --a payable; an accounting of a payable.

22          MS. HAFFEY:  And it's either of the order -- the

23   purchase order -- or it's of the receipt of the goods or

24   services so it puts in -- what we -- and again, it's just

25   nomenclature -- invoice number, you can call it a processing

DPH HOLDINGS CORP., ET AL.

Page 131

1    number, and as Mr. Unrue put in his declaration, DAS was at

2    the --

3              THE COURT:  I don't need the declaration, I'm just

4    focusing on the complaint.

5              MS. HAFFEY:  Okay, well --

6              THE COURT:  All right, so I don't think --

7              MS. HAFFEY:  -- when you have a --

8              THE COURT:  -- there is -- I don't think she has

9    admitted it.  I don't think it is --

10             MS. HAFFEY:  No, I have not.

11             THE COURT:  -- I just don't -- I don't agree with you

12   on this one.

13             MR. SULLIVAN:  Well, Your Honor, I mean -- pardon for

14   interrupting, James Sullivan, counselor of Timken -- but the

15   one thing that complaint doesn't do, is it doesn't allege the

16   date of the antecedent debt; so these could be COD, these could

17   be preparing -- there's no evidence in the record that these

18   screen shots reflect any antecedent debt; there should have

19   been another column in there saying, you know, date of the

20   ant -- date of the debt.

21             THE COURT:  No, that's what they say in paragraph 22.

22   Look, the first thing you do -- if I let them amend the

23   complaint, the first thing you do is say, I want to see these.

24   And if they don't do it, then you say motion to -- you know,

25   motion for summary judgment.

Page 132

```
 1              MR. SULLIVAN:  We've been doing that since October,
 2      Your Honor.
 3              THE COURT:  Well, not really.  Because we've been
 4      doing this instead of summary judgment.
 5              MR. SULLIVAN:  What I meant, I've been asking for
 6      them, and I've been told by Ms. Haffey she has no documents for
 7      me.
 8              THE COURT:  Well, that -- again --
 9              MS. HAFFEY:  I was just --
10              THE COURT:  -- this is just lawyers talking.  This is
11      not evidence, we're talking about Rule 8.
12              MS. HAFFEY:  And I never made that statement.
13              THE COURT:  The face of a complaint, so I think we
14      should move on this point -- off of this point.
15              MR. ROBERTS:  Your Honor, this is Buswell Roberts, on
16      behalf of Owens Corning, and I have just a real slight twist on
17      these facts; this is in relation to adversary proceeding 07-
18      02540, and --
19              MS. HAFFEY:  Could I -- I'm sorry, this is Ms.
20      Haffey --
21              THE COURT:  It's Owens Corning.
22              MS. HAFFEY:  Thank you.
23              MR. ROBERTS:  Owens Corning.  And Exhibit 1 -- well,
24      first of all, the complaint says that Owens Corning delivered
25      serves pursuant to a "service agreements", that's wrong; I mean
```

DPH HOLDINGS CORP., ET AL.

Page 133

1    Owens Corning provided goods, but for the purposes of my

2    argument it's irrelevant -- and they mention that there are

3    certain service agreements, and in the purchase order, invoice

4    number antecedent debt column, there are one, two, three, four

5    D numbers, all of which are identical.  Now, I happen to know

6    what that D number references, and I'm only bringing this up as

7    an illustration as to why the information contained in this

8    column isn't very helpful with respect to antecedent debt.

9         The purchase --or the D number references one of the

10   service agreements, it's actually referred to as a requirements

11   contract, which tells Owens Corning absolutely nothing about

12   when the indebtedness arose or what, you know, what the

13   previous indebtedness was.  Those five entries are all just

14   simply a requirements contract that has nothing to do with any

15   particular order that was made by the debtor.

16        And I think what this really boils down to is, that

17   just the debtor stating, in essence, you paid me, therefore you

18   must have owed me something because otherwise you wouldn't have

19   sent me a check.  And that's in essence what the debtor has

20   really done here; when it would have been very simply for the

21   debtor simply to say, on the date that the payment of 20,101

22   dollars was made, the debtor owed Owens Corning X, Y, Z

23   dollars, which they presumably could have gotten off of their

24   screen.

25        But, it's an awfully cumbersome way to identify what

Page 134

1    antecedent debt was, when it would have been so much easier

2    simply, to say, at the time of the payment, Owens Corning --

3    the debtor, rather -- owed Owens Corning X number of dollars.

4         And I don't think in Owens Corning's case, that the

5    four referenced numbers tell Owens Corning anything about

6    antecedent debt.

7         MS. HAFFEY:  If I can respond, Your Honor?  And again,

8    we need to go back to the DACOR payable system, which we have

9    pled in the face of the complaint.

10        For there to have been a transfer to have made on

11   these dates, under these purchase orders, it would have to have

12   been a payable; and that is why we referenced the DACOR system

13   and explained in the complaint how it worked.  The reason that

14   there are four of that purchase order listed on here, because

15   there were four different provisions of goods.  And it was paid

16   for on these four dates.  Which is why we broke it down to that

17   detail level, so that that supplier could see it was on account

18   of antecedent debt, and paid on those days, under that blanket

19   order; there were four different entries.

20        MR. ROBERTS:  But Your Honor, that doesn't tell me a

21   single thing about antecedent debt.  If that were sufficient,

22   then Iqbal and Twombly mean nothing because --

23        THE COURT:  Well, it -- counsel is saying that it

24   evidences a payable, based upon a prior demand, right?

25        MR. ROBERTS:  Well, that --

Page 135

1              MS. HAFFEY:  It's correct.

2              UNIDENTIFIED SPEAKER:  Your Honor, but it's not a

3      payable --

4              MR. ROBERTS:  -- what she's saying Your Honor, and I

5      think she just said it out loud --

6              UNIDENTIFIED SPEAKER:  -- it could be an order, it

7      could be an order or a payable.

8              MR. ROBERTS:  -- was that for antecedent debt, all we

9      need to do is to show that we made you a payment and that

10     mean -- therefore there was antecedent debt, otherwise we

11     wouldn't have paid you.

12             THE COURT:  No, I think she said that the system

13     records a payable; meaning it records a past event; something

14     that was payable.

15             MR. ROBERTS:  Well, except that the -- this purchase

16     order, invoice number, antecedent debt, doesn't do that.  All

17     it does is say we made you a payment based on a requirements

18     contract that was executed two or three years prior to the time

19     that these payments were made.

20             MS. HAFFEY:  Well, I -- but I think --

21             THE COURT:  Well that's enough.

22             MS. HAFFEY:  And particularly when you look --

23             THE COURT:  They're paying you under a pre-petition

24     contract.

25             MS. HAFFEY:  -- particularly when you look at the face

of --

MR. ROBERTS: Well, it's a -- all it is, Your Honor, is a requirements contract; it says you have to send us a request for delivery. After you send us a request for delivery, we will then send you the goods and then you have to pay us.

MS. HAFFEY: That's exactly my point.

THE COURT: I think that says it.

MS. HAFFEY: And the purchase orders themselves spell out that.

THE COURT: I just -- look, it may be the case as Mr. Sullivan is asserting, that these entries are fictitious, or don't exist or can't be reproduced; but it seems to me that the complaint, in terms of its representation, where it says an accounts payable system in respect of goods ordered or services sought, is recorded as set forth on Schedule 1, where it says that, is sufficient. You know?

Those are facts, those are not conclusory allegations; the facts may turn out to be wrong, but as far as the pleading of the complaint is concerned, that's sufficient.

MR. JEROME: Your Honor, Steve Jerome, Snell & Wilmer, on behalf defendant Microchip Technologies, Inc., in adversary 07-02436. And similar to Mr. Bowles' client, my client's Exhibit 1 -- and I have extra copies if it --

THE COURT: No, I have it.

Page 137

1          MR. JEROME:  -- has two columns, which for all eight

2      transactions, are completely blank.  And I listened with

3      interest to counsel's presentation regarding -- and I believe

4      the quote was "the exhibits to the complaint are extremely

5      important, and they reflect the detailed information regarding

6      the antecedent debt".

7          THE COURT:  No, I think we -- well, maybe we should

8      nail this down, but I think we already covered the blank

9      exhibits.  I just -- I have a real hard time with that -- with

10     those.

11         MR. SULLIVAN:  I just want to --

12         THE COURT:  I don't need to -- we already dealt with

13     that, with the DSSI one, which just -- instead of having a

14     column that was blank, it didn't have a column at all.  But I

15     think it doesn't matter; if the column's blank or the column

16     isn't there, as was the case with DSSI, then I'm just dealing

17     with the allegation and the complaint, which says that there's

18     a system in place, but I -- there's no evidence the system

19     actually spit out anything that shows that there was a payable

20     recorded; and I think that's a problem for the debtor.  I don't

21     see how they deal with that.

22         MR. SULLIVAN:  And Your Honor, and I agree, I just

23     wanted to make two real quick points, is --

24         THE COURT:  You've already won on this point.

25         MR. SULLIVAN:  Your Honor, I will sit down.

Page 138

```
 1            MR. NAYAK:  Your Honor, Mahesh Nayak, for Detroit

 2    Products --

 3            THE COURT:  Yes.

 4            MR. NAYAK:  -- when you refer to the fact that -- as

 5    you just did -- that there was a system in place, or the

 6    plaintiff has alleged that there was a system in place -- do

 7    you see that in the body of a complaint that you're looking at?

 8            THE COURT:  Yes.  Let me go back to 16 and 17.

 9    "Plaintiff did not accept physical invoices from the defendant,

10    in connection with the defendants' shipment of goods, under the

11    agreements" -- this is Doshi's complaint -- "rather the

12    defendant used its accounts payable system to make payments to

13    defendant."  And then in 22, it says that "the documents

14    evidencing the antecedent debt were" -- and then, you know,

15    we've already read that language, and obviously you can put two

16    and two together, that's the language that comes off their

17    system, on 17.  So I think it's there.  You may, in discovery,

18    show it's not there, and -- but, you know, I don't see why that

19    isn't sufficient.

20            MR. THOMAN:  Your Honor, this is Jim Thoman for

21    Unifrax, are we to interpret plaintiffs' counsel description of

22    the accounts payable system to preclude pre-payments?  That

23    there's no way a number could be generated from their system if

24    there was a COD or a pre-payment required?

25            THE COURT:  That's what I took, that it records
```

1    payables; and that these are the payables, as opposed to

2    something else.  That's what 22 says.

3            MS. HAFFEY:  Your Honor --

4            THE COURT:  That's what paragraph 22 says.

5            MS. HAFFEY:  That's correct and that is my

6    understanding, with the exception, and that's why there is a

7    blank in that antecedent debt column where there were

8    situations where we didn't -- DAS didn't use the accounts

9    payable --

10           THE COURT:  Right.

11           MS. HAFFEY:  -- DACOR system, and it was done at --

12           THE COURT:  It was a one-off thing.

13           MS. HAFFEY:  Yeah, it was a manual --

14           THE COURT:  Right.

15           MS. HAFFEY:  -- and we've got the manual documents to

16    show those deviations from payment terms.

17           THE COURT:  All right, okay.

18           MR. SULLIVAN:  Your Honor, I'm not sure if we'll get

19    to this, or you're ready to get to this yet, but are you going

20    to create today, perhaps some kind of a time limit in which

21    plaintiff must produce the documents that are the subject of

22    these --

23           THE COURT:  We're not getting to that yet.

24           MR. SULLIVAN:  Okay, thank you.

25           THE COURT:  Okay, so are there other issues with

Page 140

1  ane -- I mean, we've covered, I think, the two categories that

2  I had on this, which is where it was blank, and where there was

3  something there.  Are there other issues besides that?

4          MR. KOCHIS:  I believe there are, Your Honor.

5          THE COURT:  Okay.

6          MR. KOCHIS:  Anthony Kochis from Wolfson Bolton PLLC,

7  and I represent two different defendants in different adversary

8  proceedings.

9          So while I would echo a lot of the sentiments that

10 have been argued, one of my clients, which is Ex-cell-o Machine

11 Tools, adversary 07-02337, is where the reorganized debtors are

12 represented by the Togut law firm, and as I stated in my

13 papers, the Togut form of proposed amended complaint actually

14 differs in the allegations that are alleged and the schedules

15 that are attached; so I don't know if you want to talk about

16 this right now, but my point is I don't think those allegations

17 and those exhibits are sufficient, in addition to the futility

18 argument that I have.

19          THE COURT:  All right.  Why don't we just put a place

20 order on that, unless --

21          MR. KOCHIS:  Sure.

22          THE COURT:  -- unless we're done with the Butzel Long

23 ones.

24          MR. KOCHIS:  Sure, no problem.

25          THE COURT:  It's just a question of moving a lot of

1  notebooks around.

2          MR. KULBACK:  Your Honor, very briefly, Jerry Kulback

3  again, on behalf of Magnesium Electron; I think Your Honor made

4  it clear that with respect to schedules that are blank with

5  respect to the purchase orders and invoices, it doesn't set

6  forth a claim --

7          THE COURT:  Unless the debtors' says that there's

8  something else in the complaint that's not in the forms of

9  complaint that I've been reading.  I mean, if there's another

10 paragraph in the complaint that says, basically what counsel

11 told me at oral argument, then it would be okay, but I haven't

12 seen that.

13         MR. KULBACK:  Well, Your Honor, I'm in the position

14 that there was no schedule attached at all --

15         THE COURT:  Okay.

16         MR. KULBACK:  -- to the amended complaint filed in the

17 adversary proceeding.

18         THE COURT:  Oh, but I thought it was attached

19 somewhere else?

20         MR. KULBACK:  Well, Your Honor, it apparently was

21 buried, which I found out again, at 4:30 yesterday, in an

22 exhibit that was filed on the main docket; but that is not in

23 the adversary proceeding.  The adversary proceeding and the

24 complaint and the motion filed in the adversary proceeding as

25 it stands right now, is deficient on its face.

1           THE COURT:  All right, well --

2           MR. KULBACK:  We raised it previously --

3           THE COURT:  That would probably one where I would let

4    them amend.

5           MR. KULBACK:  Well I would be remiss if I didn't ask,

6    Your Honor.

7           THE COURT:  Okay, all right.

8           MR. HERMAN:  Your Honor?

9           THE COURT:  Yes?

10          MR. HERMAN:  Is it -- are we discussing now the

11   element of an antecedent debt of who the obligor was?

12          THE COURT:  No.

13          MR. HERMAN:  Okay.

14          THE COURT:  That's a separate issue.

15          MR. HERMAN:  Separate issue, thank you.

16          THE COURT:  All right, so I think we're ready to turn

17   to the Togut form of complaint and rather than my rearranging

18   this whole thing, do you have an extra copy of --

19          UNIDENTIFIED SPEAKER:  Yes, Your Honor.

20          THE COURT:  -- of the particular complaint at issue?

21          MR. JONES:  Your Honor., may I make one point before

22   we move on?

23          THE COURT:  Oh sure, I'm sorry, I thought we were --

24   yeah, that's fine, when he's handing that up, you can --

25          MR. JONES:  And I want to note -- I'm Roger Jones, on

1   behalf of the Calsonic entities -- I just want to make one note

2   while it's fresh in the Court's mind, and this goes to

3   futility, but it was raised by the plaintiffs in their

4   explanation of the accounting system; what they just told the

5   Court is, that where there's a blank, that reflects the payment

6   outside the ordinary course of business, and where there's a

7   number, it's inside the ordinary course of business.

8          THE COURT:  No, no, no -- nice try.

9          MS. HAFFEY:  Nice try.

10          THE COURT:  Nice try.

11          MR. JONES:  It was worth a try.

12          THE COURT:  All right.  Okay, so I have the Ex-cell-o

13   Machine Tools?

14          MR. KOCHIS:  Yes, Your Honor.

15          THE COURT:  Okay.

16          MR. KOCHIS:  And Your Honor, maybe before we lock into

17   that, very briefly, I know we're on the issue of antecedent

18   debt, but my futility argument that I raised, was premised upon

19   the fact that the Togut firm simply filed a joinder in the

20   Butzel omnibus response.  And because the Butzel omnibus

21   response dealt with the Butzel complaint, which differs in form

22   and substance from the Togut complaint, my objections were

23   never addressed.

24          So I believe that's a unique futility argument to my

25   client, that they're simply unrebutted.

Page 144

1           THE COURT:  Why don't we move on to the --

2           MR. KOCHIS:  Sure.

3           THE COURT:  -- merits of the argument.

4           MR. KOCHIS:  Sure, Your Honor.  Taking a look at the

5    complaint -- I'll just do antecedent debt at this time, I

6    imagine I'll have something on insolvency later -- but the

7    antecedent debt allegation is in paragraph number 25 of the

8    Togut proposed amended complaint, and if you take a look at it,

9    you'll immediately notice that it differs in form and substance

10   from the Butzel form of amended complaint, and it is simply a

11   recitation of the statutory element of antecedent debt; that

12   the transfers were made on account of antecedent debt.

13          THE COURT:  But they say it's more fully described in

14   Exhibit 2?

15          MR. KOCHIS:  Correct, you're correct.

16          THE COURT:  And then they have a bill of lading

17   number?

18          MR. KOCHIS:  Yes, that is correct.  So from the get

19   go, my position on the allegation, is that that is not afforded

20   the presumption of truth, and then you're correct, we would

21   turn to the exhibit.

22          THE COURT:  Right.

23          MR. KOCHIS:  So looking at Exhibit number 2, all

24   that's on there is a bill of lading number, check date,

25   transfer date, ship date, paid amount.  What I would submit,

DPH HOLDINGS CORP., ET AL.

Page 145

1    Your Honor -- and this was never made clear -- but my

2    assumption is that the conclusion is because you have a check

3    date that is after a ship date, that that is somehow evidence

4    of an antecedent debt.  My argument is in fact, that doesn't

5    show anything; maybe it's evidence of a debt, that certainly is

6    not evidence that it's antecedent; it's very likely that when

7    these goods were actually delivered, it could have been cash on

8    delivery.  There is no facts --

9              THE COURT:  But it wasn't.

10             MR. KOCHIS:  What?

11             THE COURT:  It wasn't, they have a check.

12             MR. KOCHIS:  They could have issued a check that day,

13   Your Honor.  There is -- what my point is, there is nothing

14   that evidences the antecedence of these transactions.  Just

15   because you have a bill of lading number and go through ship --

16   my understanding is that these goods were shipped to Mexico and

17   Germany.  It could have taken two months for them to get there,

18   and it could have been cash on delivery when they were

19   delivered; I don't know, and there's no facts in the complaint

20   to tell me otherwise.  And I don't think that that raises it

21   above the level the cross from possible to plausible on that

22   issue.

23             THE COURT:  I don't understand; they ship it, and then

24   they pay for it later under an invoice.

25             MR. KOCHIS:  It --

DPH HOLDINGS CORP., ET AL.

Page 146

1           THE COURT:  It's textbook.  I mean, you may be able to

2    show that there was COD, but it sure doesn't look like it.

3           MR. KOCHIS:  And when you say it doesn't look like it,

4    are you referring to the check date, as compared to the ship

5    date?

6           THE COURT:  Yeah.

7           MR. KOCHIS:  But what I'm saying is simply because I

8    ship something, it could have been delivered at a later time

9    and at that time it was delivered, it then could have been

10   paid.  There's no evidence set forth either in the allegation

11   or this exhibit that tells me that that debt that arose, was

12   antecedent debt.

13          THE COURT:  Except for the fact that the dates

14   earlier -- that's enough for me.

15          MR. KOCHIS:  Okay.

16          THE COURT:  I mean, again, you can rebut that evidence

17   in a -- or the parties can develop that evidence -- but I think

18   there's enough here to show that it was before -- it was

19   shipped before.

20          MR. KOCHIS:  But that doesn't necessarily mean the

21   debt was incurred then.

22          THE COURT:  It doesn't necessarily, but it is

23   something.  It's not -- as opposed to nothing, which is what

24   you have in the other cases, where there's DSSI and the like.

25          MR. KOCHIS:  And I'm not trying to quibble, but I

Page 147

1    mean, an essential element of 547(b) is, that that debt was

2    antecedent.  If you cannot satisfy that -- if you cannot

3    satisfy the antecedent element, you do not have a cognizable --

4            THE COURT:  I understand, but again, the dates reflect

5    antecedence -- E-N-C-E.  The ship date's before the check.

6    That's -- for pleading purposes that's enough for me.

7            MR. KOCHIS:  Okay.  Thank you, Your Honor.

8            MS. HAFFEY:  Your Honor, I just have one last -- I

9    guess to renew the argument.  While we believe -- even after

10   the blanks on the complaint -- that we have sufficiently pled

11   antecedent debt.  If this Court did not believe so, we would

12   ask the Court -- we have not had a motion to a leave, yet;

13   these are just proposed motions for leave -- we would ask the

14   Court's indulgence to give us a very short period of time --

15           THE COURT:  I'm going to cut you short on this because

16   I know people will want to respond to it.  We've only covered

17   one of several issues that have been raised, and I want to

18   consider whether there should be leave to make a motion to

19   amend, in light of the entire record.

20           MS. HAFFEY:  Okay.  I was just going to provide the

21   Court a cite, but I'll do that at some other time; thank you,

22   Your Honor.

23           THE COURT:  Yeah, that's fine.  Okay, all right.  So,

24   I think I've been clear that on its face, the forms of

25   complaint -- or the form complaint -- prepared by Butzel Long

1   is -- does not, in my view, satisfy Twombly and Iqbal and

2   HydroGen and similar cases, where neither the body of the

3   complaint nor the schedule attached to it, shows an actual

4   recorded entry, ostensibly as set forth in the complaint of a

5   payable being entered on the debtors' system.  And you need to

6   have that I believe, in light of the fact that the body of the

7   complaint itself really only refers to this payable system, and

8   obviously that means one looks to the schedule, and if you

9   don't see the entry, then I believe that you can't conclude

10  that there is in fact a payable based on the allegations in the

11  complaint.

12          As I said during oral argument, the fact that a

13  payment was made, and that's alleged in a different column,

14  could just as easily be a payment on account of COD or payment

15  in advance demand.  And by forcing the defendant into discovery

16  on that issue, the plaintiff would be leapfrogging the

17  requirement to show more than simply a conclusory pleading of

18  the law as opposed to pleading of facts entitled to the

19  assumption or presumption of evidence for purposes of delay.

20          Most of these complaints, I think -- well, I think

21  with the exception of DSSI and -- you know what, I've lost the

22  last one, the one that was blank and the --

23          MS. HAFFEY:  Magnesium Electronic --

24          THE COURT:  Yes, thank you.

25          MS. HAFFEY:  -- I think, Your Honor.

DPH HOLDINGS CORP., ET AL.

Page 149

1           THE COURT:  -- list PO or invoice numbers and

2    letters -- although some of them have a blank entry or two,

3    sometimes for a lot of money, like Doshi has one for about

4    2,000,000 dollars, I think -- that's blank, and my ruling would

5    go for not only DSSI -- or wherever the column is missing or

6    empty -- but where there's specific transfers they're not

7    covered in the column.

8           Okay, so someone was going to cover then, the debtor,

9    as far as 547?

10          MR. KLEIN:  Good afternoon, Your Honor, Sheldon Klein

11   of Butzel Long, on behalf of the plaintiff.

12          It probably doesn't need to be said again, but just to

13   give us a starting point, 547(b)(2) does require that the

14   payment is on account of an antecedent debt owed by the debtor;

15   I will be addressing the element of owed by the debtor.  Now,

16   in all of these complaints, DAS brings the claim as the debtor

17   and the claims fall into two different groups; one, in which

18   DAS is identified both as the contracting entity and as the

19   transferor of the money, and other claims in which DAS is the

20   transferor but is only one of multiple contracting entities.

21   So DAS and an additional Delphi entity is identified as the

22   contracting entity; that is very much the minority of the

23   claims, most -- substantial majority of the claims, DAS is both

24   the transferor and the contracting entity, and on its face, I

25   don't know what else can be --

1          THE COURT:  I don't think there any objections where

2     the complaint asserts that DAS is both the transferor --

3     whoever is on the phone that does not have it on mute, please

4     put it on mute -- where DAS is the transferor and the

5     contracting entity with no other allegations of other

6     contracting entities; I don't think there are any objections on

7     that basis.  I think they're all in the second category?  Am I

8     right?

9          MR. KLEIN:  Yes, okay, so I'll just add one footnote

10    to that, and otherwise not address that point; Methode -- and

11    it's possible that there may be another defendant, although I

12    don't believe so in terms of the remaining defendants --

13    Methode points out that the underlying purchase order refer --

14    although DAS is identified as both the contract entity and the

15    transferor -- the underlying purchase order identifies Delphi

16    Electronics and Safety as the buyer and so they say the

17    complaint is contradicted by the underlying record.

18          Delphi Electronics and Safety is not an entity, it's a

19    business unit in a minimum, there can be a factual issue

20    although frankly, I don't even see how there's a factual issue,

21    it's not subject to dispute that there is not an entity by that

22    name, so I would suggest that that falls into the category

23    about which there's no controversy.

24          Now, for the balance, there are a number of defendants

25    that argue that the debt paid by DAS was not owed by debtor

DPH HOLDINGS CORP., ET AL.

Page 151

1   because a contracting entity, the party that received the

2   goods, was someone other than DAS -- or the party that issued a

3   purchase order probably more precisely.

4         As to those defendants, the complaint alleges that DAS

5   assumed or otherwise became obligated for the payment, for the

6   obligation.  Now, based on that allegation, we believe that we

7   have properly pled that DAS has standing here, that DAS has a

8   claim, but before moving on to specifically why that's so, I

9   just want to review a few facts regarding DAS and I think that

10  a number of them have been touched on by Ms. Haffey, so I will

11  be very quick about it.

12        DAS was the primary U.S. operating --

13        THE COURT:  The notice is in the complaint, right?

14        MR. KLEIN:  I believe it is, actually, although I --

15        THE COURT:  Well, let me phrase it differently; you

16  should confine what you're describing to me as what's in the

17  complaint.

18        MR. KLEIN:  Okay.  The complaint does allege -- and I

19  would point the Court to paragraph 12, and I hope that's common

20  to all of the complaints, I didn't make a note of which

21  defendant I was referring to.

22        THE COURT:  Right.

23        MR. KLEIN:  Paragraph 12 explains DAS's role in taking

24  on the payment responsibilities as part of a centralized cast

25  management function for the Delphi entities overall, and that

DELPHI HOLDINGS CORP., ET AL.

Page 152

1   those bills were paid by DAS from its own funds.  And I think

2   that's the gist -- the substance of that's in the complaint.

3        Now, we believe that that is sufficient; that DAS has

4   standing in that capacity for two reasons.  First, even under

5   the most stringent definition in the case law of "owed by the

6   debtor," DAS was potentially subject to a claim if these

7   amounts had gone unpaid.  If the defendant -- the supplier who

8   for -- in many cases, for years and years and years had been

9   performing under contracts in which it was paid by DAS had gone

10  unpaid, there was the potential for a claim and, as I'll get

11  into a little more in a minute, that is sufficient to satisfy

12  the owed by the debtor element of the statute.  There is not a

13  single debtor, necessarily, that has standing to bring a claim.

14  There could be multiple entities that owe the debt within the

15  meaning of the bankruptcy statutes.

16       The second reason takes into account the equitable

17  nature of the Bankruptcy Court -- which again, I'll discuss in

18  a moment -- allows the Court to look at the substance rather

19  than the form of the transaction, including cases addressing

20  that specifically in the context of preference claims, to deal

21  with this sort of situation.

22       Now, starting with what I've described as the

23  stringent standard.  In the Second Circuit -- and I'm referring

24  to the In re: Bennett Funding Group case, 220 B.R. 739.  It's

25  Bankruptcy Appellate Panel from 1998.  The Court explained --

DPH HOLDINGS CORP., ET AL.

Page 153

1    and I'm quoting now -- well, no, excuse me, I'm not quoting --

2    "owed by the debtor" when the transfer was made simply requires

3    that the Court determine that at the time of the transfer there

4    was a recognizable claim, in quotes, that was, one, against the

5    debtor rather than only against a third party and, two, that

6    was preexisting rather than one which arose simultaneously with

7    the transfer.

8          Element two we've pro -- we've obviously addressed

9    already so I will focus on element one.  Both Bennett Funding

10   from the Second Circuit and the In re: Enron case 357 B.R. 32

11   (S.D.N.Y. 2006), endorse what they refer to as the common sense

12   approach, which was articulated by the Fourth Circuit in Smith

13   v. Creative Financial Management, 954 F. 2d 193 and that's a

14   Fourth Circuit case from 1992, that the payment is owed by the

15   debtor for preference purposes if the creditor would be able to

16   assert a claim against the estate absent the transfer.  That's

17   from page 197 at that decision.

18         Now, Enron then refers back -- after citing to the

19   Smith case, Enron refers back to the definition of "claim" and

20   "debt" in the Bankruptcy Statute Section 101(5)(A) and (5)(B)

21   respectfully, and it explains that the two concepts are

22   reciprocal.  "Debt" means liability on a claim and "claim" is

23   defined as a right to payment -- and I'll paraphrase -- whether

24   it's contingent, disputed or undisputed.  So even if there is a

25   disputed possibility of a claim against DAS, it would be a

Page 154

1    claim and thus a debt of DAS for purposes of the bankruptcy's

2    laws.  As the court in Enron says, claim and debt as synonymous

3    and that's quoting from the court.

4           Now, the question of whether there's a possible claim

5    is a matter of state law and, in fact, Enron, in footnote 12,

6    specifically says that.  And so the question is -- again going

7    back to the hypothesis that I raised before, if DAS had stopped

8    paying -- if DAS had said we have other uses for the money or

9    for whatever reason we're going to stop paying the bills that

10   we've always paid for those entities in which a name other than

11   DAS is listed on the PO, is there a possibility that DAS could

12   have been liable?  Even if there was a disputed claim, could

13   there have been a colorable -- a good faith claim asserted

14   against them?  I suggest to you the answer is yes.  The -- I

15   mean, certainly if DAS had come to me and said we'd like to do

16   this, can we?  Can we be assured that we couldn't be subject to

17   a goof faith claim on this basis?  I certainly would advise

18   them no.

19           THE COURT:  Can you walk me through, again, the

20   language on the -- in the complaint that shows this?

21           MR. KLEIN:  It --

22           THE COURT:  I mean, in paragraph 12 -- I may be

23   looking at a different complaint than you're reading but it

24   simply says that DAS was the operating subsidiaries of Delphi

25   North America that performed, among other things, accounting

1   and payment functions for the reorganized debtors.

2          MR. KLEIN:  And then it goes on to say --

3          THE COURT:  Which one are you reading from just so I

4   could --

5          MR. KLEIN:  I'm -- I just picked up --

6          UNIDENTIFIED SPEAKER:  It's Microchip.

7          MR. KLEIN:  -- it's Microchip 054481 but before we do

8   that -- yes, this would be an exemplar of what I'm talking

9   about.  And give me a moment and I'll point you to the text.

10          THE COURT:  let me just find that.

11          MR. KLEIN:  I apologize; I picked up one that I hadn't

12   highlighted for this purpose so --

13          THE COURT:  Well --

14          MR. KLEIN:  Okay.  On paragraph 14.

15          THE COURT:  -- I'm still turning to Microchip.  I hope

16   that's -- we're doing Microchip?

17          MR. KLEIN:  Yes.

18          THE COURT:  Okay.

19          MR. KLEIN:  This is Microchip.

20          THE COURT:  All right.

21          MR. KLEIN:  But I believe it is consistently repeated

22   in each of the class of claims that we're talking -- claims --

23          THE COURT:  Okay.  So, plaintiff was the operating

24   subsidiary of Delphi of North America --

25          MR. KLEIN:  No, paragraph 14.

Page 156

1              THE COURT:  14.  Okay.

2              MR. KLEIN:  And it's the --

3              THE COURT:  And then it says "and plaintiff assumed or

4    otherwise became obligated for Delphi affiliates obligations

5    there under."

6              MR. KLEIN:  Yes.  That is the language that I was

7    referring to.

8              THE COURT:  All right.  But -- there's nothing -- I

9    mean -- I guess -- so it's really at paragraph 12 and paragraph

10   14?

11             MR. KLEIN:  it is 12 --

12             THE COURT:  I'm sorry; paragraph 13 and 14 here.

13             MR. KLEIN:  Yes.  In this complaint, it would be

14   paragraph 13 and 14 that describe the function of DAS and the

15   nature of their obligation.  I would agree with that.

16             THE COURT:  Why isn't the paragraph 14 statement that

17   DAS assumed or otherwise became obligated, really just

18   repeating claim against the debt -- of the debtor.  I mean, is

19   it -- it seems conclusory to me.

20             MR. KLEIN:  Well, I --

21             THE COURT:  What is that based on?

22             MR. KLEIN:  The -- well, what it is based on is the

23   potential that they would be subject to a claim and that's, of

24   course, a legal issue, not a factual issue.

25             THE COURT:  No, but that -- so why is -- again, that

Page 157

1   goes back to Twombly.  If it's a legal conclusion, what are the

2   facts behind it to support it?

3          MR. KLEIN:  Well, the facts behind it to support it is

4   the repeated course of performance in which DAS paid -- is the

5   one that paid these suppliers.  That DAS is the one that the

6   suppliers looked to and give -- and for example, and --

7          THE COURT:  Well, just -- no, no.  But again, just the

8   complainant says that DAS performed accounting and payment

9   functions for the reorganized debtors.

10          MR. KLEIN:  I mean, it doesn't specifically use the

11   word repeated and -- over an extended period of time, I would

12   agree with that.

13          THE COURT:  Or was there only --

14          MR. KLEIN:  I don't think that makes it a legal

15   conclusion but --

16          THE COURT:  I mean -- you could have -- I mean DAS was

17   also, I guess, an operating company, right?

18          MR. KLEIN:  Yes, it was.  That's why --

19          THE COURT:  But you could have an in-house bank that

20   cuts the checks and does the accounting.  I don't see hwy that

21   would lead to a plausible inference that they were actually

22   liable to the people who got the checks.  It didn't say that

23   the checks were paid in DAS' name, for example.  If it pled

24   that the checks were issued by DAS, I would understand that, I

25   guess.

Page 158

1          MR. KLEIN:  Oh, I believe that it does or at least

2     that's certainly a fair in -- a, it's the fact and, b, if you

3     look at Exhibit 1, it identifies for all of these, it

4     identifies DAS as the transferring entity.  I mean, I certainly

5     think it's a fair inference of transferring entity to be that

6     it paid the bills.  So, I don't think --

7          THE COURT:  Okay.

8          MR. KLEIN:  -- that that part is omitted.  But I agree

9     with you that the question remains and, you know, that's what I

10     was going to move on to.  Is whether there is a colorable,

11     good-faith claim that might have been asserted against DAS had

12     it stopped doing its job, stopped paying these bills.  And it

13     so happens that Delphi standard terms and conditions, as is

14     usually the case in the automobile industry calls for the

15     application of Michigan law so I'm going to discuss the

16     potential liability under Michigan law and I would refer the

17     Court to a Michigan case called Keyes, K-E-Y-E-S, v. Scharer,

18     S-C-H-A-R-E-R. And that's 165 N.W. 2d 498 (1968).

19          And it involves -- it addresses the question of when a

20     party that has delegated responsibility -- what -- the

21     circumstances under which a party that is delegated

22     responsibilities under contract could be liable to the other

23     contracting party for the performance or nonperformance of its

24     delegated responsibilities.  And under Keyes, first the court

25     held that it was a question of fact as to the nature of

DPH LIQUIDATING CORP., ET AL.

Page 159

1   under -- it's a question of fact under the circumstances as to

2   the nature of the delegees responsibilities and, second, it

3   goes on to emphasize -- -and I'm quoting now -- "that it" --

4   and it referring to being liable to the other contracting

5   party -- "make sense for commercial transactions involving

6   assignments particularly when it is the regular business of the

7   assignee to render the incomplete performance.

8           THE COURT:  Has Delphi -- or more particularly, DAS --

9   ever taken the position contrary to this view and prevailed in

10  this case?

11          MR. KLEIN:  I'm not aware that the issue came up.  But

12  again, the question --

13          THE COURT:  I mean, in the Chapter 11 case.

14          MR. KLEIN:  I --

15          THE COURT:  There have been about 13,000 objections to

16  claims in this case and we're down to about -- what?  To about

17  a hundred now?  So, I don't know what -- you know, I don't

18  really recall that issue but -- anyway --

19          MR. KLEIN:  One, I don't know but DAS needn't be the

20  exclusive obligor.  The fact that DAS is obli --

21          THE COURT:  No, no, I understand that.  The question I

22  was -- if it is an obligor, then you win; there's no issue

23  there.  I just -- this is a -- the reason I'm asking is it's an

24  argument that would never be made in a different context.

25          MR. KLEIN:  Well, no, I don't think it's -- in our --

Page 160

1    well, I suppose it depends on what you mean.

2          THE COURT:  If DAS is -- if someone filed a proof of

3    claim against DAS and the contract party was Delphi

4    Mechatronics, DAS well may have objected to the proof of claim;

5    I don't know.

6          MR. KLEIN:  Well -- and I don't know either, Your

7    Honor.  But the question isn't whether it is disputable.  The

8    fact that DAS might have disputed it doesn't mean that they

9    weren't subject to a claim and there's noth --

10          THE COURT:  If they disputed it an won I think it mean

11    it.

12          MR. KLEIN:  I'm sorry; I had a hard time hearing, Your

13    Honor.

14          THE COURT:  If they disputed it and won, then I think

15    there might be judicial estoppel here.

16          MR. KLEIN:  I don't think so, Your Honor, and this is

17    why.

18          THE COURT:  Because you're looking at the date of the

19    petition?

20          MR. KLEIN:  No, because I'm looking --

21          THE COURT:  Or the transfer, I mean.

22          MR. KLEIN:  No, I'm -- the question focuses on the

23    date in which the payment is made.

24          THE COURT:  Right.  The date of transfer.

25          MR. KLEIN:  And it's a pre-petition date.  And the

Page 161

1    question -- the question isn't do we admit that we're liable.

2    The -- if you're protecting yourself from the risk of a claim

3    and a claim includes a disputed claim, then it is -- you are a

4    debtor for purposes of the preference statute.

5            THE COURT:  Okay.

6            MR. KLEIN:  There's a number of cases addressing this

7    in the context of disputed claims or in the context of

8    contingent claims.  So it's -- the ultimate question isn't

9    whether DAS would have won or lost the lawsuit by a supplier

10   who had been unpaid and turned to DAS, assuming, for example,

11   hypothetically, that the party that issued the purchase order

12   entered into bankruptcy but DAS hadn't.  I think it's entirely

13   foreseeable that DAS could be subject to a claim, however

14   disputable, and if that's the case, it makes them a debtor for

15   purposes of the bankruptcy statute, of the preference statute.

16   And again, this goes back to the Enron case and the Bennett

17   Funding case.

18           Now, you know, I just quoted the Michigan case which

19   makes the point that there's a particular likelihood of

20   liability of it's part of the regular business to render the

21   performance; here to pay the bills.  Obviously, that is the

22   case With DAS with respect to these contracts.  So I do think

23   that, under Michigan law, there would be a colorable risk of

24   liability and that's all that's required.

25           The second thing that I would point this Court to is

DPH HOLDINGS CORP., ET AL.

Page 162

1   this Court's decision in Randall Island Family Golf Centers

2   Inc. 290 B.R. 55 from this Court in 2003.  It involved claims

3   brought by the parent; it's quite similar to this.  It involved

4   claims brought by the parent's transferor who operated a

5   centralized cash management function.  Same as here.  And paid

6   bills on behalf of its subsidiaries.  The Court rejected the

7   defendants' argument that it wasn't the parent's debt because

8   the goods were ordered and shipped to subsidiaries.  And the

9   Court says, quote, "the complaint implicitly invoked an agency

10  type theory and asserted the preference claim on behalf of the

11  debtors."

12         Now in that case, unlike -- you know -- I know this

13  Court has already ruled and certainly I'm not revisiting that,

14  the Court has already ruled that asserting a claim generically

15  on behalf of the debtors isn't sufficient but the Court does

16  recognize that the operator of a cash management system on

17  behalf of its subsidiaries -- it think the gist of the opinion

18  is that it can give rise to an agency type of relationship

19  sufficient to support its status as a debtor under the statute.

20         Now, the second thing that I want to turn to is the

21  equitable nature of this Court's jurisdiction and how it comes

22  into play on this issue.  In Katz v. First National Bank of

23  Glen Head from the Second Circuit 1978, 568 F.2d 964, page 970,

24  the court stated that a Bankruptcy Court, as a court of equity,

25  must look through form to substance and treat the transaction

DPH HOLDINGS CORP., ET AL.

Page 163

1  according to its real nature.  The court in Missouri and the

2  case of -- matter of Isbell, I-S-B-E-L-L, 24 B.R. 234 (W.D.Mo.

3  1982), quoted Katz and then used -- relied on Katz in part, in

4  fact, looked beyond the formal nature of the transaction to

5  uphold the preference claim.

6          In Isbell, the situation was that the Isbell

7  bankruptcy involved individual -- a corporation and its owners

8  as individuals in bankruptcy.  Shortly before the bankruptcy,

9  the owners personally borrowed money, passed the money on to

10  the corporation which then repaid the bank.  I'm -- it's -- the

11  corporation had a preexisting loan application.  Defendants

12  argued that the defendants -- that the debtor and creditor

13  didn't line up under 547 because it's the individuals pay money

14  and the corporation whose debt is satisfied as a result of the

15  money.  And the court said, against relying on Katz -- first to

16  quote Katz, I won't repeat the quotation and said the parties

17  to a transaction cannot, by using the individual debtors to

18  make a payment on behalf of the corporate debtor, prevent

19  through technicality and a thin disguise the performance that's

20  being reckoned as such.

21          Now this, obviously, is factually distinguishable.

22  There's no suggestion that any one on the debtors' side was

23  trying to manipulate anything here by having DAS pay the bills

24  for other entities but, again, the Court, as a court of equity,

25  does have the ability to avoid a situation where, although

DPH HOLDINGS CORP., ET AL.

Page 164

1   there are payments which by every other characteristic, by

2   every other element, are preferences which allow the debtors --

3   excuse me, allow the creditors to be in a preferred position

4   versus the other unsecured creditors by the factual detail, the

5   technicality of DAS performing the payment function to avoid

6   its obligations under the preference statute.  And it's far

7   better characterized, I believe, as a preference than as a

8   fraudulent conveyance or any other theory in which,

9   hypothetically, that that payment, which did injure the other

10  creditors, could be recovered.

11        The only thing that stands between it and its true

12  characterization as a preference is the detail that, as with

13  many, many large companies and small companies -- Randall's

14  Golf Shops isn't a huge company -- uses centralized cash

15  management function.

16        THE COURT:  Okay.

17        MR. KLEIN:  Just briefly, I want to discuss the

18  Kimball Hill case which was just cited in early June out of the

19  Northern District of Illinois and which a number of defendants

20  cited in their surreply briefs just filed within the last few

21  days.  Kimball Hill involved a situation in which the plaintiff

22  in the preference action issued purchase orders but yet no

23  other role in the transaction.  They didn't receive

24  performance, they didn't make the payment.  And so in a

25  sense -- the company that brought the -- the company that

1   brought -- the entity that brought the claim was similarly

2   situation, in a number of respects, to the entities which

3   plaintiffs here say --

4           THE COURT:  I understand.

5           MR. KLEIN:  Let me re --

6           THE COURT:  You're basically saying it's the reverse

7   of our situation.

8           MR. KLEIN:  It's the re -- yes, thank you.  That

9   sentence was wandering off into nowhere; I apologize.  So it is

10  the reverse and the court found that in that circumstances, the

11  fact that the plaintiff issued a purchase order didn't make it

12  the debtor, where that was its only connection to the

13  transaction.  And so although plaintiffs think that Kimball

14  Hill is helpful to them, I think it's anything but helpful.  It

15  reflects the fact that this is more than a formulaic line

16  drawing exercise.  You look to the substance of what is going

17  on and if the --

18          THE COURT:  Although you'd think that the issuance of

19  a purchase order would at least give rise to a disputed claim,

20  right?

21          MR. KLEIN:  Well, I guess I could only say that that

22  issue wasn't raise in the case.

23          THE COURT:  Okay.

24          MR. KLEIN:  I take the point.  The only other thing

25  that I would add on Kimball Hill and I know that the Court

Page 166

1    doesn't want to address it in this point, but in Kimball Hill

2    leave to amend was granted to correct the parties.

3              THE COURT:  Right.  Okay.

4              MS. HAFFEY:  If I could just briefly, Your Honor.  You

5    asked Mr. Klein a question and I have talked with my client and

6    DAS never did object on the basis that Mr. Klein was raising

7    today.

8              THE COURT:  Okay.  All right.  You ready -- are you

9    passing out from hunger or are you going to --

10             MR. BOWLES:  That would be Court's choice.  If the

11   Court --

12             THE COURT:  No, really, I'm serious.  If people want

13   to take a break now or you want to finish your argument first.

14   I'm -- it depends on how faint people are.

15             MS. HAFFEY:  I would just as soon finish this.

16             MR. BOWLES:  We'll --

17             MS. HAFFEY:  Let's finish.

18             MR. BOWLES:  We'll this one --

19             THE COURT:  Okay.

20             MR. BOWLES:  -- it that would be within the Court and

21   I'm -- And I'm, once again, on behalf of the -- before we

22   started this federal stuff, before we got the DSSI ruling, but

23   there are certain things.  First of all, Your Honor, as a

24   general overview, the presentation was nice but, as Your Honor

25   noted, it's not in the proposed amended complaint.  You know,

1    the details, the facts, the inferences; none of that exists.

2    It just simply says, like Your Honor said, in a particular

3    paragraph there's about number different where they have gee,

4    we weren't operating and we paid for it.  Now, the bigger

5    problem is, Your Honor, actually going back to your December

6    17th order, in some respects of why who is the plaintiff --

7              THE COURT:  You mean the September order.

8              MR. BOWLES:  The June -- July 22nd dismissal order.

9              THE COURT:  Right.

10             MR. BOWLES:  In there, you said that they had to list

11   transferor/transferees and any known immediate transferees.

12   And this is where, as Your Honor has said, where you have a

13   number of people who contracted the -- DAS might, in fact, be

14   somebody who should have been sued by another set of debtors.

15   Because it was the initial transferee.  In other words, DAS is

16   acting as -- you know, I pay you because you have a contract

17   with me to pay somebody else.  That's either a conduit or is it

18   best of the initial transferee and their subsequent

19   transferees.  And I won't bore the Court because you know if

20   you're a subsequent, nonimmediate transferee, you have a lot

21   more rights and defenses than you would have if you are an

22   immediate and initial transferee.

23             Further, Your Honor, you still have the problem of --

24             THE COURT:  Well, I actually any known subsequent

25   transferee against whom relief is sought.

```
 1              MR. BOWLES:  Right.

 2              THE COURT:  So --

 3              MR. BOWLES:  But it still -- but remember, Your Honor,

 4     they didn't designate in any of these that the defendants were

 5     subsequent transferees and they probably were and they probably

 6     had to.  Because if they're seeking relief against the

 7     defendant and it turns out they are a subsequent transferee

 8     that they did not comply with the order and properly allege

 9     that.

10              Further, Your Honor, in the multiple identified

11     contract case, there's still the problem that we still don't

12     know who the technical plaintiff is.  When we started out this

13     on antecedent debt, the debtors said that there were two

14     elements.  There are actually three.  The third element is owed

15     to a debtor.  In other words, you actually can't have, you

16     know, some agency theory that they talk about; oh, there's an

17     agency theory.  Your Honor basically said you can't name all

18     the debtors under some agency theory.

19              And further, Your Honor -- and just preaching to the

20     choir -- this case was never substantively consolidated.  It

21     was substantively consolidated for certain voting purposes but

22     never consolidated for any other purpose including the one we

23     have here.  So if they're going to sue, they have to have the

24     right party to whom the debt was owed, who made the payment.

25     Like they said, they could have sold subsequent transferees.
```

Page 169

1    They could have sold for DAS being a fraudulent conveyance for

2    that matter.  But, if you remember, they also waived all their

3    constructive fraudulent conveyances.  They only reserved a few

4    and none of these are the ones here.

5              So, basically, Your Honor, as an initial overview,

6    what it basically has is we don't have a proper identification

7    still, in these cases where they have multiple ones, to satisfy

8    Iqbal and Twombly, of who the proper plaintiff is, who the

9    proper plaintiff should have been and you don't have immediate

10   transferee identification because, I don't believe -- I haven't

11   read every one of them but at least the of the ones I've seen,

12   it's about thirty, I have not seen anyone say oh, and by the

13   way, the defendant is a nonimmediate transferee under 549 and

14   550.

15             THE COURT:  Can I parse these through -- I understand

16   your subsequent transferee point.  I don't understand the

17   multiple plaintiff point.

18             MR. BOWLES:  Well, the multiple plaintiff point comes

19   down -- not multiple plaintiff point but the multiple people --

20   in other words, in several of these, not mine, DSSI, so I have

21   to --

22             THE COURT:  Right.

23             MR. BOWLES:  If somebody has one that you might want

24   to argue instead of this but I can -- basically, where they

25   have the ones of -- well, actually, DSSI, although we've gotten

DPH HOLDINGS CORP., ET AL.

Page 170

```
 1    another issue that's been resolved -- they did, in fact, say

 2    another entity and -- I think it was actually Delphi.  It

 3    contracted with the parties and --

 4              THE COURT:  But the plaintiff here is DAS?

 5              MR. BOWLES:  Correct.

 6              THE COURT:  Right?  There's no -- they're not multiple

 7    plaintiffs anymore.

 8              MR. BOWLES:  No.  But the truth is --

 9              THE COURT:  That's why I was -- that's the only point

10    I was --

11              MR. BOWLES:  Oh, no, no, no.  What I mean is -- by

12    multiple plaintiffs, what I mean is they have listed one party

13    as a plaintiff but they have not alleged that -- where they had

14    said, in their exhibits, that there are two parties that

15    contract with the people.  That there are a lot -- there are a

16    lot of people and there are a lot of individual debtors that

17    have their own individual claims on this.  So there are other

18    debtors here not all part of DAS.  My only point is, in cases

19    where they say various debtors contracted with the defendants,

20    they've not shown anything that shows that, gee, DAS is in fact

21    the party as opposed to the other debtor.  They have not made

22    any allegations --

23              THE COURT:  Well, they're contention is that let's get

24    over for the moment the fact that it's pretty bare bones,

25    assumed or otherwise became obligated by, but they supplement
```

DPH HOLDINGS CORP., ET AL.

Page 171

1    that by saying that they actually made the payment and it made

2    it in its own name not in the name of the contracting party.

3    That --

4              MR. BOWLES:  But wouldn't --

5              THE COURT:  The 547(B)(2) when it says for or on

6    account of an antecedent debt owed by the debtor, that as far

7    as owed by the debtor is concerned, you just need to show that

8    it completely would arise to the level of a disputed claim.

9              MR. BOWLES:  And I don't think that what they're

10   arguing there would be -- if you take the Enron case.  Probably

11   it's the most one.  Enron had various entities that paid for

12   other entities.  As people note, they were both what I would

13   call the alternative ones.  547, preference complaint and

14   constructive fraudulent conveyance claim.  Here, it's

15   undisputed the debtors waived all their constructive fraudulent

16   conveyance claims years and years ago in documents that long

17   before, thank God, I got involved in this case.  But

18   unfortunately while you were here.  That would be sadly more in

19   a fraudulent conveyance case as opposed to a preference case.

20   In other words, the Enron --

21             THE COURT:  So you're distinguishing Enron on the

22   basis that the court basically said it's either one or the

23   other and this -- and that's pleading for at least one.

24             MR. BOWLES:  Right.

25             THE COURT:  Okay.

DPH HOLDINGS CORP., ET AL.

Page 172

 1           MR. BOWLES:  In many respects there are other more

 2    specific ones --

 3           THE COURT:  What -- what --

 4           MR. BOWLES:  -- but that's who I have for the general

 5    group argument.

 6           THE COURT:  What about Bennett Funding?

 7           MR. BOWLES:  Bennett Funding, I'm not as familiar with

 8    that one but Bennett funding, once again, is well before

 9    Twombly and Iqbal which is its biggest problem.  I believe it

10    was a 2003 decision.

11           THE COURT:  I think before that.

12           MR. BOWLES:  Okay.  But I mean, when you start going

13    to what is sufficient pre-Twombly and Iqbal, I think, as Your

14    Honor has noted, there was a seat change with Twombly and Iqbal

15    including under preferences.  So whether those were allegations

16    sufficient prior to Twombly and Iqbal, I do not -- or with

17    its --

18           THE COURT:  Well, do you have any -- other than

19    Kimball, which I guess we'll get to; do you have any cases that

20    basically say the phrase debt owed by the debtor requires it to

21    be an actual, fixed, liquidated debt as opposed to a disputed

22    claim?

23           MR. BOWLES:  Not in my pleadings, Your Honor, and not

24    anything I prepared, I'll leave the other people to that but I

25    do not have anything that I cited.

1              THE COURT:  Okay.  I mean, I think, maybe this is more

2    of a question for your adversary here but it's a two-part --

3    it's a two-part standard it's kind of a debt and debt is

4    liability of a claim which includes contingent unliquidated

5    claims.  And then it says, owed by the debtor, one could argue

6    that Congress is being more specific then and said actually

7    owed by the debtor.  But I don't -- I'm not aware of any cases

8    that say that.

9              MR. BOWLES:  There's no other defendants --

10             THE COURT:  Well, you were going to say something

11   about DSSI specifically.

12             MR. BOWLES:  Oh, no, no.  I said I had nothing more.

13             THE COURT:  Oh, you have nothing more.  Sorry.  Okay.

14             MR. BOWLES:  You can go to my colleague if I'm winning

15   the issue.

16             THE COURT:  All right.  Well, I'm not sure you're

17   winning on this one.

18             MR. KULBACK:  Your Honor just briefly, Jerry Kulback

19   on behalf of Magnesium electron.

20             Your Honor raised a question to debtors' counsel as to

21   whether any objections to claims were filed.  In fact, my

22   client filed a proof of claim against Delphi Corporation et al.

23   It was an objection, a ninth objection, it was filed on the

24   basis that it was against ASAC and it was allowed by Your

25   Honor, pursuant to a stipulation that was entered against ASAC.

Page 174

1        The debtor took the position, in this bankruptcy court

2    before Your Honor, in the ninth objection that the claim was

3    against ASAC, no other debtor.  There's a schedule that's

4    attached to the omnibus objection that listed all the debtors

5    and it had a little number.

6            THE COURT:  Including DAS?

7            MR. KULBACK:  DAS is on that schedule and they did not

8    assert that this was a claim, disputed or otherwise --

9            THE COURT:  I'm sorry; the schedule was to your proof

10   of claim that asserted it was against DAS?

11           MR. KULBACK:  No, my proof of claim was against Delphi

12   Corporation, et al., which would include everyone.  They

13   decided to limit it to ASAC.  In fact, Your Honor, paragraph 14

14   of the Magnesium Electron complaint says that ASAC contracted

15   with Magnesium.

16           THE COURT:  Right.

17           MR. KULBACK:  It does not say anybody else contracted.

18   It specifically identifies ASAC as the contracting party in

19   that.  And then in conclusory fashion it says DAS became

20   obligated or assumed those obligations, but that's not the

21   position that they took in connection with the claims

22   objection.  That was resolved, I believe, by stipulation at

23   docket number 4414.

24           THE COURT:  Okay.

25           MR. KULBACK:  I'm sorry; that's the wrong docket

DPH HOLDINGS CORP., ET AL.

Page 175

```
 1    number but --
 2            THE COURT:  That's okay.
 3            MR. KLUBACK:  -- but it was revised by stipulation
 4    before Your Honor.
 5            THE COURT:  But counsel's point is that, when I was
 6    raising the issue of judicial estoppel, I said well even if
 7    that had been the case it doesn't really apply to 547(b)(2)
 8    because it refers to debt owed by the debtor before such
 9    transfer was made, so you look to the prepetition period.
10            MR. KULBACK:  Well, we are looking at the pre-petition
11    period.
12            THE COURT:  I understand.
13            MR. KLUBACK:  And it --
14            THE COURT:  And the debtors prevailed on -- the
15    debtors prevailed on a position that says that --
16            MR. KULBACK:  And they prevailed on that position,
17    Your Honor, at the time that it hid the fact that they filed
18    all these complaints against all the debtors -- against all the
19    defendants.  They're flip-flopping their position where it
20    suits them.
21            THE COURT:  All right.  Okay.
22            MR. KULBACK:  And as Your Honor noted, if it were in a
23    different context they would be taking a different position.
24    If in fact --
25            THE COURT:  Well, I don't know.  I mean, the
```

DPH HOLDINGS CORP., ET AL.

Page 176

1    representation to me was that they didn't.  They didn't take a

2    different position.

3              MR. KULBACK:  Here, Your Honor, we pushed the issue

4    that it was a claim against DAS or any other debtor, for that

5    matter, other than ASAC, the contracting party --

6              THE COURT:  Was it paid?  It wasn't paid, I guess,

7    right?

8              MR. KULBACK:  The claim?

9              THE COURT:  Yeah.

10             MR. KULBACK:  Well, that raises another issue, Your

11   Honor, because a lot of claims were assigned in this case.

12             THE COURT:  No, but was it --

13             MR. KULBACK:  My client sold its claim.

14             THE COURT:  I'm not sure it's a contested matter.  I

15   mean, if in fact it was a settlement where your client got paid

16   in full, then Delphi didn't really win because they paid you

17   off.

18             MR. KULBACK:  Well, it was a stipulation that allowed

19   the claim.

20             THE COURT:  No, I understand.  But if it -- and is

21   that all it did?

22             MR. KULBACK:  That's all it did, is allowed the claim

23   as against the ASAC estate only.

24             THE COURT:  Right.  It didn't provide for any form of

25   payment or anything like that?

DPH HOLDINGS CORP., ET AL.

1          MR. KULBACK:  No form of payment or anything else.  My

2     client subsequently assigned their claim, which goes to the

3     prejudice issue that we'll deal with later.

4          THE COURT:  And did it object?

5          MR. KULBACK:  The debtor had filed an objection.

6          THE COURT:  They filed an objection on the basis that

7     it was really owed --

8          MR. KULBACK:  Yeah, the ninth omnibus objection.

9          THE COURT:  -- it was really owed by ASAC.

10          MR. KULBACK:  They reduced the claim and changed the

11     debtor party.

12          THE COURT:  All right.

13          MR. KULBACK:  It's noted as a substantive objection

14     that they filed, the ninth objection was a substantive

15     objection both as to the debtor and the amount of the claim.

16          THE COURT:  Okay.

17          MR. KULBACK:  And it was resolved by stipulation as

18     against ASAC only because that was the contracting party.

19          THE COURT:  Okay.

20          MR. KULBACK:  Thank you, Your Honor.

21          THE COURT:  Okay.  All right.  Anything more on this

22     point?  You're just getting closer and not ultimately to the

23     microphone.

24          MR. KLEIN:  Not to the microphone, Your Honor.

25          THE COURT:  All right.

Page 178

1           MR. KLEIN:  May I address the court very briefly, Your

2    Honor?

3           THE COURT:  Very briefly.  Yeah.

4           MR. KLEIN:  One, I think Your Honor understands this;

5    I think the claim is not the least bit inconsistent with the

6    position that --

7           THE COURT:  No, it's not objecting but if you actually

8    win then it is judicial estoppel, I think, unless I buy your

9    argument that it's -- I look only at the pre-petition period.

10          MR. KLEIN:  I think you should buy that argument, Your

11   Honor.

12          THE COURT:  Okay.

13          MR. KLEIN:  But I actually don't think that it's that

14   simple.  Someone needs to make a decision whether to cut a

15   check.  If in making that decision they run a risk of being

16   subject to a claim if they don't cut the check, that's all

17   that's required.  The fact that they disagree that in fact they

18   should be liable on the claim is irrelevant.  That is the

19   essence of the point that I'm making and thus there really is

20   no inconsistency regardless of whether they objected and

21   regardless of how that objection was resolved.

22          THE COURT:  What is your response on the subsequent

23   transferee point?

24          MR. KLEIN:  Frankly it strikes me as an example of

25   expecting us to rebut in our pleading every speculative

1    possibility as to how our allegations might turn out to be

2    untrue.  We plead --

3              THE COURT:  I'm sorry to interrupt you.  I had a

4    different reaction to it, which is that at least I think this

5    is the case in all of these; you do identify the other Delphi

6    party.

7              MR. KLEIN:  Uh-huh.

8              THE COURT:  So you do put the defendant on notice that

9    they might have a subsequent transferee argument.  So I'm not

10   sure there's a real -- I mean, as far as complying with the

11   September 7th order, which says to identify subsequent

12   transferees that you're going to hold liable, your obviously

13   identifying who you're going to be able to hold liable.  You

14   don't say specifically they're are subsequent transferee but

15   you do give them the ability to argue that they're a subsequent

16   transferee by identifying the other Delphi parties for whose

17   benefit the transfer may have been made.

18             MR. KLEIN:  And we didn't identify them as subsequent

19   transferees because we don't think they're a subsequent

20   transferee.

21             THE COURT:  But they're in there.

22             MR. KLEIN:  Yes, we identify the various parties that

23   are part of this transaction.  We don't think that identifying

24   them makes them a subsequent transferee.  So certainly I agree

25   that -- with your fundamental point.

Page 180

1          Just two other quick comments.  One, there was a

2     discussion of Bennett (ph.) Funding being pre-Twombly.  Bennett

3     Funding, A, it was following Enron but more fundamentally

4     Bennett Funding is about the definition of a debt in claim, it

5     has nothing to do with Twombly or Iqbal or Connelly vs. Gibson

6     or anything else, or at least not for the purposes that I'm

7     discussing.

8          The only other point is, there was a mention of

9     substantive consolidation and indeed the substantive

10    consolidation was for limited purposes only and that's why I

11    didn't argue that as a formal matter, as a result of

12    substantive consolidation DAS could bring the claim.  But

13    there's a practical element of this as well, which is the money

14    is going into a single pot.  Creditors are unaffected, debtors

15    are -- the defendants aren't required to pay any more or any

16    less than if the claim had been brought by another party.  And

17    again going back to form over substance, the substantive

18    consolidation does matter at, I think, a common sense level.

19          THE COURT:  But I guess the issue I have there is 547

20    uses the word debtor in more places than just (b)(2).  So if

21    you're saying the debtor -- it doesn't really matter because

22    it's all going to the same place but it's -- you know, you have

23    to show the debtor was insolvent.  It has to be owed by the

24    debtor.

25          I mean, I think there are proof issues for the trial

Page 181

1    too.  I can't -- I can't see just basically saying well it's

2    really all one debtor when it isn't.  But --

3            MR. KLEIN:  It's a fair point that it matters --

4            THE COURT:  -- I mean, I think your main argument is

5    simply that it doesn't have to be a fixed liquidated claim, it

6    can be a contingent disputed claim.

7            MR. KLEIN:  Your point's a fair point, I won't dispute

8    it.

9            THE COURT:  All right.

10           MR. KLEIN:  Thank you, Your Honor.

11           THE COURT:  All right.  Well, I'm going to break for

12   lunch for about forty-five -- why don't we come back at 3,

13   it'll take a while for everyone to get out.  I thought you were

14   done.

15           MR. METH:  I was, Your Honor, and this is procedural.

16           THE COURT:  All right.

17           MR. METH:  It is my understanding -- Richard Meth, Fox

18   Rothschild LLP, local counsel for DSSI.

19           It was our understanding, based on the comments made

20   by the Court after the review of the exhibits, that based upon

21   the total lack of any descriptives with regard to the DSSI

22   complaint that the motion to amend as to DSSI could not be

23   sustained.  If in fact our interpretation of the Court's

24   comments is correct, then we would ask that, if possible, the

25   Court could, in fact, deny the motion solely as to DSSI at this

Page 182

1    point and we could be excused.

2            If the Court has not yet ruled, obviously, that is our

3    wish.

4            THE COURT:  No, I'm happy to do that although there's

5    the remaining -- I don't know if you asked for this, everyone

6    else did, that the debtors be precluded from filing a motion

7    for leave to amend and I don't really want to rule on that yet.

8            MR. METH:  Then we will remain.

9            THE COURT:  But -- but you're right about the first

10   part.

11           MR. METH:  Thank you, Your Honor.  I appreciate the

12   clarification.  Thank you.

13           THE COURT:  All right.  Thank you.  I don't think this

14   courtroom is locked normally so I wouldn't leave anything

15   valuable in here but you can leave your papers here.

16       (Recess from 2:01 p.m. until 3:00 p.m.)

17           THE CLERK:  All rise.

18           THE COURT:  Please be seated.  Okay.  We're back on

19   the record in In re DPH Holdings, the Delphi complaints and

20   DAS's motion to amend.

21           When we left off I think we concluded arguments on

22   that portion of the Rule 15(a) motion that raised issues under

23   Rule 8 concerning the necessary allegation of 547(b)(2) that

24   the transfer being made for or on account an antecedent debt

25   owed by the debtor.  The various objectors have argued that in

DELPHI HOLDINGS CORP., ET AL.

1    the instances where the complaints make it clear that the

2    contractual relationship under which the debt was incurred, was

3    with a debtor that is not a purported plaintiff, DAS, that on

4    their face the complaints don't comply with 547(b)(2) and that

5    the proposed amended complaint therefore shouldn't be permitted

6    to be filed as the amended complaint, because it wouldn't

7    survive a Rule 8 challenge.

8            The debtors contend to the contrary, that the

9    complaints in those circumstances allege enough to satisfy

10   547(b)(2) for purposes of the pleading standards set forth in

11   the Bell Atlantic Corp. vs. Twombly case, 550 U.S. 544 (2007)

12   and Ashcroft vs. Iqbal, 129 S.Ct. 1947 -- I'm sorry, 1937

13   (2009).

14           The portions of the complaint that are relevant here

15   are those -- are really threefold.  First the complaint's

16   assertion that the plaintiff made the payment at issue, that is

17   that DAS made the payment at issue which is set forth in the

18   complaint itself, as well as in the attachments to the

19   complaints, the schedules.  Secondly, there's an assertion that

20   DAS was the operating subsidiary of Delphi in North America

21   that performed, among other things, accounting and payment

22   functions for the reorganized debtors in connection with their

23   manufacture of various automotive parts, components, modules

24   and assemblies or in connection with paying for services.  And

25   lastly, that -- I'm looking for a sample complaint here.

Page 184

1          MS. HAFFEY:  Would you like me to provide you with

2     one?

3          THE COURT:  Yeah, just one that specifically covers

4     this issue because not all of the complaints that I have raise

5     the multiple transfer issue.  Okay.

6          And then lastly that plaintiff assumed, or otherwise

7     became obligated for, Delphi subs, that those are the

8     identified Delphi entities that had the direct contractual

9     relationships, payment obligations.  And in some instances

10    there's an additional allegation that that assumption was part

11    of an agreement, not with the defendant but with the Delphi,

12    the non-plaintiff Delphi affiliates that did have a contractual

13    relationship with the defendant.

14         As I've noted a couple of times in today's hearing

15    already, ultimately in Iqbal the Supreme Court stated, "In

16    determining whether a claim should survive a motion to dismiss,

17    a court must first identify each element of the cause of

18    action," Iqbal, 129 S.Ct. at 1947.  Next, "The Court must

19    identify the allegations that are not entitled to, 'the

20    assumption of truth' because they are legal conclusions not

21    factual allegations," ID at 1951.

22         Finally, "The Court must assess the factual

23    allegations in the context of the elements of the claim to

24    determine whether they are" -- I'm sorry -- "to determine

25    whether they 'plausibly suggest' an entitlement to relief," ID

Page 185

1    at 1951.

2         And that latter analysis should be done in a common

3    sense matter in light of the context specifically of the

4    particular complaint, see In re Hydrogen 431 B.R. 337 at 345 --

5    I'm sorry, 346 (Bankr. S.D.N.Y. 2010).

6         The statement in -- generally speaking in paragraph 14

7    of the proposed amended complaint that plaintiff assumed or

8    otherwise became obligated for the other Delphi entities'

9    payment obligations in my view is the type of conclusory

10   statement of law that is not entitled to the presumption of

11   truth, evidentiary truth, under Rule 8 and the Iqbal case, as I

12   believe is also confirmed or was confirmed in a similar context

13   recently in In re Kimball Hill, K-I-M-B-A-L-L, Hill Inc., 2011

14   B.R. LEXIS 2163 (Bankr. N.D. Ill., June 2, 2011) at pages 32

15   through 35.

16        However, I agree with the plaintiffs reliance upon In

17   re Enron Corporation, 357 B.R. 32 (Bankr. S.D.N.Y. 2006), and

18   in particular the discussion at pages 48 through 49 of that

19   case where Judge Gonzalez discusses Section 547(b)(2) at some

20   length and concludes that the phrase that's at issue here owed

21   by the debtor or debt owed by the debtor encompasses, properly,

22   or focuses properly on the noun debt which as defined in the

23   Bankruptcy Code includes liability that is matured, contingent

24   and disputed, et cetera.  So that with the proper allegation

25   that would set forth sufficient facts and not legal conclusions

Page 186

1    in the complaint, the complaint could satisfy Section

2    547(a)(2)'s debt owed by the debtor element by asserting a

3    disputed obligation of the debtor, as the debt that was paid.

4           The plaintiff contends that its proposed amended

5    complaint is different from the complaint in Kimball Hill in

6    this regard because in addition to making the conclusory

7    statement that I've already quoted, the complaint also makes it

8    clear that the plaintiff made the specific payments and

9    therefore, apparently, considered itself to be liable and that

10   it performed the accounting and payment function on behalf of

11   its affiliates and subsidiaries from which the plaintiff asked

12   me to infer that the DAS plaintiff could be found liable under

13   a plausible legal theory under Michigan law, as acting on

14   behalf of those entities and assuming their liability.

15          This is in contrast to Kimball Hill where, as noted by

16   Judge Sonderby, the plaintiff there, although allegedly having

17   made the payments, appears not to have done so based on other

18   statements in the complaint and where it was stated that there

19   was no fact alleged that would give rise to a claim against the

20   plaintiff under applicable non-bankruptcy law in that case,

21   Texas case law see ID at page 35.

22          I find this to be a very close call, frankly.  The

23   only real facts alleged in the complaint that would suggest a

24   claim is the fact of payment itself.  However, that is a

25   significant fact in that the DAS entity made the payment

Page 187

1    apparently not as a volunteer or at least I believe that's what

2    those with the supply and service relationships who were being

3    sued in these complaints, I believe, would plausibly allege at

4    the commencement of the DAS bankruptcy case.

5            So under the rationale of the Enron opinion that I've

6    already cited, it would appear to me that at that point the

7    defendants would have at least a disputed claim against

8    plaintiff DAS, which would satisfy that aspect of the

9    preference statute.  That's the only basis for my denial of the

10   objection on this grounds.  I believe that the rational of In

11   re Randall's Island Family Golf Centers, Inc., 290 B.R. 55

12   (Bankr. S.D.N.Y. 2003), that the plaintiff there would satisfy

13   Section 547(b)(2) because defendants were put on notice of what

14   was -- of the underlying claim implicitly invoking an agency-

15   type theory would not lie today in light of Twombly and Iqbal.

16           I also believe that there's no real equitable basis

17   for ruling in the plaintiffs' favor here, given the plain

18   language of the statute and that the plaintiffs -- the

19   plaintiff, instead, would have to show or plead sufficient

20   facts to show at least a disputed claim existing against DAS at

21   the time of the transfer, which I believe, as I said, the

22   complaint just barely does.

23           So on that basis, I will overrule those objections to

24   the motion.

25           I also note that one creditor has asserted -- that is

1    Magnesium Corporation has asserted that there would be a basis

2    for judicial estoppel in that the debtor entered into a

3    stipulation with it after it had asserted a claim against all

4    of the Delphi debtor entities, pursuant to which it was agreed

5    by the parties after the debtor had objected to that claim that

6    the claim would be allowed against only one debtor, the

7    specific contracting debtor, ACEC -- or ASEC.  And that

8    therefore, the debtor should be judicially estopped since it's

9    the same contractual relationship that gives rise to this

10   preference claim from asserting that DAS could have money owed

11   to it by Magnesium.

12        I do not have sufficient facts with regard to the

13   stipulation itself to find that judicial estoppel either does

14   not apply or does apply.  Normally, there is no judicial

15   adoption of a party's position for judicial estoppel purposes

16   in connection with a settlement.  There's an exception to that

17   rule, however, where a court approval of a settlement is one

18   which implicitly requires adoption of the position at issue.  I

19   am skeptical that court approval of this settlement did in fact

20   require adoption of the debtors' position since there could be

21   any number of other reasons why the debtor would have settled

22   and I would have approved such a settlement.  But the record is

23   not clear enough for me to establish that one way or the other

24   here.  So that issue, the judicial estoppel issue, would be

25   preserved for another day.  See, generally, In re Allegiance

Page 189

1    Telecom, Inc 356 B.R. 93 at page 107 through 108, Bankr.

2    S.D.N.Y. (2006).

3              Okay, I think that takes care of those issues under

4    547(b)(2).  So are you going to move now to relation-back

5    issues?

6              MS. HAFFEY:  I think we'll move next, Your Honor, to

7    the insolvency issue.

8              THE COURT:  Okay.

9              MR. SENDEK:  Good afternoon, Your Honor.  Bruce Sendek

10   for DAS.

11             THE COURT:  Good afternoon.

12             MR. SENDEK:  My colleagues were kind enough to leave

13   me with a rather straightforward issue that I believe we can

14   quickly demonstrate satisfies any issue that pertains to

15   sufficiency of pleading under Twombly.

16             The pleading that we have before the Court states that

17   the transfers at issue were made within ninety days of the

18   filing of the petition and we've alleged that the -- that DAS

19   wasn't solvent.  Under 547(f), the Code allows the debtor to

20   presume insolvency within ninety days preceding the filing of

21   the petition.  And this is obviously an important advantage to

22   the debtor.  It is an advantage both in terms of ultimately

23   proving insolvency during that ninety-day period and it is also

24   an advantage in meeting any pleading requirements because the

25   debtor only need allege that payments were made within that

1     ninety-day period.  And at that point, it is accepted as a

2     fact.  That is what a presumption is.

3          If the defendant does not at some later point in time

4     present evidence to rebut that presumption, then it given as

5     true and the plaintiff has met its burden of proof in that

6     regard.  And when we look at the question of Twombly and

7     whether or not something is plausible or not, we see that we've

8     done far more than that.  Whether it is not it is plausible

9     that we were insolvent is beyond dispute here.  We have

10    demonstrated through the assistance of the presumption that it

11    is a fact.  It should be given and taken as a fact by this

12    Court that DAS was insolvent at the time the petition was

13    filed.  And that may remain a fact right through trial unless

14    the defendants do something subsequently to rebut that

15    presumption.  And that's where we are right now.

16          There are --

17          THE COURT:  What if the -- I mean, the objectors say

18    that the debtors' already rebutted it itself by having

19    scheduled, DAS is in effect solvent.

20          MR. SENDEK:  Well, if the Court is talking about -- I

21    assume the Court is talking about the schedule that they put

22    out there?

23          THE COURT:  Right.

24          MR. SENDEK:  Well, that doesn't do anything of the

25    kind.  It is just a schedule and there are legions of cases

1  that talk specifically about what schedules, book values,

2  financial statements, balance sheets mean in terms of proving

3  insolvency which is, under the definition of Code, generally

4  speaking, whether or not the debts of the debtor -- liabilities

5  of the debtor exceed its assets at fair valuation.  And, of

6  course, that's the key language.  That's fair valuation.  And

7  book value -- even if prepared according to a GAAP Financial

8  Standard, this -- remember, this is just a schedule.

9          This is not -- it doesn't purport to be a GAAP

10  schedule.  But even if it were prepared in accordance with

11  GAAP, that does not speak to valuation, other than the fact

12  that it was based on historic documents that may be adjusted

13  fro depreciation and the like.  But the courts -- and I've --

14  and we've cited them -- are clear that when you talk about

15  financial statements, schedules, lists of assets, yes, cash or

16  cash equivalents may be reflected of valuations.  But when you

17  get beyond that, when you get beyond cash or cash equivalents,

18  it may or may not have any relationship to the present value of

19  the assets and generally doesn't.  That was stated clearly in

20  the case of Ames which came out of this district, I do believe.

21  And it was stated in the Enron case quite clearly and that --

22  when I'm talking about the Enron case, I'm talking about the

23  case involving the preference with Arthur Anderson where they

24  were seeking a multimillion dollars preference in that case.

25          Arthur Anderson had the idea that they could

Page 192

1    demonstrate that there was not insolvency at the time of the

2    petition being filed by reference to the Q10 report that was

3    filed with the SEC which showed, I think it was, an excess of

4    two billion dollars -- no, I think, maybe it was -- no, it was

5    ten billion dollars of assets over liabilities.  And Enron --

6    in the Enron decision, I believe that was written by Judge

7    Gonzalez in the Southern District, discusses at length why it

8    does not in fact demonstrate insolvency.  And, again, the

9    discussion, again, is of financial statements, schedules of

10   assets, don't reflect valuation and they cannot be used to

11   overcome the presumption.

12          In some cases -- I think there may be some cases where

13   a schedule -- I think I've seen one where a schedule was deemed

14   to overcome a presumption, post-leadings.  But, just -- most --

15   the majority of all the cases I have seen, Enron being one of

16   them, Ames being another, is that it doesn't overcome it.  So

17   ultimately -- at some point in this proceeding, past the

18   pleading stage, the defendants might make that argument and

19   then it will be for the Court to determine whether or not that

20   one schedule can in fact rebut the presumption that we now

21   enjoy.  But that's something to be determined later on.

22          The plaintiff in any preference action isn't required

23   to plead and presume that the presumption will be rebutted.

24   That would make no sense.  And -- because, again, Twombly talks

25   about possibilities, talks about likelihoods and we have here,

DPH HOLDINGS CORP., ET AL.

Page 193

1   for all intents and purposes as we sit today, a certainty that

2   we were insolvent at the time the petition was filed.  And as

3   far as the pleading requirements go, I would refer the Court to

4   the case that the defendants like very much because it does

5   have some rather stringent pleading requirements for preference

6   cases, and that's the Caremerica case.  And in that case, in

7   fact, the Court made a decision that with preference claims

8   that went beyond ninety days, earlier than ninety days, and in

9   that decision, the Cour -- in that circumstance, the Court said

10  well, in that circumstance, the debtor has to allege some facts

11  to show they meet the Twombly standard of plausibility that it

12  was insolvent.  But that's as to those preferences, not to

13  preferences that's (sic) within the ninety days.  The language

14  was, "The trustee may presume a debtor is to be insolvent

15  during the ninety day period preceding the date of the

16  bankruptcy filing, however, this presumption is inapplicable to

17  preferential transfers made outside of the ninety day period."

18  And that's the best case they have.

19          So, what we learn from the totality of all the cases,

20  and what we learn from Caremerica, even under the most

21  favorable of circumstances to the defendant, is that pleading

22  insolvency is based on the presumption that the statute allows

23  is a given.  We are deemed insolvent as of the date of the

24  petition.  And that'll stay the case until it's -- until it is

25  rebutted by adequate evidence.

DPH HOLDINGS CORP., ET AL.

Page 194

1          THE COURT:  Okay.

2          MR. JONES:  If it please the Court, Roger Jones on

3    behalf of the Calsonic defendants and also speaking for other

4    defendants with respect to the insolvency issue.

5          With respect to insolvency, Your Honor, we have two

6    arguments.  The first is, we do not believe that the debtor DAS

7    is entitled to rely on 547(f) to meet its pleading requirements

8    under Iqbal & Twombly.  Your Honor, if you take a look at the

9    legislative history of 547(f), you will find that it is an

10   evidentiary presumption subject to Rule 301 of Federal Rules of

11   Evidence.  That's an evidentiary presumption under 301 that is

12   applicable at trial.  The presumption is rebuttable and once

13   any evide -- some evidence is introduced to the contrary, the

14   presumption is rebutted.  That presumption does not render

15   insolvency somehow not an element of a preference claim and it

16   does not shift the burden of proof.  The burden of proof is on

17   the debtor; it is an element of the claim.

18         We understand, Your Honor, that five-for -- that

19   Caremerica permitted the debtor to rely on the presumption.

20   Your Honor, we simply disagree with that conclusion, again,

21   because Rule 301 indicates that 547(f) is nothing more than an

22   evidentiary presumption to be applied at trial and not at the

23   pleading stage, which is where we are now.

24         Second, Your Honor, if it were applicable, it is the

25   case that the debtor has itself rebutted the presumption

1     already and did so a long time ago.  There are cases -- we

2     cited those in our pleadings, Your Honor, that have found

3     schedules showing equity in the debtors' assets to be

4     sufficient to rebut the presumption.  But more importantly,

5     Your Honor, the debtors' chief restructuring officer testified

6     before this Court that the debtor was solvent at least as of

7     August of 2005, which is during the period that we have at

8     issue here.

9            Your Honor, that testimony was given to this Court in

10    connection with the motion to form or approve -- require the

11    U.S. Trustee to appoint a committee of equity holders.  And

12    there were -- there was testimony regarding whether the debtor

13    was insolvent or hopelessly insolvent in connection with

14    whether a committee should be appointed.

15           The debtors' chief restructuring officer, Mr. John

16    Sheehan, testified that in two-thou -- in August of 2005, that

17    the debtor made a distribution to its shareholders which it

18    could not have made under Delaware law unless the debtor was

19    solvent at that time.  And Mr. Sheehan testified expressly that

20    the debtor was solvent at that time.  Your Honor, that is the

21    transcript of the March 21, 2006 hearing before this Court.

22    Mr. Sheehan's testimony, most relevant parts, begins on page

23    152 of that testimony --

24           THE COURT:  Is this attached to any particular

25    objection?

```
 1              MR. JONES:  It's attached to Affinia's objection, Your

 2      Honor.  We relied on it, but it is attached to Affinia's

 3      objection.

 4              THE COURT:  All right.  Let's take a quick look.

 5              MR. JONES:  It is Exhibit G, Your Honor,

 6              THE COURT:  Right.

 7              MR. JONES:  It --

 8              THE COURT:  Okay.  The dividend there was by which

 9      debtor entity?

10              MR. JONES:  It was Delphi, Your Honor.

11              THE COURT:  Okay.

12              MR. JONES:  It was the reor -- it was the --

13              THE COURT:  It was the ultimate --

14              MR. JONES:  -- Delphi corporate --

15              THE COURT:  -- parent --

16              MR. JONES:  -- publicly traded parent.

17              THE COURT:  Right.

18              MR. JONES:  You are correct, Your Honor, that it was

19      not DAS.

20              THE COURT:  Okay.

21              MR. JONES:  And on page 157,

22      "Q.  In fact, you thought you were solvent.  That's why paid

23      the dividend, right?

24      "A.  Yes, sir."

25              THE COURT:  All right.
```

1          MR. JONES:  The Court makes an important point that

2     that testimony relates to Delphi.  But if the Court takes a

3     look at the debtors' position here, it is the debtors' position

4     that its statements and schedules are in error because its

5     statements and schedules did not reflect pension liabilities

6     that Delphi was unable to pay.  But if Delphi was solvent, that

7     means it was able to pay its pension liabilities.

8          THE COURT:  But the schedules are not prepared at a

9     fair valuation, right?  They're not conclusive evidence of --

10         MR. JONES:  No, they are not conclusive evidence.  And

11    conclusive evidence is not required to rebut the presumption.

12    It's just an evidentiary presumption.  You come forward with

13    some evidence.

14         THE COURT:  All --

15         MR. JONES:  We cited in our papers four cases that

16    have held that schedules showing equity in the assets are

17    sufficient to rebut the presumption.  Still, have to have a

18    trial, people put on their competing proof, all that sort of

19    thing.  But it sufficient to rebut the presumption.

20         THE COURT:  But, I guess, the ultimate issue -- I

21    mean, I thought about this, I think, pretty carefully.  I don't

22    see why, given that Congress has set forth that presumption,

23    that at the pleading stage unless there's, again, some form of

24    judicial estoppel which I don't think exists here, the

25    plaintiff can't rely on it -- why the plaintiff has to show

Page 198

1    more.

2            MR. JONES:  Your Honor --

3            THE COURT:  I mean, it's evidence.

4            MR. JONES:  it is an evidentiary presumption.

5            THE COURT:  But it's -- I mean -- okay.  It's still

6    evidence.  And as far as the pleading is concerned, it's not

7    conclusory because it's beyond the legal standard.  It's an

8    actual factual fact of life that Congress says is built into

9    the statute.

10           MR. JONES:  Your Honor, we don't disagree with that.

11   But 547(f) is no different than any other presumption under

12   Rule 301 of Federal Rules of Evidence.  There are many other

13   presumptions out there of 547(f), but evidentiary presumptions

14   are not applicable at the pleading stage.  But if the Court

15   concludes that 547(f) is applicable at the pleading stage, then

16   they can't rely on it in this case and they can't rely on it in

17   this case because there's already sufficient evidence in the

18   record to rebut the presumption.

19           THE COURT:  But that -- this isn't on Rule 8, though,

20   then.  This is on futility?

21           MR. JONES:  No --

22           THE COURT:  I'm --

23           MR. JONES:  -- it's not on futility, Your Honor.  We

24   understood the Court's comments that it did not wish to have an

25   evidentiary hearing on --

DPH HOLDINGS CORP., ET AL.

Page 199

```
 1              THE COURT:  Well, so --

 2              MR. JONES:  It's not on futility.  This is an Iqbal

 3    argument, Your Honor.  Our argument is very straightforward,

 4    Your Honor.  We do not believe 547(f) eliminates the

 5    requirement that they plead some facts to support insolvency as

 6    an element of preference claim.  if it is applicable at the

 7    pleading stage, we think it's -- was rebutted in this case by

 8    their statements and schedules and by their testimony of their

 9    CRO such that they can't rely on it, meaning --

10              THE COURT:  The CRO, I think, is a red herring.  He's

11    talking about the parent company and the parent company had

12    access to the equity of foreign subsidiaries.

13              MR. JONES:  It also, then, Your Honor, had the

14    ability, if it was solvent, if it were solvent at the time, to

15    pay the pension liabilities which is basis for the debtors'

16    argument that DAS was not solvent.  They argue you should

17    ignore the statements and schedules in this case because they

18    don't include the pension liabilities that Delphi could not

19    pay.

20              THE COURT:  But, I don't follow that because the --

21    that would only be on a derivative basis or secondary basis

22    after DAS couldn't pay them.

23              MR. JONES:  Your Honor --

24              THE COURT:  DAS is liable for them, too.

25              MR. JONES:  Well, that -- their argument is that they
```

Page 200

1    allocated -- and if you take a look at the affidavit that's

2    attached, they allocated to DAS pension liabilities that could

3    not be paid by Delphi.  Not all the pension liabilities, but a

4    portion of the pension liabilities that could not be paid by

5    Delphi.

6              THE COURT:  I just -- to me, this, again, does not

7    seem to me to be a pleading issue.  This is an issue that

8    parties fight out at trial when they decide what the fair

9    valuation actually is.  I mean, as far as pleading is

10   concerned, Congress has said this is a presumption.  And what's

11   the point of saying it's a presumption if you can't rely on it?

12             MR. JONES:  The question is when can you rely on it?

13   Can you rely on it at the pleading stage or is it an issue of

14   trial?

15             THE COURT:  Well, I mean, it's easier to -- I --

16             MR. JONES:  Your Honor --

17             THE COURT:  -- I think you ought to --

18             MR. JONES:  -- I'm not going to belabor the point --

19             THE COURT:  -- flip that one.  I think it's more

20   likely you rely on it at the pleading stage than at trial

21   because someone can rebut it at trial.  But pleading, it's not

22   about rebutting; it's about just getting at your case.

23             MR. JONES:  I'm not going to belabor the point, Your

24   Honor.

25             THE COURT:  Okay.

1            MR. JONES:  Those are our arguments.

2            THE COURT:  All right.

3            MR. JONES:  I do not know whether the Court wishes to

4     address (b)(5) at this time or whether the debtors intend to

5     address that and admit it as part of their presentation, we

6     would respond to it.

7            THE COURT:  They'd do better in a Chapter S -- is

8     that -- in a liquidation?

9            MR. JONES:  Yes.

10           THE COURT:  Is someone going to address that

11    separately?

12           MR. SENDEK:  We could address that, Your Honor.  Yes.

13           MR. JONES:  Thank you, Your Honor.

14           THE COURT:  Okay.  We might as well deal with that

15    now, I think.

16           MR. SENDEK:  Does the Court wish to hear any rebuttals

17    to the arguments made by counsel?

18           THE COURT:  Well, no, I don't think so.

19           MR. SENDEK:  Okay.

20           THE COURT:  I mean, no one has a case on point except

21    for perhaps Caremerica.  But that's not really in point,

22    either.  Well, I guess it is -- yeah, it is on point.  I'm

23    sorry.  It is on point.

24           MR. SENDEK:  Then I won't miss an opportunity to say

25    nothing.

Page 202

```
 1                THE COURT:  All right.

 2                MR. SENDEK:  Your Honor, 547(b)(5) is a very close

 3     cousin to the issue we just described and --

 4                THE COURT:  Right.  No -- can I cut through this?

 5                MR. SENDEK:  Yes.

 6                THE COURT:  If it's insolvent and you're dealing with

 7     unsecured debt, nonpriority unsecured debt, that's the end of

 8     it, right?

 9                MR. SENDEK:  It is, Your Honor.  And we rely --

10                THE COURT:   I mean, it has to -- you can get 99.9

11     cents on the dollar and still trip over 547(a)(5) -- (b)(5),

12     excuse me.

13                MR. SENDEK:  I couldn't have said it better.  And

14     that's exactly what Enron says, one of the key cases we rely

15     on.  It says exactly that, that that's the end of the inquiry

16     where Arthur Anderson tried to make a case that said well, you

17     haven't shown that this was the condition as of the time that

18     the petition was filed.  And the Court basically said not so,

19     the presumption carries you there as well.  As well as looking

20     at later events that occurred in the proceedings, that in Enron

21     the fact that the general creditors did not receive anything

22     was another determining factor as here --

23                THE COURT:  But, this -- again, that's a -- that's not

24     a Rule 8 case.  That's a later -- that's an evidentiary case.

25                MR. SENDEK:  Well, that was at summary judgment, Your
```

DPH HOLDINGS CORP., ET AL.

Page 203

1    Honor.

2              THE COURT:  Right.

3              MR. SENDEK:  The interesting thing is that all these

4    cases that are trying to attack the presumption are at -- are

5    well beyond the pleading stage.  And we're way ahead of the

6    game here --

7              THE COURT:  Except --

8              MR. SENDEK:  -- I mean, that's something for later on.

9              THE COURT:  Except Caremerica.

10             MR. SENDEK:  Except Caremerica which is the only one

11   that addresses at the pleading stage, but over and over again,

12   we see the cases are on summary judgment or at trial where the

13   courts make determination regarding the effect of the

14   presumption and whether or not it's been rebutted or not.  And

15   here, again, I say it's a close cousin because we've

16   established that we were insolvent as of the time the petition

17   was filed, at least for now, until somebody comes up with

18   credible evidence to rebut that.  So that also takes us through

19   547(b)(5).

20             THE COURT:  Okay.

21             MR. SENDEK:  Thank you.

22             THE COURT:  Any response on that one?

23             MR. JONES:  Your Honor, just as we don't believe that

24   the presumption ought to be applicable to carry the day with

25   respect to insolvency, we certainly don't think it should be

1    applicable to carry the day with respect to 547(b)(5).

2           There are no real other allegations in the

3    complaint -- in the proposed amended complaint that would carry

4    the day on that issue.  If they don't get the benefit of the

5    presumption to carry the day on 547(b)(5), then they would

6    lose.

7           THE COURT:  Right.

8           MR. JONES:  The only allegation is that on a

9    consolidated basis, somebody in 2009 may get less than 100

10   cents on the dollars which doesn't tell you what would have

11   happened in 2005.

12          THE COURT:  Right.  But, again, it seems to me that if

13   I accept the proposition that simply stating the debtor was

14   insolvent is sufficient because of the presumption in 547(f),

15   then given that this is described as unsecured debt, unsecured

16   trade debt, it would seem to me that that would be enough, not

17   only for (b)(3) but also for (b)(5).

18          MR. SENDEK:  Well, Your Honor, we would cite the

19   Caremerica which actually, I think, reaches a different

20   conclusion about that and looks for whether there are

21   allegations regarding (b)(5) even though the presumption

22   applied with respect to the ninety-day period prior to the

23   filing and found that the statements and schedules which showed

24   insolvency were sufficient to carry that, which is not the case

25   here.

DPH HOLDINGS CORP., ET AL.

Page 205

1          THE COURT:  But it's -- I mean, what more would you

2     say?

3          MR. JONES:  According to Caremerica, that you would

4     offer some allegations regarding what would have occurred had

5     DAS been liquidated on the petition date.

6          THE COURT:  Well, I mean, the -- under 101(32),

7     it's -- insolvency is to be determined at a fair valuation.

8          MR. JONES:  That's correct, Your Honor.

9          THE COURT:  There's a statutory presumption of

10    insolvency on the petition date.

11         MR. JONES:  Your Honor, I'm not going to belabor the

12    point --

13         THE COURT:  Okay.

14         MR. JONES:  -- I think our position's clear.

15         THE COURT:  I mean, I think the theory would have to

16    assume that a Chapter 7 liquidation would result in more value

17    than the statutory presumption?  I guess that's what we'd have

18    to assume.  That just doesn't -- I mean, that really -- I mean,

19    that tips plausibility on its head.  That truly is implausible.

20         MR. JONES:  Your Honor --

21         THE COURT:  It doesn't make any --

22         MR. JONES:  -- I would --

23         THE COURT:  It doesn't make any sense.  If that were

24    the case, Delphi would have just sold itself.

25         MR. JONES:  Your Honor, we don't disagree with that

Page 206

1    point.  We don't believe the presumption gets them over the

2    pleading hurdle with respect to insolvency or 547(b)(5).

3             THE COURT:  Okay.  All right.  Well, I did think about

4    this.  Obviously, the schedules can be used and have been used

5    at times, although at other times have not been used and been

6    found not to be a basis for rebutting the statutory presumption

7    of insolvency within the ninety days before the petition date

8    that's set forth in Section 547(f).

9             I believe that, first, that issue of rebuttal is an

10   issue to be dealt with on the facts, either on summary judgment

11   or at a trial and not in the pleading because the Court would

12   have to look at the schedules and in all likelihood, I think,

13   also have to take evidence as to their preparation and the

14   effort that went into determining whether those were done at

15   fair value or not.  None of that is before me at the pleading

16   stage.

17            What is before me, again, is a statutory presumption

18   and I think that is sufficient to take this issue, which really

19   is -- shows up twice at 547(b)(3) and 547(b)(5) out of the

20   ambit of the first aspect of the Iqbal Rule 8 test, which is

21   that I shouldn't give the presumption of evidentiary fact to

22   legal conclusions, as opposed to factual allegations.  And I

23   believe that Congress meant this to be a -- treated as a

24   factual allegation by building it into the statute as an

25   evidentiary presumption.

Page 207

1        So, I believe that the proposed amended complaint do

2   sufficiently plead insolvency, given that they're only dealing

3   with the ninety days before the petition date -- dealing with

4   transfers made within ninety days before the petition date.

5        Are there more Rule 8 issues?

6        MR. SENDEK:  Your Honor, I don't know if you consider

7   relationship back a Rules 8 issue?

8        THE COURT:  Well, I'm happy to turn to relation back.

9   I don't think there were any specific Rule 8 issues beyond

10  this, although as I noted, there were at least a couple of

11  objectors who stated that at least for some of their clients,

12  the pleadings didn't comply with my, really, order and that

13  they asserted aggregate claims against them less than 250,000

14  dollars.  I don't know if that's Rule 8 or just futility, but

15  you could -- we should deal with that one, too.

16        MS. HAFFEY:  I'd be happy to address that, Your Honor.

17  I did need to have the defendants identify themselves who

18  believe that that is the case because it was the reorganized

19  debtors' belief that any time we looked at the complaints and

20  we saw that that was the case, we dismissed them.  and as of, I

21  want to say maybe a month ago, there was one that was brought

22  to our attention that we had missed and we have agreed to

23  dismiss that.  And I believe it's already dismissed, that's why

24  I, really, do not know what defendant is making that argument.

25        THE COURT:  Okay --

DPH HOLDINGS CORP., ET AL.

Page 208

1          MS. HAFFEY:  It may be moot --

2          THE COURT:  -- is anyone making that argument?  I

3    thought someone -- I thought I saw a couple like that.

4          MR. SAYDAH:  Your Honor, again, Gilbert Saydah of

5    Kelley, Drye on behalf of various BP entities identified in the

6    complaint, in adversary proceeding 07-02270 --

7          THE COURT:  Right, right.

8          MR. SAYDAH:  -- as BP Amoco Corp., BP Products North

9    America, Inc., Castrol and Castrol Industrial.

10         Your Honor, in the amended -- in the proposed amended

11   complaint, it breaks down the transfers by BP entities

12   specifically sought against BP Amoco, the debtors seek only

13   4,660 dollars and against BP Products North America, Inc., they

14   seek only 13,561 -- -562 dollars.  And they have no claims

15   asserted at all against the defendants simply identified as BP.

16         THE COURT:  All right.  Okay, this is one of the ones

17   I reme -- maybe this is the only one I remembered, but I didn't

18   see anything dealing with this one.

19         MS. HAFFEY:  We will move to dismiss those, Your

20   Honor --

21         THE COURT:  Okay.

22         MS. HAFFEY:  -- we, earlier, dismissed the BP

23   Microsystems, Inc. when it brought to our attention and it's

24   just an oversight.

25         THE COURT:  Okay, very well.

1          MR. SAYDAH:  Thank you.

2          THE COURT:  I'm not sure there were any other ones

3     besides that.

4          Okay, why don't we turn to the relation back issues

5     and I guess there are two there.  One is new defendants and one

6     is new -- allegedly new claims.  Although perhaps that doesn't

7     exist anymore because of the doubling up issue.  I'm not sure.

8          MR. SENDEK:  We believe you're exactly right, Your

9     Honor, that the bulk of the objections were based on increased

10    amount of the claims and we've agreed that we won't seek

11    amounts beyond what were alleged in the amended compl -- in the

12    original complaint.

13         THE COURT:  Okay.  Why don't we stick with that, then,

14    first?  If the debtor is limiting the amount it's seeking in

15    each complaint now to the amount that was sought in the

16    original complaint, logically it seems to me there's no issue

17    there.  Am I missing something?

18         I mean, leaving aside the different defendants point,

19    that's a separate issue.  And the numbers may change because

20    the different defendant and I understand that point.  But

21    that's a different relation back analysis than new dollars

22    amounts.

23         MR. SULLIVAN:  Your Honor, James Sullivan, counsel for

24    Timken.  I'm in charge with this issue.  I guess it's just a

25    matter of clarifying, so just by way of example, the original

```
 1    Timken complaint had 16 transfers identified and the amended
 2    complaint had something like 142 transfers and there are only 8
 3    which overlapped.  And, you know, we couldn't really make heads
 4    or tails of them because we, you know, we asked for information
 5    on the new transfers and an explanation as to how they got from
 6    16 to 142, even though the number of plaintiffs dropped from 40
 7    to 1 and the number of defendants dropped from 5 to 2.  And
 8    I've been asking for that information since October, didn't get
 9    any.  And today in court was the first time I got any kind of
10    explanation on it.  So I guess that.  I just want to confirm --
11           THE COURT:  No, that's a good -- I mean, you make a
12    good point.  Maybe I spoke too soon.
13           How can I conclude that a complaint that lists 147
14    transfers or, you know, some number, 35 transfers, as being
15    avoidable deals with the same transaction or occurrence as a
16    complaint -- the first one filed that dealt with 10?
17           MS. HAFFEY:  May I?
18           THE COURT:  I mean, they could be completely different
19    transfers.  It just -- you know, the fact that the debtors'
20    willing to limit the aggregate exposure to the dollars amounts
21    set forth in the first complaint may not be enough.
22           MS. HAFFEY:  The original complaints, Your Honor,
23    identified transfer dates and then the amounts.  So it's a
24    matter of looking at the new -- because there's additional
25    lines is not really the issue.  It's --
```

DPH HOLDINGS CORP., ET AL.

Page 211

1           THE COURT:  It's the dates --

2           MS. HAFFEY:  -- you've got to --

3           THE COURT:  --- you're saying?

4           MS. HAFFEY:  You've got to compile the dates.  So for

5    that August 2nd date, for instance, and compile them and see if

6    for that date, if it was increased.  And generally speaking,

7    where this error happened, it -- there were doubling of

8    entries, the Timken complaint happens to be a unique one where

9    it wasn't -- it's not so clear as to the doubling.  You have to

10   add up the amounts per dates.  But, as we said just a moment

11   ago, if -- when we do that and we add it by date, if by date

12   the transfer amount is greater, we will go with what the

13   original complaint says.

14           THE COURT:  Well, but would it -- are there situations

15   where in the complaint that's currently on file you list

16   for example three million dollars for June 21st -- well, that

17   would -- no.  For September 21st, 2005, but when you look at

18   the schedule in new complaint, the transfers made on September

19   21st, 2005 don't add up to three million dollars.  Is there

20   anything like that?

21           MS. HAFFEY:  So it would be less than?

22           THE COURT:  Yeah.  Or not double but something other

23   than double or less than?

24           MS. HAFFEY:  In, perhaps, Timken and a minority, it

25   might be something other than double and they are a rare case.

DPH HOLDINGS CORP., ET AL.

Page 212

```
 1    I don't believe it would ever be less than, but -- I certainly

 2    haven't heard that argument from defendants that we're suing

 3    them for less.  Although there are certain complaints in the

 4    aggregate it has been less.

 5              THE COURT:  So how --

 6              MS. HAFFEY:  I haven't heard that complaint.

 7              THE COURT:  How would that satisfy 15(c)?  I mean,

 8    it's -- you're talking about different transactions, then,

 9    aren't you?

10              MS. HAFFEY:  I'm going to let Mr. --

11              MR. MILIN:  No, Your Honor.  It's not different

12    transactions.  The -- perhaps this was clear already.  The

13    original complaint rolled up numbers to total by date.

14              THE COURT:  Right.

15              MR. MILIN:  This unbundles them.

16              THE COURT:  But, no, I'm dealing with just the

17    specific fact pattern where when you unroll them, they unroll

18    out to a different number other than just the mathematical

19    doubling error, which you know is --

20              MR. MILIN:  And in the instances in which it's not

21    doubled, we believe it's a question of some but not all line

22    items within a single date got doubled.  let me take you a step

23    back to say, as we said in our omnibus reply, under the law of

24    this district, relation back does back -- can potentially

25    become a factual issue for -- precisely because it -- I suppose
```

Page 213

1    we would need to examine the claims at issue and, you know, be

2    able to demonstrate that the numbers in the new one tie to the

3    numbers in the old one once certain transactions are eliminated

4    or undoubled.  We can do that.

5            It's -- standing here now, I can't, you know, for a

6    particular plaintiff, take one number, show you the line items

7    on the new exhibit that tie it to the old number.  But, that is

8    the fact.  There are no -- we aren't pursuing transactions

9    which weren't included within the rolled up number in the prior

10   first version of the complaint.

11           THE COURT:  Well, isn't that a problem?

12           MR. MILIN:  At the pleading stage, I don't believe so.

13           THE COURT:  Well, but, we're talking about relation

14   back.  I mean, if these are really -- I mean, see if I could

15   say this clearly.  The complaints were filed timely as those

16   complaints and if they -- if what's being filed now is really

17   asserting different transfers, then it's time barred.

18           MR. MILIN:  But they're not.

19           THE COURT:  But how do we know that?  They say they

20   are.

21           MR. MILIN:  Well --

22           THE COURT:   I mean, there's got to be some response

23   to the defendants -- you just told me you can't do it.

24           MR. MILIN:  No, what I said is standing here now, I

25   can't take 160 line items and, you know, do it on the fly here.

Page 214

1   That's all I intended to say.  I didn't intend to say that we

2   can't demonstrate if it comes to that factual issue -- and it

3   is a factual issue that, in fact, we are pursuing the same

4   transactions as were at issue and --

5         THE COURT:  Well, is it a factual issue or is just a

6   matter of showing -- I mean, this is just -- I just -- it's not

7   a factual issue in the sense that the transfers themselves are

8   being questioned.  It's, what was the basis for your original

9   filing and what was the basis for this filing?  Right?  I mean,

10  those are documents that are in your control.

11        MR. MILIN:  The --

12        THE COURT:  If you could show me those two documents,

13  or two sets of documents, whether the others dispute it or not,

14  then I would think it would be a factual issue.  But, since

15  both sets of documents are in your control, I'm not sure why

16  this is a factual issue.  I mean, you either have them or you

17  don't.

18        MR. MILIN:  Well, first in terms of being a factual

19  issue, in our omnibus reply we cited -- and I'm sure I'm going

20  to mispronounce this -- Tabacalera Cubana v. Faber, Coe &

21  Gregg, 379 F. Supp. 772 (S.D.N.Y. 1974).

22        THE COURT:  No, I understand.  Often -- often these

23  issues are factual issues.  For example, the issue of

24  prejudice.  You know, it's a four-factor test; the issue of

25  prejudice is by nature a factual issue.  And similarly, whether

Page 215

1    the original -- I'm sorry, whether the claim in your proposed

2    amended complaint arises out of the same conduct set forth in

3    the original pleading is many times a factual issue.

4          On the other hand, here it doesn't strike me as -- it

5    strikes me as fundamentally different because this is simply

6    dealing with facts within your own control.  I wouldn't let

7    them dispute it on this record.  Okay?

8          If you came up with a list, which you have, which is

9    the attachments to the present -- the proposed amended

10   complaints, and then compared it -- and this is what's

11   missing -- to the list that formed the basis of the original

12   complaint, I wouldn't let Mr. Sullivan say, well, we disagree

13   with that, they're not really related, they didn't happen on

14   the same day.  That would be the type of factual issue we'd

15   have to develop.  On the other hand, I'm not even seeing that

16   second list.

17         MR. MILIN:  Okay.  So I respond this way.  First, in

18   those instances where the amounts are the same, I think the

19   dates and amounts are the same --

20         THE COURT:  I --

21         MR. MILIN:  -- rolled up it is a fair inference.  In

22   those instances in which there is an exact duplicate and we've

23   acknowledged the duplication I think it's a fair inference.  In

24   those instances in which it's more complex than the same number

25   or an exact duplicate I would acknowledge that, you know, we

Page 216

```
 1    would need to -- it can be reconciled; it can't be reconciled

 2    on the papers in front of the Court right now.  I would

 3    acknowledge that.

 4                THE COURT:  Okay.  All right.

 5                MR. THOMAN:  Your Honor, this is Jim Thoman

 6    representing Unifrax.

 7                I just want to point out that it gets even more

 8    complicated and harder to discern, at least in our

 9    circumstance.  We've been lumped into a lawsuit with BP, and I

10    know Mr. Saydah has spoken with respect to that complaint.  The

11    original complaint sued several BP entities as well as Unifrax,

12    and that exhibit to that complaint doesn't specify what entity

13    is being sued and so there's absolutely no way, based on even

14    the transfer date that we could possibly tie in the transfers

15    in the original complaint to their amended complaint because

16    there's several -- four or five different entities involved in

17    multiple transfers on the same day.

18                THE COURT:  Okay.  Well, I don't want to -- can we

19    put -- just put your point to the side for a second?  I just

20    wanted to deal with the more simple case where there's one

21    defendant and there's not a complete overlap of days and

22    numbers.

23                MS. HAFFEY:  Well, can I provide the Court with an

24    example?  If we would --

25                THE COURT:  Okay.
```

Page 217

```
 1              MS. HAFFEY:  -- look at Merrill Tool.

 2              THE COURT:  Let me just find that.

 3              MS. HAFFEY:  I'll be happy to share my --

 4              THE COURT:  No, I just -- okay, I have it.

 5              MS. HAFFEY:  The original complaint was for

 6    $2,111,280.54 (sic).  The proposed amended complaint is four

 7    million two hundred and twenty -- (skip in audio) -- and

 8    twenty-four cents, not quite double but similarly double.

 9              If the Court would look at the July 11th transfer just

10    as an example.  This is a complaint where we had the issue with

11    doubling as part of that date.  You can see that the transfer

12    of $4,550 is shown twice there.

13              THE COURT:  Right.

14              MS. HAFFEY:  It's the third and fourth line down on

15    the exhibit.

16              THE COURT:  Right, it's the same numbers.

17              MS. HAFFEY:  Exactly.  It used to --

18              THE COURT:  I think in the next column too, the --

19              MS. HAFFEY:  Exactly.

20              THE COURT:  Right.

21              MS. HAFFEY:  But if you go back to that one, Your

22    Honor, if you subtract the doubled one -- so add up the three

23    line items, the nineteen five -- the first, second and third

24    line item, and then look at the original complaint, it's the

25    dollar amount on the original complaint.  So there is a way to
```

DPH HOLDINGS CORP., ET AL.

Page 218

```
 1    rectify --

 2              THE COURT:  Right.

 3              MS. HAFFEY:  -- and to do this.

 4              THE COURT:  But somewhere in there, there is a number

 5    that's different and that's the one that I think --

 6              MS. HAFFEY:  It's the doubled.

 7              THE COURT:  No, no, you said that it isn't -- it isn't

 8    exactly doubled.

 9              MS. HAFFEY:  Well, it's because certain of the

10    transfers of July 11th are the same transfers as shown on the

11    original complaint but for one clerical error --

12              THE COURT:  That were not doubled.

13              MS. HAFFEY:  -- doubled one of them.

14              THE COURT:  All right.  Well, but what I'm saying --

15    okay, I think that was consistent with what your colleague

16    said.  If it's clear from the face of it that the numbers are

17    just doubled, simply doubled, then you just cross out one of

18    those and reduce the amount of the complaint.  And if that ties

19    into the transfer made on the bundled date in the first

20    complaint there shouldn't be a problem.  On the other hand, if

21    what you're left with after X'ing out the clear doubled ones,

22    and the clear doubled ones at least here are easy to X out.  I

23    mean, it's easy to see that they're --

24              MS. HAFFEY:  Right.

25              THE COURT:  -- they're duplicated.  And if the numbers
```

1   don't match up with the first complaint then the difference, I

2   think, is obviously new.  And then those, I think, should not

3   be permitted -- the new numbers.

4          MS. HAFFEY:  Again, without seeing the specific

5   factual situation I can't concede that it would obviously be

6   new.

7          THE COURT:  Okay.  All right.

8          MS. HAFFEY:  I think it's going to get down to looking

9   at each particular exhibit.

10          THE COURT:  Okay.

11          MS. HAFFEY:  But I do say to the Court I think that

12   that's going to be a very few of these and the typical problem

13   was --

14          THE COURT:  All right.  Well, it should be --

15          MS. HAFFEY:  -- what I pointed out to you.

16          THE COURT:  -- a mechanical analysis, I guess.

17          MR. SULLIVAN:  Your Honor, my only problem is, you

18   know, I've been asking them for their information since

19   October.  In my opposition papers and in my surreply I

20   highlighted the fact that we went from 16 to 140 some odd

21   transfers, that there was only overlap of 8 of those, and I got

22   no response.

23          THE COURT:  Well, I think they acknowledge you're in a

24   different position.

25          MR. SULLIVAN:  Yeah.

Page 220

```
 1              THE COURT:  But as far as the general -- and I'm

 2     not -- I don't want to -- I'm not forgetting about the

 3     gentleman on the phone, but is the general proposition that

 4     I've just laid out, is there anything wrong -- I mean, beyond

 5     that, I'm having a hard time seeing why the debtors should be

 6     precluded.

 7              MR. SULLIVAN:  Well, I guess I don't want to speak for

 8     others if I'm in a different position.

 9              THE COURT:  Right, okay.

10              MS. BRAUN:  Excuse me, Your Honor?

11              THE COURT:  Yes.

12              MS. BRAUN:  It's Beverly Braun of Jaeckle Fleischmann

13     for Jamestown Container.

14              THE COURT:  Yes.

15              MS. BRAUN:  I just want to clarify specifically what

16     the debtors are proposing because we are also in a position

17     where the amended complaint proffers an overpay -- proffers to

18     be more than what was in the original complaint.  And it is not

19     a true doubling; it's approximately 3,606 dollars.  But I can

20     tell you this that there are approximately twenty-five

21     transactions identified in the original complaint, whereas in

22     the amended complaint there's probably close to 3,000.

23              THE COURT:  Right, but you have in the amended

24     complaint the Exhibit 1 which lists the days, the transfer

25     dates.
```

Page 221

1          MS. BRAUN:  It does.

2          THE COURT:  So you could go from there to the

3    bundled -- what they clearly did was they bundled the transfers

4    in the original complaint by day.

5          MS. BRAUN:  No, that's clear, Your Honor.  I think I

6    just wanted to make sure that I understand clearly that the

7    debtors are saying that in those instances where there was a

8    duplicate or even perhaps a new transaction that appeared in

9    the amended complaint that is greater than what was on the

10   original, that the potential maximum liability to my client is

11   that which they were seeking in their original complaint.

12         THE COURT:  Well, they definitely said that as to

13   doubling; I'm saying it as to the other part.

14         MS. BRAUN:  Thank you.

15         THE COURT:  Okay.

16         MS. HAFFEY:  I think we said it to both of them.

17         THE COURT:  Okay.  Well, counsel's correcting me.

18   They're willing to say that as to both points.

19         MR. HERMAN:  Your Honor, very briefly, Victory

20   Packaging is in a similar position to Timken.  We went from

21   approximately --

22         THE COURT:  We can't hear you.

23         MR. HERMAN:  We went approximately from twenty-one

24   million dollars to twenty-seven million dollars, from 114

25   transfers to 400 pages of transfers.  We don't think that, as a

Page 222

1   defendant, Victory Packaging should have to carry the burden of

2   matching these items up.  This is the plaintiffs' burden.  We

3   shouldn't have to figure out whether it relates back --

4           THE COURT:  Well, I mean, we could do it right now.

5           MR. HERMAN:  They can sit here and do it, yes, Your

6   Honor.

7           THE COURT:  Okay.

8           MR. HERMAN:  But you know what, Your Honor, they've

9   had since Your Honor directed them to file amended complaints

10   to do that.  And the motion for -- to amend doesn't do the job.

11   It doesn't explain how you got from 114 page, you know, to, you

12   know, seven million dollars more.  And again, Your Honor, that

13   is bad faith, that is trying to push the burden that they

14   should have had onto the defendants.  And for all the reasons

15   that my colleague representing Timken has said, these

16   complaints don't meet the standards.  These complaints don't --

17   they haven't carried their burden that they should be entitled

18   to amend.

19           THE COURT:  Well, on the face of it, though, if in

20   fact these schedules do show that -- I'll just use a

21   hypothetical, you know, 75,000 dollars were transferred on

22   August 9, 2005, albeit it's now in fifteen entries instead of

23   one which is in the original complaint, then on its face it

24   seems to relate back unless the numbers don't match up when you

25   add all those up and then I think the overflow should not be --

Page 223

1    the overage should not be counted.

2            MR. HERMAN:  Your Honor, I would agree with that but

3    is is the plaintiffs' job to match it up and present it to the

4    Court and to the defendant.  Otherwise they're shifting their

5    burden to do their job and the cost of doing that job onto the

6    defendants.

7            THE COURT:  Well, they're offering to do it right now.

8            MR. HERMAN:  They're offering to do it right now?

9            THE COURT:  I guess, right?

10           MR. HERMAN:  But they had, Your Honor, since September

11   or December or February to do the job.  That was a basic --

12           THE COURT:  Well, but --

13           MR. HERMAN:  -- fundamental element of their motion to

14   amend --

15           THE COURT:  -- the job is responding to your objection

16   as opposed to amending the complaint, right?  Because they did

17   amend the complaint.  They're saying the evidence is right in

18   the amendment to the complaint; all you have to do is look at

19   the schedules and compare it to the other document that's on

20   file, which is the schedules to the first amended complaint.

21           MS. HAFFEY:  Your Honor, I think counsel's concern

22   with this one, and I understand it, is as he said, it went --

23   this is one of those --

24           THE COURT:  I can't hear you.

25           MS. HAFFEY:  This is one of those complaints Victory

Page 224

1    Packaging was the packaging supplier for DAS and --

2            THE COURT:  The schedule's very long on this one.

3            MR. HERMAN:  Still is, Judge.

4            MS. HAFFEY:  It's three hundred and --

5            THE COURT:  Right.

6            MR. HERMAN:  It's 400-some odd pages.

7            MS. HAFFEY:  -- sixty-some pages.

8            THE COURT:  Right.

9            MS. HAFFEY:  But we have said that we would do that, I

10   mean, that -- you know, as we have instructed the Court today.

11   But I understand, you know, why other counsel would not want to

12   do that.  It's a voluminous exhibit.

13           THE COURT:  Well, they're going to do it, right?

14           MR. HERMAN:  Your Honor, my point is they should have

15   done it already, but okay, they're going to do it.

16           THE COURT:  Okay.

17           MS. GRUBIN:  Your Honor, I would just like to add

18   that -- this is Janice Grubin on behalf of Select.  The

19   original complaint had twenty-one transfers.  The proposed

20   amended complaint had 276 transfers.

21           THE COURT:  No, but it's all the same point.  They did

22   everything --

23           MS. GRUBIN:  There's a 45,000 dollar difference here.

24   It's not six million certainly but my client's been put to a

25   lot of expense and time in getting to this point and we would

1    like some indication that we'll get better cooperation in a

2    timely fashion --

3            THE COURT:  Okay.

4            MS. GRUBIN:  -- to focus on --

5            THE COURT:  All right.

6            MS. GRUBIN:  -- this.

7            THE COURT:  No, I understand that.

8            MS. GRUBIN:  Thank you.

9            THE COURT:  And I certainly think all of these points

10   go to the issue of being able to replead.  I just don't -- you

11   know, all of this is sort of cumulative.  I understand that

12   point.

13           MR. HERMAN:  Your Honor --

14           THE COURT:  But I think that's where it comes in, as

15   opposed to --

16           MR. HERMAN:  I agree, Your Honor.  Maybe they should

17   be entitled to replead it, maybe not, but it's

18   not --

19           THE COURT:  No, I'm saying this is suggesting to me

20   they shouldn't be entitled to replead.

21           MR. HERMAN:  Yes.

22           THE COURT:  But --

23           MR. HERMAN:  And Your Honor, I just want to add that

24   there has been serious prejudice to Victory Packaging by the

25   overstatement of the claim, in our view, because we've had it

1    to include in our financial statements and our reporting.

2              THE COURT:  Okay.

3              MR. HERMAN:  Your Honor --

4              THE COURT:  Did any -- I mean, no one looked at it and

5    said these are the same numbers twice?

6              MR. HERMAN:  It's very hard to match it up, Judge.

7    There's a lot of data on those schedules, as you've

8    acknowledged --

9              THE COURT:  No, but -- well, I mean, we should look at

10   this --

11             MR. HERMAN:  It doesn't work.

12             THE COURT:  Because of course I'm looking at right now

13   the Merrill Tool one, but let's just look quickly at Victory

14   Packaging because I want to see; maybe yours is different

15   than --

16             MR. HERMAN:  Can I hand you my notebook?  I have an

17   extra.

18             THE COURT:  No, I have it.

19             MR. HERMAN:  Okay.

20             THE COURT:  I've just checked for it under here.

21             MR. APPLEBAUM:  Your Honor, this is Joel Applebaum on

22   behalf of Doshi.  I think what everyone here on this side is

23   asking themselves and what I think you're about to do is

24   mechanically how do we get from here to there.  We have --

25             THE COURT:  No, I understand.

DPH HOLDINGS CORP., ET AL.

 1          MR. APPLEBAUM:  We have in the first complaint a

 2    number and then in the amended complaint it's doubling, not

 3    necessarily of the entire amount but portions of the transfers

 4    and how do we get back --

 5          THE COURT:  I understand.  Let me just look --

 6          MR. APPLEBAUM:  -- to this number.

 7          THE COURT:  I mean, when you look at the Merrill Tool

 8    one it's really easy, I mean, because it's just clear that

 9    they're duplicate entries all the way through.  It's not just

10    the same amount and the same day, it's also the same purchase

11    order/invoice number.  It's all the same.  So I wanted to look

12    at the Victory one just to see if there's --

13          MS. HAFFEY:  I do not travel with our volume of

14    Victory, Your Honor.  It's, I think, at least three volumes.

15          THE COURT:  Let me just turn to it.  Okay.  So you had

16    almost your own notebook because it's so thick.

17          MR. HERMAN:  Well, Your Honor, unfortunately I had,

18    you know, helped with a little circuit training today.

19          THE COURT:  So I have gotten to that.  I'm not seeing

20    a lot of obvious duplicates here so far.

21          MR. HERMAN:  No, there aren't, Judge.

22          THE COURT:  So I mean, this does seem to -- I mean,

23    there are a lot of transfers all in one day.  The first fifty

24    or so pages is all Bastille Day.

25          MR. HERMAN:  The payment obligations and the timing

1    are set forth in the supply agreement.

2                THE COURT:  Right, it's every two weeks.

3                MR. HERMAN:  Yes, Your Honor, they got discounts for

4    early payments also.

5                THE COURT:  Okay, that's nice.  So --

6                MS. HAFFEY:  I think this wasn't one that was an exact

7    double, Your Honor, so it really would take somebody to go

8    through this one.

9                THE COURT:  It's not an exact double.

10               MS. HAFFEY:  No, no, no, no, no, and Mr. Herman says

11   it is either.

12               THE COURT:  So it's just to see whether the dates

13   themselves are bundled, and if they're not bundled the

14   difference would be disallowed.

15               MS. HAFFEY:  Yes.

16               THE COURT:  All right.

17               MR. HERMAN:  But Your Honor, the problem is, you know,

18   it's very difficult to match up and given the fact that a

19   number of --

20               THE COURT:  But why is it difficult to match up?  I

21   mean, just in this case it's like every two weeks or so, so

22   it's all on one day and then two weeks later there's another

23   day.

24               MR. HERMAN:  And I can tell you my client spent quite

25   a lot of time trying to figure it out and couldn't figure it

DPH HOLDINGS CORP., ET AL.

Page 229

1    out.  And you know, the fact that in our position papers we

2    kind of spelled out that there was only eight transfers that

3    overlapped and it looked like there was 100 and some odd

4    transfers that were completely new and we got no response from

5    the debtors on that point.

6              THE COURT:  No, I think -- I mean, we haven't really

7    turned to you yet but I think you are different.

8              MR. HERMAN:  Okay.  Judge, the data, though, as you

9    heard earlier, is not the kind of data that we can match up

10   with the data in the earlier version of the complaint because

11   there were numbers there that Victory Packaging doesn't

12   recognize that were internal numbers used by DAS on their DACOR

13   system.  And so this --

14             THE COURT:  Could --

15             MR. HERMAN:  Maybe dates can match but you can't match

16   invoices, you can't match antecedent debt.

17             THE COURT:  But you can match dates and checks.

18             MR. HERMAN:  Well, you may or may not be able to,

19   Judge.  I don't know that yet.

20             MR. SAYDAH:  Your Honor, on that point of matching

21   dates and checks -- for the record, Gilbert Saydah, Kelley Drye

22   on behalf of BP.

23             Your Honor, I think it's important.  They've said that

24   these are a rollup of dates.  On the original --

25             THE COURT:  A rollout, actually.

Page 230

1          MR. SAYDAH:  What's that?

2          THE COURT:  A rollout of the --

3          MR. SAYDAH:  Rollout, you are correct.

4          THE COURT:  Right.

5          MR. SAYDAH:  Your Honor, with respect to the original

6   exhibits attached, it indicates not only dates and amounts; it

7   also indicates methods of payment.  It's either, for our

8   example for the BP, it was a check and EFT or a wire.  That's

9   also true for the revised complaints or the proposed amended

10  complaints.  But Your Honor, the amounts don't in any way match

11  up.

12          I spoke with Ms. Haffey briefly in the hallway about

13  this and I think we're in agreement; but the issue bound not

14  only by dates and amounts but also by the methods of transfer

15  identified on the original complaint.

16          In the case of Castrol down, the one transfer against

17  Castrol, about 1.5 million dollars, as identified as a check, I

18  believe, on September 26th.  On the original complaint, the

19  only check identified on September 26th was for 586 dollars, I

20  believe.  Thus, Your Honor, that by definition would have to be

21  a new -- and the other transfers on that date don't add up to

22  1.5 million.  There are other wires -- there's a wire and an

23  EFT, but it's not just the amount and the date, it's also the

24  method of transfer that they need to bound by.

25          MR. THOMAN:  Your Honor, this is Jim Thoman on --

1    representing Unifrax.  I think the other complication here is,

2    in the original complaint they fail to allege who the transfer

3    is from.  There's multiple entities.  And that's an additional

4    complicating factor.

5              THE COURT:  But that wasn't your original point.  Your

6    original point was they didn't say who it was to, either, in

7    the first complaint.

8              MR. THOMAN:  Yeah, my point is it's very difficult

9    to --

10             THE COURT:  And I'm more sympathetic with that one,

11   frankly, since the payments are all -- I think were all alleged

12   to have come from DAS.  But if it's -- if -- it in the original

13   complaint the payments were alleged to go to defendant X, and

14   in the other complaint they're alleged to go to defendant Y,

15   then that may be a different issue.  But I think that goes to

16   the adding a new party as opposed to adding a new transfer, a

17   new --

18             MR. THOMAN:  No, they don't specify who the payments

19   went to at all.  So my point is, trying to relate them back to

20   the original complaint is extremely difficult.

21             THE COURT:  Right.  Okay.

22             UNIDENTIFIED SPEAKER:  Your Honor --

23             THE COURT:  Well, does anyone else have that issue

24   besides this gentleman, where they're multiple defendants,

25   where that's confusing?

```
 1              MS. HAFFEY:  Well, there are other complaints, Your
 2    Honor, where there are multiple defendants.
 3              THE COURT:  No, but in terms of figuring out -- on the
 4    relations back issue?
 5              I think you -- it's Unifrax right?
 6              MR. THOMAN:  Correct.
 7              THE COURT:  I think that may be sui generis.
 8              MS. HAFFEY:  Your Honor, I --
 9              THE COURT:  Because of being lumped in with BP.
10              MS. HAFFEY:  I'm sorry?
11              THE COURT:  Because of being lumped in with BP.
12    But --
13              MS. HAFFEY:  I really don't see that any different
14    from when you have other multiple defendants.  The --
15              THE COURT:  Well it's a different entity.  I mean,
16    it's --
17              MS. HAFFEY:  It's not a matter of --
18              THE COURT:  In a sense it's like a newly added
19    defendant, because it's -- you're now saying who it went to.
20              MS. HAFFEY:  But -- which is what this Court asked us
21    to do when we amended our complaints.
22              THE COURT:  No, I understand, but I did -- in terms of
23    the relation -- I didn't deal with relation back at that point.
24    But before we get to the newly-added defendant point; and I
25    think the point there is that they're saying that they're not
```

DPH HOLDINGS CORP., ET AL.

Page 233

1    BP, they're a different entity.  It's not like it's all one

2    ball of wax ultimately, so there's no harm, no foul.

3           MS. HAFFEY:  But if I could just say -- in the

4    original complaint -- they were named as a defendant in the

5    original complaint.  This is not a newly-added defendant.

6           THE COURT:  Right.  But you can't really tell whether

7    you're changing the transfers or not, from the new complaint.

8    Because -- because of that -- it's not like it all went to the

9    same entity.

10          In the old complaint, the complaint that's on file,

11   transfers that are listed on -- as of coming in on August 1st,

12   2005 in the aggregate amount of, say, a million dollars; when

13   you uncouple them there could be 500,000 to BP and 125,000 to

14   Unifrax and they're not the same -- you know, it's not -- it's

15   not the --

16          MS. HAFFEY:  But they were part of the aggregate,

17   though, Your Honor.  So they do relate back.

18          THE COURT:  That's why I think it's more of a sense of

19   a new party than -- but can we -- let's stick for a second on

20   the other points.

21          Why should I be comfortable given what I've heard from

22   Victory and Timken's counsel, that this is something that can

23   be done in a day or -- you know, a day, in terms of just

24   looking at the chart and fixing it?  They're both basically

25   saying that at the end of the day you're asking us -- you're

Page 234

```
 1    asking them to take your word for it that we really have

 2    unbundled from the original complaint?

 3              MR. MILIN:  Your Honor, if I may?

 4              THE COURT:  Because, I mean, Timken's saying that

 5    there really is only like an overlap on eight or so out of

 6    the -- all of them.

 7              MR. MILIN:  Your Honor, we volunteered to provide a

 8    reconciliation.  When we've done so -- we're all in a position

 9    to judge whether we've adequately -- whether the reconciliation

10    shows the requisite relation back.  Otherwise we're just

11    talking in a vacuum it seems to me.  And ultimately that

12    remains -- you know, when we get into the level of detail of is

13    it a check or is it a wire transfer, I certainly don't think

14    you need to decide that today, but I sure don't think that that

15    defeats relationship back if ancillary details --

16              THE COURT:  No, I think that that's probably right.

17    But I am troubled by the notion that this isn't -- that this

18    hasn't already been done; and secondly by the assertion that at

19    least with regard to Timken and perhaps Victory, it's not

20    easily done.

21              I don't know -- what?

22              MR. SAYDAH:  And the fact that we've briefed it and

23    they didn't respond to it --

24              THE COURT:  Right.  Okay.  Were you going to say

25    something, sir, in between?
```

DPH HOLDINGS CORP., ET AL.

Page 235

1          MR. SULLIVAN:  Oh, thank you.  Your Honor -- and I

2     didn't want to jump in before you had fully clarified, but as I

3     understand it, if on a given date in the original complaint

4     there was a transfer for a thousand dollars, and in the amended

5     complaint the transfer had moved to two thousand dollars, I'm

6     understanding that that doubling, at least as we've been

7     discussing it out loud here, could be easily cured according to

8     the plaintiff; and that they would go back to the lower amount?

9          THE COURT:  Right.  That's correct.

10          MR. SULLIVAN:  Okay.  I also understand that if the

11     original amount was a thousand dollars, and the

12     second -- the first amended complaint was 1,013 dollars, that

13     the plaintiff is agreeing that it would -- that it would remove

14     the thirteen dollars; that it would go back to the original

15     thousand dollar claim.

16          THE COURT:  Right.

17          MR. SULLIVAN:  Okay.  So are -- when we're talking

18     about doubling, are we only talking about doubling that has

19     occurred on the same date or are we cross-referencing doubling

20     that might have occurred in other transactions on other dates

21     that appear on another date?

22          So for example, if there was a transfer of a thousand

23     dollars on October 1st and then the amended complaint read that

24     it was two thousand dollars, and then on October 5th you pick

25     up the fact that that same transfer was made on that date,

1    would the October 1st transfer be negated?  Or are we only

2    talking about transfers that double as --

3             THE COURT:  Well, if the October 5th transfer is --

4    doesn't appear anywhere in the original complaint -- if there

5    was no October 5th transfer in the original complaint, then to

6    my mind that's a new transfer and it's -- it's time bar.

7             MR. SULLIVAN:  All right.  I mean, here's

8    the -- here's the other reason why I find this -- this

9    situation unworkable.  Well, I'm going to pause for now.

10            THE COURT:  Okay.  All right.

11            MR. SULLIVAN:  Thanks.

12            MS. HAFFEY:  The hypothetical that was just

13   represented by counsel, I don't believe exists.

14            UNIDENTIFIED SPEAKER:  We can't hear you.

15            THE COURT:  Okay, but if it does exist, I -- it would

16   be a new transaction and wouldn't be covered by the original

17   complaint, so it wouldn't relate back.

18            MS. HAFFEY:  I don't think we have any disagreement

19   with that, Judge.

20            THE COURT:  Okay.

21            MS. HAFFEY:  I think it fits squarely with what --

22            THE COURT:  All right.

23            MS. HAFFEY:  -- we've been saying in regards to --

24            THE COURT:  So I guess the only issue I have here is

25   perhaps only with three complaints.  Timken, Victory Packaging

Page 237

1   and Unifrax.

2          Let's leave Unifrax for a second.  What's your

3   response to their argument that it's too late to fix this?

4          MS. HAFFEY:  I think you actually made our argument

5   for us earlier, Judge, when you stated that we were responding

6   now to the opposition to the motions; and we are.  In various

7   conversations I've had with counsel we've talked about -- and I

8   don't want to get into negotiation discussions, but looking at

9   the original complaint value, in regards to -- so I don't think

10  it's too late.

11         THE COURT:  Okay.

12         MS. HAFFEY:  We've brought it to the Court's attention

13  that there were some first --

14         THE COURT:  So -- so let's go to the second point,

15  which is -- we're not talking about two or perhaps three

16  complaints to do -- well, that is more than just a mechanical

17  exercise, I think.

18         MS. HAFFEY:  I'm sorry; I didn't understand your

19  point.

20         THE COURT:  Well, the Merrill complaint you showed

21  me --

22         MS. HAFFEY:  Yes.

23         THE COURT:  -- you know, a paralegal could do that in

24  about an hour, right?

25         MS. HAFFEY:  Hopefully, yes.

DPH HOLDINGS CORP., ET AL.

Page 238

1          THE COURT:  Or less.  Or less, I would hope.  So, you

2     know, a couple days to do all of these except for Timken and

3     Victory's is probably, you know, in order.  Because it's

4     just -- you just go through the schedule.  And where it's

5     obvious it's obvious, then you add them up by day and you

6     compare them to the schedule.

7          MS. HAFFEY:  That's correct.

8          THE COURT:  On Timken and Victory, it's clearly going

9     to take longer and there's more potential for dispute, I guess,

10    about the outcome.  But to me it still should -- I would think

11    it could be done by Friday.  I mean, I don't see why it

12    shouldn't.

13         MS. HAFFEY:  We'll have it done by Friday.

14         THE COURT:  Okay.  And if, you know, if the numbers

15    don't match up, I think that's the end of it, as far as the

16    difference.  The only remaining point is whether -- and this

17    goes I think to Unifrax's point as well.  Given that the

18    numbers don't -- if the numbers really don't match up by a lot,

19    then conceivably there's something wrong with the whole

20    process, so that in fact these -- even the ones that are on the

21    same day but are quite different what would be on the -- in the

22    original complaint, could quite conceivably be totally brand

23    new.  That the first complaint was just off by a lot.

24         So that, I mean, that issue troubles me.  I don't know

25    what we'd do with that.  It would seem to me that that -- at

DELPHI SAVINGS CORP., ET AL.

Page 239

1    that point there maybe really is just an insurmountable

2    plaintiff at that point.

3              I don't know if that's going to happen, but

4    conceivably it would.  I mean, that's basically what Mr.

5    Sullivan is telling me.  Right?

6              MR. SULLIVAN:  Correct, Your Honor.  And you know,

7    it's still troubling to me though that they never responded --

8              THE COURT:  Well that's a --

9              MR. SULLIVAN:  -- and now they're asking for another

10   opportunity.

11             MS. HAFFEY:  You know, I --

12             THE COURT:  -- I know you're troubled.  But --

13             MR. SULLIVAN:  You can't blame me for trying, Your

14   Honor.

15             THE COURT:  All right.

16             MS. HAFFEY:  And --

17             MR. SULLIVAN:  But --

18             THE COURT:  I guess I'm trying to give you all clear

19   guidelines for -- so that no one has to come back here for an

20   additional hearing on this issue.  And it seems to me, you

21   know, if there is a big difference after you do this exercise

22   between the numbers for say July 14th in the original Victory

23   complaint, and the numbers for July 14th after you pull out any

24   potential double counting in the current complaint, then it --

25   I don't see how you're going to show that's the same

Page 240

```
1    transaction.  Because they're just so different at that point.

2               MR. MILIN:  Your Honor, with that said the plaintiffs

3    cannot carry their burden on the motion to amend today, until

4    at least they finish that task.

5               THE COURT:  Yeah, I think that's right.

6               MR. MILIN:  And secondly, Your Honor, you want to

7    be -- please be very specific on what they have to produce and

8    how they're going to match -- match, you know, the first chart

9    to the second chart so that -- somewhat can follow it, so we

10   don't get numbers again that have no meaning.

11              THE COURT:  No, I am assuming it would have to be --

12              MS. HAFFEY:  By date --

13              THE COURT:  -- I guess a blackline.  You know, a

14   melding of the two charts.  I -- you tell me.

15              MR. SULLIVAN:  The only think I can think of, Your

16   Honor, if they say what they did is they broke out transactions

17   out of the first chart, they can list the transactions from the

18   first chart and then list underneath it all the transactions in

19   the second part that are components of the transactions listed

20   on the first chart.

21              THE COURT:  Yeah, I guess --

22              MS. HAFFEY:  I think that's right.

23              THE COURT:  Okay.

24              MR. SULLIVAN:  That's the only way to do it.

25              THE COURT:  All right.  That makes sense.  Although
```

1    you -- you know, one would be in red and one would be in blue.

2            MR. MILIN:  One could be in red and one could be in

3    blue and the orphans could be in green.

4            THE COURT:  Okay.

5            MR. MICHAELSON:  Your Honor, if I may be heard.  There

6    are a lot of capable voices -- this is Robert Michaelson for

7    NXP.  There are a lot of capable voices arguing this point, and

8    I patiently listened.

9            Just so there's no mistakes concerning my client's

10   positions, which are similar to Mr. Sullivan's and Mr.

11   Hermann's to a somewhat lesser degree, okay --

12           THE COURT:  Okay.

13           MR. MICHAELSON:  -- compared to our large network.

14           THE COURT:  All right.  Well maybe I should give the

15   debtors until Friday to every one of these.

16           MR. MICHAELSON:  Right.  I just wanted to make sure

17   that you were aware that the debtor is aware that we felt we

18   were --

19           THE COURT:  All right.  As opposed to distinguishing

20   between people and say some should be done by tomorrow, and

21   some should be done by, you know -- why don't we have everyone

22   be done by Monday?

23           MS. HAFFEY:  You read my mind, Your Honor.

24           THE COURT:  All right.

25           MS. HAFFEY:  We're out traveling until tomorrow --

Page 242

1          THE COURT:  All right.

2          MS. HAFFEY:  So I was going to ask for Mon --

3          THE COURT:  Yeah, everyone done by Monday.

4          MS. HAFFEY:  Thank you.

5          THE COURT:  But -- can I go back to Unifrax now?

6    I -- Unifrax's position, as I understand it, is that it's

7    lumped in with the BP entities, when it really shouldn't be.

8    And because of that it can't really sit down and review these

9    numbers in the way that we've just described, because it would

10   basically have to sit down with BP to do that.  Am I right?  Is

11   that really the point?

12         MR. THOMAN:  Yes, Your Honor.  It -- because they

13   failed to allege who the transfers went to, either a BP entity

14   or Unifrax in the original complaint; and now in the amended

15   complaint they -- they've -- you know, some go to BP entities,

16   some go to Castrol, some go to Unifrax.

17         THE COURT:  Well if they do the same exercise and

18   provide that information at the same time to you and BP, so you

19   can see that they're not doing the same thing with each one --

20   I mean, or doing different things with each one, then doesn't

21   that solve that problem?

22         MR. THOMAN:  If --

23         MS. HAFFEY:  And we would do that, Your Honor.

24         MR. THOMAN:  If Your Honor's willing to give them

25   another bite at the apple I suppose it could.

Page 243

```
 1              THE COURT:  Okay.  All right.  I think that's what
 2      should happen.
 3              We still haven't dealt with adding new defendants,
 4      though.  Like Castrol, for example.
 5              MR. SULLIVAN:  Correct, Your Honor.  I was just also
 6      seeking clarification with respect to that the blackline will
 7      also line up methods of payment by day.  So on a certain day,
 8      EFT's will be lumped, wires will be lumped, checks will be
 9      lumped.
10              THE COURT:  Well, why does that matter if the amounts
11      are the same?
12              MR. SULLIVAN:  Well, Your Honor, in our case it -- the
13      amounts are vastly different, but -- Your Honor, it goes to the
14      basis of what their original assertion was in the original
15      complaint.
16              THE COURT:  No, but if the amounts that were received
17      in the aggregate for that day are the same, what -- I mean,
18      it's the fact that the -- it's the fact that the money was
19      paid, no how it was paid, that ultimately counts, right?
20              MR. SULLIVAN:  You're --
21              THE COURT:   I mean, I would think that the same
22      transaction requirement is never altered for relation back,
23      just because complaint one said got a check and complaint two
24      said a wire transfer.  I mean, it's essentially -- it's a
25      payment, ultimately.
```

Page 244

1          MR. SULLIVAN:  It is a payment, Your Honor, but in the

2     original complaint it was identified as a distinct item, or a

3     distinct type of payment, whereas here they're changing that.

4     So it doesn't relate back to that.

5          When they've gone out of their way in their original

6     complaints to specify wire, EFT or check, that should still

7     correspond back and be one of the items that relates back.

8          MS. HAFFEY:  And we would agree with you Judge, that

9     there's not a -- the requirement to have to plead that we added

10    onto the exhibit to deprive it -- to provide more additional

11    information to benefit the supplier -- the defendant group to

12    identify these payments, but whether it said wire or EFT the

13    first time, and now it says EFT, I mean, there's --

14         THE COURT:  I think it's the --

15         MS. HAFFEY:  -- they're just frankly the same types of

16    payments.

17         THE COURT:  I think it's the payment -- look.  If it's

18    a different amount -- if the complaint lists 125 transfers,

19    where before on that same day they aggregated as 1, but the

20    aggregate amount is the same, I don't think it matters that in

21    the first complaint it said check and in the latter complaint

22    it said ETFs.  It's a payment made on that day.  I mean, it --

23         MR. SULLIVAN:  I understand, Your Honor.

24         THE COURT:  I just think it's a -- I mean, it's

25    different, I think, qualitat -- quantitative -- qualitatively,

1   than materially, saying you know, it was a diff -- it doesn't

2   matter how the transfer was made, it's that there was a

3   transfer.

4           On the other hand, if it looks like it was a different

5   amount that was paid that day, then it may be relevant.

6           MR. SULLIVAN:  Your Honor, I --

7           THE COURT:  I mean, for the debtors to try to show the

8   other side, but I think you're -- you don't even need it then.

9   It doesn't matter if they made it -- if they paid a thousand

10  dollars on day one by check and they say that they paid two

11  thousand dollars on day one now by check.  The fact that it was

12  made by check doesn't matter.  It's still very -- over a

13  thousand dollars -- there's a problem.

14          MR. SULLIVAN:  Correct, Your Honor.  It's just -- our

15  concern is that in the original complaint it said there was a

16  check on a certain date for 500, and now it says there's a

17  check on that date for 1.5 million.

18          THE COURT:  Well, that's a problem.  But that's

19  because --

20          MR. SULLIVAN:  It is.

21          THE COURT:  -- there's a difference between 500 and

22  1.5 million --

23          MR. SULLIVAN:  Correct, Your Honor.

24          THE COURT:  -- not because one was a check and one was

25  an ETF.

DPH HOLDINGS CORP., ET AL.

Page 246

1           MR. SULLIVAN:  But there are also ETFs on that day and

2    a wire that add up, I think, to 1.1 which again, there is still

3    a 400,000 dollar problem but.

4           THE COURT:  Okay.  All right.  Well, again, if there's

5    a material difference, if we're not talking about, you know,

6    pennies here, but if there's a material difference then I think

7    we're in the realm of what Mr. Sullivan is saying which is we

8    can't trust that you really are unbundling and I think that's a

9    real problem for the debtors in terms of relation back.

10          MR. MILIN:  Your Honor, we understand what -- that we

11   need to provide a reconciliation and I'll repeat what I said

12   before that until that happens we're talking in the abstract --

13   you know, the Rule 15 relationship back standard's fairly well

14   developed in the law.

15          THE COURT:  Okay.  But I can't -- I cannot -- I will

16   hold off on my ruling on the relation back issue until -- well,

17   you need time to review it -- till next Friday a week from

18   today.  So, you'll get this information by Monday and we'll

19   check with people on Thursday as to whether I should rule or

20   not.

21          If you all want to submit -- I mean my hope is that

22   everyone will reach agreement that may well be a vain hope for

23   a lot of people but if you need a ruling and you need more time

24   then I'll delay it further but I guess I want a reality check

25   by next Thursday and then we'll contact the parties then.

DPH HOLDINGS CORP., ET AL.

Page 247

1          It would be useful, therefore, to have for the debtors

2     a list of all of the objectors who have raised the relation

3     back point so that we know who we're dealing with here.  So,

4     you all should give that information to the debtors.  Not

5     everyone raised this point.  All right.  So, I would assume by

6     the end of the day tomorrow you'll have alerted the debtors'

7     counsel to the fact that you raised this issue in your

8     pleadings and point them to where you raised it so they'll have

9     your contact information, can send you the chart they're going

10    to assemble, the reconciliation.  Okay?  All right.

11          MR. MILIN:  Your Honor, a few other relation back

12    issues and you've mentioned the defendant relationship back.

13    First, some confusion on our end.  We thought there was a

14    mention of Castrol or a Castrol entity.

15          THE COURT:  Right.

16          MR. MILIN:  I'm looking at the complaint and the first

17    amended complaint and the captions look the same.  Perhaps I'm

18    missing something.

19          THE COURT:  Right.  I thought BP alleged that they

20    added Castrol.  Maybe I was wrong.

21          MR. MILIN:  I can -- there are defendants who've

22    raised the issue.  The one that I know of standing here is

23    Wells Fargo so the issue arises.  I just don't see that it's a

24    Castrol.

25          THE COURT:  Okay.  Did I read that wrong?

1           MR. SULLIVAN:  Your Honor, for clarification, I don't

2    believe that we asserted that Castrol was added.

3           THE COURT:  Okay.

4           MR. SULLIVAN:  I think it came out of the confusion

5    with Unifrax saying it's like Your Honor's comment.

6           THE COURT:  Okay.

7           MR. SULLIVAN:  It was like adding another.

8           THE COURT:  All right.  So are we just -- who are

9    dealing with, then, as far as the objectors on the new parties

10   issue?  New defendants?

11          MR. SULLIVAN:  Your Honor, actually, can I throw in

12   one more additional wrinkle?

13          THE COURT:  Okay.

14          MR. SULLIVAN:  On the BP Unifrax there's also a

15   defendant BP Microsystems which isn't affiliated with BP and

16   they're listed as resolved.

17          THE COURT:  Okay.

18          MR. SULLIVAN:  So, there's --

19          THE COURT:  Right.

20          MR. SULLIVAN:  -- three entities that need to be

21   broken out.

22          THE COURT:  Right.  That's right.  You need to carve

23   them out of these transfers.

24          MR. SULLIVAN:  And I'm curious because the agenda

25   actually shows that Unifrax is resolved so I need to call Mr.

Page 249

1    Thoman and see why he's on the phone still but --

2            MR. THOMAN:  I can assure you we are not resolved.

3            MR. WURST:  Good afternoon, Your Honor, Ruskin Moscou

4    Faltischeck, Jeff Wurst on behalf of Wells Fargo Bank.  We are

5    one of two Wells Fargo issues that are here today.  We're

6    seated with our colleagues who are here for another division of

7    the bank but we are the group that falls into this category

8    originally named -- the original complaint names our defendant

9    as Wells Fargo Business and Wells Fargo Minnesota.  The

10   amended complaint names us a Wells Fargo Bank, N.A.  So, just

11   to preserve that issue on the record, I'll bring it forward

12   now.

13           THE COURT:  Okay.

14           MR. MILIN:  May I respond, Your Honor?

15           THE COURT:  Yes.

16           MR. MILIN:  It's pretty straightforward.  Wells Fargo

17   did object and they rely on the case of Schiavone v. Fortune,

18   477 U.S. 21 and they argue that the rule, being Rule 15, and

19   they're quoting Schiavone "Does not allow an amendment to a

20   complaint that adds dependents who are not named originally due

21   to a lack of knowledge on the part of the plaintiffs as the

22   lack of knowledge."

23           A year ago, the Supreme Court decided Krupski v. Costa

24   Crociere.  That's K-R-U-P-S-K-I and C-O-S-T -- excuse me;

25   C-O-S-T-A, separate word, C-R-O-C-I-E-R-E, 130 Supreme Court

DPH HOLDINGS CORP., ET AL.

Page 250

1   2485 (2010).

2          THE COURT:  All right.

3          MR. MILIN:  Schiavone is now bad law.

4          In Krupski the Court hold -- held the question under

5   Rule 15(c)(1)(C)(ii) is not whether Krupski knew or should have

6   know of the identity of the new defendant as the proper

7   defendant but whether the new defendant knew or should have

8   known that it would have been named as a defendant but for an

9   error.

10          Rule 15(c)(1)(C)(ii) asks what the prospective

11   defendant knew or should have known during the Rule (4)(m)

12   period not what the plaintiff knew or should have known at the

13   time of filing her original complaint.  And so Wells Fargo

14   argument is simply cites the wrong legal standard and they

15   don't address the issue under the right legal standard.  And

16   clearly when plaintiffs -- when the debtors originally

17   inadvertently apparently named divisions or BBAs of Wells Fargo

18   instead of the actual Wells Fargo, we were mistaken as to the

19   name of who we were paying money to.

20          The transactions were identified when clearly Wells

21   Fargo was in a position to know that we were complaining about

22   transactions that we filed then and under Krupski that's the

23   relevant question.

24          MR. WURST:  Counsel raises some very interesting

25   points, however, if we take a look at what Wells Fargo knew or

DPH HOLDINGS CORP., ET AL.

Page 251

1    should have known the fact is that at the time the case was

2    commenced and at the time that -- years -- years later when

3    Wells Fargo was served with the complaint, Wells Fargo knew

4    nothing about the Delphi case.  Wells Fargo did not provide

5    goods nor services to this debtor.  It was simply a factor to a

6    company that provided goods or services to the debtor; a

7    company that is -- a company or two companies that are long

8    defunct.  So, we'll get to those issues, that was the other

9    point I would raise, when we get to prejudice which Your Honor

10   raised much earlier this morning.  But at the time the

11   complaint was filed and at the time the complaint was served

12   some years la -- two and a half years later, Wells Fargo did

13   not know about the existence of the Delphi bankruptcy, they had

14   no reason to. So, the burden really is on the debtor to have

15   gotten his facts straight.  They were the ones making the

16   payment to Wells Fargo for the account of the defunct account

17   debtor but -- Wells Fargo's account debtor or facted client.

18   So, I don't necessarily buy counsel's argument.

19          MR. MILIN:  Your Honor, it's not part of my argument,

20   it's part of the Supreme Court's decision in Krupski which

21   makes clear what the pertinent issue is.  That is --

22          THE COURT:  But counsel is basically saying they

23   didn't know anything about the complaint whether there was a

24   mistake or not because they didn't see it.

25          MR. MILIN:  Well, I guess I'm confused.  If, in fact,

Page 252

1    the claim is that we named -- we filed a complaint against

2    Wells Fargo Business and Wells Fargo Minnesota and the current

3    defendant knew absolutely nothing about it at that time, I find

4    that perplexing and I suppose it's a fact issue.

5            If the argument -- I think what the argument is is

6    simply repackaging an issue that isn't up today which is the

7    alleged prejudice that flows from the procedural history of

8    this case.  And if that's the case, I think that's for another

9    day.

10           THE COURT:  Okay.  I guess the -- I understand the

11   latter point.  I just want to go back though -- just a second.

12       (Pause)

13           THE COURT:  I guess ultimately is the mistake

14   versus -- well, is the knowledge of -- the plaintiff here, I

15   think, is largely irrelevant on this -- under these particular

16   facts, right.

17           MR. MILIN:  Well, I think under Krupski, yes.

18           THE COURT:  Because there was nothing that the

19   defendant knew at all so it wouldn't be relevant.

20           MR. MILIN:  Well, I --

21           THE COURT:  The focus is on what the defendant would

22   have taken away from the filing.  Since the defendant didn't

23   see the filing it wouldn't have taken anything away from it.

24   It wouldn't have garnered any information from it at all

25   because it didn't have it.

DPH HOLDINGS CORP., ET AL.

1            That Krupski puts the focus on what's the debt the

2    defendant garners by way of information from the inaccurately

3    named defendant in the complaint.  There was nothing for the

4    defendant here to take away from the inaccurately named

5    complaint because it didn't have it.

6            MR. MILIN:  Well, I guess I don't understand that.

7            THE COURT:  So, I'm saying it's irrelevant.  That

8    factor doesn't seem to fit into this analysis at all at this

9    point.

10           MR. MILIN:  I think for the first time today I'm not

11   following.

12           THE COURT:  All right.  Well --

13           MR. MILIN:  Let me try it again.

14           THE COURT:  Okay.

15           MR. MILIN:  The question under Krupski is whether when

16   Wells Fargo Business and Wells Fargo Minnesota received a

17   complaint whether Wells Fargo recognized that we're the legal

18   entity not these other names on the complaint and so we're the

19   intended defendant.

20           The fact that Wells Fargo upon realizing that

21   someone's intending to sue us said we don't understand what

22   we're being sued for is not the question under relation back.

23   I mean assuming for sake of argument that that was their

24   reaction.  I mean when you -- you know, again, I find it

25   hard -- first of all, I didn't hear counsel for Wells Fargo say

DPH HOLDINGS CORP., ET AL.

Page 254

1    but in any case I certainly find it perplexing that when they

2    got the complaint that they didn't understand that it was the

3    legal entity and not the incorrectly named nonlegal entity that

4    was intended to be sued in this lawsuit.

5            THE COURT:  Okay.  Well, all right, I understand that.

6    So, when they ultimately learned of the complaint, you're

7    saying that their understanding was that they were the ones who

8    were meant to be sued?

9            MR. MILIN:  Um-hum.

10           THE COURT:  Okay.

11           MR. MILIN:  And I think that's the question that

12   matters under Krupski.

13           THE COURT:  So, what's the response on that?

14           MR. WURST:  As much as those of us related to finance

15   consider Wells Fargo to be a great trade name if we Google --

16   well, maybe not Google because Wells Fargo pays a lot of money,

17   I'm sure, to be well-recognized, if you look on a -- in the

18   proverbial Yellow Pages or White Pages, there are many

19   different Wells Fargos.  My home alarm company happens to be a

20   company called Wells Fargo Alarms.  So, there are many

21   businesses around the country that are named Wells Fargo --

22           THE COURT:  But in terms of ones that have

23   relationships with Delphi?

24           MR. WURST:  Well, the problem, Judge, --

25           THE COURT:  And is --

1           MR. WURST:  -- is that Wells Fargo, you know, is a

2    pretty big bank and its relations with Delphi were real small.

3    It took an incredibly long time for the people crunching

4    through the computers to find what the nexus was.

5           THE COURT:  To me --

6           MR. WURST:  So -- I do want to respond to counsel's

7    comment that we did not address this paragraph 63 of our

8    papers.  It does address it.  I'm not going to take your time

9    of -- because too much time has been taken on side stuff but we

10   do address it, we do address the legal standards, we do address

11   Anderson against Allstate and Thurman.  So, I'll leave

12   paragraph 63 of our brief to respond to that but --

13          THE COURT:  Do you -- I guess my --

14          MR. WURST:  -- the fact is it was not an easy find.

15          THE COURT:  But I -- to me I think that's a fact issue

16   that we need to develop in a hearing along with prejudice.

17          MR. WURST:  It still comes down to notice issue.  And

18   again, what makes Wells Fargo different from others is that if

19   we look at the service of process they were not served with any

20   motion, they were not served with any of the extension motions,

21   any of the 4(m) motions --

22          THE COURT:  All right.  But that --

23          MR. WURST:  -- they were not served with the plan of

24   reorganization --

25          THE COURT:  Right.

1          MR. WURST:  -- with the disclosure statement.  They

2     had no notice of these proceedings until April of 2010 when

3     they were served with this complaint.

4          THE COURT:  All right.  Okay.

5          So, that issue is still -- the issue of relation back

6     here is still a live issue.  It needs to be developed on the

7     facts as far as Wells Fargo is concerned.

8          MR. MILIN:  Okay.  And, Your Honor, I believe those

9     are the only relation back issues that relate to the complaint.

10    Obviously, if there's a further amended -- relate to the

11    pending amended complaint a further amendment is allowed,

12    there's hypothetical other issues that might arise but I assume

13    you don't want to hear hypothetical other issues.

14         THE COURT:  Okay.  All right.

15         Okay.  So, what remains?  Are we at the fourth

16    extension challenge or are there other issues still on the

17    motion to amend?

18         MS. HAFFEY:  I believe so, Your Honor.

19         MR. SULLIVAN:  Your Honor, James Sullivan counsel for

20    Timken.  I don't know if now is the time you want to address it

21    but with respect to futility, we still have the issue that the

22    debtors did not comply with Your Honor's directives at the

23    December 17th hearing to brief individualized issues.

24         THE COURT:  Well --

25         MS. HAFFEY:  And then again, I thought we --

1          THE COURT:  I think we've dealt with that.

2          MR. SULLIVAN:  Maybe I came back late from the

3   bathroom and I apologize, Your Honor.

4          THE COURT:  Well, to br -- I mean there are factual

5   issues that I've given them until -- specific dates to deal

6   with.

7          MR. SULLIVAN:  Did you deal with dates on the

8   calendar?

9          THE COURT:  Yes.

10         MR. SULLIVAN:  Okay.  So, I must have been in the

11  bathroom.  I apologize.

12         THE COURT:  I don't think you were.  I was looking

13  right at you.

14         MR. SULLIVAN:  I have no dates written in my --  in

15  my --

16         THE COURT:  I said by next Monday they have to provide

17  the charts and we'll check with the lawyers who give counsel

18  their names as to the different amounts by -- on Thursday to

19  see if I should be ruling or not.

20         MR. SULLIVAN:  Well, on relation back, Your Honor, I'm

21  talking about other issues like laches and judicial estoppel

22  and other kinds of arguments that were briefed and that you

23  ordered them to be briefed and they decided not to.

24         MS. HAFFEY:  Then again --

25         THE COURT:  Well, let me turn to my order.

Page 258

1              MR. SULLIVAN:  Well, it was in the transcript.  It

2       wasn't in the order, Your Honor.  It was in the December 17th

3       hearing.  And in the Togut sur-surreply, they basically

4       acknowledged that since your December 17th oral ruling was not

5       in the order they decided that they -- that they felt it was

6       optional whether or not they wanted to comply with it.  That's

7       basically what the Togut sur-surreply replies said.

8              MS. HAFFEY:  Well, that --

9              THE COURT:  Well, I think that's a good point.  I

10      mean, the order governs this.

11             MS. HAFFEY:  I would not agree that that is the

12      reorganized debtors' position at all, Your Honor.

13             THE COURT:  Well, all right.

14             MS. HAFFEY:  We think the hearing, this Court made

15      clear that what we were dealing with today were the Twombly

16      Iqbal pleading standards.

17             THE COURT:  Well, that's what my order -- that's why I

18      said I think the order governs.  Well, the two orders.  There's

19      the December one and there's the --

20             MS. HAFFEY:  The Dec -- the September 7th --

21             THE COURT:  -- and there's the September one.

22             MS. HAFFEY:  Right.

23             THE COURT:  And I think neither of them requires a

24      pleading on laches.

25             MR. SULLIVAN:  Well, your December 17th -- if during

DELPHI DINGS CORP., ET AL.

Page 259

1   the status conference on December 17th and we briefed it my

2   surreply and I quoted all the relevant provisions in your --

3   in -- from the transcript, you know, I personally would take an

4   oral direction during a hearing from Your Honor as being an

5   order.  Perhaps it wasn't reflected in the order but I wouldn't

6   view that as being an optional kind of thing which I could so

7   cavalierly disregarded, Your Honor.  That's just my thought.

8        (Pause)

9           MR. SULLIVAN:  If you look in my surreply that I --

10          THE COURT:  No, I'm rea -- I'm looking at it right

11   now.

12          MR. SULLIVAN:  It's at the bottom of page 2.

13          MS. HAFFEY:  If I can remind the Court this morning, I

14   pointed the Court to paragraph -- one of the paragraphs is

15   32nd -- 36, excuse me, where this Court said, "I understand

16   that people like to have a complete resolution on that

17   particular claim.  But I don't think that can happen on an

18   omnibus basis.  What could happen is an analysis of the amended

19   complaint, whether it's on its face it's unlikely to succeed

20   and/or fail on the Twombly Iqbal standards, and that's already

21   been briefed.  And it's quite possible that by the time the

22   hearing on the 17th is over we'll be down to, just as we've

23   already come down to in the claims that were issued this

24   summer, to a smaller amount."

25          And what the Court was talking about there is there

1   are -- were remaining issues from the July -- excuse me --

2   yeah, it's the July hearing.  And the question was whether or

3   not we were going to be discussing laches prejudice at this

4   hearing.  And the determination, it was our understanding, that

5   that was not going to be the case.

6           THE COURT:  I don't -- I don't think that you could --

7           MR. SULLIVAN:  I have the transcript.

8           THE COURT:  -- I don't think you can default on the

9   basis of this.  I mean, we set up what would be at issue in

10  this hearing.  I don't --

11          MR. SULLIVAN:  Right, but there was a long discourse

12  about whether or not we were going to require them to brief all

13  the issues, but we thought it would help lead to a resolution

14  of the process even if we weren't going to be having

15  individualized hearings at today's hearing, Your Honor.  And,

16  you know, certainly --

17          THE COURT:  Well, that's not on page 2 of your motion,

18  that long discourse.

19          MR. SULLIVAN:  Pardon me?  I didn't quote the whole

20  discourse, Your Honor.  But I thought that that was enough of

21  it for you to get the flavor.  But --

22          THE COURT:  It's not.  It doesn't say anything about

23  briefing.

24          MR. SULLIVAN:  Well, I have the transcript, Your

25  Honor.  You can probably go back a page or two on it to

Page 261

1    probably to get the flavor of it.  If you'd like, I can quote

2    it.  But that was the briefing why you ordered them to brief

3    all these issues, because it was going to help --

4              THE COURT:  Where's the order?

5              MR. SULLIVAN:  -- resolve all the issues.

6              THE COURT:  I don't -- what order?

7              MR. SULLIVAN:  I meant the oral -- I'm sorry, I

8    probably --

9              THE COURT:  All right, why don't you show me the

10   section of the transcript that you're referring to?  Clearly,

11   this supplemental objection just doesn't cut it on that.  It

12   just doesn't say that on page 2.

13             MR. SULLIVAN:  Your Honor, if you look at the brief, a

14   surreply that the Togut firm's filed, basically acknowledged --

15             THE COURT:  I'm trying to figure out what you wrote.

16   I just don't see it.  It's not on page 2.  There's nothing

17   about directions from me to brief anything.

18             MR. SULLIVAN:  Okay, the quoted language -- you know,

19   I think this goes not, but I guess --

20             THE COURT:  They've already dealt with the laches

21   issues.  They've basically said there's no laches --

22             MR. SULLIVAN:  Your Honor --

23             THE COURT:  -- because they're relying on my 4(m)

24   orders.  It's already -- I told people in September or actually

25   in July when we had the argument.  You don't have to brief any

DPH HOLDINGS CORP., ET AL.

Page 262

1    of this all over again.  It's already in the record; your

2    positions and their positions on 4(m).  And laches is just, you

3    know, a tail of that.

4            MR. SULLIVAN:  Well, it's just one of the issues.  I

5    mean, I think if you call the defendants here, I think they

6    would all probably -- what they took away from it, Your Honor,

7    was that they were going to have to brief all the issues.  And

8    even the Togut firm, when they submitted the tertiary reply,

9    they basically acknowledged the fact that, you know, your

10   directive -- they acknowledged that your directive required

11   them to brief these issues, but yet they felt --

12           THE COURT:  Well, you have a chart.  It says

13   antecedent debt.  We dealt with that.  Not more than Chapter 7;

14   we dealt with that.  Transfer from a non plaintiff; we dealt

15   with that.  Rule 15 relation back, alleged transfers on account

16   of assumed contracts, and alleged transfers on account of

17   previously released claims; we dealt with all of these things

18   on your chart, none of which is laches.

19           MR. SULLIVAN:  Your Honor, I have a second chart on

20   there as well.  And at the bottom, I have a footnote.  It says

21   this charts lists some but all -- but not all of defendants'

22   objection to which plaintiffs failed to respond.

23           Additionally, for example, at least forty defendants

24   raised laches to which plaintiff acknowledged by footnote, they

25   failed to address.

1          THE COURT:  They're already addressed it.  They -- we

2    dealt with this last summer.

3          MR. SULLIVAN:  They never specifically

4    individualized -- addressed the argument that Timken raised.

5    That's for sure, Your Honor.

6          THE COURT:  It's the same point.

7          MR. SULLIVAN:  They never responded, Your Honor, and

8    they didn't respond a month -- a year ago --

9          THE COURT:  Their response is they got an order.

10          MR. SULLIVAN:  -- and they didn't respond -- Pardon?

11          THE COURT:  Their response is they got four orders,

12    and I said that issue is still a live issue.

13          MR. SULLIVAN:  My -- the present argument has nothing

14    with the four extension orders, Your Honor.  They were supposed

15    to respond to each individualized argument that --

16          THE COURT:  No.

17          MR. SULLIVAN:  -- the defendants raised --

18          THE COURT:  What is -- just briefly.  What is your

19    laches argument?

20          MR. SULLIVAN:  The primary issue, dealing with is

21    prejudice, is the fact that the -- at or about the time that

22    the preference action was brought, Timken had just sold its

23    claim for 102 cents on the --

24          THE COURT:  We dealt with that.  It's on the

25    transcript.  I read it yesterday.  I reread the July

1    transcript, and we dealt with that issue then.  There's no

2    reason why they had to respond to it again.  We dealt with it.

3    Remember?

4           We had the whole talk.  Why would someone buy your

5    502(h) for more than a hundred cents on the dollar when it

6    presumes that there's been a preference, and therefore showing

7    that there's less recovery?  We went through all that.

8           MR. SULLIVAN:  Your Honor, then I'm not sure what the

9    quoted language deals with.  Why would they have to respond

10   with a few --

11          THE COURT:  Well, all right.  Give me the quoted

12   language, because the language you've quoted on point 2 just

13   doesn't say that.  Just give me the transcript section that

14   you're relying on.

15          MR. SULLIVAN:  Okay.  It's on page 40 --

16          THE COURT:  No, no.  I -- you're going to have to --

17   just give me the section of the transcri -- give me the

18   transcript's pages that you're relying on, because --

19          MR. SULLIVAN:  Your Honor, this counsel behind me are

20   asking if we can get, like, a couple of minutes break so we

21   could kind of maybe highlight the language for you.  Would that

22   be a --

23          THE COURT:  Why don't just someone gi -- I could read

24   it while you're highlighting.  Someone give me a copy of it.  I

25   mean, I know it's here because someone gave me their version of

1    it --

2              MS. HAFFEY:  I did, Your Honor.

3              THE COURT:  -- several hours ago.

4              MS. HAFFEY:  Now, I'm having trouble finding it,

5    because I don't happen to have --

6              THE COURT:  Right.  Wait a minute.  Wait a minute.  I

7    know it's here somewhere, actually.  And it should be loose.

8    I'll take a look.

9         (Pause)

10             MR. SULLIVAN:  Your Honor, I guess -- here's a copy of

11   the transcript.  And it really -- the discussion really starts

12   on page 40.  I only quoted direct -- what I thought was the key

13   language on page 42.

14             MS. HAFFEY:  And it actually --

15             MR. SULLIVAN:  Start on page --

16             MS. HAFFEY:  -- starts earlier.

17             MR. SULLIVAN:  -- 40 just to give a little bit of

18   background.

19             MS. HAFFEY:  It actually starts on page 38.  Would you

20   like a copy, Your Honor?  We have another --

21             THE COURT:  No, I'm just -- I'm sure I'm completely

22   compulsive here.  I just hate things seemingly evaporate when I

23   know they were handed to me, but you've given me the new --

24   another copy.  So let me take a look here.

25        (Pause)

DPH HOLDINGS CORP., ET AL.

Page 266

1           THE COURT:  Okay.  I still -- I'm still not -- don't

2      understand your point, Mr. Sullivan.

3           MR. SULLIVAN:  I mean, Your Honor, even Togut, in

4      their --

5           THE COURT:  No, no, no.  Let's skip what Togut said,

6      okay?  He -- first of all, the counsel from Togut here

7      disagrees with you about what he said.  But, I mean, we're

8      talking about -- starting on page 39, Mr. Winsten says well, my

9      concern, Your Honor, is that Delphi is only filing an omnibus

10     brief on the few global issues in advance of February 17 and is

11     not responding to the individualized issues that have been

12     raised by each of the defendants that we really aren't

13     advancing the ball in terms of getting these cases resolved.

14          Okay, and then I say after he repeats himself well, I

15     need to -- I need to distinguish what you're referring to as

16     the individualized issues.  If they're issues about notice, I

17     think we've already addressed that.  If they're issues about

18     the merits or the preference claim; he says yes.  I say you

19     know, I guess I have a hard time dealing with that except with

20     regard to assumed contracts and the solvency issue that you've

21     raised in an omnibus hearing.

22          Oh, no, Your Honor, I'm saying something else, he

23     says.  I'm not saying that the case-by-case gets dealt with on

24     February 17th.  What I'm saying instead is this:  I'm

25     suggesting, in fact urging, that Delphi be required in each of

Page 267

1    these seventy-seven cases to respond to all of the arguments

2    raised by each of the defendants, including the case-by-case.

3           And you know they can file an omnibus on the few

4    global issues, but there ought to be individualized briefs in

5    each -- on each issue, forcing them to focus on these cases

6    because at some point we're going to have a case-by-case

7    hearing.  And so, they're going to have to do it in any event.

8    And I think it would be a very positive event.

9           So then I say well, can you give me a couple of

10   examples on specifically what you're talking about?  Sure.  On

11   Affinia, for example, they're suing Affinia for five million.

12   And on three of the five million, the antecedent box is blank.

13   On the rest of them, all they've put in as evidence of the

14   antecedent debt is the check they claim they used to pay the

15   transfer.

16          And then here's the key lang -- this is -- this is it.

17   The Court:  but those are -- that's covered by the Twombly and

18   Iqbal points.  I'm assuming they're going to respond on each of

19   those, the individual points relating to Twombly and Iqbal and

20   whether they're pleading on its face is right or not.  And then

21   he says if they're going one omnibus brief, Your Honor, I tend

22   to think they're not.

23          And then I say well, I would think they would have to.

24   They're doing an omnibus brief, but they're going to have to

25   carve out two -- outer two on each of these points, but these

Page 268

1   points are the ones that go those issues, not facts issues like

2   laches.

3            MS. HAFFEY:  That was our understanding, Your Honor.

4            THE COURT:  I mean, I -- and then Ms. Calton, also for

5   Affinia, makes a similar point about different plaintiffs and

6   different transfers and different debtors.  And then I say no,

7   I -- but again, we're talking about -- I'm sorry, maybe this

8   terminology is misleading people.  And that's where I get into

9   the language you quote.

10           But we're talking about whether the face of the

11  complaint works, not whether they've done something like

12  laches.

13           MR. SULLIVAN:  Right, I saw the -- you're talking

14  about -- there's two issues; a and b.  A is one that has the

15  most -- for the purposes of a Rule 15 motion --

16           THE COURT:  Right.

17           MR. SULLIVAN:  -- is the individualized issues it

18  relates to.  And b, as it such --

19           THE COURT:  I just -- I just don't --

20           MR. SULLIVAN:  -- would be Twombly and Iqbal.

21           THE COURT:  -- I think you're putting a lot of weight

22  on that point.  And given the context, it just doesn't -- it

23  doesn't support it.

24           MR. SULLIVAN:  Okay, I mean, I can --

25           THE COURT:  And there was --

1              MR. SULLIVAN:  -- tell you that --

2              THE COURT:  -- there was no contemplation that we were

3       going to deal with laches today.

4              MR. SULLIVAN:  I can tell you universally all the

5       counsel for the defendants disagree with that.

6              THE COURT:  Well, really?

7              MR. SULLIVAN:  I -- I swear.  I'm not making this up.

8              THE COURT:  I mean, the surreplies don't -- I mean --

9              MR. SULLIVAN:  We were shocked when -- we were --

10      literally, we were all shocked --

11             THE COURT:  All right.  What are the issues besides

12      laches?

13             MR. SULLIVAN:  Well, there were a number -- for

14      example -- I can't speak for everybody.  For Timken, for

15      example, one of our arguments was that a settlement that was

16      reached between the debtors and Timken are --

17             THE COURT:  We dealt with that.  I agree with you on

18      that.  We dealt with that.  I said they're going to have to --

19      you're going to show to them.  They're going to have to respond

20      to you by tomorrow on that.

21             MR. SULLIVAN:  But with a slightly different argument,

22      but --

23             MS. CALTON:  Your Honor?

24             MR. SULLIVAN:  -- but --

25             MS. CALTON:  This is Judy Calton for Rotor Coaters.

Page 270

1    We were secured by right of setoff.  We thought that was a both

2    pleading (b)(5) issue and an individualized issue just as an

3    example.

4          MS. HAFFEY:  Your Honor, I think it's important to

5    note what's the last issue of what the Court said in the

6    hearing is that we were then going to set up individualized

7    hearings and briefing to cover the rest of these issues, and

8    that was the context of our conversation that day, because it

9    was a recognition that in today's hearing there was not going

10   to be time nor the place for all of the defendants to talk

11   about individual issues.

12         THE COURT:  All right.

13         MR. SULLIVAN:  And Your Honor, the fact that they

14   didn't even brief the specific issues dealing with the

15   contracts, again, leads us to believe that they were

16   universally just disregarding Your Honor's directives.  So --

17         THE COURT:  Well --

18         MS. HAFFEY:  In --

19         THE COURT:  -- I'm sorry.  I've now looked at all of

20   the pages of your exhibit.  I ruled on judicial estoppel

21   already.  And we already dealt with laches.  I mean, I --

22   there's nothing else in here as far as Timken's concerned.  Is

23   there?

24         MR. SULLIVAN:  Well, it's -- I can get into some of

25   the issues.  I briefed them all.  But the settlement I'm

 1    talking about was the settlement at its -- of its proofs of

 2    claims.

 3            THE COURT:  Right.

 4            MR. SULLIVAN:  There were two settlements.  One that

 5    predated the filing of the claim, one that postdated it.

 6            THE COURT:  Right.  And --

 7            MR. SULLIVAN:  And it was after the statute of

 8    limitations --

 9            THE COURT:  -- and you've provided those settle -- we

10    already dealt with that.  I said -- you provided to them.  You

11    did that, and I said they have to get -- they have to deal with

12    that by tomorrow.

13            MR. SULLIVAN:  Actually, I think you said the end of

14    today with respect --

15            THE COURT:  All right.  Well, fine.

16            MR. SULLIVAN:  -- to the Timken motion, so --

17            THE COURT:  That's true.  We shortened it.  Okay.  So

18    what's the answer on that one?

19            MS. HAFFEY:  We're prepared to deal with it.  Mr.

20    Radom will.

21            MR. RADOM:  Your Honor, the Timken contract that was

22    assumed related to certain Grand Rapids, Michigan facilities.

23    The POs -- that there are other POs that were not assumed that

24    related to other Delphi facilities.  The waiver only relates to

25    Grand Rapids, not to any other facilities.

1           THE COURT:  Okay.  It's --

2           MS. HAFFEY:  And we have the notices -- the affidavits

3    served is that the notices of that assumption with us as well.

4           THE COURT:  Is this separate from the settlement

5    you're referring to?

6           MR. SULLIVAN:  Yes, Your Honor.

7           MR. RADOM:  I'm sorry, I didn't understand that.

8    What's separate from the --

9           THE COURT:  There's a separate settlement.

10           MS. HAFFEY:  This is the agreement that Mr. Sullivan

11    said he sent to me this week --

12           THE COURT:  Right.

13           MS. HAFFEY:  -- that I was to look at.  That's what

14    we're referring to.  So if there's something else, we

15    definitely provided it.

16           MR. SULLIVAN:  Your Honor, I fully briefed the

17    settlement issue, which is separate and apart from the contract

18    assumption issue.

19        (Pause)

20           MR. SULLIVAN:  Would you like me to point you to it?

21           THE COURT:  No, I just read it.

22        (Pause)

23           THE COURT:  Where is the settlement that you're

24    referring to?

25           MR. SULLIVAN:  Where are the settlement agreements,

Page 273

1    Your Honor?

2              THE COURT:  Yes.

3              MR. SULLIVAN:  They're on the docket.

4              THE COURT:  Do you know how many items are on the

5    docket in this case?

6              MR. SULLIVAN:  I don't have --

7              THE COURT:  Did you provide a copy of the -- your

8    supplemental reply to chambers, by the way?

9              MR. SULLIVAN:  I did, Your Honor.

10             THE COURT:  Did he, John?  Look.

11             MR. SULLIVAN:  I apologize, Judge, I didn't bring a

12   copy of it.

13             THE COURT:  I'm sorry.  This -- and I guess I was

14   getting upset because I saw that you also briefed and expect

15   the debtors to the issue of judicial estoppel, which I already

16   ruled on in an order.

17             So I view this as a kitchen sink, and I don't think

18   that the transcript you're relying can lead to the debtors

19   being precluded from responding on that issue.  We'll set a

20   time for them to respond to it today.

21             MR. SULLIVAN:  With respect to -- with respect --

22   going back to the contract assumption issue, Your Honor, we

23   didn't really fully resolve that.

24             THE COURT:  Well, I mean, it seems like it's an open

25   issue.  He says that it's a release as to specifically assumed

Page 274

1    purchase orders, not a general release.

2            MR. SULLIVAN:  And you're -- that's correct, Your

3    Honor.  It didn't -- it wasn't a general release.  I never said

4    it was.

5            THE COURT:  All right.

6            MR. SULLIVAN:  But the firm should be -- I've

7    requested, pursuant to Your Honor's direction, for -- I told

8    them which contracts it was, and they haven't come back with

9    any information.  I asked for the POs and the invoices to which

10   this relates, so I can come to the determination of whether or

11   not any of these transactions relate to these contracts which

12   were assumed.  And they've failed and refused to respond to any

13   of my inquiries in contravention of Your Honor's directive.

14           MS. HAFFEY:  Your Honor --

15           MR. RADOM:  Your Honor, I think we're in a position to

16   identif -- I mean, if there are --

17           THE COURT:  When did they --

18           MR. RADOM:  -- purchase orders --

19           THE COURT:  -- when did they get this document?

20           MR. SULLIVAN:  Originally October of 2010, Your Honor,

21   and I've sent numerous e-mails.  And I've submitted a

22   declaration, Your Honor, attaching copies of the e-mails.

23           MS. HAFFEY:  Your Honor, we've provided them with the

24   PO numbers that we claimed were not assumed.  I can't say if it

25   came in October.  I know I got it this week on June 16th at --

1    it was 10:40 p.m.

2              THE COURT:  All right.

3              MR. SULLIVAN:  Your Honor, I received nothing.  The

4    first time they reached out to me was, I think, on Saturday.

5              MR. RADOM:  Your Honor, we're happy to respond.  If

6    you can give us a few days, we're happy to try and provide a --

7    an --

8              THE COURT:  Okay.

9              MR. RADOM:  -- ex par -- file a response

10   to --

11             THE COURT:  I think that's --

12             MR. RADOM:  -- final response to --

13             THE COURT:  -- I think that's what should happen.

14   They -- you should respond by Monday on this.

15             MR. RADOM:  Thank you, Your Honor.

16             THE COURT:  With the facts on the different orders.

17             MR. RADOM:  So just so I understand.

18             THE COURT:  It'll be part of the --

19             MR. RADOM:  Talking to --

20             THE COURT:  -- it'll be part of the exercise in doing

21   the chart.

22             MR. RADOM:  -- what we're talking is -- as I

23   understand we're talking two agreements.  We're talking this

24   assumption agreement, which relates to specific facilities, and

25   then Mr. Sullivan is saying --

DPH HOLDINGS CORP., ET AL.

Page 276

```
 1              THE COURT:  There's a --

 2              MR. RADOM:  -- a separate settlement --

 3              THE COURT:  -- settlement of a claim that doesn't

 4     specifically have a release in it, but the argument is that

 5     it's -- it covers the entire claim, including a final 502(d)

 6     claim.

 7              MR. RADOM:  Did he identify the docket number?

 8              THE COURT:  It's attached to some declaration that was

 9     submitted in connection with the July hearing.

10              MR. RADOM:  Okay, Your Honor.  Thank you.

11              THE COURT:  The Hart declaration.  Okay.  Are there

12     other issues besides laches in this release issue that people

13     want to raise?

14              MR. NAYAK:  Your Honor, this morning -- Mahesh Nayak

15     on behalf of Detroit Products -- this morning I had raised the

16     issue with you, and I wasn't sure from where you began your

17     comments that Your Honor -- regarding the issue of service of

18     the fourth extension order on our client.

19              THE COURT:  Right.

20              MR. NAYAK:  We filed affidavits --

21              THE COURT:  No, I -- I understand how that relates to

22     the fourth extension challenge.  How does it relate to the

23     motion to amend as far as the -- what was to be determined on

24     today's hearing?

25              MR. NAYAK:  I would argue, in part, Your Honor that --
```

1   on a futility basis that the extension orders, neither the

2   motions nor the orders were never served on our client to begin

3   with.

4           THE COURT:  All right.

5           MR. NAYAK:  And that's gone on relentless --

6           THE COURT:  No, no, no.  I understand the point, and

7   this is why I raised this issue in connection with the

8   discussion that began this hearing at about 10:10 when the

9   debtors laid out what they understood to be the agenda for

10  day -- today's hearing.

11          And futility, which is one of the factors under Rule

12  15(a), was not on that agenda.  And I asked everyone do they

13  disagree with that agenda.  And the disagreements went to Mr.

14  Sullivan's point and the -- a couple of -- actually, it turned

15  out to be one person on claims under 250,000, and that was it.

16  And I reviewed the December transcript, and it doesn't really

17  talk about the futility point.

18          So I understand how it's relevant on the fourth

19  extension challenge, which was on for today and was scheduled

20  for today, and that's -- it's a perfectly legitimate point on

21  that issue.  I'm just not sure it's properly teed up for today

22  as far as the Rule 15 motion.  Certainly no one said that at

23  10:10 or 10:30.

24          MR. NAYAK:  I admit, Your Honor, that I did not -- I

25  did not come onto it in our opening comments.  I came onto it,

DPH HOLDINGS CORP., ET AL.

Page 278

1    I think, maybe fifteen minutes after that discussion began.

2              THE COURT:  All right.  But --

3              MR. NAYAK:  But I sat down at your suggestion and --

4              THE COURT:  All right.  So what -- but -- where does

5    that -- where was that dealt with and preserved as part of the

6    conference that we had in December of 2010 as far as this

7    hearing as opposed to preserved for some other -- some other

8    day?

9              MR. NAYAK:  Your Honor, I'll say that the discussion

10   that Mr. Sullivan just had with you, it was my understanding

11   that that issue, because of -- because of the fact that it

12   relates to the 4(m), because we're talking about the issue of

13   futility, was preserved and that we would be talking about that

14   today.  It's the second time we've briefed this issue for the

15   defendant.

16             THE COURT:  No, but I said you don't need to brief it

17   because we've already -- we're go -- I'm going to rule on it.

18   I -- it's a live issue.  I'm still going to rule on it.  The

19   only issue is whether it was to be dealt with today.

20             MR. WURST:  Judge, if I may?  I think you may have

21   just focused that issue; if what you're saying is that that

22   issue remains ripe, that is part of your determination even if

23   it's not argued today but has been briefed, then I think,

24   especially in light of the fact that it's now ten of 6, we

25   should be all comfortable that we've briefed it properly, and

1    we have those issues before the Court.

2            I think the other issue that we may want to touch on

3    for a moment is point 5 on the debtors' agenda, which is the

4    procedures for dealing with individual issues.

5            THE COURT:  All right.  I don't want to get to that,

6    though.

7            MR. WURST:  No, I -- okay.  But I'm sure -- certainly

8    before we go home and --

9            THE COURT:  Okay.

10           MR. WURST:  -- go to bed tonight, we'll wrap with

11   something like that.

12           UNIDENTIFIED SPEAKER:  Your Honor, one sentence, Your

13   Honor?

14           THE COURT:  Let me just --

15           UNIDENTIFIED SPEAKER:  Futility is relevant to --

16           THE COURT:  -- I'm just looking at the transcript

17   here.

18           UNIDENTIFIED SPEAKER:  Okay.  And my comment goes to

19   that, Judge.

20           MR. SULLIVAN:  Your Honor --

21           THE COURT:  I mean, Mr. -- there's -- there was an

22   agreement in December that to the extent the Rule 4(m) issues

23   are issues that can be resolved as a matter of law, they're

24   appropriate for February 17th.  Okay?

25           And that's -- and that's what I said I would -- I --

DELPHI DINGS CORP., ET AL.

Page 280

1    you know -- if I left open, as I have here, the ability to file

2    an amended complaint on some issues, which is what's happened

3    here, then I would turn to Rule 4(m) challenges as a matter of

4    law.

5            UNIDENTIFIED SPEAKER:  Your Honor, I understand Your

6    Honor's view, and Your Honor correctly earlier stated that

7    there's no order in that transcript.  And I suggest, Your

8    Honor, that futility or showing a lack of futility as part of

9    the debtors' burden of going forward and burden of proof today

10   with regard to the motion to amend.  And the debtor has not

11   carried that burden.  It's part of their case.

12           MR. SULLIVAN:  Your Honor, I'd like to be a little

13   more specific.  This morning, and this is my fault, not Mr.

14   Nayak's, I think I took you when you were talking about the

15   agenda, you raised the issue of people who received no notice

16   of the 4(m) extensions of the disclosure statement that those,

17   as a matter of -- that you were going to deal with those as not

18   individualized prejudice, but across the board as -- you would

19   hear that today as a basis for futility.

20           That's what I interpreted the Court to mean this

21   morning when you set up the agenda, that for those defendants

22   who fall into that category of receiving no notice whatsoever,

23   that you would be dealing with that almost as a matter of law

24   as opposed to --

25           THE COURT:  So --

DELPHI DBGS CORP., ET AL.

Page 281

1          MR. SULLIVAN:  -- the factual --

2          THE COURT:  -- what about --

3          MR. SULLIVAN:  -- individualized --

4          THE COURT:  -- the statement on page 33?  The Court:

5    all right, I'm not going to deal with the notice issues on the

6    17.

7          MR. SULLIVAN:  But then Your -- later, Your Honor, on

8    page 42, you said and they're going to have to do it either by,

9    you know, two or three paragraphs on each objection.  And then

10   you keep going, and --

11         THE COURT:  But that --

12         MR. SULLIVAN:  -- the Court said no, it will be heard.

13   It's going to be heard.  I will hear it on the 17th.

14         THE COURT:  -- but that -- but the "it" doesn't refer

15   to the notice issues, which I've already -- I had already ruled

16   out?

17         MR. SULLIVAN:  It refers to the futility issue.  That

18   was our point.

19         THE COURT:  But not --

20         MR. SULLIVAN:  It referred to the futility.

21         UNIDENTIFIED SPEAKER:  Your Honor, yes, and again --

22         THE COURT:  Where's the word futility appear between

23   page 33 --

24         UNIDENTIFIED SPEAKER:  Line 15, Your Honor.

25         THE COURT:  On what page?

Page 282

1          UNIDENTIFIED SPEAKER:  On page 40 --

2          MR. SULLIVAN:  42, Ms. Calton --

3          MS. HAFFEY:  But it's Ms. Cal --

4          UNIDENTIFIED SPEAKER:  Ms. Calton says, "Well, this is

5    a unique futility issue that I guess the point that I believe

6    is Mr. Winsten was trying to make is Delphi should be directed

7    to pay their attention to it.  Yes, it won't be heard on the

8    17th."  No, no, it -- the Court says, "No, no, it will be

9    heard."

10          THE COURT:  But did -- but the unique futility issue

11    is the one she raised on page 41 --

12          MS. HAFFEY:  Right.

13          THE COURT:  -- which is what we have actually been

14    dealing with, which is who's the defendant and who's the

15    plaintiff and who made the transfers.  That's the unique one.

16    We spent, in this conference, the first twenty or thirty pages

17    talking about the notice issues and Rule 4(m).  And I was

18    inclined to go either way on it, and I was finally persuaded,

19    as I said on page 33, I'm not going to deal with the notice

20    issues on the 17th.

21          MR. SULLIVAN:  Your Honor, I don't want to debate it

22    further.  I don't want to debate the issue with your further.

23    I don't -- it's not my intention to argue with you on this.

24          THE COURT:  Well --

25          MR. SULLIVAN:  But I will say that the comments that

Page 283

1    Mr. Applebaum just echoed that you made this morning encouraged

2    us just to make sure that we stood up and referred --

3              THE COURT:  Okay.

4              MR. SULLIVAN:  -- one last time on this before the

5    day --

6              THE COURT:  All right.

7              MR. SULLIVAN:  -- was over.

8              THE COURT:  That's fine.  I -- that -- I understand,

9    and I think the notice issues are relevant to the fourth

10   extension challenge.  I understand that.  I just -- I mean, we

11   spent an hour or so on this on December 17th, and that's how it

12   shook out.

13             MR. SULLIVAN:  Thank you.

14             THE COURT:  Okay.  So shall we deal with the fourth

15   extension challenge?

16             MS. HAFFEY:  We shall.

17             THE COURT:  Okay.

18             MS. HAFFEY:  Mr. Sendek will deal with that.

19             MR. APPLEBAUM:  Thank you, Your Honor.  Joel Applebaum

20   of Clark Hill, on behalf of what is known to the Court as Doshi

21   Prettl Detroit Products Corporation and the other defendants.

22   I'll try to be very brief, Your Honor, because the hour's late.

23   We filed and were joined by a number of other defendants a

24   motion under Rule 60 to set aside the fourth extension order on

25   the ground of surprise and in burdens mistake as we are

DPH HOLDINGS CORP., ET AL.

1    approaching the one year anniversary of that order and based

2    upon on the reasons developed in part in the Global Crossing

3    case, 385 Bankruptcy Reporter 52.

4           Butzel, on behalf of the reorganized debtor, filed a

5    response in opposition raising two principle issues.  One;

6    whether or not that fourth extension order was a final order.

7    And two; even assuming it were a final order, that's not what

8    the -- we say Global Crossing stands for and opposed our

9    relief.

10          I don't want to rehash the arguments in the briefs.  I

11   think they were well laid out, but I do want to briefly address

12   the reorganized debtors' response.  With respect to the issue

13   of finality, we think the answer is yes.  It's a final order

14   for this purpose -- for these purposes for several reasons.

15   First, the concept of finality is more flexible in bankruptcy

16   cases than ordinary civil litigation, and orders that finally

17   dispose of discrete disputes within a larger case obviously

18   satisfy that task.

19          The fourth extension order was entered in the main

20   case, and this flexible standard applies here.  It finally

21   disposes of the discrete issue in this case their ability to

22   serve and prosecute these cases.  And, in this regard -- this

23   is particularly important -- in this regard, there was an

24   ambiguity in connection with the somewhat unusual posture of

25   these cases.  All of the adversary proceedings were dismissed,

1    albeit without prejudice, but dismissed nevertheless.

2          And we -- in the case De tie vs. Orange County, 152

3    F.3d 1109 in 9th Circuit Court of Appeals decision, the court

4    held that when a complaint is dismissed with leave to amend,

5    the order's not final in the absence of a further order

6    terminating the action.  However, whereas here the dismissal

7    order -- I'm sorry.  Whereas here leave to amend has not yet

8    been granted, the dismissal of an action, even when it's

9    without prejudice, is a final order.

10          THE COURT:  Can I -- is this argument that important

11   since I have separate authority to amend my own interlocutory

12   order and the standard really isn't that much different?

13          MR. APPLEBAUM:  I think that if the Court's willing to

14   look under either basis, I think there is -- there's overlap.

15   The Court can do it under either one.

16          THE COURT:  Okay.  And then I had one other point.

17          MR. APPLEBAUM:  I wouldn't say it's not important.

18   It's certainly --

19          THE COURT:  Well --

20          MR. APPLEBAUM:  -- important to me.

21          THE COURT:  -- well, I mean, but I'm not sure it

22   really matters since --

23          MR. APPLEBAUM:  But I think the Court can address

24   it --

25          THE COURT:  -- there's not much difference --

Page 286

1          MR. APPLEBAUM:  You know, you can cut the steak any

2    number of ways --

3          THE COURT:  The other --

4          MR. APPLEBAUM:  -- I agree with you.

5          THE COURT:  -- point I had -- I've been reminded on in

6    rereading the Family Gulf case is Judge Bernstein's remark,

7    which I think is accurate, that even though the bankruptcy rule

8    applies only to final orders.  The local rules let us apply the

9    same standard to interlocutory orders; Local Rule 9023-1, and I

10   think 9023 -- 9024-1 as well, which I have to go -- I could

11   test.  I was reminded of that reading the case again in

12   connection with the 547(b)(2) point.

13         But in any event, it seems to me that as a question of

14   power or authority to take action, I either agree with you and

15   say that it's, for these purposes, a final order or I conclude

16   that if it's interlocutory I still, subject to, you know,

17   the -- with due deference to the law, the case doctrine, I

18   could still amend it under -- well, for example, United States

19   vs. Ussio (sic) or Uccio U-C-C-I-O, 948 F.2d 753, 2nd Circuit,

20   1991.

21         MR. APPLEBAUM:  I think you're correct --

22         THE COURT:  Under both --

23         MR. APPLEBAUM:  -- Your Honor.

24         THE COURT:  -- scenarios, though, it seems to me that

25   there is a basic issue, but maybe it could be dealt with, which

DPH HOLDINGS CORP., ET AL.

Page 287

1   is prejudice to the plaintiff/debtor since there were orders

2   that it's relying on, which is -- would apply under either

3   standard.

4         MR. APPLEBAUM:  Right.  Well, and the Court obviously

5   has the right to review its orders, and that is in fact what

6   the Court did in Global Crossing when it set aside its previous

7   orders.  There were also four extension orders that were

8   granted.  I'm less concerned with the prejudice to the

9   plaintiff here because it was the elasticity, in their view, of

10  the statute of limitations that has really prejudiced my

11  client.

12        We received no notice of the orders the Court entered.

13  They were essentially, at least to my client, ex parte

14  submissions.  We received no notice of the disclosure

15  statement.  We received no notice of the confirmation of the

16  plan.  All of this took place out of our view.

17        And as a result, we're faced now, and we put in the

18  affidavits that Mr. Nayak was referring to, we're faced now

19  with what the Court sort of introduced at this morning's

20  hearing, which is all of the orders predate our involvement in

21  the case, our client's involvement in the case.  And all of

22  them were served or filed prior to their involvement in the

23  case.  They received no notice whatsoever.

24        So here, you have sort of a unique prejudice, if there

25  ever is a situation where there's prejudice, the prejudice is

Page 288

1   you had essentially ex parte orders extending the statute of

2   limitations by almost two and a half years.  So that's what the

3   focus of our Rule 60 motion was.

4          Now, the Court, I agree, has the flexibility as

5   interlocutory or final.  We filed it under Rule 60 because Rule

6   60 refers to a hard one-year anniversary from the date of the

7   order if the Court wants to treat it under the interlocutory --

8   its interlocutory powers --

9          THE COURT:  Right.

10         MR. NAYAK:  -- that's fine, too.  But the focus of the

11  motion, which I assume is -- the Court's going to address also

12  with respect to the other 4(m) issues we were just discussing

13  is the prejudice to the defendants.

14         And while the Court started the hearing this morning

15  was where you have a situation where absolutely no notice was

16  given -- could be given that that, as a matter of law, the

17  Court was willing to carve out that spot of the defendants.

18  And that, we think, is exactly what happened here, and also why

19  we're relying on the Global Crossing case, which is a similar

20  factual situation; no notice to the defendants in that case

21  either in an effort to relate back.

22         THE COURT:  Well, Judge Gerber didn't rule on the

23  basis of there being no notice.

24         MR. APPLEBAUM:  No, he didn't.  He ruled on the

25  relation back issue, but his points were, you know, equally

1    applicable.  The Court, he said, there are serious separation

2    of power concerns --

3              THE COURT:  Right, but he didn't --

4              MR. APPLEBAUM:  -- because it would enable --

5              THE COURT:  -- rule on that basis.  He was careful not

6    to.  He's very careful in everything he does.  And he ruled on

7    the basis that the complaints that were filed subsequently

8    didn't relate back.  They were untimely.

9              MR. APPLEBAUM:  They were untimely because they were

10   filed -- they were not filed within the form extensions because

11   he found that the first form extension didn't ask for the type

12   of relief --

13             THE COURT:  Right.

14             MR. APPLEBAUM:  -- that they were requesting with

15   respect to additional defendants.

16             THE COURT:  Right.

17             MR. APPLEBAUM:  I appreciate that.

18             THE COURT:  Right.

19             MR. APPLEBAUM:  He was very careful.  But

20   nevertheless, he was also very careful to point out that

21   statutes of limitations are not elastic concepts.

22             THE COURT:  That's dicta.

23             MR. APPLEBAUM:  Well, it may be dicta, but it's

24   certainly persuasive dicta.

25             THE COURT:  He wouldn't have --

1          MR. APPLEBAUM:  At least in my mind.

2          THE COURT:  -- the -- he wouldn't have the rule

3     otherwise.

4          MR. APPLEBAUM:  Your Honor, the rule, as the judge

5     pointed -- as Judge Gonzalez pointed out is a rule to serve, to

6     find and serve.  It's to facilitate service.  It's not -- it's

7     not to allow --

8          THE COURT:   I think the point that we should be

9     focusing on is the lack of notice.

10          MR. APPLEBAUM:  I agree.

11          THE COURT:  Which provides for the argument, not on

12     prejudice but on surprise, and it also, I believe, goes to

13     rebut the plaintiffs' argument that they're prejudiced by the

14     order; the argument being in response how can you prejudiced by

15     an ex parte order being revoked, because it's ex parte.  Do you

16     follow me on that?

17          MR. APPLEBAUM:  I do.

18          THE COURT:  I think it's less a question of sur -- of

19     prejudice than surprise, and then rebutting the prejudice

20     argument that the plaintiff asserts.  It's not clear to me

21     whether the plaintiff here takes the view that if in fact it is

22     true that your client literally received no notice, was not on

23     the matrix, didn't get notice of anything that somehow they can

24     still be bound by this order.

25          I don't know if that's the case.  I have a feeling

DPH HOLDINGS CORP., ET AL.

Page 291

1    that plaintiff doesn't have that view, and that it's reliant on

2    factual issues as to whether there was notice or not.

3         MR. APPLEBAUM:  I don't think they've raised any

4    factual issues in response to the two affidavits we submitted

5    in connection with our paper.

6         THE COURT:  Okay.

7         MR. APPLEBAUM:  We've seen none.

8         THE COURT:  All right.  But I don't know if they're

9    still opposing it.  That --

10        MR. APPLEBAUM:  We've seen none.

11        THE COURT:  All right.

12        MR. APPLEBAUM:  I mean, there may be, but we've seen

13   none.

14        THE COURT:  Before -- I mean, I'm laying out issues

15   that I want the plaintiff to respond to.  There's another issue

16   that I acknowledge I did not focus on sufficiently at the July

17   hearing -- because it -- I think I basically crept up in oral

18   argument.  The order I've been focusing on here is the fourth

19   one, which is the only one that's at issue in this motions.

20   And that order recites -- based upon a recital in the

21   underlying motion, as well as, I believe, a statement on the

22   record by the debtors' counsel, Ms. Marafioti that the motion

23   was served as set forth in my standing order for service in the

24   case -- your motion as well as others takes issues with that

25   cite, attaching the certificate of service.

1           And I think that's a serious issue here.  Separate and

2    apart from the other ones.  The order -- the supplemental case

3    management order dated March 17th, 2006 states that, "All

4    filing shall be served via overnight mail upon all parties with

5    a particularized interests in the subject of the filing, as

6    well as to the master service list."  And the motion that was

7    filed on October 2, 2009 states that, "Notice of this motion

8    has been provided in accordance with the supplemental order."

9    And it doesn't appear to have been.  So, I mean, I think that

10   also goes to Rule 60.

11          The argument that was made in the motion at the

12   hearing was twofold, as you all point out.  First of all, that

13   the debtors wanted more time given their drastically changed

14   circumstances.  And secondly, that it was quite possible that

15   in light of that more time they'd drop more people and would

16   not pursuit the lawsuits against them.  If people are on notice

17   of that then one can take the view that, well, you know, maybe

18   they're happy not to be served yet.  But if you're not on

19   notice of then that's a sep -- you know, it's a different

20   issue, and that's the overall notice points you made.

21          But there's a subset of that, which is, it does not

22   appear to me that that representation was correct as to the

23   service of the motion.

24          MR. APPLEBAUM:  Well, I certainly -- speaking for my

25   client only, it's correct -- you're correct on both counts.

Page 293

1    One, we are surprised, we didn't get notice, it wasn't served

2    on us per the motion or the --

3           THE COURT:  Right.

4           MR. APPLEBAUM:  -- the case management order.  And

5    secondly, I don't think the Court can ignore the resulting

6    prejudice that follows from the fact that, you know, lengthy

7    extensions were given, essentially, without notice and the

8    events that transpired between the --

9           THE COURT:  Well --

10          MR. APPLEBAUM:  -- the filing of the complaint --

11          THE COURT:  All right.

12          MR. APPLEBAUM:  -- and the ultimate release of the

13   complaint.

14          THE COURT:  On that issue, I'm -- I mean, it's a

15   balancing of different prejudices.  I mean, there's obviously a

16   prejudice because people are not served within the limitations

17   period, but if that were the case then there wouldn't be -- I

18   mean, if that were dispositive then you wouldn't have Rule 4(m)

19   in the first place.

20          MR. APPLEBAUM:  Well, not necessarily true, Your

21   Honor.  In most Rule 4 cases they're not ex parte orders; they

22   can be, but they're not always.  I mean, it's --

23          THE COURT:  But someone stands up and says we're

24   prejudiced because the limita -- I thought what your saying is

25   the prejudice the fact that we had to wait to be served during

 1    the limitations period.

 2             MR. APPLEBAUM:   No.  My prejudice is that the

 3    complaints were filed under seal and two and a half years later

 4    released and that's when we learned -- so it was surprise and

 5    prejudice.

 6             THE COURT:  All right.

 7             MR. APPLEBAUM:   And in that intervening two and half

 8    years there was an individualized prejudice that is virtually

 9    unique to our client.

10             THE COURT:  Right.

11             MR. APPLEBAUM:  There were transactions that

12    occurred -- et cetera, et cetera.

13             THE COURT:  No.  And that needs to be dealt with --

14             MR. APPLEBAUM:  I --

15             THE COURT:  -- on a case by case basis.

16             MR. APPLEBAUM:  I appreciate that.

17             THE COURT:  I thought you were saying that the

18    prejudice is simply the fact that the limitations period had

19    run.

20             MR. APPLEBAUM:  No, no.  I'm trying to bifurcate --

21             THE COURT:  All right.  All right.  Okay.  Fine.

22             MR. APPLEBAUM:  I appreciate the individualized aspect

23    of it.

24             THE COURT:  All right.  We're on the same page, then.

25             MR. APPLEBAUM:  All right.  That's fine.

Page 295

```
 1              THE COURT:  All right.  Okay.
 2              MR. APPLEBAUM:  So I guess now I'm sort of at a loss
 3       as to where --
 4              THE COURT:  All right.  So I basically have -- these
 5       are the points I have for the debtors here.  Given that --
 6       given the situation where literally there was no notice; that's
 7       situation one.  And that's what's asserted by -- is it [Doh'-
 8       shi] or [Dah'-shi]?
 9              UNIDENTIFIED SPEAKER:  Detroit Products.
10              THE COURT:  What?
11              MR. APPLEBAUM:  [Doh'-shi].
12              UNIDENTIFIED SPEAKER:  Detroit Products, formally
13       known as --
14              THE COURT:  Detroit Products, okay, Detroit Products.
15       What's the response when there's literally no notice?  Second,
16       what's the response on the supplemental case management order
17       and the representation of the motion not apparently being true.
18       And under those scenarios -- if there's not a satisfactory
19       answer on those two, isn't this really -- this is a matter of a
20       law, isn't it?  I mean, can I deal with this now?
21              We don't have to get into whether there was notice or
22       not because there doesn't appear to have been any notice and
23       there doesn't appear to be any response on that issue.
24              MR. APPLEBAUM:  I think we'll sit down, Your Honor.
25              THE COURT:  Okay.
```

1              MR. WURST:  Again, if I wasn't clear earlier that

2       those facts are analogous to Wells Fargo.

3              THE COURT:  No, I know other people have made the same

4       argument.

5              MR. WURST:  So as long as that's up there and we're on

6       the record --

7              THE COURT:  Everyone who's made these arguments on

8       their paper -- in their motions -- you don't have to repeat it,

9       I'm just -- there are these common elements.  And I'm

10      distinguishing it from people who -- where there's a dispute as

11      to whether someone got notice.

12             MR. SENDEK:  Your Honor, Bruce Sendek for DAS.  I

13      believe the scope of this motion for relief has broadened

14      substantially from what appears on the papers.  And we've

15      spent -- or at least, the defendant has spent a great deal of

16      time talking about notice and an affidavit.

17             First, there is no affidavit attached to this motion

18      for relief from the fourth order.  This particular motion that

19      was keyed up for today is very limited in its scope as I read

20      it and as we responded to it and as I understand it.  It

21      doesn't speak of prejudice to the defendant, what it says is

22      rather simple.  It says, based on Rule 60 -- okay, the fourth

23      order should be set aside because of a mistake because the

24      reasons for the fourth extension order changed from what they

25      had been previously.  And for that it relies on global crossing

Page 297

1   and it is a very inappropriate use of global crossing to make

2   that point.

3          The Court, I believe correctly referred to the dicta

4   in global crossing as not being what's at issue here, and if it

5   has any significance at all we need to look at the holding,

6   which of course is -- which is the important part of any

7   court's opinion.  And I've identified what the holding is in

8   that case -- at least what I believe it to be, because the

9   Court says, this court -- the Court concludes that the first

10  Rule 4(m) order, which appropriately entered -- while

11  appropriately entered for the purpose for which it sought had

12  neither the purpose nor effect of extending the statute of

13  limitations for claims against then unnamed and unidentified

14  dividend recipients.

15         THE COURT:  I understand that.  But --

16         MR. SENDEK:  Well, then I think -- but, Your Honor,

17  the important point is that that's what the fourth -- this is

18  what this motion --

19         THE COURT:  All right.  But there are --

20         MR. SENDEK:  -- is addressing.  I think defendants

21  were frustrated that the Court wasn't going to get into the

22  claims that weren't on the agenda today, and tried to really

23  shoehorn in this whole notice issue into this particular brief.

24  Again, there's not affidavit attached to it or referenced in

25  it.  It asked for a very narrow -- it asked for relief on very

1   narrow grounds.  That is that the Court -- that nobody can

2   change their reasons for a subsequent extension, which is not

3   at all what global crossing says.  It says you can't now

4   include that at some later in point time unnamed and

5   unidentified defendants.  That's what it says, it doesn't go

6   beyond that.

7              Now, again, I believe the defendants were frustrated

8   because they didn't get some of the issues addressed that they

9   thought ought to be, but we're properly before the Court today,

10  and I think that whole notice discussion is a matter for

11  another time, not here.

12             THE COURT:  I guess, my point though, ultimately, is I

13  understood a fair matter on this point at the July hearing.  I

14  mean, it basically said if you really didn't get any notice of

15  this then you shouldn't be sued.  I mean, I -- so why are we

16  still dealing -- I mean --

17             MR. SENDEK:  Well, there was a question at that time

18  of notice and what is notice and what frame -- what type of

19  notice would be sufficient --

20             THE COURT:  All right.  But it you're --

21             MR. SENDEK:  -- whether --

22             THE COURT:  They're asserting they weren't even on the

23  matrix, and they weren't served with motion -- and I'm very

24  troubled by the fact they weren't served by the motion.

25             MR. SENDEK:  They haven't asserted --

1          THE COURT:  This seems to be -- in balancing the

2     prejudice issues it's much harder for the plaintiff here to

3     argue that it would be prejudiced by my revoking the fourth

4     order when it, in fact, knew that the motion wasn't served.

5          MR. SENDEK:  With the Court's permission, as we are

6     seeming to drift into the notice question, Mr. Klein is --

7          THE COURT:  Okay.

8          MR. SENDEK:  -- is more on top of that, than I am,

9     which says -- again --

10          THE COURT:  Well, let me ask --

11          MR. SENDEK:  -- doesn't go to the fourth --

12          THE COURT:  I -- you're right, the Detroit pleading

13     that asserts the lack of notice is actually the objection to

14     the motion to amend; that's the one that asserts the lack of

15     notice.  This motion doesn't, and I'm not sure there is one

16     that specifically does.  But the issues there -- I'm still

17     confused as to whether the debtor is taking the position

18     that -- as I said, if someone in fact asserts that they didn't

19     get any notice --

20          MR. SENDEK:  Well, I believe --

21          THE COURT:  -- except maybe hearing about it somehow,

22     in the -- you know, through the ether, which -- to me they

23     would only have heard about the fact that others would be

24     potentially sued because they didn't get notice of the motion,

25     so they could assume they weren't affected by it.  I'm just --

Page 300

1          MR. SENDEK:  But --

2          THE COURT:  -- I'm having troubles

3          MR. SENDEK:  -- Your --

4          THE COURT:  -- with the order.

5          MR. SENDEK:  Your Honor, while --

6          THE COURT:  With the fourth order.  Not --

7          MR. SENDEK:  -- while that wasn't --

8          THE COURT:  Not really for the point that it was based

9    upon a different rationale --

10         MR. SENDEK:  Each --

11         THE COURT:  -- per se.  But it's simply because there

12   was ex parte and I think can be reviewed -- my view is should

13   be reviewed de novo, at this point.

14         MR. SENDEK:  While I -- while that isn't keyed up in

15   this motion, and I'm not prepared to respond chapter and verse,

16   nor is Ms. Teen (ph.), but Mr. Klein has a little more to say

17   about it.

18         THE COURT:  Okay.

19         MR. SENDEK:  But I will say this, my recollection is

20   that from the July transcript as I recall it, was that the

21   Court was -- did believe that there were questions of fact

22   rolled up into this whole notion of notice, there could be

23   notice in one form or another.  Perhaps from the ECF filing,

24   perhaps from the disclosure statement, perhaps from the public

25   filings that took place by Delphi.

Page 301

1       And with that, I probably said enough so I'll let Mr.

2   Klein continue.

3       MR. KLEIN:  Your Honor, I won't beat the first part to

4   death, which is we truly are surprised, and thus are not as

5   prepared as we wish we were for such, for what we acknowledge

6   is, a very important issue.  We appreciated it a year ago, and

7   we appreciate now Your Honor's concern with the issue.  First,

8   it --

9       THE COURT:  I mean, I do -- page 225, "My preliminary

10   view is that people who truly did not get notice of the

11   extension motions can argue their merits on the merits.  It's

12   not a Rule 60 requirement."

13       MR. KLEIN:  And absolutely, we read it, and, you know,

14   perhaps we focused on preliminary view.

15       THE COURT:  And then I just say, "But that leaves a

16   factual issue as to who got the notice and who didn't and what

17   do people know."

18       MR. KLEIN:  I absolute -- this is absolutely an issue

19   in the case, and in fact, the discussion we're having now is

20   the same discussion that we would have on all of the other

21   motions that weren't on the agenda today.  But I really don't

22   want to argue -- we're talking about it --

23       THE COURT:  All right.

24       MR. KLEIN:  -- and we'll do our best.  That's not my

25   point.

Page 302

1           THE COURT:  Okay.

2           MR. KLEIN:  I just hope the Court accepts that we had

3    a different understanding of the agenda.  I'll leave it at

4    that.

5           UNIDENTIFIED SPEAKER:  Your Honor, if I can ---

6           THE COURT:  All right.  And to be fair, the actual

7    motions, you know, which I have here, in a much smaller binder

8    than the six -- plus six binders on the motion to amend, don't,

9    you know, don't, like, deal with that issue.  But I guess, this

10   now turns to Wells Fargo's counsel's issue.  I mean, it should

11   be, in my mind, on the top of the agenda after you guys finish

12   the items that I just dealt with you on.

13          And I can give you a preliminary view on that too,

14   which is I am of the view that the grounds for the fourth

15   extension were a lot weaker than the grounds for the first

16   three.  And the issue of prejudice to both sides is not as

17   evenly balanced, I think, as it was before.  So, I think that's

18   something for people to think about, and maybe tee those notice

19   issues up right away --

20          MR. KLEIN:  Are you --

21          THE COURT:  -- to avoid further discovery on other

22   issues.  I mean, if people -- there's affidavits of service.  I

23   mean, there's got to be something to suggest that someone did

24   have notice.

25          MR. KLEIN:  Well, can I give an example of why it's

Page 303

```
 1    not necessarily that simple?

 2              THE COURT:  Okay.

 3              MR. KLEIN:  Doshi Prettl and I've -- Detroit -- they

 4    now have a new name and I'm drawing a blank on what it is, but

 5    they're the ones who brought the primary motion here.  They

 6    were represented in this action.  They filed the claim.  Their

 7    attorney withdrew prior to this action.  So, it's -- when we

 8    dig into the facts, it's not always going to be as black and

 9    white, as note --

10              THE COURT:  Okay.

11              MR. KLEIN:  -- but that's obviously only illustrative.

12    It doesn't deal with the broader issue.

13              THE COURT:  But they didn't get notice of the motion,

14    though.

15              MR. KLEIN:  They didn't get notice of the motion, Your

16    Honor.  Or I shouldn't say they didn't -- I will --

17              MS. HAFFEY:  We don't know.

18              MR. KLEIN:  I will accept, but no, I will --

19              THE COURT:  Well, there's a stipulative service.  I

20    mean, that's prima facie evidence of who got notice.

21              MR. KLEIN:  I will accept for purposes of this

22    discussion that there are defendants who did not receive formal

23    service --

24              THE COURT:  Okay.

25              MR. KLEIN:  -- of the motions, you know, that needs to
```

1    be assumed for purposes of this.  I don't think -- first of

2    all, I don't think it's apt to frame the question as whether

3    they're bound if they had no notice.  I don't think people are

4    bound by procedural orders of this sort.  Certainly they're

5    effective, but the Court made no determination of any right of

6    theirs, and -- so, I think it's not the same as if you rendered

7    judgment against them without them having notice.  It's

8    fundamentally different from that issue.

9         THE COURT:  That's fair, but on the other hand how

10   much can -- well, I'll leave it at that.  I do have some

11   serious doubts as to how much the debtor can said to be

12   prejudiced by undoing this, given that there wasn't that

13   notice, particularly when it was represented that there was in

14   the actual motion.

15        MR. KLEIN:  Well, I'd like to address that.  And,

16   well, I mean, one, plainly we're severely prejudiced.  Putting

17   aside balancing, we would lose claims that we otherwise would

18   have.  That seems to me to be --

19        THE COURT:  Well, the prejudice it would be, though,

20   how much would you have -- could be said to rely on such an

21   order.

22        MR. KLEIN:  Judge --

23        THE COURT:  That would be the prejudice.

24        MR. KLEIN:  We rely on the orders of the Court, and I

25   don't mean to be glib, but --

1          THE COURT:  But if it's an order entered based upon a

2     representation that the people had been served, when in fact,

3     they hadn't been served.  That's a real problem.

4          MR. KLEIN:  I agree with you and let me address that.

5          THE COURT:  Okay.

6          MR. KLEIN:  Plain and -- I wasn't involved in the case

7     at the time, so I --

8          THE COURT:  Right.

9          MR. KLEIN:  Plainly, there was not an understanding,

10    and I could imagine very sensible reasons for thinking that the

11    notice language in the -- case management will likely know what

12    the exact name of the order is -- applied here.  First, it

13    would be inherently -- expecting this sort of notice, would be

14    inherently inconsistent with the big picture series of orders

15    that were entered that provided for filing the cases under

16    seal, precisely to avoid creating the sorts of controversies

17    that would arise here.  I mean, that was --

18          THE COURT:  But that isn't -- that wasn't the basis

19    for the fourth extension.

20          MR. KLEIN:  Well, but it's inextricably tied to put

21    it -- the cases under seal.  You can't -- I mean, the whole

22    point of the extension was to continue the status quo where

23    complaints hadn't been served.

24          THE COURT:  But did -- the point as stated in the

25    motion and in the oral presentation was that the debtor needed

Page 306

1    some more time to get his act together.  That it changed from

2    the first three.  And the fact that it changed, I accept.  It

3    doesn't necessarily mean that it doesn't relate back.  But I

4    think it does affect how I view the failure to serve.  I'm not

5    sure it does fit into your argument.  It might well fit into

6    the argument in regard to the first three orders, where the

7    premise was we don't want to raise issues when everyone's going

8    to get paid anyway, so, why create this issue.

9            But the fourth one, which is the one we're really

10   focusing on, is things have been happening so fast, Judge, with

11   our new plan, we don't really know who we should be suing at

12   this point.  And I think that's, you know, that's a different

13   issue.  And maybe that should be a point where people should

14   say, well, we want to be sued at that point.  We'd rather know.

15           MR. KLEIN:  Judge, my recollection of the grounds for

16   the fourth extension was a little more complicated than that.

17           THE COURT:  Well, you know what?  They all got sued

18   after all, didn't they?  There were 177, and 177 got sued.  So,

19   there was not winnowing out process, and frankly there was no

20   refinement process either as we've been learning over the last

21   several months.  So, why don't we leave at that?

22           My view -- and now we can turn to the next step -- is

23   that after the final issues on the motion that I've been

24   hearing today on Rule 15, or I've been dealt with, but I've

25   given you the timetable for those.  To the extent that I am

Page 307

1   prepared to grant the motion to amend, the next issue is

2   another gate keeping issue, which is the, whether you want to

3   call it a Rule 60 issue or simply an amendment of a

4   interlocutory order issue, and I think that all depends upon

5   reconsideration of the October order, October 2009 order.  And

6   that does hinge on notice.  And the parties need to focus on

7   whether there really are any notice issues here.

8           As I said in July, there have been affidavits

9   submitted by people, and I didn't require people to resubmit

10  them.  The debtor has them.  I think it's really incumbent upon

11  the debtor to answer those series of, what I will deem to be,

12  motions to amend that order, either under Rule 60 or under my

13  general power to reconsider my own interlocutory orders and/or

14  the local rules.  And there should be a date for the debtors to

15  respond, I think, and fixture cut date on that, as to whether

16  they actually dispute that people got notice.

17          MR. KLEIN:  Your Honor, can I ask a clarifying

18  question?

19          THE COURT:  Sure.

20          MR. KLEIN:  Are you ruling that formal service is the

21  only relevant issue and that knowledge through any other source

22  is not relevant to this question?

23          THE COURT:  I'm not prepared to do that but the debtor

24  needs to say something more than we think they had knowledge.

25          MR. KLEIN:  Okay.

Page 308

1          THE COURT:  I mean, I think it has to -- I want to see

2     what the debtor says on that before I rule on that.

3          MR. KLEIN:  Okay.  I mean I'll --

4          THE COURT:  I mean, if it was -- I haven't ruled on

5     this but I could see a spectrum which is we had public filings

6     that referred to the disclosure statement and so you could be

7     deemed to have read the public filings and therefore deemed to

8     have read the disclosure statement to we have an affidavit of

9     Mr. X from Delphi who specifically spoke to Mr. Y at Doshi

10    about this issue.  It's that level of spectrum.

11         MR. KLEIN:  I'll make one further comment and then

12    I'll sit down.  A few minutes ago Your Honor made a reference

13    to loading it through the ether, or words to that effect.

14    Is --

15         THE COURT:  Well, that's the equivalent of there being

16    a 10-K on file, we're talking.

17         MR. KLEIN:  Well, I just wanted to make a quick point,

18    and many of us in this room are from Detroit and work in the

19    auto industry and Delphi's bankruptcy wasn't something in the

20    ether.  There was acute focus and attention throughout the

21    industry.

22         THE COURT:  Well, but it's more than Delphi's

23    bankruptcy.  Just the fact that Delphi was in bankruptcy isn't

24    going to be enough, obviously.

25         MR. KLEIN:  No, I agree.  My only point is this isn't

DPH HOLDINGS CORP., ET AL.

Page 309

1   a situation that other than through some miraculous

2   happenstance, no one could have --

3            THE COURT:  I appreciate -- that's why I say there's a

4   spectrum here.

5            MR. KLEIN:  Okay.  Thank you, Your Honor.

6            THE COURT:  Okay.

7            MR. NAYAK:  Your Honor, Mahesh Nayak again.  I'm just

8   wanting to get clarification.  You mentioned some time frames

9   that you would like to see this within --

10           THE COURT:  Yes.

11           MR. NAYAK:  -- and I also want to understand from Your

12  Honor how you view this should happen, whether it should be

13  part and parcel of the -- is this a predicate or a predecessor

14  to the debtors' motion for leave to amend that they can

15  affirmatively somehow establish that service was accomplished

16  to Your Honor's satisfaction, that we would oppose that, there

17  would be a hearing on it in advance of a motion for leave to

18  amend?  Because it seems like a motion for leave to amend, Your

19  Honor --

20           THE COURT:  That's a good question.  I think it partly

21  depend -- I'm not sure there's a difference as far as burden is

22  concerned; if I treat this as step two of their leave to amend

23  or if I treat this as everyone's request for me to take another

24  look at the October order since ultimately the issue is -- I

25  think there's -- in each case, there's a fairly modest burden

1   on the debtor in either case.  But maybe I'm wrong about that.

2           I mean, ultimately it is part of -- I think a 15

3   showing to me, ultimately, because it's the futility argument.

4   Rule 15 is -- you know, it's a fairly light burden, ultimately,

5   but -- and I think the futility point here goes back to

6   reconsideration of my order so again, there's some slight

7   burden on the debtor.

8           MR. NAYAK:  Slight burden on the debtor with respect

9   to the --

10          THE COURT:  Under either -- whether I do it under

11  either approach.  But I guess it's probably best done as part

12  two of a Rule 15 motion.

13          UNIDENTIFIED SPEAKER:  -- the timing, Your Honor?

14          THE COURT:  Well, I think step one of this part two

15  would be the defendants' assertion of their facts as to notice

16  and step two of it would be the debtors' response.

17          UNIDENTIFIED SPEAKER:  Understood.

18          MR. KLEIN:  Your Honor, I assume this is only with

19  respect to defendants who have filed an affidavit as to filing

20  notice?

21          THE COURT:  Have or will?  I mean, we specifically

22  didn't make notice part of this hearing, so --

23          MR. KLEIN:  Well, no but there's -- the relevant

24  motions were filed a year ago.

25          THE COURT:  Oh, you don't have to refile one -- you

```
 1    don't have to refile one, but --

 2            MR. KLEIN:  Maybe my question wasn't clear.

 3            THE COURT:  Okay.

 4            MR. KLEIN:  There is already a population of

 5    defendants; this was briefed over a year ago.

 6            THE COURT:  Right.

 7            MR. KLEIN:  Defendants raised these issues, certain of

 8    them.

 9            THE COURT:  Right.

10            MR. KLEIN:  Defendants filed affidavits asserting

11    those issues.

12            THE COURT:  Right.  And they don't have to refile

13    them; I've said those are live issues.

14            MR. KLEIN:  I agree, but that's what we're responding

15    to.

16            THE COURT:  Yes.

17            MR. KLEIN:  That was my question.

18            THE COURT:  Well, or -- no, or those who've filed them

19    since then.

20            MR. KLEIN:  Okay.

21            THE COURT:  In response to the motion to dismiss.

22            MR. KLEIN:  Okay.  I want to make sure we're not --

23            THE COURT:  Because again, those issues, as we --

24    about half an hour ago we said are not part of this hearing.

25            MR. KLEIN:  What's in the record as of today is --
```

 1          THE COURT:  No.  No, I don't think so because again --

 2    and I appreciate that counsel for Doshi and other counsel may

 3    have reviewed the December transcript and thought that those

 4    issues were for part of this hearing, but I've concluded they

 5    aren't.  So I don't think people should be closed out by not

 6    having raised them.  You don't have to repeat them, because

 7    you've already done it, those who have done, but I don't think

 8    people should be closed out for not having raised them because

 9    it wasn't part of this hearing.  I've already ruled that.

10          MS. GRUBIN:  Well, Your Honor, perhaps people should

11    not be foreclosed for filing affidavits subsequent to today.

12          THE COURT:  That's what I just said.

13          MS. GRUBIN:  I wanted to make it clear, Your Honor.

14          THE COURT:  You said it more clearly.  You said it

15    more clearly.

16          UNIDENTIFIED SPEAKER:  And, Your Honor, I apologize

17    because I think I'll be repeating you too, but the vehicle to

18    make this happen will be a motion that must be brought by the

19    debtor.

20          THE COURT:  Is part two of the objection -- I'm sorry.

21    Part two of the objection to the Rule 15 motion.

22          UNIDENTIFIED SPEAKER:  Part two to the objection to

23    the Rule 15 motion.

24          THE COURT:  Yes.  Yes.  And you ought to wait to see

25    what complaints survive and then you can file your objection.

DPH HOLDINGS CORP., ET AL.

Page 313

1    I'm assuming most people want to get that done sooner rather

2    than later, so you should do that promptly.  I don't want to --

3    I don't want to have new people holding back the people who

4    have already filed their affidavits already.  So I don't know

5    how soon people want to do that.  I don't know if you want to

6    meet and confer over that, you know, give yourself thirty days,

7    twenty days; I don't care.  It's up to you.

8            And the debtor should respond to that promptly.  I'm

9    assuming the debtors' thought about this and should do it

10   within again, I would say two to three weeks.

11           MR. APPLEBAUM:  Your Honor, I'm sorry; entirely my

12   fault, I'm confused.

13           We've already fi -- Doshi has already filed --

14           THE COURT:  I'm just -- no, it's everyone else.  The

15   other folks.

16           MR. APPLEBAUM:  No, no.  I appreciate that; I'm just

17   trying to -- a very prosaic issue.  We've already filed our

18   affidavits in connection with our opposition papers --

19           THE COURT:  Right.

20           MR. APPLEBAUM:  -- for us --

21           THE COURT:  Right.

22           MR. APPLEBAUM:  -- in this what is now going to be

23   part two of the Rule 15.  I'm just trying to understand

24   procedurally what I need to do.  Is now the burden on the

25   Butzel firm or the Togut firm, depending I guess on who the

DPH HOLDINGS CORP., ET AL.

Page 314

```
 1   attorney is representing them in that conflict situation, but

 2   the reorganized debtor to respond to our affidavits or to sit

 3   down with us --

 4           THE COURT:  Yes.  I think -- yes.  But the timing will

 5   have -- I mean, I don't see why they should do it piecemeal.  I

 6   think the timing should be worked from a set deadline that's

 7   not too far off from now to give people a chance to put in

 8   their affidavit now who haven't so far --

 9           MR. APPLEBAUM:  And then the idea is --

10           THE COURT:  -- we've got unduly delaying people like

11   you who have already done that.

12           MR. APPLEBAUM:  I understand.  So you'll set a date

13   then by that date they have to respond to everyone --

14           THE COURT:  Right.  Right.

15           MR. APPLEBAUM:  -- as to whether or not they agree or

16   disagree.

17           THE COURT:  Right.

18           MR. APPLEBAUM:  And then it's your hearing.

19           THE COURT:  And my only thought here is whether I

20   should expand the issue here beyond the notice issue to issues

21   of prejudice or not and my inclination is -- well, I don't

22   know.  My inclination is probably not, because I'm sort of

23   already have -- have my analysis in mind, and it really depends

24   on notice.

25           MR. APPLEBAUM:  Um-hum.
```

1          THE COURT:  In other words, it means less to me that

2     someone did transaction X and someone else's CEO went to firm Y

3     than that they got notice or not.

4          MR. APPLEBAUM:  Understood.  Thank you.

5          THE COURT:  So does it make sense to give a final date

6     on this issue of notice for thirty days from today and then

7     give the plaintiff three weeks to respond?  Not from today, but

8     from my issuance of an order on the first part of the motion to

9     dismiss?

10         MR. APPLEBAUM:  I don't want to speak for all the

11    defendants in the room, but do we really need that much time,

12    even?  I mean, I don't want to create too much of a long

13    timeline, but it's --

14         MR. SILVERSCHOTZ:  May I address Your Honor on that

15    point?

16         THE COURT:  Okay.  I'm also happy to have you all meet

17    and confer, talk to your clients about it and then set up a

18    call next week about it too, that's on the record.  So, you

19    know, because you don't have your clients here.  I don't know

20    how much you've thought about this -- not just you, but

21    everyone.

22         MR. SILVERSCHOTZ:  Good evening, Your Honor, Mark

23    Silverschotz, Reed Smith, for Wells Fargo.  I'm here with my

24    partner, Derek Baker, whose pro hac motion is pending.

25         THE COURT:  Okay.

DPH HOLDINGS CORP., ET AL.

Page 316

1          MR. SILVERSCHOTZ:  I don't like to speak before 6:30,

2      so I've waited until now.

3          THE COURT:  Okay.

4          MR. SILVERSCHOTZ:  Your Honor, just on the procedural

5      matter, we're going to put in our affidavit, but the only

6      concern we have with respect to that affidavit is how the Court

7      would like the facts framed.  To the extent that we're putting

8      in a factual assertion that attempts in essence to prove the

9      negative, where we've received no notice of anything at any

10     time, it's a -- it's a style point, I suppose.

11         THE COURT:  Well, look -- I understand.  There's the

12     documentary evidence; there's no affidavit of service, for

13     example, I'm assuming.  But that's point one on your affidavit

14     and then we don't know.  I mean, other than that we didn't

15     know.

16         MR. SILVERSCHOTZ:  And the debtor could respond as

17     they see fit.

18         THE COURT:  Debtor can respond.  Yes.

19         MR. SILVERSCHOTZ:  Okay.  That's fine, Your Honor.

20     We'll say what we can't say.

21         THE COURT:  All right.

22         MR. SILVERSCHOTZ:  Thank you, Your Honor.

23         THE COURT:  Okay.

24         MS. HAFFEY:  Your Honor, without knowing the different

25     factual scenarios that are going be presented to us, I perceive

DPH HOLDINGS CORP., ET AL.

Page 317

1    that plaintiffs are going to need to have the opportunity at

2    least to do discovery on some of these matters.  And as counsel

3    just pointed out, these are going to be factual affidavits and

4    in order for us to be able to explore those facts and determine

5    whether or not there was actual notice, I don't know how we'd

6    do that without some discovery.

7                MR. NAYAK:  Your Honor, Mahesh Nayak.  Briefly, based

8    on the extended time we were on the record, you made it clear

9    that these things would have to happen pre-discovery, without

10   discovery, and would be decided as a matter of law.  And we

11   also discussed the fact as --

12               THE COURT:  I think, given the apparent lack of

13   service of the fourth extension motion, the debtor should have

14   something already in hand before they're entitled to additional

15   discovery.  I just -- you know, you've got to know something.

16               And again, this issue is flagged in July.  I

17   understand there's not been discovery since July but I just

18   think the debtor should -- given the lack of service --

19   apparent lack of service.  If you could show me someone was

20   actually served, it's a different story.  But I think given the

21   apparent lack of service I don't see why there should be

22   discovery.  I mean, there's got to be something to show that

23   they had notice other than that.

24               MS. HAFFEY:  Well, again, I guess it's the difference

25   between notice and actual notice, Your Honor.  And to counsel's

Page 318

1    point about --

2            THE COURT:  Well, but -- but the point was that it

3    wasn't -- what was said to have been provided wasn't provided

4    so I think something else has to step in place to do it and

5    going on a fishing expedition for it now is a little late.  I

6    understand your firm didn't do the notice in October.

7            MS. HAFFEY:  And it's not just a matter of fishing

8    notice, Your Honor -- or fishing expedition, Your Honor, but

9    the reorganized debtors, of course, aren't New Delphi and to

10   your example earlier, in regards to maybe someone at Old Delphi

11   had a conversation with one of these suppliers, that's not my

12   client.

13           MR. SULLIVAN:  We also didn't ask -- Your Honor, it

14   was the debtor that obviously sought these extension motions.

15   I mean, this is the debtors' bed to make.

16           MS. HAFFEY:  Well, it is -- the debtor did what it --

17           THE COURT:  I need to see some -- I think I need to

18   see some fact on notice before I'll say that there should be

19   more discovery -- that there should be any discovery.  I mean,

20   there should be something; I just -- albeit in the context of

21   some responses to the motions to amend, I have seen several

22   affidavits where people said they didn't get anything.

23           And affidavits don't count when there's a certificate

24   of service because there's a presumption of mailing.  But that

25   didn't happen.

Page 319

1           MS. HAFFEY:  Well, and it -- I think what --

2           THE COURT:  If it did happen, it's different.  Then

3    you're going to be entitled to discovery and you'll get to the

4    next stage of this saga but if they're not on the certificate

5    of service, then I think the burden's more on you guys at that

6    point.

7           MS. HAFFEY:  In regards to timing, then, Your Honor,

8    since we don't know yet how many defendants are going to, in

9    the next several days --

10          THE COURT:  Right.

11          MS. HAFFEY:  -- provide us with declarations, I would

12   just ask that we set the time for the debtors to respond

13   until -- and maybe set a date in which the defendants will

14   provide us with their declarations and we'll look at the number

15   then and set a time for us to respond.  I think we're at this

16   stage kind of doing that in a vacuum without knowing.

17          THE COURT:  Okay.  I think that's fair.

18          MS. HAFFEY:  Thank you.

19          MR. WURST:  Judge, that's exactly the point I wanted

20   to address.  This -- I'm sorry, Jeff Wurst for Wells Fargo,

21   case 07-02597, to be distinguished from the 02720.

22          The gestation period for this motion is now longer

23   than that for a human being.  This motion was filed September

24   7th and it's now nine and a half months --

25          THE COURT:  Well, I know, but that's not -- I mean,

Page 320

1    there are a lot of people who had their hand in that.

2           MR. WURST:  No -- well, I understand that.  And part

3    of trying to accommodate everyone's dates has dragged that out

4    and --

5           THE COURT:  Right.

6           MR. WURST:  -- where some of us had preferred earlier

7    to go the individual route, we could have been home watching a

8    ballgame by now.  But --

9           THE COURT:  That's because we wouldn't even have had

10   the hearing.

11          MR. WURST:  I'm encouraging to move this as quickly as

12   possible.

13          THE COURT:  So my view is that you should set a date.

14   I don't hear anyone leaping and saying that thirty days is too

15   short.  I hear someone saying thirty days is too long.  Do you

16   want to make it twenty-one days?

17          UNIDENTIFIED SPEAKER:  Your Honor, can we make it ten?

18   Unless any defendant has an objection?

19          UNIDENTIFIED SPEAKER:  No.

20          MR. THOMAN:  This is Jim Thoman for Unifrax.  I object

21   to ten days.

22          THE COURT:  Okay.  All right.  Why not three weeks

23   from today?

24          UNIDENTIFIED SPEAKER:  Thank you, Judge.

25          UNIDENTIFIED SPEAKER:  Judge?

Page 321

```
 1            THE COURT:  Okay, and then as far as the debtors'

 2    response, my inclination would be to have it be three weeks

 3    from then.  However, if they get seventy-seven of these, then

 4    it might be a couple weeks longer than that.  Okay?

 5            Did you have a question, Ms. Grubin, or are you just

 6    getting ready to leave?

 7            MS. GRUBIN:  No, I did have a question, Judge.

 8            THE COURT:  Okay.  All right.

 9            MS. GRUBIN:  Just at the point of clarification, we

10    still are expecting from the debtors documents --

11            THE COURT:  Well, those other deadlines are still in

12    effect.

13            MS. GRUBIN:  -- on Monday.

14            THE COURT:  Yes, on part one of the Rule 15 motion.

15            MS. GRUBIN:  Okay.  And could you so order the record,

16    Your Honor?

17            THE COURT:  There's no such thing.  I mean, everyone

18    is relying upon the record and I am perfectly prepared to issue

19    an order consistent with the record, but everyone's relying

20    upon it and that's my ruling, so that that's what should

21    happen.  That's what will happen.

22            MS. GRUBIN:  Okay.

23            THE COURT:  It's the same thing but there's no dot --

24    there's no reordering a record.

25            MS. GRUBIN:  Thank you, Judge.
```

Page 322

1          THE COURT:  In my view, at least.  Okay.

2          MS. HAFFEY:  Your Honor, one housekeeping matter?  And

3   this relates back to the motions to amend and the blanks

4   that --

5          THE COURT:  Yes.

6          MS. HAFFEY:  -- that this Court said, prior to lunch,

7   that it may entertain the opport -- allowing the reorganized

8   debtors to be able to provide a amended exhibit so that it

9   would provide antecedent debt information in?

10         THE COURT:  I don't remember -- that was not my view.

11  The issue was whether I would permit you all to amend -- to

12  make a motion to amend.  I'm going to see how this exercise

13  shakes out over the next week or so --

14         MS. HAFFEY:  Okay.

15         THE COURT:  -- before I decide that.  My view, though,

16  is that there should be some costs on any motion to amend here

17  because -- on this point.  It just seems to me that it's an

18  issue that was pretty obvious and my inclination is if I allow

19  it all, the cost of responding to it would be picked up by the

20  estate.

21         I don't like repeated motions to amend where I think

22  it should have been dealt with in advance.  I just -- you know,

23  if you were able to tell this to me today, I don't know why you

24  weren't able to tell it in the complaint when it was filed.

25         MS. HAFFEY:  And all I can tell Your Honor is it was

1    just a matter of my client digging into its documents and --

2              THE COURT:  I understand, but on the other hand,

3    that's what I had granted 180 days after the effective date of

4    the fourth plan, so that these things could be done.  And they

5    weren't.  So that's if I granted any leave to amend at all.

6    So --

7              MS. HAFFEY:  Okay.

8              THE COURT:  -- I mean, to file a motion to amend,

9    which obviously incur -- people have to spend money answering

10   or responding to.

11             MS. HAFFEY:  Thank you, Your Honor.

12             THE COURT:  Okay.

13             IN UNISON:  Thank you, Your Honor.

14             THE COURT:  You look puzzled.

15             UNIDENTIFIED SPEAKER:  I am puzzled.

16             THE COURT:  About what?

17             UNIDENTIFIED SPEAKER:  Where we are in proceeding on

18   where there are blanks.

19             THE COURT:  They don't have leave to amend.

20             UNIDENTIFIED SPEAKER:  They don't have leave to amend?

21             THE COURT:  Not yet.  I'm not granting them.

22             UNIDENTIFIED SPEAKER:  So that's the thing.

23             THE COURT:  Yes.

24        (Whereupon these proceedings were concluded at 6:45 PM)

25

Page 324

1

2                                  I N D E X

3

4                                  RULINGS

5                                                    Page        Line

6   Debtors will provide definitive response to      82          17

7   defendants presenting assumption notice or

8   claim under 8.1 within 30 days

9   Objections to Proposed Amended Complaints,        187         23

10  Overruled

11  Proposed amended complaint meets the Rule 8       207          4

12  Iqbal standard

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 325

1

2                     C E R T I F I C A T I O N

3

4    I, Dena Page, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7         Dena Page                Digitally signed by Dena Page
                                   DN: cn=Dena Page, o, ou,
                                   email=digital1@veritext.com,
                                   c=US
8    _____      Date: 2011.06.27 09:53:13 -04'00'

9    DENA PAGE

10   Also transcribed by:

11   Penina Wolicki, AAERT Certified Electronic Transcriber (CET**D-

12   569)

13   Tzipora Geralnik, AAERT Certified Electronic Transcriber

14   (CET**D-489)

15   Pnina Eilberg, AAERT Certified Electronic Transcriber (CET**D-

16   488)

17   Sara Davis, AAERT Certified Electronic Transcriber (CET**D-567)

18   Sharona Shapiro, AAERT Certified Electronic Transcriber

19   (CET**D-492)

20   Miriam Greenman, AAERT Certified Electronic Transcriber

21   (CET**D-566)

22   Ellen Kolman, AAERT Certified Electronic Transcriber (CET**D-

23   568)

24   Karen Schiffmiller, AAERT Certified Electronic Transcriber

25   (CET**D-570)

**Page 326**

1  Devora Kessin

2  Aliza Chodoff

3  Avigayil Roth

4  Laurie Ann Sherby

5

6  Veritext

7  200 Old Country Road

8  Suite 580

9  Mineola, NY 11501

10

11  Date:  June 24, 2011

12

13

14

15

16

17

18

19

20

21

22

23

24

25