# EXHIBIT C

FORM B10 (Official Form 10) (10/05)

| United States Bankruptcy Court - **Southern District of New York** | **PROOF OF CLAIM** |
|---|---|

| | |
|---|---|
| Name of Debtor<br>**Delphi Corporation** | Case Number<br>**05-44481 (RDD)** |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| | |
|---|---|
| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>**Victory Packaging LP** | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. |
| Name and address where notices should be sent:<br>**See Attached Addendum** | ☐ Check box if you have never received any notices from the bankruptcy court in this case. |
| | ☐ Check box if the address differs from the address on the envelope sent to you by the court. |
| Telephone number: | This Space is for Court Use Only |

| Last 4 digits of account or other number by which creditor identifies debtor: | Check here<br>if this claim | ☐ replaces<br>☐ amends | a previously filed claim dated:_____ |
|---|---|---|---|

| | |
|---|---|
| **1. Basis for Claim**<br>■ Goods sold<br>☐ Services performed<br>☐ Money loaned<br>☐ Personal injury/wrongful death<br>☐ Taxes<br>■ Other **Breach of Contract** | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)<br>☐ Wages, salaries, and compensation (fill out below)<br>Last four digits of SS #:_____<br>Unpaid compensation for services performed<br>from _____ to _____<br>(date)          (date) |
| **2. Date debt was incurred:** **See Attached** | **3. If court judgment, date obtained:** **N/A** |

**4. Classification of Claim.** Check the appropriate box or boxes that describe your claim and state the amount of the claim at the time case filed.
See reverse side for important explanations.

Unsecured Nonpriority Claim $ **9,549,522.82**

■ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or c) none or only part of your claim is entitled to priority.

Unsecured Priority Claim.

■ Check this box if you have an unsecured claim, all or part of which is entitled to priority
Amount entitled to priority $ **658,509.45**

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B)

☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

**Secured Claim**

☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate   ☐ Motor Vehicle   ☐ Other _____

Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in the secured claim, if any: $_____

☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

■ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)( ).

* Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

| | | | | |
|---|---|---|---|---|
| **5. Total Amount of Claim at Time Case Filed: $ 9,549,522.82** | | 658,509.45 | **10,208,032.27** | |
| | (unsecured) | (secured) | (priority) | (Total) |

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

| | This Space is for Court Use Only |
|---|---|
| **6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. | |
| **7. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. | |
| **8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim | |

| Date<br>**July 25, 2006** | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br><br>Benjamin Samuels, Vice Chairman |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## Addendum

1.      Claimant expressly reserves its right to amend or supplement this Proof of Claim in any respect, or to file additional proofs of claim for additional claims or administrative expenses. The execution and filing of this Proof of Claim is not: (a) a waiver or release of Claimant's rights against any other entity or person liable for all or part of the indebtedness claimed herein; (b) a waiver of the right to withdraw the reference with respect to the subject matter of these claims, any objection or other proceedings commenced with respect thereto or any other proceedings in this case involving Claimant; (c) a waiver of any right of subrogation in favor of Claimant, regardless whether such subrogation is specifically asserted herein; (d) a waiver of any right of Claimant to assert reclamation claim status with regard to goods sold and delivered prior to October 8, 2005; (e) or an election of remedy which waives or otherwise affects any other remedy of Claimant.

2.      Victory Packaging LP ("Victory"), among other things, delivered goods to the Debtor at the Debtor's request and provided certain services to the Debtor all pursuant to a written Packaging Commodity Management Agreement, dated as of December 19, 2003, as amended by that certain Settlement Agreement, (Revision 1, dated September 14, 2005) (collectively, the "Agreement"). True copies of each of the agreements are attached as Exhibit A.

3.      Invoices and other documents evidencing and setting forth the calculation of the component parts of this claim are not attached, however, they are available upon request. The total amount of the claim is $10,208,0302.00:

    a.  goods sold and delivered - $3,423,435.18;

    b.  inventory storage fee - $39,937.16;

    c.  aged inventory invoices prior to October 8, 2005 - $430,368.93;

    d.  aged inventory purchased prior to October 8, 2005, but aged after October 8, 2005 - $627,989; and

    e.  cost savings - $5,686,302.00.

4.      This claim is an unsecured claim, except to the extent of the reclamation claim hereby asserted by claimant in the amount of $658,509.45, entitled to priority status pursuant to 11 USC § 507(a)(2).

5.      This claim is not subject to any set-off or counterclaim.

6.      All notices concerning this proof of claim should be sent to:

                Victory Packaging LLP
                3555 Timmons Land, Suite 1440
                Houston, TX 77027
                Attention: Mr. Benjamin Samuels, Vice Chairman

                        with copies to:

Thompson & Knight LLP
919 Third Avenue, 39th Floor
New York, NY 10022
Attn:   Ira L. Herman, Esq.
Tel:    212-751-3045

EXECUTION COPY

## Packaging Commodity Management Agreement

Delphi Corporation, a Delaware corporation, acting by and through its various affiliates and subsidiaries (collectively, "Delphi") and Victory Packaging L.P., a Texas limited partnership ("Victory") enter into this Commodity Management Agreement (this "Agreement") as of December 19 , 2003.

## 1. Commodity Management Services.

A.     Victory is hereby engaged by Delphi to serve as commodity manager of all corrugated packaging materials, including, without limitation, boxes, pallets, pads and partitions (collectively, "Products"), for all Delphi's facilities in the U.S. and Mexico (collectively, the "Delphi Locations"), other than the Excluded E&C Products which will be handled as set forth in Section 3.B below

B.     As commodity manager, Victory will, in addition to its supply of Products as set forth in Section 3, perform for Delphi all of the related services set forth in this Agreement as well as provide local engineering support for Delphi's Engineering Centers in Juarez, Mexico, Kokomo, Indiana, Warren, Ohio, Detroit, Michigan and Lockport/Rochester, New York.  In addition, Victory will make available to Delphi suppliers, Delphi Standard Container Listing Products at its local branches.  Compensation for the Services is included in, and part of, the unit pricing for Products, and Victory will not be entitled to any additional fees or compensation on account of the Services.

C.     Victory will utilize its "Star Wars" software system to capture, track and document in a digital database all of Delphi's current requirements and design specifications and prints for the Products and to develop and document all Cost Saving Opportunities (as defined in Section 3 below).  All CAD drawings and other data related to Delphi and/or the Products (whether provided by Delphi or created by Victory pursuant to this Agreement) will be the sole property of Delphi (subject to any patent rights of Victory with respect to new packaging designs provided to Delphi by Victory).  Delphi acknowledges and agrees that Victory and/or its licensors own all patents, copyrights, trademarks, trade secrets and any other proprietary rights in the "Star Wars" software system and any modifications or enhancements thereto, including any modifications or enhancements made in connection with Victory's performing the Services for Delphi, and that Delphi will not obtain any rights or licenses therein.

C.     Victory commits to working with cost standards and cost models in connection with the pricing for new categories, types and designs of corrugated packaging materials which are intended by Delphi to replace or supplement existing Products at Delphi Locations (collectively, "New Products").  Victory will assist Delphi to develop, and regularly update, Delphi's Cost Model Standards for corrugated packaging materials (the "Delphi Cost Model").

2.     **Term.**  The initial term of this Agreement is five (5) calendar years (each, a "Contract Year") from January 1, 2004 through December 31, 2008.  Thereafter, this Agreement will automatically renew for one additional Contract Year unless either party gives written notice to

1

**EXECUTION COPY**

the other party at least four (4) months prior to the expiration of the then current Contract Year (i.e., on or before August 31) of its election not to so extend the term of this Agreement.

3.  **Supply of Products**

A.     During the term of this Agreement, Delphi will purchase from Victory, and Victory will supply to Delphi, 100% of Delphi's requirements for those Products for those Delphi Locations that are set forth on Exhibit A attached hereto.  While the parties intend to list all Products and Delphi Locations (including applicable pricing) on Exhibit A, the parties recognize that the type, specifications and pricing for many Products and Delphi Locations has not yet been established and agreed upon due to the scope and complexity of the data.  Therefore, the parties will use commercially reasonable efforts to identify all remaining Products and Delphi Locations, and establish initial Base Unit Prices therefor, no later than March 31, 2004, by entering into written amendments to Exhibit A from time to time.

B.     Delphi has existing exclusive supply contracts (with Ackers and Genessee) for its requirements for certain corrugated packaging materials for certain of its Delphi Energy & Chassis locations in the U.S. (collectively, "Excluded E&C Products").  Delphi will transfer supply of the Excluded E&C Products to Victory upon expiration of these existing supply contracts, subject to (i) Victory having met all of its obligations under this Agreement and (ii) establishment of mutually acceptable unit pricing and savings targets for the Excluded E&C Products in accordance with Section 3.C below.

C.     During the term of this Agreement, Delphi will, subject to Victory having met all of its obligations under this Agreement, source to Victory 100% of Delphi's requirements for New Products at Base Unit Prices established in accordance with the Delphi Cost Model, and Victory will supply such New Products to Delphi.  As New Products are sourced to Victory, such New Products and corresponding Base Unit Prices will be added to Exhibit A by a written amendment thereto.  In the event that Victory is unwilling to supply any New Products at pricing that is consistent with the Delphi Price Model or Delphi reasonably determines that Victory is, or will be, unable to meet all of Delphi's quality, production and other requirements with respect to such New Products (including, without limitation, engineering validation and production start-up and volume), Delphi may award the supply of such New Products to an alternative supplier without liability to Victory (but reserving any and all of Delphi's rights and remedies on account any breach by Victory of its obligations under this Agreement).

4.  **Pricing**

A.  **Base Unit Prices.**

(i)  The initial base per unit price for all Products and Delphi Locations is set forth on Exhibit A (collectively, the "Base Unit Prices").  Delphi's current specifications and unit cost for the Products was used as the basis for Exhibit A.  The parties acknowledge that collecting this price data and specifications was a complex task and that unintentional errors may have occurred.  In the event that any cost data or specifications provided by Delphi to Victory in connection with  the development of Exhibit A is discovered to have been incorrect, the parties

2

**EXECUTION COPY**

will promptly implement appropriate and reasonable price adjustments. For a period of one (1) year following the date of this Agreement, Victory will have the right, upon advance notice to Delphi, to review Delphi's relevant books and records at reasonable times and places, in order to verify the accuracy of any data provided by Delphi to Victory.

(ii)   As additional Products (including New Products) and Delphi Locations are sourced to Victory, the parties will amend Exhibit A to reflect agreed upon Base Unit Prices. Except as otherwise expressly set forth on Exhibit A, all Base Unit Prices are Duty Delivered Paid (DDP IncoTerms 2000) to the Delphi Location (title and risk of loss to transfer only upon delivery to the Delphi Location). Base Unit Prices are subject to quarterly cost adjustment as provided in Section 4.A(iii) below. Payment terms are MNS-2 (2nd business day of the 2nd month following delivery and receipt at the applicable Delphi Location).

(iii)   If the average per ton list price of 42# east unbleached kraft linerboard as reported in the appropriate *Pulp & Paper "Pricewatch"* (the "Price Index") for the first month of any calendar quarter (i.e., January, April, July and October) varies by more than $29 per ton (up or down) compared to the Price Index for the last month of the corresponding calendar quarter (i.e., March, June, September and December), then the Base Unit Prices will be adjusted effective at the start of the second month of the following calendar quarter (i.e., May 1, August 1, November 1 and February 1) by a factor of 1.8% up or down for every $10 change in the Price Index.   For example:

- If the Price Index for December 2003 is $40 per ton lower than the Price Index on for October 2003, then, effective February 1, 2004, the Base Unit Prices will be reduced by 7.2% ($40/10 X 1.8%).

- If the Price Index for June 2004 is $45 per ton higher than the Price Index for April 2004, then, effective August 1, 2004, the Base Unit Prices will be increased by 8.1% ($45/10 X 1.8%).

- If the Price Index for March 2004 is $29 per ton higher than the Price Index for January 2004, then, effective May 1, 2004, the Base Unit Prices will be not be adjusted because the variation is not more than $29 per ton.

B.   Base Unit Price Reduction for Packard Mexico.   In addition to price adjustment in accordance with Section 4.A(iii) above and expected reductions on account of Cost Savings Opportunities implemented in accordance with Section 4.D below, Base Unit Prices for those certain Products identified on Exhibit A as "Packard Mexico (Smurfit)" Products (collectively, "Packard Mexico (Smurfit) Products") will be reduced by 5% effective November 15, 2006 (based on then current Base Unit Prices for such Products).

C.   Savings Pre-Payment and Premium Recovery.

(i)   As pre-payment of anticipated savings, Victory will pay Delphi US$1,000,000 by delivery of a bank check no later than December 30, 2003 (the "Advanced Savings Payment").

3

**EXECUTION COPY**

(ii)    On account of the Advanced Savings Payment, Delphi will pay a 5% unit price premium above and beyond the Base Unit Prices (the "Premium") for the first US$20 million of Products purchased by Delphi from Victory (calculated using the Base Unit Prices only, without the Premium) excluding any Packard Mexico (Smurfit) Products and any Products shipped to those Delphi Locations identified on Exhibit A as "Delco" sites.  In the event that, for any reason, Delphi has not purchased US$20 million of such Products by June 30, 2005, then the Premium will be discontinued as of July 1, 2005 and Delphi will pay any unrecovered balance of the Advanced Savings Payment to Victory on August 2, 2005, provided that if this Agreement is terminated on or before June 30, 2005 for any reason, Delphi will pay any unrecovered balance of the Advanced Savings Payment to Victory on the second day of the second month following such termination of this Agreement.

D.    Cost Saving Opportunities

(i)    As a full service commodity manager, Victory will be responsible for analyzing and reviewing the manufacturing sources of the Products, the design specifications for the Products and all other aspects of Delphi's purchase, use and handling of Products in order to identify opportunities for total costs savings for Delphi (collectively, "Cost Saving Opportunities"), including, but not limited to, (a) conducting competitive bidding and benchmarking activities (including right sizing and supplier consolidation to leverage buying volumes and local sourcing) to identify lower cost sourcing options to reduce Base Unit Prices, (b) re-designing certain Products to reduce Base Unit Prices by removing content and/or unnecessary features and/or to improve manufacturability by reducing material waste and quality scrap and improving processing, (c) re-designing certain Products in order to achieve a net savings for Delphi (i.e., after any increase in Base Unit Prices) due to reduced material handling, freight and inventory/warehousing costs through optimized container capacity (more components packed per container), size, stackability/handling, strength and other design features and/or (d) identifying other initiatives and activities to reduce Delphi's total costs related to the management, purchase, use, storage or handling of the Products, including, without limitation, costs for labor, warehousing/storage, freight, administration and cross docking.

(ii)    Victory will regularly present Cost Savings Opportunities to Delphi for consideration by the Corrugated Commodity Management Team (CCMT) in accordance with the Delphi IMCIP process. Delphi will use commercially reasonable efforts to timely implement Cost Savings Opportunities presented by Victory.  If Delphi elects to reject, delay or abandon implementation of a Cost Savings Opportunity presented by Victory, Delphi will provide Victory with the basis of its decision.  Throughout the term of this Agreement, Delphi may initiate internal reorganizations (overhead and headcount reduction), lean manufacturing improvements and other activities to reduce Delphi's total costs, including costs related to the Products, but which are initiated outside of the Delphi CCMT and/or are not implemented through the IMCIP process and do not require assistance and cooperation from Victory as the Commodity Manager (collectively, "Delphi Savings Activities").  Any savings to Delphi resulting from Delphi Savings Activities will not be included in determining whether Victory has met the Minimum Savings Targets or otherwise be credited as Cost Savings Opportunities presented by Victory.

4

**EXECUTION COPY**

    (iii)  On or before April 30, 2004, the parties, in good faith, will establish a baseline annual purchase volume representing Delphi's expected annualized purchase of all Products for all Delphi Locations in Contract Year 1 (January – December 2004), including annualized purchase volumes for Products and Delphi Locations that will be added to <u>Exhibit A</u> after the effective date of this Agreement in accordance with Section 3.A (the "Year 1 Baseline APV"). The Year 1 Baseline APV will be established using historic and current purchase data and is currently estimated to be $45-50 million. The Baseline APV for each succeeding Contract Year will be equal to the Baseline APV for the prior Contract Year less any incremental net annualized savings to Delphi resulting from the implementation of Cost Savings Opportunities presented by Victory during the prior Contract Year.

    (iv)  Victory is committed to developing, identifying and assisting Delphi to implement Cost Savings Opportunities that result in incremental net annualized savings to Delphi (without credit for any downward adjustment or penalty for upward adjustment of Base Unit Prices in accordance with Section 4.A(iii) or 4.B) of: (a) 5% of Year 1 Baseline APV by the end Contract Year 1; (b) 3% of Year 2 Baseline APV by the end of Contract Year 2; (c) 3% of Year 3 Baseline APV by the end of Contract Year 3; (d) 3% of Year 4 Baseline APV by the end of Contract Year 4; and (d) 3% of Year 5 Baseline APV by the end of Contract Year 5 (collectively, the "Minimum Savings Targets").

    (v)  In the event that any portion of the Minimum Savings Targets for Years 1 and 2 is not achieved by the end of Year 2, then Base Unit Prices for Contract Year 3 will be reduced in order to provide Delphi with the balance of any unachieved Minimum Savings Targets for Contract Years 1 and 2. In the event that any portion of the Minimum Savings Targets for each of Contract Years 3 or 4 is not achieved by the end of any such Contract Year, then Base Unit Prices for the next Contract Year will be reduced in order to provide Delphi with the balance of any unachieved Minimum Savings Target for such Contract Year. If the Minimum Savings Target for Contract Year 5 is not achieved and this Agreement is extended for at least one additional Contract Year (i.e., Contract Year 6), then Base Unit Prices for Contract Year 6 will be reduced in order to provide Delphi with the balance of any unachieved Minimum Savings Target for Contract Year 5.

    (vi)  In the event that the aggregate Minimum Savings Targets are fully achieved prior to the end of the term of this Agreement through implementation of Cost Savings Opportunities presented by Victory and/or reduction of Base Unit Prices in lieu thereof, then any additional incremental Base Unit Price reductions during the term of this Agreement resulting from the implementation of any additional Cost Savings Opportunities presented by Victory will be shared equally between Victory and Delphi (i.e., Base Unit Prices will be reduced by 50%, rather than 100%, of the reduction that otherwise would have resulted upon implementation of such Cost Savings Opportunities).

E.    <u>No Other Price Adjustments</u>. Except as expressly provided in Section 4.A, no increase in Base Unit Prices will be made on account of (i) Seller's failure to achieve any expected cost savings or productivity improvements or (ii) any increases in Victory's labor, materials, overhead, freight and other costs.

EXECUTION COPY

5.   **Minority Business Enterprise Involvement.** Seller agrees to use commercially reasonable efforts to source, on competitive terms, approximately 20% of the annual purchase value of Products for Delphi Locations in the U.S. to sub-suppliers that are certified Minority Business Enterprises (MBEs). Victory will provide a monthly report to Delphi tracking progress towards this goal with the expectation that it will be achieved on or before the end of Contract Year 3.  As appropriate, Delphi may, from time to time, suggest that Victory consider specific MBEs, provided, however, that Victory will be solely responsible for the selection of its sub-suppliers. In the event that Delphi requires and directs Victory to purchase certain Products from a specific MBE sub-supplier (the "Directed MBE Source Products") at a cost (FOB Victory's applicable distribution branch) to Victory (the "Directed MBE Source Cost") that exceeds the cost (FOB Victory's applicable distribution branch) offered to Victory by an alternative supplier (the "Alternative Cost"), then, unless otherwise agreed in writing by the parties, the Base Unit Price for such Directed MBE Source Products to Delphi will be equal to the Directed MBE Source Cost plus thirty-nine percent (39%) of the Alternative Cost and, for purposes of determining achievement of the Minimum Savings Targets only, the Base Unit Price for the Directed MBE Source Products will be deemed to be the Alternative Cost plus thirty-nine percent (39%).

6.   **Inventory.** Delphi will use commercially reasonable efforts to provide Victory with a rolling forecast (usually 8-12 weeks) of its anticipated requirements for Products at each Delphi Location, provided that Victory acknowledges that many Delphi Locations (approximately 50%) are not currently capable of providing such rolling forecasts.  For those Delphi Locations that are not capable of issuing rolling forecasts, such Delphi Locations will establish minimum/maximum inventory levels of each Product (by part number) to be maintained by Victory for such Delphi Location.  For those Delphi Locations that provide rolling forecasts, Victory will maintain an average of 50-60 days of inventory of Products (by part number) for each such Delphi Location in its applicable warehouses based on Delphi's rolling forecasts. While these rolling forecasts and/or inventory levels are expected to cover Delphi total purchase requirements, Victory acknowledges that the just-in-time nature of the automotive industry and the resulting production variations may, from time to time, result in variations and rush orders.  In the event that Delphi's actual purchases and/or reduced forecasts of Products (based on part number) result in Victory holding excess inventory (i.e., greater than the amounts based on the rolling forecasts and/or agreed upon maximum inventory levels) for more than 150 consecutive days (based on date of Victory's purchase), Victory will invoice Delphi and Delphi will pay within normal payment terms for such excess inventory. Any such excess inventory of Products (by part number) that is not delivered to Delphi through the normal ordering process after an additional 60 days (i.e., 210 consecutive days from Victory's date of purchase) will be delivered to Delphi or scrapped according to Delphi's instructions.  Upon expiration or cancellation of this Agreement for any reason, Delphi will purchase Victory's then useable and merchantable inventory of Products, provided that Delphi will not be required to buy any inventory in excess of Delphi's rolling forecasts and/or agreed upon maximum inventory levels.

7.   **Purchase Orders.** All Products will be ordered by Delphi, and delivered by Seller, in accordance with written purchase orders, including related delivery releases and shipping instructions (whether transmitted in paper, electronic or other format), issued by Delphi from time to time.  Delphi's General Terms and Conditions, attached hereto as **Exhibit B**, are

**EXECUTION COPY**

incorporated herein by reference and will apply to all purchases of Products, except to the extent inconsistent with the express terms of this Agreement. The provisions of this Agreement supersede and govern over any additional, inconsistent or conflicting terms and conditions of any purchase order or other agreement, arrangement or practice between Victory and Delphi relating to the Products, including Delphi's General Terms and Conditions and any terms submitted by Victory on any invoice, quote or other form.

## 8.   Early Termination

A.   No Termination for Convenience. Delphi waives its right to terminate for convenience under the Delphi General Terms and Conditions.

B.   Non-Supply Performance Issues. If Delphi believes that Victory is not meeting any of its commodity management obligations under this Agreement excluding obligations related to the timely delivery and supply of Products to Delphi Locations but including, without limitation, performing and providing the Services, presenting Cost Savings Opportunities to meet the Minimum Savings Targets and/or satisfying the MBE involvement goal set forth in Section 5, Delphi will notify Victory in writing, identifying the specific performance issues along with a brief summary of Delphi's understanding of the relevant facts and circumstances. Within 10 days of such notice, Delphi (CCMT) and Victory will meet to discuss the specific concerns and review all relevant data. Within 30 days following such meeting, Victory will submit a plan to Delphi that will indicate specific steps to be taken by Victory to correct performance issues, including expected timing, market assumptions and requirements from Delphi. In the event that (i) Victory does not submit such a plan, (ii) such plan does not, in Delphi's reasonable opinion, adequately correct the situation or (iii) Victory fails to diligently implement such plan and make reasonably satisfactory progress towards correcting performance issues, then Delphi may terminate this Agreement upon 30 days advance notice to Victory without any liability to Victory.

C.   Supply Defaults. In addition to any of Delphi's other rights and remedies (which are reserved), Delphi may terminate this Agreement without liability to Victory if Victory materially breaches any of its supply obligations under this Agreement and either (i) does not meet with Delphi (CCMT) promptly following notice by Delphi to Victory identifying the breach and a brief summary of Delphi's understanding of the relevant facts and circumstances in order to present a reasonably acceptable plan to, within a commercially reasonable time under the circumstances (but in no event more than ten (10) business days following such meeting), eliminate such breach(es) and correct any practices and procedures that caused or contributed to such breach(es) or (ii) fails to diligently implement such plan, provided, however, that Delphi will have the right to immediately obtain Products from alternative sources if Delphi reasonably believes such action to be necessary to avoid or limit the impact of any actual or potential disruption of any manufacturing operations of Delphi and/or its customers, suppliers or subcontractors, in which case Delphi will have the right to recover from Victory any additional cost to obtain such Products from alternative sources (compared to Base Unit Prices and terms of this Agreement).

EXECUTION COPY

D.    Payment Default.  In addition to any of Victory's other rights and remedies (which are reserved), Victory may terminate this Agreement without liability to Delphi if Delphi materially fails to pay Victory within payment terms for delivered product or other invoiced amounts (e.g. slow moving inventory according to the terms of Paragraph 6) if (i) Delphi (CCMT) does not meet with Victory promptly following notice by Victory to Delphi identifying the breach and a brief summary of Victory's understanding of the relevant facts and circumstances in order to present a reasonably acceptable plan to, within a commercially reasonable time under the circumstances (but in no event more than thirty (30) business days following such meeting), eliminate such breach(es) and correct any practices and procedures that caused or contributed to such breach(es).

## 9.    Indemnification by Delphi

A.    Infringement.  Delphi will defend, hold harmless and indemnify Victory and its respective successors and assigns against any claims of infringement (including patent, trademark, copyright, moral, industrial design or other proprietary rights, or misuse or misappropriation of trade secret) and resulting damages and expenses (including, without limitation, attorney and other professional fees and disbursements) relating to Victory's supply to Delphi of Products in accordance with specific designs, drawings, artwork and other specifications provided to Victory by Delphi and expressly required by Delphi.

B.    Activities on Victory's Premises.  Delphi will defend, hold harmless, and indemnify Victory and its respective successors and assigns from and against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other professional fees and disbursements) arising from or in connection with (a) the performance of any service or work by Delphi or its employees, agents, representatives and subcontractors on Victory's premises or (ii) the use by Delphi or its employees, agents, representatives and subcontractors of the property of Victory, except, in each case, to the extent such liability arises out of the negligence or willful misconduct of Victory or its employees, agents, representatives and subcontractors.

10.    Insurance.  Delphi has reviewed Victory's current insurance coverages and policy limits and acknowledges that such coverages and limits are deemed reasonable in Delphi's opinion for the purposes of Section 15 of the Delphi's General Terms and Conditions.  All other provisions of Section 15 Delphi's General Terms and Conditions will continue to apply.

11.    Option to Purchase/Lease Operating Assets.  With respect to any real property (offices, facilities and warehouses), machinery, equipment, tools, vehicles, forklifts and other similar assets that are used solely for the purpose of providing the Products and Services under this Agreement ("Dedicated Operating Assets"), Victory grants Delphi an irrevocable option, upon termination of this Agreement for any reason, to (i) purchase any Dedicated Operating Assets which are owned by Victory for fair market value and/or (ii) assume any leases for Dedicated Operating Assets that are leased by Victory.  Until determination of the fair market value of such Dedicated Operating Assets and/or finalization of the assignment and assumption of leases for Dedicated Operating Assets, Victory will use commercially reasonable efforts to make requested Dedicated Operating Assets available for use by Delphi and/or its designees,

8

**EXECUTION COPY**

provided that Delphi agrees to pay Victory any costs and expenses incurred in connection with such use of the Dedicated Operating Assets, including, without limitation, utilities and other overhead expenses, prorated taxes and assessments and any rent or other amounts due to third parties for Dedicated Operating Assets that are leased. In consideration of the foregoing option, the option provided for in Section 16 of the Delphi Terms and Conditions is hereby waived by Delphi.

12. **Assignment.** In lieu of Section 24 of the Delphi Terms and Conditions, the parties agree that neither party may assign or delegate its rights and obligations under this Agreement without the other parties prior written consent. For purposes of this Agreement, if Victory (i) sells, or offers to sell, a material portion of its assets, including by way of merger or consolidation with another entity or (ii) sells or exchanges, or offers to sell or exchange, or causes to be sold or exchanged, a sufficient amount of its partnership or other equity interests that effects a change in the control of Victory or (iii) executes, or otherwise becomes subject to, a voting or other agreement or trust that effects a change in the control of Victory, such transaction shall be considered a prohibited assignment and Delphi, unless Delphi otherwise consents to such assignment based on its reasonable evaluation of the financial, management and operational capability of Victory (or other assignee) after such transaction, may terminate this Agreement upon giving at least 60 days notice to Victory without liability except as provided in Sections 4.C (Advanced Savings Payment) and 6 (Inventory).

13. **Limitation of Liability.** IN NO EVENT WILL EITHER PARTY BE LIABLE FOR SPECIAL, INDIRECT, PUNITIVE, CONSEQUENTIAL OR OTHER DAMAGES UNDER THIS AGREEMENT FOR ANY LOSS OR INJURY THAT DOES NOT FLOW DIRECTLY FROM THE ACT OR FAILURE TO ACT OF THE OTHER PARTY, INCLUDING, BUT NOT LIMITED TO LOSS OF REPUTATION, LOSS OF GOODWILL, LOST BUSINESS OPPORTUNITIES AND ANY OTHER LOSS OR INJURY OF A SIMILAR NATURE, PROVIDED, HOWEVER, THAT VICTORY WILL BE LIABLE FOR DAMAGES SUFFERED BY DELPHI, INCLUDING CLAIMS BY DELPHI'S CUSTOMERS, RESULTING FROM OR ARISING OUT OF VICTORY'S DELIVERY OF NON-CONFORMING PRODUCTS OR ANY LATE, MISSED OR SHORT/INCOMPLETE DELIVERIES, INCLUDING, WITHOUT LIMITATION, THE COST TO REPLACE ANY NON-CONFORMING PRODUCTS (INCLUDING RETURN FREIGHT OR DISPOSAL COSTS) PLUS, UP TO A MAXIMUM OF $500,000 WITHIN ANY TWELVE (12) MONTH PERIOD, ALL ADDITIONAL COSTS, EXPENSES AND LOSSES RESULTING FROM OR ARISING OUT OF SUCH NON-CONFORMING PRODUCTS AND/OR MISDELIVERIES, SUCH AS (I) INSPECTION, CONTAINMENT OR SORTING OF POTENTIALLY NONCONFORMING PRODUCTS, (II) PRODUCTION INTERRUPTIONS OR SLOWDOWNS AT ANY DELPHI LOCATION, (III) OVERTIME LABOR, PREMIUM FREIGHT AND OTHER COSTS TO MEET CUSTOMER DELIVERY SCHEDULES AND/OR (IV) OFFLINING AND/OR RE-PACKING OF COMPONENTS.

14. **Amendment.** No amendment or modification to this Agreement will be binding upon either party unless it is in writing and is signed by both parties.

9

**EXECUTION COPY**

**15.** <u>**Governing Law and Jurisdiction.**</u> This Agreement as well as all purchase orders and supply agreements related to the Products, are to be construed according to the laws of the State of Michigan, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law. The forum and venue for any legal action or proceeding concerning this Contract will lie in the appropriate federal or state courts in the State of Michigan and each party specifically waives any and all objections to such jurisdiction and venue.

**EXECUTED** as of the above date.

**DELPHI CORPORATION**                    **VICTORY PACKAGING, L.P.**

By:_____            By:_____
Name:_____            Name:_____
Title:_____            Title:_____

10

Settlement Agreement (Revision 1, dated 09-14-2005)

This Settlement Agreement (this "Agreement") is entered into as of September 14th, 2005 (the "Effective Date") by and between Delphi Corporation (together with its affiliates and subsidiaries, "Delphi") and Victory Packaging ("Company").

A.    Company supplies various Corrugated Boxes, Corrugated Pallets, Plastic Bags, and other items (collectively, the "Parts") to Delphi pursuant to various purchase orders, the Packaging Commodity Management Agreement dated December 19, 2003, and supply contracts (collectively, the "Purchase Orders").

B.    Delphi and Company acknowledge their respective rights and obligations related to the Purchase Orders and Corrugated Packaging Agreement, including Delphi's obligation to pay for Parts received.

Based upon the foregoing recitals and for good and valuable considerations, the receipt and adequacy of which is acknowledged, Delphi and Company agree as follows:

1.    Subject to the modifications set forth herein, all Purchase Orders remain in full force and effect.

2.    With respect to purchases from Company by Delphi, which includes shipments of Parts to all Delphi's locations in the U.S. and Mexico, Delphi will pay for Parts on the following terms (the "Modified Terms"): (a) Net 7 with a funds discount of 4% per payment cycle based on the current unit pricing effective for shipments starting on September 14th, 2005, and continuing through October 31st, 2005 or until the date in which Delphi voluntarily elects or is involuntary placed into bankruptcy, whichever comes first (payments received by Victory 8 days or later after delivery, for whatever reason, are immediately past due and are not eligible for the 4% discount) and (b) MNS2-2 (without any unit price discount) thereafter. Delphi and Company agree to revisit the term of this modification based on then current events by October 31st, 2005.

3.    Notwithstanding any intervening change in Delphi's financial situation between the date of this Agreement and October 31st, 2005, or between the date of this Agreement and the date in which Delphi voluntarily elects or is involuntarily placed into bankruptcy, whichever comes first, Company will continue to supply products to Delphi in accordance with the Purchase Orders and this Agreement and waives any further right to seek adequate assurance or further contract modifications under the Michigan Uniform Commercial Code or other applicable laws provided that Delphi, in good faith, resolves and pays when due all year to date unpaid invoices and all year to date past due payments (except to the extent subject to a bona fide reconciliation dispute).

4.    Company will keep the terms of this Agreement together with all related settlement discussions strictly confidential. Company will disclose the terms of this Agreement only to its management personnel that need to know such information to implement the terms of this Agreement and legal counsel and other advisors with whom Company has a recognized legal privilege; provided that all such parties have been informed of the confidentiality restrictions contained herein. Company further agrees that it will be responsible and liable for any breach of the confidentiality provisions set forth in this Agreement by its management personnel, legal counsel and other advisors. Company acknowledges that failure to honor the confidentiality provisions contained herein would cause significant economic harm to Delphi. Any discussions by Company with any third parties, including the press or media or consultants, regarding this Agreement and its terms are expressly prohibited.

5.      The parties hereto acknowledge that they are executing this Agreement without duress or coercion and without reliance on any representations, warranties or commitments other than those representations, warranties and commitments expressly set forth in this Agreement.

6.      This Agreement constitutes the entire understanding of the parties in connection with modification of payment terms.  The parties will continue to work in good faith to resolve other issues, including the payment of past due obligations.  This Agreement may not be modified, altered, or amended except by an agreement in writing signed by Delphi and Company.  This Agreement shall be deemed to be incorporated by reference into, and shall be part of, all Purchase Orders without any specific reference to this Agreement in any such Purchase Order. The terms and conditions of the Purchase Orders are amended to include the terms of this Agreement.  Should an inconsistency or conflict exist between the express terms of the Purchase Orders and this Agreement, the terms of this Agreement shall govern and control.  This Agreement is being entered into among competent persons who are experienced in business and represented by counsel, and has been reviewed by Company and its counsel.  Therefore, any ambiguous language in this Agreement will not necessarily be construed against any particular party as the drafter of such language.

7.      This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Michigan, without regard to conflicts of law principles.

EXECUTED as of the Effective Date,

Delphi Corporation                              Victory Packaging

By:  Delphi Corporation, DGSM                   By: _____
Name: Bjoern Goeke _____                       Name: _Benjamin Samuel___
Title: DGSM Manager, Indirect                   Title: _Vice Chairman___