Hearing Date: September 22, 2011 at 10 a.m. (EDT)

BUTZEL LONG, a professional corporation
150 West Jefferson, Suite 100
Detroit, Michigan 48226
(313) 225-7000
Cynthia J. Haffey
Chester E. Kasiborski, Jr.

*Attorneys for Reorganized Debtors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| DPH HOLDINGS CORP., *et al.,* | Case No. 05-44481 (RDD) |
| | Jointly Administered |
| Reorganized Debtors. | |

**REORGANIZED DEBTORS' STATEMENT OF DISPUTED ISSUES
WITH RESPECT TO PROOF OF CLAIM NUMBER 16778
AND ADMINISTRATIVE EXPENSE CLAIM NUMBER 18902**

**(APPLE INC., APPLE COMPUTER INTERNATIONAL, AND
HON HAI PRECISION INDUSTRY COMPANY, LTD.)**

DPH Holdings Corp. and its affiliated reorganized debtors in the above-captioned cases (collectively, the "Reorganized Debtors"), hereby submit this Statement Of Disputed Issues With Respect To Proof Of Claim Number 16778 and Administrative Expense Claim Number 18902 (the "Statement Of Disputed Issues") filed by Apple Inc., Apple Computer International, and Hon Hai Precision Industry Company (the "Claimant") for the following reasons:

### I. BACKGROUND

1. On October 8 and 14, 2005, Delphi Corporation ("Delphi") and certain of its affiliates, former debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), predecessors of the Reorganized Debtors, filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101¬1330, as then amended.

2. Claimant filed a proof of claim in the captioned case on or about July 31, 2006 ("Claim 13926") seeking certain amounts arising from or relating to that certain Master Goods Agreement #C56-03-00459 dated as of May 1, 2004 (the "Master Goods Agreement") by and between Claimant and Debtors, pursuant to which Debtors supplied Claimant with certain goods.

3. Claimant amended Claim 13926 on two occasions. First, on or about July 5, 2007, Claimant filed an amendment to Claim 13926, which, among other things, was designated as both proof of claim number 16622 ("Claim 16622") and proof of claim number 16624 on the claims register maintained by the Debtors ("Claim 16624," and together with Claim 16622, the "First Amended Claim"). On or about January 8, 2008, Claimant further amended its claim against Delphi by filing a second amended proof of claim, which was designated in the claims register as three distinct claims, claim number 16770 ("Claim 16770"), 16775 ("Claim 16775") and 16778 ("Claim 16778," and collectively with Claim 16770 and Claim 16775, the "Second Amended Claim").

4. On February 15, 2008, the Debtors objected to Claim 13926, Claim 16622, Claim 16624, Claim 16770, and Claim 16775 pursuant to the Debtors' Twenty-Sixth Omnibus Objection Pursuant to 11 U.S.C. §502(b) and Fed. R. Bankr. P. 3007 to Certain (A) Duplicate or Amended Claims, (B) Untimely Claims not Reflected on Debtors' Books and Records, (C) Untimely Claims, and (D) Claims Subject to Modification and Modified Claim Asserting Reclamation (Docket No. 12686) (the "Twenty-Sixth Omnibus Claims Objection").

2

      5.      On March 13, 2008, to resolve the Twenty-Sixth Omnibus Claims Objection with respect to Claim 13926, Claim 16622, Claim 16624, Claim 16770, and Claim 16775, Claimant and Debtors entered into a Stipulation (the "Stipulation"), pursuant to which, among other things, Claimant and Debtors agreed that (a) each of Claim 13926, Claim 16622, Claim 16624, Claim 16770, and Claim 16775 would be disallowed and expunged in their entirety, (b) that Claim 16778 would remain on the Debtors' claims register as the Second Amended Claim and be referenced as an amendment to Apple's originally filed proof of claim (Claim 13296), which was filed prior to the bar date set for the filing of proofs of claims in this case, and therefore related back to the date Claim 13296 was filed, and (c) that Claim 16778 would remain subject to future objection by the Debtors and other parties-in-interest. The March Stipulation was approved by the Court on September 15, 2008 (Docket No. 14182).

      6.      On or about July 15, 2009, Claimant filed an administrative expense claim in the amount of at least $9,487,891.95 which was designated as Claim 18902 ("Administrative Expense Claim 18902"). It is Reorganized Debtors' understanding that Administrative Expense Claim 18902 is based on the same contract and the same general set of facts and circumstances as Claim 16778.

      7.      On July 30, 2009 Debtors filed their July 30, 2009 Notice of Filing Of Third Amended Plan Exhibit 8.1(a) With Respect to First Amended Joint Plan of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (As Modified)( Docket No. 18704)("July 30, 2009 Notice of Filing Amended Plan Exhibit 8.1(a)") by which Debtors filed their "Third Amended Exhibit 8.1(a), Executory Contracts and Unexpired Leases To Be Rejected"  ("Third Amended Exhibit 8.1(a)").

3

8. On October 6, 2009, the Debtors substantially consummated the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Reorganized Debtors And Reorganized Debtors-In-Possession, As Modified (the "Modified Plan"), which had been approved by this Court pursuant to an order entered on July 30, 2009 (Docket No. 18707), and emerged from chapter 11 as the Reorganized Debtors. Article 9.6(a) of the Modified Plan provides that "[t]he Reorganized Debtors shall retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Reorganized Debtors and making distributions (if any) with respect to all Claims and Interests."

9. On November 6, 2009, the Reorganized Debtors objected to Claim 16778 pursuant to the Reorganized Debtors' Thirty-Eighth Omnibus Objection Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To (I) Expunge Certain (A) Equity Interests, (B) Books And Records Claims, (C) Untimely Claims, (D) Pension, Benefit, And OPEB Claims, And (E) Workers' Compensation Claims, And (II) Modify And Allow Certain Claims (Docket No. 19044) (the "Thirty-Eighth Omnibus Claims Objection").

10. On December 3, 2009, Claimant filed a response to the Thirty-Eighth Omnibus Claims Objection (Docket No. 19145).

11. On April 16, 2010 the Reorganized Debtors objected to Administrative Expense Claim 18902 pursuant to Reorganized Debtors' Forty-Seventh Omnibus Objection Pursuant to 11 U.S.C. §503(b) And Fed. R. Bankr. P. 3007 To (I) Disallow And Expunge (A) Certain Administrative Expense Books and Records Claims, (B) A Certain Administrative Expense Duplicate Claim, And (C) Certain Administrative Expense Duplicate Substantial

4

Contribution Claims, And (II) Modify Certain Administrative Expense Claims (Docket No. 19873) (the "Forty-Seventh Omnibus Claims Objection").

12.     On May 13, 2010 Claimant filed a response to the Forty-Seventh Omnibus Claims Objection ( Docket No. 20050).

13.     On July 19, 2011, the Reorganized Debtors filed the Notice Of Claims Objection Hearing With Respect To Reorganized Debtors' Objections To Proof Of Claim Number 16778 And Administrative Expense Claim Number 18902 (Apple Inc., Apple Computer International and Hon Hai Precision Industry Company Ltd.) (Docket No. 21495), scheduling an evidentiary hearing on the merits of those claims for September 22, 2011 at 10:00 a.m. (prevailing Eastern time) in this Court.

## II.    DISPUTED ISSUES

### A.    Administrative Expense Claim 18902 Should Be Disallowed and Expunged Because It Is A Pre-Petition Claim

14.     Claimant's Administrative Expense Claim 18902 incorporates its Claim 16678 which according to Claimant "… further describes the basis for [its] administrative expense claim." Claim 16678 asserts, in Exhibit A, that Debtors are in material breach of Master Goods Agreement #C56-03-004599 dated May 1, 2004 between Claimant and Debtors ("Master Goods Agreement"). The Debtors filed their voluntary petitions in this matter on October 5 and 14, 2005, after the date that Claimant and Debtors entered into the Master Goods Agreement. The alleged breach of a contract that was entered into pre-petition gives rise only to a pre-petition claim and cannot sustain an administrative expense claim. See *Pearl-Phil GMT (Far East) Ltd. v The Caldor Corporation,* 266 B.R. 575, 582 (S.D. N.Y., 2001) ("…the clear weight of case law in this Circuit …recognizes that contract-based bankruptcy claims arise at

5

the time that the contract is executed.") Therefore, Administrative Expense Claim 18902 is a pre-petition claim and is not a viable administrative expense claim.

15. This well-established, controlling legal principle applies even where the alleged breach of a pre-petition contract or alleged damages from breach of a pre-petition contract occur post-petition. *See, e.g., In re Episode USA, Inc*., 202 B.R. 691, 696 (Bankr. S.D.N.Y. 1996) ( "…where the debtors' obligations stem from contractual liability, even a post-petition breach will be treated as giving rise to a prepetition liability where the contract was executed prepetition [citation omitted]."); *In re R.H. Macy & Co., Inc*., 283 B.R. 140, 146 (S.D.N.Y. 2002) (creditor's claims were pre-petition claims where contract was executed pre-petition and acts and omissions giving rise to claims occurred pre-petition, even though damages were not fixed until post-petition events occurred); *In re Caldor, Inc*., 240 B.R. 180, 192 (Bankr. S.D.N.Y. 1999) ( contract based claims arise at the time the contract is entered into, rather than upon the occurrence of subsequent events such as breach or termination of the contract; post-petition breach of a pre-petition contract gives rise to only a prepetition claim [citations omitted].); and *In re Chateaugay Corp*., 156 B.R. 391, 399 n. 8 (S.D.N.Y. 1993) ( "…[t]he fact that a pre-petition contract is breached or 'disaffirmed' post-petition has never affected the dischargeability of a pre-petition obligation or been in itself sufficient to entitle the other contracting party to an administrative priority claim.")

16. Further, Debtors rejected the Master Goods Agreement which was an executory contract. See Third Amended Exhibit 8.1(a). Debtors did not subsequently assume the Master Good Agreement. Per 11 USC §365(g), the rejection of an executory contract constitutes a breach of the contract. Per 11 USC §502(g)(1), a claim for rejection of an executory contract that has not been assumed shall be determined and allowed or disallowed

6

"…the same as if such claim had arisen before the date of the filing of the petition." The effect of §365(g) and §502(g) of the Bankruptcy Code is that "…the failure to assume an executory contract gives rise to a non-administration pre-petition claim…" *In re Kent*, 91B.R. 1,2 (Bankr. E.D. N.Y., 1988). See also, *In re Drexel Burnham Lambert Group, Inc*., 138 B.R. 687, 707 - 708 (Bankr. S.D.N.Y., 1992) ("… a rejected contract is actually breached, and the breach is deemed to have occurred immediately preceding the bankruptcy filing… Rejection's effect is to give rise to a remedy in the non-debtor party for breach of the rejected contract, typically a right to money damages assertable as a general unsecured claim in the bankruptcy case [citations omitted].")

17. For these reasons, Administrative Expense Claim 18902 should be disallowed and expunged in its entirety.

### B. Both Claim 16778 And Administrative Expense Claim 18902 Should Be Disallowed And Expunged Because Debtors Did Not Breach The Master Goods Agreement

#### 1. Debtors' Obligations Under The Master Goods Agreement

18. The Master Goods Agreement called for Reorganized Debtors to supply to Claimant a component described as a Liquid Cooling System ("LCS") to be installed by Claimant in computers that Claimant manufactured and sold. Debtors agreed to manufacture the LCS units in accordance with specifications provided by Claimant (See Master Goods Agreement, ¶3.1)[1]. Debtors warranted that the LCS units would be free of defects in design (except to the extent that they were based upon written designs provided by Claimant),

---

[1] It is believed that copies of all of the documents referenced in this Statement of Disputed Issues are in Claimant's possession. In deference to confidentiality concerns expressed by Claimant, they are not attached but Reorganized Debtors reserve the right to amend this Statement of Disputed Issues by re-filing it with the referenced documents attached. Reorganized Debtors will also produce copies of the documents referenced to Claimant upon request and will also produce copies of them at the Claim Objections Hearing.

7

materials, and workmanship and conform to specifications provided by Claimant (Master Goods Agreement, ¶7.1).

### 2. Debtors Met Their Obligations Under the Master Goods Agreement

19. It is Reorganized Debtors' understanding that Claimant contends that failures occurred in LCS units supplied by Debtors due to a poor design of the diaphragm in the pump which was part of the LCS. Reorganized Debtors dispute Claimant's contention and contend that any diaphragm failures were due to inadequate information in Claimant's specifications about the operating temperatures of the coolant in the LCS to which the pumps, and thus the diaphragms in the pumps, would be exposed during operation.

20. Claimant provided Debtors with its Specification 069-0522-04 revised March 4, 2004, (the "Specification"), for the LCS. The Specification contained no information about the temperature of the coolant in the LCS to which the diaphragm of the pump would be exposed.

21. Debtors conducted pre-production validation testing of the LCS units in early 2004. The material used for the diaphragms in the pumps was reinforced EPDM and Debtors' validation testing was successful.

22. Debtors started production of the LCS units with pump diaphragms made of reinforced EPDM in July, 2004.

23. After Debtors began production of the LCS units, Claimant issued to Debtors its Document #080-2015, Test Plan, LCS, Rev. A, dated 10/5/04 (the "Test Plan"), which set forth requirements for validation testing of the LCS units. Claimant's Test Plan listed temperatures, pressures, heat loads, time duration, number of cycles, etc. under which Debtors were to evaluate the LCS units to ensure adequate field life.

8

24. Claimant's Test Plan specified that the LCS units should be tested by Debtors at 40°C ambient (room) temperature but did not specify any other temperatures at which the LCS units should be tested by Debtors.

25. Debtors conducted additional validation testing of LCS units with a reinforced EPDM pump diaphragms in accordance with Claimant's Test Plan. Validation testing by Debtors at 40°C ambient temperature resulted in the temperature of the coolant to which the diaphragms of the pumps in the LCS units were exposed to be approximately 45°C at high load. Debtors also conducted additional successful validation testing of the LCS units with reinforced EPDM diaphragms in accordance with the Canadian Standards Association ("CSA") guidelines.

26. Debtors provided the results of the validation testing to Claimant. The Claimant did not advise Debtors that they should have tested the LCS units differently or with the diaphragms exposed to a higher coolant temperature.

27. In September, 2004 Debtors made changes to the LCS units when Claimant directed Debtors to increase production of LCS units, which included making a switch from reinforced EPDM diaphragms in the pumps to butyl diaphragms. Claimant did not change or modify its Specifications or its Test Plan at that time and agreed to Debtors' switch to butyl diaphragms.

28. Debtors conducted validation testing of LCS units with butyl diaphragms in the pumps in accordance with Claimant's Test Plan and the CSA guidelines. The LCS units with butyl pump diaphragms passed both tests.

29. LCS units made by Debtors with butyl diaphragms in the pumps passed a second round of validation testing by Debtors following another change to a different component of the LCS units.

30. Debtors' validation test results of LCS units with butyl pump diaphragms were approved by Claimant's Reliability Engineering group. Debtors were also informed that Claimant conducted its own validation testing of LCS units supplied by Debtors after they were installed in computers and the LCS units passed Claimant's testing.

### 3. Diaphragm Failures In LCS Units Were Caused By Excessive Heat, Not By A Design Defect By Debtors

31. Beginning in May 2005, Claimant returned to Debtors approximately 40 LCS units with cracking in butyl (not reinforced EPDM) diaphragms.

32. Per an agreement with the Claimant, reinforced EPDM diaphragms were re-instituted by Debtors in the LCS units it produced instead of continuing to use butyl pump diaphragms.

33. Debtors conducted post-failure testing and concluded that exposure to heat was the principal cause for failure of butyl diaphragms. Debtors shared the results of their post-failure testing with Claimant, including during an in-person meeting with Claimant's representatives at Claimant's headquarters on July 13, 2005.

34. Debtors asked Claimant for actual internal coolant temperatures during computer operation and learned from Claimant on July 27, 2005 via e-mail that the actual coolant temperatures to which the pump diaphragms were exposed during computer usage approached 65°C, a fact which had not previously been known to Debtors or communicated to them by Claimant.

10

35. Subsequently, Claimant specified a coolant temperature of 65°C in its revised Test Plan for a new generation of the LCS. See Claimant's Document #80-2015, Test Plan Rev. B, dated 9/14/05 (the "Revised Test Plan").

### 4. Claimant's Contention That Poor Design of the Diaphragm Led To Rupture/Failure During Operation From Unacceptable Stress and Strain Is Wrong

36. Reorganized Debtors believe that Claimant will argue that some of the pump diaphragms that Debtors supplied failed due to poor design because unacceptable stress and strain led to diaphragm rupture and failure. Claimant's theory is wrong.

37. First, Reorganized Debtors disagree with Claimant's position that the LCS unit's pump diaphragm was under-designed because elongation levels (which means the degree to which the diaphragm would stretch) were at 50%, not 20%, which Claimant incorrectly contends is the industry standard. It is Reorganized Debtors' understanding that Claimant's elongation level argument is based upon a partial Freudenberg design guide. However, the Freudenberg 20% strain or elongation limit assumes part usage over its life of 1,000,000 cycles. Here, the LCS units were expected to be exposed to only 5,500 cycles lifetime (3 on-and-off cycles per day for 5 years). See Specifications, Sec. 9.3. The Freudenberg guide upon which Claimant apparently relies also indicates a cycle reduction of 50% for each 10% increase in strain. Thus, even if the diaphragms in the pumps of LCS units supplied by Debtors were at a 50% elongation level, Debtors' LCS units would have been expected to survive 125,000 cycles, or 113.5 years, which far exceeds Claimant's requirement that it survive 5,500 cycles or 5 years.

38. Second, Debtors' post failure testing revealed that high mechanical stress on butyl diaphragms alone did not initiate cracking as observed in failed butyl diaphragms returned from the field.

11

39. Third, nothing in the Specifications or the Test Plan set forth requirements for permissible elongation levels in the diaphragms. To date, Claimant has not identified any Specification made applicable to the Master Goods Agreement or any validation Test Plan to which Debtors did not fully adhere when they supplied LCS units to Claimant.

### C. Other Defenses to Claim 16778 And Administrative Expense Claim 18902

40. The Reorganized Debtors have other defenses. Claimant did not adhere to provisions of the Master Goods Agreement mandating how Claimant was required to provide notice to the Debtors of allegedly defective LCS units. Claimant did not adhere to other provisions of the Master Goods Agreement which required it to return to the Debtors all of the LCS units that were allegedly defective. Claimant also incurred unnecessary expense by electing to replace LCS units that had not failed and were not likely to fail. Claimant has also failed to supply to Debtors or to Reorganized Debtors documentation quantifying its alleged losses.

41. Moreover, the Debtors' books and records for Claim 16778 and Administrative Expense Claim 18902 reflect a zero balance.

### D. Relief Requested

42. For these reasons, Claimant cannot meet its burden of proof on either Claim 16778 or Administrative Expense Claim 18902 which both should be disallowed and expunged in their entirety.

### III. RESERVATION OF RIGHTS

43. This Statement Of Disputed Issues is submitted by the Reorganized Debtors pursuant to paragraph 9(d) of the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (I) Dates For

Hearings Regarding Objections To Claims And (II) Certain Notices And Procedures Governing Objections To Claims (Docket No. 6089) (the "Claims Objection Procedures Order") and the Order Pursuant To 11 U.S.C. §§ 105(a) And 503(b) Authorizing Debtors To Apply Claims Objection Procedures To Address Contested Administrative Expense Claims (Docket No. 18998) (the "Administrative Claims Objection Procedures Order"). Consistent with the provisions of the Claims Objection Procedures Order and the Administrative Claims Objection Procedures Order, the Reorganized Debtors' submission of this Statement Of Disputed Issues is without prejudice to: (a) the Reorganized Debtors' right to later amend this Statement of Disputed Issues by re-filing it with copies of the documents referenced above attached to it; (b) the Reorganized Debtors' right to later identify and assert additional legal and factual bases for disallowance, expungement, reduction, or reclassification of Claim 16778 and/or Administrative Expense Claim 18902; and/or (c) the Reorganized Debtors' right to later identify additional documentation supporting the disallowance, expungement, reduction, or reclassification of Claim 16778 and/or Administrative Expense Claim 18902.

WHEREFORE the Reorganized Debtors respectfully request that this Court enter an order (a) disallowing and expunging of Claim 16778 and Administrative Expense Claim 18902 in their entirety and (b) granting the Reorganized Debtors such other and further relief as is just.

Dated:   Detroit, Michigan  
         July 26, 2011

BUTZEL LONG, a professional corporation

By: /s/ Cynthia J. Haffey  
     Cynthia J. Haffey  
     Chester E. Kasiborski, Jr.  
     150 West Jefferson, Suite 100  
     Detroit, Michigan  48226  
     (313) 225-7000  
*Attorneys for Reorganized Debtors*

13

BUTZEL LONG, a professional corporation
150 West Jefferson, Suite 100
Detroit, Michigan 48226
(313) 225-7000
Cynthia J. Haffey
Chester E. Kasiborski, Jr.

*Attorneys for Reorganized Debtors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| DPH HOLDINGS CORP., *et al.,* | Case No. 05-44481 (RDD) |
| | Jointly Administered |
| Reorganized Debtors. | |

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2011, a true and correct copy of the Reorganized Debtors' Statement of Disputed Issues with Respect to Proof of Claim Number 16778 and Administrative Expense Claim Number 18902 (Apple Inc., Apple Computer International, and Hon Hai Precision Industry Company Ltd.) was served by Fax to the following persons at the following addresses:

Philip S. Warden, Esq.
Michael P. Ellis, Esq.
50 Fremont Street
San Francisco, CA 94120
Fax: (415) 983-1200
*Attorneys for Apple Inc, Apple Computer International,
and Hon Hai Precision Industry Company*

Dated:   Detroit, Michigan              */s/ Alexis Richards*
         July 26, 2011                       Alexis Richards

#1290871 v1