# EXHIBIT 33

# EXHIBIT 33

## Rotor Coaters International, Adv. Pro. No.07-02767-rdd

Rotor Coaters International Inc. ("Rotor Coaters") filed the Declaration of Jill Warner, Vice President of Finance. *Ex. 33(a), ¶1.*  In her declaration, Ms. Warner states only that Rotor Coaters did not know that it had been sued by the Debtors.  *Ex. 33(a), ¶¶15-18.*  Ms. Warner does not declare that Rotor Coaters was unaware that the Debtors had filed the Extension Motions.

Rotor Coaters received relevant information advising that avoidance claims had been filed under seal and the time to serve the complaints and summonses had been extended.  Rotor Coaters was served with the First Amended Plan Disclosure Statement, filed in December 2007. *See Affidavit of Service (Docket No. 11974).*[4]  On December 13, 2007, the Debtors also filed a copy of the Disclosure Statement publicly with their Form 8-K (Docket No. 11388).  The Disclosure Statement outlined in detail that Preference Claims were to be filed under seal, with service deferred until after the limitations period.  As this Court discussed during the July 22, 2010 hearing, the Disclosure Statement, combined with the defendants' knowledge that they had in fact received preferential transfers, put the defendants on notice of the preference claim procedures at issue and on inquiry notice as to the need to monitor preference claim developments.  *Ex. 8, July 22, 2010 Transcript, pp. 150-153.*  Sophisticated creditors like Rotor Coaters typically are well aware of prospects and risks of preference litigation and it seems unlikely that creditors like Rotor Coaters could be surprised or caught off guard when such preference complaints are finally filed.  *See also In re TWA Inc. Post Confirmation Estate*, 305

---

[4]  *Ex. 7, Service List: Executory Contracts and Unexpired Leases, p. 196.*

B.R. 221, 227 (D. Del. 2004) ("[I]n large chapter 11 cases sophisticated creditors typically are

well aware of prospects and risks of preference litigation. … Thus, it seems unlikely that

creditors could be surprised or caught off guard when such preference complaints are finally

filed.").

# EXHIBIT A

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Aaron M. Silver (P65481)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
Telephone: (313) 465-7560
Facsimile: (313) 465-7561
Email: asilver@honigman.com

Attorneys for Defendant Rotor Coaters International Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X

In Re                                      :        Chapter 11
**DELPHI CORPORATION**, et al.,            :        Case No. 05-44481 (RDD)
                                           :
Debtors.                                   :        Hon. Robert D. Drain
---------------------------------------------------------------X

DELPHI CORPORATION, et al.,                :

Plaintiffs,                                :
Against                                    :

ROTOR COATERS INTERNATIONAL INC.,          :        Adv. Pro. No. 07-02767 (RDD)

Defendant.                                 :
---------------------------------------------------------------X

## DECLARATION OF JILL WARNER IN OPPOSITION TO DEBTORS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS

Jill Warner declares as follows:

1.    I was the Vice President of Finance of Rotor Coaters International Inc. ("**RCI**").

2.    I make this Declaration upon personal knowledge and if called as a witness would testify to the facts contained herein.

### RCI'S BUSINESS

3.    RCI is a small business that has terminated all of its operations, terminated its employees and is no longer conducting business.

4.      When it was operating, RCI applied a coating to brake rotors for Delphi. Delphi was RCI's only customer. At all times, the rotors were owned by Delphi and RCI was paid only for the services it performed.

5.      On September 30, 2002, RCI and Delphi Automotive Systems LLC entered into that certain Amended and Restated Loan and Security Agreement, a copy of which is attached as Exhibit A. The outstanding balance on the loan as of September 30, 2002 was $4,371,300.

6.      On May 1, 2004, Delphi entered into a Management and Supply Agreement with RCI. The supply agreement provided for a break even pricing such that (i) to the extent the RCI's revenue exceeded its expenses, RCI would make payment to Delphi, and (ii) to the extent RCI's expenses exceeded the revenue, Delphi would make payment to RCI. The foregoing is referred to as the "True Up Payment."

7.      During the 90 days prior to Delphi's petition date, the outstanding balance on the loan payable by RCI to Delphi was at all times in excess of $1,800,000.

8.      Delphi continued to operate under the Management and Supply Agreement post-petition through the end of 2007.

9.      In third quarter of 2007 Delphi lost a major contract with General Motors thereby causing the termination of the services provided by RCI to Delphi under the Management and Supply Agreement.

10.      After Delphi initiated this proceeding but before RCI was aware of this adversary proceeding, RCI and Delphi negotiated an orderly wind-down whereby RCI liquidated all of its assets under the supervision of and for the benefit of Delphi. Delphi agreed that, upon liquidation of the assets and payment of the proceeds to Delphi, Delphi would forgive substantially all of the remaining unpaid balance of the loans owing by RCI. The intent of these negotiations was to permit RCI to wind down its affairs.

11.    By the end of 2007, RCI had liquidated all of its assets and paid down the balance of the Delphi debt to $739,936. Delphi agreed to forgive the balance of the loan owing by RCI to Delphi, except for $56,261, which amount was specifically negotiated to permit RCI to pay its remaining creditors.

12.    Because RCI was liquidating its assets and had believed that it had resolved all of its claims with Delphi, RCI did not hire bankruptcy counsel to monitor Delphi's bankruptcy case and the Court's docket. Accordingly, until December 2009, RCI did not know that Delphi had sought and obtained authority to file the complaint filed in this adversary proceeding under seal and extend the time for service of the complaint or that, in late September 2007 or October 2007, Delphi had commenced a lawsuit under seal against RCI seeking to avoid and recover $1,640,340.26

## DELPHI'S DELAY IN PROSECUTION OF THESE CASES HAS PREJUDICED RCI

13.    RCI has been substantially prejudiced by Delphi's concealment of the lawsuit. At nearly the same time that Delphi had filed the lawsuit and was actively concealing the lawsuit from RCI, RCI was negotiating an orderly wind-down of its affairs with Delphi, its largest creditor. Had RCI known about the lawsuit and the potential liability asserted in this adversary proceeding in connection with winding up its affairs, RCI would have handled its negotiations with Delphi differently by ensuring that RCI had no continuing liability to Delphi.

14.    Since October 2007, RCI personnel with direct contact with Delphi ("**Former Key Employees**") have left RCI and are no longer employed by RCI. These individuals include Thomas Root and Kurt Thurston. In addition, RCI's primary contacts at Delphi are no longer employed by Delphi, including Larry Sears, Commodity Manager Global Purchasing, Rich DeVilbiss, Senior Buyer Global Purchasing and Keith Stipp, Director of Finance.

15.    Because RCI did not know it had been sued by Delphi, RCI did not take steps to preserve information necessary or helpful to its defense of Delphi's lawsuit.

16.     Similarly, because RCI did not know it had been sued by Delphi, RCI made no arrangements with its Former Key Employees to obtain information about the issues in the lawsuit, conduct exit interviews, or to keep in touch with them.

17.     Because RCI did not know it had been sued by Delphi, RCI took no special steps to organize and preserve its records with respect to Delphi.

18.     If RCI had known that Delphi had sued it, RCI could and would have taken special steps to organize and preserve its records with respect to Delphi, hold exit interviews with Former Key Employees and make arrangements to maintain contact with the Former Key Employees in case RCI would need them to provide litigation information or serve as witnesses.

## THE ALLEGEDLY PREFERENTIAL TRANSFERS DID NOT PERMIT RCI TO RECEIVE MORE THAN IT WOULD HAVE RECEIVED IF THE CASE WERE A CASE UNDER CHAPTER 7

19.     Because RCI was indebted to Delphi at all times during the preference period for an amount that exceeded the amount of each allegedly preferential transfer, RCI was fully secured by a right of setoff. Accordingly, the allegedly preferential transfers did not permit RCI to receive more that it would have received if the transfer had not been made and the case were a case under chapter 7.

20.     I make this Declaration under penalty of perjury.

_____
Jill Warner

Executed in Brighton, Michigan
on November 24, 2010

4