Hearing Date And Time: September 22, 2011 at 10:00 a.m. (prevailing Eastern Time)
Response Date And Time: September 15, 2011 at 4:00 p.m. (prevailing Eastern Time)

James B. Sumpter, Pro se
21169 Westbay Circle
Noblesville, IN 46062
Telephone: (317) 877-0736
Facsimile: (317) 877-1070
jsump@ieee.org

Salaried Retiree of Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------.x Chapter 11 Case No. 05-44481 (RDD)

In re:

DELPHI CORPORATION, et. al.,

: ( J o i n t l y  Administered) :

    Debtors.                                    :  :

                                                      :  :

------------------------------x

# MOTION FOR RECOUPMENT ON BEHALF OF
# DELPHI SALARIED RETIREES

1.      This motion is a request for an order under the **Equitable Doctrine of Recoupment**, which seeks the recoupment of certain payments made by, or required to be made by Delphi Salaried Retirees (DSRs) to Delphi Automotive as specified in the companies Summary Plan Document (SPD).  These payments include Social Security reimbursements, Health Care reimbursements due to Third Party payments and Workers' Compensation Offsets.

2.      For the reasons set forth herein, the relief requested is warranted and necessary.  In support of this Recoupment Motion, the Movant respectfully represents as follows:

## **Background**

3.      Recoupment of each of the three types of payments listed above is important to the Salaried Retirees.  However, the Social Security reimbursements are required of more retirees and more adversely and disproportionately affect Disabled Delphi Salaried Retirees (DDSRs).  In addition, Heath Care and Workers' Compensation reimbursement affect a smaller number of retirees.  As a result, this motion will emphasize the Social Security reimbursements and the DDSRs.  Nevertheless, the legal standards that govern recoupment in bankruptcy, as they pertain to the DSRs, apply equally to each type of reimbursement listed in paragraph 1.

4.      On 8-OCT-2005 Delphi et al. filed a petition for chapter 11 bankruptcy.  On 25-APR-2009, Delphi while under supervision of the bankruptcy court, terminated  what Delphi termed other post-employment benefit obligations (OPEB) for Salaried Retirees, which included all Salaried Retiree Health Care benefits, company paid Basic Life Insurance,  the Medicare Part B special benefit  for  DDSRs  (under age 65),  and all Retiree Health Reimbursement Accounts.

5.      In its 4-FEB-2009 filing, Delphi valued its Health Care and Life Insurance liability at 1.1 billion dollars. The lost of these long anticipated OPEB benefits resulted in significant hardship for Salaried Retirees.  For several months, most retirees were forced, by circumstances; to purchase a Delphi sponsored self pay bridge program that was priced 138 % higher than Delphi's cost.  Since then, many retirees have chosen to participate in a Salaried Retiree sponsored VEBA health plan.  Although most VEBA participants are eligible for a government subsidy, which has varied between 65% and 80% of their cost, retiree Health Care expenses still exceeds the cost of retiree Health Care prior to April 1, 2009.  Also, no DDSR receiving Social Security can receive the VEBA subsidy.  In addition, retirees who are Medicare eligible are faced with paying a higher premium, absent the Delphi "Special subsidy".

2

6.      Because of the loss of OPEB benefits, a near simultaneous transfer of the retirees' pension to the PBGC and the increased health insurance cost, many retirees have been forced to re-enter the job market.  However, the DDSR sub-class of the class DSRs has faced a significantly larger and more adverse financial impact than other retirees. The Disabled Retirees' health limitations and the terms of the disability benefit plan precludes DDSRs  from earning additional wage income,  which prevents them from  offsetting the increased Health Care cost and the loss of other benefits.  Disabled Retirees remain on a fixed income (60% of their base pay), which was set the day each retired.  The impact is significant, since Health Care cost have risen **41.3 %** over the past decade and outpaces inflation by almost two-to-one.

7.      Disabled retirees, who are Medicare eligible (who are under age 65); also face Medicare supplement premiums that are typically 230% higher than non disabled Medicare beneficiaries.  These same retirees are also required to reimburse Delphi for disability payments equal the benefit they receive from Social Security.

8.      Thus, as a means to mitigate the adverse effect of the lost of OPEB benefits and in an effort to establish the correct value of the discharged OPEB benefit, the Movant seeks to recoup, for the disabled retiree, their  prior and ongoing Social Security reimbursements against the 1.1 billion dollar OPEB liability which was discharged by Delphi.

9.      For the same reasons, the Movant also seeks recoupment of Health Care Third Party and Workers' Compensation reimbursements.

## The Doctrine of Recoupment

10.      Recoupment is an equitable doctrine, used to determine amounts owed on a given transaction. It is the ancestor of the compulsory counterclaim set forth in Federal Rule of Civil

Procedure 13(a). *(Coplay Cement Co. v. Willis & Paul Group*, 983 F.2d *1435 (7th Cir. 1993).* Thus, recoupment, a creditor's right long recognized in bankruptcy proceedings, is merely the means used to determine the proper liability on the amounts owed *(Ref-3, Sec III-A).* Therefore, particularly in regards to Delphi Salaried Retirees (DSRs), **"Where mutual debts arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations, the creditor's apparent offset is really recoupment"** *( Warsco v. Household Bank, 272 B.R. 246 (Bankr. N.D. Ind. 2002), aff'd 334 F.2d 638(7th Cir. 2003)).*

11.     Thus, recoupment avoids the absurdity of having the creditor, DSR; continue to pay the debtor, Delphi, while the debtor has discharged most if not all of its related or reciprocal liabilities.

## Recoupment Requires the Same Transaction

12.     A key principal of recoupment is that the mutual debts must arise out of the same transaction or occurrence. *(See Ref- 1, page 3; and Ref-3, sec III-A-1).*   A review of  case law reveals that there are four operating standards among the various Court Circuits as it relates to defining a single transaction:

    a.  **Logical relationship**

        i.    *In the Ninth Circuit (AK, AZ, CA, HI, ID, MT, NV, OR, WA, and Pacific territories), whether two claims arise out of the same transaction depends upon their* **"logical relationship."** *In re TLC Hospitals, Inc., 224 F.3d 1008 (9th Cir. 2000) (holding that Medicare overpayments and underpayments from different years arise out of the same transaction, the Medicare Provider Agreement,*

*because the Agreement contemplated year-to-year adjustments and an
"exchange of funds . . . over an extended period of time").*  (See Ref- 1, page 3)

**ii.    *The parameters of recoupment are derived from the common law pleading
rules concerning counterclaims… In that context it has been said that
"transaction" is a word of flexible meaning, including a series of occurrences,
depending not so much on the immediateness of their connection as upon their
<u>logical relationship</u>.*** *Moore v. New York Cotton Exch.*, 270 U.S. 593, 610 (1926);
*In re Pinkstaff*, 974 F.2d 113 (9th Cir. 1992); *Montgomery Ward Dev. Corp. v.
Juster*, 932 F.2d 1378 (11th Cir. 1991); *Tullos v. Parks*, 915 F.2d 1192 (8th Cir.
1990); *Savarese v. Agriss*, 883 F.2d 1194, 1208 (3d Cir. 1989); *United States v.
Pullman Constr. Indus., Inc.*, 153 B.R. 539, 541-42 (N.D. Ill. 1993). **(Ref-3,
section III-A-1)**

**iii.    *Whether the <u>logical relationship</u> standard applies in bankruptcy
proceedings is controversial. At least one court has permitted the use of that
standard.*** *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392 (9th Cir.
*1996). **(See Ref 2, section III-A-1)***

**iv.**    In the context of the Delphi Bankruptcy and the DSRs, the SPD linked the
various disability payments, Life Insurance, Health Care benefits and Workers'
Compensation to form the major part of the set of benefits that DSRs would
receive.  The SPD also linked Social Security reimbursements and Medical
coverage to the Disability Benefit *(See **Ref-5 SPD excerpt**, all pages; and
**Transaction Relationship Table**, page 7)*.  The SPD also linked the Workers'
Compensation Offset to retirement benefits in general *(See **Ref-5, SPD excerpt**,
page 93,)*. The discharge of Delphi's OPBE liabilities affected the set of
connected disability and retirement benefits and resulted in an overpayment by

5

DSRs.  Thus, the mutual claims are logically connected and the justification for recoupment under this test is met.

### b. A single Integrated transaction

**i.**    This concept, as it applies to recoupment in bankruptcy, is not broadly accepted.  Although*, "Other courts, such as the Third Circuit (DE, NJ, PA, and USVI), require the claims to arise out of a "single integrated transaction." University Med. Ctr. v. Sullivan (In re University Med. Ctr.), 973 F.2d 1065 (3d Cir. 1992). "In these jurisdictions, a single contract may give rise to multiple transactions for purposes of recoupment."*  (Ref-1, page 4)

**ii.**    However, in ***973 F.2d 1065 (3d Cir. 1992)*** The Honorable Judge Roth went on to write "***…both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations"***.  This Concept can easily be applied when evaluating the nature of the transaction between Delphi and the DSRs as specified in the SPD.  The highlighted excerpted pages of the SPD, found in REF-5, clearly establishes, for retirees, that the relationship among Disability Benefits, Health Care, Life Insurance, Social Security reimbursements, Third Party Health Care reimbursements and Workers' Compensation offsets are so intertwined as to operate inseparably *(See SPD **Transaction Relationship Table** below, and **Ref -5: SPD** excerpts*).  Thus, as a "single integrated transaction" it would be inequitable for Delphi to enjoy the benefits of the SPD without also meeting its obligations to the DSRs.

## SPD Transaction Relationship Table (See REF – 5)

| | |
|---|---|
| Page 66 | Part of the section; ***Administrative Provisions”:***<br>**Linking**- Retirement, Medicare special benefit, Disability Benefits, Health Care expenses and Third Party Liability |
| Page 76 | Part of the section; ***While You Are Disabled”:***<br>**Linking -** Disability, Social Security and Workers' Compensation reimbursements |
| Page 78 | Part of the section; ***Extended Disability Benefits and Supplemental Extended Disability Benefits”:***<br>**Linking** **-** Disability, Social Security and Workers' Compensation reimbursements and Health Care |
| Page 81 | Part of the section; ***Other Benefit Program Coverages While on Disability Leave”:***<br>**Linking** – Disability, Health Care and Basic Life Insurance |
| Page 84 | Part of the section; "***When You Retire”:***<br>**Linking**- Retirement and Disability |
| Page 87 | Part of the section; "***When You Retire”:***<br>**Linking** – Retirement, Social Security and Health Care |
| Page 89 | Part of the section; "***When You Retire”:***<br>**Linking** – Retirement, Disability, Social Security Disability, Health Care and Social Security reimbursement |
| Page 92 | Part of the section; "***When You Retire”:***<br>**Linking** – Retirement, Social Security Disability and Social Security reimbursement |
| Page 93 | Part of the section; "***When You Retire”:***<br>Linking – Retirement and Workers' Compensation reimbursement |
| Page 97 | Part of the section; "***Other Benefit Program Coverages After Retirement”:***<br>**Linking** – Retirement, Disability, Health Care and Basic Life Insurance |
| Page 98 | Part of the section; "***Other Benefit Program Coverages After Retirement”:***<br>**Linking** – Retirement and Basic Life Insurance |
| Page 100 | Part of the section; "***Life and Disability Program”:***<br>**Linking** – Basic Life Insurance and Disability, |
| Page 101 | Part of the section; "***Life and Disability Program”:***<br>**Linking** – Basic Life Insurance and Retirement, |
| Page 115 | Part of the section; "***Life and Disability Program”:***<br>**Linking** – Retirement, Life Insurance, Health Care and Disability payment reimbursements |

    **iii.**   Although the ruling of the Third Circuit (as stated in paragraph **12-b (i)** above), appears to be at odds with the generally held definition of a "single transaction" as it pertains to recoupment, it presents no hurdle when applied to recoupment by the DSRs.

  **c.**  **Mutual debts arise from the same contract**

    **i.**   *"Where the relationship between the creditor and the debtor is contractual, and the mutual debts arise from the same contract, withholding from ongoing payments to offset earlier overpayments has generally been allowed as recoupment.  Because recoupment is an equitable defense, most courts recognize that application of the defense of recoupment in a contractual context is especially appropriate. Where the parties' mutual debts arise out of the contract recoupment is allowed because "there is but one recovery due on a contract, and that recovery must be determined by taking into account the mutual benefits and obligations of the contract"*( See Ref-3, section III-A-1-(a), page 2)

    **ii.**   In this case, the SPD specified the relationship between Delphi and the DSRs.  Therefore it was as a contract which provided Disability, Life Insurance and Health Care Benefits for Salaried Retirees.  The SPD specifies the benefits the Salaried Retiree is to receive and the related obligations. This includes the requirements for Disability Benefits and the conditions under which Social Security benefits, Health Care and Workers Compensation benefits must be reimbursed to Delphi.

**iii.**   Thus, the requirement that there be a single contract (which appears to be the most broadly applied standard among the Circuits) is easily met and, as a result, recoupment by **DSRs** is justified.

**d.  Some type of over payment**

**i.**   *Other courts have required "'some type of overpayment,' whether accidentally or contractually made" to permit recoupment. In re Photo Mech. Servs., Inc., 179 B.R. 604, 613 (Bankr. D. Minn. 1995); In re Midway Airlines, Inc., 175 B.R. 239, 246 (Bankr. N.D. Ill. 1994).* ( See Ref-3, section III-A-1, page 2)

**ii.**   There are also rulings that reject the requirement regarding overpayment, e.g. *with Newbery Corp. v. Fireman's Fund Ins. Co., 95 F.3d 1392 (9th Cir. 1996) (rejecting "the argument that recoupment is only available in cases involving overpayments") and Matter of U.S. Abatement Corp., 79 F.3d 393 (5th Cir. 1996) (The court rejects the district court's ruling that recoupment is only permissible to recover some prior overpayment, noting that "[t]he [district] court cited no authority that substantiates this 'overpayment requirement' and we have found none.")* ( See Ref 2, section III-A-1, page 24)

**iii.**   Even though this test is controversial, it is easily met since discharge of Delphi's OPEB liabilities created an overpayment by DSRs which continues to accrue as long as Social Security and other reimbursements are made by retirees or deducted by Delphi.  As a result, according to this test, recoupment is allowed.

13.   Thus, based on widely held views in the various Circuits, the circumstances resulting in the mutual debt between Delphi and the Salaried Retirees meets the requirement of a single transaction.

9

## The Effect of Time Limits

14.      Another key issue regarding recoupment is that of time limits.  Therefore, it should be noted that ***"The time limits of setoff do not apply; prepetition claims can be withheld from postpetition debts"*** *(See REF-3: Section III Paragraph C; and REF-2, paragraph E, page 28.)*  Therefore, it logically follows that postpetition claims can also be withheld from postpetition debts.

15.      ***"Recoupment is not barred by a statute of limitations as long as the main action itself is timely".*** (See REF-3: Section III Paragraph F. In particular*: In re Mid Atl. Fund, Inc.*, 60 *B.R. 604, 609-10 (Bankr. S.D.N.Y. 1986)* ***"Statutory limitation periods generally have no application to offsetting counterclaims and other matters of defense".***

16.      In addition**, *"the defensive right of recoupment under the contract remains so long as any right under the same contract is urged against him offensively"; (Amoco Production Co. v. fry, 904 F. Supp. 3, 16-17 and n. 21 (D.D.C. 1995))***

## Recoupment and Discharge

17.      It should also be noted that ***"Recoupment is unaffected by a discharge in bankruptcy"*** (See REF-3: Section III Paragraph E; and REF-2, paragraph D, page 28.)

## Timing

18.      Prior to the petition date, 5-OCT-2005, the (SPD) was as a functioning contract between Delphi Automotive and the DSRs. After the petition date, the contractual arrangement in the SPD operated under ongoing jeopardy.

19.     On 1-JAN-2007, the Debtor eliminated the long term provisions of the health plan for non disabled retirees, replacing it with a limited value Medical Saving account.

20.     On 1-APR-2009, the Debtor eliminated all company paid Life Insurance and some medical benefits.  However, because of regulatory timing issues, some medical benefits were not eliminated until 1-JUN-2009.

21.     This motion comes, now, more than two years after Delphi was permitted to discharge most of its OPEB obligations.  However, this was not due to indifference or carelessness. Because of various preceding rulings in this case, salaried retirees have operated with limited legal funding.  As a result, the kind of legal resource that would have been available to a fully empowered 1114 committee was not accessible.  Retirees, left with three desperate choices were forced to pursue recovery of lost pension benefits, over seeking disputed lifetime COBRA benefits or potential recoupments.

22.     Thus, the Movant, who is a **DDSR** with significant health limitations and limited finances, has pursued COBRA and now recoupment.  Because of the high cost of legal representation and the significant and complex challenges of Delphi's bankruptcy case, the Movant has been unable to secure legal representation.  As a result, these issues have been pursued on a pro se basis.

23.     Because the Movant, who is an Electrical Engineer, has no legal training, the legal learning curve has been steep.  This, coupled with the Movant's significant health limitations has resulted in relatively long and/or delayed response times.  However, as noted in paragraphs 14, 15 and 16, this Recoupment Motion is not subject to any statute of limitations. Nor, is it affected by bankruptcy discharge, as noted in paragraph 17.

11

## Postpetition Recoupment

24.    The occurrence and timing of all of the events in paragraph 18, 19 and 20 were at the convenience of the Debtor and governed by the petition date of 5-OCT-2005.  Consequently the Debtors discharge of its OPEB obligation to Salaried Retirees has created an overpayment by the DSRs and the sub-class of DDSRs.  Since the Debtors actions to discharge it's liability for OPEB benefits occurred postpetition, it is logical that the DSRs and DDSRs should be able to recoup all the identified reimbursement payments including the Social Security obligations that have developed or will develop postpetition.

## Prepetition Recoupment

25.    It should also be noted that **"*prepetition claims can be withheld from postpetition debts* "(***See REF-3: Section III Paragraph D and In re TLC Hospitals, Inc., 224 F.3d at 1011.*)** Therefore, in addition to recoupment of reimbursements after 8-OCT-2005, the Movant request for recoupment is allowed for all reimbursement payments and obligations that occurred or developed prior to the petition date (8-OCT-2005) but after Delphi's spin-off date from General Motors, which was 31-MAY-1999.

## Relevant Recoupment Case History

26.    The Movant has referenced numerous relevant case histories through the citing of individual cases and the application of case references found in REF-1 through REF-3.  In addition, the case of DEER and Company vs. Rebel Saffold (REF-4) has many relevant parallels to the issues raised this motion.

27.     The essential character of the **DEER vs. Saffold** case is that Rebel Saffold was a bankrupt retiree of DEER Company, who through the receipt of Social Security disability payments had amassed a significant overpayment, which DEER pursued through recoupment.  In addition, the court determined that the DEER benefit plan that governed the retirement benefits of Saffold was an executory contract, which amounted to a single transaction for the purposes of recoupment.

28.     The contractual relationship between DEER and Saffold is analogous to the relationship between Delphi and the Salaried Retirees, except ironically, the company, Delphi is the bankrupt party and it is the retirees who seek recoupment of Social Security payments.

29.     Another difference, although not critical, is that in **DEER vs.  Saffold**, the recoupable overpayments were the result of Saffold receiving Social Security Disability payments.  In this motion the overpayments was created because Delphi discharged its OPEB liabilities through bankruptcy.

30.     There are four definitive and important parts of the ruling in **DEER vs.  Saffold** by The Honorable Michael Mellroy, Chief Bankruptcy Judge, that guide this motion:

    **i.**   The first is that the benefit plan is a contract that serves as one transaction for the purposes of recoupment.

    **ii.**   The recoupment of the overpayment by the creditor is valid.

    **iii.** Recoupment of the overpayments, which occurred both prepetition and post-petition, is allowed and

    **iv.** The important observation that ***"the debtor should not be free to "pick and choose the contract provision that they want to abide by" by using bankruptcy to get rid of the burdens, while continuing to demand the benefits."***

13

31.     Therefore Delphi cannot discharge its OPEB liabilities and avoid the recoupment of Social Security and other reimbursements that the DSRs seek.

## **Relief Requested**

32.     Consequently, based on the **Equitable Doctrine of Recoupment**,   the Movant request that the court approve a recoupment of the designated benefit reimbursement payments (past, present and future) made to Delphi against the OPEB benefits liabilities discharged by Delphi.

i. For Disabled Retirees who reimbursed Social Security Disability Benefits to Delphi between the dates of 31-May-1999 and 8-OCT-2005, this recoupment shall result in a full refund, from Delphi.

ii. For Disabled Retirees who reimbursed Social Security Disability Benefits to Delphi between the dates of 8-OCT-2005 and 1-APR-2009, this recoupment shall result in a full refund, from Delphi.

iii. For Disabled Retirees who received Social Security Disability Benefits anytime between 1-APR-2009 and now, a recoupment and full refund shall be made for any amount owed or reimbursed to Delphi.

iv. In addition, this recoupment shall eliminate any requirement for Disabled Retirees to reimburse Delphi for any currently unreimbursed or future Social Security Disability Benefit. Any requirement for future reimbursements shall be eliminated, since the offsetting liabilities are logically linked and are derived from the same transaction, which was established in paragraphs 10, 11 and 12.

14

**v.** For Salaried Retirees who directly or indirectly reimbursed Workers' Compensation payments anytime after 31-MAY-1999, this recoupment shall result in a full refund from Delphi.

**vi.** For Salaried Retirees who directly or indirectly reimbursed Third Party Health Care payments anytime after 31-MAY-1999, this recoupment shall result in a full refund, from Delphi.

33.    The Movant does not have access to a complete census of Disabled Salaried Retirees.  However, it is believed that on 1-APR-2009, there were **230** Disabled Salaried Retirees (under age 65).   Thus, to estimate the upper and lower limits of this recoupment, the Movant assumes the following:

- For each interval there were 230 disable retirees
- The high average reimbursement is the 2011 Social Security maximum of $2,366.
- The low average reimbursement is the 2011 Social Security average of $1,117.

  **A.** For the period Between 31-MAY-1999 and 5-OCT-2005 ( 6.33 years)

  - The estimated Social Security recoupment upper limit equals $41,336,000.
  - The estimated Social Security recoupment lower limit equals $19,515,000.

  **B.** For the period Between 5-OCT-2005and 1-APR-2009 ( 3.5 years)

  - The estimated Social Security recoupment upper limit equals $22,856,000.
  - The estimated Social Security recoupment lower limit equals $10,790,000.

  **C.** For the period Between 1-APR-2009 and 22-SEP-2011( 2.42 years)

  - The estimated Social Security recoupment upper limit equals $15,803,000.
  - The estimated Social Security recoupment lower limit equals   $7,461,000.

  **D.** After 22-SEP-2011 (Duration 10 years)

15

- The estimated Social Security recoupment upper limit equals $65,302,000.
- The estimated Social Security recoupment lower limit equals $30,829,000.

34.     Thus, the estimated upper limit of the Social Security reimbursement recoupment total equals $145,327,000.   While, the estimated lower limit of the Social Security reimbursement recoupment total equals $68,595,000.

35.     The Movant does not have a reference for estimating the possible range of the recoupment from Third Party Health Care reimbursements and Workers' Compensation offsets. Although, the number of retirees affected is expected to be relatively small.

36.     While allowing for unknowns, it is clear that the recoupment sums, even the upper limit total, is substantially less than Delphi's 1.1 billion dollar discharged OPEB liability and can be easily recouped.

## Benefit of Relief

Permitting this recoupment establishes Delphi's just and proper liability.  It also promotes the fairness anticipated in the bankruptcy code, while mitigating the significant hardship to Disabled Retirees, which resulted from the discharge of Delphi's OPEB liabilities. While, absent this recoupment, DSRs (in particular DDSRs) are in the worst of both worlds: they must pay their debts to the debtor in full, but are only entitled to a tiny fraction of the money the debtor owes them (See "*In re DeLaurentiis Entertainment Group, Inc.*,  *963 F.2d 1269, 1277 (9th Cir. 1992)"*.

## No Prior Request

37.     No prior motion for the relief sought herein has been made by the Movant to this

or any other court.

38.     WHEREFORE, the Movant respectfully request that this Court enter an order

granting the relief requested herein, and such other and further relief as may be just, necessary

and appropriate.


Dated: Noblesville, Indiana
August 22, 2011


By: _James B. Sumpter_

/s/ James B. Sumpter


James B. Sumpter, Pro se
21169 Westbay circle
Noblesville, IN 46062
Telephone: (317) 877-0736
Facsimile: (317) 877-1070
jsump@ieee.org

Salaried Retiree of Debtors

17

# REF-1

# Common Law Setoff, Recoupment, and Bankruptcy

Charles Canter
Trial Attorney
U.S. Department of Justice
June 14, 2011

# Common Law Setoff, Recoupment, and Bankruptcy

Charles Canter
Trial Attorney
U.S. Department of Justice
June 14, 2011

## Setoff

"The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995) (quoting *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528 (1913)).

## Mutuality

"To be mutual, the debts must be in the same right and between the same parties, standing in the same capacity." *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.,* 896 F.2d 54, 59 (3d Cir. 1990).

The United States is one party for purposes of mutuality, so one agency can setoff its claim against a debt owed by another agency. *In re HAL, Inc.,* 122 F.3d 851 (9th Cir. 1997); *In re Turner,* 84 F.3d 1294 (10th Cir. 1996) (en banc); *In Chateaugay Corp.,* 94 F.3d 772 (2d Cir. 1996).

But, the same party requirement is strictly construed as to debtors. Be aware of separate legal entities with common ownership, parent-subsidiary relationships, and, especially as to individuals, state-law issues such as community property rules.

Contracts may define or limit right of setoff and may place parties in different capacities for purposes of setoff.  E.g., parties in a fiduciary relationship do not stand in the same capacity, so a debt arising from a debtor-creditor relationship lacks mutuality with a debt arising from a fiduciary relationship.

The debts need not arise from the same transaction, but they must be of the same character.  E.g., a tort claim can be setoff against a contract claim, but a liquidated claim cannot be setoff against an unliquidated claim.  (Although a creditor may withhold funds until the unliquidated claim is liquidated.)

Timing

In general, a setoff requires three steps: (1) a decision to effect the setoff, (2) an affirmative action to accomplish the setoff, and (3) a recording of the setoff in the creditor's records.

Although a statute of limitations bars a creditor's right to sue to collect a debt, it generally does not prevent a creditor from defensively asserting setoff against other claims by a debtor.  *See* 28 U.S.C. § 2415(f).

Due process may require notice to the debtor before the United States can effectuate the setoff.

## Recoupment

Recoupment is an equitable doctrine, defensive in nature, used to determine amounts owed on a given transaction. It is the ancestor of the compulsory counterclaim set forth in Federal Rule of Civil Procedure 13(a). *Coplay Cement Co. v. Willis & Paul Group*, 983 F.2d 1435 (7th Cir. 1993). The United States has a long recognized right to money erroneously paid.

Same transaction

Unlike setoff, recoupment is only available where the mutual debts arise out of the same transaction or occurrence.

Whether two claims arise out of the same transaction or occurrence is often fact-based. Also, the test for determining whether claims arise out of the same transaction varies depending on jurisdiction.

In the Ninth Circuit (AK, AZ, CA, HI, ID, MT, NV, OR, WA, and Pacific territories), whether two claims arise out of the same transaction depends upon their "logical relationship." *In re TLC Hospitals, Inc.*, 224 F.3d 1008 (9th Cir. 2000) (holding that Medicare overpayments and underpayments from different years arise out of the same transaction, the Medicare Provider Agreement, because the Agreement contemplated year-to-year adjustments and an "exchange of funds . . . over an extended period of time").

Other courts, such as the Third Circuit (DE, NJ, PA, and USVI), require the claims to arise out of a "single integrated transaction." *University Med. Ctr. v. Sullivan (In re University Med. Ctr.),* 973 F.2d 1065 (3d Cir. 1992). In these jurisdictions, a single contract may give rise to multiple transactions for purposes of recoupment.

Where the government has only a statutory relationship with the debtor, such as an entitlement program, some courts have not permitted recoupment. *Compare, e.g.,* *In re Vance*, 298 B.R. 262, 267 (Bankr. E.D. Va. 2003) *with In re Keisler*, 176 B.R. 605, 607 (Bankr. M.D. Fla. 1994).

Recoupment is generally unaffected by a statute of limitations. 28 U.S.C. § 2415(f)

## **Setoff and Recoupment in Bankruptcy**

### Automatic Stay

The filing of a bankruptcy petition operates as stay of "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case" and of "the setoff of any debt owing to the debtor that arose before the commencement of the case . . . against any claim against the debtor." 11 U.S.C. § 362(a)(6) & (a)(7). (The automatic stay covers many other things, too; see 11 U.S.C. § 362(a) for the full list.)

4

Mere refusal to pay money does not necessarily violate the stay. A creditor may temporarily impose an administrative freeze on payments to the debtor if the creditor has a right of setoff. *See Strumpf*, 516 U.S. at 19-21. *See also* 11 U.S.C. § 542(b) (requiring payment of debts to the trustee "except to the extent that such debt may be offset under [11 U.S.C. § 553]").

**When an agency learns of a bankruptcy case, it should not pay the debtor any amount until the agency has determined that neither it nor any other agencies have any claims appropriate for setoff.**

Setoff in Bankruptcy

To exercise a right of setoff, the United States must obtain relief from stay under 11 U.S.C. § 362(d). Federal agencies should coordinate with the Department of Justice to request relief.

If the debtor has filed for bankruptcy, generally prepetition claims can only be setoff against prepetition debts.

Under the bankruptcy code, a claim that is subject to setoff is a secured claim to the extent of the amount subject to setoff. 11 U.S.C. § 506.

Nothing in the bankruptcy code requires that a right of setoff be asserted in a proof of claim.  But under some circumstances, courts have held that a creditor can waive its right of setoff by failing to timely assert it or by taking action inconsistent with the assertion of a right of setoff.  Some agencies routinely state in their proof of claim that the claim may be subject to setoff.

In general, setoff rights survive discharge, but some courts have denied setoff where the creditor failed to adequately protect its right.  *E.g.*, *United States v. Continental Airlines*, 134 F.3d 536 (3d Cir. 1998).  In general, a right of setoff should be asserted before discharge or confirmation.  A chapter 11 plan should provide that confirmation does not alter or affect the United States' setoff rights.

## Recoupment in Bankruptcy

In bankruptcy, recoupment differs from setoff in two ways:

First, the automatic stay does not apply to recoupment.  *See, e.g.*, *Matter of Holford*, 896 F.2d 176, 179 (5th Cir. 1990)

Second, prepetition claims can be recouped from postpetition debts.  *In re TLC Hospitals, Inc.*, 224 F.3d at 1011.

But remember that recoupment is available only for claims arising out of the same transaction, and whether claims arise out of the same transaction varies by jurisdiction.

# REF-2

753 PLI/Comm 733
Practising Law Institute
Commercial Law and Practice Course Handbook Series
PLI Order No. A4-4519
April, 1997
19th Annual Current Developments in Bankruptcy and
Reorganization 1997

## *733 SETOFF AND RECOUPMENT IN BANKRUPTCY
(Excerpted)

Samuel R. Maizel



753 PLI/Comm 733

Practising Law Institute

Commercial Law and Practice Course Handbook Series

PLI Order No. A4-4519

April, 1997

19th Annual Current Developments in Bankruptcy and Reorganization 1997

***733*** SETOFF AND RECOUPMENT IN BANKRUPTCY

Samuel R. Maizel

Copyright (c) 1997, Practising Law Institute

**Pachulski, Stang, Ziehl & Young**

**Los Angeles, California**

## TABLE OF CONTENTS

I.        **SETOFF AND RECOUPMENT GENERALLY**
II.       **SETOFF**
          A. Mutuality
          B. Character Of The Claim
          C. Setoff And Equity
          D. Setoff Admits The Claim
          E. Mechanics Of Setoff
          F. Setoff And The Proof Of Claim
          G. Avoidance Of The Setoff
          H. Setoff After Discharge
          I. Setoff And Turnover Proceedings Under § 542
          J. Setoff As A Voidable Preference Under § 547
          K. Setoff And The Uniform Commercial Code
          L. Setoff And Disallowance Of Claims Under § 502(d)
          M. Setoff And The Statute Of Limitations
          N. Setoff And The Automatic Stay
          O. Setoff Of Fraudulent Conveyances Under § 544(b)
          P. Setoff Against A Creditor
          Q. Applying Setoff Funds
          R. Waiver Of The Setoff Right
          S. Setoff v. Surety's Rights
III.      **RECOUPMENT**
          A. Recoupment Defined
          B. Recoupment And The Automatic Stay
          C. Timing
          D. Recoupment After Discharge
          E. Recoupment And The Statute Of Limitations

F. Recoupment On An Unassumed Executory Contract

G. Recoupment And Creditors With Secured Interests

H. State Laws May Restrict Recoupment

I. Recoupment Of Claims Arising From Rejection

J. Affirmatively Seeking Recoupment

IV.  **RECURRING SETOFF AND RECOUPMENT ISSUES**

A. Medicare Recoupment

B. Setoff Of Tax Refunds

C. Setoff Against Family Farmers

D. Setoff Against Exempt Property

E. Setoff And Recoupment Based On Statistical Sampling

F. Setoff Of Attorneys Fees Under § 303(i)

G. Postpetition Interest in Recoupment and Setoff

H. Appeals From Adverse Setoff And Recoupment Decisions

*737  **1996 UPDATE IN BANKRUPTCY:**

**SETOFF AND RECOUPMENT** [FN1]

"The right of setoff ... allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" Citizens Bank of Maryland v. Strumpf, 116 S. Ct. 286, 289 (1995) (quoting Studley v. Boylston Nat'l Bank, 229 U.S. 523, 528 (1913)) Setoff "occupie[s] a favored position in our history of jurisprudence," Bohack Corp. v. Borden, Inc., 599 F.2d 1160, 1164 (2d Cir. 1979), with which courts should interfere "only under the most compelling circumstances." In re Utica Floor Maint., Inc., 441 B.R. 941, 944 (N.D.N.Y. 1984). "The rule allowing setoff ... is not one that courts are free to ignore when they think application *738 would be unjust." In re Applied Logic Corp., 576 F.2d 952 (2d Cir. 1978). To the contrary, "the justification for permitting setoff is based on notions of fairness," In re IML Freight, Inc., 65 B.R. 788, 791-92 (Bankr. D. Utah 1986), and "[t]he primacy of setoffs is essential to the equitable treatment of creditors. ... Absent a setoff, a creditor ... is in the worst of both worlds: it must pay its debt to the debtor in full, but is only entitled to receive a tiny fraction of the money the debtor owes it. It was to avoid this unfairness that setoffs were allowed in bankruptcy in the first place." In re DeLaurentiis Entertainment Group, Inc., 963 F.2d 1269, 1277 (9th Cir. 1992).

*739  **I. SETOFF AND RECOUPMENT GENERALLY**

A. Setoff is an equitable right of a creditor to deduct a debt it owes to the debtor from a claim it has against the debtor arising out of a separate transaction. Recoupment differs in that the opposing claims must arise from the same transaction. 4 Lawrence P. King, Collier on Bankruptcy ¶ 553.03 (15th ed. 1991).

B. The Bankruptcy Code is not an independent source of law that authorizes setoff or recoupment; it recognizes and preserves rights that exist under non-bankruptcy law. Therefore, a creditor seeking to setoff or recoup a debt must establish a claim and a right to do so under state or federal law. See In re Dillard Ford, Inc., 940 F.2d 1507, 1512 (11th Cir. 1991), *740 In re Public Serv. Co., 884 F.2d 11 (1st Cir. 1989), Durham v. SMI Indus., 882 F.2d 881 (4th Cir. 1989), In re Pieri, 86 B.R. 208 (B.A.P. 9th Cir. 1988), United States v. Norton, 717 F.2d 767 (3d Cir. 1983), In re McLean Indus., 90 B.R. 614 (Bankr. S.D.N.Y. 1988).

C. Both setoff and recoupment can be affirmative defenses or counterclaims. Outside of bankruptcy the distinction is usually not significant. In bankruptcy, however, the distinction can be important. For example, the Code codifies and governs setoff but is silent as to recoupment. 11 U.S.C. § 553, see In re B&L Oil, 782 F.2d 155 (10th Cir. 1986). Most significantly, setoff is available in bankruptcy only when both the opposing claims arise on the same side of the time line described by the petition's filing; i.e., both must be prepetition claims or both must be postpetition *741 claims. Recoupment is not so limited. See generally Lee v. Schweiker, 739 F.2d 870 (3d Cir. 1984).

of an intent to relinquish voluntarily a particular right that no other reasonable explanation of [one's]  *867  conduct is possible.* [FN131] A waiver of setoff can only occur where the creditor engages in "conduct which is inconsistent with a subsequent claim of setoff" or conduct which is "tantamount to a renunciation of the privileges of setoff." [FN132]

In In re Krieger Steel Sections, Inc. [FN133] the court stated:

It would be a wrong and dangerous course to hold that the rights of the government to taxes (whether in a direct proceeding to collect them or in a proceeding where the right of setoff exists) can be lost by the erroneous and inadvertent action of a subordinate in the Bureau of Internal Revenue. [FN134]

Because an agency cannot waive the United States' setoff rights once the matter is in litigation (like a bankruptcy case), the general rule that the government is entitled to recapture money paid by mistake likely applies in bankruptcy cases. [FN135]

   *868  **S. Setoff v. Surety's Rights. The government's setoff rights are superior to a surety's claim to the funds under the doctrine of equitable subrogation.** Barret v. United States, 367 F.2d 834 (Ct. Cl. 1966), In re Lanny Jones Welding & Repair, Inc., 106 B.R. 446 (Bankr. E.D. Va. 1988), In re Pyramid Indus., Inc., 170 B.R. 974, 980 (Bankr. N.D. Ill. 1994).

## III. RECOUPMENT

   **A. Recoupment Defined. Recoupment is the setting up of a demand arising from the same transaction as the plaintiff's claim, to abate or reduce that claim. Recoupment, a creditor's right long recognized in bankruptcy proceedings, is merely the means used to determine the proper liability on the amounts owed. See, e.g.,**  *869  Reiter v. Cooper, 113 S. Ct. 1213, 1218 n.2 (1993), Bull v. United States, 295 U.S. 247, 262 (1935) ("recoupment is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded"); Newbery Corp. v. Fireman's Fund Ins. Co., 95 F.3d 1392, 1400 (9th Cir. 1996) (holding that recoupment is allowed in bankruptcy (relying on Reiter, supra), and "that recoupment does not violate the ratable distribution of assets among a bankrupt debtor's creditors"); Matter of U.S. Abatement Corp., 79 F.3d 393 (5th Cir. 1996) (recoupment is an "exception to standard rules governing [the Bankruptcy Code's] priority scheme"); In re Flagstaff Realty Assocs., 60 F.3d 1031 (3d Cir. 1995) ("[a] claim subject to recoupment avoids the usual bankruptcy channels and thus, in essence, is given priority over other creditor's claims");  *870  United Structures of Amer. v. G.R.G. Eng'g, 9 F.3d 996, 999 (1st Cir. 1993) (recoupment is "'in the nature of a defense' and is intended to permit ... judgment to be rendered that does justice in view of the one transaction as a whole;" "allowing the creditor to recoup damages simply allows the debtor precisely what is due when viewing the transaction as a whole."); In re Holford, 896 F.2d 176, 178 (5th Cir. 1990), In re B & L Oil Co., 782 F.2d 155, 158 (10th Cir. 1986), In re Smith, 737 F.2d 1549, 1553 (11th Cir. 1994), In re Izaguirre, 166 B.R. 484, 490-93 (Bankr. N.D. Ga. 1994) ("[R]ecoupment merely adjusts the claim of the plaintiff under the contract. Hence, recoupment asserted as a defense is not an "offset" to a claim ... ; recoupment speaks not simply to the net amount due from one party to the other computed by  *871  subtracting one claim from the other, but rather to the amount of the plaintiff's claim alone on a particular contract, transaction or event."); In re Keisler, 176 B.R. 605, 607 (Bankr. M.D. Fla. 1994) (Amounts subject to recoupment are not a "debt" as defined in the Bankruptcy Code.); 4 Collier on Bankruptcy ¶ 553.03, at 553-12 (15th ed. 1991); see also In re Flagstaff Realty Assocs., 60 F.3d 1031 (3d Cir. 1995) (To the extent a debtor's claim is subject to recoupment, the debtor has no interest in the future income stream to the extent of the creditor's recoupment claim.); In re Gross Plumbing & Heating Co., 146 B.R. 914 (Bankr. W.D.N.Y. 1992) (discusses concept of recoupment as an adjustment of amounts owed and that amounts subject to recoupment are not property of the estate); Amoco Prod. Co v. Fry, 904 F. Supp. 3, 16 (D.D.C. 1995)  *872  (Plaintiffs have no property right in funds withheld to preserve right of recoupment until all prior debts are resolved and satisfied.). But see In re Centergas, Inc., 172 B.R. 844, 851-52 (Bankr. N.D. Tex. 1994) (Recoupment is an impermissible violation of bankruptcy policy of equal distribution).**

   **1. Same transaction. The parameters of recoupment are derived from the common law pleading rules concerning counterclaims.** Coplay Cement Co. v. Willis & Paul Group, 983 F.2d 1435, 1440 (7th Cir. 1993) (recoupment is the "ancestor" of the compulsory counterclaim presently set forth in Fed. R. Civ. P. 13(a)); Frederick v. United States, 386 F.2d 481, 487 (5th Cir. 1967). **In that context it has been said that "transaction" is a word of flexible meaning, including a series of occurrences, depending not so much on**  *873  **the immediateness of their connection as upon their logical relationship.**

Moore v. New York Cotton Exch., 270 U.S. 593, 610 (1926), In re Pinkstaff, 974 F.2d 113 (9th Cir. 1992), Montgomery Ward Dev. Corp. v. Juster, 932 F.2d 1378 (11th Cir. 1991), Tullos v. Parks, 915 F.2d 1192 (8th Cir. 1990), Savarese v. Agriss, 883 F.2d 1194, 1208 (3d Cir. 1989), United States v. Pullman Constr. Indus., Inc., 153 B.R. 539, 541-42 (N.D. Ill. 1993). **Whether the logical relationship standard applies in bankruptcy proceedings is controversial. At least one court has permitted the use of that standard.** Newbery Corp. v. Fireman's Fund Ins. Co., 95 F.3d 1392 (9th Cir. 1996).

**Some courts, however, take a much more restrictive view of "transaction", usually requiring a single contract or even a single transaction under a *874 contract.** Compare In re University Medical Ctr., 973 F.2d 1065 (3d Cir. 1992) (recoupment requires single integrated transaction) and In re California Canners and Growers, 62 B.R. 18 (Bankr. 9th Cir. 1986) (each delivery under a single distributor's agreement a separate transaction for recoupment purposes) with In re B & L Oil, 782 F.2d 155 (10th Cir. 1986) (month-to-month purchases under a single contract arise from same transaction for recoupment). Compare In re Norsal Indus., 147 B.R. 85, 89 (Bankr. E.D.N.Y. 1992) (prepetition deposit for utility services can be used to recoup subsequent later unpaid monthly obligations as they arise out of the same transaction) with In re Village Craftsman, Inc., 160 B.R. 740, 747 (Bankr. D.N.J. 1993) (collecting cases on utility services recoupment and *875 holding against recoupment of prepetition deposit).

**Other courts have required "'some type of overpayment,' whether accidentally or contractually made" to permit recoupment.** Compare In re Photo Mech. Servs., Inc., 179 B.R. 604, 613 (Bankr. D. Minn. 1995), In re Midway Airlines, Inc., 175 B.R. 239, 246 (Bankr. N.D. Ill. 1994) (both requiring overpayments) with Newbery Corp. v. Fireman's Fund Ins. Co., 95 F.3d 1392 (9th Cir. 1996) (rejecting "the argument that recoupment reduced is only available in cases involving overpayments") and Matter of U.S. Abatement Corp., 79 F.3d 393 (5th Cir. 1996) (The court rejects the district court's ruling that recoupment is only permissible to recover some prior overpayment, noting that "[t]he [district] court cited no authority that substantiates this *876 ' overpayment requirement' and we have found none.").

**(a) Where the relationship between the creditor and the debtor is contractual, and the mutual debts arise from the same contract, withholding from ongoing payments to offset earlier overpayments has generally been allowed as recoupment. Because recoupment is an equitable defense, most courts recognize that application of the defense of recoupment in a contractual context is especially appropriate. Where the parties' mutual debts arise out of the contract recoupment is allowed because "there is but one recovery due on a contract, and that recovery must be determined by taking into account the mutual benefits and obligations of the contract."** See, e.g., In re Alpco, 62 B.R. 184, 188 (Bankr. S.D. Ohio 1986) (quoting *877 In re Maine, 32 B.R. 452, 455 (Bankr. W.D.N.Y. 1983)), accord Matter of U.S. Abatement Corp., 79 F.3d 393 (5th Cir. 1996) (Court holds that the district court erred by denying recoupment where the "terms of the contract between [the parties] not only govern" the existence of one obligation but also impose the basis for the countervailing obligation. In such circumstances the obligations arise from the same transaction.); In re Flagstaff Realty Assocs., 60 F.3d 1031 (3d Cir. 1995) (where the creditor's claim for repair costs and the debtor's claim to rent payment arise from the lease relationship they arise from the same transaction and are subject to recoupment); Matter of Coxson, 43 F.3d 189, 193-94 (5th Cir. 1995) (where creditor's and debtor's obligations arise out of the same contract recoupment is appropriate); *878 Distribution Servs. Ltd. v. Eddie Parker Interests Inc., 897 F.2d 811, 812 (5th Cir. 1990) ("Recoupment is a defense that goes to the foundation of plaintiff's claim by deducting from plaintiff's recovery all just allowances or demands accruing to the defendant with respect to the **same contract or transaction**."); First Nat'l Bank v. Master Auto Serv. Corp., 693 F.2d 308, 310 n.1 (4th Cir. 1982) ("Recoupment is the right of a defendant to have the plaintiff's monetary claim reduced by reason of some claim the defendant has against the plaintiff arising out of the **very contract giving rise to the plaintiff's claim**."); Speakman v. Bernstein, 59 F.2d 520, 522 (5th Cir. 1932) ("[Defendant]'s defensive right of recoupment under the contract remains so long as any right under that **same contract** is urged against him offensively"); *879 Amoco Production Co. v. fry, 904 F. Supp. 3, 16-17 and n. 21 (D.D.C. 1995) (Where "the same parties [are] involved" and "the debts arise out of the same leases as the [prior] overpayment" they arise out of the same transaction and are suitable for recoupment.); FSLIC v. Smith, 721 F. Supp. 1039, 1042 (E.D. Ark. 1989) (recoupment is "the right of a defendant to have the plaintiff's monetary claim reduced by reason of some claim the defendant has against the plaintiff arising out of the **very contract giving rise to the plaintiff's claim**."); In re Midwest Serv. and Supply Co., 44 B.R. 262, 266 (D. Utah 1983) ("A **single contract** must be considered one transaction."); Waldschmidt v. CBS, Inc., 14 B.R. 309, 314 (M.D. Tenn. 1981) (in case under the Bankruptcy Act, court holds that where both obligations "**grow out of the**

[same] contract," the *880 obligations "unquestionably arise from the same transaction"); In re Bram, 179 B.R. 824 (Bankr. E.D. Tex. 1995) (where prepetition overpayments and postpetition payments arise by the terms of the same contract, they arise from the "same transaction"); In re LaPierre, 180 B.R. 95 (Bankr. D.S.C. 1994) (Reduction of ongoing payments is properly characterized as recoupment where the ongoing payments arise out of same contractual relationship as prior overpayments.); In re Izaguirre, 166 B.R. 484, 493 (Bankr. N.D. Ga. 1994) ("[R]ecoupment speaks not simply to the net amount due from one party to the other computed by subtracting one claim from the other, but rather to the amount of the plaintiff's claim alone on a particular contract, transaction or event."); *881 In re Northeast Exp. Regional Airlines, Inc., 169 B.R. 258 (Bankr. D. Me. 1994) (Obligations "arising from" and "directly related" to contractual relationship are subject to recoupment.); In re Bob Brest Buick, Inc., 136 B.R. 322, 323 (Bankr. D. Me. 1991) (A business relationship is a "continuous one which permits recoupment."); In re Tidewater Memorial Hospital, 106 B.R. 876, 881-82 (Bankr. E.D. Va. 1989) ("Recoupment rests on the principle that it is just and equitable to settle in one action all claims growing out of the same contract or transaction."); In re Hiler, 99 B.R. 238, 242 (Bankr. D.N.J. 1989) (A defendant "clearly has a right of recoupment" where "all the claims arise out of the same contract."); see generally Cecile Indus. Inc. v. Cheney, 995 F.2d 1052, 1054 (Fed. Cir. 1993) ("Indisputably, the Government has long enjoyed the right to offset contract *882 debts to the United States against contract payments due to the debtor."); In re Abbey Financial Corp., 193 B.R. 89, 94-96 (Bankr. D. Mass. 1996) (court notes that "transaction" is a broader term than "contract" although "the case law is not uniform on that point" and holds that recoupment is not permissible where the creditor's conduct was "sufficiently outside the terms of the parties agreement so as to make its debit ... and act of setoff"); In re Mohawk Indus., 82 B.R. 174 (Bankr. D. Mass. 1987), In re American Cent. Airlines, Inc., 60 B.R. 587 (Bankr. N.D. Iowa 1986). Contra University Medical Ctr. v. Sullivan, 973 F.2d 1065, 1081-82 (3d Cir. 1992) ("same transaction" requirement for recoupment must be narrowly construed); In re Thompson, 182 B.R. 140, 147-49 (Bankr. E.D. Va. 1995) ("One contract alone, however, is not *883 sufficient to establish a single transaction, since separate transactions may occur within the confines of the contract."); In re California Canners and Growers, 62 B.R. 18 (Bankr. 9th Cir. 1986).

(b) Where the relationship between the creditor and the debtor is statutory rather than contractual, such as social security beneficiaries or VA overpayments, recoupment has frequently been denied. Lee v. Schweiker, 739 F.2d 870 (3d Cir. 1984), In re Rowan, 15 B.R. 834 (Bankr. N.D. Ohio 1981), aff'd, 747 F.2d 1052 (6th Cir. 1984) (no recoupment right to withhold SSA benefits "earned" postpetition to collect prepetition debts); In re Howell, 4 B.R. 102 (M.D. Tenn. 1980) (no recoupment of past overpayments under FECA from future benefits). Contra In re Ross, 104 B.R. 171 (E.D. Mo. 1989) (distinguishing Lee *884 and allowing recoupment of unemployment compensation benefits); In re Keisler, 176 B.R. 605, 607 (Bankr. M.D. Fla. 1994) (VA entitled to recoup prior overpayments from ongoing disability payments); In re Newman, 35 B.R. 97, 99 (Bankr. W.D.N.Y. 1983) (VA entitled to withhold disability benefits "earned" postpetition to offset lump sum severance payment made prepetition where both "resulted" from same disability incident); cf. Sullivan v. Everhart, 494 U.S. 83 (1990) (in dicta, referring to adjusting ongoing OASDI or SSI payments by decreasing future payments on account of past overpayments as recoupment).

## Discussion

In In re University Medical Center, [FN136] the Third Circuit held that where, as a result of prior *885 overpayments, the United States reduces a bankruptcy debtor's estimated periodic payments under a Medicare provider agreement, it violates the automatic stay. The court found that the offset did not properly constitute recoupment, which it agreed is unaffected by the automatic stay, because the mutual debts did not arise out of the "same transaction". The court distinguished between recoupment in bankruptcy and outside of bankruptcy and found that a "mere logical relationship" is not enough to support a recoupment in bankruptcy. In place of the widely accepted and well defined parameters for recoupment the court substituted a unique and unworkable "circumscribed definition": "both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that *886 transaction without also meeting its obligations." [FN137] The Third Circuit disregarded normal recoupment standards because of the numerous transactions involved in the relationship and the "extended period" involved in the provider agreement. [FN138]

Recoupment is the setting up of a demand arising from the same transaction as the plaintiff's claim, to abate or reduce that claim. Recoupment, a creditor's right long recognized in bankruptcy proceedings, is merely the means used to determine the

proper liability on the amounts owed. [FN139] The United States' right to recoup past overpayments owing to it by adjusting levels of ongoing payments "is beyond dispute and will not be deemed to have been abandoned 'unless Congress has clearly manifested its intention to raise a statutory barrier.'" [FN140]

*887  The parameters of recoupment are derived from the common law pleading rules concerning compulsory counterclaims. [FN141] In that context it has been said that "transaction" is a word of flexible meaning, including a series of occurrences, depending not so much on the immediateness of their connection as upon their logical relationship. [FN142]

Today that compulsory counterclaim standard is articulated in Federal Rule of Civil Procedure 13(a).

Rule 13 provides for "counterclaims and cross-claims." A counterclaim under this rule is a claim of one party against an opposing party. It includes common law recoupment and setoff, which is statutory. Common law recoupment was equitable in nature, resting on the principle that it was equitable to settle in one action all claims growing out of the same contract or transaction .... [FN143]

*888  The Supreme Court reaffirmed the traditional relationship between recoupment and compulsory counterclaims in Reiter v. Cooper, [FN144] when it defined recoupment as "the setting off against asserted liability of a counterclaim arising out of the same transaction." [FN145] Moreover, the Court found no difference between the right of recoupment in bankruptcy and the ability of any defendant to assert a compulsory counterclaim under Federal Rule of Civil Procedure 13 in any district court. The Court stated that "[f]or purposes of applying the [rules] governing counterclaims, it does not matter that this action arose in bankruptcy.... [Fed. R. Civ. P.] 13 is made applicable with only minor variation (not relevant here) by Bankruptcy Rule 7013." [FN146] The Court recognized that "[i]t is well settled, moreover, that a bankruptcy *889 defendant can meet a plaintiff-debtor's claim with a counterclaim arising out of the same transaction, at least to the extent that the defendant merely seeks recoupment." [FN147] The Court then cited B & L Oil Co. and Lee v. Schweiker as illustrations of the proper use of recoupment. Finally, the Court noted that recoupment "permits a determination of the 'just and proper liability on the main issue,' and involves 'no element of preference.'" [FN148]

The Bankruptcy Code did not expressly change this definition of recoupment, and in order to abrogate the common law principle of recoupment, the Bankruptcy Code would have to "speak directly" to the question addressed by the common law - what is the same transaction or occurrence for recoupment. [FN149] It has not done so and neither should have the Third Circuit.

*890  The doctrine of recoupment is well established by case law and nothing in the Bankruptcy Code alters or limits this well established right of a creditor. As the Supreme Court recently repeated, bankruptcy laws are not written "on a clean slate" and courts should be "reluctant" to "accept arguments that would ... effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history." [FN150] The Supreme Court admonishes courts to avoid arguments that "erode past bankruptcy practice absent a clear indication that Congress intended such a departure." [FN151] Moreover, other Supreme Court cases have held that where Congress has not expressly rejected existing well-established judicial interpretations of *891 bankruptcy law, the pre-existing judicial precedent survives.

In effect, passive approval of existing judicial interpretations occurs when Congress recodifies prior statutory language with little or no alteration and without express rejection of particular court rulings. Thus, where Congress has not expressly rejected existing established judicial interpretations of bankruptcy law, the pre-existing judicial interpretation survives. [FN152]

Similar to issues decided by the Supreme Court in Kelly v. Robinson, [FN153] and Midlantic Nat'l Bank v. New Jersey Dep't of Environmental Protection, [FN154] recoupment involves a "judicially created concept" and presents an important issue affecting the Bankruptcy Code. Amounts withheld subject to recoupment are not property of the estate under 11 U.S.C. § 541, [FN155] and to construe property of the estate without resort to prior decisions under the *892 doctrine of recoupment would result in potentially varying and disastrously unreliable results. To define recoupment differently in bankruptcy would force an unnecessary distinction into normal commercial relationships. It would allow debtors to receive a "windfall merely by reason of the happenstance of bankruptcy" and upset the "uniform treatment of property interests" which the Supreme Court has repeatedly recommended. [FN156] The history of the doctrine of recoupment, its frequent invocation by the bankruptcy

and other federal courts, the uniform understanding of its limits based on the well recognized standards for compulsory counterclaims, and the lack of indicia that Congress intended to alter the traditional scope of the doctrine of recoupment, demonstrate the continued *893 vitality of the traditional standards for recoupment.

In any event, to suggest that the Congress intended to abridge radically the long standing common law right of creditors to recoupment along the same standards as applied outside of bankruptcy without ever mentioning recoupment in the Bankruptcy Code is fanciful. [FN157] In United States v. Texas, [FN158] the Supreme Court articulated the standard for determining whether a common law rule has been superseded by a subsequent statute or regulation. Texas involved the issue of whether a federal statute had modified the existing common law regarding payment of prejudgment interest to the United States in contract cases. Explaining that there is a presumption favoring the retention of existing common law, the Court articulated the following standard to *894 determine whether that presumption has been overcome:

"[s]tatutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." In such cases, Congress does not write upon a clean slate. In order to abrogate a common law principle, the statute must "speak directly" to the question addressed by the common law. ... [Although] Congress need not "affirmatively proscribe" the common law doctrine at issue ... "courts may take it as a given that Congress has legislated with an expectation that the [common law] principle will apply except 'when a statutory purpose to the contrary is evident.'" [FN159]

The District Court for the District of Columbia applied the decision in Texas to hold that the Debt Collection Act did not alter the government's right to recoupment in Amoco Production Co. v. Fry. [FN160] In Amoco Production the court held that the DCA did not alter the well *895 established common law rights of the government. It noted that the DCA "itself does not purport to abrogate the common law right of offset." [FN161] Similarly, the Bankruptcy Code does not purport to abrogate or alter a creditor's right to recoupment.

The Supreme Court has followed this rule in bankruptcy cases as well. [FN162] In the absence of at least some discussion in the legislative history, courts should not hold that the well established pre-Code practice allowing recoupment of obligations employing the same standard as used outside of bankruptcy has been abridged. [FN163]

Congress's failure in the Bankruptcy Code to control recoupment, as it controls a creditor's exercise of setoff rights, 11 U.S.C. § 553, should be considered intentional not an oversight. "'Where Congress includes *896 particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.'" [FN164] Had Congress intended to permit bankruptcy courts to control a creditor's right to recoupment, it would have said so expressly as it did with setoff in § 553. While one can debate why Congress did not include any controls over a creditor's right to recoupment in the Bankruptcy Code, "'[t]he short answer is that Congress did not write the statute that way,'" [FN165] and it would be improper to assume that Congress employed different words to mean the same thing. [FN166] That Congress chose different treatments for setoff and recoupment necessarily "reflects its intent to say something *897 different." [FN167] Courts should, therefore, "refrain from concluding here that the differing [treatment] ... has the same meaning," and "should not presume to ascribe this difference to a simple mistake in draftsmanship." [FN168]

**B. Recoupment And The Automatic Stay. The automatic stay does not apply to recoupment.** See In re Holford, 896 F.2d 176, 179 (5th Cir. 1990), University Medical Ctr. v. Sullivan, 122 B.R. 919, 925 (E.D. Pa. 1990), aff'd, 973 F.2d 1065 (3d Cir. 1992), In re Norsal Indus., 147 B.R. 85 (Bankr. E.D.N.Y.), In re Rooster, 127 B.R. 560 (Bankr. E.D.Pa. 1991), In re Visiting Nurse Ass'n, 121 B.R. 114 (Bankr. M.D. Fla. 1990), In re Hiler, 99 B.R. 238, 242-43 (Bankr. D.N.J. 1989), In re Midwest Serv. and Supply Co., 44 B.R. 262, 265 (D. Utah 1983), In re Maine, 32 B.R. 452 (Bankr. S.D.N.Y. 1983), *898 In re Yonkers Hamilton Sanitarium, 22 B.R. 427 (Bankr. S.D.N.Y. 1982), aff'd, 34 B.R. 385 (S.D.N.Y. 1983). Contra In re Scharff, 143 B.R. 541 (Bankr. S.D. Iowa 1992), In re Heafitz, 85 B.R. 274 (Bankr. S.D.N.Y. 1988), In re Memorial Hosp., 82 B.R. 478 (W.D. Wis.), appeal dismissed, 862 F.2d 1299 (7th Cir. 1988), In re Klingberg Schools, 68 B.R. 173, 178 n.3 (N.D. Ill. 1986). See also In re Izagirre, 166 B.R. 484, 493 (Bankr. N.D. Ga. 1994) (Although creditor may not "technically" need relief from the stay, "the better approach is to seek relief from the stay as a precaution.")

**C. Timing.** The time limits of setoff do not apply; prepetition claims can be withheld from postpetition debts. See In re Midwest Serv. and Supply Co., 44 B.R. 262 (D. Utah 1983) (recoupment allowed when prepetition progress payments exceeded value of construction *899 work when performance continued postpetition); Waldschmidt v. CBS, Inc., 14 B.R. 309 (M.D. Tenn. 1981) (prepetition advances by creditor can be recouped from royalties earned by debtor postpetition); In re Bob Brest Buick, Inc., 136 B.R. 322 (Bankr. D. Me. 1991) (recoupment is "without regard to the pre- or post-petition timing of a particular financial event"); In re Mohawk Indus., 82 B.R. 174, 177-78 (Bankr. D. Mass. 1987), In re American Cent. Airlines, Inc., 60 B.R. 587, 590 (Bankr. N.D. Iowa 1986). But see In re Ruiz, 146 B.R. 877 (Bankr. S.D. Fla. 1992) (recoupment only available if prepetition work produces postpetition revenue which is not dependent on the debtor's postpetition efforts).

**D. Recoupment After Discharge. Recoupment is unaffected by a discharge in bankruptcy.** *900 In re Flagstaff Realty Assocs., 60 F.3d 1031 (3d Cir. 1995) (recoupment survives discharge even if creditor did not object to plan or seek a stay pending appeal); In re Harmon, 188 B.R. 421, 425 (Bankr. 9th Cir. 1995) (recoupment "unaffected by the debtor's discharge"); Brown v. General Motors Corp., 152 B.R. 935, 938 (W.D. Wis. 1993) (right of recoupment not a claim or debt to be discharged in bankruptcy); In re Bram, 179 B.R. 824 (Bankr. E.D. Tex. 1995) (recoupment does not constitute a dischargeable debt because it is essentially a defense to payment and does not permit an affirmative recovery); In re Izaguirre, 166 B.R. 484, 490-93 (Bankr. N.D. Ga. 1994) (disagrees with Brown's reasoning, but finds that recoupment as a defense survives discharge); In re Hiler, 99 B.R. 238, 244 (Bankr. D.N.J. 1989). Contra *901 In re Kings Terrace Nursing Home & Health Facility, 184 B.R. 200 (S.D.N.Y. 1995) (Medicaid recoupment is a claim within the meaning of the Bankruptcy Code; hence, a right to recoupment is barred by the discharge), aff'g, 1995 WL 65531 (Bankr. S.D.N.Y. Jan. 27, 1995), In re Baker, 100 B.R. 80 (M.D. Fla. 1989).

**E. Recoupment And The Statute Of Limitations. When recoupment is used as a defense to a plaintiff's action it is not barred by a statute of limitations as long as the main action itself is timely.** United States v. Dalm, 494 U.S. 596 (1990), Bull v. United States, 295 U.S. 247, 262 (1935), Matter of Gober, 100 F.3d 1195, 1207 (5th Cir. 1996) ("Defensive claims for recoupment are never subject to statues of limitations as long as the plaintiff's action is timely."); Matter of Coxson, 43 F.3d 189, 193-94 (5th Cir. 1995), *902 In re Romano, 175 B.R. 585, 595 (Bankr. W.D. Pa. 1994), In re Woolaghan, 140 B.R. 377, 383 (Bankr. W.D. Pa. 1992), In re Mid Atl. Fund, Inc., 60 B.R. 604, 609-10 (Bankr. S.D.N.Y. 1986) (statutory limitation periods generally have no application to offsetting counterclaims and other matters of defense).

**F. Recoupment On An Unassumed Executory Contract. Failure of the debtor to assume an executory contract does not impair a creditor's ability to recoup prepetition overpayments from ongoing postpetition payments to a debtor, where both arise from the same contract.** See In re Wang Labs., Inc., 155 B.R. 289, 290 (Bankr. D. Mass. 1993), In re Tidewater Memorial Hosp., 106 B.R. 876 (Bankr. E.D. Va. 1989), In re Advanced Professional Home Health Care, Inc., 94 B.R. 95, 97 (E.D. Mich. 1988), In re Mohawk Indus., 82 B.R. 174, 177-78 (Bankr. D. Mass. 1987), In re *903 Neuman, 55 B.R. 702 (S.D.N.Y. 1985). Contra In re University Medical Ctr., 973 F.2d 1065 (3d Cir. 1992), In re Memorial Hosp., 82 B.R. 478, 483-84 (W.D. Wis. 1988). **The right of recoupment is not contingent upon there being an express contract provision contemplating recoupment.** See In re Holford, 896 F.2d 176, 178 (5th Cir. 1990). **"This policy ... prevents the debtor from obtaining the benefits of a contract without accepting its burdens, and is consistent with the bankruptcy policy that executory contracts be assumed or rejected in whole."** Mercy Hospital of Watertown v. New York Dep't of Social Servs., 171 B.R. 490, 495 (N.D.N.Y 1994).

**G. Recoupment And Creditors With Secured Interests. A creditor who holds a properly perfected Article 9 security interest is nonetheless subject to the** *904 **defense of recoupment.** See, e.g., Newbery Corp. v. Fireman's Fund Ins. Co., 95 F.3d 1392 (9th Cir. 1996) (permitting recoupment and rejecting "argument that application of recoupment [] would impermissibly impair [Citibank's perfected] security interest" in the assets subject to recoupment); First Nat'l Bank v. Master Auto Serv. Corp., 693 F.2d 308, 312 (4th Cir. 1982), United Cal. Bank v. Eastern Mt. Sports, 546 F. Supp. 945, 963 (D. Mass. 1982), aff'd, 705 F.2d 439 (1st Cir. 1983), In re Don's Elec., Inc., 65 B.R. 399, 403 (Bankr. W.D. Wis. 1986) (all holding that creditor with security interest in accounts receivable still subject to recoupment). But see In re Tucumseh Const. Co., 157 B.R. 471 (Bankr. E.D. Cal. 1993).

*905 **H. State Laws May Restrict Recoupment.** In re Fox, 162 B.R. 729, 732 (Bankr. E.D. Va. 1993) (Virginia does not permit common law recoupment on a sealed instrument).

**I. Recoupment Of Claims Arising From Rejection.** One court has held that claims arising from rejection of an executory contract are not available for recoupment. United States v. Dewey Freight Sys., Inc., 31 F.3d 620 (8th Cir. 1994). But see In re Hirschorn, 156 B.R. 379, 388 (Bankr. E.D.N.Y. 1993), In re Don & Lin Trucking Co., 110 B.R. 562, 568 (Bankr. N.D. Ala. 1990) (rejection under § 365 does not limit the non-debtor party to filing a proof of claim for damages) and Howard Johnson, Inc. v. Tucker, 157 F.2d 959, 961 (5th Cir. 1946) (claims for damages arising on rejection of an executory lease in bankruptcy are properly subject *906 to recoupment where the obligations both arise out of the same transaction); In re Chestnut Ridge Plaza Assocs., 156 B.R. 477, 485 (Bankr. W.D. Pa. 1993) (creditor can offset losses incurred from rejection of lease against rents due the debtor under the rejected lease); In re Express Freight Lines, Inc., 130 B.R. 288, 291-92 (Bankr. E.D. Wis. 1991) (court allows setoff of claims resulting from rejection of an unexpired lease under § 365); cf. In re Klein Sleep Products, Inc., 173 B.R. 296, 299 (S.D.N.Y. 1994) ("Section 365 merely establishes the method for determining the date upon which a breach of an [executory contract] is deemed to occur. It does not purport to assign the priority awarded to damages flowing from the rejection of a[n executory contract]."). But see generally *907 Matter of Southmark Corp., 62 F.3d 104, 106 (5th Cir. 1995) (a party to an executory contract has a claim against the debtor only when the debtor has rejected the contract).

**J. Affirmatively Seeking Recoupment.** Although recoupment is a defensive doctrine, a creditor may take the offensive and seek an adjudication that it may recoup without waiting for the debtor to bring suit. In re Flagstaff Realty Assocs., 60 F.3d 1031, 1035 (3d Cir. 1995).

## IV. RECURRING SETOFF AND RECOUPMENT ISSUES

**A. Medicare Recoupment.** Can the United States recoup prepetition medicare overpayments from ongoing postpetition payments to healthcare providers? Compare (NO) *908 University Medical Ctr. v. Sullivan, 973 F.2d 1065 (3d Cir. 1992), In re Consumer Health Servs., Inc., 171 B.R. 917 (Bankr. D.D.C. 1994), appeal dismissed, Civ. Act. No. 94-2029 SSH (D.D.C. Mar. 18, 1996) (appeal pending); In re Kings Terrace Nursing Home and Health Related Facility, 1995 WL 65531, *7-8 (Bankr. S.D.N.Y. Jan. 27, 1995) (Medicaid relationship not appropriate for recoupment), aff'd, 184 B.R. 200 (S.D.N.Y. 1995) with (YES) In re Heffernan Memorial Hosp. Dist., 192 B.R. 228 (Bankr. S.D. Cal. 1996), In re St. Johns Home Health Agency, Inc., 173 B.R. 238 (Bankr. S.D. Fla. 1994) (both holding that Medicare adjustment to ongoing payments to recover prior overpayments is properly characterized as recoupment and is not subject to the automatic stay); In re Visiting Nurse Ass'n, 121 B.R. 114 (Bankr. M.D. Fla. 1990), *909 In re Homecall of S.W. Va., 1990 WL 278658 (Bankr. W.D. Va. 1990) and In re Yonkers Hamilton Sanitarium Inc., 34 B.R. 385, 387-88 (S.D.N.Y. 1983), see also Mount Sinai Hospital, Inc. v. Weinberger, 517 F.2d 329 (5th Cir.), modified, 522 F.2d 179 (5th Cir. 1975), cert. denied, 425 U.S. 935 (1976), Lowry Hospital Ass'n v. Blue Cross, 415 F. Supp. 589 (E.D. Tenn. 1976) (both holding that Medicare has common law right to recoup earlier overpayments from ongoing payments outside of bankruptcy).

**B. Setoff Of Tax Refunds.** Can the United States setoff prepetition debts against postpetition IRS tax refunds? The primary issue in these cases is when does the IRS tax refund to the debtor "arise." Generally, courts hold that the debtor's claim to a tax refund arises at the end of the tax year from which the refund results, and that the *910 Internal Revenue Code provisions establishing when a tax refund is "allowed" do not control. In re Pettibone Corp., 161 B.R. 960, 963 (N.D. Ill. 1993), aff'd sub nom. Pettibone Corp. v. United States, 34 F.3d 536 (7th Cir. 1994). Compare United States v. Reynolds, 764 F.2d 1004 (4th Cir. 1985), and United States v. Norton, 717 F.2d 767 (3d Cir. 1983), with In re Runnels, 134 B.R. 562 (Bankr. E.D. Tex. 1991) and In re Eggenmeyer, 75 B.R. 20 (Bankr. S.D. Ill. 1987). However, at least one court has held that the setting off of tax overpayments and tax underpayments is not a "setoff" as contemplated by the Bankruptcy Code. In a discussion that sounds much like recoupment, the court held that the reopening and adjusting of 13 tax periods at the same time transformed the 13 year stretch into one accounting period. The court expressly *911 limited this reasoning to corporate, as opposed to individual taxpayers. In re Pettibone Corp., 161 B.R. 960, 963 (N.D. Ill. 1993), aff'd sub nom. Pettibone Corp. v. United States, 34 F.3d 536 (7th Cir. 1994), accord In re Midway Indus. Contractors, Inc., 178 B.R.

# REF-3

**US Attorneys > USAM > Title 4 > Civil Resource Manual**

## 67.  Setoff and Recoupment in Bankruptcy -- Recoupment

US Attorneys > USAM > Title 4 > Civil Resource Manual
prev | next

# 67. Setoff and Recoupment in Bankruptcy -- Recoupment

## III. *RECOUPMENT*

**A. Recoupment Defined. Recoupment is the setting up of a demand arising from the same transaction as the plaintiff's claim, to abate or reduce that claim. Recoupment, a creditor's right long recognized in bankruptcy proceedings, is merely the means used to determine the proper liability on the amounts owed.** *See, e.g., Reiter v. Cooper*, 113 S. Ct. 1213, 1218 n.2 (1993); *Bull v. United States*, 295 U.S. 247, 262 (1935) ("recoupment is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded"); *In re Flagstaff Realty Assocs.*, 60 F.3d 1031 (3d Cir. 1995) ("[a] claim subject to recoupment avoids the usual bankruptcy channels and thus, in essence, is given priority over other creditor's claims"); *United Structures of Amer. v. G.R.G. Eng'g*, 9 F.3d 996, 999 (1st Cir. 1993) (recoupment is "'in the nature of a defense' and is intended to permit ... judgment to be rendered that does justice in view of the one transaction as a whole;" "allowing the creditor to recoup damages simply allows the debtor precisely what is due when viewing the transaction as a whole."); *In re Holford*, 896 F.2d 176, 178 (5th Cir. 1990); *In re B & L Oil Co.*, 782 F.2d 155, 158 (10th Cir. 1986); *In re Smith*, 737 F.2d 1549, 1553 (11th Cir. 1994); *In re Izaguirre*, 166 B.R. 484, 490-93 (Bankr. N.D. Ga. 1994) ("[R]ecoupment merely adjusts the claim of the plaintiff under the contract. Hence, recoupment asserted as a defense is not an "offset" to a claim ... ; recoupment speaks not simply to the net amount due from one party to the other computed by subtracting one claim from the other, but rather to the amount of the plaintiff's claim alone on a particular contract, transaction or event."); *In re Keisler*, 176 B.R. 605, 607 (Bankr. M.D. Fla. 1994) (Amounts subject to recoupment are not a "debt" as defined in the Bankruptcy Code.); 4 *Collier on Bankruptcy* ¶ 553.03, at 553-12 (15th ed. 1991); *see also In re Flagstaff Realty Assocs.*, 60 F.3d 1031 (3d Cir. 1995) (To the extent a debtor's claim is subject to recoupment, the debtor has no interest in the future income stream to the extent of the creditor's recoupment claim.); *In re Gross Plumbing & Heating Co.*, 146 B.R. 914 (Bankr. W.D.N.Y. 1992) (discusses concept of recoupment as an adjustment of amounts owed and that amounts subject to recoupment are not property of the estate); *Amoco Prod. Co v. Fry*, 904 F. Supp. 3 (D.D.C. 1995) (Plaintiffs have no property right in funds withheld to preserve right of recoupment until all prior debts are resolved and satisfied.). *But see In re Centergas, Inc.*, 172 B.R. 844, 851-52 (Bankr. N.D. Tex. 1994) (Recoupment is an impermissible violation of bankruptcy policy of equal distribution).

**1. Same transaction. The parameters of recoupment are derived from the common law pleading rules concerning counterclaims.** *Coplay Cement Co. v. Willis & Paul Group*, 983 F.2d 1435, 1440 (7th Cir. 1993) (recoupment is the "ancestor" of the compulsory counterclaim presently set forth in Fed. R. Civ. P. 13(a)); *Frederick v. United States*, 386 F.2d 481, 487 (5th Cir. 1967). **In that context it has been said that "transaction" is a word of flexible meaning, including a series of occurrences, depending not so much on the immediateness of their connection as upon their logical relationship.** *Moore v. New York Cotton Exch.*, 270 U.S. 593, 610 (1926); *In re Pinkstaff*, 974 F.2d 113 (9th Cir. 1992); *Montgomery Ward Dev. Corp. v. Juster*, 932 F.2d 1378 (11th Cir. 1991); *Tullos v. Parks*, 915 F.2d 1192 (8th Cir. 1990); *Savarese v. Agriss*, 883 F.2d 1194, 1208 (3d Cir. 1989); *United States v. Pullman Constr. Indus., Inc.*, 153 B.R. 539, 541-42 (N.D. Ill. 1993). **Some courts, however, take a much more restrictive view of "transaction", usually requiring a single contract or even a single transaction under a contract.** *Compare In re University Medical Ctr.*, 973 F.2d 1065 (3d Cir. 1992) (recoupment requires single integrated transaction) *and In re California Canners and Growers*, 62 B.R. 18 (Bankr. 9th Cir. 1986) (each delivery under a single distributor's agreement a separate transaction for recoupment

purposes) *with In re B & L Oil*, 782 F.2d 155 (10th Cir. 1986) (month-to-month purchases under a single contract arise from same transaction for recoupment). *Compare In re Norsal Indus.*, 147 B.R. 85, 89 (Bankr. E.D.N.Y. 1992) (prepetition deposit for utility services can be used to recoup subsequent later arising monthly obligations as they arise out of the same transaction) *with In re Village Craftsman, Inc.*, 160 B.R. 740, 747 (Bankr. D.N.J. 1993) (collecting cases on utility services recoupment and holding against recoupment of prepetition deposit). **Other courts have required "'some type of overpayment,' whether accidentally or contractually made" to permit recoupment.** *In re Photo Mech. Servs., Inc.*, 179 B.R. 604, 613 (Bankr. D. Minn. 1995); *In re Midway Airlines, Inc.*, 175 B.R. 239, 246 (Bankr. N.D. Ill. 1994).

**(a) Where the relationship between the creditor and the debtor is contractual, and the mutual debts arise from the same contract, withholding from ongoing payments to offset earlier overpayments has generally been allowed as recoupment. Because recoupment is an equitable defense, most courts recognize that application of the defense of recoupment in a contractual context is especially appropriate. Where the parties' mutual debts arise out of the contract recoupment is allowed because "there is but one recovery due on a contract, and that recovery must be determined by taking into account the mutual benefits and obligations of the contract."** *See, e.g., In re Alpco*, 62 B.R. 184, 188 (Bankr. S.D. Ohio 1986) (quoting *In re Maine*, 32 B.R. 452, 455 (Bankr. W.D.N.Y. 1983)); *accord In re Flagstaff Realty Assocs.*, 60 F.3d 1031 (3d Cir. 1995) (where the creditor's claim for repair costs and the debtor's claim to rent payment arise from the lease relationship they arise from the same transaction and are subject to recoupment); *Matter of Coxson*, 43 F.3d 189, 193-94 (5th Cir. 1995) (where creditor's and debtor's obligations arise out of the same contract recoupment is appropriate); *Distribution Servs. Ltd. v. Eddie Parker Interests Inc.*, 897 F.2d 811, 812 (5th Cir. 1990) ("Recoupment is a defense that goes to the foundation of plaintiff's claim by deducting from plaintiff's recovery all just allowances or demands accruing to the defendant with respect to the **same contract or transaction.**"); *First Nat'l Bank v. Master Auto Serv. Corp.*, 693 F.2d 308, 310 n.1 (4th Cir. 1982) ("Recoupment is the right of a defendant to have the plaintiff's monetary claim reduced by reason of some claim the defendant has against the plaintiff arising out of the **very contract giving rise to the plaintiff's claim.**"); *Speakman v. Bernstein*, 59 F.2d 520, 522 (5th Cir. 1932) ("[Defendant]'s defensive right of recoupment under the contract remains so long as any right under that **same contract** is urged against him offensively"); *FSLIC v. Smith*, 721 F. Supp. 1039, 1042 (E.D. Ark. 1989) (recoupment is "the right of a defendant to have the plaintiff's monetary claim reduced by reason of some claim the defendant has against the plaintiff arising out of the **very contract giving rise to the plaintiff's claim.**"); *In re Midwest Serv. and Supply Co.*, 44 B.R. 262, 266 (D. Utah 1983) ("A **single contract** must be considered one transaction."); *Waldschmidt v. CBS, Inc.*, 14 B.R. 309, 314 (M.D. Tenn. 1981) (in case under the Bankruptcy Act, court holds that where both obligations "**grow out of the [same] contract,**" the obligations "unquestionably arise from the same transaction"); *In re Bram*, 179 B.R. 824 (Bankr. E.D. Tex. 1995) (where prepetition overpayments and postpetition payments arise by the terms of the same contract, they arise from the "same transaction"); *In re LaPierre*, 180 B.R. 95 (Bankr. D.S.C. 1994) (Reduction of ongoing payments is properly characterized as recoupment where the ongoing payments arise out of same contactual relationship as prior overpayments.); *In re Izaguirre*, 166 B.R. 484, 493 (Bankr. N.D. Ga. 1994) ("[R]ecoupment speaks not simply to the net amount due from one party to the other computed by subtracting one claim from the other, but rather to the amount of the plaintiff's claim alone on **a particular contract**, transaction or event."); *In re Northeast Exp. Regional Airlines, Inc.*, 169 B.R. 258 (Bankr. D. Me. 1994) (Obligations "arising from" and "directly related" to contractual relationship are subject to recoupment.); *In re Bob Brest Buick, Inc.*, 136 B.R. 322, 323 (Bankr. D. Me. 1991) (A business relationship is a "continuous one which permits recoupment."); *In re Tidewater Memorial Hospital*, 106 B.R. 876, 881-82 (Bankr. E.D. Va. 1989) ("Recoupment rests on the principle that it is just and equitable to settle in one action all claims growing out of the **same contract** or transaction."); *In re Hiler*, 99 B.R. 238, 242 (Bankr. D.N.J. 1989) (A defendant "clearly has a right of recoupment" where "all the claims arise out of the **same contract.**"); *see generally Cecile Indus. Inc. v. Cheney*, 995 F.2d 1052, 1054 (Fed. Cir. 1993)

("Indisputably, the Government has long enjoyed the right to offset contract debts to the United States against contract payments due to the debtor."); *In re Mohawk Indus.*, 82 B.R. 174 (Bankr. D. Mass. 1987); *In re American Cent. Airlines, Inc.*, 60 B.R. 587 (Bankr. N.D. Iowa 1986). *Contra University Medical Ctr. v. Sullivan*, 973 F.2d 1065, 1081-82 (3d Cir. 1992) ("same transaction" requirement for recoupment must be narrowly construed); *In re Thompson*, 182 B.R. 140, 147-49 (Bankr. E.D. Va. 1995) ("One contract alone, however, is not sufficient to establish a single transaction, since separate transactions may occur within the confines of the contract."); *In re California Canners and Growers*, 62 B.R. 18 (Bankr. 9th Cir. 1986).

**(b) Where the relationship between the United States and the debtor is statutory rather than contractual, such as social security beneficiaries or VA overpayments, recoupment has frequently been denied.** *Lee v. Schweiker*, 739 F.2d 870 (3d Cir. 1984); *In re Rowan*, 15 B.R. 834 (Bankr. N.D. Ohio 1981), *aff'd*, 747 F.2d 1052 (6th Cir. 1984) (no recoupment right to withhold SSA benefits "earned" postpetition to collect prepetition debt); *In re Howell*, 4 B.R. 102 (M.D. Tenn. 1980) (no recoupment of past overpayments under FECA from future benefits). *Contra In re Ross*, 104 B.R. 171 (E.D. Mo. 1989) (distinguishing *Lee* and allowing recoupment of unemployment compensation benefits); *In re Keisler*, 176 B.R. 605, 607 (Bankr. M.D. Fla. 1994) (VA entitled to recoup prior overpayments from ongoing disability payments); *In re Newman*, 35 B.R. 97, 99 (Bankr. W.D.N.Y. 1983) (VA entitled to withhold disability benefits "earned" postpetition to offset lump sum severance payment made prepetition where both "resulted" from same disability incident); *cf. Sullivan v. Everhart*, 494 U.S. 83 (1990) (in dicta, referring to adjusting ongoing OASDI or SSI payments by decreasing future payments on account of past overpayments as recoupment).

**B. United States Right To Recoupment. The United States has a long recognized right to recoup federal monies erroneously paid out.** *See, e.g., United States v. Carr*, 132 U.S. 644 (1890); *Bechtel v. PBGC*, 781 F.2d 906, 907 (D.C. Cir. 1986) (United States has inherent right to recoup past overpayments by adjusting the levels of ongoing payments).

**C. Recoupment And The Automatic Stay. The automatic stay does not apply to recoupment**. *See In re Holford*, 896 F.2d 176, 179 (5th Cir. 1990); *University Medical Ctr. v. Sullivan*, 122 B.R. 919, 925 (E.D. Pa. 1990), *aff'd*, 973 F.2d 1065 (3d Cir. 1992); *In re Norsal Indus.*, 147 B.R. 85 (Bankr. E.D.N.Y.); *In re Rooster*, 127 B.R. 560 (Bankr. E.D. Pa. 1991); *In re Visiting Nurse Ass'n*, 121 B.R. 114 (Bankr. M.D. Fla. 1990); *In re Hiler*, 99 B.R. 238, 242-43 (Bankr. D.N.J. 1989); *In re Midwest Serv. and Supply Co.*, 44 B.R. 262, 265 (D. Utah 1983); *In re Maine*, 32 B.R. 452 (Bankr. S.D.N.Y. 1983); *In re Yonkers Hamilton Sanitarium*, 22 B.R. 427 (Bankr. S.D.N.Y. 1982), *aff'd*, 34 B.R. 385 (S.D.N.Y. 1983). *Contra In re Scharff*, 143 B.R. 541 (Bankr. S.D. Iowa 1992); *In re Heafitz*, 85 B.R. 274 (Bankr. S.D.N.Y. 1988); *In re Memorial Hosp.*, 82 B.R. 478 (W.D. Wis.), *appeal dismissed*, 862 F.2d 1299 (7th Cir. 1988); *In re Klingberg Schools*, 68 B.R. 173, 178 n.3 (N.D. Ill. 1986). *See also In re Izagirre*, 166 B.R. 484, 493 (Bankr. N.D. Ga. 1994) (Although creditor may not "technically" need relief from the stay, "the better approach is to seek relief from the stay as a precaution.")

**D. Timing. The time limits of setoff do not apply; prepetition claims can be withheld from postpetition debts.** *See In re Midwest Serv. and Supply Co.*, 44 B.R. 262 (D. Utah 1983) (recoupment allowed when prepetition progress payments exceeded value of construction work when performance continued postpetition); *Waldschmidt v. CBS, Inc.*, 14 B.R. 309 (M.D. Tenn. 1981) (prepetition advances by creditor can be recouped from royalties earned by debtor postpetition); *In re Bob Brest Buick, Inc.*, 136 B.R. 322 (Bankr. D. Me. 1991) (recoupment is "without regard to the pre- or post-petition timing of a particular financial event"); *In re Mohawk Indus.*, 82 B.R. 174, 177-78 (Bankr. D. Mass. 1987); *In re American Cent. Airlines, Inc.*, 60 B.R. 587, 590 (Bankr. N.D. Iowa 1986). *But see In re Ruiz*, 146 B.R. 877 (Bankr. S.D. Fla. 1992) (recoupment only available if prepetition work produces postpetition revenue which is not dependent on the debtor's postpetition efforts).

**E. Recoupment After Discharge. Recoupment is unaffected by a discharge in bankruptcy.** *In re Flagstaff*

*Realty Assocs.*, 60 F.3d 1031 (3d Cir. 1995) (recoupment survives discharge even if creditor did not object to plan or seek a stay pending appeal); *In re Harmon*, 188 B.R. 421, 425 (Bankr. 9th Cir. 1995) (recoupment "unaffected by the debtor's discharge"); *Brown v. General Motors Corp.*, 152 B.R. 935, 938 (W.D. Wis. 1993) (right of recoupment not a claim or debt to be discharged in bankruptcy); *In re Bram*, 179 B.R. 824 (Bankr. E.D. Tex. 1995) (recoupment does not constitute a dischargeable debt because it is essentially a defense to payment and does not permit an affirmative recovery); *In re Izaguirre*, 166 B.R. 484, 490-93 (Bankr. N.D. Ga. 1994) (disagrees with *Brown*'s reasoning, but finds that recoupment as a defense survives discharge); *In re Hiler*, 99 B.R. 238, 244 (Bankr. D.N.J. 1989). *Contra In re Kings Terrace Nursing Home & Health Facility*, 184 B.R. 200 (S.D.N.Y. 1995) (Medicaid recoupment is a claim within the meaning of the Bankruptcy Code; hence, a right to recoupment is barred by the discharge), *aff'g*, 1995 WL 65531 (Bankr. S.D.N.Y. Jan. 27, 1995); *In re Baker*, 100 B.R. 80 (M.D. Fla. 1989).

**F. Recoupment And The Statute Of Limitations. When recoupment is used as a defense to a plaintiff's action it is not barred by a statute of limitations as long as the main action itself is timely.** *United States v. Dalm*, 494 U.S. 596 (1990); *Bull v. United States*, 295 U.S. 247, 262 (1935); *Matter of Coxson*, 43 F.3d 189, 193-94 (5th Cir. 1995); *In re Romano*, 175 B.R. 585, 595 (Bankr. W.D. Pa. 1994); *In re Woolaghan*, 140 B.R. 377, 383 (Bankr. W.D. Pa. 1992); *In re Mid Atl. Fund, Inc.*, 60 B.R. 604, 609-10 (Bankr. S.D.N.Y. 1986) (statutory limitation periods generally have no application to offsetting counterclaims and other matters of defense).

**G. Recoupment On An Unassumed Executory Contract. Failure of the debtor to assume an executory contract does not impair a creditor's ability to recoup prepetition overpayments from ongoing postpetition payments to a debtor, where both arise from the same contract.** *See In re Wang Labs., Inc.*, 155 B.R. 289, 290 (Bankr. D. Mass. 1993); *In re Tidewater Memorial Hosp.*, 106 B.R. 876 (Bankr. E.D. Va. 1989); *In re Advanced Professional Home Health Care, Inc.*, 94 B.R. 95, 97 (E.D. Mich. 1988); *In re Mohawk Indus.*, 82 B.R. 174, 177-78 (Bankr. D. Mass. 1987); *In re Neuman*, 55 B.R. 702 (S.D.N.Y. 1985). *Contra In re University Medical Ctr.*, 973 F.2d 1065 (3d Cir. 1992); *In re Memorial Hosp.*, 82 B.R. 478, 483-84 (W.D. Wis. 1988). **The right of recoupment is not contingent upon there being an express contract provision contemplating recoupment.** *See In re Holford*, 896 F.2d 176, 178 (5th Cir. 1990). **"This policy ... prevents the debtor from obtaining the benefits of a contract without accepting its burdens, and is consistent with the bankruptcy policy that executory contracts be assumed or rejected in whole."** *Mercy Hospital of Watertown v. New York Dep't of Social Servs.*, 171 B.R. 490, 495 (N.D.N.Y 1994).

**H. Recoupment And Sovereign Immunity. As with setoff, recoupment alone should not waive sovereign immunity; recoupment is a merely a defense, not a claim (a right of payment) as defined in 11 U.S.C. § 101(5).** *In re Harmon*, 188 B.R. 421 (Bankr. 9th Cir. 1995) ("Because recoupment only reduces a debt as opposed to constituting an independent basis for a debt, it is not a claim in bankruptcy ...."); *Mercy Hospital of Watertown v. New York Dep't of Social Servs.*, 171 B.R. 490 (N.D.N.Y 1994) ("[R]ecoupment does not fall within even the broadest definition of claim for purposes of waiving immunity under § 106(a) or (b)."); *Brown v. General Motors Corp.*, 152 B.R. 935, 938 (W.D. Wis. 1993) ("Because of its unique nature as an equitable defense, the right of recoupment does not constitute a claim within the meaning of 11 U.S.C. § 101(5) which defines a claim."); *see also Mullen v. United States*, 696 F.2d 470, 472 (6th Cir. 1985).

**I. Recoupment And Creditors With Secured Interests.** A creditor who holds a properly perfected Article 9 security interest is nonetheless subject to the defense of recoupment. *See, e.g., First Nat'l Bank v. Master Auto Serv. Corp.*, 693 F.2d 308, 312 (4th Cir. 1982) (Bank with security interest in accounts receivable still subject to recoupment); *United Cal. Bank v. Eastern Mt. Sports*, 546 F. Supp. 945, 963 (D. Mass. 1982) (same), *aff'd*, 705 F.2d 439 (1st Cir. 1983); *In re Don's Elec., Inc.*, 65 B.R. 399, 403 (Bankr. W.D. Wis. 1986) (same). *But see In re*

*Tucumseh Const. Co.*, 157 B.R. 471 (Bankr. E.D. Cal. 1993).

**J. State Laws May Restrict Recoupment.** *In re Fox*, 162 B.R. 729, 732 (Bankr. E.D. Va. 1993) (Virginia does not permit common law recoupment on a sealed instrument). **However, we should argue that does not restrict the federal government.**

**K. Recoupment Of Claims Arising From Rejection. One court has held that claims arising from rejection of an executory contract are not available for recoupment.** *United States v. Dewey Freight Sys., Inc.*, 31 F.3d 620 (8th Cir. 1994). *But see In re Hirschorn*, 156 B.R. 379, 388 (Bankr. E.D.N.Y. 1993); *In re Don & Lin Trucking Co.*, 110 B.R. 562, 568 (Bankr. N.D. Ala. 1990) (rejection under § 365 does not limit the non-debtor party to filing a proof of claim for damages) *and Howard Johnson, Inc. v. Tucker*, 157 F.2d 959, 961 (5th Cir. 1946) (claims for damages arising on rejection of an executory lease in bankruptcy are properly subject to recoupment where the obligations both arise out of the same transaction); *In re Chestnut Ridge Plaza Assocs.*, 156 B.R. 477, 485 (Bankr. W.D. Pa. 1993) (creditor can offset losses incurred from rejection of lease against rents due the debtor under the rejected lease); *In re Express Freight Lines, Inc.*, 130 B.R. 288, 291-92 (Bankr. E.D. Wis. 1991) (court allows setoff of claims resulting from rejection of an unexpired lease under § 365); *cf. In re Klein Sleep Products, Inc.*, 173 B.R. 296, 299 (S.D.N.Y. 1994) ("Section 365 merely establishes the method for determining the date upon which a breach of an [executory contract] is deemed to occur. It does not purport to assign the priority awarded to damages flowing from the rejection of a[n executory contract]."). *But see generally Matter of Southmark Corp.*, 62 F.3d 104, 106 (5th Cir. 1995) (a party to an executory contract has a claim against the debtor only when the debtor has rejected the contract).

**L. Affirmatively Seeking Recoupment. Although recoupment is a defensive doctrine, a creditor may take the offensive and seek an adjudication that it may recoup without waiting for the debtor to bring suit.** *In re Flagstaff Realty Assocs.*, 60 F.3d 1031, 1035 (3d Cir. 1995).

**IV. *RECURRING SETOFF AND RECOUPMENT ISSUES***

**A. Medicare Recoupment. Can the United States recoup prepetition medicare overpayments from ongoing postpetition payments to healthcare providers?** *Compare* (NO) *University Medical Ctr. v. Sullivan*, 973 F.2d 1065 (3d Cir. 1992); *In re Consumer Health Servs., Inc.*, 171 B.R. 917 (Bankr. D.D.C. 1994), *appeal dismissed*, Civ. Act. No. 94-2029 SSH (D.D.C. Mar. 18, 1996) (appeal pending); *In re Kings Terrace Nursing Home and Health Related Facility*, 1995 WL 65531, *7-8 (Bankr. S.D.N.Y. Jan. 27, 1995) (Medicaid relationship not appropriate for recoupment), *aff'd*, 184 B.R. 200 (S.D.N.Y. 1995) *with* (YES) *In re Heffernan Memorial Hosp. Dist.*, 192 B.R. 228 (Bankr. S.D. Cal. 1996); *In re St. Johns Home Health Agency, Inc.*, 173 B.R. 238 (Bankr. S.D. Fla. 1994) (both holding that Medicare adjustment to ongoing payments to recover prior overpayments is properly characterized as recoupment and is not subject to the automatic stay); *In re Visiting Nurse Ass'n*, 121 B.R. 114 (Bankr. M.D. Fla. 1990); *In re Homecall of S.W. Va.*, 1990 WL 278658 (Bankr. W.D. Va. 1990) *and In re Yonkers Hamilton Sanitarium Inc.*, 34 B.R. 385, 387-88 (S.D.N.Y. 1983); *see also Mount Sinai Hospital, Inc. v. Weinberger*, 517 F.2d 329 (5th Cir.), *modified*, 522 F.2d 179 (5th Cir. 1975), *cert. denied*, 425 U.S. 935 (1976); *Lowry Hospital Ass'n v. Blue Cross*, 415 F. Supp. 589 (E.D. Tenn. 1976) (both holding that Medicare has common law right to recoup earlier overpayments from ongoing payments outside of bankruptcy).

**B. Setoff Of Tax Refunds. Can the United States setoff prepetition debts against postpetition IRS tax refunds? The primary issue in these cases is when does the IRS tax refund to the debtor "arise." Generally, courts hold that the debtor's claim to a tax refund arises at the end of the tax year from which the refund results, and that the Internal Revenue Code provisions establishing when a tax refund is "allowed" do not**

control. *In re Pettibone Corp.*, 161 B.R. 960, 963 (N.D. Ill. 1993), *aff'd sub nom. Pettibone Corp. v. United States*, 34 F.3d 536 (7th Cir. 1994). *Compare United States v. Reynolds*, 764 F.2d 1004 (4th Cir. 1985); *and United States v. Norton*, 717 F.2d 767 (3d Cir. 1983); *with In re Runnels*, 134 B.R. 562 (Bankr. E.D. Tex. 1991) *and In re Eggenmeyer*, 75 B.R. 20 (Bankr. S.D. Ill. 1987). **However, at least one court has held that the setting off of tax overpayments and tax underpayments is not a "setoff" as contemplated by the Bankruptcy Code. In a discussion that sounds much like recoupment, the court held that the reopening and adjusting of 13 tax periods at the same time transformed the 13 year stretch into one accounting period. The court expressly limited this reasoning to corporate, as opposed to individual taxpayers.** *In re Pettibone Corp.*, 161 B.R. 960, 963 (N.D. Ill. 1993), *aff'd sub nom. Pettibone Corp. v. United States*, 34 F.3d 536 (7th Cir. 1994); *accord In re Midway Indus. Contractors, Inc.*, 178 B.R. 734, 737 (N.D. Ill. 1995). *Contra In re Chateaugay Corp.*, 1995 WL 386483, *5 (S.D.N.Y. Jun. 28, 1995) (holding that there is no common law right to offset tax refunds against claims of other federal agencies); *In re Custom Ctr., Inc.*, 163 B.R. 309, 313 (E.D. Tenn. 1994) (rejecting *Pettibone*).

**C. Setoff Against Family Farmers. Can the United States setoff prepetition debts from ongoing postpetition payments to family farmers?** *Compare* (YES) *United States v. Gerth*, 991 F.2d 1428 (8th Cir. 1993); *In re Buckner*, 165 B.R. 942 (D. Kan. 1994), *appeal dismissed*, 66 F.3d 263 (10th Cir. 1995); *In re Mohar*, 140 B.R. 273 (Bankr. D. Mont. 1992); *In re Allen*, 135 B.R. 856 (Bankr. N.D. Iowa 1992); *In re Lundell Farms*, 86 B.R. 582 (Bankr. W.D. Wis. 1988); *In re Greseth*, 78 B.R. 936 (D. Minn. 1987); *In re Parrish*, 75 B.R. 14 (Bankr. N.D. Tex. 1987); *In re Buske*, 75 B.R. 213 (Bankr. N.D. Tex. 1987); *In re Pinkert*, 75 B.R. 218 (Bankr. N.D. Tex. 1987); *In re Woloschak Farms*, 74 B.R. 261 (Bankr. N.D. Ohio 1987); *In re Matthieson*, 63 B.R. 56 (D. Minn. 1986) *with* (NO) *In re Young*, 144 B.R. 45 (Bankr. N.D. Tex. 1992); *In re Gore*, 124 B.R. 75 (Bankr. E.D. Ark. 1990); *In re Evatt*, 112 B.R. 405 (Bankr. W.D. Okla. 1989), *aff'd* 112 B.R. 417 (W.D. Okla. 1990); *In re Walat Farms*, 69 B.R. 529 (Bankr. E.D. Mich. 1987).

**D. Setoff Against Exempt Property. Can a creditor exercise a right of setoff against exempt property?** *Compare* (YES) *Posey v. Dep't of Treasury*, 156 B.R. 910, 915 (W.D.N.Y. 1993); *In re Glaze*, 169 B.R. 956 (Bankr. D. Ariz. 1994) (exempt homestead sale proceeds subject to setoff); *In re Runnels*, 134 B.R. 562, 564 (Bankr. E.D. Tex. 1991); *In re Swickard*, 133 B.R. 902 (Bankr. S.D. Ohio 1991); *In re Pieri*, 86 B.R. 208 (Bankr. 9th Cir. 1988); *In re Lee*, 40 B.R. 123 (Bankr. E.D. Mich. 1984) *with* (NO) *In re Laues*, 90 B.R. 158 (Bankr. E.D.N.C. 1988); *In re Wilde*, 85 B.R. 147 (Bankr. D.N.M. 1988); *In re Hinson*, 65 B.R. 675 (Bankr. W.D. Tenn. 1986); *In re Davies*, 27 B.R. 898 (Bankr. E.D.N.Y. 1983); *In re Monteith*, 23 B.R. 601 (Bankr. N.D. Ohio 1982); *In re Haffner*, 12 B.R. 371 (Bankr. M.D. Tenn. 1981). *See generally In re Powell*, 173 B.R. 338, 340 (Bankr. E.D. Ky. 1994) (dicta contrasting Ky. statute which does not permit setoff against exempt property with Ohio statute which does).

**E. Setoff And Recoupment Based On Statistical Sampling. Can the United States base recoupment or setoff on debts established through statistical sampling?** *Compare* (YES) *Ratanasen v. California Dep't of Health Servs.*, 11 F.3d 1467, 1470-71 (9th Cir. 1993) (collecting cases); *Mount Sinai Hosp. v. Weinberger*, 517 F.2d 329, *modified*, 522 F.2d 179 (5th Cir. 1975), *cert. denied*, 425 U.S. 935 (1976); *and Mile High Therapy Ctrs. v. Bowen*, 735 F. Supp. 984 (D. Colo. 1988) *with* (NO) 56 Comp. Gen. 963 (1977) (although the Government may base its setoff on an estimate, it may not base its estimate on a statistical sampling; a projection based on a random sample is not sufficiently certain in amount to warrant a setoff).

**F. Setoff Of Attorneys Fees Under § 303(i). Can the United States setoff against attorney's fee awards imposed under § 303(i)?** *Compare In re Schiliro*, 72 B.R. 147 (Bankr. E.D. Va. 1987) (no setoff of § 303(i) awards allowed because (1) award of attorney's fees analogous to penalty to discourage frivolous involuntary

filings, and (2) fees are for the benefit of the attorney and lack mutuality for setoff purposes); *In re K. P. Enters.*, 135 B.R. 174 (Bankr. D. Me. 1992) (no setoff of § 303(i) awards because purpose of award is to discourage creditors from improperly filing involuntary petitions); *and 2 Collier on Bankruptcy* ¶ 303.39 (setoff of awards under 303(i) should not be permitted) *with In re Better Care, Ltd.*, 97 B.R. 405 (Bankr. N.D. Ill. 1989) (§ 303(i) attorney's fees awards are compensatory in nature, for the benefit of the debtor, and are subject to setoff).

**G. Postpetition Interest in Recoupment and Setoff. Interest unmatured when the petition is filed is not allowed against the estate.** 11 U.S.C. § 502(b)(2); *see In re Compass Marine Corp.*, 146 B.R. 138, 157 (Bankr. E.D. Pa. 1992). **However, interest continues to accrue on a prepetition debt which is oversecured under 11 U.S.C. § 506(b).** *See United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 237 (1989). **An amount withheld subject to setoff is a secured claim under 11 U.S.C. § 506(a). Therefore, if and to the extent the debtor's claim against the United States is greater than the United States claim against the estate, the United States may collect interest from any monies withheld subject to setoff.**

**H. The Assignment of Claims Act And Setoff/Recoupment. The assignment by the contractor of amounts due on a government contract, even if properly assigned pursuant to the Assignment of Claims Act, 31 U.S.C. § 3727; 41 U.S.C. § 15, does not extinguish already accrued setoff or recoupment rights against those payables, unless the government expressly waives those rights through a "no setoff" commitment clause. Nothing in the Assignment of Claims Act alters the generally applicable rule that an assignee of a contract merely "stand in the shoes of its assignor and takes subject to those liabilities of its assignor that were in existence prior to the assignment."** *Septembertide Publishing, B.V. v. Stein and Day, Inc.*, 884 F.2d 675, 682 (2d Cir. 1989). **Therefore, liabilities arising from a government contract are still "subject to ... defenses arising under the contract which the Government could have asserted against the contractor absent the assignment .... If the contractor could recover nothing, then in most cases the assignee, standing in the shoes of the contractor, is entitled to nothing."** *Produce Factors Corp. v. United States*, 467 F.2d 1343, 1349 (Ct. Cl. 1972). **This includes the right to recoupment against contract payments.** *Unity Bank & Trust Co. v. United States*, 5 Cl. Ct. 380, 384 (1984) (the Act does not protect assignee from assignor's failure to comply with assigned contract's terms where the moneys at issue have yet to be disbursed); *Modern Indus. Bank v. United States*, 101 Ct. Cl. 808, 820-21 (1944) (assignee's right to payments subject to rights of the government under the contract); *cf. Central Bank v. United Sates*, 345 U.S. 639, 646 (1953) (assignee is always liable to defenses which "lay [] in execution []or in breach of the contract"). **The statue also expressly permits the United States to set off any liability of the assignor which exists at the time notice of the assignment was received.** *Southside Bank and Trust Co. v. United States*, 221 F.2d 813 (Ct. Cl. 1957); 37 Comp. Gen 318, 320 (1957); FAR 32.803(e) (the Act permits "the Government [to] apply against payments to the assignee any liability of the contractor to the Government arising independently of the assigned contract if the liability existed at the time notice of the assignment was received even though that liability had not yet matured so as to be due and payable."). **However, government contracts may include a "no setoff commitment" which entitles an assignee to receive contract payments free of reduction or setoff for (1) any liability of the contractor arising independently of the contract, and (2) any liabilities of the contractor arising from the assigned contract resulting from renegotiation, fines, penalties, taxes, or social security contributions. FAR 32.801, 32.804(b).**

**I. Appeals From Adverse Setoff And Recoupment Decisions.**

**1. An order denying relief from the stay to setoff is final and appealable.** *See In re Graves*, 33 F.3d 242 (3d Cir. 1994); *Franklin Sav. Ass'n. v. OTS*, 31 F.3d 1020, 1022 n.3 (10th Cir. 1994); *In re Swedlund Dev. Group, Inc.*, 16 F.3d 552, 559 (3d Cir. 1994). **Whether denial of relief from the stay to setoff, on the basis that the creditor**

has been granted adequate protection, is a final order and immediately appealable, is subject to controversy. *Compare In re Regency Woods Apartments*, 686 F.2d 899 (11th Cir. 1982) (where the court retains jurisdiction to modify order if adequate protection seems inadequate later, such order is not final) *with In re West Electronics*, 852 F.2d 79 (3d Cir. 1988) (order denying relief from stay is final and appealable if the court rejects the legal basis for the setoff). **A district court order reversing the bankruptcy court's denial of relief to setoff and remanding for further significant proceedings is not final and appealable.** *In re Buckner*, 66 F.3d 263 (10th Cir. 1995).

**2. Standard of Review. Whether the United States has a right of setoff is a matter of law which the appellate court reviews *de novo*.** *United States v. Gerth*, 991 F.2d 1428 (8th Cir. 1993). **However, most courts hold the decision to lift the stay to allow setoff is discretionary with the bankruptcy court, and denial of a motion to lift the stay may be overturned only upon a showing of abuse of discretion. If the court denies relief from the stay because it applied an erroneous legal principle or standard, that is an abuse of discretion.** *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990) (trial court abuses its discretion where its ruling is based "on an erroneous view of the law or on a clearly erroneous assessment of the evidence."); *In re Seaescape Cruises, Ltd.*, 172 B.R. 1002, 1013 (S.D. Fla. 1994) (same); *Contemporary Mortg. v. High Peaks Base Camp*, 156 B.R. 890, 893 (N.D.N.Y. 1993) (same).

**3. "[W]hether a creditor's conduct is so egregious" as to allow the court to deny setoff on equitable grounds should be considered a "question of law, over which an appellate court may exercise plenary review."** *See generally Matter of U.S. Abatement Corp.*, 39 F.3d 556, 559 (5th Cir. 1994) (discussing in context of equitable subordination).

**J. Setoff Of Transportation Claims. The GSA may setoff overcharges and loss and damage claims against ongoing payments to transportation carriers.** *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1020 (Fed. Cir. 1995); *IML Freight, Inc. v. United States*, 639 F.2d 676, 678 (Ct. Cl. 1980); *Burlington Northern, Inc. v. United States*, 462 F.2d 526, 529 (Ct. Cl. 1972). **If the transportation carrier is operating under a GBL solely, that offset is not subject to the Contract Disputes Act.** *Sherwood Van Lines, supra*.

[updated November 1998] [cited in Civil Resource Manual 62]

# REF-4

# In the United States Bankruptcy Court

## for the Northern District of Iowa

REBEL SAFFOLD and
RUTHIE MARIE SAFFOLD

*Debtor(s).*

Bankruptcy No. L-88-01003W

Chapter 7

# In the United States Bankruptcy Court

## for the Northern District of Iowa

| | |
|---|---|
| REBEL SAFFOLD and<br>RUTHIE MARIE SAFFOLD<br>*Debtor(s).* | Bankruptcy No. L-88-01003W<br><br>Chapter 7 |

| | |
|---|---|
| DEERE & COMPANY<br>*Plaintiff(s)* | Adversary No. L-89-0198W |

vs.

REBEL SAFFOLD
*Defendant(s)*

### Ruling Re: Complaint to Determine Validity of Recoupment

This adversary proceeding is before the Court on plaintiff, Deere and Company's complaint to determine the validity and dischargeability of a recoupment plan Deere exercised against defendant-debtor, Rebel Saffold prior to his bankruptcy, and continued to execute throughout his bankruptcy. Saffold contends that the debt which is the subject of the recoupment plan has been discharged and that Deere should cease the recoupment and return the amount withheld from Saffold during his bankruptcy. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). The following constitutes the Court's findings of facts and conclusions of law pursuant to Bankr. R. 7052.

### Findings of Fact

Plaintiff, Deere and Company ("Deere") is the administrator of a pension plan which pays defendant-debtor, Rebel Saffold ("Saffold") monthly retirement benefits. Saffold receives the benefits as a result of his former employment as an hourly and incentive worker with the John Deere Waterloo Works. Saffold retired from that position in May of 1977 when he was 46 years old, after accumulating 33 years and 5 months of service time with the company.

The Deere pension plan provided for an early retirement benefit for those employees who retired before the age of 62. Based on his accumulated service time, Saffold was entitled to and began to receive a monthly supplemental allowance of income. The terms of the benefit plan provided specifically that the company would reduce a retiree's supplemental allowance by up to $300 "for any month prior to age 62 for which employee becomes or could have become eligible for an unreduced social security benefit." In February of

1983, Saffold became eligible for social security disability income. Saffold has received an unreduced social security benefit from February of 1983 to the date of the trial.

Saffold failed to notify Deere promptly of the social security payments. Deere continued to pay Saffold a full and unreduced supplemental allowance until April of 1988 when Saffold made Deere aware of the social security payments. On April 29, 1988, Deere sent Saffold a letter notifying him that Deere overpaid his benefits from February of 1983 to April of 1988, a period of 5 years and 3 months. The letter also informed Saffold of Deere's plan to recoup the overpayment, totaling $18,308.10, by deducting $300 per month from Saffold's benefit payments from April 1988 until June of 1993.

Saffold and his wife, Ruthie Marie Saffold, filed for bankruptcy under Chapter 7 on June 25, 1988. Saffold listed Deere and Company as an unsecured creditor with a claim of $18,000. Deere already had withheld $300 from Saffold's May and June benefits payments by the date of bankruptcy. Deere has continued to deduct and withhold monthly payments since Saffold filed for bankruptcy. Rebel and Ruthie Marie Saffold received a Chapter 7 discharge on October 6, 1988. Deere has continued to withhold $300 per month from Rebel Saffold's benefits since entry of the discharge.

The Saffold's filed a motion to reopen the case on June 15, 1989, in order to determine the validity of Deere's continued withholding of $300 per month from the pension benefit. On November 8, 1989, Deere filed a complaint to determine the validity of its monthly recoupment plan. Through pleading and statements at the trial, the parties have agreed that the sole issue before the Court is the validity of the recoupment plan Deere continued to execute during and after the Saffold's bankruptcy. Deere seeks a declaration from this Court that the recoupment is valid and has been properly executed throughout the proceeding. Saffold contends that the debt owed to Deere has been discharged and the continued recoupment is not valid. Saffold also requests that the money withheld from the Saffold's monthly retirement benefit payment from the date of filing the Chapter 7 petition should be restored to Saffold and that further recoupment should cease.

### Discussion and Conclusions of Law

Deere contends that withholding $300 monthly from Saffold's retirement benefit payments during and after Saffold's bankruptcy is a valid practice either under the doctrine of set-off, as codified in 11 U.S.C. § 553(a), or under the equitable doctrine of recoupment. Under bankruptcy law, both the doctrines of recoupment and set-off are applicable to adjudicate "countervailing claims in one suit" when the bankruptcy case involves one of those claims. In re Hiler, 99 B.R. 238, 241 (Bankr. D. N.J. 1989) (citing Lee v. Schweiker, 739 F.2d 870, 875 (3rd Cir. 1984)). Since there is no dispute that Deere has a valid countervailing claim in this proceeding, the parties have agreed that the question presented for this Court is whether Deere's monthly withholding plan meets the requisites for either a valid set-off or recoupment. This Court, and many others, have discussed the differences between these doctrines and the circumstances in which each applies. In re American Central Airlines, 60 B.R. 507 (Bankr. N.D. Iowa 1986).

Set-off is authorized under the Bankruptcy Code in 11 U.S.C. § 553(a). That section provides:

(a) Except as otherwise provided in this sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before commencement of the case . . . .

11 U.S.C. § 553(a) (1988).

The applicability of set-off in bankruptcy is limited to "very narrow circumstances." In re American Central Airlines, 60 B.R. at 589; In re B & L Oil Co., 782 F.2d 155, 157 (10th Cir. 1986) (citing 4 Collier on Bankruptcy § 553.03 (15th Ed. 1981)). In general, set-off is available to a creditor as a means to reduce debtor's bankruptcy claim against creditor only to the extent that mutual obligations exist between debtor and creditor which arise from different transactions between the parties. In re Holford, 846 F.2d 176, 178 (5th Cir. 1990); see also In re Hiler, 99 B.R. 238, 241 (Bankr. D. N.J. 1989) (citing In re Heafitz, 85 B.R. 274, 278 (Bankr. S.D.N.Y. 1988)). The Bankruptcy Code limits set-off to pre-petition claims of the debtor against a creditor being set-off against pre-petition claims of the creditor against the debtor. 11 U.S.C. § 553(a) (1988). Bankruptcy law does not allow "prepetition claim against the debtor (to) be set-off against post-petition debts to the debtor." Lee v. Schweiker, 739 F.2d 870, 875 (3rd Cir. 1984). The mutuality requirement is not satisfied in that situation since the creditor's pre-petition claim against the debtor is being used to set-off the creditor's post-petition debt to the debtor-in-possession. American Central Airlines, 60 B.R. at 590.

Set-off is further limited by the express provisions of the automatic stay. 11 U.S.C. § 362(a)(7) (1988). Creditors must acquire relief from the stay before executing a set-off. Hiler, 99 B.R. at 241, 243. Some courts have indicated that the reason the stay is made applicable to creditors using set-off in bankruptcy is that set-off allows creditors to enhance their position. See Hiler, 99 B.R. at 242-43; American Central Airlines, 60 B.R. at 590. This Court previously noted, for example, that while creditors normally assert set-off to extinguish "creditor's claim against debtor, . . . [creditor] may be entitled to a judgment in his favor for any excess over and above creditor's claim against the debtor." American Central Airlines, 60 B.R. at 590 (citing 4 Collier on Bankruptcy, § 553.03 (15th Ed. 1984)). Set-off also allows a creditor a greater priority in bankruptcy since set-off essentially "elevates an unsecured claim to a secured position" by giving the creditor "a permissible preference over other creditors." Hiler, 99 B.R. at 243 (quoting American Central Airlines, 60 B.R. at 590); see also Lee v. Schweiker, 739 F.2d 870, 875 (3rd Cir. 1984). The automatic stay requires the creditor to get leave from the court before obtaining this favored treatment.

The doctrine of recoupment, on the other hand, "allows a [creditor] to reduce the amount of a [debtor's] claim by asserting a claim against the [debtor] which arose out of the same transaction to arrive at a just and proper liability on [debtor's] claim." In re Holford, 896 F.2d 176, 178 (5th Cir. 1990) (citations omitted) (emphasis in original). The mutuality limitation on set-off does not apply to recoupments. Recoupment is "a defense to the debtor's claim against the creditor rather than mutual obligation." In re B & L Oil, 782 F.2d 155, 157 (10th Cir. 1986) (quoting Lee v. Schweiker, 739 F.2d 870, 875 (3rd Cir. 1984)). In American Central, this Court characterized recoupment as a creditor's claim to reduce growing out of the "identical transaction that furnishes the (debtor's) cause of

action" which is available to creditors as a damage claim against the debtor "strictly for the purpose of abatement or reduction" of the claim debtor made in bankruptcy against creditor. American Central Airlines, 60 B.R. at 590. This Court went on to observe that a creditor can use recoupment only to the extent needed to satisfy the claim stemming from that particular transaction, not to obtain a judgment for additional amounts debtor owes creditor from other transactions. American Central Airlines, 60 B.R. at 590. Hence, a recouping creditor can reach no additional property of the estate beyond that which is the subject of the claim and defense. See In re Hiler, 99 B.R. at 243. Courts have concluded that the automatic stay limitation found in set-off does not apply to recoupment because recoupment is an equitable apportionment of creditor's claim, not an enhancement of creditor's position.[1] In re Hiler, 99 B.R. at 243.

The distinction between recoupment and set-off is critical since these doctrines "produce very separate results." In re Hiler, 99 B.R. at 242. The availability of set-off, for example, is barred by the stay and mutuality limitations in many cases where recoupment may be allowed. See B & L Oil, 782 F.2d at 157. The factor most courts use to make this important distinction between the doctrines is "whether the claim arises out of the same or different transactions." Hiler, 99 B.R. at 241 (citations omitted). When the creditor's claim against the debtor arises from the same transaction as the debtor's claim against the creditor, the creditor's reduction can be properly characterized as a recoupment. Conversely, when the claims arise from different transactions between the parties, the creditor's reduction can be accomplished only by set-off, subject to the limitations noted above.

In general, recoupment is allowed in bankruptcy "where creditor's claim against the debtor, and debtor's claim against the creditor arise out of the same contract." Lee, 875 F.2d at 875. One court recently noted that "courts have generally only found this 'same transaction' requirement to be satisfied when the debts to be offset arise out of a single, integrated contract or similar transaction." In re Davidovich, 901 F.2d 1533, 1539 (10th Cir. 1990) (citations omitted). In the present case, the transactions between Deere and Saffold giving rise to the claims before this Court are based on benefits paid under an employment agreement. The operative facts are very similar to those underlying the dispute in In re Hiler, 99 B.R. 238 (Bankr. D. N.J. 1989), where the court found that the countervailing claims of the parties were based on the same contract and therefore the same transaction. In Hiler, an employee long terms disability plan sought to recoup overpayment it made to George Hiler, a beneficiary under the plan. Hiler, 99 B.R. at 239-240. The overpayment resulted from Hiler's failure to notify the plan administrator when he became eligible for social security disability payments. The plan terms specifically called for a reduction in benefits when the beneficiary became eligible for social security benefits. The plan became aware of the overpayment pre-petition and began to recoup the overpayment balance from Hiler's monthly check. Hiler subsequently filed bankruptcy, and the plan, which continued to deduct overpayment from monthly benefit checks, argued that it had a valid right of recoupment notwithstanding the bankruptcy. Hiler, 99 B.R. at 240-241. The court in Hiler found that "the [plan's] claim for reimbursement for overpayment stems from the same contract under which the debtor asserts a claim, i.e., the Plan." Hiler, 99 B.R. at 242. The court concluded that since the claims arose from the

4

same contract, the plan holds a valid right of recoupment against the debtor. Hiler, 99 B.R. at 242.

Since this Court believes In re Hiler provides a well-reasoned approach and is indistinguishable from the present case on the material facts, this Court will apply the principles of Hiler in the present case. Like the employee benefits plan in Hiler, the Deere employee benefits plan in this case gave rise to the Saffold's claim, a debt owed to Deere he sought to discharge, and the Deere's claim to have overpayment returned. This Court, like the court in Hiler, concludes that this plan constitutes the same contract and therefore the same transaction for the countervailing claims. The withholding plan, then, is properly characterized as a recoupment, and not set-off.[2]

Deere's recoupment plan pays off the pre-petition debt owed by Saffold to Deere by reducing the post-petition obligations of Deere to pay monthly retirement benefits. Many courts, including Hiler, have expressly validated this type of recoupment plan. It is worth noting here that the recoupment executed by Deere is far less restrictive than recoupments approved by other courts. The court in Hiler, for example, approved a recoupment which deprived the debtor of all monthly benefit payments until the plan recovered overpayment completely. Hiler, 99 B.R. at 241. Here, Deere's recoupment plan only reduces Saffold's monthly benefits payments.

The leading theory for validating such recoupment plans is that an agreement to pay benefits subject to later reductions or repayments is an executory contract, and the debtor must accept the benefits and the burdens of such an arrangement. See, e.g., B & L Oil, 782 F.2d at 159; Hiler, 99 B.R. at 244; American Central Airlines, 60 B.R. at 587. Here, as in Hiler, the benefit the debtor receives by continuing to accept monthly payments brings with it a duty to accept equally the burden to recount for the overpayment. Hiler, 99 B.R. at 244. The principle at work under this theory is that the debtor should not be free to "pick and choose the contract provisions that they want to abide by" by using bankruptcy to get rid of the burdens, while continuing to demand the benefits. Hiler, 99 B.R. at 244.

The Hiler court provided a second theory for approving the creditor's recoupment of a pre-petition claim by reducing a postpetition debt owed to debtor. The theory is that property subject to recoupment never becomes property of the estate under § 541(a)(1). Hiler, 99 B.R. at 244. As the 5th Circuit noted in In re Holford, 896 F.2d 178 (5th Cir. 1990), "the trustee of a bankruptcy estate takes the property subject to rights of and to the extent that [the creditor's] damages recoupment . . . and to the extent that [the creditor's] damages equal or exceed the funds withheld, the debtor has no interest in the funds." Holford, 896 F.2d at 179, (citing In re Career Consultants, Inc., 84 B.R. 419, 424, 426 (Bankr. E.D. Va. 1988)). Hence, the primary idea underlying this theory is that during and after bankruptcy a debtor is only entitled to receive payments from a creditor to the extent they exceed that creditor's recoupment claim. Based on this theory, the court in Hiler concluded that "a creditor's right of recoupment will survive discharge" and "to the extent that the Plan's right to recoupment is not property of the estate, the dollar value of that right is non-dischargeable." Hiler, 99 B.R. at 244, 245; see also In re Maine, 32 B.R. 452, 455 (Bankr. W.D.N.Y. 1983). Applying this theory to the present case, Saffold's bankruptcy did not defeat Deere's right to recoupment because to the extent of Deere's

countervailing claim against Saffold, Saffold has never been entitled to that property. Moreover, allowing Deere to recover the value of their claim against Saffold prevents Saffold from being unjustly enriched through the use of bankruptcy. See B & L Oil, 782 F.2d at 159; Hiler, 99 B.R. at 245.

The Hiler case does differ from the case before this Court in one respect. In Hiler, the plan provided expressly for recoupment or withholdings from monthly payments in order to remedy overpayment and there is no such clause in the Deere benefits contract. A valid recoupment, however, does not require that the contract provide specifically for withholding or recouping subsequent payments. Holford, 896 F.2d at 178; B & L Oil, 782 F.2d at 159. This factual difference therefore does not impact on this Court's reliance on Hiler.

Some courts, in addressing a creditor's attempt to recoup overpayment of benefits in a bankruptcy, have found that only setoff, and not recoupment, is available to the creditor. Lee v. Schweiker, 875 F.2d 870 (3rd Cir. 1984); In re Hagan, 41 B.R. 122 (Bankr. D. R.I. 1984). These cases, however, can be distinguished from the case presently before this Court. Such cases have arisen only in situations where the government overpaid social security benefits to debtor and sought to recoup the repayments from debtor's later checks. Lee, 739 F.2d at 876. (citations omitted). These cases reason that recoupment is not applicable because "[s]ocial welfare payments, such as social security, are statutory 'entitlements' rather than contractual rights" and that "the obligation to repay a previous overpayment is a separate debt subject to the ordinary rules of bankruptcy." Lee, 739 F.2d at 876. Furthermore, the Hagan court noted that each monthly payment "should be viewed as a separate transaction, since eligibility for benefits is independently made each month" and the benefit is dispersed only when debtor actually can demonstrate need. Hagan, 41 B.R. at 126. The case before this Court differs substantially from this line of cases. The Deere benefit plan is not an entitlement program. Deere and Saffold have a contractual relationship where all the rights and liabilities were set out when they entered into the contract. Deere pays monthly benefits to Saffold pursuant to that contract for work already performed by Saffold. All rights and duties of the parties are fixed pursuant to contract terms and no separate or independent transaction, like a monthly demonstration of need, is required to determine the obligations. The reasoning of these social security benefit cases is inapplicable in the present case since the transactional basis of the claims is a contractual arrangement fixing the liabilities of the parties.

## Conclusion

Deere's plan of recoupment is valid, and has been properly exercised during Saffold's bankruptcy. Deere may continue to withhold $300 monthly until the overpayment are recovered.

## ORDER

It is therefore ordered that Deere's plan of recoupment was validly executed during Saffold's bankruptcy and Deere may continue to execute the plan until the entire overpayment is recouped.

DONE AND ORDERED this 27th day of August, 1990.

Michael J. Melloy

Chief Bankruptcy Judge

1. The court in Hiler noted that some courts have found that recoupments, like set-offs, should be subject to the automatic stay. Hiler, 99 B.R. at 242 (citing In re Newport Offshore, Ltd., 88 B.R. 566, 569 (Bankr. D. R.I. 1988); In re Heafitz, 85 B.R. 274, 280 (Bankr. S.D.N.Y. 1988); In re Klingberg Schools, 68 B.R. 173, 178 (Bankr. N.D. Ill. 1986); In re Ohning, 57 B.R. 714, 716-17 (Bankr. N.D. Ind. 1986)). This Court will adopt the Hiler approach since the Court finds that approach to be well founded by reason and the findings of other courts. See, e.g., In re Holford, 896 F.2d at 179; In re Ross, 104 B.R. 171, 173 (E.D. Mo. 1989); In re Maine, 32 B.R. 452, 454-55 (Bankr. W.D.N.Y. 1983).

2. The Court's conclusion that the Deere plan is not a set-off is significant to the outcome of this case. If the Court had found that the claims arise from different transactions and set-off was the only method available to Deere, the reimbursement plan Deere executed against Saffold would run into problems with the limitations on set-off. For example, Deere failed to obtain relief from the stay before executing the plan and Deere's plan has a mutuality problem since it attempts to set-off a pre-petition debt Saffold owed against a post-petition debt owed to Saffold.

# REF-5

# Summary Plan Document Excerpts



# Summary Plan Description

For salaried employees hired on or
before December 31, 2000 and/or
with a service date on or before December 31, 2000



## Special Benefit

**If you are eligible for Corporation contributions for health care in retirement, and you are enrolled in Medicare Part B, and are a (1) retiree or surviving spouse receiving a Delphi monthly Part A retirement benefit, or (2) disabled employee eligible to receive Extended Disability Benefits, you may be** eligible to receive a full monthly Special Benefit for each month you maintain Medicare Part B enrollment. The amount is equal to the lesser of the Medicare Part B premium or $61.50, and will be included in your monthly Delphi retirement check or Extended Disability Benefit check. Also, under current federal income tax law, because receipt of the Special Benefit is conditioned on your Medicare Part B enrollment as verified by Delphi, the Special Benefit will be non-taxable.

This Special Benefit also is payable, upon application, to an eligible retiree or eligible surviving spouse who is (1) receiving Delphi monthly Part A retirement benefits, (2) under age 65, and (3) enrolled in Medicare Part B.

Evidence satisfactory to Delphi of your enrollment in Medicare Part B is required for you to receive a Special Benefit. If evidence of enrollment is not provided in a timely manner, retroactive payment of the Special Benefit will be limited to 12 months. Any recipient who is enrolled in Medicare Part B coverage will have the Special Benefit discontinued for periods during which Medicare Part B enrollment is not maintained.

The Special Benefit is *not* payable to any: (1) former employee receiving a deferred vested retirement benefit, or (2) surviving spouse receiving a survivor benefit resulting from a deferred vested retirement benefit.

No more than one Special Benefit is payable to any individual for any one month.

## Reimbursement for Third-Party Liability

Occasionally a person may sustain an injury and incur health care expenses because of another party's wrongdoing. While Delphi does not suspend coverage while liability is being determined, Delphi should not bear the financial burden if another party is responsible. Consequently, if (1) Delphi pays benefits on behalf of you or one of your dependents, and (2) you recover any monies from a third party for the same expenses, you are expected to reimburse the SHCP.

**You must provide notice to the Corporation (or to your health care Carriers on behalf of the Corporation) of any such recovery (or effort to recover) from a third party. You are required to assist in the recovery effort. In this regard, you should note:**

- Delphi assumes your right to recover payment from any third party, up to the extent of such third party's liability;

- If you recover any monies through lawsuit, settlement, or other means, you must reimburse Delphi for benefits paid;

- You grant Delphi a lien on any monies you or your Beneficiaries may recover, either through settlement or otherwise, whether the recovery is designated economic or non-economic damages;

- You grant Delphi the right to intervene in a lawsuit for the purpose of enforcing the Delphi's lien;

- You grant Delphi the right to recover its legal fees and costs that exceed Delphi payment of benefits from any recovery;

- You agree to inform Delphi when you engage an attorney to pursue a claim, and to inform your attorney of Delphi rights under the SHCP, and

- You agree not to settle any claim or take any action that would prejudice Delphi's rights or interests.

Sickness and accident benefits are reduced by:

- Primary Social Security Disability Insurance Benefits (SSDIB) or unreduced Social Security Old Age Insurance (including retroactive amounts paid for the same period of disability);

- Certain workers' compensation payments;

- Any unemployment compensation payments to which you are entitled for the same period you receive Sickness and Accident benefits;

- Any payments made under the Corporation's salary continuation policy or any other salary payments that may be made in connection with any Corporation incentive separation plan or the Separation Allowance Plan.

You may be required to apply for SSDIB if your disability is expected to continue for a year or longer.

**You may be required to be examined** by a doctor, clinic, or other medical authority for the purpose of verifying disability, at any time you may be eligible to receive Sickness and Accident benefits, Extended Disability Benefits; Supplemental Extended Disability Benefits, or Personal Accident Insurance benefits. Generally, if you are found able to work, your benefits will be discontinued. Failure to report for the examination may affect any eligibility you may have for benefits. You will be reimbursed, upon request, at 31¢ per mile for travel to and from the examination, if your residence is more than 40 miles (one-way) from the examiner's office.



To apply for **Sickness and Accident Benefits**, you must complete a claim form provided by the **National Benefit Center**.

You may contact the center, toll-free, at **1-800-734-0346 or 1-800-882-3563 for the hearing or speech impaired**.

In certain states, employees in either classified or executive salaried positions may be eligible under a statutory disability benefits law for disability benefits for time lost from work. **If you are an employee working in California, New Jersey, or New York**, certain modifications in your Sickness and Accident benefits, or salary continuation payments during disability, are explained in a special enclosed insert.

## Part of SPD section: "*While You Are Disabled*"

If you are eligible, Supplemental Extended Disability Benefits provides you with disability benefits equal to 60% of your monthly base salary in effect as of September 1 of the year prior to your first day of disability. Supplemental Extended Disability Benefits will begin when your Extended Disability Benefits are exhausted. The length of time the benefit is paid may continue until the earliest of recovery from your qualifying disability, age 65, or death. This additional coverage will provide you with the maximum duration of Extended Disability Benefits available to employees with 10 or more years of credited service.

**Extended Disability Benefits and Supplemental Extended Disability Benefits are reduced by:**

- Any monthly Part A benefits and Part B supplementary benefits (see pages 84 - 98) for which you may be eligible under the Delphi Salaried Retirement Program;

- Any benefit for which you are eligible under any other Delphi retirement or pension plan;

- Any salary payments that may be made in connection with any Corporation separation plan;

- Governmental benefits, such as workers' compensation;

- Certain social security benefits; and

- Any federal or state lost-time disability benefits.

Increases in any of these benefits payable after Extended Disability Benefits or Supplemental Extended Disability Benefits commence will not be deducted, unless the increase represents an adjustment in the original determination of the amount of such benefit. **A retroactive award of any of these benefits will create an overpayment of Extended Disability Benefits or Supplemental Extended Disability Benefits that were paid for the same period of disability. (See page 115 for Recovery of Benefit Overpayments.)**

For both Extended Disability Benefits and Supplemental Extended Disability Benefits, you will be required to apply for Social Security Disability Insurance Benefits (SSDIB) under a special procedure designed to handle the offset of SSDIB against Extended Disability Benefits. You also will be required to repay any overpayment incurred due to receipt of an SSDIB award.

## Social Security Disability Insurance Benefits

If you become disabled before age 65, you may be eligible for disability insurance benefits from Social Security. Your nearest Social Security office can tell you if you qualify. Benefits may be payable after you have been disabled for five full calendar months.

The amount of Social Security benefits payable because of disability generally is in accordance with the schedule set forth on page 95 for benefits payable at age 65.

It is important for you to apply for Social Security Disability Insurance Benefits (SSDIB) for these reasons:

- Failure to obtain an SSDIB award may result in a lesser Social Security old age benefit.

- Your dependents also may qualify for Social Security benefits.

- Your Social Security benefits may be increased annually to reflect cost-of-living increases.

- You become eligible for Medicare after receiving 24 months of SSDIB. If you become enrolled in Medicare Part B, you may become eligible for payment of a monthly Special Benefit under the Delphi Salaried Health Care Program (see page 66).

- If you are receiving SSDIB and return to work you may be eligible to continue these benefits, in addition to your salary, up to 12 months. You should contact your nearest Social Security office for additional information.

- SSDIB awards are given favorable federal tax treatment, under current tax laws.

**Part of SPD section: "*While You Are Disabled*"**

78

# Other Benefit Program Coverages While on Disability Leave

## Health Care Coverages

Delphi will continue contributions towards your health care coverages while you remain totally and continuously disabled and you remain on an approved disability leave. If while you are receiving Sickness and Accident or Extended Disability Benefits the period of disability exceeds your length of service, health care coverage will be continued. However, receipt of Supplemental Extended Disability Benefits does not extend the continuation period. Note also that for this coverage to remain in effect you must continue to pay the applicable monthly employee contribution, if any.

## Savings-Stock Purchase Program

You may continue to contribute to the S-SPP while you are on an approved disability leave and while you continue to receive salary continuation payments. If you are eligible, you may contribute for a period of up to six months, and such contributions will be based on salary continuation payments of 25% of your monthly base salary.

Delphi contributions continue to vest while you remain on disability leave. You retain the usual withdrawal, fund exchange and loan privileges. You must, however, continue to make your loan repayments to the Program.

## Life and Disability Benefits Coverages

Corporation contributions for Basic Life Insurance, Sickness and Accident, and Extended Disability Benefits coverages will be continued:

- For any period you are entitled to receive Sickness and Accident benefits or salary continuation payments while you are totally disabled;

- And thereafter, while you are totally and continuously disabled and remain on an approved disability leave, but not to exceed a period equal to your years of participation (see page 116) as of the first day of disability.

Also, in the event your disability leave is canceled because the period of the leave equaled your length of service, life and disability benefits coverages may be continued while you are entitled to receive monthly Extended Disability Benefits. Delphi will make contributions for these coverages during these periods. However, receipt of Supplemental Extended Disability Benefits will not extend continuation of Life and Disability Benefits coverage.

If your disability leave is canceled because you recovered, and you again become totally disabled within three working days of the date your leave was canceled, so as to be unable to work, life and disability benefits coverages to which you were entitled will be continued under these circumstances. If you are returned to an approved disability leave, Delphi will make contributions for these coverages while you remain totally disabled. However, coverage cannot continue beyond the period equal to your years of participation as of your first day of disability.

You will need to pay the required monthly contributions to continue Optional Life, Dependent Life and Personal Accident Insurance while your Basic Life Insurance remains in force.

If you have 10 or more years of participation at the commencement of your disability, your Basic Life Insurance will be continued at no cost to you while you are totally and permanently disabled prior to age 65.

## Accelerated Benefits Options

If you are diagnosed as having a terminal illness with a life expectancy not to exceed 12 months, you may be eligible to receive an accelerated benefits option payment of up to 50%, but not less than $1,000, of your Basic Life Insurance. However, if your Basic Life Insurance will be reduced within twelve months of the date the accelerated benefits option payment is approved, such payment will be limited to 50% of the fully reduced amount of Basic Life Insurance.

**81**

# *Your Delphi Retirement Program Is Made Up of Two Parts*

**Part A** is non-contributory. Delphi Automotive Systems pays the entire cost. Part A provides monthly benefits for all employees who have five or more years of credited service and retire or receive deferred vested benefits under the Program. Monthly retirement benefits also are payable when you retire at age 65, or older, based on your credited service. Part A may consist of:

- Basic benefits;

- Temporary benefits; and

- Supplements.

**Part B** is contributory. To receive full Part B benefits, you must (1) contribute at all times while eligible, and (2) leave your contributions in the Program. Part B provides you with an opportunity to build up substantial additional monthly benefits, consisting of:

- Supplementary benefits, which are based on your (1) years of Part B credited service, and (2) average monthly base salary over the highest 60 months during the 120 months immediately preceding retirement; and

- Primary benefits, which are based on the amount you contribute.

While you are required to contribute to participate in Part B of the Program, Delphi also contributes in the aggregate, about 85% of the cost of this part of the Program.

## *Eligibility*

- **To Participate**
  In general you are eligible to participate in Part A automatically when you become a regular Delphi salaried employee.

- **Part B**
  You are eligible to contribute under Part B when you have attained (1) age 21, and (2) six months of continuous service.

  Your Part B contribution is 1.25% of your eligible monthly base salary in excess of $3,000. When you elect to participate in Part B, your contribution is deducted (after-tax) from your salary each month. Your Part B contributions are limited to 35 years.

- **To Retire**
  You are eligible to retire under normal retirement provisions when you attain age 65.

  You may retire voluntarily at (1) any age if you have 30 or more years of credited service*, or (2) age 55 with 10 or more years of credited service.

  If you have 10 or more years of credited service, you may retire at any age prior to age 65 if totally and permanently disabled.

  *\* This provision is not applicable to a salaried employee hired on or after January 1, 1988.*

**84**

# Retirement at Age 62 or Later

If you retire at, or after, age 62, you may receive the following benefits:

## Part A Basic Benefit

Your monthly Part A basic benefit is determined by your basic benefit rate times your years of credited service.

Your basic benefit rate depends on your (1) benefit class code (which is based on your salaried position level), and (2) retirement date, as follows:

| Salaried Position Level | Benefit Class Code | Basic Benefit Rate Per Year of Credited Service for Months Commencing | | | |
|---|---|---|---|---|---|
| | | 10-1-99 through 9-1-00 | 10-1-00 through 9-1-01 | 10-1-01 through 9-1-02 | 10-1-02 and After |
| 1 and 2 | A | $40.80 | $42.50 | $44.50 | $46.70 |
| 3 | B | $41.05 | $42.75 | $44.75 | $46.95 |
| 4 | C | $41.30 | $43.00 | $45.00 | $47.20 |
| 5 & above | D | $41.55 | $43.25 | $45.25 | $47.45 |

**For example,** if you retired June 1, 2000, at age 65 with a "D" benefit class code, your basic rate will be $41.55. If you had 30 years of credited service, your monthly Part A basic benefit would be $1,246.50 ($41.55 X 30 = $1,246.50). Employees retiring October 1, 1999 and after will receive increases to their Part A basic benefit as shown in the table above.

## Special Benefit

In addition, at age 65, or earlier while you are enrolled in Medicare Part B, you may receive a monthly Special Benefit, as described on page 66.

## Part B Primary Benefit

Your Part B primary benefit will be based on your contributions to the Program. This monthly benefit will equal the sum of 5% of your contributions made before July 1, 1977, plus 6- 1/4% of your contributions made between July 1, 1977 and October 1, 1979, plus 8-1/3% of your contributions made thereafter.

**For example,** if you retired June 1, 2000, and you had contributed $2,000 before July 1, 1977; $1,000 between July 1, 1977, and October 1, 1979; and $6,700 through May 31, 2000, your monthly Part B primary benefit would be:

| Contributions | | | | Benefit |
|---|---|---|---|---|
| $ 2,000 | x | 5% | = | $100.00 |
| $ 1,000 | x | 6-1/4% | = | $ 62.50 |
| $ 6,700 | x | 8-1/3% | = | $558.33 |
| Monthly Part B primary benefit: | | | | $720.83 |

## Part B Supplementary Benefit

You also may receive a monthly Part B supplementary benefit, **if you have contributed to Part B at all times while eligible and have not withdrawn your contributions**. This benefit will equal 1% of the amount by which your average monthly base salary exceeds the applicable amount, shown in the following table, multiplied by your years of Part B credited service. Average monthly base salary is calculated over the highest 60 months during the 120 months preceding your date of retirement.

| Retirement Date | Applicable Amount |
|---|---|
| 10-1-99 through 9-1-00 | $4,155 |
| 10-1-00 through 9-1-01 | $4,325 |
| 10-1-01 through 9-1-02 | $4,525 |
| 10-1-02 and thereafter | $4,745 |

# *Retirement Prior to Age 62 With Unreduced Benefits*

Your benefits will not be reduced if you retire prior to age 62 under a:

■ Total and Permanent Disability retirement — at any age with 10 or more years of credited service. Retirement can commence if you are an employee, after you are disabled for at least 5 months, (may apply immediately in the case of an occupational injury or disease or in the case of a terminal condition).

## *Part A Basic Benefit*

If you retire under any of the retirement provisions shown above, your monthly Part A basic benefit, as shown on page 87, will be determined as if you had retired at age 62, but based on your credited service at the time you retire.

## *Part A Temporary Benefit*

In addition, you may receive a monthly Part A temporary benefit until you reach age 62 and one month or, if earlier, until you become eligible for Social Security Disability Insurance Benefits (SSDIB).

The amount of your monthly temporary benefit will be based on your years of credited service, up to 30, and your retirement date, as follows:

| Monthly Temporary Benefit | | |
|---|---|---|
| Retirement Date | Rate* | Maximum |
| 10-1-99 through 9-1-00 | $38.85 | $1,165.50 |
| 10-1-00 through 9-1-01 | $40.45 | $1,213.50 |
| 10-1-01 through 9-1-02 | $42.35 | $1,270.50 |
| 10-1-02 and thereafter | $44.45 | $1,333.50 |

*\*Rate per year of credited service*

*If you retire because of total and permanent disability*, the temporary benefit will be paid only if you submit evidence satisfactory to Delphi that you are not eligible for SSDIB. A retroactive SSDIB award creates an overpayment of any temporary benefit that was paid for the same period of disability.

## *Part A Supplement*

You also may receive a monthly Part A early retirement supplement. The Part A supplement is described on page 91.

## *Part B Primary Benefit*

If you have contributed to the Program, you also will receive a monthly Part B primary benefit, determined as if you had retired at age 62, but based upon the actual amount of contributions you made. An example of this benefit is shown on page 87.

## *Part B Supplementary Benefit*

Any monthly Part B supplementary benefit will be based on your (1) average monthly base salary over the highest 60 months during the 120 months immediately preceding retirement, and (2) your Part B credited service at the time you retire. An example of this benefit is shown on page 87.

## *Special Benefit*

In addition, at age 65, or earlier while you are enrolled in Medicare Part B, you may receive a monthly special benefit, as described on page 66.

**89**

# Part A Supplements for Retirement With Less Than 30 Years of Credited Service

## Interim Supplement

An "interim" supplement may be payable to you each month until you attain age 62 and one month **if you retire voluntarily with less than 30 years of credited service**. If you retire as early as age 55 and prior to age 60, your age plus credited service must total 85 or more, and you must have been hired prior to January 1, 1988 to be eligible for this supplement. This supplement also may be payable if you retire between ages 60 and 62 with less than 30 years of credited service.

The following table shows the amount of this supplement, which is based on your age at retirement. The amount of this supplement is reduced by the amount of any monthly Part B supplementary benefit payable to you, prior to reduction for any survivor coverage.

| Age at Retirement | Monthly Amount * and Effective Date of Interim Supplement Payable Prior to Age 62 and One Month for Each Year of Credited Service for Retirements | | | |
|---|---|---|---|---|
| | 10-1-99 through 9-1-00 | 10-1-00 through 9-1-01 | 10-1-01 through 9-1-02 | 10-1-02 and After |
| | $ | $ | $ | $ |
| 55 | 17.10 | 17.80 | 18.65 | 19.55 |
| 56 | 20.15 | 21.00 | 22.00 | 23.10 |
| 57 | 24.40 | 25.40 | 26.60 | 27.90 |
| 58 | 28.55 | 29.75 | 31.15 | 32.70 |
| 59 | 31.90 | 33.20 | 34.75 | 36.50 |
| 60 | 36.90 | 38.45 | 40.25 | 42.25 |
| 61 | 36.90 | 38.45 | 40.25 | 42.25 |

\* NOTE: The interim supplement is prorated for intermediate ages and is computed on the basis of the number of complete calendar months by which you are under the age you will attain on your next birthday.

## Part A Supplements — Limitations

- Supplements are not payable to you if you (1) retire voluntarily as early as age 55 and prior to age 60 and the sum of your age and years of credited service is less than 85, or (2) are discharged.

- If the total of monthly benefits under Part A and the Part B supplementary benefit exceeds 70% of your final monthly base salary, the monthly Part A supplement will be reduced to the extent required so that such benefits would equal 70% of the final base salary.

- Supplements are not applicable to you if you were hired on or after January 1, 1988.

- If you retire voluntarily and become eligible for SSDIB, your monthly supplement will be reduced by the temporary benefit amount in effect at the date of your SSDIB award.

- Supplements are only payable if you retire within five years of your last day worked for Delphi Automotive Systems.

**92**

# *Survivor Benefits*

In the event of your death, either before or after you retire, monthly benefits may be provided for the lifetime of your survivor.

Refer to pages 107 through 109 for an explanation of these important benefits, including the pre-retirement surviving spouse benefit provided at no cost to you.

To waive any surviving spouse coverage available after retirement under this Program, it will be necessary for you to obtain the written consent of your spouse, witnessed by a notary public.

If survivor coverage is rejected, it will not be available in the future and, if you predecease your spouse, your spouse will not receive any surviving spouse benefits.

# *Workers' Compensation Offset*

Workers' compensation benefits paid to retired employees will be deducted from Delphi retirement benefits otherwise payable.

## *Information*

Additional information about Salaried Retirement Program benefits appears elsewhere in this booklet under applicable headings. For more information about your retirement or to apply for retirement benefits you should contact the **Delphi Pension Administration Center** at **1-800-659-2000**, or for the hearing/speech impaired, **1-800-659-8811**.

## *Part of Section: "When You Retire"*

**93**

**Lifetime Annuity Contract:** If you were hired prior to November 1, 1998 in lieu of (1) receiving your account in a lump sum at retirement or (2) deferring receipt of your account, you may elect to receive an annuity contract to be purchased by the S-SPP trustee in lieu of all the assets in your account. This arrangement will provide a monthly income after retirement.

Refer to pages 1 through 10 for additional information on the Savings-Stock Purchase Program.

### Individual Retirement Account

Another alternative available at retirement, is the "rollover" of the taxable amount of a S-SPP distribution to an Individual Retirement Account (IRA). Similar to the annuity option, an IRA will provide for deferred income. Any rollover of assets would be arranged between you and a bank or investment company of your choice. You should consult with a financial advisor concerning the tax impact or any sales and commission charges associated with an IRA.

## Health Care Program

Generally, under current provisions your participation in the Salaried Health Care Program can be continued in retirement. However, you will be required to pay the full monthly cost of any continuing coverage if you:

- Are an employee whose continuous service with the Corporation commenced on or after January 1, 1993 (or have an adjusted service date on or after that date);

- Retire with less than 10 years of credited service under the Delphi Automotive Systems Retirement Program for Salaried Employees; or

- Retire voluntarily at or after age 55 and prior to age 60 when your combined years of age and credited service total less than 85 or if hired on or after January 1, 1988 regardless of whether you have 85 points.

*Note: If you are eligible to retire with 30 or more years of credited service **at any age** (and your most recent date of hire is prior to January 1, 1988), you are eligible for corporation contributions for health care in retirement.*

*In addition, at age 65, or earlier while you are enrolled in Medicare Part B, you may receive a monthly special benefit, as described on page 66.*

As a retiree, any dependent you acquire after you retire will be limited to sponsored dependent coverage for which you pay the full cost.

**Former employees eligible only for a deferred retirement benefit are NOT entitled to any Delphi Automotive Systems Salaried Health Care Program coverage.**

## Life Insurance

In retirement, your life insurance coverage may be continued as stated below.

- **If your most recent date of hire (or adjusted service date) with Delphi was prior to January 1, 1993,** your Basic Life Insurance will immediately reduce upon retirement, as shown on page 101. **If you retire under the total and permanent disability provisions of the Retirement Program,** your Basic Life Insurance will continue, unreduced, until age 65.

  This coverage will be continued with Delphi contributions (except for voluntary retirement as early as age 55 and prior to age 60 when your combined years of age and credited service total less than 85.

  *Note: If you are eligible to retire with 30 or more years of credited service at any age (and your most recent date of hire is prior to January 1, 1988), you are eligible for corporation contributions for Basic Life Insurance in retirement.*

- **If your most recent date of hire (or adjusted service date) is prior to January 1, 1993 and you retire voluntarily as early as age 55 and prior to age 60 when your combined years of age and credited service total less than 85,** you may continue your Basic Life Insurance to the end of the month in which you attain age 65, provided you contribute $0.50 per month per $1,000 of Basic Life Insurance in force.

  Refer to page 101 for an explanation of continuing life insurance in retirement.

*Part of Section: "Other Benefit Program Coverages After Retirement"*

**If your most recent date of hire (or adjusted service date) is prior to January 1, 1993 and you have at least 5 years of participation at age 60 and cease active work,** you may continue Basic Life Insurance to the end of the month in which you attain age 65. **If you are eligible for retirement benefits,** Delphi Automotive Systems will make contributions for such insurance.

- **If your most recent date of hire (or adjusted service date) is on or after January 1, 1993,** Basic Life Insurance may not be continued in retirement. However, you may convert to a personal insurance policy without providing proof of good health, provided you make written application to the insurance company within 31 days from the cessation of such coverage.

- If you are eligible for continuing life insurance in retirement and you become terminally ill, with a life expectancy not to exceed 12 months, you may be eligible for an accelerated benefits option payment as discussed on page 81.

- Optional Life Insurance in force when you retire may be continued to age 75 and Dependent Life Insurance may be continued to age 70, provided (1) your Basic Life Insurance remains in force, unless your most recent date of hire (or adjusted service date) is on or after January 1, 1993, and you have 10 or more years of credited service, and (2) you make the required monthly contributions. See page 102 for further explanation of these coverages after age 65.

- In retirement, you may continue Personal Accident Insurance on yourself and any eligible dependents for your lifetime, provided (1) your Basic Life Insurance remains in force, unless your most recent date of hire (or adjusted service date) is on or after January 1, 1993, and you have 10 or more years of credited service, and (2) you pay the required contributions. However, after attainment of age 70, insurance in force on any person may not exceed $150,000.

*Former employees eligible only for a deferred vested retirement benefit are NOT entitled to any Delphi Life and Disability Benefits Program coverage.*

## *Part of Section: "Other Benefit Program Coverages After Retirement"*

# *Life and Disability Benefits Program*

The Basic Life, Optional Life and Dependent Life Insurance plans will be administered in compliance with applicable state laws to the extent legally required and to the extent such laws are not pre-empted by federal law. For example, Texas insurance law limits the amount of Dependent Life Insurance an employee residing in Texas may have. This amount of Dependent Life Insurance may not exceed the combined amount of Basic Life Insurance and Optional Life Insurance on the employee.

## *When Basic Life Insurance Coverage Starts*

Basic Life Insurance coverage starts on the first day of the third month following the month in which your employment commences. If you are not actively at work on the day your coverage otherwise would start, coverage starts on the day you return to active work.

## *Your Basic Life Insurance*

Your Basic Life Insurance is equal to a maximum of two times your annual base salary.* Base salary, for this purpose, includes the premium for necessary continuous seven-day operations, but does not include overtime, night-shift premium, or any other payments.

If you are eligible for the Delphi Options! Program, your annual base salary will be based upon your monthly base salary in effect on September 1 of the year preceding the next Options! Plan year.

*\* You may exchange benefit dollars allocated to half of your Basic Life Insurance coverage for benefit dollars to purchase other coverages, or receive these benefit dollars as cash, under the Delphi Options! Program (see page 18). A separate brochure describing this program is available upon request.*

You may name any individual or individuals you wish as your Beneficiary or Beneficiaries. You may change your Beneficiary designation at any time by appropriately completing and submitting the proper form. If circumstances in your life change, such as marriage, birth of a child, death of a spouse or divorce, you may want to consider the appropriateness of your Beneficiary designation. If you die, while coverage is in force your Beneficiary will receive a benefit equal to the amount of your Basic Life Insurance in effect, less any accelerated benefits option payment you may have received.

Your Beneficiary(ies) may receive this benefit under the MetLife total control account® (TCA) money market option. The TCA program is the automatic settlement option for benefit amounts of $6,000 or higher for Delphi Automotive Systems. The TCA gives Beneficiaries immediate access to their insurance proceeds at a competitive rate guaranteed to equal or exceed a leading national index of money market rates. The Beneficiary receives a checkbook, and gets free check-writing privileges that allow easy access to the funds. There are no maintenance fees, and the Beneficiaries receive monthly statements detailing the activity on the account. The account is fully guaranteed by MetLife. The Total Control Account is not available to Beneficiaries residing outside the United States. A description of the TCA program is contained in a separate brochure entitled "Enough Time to Decide," which is available from the National Benefit Center by calling 1-800-435-3946 or TTY 1-800-872-8682 (for hearing or speech impaired).

**If death should occur as the result of an accident while you are on company business**, your Beneficiary will receive an additional benefit, equal to 50% of your Basic Life Insurance in force, up to one times your annual base salary.

For the work-related accidental death benefit to be payable, your death must occur within one year following the accident and must not be due to disease, self-inflicted injury, or any act of war or other causes stipulated in the Plan.

*100*



A separate brochure describing *TCA options* is available upon request by contacting the *National Benefit Center*, toll-free at *1-800-435-3946* or, for the hearing/speech impaired, *1-800-872-8682*.

To *apply for life insurance benefits*, a Beneficiary will be required to complete a claim form provided by the *National Benefit Center*. A form may be obtained by calling the National Benefit Center, toll-free at, *1-800-435-3946* or, for the hearing/speech impaired, *1-800-872-8682*. In addition, a certified copy of the death certificate will be required.

## Your Continuing Insurance After Retirement (Other than for Total and Permanent Disability)

**If you have 10 or more years of participation at retirement (other than for total and permanent disability) and (1) your most recent date of hire (or adjusted service date) is prior to January 1, 1993, and (2) you are otherwise eligible for continuation of coverage in retirement, coverage will be reduced.** The amount of your Basic Life Insurance will reduce immediately to an amount equal to 1-1/2% for each year of participation times the amount of life insurance in force at retirement.

### Example...

If you have 30 years of participation with $80,000 of Basic Life Insurance in force at retirement, you will have an amount of continuing life insurance equal to $36,000 immediately upon retiring.

| | | |
|---|---|---|
| 1-1/2% x 30 | = | 45% |
| 45% x $80,000 | = | $36,000 |

**If your most recent date of hire (or adjusted service date) is prior to January 1, 1993** and you retire as totally and permanently disabled, the amount of your Basic Life Insurance will reduce at age 65.

If eligible, the minimum amount of continuing life insurance is $5,000.

**If your most recent date of hire (or adjusted service date) is on or after January 1, 1993**, your Basic Life Insurance will not continue in retirement. However, you may convert Basic Life Insurance to a personal policy of insurance without proof of good health provided you make written application to the insurance company within 31 days from the cessation of such coverage.

## Terminating Employment

**If you terminate employment with Delphi for any reason after age 65**, your Sickness and Accident and Extended Disability Benefits coverages are canceled at the time you terminate employment. Your Basic Life Insurance is canceled unless your most recent date of hire (or adjusted service date) is prior to January 1, 1993 and you have 10 or more years of participation when you terminate employment. Refer to page 119 regarding Program conversion privileges.

### Part of Section:
### "Life and Disability Program"

**101**

## Delphi Contributions

Delphi makes contributions for Part A of the Retirement Program, most of the cost of Part B of the Retirement Program, Basic Life Insurance and disability benefit coverages, while you are in active service. Delphi also makes contributions for health care coverages, with the exception of contributions that may be required for sponsored dependent coverage, or self-paid continuation, or for deductibles, copayments, or sanctions required under the rules of the Salaried Health Care Program. The Enhanced Medical Plan (EMP) the POS plan and certain HMOs or PPOs and dental coverage, if elected, may require an enrollee contribution. Under the Savings-Stock Purchase Program, Delphi may make contributions for each $1.00 an employee contributes up to 7% of eligible salary.

The contributions to the Retirement Program are actuarially determined. The contribution amounts under the Life and Disability Benefits Program are determined by the Carrier and Delphi based on claim experience. The contribution amounts for the self-insured Salaried Health Care Program also are based on claim experience.

Benefits made available by Delphi, the full costs of which are borne by employees, are Optional Life Insurance, Dependent Life Insurance, Personal Accident Insurance, flexible spending accounts, Supplemental Extended Disability Benefit and sponsored dependent medical coverage.

## Recovery of Benefit Overpayments

If any benefit paid to you should not have been paid, or should have been paid in a lesser amount, your prompt voluntary repayment will be requested. If necessary, to the extent allowed by applicable law, overpayments or an overpayment may be recovered from any monies then payable, or which may become payable, to you in the form of salary or benefits payable under a Delphi benefit plan (excluding the Delphi Automotive Systems Retirement Program and S-SPP, except with respect to overpayments by the respective plans). Salaried Health Care Program overpayments may be recovered from salary or benefit plans or programs, as appropriate; but overpayments under other plans or programs will not be offset against health care benefits.

If you wish, you may direct Delphi to withhold an amount up to 10% of your monthly retirement benefit to repay a benefit overpayment. S-SPP distributions also may be reduced to repay an overpayment.

## Cessation of Coverages

Health care coverages cease at the end of the month in which you quit or are discharged, or immediately if you do not make required contributions. COBRA and conversion privileges are described on pages 131 and 132.

All Life and Disability Benefits Program coverages cease on the day you quit voluntarily or are discharged. If your employment is terminated for any other reason, except retirement, all coverages continue until the end of the month in which your length of service is broken, provided you make all required contributions.

Optional Life Insurance ceases when Basic Life Insurance ceases (except for retirement) or at the end of the month in which you attain age 75; however, if you continue to work beyond age 75, this insurance ceases at the end of the month preceding your retirement date. If you fail to make a required monthly contribution, insurance will cease at the end of the month preceding the month for which the contribution was due.

Dependent Life Insurance ceases when Basic Life Insurance ceases (except for retirement) or at the end of the month in which you attain age 70, or if you continue to work beyond age 70, this insurance ceases at the end of the month preceding your retirement date. If you fail to make a required monthly contribution, insurance will cease at the end of the month preceding the month for which the contribution was due.

Personal Accident Insurance ceases when Basic Life Insurance ceases (except for retirement). If you fail to make a required monthly contribution, insurance will cease at the end of the month preceding the month for which the contribution was due.

Dependent Life Insurance and Personal Accident Insurance spouse and child(ren) coverages also cease for any person when that person no longer is an eligible dependent.

Conversions privileges are set forth on page 120.

Part of Section:
"Life and Disability Program"

DELPHI
Automotive Systems

December 2001