# EXHIBIT G

202362 rough

21  name of it I don't know.
22      Q   Okay. Is that information that you

67

1   might be able to find and give to your attorneys?
2       A   I don't even know where to look for it.
3       Q   Okay.
4           MR. MALLAHAN: After the depo, if you
5       want to write me a letter, I will make every
6       effort to obtain every physician that she went
7       to for treatment.
8           MS. WORLEY: All right. We will do it
9       that way, then.
10          MR. MALLAHAN: I mean, if you want to
11      ask her -- I don't know which one she knows
12      and which ones she doesn't. I'm just trying
13      to help out.
14          MS. WORLEY: Okay.
15  BY MS. WORLEY:
16      Q   Do you know where you went for your
17  physical therapy?
18      A   The office is also closed. But in
19  Pikesville, so...
20      Q   Okay. Do you remember what the name of
21  your physical therapist was?
22      A   No, I never asked.

68

1       Q   Okay. Okay. This may seem like an odd
2   request, but would you mind if I took a picture of
3   your scar and attach it as an exhibit to the
4   deposition?
5       A   It's okay.

Page 45

```
                              202362 rough
  6      Q    I forgot my digital camera so I'm going
  7   to have to do it on my phone.
  8           MS. WORLEY:  We can go off the record
  9      while I do this.
 10           (Discussion held off the record.)
 11   BY MS. WORLEY:
 12      Q    After a short break, are you ready to
 13   continue?
 14      A    Yes.
 15      Q    After the accident, did you discuss
 16   filing a lawsuit with your sons?
 17      A    Of course we talked about it.  It's a
 18   family.
 19      Q    How soon after the accident did you
 20   discuss potentially filing a lawsuit with your
 21   sons?
 22      A    After the accident, after I came home.
                                                    69

  1      Q    After you came home from the hospital?
  2      A    Yes.
  3      Q    Okay.  And do you remember how long
  4   after the accident that would have been?
  5      A    About a week.
  6      Q    Okay.  About how long after that was it
  7   that you first contacted an attorney?
  8           MS. SAMUELS:  Objection.  You can
  9      answer.
 10      A    My oldest son took care of it, he found
 11   the lawyer.  He just -- the oldest son takes care
 12   of me.  And my youngest son.
 13      Q    Do you know when it was that your --
 14   your oldest son, Vladimir, do you know when it was
                         Page 46
```

202362 rough

15   that Vladimir contacted an attorney?
16        A     It was very soon after the accident.
17        Q     Within a month?
18        A     Less than that.
19        Q     Okay. Who was it that your son
20   contacted, if you recall?
21        A     Poberesky.
22        Q     Can you spell that?

                                                          70

1               THE INTERPRETER: I will spell it for
2        you. P-O-B-E-R-Z-H --
3               MR. HOPPER: No. E-V-S-K-Y.
4               THE INTERPRETER: S-K-Y.
5               MR. HOPPER: His first name is
6        Alexander. He's in Pikesville as well. I
7        don't think he's on Milford Mill, though.
8               THE INTERPRETER: Yes, yes.
9        Q      Before today, have you ever met with Mr.
10   Kuhlman?
11       A      Yes.
12       Q      When was that?
13              MR. HOPPER: I think she's confused. I
14       think she's talking about me.
15              MR. KUHLMAN: She's confused. I'm Mr.
16       Kuhlman.
17              THE WITNESS: Oh, I'm sorry. Never.
18       Never.
19              THE INTERPRETER: Never, no.
20              MR. KUHLMAN: We haven't had the
21       pleasure.
22              THE WITNESS: I'm so sorry.
                                                          71

202362 rough

1          MS. WORLEY:  You'll have to go to Kansas
2     City.
3     Q     Before today, have you ever met Mr.
4     Hopper?
5          MR. KUHLMAN:  It's been a long time.
6     A     Yes.  Not too many times.
7     Q     Okay.  Do you remember when the first
8     time was that you met Mr. Hopper?
9     A     I don't remember.
10    Q     Would it have been pretty soon after the
11    accident?
12    A     Yeah, I think so, yes.
13    Q     Do you know when your sons first
14    retained Mr. Kuhlman?
15    A     You know, I don't know such details.  I
16    don't remember.  My son was handling that.
17    Q     Would it have been around the same time
18    that you met Mr. Hopper?
19         MS. SAMUELS:  Objection.  You can
20    answer.
21    A     Perhaps.
22    Q     Okay.  But you don't know for sure.
                                                72

1     A     I cannot remember all the days
2     precisely.
3     Q     Okay.  Do you remember if it would have
4     been in 2007 or 2008?
5     A     2007.
6          MS. SAMUELS:  Objection.  You can
7     answer.
8     A     It was 2007.

Page 48

202362 rough

9      MR. KUHLMAN: Let me put on the record
10    an objection to the form of the question. I
11    don't know what you're asking, Katheryne, when
12    she met with Mr. Hopper, when she thinks her
13    sons may have met or talked to me. So I think
14    it's unclear what exactly you are asking and
15    what she was answering.
16      MS. WORLEY: I agree.
17  Q  Are you saying that your sons retained
18 Mr. Kuhlman in 2007?
19      MR. HOPPER: Him, not me.
20      MS. SAMUELS: Objection. You can
21  answer.
22      MR. MALLAHAN: If you know.

73

1  A  I don't know whom he hired. I see this
2 person for the first time in my life.
3  Q  What is your understanding of the
4 allegations being made against you in this lawsuit?
5      MS. SAMUELS: Objection. You can answer
6  if you know.
7  A  I think nothing.
8  Q  Okay. Do you understand that you're a
9 defendant in this lawsuit?
10  A  I'm not a defendant in this case. I
11 experience a heavy loss.
12  Q  So is it your understanding that you are
13 not a defendant in this lawsuit?
14  A  I think I'm not. It did not happen on
15 purpose. I've been driving for 18 years and
16 nothing ever happened.

202362 rough

17    Q    Have your sons ever told you that you --
18 that they were bringing this lawsuit against you?
19         THE INTERPRETER:  Against her?
20         MS. WORLEY:  Yes.
21         MR. MALLAHAN:  Objection.
22         THE INTERPRETER:  Can you repeat the

74

1 question?
2    Q    Have your sons ever told you that they
3 were bringing this lawsuit against you?
4         THE INTERPRETER:  I don't understand the
5 question.  I'm sorry.  The sons were suing
6 her?
7         MS. WORLEY:  Yes.
8    A    Yes, I do understand.
9         THE INTERPRETER:  I'm sorry, I didn't
10 understand.
11    Q    Okay.  So they have told you, your sons
12 have told you?
13    A    Yes.
14    Q    Knowing that, is it still your
15 understanding that you're not a defendant in this
16 lawsuit?
17    A    My son knows it's not my fault.
18         MR. MALLAHAN:  There's no question.
19    A    This is a legal procedure the way I
20 understand.
21    Q    Okay.  I guess I'm still a little
22 confused as to whether or not you believe you are a

75

1 defendant in this lawsuit.
2         MS. SAMUELS:  Is there a question or --

Page 50

202362 rough

8    A    No. He did not lean any way. He was
9    buckled up with the belt. He couldn't even if he
10   wanted to.
11   Q    Was he ever reaching forward, messing
12   with the radio while you were talking about
13   possible future grandkids?
14   A    No. We never use radio when we drive.
15   Q    And did your husband always wear a seat
16   belt ever since he became a full-time taxi driver?
17   A    Always. My husband was driving since
18   age of 15.
19          MR. KUHLMAN: Mrs. Averbukh, I have no
20       further questions. Thank you.
21          MS. WORLEY: I have one follow-up.
22
                                                 84

1                FURTHER EXAMINATION
2    BY MS. WORLEY:
3    Q    I'm sorry, I forgot to ask you this
4    earlier. Do you know whether or not you have ever
5    retained Mr. Kuhlman to represent you?
6          THE INTERPRETER: I'm sorry?
7    Q    Do you know whether or not you have ever
8    retained Mr. Kuhlman to represent you as her
9    lawyer?
10         MR. KUHLMAN: Me again.
11   A    I don't know. I've never seen this
12   person before. I know this person.
13         MR. MALLAHAN: Let the record reflect --
14   Q    Okay. You know Mr. Hopper.
15         MR. MALLAHAN: I'm Kip Mallahan.

Page 57

202362 rough

16      MS. WORLEY:   Okay.  That's all.

17      THE WITNESS:   Thank you very much.

18      MR. KUHLMAN:   While we're still on the

19  record -- Jodi, do you have any other

20  questions?

21      MS. OLEY:   I do not.

22      MR. KUHLMAN:   Marsha.

85

1       MS. SAMUELS:   No, I have no questions.

2       MR. KUHLMAN:   Kip.

3       MR. MALLAHAN:   I have none.

4       MR. KUHLMAN:   Okay.  Two things I want

5   to put on the record, and this is not for Mrs.

6   Averbukh.  One was the -- Jodi, where are we

7   on the extension of the deadlines?

8       MS. OLEY:   Well, the only deadline that

9   I thought we were extending was the one for

10  the expert designation.  Is that correct?

11      MR. KUHLMAN:   Right.  Correct.  And

12  where are we on that?

13      MS. OLEY:   As far as I know, I thought

14  we were only doing it informally.  But if you

15  want, we'll just file a motion with the court.

16      MR. KUHLMAN:   Just a stipulation.

17      MS. OLEY:   Okay.

18      MR. KUHLMAN:   And then the second thing

19  related to that was, I've sent everybody a

20  couple of e-mails about the EDR download, and

21  we kind of, before we get to the experts, need

22  to know what everybody's position on that is.

86

1       MS. OLEY:   Well, my position is --

Page 58