UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                               :

In re                              :        Chapter 11
                                                 :

DPH HOLDINGS CORP., *et al.*,       :        Case No. 05-44481 (RDD)
                                                 :

                Reorganized Debtors. :       (Jointly Administered)
                                                 :
                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### ORDER REGARDING MOTION OF METHODE ELECTRONICS INC
### FOR LEAVE TO FILE ITS AMENDED COUNTERCLAIM IN MICHIGAN

Upon the Reorganized Debtors' Forty-Sixth Omnibus Objection Pursuant To 11

U.S.C. § 503(b) And Fed. R. Bankr. P. 3007 To (I) Disallow And Expunge Certain

Administrative Expense (A) Books And Records Claims, (B) Methode Electronics Claims, (C)

State Workers' Compensation Claims, (D) Duplicate State Workers' Compensation Claims, (E)

Workers' Compensation Claims, (F) Transferred Workers' Compensation Claims, (G) Tax

Claims, (H) Duplicate Insurance Claims, And (I) Severance Claims, (II) Disallow And Expunge

(A) A Certain Duplicate Workers' Compensation Claim, (B) A Certain Duplicate Tax Claim,

And (C) A Certain Duplicate Severance Claim, (III) Modify Certain Administrative Expense

(A) State Workers' Compensation Claims And (B) Workers' Compensation Claims, And (IV)

Allow Certain Administrative Expense Severance Claims (the "Forty-Sixth Omnibus Objection")

(Docket No. 19711); and upon the Motion of Methode Electronics, Inc. ("Methode") for an

Order (I) Granting it Leave to File its Amended Counterclaim against the Reorganized Debtors

in Michigan and (II) Overruling the Objection of the Reorganized Debtors to Methode's

Administrative Claims to the Extent the Objection is Predicated on the Date when Methode Filed

Certain Claims Forms with this Court (the "Motion") (Docket Nos. 21424 & 21425); and upon

the Reorganized Debtors' Objection To Motion Of Methode Electronics, Inc. For Leave To File

Its Amended Counterclaim Against The Reorganized Debtors In Michigan (Docket No. 21529);

and upon Methode Electronics, Inc.'s Response To The Reorganized Debtors' Objection To

Motion Of Methode Electronics, Inc. For Leave To File Its Amended Counterclaim Against The

Reorganized Debtors In Michigan (Docket No. 21538), and upon the related filings set forth in

the Sixty-Ninth Omnibus Hearing Agenda (Docket No. 21545), and for the reasons stated on the

record at the August 25, 2011 Omnibus Hearing with respect to the Motion (the "Hearing"), the

transcript of which is incorporated herein; and after due deliberation thereon; and good and

sufficient cause appearing therefor:

IT IS HEREBY FOUND, DETERMINED AND ORDERED THAT[1]:

1.    Methode's request to lift the Plan Injunction by filing and prosecuting the

First Amended Counterclaim attached hereto as Exhibit A in the Michigan state court is granted

without prejudice to any and all rights and defenses that DPH-DAS, LLC may have with respect

to the First Amended Counterclaim.

2.    The Motion is denied with prejudice except as set forth in the preceding

paragraph.  Methode's claims against the Reorganized Debtors, as asserted in proofs of

administrative expense numbers 19950 and 19951, are disallowed with prejudice except as set

forth in the preceding paragraph.  Methode is barred from pursuing any claims in the Michigan

proceeding other than those set forth in the First Amended Counterclaim.

3.    The Forty-Sixth Omnibus Objection with respect to the 2008 supply

agreement is continued until resolution of the litigation in Michigan or further order of this Court.

---

[1]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings
of fact when appropriate. See Fed. R. Bankr. P. 7052

4.        Kurtzman Carson Consultants LLC is hereby directed to serve this Order

in accordance with the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m),

3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding

Objections To Claims And (ii) Certain Notices And Procedures Governing Objections to Claims

(Docket No. 6089).

5.        This Court shall retain jurisdiction to hear and determine all matters

arising from the implementation of this Order.

Dated: _____, 2011
        White Plains, New York


_____
        UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

# STATE OF MICHIGAN
# IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

DPH-DAS, LLC,
a Delaware limited liability company,

       Plaintiff,                  Civil Action No.:  08-095518-CK

vs.                              Hon. Judge Nanci J. Grant

METHODE ELECTRONICS, INC.,

       Defendant.

| | |
|---|---|
| Thomas S. Bischoff (P53753) | Ann Marie Walsh (*pro hac vice*) |
| Stephen W. King (P56456) | Helen Din (*pro hac vice*) |
| Attorneys for Delphi | Attorneys for Methode |
| Dykema Gossett PLLC | Locke Lord Bissell & Liddell LLP |
| 400 Renaissance Center, 35th Floor | 111 South Wacker Drive |
| Detroit, Michigan  48243 | Chicago, Illinois  60606 |
| (313) 568-5341 | (312) 443-0654 |
| | |
| Joseph E. Papelian (P26582) | John R. Trentacosta (P31856) |
| Co-counsel for Delphi | Larry S. Perlman (P71698) |
| Delphi Automotive Systems, LLC | Co-Counsel for Methode |
| M/C 483-400-603 | Foley & Lardner LLP |
| Troy, Michigan 48098-2815 | 500 Woodward Avenue, Suite 2700 |
| (248) 813-2535 | Detroit, Michigan  48226-3489 |
| | (313) 234-7100 |

## METHODE'S FIRST AMENDED COUNTERCLAIM

    Methode Electronics, Inc. ("Methode") states as follows for its amended counterclaim

against DPH-DAS, LLC ("Delphi"):

## NATURE OF THE ACTION

1.      On August 26, 2009, Delphi breached a three-year supply agreement between
Methode and Delphi by terminating it after just ten months of performance because the three-
year term negotiated by the parties overrides any general boilerplate terms relating to duration of
the contract.

2.      Due to Delphi's contract breach, Methode sustained substantial damages.
Methode was forced to shut down an entire division that was devoted to the production of parts
for Delphi, a shut down that eliminated numerous jobs throughout Methode as it sought to
mitigate the significant loss of income.  Methode also sustained additional damages including
unrecovered investments in capital, lost profits and loss of goodwill in the industry, all of which
stem from Delphi's breach of contract in August 2009.  Methode's damages were exacerbated by
Delphi's conduct in providing less than two weeks notice to Methode thus denying Methode the
ability to redirect its valuable capital and human resources.

### Jurisdiction and Venue

3.      Jurisdiction and venue are proper in this Court because the original claims
brought by Delphi to which this counterclaim applies are pending in this Court and the Counter-
Defendant has submitted to the jurisdiction and venue of this Court.  In addition, the contract
included a choice of venue clause requiring disputes arising out of the contract to be resolved in
Michigan courts.

### Parties

4.      Counter-Plaintiff Methode designs, manufactures, and markets component
devices and parts for the consumer and industrial markets, including supplying components to
original equipment manufacturers and suppliers in the automotive industry.

5.     Counter-Defendant Delphi was at all relevant times a supplier of various parts, including the Passive Occupant Detection System (PODS), to the automotive industry.  The PODS, which is installed in the front passenger seat, provides a signal that controls and modifies airbag deployment characteristics depending on the presence or weight of an occupant (such as a child) in the passenger seat.

## GENERAL ALLEGATIONS

### Methode supplies parts to Delphi.

6.     Methode manufactured for Delphi certain bladder assemblies ("subject parts" or "bladders") that are components of Delphi's PODS.  Methode's bladder is critical to the determination of whether a minimum threshold weight is present on the vehicle's passenger seat. If the minimum threshold is met, the PODS activates the airbag for deployment when a deployable event occurs.  If the minimum threshold is not met, no signal is sent to the airbag, and thus the airbag will not deploy and possibly injure a small occupant.

7.     Beginning in 2001, through a series of long-term supply agreements, Methode was the exclusive supplier of the subject parts to Delphi.  Each long-term supply agreement spanned several years.

8.     The parties performed under a December 2004 agreement that was set to expire on June 30, 2008.

### The parties enter into a new agreement.

9.     On September 4, 2008, Delphi and Methode entered into a new supply agreement with an express term of three years.  *See* Ltr from Timothy Glandon to Mark Shively dated Aug. 25, 2008 (Ex. A); Letter from Timothy Glandon to Mark Shively dated Aug. 26, 2008 (Ex. B); Ltr from Mark Shively to Timothy Glandon dated Sept. 4, 2008 (Ex. C); Email from Joyce

Hoffman to Tim Glandon dated September 12, 2008 attaching modified terms and conditions (Ex. D).  Under the three-year contract, Delphi agreed that between October 1, 2008 and June 30, 2011, Methode would supply and Delphi would purchase 100% of Delphi's requirements for the parts identified in the agreement.  A 100% requirements contract means that neither Delphi nor any other company could supply any of the subject parts to Delphi and that Methode would be the exclusive source of the parts for three years.

10.     Consistent with the new three-year contract, Delphi initially performed its contract duties by purchasing the subject parts from Methode and paying Methode the agreed prices under the contract.

11.     After ten months of performance under the three-year agreement, Delphi prematurely terminated its three-year contract with Methode by sending a notice of termination on August 26, 2009.  Delphi's termination became effective on September 10, 2009.  *See* Ltr from Beth Schwarting to Timothy Glandon dated Aug. 26, 2009 (Ex. E).

## DELPHI'S  BREACH OF THE  CONTRACT IN AUGUST 2009

12.     Delphi violated the specifically-negotiated three-year term of the contract by terminating it after only ten months of performance because the three-year term negotiated by the parties overrides any general boilerplate terms relating to duration of the contract.

13.     The parties' three-year supply agreement was a valid executory contract at the time of Delphi's premature termination.

14.     Delphi's August 26, 2009 termination notwithstanding the specifically negotiated three-year term of the Agreement constitutes a breach of the three-year Agreement.

15.    At the time of Delphi's breach of the contract in August 2009, Methode had fully performed and would have continued to perform its obligations under the three-year supply agreement.

16.    As a consequence of Delphi's breach of the three-year agreement in August 2009, Methode incurred substantial damages in an amount to be determined at trial.

WHEREFORE, Defendant Counter-Plaintiff Methode Electronics, Inc. requests the following relief against the Plaintiff Counter-Defendant:

(1)    Entry of judgment in favor of Methode and against Delphi, including an award of money damages in favor of Methode sufficient to compensate it for all forms of economic loss incurred by it as a result of Delphi's breach of the parties' agreement, including, without limitation, direct damages, indirect damages, incidental damages, consequential damages, lost profits and lost goodwill;

(2)    An award of legal fees and other costs arising out of Delphi's breach; and

(3)    All such other relief as permitted by law.

Date: September __, 2011

Respectfully submitted,

METHODE ELECTRONICS, INC.

BY:

_____
One of its Attorneys

Ann Marie Walsh (*pro hac vice*)
Helen Din (*pro hac vice*)
LOCKE LORD BISSELL & LIDDELL LLP
111 South Wacker Drive
Chicago, IL 60606
(312) 443-0654
(312) 896-6654  (fax)

and

John R. Trentacosta (P31856)
Larry S. Perlman (P71698)
FOLEY & LARDNER LLP
One Detroit Center
500 Woodward Avenue, Suite 2700
Detroit, MI 48226-3489
(313) 234-7100

# EXHIBIT A



**METHODE ELECTRONICS, INC.**

Corporate Headquarters
7401 West Wilson Avenue
Chicago, IL 60706-4548
708.867.6777 • Fax. 708.867.6999 • 877.316.7700

<u>**Via e-mail**</u>

August 25, 2008

Mr. Mark A. Shively
Delphi E & S
2151 East Lincoln Road
Kokomo, Indiana 46901

**Re: Methode/ Delphi - Long-Term Agreement**

Dear Mark:

As you know, Methode and Delphi do not currently have in place a long-term agreement but Methode has agreed to ship parts to Delphi at the prices provided in our May 1, 2008 letter. As indicated in our prior letters, these prices will be effective through September 30, 2008.

As we have previously communicated, Methode is interested in continuing as a supplier to Delphi and is interested in entering into a long-term agreement. Per your request, Methode is providing the attached pricing which will be in effect for three years, beginning October 1, 2008. This revised three-year pricing reflects the impact of material and component price increases since providing our May 1, 2008 pricing, as well as the impact of further, significantly reduced volumes. The May 1, 2008 pricing was based on anticipated 2009 model year volumes of 5,293,924 units. Based on the latest information available, including Delphi releases, however, the 2009 model year volumes will be closer to 4,300,000 units, if not lower. Please note the differential between this figure and the Finley volumes for the same period of 6,805,000 units.

Moving forward, we will use 4,300,000 units as the baseline for model year 2009 and 3,900,000 for model year 2010 and 2,500,000 for model year 2011. As previously committed, any shipments above this baseline quantity will be subject to a 5% rebate on the additional units. Further, in order to address your concerns as to possible pricing consequences for volumes 20% or more below the Finley volumes, we are withdrawing our right to readjust pricing. Note that we have also removed our requirement to review PODS D pricing after one year. Due to the significant reduction in GMT900 volume, updated pricing for the GMT900 PODS-D program is included in the attached prices.

As to the three-year pricing provided herein, we require the following conditions. First, as previously discussed, Methode must be placed on a material/component cost adder program. The material/component costs used to calculate the attached pricing will be the base line. On a quarterly basis any increases or surcharges would be passed along to Delphi for reimbursement which must be paid within 30 days.

Second, ZCRI payment terms must apply for the term of the agreement.

Third, as previously discussed Methode cannot agree to several terms of the purchase orders and the Delphi General Terms and Conditions ("Delphi T's & C's"). One such term is paragraph 12 of PO# 550063028, which provides that "tools and equipment provided for performance of an operation by consignee remain the property of Delphi unless otherwise noted". As Delphi knows, not all tools and equipment used by Methode in the production of Delphi parts are the property of Delphi. As such, Methode objects to that term to the extent it was intended to include tools or equipment not paid for by Delphi.

Similarly, Methode cannot agree to paragraph 16 of the Delphi T's & C's to the extent that it grants Seller the right to take possession of and title to any part of any equipment owned by Methode if it was used in the production of Delphi parts.

Given the fact that the agreement would expire after three years, Methode can not agree to paragraph 18 of the Delphi T's and C's. Specifically, Methode does not agree to produce any service or replacement parts other than those that will be produced prior to September 30, 2011. Given the limited amount of service parts ordered and the resulting set-up costs incurred by Methode, the pricing for service parts will be determined by the order quantity.

Finally, Methode does not agree to paragraph 28 of the Delphi T's and C's regarding Delphi audits. In lieu of that paragraph, Methode will agree to the following term adapted from the OESA (Original Equipment Suppliers Association) Draft Model Terms and Conditions:

> Seller will maintain records as necessary to support amounts charged to Buyer in accordance with Seller's document retention policies. Buyer and its representatives may audit Seller's records of transactions completed within one year prior to the audit date, to the extent needed to verify the quantities shipped and that the prices charged match the agreed prices. Any audit will be conducted at Buyer's expense (but will be reimbursed by Seller if the audit uncovers material errors in the amounts charged), at reasonable times, and at Seller's usual place of business.

Methode will accept purchase orders with the attached pricing subject to the above conditions and exceptions through September 30, 2011. In order for Methode to accept purchase orders for product shipped after September 30, 2008, the purchase orders must have these exceptions noted as well as Delphi must remove any reference to pricing being "under protest". Delphi must also waive all rights or claims to having paid Methode "under protest" as to any past purchase orders.

Please provide written acceptance to this letter no later than close of business September 5, 2008.

Sincerely,

Timothy R. Glandon
Vice President & General Manager
North American Automotive Operations

# EXHIBIT B



**METHODE ELECTRONICS, INC.**

Corporate Headquarters
7401 West Wilson Avenue
Chicago, IL  60706-4548
708.867.6777 • Fax: 708.867.6999 • 877.316.7700

<u>**Via e-mail**</u>

August 26, 2008

Mr. Mark A. Shively
Delphi E & S
2151 East Lincoln Road
Kokomo, Indiana  46901

**Re:  Methode/ Delphi - One Year Pricing**

Dear Mark:

As you know, Methode and Delphi do not currently have in place a long-term agreement but
Methode has agreed to ship parts to Delphi at the prices provided in our May 1, 2008 letter.  As
indicated in our prior letters, these prices will be effective through September 30, 2008.

As we have previously communicated, Methode is interested in continuing as a supplier to
Delphi and is interested in entering into a long-term agreement.  However, we understand that
Delphi wishes to consider all of its options and has therefore requested Methode to provide one-
year pricing.  Per your request, Methode is providing the attached pricing which will be in effect
for one year, beginning October 1, 2008. The May 1, 2008 pricing was based on anticipated 2009
model year volumes of 5,293,924 units. Based on the latest information available, including
Delphi releases, however, the 2009 model year volumes will be closer to 4,300,000 units, if not
lower and the attached pricing is based on those volumes. Please note the differential between
this figure and the Finley volumes for the same period of 6,805,000 units.

As to the one-year pricing provided herein, we require the following conditions. First, ZCRI
payment terms must apply for the term of the agreement.

Second, as previously discussed Methode cannot agree to several terms of the purchase orders
and the Delphi General Terms and Conditions ("Delphi T's & C's").  One such term is paragraph
12 of PO# 550063028, which provides that "tools and equipment provided for performance of an
operation by consignee remain the property of Delphi unless otherwise noted".  As Delphi
knows, not all tools and equipment used by Methode in the production of Delphi parts are the
property of Delphi.  As such, Methode objects to that term to the extent it was intended to
include tools or equipment not paid for by Delphi.

Similarly, Methode cannot agree to paragraph 16 of the Delphi T's & C's to the extent that it
grants Seller the right to take possession of and title to any part of any equipment owned by
Methode if it was used in the production of Delphi parts.

Given the fact that the agreement would expire after one year, Methode can not agree to paragraph 18 of the Delphi T's and C's. Specifically, Methode does not agree to produce any service or replacement parts other than those that will be produced prior to September 30, 2009. Given the limited amount of service parts ordered and the resulting set-up costs incurred by Methode, the pricing for service parts will be determined by the order quantity.

Methode does not agree to paragraph 28 of the Delphi T's and C's regarding Delphi audits. In lieu of that paragraph, Methode will agree to the following term adapted from the OESA (Original Equipment Suppliers Association) Draft Model Terms and Conditions:

> Seller will maintain records as necessary to support amounts charged to Buyer in accordance with Seller's document retention policies. Buyer and its representatives may audit Seller's records of transactions completed within one year prior to the audit date, to the extent needed to verify the quantities shipped and that the prices charged match the agreed prices. Any audit will be conducted at Buyer's expense (but will be reimbursed by Seller if the audit uncovers material errors in the amounts charged), at reasonable times, and at Seller's usual place of business.

Finally, Methode requires that Delphi provide written assurance that Delphi will not manufacture, use or sell products or induce any third party to manufacture, use or sell products that infringe Methode's patents. As you know, the applicable patents in the United States are D409,935 and 5,975,568 and 7,237,443.

Methode will accept purchase orders with the attached pricing subject to the above conditions and exceptions through September 30, 2009. In order for Methode to accept purchase orders for product shipped after September 30, 2008, the purchase orders must have these exceptions noted as well as Delphi must remove any reference to pricing being "under protest". Delphi must also waive all rights or claims to having paid Methode "under protest" as to any past purchase orders.

Please provide written acceptance to this letter no later than close of business September 5, 2008.

Sincerely,

Timothy R. Glandon
Vice President & General Manager
North American Automotive Operations

# EXHIBIT C

# DELPHI

Electronics & Safety

<u>Via E-Mail and UPS or FedX</u>

September 4, 2008

Mr. Timothy R. Glandon
Vice President & General Manager
North American Automotive Operations
111 W. Buchanan Street
P.O. Box 130
Carthage, IL  62321-0130

Re:   **Methode/Delphi**

Dear Tim:

Delphi accepts the three-year pricing proposal set out in your August 25, 2008 letter.

Methode will be placed on a material cost adder program.  The material/component costs used to calculate the attached pricing will be the baseline.  On a quarterly basis any increases or surcharges will be passed along to Delphi for reimbursement which must be paid within 30 days.

ZCRI payment terms to apply for the term of the agreement.

That portion of Paragraph 12 on the Purchase Order providing that "tools and equipment provided for performance of an operation by consignee remain the property of Delphi unless otherwise noted" shall be deleted as you have demanded.

Additionally, Paragraph 16 of Delphi's Terms and Conditions shall not be applicable to the extent that it allows Delphi to take possession of and title to any part of any equipment owned by Methode (not paid for by Delphi) if it was used in the production of Delphi parts.

In regard to service parts obligation in Paragraph 18 of Delphi's Terms & Conditions, Delphi is in agreement with your proposal as to service parts with the price to be determined by order quantity.

It is agreed that Paragraph 28 of Delphi's Terms & Conditions as to "Right to Audit and Inspect" shall not be applicable and that instead, the OESA Draft Model Terms and Conditions must apply:

> Seller will maintain records as necessary to support amounts charged to Buyer in accordance with the Seller's document retention policies.  Buyer and its representatives may audit Seller's records of transactions completed within one year prior to the audit date, to the extent needed to verify the quantities shipped and that the prices charged match the agreed prices.  Any audit will be conducted at Buyer's expense (but will be reimbursed by Seller if the audit uncovers material

errors in the amounts charged) at reasonable times, and at Seller's usual place of business.

Delphi will delete the reference to pricing being "under protest" and waive its right in regard to having paid Methode "under protest" as to past purchase orders. Delphi will issue new Purchase Orders with the above exceptions with an expiration date of September 30, 2011.

A copy of your August 25, 2008 letter is attached hereto. Purchase orders consistent with the terms of this letter will follow.

Sincerely,

*Mark A. Shively*
Mark A. Shively
Purchasing Manager
Delphi Electronics Group

# EXHIBIT D

**From:** Hoffman, Joyce A [mailto:joyce.a.hoffman@delphi.com]
**Sent:** Friday, September 12, 2008 2:12 PM
**To:** Glandon, Tim
**Cc:** Beteet, Kenneth H; Brown, Charles E; Shively, Mark A
**Subject:** POs and T&Cs

Hi Tim,

Attached are the modified PO's and Terms and Conditions as per the agreement. Have a good weekend.

Regards,
Joyce

**"All Delphi Documents are Delphi proprietary and as such consider this document and those attached as Delphi Confidential"**
Joyce A. Hoffman, CPPM
Sr. Buyer
Delphi E&S
2151 E. Lincoln Rd.
Kokomo, IN 46901
Phone: 765-451-0732
eFax: 866-897-0135
Email: joyce.a.hoffman@delphi.com

'The will of God will never take you where the Grace of God will not protect you.'

*************************************************************************************

Note: If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.

*************************************************************************************

**DELPHI CORPORATION** General Terms and Conditions
Effective February 1, 2008

## 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and Conditions are
incorporated in, and a part of, this contract and each purchase order, release, requisition,
work order, shipping instruction, specification and other document, whether expressed in
written form, by electronic data interchange or other tangible format, relating to the
goods and/or services to be provided by Seller pursuant to this contract (such documents
are collectively referred to as this "Contract"). Seller acknowledges and agrees that it has
read and understands these General Terms and Conditions. If Seller accepts this Contract
in writing or commences any of the work or services which are the subject of this
Contract, Seller will be deemed to have accepted this Contract and these General Terms
and Conditions in their entirety without modification. Any additions to, changes in,
modifications of, or revisions of this Contract (including these General Terms and
Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the
extent that an authorized employee of Buyer expressly agrees to accept any such
proposals in writing.

## 2. SHIPPING AND BILLING

2.1. Shipping. Seller will (a) properly pack, mark and, ship goods as instructed by Buyer
or any carriers and in accordance with any applicable laws or regulations, (b) route
shipments as Buyer instructs, (c) not charge for costs relating to handling, packaging,
storage or transportation (including duties, taxes, fees, etc.) unless otherwise expressly
stated in this Contract, (d) provide packing slips with each shipment that identify Buyer's
contract and release number and the date of the shipment, and (e) promptly forward the
original bill of lading or other shipping receipt with respect to each shipment as Buyer
instructs. Seller will include on bills of lading or other shipping receipts the correct
classification identification of the goods shipped as Buyer or the carrier requires. The
marks on each package and identification of the goods on packing slips, bills of lading
and invoices must enable Buyer to easily identify the goods.

2.2. Billing. Seller will (a) accept payment based upon Buyer's Evaluated Receipt
Record/Self-Billed Invoice unless Buyer requests that Seller issue and deliver an invoice
and (b) accept payment by electronic funds transfer. Payment terms established by this
contract are from the date the Buyer receives the goods or services. Buyer may withhold
payment for any goods or services until Buyer receives evidence, in such form and detail
as Buyer requires, of the absence of any liens, encumbrances and claims on such goods
or services.

2.3. Taxes. Unless otherwise stated in this Contract, the price includes all applicable
federal, state, provincial, and local taxes other than sales, value added, or similar
turnover taxes or charges. Seller will separately invoice Buyer for any sales, value
added, or similar turnover taxes or charges that Seller is required by law to collect from
Buyer. Seller will provide Buyer with whatever information and documentation that is
required under local law in order to enable Buyer to recover any sales, value added, or
similar turnover taxes or charges. Invoices shall also be in the appropriate form as

required by local law to permit deduction of payments for income tax purposes by the Buyer.

2.4. <u>Withholding of Taxes by Buyer</u>. If Buyer is required by law to make any deduction or withholding from any sum otherwise payable to Seller under this Contract, Buyer shall be entitled to deduct or withhold such amount and effect payment thereof to the applicable tax authority. Buyer will, upon request from Seller, provide Seller official tax receipts or other evidence issued by the applicable tax authorities sufficient to establish that any taxes which are withheld have been paid.

2.5. <u>Delivery Schedules</u>. Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract. Time is of the essence with respect to all delivery schedules Buyer establishes. Buyer will not be required to pay for any goods that exceed the quantities specified in Buyer's delivery schedules or to accept goods that are delivered in advance of the delivery date specified in Buyer's delivery schedules. Seller bears the risk of loss of all goods delivered in advance of the delivery date specified in Buyer's delivery schedules. If the requirements of Buyer's customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other compensation.

2.6. <u>Premium Shipments</u>. If Seller fails to have goods ready for shipment in time to meet Buyer's delivery schedules using the method of transportation originally specified by Buyer and, as a result, Buyer requires Seller to ship the goods using a premium (more expeditious) method of transportation, Seller will ship the goods as expeditiously as possible. Seller will pay, and be responsible for, the entire cost of such premium shipment, unless Buyer's actions caused Seller to fail to meet Buyer's delivery schedules, in which case Buyer will pay any costs for premium shipment.

2.7. <u>Volume Forecasts</u>. Buyer may provide Seller with estimates, forecasts or projections of its future anticipated volume or quantity requirements for goods. Seller acknowledges that any such forecasts are provided for informational purposes only and, like any other forward looking projections, are based on a number of economic and business factors, variables and assumptions, some or all of which may change over time. Buyer makes no representation, warranty, guaranty or commitment of any kind or nature, express or implied, regarding any such forecasts provided to Seller, including with respect to the accuracy or completeness of such forecasts.

# 3. SPECIFICATION, DESIGN AND SCOPE CHANGES

Buyer may at any time require Seller to implement changes to the specifications or design of the goods or to the scope of any services or work covered by this Contract, including work related to inspection, testing or quality control. While Buyer will endeavor to discuss any such changes with Seller as early as practical, Seller will promptly implement such changes. Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes, including Buyer's payment of reasonable costs of modifications to Seller's Equipment (as defined in Article 16) necessary to implement such changes. In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller will, as requested, provide

information to Buyer, including documentation of changes in Seller's cost of production and the time to implement such changes. In the event of any disagreement arising out of such changes, Buyer and Seller will work to resolve the disagreement in good faith, provided, however, that Seller will continue performing under this Contract, including the manufacture and delivery of goods and prompt implementation of changes required by Buyer, while Buyer and Seller resolve any disagreement arising out of such changes.

## 4. QUALITY AND INSPECTION

Seller will participate in Buyer's supplier quality and development program(s) and comply with all engineering release and validation requirements and procedures, including Buyer's production part approval processes, which Buyer specifies from time to time. Seller will permit Buyer and its representatives and consultants to enter Seller's facilities at reasonable times to inspect such facilities and any goods, inventories, work-in-process, materials, machinery, equipment, tooling, fixtures, gauges and other items and processes related to Seller's performance of this Contract. No such inspection by Buyer will constitute acceptance by Buyer of any work-in-process or finished goods.

## 5. NON-CONFORMING GOODS

Buyer is not required to perform incoming inspections of any goods, and Seller waives any right to require Buyer to conduct any such inspections. Seller will not substitute any goods for the goods covered by this Contract unless Buyer consents in writing. If Buyer rejects any goods as non-conforming, Buyer may, at its option, (a) reduce the quantities of goods ordered under this Contract by the quantity of non-conforming goods, (b) require Seller to replace the non-conforming goods, and/or (c) exercise any other applicable rights or remedies. If Seller fails to inform Buyer in writing of the manner in which Seller desires that Buyer dispose of non-conforming goods within forty-eight (48) hours of notice of Buyer's rejection of non-conforming goods (or such shorter period as is reasonable under the circumstances), Buyer will be entitled to dispose of the non-conforming goods without liability to Seller, provided, however, that in any event Buyer may elect to arrange for the shipment of any non-conforming goods back to Seller at Seller's expense. Seller will bear all risk of loss with respect to all non-conforming goods and will promptly pay or reimburse all costs incurred by Buyer to return, store or dispose any non-conforming goods. Buyer's payment for any non-conforming goods will not constitute acceptance by Buyer, limit or impair Buyer's right to exercise any rights or remedies, or relieve Seller of responsibility for the non-conforming goods.

## 6. FORCE MAJEURE

If Seller is unable to produce, sell or deliver any goods or services covered by this Contract, or Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract, as a result of an event or occurrence beyond the reasonable control of the affected party and without such party's fault or negligence, then any delay or failure to perform under this Contract that results from such event or occurrence will be excused for only so long as such event or occurrence continues, provided, however, that the affected party gives written notice of each such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires,

floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems
(including lockouts, strikes and slowdowns), equipment breakdowns and power failures.
During any delay or failure to perform by Seller, Buyer may (i) purchase substitute goods
from other available sources, in which case the quantities under this Contract will be
reduced by the quantities of such substitute goods and Seller will reimburse Buyer for
any additional costs to Buyer of obtaining the substitute goods compared to the prices
set forth in this Contract and/or (ii) have Seller provide substitute goods from other
available sources in quantities and at times Buyer requests and at the prices set forth in
this Contract. If Seller fails to provide adequate assurances that any delay will not
exceed thirty (30) days or if any delay lasts more than thirty (30) days, Buyer may
terminate this Contract without any liability to Seller or obligation to purchase raw
materials, work-in-process or finished goods under Section 11. Before any of Seller's
labor contracts expire and as soon as Seller anticipates or learns of any impending
strike, labor dispute, work stoppage or other disruption at Seller's facilities that might
affect the delivery of goods to Buyer, Seller will produce (and locate in an area that will
not be affected by any such disruption) a finished inventory of goods in quantities
sufficient to ensure the supply of goods to Buyer for at least thirty (30) days after such
disruption commences.

## 7. WARRANTY

7.1. <u>General</u>. Seller warrants and guarantees to Buyer, its successors, assigns and
customers that the goods and services covered by this Contract will (a) conform to the
then current release/revision level (based on date Buyer's release is issued to Seller) of
Buyer's applicable specifications and drawings, (b) conform to all samples, descriptions,
brochures and manuals furnished by Seller or Buyer, (c) be merchantable, (d) be of
good material and workmanship, (e) be free from defect, and (f) be fit and sufficient for
the particular purposes intended by Buyer and any customer of Buyer. If requested by
Buyer, Seller will enter into a separate agreement for the administration or processing of
warranty chargebacks for nonconforming goods.

7.2. <u>Warranty Period.</u> In the case of goods supplied for use as, or incorporation into,
parts, components or systems for automotive vehicles or other finished products, the
period for each of the foregoing warranties will commence upon delivery of the goods to
Buyer and, except as provided in Section 7.4 or as otherwise expressly agreed in writing
by an authorized employee of Buyer, end forty-eight (48) months following the date the
vehicle or other finished product on which such parts, components or systems are
installed is first sold and delivered or otherwise utilized for consumer or commercial
purposes, provided, however, that if Buyer offers and provides a longer warranty to its
customers with respect to any such parts, components or systems, then such longer
warranty period will apply to the goods. In the case of goods supplied for other uses, the
period for each of the foregoing warranties will be that provided by applicable law unless
otherwise expressly agreed in writing by an authorized employee of Buyer.

7.3. <u>Remedies and Damages</u>. If any goods are reasonably determined (including by use
of statistical analysis or other sampling methodology) to fail to conform to the warranties
set forth in this Contract, Seller shall reimburse Buyer for all reasonable losses, costs
and damages caused by such nonconforming goods. Such costs and damages may
include, without limitation, costs, expenses and losses of Buyer and/or its customers
arising from (i) inspection, sorting, repair or replacement of any nonconforming goods or
any system or component that incorporates such nonconforming goods, (ii) production

interruptions or slowdowns, (iii) offlining of vehicles or component systems, and (iv) field service campaigns and other corrective service actions, including, without limitation, the amounts paid to distributors and/or dealers for materials and replacement parts (including reasonable markup to recover administrative costs or other capital expenses) and the labor costs to perform such work.

7.4. <u>Recalls</u>. Notwithstanding the expiration of the warranty period set forth in Section 7.2, if Buyer and/or the manufacturer of the vehicles (or other finished product) on which the goods, or any parts, components or systems incorporating the goods, are installed, voluntarily or pursuant to a government mandate, makes an offer to owners of such vehicles to provide remedial action to address a defect that relates to motor vehicle safety or the failure of the vehicle to comply with any applicable law, safety standard or guideline (a so-called "recall"), Seller will nonetheless be liable for costs and damages associated with the conduct of such recall to the extent that such recall is based upon a reasonable determination (including by use of statistical analysis or other sampling methodology) that the goods fail to conform to the warranties set forth in this Contract.

## 8. INGREDIENTS AND HAZARDOUS MATERIALS

If Buyer requests, Seller will promptly furnish to Buyer, in such form and detail as Buyer directs: (a) a list of all ingredients in the goods, (b) the amount of all ingredients, and (c) information concerning any changes in or additions to the ingredients. Prior to, and together with, the shipment of the goods, Seller will furnish to Buyer and all carriers sufficient written warning and notice (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with all special handling instructions, safety measures and precautions as may be necessary to comply with applicable law, to inform Buyer and all carriers of any applicable legal requirements and to best allow Buyer and all carriers to prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing.

## 9. INSOLVENCY OF SELLER

In any of the following or any similar events Buyer may immediately terminate this Contract without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11: (a) insolvency or financial difficulties of Seller, (b) filing of a voluntary petition in bankruptcy by Seller, (c) filing of any involuntary petition in bankruptcy against Seller, (d) appointment of a receiver or trustee for Seller, (e) execution of an assignment for the benefit of creditors by Seller, or (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract. Seller will reimburse Buyer for all costs Buyer incurs in connection with any of the foregoing whether or not this Contract is terminated, including, but not limited to, all attorney or other professional fees.

## 10. TERMINATION FOR BREACH

Buyer may terminate all or any part of this Contract without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11 if Seller (a) repudiates, breaches, or threatens to breach any of the terms of this Contract, including Seller's warranties, (b) fails to perform or threatens not to perform

services or deliver goods in accordance with this Contract or (c) fails to assure timely and proper completion of services or delivery of goods.

## 11. TERMINATION FOR CONVENIENCE

In addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing. Upon such termination, Buyer may, at its option, purchase from Seller any or all raw materials, work-in-process and finished goods inventory related to the goods under this Contract which are useable and in a merchantable condition. The purchase price for such finished goods, raw materials and work-in-process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory which is the basis for any claim by Seller) on account of such termination, will be (a) the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by Buyer and not previously paid for, plus (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract less (c) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent. In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which Seller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required to pay for any goods or materials that are in Seller's standard stock or that are readily marketable. Payments made under this Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination. Within sixty (60) days after the effective date of termination, Seller will submit a comprehensive termination claim to Buyer, with sufficent supporting data to permit an audit by Buyer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

## 12. TECHNICAL INFORMATION

12.1. Information Disclosed by Seller. Seller will create, maintain, update, and provide to Buyer, in compliance with Buyer's drafting and math data standards, all technical information about the goods and their manufacture which is reasonably necessary or requested by Buyer in connection with its use of the goods, including, without limitation, the engineering validation and qualification of the goods for automotive production and other applications and compliance with any legal or regulatory requirements. Such technical information will not be subject to any use or disclosure restrictions, except as provided in Section 12.2 below.

12.2. Waiver of Claims. Seller agrees not to assert any claim (other than a claim for patent infringement) against Buyer, Buyer's customers or their respective suppliers with respect to any technical information that Seller shall have disclosed, or may hereafter disclose, in connection with the goods or services covered by this Contract.

12.3. Repair and Rebuild. Seller authorizes Buyer, its affiliates, agents and subcontractors, and Buyer's customers and their subcontractors to repair, reconstruct or rebuild the goods and products delivered under this Contract without payment of any royalty or other compensation to Seller.

12.4. <u>Software and Written Works</u>. Seller grants to Buyer a permanent, paid-up license to use, repair, modify and sell any operating software incorporated in the goods in conjunction with the use or sale of the goods. In addition, all works of authorship, including without limitation, software, computer programs and databases (including object code, micro code, source code and data structures), and all enhancements, modifications and updates thereof and all other written work products or materials, which are created in the course of performing this Contract, separately or as part of any goods and components, are "works made for hire" and the sole property of Buyer. To the extent that such works of authorship do not qualify under applicable law as works made for hire, Seller hereby assigns to Buyer all right, title and interest in any intellectual property rights in such works of authorship. If such assignment is not possible under any applicable law, Seller hereby grants an exclusive, royalty-free license to Buyer with respect to such works of authorship.

12.5. <u>Development, Engineering And Consulting Services</u>. Engineering, consulting or development services ("Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of authorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole property of Buyer. Seller agrees to assign all right, title and interest in and to IP that results from Development Services ("Developed IP") to Buyer. Seller shall notify Buyer of the existence of Developed IP and assist Buyer in every reasonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional documents reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse Seller for reasonable costs incurred by Seller in providing such assistance.


13. INDEMNIFICATION

13.1. <u>Infringement</u>. Seller will defend, hold harmless and indemnify Buyer and its customers, and their respective successors and assigns, against any claims of infringement (including patent, trademark, copyright, moral, industrial design or other proprietary rights, or misuse or misappropriation of trade secret) and resulting damages and expenses (including, without limitation, attorney and other professional fees and disbursements) relating to the goods or services covered by this Contract, including any claims in circumstances where Seller has provided only part of the goods or services. Seller waives any claim against Buyer that any such infringement arose out of compliance with Buyer's specifications.

13.2. <u>Activities on Buyer's Premises</u>. Seller will defend, hold harmless, and indemnify Buyer from and against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other professional fees and disbursements) arising from or in connection with the performance of any service or work by Seller or its employees, agents, representatives and subcontractors on Buyer's or Buyer's customer's premises or the use of the property of Buyer or any customer of Buyer, except to the extent such liability arises out of the negligence or willful misconduct of Buyer or Buyer's customer.

13.3. <u>Product Liability</u> . Seller will defend, hold harmless, and indemnify Buyer from and against any liability and expenses (including, without limitation, attorney and other

professional fees and disbursements) arising from or in connection with any third party claims or demands to recover for personal injury or death, property damage or economic loss caused by any of the goods or services supplied by Seller (regardless of whether such claim or demand arises under tort, negligence, contract, warranty, strict liability or any other legal theories), except to the extent such injury, damage or loss results from Buyer's specifications as to design or materials or from alteration or improper repair, maintenance or installation by any party other than Seller.

## 14. COMPLIANCE WITH LAWS

Seller, and any goods or services supplied by Seller, will comply with all applicable laws, rules, regulations, orders, conventions, ordinances and standards of the country(ies) of origin and destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval, performance and/or certification of the goods or services, including, but not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety. Neither Seller nor any of its subcontractors will utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or services under this Contract. Upon Buyer's request, Seller will certify in writing its compliance with the foregoing. Seller will defend, hold harmless and indemnify Buyer from and against any liability, claims, demands, damages or expenses (including reasonable attorney or other professional fees and disbursements) arising from or relating to Seller's noncompliance with this Article.

## 15. INSURANCE

Seller will maintain insurance coverage as required by applicable law or as reasonably requested by Buyer with carriers reasonably acceptable to Buyer. With respect to any such insurance coverage, Seller will furnish to Buyer either a certificate evidencing satisfaction of the above-mentioned insurance requirements under this Contract or certified copies of all insurance policies within ten (10) days after Buyer requests. The certificate must provide that Buyer will receive thirty (30) days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. The furnishing of certificates of insurance and purchase of insurance will not limit or release Seller from Seller's obligations or liabilities under this Contract.

## 16. SELLER'S EQUIPMENT

Seller, at its expense, will furnish, keep in good condition, and replace when necessary all of its machinery and equipment, including related tooling, jigs, dies, gauges, fixtures, molds, patterns, fixtures and other accessories, required for the production of goods covered by this Contract (collectively, "Seller's Equipment"). Seller will insure Seller's Equipment with fire and extended coverage insurance for its full replacement value.

## 17. BUYER'S PROPERTY AND INFORMATION

17.1. Acquisition of Tooling and Materials. To the extent that this Contract covers Buyer's purchase of, or reimbursement to Seller for, any tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment, supplies, materials and other items (collectively,

"Tooling and Materials") to be used in connection with Seller's actual or anticipated supply of goods to Buyer, Seller will acquire such Tooling and Materials as agent of Buyer and Buyer shall pay to or reimburse Seller the lower of (i) the amount specified in this Contract for such Tooling and Materials or (ii) Seller's actual out-of-pocket cost to acquire the Tooling or Materials from an unrelated third party or, if the Tooling and Materials are constructed or fabricated by Seller or any affiliate of Seller, the actual direct costs for materials, labor and overhead associated with such construction and fabrication. Seller shall assign to Buyer any contract rights or claims in which Seller has an interest with respect to such Tooling and Materials. Seller shall establish a reasonable accounting system that readily enables the identification of Seller's costs as described above. Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any such Tooling and Materials. Upon Seller's acquisition of such Tooling and Materials, title thereto shall vest immediately in Buyer and such Tooling and Materials shall be held as "Buyer's Property" by Seller in accordance with this Article 17.

17.2. <u>Bailment of Buyer's Property</u>. All Tooling and Materials which Buyer furnishes, either directly or indirectly, to Seller or which Buyer buys from, or gives reimbursement to, Seller in whole or in part (collectively, "Buyer's Property") will be and remain the property of Buyer and be held by Seller on a bailment basis. Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer immediately upon attachment to or incorporation into Buyer's Property. When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property for work performed on, or utilizing, such property or otherwise.

17.3. <u>Seller's Duties with Respect to Buyer's Property</u>. While Buyer's Property is in Seller's possession and until Seller delivers Buyer's Property back to Buyer, Seller bears the risk of loss, theft and damage to Buyer's Property. Seller will be responsible for the cost of repairing or replacing Buyer's Property if it is stolen, damaged or destroyed regardless of cause or fault. Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's own expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be personal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not commingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from Seller's applicable shipping location (as shown by the shipping address of Seller) without prior written approval from an authorized employee of Buyer, and (g) use Buyer's Property in compliance with Buyer's or the manufacturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations. Buyer will have the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with respect thereto. Seller will not sell, lend, rent, encumber, pledge, lease, transfer or otherwise dispose of Buyer's Property. Furthermore, Seller will not assert, or permit any person claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property.

17.4. <u>Return of Buyer's Property</u>. Seller agrees that Buyer has the right, at any time and from time to time, with or without reason and without payment of any kind, to retake possession of or request the return of Buyer's Property. Without further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the right to enter Seller's premises and take possession of any and all of Buyer's Property. Upon Buyer's request and in accordance with Buyer's instructions, Buyer's Property will

be immediately released to Buyer or delivered to Buyer by Seller, either (i) Ex Works (IncoTerms 2000) at Seller's plant properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates, in which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates. If Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an immediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or without legal process, and take immediate possession of Buyer's Property.

17.5. <u>Disclaimer of Warranties</u>. Seller acknowledges and agrees that (i) Buyer is not the manufacturer of Buyer's Property nor the manufacturer's agent nor a dealer therein, (ii) Buyer is bailing Buyer's Property to Seller for Seller's benefit, (iii) Seller is satisfied that Buyer's Property is suitable and fit for its purposes, and (iv) BUYER HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS OR IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF BUYER'S PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. Buyer will not be liable to Seller for any loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by Buyer's Property, including, without limitation, the use or maintenance thereof, or the repair, service or adjustment thereof, or by any interruption of service or for any loss of business whatsoever or howsoever caused, including, without limitation, any loss of anticipatory damages, profits or any other indirect, special or consequential damages and/or personal injury or death.

17.6. <u>Use of Buyer's Information</u>. Seller will (i) keep all Buyer's Information (as defined below) confidential and disclose it only to its employees who need to know such Buyer's Information in order for Seller to supply goods and services to Buyer under this Contract and (ii) use the Buyer's Information solely for the purpose of supplying goods and services to Buyer. Goods manufactured based on Buyer's Information may not be used for Seller's own use or sold by Seller to third parties without prior express written consent from an authorized employee of Buyer. "Buyer's Information" means all information provided to Seller by Buyer or its representatives or subcontractors in connection with the business, programs, goods and services covered by this Contract, including, without limitation, pricing and other terms of this Contract, specifications, data, formulas, compositions, designs, sketches, photographs, samples, prototypes, test vehicles, manufacturing, packaging or shipping methods and processes and computer software and programs (including object code and source code). Buyer's Information also includes any materials or information that contain, or are based on, any Buyer's Information, whether prepared by Buyer, Seller or any other person.

# 18. SERVICE AND REPLACEMENT PARTS

During the term of this Contract, Seller will sell to Buyer goods necessary to fulfill Buyer's service and replacement parts requirements to Buyer's customers at the then current production price(s) under this Contract.  Service parts pricing to be determined by set up costs incurred and order quantity.

## 19. REMEDIES AND INJUNCTIVE RELIEF

The rights and remedies reserved to Buyer in this Contract are cumulative with, and in addition to, all other or further remedies provided in law or equity. To the extent that this Contract is for the supply of goods for use as, or fabrication into, parts, components or systems, Seller acknowledges and agrees that money damages would not be a sufficient remedy for any actual, anticipatory or threatened breach of this Contract by Seller with respect to its delivery of goods to Buyer and that, in addition to all other rights and remedies which Buyer may have, Buyer shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach.

## 20. CUSTOMS AND EXPORT CONTROLS

20.1. Credits and Refunds. Transferable credits or benefits associated with or arising from goods purchased under this Contract, including trade credits, export credits or rights to the refund of duties, taxes or fees, belong to Buyer. Seller will, at its expense, provide all information necessary (including written documentation and electronic transaction records in Buyer-approved formats) to permit Buyer to receive these benefits, credits, or rights. Seller will furthermore, at its expense, provide Buyer with all information, documentation, and electronic transaction records relating to the goods necessary for Buyer to fulfill any customs -related obligations, origin marking or labeling requirements and certification or local content reporting requirements, to enable Buyer to claim preferential duty treatment for goods eligible under applicable trade preference regimes, and to make all arrangements that are necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import. Seller will, at its expense, provide Buyer or Buyer's nominated service provider with export documentation to enable the goods to be exported, and obtain all export licenses or authorizations necessary for the export of the goods unless otherwise indicated in this Contract, in which event Seller will provide all information as may be necessary to enable Buyer to obtain such licensees or authorization(s).

20.2. Customs-Trade Partnership Against Terrorism. To the extent any good covered by this Contract are to be imported into the United States of America, Seller shall comply with all applicable recommendations or requirements of the Bureau of Customs and Border Protection's Customs-Trade Partnership Against Terrorism ("C-TPAT") initiative. Upon request, Seller shall certify in writing its compliance with the C-TPAT initiative.

## 21. BUYER'S RECOVERY RIGHT

With respect to any monetary obligations of Seller or Seller's affiliates to Buyer or Buyer's affiliates, including, without limitation, direct and indirect losses, costs and damages resulting from Seller's failure to timely delivery goods or services, the failure of any goods or service to conform to applicable warranties or other breach by Seller of this Contract, Buyer may at any time, as applicable, recover, recoup or setoff such amounts by deducting such amounts from any sums that are, or will become, owing, due or payable to Seller or Seller's affiliates by Buyer or Buyer's affiliates.

## 22. NO ADVERTISING

Seller will not, in any manner, advertise or publish that Seller has contracted to furnish Buyer the goods or services covered by this Contract or use any trademarks or trade names of Buyer in Seller's goods, advertising or promotional materials unless Buyer consents in writing.

## 23. NO IMPLIED WAIVER

The failure of either party at any time to require performance by the other party of any provision of this Contract will not affect the right to require such performance at any later time, nor will the waiver by either party of a breach of any provision of this Contract constitute a waiver of any succeeding breach of the same or any other provision. No failure or delay in exercising any right or remedy will operate as a waiver thereof nor will any single or partial exercise thereof preclude other or further exercise thereof. No course of dealing or course of performance may be used to evidence a waiver or limitation of Seller's obligations under this Contract.

## 24. ASSIGNMENT AND CHANGE IN CONTROL

Buyer may assign its rights and obligations under this Contract without Seller's prior written consent. Seller may not assign or delegate its rights or obligations under this Contract without prior written consent from an authorized employee of Buyer. In addition, Buyer may terminate this Contract upon giving at least 60 days notice to Seller, without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11, if Seller (i) sells, or offers to sell, a material portion of its assets or (ii) sells or exchanges, or offers to sell or exchange, or causes to be sold or exchanged, a sufficient amount of its stock or other equity interests that effects a change in the control of Seller or (iii) executes, or otherwise becomes subject to, a voting or other agreement or trust that effects a change in the control of Seller.

## 25. RELATIONSHIP OF PARTIES

Seller and Buyer are independent contracting parties. Nothing in this Contract makes either party the agent or legal representative of the other for any purpose whatsoever, nor grants either party any authority to assume or create any obligation on behalf of or in the name of the other party.

## 26. GOVERNING LAW AND JURISDICTION

26.1. U.S. Contracts. If either (i) this Contract is issued by Buyer from a location within the United States of America or its territories (as shown by the issuing address of Buyer), (ii) this Contract is issued, in whole or part, for goods to be shipped to a Buyer location within the United States of America or its territories (as shown by the ship to or receiving address of Buyer) or (iii) Seller's applicable shipping location is within the United States of America or its territories (as shown by the shipping address of Seller), then: (a) this Contract is to be construed according to the laws of the United States of America and the State of Michigan, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law, and (b) each party hereby agrees

that the forum and venue for any legal or equitable action or proceeding arising out of, or in connection with, this Contract will lie in the appropriate federal or state courts in the State of Michigan and specifically waives any and all objections to such jurisdiction and venue.

26.2. Non-U.S. Contracts. In all cases not covered by Section 26.1 above, (a) this Contract is to be construed according to the laws of the country (and state or province, if applicable) where Buyer's receiving location is located (as shown by the ship to or receiving address of Buyer), excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law; (b) any legal or equitable action or proceedings by Buyer against Seller arising out of, or in connection with, this Contract may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in any court(s) having jurisdiction over Buyer's receiving location, in which event Seller consents to such jurisdiction and venue, including service of process in accordance with applicable procedures; and (c) any legal or equitable actions or proceedings by Seller against Buyer arising out of, or in connection with, this Contract may be brought by Seller only in the court(s) having jurisdiction over the Buyer's receiving location.


## 27. SEVERABILITY

If any provision of this Contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision will be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Contract will remain in full force and effect.

## 28. RIGHT TO AUDIT AND INSPECT
OESA Draft Model Terms and Conditions apply:
Seller will maintain records as necessary to support amounts charged to Buyer in accordance with the Seller's document retention policies. Buyer and its representatives may audit Seller's records of transactions completed within one year prior to the audit date, to the extent needed to verify the quantities shipped and that the prices charged match the agreed prices. Any audit will be conducted at Buyer's expense (but will be reimbursed by Seller if the audit uncovers material errors in the amounts charged) at reasonable times, and at Seller's usual place of business.

## 29. ENTIRE AGREEMENT

This Contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this Contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. This Contract may only be modified by a written contract amendment issued by Buyer. Notwithstanding anything to the contrary contained herein, Buyer explicitly reserves, and this Contract will not constitute a waiver or release of, any rights and claims against Seller arising out of, or relating to, any fraud or duress in connection with the formation of this Contract or any breach or anticipatory breach of any previously existing contract between Buyer and Seller (whether or not such previously existing contract related to the same or similar

goods or subject matter as this Contract). All payments by Buyer to Seller under this
Contract are without prejudice to Buyer's claims, rights, or remedies.

## 30. TRANSLATIONS

Buyer may provide various translated versions of these General Terms and Conditions
for informational purposes only. However, the original English language version of these
General Terms and Conditions will apply in the event of any disagreement over the
meaning or construction of any provisions of these General Terms and Conditions.

# EXHIBIT E

# DELPHI

Electronics & Safety

**Via Email, Facsimile and Federal Express**
**tim.glandon@methode.com / 708.867-6999**

August 26, 2009

Mr. Timothy R. Glandon
Vice President & General Manager - North American Automotive Operations
Methode Electronics, Inc.
7401 West Wilson Avenue
Chicago, IL 60706-4548

Re:   Termination for Convenience Notice Effective September 10, 2009; Termination for Lack of Service
and Delivery and Breach; Termination for Lack of Price Competitiveness

Dear Mr. Glandon:

Delphi Automotive Systems LLC, acting through its Delphi E&S Division ("Delphi"), notifies Methode Electronics, Inc, that effective September 10, 2009, Delphi hereby terminates the Delphi Purchase Order Requirements Contracts ("Contracts") issued to Methode as part of, incorporated into and pursuant to, among other things, Methode's August 25, 2008 letter to Delphi, Delphi's September 4, 2008 letter to Methode, and Delphi's modified General Terms and Conditions for supply of bladder assemblies used by Delphi in manufacturing Delphi's PODS products. This termination is pursuant to paragraph 11, entitled "Termination for Convenience," of Delphi's modified General Terms and Conditions incorporated into the Contracts.

In addition, effective September 10, 2009, Delphi terminates these Contracts for breach. This termination for breach is pursuant to paragraph 10, entitled "Termination for Breach," of Delphi's modified General Terms and Conditions incorporated into these Contracts and under Delphi's accumulated and vested rights pursuant to past and current contracts with Methode. Methode's breach of contract arises from its refusal to provide tooling drawings as well as prototype, pilot and production parts for new or upcoming OEM customer programs, as set forth in Delphi's Second Amended and Supplemented Verified Complaint for Breach of Contract and Injunctive or Other Relief, filed July 21, 2009 in the pending Michigan state court action between the parties.

Further, Delphi terminates these Contracts pursuant to Delphi's accumulated and vested rights from its various contracts with Methode. In particular, Delphi terminates these Contracts for Methode's lack of appropriate and satisfactory service and delivery for the reasons set forth above. In addition, Delphi terminates these Contracts for Methode's lack of price competitiveness. As set forth in Tim Hamashuk's July 20, 2009 letter to you, Methode is non-competitive as to pricing compared to pricing available to Delphi from others or from in-sourcing. Methode has not responded with an offer to meet the more competitive pricing.

Pursuant to Paragraph 11 of Delphi's General Terms and Conditions, please provide an inventory and cost breakdown of all raw materials, work-in-progress and finished goods inventory related to the goods under the Contracts which are usable and in a merchantable condition.

Respectfully,

Beth M. Schwartling
Vice President, Safety Systems
Delphi Electronics and Safety