# EXHIBIT A

ORIGINAL

530 265

81

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

Exhibits 1-12

DELPHI AUTOMOTIVE SYSTEMS, LLC,
*a Delaware corporation,*

          *Plaintiff,*

vs.

LANEKO ENGINEERING, Inc.
*a Pennsylvania corporation,*

          *Defendant.*

JUDGE : Cleland, Robert H.
DECK  : S. Division Civil Deck
DATE  : 08/17/2005 @ 16:15:16
CASE NUMBER : 2:05CV73193
CMP DELPHI AUTO V. LANEKO
ENGINEERING  (DA)  SI

MAGISTRATE JUDGE CAPEL

| | |
|---|---|
| BUTZEL LONG, P.C.<br>By: James G. Derian (P33580)<br>    Brent W. Warner (P67733)<br>Attorneys for Plaintiff<br>100 Bloomfield Hills Parkway, Suite 200<br>Bloomfield Hills, MI 48304-2949<br>(248) 258-1616 | Charles E. Brown (P46400)<br>Co-Counsel for Plaintiff<br>Delphi Automotive Systems<br>5825 Delphi Drive<br>Troy, MI 48098-2815<br>(248) 813-3368 |

## VERIFIED COMPLAINT FOR SPECIFIC PERFORMANCE, DECLARATORY RELIEF AND MONEY DAMAGES

        Plaintiff, Delphi Automotive Systems, LLC ("Delphi"), alleges as follows for its

complaint against Defendant, Laneko Engineering, Inc. ("Laneko"):

### PARTIES, JURISDICTION AND VENUE

        1.    Plaintiff Delphi is a Delaware corporation with its principal executive

offices in Troy, Michigan.

        2.    On information and belief, Defendant Laneko is a Pennsylvania

corporation with its principal executive offices at 275 New Jersey Drive, Fort

Washington, Pennsylvania, 19034-2603.

3.      Subject matter jurisdiction is proper in this Court, pursuant to 28 USC § 1332(a), because: (a) the amount in controversy exceeds Seventy-Five Thousand ($75,000) Dollars, exclusive of costs, interest, and attorney fees; and (b) there is complete diversity of citizenship.

4.      Defendant Laneko has consented to personal jurisdiction in Michigan in the parties' contractual agreements, which provide that personal jurisdiction and venue "will lie in the appropriate federal or state courts in the State of Michigan...."

5.      Venue in the United States District Court for the Eastern District of Michigan is appropriate and consistent with 28 USC § 1391(a) et seq, and the parties' contractual agreements.

## FACTUAL BACKGROUND ALLEGATIONS

### The Contracts

6.      Defendant Laneko supplies Delphi with its requirements of several stamped steel parts collectively (the "Components"). Delphi incorporates the Components into various door latch assemblies (the "Door Latch Assemblies") that it supplies to its customers, General Motors Corporation ("GM") and Ford Motor Company ("Ford") (collectively: Delphi's "Customers").

7.      Delphi and Laneko are parties to eight separate Purchase Order Requirements Contracts for these Components (P.O.'s 550022726, 550022727, 550023480, 550023542, 550023555, 550023556, 550023557, 550057104), under which Laneko is required to supply Delphi with 100% of its requirements of the Components through December 31, 2005. (See Purchase Order Requirements Contracts, Exhibit No. 1).

8.      Delphi's standard General Terms and Conditions are incorporated by reference into the Purchase Order Requirements Contracts. (See Delphi's General Terms and Conditions, Exhibit No. 2). The Purchase Order Requirements Contracts, together with Delphi's General Terms and Conditions, are the parties' governing contracts (the "Contracts").

9.      Pursuant to the terms of the Contracts, commencement of any work by Laneko constituted acceptance by Laneko of them "in [their] entirety without modification." (See Exhibits 1 and 2).

10.     Laneko approved and accepted the Contracts by commencing the work which is called for by them; that is, by producing and shipping the Components to Delphi in accordance with the Contracts.

11.     Delphi acts as a Tier I supplier to its Customers, GM and Ford, which in turn incorporate Delphi's Door Latch Assemblies into vehicles produced and sold to the public. Delphi sends shipments of the Door Latch Assemblies every day to its Customers at their plants in Wayne, MI; Lake Orion, MI; Hamtramck, MI; Vandalia, OH; Lordstown, OH; Springhill, TN; Fairfax, MO; Oshawa, ON and Oakville, ON.

12.     The Components supplied by Laneko to Delphi are unique custom-made products. They are critical elements in the production of Delphi's Door Latch Assemblies. These Door Latch Assemblies are integral to many of GM's and Ford's vehicle platforms. Because Laneko is the sole supplier of these Components to Delphi, and Delphi is the sole supplier of these Door Latch Assemblies to GM and Ford, any supply cut off by Laneko would quickly result in production shutdowns at both Delphi's and its Customers' assembly plants.

3

13.     The parties' Contracts require that Laneko supply Delphi with 100% of its requirements of the Components at fixed per-piece prices until their expiration date, December 31, 2005.

**Laneko's Unilateral Price Increases And  Stop Shipment Threats**

14.     In the past 1 ½ years, Laneko has made numerous coercive demands for price increases and modification of payment terms in direct contravention of its existing Contracts with Delphi.  In April of 2004, Laneko coerced Delphi into agreeing to allow Laneko to pass-through 100% of the steel surcharges Laneko was then incurring from its steel supplier to Delphi by threatening to cut off Component supply.

15.     On April 11, 2005, upon learning that Delphi intended to re-source some of the Components supplied by Laneko to another supplier after the expiration of the parties' Contracts, Laneko again threatened to impose a supply cut-off unless Delphi surrendered several of its contractual rights.  (See Exhibit 3).

16.     In an effort to appease Laneko and thereby assure the transition to a new supplier without plant shut downs and other production interruptions, Delphi reached an agreement with Laneko on revised terms for the parties' Contracts.  These revised terms were confirmed as follows in an e-mail dated April 28, 2005:

- Delphi will change the payment terms from MNS-2[1] to Net 30, effective May 1, 2005.
- Delphi will take the current steel surcharges and roll them into the piece price, effective May 1, 2005.
- Delphi will close out the open Covisint problem cases up to and including April 22, 2005.

- Delphi and Laneko will work together on a build out plan for all parts supplied by Laneko to Delphi.  The plan will

---

[1]     The payment terms are "MNS2-2":  second working day two months after receipt of material.

4

> address the raw material and minimize the amount of work
> in process, finished goods to a reasonable level.
>
> As I stated to  you in our conversation, the earliest estimated time
> for moving this business is September, 2005....

(See Exhibit 4, "April 28, 2005 Agreement").

17.    Despite Delphi's numerous concessions in the April 28, 2005 Agreement, Laneko imposed a partial supply cut off on May 3, 2005 because of dissatisfaction with the Net 30 payment terms that it had agreed to one week earlier.

18.    In response to Laneko's May 3 supply cut-off, Delphi agreed to amend the payment terms in the April 28, 2005 Agreement from Net 30 to Net Immediate.  In its confirming letter, Delphi again reminded Laneko that the "earliest" estimated time for moving its business with Laneko would be sometime in September 2005.  Delphi emphasized that this was only an "estimate" and that "Laneko's continuing cooperation will be required as per our contract terms."  (See Exhibit 5).

19.    In order to develop a build out plan with Laneko for an orderly transition to another supplier, Delphi needed to know what Laneko's lead times are for ordering raw materials.

20.    Beginning in May 2005, Delphi initiated the process of developing a build out plan by sending weekly forecasts to Laneko projecting Delphi's future weekly requirements of the Components and by requesting that Laneko provide Delphi with the necessary lead times for ordering raw materials.  (See, e.g., Exhibit 6 of Verified Complaint).

21.    Laneko has not been cooperative in developing this build out plan, but instead has engaged in conduct that immediately threatens Delphi's ability to fulfill its

5

contractual obligations to GM and Ford.  First, despite Delphi's repeated requests, Lancko failed to supply Delphi with the information regarding the necessary lead times for ordering raw materials until July 18, 2005.  Second, On July 7, 2005, Lancko verbally informed Delphi that it would not ship any of the Components beyond September 1, 2005, despite the fact that the parties' Contracts do not expire until December 31, 2005.

22.    In a letter dated August 4, 2005, Lancko expanded on its threatened September 1, 2005 supply cut-off by informing Delphi that, contrary to the commitment it had made in the April 28, 2005 Agreement, it would not work with Delphi on a mutually agreeable build out plan, but would instead cease shipment of the Components on September 1, 2005, unless Delphi paid it an additional $2.982 million.  Lancko justified its September 1, 2005 supply cut-off threat by stating that the parties had agreed to a September 1, 2005 termination date in "late April and early May." (See Exhibit 7 of Verified Complaint).  In fact, no such representation had ever been made to Lancko.  The April 28, 2005 Agreement expressly states that the "earliest estimated time for moving [Delphi's] business is September, 2005."

23.    Delphi responded to Lancko's August 4, 2005 letter in a letter dated August 8, 2005, stating that Lancko's demand for the additional $2.982 million was unreasonable and a breach of the parties' April 28, 2005 Agreement.  Delphi also reminded Lancko that September 1, 2005 was not the agreed upon end date, but only the "earliest" estimated time for moving the Components to another supplier.  Finally, Delphi stated that Lancko's threatened supply cut-off was a breach of the parties' Contracts, which obligate Lancko to keep shipping until December 31, 2005 -- unless the parties

6

work out an earlier termination date through the adoption of a mutually agreeable build out plan, per the April 28, 2005 Agreement. (See Exhibit 8).

24.     In an August 9, 2005 conference call, Laneko attempted to justify its demand for an additional $2.982 million by claiming that it had made arrangements to "sell off" part of its production equipment and close one of its three facilities based on the assumption that Delphi would no longer need Laneko after September 1, 2005.  Delphi reminded Laneko that September 1, 2005 had only been given as an "estimate" of the earliest possible date of a transition.  Moreover, Delphi was never notified by Laneko of its intention to sell off its production facilities before the expiration of the Contracts, or before an earlier exit date could be agreed to under a mutually acceptable build out plan.  Delphi confirmed its position the following day in an August 10, 2005 letter to Laneko. (See Exhibit 9).

25.     Laneko replied to Delphi on August 10, 2005 with a terse e-mail message stating that it refused to provide Delphi with the data Delphi had requested regarding Laneko's justification for the new $2.982 million demand.   Further, Laneko demanded a "serious counter offer" from Delphi to avert a supply cut off on September 1, 2005.  (See Exhibit 10).

26.     On August 15, 2005, Delphi attorney Charles E. Brown sent Laneko a letter advising that Delphi would not pay the $2.98 million "ransom payment" over and above the contract pricing.  He further informed Laneko that Delphi expected Lanko to continue to honor its obligations under the Contracts until Delphi could safely make the transition to a new supplier without incurring production interruptions and plant shut downs at its and its automaker customers' plants.  He added that, if any production

interruptions or plant shut downs occurred due to Laneko slowing down or cutting off shipments, Delphi would "pursue the full recovery of any and all damages." (See Exhibit 11 of Verified Complaint).

27.     On August 16, 2005, Laneko announced that it was reducing its ransom demand from $2.98 million to $1.75 million. It also confirmed that it would default on the Contracts and impose a supply cut off on September 1, 2005, if Delphi did not accede to its demands.

28.     Since receiving Laneko's threats of its intention to default under the parties' Contracts and impose a supply cut-off on September 1, 2005, Delphi has repeatedly demanded adequate written assurances from Laneko that it will continue to produce Delphi's requirements per the Contracts until they expire, or until sufficient parts banks can be built to allow re-sourcing without incurring production interruptions. Defendant has failed to provide any such assurances to date.

29.     Based on Delphi's most recent communications with Laneko's representatives, Delphi expects that Laneko will not cure its deficiency with respect to its supply of the Critical Component and will stop shipping all Components to Delphi on September 1, 2005, as threatened, unless Delphi acquiesces to Laneko's demand that Delphi surrender its existing legal rights under the parties' Contracts and April 28, 2005 Agreement and pay Laneko the additional $1.75 million.

30.     Delphi has complied in good faith with all of its contractual obligations to Laneko, while Laneko has defaulted under the Contracts and April 28, 2005 Agreement.

31.     Laneko is contractually obligated to continue supplying Delphi with its requirements of the Components at the agreed-upon fixed prices and payment terms in

8

the Contracts and April 28, 2005 Agreement until the Contracts' expiration on December 31, 2005 -- unless and until the parties agree on a build out plan that allows Laneko to cease production prior to December 31, 2005.

32.    Without any legal justification, Laneko has breached the parties' Requirements Contract covering the supply of the Critical Component, by failing to supply Delphi with its requirements of the Critical Component and has anticipatorily breached the parties' Contracts and the April 28, 2005 Agreement by threatening to cease shipment of the Components on September 1, 2005, unless Delphi agrees to surrender its existing contractual rights and submit to Laneko's new unilaterally imposed contract terms.  As a result, Delphi does not have an adequate remedy at law.

33.    The Contracts between Delphi and Laneko provide for fixed, per-piece prices for each of the Components supplied by Laneko.  The Contracts do not permit Laneko to stop shipping Components if Delphi does not submit to Laneko's demand for an additional $1.75 million.

## The Supply Chain

34.    Delphi's manufacturing facilities use the "just-in-time" inventory method for the processing of Laneko-supplied Components.  The just-in-time supply method is standard in the automotive industry and is used by Delphi's Customers, GM and Ford, as well as other automotive equipment suppliers.  Use of the just-in-time supply method means that Delphi does not maintain a significant inventory of the Components supplied by Laneko.    Accordingly, Delphi relies on daily shipments of Laneko-supplied Components in order to meet its production needs.

9

35.    Delphi also relies on the sole-source supply method – a method under which it purchases all of its requirements for a particular part from one supplier. Laneko is Delphi's sole supplier of the Components at issue in this case, which are unique custom-made products. Each of these Components must meet demanding specifications imposed by Delphi and its Customers before they can be used in the manufacture of any Delphi Door Latch Assemblies. In this regard, numerous tests must be run to validate and qualify each of the Components. Delphi employs the sole-source supply method to reduce the cost of validation necessary to make each part, to achieve a consistent quality of steel parts and to achieve economies of scale.

36.    In order to obtain an alternative source of supply for the Components, Delphi must also go through its automaker Customers' rigorous Production Part Approval Process ("PPAP"), which involves extensive testing and evaluation that typically lasts six months or more. Additionally, the Components sold to Delphi by Laneko are unique parts that are custom designed and built to fit Delphi's specific needs. In this particular case, because the Door Latch Assemblies are considered safety-critical parts by the federal government, the validation process is particularly stringent and lengthy for Delphi and its Customers. Even when accelerated, the tooling, testing and approval process for validating new suppliers typically takes at least six months to complete. In this case, it appears Delphi will not be ready to get all of the Components covered by a new supplier until December 31, 2005.

37.    Delphi's use of the just-in-time and sole-source supply methods, therefore, makes the continuity of Delphi's operations dependant upon Laneko's continuous delivery of Components. Any interruption in delivery would create ripple effects

throughout the operations of Delphi, GM and Ford, stopping assembly lines and preventing delivery of Delphi's Door Latch Assemblies and its Customers' motor vehicles.

38.     Delphi keeps only one to two days' supply of the Components because of the just-in-time inventory method employed by the automotive industry.  General Motors and Ford likewise maintain only one to two days' supply of Delphi's Door Latch Assemblies.

39.     If Laneko is permitted to breach the Contracts and April 28, 2005 Agreement by imposing a supply cut-off on September 1, 2005, Delphi will be forced to begin shutting down its plants within one to two days.  Within one to two days after Delphi begins shutting down its production, General Motors and Ford will be forced to begin shutting down several of their automotive assembly plants, affecting tens of thousands of autoworkers.  For example, if Laneko is permitted to breach the parties' April 28, 2005 Agreement and the parties' Contracts by imposing a September 1, 2005 supply cut-off, Delphi will begin running out of Components at its Columbus OH, Vandalia OH and Matamoras MX plants as early as September 2, 2005.  One to two days after that, GM and Ford will begin running out of Door Latch Assemblies and will be forced to begin halting production at their plants in Wayne, MI; Lake Orion, MI; Vandalia, OH; Lordstown, OH; Springhill, TN; Fairfax, MO; Oshawa, ON and Oakville, ON.

40.     In addition, hundreds of other automotive suppliers, ranging from large Tier I Fortune 100 corporations like Delphi to "Mom and Pop" tool & die shops that are in the supply chain for the automotive industry will be affected, because production of

11

the automotive platforms that incorporate these Delphi Door Latch Assemblies will be halted.

41.      Delphi will be unable to obtain sufficient production volumes of substitute Components from a new supplier until December 31, 2005 because of the PPAP and validation processes.  As a result, if Lancko does not continue supplying Delphi with Components, Delphi will be unable to obtain them from an alternative source on a timely basis so as to avoid an interruption of production, resulting in lay offs and other adverse employment consequences to  tens of thousands of Delphi, GM and Ford production workers.

42.      Delphi's Customers, GM and Ford, have informed Delphi that a shutdown of even one of their plants will result in damages exceeding $1 million per day.  A shut down of Delphi's and its Customers' plants could, therefore, potentially result in damages of millions of dollars per day to Delphi.

43.      Such plant shutdowns will also cause Delphi to suffer a loss of customer relations and goodwill.  This type of damage to Delphi's customer relations and goodwill will result in irreparable injury to Delphi's reputation as a reliable supplier.  Delphi's Customers, GM and Ford, will also suffer a loss of customer relations and goodwill as a result of their inability to deliver vehicles ordered by their customers.

44.      Lancko has no right under the Contracts or April 28, 2005 Agreement to cease supplying Delphi with its requirements of any of the Components or to demand the additional $1.75 million from Delphi to ensure supply beyond September 1, 2005.  Further, Delphi is under no obligation to agree to Lancko's demand.  Delphi has complied in good faith with all of its known contractual obligations to Lancko.

45.     Laneko is unlawfully using its supply deficiency of the Critical Component and its September 1, 2005 threatened supply cut off for all Components as leverage in an attempt to coerce Delphi into releasing Laneko from its remaining obligations under the parties' Contracts and the April 28, 2005 Agreement. If Delphi submits to Laneko's economic coercion and agrees to the additional $1.75 million that Laneko is demanding as the price of lifting the supply cut-off, Delphi will not have an adequate remedy of law against Laneko for its breach of the parties' Contracts and April 28, 2005 Agreement.

46.     Delphi's use of the just-in-time and sole-source supply methods make the continuity of Delphi's operations dependent upon Laneko's good-faith continuous delivery of Components until the expiration of the Contracts.

47.     Laneko has no legal basis to cease supplying Delphi with its good faith requirements of the Components prior to the expiration of the Contracts on December 31, 2005 without at least providing Delphi with reasonable notice of its intention to cancel, so that Delphi can secure an alternative supplier without production interruptions -- and then later pursue Laneko for its contract damages.

48.     As set forth in the Affidavit of David L. DeRonne (attached as Exhibit 12), a Laneko supply cut-off on September 1, 2005 will trigger a cascading shut down of factories and idling of workers, starting September 2 at Delphi and September 3 at its Customers' affected plants, costing millions of dollars per day, because Delphi will be unable to secure substitute Components from an alternate supplier in time.

49.     Laneko's refusal to fulfill its obligations under the Contracts will prevent Delphi from fulfilling its contractual obligations to its Customers and will disrupt the

13

employment of thousands of Delphi's and its Customers' workers. It will also cause irreparable harm to Delphi's and its Customers' reputations, and will jeopardize other potential business opportunities between Delphi and its Customers.

## COUNT I – BREACH OF CONTRACT / SPECIFIC PERFORMANCE

50.    Delphi re-alleges each of the preceding paragraphs.

51.    The Contracts are valid and binding, and require Laneko to fulfill Delphi's requirements of the Components until their expiration on December 31, 2005.

52.    Delphi has satisfied all of its obligations to Laneko under the Contracts, while Laneko has breached its contractual obligations to Delphi.

53.    Laneko, in violation of its contractual obligations, is demanding that Delphi pay $1.75 million more for the Components than the prices specified in the Contracts, and has threatened to impose a supply cut-off beginning September 1, 2005, unless Delphi agrees to release its existing contractual rights and submit to Laneko's unilaterally imposed contract terms.

54.    Delphi will be unable to cover in time to avoid the irreparable harm caused by Laneko's breach of contract, because the Components are unique products that are specially manufactured for Delphi and Delphi cannot readily obtain substitutes for the Components from another supplier.

55.    If Laneko does not perform its obligations under the Contracts, Delphi will not have an adequate remedy at law for the harm caused by Laneko's breach, because Laneko has demanded that Delphi release it of its obligations under the parties' existing Contracts as a condition of avoiding a supply cut-off.

14

56.    Such plant shut downs will have an immediate and devastating effect on the local and national economies.

57.    Delphi is entitled to injunctive relief through an order of specific

58.    Performance for the remainder of the Contracts or until such time as Delphi can secure an alternative supplier, inasmuch as the Components are unique specially-manufactured goods without readily obtainable substitutes. MCL § 440.2716.

59.    As a result of Laneko's breach of contract, Delphi will sustain economic damages in excess of $75,000, as detailed above.

WHEREFORE, Delphi requests that this Court order as follows to preserve the status quo:

A.    Temporary, preliminary and permanent mandatory injunctive relief, under Fed. R. Civ. P. 65, preventing Laneko from taking any action inconsistent with its contractual obligations to Delphi;

B.    Temporary, preliminary and permanent mandatory injunctive relief, under Fed. R. Civ. P. 65, requiring Laneko to order raw materials and supply Delphi with the Components until such time as sufficient production volumes of quality substitute parts may be obtained, or until sufficient parts banks are built to allow resourcing without production interruptions.

C.    In addition, or in the alternative, an award of money damages in favor of Delphi sufficient to compensate it for all forms of economic loss, including without limitation, cover damages, incidental damages, consequential damages, lost profits, lost goodwill, and all other costs related to Laneko's breach of contract;

D.    An award of legal fees and other costs arising out of Laneko's failure to perform under the Contracts; and

E.    All such other relief as the Court may deem just, equitable or appropriate under the circumstances.

## COUNT II– ANTICIPATORY REPUDIATION AND REQUIREMENTS CONTRACT

60.    Delphi re-alleges each of the preceding paragraphs.

15

61.    Laneko's oral and written communications that it will no longer honor its contractual obligations to Delphi constitute a blatant, unreasonable and bad faith repudiation of the Contracts and the parties' April 28, 2005 Agreement.

62.    Delphi has sought adequate written assurances from Laneko that it will honor its contractual obligations, but Laneko has persisted in its threats to default under the Contracts and impose a supply cut-off beginning September 1, 2005.

63.    Laneko's failure to perform its contractual obligations will substantially impair the value of the Contracts to Delphi.   Consequently, Laneko has anticipatorily repudiated the Contracts under MCL § 440.2610 and the common law.

64.    In good faith and without unreasonable delay, Delphi has attempted to locate and secure an alternative supply of the Components in substitution for those which are or may become due from Laneko. However, Delphi cannot obtain substitutes for the Components from another supplier in time to avoid plant shut downs, if Laneko is allowed to default on its contractual obligations and impose a supply cut-off on September 1, 2005. (See David L. DeRonne's Affidavit, Exhibit 11).

65.    Delphi is entitled to recover from Laneko the difference between the cost of cover and the contract prices over the terms of the Contracts, together with any incidental or consequential damages allowed by law.  MCL § 440.2712(2).

WHEREFORE, Delphi requests that this Court order as follows to preserve the status quo:

A.    Declaratory relief under Fed. R. Civ. P. 57, 28 USC §2201 and MCL § 600.6419 that Laneko has anticipatorily and in bad faith repudiated its obligations under the Contracts;

B.    Temporary, preliminary and permanent mandatory injunctive relief, under Fed. R. Civ. P. 57, preventing Laneko from taking any action inconsistent with its supply obligations to Delphi;

16

C.   Temporary, preliminary and permanent mandatory injunctive relief, under Fed. R. Civ. P. 57, requiring Lancko to supply Delphi with necessary quantities of the Components to satisfy Delphi's requirements under the Contracts, without the condition that Delphi pay additional charges that exceed the prices specified in the parties' Contracts, until such time as sufficient production volumes of quality (validated) substitute Components may be obtained; or until sufficient parts banks are built to allow resourcing without production interruptions.

D.   In addition, or in the alternative, an award of money damages in favor of Delphi sufficient to compensate it for all forms of economic loss, including without limitation, cover damages, incidental damages, consequential damages, lost profits, lost goodwill, and all other related to Lancko's breach of contract.

E.   An award of legal fees and other costs arising out of Lancko's threatened failure to perform under the Contracts; and

F.   All such other relief as this Court may deem just, equitable or appropriate under the circumstances.

## COUNT III – DECLARATORY RELIEF

66.   Delphi re-alleges each of the preceding paragraphs.

67.   In direct contravention of its contractual obligations, Lancko has threatened to stop ordering raw materials and supplying Delphi with Components at the agreed-upon prices and payment terms in the parties' Contracts, even though Delphi has not breached any of its obligations under the Contracts.

68.   Delphi is entitled to a declaration that it did not breach, and is not currently breaching, any provision of the Contracts.

69.   Delphi is entitled to a declaration that Lancko is obligated to perform all of its obligations and commitments to Delphi under the terms of the parties' Contracts, including the obligation to provide Delphi with its requirements of the Components at the agreed-upon prices and payment terms for the duration of the Contracts.

17

70.     Delphi is entitled to a declaration that Laneko is not entitled to either a retroactive or a prospective price increase, but instead is bound by the fixed prices specified in the Contracts.

71.     Delphi is entitled to a declaration that any unilateral modification of the parties' fixed-price Contracts purporting to provide Laneko with price increases or new payment terms for the Components is unenforceable.

72.     Delphi is entitled to a declaration that Defendant's threatened default on September 1, 2005 is a breach of the parties' Contracts and April 28, 2005 Agreement, entitling Delphi to an award of damages.

73.     An actual controversy now exists between Delphi and Laneko as to the proper interpretation of the Contracts, and it is within the jurisdiction of this Court, under 28 U.S.C. § 2201, Fed. R. Civ. P. 57 and MCL § 600.6419, to render a declaratory judgment as to the parties' respective rights under the Contracts and April 28, 2005 Agreement.

**WHEREFORE**, Delphi requests that this Court order as follows:

A.     A declaration that Delphi performed all of its obligations under the Contracts and April 28, 2005 Agreement;

B.     A declaration that Laneko is obligated to perform all of its obligations and commitments to Delphi under the terms of the Contracts and April 28, 2005 Agreement, including the obligation to supply Delphi's requirements of the Components at the parties' agreed-upon fixed prices for the duration of the Contracts;

C.     A declaration that Laneko is not entitled to either a retroactive or a prospective price increase, but instead is bound by the fixed prices specified in the Contracts;

D.     A declaration that any unilateral attempt at modification of the parties' Contracts to provide Laneko price increases for Components is unenforceable;

18

E.    A declaration that Lancko's threatened default on September 1, 2005 is a breach of the parties' Contracts and April 28, 2005 Agreement, entitling Delphi to an award of damages.

F.    An award of legal fees and other costs arising out of Lancko's failure to perform under the Contract; and

G.    All other such relief as this Court may deem just, equitable or appropriate under the circumstances.

## COUNT IV – BREACH OF IMPLIED OBLIGATION OF GOOD FAITH

74.    Delphi re-alleges each of the preceding paragraphs.

75.    Every Contract involving the sale of goods contains an implied obligation

76.    of good faith. MCL § 440.1203.

77.    Lancko's threatened total cessation of the production and supply of Components to Delphi prior to the expiration of the parties' Contracts on December 31, 2005 is a breach of Lancko's implied obligation of good faith, because Lancko has failed to give Delphi sufficient notice of termination to allow it to re-source the Components in time to avoid supply disruptions and shutdowns of its and its Customers' plants.

78.    As a result of Lancko's breach of its implied obligation of good faith, Delphi will sustain economic damages in excess of $75,000, as detailed above.

WHEREFORE, Delphi requests that this Court order as follows to preserve the status quo:

A.    Declaratory relief under Fed. R. Civ. P. 57, 28 U.S.C. § 2201 and MCL § 600.605 that Lancko has in bad faith repudiated its obligations under the Contracts; and April 28, 2005, 2005 Agreement;

B.    Temporary, preliminary and permanent injunctive relief, under Fed. R. Civ. P. 65, preventing Lancko from taking any action inconsistent with its supply obligations to Delphi;

19

C.       Temporary, preliminary and permanent mandatory injunctive relief, under Fed. R. Civ. P. 65, requiring Lancko to order raw materials and supply Delphi with necessary quantities of the Components to satisfy Delphi's requirements under the Contracts, without the condition that Delphi pay additional charges that exceed the prices specified in the Contracts, until such time as sufficient production volumes of quality (validated) substitute parts may be obtained, or until sufficient parts banks are built to allow resourcing without production interruptions.

D.       In addition, or in the alternative, an award of money damages in favor of Delphi sufficient to compensate it for all forms of economic loss, including, without limitation, cover damages, incidental damages, consequential damages, lost profits, lost goodwill, and other costs incident to having to re-source the Contracts;

E.       An award of legal fees and other costs arising out of Lancko's failure to perform under the Contracts; and

F.       All such other relief as this Court may deem just, equitable or appropriate under the circumstances.

Respectfully submitted,

By: _____

James G. Derian (P33580)
Brent W. Warner (P67733)
Butzel Long, P.C.
Attorneys for Plaintiff
100 Bloomfield Hills Pkwy., Ste. 200
Bloomfield Hills, MI 48304
(248) 258-1616

By: _____

Charles E. Brown (P46400)
Delphi Automotive Systems
Co-Counsel for Plaintiff
5825 Delphi Drive
Troy, MI 48098-2815
(248) 813-3368

Date: August 17, 2005

## VERIFICATION OF COMPLAINT

STATE OF MICHIGAN     )
                              ) SS

COUNTY OF OAKLAND    )

       I, David L. DeRonne, having first been duly sworn, depose and state that I have read the foregoing Verified Complaint for Specific Performance, Declaratory Relief and Money Damages, and verify that the facts stated therein are true and accurate to the best of my knowledge, information and belief.

                             David L. DeRonne
                             Senior Buyer, Global Supply Management
                             Thermal & Interior Systems
                             Delphi Automotive Systems, LLC

The signator is known to me and acknowledged the foregoing instrument this 17th day of August, 2005.

Sarah A. Berlin , Notary Public
Oakland County, Michigan,
My Commission Expires: 9-10-2010

620136

SARAH A. BERLIN
NOTARY PUBLIC, STATE OF MI
COUNTY OF OAKLAND
MY COMMISSION EXPIRES Sep 10, 2010
ACTING IN COUNTY OF Oakland

21

08/08/05  08:56 FAX   2:05-cv-73193-RHC-WC   Doc #:1   Filed 08/17/05   Pg 23 of 50   Pg ID 23   ☒004
DELPHI AUTOMOTIVE

# DELPHI

Delphi Thermal and Interior

Page 1 of 4

**Buyer:**

DELPHI
SAFETY & INTERIOR SYSTEMS
1401 CROOKS RD.
TROY MI 48084-7106

**Requirements Contract**

| PO Number | Date Issued |
|---|---|
| 550022726 | 01-Jan-2003 |
| Version | |
| 08-Aug-2005  08:10:21 | |

**Deliver to:**

DELPHI S&I COLUMBUS
FRANKLIN 200 GEORGESVILLE ROAD
COLUMBUS OH 43228

LANEKO ENGINEERING INC
275 NEW JERSEY DR
FORT WASHINGTON PA 19034-2603

Vendor No:  1008806
DUNS No:   002263069

**Payment Terms:  2CAD**          **Currency:  USD**

**Incoterms:  FOB FREIGHT COLLECT**

| Item No. | Material No. Description | Plant | | | | |
|---|---|---|---|---|---|---|
| 00010 | 16640585 | RD01 DELPHI T & I COLUMBUS | | | | |
| | FRAME-CINCHING ACTUATOR | | | | | |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 01-Jan-2003 | 31-Dec-2005 | USD | 870.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

| Item No. | Material No. Description | Plant | | | | |
|---|---|---|---|---|---|---|
| 00040 | 16872545 | RD01 DELPHI T & I COLUMBUS | | | | |
| | MOUNTING PLATE UNLAT ACTR L/GATE | | | | | |
| | ADDING PART MISSED FROM PROBE CARRYOVER | | | | | |
| | ADDING PART MISSED FROM PROBE CARRYOVER | | | | | |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 01-Jan-2003 | 30-Apr-2005 | USD | 420.00 | 1,000 | PC |
| 01-May-2005 | 31-Dec-2005 | USD | 460.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

| Item No. | Material No. Description | Plant | |
|---|---|---|---|
| 00030 | 16872550 | RD01 DELPHI T & I COLUMBUS | |
| | B/CRANK LEVER UNLAT ACTR L/GATE | | |
| | ADDING PARTS MISSED FROM PROBE CARRYOVER | | |
| | ADDING PARTS MISSED FROM PROBE CARRYOVER | | |

Purchasing Contact: DeRonne, David                    Contact Address:
Phone:  248-655-8820
Fax:  248-655-8360

Date and Time Printed:  08-Aug-2005  08:10:21



# DELPHI

Delphi Thermal and Interior

Page 2 of 4

| LANEKO ENGINEERING INC<br>275 NEW JERSEY DR<br>FORT WASHINGTON PA 19034-2603 | **Requirements Contract** | |
|---|---|---|
| | PO Number<br>550022726<br>Version<br>08-Aug-2005  08:10:21 | Date Issued<br>01-Jan-2003 |

| Item No. | Material No.<br>Description | | | Plant | | |
|---|---|---|---|---|---|---|

| | Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|---|
| | 01-Jan-2003 | 30-Apr-2005 | USD | 195.00 | 1,000 | PC |
| | 01-May-2005 | 31-Dec-2005 | USD | 340.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

| 00020 | 16872555 | | | RD01 DELPHI T & I COLUMBUS |
|---|---|---|---|---|

**MAIN FRAME-CINCHING/UNLATCH ACTUATORS**
ADDING PARTS MISSED FROM PROBE CARRYOVER
ADDING PARTS MISSED FROM PROBE CARRYOVER

| | Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|---|
| | 01-Jan-2003 | 30-Apr-2005 | USD | 950.00 | 1,000 | PC |
| | 01-May-2005 | 31-Dec-2005 | USD | 1,670.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

**Notes:**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# DELPHI

Delphi Thermal and Interior

Page 3 of 4

LANEKO ENGINEERING INC
275 NEW JERSEY DR
FORT WASHINGTON PA 19034-2603

**Requirements Contract**

PO Number                                    Date Issued
550022726                                    01-Jan-2003
Version
08-Aug-2005  08:10:21

| Item No. | Material No. Description | | | Plant | |
|---|---|---|---|---|---|

**Notes Continued**

Seller acknowledges and agrees that Buyer's General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions is available upon written request to Buyer or via the internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.
********************************************************************************************

********************
Title to goods shall transfer from seller to buyer upon arrival at buyer's consuming plant.
********************

********************************************************************************************
Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).

********************************************************************************************
Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

********************************************************************************************
Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredient Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

********************************************************************************************

# DELPHI

_____ Delphi Thermal and Interior

Page  4  of 4

LANEKO ENGINEERING INC
275 NEW JERSEY DR
FORT WASHINGTON  PA  19034-2603

### Requirements Contract

| | |
|---|---|
| PO Number | Date Issued |
| 550022726 | 01-Jan-2003 |
| Version | |
| 08-Aug-2005  08:10:21 | |

**Item No.   Material No.   Plant**
**Description**

**Notes Continued**

Seller acknowledges and agrees that Buyer's General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions is available upon written request to Buyer or via the internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.
**********************************************************************************

********************
Title to goods shall transfer from seller to buyer upon arrival at buyer's consuming plant.
********************

08/08/05   09:03 FAX               DELPHI AUTOMOTIVE                      ☑017

# DELPHI
_____   Delphi Thermal and Interior

Page  1  of  4

| Buyer: | Requirements Contract |
|---|---|

**Buyer:**
DELPHI
SAFETY & INTERIOR SYSTEMS
1401 CROOKS RD.
TROY MI 48084-7106

**Requirements Contract**

| PO Number | Date Issued |
|---|---|
| 550022727 | 01-Jan-2003 |

Version
08-Aug-2005  08:13:50

**Deliver to:**
DELPHI T & I CMM 1&2
Ave Michigan Y Prolongacion Union C
87310 MATAMOROS
MEXICO

LANEKO ENGINEERING INC
275 NEW JERSEY DR
FORT WASHINGTON PA 19034-2603

Vendor No:  1008806
DUNS No:  002263069

**Payment Terms:**  ZCAD          **Currency:**  USD

**Incoterms:**  FOB FREIGHT COLLECT

| Item No. | Material No. Description | Plant |
|---|---|---|
| 00020 | 16642777 FRAME LH | RH01 DELPHI T & I CMM 1&2 |

CHANGE TO DEPOR PLATING. REF: T/L 1-9-0

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 01-Jan-2003 | 23-May-2004 | USD | 335.00 | 1,000 | PC |
| 24-May-2004 | 30-Apr-2005 | USD | 425.00 | 1,000 | PC |
| 01-May-2005 | 31-Dec-2005 | USD | 710.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

| 00030 | 16642890 FRAME-FASTENER | RH01 DELPHI T & I CMM 1&2 |
|---|---|---|

ADD COST OF BLACK FINISH. REF. T/L 5/28/03 - E/C #007

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 01-Jan-2003 | 16-Jul-2003 | USD | 335.00 | 1,000 | PC |
| 17-Jul-2003 | 30-Apr-2005 | USD | 527.00 | 1,000 | PC |
| 01-May-2005 | 31-Dec-2005 | USD | 810.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

| 00010 | 16642891 FRAME-FASTENER | RH01 DELPHI T & I CMM 1&2 |
|---|---|---|

ADD COST FOR BLACK FINISH. REF T/L 5/28/03. E/C # 007

Purchasing Contact: DeRonne, David                 Contact Address:
Phone:  248-655-8820
Fax:  248-655-8360

Date and Time Printed:  08-Aug-2005  08:13:50

08/08/05  09:04 FAX    2:05-cv-73193-RHC-WC  Doc # 1  Filed 08/17/05  Pg 28 of 50  Pg ID 28    DELPHI AUTOMOTIVE    ☒018

# DELPHI



Delphi Thermal and Interior

Page  2  of  4

LANEKO ENGINEERING INC
275 NEW JERSEY DR
FORT WASHINGTON PA 19034-2603

## Requirements Contract

PO Number
550022727
Version
08-Aug-2005  08:13:50

Date Issued
01-Jan-2003

| Item No. | Material No. Description | | Plant | | | |
|---|---|---|---|---|---|---|
| | Valid From | Valid To | Currency | Price | Price Unit | UOM |
| | 01-Jan-2003 | 16-Jul-2003 | USD | 335.00 | 1,000 | PC |
| | 17-Jul-2003 | 30-Apr-2005 | USD | 527.00 | 1,000 | PC |
| | 01-May-2005 | 31-Dec-2005 | USD | 810.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

## Notes:

Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).

Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

Seller acknowledges and agrees that Buyer's General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions is available upon written request to Buyer or via the internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept

# DELPHI

Delphi Thermal and Interior

Page  3  of  4

LANEKO ENGINEERING INC
275 NEW JERSEY DR
FORT WASHINGTON PA 19034-2603

## Requirements Contract

| PO Number | Date Issued |
|---|---|
| 550022727 | 01-Jan-2003 |
| Version | |
| 08-Aug-2005  08:13:50 | |

| Item No. | Material No. Description | Plant |
|---|---|---|

## Notes Continued

any such proposals in writing.

*********************

Title to goods shall transfer from seller to buyer upon arrival at buyer's consuming plant.

Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).

Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

Restricted, toxic, and hazardous materials – Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

Seller acknowledges and agrees that Buyer's General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions is available upon written request to Buyer or via the Internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept

# DELPHI

_____Delphi Thermal and Interior

Page  4  of  4

| LANEKO ENGINEERING INC<br>275 NEW JERSEY DR<br>FORT WASHINGTON PA 19034-2603 | Requirements Contract<br><br>PO Number                          Date Issued<br>550022727                        01-Jan-2003<br>Version<br>08-Aug-2005  08:13:50 |
|---|---|

| Item No.   Material No.<br>Description | Plant |
|---|---|

**Notes Continued**

any such proposals in writing.
**************************************************************************************

**********************
Title to goods shall transfer from seller to buyer upon arrival at buyer's consuming plant.
**********************

2:05-cv-73193-RHC-WC   Doc # 1   Filed 08/17/05   Pg 31 of 50   Pg ID 31

08/08/05   08:55 FAX               DELPHI AUTOMOTIVE                              ☑001

# DELPHI

Delphi Thermal and Interior

Page  1  of  3

**Buyer:**

DELPHI
SAFETY & INTERIOR SYSTEMS
1401 CROOKS RD.
TROY MI 48084-7106

**Requirements Contract**

| PO Number | Date Issued |
|---|---|
| 550023480 | 01-Nov-2002 |

Version
08-Aug-2005  08:09:20

LANEKO ENGINEERING INC
275 NEW JERSEY DR
FORT WASHINGTON PA 19034-2603

Vendor No:  1008806
DUNS No:   002263069

**Payment Terms: 2CAD**       **Currency:  USD**

**Incoterms:  FOB FREIGHT COLLECT**

| Item No. | Material No. Description | Plant |  |  |  |
|---|---|---|---|---|---|
| 00020 | 16640478 SHIM-P/U COVER STRIKER | RD01 DELPHI T & I COLUMBUS |  |  |  |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 01-Jan-2003 | 31-Dec-2005 | USD | 307.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

| Item No. | Material No. Description | Plant |  |  |  |
|---|---|---|---|---|---|
| 00040 | 16641264 SPACER-LIFT ASM TO P/U BOX COVER | RD01 DELPHI T & I COLUMBUS |  |  |  |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 01-Jan-2003 | 31-Dec-2005 | USD | 660.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

| Item No. | Material No. Description | Plant |  |  |  |
|---|---|---|---|---|---|
| 00010 | 16641700 FRAME | RD01 DELPHI T & I COLUMBUS |  |  |  |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 01-Nov-2002 | 30-Apr-2005 | USD | 750.00 | 1,000 | PC |
| 01-May-2005 | 31-Dec-2005 | USD | 1,690.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

| Item No. | Material No. Description | Plant |
|---|---|---|
| 00030 | 16642026 STRIKER-P/U BOX COVER | RD01 DELPHI T & I COLUMBUS |

Purchasing Contact: DeRonne, David                Contact Address:
Phone:  248-655-8820
Fax:   248-655-8360

Date and Time Printed:  08-Aug-2005  08:09:20

08/08/05  08:35 FAX  2:05-cv-73193-RHC-WC   Doc # 1   Filed 08/17/05   Pg 32 of 50   Pg ID 32   ☑002
DELPHI AUTOMOTIVE

# DELPHI
_____

Delphi Thermal and Interior

Page  2  of 3

LANEKO ENGINEERING INC
275 NEW JERSEY DR
FORT WASHINGTON PA 19034-2603

## Requirements Contract

PO Number                                    Date Issued
550023480                                    01–Nov–2002
Version
08–Aug–2005  08:09:20

| Item No. | Material No. Description | | Plant | | | |
|----------|--------------------------|--|-------|--|--|--|

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|------------|----------|----------|-------|------------|-----|
| 01–Jan–2003 | 31–Dec–2005 | USD | 2,700.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

00050    16643596                          RD01 DELPHI T & I COLUMBUS
         PLATE
         CORRECTING PRICE - REF. T/L/ 5/30/2002

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|------------|----------|----------|-------|------------|-----|
| 01–Jan–2003 | 30–Apr–2005 | USD | 400.00 | 1,000 | PC |
| 01–May–2005 | 31–Dec–2005 | USD | 500.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

## Notes

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●
Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●
Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●
Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●
Seller acknowledges and agrees that Buyer's General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written

08/08/05    08:36 FAX    2:05-cv-73193-RHC-WC    Doc # 1    Filed 08/17/05    Pg 33 of 50    Pg ID 33    ☑003
DELPHI AUTOMOTIVE

# DELPHI

Delphi Thermal and Interior

Page  3  of  3

| | |
|---|---|
| LANEKO ENGINEERING INC<br>275 NEW JERSEY DR<br>FORT WASHINGTON PA 19034-2603 | **Requirements Contract**<br><br>PO Number 550023480    Date Issued 01-Nov-2002<br>Version<br>08-Aug-2005  08:09:20 |

| Item No. | Material No.<br>Description | Plant | |
|---|---|---|---|

**Notes Continued:**

form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions is available upon written request to Buyer or via the internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.
*********************************************************************************

*****************
Title to goods shall transfer from seller to buyer upon arrival at buyer's consuming plant.
*****************

08/08/05   08:58 FAX      2:05-cv-73193-RHC-WC   Doc # 1   Filed 08/17/05   Pg 34 of 50   Pg ID 34
                          DELPHI AUTOMOTIVE                                         ☑008

# DELPHI

Delphi Thermal and Interior

Page  1  of 2

**Buyer:**

DELPHI
SAFETY & INTERIOR SYSTEMS
1401 CROOKS RD.
TROY MI 48084-7106

**Deliver to:**

DELPHI S&I VANDALIA
250 NORTHWOODS BLVD
VANDALIA OH 45377

LANEKO ENGINEERING INC
275 NEW JERSEY DR
FORT WASHINGTON PA 19034-2603

**Requirements Contract**

| | |
|---|---|
| PO Number | Date Issued |
| 550023542 | 01-Nov-2002 |
| Version | |
| 08-Aug-2005  08:11:09 | |

Vendor No:  1008806
DUNS No:   002263069

Payment Terms:  Z0AD          Currency:  USD

Incoterms:  FOB FREIGHT COLLECT

| Item No. | Material No. Description | Plant | | | |
|---|---|---|---|---|---|
| 00010 | 16642468 CHANNEL | RT01 DELPHI T & I VANDALIA | | | |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 01-Nov-2002 | 31-Dec-2003 | USD | 1,290.00 | 1,000 | PC |
| 01-Jan-2004 | 30-Apr-2005 | USD | 1,290.00 | 1,000 | PC |
| 01-May-2005 | 31-Dec-2005 | USD | 3,030.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

**Notes:**

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••
Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the
Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••
Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process
(SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and

Purchasing Contact: DeRonne, David          Contact Address:
Phone:  248-655-8820
Fax:  248-655-8360

Date and Time Printed:  08-Aug-2005 08:11:09

# DELPHI

Delphi Thermal and Interior

Page 2 of 2

LANEKO ENGINEERING INC
275 NEW JERSEY DR
FORT WASHINGTON PA 19034-2603

## Requirements Contract

| PO Number | Date Issued |
|---|---|
| 550023542 | 01-Nov-2002 |
| Version | |
| 08-Aug-2005  08:11:09 | |

| Item No. | Material No. Description | Plant |
|---|---|---|

## Notes Continued

the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

********************************************

Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

********************************************

Seller acknowledges and agrees that Buyer's General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions is available upon written request to Buyer or via the Internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

********************************************

*******************
Title to goods shall transfer from seller to buyer upon arrival at buyer's consuming plant.
*******************

# DELPHI

Delphi Thermal and Interior

Page   1   of   2

**Buyer:**
DELPHI
SAFETY & INTERIOR SYSTEMS
1401 CROOKS RD.
TROY MI 48084-7106

**Deliver to:**
DELPHI T & I CMM 1&2
Ave Michigan Y Prolongacion Union C
87310 MATAMOROS
MEXICO

LANEKO ENGINEERING INC
275 NEW JERSEY DR
PORT WASHINGTON PA 19034-2603

**Requirements Contract**

| PO Number | Date Issued |
|---|---|
| 550023555 | 01-Nov-2002 |
| Version | |
| 08-Aug-2005  08:12:01 | |

Vendor No:   1008806
DUNS No:   002263069

**Payment Terms:  2CAD        Currency:  USD**

**Incoterms:  FOB FREIGHT COLLECT**

| Item No. | Material No. / Description | Plant | | | | |
|---|---|---|---|---|---|---|
| 00010 | 16642770 | RH01 DELPHI T & I CMM 1&2 | | | | |
| | BACKPLATE RH | | | | | |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 01-Nov-2002 | 31-Dec-2005 | USD | 220.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

| Item No. | Material No. / Description | Plant | | | | |
|---|---|---|---|---|---|---|
| 00020 | 16644860 | RH01 DELPHI T & I CMM 1&2 | | | | |
| | BACKPLATE RH | | | | | |
| | REPLACES 16642770 | | | | | |
| | REPLACES 16642770 | | | | | |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 17-Apr-2003 | 30-Apr-2005 | USD | 220.00 | 1,000 | PC |
| 01-May-2005 | 31-Dec-2005 | USD | 430.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

**Notes:**

Purchasing Contact: DeRonne, David          Contact Address:
Phone:  248-655-8820
Fax:   248-655-8360

Date and Time Printed:  08-Aug-2005 08:12:01

08/08/05   09:00 FAX     2:05-cv-73193-RHC-WC   Doc # 1   Filed 08/17/05   Pg 37 of 50   Pg ID 37   @011
DELPHI AUTOMOTIVE

# DELPHI

Delphi Thermal and Interior

Page  2  of  2

LANEKO ENGINEERING INC
275 NEW JERSEY DR
FORT WASHINGTON PA 19034-2603

## Requirements Contract

| PO Number | Date Issued |
|---|---|
| 550023555 | 01-Nov-2002 |
| Version | |
| 08-Aug-2005  08:12:01 | |

| Item No. | Material No. Description | Plant |
|---|---|---|

## Notes Continued:

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●
Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●
Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●
Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities.  If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division.  Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI).  To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material.  EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●
Seller acknowledges and agrees that Buyer's General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract").  A copy of Buyer's General Terms and Conditions is available upon written request to Buyer or via the internet at Delphi's website, delphi.com.  Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions.  If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions in their entirety without modification.  Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.
●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●

●●●●●●●●●●●●●●●●●●●●●
Title to goods shall transfer from seller to buyer upon arrival at buyer's consuming plant.
●●●●●●●●●●●●●●●●●●●●●

# DELPHI

Delphi Thermal and Interior

Page  1  of  3

**Buyer:**
DELPHI
SAFETY & INTERIOR SYSTEMS
1401 CROOKS RD.
TROY  MI  48084-7106

**Requirements Contract**

| | |
|---|---|
| PO Number | Date Issued |
| 550023556 | 01-Nov-2002 |
| Version | |
| 08-Aug-2005  08:12:36 | |

**Deliver to:**
DELPHI T & I CMM 1&2
Ave Michigan Y Prolongacion Union C
87310 MATAMOROS
MEXICO

LANEKO ENGINEERING INC
275 NEW JERSEY DR
FORT WASHINGTON PA 19034-2603

Vendor No:   1008806
DUNS No:    002263069

Payment Terms:  2CAD          Currency:  USD

Incoterms:  FOB FREIGHT COLLECT

| Item No. | Material No. Description | Plant |
|---|---|---|
| 00010 | 16642771 BACKPLATE LH | RH01 DELPHI T & I CMM 1&2 |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 01-Nov-2002 | 31-Dec-2005 | USD | 220.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

| Item No. | Material No. Description | Plant |
|---|---|---|
| 00020 | 16644861 BACKPLATE LH REPLACES 16642771 REPLACES 16642771 | RH01 DELPHI T & I CMM 1&2 |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 17-Apr-2003 | 30-Apr-2005 | USD | 220.00 | 1,000 | PC |
| 01-May-2005 | 31-Dec-2005 | USD | 430.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

| Item No. | Material No. Description | Plant |
|---|---|---|
| 00030 | 16888946 FRAME, 3 FASTENER REPLACES 16642776 | RH01 DELPHI T & I CMM 1&2 |

Purchasing Contact: DeRonne, David                    Contact Address:
Phone:  248-655-8820
Fax:  248-655-8360

Date and Time Printed:  08-Aug-2005  08:12:36



08/08/05  09:01 FAX  2:05-cv-73193-RHC-WC    Doc # 1    Filed 08/17/05    Pg 39 of 50    Pg ID 39
DELPHI AUTOMOTIVE    ☒013

# DELPHI

Delphi Thermal and Interior

Page  2  of  3

LANEKO ENGINEERING INC
275 NEW JERSEY DR
FORT WASHINGTON PA 19034-2603

## Requirements Contract

PO Number                                    Date Issued
550023556                                    01-Nov-2002
Version
08-Aug-2005  08:12:36

| Item No. | Material No. Description | | Plant | | | |
|---|---|---|---|---|---|---|
| | **Valid From** | **Valid To** | **Currency** | **Price** | **Price Unit** | **UOM** |
| | 01-Apr-2005 | 30-Apr-2005 | USD | 425.00 | 1,000 | PC |
| | 01-May-2005 | 31-Dec-2005 | USD | 710.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

| 00040 | 16888947 | | RH01 DELPHI T & I CMM 1&2 | | | |
|---|---|---|---|---|---|---|
| | FRM ASM-MOUNTING DR LAT | | | | | |
| | REPLACES 16642777 | | | | | |
| | **Valid From** | **Valid To** | **Currency** | **Price** | **Price Unit** | **UOM** |
| | 01-Apr-2005 | 30-Apr-2005 | USD | 425.00 | 1,000 | PC |
| | 01-May-2005 | 31-Dec-2005 | USD | 710.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

## Notes

**********************
Title to goods shall transfer from seller to buyer upon arrival at buyer's consuming plant.
**********************

**************************************************************
Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).

**************************************************************
Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

**************************************************************
Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

08/08/05    09:52 FAX    2:05-cv-73193-RHC-WC    Doc # 1    Filed 08/17/05    Pg 40 of 50    Pg ID 40    ☑014
DELPHI AUTOMOTIVE

# DELPHI

Delphi Thermal and Interior

Page 3 of 3

LANEKO ENGINEERING INC
275 NEW JERSEY DR
FORT WASHINGTON PA 19034-2603

## Requirements Contract

| PO Number | Date Issued |
|---|---|
| 550023556 | 01-Nov-2002 |
| Version | |
| 08-Aug-2005  08:12:36 | |

| Item No. | Material No. Description | Plant |
|---|---|---|

## Notes Continued

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Seller acknowledges and agrees that Buyer's General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions is available upon written request to Buyer or via the Internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# DELPHI

Delphi Thermal and Interior

Page  1  of  2

**Buyer:**

DELPHI
SAFETY & INTERIOR SYSTEMS
1401 CROOKS RD.
TROY MI 48084-7106

**Requirements Contract**

| PO Number | Date Issued |
|---|---|
| 550023557 | 01-Nov-2002 |
| Version | |
| 08-Aug-2005  08:13:06 | |

**Deliver to:**

DELPHI T & I CMM 1&2
Ave Michigan Y Prolongacion Union C
87310 MATAMOROS
MEXICO

Vendor No:  1008806
DUNS No:  002263069

LANEKO ENGINEERING INC
275 NEW JERSEY DR
FORT WASHINGTON PA 19034-2603

Payment Terms:  ZCAD          Currency:  USD

Incoterms:  FOB FREIGHT COLLECT

| Item No. | Material No. Description | | Plant | | |
|---|---|---|---|---|---|
| 00010 | 16642776 | | RH01 DELPHI T & I CMM 1&2 | | |
| | FRAME RH - 3 FASTENER | | | | |
| | CHANGE TO DECOR PLATING. REP. 7/L 1-9-04. | | | | |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 01-Nov-2002 | 23-May-2004 | USD | 335.00 | 1,000 | PC |
| 24-May-2004 | 30-Apr-2005 | USD | 425.00 | 1,000 | PC |
| 01-May-2005 | 31-Dec-2005 | USD | 710.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

**Notes:**

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●
Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●
Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process

Purchasing Contact: DeRonne, David          Contact Address:

Phone:  248-655-8820

Fax:  248-655-8360

Date and Time Printed:  08-Aug-2005  08:13:06

# DELPHI

Delphi Thermal and Interior

Page 2 of 2

| LANEKO ENGINEERING INC<br>275 NEW JERSEY DR<br>FORT WASHINGTON PA 19034-2603 | Requirements Contract |  |
|---|---|---|
| | PO Number<br>550023557<br>Version<br>08-Aug-2005  08:13:06 | Date Issued<br>01-Nov-2002 |

| Item No. | Material No.<br>Description | Plant |
|---|---|---|
| | | |

### Notes Continued

(SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

••••••••••••••••••••••••••••••••••••••••••••••••••••••••

Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

••••••••••••••••••••••••••••••••••••••••••••••••••••••••

Seller acknowledges and agrees that Buyer's General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions is available upon written request to Buyer or via the Internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

••••••••••••••••••••••••••••••••••••••••••••••••••••••••

••••••••••••••••••••••
Title to goods shall transfer from seller to buyer upon arrival at buyer's consuming plant.
••••••••••••••••••••••

08/15/05    2:05-cv-73193-RHC-WC    Doc # 1    Filed 08/17/05    Pg 43 of 50    Pg ID 43
          11:46 FAX                     DELPHI AUTOMOTIVE                                ☑001

# DELPHI

Delphi Thermal and Interior

Page 1 of 2

**Buyer:**

DELPHI
SAFETY & INTERIOR SYSTEMS
1401 CROOKS RD.
TROY MI 48084-7106

**Requirements Contract**

PO Number
550057104
Version
15-Aug-2005 11:32:03

Date Issued
09-Jul-2004

**Deliver to:**

DELPHI T & I COLUMBUS
200 Georgesville Road
COLUMBUS OH 43228

LANEKO ENGINEERING INC
275 NEW JERSEY DR
FORT WASHINGTON PA 19034-2603

Vendor No:  1008806
DUNS No:  002263069

**Payment Terms**  ZMN2                **Currency**  USD

Payment settled on 2nd, 2nd Month

**Incoterms**  FOB FREIGHT COLLECT

| Item No. | Material No. Description | Plant |
|----------|--------------------------|-------|
| 00010 | PR12678<br>SPR F/D LK REM LVR | KD01 DELPHI T & I COLUMBUS |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|------------|----------|----------|-------|------------|-----|
| 09-Jul-2004 | 31-Dec-2005 | USD | 7.50 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

**Notes:**

*********************************************************************************
Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).

*********************************************************************************
Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

Purchasing Contact: DeRonne, David
Phone: 248-655-8820
Fax:  248-655-8360

Contact Address:

Date and Time Printed:  15-Aug-2005 11:32:03

# DELPHI

Delphi Thermal and Interior

Page 2 of 2

LANEKO ENGINEERING INC
275 NEW JERSEY DR
FORT WASHINGTON PA 19034-2603

## Requirements Contract

PO Number                                    Date Issued
550057104                                    09-Jul-2004
Version
15-Aug-2005  11:32:03

| Item No. | Material No. Description | Plant |
|---|---|---|

## Notes Continued

**************************************************

Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

**************************************************

Seller acknowledges and agrees that Buyer's General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions is available upon written request to Buyer or via the Internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.
**************************************************

**************************
Title to goods shall transfer from seller to buyer upon arrival at buyer's consuming plant.
**************************



Effective March 2004

## DELPHI CORPORATION

## GENERAL TERMS AND CONDITIONS

## 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document, whether expressed in written form, by electronic data interchange or other tangible format, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). Seller acknowledges and agrees that it has read and understands these General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that an authorized employee of Buyer expressly agrees to accept any such proposals in writing.

## 2. SHIPPING AND BILLING

2.1 Shipping. Seller will (a) properly pack, mark and, ship goods as instructed by Buyer or any carriers and in accordance with any applicable laws or regulations, (b) route shipments as Buyer instructs, (c) not charge for costs relating to handling, packaging, storage or transportation (including duties, taxes, fees, etc.) unless otherwise expressly stated in this Contract, (d) provide packing slips with each shipment that identify Buyer's contract and release number and the date of the shipment, and (e) promptly forward the original bill of lading or other shipping receipt with respect to each shipment as Buyer instructs. Seller will include on bills of lading or other shipping receipts the correct classification identification of the goods shipped as Buyer or the carrier requires. The marks on each package and identification of the goods on packing slips, bills of lading and invoices must enable Buyer to easily identify the goods.

2.2 Billing. Seller will (a) accept payment based upon Buyer's Evaluated Receipt Record/Self-Billed Invoice unless Buyer requests that Seller issue and deliver an invoice and (b) accept payment by electronic funds transfer. If the payment due date is not otherwise specified in this Contract, the payment due date will be the due date established by the Multilateral Netting System (MNS-2) used by Buyer, which provides, on average, that payment will be due on the second day of the second month following the date Buyer receives the goods or services. Buyer may withhold payment for any goods or services until Buyer receives evidence, in such form and detail as Buyer requires, of the absence of any liens, encumbrances and claims on such goods or services.

2.3 Taxes. Unless otherwise stated in this Contract, the price includes all applicable federal, state, provincial, and local taxes other than sales, value added, or similar turnover taxes or charges. Seller will separately invoice Buyer for any sales, value added, or similar turnover taxes or charges that Seller is required by law to collect from Buyer. Seller will provide Buyer with whatever information and documentation that is required under local law in order to enable Buyer to recover any sales, value added, or similar turnover taxes or charges. Invoices shall also be in the appropriate form as required by local law to permit deduction of payments for income tax purposes by the Buyer.

2.4 Withholding of Taxes by Buyer. If Buyer is required by law to make any deduction or withholding from any sum otherwise payable to Seller under this Contract, Buyer shall be entitled to deduct or withhold such amount and effect payment thereof to the applicable tax authority. Buyer will, upon request from Seller, provide Seller official tax receipts or other evidence issued by the applicable tax authorities sufficient to establish that any taxes which are withheld have been paid.

1

**Effective March 2004**

2.5 <u>Delivery Schedules</u>. Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract. Time is of the essence with respect to all delivery schedules Buyer establishes. Buyer will not be required to pay for any goods that exceed the quantities specified in Buyer's delivery schedules or to accept goods that are delivered in advance of the delivery date specified in Buyer's delivery schedules. Seller bears the risk of loss of all goods delivered in advance of the delivery date specified in Buyer's delivery schedules. If the requirements of Buyer's customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other compensation.

2.6 <u>Premium Shipments</u>. If Seller fails to have goods ready for shipment in time to meet Buyer's delivery schedules using the method of transportation originally specified by Buyer and, as a result, Buyer requires Seller to ship the goods using a premium (more expeditious) method of transportation, Seller will ship the goods as expeditiously as possible. Seller will pay, and be responsible for, the entire cost of such premium shipment, unless Buyer's actions caused Seller to fail to meet Buyer's delivery schedules, in which case Buyer will pay any costs for premium shipment.

2.7 <u>Volume Forecasts</u>. Buyer may provide Seller with estimates, forecasts or projections of its future anticipated volume or quantity requirements for goods. Seller acknowledges that any such forecasts are provided for informational purposes only and, like any other forward looking projections, are based on a number of economic and business factors, variables and assumptions, some or all of which may change over time. Buyer makes no representation, warranty, guaranty or commitment of any kind or nature, express or implied, regarding any such forecasts provided to Seller, including with respect to the accuracy or completeness of such forecasts.

## 3. SPECIFICATION, DESIGN AND SCOPE CHANGES

Buyer may at any time require Seller to implement changes to the specifications or design of the goods or to the scope of any services or work covered by this Contract, including work related to inspection, testing or quality control. While Buyer will endeavor to discuss any such changes with Seller as early as practical, Seller will promptly implement such changes. Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes, including Buyer's payment of reasonable costs of modifications to Seller's Equipment (as defined in Article 16) necessary to implement such changes. In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller will, as requested, provide information to Buyer, including documentation of changes in Seller's cost of production and the time to implement such changes. In the event of any disagreement arising out of such changes, Buyer and Seller will work to resolve the disagreement in good faith, provided, however, that Seller will continue performing under this Contract, including the manufacture and delivery of goods and prompt implementation of changes required by Buyer, while Buyer and Seller resolve any disagreement arising out of such changes.

## 4. QUALITY AND INSPECTION

Seller will participate in Buyer's supplier quality and development program(s) and comply with all engineering release and validation requirements and procedures, including Buyer's production part approval processes, which Buyer specifies from time to time. Seller will permit Buyer and its representatives and consultants to enter Seller's facilities at reasonable times to inspect such facilities and any goods, inventories, work-in-process, materials, machinery, equipment, tooling, fixtures, gauges and other items and processes related to Seller's performance of this Contract. No such inspection by Buyer will constitute acceptance by Buyer of any work-in-process or finished goods.

## 5. NON-CONFORMING GOODS

2

Effective March 2004

Buyer is not required to perform incoming inspections of any goods, and Seller waives any right to require Buyer to conduct any such inspections. Seller will not substitute any goods for the goods covered by this Contract unless Buyer consents in writing. If Buyer rejects any goods as non-conforming, Buyer may, at its option, (a) reduce the quantities of goods ordered under this Contract by the quantity of non-conforming goods, (b) require Seller to replace the non-conforming goods, and/or (c) exercise any other applicable rights or remedies. If Seller fails to inform Buyer in writing of the manner in which Seller desires that Buyer dispose of non-conforming goods within forty-eight (48) hours of notice of Buyer's rejection of non-conforming goods (or such shorter period as is reasonable under the circumstances), Buyer will be entitled to dispose of the non-conforming goods without liability to Seller, provided, however, that in any event Buyer may elect to arrange for the shipment of any non-conforming goods back to Seller at Seller's expense. Seller will bear all risk of loss with respect to all non-conforming goods and will promptly pay or reimburse all costs incurred by Buyer to return, store or dispose any non-conforming goods. Buyer's payment for any non-conforming goods will not constitute acceptance by Buyer, limit or impair Buyer's right to exercise any rights or remedies, or relieve Seller of responsibility for the non-conforming goods.

## 6. FORCE MAJEURE

If Seller is unable to produce, sell or deliver any goods or services covered by this Contract, or Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract, as a result of an event or occurrence beyond the reasonable control of the affected party and without such party's fault or negligence, then any delay or failure to perform under this Contract that results from such event or occurrence will be excused for only so long as such event or occurrence continues, provided, however, that the affected party gives written notice of each such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures. During any delay or failure to perform by Seller, Buyer may (i) purchase substitute goods from other available sources, in which case the quantities under this Contract will be reduced by the quantities of such substitute goods and Seller will reimburse Buyer for any additional costs to Buyer of obtaining the substitute goods compared to the prices set forth in this Contract and/or (ii) have Seller provide substitute goods from other available sources in quantities and at times Buyer requests and at the prices set forth in this Contract. If Seller fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, Buyer may terminate this Contract without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11. Before any of Seller's labor contracts expire and as soon as Seller anticipates or learns of any impending strike, labor dispute, work stoppage or other disruption at Seller's facilities that might affect the delivery of goods to Buyer, Seller will produce (and locate in an area that will not be affected by any such disruption) a finished inventory of goods in quantities sufficient to ensure the supply of goods to Buyer for at least thirty (30) days after such disruption commences.

## 7. WARRANTY

7.1 <u>General</u>. Seller warrants and guarantees to Buyer, its successors, assigns and customers that the goods and services covered by this Contract will (a) conform to the then current release/revision level (based on date Buyer's release is issued to Seller) of Buyer's applicable specifications and drawings, (b) conform to all samples, descriptions, brochures and manuals furnished by Seller or Buyer, (c) be merchantable, (d) be of good material and workmanship, (e) be free from defect, and (f) be fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

7.2 <u>Warranty Period</u>. In the case of goods supplied for use as, or incorporation into, parts, components or systems for automotive vehicles or other finished products, the period for each of the foregoing warranties will commence upon delivery of the goods to Buyer and, except as provided in Section 7.4 or as otherwise

3

**Effective March 2004**

expressly agreed in writing by an authorized employee of Buyer, end forty-eight (48) months following the date the vehicle or other finished product on which such parts, components or systems are installed is first sold and delivered or otherwise utilized for consumer or commercial purposes, provided, however, that if Buyer offers and provides a longer warranty to its customers with respect to any such parts, components or systems, then such longer warranty period will apply to the goods. In the case of goods supplied for other uses, the period for each of the foregoing warranties will be that provided by applicable law unless otherwise expressly agreed in writing by an authorized employee of Buyer.

7.3 <u>Remedies and Damages</u>. If any goods are reasonably determined (including by use of statistical analysis or other sampling methodology) to fail to conform to the warranties set forth in this Contract, Seller shall reimburse Buyer for all reasonable losses, costs and damages caused by such nonconforming goods. Such costs and damages may include, without limitation, costs, expenses and losses of Buyer and/or its customers arising from (i) inspection, sorting, repair or replacement of any nonconforming goods or any system or component that incorporates such nonconforming goods, (ii) production interruptions or slowdowns, (iii) offlining of vehicles or component systems, and (iv) field service campaigns and other corrective service actions, including, without limitation, the amounts paid to distributors and/or dealers for materials and replacement parts (including reasonable markup to recover administrative costs or other capital expenses) and the labor costs to perform such work.

7.4 <u>Recalls</u>. Notwithstanding the expiration of the warranty period set forth in Section 7.2, if Buyer and/or the manufacturer of the vehicles (or other finished product) on which the goods, or any parts, components or systems incorporating the goods, are installed, voluntarily or pursuant to a government mandate, makes an offer to owners of such vehicles to provide remedial action to address a defect that relates to motor vehicle safety or the failure of the vehicle to comply with any applicable law, safety standard or guideline (a so-called "recall"), Seller will nonetheless be liable for costs and damages associated with the conduct of such recall to the extent that such recall is based upon a reasonable determination (including by use of statistical analysis or other sampling methodology) that the goods fail to conform to the warranties set forth in this Contract.

## 8. INGREDIENTS AND HAZARDOUS MATERIALS

If Buyer requests, Seller will promptly furnish to Buyer, in such form and detail as Buyer directs: (a) a list of all ingredients in the goods, (b) the amount of all ingredients, and (c) information concerning any changes in or additions to the ingredients. Prior to, and together with, the shipment of the goods, Seller will furnish to Buyer and all carriers sufficient written warning and notice (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with all special handling instructions, safety measures and precautions as may be necessary to comply with applicable law, to inform Buyer and all carriers of any applicable legal requirements and to best allow Buyer and all carriers to prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing.

## 9. INSOLVENCY OF SELLER

In any of the following or any similar events Buyer may immediately terminate this Contract without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11: (a) insolvency or financial difficulties of Seller, (b) filing of a voluntary petition in bankruptcy by Seller, (c) filing of any involuntary petition in bankruptcy against Seller, (d) appointment of a receiver or trustee for Seller, (e) execution of an assignment for the benefit of creditors by Seller, or (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract. Seller will reimburse Buyer for all costs Buyer incurs in connection with any of the foregoing whether or not this Contract is terminated, including, but not limited to, all attorney or other professional fees.

4

**Effective March 2004**

## 10. TERMINATION FOR BREACH

Buyer may terminate all or any part of this Contract without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11 if Seller (a) repudiates, breaches, or threatens to breach any of the terms of this Contract, including Seller's warranties, (b) fails to perform or threatens not to perform services or deliver goods in accordance with this Contract or (c) fails to assure timely and proper completion of services or delivery of goods.

## 11. TERMINATION FOR CONVENIENCE

In addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing. Upon such termination, Buyer may, at its option, purchase from Seller any or all raw materials, work-in-process and finished goods inventory related to the goods under this Contract which are useable and in a merchantable condition. The purchase price for such finished goods, raw materials and work-in-process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory which is the basis for any claim by Seller) on account of such termination, will be (a) the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by Buyer and not previously paid for, <u>plus</u> (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract <u>less</u> (c) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent. In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which Seller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required to pay for any goods or materials that are in Seller's standard stock or that are readily marketable. Payments made under this Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination. Within sixty (60) days after the effective date of termination, Seller will submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit an audit by Buyer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

## 12. TECHNICAL INFORMATION

**12.1** <u>Information Disclosed by Seller</u>. Seller will create, maintain, update, and provide to Buyer, in compliance with Buyer's drafting and math data standards, all technical information about the goods and their manufacture which is reasonably necessary or requested by Buyer in connection with its use of the goods, including, without limitation, the engineering validation and qualification of the goods for automotive production and other applications and compliance with any legal or regulatory requirements. Such technical information will not be subject to any use or disclosure restrictions, except as provided in Section 12.2 below.

**12.2** <u>Waiver of Claims</u>. Seller agrees not to assert any claim (other than a claim for patent infringement) against Buyer, Buyer's customers or their respective suppliers with respect to any technical information that Seller shall have disclosed, or may hereafter disclose, in connection with the goods or services covered by this Contract.

**12.3** <u>Repair and Rebuild</u>. Seller authorizes Buyer, its affiliates, agents and subcontractors, and Buyer's customers and their subcontractors to repair, reconstruct or rebuild the goods and products delivered under this Contract without payment of any royalty or other compensation to Seller.

**12.4** <u>Software and Written Works</u>. Seller grants to Buyer a permanent, paid-up license to use, repair, modify and sell any operating software incorporated in the goods in conjunction with the use or sale of the goods. In addition, all works of authorship, including without limitation, software, computer programs and databases (including object code, micro code, source code and data structures), and all enhancements, modifications and updates thereof and all other written work products or materials, which are created in the course of performing

5

**Effective March 2004**

this Contract, separately or as part of any goods and components, are "works made for hire" and the sole property of Buyer. To the extent that such works of authorship do not qualify under applicable law as works made for hire, Seller hereby assigns to Buyer all right, title and interest in any intellectual property rights in such works of authorship. If such assignment is not possible under any applicable law, Seller hereby grants an exclusive, royalty-free license to Buyer with respect to such works of authorship.

12.5 <u>Development, Engineering And Consulting Services</u>. Engineering, consulting or development services ("Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of authorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole property of Buyer. Seller agrees to assign all right, title and interest in and to IP that results from Development Services ("Developed IP") to Buyer. Seller shall notify Buyer of the existence of Developed IP and assist Buyer in every reasonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional documents reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse Seller for reasonable costs incurred by Seller in providing such assistance.

## 13. INDEMNIFICATION

13.1 <u>Infringement</u>. Seller will defend, hold harmless and indemnify Buyer and its customers, and their respective successors and assigns, against any claims of infringement (including patent, trademark, copyright, moral, industrial design or other proprietary rights, or misuse or misappropriation of trade secret) and resulting damages and expenses (including, without limitation, attorney and other professional fees and disbursements) relating to the goods or services covered by this Contract, including any claims in circumstances where Seller has provided only part of the goods or services. Seller waives any claim against Buyer that any such infringement arose out of compliance with Buyer's specifications.

13.2 <u>Activities on Buyer's Premises</u>. Seller will defend, hold harmless, and indemnify Buyer from and against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other professional fees and disbursements) arising from or in connection with the performance of any service or work by Seller or its employees, agents, representatives and subcontractors on Buyer's or Buyer's customer's premises or the use of the property of Buyer or any customer of Buyer, except to the extent such liability arises out of the negligence or willful misconduct of Buyer or Buyer's customer.

13.3 <u>Product Liability</u>. Seller will defend, hold harmless, and indemnify Buyer from and against any liability and expenses (including, without limitation, attorney and other professional fees and disbursements) arising from or in connection with any third party claims or demands to recover for personal injury or death, property damage or economic loss caused by any of the goods or services supplied by Seller (regardless of whether such claim or demand arises under tort, negligence, contract, warranty, strict liability or any other legal theories), except to the extent such injury, damage or loss results from Buyer's specifications as to design or materials or from alteration or improper repair, maintenance or installation by any party other than Seller.

## 14. COMPLIANCE WITH LAWS

Seller, and any goods or services supplied by Seller, will comply with all applicable laws, rules, regulations, orders, conventions, ordinances and standards of the country(ies) of origin and destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval, performance and/or certification of the goods or services, including, but not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety. Neither Seller nor any of its subcontractors will utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or services under this Contract. Upon Buyer's request, Seller will certify in writing its compliance with the foregoing. Seller will defend, hold harmless and indemnify Buyer from and against any liability, claims, demands, damages or expenses (including reasonable attorney or other professional fees and disbursements) arising from or relating to Seller's noncompliance with this Article.

6

Effective March 2004

## 15. INSURANCE

Seller will maintain insurance coverage as required by applicable law or as reasonably requested by Buyer with carriers reasonably acceptable to Buyer. With respect to any such insurance coverage, Seller will furnish to Buyer either a certificate evidencing satisfaction of the above-mentioned insurance requirements under this Contract or certified copies of all insurance policies within ten (10) days after Buyer requests. The certificate must provide that Buyer will receive thirty (30) days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. The furnishing of certificates of insurance and purchase of insurance will not limit or release Seller from Seller's obligations or liabilities under this Contract.

## 16. SELLER'S EQUIPMENT

Seller, at its expense, will furnish, keep in good condition, and replace when necessary all of its machinery and equipment, including related tooling, jigs, dies, gauges, fixtures, molds, patterns, fixtures and other accessories, required for the production of goods covered by this Contract (collectively, "Seller's Equipment"). Seller will insure Seller's Equipment with fire and extended coverage insurance for its full replacement value. Seller grants Buyer an irrevocable option to take possession of, and title to, all or part of Seller's Equipment that is specially designed or outfitted for the production of the goods covered by this Contract, in which event Buyer will, within 45 days following delivery of such Seller's Equipment to Buyer, pay to Seller of the lower of (i) the net book value of such Seller's Equipment (i.e., actual cost less amortization) or (ii) then current fair market value of such Seller's Equipment, in each case less any amounts that Buyer has previously paid to Seller on account of such Seller's Equipment. The foregoing option will not apply to the extent that Seller's Equipment is used to produce goods that are the standard stock of Seller and are then being sold by Seller to other customers. Buyer's right to exercise the foregoing option is not conditioned on Seller's breach or Buyer's termination of this Contract or upon payment of any other amounts due under this Contract.

## 17. BUYER'S PROPERTY AND INFORMATION

17.1 Acquisition of Tooling and Materials. To the extent that this Contract covers Buyer's purchase of, or reimbursement to Seller for, any tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment, supplies, materials and other items (collectively, "Tooling and Materials") to be used in connection with Seller's actual or anticipated supply of goods to Buyer, Seller will acquire such Tooling and Materials as agent of Buyer and Buyer shall pay to or reimburse Seller the lower of (i) the amount specified in this Contract for such Tooling and Materials or (ii) Seller's actual out-of-pocket cost to acquire the Tooling or Materials from an unrelated third party or, if the Tooling and Materials are constructed or fabricated by Seller or any affiliate of Seller, the actual direct costs for materials, labor and overhead associated with such construction and fabrication. Seller shall assign to Buyer any contract rights or claims in which Seller has an interest with respect to such Tooling and Materials. Seller shall establish a reasonable accounting system that readily enables the identification of Seller's costs as described above. Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any such Tooling and Materials. Upon Seller's acquisition of such Tooling and Materials, title thereto shall vest immediately in Buyer and such Tooling and Materials shall be held as "Buyer's Property" by Seller in accordance with this Article 17.

17.2 Bailment of Buyer's Property. All Tooling and Materials which Buyer furnishes, either directly or indirectly, to Seller or which Buyer buys from, or gives reimbursement to, Seller in whole or in part (collectively, "Buyer's Property") will be and remain the property of Buyer and be held by Seller on a bailment basis. Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer immediately upon attachment to or incorporation into Buyer's Property. When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property for work performed on, or utilizing, such property or otherwise.

17.3 Seller's Duties with Respect to Buyer's Property. While Buyer's Property is in Seller's possession and until Seller delivers Buyer's Property back to Buyer, Seller bears the risk of loss, theft and damage to Buyer's

7

Effective March 2004

Property.  Seller will be responsible for the cost of repairing or replacing Buyer's Property if it is stolen, damaged or destroyed regardless of cause or fault.  Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's own expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be personal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not commingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from Seller's applicable shipping location (as shown by the shipping address of Seller) without prior written approval from an authorized employee of Buyer, and (g) use Buyer's Property in compliance with Buyer's or the manufacturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations.  Buyer will have the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with respect thereto. Seller will not sell, lend, rent, encumber, pledge, lease, transfer or otherwise dispose of Buyer's Property.  Furthermore, Seller will not assert, or permit any person claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property.

17.4  Return of Buyer's Property.  Seller agrees that Buyer has the right, at any time and from time to time, with or without reason and without payment of any kind, to retake possession of or request the return of Buyer's Property.  Without further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the right to enter Seller's premises and take possession of any and all of Buyer's Property.  Upon Buyer's request and in accordance with Buyer's instructions, Buyer's Property will be immediately released to Buyer or delivered to Buyer by Seller, either (i) Ex Works (IncoTerms 2000) at Seller's plant properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates, in which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates.  If Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an immediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or without legal process, and take immediate possession of Buyer's Property.

17.5  Disclaimer of Warranties.  Seller acknowledges and agrees that (i) Buyer is not the manufacturer of Buyer's Property nor the manufacturer's agent nor a dealer therein, (ii) Buyer is bailing Buyer's Property to Seller for Seller's benefit, (iii) Seller is satisfied that Buyer's Property is suitable and fit for its purposes, and (iv) BUYER HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS OR IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF BUYER'S PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. Buyer will not be liable to Seller for any loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by Buyer's Property, including, without limitation, the use or maintenance thereof, or the repair, service or adjustment thereof, or by any interruption of service or for any loss of business whatsoever or howsoever caused, including, without limitation, any loss of anticipatory damages, profits or any other indirect, special or consequential damages and/or personal injury or death.

17.6  Use of Buyer's Information.  Seller will (i) keep all Buyer's Information (as defined below) confidential and disclose it only to its employees who need to know such Buyer's Information in order for Seller to supply goods and services to Buyer under this Contract and (ii) use the Buyer's Information solely for the purpose of supplying goods and services to Buyer.  Goods manufactured based on Buyer's Information may not be used for Seller's own use or sold by Seller to third parties without prior express written consent from an authorized employee of Buyer.  "Buyer's Information" means all information provided to Seller by Buyer or its representatives or subcontractors in connection with the business, programs, goods and services covered by this Contract, including, without limitation, pricing and other terms of this Contract, specifications, data, formulas, compositions, designs, sketches, photographs, samples, prototypes, test vehicles, manufacturing, packaging or shipping methods and processes and computer software and programs (including object code and source code). Buyer's Information also includes any materials or information that contain, or are based on, any Buyer's Information, whether prepared by Buyer, Seller or any other person.

18. SERVICE AND REPLACEMENT PARTS

Effective March 2004

During the term of this Contract, Seller will sell to Buyer goods necessary to fulfill Buyer's service and replacement parts requirements to Buyer's customers at the then current production price(s) under this Contract. If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module at price(s) that will not, in the aggregate, exceed the price of the system or module less assembly costs. If this Contract is in effect at the end of the vehicle production program into which the goods covered by the Contract are incorporated, Seller will also sell goods to Buyer to fulfill Buyer's and its customers' service and replacement parts requirements during the fifteen (15) year period following the end of such vehicle production program (the "Post-Production Period"), and this Contract will automatically remain in effect during the entire Post-Production Period. During the initial five (5) years of the Post-Production Period, the price(s) for such goods will be the production price(s) which were in effect at the commencement of the Post-Production Period. For the remainder of the Post-Production Period, the price(s) for such service goods will be as reasonably agreed to by the parties. If requested by Buyer, Seller will also make service literature and other materials available at no additional charge to support Buyer's service activities.

## 19. REMEDIES AND INJUNCTIVE RELIEF.

The rights and remedies reserved to Buyer in this Contract are cumulative with, and in addition to, all other or further remedies provided in law or equity. To the extent that this Contract is for the supply of goods for use as, or fabrication into, parts, components or systems, Seller acknowledges and agrees that money damages would not be a sufficient remedy for any actual, anticipatory or threatened breach of this Contract by Seller with respect to its delivery of goods to Buyer and that, in addition to all other rights and remedies which Buyer may have, Buyer shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach.

## 20. CUSTOMS AND EXPORT CONTROLS

20.1 Credits and Refunds. Transferable credits or benefits associated with or arising from goods purchased under this Contract, including trade credits, export credits or rights to the refund of duties, taxes or fees, belong to Buyer. Seller will, at its expense, provide all information necessary (including written documentation and electronic transaction records in Buyer-approved formats) to permit Buyer to receive these benefits, credits, or rights. Seller will furthermore, at its expense, provide Buyer with all information, documentation, and electronic transaction records relating to the goods necessary for Buyer to fulfill any customs -related obligations, origin marking or labeling requirements and certification or local content reporting requirements, to enable Buyer to claim preferential duty treatment for goods eligible under applicable trade preference regimes, and to make all arrangements that are necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import. Seller will, at its expense, provide Buyer or Buyer's nominated service provider with export documentation to enable the goods to be exported, and obtain all export licenses or authorizations necessary for the export of the goods unless otherwise indicated in this Contract, in which event Seller will provide all information as may be necessary to enable Buyer to obtain such licensees or authorization(s).

20.2 Customs-Trade Partnership Against Terrorism. To the extent any good covered by this Contract are to be imported into the United States of America, Seller shall comply with all applicable recommendations or requirements of the Bureau of Customs and Border Protection's Customs-Trade Partnership Against Terrorism ("C-TPAT") initiative. Upon request, Seller shall certify in writing its compliance with the C-TPAT initiative.

## 21. BUYER'S RECOVERY RIGHT

With respect to any monetary obligations of Seller or Seller's affiliates to Buyer or Buyer's affiliates, including, without limitation, direct and indirect losses, costs and damages resulting from Seller's failure to timely delivery goods or services, the failure of any goods or service to conform to applicable warranties or other breach by Seller of this Contract, Buyer may at any time, as applicable, recover, recoup or setoff such amounts by

9

Effective March 2004

deducting such amounts from any sums that are, or will become, owing, due or payable to Seller or Seller's affiliates by Buyer or Buyer's affiliates.

## 22. NO ADVERTISING

Seller will not, in any manner, advertise or publish that Seller has contracted to furnish Buyer the goods or services covered by this Contract or use any trademarks or trade names of Buyer in Seller's goods, advertising or promotional materials unless Buyer consents in writing.

## 23. NO IMPLIED WAIVER

The failure of either party at any time to require performance by the other party of any provision of this Contract will not affect the right to require such performance at any later time, nor will the waiver by either party of a breach of any provision of this Contract constitute a waiver of any succeeding breach of the same or any other provision. No failure or delay in exercising any right or remedy will operate as a waiver thereof nor will any single or partial exercise thereof preclude other or further exercise thereof. No course of dealing or course of performance may be used to evidence a waiver or limitation of Seller's obligations under this Contract.

## 24. ASSIGNMENT AND CHANGE IN CONTROL

Buyer may assign its rights and obligations under this Contract without Seller's prior written consent. Seller may not assign or delegate its rights or obligations under this Contract without prior written consent from an authorized employee of Buyer. In addition, Buyer may terminate this Contract upon giving at least 60 days notice to Seller, without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11, if Seller (i) sells, or offers to sell, a material portion of its assets or (ii) sells or exchanges, or offers to sell or exchange, or causes to be sold or exchanged, a sufficient amount of its stock or other equity interests that effects a change in the control of Seller or (iii) executes, or otherwise becomes subject to, a voting or other agreement or trust that effects a change in the control of Seller.

## 25. RELATIONSHIP OF PARTIES

Seller and Buyer are independent contracting parties. Nothing in this Contract makes either party the agent or legal representative of the other for any purpose whatsoever, nor grants either party any authority to assume or create any obligation on behalf of or in the name of the other party.

## 26. GOVERNING LAW AND JURISDICTION

**26.1 U.S. Contracts.** If either (i) this Contract is issued by Buyer from a location within the United States of America or its territories (as shown by the issuing address of Buyer), (ii) this Contract is issued, in whole or part, for goods to be shipped to a Buyer location within the United States of America or its territories (as shown by the ship to or receiving address of Buyer) or (iii) Seller's applicable shipping location is within the United States of America or its territories (as shown by the shipping address of Seller), then: (a) this Contract is to be construed according to the laws of the United States of America and the State of Michigan, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law, and (b) each party hereby agrees that the forum and venue for any legal or equitable action or proceeding arising out of, or in connection with, this Contract will lie in the appropriate federal or state courts in the State of Michigan and specifically waives any and all objections to such jurisdiction and venue.

**26.2 Non-U.S. Contracts.** In all cases not covered by Section 26.1 above, (a) this Contract is to be construed according to the laws of the country (and state or province, if applicable) where Buyer's receiving location is located (as shown by the ship to or receiving address of Buyer), excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law; (b) any legal or equitable action or proceedings by Buyer against Seller arising out

**Effective March 2004**

of, or in connection with, this Contract may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in any court(s) having jurisdiction over Buyer's receiving location, in which event Seller consents to such jurisdiction and venue, including service of process in accordance with applicable procedures; and (c) any legal or equitable actions or proceedings by Seller against Buyer arising out of, or in connection with, this Contract may be brought by Seller only in the court(s) having jurisdiction over the Buyer's receiving location.

## 27. SEVERABILITY

If any provision of this Contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision will be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Contract will remain in full force and effect.

## 28. RIGHT TO AUDIT AND INSPECT

Buyer, at its expense, has the right to audit and review all relevant books, records, income statements, balance sheets, cash flow statements, payroll data, receipts and other related supporting data, including Seller's administrative and accounting policies, guidelines, practices and procedures, in order to (i) substantiate any charges and other matters under this Contract and (ii) assess Seller's ongoing ability to perform its obligations under the Production Purchase Order. Seller will maintain and preserve all such documents for a period of four (4) years following final payment under this Contract. Seller will provide Buyer with reasonable access to its facilities and otherwise cooperate and facilitate any such audits by Buyer.

## 29. ENTIRE AGREEMENT

This Contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this Contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. This Contract may only be modified by a written contract amendment issued by Buyer. Notwithstanding anything to the contrary contained herein, Buyer explicitly reserves, and this Contract will not constitute a waiver or release of, any rights and claims against Seller arising out of, or relating to, any fraud or duress in connection with the formation of this Contract or any breach or anticipatory breach of any previously existing contract between Buyer and Seller (whether or not such previously existing contract related to the same or similar goods or subject matter as this Contract). All payments by Buyer to Seller under this Contract are without prejudice to Buyer's claims, rights, or remedies.

## 30. TRANSLATIONS

Buyer may provide various translated versions of these General Terms and Conditions for informational purposes only. However, the original English language version of these General Terms and Conditions will apply in the event of any disagreement over the meaning or construction of any provisions of these General Terms and Conditions.

3

Barbara FINAZZO - Schedules                                                                Page 1

| | |
|---|---|
| From: | "Steve Derrah" <Steve.Derrah@laneko.com> |
| To: | "Tienda, Maria " <maria.tienda@delphi.com>, "DeRonne, David L" |
| | <david.l.deronne@delphi.com>, <andy.scott@delphi.com> |
| Date: | 4/12/2005 10:03:55 AM |
| Subject: | Schedules |

Delphi PC&L Contacts,


Laneko has learned Delphi re-tooled our work and will begin using the
new sources shortly. I need firm releases via EDI to our build out
immediately. I want material and fabrication authorization to cover all
parts to the build out. I cannot order steel without this
authorization. I will not allow our company to be at risk for
obsolescence.


Steve Derrah

Plant Manager

Laneko Engineering Co.

215-646-8180 x 131



CC:         <jim.derrahjr@laneko.com>, <bob.taunt@laneko.com>

| | |
|---|---|
| From: | "DeRonne, David L" <david.l.deronne@delphi.com> |
| To: | <jim.derrahjr@laneko.com> |
| Date: | 4/13/2005 8:24:00 AM |
| Subject: | FW: Schedules |

Jim,
I am confused.  What exactly do you require here?  What is your lead time on raw material?
Thank you,

David DeRonne
Delphi Thermal and Interior Systems
Global Supply Management
Phone:  (248) 655-8820
Fax:  (866) 749-6015

-----Original Message-----
From: Steve Derrah [mailto:Steve.Derrah@laneko.com]
Sent: Wednesday, April 13, 2005 8:19 AM
To: Tienda, Maria ; Watkins, Jerry L; DeRonne, David L
Cc: jim.derrahjr@laneko.com; bob.taunt@laneko.com
Subject: Schedules


Delphi PC&L Contacts,


I received no response to my e-mail yesterday requesting build-out schedules and material and fabrication authorization.  For all Delphi parts Laneko has already exceeded the material authorization on our schedules.  I have cancelled all material orders in excess of what the authorizations allow.  I suggest you address this issue or Delphi is exposed to interruption in the raw material supply.


Steve Derrah

Plant Manager

Laneko Engineering Co.

215-646-8180 x 131

4