BRYAN CAVE LLP
Michelle McMahon (MM-8130)
Jessica Fischweicher
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 541-2000
Facsimile: (212) 541-1493

BRYAN CAVE LLP
Lloyd A. Palans (admitted pro hac vice)
Christopher J. Lawhorn (admitted pro hac vice)
200 North Broadway, Suite 3600
St. Louis, MO 63102
Telephone: (314) 259-2000
Facsimile: (314) 259-2020
lapalans@bryancave.com
cjlawhorn@bryancave.com

*Attorneys for Spartech Polycom*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                             :
In re:                                                       :    Chapter 11:
                                                             :
DELPHI CORPORATION, *et al.*,                                :    Case No. 05-44481 (RDD)
                                                             :    Jointly Administered
-------------------------------------------------------------x
DELPHI CORPORATION, *et al.*,                                :
                                                             :    Adv. Pro. No. 07-02639 (RDD)
                          Plaintiffs,                        :
                                                             :
               -against-                                     :
                                                             :
SPARTECH POLYCOM                                             :
                                                             :
                          Defendant.                         :
-------------------------------------------------------------x

**NOTICE OF FILING OF SECOND DECLARATION OF CHAD R. TOMSHECK
IN SUPPORT OF SPARTECH POLYCOM'S OPPOSITION TO REORGANIZED
<u>DEBTORS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS</u>**

3732689.1                              1

Spartech Polycom ("Spartech"), by its undersigned attorneys, and in further support of its opposition to the Reorganized Debtors' Motion for Leave to File Amended Complaints (the "Motion to Amend") against various preference defendants (collectively, the "Defendants"), including Spartech, respectfully states:

1. Following dismissal of their initial complaint in this matter against Spartech, the Reorganized Debtors filed their Motion to Amend on or about September 7, 2010.

2. Spartech responded by filing its Brief in Opposition to Reorganized Debtors' Motion for Leave to File Amended Complaints on or about November 24, 2010.

3. The Reorganized Debtors filed their Omnibus Reply in Further Support of Motions for Leave to File Amended Complaints on or about January 28, 2011.

4. Spartech filed a Joinder and Sur-Reply in Opposition to Reorganized Debtors' Motion for Leave to File Amended Complaints on or about June 17, 2011.

5. On June 21, 2011, the Court held a hearing on the Motion to Amend and considered the various arguments that Spartech and other Defendants raised in opposition.

6. Among other things, Spartech asserted at the hearing and in its pleadings that it could not have preference liability to the Reorganized Debtors because the alleged preferential transfers were made pursuant to a contract that had been assumed.

7. In connection with Spartech's asserted contract-assumption defense, the Court authorized Spartech to file a declaration with the Court explaining its defense and the assumed contract.

8. Accordingly, Spartech submits the <u>Second Declaration of Chad R. Tomsheck in Support of Spartech Polycom's Opposition to Reorganized Debtors' Motion for Leave to File Amended Complaints</u> attached hereto as <u>Exhibit A</u> and requests that the Reorganized Debtors' Motion to Amend be denied as to Spartech on a final basis.

Dated: October 21, 2011

Respectfully submitted,

/s/ Michelle McMahon
BRYAN CAVE LLP
Michelle McMahon (MM-8130)
Jessica Fischweicher
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 541-2000
Facsimile: (212) 541-1493

BRYAN CAVE LLP
Lloyd A. Palans (admitted pro hac vice)
Christopher J. Lawhorn (admitted pro hac vice)
200 North Broadway, Suite 3600
St. Louis, MO 63102
Telephone: (314) 259-2000
Facsimile: (314) 259-2020
lapalans@bryancave.com
cjlawhorn@bryancave.com

*Attorneys for Spartech Polycom*

# **CERTIFICATE OF SERVICE**

I, Michelle McMahon, hereby certify that a copy of the Notice of Filing of Second Declaration of Chad R. Tomsheck in Support of Spartech Polycom's Opposition to Reorganized Debtors' Motion for Leave to file Amended Complaints was served on the following counsel on October 21, 2011 by regular U.S. Mail and electronic mail.

BUTZEL LONG
380 Madison Avenue, 22nd Floor
New York, New York 10017
Attention:     Eric B. Fisher (fishere@butzel.com)
               Barry N. Seidel (seidel@butzel.com)

BUTZEL LONG
Suite 100
150 West Jefferson Ave.
Detroit, Michigan  48226
Attention:     Cynthia J. Haffey (haffey@butzel.com)


                                /s/ Michelle McMahon

3732689.1

BRYAN CAVE LLP
Michelle McMahon (MM-8130)
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 541-2000
Facsimile: (212) 541-1493

BRYAN CAVE LLP
Lloyd A. Palans (admitted pro hac vice)
Christopher J. Lawhorn (admitted pro hac vice)
200 North Broadway, Suite 3600
St. Louis, MO 63102
Telephone: (314) 259-2000
Facsimile: (314) 259-2020
lapalans@bryancave.com
cjlawhorn@bryancave.com

*Attorneys for Spartech Polycom*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11: |
| DELPHI CORPORATION, *et al.*, | Case No. 05-44481 (RDD)<br>Jointly Administered |

-----------------------------------------------------------x

| | |
|---|---|
| DELPHI CORPORATION, *et al.*, | |
| | Adv. Pro. No. 07-02639 (RDD) |
| Plaintiffs, | |
| -against- | |
| SPARTECH POLYCOM | |
| Defendant. | |

-----------------------------------------------------------x

**SECOND DECLARATION OF CHAD R. TOMSHECK IN SUPPORT OF
SPARTECH POLYCOM'S OPPOSITION TO REORGANIZED DEBTORS'
<u>MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS</u>**

Chad R. Tomsheck, first being duly sworn and under oath, states:

1. I am Chad R. Tomsheck and I am over 18 years old. I am the Director of

Specialty Compounds and Tolling of Spartech Polycom ("Spartech"). I have personal

3679342.3                                  1

knowledge of the facts stated in this declaration. If called and sworn as a witness, I could and would testify competently to the matters set forth herein.

2.    I am an employee of Spartech with knowledge of Spartech's relationship with Delphi Corporation and its affiliates (collectively, the "Debtors").

3.    I understand that Delphi Automotive Systems, LLC ("DAS") seeks to file a proposed amended complaint (the "Complaint") in the above-captioned adversary proceeding in an attempt to recover as much as $8,637,901.23 in alleged preferential transfers from Spartech (the "Payments"). I have reviewed the Complaint and, in particular, Exhibit 1 to the Complaint (the "Exhibit"), which purports to list the Payments made to Spartech. The Exhibit also contains a list of purchase orders (the "POs") in respect of which DAS claims the Payments were made.

4.    The Debtors and Spartech were parties to a certain Long Term Contract dated February 18, 2004 (the "LTA") relating to Spartech's sale and delivery of goods to the Debtors. A copy of the LTA is attached hereto as Exhibit A. The term of the LTA was January 1, 2004 through December 31, 2009. The LTA was in effect during the time all of the Payments described in the Complaint were made.

5.    On August 22, 2005, the LTA and all other agreements between Spartech and the Debtors were amended pursuant to an Amendment to Supply Agreements (the "Amendment"). A copy of the Amendment is attached as Exhibit B. The Amendment essentially changed the terms of payment for all products delivered by Spartech to the Debtors to "net immediate," and it covered all payments made by the Debtors to Spartech. The Amendment contemplated that, under the revised terms, all transactions between the parties on and after August 22, 2005 were, and were intended to be, cash-on-delivery transactions.

6.    However, the Amendment did not change the term of the LTA, which remained in effect through December 31, 2009. The LTA remained an executory contract: (i) at the time the

Debtors filed their bankruptcy cases; (ii) when the Debtors' modified plan was confirmed on July 30, 2009; and (iii) when the plan became effective on October 6, 2009.

7.      Every Payment listed in the Exhibit to the Complaint was made under and pursuant to the LTA, as amended by the Amendment. Section 5 of the LTA contemplated that the Debtors would issue written purchase orders to Spartech to order product shipments under the LTA, stating as follows: "All Products will be ordered by Buyer, and delivered by Seller, in accordance with written purchase orders…issued by Buyer from time to time during the term of this Contract." The Debtors did, in fact, issue purchase orders to Spartech requesting shipments of products under the LTA, including the POs listed on the Exhibit to the Complaint.

8.      The purchase orders, including the POs, were not individual contracts between the Debtors and Spartech; rather, all of Spartech's shipments and sales to the Debtors were governed by the LTA, and the POs were simply the mechanism by which the Debtors ordered products from Spartech under the LTA. The POs themselves were not separate agreements and would be meaningless without reference to the LTA, which controlled the relationship between Spartech and the Debtors.

9.      I have reviewed the PO numbers listed in the Exhibit to the Complaint. All of these POs relate to the LTA. The vast majority of the POs were originally issued pursuant to the LTA in connection with the Debtors' "Thermal and Interior" business unit. Any POs that were not originally issued pursuant to the LTA were, and were intended by the parties to be, included as part of the LTA through the execution of the Amendment.

10.     The Debtors never rejected the LTA during their bankruptcy cases. Instead, they assumed the LTA and all obligations thereunder in connection with their modified plan of reorganization. The Debtors never sent a notice of non-assumption to Spartech with respect to the LTA, and Spartech has no record of having received any notice of non-assumption at all,

whether in respect of a particular PO or otherwise. As a result, the Debtors assumed all obligations to Spartech under Section 8.1 of their confirmed modified plan, including all obligations under the POs that had been issued under the LTA.

11.     Instead of notices of non-assumption, the Debtors sent notices of assumption to Spartech with respect to at least two purported contracts. First, the Debtors sent notice of intent to assume "Contract 55538." Spartech has no information regarding what the Debtors intended with their reference to "Contract 55538." Second, the Debtors sought to assume "All contracts between SPARTECH POLYCOM, INC. and Delphi related to products shipped to SPARTECH POLYCOM, INC. from Delphi's DTI facility." The only contract between Spartech and the Debtors that related to goods shipped from the Debtors to Spartech was the LTA, which provides for the return of certain scrap parts by the Debtors to Spartech.

12.     The obligations the Debtors assumed pursuant to the LTA included those described in the notice of proposed cure claims (the "Cure Claim Notice") that Spartech originally filed on or about March 10, 2008 in connection with the confirmation of the Debtors' first amended plan of reorganization. The Cure Claim Notice lists a number of POs that were issued by the Debtors to Spartech under the LTA. Spartech filed the Cure Claim Notice simply to ensure that it would receive its required cure payment in connection with the assumption of the LTA and provided the list of POs in the Cure Claim Notice to assist the Debtors in understanding the amounts that remained owing to Spartech under the assumed LTA.

13.     Spartech has never regarded the POs listed on the Exhibit to the Complaint as separate contracts or agreements, and instead has always regarded them as part of the LTA. To my knowledge, no employee or agent of the Debtors has ever taken the position with Spartech that the POs listed on the Exhibit to the Complaint could exist as independent contracts apart

3679342.3                                     4

from the LTA, and such a position would be inconsistent with the business relationship between Spartech and the Debtors.

    I declare under penalty of perjury that the foregoing is true and correct.

_____
Chad R. Tomsheck

**DELPHI** 

# DELPHI CORPORATION
# LONG TERM CONTRACT

### 1. Purchase of Product

**Spartech Polycom** ("Seller") agrees to sell, and **Delphi Corporation** acting through its **Delphi Thermal Systems and Interior Division** ("Buyer") agrees to purchase, **100 percent** of Buyer's production and service requirements for the following products (each referred to as a "Product" and collectively referred to as the "Products"):

| Part Number | Description | Estimated Annual Volume |
|---|---|---|
| 97685 | 20% TFPP F5134T2-4 | 24,000,000 |
| 97691 | 40% TFPP F5134T4-1 | 12,000,000 |

### 2. Term

With respect to each Product, the term of this Contract is from January 1, 2004 through December 31, 2009.

### 3. Prices

The base per unit price of each Product is F.O.B. Delivered, freight collect. Pricing is based on the following starting prices for product delivered through the pipeline.

| | |
|---|---|
| F5134T2-4 | $0.3880 |
| F5134T4-1 | $0.3424 |

Prices to other Delphi locations and outside molders would be this price, with any subsequent adjustments in effect at the time of sale, plus the cost of packaging and freight to be disclosed by Seller and paid by Buyer. Buyer may choose to have seller handle delivery and pay the disclosed cost or, if more cost effective, utilize Buyer's own delivery arrangements and pay the freight collect price plus packaging costs of $0.025 per pound for boxes or bulk bags.

These prices are based on PP pricing of 0.31 per pound. These prices will be adjusted as follows for the following components:

<8;12;16;>
<8;12;16;>
<8;12;16;>
<8;12;16;>
<8;12;16;>
<8;12;16;>
<8;12;16;>

# DELPHI



Minerals, Stabilizers and Pigments

| Part Number | Cost Component | Adjustment |
|---|---|---|
| 97685 | $0.0420 | No Adjustment |
| 97691 | $0.0584 | No Adjustment |

Resin

| | | |
|---|---|---|
| 97685 | $0.248 | Quarterly or based on mutually |
| 97691 | $0.186 | negotiated resin supply agmt |

Mark Up

| | | |
|---|---|---|
| 97685 | $0.098 | 1% reduction per calendar year |
| 97691 | $0.098 | 1% reduction per calendar year |

Pricing for each subsequent period is subject to the following minimum annual percentage reductions from the prior period's pricing:

| Year | Beginning | % | Reduction | UOM |
|---|---|---|---|---|
| 2005 | January 1 | 1 | $0.00098 | lb |
| 2006 | January 1 | 1 | $0.00097 | lb |
| 2007 | January 1 | 1 | $0.00096 | lb |
| 2008 | January 1 | 1 | $0.00095 | lb |
| 2009 | January 1 | 1 | $0.00094 | lb |

Buyer and Seller will use their best efforts to implement cost savings and productivity improvements in order to reduce Seller's costs of supplying each Product. Buyer and Seller agree that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to fifty percent (50 %) of any net cost savings achieved by Seller with respect to such Product (i.e., savings after recovery by Seller of a pro rata portion, based on the remaining term of this Contract, of the reasonable and documented costs to achieve such cost savings), provided, however, that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any savings resulting from reduction on the content of the such Product.

No price increases (including any decrease of the scheduled price reductions) will be made on account of (i) Seller's failure to achieve any expected cost

**DELPHI** 

savings or productivity improvements or (ii) any increases in Seller's labor, overhead and utility costs or non-resin related raw material costs.

4.  **Right to Purchase from Others**

During the entire term of this Contract, Seller will assure that each Product remains competitive in terms of technology, design, service and quality with any similar product available to Buyer. Following the end of Calendar year 2005 Seller will also assure that each Product remains competitive in terms of price with any similar product available to Buyer. If, in the reasonable opinion of Buyer, a Product does not remain competitive, Buyer will advise Seller in writing of the area(s) in which a similar product is more competitive. If, within ninety (90) days, Seller does not agree to immediately sell any Product with comparable technology, design, quality, or, if applicable, price, Buyer may elect to purchase any similar products available to Buyer without any liability to Seller under this Contract.

5.  **Purchase Orders**

All Products will be ordered by Buyer, and delivered by Seller, in accordance with written purchase orders (including related delivery releases and shipping instructions) issued by Buyer from time to time during the term of this Contract. Buyer's General Terms and Conditions, a copy of which is attached, are hereby incorporated into this Contract by reference, provided, however, that Buyer's right to "terminate for convenience" under the General Terms and Conditions will be inapplicable to this Contract until the end date of December 31, 2009. Any amendment to, or revision of, such General Terms and Conditions shall also become a part of this Contract, provided that (i) Buyer provides Seller with a copy of such revised Terms and Conditions and (ii) Seller does not object to such revised Terms and Conditions in writing within thirty (30) days after receipt. The Terms and Conditions (together with any revision made a part of this Contract) shall be construed, to the extent possible, as consistent with the terms and conditions set forth in this Contract and as cumulative, provided, however, that if such construction is unreasonable, the terms and conditions set forth in this Contract shall control.

6.  **Regrind**

Buyer and Seller agree that Seller will purchase from Buyer its scrap parts from its Lockport, NY facility and will grind those parts for use in the manufacuture of Buyer's product. The terms of this supply are outlined below:

Seller will pay Buyer $0.07 per pound for unground parts, FOB delivered, freight prepaid to its Lockport plant. This price would be adjusted every 6 months based on the change in the Phillip Townshend Wide Spec homopolmer PP index from the beginning of the period to the beginning of the next period. For example, the

**DELPHI** 

current price of $0.07 is based on the PT index of $0.31 for January of 2004. Any price change would be based on the difference between that number and the number on July 1, 2004 multiplied by 70% for the % of PP in the parts. This price can never go below $0.025 per pound and can never go above $0.115 per pound regardless of the change in the PP index.

Seller will charge Buyer $0.135 per pound for cleaning, sorting and grinding of these parts.

**EXECUTED** by Buyer and Seller as of February 18, 2004

| Buyer: | Seller: |
|---|---|
| **Delphi Automotive Systems LLC** acting through its Harrison Thermal Systems | **Spartech Polycom** |
| By: _W. Daniel Bedford_ (signature) | By: _George Abd_ (signature) |
| Name: W. Daniel Bedford | Name: George Abd |
| Title: Sr. Div. Commodity Mgr. | Title: Executive Vice President |

## Amendment to Supply Agreements

This Amendment to Supply Agreements (this "Amendment") is entered into as of August 22, 2005 (the "Effective Date") by and between Delphi Corporation (together with its affiliates and subsidiaries, "Delphi") and Spartech Corporation on behalf of itself and its subsidiaries (together, "Spartech"). It is premised on the following facts, agreed to by the parties:

A. Spartech is a supplier to Delphi of various resin compounds (the "Products") to Delphi under credit arrangements and other terms provided in various purchase orders and supply contracts between Delphi and Spartech (collectively, the "Supply Agreements").

B. Spartech has reasonable grounds for insecurity concerning Delphi's future performance of the Supply Agreements and similar agreements that the parties may enter into in the future, and has in writing demanded adequate assurance of performance from Delphi under Uniform Commercial Code Section 2-609. Delphi has proffered the Modified Terms as adequate assurance under Uniform Commercial Code Section 2-609.

Based upon the foregoing recitals and agreed facts, and for good and valuable consideration, the receipt and adequacy of which is acknowledged, Delphi and Spartech agree as follows:

1. This Amendment applies only to purchases of Products by entities qualified to initiate proceedings as debtors under the United States Bankruptcy Code.

2. Delphi shall continue to pay all invoices dated prior to the Effective Date in the normal course of business as heretofore carried on between the parties.

3. Beginning on the Effective Date, Delphi shall purchase and pay for Products not previously invoiced by Spartech on the following terms (the "Modified Terms"):

    (a) Spartech does not intend to grant further credit to Delphi, and Delphi does not intend to purchase Products on credit. Where Products are not paid for prior to delivery and passage of title (as provided in paragraph 3(b), below), the parties intend that there shall be a contemporaneous exchange of value, i.e. payment for Products shall be as nearly simultaneous as possible with their delivery, and payment terms shall be cash upon delivery ("Net Immediate").

    (b) The existing consignment arrangements for certain Products are modified as follows:

        (i) For rail car deliveries to the Adrian plant, Spartech shall invoice Delphi for the contents of the rail car upon shipment. Payment shall be due immediately upon Delphi's receipt of the rail car at its plant. Title to the invoiced Products shall pass to Delphi when the invoice has been paid or when the invoiced Products are drawn out of the rail car by Delphi, whichever occurs later.

  (ii) For Product delivered through the Lockport pipeline and currently in the pipeline or in the silos at Delphi's plant (which has heretofore been owned by Spartech and consigned to Delphi), Spartech shall promptly invoice Delphi for that Product, and Delphi shall pay the invoice before it draws further Products out of the silos. Title to those Products shall pass to Delphi when the invoice has been paid or when the Products are drawn out of the silo at Delphi's plant, whichever occurs later.

  (iii) For future deliveries through the Lockport pipeline, Spartech shall invoice Delphi when it sends the Product through the pipeline (however, for administrative convenience, Spartech may elect to send its invoices in batches, e.g. on Mondays, Wednesdays and Fridays). Payment shall be due immediately upon receipt of invoices. Delphi shall pay each invoice before it draws the invoiced Products out of the silos at its plant. Title to the invoiced Products shall pass to Delphi when the invoice has been paid or when the invoiced Products are drawn out of the silos at Delphi's plant, whichever occurs later.

(c) Spartech will provide a 1.5% discount to Delphi based on the aggregate net invoice amounts of Products purchased by Delphi under the Modified Terms in the prior month, payable on or before the last business day of the following month, but such discount shall be earned and paid only if Delphi has timely paid all invoices due during the prior month.

(d) Spartech may immediately suspend or cancel deliveries to Delphi if Delphi does not comply with the Modified Terms.

4. Spartech accepts the Modified Terms as adequate assurance of performance under Uniform Commercial Code Section 2-609 based on the circumstances currently known to Spartech. Such acceptance is subject to Delphi's continuing compliance with this Amendment and to there being no further adverse change in Delphi's financial or business circumstances. Nothing herein shall constitute a waiver of any other rights of Spartech with respect to Delphi or the Products.

5. This Amendment amends, and its terms shall be deemed to be incorporated by reference into, all of the Supply Agreements, without any specific reference to this Amendment in any such Supply Agreement. Should any inconsistency or conflict exist between the express terms of the Supply Agreements and this Amendment, the terms of this Amendment shall govern and control. The terms of this Amendment shall be part of, and shall be deemed to be incorporated by reference into, all future agreements and purchase orders for the supply of Products, without any specific reference to this Amendment in any such future agreement or purchase order; and the terms hereof shall supersede any conflicting provisions of any such future agreement or purchase order unless the parties expressly and explicitly state in such future agreement or purchase order that the terms thereof shall take precedence over this Amendment, specifically referring to this Amendment by name and Effective Date.

6. Subject to the modifications set forth herein, all Supply Agreements remain in full force and effect according to their terms, subject to applicable law and principles of equity.

7. The parties will meet monthly to review Delphi's financial condition and to discuss, in good faith, moving to more favorable payment terms until Delphi is back to the terms as existing immediately prior to the Effective Date (without any price discount). Unless the parties mutually agree otherwise, the Modified Terms shall cease to apply to Products invoiced on or after the 90th day after the Effective Date (but will continue to apply to Products invoiced prior to that date).

8. Spartech will keep the terms of this Amendment together with all related discussions strictly confidential. Spartech may disclose the terms of this Amendment only to its management personnel who need to know such information to implement the terms of this Amendment and to legal counsel and other advisors, provided that all such parties have been informed of the confidentiality restrictions contained herein. Spartech further agrees that it will be responsible and liable for any breach of the confidentiality provisions set forth in this Amendment by its management personnel, legal counsel and other advisors. Spartech acknowledges that failure to honor the confidentiality provisions contained herein may cause significant economic harm to Delphi. Any discussions by Spartech with any third parties, including the press or media, regarding this Amendment and its terms are expressly prohibited. These obligations of confidentiality shall not apply to disclosures mandated by law, regulation, or order of a court or agency of competent jurisdiction.

9. This Amendment constitutes the entire understanding of the parties in connection with the subject matter hereof. This Amendment may not be modified, altered, or amended except by an Amendment in writing signed by Delphi and Spartech.

10. The parties hereto acknowledge that they are executing this Amendment without duress or coercion and without reliance on any representations, warranties or commitments other than those representations, warranties and commitments expressly set forth in this Amendment.

11. This Amendment is being entered into among competent persons who are experienced in business and represented by counsel, and has been reviewed by Delphi and Spartech and their respective counsel. Therefore, any ambiguous language in this Amendment will not necessarily be construed against any particular party as the drafter of such language.

12. This Amendment shall be governed by, and construed and enforced in accordance with, the laws of the State of Michigan, without regard to conflicts of law principles.

EXECUTED as of the Effective Date.

DELPHI CORPORATION

By: *Chris E Schafer*
Name: Chris E. Schaefer
Title: Global Resin Manager

SPARTECH CORPORATION

By: *[signature]*
Name: GEORGE A. ABD
Title: PRESIDENT & CEO