**Hearing Date and Time: November 17, 2011, 9:00 a.m. (EST)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| DPH HOLDINGS CORP., *et al.*, | Case No. 05-44481 (RDD) |
| Reorganized Debtors. | Jointly Administered |

**STATEMENT OF THE UNITED STATES OF AMERICA**
**IN SUPPORT OF REORGANIZED DEBTORS' MOTION FOR ORDER APPROVING**
**SETTLEMENT AGREEMENT BETWEEN REORGANIZED DEBTORS AND UNITED**
**STATES COMPROMISING AND ALLOWING PROOF OF CLAIM NUMBER 14309**

PREET BHARARA
United States Attorney for the
Southern District of New York
By:  JOSEPH N. CORDARO
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2745
Facsimile:  (212) 637-2686
Email: joseph.cordaro@usdoj.gov

The United States of America, on behalf of the Environmental Protection Agency ("EPA"),

by its attorney Preet Bharara, United States Attorney for the Southern District of New York,

respectfully submits this Statement in Support of Reorganized Debtors' Motion for an Order

Approving Settlement Agreement Between Reorganized Debtors and United States

Compromising and Allowing Proof of Claim Number 14309 (the "Environmental Settlement

Agreement" or "Agreement"), filed on October 4, 2011 (Docket # 21605) and respectfully joins in

Reorganized Debtors' request for the Court's approval of the Agreement.

## BACKGROUND[1]

1.      The proposed Environmental Settlement Agreement is one part of a proposed

settlement that would resolve the action *Delphi Corp., et al. v. United States*, No. 08 Civ. 4487

(JPO) (the "Delphi FICA Action"), pending in the United States District Court for the Southern

District of New York.  It is contingent on the effectiveness of that proposed settlement.

2.      Except as provided therein, the Agreement resolves environmental liabilities of the

Debtors asserted by the United States in connection with a proof of claim ("Claim 14309") filed by

the United States on behalf of EPA against debtor Delphi Automotive Systems LLC n/k/a

DPH-DAS LLC ("DAS") on July 31, 2006 under *inter alia*, the Comprehensive Environmental

Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§

9601-75, and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901-92.

3.      Under the Agreement, the United States on behalf of EPA will receive an allowed

prepetition claim of $857,582.52 against DAS, which amount shall be applied as a setoff against

---

[1]     This Statement contains a summary of the terms and provisions of the Environmental
Settlement Agreement.  If there is any conflict between the description of the Agreement
contained in this Statement and the terms and provisions of the Agreement, the terms and
provisions of the Agreement are controlling.

the refund that would be owed by the United States to the Reorganized Debtors in connection with the settlement of the Delphi FICA case, if that settlement becomes effective. The allocation of these funds is set out in the *Federal Register* publication giving notice of the Agreement.[2]  The *Federal Register* Notice provides that the allowed claim will be allocated as follows: $559,292.95 for the Tremont City Landfill Superfund Site in Tremont City, Ohio (the "Tremont Site" or "Tremont"), and $298,289.57 for the South Dayton Dump & Landfill Superfund Site in Moraine, Ohio (the "South Dayton Site" or "South Dayton").  There are three adjoining sites in Tremont City, Ohio that formerly comprised the Tremont City Landfill Superfund Site, including the Tremont City Barrel Fill Site.  At the time the United States filed Claim 14309, the Tremont City Landfill Superfund Site included the site that is now known as the Tremont City Barrel Fill Superfund Site.

4.       The Agreement was the product of lengthy negotiation of its terms among sophisticated counsel.  In addition, the parties weighed the merits, costs, risks, and delays that litigation would entail against the value of the settlement, including EPA's ability to receive cash towards funding cleanup at the Sites.

5.       Pursuant to the *Federal Register* Notice, published on October 7, 2011, members of the public had a fourteen-day period to provide comments on the Environmental Settlement Agreement.  On October 21, 2011, Ballard Spahr LLP submitted a comment (the "Comment") on behalf of The Proctor & Gamble Company, PPG Industries, Inc., International Paper Company,

---

[2]      *See* Notice of Lodging of Settlement Agreement Under the Comprehensive Environmental Response, Compensation, and Liability Act, 76 Fed. Reg. 62,446, 2011 WL 4625850 (Oct. 7, 2011) (the "*Federal Register* Notice"), annexed hereto as Exhibit A.

Franklin International, Inc., Strebor Inc., and Worthington Cylinder Corporation (the "Companies").[3]  The United States received no other comments.

6.      The Companies state that they, along with DPH Holdings Corp., have conducted response actions at the Tremont Site, and have reimbursed EPA for a portion of its response costs. The Companies claim to have incurred in excess of $7,000,000 in response costs at the Tremont Site.  The Companies object to the Environmental Settlement Agreement, contending that the Agreement, and any order approving the Agreement, should expressly provide that EPA will place the amount of $559,292.95—*i.e.,* the amount of the allowed claim for the Tremont Site—in the Superfund, and that those funds (including interest) "will remain available for payment of costs of response" by any of the Companies, if any of them agree to perform the remedy selected for the Tremont Site in a Record of Decision dated September 28, 2011, or any modification thereto. Ex. B.

7.      Having reviewed the comment, the United States has determined that the Environmental Settlement Agreement is fair, reasonable, and consistent with environmental law. The Agreement and *Federal Register* Notice make clear that if the Agreement becomes effective, EPA will deposit $559,292.95 into a special account for the Tremont Site.  Moreover, requiring EPA to set aside that amount solely for reimbursement of the Companies would divest EPA of its discretion to disburse funds from special accounts to potentially responsible parties ("PRPs"), and is contrary to EPA guidance on special accounts.  Finally, by operation of section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), the effectiveness of the Environmental Settlement Agreement will result in a reduction of the potential liability of other PRPs with respect to matters addressed in the Agreement.

---

[3]      The Comment is annexed hereto as Exhibit B.

**ARGUMENT**

**THE COURT SHOULD APPROVE THE PROPOSED AGREEMENT**

8.      Approval of a settlement agreement is a judicial act committed to the informed

discretion of the Court.  *See Publicker Indus. Inc. v. United States (In re Cuyahoga Equip. Corp.)*,

980 F.2d 110, 118 (2d Cir. 1992).  Judicial review of a settlement negotiated by the United States

to protect the public interest is subject to special deference; the Court should not engage in

"second-guessing the Executive Branch."  *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84

(1st Cir. 1990); *In re Cuyahoga*, 980 F.2d at 118 (noting the "usual deference given the EPA");

*New York v. Solvent Chem. Corp.*, 984 F. Supp. 160, 165 (W.D.N.Y. 1997).  The function of the

Court in reviewing such settlements is not to substitute its judgment for that of the parties to the

proposed settlement, but to confirm that the terms of the proposed settlement are "fair and

adequate and are not unlawful, unreasonable, or against public policy."  *United States v. Hooker*

*Chem. & Plastics Corp.*, 540 F. Supp. 1067, 1072 (W.D.N.Y. 1982) (citations omitted), *aff'd*, 749

F.2d 968 (2d Cir. 1984).  If the Court finds that these standards have been met, then the settlement

should be approved.  *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1426 (6th Cir.

1991).  This "limited standard of review reflects a clear policy in favor of settlements."  *Solvent*

*Chem. Corp.*, 984 F. Supp. at 165.

9.      <u>Fairness</u>: The Companies do not challenge the fairness of the Settlement.  The

fairness criterion of a CERCLA settlement integrates both procedural fairness and substantive

fairness.  *Cannons Eng'g*, 899 F.2d at 86-88.  To measure procedural fairness, the Court "should

ordinarily look to the negotiation process and gauge its candor, openness, and bargaining balance."

*Id.* at 86.  The proposed Agreement is procedurally fair because it was negotiated at arm's length

over several months, and the parties were represented by experienced counsel.

4

10.    To measure "substantive" fairness, the Court considers whether the settlement is "based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability . . . according to rational (if necessarily imprecise) estimates of how much harm each PRP has done." *Id.* at 87; *see also United States v. Davis*, 261 F.3d 1, 24 (1st Cir. 2001). The proposed Agreement is substantively fair because it was the product of an analysis of DAS's environmental liabilities, the circumstances under which contamination occurred, litigation risks, and multiple other factors. Under the Agreement, the United States will recover cash for the Tremont and South Dayton Sites in the event that a settlement of the Delphi FICA Action is consummated, while avoiding the uncertainty of litigation over Claim 14309.

11.    <u>Reasonableness</u>: Courts evaluating the reasonableness of CERCLA settlements have considered (i) the technical adequacy of the cleanup work to be performed; (ii) satisfactory compensation to the public for response costs; and (iii) the risks, costs, and delays inherent in litigation. *See United States v. Charles George Trucking*, 34 F.3d 1081, 1085; (1st Cir. 1994); *Cannons Eng'g*, 899 F.2d at 89-90. Although the first prong of the reasonableness inquiry is not at issue here, the Environmental Settlement Agreement satisfies the other, necessarily intertwined, considerations relevant to reasonableness. As discussed above, the United States will receive cash for the Tremont and South Dayton Sites without risk of litigation, or the uncertainties of general unsecured treatment under Debtors' Modified Plan.[4] The Agreement thus reasonably balances the litigation risks and potential expense and delay of protracted litigation, the strength of the United States' case against the Debtors, the Debtors' bankruptcy, and the need for cleanup. Accordingly, the Environmental Settlement Agreement is reasonable.

---

[4]    According to Debtors' Closing Report in Chapter 11 Cases, filed on October 21, 2009 (Docket # 18994), "a distribution to holders of General Unsecured Claims, if any, is unlikely to exceed 4.2% of the Allowed Claims."

12.    <u>Consistency with CERCLA's Goals</u>:  The primary goals of CERCLA are to "encourage prompt and effective responses to hazardous waste releases and to impose liability on responsible parties," and to "encourage settlements that would reduce the inefficient expenditure of public funds on lengthy litigation."  *In re Cuyahoga*, 980 F.2d at 119.  The Environmental Settlement Agreement furthers these statutory goals.  As discussed above, the proposed Agreements obtain allowed prepetition claims at Tremont and South Dayton, to be funded by a setoff against the refund owed to Reorganized Debtors under the proposed settlement of the Delphi FICA Action.  Moreover, the Agreement serves CERCLA's goal of reducing, where possible, the litigation and transaction costs associated with response actions, as well as the public policy favoring settlement to reduce costs to litigants and burdens on the courts.  *See Solvent Chem. Corp.*, 984 F. Supp. at 165; *Hooker Chem.*, 540 F. Supp. at 1072.[5]

13.    The only Comment that the United States received was from the Companies.  *See* Ex. B.  That Comment does not warrant rejection of the Agreement.  The Agreement need not be revised to provide, as the Companies suggest, that $559,292.95 will be placed into a Superfund account.  As worded, the Agreement already makes clear that $559,292.95 will be placed into a Tremont Site special account within the Superfund.[6]  Paragraph 5 of the Agreement indicates that EPA will allocate funds received under the Agreement to specific Superfund sites to be named in the *Federal Register*.  The *Federal Register* Notice indicates, *inter alia*, that the Tremont Site will be allocated an allowed claim of $559,292.95.  *See* 76 Fed. Reg. 62,446.  Under Paragraph 5 of the

---

[5]    Reorganized Debtors agree that the Agreement is fair, reasonable, and consistent with the goals of CERCLA.  *See* Reorg. Debtors' Motion to Approve ¶¶ 28-35.

[6]    As noted above, there are three adjoining sites in Tremont City, Ohio that formerly comprised the Tremont City Landfill Site, one of which is the Tremont City Barrel Fill Site.  Consistent with the Comment, an EPA special account has been set up for the Tremont City Barrel Fill Site.  EPA will place the funds in the Tremont City Barrel Fill special account.

Agreement, that claim will be setoff against the refund owed by the United States to Reorganized Debtors under the proposed settlement of the Delphi FICA Action. Finally, paragraph 6 of the Agreement provides that "[a]ny funds received by EPA for a site specified in the *[Federal Register* Notice] *shall be deposited into the EPA special account for that site* within the Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the site, or to be transferred to the Hazardous Substance Superfund."  (emphasis added).

14.    Paragraph 6 of the Agreement strictly conforms to the language required by EPA's Consolidated Guidance on the Establishment, Management and Use of CERCLA Special Accounts, dated October 4, 2002 (the "Special Account Establishment Guidance"),[7] annexed hereto as Exhibit C.  *See* Ex. C at 3 (model language).  The Special Account Establishment Guidance specifies that the purpose of settlement involving special accounts is "to provide funds for the cleanup of a site.  In these situations, the Agency expects to use the funds consistent with Agency Model language (i.e., to conduct or finance response actions at or in connection with the site.)."  Ex. C at 6 n.12.  The Tremont cleanup is a high priority of EPA.  The Agency has every incentive to use the proposed setoff funds, consistent with the purpose for special accounts identified in EPA's Special Account Establishment Guidance.

15.    In addition, the Special Account Establishment Guidance explicitly provides that "[i]t is Agency policy to provide disbursements of special account funds to a PRP only when the PRP agrees to conduct a response action *as part of a settlement agreement*."  *See* Ex. C at 7 (emphasis added).  The Comment does not indicate that any of the Companies have reached a

---

[7]    The Establishment Guidance is available at http://www.epa.gov/compliance/ resources/policies/cleanup/superfund/congui-estmgt-specacct.pdf.

settlement with EPA to perform the work indicated in the Record of Decision.  If and when they do enter into a settlement, EPA's special account guidance will apply.

16.      Finally, PRPs are entitled to receive the benefit of a reduction in total liability at the Tremont Site pursuant to section 113(f)(2) of CERCLA.  Under that provision, a settlement "reduces the potential liability of [other potentially responsible parties] by the amount of the settlement." 42 U.S.C. § 9613(f)(2).  In the event the proposed Environmental Settlement Agreement becomes effective, the potential liability of PRPs with respect to matters addressed in the Agreement will be reduced by the amount of the settlement ($559,292.95), by operation of CERCLA.

## CONCLUSION

For the above reasons, the United States respectfully requests that the Court find the Environmental Settlement Agreement fair, reasonable, and consistent with environmental law, and that the Court approve and enter the proposed order submitted with Debtors' Motion to Approve the Agreement.

Dated: New York, New York
       November 15, 2011

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York
                                        *Attorney for the United States of America*

                        By:      s/ Joseph N. Cordaro
                                        JOSEPH N. CORDARO
                                        Assistant United States Attorney
                                        86 Chambers Street, 3rd Floor
                                        New York, New York 10007
                                        Telephone: (212) 637-2745
                                        Facsimile:  (212) 637-2686
                                        Email: joseph.cordaro@usdoj.gov

8

# EXHIBIT A

*respond:* It is estimated that 2,000 respondents will complete the form annually within approximately 2.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* There are an estimated 5,000 total annual burden hours associated with this collection.

If additional information is required contact: Jerri Murray, Department Clearance Officer, United States Department of Justice, Justice Management Division, Policy and Planning Staff, Two Constitution Square, 145 N Street, NE., Room 2E–508, Washington, DC 20530.

**Jerri Murray,**
*Department Clearance Officer, PRA, United States Department of Justice.*
[FR Doc. 2011–25988 Filed 10–6–11; 8:45 am]
**BILLING CODE 4410–12–P**

## DEPARTMENT OF JUSTICE

### Notice of Lodging of Settlement Agreement Under the Comprehensive Environmental Response, Compensation, and Liability Act

Notice is hereby given that on October 4, 2011, a proposed Settlement Agreement in the bankruptcy matter *In re DPH Holdings Corp., et al.,* Jointly Administered Case No. 05–44481 (RDD), was filed with the United States Bankruptcy Court for the Southern District of New York. The Settlement Agreement between the United States and DPH Holdings Corp., f/k/a Delphi Corp., and its affiliated reorganized debtors (''Reorganized Debtors'') resolves claims and causes of action of the United States on behalf of the Environmental Protection Agency (''EPA'') against debtor Delphi Automotive Systems LLC n/k/a DPH–DAS LLC under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C 9601–75 (''CERCLA''), and Section 7003 of the Resource Conservation and Recovery Act (''RCRA''), 42 U.S.C. 6973, with respect to the Tremont City Landfill Superfund Site in Tremont City, Ohio (''Tremont Site''), and the South Dayton Dump & Landfill Superfund Site in Moraine, Ohio (''South Dayton Site'').

Under the Settlement Agreement, the United States, on behalf of EPA, will have an allowed claim of $857,582.52. The allowed claim shall be allocated as an allowed claim of $559,292.95 for the Tremont Site and an allowed claim of $298,289.57 for the South Dayton Site. The effectiveness of the settlement is subject to the approval of a potential settlement of a tax refund action, *Delphi Corp., et al.* v. *United States,* Case No. 08 Civ. 4487 (PKC) (the ''Tax Refund Action''), pending in the United States District Court for the Southern District of New York. If the Tax Refund Action settlement is approved, the allowed claim of $857,582.52 shall be applied as a setoff against the refund that would be owed to the Reorganized Debtors. Pursuant to the Settlement Agreement, the Debtors and Reorganized Debtors will receive a covenant not to sue from the United States on behalf of EPA for the sites identified in this Notice, i.e., the Tremont Site and South Dayton Site.

Comments relating to the Settlement Agreement must be received by the Department of Justice no later than fourteen (14) days from the date of this publication. Comments should be addressed to the Assistant Attorney General, Environment and Natural Resources Division, and either e-mailed to *pubcomment-ees.enrd@usdoj.gov* or mailed to P.O. Box 7611, U.S. Department of Justice, Washington, D.C. 20044–7611, and should refer to *In re DPH Holdings Corp.,* D.J. Ref. _90–11–3–08913. Commenters may request an opportunity for a public meeting in the affected area, in accordance with Section 7003(d) of RCRA, 42 U.S.C. 6973(d).

The Settlement Agreement may be examined at the Office of the United States Attorney, 86 Chambers Street, 3rd Floor, New York, New York 10007, and at the U.S. Environmental Protection Agency, Ariel Rios Building, 1200 Pennsylvania Avenue, NW., Washington, DC 20460. During the public comment period, the Settlement Agreement may also be examined on the following Department of Justice Web site, *http://www.usdoj.gov/enrd/Consent_Decrees.html.* A copy of the Settlement Agreement also may be obtained by mail from the Consent Decree Library, P.O. Box 7611, U.S. Department of Justice, Washington, DC 20044–7611 or by faxing or e-mailing a request to Tonia Fleetwood (*tonia.fleetwood@usdoj.gov*), fax no. (202) 514–0097, phone confirmation number (202) 514–1547. In requesting a copy from the Consent Decree Library, please enclose a check in the amount of $2.50 (25 cents per page reproduction cost) payable to the U.S. Treasury or, if by e-mail or fax, forward a check in that amount to the Consent Decree Library at the stated address.

**Maureen M. Katz,**
*Assistant Chief, Environmental Enforcement Section, Environment and Natural Resources Division.*
[FR Doc. 2011–26037 Filed 10–6–11; 8:45 am]
**BILLING CODE 4410–15–P**

## DEPARTMENT OF JUSTICE

### Drug Enforcement Administration

### Importer of Controlled Substances; Notice of Application

Pursuant to 21 U.S.C. 958(i), the Attorney General shall, prior to issuing a registration under this Section to a bulk manufacturer of a controlled substance in schedule I or II, and prior to issuing a regulation under 21 U.S.C. 952(a)(2) authorizing the importation of such a substance, provide manufacturers holding registrations for the bulk manufacture of the substance an opportunity for a hearing.

Therefore, in accordance with 21 CFR 1301.34(a), this is notice that on August 11, 2011, Fisher Clinical Services, Inc., 7554 Schantz Road, Allentown, Pennsylvania 18106, made application by renewal to the Drug Enforcement Administration (DEA) to be registered as an importer of the following basic classes of controlled substances:

| Drug | Schedule |
| --- | --- |
| Noroxymorphone (9668) .............. | II |
| Sufentanil (9740) .......................... | II |
| Tapentadol (9780) ......................... | II |

The company plans to import the listed substances for analytical research and clinical trials.

Any bulk manufacturer who is presently, or is applying to be, registered with DEA to manufacture such basic classes of controlled substances may file comments or objections to the issuance of the proposed registration and may, at the same time, file a written request for a hearing on such application pursuant to 21 CFR 1301.43, and in such form as prescribed by 21 CFR 1316.47.

Any such written comments or objections should be addressed, in quintuplicate, to the Drug Enforcement Administration, Office of Diversion Control, **Federal Register** Representative (ODL), 8701 Morrissette Drive, Springfield, Virginia 22152; and must be filed no later than November 7, 2011.

This procedure is to be conducted simultaneously with, and independent of, the procedures described in 21 CFR 1301.34(b), (c), (d), (e), and (f). As noted

# EXHIBIT B

# Ballard Spahr
LLP

210 Lake Drive East, Suite 200
Cherry Hill, NJ 08002-1163
TEL 856.761.3400
FAX 856.761.1020
www.ballardspahr.com

October 21, 2011

*Via E-mail*

Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
P.O Box 7611
Washington, DC  2004-7611

Re:   Proposed Settlement Agreement in *In re DPH Holdings Corp., et al.*
      Jointly Administered Case No. 05-44481 (RDD)

Dear Assistant Attorney General:

I am writing on behalf of The Procter & Gamble Company, PPG Industries, Inc., International Paper Company, Franklin International, Inc., Strebor Inc., and Worthington Cylinder Corporation (collectively the "Companies") with respect to the October 7, 2011 Federal Register notice of the above-referenced proposed settlement agreement (the "Proposed Settlement"). The Companies are among the persons who, along with DPH Holding Corp., have conducted response actions at the Tremont City Barrel Fill Superfund Site (the "Barrel Fill Site"), a portion of the Tremont City Landfill Superfund Site, and have reimbursed the United States Environmental Protection Agency ("EPA") for a portion of its response costs. To date, the Companies have incurred in excess of $7 million in costs of response at the Site. The Companies object to the Proposed Settlement.

The Proposed Settlement gives to the United States, on behalf of EPA, an allowed claim in the amount of $559,292.95 with respect to the Barrel Fill Site. The Proposed Settlement also states that this amount will be applied as a setoff against the refund owed to the Reorganized Debtors. The Proposed Settlement should expressly provide that EPA will place the amount of $559,292.95 in the Superfund, and those monies (including interest earned) will remain available for payment of costs of response by any one or more of the Companies, if any one or more of the Companies agree to perform the remedy selected for the Barrel Fill Site in the September 28, 2011 Record of Decision (or any modification thereto). This same term should be included in any Order of the Bankruptcy Court approving the Proposed Settlement.

Very truly yours,

Glenn A. Harris
GAH/

DMEAST #14181946 v2

A PA Limited Liability Partnership | Steven W. Suflas, Managing Partner

Atlanta   Baltimore   Bethesda | Denver | Las Vegas | Los Angeles | New Jersey | Philadelphia | Phoenix | Salt Lake City   San Diego
Washington, DC | Wilmington   www.ballardspahr.com

**EXHIBIT C**



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C.  20460

OCT    4 2002

## MEMORANDUM

SUBJECT:    Consolidated Guidance on the Establishment, Management and Use of CERCLA
Special Accounts

FROM:       Barry Breen, Director
Office of Site Remediation Enforcement (OSRE)

Michael Cook, Director
Office of Emergency and Remedial Response (OERR)

Joseph L. Dillon, Comptroller
Office of the Chief Financial Officer (OCFO)

TO:          Office of Regional Counsel Superfund Branch Chiefs
Regional CERCLA Program Branch Chiefs
Regional Finance Office Branch Chiefs

---

This memorandum transmits the  "Consolidated Guidance on the Establishment,
Management and Use of CERCLA Special Accounts."

The Agency has developed a number of effective ways to manage and use special accounts
to meet Agency goals.  The attached guidance is a reference guide for issues involving the deposit
and use of special accounts.  However, as there may be greater delineation of issues in other
special account guidance, this guidance should be read in conjunction with other special account
guidance.

If you have questions regarding this guidance, please contact Gary Worthman in OSRE
(202-564-4296), or Vince Velez in OCFO (202-564-4972).

Attachment

# Consolidated Guidance on the Establishment, Management and Use of CERCLA Special Accounts

Office of Site Remediation Enforcement/OECA
Office of Emergency and Remedial Response/OERR
Office of the Chief Financial Officer/OCFO

## Consolidated Guidance on the Establishment, Management and Use of CERCLA Special Accounts

*Table of Contents*

I.      INTRODUCTION.................................................................................1

II.     BACKGROUND..................................................................................1

III.    ESTABLISHING SPECIAL ACCOUNTS...............................................2

        A       Special Accounts Require an Agreement...............................2
        B.      Special Accounts Require Potential Future Work....................2
        C.      Depositing Payments Into a Special Account.........................3
        D.      Settlement Language for Depositing Funds into a Special Account.......................3
        E.      Oversight Payments............................................................4

IV.     USE OF SPECIAL ACCOUNTS FUNDS .............................................5

        A.      General Use of Special Account Funds.................................5
        B.      Timing for Use of Special Account Funds..............................7
        C.      Disbursing Special Account Funds to a PRP..........................7
                1.      Special Notice Letter................................................8
                2.      Establishing the Amount Available for Disbursement to a PRP.................9
                        a.      *Retaining Funds for EPA Use*...........................9
                        b.      *Considering the PRPs Site Responsibility and Other Compensation*..........................9
                3.      Settlement Language for Disbursing Funds to a PRP...............10
        D.      Disbursing Funds to a State................................................11
        E.      Disbursing Funds to Other Federal Agencies.........................12

V.      PURPOSE AND USE OF THIS DOCUMENT.........................................13

Attachment 1    Chronological List of Special Account Events, Policies and Guidance
Attachment 2    An Example of How to Consider the Work PRPs Site Responsibility and Other Compensation

## I.    INTRODUCTION

The Agency has developed a framework to manage and use special accounts to facilitate site clean-up.  Regions are encouraged to create and use special accounts as an incentive to secure private party cleanups and to fund EPA-lead response actions.  Special account funds may also be used, where appropriate, to assist response actions performed by a State or other Federal Agencies.

There are several EPA documents that address different aspects of the special account program.  This memorandum highlights several of these guidances, and provides additional guidance on a number of issues.  This memorandum addresses:

- •    when to establish a special account;
- •    types of funds that can be deposited in a special account;
- •    activities that may be funded through a special account;
- •    timing for use of special account funds; and
- •    considerations for disbursements to potentially responsible parties (PRPs), States and other Federal Agencies.

This memorandum should be read in conjunction with prior guidance, as it supplements but does not supersede prior guidance.  Where a topic is more fully discussed in other guidance, citation to that document is provided.  See Attachment 1 for a list of the major events, policies and guidance that address special accounts issues.

## II.    BACKGROUND

Section 122(b)(3) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) authorizes EPA to retain and use funds received in settlement to address CERCLA response actions contemplated in a settlement agreement.  The statutory provision provides that:

> "If, as part of any agreement, the President will be carrying out any action and the parties will be paying amounts to the President, the President may, notwithstanding any other provision of law, retain and use such amounts for purposes of carrying out the agreement."

42 U.S.C. §9622(b)(3)(Retention of Funds).  EPA retains these funds in site-specific accounts, called "special accounts," which are subaccounts within the EPA Hazardous Substance Superfund (Trust Fund).

1

### III.    ESTABLISHING SPECIAL ACCOUNTS

A.    Special Accounts Require an Agreement

In accordance with Section 122(b)(3) of CERCLA, the Agency may establish a special account when EPA receives funds pursuant to an "agreement" with a PRP.  Agreements that require a settling PRP to pay an amount to the Agency are usually in the form of an administrative order on consent (AOC) or consent decree (CD).   In addition, funds the Agency receives from parties that enter into a prospective purchaser agreement, or that comply with a court-approved bankruptcy plan, may be deposited into a special account.

Funds may be deposited in a special account regardless of whether the settling party is performing the work.  Typically, agreements under which the Agency receives funds that are deposited in a special account are with parties that are unable or unwilling to perform the response action (*e.g., de minimis*, ability to pay, or bankruptcy).  These funds are then used by the Agency to assist in the financing of the cleanup.  In addition, parties which are performing a response action under an AOC or CD make payments to the Agency to address past or future response actions.  These payments should also be considered for deposit into a special account.

Funds should not be placed in a special account unless there is an agreement between the Agency and the PRP.  Examples where funds should not be placed in a special account include: payments made in response to a demand letter, payments of EPA oversight costs for work performed under a unilateral order, or funds received pursuant to a court-ordered judgment.[1]  In these situations the funds are not being received pursuant to an agreement.

B.    Special Accounts Require Potential Future Work

The Agency will consider depositing amounts in a special account when, at the time of the agreement or at the time the payment under the agreement is made, there is "future work" at a site.  For purposes of this guidance future work is where:

- CERCLA response actions (*e.g.,* additional operable units) remain to be performed; or
- costs remain to be incurred (*e.g.,* oversight costs, 5-year review) at a site.

If there is no future work at a site, amounts received by the Agency should not be placed in a special account.  Instead, funds received should be deposited in the Trust Fund.

_____

[1]  In contrast, funds received pursuant to a judicially-approved settlement may be placed in a special account.

C.    Depositing Payments Into a Special Account

There are different types of payments that may be deposited by the Agency in a special account.[2] Some payments address a PRP's liability for "past response costs." Other payments address a PRP's liability for "future response costs." Payments for either past response costs or future response costs may be deposited in a special account.[3]

Solely for financial recording and reporting purposes, the Agency differentiates between payments for past response costs and future response costs. OCFO classifies payments made by a PRP to address its liability for EPA past response costs as a "cost recovery." OCFO refers to payments made by a PRP to address liability before the work is performed as a "cashout."[4] OCFO recently issued new procedures for financial management and accounting of these funds.[5]

D.    Settlement Language for Depositing Funds into a Special Account

Section 122(b)(3) of CERCLA provides the Agency with the discretion to establish and use a special account. OSRE has developed model language (which is appropriate for all types of agreements) to address the establishment and use of a special account. This language provides:

> "The total amount to be paid by Settling [Defendants or Parties] shall be deposited in the [Site Name] Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the Hazardous Substance Superfund."

While use of language providing for a special account is the preferred approach, there are CERCLA settlements that are silent on the use of a special account. These settlements generally state that the payments made to the Agency to address past or future response costs will be deposited in the Trust Fund. If there is potential future work at these sites, EPA may deposit any new payments received (regardless of whether they are payments for past or future response costs) into a special account for that site. No amendment of the agreement is necessary for EPA

---

[2]  *See* "Placement of Proceeds from CERCLA Settlements in Special Accounts" (January 2000), issued by OSRE (Deposit Guidance).

[3]  There also may be situations where a settlement also provides for other payments, such as payments for "interim response costs." These payments may also be deposited in a special account.

[4]  The financial definition of "cashout" is different from the use of "cashout" in the settlement context.

[5]  "Superfund Special Account Guidance" (July 2002), issued by OCFO.

3

to deposit funds in a special account. However, to facilitate coordination among regional program, counsel, and financial offices, the Division Director of the regional program office should, in consultation with legal and financial staff, send a memorandum to the Director, OSRE and the Comptroller, OCFO informing them of the intent to establish a special account and indicating: 1) the potential future work at the site that may be funded by the special account; and 2) the amount of the funds that the Region expects to deposit in the special account.

### E.    Oversight Payments

When the Agency enters into a settlement with a PRP for the performance of work, the PRP often will also agree to make a payment to address both past response costs and future response costs. The agreement usually defines past response costs as those incurred before a certain date, and future response costs as those that will be incurred after a specified date. EPA costs of overseeing (including the costs of an EPA contractor) the PRP's implementation of the work are usually included in the definition of future response costs.[6] As such, when a PRP reimburses EPA for oversight costs, the PRP is paying a future response cost.

It is common practice for the Agency to use appropriated Trust Fund money to pay for the oversight of a PRP activity, bill the PRP periodically for payment, and then deposit the future cost response funds collected from the PRPs into the Trust Fund.[7] An alternative approach is to use the funds in a special account to pay Agency oversight costs. If there is an existing special account (usually from a prior settlement) with an adequate balance, the Region may draw down on the special account to fund the Agency's oversight expenses. Similar to appropriated Trust Fund expenditures, the Agency would then bill the PRP in the next billing cycle, and deposit the reimbursement payment into the special account. This sequence (*e.g.,* draw down, bill, deposit) should be repeated until the cleanup is complete. If there is no special account when EPA commences oversight, the Region can establish one when the Agency receives a future response cost payment (*e.g.,* an oversight payment) or any other payment from the PRPs.[8] The model language discussed above may be

> *Deposit oversight payments into the site-specific special account and use these funds to pay for EPA's oversight.*

---

[6]  To the extent the decision in United States v. Rohm & Haas Co., 2 F.3d 1265 (3d Cir. 1993) may limit EPA's ability to recover oversight costs through litigation in states subject to the jurisdiction of the Third Circuit Court of Appeals, it should not be directly relevant to settlement situations covered by this guidance where the settling PRPs have agreed to pay such costs.

[7]  Even though the payment section of the settlement usually describes the payment as being a future response cost, OCFO classifies the funds as a "cost recovery," because the PRP's oversight payment occurs after the Agency's oversight costs are incurred.

[8]  In considering whether to deposit oversight payments to establish a special account, the Agency should decide if the amounts being received (*e.g.,* less than $25,000/year) are so minor that the costs of establishing and managing a special account outweigh the benefits to be realized.

used for the deposit and use of future response cost payments into a special account.

The chief benefit of using special accounts to fund oversight is that no matter when the special account is established, once these funds are available to pay the Agency's oversight costs, appropriated Trust Fund dollars are no longer needed for this activity. This allows the Agency to retain appropriated Trust Fund money for use at sites where there are no viable PRPs.

Using a special account to fund oversight does not affect the legal obligations of the PRPs to make payments; they have agreed to reimburse the Agency for the incurrence of future response costs.[9] The source of the funding (special account or appropriated Trust Fund money) does not affect the PRP's obligation to pay for future response costs under the settlement.

EPA can also negotiate with the PRPs to pre-pay oversight costs, placing the payments into a special account.[10] For example, payments may be made for the estimated amount of oversight (based on Record of Decision cost information) or on a periodic basis (*e.g.*, annually). If pre-payments are made annually, cost information from the prior year can be used to adjust the payment amount for the next year. To protect against potential cost overruns, the agreement may provide for payment above the prior year's costs (*e.g.*, 10%), and require the PRP to reimburse the Agency if there is a shortfall in a given year. PRPs that perform the response action and pre-pay oversight costs may be eligible to receive a refund of any remaining oversight dollars at the conclusion of the response action.[11]

## IV.    USE OF SPECIAL ACCOUNT FUNDS

### A.    General Use of Special Account Funds

Section 122(b)(3) provides that the Agency may retain and use such amounts (paid by the settling PRP) for purposes of carrying out the agreement. As discussed earlier, the Agency's model language indicates that amounts in a special account shall be retained and used to

---

[9] When the payment is received from the PRP, Regions should record the payment as a "cost recovery" because the payment is being made to address oversight work that has already occurred.

[10] Pre-payment of oversight should be recorded as a "cashout," and not a cost recovery, as the funds will be received in advance of the work to be performed.

[11] *See* "Update and Implementation of the Superfund Reform on Special Accounts" (February 7, 1997), issued by OSRE and OCFO. As a general matter, the Agency does not return funds to a PRP who enters into a cashout settlement and receives a covenant not to sue, even if the actual costs at the site end up being less then anticipated. EPA may, however, return overpayments of pre-paid oversight costs because, in agreeing to perform work at the site (while assuming the risks that cost will be higher than anticipated) and pay oversight, the settling work party agrees to pay only the actual costs of the oversight.

5

conduct or finance response actions at or in connection with the Site.[12]   There are two critical components of the model language:

- use of the funds for a *response* action; and
- use *at that site*.

This language allows the special account to be used for any CERCLA response action at the site. Section 101(25) of CERCLA defines "response" as "remove, removal, remedy, and remedial action, [and] all such terms (including the terms "removal" and "remedial action") including enforcement activities related thereto." Special account funds may be used for both intramural (*e.g.,* salaries and benefits) and extramural (*e.g.,* contract) expenses at a site.[13]

> *Special account use is determined by the agreement under which the funds were received.*

The model language provides the Agency with the flexibility to disburse funds from a special account to any party (other than the one that gave EPA the funds) performing the response action at that site. Thus, EPA may use the funds for Agency-lead response activities, and may provide special account funds to a PRP, State, or another Federal Agency for response activities.[14]

Special account funds may be used for response actions even where other CERCLA authorities may limit the use of appropriated Trust Fund dollars.   For example, Section 104 of CERCLA places limits on the use of appropriated Trust Fund dollars (*i.e.,* cost caps for a removal action) or requires state assurances (*e.g.,* state cost share and performance of operation and maintenance).   Section 122(b)(3) of CERCLA places no such limitations on the use of special account funds. However, special account funds may be used only for CERCLA-authorized response actions that are consistent with the agreement under which the funds were received.

If a settlement resolves the liability of parties at more than one site and the settlors want their payments to be available at each site, the settlement should contain a clear allocation of the funds among the different sites. In that situation, the Agency would establish a separate special account for each site because special account funds should not be transferred from one site to

---

[12]   Even where the settlement is silent on the establishment and use of the special account, the purpose of most settlements is to provide funds for the cleanup of a site. In these situations, the Agency expects to use the funds consistent with the Agency model language (*i.e.,* to conduct or finance response actions at or in connection with the site).

[13]   *See* "Chapter 15 - Financial Management of Special Accounts"(May 2001), issued by the Office of the Comptroller, OCFO.

[14]   *See* Sections IV. C.,D., and E. for guidance concerning disbursement to PRPs, States, or Other Federal Agencies.

another. However, special account funds may be used for any operable unit or subsite of one site, unless otherwise provided in the settlement agreement. Limiting the use of funds to a particular activity may be short-sighted, however, as later site developments may result in the Agency's need to use those funds for other activities at the site.

B.    Timing for Use of Special Account Funds

On September 28, 2001, OSRE and OERR issued "Special Accounts: Guidance on Key Decision Points in Using Special Account Funds" (Timing and Use Guidance). This guidance describes the general hierarchy for use of special account funds. As a general matter, absent an emergency situation, special account funds should not be used to fund EPA response work until EPA has exhausted efforts to reach a settlement with PRPs for the performance of work. The availability of special account funds can serve as a significant incentive for PRPs to enter into settlements for the performance of work. Once EPA has exhausted efforts to negotiate a settlement involving special account funds, EPA can begin to spend the special account funds to perform a response action in lieu of using appropriated Trust Fund dollars for that activity.

If there are no future EPA expenditures contemplated at a site, the regions should then consider applying the special account funds toward unreimbursed EPA expenditures at a site. This process is considered by OCFO as a "reclassification" of funds.[15] The remaining use of special account funds is to replenish the Trust Fund. EPA generally will transfer funds from the special account to the Trust Fund at the point in the process when there are no longer unaddressed risks and unreimbursed Agency costs at a site.

Decisions regarding the best and most appropriate use of special account funds are made throughout the response cycle at a site. As site conditions change (*e.g.,* need for an emergency removal), or if the circumstances of the PRP change (*e.g.,* insolvency), so may the priority for use of the special account funds. The Agency should routinely evaluate the use of special account funds.

C.    Disbursing Special Account Funds to a PRP

In November 1998 OSRE issued the "Interim Final Guidance on Disbursement of Funds from EPA Special Accounts to CERCLA Potentially Responsible Parties" (PRP Disbursement Guidance), which discusses the circumstances under which a PRP may receive special account funds. It is Agency policy to provide disbursements of special account funds to a PRP only when the PRP agrees to conduct a response action as part of a settlement agreement. Special account funds should not be disbursed to a PRP performing the response

> *PRPs are eligible to receive funds from a special account only if they enter into a settlement.*

---

[15]    *See* "Superfund Special Account Guidance" (OCFO)(July 2002)(Attachment 4), for the proper steps to undertake the reclassification process.

7

action under a unilateral administrative order. Prior Written Approval (PWA) from Headquarters (OSRE/Regional Support Division) is required before making an offer or providing settlement language for disbursement of funds from a special account to a PRP.[16]

There are the different components of a disbursement offer: the timing for making the offer; the amount, if any, for disbursement; and the appropriate disbursement settlement language. These components are discussed in greater detail in the following section.

1.    Special Notice Letter

When issuing a Special Notice Letter to PRPs for a site where there is an established special account, the letter should state that a special account exists at the site, and that funds may be available if EPA and the PRPs enter into a settlement agreement.[17] Because a number of settlement issues are unresolved at this stage in the negotiations, the letter should not be specific regarding amounts available for disbursement. The following language should be incorporated into the Special Notice Letter at sites with available special account funds:

> "Under Section 122(b)(3) of CERCLA, EPA has established a special account for this site from settlement proceeds previously received at this site. Special account funds may be used to conduct or finance response actions at a site. EPA anticipates there may be special account funds available for disbursement to the PRPs at the [insert site name] Superfund site if the parties can reach a settlement with EPA to perform response actions at the site. Special account funds will not be available to unilateral order recipients. The Agency may use the special account funds to reimburse past response costs incurred by the United States or to pay for other response activities at the site. The disbursement of special account proceeds is solely at the discretion of EPA. If EPA receives a good faith offer to perform the work, EPA will discuss, during the ensuing settlement negotiations, the actual amount of special account proceeds the Agency may make available to settling work parties."

Specific disbursement offers in the Special Notice Letter must receive prior written approval from Headquarters before the Special Notice Letter is issued.

---

[16]  *See* "OSRE Prior Approvals, Concurrence, and Consultation Roles Chart" (July 2001).

[17]  When EPA believes that negotiation with a PRP(s) to clean up a site may result in a settlement, the Agency issues a Special Notice Letter to the PRP(s). The Special Notice Letter typically includes information regarding why the Agency believes the party is a PRP, EPA's plans for the cleanup, and invites the PRP(s) to make an offer to perform the work and pay remaining past or future EPA costs. *See* "Interim Guidance on Notice Letters, Negotiations, and Information Exchange" (October 1987).

8

2.    Establishing the Amount Available For Disbursement to a PRP

The Timing and Use Guidance and the PRP Disbursement Guidance discuss a number of competing uses for special account funds (*e.g.,* settlement incentive, funding of an emergency response action, or other EPA-lead activities) that the Agency will consider before agreeing to disburse funds to a PRP. Additional factors to consider in determining the amount, if any, of special account funds to disburse to a PRP, follow.

a.    *Retaining Funds for EPA Use*

When negotiating a settlement agreement with the PRPs for performance of a response action, there may be situations where the PRPs only agree to fund a particular activity (*e.g.,* one operable unit), and do not agree to perform additional work beyond the scope of the response action, fund 5-year reviews, or perform future response actions at other operable units. In those situations, the Agency should retain an adequate amount of special account funds to fund these various activities, particularly if there are no other viable PRPs at the Site.

b.    *Considering the PRPs Site Responsibility and Other Compensation*

Consistent with the Agency policy of "polluter pays" and principles of equity, the work PRPs should be contributing at least their share of response costs at a site. This means that in negotiating a settlement which provides for disbursement from a special account, EPA will need to consider:

- the funds that the work PRPs receive from other PRPs;
- consideration provided by EPA (*e.g.,* orphan share compensation or other cost forgiveness); and
- the work parties' potential site share.

Consideration of these factors ensures that the work PRPs will not receive an undue benefit by the receipt of special account funds (since providing special account funds contributes towards reducing the amount that the work PRPs actually pay at the site). Once EPA determines that the work parties are paying at least their potential site share without special account disbursement, the Agency can then quantify the amount of special account funds that could be made available for disbursement to those settling work PRPs. Attachment 2 provides an example of how the Agency might perform a disbursement analysis.

It is important to note that the Agency's consideration of the above factors is solely for purposes of considering a special account disbursement settlement proposal. Regions should emphasize to PRPs that consideration of a party's site share as part of negotiations will have no legal effect on, or otherwise limit any positions the Agency may take in litigation. In addition, consideration of a party's share in the disbursement analysis for settlement purposes does not prevent EPA from pursuing that same PRP in litigation for the reimbursement of all Agency

9

costs if settlement is not reached.

3.     Settlement Language for Disbursing Funds to a PRP

The disbursement agreement with the work parties should be memorialized using the special account disbursement settlement language provided in the June 2001 "Revised Model RD/RA CD" (Model CD), issued by OSRE and the Department of Justice.[18]  As discussed earlier, all settlement language providing for disbursement to a PRP must be approved by Headquarters.  All settlements providing for the disbursement of special account funds to a PRP should contain, at a minimum, provisions that address the following issues:

- Creation of a Disbursement Special Account[19]   The disbursement amount negotiated with the PRPs should be reflected in the settlement.[20]  To ensure that the funds are available for disbursement to the PRPs (including interest earned on the disbursement amount) Regions should create a new special account - called a Disbursement Special Account.[21]

- Disbursement Requests and Timing for Disbursements[22]   The settlement should provide that the PRPs may submit a request for disbursement only after EPA confirms that a work milestone required by the agreement has been met.  Special account funds should not be disbursed to a PRP in excess of amounts the PRPs have actually spent on the response action covered by the settlement.

- Cost Documentation and Certification[23]  Each request for disbursement by a PRP should include a "Cost Summary and Certification."  The cost information should include an accurate written cost summary that describes the necessary costs incurred and paid by the PRPs for the work covered by a particular submission (while excluding costs not eligible

---

[18]  *See* Paragraphs 58-64 of the Model CD.

[19]  *See* Paragraph 58 of the Model CD.

[20]  After a settlement is effective, there may be situations in which the Agency wants to increase the amount of funds that will be made available to the work parties (*e.g.,* additional funds received from a new settlement).  In these situations, the work settlement should be modified to reflect the increase in funds, or the parties should execute a new settlement agreement.  In either case, any increase in the amount to be disbursed will need Headquarters' approval.

[21]  *See* "Chapter 15- Financial Management of Special Accounts" (June 2001), issued by OCFO for procedures to establish a Disbursement Special Account.

[22]  *See* Paragraph 59 and Paragraph 60.a. of the Model CD.

[23]  *See* Paragraph 60.b. of the Model CD.

10

for disbursement). Submissions should be certified by the Chief Financial Officer of at least one of the PRPs or an Independent Certified Public Accountant.

- Costs Excluded from Disbursement[24]   The settlement should provide that certain costs that the PRP incur should not be eligible for reimbursement from a special account  For example, if the work parties make a payment (*e.g.,* payment for past costs or stipulated penalty) under the Consent Decree they may not seek to have those costs reimbursed. PRPs should also not submit a disbursement request for work performed under a separate agreement or order. While the Agency may consider the prior work in establishing the amount to be reimbursed under the settlement, funds should be disbursed only for work performed under the current agreement.

- Terminating and Recapturing Special Account Disbursements[25]   There are several ways a PRP can lose access to special account funds, including submittal of inadequate documentation supporting the request for disbursement or EPA takeover of the work.[26] Materially false, inaccurate or misleading submissions may also result in termination of disbursements. The Agency may also consider suspending payments if the PRP is in violation of other aspects of the settlement (*e.g.,* pending penalty matter, non-payment of oversight bills, or other violation that does not result in work takeover) until the violation is resolved. Minor paperwork mistakes should not result in termination or suspension of disbursements. EPA should provide PRPs with an opportunity to rectify most deficiencies before terminating or suspending disbursement from a special account. If termination occurs and the reason relates to any previously disbursed funds (*e.g.,* discovery of a materially false submission after disbursement), the settlement should provide that those previously disbursed funds will be returned to EPA.

D.    Disbursing Funds to a State[27]

States are eligible to receive special account funds when they take a lead role at the site or provide support agency activities. EPA can provide the states with the special account funds through a cooperative agreement. A State is not required to provide a 10% cost share for that part of the remedial action funded through the special account, as the activity will be undertaken pursuant to EPA's authority under Section 122(b)(3). Special account funds may be provided to a State for funding for any aspect of the CERCLA response action, including operation and maintenance (O&M), unless the terms of the agreement under which the funds were received limit EPA's use of the PRP payments (funds may only be used consistent with the terms of the

---

[24]  *See* Paragraph 61 of the Model CD.

[25]  *See* Paragraph 62 of the Model CD.

[26]  *See* Paragraph 95 of the Model CD for the work takeover provision.

[27]  This paragraph applies to situations where the State is a not a PRP.

11

agreement).  Funds should be provided to the State only for the activities addressed by the settlement (*e.g.,* PRPs provide funds for a specific operable unit and the State performs that activity).  Remedial action or O&M activities not funded by the special account require the State to agree to pay its cost share, and provide financial or other assurances, as necessary.[28]

Before agreeing to disburse special account funds to a State, several factors should be considered:

- *Settlement Agreement* - The terms of the agreement indicate that the payment or use of the special account funds should be for that activity.
- *Funding Amount* - The level of funding should be consistent with the amount received in recognition or anticipation of that activity.[29]
- *Site Conditions* - If there are remaining risks at the site, the Region should retain adequate amounts in the special account to address those risks.
- *Status of Previous State Assurances* - If a State is not currently meeting its state assurance obligations, that issue should be resolved before providing special account funds.

Whenever EPA provides special account funds to a State, the State must agree to assure payment of the required cost share for appropriated Trust Fund monies it receives, as well as assure full performance of the O&M after the remedy is operational and functional if O&M is not fully funded through the settlement.  The accounting, reporting and financial reconciliation requirements prescribed by 40 CFR Part 35, Subpart O apply to both the special account and Trust Fund monies the State receives under the cooperative agreement.

E.    Disbursing Funds to Other Federal Agencies[30]

Other Federal Agencies may be eligible to receive special account funds when they are performing all or a part of the response action in lieu of EPA.  "Chapter 15 - Financial Management of Special Accounts" (June 2001), issued by OCFO, indicates that if a Federal Agency agrees, via a Memorandum of Understanding, to perform response work using a special account, EPA may provide that agency with funds from the special account by entering into a site-specific Interagency Agreement.  An example of this type of arrangement is where the

---

[28] *See* Section 104(c) of CERCLA.  For example, if a remedial action will cost $5 M, and the special account provides $1.0 M towards the remedial action, the State will be required to assure payment of $400,000 or 10% of the remaining $4 M necessary to complete the remedial action and assure operation and maintenance of the remedy.

[29] For example, if EPA deposited $1.0 M in a special account, and $100,000 of that payment represents the amount paid by PRPs for O&M, then EPA should only provide up to $100,000 to the State for O&M (especially if the special account is needed to fund the remedial action).

[30] This paragraph applies to situations where the Federal Agency is a not a PRP.

Agency enters into an Interagency Agreement with the U.S. Army Corps of Engineers, under which EPA provides special account funds and the U.S. Army Corps of Engineers performs the response action.

Special account funds may be provided to a Federal Agency to pay for any aspect of the CERCLA response action, including funds for O&M, provided that the settlement terms (under which the funds were received) allow the use of the PRP's payments for that activity. Special account funds provided to a Federal Agency should be consistent with applicable statutory and regulatory provisions regarding transfers of funds from one Federal Agency to another Federal Agency.

## V.    PURPOSE AND USE OF THIS DOCUMENT

This Memorandum and any internal procedures adopted as a result of its implementation are intended exclusively as guidance for employees of the U.S. Environmental Protection Agency and create no substantive rights for any persons.

If you have any questions concerning the establishment and use of special accounts please contact any of the OSRE Headquarters staff listed below for assistance. The same staff are available to assist when a Region is seeking prior written approval from OECA before offering to disburse funds to a PRP.

> Gary Worthman (Regions 3, 5, and 10)(202-564-4296)
> Doug Dixon (Regions 4, 7 and 8)(202-564-4232)
> Beth Tomasello (Regions 1 and 2)(202-564-8203)
> Lisa Blum (Regions 6 and 9)(202-546-4283)

For questions related to the financial management of special accounts, please contact Vince Velez in OCFO, at 202-564-4972.

cc:    Earl Salo, Office of General Counsel
       Bruce Gelber, Department of Justice

13

*September 2002*

**Attachment 1**

---

| **Consolidated Guidance on the Establishment, Management and Use of CERCLA Special Accounts** |
|---|

Chronological List of Special Account Events, Policies and Guidance

- *October 1986* - Congress enacts Section 122(b)(3) of the Superfund Amendments and Reauthorization Act of 1986 (Public Law 99-499), which amends the Comprehensive Environmental Response, Compensation, and Liability Act. The new provision is published in 42 U.S.C. §9622(b)(3), which provides the authority for EPA to establish special accounts.

- *October 1995* - The Agency announces, as part of its Superfund Administrative Reforms, the intention to encourage greater use of special accounts as a means to ensure that settlement funds would be used for response actions at a particular site. The Agency also seeks to ensure that interest earned on special accounts would be credited to those accounts, and be available for response actions.

- *June 1996* - EPA, the Office of Management and Budget, and the Department of the Treasury agree that the interest earned by a special account can be credited to that account and used to fund response actions at the site for which the special account was established.

- *October 1996* - The Office of the Chief Financial Officer (OCFO) issues "Requesting Reimbursable Authority for Superfund Special Accounts (Principal and Interest)." This memorandum outlines the process for Regions to request reimbursable authority for special account funds. .Also included was the first report on special account balances (principal, interest, disbursements, unliquidated obligations, and available balance) compiled by the Cincinnati Finance Center (formerly known as the Cincinnati Financial Management Center). This report is updated quarterly each year.

  (www.intranet.epa.gov/ocfo/finservices/spec_accts/specaccts)(quarterly report)

- *May 1997* - The Office of Site Remediation Enforcement (OSRE) issues the "Special Account Implementation Notebook: A Reference Tool" (Notebook). The Notebook provides information implementing the special accounts reform, including a step-by-step process for establishing and disbursing funds from a special account. The Notebook was updated in May 2001.

1

- *November 1998* - OSRE issues the"Interim Final Guidance on Disbursement of Funds from EPA Special Accounts to CERCLA Potentially Responsible Parties." This guidance discusses when a potentially responsible party (PRP) may receive special account funds,        the timing and amount of special account disbursements, special account disbursement priorities, the disbursement process, and disposition of special account funds after completion of the response action.

  (www.epa.gov/compliance/resources/policies/cleanup/superfund/disburs-spact-mwm.pdf)

- *January 2000* - OSRE issues the "Placement of Proceeds  from CERCLA Settlements in Special Accounts." This guidance clarifies that both payments for past response costs and payments for future response costs funds received by the Agency can be deposited into a special account.[1]

  (www.epa.gov/compliance/resources/policies/cleanup/superfund/disburs-spact-mwm.pdf)

- *June 2001* -  OSRE and the United States Department of Justice issue the "Revised Model RD/RA Consent Decree." This model includes language for deposit of funds into a special account (paragraphs 54 and 55 of the Model CD) and language for disbursement of special account funds to a PRP (paragraphs 58-64 of the Model CD).[2]  All other model settlement documents that provide for the receipt of funds have also been updated to include the model deposit language.

- *June 2001* -  The Office of the Comptroller, OCFO issues "Chapter 15 - Financial Management of Special Accounts." This document is part of EPA's Resources Management Directives System (RMDS), 2550D, Financial Management of the Superfund Program, and sets forth the financial aspects associated with managing special accounts.

  (www:intranet.epa.gov/ocfo/policies/direct/2550d.htm)

- *September 2001* - OSRE and the Office of Emergency and Remedial Response (OERR) issue the "Special Accounts: Guidance on Key Decision Points in Using Special Account Funds." This guidance provides a general framework for deciding when and how to use special account funds (*e.g.,* as a settlement incentive or for performance of work).

  (www.epa.gov/compliance/resources/policies/cleanup/superfund/key-point-mem.pdf)

---

[1] This policy effectively superceded the "Interim Cashout Settlement Procedures," (OSWER Directive #9832.22), which was issued in January 1992.

[2] The disbursement language was first issued in the May 2000 "Revised Model RD/RA Consent Decree." The disbursement provisions were not changed in the 2001 revision.

- *July 2002* - The Financial Management Division, OCFO issues the "Superfund Special Account Guidance." This document provides additional accounting procedures for the recording and tracking of funds in a special account.

  (www.intranet.epa.gov/ocfo/policies/superfund/sfsamemo.pdf)(cover note)
  (www.intranet.epa.gov/ocfo/policies/superfund/saguide.pdf)

*September 2002*

**Attachment 2**

| Consolidated Guidance on the Establishment, Management and Use of CERCLA Special Accounts |
|---|

An Example of How to Consider the Work PRPs Site Responsibility and Other Compensation

**Step One** - EPA identifies all the costs at a site and the percentage of costs the work parties will expend at the site if they enter into the settlement. In considering the PRP expenditures, EPA should account for the amounts the work PRPs are receiving from other parties and the orphan share compensation or other compensation to be offered by EPA. Another component of this step is for EPA to perform an allocation analysis to determine the relative share of the work parties (as a group) at the site.

Once the percentage of costs and potential share are identified, the two components can be matched to determine if the costs that the work PRPs will be paying equal at least their site share. An example of step one of the process follows:

| Example - Step One | |
|---|---|
| Estimated Cost of Response Action to be Performed by Work Parties | $30 M |
| EPA Past/Future Costs | $ 3 M |
| Performing Parties' Past Costs[1] | $ 2 M |
| *Total Site Costs* | *$35 M* |
| Amount in Special Account | $12 M (received from *de minimis* parties) |
| Share Analysis | EPA allocates the work parties a 50% share of site costs |
| Non-*de minimis* PRP Cashout Funds | $3 M will be provided directly to the work PRPs |
| Orphan Share Compensation | EPA determines the orphan share is 10%. The work parties are offered orphan share compensation equal to EPA past plus future costs ($3M). |

---

[1] Only PRP costs related to a response action at the site should be considered. PRP litigation expenses should not be considered as part of this analysis unless it relates to performance of the response action (*e.g.*, obtaining access).

1

In this example, total site costs are $35 M, but the work parties will actually be spending $29 M:

|  |  |  |
|---|---|---|
| Response Action |  | $30 M |
| PRP Past Costs | + | $ 2 M |
| Funds Received From Non- De min Parties | - | $ 3 M |
| Payment of EPA Past Costs | + | $ 0 M |
|  |  | $29 M |

This means that the work PRPs would actually be paying approximately 83% ($29 M of $35 M) of site costs. As EPA allocation analysis indicates a 50% site share, the work parties would be paying more than their allocated share at the site, and would be eligible to receive special account funds (step two).

**Step Two -** Identify the estimated amount the work PRPs will be paying (using the amount derived in step one) and then compare that number to the allocated share percentage (now expressed as an amount). This analysis will identify the maximum amount of special account funds that may be offered to a work PRP in settlement. Continuing from the example above, the calculation is:

| **Example - Step Two** ||
|---|---|
| Amount work parties will spend | $29 M ($30 M + $2 M already spent - $3 M to be received, + 0 payment for EPA past/future costs) |
| Share analysis (expressed as a cost) | $17.5 M (50% of $35 M site costs) |
| *Amount of special account funds PRPs may be eligible to receive* | *$11.5 M ($29 M - $17.5 M)* |

In this example, the work PRPs could be offered up to $11.5 M of the $12 M in the special account. EPA can offer less than $11.5 M if the Agency needs to retain more than $0.5 M from the special account to address remaining site risks or responsibilities (*e.g.,* 5-year review).

2