**Hearing Date and Time: December 21, 2011 at 10:00 a.m. (prevailing Eastern Time)**
**Response Date and Time: December 14, 2011 at 4:00 p.m. (prevailing Eastern Time)**

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Norman C. Ankers (Michigan Bar No. P30533)
Seth A. Drucker (Michigan Bar No. 656451)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
Telephone: (313) 465-7306
Facsimile: (313) 465-7307
Email: nankers@honigman.com

Attorneys for Swynson Limited, assignee of evo Medical Solutions, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
|  |  |  |
|---|---|---|
| **In re** | : | Chapter 11 |
|  | : |  |
| **DPH HOLDINGS CORP.,** et al., | : | Case No. 05-44481 (RDD) |
|  | : |  |
| Reorganized Debtors. | : | (Jointly Administered) |

----------------------------------------------------------------x

**NOTICE OF MOTION FOR ORDER DETERMINING THAT**
**SWYNSON LIMITED, ASSIGNEE OF evo MEDICAL SOLUTIONS, INC.,**
**MAY PURSUE BINDING ARBITRATION**

PLEASE TAKE NOTICE that on November 23, 2011, Swynson Limited ("**Swynson**"),

assignee of evo Medical Solutions, Inc. ("**evo**"), through its attorneys, Honigman Miller

Schwartz and Cohn LLP, filed a *Motion for Order Determining that Swynson Limited, Assignee*

*of evo Medical Solutions, Inc., May Pursue Binding Arbitration* (the "**Motion**").

PLEASE TAKE FURTHER NOTICE that a hearing to consider approval of the Motion will

be held before the Honorable Robert D. Drain, United States Bankruptcy Judge, of the United States

Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, Courtroom 118,

White Plains, New York 10601, on **December 21, 2011 at 10:00 a.m. (prevailing Eastern Time)**,

or as soon thereafter as counsel may be heard.

The deadline to file any objections and responses to the Motion is **December 14, 2011 at 4:00 p.m. (prevailing Eastern Time)** (the "**Objection Deadline**").

Objections and responses, if any, to the Motion must be in writing and must (a) conform to the Bankruptcy Rules, the Local Rules of the Bankruptcy Court for the Southern District of New York, and any case management orders in these chapter 11 cases, (b) set forth the name of the objecting party, the nature and amount of claims or interests held or asserted by the objecting party against the Debtors' estates or property, and (c) set forth the basis for the objection and the specific grounds therefore.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with hard copy delivered directly to Chambers), in accordance with General Order M-182 (which can be found at www.nysb.uscourts.gov), and served in accordance with General Order M-242, and on (i) Honigman Miller Schwartz and Cohn LLP, Attn. Norman C. Ankers and Seth A. Drucker, 660 Woodward Avenue, 2290 First National Building, Detroit Michigan 48226; (ii) the Debtors, DPH Holdings Corp., 5725 Delphi Drive, Troy, Michigan 48098 (Attn: President); (iii) counsel to the Reorganized Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 155 North Wacker Drive, Chicago, Illinois 60606 (Attn: John Wm. Butler, Jr., John K. Lyons, and Ron E. Meisler); (iv) counsel for the agent under the Debtors' former postpetition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017 (Attn: Donald S. Bernstein and Brian M. Resnick); (v) the Office of the United States Trustee for the Southern District

of New York, 33 Whitehall Street, Suite 2100, New York, New York 10004 (Attn: Attn:  Brian

Masumoto), so as to be received no later than the **Objection Deadline.**

PLEASE TAKE FURTHER NOTICE that only those objections made as set forth herein and

in accordance with the Case Management Orders will be considered by the Bankruptcy Court at the

Hearing.  If no objections to the Motion are timely filed and served in accordance with the

procedures set forth herein and in the Case Management Orders, the Bankruptcy Court may enter an

order granting the Motion without further notice.

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Attorneys for Swynson Limited.


Dated: November 23, 2011          By:  ___/s/ Norman C. Ankers_____
                                       Norman C. Ankers (Michigan Bar No. P30533)
                                       Seth A. Drucker (Michigan Bar No. 656451)
                                  2290 First National Building
                                  660 Woodward Avenue
                                  Detroit, MI  48226
                                  Telephone: (313) 465-7306
                                  Facsimile:  (313) 465-7307
                                  Email: nankers@hongiman.com

10026570.1

**Hearing Date and Time:  December 21, 2011 at 10:00 a.m. (prevailing Eastern Time)**
**Response Date and Time:  December 14, 2011 at 4:00 p.m. (prevailing Eastern Time)**

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Norman C. Ankers (Michigan Bar No. P30533)
Seth A. Drucker (Michigan Bar No. 656451)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
Telephone: (313) 465-7306
Facsimile: (313) 465-7307
Email: nankers@honigman.com

Attorneys for Swynson Limited, assignee of evo Medical Solutions, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
| | | |
|---|---|---|
| **In re** | : | Chapter 11 |
| | : | |
| **DPH HOLDINGS CORP.,** et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Reorganized Debtors. | : | (Jointly Administered) |
-------------------------------------------------------------x

**MOTION FOR ORDER DETERMINING THAT SWYNSON LIMITED, ASSIGNEE OF**
**evo MEDICAL SOLUTIONS, INC., MAY PURSUE BINDING ARBITRATION**

Swynson Limited ("**Swynson**"), assignee of evo Medical Solutions, Inc. ("**evo**"), files

this Motion for Order Determining that Swynson May Pursue Binding Arbitration Against DPH

Medical Systems LLC ("**Reorganized DMS**") and requests that the Court enter an order

confirming that the injunction and discharge of the Debtors' First Amended Joint Plan of

Reorganization of Delphi Corporation and Certain Affiliates, Debtors in Possession and

Affiliates (as modified) Docket 17030 (the "**Plan**") do not bar evo's claims against Reorganized

DMS for claims that arose after October 6, 2009.  In support of its Motion, Swynson states as

follows:

## INTRODUCTION

evo has claims against Reorganized DMS which arose after October 6, 2009, the effective date of Plan (the Effective Date), which are not subject to the Plan injunction or discharge. Pursuant to a Collateral Surrender Agreement dated October 5, 2011, Swynson is the assignee of evo's rights with respect to its claims against Reorganized DMS.

After unsuccessful attempts to resolve its claims against Reorganized DMS, evo sought binding arbitration to resolve its claims, as allowed under the agreement between the parties. Reorganized DMS refused to participate in binding arbitration, claiming that evo's post-effective date claims against Reorganized DMS were barred by the Plan. Swynson seeks a determination from this Court that it may commence binding arbitration against Reorganized DMS, as assignee of evo, only for claims arising after October 6, 2009, because the Plan injunction and discharge do not affect evo's post-effective date remedies against Reorganized DMS.

## BACKGROUND

1.      evo and debtor Delphi Medical Systems Corporation ("**Debtor DMS**") entered into a post-petition agreement dated November 28, 2007 (the "**Agreement**") for the supply of portable oxygen concentrators by Debtor DMS to evo (the "**Product**"). A copy of the Agreement is attached as **Exhibit A**. The Agreement was neither assumed nor rejected by DMS, and was instead, pursuant to paragraph 37 of the Order Approving Modification Under 11 U.S.C.§1127(b) To (I) First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession, as Modified and (II) Confirmation Order (Docket No. 18958) dated July 30, 2009 (the "**Plan Modification Order**") (Docket 18707), assigned to Reorganized DMS.

2

2.      Paragraph 47 of the Plan Modification Order established the bar date for filing administrative expense claims against the Debtors for claims accruing before the Effective Date of the Plan as 30 days after notice of the Effective Date of the Plan is filed on the docket.  The Effective Date occurred on October 6, 2009.

3.      The Products provide patients in need of supplemental oxygen therapy with a portable source for such oxygen, without the burden of carrying clumsy and heavy oxygen tanks around with them.

4.      Debtor DMS began supplying Products to evo under the Agreement after execution thereof.  Soon after shipments of Products began, evo discovered that the Products were defective and unsalable.

5.      evo timely notified Debtor DMS of the defective nature of the Products.  evo returned the defective Products to Debtor DMS.  Debtor DMS's supply of defective Products was a breach of the Agreement.  evo suffered damages as a result of Debtor DMS's breach of the Agreement.

6.      After entry of the Plan Modification Order, Reorganized DMS continued to do business with evo under the Agreement until about May 2010.  **Exhibit B**, Declaration of Dan Bunting (the "**Bunting Declaration**") at ¶3.  Reorganized DMS continued to, accept returns of defective Products.  Through May, 2010, it issued credits for defective Products.

7.      Indeed, after October 6, 2009, Reorganized DMS made promises that it would ship new replacement units that contained all the salient design features that would be necessary to make the oxygen concentrators saleable and marketable.

8.      The Agreement contains detailed procedures for the parties to resolve any disputes under the Agreement, including voluntary discussions and negotiations (Section 17.2) and binding arbitration (Section 16.2).  On or about May 18, 2010 pursuant to Section 17.2 of

the Agreement, evo notified Reorganized DMS of the breaches under the Agreement and requested that the parties commence informal discussions (as required by the Agreement) to resolve their dispute.

9.      Such informal discussions did not result in a satisfactory resolution of evo's claims regarding Reorganized DMS's breaches.  Accordingly, pursuant to Section 16.2 of the Agreement, on February 8, 2011, evo formally requested that Reorganized DMS submit the dispute to binding arbitration.

10.     Arbitration under the terms of the Agreement is in the best interest of both evo and Reorganized Delphi to allow for the efficient and final resolution of the dispute between the parties.   Under Michigan law, which is applicable to the Agreement, there is a strong presumption in favor of arbitrating disputes where the parties have so agreed.  *See Omega Constr. Co. v. Altman*, 382 N.W. 2d 839, 841 (Mich. 1986) (public policy favors arbitration in the resolution of disputes; arbitration clauses contained in contracts are to be liberally construed and any doubts about the arbitrability of an issue must be resolved in favor of arbitration); *Armoudlian v Zadeh*, 323 N.W. 2d 502 (Mich. App. 1982) (Michigan's courts have expressed a long-standing preference for arbitration as a means of resolving disputes; any doubts regarding the arbitrability of an issue must be resolved in favor of arbitration.); and *Kukowski v. Piskin*, 297 N.W. 2d 612, 613 (Mich. App. 1982) (Public policy favoring arbitration requires liberal construction of arbitration clauses, with all doubts regarding arbitrability of issue resolved in favor of arbitration.).

11.     Reorganized DMS refused to participate in binding arbitration, instead claiming that all of evo's claims, including evo's claims arising after the Effective Date, were barred by the injunction and discharge of sections 11.2 and 11.14, respectively, of the Plan.

12.     To the extent Reorganized DMS's breaches related to the Replacement Products occurred after the Effective Date, evo is entitled to pursue those claims against Reorganized

4

DMS as provided by the Agreement.  Addressing this same issue in *In re Texaco, Inc.*, 254 B.R. 536, 559-560 (Bankr.S.D.N.Y. 2000), this Court held that

> Simply stated, the basic rule is that claims arising after confirmation from a contractual relationship are not barred by a confirmation order.  It is only where the liability asserted in a claim is based upon a breach of contract that occurred before confirmation that the claim must be filed in the bankruptcy.

13.    Reorganized DMS should not be allowed to hide behind the Plan injunction and avoid liability for its post Effective Date breaches of the Agreement.

## CONCLUSION

Accordingly, Swynson, as assignee of evo's rights under the Agreement, requests that this Court enter an order confirming that the Plan injunction and discharge are not applicable to evo's post-Effective Date breach of contract claims against Reorganized DMS, and allowing Swynson to pursue evo's remedies against Reorganized DMS under the Agreement, including evo's right to compel Reorganized DMS to participate in binding arbitration.

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Attorneys for Swynson Limited.


Dated: November 23, 2011            By:    /s/ Norman C. Ankers
                                           Norman C. Ankers (Michigan Bar No. P30533)
                                           Seth A. Drucker (Michigan Bar No. 656451)
                                    2290 First National Building
                                    660 Woodward Avenue
                                    Detroit, MI  48226
                                    Telephone: (313) 465-7306
                                    Facsimile:  (313) 465-7307
                                    Email: nankers@hongiman.com


9762960.4

# EXHIBIT A

*Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007*

## DEVELOPMENT AND SUPPLY AGREEMENT

THIS DEVELOPMENT AND SUPPLY AGREEMENT ("**Agreement**") is dated as of November 28 , 2007 (the "**Effective Date**"), by and between **evo Medical Solutions, Inc.**, an Iowa Corporation ("**Customer**"), and **DELPHI MEDICAL SYSTEMS CORPORATION**, a Delaware corporation ("**Delphi**") (collectively the "**Parties**," and each individually a "**Party**"), based upon the following recitals.

A.     Customer and Delphi desire to collaborate in the development of a Pulsed Delivery Single Mode Portable Oxygen Concentrator (the "Product").

B.     Delphi desires to sell and Customer desires to purchase the Products on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises contained in this Agreement, the Parties agree as follows:

## ARTICLE 1.  DEFINITIONS

As used in this Agreement, the following words, when capitalized, have the meanings set forth below:

1.1     "**Affiliate**" means any business or other entity which is directly or indirectly controlling, controlled by or under common control with the specified entity, and control means direct or indirect ownership or actual control of at least fifty percent (50%) of the voting shares or other equity interest having power to elect directors or persons performing a similar function.

1.2     "**Background Intellectual Property**" of a Party means (a) the Intellectual Property of a Party that is owned or controlled by that Party before the Effective Date of this Agreement, or (b) created by a Party outside the scope of this Agreement.

1.3     "**Confidential Information**" means any and all information which that Party treats as confidential, whether the information is in oral, written, graphic or electronic form; provided that (a) if the information is in writing or other tangible form, it is clearly marked as "proprietary" or "confidential" when disclosed to the receiving Party or (b) if the information is not in tangible form, it (i) is identified as "proprietary" or "confidential" when disclosed and (ii) is identified in reasonable detail in a writing which is marked "proprietary" or "confidential" and is delivered to the receiving Party within thirty (30) days after the date of disclosure by the disclosing Party to the receiving Party. Confidential Information excludes any information, data or material which (a) the disclosing Party expressly agrees in writing is free of any non-disclosure obligations; (b) is independently developed by the receiving Party or its

Delphi Initials [signature]                    1                    EVO Initials [signature]

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

---

Affiliates without reference to the Confidential Information of the disclosing Party (as evidenced by documentation in the receiving Party's possession); (c) is lawfully received by the receiving Party or its Affiliates, free of any non-disclosure obligations, from a third Party having the right to so furnish the applicable Confidential Information; or (d) is or becomes generally available to the public without any breach of this Agreement or unauthorized disclosure of Confidential Information by the receiving Party or any of its Affiliates.

1.4 **"Direct Competitor"** means any entity which (i) manufactures Products in direct competition with Customer or (ii) sells Products branded with that entity's trademarks in direct competition with Customer.

1.5 **"Ex Works"** has the meaning as defined in Incoterms 2000.

1.6 **"Foreground Intellectual Property"** means Intellectual Property resulting directly from and authored, conceived, developed, reduced to practice or otherwise created during the performance of this Agreement.

1.7 **"Independently Developed Foreground Intellectual Property"** means Foreground Intellectual Property developed solely by a Party during the course of performing under this Agreement.

1.8 **"Intellectual Property"** means all rights in ideas, inventions, works of authorship, know-how, technical information, trade secrets, pending patent applications, patents, copyrights and Confidential Information.

1.9 **"Jointly Developed Foreground Intellectual Property"** means Foreground Intellectual Property developed jointly by the Parties during the course of performing under this Agreement.

1.10 **"Production Year"** means, for the first Production Year, the 365 day period beginning on the Start of Production and for all subsequent Production Years during the term of this Agreement, the 365 day period beginning on the anniversary of the Start of Production.

1.11 **"Products"** means (i) All Pulsed Delivery Single Mode Portable Oxygen Concentrators developed by Delphi and sold hereunder by Delphi, which are identified in **Exhibit 1**, (ii) Service Parts (as defined in Section 13.1), and (iii) all other goods identified in **Exhibit 1** or otherwise delivered by Delphi to Customer under this Agreement pursuant to an amendment or supplement executed by Delphi and Customer. Customer shall have the right of first offer on distribution rights for any future multi mode oxygen producing products developed by Delphi.

Delphi Initials                     2                    EVO Initials 

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

---

## ARTICLE 2. DEVELOPMENT OF PRODUCTS

2.1     **Project Development.**  Delphi agrees to use commercially reasonable efforts in consultation with Customer to develop Products described in **Exhibit 1**.

2.2     **Research and Development Schedule.**  Delphi and Customer shall make commercially reasonable efforts to achieve their respective milestones and delivery dates specified in the R&D schedule attached to this Agreement as **Exhibit 2**.  The date on which Customer and Delphi expect Delphi to start commercial production of Products for Customer (other than prototypes) ("**Start of Production**") is set forth on **Exhibit 2**.  The Start of Production may be extended as necessary in connection with any changes in functions or features requested by Customer not otherwise set forth on **Exhibit 1**, and as a result of any delays in the completion of activities to be carried out by Customer as set forth in this Agreement, including, but not limited to, any necessary approvals to be obtained by Customer as set forth in Section 20.2 of this Agreement.  Delphi must submit notice of any required change in the Start of Production pursuant to the foregoing sentence within a reasonable period following the event giving rise to the change.  Upon receipt of any notice from Delphi regarding the necessity of a delay in the Start of Production, Delphi and Customer shall consult with each other to determine the appropriate length of the postponement in the Start of Production and the allocation of costs associated with the delay.

2.3     **Development Costs.**  Delphi shall be responsible for all of its costs and expenses incurred in designing, developing and making the Products ready for commercial production in accordance with Sections 2.1 and 2.2 above.  Customer is responsible for all tooling costs relevant to the manufacture of Customer's specific and proprietary product(s) pursuant to Article 5 of this Agreement.  Customer will be responsible for all of its own development costs and expenses.

2.4     **Intellectual Property Rights.**

(a)     **Independent Ownership.**  Each Party is and remains the owner of its Background Intellectual Property and Independently Developed Foreground Intellectual Property, and the Parties understand and agree that, except as specifically set forth in this Agreement, no license or other rights, either express or implied, are granted by either Party to the other under this Agreement with respect to any Background Intellectual Property or any Independently Developed Foreground Intellectual Property.  Each Party shall decide in its sole discretion whether it protects, and shall bear all costs of protecting, its Background Intellectual Property and Independently Developed Foreground Intellectual Property.

Delphi Initials                     3                    EVO Initials 

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

(b) **Joint Ownership**. Delphi and Customer may develop new Jointly Developed Foreground Intellectual Property during the course of performing under this Agreement. Except as otherwise provided by this Agreement, Customer assigns to Delphi all of Customer's right, title and interest to any and all Jointly Developed Foreground Intellectual Property. Customer further agrees to take all actions that are necessary to effect the assignment pursuant to the preceding sentence. In return, Delphi grants to Customer a perpetual, royalty-free, worldwide license (without the right to sublicense) to use any Jointly Developed Foreground Intellectual Property. Delphi further agrees to take all actions that are necessary to effect the grant pursuant to the preceding sentence. Customer's license to use any Jointly Developed Foreground Intellectual Property applies only to Customer's distribution and sale of Products, and is inapplicable to any field or activity other than the distribution and sale of Products. Delphi's rights with respect to any Jointly Developed Intellectual Property are unlimited.

It is acknowledged and agreed that the Product under this Agreement is an Independently Developed Foreground Intellectual Property of Delphi. The Product is not based in any part on Background Intellectual Property or Independently Developed Foreground Intellectual Property of the Customer. Further, that the Product was not developed in any way by the Customer (including Jointly Developed Foreground Intellectual Property), that its development was not out of necessity of substantial conformance to Customer's specifications, and that there is no Customer Tooling.

(c) **Unauthorized Use**. If Customer engages in, or permits any other person or entity to engage in, the unauthorized exploitation of any Jointly Developed Foreground Intellectual Property, Customer's license(s) to use that Jointly Developed Foreground Intellectual Property shall automatically terminate and be null and void.

(d) **Protection of Joint Intellectual Property**. Delphi shall bear the costs of securing and maintaining patent, copyright or other protection for Jointly Developed Foreground Intellectual Property. Delphi agrees to consider suggestions Customer makes regarding filing decisions, preparation, and prosecution of patents and copyrights for Jointly Developed Foreground Intellectual Property. Although filing decisions shall be made by Delphi in its sole discretion, if Delphi is unwilling to maintain any particular issued patents that are Jointly Developed Foreground Intellectual Property, Customer may maintain those particular patents at its sole expense, in which case Delphi agrees to assign to Customer all right, title and interest to those particular patents, subject to Delphi's retention of a non-exclusive royalty-free worldwide

Delphi Initials ___                    4                    EVO Initials ___

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

right and license to use the Jointly Developed Foreground Intellectual Property which is covered by those particular patents.

(e)  **Infringement Claims**.  This Agreement contemplates the development and sale of Products based on specifications developed by Customer and listed in **Exhibit 3** and technological solutions developed by Delphi to fulfill those specifications.    Subject to Section 2.4(g) of this Agreement, if any third party alleges that the manufacture, sale or use of Products or any individual component of any Products infringes upon a patent, copyright or other Intellectual Property right belonging to that third party, then each Party shall defend, indemnify and hold harmless the other Party and its Affiliates from such claims and any resulting damages and expenses (including reasonable attorneys', other professionals'- and court fees) as follows:  (i) if the alleged infringement arises out of Background Intellectual Property belonging to or provided by Customer, Independently Developed Foreground Intellectual Property developed by Customer, or out of the necessity of substantial conformance to Customer's specifications, then Customer shall defend, indemnify and hold Delphi and its Affiliates harmless from the infringement claim; (ii) if the alleged infringement arises out of Background Intellectual Property belonging to or provided by Delphi or Independently Developed Foreground Intellectual Property developed by Delphi, except to the extent such Independently Developed Foreground Intellectual Property is necessary for substantial conformance to Customer's specifications, then Delphi shall defend, indemnify and hold Customer and its Affiliates harmless from the infringement claim; and (iii) if the alleged infringement arises out of Jointly Developed Foreground Intellectual Property or a combination of (i) and (ii) above, then neither Party shall be obligated to indemnify the other Party, the Parties shall arrange for joint or separate defense as they may mutually agree and each Party shall reasonably cooperate with the other Party in connection with the defense of the claim, including, without limitation, by sharing information as is reasonably necessary for the defense of the claim.

(f)  **Right to Use; Re-Design**.  If the Party which is responsible for indemnification under Section 2.4(e), or any final, non-appealable judgment of a court of competent jurisdiction, determines that any Product or individual component of any Product (each, an **"Infringing Unit"**) infringes on any patents, trademarks, copyrights, industrial design rights, or other proprietary rights, or by misuse or misappropriation of trade secrets, then, in addition to the obligations set forth in Section 2.4(e), the indemnifying Party shall, at its expense, use commercially reasonable efforts to either:    (i) secure the rights to manufacture, sell and use the allegedly Infringing Unit; (ii) replace or

Delphi Initials _____

5

EVO Initials _____

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

modify the Infringing Unit with a non-infringing product without material degradation in performance, features, functions or quality, or with a mutually agreeable amount of degradation in performance, features, functions or quality; or (iii) if, in the sole judgment and discretion of the indemnifying Party, none of the foregoing alternatives is reasonably available, the indemnifying Party shall notify the indemnified Party to discontinue using the Infringing Unit, but only to the extent necessary to avoid the infringement, and in the case of this clause (iii) the indemnifying Party shall not be liable for any indemnification beyond the indemnified Party's inventory of Infringing Units on hand at the time of such notification, and the indemnified Party may pursue its remedies available under this Agreement (subject to the limitations contained in Article 12 and elsewhere in this Agreement).

(g)   **Indemnification Procedures.**   Promptly after either Party receives information regarding the commencement or threatened commencement of any third party infringement claim, the Party receiving the information shall promptly notify the other Party in writing. The obligations of Section 2.4(e) above are contingent on: (i) the indemnified Party not entering into any settlement or concession with regard to the applicable indemnified claim without prior approval of the indemnifying Party; (ii) the indemnifying Party having full control of the defense of the indemnified claim, with the reasonable cooperation of the indemnified Party; and (iii) the cooperation of the indemnified Party in implementing and distributing revised Products to avoid any continuing or future infringement, or otherwise assisting in mitigating potential infringement damages.

(h)   **Party's Failure to Act.**  If the indemnifying Party does not confirm that it will assume control of the defense of any infringement claim (and provide reasonable assurance regarding its fulfillment of this obligation), the indemnified Party shall have the right to take appropriate legal action and the indemnifying Party shall promptly reimburse the indemnified Party for all reasonable costs and expenses upon presentation of reasonable supporting documentation.

## ARTICLE 3.  ORDER OF PRODUCTS

3.1   **Purchase and Supply.**  Customer agrees to purchase, and Delphi agrees to supply, Products and Service Parts, in accordance with the terms of this Agreement, at the prices listed in **Exhibit 1**, and in the quantities stated in **Exhibit 4** provided that Delphi's obligation to supply Products shall be conditioned upon Delphi's acceptance of any changes to the specifications set forth on **Exhibit 3**.

Delphi Initials 

6

EVO Initials

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

3.2    <u>Forecasts; Purchase Orders</u>.

(a)    <u>Beginning Forecast</u>.  Customer has provided Delphi in <u>**Exhibit 4**</u> with Customer's estimated purchase volume for each of the Products on a yearly basis for the three (3) -year period commencing upon the Start of Production (the "Beginning Forecast").

(b)    <u>Rolling 6-Month Forecast</u>.  At least thirty (30) days before the Start of Production, and on approximately the first day of each month after the Start of Production, Customer shall deliver to Delphi a rolling six (6) month estimate of Product purchases on a monthly basis (each, a "Rolling Forecast").  The purchase volume set forth in each Rolling Forecast for the first two (2) month period of each Rolling Forecast shall constitute a firm order by means of a purchase order, which is not subject to revision by subsequent Rolling Forecasts.  If Customer does not provide an updated Rolling Forecast within ten (10) days after the beginning of any month, then Delphi shall use the most recent forecast provided by Customer as the then-applicable Rolling Forecast, including for the purposes of firm orders for the eight (8) week period commencing at the beginning of the then-current month.  Customer shall provide Delphi with adequate advance notice of any special forecasts, or any unique demand increases or decreases for the Products.

(c)    <u>Submittal of Purchase Orders</u>.  Customer shall submit purchase orders to Delphi for the Product in accordance with the Beginning Forecast and each Rolling Forecast, and Delphi shall accept purchase orders from Customer submitted in accordance with this Agreement. Purchase orders may be issued by mail, facsimile or (upon mutual agreement of the Parties), electronic data interchange.  All purchase orders issued under this Agreement shall be deemed to incorporate and be governed by the terms and conditions of this Agreement.

3.3    <u>Confirmation of Orders</u>.  Delphi shall notify Customer in writing of its acceptance of purchase orders within fifteen (15) business days after they are received by Delphi.

3.4    <u>Non-standard Orders</u>.  Delphi shall use commercially reasonable efforts to (i) fill any purchase orders in excess of estimated purchase volumes provided that Delphi shall have no liability for failure to timely deliver Products subject to purchase orders in excess of 20% of any Rolling Forecast; and (ii) fill any purchase orders on an expedited basis provided that Delphi shall have no liability for failure to deliver Products based upon non-standard lead times. Notwithstanding the foregoing, if Delphi may incur additional costs to fill purchase orders in accordance with this Section 3.4, Delphi shall provide a

Delphi Initials                                     7                    EVO Initials 

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

written estimate of the additional costs to Customer, and Delphi shall have no obligation to fulfill the applicable purchase order unless the Parties mutually agree upon the amount of the additional costs which shall be paid to Delphi.

3.5    **Rescheduling of Orders**. Customer reserves the right, at its sole discretion, to reschedule the delivery date identified in any purchase order: (i) more than 90 days prior to the scheduled delivery date, without liability; or (ii) between 30-90 days prior to the delivery date, upon payment to Delphi of all actual costs that Delphi incurs as a result of such rescheduling. Customer shall have no right to reschedule the delivery date identified in any purchase order within 30 days prior to the delivery date without the written consent of Delphi.

3.6    **Conflicting Terms Void; Modifications.** Any terms contained in any purchase order, confirmation or invoice, which are different from, or in addition to, the terms of this Agreement shall be deemed void and of no effect, unless otherwise agreed in a writing signed by both of the Parties.

## ARTICLE 4. PRICES AND PAYMENTS

4.1    **Products Pricing**.

(a)    **Sale Terms**. Delphi shall sell the Products to Customer at the prices which are listed in **Exhibit 1** to this Agreement. The prices for the Products listed on **Exhibit 1** as of the Effective Date are based on the specifications as of the Effective Date of this Agreement; changes in the Product specifications may result in mutually-agreeable changes to Product prices. Delphi shall have no obligation to implement any changes to the Products until Delphi and Customer agree upon changes to the Product prices.

On a case by case basis, Delphi, in its sole discretion may consider volume discounts.

## ARTICLE 5. TOOLING COSTS

5.1    **Customer Obligation**. Customer is responsible for all tooling costs relevant to the manufacture of Customer's specific and proprietary product(s) (Tooling for specific products which is paid for by Customer is referred to in this Agreement as **"Customer Tooling."**)

5.2    **Property of Customer**. All Customer Tooling will be for the exclusive benefit of Customer.

5.3    **Repair and Maintenance**. Delphi shall be responsible for the repair and maintenance of the Customer Tooling, the cost of which shall be borne by Customer. Customer shall be responsible for all replacements of Customer

Delphi Initials _____    8    EVO Initials _____

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

---

Tooling. If replacement of Customer Tooling would be more cost-effective than repairs, then the applicable Customer Tooling shall be replaced at Customer's expense.

5.4    **Delphi Obligation.** Delphi shall pay for any manufacturing tooling required for Delphi to manufacture or test the Products. Delphi shall be the owner of all tooling described in this Section 5.4.

## ARTICLE 6. EXCLUSIVITY AND BRANDING

6.1    Delphi shall not sell the Products for direct competition with Customer within the field of use defined as home oxygen therapy within the Territory, defined as the United States of America, Canada, and Mexico. Notwithstanding the foregoing, Delphi shall be free to sell any Products to any party outside of either the field of use or the Territory at any time.

6.2    **Loss of Exclusivity.** If Customer orders for delivery in any Production Year less than seventy-five percent (75%) of the number of any Product set forth in the forecast for that Production Year on **Exhibit 4** (the "**Product Forecast**"), Customer shall loose exclusivity described in 6.1 upon the anniversary of the contract. If the Customer orders for delivery in any 6 months period less than twenty-five percent (25% ) of the number of any Product set forth in the forecast for that Production Year on **Exhibit 4** (the "**Product Forecast**"), Customer shall loose exclusivity described in 6.1, 60 days following the 6 month period.

6.3    **Future Opportunities.** Provided Customer's account remains in good standing, Customer may submit for Delphi's review and consideration marketing and sales plans, on a country-by-country basis, for opportunities outside the Territory. Delphi retains the right, in its sole discretion, to approve or disapprove of any Customer proposal.

6.4    Customer acknowledges that Delphi owns the various names, logos, trademarks and service marks which are associated and used in connection with the Products and that Delphi must provide written approval, at Delphi's sole discretion, of Customer's display or use of any of Delphi's names, logos, trademarks and service marks in any advertisement, packaging, literature, WEB based advertising, or other such public use.

6.5    Customer is granted the non-exclusive right, without the right to sublicense to display the Delphi names, logos, trademarks and service marks. which may be amended from time to time by Delphi, in connection with the sale of the Products, in the Territory, provided, however, that Customer will discontinue the display or use of any such names, logos, trademarks and service marks when requested to do so by Delphi.

Delphi Initials         EVO Initials 

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

6.6   The Customer will not use, authorize, or permit the use of any of Delphi's trademarks or trade names as part of its firm, corporate or business name. Customer shall use Delphi's name, trademarks, trade names and copyrighted materials only for the purpose of advertising and promoting sales of Products in a manner approved by Delphi and shall not use any such name or materials in any advertising or other communication which is damaging to Delphi, or in any unlawful manner, or in any way which tends directly or indirectly to lessen the value and goodwill of the Delphi brand or Products or in connection with the sale of any other product or group of products, whether or not such products or components thereof are made by Delphi or one of Delphi's affiliates. Nothing herein shall provide Customer with any right, title or interest or any license, except as explicitly provided herein, in any intellectual property of Delphi, including any name, trademark, trade name, or copyright, or in any patent applications or patents. Customer's right to use Delphi's name, trademarks, trade names and copyrighted materials shall immediately terminate upon the termination of this Agreement.

## ARTICLE 7. PAYMENT

7.1   <u>Wire Transfer</u>.  Payment of the amount of any purchase order accepted by Delphi shall be made by Customer by means of a bank wire transfer of immediately available funds in U.S. Dollars to the Delphi account number provided to Customer by Delphi.

7.2   <u>Payment Terms</u>.  Customer shall make all payments within 45 days after the date of Delphi's invoice.

7.3   <u>Late Payment</u>.  All amounts not paid when due shall bear interest from the due date at the rate of one and one-half percent (1.5%) per month.

7.4   <u>Suspension of Performance</u>.  Delphi may suspend performance of any order or require payment in cash, security, or other adequate assurance satisfactory to Delphi, when in Delphi's reasonable opinion, the financial condition of Customer or other reasonable grounds for insecurity warrant such action.

7.5   <u>Tax Liability</u>.  Customer is liable for Non-Income Taxes (as defined below) applicable to goods and services sold to Customer by Delphi.  Delphi shall invoice and Customer shall pay the Non-Income Taxes that Customer is liable for unless Customer has provided Delphi with a valid certificate evidencing Customer's exemption from payment of or liability for such Non-Income Taxes. Customer's invoices shall separately state applicable Non-Income Taxes as required by law.  "Non-Income Taxes" means any federal, state and local sales, use, excise, utility, consumption, value-added and other similar types of transaction based taxes assessed on the provision of goods and services.  Each

Delphi Initials _OB_

10

EVO Initials _BH_

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

party shall be responsible for filing all property tax returns and paying all property taxes with respect to its tooling.

## ARTICLE 8. DELIVERY

8.1     **Delivery Terms**. All Products shall be sold Ex Works (Delphi or Delphi Affiliate facility) to one ship to location, unless agreed otherwise in writing by the Parties. Title shall pass to Customer simultaneously with passage of risk of loss to Customer as specified in Incoterms 2000.

8.2     **Packaging**. Delphi shall pack and mark the Products in accordance with the specifications attached as Exhibit 3, if applicable.

8.3     **Lead Times; Expedited Delivery**. In the case of an emergency order (which shall be more than 20% in excess of any Rolling Forecast), Delphi shall determine whether, and if so, when, the amount in excess of 20% of the Rolling Forecast can be filled and advise Customer as to the earliest practicable delivery date. All costs, if any, of fulfilling emergency orders shall be paid by Customer to Delphi within thirty (30) days after Customer receives an invoice for those costs. Delphi shall have no liability to Customer for any failure or delay in satisfying such emergency orders.

8.4     **Late Delivery**. If Delphi fails to make delivery of Products within forty-five (45) days after a mutually agreed delivery date, then Customer may cancel the portion of the purchase order that has not been delivered by notifying Delphi in writing.  Delphi shall use reasonable efforts to timely deliver Product to the Customer.

8.5     **Testing and Inspection**.  Delphi shall use commercially reasonable efforts to inspect and test Products prior to delivery, according to a written inspection plan as set forth in **Exhibit 3**, if applicable. Delphi shall maintain as part of its quality records inspection reports that confirm the delivered Products have been manufactured, tested and packaged in accordance with the requirements set forth in this Agreement. Upon reasonable advance written notice of no less than two (2) weeks, and implementation of reasonable procedures, Delphi shall grant Customer or its designated representatives reasonable access to Delphi's quality records and manufacturing facilities used to manufacture the Products to confirm the adequacy of Delphi's manufacturing and testing practices, subject to reasonable confidentiality, security and safety procedures imposed by Delphi.

## ARTICLE 9. INCORRECT QUANTITIES OR TYPE

9.1     **Discrepancy**. If, after delivery, Customer discovers any discrepancy between (i) the quantity or type of Products ordered by Customer and that received by Customer or (ii) the quantity or type of Products invoiced by Delphi and that

11

Delphi Initials _____                              EVO Initials _____

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

received by Customer, Customer shall immediately notify Delphi of the discrepancy.

9.2    **Shortage**. If the discrepancy is a shortage, Delphi shall, at Customer's option, (i) adjust the invoice, (ii) make a cash refund to adjust for such shortage, or (iii) as quickly as commercially and reasonably practicable, supply the number of units in the applicable shortage to Customer. Delphi shall be entitled to any insurance proceeds paid to Customer in respect of a shortage for which Delphi replaces units or compensates Customer.

9.3    **Overage**. If there is an overage in any shipment, Customer shall, immediately on learning of the overage, inform Delphi whether Customer will either (i) keep the excess quantity and pay the amount invoiced or the amount to be invoiced if the invoice did not reflect the excess, or (ii) dispose of the excess Products in accordance with Delphi's instructions, in which case, all reasonable costs and expenses incurred by Customer in complying with Delphi's instructions shall be promptly reimbursed by Delphi.

9.4    **Non-Conformity**. If the discrepancy is non-conformity as to type, Customer shall, at Delphi's election, return the non-conforming Products to Delphi at Delphi's expense and Delphi shall, upon Customer's and Delphi's mutual election, (i) supply Customer with the conforming Products at its own expense, (ii) refund the purchase price for returned non-conforming Products, (iii) repair product, or (iv) settle such discrepancy in such other manner as agreed upon between Customer and Delphi. If Customer and Delphi agree to exercise option (i) or (iv) above, Delphi shall use commercially reasonable efforts to supply conforming Products as soon as reasonably possible and Delphi shall advise Customer of the earliest practicable delivery date.

## ARTICLE 10.  QUALITY ASSURANCE, WARRANTY AND RECALL

10.1    **Conformity with Specifications**. All Products sold by Delphi are warranted to conform to the Products specifications (as described in Section 2.1, above) and to be free from defects in material and workmanship under normal use. This warranty does not cover defects or deficiencies in the Products to the extent that such defects or deficiencies are the result of Customer's specifications as to design or materials, including, but not limited to, Customer's specifications attached to this Agreement as **Exhibit 3** if applicable.

NO OTHER WARRANTIES, EXPRESS OR IMPLIED, ARE MADE WITH RESPECT TO THE PRODUCTS INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

Delphi Initials ___

EVO Initials ___

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

10.2 **Defective Products**. As used in this Agreement, the term "**Defective Products**" means any Product which fails to meet the warranty contained in Section 10.1 within the warranty periods described in Section 10.4. "Defective Products" shall specifically exclude, without limitation, any Products (i) which have been subjected to misuse, negligence, accident, or improper maintenance, installation, or application or (ii) which have been repaired or altered without Delphi's prior written consent.

10.3 **Warranty Obligation**. Except as set forth in Section 10.6 and Article 11, Delphi's sole obligation, and Customer's exclusive remedy, regarding Defective Products is for Delphi, at Delphi's option, to either repair or replace Defective Products or refund Customer's purchase price for the applicable Defective Products.

10.4 **Warranty Period**. The warranty period for Products (excluding batteries and accessories) shall be thirty-six (36) months from the date the Customer ships such Product, however such warrantee period shall not exceed 39 months from the date of shipment from Delphi. Warranty period for batteries and accessories shall be ninety (90) days from the date Customer ships such Product, however such warrantee shall not to exceed 180 days from date of shipment from Delphi.

10.5 **Product Returns**. At Delphi's election, Customer shall either (i) return to a location designated by Delphi, and at Delphi's cost, any allegedly Defective Products for which claims are made, with a written explanation of the claimed failures, for Delphi's inspection, or (ii) make the allegedly Defective Products available at Customer's premises for inspection by Delphi or its designated representative. If the allegedly Defective Products are determined to be in compliance with Delphi's warranty under Section 10.1 to the reasonable satisfaction of the Parties, they shall be returned to, or retained by, Customer, and Customer shall bear the cost of any freight and duty in both directions and any costs incurred by Delphi in inspecting the Products.

10.6 **Recall Procedures**. If a recall or field corrective action caused solely by Defective Products provided by Delphi to Customer is required in Customer's reasonable judgment, then Customer will promptly notify Delphi in writing of the required recall or field corrective action, with reasonable detail and with reasonable supporting documentation. The Parties shall immediately, diligently and in good faith work together to determine the cause of the Defective Products, and Delphi shall immediately assist Customer in preparing and implementing a recall or field corrective action of Defective Products. Delphi's sole obligation, and Customer's exclusive remedy, in the event of such a recall or field corrective action of Defective Products is for Delphi, at Delphi's option, to either repair or replace Defective Products or refund Customer's purchase price for Defective Products and pay the reasonable cost

Delphi Initials _DS_                                  13                                  EVO Initials _BH_

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

---

of: (i) preparing, printing and mailing a recall notice to inform Customer's dealers, distributors and customers of the nature of the recall, (ii) freight for replacement parts required to repair or replace Defective Products, and (iii) reasonable labor costs for Customer dealers to perform in-field replacement activities, if any, for Defective Products provided that the labor rates of such dealers are approved by Delphi in advance of any replacement activities.

## ARTICLE 11. PRODUCT LIABILITY

11.1    **Losses Defined**.  As used in this Article 11, the term "Losses," when capitalized, means any loss, cost, damage and expense (including reasonable attorneys', other professionals' and court fees), arising from any death of or injury to any person, or damage to any property.

11.2    **Indemnity for Losses**.  Delphi shall defend, indemnify and hold harmless Customer and its Affiliates for Losses proximately caused by Defective Products. Customer shall defend, indemnify and hold harmless Delphi and its Affiliates from all Losses (a) caused by or related to Products, other than Losses which are proximately caused by Defective Products or (b) which are proximately caused by Customer's acts or omissions, or the acts or omissions of any person which purchases, resells, uses or operates Products, including, but not limited to, (i) Customer's specifications as to design or materials, whether contained in **Exhibit 3** or otherwise provided by Customer, (ii) any failure to provide adequate warnings or instructions for use of the Product (including proper packaging and labeling), (iii) testing, storage, handling, release, export, import or shipment of the Product by or on behalf of Customer and (iv) misuse of the Products.  If it cannot be readily determined whether or the extent to which the Losses were proximately caused by Defective Products, either Party may submit the matter to binding arbitration pursuant to Section 16.3 to determine the amounts attributable to the Defective Products or to each Party, as the case may be.

11.3    **Notice of Claims**.  If any claim is made or threatened against Delphi or its Affiliates or Customer or its Affiliates based on death of or injury to any person, or damage to any property, which is allegedly caused by the Products, regardless of whether the claim is based upon strict liability, negligence, warranty, or any other theory of recovery, each Party will provide to the other Party prompt notice of the claim and copies of all documents they receive which relate to the claim.

11.4    **Defense of Claims**.  With respect to any claim described in Section 11.3, Delphi and Customer shall immediately discuss the claim and shall attempt to determine if the claim relates to Defective Products.  If a claim relates solely to Defective Products, Delphi shall defend, indemnify and hold Customer harmless from and against the claim and all related Losses.  If a claim does not relate to Defective Products, Customer shall defend, indemnify and hold

Delphi Initials _____    EVO Initials _____

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

Delphi harmless from and against the claim and all related Losses. If a claim contains allegations of both a Defective Product and matters for which Customer is obligated to indemnify Delphi pursuant to Section 11.2, then Delphi and Customer shall separately defend their own interests. Delphi and Customer agree to discuss allocation of any verdict or settlement with respect to claims and if they do not reach agreement on an allocation to submit the matter to binding arbitration pursuant to Section 16.3 to determine the amount each should pay for any claim that results in a judgment against either Party. Customer and Delphi agree to communicate and cooperate with each other and, if necessary, any appropriate insurance carrier, in the defense of the claim. Delphi and Customer will make available to each other the services of knowledgeable personnel and information necessary to defend the claim. During the pendency of any third-party claim arising out of death or injury to any person, or damage to any Property which is allegedly caused by the Products, neither Party shall take any adverse action, including, without limitation, cross-claims, against the other with respect to that claim except as is necessary to preserve their rights.

11.5 **Conditions to Indemnification Obligations.** The indemnification and defense obligations under this Section 11 are contingent on: (i) the indemnified Party not entering into any settlement or concession with regard to an indemnified claim without prior approval of the indemnifying Party and (ii) the indemnifying Party having full control of the defense of the indemnified claim, with the reasonable cooperation of the indemnified Party. If the indemnifying Party does not confirm that it will assume control of the defense of any claim for which the indemnified Party seeks indemnification (and provide reasonable assurance regarding its fulfillment of this obligation), the indemnified Party shall have the right to take appropriate legal action and the indemnifying Party shall promptly reimburse the indemnified Party for all reasonable costs and expenses of defending the applicable claim upon presentation of reasonable supporting documentation.

## ARTICLE 12. LIMITATION OF LIABILITY

12.1 **No Recovery of Certain Damages.** IN NO EVENT, WHETHER AS A RESULT OF BREACH OF CONTRACT OR WARRANTY, ALLEGED NEGLIGENCE OR OTHERWISE, SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO LOSS OF PROFITS OR REVENUE, LOSS OF USE OF PRODUCTS OR OTHER EQUIPMENT, OR DOWNTIME COSTS.

12.2 **Available Remedies.** Except as limited pursuant to Article 9, Article 10, Section 12.1 and Section 12.2 above, or otherwise limited by other provisions

Delphi Initials     15    EVO Initials

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

of this Agreement, in the event of any breach or termination of this Agreement, either Party shall be entitled to pursue all remedies available at law or in equity.

## ARTICLE 13.  SUPPLY OF SERVICE PARTS

13.1    **Service Parts.**  Delphi or its designee shall supply Customer with new or refurbished Products for use as service parts ("**Service Parts**") in addition to normal original equipment sales in accordance with this Agreement.  The prices for such Service Parts are those specified in **Exhibit 1**.  Delphi shall clearly label any Service Parts that are refurbished Products as "refurbished" or otherwise identify them in such manner as provides reasonable notice that the applicable Service Parts are not new Products.

13.2    **Availability of Service Parts.**  Delphi shall supply Service Parts for seven (7) years after product ends or Customer no longer purchases .Notwithstanding the foregoing, Delphi may, at any time, require that Customer notify Delphi of Customer's total anticipated service requirements and, at Delphi's option, sell to Customer the amount of Products Customer determines it needs to satisfy its service requirements, after which Delphi shall have no further obligation to sell Service Parts to Customer.  In addition, if as a consequence of any action of Customer this Agreement is terminated, or Delphi's supply of any Product that is covered by this Agreement otherwise ceases, prior to the termination of production of the applicable Products, Delphi shall have no further obligation for the delivery of Service Parts with respect to the applicable Products unless Delphi and Customer agree in writing.  If Delphi and Customer do not agree on the terms under which Delphi will continue to provide Service Parts under the previous sentence, Customer shall be solely responsible for assuring that an adequate supply of Service Parts is available to meet all contractual and governmental requirements.  Service Parts shall be packaged by Delphi in the same manner as non-service Products unless Customer agrees to pay for special packaging.

## ARTICLE 14.  PRODUCT CHANGES

If either Party desires to make changes to the Products, it shall submit a written request to the other Party.  Within a reasonable period, the Party that received the request shall notify the other Party of its acceptance or rejection of the proposal.  As part of the Product change evaluation process, Delphi shall provide Customer with its charges for the change, a proposed implementation date and the impact of such change to the Product unit price.

## ARTICLE 15.  FORCE MAJEURE

15.1    **Force Majeure Defined.**  Each Party shall be temporarily excused from performing its obligations under this Agreement (other than the payment of money) for so long as such performance is prevented or delayed by any event of Force Majeure.  The term "**Force Majeure**" shall, for purposes of this

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

Agreement, be defined as: (i) any acts of God, terrorism, natural disasters, or wars, (ii) any strike, lockout or labor dispute, (iii) any shortage or curtailment of utilities, materials or transportation, (iv) any act or omission of any government authority, or (v) any other cause beyond the reasonable control of a Party.

15.2 **Notice and Mitigation**. A Party affected by an event of Force Majeure shall promptly notify the other Party and shall use commercially reasonable efforts to overcome and mitigate such event of Force Majeure. Without limiting the foregoing, if Delphi is unable to supply any Products due to Force Majeure, Customer shall be free to purchase such Products from other suppliers as long as Delphi remains unable to do so.

## ARTICLE 16. GOVERNING LAW, ARBITRATION AND SPECIFIC PERFORMANCE

16.1 **Governing Law**. This Agreement shall be governed by and construed according to the laws of the State of Michigan as such laws are applied to contracts between residents of the State of Michigan to be performed entirely within such state. By its execution of this Agreement, each Party submits to the jurisdiction of any state or federal courts located in the State of Michigan.

16.2 **Informal Settlement Procedures**. The Parties shall attempt to settle any and all claims, disputes, controversies or differences arising between the Parties which arise out of or in relation to or in connection with this Agreement shall in the first instance be attempted to be settled by good faith negotiations between the Parties pursuant to Section 17.2, and if they are not settled by negotiation, they shall be resolved by binding arbitration upon written request of either Party.

16.3 **Arbitration Procedures**. Any arbitration shall take place in Oakland County, Michigan in accordance with the Arbitration Rules of the American Arbitration Association. The arbitration shall be conducted by a single neutral arbitrator agreed upon by the Parties. In relation to any matters not governed by such rules, the arbitrator shall determine the rules of procedure to be followed, provided, however, that in such case, the opportunity to cross-examine any witness shall be given to both Parties upon request of either Party.

16.4 **Entry of Judgment**. The arbitration award shall be final and binding upon both Parties, and judgment on the arbitration award may be entered in any court having jurisdiction over the Party against whom enforcement is sought or such Party's property, and application may be made to such court for judicial acceptance of the award or an order of enforcement, as the case may be.

Delphi Initials ____    17    EVO Initials ____

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

## ARTICLE 17.  TERM AND TERMINATION

17.1   **Term of Agreement**.  This Agreement shall become effective on the Effective Date and shall remain in effect until three (3) years after the Start of Production, and shall automatically renew annually by mutual consent of the Parties

17.2   **Notice of Default; Informal Discussions**.  Except for matters set forth in Section 17.4 which are not subject to this Section 17.2, following any dispute under this Agreement, including any event of default which, upon notice or the passage of time, may constitute grounds for terminating this Agreement, either Party may notify the other Party that it requests that the Parties attempt to resolve the dispute or determine the remedy for the event of default pursuant to informal dispute resolution.  The notice of informal dispute resolution must provide reasonable details describing the nature of the default.  Within fifteen (15) days after either Party receives a notice requesting informal dispute resolution, an authorized representative of each Party shall meet and confer for a reasonable period of time to:  (i) exchange information pertaining to the dispute or event of default, and (ii) attempt in good faith to agree upon a resolution to the dispute or a remedy for the event of default, as applicable.  If the informal dispute resolution procedures or corrective action plan fail to resolve the dispute or achieve an agreement on the remedy for the event of default within sixty (60) days after the receipt of the notice requesting informal dispute resolution, then either Party may pursue arbitration pursuant to Section 16.3, notwithstanding any election to terminate the Agreement pursuant to Section 17.3.

17.3   **Termination for Breach**.  In the event of breach by either Party of any material provision of this Agreement, the other Party shall have the right to terminate this Agreement if the breach is not cured within ninety (90) days after the end of the informal dispute resolution process set forth in Section 17.2 (and the Parties are not engaged in arbitration under Section 16.3).

17.4   **Immediate Termination**.

(a)   Either Party may terminate this Agreement immediately in the event the other Party:  (a) is prevented from performing its obligations by reason of an event of Force Majeure for a period of six (6) months or more, (b) becomes insolvent, or (c) enters bankruptcy, receivership, liquidation, composition of creditors, dissolution or similar proceeding.

(b)   Delphi may terminate this Agreement if Customer fails to make payment to Delphi of any amounts owing under this Agreement within thirty (30) days after the due date if Customer does not cure that default within ten (10) days after Customer receives written notice from Delphi of such default.

Delphi Initials                    18                    EVO Initials

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

17.5    <u>No Prejudice</u>.  The provisions of this Article are without prejudice to any other rights or remedies either Party may have by reason of the default of the other Party.

## ARTICLE 18.  CONFIDENTIALITY

18.1    <u>Scope of Use</u>.  Each Party agrees that it shall not use or disclose any of another Party's Confidential Information, except as authorized herein.  All Confidential Information of a Party shall remain such Party's property during and after the term of this Agreement.

18.2    <u>Non-Disclosure</u>.  Each Party (the "**Receiving Party**") shall protect all Confidential Information of the other Party (the "**Disclosing Party**") against disclosure to third parties in the same manner as it would protect its own similar confidential information against disclosure to others for a period from the Effective Date until two (2) years following termination of this Agreement.  Notwithstanding the above, during such period, each Party may make any disclosure of any of the Disclosing Party's Confidential Information to (i) its Affiliates, (ii) its and its Affiliates' employees, agents, and consultants who have a need to know and (ii) any others to whom such disclosure is expressly authorized hereunder and is necessary to the Receiving Party's fulfillment of its obligations hereunder.  The Receiving Party shall appropriately notify each person to whom any such disclosure is made that such disclosure is made in confidence and shall be kept in confidence by such person.  If the Receiving Party reasonably believes that disclosure of Confidential Information is required in accordance with applicable law, then prior to such disclosure (if permitted under applicable law) the Receiving Party shall (a) notify the Disclosing Party and afford the Disclosing Party an opportunity to limit the scope of the required disclosure and (b) take reasonable efforts to minimize the extent of any required disclosure and to obtain an undertaking from the recipient to maintain the confidentiality thereof.

## ARTICLE 19.  INSURANCE

19.1    Each Party (or an Affiliate of a Party shall on behalf of that Party) shall obtain and maintain consistent with the provisions of this Agreement, at its sole expense, the following types of insurance coverages, to remain in force during the term of this Agreement, with minimum limits as set forth below:

(a)    Commercial General Liability covering liability arising from premises, operations, independent contractors, products-completed operations, personal and advertising injury, and blanket contractual liability - US$ 3,000,000 each occurrence and $9,000,000 aggregate.

Delphi Initials           19          EVO Initials 

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

(b) Business Automobile Liability covering all owned, hired, and non-owned vehicles - US$1,000,000 each occurrence, including all applicable statutory coverages.

(c) Workers Compensation - statutory limits for all states of operation (U.S. only).

(d) Employers Liability – US$1,000,000 each employee for bodily injury by accident and - US$1,000,000 each employee for bodily injury by disease.

19.2 All policies of insurance maintained by each Party in accordance with this Agreement shall be written as primary policies; not contributing with or in excess of coverage that the other Party may carry. If a Party's liability policies do not contain the standard separation of insureds provision, or a substantially similar clause, they shall be endorsed to provide cross-liability coverage. Each Party shall agree to waive their insurer's right of subrogation under its policies. Each Party shall be an additional insured under the other Party's insurance policy (except Worker's Compensation and Employer's Liability), and at the other Party's request, each Party shall provide the other Party with a certificate of insurance evidencing compliance with the limits, insurance requirements and waiver of subrogation set forth above. Such certificate shall be in a form acceptable to, and underwritten by an insurance company reasonably satisfactory to the other Party and with an A.M. Best Company rating of A- or above. By requiring insurance herein, neither Party represents that coverage nor limits will necessarily be adequate to protect the other Party. The purchase of appropriate insurance coverage by each Party or the furnishing of a certificate of insurance shall not release each Party from its respective obligations or liabilities under this Agreement.

## ARTICLE 20.  GENERAL PROVISIONS

20.1 **No Inducement**.  The Parties represent to each other and each agrees that, neither it nor any person acting on its behalf has, in contravention of any applicable law, given or offered to give or shall give or offer to give any sum of money or other material consideration to any person, directly or indirectly, as an inducement to obtain business under this Agreement or to influence the granting of licenses or other governmental permissions to enter into this Agreement or perform obligations hereunder.

20.2 **Government Approvals; Regulatory Requirements**.

(a) Delphi and Customer, respectively, shall be responsible for compliance with and for the obtaining of approvals and permits as may be required under federal, state, and local laws, ordinances, regulations, and rules

Delphi Initials 

20

EVO Initials 

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

for the performance of their respective responsibilities and obligations under this Agreement.

(b)    Delphi is responsible for final quality control testing, for providing adequate warnings and instructions for use of the Products and all products incorporating the Products (including proper labeling and packaging), and release of the Products, and all products incorporating the Products. Customer shall not modify any Product, Product documentation, or Product labeling that without approval of Delphi. Customer shall be responsible for reporting to Delphi of any adverse events related to the Products, and all Products incorporating the Products, or their use.

20.3    **No Agency**. This Agreement does not constitute either Party the agent or legal representative of the other Party. Neither Party is authorized to create any obligation on behalf of the other Party.

20.4    **Assignment**. Neither Customer nor Delphi may assign any of its rights or obligations under this Agreement without first obtaining the written consent of the other; provided, however, that Delphi has the right to assign any of its rights or obligations hereunder to any division, subsidiary, or affiliate of Delphi Corporation, or to any successor to Delphi's business. Nothing herein shall preclude Delphi from subcontracting any of its obligations under this Agreement to any other party.

20.5    **No Implied Waiver**. The failure of either Party at any time to require performance by the other Party of any provision of this Agreement shall in no way affect the full right to require such performance at any later time. The waiver by either Party of a breach of any provision of this Agreement shall not constitute a waiver of the provision itself. The failure of either Party to exercise its rights provided under this Agreement shall not constitute a waiver of such right.

20.6    **Notices**. Any notice under this Agreement shall be in writing (letter or facsimile) and shall be effective upon receipt or refusal or failure to accept receipt by the addressee at its address indicated below:

(a)    Notice sent to Delphi shall be addressed as follows:

Delphi Initials 

21

EVO Initials 

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

**Delphi Medical Systems Corporation**
5725 Delphi Drive
Troy, Michigan 48098
Attention: President
Facsimile: (248) 813-2599

With copies to:

**Delphi Corporation**
Assistant General Counsel – Commercial and Transactional
5725 Delphi Drive
Troy, Michigan 48098
Facsimile: (248) 813-2491

(b)    Notice sent to Customer shall be addressed as follows:

**evo Medical Solutions, Inc.**
2636 289th Place
Adel, Iowa 50003-8021
Attention: Bryan Hansel, CEO
Facsimile: (515) 993-4172
Telephone: (515) 993-5001

With copies to:

**evo Medical Solutions, Inc.**
General Counsel
2636 289th Place
Adel, Iowa 50003-8021

Facsimile: (515) 993-4172

(c)    The Parties by notice given in accordance with this Section may designate other addresses to which notices shall be sent.

20.7    **Amendments**.  This Agreement supersedes all previous agreements, oral or written, between Customer and Delphi with respect to the subject matter of this Agreement.  No amendment or modification to this Agreement shall be binding upon either Party unless it is in writing and is signed by both Parties.

20.8    **Headings**.  The Article, Section, and/or Paragraph headings in this Agreement are used for convenience of reference only and shall not be deemed a part of this Agreement for any purpose.

Delphi Initials ___    22    EVO Initials ___

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

20.9 **Severability**. If any provision of this Agreement shall be held to be invalid, illegal, or unenforceable under any statute, regulation, ordinance, executive order, or other rule of law, that provision shall be deemed severed to the extent necessary to comply with such statute, regulation, ordinance, order, or rule, and the Parties shall negotiate in good faith to arrive at an alternative replacement provision approximating the Parties' original business objective. The remaining provisions of this Agreement shall remain in effect.

20.10 **Entire Agreement**. This Agreement contains all the representations and agreements between the Parties hereto and there are no other agreements or understandings, oral or in writing, regarding the matters covered by this Agreement. No terms submitted by either Party which are in addition to or inconsistent with those set forth in this Agreement shall apply to this Agreement unless agreed to in a writing signed by both Parties. The Exhibits attached to this Agreement are made a part of and incorporated in this Agreement.

20.11 **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery by facsimile of this Agreement or an executed counterpart shall be deemed a good and valid execution and delivery of this Agreement.

IN WITNESS WHEREOF, Customer and Delphi have caused this Development and Supply Agreement to be executed by their duly authorized representatives as of the day and year first above written.

evo Medical Solutions, Inc.

By _____
Title _____CEO_____

**DELPHI MEDICAL SYSTEMS CORPORATION**

By _____
Title _____MANAGING DIRECTOR_____

EXHIBIT 1    Products
EXHIBIT 2    R&D Schedule
EXHIBIT 3    Product Specifications
EXHIBIT 4    Product Forecast
EXHIBIT 5    Quality Agreement

Delphi Initials _____

23

EVO Initials _____

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

EXHIBIT 1    Products

ss

**Pricing (Standard Items + Options)** | $1,750.00 |

**Standard Items Included with**
**Delphi Portable Oxygen Concentrator Unit:**   Soft Case
AC Adapter
Single Battery (90 days Warranty)
Quick Start Guide
Users Manual with EVO Branding on Cover and Contact Informat
Compact box with one color custom silk screen artwork
Labeling in accordance with US medical device requirements
12 month Unit Warranty

**Optional Items Included at Listed Price**    Three Year Warranty (2 additional years)
Cart
Soft Case

**Accessories not included in above pricing**        **Accessory Pricing**
Battery              $173.30
Case                 $75.00
Cart                 $38.60
Car Charger          $81.15
External Battery Charger   TBD
AC adapter           $127.79
Owners Manual        TBD
Quick Start Guide    TBD
Shipping Box         $16.61

The Parties agree:

1. Product and manuals to be co-branded with evo being primary brand (Parties shall mutually agree on co-branding materials and issues).
2. Evo to process all inbound complaints, escalating complaints as appropriate to Delphi (Parties shall work in good faith to develop written mutually agreeable protocols concerning customer service issues).
3. Customer shall screen all Product returns prior to shipment of in-warrantee failures to Delphi. Delphi shall be responsible for all warrantee costs associated with returned units to Delphi and warranty repairs made by Delphi. (Parties shall work in good faith to develop written mutually agreeable protocols concerning product returns and warrantee service)

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

4. Product Freight shall be ExWorks Longmont, Colorado.
5. Delphi agrees to provide product training and materials as reasonably requested by the Customer, which shall include:
   a. operation and key features for evo sales, engineering, and customer service teams;
   b. troubleshooting guides and training on how to solve customer problems and Product issues and concerns;
   c. proper scripts to be used by the evo customer service team;
   d. Protocols concerning testing or checking of Product returns;
   e. basic product specs or simple drawings permitting evo to properly setup the Product in evo's quality system.
   f. notification protocols of Delphi engineering changes (change description, when they are occurring, and any actions required of evo concerning training, product testing, inventory turnover, etc.)
6. The Parties agree to mutually develop and to execute, contemporaneously with this Agreement, a Quality Agreement that establishes regulatory compliance.
7. The Parties agree that used and new returned Product may be refurbished and resold. (Parties agree to mutually develop protocols concerning returned Product.

The Parties agree that they will meet prior to December 31, 2007, and thereafter annually prior to the anniversary date of this Agreement, to establish a marketing plan and budget to promote the sale of the Product.  Delphi agrees to participate in the marketing plan and host special events at Delphi's Corporate Offices  and assist EVO with other marketing promotions upon mutual consent of scope, cost, and expected results

Delphi Initials 

25

EVO Initials 

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

EXHIBIT 2    R&D Schedule

Product is expected to be released for sale on or before Feb 1, 2008.  Accessories availability
within 6 month of production release.

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

EXHIBIT 3    Product Specifications

Portable Oxygen Concentrator - Pulsed Mode Delivery

| O2 Capacity | ~875 ml/m |
| O2 Purity | 90% +/- 3% |
| Breath Detect | Delphi Proprietary |
| Settings | 1 – 5 pulsed delivery |
| Warm-up time | ~ 10 min Cold |
| | ~ 1 min with Battery Change |
| Weight | ~8.5 lbs |
| Battery duration | ~4 hrs @ 2 LPM |
| Noise level | ~45dB |

**all measurements taken at standard conditions**
( 22°C +/-3°C, 14.29 PSIA +/- 0.04, 40% +/-15% RH 739 mmHg)

**Final specifications subject to change based on completed validation and verification testing**

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

EXHIBIT 4    Product Forecast

In reference to Article 3, it is agreed that the 3-year forecast, volume targets, and annual purchase minimums to maintain exclusivity for Product shall be:

| Year | Volume Targets | Required minimums to maintain exclusivity |
|---|---|---|
| 2007 | 300 | N/A |
| 2008 | 8000 | 6000 |
| 2009 | 12000 | 9000 |
| 2010 | 18000 | 13500 |

| 2008 | Jan | Feb | March | April | May | June | July | Aug | Sept | Oct | Nov | Dec. | 2008 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EVO Branded Concentrator | 300 | 400 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 600 | 600 | 600 | 6000 |

Initial 12 month Rolling Forecast

In the event product availability materially affects sales, the parties agree to meet to adjust volume targets and required minimums to maintain exclusivity.

The Parties shall meet in the last quarter of year three (3) of this Agreement and prior to the each anniversary date of the Agreement thereafter to negotiate in good faith annual forecast and purchase minimums to maintain exclusivity for Product for each subsequent year of this Agreement. Such forecasts and purchase minimums shall reflect, among other things, market acceptance of Product, actual Product sales to-date, competing products, re-imbursement issues, and Product availability.

In reference to Section 8.4, in the event Delphi fails to timely deliver Product and the order is cancelled by the Customer, the Customer shall be given credit for such Product ordered in its Annual Sales Goals, and said Annual sales Goals shall be appropriately modified, following good faith discussion by the Parties, in light of the impact such failure to deliver may have on short and long term sales of the Product.

Delphi Initials 

28

EVO Initials 

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

---

EXHIBIT 5 Quality Agreement


between


**Delphi Medical Systems Corporation**
**5725 Delphi Drive**
**Troy, Michigan 48098 USA**


referred to in the following as Delphi


and


**evo Medical Solutions, Inc.**


referred to in the following as Customer.


Delphi Initials                    29                    EVO Initials

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

20.11.a.i.1.1    Paragraph 1: General Conditions

The parties have entered into a Development and Supply Agreement dated November 28, 2007. This Quality Assurance Agreement forms an indispensable part of the agreement between Delphi and Customer and is identified as Exhibit 5.

The medical device defined in Exhibit 1 is covered by the Scope of this Quality agreement. Products will conform to the "Essential requirements" of the Council Directive 93/42/EEC for medical devices, EN ISO 13485 (2003), QSR and other valid guidelines.

This Quality Assurance Agreement comes into force upon signature by both parties and may be changed from time to time by mutual approval of both parties.

Modifications and amendments to this Quality Assurance Agreement and its appendices are only valid upon documented agreement by both parties.

20.11.a.i.1.2    Paragraph 2: Regulatory

Delphi is responsible for complying with the requirements of the MDD for placing a CE Mark on the product. Delphi will comply with requirements of their notified body and ensure the continuation of the technical file and applicable CE Mark Certifications through the notified body. A copy of the CE Mark Certification and the Declaration of Conformity will be provided to Customer.

Delphi is responsible for maintaining Delphi Certifications to its Quality System and to the product carrying the Delphi CE Mark.

Delphi and Customer are responsible for their respective quality system responsibilities to ensure compliance to the applicable regulations.

Delphi Initials _____        EVO Initials _____

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

### 20.11.a.i.1.3    Paragraph 3: Quality System

Delphi has established and maintains a certified quality system according to EN ISO 13485 and QSR requirements for indicated responsibilities in Annex II. Any changes of the certification status or observations by the certification body indicating a possible withdrawal of the certification have to be communicated to Customer.

Delphi has implemented a system in which all requirements for the development and production of a product conform to Annex II.3 of the council directive 93/42/EEC for medical devices (MDD) and all other relevant product standards are covered.

Customer has established and maintains a certified quality system according to EN ISO 13485 and QSR requirements for indicated responsibilities in Annex II.

### 20.11.a.i.1.4    Paragraph 4: Conformity Assessment Procedure / Declaration of Conformity

Delphi is responsible for the conformity assessment procedure according to MDD Article 11 and to compile the declaration of conformity. Delphi herewith commits to take all necessary measures to continuously fulfil the requirements as set out in the relevant conformity assessment procedures chosen from the European Directive 93/42/EEC to obtain CE-marking. Any deviations from these requirements have to be communicated to Customer.

### 20.11.a.i.1.5    Paragraph 5: Labels, User Instructions and Technical Manual

Development and Approval
The films or samples of product/packaging labels and of instructions for use are compiled, printed, approved and released by Delphi. Release and changes associated with labelling containing Customer branding shall be approved by Customer prior to implementation. All labelling and any changes with the labelling associated with the product which bears the CE Mark of Delphi require approval by Delphi.

### 20.11.a.i.1.6    Paragraph 6: Design Control and Modification of existing products

The products comply with all applicable essential requirements of Annex I of the MDD and the relevant product standards. Delphi has implemented a system to identify, document and approve any changes to the design of the products; which implies modifications of functional, labelling, equipment code; before implementation. Delphi communicates design changes to form, fit or function of the product to Customer.

Change requests to the design of the product(s) initiated by Customer have to be forwarded to Delphi in writing. Such changes are implemented by Delphi only if they are approved by authorised personnel of Customer.

---

Delphi Initials_____                31                EVO Initials_____

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

Delphi must be able through the traceability process to identify the implementation of modifications according to the quality system of Delphi.

If changes of the product(s) are implemented, Delphi is responsible to maintain the system compatibility of the product(s) with the related accessories and/or consumable products as applicable.

### 20.11.a.i.1.7    Paragraph 7: Materials

Delphi shall guarantee the composition and functionality of the materials and components used in production.

### Paragraph 8: Technical Dossier

Delphi is responsible to compile and update the technical dossier for the products according to the requirements of the European Directive 93/42/EEC. Delphi has implemented procedures to review and approve changes and amendments to the technical dossier. This technical dossier as well as approved changes and amendments to this dossier are maintained by Delphi.

If necessary the technical dossier as well as the released modifications and updates of the technical documentation are made available to Customer on request. A full copy of the technical file including the risk analysis conform EN ISO 14971 will be submitted to European Representative of Delphi.

The product related Customer documentation is:
- Supplier contract between Delphi and Customer
- QA contract between Delphi and Customer
- Declaration of conformity and EC Certificate
- Reference to the technical dossier maintained under the responsibility of Delphi
- Change control documents

The Delphi dossier shall be made available to the Notified Body of Customer and the national authorities upon request.

### 20.11.a.i.1.8    Paragraph 9: Production

The manufacturing location (of Delphi) is in possession of appropriately qualified personnel and production installations and equipment to produce the products as stipulated in his own production specifications and in compliance with the production technology available to him, as described in his quality assurance manual and by fulfilling the EN ISO 9001, EN ISO 13485 and MDD standards. The manufacturing location is committed to produce and store the products according the most recent and approved specifications and instructions as authorised and documented in the technical dossier (§ 8). In particular the manufacturing location has to assure the proper condition and function of raw materials and components and has to assure that the final product conforms to quality and security specifications.

Delphi Initials _____    32    EVO Initials _____

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

20.11.a.i.1.9   Paragraph 10: Quality Assurance

Control of starting materials, in-process-controls and control of the finished product are in the responsibility of the manufacturing location of Delphi. Quality control procedures have to be conducted using validated methods specified in written form, which must comply with current scientific and technical standards. The number of samples to be analysed and the methods used must ensure that the product quality can be correctly assessed.

All results of quality control checks must be documented in an appropriate form. These are considered to be part of the production documentation and must be kept for at least 7 years.)

The production documentation is filed at the manufacturing location of Delphi and by request is made available to Customer for inspection.

Customer shall examine each delivery for completeness and shipping damage on delivery.

**Paragraph 11: Customer Complaints and Product Quality Issues**

Delphi and the Customer undertake to inform the other party as soon as possible after receipt of complaints or reports of product defects. Delphi must act as soon as possible after receipt of complaints or notification of product defects passed to them by Customer. Delphi must supply a written report to Customer at the earliest opportunity.

If Delphi or the Customer is informed/becomes aware of product non-conformances that involve a risk to patients/users, the responsible person will notify the other party within 24 hours.

Delphi and Customer will comply with regulatory requirements of all incidents as well as the reportability requirements of the QSR, MDD and other applicable regulations. Delphi or Customer will provide copies of applicable reports upon request. In regards to complaints, incidents and near incidents, the following is the responsibilities for Customer and Delphi:

Delphi is the complaint handling group for the product.

**Customer:**
Customer is responsible for
- Securing the product from the person(s) lodging the complaint.
- Returning the product to Delphi.
- Informing Delphi of any complaints, incidents or near incidents.
- Providing screening service reports to ensure appropriate information is fed into the complaint handling process.

**Delphi:**
Delphi must
- Supply information and file reports to the appropriate regulatory authorities, as required

Delphi Initials P3                33                EVO Initials

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

---

- conduct an investigation to determine the causes of the complaint
- place all relevant documentation, reference samples, and the relevant qualified personnel at the disposal of Customer and the appropriate authorities

Delphi shall immediately notify Customer of all incidents and near incidents on other markets. Customer shall immediately notify of all incidents and near incidents of same products within the same market or other markets to Delphi.

In the case of a product removal, the procedures will be followed according to the prevailing quality system. Customer will be responsible for implementing the product removal from the field according to the instructions of Delphi. The product removal plan must be agreed between Delphi and Customer. The costs associated with any product removals will be governed by the commercial agreements between the two parties.

**Paragraph 12: Quality Audits**

Customer representatives are permitted at any time, within reason, to audit the quality system and the relevant manufacturing, testing, labelling, packaging and storage processes and the relevant equipment and facilities as well as the related documentation for the product(s). This permission is also granted to the Notified Body of Customer or the authorities.

Delphi is required to implement appropriate corrective actions to identified issues from an audit report. The corrective actions and the implementation dates must be agreed upon between Customer and Delphi.

Measures imposed by the Notified Body or the authorities or agreed with Customer from such audits have to be implemented by Delphi within an agreed time frame. Customer may verify the implementation of these measures on site.

20.11.a.i.1.10  Paragraph 13: Distribution / Shipping

The products must be clean and undamaged on delivery from Delphi to Customer. Delphi will ensure that all products are packaged according to approved packaging materials and approved packaging procedures and specifications. The products must be shipped according to the dispatch and pallet scheme stipulated by Customer.

**Paragraph 14: Servicing**

Customer is responsible for providing initial screening of products. Any found to require servicing will be sent to Delphi for service repair. The service repair procedures shall comply with QSR and ISO 13485 requirements including documentation required by regulations. Screening procedures shall be validated and validations shall be reviewed and approved by Delphi. Delphi will establish any required screening procedures with Customer's assistance.

---

Delphi Initials _____    34    EVO Initials _____

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

## Paragraph 14: Product Corrections and Removals

As soon as the product is on the market, Customer shall ensure that the unit serial number can be traced back. This is necessary in case a batch could cause injury to a patient due to a defect or undesired side effect and therefore have to be recalled from the market. Products that require traceability include the following:

- Delphi Portable Oxygen Concentrator

If a product correction or removal becomes necessary, the delegation of responsibilities will be as follows:

**Customer:**

Customer is responsible for

- locating and securing, as required, the product from the person(s) lodging the complaint
- correcting or recalling the product in the market after the written correction or removal notification.
- returning the product to Delphi, if applicable.

**Delphi:**

Delphi must

- submit information to the appropriate authorities, as required
- conduct an inquiry to determine the causes of the complaint
- agree with Customer on how product correction or removal is to be implemented
- place all relevant documentation, reference samples, and the relevant qualified personnel at the disposal of Customer and the appropriate authorities

Costs associated with any product correction or removal will be governed by the commercial agreements.

**Approvals:**

Evo Medical Solutions

Delphi Medical Systems Corporation

Delphi Initials _____    35    EVO Initials _____

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

...............................................
Approver
Title

...............................................
Approver
Title

**Annex 1: Contractual Products**
**Annex 2: Responsibilities**

Delphi Initials _____                    EVO Initials _____

Delphi Medical and evo Medical Solutions Supply Agreement Dated November 28, 2007

20.12    Annex 1

Delphi Portable Oxygen Concentrator

Delphi Medical and EVO Medical Solutions Supply Agreement

20.13    Annex 2

of the Quality Assurance Contract between Customer and Delphi Medical Systems Corporation

(a)    Responsibilities

| | Customer | Delphi Medical Systems Corporation |
|---|---|---|
| QM System | | |
| Compliance with EN ISO 13485 certifications | X | X |
| Product development | | |
| Drawings and parts list | | X |
| Specification and release of production materials | | X |
| Assurance of suitability of materials for the application purpose | | X |
| Process-controls | | X |
| Process Validation | | X |
| Design Control | | X |
| Risk Management | | X |
| Regulations concerning the labelling of contract products | A (Customer Branding) | X |
| Implementation of the labelling regulations for contractual products | | X |
| Declaration of compliance for contract products | | X |
| Further processes | | |
| Purchasing of production materials | | X |
| Manufacturing, including documentation | | X |
| Suitability of transport packaging | | X |
| Acceptance Activities | | X |
| Screening and Servicing | | X |
| Complaint processing and evaluation | C | X |
| Monitoring of the market | X | X |
| Notification of incidents and near incidents | X | C |

C = Co-working
A = Approval

38

Delphi Initials                     EVO Initials

# EXHIBIT B

## DECLARATION OF DAN BUNTING

DAN BUNTING says:

1.      I make this declaration upon personal knowledge of the facts set forth herein; and, if called as a witness, I would be competent to testify thereto.

2.      At all relevant times hereto, I was the president and chief executive officer of Medical Industries America dba evo Medical Solutions (evo).  In that capacity, I was familiar with oxygen concentrators which Delphi Medical Supply Corporation (Delphi) supplied to evo as part of ongoing development efforts which took place from time to time between evo and Delphi.

3.      Between October, 2009 and June, 2010, Delphi continued to do business with evo.  Delphi took returns from evo through May, 2010.  It sent evo checks for defective units for which evo had already paid through June, 2010.  What is more, from and after October, 2009, Delphi's representatives assured evo that it would in the future be manufacturing and shipping new replacement units that contained all of the salient design features that would be necessary to make the oxygen concentrators saleable and marketable.  For example, in November, 2009, it advised evo that it was prepared to assemble and ship dummy units to Delta Airlines, so that Delta Airlines could use these portable concentrators to train its staff.  An e-mail reflecting this communication from Delphi is attached as Exhibit 1 to my declaration.  On October 27, 2009, Delphi announced that it was considering building a batch of ten additional units in pursuance of its continuing relationship with evo.  The e-mail so announcing is attached as Exhibit 2 to my affidavit.

4.      evo has assigned any and all of its claims against Delphi to Swynson Limited by virtue of a Collateral Surrender Agreement dated October 5, 2011.



5.    I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

_____

Dan Bunting

Executed in   _Adel, Iowa USA_

November _1_, 2011

9098992.6

2

# EXHIBIT 1

**From:** Horton, Roger [mailto:Roger.Horton@delphi.com]
**Sent:** Friday, November 20, 2009 2:04 PM
**To:** Walker, Kevin
**Cc:** Wolf, Nichole L.; Vanessa Saltmarsh
**Subject:** Dummy CentralAir Units for Airline Training

Here is the contact info I have for the request (they are the commuter airline for Delta)

Barbara Mikkelson
Barbara.Mikkelson@mesaba.com
651-367-5048
Kevin, Please work with Nikki and contact Barbara for her shipping info.

Vanessa, we have 5 total dummy units made up.  would you like the 4 at your place or do you want us to hold them here?


rnh


Roger Horton
Director of Sales and Marketing - Contract Manufacturing
Delphi Product and Service Solutions
www.delphimedical.com
4300 Road 18
Longmont, Colorado 80504

Tel: +1 303 678 8585 ext 110
Cell: +1 303 517 9202
Home: +1 303 823 5322
Fax: +1 303 678 8138
Email: roger.horton@delphi.com

# EXHIBIT 2

**From:** Horton, Roger [mailto:Roger.Horton@delphi.com]
**Sent:** Tuesday, October 27, 2009 11:31 AM
**To:** Vanessa Saltmarsh
**Cc:** Walker, Kevin; Todd Osborn
**Subject:** RE: Airline request - dummy training units

The new Delphi is still "forming"...will be interesting to see where we end up.   I could see us building up a batch of 10 units that have outer cases with some kind of weight inside to simulate the physical piece, but I am not sure what actual training can be done.

I will contact the airline to see exactly what they want and more than likely stall...rnh

Roger Horton
Director of Sales and Marketing - Contract Manufacturing
Delphi Product and Service Solutions
www.delphimedical.com
4300 Road 18
Longmont, Colorado 80504

Tel: +1 303 678 8585 ext 110
Cell: +1 303 517 9202
Home: +1 303 823 5322
Fax: +1 303 678 8138
Email: roger.horton@delphi.com