Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 05-44481-rdd

5  - - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  DPH HOLDINGS CORP., ET AL.,

9

10              Debtors.

11

12  - - - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              300 Quarropas Street

16              White Plains, NY

17

18              October 24, 2011

19              10:20 AM

20

21  B E F O R E:

22  HON. ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25

Page 2

1

2    Notice of Agenda Proposed Seventy-First Omnibus Hearing Agenda

3    (Re: Doc #21674)

4

5    Notice of Agenda -- Notice of Agenda Proposed Forty-Ninth

6    Claims Hearing Agenda (Re:  Doc #21675)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dena Page

Page 3

```
 1

 2   A P P E A R A N C E S :

 3   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

 4         Attorneys for DPH Holdings

 5         155 North Wacker Drive

 6         Chicago, IL 60606

 7

 8   BY:   JOHN WM. BUTLER, JR., ESQ.

 9         ALBERT L. HOGAN, III, ESQ.

10         LOUIS S. CHIAPPETTA, ESQ.

11         JOHN LYONS, ESQ. (TELEPHONICALLY)

12

13

14   BUTZEL LONG

15         Attorneys for DPH Holdings

16         Suite 100

17         150 West Jefferson

18         Detroit, MI 48226

19

20   BY:   BRUCE L. SENDEK, ESQ.

21         DAVID J. DEVINE, ESQ.

22         CYNTHIA J. HAFFEY, ESQ.

23

24

25
```

Page 4

1

2    BUTZEL LONG

3         Attorneys for DPH Holdings

4         41000 Woodward Avenue

5         Bloomfield Hills, MI 48304

6

7    BY:   THOMAS B. RADOM, ESQ.

8         SHELDON H. KLEIN, ESQ.

9

10

11   TOGUT, SEGAL & SEGAL LLP

12        Attorneys for DPH Holdings

13        One Penn Plaza

14        New York, NY 10110

15

16   BY:   RICHARD K. MILIN, ESQ.

17

18

19   BRAUN KENDRICK FINKBEINER P.L.C.

20        4301 Fashion Square Boulevard

21        Saginaw, MI 48603

22

23   BY:   COREY GRANDMAISON, ESQ. (TELEPHONICALLY)

24

25

Page 5

1

2   BRYAN CAVE LLP

3        Attorneys for Spartech Polycom

4        211 North Broadway, Suite 3600

5        St. Louis, MO 63102

6

7   BY:   CHRISTOPHER J. LAWHORN, ESQ.

8

9

10  CALFEE, HALTER & GRISWOLD LLP

11       Attorneys for Blair Strip Steel, William Advanced

12         Materials, and Park Ohio Industries

13       1400 KeyBank Center

14       800 Superior Avenue

15       Cleveland, Ohio 44114

16

17  BY:   NATHAN WHEATLEY, ESQ. (TELEPHONICALLY)

18

19

20  HODGSON RUSS, LLP

21       Attorneys for Unifax Corp.

22       140 Pearl Street,  Suite 100

23       Buffalo, NY 14202

24

25  BY:   JAMES C. THOMAN, ESQ. (TELEPHONICALLY)

Page 6

1

2    FROST BROWN TODD, LLC

3            Attorneys for Sprimag Inc.

4            3300 Great American Tower

5            301 East Fourth Street

6            Cincinnati, OH 45202

7

8    BY:   DOUGLAS L. LUTZ, ESQ. (TELEPHONICALLY)

9

10

11   JAECKLE, FLEISCHMANN & MUGEL, LLP

12            Attorneys for Jamestown Container Corporation

13            Suite 900

14            200 Delaware Avenue

15            Buffalo, NY 14202

16

17   BY:   BEVERLY S. BRAUN, ESQ. (TELEPHONICALLY)

18

19

20   KEATING, MUETHING & KLEKAMP, PLL

21            Attorneys for FA Tech

22            One East Fourth Street, Suite 1400

23            Cincinnati, OH 45202

24

25   BY:   JASON STITT, ESQ. (TELEPHONICALLY)

Page 7

```
 1
 2   KELLEY DRYE & WARREN LLP
 3          Attorneys for Castrol and Tata
 4          101 Park Avenue
 5          New York, NY 10178
 6
 7   BY:   GILBERT R. SAYDAH, JR., ESQ.
 8
 9

10   LAMBERT, LESER, ISACKSON, COOK & GIUNTA, P.C.
11          Attorneys for Stephenson & Sons, Protech
12          916 Washington Avenue
13          Suite 309
14          Bay City, MI 48708
15
16   BY:   ROZANNE M. GIUNTA, ESQ. (TELEPHONICALLY)
17          SUSAN M. COOK, ESQ.  (TELEPHONICALLY)
18
19

20   THE MICHAELSON LAW FIRM
21          Attorneys for NXP Semiconductors
22          11 Broadway, Suite 615
23          New York, NY 10004
24
25   BY:   ROBERT N. MICHAELSON, ESQ.
```

Page 8

1

2    MOSES & SINGER LLP

3         Attorneys for Timken

4         405 Lexington Avenue

5         New York, NY 10174

6

7    BY:    JAMES M. SULLIVAN, ESQ.

8

9

10   POLSINELLI SHUGHART P.C.

11        Attorneys for Florida Production Engineering, Inc.

12        7 Penn Plaza

13        Suite 600

14        New York, NY 10001

15

16   BY:    JASON A. NAGI, ESQ.

17

18

19   REED SMITH LLP

20        Attorneys for Wells Fargo N.A.

21        599 Lexington Avenue

22        New York, NY 10022

23

24   BY:    MARK D. SILVERSCHOTZ, ESQ.

25        SARAH K. KAM, ESQ.

Page 9

1

2   RUSKIN MOSCOU FALTISCHEK, P.C.

3        Attorneys for Wells Fargo

4        East Tower, 15th Floor

5        1425 RXR Plaza

6        Uniondale, NY 11556

7

8   BY:   JEFFREY A. WURST, ESQ.

9

10

11  SMITH, GAMBRELL & RUSSELL, LLP

12        Attorneys for Heraeus

13        250 Park Avenue, Suite 1900

14        New York, NY 10177

15

16  BY:   WILLIAM M. BARRON, ESQ.

17

18

19  SNELL & WILMER, L.L.P.

20        Attorneys for Microchip Technology Incorporated

21        400 East Van Buren Street

22        Suite 1900

23        Phoenix, AZ 85004

24

25  BY:   STEVEN D. JEROME, ESQ. (TELEPHONICALLY)

Page 10

```
 1
 2    STEVENS & LEE
 3          Attorneys for Globe Motors, Inc.
 4          485 Madison Avenue
 5          20th Floor
 6          New York, NY 10022
 7
 8    BY:   CONSTANTINE D. POURAKIS, ESQ.
 9
10
11    THOMPSON & KNIGHT LLP
12          Attorneys for Victory Packaging
13          900 Third Avenue
14          20th Floor
15          New York, NY 10022
16
17    BY:   IRA L. HERMAN, ESQ.
18
19
20    WARNER NORCROSS & JUDD LLP
21          900 Fifth Third Center
22          111 Lyon Street, N.W.
23          Grand Rapids, MI 49503
24
25    BY:   MICHAEL B. O'NEAL, ESQ.
```

Page 11

1

2    WINEGARDEN, HALEY, LINDHOLM & ROBERTSON, P.L.C.

3          Attorneys for HSS LLC

4          G-9460 South Saginaw Road

5          Suite A

6          Grand Blanc, MI 48439

7

8    BY:   DENNIS M. HALEY, ESQ. (TELEPHONICALLY)

9

10

11   ALSO PRESENT:

12          JAMES SUMPTER, Party Pro Se

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 12

1                        P R O C E E D I N G S

2            THE CLERK:  All rise.

3            THE COURT:  Please be seated.

4            Okay, good morning.  DPH Holdings.

5            MR. BUTLER:  Your Honor, good morning.  Jack Butler,

6    Al Hogan, and Louis Chiappetta from Skadden.  Bruce Sendek,

7    Cynthia Haffey, Sheldon Klein, Thomas Radom, and David Devine

8    from the Butzel law firm, and Richard Milin from the Togut law

9    firm, all here on behalf of DPH holdings for its forty-ninth

10   claims hearing and its seventy-first omnibus hearing.

11           Your Honor, with the Court's permission, given the

12   nature of the matters before the Court today, we'd like to

13   proceed with the claims hearing first.  We think we can dispose

14   of that quickly.

15           THE COURT:  That's fine.

16           MR. BUTLER:  Your Honor, there is only -- when looking

17   at the forty-ninth claims hearing, there is one matter that's

18   been adjourned, matter number 1, the Calsonic Kansei matter has

19   settled in principle but has been adjourned to the November

20   17th hearing pursuant to a notice of adjournment we filed at

21   docket number 21573.

22           THE COURT:  Okay.

23           MR. BUTLER:  There are three matters, Your Honor,

24   before the Court.  The first is the -- matter number 2 is the

25   Select Industries Corporation matter.  This has been resolved

1    by a joint stipulation that's been submitted to the Court, and

2    Your Honor entered it at docket number 21661 which resolves

3    matter number 2.

4         Matter number 3 is the Vanguard Distributors matter.

5    This was at docket number 19873.  That matter has been settled

6    in principle.  The reorganized debtors have submitted a

7    stipulation to chambers reflecting that settlement; it's not

8    yet been docketed.

9         THE COURT:  Okay.

10         MR. BUTLER:  And matter number 4, Your Honor, is the

11    one matter we're proceeding with.  It's not contested, and it

12    was our claims objection regarding the claim of

13    STMicroelectronics, Inc. at docket number 19356.  We noticed

14    this claim for hearing at docket number 21591, and we filed our

15    supplemental reply at docket number 21646.  According to the

16    response from STMicroelectronics, which was docketed at 19403,

17    there was the amount of 15,275 that remained owing in

18    connection with the proof administrative claim.  That claim was

19    claim number 18969.  As we've indicated in our papers, and as

20    reflected in the books and records of the company, all of these

21    amounts were paid by five separate checks in 2009, totaling in

22    the aggregate -- excuse me, in 2011, the last check being paid

23    on September 15th of 2011 -- in the aggregate amount of 15,275.

24    STMicroelectronics chose not to file a supplemental response in

25    connection with the check numbers and dates and so on we

Page 14

1    provided in our Exhibit A and Exhibit B of our supplemental

2    reply.  I don't think there's anything, Your Honor, here at

3    controversy.  We'd ask Your Honor, therefore, to enter an order

4    disallowing the proof of administrative expense claim number

5    18969 in its entirety.

6           THE COURT:  Okay, in light of the supplemental reply,

7    including the exhibits, and there being no opposition to that

8    or appearance today by the claimant, I'll enter the order

9    disallowing the administrative claim.

10          MR. BUTLER:  Thank you, Your Honor.

11          Your Honor, that concludes the forty-ninth claims

12   hearing.

13          THE COURT:  Okay.

14          MR. BUTLER:  Your Honor, we now move to the seventy-

15   first omnibus hearing, and there is an agenda here that lists a

16   total of eight matters.  My understanding, Your Honor, based on

17   discussions with chambers and preparing the agenda that matter

18   number 6, the reorganized debtors' third case closing motion,

19   which is contested, will be dealt with last on the calendar

20   today.

21          So moving to the other matters, let me begin with the

22   adjourned matters.  First, the reorganized debtors' motion to

23   enforce a judgment against nonparty Charles Tebele.  That

24   matter's been adjourned to the November 17th hearing by

25   agreement of the parties.

DPH HOLDINGS CORP., ET AL.

Page 15

1           Your Honor, that's also true with matter number 2, the

2      motion by reorganized debtors to enforce plan injunction

3      against Oldco trustee at docket number 21556.  The parties have

4      agreed to continue that matter until November 17th, as well.

5           A word, Your Honor, about matter number 3.  This is

6      the motion by the reorganized debtors to approve a settlement

7      with the United States at docket number 21605.  This matter has

8      been adjourned in discussions with the United States, with the

9      Department of Justice, to the November 17th hearing.  As we

10     indicated to the Court in our papers, the United States

11     published notice of the proposed settlement in the federal

12     register on October 7th of this year, and the public comments

13     period expired last Friday, on October 21st.  The United States

14     has advised us that upon conclusion of the comment period, they

15     intend to file with this Court any comments received, although

16     we understand none were, as well as their responses and view in

17     connection with the pleading in support of the relief sought in

18     the motion.  The United States has indicated they need the time

19     to the next hearing to take the actions they need to take on

20     behalf of the government, and we expect them to file their

21     pleadings, Your Honor, and be before you on that motion next

22     month.

23           THE COURT:  Okay.

24           MR. BUTLER:  The fourth matter, Your Honor, to be

25     adjourned is a letter by James Grai, G-R-A-I, to lift the stay.

1    It's been docketed number 21574, and we have treated it as a

2    motion to lift the stay.  It has been -- and we filed, as

3    coordinated with chambers, a response to the letter at docket

4    number 21652, which is treated as an objection to that motion.

5    And by agreement of the parties, that -- I should also tell

6    you, in the interim, Mr. Grai is now represented by counsel.

7    His counsel filed a joinder in connection with that to be heard

8    at the November 17th hearing.  And so there's been a lot of

9    other documents filed.  There's also been documents filed by

10   the Michigan defendants and some other papers.  But the long

11   and the short of it is his counsel has agreed with the

12   reorganized company to adjourn this matter to November 17th and

13   have it heard on that hearing date.

14        THE COURT:  Okay, was this the letter where the former

15   employee said that the State of Michigan wasn't making payments

16   out of its own funds because of the stay?

17        MR. BUTLER:  Yes, Your Honor.  That's the letter.  We

18   don't believe -- the reorganized debtors don't believe that

19   there's anything in either the modified plan, Your Honor's

20   prior orders, or applicable bankruptcy law that prohibits the

21   fund from paying workers' compensation benefits.  We understand

22   that it is the position, at least at the moment, of the

23   Michigan defendants, that because of the funds administration

24   is currently involved in appeal of this Court's ruling on

25   issues of lack of jurisdiction and sovereign immunity, that the

DPH HOLDINGS CORP., ET AL.

Page 17

1    funds administration has determined it doesn't intend to make

2    payments until that matter is resolved.

3            THE COURT:  It's not really a stay issue, then?

4            MR. BUTLER:  No, it's not, Your Honor.

5            THE COURT:  Okay, it just seemed to me that someone

6    should focus on it and perhaps -- well, now that he has a

7    lawyer, I think that's helpful.

8            MR. BUTLER:  Right, and we have advised him, Your

9    Honor, of that matter, but I mean, and -- from the -- again,

10   from the reorganized debtors point of view, there's nothing

11   that this Court has entered and there's nothing that the

12   company has sought in any of its plan documents or any order

13   that we've procured from this Court that would prohibit the

14   funds administration from making these payments.

15           THE COURT:  Okay.  So that leaves Mr. Sumpter?

16           MR. BUTLER:  Matter number -- no, that's part of --

17   the only thing we have left -- that's part of number 6.  That's

18   the, Your Honor, the third case closing motion.  We indicated

19   we're, I believe in connection with chambers, it was going to

20   be taken at the end of the case.

21           THE COURT:  Well --

22           MR. BUTLER:  Unless you want to deal with it now,

23   whatever you want to --

24           THE COURT:  Mr. Sumpter, are you on the phone?

25           MR. SUMPTER:  Yes, I am.

1            THE COURT:  Okay, I think it's a fairly simple motion.

2    I think it's probably worthwhile to do it now rather than --

3            MR. BUTLER:  Let me -- yeah.

4            THE COURT:  -- keep you all waiting.

5            MR. BUTLER:  Mr. Radom's going to handle that, Your

6    Honor.

7            THE COURT:  That's fine.

8            MR. RADOM:  Good morning, Your Honor.  Tom Radom from

9    the firm of Butzel Long.  This is the third case -- third

10   motion to close certain debtor cases, and in this case, there's

11   five cases that we're requesting they be closed.  They're fully

12   administered.  We have had conversations with the U.S.

13   Trustee's office in regard to the closing of these five cases.

14   I won't go through the motion itself; I'll assume you've read

15   it.

16            We've had one objection by Mr. Sumpter.  And as we've

17   indicated in our reply to Mr. Sumpter, again, it's one of these

18   pleadings where we're not sure exactly what he's saying or

19   whether he's provided a legitimate reason for filing the

20   objection in the first place, but reading it, I think what he's

21   saying here is don't close these cases because I'm going to

22   take an appeal, and if I succeed on my appeal, then somehow,

23   maybe I have rights against these five debtors, or

24   alternatively, that the closing of these cases could impair my

25   appellate rights, and we've indicated in our reply that that

1    just isn't the case.

2         THE COURT:  Okay, and as part of that, you've pointed

3    out that none of these five debtors was an employer of Mr.

4    Sumpter's, and secondly, that none of them is the administrator

5    of any --

6         MR. RADOM:  Salaried retiree benefits, that's correct,

7    Your Honor.

8         THE COURT:  -- any benefit plan.

9         MR. RADOM:  That's correct.

10        THE COURT:  So it appears to me, Mr. Sumpter, that

11   there's a legitimate reason to close these cases and that they

12   couldn't possibly affect -- and that that order couldn't

13   possibly affect your appeal.

14        MR. SUMPTER:  Well, my one concern was, in my appeal,

15   I was going to ask the district court to consider the issue

16   whether or not my motion could represent the interest of all

17   salaried retirees.  And so, you know, we don't -- I didn't have

18   the option -- opportunity to get discovery, but the assumption

19   was that there are salaried retirees from those five companies.

20        THE COURT:  All right.

21        MR. SUMPTER:  And so if I did prevail, that's where

22   the issue would be.  And that's why I was concerned about the

23   cases being closed, because according to the motion written by

24   Ms. Haffey, all the -- it assumed that all contested matters

25   were resolved.

1            THE COURT:  Well, I do not believe that the closing of

2     these five cases prejudices your appeal.

3            MR. SUMPTER:  Okay.

4            THE COURT:  And if for some reason, the closing of the

5     cases does that -- but I don't believe it would -- you could

6     always petition to reopen them.

7            MR. SUMPTER:  Okay.

8            THE COURT:  Okay?

9            MR. SUMPTER:  That's fine with me.  Thank you very

10    much.

11            THE COURT:  All right, so I grant the motion.

12            MR. RADOM:  Thank you, Your Honor.

13            MR. BUTLER:  Your Honor, we now move to matter 5 on

14    the agenda which is the reorganized debtors' motion to file

15    statement regarding service of the final form extension motion,

16    docket number 21509.

17            Just a word, Your Honor, about the procedural posture

18    of these cases in this regard and with respect to this hearing.

19    The substantive motion which is before the Court is listed at

20    matter number 7, and it's a motion that applies across a series

21    of separate adversary cases, and that is the debtors', DPH

22    Holdings' first motion to amend or seeking leave to amend was

23    filed back on September 7th of 2010 at docket number 20575, and

24    it was filed in connection with 132 of the 177 actions that

25    were retained under the plan of reorganization that the debtors

DPH HOLDINGS CORP., ET AL.

Page 21

1   sought to be confirmed as modified by this Court, which

2   occurred in July of 2009 and which went effective in October of

3   2009.  Of those 132 cases, 68 of them remain open today, and of

4   those 68, there are 10 that are on hold but are not

5   particularly active because no defendant has yet been able to

6   be located or active; there's about 21 million dollars worth of

7   preference actions sort of staying on the outside that may

8   ultimately come before Your Honor in the form of default

9   judgments or other activity, but they're on the side.

10          There are fifty-eight active cases.  Of those fifty-

11   eight active cases, the aggregate avoidance amounts for the

12   ninety-day period are 254 million dollars.  And of those fifty-

13   eight active cases, there are thirty-seven parties that oppose

14   the motion.  That is, thirty-seven parties that oppose DPH's

15   first motion for leave to amend.  And those thirty-seven

16   parties represent 204,112,570 dollars worth of alleged

17   transfers during the ninety-day period.  Now, I was advised by

18   Ms. Haffey, as we were getting ready to begin the hearing

19   today, that one of those defendants has settled, and that will

20   come to Your Honor subsequently.  That would reduce the thirty-

21   seven to thirty-six and the amount in controversy, from a

22   preference perspective down to 192 million dollars.

23          So as we sit here procedurally, there is a first

24   request for leave to amend, there are thirty-six defendants who

25   are opposing that motion to defend, and they are the subjects

Page 22

1   of at least what DPH Holdings alleges to be 192 million dollars

2   worth of transfers during the ninety-day period.

3           In connection with that motion, on October 22nd of

4   last year, October 22nd, 2010, Your Honor entered a scheduling

5   order that covered all of the cases in which Your Honor

6   indicated that the Court would hold particularized hearings

7   with each defendant in each case at an appropriate time as set

8   by Your Honor's scheduling order to determine how to proceed

9   with that particular case.  Since that time, there've been a

10  series of omnibus hearings covering issues that were alleged to

11  transcend all of the cases, the most recent of which occurred

12  on June 21st, at the June 21st hearing.  And Your Honor asked

13  that in connection with this hearing, that notice matters

14  raised on that record at a transcript that's been docketed

15  docket number 21490 be addressed by the reorganized debtors and

16  the defendants.  And Your Honor invited defendants to file

17  declarations in connection with those matters relating to,

18  among other things, the service of the final 4(m) extension

19  motion which was docket number 18952 and which was approved by

20  Your Honor October 22nd, 2009.  And so in connection with this

21  hearing, at least the reorganized company's understanding is

22  that all the matters listed under number 7, except the limited

23  notice matter that Your Honor has focused on for this hearing

24  that Your Honor dealt with at the June 21st hearing, the

25  remainder of these matters of which there a voluminous number

DPH HOLDINGS CORP., ET AL.

Page 23

1    of filings from these thirty-six defendants, that those matters

2    and, for that matter, the substance of the company's motion for

3    leave to amend, that those matters would be adjourned to a

4    later date to be set by Your Honor after this hearing is

5    completed.

6            And so where we are, Your Honor, is here to address

7    the notice issues that Your Honor directed be reviewed and

8    responded to and answer any questions that the Court has in

9    connection with those.  And it was in response to that

10   direction on the record at the June 21st hearing that the

11   reorganized debtors prepared a statement regarding the form

12   extension motions and asked for leave to file that, and that

13   matter is at docket number 21509.  That statement was prepared

14   by our law firm, by Skadden, Arps, in connection with the

15   reorganized company because it covered time periods and motions

16   where we represented the debtors and we were before the Court.

17           And Your Honor, it also -- there is pending, today, as

18   to that motion, I believe only three objections to our leave --

19   to the reorganized company's motion for leave to file that

20   statement, the most substantive of which are -- two of them are

21   just objections that relate to sort of general relief.  The

22   third, which is substantive, that was filed is an objection to

23   that motion as filed by Methode, and they have -- one objection

24   was filed by Heraeus, and there was a joinder filed by Unifrax;

25   those were blanket objections to all relief sought by the

Page 24

1    reorganized debtors in connection with the adversary

2    proceedings.  Those two objections didn't raise, at least in

3    their papers, any argument as to why the reorganized debtors

4    should not be permitted to file the statement, and we believe

5    are more appropriately dealt with in connection with the motion

6    to leave when it's addressed ultimately by the Court.

7            The objection filed by Methode raises arguments as to

8    why the reorganized debtors shouldn't be permitted to file the

9    statement.  Your Honor, the statement, which I'm not going to

10   summarize because it details the procedural history here, there

11   are, I think, with Your Honor's permission, just sort of four

12   or five, six points, very briefly, I'd like to make in

13   connection with it.

14           First, that the 4(m) motions, from their inception,

15   were dealt with as ex parte motions by the debtors.  That is

16   what the case law anticipates that it was the notice and design

17   of them, and it was our view at the time and remains our view

18   that the case management order, which was a procedural order,

19   did not require particularized service of that, and in fact, we

20   had a series of discussions on the record at various of those

21   hearings in which there was extended colloquy between the Court

22   and, frankly, myself representing the debtors, as to who is

23   being served and under what bases they were being served.  And

24   that dates all the way back to March 19th of 2008, and in each

25   of the subsequent hearings, we discussed who would be served

DPH HOLDINGS CORP., ET AL.

Page 25

1    and who wasn't served, and we've indicated in the statement and

2    made reference to and attached the hearing transcripts and the

3    references because, in fact, we had never intended and we did

4    not give, and the reorganized companies do not assert that they

5    gave particularized notice of the 4(m) motions to the

6    defendants, which were the subject of sealed actions at the

7    time.

8            The only deviation to that was in connection with the

9    first extension hearing back in March of 2008.  In the colloquy

10   we had on the record there, Your Honor directed us to serve

11   preference defendants, and we did so.  And those, in fact,

12   ironically enough, are the subject of one of the motions --

13   separate motions on today's agenda, matter number 8.  And we

14   did that on each of the hearings, the first extension -- the

15   original preservation of estate claims hearing, and then the

16   extension hearings that occurred in April of 2008 and again in

17   October of 2009.

18           The next point, Your Honor, I'd like to make in

19   connection with this is that there was at least a suggestion in

20   the June 21st record that somehow the reorganized debtors and

21   their counsel either misrepresented or mislead the Court in

22   connection with the notices and the method of notice that was

23   applied here, and I wanted to make a point of standing here

24   before Your Honor and asking any questions Your Honor has in

25   connection with that because at least we don't believe that was

DPH HOLDINGS CORP., ET AL.

Page 26

1   ever the case.  We think the record is clear, and we, frankly,

2   think the orders are crystal clear on this matter because both

3   the preservation of claims order and each of the extension

4   orders, the first, the second, and the final, specifically

5   provide that the service on the defendants in each adversary

6   proceeding of the order relating to the 4(m) motions was to

7   occur either when the debtors served a summons and complaint on

8   the defendant or soon thereafter as practicable.  And so there

9   was a process that was set up in terms of how we were going

10  about giving that notice.  And the reason for that, of course,

11  is under Rule 4 and under the case law, and frankly, as we

12  stand here today, all the due process rights of all the

13  parties, the reorganized company vis-a-vis the couple hundred

14  million dollars in dispute, the thirty-six parties that are

15  objecting here today, all those rights are preserved.  And at

16  least from the company's perspective, other than answering

17  questions Your Honor has and making sure the record, here, is

18  crystal clear, the company's view -- and Mr. Sendek will speak

19  later on behalf of the Butzel firm and of the matters that are

20  before the Court that they're handling -- but the view is that,

21  from the reorganized company is that each of the defendants and

22  the company should be able, under the scheduling order Your

23  Honor entered in October of last year, as supplemented by some

24  procedures orders that Mr. Sendek's going to talk to you about,

25  ought to be able to have -- those thirty-six parties ought to

1    be able to have their day in court in their individual

2    adversary proceedings to allege anything they want to allege in

3    connection with the Rule 15 motion that's pending before Your

4    Honor, and Your Honor has the discretion to make whatever

5    judgment Your Honor believes is appropriate in those

6    particularized circumstances.  And therefore, everyone's rights

7    are, as I indicated, preserved, and to the extent there's

8    prejudice and Your Honor finds that prejudice weighs one way or

9    another, Your Honor is able to sort those out on a case-by-case

10   basis.

11          So Your Honor, I mean, that's really the substance of

12   the statement we filed.  We're not asking for any relief today

13   from Your Honor other than as it relates to matter number 5, to

14   grant the motion to have that statement made as part of the

15   record.

16          THE COURT:  What is DPH's response to Methode's

17   objection?

18          MR. BUTLER:  Well, Methode makes a couple of

19   objections, Your Honor.  They argue that the statement

20   amplifies the fact that the reorganized debtors have not

21   complied with the case management order.  I don't know there's

22   a response to that; I think they're wrong, in terms of what

23   we've done, and we've laid it out as to what our views were,

24   and it's very transparent during the course of the case as to

25   how we were dealing with 4(m) motions in connection with the

1    case management order.

2         They asked that any additions provided by the -- their

3    second argument is any additions provided by the statement

4    would be irrelevant, and I think, Your Honor, in reviewing the

5    June 21st transcript which went all over -- it was a lengthy

6    and involved hearing, and lots of things were said, some of

7    which were inaccurate about what occurred in connection with

8    notice, even the facts, that the reorganized company ought to

9    be able to file a factual statement that simply, as this

10   statement does, lays out in a clear and concise way so the

11   record is clear and concise about what occurred in connection

12   with the 4(m) motions.

13        Their third argument is the cases have proceeded for

14   over a year without the record being supplemented, and to

15   supplement it now would be inequitable.  Your Honor, I don't

16   see how that's actually relevant here at all.  The fact is the

17   debtors, DPH Holdings, the reorganized companies filed a motion

18   to amend back in September 7th of 2010; it's October of 2011.

19   That motion is still pending, and in connection with that

20   motion, there's been a series of hearings, the last one of

21   which had a lengthy discourse and a lot of allegations made

22   about notice.  That was in June, and shortly thereafter, the

23   reorganized companies, following Your Honor's directive in

24   June, filed a motion to supplement the record and to provide

25   information.  So I don't know how it's viewed as not relevant

1    or untimely or inequitable when, in fact, it arises, in at

2    least the reorganized company's business judgment, it arises

3    directly from the June 21st hearing.

4         THE COURT:  Okay.

5         MR. BUTLER:  And then finally, they said the rationale

6    underlying the final extension motion changed from that

7    asserted in the prior extension motions.  And maybe just a word

8    about that, Your Honor, since the Court asked, we said in the

9    statement, and I stand before Your Honor today and say that the

10   basic, if you will, the umbrella rationale, the basic rationale

11   for the extension motion at all these times continue to be

12   relevant.  The facts and circumstances changed from one

13   extension motion to the other.  Having lived this life, I know

14   it personally.

15        The first several times we came to Your Honor, we came

16   to you at a time when we thought we were operating under a

17   settlement with our creditors that was going to lead to a plan

18   investor, seven billion dollars' worth of financing, dividends

19   approaching a hundred percent to creditors and one path, and it

20   was on that basis that we approached the Court and dealt with

21   those issues, still believing that we needed time to evaluate

22   things and time to sort them through, but the facts were there.

23        The second time we came before the Court, in terms of

24   the second extension motion, things had changed dramatically in

25   terms of underlying facts, but the same basic rationale, that

1   we needed more time because of where we were at that moment in

2   the case, was necessary, and that we established cause under

3   4(m).  And 4(m) has -- we've gone far afield in this case, but

4   4(m) is reasonably precise about what you can seek and what --

5   and gives the Court wide latitude in terms of deciding whether

6   cause is established, and that was in the case of heading to a

7   place where we were unable to repay a DIP loan of 4.7 billion

8   dollars and had to figure out how to get out of the case and it

9   turned out -- and dramatically changed, through a plan

10  modification, our approach.

11        And those, I should point out, I think it's relevant

12  here, all those motions and all of the work done in connection

13  with 4(m) and these adversary proceedings was subsumed within

14  the plan modification order.  These were all dealt with in the

15  plan of reorganization.  They were all specifically addressed

16  in the plan modification order.  Your Honor made very specific

17  findings in the plan modification order.  And the time to

18  attack that order has long expired under any theory that anyone

19  can promulgate.  That period is gone.

20        And so at most, people can argue about the final

21  extension motion.  That one was filed after the plan

22  modification order and after the company emerged, in the same

23  month the company emerged from Chapter 11.  And we came to the

24  Court and talked about seven basic facts and circumstances and

25  issues that occurred.  The same umbrella, same basic rationale.

1    We said in the final extension motion at pages 17 and 18 of

2    that -- or, paragraphs 17 and 18 of that motion that the

3    complex nature of the transactions set forth in what was the

4    modified plan, the master disposition agreement were causing

5    the company in need to focus on them.

6          We told the Court, basis number two, that the fact

7    that a significant amount of time and resources would be

8    devoted to supporting the transition operations among DPH

9    Holdings, GM components, and DIP Holdco III was diverting the

10   company's time and attention; we needed more time to evaluate

11   the actions.

12         The third thing we told the Court was the factors --

13   the debtors do not believe that DPH Holdings will be able to

14   evaluate each of the retained proceedings within thirty days

15   after the effective date; this came on in that thirty-day

16   period, October 22nd.  Thirty days after the effective date

17   would have been November 4th, 2009.

18         And the fourth we said in the papers was the debtors

19   may ultimately determine not to prosecute certain of the

20   adversary proceedings.

21         That was supplemented at the October 22nd hearing in

22   exchanges with the Court; we said three more things, all

23   related to the same general need for an extension of time.  One

24   was that the intense period that led to the closing, it wasn't

25   possible for the debtors to sort through the adversary

1    proceedings any further.  I think the phrase used was "winnow

2    down".

3           We told the Court that there was only one employee of

4    DPH Holdings going forward, and he expressed the need to have

5    more time to evaluate the proceedings.

6           And third, we informed the Court what we understood at

7    that point, for the first time, which was a different law firm

8    would be taking over the proceedings.

9           Now, just to be clear, going back to October 2009,

10   Skadden only dealt with a very small number of those

11   proceedings.  The Togut law firm, Mr. Milin's law firm, handled

12   the majority of those, and the company chose to bring in the

13   Butzel firm to deal with the majority of those.  Mr. Milin's

14   continued to act as conflicts counsel.  We're not handling any

15   of them as relates to that.  And that transition was another

16   basis for time.

17          Now again, Your Honor, changed facts and

18   circumstances, but all expressing a need for additional time.

19   And the fact of the matter is that as we sit here today, the

20   177 that were retained are down to 68, and of the 68, there's

21   36 here complaining.  About twenty percent of the retained

22   actions are trying -- and I get why, I understand it.  They've

23   got 192 million dollars worth of transfers.  So I understand

24   the economic motivation.

25          But I think it's very important for the record to be

Page 33

1   crystal clear that the due process rights of people under the

2   case law and in fact are completely preserved, and they were

3   completely preserved by Your Honor's October 2010 scheduling

4   order.  It seemed to me, at that point a bystander, now back

5   here because some of our actions have been called into

6   question, it seemed to us when we had reviewed those orders at

7   the time that the Court got it.  The Court understood that

8   there needed to be, in connection with the motion for leave to

9   amend, individualized hearings in each of the cases where each

10   party could have their right to say whatever they wanted to

11   say.  That had to be balanced as Rule 15 requires; it had to be

12   balanced by the Court against the broad public policy, and

13   frankly, the case law that says that motions for leave to

14   amend, certainly in the first instance, are generally widely

15   granted.  But there are certainly circumstances where Your

16   Honor can conclude not here, not this time, not for this

17   reason.  And that's the discretion of this Court.  And Your

18   Honor has that discretion.  And that discretion can be

19   exercised under your own scheduling order.  I think Mr.

20   Sendek's going to talk to you about the view that from the

21   company's perspective that not only ought nothing be done here,

22   today, and the company's certainly not seeking to seek approval

23   of the motion for leave to amend here, but rather, setting up a

24   procedures order that you would consider next month to

25   implement your October 2010 scheduling order so people can get

1    about the business of having, as to these remaining thirty-six,

2    the last twenty percent, if you will, to have individual

3    hearings where they can present whatever they want, and also

4    perhaps including an ADR element of it, and hopefully those can

5    get resolved, as well.

6          But there is a process, here, where everyone's rights

7    are preserved, and it's not a backward attempt by some of these

8    parties to try to essentially amend or revoke the plan

9    modification order, as some folks try to delve back into this

10   process pre-October of 2009, and it's certainly not, Your

11   Honor, in the company's view, with respect to the final

12   extension motion that was granted in October of 2009, pursuant

13   to which these parties were served within 180 days.  And unlike

14   most of the cases that have been cited in all these things,

15   there has been no substantive action taken by the Court.

16   There's been no motion for summary judgment, there's been no

17   action taken, there's been no decision taken by the Court that

18   has made a determination here of any kind, as to these thirty-

19   six defendants.

20         So Your Honor, we simply wanted to make clear in what

21   had become, at least in the reorganized company's view, a less-

22   than-clear record, we wanted to make clear what the facts are.

23   And to the extent that particularly because these defendants,

24   by the reorganized company's own admission -- and I should

25   point out, there is a broad range of actual notice.  When you

DPH HOLDINGS CORP., ET AL.

Page 35

```
 1    get to the particularized hearings and any of those defendants,
 2    there is a wide scope of notice that people actually had, which
 3    Your Honor, from at least our perspective is not really
 4    before -- ought not be the focus of today's inquiry.  But by
 5    the company's own admission, we did not give particularized
 6    notice under the case management order to 4(m) defendants.  We
 7    told the Court that, we spelled it out in the orders, in terms
 8    of when things were going to be served.  And I simply, Your
 9    Honor, as the company's lead counsel at the time, if there were
10    issues that the Court had with that or had with our
11    representations, I wanted to be here before you to answer them.
12              THE COURT:  Okay, all right.  Well, as you noted,
13    there were three objections to the debtors' motion to
14    supplement the record.
15              MR. HERMAN:  Your Honor, there were four.
16              THE COURT:  Okay, there were four.
17              MR. HERMAN:  Victory Packaging filed one on July 22;
18    somehow, it was filed on the ECF --
19              THE COURT:  All right.
20              MR. HERMAN:  -- the debtor ignored it.
21              THE COURT:  But I guess I read the objections as going
22    to arguments as to whether the notice was proper or not, as
23    opposed to the debtors' right to file a supplement.  And I
24    frankly welcome something on record saying what notice was
25    given and the rationale for it, given that I raised the issue,
```

05-44481-rdd   Doc 21757   Filed 11/30/11   Entered 12/08/11 11:09:55   Main Document
Pg 36 of 119
DPH HOLDINGS CORP., ET AL.

Page 36

1    and I think other than Victory, I'm not sure anyone had.  And

2    it certainly sets forth the debtors' rationale as to this issue

3    and puts in context the filings that were made by the various

4    defendants who I asked to file something on it.  So I'm not

5    quite sure why the record shouldn't have this in it.

6         MR. BARRON:  Your Honor, may I be heard?

7         THE COURT:  Sure.

8         MR. BARRON:  William Barron of Smith, Gambrell &

9    Russell for the Heraeus defendants who are named in adversary

10   proceedings 2442 AND 2445; we filed an objection.  May I first

11   make a comment on a couple of the opening statements regarding

12   the agenda today?  Because I think they dovetail with the

13   question of the submission.

14         I note that the agenda that I saw this morning and the

15   comment by Mr. Butler suggest that the entire motion for leave

16   to file amended complaints is not part of the hearing today and

17   is adjourned without date.  That is not our understanding.  Our

18   understanding is that on June 21, the Court declared that there

19   would be a part 2, in effect, to the motions for leave to file

20   amended complaints, and that was all going to be part of what

21   we do today and what Your Honor inquires and hopefully hears

22   about today, and that point of clarification, from our

23   perspective, would be very helpful.

24         Number 2, there are two groups, if you will, of

25   defendants of the thirty-six, we now know.  One group filed an

05-44481-rdd    Doc 21757    Filed 11/30/11    Entered 12/08/11 11:09:55    Main Document
DELPHI HOLDINGS CORP., ET AL.
Pg 37 of 119

Page 37

1    omnibus paper on October 7 giving them the self-designed

2    moniker of the "no notice defendants".  The fact is, none of

3    the defendants received notice; none of the thirty-six of the

4    third extension -- sorry, the fourth extension motion.  The

5    only thing that distinguishes the smaller group of the so-

6    called no notice defendants is the fact that they received

7    absolutely no notice, no constructive, no imputed, none of the

8    other notice arguments that we have seen in the filings by the

9    debtors.  There were other defendants who -- and I don't know

10    which ones; if it becomes relevant, it will develop -- where

11    there are affidavits.  They were either on ECF filing or they

12    were mailed or received or somehow should have seen a copy of

13    the disclosure statement or statements, and that those impacted

14    on their receipt of actual notice sufficient to notify them

15    that they had lawsuits against them and they should be

16    defending themselves.  Whether that be so, or not, we all

17    submit that that's irrelevant.  That, of course, would be for

18    you to decide, but we think that could be decided on the

19    current record.

20         We have the clear impression that the debtors want to

21    put off as long as possible and put off over and over again a

22    determination based on issues that have been fully briefed by

23    all the parties, and yet we have another submission that comes

24    in from Skadden, the so-called supplemental document that they

25    asked the Court --

1          THE COURT:  I asked everyone to submit information on

2     this.  Your client submitted affidavits.  People submitted

3     affidavits on this.  And the debtors were supposed to respond

4     to it; I directed them to.

5          MR. BARRON:  Your Honor, if so -- if you're inclined,

6     at your discretion, to accept that we have no basis on which to

7     object to that, we're asking you to exercise your discretion

8     not to.

9          THE COURT:  But why?  Why not?

10          MR. BARRON:  Only because the view is enough is

11     enough.  But if we can have all these things on the table and

12     on the agenda for today, that would be a welcome result for the

13     defendants.

14          THE COURT:  Okay.  Well, I'm going to grant the

15     debtors' motion to file their motion to supplement the record

16     on the notice issue in connection with the Rule 15 motion.  I

17     think it's also applicable to the ultimate Rule 4(m) issues

18     that are still before the Court but have been put on hold

19     because we've been dealing with the amended complaint or the

20     proposal to amend the complaint, just as I believe it's

21     appropriate and directed the other parties to file their

22     factual records as to notice.  And so I'll overrule the

23     objection on that point, which I viewed basically as commenting

24     on the quality of notice and the legal arguments that are

25     subsumed in first the Rule 15 motion and secondly, if and when

05-44481-rdd   Doc 21757   Filed 11/30/11   Entered 12/08/11 11:09:55   Main Document
Pg 39 of 119
DPH HOLDINGS CORP., ET AL.

Page 39

1   we get to it, the issues with regard to Rule 4(m) and on what

2   basis should I view my prior orders.  So the debtors can submit

3   an order on that basis.

4           MR. BUTLER:  Thank you, Your Honor.

5           THE COURT:  Okay, now, the focus of this hearing is,

6   in fact, on notice issues and/or assuming there's something

7   more to be done in the cases, on the process thereafter.  But I

8   do want to circle back to the June 21 hearing, first, before we

9   get to that.  As you all who were here remember, and certain of

10  you were not here then because you didn't have objections on on

11  that basis, but there were several rulings by me on certain

12  objections to the Rule 15 motion.  Have they all been dealt

13  with now?  I mean, they were rulings on the -- they were

14  issues, all basically going to the futility argument.  There

15  was the issue about amending -- making sure that the complaint

16  reflected no double counting.  There were Rule 8 issues; there

17  were relation back issues.  Have they all been dealt with at

18  this point?

19          MS. HAFFEY:  Your Honor, at that hearing, you -- this

20  is Cynthia Haffey on behalf of the reorganized debtors -- asked

21  the reorganized debtors to, to any of the defendants that

22  requested a, what we call reconciliation of the relation back

23  issue, to respond to those.  We did do that timely and provided

24  that to those defendants.  And with the exception of one matter

25  which now has been resolved, we did not receive any response

1   back from the defendants that they had any issue with the

2   relation back --

3              THE COURT:  Okay.

4              MS. HAFFEY:  -- analysis that we did.

5              THE COURT:  And so, just to make sure I'm closing the

6   loop on this, I had communications from the Clarke Hill firm,

7   and then you responded on that score.  They were representing

8   Doshi Prettl, I think.

9              MS. HAFFEY:  That's correct, Your Honor.

10             THE COURT:  That's the one that's been resolved?

11             MS. HAFFEY:  That case has been resolved.

12             THE COURT:  All right, so we really are just talking

13  at this point, then, I guess, on the issue that I directed the

14  parties to focus on which was the specific issues with respect

15  to notice, right?

16             MS. HAFFEY:  And if I could just -- and Mr. Sendek's

17  going to deal more fully with this, Your Honor, but if I could

18  just make one additional statement, Mr. Butler gave you

19  statistics today of the remaining cases.  I think it's also

20  important to note that of those thirty-six remaining cases in

21  which the defendants filed motions -- excuse me, filed

22  oppositions to our motion to amend, of those, only thirty of

23  those defendants actually did file an affidavit or declaration,

24  so there would only be thirty before this Court.  Thank you.

25             THE COURT:  All right.

1          MR. SENDEK:  Good morning, Your Honor.  Bruce Sendek

2     on behalf of the reorganized debtors.  As Ms. Haffey just

3     indicated, since we were last together on this matter in June,

4     thirty affidavits have been filed in one form or another

5     complaining that those defendants did not have notice of the

6     final extension order.

7          The presentation you heard today from Mr. Butler

8     regarding the statements submitted by Skadden is most important

9     to the consideration of those objections.  That statement puts

10    matters in its proper framework.  It demonstrates -- it

11    demonstrates conclusively, Your Honor, that there is no basis

12    here to undo, to void the fourth extension order.  It was

13    entered entirely appropriately following the rules of

14    procedure, 4(m), 9006, in a way that has its roots, as the

15    Court well knows, back to 2007.  When the first preservation

16    order was entered back then, the process that was established

17    then was to seal -- seal the complaints, stay -- stay

18    proceedings, and extend the time for service of the complaints.

19         Now, there were three subsequent extensions, and I

20    will try not to repeat the history in the statement submitted

21    by Skadden or the points made by Mr. Butler but there are some

22    that I will amplify because they are important.  But that set

23    the procedure.  And in the subsequent two years and a little

24    bit more that occurred after the first preservation order,

25    there were some changed circumstances, and there were some new

Page 42

1    developments.  And in each occasion, when the debtor came

2    before the Court seeking an additional extension, it was done

3    entirely appropriately under the rules.

4              THE COURT:  Can I interrupt you?  Because I read the

5    supplemental submission and I heard Mr. Butler, and I have my

6    views on that.  But I want to go to, I guess, a different part

7    of this, which is of the defendants who filed affidavits, which

8    do the debtors agree with, as to their not having received any

9    notice?

10             MR. SENDEK:  Well --

11             THE COURT:  Of the last extension order.

12             MR. SENDEK:  When the Court says "any notice", it

13   becomes a relative term.

14             THE COURT:  I'm stating it broadly --

15             MR. SENDEK:  Okay.

16             THE COURT:  -- on purpose.

17             MR. SENDEK:  At this point, we have responded, I

18   believe, to all of those objections, and in varying degrees, as

19   the Court used the expression "spectrum of notice", we have

20   identified a spectrum of notice that each and every one of them

21   received.  Some far more specific than others.  And we have

22   done that.  The point that we are making is that the whole

23   process didn't require the type of notice.

24             THE COURT:  No, I understand that.  I'm just trying

25   to -- I know -- I mean, I'll hear from the others on that.

1          MR. SENDEK:  Right.

2          THE COURT:  I think you all have already made that

3   point.  I don't think we need to go over it.

4          MR. SENDEK:  Okay.  Here's what we're suggesting, if I

5   may.  Notice -- those who claim that they didn't get any notice

6   whatsoever, they were completely in the dark, they were living

7   in a cave, they didn't know that Delphi was in bankruptcy, they

8   forgot that they received a payment within ninety days, be it

9   five million or ten million -- and some of them fit that

10  category -- so they forgot it, it never occurred to them that

11  they might be asked to account for that preference payment.

12  Okay?  That's the claim of some.  All right?  Notice is only

13  relevant in the context of a potential prejudice that has to be

14  evaluated by the Court.  And those who did receive absolutely

15  no notice, as I described it, they were in the cave, may have

16  suffered absolutely no prejudice.  The records may be readily

17  obtainable.  They may have a very good handle on what happened

18  and when, and there may be not a scintilla of prejudice.  So

19  notice only has the potential relevance in the context of

20  prejudice to the defendants.

21          And what we are suggesting, what Mr. Butler alluded

22  to, is a process that goes back to a process the Court

23  discussed in October of 2010 to identify, to make a record on

24  an individualized basis of each and every defendant of those

25  who want to claim that they were prejudiced, how were you

DPH HOLDINGS CORP., ET AL.

Page 44

1    prejudiced.  And notice may come into that, but that is the

2    only way which notice is relevant because notice wasn't

3    required to do what we did.  That's how it is.

4         And what we are suggesting and offering to the Court

5    is to submit a motion in the next calendar, the next November

6    calendar, for a procedures order whereby we can define what

7    ought to take place leading up to individualized hearings.

8    Now, it may be some aspect of discovery; we'll work that out

9    between now and then.  We'll consult with the defendants.  But

10   we'll work that out and come up with a procedure and determine

11   if the people who claim that they are prejudiced were, in fact,

12   prejudiced, and if so, what falls from that.  It may not

13   necessarily be dismissal.  It may be a weighing of the

14   prejudice claimed by the defendants versus the prejudice that

15   will be suffered by the debtors if the Court were to vacate the

16   2009 October order, which of course, is severe and

17   irreversible, or could be unless the Court's going to apply

18   some sort of equitable tooling procedure.  But those are

19   significant.

20        And again, to say I knew nothing is one thing, but to

21   say that I was prejudiced is another.  And that can't be

22   determined until we establish a record, perhaps with some

23   limited discovery on the subject.  But not in a vacuum, Your

24   Honor, and that's why I'm coming back to the point I made

25   originally, is that notice is only relevant potentially in the

1    context of prejudice.  So that's how we see -- there's too much

2    at stake here, Your Honor.  There's --

3              THE COURT:  Let me --

4              MR. SENDEK:   -- as Mr. Butler indicated, over 215

5    billion dollars in preference payments.

6              THE COURT:  Okay.  I hope this isn't a curveball to

7    you, but the hearing last June was on the debtors' motion under

8    Rule 15.  We had had prior hearings which dealt with Rule 8

9    objections as well as due process objections, for want of a

10   better word.  And I left part of those issues open.  And to

11   some extent, they were addressed in the Rule 15 hearing because

12   we dealt with specific futility objections which you all have

13   now done and resolved, by what the amended complaint can and

14   cannot say.

15             One of the issues, at least in my mind, is defendants'

16   retroactive ability to challenge the Rule 4 extension order,

17   and it seems to me from the case law, that if they got no

18   notice of that, then their ability to challenge it

19   retroactively is pretty much unfettered, as is your ability

20   to -- it's as if we're back in 2009 again, in other words,

21   whereas if they had some notice of it, they may have less of an

22   ability to challenge that.  And so what I am raising for you,

23   as well as the other parties, is whether, in terms of managing

24   these remaining adversary proceedings, the hearings that you

25   are positing on prejudice should be ones that cover not only --

Page 46

1    or fill in the remaining gaps on your Rule 15 motion, but also

2    deal with those challenges to the Rule 4(m) extension order,

3    and that the record should -- I mean, the facts are the same.

4    The standard may be different, but it seems to me the facts are

5    the same, and I don't see why we would have two hearings as

6    opposed to one on it.

7            MR. SENDEK:  Your Honor, it certainly sounds like it

8    makes sense from a judicial economy standpoint and certainly

9    the debtors' to find out more about what they are claiming and

10   what they would say, so yes, I'm agreeing with the Court.  I

11   think that makes sense, reserving, of course, our position that

12   notice of the 4(m) extension as it relates to the fourth and

13   final extension order wasn't required, but of course, I think

14   that can be -- I think the record can be better established in

15   that type of process.

16           THE COURT:  Okay.  All right.  Now, I think there are

17   unique issues raised by the Wells Fargo motion, so I want to

18   separate out that from the other submissions that are here.

19   But I understand your point, here.  So why don't I hear from

20   the other parties, then.

21           MR. SENDEK:  Before I leave the podium, Your Honor, if

22   I may just offer this.  There were some new twists, new

23   objections raised by the defendants in their recent briefing.

24   We are prepared to deal with those -- I would suggest the Court

25   defer those, as well -- such as violation of the Rules'

Page 47

1   enabling act, separation of powers, and which some of the

2   defendants argue is a basis for voiding the order.  Now, we are

3   prepared to respond to that if the Court desires, but I would

4   suggest that if we do follow this procedure, this process the

5   Court just suggested, that that could be adjourned, as well.

6          With that, I'll sit down.  Thank you, Your Honor.

7          THE COURT:  Okay.

8          All right, I don't know how the objectors have divided

9   this up, if you have a spokesperson as you've done in past

10  hearings before me or if you all want to say your piece.  I'm

11  amenable to either approach.

12         MR. BARRON:  Your Honor, Bill Barron.  Since I began,

13  I'll continue, at least for the moment.

14         THE COURT:  Okay.

15         MR. BARRON:  And the answer is I don't think we have a

16  fully organized presentation on behalf of all of the thirty-six

17  that you've heard about.

18         THE COURT:  Okay.

19         MR. BARRON:  I would offer at least a couple of

20  comments.  First, the issue of prejudice to a defendant as a

21  matter of law, I think, was answered -- and this has been

22  briefed to you, but I'm not sure it's been adequately

23  briefed -- in the Zapata case, Second Circuit case.  There, the

24  court stated it's been characterized as dicta in the response

25  from Delphi.  I don't think it's dicta.  If I may, it's only a

DPH HOLDINGS CORP., ET AL.

Page 48

1    long sentence, and I'd read it into the record.  "It is obvious

2    that any defendant would be harmed by a generous extension of

3    the service period beyond the limitations period for the

4    action, especially if the defendant had no actual notice of the

5    existence of the complaint until the service period had

6    expired."  It's almost prescient in actually anticipating the

7    bizarre procedural facts of this case.  The Second Circuit did

8    reject the district court's sort of pro se holding that any

9    prejudice is presumed as a matter of law if service is made

10   after the period had expired.  But that's not relevant here,

11   nor is it relevant to the holding that I've just read into the

12   record by the Second Circuit, which is at 502 F.3d at 198.

13           THE COURT:  I have to tell you, and I've said this in

14   prior hearings, I view that case completely differently.  The

15   case gives the Court very wide discretion, and yes, obviously,

16   whenever you extend the time to answer, there's going to be

17   prejudice.  There's no limit on it, though.  That's just one of

18   the factors.

19           MR. BARRON:  Of course, but we're saying that there's

20   prejudice as a matter of law.  And then there's a balancing of

21   equities, and you're quite right, the Second Circuit goes on to

22   point out the district court has that discretion.  And the

23   issue is what is the discretion when the fact is whatever the

24   situation is is the result of the plaintiff's own neglect.  And

25   to that point, the two cases that were cited earlier by the,

1    I'll call them the "no notice defendants" and responded to by

2    Delphi, one of them was a Ninth Circuit decision, the so-called

3    Fimbres case, Fimbres v. United States, 833 F.2d 138.  And that

4    one noted what, frankly, is obvious in every 4(m) case other

5    than this one, which is that 4(j) -- that was the predecessor

6    of 4(m) -- "is intended to force parties and their attorneys to

7    be diligent in prosecuting their cause of action";  4(m) was

8    never designed to be a blank check not to serve.

9            THE COURT:  I've heard all this, sir.  I heard this a

10   year ago.  We're focusing on one issue.  This is like deja vu

11   all over again.  We've dealt with this.

12           MR. BARRON:  Well, if --

13           THE COURT:  I don't think -- did you -- I don't

14   actually think your client made the objection a year ago, but

15   we dealt with this.

16           MR. BARRON:  We objected when we filed our answer --

17           THE COURT:  Okay.

18           MR. BARRON:  -- fulsomely.

19           THE COURT:  Not fulsomely, but okay.

20           MR. BARRON:  And I will defer, then, to any of my

21   other colleagues who wish to address the Court.

22           THE COURT:  Okay.  I'm not -- really, I'm not trying

23   to put you down or anything, but I've already -- I heard all

24   these arguments.  I heard them back in 2010 and deferred ruling

25   on the due process issue after a very lengthy hearing when it

1    became clear to me that the complaints at that time should be

2    focused on because they were, in my mind, serious gatekeeping

3    issues for the debtors to go forward on a large number of them,

4    and that's been borne out.

5            MR. BARRON:  Yes.

6            THE COURT:  But I -- I really wanted to focus in

7    this -- today on the issue of -- which was raised, I think, by

8    only one or two parties, but it was enough to bother me for

9    everyone, which was the notice issue on the fourth extension.

10           MR. BARRON:  Understood.

11           THE COURT:  So, I mean, the issue about this being

12   unusual, I get that.  I understand that.  The issue of the

13   fourth extension, or the last extension being on a different

14   rationale than the first three, I get that, too.  But I also

15   get that under Zapata, the court has enormous discretion in

16   light of what was the state of play at the time to grant or

17   deny a 4(m) request, and I want to set a proper context for

18   evaluating that retroactively in light of all of the motions to

19   dismiss, which to my mind depends upon whether people got

20   notice or not.  But I don't view it specifically as a

21   gatekeeping issue, but I wanted it to be considered separately

22   by everyone because I don't think it had really been addressed

23   prior to today, specifically, before we got into what I

24   contemplated to be the next step of this, which is focusing on

25   that inquiry, that retroactive inquiry.

Page 51

1          MR. BARRON:  As to the notice issue, if I may, Your

2     Honor, you addressed a question to my esteemed adversary as to

3     which of the affidavits, if any, do the debtors disagree with.

4          THE COURT:  Right.

5          MR. BARRON:  I can speak only for my own; I haven't

6     read -- the fact is, I haven't seen any declarations from the

7     debtors' side.  They did file in an amended -- a series of

8     numbers, they gave them exhibit numbers for each of the

9     defendants.  I was exhibit -- Heraeus was Exhibit 31.  And with

10     that, they served unsigned, unsworn statements, in effect like

11     briefs commenting on either the record or otherwise.  In my

12     case, there was no disagreement with any affidavit that we had

13     filed, nor was there any actual argument that actual notice had

14     been given, but rather what I call the constructive notice or

15     the imputed notice or some other kind of alternative notice

16     that somehow the defendant should know, should have known or

17     could have known.

18          THE COURT:  Right.

19          MR. BARRON:  And so in that sense, there's no

20     disagreement that I'm aware of, at least with Heraeus

21     declarations, of which we filed several.

22          THE COURT:  All right.

23          MR. BARRON:  There may be with others; I can't speak

24     to that.

25          THE COURT:  And on that score -- and this is why I

1    asked the question; I guess I was jumping ahead of it -- it

2    seemed to me that if I am going to enter a scheduling order for

3    the company and the defendants lead up to individual hearings

4    on the combined issue of the prejudice factor under Rule 15 and

5    cause under Rule 4, if there's no dispute about the nature of

6    the notice that was received, then obviously, no one has to

7    take any discovery on it.  And it seems to me that that's the

8    case.  I'll hear from the debtor on that, but if a defendant,

9    like Heraeus, submits an affidavit that says we didn't get

10   notice and we didn't know about this until we were served, and

11   the debtor hasn't given anything -- any basis to say otherwise,

12   then I think that notice issues off the table, and I should

13   assume that that's true.  On the other hand, if the debtor

14   filed a statement that said -- well, the easiest would be,

15   well, we did serve them, I guess the next easiest would be we

16   were in discussions with them so they had to have known it,

17   then I think there's a live issue there that I need to hear at

18   some point.

19              MR. BARRON:  Thank you, Your Honor.

20              MR. KLEIN:  Your Honor, may I respond?

21              THE COURT:  Sure.

22              MR. KLEIN:  And I'll be very brief.  And this was a

23   part of --

24              THE COURT:  Could you state your name for the record?

25              MR. KLEIN:  I'm sorry.  Sheldon Klein, Butzel Long on

Page 53

1   behalf of the debtors, and I'm responding because originally

2   there was a series of questions that I was planning on

3   addressing based on the Court's comments.  Virtually all of

4   them now are on the cutting room floor.  But I do want to

5   address this question of revisiting 4(m) issue.

6          First of all, the 4(m) order is an interlocutory order

7   and as a general matter, of course, the Court has the

8   discretion to revisit its interlocutory orders.  There are

9   facts and circumstances here that are unique, far different

10  from the usual interlocutory order that bear on what the Court

11  should do.  In revisiting it, I suspect the time for discussing

12  that is at a later time when we actually have a hearing on the

13  4(m) issues, and therefore, I just want to note that we don't

14  view this as a generic reviewing an interlocutory order issue.

15         Finally --

16         THE COURT:  But I do think, and I think this is

17  consistent with the case law, that if the 4(m) order is issued

18  ex parte, the review is much more open.  It's a much more -- as

19  if it was de novo type of review.

20         MR. KLEIN:  Well, I have a hard time understanding

21  that, Your Honor.

22         THE COURT:  Well, I -- I'll ask the parties to focus

23  on that, but -- and as I said, I hope I'm not throwing a

24  curveball at you all.  And I'm really focusing more in

25  preparation for the hearings --

1           MR. KLEIN:  Yeah.

2           THE COURT:  -- that I think will be happening in the

3    future.  But that's my belief, at least.

4           MR. KLEIN:  Okay, and can I ask, when you said "I'll

5    ask the parties to focus on that," do you mean at some point

6    down the road?

7           THE COURT:  Yes.

8           MR. KLEIN:  Because I don't want to spend your --

9           THE COURT:  Yeah, no, not today.  I don't expect you

10   to have been prepared on that issue.

11          MR. KLEIN:  Okay, I mean, well, in fact, we were.

12   However, I do agree that it makes sense, in part because I

13   certainly agree with you that any conceivable fact that is

14   relevant to a possible 4(m) reconsideration is also relevant to

15   the Rule 15 issues, and therefore, assuming for the sake of

16   argument there's a 4(m) issue, it makes sense to deal with them

17   together.

18          The only final point that I want to make is it

19   continues to be our position that whether viewed as a Rule 4(m)

20   reconsideration or as a Rule 15 decision, prejudice and

21   balancing of prejudice is the essential core from either

22   perspective, and so to that extent, I would disagree with the

23   Court that it is possible to resolve the 4(m) issue, at least

24   in terms of the substantive outcome of any reconsideration

25   based solely on the present record.  It may be possible that

Page 55

1    the Court can decide that 4(m) reconsideration is appropriate,

2    but the outcome of that reconsideration, we believe, is

3    inappropriate precisely because, as the Court suggested --

4              THE COURT:  You mean today?

5              MR. KLEIN:  No, I mean at any -- okay, perhaps I

6    misunderstood the Court's comments in terms of the present

7    state of the record and what the judge can decide.

8              THE COURT:  Well, I wasn't planning on ruling on the

9    4(m) today.

10             MR. KLEIN:  Okay, then I suspect I misunderstood the

11   Court's comments --

12             THE COURT:  Okay.

13             MR. KLEIN:  -- and I will sit down.

14             THE COURT:  Okay.

15             MR. KLEIN:  Thank you, Your Honor.

16             THE COURT:  Um-hum.

17             MS. BRAUN:  Good morning, Your Honor.  Beverly

18   Braun for Jamestown Container --

19             THE COURT:  Yes, good morning.

20             MS. BRAUN:  -- one of the defendants.  And I don't

21   presume to speak for any other defendant.  From our

22   perspective, I believe we're at a place where individualized

23   hearings where we can address the 4(m) and the prejudice issue

24   at once would be particularly apt.  It seems as though the

25   claims are now becoming more and more particularized based on

05-44481-rdd   Doc 21757   Filed 11/30/11   Entered 12/08/11 11:09:55   Main Document
Pg 56 of 119
DPH HOLDINGS CORP., ET AL.

Page 56

1   the particular facts, and like Mr. Butler, I presumed after our

2   last hearing in June that there would be individualized

3   hearings dealing with the specific issues for each defendant.

4   I can't believe I'm actually going to say I agreed with the

5   debtor.

6           THE COURT:  Yeah, he was writing that down.  He's

7   going to frame that.

8           MS. BRAUN:  And I'm going to put the caveat on that

9   issue and that issue only --

10          THE COURT:  Okay.

11          MS. BRAUN:  -- as to there would be hearings.

12          THE COURT:  Okay, all right.  Okay, thank you.

13          MR. LAWHORN:  Good morning, Your Honor.  Chris Lawhorn

14  from the Bryan Cave law firm on behalf of the defendant

15  Spartech Polycom.  Your Honor, our adversary proceeding number

16  is 07-02639.

17          Your Honor, at the last hearing, the Court ended the

18  hearing by saying in my gatekeeper role, I want to know who

19  received notice, what type of notice did you receive.  So my

20  client, Spartech Polycom, filed the declaration of one of our

21  businessmen, Chad Tomsheck, who confirmed that Spartech

22  received none of the extension motions.  And in fact, our

23  motion went further to say that we have been prejudiced, and we

24  specifically identify the prejudice we suffered by stating,

25  Your Honor -- this is paragraph 9 of the declaration -- "among

1    other things, Spartech has lost the ability to identify,

2    locate, and preserve its records that are relevant to the

3    claims in the complaint and to preserve information from

4    Spartech employees knowledgeable about Spartech's relationship

5    with the debtors."

6          Your Honor, we believe we did exactly what Your Honor

7    had requested in your gatekeeping function, and we believe Your

8    Honor can rule, at least as to our client, and perhaps those

9    similarly situated --

10         THE COURT:  Well, but I directed people to file

11   affidavits on notice.  I didn't direct people to file

12   affidavits on prejudice.

13         MR. LAWHORN:  Correct, Your Honor, and our declaration

14   does both.  I was simply pointing out to Your Honor, to the

15   extent the debtors are wanting to add the second piece of

16   prejudice, our declaration does that.  But the first part

17   clearly says, Your Honor, Spartech has received no notice as to

18   any of these issues.

19         THE COURT:  Right.

20         MR. LAWHORN:  And the response we received, Your

21   Honor, was not they disagree -- they, the debtors, disagree

22   with any of that.  The debtors point simply to the first

23   amended disclosure statement and the SEC filing.  Your Honor,

24   there's been no other counter or rebuttal to our declaration.

25         THE COURT:  Okay.

DPH HOLDINGS CORP., ET AL.

Page 58

1          MR. LAWHORN:  Unless you have questions, Your Honor,

2     with that, I believe that's --

3          THE COURT:  Well, I -- this goes back to the point

4     that I made earlier.  I'm not sure the debtors have responded

5     to it.  I'm going to leave the prejudice point aside, because I

6     do think that's not what this hearing is about.  On the notice

7     point, Spartech files its declarations, says it didn't have

8     notice.  If the debtors don't refute that, except to say sort

9     of generally, it was in the air, which is sort of in your

10    general statements, that there might have been preferences to

11    some people, it would seem to me that I don't think that that

12    should -- that notice should be the subject of the deposition

13    anymore.  Am I missing something on that?  As opposed to there

14    being a specific response where the debtor says, well, you

15    know, Mr. X of DAS spoke with people at Spartech and one of the

16    things they talked about was the potential for preferences, you

17    know, something like that where there's some specific

18    allegation that they were, at least on -- if not service of

19    process notice, notice that this issue was a real issue, and so

20    therefore, they weren't prejudiced.  And then it would seem to

21    me that that would be something that the parties would be

22    developing in fairly focused discovery in advance of the

23    hearing.

24          MS. HAFFEY:  May I respond?

25          THE COURT:  Yes.

1          MS. HAFFEY:  This is Cynthia Haffey.  Your Honor, I

2     think this is one of those examples of the spectrum of notice

3     and why the individualized hearings are important.  Spartech

4     received, in addition to what Mr. Lawhorn told you, they also

5     received notice of the confirmation hearing and the

6     solicitation procedures order.  And as this Court recalls,

7     that's docket number 11974, the solicitation procedures order

8     specifically dealt with the preservation of claims process.

9          THE COURT:  No, I understand.  I understand that

10     point, but I was kind of putting it to you a little more

11     harshly, which is that if that's it, if that's the only point,

12     I'm not sure why there needs to be any discovery.  Because

13     they've said they didn't know.

14          MS. HAFFEY:  Well --

15          THE COURT:  Even though they had that notice, they

16     didn't know.  So it seems to me it's a straight issue for me as

17     to whether that thing in writing, that notice of the disclosure

18     statement is enough.  I don't think you need to spend money on

19     discovery because that's all you're relying upon.

20          MS. HAFFEY:  Well, and my response, and not talking

21     specifically just to Spartech, Your Honor, but the affidavits

22     are, themselves, a spectrum.

23          THE COURT:  No, but I'm trying -- you're going to have

24     some looted discovery on prejudice, right?

25          MS. HAFFEY:  Yes.

1          THE COURT:  I'd rather not have whatever thousand

2     dollars would be spent on notice issues spent if we've already

3     gone through it and the only objection is based on this generic

4     point, which is they got notice of the plan and the

5     confirmation order and the disclosure statement, all of which

6     say what they say, and the missing link is that there's no

7     suggestion, and in fact it's contradicted by an affidavit that

8     those notices hit a synapse and those people realized that they

9     were at risk.  And they filed affidavits to say no, it didn't

10    happen.

11         MS. HAFFEY:  And I don't think we're on a different

12    page with this, Your Honor.  I think we're in agreement that

13    the discovery, as Mr. Sendek laid out, would be a limited

14    discovery as to where it was necessary within the affidavits.

15         THE COURT:  All right, so you -- so in other words,

16    you're obviously preserving your argument --

17         MS. HAFFEY:  Yes.

18         THE COURT:  -- that they were on inquiry notice from

19    those documents, but just assuming that the affidavit says we

20    didn't know, period, we didn't put two and two together, we

21    didn't know, that you wouldn't spend two hours questioning them

22    on did you really mean that.

23         MS. HAFFEY:  That's correct, Your Honor.

24         THE COURT:  Okay.

25         MS. HAFFEY:  And the only caveat to that is if there's

1   an affidavit or there's a question as to --

2        THE COURT:  No, each affidavit -- some affidavits may

3   be more equivocal --

4        MS. HAFFEY:  Exactly.

5        THE COURT:  -- and more artfully drafted than that.

6        MS. HAFFEY:  Exactly.

7        THE COURT:  Okay.

8        MS. HAFFEY:  Thank you, Your Honor.

9        THE COURT:  Like, I think that MGK, or --

10        MS. HAFFEY:  That's --

11        THE COURT:  No, but I think that one, you point out it

12   has a hole in it.

13        MR. LAWHORN:  And Your Honor, just further on behalf

14   of Spartech, we don't believe there's a need for a second step

15   in this process, which would be the secondary discovery,

16   perhaps in another hearing individualized to our client, unlike

17   the person who's on the phone, not in the courtroom, we, Your

18   Honor, believe that the law is adequate.  We've briefed it and

19   I don't believe Your Honor wants argument on it, unless you do,

20   in which case I'm happy to give the argument to you.  We

21   believe Your Honor could exercise today your discretion, and

22   say at least as to Spartech and defendants similarly situated

23   who received no actual notice, that those claims can be

24   dismissed.

25        THE COURT:  Well, I know that I could do that.  I

1      don't think I have to.

2            MR. LAWHORN:  I agree.  And my question to you, Your

3      Honor, is if you'd like to hear argument, we're prepared to

4      make those arguments because we believe it's appropriate, Your

5      Honor.

6            THE COURT:  The argument that I have to?

7            MR. LAWHORN:  I'm not saying you have to.  I'd like

8      you to, but you don't have to.  And Your Honor, one other

9      thing, my client is in the courtroom, today.  And I just want

10     to make it very clear to Your Honor that my client doesn't live

11     in a cave, that my client was never served with any of these

12     papers.  My client, even to the extent they knew that there was

13     a preference period and they received transfers during that

14     preference period, once the statute of limitations is over,

15     what is my client supposed to do when they receive no notice of

16     a filing under seal of a lawsuit against them, all the while,

17     the debtor continues to do business with them, never once

18     telling them that they've been sued for nine million dollars.

19     So Your Honor, my client would not take very kindly to the

20     characterization of living in a cave, so we just want to make

21     on the record that very clear that many of us defendants do not

22     live in a cave.

23            THE COURT:  Well, I know that.

24            MR. LAWHORN:  Thank you, Your Honor.

25            THE COURT:  They're not cavemen.  They're not the

1    GEICO guy.

2            MR. LAWHORN:  Precisely, Your Honor.  Thank you.

3            THE COURT:  But I mean, that's the debtors' point, I

4    think, that the sophistication of the parties is important.

5            MR. LAWHORN:  Thank you, Your Honor.

6            MR. WURST:  Good morning, Your Honor.  Ruskin Moscou

7    Faltischek by Jeffrey Wurst on behalf of Wells Fargo.  I'm not

8    sure if in your remark before if I'm premature in standing up

9    or if you want just to wait.

10           THE COURT:  Well, there were two Wells Fargos.  I'm

11   really focusing on Mr. Silverschotz's Wells Fargo, not yours.

12           MR. WURST:  That's fine, okay.

13           THE COURT:  Yours was within this group, I think.

14           MR. WURST:  It certainly was, and when we've been

15   speaking, I've referred to Wells Fargo as the poster child of

16   this issue based on the June 21st hearing.

17           Shall I go on?  It looks like you were about to say

18   something.

19           THE COURT:  No, go ahead.

20           MR. WURST:  And I'm going to limit this to notice,

21   although I was very moved before by Mr. Butler's presentation

22   which, candidly, brought to mind a major theme in literature,

23   point of view.  And certainly, this Court has heard the point

24   of view of the debtor for years but really hasn't had the

25   opportunity, until these proceedings, to hear the point of view

Page 64

1    of the defendants.  If I can make a reference to literature,

2    the wonderful poet James Dickey who's best known for writing

3    Deliverance, where he made money, but his poetry was really his

4    great art, wrote a poem in 1964 called The Firebombing.  And he

5    discusses the differences in points of view from the pilot

6    firebombing Japan during World War II to the point of view of

7    those down on the ground who were close to the destruction

8    caused by those firebombs.  Well, we, here, today are hearing

9    the other side of this point of view.

10            It is undisputed that Wells Fargo did not receive

11   actual notice of any of the extension notices.  There's not

12   even an allegation that they received imputed notice of any of

13   the extension motions.  Our reference is Exhibit 57 where the

14   debtor claims Wells Fargo received notice because the debtor

15   filed an 8(k).  Well, the firebombing was from 20,000 feet

16   above.  There are over 20,000 reporting companies.  To expect

17   Wells Fargo to read and follow 8(k)s in 20,000 filing

18   companies, I think is just approaching absurdity.

19            But again, in this case, Wells Fargo did not have a

20   direct relationship with these debtors.  They factored two

21   entities that did business directly with the debtor.  That gets

22   more to the prejudice side, so I'll skip that, but that's the

23   reason Wells Fargo wasn't getting notice.  The only notice of

24   anything in these proceedings --

25            THE COURT:  Well, you wouldn't have gotten notice

1    anyway, then, probably, if they'd given -- they wouldn't have

2    given it to you anyway.

3            MR. WURST:  Exactly right, and they didn't.

4            THE COURT:  Even if they were giving notice, they

5    wouldn't have given it to you.

6            MR. WURST:  I didn't follow that; I'm sorry.

7            THE COURT:  If you step into the shoes of your

8    debtor --

9            MR. WURST:  Yeah.

10            THE COURT:  -- they would have given notice to your

11    debtor, at some point, but that wouldn't assume you would have

12    gotten it.

13            MR. WURST:  What I find interesting -- and let me just

14    raise one other point -- they claim the notice we got was

15    notice of the confirmation hearing which was sent to some

16    individual in the corporate trust unit at Wells Fargo.  The

17    corporate trust usually hold stocks or something for the

18    benefit of some third party.  And we submitted an affidavit

19    from our business group; they don't know anything about that

20    person.  He doesn't appear to be employed at Wells Fargo any

21    longer, and there's no way they were given notice.

22            What is interesting, though, and yesterday, as I was

23    thinking about this, I said, let me go revisit the affidavit of

24    service of the complaint which took place years later.  But

25    when it got to the affidavit of service of complaint, they

Page 66

1    managed to send it exactly to the right place.  So on April

2    6th, 2010, the debtor knew exactly who the defendant was, they

3    knew how to get notice to us then, but they didn't know or

4    consider getting notice at any time before.  So Wells Fargo had

5    absolutely no notice of the bankruptcy.  As big as the bank is,

6    apparently it didn't have money at risk with Delphi because it

7    was not given notice of any of the proceedings.  That seems

8    hard to imagine, but as luck has it, Wells Fargo was not

9    getting notice of the proceedings.

10          But my colleague will speak from Wells Fargo from the

11   Wachovia point of view an acquisition that took place someplace

12   during the road.

13          So we fall right into the absolutely no notice unless

14   the Court is inclined to believe that the filing of an 8(k) or

15   a single notice of a confirmation hearing is fair notice, and

16   we submit it's not.  Hopefully, we don't have to go through the

17   discovery process to show prejudice.  That will be a whole

18   other issue.

19          But the basic tenet of American jurisprudence is fair

20   notice.  And yes, there are exceptions to that for ex parte --

21          THE COURT:  Including 4(a) of 9006.

22          MR. WURST:  Well --

23          THE COURT:  4(m), I mean.

24          MR. WURST:  -- 4(m), yes.  And that's what I was about

25   to say.  Except for good reason shown.  But of course today,

Page 67

1    we're looking at it from a different point of view.  Now we're

2    looking at it from the defendant's point of view.  There was no

3    one here during the first, second, third, or fourth extension

4    motion to say, hey, Judge, perhaps we should consider the

5    rights of defendants.  You had to do that on your own.  And

6    perhaps they did, perhaps they did not bring out the risks

7    inherent.

8              THE COURT:  Well, the creditors' committee supported

9    it.

10             MR. WURST:  Well, the creditors' committee did, but

11   the creditors' committee certainly wasn't representing clients

12   like mine.

13             THE COURT:  And the debtors assert, and I'd be

14   interested in anyone's response on this, that there were, at

15   various times, between nineteen and twenty-two defendants that

16   did get notice, and they didn't object.

17             MR. WURST:  Then they certainly have no right to

18   object now.  But I represent the client that didn't have

19   control over the papers -- that's the prejudice issue -- the

20   factored clients are long defunct.  So if we have to get down

21   to discovery on that, we'll go there.  I just don't think it's

22   necessary.

23             THE COURT:  Discovery on what?

24             MR. WURST:  Discovery on the prejudice issue.  So I

25   certainly hope that Wells Fargo doesn't have to get to that

Page 68

1    point because we had no notice, and even when we read the

2    debtors' appears, they concede they had none.  I'm kind of

3    surprised that with all of the time we spent on June 21st, that

4    the debtor couldn't find a single matter where, yes, maybe this

5    wasn't fair notice; we'll let them out of the case.  But no,

6    they continue to protest now.  Methinks they protest too much.

7    So let's at least get one posted trial out of the case.  Thank

8    you.

9            THE COURT:  Okay.

10           MR. NAGI:  Good morning, Your Honor.  Jason Nagi from

11   the law firm of Polsinelli Shughart on behalf of Florida

12   Production Engineering.  We're one of the no notice defendants

13   but there's a bit of a contest about it.  I'll just give you a

14   couple of facts to keep you up-to-date.

15           Florida Production filed a notice -- a proof of claim,

16   I should say in this case.  On September 26 and for everyone's

17   clarification, we're number forty-seven on the omnibus reply.

18           MS. HAFFEY:  Thank you.

19           MR. NAGI:  You're welcome.  On September 25, 2006, Don

20   Mallory of Dinsmore & Shohl, filed a notice of withdrawal and

21   withdrew its claim.  At that point, Florida Production was out

22   of the case.  Dinsmore & Shohl didn't represent Florida

23   Production anymore.  The debtors never served Florida

24   Production with a disclosure statement.  They claim they do but

25   when you look at our reply, what it indicates is we were served

1   with the notice of a confirmation hearing.  And that's all that

2   we were served with.  Obviously, that notice said nothing about

3   preferences.

4           And by the way, Your Honor, at the time the disclosure

5   statement called for a one hundred cent plan.  So the notice

6   that we would have had that we were up for preferences

7   diminished even further had we been served with the disclosure

8   statement; we weren't.

9           We were not served with one of the four extension

10  orders and we weren't served with the disclosure statement.

11  What the debtors say in response to that, aside from the 8K and

12  the notice because everyone knew about Delphi was that --

13          THE COURT:  I'm sorry.  Let me make sure I -- when you

14  say you weren't served with one of the four extension orders,

15  you mean you weren't served with any of them.

16          MR. NAGI:  That's correct.  We were not served with

17  any extension order.

18          What the debtors say in response to this is well, we

19  served Dinsmore & Shohl with the fourth extension order

20  eighteen months after Florida Production had withdrawn its

21  notice of claim and we served Dinsmore & Shohl on behalf of

22  Proctor & Gamble.  Therefore, you had notice because Dinsmore &

23  Shohl used to represent Florida Production.

24          So essentially, what they're saying is that you could

25  have notice to a separate party that is completely unrelated to

DPH HOLDINGS CORP., ET AL.

Page 70

1    Florida Production and that can serve as notice to Florida

2    Production which pretty much exited the case eighteen months

3    prior by the accident of common counsel.  That's kind of a like

4    Rube Goldberg contraption.  That's not really due process.

5            Those are the specific facts here that we have.

6    That's what I believe separates us and makes us one of the

7    candidates as a true no notice defendant.

8            THE COURT:  Okay.  Well, if that -- I mean if the only

9    basis for saying there was actual, as opposed to assumed notice

10   through the disclosure statement hearing notice is notice on

11   counsel and when counsel's wearing his other hat, I understand

12   your point.

13           MR. NAGI:  Thank you, Your Honor.

14           MS. HAFFEY:  But it's not, Your Honor.

15           THE COURT:  Okay.

16           MS. HAFFEY:  And I can go into the specifics if you

17   would like  or save these for the individualized hearings.

18           THE COURT:  Well I mean I guess where I'm coming out

19   on this because I'm looking for a way to streamline this, I

20   guess what I'm going to have to say is where there are disputes

21   like there may be here, if you have discovery on it and the

22   defendant thinks it's obvious that there shouldn't be any more

23   discovery and the debtor disagrees, you can have a telephonic

24   conference with me right away on that issue.

25           MS. HAFFEY:  We'll put that in the procedures order,

05-44481-rdd   Doc 21757   Filed 11/30/11   Entered 12/08/11 11:09:55   Main Document
Pg 71 of 119
DPH HOLDINGS CORP., ET AL.

Page 71

```
 1   Your Honor.

 2           THE COURT:  Okay.  But I mean obviously if it's just

 3   service on someone's former counsel who happens to be still in

 4   the case because he or she is representing someone else, then

 5   you don't need a telephonic conference on that one.  There

 6   shouldn't be discovery on that basis.

 7           MS. HAFFEY:  Understood.

 8           THE COURT:  Okay.

 9           MS. HAFFEY:  But as I said, the

10           THE COURT:  No, I know.

11           MS. HAFFEY:  Yes.

12           THE COURT:  I understand.

13           MS. HAFFEY:  Thank you.  Sure.

14           THE COURT:  Okay.

15           MR. SILVERSCHOTZ:  Good morning, Your Honor.  Mark

16   Silverschotz, Reed Smith for Wells Fargo, N.A.  I'm here with

17   my colleague Sarah Kam.

18           As Your Honor pointed out, we have a separate motion

19   pending and we are, we think, in a -- presented by a unique set

20   of circumstances.  The only reason I'm up now in connection

21   with this item is to make inquiry of the Court as to whether

22   Your Honor or perhaps debtors' counsel would prefer to address

23   the Rule 60 motion as a free-standing motion now which I, of

24   course, am prepared to do after this matter is finished, or

25   subsume it within whatever procedural --
```

Page 72

1           THE COURT:  No, I think it should be addressed

2    separately.

3           MR. SILVERSCHOTZ:  Okay, fine.  We'll wait for that

4    then.

5           THE COURT:  Okay.  It may end up getting subsumed but

6    because it was brought as a separate motion, the debtors,

7    rather than dealing with the procedure I laid out on June 21

8    dealt with it in its entirety.  So I think it's potentially

9    resolvable on its standalone basis.

10          MR. SILVERSCHOTZ:  Thank you, Your Honor.  We'll wait.

11          THE COURT:  Okay.

12          MR. SENDEK:  Your Honor, just for clarification, is

13   the Court's suggestion that we deal with that motion separately

14   at a separate event?

15          THE COURT:  No, today.

16          MR. SENDEK:  Today.

17          THE COURT:  Today.  But I think we shouldn't get --

18   unless we're done with the other people who filed objections or

19   submissions, in which case I'm happy to turn to Mr.

20   Silverschotz's motion, but I'm happy to hear anyone else, too.

21   All right.

22          Let me address then the various pleadings that were

23   filed at my direction from June 21, 2011 and that direction was

24   for defendants to flag their specific notice that they received

25   if they want to rely upon notice as a basis for or lack of

1    notice more properly put, as a basis for their objection to the

2    debtors' motion for leave to amend under Rule 15.

3            I requested this in particular because of my re-review

4    of the last extension motion, the transcript of the hearing on

5    it and my September 22, 2009 order, which was the last

6    extension order, as well as the issue raised by at least one

7    party and I think it was Victory Packaging, although maybe I

8    have that wrong, that leaving aside all the other notice

9    issues, the very fact that this was intended to be by the

10   debtor, ex parte, that there was something about the fourth

11   extension order that was in addition to or crates an impediment

12   for the debtors, in addition to the arguments that numerous

13   parties have raised and continue to raise, that the fact that

14   the orders were granted ex parte means that I should vacate

15   them or that the motion to amend would be futile.

16           I received thirty declarations with respect to notice,

17   as well as, of course, the debtors' supplemental filing and

18   I've gone back and read yet again the last extension motion in

19   the transcript of the hearing and the order and I find that the

20   motion transcript and order do not reflect a clear violation of

21   the notice procedures established in this case years earlier in

22   the case, which require particularized notice or service

23   directly to a party-in-interest who is directly affected by a

24   particular motion.

25           I say that because clearly the premise behind the

Page 74

1   first three extensions was that they needed to be ex parte

2   since the debtors' rationale for seeking those extensions was

3   that it was unlikely that they would need to bring these cases

4   on an active basis or these adversary proceedings and litigate

5   them on an active basis, given the nature of their plan and the

6   likelihood that ultimately, they wouldn't be pursuing

7   preference avoidance claims, given the substantial recoveries

8   by unsecured creditors.

9          And consequently, the disruption to their business

10  over parties litigating and reacting to preference complaints,

11  really would be unnecessary given that most of those

12  complaints, if not all of them, would be withdrawn upon the

13  effectiveness of the plan.

14         That was, in fact, the notice assumption for the

15  initial extension order and the subsequent ones and it's fair

16  to believe that the debtors concluded that that would apply to

17  the last one also, even though the rationale for the last one

18  was not premised upon business disruption but rather upon the

19  need to have more time simply to focus on which preference

20  complaints to litigate.

21         In addition to that, the orders themselves required

22  specific notice to three parties which is inconsistent with the

23  notion that all defendants would be getting notice of the

24  motion.  So it appears to me that with regard to the last

25  extension order, which is the one that I was focusing on at the

Page 75

1    June 21, 2011 hearing and which I've been focusing on today,

2    the facts as I see them are not such that I believe the debtor

3    should be precluded from pursuing lawsuits against parties that

4    did not receive actual notice of that order, that extension

5    order, merely because of that fact.

6           Therefore, it appears to me that we're really back at

7    the state of play that we were in on this issue, on the issue

8    of the ex parte issuance of the extension order, where we were

9    last year when I was dealing with motions to dismiss premised

10   upon due process or other arguments to cause me to vacate the

11   4(m) order.  The record certainly has been made clear as to the

12   extent of notice but I think that record is not such that it

13   would lead me simply to deny the Rule 15 motion today on the

14   basis of any of the four factors that I need to consider when

15   evaluating such a motion.

16          I don't believe as a matter of law that the filing in

17   pursuit of the amended complaint would be futile on this basis,

18   simply on the basis that the orders were obtained ex parte

19   since the rule, as well as Rule 9006, although I'm really

20   focusing on Rule 4(m), contemplates ex parte relief and as laid

21   out by the Second Circuit under the Zapata case, gives the

22   trial court almost blanket discretion to grant such relief.

23          Given my views that I've just articulated, with regard

24   to what was reasonable for the debtors to assume in connection

25   with the fourth -- with the last extension order as to notice,

1    I don't believe that the debtor has acted in bad faith.  I

2    don't believe that has been undue delay in bringing the Rule 15

3    motion and finally, the issue as to whether there would be

4    prejudice to the opposing party in my permitting the complaint

5    to be amended, and while prejudice is a legitimate issue to

6    consider in connection with the Rule 4(m) review that I believe

7    should be undertaken, I don't believe that there is sufficient

8    prejudice in permitting the complaint to be amended to preclude

9    the amendment.  Again, that is distinguished from whether now

10   that there has been obviously notice in my retroactive review

11   of the extension order, I should find sufficient prejudice to

12   vacate that order, which of course would mean that the

13   complaints were untimely.

14        So, I think that the parties should move to the next

15   stage in this litigation which, with respect to the thirty-six

16   objections to the Rule 15 motion, would be a focus on

17   individual hearings with regard to whether I should vacate the

18   4(m) order which is primarily to be based upon prejudice which

19   would include, and I believe at this point the record has been

20   substantially clarified, a consideration of the notice to the

21   other -- to the defendants or the extent of notice, although I

22   guess I could imagine a scenario where a defendant received no

23   notice, neither actual nor presumptive, and yet was not

24   prejudiced in any way, i.e., all of its witnesses are still

25   there, it didn't enter into any transaction and reliance on

1    their being no preference exposure and I would find that there

2    would be no basis to vacate the 4(m) order as to it for that

3    reason.

4            On the other hand, if someone did receive notice, I

5    think it would be quite difficult for them to argue prejudice.

6    And finally, if someone did not receive notice and had some

7    level of prejudice, I think it is appropriate for me to

8    consider that they didn't receive notice.

9            And again, leaving aside the Wachovia motion, I think

10   the parties should focus on a schedule for my resolving those

11   issues and ultimately the main issue of reconsideration and not

12   under Rule 60 but simple reconsideration by me in my discretion

13   of the 4(m) orders.  The parties haven't had time, I guess to

14   discuss a schedule for that or something I think Mr. Butler

15   alluded to as a potential ADR of it.   Am I wrong about that or

16   have you discussed it?

17           MS. HAFFEY:  Not in any group sense, Your Honor, no.

18           THE COURT:  Okay.  At this point, is there kind of a

19   steering counsel or group, no, on the defendant's side?  You're

20   each pretty much on your own at this point?

21           MR. KLEIN:  There is not, Your Honor, but I think it's

22   something at this point now that we're focusing will be

23   appropriate.

24           THE COURT:  Okay.

25           MR. KLEIN:  We'll consider that among ourselves while

Page 78

1    we're here.

2           THE COURT:  All right.  Well, I would like you to meet

3    and confer about that process and I'm happy to hear from you

4    very promptly.  I could do it on a telephonic conference later

5    this week to see where you are on it, including whether you

6    want to have a mediator appointed to deal with those issues,

7    too in the first instance.

8           Obviously, thirty-six hearings is going to take some

9    time for me, even if they are limited to say half a day but I

10   am prepared to do it or if you want to have some test cases,

11   you know, there are some that fall in certain fact patterns and

12   some -- or if they do, common fact patterns or you could set it

13   up for mediation if you want to.

14          So if we scheduled a call say for the end of this

15   week, for you all to air with me where you are on a process for

16   dealing with that issue, would that give you all enough time to

17   talk about it?

18          MR. KLEIN:  Hard to say since nobody everybody is

19   here, of course.

20          THE COURT:  Right.

21          MR. KLEIN:  Many are on the phone but I am not even

22   sure who is on the phone.

23          THE COURT:  Right.

24          MR. KLEIN:  I would think that maybe ten days is a

25   wiser timetable.

1          THE COURT:  You want to do it next week?

2          MR. KLEIN:  If not this week; yes.

3          THE COURT:  Okay.

4          MR. KLEIN:  Would your office be able to -- assuming

5    mediation is not an attractive alternative, would your office

6    be able to provide us with any blocks of dates that --

7          THE COURT:  Yes.

8          MR. KLEIN:  -- might still be convenient for Your

9    Honor?

10          THE COURT:  Sure.  You could check with Ms. Lee about

11   my calendar.  I'm assuming that it would probably be -- you'd

12   probably want some limited discovery and it would be probably

13   in February, I would think.

14          MR. KLEIN:  Thank you.

15          THE COURT:  February or March.

16          MS. HAFFEY:  Your Honor, can I suggest that the

17   debtors propose an order, a procedures order?

18          THE COURT:  Well, you could circulate that to the

19   objectors.

20          MS. HAFFEY:  Okay.

21          THE COURT:  Yes,  you could do that if you wanted to

22   but it may make sense for you to spend a little time with them

23   first --

24          MS. HAFFEY:  Oh, certainly.

25          THE COURT:  -- before you do that.  And when do you

1    think you could circulate that order by?

2            MS. HAFFEY:  Within a week, sometime next week.

3            THE COURT:  Okay.  So by Monday next week?

4            MS. HAFFEY:  Sure.

5            THE COURT:  And then maybe we could set up a call for

6    Friday next week, unless you're still talking about it and then

7    you can put it off.  But in the meantime, you can get a block

8    of dates.

9            MS. HAFFEY:  We'll circulate it on Monday and then we

10   can advise the Court's clerk --

11           THE COURT:  Right.

12           MS. HAFFEY:  -- as to whether the parties are ready to

13   talk at the end of the week or --

14           THE COURT:  Right.

15           MS. HAFFEY:  -- we need more time.

16           THE COURT:  I mean, this is a fairly small number at

17   this point.

18           MS. HAFFEY:  Yes.

19           THE COURT:  And in several cases with larger numbers,

20   judges have gotten their colleagues to act in non-binding

21   mediation on much -- 2000 preferences, for example.  So that's

22   probably achievable here too.  I'm not sure anyone would want

23   to mediate just the 4(m) issues though.  They'd probably want

24   to throw in the underlying preference issue.  But you all

25   should consider that as a possible alternative.  But it may be

1    a small enough number, so that we would just go right to a

2    hearing on that issue, limited again to the 4(m)-15 issue.

3            MR. KLEIN:  Your Honor, could I ask for a point of

4    clarification?  Earlier than no more than four minutes ago, you

5    were going through your current views as to the different sort

6    of lack of notice and some prejudice or no prejudice or what

7    you think the likely result without --

8            THE COURT:  Right.

9            MR. KLEIN:  -- being a holding, of course.

10           THE COURT:  Right.

11           MR. KLEIN:  I either -- either you lowered your voice

12   or something interfered with my hearing with what I thought,

13   many will of course claim, which is complete lack of notice and

14   at least some prejudice, lost witnesses, lost documents, and

15   the like --

16           THE COURT:  Right.

17           MR. KLEIN:  -- where you felt that would be likely to

18   play out.

19           THE COURT:  Well, that's the most appealing issue for

20   a defendant --

21           MR. KLEIN:  Of course.

22           THE COURT:  -- an appealing fact pattern for a

23   defendant but a lot -- there's a lot of the details about

24   missing, you know -- what does it really mean, missing

25   documents, so --

 1              MR. KLEIN:  Of course.

 2              THE COURT:  Right.

 3              MS. HAFFEY:  Thank you.

 4              THE COURT:  Okay.  All right.

 5              UNIEDENTIFIED SPEAKER:  Your Honor, could we take a

 6      quick break before the last motion?

 7              THE COURT:  Yes, sure.  Ten minutes?

 8              UNIDENTIFIED SPEAKER:  Thank you, Judge.

 9          (Recess from 12:13 p.m. until 12:24 p.m.)

10              THE CLERK:  All rise.

11              THE COURT:  Please be seated.  Okay.  We're back on

12      the record in DPH Holdings.  So, we're clear about the timing

13      then on the next steps with regard to the thirty-five

14      objectors; proposed order by the debtors by next Monday,

15      hopefully after reaching some consensus with the objectors

16      before then and then if we need to, we'll have a telephonic

17      conference either that Friday of that week or if you still need

18      some more time later, the following week and you can get a

19      block of time from Ms. Lee today if you want.

20              MS. HAFFEY:  Yes.

21              THE COURT:  Okay.  All right.

22              MS. HAFFEY:  Judge, we're clear and we spoke with

23      defense counsel during the break and they're going to see if

24      they can get a couple of spokespersons for us to work with, so

25      we'll expedite it.

1       THE COURT:  And then, it seemed to me that mediation

2   could be useful here if you were in the position to focus on

3   the merits, as well, so you could actually get to a final

4   result.  I'm not sure whether the parties are at that point or

5   not but if you are, that's something that you should raise.

6   I'm not sure if mediation is sufficient, just as to these

7   threshold issues that I've been dealing with now for over a

8   year.  But it would be, if you could get to the merits with a

9   mediator.

10      MS. HAFFEY:  It's our position, Judge, that the

11  majority of the cases that at least we are in that position, I

12  believe.

13      THE COURT:  Okay.  And then Mr. Butler said there are

14  really fifty-eight active cases.

15      MS. HAFFEY:  Yes.  Fifty-seven actually; one resolved

16  this morning.

17      THE COURT:  Fifty-seven.

18      MS. HAFFEY:  And the --

19      THE COURT:  I have no problem with the debtors seeking

20  a default judgment on the others and then as far as the -- it's

21  not clear to me, the twenty-one where there weren't objections

22  to the Rule 15 motion, were there objections or motions to

23  dismiss though on those remaining twenty-one?

24      MS. HAFFEY:  If you'll --

25      THE COURT:  If not, we should have a pretrial

1    conference and move and deal with discovery on those.

2          MS. HAFFEY:  Very good, Your Honor.  I just have to

3    look at my chart to see.

4          THE COURT:  Right.

5          MS. HAFFEY:  My recollection is there were motions to

6    dismiss as to some of them but not to all of them.

7          THE COURT:  Okay.  Well, I guess the ones where there

8    wasn't a motion to dismiss, we should, you know --

9          MS. HAFFEY:  Okay.

10         THE COURT:  -- have a pretrial conference on those

11   and/or just if the parties just want to agree to a pretrial

12   order and move into the discovery phase on those, that's fine.

13         MS. HAFFEY:  Very good.

14         THE COURT:  Okay.

15         MR. SILVERSCHOTZ:  Your Honor, it may not make a

16   difference or it may make a difference, we filed a joinder and

17   prior to the June 21 hearing, there was some confusion in the

18   agenda about whether we were included or not included and

19   whether or not we're in the thirty-seven or thirty-eight.  We

20   think we would be if we're still around.  And I would just

21   throw that out there for something for Ms. Haffey can either to

22   perhaps double check on before we finish up.

23         MS. HAFFEY:  As to the fifty-seven active cases,

24   Wachovia-Laneco (ph.) case is included.

25         MR. SILVERSCHOTZ:  It's an active case but in terms of

Page 85

1    the Rule 15 issue, Your Honor, I just wanted to make sure we

2    were in that group and -- but that, as I say, is a purely --

3    it's a pure issue of documentation rather than any substance at

4    all.  We'll worry about that at the time.

5            May I proceed, Your Honor?

6            THE COURT:  Yes.

7            MR. SILVERSCHOTZ:  Good afternoon.  Mark Silverschotz

8    again, Reed Smith, for Wells Fargo Bank, N.A., with my

9    colleague Sarah Kam.

10           Your Honor, you mentioned this morning that our

11   situation is somewhat unique and to the extent that this motion

12   causes the Court to hear yet again the same arguments that have

13   been before Your Honor for a period of time now, I apologize.

14   That's not our intention.

15           And one reason we didn't rise in connection with Mr.

16   Butler's presentation regarding the supplemental filing is

17   speaking on my own behalf, I was actually very pleased to get

18   the filing that Skadden put in because it brought together all

19   sorts of items that frankly hadn't appreciated before.  And

20   from the stand point of Wachovia/Wells Fargo, we really think

21   the story is a simple one.

22           MR. BUTLER:  Your Honor, if I may just interrupt the

23   argument, just so the record is clear, I am present in the

24   courtroom today for the purposes of the motion we provided.

25   I'm no participating in this adversary --

Page 86

 1           THE COURT:  Right.

 2           MR. BUTLER:  -- on either side and I just want the

 3      record to be crystal clear on that point.

 4           MR. SILVERSCHOTZ:  Understood.  I am sorry.  And I

 5      understand why and I certainly didn't mean to bootstrap Mr.

 6      Butler into this particular hearing.

 7           THE COURT:  Okay.

 8           MR. SILVERSCHOTZ:  Although now that I think about

 9      it --

10           As I said, we really think it's a simple story.

11      Wachovia lent money to Laneco.  Laneco supplied Delphi and it

12      was not -- the relationship between Delphi and Laneco seems to

13      have been fraught.  Delphi sued Laneco.  The parties settled.

14      Laneco got paid and Laneco paid Wachovia and Delphi went into

15      bankruptcy.

16           Wachovia, as one would expect, as a secured creditor,

17      had liens on Laneco property and those liens were held onto as

18      the Delphi bankruptcy unfolded and two years went by.  And in

19      November of 2007, Laneco, as was its right under the agreements

20      between the parties, and I believe under Pennsylvania statute

21      as well, demanded a release of those retained liens because as

22      far as Laneco and Wachovia knew, the statute of limitations had

23      expired.

24           And Wachovia looked at the Delphi docket for a lawsuit

25      that would have been brought against Laneco or both and the

1    good news here, Judge, and there's always good news some place

2    in a case like this, is that the sealing mechanism that the

3    clerk's office imposed worked.  We looked, the client looked,

4    and the complaint was not visible to us and accordingly, in

5    accordance with its responsibilities, it released its lien a

6    couple of months later, effectively in January of 2008, but

7    clearly the process was unfolding during those last two months.

8         It's our understanding that the assessed value of the

9    liens released were around two million dollars or so but of

10   course, that's an assessment.  That's not necessarily market

11   value and I'm not sure that's going to be an issue but if it

12   is, well that's something the parties can determine.

13        The history as I mentioned between Delphi and Laneco

14   had several years of unhappiness associated with it.  The anger

15   between them apparently persisted such that in December of

16   2007, the debtors filed their plan exhibit saying that the

17   estate claims against Laneco and Wachovia were going to be

18   retained under the plan, even though as has been noted

19   previously, at the time the plan was a hundred cent plan.

20        And I am late to the game here, Your Honor.  I showed

21   up on June 21 to move my colleague's pro hac admission and I

22   think if it demonstrates anything, one should be careful when

23   one offers to do a favor because here I am arguing the Rule 60

24   motion.  But from reading the debtors' response papers, it

25   seems that at least with respect to everyone other than Laneco

1    and Wachovia in 2007, December, the Delphi case was a big love

2    fest.  They had that full pay plan in the works.  The creditors

3    committee was supporting what the debtor was trying to do.  And

4    in August of 2007, the debtor was negotiating all sorts of

5    contracts and amendments to contracts and deals with its

6    various suppliers, I suppose in anticipation of the happy day

7    of consummation of that full pay plan.

8          So, just standing here as a regular kind of bankruptcy

9    lawyer, I can understand why in that environment, the last

10   thing in the world the debtor wanted to do was to bring a

11   bucket of skunks to this garden party that they were having and

12   in the middle of negotiating all those contracts with all those

13   parties, not want to tell them by the way, we've sued you for X

14   million dollars on the Chapter 5.

15         And I also know that I'm sure every lawyer in this

16   courtroom, and I suspect Your Honor when you were in practice,

17   was involved in either prosecuting or defending a preference

18   case in which there was an omnibus preference case management

19   order where the debtor was in a posture similar to this debtor

20   and they didn't want to spend time and treasure pursuing cases,

21   even if they had to file them to preserve the statute of

22   limitations and the standards order wouldn't seal the

23   complaints but it would say you serve them and the case is

24   stayed.  And no answer should be filed.  And the case won't

25   proceed unless there's ninety days notice and we're not going

1    to spend money, we're not going to do anything other than

2    preserve the debtors' rights.

3            That sort of procedure is standard and we've done it

4    for years and I'm sure it was the process undertaken back when

5    this debtor proposed their original sealing and extension

6    motion in August of 2007.

7            But what happened here was different and for reasons

8    that I think one can imagine why it would have made sense at

9    the time.

10           THE COURT:  Well, can I go back?  When did Wachovia

11   release its liens?

12           MR. SILVERSCHOTZ:  The lien release filing shows

13   January of 2008.

14           THE COURT:  Okay.

15           MR. SILVERSCHOTZ:  The docket review was after the

16   statute of the original -- the two year anniversary of the

17   debtors' filing had passed by I believe several weeks.  The

18   debtors' motion to seal and extend time, the first motion, was

19   quite explicit why the debtors were seeking the relief that

20   they sought.  They had the negotiations going on and they had a

21   variety of other business relationships that were in various

22   states of advancement and they may not have been suppliers but

23   they were counterparties to other relationships.

24           The debtor decided to seek a sealing order, rather

25   than file everything in the open and send a letter to everyone

Page 90

1    along with the complaint being apologetic and saying we're not

2    going to pursue this, we had to do this because of the statute

3    of limitations.

4          THE COURT:  When did Wachovia see the plan that

5    actually reserved causes of action against Laneco?

6          MR. SILVERSCHOTZ:  I don't know that Wachovia ever saw

7    the plan, Your Honor, and I don't know that Wachovia -- I don't

8    believe that there was a reference to Laneco or Wachovia until

9    such time as the plan exhibit was filed, I'm going to believe,

10   the 28th of December of 2007.

11         THE COURT:  Right.

12         MR. SILVERSCHOTZ:  So even if the plan had been served

13   on Wachovia in some other connection, I don't believe that the

14   reference to Laneco and Delphi was there.  Certainly it was not

15   until after the docket review, after the statute had "run", in

16   quotes, but probably that filing was, I think, two weeks --

17   excuse me, the filing was maybe a week or so after the holiday

18   and the filing was I think on the day or two before the

19   holiday.  That is the exhibit filing.

20         They did review the docket though, as I said, and

21   what's interesting is the manner, at least to me, the manner in

22   which the original, what we refer to as the sealing motion, was

23   described in its caption.  And I won't read it into the record.

24   It's clear on the papers what it says.  But to the extent that

25   sealing the complaints was a principle form of relief that the

1     debtors were seeking and to the extent that the presence of

2     that procedures motion could be expected to provide notice to

3     someone, even reviewing the docket, one would, I think expect

4     there to be reference to the fact that complaints had been

5     filed and sealed.  And that's not what the motion was called.

6              So even if someone had searched the word seal or

7     sealing when going through this multi-thousand entry docket in

8     addition to looking for complaints against Laneco or Wachovia,

9     that wouldn't have popped up.

10             THE COURT:  And complaints wouldn't have popped up.

11             MR. SILVERSCHOTZ:  The complaints wouldn't have popped

12    up.

13             THE COURT:  No, no, the word complaint wouldn't have

14    popped up.

15             MR. SILVERSCHOTZ:  I don't know if the word would or

16    would not have popped up but because -- I think that's probably

17    not because the -- frankly, I don't know, Your Honor, if the

18    word complaint would pop up where complaints have been sealed.

19    I don't know if the fact of the filing is there or just the

20    names of the parties sued are what are shielded from search but

21    in any event, the names clearly were sealed and shielded.

22             What was interesting also and just looking at the

23    original motion in addition to that relief not being in the

24    caption, it's not even in the -- it's not in the introduction,

25    that is to say request for sealing relief isn't in the

1    introductory description of the relief of the motion.  And the

2    prayer for relief on the last page that says please enter the

3    order annexed and of course the order annexed provides for

4    sealing relief.  It's not until I think page 20 of the original

5    sealing motion that any reference is made to request for relief

6    in the form of the sealing of the complaints.

7         Your Honor, I'm old enough to remember when cutting

8    and pasting involved scissors and tape and I've dealt with the

9    most excellent counsel who represent this debtor for the better

10   part of thirty years, and they're among the finest debtors'

11   counsel that we have to offer here in the United States.  And

12   Mr. Butler can order a copy of the transcript if he'd like.

13   But one might be forgiven for suspecting that maybe, perhaps,

14   there was a bit of cutting and pasting going on in the

15   preparation of what at the time may have seemed to be a

16   boilerplate motion and I am all for not reinventing wheels and

17   I'm all for keeping administrative expenses down.  And I think

18   we can all imagine how upset the United States Trustee's

19   Office, not to mention the creditors committee would be if

20   every basic motion in a complex Chapter 11 such as the Delphi

21   case, was written from scratch.

22        It is perhaps speculation on my part but I think that

23   someone took a traditional adversary proceeding procedures

24   motion, plugged in some additional relief respecting seeking to

25   seal the complaints and filed it forgetting or perhaps not

Page 93

1   being aware that the predicate for the sealing relief did not,

2   in fact, apply to every prospective defendant against which the

3   debtor was anticipating bringing a preference complaint.

4           It's speculation, Your Honor, but in looking at this

5   set of facts retrospectively, I described it to someone, it's

6   almost like sitting in the backseat of one of those old station

7   wagons where it flips up and you're pointing backwards and

8   you're -- everything's going past you as you go by it, from the

9   opposite direction.

10          All of this, I think -- I, for one, am not prepared to

11  believe that this debtor intentionally misled anyone and I

12  don't want our papers and I certainly don't want my argument

13  here today to suggest -- first of all, I don't think that's the

14  standard that I would have to achieve in any event, but I don't

15  think that there was an intention here to mislead or to subvert

16  the due process that we believe Wachovia and Wells Fargo were

17  entitled to.

18          It's not disputed that Wachovia was properly asked by

19  Laneco to release the liens and nor that Wachovia did so after

20  reviewing the docket.  Assuming for the sake of argument that

21  the purpose that the debtor stated in their motion was fair and

22  legitimate, it simply didn't apply to Wachovia.  And to the

23  extent that under Rule 6, as I think has been correctly stated,

24  the Court has the capacity for cause to modify those

25  requirements.  We think it's incontrovertible that as to

Page 94

 1    Wachovia, no such cause existed and with all due respect to the
 2    debtor, we don't think that their response gets them to cause,
 3    demonstrates some sort of additional cause that was existing in
 4    the case at the time.
 5              We think, Your Honor, that maybe a sealing order makes
 6    sense in some cases.  Maybe it made sense in this case with
 7    respect to the various suppliers and I believe Your Honor said
 8    as much previously.  But sealing complaints should and I think
 9    in the case of Wachovia, have consequences where the factual
10    predicate for the relief that a party seeks in sealing a
11    pleading in retrospect, clearly did not apply.
12              THE COURT:  And that's because the debtor did identify
13    Laneco and Wachovia, so it wasn't -- the rationale of stirring
14    up a hornet's nest didn't apply because they were identified
15    later --
16              MR. SILVERSCHOTZ:  That's correct, Your Honor.
17              THE COURT:  -- or in the exhibit to the disclosure
18    statement.
19              MR. SILVERSCHOTZ:  That's correct, Your Honor.  One
20    might suggest that the debtor asked the Court to seal the
21    various complaints because they thought it might give them a
22    negotiating advantage over the parties that may not have been
23    aware that they were potentially going to be sued but again,
24    that didn't apply to us.  And we think that parties without
25    notice such as Wachovia which acted to their detriment, who

1   suffered materially, are entitled to relief on the Rule 60.

2   And with all due respect to the debtors, we think they want to

3   have it both ways here and we don't think that in our case,

4   that should be allowed.

5           As Your Honor just noted, I think the inference that

6   can be drawn from 7.24, Exhibit 7.24, is that the debtors

7   really never were entitled to any extension relief or sealing

8   relief against Wachovia.  We weren't the supplier.  We were a

9   target and the debtors knew we were a target and frankly, Your

10  Honor, even in the reply, as far as I can tell, the debtors

11  have never articulated --

12          THE COURT:  But didn't you know you were a target?

13  Didn't Laneco know it was a target?

14          MR. SILVERSCHOTZ:  I certainly don't know what Laneco

15  knew.  I know that Wachovia waited until after the statute of

16  limitations expired before releasing its lien, checked the

17  docket and saw nothing there.  And to the extent that prudence

18  business practice suggests that where one is paid by a borrower

19  that has a -- that is a supplier to a debtor, that one retain

20  liens pending expiration of a preference statute of

21  limitations, Wachovia undertook a prudent business practice and

22  even went the further step of checking the docket.  That's the

23  whole point here, Your Honor.

24          If the debtors knew that they were going to sue, and

25  in fact had sued, but for whatever reason decided to have that

Page 96

1    complaint sealed without cause, that's a risk the debtor took

2    and the burden of the consequences of Wachovia's reasonable

3    actions should be borne by the estate.

4            THE COURT:  What's the status of Laneco today?

5            MR. SILVERSCHOTZ:  Your Honor, I am informed that for

6    all intents and purposes, there is no Laneco.  Laneco is either

7    dissolved, a shell, or otherwise unavailable and I don't know

8    if perhaps the debtor can inform us if they've been able to

9    effect service on Laneco or if they have any additional

10   information.

11           THE COURT:  Why didn't Wachovia react as it's now

12   reacted when it got service of the second extension?

13           MR. SILVERSCHOTZ:  It's an interesting question, Your

14   Honor, and we address it in our reply; two observations.  And

15   first, Your Honor, speaking for my client, I appreciate the

16   fact that Your Honor as the transcripts indicate, had some

17   sensitivity to the issue of service on non-2002 list Wachovia

18   and I suppose Laneco, as well.  The second motion, as I

19   understood it, was never served on us.  What was served was the

20   order via notice of settlement and I believe that was the

21   Court's direction, and I believe also and counsel can correct

22   me or perhaps Ms. Kam can correct me, that the order didn't

23   reference -- didn't say anything about sealing complaints in

24   any event, nor did the third or fourth orders which I believe

25   were served.

1            The debtors' references to Wachovia and Laneco start

2      showing up on page 8 or 9 in a footnote on the second, third

3      and fourth applications.  And by the time all those pleadings

4      were served, and I believe they were mailed to Wachovia care of

5      general counsel in Charlotte, and I'm sure Your Honor will

6      appreciate the banks get probably hundreds, if not thousands,

7      of documents every week, Delphi was not a borrower of

8      Wachovia's.  Laneco was.  There was no correlation, I suppose,

9      between the nature of the motion which appears to, I suppose,

10     one looking at the cover to be a boilerplate procedures motion

11     or an extension motion.  And certainly until such time as the

12     complaint was actually served, real effective notice wasn't had

13     by Wachovia and notwithstanding that, the damage was done

14     months earlier when the liens were released.

15            So those orders correlated to nothing, at least on

16     their face, and one would have to look for the buried reference

17     literally in the footnote, literally towards the backs of the

18     documents.

19            THE COURT:  Well Wachovia wasn't getting any other

20     notices from the debtor; right?

21            MR. SILVERSCHOTZ:  I don't believe so, Your Honor.

22            THE COURT:  So you think this one might have caught

23     someone's eye?

24            MR. SILVERSCHOTZ:  It might have, Your Honor.

25            THE COURT:  Okay.

BP1 HOLDINGS CORP., ET AL.

Page 98

1          MR. SILVERSCHOTZ:  And for me to stand up here and say

2    no, absolutely, I don't think Your Honor would buy it.  But we

3    were talking earlier about spectrum of prejudice, spectrum of

4    notices here, here I think it has to be considered in context;

5    why is this even an issue?  And the only reason it's even an

6    issue, and in fairness to Your Honor, the only reason Your

7    Honor is really asking me the question is that the original

8    motion sealed the complaint and it wasn't served in the first

9    place.  And the question is whether Wachovia in that context

10   should have been required to figure it out and then come

11   roaring into court on this motion a couple of years earlier.

12          In that context, Your Honor, the question is well how

13   do we balance the prejudice in light of that?  The debtor

14   hasn't proceeded.  The debtor doesn't have a complaint out

15   there.  Wachovia released its liens back in November of 2007.

16          THE COURT:  January --

17          MR. SILVERSCHOTZ:  Excuse me, January of 2008 after

18   reviewing the docket in November of 2007 and with respect to

19   the cause that the core cause of the prejudice, it was the fact

20   that the predicate for the debtors original sealing motion did

21   not apply to us.

22          Your Honor, the debtor contends that we're --

23          THE COURT:  Well did --

24          MR. SILVERSCHOTZ:  I'm sorry.

25          THE COURT:  When it was filed, I guess it applied to

1     Laneco.

2              MR. SILVERSCHOTZ:  I don't think it did, Your Honor,

3     and the reason is at that point it's my understanding that

4     Laneco was no longer a supplier to the debtor.  Laneco had no

5     ongoing business relationships with the debtor.  They were out

6     of that relationship completely and I suspect, Your Honor, that

7     if Laneco did have an ongoing business relationship with the

8     debtor, they wouldn't have shown up in Exhibit 7.24.  Your

9     Honor --

10             THE COURT:  Well, I'll ask them about that.

11             MR. SILVERSCHOTZ:  Okay.

12             THE COURT:  Are you saying that there was no -- even

13    if Wachovia had put two and two together when it got the notice

14    in the third or fourth week of March from the first

15    extension -- the second extension --

16             MR. SILVERSCHOTZ:  Second extension.  And then I guess

17    April was the motion of the third.

18             THE COURT:  But just the second extension, it couldn't

19    have gone back and gotten the liens back on again?

20             MR. SILVERSCHOTZ:  I don't think they would have been

21    able to -- I don't think a party has a right to, on a unitary

22    or individual basis --

23             THE COURT:  Did it --

24             MR. SILVERSCHOTZ:  -- to throw that on -- throw a lien

25    on there.

1        THE COURT:  In connection with the lien release, did

2    Wachovia ask Laneco whether it knew of any avoidance action?

3    Did it take any reps or warranties from Laneco?

4        MR. SILVERSCHOTZ:  Your Honor, the demand -- the

5    initial demand, which I believe is an exhibit to the McGovern

6    affidavit, indicates a representation from Laneco and I'll

7    double check that but a representation that no action was

8    commenced and that it was not aware of any action.  And

9    frankly, I would have been surprised if they had been aware of

10   anything because they wouldn't have had any better notice.  We

11   released the liens, Your Honor, in response to a demand, a

12   timely demand, made subsequent to the expiration of the statute

13   of limitations with no lawsuit having been filed to the

14   knowledge of Laneco or Wachovia.

15       THE COURT:  Okay.

16       MR. SILVERSCHOTZ:  Thank you.  Your Honor, that's --

17       THE COURT:  And that's exhibit what?

18       MR. SILVERSCHOTZ:  Exhibit A to the McGovern

19   affidavit.

20       THE COURT:  Oh, I'm sorry, not Exhibit A to the

21   motion?

22       MR. SILVERSCHOTZ:  Not to the motion, Your Honor.  We

23   only have the exhibit.

24       THE COURT:  Could you show that to me?

25       MR. SILVERSCHOTZ:  May I approach, Your Honor?

DPH HOLDINGS CORP., ET AL.

Page 101

1           THE COURT:  Yes.

2           MR. SILVERSCHOTZ:  It looks like I was overly

3     enthusiastic in my description of the letter, Your Honor, but

4     it references specifically the running of the second

5     anniversary on October 18.

6         (Pause)

7           THE COURT:  Okay.

8           MR. SILVERSCHOTZ:  Your Honor, the response does

9     something that I suppose I would do if I was in the debtors'

10    shoes which is to try to shoehorn this motion into an 1144

11    context.  In our reply, we I think explain why it's

12    inappropriate because we are fundamentally not attacking any

13    functionality of the plan or the confirmation order or the

14    amended confirmation order.

15          If the debtor has rights in this lawsuit, if the

16    reorganized debtor has rights in this lawsuit, then great.  And

17    the retention -- my understanding of retention provisions in

18    plans is to provide, if you will, a chain of title in the

19    inchoate asset of the cause of action against a particular

20    party.  And that derives from a -- we don't have a judicial

21    estoppel contention here, Your Honor.  We have a traditional

22    Rule 60 motion.

23          Your Honor's questions to me, I believe go to the --

24    excuse me -- go to the issue of timeliness of our motion.  We

25    think that under the facts here, our motion is timely.  That no

1    prejudice is befalling the debtor by having this motion heard

2    in this particular timeframe, given the procedural posture of

3    both the case and the adversary proceedings.  We've cited cases

4    in which these motions have been heard two, four years after

5    the fact.  There are probably cases out there that are even

6    longer.

7           The key here is whether these facts create a set of

8    circumstances which are legally cognizable to compel the result

9    that the orders sealing the complaint and extending time to

10   serve this debtor -- excuse me, this defendant, should be

11   vacated.  We go back to our original contention, Your Honor --

12          THE COURT:  Can I interrupt you?  Normally, release of

13   a lien is prejudicial.  What was your lien on?

14          MR. SILVERSCHOTZ:  It was on real estate, Your Honor.

15          THE COURT:  And do you --

16          MR. SILVERSCHOTZ:  And I believe other assets.  I

17   certainly know that it was on -- that real estate, there's

18   several million dollars or at least two million dollars worth

19   of real estate based on the assessment.

20          THE COURT:  And that's reflected in the letter that

21   you just handed to me where they were about to sell that piece

22   of property.

23          MR. SILVERSCHOTZ:  I believe that is reflected -- the

24   price is not reflected on the property but the Exhibit B which

25   I'll hand up again, Your Honor --

1          THE COURT:  That's okay, I remember it.

2          MR. SILVERSCHOTZ:  Exhibit B is the computer printout

3   from the clerk's office for the property on which liens were

4   released showing the assessed value for two parcels; one for

5   $1.7 million and change and another for $300,000.  So we're

6   talking about on an assessed basis, at least two million

7   dollars of value and that's as I said, Exhibit B to the

8   McGovern affidavit.

9          THE COURT:  And that's the property that's referenced

10   in the letter?

11          MR. SILVERSCHOTZ:  Yes, Your Honor.

12          THE COURT:  Okay.

13          MR. SILVERSCHOTZ:  Your Honor, just to wrap it up,

14   there was no cause to seal the complaint against Wachovia.  We

15   weren't served with the sealing motion.  We released our liens

16   after reviewing the silent docket.  None of the motions have

17   captions or reference the fact that complaints have been sealed

18   and the reference to Wachovia and Laneco, we think was

19   consistent buried, confusing and fundamentally post hoc, at

20   least as far as what would have constituted effective and

21   reasonable notice to us.  And we think that the debtors really

22   never, probably never intended or were trying to pull a fast

23   one here with respect to us.  We hope that wasn't the case but

24   the predicate for the motion simply didn't apply.

25          And, Your Honor, it's always dangerous for lawyer to

1    get too caught up in their client's case but I have to tell

2    you, I'd be hard pressed to come up with a set of facts that

3    didn't -- I didn't find as jarring as I do this, in particular

4    here where Wachovia went the extra mile, didn't just rely on

5    the calendar and rely on their service office that handles

6    complaints.  They went and looked at the docket and a sealing

7    order is a double-edged sword, Your Honor.  I think in this

8    particular case, Your Honor, it cut back against the estate.

9           Wachovia didn't do anything wrong.  Your Honor, we can

10    cite Pepper v. Litton all we want in this court of equity.

11    It's supposed to mean something and I think it does and I know

12    Your Honor thinks it does.  In this particular case, equity

13    requires that the orders be revoked pro tanto to the extent

14    they targeted Wachovia.  Thank you.

15           THE COURT:  Okay.

16           MR. SENDEK:  Your Honor, Bruce Sendek for the

17    reorganized debtors.  I'd like to start by making one point

18    clear.  Wachovia is not as innocent as it seems to posture.  We

19    use in our response the word hostage payment and it is apropos.

20    It was a 1.86 million dollar payment made within approximately

21    sixty days or less of the Chapter 11 filing.  What led to that

22    payment made directly to Wachovia is rather interesting and we

23    know it well.  My partner here, Tom Radom, was involved in

24    working out that settlement with Wachovia.  Laneco was the

25    supplier, a very strategic supplier at the time for Delphi and

1    Delphi needed the shipments.

2           Wachovia, who had a lock on Laneco, wasn't going to

3    let that happen unless it got its part of the tribute and that

4    tribute was 1.86 million dollars that was paid directly by

5    Delphi to the bank.

6           So you start off with Wachovia knowing that it is

7    definitely within the sights of a preference action it received

8    of 1.86 million dollars within the time period and it knows the

9    circumstance under which it received that money.  And I believe

10   in the settlement agreement, there's even language to the

11   effect that nothing that happens in bankruptcy is going to undo

12   that.  Well, of course, that's not enforceable.  So that's how

13   we start off.

14          And some of the points that the bank makes don't make

15   much sense.  They claim that before they released the lien in

16   January of 2008, they were diligent.   It's hard to imagine,

17   they say they searched the docket and had no inkling that they

18   were a potential defendant or that this process was taking

19   place.  The order itself counsel didn't want to belabor the

20   record but certainly anyone searching the docket to see if

21   there's the need for further inquiry or that if some adverse

22   action is being taken against the bank would have reason for

23   further inquiry when they saw that this court entered an order,

24   and I won't read the whole thing, but tolling statute of

25   limitations with respect to certain claims, subsection two,

1    authorizing procedures to identify causes of action that should

2    be preserved and three, establishing procedures for certain

3    adversary proceedings including those commenced by the debtor

4    under the -- and it identifies the particular statute in

5    question.  So --

6              THE COURT:  I'm sorry, what's the date of that order?

7    That's the --

8              MR. SENDEK:  This was the first order entered --

9              THE COURT:  That's the --

10             MR. SENDEK:  -- the first preservation order.

11             THE COURT:  That's the September 2007?

12             MR. SENDEK:  Yes, Your Honor.

13             THE COURT:  Okay.

14             MR. SENDEK:  It was.  And if the bank was really being

15   so cautious, as well and waiting until the two year anniversary

16   passed, they would also know that a summons that would have

17   been issued would not necessarily be served on day one

18   following the anniversary date.

19             THE COURT:  No, I think they acknowledge that but

20   their point is that there was no complaint on the docket.

21             MR. SENDEK:  Well --

22             THE COURT:  No filing.

23             MR. SENDEK:  And their other point is that they think

24   that that order was entered for the very limited purposes of

25   not disturbing the suppliers.  That they were --

1            THE COURT:  But that's a separate issue.  That's the

2    issue about the rationale of the motion not applying to them

3    but that doesn't really go to the notice issue.

4            MR. SENDEK:  Well, it does go to this sense -- in this

5    sense, Your Honor.  They're seeking to attack that order under

6    Rule 60(b)(4) declaring that the order was void and that can

7    only be done under extreme showing of exceptional circumstances

8    and they go that route because they've waited so long to attack

9    this particular order.

10            THE COURT:  But you're right.  This isn't a Rule 60

11    attack.

12            MR. SENDEK:  That's how they framed their motion, Your

13    Honor.

14            THE COURT:  Well, I understand.

15            MR. SENDEK:  And our position is that it should have

16    been foreclosed by --

17            THE COURT:  Why can't they attack it simply as asking

18    me to reconsider my interlocutory order now that notice is

19    properly out there?

20            MR. SENDEK:  Because the plan confirmation order

21    precludes that under -- their attack had to be under 1144

22    within, I think it's 180 day period.  They didn't.  They didn't

23    do that and they admit that in their reply brief that a motion

24    under --

25            THE COURT:  And how does the plan confirmation order

1   operate here to preclude my applying Rule -- looking at the

2   4(m) all over again?

3          MR. SENDEK:  It authorizes the reorganized debtor to

4   bring the adversary proceedings including this one.  And now

5   what they're doing is going prior -- going back prior to that

6   particular order, the confirmation order, and looking at an

7   order that predated it substantially and trying to attack that.

8   I think the Supreme Court decision of Espinosa is instructive

9   on this.  That's the case where there was a challenge by a

10  creditor to -- it was a Chapter 13 proceeding, who claimed that

11  the --

12         THE COURT:  But the difference is that the Espinosa

13  ruling was a ruling on the merits that the government could be

14  crammed-down, notwithstanding the Bankruptcy Code.  Here it

15  just preserves the cases subject to everything; right?

16         MR. SENDEK:  Well, Espinosa I think goes farther than

17  that.  It says that the creditor should have attacked much

18  sooner if they were going to complain about the process and the

19  procedure.

20         THE COURT:  But how was the ruling res judicata?  How

21  is that order res judicata on this point, on the 4(m) point?

22         MR. SENDEK:  Because the Court found that as part of

23  the plan, the reorganized debtors had a right to bring these

24  actions.  They're part of the plan.  They are -- and this is a

25  collateral attack on the plan and, of course, one of the cases

Page 109

1    we cited of In Re: Bencorp, that's a Delaware case, says that

2    an indirect attack like this on the plan is not permitted.  And

3    that's what this is.  And, of course, they did have notice,

4    Your Honor and yet they waited over three years to bring this

5    motion.

6              THE COURT:  But they say it doesn't matter.   They

7    already released the lien.

8              MR. SENDEK:  Well, they say that.  That's correct.

9    They say that but to have -- but still to have waited three and

10   a half years to have tried to undo that?

11             THE COURT:  How are the debtors hurt by that?

12             MR. SENDEK:  The debtors are hurt by that because it's

13   now three and a half years and if there was an opportunity for

14   the bank to reinstate its position, we don't know that --

15             THE COURT:  But how would Laneco have given them the

16   collateral back?

17             MR. SENDEK:  How would we have given the collateral

18   back?

19             THE COURT:  How would Laneco have given them the lien

20   back?  It seems pretty far-fetched to me.

21             MR. SENDEK:  Well, I don't know how the bank could --

22   I don't know how the debtor could give --

23             THE COURT:  No, how would -- they released the lien --

24             MR. SENDEK:  Right.

25             THE COURT:  -- on two assets that were going to be

Page 110

```
 1    sold imminently.

 2              MR. SENDEK:  Right.  Correct.

 3              THE COURT:  How can they get their lien back?

 4              MR. SENDEK:  Well, I don't know that standing here

 5    today, Your Honor.  And maybe --

 6              THE COURT:  But is there any conceivable way they

 7    would have?

 8              MR. SENDEK:  Well, there's a letter that I saw, had a

 9    representation made by Laneco of no known --

10              THE COURT:  No lawsuits had been brought.

11              MR. SENDEK:  No lawsuits were brought.

12              THE COURT:  You don't assert that Laneco had knowledge

13    of it, do you?

14              MR. SENDEK:  I'm sorry, Your Honor.

15              THE COURT:  Do you say that Laneco had knowledge of

16    the lawsuit?

17              MR. SENDEK:  I'm not making that statement, Your

18    Honor.

19              THE COURT:  So --

20              MR. SENDEK:  But --

21              THE COURT:  I mean that's why I asked them about this.

22    I mean if Laneco had misrepresented a fact to them, then they

23    probably could have gotten the lien back but I don't see --

24    given that it doesn't appear that they did, Laneco could say

25    look, you know, you released the lien.  I'm not going to give
```

1    it back to you.

2              MR. SENDEK:  I think the better question is, Your

3    Honor, why did the bank wait this long to bring this action

4    when it had notice, it had specific -- at the first extension,

5    at the first extension that -- I mean Wachovia was a subject of

6    discussion with the Court.

7              THE COURT:  Right.

8              MR. SENDEK:  And the Court directed the debtors'

9    counsel to give notice of presentment of the order and they

10   did.  And then from that point on, there was no objection and

11   there --

12             THE COURT:  What should I take away from that though?

13             MR. SENDEK:  Well I would quote counsel for Wells

14   Fargo who appeared earlier today when asked, when the Court

15   said that look, there was no objections filed by any of the

16   recipients of notice to any of the extension orders and I think

17   the Court said what should I take away from that and the answer

18   was, then they shouldn't object now.  I think that's what the

19   Court should take away from it.  They shouldn't object now.

20   Wells Fargo counsel says so and it's far too late now at this

21   point.

22             THE COURT:  Why?  If you haven't been prejudiced, why

23   is it too late?

24             MR. SENDEK:  Well again, we don't know all of the

25   circumstances and facts that dealt with particular release of

Page 112

1    this lien.  We know what the affidavit says but we don't know

2    more than what's on the face of that affidavit.  Of course we

3    haven't had an opportunity to do any discovery on that.  So

4    that is, of course, one issue out there.

5         And second, the debtor -- the reorganized debtor

6    entered into a plan of reorganization expecting funding from a

7    number of sources, one of them which is this particular action

8    which was part of the adversary proceedings which we're going

9    to fund the reorganized debtor.  And it understood and believed

10   and is part of the plan approved by the Court, that it would

11   have the right to bring these adversary proceedings.  Now that

12   is prejudice in my mind because that turned out, according to

13   the bank --

14        THE COURT:  But they're not --

15        MR. SENDEK:  -- not to be accurate.

16        THE COURT:  Okay.  And you say that since they were on

17   the exhibit, they should know that.

18        MR. SENDEK:  Since they were on the exhibit, since

19   they received notice of the confirmation hearing, sure, they

20   should have known that.  And they should have determined that

21   if they had a right to, if they wanted to object, that was

22   their time.  Otherwise, they would be foreclosed in the future.

23        THE COURT:  Of course, the last order was entered

24   after a plan confirmation.

25        MR. SENDEK:  That's correct but they're not attacking

DPH HOLDINGS CORP., ET AL.

Page 113

1    the fourth -- the final extension order.  That's -- by what --

2           THE COURT:  Why aren't they?  I mean, they are, aren't

3    they?

4           MR. SENDEK:  No, they're not.  The Court gave the

5    parties the opportunity to challenge notice of the fourth

6    extension order back in June.

7           THE COURT:  Separately.

8           MS. HAFFEY:  The June date.

9           MR. SENDEK:  Wachovia did not submit an affidavit on

10   that.  So they have filed this separate motion under 60(b)(4)

11   because it's the only avenue that they can come up with to

12   challenge it at this late date.  And the only way they can come

13   up with an avenue to -- because they know they got notice of

14   the final extension, the second extension, the first extension.

15   They know that.  They have one procedural angle that they're

16   playing and that is to use 60(b)(4), which should only be,

17   which should only be allowed to undo an order under exceptional

18   circumstances, exceptional circumstances, and they've not shown

19   that the order is void.  They're claiming that the order is

20   void.  That's the other point, too, Your Honor.  It's not just

21   a question of waiving preference -- I'm sorry -- prejudice,

22   which I think is premature on this record.  It's not just that.

23   To get where they want to go, the Court needs to make a finding

24   that that order that it entered was void and how does it void?

25   We go -- it was entered appropriately.  It was a 4(m) order

DPH HOLDINGS CORP., ET AL.

Page 114

1    entered by this Court, okay, ex parte, under seal, all

2    appropriate using the avenue of 4(m) and 9006 and the Court

3    determined that there was good cause for its entry.

4           Now, they tried to say well hey there wasn't.  It's a

5    void order.  Why?  Because -- and their only rationale is

6    because that order, that order they say, was only entered

7    because Delphi didn't want to upset its suppliers.  Well, of

8    course, there was far more to it than that.  And even if

9    that -- at that point, there was an understanding, a belief, a

10   hope that there would be full funding and that if the adversary

11   proceedings would not take place.  There was more to it than

12   that.

13          But the fact that one of the reasons, one of the

14   grounds arguably didn't apply to them because they say there

15   was no need not to upset up, arguably, we don't know what other

16   relationships there were --

17          THE COURT:  Let me interrupt you.  This is the

18   argument I think they're making, that the confirmation order

19   doesn't come into this because the Rule 4(m) order was entered

20   into before confirmation of the plan and they released their

21   lien before confirmation of the plan and so, therefore, the

22   damage was done at that point.

23          MR. SENDEK:  That is their argument but it doesn't

24   work because it all hinges on what?  On the order that this

25   Court entered into September 2007 being void.  If it's not

1    void, their argument fails right there.

2           THE COURT:  Well, let me -- Mr. Silverschotz, is this

3    just a Rule 60 motion?

4           MR. SILVERSCHOTZ:  It's filed under 60(b)(4) and

5    60(b)(6), Your Honor.

6           THE COURT:  All right.  So as a Rule 60 motion, I

7    don't think it works.  I mean it may work as a motion to get me

8    to reconsider the entry of my order as I've been talking about

9    with other defendants but I don't think it works as a Rule 60

10   motion.

11          MR. SILVERSCHOTZ:  Your Honor, in our prayer for

12   relief, we asked for such further and other relief as

13   appropriate and the factual predicates are as they are and to

14   the extent that Your Honor can give us effective relief by

15   simply reconsidering the orders, rather than revoking them,

16   that would be acceptable to Wachovia.

17          THE COURT:  All right.  I'd rather do that in the

18   context of what we're setting up with everyone else.  I don't

19   think it works as a Rule 60 motion.  It's an interlocutory

20   order and there's been a lot of time that has passed since

21   then.  Arguably, you all should have known about this in March

22   of 2008.  You could have made the motion then.  So I think it's

23   more appropriate to deal with in the context of the other

24   thirty-five objectors.

25          MR. SILVERSCHOTZ:  Thirty-six or thirty-seven.

1        THE COURT:  And I think that frankly, the debtor is

2   entitled to probe the affidavit as to checking the docket and

3   knowledge, and also what discussions, if any, there were with

4   Laneco.

5        MR. SILVERSCHOTZ:  So going back to the point I made

6   earlier this morning, Your Honor, when my question was --

7        THE COURT:  Yes.

8        MR. SILVERSCHOTZ:  -- whether the issues that we

9   raised in this motion with respect to individualized prejudice,

10  the Court would rather --

11       THE COURT:  Right.

12       MR. SILVERSCHOTZ:  -- consider in the context of the

13  Rule 15 application --

14       THE COURT:  Yes.

15       MR. SILVERSCHOTZ:  -- having heard the parties --

16       THE COURT:  Having heard enough, I think it should be.

17       MR. SILVERSCHOTZ:  Okay.

18       THE COURT:  I agree with you that releasing a lien is

19  a textbook example of prejudice and if, in fact, your clients

20  checked the docket and legitimately didn't focus on the

21  disclosure statement, they may well win on that but it's not in

22  the context of a Rule 60 motion and plus which I think that

23  that issue needs to be developed some.

24       MR. SILVERSCHOTZ:  That's fine, Your Honor.  As I am

25  sure all the other defendants will do, I'm happy to work with

Page 117

1    counsel on an appropriate discovery schedule.  We brought this

2    motion, Your Honor, the way we did --

3            THE COURT:  I don't fault you for that.

4            MR. SILVERSCHOTZ:  Thank you, Your Honor.  The context

5    was somewhat bizarre and we just thought it was a good way to

6    present it to Your Honor.  And at some other point, Your Honor

7    and I perhaps we can discuss whether or not there really is a

8    final order or it is an interlocutory order which I think is --

9    it's an interesting issue but for now we'll proceed as Your

10   Honor has directed us.

11           THE COURT:  Okay.  I mean I think ultimately you are

12   better off with it being an interlocutory order.

13           MR. SILVERSCHOTZ:  I think so too, Your Honor.  I

14   think so too.  Your Honor, do you want us to work an order back

15   and forth?  Is it denied with prejudice?

16           THE COURT:  It's denied as to the Rule 60 point.  It's

17   without prejudice to request to have me reconsider the -- under

18   Rule 6, the 4(m) order.

19           MR. SILVERSCHOTZ:  That's fine.  We'll do that, Your

20   Honor, and thank you very much for your time.

21           THE COURT:  Okay.  Thank you.

22           MR. SENDEK:  Thank you, Judge.

23           THE COURT:  Okay.  Thanks.

24      (Whereupon these proceedings were concluded at 1:25 PM)

25

1

2                              **I N D E X**

3

4                              RULINGS

5                                                          Page      Line

6    STMicroelectronics' proof of administrative      14        6

7    expense claim number 18969 disallowed

8    Reorganized Debtors' Third Case Closing          20        11

9    Motion

10   Debtors' motion to file their motion to          38        14

11   supplement the record on the notice issue in

12   connection with the Rule 15 motion granted

13   Rule 60 motion denied without prejudice          117       16

14

15

16

17

18

19

20

21

22

23

24

25

Page 119

1

2                    C E R T I F I C A T I O N

3

4    I, Dena Page, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7    Dena Page    Digitally signed by Dena Page
                  DN: cn=Dena Page, c=US
                  Date: 2011.10.26 16:26:13
8    _____  -04'00'

9    DENA PAGE

10

11   Also transcribed by:  LINDA FERRARA

12

13   Veritext

14   200 Old Country Road

15   Suite 580

16   Mineola, NY 11501

17

18   Date:  October 26, 2011

19

20

21

22

23

24

25