# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| IN RE: | : |
| | :    Chapter 11 |
| DPH HOLDINGS CORP., et al., | : |
| | :    Case No. 05-44481 (RDD) |
|             Reorganized Debtors. | :    (Jointly Administered) |

_____ :

|  |  |
|---|---|
| CAI DISTRESSED DEBT OPPORTUNITY | :    **COMPLAINT FOR** |
| MASTER FUND LTD.; D-STAR LTD.; | :    **DECLARATORY RELIEF,** |
| ANCHORAGE CAPITAL GROUP, LLC; CSS, | :    **BREACH OF CONTRACT,** |
| LLC; DP AUTO HOLDINGS, LP, EACH ON | :    **BREACH OF THE IMPLIED** |
| BEHALF OF ITSELF AND ON BEHALF OF | :    **COVENANT OF GOOD FAITH** |
| PENSION BENEFIT GUARANTY | :    **AND FAIR DEALING, AND CIVIL** |
| CORPORATION AS HOLDER OF RECORD; | :    **CONTEMPT** |
| MUDRICK CAPITAL MANAGEMENT LP; AND | : |
| ARMORY MASTER FUND LTD. | : |
| | : |
| | : |
|             Plaintiffs, | : |
| | :    Adversary No. _____ |
|      vs. | : |
| | : |
| DELPHI AUTOMOTIVE PLC; DIP HOLDCO 3, | : |
| LLC; AND DIP HOLDCO LLP DBA DELPHI | : |
| AUTOMOTIVE LLP | : |
| | : |
|             Defendants. | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiffs CAI Distressed Debt Opportunity Master Fund Ltd.; D-STAR Ltd.; Anchorage

Capital Group, LLC; CSS, LLC; DP Auto Holdings LP, each on Behalf of Itself and on Behalf of

Pension Benefit Guaranty Corporation ("PBGC") as a Holder of Record; Mudrick Capital Management, LP; and Armory Master Fund Ltd. (collectively, "Plaintiffs"), in their capacity as holders of general unsecured claims of the Debtors (as defined below), file this Complaint against defendants Delphi Automotive PLC, DIP Holdco 3, LLC, and DIP Holdco LLP dba Delphi Automotive LLP (collectively, "Defendants") pursuant to 11 U.S.C. §§ 105(a), 1141(a), and 1142, 28 U.S.C. § 2201 and Rules 7001(1) and 7001(9) of the Federal Rules of Bankruptcy Procedure. In support of their Complaint, Plaintiffs allege as follows:

## I. NATURE OF THIS ACTION

1.    This action arises in and from the chapter 11 cases filed with this Court in October 2005 by the former Delphi Corporation and certain of its United States subsidiaries (collectively, the "Debtors").

2.    Pursuant to the Modified Plan of Reorganization confirmed in July 2009, the holders of general unsecured claims against the Debtors are entitled to receive a portion of distributions over a threshold level of $7.2 billion made by defendant Delphi Automotive LLP to its members, with general unsecured creditors having the right to receive up to a total of $300 million.

3.    Defendants' actions as described below have subverted and deprived the Debtors' general unsecured creditors of their entitlement to distributions. Specifically, although transactions associated with the recent initial public offering of defendant Delphi Automotive PLC now have caused the total amount of applicable distributions to Delphi Automotive LLP members to exceed $7.2 billion, no distributions have been made to unsecured creditors. Plaintiffs, as general unsecured creditors of the Debtors, file this action to enforce their rights to receive distributions under the Modified Plan and related documents.

## II.  THE PARTIES

4.      Plaintiff CAI Distressed Debt Opportunity Master Fund Ltd., on behalf of itself and on behalf of PBGC as a holder of record, is a Cayman Islands limited company with its principal place of business in New York, New York.  It either directly or beneficially holds general unsecured claims of the Debtors.

5.      Plaintiff D-Star Ltd., on behalf of itself and on behalf of PBGC as a holder of record, is a Cayman Islands limited company with its principal place of business in New York, New York.  It either directly or beneficially holds general unsecured claims of the Debtors.

6.      Plaintiff Anchorage Capital Group, L.L.C., on behalf of itself and on behalf of PBGC as a holder of record, is a Delaware limited liability company with its principal place of business in New York, New York.  It manages entities that either directly or beneficially hold the general unsecured claims of the Debtors.

7.      Plaintiff CSS, LLC, on behalf of itself and on behalf of PBGC as a holder of record, is an Illinois limited liability company with its principal place of business in Chicago, Illinois.  It either directly or beneficially holds the general unsecured claims of the Debtors.

8.      Plaintiff DP Auto Holdings, L.P., on behalf of itself and on behalf of PBGC as a holder of record, is a limited partnership duly organized and existing under the laws of the State of Delaware, with its principal place of business in Los Angeles, California.  It either directly or beneficially holds general unsecured claims of the Debtors.

9.      Plaintiff Mudrick Capital Management, L.P. is a limited partnership duly organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  It manages entities that either directly or beneficially hold the general unsecured claims of the Debtors.

10.    Plaintiff Armory Master Fund Ltd. is a Cayman Islands limited company, with its principal place of in New York, New York and San Rafael, California.  It either directly or indirectly holds general unsecured claims of the Debtors.

11.    Pension Benefit Guaranty Corporation ("PBGC") is a federal government corporation and agency with its headquarters in Washington, D.C.  It is a holder of record of certain unsecured claims of the Debtors that it subsequently conveyed and assigned, including all rights, title and interest in such claims.  Certain of the plaintiffs bring this suit on their own behalf and on behalf of PBGC in PBGC's capacity as a holder of record of such unsecured claims.  PBGC has been named solely as a nominal plaintiff here because, on information and belief, the Debtors have refused PBGC's requests that PBGC be removed as a holder of record and that PBGC's assignee be added as the holder of record instead.

12.    On information and belief, defendant DIP Holdco 3, LLC ("DIP Holdco 3") is a limited liability company formed under the laws of Delaware with its principal place of business in Troy, Michigan.  On information and belief, DIP Holdco 3 was formed for the purpose of acquiring certain assets of the Debtors.

13.    Defendant DIP Holdco LLP dba Delphi Automotive LLP ("DAL") is a limited liability partnership incorporated under the laws of England and Wales with its principal place of business in Troy, Michigan.  DAL is the successor-in-interest to defendant DIP Holdco 3.

14.    Defendant Delphi Automotive PLC ("DAP") is a public limited liability registered in Jersey, Channel Islands.  On information and belief, DAP was formed as a shell company, with nominal assets, no liabilities and no operations, for the purpose of acquiring the membership interests in DAL in connection with the initial public offering described below, pursuant to which DAP recently took control of the businesses previously operated by DAL.

4

### III.  JURISDICTION AND VENUE

15.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 157(b) and 1334(b) and Article XIII(c) the "First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (As Modified)" (the "Modified Plan").

16.     In particular, this is an action to enforce, and for damages in breach of obligations under, the Modified Plan, specifically the provisions of the Modified Plan governing "General Unsecured MDA Distributions."  Article XIII(c) of the Modified Plan provides that this Court shall have exclusive jurisdiction over all matters related to the Modified Plan, specifically including "any and all disputes arising from or relating to the distribution or retention of the General Unsecured MDA Distributions, or other consideration under this Plan."

17.     Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

18.     This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (L), and (O).

### IV.  FACTUAL BACKGROUND

**A.     The Debtors' Bankruptcy Filing, Proposal To Pay General Unsecured Creditors In Full, And Ultimate Compromise With Unsecured Constituents.**

19.     On or about October 8 and 14, 2005, the former Delphi Corporation ("Old Delphi") and the other Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code with this Court.  The chapter 11 proceedings are now jointly administered under Case No. 05-44481 (RDD).

20.     In 2007, the Debtors filed their proposed "First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates" (the "Original Plan"), which provided for holders of general unsecured claims – estimated to total more than $3.2 billion – to be paid in full with all accrued interest.

5

21.    On January 25, 2008, the Court entered an order confirming the Original Plan. However, because the Debtors were unable to close the exit financing needed to finance certain distributions to be made under the Original Plan, the Debtors never consummated the Original Plan.

22.    Instead, on June 1, 2009, the Debtors proposed modifications to the Original Plan providing, among other things, that distributions to general unsecured creditors would be dramatically reduced, if not eliminated.  Specifically, the proposed modifications would have entitled unsecured creditors to receive just 3% of distributions made by the acquiror of the Debtors' assets to its members in excess of $7.2 billion, up to an aggregate maximum distribution to unsecured creditors of just $180 million – a far cry from the payment in full proposed by the Debtors in the Original Plan.

23.    After numerous unsecured creditors and constituents – including the Official Committee of Unsecured Creditors – objected to the Debtors' proposed modifications, a compromise was reached on the eve of the confirmation hearing.  That compromise – which is described more fully below – substantially increased recoveries on unsecured claims, providing for unsecured creditors to receive distributions made by the acquiror of the Debtors' assets to its members in excess of $7.2 billion, up to an aggregate maximum distribution of *$300* million (instead of $180 million).

24.    The compromise was embodied in the Modified Plan and ultimately was approved as part of this Court's order approving the Modified Plan, entered on or about July 30, 2009 (the "Confirmation Order") [Dkt. #18707].

25.     On information and belief, the Modified Plan became effective and was substantially consummated on or about October 6, 2009, with the Debtors emerging from chapter 11 as DPH Holdings Corp. and its subsidiaries and affiliates (collectively, "DPHH").

**B.     Obligations Under the Modified Plan of Defendants DIP Holdco 3 and DIP Holdco LLP dba Delphi Automotive LLP To Make Distributions On Behalf Of General Unsecured Creditors.**

26.     On information and belief, certain of the debtor-in-possession lenders to the Debtors formed defendant DIP Holdco 3 for the purpose of acquiring Old Delphi assets via a credit bid to be consummated pursuant to the Modified Plan.

27.     The Modified Plan incorporates by reference a Master Disposition Agreement dated as of July 26, 2009 (the "MDA"), a true and correct copy of which is attached as Exhibit A.   The parties to the MDA include Old Delphi, DIP Holdco 3 and General Motors Company ("GM").   The MDA provides, among other things, for Old Delphi to transfer to DIP Holdco 3 substantially all of the Old Delphi's businesses and assets in accordance with the Modified Plan.

28.     Defendant DIP Holdco LLP is the successor-in-interest to DIP Holdco 3.   DIP Holdco 3 assigned to defendant DIP Holdco LLP all of its rights and obligations under the MDA to acquire the assets and subsidiaries of Old Delphi.   On or about October 8, 2009, DIP Holdco LLP changed its name to "Delphi Automotive LLP."

29.     Section 5.3 of the Modified Plan provides for holders of general unsecured claims against the Debtors – including Plaintiffs – to receive their "Pro Rata share of the proceeds of the General Unsecured MDA Distribution."   Modified Plan § 5.3.   The General Unsecured MDA Distribution is defined as follows:

> **1.102 "General Unsecured MDA Distribution"** means, if and to the extent Company Buyer makes distributions to its members in accordance with the Company Buyer Operating Agreement, as described in section 3.2.3 of Master Disposition Agreement, in excess of $7.2 billion, an amount equal to $32.50 for every $67.50

7

so distributed in excess of $7.2 billion; provided, however, that in
no event shall the General Unsecured MDA Distribution exceed
$300,000,000 in the aggregate.

Id. § 1.102.  "Company Buyer" is defined as defendant DIP Holdco 3, "as assignee[] of the rights

of the DIP Agent to the Company Acquired Assets in connection with the Credit Bid," id. at

§1.36, and includes its successor-in-interest, defendant DAL.

30.    Section 3.2.3 of the MDA expressly obligates the defendants to make the

payments required under the Modified Plan:

> To the extent payable following the Closing, the Company Buyer
> shall pay to a disbursement agent such amounts payable to the
> unsecured creditors of Delphi and the Filing Affiliates pursuant to
> the Plan of Reorganization as filed on the date of execution of this
> Agreement (without modification as to the consideration to be paid
> under this Section 3.2.3 unless consented to by Company Buyer)
> and the form of Company Buyer operating agreement included as
> an exhibit to the Securities Purchase Agreement as in effect as of
> the date hereof (regardless of whether such agreement is
> subsequently amended), for distribution to such unsecured
> creditors on behalf of Delphi and the Filing Affiliates, subject to
> the terms, conditions and limits as set forth in the Plan of
> Reorganization and such operating agreement, which payment to
> such disbursement agent shall be made only if the transactions
> contemplated hereby are consummated pursuant to a Plan of
> Reorganization and which payment shall not exceed $300,000,000
> in the aggregate.

MDA § 3.2.3.  As in the Modified Plan, "Company Buyer" is defined as defendant DIP

Holdco 3, and includes its successor-in-interest, defendant DAL.  See MDA at Recitals.

**C.    Organizational Documents Confirm Defendants' Obligations To Make Distributions
On Behalf Of General Unsecured Creditors.**

31.    As detailed above, the obligation to make distributions to the holders of general

unsecured claims under the Modified Plan and the MDA is triggered if defendant DIP Holdco 3

or its successor entity DAL "makes distributions to its members in accordance with the Company

Buyer Operating Agreement, as described in Section 3.2.3 of the Master Disposition Agreement,

in excess of $7.2 billion." Modified Plan § 1.102.

32.    On information and belief, the Operating Agreement specified in Section 1.102 of

the Modified Plan has not been publicly filed with the Court or the Securities and Exchange

Commission.   Nonetheless, the provisions of that agreement relevant to this lawsuit are readily

apparent through review of related documents.

33.    First, the Confirmation Order provides that:

> neither prior to or after the Effective Date shall any provision in
> the [MDA] or [Operating Agreement] regarding distributions  to
> holders of general unsecured claims of the Debtors be amended,
> modified, or waived to reduce, eliminate, or otherwise affect such
> distributions.

See Confirmation Order ¶ 64(g).

34.    Second, upon the emergence of Old Delphi from chapter 11, DIP Holdco 3's

members entered into an Amended and Restated Limited Liability Partnership Agreement of DIP

Holdco LLC dated October 6, 2009 (the "LLP Agreement"), true and correct excerpts of which

are attached as Exhibit B.   By the LLP Agreement, the parties "intended that the existing

membership arrangements in relation to DIP Holdco 3 be replicated in relation to [DAL] and that

the rights of DIP Holdco 3 pursuant to the Asset Purchase [from the Debtors] be assigned to

[DAL]." LLP Agreement at Recital G.

35.    On information and belief, all provisions of the Operating Agreement relating to

or affecting distributions to holders of general unsecured claims of the Debtors were replicated

faithfully in the LLP Agreement in accordance with the requirements of the Confirmation Order.

36.    Among other things, the LLP Agreement expressly acknowledges DAL's

obligation under the Modified Plan and the MDA to make payments to the holders of general

unsecured claims of the Debtors:

9

> **Section 5.6.   Payments Pursuant to the Master Disposition Agreement.**  In accordance with Section 3.2.3 of the MDA, if the Asset Purchase is consummated pursuant to the Plan of Reorganization, once an aggregate of $7,200,000,000 has been paid as Distributions to the Holders pursuant to this Agreement, the LLP shall pay an amount equal to $32.5 to a disbursement agent on behalf of the unsecured creditors of Old Delphi for every $67.5 in excess of such $7,200,000,000 that is distributed to the Holders pursuant to Section 5.1(a)(iv), up to a maximum amount of $300,000,000.

LLP Agreement § 5.6.  The LLP Agreement defines "Holders" as those holding membership interests in DAL and "Distribution" as "each distribution after the Effective Date made by the LLP to a Member, whether in cash, property or securities of the LLP, pursuant to, or in respect of, Article V or Article X."  LLP Agreement § 1.1.  Article V of the LLP Agreement pertains to distributions of available cash, and Article X pertains to distributions in the event of dissolution and incorporates the distribution provisions of Article V.  See LLP Agreement at 30-34 and 58-59.

37.     The LLP Agreement was later succeeded by a second, third, and ultimately fourth amended and restated agreement, certain provisions of which are summarized below.

**D.     Prior To The IPO, DAL Made At Least $4.668 Billion In Distributions To Its Members.**

38.     As part of the Delphi restructuring, DIP Holdco 3 issued membership interests to a group of investors, to GM, and to PBGC.

39.     On or about March 31, 2011, DAL (successor to DIP Holdco 3) redeemed all of the 1,750,000 class A membership interests owned by GM and all of the 100,000 class C membership interests owned by the PBGC for $3.8 billion and $594 million, respectively.

40.     In October 2011, DAL announced that it had repurchased 10,005 class B membership interest units at a cumulative cost of approximately $179 million.  DAL also

10

approved the payment of a distribution of approximately $95 million on December 5, 2011 to members who hold membership interests as of the close of business on October 31, 2011.

41.    DAL's redemptions of various membership interests and approval of the $95 million distribution constitute "distribution[s] to its members" under the Modified Plan, the MDA, and the Operating Agreement.  The distributions detailed above total $4.668 billion and thereby reduced the $7.2 billion triggering threshold for General Unsecured MDA Distribution to $2.532 billion.  There may be additional qualifying distributions of which Plaintiffs are unaware.

**E.    The Formation of DAP, the Further Amendment of the LLP Agreement, and the Preparation for an IPO.**

42.    On or about May 19, 2011, Delphi Automotive PLC, a Jersey, Channel Islands public limited liability company (defined above as "DAP"), was formed.

43.    On information and belief, DAL directed and/or caused the formation of DAP and DAP was entirely controlled by DAL prior to the pre-IPO exchange as detailed below.

44.    On information and belief, upon its formation DAP was a shell with nominal assets, no liabilities, no operations, no management team, and no employees.

45.    On information and belief, upon formation DAP's only directors were Kevin Clark (the Chief Financial Officer of DAL) and David Sherbin (Vice President, General Counsel, and Secretary of DAL) and DAL's Board of Managers were expected to be on DAP's Board of Directors.

46.    DAP's only shareholders upon its formation were two companies:  Carey Olsen Nominees Jersey Limited and Carey Olsen Corporate Services Jersey Limited, each holding one share of DAP.  On information and belief, each of Carey Olsen firms is an affiliate of Carey Olsen, DAL's Channel Islands legal counsel.  The Carey Olsen firms held no position on the

DAP Board of Directors and, on information and belief, were simply incorporators acting for the benefit of, and on behalf of, DAL.

47.     On or about May 25, 2011, DAP filed a preliminary prospectus in connection with a proposed initial public offering of common shares of DAP (the "IPO") indicating that DAP would acquire all membership interests of DAL immediately prior to the IPO.

48.     On July 12, 2011, as part of the preparations for the IPO, DAL amended the LLP Agreement through the Fourth Amended and Restated Limited Liability Partnership Agreement of Delphi Automotive LLP (the "Fourth LLP Agreement"),  a true and correct copy of which is attached as Exhibit C.

49.     Under the Fourth LLP Agreement, the definition of "Distribution" is identical to prior versions, providing that "Distribution" means "each distribution after the Initial Effective Date made by the LLP to a Member, whether in cash, property or securities of the LLP, pursuant to, or in respect of, Article V or Article X."  Fourth LLP Agreement § 1.1.  Similarly, as with its predecessor agreements, the Fourth LLP Agreement confirms that "[i]n accordance with Section 3.2.3 of the MDA, if the Asset Purchase is consummated pursuant to the Plan of Reorganization, once an aggregate of $7,200,000,000 has been paid as Distributions to the Holders pursuant to this Agreement, the LLP shall pay an amount equal to $32.5 to a disbursement agent on behalf of the unsecured creditors of Old Delphi for every $67.5 in excess of such $7,200,000,000 that is distributed to the Holders pursuant to Section 5.1(a)(ii), up to a maximum amount of $300,000,000."  Fourth LLP Agreement § 5.6.  As with prior versions, Article X of the Fourth LLP Agreement incorporates the distribution provisions of Article V.

50.     Notwithstanding its acknowledged obligations to general unsecured creditors under the Modified Plan, however, DAL added a new provision – Section 10.2(d) – not found in

prior versions of the LLP Agreement. This provision apparently purports to exempt IPO-related distributions from the definition of "Distributions" by providing that "distributions and other payments made in connection with an Initial Public Offering shall be governed by Section 14.13 rather than this Section 10.2." Fourth LLP Agreement § 10.2(d). Pursuant to Paragraph 64(g) of the Confirmation Order (quoted above), this provision is void to the extent it purports to amend, modify, or conflict with Defendants' obligation under the Modified Plan to make the General Unsecured MDA Distribution to unsecured creditors of the Debtors, including Plaintiffs.

**F.      DAL And DAP Consummate The IPO And Become Obligated To Make A General Unsecured MDA Distribution.**

51.      On or about November 16, 2011, DAP filed a final prospectus with respect to the IPO (the "Form S-1"). The Form S-1 available at: http://services.corporate-ir.net/ SEC.Enhanced/SecCapsule.aspx?c=245477&fid=7860793, accessed December 15, 2011. On or about November 16, 2011, DAP commenced its IPO, thereby allowing certain selling shareholders identified in the Form S-1 to sell 27,690,651 shares for $22 a share.

52.      The Form S-1 confirms DAL's obligations to general unsecured creditors of the Debtors: "if cumulative distributions to the members of Delphi Automotive LLP under certain provisions of our limited liability partnership agreement exceed $7.2 billion, we, as disbursing agent on behalf of DPHH, are required to pay to the holders of allowed general unsecured claims against [the Debtors] . . . up to a maximum of $300 million." Form S-1 at 54.

53.      According to the Form S-1, immediately prior to the IPO, DAP acquired "all of the outstanding units of [DAL] from its existing unit holders in exchange for common shares and, as a result, [DAL became] a wholly-owned subsidiary of [DAP]." Form S-1 at 10.

54.      The distribution of DAP stock to DAL members in exchange for those members' DAL interests constitutes a "distribution" within the meaning of the Modified Plan, the MDA

13

and the Operating Agreement because it qualifies as a distribution of "cash, property or securities

of [DAL]."

55.    In fact, Section 14.13(b) of the Fourth LLP Agreement specifically provides that

distributions made in connection with the IPO are the equivalent of the distributions that would

be made upon the liquidation of DAL pursuant to Article X of the Fourth LLP Agreement:

> [T]he Members shall be entitled to receive common equity
> securities of the Issuer (of the same class and series, if applicable,
> as the common equity securities issued to the public in the Initial
> Public Offering) as follows**:** . . . to the Class B Holders, such
> number of common equity securities equal in aggregate value
> (based on the IPO Offering Price) to the amount of Distributions
> set forth in Section 5.1(a)(i) (but using the Plan Dilution
> Percentage for the Management Withholding Percentage) ***that
> would be made in connection with a liquidation of the LLP under
> Section 10.2 at the time of the Initial Public Offering*** to the extent
> Distributions were not previously paid under such Section
> 5.1(a)(i).

Fourth LLP Agreement § 14.13(b) (emphasis added).

56.    Immediately prior to the IPO, DAP had 328,244,330 million shares outstanding,

which shares were exchanged for DAL partnership units such that the members of the

partnership received distributions of DAP common stock.  Form S-1 at 12.  Based on the IPO

price of $22 per share, the value of the common stock received by the members of DAL totaled

approximately $7.22 billion.

57.    In conjunction with the previous distributions of at least $4.668 billion, the total

distributions to members of DAL now amount to at least $11.88 billion, which is at least $4.68

billion in excess of $7.2 billion threshold that triggers the obligation to make the General

Unsecured MDA Distribution.

14

58.     As detailed above, the holders of general unsecured claims are entitled to $32.50 for every $67.50 of the approximately $4.6 billion distributed in excess of the $7.2 billion threshold, subject to the $300 million cap.

59.     Based on the amount DAL has made distributions in excess of the $7.2 billion threshold, the holders of general unsecured claims are immediately entitled to the entire $300 million.

60.     Notwithstanding the foregoing, DAL and DAP have denied any obligation to make the General Unsecured MDA Distribution to creditors of the Debtors.  The Final S-1 states without explanation that the "contingency" of member distributions exceeding $7.2 billion "is not considered probable of occurring."  Form S-1 at F-61 and F-101.

### COUNT ONE – DECLARATORY JUDGMENT
### (Against all Defendants Pursuant to 28 U.S.C. 2201 and
### Fed. R. Bankr. P. 7001(9) and 7001(1))

61.     Plaintiffs incorporate by reference paragraphs 1 through 60, as though fully alleged herein.

62.     Pursuant to 28 U.S.C. § 2201, an actual controversy exists with respect to Defendants' obligations to make the General Unsecured MDA Distribution in light of the recent transactions of DAL and DAP as described above.  In particular, the Modified Plan, the Plan Modification Order, the MDA and the Operating Agreement require payment of the General Unsecured MDA Distribution when distributions to DAL members exceed an aggregate $7.2 billion.

63.     In light of prior distributions to DAL members, in forming DAP and distributing interests in DAP to DAL members in connection with the transactions yet failing to make any General Unsecured MDA Distribution, Defendants violated the Modified Plan, the Confirmation

15

Order, the MDA, the Operating Agreement, and sections 1141(a) and 1142(a) of the Bankruptcy

Code.

64.     As a result of the foregoing, Plaintiffs seek a declaratory judgment pursuant to 28

U.S.C. § 2201 that:

(a)     DAL's redemptions of various membership interests and
        approval of the $95 million distribution on December 5,
        2011 constitute "distribution[s] to its members" of at least
        $4.668 billion under the Modified Plan, the MDA, and the
        Operating Agreement, thereby reducing the $7.2 billion
        triggering threshold for the General Unsecured MDA
        Distribution to $2.532 billion;

(b)     Transactions in which all of the outstanding units of DAL
        held by its then-existing unit holders were exchanged for
        common shares of DAP constituted a "distribution" of DAP
        common shares to members of DAL in accordance with the
        Operating Agreement, as described in Section 3.2.3 of the
        MDA, and thus the amount of this distribution should be
        applied towards the $7.2 billion threshold to trigger a
        General Unsecured MDA Distribution under the Modified
        Plan, the MDA and the Operating Agreement;

(c)     The distribution of DAP common stock to members of
        DAL constituted a distribution of an amount equal to or
        more than $7,221,375,260, which in conjunction with
        DAL's previous distributions of at least $4.668 billion,
        resulted in aggregate distributions to the members of DAL
        in an amount equal to or more than $11,889,375,260;

(d)     The holders of the general unsecured claims of the Debtors
        are entitled to an amount equal to $32.50 for every $67.50
        distributed by DAL in excess of $7.2 billion, and are thus
        entitled to $300,000,000 utilizing the formula [32.5% *
        ($11,889,375,260 – 7,200,000,000)], plus interest at the
        maximum allowable rate;

(e)     By failing to treat the transactions described herein as a
        distribution to the members of DAL under the Modified
        Plan, the MDA and the Operating Agreement, and failing
        to make any associated General Unsecured MDA
        Distribution, Defendants breached the Modified Plan, the
        Confirmation Order, the MDA, and the Operating
        Agreement; and

16

(f)     Plaintiffs are entitled to recover their attorney fees, costs and expenses, as well as such other and further relief as the Court may deem just and proper.

## COUNT TWO – BREACH OF CONTRACT

### (Against all Defendants For Breach of the Modified Plan)

65.     Plaintiffs incorporate by reference paragraphs 1 through 64, as though fully alleged herein.

66.     The Modified Plan, as confirmed by the Confirmation Order, constitutes a contract among the Debtors, their creditors and other parties in interest, including the Defendants and the holders of general unsecured claims and their assignees.

67.     Defendants' transactions in which all of the outstanding units of DAL held by its then-existing unit holders were exchanged for common shares of DAP constituted a "distribution" to members of DAL in accordance with the Company Buyer Operating Agreement, as described in section 3.2.3 of Master Disposition Agreement, and thus the amount of such distribution should have been applied towards the $7.2 billion threshold to trigger a General Unsecured MDA Distribution under the Modified Plan, the MDA and the Operating Agreement.

68.     The distribution of DAP common stock to members of DAL constituted a distribution of such an amount that, in conjunction with DAL's prior distributions of at least $4.668 billion, resulted in aggregate distributions to the members of DAL of more than $7.2 billion.

69.     In breach of the Modified Plan, Defendants failed to make any General Unsecured MDA Distribution for the benefit of the holders of general unsecured claims of the Debtors.

70.     Plaintiffs have performed any obligations that they were required to perform under the Modified Plan.

17

71.    As a direct and proximate result of Defendants' breach of the Modified Plan, Plaintiffs have sustained damages in an amount to be proven at trial, and are further entitled to recover interest on their damages at the maximum allowable rate, as well as their attorney fees, costs and expenses incurred in this action.

## COUNT THREE – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (In the Alternative to Count Two Against All Defendants)

72.    Plaintiffs incorporate by reference paragraphs 1 through 64, as though fully alleged herein.

73.    The Modified Plan, as confirmed by the Confirmation Order, constitutes a contract among the Debtors, their creditors and other parties in interest, including the Defendants and the holders of general unsecured claims and their assignees.

74.    Under New York law, all contracts contain an implied covenant of good faith and fair dealing in the course of performance.

75.    A party breaches the implied covenant of good faith and fair dealing, even if it is not in breach of its express contractual obligations, when it exercises a contractual right as part of a scheme to realize gains that the contract implicitly denied or to deprive the other party of the fruits of its bargain.

76.    As alleged above, Defendants engaged in various activities alleged above for the purpose of avoiding the payment of General Unsecured MDA Distribution which otherwise would have been due.

77.    As a result, Defendants frustrated the rights of the holders of general unsecured claims of the Debtors in violation of the implied covenant of good faith and fair dealing in the Modified Plan.

18

78.     Defendants interfered with Plaintiffs' rights under Modified Plan, violated the underlying purpose of the heavily-negotiated provisions regarding the General Unsecured MDA Distribution, and unfairly deprived the holders of general unsecured claims of the Debtors of the right to receive distributions under such clause.

79.     As a direct and proximate result of Defendants' breach of the implied covenant, Plaintiffs have sustained damages in an amount to be proven at trial, and are further entitled to recover interest on their damages at the maximum allowable rate, as well as their attorney fees, costs and expenses incurred in this action.

## COUNT FOUR – CIVIL CONTEMPT

### (Against All Defendants Pursuant to 11 U.S.C. § 105(a))

80.     Plaintiffs incorporate by reference paragraphs 1 through 79, as though fully alleged herein.

81.     The court may issue any order, process, or judgment, including a civil contempt order, necessary or appropriate to carry out the provisions of the Bankruptcy Code.  11 U.S.C. §105(a).

82.     Pursuant to the Modified Plan, Defendants are required to make the General Unsecured MDA Distribution as described above.

83.     Moreover, the Confirmation Order provides that "neither prior to or after the Effective Date shall any provision in the [MDA] or [Operating Agreement] regarding distributions  to holders of general unsecured claims of the Debtors be amended, modified, or waived to reduce, eliminate, or otherwise affect such distributions."  *See* Confirmation Order at 87.

84.     Pursuant to section 1141(a) of the Bankruptcy Code, "the provisions of a confirmed plan bind the debtor, . . . and any creditor, . . . whether or not the claim or interest of such creditor, . . . is impaired under the plan and whether or not such creditor, . . . has accepted the plan." 11 U.S.C. § 1141(a).

85.     Pursuant to section 1142(a) of the Bankruptcy Code, "[n]otwithstanding any otherwise applicable non-bankruptcy law . . . the debtor or any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court."

86.     Pursuant to section 1142(b) of the Bankruptcy Code, "[t]he Court may direct the debtor and any other necessary party to . . . perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan."

87.     Section 14.1 of the Modified Plan provides that it will be binding upon all parties, including, "the Debtors, the Reorganized Debtors, all current and former holders of Claims, all current and former holders of Interests, and all other parties-in-interest and their respective heirs, successors, and assigns."  Modified Plan § 14.1.

88.     Defendants are parties to and/or bound by the Modified Plan as well as the Confirmation Order.

89.     Defendants' actions as alleged above frustrated the rights of the holders of general unsecured claims of the Debtors in violation of the Modified Plan and the Confirmation Order.

90.     As a result, Defendants are in civil contempt of this Court's orders and are entitled to money damages in an amount to be determined at trial, as well as interest in the maximum allowable rate and their attorney fees, costs and expenses incurred in this action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.     As to the First Count, for a declaratory judgment as follows:

    (a)     DAL's redemptions of various membership interests and approval of the $95 million distribution on December 5, 2011 constitute "distribution[s] to its members" of at least $4.668 billion under the Modified Plan, the MDA, and the Operating Agreement, thereby reducing the $7.2 billion triggering threshold for the General Unsecured MDA Distribution to $2.532 billion;

    (b)     That Defendants' pre-IPO transactions, in which all of the outstanding units of DAL held by its then-existing unit holders were exchanged for common shares of DAP, constituted a "distribution" to members of DAL of DAP common shares in accordance with the Operating Agreement, as described in Section 3.2.3 of the MDA, and thus the amount of this distribution should be applied towards the $7.2 billion threshold to trigger a General Unsecured MDA Distribution under the Modified Plan, the MDA and the Operating Agreement;

    (c)     That the pre-IPO distribution of DAP common stock to members of DAL constituted a distribution of an amount equal to or more than $7,221,375,260, which in conjunction with DAL's previous distributions of at least $4.668 billion, resulted in aggregate distributions to the members of DAL in an amount equal to or more than $11,889,375,260;

    (d)     That the holders of the general unsecured claims of the Debtors are entitled to an amount equal to $32.50 for every $67.50 distributed in excess of $7.2 billion, and are thus entitled to $300,000,000 utilizing the formula [32.5% * ($11,889,375,260 – 7,200,000,000)], plus interest at the maximum allowable rate;

    (e)     That by failing to treat the pre-IPO transactions as a distribution to the members of DAL under the Modified Plan, the MDA and the Operating Agreement, and failing to make any associated General Unsecured MDA Distribution, defendants breached the Modified Plan, the Court's July 30, 2009 Plan Modification Order, the MDA, and the Operating Agreement; and

(f)     That Plaintiffs are also entitled to recover their attorney fees, costs and expenses, as well as such other and further relief as the Court may deem just and proper.

2.     As to the Second Count, for damages in an amount to be proven at trial, as well as interest on such damages at the maximum allowable rate, and recovery of Plaintiffs' attorney fees, costs and expenses incurred in this action.

3.     As to the Third Count, pled in the alternative to the Second Count, for damages in an amount to be proven at trial, as well as interest on such damages at the maximum allowable rate, and recovery of Plaintiffs' attorney fees, costs and expenses incurred in this action.

4.     As to the Fourth Count, for damages in an amount to be proven at trial, as well as interest on such damages at the maximum allowable rate, and recovery of Plaintiffs' attorney fees, costs and expenses incurred in this action.

5.     For such other and further relief as the Court may deem just and proper.

Dated:  December 20, 2011                Respectfully submitted,


By: _/s/ John E. Schreiber_____
      John E. Schreiber
      jschreiber@dl.com
      DEWEY & LEBOEUF LLP
      1301 Avenue of the Americas
      New York, NY 10019
      (212) 259-8000

      Bruce Bennett (pro hac vice application to be
      submitted)
      bbennett@dl.com
      James O. Johnston (pro hac vice application
      to be submitted)
      jjohnston@dl.com
      Matthew M. Walsh (pro hac vice application
      to be submitted)
      mwalsh@dl.com

      DEWEY & LEBOEUF LLP
      333 South Grand Avenue
      Suite 2600
      Los Angeles, CA 90071
      (213) 621-6000

      *Attorneys for Plaintiffs CAI Distressed Debt*
      *Opportunity Master Fund Ltd.; D-Star Ltd.;*
      *Anchorage Capital Group, LLC; CSS, LLC;*
      *DP Auto Holdings, LP, Each On Behalf Of*
      *Itself And On Behalf Of Pension Benefit*
      *Guaranty Corporation As Holder Of Record;*
      *Mudrick Capital Management LP; and Armory*
      *Master Fund Ltd.*

US1 32265611.1