# EXHIBIT B

EXECUTION COPY

# AMENDED AND RESTATED
# LIMITED LIABILITY PARTNERSHIP AGREEMENT
# OF
# DIP HOLDCO LLP[1]

Dated October 6, 2009

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS LIMITED LIABILITY PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS LIMITED LIABILITY PARTNERSHIP AGREEMENT ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER SET FORTH IN THIS LIMITED LIABILITY PARTNERSHIP AGREEMENT.

---

[1] On October 8, 2009, DIP Holdco LLP was renamed Delphi Automotive LLP (rather than Delphi Holdings LLP as was previously contemplated).

LS ACTIVE 43117017.22 722240 5726

# TABLE OF CONTENTS

Page

ARTICLE I.   DEFINITIONS; INTERPRETATIVE MATTERS ... 2
   Section 1.1.   Definitions ... 2
   Section 1.2.   Cross-References ... 16
   Section 1.3.   Interpretative Matters ... 17

ARTICLE II.   ORGANIZATIONAL MATTERS; GENERAL PROVISIONS ... 18
   Section 2.1.   Formation ... 18
   Section 2.2.   Name; Office; Registered Office ... 18
   Section 2.3.   Purposes; Powers ... 19
   Section 2.4.   Duration ... 20
   Section 2.5.   No State Law Partnership ... 20
   Section 2.6.   Filings; Qualification in Other Jurisdictions ... 20
   Section 2.7.   Income Tax Classification ... 20

ARTICLE III.   CAPITALIZATION; MEMBERSHIP INTERESTS ... 20
   Section 3.1.   Membership Interests; Initial Capitalization; Initial Capital Accounts ... 20
   Section 3.2.   Authorization and Issuance of Additional Membership Interests ... 21
   Section 3.3.   Application of Article 8 of the Uniform Commercial Code ... 22
   Section 3.4.   Certification of Membership Interests ... 22
   Section 3.5.   Capital Accounts ... 24
   Section 3.6.   No Right of Partition ... 24
   Section 3.7.   Additional Capital Contributions and Financing ... 25

ARTICLE IV.   SCHEDULE OF MEMBERS; BOOKS AND RECORDS ... 25
   Section 4.1.   Schedule of Members ... 25
   Section 4.2.   Books and Records; Other Documents ... 25
   Section 4.3.   Certain Tax Matters ... 28
   Section 4.4.   Independent Auditor ... 30

# TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| Section 4.5. | LLP Policies | 30 |
| ARTICLE V. | DISTRIBUTIONS | 30 |
| Section 5.1. | Distributions of Available Cash | 30 |
| Section 5.2. | Successors | 32 |
| Section 5.3. | Distributions of Assets other than Cash | 33 |
| Section 5.4. | Limitation on Distributions | 33 |
| Section 5.5. | Tax Distributions | 33 |
| Section 5.6. | Payments Pursuant to the Master Disposition Agreement | 34 |
| Section 5.7. | Certain Offsets | 34 |
| ARTICLE VI. | ALLOCATIONS | 34 |
| Section 6.1. | Allocations of Tax Book Profits and Tax Book Losses | 34 |
| Section 6.2. | Allocations for Tax Purposes | 35 |
| Section 6.3. | Certain Accounting Matters | 35 |
| Section 6.4. | Section 704(c) Allocations | 35 |
| Section 6.5. | Qualified Income Offset | 35 |
| Section 6.6. | Gross Income Allocation | 36 |
| Section 6.7. | LLP Minimum Gain Chargeback | 36 |
| Section 6.8. | Member Nonrecourse Debt Minimum Gain Chargeback | 36 |
| Section 6.9. | Limitations on Tax Book Loss Allocations | 36 |
| Section 6.10. | Member Nonrecourse Deductions | 36 |
| Section 6.11. | Nonrecourse Deductions | 37 |
| Section 6.12. | Excess Nonrecourse Liabilities | 37 |
| Section 6.13. | Ordering Rules | 37 |
| Section 6.14. | Curative Allocations | 37 |
| ARTICLE VII. | RIGHTS AND DUTIES OF MEMBERS | 38 |
| Section 7.1. | Members | 38 |
| Section 7.2. | No Management or Dissent Rights | 38 |

# TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| Section 7.3. | No Member Fiduciary Duties | 38 |
| Section 7.4. | Meetings of Members | 39 |
| Section 7.5. | Notice of Meetings | 40 |
| Section 7.6. | Quorum | 40 |
| Section 7.7. | Voting | 40 |
| Section 7.8. | Action Without a Meeting; Telephonic Meetings | 42 |
| Section 7.9. | Record Date | 43 |
| Section 7.10. | Removal or Resignation of Members | 43 |
| Section 7.11. | Liability of Members | 43 |
| Section 7.12. | Investment Representations of Members | 44 |
| ARTICLE VIII. | BOARD OF MANAGERS; OFFICERS | 44 |
| Section 8.1. | Establishment of Board of Managers | 44 |
| Section 8.2. | General Powers of the Board of Managers | 45 |
| Section 8.3. | Operator | 45 |
| Section 8.4. | Election of Managers | 46 |
| Section 8.5. | Meetings | 48 |
| Section 8.6. | Notice of Meetings | 48 |
| Section 8.7. | Quorum | 49 |
| Section 8.8. | Voting | 49 |
| Section 8.9. | Action Without a Meeting; Telephonic Meetings | 50 |
| Section 8.10. | Compensation of Managers; Expense Reimbursement | 51 |
| Section 8.11. | Committees of the Board of Managers | 51 |
| Section 8.12. | Delegation of Authority | 52 |
| Section 8.13. | Officers | 52 |
| Section 8.14. | Standard of Care; Fiduciary Duties; Liability of Managers and Officers | 53 |
| ARTICLE IX. | TRANSFER OF MEMBERSHIP INTERESTS; SUBSTITUTED MEMBERS | 55 |
| Section 9.1. | Limitations on Transfer of Membership Interests | 55 |

05-44481-rdd    Doc 21776-2    Filed 12/20/11    Entered 12/20/11 13:08:06    Exhibit B
Pg 6 of 20

# TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| Section 9.2. | Void Transfers | 56 |
| Section 9.3. | Substituted Member | 56 |
| Section 9.4. | Effect of Transfer | 56 |
| Section 9.5. | Additional Transfer Restrictions | 56 |
| Section 9.6. | Transfer Fees and Expenses | 58 |
| Section 9.7. | Effective Date | 58 |
| Section 9.8. | Acceptance of Prior Acts | 58 |
| ARTICLE X. | DISSOLUTION | 58 |
| Section 10.1. | In General | 58 |
| Section 10.2. | Liquidation and Termination | 58 |
| Section 10.3. | Complete Distribution | 59 |
| Section 10.4. | Filing of Certificate of Cancellation | 59 |
| Section 10.5. | Reasonable Time for Winding Up | 59 |
| Section 10.6. | Return of Capital | 59 |
| Section 10.7. | Antitrust Laws | 59 |
| Section 10.8. | Other Remedies | 60 |
| ARTICLE XI. | INDEMNIFICATION | 60 |
| Section 11.1. | General Indemnity | 60 |
| Section 11.2. | Fiduciary Insurance | 61 |
| Section 11.3. | Rights Non-Exclusive | 61 |
| Section 11.4. | Merger or Consolidation; Other Entities | 61 |
| Section 11.5. | No Member Recourse | 62 |
| ARTICLE XII. | OTHER AGREEMENTS | 62 |
| Section 12.1. | Matters Requiring Class A Holders/Class B Designee Managers Consent | 62 |
| Section 12.2. | Further Matters Requiring Additional Class A Holder Consent | 64 |
| Section 12.3. | Matters Requiring Class C Holders Consent | 64 |

# TABLE OF CONTENTS
(continued)

|   |   | Page |
|---|---|---|
| Section 12.4. | Appointment of Chief Executive Officer | 65 |
| Section 12.5. | Preemptive Rights | 65 |
| ARTICLE XIII. | CONFIDENTIALITY | 67 |
| Section 13.1. | Non-Disclosure | 67 |
| Section 13.2. | Exceptions | 68 |
| Section 13.3. | PBGC Confidentiality Provisions | 69 |
| ARTICLE XIV. | MISCELLANEOUS PROVISIONS | 69 |
| Section 14.1. | Amendments | 69 |
| Section 14.2. | Remedies | 70 |
| Section 14.3. | Notice Addresses and Notices | 70 |
| Section 14.4. | Counterparts | 71 |
| Section 14.5. | Assignment | 71 |
| Section 14.6. | Entire Agreement; Waiver | 71 |
| Section 14.7. | Severability | 71 |
| Section 14.8. | Governing Law | 71 |
| Section 14.9. | Independent Contractors; Expenses | 72 |
| Section 14.10. | Press Release | 72 |
| Section 14.11. | Survival | 72 |
| Section 14.12. | Creditors | 72 |
| Section 14.13. | Further Action; Initial Public Offering | 72 |
| Section 14.14. | Delivery by Facsimile or Email | 74 |
| Section 14.15. | Strict Construction | 75 |
| Section 14.16. | Consent to Jurisdiction | 75 |
| Section 14.17. | Waiver of Jury Trial | 75 |
| Section 14.18. | Specific Performance | 75 |
| Section 14.19. | Unfair Prejudice | 75 |
| ARTICLE XV. | DESIGNATED MEMBERS | 76 |

# TABLE OF CONTENTS
## (continued)

|  |  | Page |
|---|---|---|
| Section 15.1. | Designated Members | 76 |
| Section 15.2. | Written Notice | 76 |

## SCHEDULES AND EXHIBITS

Schedule of Members
Exhibit A — Class B Subscribers
Exhibit B — Transaction Documents
Exhibit C — LLP Policies
Exhibit D — Environmental Guidelines
Exhibit E — General Motors Consolidation Requirements
Exhibit F — Form of Transfer Instrument

AMENDED AND RESTATED LIMITED LIABILITY PARTNERSHIP
AGREEMENT
OF
DIP HOLDCO LLP[2]

This AMENDED AND RESTATED LIMITED LIABILITY PARTNERSHIP AGREEMENT of DIP Holdco LLP, a limited liability partnership incorporated under the laws of England and Wales on August 19, 2009 (the "LLP"), is made and entered into on October 6, 2009 (the "Effective Date") by and among the Class B Holders and Class D Holders who are Members on the date hereof, General Motors Company, a Delaware corporation ("General Motors"), and Pension Benefit Guaranty Corporation ("PBGC"), as Members, the LLP and each other Person who at any time becomes a Member in accordance with the terms of this Agreement and the Act.

RECITALS:

A. The LLP was formed as a limited liability partnership pursuant to the Act, on August 19, 2009 with registered number OC348002.

B. On July 30, 2009, the United States Bankruptcy Court for the Southern District of New York approved a Modified Plan of Reorganization (the "Reorganization Plan") for Delphi Corporation, a Delaware corporation ("Old Delphi"), in its proceedings under Chapter 11 of the Bankruptcy Code (Case No. 05-44481 (RDD)).

C. Old Delphi, DIP Holdco 3, LLC, a Delaware limited liability company ("DIP Holdco 3"), and certain other parties entered into a Master Disposition Agreement (as amended, the "MDA") dated as of July 30, 2009 pursuant to which, among other things, Old Delphi proposed to sell to DIP Holdco 3 certain assets of Old Delphi and certain subsidiaries of Old Delphi, on the terms and subject to the conditions set forth in the MDA (the "Asset Purchase").

D. DIP Holdco 3, General Motors, Elliott Associates, L.P. ("Elliott"), Silver Point Capital Fund, L.P. and Silver Point Capital Offshore Fund, Ltd. have entered into an Investment Commitment Agreement (the "Investment Commitment Agreement"), dated as of July 26, 2009, pursuant to which, among other things, General Motors subscribed for certain class A membership interests in DIP Holdco 3 and Elliott, Silver Point Capital Fund, L.P. and Silver Point Capital Offshore Fund, Ltd. subscribed for certain class B membership interests in DIP Holdco 3 subject to the terms and conditions set forth in such agreement.

E. Pursuant to the Investment Commitment Agreement, Elliott, Silver Point Capital Fund, L.P. and Silver Point Capital Offshore Fund, Ltd. assigned

---

[2] The LLP's name was changed to Delphi Automotive LLP on October 8, 2009.

subscription rights to acquire certain class B membership interests in DIP Holdco 3 to certain other class B holders (the "Other Class B Holders") listed on Exhibit A, subject to the terms and conditions set forth in such agreement.

F.  General Motors has caused the class C membership interests in DIP Holdco 3 to be issued to PBGC as partial consideration for PBGC's agreements set forth in that certain Waiver and Release Agreement (the "Waiver and Release Agreement"), dated as of July 21, 2009, among General Motors, Motors Liquidation Company and PBGC.

G.  It is intended that the existing membership arrangements in relation to DIP Holdco 3 be replicated in relation to the LLP and that the rights of DIP Holdco 3 pursuant to the Asset Purchase be assigned to the LLP.

H.  In connection with the consummation concurrently herewith of the Asset Purchase and the transactions contemplated by the Investment Commitment Agreement and the Waiver and Release Agreement, the parties hereto desire to set forth the terms for the issuance of the Membership Interests, and to set forth, inter alia, their understandings and agreements regarding the governance and certain operations of the LLP.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants, conditions and agreements herein contained, the parties hereto, each intending to be legally bound, agree as follows:

## ARTICLE I.
## DEFINITIONS; INTERPRETATIVE MATTERS

Section 1.1.  **Definitions**.  The following terms, as used herein, shall have the following meanings:

"Act" means the Limited Liability Partnership Act 2000 under the laws of England and Wales (as amended or replaced from time to time).

"Adjusted Capital Account Balance" means, with respect to any Member, the balance in such Member's Capital Account after giving effect to the following adjustments:

(i)  debits to such Capital Account of the items described in Section 1.704-1(b)(2)(ii)(d)(4) through (6) of the Treasury Regulations; and

(ii)  credits to such Capital Account of such Member's share of LLP Minimum Gain or Member Nonrecourse Debt Minimum Gain or any amount which such Member would be required to restore under this Agreement or otherwise.

election of (whether by way of voting capital stock, by contract, trust or otherwise), the majority of the members of the Board of Managers or a similar governing body of the first Person, or (ii) direct (whether by way of voting capital stock, by contract, trust or otherwise) the affairs and policies of such Person.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization or other cost recovery deduction as reported for federal Income tax purposes with respect to an asset for such year or other period, except that if the Tax Book Value of an asset differs from its adjusted basis for federal income tax purposes, Depreciation shall be an amount which bears the same ratio to such beginning Tax Book Value as the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Tax Book Value using any reasonable method selected by the Board of Managers.

"Designated Members" means such of the Members from time to time as shall be designated in accordance with the Agreement as designated members for the purposes of Section 8 of the Act.

"DIP Lenders" has the meaning set forth in the MDA.

"Disproportionate Class C Economic Effect" means a disproportionate reduction in the percentage within any given tier of the Distributions payable with respect to the Class C Membership Interests relative to that payable within such tier with respect to the other Membership Interests. For purposes of this definition, the term "tier" refers to a tier during which Distributions are to be made simultaneously to Class C Holders and other Members.

"Distribution" means each distribution after the Effective Date made by the LLP to a Member, whether in cash, property or securities of the LLP, pursuant to, or in respect of, Article V or Article X.

"Entity" means any general partnership, limited partnership, limited liability partnership, corporation, association, cooperative, joint stock company, trust, limited liability company, business or statutory trust, joint venture, unincorporated organization or Governmental Entity.

"Equity Securities" means, as applicable, (i) any capital stock, membership or limited liability partnership interests, general or limited partnership interests or other share capital or equity interests, (ii) any securities directly or indirectly convertible into or exchangeable for any capital stock, membership or limited liability partnership interests, general or limited partnership interests or other share capital or equity interests or containing any profit participation features, (iii) any rights or options directly or indirectly to subscribe for or to purchase any capital stock, membership or

commence on the day immediately following the last day of the immediately preceding Fiscal Year.

"FSMA" means the Financial Services and Markets Act 2000 under the laws of England and Wales (as amended or replaced from time to time).

"GAAP" means accounting principles generally accepted in the United States of America as in effect from time to time, consistently applied and maintained throughout the applicable periods both as to classification or items and amounts.

"Governmental Entity" means the United States of America or any other nation, any state, province or other political subdivision, any international or supra national entity, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government, including any court, in each case having jurisdiction over the LLP or any of its Subsidiaries or any of the property or other assets of the LLP or any of its Subsidiaries.

"Holders" means the Class A Holders, the Class B Holders, the Class C Holders, the Class D Holders and the holders of any other Membership Interests hereinafter created by the Board of Managers in accordance with the terms of this Agreement.

"Incremental Cost" means the incremental cost to the LLP of delivering the items and complying with the terms and conditions set forth on Exhibit E or Section 4.2(k), as reasonably agreed by General Motors and the LLP; provided, that if General Motors and the LLP are unable to reach agreement, they shall promptly thereafter cause a mutually agreed upon independent accounting firm (the "Arbiter") to review the disputed items and the decision of such accounting firm shall be final and binding upon General Motors and the LLP. The fees, costs and expenses of the Arbiter shall be allocated to and borne by General Motors and the LLP based on the inverse of the percentage that the Arbiter's determination (before such allocation) bears to the total amount of the total items in dispute as originally submitted to the Arbiter. For example, should the items in dispute total in amount to $1,000 and the Arbiter awards $600 in favor of the LLP's position, 60% of the costs of its review would be borne by General Motors and 40% of the costs would be borne by the LLP.

"Independent" means with respect to any individual, any individual other than (i) an individual who is, or at anytime during the three years prior to the determination of whether such individual is Independent, was, a director, officer or employee of, or a consultant or advisor to (a) the LLP or any of its Subsidiaries or (b) any direct or indirect equityholder of the LLP or any of their respective Affiliates; (ii) an individual who has, or at anytime during three years prior to the determination of whether such individual is Independent, had, any direct or indirect interest of any kind in, or the right to participate in the profits of the LLP or any direct or indirect equityholder of the LLP or any of their respective Affiliates; and (iii) an individual who is, or at anytime during the three years prior to the determination of whether such individual is

consent); provided, however, that, if the Majority Class B Managers and, for so long as any of the Release Conditions have not been satisfied, a majority of the Class A Holders that received information in accordance with this Section, do not consent to the filing of any tax return at least fifteen calendar days before the due date, then the LLP (A) shall promptly notify the Majority Class B Managers and, for so long as any of the Release Conditions have not been satisfied, a majority of the Class A Holders that received information in accordance with this Section, of the disputed issues; and (B) may file such return after making a good faith effort to incorporate in such return any comments previously received from the Majority Class B Managers and, for so long as any of the Release Conditions have not been satisfied, a majority of the Class A Holders that received information in accordance with this Section.

(e)     To the extent appropriate, the Majority Class B Managers, Holders of 5% or more of the Class A Membership Interests and Holders of 17.5% or more of the Class C Membership Interests shall be consulted in connection with the preparation and filing of tax returns contemplated by this Section 4.3.

Section 4.4.   Independent Auditor. The LLP and its Subsidiaries at all times shall engage a Person to audit its financial statements (the "Independent Auditor") that (a) is an independent public accounting firm within the meaning of the American Institute of Certified Public Accountants' Code of Professional Conduct (American Institute of Certified Public Accountants, Professional Standards, vol. 2, et sec. 101), (b) is a registered public accounting firm (as defused in Section 2(a)(12) of SOX, and (c) if the LLP were an "issuer" (as defined in SOX), would not be in violation of the auditor independence requirements of SOX by reason of its acting as the auditor of the LLP and its Subsidiaries. The Independent Auditor shall be appointed by the Board of Managers and shall be a nationally recognized certified public accounting firm. The LLP shall engage the Independent Auditor from time to time to conduct such review and testing as from time to time may be necessary or reasonably required under SOX and to issue to the LLP its written opinions and recommendations with respect thereto.

Section 4.5.   LLP Policies. At the first meeting of the Board of Managers after the Effective Date, the Members shall cause the Board of Managers (a) to reconfirm the policies, standards and procedures relating to the LLP and its Subsidiaries set forth on Exhibit C and (b) to adopt or reconfirm, as applicable, the environmental guidelines set forth on Exhibit D. It is the intent of the parties hereto that the LLP and its Subsidiaries operate in compliance with all Laws.

## ARTICLE V.
## DISTRIBUTIONS

Section 5.1.   Distributions of Available Cash.

(a)     Subject to the Act, and except as set forth in this Article V, all Available Cash (and, in the case of the winding up of the LLP, subject to Section 10.2) available for distribution to the Members may be distributed to the extent approved by the

Board of Managers, in accordance with the applicable provisions of this Article V, in the following amounts and order of priority (and, for the avoidance of doubt, the parties hereto intend that for purposes of applying the following priorities, all Distributions shall be given cumulative effect):

   (i)   first, simultaneously, (A) 49.12 percent to the Class A Holders, (B) 38.60 percent to the Class B Holders and (C) 12.28 percent to the Class C Holders, until the aggregate amount distributed to the Holders pursuant to clauses (A), (B) and (C) of this subparagraph (i) equals $1,000,000,000;

   (ii)   second, simultaneously, (A) 57.78 percent to the Class A Holders, (B) 27.78 percent to the Class B Holders and (C) 14.44 percent to the Class C Holders, until the aggregate amount distributed to the Holders pursuant to clauses (A), (B) and (C) of this subparagraph (ii) equals $ 1,000,000,000;

   (iii)   third, simultaneously, (A) 61.39 percent to the Class A Holders, (B) 27.78 percent to the Class B Holders and (C) 10.83 percent to the Class C Holders, until the aggregate amount distributed to the Holders pursuant to clauses (A), (B) and (C) of this subparagraph (iii) equals $500,000,000;

   (iv)   fourth, simultaneously, (A) 68.61 percent to the Class A Holders, (B) 27.78 percent to the Class B Holders and (C) 3.61 percent to the Class C Holders, until the aggregate amount distributed to the Holders pursuant to clauses (A), (B) and (C) of this subparagraph (iv) equals $141,757,563;

   (v)   fifth, simultaneously, (A) 24.94 percent to the Class A Holders, (B) 73.75 percent to the Class B Holders and (C) 1.31 percent to the Class C Holders, until the aggregate amount distributed to the Holders pursuant to clauses (A), (B) and (C) of this subparagraph (v) equals $858,242,437;

   (vi)   sixth, simultaneously, (A) 19.69 percent to the Class A Holders, (B) 73.75 percent to the Class B Holders and (C) 6.56 percent to the Class C Holders, until the aggregate amount distributed to the Holders pursuant to clauses (A), (B) and (C) of this subparagraph (vi) equals $141,757,563;

   (vii)   seventh, simultaneously, (A) 26.25 percent to the Class A Holders, (B) 65.00 percent to the Class B Holders and (C) 8.75 percent to the Class C Holders, until the aggregate amount distributed to the Holders pursuant to clauses (A), (B) and (C) of this subparagraph (vii) equals $358,242,437;

   (viii)   eighth, simultaneously, (A) 17.50 percent to the Class A Holders, (B) 65.00 percent to the Class B Holders and (C) 17.50 percent to the Class C Holders, until the aggregate amount distributed to the Holders pursuant to clauses (A), (B) and (C) of this subparagraph (viii) equals $1,500,000,000;

(ix) <u>ninth</u>, simultaneously, (A) 26.25 percent to the Class A Holders, (B) 65.00 percent to the Class B Holders and (C) 8.75 percent to the Class C Holders, until the aggregate amount distributed to the Holders pursuant to clauses (A), (B) and (C) of this subparagraph (ix) equals $500,000,000;

(x) <u>tenth</u>, simultaneously, (A) 31.50 percent to the Class A Holders, (B) 65.00 percent to the Class B Holders and (C) 3.50 percent to the Class C Holders, until the aggregate amount distributed to the Holders pursuant to the clauses (A), (B) and (C) of this subparagraph (x) equals $1,000,000,000; and

(xi) <u>thereafter</u>, simultaneously, (A) 35.00 percent to the Class A Holders and (B) 65.00 percent to the Class B Holders.

(xii) For the avoidance of doubt, (a) once the Class C Holders have received their aggregate Distributions pursuant to clauses (i) - (x) above, they shall no longer be deemed outstanding and shall not be entitled to any rights under this Agreement and (b) the Class D Holders shall not be entitled to receive any Distributions. In addition, if the LLP redeems or repurchases any Membership Interests in accordance with this Agreement, the LLP shall make appropriate adjustments to this Section 5.1 (as determined by the Independent Managers) to reflect such redemptions or repurchases.

(b) Each Distribution to the Class A Holders under this Agreement shall be made ratably among the Class A Holders determined as of, and based on the LLP Class A Interest of such Class A Holders as of, either (A) immediately prior to such Distribution or, if applicable, (B) on the record date set by the Board of Managers pursuant to <u>Section 7.9</u> with respect to such Distribution.

(c) Each Distribution to the Class B Holders under this Agreement shall be made ratably among the Class B Holders determined as of, and based on the LLP Class B Interest of such Class B Holders as of, either (A) immediately prior to such Distribution or, if applicable, (B) on the record date set by the Board of Managers pursuant to <u>Section 7.9</u> with respect to such Distribution.

(d) Each Distribution to the Class C Holders under this Agreement shall be made ratably among the Class C Holders determined as of, and based on the LLP Class C Interest of such Class C Holders as of, either (A) immediately prior to such Distribution or, if applicable, (B) on the record date set by the Board of Managers pursuant to <u>Section 7.9</u> with respect to such Distribution.

Section 5.2. <u>Successors</u>. For purposes of determining the amount of Distributions, each Member shall be treated as having made the Capital Contributions and as having received the Distributions made to or received by its predecessors in respect of any of such Member's Membership Interests.

Section 5.3. **Distributions of Assets other than Cash**. With the consent of the Majority Class A Holders, the Majority Class B Holders and the Majority Class C Holders in the case of Distributions to any Holders of any class of Membership Interests that are not on a ratable basis with that made to the other Holders, in each case subject to the Act, the LLP shall be permitted to distribute property consisting of assets other than cash to the Members in accordance with Section 5.1 and the other provisions of this Agreement; provided that no such consent shall be required in connection with any distribution in-kind pursuant to Section 10.2. Any property distributed pursuant to Section 5.3 shall be valued at Fair Market Value.

Section 5.4. **Limitation on Distributions**.

(a) Notwithstanding anything to the contrary herein except as set forth in Section 5.5 below, without the prior approval of the Majority Initial Class A Holders and the Majority Class B Holders, no Distributions shall be made pursuant to Section 5.1 so long as the aggregate Unreturned Original Cost of the outstanding Class A Membership Interests issued to General Motors on the Effective Date exceeds zero, unless each of the following conditions is satisfied:

(i) there are no principal amounts outstanding under the Senior Loan Agreement;

(ii) the distribution occurs later than 18 months following the Effective Date;

(iii) after giving effect to such Distribution, the LLP and its Subsidiaries shall have at least $800,000,000 of cash and cash equivalents on hand; and

(iv) the LLP's cash flow from operating activities during the six months immediately prior to the distribution date was positive and the LLP reasonably expects that its cash flow from operating activities will continue to be positive for six months following the distribution date; provided, however, if the proposed Distribution would cause the aggregate Unreturned Original Cost of the outstanding Class A Membership Interests issued to General Motors on the Effective Date to equal zero, then the conditions set forth in this clause (iv) shall be deemed satisfied.

Section 5.5. **Tax Distributions**. Notwithstanding Section 5.4 and Section 5.7, if there is Available Cash, such Available Cash shall be distributed (a "Tax Distribution") in an amount sufficient to enable the Holders to pay projected tax liabilities attributable to allocations of Tax Book Profits and Tax Book Losses by the LLP using an assumed tax rate equal to the highest effective marginal combined U.S. federal, state and local income tax rate prescribed for a corporation resident in New York, New York (the "Assumed Tax Rate"), assuming that taxable income or loss is equivalent to Tax Book Profits or Tax Book Losses, and assuming that such Holder does not have any

items of income, gain, loss, deductions or credits other than those attributable to its Membership Interests. Tax Distributions shall be made to each Holder within 10 days prior to April 15, June 15, September 15 and December 15 of each year based upon the determination by the Board of Managers of the excess of (x) the product of (i) the amount of Tax Book Profits, if any, allocated to such Holder for the period beginning on January 1 of such year and ending on March 31, May 31, August 31 and November 30 as if each such period were a taxable year and (ii) the Assumed Tax Rate over (y) Tax Distributions previously made to such Holder with respect to any prior period within the same taxable year. Any Tax Distribution shall be treated as an advance of amounts otherwise distributable to such Holder pursuant to Section 5.1(a) such that, in determining a Holder's right to distributions pursuant to Section 5.1(a), distributions received by such Holder pursuant to this Section 5.5 shall be taken into account as if received pursuant to Section 5.1(a).

Section 5.6. **Payments Pursuant to the Master Disposition Agreement**. In accordance with Section 3.2.3 of the MDA, if the Asset Purchase is consummated pursuant to the Plan of Reorganization, once an aggregate of $7,200,000,000 has been paid as Distributions to the Holders pursuant to this Agreement, the LLP shall pay an amount equal to $32.5 to a disbursement agent on behalf of the unsecured creditors of Old Delphi for every $67.5 in excess of such $7,200,000,000 that is distributed to the Holders pursuant to Section 5.1(a)(iv), up to a maximum amount of $300,000,000.

Section 5.7. **Certain Offsets**. Each Class B Holder acknowledges and agrees that to the extent that the LLP makes any payment or incurs liabilities and expenses pursuant to Section 4(f)(i) of the Investment Commitment Agreement, such amounts shall be withheld from Distributions otherwise payable to the Class B Holders under Section 5.1 and available to the LLP for general corporate purposes. Any amounts withheld shall be deemed distributed to the Class B Holders for the purposes of Section 5.1.

## ARTICLE VI.
## ALLOCATIONS

Section 6.1. **Allocations of Tax Book Profits and Tax Book Losses**. Except as otherwise provided by this Article VI, the Tax Book Profit and Tax Book Loss of the LLP for each Fiscal Year (or portion thereof) shall be determined as of the end of each such Fiscal Year (or portion thereof). For each Fiscal Year of the LLP, after adjusting each Member's Capital Account for all Capital Contributions and distributions during such Fiscal Year and all special allocations pursuant to this Article VI with respect to such Fiscal Year, all Tax Book Profits and Tax Book Losses (other than Tax Book Profits and Tax Book Losses specially allocated pursuant to Section 6.5 through Section 6.14) shall be allocated to the Holders' Capital Accounts in a manner such that, as of the end of such Fiscal Year, the Capital Account of each Holder (which have either a positive or negative balance) shall be equal to the amount which would be distributed to such

Section 9.7. **Effective Date**. Any Transfer and any related admission of a Person as a Member in compliance with this Article IX shall be deemed effective on such date that the Transfer complies with the requirements of this Agreement and the Transfer Instrument.

Section 9.8. **Acceptance of Prior Acts**. A Transferee of the Membership Interest of a Member who is admitted to the LLP in place and stead of a Member accepts, ratifies and agrees to be bound by all actions duly taken pursuant to the terms and provisions of this Agreement by the LLP prior to the date it was admitted to the LLP and, without limiting, the generality of the foregoing, specifically ratifies and approves all agreements and other instruments as may have been executed and delivered on behalf of the LLP prior to such date and which are in force and effect on such date.

## ARTICLE X.
## DISSOLUTION

Section 10.1. **In General**. The LLP shall dissolve and its affairs shall be wound up upon the first to occur of the following: (a) the written consent of (I) the Majority Class A Holders, (ii) the Majority Class B Holders and (iii) unless such dissolution and winding up has been approved by an Independent Manager who meets the criteria to be considered Independent without regard to any agreement by the Class A Designee Managers (or Class A Members) and Class B Designee Managers (or Class B Members) pursuant to the last paragraph of the definition of "Independent" set forth in Section 1.1, the Majority Class C Holders; (b) at such time as there are no Members of the LLP unless the LLP is continued in accordance with the Act; or (c) the entry of a decree of judicial dissolution.

Section 10.2. **Liquidation and Termination**. On the dissolution of the LLP, the Board of Managers shall appoint a suitable qualified person to act as liquidator or. The liquidator shall proceed diligently to wind up the affairs of the LLP and make final distributions as provided herein and in the Act. The costs of liquidation shall be borne as a LLP expense. Until final distribution, the liquidator shall continue to operate the LLP with all of the power and authority of the Board of Managers. The steps to be accomplished by the liquidator are as follows:

(a) the liquidator shall pay, satisfy or discharge from the LLP funds all of the debts, liabilities and obligations of the LLP (including all expenses incurred in liquidation and all such debts, liabilities and obligations owed to any Member other than with respect to such Member's Membership Interests) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash fund for contingent liabilities in such amount and for such term as the liquidators may reasonably determine); and

(b) after payment or provision for payment of all of the LLP's liabilities has been made in accordance with Section 10.2(a), all remaining assets of the LLP shall be distributed in accordance with Section 5.1.

(c) For the purposes of Section 74 of the Insolvency Act as it is applied to LLPs under the Act, no Member is liable to contribute any amount to the assets of the LLP on liquidation to cover any of the matters set out in that section..

Section 10.3. **Complete Distribution**. The distribution to a Member in accordance with the provisions of Section 10.2 constitutes a complete return to the Member of its Capital Contributions and a complete distribution to the Member of its interest in the LLP and all the LLP's property. If a Member returns funds to the LLP and such funds exceed such Member's *pro rata* share of all funds required to be returned to the LLP, then such Member shall have a claim against the other Members for an amount equal to such excess. Each other Member shall be liable for a *pro rata* portion of such excess equal to the amount such Member would have paid had the amount paid by the Member seeking recovery been recovered from all Members *pro rata* based on the relative amount of funds to be returned by each such Member.

Section 10.4. **Filing of Certificate of Cancellation**. Immediately following the completion of the distribution of the LLP's assets as provided in this Article X, the Board of Managers (or such other Person or Persons as the Act may require or permit) shall take such actions as may be necessary to wind up the LLP. The LLP shall be deemed to continue in existence for all purposes of this Agreement until such actions are taken pursuant to this Section 10.4.

Section 10.5. **Reasonable Time for Winding Up**. A reasonable time shall be allowed for the orderly winding up of the business and affairs of the LLP and the liquidation of its assets pursuant to Section 10.2 to minimize any losses otherwise attendant upon such winding up.

Section 10.6. **Return of Capital**. The liquidators shall not be personally liable for the return of Capital Contributions or any portion thereof to the Members (it being understood that any such return shall be made solely from LLP assets).

Section 10.7. **Antitrust Laws**. Notwithstanding any other provision in this Agreement, in the event that any Antitrust Law is applicable to any Member by reason of the fact that any assets of the LLP shall be distributed to such Member in connection with the winding up of the LLP, such Distribution shall not be consummated until such time as the applicable waiting periods (and extensions thereof) under such Antitrust Law have expired or otherwise been terminated with respect to each such Member.

Section 10.8. **Other Remedies**. Nothing in this Article X shall limit any Member's right to enforce any provision of this Agreement by an action at Law or equity, nor shall an election to dissolve the LLP pursuant to this Article X relieve any Member of any liability for any prior or subsequent breach of this Agreement or another document referred to herein.