# EXHIBIT 1

**Hearing Date And Time: February 24, 2009 at 10:00 a.m. (prevailing Eastern time)**
**Objection Deadline: February 17, 2009 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Ron E. Meisler

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                            :
        In re                               :    Chapter 11
                                            :
DELPHI CORPORATION, et al.,                 :    Case No. 05-44481 (RDD)
                                            :
                                            :    (Jointly Administered)
        Debtors.                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 363(b)(1), AND 1108
CONFIRMING DEBTORS' AUTHORITY TO TERMINATE EMPLOYER-PAID POST-
RETIREMENT HEALTH CARE BENEFITS AND EMPLOYER-PAID
POST-RETIREMENT LIFE INSURANCE BENEFITS FOR CERTAIN (A) SALARIED
EMPLOYEES AND (B) RETIREES AND THEIR SURVIVING SPOUSES

("SALARIED OPEB TERMINATION MOTION")

Delphi Corporation ("Delphi" ) and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), and 1108 confirming the Debtors' authority (or, alternatively, authorizing, but not directing, the Debtors) to terminate their applicable employee benefit plans and programs as soon as practicable after March 31, 2009 so as to: (a) eliminate eligibility for employer-paid post-retirement health care benefits for all current and future active salaried employees; (b) cease making Company[1] contributions to provide post-retirement health care for current and future salaried retirees and their surviving spouses; (c) cancel all Retiree Health Reimbursement Accounts ("RHRAs") for Medicare-eligible salaried retirees and their surviving spouses; (d) terminate the Medicare Part B special benefit for current and future salaried retirees and their surviving spouses; (e) cease providing the 1% employer contribution to the Salaried Retirement Savings Program for those active salaried employees hired on or after January 1, 1993 and on or prior to December 31, 2000; (f) eliminate eligibility for employer-paid post-retirement basic life insurance benefits for all current and future active salaried employees; and (g) cease making Company contributions to provide post-retirement basic life insurance benefits for current and future salaried retirees, and respectfully represent as follows:

<u>Preliminary Statement</u>

1.    The Debtors currently maintain employee benefit plans and programs to provide retirement benefits to certain of the Debtors' current active salaried employees, retirees,

---

[1]    Undefined capitalized terms used in this preface and in the Preliminary Statement are defined below.

2

and their surviving spouses (collectively, the "Eligible Salaried Retirees"),[2] with: (i) employer-paid health benefits, including medical, prescription drug, dental, mental health, vision, extended care, and hearing (the "Medical Benefits") and (ii) employer-paid life insurance benefits (the "Insurance Benefits," and together with the Medical Benefits, the "Medical and Insurance Benefits").  In total, Delphi currently provides approximately 15,000 Eligible Salaried Retirees with Medical and Insurance Benefits.  By their terms, all of the employee benefit plans and programs that provide post-retirement health and life insurance benefits (hereinafter "Salaried OPEB") to the Eligible Salaried Retirees and their surviving spouses, may be amended, modified, suspended, or terminated by the Debtors at any time.[3]  The projected cash costs associated with these programs that would be saved if these programs were eliminated

---

[2]     Eligible Salaried Retirees include those salaried employees who retire in accordance with the Debtors' policies. Employees may retire under various eligibility provisions including, but not limited to, (i) attaining 30 years of credited service, (ii) attaining age 55 with at least 10 years of credited service, or (iii) attaining age 65 with at least one year of credited service.  Eligible Salaried Retirees includes similarly-qualified retirees of several of Delphi's subsidiaries and affiliates which are also debtors in these jointly administered chapter 11 cases, including Packard Hughes Interconnect Company ("PHI"), Delphi Mechatronic Systems, Inc. ("D-MS"), ASEC Manufacturing General Partnership, and ASEC Sales General Partnership (collectively "ASEC").  Eligible Salaried Retirees also include employees, retirees, and surviving spouses from certain Delphi divested business units.  Finally, Eligible Salaried Retirees includes eligible non-union hourly and timesheet employees who are employed by Delphi Diesel Systems Corp. ("Delphi Diesel").  Delphi Diesel is a subsidiary of Delphi and a debtor in these jointly-administered chapter 11 cases.  Delphi Diesel does not have any union employees or retirees and maintains only one benefit plan for all of its hourly, salaried, and timesheet employees and retirees. The Debtors' records reflect that four Delphi Diesel retirees and eighty-seven active Delphi Diesel employees, including thirty-one hourly and seventeen timesheet employees, would be affected by the relief sought by this Motion.

[3]     Article I, Section 1(b)(1) of the Delphi Salaried Health Care Program and Article III, Section 3.05(b)(1) of the Delphi Salaried Life and Disability Benefits Program contain the same reservation of rights language:  "The Corporation reserves the right to amend, modify, suspend or terminate the Program in whole or in part, at any time, by action of its Board of Directors or other committee expressly authorized by the Board to take such action."  Likewise, Article III, Section 2 of the Salaried Retirement Savings Program (which documents the 1% contribution for 1993 to 2000 Salaried Employees) provides: "The Corporation reserves the right to amend, modify, suspend, or terminate the Program in whole or in part, at any time, by action of its Board of Directors or other individual or committee expressly authorized by the Board to take such action."  Delphi has consistently communicated its reservation of rights to the Eligible Salaried Retirees in its summary plan descriptions and other employee communications. The Delphi Strategy Board has approved the actions set forth herein, and the Board of Directors concurs with such action.

exceeds $70 million per year.  The balance sheet liability that would be eliminated from the Debtors' reorganization balance sheet if these programs were eliminated exceeds $1.1 billion.

2.       Although the Debtors have always retained the authority to modify or terminate these discretionary programs unilaterally, the Debtors had intended to seek to continue these programs in an economic climate where the total enterprise value associated with the Debtors' go-forward business plan provided a reasonable basis for such business judgment.  For example, on January 25, 2008, this Court entered an order confirming the Debtors' chapter 11 Plan, the consummation of which was anticipated to allow the Debtors to complete their transformation plan and emerge from chapter 11.  The total business enterprise value associated with the Plan was $12.8 billion (based on an agreed negotiated value with the Debtors' principal stakeholders).  When the Debtors were precluded from consummating the Confirmed Plan on April 4, 2008 due to the Plan Investors' breach of the Investment Agreement, the Debtors continued to implement their transformation plan while working with their stakeholders to formulate and file the Plan Modification Approval Motion (Docket No. 14310) which sought approval of modifications to the Confirmed Plan that would allow the Debtors to move forward with a reaffirmed business plan for 2008-2011 (the "RPOR").  The mid-point of the total enterprise business valuation associated with the RPOR, filed in October 2008, was $7.2 billion.

3.       The financial projections set forth in the RPOR, however, were based on, among other factors, then-projected production volumes for the North American light vehicle automotive market of 14.2 million vehicles in 2009 and up to 16.3 million vehicles in 2011, and included forecasts for GM vehicle builds ranging from a low of 3.15 million vehicles in 2009 to a high of 3.61 million vehicles in 2011.  During the fourth quarter of 2008, the outlook for the global automotive industry took a dramatic turn for the worse, with volumes, both domestic and

global, plummeting to the lowest levels in recent history. The Congressional testimony of the CEO's of the "Detroit Three" in November and December 2008 highlighted the dire circumstance of the North American automotive industry, in which the Detroit Three generally assumed a 2009 "base case" of North American light vehicle production of approximately 12 to 12.5 million vehicles.

4.     Thereafter, in the "Restructuring Plan for Long-Term Viability" that GM submitted to the U.S. Congress on December 2, 2008 in support of its request for federal financial assistance (the "GM Plan"), GM forecast 2009 North American vehicle sales to be 12 million units in a baseline scenario and 10.5 million units in a downside scenario. These projections were dramatic and unprecedented declines from the 16.5 million units sold in 2007 and the then-projected 13.7 million unit sales in 2008. In a further move that underscores the depth of the economic challenges facing the North American automotive industry, GM announced on January 12, 2009 that its forecast for 2009 North American vehicle sales would follow its earlier "downside" scenario of 10.5 million units for North American vehicle sales, a staggering 3.2 million fewer units than were sold in 2008 and 6 million fewer units than were sold in 2007. Then, on February 3, 2009, GM announced that January sales were down 49% from a year ago.

5.      As illustrated in the chart below, the reductions in volume since the Debtors filed their Confirmed Plan in September 2007 and Plan Modification Motion on October 3, 2008 have been dramatic:



6.      Moreover, subsequent to the filing of the Plan Modification Motion, the global economic environment has continued to deteriorate, placing severe pressure on all industries, but especially on automotive manufacturers and their suppliers due to limited consumer credit and lack of financing for both OEMs and suppliers.  As illustrated by the chart below, despite the federal government's intervention through bailout relief and other programs, the Dow Jones Industrial Average has lost nearly 3,000 points since October 2008.



7.    The Debtors are currently engaged in discussions with their stakeholders which have a continuing economic interest in the Debtors' reorganization cases to formulate further plan modifications consistent with the timetable agreed to in the Accommodation Agreement entered into with their DIP Lenders in December 2008 (which contemplates the filing of further proposed modifications to the Confirmed Plan on February 27, 2009).  In connection with those discussions, the Debtors are making further revisions to their business plan consistent with the extremely low volume production environment in the global automotive industry and depressed global capital and equity markets.  Although no formal valuation of the revised business plan has been completed, it is anticipated that the total business enterprise value associated with the revised plan will be substantially below the valuation range contained in the Plan Modification Motion and may be equivalent to, or even less than, the amount of the Debtors' postpetition obligations including the DIP Facility.

8.    In these circumstances, the Debtors' reasonable business judgment no longer permits them to maintain discretionary benefit programs such as Salaried OPEB that would cost hundreds of millions of dollars over the business plan period and burden the Debtors' reorganized balance sheet with a billion dollars or more of associated liabilities.  The Debtors acknowledge that the actions proposed by the Debtors in this Motion will impose real hardship on the former beneficiaries of these terminated programs.  However, the Debtors' recognition of such hardships – which was a motivating factor in the Debtors' seeking to continue these discretionary programs in a more robust economic environment – regretfully provides no business justification or legal basis for the Debtors to continue these programs in the current economic climate.

9.      Decisions to discontinue discretionary programs such as those the Debtors intend to terminate here have in the past been made by other large companies involved in chapter 11 cases or otherwise facing financial distress, and are likely to be faced in the near future by other large corporations that provide retiree healthcare benefits.  OPEB obligations will continue to increase due to, among other things, medical advancements that increase life span, the increasing costs of medical treatment and prescription drugs, and the aging population of the United States.  In addition, many OPEB plans operate on a pay-as-you-go basis.  In May 2008, Standard & Poor's released a report on the S&P 500's 2007 Pension and Other Post Employment Benefits that found that the state of OPEB remains "extremely poor," and that within the S&P 500, 310 companies offer OPEB, with the aggregate unfunded obligations being $269.1 billion.[4] Given the current economic climate, it is likely that OPEB conditions have not improved since the report was issued.  The conclusion of the report presages the relief sought in this Motion:

> The longer the situation goes on however, the worse it will become.  Eventually, the government, in conjunction with the private sector, will be forced to address the situation and take painful steps.  The concern is that neither the public nor the private sector has shown a tolerance for the pain associated with the type of forward action needed to address the problem.  The longer the situation goes unaddressed, the stronger the measures will have to be to solve the situation.  In the end, however, individuals, either as taxpayers or consumers, will need to pay the bills, as well as live with the reduction in benefits and their lifestyle.

Id. at 14.

10.      After careful deliberation, the Debtors have determined that they must take a number of immediate actions to eliminate the Debtors' current and future costs associated

---

[4]    Standard & Poor's S&P 500 2007:  Pensions and Other Post Employment Benefits at 8, available at http://www2.standardandpoors.com/spf/pdf/index/051908_SP500_PENSION-Report.pdf.  Notably, as of the date of the report, Ford and GM had only "$20.2 billion in assets set aside for $92.1 billion in [OPEB] obligations."

8

with providing Salaried OPEB to certain of their active salaried employees, retirees, and their surviving spouses. Assuming an April 1, 2009 effective date, it is anticipated that upon the effectiveness of the proposed terminations there will be cash savings to the Debtors of approximately $200,000,000 in the aggregate from 2009 through 2011 as well as the elimination of balance sheet liabilities in excess of $1.1 billion.

Background

A.     The Chapter 11 Filings

11.     On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

12.     No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the Creditors' Committee, the "Statutory Committees").

13.     On December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "December 10 Disclosure Statement"). The Court entered an order approving the adequacy of the December 10 Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389). On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No.

9

12359) (the "Confirmation Order"), and the order became final on February 4, 2008.  Although

the Debtors on April 4, 2008 had satisfied the conditions required to substantially consummate

the Plan, as confirmed by this Court (the "Confirmed Plan"), including obtaining $6.1 billion of

exit financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate

in a closing that was commenced but not completed and refused to fund their Investment

Agreement (as defined in the Confirmed Plan) with Delphi.[5]  On May 16, 2008, Delphi filed

complaints for damages and specific performance against the Plan Investors and related parties

who refused to honor their equity financing commitments or participate in the closing that would

have led to Delphi's successful emergence from chapter 11.  The Debtors nevertheless have

continued to work with their stakeholders to achieve their goal of emerging from chapter 11 as

soon as practicable.  On October 3, 2008, Delphi filed a motion (Docket No. 14310) (the "Plan

Modification Approval Motion") under 11 U.S.C. § 1127 for an order approving (i) certain

modifications to the Confirmed Plan and related modifications to the December 10 Disclosure

Statement and (ii) related procedures for re-soliciting votes on the Confirmed Plan, as modified.

In light of the unprecedented decline in global automotive production volumes and the deepening

of the crisis in global debt and equity markets, the Debtors adjourned the hearing on the Plan

Modification Approval Motion to March 24, 2009 (Docket No. 14580).  The adjournment has

facilitated the Debtors' consideration of further supplemental plan modifications required by the

current economic environment.

---

[5]    Although two parties-in-interest (the Creditors' Committee and Wilmington Trust Company, as indenture
trustee) commenced actions to revoke the Confirmation Order, those adversary proceedings have been stayed
indefinitely by stipulated orders between those parties and the Debtors.  In addition, at the confirmation hearing
the Court reserved for itself the remedy of vacating the Confirmation Order (see Hr'g Tr., 45, 67-68, Jan. 17,
2008), which is a power available to the Court to address a result that is either fundamentally unfair or is the
product of an abuse of process in the bankruptcy court.

14.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

15.     The statutory predicates for the relief requested herein are sections 105(a), 363(b)(1), and 1108 of the Bankruptcy Code.

B.     Current Business Operations Of The Debtors

16.     Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately $13.7 billion.[6]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[7]

17.     The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

---

[6]     The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[7]     On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

18.      Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

19.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[8] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

20.      The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational

---

[8]      Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

21.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

22.    On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their pension situation.

13

E.        Plan Confirmation And Postconfirmation Matters

        23.        The Confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases, including Delphi's labor unions and GM.  The effectiveness of certain of these agreements, including the Debtors' two comprehensive agreements with GM (the "Original GSA" and the "Original MRA"), was conditioned on consummation of the Confirmed Plan.  After the Plan Investors refused to fund their obligations under the Investment Agreement, the Debtors nevertheless continued working with their stakeholders to evaluate their options to move forward to emerge from chapter 11 as soon as reasonably practicable.

        24.        On September 12, 2008, Delphi announced steps that it was taking to complete the successful restructuring of its U.S. operations and transformation of the Company on a global basis.  Those steps included implementing amended, comprehensive settlement agreements with GM, taking action then intended to fund and preserve Delphi's hourly and salaried pension plans, and completing the reaffirmation process for Delphi's August 2008 Reaffirmed Plan Of Reorganization Business Plan.

        25.        Concurrently with the announcement on September 12, 2008, the Debtors filed a motion for approval of two comprehensive agreements with GM: the Amended and Restated Global Settlement Agreement (the "Amended GSA") and the Amended and Restated Master Restructuring Agreement (the "Amended MRA").  On September 26, 2008, this Court entered an order authorizing the Debtors' implementation of the Amended GSA and the Amended MRA, the provisions of which became effective on September 29, 2008.

        26.        Through the Amended GSA and Amended MRA, the Debtors addressed two fundamental tenets of their Transformation Plan:  (i) obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going

14

forward and (ii) devising a workable solution to Delphi's pension funding situation.  Under the
Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the
Debtors and eliminate significant elements of conditionality to the performance of GM's
obligations.  Delphi estimated the value of the net consideration received under the Amended
GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0
billion under the Original GSA and Original MRA).

27.    By transferring nearly $2 billion of pension liabilities to GM through the
Amended GSA and Amended MRA and freezing Delphi's hourly pension plan (which was also
approved as part of the Amended GSA with the consent of Delphi's North American unions),
Delphi has made substantial progress towards achieving its pension funding strategy objectives
for hourly employees.  In addition, on September 23, 2008, this Court entered an order
authorizing the Debtors to take certain actions with respect to its pension plans for salaried
employees and to implement replacement pension plans that will be more cost-effective for the
remainder of their chapter 11 cases and after emergence from chapter 11.

28.    As a result of all the factors described above, the Debtors were able to
formulate certain modifications to the Confirmed Plan, which are set forth in the Plan
Modification Approval Motion filed on October 3, 2008.  Since October 3, 2008, however, the
automotive industry has suffered dramatic declines.  The Debtors are working to make
appropriate changes to their business plan and supplemental modifications to the Confirmed Plan
in furtherance of their reorganization efforts.

F.    The Accommodation Agreement

29.    In the fourth quarter of 2008, facing frozen global credit markets and one
of the worst bear markets in the history of the global capital markets, the Debtors negotiated an
accommodation agreement (the "Accommodation Agreement") with the administrative agent

15

(the "Agent") and the requisite percentage of lenders from tranche A and tranche B (the

"Required Lenders")[9] of the Debtors' approximately $4.35 billion DIP facility (the "DIP

Facility").[10]  Under the Accommodation Agreement, and subject to the terms and conditions set

forth therein, the Debtors could continue using the proceeds of the DIP Facility to the extent

already drawn by the effective date of the Accommodation Agreement, through June 30, 2009[11]

(the "Accommodation Period") notwithstanding the occurrence of certain events of default under

the DIP Facility, including the passing of the Maturity Date on December 31, 2008.  This Court

authorized the Debtors to enter into the Accommodation Agreement by order entered on

December 3, 2008 (the "Accommodation Order") (Docket No. 14515) and the parties

subsequently effectuated the agreement on December 12, 2008.

   30. When the Debtors received this Court's authorization to enter into and

consummate the Accommodation Agreement they believed that they had secured a transparent

liquidity runway that would be sufficient to allow them to weather the ongoing economic

recession, negotiate further modifications to the Confirmed Plan to maximize value for all

stakeholders, and emerge from chapter 11 as soon as practicable.

---

[9] Although under the terms of the Second Amended and Restated DIP Credit Agreement the Debtors were not required to seek the tranche C lenders' consent to the Accommodation Agreement, to encourage tranche C lenders to assist the Debtors' with their emergence capital funding efforts, the Debtors nevertheless sought and obtained this Court's approval of certain incentives for those tranche C lenders that consented to the Accommodation Agreement.

[10] The history of the DIP Facility is described in detail in the Debtors' Expedited Motion For Order (I) Supplementing January 5, 2007 DIP Refinancing Order (Docket No. 6461) And Authorizing Debtors To Enter Into And Implement Accommodation Agreement With Agent And Participating Lenders And (II) Authorizing Debtors To (A) Enter Into Related Documents And (B) Pay Fees In Connection Therewith, filed on November 7, 2008 (Docket No. 14408) (the "Accommodation Motion").

[11] As described more fully in the Accommodation Motion, under the terms of the Accommodation Agreement, the Accommodation Period may be shortened to May 5, 2009 if the Debtors do not meet certain milestones in connection with the Debtors' plan of reorganization.

G.    Subsequent Challenges To The Global Economy, Capital Markets, And Auto Industry

31.    Although the Debtors gained momentum and obtained necessary liquidity based in large part upon the financial accommodations and support which this Court had approved in early December 2008, fourth quarter 2008 North American vehicle sales continued their dramatic and unprecedented decline due to the pervasive global economic recession and continuing credit freeze.  For the fourth quarter of 2008, GMNA, still Delphi's largest customer, announced that it had produced 823,000 vehicles, a 21% reduction from its fourth quarter 2007 production.  Then, on December 12, 2008, GM reduced projected production for the first quarter of 2009 to 420,000 vehicles, resulting in a 53% reduction from the same period in 2008.  On February 3, 2009, however, GM further reduced projected production for the first quarter of 2009 to 380,000 vehicles, down approximately 57% from the same period in 2008.

32.    Facing these unprecedented North American production volume declines, a global slowdown in vehicle sales, and the ongoing deep economic recession, Delphi has been working and continues to work closely with its advisors and stakeholders to reevaluate its business plan and implement cash-conservation measures wherever it can.  Consequently, the Debtors have had to consider and implement remedies such as the relief requested in this Motion.

Relief Requested

33.    By this Motion, the Debtors seek entry of an order under sections 105(a), 363(b)(1), and 1108 of the Bankruptcy Code confirming the Debtors' authority (or, alternatively, authorizing, but not directing, the Debtors) to terminate their applicable employee benefit plans and programs as soon as practicable after March 31, 2009 so as to:  (a) eliminate eligibility for employer-paid post-retirement health care benefits for all current and future active salaried employees; (b) cease making Company contributions to provide post-retirement health care for current and future salaried retirees and their surviving spouses; (c) cancel all RHRAs

17

for Medicare-eligible salaried retirees and their surviving spouses; (d) terminate the Medicare

Part B special benefit for current and future salaried retirees and their surviving spouses; (e)

cease providing the 1% employer contribution to the Delphi Salaried Retirement Savings

Program for those active salaried employees hired on or after January 1, 1993 and on or prior to

December 31, 2000 (the "1993 to 2000 Salaried Employees"); (f) eliminate eligibility for

employer-paid post-retirement basic life insurance benefits for all current and future active

salaried employees; and (g) cease making Company contributions to provide post-retirement

basic life insurance benefits for current and future salaried retirees.

Basis For Relief

34.     The Debtors have always retained the authority to modify or terminate

their discretionary Salaried OPEB programs on a unilateral basis.  In light of the historically low

production volumes in the automotive industry, the depressed equity markets, and the

concomitant reduction in the Debtors' total enterprise value, Delphi can no longer maintain these

programs.  After careful deliberation, the Debtors have determined that they must reduce their

current and futures costs associated with providing Salaried OPEB.  The proposed terminations

will achieve a cumulative cash savings to the Debtors of approximately $200,000,000 for the

period from 2009 through 2011, and eliminate balance sheet liabilities in excess of $1.1 billion,

assuming an April 1, 2009 effective date.

H.    Salaried OPEB

35.     As discussed above, the Debtors currently maintain employee benefit

plans and programs to provide Medical Benefits and Insurance Benefits to Eligible Salaried

Retirees and their surviving spouses.  In total, Delphi currently provides approximately 15,000

Eligible Salaried Retirees with Medical and Insurance Benefits.

18

36.    The Debtors fund the Medical and Insurance Benefits through Company contributions, Eligible Salaried Retirees' contributions, and private insurance arrangements.  By this Motion, the Debtors do not seek to modify, amend, or terminate the existing Medical and Insurance Benefits of active salaried employees and their dependents prior to their retirement.  Instead, the Debtors seek to terminate Medical and Insurance Benefits provided to active salaried employees, and to current and future retirees and their surviving spouses, following retirement.

37.    Eligibility for the Medical and Insurance Benefits in retirement is based upon an Eligible Salaried Retiree's date of hire and the plans or programs of the particular Debtor employer.[12]  Generally, those Eligible Salaried Retirees who began working for GM prior to January 1, 1993 (the "Pre-1993 Salaried Employees") are currently eligible for employer-paid Salaried OPEB.  1993 to 2000 Salaried Employees and salaried employees who began working for Delphi or GM on or after January 1, 2001 (the "Post-2000 Salaried Employees") are not currently eligible for employer-paid Salaried OPEB.[13]

(a)    Current Medical And Insurance Benefits In Retirement

38.    The Medical and Insurance Benefits currently available to each group of Eligible Salaried Retirees are as follows:

---

[12]    Although the eligibility of certain Eligible Salaried Retirees was originally determined by the employee benefits plans or programs of the particular Debtor employer, Delphi currently provides Salaried OPEB to the Eligible Salaried Retirees who retired from PHI, D-MS, and ASEC through the same employee benefit plans and programs through which Delphi delivers Salaried OPEB to its Eligible Salaried Employees.

[13]    The 1993 to 2000 Salaried Employees are, however, eligible to receive the 1% employer contribution to the Salaried Retirement Savings Program which the Debtors by this Motion seek to terminate.

(i)    Pre-1993 Salaried Employees

39.    Pre-1993 Salaried Employees are eligible for employer-paid Salaried

OPEB until they become eligible for Medicare benefits in the normal course (i.e., age 65). At

that point, they are no longer eligible for coverage under the Delphi Salaried Health Care

Program, even on a self-pay basis. Rather, Delphi makes available to them a notional RHRA

(of $10,000 or $20,000 depending on retirement date) which the Eligible Salaried Retiree can

use to defray the costs of purchasing medical insurance supplemental to Medicare.[14] Pre-1993

Salaried Employees are also eligible to receive a Medicare special benefit (the "Medicare

Special Benefit") that partially reimburses them for the Medicare Part B premiums they pay if

they are enrolled in Part B.[15] Pre-1993 Salaried Employees also remain eligible for employer-

paid Insurance Benefits in retirement.

(ii)    1993 to 2000 Salaried Employees

40.    In lieu of employer-paid Salaried OPEB, 1993 to 2000 Salaried

Employees currently receive a 1% employer contribution into their defined contribution plan,

the Delphi Salaried Retirement Savings Program, while they are actively employed.[16] They are

eligible to purchase post-retirement Medical Benefits at 100% of cost. They are also eligible to

continue Insurance Benefits after retirement, provided they pay a portion of the cost.

---

[14]    The Debtors currently maintain approximately 1,300 RHRAs for current Eligible Salaried Retirees.
Additionally, there are approximately 10,500 current and future Eligible Salaried Retirees for which the Debtors
would have to establish accounts under the current provisions for such accounts. On a yearly basis, the Debtors
reimburse approximately $3.2 million to Eligible Salaried Retirees.

[15]    The Medicare Special Benefit amounts to an additional $76.20 per month ($914.40 per annum) to each Eligible
Salaried Retirees' pension check. As of today approximately 1,300 Eligible Salaried Retirees receive the
Medicare Part B premium reimbursement. Accordingly, the Debtors currently spend in the aggregate
approximately $1.2 million per year on the Medicare Special Benefit.

[16]    Currently, approximately 2,500 of the 1993 to 2000 Salaried Employees receive a 1% employer contribution.
On a yearly basis, this amounts to approximately $2 million annually.

(iii)    Post-2000 Salaried Employees

41.    The Post-2000 Salaried Employees may also purchase Medical Benefits

from Delphi after they retire, so long as they pay 100% of the costs.  They are not, however,

eligible for the 1% Salaried Retirement Savings Program contribution and are not eligible for

Insurance Benefits (even on a self-pay basis) after retiring.

42.    During the course of these chapter 11 cases, the Debtors have been

providing Salaried OPEB to Eligible Salaried Retirees as authorized by the Human Capital

Obligations Order entered by this Court on October 13, 2005 (Docket No. 198) (the "Human

Capital Order").  The Human Capital Order authorized, but did not direct, the Debtors to

continue their various benefit plans and programs as described in the Human Capital Motion,[17]

including the various programs comprising Salaried OPEB.

43.    As of the end of 2008, the Debtors have an estimated balance sheet

liability of $1.167 billion attributable to Medical and Insurance Benefits provided to Eligible

Salaried Retirees.

(b)    Proposed Medical And Insurance Benefits In Retirement

44.    By this Motion, the Debtors intend to terminate Salaried OPEB (except

for those self-paid Medical and Insurance Benefits noted below) as summarized in the following

table:

---

[17]    Motion For Order Under 11 U.S.C. §§ 105(a), 363, 507, 1107, And 1108 (I) Authorizing Debtors To Pay
Prepetition Wages And Salaries To Employees And Independent Contractors, (II) Authorizing Debtors To Pay
Prepetition Benefits And Continue Maintenance Of Human Capital Benefit Programs In The Ordinary Course,
And (III) Directing Banks To Honor Prepetition Checks For Payment Of Prepetition Human Capital Obligations
(Docket No. 12).

| Employee Status | Current Retiree Medical and Insurance Benefits | Proposed Treatment |
|---|---|---|
| Active Salaried Employees Hired By GM Prior To 1993 | Eligible for Delphi-paid Medical and Insurance Benefits in retirement | Not eligible for Delphi-paid Medical and Insurance Benefits in retirement<br><br>May purchase Medical Benefits in retirement, provided 100% self-paid.  May convert Insurance Benefits to individual policy at retirement |
|  | Eligible for RHRA at Medicare eligibility | No RHRA at Medicare eligibility |
|  | Eligible for Medicare Special Benefit | No Medicare Special Benefit |
| Active Salaried Employees Hired By GM Or Delphi Between 1993 And 2000 | Not eligible for Delphi-paid Medical or Delphi-paid Insurance Benefits in retirement; may purchase Medical Benefits in retirement, provided 100% self-paid; and may convert Insurance Benefits to individual policy at retirement, provided 100% self-paid | No changes |
|  | Delphi contributes 1% of base into Delphi Salaried Retirement Savings Program | 1% contribution cancelled |
| Active Post-2000 Salaried Employees Hired By Delphi | Not Eligible for Delphi-paid Medical or Delphi-paid Insurance Benefits in retirement; may purchase Medical Benefits in retirement, provided 100% self-paid; and may convert Insurance Benefits to individual policy at retirement, provided 100% self-paid | No changes |
| Retired Salaried Employees Who Were Hired By GM Prior To 1993 | Delphi subsidizes Medical Benefits until Medicare eligible (i.e., age 65) and Insurance Benefits for life | Subsidies for Medical and Insurance Benefits terminated<br><br>May purchase Medical Benefits in retirement, provided 100% self-paid<br><br>Will be offered one-time ability to enroll in or increase coverage (subject to proof of good health) under Optional Life Plan, provided 100% self-paid.  May elect an increase of one times base salary |
|  | Eligible for RHRA at Medicare eligibility | Cancelled |
|  | Eligible for Medicare Special Benefit | Cancelled |

| Retired Salaried Employees Hired By GM Or Delphi Between 1993 And 2000 | No subsidy for Medical Benefits; may purchase Medical Benefits in retirement, provided 100% self-paid; and may convert active Insurance Benefits to individual policy at retirement, provided 100% self-paid | No changes |
|---|---|---|
| Retired Post-2000 Salaried Employees Hired By Delphi | No subsidy for Medical and Insurance Benefits; may purchase Medical Benefits in retirement provided 100% self-paid; and may convert active Insurance Benefits to individual policy at retirement, provided 100% self-paid | No changes |

Each of the plans and programs that comprises Salaried OPEB may be terminated unilaterally by the Debtors at any time.  Therefore, in exercise of the Debtors' sound business judgment, the Debtors request an order confirming the Debtors' authority (or, alternatively, authorizing but not directing the Debtors), to terminate Salaried OPEB as described above as soon as practicable after March 31, 2009.[18]  The Debtors submit that the relief sought herein is in the best interests of the Debtors and their estates.

Applicable Authority

I.      The Salaried OPEB Plans Are Terminable At Will

45.      All of the employee benefit plans and programs that provide Medical and Insurance Benefits that comprise Salaried OPEB to the Eligible Salaried Retirees and their surviving spouses may be terminated by the Debtors at any time.  For example, Article I, Section 1(b)(1) of the Delphi Salaried Health Care Program and Article III, Section 3.05(b)(1)

---

[18]    The UAW represents a very small bargaining unit of two salaried medical personnel at the Company's Lockport, New York site and one at the Rochester, New York site, also consisting of two employees.  Both units are governed by the 2003 UAW-Delphi Salaried Master Agreement ("CBA") currently in effect. CBA Paragraphs 66 and 67 obligate Delphi to provide to bargaining unit employees the same benefits provided to similarly situated non-bargaining unit salaried employees.  CBA Paragraph 68 provides that the Company may, at its sole discretion, revoke, terminate, suspend, modify or change any and all applicable salaried benefits.  Consequently, the CBAs do not bind the Company to OPEB continuation through the term of the CBA or thereafter. Further, Delphi has neither consented to UAW representation of, nor bargained with the UAW over, OPEB for current salaried retirees formerly represented by the UAW.

23

of the Delphi Salaried Life and Disability Benefits Program contain the same reservation of

rights language:  "The Corporation reserves the right to amend, modify, suspend or terminate

the Program in whole or in part, at any time, by action of its Board of Directors or other

committee expressly authorized by the Board to take such action."  Likewise, Article III,

Section 2 of the Salaried Retirement Savings Program (which documents the 1% contribution

for 1993 to 2000 Salaried Employees) provides: "The Corporation reserves the right to amend,

modify, suspend, or terminate the Program in whole or in part, at any time, by action of its

Board of Directors or other individual or committee expressly authorized by the Board to take

such action."  Because the Debtors' right to terminate Salaried OPEB is preserved in the

respective plan documents, as discussed in greater detail below, no relief under section 1114 of

the Bankruptcy Code is required.

J.     Section 1114 Of The Bankruptcy Code Is
       Inapplicable To The Proposed Termination Of Salaried OPEB

46.     The Debtors believe that the procedures outlined in section 1114(d) of the

Bankruptcy Code are inapplicable to the termination of Salaried OPEB proposed herein.  That

section provides that:

> The court, upon a motion by any party in interest, and after notice and
> a hearing, shall appoint a committee of retired employees if the debtor
> seeks to modify or not pay the retiree benefits or if the court otherwise
> determines that it is appropriate, to serve as the authorized representative,
> under this section, of those persons receiving any retiree benefits not covered by
> a collective bargaining agreement.

Section 1114(a) of the Bankruptcy Code, in turn, defines "retiree benefits" as:

> payments to any entity or person for the purpose of providing or
> reimbursing payments for retired employees and their spouses and
> dependents, for medical, surgical, or hospital care benefits, or benefits
> in the event of sickness, accident, disability, or death under any plan,
> fund, or program (through the purchase of insurance or otherwise)
> maintained or established in whole or in part by the debtor prior to
> filing a petition commencing a case under this title.

24

47.      Where the terms of a plan unambiguously state that benefits can be modified or terminated at any time, the committee appointment procedure provided in section 1114(d) of the Bankruptcy Code is not applicable, and a debtor may modify or terminate benefits without any obligation to comply with such section. See In re Wellman, Inc., No. 08-10595, slip op. at 6, (Bankr. S.D.N.Y. Jan. 23, 2009) (quoting Curtiss-Wright Corp. v. Shoonejongen, 524 U.S. 73, 78 (1995)) ("[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans."); In re Doskocil Cos., 130 B.R. 870 (Bankr. D. Kan. 1991) (where debtor has no legal obligation under ERISA to refrain from modifying or terminating future benefits, bankruptcy court is not required to appoint section 1114(d) committee); In re Delphi Corporation, Hr'g Tr. at 25, Aug. 16, 2007 ("the debtor has the right to terminate [the program] which would make going through hoops moot or irrelevant. And I think that's the proper interpretation of the statute. . . . because the program as maintained by the debtor had that right in it, that termination right.  So I think the [Doskocil] case gets it right."). See also CF & I Steel Corp. v. Conners (In re CF & I Fabricators of Utah Inc.), 163 B.R. 858,874 (Bankr. C.D. Utah 1994) (section 1114 does not protect retiree benefits beyond contractual obligations of debtors); In re Federated Dept. Stores, Inc., 132 B.R. 572, 574 (Bankr. S.D. Ohio 1991) (section 1129(a)(13) creates no new substantive rights to benefits for prepetition retirees; expiration of old contract rights makes modification process of section 1114 inapplicable). But see In re Farmland Indus., Inc., 294 B.R. 903 (Bankr. W.D. Mo. 2003) (holding that § 1114 prohibits debtor from terminating or modifying any retiree benefits during chapter 11 case unless debtor complies with section 1114, regardless of whether debtor has prepetition non-bankruptcy right to unilaterally terminate or modify benefits).

25

48.     Delphi has the right to terminate Salaried OPEB unilaterally under the terms of its benefit plans with respect to the salaried active employees and retirees.  As set forth in Doskocil, there is no provision of section 1114 indicating that Congress intended section 1114 to apply to benefit plans that are terminable by their own terms.  In Doskocil, the court, relying on precedent from the Southern District of New York and citing the legislative history of section 1114, held that section 1114 applies only in situations where a debtor has a continuing legal obligation to pay retiree benefits.  Doskocil, 130 B.R. at 875, citing In re Chateaugay Corp., 111 B.R. 399 (S.D.N.Y. 1990).  "Congress intended to focus primarily on the modification of [a] debtor's legal obligations to retirees as opposed to creating for the debtor some new obligation not already imposed by the terms of the retiree benefit plan."  Doskocil, 130 B.R. at 876.

49.     Because the terms of the Delphi retiree health and welfare plans for salaried employees and retirees that provide for the payment of Salaried OPEB explicitly state that they may be amended or terminated at any time, the Debtors are under no contractual obligation to refrain from effectuating the proposed termination.  Therefore, section 1114 of the Bankruptcy Code does not apply to the Debtors' proposed OPEB termination with respect to its salaried employees and retirees, and the salaried employees and retirees have no right to be represented by a statutory committee, the appointment of which would be an administrative expense to the Debtors' estates and which could delay the Debtors' efforts to preserve liquidity and to reorganize.

K.     Terminating Salaried OPEB Satisfies The Business Judgment Test

50.     Section 1108 of the Bankruptcy Code authorizes the Debtors to operate their businesses.  Section 363(b)(1) of the Bankruptcy Code further permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after

notice and a hearing.  11 U.S.C. § 363(b)(1).  The Court should grant the relief requested in this

Motion because the basis for relief articulated by the Debtors is clearly compliant with section

363(b)(1) of the Bankruptcy Code, which requires that "there must be some articulated business

justification for using, selling, or leasing the property outside the ordinary course of business."

Institutional Creditors of Continental Airlines, Inc. v. Continental Airlines, Inc. (In re

Continental Airlines, Inc.), 780 F.2d 1223, 1226 (5th Cir. 1986) (citing In re Lionel Corp., 722

F.2d 1063, 1071 (2d Cir. 1983)); accord Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390

(6th Cir. 1986); Fulton State Bank v. Schipper (In re Schipper), 109 B.R. 832, 836 (Bankr. N.D.

Ill. 1989), aff'd, 112 B.R. 917 (N.D. Ill. 1990), aff'd, 933 F.2d 513 (7th Cir. 1991); In re

Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1988).  As noted above, terminating

Salaried OPEB will generate significant cost savings to the Debtors and preserve liquidity going

forward.

　　　　51.　　The Second Circuit has held that, although the bankruptcy court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the

. . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between

creditors and the estate."  Orion Picture Corp. v. Showtime Networks, Inc. (In re Orion Pictures

Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's consideration of a debtor's section

363(b) motion is a summary proceeding, intended merely as a means to "efficiently review the

. . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate.  It

is not the time or place for prolonged discovery or a lengthy trial with disputed issues."  Id.

　　　　52.　　As a rule, the debtor's business judgment "should be approved by the

court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound

business judgment, but only on bad faith, or whim or caprice.'"  In re Aerovox, Inc., 269 B.R.

74, 80 (Bankr. D.Mass. 2001) (quoting In re Logical Software, Inc., 66 B.R. 683, 686 (Bankr.

D. Mass. 1986)).  The Debtors have sound business reasons for the termination of Salaried

OPEB in that granting the relief requested herein will achieve significant cost savings that will

inure to the benefit of the Debtors' estates and stakeholders.

<u>Notice</u>

53.    Notice of this Motion has been provided in accordance with the

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Thirteenth

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered December 4, 2008 (Docket No. 14534).  In addition, a

complete copy of this Motion has been served via overnight mail upon each Eligible Salaried

Retiree.  In light of the nature of the relief requested, the Debtors submit that no other or further

notice is necessary.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) confirming the Debtors' authority (or, alternatively, authorizing, but not directing, the Debtors) to terminate Salaried OPEB as set forth herein and (b) granting the Debtors such other further relief as is just.

Dated:     New York, New York
           February 4, 2009

                          SKADDEN, ARPS, SLATE, MEAGHER
                          & FLOM LLP
                          By:    /s/ John Wm. Butler, Jr.
                                 John Wm. Butler, Jr.
                                 Ron E. Meisler
                          333 West Wacker Drive, Suite 2100
                          Chicago, Illinois 60606
                          (312) 407-0700

                                       - and –

                          By:    /s/ Kayalyn A. Marafioti
                                 Kayalyn A. Marafioti
                                 Thomas J. Matz
                          Four Times Square
                          New York, New York 10036
                          (212) 735-3000

                          Attorneys for Delphi Corporation, et al.,
                            Debtors and Debtors-in-Possession

29

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :
    In re                               :    Chapter 11
                                                            :
DELPHI CORPORATION, et al.,                                 :    Case No. 05-44481 (RDD)
                                                            :
                  Debtors.    :    (Jointly Administered)
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. §§ 105, 363(b)(1), AND 1108
CONFIRMING DEBTORS' AUTHORITY TO TERMINATE EMPLOYER-PAID POST-
RETIREMENT HEALTH CARE BENEFITS AND EMPLOYER-PAID
POST-RETIREMENT LIFE INSURANCE BENEFITS FOR CERTAIN (A) SALARIED
EMPLOYEES AND (B) RETIREES AND THEIR SURVIVING SPOUSES

("SALARIED OPEB TERMINATION ORDER")

Upon the motion, dated February 4, 2009 (the "Motion"), of Delphi Corporation and

certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned

cases (collectively, the "Debtors"), for an order confirming the Debtors' authority (or alternatively,

authorizing, but not directing, the Debtors) to terminate, as soon as practicable after March 31,

2009, Salaried OPEB,[1] which termination, inter alia, consists of: (a) eliminating eligibility for

employer-paid post-retirement health care benefits for all current and future active salaried

employees; (b) ceasing to make Company contributions to provide post-retirement health care for

current and future salaried retirees and their surviving spouses; (c) canceling all Retiree Health

Reimbursement Accounts for Medicare-eligible salaried retirees and their surviving spouses; (d)

terminating the Medicare Part B special benefit for current and future salaried retirees and their

---

[1]       Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.
"Salaried OPEB" means the Debtors' current and future costs associated with providing post-retirement
health and life insurance benefits to salaried retirees and their surviving spouses.

surviving spouses; (e) ceasing to provide the 1% employer contribution to the Salaried Retirement

Savings Plan for those active salaried employees hired on or after January 1, 1993 and on or prior

to December 31, 2000; (f) eliminating eligibility for employer-paid post-retirement basic life

insurance benefits for all current and future active salaried employees; and (g) ceasing to make

Company contributions to provide post-retirement basic life insurance benefits for current and

future salaried retirees; and upon the record of the hearing held on the Motion; and after due

deliberation thereon; and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.      This Court has core jurisdiction over these chapter 11 cases and the parties and

property affected hereby pursuant to 28 U.S.C. §§157(b) and 1334.  Venue of this proceeding

and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The Motion is hereby granted in its entirety.

3.      The Debtors are authorized, but not directed, to terminate their applicable

employee benefit plans and programs for Eligible Salaried Retirees and their surviving spouses

in accordance with the terms set forth in the Motion.

4.      This Court shall retain jurisdiction to hear and determine all matters arising from

the implementation of this order.

Dated:   February ___, 2009
         New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

**Hearing Date And Time:  February 24, 2009 at 10:00 a.m. (prevailing Eastern time)**
**Objection Deadline:  February 17, 2009 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
George N. Panagakis
Ron E. Meisler

　　- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
　Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
　　　　　　　　　　　　　　　　　　　　　:
　　In re　　　　　　　　　　　　　　　 :　　Chapter 11
　　　　　　　　　　　　　　　　　　　　　:
DELPHI CORPORATION, et al.,　　　 :　　Case No. 05-44481 (RDD)
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　 Debtors.　 :　　(Jointly Administered)
　　　　　　　　　　　　　　　　　　　　　:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 363(b)(1), AND 1108
CONFIRMING DEBTORS' AUTHORITY TO TERMINATE EMPLOYER-PAID POST-
RETIREMENT HEALTH CARE BENEFITS AND EMPLOYER-PAID
POST-RETIREMENT LIFE INSURANCE BENEFITS FOR CERTAIN (A) SALARIED
EMPLOYEES AND (B) RETIREES AND THEIR SURVIVING SPOUSES

PLEASE TAKE NOTICE that on February 4, 2009, Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), filed a Motion For Order Under 11 U.S.C. §§ 105(a), 363(b)(1), And 1108 Confirming Debtors' Authority To Terminate Employer-Paid Post-Retirement Health Care Benefits And Employer-Paid Post-Retirement Life Insurance Benefits For Certain (A) Salaried Employees And (B) Retirees And Their Surviving Spouses (the "Motion").

PLEASE TAKE FURTHER NOTICE that a hearing to consider approval of the Motion will be held on February 24, 2009 at 10:00 a.m. (prevailing Eastern time) (the "Hearing") before the Honorable Robert D. Drain, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610, New York, New York 10004.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion must (a) be in writing, (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883) ("Supplemental Case Management Order"), and the Thirteenth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered December 4, 2008 (Docket No. 14534) (together with the Supplemental Case Management Order, the "Case Management Orders"), (c) be filed with the Bankruptcy Court in accordance with General Order

2

M-242 (as amended) – registered users of the Bankruptcy Court's case filing system must file electronically, and all other parties-in-interest must file on a 3.5 inch disk (preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format), (d) be submitted in hard-copy form directly to the chambers of the Honorable Robert D. Drain, United States Bankruptcy Judge, and (e) be served upon (i) Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098 (Att'n: General Counsel), (ii) counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr.), (iii) counsel for the agent under the postpetition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017 (Att'n: Donald Bernstein and Brian Resnick), (iv) counsel for the official committee of unsecured creditors, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022 (Att'n: Robert J. Rosenberg and Mark A. Broude), (v) counsel for the official committee of equity security holders, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004 (Att'n: Bonnie Steingart), and (vi) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, Suite 2100, New York, New York 10004 (Att'n:  Brian Masumoto) in each case so as to be **received** no later than **4:00 p.m. (prevailing Eastern time) on February 17, 2009**.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

PLEASE TAKE FURTHER NOTICE that only those objections made as set forth herein and in accordance with the Case Management Orders will be considered by the Bankruptcy Court at the Hearing.  If no objections to the Motion are timely filed and served in accordance with the procedures set forth herein and in the Case Management Orders, the Bankruptcy Court may enter an order granting the Motion without further notice.

Dated:    New York, New York
          February 4, 2009

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:    /s/ John Wm. Butler, Jr.
       John Wm. Butler, Jr.
       George N. Panagakis
       Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:    /s/ Kayalyn A. Marafioti
       Kayalyn A. Marafioti
       Thomas J. Matz
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession