# EXHIBIT 13

James B. Sumpter, Pro Se
21169 Westbay circle
Noblesville, IN 46062
Telephone: (317) 877-0736
Facsimile: (317) 877-1070
Jsump @ieee.org

Salaried Retiree of Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

— — — — — — — — — — — — ·.x Chapter 11 Case No. 05-44481 (RDD)

In re:

DELPHI CORPORATION, et. al.,    : (Jointly Administered)
                                :
     Debtors.                   : :
                                : :

— — — — — — — — — — — — ·x

## EXPEDITED MOTION TO ENFORCE COBRA BENEFIT FOR DELPHI SALARIED RETIREES AND MOTION FOR COBRA SETTLEMENT (COBRA BENEFIT MOTION)

This motion is in response to Debtors amended reorganization motion (0544481-18085 ) for an order pursuant to 11 U.S.C. §§ 102(1), 105(a), and 9006(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9006-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), which request the enforcement of COBRA Benefits to Delphi Salaried Retirees and a COBRA Settlement in lieu of lifetime benefits for Delphi Salaried Retires.

For the reasons set forth herein, the relief requested is warranted and necessary. In support of this COBRA Benefit Motion, the Movant respectfully represent as follows:

1.       On February 4, 2009 Debtors filed a motion seeking to eliminate all subsidies for

1

retiree benefit plans and programs for non-union salaried retirees effective April 1, 2009. [Docket No. 14705.] Debtors argued they did not need to comply with Section 1114 because they retained the right to amend or terminate the retiree benefits outside of bankruptcy, and therefore Section 1114 did not apply. *Id.* at ¶¶ 46-48. They further argued that, because Section 1114 did not apply to amendable benefits, no official committee of retirees should be appointed pursuant to Section 1114(d). *Id.* ¶ 49.

2.      In response, three groups of retirees and approximately 1,500 individually affected retirees opposed the Termination Motion. In addition, the retirees who filed the Original Motion to Appoint Section 1114 Committee renewed their motion, and several other retirees also sought the appointment of an official Section 1114(d) Committee. [Docket Nos. 14882 (incorporating Docket No. 874), 14886, 15283, 16297.]

4.      The Court heard argument on February 24, 2009. At the hearing, the Court concluded that the protections of Section 1114 do not apply to employee benefit plans and programs that may be unilaterally modified or terminated outside of bankruptcy, and therefore that no Section 1114(d) Committee need be appointed. The Court thus granted the Debtors' motion and authorized the Debtors' to terminate – as soon as April 1, 2009 – all subsidies for amendable retiree benefit plans and programs.

5.      The Court issued its written final order on March 11, 2009 granting the Debtors' motion and authorized the Debtors' to terminate – as soon as April 1, 2009 – all subsidies for amendable retiree benefit plans and programs. . [Docket No. 16448.]

6.      On June 1, 2009 Debtors filed a SUPPLEMENT TO MOTION FOR ORDER APPROVING MODIFICATIONS TO DEBTORS' FIRST AMENDED PLAN OF REORGANIZATION [Docket No. 16647.]

7.      Title 29 § 1163 and Title 26 § 4980B defines a proceeding in a case under title 11, United States Code, commencing on or after July 1, 1986, with respect to the employer from whose employment the covered employee retired at any time, as a COBRA qualifying event. (Pages 6 –17, Attachment B)

In both titles, the above paragraph for both code sections states that In the case of an event described in the above paragraph, a loss of coverage includes a substantial elimination of coverage with respect to a qualified beneficiary within one year before or after the date of commencement of the proceeding.

8.      Title 29 § 1162 has a special rule for qualifying events described in item (7) above. The period of continuing coverage must extend for at least the period beginning on the date of the qualifying event and ending not earlier than the date of the death of the covered employee:

9.      In its motion on March 13, 2009, the Debtor interpreted this section of Title 26 and Title 29 to mean that a reduction in coverage is a qualifying event only if it occurs in the time interval beginning 12 months before bankruptcy filing and ending 12 months after bankruptcy filing. Therefore, by practice contends that retirees are not entitled to "COBRA until death", and by implication then, there is no COBRA obligation for any successor employer to the company. [Docket No. 16457.]

However, the Debtor avoids the plain reading of the statute and ignores the intent of Congress; and the court, in its wisdom, has made no ruling confirming the Debtor's position.

3

10.     Title 29 states that Congress' intent in passing the ERISA statute was to protect retiree's pensions and health care benefits. Title 29, § 1163-(6) and Title 26, § 4980B-(f)(3)(f) were written to provide a special protection for retirees of companies in bankruptcy. Congress appears to have placed the "twelve months prior to bankruptcy" as a safe harbor for companies, while also providing a reasonable barrier against manipulation by companies whose management anticipated an eminent bankruptcy.

Since Congress recognized the potential risk corporate manipulation posed for retirees, it would be inconsistent to believe that congress would provide this protection for only the first twelve months of Bankruptcy. Otherwise, most, if not all, companies would do just as the Debtor has done, and wait to a time longer than twelve months after the commencement of Bankruptcy to reduce benefits. Such delaying tactics would avoid COBRA obligations, while making that section of Title 29 (also Title 26) meaningless in regards to Congress' intent to provide protection for retirees.

## Relief Requested

11.     The Movant is seeking entry of an order, which does the following:

1.      Delay action on the Debtor's motion [Docket No. 16646], until a coordinated rulings has been issue by the Department of Treasury and the Department of labor (pursuant to the Movant's request of July 8, 2009, to both departments **(Attachment B).**

## OR

2.      Orders the debtor to provide salaried retirees COBRA coverage retroactively from April 1, 2009, until the death of each eligible retiree, in conformance with relevant sections of Title 26 and Title 29.

3.      Orders the debtor to immediately reimburse salaried retiree's premiums paid in

4

excess of the 102% COBRA rate mandated by statute.

      4.      Instruct that all potential successor employers, transferees and asset purchasers be advised by debtor prior to any transaction that they may have continuing coverage liabilities  **(I.R.B 2001-8, page 688 – Attachment C)**

      5.      Order the debtor, prior to (or at the latest simultaneous to) any reorganization, in lieu of lifetime continuing coverage, to make a one time payment of $532,169,000.00 (Five hundred thirty-two million, one hundred-sixty-nine thousand dollars), to be adjusted with any payment data corrections and less reimbursed premiums; to the Delphi Salaried Retirees VEBA Trust., as full settlement. (See attachment A.)

<u>**Benefit of Relief**</u>

      12.      The benefit of the relief sought is that it will:

      i.   Insure that the Debtor has a successful reorganization.

      ii.   Help the Debtor avoid potentially large tax sanctions regarding COBRA regulations and notification requirements.

      iii.   Insure that purchaser of certain assets, transferees of certain assets and / or successor employers avoid unexpected COBRA liabilities **(I.R.B 2001-8, page 688 - Attachment C)**

      iv.   Avoid expensive and disruptive post reorganization litigation for Delphi Salaried Retirees and Successor Employers, asset transferees and asset purchasers.

      v.   Insure that Congress' intent "to protect retiree health benefits when reduced during Title 11 proceedings" is met.

      vi.   Ensure that Delphi Salaried Retirees do not carry a disproportionate and unfair portion of the Debtor reorganization expense.

**Memorandum of Law**

13.     It is respectfully requested that the Court waive the requirement contained in

Local Bankruptcy Rule 9013-1(b) that a separate memorandum of law be submitted.

### No Prior Request

14.     No prior motion for the relief sought herein has been made by the Movant to this

or any other court.

WHEREFORE the Movant respectfully request that this Court enter an order in the form

attached hereto granting the relief requested herein, and such other and further relief as may be

just, necessary and appropriate.

Dated: Noblesville, Indiana
July 10, 2009

By: _____
James B. Sumpter

James B. Sumpter, Pro Se
21169 Westbay circle
Noblesville, IN 46062
Telephone: (317) 877-0736
Facsimile: (317) 877-1070
jsump@ieee.org

Salaried Retiree of Debtors

6

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

— — — — — — — — — — — — --x Chapter 11 Case No. 05-44481 (RDD)

In re:

DELPHI CORPORATION, et. al.,                    :(Jointly Administered)
                                                :
        Debtors.                                : :
                                                : :

— — — — — — — — — — — — -x

**ORDER TO ENFORCE COBRA BENEFIT FOR DELPHI SALARIED RETIREES AND
ORDER OF COBRA SETTLEMENT (COBRA BENEFIT MOTION)**

Upon the motion dated July 10, 2009 the ( "COBRA Benefit Motion") filed by the James

B. Sumpter, a salaried retiree of Debtors pursuant to 11 U.S.C. §§ 102(1), 105(a), and Rules 8005

and 9006(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule

9006-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of New

York (the "Local Rules") requesting that the Court enforce Salaried Retiree bankruptcy related,

Cobra Benefit rights

ORDERED that:

1.      The Debtor shall provide salaried retirees COBRA coverage retroactively from

April 1, 2009, and ending not earlier than the death of each eligible retiree, in conformance with

relevant sections of Title 26 and Title 29.

2.      The debtor shall reimburse salaried retiree's, by August 23, 2009, premiums paid

in excess of the 102% COBRA rate mandated by statute.

3.      The debtor shall advise all potential successor employers, transferees and asset

purchasers that they may have continuing coverage liabilities pursuant to **I.R.B 2008-1, page 688,**

until this order is fully implemented.

4.      The Debtor, prior to (or at the latest simultaneous to) any reorganization, in lieu of
lifetime continuing coverage, shall make a one time payment of $532,169,000.00 ((Five hundred

thirty-two million, one hundred-sixty-nine thousand dollars), to be adjusted with any payment data corrections (conforming to attachment A in the COBRA Benefit Motion, in agreement with James B. Sumpter, Movant) and less reimbursed premiums; to the Delphi Salaried Retirees VEBA Trust., as full settlement.

Dated:      New York, New York
           July __, 2009

_____
HONORABLE ROBERT D. DRAIN UNITED STATES BANKRUPTCY JUDGE

# Attachment A

# DELPHI

## Estimated 2009 Retiree Self-Pay Rates

| Rates shown below are Monthly Rates | | | | | | | |
|---|---|---|---|---|---|---|---|
| Health Plan Name | Employee Only | Employee and Spouse | Employee and Child(ren) | Family | Spouse Only | Child(ren) Only | Spouse & Child(ren) |
| Enhanced Medical Plan | $666.00 | $1,332.00 | $1,198.80 | $1,864.8 | $666.00 | $666.00 | $1,198.80 |
| Point-of-Service Plan | $636.00 | $1,272.00 | $1,144.80 | $1,780.8 | $636.00 | $636.00 | $1,144.80 |
| Comprehensive Health Savings | $332.00 | $664.00 | $597.60 | $929.60 | $332.00 | $332.00 | $597.80 |
| Health Net (Southern CA) | $520.99 | $1,094.08 | $989.88 | $1,458.7 | N/A | N/A | N/A |
| Advantage Health Plan ((N) | $502.72 | $1,055.77 | $955.17 | $1,407.6 | N/A | N/A | N/A |
| HAP (MI) | $333.43 | $700.21 | $633.52 | $933.60 | N/A | N/A | N/A |
| Priority Health West (MI) | $507.89 | $1,066.57 | $965.02 | $1,422.2 | N/A | N/A | N/A |
| Blue Care Network (Southeast | $312.81 | $656.90 | $594.34 | $875.87 | N/A | N/A | N/A |
| Priority Health East (MI) | $377.92 | $793.67 | $718.07 | $1,058.2 | N/A | N/A | N/A |
| Health Plus of Michigan (M(-Flint) | $386.05 | $810.70 | $733.49 | $1,080.9 3 | N/A | N/A | N/A |
| Health Plus of Michigan (M(-SE | $304.99 | $640.48 | $579.48 | $853.97, | N/A | N/A | N/A |
| Health Plus of Michigan (M(-Saginaw) | $399.75 | $839.49 | $759.54 | $1,119.3 2 | N/A | N/A | N/A |
| Blue Care Network (M(-East/Saginaw) | $404.59 | $849.64 | $768.73 | $1,132.8 5 | N/A | N/A | N/A |
| Blue Care Network (Mid-Michigan) | $404.59 | $849.64 | $768.73 | $1,132.8 5 | N/A | N/A | N/A |
| Blue Care Network (East/Flint | $368.60 | $774.06 | $700.34 | $1,032.0 8 | N/A | N/A | N/A |
| Blue Point 2 (NY-Rochester) | $370.98 | $853.26 | $934.13 | $983.10 | N/A | N/A | N/A, |
| United HealthCare (Dayton/Cinci) | $600.59 | $1,261.24 | $1,141.12 | $1,681.6 4 | N/A | N/A | N/A |
| Kaiser Permanente (OH) | $419.44 | $880.82 | $796.94 | $1,174.4 | N/A | N/A | N/A |
| Health Assurance - Warren/Youngstown (OH) | $550.38 | $1,155.79 | $1,045.72 | $1,541.0 6 | N/A | N/A | N/A |
| | | | | | | | |
| Dental | $44.00 | $88.00 | $79.20 | $123.20 | N/A | N/A | N/A |
| Vision | $3.00 | $6.00 | $5.40 | $8.40 | N/A | N/A | N/A |
| Extended Care Coverage | $11.00 | $22.00 | $19.80 | $30.80 | N/A | N/A | N/A |

Notes: Rates are evaluated on an annual basis and are subject to change.

Spouse Only, Child(ren) Only, Spouse & Child(ren) are available only to retirees who are Medicare eligible and age 65 or older.

1 of 4   **Attachment A**

## 2009 Salaried COBRA Rates

### Rates shown below are Monthly Rates

| Medical Plan | Enrollee Only | Enrollee and Spouse | Enrollee and Child(ren | Enrollee and Family |
|---|---|---|---|---|
| Optional Canadian HC | 100.98 | 201.96 | 181.77 | 282.75 |
| Comprehensive Health Savings | 246.84 | 493.68 | 444.31 | 691.15 |
| Enhanced Medical Plan | 491.64 | 983.28 | 884.95 | 1376.59 |
| Point-of-Service Plan | 423.30 | 846.60 | 761.94 | 1185.24 |
| Health Net (Southern CA) | 531.41 | 1115.96 | 1009.68 | 1487.95 |
| Advantage Health Plan ((N) | 512.78 | 1076.89 | 974.27 | 1435.77 |
| HAP (M() | 340.10 | 714.21 | 646.19 | 952.27 |
| Priority Health West (M() | 518.05 | 1087.90 | 984.32 | 1450.65 |
| Blue Care Network (Southeast Michigan) | 319.07 | 670.04 | 606.23 | 893.39 |
| Priority Health East (M() | 385.48 | 809.54 | 732.43 | 1079.38 |
| Health Plus of Michigan (M(- | 393.77 | 826.91 | 748.16 | 1102.55 |
| Health Plus of Michigan (M(-SE | 311.09 | 653.29 | 591.07 | 871.05 |
| Health Plus of Michigan (M(-Saginaw) | 407.75 | 856.28 | 774.73 | 1141.71 |
| Blue Care Network (MI-East/Saginaw) | 412.68 | 866.63 | 784.10 | 1155.51 |
| Blue Care Network (Mid- | 412.68 | 866.63 | 784.10 | 1155.51 |
| Blue Care Network (East/Flint Michigan) | 375.97 | 789.54 | 714.35 | 1052.72 |
| Blue Point 2 (NY-Rochester) | 378.40 | 870.33 | 952.81 | 1002.76 |
| United HealthCare | 612.60 | 1286.46 | 1163.94 | 1715.27 |
| Kaiser Permanente (OH) | 427.83 | 898.44 | 812.88 | 1197.92 |
| Health Assurance - Warren/Youngstown (OH) | 561.39 | 1178.91 | 1066.64 | 1571.88 |
| CIGNA (nternational HC Plan | 274.20 | 665.02 | 557.47 | 948.00 |
| **Dental Plan*** | **Enrollee Only** | **Enrollee and Spouse** | **Enrollee and Child(ren** | **Enrollee and Family** |
| C(GNA Traditional Dental Plan | 30.60 | 61.20 | 55.08 | 85.68 |
| **Vision Pla** | **Enrollee Only** | **Enrollee and Spouse** | **Enrollee and Child(ren** | **Enrollee and Family** |
| EyeMed Traditional Vision | 3.06 | 6.12 | 5.51 | 8.57 |

* (f Medicare eligible at time of qualifying event, rates may vary

** Alternative Dental Plan rates may vary

## **Calculation of Delphi Retiree Self Pay Health Care Rate Relative to the COBRA Rate**

From Delphi Charts  (Exhibit A)

Self Pay Rate (single, enhanced plan) [SPS]          $   666.00

Self Pay Rate (family, enhanced plan) [SPF]          $ 1864.80

From Delphi Charts  (Exhibit B)

COBRA Rate (single, enhanced plan) [CRS]          $   491.61

COBRA Rate (family, enhanced plan)[CRF]          $ 1376.59

- ♦   Assumption 1:  COBRA rate  is 102% of  applicable premium
- ♦   Assumption 2:  All rate ratios are the same

100% rate (single, enhanced plan) =      $[PRS] = \dfrac{CRS}{102} = \dfrac{\$491}{102} = \$482$
   (100% Premium Rate)

100% rate (family, enhanced plan) =      $[PRF] = \dfrac{CRF}{102} = \dfrac{\$1376.59}{102} = \$1349.60$
   (100% Premium Rate)

Self Pay % (single, enhanced plan) =      $\dfrac{SPS}{PRS} = \dfrac{\$666}{\$482} \times 100 = 138.2\%$

Self Pay % (Family, enhanced plan) =      $\dfrac{SPF}{PRF} = \dfrac{\$1864.80}{\$1349.60} \times 100 = 138.2\%$

Therefore Retirees are paying a rate **36.2%** higher than the COBRA rate.

Therefore  value of the COBRA benefit  is  1.362 x  Debtor premium rate.

3 of 4   **Attachment A**

Prior to April 1, 2009 it is believed that Delphi was paying 2.5 million dollars ($2,500,000) per month for Salaried Retiree health care benefits.

Yearly cost of retiree health care = 12 x 2,500,000 =  $ 30,000,000

2009  COBRA cost = $30,0000,000 x .362  =  **$ 10,860,000**

-------------

Allowing that health care costs are increasing at twice the rate of inflation


Assume average yearly  inflation rate over the next thirty years  =  3%

Therefore assumed:

 average yearly health care rate growth over thenext thirty years  =  6%

--------------

Assume an average 30 year benefit period per retiree.


Then the Future value   **= The COBRA health care cost     $532,169,085.01**

**(over the next thirty years allowing for inflation and health care cost growth.)**

**Therefore:**

**The required Lump Sum Payment to Retiree VEBA  = $532, 169,000.00**

4 of 4   **Attachment A**

**Expedited Handling Is Requested. See page 19 of this letter.**

July 8, 2009

Internal Revenue Service
Commissioner, TE/GE
Attention: SE:T:EP:RA
P.O. Box 27063
McPherson Station
Washington, DC 20038

Dear Sir or Madam:

I, James B. Sumpter, a tax payer and Salaried Retiree of Delphi Automotive, am requesting a ruling on the proper interpretation of timing associated with a COBRA qualifying event during a Title 11 proceeding, as it pertains to retirees under **Title 26 § 4980B-(t)** of the Internal Revenue Code, and **Title 29 § 1163- (6)** of Regulations of the Department of Labor. These sections both (using the same language) define a COBRA Qualifying event during a Title 11 proceeding. Both of these sections are referenced here because Title 29, § 1204 requires coordination between the Department of the Treasury and the Department of Labor.

**Statement of Facts**

1   Petitioner

James B. Sumpter
21169 Westbay Circle
Noblesville, IN 46062
(317) 877-0736
j sump@ieee.org

2.  On October 8, 2005 Delphi Corporation, et al. filed for Chapter 11 bankruptcy protection,
♦ In the Southern District of New York
. Case number 05-44481 (RDD)

3.  On April 1 2009, with bankruptcy court approval Delphi eliminated all company funded health care benefits for Salaried Retirees.

4.  On April 1, 2009 Delphi offered a separate health care plan to retirees which required retirees to pay 100% of the premium cost. A schedule of these premiums is attached **(Exhibit A)**

5.  This reduction in coverage specifically and directly affects more than 6000 Delphi Salaried Retirees.

6.  A small group of Salaried Retirees who were involuntarily separated in recent months receive COBRA coverage, which is expected to last 18 months. A schedule of the COBRA rates for these retires is attached **(Exhibit-B)**

7.  The Self Pay insurance rate is 138.2% of the active employee rate **(Exhibit-C)**

8.  Title 26 § 4980B and Title 29 § 1163 stipulate that a substantial reduction in coverage 12 months before or after commencement of bankruptcy is a qualifying event for retirees. See actual text below:

> **Title 26 § 4980B-(I) /** *(also) Title 29 § 1163 – (6)*
> *(3) Qualifying event*
>
> > *(F) A proceeding in a case under title 11, United States Code, commencing on or after July 1, 1986, with respect to the employer from whose employment the covered employee retired at any time.*
> > *In the case of an event described in subparagraph (F), a loss of coverage includes a substantial elimination of coverage with respect to a qualified beneficiary described in subsection (g)(1)(D) within one year before or after the date of commencement of the proceeding.*

9.  Delphi has interpreted this section of Title 26 and Title 29 to specify that a reduction in coverage is a qualifying event only if it occurs in the time interval beginning 12 months before bankruptcy filing and ending 12 months after bankruptcy filing. Therefore, by practice contends that retirees are not entitled to COBRA until death, and by implication there is no COBRA obligation for any successor to the company.

10. As of July 8, 2008 Delphi continues in bankruptcy; however Delphi has filed a plan for emergence which has a Final Modification Hearing scheduled for July 23, 2009.

11. Bankruptcy Court Addresses

| | |
|---|---|
| United States Bankruptcy Court | <u>United States Trustee</u> |
| Southern District of New York | Brian S. Masumoto, Trial Attorney |
| One Bowling Green | U.S. Department of Justice |
| New York, NY 10004 | Office of the United States Trustee |
| T: 212-668-2870 | 33 Whitehall Street, 21st Floor |
| http://www.nysb.uscourts.gov | New York, NY 10004-2111 |
| | T: 212-510-0500 |
| | F: 212-668-2255 |
| | http://www.usdoj.gov/ust/r02/ |

12. Information regarding the Delphi Bankruptcy proceeding may be found at:

http://www.delphidocket.com

13. Copies of this Request were mailed to the Following:

> Internal Revenue Service
> Commissioner, TE/GE
> Attention: SE:T:EP:RA
> P.O. Box 27063
> McPherson Station
> Washington, DC 20038

> U.S. Department of Labor
>  Employee Benefits Security Administration
>  Public Disclosure Room
> 200 Constitution Avenue, NW, Suite
> N-1513 Washington, DC 20210
> Tel 202.693.8673

> U.S. Department of Labor
> Employee Benefits Security Administration
> Office of Health Plan Standards and Compliance Assistance
> 200 Constitution Avenue, NW, Suite N-5653
> Washington, DC 20210
> Tel 202.693.8335

## Ruling Request

I am requesting a ruling from the Treasury and Labor departments that specifically voids Delphi's interpretation of the sited sections of Title 26 and Title 29. I am requesting that a ruling be issued that explicitly states that referenced sections in Title 26 and Title 29 shall mean that:

> **(F) A proceeding in a case under title 11, United States Code, commencing on or after July 1, 1986, with respect to the employer from whose employment the covered employee retired at any time.**

> **In the case of an event described in subparagraph (F), a loss of coverage includes a substantial elimination of coverage with respect to a qualified beneficiary described in subsection (g)(1)(D) in either of the two following cases:**

> > **a. The event occurs in the time period beginning 12 months before the commencement of a proceeding under title 11.**

       **b. The event occurs anytime after the commencement of a proceeding under title 11.**

**Statement of Law**

Title 29 > Chapter 18 > Subtitle B > Part 6 > § 1163 and

Title 26 > Subtitle D > Chapter 43 > § 4980B

The referenced sections follow immediately.

**Statement of Law Continued:**

**Title 29 > Chapter 18 > Subtitle B > Part 6 > § 1163**

Cornell University
Law School

LII / Legal Information Institute

# U.S. Code collection

TITLE 29 > CHAPTER 18 > SUBCHAPTER I > Subtitle B > part 6 > § 1163

## § 1163. Qualifying event

f or purposes of this part, the term "qualifying event" means, with respect to any covered employee, ar y of the following events which, but for the continuation coverage required under this part, would -esult in the loss of coverage of a qualified beneficiary:

(1)   The death of the covered employee.

(2)   The termination (other than by reason of such employee's gross misconduct), or reduction of hours, of the covered employee's employment.

(3)   The divorce or legal separation of the covered employee from the employee's spouse.

(4)   The covered employee becoming entitled to benefits under title <VII l of the Social Security Act [42 U.S.C. 1395 et seq.].

(5)   A dependent child ceasing to be a dependent child under the generally applicable requirements of the plan.

(6)   A proceeding in a case under title 11, commencing on or after July 1, 1986, with respect to the employer from whose employment the covered employee retired at any time.

In the case of an event described in paragraph (6), a loss of coverage includes a substantial elimination of coverage with respect to a qualified beneficiary described in section 11( 7 3)(C) of this title within one year before or after the date of commencement of the proceeding.

*LII has no control over and does not endorse any external Internet site that contains links to or references LII.*

**Statement of Law Continued:**


**Title 26** > **Subtitle D** > **Chapter 43** > § **4980B**

Cornell University
Law School

LII / Legal Information Institute

# U.S. Code collection

TITLE 26 > Subtitle D > CHAPTER 43 > § 4980B

## § 4980B. Failure to satisfy continuation coverage requirements of group health plans

(a) General rule

There is hereby imposed a tax on the failure of a group health plan to meet the requirements of subsection (f) with respect to any qualified beneficiary.

(b) Amount of tax

(1) In general

The amount of the tax imposed by subsection (a) on any failure with respect to a qualified beneficiary shall be $100 for each day in the noncompliance period with respect to such failure.

(2) Noncompliance period

For purposes of this section, the term "noncompliance period" means, with respect to any failure, the period

(A)   beginning on the date such failure first occurs, and

(B)   ending on the earlier of-

(i)   the date such failure is corrected, or

(ii)   the date which is 6 months after the last day in the period applicable to the qualified beneficiary under subsection (f)(2)(B) (determined without regard to clause (iii) thereof).

If a person is liable for tax under subsection (e)(1)(B) by reason of subsection (e)(2)(B) with respect to any failure, the noncompliance period for such person with respect to such failure shall not begin before the 45th day after the written request described in subsection (e)(2)(B) is provided to such person

(3) Minimum tax for noncompliance period where failure discovered after notice of examination

Notwithstanding paragraphs (1) and (2) of subsection (c)—

(A) In general

In the case of 1 or more failures with respect to a qualified beneficiary-

(i)   which are not corrected before the date a notice of examination of income tax liability is sent to the employer, and

(ii)   which occurred or continued during the period under examination,

the amount of tax imposed by subsection (a) by reason of such failures with respect to such beneficiary shall not be less than the lesser of $2,500 or the amount of tax which would be imposed by subsection (a) without regard to such paragraphs.

(B) Higher minimum tax where violations are more then de minimis

To the extent violations by the employer (or the plan in case of a multiemployer plan) for any year are more than de minimis, subparagraph (A) shall be applied by substituting "$15,000" for "$2,500" with respect to the employer (or such plan).

(c) Limitations on amount of tax

   (1) Tax not to apply where failure not discovered exercising reasonable diligence

No tax shall be imposed by subsection (a) on any failure during any period for which it is established to the satisfaction of the Secretary that none of the persons referred to in subsection (e) knew, or exercising reasonable diligence would have known, that such failure existed.

   (2) Tax not to apply to failures corrected within 30 days

No tax shall be imposed by subsection (a) on any failure if

     (A)   such failure was due to reasonable cause and not to willful neglect, and

     (B)   such failure is corrected during the 30-day period beginning on the 1st date any of the persons referred to in subsection (e) knew, or exercising reasonable diligence would have known, that such failure existed.

   (3) $100 limit on amount of tax for failures on any day with respect to a qualified beneficiary

     (A) In general

Except as provided in subparagraph (B), the maximum amount of tax imposed by subsection (a) on failures on any day during the noncompliance period with respect to a qualified beneficiary shall be $100.

     (B) Special rule where more than 1 qualified beneficiary

If there is more than 1 qualified beneficiary with respect tc the same qualifying event, the maximum amount of tax imposed by subsection (a) on all failures on any day during the noncompliance period with respect to such qualified beneficiaries shall be $200.

   (4) Overall limitation for unintentional failures

In the case of failures which are due to reasonable cause and not to willful neglect

     (A) Single employer plans

       (i) In general In the case of failures with respect to plans other than multiemployer plans, the tax imposed by subsection (a) for failures during the taxable year of the employer shall not exceed the amount equal to the lesser of

         (I)   10 percent of the aggregate amount paid or incurred by the employer (or predecessor employer) during the preceding taxable year for group health plans, or

         (II)   $500,000.

       (ii) Taxable years in the case of certain controlled groups For purposes of this subparagraph, if not all persons who are treated as a single employer for purposes of this section have the same taxable year, the taxable years taken into account shall be determined under principles similar to the principles of section 1561.

     (B) Multiemployer plans

       (i) In general In the case of failures with respect to a multiemployer plan, the

tax imposed by subsection (a) on failures during the taxable year of the trust forming part of such plan shall not exceed the amount equal to the lesser of

(I) 10 percent of the amount paid or incurred by such trust during such taxable year to provide medical care (as defined in section 213 (d)) directly or through insurance, reimbursement, or otherwise, or

(II) $500,000.

For purposes of the preceding sentence, all plans of which the same trust forms a part shall be treated as 1 plan.

(ii) Special rule for employers required to pay tax If cn employer is assessed a tax imposed by subsection (a) by reason of a failure with respect to a multiemployer plan, the limit shall be determined under subparagraph (A) (and not under this subparagraph) and as if such plan were rot a multiemployer plan.

(C) Special rule for persons providing benefits

In the case of a person described in subsection (e)(1)(B) (and not subsection (e)(1)(A)), the aggregate amount of tax imposed by subsection (a) for failures during a taxable year with respect to all plans shall not exceed $2,000,000.

(5) Waiver by Secretary

In the case of a failure which is due to reasonable cause and not to willful neglect, the Secretary may waive part or all of the tax imposed by subsection (a) to the extent that the payment of such tax would be excessive relative to the failure involved.

(d) Tax not to apply to certain plans

This section shall not apply to

(1)  any failure of a group health plan to meet the requirements of subsection (f) with respect to any qualified beneficiary if the qualifying event with respect to such beneficiary occurred during the calendar year immediately following a calendar year during which all employers maintaining such plan normally employed fewer than 20 employees on a typical business day,

(2)  any governmental plan (within the meaning of section 414 d)), or

(3)  any church plan (within the meaning of section 414 (e)).

(e) Liability for tax

(1) In general

Except as otherwise provided in this subsection, the following shall be liable for the tax imposed by subsection (a) on a failure:

(A)

(i)  In the case of a plan other than a multiemployer plan, the employer.

(ii)  In the case of a multiemployer plan, the plan.

(B) Each person who is responsible (other than in a capacity as an employee) for administering or providing benefits under the plan and whose act or failure to act caused (in whole or in part) the failure.

(2) Special rules for persons described in paragraph (1)(B)

(A) No liability unless written agreement

Except in the case of liability resulting from the application of subparagraph (B) of this paragraph, a person described in subparagraph (B) (and not in subparagraph

**(A))** of paragraph (1) shall be liable for the tax imposed by subsection (a) on any failure only if such person assumed (under a legally enforceable written agreement) responsibility for the performance of the act to which the failure relates.

( B) Failure to cover qualified beneficiaries where current employees are covered

A person shall be treated as described in paragraph (1)(B) with respect to a qualified beneficiary if-

(i)   such person provides coverage under a group health plan for any similarly situated beneficiary under the plan with respect to whom a qualifying event has not occurred, and

(ii)   the

(I)   employer or plan administrator, or

(II)   in the case of a qualifying event described in subparagraph (C) or (E) of subsection (f)(3) where the person described in clause (i) is the plan administrator, the qualified beneficiary,

submits to such person a written request that such pe . son make available to such qualified beneficiary the same coverage which such person provides to the beneficiary referred to in clause (i).

## (f) Continuation coverage requirements of group health plans

(1)  In general

A group health plan meets the requirements of this subsection only if the coverage of the costs of pediatric vaccines (as defined under section 2162 of the Public Health Service Act) [1] is not reduced below the coverage provided by the plan as of May 1, 1993, and only if each qualified beneficiary who would lose coverage unde the plan as a result of a qualifying event is entitled to elect, within the election period, continuation coverage under the plan.

(2)  Continuation coverage

For purposes of paragraph (1), the term "continuation coverage means coverage under the plan which meets the following requirements:

(A)  Type of benefit coverage

The coverage must consist of coverage which, as of the time the coverage is being provided, is identical to the coverage provided under the plan to similarly situated beneficiaries under the plan with respect to whom a qualifying event has not occurred. If coverage under the plan is modified for any group of similarly situated beneficiaries, the coverage shall also be modified in the same manner for all individuals who are qualified beneficiaries under the plan pursuant to this subsection in connection with such group.

(B)  Period of coverage

The coverage must extend for at least the period beginning on the date of the qualifying event and ending not earlier than the earliest of the following:

(i) Maximum required period

(I)   General rule for terminations and reduced hours In the case of a qualifying event described in paragraph (3)(B), except as provided in subclause (II), the date which is 18 months after the date of the qualifying event.

(II)   Special rule for multiple qualifying events If a qualifying event (other

than a qualifying event described in paragraph (3)(F)) occurs during the 18 months after the date of a qualifying event described in paragraph (3)(B), the date which is 36 months after the date of the qualifying event described in paragraph (3)(B).

(III)   Special rule for certain bankruptcy proceedings In the case of a qualifying event described in paragraph (3)(F) (relating to bankruptcy proceedings), the date of the death of the covered employee or qualified beneficiary (described in subsection (g)(1)(D)(iii)), or in the case of the surviving spouse or dependent children of the covered employee, 36 months after the date of the death of the covered employee.

(IV)   General rule for other qualifying events In the case of a qualifying event not described in paragraph (3)(B) or (3)(F), the date which is 36 months after the date of the qualifying event.

(V)   Medicare entitlement followed by qualifying event In the case of a qualifying event described in paragraph (3)(B) that occurs less than 18 months after the date the covered employee becamE entitled to benefits under title XVII I of the Social Security Act, the period of coverage for qualified beneficiaries other than the covered emplo ʸee shall not terminate under this clause before the close of the 36-month period beginning on the date the covered employee became so entitled.

    In the case of a qualified beneficiary who is determined, under title II or XVI of the Social Security Act, to have been disabled at any time during the first 60 days of continuation coverage under this section, any reference in subclause (I) or (II) to 18 months is deemed a reference to 29 months (with respect to all qualified beneficiaries), but only if the qualified beneficiary has provided notice of such determination under paragraph (6)(C) before the end of such 18 months.

(ii) End of plan The date on which the employer ceases to provide any group health plan to any employee.

(iii) Failure to pay premium The date on which coverage ceases under the plan by reason of a failure to make timely payment of any premium required under the plan with respect to the qualified beneficiary. The payment of any premium (other than any payment referred to in the last sentence of subparagraph (C)) shall be considered to be timely if made within 30 days after the date due or within such longer period as applies to or under the plar .

(iv) Group health plan coverage or medicare entitlement The date on which the qualified beneficiary first becomes, after the date of the election

(I)   covered under any other group health plan (as ₐn employee or otherwise) which does not contain any exclusion or limitation with respect to any preexisting condition of such beneficiary (other than such an exclusion or ǀimitation which does not apply to (or is satisfied by) such beneficiary by reason of chapter 100 of this title, part 7 of subtitle B of title I of the Employee Retirement Income Security Act of 1974, or title XXVII of the Public Health Service Act), or

(II)   in the case of a qualified beneficiary other than a qualified beneficiary described in subsection (g)(1)(D) entitled to benefits under title XVIII of the Social Security Act.

(v) Termination of extended coverage for disability In the case of a qualified beneficiary who is disabled at any time during the first E0 days of continuation coverage under this section, the month that begins more than 30 days after the date of the final determination under title II or XVI of the Social Security Act that the qualified beneficiary is no longer disabled.

( C) Premium requirements

The plan may require payment of a premium for any perioc of continuation coverage, except that such premium-

   (i)   shall not exceed 102 percent of the applicable premium for such period, and

   (ii)  may, at the election of the payor, be made in monthly installments.

In no event may the plan require the payment of any premium before the day which is 45 days after the day on which the qualified beneficiary mace the initial election for continuation coverage. In the case of an individual describes in the last sentence of subparagraph (B)(i), any reference in clause (i) of this subparagraph to "102 percent" is deemed a reference to "150 percent" for any month after :he 18th month of continuation coverage described in subclause (I) or (II) of a bparagraph (B)(i).

( D) No requirement of insurability

The coverage may not be conditioned upon, or discriminate on the basis of lack of, evidence of insurability.

(E) Conversion option

In the case of a qualified beneficiary whose period of continuation coverage expires under subparagraph (B)(i), the plan must, during the 180-day period ending on such expiration date, provide to the qualified beneficiary the option of enrollment under a conversion health plan otherwise generally available under the plan.

## (3) Qualifying event

For purposes of this subsection, the term "qualifying event" means , with respect to any covered employee, any of the following events which, but for the continuation coverage required under this subsection, would result in the loss of coverage of a qualified beneficiary

   (A)   The death of the covered employee.

   (B)   The termination (other than by reason of such employ€ e's gross misconduct), or reduction of hours, of the covered employee's employment.

   (C)   The divorce or legal separation of the covered employee from the employee's spouse.

   (D)   The covered employee becoming entitled to benefits under title XVIII of the Social Security Act.

   (E)   A dependent child ceasing to be a dependent child under the generally applicable requirements of the plan.

   (F)   A proceeding in a case under title 11, United States Code, commencing on or after July 1, 1986, with respect to the employer from whose employment the covered employee retired at any time.

In the case of an event described in subparagraph (F), a loss of coverage includes a substantial elimination of coverage with respect to a qualified beneficiary described in subsection (g)(1)(D) within one year before or after the date of commencement of the proceeding.

## (4) Applicable premium

For purposes of this subsection

(A) In general

The term "applicable premium" means, with respect to any period of continuation

coverage of qualified beneficiaries to the plan for such period of the coverage for similarly situated beneficiaries with respect to whom a qualifying event has not occurred (without regard to whether such cost is paid by the employer or employee).

(B) Special rule for self-insured plans

To the extent that a plan is a self-insured plan-

(i) In general Except as provided in clause (ii), the applicable premium for any period of continuation coverage of qualified beneficiaries shall be equal to a reasonable estimate of the cost of providing coverage for such period for similarly situated beneficiaries which

(I)   is determined on an actuarial basis, and

(II)   takes into account such factors as the Secretary may prescribe in regulations.

(ii) Determination on basis of past cost If a plan administrator elects to have this clause apply, the applicable premium for any period of continuation coverage of qualified beneficiaries shall be equal to

(I)   the cost to the plan for similarly situated beneficiaries for the same period occurring during the preceding determination period under subparagraph (C), adjusted by

(II)   the percentage increase or decrease in the implicit price deflator of the gross national product (calculated by the Department of Commerce and published in the Survey of Current Business) for the 12-month period ending on the last day of the sixth month of such preceding determination period.

(iii) Clause (ii) not to apply where significant change A plan administrator may not elect to have clause (ii) apply in any case in which tiere is any significant difference between the determination period and the preceding determination period, in coverage under, or in employees covered by, :he plan. The determination under the preceding sentence for any determination period shall be made at the same time as the determination under subparagraph (C).

(C) Determination period

The determination of any applicable premium shall be made for a period of 12 months and shall be made before the beginning of such period.

(5) Election

For purposes of this subsection

(A) Election period

The term "election period" means the period which-

(i)   begins not later than the date on which coverage terminates under the plan by reason of a qualifying event,

(ii)   is of at least 60 days' duration, and

(iii)   ends not earlier than 60 days after the later of

(I)   the date described in clause (i), or

(II)   in the case of any qualified beneficiary who receives notice under paragraph (6)(D), the date of such notice.

(B) Effect of election on other beneficiaries

Except as otherwise specified in an election, any election of ' coverage by a qualified beneficiary described in subparagraph (A)(i) or B) of subsection (g)(1) shall be deemed to include an election of continuation coverage on behalf of any other qualified beneficiary who would lose coverage under he plan by reason of the qualifying event. If there is a choice among types of coverage under the plan, each qualified beneficiary is entitled to make a separate selectio 1 among such types of coverage.

(C) Temporary extension of COBRA election period for :certain individuals

(i) In general In the case of a nonelecting TAA-eligible individual and notwithstanding subparagraph (A), such individual may elect continuation coverage under this subsection during the 60-day period that begins on the first day of the month in which the individual becomes a TAI -eligible individual, but only if such election is made not later than 6 months of er the date of the TAA-related loss of coverage.

(i i) Commencement of coverage; no reach-back Any continuation coverage elected by a TAA-eligible individual under clause (i) sha I commence at the beginning of the 60-day election period described in such paragraph and shall not include any period prior to such 60-day election period.

(iii) Preexisting conditions With respect to an individual al who elects continuation coverage pursuant to clause (i), the period

(I) beginning on the date of the TAA-related loss of coverage, and

(II) ending on the first day of the 60-day election period described in clause (i),

shall be disregarded for purposes of determining the 63-day periods referred to in section 9801 (c)(2), section 701(c)(2) of the Employee Retirement Income Security Act of 1974, and section 2701(c)(2) of the Public Health Service Act.

(iv) Definitions For purposes of this subsection:

(I) Nonelecting TAA-eligible individual The term "r onelecting TAA-eligible individual" means a TAA-eligible individual who has TAA-related loss of coverage and did not elect continuation coverage under this subsection during the TAA-related election period.

(II) TAA-eligible individual The term "TAA-eligible individual" means an eligible TAA recipient (as defined in paragraph (2) of section 35 (c)) and an eligible alternative TAA recipient (as defined in paragraph (3) of such section).

(III) TAA-related election period The term "TAA-related election period" means, with respect to a TAA-related loss of coverage, the 60-day election period under this subsection which is a direct consequence of such loss.

(IV) TAA-related loss of coverage The term "TAA-related loss of coverage" means, with respect to an individual whose separation from employment gives rise to being an TAA-eligible individual, the loss of health benefits coverage associated with such separation.

(6) Notice requirement

In accordance with regulations prescribed by the Secretary

(A) The group health plan shall provide, at the time of commencement of coverage under the plan, written notice to each covered employee and spouse of the employee (if any) of the rights provided under this subsection.

(B) The employer of an employee under a plan must notify the plan administrator of

a qualifying event described in subparagraph (A), (B), (D), c r (F) of paragraph (3) with respect to such employee within 30 days (or, in the case of 3 group health plan which is a multiemployer plan, such longer period of time as may he provided in the terms of the plan) of the date of the qualifying event.

(C)   Each covered employee or qualified beneficiary is responsible for notifying the plan administrator of the occurrence of any qualifying event described in subparagraph (C) or (E) of paragraph (3) within 60 days after the date of he qualifying event and each qualified beneficiary who is determined, under title II c r XVI of the Social Security Act, to have been disabled at any time during the f rst 60 days of continuation coverage under this section is responsible for notifying the f lan administrator of such determination within 60 days after the date of the determin ation and for notifying the plan administrator within 30 days of the date of any final determination under such title or titles that the qualified beneficiary is no longer disab ed.

(D)   The plan administrator shall notify-

(i)   in the case of a qualifying event described in subparagraph (A), (B), (D), or (F) of paragraph (3), any qualified beneficiary with respect to such event, and

(ii)   in the case of a qualifying event described in subpE ragraph (C) or (E) of paragraph (3) where the covered employee notifies the plan administrator under subparagraph (C), any qualified beneficiary with respect to such event,

of such beneficiary's rights under this subsection.

The requirements of subparagraph (B) shall be considered satisfied in the case of a multiemployer plan in connection with a qualifying event described in paragraph (3)(B) if the plan provides that the determination of the occurrence of such qualifying event will be made by the plan administrator. For purposes of subparagraph (I)), any notification shall be made within 14 days (or, in the case of a group health plan which is a multiemployer plan, such longer period of time as may be provided in the terms of the plan) of the date on which the plan administrator is notified under subparagraph (B) r (C), whichever is applicable, and any such notification to an individual who is a qualified beneficiary as the spouse of the covered employee shall be treated as notification t ° all other qualified beneficiaries residing with such spouse at the time such notificat on is made.

(7) Covered employee

For purposes of this subsection, the term "covered employee" rr eans an individual who is (or was) provided coverage under a group health plan by virtue of the performance of services by the individual for 1 or more persons maintaining the plan (including as an employee defined in section 401 (c)(1)).

(8) Optional extension of required periods

A group health plan shall not be treated as failing to meet the requirements of this subsection solely because the plan provides both

(A)   that the period of extended coverage referred to in paragraph (2)(B) commences with the date of the loss of coverage, and

(B)   that the applicable notice period provided under paragraph (6)(B) commences with the date of the loss of coverage.

(g) Definitions

For purposes of this section

(1) Qualified beneficiary

(A) In general

The term "qualified beneficiary" means, with respect to a covered   employee under a

group health plan, any other individual on the day be ore the qualifying event for that employee, is a beneficiary under the plan-

> (i)   as the spouse of the covered employee, or

> (ii)   as the dependent child of the employee.

Such term shall also include a child who is born to or placed for adoption with the covered employee during the period of continuation coverage under this section.

(B)  Special rule for terminations and reduced employment

In the case of a qualifying event described in subsection (f)(3)(B), the term "qualified beneficiary" includes the covered employee.

(C)  Exception for nonresident aliens

Notwithstanding subparagraphs (A) and (B), the term "qualified beneficiary" does not include an individual whose status as a covered employee attributable to a period in which such individual was a nonresident alien who received no earned income (within the meaning of section 911 (d)(2)) from the emplo $^{y}$er which constituted income from sources within the United States (within the meaning of section 861 (a)(3)). If an individual is not a qualified beneficiary pursuant to the previous sentence, a spouse or dependent child of such individual shall not be considered a qualified beneficiary by virtue of the relationship of the individual.

(D)  Special rule for retirees and widows

In the case of a qualifying event described in subsection (f)(3)(F), the term "qualified beneficiary" includes a covered employee who had retired c n or before the date of substantial elimination of coverage and any other individual who, on the day before such qualifying event, is a beneficiary under the plan-

> (i)   as the spouse of the covered employee,

> (ii)   as the dependent child of the covered employee, or

> (iii)   as the surviving spouse of the covered employee.

(2)  Group health plan

The term "group health plan" has the meaning given such term by section 5000 (b)(1). Such term shall not include any plan substantially all of the coverage under which is for qualified long-term care services (as defined in section 7702B (c)).

(3)  Plan administrator

The term "plan administrator" has the meaning given the term 'administrator' by section 3(16)(A) of the Employee Retirement Income Security Act of 1074.

(4)  Correction

A failure of a group health plan to meet the requirements of subsection (f) with respect to any qualified beneficiary shall be treated as corrected if

> (A)   such failure is retroactively undone to the extent possi )le, and

> (B)   the qualified beneficiary is placed in a financial position which is as good as such beneficiary would have been in had such failure not occurred .

For purposes of applying subparagraph (B), the qualified benefic ary shall be treated as if he had elected the most favorable coverage in light of the expenses he incurred since the failure first occurred.

### Analysis and Conclusion

Title 29 states that Congress' intent in passing the ERISA statute was to protect retiree's pensions and health care benefits. Title 29, § 1163-(6) and Title 26, § 4980B-(f)(3)(0 were written to provide a special protection for retirees of companies in bankruptcy. Congress appears to have placed the "twelve months prior to bankruptcy" as a safe harbor for companies, while also providing a reasonable barrier against manipulation by companies whose management anticipated an eminent bankruptcy.

Since Congress recognized the potential risk corporate manipulation posed for retirees, it would be inconsistent to believe that congress would provide this protection for only the first twelve months of Bankruptcy. Otherwise, most, if not all, companies would do just as Delphi has done, and wait to a time longer than twelve months after the commencement of Bankruptcy to reduce benefits. Such delaying tactics would avoid **COBRA** obligations, while making that section of Title 29 (also Title 26) meaningless in regards to Congress' intent to provide protection for retirees.

### Prior Rulings

Since Title 29, § 1204 requires coordination between the Department of the Treasury and the Department of Labor, A search was completed using an online legal database of IRS Revenue Rulings and **IRS** Private Letter Rulings related to Title 26 § 4980B. That search revealed 23 private letter rulings and 5 Revenue Rulings. None of those ruling addressed the issue that has been raised in this request **(Exhibit D).**

### Pending Rulings

I am aware of no pending ruling on any issue raised in this request.

### Pending Legislation

I am aware of no pending legislation on any issue raised in this request.

**Request for Expedited Consideration**

The timing and complexity of Delphi Bankruptcy filings, the time required to become
educated on the issues, and the limitations imposed by my health (I am retired on
permanent disability) have prevented me from making a timelier request. However, I am
requesting that this Ruling Request receive expedited handling for the following reasons:

♦ The Bankruptcy court is about to make decisions that may permanently
   eliminate rights and protections Congress intended for retirees.

♦ Salaried retirees have not receive proper COBRA notification and are
   currently paying health insurance rates that are 38.2% higher than mandated
   by congress, for which there may be no recovery.

♦ Retirees may be saved the expense and burden of post bankruptcy litigation.

• Potential successor companies should be made aware of this issue and their
   potential liability prior to exit plan approval.

If it is not feasible to expedite this Ruling Request, I am requesting that this department,
at least, notify the court as soon as possible and, prior to July 23, 2009 that this issue is
under review and may have an impact on the bankruptcy proceedings.

**Fee Payment**

After reviewing Rev. Proc. 2009-8, I'm not able to identify a category that applies to the
nature of this request. However, this request does not convey a special benefit to me.
Instead, this request provides a clarification and benefit to the general public. As a result,
I believe it is possible that no fee is required.

For the reasons stated above, I have not enclosed a fee. I am requesting immediate
notification of the amount due if a fee is required.

Very truly yours,

James B. Sumpter                    7-8-2009

_____            _____
James B. Sumpter                    Date

# DELPHI

## Estimated 2009 Retiree Self-Pay Rates

| Health Plan Name | Employee Only | Employee and Spouse | Employee and Child(ren) | Family | Spouse Only | Child(ren) Only | Spouse & Child(ren) |
|---|---|---|---|---|---|---|---|
| Enhanced Medical Plan | $666.00 | $1,332.00 | $1,198.80 | $1,864.8 | $666.00 | $666.00 | $1,198.80 |
| Point-of-Service Plan | $636.00 | $1,272.00 | $1,144.80 | $1,780.8 | $636.00 | $636.00 | $1,144.80 |
| Comprehensive Health Savings | $332.00 | $664.00 | $597.60 | $929.60 | $332.00 | $332.00 | $597.80 |
| Health Net (Southern CA) | $520.99 | $1,094.08 | $989.88 | $1,458.7 | N/A | N/A | N/A |
| Advantage Health Plan ((N) | $502.72 | $1,055.77 | $955.17 | $1,407.6 | N/A | N/A | N/A |
| HAP (MI) | $333.43 | $700.21 | $633.52 | $933.60 | N/A | N/A | N/A |
| Priority Health West (MI) | $507.89 | $1,066.57 | $965.02 | $1,422.2 | N/A | N/A | N/A |
| Blue Care Network (Southeast | $312.81 | $656.90 | $594.34 | $875.87 | N/A | N/A | N/A |
| Priority Health East (MI) | $377.92 | $793.67 | $718.07 | $1,058.2 | N/A | N/A | N/A |
| Health Plus of Michigan (M(-Flint) | $386.05 | $810.70 | $733.49 | $1,080.93 | N/A | N/A | N/A |
| Health Plus of Michigan (M(-SE | $304.99 | $640.48 | $579.48 | $853.97, | N/A | N/A | N/A |
| Health Plus of Michigan (M(-Saginaw) | $399.75 | $839.49 | $759.54 | $1,119.32 | N/A | N/A | N/A |
| Blue Care Network (M(-East/Saginaw) | $404.59 | $849.64 | $768.73 | $1,132.85 | N/A | N/A | N/A |
| Blue Care Network (Mid-Michigan) | $404.59 | $849.64 | $768.73 | $1,132.85 | N/A | N/A | N/A |
| Blue Care Network (East/Flint) | $368.60 | $774.06 | $700.34 | $1,032.08 | N/A | N/A | N/A |
| Blue Point 2 (NY-Rochester) | $370.98 | $853.26 | $934.13 | $983.10 | N/A | N/A | N/A, |
| United HealthCare (Dayton/Cinci) | $600.59 | $1,261.24 | $1,141.12 | $1,681.64 | N/A | N/A | N/A |
| Kaiser Permanente (OH) | $419.44 | $880.82 | $796.94 | $1,174.4 | N/A | N/A | N/A |
| Health Assurance - Warren/Youngstown (OH) | $550.38 | $1,155.79 | $1,045.72 | $1,541.06 | N/A | N/A | N/A |
| Dental | $44.00 | $88.00 | $79.20 | $123.20 | N/A | N/A | N/A |
| Vision | $3.00 | $6.00 | $5.40 | $8.40 | N/A | N/A | N/A |
| Extended Care Coverage | $11.00 | $22.00 | $19.80 | $30.80 | N/A | N/A | N/A |

Rates shown below are Monthly Rates

Notes: Rates are evaluated on an annual basis and are subject to change.

Spouse Only, Child(ren) Only, Spouse & Child(ren) are available only to retirees who are Medicare eligible and age 65 or older.

Page 20 of 29    Exhibit A

# 2009 Salaried COBRA Rates

Rates shown below are Monthly Rates

| Medical Plan | Enrollee Only | Enrollee and Spouse | Enrollee and Children | Enrollee and Family |
|---|---|---|---|---|
| Optional Canadian HC | 100.98 | 201.96 | 181.77 | 282.75 |
| Comprehensive Health Savings | 246.84 | 493.68 | 444.31 | 691.15 |
| Enhanced Medical Plan | 491.64 | 983.28 | 884.95 | 1376.59 |
| Point-of-Service Plan | 423.30 | 846.60 | 761.94 | 1185.24 |
| Health Net (Southern CA) | 531.41 | 1115.96 | 1009.68 | 1487.95 |
| Advantage Health Plan ((N) | 512.78 | 1076.89 | 974.27 | 1435.77 |
| HAP (M() | 340.10 | 714.21 | 646.19 | 952.27 |
| Priority Health West (M() | 518.05 | 1087.90 | 984.32 | 1450.65 |
| Blue Care Network (Southeast Michigan) | 319.07 | 670.04 | 606.23 | 893.39 |
| Priority Health East (M() | 385.48 | 809.54 | 732.43 | 1079.38 |
| Health Plus of Michigan (M(- | 393.77 | 826.91 | 748.16 | 1102.55 |
| Health Plus of Michigan (M(-SE | 311.09 | 653.29 | 591.07 | 871.05 |
| Health Plus of Michigan (M(-Saginaw) | 407.75 | 856.28 | 774.73 | 1141.71 |
| Blue Care Network (MI-East/Saginaw) | 412.68 | 866.63 | 784.10 | 1155.51 |
| Blue Care Network (Mid- | 412.68 | 866.63 | 784.10 | 1155.51 |
| Blue Care Network (East/Flint Michigan) | 375.97 | 789.54 | 714.35 | 1052.72 |
| Blue Point 2 (NY-Rochester) | 378.40 | 870.33 | 952.81 | 1002.76 |
| United HealthCare | 612.60 | 1286.46 | 1163.94 | 1715.27 |
| Kaiser Permanente (OH) | 427.83 | 898.44 | 812.88 | 1197.92 |
| Health Assurance - Warren/Youngstown (OH) | 561.39 | 1178.91 | 1066.64 | 1571.88 |
| CIGNA (nternational HC Plan | 274.20 | 665.02 | 557.47 | 948.00 |
| Dental Plan* | Enrollee Only | Enrollee and Spouse | Enrollee and Children | Enrollee and Family |
| C(GNA Traditional Dental Plan | 30.60 | 61.20 | 55.08 | 85.68 |
| Vision Pla | Enrollee Only | Enrollee and Spouse | Enrollee and Children | Enrollee and Family |
| EyeMed Traditional Vision | 3.06 | 6.12 | 5.51 | 8.57 |

* (f Medicare eligible at time of qualifying event, rates may vary

** Alternative Dental Plan rates may vary

# Calculation of Delphi Retiree Self Pay Health Care Rate Relative to the COBRA Rate

<u>From Delphi Charts (Exhibit A)</u>

Self Pay Rate (single, enhanced plan) [SPS]       $ 666.00

Self Pay Rate (family, enhanced plan) [SPF]       $ 1864.80

<u>From Delphi Charts (Exhibit B)</u>

COBRA Rate (single, enhanced plan) [CRS]       $ 491.61

COBRA Rate (family, enhanced plan) [CRF]       $ 1376.59

♦ Assumption 1: COBRA rate is 102% of applicable premium
\* Assumption 2: All rate ratios are the same

100% rate (single, enhanced plan) =
(100% Premium Rate)
$$[PRS] = \frac{CRS}{102} = \frac{\$491}{102} = \$482$$

100% rate (family, enhanced plan) =
(100% Premium Rate)
$$[PRF] = \frac{CRF}{102} = \frac{\$1376.59}{102} = \$1349.60$$

Self Pay % (single, enhanced plan) =
$$\frac{SPS}{PRS} = \frac{\$666}{\$482} \times 100 = 138.2\%$$

Self Pay % (Family, enhanced plan) =
$$\frac{SPF}{PRF} = \frac{\$1864.80}{\$1349.60} \times 100 = 138.2\%$$

Therefore Retirees are paying a rate <u>36.2%</u> higher than the COBRA rate.

www.legalbitstream.com
http://www.legalbitstream.com/scripts/isyswebext.dll




SEARCHING: **Revenue Rulings**
RESULTS: FOUND: 74 HITS IN 5 DOCUMENTS SEARCHING ON 4980b

| Documents 1 to 5 | | | New search |
|---|---|---|---|

1. Revenue Ruling 2003-70 Internal Revenue Service 2003-27 I.R.B. 3 Section 4980B.—Failure to Satisfy Continuation Coverage Requirements of Group Health Plans 26 CFR 54.4980B-2: Plans that must comply. (Also section 7805; §. 54.4980B-9.) Small employer plan exception to the COBRA continuation coverage
16 KB **25 ht(s)**

2. Revenue Ruling 2004-22 Internal Revenue Service 2004-10 I.R.B. 553 Section 4980B.—Failure to Satisfy Continuation Coverage Requirements of Group Health Plans 26 CFR 54.4980B-7: Duration of COBRA continuation coverage. (Also 26 CFR 54.4980B-4) COBRA and Medicare entitlement . The COBRA continuation coverage period can be ex<sup>p</sup>anded from 18 to 36
26 KB 19 ht(s)

3. Revenue Ruling 96-8 Internal Revenue Service 1996-4 I.R.B. 62 Section 4980B. —Continuation Coverage Requirements of Group Health Plans Two COBRA premium issues. Guidance is given on two premium issues that arise under the continuation coverage requirements for <sup>g</sup>roup health plans in
27 KB **14 ht(s)**

4. Revenue Ruling 2002-88 Internal Revenue Service 2002-52 I.R.B. 995 Section 4980B. Continuation Coverage Requirements of Grou <sup>p</sup> Health Plans 26 CFR 54.4980B-7: Duration of COBRA continuation coverage. Duration of COBRA continuation coverage and divorce. This ruling provides guidance on when COBRA
14 KB 11 ht(s)

5. Revenue Ruling 2002-32 Internal Revenue Service 2002-23 I.R.B. 1069 Section 125.—Cafeteria Plans (Also sections 106, 4980B.) Cafeteria Plans. In an asset sale, transferred employees who have elected to participate in health flexible spending arrangements (FSAs) under the seller's cafeteria plan may
16 KB 5 ht(s)

| Documents 1 to 5 | | | New search |
|---|---|---|---|

Search within results: [                    ] Search

**Exhibit D-1**



SEARCHING:  Private Letter Rulings
RESULTS:  FOUND: 127 HITS IN 23 DOCUMENTS SEARCHING ON 4980b

| Documents 1 to 10 | Next 10 documents | New search |
|---|---|---|

1. Private Letter Ruling Number: 200624071 Internal Revenue Service December 5, 2005 Internal Revenue Service Department of the Treasury Washin ᵃton, DC 20224 Number: 200624071 Release Date: 6/16/2006 Index Number: 35.00-00
30 KB 28 hit(s)

2. Private Letter Ruling Number: 200432012 Internal Revenue Service April 22, 2004 Internal Revenue Service Department of the Treasury Washington, DC 20224 Number: 200432012 Release Date: 8/6/04 Index Number: 35.00-00
31 KB **25 hit(s)**

3. Private  Letter Ruling Number:  9641032 Internal Revenue Service Jul ʸ 17, 1996 Internal Revenue Service Department of the Treasury Washington, DC 20224 SIGNIFICANT INDEX NUMBER 414.08-00
40 KB 7 **ht(s)**

4. Private Letter Ruling Number: 200518082 Internal Revenue Service February 10, 2005 DEPARTMENT  OF THE TREASURY INTERNAL REVENUE SERVICE WASHINGTON, D.C.  20224 TAX  EXEMPT AND GOVERNMENT ENTITIES DIVISION Uniform Issue List: 414.08-00; 4980B.00-00 SE:T:EP:RA:T1
75 KB 7 ht(s)

5. Private Letter Ruling Number: 200514025 Internal Revenue Service January 10 , 2005 DEPARTMENT OF THE TREASURY INTERNAL REVENUE SERVICE WASHINGTON, D.C. 20224 TAX EXEMPT AND GOVERNMENT ENTITIES DIVISION Uniform Issue List: 414.08-00, 498013.01-00 SE:T: EP: RA:T1
28 KB 6 hit(s)

6. Private  Letter Ruling Number: 9325044 Internal Revenue Service March 29, 1993 Sʸmbol: E: EP: R:5 Uniform  Issue List No.: 0414.08-00 This letter  is in response to your ruling request  dated August 31, 1992, as supplemented by correspondence dated January 13, 14,
35 KB 5 hit(s)

7. Private  Letter Ruling Number: 9034048 Internal Revenue Service  May 29, 1990 Symbol: CC:EE:2:6-TR-31-2003-89 Uniform Issue List Nos.: 0061.09-001 0106.00-00,  0152.05-00, 4980.00-00 This is in reply to your letter dated May 17, 1989, Concerning the  application of sections 89, 105, 106 and
23 KB 5 ht(s)

**Exhibit D-2**

www.legalbitstream.com                    http://www.legalbitstream.com/scripts/isyswebext.dll

8. <u>Private Letter Ruling Number: 9847024 Internal Revenue Service August 24,</u>
<u>1998 Internal Revenue Service Department of the Treasury Washington, DC 20224</u>
<u>SIN 414.08-00</u>
19 KB  4 hit(s)

9. <u>Private Letter Ruling Number: 9847023 Internal Revenue Service August 24,</u>
<u>1998 Internal Revenue Service Department of the Treasury Washington, DC 20224</u>
<u>SIN 414.08-00</u>
19 KB  4 hit(s)

10. <u>Private Letter Ruling Number: 9725043 Internal Revenue Service March 28,</u>
<u>1997 Significant Index no: 414.08-00 Internal Revenue Service Department of the</u>
<u>Treasury Washington, DC 20224</u>
24 KB  4 hit(s)

| Documents 1 to 10 | Next 10 documents | | New search |
|---|---|---|---|

Search within results: | | Search



Exhibit D-3



www.legalbitstream.com

SEARCHING: **Private Letter Rulings**
RESULTS: FOUND: 127 HITS IN 23 DOCUMENTS SEARCHING ON **4980b**

| Documents 11 to 20 | Next 3 documents | Previous 10 documents | New search |
|---|---|---|---|

11.  Private Letter Ruling Number: 9401036 Internal Revenue Service October 14,
1993 Symbol: E:EP:R Uniform Issue List No.: 0414.00-00a This is in response to a
letter dated May 17, 1993, as supplemented by correspondence dated July 21,
1993, which was submitted on
21 KB **4 ht(s)**

12.  Private Letter Ruling Number:  9038060 Internal Revenue Service June 29,
1990 Symbol: E:EP:R:5 Uniform Issue List No.: 0414.08-00 This is in response to a
request for a ruling, dated September 12, 1989, and supplemented by
correspondence dated April 9 and April
17 KB **4 ht(s)**

13.  Private Letter Ruling Number: 9035053 Internal Revenue Service June 5,
1990 Symbol: E:EP:R:5 Uniform Issue List No.: 0414.08-00 This is in response to a
request for a ruling, dated September 1, 1989, and supplemented by
correspondence dated
14 KB **4 ht(s)**

14.  Private Letter Ruling Number: 9846046 Internal Revenue Service August 20,
1998 Internal Revenue Service Department of the Treasury Washington, DC 20224
SIN 0414.08-00
18 KB 3 ht(s)

15.  Private Letter Ruling Number:  9844039 Internal Revenue Service August 6,
1998 Internal Revenue Service Department of the Treasury Washington, DC 20224
SIN 414.08-00
21 KB 3 ht(s)

16.  Private  Letter Ruling Number: 9343037 Internal Revenue Service August 4,
1993 Symbol:  E: EP: R:7 Uniform Issue List No.: 0414.08-00 This  is in response to
your ruling request dated February 5, 1993, as supplemented by correspondence
dated May 14, 1993, and
28 KB 3 hit(s)

17.  Private Letter Ruling Number: 9334029 Internal Revenue Service June 4,
1993 Symbol: E: EP: R:5 Uniform Issue List No.: 0414.08-00 This letter  is in
response to your request for a private letter ruling, submitted on your behalf by
your authorized representative,

www.legalbitstream.com
http://www.legalbitstream.com/scripts/isyswebext....

22 KB **3 ht(s)**

<u>18.</u>  <u>Private Letter Ruling Number: 9351037 Internal Revenue Service September</u>
<u>28, 1993 Symbol: E: EP: R:7 Uniform Issue List No.: 0414.08-00 This is in response</u>
<u>to a letter dated January 15, 1993, as su</u>ᴅ<u>plemented by additional information</u>
<u>submitted on July 8 and July</u>

34 KB **2 ht(s)**

<u>19.</u>  <u>Private Letter Ruling Number: 9123033 Internal Revenue Service March 11,</u>
<u>1991 Symbol: E: EP: R:5 Uniform  Issue List No.: 0414.08-00 This letter is In</u>
<u>response to a rulin</u>ᵍ<u> request dated May 9, 1990, as su</u>ᴅ<u>plemented by letters dated</u>
<u>lune 18,</u>

24 KB 2 ht(s)

<u>20.</u>  <u>Private Letter Ruling Number:  9332045 Internal Revenue Service May 21,</u>
<u>1993</u> <u>Symbol: E: EP: R:7 Uniform Issue List  No.: 0414.08-00 This is in response to a</u>
<u>letter dated December 31, 1992,  supplemented by additional correspondence dated</u>
<u>Februar</u>ʸ <u>12, March  24,</u>





SEARCHING: Private Letter Rulings

RESULTS: FOUND: **127** HITS IN 23 DOCUMENTS SEARCHING ON 4980b

| Documents 21 to 23 | | Previous 10 documents | New search |
|---|---|---|---|

21. Private Letter Ruling Number: 9112022 Internal Revenue Service December 21, 1990 Symbol: CC:EE:4-TR-31-20-90 Uniform Issue List Nos.: 0083.01-00 0105.00-00, 0106.00-00, 0162.00-00, 0404.10-00, 0404.11-00, 0419.10-00 0451 14-00, 0671.02-00, 0677.02-00 This is in response to your ruling
35 KB 1 ht(s)

22. Private Letter Ruling Number: 8939050 Internal Revenue Service Jul ˇ 6, 1989 Symbol:  CC:EE:4-TR-31-3498-88 Uniform Issue List Nos.: 0083.01-00, 0105.00-00, 0106.00-00, 0162.00-00, 0404.10-00, 0404.14-00, 0419.00-00, 0451 14-00, 0701.00-00 This is in response to your ruling
34 KB 1 ht(s)

23. Private Letter Rulin ª Number: 200108010 Internal Revenue Service 11/17/2000 Release Date: 2/23/2001 Third Party Contact: 1/3/2000 to 11/1712000, Index  Numbers: 61.00-00, 104.01-00, 105.00-00, 106.00-00. 152.04-00, 501.09-00, 3102.00-00,  3121.01-00, 3306.02-00, 3401.01-00, 3401.04-01, 3402.00-00 Internal Revenue Service Department of the Treasur**y**
58 KB 1 ht(s)



| Documents 21 to 23 | | Previous 10 documents | New search |
|---|---|---|---|

Search within results:



**Declaration**

Under penalties of perjury, I declare that I have examined this request, including
accompanying documents and to the best of my knowledge and belief, the request
contains all the relevant facts relating to the request and such facts are true, correct and
complete.

_____    7-8-2009
James B. Sumpter                    Date

# Deletion Statement

I am requesting deletion of typical information as listed below:

- name
- address
- phone number
- e-mail address
-  social security number

James B. Sumpter

7/8/2009

Date

# ATTACHMENT C

*Excerpt of I.R.S. 2001-8*
*Page 688 & 689*

## Internal Revenue



bulletin

Bulletin No. 2001-8
February 20, 2001

## HIGHLIGHTS
## OF THIS ISSUE
These synopses are intended only as aids to the reader in identifying the subject matter covered. They may not be relied upon as authoritative interpretations.

### INCOME TAX

**Rev. Rul. 2001-9, page 652.**
**UFO; price indexes; department stores.** The December 2000 Bureau of Labor Statistics price indexes are accepted for use by department stores employing the retail inventory and last-in, first-out inventory methods for valuing inventories for tax years ended on, or with reference to, December 31, 2000.

**T.D. 8914, page 653.**
Final regulations under section 988 of the Code relate to when a currency will be considered hyperinflationary. These final regulations are intended to prevent distortions associated with the computation of income and expense arising from section 988 transactions denominated in hyperinflationary currencies.

### EMPLOYEE PLANS

**T.D. 8928, page 685.**
Final regulations provide guidance on various issues arising under the COBRA continuation coverage requirements for group health plans. The issues include those related to business reorganizations, employer withdrawals from multiemployer plans, health flexible spending arrangements, and counting employees for purposes of the exception under the COBRA continuation coverage provisions for plans of small employers.

**REG-209461-79, page 712.**
Partial withdrawal of, and amendments to, the notices of proposed rulemaking that relate to the tax treatment of cafeteria plans under section 125 of the Code.

### EXEMPT ORGANIZATIONS

**T.D. 8920, page 654.**
**REG-246256-96, page 713.**
Temporary and proposed regulations under section 4958 of the Code add details to the definitions and rules of section 4958. Section 4958 imposes excise taxes on excess benefit transactions between a section 501(c)(3) or 501(c)(4) organization (except a private foundation) and a person with substantial influence over the affairs of the organization.

**Announcement 2001-20, page 716.**
A list is provided of organizations that no longer qualify as organizations to which contributions are deductible under section 170 of the Code.

### EMPLOYMENT TAX

**Announcement 2001-16, page 715.**
This announcement provides guidance to federally recognized Indian tribal governments about their Federal Unemployment Tax Act (FUTA) obligations for 2000. Recent legislation changed how FUTA applies to Indian tribal governments. As of December 21, 2000, federally recognized Indian tribal governments are exempt from FUTA. The new law contains a transition rule which eliminates an Indian tribal government's 2000 liability for FUTA taxes for services performed before December 21, 2000, if certain requirements are met. Because the due date for the 2000 Form 940 used to report FUTA tax liability is January 31, 2001, this announcement is made to provide Indian tribal governments options in filing their Forms 940.

Finding Lists begin on page ii.
Announcements of Disbarments and Suspensions begin on page 717.



Department of the Treasury
Internal Revenue Service

retroactive reinstatement of coverage, coverage can be terminated and later reinstated when the election (and, if applicable, payment for the coverage) is made. Thus, under these final regulations, the rules for when coverage must be reinstated and when claims must be paid are the same.

*Maximum Coverage Period*

The 1999 proposed regulations relating to the maximum coverage period are adopted as final regulations with a minor change to a cross-reference.

*Insignificant Underpayments*

The 1999 final regulations prescribe how plans are to treat payments for COBRA continuation coverage that are short by an amount that is not significant. They require the plan to treat the payment as full payment unless the plan notifies the qualified beneficiary of the amount of the deficiency and grants a reasonable period for payment of the deficiency. The regulations provide as a safe harbor that a period of 30 days after the notice is provided is a reasonable period for this purpose.

Many commenters requested that the regulations specify what is considered a significant amount. These final regulations provide that a shortfall is not significant if it is no greater than the lesser of $50 (or another amount specified by the Commissioner in guidance of general applicability) or 10 percent of the required amount.

Several commenters also requested that the regulations specify a period shorter than 30 days for payment of the deficiency to be considered timely, but these final regulations do not adopt this suggestion. The regulations require only that a plan grant a reasonable period for payment of the deficiency. In some circumstances, a period shorter than 30 days may be reasonable. However, in other circumstances, a shorter period might not be reasonable. The IRS and Treasury believe it is useful to provide the certainty of a safe harbor, but they do not believe that a period shorter than 30 days is sufficiently long in all cases.

*Business Reorganizations*

The 1999 proposed regulations relating to business reorganizations are adopted as

final regulations with two clarifications. The proposed regulations provide that, in an asset sale (which is defined as the sale of substantial assets such *as a* plant or division or substantially all the assets of a trade or business), a purchaser of assets is considered a successor employer if the seller ceases to provide any group health plan to any employee in connection with the sale and if the buyer continues those business operations associated with those assets without substantial change or interruption. Several inquiries raised the question whether this rule applies if the assets are purchased as part of a bankruptcy proceeding. The final regulations clarify this rule for assets purchased in bankruptcy by providing that a buying group does not fail to be a successor employer in connection with an asset sale merely because the sale takes place in connection with a bankruptcy proceeding. Thus, the general rule for determining whether a buyer is a successor employer applies in bankruptcy the same way that it does outside of bankruptcy.

These final regulations also clarify that asset sale includes not only sales but other transfers as well.

Comments were received about other aspects of the proposed rules for business reorganizations. Several commenters requested additional guidance on the amount of assets that would constitute "substantial assets" for purposes of the asset sale rules. The final regulations retain the definition in the proposed regulations. This definition is intended to be flexible enough to apply reasonably to the myriad situations in which this issue arises. The asset sale rules, including the definition of asset sale, are similar to the various formulations of successor employer rules that have been fashioned by the courts for various labor law purposes, adapted to the peculiar circumstances that the COBRA continuation coverage requirements create. In those cases, as in the final rule, a case-by-case approach is favored. See, for example, *Golden State Bottling Co. v. NLRB,* 414 U.S. 168 (1973); *Howard Johnson Co. v. Detroit Local Joint Executive Board, Hotel & Restaurant Employees & Bartenders International Union,* 417 U.S. 249 (1974); *John Wiley & Suns, Inc. v. Livingston,* 376 U.S. 543 (1964); *NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272 (1972); *Fall River*

*Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27 (1987); *EEOC v. MacMillan Bloedel Containers, Inc.,* 503 F.2d 1086 (6th Cir. 1974); *In re National Airlines, Inc.,* 700 F.2d 695 (11th Cir. 1983); *Upholsterers' International Union Pension Fund v. Artistic Furniture* of *Pontiac,* 920 F.2d 1323 (7th Cir. 1990); *Central States, Southeast & Southwest Areas Pension Fund v. PYA/Monarch of Texas, Inc.,* 851 F.2d 780 (5th Cir. 1988).

One commenter requested clarification that the cessation of a plan shortly before an asset sale is in connection with the sale (and thus that the buying group would be responsible for making COBRA continuation coverage available to M&A qualified beneficiaries in connection with the sale if the buying group is a successor employer). The regulations have not been modified for this request. In many circumstances, cessation of a plan shortly before an asset sale would be considered to be in connection with the sale. However, there may be cases in which the plan was being terminated for an unrelated reason. The application of this rule in any particular case depends on all the relevant facts and circumstances.

The preamble to the 1999 proposed regulations included a description of a potential rule that the IRS and Treasury were considering adopting and solicited comments on that potential rule. The rule would have provided that no loss of coverage occurs, and thus no qualifying event occurs, if a purchaser of assets maintains substantially the same plan for continuing employees for what would otherwise be the maximum coverage period (generally 18 months). The IRS and Treasury also acknowledged in the 1999 preamble concerns about protecting the rights of qualified beneficiaries in this situation. After consideration of the comments, the IRS and Treasury have determined not to adopt such a special rule. Thus, under these final regulations, in an asset sale, employees who terminate employment with the seller and who no longer get health coverage from the seller experience a qualifying event with respect to the seller's plan even though they are employed by the buyer at the same jobs they had with the seller and have the same health coverage through the buyer.

Like the 1999 proposed regulations, these final regulations do not address how

the obligation to make COBRA continuation coverage available is affected by the transfer of an ownership interest in a noncorporate entity. However, it is intended that, in general, the principles reflected in the rules in the final regulations for transfers of ownership interests in corporate entities should apply in a similar fashion in analogous cases involving the transfer of ownership interests in noncorporate entities.

*Employer Withdrawals from
Multiemployer Plans*

The 1999 proposed regulations relating to employer withdrawals from a multiemployer plan are adopted with two changes and two additional examples to illustrate the rules as changed. The general approach of the 1999 proposed regulations is retained. However, the proposed rule renders an employer who stops contributing to a multiemployer plan responsible for making COBRA continuation coverage available to qualified beneficiaries associated with that employer only if the employer establishes a new plan to cover active employees formerly covered under the multiemployer plan. Several commenters suggested that the employer should also be responsible for COBRA if the coverage provided to employees formerly covered under the multiemployer plan comes from an existing plan of the employer (rather than from a new plan). The final rules have been revised to apply the general approach to existing plans as well as to new plans.

The 1999 proposed regulations also place a threshold condition on the obligation of an employer or subsequent multiemployer plan to make COBRA coverage available to existing qualified beneficiaries associated with the withdrawing employer. That threshold is that the employer or subsequent multicmployer plan must cover a significant number of the employer's employees formerly covered under the multiemployer plan. Several commenters requested further guidance on what a significant number was in this context. Some of them also wanted to know what purpose this threshold condition serves. The intent in imposing this threshold condition in the proposed regulations was to leave responsibility for COBRA compliance with the existing multiemployer plan in a case where, for example, only one or two of the employees formerly covered under the multiemployer plan were transferred into management and became covered under a plan of the employer for which union employees were not eligible. The final rule has been revised to more clearly accomplish this intent. This threshold condition has been revised so that the employer plan or subsequent multiemployer plan has responsibility for COBRA compliance once coverage under the plan is available to a class of employees formerly covered under the multiemployer plan. New examples illustrate the application of this standard.

Several commenters expressed concern that the proposed regulations would require multiemployer plans to begin investigating why an employer stops contributing to the multiemployer plan and to determine whether the withdrawing employer subsequently covered union (or former union) employees under a single employer plan. Concern was also expressed that the proposed regulations would require the multiemployer plan to keep employer-by-employer data for qualified beneficiaries receiving COBRA continuation coverage. The IRS and Treasury recognized when they proposed these rules that in many industries it is impracticable for multicmployer plans to determine whether an employer that stops contributing to a multiemployer plan covers union employees under its own plan and that it is impracticable to maintain employer-specific data on employees and qualified beneficiaries. If a multiemployer plan finds it easier to make COBRA coverage available for the maximum coverage period, these final regulations do not require the plan to start gathering information that is difficult to assemble. Such a plan can comply with the COBRA continuation coverage requirements by making COBRA continuation coverage available to existing qualified beneficiaries in accordance with the general rules for the duration of COBRA continuation coverage (in §54.4980B-7).

One commenter requested clarification of the proposed rules if an employer establishes a plan for employees formerly covered under the multiemployer plan but applies a waiting period before the employees are eligible for coverage under that plan. These final regulations clarify that the employer's obligation does not arise until the employer makes coverage available. Thus, the multiemployer plan would be responsible for COBRA coverage until the waiting period under the employer's plan had expired for a class of employees formerly covered under the multiemployer plan.

Several commenters submitted substantially similar comments requesting that the rules be revised so that a multiemployer plan no longer receiving contributions from a certain employer would not be required to make COBRA continuation coverage available to any qualified beneficiaries affiliated with that employer. Such an approach, however, would not resolve the problem of qualified beneficiaries not having access to COBRA coverage, and the statutory basis for such a position is questionable in situations in which none of the statutory reasons for ending a plan's obligation to make COBRA coverage available to a particular qualified beneficiary is present. The final regulations do not adopt this suggestion.

The IRS and Treasury received an inquiry about who has the obligation to make COBRA continuation coverage available to existing qualified beneficiaries in a situation that reverses the situation addressed in the proposed rules, one in which employees cease to be covered under a plan maintained by their employer and commence to be covered under a multiemployer plan. In such a situation, the existing qualified beneficiaries should get the same coverage that similarly situated nonCOBRA beneficiaries are receiving, that is, the coverage under the multiemployer plan. The 1999 final regulations suggest this result in describing what COBRA continuation coverage is. However, the language used in the 1999 final regulations can be read to suggest that this is the result only when coverage is under the same plan: "If coverage *under the plan* is modified for similarly situated nonCOBRA beneficiaries, then the coverage made available to qualified beneficiaries is modified in the same way." (Q&A-1(a) of §54.4980B-5; emphasis added.) These final regulations delete the phrase "under the plan" from the quoted language to make clear that if coverage for the similarly situated nonCOBRA beneficiaries is modified by switching from one plan to another, then

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

---------------------------------------x Chapter 11 Case No. 05-44481 (RDD)

In re:                                          :

DELPHI CORPORATION, et. al.,          :( J o i n t l y  Administered)
                                                 :

    Debtors.                              : :
                                                 : :

---------------------------------------x

## AFFIDAVIT OF SERVICE

**I, James B. Sumpter, do herby state that relative to the two motions:**

**MOTION TO SHORTEN NOTICE WITH RESPECT TO JAMES B. SUMPTER'S EXPEDITED MOTION TO ENFORCE COBRA BENEFIT FOR DELPHI SALARIED RETIREES AND MOTION FOR COBRA SETTLEMENT (COBRA BENEFIT MOTION)**

**and**

**EXPEDITED MOTION TO ENFORCE COBRA BENEFIT FOR DELPHI SALARIED RETIREES AND MOTION FOR COBRA SETTLEMENT (COBRA BENEFIT MOTION)**

**I served paper copies of the two motions and a DVD with copies of the motions and attachments on the entities listed in Exhibit A, via FED-EX next day delivery. The documents were placed in the care and control of FED-EX on the dates indicated.**

 

_____    _____
    **James B. Sumpter**                    **Date**
    **21169 Westbay circle**
    **Noblesville, IN  46062**
    **Telephone: (317) 877-0736**
    **Facsimile: (317) 877-1070**
    **jsump@ieee.org**

# ATTACHMENT A

### Serving Date  - July 13, 2009

Honorable Robert D. Drain,
United States Bankruptcy Judge,
One Bowling Green,
 Room 610,
 New York, New York 10004,


Office of the Untied States Trustee
 For the Southern District of New York
33 Whitehall Street, Suite 2100
New York, New York 10044
(Attn: Deirdre A. Martini, Esq.)


Delphi Corporation
5725 Delphi Drive,
 Troy, Michigan 48098
(Attn: General Counsel)

 Deloitte & Touche LLP,
600 Renaissance Center,
Suite 900
Detroit, Michigan 48024
(Attn: Brock E. Plumb),

Skadden, Arps, Slate, Meagher & Flom LLP,
333 West Wacker Drive, Suite 2100,
Chicago, Illinois 60606
(Attn: John Wm. Butler, Jr.),


Shearman & Sterling LLP,
599 Lexington Avenue, New York, New York 10022
 (Attn: Douglas P. Bartner),

**Serving Date  - July 13, 2009**

Simpson Thacher & Bartlett LLP,
425 Lexington Avenue,
New York, New York 10017
 (Attn: Marissa Wesley),


 Davis Polk & Wardwell,
450 Lexington Avenue,
New York, New York 10017
(Attn: Marlane Melican),


Latham & Watkins LLP,
885 Third Avenue,
 Suite 1000,
 New York, NY 10022
(Attn: Robert J. Rosenberg),


Skadden, Arps, Slate, Meagher & Flom LLP,
Four Times Square,
New York, New York 10036
(Att'n: Kayalyn A. Marafioti and Thomas J. Matz),


Davis Polk & Wardwell,
450 Lexington Avenue
New York, New York 10017
(Att'n: Donald Bernstein and Brian Resnick),


Willkie Farr & Gallagher LLP
 787 Seventh Avenue
New York, New York 10019
Att'n: Richard Mancino and Marc Abrams),


Cadwalader, Wickersham & Taft LLP,
One World Financial Center,
New York, New York 10281
(Att'n: John J. Rapisardi and Oren B. Haker),

## Serving Date  - July 13, 2009

United States Department of Justice,
86 Chambers Street, 3rd Floor,
New York, New York 10007
(Att'n: Matthew L. Schwartz and Joseph N. Cordaro,


Weil, Gotshal & Manges LLP,
767 Fifth Avenue,
New York, New York 10153
(Att'n: Jeffrey L. Tanenbaum and Robert J. Lemons)


Schulte  Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
(Att'n: Adam C. Harris and David J. Karp),


## Serving Date  -  July 14, 2009

Wilmington Trust company,
1100 North Market Street,
Rodney Square North,
Wilmington, Delaware 19890
(Attn: Corporate Trust Office)

Law Debenture Trust Company of New York,
780 Third Avenue,
31st Floor, New York, New York 10017
Attn: Corporate Trust Office