**Hearing Date and Time:  January 12, 2012 at 10:00 a.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Albert L. Hogan, III
Ron E. Meisler

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036

Attorneys for DPH Holdings Corp., et al.,
 Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| DPH HOLDINGS CORP., et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Reorganized Debtors. | : | (Jointly Administered) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

REORGANIZED DEBTORS' OBJECTION TO MOTION OF THE BANK OF NEW
YORK MELLON, AS INDENTURE TRUSTEE, PAUL FEINSILVER, JAMES A.
KLOTZ AND TERRENCE O'GRADY FOR PERMISSION TO PROCEED IN THE
APPROPRIATE TRIBUNAL AS AGAINST THE REORGANIZED DEBTORS

DPH Holdings Corp. ("DPH Holdings") and its affiliated reorganized debtors

(collectively, the "Reorganized Debtors") submit this objection to the Motion Of The Bank Of

New York Mellon, As Indenture Trustee, Paul Feinsilver, James A. Klotz And Terrance O'Grady

For Permission To Proceed In The Appropriate Tribunal As Against The Reorganized Debtors

(Docket No. 21758), dated December 12, 2011 (the "Motion").

<u>Preliminary Statement</u>

1.      In 1994, the County of Trumbull, Ohio ("Trumbull County") issued

certain bonds in the aggregate principal amount of $2.75 million pursuant to a trust indenture

(the "Bonds").  The Bank of New York Mellon Corporation (the "Indenture Trustee") is the

successor indenture trustee under the trust indenture.  At the same time, Trumbull County

entered into a loan agreement with General Motors Corporation ("GM") under which it agreed to

loan to GM the proceeds from the sale of the Bonds and GM agreed to make certain payments to

the Indenture Trustee with respect to the Bonds.  GM assigned the loan agreement to Delphi

Automotive Systems LLC ("DAS LLC") in 1999.

2.      It is the Reorganized Debtors' understanding that GM made payments on

the Bonds from the commencement of these cases in October 2005 through September 2008,

when this Court entered an order approving the Amended And Restated Master Restructuring

Agreement between Delphi Corporation ("Delphi") and GM.  (Docket No. 14287.)  Pursuant to

its obligations to GM under the Amended MRA, Delphi made payments on the Bonds from the

effective date of the Amended MRA in September 2008 through October 2009, when the

Amended MRA was terminated.

3.      Like the bar date for any other prepetition claim, the bar date for filing

proofs of claim arising from the 1999 assignment agreement was July 31, 2006.  (Docket No.

3206.)  Although the Indenture Trustee received notice of the bar date (Docket No. 3501), it did

not file a proof of claim relating to the Bonds.  As a result, the Indenture Trustee was barred

from pursuing its claim and voting on or receiving any distribution under the Modified Plan on

account of its claim.  (Docket No. 3206 ¶ 11.)  The Indenture Trustee also received notice of the

objection deadline with respect to the Modified Plan (Docket No. 17267), but it did not file an

objection to the proposed termination of the Amended MRA.

       4.     When the Reorganized Debtors substantially consummated the Modified

Plan in October 2009, they were discharged from any debt arising from the 1999 assignment

agreement pursuant to 11 U.S.C. § 1141(d)(1)(A), Article XI of the Modified Plan, and

paragraph 20 of the Plan Modification Order.  (Docket No. 18707 ¶ 20 & Ex. A art. XI.)  The

discharge was accompanied by an injunction under 11 U.S.C. § 524(a)(2), Article 11.14 of the

Modified Plan, and paragraph 22 of the Plan Modification Order that precludes the pursuit of

claims arising from the 1999 assignment agreement.  (Docket No. 18707 ¶ 22 & Ex. A art. 11.14.)

       5.     In August 2010, the Indenture Trustee demanded that DPH Holdings

continue to make payments relating to the Bonds.  In November 2010, the Reorganized Debtors

filed the Second Indenture Trustee Plan Injunction Motion seeking an order barring the Indenture

Trustee from taking any further action against the Reorganized Debtors concerning any demand

for payment with respect to the Bonds.  (Docket No. 20795.)

       6.     The Second Indenture Trustee Plan Injunction Motion was resolved in

December 2010, when this Court entered the Joint Stipulation And Agreed Order Resolving

Reorganized Debtors' Motion For Order Enforcing Modified Plan And Plan Modification Order

Injunctions Against Indenture Trustee With Respect To Certain 1994 Bonds Issued By The

County Of Trumbull, Ohio (Docket No. 20795) (the "Joint Stipulation And Agreed Order").

(Docket No. 20993.)  In the Joint Stipulation And Agreed Order, the Indenture Trustee agreed, and this Court determined, that the plan injunction bars the Indenture Trustee from taking further action "unless this Court authorizes the Indenture Trustee to take such action."  (Id. ¶ A.)  A copy of the Joint Stipulation And Agreed Order is attached to this objection as Exhibit A.

7.       In the Motion, the Indenture Trustee and Paul Feinsilver, James A. Klotz, and Terrence O'Grady (collectively, the "Bondholders") request the authority to pursue their purported claims relating to the Bonds in an unidentified "appropriate tribunal" or, in the alternative, an order from this Court "directing the Reorganized Debtors to continue to make all payments of principal and interest due under the Bonds."  (Docket No. 21758 at 9.)  The request is based on arguments concerning (i) the Reorganized Debtors' discharge and the ride through doctrine, (ii) notice issues, (iii) equitable estoppel, and (iv) general considerations of equity.  The Motion should be denied.

8.       As a threshold matter, in their framing of the issues, the Indenture Trustee and the Bondholders proceed as though the Second Indenture Trustee Plan Injunction Motion and the Joint Stipulation And Agreed Order never happened.  The arguments set forth in the Motion appear to address the question whether the plan injunction applies in the first instance.  That question was resolved in the affirmative in the Joint Stipulation And Agreed Order in December 2010 (at least as to the Indenture Trustee), and there has been no request for reconsideration of the Joint Stipulation And Agreed Order.

9.       Under these circumstances, authority to proceed would have to take the form of an order lifting the plan injunction.  The Motion does not request that relief or even attempt to establish cause for lifting the plan injunction under the Sonnax factors.  See Grayson v. WorldCom, Inc. (In re WorldCom, Inc.) ("WorldCom I"), 05 Civ. 5704, 2006 WL 2270379, at

*7-8 (S.D.N.Y. Aug. 8, 2006); In re WorldCom, Inc., No. 02-13533, 2007 WL 841948, at *5

(Bankr. S.D.N.Y. Mar. 12, 2007) ("WorldCom II").  Accordingly, this Court should conclude

that the plan injunction remains in force as to demands for payment relating to the Bonds and

deny the Motion.

        10.     Furthermore, even if it were an open question whether the plan injunction

applies, the Indenture Trustee's and the Bondholders' arguments fail on the merits.  With respect

to the Reorganized Debtors' discharge, the discharge covers, among other things, the

Reorganized Debtors' pre-confirmation debts, including their debts under the 1999 assignment

agreement, the sole source of the Reorganized Debtors' payment obligations relating to the

Bonds.  (Docket No. 18707 ¶ 20 & Ex. A art. 11.2.)  The Indenture Trustee and the Bondholders

argue that the discharge does not apply based on the "ride through" doctrine that is triggered

when a trustee or debtor-in-possession does not assume or reject an executory contract, but that

doctrine is not implicated here because the 1999 assignment agreement between GM and DAS

LLC was not an executory contract.  In particular, GM had no unperformed material obligations

under the 1999 assignment agreement.  The underlying 1994 loan agreement likewise was not an

executory contract because Trumbull County, the lender under the agreement, had no

unperformed material obligations.

        11.     With regard to notice issues, contrary to the assertions of the Indenture

Trustee and the Bondholders, and without conceding that the Indenture Trustee was entitled to

notice, the affidavits of service filed by the Reorganized Debtors' noticing agent, Kurtzman

Carson Consultants LLC ("KCC"), show that the Indenture Trustee did in fact receive adequate

notice of the bar date and the Modified Plan.  (Docket Nos. 3501, 17267.)  As for the

Bondholders, their complaint that they did not receive notices misses the mark because they have

not shown that they were entitled to notice as creditors of the Reorganized Debtors.  As

discussed more fully below, the Bondholders are not parties to either 1994 loan agreement

between Trumbull County and GM or the 1999 assignment agreement between GM and DAS

LLC.  In addition, the payment obligations that GM assigned to DAS LLC via the 1999

assignment agreement ran to the Indenture Trustee, not the Bondholders.  Moreover, while this

would not be enough in and of itself to show that the Bondholders were creditors of the

Reorganized Debtors, the Bondholders have not demonstrated that they held any of the Bonds at

the times used for determining which persons and entities were entitled to notice of the bar date

and the Modified Plan.

    12.  Even if the Bondholders <u>could</u> establish that they were entitled to notice

and did not receive adequate notice, this would merely place them in a position to ask this Court

for an order allowing them to file a late proof of claim more than five years after the bar date for

prepetition claims under the excusable neglect standard.  The Bondholders have not requested

that relief in the Motion or attempted to show that it would be appropriate to allow them to file a

late proof of claim under the <u>Pioneer</u> factors.

    13.  With regard to equitable estoppel, the Indenture Trustee and the

Bondholders claim that the Reorganized Debtors cannot deny that the Indenture Trustee and/or

the Bondholders have an allowed claim relating to the Bonds based on statements made by Al

VanDenBergh in an e-mail to Jay Abrams of fmsbonds, Inc. on October 29, 2009.  This

argument fails because the Indenture Trustee and the Bondholders have not shown that Mr.

VanDenBergh's statements are attributable to the Reorganized Debtors, that Mr. VanDenBergh

made the statements to the Indenture Trustee or the Bondholders, or that the Indenture Trustee

and the Bondholders reasonably relied on Mr. VanDenBergh's statements, all of which are

elements of equitable estoppel.  Indeed, Mr. VanDenBergh made the statements on October 29,

2009, more than three years after the bar date and months after the hearings on the Modified Plan,

making it impossible for the Indenture Trustee and the Bondholders to demonstrate that they

relied on those statements in connection with any action they took or failed to take in connection

with the bar date or the Modified Plan.

14.    Finally, the Indenture Trustee's and the Bondholders' references to general

equitable considerations – which we construe as a request that this Court exercise its equitable

power under 11 U.S.C. § 105(a) – provide no ground for relief because they are not tied to any

alleged rights under some other provision of title 11, as required under Second Circuit precedents.

E.g., New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart

Convenience Stores, Inc.), 351 F.3d 86, 92 (2d Cir. 2003).

15.    In sum, the Indenture Trustee and the Bondholders are seeking this Court's

authority to pursue prepetition claims arising from the 1999 assignment agreement even though

the Indenture Trustee did not file a proof of claim on or before the Bar Date and the Bondholders

have no right to payment under the 1999 assignment agreement.  In doing so, they make

arguments that are misguided from a procedural perspective because they appear to challenge

whether the plan injunction applies, even though that issue was resolved in the Joint Stipulation

And Agreed Order.  We discuss this point in more detail in Part I, below.  Their arguments are

also misguided from a substantive perspective for the reasons set forth above and described in

more detail in Part II, below.  The Motion should therefore be denied.

<u>Background</u>

A.    <u>The Bonds</u>

16.    On July 1, 1994, Trumbull County and Dai-Ichi Kangyo Trust Company

of New York entered into an Indenture of Trust under which Trumbull County issued the

Sewage Disposal Revenue Bonds (General Motors Corporation Project) Series 1994 in the aggregate principal amount of $2.75 million. The Bank of New York Mellon Corporation is the successor indenture trustee.

B.    The 1994 Loan Agreement

17.    On July 1, 1994, Trumbull County entered into a Loan Agreement with GM (the "1994 Loan Agreement"), a copy of which is attached to this objection as Exhibit B. Under the 1994 Loan Agreement, Trumbull County agreed to lend to GM the proceeds from the sale of the Bonds (Ex. B § 4.1), and GM agreed to make to the Indenture Trustee certain payments of principal, premium, and interest with respect to the Bonds (Ex. B § 4.2(a)).

18.    The 1994 Loan Agreement is an agreement between Trumbull County and GM. The Indenture Trustee and the Bondholders are not parties to the 1994 Loan Agreement.

C.    The 1999 Assignment Agreement

19.    On January 1, 1999, in connection with the spin-off of Delphi Automotive Systems Corporation from GM, GM and DAS LLC entered into an Assignment And Assumption Agreement – Industrial Development Bonds (the "1999 Assignment Agreement"), a copy of which is attached to this objection as Exhibit C. Under the 1999 Assignment Agreement, GM assigned to DAS LLC the 1994 Loan Agreement (Ex. C § 1), and DAS LLC assumed certain obligations of GM under the 1994 Loan Agreement (Ex. C § 2). In addition, DAS LLC agreed to indemnify GM for losses relating to the 1994 Loan Agreement. (Ex. C § 6.) DPH Holdings is the successor to DAS LLC with respect to the 1999 Assignment Agreement.

20.    The 1999 Assignment Agreement is an agreement between GM and DAS LLC. The Indenture Trustee and the Bondholders are not parties to the 1999 Assignment Agreement.

D.    The Chapter 11 Filings

21.    On October 8 and 14, 2005, the Reorganized Debtors filed voluntary

petitions for reorganization relief under chapter 11 of title 11 of the United States Code, as

amended and in effect as of those dates (the "Bankruptcy Code").

E.    The Amended MRA

22.    In the September 2008, this Court approved the Amended MRA between

Delphi and GM.  (Docket No. 14287.)  Under the Amended MRA, Delphi agreed to make certain

postpetition payments pursuant to its prepetition contractual arrangements with GM, including

the 1999 Assignment Agreement.  (Docket No. 14287 Ex. B § 5.01(a)(vi).)

23.    The Indenture Trustee and the Bondholders were not parties to the

Amended MRA, nor were they third-party beneficiaries.  Specifically, with regard to third-party

beneficiaries, the Amended MRA provided as follows:

> Section 8.18  Third Party Beneficiaries.  Except as otherwise provided in
> section 8.06 herein with respect to the releases of the GM Parties and GM
> Suppliers, nothing contained in this Agreement is intended to confer any rights or
> remedies under or by reason of this Agreement on any person or entity other than
> the Parties hereto, nor is anything in this Agreement intended to relieve or
> discharge the obligation or liability of any third party to any Party to this
> Agreement, nor shall any provision give any third party any right of subrogation
> or action over or against any Party to this Agreement.

(Docket No. 14287 Ex. B § 8.18 (emphasis added).)

24.    The Amended MRA also included a termination provision stating that the

Amended MRA "may be terminated . . . and the transactions contemplated hereby abandoned,

upon the occurrence of," among other things, the "mutual written consent of both Delphi and

GM."  (Docket No. 14287 Ex. B § 8.02(a).)  The consent of the Indenture Trustee, the

Bondholders, or any other third party was not required.

F.      Termination Of The Amended MRA Pursuant To The MDA

25.      On July 30, 2009, this Court entered the Plan Modification Order

approving the Modified Plan and the Master Disposition Agreement among Delphi, GM

Components Holdings, LLC, GM, Motors Liquidation Company, DIP Holdco 3, LLC, and the

other sellers and other buyers party thereto (the "MDA").  (Docket No. 18707.)  A copy of the

MDA is attached to this objection as Exhibit D.

26.      The MDA includes the following provision terminating the Amended

MRA:

> 9.19.2.  Effective on the Closing Date, without further action by the
> Parties the [Amended] MRA shall (except as specifically set forth below) be
> terminated in its entirety and the parties thereto shall have no further obligations
> thereunder (other than as specifically set forth in this Section 9.19.2), including,
> without limitation, any obligations of Delphi for payments with respect to
> flowbacks under Section 5.11 of the [Amended] MRA or otherwise.
> Notwithstanding the foregoing, Old GM agrees to pay any and all amounts due to
> Delphi which accrue under the [Amended] MRA for periods prior to Closing
> regardless of the date on which such amounts become due under the terms of the
> [Amended] MRA.  In addition, Old GM shall continue to be responsible for the
> payment of all costs and amounts due to Delphi under the [Amended] MRA with
> respect to the Athens Facility (as defined in the [Amended] MRA).

(Ex. D § 9.19.2 (emphasis added).)  This provision is in accord with the termination provision set

forth in the Amended MRA, which allowed Delphi and GM to terminate the Amended MRA by

"mutual written consent."  (Docket No. 14287 Ex. B § 8.02(a).)

27.      The "Closing Date" referenced in the MDA occurred on October 6, 2009,

when the Reorganized Debtors substantially consummated the Modified Plan and emerged from

chapter 11.  (Docket No. 18958.)  The Amended MRA was therefore terminated effective as of

October 6, 2009.

28.      The Reorganized Debtors disclosed that the Amended MRA would be

terminated pursuant to the MDA (or, more precisely, an earlier version of the MDA among

Delphi, GM Components Holdings, LLC, GM, Parnassus Holdings II, LLC, and the other sellers and other buyers party thereto) in a number of filings related to the Modified Plan, including:

- the (A) Supplement To Motion For Order (I) Approving Modifications To Debtors' First Amended Plan Of Reorganization (As Modified) And Related Disclosures And Voting Procedures And (II) Setting Final Hearing Date To Consider Modifications To Confirmed First Amended Plan Of Reorganization And (B) Request To Set Administrative Expense Claims Bar Date And Alternative Sale Hearing Date, dated June 1, 2009 (Docket No. 16646 at 10; Docket No. 16646 Ex. 1-A, Ex. 7.7 § 9.19.2; Docket No. 16646 Ex. 2 at S-x, S-8, S-18, S-39);

- the Debtors' Omnibus Reply To Objections To Plan Modification Approval Motion, dated June 10, 2009 (Docket No. 16935 Ex. C at S-x, S-8, S-18, S-41);

- the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, dated June 16, 2009 (Docket No. 17030 Ex. 7.7 § 9.19.2); and

- the Supplement To First Amended Disclosure Statement With Respect To First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (As Modified), dated June 16, 2009 (Docket No. 17031 at S-x, S-8, S-20, S-43).

29.     The Indenture Trustee received notice of the hearing on the Modified Plan and the deadline and procedures for objecting to the Modified Plan (Docket No. 17267), but it did not object to the termination of the Amended MRA in connection with the Modified Plan or at any other time.

G.     Payments On The Bonds

30.     The Reorganized Debtors believe that GM made payments on the Bonds from the petition dates in October 2005 through the effective date of the Amended MRA in September 2008.  The Reorganized Debtors made payments on the Bonds from September 2008 through the termination of the Amended MRA in October 2009.

H.    The Bar Date

31.    On April 12, 2006, this Court entered the Bar Date Order establishing July 31, 2006 as the bar date for filing proofs of claim, including proofs of claim regarding contingent claims (the "Bar Date").  (Docket No. 3206 ¶ 2.)  The Indenture Trustee was timely served with notice of the Bar Date and an individualized proof of claim form (Docket No. 3501), but it did not file a proof of claim concerning the Bonds on or before the Bar Date (or thereafter).[1]

32.    Because the Indenture Trustee failed to file a proof of claim on or before the Bar Date, it was forever barred, estopped, and enjoined from, among other things, asserting its claim relating to the Bonds and voting on or receiving distributions under the Modified Plan on account of its claim, as provided in Fed. R. Bankr. P. 3003(c)(2) and the Bar Date Order (Docket No. 3206 ¶ 11) and explained in the Bar Date Notice (id. Ex. B ¶ 7).

I.    The Plan Injunction

33.    Article 11.14 of the Modified Plan provides:

Subject to Article 11.13 of this Plan, the satisfaction, release, and discharge pursuant to this Article XI shall act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim, Interest, or Cause of Action satisfied, released, or discharged under this Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.

(Docket No. 18707 Ex. A art. 11.14.)

34.    Similarly, paragraph 22 of the Plan Modification Order provides:

Except as otherwise specifically provided in the Modified Plan, the MDA Documents, or this order and except as may be necessary to enforce or remedy a breach of the Modified Plan, the Debtors and all Persons shall be precluded and

---

[1]    The Indenture Trustee also received notice of the bar date of July 15, 2009 for filing proofs of administrative expenses arising on or before June 1, 2009 (Docket No. 17267) and the bar date 30 days after the effective date of the Modified Plan for filing proofs of administrative expenses arising after June 1, 2009 (Docket No. 18978). The Indenture Trustee did not file a proof of administrative expenses concerning the Bonds on or before those bar dates (or thereafter).

permanently enjoined on and after the Effective Date from (a) commencing or continuing in any manner any Claim, action, employment of process, or other proceeding of any kind with respect to any Claim, Interest, Cause of Action, or any other right or Claim against the Reorganized Debtors, which they possessed or may possess prior to the Effective Date, (b) the enforcement, attachment, collection, offset, recoupment, or recovery by any manner or means of any judgment, award, decree, order, or otherwise with respect to any Claim, Interest, Cause of Action, or any other right or Claim against the Reorganized Debtors, which they possessed or may possess prior to the Effective Date, (c) creating, perfecting, or enforcing any encumbrance of any kind with respect to any Claim, Interest, Cause of Action, or any other right or Claim against the Reorganized Debtors, which they possessed or may possess prior to the Effective Date, and (d) asserting any Claims, Interests, or Causes of Action that are satisfied, discharged, released, or subject to exculpation hereby or by the Modified Plan.

(Docket No. 18707 ¶ 22.)

35.    We refer to the injunctions established by Article 11.14 of the Modified

Plan and paragraph 22 of the Plan Modification Order as the "Plan Injunction."

J.    The Indenture Trustee's Post-Emergence Pursuit Of A Claim Against DPH Holdings

36.    After the effective date of the Modified Plan on October 6, 2009, the

Indenture Trustee asserted that DPH Holdings remained obligated to perform the obligations

assigned to DAS LLC under the 1999 Assignment Agreement – i.e., that DPH Holdings

remained obligated to make to the Indenture Trustee certain post-emergence cash payments with

respect to the Bonds.  The Indenture Trustee demanded payment from DPH Holdings in a letter

dated August 20, 2010, more than ten months after the effective date of the Modified Plan.

K.    The Second Indenture Trustee Plan Injunction Motion

37.    On November 15, 2010, the Reorganized Debtors filed the Second

Indenture Trustee Plan Injunction Motion seeking an order enforcing the Plan Injunction against

the Indenture Trustee in connection with their actions in seeking payment with respect to the

Bonds.  (Docket No. 20795.)  The Indenture Trustee did not file an objection to the Second

Indenture Trustee Plan Injunction Motion.

L.      The Joint Stipulation And Agreed Order

38.     The Second Indenture Trustee Plan Injunction Motion was resolved through the Joint Stipulation And Agreed Order.  (Ex. A.)  In the Joint Stipulation And Agreed Order, the Reorganized Debtors, the Indenture Trustee, and Delphi Automotive LLP stipulated and agreed that:

> The Indenture Trustee (i) is subject to the injunctions in Article 11.14 of the Modified Plan and paragraph 22 of the Plan Modification Order (collectively, the 'Plan Injunction'), and, therefore, (ii) shall not make any demand for payment or take any other action to obtain payment with respect to the Bonds from DPH Holdings, any of the other former debtors in the above-captioned cases, or Delphi Automotive LLP or any of its subsidiaries or affiliates unless this Court authorizes the Indenture Trustee to take such action.

(Ex. A ¶ A.)  This Court entered the Joint Stipulation And Agreed Order on December 10, 2010.  (Id. at 4.)

Argument

I.      THE MOTION SHOULD BE DENIED BECAUSE THE INDENTURE TRUSTEE AND THE BONDHOLDERS HAVE NOT MADE AN INITIAL SHOWING OF CAUSE TO LIFT THE PLAN INJUNCTION.

39.     The Joint Stipulation And Agreed Order entered in December 2010 establishes through the agreement of the parties and this Court's order that the Indenture Trustee "is subject to the injunctions in Article 11.14 of the Modified Plan and paragraph 22 of the Plan Modification Order (collectively, the 'Plan Injunction')."  (Ex. A ¶ A.)  It also establishes that the Plan Injunction bars the Indenture Trustee from "mak[ing] any demand for payment or tak[ing] any other action to obtain payment with respect to the Bonds from DPH Holdings [or] any of the other former debtors in the above-captioned cases . . . unless this Court authorizes the Indenture Trustee to take such action."  (Id.)

40.     Given the parties' agreement that the Indenture Trustee's pursuit of the claim is covered by the Plan Injunction (id.), it follows that the Indenture Trustee cannot proceed

unless this Court lifts the Plan Injunction.  Thus, the Court authorization contemplated by the

Joint Stipulation And Agreed Order is an order lifting the Plan Injunction to allow the Indenture

Trustee to pursue its claim relating to the Bonds.[2]

41.    The parties recognized this when they executed the Joint Stipulation And

Agreed Order.  Indeed, in paragraph B of the Joint Stipulation And Agreed Order, the parties

"reserve[d] all other rights, claims, and defenses in connection with any subsequent matter or

proceeding concerning the Bonds, <u>including any subsequent request by the Indenture Trustee for

relief from this Court to lift the Plan Injunction</u>."  (<u>Id.</u> ¶ B (emphasis added).)

42.    Requests to lift or modify a plan injunction are subject to the same "cause"

standard that applies to requests to lift or modify the automatic stay under section 362(d)(1) of

the Bankruptcy Code.  <u>WorldCom I</u>, 2006 WL 2270379, at *7-8; <u>WorldCom II</u>, 2007 WL

841948, at *5.

43.    Under this standard, courts consider the twelve <u>Sonnax</u> factors to the

extent they are applicable:  (i) "whether relief would result in a partial or complete resolution of

the issues"; (ii) "lack of any connection with or interference with the bankruptcy case";

(iii) "whether the other proceeding involves the debtor as a fiduciary"; (iv) "whether a

specialized tribunal with the necessary expertise has been established to hear the cause of action";

(v) "whether the debtor's insurer has assumed full responsibility for defending it"; (vi) "whether

the action primarily involves third parties"; (vii) "whether litigation in another forum would

prejudice the interests of other creditors"; (viii) "whether the judgment claim arising from the

other action is subject to equitable subordination"; (ix) "whether movant's success in the other

---

[2]    To proceed against the Reorganized Debtors in this Court, the Indenture Trustee and the Bondholders must also
obtain an order allowing them to file a late proof of claim under the excusable neglect standard and the <u>Pioneer</u>
factors.  They have not requested or established that they are entitled to that relief either.

proceeding would result in a judicial lien avoidable by the debtor"; (x) "the interests of judicial economy and the expeditious and economical resolution of litigation"; (xi) "whether the parties are ready for trial in the other proceeding"; and (xii) "impact of the stay on the parties and the balance of harms." Sonnax Indus., Inc. v. TRI Component Prods. Corp. (In re Sonnax Indus., Inc.), 907 F.2d 1280, 1286 (2d Cir. 1990); accord Spencer v. Bogdanovich (In re Bogdanovich), 292 F.3d 104, 110 n.1 (2d Cir. 2002).

44.    A party seeking relief from the automatic stay under section 362(d)(1) of the Bankruptcy Code must make an initial showing of cause. Bogdanovich, 292 F.3d at 110; Mazzeo v. Lenhart (In re Mazzeo), 167 F.3d 139, 142 (2d Cir. 1999). A party seeking relief from a plan injunction bears the same burden. WorldCom II, 2007 WL 841948, at *6. The Second Circuit has "emphasized that a bankruptcy court should deny relief from the [automatic] stay if the movant 'fails to make an initial showing of cause.'" Capital Commc'ns Fed. Credit Union v. Boodrow (In re Boodrow), 126 F.3d 43, 48 (2d Cir. 1997) (quoting Sonnax, 907 F.2d at 1285); accord Mazzeo, 167 F.3d at 142. The same rule applies to requests for relief from a plan injunction. WorldCom II, 2007 WL 841948, at *6.

45.    In this case, the Indenture Trustee and the Bondholders have not expressly requested an order lifting the Plan Injunction, even though the Plan Injunction bars them from pursuing their purported claims relating to the Bonds. They have not cited or addressed the Sonnax factors that would govern any such request. And they have not even attempted to satisfy their burden to make an initial showing of cause under the Sonnax factors to lift the Plan Injunction.

46.    In short, the Indenture Trustee and the Bondholders cannot move forward with their purported claims relating to the Bonds unless the Plan Injunction is lifted. The Plan

Injunction cannot be lifted unless, among other things, the Indenture Trustee and the

Bondholders make an initial showing of cause under the Sonnax factors.  Because the Indenture

Trustee and the Bondholders have not satisfied (or even acknowledged) their burden, their

request for authority to pursue their purported claims should be denied.  See Bogdanovich, 292

F.3d at 110 ("Absent such showing [of cause], relief from the effect of a stay will be denied.");

Mazzeo, 167 F.3d at 142 ("[A]bsent a showing of cause, the court should simply deny relief from

the stay."); Boodrow, 126 F.3d at 48 ("We have emphasized that a bankruptcy court should deny

relief from the stay if the movant fails to make an initial showing of cause.") (internal quotation

marks omitted); Sonnax, 907 F.2d at 1285 ("If the movant fails to make an initial showing of

cause, . . . the court should deny relief without requiring any showing from the debtor that it is

entitled to continued protection.").

II.     THE INDENTURE TRUSTEE'S AND THE BONDHOLDERS' ARGUMENTS
        REGARDING DISCHARGE, NOTICE, EQUITABLE ESTOPPEL, AND EQUITY
        ARE WITHOUT MERIT.

                47.     Instead of seeking appropriate relief to lift the Plan Injunction, the

Indenture Trustee and the Bondholders make a series of arguments relating to (i) the

Reorganized Debtors' discharge, (ii) notice issues, (iii) equitable estoppel, and (iv) general

considerations of equity that seem to challenge whether the Plan Injunction applies in the first

instance.  As we explained above, that issue was resolved by the Joint Stipulation And Agreed

Order (at least as to the Indenture Trustee) (Docket No. 20993 ¶ A), and the Indenture Trustee

and the Bondholders have not sought reconsideration of the Joint Stipulation And Agreed Order.

In any event, the Indenture Trustee's and the Bondholders' arguments lack merit and offer no

basis for allowing the Indenture Trustee or the Bondholders to pursue their purported claims

against the Reorganized Debtors.

A.      <u>Discharge</u>

48.      In their Motion, the Indenture Trustee and the Bondholders assert that the Reorganized Debtors' obligations relating to the Bonds were not discharged in connection with the Modified Plan.  (Docket No. 21758 ¶¶ 1, 5, 25-26.)  That is incorrect.

49.      In general terms, "[w]hen there is a confirmation order of a reorganization plan in bankruptcy pursuant to Chapter 11, that confirmation order discharges the debtor from all pre-confirmation claims" pursuant to section 1141(d)(1)(A) of the Bankruptcy Code.   <u>Solow v. Kalikow</u> (In re Kalikow), 602 F.3d 82, 94 (2d Cir. 2010); <u>accord</u> <u>Olin Corp. v. Riverwood Int'l Corp.</u> (In re Manville Forest Prods. Corp.), 209 F.3d 125, 128 (2d Cir. 2000).  Section 1141(d)(1)(A) provides:

> <u>Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan</u> –
>
> > (A)      <u>discharges the debtor from any debt that arose before the date of such confirmation,</u> and any debt of a kind specified in section 502(g), 502(h), or 502(i) of this title [11], whether or not –
> >
> > > (i)      a proof of claim based on such debt is filed or deemed filed under section 501 of this title;
> > >
> > > (ii)      such claim is allowed under section 502 of this title; or
> > >
> > > (iii)      the holder of such claim accepted the plan . . . .

(Emphasis added.)

50.      This Court entered the Plan Modification Order confirming the Modified Plan on July 30, 2009.  (Docket No. 18707.)  To the extent the Reorganized Debtors had any obligations to the Indenture Trustee or the Bondholders relating to the Bonds, that debt arose from the 1999 Assignment Agreement executed by GM and DAS LLC on January 1, 1999, more

than ten years before this Court confirmed the Modified Plan.[3]  Thus, the Reorganized Debtors'

purported debts to the Indenture Trustee and the Bondholders relating to the Bonds were

discharged pursuant to section 1141(d)(1)(A) of the Bankruptcy Code unless section 1141(d), the

Modified Plan, or the Plan Modification Order provide otherwise.

51.     They do not.  Nothing in section 1141(d) of the Bankruptcy Code states or

suggests that debts such as the purported debts at issue here fall outside the scope of the

discharge.  As for the Modified Plan, Article 11.2 provides for an expansive discharge of the

Reorganized Debtors' debts as of the so-called "Effective Date," which occurred on October 6,

2009, and contains no exception for the purported debts at issue here.  (Docket No. 18707 Ex. A

art. 11.2.)  Paragraph 20 of the Plan Modification Order incorporates and approves the discharge

as set forth in Article 11.2 of the Modified Plan.  (Docket No. 18707 ¶ 20.)  Accordingly, despite

the Indenture Trustee's and the Bondholders' argument to the contrary, the debts at issue here

were discharged as of October 6, 2009, pursuant to section 1141(d)(1)(A) of the Bankruptcy

Code, Article 11.2 of the Modified Plan, and paragraph 20 of the Plan Modification Order.

52.     In connection with their misguided discharge argument, the Indenture

Trustee and the Bondholders note that the Reorganized Debtors' obligations relating to the Bonds

did not appear on their schedules of assets and liabilities.  (Docket No. 21758 ¶¶ 3, 10, 24-26, 29.)

That does not matter for purposes of determining whether the discharge covers the debts at issue

here.  The scheduling of a claim may make it unnecessary for a creditor to file a proof of claim

under some circumstances, see 11 U.S.C. § 1111(a); Fed. R. Bankr. P. 3003(b)(1), (c)(2), but it

---

[3]     The term "debt" refers to "liability on a claim."  11 U.S.C. § 101(12).  A "claim" includes any "right to payment,
whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured,
unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  Id. § 101(5)(A).

does not affect whether a debt with respect to the claim falls within the discharge provided pursuant to section 1141(d)(1)(A) of the Bankruptcy Code.

53.     The Indenture Trustee and the Bondholders also argue that the Reorganized Debtors' obligations relating to the Bonds remain in place under the so-called "ride through" doctrine.  (Docket No. 21758 25-26.)  In this regard, the Indenture Trustee and the Bondholders rely on <u>Diamond Z Trailer, Inc. v. JZ L.L.C.</u> (In re JZ L.L.C.), 371 B.R. 412 (B.A.P. 9th Cir. 2007), and <u>In re Hernandez</u>, 287 B.R. 795 (Bankr. D. Ariz. 2002), both of which involved an application of the doctrine to executory contracts that the trustee or debtor-in-possession had neither assumed nor rejected under section 365 of the Bankruptcy Code.

54.     In <u>JZ</u>, the court summarized its decision as follows:

> The bankruptcy court ruled that the 'ride through' doctrine developed under the Bankruptcy Act of 1898 survives and applies to <u>an executory contract that is neither assumed nor rejected under 11 U.S.C. 365(a) during the course of a chapter 11 case in which a plan is confirmed</u>.  The First, Second, and Fifth Circuits have reached the same conclusion.  So do we.

<u>JZ</u>, 371 B.R. at 422 (emphasis added).  <u>Hernandez</u> likewise explained that the doctrine relates to executory contracts that are neither assumed nor rejected:  "Simply stated, the ride through doctrine provides that <u>executory contracts that are neither affirmatively assumed or rejected by the debtor under 365</u>, pass through the bankruptcy unaffected."  <u>Hernandez</u>, 287 B.R. at 799 (emphasis added).

55.     The ride through doctrine in <u>JZ</u> and <u>Hernandez</u> does not apply here because the 1999 Assignment Agreement – the source of the Reorganized Debtors' obligations relating to the Bonds – is not an "executory contract" within the meaning of section 365 of the Bankruptcy Code.

56.     In this context, a contract is executory only when "'the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to

complete performance would constitute a material breach excusing the performance of the

other.'" ReGen Capital I, Inc. v. Halperin (In re Wireless Data, Inc.), 547 F.3d 484, 488 n.1 (2d

Cir. 2008) (quoting Vernon Countryman, Executory Contracts in Bankruptcy:  Part I, 57 Minn. L.

Rev. 439, 460 (1973)); COR Route 5 Co. v. Penn Traffic Co. (In re Penn Traffic Co.), 524 F.3d

373, 379 (2d Cir. 2008) (quoting same).

57.     The 1999 Assignment Agreement between GM and DAS LLC does not

fall within this definition.  Under the principal terms of the 1999 Assignment Agreement, (i) GM

assigned to DAS LLC certain loan agreements and lease agreements, including the 1994 Loan

Agreement relating to the Bonds, as well as certain related securities and assets held by GM (Ex.

C §§ 1, 3) (ii) DAS LLC accepted the assignment and assumed GM's obligations under the

assigned agreements (id. §§ 2-3), and (iii) DAS LLC agreed to indemnify GM and its affiliates

against losses arising from the assigned agreements or the assigned assets (id. § 6).  Insofar as

GM had any material performance obligations under these or any other terms of the 1999

Assignment Agreement, it completed its performance on or shortly after January 1, 1999, when

the 1999 Assignment Agreement was executed and the assignments contemplated by the 1999

Assignment Agreement went into effect.

58.     Because GM had no material unperformed obligations under the 1999

Assignment Agreement as of the petition dates in October 2005 or thereafter, the 1999

Assignment Agreement is not an executory contract subject to assumption or rejection under

section 365 of the Bankruptcy Code (or under a plan of reorganization pursuant to section

1123(b)(2) of the Bankruptcy Code).  The ride through doctrine cited by the Indenture Trustee

and the Bondholders therefore does not apply to the 1999 Assignment Agreement and does not

support their position that the Reorganized Debtors' obligations under the 1999 Assignment

Agreement survived the substantial consummation of the Modified Plan.[4]

59.    The same is true with respect to the 1994 Loan Agreement between

Trumbull County and GM that was assigned to DAS LLC under the 1999 Assignment

Agreement.  The counterparty to the 1994 Loan Agreement was Trumbull County.  (Ex. B.)

Trumbull County's principal obligations under the 1994 Loan Agreement were to issue the

Bonds (Ex. B § 3.1) and lend to GM the proceeds from the sale of the Bonds (Ex. B § 4.1).

Trumbull County performed those obligations long before the Reorganized Debtors commenced

these cases in October 2005, and it had no other material unperformed obligations under the

1994 Loan Agreement as of that time or thereafter.  Thus, like the 1999 Assignment Agreement,

the underlying 1994 Loan Agreement was not an executory contract and therefore was not

subject to the ride through doctrine cited by the Indenture Trustee and the Bondholders.  See In

re General Growth Props., Inc., 451 B.R. 323, 329 (Bankr. S.D.N.Y. 2011) (explaining that "loan

agreements are generally not considered to be executory contracts").

60.    On a broader level, the Indenture Trustee's current argument that the

Reorganized Debtors' debts relating to the Bonds were not discharged is in direct conflict with

the Joint Stipulation And Agreed Order, in which the Indenture Trustee agreed that its action in

seeking payment from the Reorganized Debtors was covered by the Plan Injunction.  (Ex. A ¶ A.)

As provided in Article 11.14 of the Modified Plan, the Plan Injunction applies to the pursuit of

claims that were "satisfied, released, or discharged under this [Modified] Plan."  (Docket No.

18707 Ex. A art. 11.14.)  In agreeing that the Plan Injunction applied in the Joint Stipulation And

---

[4]    As for the Reorganized Debtors' contracts that were executory, Article VIII of the Modified Plan handled
assumption and rejection in a comprehensive manner (Docket No. 18707 Ex. A art. VIII), leaving no room for
application of the ride through doctrine even to those contracts.

Agreed Order, the Indenture Trustee necessarily agreed that its claim relating to the Bonds was satisfied, released, or discharged.  Again, the Indenture Trustee has not asked for reconsideration of the Joint Stipulation And Agreed Order, and the agreements and determinations reflected in the Joint Stipulation And Agreed Order remain binding here.

B.    Notice

61.    Although the Indenture Trustee and the Bondholders assert that they were entitled to but did not receive notice of the Bar Date or the Modified Plan (Docket No. 21758 ¶¶ 3, 10, 22, 24, 27), that is not the case.

62.    With respect to the Indenture Trustee, and without conceding that the Indenture Trustee was entitled to notice, the affidavit of service filed by KCC on April 28, 2006, shows that the Indenture Trustee was served with the Court-approved Notice Of Bar Date For Filing Proofs Of Claim and a Proof Of Claim form at several addresses in Newark, New Jersey, and New York, New York.  (Docket No. 3501.)[5]  The Indenture Trustee was served by postage prepaid U.S. mail on or before April 20, 2006.  (Id.)

63.    The Indenture Trustee also received adequate notice regarding the Modified Plan.  On June 23, 2009, KCC filed another affidavit of service showing that the Indenture Trustee was served with the following Court-approved documents at several addresses in Newark, New Jersey, and New York, New York:

- Notice Of (1) Approval Of Supplement; (2) Hearing On Modifications To Plan; (3) Deadline And Procedures For Filing Objections To Modifications Of Plan; (4) Deadline And Procedures For Temporary Allowance Of Certain Claims For Voting Purposes; (5) Treatment Of Certain Unliquidated, Contingent, or Disputed Claims For Notice, Voting, And Distribution Purposes; (6) Record Date; (7) Voting Deadline For Receipt Of Ballots; And (8) Proposed Releases, Exculpation, And Injunction In Modified Plan;

---

[5]    A redacted copy of this affidavit is attached to this objection as Exhibit E.

- Notice Of Bar Date For Filing Proofs Of Administrative Expense; and

- Administrative Expense Claim Form.

(Docket No. 17267.)[6] The Indenture Trustee was served by postage prepaid U.S. mail on or before June 20, 2009.  (Id.)

64.    Insofar as the Indenture Trustee and the Bondholders assert that the Indenture Trustee did not receive any notice of the Bar Date or the Modified Plan – as they do in certain places in the Motion (Docket No. 21758 ¶¶ 10, 24, 27) – KCC's affidavits demonstrate that that assertion is inaccurate.

65.    To the extent they make the slightly different allegation that the Indenture Trustee did not receive notices in its capacity as Indenture Trustee with respect to the Bonds – as they appear to do in certain other places in the Motion (id. ¶¶ 3, 22) – that argument fails as well. As explained above, the Indenture Trustee did in fact receive notice of the Bar Date and the Modified Plan.  The Indenture Trustee and the Bondholders do not cite any provision of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, or this Court's orders that would require the Reorganized Debtors to have specified that the notices were directed toward the Indenture Trustee in its capacity as indenture trustee with respect to the Bonds.  Nor are the Reorganized Debtors aware of any such provision.

66.    With respect to the Bondholders, the question whether they received notice of the Bar Date and the Modified Plan is irrelevant because they have not shown that they were entitled to notice.  Keep in mind that this is not a situation where bondholders are asserting a right to payment from the issuer of bonds.  Trumbull County issued the Bonds pursuant to a trust indenture between Trumbull County and the predecessor indenture trustee.  Under the 1994

---

[6]    A redacted copy of this affidavit is attached to this objection as Exhibit F.

Loan Agreement between Trumbull County and GM, Trumbull County agreed to lend the

proceeds from the sale of the Bonds to GM in exchange for, among other things, GM's promise

to make certain payments to the Indenture Trustee.  (Ex. B §§ 4.1-4.2.)  In the 1999 Assignment

Agreement between GM and DAS LLC, GM assigned the 1994 Loan Agreement to DAS LLC.

(Ex. C § 1.)

        67.    As the assignee of the 1994 Loan Agreement, DAS LLC took on GM's

payment obligations under the 1994 Loan Agreement.  Those obligations ran solely to the

Indenture Trustee, not the Bondholders.  This is clear from Section 4.2(a) of the 1994 Loan

Agreement, under which GM – and through the 1999 Assignment Agreement, DAS LLC –

covenanted and agreed to make certain payments "to the Trustee."  (Ex. B § 4.2(a).)  It is also

clear from Section 4.4, which provides:

> As security for the payment of its Bonds, the Issuer [Trumbull County]
> will assign and pledge <u>to the Trustee</u> all right, title and interest of the Issuer in and
> to this Agreement, <u>including the right to receive payments</u> hereunder and
> thereunder . . . , and hereby directs the Company [GM] to <u>make said payments
> directly to Trustee</u>.  The Company herewith assents to such assignment and
> pledge and will <u>make payments directly to the Trustee</u> without defense or set-off
> by reason of any dispute between the Company and the Issuer or the Trustee.

(<u>Id.</u> § 4.4 (emphasis added).)

        68.    To establish that they were entitled to notice of the Bar Date and the

Modified Plan, the Bondholders would have to show that they were creditors of DAS LLC under

the 1994 Loan Agreement between Trumbull County and GM and the 1999 Assignment

Agreement between GM and DAS LLC, despite the fact that they were not parties to either of

those agreements and despite the clear and unambiguous language of the 1994 Loan Agreement

that grants a payment right to the Indenture Trustee, not the Bondholders.  They would then face

the additional hurdle of showing that they were known creditors of the Reorganized Debtors at

the relevant times – that is, the dates used for measuring which persons and entities were entitled

to receive notice of the Bar Date in April 2006 and notice of the Modified Plan in June 2009.

The Indenture Trustee and the Bondholders do not address these points in the Motion, let alone

demonstrate that the Bondholders were creditors entitled to the specific notices at issue.

Accordingly, the alleged fact that the Bondholders did not receive notice of the Bar Date or the

Modified Plan is beside the point.

C.    Equitable Estoppel

69.    The Indenture Trustee's and the Bondholder's next argument is that

equitable estoppel bars the Reorganized Debtors from taking the position that the Indenture

Trustee and/or the Bondholders do not have an allowed claim relating to the Bonds.  (Docket No.

21758 ¶¶ 1, 28, 30.)  This argument is based on an e-mail dated October 29, 2009 from Mr.

VanDenBergh to Mr. Abrams of fmsbonds, Inc.  (Id. ¶¶ 1, 5, 12-13, 28, 30.)  The e-mail reads as

follows:

> Jay,
>
> These bonds were an allowed secured claim in Delphi's bankruptcy case and as of
> emergence have been assigned to "New" Delphi.  Allowed secured claims are to
> be satisfied in equal installments of cash payments over seven years from the date
> of emergence (October 6, 2009).  Outstanding amounts will accrue interest at the
> seven-year treasury yield rate as of emergence plus 200 basis points.
>
> Regards,
> Al

(Id. Ex. B.)

70.    "The doctrine of equitable estoppel is properly invoked where the

enforcement of the rights of one party would work an injustice upon the other party due to the

latter's justifiable reliance upon the former's words or conduct."  Kosakow v. New Rochelle

Radiology Assocs., P.C., 274 F.3d 706, 725 (2d Cir. 2001); accord Republic of Ecuador v.

Chevron Corp., 638 F.3d 384, 400 (2d Cir. 2011).  "Under federal law, a party may be estopped

from pursuing a claim or defense where:  1) the party to be estopped makes a misrepresentation

of fact to the other party with reason to believe that the other party will rely upon it; 2) and the

other party reasonably relies upon it; 3) to her detriment."  <u>Kosakow</u>, 274 F.3d at 725; <u>accord</u>

<u>OSRecovery, Inc. v. One Groupe Int'l, Inc.</u>, 462 F.3d 87, 93 n.3 (2d Cir. 2006).

71.     The Indenture Trustee's and the Bondholder's estoppel argument fails for

several reasons.  First, the Indenture Trustee and the Bondholder have not established whether

Mr. VanDenBergh was speaking on behalf of DPH Holdings or any of the other Reorganized

Debtors, on one hand, or so-called "new" Delphi, on the other.  In the absence of a showing that

he was speaking on behalf of the Reorganized Debtors, his e-mail cannot be used to estop the

Reorganized Debtors, as equitable estoppel requires a misrepresentation of fact by "the party to

be estopped."  <u>OSRecovery</u>, 462 F.3d at 93 n.3; <u>Kosakow</u>, 274 F.3d at 725.

72.     Second, the relationship, if any, between Mr. Abrams, on one hand, and

the Indenture Trustee and the Bondholders, on the other, is also uncertain.  The Indenture Trustee

and the Bondholders have not demonstrated that Mr. Abrams, Chief Municipal Credit Analyst of

fmsbonds, Inc., was acting on behalf of the Indenture Trustee or the Bondholders in his

communications with Mr. VanDenBergh.  As a result, they have not satisfied their burden of

proving that there was a misrepresentation of fact "to the other party" – in this case, the Indenture

Trustee and the Bondholders.  <u>OSRecovery</u>, 462 F.3d at 93 n.3; <u>Kosakow</u>, 274 F.3d at 725.

73.     Third, assuming for the sake of argument that the Indenture Trustee and

the Bondholders could establish that they relied on Mr. VanDenBergh's statements in any

relevant sense (as we discuss in the next paragraph, they cannot), that reliance was not

reasonable.  The Indenture Trustee and the Bondholders did not file proofs of claim relating to

the Bonds.  The Indenture Trustee and the Bondholders knew this.  Given this state of affairs, it

was not reasonable for them to construe Mr. VanDenBergh's statements as establishing that they

nevertheless held allowed claims relating to the Bonds or to rely in any way on that

understanding of Mr. VanDenBergh's e-mail.

74. Fourth, and most important, the timeline of events establishes that the

Indenture Trustee and the Bondholders did not rely and could not have relied on Mr.

VanDenBergh's statements in any relevant sense. The Bar Date was July 31, 2006. (Docket No.

3206 ¶ 2.) This Court entered the Plan Modification Order confirming the Modified Plan on July

30, 2009. (Docket No. 18707.) The Reorganized Debtors substantially consummated the

Modified Plan and emerged from chapter 11 on October 6, 2009. (Docket No. 18958.) Mr.

VanDenBergh did not make his statements until October 29, 2009. As a matter of logic, the

Indenture Trustee and the Bondholders cannot demonstrate that they relied on Mr.

VanDenBergh's statements in connection with the prior actions that they took or failed to take

concerning the Bar Date, including their failure to file proofs of claim, or the Modified Plan.

75. We also note that, according to the Indenture Trustee and the Bondholders,

Mr. VanDenBergh retracted his statements no later than June 22, 2010, in a follow-up e-mail to

Mr. Abrams. (Docket No. 21758 ¶ 19 & Ex. E.) Yet the Indenture Trustee and the Bondholders

waited almost eighteen months, until December 12, 2011, to file the Motion and make their

initial request for relief from this Court. If Mr. VanDenBergh's statements were really as

important as the Indenture Trustee and the Bondholders contend, his subsequent retraction of

those statements would have prompted a much faster reaction. As it is, the Indenture Trustee and

the Bondholders have offered no explanation for their lengthy delay in filing the Motion.

76. It is unclear whether the Indenture Trustee and the Bondholders also

believe that the Reorganized Debtors' conduct in making certain payments relating to the Bonds

during these cases gives rise to equitable estoppel.  To the extent they do, their argument is

without merit.  As set forth in paragraphs 2 and 19-27 of this objection, the Reorganized Debtors

made the payments pursuant to their obligations to GM under the Amended MRA.  The

payments started in September 2008, when the Amended MRA became effective, and they ended

in October 2009, when the Amended MRA was terminated.  The Indenture Trustee and the

Bondholders have offered no basis for concluding that the Reorganized Debtors' performance of

their contractual obligations to GM under the Amended MRA involves any misrepresentation of

fact or otherwise satisfies the elements of equitable estoppel.

        D.      <u>Equity</u>

        77.     The Indenture Trustee and the Bondholders also make vague references to

"equity" and "fundamental fairness" (Docket No. 21758 ¶ 1), "the equities of the matter" (<u>id.</u> ¶ 5),

and "the equities of this case" (<u>id.</u> ¶ 32).  The Reorganized Debtors construe these references as

appeals to this Court's equitable power under section 105(a) of the Bankruptcy Code, which

allows bankruptcy courts to "issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of this title [11]."

        78.     The Second Circuit "has long recognized that [s]ection 105(a) limits the

bankruptcy court's equitable powers, which must and can only be exercised within the confines

of the Bankruptcy Code."  <u>Dairy Mart Convenience Stores</u>, 351 F.3d at 92 (internal quotation

marks omitted here and through the end of this objection); <u>accord</u> <u>Kalikow</u>, 602 F.3d at 96.  "It

does not authorize the bankruptcy courts to create substantive rights that are otherwise

unavailable under applicable law, or constitute a roving commission to do equity."  <u>Dairy Mart</u>

<u>Convenience Stores</u>, 351 F.3d at 92; <u>accord</u> <u>Kalikow</u>, 602 F.3d at 96.

79.    In other words, "[t]he equitable power conferred on the bankruptcy court by section 105(a) is the power to exercise equity in carrying out the <u>provisions</u> of the Bankruptcy Code, rather than to further the purposes of the Code generally, or otherwise do the right thing." <u>Dairy Mart Convenience Stores</u>, 351 F.3d at 92; <u>accord</u> <u>Kalikow</u>, 602 F.3d at 97.  As a result, "an exercise of section 105 power [must] be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective."  <u>Dairy Mart Convenience Stores</u>, 351 F.3d at 92; <u>accord</u> <u>Kalikow</u>, 602 F.3d at 97.

80.    Despite these well-established rules, the Indenture Trustee and the Bondholders have not linked their request that this Court exercise its equitable power with any provision of the Bankruptcy Code.  Indeed, one of the more remarkable features of the Motion is that it does not contain a single citation to any section of the Bankruptcy Code, either in connection with the Indenture Trustee's and the Bondholders' equity argument or anywhere else. Accordingly, the Indenture Trustee's and the Bondholders' general invocation of what they believe are the equities of this matter is not a valid ground for granting them the relief they seek.

<u>Conclusion</u>

WHEREFORE, the Reorganized Debtors respectfully request that this Court enter

an order sustaining this objection, denying the Motion, and granting the Reorganized Debtors

such other and further relief as is just.

Dated: New York, New York
       January 5, 2012

                                    SKADDEN, ARPS, SLATE, MEAGHER
                                     & FLOM LLP

                           By: /s/ Ron E. Meisler
                               John Wm. Butler, Jr.
                               John K. Lyons
                               Albert L. Hogan, III
                               Ron E. Meisler
                               155 North Wacker Drive
                               Chicago, Illinois 60606

                                    - and -

                               Four Times Square
                               New York, New York 10036

                               Attorneys for DPH Holdings Corp., <u>et</u> <u>al.</u>,
                                Reorganized Debtors

# Exhibit A
# Joint Stipulation And Agreed Order

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Albert L. Hogan, III
Ron E. Meisler

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036

Attorneys for DPH Holdings Corp., et al.,
 Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
        In re                           :    Chapter 11
                                        :
DPH HOLDINGS CORP., et al.,             :    Case No. 05-44481 (RDD)
                                        :
              Reorganized Debtors. :         (Jointly Administered)
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


JOINT STIPULATION AND AGREED ORDER RESOLVING REORGANIZED DEBTORS'
MOTION FOR ORDER ENFORCING MODIFIED PLAN AND PLAN MODIFICATION
ORDER INJUNCTIONS AGAINST INDENTURE TRUSTEE WITH RESPECT TO CERTAIN
1994 BONDS ISSUED BY THE COUNTY OF TRUMBULL, OHIO (DOCKET NO. 20795)

          DPH Holdings Corp. ("DPH Holdings") and certain of its affiliated reorganized

debtors in the above-captioned cases (collectively, the "Reorganized Debtors"), the Bank of New



0544481101210000000000007

York Mellon Corporation (the "Indenture Trustee"), as successor indenture trustee with respect to the Sewage Disposal Revenue Bonds (General Motors Corporation Project) Series 1994, issued by the County of Trumbull, Ohio, in the aggregate principal amount of $2.75 million (the "Bonds"), and Delphi Automotive LLP respectfully submit this Joint Stipulation And Agreed Order Resolving Reorganized Debtors' Motion For Order Enforcing Modified Plan And Plan Modification Order Injunctions Against Indenture Trustee With Respect To Certain 1994 Bonds Issued By The County Of Trumbull, Ohio (Docket No. 20795) (the "Stipulation"), and agree and state as follows:

WHEREAS, by letter dated August 20, 2010 and in subsequent communications, the Indenture Trustee demanded payment from DPH Holdings with respect to the Bonds (the "Demand").

WHEREAS, on November 15, 2010, the Reorganized Debtors filed the Reorganized Debtors' Motion For Order Enforcing Modified Plan And Plan Modification Order Injunctions Against Indenture Trustee With Respect To Certain 1994 Bonds Issued By The County Of Trumbull, Ohio (Docket No. 20795) (the "Motion") seeking the entry of an order enforcing the injunctions set forth in Article 11.14 of the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (As Modified) (Docket No. 18707 Ex. A) (the "Modified Plan") and paragraph 22 of the Order Approving Modifications Under 11 U.S.C. § 1127(b) To (I) First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified And (II) Confirmation Order (Docket No. 12359) (Docket No. 18707) (the "Plan Modification Order"), which enjoin any person from taking any action against DPH Holdings or any of the other former debtors in the above-captioned cases to collect, offset, or

2

recover any claim, interest, or cause of action satisfied, released, or discharged under the Modified Plan.

WHEREAS, on November 19, 2010, Delphi Automotive LLP filed a Joinder Of Delphi Automotive LLP Regarding Reorganized Debtors' Motion For Order Enforcing Modified Plan And Plan Modification Order Injunctions Against Indenture Trustee With Respect To Certain 1994 Bonds Issued By The County Of Trumbull, Ohio (Docket No. 20835) (the "Joinder") alleging that, to the extent the Demand is construed as a demand for payment from Delphi Automotive LLP or any of its subsidiaries or affiliates, the injunctions in Article 11.14 of the Modified Plan and paragraph 22 of the Plan Modification Order similarly prohibit the Indenture Trustee from taking action against Delphi Automotive LLP or any of its subsidiaries or affiliates with respect to the Bonds.

NOW, THEREFORE, the Reorganized Debtors, the Indenture Trustee, and Delphi Automotive LLP stipulate and agree as follows:

A.      The Indenture Trustee (i) is subject to the injunctions in Article 11.14 of the Modified Plan and paragraph 22 of the Plan Modification Order (collectively, the "Plan Injunction"), and, therefore, (ii) shall not make any demand for payment or take any other action to obtain payment with respect to the Bonds from DPH Holdings, any of the other former debtors in the above-captioned cases, or Delphi Automotive LLP or any of its subsidiaries or affiliates unless this Court authorizes the Indenture Trustee to take such action.

B.      Subject to the foregoing, the parties reserve all other rights, claims, and defenses in connection with any subsequent matter or proceeding concerning the Bonds, including any subsequent request by the Indenture Trustee for relief from this Court to lift the Plan Injunction.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND

DECREED THAT:

1.      The Motion and the Joinder are resolved on the terms set forth in this Stipulation, which is hereby approved.

2.      This Stipulation shall be binding on any successor indenture trustee with respect to the Bonds.

3.      This Court shall retain original and exclusive jurisdiction to adjudicate any disputes arising from or in connection with this Stipulation or any of the rights, claims, and defenses reserved in this Stipulation.

So Ordered in White Plains, New York, this 10th day of December, 2010.


_____/s/Robert D. Drain_____
UNITED STATES BANKRUPTCY JUDGE

AGREED TO AND
APPROVED FOR ENTRY:

/s/ Ron E. Meisler                                          /s/ Edward P. Zujkowski
John Wm. Butler, Jr.                                      Edward P. Zujkowski
John K. Lyons                                                EMMET, MARVIN & MARTIN, LLP
Albert L. Hogan, III                                       120 Broadway 32nd Floor
Ron E. Meisler                                               New York, New York 10271
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP                                               Attorneys for Bank of New York Mellon
155 North Wacker Drive                                 Corporation, as Indenture Trustee
Chicago, Illinois 60606

          - and -

Four Times Square
New York, New York 10036

Attorneys for DPH Holdings Corp., et al.,
  Reorganized Debtors



/s/ Karen J. Craft
Sean P. Corcoran
Karen J. Craft
DELPHI AUTOMOTIVE LLP
5725 Delphi Drive
Troy, Michigan 48098

Attorneys for Delphi Automotive LLP

# Exhibit B
# 1994 Loan Agreement

COUNTY OF TRUMBULL, OHIO

and

GENERAL MOTORS CORPORATION

LOAN AGREEMENT

Dated as of July 1, 1994

All right, title and interest of the County of Trumbull, Ohio in this Agreement (with the exception of its rights under Sections 4.2(b), 5.3(a) and 6.3 hereof) have been assigned pursuant to the Indenture referred to herein, for the benefit of the owners of, and as security for payment of, the Bonds of said Issuer described herein.

249109.01.13.B
2012276/MR:7/8/94

## LOAN AGREEMENT

(This Table of Contents is not
a part of this Loan Agreement
and is only for convenience of reference)

### TABLE OF CONTENTS

| SECTION | HEADING | PAGE |
|---------|---------|------|
| Parties | | 1 |
| Preambles | | 1 |
| ARTICLE I | DEFINITION OF TERMS | 1 |
| ARTICLE II | REPRESENTATIONS | 4 |
| Section 2.1. | Representations of the Issuer | 4 |
| Section 2.2. | Representations of the Company | 5 |
| ARTICLE III | CONSTRUCTION OF THE PROJECT; ISSUANCE OF BONDS | 6 |
| Section 3.1. | Agreement to Construct and Equip the Project | 6 |
| Section 3.2. | Agreement to Issue Bonds; Application of Bond Proceeds | 7 |
| Section 3.3. | Disbursements from the Construction Fund | 7 |
| Section 3.4. | Establishment of Completion Date; Obligation of the Company to Complete | 8 |
| Section 3.5. | Investments | 10 |
| Section 3.6. | Arbitrage Certifications | 10 |
| ARTICLE IV | LOAN OF BOND PROCEEDS; PAYMENT OBLIGATIONS | 10 |
| Section 4.1. | Loan of Bond Proceeds | 10 |
| Section 4.2. | Amounts Payable by Company | 11 |
| Section 4.3. | No Defense or Set-Off; Unconditional Obligation | 11 |
| Section 4.4. | Assignment and Pledge of Issuer's Rights | 12 |
| ARTICLE V | SPECIAL COVENANTS AND AGREEMENTS | 12 |
| Section 5.1. | Right of Access to the Project | 12 |
| Section 5.2. | Company to Maintain its Existence; Conditions Under Which Exceptions Permitted | 12 |
| Section 5.3. | Release and Indemnification Covenants | 13 |
| Section 5.4. | Validity and Tax-Exempt Status of the Bonds | 14 |
| Section 5.5. | Taxes and Governmental Charges | 15 |
| Section 5.6. | Maintenance and Repair; Insurance | 15 |
| Section 5.7. | Financial Reports | 15 |

Section 5.8.    Filings; Lien of Indenture................................................................ 16
Section 5.9.    Operation of Project.................................................................... 16

ARTICLE VI    EVENTS OF DEFAULT AND REMEDIES................................................ 16

Section 6.1.    Events of Default........................................................................ 16
Section 6.2.    Remedies on Default..................................................................... 17
Section 6.3.    Agreement to Pay Attorneys' Fees and Expenses............................ 18
Section 6.4.    No Remedy Exclusive ................................................................... 18
Section 6.5.    No Additional Waiver Implied by One Waiver............................... 19

ARTICLE VII    PREPAYMENT ................................................................................ 19

Section 7.1.    Obligation to Prepay.................................................................... 19
Section 7.2.    Option to Prepay ......................................................................... 19
Section 7.3.    Redemption of the Bonds.............................................................. 20

ARTICLE VIII    MISCELLANEOUS ............................................................................ 20

Section 8.1.    Notices...................................................................................... 20
Section 8.2.    Assignments............................................................................... 20
Section 8.3.    Severability................................................................................ 20
Section 8.4.    Execution of Counterparts............................................................ 21
Section 8.5.    Amounts Remaining in any Fund or with Trustee .......................... 21
Section 8.6.    Amendments, Changes and Modifications....................................... 21
Section 8.7.    Governing Law ........................................................................... 21
Section 8.8.    Authorized Company Representative ............................................. 21
Section 8.9.    Term of this Agreement................................................................ 21
Section 8.10.    Binding Effect............................................................................ 21
Section 8.11.    Limited Liability of Officers, Etc.................................................. 22

Testimonium ................................................................................................................. 22

EXHIBIT A

## LOAN AGREEMENT

THIS LOAN AGREEMENT dated as of July 1, 1994, by and between the COUNTY OF TRUMBULL, OHIO, a county and political subdivision of the State of Ohio (the "Issuer"), and GENERAL MOTORS CORPORATION, a corporation duly organized and validly existing under the laws of the State of Delaware (the "Company");

## W I T N E S S E T H:

WHEREAS, pursuant to Chapter 165, Ohio Revised Code, as amended (the "Act"), the Issuer has the authority to issue its bonds to provide funds, by loans or otherwise, for acquiring, constructing, reconstructing, enlarging, improving, furnishing or equipping one or more projects (as defined in the Act) or parts thereof in furtherance of the public purposes in the Act; and

WHEREAS, pursuant to and in accordance with the provisions of the Act, and at the request of the Company, the Issuer has agreed to issue its Sewage Disposal Revenue Bonds (General Motors Corporation Project) Series 1994 in the aggregate principal amount of $2,750,000 (the "Bonds") in order to provide funds to be lent to the Company hereunder to finance costs of the Project hereinafter described; and

WHEREAS, the Bonds will be secured by an assignment and pledge of the Issuer's rights under this Agreement (except its rights under Sections 4.2(b), 5.3(a) and 6.3 hereof); and

WHEREAS, the execution and delivery of this Agreement have been in all respects duly and validly authorized by action of the Issuer's governing body;

NOW, THEREFORE, in consideration of the respective representations and agreements herein contained, the parties hereto agree as follows (provided, that in the performance of the agreements of the Issuer herein contained, any obligation it may thereby incur shall be payable solely out of the revenues and receipts derived from this Agreement, the sale of the Bonds and the income from the temporary investment thereof):

## ARTICLE I

### DEFINITION OF TERMS

All words and phrases defined in Article I of the Indenture shall have the same meanings in this Agreement. Certain terms used in this Agreement are hereinafter defined in this Article I. When used herein, such terms shall have the meanings given them by the language employed in this Article I defining such terms unless the context clearly indicates otherwise:

"Agreement" means this Loan Agreement, as from time to time supplemented and amended.

"Authorized Company Representative" means such person at the time and from time to time designated to act on behalf of the Company by written certificate furnished to the Issuer and the Trustee, containing the specimen signature of such person, signed on behalf of the Company by the chief executive officer, the chairman, any vice president, the treasurer, any assistant treasurer, the secretary or any assistant secretary of the Company.  Such certificate may designate an alternate or alternates.

"Bond Counsel" means the counsel who rendered the opinion as to the tax-exempt status of the interest on the Bonds on the date of the issuance, sale and delivery of the Bonds or such other nationally recognized municipal bond counsel of recognized expertise with respect to such matters as may be mutually satisfactory to the Issuer, the Company and the Trustee.

"Bond Fund" means the fund created and established in Section 5.2 of the Indenture.

"Bonds" means the Sewage Disposal Revenue Bonds (General Motors Corporation Project) Series 1994 of the Issuer, in the aggregate principal amount of $2,750,000, issued pursuant to the Indenture.

"Code" means the Internal Revenue Code of 1986, as amended, together with any regulations promulgated thereunder or applicable thereto.

"Company" means General Motors Corporation, a corporation duly organized and validly existing under the laws of the State of Delaware, and any surviving, resulting or transferee corporation as permitted by Section 5.2 hereof.

"Completion Date" means the date of completion of construction of the Project.

"Construction Fund" means the Construction Fund created and established in Section 5.6 of the Indenture.

"Construction Period" means the period between the beginning of construction of the Project or the date on which the Bonds are first delivered to the purchasers thereof, whichever is earlier, and the Completion Date.

"Cost of the Project" means the sum of the items authorized to be paid from the Construction Fund pursuant to the provisions of Section 3.3 hereof.

"Event of Default" means any occurrence or event specified as such in and defined as such by Section 6.1 hereof.

"Indenture" means the Indenture of Trust dated as of July 1, 1994, by and between the Issuer and the Trustee, as from time to time supplemented and amended.

"Issuer" means the County of Trumbull, Ohio, a county and political subdivision of the State of Ohio, and any successor body to the duties or functions of the Issuer.

-2-

"Permitted Investments" means:

    (a)    Bonds or other obligations of the United States of America;

    (b)    Bonds or other obligations, the payment of the principal and interest of which is unconditionally guaranteed by the United States of America;

    (c)    Obligations issued or guaranteed as to principal and interest by any agency or person controlled or supervised by and acting as an instrumentality of the United States of America pursuant to authority granted by the Congress of the United States of America;

    (d)    Securities or receipts evidencing ownership interests in obligations or specified portions (such as principal or interest) of obligations described in (a), (b) or (c) above;

    (e)    Commercial or finance company paper which is rated either P-1 or A-1 or an equivalent by Moody's or S&P (including investments in pools or such commercial or finance company paper owned by the Trustee or any affiliate of the Trustee);

    (f)    Obligations issued by or on behalf of any state of the United States of America, or any political subdivision of any such state, which are rated at least A (or an equivalent) by Moody's or S&P;

    (g)    Funds comprised of obligations described in (f) above to the extent described in Treasury Regulation 1.148-8(e)(3)(iii), including any such fund managed by the Trustee or any affiliate of the Trustee;

    (h)    Money market funds which are rated prime-1 or AAAm (or an equivalent) by Moody's or S&P, including any such money market fund managed by the Trustee or any affiliate of the Trustee;

    (i)    repurchase agreements secured by (a) or (b) above which are authorized by law as security for public deposits, provided that no proceeding under any applicable insolvency or reorganization law has been commenced by or against the issuer of such bonds or obligations; or

    (j)    Any other investment not prohibited by applicable law (as evidenced by an opinion of counsel furnished to the Trustee).

"Plans and Specifications" means the plans and specifications prepared for the Project by the Company, as amended from time to time prior to the Completion Date, which plans and specifications are on file at the principal office of the Company.

"Project" means facilities described in Exhibit A hereto, which are further described in the Project Certificate.

"Project Certificate" means the Company's Project Certificate delivered concurrently with the issuance of the Bonds, concerning facts, estimates and circumstances so as to enable Bond Counsel to render its approving opinion required under the Indenture.

"Rebate Fund" means the Rebate Fund established in accordance with the requirements of the Tax Agreement.

"Regulations" means the Treasury Regulations dealing with the tax-exempt bond provisions of the Code.

"State" means the State.

"Tax Agreement" means the Tax Exemption Certificate and Agreement, dated the date of delivery of the Bonds, by and among the Issuer, the Company and the Trustee, as from time to time supplemented and amended.

"Trustee" means the Trustee at the time serving as such under the Indenture.

"Underwriter" means First Commerce Capital, division of Morgan Keegan & Company, Inc., and its successors and assigns.

The words "hereof", "herein", "hereunder" and other words of similar import refer to this Agreement as a whole.

Unless otherwise specified, references to Articles, Sections and other subdivisions of this Agreement are to the designated Articles, Sections and other subdivisions of this Agreement as originally executed.

The headings of this Agreement are for convenience only and shall not define or limit the provisions hereof.

## ARTICLE II

### REPRESENTATIONS

**Section 2.1.    Representations of the Issuer**. The Issuer makes the following representations as the basis for the undertakings on its part herein contained:

(a)    The Issuer is a county and political subdivision of the State.

(b)    The Issuer has determined that the Project is a "Project" as that term is defined in the Act, is consistent with the purposes of the Act and will benefit the people of the Issuer by maintaining or increasing jobs and employment opportunities and promoting the economic development of the Issuer and the State.

(c)    Under the provisions of the Act and proceedings of the Issuer, the Issuer has the power and authority to enter into the transactions contemplated by, and to

-4-

execute and deliver, this Agreement, the Tax Agreement, the Indenture and the Bonds and to carry out its obligations hereunder and thereunder.

(d)    Neither the execution and delivery of this Agreement, the Indenture, the Tax Agreement and the Bonds, the consummation of the transactions contemplated hereby or thereby nor the fulfillment of or compliance with the terms and conditions of this Agreement, the Indenture, the Tax Agreement and the Bonds conflicts with or results in a breach of the terms, conditions or provisions of any restriction or any agreement or instrument to which the Issuer is now a party or by which it is bound, or constitutes a default under any of the foregoing.

(e)    The Bonds are to be issued under the Indenture and the payment of the principal of, premium, if any, and interest on the Bonds are to be secured under the Indenture by an assignment and pledge to the Trustee of all right, title and interest of the Issuer in and to this Agreement (except the rights of the Issuer under Sections 4.2(b), 5.3(a) and 6.3 hereof).

(f)    The Issuer has not assigned or pledged and will not assign or pledge its right, title or interest in or to this Agreement, other than to secure the Bonds and as otherwise provided in the Indenture.

**Section 2.2.    Representations of the Company.**  The Company makes the following representations as the basis for the undertakings on its part herein contained:

(a)    The Company is a corporation duly organized and validly existing under the laws of the State of Delaware, is authorized to do business in, and is in good standing under the laws of, the State, and has the power to enter into, and by proper corporate action has been duly authorized to execute and deliver, this Agreement and the Tax Agreement.

(b)    Neither the execution and delivery of this Agreement and the Tax Agreement, the consummation of the transactions contemplated hereby or thereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement and the Tax Agreement, conflicts with or results in a breach of any of the terms, conditions or provisions of any restriction or any agreement or instrument to which the Company is now a party or by which it is bound, or constitutes a default under any of the foregoing, or results in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of the property or assets of the Company or any subsidiary thereof in a manner which would result in any material adverse change in the consolidated financial position of the Company.

(c)    The statements, information and descriptions contained in the Project Certificate and in the Tax Agreement are true, correct and complete and such statements, information, description and estimates and assumptions contained in the Project Certificate and the Tax Agreement are based upon the best information available to the Company.

-5-

## ARTICLE III

### CONSTRUCTION OF THE PROJECT; ISSUANCE OF BONDS

**Section 3.1. Agreement to Construct and Equip the Project.** The Company agrees that it will acquire or construct, or complete the acquisition and construction of, the Project near Warren, Ohio substantially in accordance with the Plans and Specifications.

(a)    In the event that Exhibit A hereto is to be amended or supplemented in accordance with the provisions of Section 11.1 of the Indenture, the Issuer will enter into, and will instruct the Trustee to consent to, an amendment of or supplement to Exhibit A hereto upon receipt of:

(i)    a certificate of an Authorized Company Representative describing in detail the proposed changes; and

(ii)    a copy of the proposed form of amendment or supplement to Exhibit A hereto and such other documents, certificates and showings as may be required by counsel rendering the opinion in clause (iii) of this paragraph; and

(iii)    an opinion of Bond Counsel to the effect that such amendment complies with the requirements of this Section 3.1, is in proper form for execution and delivery by the Issuer and will not adversely affect the validity of the Bonds or the exemption from federal income taxes of the interest thereon.

(b)    All laborers and mechanics employed on the Project shall be paid at the prevailing rates of wages of laborers and mechanics for the class of work called for by the Project, which wages shall be determined in accordance with the requirements of Chapter 4115 of the Ohio Revised Code, for determination of prevailing wages, provided that should the Company or other non-public user beneficiary of the Project undertake, as part of the Project, construction to be performed by its regular collective bargaining unit employees who are covered under a collective bargaining agreement which was in existence prior to the date of the commitment instrument undertaking to issue the Bonds, then, in that event, the rate of pay provided under the collective bargaining agreement may be paid to such employees. To the extent required by Section 4115.032 of the Ohio Revised Code, the Company shall comply, and shall require compliance by all contractors or subcontractors working on the Project, with all applicable requirements of Sections 4115.03 through 4115.16 of the Ohio Revised Code, including, without implied limitation, obtaining or causing to be obtained from the Ohio Department of Industrial Relations ("Department") its determination of the prevailing rates of wages to be paid for the class of work called for by the Project and requesting it to designate a prevailing wage coordinator ("Coordinator") for the Project, pursuant to Section 4115.032 of the Ohio Revised Code. Prior to issuance of the Bonds, the Company shall be required to provide the Issuer with evidence that it has complied with the foregoing agreements. In the event of failure or refusal by the Department to designate a Coordinator for the Project within thirty days of receipt of such request, the Issuer shall designate one of its employees to act as the interim Coordinator for

-6-

the Project until the Department designates a Coordinator, and the cost of such employee's services, based upon the time of such employee expended in performing such services at his or her usual rate of compensation, shall upon demand be reimbursed to the Issuer by the Company.

**Section 3.2.    Agreement to Issue Bonds; Application of Bond Proceeds.** In order to provide funds to finance the Cost of the Project, the Issuer agrees that it will issue under the Indenture, sell and cause to be delivered to the Underwriter, the Bonds, bearing interest and maturing as set forth in the Indenture. The Issuer will thereupon cause the accrued interest, if any, received upon the delivery of the Bonds to be deposited in the Bond Fund and the balance of the proceeds (net of underwriting discount) received from the sale of the Bonds to be deposited in the Construction Fund.

**Section 3.3.    Disbursements from the Construction Fund.** The Issuer hereby authorizes and directs the Trustee, upon compliance with Section 5.7 of the Indenture, to disburse the moneys in the Construction Fund to or on behalf of the Company for the following purposes (but, subject to the provisions of Sections 3.4 and 3.5 hereof, for no other purpose):

(a)    Payment to the Company of such amounts, if any, as shall be necessary to reimburse the Company in full for all advances and payments made by it at any time prior to or after the delivery of the Bonds for expenditures in connection with the preparation of the Plans and Specifications (including any preliminary study or planning of the Project or any aspect thereof) and the construction and acquisition of the Project.

(b)    Payment of the initial or acceptance fee of the Trustee, legal, financial and accounting fees and expenses, original issue discount, and printing and engraving costs incurred in connection with the authorization, issuance and sale of the Bonds, the execution and filing of the Indenture and the preparation and recording or filing of all other documents in connection therewith, and payment of all fees, costs and expenses for the preparation of this Agreement, the Tax Agreement, the Indenture and all other documents in connection with the authorization, issuance and sale of the Bonds.

(c)    Payment for labor, services, materials and supplies used or furnished in the construction and acquisition of the Project, and payment of amounts due under contracts for the acquisition, construction and installation of the Project, all as provided in the plans, specifications and work orders therefor.

(d)    Payment of the fees, if any, for architectural, engineering, legal, underwriting and supervisory services with respect to the Project.

(e)    To the extent not paid by a contractor for construction or installation with respect to any part of the Project, payment of the premiums on all insurance required to be taken out and maintained during the Construction Period.

(f)     Payment of the taxes, assessments and other charges, if any, that may become payable during the Construction Period with respect to the Project, or reimbursement thereof if paid by the Company.

(g)     Payment of expenses incurred in seeking to enforce any remedy against any contractor or subcontractor in respect of any default under a contract relating to the Project.

(h)     Interest on the Bonds during construction of the Project.

(i)     Payment of any other costs which constitute part of the Cost of the Project in accordance with generally accepted accounting principles and which are permitted by the Act and will not affect the exemption from federal income taxes of interest on any of the Bonds.

(j)     For transfer to the Rebate Fund in order to comply with the provisions of the Tax Agreement.

All moneys remaining in the Construction Fund after the Completion Date and after payment or provision for payment of all other items provided for in the preceding subsections (a) to (i), inclusive, of this Section, shall at the direction of the Company be used in accordance with Section 3.4 hereof.

**Section 3.4.  Establishment of Completion Date; Obligation of the Company to Complete**. As soon as practicable after the completion of construction of the Project, and in any event not more than ninety (90) days thereafter, the Company shall furnish to the Trustee a certificate signed by an Authorized Company Representative stating (i) that construction of the Project has been completed substantially in accordance with the Plans and Specifications, (ii) the Completion Date, (iii) the Cost of the Project, (iv) the portion of the Cost of the Project which has then been paid, (v) the portion of the Cost of the Project which has not yet then been paid and (vi) that all bond proceeds have been applied solely to the payment of the Cost of the Project on account of which the Bonds were issued, as required by the Act. Such certificate may state that it is given without prejudice to any rights against third parties which exist at the date of such certificate or which may subsequently come into being. Moneys (including investment proceeds) remaining in the Construction Fund on the date of such certificate may be used, at the direction of an Authorized Company Representative, to the extent indicated, for one or more of the following purposes:

(1)     for the payment, in accordance with the provisions of this Agreement, of any Cost of the Project not then paid as specified in the above-mentioned certificate; or

(2)     for transfer to the Bond Fund, but only if, and to the extent that, such transfer is permitted by the Act and does not adversely affect the exemption from federal income taxes of interest on any of the Bonds; or

-8-

(3) for the payment of redemption of Bonds in accordance with the provisions of Section 3.1(d) of the Indenture within 180 days following the filing of said completion certificate with the Trustee, such moneys to be used only to pay principal of Bonds upon any such redemption.

Any moneys (including investment proceeds) remaining in the Construction Fund on the date of the aforesaid certificate and not set aside for the payment of the Cost of the Project as specified in (1) above or transferred to the Bond Fund pursuant to (2) above shall on such date be placed by the Trustee in a separate and segregated escrow account and used to pay principal of Bonds upon the redemption thereof as provided in (3) above; provided that, until so used such moneys may also be used, at the direction of the Company, for one or more of the following purposes:

(a) to pay all or part of the price of purchasing Bonds on tender, in the open market or at private sale, on or before such date or dates, for the purpose of cancellation;

(b) for the payment of the cost of any purpose authorized under the Act, provided that prior to such use this Agreement is amended in accordance with Section 3.1 hereof to include such additional facilities within the definition of Project as used herein; or

(c) for any other purpose;

provided that, no moneys on deposit in such escrow account may be used for any of the purposes specified in (a), (b) or (c) in this paragraph unless and until the Company delivers to the Trustee the opinion of Bond Counsel upon which the Trustee may rely to the effect that such use is permitted by the Act and does not adversely affect the exemption from federal income taxes of interest on any of the Bonds; and provided further that, until used for one or more of the foregoing purposes, moneys on deposit in such escrow account may be invested in investments authorized by the first paragraph of Section 3.5 of this Agreement, but may not be invested to produce a yield on such moneys (computed from the Completion Date and taking into account any investment of such moneys during the period from the Completion Date until such moneys were deposited in such escrow account) greater than the yield on the Bonds, all as such terms are used in and determined in accordance with relevant provisions of the Code and the Regulations.

In the event the moneys in the Construction Fund available for payment of the Cost of the Project should not be sufficient to pay the costs thereof in full, the Company agrees to pay directly, or to deposit in the Construction Fund moneys sufficient to pay, the costs of completing the Project as may be in excess of the moneys available therefor in the Construction Fund. The Issuer does not make any warranty, either express or implied, that the moneys which will be paid into the Construction Fund and which, under the provisions of this Agreement, will be available for payment of the Cost of the Project, will be sufficient to pay all the costs which will be incurred in that connection. The Company agrees that if after exhaustion of the moneys in the Construction Fund the Company should pay, or deposit moneys in the Construction Fund for the payment of, any portion of the Cost of the Project

pursuant to the provisions of this Section, it shall not be entitled to any reimbursement therefor from the Issuer or from the Trustee or from the owners of any of the Bonds, nor shall it be entitled to any diminution of the loan repayment installments or other amounts payable under Section 4.2 hereof.

**Section 3.5.   Investments**.  Any moneys held as a part of the Construction Fund or the Bond Fund shall be invested or reinvested by the Trustee, at the direction of the Authorized Company Representative as provided in Article VI of the Indenture and in the Tax Agreement, to the extent permitted by law in Permitted Investments.   Any such investment may be purchased at the offering or market price thereof at the time of such purchase.   The Trustee may make any and all such investments through its own bond department.

The investments so purchased shall be held by the Trustee and shall be deemed at all times a part of the Construction Fund or the Bond Fund, as the case may be, and the interest accruing thereon and any profit realized therefrom shall be credited to such fund and any net losses resulting from such investment shall be charged to such fund (on the date on which the proceeds of any such investment are needed for the purposes of such fund) and paid by the Company.

The Company covenants that any funds (including investment proceeds) on deposit in the Construction Fund more than three years after the date of delivery of the Bonds will not be invested to produce a yield greater than the yield on the Bonds, all as such terms are used in and determined in accordance with the regulations promulgated or proposed under relevant provisions of the Code and shall be treated as provided in the Tax Agreement.

**Section 3.6.   Arbitrage Certifications**.  The Company reasonably expects, based on its knowledge, information and belief, and hereby certifies and represents to the Issuer, and the Issuer hereby certifies that it reasonably expects, that the proceeds of the Bonds will not be used in a manner that would cause the Bonds to be classified as "arbitrage bonds" under Section 148 of the Code and Regulations prescribed under that Section.   The Issuer and the Company jointly and severally certify and covenant with all purchasers and owners of the Bonds from time to time outstanding that so long as any of the Bonds remain outstanding moneys on deposit in any fund or account in connection with the Bonds, whether or not such moneys were derived from the proceeds of the sale of the Bonds or from any other sources, will not be used in a manner which will cause the Bonds to be "arbitrage bonds" within the meaning of the Code and the Regulations.

## ARTICLE IV

### LOAN OF BOND PROCEEDS; PAYMENT OBLIGATIONS

**Section 4.1.   Loan of Bond Proceeds**.  The Issuer agrees, upon the terms and conditions in this Agreement, to lend to the Company the proceeds (exclusive of accrued interest, if any) received by the Issuer from the sale of the Bonds.

-10-

**Section 4.2.    Amounts Payable by Company.** (a) The Company covenants and agrees to pay to the Trustee as a loan repayment installment, on each date provided in or pursuant to the Indenture for the payment of principal (whether at maturity or upon redemption or acceleration) of, premium, if any, and/or interest on the Bonds, until the principal of, premium, if any, and interest on the Bonds shall have been fully paid or provision for the payment thereof shall have been made in accordance with the Indenture, in lawful money of the United States of America in federal or other immediately available funds, for deposit in the Bond Fund, a sum equal to the amount payable on such date as principal (whether at maturity or upon redemption or acceleration), premium, if any, and interest upon the Bonds as provided in the Indenture. Each payment pursuant to this Section 4.2(a) shall at all times be sufficient to pay the corresponding amount of interest and principal (whether at maturity or upon redemption or acceleration) and premium, if any, payable on the Bonds; provided that any amount held by the Trustee in the Bond Fund on any due date for an installment hereunder shall be credited against the amount due on such date to the extent available for such purpose; and provided further that, subject to the provisions of this Section 4.2(a), if at any time the amounts held by the Trustee in the Bond Fund are sufficient to pay all of the principal of and interest and premium, if any, on the Bonds as such payments become due, the Company shall be relieved of any obligation to make any further payments under the provisions of this Section 4.2(a). Notwithstanding the foregoing, if on any date the amount held by the Trustee in the Bond Fund is insufficient to make any required payments of principal of (whether at maturity or upon redemption or acceleration) and interest and premium, if any, on the Bonds as such payments become due, the Company shall forthwith pay such deficiency as an installment hereunder. If the Company shall fail to pay any amount under this Section 4.2(a), the amount so in default shall continue as an obligation of the Company until the amount so in default shall have been fully paid, and the Company agrees to pay the same with interest thereon until paid (to the extent legally enforceable) at a rate equal to the rate borne by the Bonds from time to time from the due date thereof until paid.

(b)    The Company also agrees to pay to the Issuer its fees, if any, for issuing the Bonds, plus the reasonable expenses of the Issuer incurred in fulfilling the Issuer's obligations under this Agreement and the Indenture, which are not otherwise required to be paid by the Company under the terms of this Agreement.

(c)    The Company also agrees to pay to the Trustee, Registrar and Paying Agent (l) the initial acceptance fee of the Trustee and the costs and expenses, including reasonable attorney's fees, incurred by the Trustee in entering into and executing the Indenture, and (2) during the term of this Agreement (i) an amount equal to the annual fee of the Trustee for the ordinary services of the Trustee, as trustee, rendered and its ordinary expenses incurred under the Indenture, including reasonable attorneys' fees, as and when the same become due, (ii) the fees, charges and expenses of the Trustee, the Paying Agent and the Registrar, as and when the same become due, and (iii) the fees, charges and expenses of the Trustee for the necessary extraordinary services rendered by it and extraordinary expenses incurred by it under the Indenture, including reasonable attorneys' fees, as and when the same become due.

**Section 4.3.    No Defense or Set-Off; Unconditional Obligation.** The obligations of the Company to make the payments required in Section 4.2(a) hereof shall be

absolute and unconditional, irrespective of any defense or any rights of set-off, recoupment or counterclaim it might otherwise have against the Issuer, the Trustee, the Paying Agent or the Registrar. The Company shall pay net during the term of this Agreement the payments to be made under Section 4.2(a) hereof free of any deductions and without abatement, diminution or set-off other than those herein expressly provided. Until such time as the principal of, premium, if any, and interest on the Bonds shall have been fully paid, or provision for the payment thereof shall have been made in accordance with the Indenture, the Company: (i) will not suspend or discontinue any payments provided for in Section 4.2(a) hereof; (ii) will perform and observe all of its agreements contained in this Agreement; and (iii) will not terminate this Agreement for any cause, including, without limiting the generality of the foregoing, the occurrence of any acts or circumstances that may constitute failure of consideration, destruction of or damage to the Project, commercial frustration of purpose, any change in the tax laws of the United States of America or the State or any political subdivision thereof, or any failure of the Issuer or the Trustee to perform and observe any agreement, whether express or implied, or any duty, liability or obligation arising out of or connected with this Agreement, except to the extent permitted by this Agreement.

**Section 4.4.   Assignment and Pledge of Issuer's Rights**. As security for the payment of its Bonds, the Issuer will assign and pledge to the Trustee all right, title and interest of the Issuer in and to this Agreement, including the right to receive payments hereunder and thereunder (except the right to receive payments, if any, under Sections 4.2(b), 5.3(a) and 6.3 hereof and the rights to make determinations and receive notices as herein provided), and hereby directs the Company to make said payments directly to the Trustee. The Company herewith assents to such assignment and pledge and will make payments directly to the Trustee without defense or set-off by reason of any dispute between the Company and the Issuer or the Trustee.

## ARTICLE V

### SPECIAL COVENANTS AND AGREEMENTS

**Section 5.1.   Right of Access to the Project**. The Company agrees that during the term of this Agreement the Issuer, the Trustee and their duly authorized agents shall have the right during regular business hours, with reasonable notice, to examine and inspect the Project. The Company agrees that the Issuer, the Trustee and their duly authorized agents shall have, subject to such limitations, restrictions and requirements as the Company may reasonably prescribe, such rights of access to the Project.

**Section 5.2.   Company to Maintain its Existence; Conditions Under Which Exceptions Permitted**. The Company agrees that during the term of this Agreement it will maintain its corporate existence, will not dissolve or otherwise dispose of all or substantially all of its assets, and will not consolidate with or merge into another corporation or permit one or more corporations to consolidate with or merge into it unless the Company is the surviving, resulting or transferee corporation, as the case may be, provided, that the Company may, without violating the agreements contained in this Section 5.2, consolidate with or merge into another domestic corporation (i.e., a

corporation incorporated and existing under the laws of the United States of America or any state, district or territory thereof) or permit one or more other domestic corporations to consolidate with or merge into it, or sell or otherwise transfer to another domestic corporation all or substantially all of its assets as an entirety and thereafter dissolve, provided, in the event the Company is not the surviving, resulting or transferee corporation, as the case may be, that the surviving, resulting or transferee corporation (i) is a domestic corporation as aforesaid, (ii) is qualified to do business in the State, and (iii) assumes in writing all of the obligations of the Company under this Agreement and the Tax Agreement.

**Section 5.3.    Release and Indemnification Covenants.** (a) The Company agrees to indemnify and save the Issuer, its officials, officers and employees (each an "indemnified party") harmless against and from all claims by or on behalf of any person, firm or corporation arising from the conduct or management of, or from any work or thing done on, the Project or relating to the issuance of the Bonds, in each case while the Bonds remain outstanding, including but not limited to (i) any condition of the Project, (ii) any breach or default on the part of the Company in the performance of any of its obligations under this Agreement, the Tax Agreement or the Indenture, (iii) any act of negligence of the Company or of any of its agents, contractors, servants, employees or licensees, (iv) any act of negligence of any assignee or lessee of the Company, or of any agents, contractors, servants, employees or licensees of any assignee or lessee of the Company, (v) any violation by the Company of state or federal securities laws in connection with the offer and sale of the Bonds, or (vi) any performance by any indemnified party of any act required under this Agreement, the Tax Agreement or the Indenture or requested by the Company; excluding, however, claims occasioned by the negligence or willful misconduct of the indemnified party. The Company agrees to indemnify and save each indemnified party harmless from and against all costs and expenses incurred in or in connection with any such claim arising as aforesaid or in connection with any action or proceeding brought thereon. In case any such claim shall be made or action brought based upon any such claim in respect of which indemnity may be sought against the Company, upon receipt of notice promptly given to the Company in writing from the indemnified party setting forth the particulars of such claim or action, the Company shall assume the defense thereof including the employment of counsel and the payment of all costs and expenses. Each indemnified party shall have the right to employ separate counsel in any such action and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such indemnified party, unless (A) the employment of such counsel has been specifically authorized in writing by the Company, or (B) representation of both the indemnified party and the Company by the same counsel is inappropriate by applicable standards of professional conduct which attorneys maintain in the jurisdiction in which the suit shall have been instituted due to actual or potential conflicting interests (it being understood that the Company shall not be liable for the expense of more than one separate counsel representing such indemnified party unless representation by more than one counsel shall have been specifically authorized in writing by the Company).

(b)    The Company also agrees to pay and to indemnify and hold harmless the Trustee, the Registrar, any person who "controls" the Registrar or the Trustee within the meaning of Section 15 of the Securities Act of 1933, as amended, and any member, officer, director, official and employee of the Registrar or the Trustee (collectively called the

-13-

"Indemnified Parties") from and against, any and all claims, damages, demands, expenses, liabilities and losses of every kind, character and nature asserted by or on behalf of any person arising out of, resulting from, or in any way connected with, the condition, use, possession, conduct, management, planning, design, acquisition, construction, installation, renovation or sale of the Project or any part thereof. The Company also covenants and agrees, at its expense, to pay, and to indemnify and save the Indemnified Parties harmless of, from and against, all costs, reasonable counsel fees, expenses and liabilities incurred in any action or proceeding brought by reason of any such claim or demand subject, however, to the provisions contained below in this paragraph and excluding claims occasioned by the gross negligence or willful misconduct of the Indemnified Parties. In the event that any action or proceeding is brought against any Indemnified Party by reason of any such claim or demand, such Indemnified Party shall immediately notify the Company, which shall resist and defend any action or proceeding on behalf of such Indemnified Party, including the employment of counsel, the payment of all expenses and the right to negotiate and consent to settlement. Any one or more of the Indemnified Parties shall have the right to employ separate counsel in any such action and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Parties unless the (A) employment of such counsel has been specifically authorized in writing by the Company or (B) representation of both the Indemnified Parties and the Company by the same counsel is inappropriate by applicable standards of professional conduct which attorneys maintain in the jurisdiction in which the suit shall have been instituted due to actual or potential conflicting interests (it being understood that the Company shall not be liable for the expense of more than one separate counsel representing any of the Indemnified Parties unless representation by more than one counsel shall have been specifically authorized in writing by the Company). The Company shall not be liable for any settlement of any such action effected without its consent, but if settled with the consent of the Company or if there be a final judgment for the plaintiff in any such action, the Company agrees to indemnify and hold harmless the Indemnified Parties.

The rights of the Indemnified Parties under this Section 5.3(b) shall survive the payment in full of the Bonds and the discharge of this Agreement and the Indenture.

**Section 5.4. Validity and Tax-Exempt Status of the Bonds.** The Company and the Issuer covenant and agree that they, and each of them, will not take or authorize or permit any action to be taken and have not taken or authorized or permitted any action to be taken which results in interest paid on the Bonds being included in gross income of any owner thereof for purposes of federal income taxation (other than an owner who is a "substantial user" of the Project or a "related person" within the meaning of Section 147(a) of the Code) or adversely affects the validity of the Bonds. If Treasury Regulation Section 1.150-1(c) or Proposed Treasury Regulation Section 1.103-10(a) or Section 144(a)(6) of the Code are applicable to the Bonds and result in the aggregation of the Bonds with any other obligation issued or to be issued by or on behalf of any state, territory or possession of the United States, or any political subdivision and body corporate and politic of the foregoing, or of the District of Columbia, which constitutes a "private activity bond" within the meaning of the Code, causing the interest on the Bonds to be or become subject to Federal income taxes pursuant to Section 103 of the Code, the Company shall be deemed to have failed to observe the foregoing covenant. Promptly after the

-14-

Company first becomes aware of any event which would result in a mandatory redemption of the Bonds under Section 3.1(b)(2) of the Indenture, the Company shall give written notice thereof to the Issuer and the Trustee.

**Section 5.5.    Taxes and Governmental Charges**.    The Company will promptly pay, as the same become due, all lawful taxes, assessments, utility charges and other governmental charges of any kind whatsoever levied or assessed by federal, state or any municipal government upon or with respect to the Project or any part thereof.    The Company may, at its expense and in its own name and behalf or in the name and behalf of the Issuer, if it is a necessary party thereto, in good faith contest any such taxes, assessments and other charges and, in the event of any such contest, permit the taxes, assessments or other charges so contested to remain unpaid during the period of such contest and any appeal therefrom, provided that such non-payment does not adversely affect the payment by the Company of all other amounts required to be paid by it hereunder or adversely affect the validity of the Bonds or the tax-exempt status of the interest thereon.

**Section 5.6.    Maintenance and Repair; Insurance**.    The Company will maintain the Project in a reasonably safe and sound operating condition, making from time to time all needed repairs thereto, and shall maintain insurance coverage (including self-insurance) with respect to the Project, all in accordance with its corporate practice for similar assets (subject, however, to its right to discontinue operation of any portion of the Project as provided in Section 5.9 hereof), and shall pay all costs of such maintenance, repair and insurance.

**Section 5.7.    Financial Reports**.    The Company shall furnish to the Trustee the following:

(a)    Within one hundred twenty (120) days after the end of the preceding fiscal year, copies of Form 10-K as filed with the Securities and Exchange Commission and the annual report to shareholders which includes the consolidated balance sheet of the Company and subsidiaries and the related statements of consolidated income, consolidated shareholders' equity and consolidated cash flows for the year ended that date, with its report thereon by the Company's public accountants.

(b)    Upon the request of any Bondholder, the Trustee may request and the Company shall provide copies of Form 10-Q as filed with the Securities and Exchange Commission.

(c)    Upon the request of any Bondholder, the Trustee may request and the Company shall provide copies of all regular or periodic financial statements or financial reports as the Company shall send to its shareholders and copies of all regular or periodic reports which are available for public inspection which the Company may be required to file with the Securities and Exchange Commission.

The Company agrees that any such information furnished to the Trustee in accordance with this Section 5.7 may be furnished by the Trustee to any Bondholder who so requests.

**Section 5.8.   Filings; Lien of Indenture.** The Company will, at its expense, take all necessary action in cooperation with the Issuer and the Trustee to maintain and preserve the lien and security interest of the Indenture so long as the Bonds remain outstanding.

**Section 5.9.   Operation of Project.** Although the Company intends to operate, or cause to be operated, the Project for its designed purposes until the date on which no Bonds are outstanding, the Company is not required by this Agreement to operate, or cause to be operated, any portion of the Project after the Company shall deem in its discretion that such continued operation is not advisable, and in such event it is not prohibited by this Agreement from selling, leasing or retiring all or any such portion of the Project, subject to the provisions of Section 5.4 hereof. The Issuer will execute and deliver at the Company's expense such releases or other instruments as the Company may request in order to permit the Company to exercise any of its rights pursuant to this Section 5.9. The net proceeds from such sale, lease or other disposition, if any, shall belong to, and may be used for any lawful purpose by, the Company, subject to the provisions of Section 5.4. No such sale, lease or other disposition of all or any portion of the Project shall reduce or otherwise affect the Company's obligation to pay amounts under Section 4.2 hereof.

## ARTICLE VI

### EVENTS OF DEFAULT AND REMEDIES

**Section 6.1.   Events of Default.** The occurrence and continuation of any one of the following shall constitute an Event of Default hereunder:

(a)   failure by the Company to pay any amounts required to be paid under Section 4.2(a) hereof on the dates and in the manner specified herein; or

(b)   failure by the Company to perform any covenant, condition or agreement on its part to be observed or performed in this Agreement, other than as referred to in subsection (a) above, for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Company by the Issuer or the Trustee, unless (i) the Issuer and the Trustee shall agree in writing to an extension of such time prior to its expiration or (ii) if the failure is such that it can be corrected but not within such 30-day period, corrective action is instituted by the Company within such period and diligently pursued until such failure is corrected; or

(c)   the dissolution or liquidation of the Company or the filing by the Company of a voluntary petition in bankruptcy, or failure by the Company promptly to lift any execution, garnishment or attachment of such consequence as will impair its ability to carry on its obligations hereunder, or an order for relief under Title 11 of the United States Code, as amended from time to time, is entered against the Company, or a petition or answer proposing the entry of an order for relief against the Company under Title 11 of the United States Code, as amended from time to time, or its reorganization, arrangement or debt readjustment under any present or future federal bankruptcy act or any similar federal or state law shall be filed in any court

-16-

and such petition or answer shall not be discharged within ninety (90) days after the filing thereof, or the Company shall fail generally to pay its debts as they become due, or a custodian (including without limitation a receiver, trustee, assignee for the benefit of creditors or liquidator of the Company) shall be appointed for or take possession of all or a substantial part of its property and shall not be discharged within ninety (90) days after such appointment or taking possession, or the Company shall consent to or acquiesce in such appointment or taking possession, or assignment by the Company for the benefit of its creditors, or the entry by the Company into an agreement of composition with its creditors, or the adoption of a resolution by the board of directors of the Company or the taking of any other corporate action to file a petition or answer proposing the entry of an order for relief against the Company under Title 11 of the United States Code, as amended from time to time, or its reorganization, arrangement or debt readjustment under any present or future federal bankruptcy act or any similar federal or state laws; provided, that the term "dissolution or liquidation of the Company", as used in this subsection (c), shall not be construed to include the cessation of the corporate existence of the Company resulting either from a merger or consolidation of the Company into or with another domestic corporation or a dissolution or liquidation of the Company following a transfer of all or substantially all of its assets as an entirety, under the conditions permitting such actions contained in Section 5.2 hereof; or

(d)    any material warranty, representation or other statement made by or on behalf of the Company contained herein, or in any document or certificate furnished by the Company in compliance with or in reference hereto, shall prove to have been false or misleading in any material respect when made; or

(e)    an "event of default" shall occur and be continuing under the Indenture.

**Section 6.2.    Remedies on Default.**  Whenever any Event of Default shall have occurred and be continuing hereunder, the Trustee may take any one or more of the following remedial steps:

(a)    The Trustee may exercise any right, power or remedy permitted to it by law, and shall have in particular, without limiting the generality of the foregoing, the right to declare the entire principal payable under Section 4.2(a) hereof, and all unpaid interest accrued thereon to the date of such declaration and any premium the Company shall have become obligated to pay to be immediately due and payable, if concurrently with or prior to such notice the unpaid principal of and all unpaid accrued interest and premium on the Bonds have become or have been declared to be due and payable under the Indenture, and upon such declaration the principal payable under Section 4.2(a) hereof, the unpaid accrued interest thereon and such premium shall thereupon become forthwith due and payable in an amount sufficient to pay the principal of, premium, if any, and interest on the Bonds under Section 8.2 of the Indenture, without presentment, demand or protest, all of which are hereby expressly waived.  The Company shall forthwith pay to the Trustee the entire principal, premium, if any, and interest payable under Section 4.2(a) hereof.  The Trustee shall waive, rescind and annul such declaration and the consequences thereof, when any

-17-

declaration of acceleration on the Bond has been waived, rescinded and annulled pursuant to and in accordance with Section 8.11 of the Indenture.

(b)    The Issuer or the Trustee may take whatever action at law or in equity may appear necessary or desirable to collect the payments and other amounts then due and thereafter to become due or to enforce the performance and observance of any obligation, agreement or covenant of the Company under this Agreement.

In case the Issuer or the Trustee shall have proceeded to enforce its rights under this Agreement, and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Issuer or the Trustee, as the case may be, then and in every such case the Company, the Issuer and the Trustee shall be restored respectively to their several positions and rights hereunder, and all rights, remedies and powers of the Company, the Issuer and the Trustee shall continue as though no such proceeding had been taken.

In case there shall be pending proceedings for the bankruptcy or for the reorganization of the Company under the federal bankruptcy laws or any other applicable law, or in case a receiver or trustee shall have been appointed for the property of the Company, or in the case of any other similar judicial proceedings relative to the Company, or to the creditors or property of the Company, the Trustee shall be entitled and empowered, by intervention in such proceedings or otherwise, to file and prove a claim or claims for the whole amount owing and unpaid pursuant to this Agreement and, in case of any judicial proceedings, to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee allowed in such judicial proceedings relative to the Company, its creditors or its property, and to collect and receive any moneys or other property payable or deliverable on any such claims, and to distribute the same after the deduction of its charges and expenses; and any receiver, assignee or trustee in bankruptcy or reorganization is hereby authorized to make such payments to the Trustee, and to pay to the Trustee any amount due it for compensation and expenses, including reasonable counsel fees incurred by it up to the date of such distribution.

**Section 6.3.    Agreement to Pay Attorneys' Fees and Expenses**. In the event the Issuer or the Trustee should reasonably employ attorneys or incur other expenses for the collection of the payments due under this Agreement or the enforcement of the performance or observance of any obligation or agreement on the part of the Company herein contained, the Company agrees that it will on demand therefor pay to the Issuer or the Trustee the reasonable fees of such attorneys and such other expenses so incurred by the Issuer or the Trustee.

**Section 6.4.    No Remedy Exclusive**. No remedy herein conferred upon or reserved to the Issuer or the Trustee is intended to be exclusive of any other available remedy or remedies but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement and the Indenture or now or hereafter existing at law or in equity or by statute. No delay or omission to exercise any right or power accruing upon any Event of Default hereunder shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be

-18-

exercised from time to time and as often as may be deemed expedient. In order to entitle the Issuer to exercise any remedy reserved to it in this Article VI, it shall not be necessary to give any notice other than such notice as may be herein expressly required. Such rights and remedies as are given the Issuer hereunder shall also extend to the Trustee, and the Trustee and the owners from time to time of the Bonds shall be deemed third party beneficiaries of all covenants and agreements herein contained.

**Section 6.5.    No Additional Waiver Implied by One Waiver**. In the event any agreement contained in this Agreement should be breached by the Company and thereafter waived by the Issuer or the Trustee, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder.

## ARTICLE VII

### PREPAYMENT

**Section 7.1.    Obligation to Prepay**. The Company shall have the obligation to prepay installments payable hereunder in whole (or in the case of the event stated in (b) of this Section 7.1 in whole or in part), if either of the following shall have occurred:

(a)    As a result of any changes in the Constitution of the State or the Constitution of the United States of America or of legislative or administrative action (whether state or federal) or by final decree, judgment or order of any court or administrative body (whether state or federal) entered after the contest thereof by the Company in good faith, this Agreement shall have become void or unenforceable or impossible of performance in accordance with the intent and purposes of the parties as expressed in this Agreement; or

(b)    A final determination by the Internal Revenue Service or a court of competent jurisdiction as a result of a proceeding in which the Company participates to the degree it deems sufficient, which determination the Company, in its discretion, does not contest by an appropriate proceeding, that, as a result of a failure by the Company to observe any covenant, agreement or representation by the Company in this Agreement, the interest payable on the Bonds or any of them is includable for federal income tax purposes in the gross income of any owner or beneficial owner of a Bond (other than an owner who is a "substantial user" of the Project or a "related person" within the meaning of Section 147(a) of the Code and the applicable Regulations).

In case either of the events stated in this Section 7.1 shall occur, the Company agrees it will fulfill its obligation and prepay within 180 days after the Company has notice or actual knowledge of such event.

**Section 7.2.    Option to Prepay**. The Company shall have, and is hereby granted, the option to prepay the principal payable under Section 4.2(a) hereof with respect to the Bonds as a whole, or in part, by paying to the Trustee an amount sufficient to redeem

all or a portion of the Bonds then Outstanding, in the manner, at the redemption price and on the dates specified in Section 3.1(a) of the Indenture.

**Section 7.3.    Redemption of the Bonds.** To perform an obligation imposed upon the Company or to exercise an option granted to the Company by this Article VII, the Company shall give written notice to the Issuer, the Trustee and the Registrar, which notice shall specify therein the date upon which prepayment of the principal payable under Section 4.2(a) hereof (or a portion thereof) will be made, which date shall be not less than forty (40) days from the date the notice is mailed (or such later date as is acceptable to the Issuer and the Trustee), and shall specify that all of the principal amount payable under Section 4.2(a) hereof or a specified portion thereof is to be so prepaid. The Issuer has directed the Trustee and the Registrar to take forthwith all steps (other than the payment of the money required to redeem the Bonds) necessary under the applicable provisions of the Indenture to effect the redemption of the Bonds (or a portion thereof) in amounts equal to the amount of the principal so prepaid as provided in this Article VII.

## ARTICLE VIII

### MISCELLANEOUS

**Section 8.1.    Notices.** All notices, certificates or other communications shall be sufficiently given and shall be deemed given when the same are (i) deposited in the United States mail and sent by first class mail, postage prepaid, or (ii) delivered by hand, in each case, to the parties at the addresses set forth below or at such other address as a party may designate by notice to the other parties: if to the Issuer, at Board of County Commissioners, County Administration Building, 1560 High Street N.W., Warren, Ohio 44481, Attention: Clerk; and if to the Company, at 3044 West Grand Boulevard, Detroit, Michigan 48202, Attention: Office of the General Counsel; and 767 Fifth Avenue, 24th Floor, New York, New York 10153, Attention: Capital Markets; if to the Trustee, at One World Trade Center, Suite 4911, 49th Floor, New York, New York 10048, Attention: Corporate Trust Department. A duplicate copy of each notice, certificate or other communication given hereunder by either the Issuer or the Company to the other shall also be given to the Trustee.

**Section 8.2.    Assignments.** This Agreement may not be assigned by either party without the consent of the other and the Trustee, except that the Issuer shall assign and pledge to the Trustee certain of its right, title and interest in and to this Agreement as provided by Section 4.4 hereof, and the Company may without any consent assign to any surviving, resulting or transferee corporation its rights under this Agreement as provided by Section 5.2 hereof.

**Section 8.3.    Severability.** If any provision of this Agreement shall be held or deemed to be or shall, in fact, be illegal, inoperative or unenforceable, the same shall not affect any other provision or provisions herein contained or render the same invalid, inoperative or unenforceable to any extent whatsoever.

**Section 8.4.   Execution of Counterparts**. This Agreement may be simultaneously executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

**Section 8.5.   Amounts Remaining in any Fund or with Trustee**. It is agreed by the parties hereto that, subject to Section 5.12 of the Indenture, after payment in full of (i) the principal of, premium, if any, and interest on the Bonds, (ii) the fees, charges, and expenses of the Issuer, the Trustee and the Bond Registrar in accordance herewith and with the Indenture, and (iii) all other amounts required to be paid under this Agreement and the Indenture, any amounts remaining in any fund or account maintained under this Agreement or the Indenture and not applied to the payment of the above in accordance with the provisions of the Indenture or this Agreement shall belong to and be paid to the Company by the Trustee.

**Section 8.6.   Amendments, Changes and Modifications**. Except as otherwise provided in this Agreement or the Indenture subsequent to the initial issuance of the Bonds and prior to their payment in full, this Agreement may not be effectively amended, changed, modified, altered or terminated without the written consent of the Trustee.

**Section 8.7.   Governing Law**. This Agreement shall be governed exclusively by and construed in accordance with the applicable law of the State.

**Section 8.8.   Authorized Company Representative**. Whenever under the provisions of this Agreement the approval of the Company is required or the Company is required to take some action at the request of the Issuer, the Trustee or the Registrar, such approval or such request shall be given for the Company by the Authorized Company Representative, and the Issuer, the Trustee and the Registrar shall be authorized to act on any such approval or request and neither party hereto shall have any complaint against the other or against the Trustee or the Registrar as a result of any such action taken.

**Section 8.9.   Term of this Agreement**. This Agreement shall be in full force and effect from the date hereof, and shall continue in effect until the payment in full of all principal of, and premium, if any, and interest on the Bonds, or provision for the payment thereof shall have been made pursuant to Article VII of the Indenture, all fees, charges, indemnities and expenses of the Issuer and the Trustee have been fully paid or provision made for such payment (the payment of which fees, charges, indemnities and expenses shall be evidenced by a written certification of the Company that it has fully paid all such fees, charges, indemnities and expenses) and all other amounts due hereunder have been duly paid or provision made for such payment. All representations, certifications and covenants by the Company as to the indemnification of various parties as described in Section 5.3 hereof, the payment of fees and expenses of the Issuer and the Trustee as described in Section 6.3 hereof, and all matters affecting the tax-exempt status of the Bonds shall survive the termination of this Agreement.

**Section 8.10.   Binding Effect**. This Agreement shall inure to the benefit of and shall be binding upon the Issuer, the Company and their respective successors and assigns, subject, however, to the limitations contained in Sections 4.4 and 5.2 hereof.

**Section 8.11.    Limited Liability of Officers, Etc.**  No recourse shall be had for the payment of the principal of, premium, if any, and interest on the Bonds or for any claim based thereon or upon any obligation, covenant or agreement contained in this Agreement, the Indenture or the Bonds against any past, present or future officer, agent or employee of the Issuer, or any officer, agent or employee of any successor thereto, as such, either directly or through the Issuer or any successor thereto, under any rule of law or equity, statute or constitution or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such officer, employee or agent as such is hereby expressly waived and released as a condition of and in consideration for the execution of this Agreement and the Indenture and the issuance of the Bonds.

IN WITNESS WHEREOF, the Issuer and the Company have caused this Agreement to be executed in their respective names, all as of the date first above written.

COUNTY OF TRUMBULL, OHIO

By _____

County Commissioner

By _____

County Commissioner

By _____

County Commissioner

The form of the foregoing Agreement is hereby approved by the Office of the Prosecuting Attorney of the County of Trumbull, Ohio.

By _____

Prosecuting Attorney

GENERAL MOTORS CORPORATION

HEIDI KUNZ

By _____

Florence L. Walsh

ATTORNEY-IN-FACT

## EXHIBIT A

Description of Project

The Project consists principally of the following sewage disposal facilities and associated building services, piping, electrical equipment and instrumentation (all as more fully described in the Project Certificate) at the Company's Packard Electric Division Plant in Warren, Ohio:

1.    Additional Final Clarification Equipment
2.    Recirculation System for Electrochemical Treatment Unit
3.    Replacement Blend Tank
4.    Upgrade and flow control to Final Lamella Clarifiers
5.    Increased pump capacity
6.    Additional Filtration
7.    Additional storage capacity
8.    Unloading Station

# <u>Exhibit C</u>
# 1999 Assignment Agreement

ASSIGNMENT AND ASSUMPTION AGREEMENT—
INDUSTRIAL DEVELOPMENT BONDS

This ASSIGNMENT AND ASSUMPTION AGREEMENT by and between
General Motors Corporation, a Delaware corporation ("GM"), and Delphi Automotive
Systems LLC, a Delaware limited liability company ("Delphi") is made as of January 1,
1999.

WHEREAS, GM has organized Delphi as the wholly owned subsidiary of Delphi
Automotive Systems Corporation, a Delaware corporation which is wholly owned by
GM, and intends to transfer certain assets and corresponding liabilities to Delphi as of
January 1, 1999, as part of preparations for establishing Delphi Automotive Systems
Corporation and its subsidiaries as an entity operated separately and at arms' length from
GM;

WHEREAS, GM has from time to time entered into loan or lease agreements in
connection with industrial development bonds, tax abatement bonds, industrial revenue
bonds or similar arrangements whereby a state or local government agency in the United
States issues securities for the benefit of GM;

WHEREAS, certain of the real property, fixtures, and equipment to be transferred
from GM to Delphi as described above is subject to loan or lease agreements of the type
described in the preceding paragraph; and

WHEREAS, GM intends to transfer such real property, fixtures and equipment
and is willing to transfer the benefits and Delphi is willing to assume the liabilities
associated with such loan or lease agreements;

NOW THEREFORE, in consideration of the mutual covenants contained herein
and other good and valuable consideration, the receipt and sufficiency of which are
hereby acknowledged, and intending to be legally bound thereby, GM and Delphi hereby
agree as follows:

1. Assignment of Agreements. GM hereby assigns, transfers, conveys, grants and
   delivers to Delphi (a) all of GM's right, title and interest in and to the loan agreements
   listed on Exhibit A (the "Loan Agreements") and the lease agreements listed on
   Exhibit B (the "Lease Agreements") (together with the Loan Agreements, the
   "Transferred Agreements"), (b) all of the notes, bonds, or other securities held by GM
   in connection with the Transferred Agreements, and (c) all of GM's residual
   ownership interest, if any, in any real property, fixtures, and equipment subject to the
   Transferred Agreements (collectively, the "Associated Assets").

2.  <u>Assumption of Agreements.</u>  Delphi hereby accepts the assignment and transfer of the Associated Assets,  assumes and agrees to pay and discharge the contractual obligations and liabilities of GM under and pursuant to the Transferred Agreements, and agrees to be bound by the terms of the Transferred Agreements to the extent that GM would have been bound by such terms.

3.  <u>Transfer of Portion of Property Subject to Transferred Agreement.</u>  In certain instances, indicated on Exhibit A and Exhibit B, GM intends to transfer to Delphi an ownership interest in only a portion of the real property, fixtures or equipment subject to a Transferred Agreement.  In such circumstances, GM hereby transfers, and Delphi hereby accepts the rights and obligations pursuant to such Transferred Agreement only to the extent that corresponds to the proportion of real property, fixtures, or equipment thus transferred.  Further, in such circumstances, the term "Associated Assets" shall be deemed to refer to the securities held by GM in connection with such Transferred Agreement, and in such residual interest in property subject to such Transferred Agreement only to the extent that corresponds to the proportion of real property, fixtures, or equipment thus transferred.

4.  <u>Notification and Further Assurances.</u>  Delphi covenants that it will promptly provide written notice of this Assignment and Assumption Agreement to the lender or lessor and to the trustee for each of the Transferred Agreements in compliance with the terms of the respective Transferred Agreement.  GM, for itself and its successors and assignees, convenants with Delphi and its successors and assignees that GM will do, execute, act, and deliver, or will cause to be done, executed, acted, and delivered, such and all other acts, transfers, notices, assignments, deeds of conveyance, powers of attorney, and assurances as Delphi and its successors and assignees shall reasonably require to further effect the transfer and assignment to Delphi and its successors and assignees the Transferred Agreements and the Associated Assets as contemplated hereby.

5.  <u>Power of Attorney.</u>  Solely for the purposes herein described, GM hereby constitutes and appoints Delphi as its true and lawful attorney in fact, with full power of substitution, and Delphi hereby accepts such appointment, to prosecute, defend and compromise any and all proceedings at law, in equity, or otherwise which GM and its successors and assignees may deem necessary or proper in order to collect, assert, enforce, or defend any claim, right, title, or interest of any kind in and to the Transferred Agreements or Associated Assets transferred, conveyed, and assigned to Delphi hereby, and to do all such acts and things in relation thereto as Delphi and its successors and assignees shall deem desirable.  GM hereby declares that the appointment hereby made and powers hereby granted shall be irrevocable.

6. <u>Indemnification.</u>  Delphi shall indemnify GM and its affiliates and hold GM and its affiliates harmless from and against any and all losses, liabilities, deficiencies, interest, costs and expenses (including all reasonable expenses incurred in preparing or defending any litigation or proceeding, whether commenced or threatened, including reasonable attorney's fees), whether contingent or otherwise, fixed or absolute, known or unknown, present or future or otherwise, relating directly or indirectly to, arising out of, or resulting from the Transferred Agreement or the Associated Assets.

7. <u>Correction of Exhibits.</u>  As of the date of this Assignment and Assumption Agreement, each of GM and Delphi agrees that it is not aware of any omissions or misstatement contained in Exhibit A or Exhibit B.  Each party agrees further that it will use its best efforts to confirm the accuracy and completeness of the information contained in Exhibit A or Exhibit B, and that it will promptly notify the other party in writing if and when it becomes aware of any misstatements or omissions.  Unless either party promptly objects, Exhibit A and Exhibit B, as amended by such notices, will be deemed final, complete, and correct as of June 30, 1999.

8. <u>Counterparts.</u>  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have caused this Assignment and Assumption Agreement to be executed by their duly authorized officers.

GENERAL MOTORS CORPORATION

By: _____

Title:   <u>Vice President and Treasurer</u>

DELPHI AUTOMOTIVE SYSTEMS LLC

By: _____John Blahnik_____

Title:   <u>Vice President and Treasurer</u>

EXHIBIT A

## Loan Agreements

| Counterparty | Agreement Date | Bond Series | Bond Information | | | | |
|---|---|---|---|---|---|---|---|
| | | | Notional on 1/1/99 ($000) | Delphi Portion | Delphi Notional | Maturity Date |
| Michigan Strategic Fund | April 15, 1988 | 1988A | 26,230 | 6.20% | 1,626 | 01-Apr-08 |
| Michigan Strategic Fund | July 1, 1995 | 1995 | 58,800 | 6.40% | 3,763 | 01-Sep-20 |
| County of Portage, Ohio | December 1, 1984 | 1984 | 10,000 | 100.00% | 10,000 | 01-Oct-00 |
| County of Trumbull, Ohio | July 1, 1994 | 1994 | 2,750 | 100.00% | 2,750 | 01-Jul-14 |
| Ohio Water Development Authority | June 15, 1978 | 1978A | 27,000 | 84.50% | 22,815 | 15-Jun-07 |

EXHIBIT B

## Lease Agreements

| Counterparty | Agreement Date | Bond Information | | | | |
|---|---|---|---|---|---|---|
| | | Bond Series | Notional on 1/1/99 ($000) | Delphi Portion | Delphi Notional | Maturity Date |
| City Of Saginaw, Michigan | June 1, 1978 | 1978 | 18,520 | 31.60% | 5,852 | 01-Jun-05 |
| City Of Laurel, Mississippi | May 1, 1977 | 1977 | 1,000 | 100.00% | 1,000 | 01-Jun-07 |
| City Of Brookhaven, Mississippi | May 1, 1977 | 1977 | 1,000 | 100.00% | 1,000 | 01-Jun-07 |
| Industrial Development Board of the City of Tuscaloosa, Alabama | April 1, 1988 | 1988 | 30,000 | 100.00% | 30,000 | 01-Feb-08 |
| Industrial Development Board of the City of Tuscaloosa, Alabama | February 1, 1991 | 1991 | 25,000 | 100.00% | 25,000 | 01-Feb-08 |
| County of Monroe Industrial Development Agency | December 1, 1985 | 1985 | 42,803 | 100.00% | 42,803 | 01-Dec-15 |

# Exhibit D
# Affidavit Of Service – Bar Date

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                             :
      In re                    :     Chapter 11
                                                             :
DELPHI CORPORATION, et al.,                                  :     Case No. 05-44481 (RDD)
                                                             :
                  Debtors.    :     (Jointly Administered)
                                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

AFFIDAVIT OF SERVICE

      I, Evan Gershbein, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants, LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

      On or before April 20, 2006, I caused to be served the documents listed below upon the parties listed on Exhibit A hereto via postage pre-paid U.S. mail:

      1)  Notice of Bar Date for Filing Proofs of Claim [a copy of which is attached hereto as Exhibit B]

      2)  Proof of Claim form [a copy of which is attached hereto as Exhibit C]

Dated: April 28, 2006

                                  */s/ Evan Gershbein*
                                  Evan Gershbein

Subscribed and sworn to (or affirmed) before me on this 28th day of April, 2006, by Evan Gershbein, personally known to me or proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature :   */s/ Amy Lee Huh*

Commission Expires:   *3/15/09*

# EXHIBIT A

# PAGE INTENTIONALLY OMITTED

## Delphi Service List

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| Bank Of New York | | 101 Barclay St | Cash Management Division 19 West | | New York | NY | 10286 | |
| Bank Of New York | | Add Chg 5 97 | PO Box 19015 | | Newark | NJ | 071950015 | |
| Bank Of New York | | Billing Department | 101 Barclay St 12w | | New York | NY | 10286-1091 | |
| Bank Of New York | | C O Customer Charging | 1 Wall St 27th Fl | | New York | NY | 10286 | |
| Bank Of New York | | Co Customer Charging | 1 Wall St 27th Fl | | New York | NY | 10286 | |

REDACTED

## Delphi Service List

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| Bank Of New York | | Financial Control Billing Dept | PO Box 19445 | Upd Per Gol 3 11 03 Ph | Newark | NJ | 071950445 | |
| Bank Of New York | | PO Box 19015 | | | Newark | NJ | 071950015 | |
| Bank Of New York | | PO Box 19015 | | | Newark | NJ | 07195-0015 | |
| Bank Of New York | | PO Box 19015 | | | Newark | NJ | 07195-0015 | |
| Bank Of New York C o Customer Charging | | 1 Wall St 27th Fl | | | New York | NY | 10286 | |
| Bank Of New York Co Customer Charging | | 1 Wall St 27th Fl | | | New York | NY | 10286 | |
| Bank Of New York Financial Control Billing Dept | | PO Box 19445 | | | Newark | NJ | 07195-0445 | |

REDACTED

# PAGES INTENTIONALLY OMITTED

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        :
      In re                                   :    Chapter 11
                                                        :
DELPHI CORPORATION, et al.,                             :    Case No. 05-44481 (RDD)
                                                        :
                      Debtors.               :    (Jointly Administered)
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>NOTICE OF BAR DATE FOR FILING PROOFS OF CLAIM</u>

TO ALL CREDITORS OF THE DEBTORS, AND OTHER PARTIES-IN-INTEREST:

PLEASE TAKE NOTICE THAT:

            In accordance with an order entered on April 12, 2006 by the United
States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court")
in the above-captioned chapter 11 cases (the "Bar Date Order"), **5:00 p.m. Eastern Time
on July 31, 2006** (the "General Bar Date") has been established as the last date for each
person or entity (including individuals, partnerships, corporations, limited liability
companies, estates, trusts, unions, indenture trustees, the United States Trustee, and
governmental units) (individually, a "Person" or "Entity," and collectively, "Persons" or
"Entities") to file a proof of claim in the chapter 11 cases of the above-captioned debtors
and debtors-in-possession (collectively, the "Debtors").  A list of all Debtors in these
chapter 11 cases is attached hereto as Exhibit A.

            On October 8, 2005, Delphi and certain of its U.S. subsidiaries filed
voluntary petitions in the Bankruptcy Court for reorganization relief under chapter 11 of
title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy
Code").  On October 14, 2005, three additional U.S. subsidiaries of Delphi filed
voluntary petitions in the Bankruptcy Court for reorganization relief under the
Bankruptcy Code.  The term "Petition Date" shall mean the date on which each Debtor
filed its chapter 11 bankruptcy petition as set forth on Exhibit A attached hereto.  The
General Bar Date and the procedures set forth below for filing proofs of claim apply to all
claims against the Debtors that arose before the applicable Petition Date, except for those
holders of the claims listed in Section 4 below which are specifically excluded from the
General Bar Date filing requirement.

**1.**       **Who Must File A Proof Of Claim**

            You MUST file a proof of claim to vote on a chapter 11 plan filed by the
Debtors or to share in distributions from the Debtors' bankruptcy estates if you have a
claim against any of the Debtors that arose prior to the applicable Petition Date, and such
claim is not one of the types of claim described in Section 4 below.  Claims based on acts
or omissions of the Debtors that occurred before the applicable Petition Date must be

filed on or prior to the General Bar Date, even if such claims are not now fixed, liquidated, or certain or did not mature or become fixed, liquidated, or certain before the applicable Petition Date.

Under section 101(5) of the Bankruptcy Code and as used in this Notice, the word "claim" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

## 2.    What To File

The Debtors are enclosing a proof of claim form which you may use to file any claim you may have in these cases.  If the Debtors scheduled you as a creditor in any of the Debtors' schedules of assets and liabilities (as amended from time to time, the "Schedules"), the form sets forth the amount of your claim as scheduled and whether the claim is scheduled as disputed, contingent, or unliquidated.  Additional proof of claim forms may be obtained at http://www.uscourts.gov/bkforms/index.html or at http://www.delphidocket.com.

All proofs of claim must be signed by the claimant or, if the claimant is not an individual, by a claimant's authorized agent.  All proofs of claim must be written in English and be denominated in United States currency.  You should attach to your completed proof of claim any documents on which the claim is based (if voluminous, attach a summary) or an explanation as to why the documents are not available.

If any supporting documentation provided with any proof of claim contains confidential information, such documentation will be subject to examination only by the party asserting the claim, the Debtors, the Debtors' counsel and advisers, the United States Trustee, counsel and advisers to the official committee of unsecured creditors appointed in these chapter 11 cases, Kurtzman Carson Consultants, LLC, the claims and noticing agent in these chapter 11 cases, and any personnel of the United States Bankruptcy Court for the Southern District of New York in the performance of their official duties, and such entities have been ordered to maintain the confidentiality of all supporting documentation to any proof of claim and the information contained therein.

Any holder of a claim against more than one Debtor must file a separate proof of claim with respect to each such Debtor and each holder of a claim must identify on its proof of claim the specific Debtor against which its claim is asserted and the case number of that Debtor's reorganization case.  A list of the names of the Debtors and their reorganization case numbers is attached hereto as Exhibit A.

3.        **When And Where To File**

Except as provided for herein, all proofs of claim must be filed so as to be underlined_received no later than **5:00 p.m. Eastern Time on July 31, 2006** at the following address:

If sent by mail:                              If sent by messenger or overnight courier:

United States Bankruptcy Court        United States Bankruptcy Court
Southern District of New York          Southern District of New York
Delphi Corporation Claims               Delphi Corporation Claims
Bowling Green Station                     One Bowling Green
P.O. Box 5058                              Room 534
New York, New York 10274-5058       New York, New York 10004-1408

**Proofs of claim will be deemed filed only when actually received at the addresses above on or before the General Bar Date.** Proofs of claim may not be delivered by facsimile, telecopy, or electronic mail transmission.

Governmental units must file proofs of claims in these chapter 11 cases on or prior to the General Bar Date.

4.        **Who Need Not File A Proof Of Claim**

You do not need to file a proof of claim on or prior to the General Bar Date if you are:

(a)        Any Person or Entity (i) which agrees with the nature, classification, and amount of its Claim set forth in the Schedules and (ii) whose Claim against a Debtor is not listed as "disputed," "contingent," or "unliquidated" in the Schedules;

(b)        Any Person or Entity which has already properly filed a proof of claim against the correct Debtor;

(c)        Any Person or Entity which asserts a Claim allowable under sections 503(b) and 507(a)(1) of the Bankruptcy Code as an administrative expense of the Debtors' chapter 11 cases;

(d)        Any Person or Entity which asserts a Claim solely on the basis of future pension or other post-employment benefits, including, without limitation, retiree health care and life insurance; provided, however, that any such Person or Entity which wishes to assert a Claim against any of the Debtors based on anything other than

future pension or other post-employment benefits must file a proof
of claim on or prior to the General Bar Date;[1]

(e)    Any Debtor or any direct or indirect subsidiary of any of the
Debtors in which the Debtors in the aggregate directly or indirectly
own, control or hold with power to vote, 50 percent or more of the
outstanding voting securities of such subsidiary;

(f)    Any Person or Entity whose Claim against a Debtor previously has
been allowed by, or paid pursuant to, an order of the Bankruptcy
Court;

(g)    Any holder of a Claim arising under or in respect of any of the
following issuances of Delphi Corporation senior and junior
subordinated unsecured debt (each, a "Noteholder"): (i) those
certain senior unsecured securities bearing interest at 6.55% and
maturing on June 15, 2006; (ii) those certain senior unsecured
securities bearing interest at 6.50% and maturing on May 1, 2009;
(iii) those certain senior unsecured securities bearing interest at
6.50% and maturing on August 15, 2013; (iv) those certain senior
unsecured securities bearing interest at 7.125% and maturing on
May 1, 2029; (v) those certain 8.25% junior subordinated notes
due 2033; or (vi) those certain adjustable-rate junior subordinated
notes due 2033  (collectively, the "Unsecured Securities"), other
than the indenture trustees of the Unsecured Securities; <u>provided,
however,</u> that any Noteholder who wishes to assert a Claim against
the Debtors that is not based solely upon the outstanding
prepetition principal and interest due on account of its ownership
of such Unsecured Securities must file a proof of claim on or prior
to the General Bar Date in respect of such Claim; and

(h)    Any holder of equity securities of, or other interests in, the Debtors
solely with respect to such holder's ownership interest in or
possession of such equity securities, or other interest; <u>provided,
however,</u> that any such holder which wishes to assert a Claim
against any of the Debtors that is not based solely upon its
ownership of the Debtors' securities, including, but not limited to,
Claims for damages or recision based on the purchase or sale of
such securities, must file a proof of claim on or prior to the General
Bar Date in respect of such Claim.

This notice is being sent to many persons and entities which have had
some relationship with or have done business with the Debtors but may not have an
unpaid claim against the Debtors.  The fact that you have received this Notice does not

---

[1] The bar date for the filing of Proofs of Claim on account of Claims arising from modification to or
termination of future pension or other post-employment benefits will be determined pursuant to an order of
the Bankruptcy Court approving such modification or termination.

necessarily mean that you have a claim or that the Debtors or the Bankruptcy Court believe that you have a claim against the Debtors.

**5.      Executory Contracts And Unexpired Leases**

Any person or entity which has a claim arising from the rejection of an Executory Contract must file a proof of claim on account of such claim against the Debtors on or before the later of (a) the General Bar Date or (b) 30 calendar days after the effective date of such rejection or such other date as fixed by the Bankruptcy Court in an order authorizing such rejection.

**6.      Amended Schedule Bar Date**

If the Debtors amend the Schedules on or after the date of this Notice (listed below) to reduce the undisputed, noncontingent, and liquidated amounts or to change the nature or classification of a claim against a Debtor reflected therein, the bar date for filing a proof of claim in respect of such amended schedule claim is the later of (a) the General Bar Date or (b) 30 calendar days after a claimant is served with notice that the Debtors have amended their Schedules.

**7.      Consequences Of Failure To File A Proof Of Claim By The General Bar Date**

ANY HOLDER OF A CLAIM WHICH IS NOT EXCEPTED FROM THE REQUIREMENTS OF THIS NOTICE, AS SET FORTH IN SECTION 4 ABOVE, AND WHICH FAILS TO TIMELY FILE A PROOF OF CLAIM IN THE APPROPRIATE FORM, WILL BE BARRED FROM ASSERTING SUCH CLAIM AGAINST THE DEBTORS AND THEIR CHAPTER 11 ESTATES, FROM VOTING ON ANY PLAN OF REORGANIZATION FILED IN THESE CASES, AND FROM PARTICIPATING IN ANY DISTRIBUTION IN THE DEBTORS' CASES ON ACCOUNT OF SUCH CLAIM.

**8.      The Debtors' Schedules And Access Thereto**

You may be listed as the holder of a claim against the Debtors in any of the Debtors' Schedules of Assets and Liabilities and/or Schedules of Executory Contracts and Unexpired Leases.

To determine if and how you are listed on any of the Schedules, please refer to the descriptions set forth on the enclosed proof of claim forms regarding the nature, amount, and status of your claim(s).

As set forth above, if you agree with the nature, amount, and status of your claim as listed in any of the Debtors' Schedules, and if your claim is not described as "disputed," "contingent," or "unliquidated," you need not file a proof of claim. Otherwise, or if you decide  to file a proof of claim, you must do so before the General Bar Date in accordance with the procedures set forth in this Notice.

Copies of any of the Debtors' Schedules are available for inspection online at http://www.delphidocket.com or on the Court's Internet Website at

http://www.nysb.uscourts.gov.  A login and password to the Court's Public Access to Electronic Court Records ("PACER") are required to access this information on the Court's Internet Website and can be obtained through the PACER Service Center at http://www.pacer.psc.uscourts.gov.  No login or password is required to access this information on the Debtors' Legal Information Website (http://www.delphidocket.com). Copies of any of the Schedules may also be examined between the hours of 9:00 a.m. and 4:30 p.m., Monday through Friday at the Office of the Clerk of the Bankruptcy Court, One Bowling Green, Room 511, New York, New York 10004-1408.

A holder of a possible claim against any of the Debtors should consult an attorney regarding any matters not covered by this Notice, such as whether the holder should file a proof of claim.

Dated:  New York, New York                                    BY ORDER OF THE COURT
        April 12, 2006

        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
        John Wm. Butler, Jr.
        John K. Lyons
        Ron E. Meisler
        333 West Wacker Drive, Suite 2100
        Chicago, Illinois  60606

          - and -

         Kayalyn A. Marafioti (KM 9632)
         Thomas J. Matz (TM 5986)
         Four Times Square
         New York, New York 10036


        Attorneys for Delphi Corporation, et al.,
            Debtors and Debtors-in-Possession



**For additional information:**

Delphi Restructuring Information Hotline:
Toll Free:  (866) 688-8740
International:  (248) 813-2602

Delphi Legal Information Website:
http://www.delphidocket.com

## EXHIBIT A

| | Entity | Tax / Federal ID Number | Case Number | Address | Date Of Petition Filing |
|---|---|---|---|---|---|
| 1. | Delphi NY Holding Corporation | 20-3383408 | 05-44480 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 2. | Delphi Corporation | 38-3430473 | 05-44481 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 3. | ASEC Manufacturing General Partnership | 73-1474201 | 05-44482 | 1301 Main Parkway Catoosa, OK 74015 | October 8, 2005 |
| 4. | ASEC Sales General Partnership | 73-1474151 | 05-44484 | 1301 Main Parkway Catoosa, OK 74015 | October 8, 2005 |
| 5. | Environmental Catalysts, LLC | | 05-44503 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 6. | Delphi Medical Systems Colorado Corporation | 84-1524184 | 05-44507 | 4300 Road 18 Longmont, CO 80504 | October 8, 2005 |
| 7. | Delphi Medical Systems Texas Corporation | 20-2885110 | 05-44511 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 8. | Delphi Medical Systems Corporation | 32-0052827 | 05-44529 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 9. | Specialty Electronics International Ltd. | 66-0522490 | 05-44536 | 69A Kronprindsens Gade (Third Floor) P.O. Box 1858 St. Thomas, VI | October 8, 2005 |
| 10. | Specialty Electronics, Inc. | 57-0755068 | 05-44539 | 19200 Asheville Highway P.O. Box 519 Landrum, SC 29356 | October 8, 2005 |
| 11. | Delphi Liquidation Holding Company | 95-4359324 | 05-44542 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 12. | Delphi Electronics (Holding) LLC | 95-4554161 | 05-44547 | One Corporate Center Kokomo, IN 46904 | October 8, 2005 |
| 13. | Delphi Technologies, Inc. | 38-3430681 | 05-44554 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 14. | Delphi Automotive Systems Tennessee, Inc. | 38-3319836 | 05-44558 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 15. | Delphi Mechatronic Systems, Inc. | 38-3589834 | 05-44567 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 16. | Delphi Automotive Systems Risk Management Corp. | 38-3575299 | 05-44570 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 17. | Exhaust Systems Corporation | 38-3211473 | 05-44573 | 4800 S. Saginaw Street Flint, MI 48501 | October 8, 2005 |
| 18. | Delphi China LLC | 38-3196159 | 05-44577 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 19. | Delphi Automotive Systems Korea, Inc. | 38-2849490 | 05-44580 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 20. | Delphi International Services, Inc. | 38-3439894 | 05-44583 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |

| | Entity | Tax / Federal ID Number | Case Number | Address | Date Of Petition Filing |
|---|---|---|---|---|---|
| 21. | Delphi Automotive Systems Thailand, Inc. | 38-3379709 | 05-44586 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 22. | Delphi Automotive Systems International, Inc. | 38-3280289 | 05-44589 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 23. | Delphi International Holdings Corp. | 38-3449527 | 05-44591 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 24. | Delphi Automotive Systems Overseas Corporation | 38-3318021 | 05-44593 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 25. | Delphi Automotive Systems (Holding), Inc. | 38-3422378 | 05-44596 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 26. | Delco Electronics Overseas Corporation | 38-2638990 | 05-44610 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 27. | Delphi Diesel Systems Corp. | 38-3505001 | 05-44612 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 28. | Delphi LLC | 37-1438255 | 05-44615 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 29. | Aspire, Inc. | 36-4392806 | 05-44618 | U.S. Route 1 Morrisville, PA 19067 | October 8, 2005 |
| 30. | Delphi Integrated Service Solutions, Inc. | 38-3473261 | 05-44623 | 1322 Rankin Street Troy, MI 48083 | October 8, 2005 |
| 31. | Delphi Connection Systems | 95-2563022 | 05-44624 | 17150 Von Karman Avenue Irvine, CA 92614 | October 8, 2005 |
| 32. | Packard Hughes Interconnect Company | 33-0595219 | 05-44626 | 17150 Von Karman Avenue Irvine, CA 92614 | October 8, 2005 |
| 33. | DREAL, Inc. | 38-3457411 | 05-44627 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 34. | Delphi Automotive Systems Services LLC | 38-3568834 | 05-44632 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 35. | Delphi Services Holding Corporation | 20-0577653 | 05-44633 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 36. | Delphi Automotive Systems Global (Holding), Inc. | 38-3547659 | 05-44636 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 37. | Delphi Foreign Sales Corporation | 66-0564421 | 05-44638 | Chase Trade, Inc. Post Office Box 309420 55-11 Conacao Gade Charlotte Amalie St. Thomas, VI 00803-9420 | October 8, 2005 |
| 38. | Delphi Automotive Systems Human Resources LLC | 38-3547664 | 05-44639 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 39. | Delphi Automotive Systems LLC | 38-3431131 | 05-44640 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 40. | Delphi Furukawa Wiring Systems LLC | 20-2478586 | 05-47452 | 5725 Delphi Drive Troy, MI 48098 | October 14, 2005 |

|  | Entity | Tax / Federal ID Number | Case Number | Address | Date Of Petition Filing |
|---|---|---|---|---|---|
| 41. | Delphi Receivables LLC | 61-1446224 | 05-47459 | 5725 Delphi Drive Troy, MI 48098 | October 14, 2005 |
| 42. | MobileAria, Inc. | 31-1695929 | 05-47474 | 800 West El Camino Real Suite 240 Mountain View, CA 94040 | October 14, 2005 |

# EXHIBIT C

| UNITED STATES BANKRUPTCY COURT ___ Southern ___ DISTRICT OF ___ New York ___ | PROOF OF CLAIM |
|---|---|

| Name of Debtor | Case Number |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

**Name of Creditor (The person or other entity to whom the debtor owes money or property):**

**Name and address where notices should be sent:**

**Telephone number:**

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.
☐ Check box if you have never received any notices from the bankruptcy court in this case.
☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

Account or other number by which creditor identifies debtor:

Check here ☐ replaces
if this claim ☐ amends a previously filed claim, dated:_____

**1. Basis for Claim**
☐ Goods Sold / Services Performed
☐ Customer Claim
☐ Taxes
☐ Money Loaned
☐ Personal Injury
☐ Other _____

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)
Last four digits of SS #: _____
Unpaid compensation for services performed
from _____ to _____
          (date)                    (date)

**2. Date debt was incurred:**

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed: $** _____ _____ _____ _____
                                                    (unsecured)        (secured)        (priority)         (Total)
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate    ☐ Motor Vehicle
☐ Other_____

Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

**6. Unsecured Nonpriority Claim** $_____

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $_____
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).
☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units-11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(____).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. $10,000 and 180-day limits apply to cases filed on or after 4/20/05. Pub. L. 109-8.

**8. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim

THIS SPACE IS FOR COURT USE ONLY

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): |
|---|---|

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

FORM B10 (Official Form 10) (04/04)

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In particular types of cases or circumstances, such as bankruptcy cases that are not filed voluntarily by a debtor, there may be exceptions to these general rules.*

## —— DEFINITIONS ——

### Debtor

The person, corporation, or other entity that has filed a bankruptcy case is called the debtor.

### Creditor

A creditor is any person, corporation, or other entity to whom the debtor owed a debt on the date that the bankruptcy case was filed.

### Proof of Claim

A form telling the bankruptcy court how much the debtor owed a creditor at the time the bankruptcy case was filed (the amount of the creditor's claim). This form must be filed with the clerk of the bankruptcy court where the bankruptcy case was filed.

### Secured Claim

A claim is a secured claim to the extent that the creditor has a lien on property of the debtor (collateral) that gives the creditor the right to be paid from that property before creditors who do not have liens on the property.

Examples of liens are a mortgage on real estate and a security interest in a car, truck, boat, television set, or other item of property. A lien may have been obtained through a court proceeding before the bankruptcy case began; in some states a court judgment is a lien. In addition, to the extent a creditor also owes money to the debtor (has a right of setoff), the creditor's claim may be a secured claim. (See also *Unsecured Claim.*)

### Unsecured Claim

If a claim is not a secured claim it is an unsecured claim. A claim may be partly secured and partly unsecured if the property on which a creditor has a lien is not worth enough to pay the creditor in full.

### Unsecured Priority Claim

Certain types of unsecured claims are given priority, so they are to be paid in bankruptcy cases before most other unsecured claims (if there is sufficient money or property available to pay these claims). The most common types of priority claims are listed on the proof of claim form. Unsecured claims that are not specifically given priority status by the bankruptcy laws are classified as *Unsecured Nonpriority Claims.*

## Items to be completed in Proof of Claim form (if not already filled in)

**Court, Name of Debtor, and Case Number:**

Fill in the name of the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the name of the debtor in the bankruptcy case, and the bankruptcy case number. If you received a notice of the case from the court, all of this information is near the top of the notice.

**Information about Creditor:**

Complete the section giving the name, address, and telephone number of the creditor to whom the debtor owes money or property, and the debtor's account number, if any. If anyone else has already filed a proof of claim relating to this debt, if you never received notices from the bankruptcy court about this case, if your address differs from that to which the court sent notice, or if this proof of claim replaces or changes a proof of claim that was already filed, check the appropriate box on the form.

**1. Basis for Claim:**

Check the type of debt for which the proof of claim is being filed. If the type of debt is not listed, check "Other" and briefly describe the type of debt. If you were an employee of the debtor, fill in the last four digits of your social security number and the dates of work for which you were not paid.

**2. Date Debt Incurred:**

Fill in the date when the debt first was owed by the debtor.

**3. Court Judgments:**

If you have a court judgment for this debt, state the date the court entered the judgment.

**4. Total Amount of Claim at Time Case Filed:**

Fill in the applicable amounts, including the total amount of the entire claim. If interest or other charges in addition to the principal amount of the claim are included, check the appropriate place on the form and attach an itemization of the interest and charges.

**5. Secured Claim:**

Check the appropriate place if the claim is a secured claim. You must state the type and value of property that is collateral for the claim, attach copies of the documentation of your lien, and state the amount past due on the claim as of the date the bankruptcy case was filed. A claim may be partly secured and partly unsecured. (See DEFINITIONS, above).

**6. Unsecured Nonpriority Claim:**

Check the appropriate place if you have an unsecured nonpriority claim, sometimes referred to as a "general unsecured claim". (See DEFINITIONS, above.) If your claim is partly secured and partly unsecured, state here the amount that is unsecured. If part of your claim is entitled to priority, state here the amount **not** entitled to priority.

**7. Unsecured Priority Claim:**

Check the appropriate place if you have an unsecured priority claim, and state the amount entitled to priority. (See DEFINITIONS, above.) A claim may be partly priority and partly nonpriority if, for example, the claim is for more than the amount given priority by the law. Check the appropriate place to specify the type of priority claim.

**8. Credits:**

By signing this proof of claim, you are stating under oath that in calculating the amount of your claim you have given the debtor credit for all payments received from the debtor.

**9. Supporting Documents:**

You must attach to this proof of claim form copies of documents that show the debtor owes the debt claimed or, if the documents are too lengthy, a summary of those documents. If documents are not available, you must attach an explanation of why they are not available.

# Exhibit E
# Affidavit Of Service – Modified Plan

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                             :

|  | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AFFIDAVIT OF SERVICE

I, Evan Gershbein, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases. I submit this Affidavit in connection with the service of the solicitation materials for the **First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified)** [Docket No. 17030] ("the Plan").

On December 1, 2005, the Court signed and entered an Order Pursuant to 28 U.S.C. § 156(c) Authorizing Retention and Appointment of Kurtzman Carson Consultants LLC as Claims, Noticing and Balloting Agent for Clerk of Bankruptcy Court [Docket No. 1374] designating KCC as the official Balloting Agent.

KCC is charged with the duty of printing and distributing Solicitation Packages to creditors and other interested parties pursuant to the instructions set forth in the **Order (A)(I) Approving Modifications to Debtors' First Amended Plan of Reorganization (as Modified) and Related Disclosures and Voting Procedures and (II) Setting Final Hearing Date to Consider Modifications to Confirmed First Amended Plan of Reorganization and (B) Setting Administrative Expense Claims Bar Date and Alternative Transaction Hearing Date ("Modification Procedures Order")** [Docket No. 17032] ("Modification Procedures Order") as entered by the Court on June 16, 2009.

The various solicitation materials consist of the following documents:

1) Ballot for Accepting or Rejecting First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified) (Class A Secured Claims) ("Class A Ballot") (attached hereto as Exhibit A);

2) Ballot for Accepting or Rejecting First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified) (Class C-1 General Unsecured Claims) ("Class C-1 Ballot") (attached hereto as Exhibit B);

3) Ballot for Accepting or Rejecting First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified) (Class C-2 Pension Benefit Guaranty Corporation Claims) ("Class C-2 Ballot") (attached hereto as <u>Exhibit C</u>);

4) Ballot for Accepting or Rejecting First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified) (Class D General Motors Corporation Claim) ("Class D Ballot") (attached hereto as <u>Exhibit D</u>);

5) Notice of (1) Approval of Supplement; (2) Hearing on Modifications to Plan; (3) Deadline and Procedures for Filing Objections to Modifications of Plan; (4) Deadline and Procedures for Temporary Allowance of Certain Claims for Voting Purposes; (5) Treatment of Certain Unliquidated, Contingent, or Disputed Claims for Noticing, Voting, and Distribution Purposes; (6) Record Date; (7) Voting Deadline for Receipt of Ballots; and (9) Proposed Releases, Exculpation, and Injunction in Modified Plan ("Final Modification Hearing Notice") (attached hereto as <u>Exhibit E</u>);

6) a letter from the Delphi Corporation Official Committee of Unsecured Creditors ("Creditors' Committee Letter") (attached hereto as <u>Exhibit F</u>);

7) First Amended Disclosure Statement Supplement with Respect to First Amended Plan of Reorganization (As Modified), Modification Procedures Order and December 10, 2007 Solicitation Procedures Order, in CD-ROM format ("CD-ROM")

8) Notice of Non-Voting Status with Respect to Certain Claims and Interests ("Notice of Non-Voting Status") (attached hereto as <u>Exhibit G</u>);

9) Notice to Unimpaired Creditors of (I) Filing of Proposed Modified Plan of Reorganization, (II) Treatment of Claims Under Modified Plan, (III) Hearing on Approval of Modified Plan, and (IV) Deadline and Procedures for Filing Objections Thereto ("Unimpaired Notice") (attached hereto as <u>Exhibit H</u>);

10) a memorandum from Kurtzman Carson Consultants to additional notice parties of ballot recipients ("Ballot Notice Party Memo") (attached hereto as <u>Exhibit I</u>);

11) Notice of Bar Date for Filing Proofs of Administrative Expense ("Administrative Bar Date Notice") (attached hereto as <u>Exhibit J</u>); and

12) Administrative Expense Claim Form ("Administrative Expense Claim Form") (attached hereto as <u>Exhibit K</u>).

On or before June 20, 2009, I caused to be served a personalized Class A Ballot, Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Administrative Bar Date Notice, Administrative Expense Claim Form and a pre-addressed, postage pre-paid return envelope upon the parties listed on <u>Exhibit L</u> via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served a personalized Class C-1 Ballot, Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Administrative Bar Date Notice, Administrative Expense Claim Form and a pre-addressed, postage pre-paid return envelope upon the parties listed on <u>Exhibit M</u> via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served a personalized Class C-2 Ballot, Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Administrative Bar Date Notice, Administrative Expense Claim Form and a pre-addressed, postage pre-paid return envelope upon the party listed on <u>Exhibit N</u> via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served a personalized Class D Ballot, Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Administrative Bar Date Notice, Administrative Expense Claim Form and a pre-addressed, postage pre-paid return envelope upon the party listed on <u>Exhibit O</u> via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on <u>Exhibit P</u> via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Notice of Non-Voting Status, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on <u>Exhibit Q</u> via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Unimpaired Notice, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on <u>Exhibit R</u> via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Notice of Non-Voting Status, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on <u>Exhibit S</u> via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Ballot Notice Party Memo, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on <u>Exhibit T</u> via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on Exhibit U via postage pre-paid U.S. mail.

Dated: June 23, 2009

Evan Gershbein

State of California
County of Los Angeles

Subscribed and sworn to (or affirmed) before me on this 23rd day of June, 2009, by Evan Gershbein, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature

Commission Expires: 10-1-09

L. MAREE SANDERS
Commission # 1610322
Notary Public - California
Los Angeles County
My Comm. Expires Oct 1, 2009

4

PAGES INTENTIONALLY OMITTED

# EXHIBIT E

**Hearing Date And Time: July 23, 2009 at 10:00 a.m.**
**Objection Deadline: July 15, 2009 at 4:00 p.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
     In re                            :     Chapter 11
:
DELPHI CORPORATION, et al.,       :     Case No. 05-44481 (RDD)
:
                  Debtors.     :     (Jointly Administered)
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF

(1) APPROVAL OF SUPPLEMENT;
(2) HEARING ON MODIFICATIONS TO PLAN;
(3) DEADLINE AND PROCEDURES FOR FILING OBJECTIONS TO MODIFICATIONS OF
     PLAN;
(4) DEADLINE AND PROCEDURES FOR TEMPORARY ALLOWANCE OF CERTAIN
     CLAIMS FOR VOTING PURPOSES;
(5) TREATMENT OF CERTAIN UNLIQUIDATED, CONTINGENT, OR DISPUTED
     CLAIMS FOR NOTICE, VOTING, AND DISTRIBUTION PURPOSES;
(6) RECORD DATE;
(7) VOTING DEADLINE FOR RECEIPT OF BALLOTS; AND
(8) PROPOSED RELEASES, EXCULPATION, AND INJUNCTION IN MODIFIED PLAN

TO ALL CREDITORS AND INTEREST HOLDERS, INCLUDING EQUITY SECURITY HOLDERS
OF DELPHI CORPORATION AND ITS AFFILIATED DEBTORS-IN-POSSESSION:

     PLEASE TAKE NOTICE that Delphi Corporation ("Delphi") and certain of its subsidiaries and
affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), are
soliciting acceptances of the First Amended Joint Plan Of Reorganization Of Delphi Corporation And
Certain Affiliates, Debtors And Debtors-In-Possession (As Modified) (the "Modified Plan"),[1] modifying
the plan confirmed on January 25, 2008, from holders of impaired claims and interests who are (or may
be) entitled to receive distributions under the Modified Plan.

     PLEASE TAKE FURTHER NOTICE that if the Modified Plan is approved by the United States
Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") the terms of the
Modified Plan will be binding on all holders of claims against, and all current and former holders of
equity security and other interests in, the respective Debtors.

     PLEASE TAKE FURTHER NOTICE that the Bankruptcy Court has entered an order on June 16,
2009 (the "Modification Procedures  Order") (Docket No. 17032) approving a supplement to the

---

[1]     The Modified Plan seeks certain modifications to (i) the First Amended Joint Plan Of Reorganization Of
Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, as modified (the
"Confirmed Plan"), confirmed on January 25, 2008, and (ii) the Order Approving (I) Disclosure Statement,
(II) Record Date, Voting Deadline, And Procedures For Temporary Allowance Of Certain Claims, (III)
Hearing Date To Consider Confirmation Of Plan, (IV) Procedures For Filing Objections To Plan, (V)
Solicitation Procedures For Voting On Plan, (VI) Cure Claim Procedures, (VII) Procedures For Resolving
Disputes Relating To Postpetition Interest, And (VIII) Reclamation Claim Procedures  (Docket No. 11389)
(the "December 10 Solicitation Procedures Order").

disclosure statement approved by the Bankruptcy Court on December 10, 2007 (the "Supplement") with respect to the Modified Plan and providing, among other things, that:

1.  Final Modification Hearing Date.  The hearing to consider approval of the Modified Plan (the "Final Modification Hearing"), will commence on **July 23, 2009 at 10:00 a.m.** (prevailing Eastern time) or as soon thereafter as counsel can be heard, before the Honorable Robert D. Drain, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610, New York, New York 10004.  The Final Modification Hearing may be adjourned from time to time by announcing the adjournment in open court, and the Modified Plan may be further modified, if necessary, under 11 U.S.C. § 1127 before, during, or as a result of the Final Modification Hearing, without further notice to parties-in-interest.

2.  Objections To Approval Of Modified Plan.  **July 15, 2009 at 4:00 p.m.** (prevailing Eastern time) (the "Objection Deadline") is fixed as the last date and time for filing and serving objections to approval of the Modified Plan.  To be considered, objections, if any, to approval of the Modified Plan must (a) be in writing, (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on March 20, 2006 (Docket No. 2883), the Fourteenth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered May 1, 2009 (Docket No. 16589), and the Modification Procedures Order, (c) be filed with the Bankruptcy Court in accordance with General Order M-242 (as amended) – registered users of the Bankruptcy Court's case filing system must file electronically, and all other parties-in-interest must file on a 3.5 inch disk (preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format), (d) be submitted in hard-copy form directly to the chambers of the Honorable Robert D. Drain, United States Bankruptcy Judge, One Bowling Green, Room 632, New York, New York 10004, and (e) be served upon (i) Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098 (Att'n: General Counsel), (ii) counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr. and Ron E. Meisler) and Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 (Att'n: Kayalyn A. Marafioti and Gregory W. Fox), (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, Suite 2100, New York, New York 10004 (Att'n: Brian Masumoto), (iv) counsel for the official committee of unsecured creditors, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022 (Att'n: Robert J. Rosenberg, Mark A. Broude, and Mitchell A. Seider), (v) counsel for the agent under the postpetition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017 (Att'n: Donald Bernstein and Brian Resnick), (vi) counsel for the Tranche C Collective, Willkie Farr & Gallagher LLP, 787 Seventh Avenue New York, New York 10019 (Att'n: Richard Mancino and Marc Abrams), (vii) counsel for the United States Department of the Treasury, Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, New York 10281 (Att'n: John J. Rapisardi and Oren B. Haker), (viii) counsel for the United States Department of Justice, 86 Chambers Street, 3rd Floor, New York, New York 10007 (Att'n: Matthew L. Schwartz and Joseph N. Cordaro), (ix) counsel for General Motors Corporation, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Att'n:  Jeffrey L. Tanenbaum and Robert J. Lemons), and (x) counsel for Parnassus Holdings II, LLC, Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022 (Att'n: Adam C. Harris and David J. Karp), in each case so as to be **received no later than the Objection Deadline.  Objections not timely filed and served in the manner set forth above may not be considered and may be deemed overruled.**

3.  Temporary Allowance Of Claims.  The following persons or entities, among others, are not entitled to vote on the Modified Plan and, therefore, will not receive a ballot: holders of (a) unimpaired claims, (b) claims and interests who will receive no distribution under the Modified Plan, (c) claims and

interests that have been scheduled as contingent, unliquidated, or disputed and for which (i) no proof of claim was timely filed and (ii) no Rule 3018(a) Motion (as defined below) has been filed by the Rule 3018(a) Motion Deadline (as defined below), and (d) claims and interests that are the subject of an objection filed by the Debtors (except to the extent and in the manner as may be set forth in the objection). If you disagree with the Debtors' classification of, or objection to, your claim or interest and believe that you should be entitled to vote on the Modified Plan, then you must (x) have timely filed a proof of claim by the applicable bar date or your proof of claim must be deemed timely filed by an order of the Bankruptcy Court before the Voting Deadline (as defined below), (y) contact the Creditor Voting Agent (as set forth below) to obtain a ballot and file the ballot by the Voting Deadline (as defined below), and (z) timely file and serve a motion for order under Fed. R. Bankr. P. 3018(a) (a "Rule 3018(a) Motion") seeking temporary allowance of your claim for the purpose of accepting or rejecting the Modified Plan. The Rule 3018(a) Motion must be filed with the Clerk of the Court on or before **July 2, 2009** at **4:00 p.m.** (prevailing Eastern time) (the "Rule 3018(a) Motion Deadline") and served so as to be received by the Notice Parties (as defined in the Modification Procedures Order) by the Rule 3018(a) Motion Deadline in accordance with the procedures set forth in the Modification Procedures Order; provided, however, that if the Debtors object to a claim or interest after June 19, 2009, the Rule 3018(a) Motion Deadline would be extended for that claim or interest such that the deadline would be ten days following the filing of the Debtors' objection.

4. Provisional Votes. Any party who has (a) timely filed a proof of claim (as stated above) and (b) files and serves a Rule 3018(a) Motion in accordance with the paragraph above shall be permitted to cast a provisional vote to accept or reject the Modified Plan. If, and to the extent that, the Debtors and such party are unable to resolve the issues raised by the Rule 3018(a) Motion before the Voting Deadline, then at the Final Modification Hearing the Court will determine whether the provisional ballot is to be counted as a vote on the Modified Plan and, if so, in what amount. Rule 3018(a) Motions that are not timely filed and served in the manner set forth above will not be considered, and the claims or interests referred to therein will not be counted in determining whether the Modified Plan has been accepted or rejected.

5. Treatment Of Certain Claims. Any holder of a claim that (a) is scheduled in the Debtors' schedules of assets and liabilities, dated April 18, 2006, or any amendment thereof (the "Schedules"), at zero or in an unknown amount or as disputed, contingent, or unliquidated and is not the subject of a timely filed proof of claim or a proof of claim deemed timely filed with the Bankruptcy Court under either chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended and in effect on October 8, 2005 (the "Bankruptcy Code") or any order of the Bankruptcy Court or otherwise deemed timely filed under applicable law, or (b) is not scheduled and is not the subject of a timely filed proof of claim or a proof of claim deemed timely filed with the Bankruptcy Court under either the Bankruptcy Code or any order of the Bankruptcy Court or otherwise deemed timely filed under applicable law, will not be treated as a creditor with respect to the claim for purposes of (i) receiving notices regarding, or distributions under, the Modified Plan or (ii) voting on the Modified Plan. Unless otherwise provided in the Modified Plan, any holder of a claim who is otherwise entitled to vote on the Modified Plan and who filed against the Debtors a proof of claim reflecting a claim or portion of a claim that is unliquidated, will have such claim allowed temporarily for voting purposes only, and not for purposes of allowance or distribution, for that portion of the claim that is not unliquidated and no amount shall be allocated for voting purposes on account of the unliquidated portion. Fully unliquidated claims shall be counted for purposes of determining whether a sufficient number of the allowed claims in the applicable class has voted to accept the Modified Plan, but the allowed amount of the fully unliquidated claim shall be $1.00 for voting purposes, subject to the right of the holder to file a Rule 3018(a) Motion. Unless otherwise provided in the Modified Plan, any holder of a claim that is contingent will have such claim temporarily disallowed for voting purposes, subject to the right of such holder to file a Rule 3018(a) Motion.

6. <u>Record Date</u>.  **June 8, 2009**, is the record date for determining the holders of Debtors' publicly traded debt and equity securities (the "Securities") and the creditors entitled to receive (a) solicitation packages and (b) entitled to vote to accept or reject the Modified Plan.

7. <u>Voting Deadline</u>.  If you hold a claim against one of the Debtors as of June 8, 2009, the Record Date as established in the Modification Procedures Order, and are entitled to vote to accept or reject the Modified Plan, you have received this Notice with a ballot form and voting instructions appropriate for your claim or interest.  For your vote to be counted, ballots to accept or reject the Modified Plan must be executed, completed, and RECEIVED by **7:00 p.m.** (prevailing Eastern time) on **July 15, 2009** (the "Voting Deadline") by the appropriate voting agent, Financial Balloting Group (the "Securities Voting Agent"), for holders of Securities, or Kurtzman Carson Consultants LLC (the "Creditor Voting Agent"), for all other creditors, at:

|  |  |
|---|---|
| Securities Voting Agent | Creditor Voting Agent |
| Delphi Corporation, <u>et al.</u> | Delphi Corporation, <u>et al</u>. |
| c/o Financial Balloting Group | c/o Kurtzman Carson Consultants LLC |
| 757 Third Avenue—3rd Floor | 2335 Alaska Avenue |
| New York, New York  10017 | El Segundo, California  90245 |
| (866) 486-1727 | (888) 249-2691 |

Ballots may **NOT** be cast by facsimile transmission or other electronic means.  **Ballots that are not received by the Voting Deadline will not be counted.**

8. <u>Injunction To Enforce Releases And Exculpation In The Modified Plan</u>.  **The Modified Plan proposes to release and exculpate various parties and to enjoin the pursuit of any claims subject to the releases and exculpation.  The releases generally provide that the Debtors, the Debtors' present and certain former officers and directors, the official committee of unsecured creditors, the official committee of equity security holders, the DIP agent, the DIP lenders, the buyers, all professionals retained in these cases, the unions representing the Debtors' employees and former employees, General Motors Corporation, and certain related persons and entities, will receive releases from the Debtors' present and former creditors and equity security holders, certain hourly employees and former employees of the Debtors, and certain related persons and entities, with respect to any claims or causes of actions existing as of the effective date of the Modified Plan that relate to the Debtors or the Debtors' chapter 11 cases.  These released parties will also be exculpated generally from Debtor-related liability by all parties.**

> **You Are Advised To Carefully Review And Consider The Modified Plan, Including The Release, Exculpation, And Injunction Provisions, As Your Rights Might Be Affected.**

9.     <u>Information And Documents</u>.  Copies of the Supplement, the Modified Plan, and any exhibits thereto are publicly available along with the docket and other case information by accessing the Delphi Legal Information Website set forth below and may also be obtained, upon reasonable written request, from the Creditor Voting Agent at the address set forth above.

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
<u>http://www.delphidocket.com</u>

Dated:     New York, New York
           June 16, 2009

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
     John Wm. Butler, Jr.
     Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606

           - and -

     Kayalyn A. Marafioti
     Thomas J. Matz
Four Times Square
New York, New York 10036

Attorneys for Delphi Corporation, <u>et al.</u>,
  Debtors and Debtors-in-Possession

PAGES INTENTIONALLY
OMITTED

# EXHIBIT J

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -   x
                                                          :
    In re                            :    Chapter 11
                                                          :
DELPHI CORPORATION, <u>et al.</u>,                        :    Case No. 05-44481 (RDD)
                                                          :
               Debtors.    :    (Jointly Administered)
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

### <u>NOTICE OF BAR DATE FOR FILING PROOFS OF ADMINISTRATIVE EXPENSE</u>

          PLEASE TAKE NOTICE that on June 16, 2009, the United States Bankruptcy
Court for the Southern District of New York (the "Bankruptcy Court") entered an order (the
"Modification Procedures Order") (Docket No. 17032), which among other things, established
**July 15, 2009** (the "Administrative Expense Bar Date") as the last date to file proof of
administrative expense (each, an "Administrative Expense Claim Form") for the purpose of
asserting administrative expense claims ("Administrative Expense Claims" or "Claims"), against
Delphi Corporation ("Delphi") and its affiliated debtors and debtors-in-possession (the "Debtors"
or "Company").  The Administrative Expense Bar Date and the procedure set out below for filing
proofs of administrative expense with respect to Claims apply to all alleged postpetition Claims
against the Debtors that arose, accrued, or that were incurred on or before **June 1, 2009**.

          PLEASE TAKE FURTHER NOTICE that the Modification Procedures Order
requires all parties to file an Administrative Expense Claim Form with Kurtzman Carson
Consultants LLC ("KCC"), the claims, noticing, and solicitation agent in these cases, **so that
such Administrative Expense Claim Form is received on or before 5:00 p.m., prevailing
Eastern time, on the Administrative Expense Bar Date**.

### **WHO SHOULD FILE AN ADMINISTRATIVE EXPENSE CLAIM FORM**

          You must file an Administrative Expense Claim Form if you believe that you are
entitled to an Administrative Expense Claim as described in 11 U.S.C. § 503, except as provided
below.

          You do not need to file an Administrative Expense Claim Form for (i) any claim
for postpetition goods and services delivered to the Debtors prior to June 1, 2009 that are not yet
due and payable pursuant to the applicable contract terms, (ii) employee claims arising prior to
June 1, 2009 for wages, salary, and other benefits arising in the ordinary course of business that
are not yet due and payable; (iii) any claim for which the party has already properly filed an
Administrative Expense Claim Form or a proof of claim form with the Court which has not been
expunged by order of the Court and provided that such proof of claim clearly and unequivocally
sets forth that such claim is made for an administrative expense priority; (iv) any claim for fees
and/or reimbursement of expenses by a professional employed in these chapter 11 cases accruing
through January 25, 2008, to the extent that such claim is subject to this Court's Interim

Compensation Orders;[1] or (v) any claim asserted by any Debtor or any direct or indirect subsidiary of any of the Debtors in which the Debtors in the aggregate directly or indirectly own, control or hold with power to vote, 50% or more of the outstanding voting securities of such subsidiary.

## TIME AND PLACE FOR FILING ADMINISTRATIVE EXPENSE CLAIMS

**A signed original of any Administrative Expense Claim Form, together with accompanying documentation, must be delivered to Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, CA 90245, so as to be received no later than 5:00 p.m., prevailing Eastern time, on the Administrative Expense Bar Date**.  Claims may be submitted in person or by courier service, hand delivery or mail addressed to KCC at the foregoing address.  Any Claim submitted by facsimile, e-mail, or by other electronic means will not be accepted and will not be deemed filed until such Claim is submitted by one of the methods described in the preceding sentence.  Claims will be deemed filed only when actually received by KCC.  If you wish to receive acknowledgment of KCC's receipt of your Claim, you must also submit a copy of your original Claim and a self-addressed, stamped envelope.

## CONSEQUENCES OF FAILURE TO TIMELY SUBMIT ADMINISTRATIVE EXPENSE CLAIM FORM

**ANY PARTY THAT IS REQUIRED BUT FAILS TO FILE AN ADMINISTRATIVE EXPENSE CLAIM FORM IN ACCORDANCE WITH THIS NOTICE ON OR BEFORE THE ADMINISTRATIVE EXPENSE BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH CLAIM AGAINST THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, AND THEIR PROPERTY SHALL BE FOREVER DISCHARGED FROM ANY AND ALL INDEBTEDNESS, LIABILITY, OR OBLIGATION WITH RESPECT TO SUCH CLAIM**.

---

[1]    See Order Under 11 U.S.C. § 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated November 4, 2005 (Docket No. 869) (the "Interim Compensation Order"); Supplemental Order Under 11 U.S.C. § 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated March 8, 2006 (Docket No. 2747) (the "Supplemental Compensation Order"); Second Supplemental Order Under 11 U.S.C. Section 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated March 28, 2006 (Docket No. 2986) (the "Second Supplemental Interim Compensation Order"); and Third Supplemental Order Under 11 U.S.C. § 331 Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of Professionals, dated May 5, 2006 (Docket No. 3630) (the "Third Supplemental Interim Compensation Order"); Fourth Supplemental Order Under 11 U.S.C. Section 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated July 13, 2006 (Docket No. 4545) (the "Fourth Supplemental Interim Compensation Order"); Fifth Supplemental Order Under 11 U.S.C. Section 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses, dated October 13, 2006 (Docket No. 5310) (the "Fifth Supplemental Interim Compensation Order"); Sixth Supplemental Order Under 11 U.S.C. Section 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated December 12, 2006 (Docket No. 6145) (the "Sixth Supplemental Interim Compensation Order"); and the Seventh Supplemental Order Under 11 U.S.C. §331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated January 28, 2008 (Docket No. 12367) (together with the Interim Compensation Order, the Supplemental Compensation Order, the Second Supplemental Interim Compensation Order, the Third Supplemental Interim Compensation Order, the Fourth Supplemental Interim Compensation Order, the Fifth Supplemental Interim Compensation Order, and the Sixth Interim Compensation Order, the "Interim Compensation Orders").

PLEASE TAKE FURTHER NOTICE that all pleadings and orders of the Bankruptcy Court are publicly available along with the docket and other case information by accessing the Delphi Legal Information Website at www.delphidocket.com and may also be obtained, upon reasonable written request, from the Creditor Voting Agent, Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, Att'n: Delphi Corporation, et al.

Delphi Legal Information Hotline:         Delphi Legal Information Website:
Toll Free:  (800) 718-5305                  http://www.delphidocket.com
International:  (248) 813-2698

Dated:  New York, New York
       June 16, 2009

SKADDEN, ARPS, SLATE, MEAGHER  & FLOM LLP

John Wm. Butler, Jr.                 Kayalyn A. Marafioti
Ron E. Meisler                          Thomas J. Matz
333 West Wacker Drive, Suite 2100      Four Times Square
Chicago, Illinois 60606               New York, New York 10036

Attorneys for Delphi Corporation, et al., Debtors and Debtors-in-Possession

# EXHIBIT K

United States Bankruptcy Court

Southern District of New York

Delphi Corporation et al. Claims Processing
c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue

El Segundo, California 90245

**Administrative
Expense Claim
Form**

| Debtor against which claim is asserted : | Case Name and Number |
|---|---|
| Delphi Corporation, *et al.* 05-44481 | In re Delphi Corporation.., *et al.*  05-44481 |
| | Chapter 11, Jointly Administered |

**NOTE: This form should not be used to make a claim in connection with a request for payment for goods or services provided to the Debtors prior to the commencement of the case.  This Administrative Expense Claim Form is to be used solely in connection with a request for payment of an administrative expense arising after commencement of the case but prior to June 1, 2009, pursuant to 11 U.S.C. § 503.**

| | |
|---|---|
| Name of Creditor<br>*(The person or other entity to whom the debtor owes money or property)*<br><br><br>Name and Address Where Notices Should be Sent<br><br><br><br>Telephone No. | ☐  Check box if you are aware that anyone else has filed a proof of claim relating to your claim.  Attach copy of statement giving particulars.<br>☐  Check box if you have never received any notices from the bankruptcy court in this case.<br>☐  Check box if the address differs from the address on the envelope sent to you by the court.<br><br><br>**THIS SPACE IS FOR COURT USE ONLY** |

| ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR: | Check here if this claim   ☐  replaces<br>                                      ☐  amends a previously filed claim, dated: _____ |
|---|---|

1. BASIS FOR CLAIM
   - ☐  Goods sold
   - ☐  Services performed
   - ☐  Money loaned
   - ☐  Personal injury/wrongful death
   - ☐  Taxes
   - ☐  Other (Describe briefly)

   - ☐  Retiree benefits as defined in 11 U.S.C. § 1114(a)
   - ☐  Wages, salaries, and compensation (Fill out below)
   - Your social security number _____
   - Unpaid compensation for services performed
   - from _____ to _____
   -        (date)             (date)

| 2. DATE DEBT WAS INCURRED | 3.  IF COURT JUDGMENT, DATE OBTAINED: |
|---|---|

4. TOTAL AMOUNT OF ADMINISTRATIVE CLAIM: $_____
   ☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim.  Attach itemized statement of all additional charges.

5. Brief Description of Claim (attach any additional information):

| | |
|---|---|
| 6.  **CREDITS AND SETOFFS**: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.  In filing this claim, claimant has deducted all amounts that claimant owes to debtor.<br><br>7.  **SUPPORTING DOCUMENTS**: *Attach copies of supporting documents*, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests.  DO NOT SEND ORIGINAL DOCUMENTS.  If the documents are not available, explain.  If the documents are voluminous, attach a summary. Any attachment must be 8-1/2" by 11".<br><br>8.  **DATE-STAMPED COPY**: To receive an acknowledgement of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim. | **THIS SPACE IS FOR COURT USE ONLY** |

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any) |
|---|---|

*The instructions below are general explanations of the law. In particular types of cases or circumstances, such as bankruptcy cases that are not filed voluntarily by a debtor, there may be exceptions to the general rules.*

| "DEFINITIONS" |
|---|

| DEBTORS | ADMINISTRATIVE EXPENSE CLAIM | ADMINISTRATIVE BAR DATE |
|---|---|---|
| The person, corporation, or other entity that has filed a bankruptcy case is called the debtor.<br><br>**CREDITOR**<br>A creditor is any person, corporation, or other entity to whom the debtor owes a debt. | Any right to payment constituting a cost or expense of administration of any of the Chapter 11 Cases arising under 11 U.S.C. § 503(b) of the Bankruptcy Code for the period from the commencement of these cases through June 1, 2009, <u>provided however</u>, that you do **not** need to file an Administrative Expense Claim Form for (i) any claim for postpetition goods and services delivered to the Debtors prior to June 1, 2009 that are not yet due and payable pursuant to the applicable contract terms; (ii) employee claims arising prior to June 1, 2009 for wages, salary, and other benefits arising in the ordinary course of business that are not yet due and payable; (iii) any claim for which the party has already properly filed an Administrative Expense Claim Form (as defined in the Modification Procedures Order) (Docket No. 17032) or a proof of claim form with the Court which has not been expunged by order of the Court and provided that such proof of claim clearly and unequivocally sets forth that such claim is made for an administrative expense priority; (iv) any claim for fees and/or reimbursement of expenses by a professional employed in these chapter 11 cases accruing through January 25, 2008, and which are subject to this Court's Interim Compensation Orders (as defined in Modification Procedures Order); or (v) any claim asserted by any Debtor or any direct or indirect subsidiary of any of the Debtors in which the Debtors in the aggregate directly or indirectly own, control or hold with power to vote, 50% or more of the outstanding voting securities of such subsidiary. | Pursuant to section 10.2 of the Modified Plan and paragraphs 38-39 of the Modification Procedures Order, all requests for payment of an Administrative Claim that has arisen between October 8, 2005 and June 1, 2009 must be filed no later than **July 15, 2009.** |

### Items to be completed in Administrative Expense Claim Form (if not already filled in):

**Information about Creditor:**
Complete the section giving the name, address, and telephone number of the creditor to whom the Debtors owe money or property, and the Debtors' account number(s), if any. If anyone else has already filed an Administrative Expense Claim Form relating to this debt, if you never received notices from the bankruptcy court about this case, if your address differs from that to which the court sent notice, or if this Administrative Expense Claim Form replaces or changes an Administrative Expense Claim Form that was already filed, check the appropriate box on the form.

**1. Basis for Claim:**
Check the type of debt for which the Administrative Expense Claim Form is being filed. If the type of debt is not listed, check "Other" and briefly describe the type of debt. If you were an employee of the Debtors, fill in your social security number and the dates of work for which you were not paid.

**2. Date Debt Incurred:**
Fill in the date when the Debtors first owed the debt.

**3. Court Judgments:**
If you have a court judgment for this debt, state the date the court entered the judgment.

**4. Total Amount of Administrative Claim:**
Fill in the total amount of the entire Claim. If interest or other charges in addition to the principal amount of the Claim are included, check the appropriate place on the form and attach an itemization of the interest and charges.

**5. Brief Description of Claim:**
Describe the Administrative Expense Claim including, but not limited to, the actual and necessary costs and expenses of operating one or more of the Debtors' Estates or any actual and necessary costs and expenses of operating one or more of the Debtors' businesses.

**6. Credits and Setoffs:**
By signing this Administrative Expense Claim Form, you are stating under oath that in calculating the amount of your Claim you have given the Debtors credit for all payments received from the Debtors.

**7. Supporting Documents:**
You must attach to this Administrative Expense Claim Form copies of documents that show the Debtors owe the debt claimed or, if the documents are too lengthy, a summary of those documents. If documents are not available you must attach an explanation of why they are not available.

**8. Date-Stamped Copy:**
To receive an acknowledgement of the filing of your Claim, enclose a stamped, self-addressed envelope and copy of this Administrative Expense Claim Form.

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 357

PAGES INTENTIONALLY
OMITTED

# EXHIBIT U

PAGES INTENTIONALLY
OMITTED

Delphi Corporation
Creditor Matrix

REDACTED

REDACTED

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | Address4 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| BANK OF NEW YORK | | ADD CHG 5 97 | PO BOX 19015 | | | NEWARK | NJ | 07195-0015 | |
| BANK OF NEW YORK | | BILLING DEPARTMENT | 101 BARCLAY ST 12W | | | NEW YORK | NY | 10286-1091 | |
| BANK OF NEW YORK | | C/O CUSTOMER CHARGING | 1 WALL ST 27TH FL | | | NEW YORK | NY | 10286 | |
| BANK OF NEW YORK | | C/O CUSTOMER CHARGING | 1 WALL ST 27TH FL | | | NEW YORK | NY | 10286 | |
| BANK OF NEW YORK | | FINANCIAL CONTROL BILLING DEPT | PO BOX 19445 | UPD PER GOI 3 11 03 PH | | NEWARK | NJ | 07195-0445 | |
| BANK OF NEW YORK | | PO BOX 19015 | | | | NEW YORK | NJ | 07195-0015 | |
| BANK OF NEW YORK | | PO BOX 19015 | | | | NEWARK | NJ | 07195-0015 | |
| BANK OF NEW YORK | JENNIFER BRAITHWAITE | 101 BARCLAY ST | CASH MANAGEMENT DIVISION 19 WEST | | | NEW YORK | NY | 10286 | |
| BANK OF NEW YORK FINANCIAL CONTROL BILLING DEPT | | PO BOX 19445 | | | | NEWARK | NJ | 07195-0445 | |
| BANK OF NEW YORK MELLON CORP, THE | | ONE WALL ST | | | | NEW YORK | NY | 10706-0001 | |

# PAGES INTENTIONALLY OMITTED