## PROSPECTUS SUMMARY

*This summary highlights information contained elsewhere in this prospectus. This summary is not complete and may not contain all of the information that you should consider before deciding to invest in our common stock. We urge you to read this entire prospectus carefully, including the "Risk Factors" section and the consolidated financial statements and the notes to those statements.*

### DELPHI

**Our Company**

Delphi is the world's largest and most diversified supplier of automotive parts, with 1997 revenues of $31.4 billion. Based on the latest Fortune 500 survey, Delphi on an independent basis would have ranked as the 25th largest industrial corporation in the United States based on 1997 revenues.

As an automotive parts supplier, Delphi manufactures and sells individual component parts for automotive vehicles as well as groups of components that are arranged either as modules based on physical proximity within a vehicle, such as an instrument panel, or as integrated systems that operate throughout a vehicle to provide a specific function, such as audio and braking. We sell these components, systems and modules to automotive vehicle manufacturers, including General Motors, which is the world's largest manufacturer of automotive vehicles and by far our largest customer.

Let us tell you more about our company:

- *Relationship With GM.* We have become a leader in the global automotive parts industry by capitalizing on the extensive experience we have gained as the principal supplier of automotive parts to General Motors. General Motors currently owns all of our stock. After this offering, GM will own about 82.3% of our common stock and will continue to control our company. GM has announced that it intends to complete its divestiture of Delphi later in 1999, which we believe will enhance our ability to increase sales to other vehicle manufacturers over time.

- *Expanded Customer Base.* Several years ago, we began to transform our company from a North America-based, captive supplier to GM into a global supplier of components, integrated systems and modules for a wide range of customers. We now sell our products to every major manufacturer of light vehicles in the world. Our sales to customers other than GM have grown from 13.3% of our total sales in 1993 to 18.3% in 1997. As used in this calculation, our "total sales" include all sales by entities in which we have a minority interest.

- *Global Presence.* We have an expansive global presence, with a network of manufacturing sites, technical centers, sales offices and joint ventures located in every major region of the world. About 59% of our employees and, based on square footage, about 30% of our wholly owned and leased manufacturing sites were located outside the United States and Canada as of September 30, 1998. About 28% of our total 1997 sales were derived from products manufactured at sites located outside the United States and Canada.

- *Vehicle Knowledge.* Through our experience with GM, we have developed a sophisticated understanding of the design, engineering, manufacture and operation of all aspects of the automotive vehicle. We have both extensive technical expertise in a broad range of product lines and strong systems integration skills, which enable us to provide comprehensive, systems-based solutions for our customers.

4

## TABLE OF CONTENTS

| | Page | | Page |
|---|---|---|---|
| Prospectus Summary | 4 | Management | 92 |
| Risk Factors | 13 | Arrangements Between Delphi and | |
| Delphi and Its Separation from | | General Motors | 110 |
| General Motors | 26 | Principal Stockholder | 132 |
| Use of Proceeds | 30 | Description of Capital Stock | 132 |
| Dividends | 30 | Shares Eligible for Future Sale | 142 |
| Capitalization | 31 | Material United States Federal Tax | |
| Selected Financial Data | 32 | | |

## TABLE OF CONTENTS

| | Page | | Page |
|---|---|---|---|
| Prospectus Summary | 4 | Management | 92 |
| Risk Factors | 13 | Arrangements Between Delphi and | |
| Delphi and Its Separation from | | General Motors | 110 |
| General Motors | 26 | Principal Stockholder | 132 |
| Use of Proceeds | 30 | Description of Capital Stock | 132 |
| Dividends | 30 | Shares Eligible for Future Sale | 142 |
| Capitalization | 31 | Material United States Federal Tax | |
| Selected Financial Data | 32 | Consequences to Non-United States | |
| Unaudited Pro Forma Condensed | | Holders | 144 |
| Consolidated Financial Statements | 34 | Underwriters | 147 |
| Management's Discussion and Analysis | | Legal Matters | 151 |
| of Financial Condition and Results of | | Experts | 151 |
| Operations | 39 | Where You Can Find More | |
| Business of Delphi | 61 | Information | 151 |
| | | Index to Consolidated Financial | |
| | | Statements | F-1 |

In this prospectus, "Delphi," the "company," "we," "us" and "our" each refers to Delphi Automotive Systems Corporation and "General Motors" and "GM" each refers to General Motors Corporation.

You should rely only on the information contained in this prospectus. We have not authorized anyone to provide you with information different from that contained in this prospectus. We are offering to sell, and seeking offers to buy, shares of common stock only in jurisdictions where offers and sales are permitted. The information contained in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or of any sale of common stock.

Until            , 1999, all dealers that buy, sell or trade Delphi's common stock, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the dealers' obligation to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.

MG>

- *Products.* We are primarily a "Tier 1" supplier, providing our products directly to vehicle manufacturers. We believe that we are one of the leading Tier 1 suppliers in each of our major product sectors:

(X)

- Electronics & Mobile Communication, which includes our automotive electronics and audio and communication systems

- Safety, Thermal & Electrical Architecture, which includes our interior, thermal and power and signal distribution products

- Dynamics & Propulsion, which includes our energy and engine management, chassis and steering products

We also supply our products to the worldwide aftermarket for replacement parts and to customers other than vehicle manufacturers.

## Our Industry

We operate in the highly competitive global automotive parts industry. Many vehicle manufacturers are continuing to reduce their reliance on their own internal captive component operations and are moving towards a competitive sourcing process for automotive parts. As a result, independent suppliers are becoming a more important part of the automotive parts industry and many captive suppliers no longer sell their products exclusively to their parent company. The global automotive parts industry is being further reshaped by a number of other key trends, including the following:

- Suppliers are becoming increasingly involved in vehicle design and assembly processes as customers source more fully-engineered, integrated systems and modules.

- Suppliers are establishing a broader geographic presence to satisfy the needs of customers as they produce and sell more vehicles on a global basis.

- The electronic content of vehicles is increasing in response to changing regulatory requirements and consumer demand.

- Suppliers are consolidating globally as they seek to achieve operating synergies, shift production to lower-cost manufacturing locations and acquire complementary technologies. Consolidation also enables suppliers to build new customer relationships and to follow their customers as they expand around the world.

- Product development cycles are becoming shorter as vehicle manufacturers seek to respond more quickly to changes in regulatory requirements and consumer preferences.

## Business Objective

Our core business objective is to increase our earnings by expanding our sales globally while improving operating performance. We have entered into a supply agreement with General Motors that we believe will ide us with a substantial base of future business well into the next decade. We will strive to maintain our rtant relationship with GM and expect that it will remain our largest customer for a significant period of . However, we expect that our sales to GM's North American operations will decline over time, and our gy accordingly focuses on increasing sales to other customers. We believe that our ability to achieve this growth over the long term will be enhanced by our complete separation from GM.

Our business objective emphasizes continuing operational improvements. Since 1991, when GM ized its various automotive parts operations into a separate business group, we have been evolving from a

## THE OFFERING

| | |
|---|---|
| Common stock offered: | |
| U.S. offering . . . . . . . . . . . . . . . . . . . . . . . . | 85,000,000 shares |
| International offering . . . . . . . . . . . . . . . . . . | 15,000,000 shares |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100,000,000 shares |

Common stock to be outstanding immediately after the offering . . . . . . . . . . . . . . . . . . . . . .    565,000,000 shares

Common stock to be held by General Motors immediately after the offering . . . . . . . . . . . .    465,000,000 shares

Use of proceeds . . . . . . . . . . . . . . . . . . . . . . . . .    We estimate that our net proceeds from the offering will be about $1.573 billion, based on an assumed initial public offering price of $16.50 per share. We will use the net proceeds from the offering for general corporate purposes, including working capital. See "Use of Proceeds."

Dividends . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Subject to our financial results and action by our Board of Directors, we currently intend to pay dividends on a quarterly basis, at an initial rate of $0.07 per share, commencing with the first declaration in June 1999 for payment in July 1999. See "Dividends."

Proposed NYSE symbol . . . . . . . . . . . . . . . . . . .    DPH

Preferred share purchase rights . . . . . . . . . . . . .    One preferred share purchase right will be attached to each share of common stock sold in the offering and thus the rights are also being offered hereby. The rights would cause substantial dilution to any person or group who attempts to acquire a significant interest in our company without advance approval from our Board of Directors and thus could make an acquisition of control of our company more difficult. See "Description of Capital Stock—Rights Plan."

Unless we specifically state otherwise, the information in this prospectus does not take into account the issuance of up to 15,000,000 shares of common stock which the U.S. underwriters have the option to purchase solely to cover over-allotments. If the U.S. underwriters exercise their over-allotment option in full, 580,000,000 shares of common stock will be outstanding after the offering.

The number of shares of our common stock to be outstanding immediately after the offering listed above does not take into account about 26,000,000 shares of our common stock that will be issuable upon exercise by our employees of "founders grant" stock options and restricted stock units and about 23,718,000 shares of our common stock that will be issuable upon exercise by our employees of stock options that will be substituted for GM stock options at the time of GM's divestiture of its shares of our common stock. The actual number of substituted awards will be determined at the time of such divestiture, primarily based on the ratio of the price of our common stock to the price of GM's stock. For a discussion of these stock options and employee benefits awards, see "Management—Incentive Plans—Founders Grants" and "Arrangements Between Delphi and General Motors—Employee Matters—Shares of Delphi's Common Stock Subject to Substitute Awards."

## RECENT FINANCIAL RESULTS

Our consolidated financial results for the three months and years ended December 31, 1997 and 1998 are summarized as follows:

| | Three Months Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| | 1997 | 1998 | 1997 | 1998 |
| | (in millions, except per share amounts) | | | |
| Net sales | $8,079 | $7,800 | $31,447 | $28,479 |
| Operating (loss) income | (877) | 63 | 352 | (221) |
| Net (loss) income | (521) | 88 | 215 | (93) |
| Basic and diluted (loss) earnings per share | (1.12) | .19 | 0.46 | (0.20) |

*Net Sales.* Net sales for the fourth quarter of 1998 decreased $279 million compared to the fourth quarter of 1997. The decrease reflects lost volume associated with the divestiture of our seating, lighting and coil spring operations during the third quarter of 1998. The sales volume lost from divested businesses was partially offset by the impact of improved production volumes of GM-North America and non-GM customers during the fourth quarter of 1998. In addition, our sales continue to be impacted by price reductions which amounted to about $125 million (or 1.6% of net sales) in the fourth quarter of 1998. Net sales for the year ended December 31, 1998 decreased $3.0 billion compared to the year ended December 31, 1997. The decrease reflects unfavorable volumes associated with work stoppages, divested businesses and economic conditions in Asia and Latin America as well as the impact of price reductions during 1998.

*Operating (Loss) Income.* Operating income was $63 million for the fourth quarter of 1998 compared to an operating loss of $877 million for the fourth quarter of 1997. Our operating loss for the year ended December 31, 1998 was $221 million compared to operating income of $352 million for the year ended December 31, 1997. As part of our ongoing evaluation of the competitiveness of our business, we recorded a 1998 fourth quarter charge of $310 million ($192 million after-tax). The charge primarily related to underperforming assets, voluntary early retirements and the closure of certain unprofitable joint ventures. For additional information on other special items and work stoppages which impacted our operating results in prior periods, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Results of Operations—Special Items and Work Stoppages."

Operating income, excluding charges associated with the on-going evaluation of the competitiveness of our business, was $485 million and $373 million for the fourth quarters of 1997 and 1998, respectively. Our 1998 fourth quarter results were unfavorably impacted by continuing worldwide price pressures, the economic downturn in Latin America and unfavorable design costs and product mix. These unfavorable items were significantly offset by the impact of our aggressive cost reduction efforts. Operating income, excluding the impact of special items and work stoppages, was $1.9 billion and $1.2 billion for the years ended December 31, 1997 and 1998, respectively. The reduction in operating income for the 1998 year, excluding the impact of special items and work stoppages, reflects lower volume and the unfavorable impact of economic conditions in Asia and Latin America. For the 1998 year, material and manufacturing cost savings exceeded the impact of price reductions and unrecovered design costs and partially offset the unfavorable impact of lower volume.

*Net (Loss) Income.* Our net income totaled $88 million for the fourth quarter of 1998 compared to a net loss of $521 million for the comparable period of 1997. Excluding charges associated with the on-going evaluation of the competitiveness of our business and other special items, our income was $280 million and $325 million for the fourth quarter of 1998 and 1997, respectively. Our net loss was $93 million for the year ended December 31, 1998 compared to net income of $215 million in 1997. Excluding the impact of special items and work stoppages, our income was $820 million and $1.17 billion for the years ended December 31, 1998 and 1997, respectively.

### *Failure to Realize the Labor Benefits We Expect from Our Separation from General Motors*

In the past, we have been adversely affected by work stoppages and other labor relations matters, which are discussed under "—Risk Factors Relating to Our Business—Our Business May Be Adversely Impacted by Work Stoppages and Other Labor Relations Matters." We expect that our separation from General Motors will provide certain benefits in this regard, which are discussed under "Business of Delphi—Strategy—Improve Operating Performance—Labor Relations." However, we cannot assure you as to when or the extent to which we will be able to achieve these benefits.

In this regard, our largest union, the UAW, which represents about 29% of our unionized employees, has stated that it is on record as opposing the separation of Delphi from GM and that, should GM decide to proceed with the transaction, the UAW can and will aggressively work to protect the rights and interests of its members who would be impacted by GM's distribution of Delphi common stock to the holders of its $1⅔ common stock. Since that time, GM and the UAW have agreed that any of our employees who are members of the UAW and who retire on or before October 1, 1999 will be treated as GM retirees. GM and Delphi have been working with the UAW and the other unions representing our employees to address the best interests of their members regarding these matters.

### *We May Incur Higher Costs Than Planned in Connection with Our Separation from General Motors*

We may incur costs and expenses, potentially including additional taxes and employee costs, greater than those we have planned for in connection with our separation from GM. We cannot assure you that these costs will not be material to our business. See "—Risk Factors Relating to Our Business—Pensions and Other Postretirement Employee Benefits Could Adversely Affect Our Liquidity" and "Management's Discussion and Analysis of Financial Condition and Results of Operations."

### *General Motors Will Control All Matters Affecting Our Company Prior to the Distribution*

After the completion of this offering, GM will own about 82.3% of our outstanding shares of common stock, or about 80.2% if the U.S. underwriters exercise their over-allotment option in full. As long as GM owns a majority of our outstanding common stock, GM will continue to be able to elect our entire Board of Directors and to remove any director, with or without cause, and generally to determine the outcome of all corporate actions requiring stockholder approval. As a result, GM will be in a position to continue to control all matters affecting our company, including:

- the composition of our Board of Directors and, through it, any determination with respect to the direction and policies of our company, including the appointment and removal of officers;

- any determinations with respect to mergers or other business combinations involving our company;

- the acquisition or disposition of assets by our company;

- future issuances of common stock or other securities of our company;

- the incurrence of debt by our company;

- amendments, waivers and modifications to the Supply Agreement and other agreements providing for our separation from GM;

- the payment of dividends on our common stock; and

- certain determinations with respect to treatment of items in those of our tax returns which are consolidated or combined with GM's tax returns.

After the closing of this offering, we expect that three of our eleven directors will be directors and/or officers of GM. See "Management—Directors, Executive Officers and Key Employees of Delphi." Under our

14

Restated Certificate of Incorporation, our Bylaws and Board policies established thereunder, so long as GM owns at least a majority of Delphi's outstanding common stock, many actions by our Board of Directors require the approval of 80% of all our directors. See "Description of Capital Stock—Certain Provisions of the Restated Certificate of Incorporation and Bylaws." Thus, in order to take any such action, the approval of one or more of our directors who are also directors and/or officers of GM will be required.

### *Certain of Our Directors May Have Conflicts of Interest Because They Are Also Directors or Executive Officers of General Motors*

We currently anticipate that, until after GM's divestiture of our common stock, three members of our Board of Directors will be executive officers of GM. Two of these GM officers are also directors of GM. For more information about our Board of Directors both prior to and following GM's divestiture of our common stock, see "Management—Directors, Executive Officers and Key Employees of Delphi." Our directors who are also directors or executive officers of GM will have obligations to both companies and may have conflicts of interest with respect to matters potentially or actually involving or affecting us, such as acquisitions, financings and other corporate opportunities that may be suitable for both us and GM. Our Restated Certificate of Incorporation contains provisions designed to facilitate resolution of these potential conflicts which we believe will assist the directors of our company in fulfilling their fiduciary duties to our stockholders. These provisions do not, however, alter the fiduciary duty of loyalty of our directors under applicable Delaware law. Subject to applicable Delaware law, by becoming a stockholder in our company, you will be deemed to have notice of and have consented to these provisions of our Restated Certificate of Incorporation. Although these provisions are designed to resolve such conflicts between us and General Motors fairly, we cannot assure you that any conflicts will be so resolved. See "Description of Capital Stock—Certain Provisions of the Restated Certificate of Incorporation and Bylaws."

### *Certain of Our Directors and Executive Officers May Have Conflicts of Interest Because of Their Ownership of General Motors Stock*

Certain of our directors and a number of our executive officers own substantial amounts of GM stock and options on GM stock. See "Management—Stock Ownership of Directors and Executive Officers." Although we believe that such directors and officers will be able to fulfill their fiduciary duties to our stockholders despite their ownership of GM stock, such ownership could create, or appear to create, potential conflicts of interest when directors and officers are faced with decisions that could have different implications for our company and GM.

### *We May Have Potential Business Conflicts of Interest with General Motors*

GM will continue to be our largest customer for a significant period of time. Unless and until GM completes its divestiture of our common stock, it will continue to be our controlling stockholder. As a result, conflicts of interest may arise between us and GM in a number of areas relating to our past and ongoing relationships, including:

- the nature, quality and pricing of products and services we provide to GM;
- the nature, quality and pricing of transitional services GM has agreed to provide us;
- labor, tax, employee benefit and other matters arising from the separation of our company from GM;
- the incurrence of debt by our company and major business combinations by our company;
- sales or distributions by GM of all or any portion of its ownership interest in our company;
- business opportunities that may be attractive to both GM and our company; and
- GM's ability to control the management and affairs of our company.

15

Except for the arrangements with respect to the first replacement cycle of certain product programs, if we elect to bid for GM's business, we will do so on the same basis as all other suppliers. While we intend to continue to focus on retaining and winning GM's business and we believe that we will continue to be able to compete effectively for this business, we cannot assure you in this regard. See "Business of Delphi—Customers—General Motors."

### *Our Business May Be Adversely Impacted by Work Stoppages and Other Labor Relations Matters*

We are subject to a risk of work stoppages and other labor relations matters because our hourly workforce is highly unionized. As of September 30, 1998, about 96% of our hourly workforce was represented by unions. These employees are represented by about 53 unions, including the UAW, which is our largest union. The national labor agreements negotiated by GM with the unions currently apply to our workforce and will continue to apply to our workforce after the offering. This means that, in the United States, the majority of our workers are currently paid at hourly wage rates similar to those paid to GM workers rather than the lower rates we believe are generally prevailing in the automotive parts industry. We will assume the terms of these national agreements for our employees in connection with GM's distribution of its shares of our common stock to the holders of its $1⅔ common stock.

We experienced work stoppages at certain of our facilities in each of 1996, 1997 and 1998. The 1996 and 1998 work stoppages each had a significant adverse impact on our net income. These work stoppages and work stoppages at GM's facilities had an unfavorable impact of $281 million on our 1996 net income and $560 million on our net income for the nine months ended September 30, 1998. The 1997 work stoppage lasted only one day. We cannot assure you that issues with our labor unions will be resolved favorably to us in the future, that we will not experience significant work stoppages in future years or that we will not record significant charges related to those work stoppages.

In the past we have been adversely affected by work stoppages that have led to the shutdown of GM's assembly plants. Strikes by the UAW, including at one of our facilities, led to the shutdown of most of GM's North American assembly plants in June and July 1998. In the event that one or more of our customers, including GM, experiences a material work stoppage, such work stoppage may have a resulting effect on our company, including the possible shutdown of our production lines related to such customers, which could have a material adverse effect on our business.

For more information about our labor relations, see "—Risk Factors Relating to Separating Our Company from General Motors—Failure to Realize the Labor Benefits We Expect from Our Separation from General Motors," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Business of Delphi—Employees; Union Representation."

### *We May Be Unable to Realize All of the Sales Represented By Our Awarded Business*

We believe that we currently have a solid foundation of future business that has been awarded to us by GM and other customers at various stages of the vehicle development cycle. However, the realization of future sales from awarded business is inherently subject to a number of important risks and uncertainties, including as to the number of vehicles that our customers will actually produce, the timing of that production and the mix of options that our customers and consumers may choose. In addition, our customers generally have the right to replace us with another supplier at any time for a variety of reasons. Accordingly, we cannot assure you that we will in fact realize any or all of the future sales represented by our awarded business. For more information, see "Business of Delphi—Overview—Our Sales and Awarded Business" and "—Industry—Awarded Business."

### *We May Be Unable to Capture Business with Customers Other Than GM-North America*

An important part of our business strategy is to increase our sales to vehicle manufacturers other than GM's North American operations, including, among others, GM's international operations. We will need to do this in order to offset the expected decline in our sales to GM's North American operations. While we

the exact nature of the problems that may arise, our contingency planning will focus on minimizing the scope and duration of any disruptions by having sufficient personnel, inventory and other resources in place to permit a flexible, real-time response to specific problems as they may arise at individual locations around the world

There is still uncertainty about the broader scope of the Year 2000 issue as it may affect our company and third parties, including our suppliers and customers, that are critical to our operations. For example, lack of readiness by electrical and water utilities, financial institutions, governmental agencies or other providers of general infrastructure could, in some geographic areas, pose significant impediments to our ability to carry on our normal operations in the area or areas so affected. In the event that we are unable to complete our remedial actions and are unable to implement adequate contingency plans in the event that problems are encountered, there could be a material adverse effect on our business, results of operations or financial condition.

We also are in the process of implementing throughout our global operations on an incremental basis a new enterprise software system that will replace the existing software systems. We believe this new system will provide us opportunities to realize cost savings throughout our operations and we expect multi-phase implementation of this system to be completed within about five years. In the event we are unable to successfully implement this new system, it could have a material adverse effect on our business. Also, we cannot assure you that we will be able to achieve the cost savings we expect to result from the implementation of this new software system. For more information about this new software system, see "Business of Delphi—Information Technology."

## Risk Factors Relating to Securities Markets

*There are risks relating to securities markets that you should consider in connection with your investment in and ownership of our stock. These risks include limitations on our ability to execute certain business combinations and change of control transactions.*

### Substantial Sales of Our Common Stock Could Adversely Affect the Market Price

Sales by GM or others of substantial amounts of our common stock in the public market or the perception that such sales might occur could have a material adverse effect on the price of our common stock. After this offering, GM will own 465,000,000 shares of our common stock. If GM distributes these shares to the holders of its $1⅔ common stock, they would be eligible for immediate resale in the public market, other than any shares held by affiliates of Delphi. We cannot predict whether substantial amounts of our common stock will be sold in the open market in anticipation of, or following, any distribution of our shares by GM to holders of its $1⅔ common stock. GM has the sole discretion to determine the timing, structure and all terms of its distribution of our common stock, all of which may also affect the level of market transactions in our common stock. In addition, if GM does not distribute to the holders of its $1⅔ common stock all of the shares of Delphi common stock that GM owns, GM and its transferees will have the right to require us to register such shares of our common stock under the Securities Act for sale into the public market. See "Arrangements Between Delphi and General Motors—Registration Rights Agreement".

### Certain Provisions Could Delay or Prevent a Change in Control of Our Company

Our Restated Certificate of Incorporation and Bylaws contain certain provisions that may make the acquisition of control of our company more difficult, including provisions relating to the nomination, election and removal of directors, limitations on actions by our stockholders and restrictions on business combinations with 10% stockholders. In addition, our preferred share purchase rights would cause substantial dilution to any person or group who attempts to acquire a significant interest in our company without advance approval from our Board of Directors. Delaware law also imposes certain restrictions on mergers and other business combinations between us and any holder of 15% or more of our outstanding common stock. General Motors is

24

## DELPHI AND ITS SEPARATION FROM GENERAL MOTORS

### Delphi's History

We are currently a wholly owned subsidiary of General Motors. Our company was incorporated in Delaware in late 1998 in preparation for this initial public offering of our common stock (the "Offering") and our separation from General Motors. Effective as of January 1, 1999, we acquired those assets, and assumed those liabilities, comprising the business of the Delphi Automotive Systems business sector of GM, in each case to the extent agreed to by GM and us and described elsewhere in this prospectus.

Before 1991, Delphi's business was conducted by many separate automotive parts operations which GM had acquired over time, beginning in the early twentieth century, as it increased its vertical integration. GM acquired these operations principally to assure itself of a sufficient and high-quality supply of automotive parts for the vehicles it produced. These operations were generally managed independently from each other within the GM organization.

In 1991, General Motors organized its components businesses into the Automotive Components Group. GM's stated objective was to improve the competitiveness of these operations and then, based on this improved competitive position, increase its business through penetration of new markets. In 1995, the group was given the name "Delphi Automotive Systems" in order to establish its separate identity in the automotive parts industry.

In late 1997, in connection with the spin-off by GM of its defense electronics business, GM transferred Delco Electronics to its Delphi Automotive Systems business sector in order to more closely integrate Delco Electronics' expertise in electronics with our capabilities in automotive components and systems. Our Electronics & Mobile Communication product sector consists of the operations of our Delco Electronics subsidiary. From 1986 through 1997, Delco Electronics was operated by GM's Hughes Electronics Corporation subsidiary, which is a leader in satellite and wireless communications and space technology and was at that time also a leading defense electronics company. Unless we have indicated otherwise, the information contained in this prospectus assumes that Delco Electronics has been a part of our company for all periods presented.

### Separation from General Motors

*GM's Plan to Divest Delphi.* After completion of the Offering, GM will own about 82.3% of the outstanding shares of our common stock, or about 80.2% if the U.S. underwriters exercise their over-allotment option in full. GM has announced that it currently plans to complete its divestiture of our company later in 1999 by distributing all of its shares of Delphi common stock to the holders of GM's $1⅔ common stock. GM expects to accomplish this through a split-off, a spin-off or some combination of both transactions. We refer to this distribution, in whatever form it may take, as the "Distribution." For more information, see "Prospectus Summary—Relationship With General Motors."

GM has advised us that it has not yet determined definitively either when it expects to complete the Distribution or the structure or terms on which it would accomplish the Distribution. However, GM has advised us that it believes it would be desirable to have an intervening period of several months between the Offering and the Distribution, and that GM accordingly does not currently expect that it would complete the Distribution prior to mid-1999.

GM has also advised us that, based on its current plans, in the event it decides to effect the Distribution through a split-off exchange offer and not enough of its $1⅔ common stockholders tender their shares to enable GM to divest itself of all of its shares of our common stock, it would distribute its remaining shares of Delphi common stock to the holders of GM's $1⅔ common stock in a spin-off.

As noted above, GM is not obligated to complete the Distribution and we cannot assure you as to whether or when it will occur. See "Risk Factors—Risk Factors Relating to Separating Our Company from General Motors—Our Business May Be Adversely Affected if the Distribution Is Not Completed."

GM has also advised us that it would not complete the Distribution if its Board of Directors determines that the Distribution is no longer in the best interests of General Motors and its stockholders. GM has further advised us that it currently expects that the principal factors that it would consider in making this determination, as well as the principal factors that it would consider in making the determination as to the timing, structure and terms of the Distribution, would be:

- the market price of the Delphi common stock;

- the market price of GM's $1⅔ common stock;

- satisfaction that the Distribution will be tax-free to GM and its stockholders and as to the other tax consequences of the transactions;

- the absence of any court orders or regulations prohibiting or restricting the completion of the Distribution; and

- other conditions affecting the businesses of Delphi or GM that make it no longer in the best interests of such businesses to be fully separated.

On January 13, 1999, GM received a private letter ruling from the IRS to the effect that the Distribution would be tax-free to GM and its stockholders for U.S. federal income tax purposes.

*Background of the Separation.* Historically, many large automotive vehicle manufacturers, which we sometimes refer to as "VMs," have relied on in-house components divisions to fill their supply needs. Over the past few decades, however, the automotive industry has moved away from such vertical integration. Instead, VMs have moved towards sourcing a substantial portion of a vehicle's parts from independent suppliers and purchasing more fully-engineered, integrated systems and modules rather than individual components. As a result, VMs are now requiring their suppliers to perform many of the design, engineering and assembly functions traditionally executed by VMs. The degree to which VMs source from independent, outside suppliers varies by VM.

General Motors began reducing its vertical integration several years ago by adopting a global sourcing program. We believe that this initiative was designed to leverage GM's purchasing power and reduce its purchasing costs by enhancing competition for its business among its suppliers on the basis of quality, service, technology and price. As a result of the completion of the Distribution, GM would substantially reduce its vertical integration.

*Benefits of the Separation.* We believe that we will realize certain benefits from our complete separation from General Motors. As an independent company, we expect to be better able to expand our revenue base through sales to major VM customers other than GM. We also believe that, as a fully independent company after the completion of the Distribution, we will be better able, over time, to establish more flexible local work rules and practices through improved labor relations, thereby increasing our competitiveness. These and other benefits of the separation are discussed further below.

- *Increased Non-GM Sales.* We believe that one of the most significant limitations on our ability to expand our sales to major VMs other than GM is a general reluctance by such VMs to source from a supplier owned by GM. Other major VMs have shown varying degrees of reluctance to source extensively from a supplier owned by GM since GM, one of their major competitors, may be strengthened by the related profits. In addition, we believe that many major VMs remain reluctant to source from us because they fear that GM might obtain access through us to confidential information regarding their vehicle designs and manufacturing processes. This is particularly important as suppliers are increasingly performing more of the vehicle design and assembly functions traditionally executed

27

### SELECTED FINANCIAL DATA

The following selected financial data of Delphi reflect the historical results of operations and cash flows of the businesses that were considered part of the Delphi Automotive Systems business sector of GM during each respective period. In addition, the data for all periods include amounts relating to Delco Electronics, the electronics and mobile communication business that was transferred by GM from Hughes Electronics to Delphi in December 1997. The historical consolidated statement of income data set forth below do not reflect many significant changes that will occur in the operations and funding of our company as a result of our separation from GM and the Offering. The historical consolidated balance sheet data set forth below reflect the assets and liabilities that are expected to be transferred to our company in accordance with the Separation Agreement.

The selected financial data of Delphi should be read in conjunction with, and are qualified by reference to, "Unaudited Pro Forma Condensed Consolidated Financial Statements," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and notes thereto included elsewhere in this prospectus. The consolidated statement of income and cash flow data set forth below for each of the three years in the period ended December 31, 1997, and the consolidated balance sheet data as of December 31, 1996 and 1997 are derived from, and qualified by reference to, the audited consolidated financial statements included elsewhere in this prospectus, and should be read in conjunction with those consolidated financial statements and the notes thereto. The consolidated statement of income and cash flow data for each of the years ended December 31, 1993 and 1994 and the consolidated balance sheet data as of December 31, 1993, 1994 and 1995 are derived from unaudited consolidated financial statements not included in this prospectus, which in our opinion, include all adjustments, consisting of only normal recurring adjustments, necessary for a fair presentation of the results for such periods. The consolidated statement of income and cash flow data for the nine months ended September 30, 1997 and 1998 and the consolidated balance sheet data as of September 30, 1998 are derived from, and should be read in conjunction with, the unaudited consolidated financial statements included elsewhere in this prospectus, which in our opinion include all adjustments, consisting of only normal recurring adjustments, necessary for a fair presentation of the results for such periods.

The financial information presented below may not be indicative of our future performance and does not necessarily reflect what our financial position and results of operations would have been had we operated as a separate, stand-alone entity during the periods presented. Results for the nine months ended September 30, 1998 are not necessarily indicative of results that may be expected for the entire year. See "Risk Factors—Risk Factors Relating to Separating Our Company from General Motors—Our Historical Financial Information Has Limited Relevance to Our Results As a Separate Company." You should also read the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section, which describes a number of factors which have affected our financial results, including significant price reductions as GM implemented its global sourcing initiative, labor disruptions at both GM and Delphi and charges associated with certain competitiveness initiatives.

under these financing arrangements for general corporate purposes. The credit facilities include certain customary affirmative and negative covenants, including maintenance of a ratio of consolidated total debt to consolidated EBITDA, excluding extraordinary items. For additional information on the revolving credit facilities, see Note 8 to the audited consolidated financial statements included elsewhere in this prospectus.

We expect the draw downs from the revolving credit facilities to be refinanced with a combination of operating cash flows and the issuance of long-term debt during the first half of 1999. Subsequently, it is expected that the $5.0 billion revolving credit facilities would be reduced to $3.0 billion in available funds, generally split between 364-day and five-year tranches.

The factors considered in determining the initial capitalization include our company's prospective financing requirements, expected working capital and capital expenditure requirements, desired credit rating and the need for adequate debt capacity to pursue strategic initiatives. In reviewing these factors, the capitalization and credit ratings of comparable companies in the automotive components and systems industry were also considered.

After the Offering, General Motors will continue to own a significant portion of our common stock. As a result, GM will continue to include us as a "subsidiary" for various financial reporting, accounting and other purposes. Accordingly, we have agreed to certain covenants regarding the incurrence of debt. Specifically, so long as GM owns at least 50% of our outstanding shares of common stock, these covenants limit our maximum indebtedness, including indebtedness incurred in connection with acquisitions. See "Arrangements Between Delphi and General Motors—IPO and Distribution Agreement."

Delphi's intra-year cash fluctuations are impacted by the volume and timing of worldwide vehicle production. Examples of seasonal effects in the industry include the shut-down of operations of our primary North American customers for about two weeks in July, the subsequent ramp-up of new model production and the additional one-week shut-down in December. We believe that our company has sufficient financial flexibility to fund these fluctuations and to access the global capital markets on terms and in amounts satisfactory to it, although there can be no assurance that that will be the case. In addition, we expect cash flows from operations, funding obtained through the Offering, the establishment of the revolving credit facilities and other short-term sources to be sufficient to satisfy future working capital, capital expenditure, research and development, pension funding requirements and debt service requirements during the next 12 to 18 months. We expect cash flows from operations, the establishment of the revolving credit facilities and access to the short-term and long-term capital markets to satisfy our funding needs during our five-year business planning cycle. See "—Cash Flows—Investing Activities" and "—Our Other Postretirement Employee Benefits and Underfunded Pension Obligations."

### Cash Flows

*Operating Activities.* Cash flows used in operating activities during the first nine months of 1998 totaled $51 million compared to cash flows provided by operating activities of $1.8 billion for the same period in 1997. The decrease in 1998 resulted from the impact of work stoppages and the related overall decline in net income. In addition, operating cash flow in 1998 reflected cash used for other postretirement benefits, as discussed below.

Net cash provided by operating activities was $2.9 billion for the year ended December 31, 1997 compared to $2.7 billion in 1996 and $1.4 billion in 1995. The 1997 increase in cash flows from operating activities primarily reflects increases in accounts payable, accrued liabilities and other liabilities, partially offset by increased accounts receivable and cash used for other postretirement benefits as discussed below. The changes referenced above primarily reflected an increased volume of activity, differences in the timing of settlements and amounts accrued in connection with the Competitiveness Study. The increase in net cash provided by operating activities in 1996 resulted from a decrease in accounts receivable and cash contributions to GM's worldwide pension funds. Cash pension contributions for 1996 decreased due to the improved funding of GM's U.S. hourly pension plan.

capital expenditures were impacted by spending related to increased penetration with non-GM customers and expansion projects, primarily in Europe and Mexico.

We expect capital expenditures to total $1.4 billion in 1998. About 42% of 1998 capital expenditures are targeted outside the United States. The Electronics & Mobile Communication; Safety, Thermal & Electrical Architecture; and Dynamics & Propulsion product sectors are expected to account for 15.1%, 32.7% and 51.5%, respectively, of 1998 capital expenditures.

We expect capital expenditures to total $1.5 billion in 1999. Such expenditures will primarily be utilized for equipment, tooling and other spending associated with new product programs, including increasing sales to non-GM customers. Expenditures will also be used for expansion into new markets outside the United States and the continued implementation of lean manufacturing strategies. About 43% of 1999 capital expenditures are targeted outside the United States. The Electronics & Mobile Communication; Safety, Thermal & Electrical Architecture; and Dynamics & Propulsion product sectors are expected to account for 18.3%, 33.4% and 47.5%, respectively, of 1999 capital expenditures.

*Financing Activities.* Net cash provided by financing activities for the first nine months of 1998 totaled $741 million compared to $903 million of cash used in financing activities during the first nine months of 1997. Net cash used in financing activities totaled $1.5 billion in 1997 compared with $1.7 billion and $263 million in 1996 and 1995, respectively. Cash provided by or used in financing activities primarily related to the transfer or assumption of assets and liabilities to our company from GM under the terms of the Separation Agreement. The period to period change reflects differences in separation adjustments for various assets and liabilities, principally pensions and other postretirement benefits.

## Our Other Postretirement Employee Benefits and Underfunded Pension Obligations

In connection with our separation from General Motors, we have entered into several agreements relating to pensions and other postretirement employee benefits for our employees as well as certain employees associated with prior divestitures. See "Arrangements Between Delphi and General Motors—Employee Matters." Our pension obligations are based on the pension plans' assets, the expected investment return on those assets and the plans' expected liabilities. Under current economic conditions and federal government regulations, our pension obligations would be considered to be "underfunded." The amount of underfunding can vary from time to time, depending on factors such as discount rates, asset returns, contributions and other factors. As of September 30, 1998, Delphi's salaried and hourly other postretirement employee benefit obligation was about $4.5 billion and the underfunded pension obligation was about $1.9 billion.

Because of the underfunded nature of our pension plans, federal regulations will require that our contributions over time meet minimum funding requirements. Delphi is responsible for assuming the underfunded hourly pension liability associated with Delphi hourly employees or paying GM for underfunding relating to such employees.

Although we are not required to do so, we have commenced discussions with the Pension Benefit Guaranty Corporation ("PBGC") regarding the underfunded nature of our pension plans. In connection with these discussions, the PBGC may request that we take actions in excess of federal regulatory minimum requirements. The outcome of these discussions is as yet unknown; but if any actions in excess of federal regulatory minimum requirements are discussed, we intend to seek to maintain sufficient financial flexibility in order to execute our business strategy. We may also determine, as part of our capital planning process, to make voluntary contributions to our pension plans in excess of federal regulatory minimum requirements in order to further address the underfunded status of our pension plans.

In any event, regardless of the outcome of our discussions with the PBGC, we expect these contributions to be material to our results of operations and financial condition. We cannot accurately predict the amount or timing of contributions that will be required in the future or the related impact on our financial results and financial condition. These amounts may be affected by general economic conditions (including anticipated

the necessary flexibility of response are expected to be identified and put into place commencing in mid-1999.

The assessment and remediation phases described above include communicating with our suppliers as part of a broader supplier assessment program in which we are participating with GM. As part of that program, an industry trade association, the Automotive Industry Action Group, has distributed Year 2000 compliance questionnaires as well as numerous Year 2000 awareness and assistance mailings to many of the about 40,000 supplier sites that supply Delphi throughout the world. We are not relying entirely on assurances contained in those questionnaire responses and we are participating in GM's own further assessment of our suppliers. That further assessment includes GM's own on-site review of suppliers considered to be critical to GM's operations, including Delphi's operations as part of GM. These supplier assessment efforts have been substantially completed with respect to our critical supplier sites. Based on our participation with GM in this assessment activity to date, we believe that a substantial majority of our suppliers are making acceptable progress toward Year 2000 readiness. We are also participating in a program that GM has established to provide further assistance to suppliers that desire more input or that are believed to be at high risk of noncompliance as a result of the foregoing assessment efforts. This supplier assistance program currently includes providing compliance workshops and remediation consultants to work with suppliers on developing and implementing their own remediation programs. We also expect that our contingency planning efforts described above will address any critical suppliers that we still identify as being at high risk of encountering Year 2000 problems upon completion of the supplier assistance program. We intend to enter into appropriate arrangements with GM to provide for continued coordination of our respective supplier assessment and assistance efforts after the Distribution.

In contrast to some Year 2000 programs, we are not relying entirely on the receipt of written assurances from our suppliers with respect to their Year 2000 compliance; rather, together with GM, we are also evaluating certain suppliers on a first-hand basis and are seeking to enhance their likelihood of full Year 2000 readiness by actively assisting them with training and consultation regarding Year 2000 remediation projects. We expect that information from our suppliers, written responses and our interactions with them will provide us with a basis for further contingency planning and risk management.

The cost of our Year 2000 program is being expensed as incurred with the exception of capitalizable replacement hardware. Total incremental spending by Delphi is not expected to be material to the company's operations, liquidity or capital resources. We incurred about $7 million of Year 2000 expense during 1997 and about $16 million in the first nine months of 1998. Delphi currently expects its total Year 2000 spending to be about $125 million, with peak spending occurring in late 1998 and early 1999, plus approximately $9 million of additional costs associated with information technology projects that were already underway or scheduled independently of our Year 2000 program but that have been accelerated due to the Year 2000 issue. This total spending also includes an additional payment of about $13 million (part of GM's overall additional payment to EDS of $75 million) at the end of the first quarter of 2000 if systems remediated by EDS under its master information technology services agreement with GM are capable of continued operation before, on and after January 1, 2000 without causing a significant business disruption that results in a material financial loss to "GM" due to the millennium change. For this purpose, "GM" includes Delphi and all other GM units being supported by EDS as of September 30, 1998, taken in the aggregate, including any such GM unit which may subsequently be divested but that continues to be supported by the remediation services of EDS. The estimated value of the services EDS is required to provide to Delphi under its master information technology services agreement with GM that are included in normal fixed price services and other ongoing payments to EDS that are attributable to work being performed in connection with Delphi's Year 2000 program is about $77 million (part of the estimated $300 million attributable to GM overall). This does not represent incremental spending to Delphi. None of our information technology projects has been delayed due to Year 2000.

In view of the foregoing, we do not currently anticipate that we will experience a significant disruption of our business as a result of the Year 2000 issue. However, there is still uncertainty about the broader scope of the Year 2000 issue as it may affect Delphi and third parties, including our customers, that are critical to our

56

STYLE:01 ast. 15 aOEVONS  Fm  VV 20 BOE:0351.4 C  00
seq  . Free lead   /OMpoints  Next lead   /O  \just
GENERAL MOTORS   BOW NE OF DETROIT   · 313 · 964 · 1330
OET_PS4   NO MARKS   16 · NOV · 1998 08:32  NEXT PCN · 370 00 00 00 · · Page is valid, no graphics
JB: K44950 PN: 069.00.00.00 SN: 45 <

Architecture and the Dynamics & Propulsion product sectors are expected to account for 18.3%, 33.4% and 47.5% of 1999 capital expenditures, respectively.

*Financing Activities.* Net cash provided by financing activities for the first nine months of 1998 totaled $741 million compared to $903 million of cash used in financing activities during the first nine months of 1997. Net cash used in financing activities totaled $1.5 billion in 1997 compared with $1.7 billion and $263 million in 1996 and 1995, respectively. Cash provided by or used in financing activities primarily related to the transfer or assumption of assets and liabilities to our company from GM under the terms of the Separation Agreement. The period to period change reflects differences in separation adjustments for various assets and liabilities, principally pensions and other postretirement benefits.

### Our Other Postretirement Employee Benefits and Underfunded Pension Obligations

In connection with our separation from General Motors, we have agreed to assume certain obligations relating to pensions and other postretirement employee benefits for our employees as well as certain employees associated with prior divestitures. In connection with the separation, we will receive from GM certain assets and liabilities related to GM salaried pension plans. In connection with the Distribution, we will receive from GM certain assets and liabilities related to GM hourly pension plans. Under current economic conditions and federal government regulations, our pension obligations (based on their assets, the expected investment return on those assets and the plans' expected liabilities) would be considered to be "underfunded." The amount of underfunding can vary from time to time, depending on factors such as discount rates, asset returns, contributions and other factors. As of September 30, 1998, Delphi's salaried and hourly other postretirement employee benefit obligation was about $4.5 billion and the underfunded pension obligation was about $1.9 billion.

Because of the underfunded nature of our pension plans, federal regulations will require us to make contributions over time to meet minimum funding requirements. Delphi is responsible for assuming the underfunded hourly pension liability associated with Delphi hourly employees or paying GM for underfunding relating to such employees.

We cannot accurately predict the amount or timing of contributions that will be required in the future or the related impact on our financial results and financial condition. These amounts may be affected by general economic conditions (including anticipated interest rates), the actual investment return on plan assets, the retirement rate of our employees, the attrition rate of our employees and other factors. In addition, we have agreed with General Motors that the obligations associated with certain employees who leave Delphi and join GM will be shared. The movement of employees from Delphi to GM, and changes in their status once they are at GM, may also have a material adverse effect on the funding status of the plans or payment obligations related to such employees.

### Inflation

Inflation generally affects Delphi by increasing the cost of labor, equipment and raw materials. We believe that, because rates of inflation in countries where we have significant operations have been moderate during the periods presented, inflation has not had a significant impact on our results of operations.

### Year 2000

Many computerized systems and microprocessors that are embedded in a variety of products either made or used by Delphi have the potential for operational problems if they lack the ability to handle the transition to the Year 2000. This issue has the potential to cause disruption to the business of Delphi and the companies that it supplies. In our capacity as principal supplier to and wholly owned subsidiary of GM, we are part of GM's comprehensive worldwide Year 2000 program. As part of that program, Delphi is identifying and remediating potential Year 2000 problems in its business information systems and other systems embedded in its engineering and manufacturing operations. Delphi, in conjunction with GM's supplier assessment and

67

STYLE: 3 BST #5  #DE0000%.5m % 22: 5 0E3%005/1 C :30
Seq : Free ead  600Mpoint, Next lead  5D. 3 just 11 1
GENERAL MOTORS    BOWNE OF DETROIT   -313- 964-1330
DET_PS4    NO MARKS    16-NOV-1998 08:32  NEXT PCN  071 00 00 00 -- Page it valid, no graphics
JB: K44950  PN: 070.00.00.00  SN: 39 <3

remediation program, has also initiated communications and site assessments with its suppliers and other third parties in order to assess and reduce the risk that Delphi's operations could be adversely affected by the failure of these third parties to address adequately the Year 2000 issue.

One of our first priorities was the analysis of microprocessors used in our automotive components, integrated systems and modules supplied to vehicle manufacturers. Most of the processors reviewed have no date-related functionality, and accordingly have no specific Year 2000 issues. Of the vehicle processors that perform date-related functions, none had any Year 2000 issues. However, one indicator light manufactured by us and provided for three GM vehicle models (1988 and 1989 only) prematurely indicates the need for an oil change at the end of every decade. In addition, one trip computer module supplied by us to another vehicle manufacturer does not recognize 2000 as a leap year but can be reset without affecting performance. Neither of these issues affects vehicle operation or occupant safety or is expected to result in material cost to Delphi.

Our Year 2000 program teams are responsible for remediating all of our information technology and embedded systems. Information technology principally consists of business information systems (such as mainframe and other shared computers and associated business application software) and infrastructure (such as personal computers, operating systems, networks and devices like switches and routers). Embedded systems include microprocessors used in factory automation and in systems such as elevators, security and facility management. Delphi's Year 2000 program includes assessment and remediation services provided by Electronic Data Systems Corporation ("EDS"), which is a principal supplier of information technology services to Delphi.

The Year 2000 program is being implemented in seven phases (some of which are being conducted concurrently):

- *Inventory*. This phase involves the identification and validation of an inventory of all systems that could be affected by the Year 2000 issue. The inventory phase commenced in earnest in 1997 and is substantially complete. As a result, we have identified approximately 1,600 business information systems and about 300,000 infrastructure items and embedded systems.

- *Assessment*. This phase involves the initial testing, code scanning and supplier contacts to determine whether remediation is needed and to develop a remediation plan, if applicable. The assessment of business information systems is substantially complete and included a determination that about one quarter of such systems should be regarded as "critical" based on criteria such as the potential for business disruption. The assessment of infrastructure items and embedded systems is still underway but is expected to be substantially complete by the end of 1998.

- *Remediation*. This phase involves the design and execution of a remediation plan, followed by testing for adherence to the design. We are generally targeting the end of 1998 for remediation of our critical systems and will continue to address remediation of these and other systems on a prioritized basis thereafter (unimportant systems have been and will continue to be removed from our Year 2000 inventory and will not be remediated). We believe that we are substantially on track to meet our remediation targets. Based on our on-going plan to incrementally implement new enterprise software, we will replace rather than remediate certain existing information systems. In this regard, a number of implementations are scheduled to be completed in Europe in the first quarter of 1999. In the United States, implementation of the enterprise software at one of our principal product groups is expected to be completed in July 1999.

- *System Test*. This phase involves the testing of remediated items to ensure that they function normally after being replaced in their original operating environment. This phase is closely related to the remediation phase and follows essentially the same schedule.

- *Implementation*. This phase involves the return of items to normal operation after satisfactory performance in system testing. This phase follows essentially the same schedule as remediation and system testing.

68

1999 will generally remain in effect, including the pricing, duration and purchase order terms and conditions. This includes existing contracts under which we have not yet begun to supply products. However, the timing of payments from GM to us under the existing contracts will change. For a description of these payment terms and the effect on our liquidity, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources—Extension of Payment Terms."

Under the Supply Agreement, we have the right to provide on competitive terms the first replacement cycle of all product programs in the United States and Canada which we were providing to GM as of January 1, 1999, *provided* that GM sources such replacement programs prior to January 1, 2002 and we are competitive in terms of design, quality, price, service and technology as these factors relate to all aspects of bid packages that may be submitted by other suppliers. Other suppliers' bids to provide particular products may include offers of price reductions to GM on other current or future products, and GM may under the Supply Agreement consider the overall economic effect of such package proposals in assessing our competitiveness. Given the general duration of most vehicle programs of about five to eight years, depending on the vehicle model, we expect that this ability to secure next generation business from GM-North America, together with our existing contracts and other commitments, will provide us with the opportunity to maintain substantial business with GM-North America well into the next decade. We will also have the opportunity to bid on the same basis as other suppliers for other new GM-North America business as well as for GM-International business. Our ability to realize revenues on all GM business, including business awarded pursuant to existing contracts, is in all cases subject to a variety of factors, including the volume and option mix of vehicles actually produced by GM, the timing of such production and our continuing competitiveness. For more information about the uncertainties and risks related to the Supply Agreement and to realizing awarded business, see "—Industry—Awarded Business."

The Supply Agreement specifies that GM has the right to move its existing business with us to other suppliers in the event that we are not competitive in terms of quality, service, design or technology. In addition, GM has the right at all times to adopt new technology, whether or not such technology is available through us. If we are unable to provide the new technology or an equivalent technology acceptable to GM on a competitive basis, GM is free to move the business from us to another supplier. For more information regarding the terms of the Supply Agreement, see "Arrangements Between Delphi and General Motors—Supply Agreement."

*Other VMs.* Although General Motors is by far our largest customer, we do business with all of the other major VMs worldwide. These relationships have enabled us to develop an understanding of global customer needs and business opportunities. Based on 1997 worldwide market shares, the next five largest VMs after GM are Ford Motor Company, Toyota Motor Corp., Volkswagen AG, DaimlerChrysler AG and Fiat S.p.A., who collectively had an aggregate market share of about 43% of all light vehicles produced throughout the world in 1997 according to Standard & Poor's DRI 1998 World Car Industry Forecast Report. We currently do business with each of these VMs as well as all other major VMs. Our top five VM customers other than GM accounted for about 5.8% of our total 1997 revenues, and our top ten VM customers other than GM accounted for about 8.5% of our total 1997 revenues. In determining these percentages, we have not included sales of entities in which we have a minority interest.

Substantially all of our existing contracts with these non-GM customers, which we entered into while we were a business sector of GM, require the consent of the customer in order to assign or transfer the contract. We have had discussions with all of our major non-GM customers regarding our separation from GM and our intent to continue to perform under these existing contracts. Given the extremely large number of existing contracts with our non-GM customers and the positive feedback received during discussions with our major non-GM customers, we do not currently intend either to seek consents from or to enter into new contracts with these customers in connection with our separation from GM. Based on these discussions, we do not believe that our separation from GM will adversely affect our business with these customers. However, we cannot assure you in this regard.

us and GM relating to the substance of such agreements. The Separation Agreement and certain of the Ancillary Agreements specify certain procedures with respect to claims thereunder subject to indemnification and related matters.

   ***Claims and Litigation.*** The Separation Agreement provides for the allocation of the liability between us and GM for certain claims and litigation relating to or arising out of the Delphi Automotive Systems Business.

• ***Product Liability.*** GM has retained responsibility for all product liability actions relating to products we manufactured prior to January 1, 1999 and sold or otherwise supplied to GM either before or after that date. Responsibility for product liability actions relating to products we manufacture on or after January 1, 1999 and sell to GM shall be determined in accordance with the agreements for such sales. We will be responsible for liability relating to all products we sold at any time or sell in the future to customers other than GM. In connection therewith, we will indemnify GM against, and reimburse GM for costs associated with, the claims for which we are liable, and GM will indemnify us against, and reimburse us for costs associated with, the claims for which GM has retained liability.

• ***General Litigation.*** With respect to general litigation claims, we have assumed the liability for all new claims related to the Delphi Automotive Systems Business and for certain specified claims. GM has agreed to defend certain other specified claims at our expense and GM has retained the liability for certain other specified claims. In connection therewith, we will indemnify GM against, and reimburse GM for costs associated with, the claims for which we are liable, and GM will indemnify us against, and reimburse us for costs associated with, the claims for which GM has retained liability.

• ***Employment-Related Claims.*** We have assumed the liability for certain specified employment-related claims and we will indemnify GM against any such claims and reimburse GM for any legal or other expenses reasonably incurred by GM in connection with such claims. Certain other employment related claims will be jointly defended by us and GM. We have financial responsibility for employment related claims regarding all Delphi Employees and Delphi Terminated Employees whether incurred before or after the Contribution Date. We will mutually determine with GM how new claims shall be treated. However, U.S. claims for pension and welfare benefits from salaried employees who retire on or before the Contribution Date and hourly employees who retire on or before October 1, 1999 will remain the responsibility of GM.

We have agreed with GM to cooperate with each other in the defense of any and all claims covered by these provisions of the Separation Agreement.

   ***Insurance.*** The Separation Agreement provides that during the period beginning on the Contribution Date and ending on the earlier of the date of the completion of the Distribution or the first anniversary of the Contribution Date (the "Insurance Transition Period"), GM shall, subject to certain conditions and exceptions, maintain policies of insurance, including for the benefit of Delphi or any of its affiliates, directors officers or other covered parties, which are comparable to those generally maintained by GM. The Separation Agreement sets forth procedures we must follow for asserting claims, reimbursing GM for premium expenses and other insurance related matters during the Insurance Transition Period. Following the expiration of the Insurance Transition Period, except as provided in the Separation Agreement, we will be responsible fo obtaining and maintaining our own insurance programs.

   ***Dispute Resolution.*** The Separation Agreement contains provisions that govern, except as provided in any Ancillary Agreement, the resolution of disputes, controversies or claims that may arise between us and GM. The Separation Agreement provides that the parties will use all commercially reasonable efforts to settle all disputes arising in connection with the Separation Agreement without resorting to mediation, arbitration o otherwise. If these efforts are not successful, any party may submit the dispute for non-binding mediation by delivering notice to the other party of the dispute and expressly requesting mediation of the dispute. If, afte mediation, the parties disagree regarding the mediator's recommendation, the dispute will be submitted to binding arbitration in accordance with the terms of the Separation Agreement. The Separation Agreemen contains procedures for the selection of a three-arbitrator panel to act by majority vote and the conduct of the

part of the Distribution and all terms of the Distribution, including the form, structure and terms of any transaction(s) and/or offering(s) to effect the Distribution and the timing of and conditions to the consummation of the Distribution. In the event that GM determines that it no longer intends to proceed with or complete the Distribution, GM must provide us notice to such effect. Upon such notification, GM's rights and our obligations under the Registration Rights Agreement described below become immediately effective.

*Preservation of the Tax-Free Status of the Distribution.* General Motors intends for the Distribution to qualify as a tax-free distribution under Section 355 of the Code to GM and its stockholders. On January 13, 1999, GM received from the IRS a private letter ruling (the "IRS Ruling") to such effect. In connection with GM's request for the IRS Ruling, we made certain representations and warranties to GM regarding our company and our business. We have also agreed to certain covenants in the IPO and Distribution Agreement intended to preserve the tax-free status of the Distribution. We may take any action otherwise prohibited by these covenants only if GM has determined, in its sole and absolute discretion, that such action would not jeopardize the tax-free status of the Distribution. See "—Cooperation on Tax Matters." Certain of these covenants are described in greater detail below:

*Stock Issuance.* Prior to the completion of the Distribution, we have agreed not to issue or agree to issue shares of our capital stock in an amount that would result in GM owning less than 80% of either (1) the total combined voting power of all outstanding shares of our voting stock and/or (2) any other class and/or series of Delphi capital stock. This covenant will not prohibit us from issuing stock options and restricted stock awards to our employees so long as we repurchase sufficient shares of our capital stock prior to the date when such options and awards become exercisable to ensure that GM's ownership remains at or higher than 80% and GM approves of our procedures to comply with this covenant.

• *Certain Acquisition Transactions.* Until two years after the completion of the Distribution (or, if GM determines not to complete the Distribution, the last date on which GM distributed any Delphi common stock in connection with the Distribution), we have agreed not to enter into or permit any transaction or series of transactions which would result in a person or persons acquiring or having the right to acquire shares of our capital stock that would comprise 50% or more of (1) the value of all outstanding shares of our capital stock or (2) the total combined voting power of our outstanding voting stock.

• *Continuation of Active Trade or Business.* Until two years after the completion of the Distribution (or, if GM determines not to complete the Distribution, the last date on which GM distributed any Delphi common stock in connection with the Distribution), we have agreed to continue to conduct the active trade or business (within the meaning of Section 355 of the Code) of our company as we conduct it immediately prior to the completion of the Distribution. During such time, we have agreed not to (1) liquidate, dispose of or otherwise discontinue the conduct of any portion of our active trade or business with a value in excess of $2.0 billion or (2) dispose of any business or assets that would cause our company to be operated in a manner inconsistent in any material respect with the business purposes for the Distribution as described to the IRS or tax counsel in connection with GM's request for the IRS Ruling. Also, until two years after the completion of the Distribution, we have agreed not to liquidate, dispose of, or otherwise discontinue the conduct of any portion of the active trade or business of our company if such liquidation, disposition or discontinuance would breach the covenant described below regarding our continuity of business.

• *Continuity of Business.* Until two years after the completion of the Distribution (or, if GM determines not to complete the Distribution, the last date on which GM distributed any Delphi common stock in connection with the Distribution), we have agreed that (1) we will not voluntarily dissolve or liquidate, and (2) except in the ordinary course of business, neither we nor any of our direct or indirect subsidiaries will sell, transfer, or otherwise dispose of or agree to dispose of assets (including any shares of capital stock of our subsidiaries) that, in the aggregate, constitute more than (x) 60% of our gross assets or (y) 60% of the consolidated gross assets of us and our subsidiaries. For this purpose, we are

115

The information contained in this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and we are not soliciting offers to buy these securities in any state where the offer or sale is not permitted.

*PROSPECTUS (Subject to Completion)*
*Issued January 20, 1999*

## 100,000,000 Shares



# Delphi Automotive Systems Corporation

### COMMON STOCK

*Delphi Automotive Systems Corporation is offering 100,000,000 shares of its common stock. This is our initial public offering and no public market exists for our shares. We estimate that the initial public offering price will be between $15 and $18 per share.*

*Our common stock has been approved for listing on the New York Stock Exchange under the trading symbol "DPH," subject to notice of issuance.*

**Investing in our common stock involves risks.**
**See "Risk Factors" beginning on page 13.**

**PRICE $        A SHARE**

|  | Price to Public | Underwriting Discounts and Commissions | Proceeds to Delphi |
|---|---|---|---|
| Per Share ... ............. | $ | $ | $ |
| Total ...................... | $ | $ | $ |

*The Securities and Exchange Commission and state securities regulators have not approved or disapproved these securities, or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.*

*Delphi has granted the U.S. underwriters an option to purchase an additional 15,000,000 shares to cover over-allotments. Morgan Stanley & Co. Incorporated expects to deliver the shares to purchasers on        , 1999.*

### MORGAN STANLEY DEAN WITTER

GOLDMAN, SACHS & CO.                    MERRILL LYNCH & CO.
DONALDSON, LUFKIN & JENRETTE            SCHRODER & CO. INC.

, 1999