Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 05-44481-rdd

5   - - - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   DPH HOLDINGS CORP., ET AL.,

9

10                  Debtors.

11

12  - - - - - - - - - - - - - - - - - - - - - - -x

13

14                  United States Bankruptcy Court

15                  300 Quarropas Street

16                  White Plains, New York

17

18                  February 16, 2012

19                  10:13 AM

20

21  B E F O R E:

22  HON. ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25

Page 2

1

2    Notice of Agenda Proposed Seventy-Fourth Omnibus Hearing Agenda

3

4    Notice of Agenda Proposed Fifty-Second Claims Hearing Agenda

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Avigayil Roth

Page 3

```
 1

 2    A P P E A R A N C E S :

 3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

 4          Attorneys for Debtors

 5          155 North Wacker Drive

 6          Chicago, IL 60606

 7

 8    BY:   LOUIS S. CHIAPPETTA, ESQ.

 9          RON E. MEISLER, ESQ.

10          ALBERT L. HOGAN, ESQ. (TELEPHONICALLY)

11

12

13    BUTZEL LONG

14          Attorneys for Debtors

15          Suite 100

16          150 West Jefferson

17          Detroit, MI 48226

18

19    BY:   CYNTHIA J. HAFFEY, ESQ.

20

21

22

23

24

25
```

1   MORRISON COHEN LLP

2        Attorneys for Bondholders

3        909 Third Avenue

4        New York, NY 10022

5

6   BY:   ANDREA FISCHER, ESQ.

7

8

9   EMMET, MARVIN & MARTIN, LLP

10        Attorneys for Bank of New York Mellon

11        120 Broadway

12        32nd Floor

13        New York, NY 10271

14

15   BY:   EDWARD P. ZUJKOWSKI, ESQ.

16

17

18   LAW OFFICES OF RICHARD A. MEIER

19        Attorneys for Ratko Menjak

20        30300 Northwestern Highway

21        Suite 320

22        Farmington Hills, MI 48334

23

24   BY:   RICHARD A. MEIER, ESQ. (TELEPHONICALLY)

25

1                    P R O C E E D I N G S

2              THE COURT:  Please be seated.

3              MR. CHIAPPETTA:  Good morning, Your Honor.

4              THE COURT:  Okay.  Good morning.

5              MR. CHIAPPETTA:  Louis Chiappetta of Skadden, Arps,

6    Slate, Meagher & Flom on behalf of the reorganized debtors.

7              THE COURT:  Right.

8              MR. CHIAPPETTA:  Here with my colleague Ron Meisler

9    and on the phone is Al Hogan.  Also with me is Cynthia Haffey

10   of Butzel Long on behalf of the reorganized debtors.

11             MS. HAFFEY:  Good morning, Your Honor.

12             THE COURT:  Good morning.

13             MR. CHIAPPETTA:  Your Honor, there's no contested

14   matters on the fifty-second claims hearing agenda, and there's

15   two contested matters on today's seventy-fourth omnibus

16   hearing.

17             THE COURT:  Right.

18             MR. CHIAPPETTA:  We filed the proposed agendas

19   yesterday at docket number 21831 for the omnibus hearing and

20   docket number 21832 for the claims hearing.  With your

21   permission, I'd like to proceed in accordance with the agendas.

22             THE COURT:  Okay.  That's fine.

23             MR. CHIAPPETTA:  For the fifty-second claims hearing

24   agenda, the first matter listed is the Ohio Bureau of Workers'

25   Compensation.  This matter has been adjourned by stipulation,

1    and we're really close to resolving this consensually.

2              THE COURT:  Okay.

3              MR. CHIAPPETTA:  The U.S. Department of Health and

4    Human Services was resolved by stipulation entered by Your

5    Honor at docket 21806.  And the U.S. Customs Border Patrol

6    matter was resolved by stipulation entered by Your Honor at

7    21805.

8              So that takes us to the seventy-fourth omnibus

9    hearing.  And there is one adjourned matter and three contested

10   matters -- or three uncontested matters.  The first adjourned

11   matter is the reorganized debtors' motion to enforce plan

12   injunction against Oldco trustee.  My understanding is that

13   this is close to resolution and has been adjourned pursuant to

14   an agreement of the parties.

15             The second matter, the motion by Swynson Limited was

16   resolved pursuant to the notice of withdrawal filed by Swynson

17   at docket 21781.

18             The reorganized debtors' motion for sanction against

19   the Averbukhs, which is the third matter, has been resolved

20   pursuant to withdrawal filed by the reorganized debtors at

21   21819.

22             The fourth and final uncontested matter is the amended

23   motion of James Grai.  Just a quick update for Your Honor.  The

24   reorganized debtors have submitted proposed stipulations to

25   both the ACE companies and Michael Doud, who is Mr. Grai's

DELPHI HOLDINGS CORP., ET AL.

Page 7

```
 1    attorney.

 2             THE COURT:  This is one where everyone -- you were

 3    supposed to everyone that clearly wasn't covered by the

 4    injunction?

 5             MR. CHIAPPETTA:  Exactly.  Exactly.  And so right now

 6    we're currently reconciling those lists.  Mr. Doud, Mr. Grai's

 7    attorney, is going to provide us with information.  And again,

 8    there's five parties to the stipulation, and there are over 200

 9    names we're trying to reconcile among the five different

10    parties.

11             THE COURT:  Right.

12             MR. CHIAPPETTA:  So I just wanted to let you know we

13    are making progress on that.

14             THE COURT:  And Mr. Grai is happy to be included in

15    the 200 as opposed to just having his own stipulation?

16             MR. CHIAPPETTA:  It sounds like it.

17             THE COURT:  Okay.

18             MR. CHIAPPETTA:  At least, according to -- Mr. Doud is

19    representing the entire group.

20             THE COURT:  More than just that one person.

21             MR. CHIAPPETTA:  More than just that one person.

22             THE COURT:  Right.

23             MR. CHIAPPETTA:  I believe his amended motion included

24    a joinder.

25             THE COURT:  It did include others, yeah.
```

Page 8

```
 1              MR. CHIAPPETTA:  So, Your Honor, just to jump out of

 2    order.  This might be tied to the Michigan adversary

 3    proceeding, which is adjourned pursuant to a stipulation that

 4    was submitted by Your Honor.  It's matter 7 on the agenda.

 5              THE COURT:  Right.

 6              MR. CHIAPPETTA:  But if you have questions regarding

 7    that, Al Hogan is on the line if you have any further

 8    questions.

 9              THE COURT:  No.  I mean, I think I so ordered the

10    stipulation the other day.  It just sets a briefing schedule

11    and a date for the hearing on Michigan's motion.

12              MR. CHIAPPETTA:  Correct.

13              So, Your Honor, that concludes the adjourned and

14    uncontested matters.  And the first contested matter we have

15    listed is the motion by the Bank of New York Mellon for

16    permission to proceed in the appropriate tribunal against the

17    reorganized debtors, which was filed at docket 21758.  Because

18    this is their motion, unless you would like to proceed with the

19    Menjak motion, which is at matter number 6, I'd turn it over

20    to --

21              THE COURT:  Well, is counsel here for the Menjak

22    motion?

23              MS. HAFFEY:  I believe he is.

24              MR. MEIER:  This is Richard Meier --

25              THE COURT:  On the phone.
```

1          MR. MEIER:  -- appearing on behalf of Mr. Menjak.

2          THE COURT:  Okay.  I think it may make sense to go

3     with that one first; it seemed to me to involve fewer facts.

4     And rather than keep counsel hanging on the phone, why don't we

5     deal with that one first.

6          MR. CHIAPPETTA:  Very well.

7          THE COURT:  So, Mr. Meier, I've read the motion and

8     the debtors' response and the exhibits.  But feel free to tell

9     me anything else.

10          MR. MEIER:  The issue that I believe is -- has to be

11     decided by the Court is whether or not we should be allowed to

12     proceed on willful misconduct discrimination case under the

13     American's Age Discrimination Employment Act.  So the way I

14     would do this is if we proceed in court anybody decides --

15     whether it be a jury or the judge or anyone besides -- this is

16     not a willful act, it would be covered under the bankruptcy and

17     looks to me like it wouldn't proceed.

18          If it is found to be a willful act, then I think it

19     falls outside the agreement that was made in the bankruptcy

20     court, and really should be allowed.  So I think that -- we

21     filed a willful act.  I showed the Court the copy of the

22     complaint.  We've only alleged the willful act in this

23     particular case, and based on that we're asking that the Court

24     allow us to proceed under the willful misconduct under the

25     American's Age Employment Discrimination Act.

```
 1            THE COURT:  Okay.

 2            MR. MEIER:  And that's what we're before the Court to

 3   do --

 4            THE COURT:  And --

 5            MR. MEIER:  -- allow us, but just litigate that issue.

 6            THE COURT:  Right.  But you're relying on paragraph 20

 7   of the plan modification order, right?

 8            MR. MEIER:  It looks to me like it was article --

 9   yeah.  It was section 20, and it was article 11.2.

10            THE COURT:  Right.  Well, at paragraph 20 of the plan

11   modification order and the proviso in it, right?  The "provided

12   however"?

13            MR. MEIER:  Right.

14            THE COURT:  "Notwithstanding anything in this order,

15   the exculpation provisions or releases provided pursuant to

16   article 11 of the modified plan shall have no affect", et

17   cetera?

18            MR. MEIER:  Right.

19            THE COURT:  "In respect of the liability of any entity

20   that otherwise would result from any action or omission, to the

21   extent that such action or omission is determined in the final

22   order to have constituted intentional fraud or willful

23   misconduct"?

24            MR. MEIER:  Right.  That's it.

25            THE COURT:  Okay.  I think there are two problems with
```

1   this argument, and I'd like you to address them if you can.

2   The first and most important one is that the proviso that I

3   just quoted pertains only to the exculpation provisions or

4   releases under article 11, which are not the provisions that

5   the debtors are relying upon.  They are relying upon the

6   fact -- well, two facts.  First, they contend that the debt was

7   discharged.  And secondly, that it was barred by the second

8   administrative claims bar date order.

9            And I certainly agree with them on the second point.

10  On the first point it's a little, I think, more complicated in

11  that the plan itself refers to a discharge of all of pre-

12  effective date claims.  Although it does so only to the fullest

13  extent permitted by Section 1141, and 1141 refers to pre-

14  confirmation date claims.  And if I'm understanding the facts

15  correctly, Mr. Ratjak's (sic) claim -- I'm sorry, I'm using his

16  first name -- your client's claim, Mr. Menjak's claim, arose

17  after the confirmation date but before the effective date.  So

18  I don't think it would be discharged, but I do believe it's

19  barred by the bar date because it arose on September 1, 2009.

20  They've asserted without dispute that he got notice of the

21  administrative claims bar date, and he didn't file an

22  administrative claim for that discharge.

23           So I think that's the -- I mean, that's my conclusion

24  on this one unless you can persuade me otherwise.

25           MR. MEIER:  Okay.  In this particular case we have

1   what amounts to an age discrimination case.  The plaintiff was

2   going through the AEOC (ph.).  He didn't know until such time

3   as he was able to accumulate the records and what we show here

4   and what he showed at the AEOC was basically that there were I

5   think thirty people that were let go in the mass exodus of

6   employees.  And not until he was able to get agents and

7   comparables was he able to even know whether or not he had a

8   viable claim.

9          THE COURT:  Okay.

10          MR. MEIER:  So, I mean, the claim, it wasn't -- the

11   date he was let go, I don't think -- I think is when he

12   learned -- when he first learned he had a viable claim.

13          THE COURT:  Well --

14          MR. MEIER:  -- after he was able to accumulate the

15   information.

16          THE COURT:  I think that really raises a separate set

17   of issues.  And your motion really doesn't cover that.  Should

18   you or your client have relief from the bar date under the

19   Pioneer case and the Midland Cogeneration v. Enron case in the

20   Second Circuit.  And I'm happy to hear a motion like that and

21   I'll decide it on the merits, but I don't that's really teed up

22   for me today.

23          MR. MEIER:  Okay.

24          THE COURT:  But as far as what the district court in

25   Michigan directed you to do, at least on the facts set forth in

1    this motion I'm not prepared to lift the plan injunction

2    because I don't believe there is cause to do so.  I agree with

3    the district judge that I certainly have jurisdiction to

4    interpret my own order under the Travelers Indemnity case from

5    the Supreme Court, 557 U.S. 137 (2009), as well as the law in

6    the Second Circuit including In re:  Petrie Retail, 304 F.3d

7    223 (2d Cir. 2002).

8         It's clear to me both from the plain language of this

9    order and my knowledge of the order and provisions like this in

10   similar orders that this proviso is a proviso put in to deal

11   with limitations -- or recognize proper limitations on

12   protections for third parties who are either exculpated or

13   released under a plan.  And they don't apply to the debtor,

14   which is getting separately the protection of either a

15   discharge or a bar date order or both.  Because obviously,

16   there are many causes of action that involve willful

17   misconduct, and you never carve those out in a Chapter 11 plan

18   as against the debtor; they're all dealt with in the plan.

19   They don't -- I mean, that's basically a given.

20        And it's clear to me that the meaning of this order is

21   not to have a carve-out or a proviso for potential fraud or

22   willful misconduct claims against the debtor that would

23   otherwise be discharged or that would be barred by a bar date.

24   And here I find, at least on the facts before me, that the

25   claim is in fact barred by the bar date given the notice that

Page 14

1    was given to Mr. Menjak and the date that it appears he had a

2    discrimination claim.  On the other hand, I'm not dealing with

3    a motion under Pioneer and Midland Cogeneration and Bankruptcy

4    Rule 9006 for leave to file a late claim.  And the whole host

5    of factors that I consider when there is such a motion like

6    that and my ruling denying the motion for relief from the plan

7    injunction today is without prejudice to your right to make

8    such a motion.  And of course, without prejudice to the

9    debtors' right to object to it.

10           There are a lot of cases on that type of issue; there

11   are several from this bankruptcy case itself that you may want

12   to look at to decide whether you want to make the motion.  But

13   my ruling is without prejudice to your right to do that.

14           MR. MEIER:  Thank you, Your Honor.

15           THE COURT:  Okay.

16           MR. MEIER:  Thanks.

17           THE COURT:  All right.  So I'm going to ask the

18   reorganized debtors' counsel to prepare and e-mail to chambers

19   an order denying the motion for relief from the plan injunction

20   on the basis that the proviso relied upon in paragraph 20 of

21   the plan modification order is inapplicable to this claim.  And

22   the Court's finding that on the facts before it the claim would

23   be barred by -- because not filed by the date of the second

24   administrative claims bar date.  But the order should state

25   it's without prejudice to Mr. Menjak's right to file a motion

1    for relief to file a late proof of claim under Bankruptcy Rule

2    9006.

3            MS. HAFFEY:  We'll do that, Your Honor.  Thank you.

4            THE COURT:  And you should just e-mail that to Mr.

5    Meier before you e-mail it to chambers.

6            MS. HAFFEY:  We'll do so, Your Honor.

7            THE COURT:  Okay.  Thank you.

8            MR. CHIAPPETTA:  Thank you, Your Honor.  That leaves

9    the final contested matter on today's hearing, which is the

10   motion of Bank of New York Mellon for permission to proceed in

11   the appropriate tribunal against the reorganized debtors.

12           THE COURT:  Right.

13           MR. CHIAPPETTA:  With that, I'll turn it over to

14   opposing counsel.

15           THE COURT:  Okay.

16           MS. FISCHER:  Good morning, Your Honor.  Would you

17   like me to take the podium, or --

18           THE COURT:  Wherever you're comfortable.  Just be

19   reasonably near a microphone.

20           MS. FISCHER:  Okay.  Good morning, Your Honor.  I'm

21   Andrea Fischer of Morrison Cohen LLP on behalf of the

22   bondholders Paul Feinsilver, James Klotz and Terrance O'Grady.

23   With me --

24           MR. ZUJKOWSKI:  Good morning, Your Honor.  Ed

25   Zujkowski of Emmet, Marvin & Martin for the Bank of New York

1    Mellon.

2          THE COURT:  Okay.  And let me just -- it's actually --

3    Bank of New York is a comovant here, right?

4          MR. ZUJKOWSKI:  That's correct, Your Honor.

5          THE COURT:  Okay.  All right.

6          MR. ZUJKOWSKI:  But we feel that the bondholders have

7    standing, and they're certainly entitled to be heard on this

8    matter.

9          THE COURT:  All right.  Well, I'm not sure -- well,

10   the relationships are different, but I'm happy to hear you on

11   behalf of the bondholders, particularly since Bank of New York

12   Mellon is a comovant and is okay with your being heard.  All

13   right.

14         MS. FISCHER:  Thank you, Your Honor.

15         We're here before you today on our motion to allow the

16   bondholders and indenture trustee to litigate against the

17   reorganized debtors in an appropriate tribunal, or in the

18   alternative to allow the bond claim as an administrative claim.

19   I will briefly describe the background of the matter.

20         In 1994, GM entered into a loan with the county of

21   Trumbull, Ohio in order to build a sewage disposal facility at

22   its plant in Warren, Ohio.  Trumbull County agreed to loan GM

23   the proceeds of the sales of bonds issued under an indenture

24   between Trumbull County on the one hand as the issuer, and the

25   indenture trustee at that point, which was Dai-Ichi Kangyo

1    Trust Company of New York.  Trumbull County issued the bonds to

2    finance the construction of the sewage processing facility, and

3    in order to make payments on the bonds assigned the loan with

4    GM to the indenture trustee directing that GM make payments on

5    the loan directly to the indenture trustee.

6         As I said before, the initial indenture trustee was

7    Dai-Ichi Kangyo Trust Company of New York, then succeeded by

8    JPMorgan Chase, and then actually during the pendency of this

9    bankruptcy succeeded by Bank of New York Mellon.  In 1999, GM

10   assigned the loan --

11        THE COURT:  I'm sorry.  Is it -- it's clear that at

12   the commencement of the bankruptcy case and at the time of the

13   bar date Dai-Ichi wasn't in the picture?

14        MS. FISCHER:  Correct, Your Honor.

15        THE COURT:  Okay.

16        MS. FISCHER:  In fact, I think they went out of

17   business at some point in the early --

18        THE COURT:  Okay.

19        MS. FISCHER:  2000.

20        THE COURT:  All right.

21        MS. FISCHER:  Though the indenture and the loan

22   agreement says that notice is to go to Dai-Ichi Kangyo, I think

23   at 1 World Trade Center.

24        THE COURT:  All right.  And I recognize that's

25   there -- there may be some dispute between DPH and Bank of New

```
 1     York on whether -- or when Bank of New York actually became the

 2     trustee for this particular indenture.  But the debtors also

 3     take the position that ultimately that's not relevant, so --

 4            MS. FISCHER:  I'm --

 5            THE COURT:  I'm aware of that issue.

 6            MS. FISCHER:  In 1999, GM assigned the loan to I think

 7     it was DAS at that point, and DAS became the direct obligor on

 8     the bonds.

 9            THE COURT:  Can I -- on that score, did the indenture

10     trustee -- was the indenture trustee part of that agreement?

11            MS. FISCHER:  No, Your Honor.  It was an ag -- well --

12            MR. ZUJKOWSKI:  I'm sorry.  I can answer that, Your

13     Honor.

14            THE COURT:  Okay.

15            MR. ZUJKOWSKI:  Not only was it not part of that

16     agreement, it didn't become aware of that agreement until

17     sometime in 2010.  And I can get into the facts --

18            THE COURT:  All right.

19            MR. ZUJKOWSKI:  -- and circumstances surrounding that,

20     but that's the answer to your question.

21            THE COURT:  So if it is just an agreement between GM

22     and DAS -- I mean, as far as the indenture trustee was

23     concerned, GM was on the hook, right?  On your notes.  On the

24     notes to the sewage district -- or the county.

25            MR. ZUJKOWSKI:  Your Honor, as with all municipal
```

Page 19

1   financing, the municipal entity -- which was the county of

2   Trumbull was the direct obligor --

3          THE COURT:  Right.  But GM was the --

4          MR. ZUJKOWSKI:  They had a loan agreement, and then

5   the payments by GM --

6          THE COURT:  Right.  Would be made directly to the

7   trustee.

8          MR. ZUJKOWSKI:  -- to the county were made directly to

9   the Bank of New York, yes.

10          THE COURT:  Okay.  So I guess, leaving aside all of

11   the issues about whether there is a barred or discharged claim

12   against DAS and the reorganized debtor, if GM and the

13   reorganized debtor agree that the assignment is null and void

14   and DAS doesn't owe GM anything under that assignment, what --

15   how does the trust have a claim against DAS?

16          MS. FISCHER:  Well, there's a couple of issues here,

17   Your Honor.  In, actually, the objection to the motion the

18   reorganized debtors stated in paragraph 67 of their objection

19   "as the assignee of the 1994 loan agreement, DAS LLC took on

20   GM's payment obligations under the 1994 loan agreement".

21          THE COURT:  All right.

22          MS. FISCHER:  These obligations run solely to the

23   indenture trustee, not the bondholders.  Because this was in a

24   paragraph --

25          THE COURT:  All right.

1          MS. FISCHER:  -- discussing whether they had direct

2     obligations to the bondholders.

3          THE COURT:  But it took it on as an obligation to GM.

4     So if GM then released them of that obligation, why would it

5     have any obligation to the trust?

6          MS. FISCHER:  Well, they took it over and became the

7     direct obligor.  And I would argue that the indenture trustee

8     was a direct beneficiary of that agreement.  But moreover, when

9     the amended MRA was executed in 2008 they assumed -- the

10    reorganized -- I think they were the debtors at that point --

11    assumed the 1999 assignment agreement.  Payments were being

12    made throughout this process because they were continuing the

13    use the facility in Warren, Ohio.

14          And I think that the understanding among GM and

15    Delphi -- though obviously I can't speak to them -- is this is

16    more in the nature in a typical muni bond of a lease on the

17    facility.  So they were using the facility, so they were making

18    payments on the facility.  When payments stopped being made --

19    and the indenture trustee can speak to this -- they reached out

20    to GM, who said we signed an MRA, this is Delphi's obligation.

21    And it's not scheduled on GM's schedules, and it's not

22    scheduled --

23          THE COURT:  But Delphi contends with some force that

24    in a subsequent agreement GM then released them.

25          MS. FISCHER:  And, Your Honor, I agree that the

1    obligations as between GM and Delphi can be disposed of in the

2    MDA.  Their obligations where they became the direct obligor on

3    these bonds is not obviated by an agreement between Delphi and

4    GM.

5              THE COURT:  But when you say that they became the

6    direct obligor on these bonds, I don't understand that.  I

7    mean, they didn't agree with the indenture trustee or with the

8    underlying county to be the obligor; they agreed with GM.

9              MS. FISCHER:  The --

10             THE COURT:  And there was a no third party beneficiary

11   provision.

12             MS. FISCHER:  In the MRA.

13             THE COURT:  Right.

14             MS. FISCHER:  I agree.  There's an explicit provision

15   in the MRA that has nothing to do with whether they -- whether

16   GM, excuse me -- whether the indenture trustee is a direct

17   beneficiary of the 1999 assignment agreement which was assumed.

18   And the 1999 assignment agreement assumes the 1994 loan

19   agreement, which directly puts GM on the hook to the indenture

20   trustee.

21             THE COURT:  Well, I understand.  But while DAS was

22   bound by that assignment agreement, I understand, I guess --

23   although, as a technical matter I think the duty runs to GM and

24   not the trust.  But I understand that the trust could sue --

25   ultimately would be able to sue, I think, on that assignment

Page 22

1    agreement.  But that's because they agreed with GM.  And if GM

2    subsequently says we release you from that agreement, there's

3    no privity between DAS and the trust or the county.  So what

4    would be the basis for the lawsuit?

5            MS. FISCHER:  I think, Your Honor, it's -- again, it's

6    two grounds --

7            THE COURT:  Do you have any cases to support that?

8            MS. FISCHER:  Well, I don't think that -- I don't

9    think that we're a third-party beneficiary of the MRA.  I think

10   we're a direct beneficiary of the 1999 assignment agreement,

11   which is what was assumed --

12           THE COURT:  But the assignment agreement itself

13   permits it to be terminated.

14           MS. FISCHER:  But once it's assumed, the obligations

15   run directly to the indenture trustee, not just to -- I don't

16   think that GM and Delphi between them can decide to eviscerate

17   obligations to a third party.

18           THE COURT:  When you say assumed, assumed when?

19           MS. FISCHER:  It was assumed pursuant to the MRA --

20           THE COURT:  During the bankruptcy case.

21           MS. FISCHER:  Yeah.  Yeah.  And --

22           THE COURT:  With the no third-party beneficiary

23   language in it.  So it expressly --

24           MS. FISCHER:  I agree.  I'm not trying to enforce the

25   MRA.  The MRA to me was the vehicle per which -- pursuant to

Page 23

1    which they assumed the assignment agreement.

2           THE COURT:  But the agreement that they were -- let's

3    assume for the moment that they -- that it was assumed.

4           MS. FISCHER:  Um-hum.

5           THE COURT:  The agreement that was assumed has a

6    provision that let's the parties terminate it, which they

7    subsequently did.  So it was assumed cum onere, and it was --

8           MS. FISCHER:  The agreement which was assumed, I do

9    not think has a provision that says they can walk away from it.

10   The MRA does, but the -- let me look at the 1999 assignment

11   agreement.

12          THE COURT:  Well, that's what I said.  That the

13   agreement that let -- that pursuant to which they assumed the

14   agreement had that provision in it.

15          MS. FISCHER:  Your Honor, I understand.  I understand

16   that the MRA is the device -- the vehicle through which they

17   assume the agreement.

18          THE COURT:  Right.

19          MS. FISCHER:  And through the MDA the parties then

20   walked away from obligations with the -- the extent of some

21   obligations that are not relevant here.

22          THE COURT:  Well, and this one too.

23          MS. FISCHER:  Between --

24          THE COURT:  They walked away from this one.

25          MS. FISCHER:  Well, that's interesting, because

Page 24

1  there -- the MDA specifically lists all the contracts that they

2  walked away from; this is not listed.  They're relying on a

3  general catch-all provision --

4         THE COURT:  But it says "the MRA shall be terminated

5  in its entirety and the parties shall have no further

6  obligations thereunder".

7         MS. FISCHER:  I understand that, but that doesn't

8  alleviate them of another obligation that they picked up

9  through the vehicle of the MRA.

10        MR. ZUJKOWSKI:  Your Honor, if I may add something.

11        THE COURT:  Well, if you crash the vehicle how would

12  you have any more pickup?  It's gone.

13        MS. FISCHER:  I don't think you --

14        THE COURT:  It's vaporized.

15        MR. ZUJKOWSKI:  Your Honor, I think the point is that

16  you have, really three agreements here.  And I would agree with

17  you:  if the obligation was assumed pursuant to the MRA, then

18  that obligation could have been terminated by the master

19  distribution agreement.

20        THE COURT:  Right.

21        MR. ZUJKOWSKI:  But the actual obligation was assumed

22  under the assignment agreement, which was a 1994 agreement.

23  And that agreement had no provision for termination.

24        THE COURT:  Well, no.  I think your colleague here is

25  saying no, the assumption was the bankruptcy assumption.

DPH HOLDINGS CORP., ET AL.

Page 25

1          MR. ZUJKOWSKI:  Well, let me just follow through on

2     the argument.

3          THE COURT:  Okay.

4          MR. ZUJKOWSKI:  You have a 1994 agreement, which

5     specifically states that Delphi is going to step into the shoes

6     of GM and perform all the obligations of GM under the existing

7     loan agreement.  That agreement was then assumed by the master

8     restructuring agreement, which basically just confirmed an

9     obliga -- it didn't create a new obligation, it just confirmed

10    an existing pre-petition obligation.

11         THE COURT:  Well, which ran to GM.  It was a contract

12    with GM.

13         MR. ZUJKOWSKI:  With GM.

14         THE COURT:  Right.

15         MR. ZUJKOWSKI:  And then that agreement provided that

16    it could be terminated --

17         THE COURT:  Right.

18         MR. ZUJKOWSKI:  -- which in fact, it was terminated by

19    the master disposition agreement.  But all that did was put the

20    parties back where they were  pre-petition, where you had the

21    1994 whereby Delphi assumed the obligations of GM.

22         THE COURT:  Well, all right.  Is GM -- and has GM

23    asserted a claim in this case under that agreement?  No, right?

24    They haven't.

25         MS. FISCHER:  No.  And --

Page 26

```
 1              THE COURT:  They released their claim.  It's dealt

 2    with in the plan.  So again, I guess I have -- my question is

 3    why are you guys here?  I mean, you still have your claim

 4    against GM --

 5              MR. ZUJKOWSKI:  Well, no.  Again, Your Honor, when the

 6    GM case was filed we checked the claims register.

 7              THE COURT:  Right.

 8              MR. ZUJKOWSKI:  There was no indication of this

 9    obligation on the GM claims --

10              THE COURT:  Well, that was --

11              MR. ZUJKOWSKI:  -- register.  And --

12              THE COURT:  The bonds and the agreements were with GM.

13    So if you didn't see it on GM's register does that relieve you

14    from filing a proof of claim against GM?  It doesn't, right?

15              MR. ZUJKOWSKI:  Well, I guess -- and again, we did not

16    represent --

17              THE COURT:  They didn't -- did they --

18              MR. ZUJKOWSKI:  -- the Bank of New York at that --

19              THE COURT:  No, I'm not talking about you, but I'm

20    saying your clients.  Did they file a claim against GM?

21              MR. ZUJKOWSKI:  They did not because the bonds were

22    being paid during the course of the proceeding, and they were

23    told by GM --

24              THE COURT:  Well --

25              MR. ZUJKOWSKI:  -- that this was a Delphi obligation.
```

```
 1              THE COURT:  Um-hum.

 2              MR. ZUJKOWSKI:  And that's why we're -- you know, this

 3       is a very unusual case for us.

 4              THE COURT:  All right.  I mean, my colleague -- I'm

 5       sorry, my predecessor and colleague -- my predecessor and peer,

 6       Judge Hardin has ruled in three decisions in the Texaco case

 7       that the fact that executory contracts were being paid during a

 8       bankruptcy case doesn't relieve anyone of filing a proof of

 9       claim in respect of a bar date where they got notice of the bar

10       date.  So the fact that GM told you or that it was being

11       paid -- I mean, there was a contract.  How could the -- I mean,

12       the contract was with GM.

13              MS. FISCHER:  Your Honor, as to the -- I just wanted

14       to go to your point as to the executory contract being paid and

15       therefore not alleviated from --

16              THE COURT:  Well, I'm not sure it's executory, but --

17       I mean --

18              MS. FISCHER:  And I agree with Your Honor --

19              THE COURT:  Under better facts for the claimant, the

20       case law in this district and in this circuit is you still have

21       to file a proof of claim.

22              MS. FISCHER:  I think the issue here goes to the fact

23       that it's a game of hot potato, essentially.  Delphi did not

24       list it as a debt to Trumbull County or a debt to the indenture

25       trustee or an executory contract between --
```

```
 1              THE COURT:  Right.

 2              MS. FISCHER:  -- Delphi and GM or between Delphi and

 3    the indenture trustee, or between Delphi --

 4              THE COURT:  Well, it did list it --

 5              MS. FISCHER:  It list it as a --

 6              THE COURT:  -- as an agreement between GM and Delphi.

 7              MS. FISCHER:  Right.  A debt to GM.

 8              THE COURT:  Right.

 9              MS. FISCHER:  I agree.

10              THE COURT:  Right.

11              MS. FISCHER:  And again, when we search the word

12    Trumbull County, Trumbull, we finally found it.  GM didn't list

13    it at all when -- this was getting paid by Delphi during the

14    course.  So you have your schedules.  Your creditor matrix is

15    generated through your schedules.  Notice should go to the

16    people who are getting paid on this, and --

17              THE COURT:  What's the legal proposition for that?

18              MS. FISCHER:  Well, 342(g) --

19              THE COURT:  That's why you give them notice.

20              MS. FISCHER:  Right.  And --

21              THE COURT:  We designate noti -- did anyone from JP

22    Morgan or Bank of New York give Delphi notice that this is

23    where the notices should go?

24              MS. FISCHER:  I know that -- and I've asked the

25    question.  I don't know about JPMorgan Chase just because
```

Page 29

1   they're not here before us, Your Honor.  I know that payments

2   were being made to Bank of New York at its Barclay Street

3   address in the muni department.  No notice went there.

4         THE COURT:  But again, I mean, the Rules and the Code

5   are clear on this.  Even if 342(g) can be said to have applied

6   to this case --

7         MS. FISCHER:  Um-hum.

8         THE COURT:  -- Rule 2002(g)(5) says "a creditor may

9   treat a notice as not having been brought to the creditor's

10   attention under Section 342(g)(1) only if prior to issuance of

11   the notice the creditor has filed a statement that designates

12   the name and address of the person or organizational

13   subdivision of the creditor responsible for receiving notices

14   under the Code and it describes the procedures established by

15   the creditor to cause such notices to be deliver to the

16   designated person or subdivision".

17         So, I mean, there's nothing in the record that

18   suggests that was done.  In fact, what appears to be the case

19   is that the indenture trustee, whoever -- whether it was JP

20   Morgan or BoNY got the money, didn't care where it was coming

21   from -- understandable -- and was happy even though it got the

22   bar date notice.

23         MS. FISCHER:  Well, that's the issue, Your Honor.  I

24   mean, according to the initial agreements, Dai-Ichi Kangyo

25   Trust was supposed to get notice.  I have no idea what

Page 30

1    happened, whether --

2         THE COURT:  But that's not the type of notice

3    provision that's contemplated by 542(g) or 2002(g).

4         MS. FISCHER:  But you're also supposed to send it to

5    the last known mailing address, and theoretically the last

6    known mailing address would have been the Barclay Street

7    address for JP -- I'm sorry, for Bank of New York Mellon.

8         THE COURT:  Well, no.  Because you're saying that they

9    didn't even get it, so it's really JP Morgan, right?

10        MS. FISCHER:  Well, for the bar date, once we got to

11   the MRA Bank of New York Mellon was already there.

12        THE COURT:  I'm focusing on the bar date.

13        MS. FISCHER:  Right.  For the bar date it was JPMorgan

14   Chase.  And I can't --

15        THE COURT:  I mean, there was the discharge too.

16        MS. FISCHER:  I can't answer that.  I looked -- you

17   know, I scoured the schedules for JPMorgan Chase.  This was --

18   just as Bank of New York Mellon got notice in a bunch of

19   different places for various executory contracts or accounts

20   that were held there.

21        THE COURT:  Right.

22        MS. FISCHER:  There was no listing of this particular

23   debt.

24        THE COURT:  Okay.

25        MS. FISCHER:  And/or executory contract.  And I

1    understand -- it was not listed.  It was not listed by Delphi,

2    it was not listed by GM.  My understanding is the indenture

3    trustee first -- and it's an exhibit to our motion -- reached

4    out to GM and said hey, why did you stop paying.

5              THE COURT:  Right.

6              MS. FISCHER:  And GM said pursuant to the MRA this is

7    a Delphi obligation.  This was assumed by Delphi.  And this was

8    well-after the MDA had been signed.

9              THE COURT:  Well, I mean, that's understandable for

10   them to say because that is the accurate answer:  Delphi's

11   paying it instead.  But that didn't relieve them of their

12   obligation to pay you, right?  They were still the ones that

13   you had privity with.

14             MS. FISCHER:  I think that Delphi was already on the

15   hook.

16             THE COURT:  To GM.

17             MS. FISCHER:  Directly to the client, because they

18   assumed the 1994 loan agreement, which put them directly on the

19   hook to the indenture trustee.  They assumed it in 1999.

20             THE COURT:  So you're saying the indenture trustee

21   released GM?

22             MS. FISCHER:  I don't know if that ever came up.

23             THE COURT:  And accepted in its place Delphi?

24             MS. FISCHER:  They accepted payment -- they accepted

25   payments from Delphi.

1            THE COURT:  In its place?

2            MS. FISCHER:  Correct, Your Honor.

3            THE COURT:  So Delphi was the contract party?

4            MS. FISCHER:  Delphi stepped into the shoes of GM.

5            THE COURT:  I don't -- you --

6            MS. FISCHER:  And I don't know why -- because I'm

7    obviously not a party to this -- why then later --

8            THE COURT:  But there was no agreement between the

9    trustee or the issuing -- or Trumbull County that Delphi was

10   going to take GM's place.

11           MS. FISCHER:  Correct.  That was between GM and

12   Delphi.

13           THE COURT:  All right.

14           MS. FISCHER:  But GM -- but Delphi became directly

15   obligated as a result of that assumption.  And --

16           THE COURT:  So then GM --

17           MS. FISCHER:  And putting aside --

18           THE COURT:  So then GM had a claim against Delphi for

19   breaching that agreement, right?

20           MS. FISCHER:  I don't know if the agreement was

21   breached.

22           THE COURT:  Well, they would have a contingent claim

23   for which they would be filing --

24           MS. FISCHER:  Yeah.

25           THE COURT:  -- a claim in the bankruptcy case as a

Page 33

1    contingent claim.  Because they had a pre-petition agreement

2    from 1994 -- I'm sorry, 1999.

3         MS. FISCHER:  1999.

4         THE COURT:  And then they dealt with that claim in the

5    MRA in which they said that it would be paid as follows.  That

6    agreement said there would be no third-party beneficiaries,

7    reserved their right to alter the payment terms -- which they

8    subsequently did.  I just -- I don't see how the county or the

9    indenture trustee steps into it.

10        MS. FISCHER:  I think that the county -- the indenture

11   trustee or the county stepped into it in 1999.  I think that

12   Delphi made this clear in 2008 when it entered into the MRA.

13   Again, I don't know why they entered into the MRA, but I look

14   at it as a motion to assume an executory contract.

15        THE COURT:  Okay.  So if it's based on the 1999

16   assumption agreement, I guess you're saying -- it seems to me

17   then the MRA is a red herring and the real issue is whether

18   that obligation to the extent there is one was either barred by

19   the bar date or discharged.

20        MS. FISCHER:  And I think -- it's interesting you said

21   the MRA is a red herring, because I thought it was a red

22   herring when I read it in the objection because I've never

23   argued that our clients were third-party beneficiaries of the

24   red -- of the red herring -- of the MRA.

25        THE COURT:  Okay.

```
 1              MS. FISCHER:  But --

 2              THE COURT:  Well, but it provided for the assumption

 3     and the assumption was then --

 4              MS. FISCHER:  But it provided for the assumption.

 5              THE COURT:  But then they changed their mind.

 6              MS. FISCHER:  But I think it was all -- I think that

 7     this was either a pre-petition -- I think alternatively this

 8     was a pre-petition obligation of this debtor due to the 1999

 9     agreement.  And they were directly obligated to pay the

10     indenture trustee.  And they didn't give them notice of these

11     proceedings appropriately.  And they continued to pay.

12              Alternatively, they assumed it -- now -- and their

13     argument whether --

14              THE COURT:  All right.  You're going to lose on that

15     second one with me.

16              MS. FISCHER:  Yeah.  I understand.  I understand, Your

17     Honor.

18              THE COURT:  On the first one, why didn't they give

19     notice appropriately of the bar date and/or the discharge?

20              MS. FISCHER:  Because it wasn't scheduled as either an

21     executory contract or a debt.

22              THE COURT:  We know that's not the law.  Bar date

23     particularly applies to debts that aren't scheduled.  You know,

24     I mean that just doesn't make any sense.  I'm sorry.

25              MS. FISCHER:  No, but --
```

1          THE COURT:  Under the Rules, under the order itself it

2    applies to claims that aren't scheduled, as well as to claims

3    that are scheduled in amounts you don't agree with or they're

4    scheduled as liquidated -- I'm sorry, unliquidated or disputed.

5          MS. FISCHER:  Or contingent.

6          THE COURT:  So that just doesn't make sense.

7          MS. FISCHER:  It's --

8          THE COURT:  I mean, the fact that it wasn't scheduled

9    means that if you get a notice you really should -- the first

10   thing you do when you get the notice is you look at the

11   schedules.  And if it's not there you say oh my god, I've got

12   to file this proof of claim because they don't even recognize

13   my claim.  And that's how it works.

14         MS. FISCHER:  And I can't go to -- I don't know -- I

15   don't think JPMorgan Chase filed a proof of claim.  I think we

16   checked that.  I don't --

17         THE COURT:  Okay.

18         MS. FISCHER:  I don't recall whether -- what --

19   whether they did or didn't, and I can't speak to it, Your

20   Honor.

21         THE COURT:  All right.  Okay.

22         MS. FISCHER:  And again, my understanding -- my

23   current understanding is Bank of New York Mellon was not the

24   indenture trustee at that point.

25         THE COURT:  Well, there's --

 1              MS. FISCHER:  But --

 2              THE COURT:  There's no proof of claim filed for this

 3    debt.

 4              MS. FISCHER:  For Bank of New York Mellon.

 5              THE COURT:  Right.

 6              MS. FISCHER:  Yeah.  No.  I agree.

 7              THE COURT:  Or for Morgan, I assume, right?

 8              MS. FISCHER:  I don't think so.

 9              THE COURT:  Okay.

10              MS. FISCHER:  I think I had -- I had checked, and I

11    don't think that -- I don't think that there was.

12              THE COURT:  Okay.

13              THE COURT:  But, Your Honor, I have to frankly tell

14    you I'm not --

15              THE COURT:  All right.

16              MS. FISCHER:  I mean, we checked the GM schedules and

17    we checked the proofs of claims, but I just don't recall -- I

18    just can't close that loop right now.

19              THE COURT:  Okay.  So, I mean, it appears from the

20    statement in the reply that JPMorgan Chase was the indenture

21    trustee at the time of the bar date in 2006.  And at least

22    based on the exhibit attached to the debtors' objection or

23    reply, the bar date notice went to JP Morgan at a number of

24    different addresses and to its counsel, who said send me the

25    notices.  So there they actually did comply with 342(g) and

Page 37

1    2002(g)(5).  They sent it to him.

2           MS. FISCHER:  And, I mean, I saw it was attached to

3    the debtors' surreply.

4           THE COURT:  Right.

5           MS. FISCHER:  So I can't really -- I obviously can't

6    speak to it.  I haven't had conversations with --

7           THE COURT:  So, I mean, it seems to me that they're

8    barred.  Clearly the notice does not -- there's no obligation

9    under the order and there's no case that says this, that the

10   notice has to say beyond you may have a claim, you may have

11   claim X.  There's no requirement to say that.  It's up to the

12   creditor to look and see whether they have a claim or not.

13          MS. FISCHER:  And, Your Honor, again, I would

14   reiterate but it's -- I think that it was the 1999 assignment

15   and assumption agreement that put Delphi on the hook --

16          THE COURT:  Well, fine.  So then JP Morgan should have

17   said we're relying upon the 1999 assumption agreement.

18          MS. FISCHER:  And I can't speak to that, Your Honor.

19          THE COURT:  Okay.  So it would seem to me that they

20   missed bar date.  And then on top of that there was a

21   discharge.

22          MS. FISCHER:  I think --

23          THE COURT:  I mean, it's an alternative basis for

24   defeating the claim.  But, I mean, there was a discharge too.

25   That would have been noticed to Bank of New York.  And you're

1   saying that it should have gone to a particular office at Bank

2   of New York.  And what is the basis for that?

3          MS. FISCHER:  That is where they were sending --

4   that's where they were sending the payments.

5          THE COURT:  Well, but --

6          MS. FISCHER:  So they were aware, and that's --

7          THE COURT:  So you have --

8          MS. FISCHER:  You're supposed --

9          THE COURT:  Do you have cases that say that you have

10  to send the bar date notice to the address where payments are

11  made as opposed to just, for example, the general counsel?

12         MS. FISCHER:  You're supposed to send it to the party

13  to whom you are making -- the last known address where you were

14  making payments.

15         THE COURT:  What's the authority for that?  I mean,

16  I -- if you, for example, if you want to send a bar date notice

17  on a credit card debt you generally send it to the general

18  counsel's office.  Because the people that deal with credit

19  card payments are functionaries that don't really understand,

20  necessarily, bankruptcy cases.  I think the rule is you're

21  supposed to send notice to the known creditor reasonably

22  calculated to inform them of the bar date.

23         MS. FISCHER:  Right.  And I guess -- it's supposed to

24  be sent to the address listed on the schedules, and it wasn't

25  scheduled.

```
 1              THE COURT:  Well --

 2              MS. FISCHER:  I mean, that's the issue.  So notice was

 3      going to GM about --

 4              THE COURT:  Wait.  Let's -- now, where did -- yeah,

 5      but that doesn't -- there's no requi -- I

 6              MS. FISCHER:  And unfortunately --

 7              THE COURT:  I mean, how do --

 8              MS. FISCHER:  It's --

 9              THE COURT:  Yes, if you do schedule them you're

10      supposed to send it under 2002(g).

11              MS. FISCHER:  Right.  Right.

12              THE COURT:  I understand that.

13              MS. FISCHER:  Right.

14              THE COURT:  If you do schedule them, but they didn't

15      schedule them.

16              MS. FISCHER:  But we have a case --

17              THE COURT:  Under a fairly good rationale, which was

18      that the debt was really owed to GM.

19              MS. FISCHER:  Right.  I mean, we have a case where

20      this money was being paid during the course of the bankruptcy.

21      If it's a pre-petition debt, why on earth would they pay it

22      during the course of the bankruptcy?

23              THE COURT:  To keep the -- not to break the tax

24      benefits of the loan.  I mean, this was a -- remember, this was

25      a case where a lot of payments were being made during the
```

Page 40

1    bankruptcy.  And until the financial crisis of 2008 and the

2    buyers opted out is was going to be hundred cent plan.  So yes,

3    to save this deal from cratering and causing all the tax

4    problems that happen when you do a sewage treatment plant bond,

5    they kept it going.

6              MS. FISCHER:  And, Your Honor, I --

7              THE COURT:  Under that benefit -- under that basis it

8    makes sense.  And by the way, most of the payments were made by

9    GM.

10             MS. FISCHER:  Right.  And, Your Honor, I would --

11             THE COURT:  Until they worked out the plan where they

12   thought it was going to be a hundred cent plan.

13             MS. FISCHER:  I would argue they were -- I mean, they

14   were paying because they were using the facility.

15             THE COURT:  Okay.  So?

16             MS. FISCHER:  And if they were paying because they

17   were using the facility and that's why it was assumed in the

18   MRA, it elevates it to an administrative expense of the estate.

19             THE COURT:  I don't -- do you have any cases to

20   support that?  You don't, right?

21             MS. FISCHER:  No, Your Honor.

22             THE COURT:  No.  And -- okay.  I mean, the claim -- we

23   spent the first fifteen minutes saying that the claim here

24   derives from a 1999 assignment.  It's clearly, under Duplan and

25   Chateaugay and all the other cases, a pre-petition claim.  The

1   relationship started -- if there was one -- then.  It's like a

2   claim for a breach of a lease.  I mean, the lease occurred pre-

3   petition.  Well, I mean, I'm reluctant even to get into the

4   Bank of New York notice issue because everything in the record

5   suggests that as far as the bar date is concerned it doesn't

6   matter at all.  But -- am I missing -- I mean, on the Bank of

7   New York is --

8            MR. MEISLER:  Your Honor, actually, I'd like to

9   clarify.  Because counsel had suggested that notice didn't go

10  to the Barclay Street address.

11           THE COURT:  Right.

12           MR. MEISLER:  But, in fact, there were at least two

13  pieces of mail that went to the Barclay Street address, and

14  it's set forth in our affidavits of service.

15           THE COURT:  Okay.  And what were those pieces of mail?

16           MR. MEISLER:  It was notice of bar date, and the Your

17  Honor the timing -- look, it's unclear.  All they have for us

18  is some press release showing the timing of the assumption of

19  the book of business related to the corporate trust services.

20           THE COURT:  From JPM -- JPMorgan.

21           MR. MEISLER:  Exactly.  Even they're right -- just

22  suppose that they got the timing right, it was a matter of

23  months after the bar date that they became --

24           THE COURT:  Well, where -- I'm sorry.  Which affidavit

25  of service shows that notice to the Barclay's address?

1          MR. MEISLER:  So docket number 3501.

2          THE COURT:  But is this the one that's attached to

3     your objection or to the reply?

4          MR. MEISLER:  To the objection, Your Honor.

5          THE COURT:  To the objection.

6          MR. MEISLER:  And we could hand a copy up.

7          THE COURT:  Well, I have it here.  I thought I had it

8     here.

9          MS. FISCHER:  What exhibit is it?

10          MR. MEISLER:  Exhibit A.

11          MR. CHIAPPETTA:  I'm sorry, Exhibit D.

12          MS. FISCHER:  Exhibit D.

13          THE COURT:  And what were the two documents?  I'm

14     sorry.

15          MR. MEISLER:  So if you look, there's the 101 Barclay

16     Street address.  It's page 75 and 115.

17          THE COURT:  Okay.

18          MR. MEISLER:  So that was the notice of bar date.

19     That was our July 2006 bar date.

20          THE COURT:  Right.

21          MR. MEISLER:  We then used that address again for the

22     notice of administrative bar date for the supplement to the

23     disclosure statement when we filed our motion to approve the

24     entrance into the amended MRA, the omnibus reply to the

25     objection of plan modification approval motion, the first

Page 43

1   amended joint plan of reorganization supplemental disclosure

2   statement.  And the list goes on and on.

3           THE COURT:  So that would have included the plan with

4   the discharge provision?

5           MR. MEISLER:  Absolutely.

6           THE COURT:  Okay.

7           MR. MEISLER:  Your Honor, if you're ready, I just have

8   two other clarifications.

9           THE COURT:  Oh.  I know why I can't find it.  Is I

10  think it just -- my thing just doesn't -- it has the exhibit

11  page, but not the relevant page.  Could you show them to me?

12          MR. MEISLER:  Yes, Your Honor.

13          THE COURT:  Okay.

14          MR. MEISLER:  Your Honor, if you were willing to

15  accept my copy?  The front is marked up, but the exhibit is not

16  marked up.

17          THE COURT:  What page is that on?  You said 80-

18  something?

19          MR. MEISLER:  It's 75.

20          THE COURT:  75.  75.  Okay.  And this is the one for

21  the bar date or for the --

22          MR. MEISLER:  This is the bar date.

23          THE COURT:  And then there's a separate one for the

24  plan?

25          MR. MEISLER:  My apologies for the --

1          THE COURT:  Sorry.  Okay.  So Bank of New York billing

2     department, right?  That's the 101 Barclay Street?

3          MR. MEISLER:  That's right.  And then there's another

4     one 101 Barclay Street to the cash management division.

5          THE COURT:  Right.  Okay.

6          MR. MEISLER:  Your Honor, we did locate a better copy

7     of the objection with larger --

8          THE COURT:  That's all right, I saw it.

9          MR. MEISLER:  Your Honor, I can list off the different

10    affidavits of service where we're served on that same address

11    to Bank of New York --

12          THE COURT:  They use the same address?

13          MR. MEISLER:  Exactly.

14          THE COURT:  Or same group of addresses?

15          MR. MEISLER:  Exactly, Your Honor.

16          THE COURT:  All right.

17          MR. MEISLER:  Your Honor, but that's all set forth in

18    our pleadings.  The other clarifications I wanted to make was

19    that Bank of New York Mellon was arguing that Delphi was paying

20    from 2005 to 2008, and Your Honor, this actually fits right in

21    with why we scheduled, and as you mentioned we scheduled the

22    claim because it was a claim as to GM.  Well GM was making the

23    payments from 200--

24          THE COURT:  Up to a point, and then there was several

25    months where Delphi was paying it.

1          MR. MEISLER:  That's correct.  We made those payments

2    starting in the fall of 2008.  Actually, the payment came due

3    January 2009.  We did that because the agreement, the amended

4    MRA which was allocating rights and responsibilities as between

5    Delphi and GM, we agreed that we were going to take on that

6    obligation again for them.  But see they were making the

7    payments from 2005 to 2008 because they knew they were still

8    liable.  And that's why there's an indemnification provision in

9    the '99 agreement.  And it was because of the indemnification

10   provision that we scheduled the claim against General Motors.

11          THE COURT:  Okay, the 1999 agreement doesn't have a no

12   third-party beneficiary provision, right?

13          MR. MEISLER:  It does not, Your Honor.

14          THE COURT:  It does not, but the record I think is

15   clear that neither the county nor the indentured trustee knew

16   about the agreement.

17          MR. MEISLER:  Your Honor, and in fact Mr. Zujkowski,

18   this was per his clarification, he said as we started this

19   hearing and we can look back into the record, that the

20   indentured trustee wasn't even aware that the agreement -- that

21   Delphi had been making these payments until 2010.

22          THE COURT:  Okay.

23          MR. MEISLER:  Your Honor, with that I conclude.

24          THE COURT:  Okay.  All right, it's the 101 address,

25   right?

1          MS. FISCHER:  It is, Your Honor.

2          THE COURT:  Okay all right, so the only thing that

3    they didn't do it seems is tell them all the claims they might

4    have.

5          MR. ZUJKOWSKI:  That's correct, Your Honor, but it's

6    still not established -- I'm not sure when this notice -- this

7    notice came before the bar date which was at a time when the

8    Bank of New York was not the indentured trustee.

9          THE COURT:  Well but there's a separate -- I mean, I

10   did see -- because these were attached, the reorganized debtors

11   surreply contains the affidavit of service to JPMorgan, and to

12   Mr. Bromley their counsel.

13         And there are really two bars here that the debtors

14   are relying upon, each of which independently I think is --

15   stands on its own, which is the bar date; and then secondly,

16   the discharge.  And the second notice goes to the discharge

17   because at that point under both sides' view of the facts, Bank

18   of New York Mellon was the indentured trustee.

19         MR. ZUJKOWSKI:  Yes, Your Honor, but I believe at the

20   time of the discharge, the most recent bond payment had been

21   made.  It wasn't until after the discharge that there was

22   default in the making of the payments --

23         THE COURT:  I understand, but as far as I can tell,

24   and I've ruled on this, as have three bankruptcy appellate

25   panels, it doesn't matter.  It's still a debt.  It's pre-

Page 47

1    petition debt.  The -- I think you're arguing that there should

2    be some form of estoppel, some sort of equitable right, and 524

3    is not waivable.  It's for third parties as well as the debtor.

4    And by its own terms it's not waivable unless you go through a

5    reaffirmation agreement.  And I mean I'll give you the cites

6    when I give my bench ruling, but leaving aside the issue about

7    the bar date issue, which is the -- that there couldn't have

8    been any reliance at that point on what the guy told the person

9    that was -- what is the -- the guy that asked the Delphi

10   employee, is that like an investor service or what was that?

11   What is that?

12            MS. FISCHER:  The -- my clients work for FMS Bonds,

13   Inc..  One of the employees of FMS Bonds, Inc. is who reached

14   out to Mr. Vanderberg (ph.) to find out what the situation was.

15            THE COURT:  Okay, so FMS Bonds, Inc. is the parent

16   of --

17            MS. FISCHER:  Yeah, I mean they individually hold the

18   bonds but that's how the -- that was the vehicle for the

19   investment and the bonds, so that's why one of their employees

20   reached out to Mr. Vanderberg.

21            THE COURT:  Okay.  Okay.  All right, anything else on

22   this?

23            MS. FISCHER:  No, Your Honor.

24            THE COURT:  Okay, I have a motion in front of me by

25   Bank of New York Mellon as indenture trustee and three

Page 48

1    individuals who estate that they are at least currently holders

2    of the bonds for which Bank of New York Mellon is the trustee.

3    Those bonds were issued by Trumbull County Ohio under a July 1,

4    1994 indenture that was a typical tax-driven municipal bond

5    deal to fund a plant in Ohio.  As part of the transaction GM

6    agreed, in notes issued to the county, to pay the debt service

7    on the notes directly to, and be obligated to pay directly to

8    the indenture trustee.

9         The debtor DAS enters into the picture pursuant to a

10   1999 agreement entered into as of January 1, 1999, pursuant to

11   which GM assigned to Delphi Automotive Systems, or DAS LLC and

12   DAS LLC assumed all of GM's rights and obligations and benefits

13   under the 1994 loan agreement, including implicitly the

14   obligation to pay debt service under that loan, not to Trumbull

15   County, but to the indenture trustee.

16        DAS agreed to indemnify GM for losses relating to that

17   agreement and the parties continued on their way until the

18   commencement of DAS and the other Delphi debtors' bankruptcy

19   cases in October of 2005.

20        It's stated by movant Bank of New Mellon that the

21   indenture trustee was not aware of the assumption and

22   assignment agreement and there is some question in my mind as

23   to whether once GM relieved DAS of its obligations under that

24   agreement, which I'll discuss in a moment, the indenture

25   trustee or ultimately Trumbull County has any rights under that

DPH HOLDINGS CORP., ET AL.

Page 49

1    agreement since they were not in contractual privity with DAS.

2    I'll note, however, that there was no provision in the

3    assumption and assignment agreement limiting third-party

4    beneficiary rights, so it's at least conceivable to me that as

5    long as that agreement was in effect the indenture trustee

6    would or could be a third-party beneficiary of the agreement.

7            The underlying context of the motion before me stems

8    from the fact that notwithstanding the existence of the 1999

9    assumption and assignment agreement, during Delphi's bankruptcy

10   case no claim was filed against DAS or the other Delphi debtors

11   in respect of that agreement.  That is notwithstanding the fact

12   that the Court established a bar date for filing pre-bankruptcy

13   claims for the summer of 2006.

14           And further, that Delphi's modified Chapter 11 plan,

15   which went effective in October of 2009, contained a discharge

16   or provided for a discharge of the Delphi debtors, including

17   DAS, of all pre-confirmation -- I'm sorry -- yeah, pre-

18   confirmation claims, including all pre-bankruptcy claims, pre-

19   petition claims to the fullest extent permitted by Section 1141

20   of the Bankruptcy Code.

21           In light of that fact, or those facts, Delphi or

22   reorganized Delphi takes the position that the indenture

23   trustee has no claim against it, even if it were the third-

24   party beneficiary of the assumption and assignment agreement.

25   And faced with the bar date and the discharge, the Bank of New

DPH HOLDINGS CORP., ET AL.

Page 50

1   York Mellon and three holders of the underlying bonds take the

2   position that they are not bound by the bar date order or by

3   the discharge under the confirmation order and plan.

4          They need to do that in the context of seeking relief

5   from the injunction and furtherance of the discharge in the

6   Court's confirmation order.  So in essence, the proper context

7   of this motion is their request to seek relief to pursue an

8   allegedly non-discharged and non-time-barred claim for cause,

9   notwithstanding the plan injunction.  Obviously, since the plan

10  injunction was in furtherance of the discharge, if the

11  discharge applies or almost as obviously, if the claim

12  ultimately is barred, then there would be no cause for relief

13  from the plan injunction to pursue the claim.

14         The movants, in essence I think, make three arguments.

15  The first is that they are not bound by the Court's bar-date

16  order.  That argument is prefaced upon two points.  The first

17  is that the indenture trustee's claim under the 1999 GM/DAS

18  agreement was not listed on the debtors' schedules, and

19  therefore, for some reason I frankly do not understand, the

20  indenture trustee is not required or was not required to file a

21  proof of claim in respect to that agreement, which was clearly

22  a pre-petition agreement giving rise to a pre-petition claim.

23  Since a claim arises for purposes of bankruptcy, when the

24  relationship between the debtor and creditor contained all of

25  the elements necessary to give rise to a legal obligation under

DPH HOLDINGS CORP., ET AL.

Page 51

1    the relevant non-bankruptcy law, whether that obligation was

2    contingent or not, see In re: Duplan Corporation 212 F.3d, 144,

3    151 (2nd Cir. 2000); In re: Chateaugay Corp. 53 F.3d, 478, 497,

4    (2nd Cir.), cert denied, 516 U.S. 913 (1995); and In re: Texaco

5    Inc., 218 B.R. 1, (Bankr. S.D.N.Y. 1990).

6            In fact, both Bankruptcy Rule 3003 as well as the

7    Court's bar date order, and the guidelines for submitting bar

8    date orders for the Bankruptcy Court for the Southern District

9    of New York all make clear that the bar date applies not only

10   to scheduled claims to which the claimant -- with which the

11   claimant disagrees, or if the scheduled claim as scheduled is

12   on liquidated, contingent, or disputed but also to unscheduled

13   claims.

14           Although this is not particularly relevant, it appears

15   to me that there is a legitimate reason for the debtors not

16   scheduling the claim as a claim of the indenture trustee as

17   opposed to a claim of GM, given that the agreement -- the

18   underlying agreement i.e. the 1999 assumption and assignment

19   agreement was one between GM and DAS, to which the indenture

20   trustee was not a party.

21           But in any event, the debtors' failure to schedule a

22   claim is not a basis under bankruptcy rules of the Bankruptcy

23   Code for exempting the creditor from compliance with a bar date

24   order that requires creditors who have unscheduled claims to

25   file the proof of claim by the bar date.  Again, see Bankruptcy

Page 52

1    Rule 3003(b)(1) and then (c)(2) as well as the Court's bar date

2    order itself in this case from 2006.

3         What is required is that a known creditor be given

4    actual notice of the bar date and generally that actual notice

5    is provided by mailing.  Here, it appears to be uncontroverted

6    that that was in fact the case, as set forth in the affidavits

7    of mailing attached as exhibits and shown to the Court at the

8    hearing.  Actual notice of the 2006 bar date was provided to

9    Bank of New York Mellon, including at what Bank of New York

10   Mellon has stated is the billing address in respect of the

11   indenture payments at 101 Barclay Street.

12        And it also appears to be the case from the affidavit

13   of service attached to the debtors' surreply brief that notice

14   was also given by mail to JPMorgan Chase at many different

15   addresses, as well as to its counsel at Cleary Gottlieb who

16   specifically requested notice on behalf of JPMorgan Chase and

17   therefore would be entitled to notice under Bankruptcy Rule

18   2002(g), including (g)(5), and to the extent it's applicable,

19   11 U.S.C. Section 342(g).

20        So it appears clear to me that any third-party

21   beneficiary claim that the indenture trustee had under the 1992

22   agreement or a direct claim to the extent that the agreement

23   was in effect for its benefit is barred by the bar date order,

24   and therefore a request to pursue the claim as set forth in

25   this motion would be moot.

DPH HOLDINGS CORP., ET AL.

Page 53

1          It also appears to me that the claim is discharged

2     under Delphi's confirmed and effective plan and the order

3     confirming the plan which provided for discharge to the full

4     extent recognized by Section 1141 of the Bankruptcy Code and

5     Section 524 of the Bankruptcy Code.

6          There's no dispute that Bank of New York Mellon was

7     the indenture trustee at the time of the confirmation order and

8     the discharge and the same notice addresses were sent notice of

9     the plan which included the discharge provision.

10          That would be a separate basis for finding that the

11     pursuit of the claim at this time would be moot, and that

12     relief from the plan -- injunction, which again as far as it

13     applies here was intended to apply to enforce the discharge

14     injunction, is not supported by cause.

15          The second argument that the movants make for relief

16     from the plan injunction is that the debtors should be

17     equitably estopped or bound by other equitable principles, such

18     as laches, from denying an obligation to pay the indenture

19     trustee.

20          As an initial matter, I believe it's clear, given that

21     the discharge injunction and Section 524 are for the benefit

22     not only of the debtor but in this case thousands of the

23     debtors' constituents, and the fact that Congress set forth

24     specific limitations on the ability to waive a discharge.

25     Doctrines of an equitable nature do not apply to relief from a

Page 54

1   discharge.  See In re: Kimmel, 378 B.R. 630, 638 (9th Cir. BAP

2   2007), affirmed 302 Fed.Appx. 518 (9th Cir. 2008), cert denied,

3   129 S. Ct. 2394 (2009); Pritner v. Cofco Credit Company, 323

4   B.R. 802 (10th Cir. BAP 2005); and In Re. Gurrola,

5   G-U-R-R-O-L-A, 328 B.R. 158, 172, 176 (9th Cir. BAP 2005).

6          As far as whether there should be any equitable

7   estoppel with respect to the bar date aspect of the debtors'

8   defense, the debtors make the very legitimate point that the

9   representation made by an officer of one of the debtors in fall

10   of 2009 as to their debtor's intention to continue to pay the

11   amounts on the bonds, it should be an estoppel, is that there

12   could not have been any reliance upon such a representation

13   which was made over three years after the bar date, and not

14   filing a proof of claim, having gotten notice of the bar date

15   by the bar date.

16          Far more would be needed, obviously something in the

17   nature of you don't need to pay being given by an authorized

18   person before the bar date to establish reasonable -- a basis

19   for reasonable reliance.  In addition, the fact that the debt

20   was being kept current during the case does not establish a

21   basis for an equitable exception to the bar date, where the

22   notice made it clear that any pre-bankruptcy claim, and of

23   course a claim for a breach of the assignment and assumption

24   agreement would relate back to the date of the agreement, and

25   therefore the claim would be a pre-petition claim, would need

Page 55

1    to be asserted and filed by the bar date to survive.  See

2    generally In re: Texaco, Inc., 218 B.R. 1 (Bankr. S.D.N.Y.

3    1998); and In re: Texaco, Inc., 182 B.R. 937 (Bankr. S.D.N.Y.

4    1995) where frankly it appears to me there were much more

5    favorable facts for an equitable estoppel and nevertheless

6    Judge Hardin, I believe for entirely legitimate reasons, held

7    the parties to a bar date.

8         The last argument that the movants make for why their

9    claims should not be barred by either the bar order or the

10   discharge provision in the plan is that the claim for breach of

11   the 1991 assumption and assignment is an administrative claim

12   because it was allegedly assumed by the debtor DAS during the

13   course of the bankruptcy case, and therefore as an assumed

14   agreement, its breach gives rise to a post-petition

15   administrative claim.

16        The argument, however, improperly conflates the

17   indenture trustee's rights under the 1999 agreement and GM's

18   rights under the agreement pursuant to which the debtors agreed

19   to honor their obligations to GM under the 1999 agreement.

20   That agreement is referred to as the MRA and it was in fact

21   agreed by the debtors in the MRA that they would, going

22   forward, starting at the time of the MRA in 2008 make, among

23   other things, the payments under the 1999 GM DAS agreement.

24        However, the MRA was very clearly in agreement solely

25   between GM and the debtors, including DAS, it contained an

1    express no third-party beneficiary provision.  And it resolved

2    the treatment of GM's claims against Delphi including its claim

3    under the 1999 agreement.  It did not resolve any other party's

4    claims.  It also contained an express provision permitting the

5    parties, that is GM and the debtors, to terminate the MRA.

6          The parties in fact did that in a subsequent agreement

7    referred to as the MDA in which in paragraph 9.19.2 they

8    provided that "Without further action by the parties the MRA

9    shall, except as specifically set forth below, be terminated in

10   its entirety, an the parties thereto shall have no further

11   obligations thereunder other as specifically set forth in this

12   Section 9.19.2, including without limitation," and then it sets

13   for several specific obligations under the MRA.

14          I have not found, and no one has cited to me any

15   provision of the MDA that would fall under the proviso in the

16   language I just quoted.  So it appears clear to me the MRA is

17   of no further force or effect.  So the only basis for the

18   indenture trustee's claim is once more the 1999 agreement,

19   which the debtor only assumed as between itself and GM, and

20   then with GM agreed would no longer be in effect as between

21   them.

22          So I see no basis to find that the debtors have taken

23   on a post-petition obligation under the 1999 agreement to the

24   indenture trustee.  Moreover, it appears clear to me to be the

25   case that that agreement is not an executory contract that

DPH HOLDINGS CORP., ET AL.

Page 57

1    could have been assumed; rather as I stated, it was an

2    obligation on the debtors' part, among many that it owed to GM,

3    which it agreed to resolve first in the MRA and then when the

4    parties revised the MRA in the MDA.

5           So to the extent that the indenture trustee has a

6    right under that agreement, the 1999 agreement, the rights

7    under it are pre-petition claims that are clearly governed

8    again by the bar date order and the discharge.

9           So, for those reasons I find and conclude that the

10   movants have not shown cause for relief from the plan

11   injunction to pursue claims in light of the fact that those

12   claims are barred and discharged.  So the debtors should submit

13   an order consistent with that ruling.

14          Okay, thank you.

15       (Whereupon these proceedings were concluded at 11:39 AM)

16

17

18

19

20

21

22

23

24

25

Page 58

1

2                          I N D E X

3

4                          RULINGS

5                                          Page      Line

6   Motion by Ratko Menjak for Relief from      13        1

7   Automatic Stay, Denied Without Prejudice

8

9   Motion of Bank of New York Mellon to Proceed  57       10

10  in the Appropriate Tribunal Against the

11  Reorganized Debtors, Denied

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 59

1

2                         C E R T I F I C A T I O N

3

4    I, Avigayil Roth, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9    _____

10   AVIGAYIL ROTH

11   AAERT Certified Electronic Transcriber CET**D-640

12

13   Also transcribed by:

14   TAMARA BENTZUR

15

16   Veritext

17   200 Old Country Road

18   Suite 580

19   Mineola, NY 11501

20

21   Date:  February 20, 2012

22

23

24

25